# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of Dave Kleiman,<br><br>         Plaintiff,<br><br>v.<br><br>CRAIG WRIGHT<br><br>         Defendant. | **CASE NO.:**<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, Ira Kleiman, brings this action as the personal representative of David Kleiman's estate. The following allegations are based on personal knowledge as to his own acts and observations and are made on information and belief as to all other matters based upon the undersigned counsels' investigation:

## **INTRODUCTION**

1. This matter concerns the rightful ownership of hundreds of thousands of bitcoins[1] and the valuable intellectual property rights of various blockchain technologies. As of the date of filing, the value of these assets far exceed $5,118,266,427.50 USD (before punitive or treble damages).

2. At the heart of these claims is the relationship between Craig Wright ("Craig") and David Kleiman ("Dave"). This relationship, born out of a mutual obsession with cryptography and data security, remained mostly hidden from the outside world. Craig, a computer scientist in Australia, and Dave, a paralyzed IT security expert in Pam Beach, Florida, communicated almost exclusively through various private email accounts.

3. Bitcoin is the world's first decentralized cryptocurrency. The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent the now famous protocol to a

---

[1] The term "Bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoins" to label the units of exchange.

mailing list of cryptography enthusiasts.  That protocol has since spawned a system of value and exchange with a current market cap of ~$150 billion.

4.  It is unclear whether Craig, Dave, and/or both created Bitcoin. For reasons not yet completely clear, they chose to keep their involvement in Bitcoin hidden from most of their family and friends. It is undeniable, however, that Craig and Dave were involved in Bitcoin from its inception and that they both accumulated a vast wealth of bitcoins from 2009 through 2013.

5.  In April 2013, mere months prior to Bitcoin's entry into the mainstream, Dave died after a long battle with MRSA.  At the time of his death, no one in his family was aware of the extent of his involvement in creating Bitcoin. Nor were they aware that he had accumulated, with Craig, an incredible sum of bitcoins.

6.  Recognizing that Dave's family and friends weren't aware of this, Craig perpetrated a scheme against Dave's estate to seize Dave's bitcoins and his rights to certain intellectual property associated with the Bitcoin technology.

7.  As part of this plan, Craig forged a series of contracts that purported to transfer Dave's assets to Craig and/or companies controlled by him.  Craig backdated these contracts and forged Dave's signature on them.

8.  Shortly after Dave's death on April 26, 2013, Craig reached out to Ira, Dave's brother.  Craig disclosed he had partnered with Dave to create Bitcoin, mine bitcoin, and create valuable IP.  But, he claimed Dave signed all these property

3

rights away in exchange for non-controlling share of a non-operational Australian company worth "millions." Craig told Ira he'd be able to sell Dave's stake in the company in a few months.

9.  This was a lie. The company went bankrupt after Craig apparently misled the Australian Tax Office ("ATO").

10. The ATO's investigation of Craig led them to raid Craig's home in late 2015. Craig fled Australia for London.

11. Since fleeing to London, Craig has lived a life of fame and fortune. In May 2016, he publicly revealed himself as the alleged creator of Bitcoin. He currently serves as Chief Scientist of nChain, a UK company purporting to be the global leader in research and development of blockchain technologies. He also regularly posts pictures to his social media accounts of his lavish lifestyle.

12. To date, Craig has not returned any of the mined bitcoins or intellectual property rights belonging to Dave's estate. This action is brought to rectify that injustice.

## PARTIES

13. Plaintiff Ira Kleiman is a resident of Palm Beach County, Florida. He is Dave's brother and the personal representative of his Estate.

14. Defendant Craig Steven Wright is a resident of London, United Kingdom. He is Dave's former business partner in W&K Info Defense Research LLC, a company operating in the state of Florida and formed pursuant to its laws. This

4

Court has personal jurisdiction over Craig pursuant to Fla. Stat. § 48.193 as he operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within the state; and caused injury to persons and property within this state at or about the time he was engaged in solicitation and service activities within the state.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

16. Venue lies within this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District.  These events are included, but not limited to: the wrongful taking of property belonging to a Florida estate within this District; the operation of W&K Info Defense Research LLC by Dave and Craig within this District; the mining of a substantial amount of bitcoins through the use of computer equipment located within this District; and the development of certain blockchain related intellectual property within this District.

## FACTUAL ALLEGATIONS

### BITCOIN

17. Bitcoin is a decentralized digital currency with a current market cap of ~$150 billion as of February 14, 2018.[2]  At its core, Bitcoin is simply a giant ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the bitcoin blockchain.

18. In order to transact with bitcoins, you must have a bitcoin wallet.  Like a bank account number, each bitcoin wallet has a "public key" that is the "address" provided if one would like to receive bitcoin from others.  Every wallet can be identified on the blockchain (by referring to its "public key") along with the number of bitcoins inside that particular wallet.

19. Each wallet is also assigned a "private key."  Unlike public keys, private keys are only known by the individual who creates the bitcoin wallet.  The private key is like the "password" to the wallet.  To send bitcoin out of a wallet, an individual must have the private key associated with the bitcoin wallet.  This is similar to the manner in which one must have a PIN to withdraw cash from an ATM.

20. There are two methods of acquiring bitcoin.  The first involves simply receiving bitcoin from someone who has.  In fact, there are many businesses that operate

---

[2] https://coinmarketcap.com/.

"bitcoin exchanges," such as coinbase.com, which is a bitcoin marketplace where individuals can purchase bitcoins with their native currency from other individuals looking to sell.

21. The second way one can acquire bitcoin is by "mining" them.

22. There is no centralized authority that curates the bitcoin blockchain. Consequently, the protocol has to incentivize individuals to curate the blockchain, i.e., to update the "ledger" with new transactions as they take place. This process is called "bitcoin mining."

23. Anyone with internet access can "mine bitcoins" by employing computer power to solve a complex mathematical problem. The first "miner" who solves the problem gets the right to add a block of recent transactions to the blockchain, i.e., the right to update the ledger. In return for this work, the protocol pays the successful miner in newly minted bitcoin (the number of which is fixed by a pre-existing algorithm). This process is repeated every 10 minutes or so, ensuring an accurate and up to date record of all bitcoin transactions.

24. When the Bitcoin protocol was first launched in January 2009, the protocol paid the successful miner 50 bitcoins for each block of transactions processed. This mining reward is cut in half approximately once every four years. Today, the mining reward 12.5 bitcoins. Obviously, it was easier to amass significant amounts of bitcoin in 2009, than now.

25. To date almost 17 million of the total 21 million bitcoins have been mined.

## HISTORY OF BITCOIN

26. On October 31 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto ("Satoshi") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."

27. Less than three months later, the system outlined became a reality. On January 3, 2009, Satoshi mined the first 50 bitcoins. To place a timestamp on the occasion, Satoshi left a text message digitally encoded on these first 50 bitcoins that read, "The Times 3 January 2009 Chancellor on brink of second bailout for banks," referring to that day's headline in the British newspaper, *The Times*.

28. Hal Finney, one of the first supporters and adopters of Bitcoin, downloaded the bitcoin software that same day, and received 10 bitcoins from Satoshi in the world's first bitcoin transaction.

29. Satoshi also created a website under the domain name bitcoin.org and continued to collaborate with other developers on the bitcoin protocol until mid-2010. Around this time, he handed control of the bitcoin source code repository to Gavin Andresen, another active member of the bitcoin development community, and disappeared. The last confirmed email from Satoshi was sent

on April 23, 2011.  It read, "I've moved on to other things. It's in good hands with Gavin and everyone."

30. For most of its early history, bitcoins were of relatively little value.  Famously, the first documented commercial bitcoin transaction occurred when developer Laszlo Hanyecz used 10,000 bitcoin to purchase two Domino's pizzas on May 22, 2010.  At today's prices, those two pizzas would be worth approximately 1% of Domino's total market cap.

31. During Bitcoin's early history, cryptocurrencies were a niche technology with a small development community.  Consequently, there was little competition for maintaining the ledger or "mining bitcoin."  Thus, individuals mining bitcoin through 2013 could expend relatively minor resources to accumulate large sums of bitcoin.

32. It has been widely reported that Satoshi Nakamoto mined approximately 1 million bitcoins during this time.[3]

## BACKGROUND ON PARTIES AND KEY INDIVIDUALS

33. Dave Kleiman was born in 1967.  Obsessed with computers and technology at an early age, he joined the U.S. Army in 1986 as a helicopter technician.

---

[3]    *See*    *e.g.*    http://time.com/money/5002378/bitcoin-creator-nakamoto-billionaire/; http://www.businessinsider.com/satoshi-nakamoto-owns-one-million-bitcoin-700-price-2016-6; https://eklitzke.org/how-many-bitcoins-did-satoshi-nakamoto-mine.

34. A few years after being honorably discharged, Dave got into a serious motorcycle accident which left him physically handicapped and wheelchair-bound.  After this accident, Dave's interest in computers intensified, and he began to build a reputation in computer forensics and secure network infrastructures.

35. Dave began working in the information technology security sector in 1990.  He was a frequent speaker at national security conferences and was a regular contributor to many security related newsletters, websites, and online forums.

36. Dave was a member of several computer security organizations, including the International Association of Counter Terrorism and Security Professionals (IACSP), International Society of Forensic Computer Examiners (ISFCE), Information Systems Audit and Control Association (ISACA), High Technology Crime Investigation Association (HTCIA), Network and Systems Professionals Association (NaSPA), Association of Certified Fraud Examiners (ACFE), Anti-Terrorism Accreditation Board (ATAB), and ASIS International.

37. Dave was also a Secure Member and Sector Chief for Information Technology at The FBI's InfraGard and a Member and Director of Education at the International Information Systems Forensics Association (IISFA).  When he attended conferences, he was known as "Dave Mississippi," a nickname referring to the long string of three letter certificates that followed his name.

38. He co-authored and was the technical editor of numerous publications, including *Perfect Passwords: Selection, Protection and Authentication*,[4] and Security Log Management: Identifying Patterns in the Chaos.[5]

39. In 2010, Dave was hospitalized. He was in and out of medical facilities due to MRSA infected sores.  On March 22, 201 3, Dave signed out of the hospital against medical advice.  He was unstable and nearing death.  A friend asked him if the Hospital had discharged him and he responded with "no . . . I told the doctors to go fuck themselves."[6]  On April 26, 2013, Dave passed away.

40. Ira Kleiman is Dave's brother and the personal representative of his estate.

41. Craig is a 46-year-old Australian computer scientist and businessman.  Craig began his career in information technology working for various entities in Australia, including the Australian Securities Exchange.

42. In May 2016, Craig claimed to be Satoshi Nakamoto—the pseudonymous name behind the creation of Bitcoin.

### DAVE AND CRAIG'S RELATIONSHIP

43. Dave and Craig met in an online cryptography forum in 2003.  Both men had a longtime interest in cyber security, digital forensics, and the future of money.

---

[4] https://www.amazon.com/Perfect-Passwords-Selection-Protection-Authentication/dp/1597490415.

[5] https://www.amazon.com/Security-Log-Management-Identifying-Patterns/dp/1597490423.

[6] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

44. For years, they communicated on various topics related to the internet and file sharing. For example, in 2007, they coauthored a paper on the mechanics of overwriting hard drive data.[7]

45. Around that time, they began to speak about ways to use peer-to-peer file sharing, infamously used by the Napster music sharing service, to solve some of the most difficult issues in cryptography.

46. In March 2008, just a few months before Satoshi's paper on the Bitcoin protocol was published, Craig wrote Dave an email stating: "I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin . . . [y]ou are always there for me Dave. I want you to be part of it all."[8]

47. After leaving his job in late 2008, Craig wrote to Dave: "I need your help. You edited my paper and now I need to have you aid me build this idea." (Ex. 1 at 30). For the next few months, Craig and Dave worked to get Bitcoin operational.

48. On January 12, 2009, Craig, Dave, and two others sent each other bitcoin transactions recorded on the blockchain. (Ex. 1 at 31).

---

[7] https://www.vidarholen.net/~vidar/overwriting_hard_drive_data.pdf.

[8] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

49. On Thanksgiving Day 2009, Dave told Ira he was creating "digital money" with a wealthy foreign man, i.e., Craig.

50. In April 2013, Dave was found dead in his home.  The scene of Kleiman's death was gruesome.  His body was decomposing, there were wheelchair tracks of blood and fecal matter, open bottles of alcohol, and a loaded handgun next to him.  A bullet hole in his mattress was found.  The exact details surrounding his death remain unknown.

51. After Dave's death, Craig posted an emotional video on Craig's YouTube channel.  In the video, Craig narrates footage from Dave's various TV appearances, growing increasingly emotional.  At the end, Craig concludes "I'm proud to say I knew Dave Kleiman . . . I'll miss you, Dave.  You were my friend, and I'll miss you."[9]

52. On December 8, 2015, two popular tech publications, *Wired* and *Gizmodo*, outed Craig as Satoshi.[10]  Both articles also articulated Dave's integral role in the development of Bitcoin.  They described numerous details and leaked communications implicating David and Craig's roles in creating and

---

[9] https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

[10] https://www.wired.com/2015/12/bitcoins-creator-satoshi-nakamoto-is-probably-this-unknown-australian-genius/;  https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

developing bitcoin; they also discussed their accumulation of a vast hoard of bitcoin.

53. On May 2, 2016, nearly five months after the *Wired* and *Gizmodo* publications, Craig published a blog post in which he claimed to be Satoshi.[11]

54. Craig has readily admitted Dave was intimately involved in the creation of Bitcoin.  In numerous interviews with Andrew O'Hagan, documented in *The Satoshi Affair*, Craig told O'Hagan that "[Craig] did the coding and that Kleiman helped him to write the white paper."  (Ex. 1 at 30).

55. From their collaboration in 2008 until Dave's death in 2013, Craig and Dave would go on to mine over a million of the initial bitcoins.

## W&K INFO DEFENSE AND RESEARCH LLC

56. On February 14, 2011, over two years after the first bitcoins were mined, Dave formed W&K Info Defense Research LLC ("W&K") in Florida (company number: L11000019904).  The Articles of Incorporation for W&K list Dave as the sole member of the LLC.  (Ex. 2).  Dave was also listed as the registered agent for W&K and his home address was listed as its place of business.  (*Id.*)

---

[11] https://qz.com/674129/an-australian-nobody-claims-to-be-the-inventor-of-bitcoin-but-no-one-knows-for-sure/ .

57.  However, in an email to Ira on February 15, 2014, Craig represented that "Dave owned 50% of [W&K]."  (Ex. 3).  Craig did not identify in this email who owned the other half.

58.  According to documents produced by Craig, W&K engaged in the business "known as Bitcoin mining and Software development / Research."  (Ex. 4).

59.  Craig identified certain R&D projects and the associated intellectual property owned by W&K.  (Ex. 3).

60.  On March 28, 2014, nearly a year after Dave died, W&K was reinstated by an individual named Uyen Nguyen ("Uyen").  (Ex. 5).  Uyen removed Dave as the registered agent for W&K and listed herself.  *Id.*  Uyen added both herself and an entity named Dr. Coin-Exch Pty Ltd. as authorized persons for W&K.

61.  On September 23, 2016, W&K was administratively dissolved by Uyen.[12]

### DAVE OWNED A SUBSTANTIAL AMOUNT OF BITCOIN

62.  The exact number of bitcoins belonging to Dave's estate will be determined at trial.  That said, various documents including private emails and transcripts from 2014 Australian Tax Office ("ATO") meetings with Craig, his counsel, and his accountant evidence Dave and Craig owned and controlled over 1,100,000 Bitcoins.

---

[12] https://www.flbusinessgo.com/gg?utm_term=L11000019904.

63. In a 2015 article, *Gizmodo* reported it had confirmed the authenticity of an email from Craig to Dave's other business partners stating that Dave *"had mined an enormous amount of bitcoins – an amount 'too large to email.'"* In the email, Craig asked Dave's business partners to secure Dave's hard drives and check for Bitcoin wallet files. He later stated he wasn't after the funds, and only wanted to ensure the bitcoins entered Dave's estate.[13]

64. Minutes from a February 26, 2014 meeting between the ATO and Craig's bookkeeper obtained by Gizmodo confirm that Dave owned a substantial amount of bitcoins. At the meeting, Craig's accountant, John Chescher, stated:

> Craig Wright had mined a lot of [b]itcoins . . . Craig had gotten approximately 1.1 million [b]itcoins. There was a point in time, when he had . . . around 10% of all the [b]itcoins out there.  Mr Kleiman would have had a similar amount.  However, Mr Kleiman passed away during that time.  (Ex. 6 at 3).

65. Further, meeting minutes from a February 18, 2014 meeting between the ATO and Craig's bookkeeper also obtained by Gizmodo further reveal that Craig has let others understand that he took ownership of Dave's bitcoin.  The ATO investigator states:

> We thought yes, you've picked up some bitcoin ownership from the deceased director so we were trying to, you know, get the picture and connect all the dots.  (Ex. 7 at 19).

---

[13]   https://www.gizmodo.com.au/2015/12/this-australian-says-he-and-his-dead-friend-invented-bitcoin/.

66.  As reflected in the February 18, 2014 transcript, in the meeting, Craig's counsel

states that the bitcoins W&K mined was held by Seychelles, Singapore, and UK

trusts.  As Dave owned between 50% to 100% of W&K, *at least* half of the

bitcoins transferred to the trusts belonged to Dave.

> In 2009 the mining of bitcoin commences *** 2011, bitcoin was
> transferred overseas. R and D then conducted in the US under –
> by a joint venture company formed as . . . effectively info defence
> research LOC. Bitcoin mining continues throughout 2011. The
> bitcoins are derived by companies in Singapore and the Seychelles
> or entities in Singapore and the Seychelles, and they're actually
> trusts. Trustee companies and trusts established - or trustee
> companies in the United Kingdom and other trusts established in
> the Seychelles. Further work was planned. In early April 2013
> unfortunately Dave . . . dies in the US towards the end of April
> 2013.  (*Id.* at 6).

67.  Years later, Craig admitted to Andrew O'hagan that "his and Kleiman's mining

activity ha[d] led to a complicated trust."  (Ex. 1 at 35).

68.  In a 2012 email Craig forwarded to Ira, Craig wrote to Dave reaffirming the

joint nature of the bitcoin held in trust (emphasis added):

> From: Craig Wright [mailto:craig@rcjbr.org]
> Sent: Wednesday, 10 October 2012 4:55 PM
> To: Dave Kleiman [mailto:dave@davekleiman.com]
> Subject: FW: IFIP-WG11.9 CFP
>
> We need to discuss the trsut [sic] and work out what the fuck *we*
> are doing with it all. So, a good tax deductible way to have a visit
> and also write a paper. (Ex. 7(a))

69.  In fact, Craig consistently referred to the trust as both Craig and Dave's, for

example in another email Craig forwarded to Ira (emphasis added):

17

From: Craig S Wright
To: dave@davekleiman.com
Subject: This week
Date: Tue, 22 May 2012 09:45:31 +1000

Dave,
A recycled rant. I have done the same to Ramona . . . The meeting with the AAT should have occurred weeks ago, but the ATO have stalled and put it off. John has all the materials and the ATO are simply BS'ing again. It costs me money and in a way I guess they want to get a result through attrition rather than honesty. They will drain all I have if they can. **We do not touch the trusts**. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions and let them try shit **on us** then. FUCKING DICKS. Bloody lying ATO cock sucking bastards! They lost evidence and use my temper against me. I hate their lies. I did everything right and I am STILL punished. . .  (Ex. 8).

70.  Finally, in a 2014 email exchange with Ira, Craig admitted that at least 300,000 of the 1,000,000+ bitcoins held in trust belong to David:

From: Ira K <███████████████████>
To: Craig S Wright <craig.wright@hotwirepe.com>
Subject: Bond villains
Date: Sat Mar 01 19:42:27 +0000 2014

Just to clarify on thoughts from previous email... In one of the email exchanges between Dave and you, he mentioned that you had 1 million Bitcoins in the trust and since you said he has 300,000 as his part. I was figuring the other 700,000 is yours.  Is that correct?
Ira
 ---
From: Craig S Wright <craig.wright@hotwirepe.com>
To: Ira K <███████████████████>
Subject: Re: Bond villains

18

Date: Sat Mar 01 20:00:48 +0000 2014

Around that. Minus what was needed for the company's use
Sent from my HTC.  (Ex. 9).

71.  As discussed below in more detail, Craig provided fraudulent contracts to the ATO in an attempt to substantiate his ownership of bitcoins and IP assets that belonged to Dave. Their authenticity aside, however, these "contracts" produced by Craig constitute his admission that Dave, Craig, and W&K collectively owned hundreds of thousands of bitcoins.

72.  For example, a 2011 contract produced by Craig includes a provision stating W&K expected to mine new bitcoin at a rate of 12,000 bitcoins per month for a period of over two years (312,000 bitcoin).  (Ex.10).

73.   Further, a 2012 contract produced by Craig lists Bitcoin wallets containing over 650,000 bitcoins. Next to the list of wallets and total bitcoin held, there is a handwritten annotation stating: "*as agreed, all wallets to be held in UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW.*"  (Ex. 11 at 8).  This annotation is in Craig's handwriting.

74.  A 2013 contract contains Craig's admission that W&K's "[o]wnership is 50% in [Dave's] name and 50% in trust held for [Craig]."  (Ex. 4 at 2).  And that W&K "is the owner and conducts the business known as Bitcoin mining and Software development / Research." (*Id.*)

19

## AFTER DAVE'S DEATH, CRAIG FRAUDULENTLY CONVERTED THE BITCOIN AND IP THAT BELONGED TO DAVE

75.  After Dave's death, Craig concocted a scheme to claim sole ownership of all bitcoins owned by Dave, to steal Dave's share of IP assets that belonged to Dave and Craig jointly through W&K.

76.  To accomplish this scheme, he drafted and backdated at least three contracts to create a paper trail purporting to document that many of Dave's bitcoins and IP rights were to be transferred, sold, and/or returned to himself. Specifically, he fraudulently created:

  a.   2011 contract titled "Intellectual Property License Funding Agreement" (the "2011 IP Agreement") (Ex. 10);

  b.   2012 contract titled "Deed of Loan" (the "2012 Deed of Loan") (Ex. 10); and

  c.   2013 contract titled "Contract for the Sale of Shares of a Company Owning Business" (the "2013 W&K Sale Agreement") (Ex. 4).

77. On their face, these contracts strain credulity in a number of manners.

78. *First*, the electronic signatures that appear on these documents are substantially different than known examples of Dave's electronic and written signatures:



79. In reality, this signature appears to be a near identical copy of a computer-generated font called Otto, available here:  https://www.wfonts.com/font/otto. When computer generated, this Otto font produces the signature:

---

[14] See Ex. 19 (signature on Computer Forensics LLC Operating Agreement).
[15] See Ex. 20 (signature on Dave's last will and testament).

80. When confronted with this information by Ira, Craig admitted the signature was computer generated, but claimed there were other ways to prove its veracity.

81. Craig has never provided additional evidence of their legitimacy.

82. *Second*, the fraudulent signatures aren't witnessed or notarized. Even the most un-sophisticated parties would understand that a contract purporting to release and transfer property valued at eight figures should be substantiated in some way with witnesses and/or notaries.

83. *Third,* the terms of the 2011 IP Agreement are nonsensical.  While it purports to "finance" W&K through the transfer of around 215,000 bitcoin, and requires W&K to "fund the software development using bitcoin," there was essentially nothing that could be purchased with bitcoins at that time.  Thus, no one could "finance" or "fund" anything with bitcoins then.  This calls the 2013 Sales Contract's purported "release" of this nonsensical "financing arrangement" into question.

84. *Fourth,* the 2011 IP Agreement, the 2012 Deed of Loan, and the 2013 W&K Sale Agreement conflict with each other.  The 2011 IP Agreement provides that Bitcoin wallet 1933***XYa8 would be held by Craig in escrow and revert to him if W&K defaulted, but the 2013 W&K Sale Agreement provides that it will be "released to" Craig despite satisfaction of the liability, and the 2012 Deed of

Loan shows the wallet being placed into a trust by Craig with a notation that it be held there until Dave and Craig can set up joint-companies later.

85. *Fifth*, the 2013 agreement references 250,000 bitcoin and then 250,500 bitcoin as the amount of bitcoin Dave was to transfer to Craig.

86. *Lastly*, many of the contractual terms are extremely convenient for Craig.  For example, the 2011 IP Agreement provides for confidentiality even from family members, stipulates the value of 215,000 bitcoin at 40,000,000 (when it was really worth around ~$250,000), and includes a "typo" showing the date as 2013, and amending it by hand to 2011 (likely because it was written in 2013).

87. These internal red flags are rendered even more suspicious by the fact that the 2013 agreement was purportedly signed a mere 10 days after Dave left the VA hospital, and no more than three weeks before he died.

88. Craig has a documented history of backdating contracts and documents to suit his needs.  In its 2015 audit of Coin-Exch, the ATO assessed tax liability and penalties against Craig for providing recklessly misleading tax information.  Among other wrongs, the ATO found Craig had backdated numerous documents. (Ex. 12):

   a.   "Craig Wright, has admitted that he backdated these invoices";

   b.   "the court case was not finalised until 6 Nov 2013; after the deed date of 22 August 2013.  That is, the licence agreement makes

23

specific reference to an event which had not yet occurred, raising questions as to its validity";

    c.    "[Craig's trust] purports to have acquired the software . . . from Craig Wright, pursuant to a contract . . . which predates its existence and establishment as a trust.";

    d.    "Craig Wright purports to have received a loan of 650,000 Bitcoin from the Seychelles Trust pursuant to a Deed of Loan entered into with the Trustee for the Seychelles Trust; a company called Design by Human Ltd (DBH).  However, records show Craig Wright was only informed of the existence of this company on a date after the purported Deed of Loan was entered into.";

    e.    "Furthermore, information obtained from Her Majesty's Revenue and Customs . . . suggests [Craig] backdated the Directorship of Uyen Nguyen and Dave Kleiman."

89.  In addition, during the February 18, 2014 interview with Craig by the ATO, Craig admitted that he backdated certain tax invoices.  (Ex. 7).  Further, Wired has written that Craig likely backdated numerous blog posts to further his claim of being Satoshi.[16]

---

[16] https://www.wired.com/2015/12/new-clues-suggest-satoshi-suspect-craig-wright-may-be-a-hoaxer/.

## CRAIG SECURES DEFAULT JUDGMENTS AGAINST W&K WITH FRAUDULENT CONTRACTS

90. In July and August 2013, Craig filed two claims in New South Wales Supreme Court against W&K for ~$28 million each.  (Ex. 13).

91. In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research" and that this contract was "bonded against the intellectual property of [W&K]."  (*Id.* at 2, 8).   The pleadings alleged that "the contract stated that a breach would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]."  (*Id.* at 3, 9).  The complaints alleged that the IP at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties."  (*Id.*)

92. These claims, submitted by Craig, are based on demonstrably false factual allegations.

93. The July 2013 claim alleges the existence of an October 27, 2008 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services."  (*Id.* at 2).  However, W&K did not exist in 2008.

94. Also, the July 2013 claim alleges:

> "[Craig] conducted four projects associated with the DHS (Dept. of Homeland Security USA) with [W&K] under contract:

    a. BAA 11-02-TTA 01-0127-WP  TTA 01 - Software Assurance: Software Assurance through Economic Measures

    b. BAS 11-02-TTA 05-0155-WP TTA 05 - Secure Resilient Systems and Networks

    c. BAA 11-02-TTA 09-0049-WP TTA 09 - Cyber Economics

    d. BAA 11-02-TTA 14-0025-WP TTA 14 - Software Assurance MarketPlace (SWAMP)." (*Id.* at 8-9).

95. The July 2013 claim goes on to state that "these funds were rated as:

    a. TTA 01    US$ 650,000

    b. TTA 05    US$ 1,8000,000 (*sic*)

    c. TTA 09    US$ 2,200,000

    d. TTA 14    US$ 1,200,000." (*Id.* at 9).

96. However, these statements were false. The 2017 results of a Freedom of Information Act request by Ira to the DHS reveals that TTA 01, TTA 05, and TTA 09 were all denied by the DHS. (Ex. 14).

97. The August 2013 claim also contains a demonstrably false allegation, alleging the existence of a January 9, 2009 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (Ex. 2). But again, W&K did not exist until 2011.

98. On August 28, 2013, a Consent Order was entered for the July 2013 claim by the Supreme Court of New South Wales. (Ex. 15).  The Order states it was "made by the court by consent."  (*Id.* at 1).  In support of that "consent" the order purports to be signed by an "authorised officer" of W&K, a "J Wilson." (*Id.*at 2).  But J Wilson, whoever he is, was not authorized.  No public record for W&K identifies him as an individual with any capacity to act for W&K.

99. On November 6, 2013, a Judgment was entered for the August 2013 claim by the Supreme Court of New South Wales.  (Ex. 16).  In the decision, the Court "note[d] the agreement of the parties that [Craig] will accept the transfer of the intellectual property held by the plaintiff in full and final satisfaction of the judgment."  (*Id.*).  However, as with the August judgment, there was never authorized consent to the judgment.

100. Further, W&K was never properly served with either the complaints or the judgments in these actions.

101. Thus, the contents of the claims submitted to the court are demonstrably false and Craig obtained both of these judgments by perpetuating a fraud on the New South Wales court.

102. To this day, Craig has used these fraudulently obtained judgments to assert ownership over the intellectual property assets developed by W&K.  For example, in the February 18, 2014 meeting with the ATO, Craig's attorney

represented to the ATO that "intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange ..... and so on." (Ex. 7 at 6). And later again stating: "Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire . . ." *(Id.* at 17).

103. Craig also used this judgment, supported by the fraudulent contracts between him and Dave, to claim millions in tax rebates for his other Australian based companies.

### CRAIG REACHES OUT TO IRA TO COVER UP THE FRAUD

104. Nearly ten months after Dave's death, on February 11, 2014, Craig reached out to Dave and Ira's 94 year old father Louis, and wrote:

> Date: Feb. 11, 2014
> From: Craig Wright <Craig.Wright@hotwirepe.com>
> To: Louis <████████████████████>
>
> Hello Louis,
>
> Your son Dave and I are two of the three key people behind Bitcoin . . .
>
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.

28

> Know also that Dave was a key part of an invention that will revolutionise the world . . .
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.
>
> I will let you know when I am in the USA. (Ex. 17).

105. This was the first time anyone in Dave's family learned of either (1) his friendship with Craig or (2) the extent of his involvement in the creation of Bitcoin.

106. As Louis Kleiman was elderly, Ira took over the correspondence with Craig.

107. Craig told Ira that he was partners with Dave in W&K and that no one knew about the company.  He explained to Ira that the business was involved in Bitcoin mining and that it was quite successful.

108. Shortly after informing Ira about W&K, Craig told Ira that Craig and Dave were planning on starting a new company together called "Coin-Exch."  He explained to Ira that Dave's estate would receive shares in it.

109. On April 23, 2014, Craig wrote to Ira:

> Date: April 23, 2014 8:56pm
> From: Craig <craig@rcjbr.org>
> To: Ira < ██████████████████ >

The software Dave updated, and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level.  This is all good under the law.  Basically the GST (like a Vat) cancels as it is an international transfer

What company owns right now is:

- Software – incl source code and perpetual licenses valued at over $50 million.
- Intellectual Property, design, codes etc
- Research claims.  (Ex. 18).

110. On April 15, 2014, an auditor from the Australian Taxation Office, reached out to Ira to inquire about his knowledge concerning the legal action Craig took against W&K.  The auditor provided Ira copies of the 2011 IP Agreement and the 2013 W&K Sale Agreement.

111. On April 22, 2014, Ira wrote to Craig that after he had time to review the documents sent by the ATO, he "felt like there [were] questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value . . .".

112. On the same day, Ira wrote ". . . From [the] documents [I have] it appears clear to see a systematic transfer of assets out of W&K back to you . . .  But you never mentioned any of the actions you were taking against W&K prior to contacting us."

113. Craig responded 11 minutes later "Dave died.  I did the actions to make sure that the court signed off on what Dave and I planned."

114. To keep Ira from going public, Craig promised Ira that he could be paid out of what was owed to Dave's estate "based on what Dave and I had been arranging." He then told Ira "October [2014 would be] the first payment."

115. The payment never came. Craig blamed the delay on the ATO investigation and kept promising Ira he would see value when the investigation closed.

116. On October 9, 2015, Craig ceased responding to Ira's email correspondence. Shortly thereafter, *Gizmodo* and *Wired* published the articles outing Craig and Dave's involvement in the beginnings of Bitcoin.

117. Craig currently serves as Chief Scientist of a UK company called nChain in London, where he has filed hundreds of patents related to Bitcoin and blockchain technology through this entity.[17]

118. To date, Dave's estate has received none of the assets belonging to him as a result of Dave's early involvement in Bitcoin and bitcoin mining.

## CLAIMS FOR RELIEF

### COUNT I
### Conversion (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

119. Dave lawfully mined and possessed hundreds of thousands of bitcoins both individually and as a member of W&K.

---

[17] https://www.reuters.com/article/us-bitcoin-wright-fund-exclusive/exclusive-company-behind-bitcoin-creator-sold-to-private-investors-idUSKBN17F26V

120. Craig unlawfully and without permission converted this property from Dave's estate by exercising exclusive possession over the private keys necessary to own, move, or spend the bitcoins belonging to Dave.

121. While the exact number of bitcoins remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of at least 300,000 bitcoins. Further, Craig's admission that Ira owned 50% of W&K entitles Dave to possession of at least 550,055.5 Bitcoin. Finally, pursuant to the formation documents of W&K, Dave is the sole member of W&K and would therefore be entitled to possession of all 1,100,111 Bitcoin mined by W&K.

122. To Plaintiff's best knowledge, information, and belief, these bitcoins are worth approximately $10,236,532,855.00.

123. Ira has demanded Craig return these bitcoins, but Craig has not done so.

124. Further, Craig has, and continues to, exercise authority over Dave's bitcoins by claiming them as his own and moving them into other wallets.  Craig has therefore wrongfully deprived Dave's estate from the Bitcoins belonging to Dave.

125. Dave's estate is entitled to actual damages, amounting in either return of all bitcoins converted from Dave's possession or the fair market value of the bitcoin.

WHEREFORE, Plaintiff demands judgment against Defendant for damages in the amount of at least $10,236,532,855.00 and/or return of the wrongfully converted Bitcoin, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT II
## Misappropriation

Plaintiff incorporates paragraphs 1 to 118.

126. After David's death, Craig unlawfully, willfully, and maliciously misappropriated trade secrets belonging to Dave's estate relating to blockchain based technologies by using a series of fraudulent contracts, misrepresentations, and fraudulently obtained court judgments to transfer/acquire the property rights in these trade secrets to/for himself.

127. These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies.  These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use. As evidence of the substantial economic value relating to these trade secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

128. Dave made reasonable efforts to maintain the secrecy of these trade secrets. Outside of W&K's applications to the Department of Homeland Security, Dave made no other disclosures of the nature of these trade secrets to anyone but Craig.

129. As a proximate result of Craig's unlawful misappropriation, Dave's estate has suffered actual losses consisting of the loss in economic value associated with the trade secrets.

130. As a proximate result of Craig's unlawful misappropriation, Dave's estate is informed and believes that Craig has been unjustly enriched.

131. As a proximate result of Craig's unlawful and willful misappropriation, Dave's estate is entitled to a recovery of damages pursuant to Fla. Stat. § 688.004.

WHEREFORE, Plaintiff demands judgment against Defendant for all available damages caused by Craig's misappropriation, including exemplary damages, together with court costs, interest, attorney's fees pursuant to Fla. Stat. 688.005, and any other relief this Court deems just and proper.

## COUNT III
## Replevin (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

132. Dave lawfully mined and possessed a massive amount of bitcoins both individually and as a partner in W&K. These bitcoins belonged to David as evidenced by Craig's various admissions.

133. While the exact number of bitcoins remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of at least 300,000 bitcoins. Further, Craig's admission that Ira owned 50% of W&K entitles Dave to possession of at least 550,055.5 bitcoins. Finally, pursuant to the formation documents of WK, Dave is the sole member of W&K and would therefore be entitled to possession of all 1,100,111 Bitcoin mined by WK.[18]

134. To Plaintiff's best knowledge, information, and belief, these bitcoin are worth approximately $10,236,532,855.00.

135. To Plaintiff's best knowledge, information, and belief, these bitcoins, and the private keys associated with these bitcoins, are in Craig's exclusive possession.

136. These bitcoins are wrongfully detained by Craig.  Craig has maintained possession of these bitcoins by using the private keys he had access to and has since refused to return these assets to Dave's estate after Dave's death.  To Plaintiff's best knowledge, information, and belief, Craig detains the property because of its significant economic value.

137. These bitcoins have not been taken for any tax, assessment, or fine pursuant to law, nor under an execution or attachment against Plaintiff's property.

---

[18] Should discovery reveal additional bitcoin were mined, Plaintiff may amend this complaint to assert a claim over those as well.

WHEREFORE, Plaintiff demands judgment against Defendant for the return of the wrongfully withheld Bitcoin, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT IV
## Breach of Fiduciary Duty (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

138. As a Dave's partner in W&K, Craig owed fiduciary duties of care, loyalty and good faith to Dave by virtue of their joint venture.

139. Craig breached his fiduciary duty of loyalty and good faith, by, among other things, intentionally and wrongly transferring assets that belonged to Dave's estate out of W&K and to himself personally.

140. Dave's estate has been damaged by Craig's breach of his fiduciary duties.

WHEREFORE, Plaintiff demands judgment against Defendant for damages and/or return of the wrongfully taken bitcoins and IP, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT V
## Breach of Partnership Agreement (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

141. Pursuant to Fla. Stat. § 620.8202, Craig and Dave had a valid partnership through their bitcoin mining activities that were carried out with the intention of generating a profit.

36

142. Craig breached this partnership duties to Dave under Fla. Stat. § 620.8202 when he illegally transferred all bitcoin related assets to himself personally.

143. Pursuant to Fla. Stat. § 620.1704 Dave's estate is entitled to enforce the rights associate with his Partnership with Craig.

144. Pursuant to Fla. Stat. § 620.8405, Ira's estate is entitled to seek purchase of the partnership interest under Fla. Stat. § 620.8701.

WHEREFORE, Plaintiff demands judgment against Defendant for purchase of his partnership interest together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT VI
### Unjust Enrichment (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

145. Dave mined over one million bitcoin into an account that Craig obtained access to and Dave developed IP that Craig obtained copies of.

146. Dave therefore conferred a substantial benefit upon Craig through his unauthorized use of the bitcoins and intellectual property belonging to Dave's estate.

147. Craig had knowledge of, retained, and accepted that benefit by, without Plaintiff's prior knowledge or consent, using and distributing his bitcoin and intellectual property that belonged to Dave's estate for his own economic benefit and trade purposes.

148. It would be inequitable to allow Craig to retain this benefit without paying the

value of these bitcoin and IP.

WHEREFORE, Plaintiff demands judgment against Defendant for the value

of the wrongfully retained Bitcoin and IP, together with court costs, interest, and any

other relief this Court deems just and proper.

Plaintiff demands a trial by jury for all issues triable by right.

Dated:  February 14, 2018

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: */s/Velvel Devin Freedman*
Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.   (305)539-8400
Fax.   (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.   (914)749-8200
Fax.   (914)749-8300
Email: kroche@bsfllp.com
*pro hac vice pending*

Attorneys for Plaintiff
IRA KLEIMAN in his capacity as Personal
Representative of the Estate of Dave
Kleiman