# Exhibit 6

*DLM = Sensitive – when completed*

# Record of client contact

| ☐ Interview | ☐ Telephone call | ☑ Other meeting |

| | |
|---|---|
| **Person/s Interviewed** | Authorised contact, John Chesher |
| | Bookkeeper, Ann Wrightson |
| **Representatives for the ATO** | Andrew Miller and Jenifer Trinh |
| **Date:** | 26 February 2014 |
| **Location:** | Interview Room 1, ATO Parramatta Office |
| | 2-12 Macquarie Street |
| | Parramatta NSW 2150 |
| **Start time:** | 1:00PM |
| **End time:** | 2:50PM |

*Important: Interview notes are an important part in gathering evidence to support your decisions. Consider the following issues and ensure an accurate and contemporaneous record is kept.*

### Contact summary:

### Purpose of the contact

Meeting was for John Chesher to explain workings in the revised activity statements sent to the ATO on 25 February 2014

### Issues Discussed:

1. Craig Wright
2. Hotwire Preemptive Intelligence Pty. Ltd. (Hotwire)
3. The Trustee for the Wright Family Trust (DeMorgan)
4. Coin-Exch Pty. Ltd. (Coin-Exch)
5. Cloudcroft Pty. Ltd. (Cloudcroft)
6. Strasan Pty Ltd (Strasan)
7. Pholus Pty. Ltd. (Pholus)

### Record of Conversation:

ATO auditor, Andrew Miller (AM) brought authorised contact (John Chesher) and bookkeeper, Ann Wrightson (AW) into Interview Room 1 at 1:00pm on 26 February 2013.  AM and ATO auditor, Jenifer Trinh (JT) then introduced themselves to JC and AW.

After the introduction, the meeting commenced. To the best of my recollection, and

1

based on notes I made during the meeting, the conversation was as follows:

**JC:** Have you been able to have a chance to look at the briefing report sent earlier today?

**AM:** I did have a chance to look at the briefing before the meeting. I will be holding a meeting with Marina Dolevski and Hoa Do tomorrow and will raise the issues raised in the briefing at the meeting.

**JC:** We have gone through various stages of how the Bitcoins are viewed. We have gotten our legal adviser, Andrew Sommer to have a final look at it and he has advised us that our previous treatment of the Bitcoins was incorrect and that it should have been treated as an assignment of right of Bitcoins as no Bitcoins were actually physically exchanged between the related entities.

**AM:** I have had a brief look into the revised activity statements sent by you yesterday. Our meeting today is an opportunity for you to walk through the revisions made on the activity statements for the various entities.

**JC:** There is not much difference between the revised activity statements and the original activity statements. Initially, we treated the Bitcoins as money. Now, we will be treating them as an assignment of right of Bitcoins. The outcome to the ATO would not be much different. The focus on the audits should be on the external transaction, that is, the transactions made with MJF Consulting Pty Ltd (MJF).

**AM:** We will first start with the GST worksheet provided for Craig Wright himself. *AM then shows JC a relationship map titled 'Other Observations'.* This is my understanding of the relationship amongst the related entities. I may be making changes to it or adding things to the current diagram during the meeting. I can give you a copy of this as well.

*JC looks at the diagram and points at Craig Wright on the diagram.*

**JC:** This all starts with Craig Wright. Craig Wright started all this in 2009 when he started mining Bitcoins. There was a previous GST audit conducted on Craig Wright. The audit was in relation to transactions that occurred relating to Intellectual Property. The auditor took an adverse view. The auditor and Craig Wright had a difference of personality. The outcome of the audit resulted in allowable deductions and GST acquisitions revised to nil. Craig Wright couldn't save the two entities. We took the audits to objection but the objection officer agreed with the auditor. The decision was upheld in objections. We then took the matter to the AAT and the court allowed some of the deductions. The audit resulted in liabilities being raised and your debt department was onto us immediately. However, the AAT decision changed this. From owing the ATO hundreds of thousands, we were now allowed a net loss to be carried forward to future years.

We were apprehensive about director Des McMaster's involvement with the current audits due to his past involvement with the previous GST audit.

**AM:** That shouldn't be a problem. I am the auditor conducting the audit, not Des.

**JC:** We understand. Craig Wright took the Bitcoins that he had mined offshore. At the time, it was worth 3-4 cents. The total value of this was around $5000. He then started up W&K Info Defense LLC (W&K) with Mr Dave Kleiman. W&K was an entity created for the purpose of mining Bitcoins. Craig Wright is a forensic computer expert. He is constantly updating himself attending courses, workshops and training sessions. He is also a university lecturer at Charles Sturt University and conducts courses. He even provides services to some Australian government agencies including the ATO and the Defence Force. However, this is all done on a very high level.

2

Craig Wright had mined a lot of Bitcoins. Craig then took the Bitcoins and put them into a Seychelles Trust. A bit of it was also put into Singapore. This was run out of an entity from the UK. Craig had gotten approximately 1.1 million Bitcoins. There was a point in time, when he had around 10% of all the Bitcoins out there. Mr Kleiman would have had a similar amount. However, Mr Kleiman passed away during that time. He was a war veteran; he was wheel chair bound.

The deed between Craig Wright and W&K was created in 2012. W&K gave Craig Wrights rights to the Bitcoins and he has used the Bitcoins to do all this stuff.

Mr Kleiman and Craig Wright decided to start up W&K because they both wanted to get involved with Bitcoins. They recognised that this industry was not regulated and they wanted to start up a regulated Bitcoin bank. They knew they couldn't do this in the US so they wanted to do this in Australia.

In the agreement entered into, it was stated that Strasan Pty Ltd (Strasan) was to perform the ground work and create the e-learning package for them. W&K was responsible for providing funding. It was decided that one entity will also be created to be banking front. This was basically the reason why Coin-Exch Pty. Ltd. (Coin-Exch) was created. W&K then bought all the work done by Strasan.

A deed was then entered into with Hotwire. It is noted that at the time, Strasan did not belong to Craig Wright. It was an independent entity at the time. Panopticrypt is a shareholder of Strasan. Craig had a minor shareholding in Panopticrypt Pty Ltd (Panopticrypt). He was only a minor shareholder at the time and did not control have control of this entity at the time.

Strasan then got a person from the UK by the name of David Rees to create a pathway outline to go forward with the e-learning process.

Craig Wright was speaking in a conference in Melbourne. He was giving a talk about Bitcoins and mining. He was then approached by a man by the name of Mark Ferrier and that was how they met. This was how the relationship was formed. They started talking. Craig Wright told Mark Ferrier that he wanted to start up a Bitcoin bank. They then started emailing. Mark Ferrier told him that he knew someone who could help him start up the bank. This was all done in early June 2013. Everything was done very quickly- most of it was done in one weekend. Craig Wright, with the help of Mark Ferrier, agreed to purchase banking software from Al Baraka. Mark Ferrier also convinced him to purchase gold ore. He also offered Ian Ferrier's services to Mark Ferrier. Ian Ferrier is Mark Ferrier's father. Before engaging in Mark Ferrier's services, Craig Wright had conducted lots of checks on him and everything came up clean. So in essence, Craig Wright wanted the banking software and Mark Ferrier wanted Bitcoins.

Around mid-July/August, Craig Wright released funds from an entity located in the UK to MJF Consulting. This was all going through a server located in Central West Africa.

Mark Ferrier was then arrested in September 2013. Craig Wright then started to take action to protect his own rights. Your director, Des McMaster has informed us that ASIC documents show that Mark Ferrier was only put on as a director for one day. Craig Wright then contacted Pitcher Partners in Brisbane and asked them for an explanation. We found out that Mark Ferrier was never a director. The address that he had on ASIC was false as well.

Craig Wright was able to get hold of the banking software and automation system. He has everything but not the gold ore. He was expected to receive the gold ore in 2015 but now that's not happening as the gold can't be delivered. Craig Wright has also contacted Ian Ferrier. Ian Ferrier advised us that he has not spoken to Mark Ferrier for 2 years and wants nothing to do with him. We have a case against MJF Consulting with the Supreme Court of NSW and also the Federal Court. The case with the Federal Court is for deceptive conduct against Mark Ferrier

3

personally as an individual.

Due diligence was conducted on Mark Ferrier before we engaged him. We have done all we could to protect ourselves.

If you look at the transactions made, you will see that every transaction was pegged against the currency exchange rate at the time. Craig Wright has already advised you that the accounting method for this personal enterprise should be changed from cash to accruals. The accounts should be on accruals from the start of the 2013 income year. Craig Wright has previously informed the ATO of this.

We have previously been dealing with ATO officers from different sites at first, e.g. some initial work was being conducted from the Hurstville office, Brisbane office etc. But then Des McMaster made a decision for all the audits to be done from Parramatta. The audits were then being conducted by Celso. I am uncomfortable with the fact that Des McMaster is looking after these audits. We have had past dealings with him in the previous audits.

**AM:** That is why I'm coming in with a fresh pair of eyes.

**JC:** Des' judgment is tainted due to his involvement with the old audits. We don't want the current audits to be tainted by the past audits.

**AM:** Yes, I understand.

**JC:** We want to make sure that you are comfortable with all the transactions.

**AM:** We should have all the documents already provided on our systems. I have a question to ask. Were actual Bitcoins physically paid to MJF Consulting or Mark Ferrier?

**JC:** Yes. We paid Bitcoins to him. We paid the Bitcoins to where he directed for the Bitcoins to be paid into.

**AM:** Just to confirm, was it actual physical Bitcoins that was paid?

**JC:** Yes.

*JC then opened his folder and showed AM written communication between Craig Wright and Mark Ferrier. He first showed a letter dated 1 June 2013 from MJF Consulting. His second (dated 1 June 2013) and subsequent documents were email correspondence between Mark Ferrier and Craig Wright.*

**JC:** *(referring to an email correspondence between Mark Ferrier and Craig Wright)* After the deal was signed, Mark Ferrier signed the agreement. Popal *(the name was referenced in one of email correspondence between Craig Wright and Mark Ferrier showed to AM )* is the person responsible for bringing Mark Ferrier into the deal. From our correspondence and understanding of Mark Ferrier, it appears that the person behind this is much smarter than Mark Ferrier. There was a spike in the value of shares at the time from $2 to $6 in the weekend that we signed the deal. We believe that this was done intentionally. We are now dealing with Al Baraka ourselves. We are liaising with the people in Turkey. I hope that you've been able to get an understanding of how this all started now.

**AM:** I have an understanding of the background now.

**JC:** Craig Wright has a Blockchain view of this. In relation to the transactions done with Mark Ferrier, the Bitcoins left Doncaster in UK and was transferred to West Africa. Craig Wright

4

obtained the automation and banking software through Mark Ferrier. The software first goes to Craig Wright and then he transfers them into The Wright Family Trust (DeMorgan) for distribution. The banking software was transferred into Coin-Exch as this company is acting as the banking front. The automation and exchange software was transferred to Hotwire. Basically, everything goes through Craig Wright and then into the trust. The security work was performed by W&K.

In relation to the valuation of the software, Al Baraka determined the value of the software that was obtained from them. The Supreme Court of NSW determined the value of the software obtained from W&K. You should already have copies of the two Supreme Court of NSW judgments.

**AM:** When was the Supreme Court judgments made? On the invoices you provided us, they appear to be dated sometime in mid-to-late 2013?

**JC:** The W&K transactions were dated 1 September 2013. The judgments came through in November/ December 2013. There is a time difference of a few months here as Craig Wright had to demonstrate the value of the claims to the Court. He was dealing with this matter from 1 September 2013.

So essentially to sum it up, software and intellectual property were sitting in DeMorgan and was distributed out as follows:
- A third was distributed to Hotwire.
- A third went to Coin-Exch.
- A third went to Cloudcroft. Craig Wright may be the sole director of this entity at the moment but he was not the sole director at the time the company started. This company was responsible for performing security work at the time it was first established.

Most of the intellectual property and software were licensed to the three entities and not sold. The reason for this is because the licenses costs will be considered an expense and not an asset and this protects the R&D position.

Cloudcroft was actually started-up by his ex-wife, Lynn Wright. It was 100% owned by Lynn Wright at the time. They were separating at the time it started. He was dealing with clients including Hoyts in his security role. Lynn Wright had 100% ownership of the company until late 2012 when the company was put into liquidation. The liquidators decided to pursue Cloudcroft and Lynn Wright for the contract to sell from W&K to Cloudcroft. However, no deal came out of this.

Lynn Wright then went bankrupt. This was when Craig Wright took over Cloudcroft. It is possible that he may currently be the sole shareholder.

Coin-Exch is the banking front of the group and is holding the banking software.

Hotwire has the exchange and automation software and is also the R&D engine for the group. Hotwire came into existence because of the contract entered into between W&K and Strasan. It was stipulated in the contract, that a company would be created; and consequently, Hotwire was formed as a result. Hotwire is funded by a Deed of Assignment. The initial funding was by an equity distribution of rights in late July/ August.

1. **Craig Wright**

**AM:** I will start by going through the revised activity statement for Craig Wright.

**JC:** All the transactions made amongst the related entities are GST neutral. The overall GST

5

credit expected from the related entities is around $5.5 million. The sum total of the GST on the Al Baraka deal is around $5.346 million.

*(JC then looks at the revised GST ledger (sent on 25 February 2014) for Craig Wright)* You can see this at the bottom of page 3 and top of page 4 of the GST ledger. The total amount as stated on page 4 is $5.376 million.

**AM:** The original activity statement lodged for Craig Wright resulted in a GST payable amount of $2.3 million. The new revised activity statement results in an increased payable amount of around $4.2 million. Just to clarify, do you want this to be amended on our systems? Or are you just putting forward these figures for us to consider?

**JC:** I want you to revise the activity statements for us. The process for us to change the accounting method from cash to accruals and then to request a new activity statement to be generated on your system is just too complicated. We were not able to change to accruals on the Portal and we already requested many times for this to be changed to accruals. However, at the moment, the accounting method is still cash on your system.

**AM:** To confirm, the new revised statement is on accruals basis?

**JC:** Yes, it's on accruals. We have previously advised of this before. Craig Wright has been asking for this consistently.

You should also note that I have only come on board after October/November 2013. Jamie Wilson was previously responsible for the accounts for the entities. Jamie was responsible for introducing Xero. His role fell apart around October 2013 due to his personal situation. ▮

**AM:** I had a quick look at the revised activity statements. It looks like the main difference between the two is that there is now an additional $31 million included under the accruals method. In the current statement, there are two lots of income received from DeMorgan of $34.1 million each. The cash version only showed one lot of $34.1 million. Why is there an additional sale made to DeMorgan in the current statement?

**JC:** *(JC checks this on his laptop for a few moments.)* I believe this is in relation to the international payments made. Those were external payments made. It came in externally and went out externally.

## 2. The Trustee for Wright Family Trust (DeMorgan)

**AM:** Let's move on to the second entity, The Trustee for Wright Family Trust (DeMorgan). Who is the trustee of the trust?

**JC:** I think it may be Panopticrypt or Craig Wright himself. I'm not uncertain of this though. I will get back to you on this.

**AM:** No changes were made from the original activity statement. There is nothing to discuss on this one.

## 3. Hotwire Preemptive Intelligence Pty. Ltd. (Hotwire)

**AM:** I'll move onto Hotwire now. The combined total of G10 and G11 has decreased. The end result is a slight increase in refund.

GIZMODO

6

**JC:** *(JC checks this on his laptop for a few moments.)* This is for minor expenses, like general expenses. These were previously sitting in GST-free. We have moved all the computer equipment of the group to Pholus Pty. Ltd. (Pholus). Pholus will be providing the funding for the IT services. We initially went to the bank to get a lease. But the bank told us that they will give us $90,000 in return for $90,000. If we give them $90,000.00, they will lend us $90,000. That didn't make sense to me. We didn't get a lease from them. We are currently setting up Pholus to do the IT side of things. Our next task is to move the assets to Pholus. The leasing expenses for the equipment will be treated as a liability.

**AM:** There were four invoices issued from DeMorgan to Hotwire on the same day. Just out of curiosity, why was it separated into four tax invoices? The payments made added up to approximately $37 million. It was for tax invoices numbered 1, 2, 3 and 4.

**JC:** *(checks laptop for a few moments)* This is because they obtained a three year licence for the intellectual property. It was $10 million per annum. One tax invoice is for payment for the current year and the other two are prepaid payments made. They moved in as a lump. For the R&D side of things, it is considered to be a prepayment. A similar situation has occurred in Coin-Exch as well.

### 4. Coin-Exch Pty. Ltd. (Coin-Exch)

**AM:** We will now move on to Coin-Exch. The revised calculation shows a significant increase in capital purchases of $21.8 million. This is marked as a GST-free capital expense for Bitcoin Assignment. However, there is no change in the overall GST refund as the new $21.8 million is marked as GST-free.

**JC:** That is an assignment of right. It reflects the Bitcoin assignment made.

**AM:** Did Craig Wright make a Bitcoin right assignment to Coin-Exch?

**JC:** Yes.

**AM:** What was this in exchange for? If Craig Wright made an assignment to Coin-Exch, what did he get back in return?

**JC:** Let me check this. *(JC checks this on his laptop)*

**AM:** Could this be for the IP Licence obtained from DeMorgan?

**JC:** So what happened is that Coin-Exch has an assignment of right and the corresponding transaction made against it is marked as a loan. It is a loan from Craig Wright for the right to use it.

**AM:** This is different to what happened to Hotwire. Was there a written agreement between Craig Wright and Hotwire for the assignment? Were they both marked as GST-free?

**JC:** Yes. They were moving through as a series of loans made. The Deed moved from the UK to Craig Wright and then he distributes this.

**AM:** The word 'loan' was not used in the briefing paper that you sent earlier today. 'Loan' and 'Rights' have different meanings.

**JC:** They are not loans, they are Assignment of Rights. I got confused as the assignment of rights is categorised as a liability and consequently, I called it a loan. But it's not actually a loan.

**AM:** Okay. So to confirm, Coin-Exch acquired intellectual property from DeMorgan. The right to call BTC is then assigned to Coin-Exch?

**JC:** Yes.

**AM:** Jenifer do you have any questions to ask?

**JT:** No.

**JC:** She is too busy writing up the minutes.

**AM:** We can send you a copy of today's minutes if you like?

**JC:** Yes, that would be appreciated.

### 5. Cloudcroft Pty. Ltd. (Cloudcroft)

**AM:** We will now move onto Cloudcroft. Overall sales reported in the revised statement have decreased. The export sale on the original ledger is no longer included in the revised calculation. The previous statement showed export sales of $3.1 million. However, this does not affect the final GST amount.

**JC:** *(JC checks this on his laptop)* I have no reference on my report of this amount.

**AM:** If you go back to the original statement, you will see that there is export income of $3.1 million reported.

**JC:** That may have been a mistake. The only thing that jumps to me is the Strasan transaction which was also for $3.1 million.

**AM:** The amount is GST-free. For your record, GST refund remains the same.

**JC:** We have an entity in Singapore. The export sales may have been made to that entity.

**AM:** Was it for a sale of a software package to Singapore?

**JC:** This is possible, but I can't confirm.

### 6. Strasan Pty Ltd (Strasan)

**AM:** I have no more questions to ask in relation to Cloudcroft. I will now move on to Strasan. You provided us revised GST ledgers for the tax periods ended 30 June 2013 and 30 September 2013. However, I noticed just before the meeting that the two PDF documents are the same.

**JC:** I must have forgotten to change the header. I will send this to you again. Nothing happened in the first quarter of 2014 except for sales.

**AM:** As I only have the revised June 2013 quarter, I will just be asking questions in relation to that. I can see that the sales have been reduced to $nil.

**JC:** *(Checks his laptop)* This was for payment to Strasan from Hotwire for work performed. They issued a Deed of Assignment at the end of June 2013. It was paid out of the wallets given to you in July/August.

8

**AM:** Who were the expenses incurred to? Was it Hotwire or Craig Wright?

**JC:** Strasan got the benefit of 'DeMorgan Info Security Services' which was otherwise known as DISS. This entity does not exist anymore. Craig Wright was involved with this entity in early 2000s. DeMorgan is Craig Wright's grandmother's name. The company created a bunch of stuff. Craig had a dispute with the director and then got out even though he had 75% of the shareholding. They ended up stripping the company. Craig Wright then had a ten year court case against DISS and had legal fees incurred for the ten years. A judgement made in Court assigned the right of 4 projects to Craig Wright and Strasan got the benefit of the 4 different projects.

**AM:** In relation to the expenses reported, which entity is responsible for reporting the corresponding sales made for the June 2013 quarter?

**JC:** Strasan was working for Hotwire and received payment which was the Right of Assignment of $3.8 million.

**AM:** There is no income reported by Strasan in the revised statement. There were $5.3 million in sales reported in the original statement. The revised BAS has no sales but does have expenses.

**JC:** That's odd. I have the $5.3 million in sales on the laptop as well. This amount is not part of the GST audit so it must be GST-free. The amount was for export sales made.

**AM:** It would most likely be a G2 amount then.

*JC then shows AM the laptop screen.*

**JC:** This amount shows up as an export sale made. I will need to get back to you on this. In August, there was an invoice with a due date for payment as 30 October 2013. There was another amount to Hotwire but that was for the previous year. In the fourth quarter in 2013, there was a sale amount made of $3.2 million. There should be a corresponding amount in June for Hotwire for $3.2 million.

**AM:** In the original statement lodged, there was a GST-free amount of $5.3 million reported. The description provided for the transaction is 'Dallah Group (INV-0001)'.

*JC then checks this on his laptop.*

**JC:** That invoice was voided. *(JC then shows AM the invoice on the laptop.)* This was entered into the wrong entity. See the bottom note made here, it states that the invoice has been voided. Dallah has nothing to do with Strasan. You will see the transaction in another entity. It would be in either Coin-Exch or Hotwire.

**AM:** Let's have a look now. *(AM then looks at the revised statements provided for Hotwire and Coin-Exch.)* It doesn't appear to be in Hotwire or Coin-Exch.

**JC:** It was voided in November 2013 because it didn't exist and there was no Dallah at that point in time. Micropayment system was part of the stuff that came in. It if went anywhere, it would have gone to Coin-Exch or Hotwire. We are looking to do micropayments in Bitcoins. The micropayment system allows people to buy fractions of a Bitcoin. The smallest fraction is a satoshi. The micropayment system was about half the value of the software package.

9

### 7. <u>Pholus Pty Ltd (Pholus)</u>

**AM:** Now, we'll be moving onto the final entity, which is Pholus. Sales and export sales made have remained the same. Export purchase reported in original statement of $2.3 million has now decreased to nil. G10 was originally $2.3 million and has been revised to nil. The reverse has occurred for label G11. The amount reported was originally nil and has been revised to $2.3 million. The description provided is 'university software- install system design and deployment'.

**JC:** We had a bunch of chords as inventory. There are around a thousand of them. We moved them to Pholus as part of their inventory. These chords are similar to CPUs. Each chord is a data miner. We changed it from G10 to G11 as they are inventory and should have been classified as a non-capital purchase instead of a capital purchase as they are not capital. The other stuff reported was for accounting and consulting services.

**AM:** That's all the questions I have. Do you have any questions to ask Jenifer?

**JT:** No.

**JC:** After the meeting, we will get back to you on the following:
- Who the shareholders of Cloudcroft are;
- Clarification of the loan or rights issue;
- The discrepancy identified in relation to the Dallah Group invoice;
- The anomalies not appearing in Coin-Exch or Hotwire; and
- Who the trustee of DeMorgan is.

You should have the backup for everything with you. You can see that the fundamental issue is the external transaction made with MJF Consulting.

**AM:** I will be having a discussion tomorrow with our AC, Marina Dolevski and Hoa Do in relation to the Assignment of Rights. I am happy to relay the outcome back to you after the meeting.

**JC:** That would be much appreciated if you could do so. Craig Wright has been moving stuff around but if you look at in holistically, he isn't moving anything around at all. The only external transaction is with MJF Consulting and to David Rees. The transaction with David Rees was GST-free as it was for educational stuff.

So, what's next from here?

**AM:** I can't say at the moment. This will be dependent on the meeting to be held tomorrow. We will make a decision as to how to go forth from there.

**JC:** There is an amount coming our way. We want to propose receiving 20% of this amount first. I will be putting this forth to Marina. If this is not a reality, we will have further discussions but if it is, we want it released immediately. We have spent a lot of money during this process and we need the funds to ease our cash flow. The Bitcoin industry is very volatile and there is no clear picture as to the future. Our bank options are limited. Everything we have been doing is legitimate. If you were able to come out to our premise today to hold the meeting, you would have seen 40 to 50 people working out there. We have lots of activity happening at the moment. $5 million does make a difference. We need to recover the money already spent.

**AM:** I can't comment on this. This discussion is best held with Marina Dolevski.

**JC:** We need to be back in a position of control.

GIZMODO

10

**AM:** I will be having a meeting with Marina and Hoa Do tomorrow at 2pm. I will let you know of the outcome of tomorrow's meeting.

*AM then thanked JC and AW for their time.*

Meeting concluded at 2:50pm.

**Include reference/hyperlink to main documents relied upon:**

Relationship_Diagram_No_Markings
Relationship_Diagram_with_Markings


**Author's name: Jenifer Trinh
Date of document:   27 February 2014**



11