# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| IRA KLEIMAN, as the personal Representative of the Estate of Dave Kleiman<br><br>*Plaintiff(s)*<br><br>v.<br><br>CRAIG WRIGHT<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 18-cv-80176-BLOOM/Hopkins

AFFIDAVIT OF SERVICE OF SUMMONS, COMPLAINT, TOGETHER WITH THE EXHIBITS

**AFFIDAVIT OF CESAR AUGUSTO SEPULVEDA**

Cesar Augusto Sepulveda, being duly sworn, Deposes and says as follows:-

1.  That Deponent is not a party to this action, is over 18 years of age and is employed at 12 Angel Gate, 326 City Road, London EC1V 2PT, England and is a person authorised to effect service of Judicial Process according to the laws of England & Wales.

2.  That on Thursday the 22nd day of February 2018, at 3.15pm and before 4.30pm, at 21 Harebell Hill, Cobham, Surrey, KT11 2RS, England, being the current residential address of the Defendant, Craig Wright, Deponent personally served Craig Wright with true copies of the Summons in the above mentioned Civil Action from the United States District Court for the Southern District of Florida, dated the 15th day of February 2018, together with the Complaint and Jury Demand, dated the 14th day of February 2018, the Exhibits thereto, and a letter from the instructing Solicitors, dated the 16th day of February 2018.

3.  That personal service was effected and the Defendant, Craig Wright, came to the front door of the property and admitted his identity and freely accepted the service and Deponent was able to identify the Defendant through open source

photographs and the Defendant thanked Deponent and then closed the front door to the property.

4. That service as described herein is consistent with the provisions for service upon an individual Defendant under Section 6 of the Civil Procedure Rules, as required by the Supreme Court of Judicature in England & Wales.

5. That a copy of the Summons,Complaint, Exhibits, and Letter from Solicitors, so served as aforesaid are exhibited hereto and marked "A".

SWORN AT *London*                                     )

IN *England*                                          )
                                                      )
THIS *First* DAY OF *March* 2018                      )
                                                      )

BEFORE ME

*David Noel Lloyd Fawcett*
A NOTARY PUBLIC *of London*.

D.N.L. FAWCETT
NOTARY PUBLIC
MY COMMISSION EXPIRES
WITH LIFE



# UNITED STATES DISTRICT COURT
## for the
### Southern District of Florida

|  |  |
|---|---|
| IRA KLEIMAN, as the personal Representative of the Estate of Dave Kleiman | ) ) ) ) ) |
| *Plaintiff(s)* | ) Civil Action No. 18-cv-80176-<br>) BLOOM/Hopkins |
| v. | ) |
| CRAIG WRIGHT | ) AFFIDAVIT OF SERVICE OF<br>) SUMMONS, COMPLAINT,<br>) TOGETHER WITH THE EXHIBITS |
| *Defendant(s)* | ) ) |

## AFFIDAVIT OF CESAR AUGUSTO SEPULVEDA

**This is the exhibit marked "A" referred to in the
Affidavit of Cesar Augusto Sepulveda sworn before me this
~~FIRST~~      day of   MARCH   2018**



DAVID  NOEL  LLOYD  FAWCETT

**A Notary Public** or London

D.N.L. FAWCETT
NOTARY PUBLIC
MY COMMISSION EXPIRES
WITH LIFE

DE PINNA
35 PICCADILLY
LONDON
W1J 0LJ
SCRIVENER NOTARIES

Case 9:18-cv-80176-BB   Document 3   Entered on FLSD Docket 02/15/2018   Page 1 of 1

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of Dave Kleiman <br><br> *Plaintiff(s)* <br> v. <br> CRAIG WRIGHT <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.  18-cv-80176-BLOOM/Hopkins

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Dr. Craig Steven Wright
7 Oak Road
Cobham KT11 3AZ
United Kingdrom

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Velvel (Devin) Freedman
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, FL 33131
1 (305) 539 8400
vfreedman@bsfllp.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**SUMMONS**

Date:  02/15/2018

s/ Ledys M. Rodriguez
Deputy Clerk
U.S. District Courts

Steven M. Larimore
Clerk of Court

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal
representative of the Estate of Dave
Kleiman,

     Plaintiff,

v.

CRAIG WRIGHT

     Defendant.

**CASE NO.:**

**COMPLAINT AND
JURY DEMAND**

Plaintiff, Ira Kleiman, brings this action as the personal representative of David Kleiman's estate. The following allegations are based on personal knowledge as to his own acts and observations and are made on information and belief as to all other matters based upon the undersigned counsels' investigation:

## INTRODUCTION

1.  This matter concerns the rightful ownership of hundreds of thousands of bitcoins[1] and the valuable intellectual property rights of various blockchain technologies. As of the date of filing, the value of these assets far exceed $5,118,266,427.50 USD (before punitive or treble damages).

2.  At the heart of these claims is the relationship between Craig Wright ("Craig") and David Kleiman ("Dave"). This relationship, born out of a mutual obsession with cryptography and data security, remained mostly hidden from the outside world. Craig, a computer scientist in Australia, and Dave, a paralyzed IT security expert in Pam Beach, Florida, communicated almost exclusively through various private email accounts.

3.  Bitcoin is the world's first decentralized cryptocurrency. The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent the now famous protocol to a

---

[1] The term "Bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoins" to label the units of exchange.

mailing list of cryptography enthusiasts.  That protocol has since spawned a system of value and exchange with a current market cap of ~$150 billion.

4.  It is unclear whether Craig, Dave, and/or both created Bitcoin. For reasons not yet completely clear, they chose to keep their involvement in Bitcoin hidden from most of their family and friends. It is undeniable, however, that Craig and Dave were involved in Bitcoin from its inception and that they both accumulated a vast wealth of bitcoins from 2009 through 2013.

5.  In April 2013, mere months prior to Bitcoin's entry into the mainstream, Dave died after a long battle with MRSA.  At the time of his death, no one in his family was aware of the extent of his involvement in creating Bitcoin. Nor were they aware that he had accumulated, with Craig, an incredible sum of bitcoins.

6.  Recognizing that Dave's family and friends weren't aware of this, Craig perpetrated a scheme against Dave's estate to seize Dave's bitcoins and his rights to certain intellectual property associated with the Bitcoin technology.

7.  As part of this plan, Craig forged a series of contracts that purported to transfer Dave's assets to Craig and/or companies controlled by him.  Craig backdated these contracts and forged Dave's signature on them.

8.  Shortly after Dave's death on April 26, 2013, Craig reached out to Ira, Dave's brother.  Craig disclosed he had partnered with Dave to create Bitcoin, mine bitcoin, and create valuable IP.  But, he claimed Dave signed all these property

3

rights away in exchange for non-controlling share of a non-operational Australian company worth "millions." Craig told Ira he'd be able to sell Dave's stake in the company in a few months.

9. This was a lie. The company went bankrupt after Craig apparently misled the Australian Tax Office ("ATO").

10. The ATO's investigation of Craig led them to raid Craig's home in late 2015. Craig fled Australia for London.

11. Since fleeing to London, Craig has lived a life of fame and fortune. In May 2016, he publicly revealed himself as the alleged creator of Bitcoin. He currently serves as Chief Scientist of nChain, a UK company purporting to be the global leader in research and development of blockchain technologies. He also regularly posts pictures to his social media accounts of his lavish lifestyle.

12. To date, Craig has not returned any of the mined bitcoins or intellectual property rights belonging to Dave's estate. This action is brought to rectify that injustice.

<u>PARTIES</u>

13. Plaintiff Ira Kleiman is a resident of Palm Beach County, Florida. He is Dave's brother and the personal representative of his Estate.

14. Defendant Craig Steven Wright is a resident of London, United Kingdom. He is Dave's former business partner in W&K Info Defense Research LLC, a company operating in the state of Florida and formed pursuant to its laws. This

4

Court has personal jurisdiction over Craig pursuant to Fla. Stat. § 48.193 as he operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within the state; and caused injury to persons and property within this state at or about the time he was engaged in solicitation and service activities within the state.

## JURISDICTION AND VENUE

15.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

16.  Venue lies within this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District.  These events are included, but not limited to: the wrongful taking of property belonging to a Florida estate within this District; the operation of W&K Info Defense Research LLC by Dave and Craig within this District; the mining of a substantial amount of bitcoins through the use of computer equipment located within this District; and the development of certain blockchain related intellectual property within this District.

## FACTUAL ALLEGATIONS

### BITCOIN

17.  Bitcoin is a decentralized digital currency with a current market cap of ~$150 billion as of February 14, 2018.[2]  At its core, Bitcoin is simply a giant ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the bitcoin blockchain.

18.  In order to transact with bitcoins, you must have a bitcoin wallet.  Like a bank account number, each bitcoin wallet has a "public key" that is the "address" provided if one would like to receive bitcoin from others.  Every wallet can be identified on the blockchain (by referring to its "public key") along with the number of bitcoins inside that particular wallet.

19.  Each wallet is also assigned a "private key."  Unlike public keys, private keys are only known by the individual who creates the bitcoin wallet.  The private key is like the "password" to the wallet.  To send bitcoin out of a wallet, an individual must have the private key associated with the bitcoin wallet.  This is similar to the manner in which one must have a PIN to withdraw cash from an ATM.

20.  There are two methods of acquiring bitcoin. The first involves simply receiving bitcoin from someone who has.  In fact, there are many businesses that operate

---

[2] https://coinmarketcap.com/.

6

"bitcoin exchanges," such as coinbase.com, which is a bitcoin marketplace where individuals can purchase bitcoins with their native currency from other individuals looking to sell.

21. The second way one can acquire bitcoin is by "mining" them.

22. There is no centralized authority that curates the bitcoin blockchain. Consequently, the protocol has to incentivize individuals to curate the blockchain, i.e., to update the "ledger" with new transactions as they take place. This process is called "bitcoin mining."

23. Anyone with internet access can "mine bitcoins" by employing computer power to solve a complex mathematical problem. The first "miner" who solves the problem gets the right to add a block of recent transactions to the blockchain, i.e., the right to update the ledger. In return for this work, the protocol pays the successful miner in newly minted bitcoin (the number of which is fixed by a pre-existing algorithm). This process is repeated every 10 minutes or so, ensuring an accurate and up to date record of all bitcoin transactions.

24. When the Bitcoin protocol was first launched in January 2009, the protocol paid the successful miner 50 bitcoins for each block of transactions processed. This mining reward is cut in half approximately once every four years. Today, the mining reward 12.5 bitcoins. Obviously, it was easier to amass significant amounts of bitcoin in 2009, than now.

25. To date almost 17 million of the total 21 million bitcoins have been mined.

### HISTORY OF BITCOIN

26. On October 31 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto ("Satoshi") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."

27. Less than three months later, the system outlined became a reality. On January 3, 2009, Satoshi mined the first 50 bitcoins. To place a timestamp on the occasion, Satoshi left a text message digitally encoded on these first 50 bitcoins that read, "The Times 3 January 2009 Chancellor on brink of second bailout for banks," referring to that day's headline in the British newspaper, *The Times*.

28. Hal Finney, one of the first supporters and adopters of Bitcoin, downloaded the bitcoin software that same day, and received 10 bitcoins from Satoshi in the world's first bitcoin transaction.

29. Satoshi also created a website under the domain name bitcoin.org and continued to collaborate with other developers on the bitcoin protocol until mid-2010. Around this time, he handed control of the bitcoin source code repository to Gavin Andresen, another active member of the bitcoin development community, and disappeared. The last confirmed email from Satoshi was sent

on April 23, 2011.  It read, "I've moved on to other things.  It's in good hands with Gavin and everyone."

30. For most of its early history, bitcoins were of relatively little value.  Famously, the first documented commercial bitcoin transaction occurred when developer Laszlo Hanyecz used 10,000 bitcoin to purchase two Domino's pizzas on May 22, 2010.  At today's prices, those two pizzas would be worth approximately 1% of Domino's total market cap.

31. During Bitcoin's early history, cryptocurrencies were a niche technology with a small development community.  Consequently, there was little competition for maintaining the ledger or "mining bitcoin."  Thus, individuals mining bitcoin through 2013 could expend relatively minor resources to accumulate large sums of bitcoin.

32. It has been widely reported that Satoshi Nakamoto mined approximately 1 million bitcoins during this time.[3]

### BACKGROUND ON PARTIES AND KEY INDIVIDUALS

33. Dave Kleiman was born in 1967.  Obsessed with computers and technology at an early age, he joined the U.S. Army in 1986 as a helicopter technician.

---

[3]  *See  e.g.*  http://time.com/money/5002378/bitcoin-creator-nakamoto-billionaire/; http://www.businessinsider.com/satoshi-nakamoto-owns-one-million-bitcoin-700-price-2016-6; https://eklitzke.org/how-many-bitcoins-did-satoshi-nakamoto-mine.

34. A few years after being honorably discharged, Dave got into a serious motorcycle accident which left him physically handicapped and wheelchair-bound. After this accident, Dave's interest in computers intensified, and he began to build a reputation in computer forensics and secure network infrastructures.

35. Dave began working in the information technology security sector in 1990. He was a frequent speaker at national security conferences and was a regular contributor to many security related newsletters, websites, and online forums.

36. Dave was a member of several computer security organizations, including the International Association of Counter Terrorism and Security Professionals (IACSP), International Society of Forensic Computer Examiners (ISFCE), Information Systems Audit and Control Association (ISACA), High Technology Crime Investigation Association (HTCIA), Network and Systems Professionals Association (NaSPA), Association of Certified Fraud Examiners (ACFE), Anti-Terrorism Accreditation Board (ATAB), and ASIS International.

37. Dave was also a Secure Member and Sector Chief for Information Technology at The FBI's InfraGard and a Member and Director of Education at the International Information Systems Forensics Association (IISFA). When he attended conferences, he was known as "Dave Mississippi," a nickname referring to the long string of three letter certificates that followed his name.

38. He co-authored and was the technical editor of numerous publications, including *Perfect Passwords: Selection, Protection and Authentication*,[4] and Security Log Management: Identifying Patterns in the Chaos.[5]

39. In 2010, Dave was hospitalized. He was in and out of medical facilities due to MRSA infected sores.  On March 22, 201 3, Dave signed out of the hospital against medical advice.  He was unstable and nearing death.  A friend asked him if the Hospital had discharged him and he responded with "no . . . I told the doctors to go fuck themselves."[6]  On April 26, 2013, Dave passed away.

40. Ira Kleiman is Dave's brother and the personal representative of his estate.

41. Craig is a 46-year-old Australian computer scientist and businessman.  Craig began his career in information technology working for various entities in Australia, including the Australian Securities Exchange.

42. In May 2016, Craig claimed to be Satoshi Nakamoto—the pseudonymous name behind the creation of Bitcoin.

### DAVE AND CRAIG'S RELATIONSHIP

43. Dave and Craig met in an online cryptography forum in 2003.  Both men had a longtime interest in cyber security, digital forensics, and the future of money.

---

[4] https://www.amazon.com/Perfect-Passwords-Selection-Protection-Authentication/dp/1597490415.

[5] https://www.amazon.com/Security-Log-Management-Identifying-Patterns/dp/1597490423.

[6] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

44. For years, they communicated on various topics related to the internet and file sharing. For example, in 2007, they coauthored a paper on the mechanics of overwriting hard drive data.[7]

45. Around that time, they began to speak about ways to use peer-to-peer file sharing, infamously used by the Napster music sharing service, to solve some of the most difficult issues in cryptography.

46. In March 2008, just a few months before Satoshi's paper on the Bitcoin protocol was published, Craig wrote Dave an email stating: "I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin . . . [y]ou are always there for me Dave. I want you to be part of it all."[8]

47. After leaving his job in late 2008, Craig wrote to Dave: "I need your help. You edited my paper and now I need to have you aid me build this idea." (Ex. 1 at 30). For the next few months, Craig and Dave worked to get Bitcoin operational.

48. On January 12, 2009, Craig, Dave, and two others sent each other bitcoin transactions recorded on the blockchain. (Ex. 1 at 31).

---

[7] https://www.vidarholen.net/~vidar/overwriting_hard_drive_data.pdf.

[8] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

49. On Thanksgiving Day 2009, Dave told Ira he was creating "digital money" with a wealthy foreign man, i.e., Craig.

50. In April 2013, Dave was found dead in his home.  The scene of Kleiman's death was gruesome.  His body was decomposing, there were wheelchair tracks of blood and fecal matter, open bottles of alcohol, and a loaded handgun next to him.  A bullet hole in his mattress was found.  The exact details surrounding his death remain unknown.

51. After Dave's death, Craig posted an emotional video on Craig's YouTube channel.   In the video, Craig narrates footage from Dave's various TV appearances, growing increasingly emotional.   At the end, Craig concludes "I'm proud to say I knew Dave Kleiman . . . I'll miss you, Dave.  You were my friend, and I'll miss you."[9]

52. On December 8, 2015, two popular tech publications, *Wired* and *Gizmodo*, outed Craig as Satoshi.[10]  Both articles also articulated Dave's integral role in the development of Bitcoin.   They described numerous details and leaked communications  implicating  David  and  Craig's  roles  in  creating  and

---

[9] https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

[10] https://www.wired.com/2015/12/bitcoins-creator-satoshi-nakamoto-is-probably-this-unknown-australian-genius/;  https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

developing bitcoin; they also discussed their accumulation of a vast hoard of bitcoin.

53.  On May 2, 2016, nearly five months after the *Wired* and *Gizmodo* publications, Craig published a blog post in which he claimed to be Satoshi.[11]

54.  Craig has readily admitted Dave was intimately involved in the creation of Bitcoin.  In numerous interviews with Andrew O'Hagan, documented in *The Satoshi Affair*, Craig told O'Hagan that "[Craig] did the coding and that Kleiman helped him to write the white paper." (Ex. 1 at 30).

55.  From their collaboration in 2008 until Dave's death in 2013, Craig and Dave would go on to mine over a million of the initial bitcoins.

### W&K INFO DEFENSE AND RESEARCH LLC

56.  On February 14, 2011, over two years after the first bitcoins were mined, Dave formed W&K Info Defense Research LLC ("W&K") in Florida (company number: L11000019904).  The Articles of Incorporation for W&K list Dave as the sole member of the LLC.  (Ex. 2).  Dave was also listed as the registered agent for W&K and his home address was listed as its place of business.  (*Id.*)

---

[11]  https://qz.com/674129/an-australian-nobody-claims-to-be-the-inventor-of-bitcoin-but-no-one-knows-for-sure/ .

57. However, in an email to Ira on February 15, 2014, Craig represented that "Dave owned 50% of [W&K]." (Ex. 3). Craig did not identify in this email who owned the other half.

58. According to documents produced by Craig, W&K engaged in the business "known as Bitcoin mining and Software development / Research." (Ex. 4).

59. Craig identified certain R&D projects and the associated intellectual property owned by W&K. (Ex. 3).

60. On March 28, 2014, nearly a year after Dave died, W&K was reinstated by an individual named Uyen Nguyen ("Uyen"). (Ex. 5). Uyen removed Dave as the registered agent for W&K and listed herself. *Id.* Uyen added both herself and an entity named Dr. Coin-Exch Pty Ltd. as authorized persons for W&K.

61. On September 23, 2016, W&K was administratively dissolved by Uyen.[12]

### DAVE OWNED A SUBSTANTIAL AMOUNT OF BITCOIN

62. The exact number of bitcoins belonging to Dave's estate will be determined at trial. That said, various documents including private emails and transcripts from 2014 Australian Tax Office ("ATO") meetings with Craig, his counsel, and his accountant evidence Dave and Craig owned and controlled over 1,100,000 Bitcoins.

---

[12] https://www.flbusinessgo.com/gg?utm_term=L11000019904.

63. In a 2015 article, *Gizmodo* reported it had confirmed the authenticity of an email from Craig to Dave's other business partners stating that Dave *"had mined an enormous amount of bitcoins – an amount 'too large to email.'"* In the email, Craig asked Dave's business partners to secure Dave's hard drives and check for Bitcoin wallet files. He later stated he wasn't after the funds, and only wanted to ensure the bitcoins entered Dave's estate.[13]

64. Minutes from a February 26, 2014 meeting between the ATO and Craig's bookkeeper obtained by Gizmodo confirm that Dave owned a substantial amount of bitcoins. At the meeting, Craig's accountant, John Chescher, stated:

> Craig Wright had mined a lot of [b]itcoins . . . Craig had gotten approximately 1.1 million [b]itcoins. There was a point in time, when he had . . . around 10% of all the [b]itcoins out there.  Mr Kleiman would have had a similar amount.  However, Mr Kleiman passed away during that time. (Ex. 6 at 3).

65. Further, meeting minutes from a February 18, 2014 meeting between the ATO and Craig's bookkeeper also obtained by Gizmodo further reveal that Craig has let others understand that he took ownership of Dave's bitcoin.   The ATO investigator states:

> We thought yes, you've picked up some bitcoin ownership from the deceased director so we were trying to, you know, get the picture and connect all the dots. (Ex. 7 at 19).

---

[13]   https://www.gizmodo.com.au/2015/12/this-australian-says-he-and-his-dead-friend-invented-bitcoin/.

66. As reflected in the February 18, 2014 transcript, in the meeting, Craig's counsel

   states that the bitcoins W&K mined was held by Seychelles, Singapore, and UK

   trusts.  As Dave owned between 50% to 100% of W&K, *at least* half of the

   bitcoins transferred to the trusts belonged to Dave.

> In 2009 the mining of bitcoin commences *** 2011, bitcoin was
> transferred overseas. R and D then conducted in the US under –
> by a joint venture company formed as . . . effectively info defence
> research LOC. Bitcoin mining continues throughout 2011. The
> bitcoins are derived by companies in Singapore and the Seychelles
> or entities in Singapore and the Seychelles, and they're actually
> trusts. Trustee companies and trusts established - or trustee
> companies in the United Kingdom and other trusts established in
> the Seychelles. Further work was planned. In early April 2013
> unfortunately Dave . . . dies in the US towards the end of April
> 2013. (*Id.* at 6).

67. Years later, Craig admitted to Andrew O'hagan that "his and Kleiman's mining

   activity ha[d] led to a complicated trust." (Ex. 1 at 35).

68. In a 2012 email Craig forwarded to Ira, Craig wrote to Dave reaffirming the

   joint nature of the bitcoin held in trust (emphasis added):

> From: Craig Wright [mailto:craig@rcjbr.org]
> Sent: Wednesday, 10 October 2012 4:55 PM
> To: Dave Kleiman [mailto:dave@davekleiman.com]
> Subject: FW: IFIP-WG11.9 CFP
>
> We need to discuss the trsut [sic] and work out what the fuck *we*
> are doing with it all. So, a good tax deductible way to have a visit
> and also write a paper. (Ex. 7(a))

69. In fact, Craig consistently referred to the trust as both Craig and Dave's, for

   example in another email Craig forwarded to Ira (emphasis added):

17

From: Craig S Wright
To: dave@davekleiman.com
Subject: This week
Date: Tue, 22 May 2012 09:45:31 +1000

Dave,
A recycled rant. I have done the same to Ramona . . . The meeting
with the AAT should have occurred weeks ago, but the ATO
have stalled and put it off. John has all the materials and the ATO
are simply BS'ing again. It costs me money and in a way I guess
they want to get a result through attrition rather than honesty.
They will drain all I have if they can. **We do not touch the
trusts**. Not yet. Not even for this. ONE DAY, they will change
the world. Not millions, not billions. If I am right, they will be
trillions and let them try shit **on us** then. FUCKING DICKS.
Bloody lying ATO cock sucking bastards! They lost evidence
and use my temper against me. I hate their lies. I did everything
right and I am STILL punished. . . (Ex. 8).

70.   Finally, in a 2014 email exchange with Ira, Craig admitted that at least 300,000

of the 1,000,000+ bitcoins held in trust belong to David:

From: Ira K < ████████████████████ >
To: Craig S Wright <craig.wright@hotwirepe.com>
Subject: Bond villains
Date: Sat Mar 01 19:42:27 +0000 2014

Just to clarify on thoughts from previous email... In one of the
email exchanges between Dave and you, he mentioned that you
had 1 million Bitcoins in the trust and since you said he has
300,000 as his part. I was figuring the other 700,000 is yours.  Is
that correct?
Ira

---
From: Craig S Wright <craig.wright@hotwirepe.com>
To: Ira K < ████████████████████ >
Subject: Re: Bond villains

18

Date: Sat Mar 01 20:00:48 +0000 2014

Around that. Minus what was needed for the company's use
Sent from my HTC. (Ex. 9).

71. As discussed below in more detail, Craig provided fraudulent contracts to the
ATO in an attempt to substantiate his ownership of bitcoins and IP assets that
belonged to Dave. Their authenticity aside, however, these "contracts"
produced by Craig constitute his admission that Dave, Craig, and W&K
collectively owned hundreds of thousands of bitcoins.

72. For example, a 2011 contract produced by Craig includes a provision stating
W&K expected to mine new bitcoin at a rate of 12,000 bitcoins per month for
a period of over two years (312,000 bitcoin). (Ex.10).

73. Further, a 2012 contract produced by Craig lists Bitcoin wallets containing over
650,000 bitcoins. Next to the list of wallets and total bitcoin held, there is a
handwritten annotation stating: "*as agreed, all wallets to be held in UK in trust
until all regulatory issues solved and Group Company formed with Dave K and
CSW.*" (Ex. 11 at 8). This annotation is in Craig's handwriting.

74. A 2013 contract contains Craig's admission that W&K's "[o]wnership is 50%
in [Dave's] name and 50% in trust held for [Craig]." (Ex. 4 at 2). And that
W&K "is the owner and conducts the business known as Bitcoin mining and
Software development / Research." (*Id.*)

19

### AFTER DAVE'S DEATH, CRAIG FRAUDULENTLY CONVERTED THE BITCOIN AND IP THAT BELONGED TO DAVE

75. After Dave's death, Craig concocted a scheme to claim sole ownership of all bitcoins owned by Dave, to steal Dave's share of IP assets that belonged to Dave and Craig jointly through W&K.

76. To accomplish this scheme, he drafted and backdated at least three contracts to create a paper trail purporting to document that many of Dave's bitcoins and IP rights were to be transferred, sold, and/or returned to himself. Specifically, he fraudulently created:

   a. 2011 contract titled "Intellectual Property License Funding Agreement" (the "2011 IP Agreement") (Ex. 10);

   b. 2012 contract titled "Deed of Loan" (the "2012 Deed of Loan") (Ex. 10); and

   c. 2013 contract titled "Contract for the Sale of Shares of a Company Owning Business" (the "2013 W&K Sale Agreement") (Ex. 4).

77. On their face, these contracts strain credulity in a number of manners.

78. *First*, the electronic signatures that appear on these documents are substantially different than known examples of Dave's electronic and written signatures:

| Authentic Signatures 2/1/2013[14] & 7/30/2003[15] & 2/22/2012 | Signature on Fraudulent Contracts 4/22/2011 & 04/2/2013 |
|---|---|
| | |

79. In reality, this signature appears to be a near identical copy of a computer-generated font called Otto, available here:  https://www.wfonts.com/font/otto. When computer generated, this Otto font produces the signature:

Otto.ttf

---

[14] See Ex. 19 (signature on Computer Forensics LLC Operating Agreement).
[15] See Ex. 20 (signature on Dave's last will and testament).

80. When confronted with this information by Ira, Craig admitted the signature was computer generated, but claimed there were other ways to prove its veracity.

81. Craig has never provided additional evidence of their legitimacy.

82. *Second*, the fraudulent signatures aren't witnessed or notarized. Even the most un-sophisticated parties would understand that a contract purporting to release and transfer property valued at eight figures should be substantiated in some way with witnesses and/or notaries.

83. *Third,* the terms of the 2011 IP Agreement are nonsensical. While it purports to "finance" W&K through the transfer of around 215,000 bitcoin, and requires W&K to "fund the software development using bitcoin," there was essentially nothing that could be purchased with bitcoins at that time. Thus, no one could "finance" or "fund" anything with bitcoins then. This calls the 2013 Sales Contract's purported "release" of this nonsensical "financing arrangement" into question.

84. *Fourth,* the 2011 IP Agreement, the 2012 Deed of Loan, and the 2013 W&K Sale Agreement conflict with each other. The 2011 IP Agreement provides that Bitcoin wallet 1933***XYa8 would be held by Craig in escrow and revert to him if W&K defaulted, but the 2013 W&K Sale Agreement provides that it will be "released to" Craig despite satisfaction of the liability, and the 2012 Deed of

Loan shows the wallet being placed into a trust by Craig with a notation that it be held there until Dave and Craig can set up joint-companies later.

85. *Fifth*, the 2013 agreement references 250,000 bitcoin and then 250,500 bitcoin as the amount of bitcoin Dave was to transfer to Craig.

86. *Lastly*, many of the contractual terms are extremely convenient for Craig. For example, the 2011 IP Agreement provides for confidentiality even from family members, stipulates the value of 215,000 bitcoin at 40,000,000 (when it was really worth around ~$250,000), and includes a "typo" showing the date as 2013, and amending it by hand to 2011 (likely because it was written in 2013).

87. These internal red flags are rendered even more suspicious by the fact that the 2013 agreement was purportedly signed a mere 10 days after Dave left the VA hospital, and no more than three weeks before he died.

88. Craig has a documented history of backdating contracts and documents to suit his needs. In its 2015 audit of Coin-Exch, the ATO assessed tax liability and penalties against Craig for providing recklessly misleading tax information. Among other wrongs, the ATO found Craig had backdated numerous documents. (Ex. 12):

    a.    "Craig Wright, has admitted that he backdated these invoices";

    b.    "the court case was not finalised until 6 Nov 2013; after the deed date of 22 August 2013. That is, the licence agreement makes

specific reference to an event which had not yet occurred, raising questions as to its validity";

c.   "[Craig's trust] purports to have acquired the software . . . from Craig Wright, pursuant to a contract . . . which predates its existence and establishment as a trust.";

d.   "Craig Wright purports to have received a loan of 650,000 Bitcoin from the Seychelles Trust pursuant to a Deed of Loan entered into with the Trustee for the Seychelles Trust; a company called Design by Human Ltd (DBH). However, records show Craig Wright was only informed of the existence of this company on a date after the purported Deed of Loan was entered into.";

e.   "Furthermore, information obtained from Her Majesty's Revenue and Customs . . . suggests [Craig] backdated the Directorship of Uyen Nguyen and Dave Kleiman."

89.   In addition, during the February 18, 2014 interview with Craig by the ATO, Craig admitted that he backdated certain tax invoices. (Ex. 7). Further, Wired has written that Craig likely backdated numerous blog posts to further his claim of being Satoshi.[16]

---

[16] https://www.wired.com/2015/12/new-clues-suggest-satoshi-suspect-craig-wright-may-be-a-hoaxer/.

### CRAIG SECURES DEFAULT JUDGMENTS AGAINST W&K WITH FRAUDULENT CONTRACTS

90. In July and August 2013, Craig filed two claims in New South Wales Supreme Court against W&K for ~$28 million each. (Ex. 13).

91. In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research" and that this contract was "bonded against the intellectual property of [W&K]." (*Id.* at 2, 8). The pleadings alleged that "the contract stated that a breach would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]." (*Id.* at 3, 9). The complaints alleged that the IP at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties." (*Id.*)

92. These claims, submitted by Craig, are based on demonstrably false factual allegations.

93. The July 2013 claim alleges the existence of an October 27, 2008 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (*Id.* at 2). However, W&K did not exist in 2008.

94. Also, the July 2013 claim alleges:

> "[Craig] conducted four projects associated with the DHS (Dept. of Homeland Security USA) with [W&K] under contract:

25

     a.  BAA 11-02-TTA 01-0127-WP  TTA 01 - Software Assurance: Software Assurance through Economic Measures

     b.  BAS  11-02-TTA  05-0155-WP  TTA  05 - Secure  Resilient Systems and Networks

     c.  BAA 11-02-TTA 09-0049-WP TTA 09 - Cyber Economics

     d.  BAA 11-02-TTA 14-0025-WP TTA 14 - Software Assurance MarketPlace (SWAMP)." (*Id.* at 8-9).

95.  The July 2013 claim goes on to state that "these funds were rated as:

     a.  TTA 01    US$ 650,000

     b.  TTA 05    US$ 1,8000,000 (*sic*)

     c.  TTA 09    US$ 2,200,000

     d.  TTA 14    US$ 1,200,000." (*Id.* at 9).

96.  However, these statements were false.  The 2017 results of a Freedom of Information Act request by Ira to the DHS reveals that TTA 01, TTA 05, and TTA 09 were all denied by the DHS.  (Ex. 14).

97.  The August 2013 claim also contains a demonstrably false allegation, alleging the existence of a January 9, 2009 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (Ex. 2).  But again, W&K did not exist until 2011.

26

98. On August 28, 2013, a Consent Order was entered for the July 2013 claim by the Supreme Court of New South Wales. (Ex. 15).  The Order states it was "made by the court by consent." (*Id.* at 1).  In support of that "consent" the order purports to be signed by an "authorised officer" of W&K, a "J Wilson." (*Id.* at 2).  But J Wilson, whoever he is, was not authorized.  No public record for W&K identifies him as an individual with any capacity to act for W&K.

99. On November 6, 2013, a Judgment was entered for the August 2013 claim by the Supreme Court of New South Wales.  (Ex. 16).  In the decision, the Court "note[d] the agreement of the parties that [Craig] will accept the transfer of the intellectual property held by the plaintiff in full and final satisfaction of the judgment." (*Id.*).  However, as with the August judgment, there was never authorized consent to the judgment.

100. Further, W&K was never properly served with either the complaints or the judgments in these actions.

101. Thus, the contents of the claims submitted to the court are demonstrably false and Craig obtained both of these judgments by perpetuating a fraud on the New South Wales court.

102. To this day, Craig has used these fraudulently obtained judgments to assert ownership over the intellectual property assets developed by W&K.  For example, in the February 18, 2014 meeting with the ATO, Craig's attorney

represented to the ATO that "intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange ..... and so on." (Ex. 7 at 6). And later again stating: "Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire . . ." (*Id.* at 17).

103. Craig also used this judgment, supported by the fraudulent contracts between him and Dave, to claim millions in tax rebates for his other Australian based companies.

### CRAIG REACHES OUT TO IRA TO COVER UP THE FRAUD

104. Nearly ten months after Dave's death, on February 11, 2014, Craig reached out to Dave and Ira's 94 year old father Louis, and wrote:

> Date: Feb. 11, 2014
> From: Craig Wright <Craig.Wright@hotwirepe.com>
> To: Louis <██████████████████>
>
> Hello Louis,
>
> Your son Dave and I are two of the three key people behind Bitcoin . . .
>
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.

28

> Know also that Dave was a key part of an invention that will revolutionise the world . . .
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.
>
> I will let you know when I am in the USA.  (Ex. 17).

105. This was the first time anyone in Dave's family learned of either (1) his friendship with Craig or (2) the extent of his involvement in the creation of Bitcoin.

106. As Louis Kleiman was elderly, Ira took over the correspondence with Craig.

107. Craig told Ira that he was partners with Dave in W&K and that no one knew about the company.  He explained to Ira that the business was involved in Bitcoin mining and that it was quite successful.

108. Shortly after informing Ira about W&K, Craig told Ira that Craig and Dave were planning on starting a new company together called "Coin-Exch."  He explained to Ira that Dave's estate would receive shares in it.

109. On April 23, 2014, Craig wrote to Ira:

> Date: April 23, 2014 8:56pm
> From: Craig <craig@rcjbr.org>
> To: Ira <███████████████████>

The software Dave updated, and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level. This is all good under the law. Basically the GST (like a Vat) cancels as it is an international transfer

What company owns right now is:

- Software – incl source code and perpetual licenses valued at over $50 million.
- Intellectual Property, design, codes etc
- Research claims. (Ex. 18).

110. On April 15, 2014, an auditor from the Australian Taxation Office, reached out to Ira to inquire about his knowledge concerning the legal action Craig took against W&K. The auditor provided Ira copies of the 2011 IP Agreement and the 2013 W&K Sale Agreement.

111. On April 22, 2014, Ira wrote to Craig that after he had time to review the documents sent by the ATO, he "felt like there [were] questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value . . .".

112. On the same day, Ira wrote ". . . From [the] documents [I have] it appears clear to see a systematic transfer of assets out of W&K back to you . . . But you never mentioned any of the actions you were taking against W&K prior to contacting us."

113. Craig responded 11 minutes later "Dave died. I did the actions to make sure that the court signed off on what Dave and I planned."

114. To keep Ira from going public, Craig promised Ira that he could be paid out of what was owed to Dave's estate "based on what Dave and I had been arranging." He then told Ira "October [2014 would be] the first payment."

115. The payment never came. Craig blamed the delay on the ATO investigation and kept promising Ira he would see value when the investigation closed.

116. On October 9, 2015, Craig ceased responding to Ira's email correspondence. Shortly thereafter, *Gizmodo* and *Wired* published the articles outing Craig and Dave's involvement in the beginnings of Bitcoin.

117. Craig currently serves as Chief Scientist of a UK company called nChain in London, where he has filed hundreds of patents related to Bitcoin and blockchain technology through this entity.[17]

118. To date, Dave's estate has received none of the assets belonging to him as a result of Dave's early involvement in Bitcoin and bitcoin mining.

## CLAIMS FOR RELIEF

### COUNT I
### Conversion (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

119. Dave lawfully mined and possessed hundreds of thousands of bitcoins both individually and as a member of W&K.

---

[17] https://www.reuters.com/article/us-bitcoin-wright-fund-exclusive/exclusive-company-behind-bitcoin-creator-sold-to-private-investors-idUSKBN17F26V

120. Craig unlawfully and without permission converted this property from Dave's estate by exercising exclusive possession over the private keys necessary to own, move, or spend the bitcoins belonging to Dave.

121. While the exact number of bitcoins remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of at least 300,000 bitcoins. Further, Craig's admission that Ira owned 50% of W&K entitles Dave to possession of at least 550,055.5 Bitcoin. Finally, pursuant to the formation documents of W&K, Dave is the sole member of W&K and would therefore be entitled to possession of all 1,100,111 Bitcoin mined by W&K.

122. To Plaintiff's best knowledge, information, and belief, these bitcoins are worth approximately $10,236,532,855.00.

123. Ira has demanded Craig return these bitcoins, but Craig has not done so.

124. Further, Craig has, and continues to, exercise authority over Dave's bitcoins by claiming them as his own and moving them into other wallets.  Craig has therefore wrongfully deprived Dave's estate from the Bitcoins belonging to Dave.

125. Dave's estate is entitled to actual damages, amounting in either return of all bitcoins converted from Dave's possession or the fair market value of the bitcoin.

128. Dave made reasonable efforts to maintain the secrecy of these trade secrets. Outside of W&K's applications to the Department of Homeland Security, Dave made no other disclosures of the nature of these trade secrets to anyone but Craig.

129. As a proximate result of Craig's unlawful misappropriation, Dave's estate has suffered actual losses consisting of the loss in economic value associated with the trade secrets.

130. As a proximate result of Craig's unlawful misappropriation, Dave's estate is informed and believes that Craig has been unjustly enriched.

131. As a proximate result of Craig's unlawful and willful misappropriation, Dave's estate is entitled to a recovery of damages pursuant to Fla. Stat. § 688.004.

WHEREFORE, Plaintiff demands judgment against Defendant for all available damages caused by Craig's misappropriation, including exemplary damages, together with court costs, interest, attorney's fees pursuant to Fla. Stat. 688.005, and any other relief this Court deems just and proper.

## COUNT III
### Replevin (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

132. Dave lawfully mined and possessed a massive amount of bitcoins both individually and as a partner in W&K. These bitcoins belonged to David as evidenced by Craig's various admissions.

34

133. While the exact number of bitcoins remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of at least 300,000 bitcoins. Further, Craig's admission that Ira owned 50% of W&K entitles Dave to possession of at least 550,055.5 bitcoins. Finally, pursuant to the formation documents of WK, Dave is the sole member of W&K and would therefore be entitled to possession of all 1,100,111 Bitcoin mined by WK.[18]

134. To Plaintiff's best knowledge, information, and belief, these bitcoin are worth approximately $10,236,532,855.00.

135. To Plaintiff's best knowledge, information, and belief, these bitcoins, and the private keys associated with these bitcoins, are in Craig's exclusive possession.

136. These bitcoins are wrongfully detained by Craig.   Craig has maintained possession of these bitcoins by using the private keys he had access to and has since refused to return these assets to Dave's estate after Dave's death.   To Plaintiff's best knowledge, information, and belief, Craig detains the property because of its significant economic value.

137. These bitcoins have not been taken for any tax, assessment, or fine pursuant to law, nor under an execution or attachment against Plaintiff's property.

---

[18] Should discovery reveal additional bitcoin were mined, Plaintiff may amend this complaint to assert a claim over those as well.

WHEREFORE, Plaintiff demands judgment against Defendant for the return of the wrongfully withheld Bitcoin, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT IV
### Breach of Fiduciary Duty (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

138. As a Dave's partner in W&K, Craig owed fiduciary duties of care, loyalty and good faith to Dave by virtue of their joint venture.

139. Craig breached his fiduciary duty of loyalty and good faith, by, among other things, intentionally and wrongly transferring assets that belonged to Dave's estate out of W&K and to himself personally.

140. Dave's estate has been damaged by Craig's breach of his fiduciary duties.

WHEREFORE, Plaintiff demands judgment against Defendant for damages and/or return of the wrongfully taken bitcoins and IP, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT V
### Breach of Partnership Agreement (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

141. Pursuant to Fla. Stat. § 620.8202, Craig and Dave had a valid partnership through their bitcoin mining activities that were carried out with the intention of generating a profit.

142. Craig breached this partnership duties to Dave under Fla. Stat. § 620.8202 when he illegally transferred all bitcoin related assets to himself personally.

143. Pursuant to Fla. Stat. § 620.1704 Dave's estate is entitled to enforce the rights associate with his Partnership with Craig.

144. Pursuant to Fla. Stat. § 620.8405, Ira's estate is entitled to seek purchase of the partnership interest under Fla. Stat. § 620.8701.

WHEREFORE, Plaintiff demands judgment against Defendant for purchase of his partnership interest together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT VI
### Unjust Enrichment (against Craig)

Plaintiff incorporates paragraphs 1 to 118.

145. Dave mined over one million bitcoin into an account that Craig obtained access to and Dave developed IP that Craig obtained copies of.

146. Dave therefore conferred a substantial benefit upon Craig through his unauthorized use of the bitcoins and intellectual property belonging to Dave's estate.

147. Craig had knowledge of, retained, and accepted that benefit by, without Plaintiff's prior knowledge or consent, using and distributing his bitcoin and intellectual property that belonged to Dave's estate for his own economic benefit and trade purposes.

37

148. It would be inequitable to allow Craig to retain this benefit without paying the value of these bitcoin and IP.

WHEREFORE, Plaintiff demands judgment against Defendant for the value of the wrongfully retained Bitcoin and IP, together with court costs, interest, and any other relief this Court deems just and proper.

Plaintiff demands a trial by jury for all issues triable by right.

Dated: February 14, 2018

Respectfully submitted,

<div align="center">

**BOIES SCHILLER FLEXNER LLP**

</div>

By: */s/Velvel Devin Freedman*
Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.   (305)539-8400
Fax.   (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.   (914)749-8200
Fax.   (914)749-8300
Email: kroche@bsfllp.com
*pro hac vice pending*

Attorneys for Plaintiff
IRA KLEIMAN in his capacity as Personal
Representative of the Estate of Dave
Kleiman

Exhibit 1

# The Satoshi Affair

## Andrew O'Hagan on the many lives of Satoshi Nakamoto

**The Raid**

Ten men raided a house in Gordon, a north shore suburb of Sydney, at 1.30 p.m. on Wednesday, 9 December 2015. Some of the federal agents wore shirts that said 'Computer Forensics'; one carried a search warrant issued under the Australian Crimes Act 1914. They were looking for a man named Craig Steven Wright, who lived with his wife, Ramona, at 43 St Johns Avenue. The warrant was issued at the behest of the Australian Taxation Office. Wright, a computer scientist and businessman, headed a group of companies associated with cryptocurrency and online security. As one set of agents scoured his kitchen cupboards and emptied out his garage, another entered his main company headquarters at 32 Delhi Road in North Ryde. They were looking for 'originals or copies' of material held on hard drives and computers; they wanted bank statements, mobile phone records, research papers and photographs. The warrant listed dozens of companies whose papers were to be scrutinised, and 32 individuals, some with alternative names, or alternative spellings. The name 'Satoshi Nakamoto' appeared sixth from the bottom of the list.



*Craig Wright in the Oxford Circus office.*

Some of the neighbours say the Wrights were a little distant. She was friendly but he was weird – to one neighbour he was 'Cold-Shoulder Craig' – and their landlord wondered why they needed so much extra power: Wright had what appeared to be a whole room full of generators at the back of the property. This fed a rack of computers that he called his 'toys', but the real computer, on which he'd spent a lot of money, was nearly nine thousand miles away in Panama. He had already taken the computers away the day before the raid. A reporter had turned up at the house and Wright, alarmed, had phoned Stefan, the man advising them on what he and Ramona were calling 'the deal'. Stefan immediately moved Wright and his wife into

a luxury apartment at the Meriton World Tower in Sydney. They'd soon be moving to England anyway, and all parties agreed it was best to hide out for now.

At 32 Delhi Road, the palm trees were throwing summer shade onto the concrete walkways – 'Tailor Made Office Solutions', it said on a nearby billboard – and people were drinking coffee in Deli 32 on the ground floor. Wright's office on level five was painted red, and looked down on the Macquarie Park Cemetery, known as a place of calm for the living as much as the dead. No one was sure what to do when the police entered. The staff were gathered in the middle of the room and told by the officers not to go near their computers or use their phones. 'I tried to intervene,' one senior staff member, a Dane called Allan Pedersen, remarked later, 'and said we would have to call our lawyers.'

Ramona wasn't keen to tell her family what was happening. The reporters were sniffing at a strange story – a story too complicated for her to explain – so she just told everyone that damp in the Gordon house had forced them to move out. The place they moved into, a tall apartment building, was right in the city and Wright felt as if he was on holiday. On 9 December, after their first night in the new apartment, Wright woke up to the news that two articles, one on the technology site *Gizmodo*, the other in the tech magazine *Wired*, had come out overnight fingering him as the person behind the pseudonym Satoshi Nakamoto, who in 2008 published a white paper describing a 'peer-to-peer electronic cash system' – a technology Satoshi went on to develop as bitcoin. Reading the articles on his laptop, Wright knew his old life was over.

By this point, cameras and reporters were outside his former home and his office. They had long heard rumours, but the *Gizmodo* and *Wired* stories had sent the Australian media into a frenzy. It wasn't clear why the police and the articles had appeared on the same day. At about five that same afternoon, a receptionist called from the lobby of Wright's apartment building to say that the police had arrived. Ramona turned to Wright and told him to get the hell out. He looked at a desk in front of the window: there were two large laptop computers on it – they weighed a

few kilos each, with 64 gigabytes of RAM – and he grabbed the one that wasn't yet fully encrypted. He also took Ramona's phone, which wasn't encrypted either, and headed for the door. They were on the 63rd floor. It occurred to him that the police might be coming up in the elevator, so he went down to the 61st floor, where there were office suites and a swimming pool. He stood frozen for a minute before he realised he'd rushed out without his passport.

Ramona left the apartment shortly after Wright. She went straight down to the basement car park and was relieved to find the police weren't guarding the exits. She jumped into her car, a hire vehicle, and, in her panic, crashed into the exit barrier. But she didn't stop, and was soon on the motorway heading to north Sydney. She just wanted to be somewhere familiar where she would have time to think. She felt vulnerable without her phone, and decided to drive to a friend's and borrow his. She went to his workplace and took his phone, telling him she couldn't explain because she didn't want to get him involved.

Meanwhile, Wright was still standing beside the swimming pool in his suit, with a laptop in his arms. He heard people coming up the stairs, sped down the corridor and ducked into the gents. A bunch of teenagers were standing around but seemed not to notice him. He went to the furthest cubicle and deliberately kept the door unlocked. (He figured the police would just look for an engaged sign.) He was standing on top of the toilet when he heard the officers come in. They asked the youngsters what they were doing, but they said 'nothing' and the police left. Wright stayed in the cubicle for a few minutes, then went out and used his apartment keycard to hide in the service stairwell. Eventually, a call came from Ramona on her friend's phone. She was slightly horrified to discover he was still in the building and told him again to get out. He, too, had a rental car, and had the key in his pocket. He went down sixty flights of stairs to the car park in the basement, unlocked his car and opened the boot, where he lifted out the spare wheel and put his laptop in the wheel cavity. He drove towards the Harbour Bridge and got lost in the traffic.



*Craig Wright in 2016.*

As Ramona drove along she began texting the mysterious Stefan, who was at Sydney Airport, having already checked in for a flight to Manila, where he lived. Stefan had to make a fuss to get his bag removed from the plane and then he spoke to Ramona, telling her that Wright would have to get out of the country. She didn't argue. She called the Flight Centre and asked what flights were leaving. 'To where?' asked the saleswoman.

'Anywhere,' Ramona said. Within ten minutes she had booked her husband on a flight to Auckland.

In the early evening, Wright, scared and lost, made his way to Chatswood. He texted Ramona to come and meet him, and she immediately texted back saying he should go straight to the airport. She'd booked him a flight. 'But I don't have my passport,' he said. Ramona was afraid she'd be arrested if she returned to their apartment, but her friend said he'd go into the building and get the passport. They waited until the police left the building, then he went upstairs. A few minutes later he came back with the passport, along with the other computer and a power supply.

They met Wright in the airport car park. Ramona had never seen him so worried. 'I was shocked,' he later said. 'I hadn't expected to be outed like that in the media, and then to be chased down by the police. Normally, I'd be prepared. I'd have a bag packed.' As Ramona gave him the one-way ticket to Auckland, she was anxious about when she would see him again. Wright said New Zealand was a bit too close and wondered what to do about money. Ramona went to an ATM and gave him $600. He bought a yellow bag from the airport shop in which to store his computers. He had no clothes. 'It was awful saying goodbye to him,' Ramona said.

In the queue for security, he felt nervous about his computers. His flight was about to close when the security staff flagged him down. He was being taken to an interview room when an Indian man behind him started going berserk. It was just after the Paris bombings; the man's wife was wearing a sari and the security staff wanted to pat her down. The man objected. All the security staff ran over to deal with the situation and told Wright to go. He couldn't believe his luck. He put his head down and scurried through the lounge.

Back at Wright's office, Allan Pedersen was being interviewed by the police. He overheard one of them ask: 'Have we got Wright yet?'

'He's just hopped a flight to New Zealand,' his colleague said.

Wright was soon 30,000 feet above the Tasman Sea watching the programmer Thomas Anderson (Keanu Reeves) being chased by unknowable agents in *The*

*Matrix*. Wright found the storyline strangely comforting; it was good to know he wasn't alone.

At Auckland Airport, Wright kept his phone on flight mode, but turned it on to use the airport's wifi to Skype with Stefan, using a new account. They had a discussion about how to get him to Manila. There was a big rock concert that night in Auckland, and all the hotels were full, but he crossed town in a cab and managed to get a small room at the Hilton. He booked two nights, using cash. He knew how to get more cash out of ATMs than the daily limit, so he worked several machines near the hotel, withdrawing $5000. He ordered room service that night and the next morning went to the Billabong store in Queen Street to buy some clothes. He felt agitated, out of his element: normally he would wear a suit and tie – he enjoys the notion that he is too well dressed to be a geek – but he bought a T-shirt, a pair of jeans and some socks. On the way back to the hotel he got a bunch of SIM cards, so that his calls wouldn't be monitored. Back at the Hilton he was packing up his computers when the dependable Stefan came on Skype. He told Wright to go to the airport and pick up a ticket he'd left him for a flight to Manila. His picture was all over the papers, along with the story that he was trying to escape.

Within hours of Wright's name appearing in the press, anonymous messages threatened to reveal his 'actual history'. Some said he had been on Ashley Madison, the website that sets up extramarital affairs, others that he'd been seen on Grindr, the gay hook-up app. During a six-hour layover in Hong Kong, he killed his email accounts and tried to wipe his social media profile, which he knew would be heavy with information he wasn't keen to publicise: 'Mainly rants,' he said later. When he got to Manila airport, Stefan picked him up. They went to Stefan's apartment and the maid washed Wright's clothes while he set up his laptops on the dining-room table. They spent the rest of Saturday wiping his remaining social media profile. Stefan didn't want any contact to be possible: he wanted to cut Wright off from the world. The next day he put him on a plane to London.

**Mayfair**

Technology is constantly changing the lives of people who don't really understand it – we drive our cars, and care nothing for internal combustion – but now and then a story will break from that frontier. I was one of the people who had never heard of Satoshi Nakamoto or the blockchain – the invention underlying bitcoin, which verifies transactions without the need for any central authority – or that it is the biggest thing in computer science.  It was news to me that the banks were grabbing onto the blockchain as the foundation of a future 'internet of value'. The story of a mythical computer scientist was an odd one to come my way. I'm not much detained by thoughts of new computer paradigms. (I'm still getting the hang of the first one.) But to those who are much more invested in the world of tomorrow, the Satoshi story has the lineaments of a modern morality tale quite independent of stock realities. There are things, there are always things, that others assume are at the centre of the universe but don't make a scratch on your own sense of the everyday world. This story was like that for me, enclosing me in an enigma I couldn't have named. A documentary is a fashioned thing, of course, as fashioned as fiction in its own ways, but I had to overcome my own bafflement – as will you – to enter this world.

A few weeks before the raid on Craig Wright's house, when his name still hadn't ever been publicly associated with Satoshi Nakamoto, I got an email from a Los Angeles lawyer called Jimmy Nguyen, from the firm Davis Wright Tremaine (self-described as 'a one-stop shop for companies in entertainment, technology, advertising, sports and other industries'). Nguyen told me that they were looking to contract me to write the life of Satoshi Nakamoto. 'My client has acquired life story rights … from the true person behind the pseudonym Satoshi Nakamoto – the creator of the bitcoin protocol,' the lawyer wrote. 'The story will be [of] great interest to the public and we expect the book project will generate significant publicity and media coverage once Satoshi's true identity is revealed.'

Journalists, it turned out, had spent years looking for Nakamoto. His identity was one of the great mysteries of the internet, and a holy grail of investigative reporting, with writers who couldn't dig up evidence simply growing their own. For the *New*

*Yorker*'s Joshua Davis the need to find him seemed almost painful. 'Nakamoto himself was a cipher,' he wrote in October 2011:

> Before the debut of bitcoin, there was no record of any coder with that name. He used an email address and a website that were untraceable. In 2009 and 2010, he wrote hundreds of posts in flawless English, and though he invited other software developers to help him improve the code, and corresponded with them, he never revealed a personal detail. Then, in April 2011, he sent a note to a developer saying that he had 'moved on to other things'. He has not been heard from since.

Davis went on to examine Satoshi's writing quite closely and concluded that he used British spelling and was fond of the word 'bloody'. He then named a 23-year-old Trinity College Dublin graduate student, Michael Clear, who quickly denied it. The story went nowhere and Clear went back to his studies. Then Leah McGrath Goodman wrote a piece for *Newsweek* claiming Satoshi was a maths genius called Dorian Nakamoto, who lived in the Californian suburb of Temple City and didn't actually know, it turned out, how to pronounce bitcoin. When Goodman's article ran on the magazine's cover reporters from all over the world arrived on Dorian's doorstep. He said he would give an interview to the first person who would take him to lunch. It turned out that his hobby wasn't alternative currencies but model trains. Someone calling himself Satoshi Nakamoto, and using Satoshi's original email address, visited one of the forums Satoshi used to haunt and posted the message: 'I am not Dorian Nakamoto.'  Other commentators, including Nathaniel Popper of the *New York Times*, named Nick Szabo, a cool cryptocurrency nut and the inventor of Bit Gold, but he denied it profusely. *Forbes* believed it was Hal Finney, who, the blockchain irrefutably showed, was the first person in the world to be sent bitcoin by Satoshi. Finney, a native Californian, was an expert cryptographer whose involvement in the development of bitcoin was vital. He was diagnosed with motor neurone disease in 2009 and died in 2014. It came to seem that the holy grail would remain out of reach. 'Many in the bitcoin community … in deference to the bitcoin creator's clear desire for privacy … didn't want to see the wizard unmasked,' Popper wrote in the *New York Times*. 'But even among those who said this, few could resist debating the clues the founder left behind.'

The 'Stefan' who was hovering during the raid on Craig Wright's house and office is Stefan Matthews, an IT expert whom Wright had known for ten years, since they both worked for the online gambling site Centrebet. In those days, around 2007, Wright was often hired as a security analyst by such firms, deploying his skills as a

Case 9:18-cv-80176-BB-XXXX Document 1-3 Entered on FLSD Docket 03/25/2018 Page 52 of 308

computer scientist (and his experience as a hacker) to make life difficult for fraudsters. Wright was an eccentric guy, Stefan Matthews remembered, but known to be a reliable freelancer. Matthews said that Wright had given him a document to look at in 2008 written by someone called Satoshi Nakamoto, but Matthews had been busy at the time and didn't read it for a while. He said that Wright was always trying to get him interested in this new venture called bitcoin. He tried to sell him 50,000 coin for next to nothing, but Matthews wasn't interested, he told me, because Wright was weird and the whole thing seemed a bit cranky. A few years later, however, Matthews realised that the document he had been shown was, in fact, an original draft of the by now famous white paper by Satoshi Nakamoto. (Like the governments they despise, bitcoiners deal – when it comes to ideas – in 'white papers', as if they were issuing laws.) Last year, when Wright was in financial trouble, he approached Matthews several times. By that time, Matthews had become friendly with Robert MacGregor, the founder and CEO of a Canada-based money-transfer firm called nTrust. Matthews encouraged MacGregor to come to Australia and assess Wright's value as an investment opportunity. Wright had founded a number of businesses that were in trouble and he was deeply embedded in a dispute with the ATO. Nevertheless, Matthews told MacGregor, Wright was almost certainly the man behind bitcoin.

Matthews argued that since Satoshi's disappearance in 2011, Wright had been working on new applications of the blockchain technology he had invented as Satoshi. He was, in other words, using the technology underlying bitcoin to create new versions of the formula that could, at a stroke, replace the systems of bookkeeping and registration and centralised authority that banks and governments depend on. Wright and his people were preparing dozens of patents, and each invention, in a specific way, looked to rework financial, social, legal or medical services, expanding on the basic idea of the 'distributed public ledger' that constitutes the blockchain. This is utopian thinking, even by normal geek standards,

but it's a hot topic in computer science and banking at the moment, and hundreds of millions of dollars are being invested in such ideas. Thus: Matthews's proposal.

After initial scepticism, and in spite of a slight aversion to Wright's manner, MacGregor was persuaded, and struck a deal with Wright, signed on 29 June 2015. MacGregor says he felt sure that Wright was bitcoin's legendary missing father, and he told me it was his idea, later in the drafting of the deal, to insist that Satoshi's 'life rights' be included as part of the agreement. Wright's companies were so deep in debt that the deal appeared to him like a rescue plan, so he agreed to everything, without, it seems, really examining what he would have to do. Within a few months, according to evidence later given to me by Matthews and MacGregor, the deal would cost MacGregor's company $15 million. 'That's right,' Matthews said in February this year. 'When we signed the deal, $1.5 million was given to Wright's lawyers. But my main job was to set up an engagement with the new lawyers … and transfer Wright's intellectual property to nCrypt' – a newly formed subsidiary of nTrust. 'The deal had the following components: clear the outstanding debts that were preventing Wright's business from getting back on its feet, and work with the new lawyers on getting the agreements in place for the transfer of any non-corporate intellectual property, and work with the lawyers to get Craig's story rights.' From that point on, the 'Satoshi revelation' would be part of the deal. 'It was the cornerstone of the commercialisation plan,' Matthews said, 'with about ten million sunk into the Australian debts and setting up in London.'

The plan was always clear to the men behind nCrypt. They would bring Wright to London and set up a research and development centre for him, with around thirty staff working under him. They would complete the work on his inventions and patent applications – he appeared to have hundreds of them – and the whole lot would be sold as the work of Satoshi Nakamoto, who would be unmasked as part of the project. Once packaged, Matthews and MacGregor planned to sell the intellectual property for upwards of a billion dollars. MacGregor later told me he was speaking

to Google and Uber, as well as to a number of Swiss banks. 'The plan was to package it all up and sell it,' Matthews told me. 'The plan was never to operate it.'






*Clockwise from top left: Hal Finney, Gavin Andresen, Robert MacGregor, Stefan Matthews*

*

Since the time I worked with Julian Assange, my computers have been hacked several times. It isn't unusual for me to find that material has been wiped, and I was careful to make sure the lawyer's approach wasn't part of a sting operation. But I was curious to see what these men had. I assumed MacGregor – or someone behind him – must be the 'client' referred to in the email I had received from California. On Thursday, 12 November, I turned up at MacGregor's office near Oxford Circus, where I signed in under a pseudonym and made my way to a boardroom wallpapered with mathematical formulae. MacGregor came into the room wearing a tailored jacket and jeans, with a blue-edged pocket square in his breast pocket, a scarf and brown brogue boots. He was 47 but looked about 29. There was something studied about him – the Alexander McQueen scarf, the lawyerly punctilio – and I'd never met anyone who spoke so easily about such large

sums of money. When I asked him the point of the whole exercise he said it was simple: 'Buy in, sell out, make some zeroes.'

MacGregor described Wright to me as 'the goose that lays the golden egg'. He said that if I agreed to take part I would have exclusive access to the whole story, and to everyone around Wright, and that it would all end with Wright proving he was Satoshi by using cryptographic keys that only Satoshi had access to, those associated with the very first blocks in the blockchain. MacGregor told me this might happen at a public TED talk. He said it would be 'game over'. Wright's patents would then be sold and Wright could get on with his life, out of the public eye. 'All he wants is peace to get on with his work,' MacGregor told me at that first meeting. 'And how this ends, for me, is with Craig working for, say, Google, with a research staff of four hundred.'

I told MacGregor that there would have to be a process of verification. We talked about money, and negotiated a little, but after several meetings I decided I wouldn't accept any. I would write the story as I had every other story under my name, by observing and interviewing, taking notes and making recordings, and sifting the evidence. 'It should be warts and all,' MacGregor said. He said it several times, but I was never sure he understood what it meant. This was a changing story, and I was the only one keeping account of the changes. MacGregor and his co-workers were already convinced Wright was Satoshi, and they behaved, to my mind, as if that claim was the end of the story, rather than the beginning.

I don't mean to imply anything sinister. The company was excited by the project and so was I. Very quickly we were working hand in hand: I reserved judgment (and independence) but I was very caught up in the thought of the story unfolding as planned. At this point, nobody knew who Craig Wright was, but he appeared, from the initial evidence, to have a better claim to being Satoshi Nakamoto than anyone else had. He seemed to have the technical ability. He also had the right social history, and the timeline worked. The big proof was up ahead, and how could it not be spectacular? I went slowly forward with the project, and said no to everything

that would hamper my independence. This would become an issue later on with MacGregor and Matthews, or the men in black, as I'd taken to calling them, but for those first few months, nobody asked me to sign anything and nobody refused me access. Mysteries would open up, and some would remain, but there seemed no mystery about the fact that these people were confident that a supremely important thing was happening and that the entire process should be witnessed and recorded. My emails to MacGregor took it for granted that what would be good for my story, in terms of securing proof, would also be good for his deal, and that seemed perfectly true. Yet I feel bad that I didn't warn him of the possibility that this might not be what happened, that my story wouldn't die if the deal died, that human interest doesn't stop at success.

It was at this point, four weeks after my first meeting with MacGregor, that *Wired* and *Gizmodo* reported that he might be Satoshi. The news unleashed a tsunami of responses from the cryptocurrency community, and most of it was bad for Wright's credibility. Had he left artificial footprints to suggest his involvement with bitcoin had been earlier than it was? Had he exaggerated the number and nature of the degrees he'd accumulated from various universities? Why did the company that supplied the supercomputer he claimed to have bought with amassed bitcoin say it had never heard of him?

'The smell,' as one commentator said, 'was a mile high.' The nCrypt people were unfazed by this mudslinging, believing that every one of the charges made against Wright could be easily disproved. Wright produced an impressive paper showing that his 'footprint' wasn't faked and that the 'cryptographic' evidence against him was bogus (people continue to argue on this point). He produced a letter from the supercomputer supplier acknowledging the order. Charles Sturt University provided a photocopy of his staff card, proving he had lectured there, and Wright sent me a copy of the thesis he'd submitted for a doctorate his critics claim he doesn't have.

\*

I had arrived five minutes early at 28-50 Degrees, a wine bar and restaurant in Mayfair. It was just before 1 p.m. on 16 December and the lunchtime crowd, men in blue suits and white shirts, were eating oysters and baby back ribs and drinking high-end wine by the glass. A jeroboam of Graham's ten-year-old tawny port stood on the bar, and I was inspecting it when MacGregor arrived with Mr and Mrs Smith. That's what he'd been calling them in his emails to me. Craig Wright, 45 years old, wearing a white shirt under a black jacket, a pair of blue chinos, a belt with a large Armani buckle and very green socks, wasn't the kind of guy who seems comfortable in a swish restaurant. He sat across from me and lowered his head and at first he let MacGregor do the talking. Ramona was very friendly, chatting about their time in London as if they were a couple of holidaymakers who'd just blown into Mayfair. She wasn't drinking, but the rest of us ordered a glass of Malbec each. When Wright lifted his head to laugh at something, I noticed he had a nice smile but uneven teeth, and a scar that climbed from the top of his nose to the area just above his left eyebrow. He hadn't shaved since he'd left Sydney.

Wright told me he was rubbish at small talk. He too wanted what I wrote to be 'warts and all'; he felt he was being misunderstood by everybody, and normally that wouldn't bother him but he had to consider the respectability of his work, and his family's rights. He appeared to ponder this for a moment, then he told me his old neighbours at the house in Gordon hadn't been friendly.

'They barely even knew your name,' Ramona said.

'They do now,' he replied.

I found him easier to talk to than I'd expected. He said his father had worked for the NSA (he couldn't explain this), but that, to this day, his mother thinks he worked for Nasa. 'The few people I care about I care about a lot,' he said, 'and I care about the state of the world. But there's not much in between.' He said he was happy I was writing about him because he wanted 'to step into history', but mainly because he wanted to tell the story of the brilliant people he had collaborated with. He and

Ramona were both jet-lagged and anxious about things back home. 'We should have been having our company's Christmas party today,' Ramona said.

MacGregor asked Wright if being a libertarian had influenced his work, or if the work had turned him into a libertarian. 'I was always libertarian,' he replied, and then he told me his father had more or less kidnapped him after his parents got divorced. He hated being told what to do – that was one of his main motivations. He believed in freedom, and in what freedom would come to mean, and he said his work would guarantee a future in which privacy was protected. 'Where we are,' he said, 'is a place where people can be private and part of that privacy is to be someone other than who they were. Computing will allow you to start again, if you want to. And that is freedom.' In fact he never stopped imagining different lives for himself. That afternoon he seemed preoccupied by the case people were making against his being Satoshi. He shook his head a lot and said he wished he could just get on in silence with his work. 'If you want to stay sane through this, ignore Reddit,' his wife told him.

The next day, 17 December, we met again, in a private room in Claridge's. You could see outside, over the rooftops, cranes garlanded in fairy lights. Ramona came in looking tired and totally fed up. From time to time, especially when exhausted, she would resent the hold these people had over them. 'We have sold our souls,' she said to me in a quiet moment.

MacGregor said he would spend the evening preparing paperwork to be signed by Wright the following day. This would effectively be the final signing over to nCrypt of the intellectual property held by Wright's companies. This was the main plank in the deal. MacGregor was confident the work was 'world historical', that it would change the way we lived. He regularly described the blockchain as the greatest invention since the internet. He said that what the internet had done for communication, the blockchain would do for value.

MacGregor explained that Wright's Australian companies were being signed over to nCrypt and that he'd extended an 'olive branch' to the ATO, which had responded quickly and positively. A lot of trouble with the ATO had to do with whether bitcoin was a commodity or a currency and how it should be taxed. It also had doubts about whether Wright's companies had done as much research and development as they claimed, and whether they were therefore entitled to the tax rebates they had applied for. The ATO had said it couldn't see where the spending was going. Some critics in the media claimed Wright's companies had been set up only for the purpose of claiming rebates, though not even the ATO went that far.

Wright told me that thanks to the tax office they'd had to lay out all the research for their patents, which had been useful since the nCrypt team was in a hurry: the banks, now alert to cryptocurrencies and the effectiveness of the blockchain, are rushing to create their own versions. At that moment, Bank of America was patenting ten ideas for which Craig and his team told me they had a claim to 'prior art'. Governments spent a long time denying the value of bitcoin – seeing it as unstable, or the currency of criminals – but now they celebrate the potential of the technology behind it.

'They're behaving like children,' Wright said of the ATO.

MacGregor looked at his watch. He straightened his cuffs. 'I see this as a pivotal moment in history … It's like being able to go back in time and watch Bill Gates in the garage.' He turned to Wright. 'You released this thing into the wild. Some people got it right and some people got it wrong. But you've got a vision of where it's going next and next and next.'

'None of this would have worked without bitcoin,' Wright said, 'but it's a wheel and I want to build a car.'

Ramona looked depressed. She was worried that her husband, as the person claiming to have invented bitcoin, might be held liable for the actions of those who'd

used the currency for nefarious purposes. 'He didn't issue a currency,' MacGregor assured her. 'This is just technology – it is not money.' Ramona was still anxious. 'We're talking about legal risk … I'm giving you the legal answer,' MacGregor said. 'I would stake my career on the fact that the creation of bitcoin is not a prosecutable event.'

Right to the end, the Wrights would express worries about things Craig did as a young computer forensics worker. Much of his professional past looked questionable, but in the meeting room at Claridge's he simply batted the past away. 'It's what you're doing now that matters. I'm not perfect. I never will be … All these different people arguing about what Satoshi should be at the moment, it's crazy.'

**Ninjutsu**

Wright's father, Frederick Page Wright, was a forward scout in Vietnam, serving with the 8th Battalion of the Australian army. 'He lost all his friends,' Wright told me, 'every single one of them' – and before long he was drinking and being violent towards Wright's mother, who eventually left him. Both Wright and his mother, when I went to meet her in Brisbane in March, told me about his father's anger at his own mother: he sent all his army pay cheques home to her and she spent them while he was away. He also dreamed of a football career that never happened. 'I have a chip on my shoulder,' Wright said, 'but his was bigger.'

'Did you admire him?'

'He never admired me. I was never fucking good enough. We played chess from when I was three or four and if I made a wrong move he'd wallop me. We clashed right from the beginning.'

The boy had two great influences. The first was his grandfather Ronald Lyman, who his family claims received the first degree awarded by the Marconi School of Wireless in Australia, and who served in the army as a signals officer. They also say he later became a spy with the Australian security services. Craig's favourite place

Case 9:18-cv-80176-BB XXXX Document 1-3 Entered on FLSD Docket 03/25/2018 Page 12 of 36

was his grandfather's basement, a paradise of early computing. 'We'd sit there and look at these books of log tables,' he told me. 'I loved doing it.' Captain Lyman had an old terminal and a Hayes 80-103A modem that they used to connect to the University of Melbourne's network. To keep Craig quiet while he worked, Pop, as the children called him, would let him write code. 'I found this community of hackers,' Wright says, 'and I worked out how to interact with them. I started building games and hacking other people's games. In time, I'd be pulling apart hacker code, and eventually I did this for companies, to help them create defences against hackers.'

His mother told me he was sometimes picked on at school. 'He struggled,' she said, 'but after a while I sent him to Padua College' – a private Catholic college in Brisbane – 'and he shone there. I mean, he was different. He used to dress up and he had an obsession with Japanese culture. He had big samurai swords.'

'As a teenager?'

'Dressed up in samurai clothes, with the odd wooden shoes and everything. Making all the noises. His sisters would complain about him embarrassing them: "We're down the park, we've got friends down there, and he's walking around with webbed feet." He used to have this group of nerdy friends in the 1980s: they'd come around in horn-rimmed glasses and play Dungeons & Dragons for hours.'

He had a karate teacher called Mas who moved him quickly from karate through judo to Ninjutsu. Craig broke his knuckles over and over again and 'became stronger', he told me, because 'the pain led to a "me" that could handle more.' The thing that attracted him most to martial arts was the discipline. Learning to become a ninja involves 18 disciplines, including *bōjutsu* (tactics), *hensōjutsu* (disguise and impersonation), *intonjutsu* (escape and concealment) and *shinobi-iri* (stealth and infiltration). He walked home from his lessons feeling stronger, like another self.

When he was 18, Wright joined the air force. 'They locked me in a bunker,' he told me, 'and I worked on a bombing system. Smart bombs. We needed fast code, and I did that.' When he was in his twenties a melanoma appeared on his back and he had several skin grafts. 'This was after he got out of the air force,' his mother told me, 'and when he recovered he was off to university, and it's been degrees, degrees, degrees since then.' He went to the University of Queensland to study computer systems engineering. And over the following 25 years he would finish, or not finish, or finish and not do the graduation paperwork for degrees in digital forensics, nuclear physics, theology, management, network security, international commercial law and statistics. After our first full interview, he went home to work on an assignment for a new course he was taking at the University of London, a masters in quantitative finance.

Over the months I spent with him, I noticed that he loved the idea of heroism and was strongly attracted to creation myths. One of the first things he emailed me was a copy of one of his dissertations, 'Gnarled Roots of a Creation Mythos'. I noticed it was dedicated to Mas, his martial arts instructor. The text wasn't merely an argument for self-invention, but a feminist exegesis that railed against patriarchal views of the Fall. Wright also speaks of the pilgrim-visitor in the 'world garden'. 'While in the garden, the pilgrim almost inevitably suffers deception. His or her senses, enchanted by illusory and transitory formal appearances, betray his or her soul and lead to sin.'

Wright said he had never expected the myth of Satoshi to gather such force. 'We were all used to using pseudonyms,' he told me. 'That's the cypherpunk way. Now people want Satoshi to come down from the mountain like a messiah. I am not *that*. And we didn't mean to set up a myth that way.' Satoshi was loved by bitcoin fans for making a beautiful thing and then disappearing. They don't want Satoshi to be wrong or contradictory, boastful or short-tempered, and they don't really want him to be a 45-year-old Australian called Craig.

While reading Wright's ideas on creation, I kept thinking of his karate teacher and the position he had in the young man's life. An offhand remark Wright made had stayed with me. It was about storytelling and how a possible meaning of freedom might reside not only in martial arts, in the ability to defend oneself, but in the ability to make oneself. Mas 'taught me a lot of Eastern philosophy and gave me the means to become myself', Wright said. One day Mas told him about Tominaga Nakamoto. 'He was a Japanese merchant philosopher,' Wright told me. 'I read translations of his stuff, material from the 1740s.'

Weeks later, I was in the kitchen of the house Wright was renting in London drinking tea with him when I noticed a book on the worktop called *Visions of Virtue in Tokugawa Japan.*I'd done some mugging up by then and was keen to nail the name thing.

'So that's where you say you got the Nakamoto part?' I asked. 'From the 18th-century iconoclast who criticised all the beliefs of his time?'

'Yes.'

'What about Satoshi?'

'It means "ash",' he said. 'The philosophy of Nakamoto is the neutral central path in trade. Our current system needs to be burned down and remade. That is what cryptocurrency does – it is the phoenix …'

'So *satoshi* is the ash from which the phoenix …'

'Yes. And Ash is also the name of a silly Pokémon character. The guy with Pikachu.' Wright smiled. 'In Japan the name of Ash is Satoshi,' he said.

'So, basically, you named the father of bitcoin after Pikachu's chum?'

Case 9:18-cv-80176-BB XD Document 1-3 Entered on FLSD Docket 07/25/2018 Page 64 of 308

'Yes,' he said. 'That'll annoy the buggery out of a few people.' This was something he often said, as if annoying people was an art.

Wright's generation, now in their mid to late forties, are seeing a world that enlarges on their teenage kicks. For Wright, as for Jeff Bezos, the rules of how to shop and how to think and how to live are extrapolations of dreams they had sitting in a box room somewhere. 'The person who experiences greatness must have a feeling for the myth he is in,' Frank Herbert wrote in *Dune*, Wright's favourite novel as a teenager. '*Dune* was really about people,' Wright told me. 'It was about the idea that we don't want to leave things to machines and [should instead] develop as humans. But I see things a little differently from Mr Herbert. I see that it's not one or the other – man or machines – it's a symbiosis and a way of becoming something different together.' This kind of cyberpunk energy – as opposed to cypherpunk, which came later – delivered Wright's generation of would-be computer scientists into the brightness of the future.

After getting his first degree, Wright settled into IT roles in a number of companies. He became a well-known 'go-to guy' among startups and security firms: he always solved the problem and they always came back for more. 'When I've characterised Craig to colleagues and friends,' Rob Jenkins, who worked with Wright in this period and now holds a senior position in Australia's Westpac Bank, told me, 'I've always described him as the most qualified person I've ever known. I've worked with other smart people but Craig has such a strong desire to pursue knowledge. He has passion. And bitcoin was just another one of those bright things he was talking about.'

'Sketch it out for me,' I said to Wright. 'Those years before bitcoin. What was happening that would later have an influence? I want to know about all the precursors, all the previous attempts to solve the problem.'

'Back in 1997 there was Tim May's BlackNet …' May was a crypto-anarchist, who had been operating and agitating in the cypherpunk community since the mid-1980s. 'Computer technology is on the verge of providing the ability for individuals and groups to communicate and interact with each other in a totally anonymous manner,' he wrote in the *Crypto-Anarchist Manifesto in 1988*. BlackNet

operated like a precursor to WikiLeaks, soliciting secret information with payments made by untraceable, digital money.

'We all have a narcissistic hubris,' Wright told me. He wanted to take May's BlackNet idea further. He was also enthusiastic, in those early days, about Hashcash and B-money. The idea behind Hashcash, a 'proof of work' algorithm where each of a group of computers performs a small task that can be instantly verified (thus making life impossible for spammers, who depend on multiple emails going out with little to no work involved), was 'totally necessary for the building of bitcoin'. Wright said that he spoke to Adam Back, who proposed Hashcash in 1997, 'a few times in 2008, whilst setting up the first trials of the bitcoin protocol'.

B-Money was invented by a man called Wei Dai. At the time of its creation, Wei wrote a paper which assumed 'the existence of an untraceable network, where senders and receivers are identified only by digital pseudonyms (public keys) and every message is signed by its sender and encrypted to its receiver.' The public key, or address, is matched, as John Lanchester handily described it in the *LRB*, to 'a private key which provides access to that address'. A key is really just a string of numbers and digits: the public key demonstrates ownership of any given address; the private key can only be used by the owner of that address. Wei went on to suggest a system for the exchange and transfer of money. 'Anyone can create money by broadcasting the solution to a previously unsolved computational problem,' he wrote. The system had methods for rewarding work and keeping users honest. 'I admired B-Money,' Wright told me, 'and he definitely gave me some of the cryptographic code that ended up in the first version of bitcoin.' Wright was always careful to give credit to those early developers. 'Wei was very helpful,' he went on, but 'to people like that bitcoin seems a bit of a fudge. It works, but it's not mathematically elegant.'

'Wei said that?'

'Wei was very polite. But others said it: Adam Back, Nick Szabo. They would probably like to find a more elegant solution to the problem. Perhaps they see the mining system in bitcoin as wasteful: there's wasted computation in my system –

Case 9:18-cv-80176-BB Document 91-3 Entered on FLSD Docket 03/25/2018 Page 66 of 308

machines which are trying to solve problems and not winning. But that's like society.'

'Are these early cryptocurrency people in a state of rivalry?'

'Yes, but it doesn't matter.'

**Kleiman**

The flat in Marylebone where I interviewed Wright had wooden shutters and modern ornaments and pictures, mainly of crows. I set the flat up for work while Craig and Ramona were in the City signing over his intellectual property, and all his companies, to MacGregor. They arrived at the flat a couple of hours late. 'When did you realise the whole Satoshi thing wasn't going to be a secret for ever?' I asked.

'Very recently,' Wright said. 'I didn't really believe it would need to come out. What we believed is that we could leave it in doubt – we wouldn't have to sign using the Satoshi keys or anything else. We have hundreds of patents and papers in progress – research from the beginning – and in the next year we're going to start releasing them. We thought people could suspect and people could query and we could leave it like that.'

'And how did that change?'

Ramona said a single word: 'Rob.'

The days in St Christopher Place were almost languorous. We would bring coffee back to the flat and spread out, and I'd try to build a picture of how he did what he said he did. We put up whiteboards and he bamboozled me with maths. Sometimes he would write at the board for hours, then tear open books and point to theories and proofs. I talked to the scientists he worked with, many of whom were better explainers than he was. One of the things I noticed was that Wright hated claiming outright to be Satoshi and would spend hours giving credit to everyone who had

ever contributed. It was odd: we were in the room because he was coming out as Satoshi, yet the claim embarrassed him and I have many hours of tape in which he deflects it. I felt this unwillingness supported his claim because it showed a proper regard for the communal nature of the work. He was contradictory enough sometimes to enjoy the limelight and actively court it, and this would cause trouble for him, but the idea of speaking directly as Satoshi seemed to fill him with dread. 'I'm afraid that they're just going to look at my papers because I've got Satoshi after my name,' he told me. 'I've got my little Satoshi mask on, and people go "Aren't you wonderful?" because you were Satoshi. I wanted the doubt. When I released future papers, I wanted people to go: "Oh, fuck, he could be, and these papers are so good he might be."'

Dave Kleiman was to become the most important person in Wright's professional life, the man he says helped him do Satoshi's work. They met online: they visited the same cryptography forums and had interacted since 2003. Both men were interested in cyber security, digital forensics and the future of money, but Kleiman was a boy's boy, an army veteran who loved contact sports and fast living. Five foot ten and weighing 200 pounds, he lived in Riviera Beach, Florida, and from 1986 to 1990 he was an army helicopter technician. When I looked into Kleiman's life, I discovered he had also done computer forensics work for Homeland Security and the army. After active service he became a deputy in the Palm Beach County sheriff's office. A motorcycle crash in 1995, when he was 28, left him in a wheelchair. Kleiman was a drug user and one source told me he was heavily into online gambling and various illicit activities; there is evidence he was associated with Silk Road, the online marketplace for all things illegal. After the accident he devoted himself to computers, and set up a company called Computer Forensics LLC.

Until Napster (the brainchild of a teenager called Shawn Fanning) came along in 1999, enabling users to share music files across the internet without a central server, the phrase 'peer-to-peer sharing' was familiar only to the early internet's true believers.  Napster, with its user-friendly interface, brought file-sharing to the

masses. The old model of copyright and revenue generation became obsolete overnight: people stopped buying CDs; young people got music through the internet for free. The music industry had to reinvent itself or die. Wright told me that his earliest conversations with Kleiman were about file-sharing. In 2007 they wrote a study guide together on hacking. 'I used to fire ideas off him,' Wright said. 'I'm pretty good at maths but I'm not very good at people.' Kleiman, he said, could put up with his temper, which not everybody could. They began to speak of ways to use the Napster idea in other areas and solve some old problems in cryptography. Wright never, I have to say, made it fully clear how they had collaborated on building bitcoin. I kept returning to the subject, and my doubts would flare up when he failed to be explicit.

'Give me a sense of how the idea of Satoshi formed,' I said.

'I guess,' Wright replied, 'the initial idea was having a pseudonymous head that wouldn't be cut off.'

'More your idea than his?'

'Probably mine.'

'And was there a point you realised you needed a figurehead?' I asked.

'We needed people to respond to us,' he said. 'But I didn't really want people to respond to me. There are a couple of reasons for that. I don't think I would really have sold the idea to anyone. If I'd come out originally as Satoshi without Dave, I don't think it would have gone anywhere. I've had too many conversations with people who get annoyed because it's me.'

'The blockchain came about as an idea of a ledger,' he said. 'But there were a number of problems that needed to be solved. It needed to be distributed, but how do you make sure people don't collude – it may seem awful but you don't put trust in people, you incentivise people to act. And you incentivise people to act by giving them the opportunity to earn something. It's as Adam Smith says: it's not through the goodness of the heart, it's not the baker caring about you, it's not the butcher

caring about you, it's them caring about their own families. Together, as he put it, the invisible hand controls the way society works.'

I asked him to explain the distributed ledger in layman's terms and he went into an algorithmic paroxysm of verbal ingenuity. Ignoring all that, a distributed ledger is a database that is shared between multiple users, with every contributor to the network having their own identical copy of the database. Any and all additions or alterations to the ledger are mirrored in every copy as soon as they're made. No central authority is in charge of it, but no entry on it can be disputed. Adam Smith's point about 'incentive' is embedded in the way bitcoin works: people do not just buy coins or use them; they 'mine' them. Miners use their computers to solve increasingly difficult mathematical problems, the reward for the solving of which can be paid in bitcoin. This keeps the currency honest and, ideally, stops it from being dominated by any single entity.

I had brought rolls of disposable whiteboard and stuck it up around the flat, and, while we were speaking, he would jump up and cover the walls in formulae, along with arrows, arcs and curves. His wife told me she sometimes goes into the shower room and finds him standing there, stark naked, writing on the steamed glass. 'Was there a primary person doing the maths?' I asked.

'Me,' he said. 'Dave wasn't really a mathematician. What he did was make me simplify it.'

'How did he know how to make you simplify it?'

'We got to a point in the writing of the Satoshi white paper where it was … People say that it was hard.'

'He wanted you to bring the language down a little bit?'

'A lot. It's very simple. The elliptical curve stuff is not described in the paper at all, it's just there. The crypto stuff isn't described either.' I asked him to show me the

trail of ideas that led to their collaboration. 'So all these things are there,' he said, pointing to a 337-page thesis on his computer called 'The Quantification of Information Systems Risk', which he had recently submitted in partial fulfilment of a philosophy doctorate at Charles Sturt University. 'Application to audits, how you analyse failures, deriving the mathematics behind it, simplifying the mathematics and there you go … The core of the bitcoin paper is a Poisson model based on binomial distribution. That's how it got solved.'

In 2008 it was a 'hodgepodge', he said. I asked him if he felt the development of bitcoin was, at some level, a response to the financial crisis. 'It was already in process. I saw [the crisis] coming though. It was a kind of perfect storm. During that year, I spoke to Wei Dai. So between him and Hal Finney there were a lot of really good ideas about making money work … [Finney] was the one who actually took what I said seriously. He received the first bitcoin.'

Craig started turning up to our interviews in a three-piece suit. His suits were unfashionable and his ties even more so – 1970s-style yellow, sometimes paisley – and he would ramble on a range of subjects. On his own subject, he could be brilliant, but he was wayward: he would side-track, miss the point and never come back to it. He was nothing like people imagine the mythical Satoshi to be – in fact, he was Satoshi's comic opposite. He told stories against himself that weren't really against himself. He was obsessed with his opponents' views but had no skill at providing a straight answer to their questions. 'I'm an arsehole,' he said many times, as if saying so were a major concession. But he wasn't really, he was actually pretty nice. He was arrogant about maths and computing, which wasn't so surprising. He also had a habit of dissembling, of now and then lying about small things in a way that cast shade on larger things. At one point, I asked him to send me an email from the original Satoshi account.

'Can you do that?' I asked.

'Yes,' he said. 'But I'd need Rob's permission.' When I asked MacGregor he said that was absurd. He simply didn't want to – or couldn't – give too much away, and that was unfortunate in someone who'd agreed to sit down every day with a writer. He seemed to have full knowledge of that email account, in a way that made it seem unquestionably his. But somehow, it offended his sense of personal power to prove it. At first, I thought he was a man in existential crisis, like the hero of Bellow's *Dangling Man*, brilliant but antisocial, waiting to be drafted. But as the months passed I began to think of him more as a Russian 'superfluous' man of the 1850s, a romantic hero out of Turgenev, constantly held back from self-realisation by some blinding secret, showing himself not by action but in speech. Wright talked all day and he scribbled on the board and he called me his friend. He cried and he shouted and he unloaded his childhood and spoke about his father. He claimed to be Satoshi and he spoke Satoshi's thoughts and described what he did and gave an account of what people misunderstood about his invention and where bitcoin needed to go now. I moved to an office in Piccadilly – it was like something out of John le Carré, all those rooftops and fluttering Union Jacks – and we continued to do interviews. He talked without cease, without direction, and continued to find it difficult to land near the spot where my question was marked on the ground. When I asked to see the emails between him and Kleiman, he shrugged. He said he wasn't getting on well with his first wife when he wrote them and I assumed that meant they were full of talk about her. 'Just edit them down for me,' I said.

'I don't know if I can find them,' he said. But I wouldn't let it go and eventually he sent me a selection and they certainly seem to be authentic. A few of the emails were obviously the same as those quoted in the *Wired* and *Gizmodo* stories before Christmas. Wright always said these stories had been provoked by a 'leak', the work of a disgruntled employee of his who had stolen a hard drive. In any case, the emails he sent me show a pair of men with shadowy habits – socially undernourished men, I'd say, with a high degree of intellectual ability – operating in a world where the line between inventing and scamming is not always clear. The first email Wright sent me was from 27 November 2007, when he was working for

the Sydney accountancy firm BDO Kendalls and the two men were working on a paper on 'Cookies in Internet Banking'. 'Next year Dave, we come out with something big. I will tell you, but not now,' he wrote to Kleiman on 22 December 2007. Kleiman's reply told him what he was reading – 'Sagan, Feynman, Einstein' – and added: 'I hope we make an event together this year so we can "break some bread" and have a casual conversation, instead of the brain dump middle of the night email exchanges we normally have.' On 1 January 2008, Wright closed an email: 'Nothing now, but I want your help on something big soon.'

The subject of bitcoin came up – quite starkly – in an email from Wright dated 12 March 2008. 'I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, bitcoin … you are always there for me Dave. I want you to be part of it all. I cannot release it as me. GMX, vistomail and Tor. I need your help and I need a version of me to make this work that is better than me.' Wright told me that he did the coding and that Kleiman helped him to write the white paper and make the language 'serene'. With a protocol as clever as the one underlying bitcoin, you would imagine the work was complex and endlessly discussed. But Wright says they mainly talked about it by direct message and by phone. Wright had been fired from his job at BDO (the crash was taking effect) and had retired with his then wife, Lynn, and many computers to a farm in Port Macquarie. It was there, Wright says, that he did the majority of the work on bitcoin and where he spoke to Kleiman most regularly. The Satoshi white paper, 'Bitcoin: A Peer-to-Peer Electronic Cash System', was published on a cryptography mailing list on 31 October 2008.

On 27 December 2008, Wright wrote to Kleiman: 'My wife will not be happy, but I am not going back to work. I need time to get my idea going … The presentation was good and the paper is out. I am already getting shit from people and attacks on what we did. The bloody bastards are wrong and I friken showed it, they should stick to the science and piss off with their politicised crap. I need your help. You edited my paper and now I need to have you aid me build this idea.' Wright told me

that it took several attempts to get the protocol up and running. He began to test it early in January 2009. 'That was where the real money started rolling in,' he told me. The originating block in the blockchain – the file that provably records every transaction ever made – is called the Genesis block. 'There were actually a few versions of the Genesis block,' Wright told me. 'It fucked up a few times and we reviewed it a few times. The Genesis block is the one that didn't crash.' There from the beginning was Hal Finney, who would receive the first bitcoin transaction, on block 9. This was a key moment for the new cryptocurrency: block 9 for ever shows that Satoshi sent Finney ten bitcoin on 12 January 2009 – it is the first outgoing transaction we know to have come from Satoshi. Satoshi also sent four other transactions on the same day. I asked Wright who the recipients were – who the four addresses belonged to. 'Hal, Dave, myself,' he replied. 'And another I cannot name as I have no right to do so.' Wright told me that around this time he was in correspondence with Wei Dai, with Gavin Andresen, who would go on to lead the development of bitcoin, and Mike Hearn, a Google engineer who had ideas about the direction bitcoin should take. Yet when I asked for copies of the emails between Satoshi and these men he said they had been wiped when he was running from the ATO. It seemed odd, and still does, that some emails were lost while others were not. I think he believed it would be more interesting to play hide and seek than to be a man with a knowable past.

Wright's emails to Kleiman suggest that by this point he was starting to mine the million or so bitcoins that are said to be owned by Satoshi Nakamoto. 'I have a few potential clients in gaming and banking,' he wrote to Kleiman. 'I figure I can work ten to 15 hours a week and pretend to have a consultancy and use this to build and buy the machines I need. If I automate the code and monitoring, I can double the productivity and still offer more than others are doing … The racks are in place in Bagnoo and Lisarow. I figure we can have 100 cores a month setup and get to around 500.' Kleiman replied the same day to affirm their vows.

'Craig, you always know I am there for you. You changed the paradigm that was held for over a decade and destroyed the work of a couple [*sic*] academics. Do you really think they will just take this happily? I know you will not, but try not to take the comments to heart. Let the paper speak for itself. Next time you need to get me a copy of the conference proceedings as well. You know it is not easy for me to travel.' A picture emerges of an ailing Kleiman sitting at his computer day and night in his small ranch-style house in Riviera Beach, Florida. After writing this last email, he spent a frighteningly long period in hospital. The two men agreed to meet up at a conference in Florida on 11 March 2009 and Kleiman wrote expressing his excitement at the prospect of a few beers with Wright. Craig and Lynn stayed at Disney's Coronado Springs Resort Hotel and Kleiman drove there in his customised van, rolling into the bar with a big smile: Kleiman was the brother and drinking buddy and like-minded computer nerd Wright had never had. Not even Lynn had a clue what they were talking about.

During my visit to Australia I met Lynn in Chatswood, on Sydney's north shore, a busy commercial district that heaves with eager shoppers on a Saturday morning. She had met Wright on the internet while she was working as the nursing manager of the ICU in a military hospital in Ottawa. She told me Wright asked her to marry him about six weeks after they met online. When she eventually went to Sydney to visit him, he brought a ring to the airport. 'He was 26 and I was 44,' she said. Neither of them had been married before.

'He was very mature for 26,' Lynn told me. 'He always has to be the best. And the hard part about that is he left bodies by the wayside. He stepped on people.' She began working for him – 'he was the geek and I was the gofer' – and he got a lot of work in information security, working for the Australian Securities Exchange, and Centrebet, which is where he first got to know Stefan Matthews. Wright told me he was afraid some of the things he did for those online betting companies would come back to bite him, if and when he was outed as Satoshi. Other sources told me that he and Kleiman had had some involvement with illegal gambling. 'I knew Dave

Kleiman and he were working together,' Lynn told me, 'and I remember them saying that digital money was the way of the future. I've never said this to anybody, but I knew he was working on it and I didn't ask, because I knew he would bite my head off if I didn't understand it. He's got a very sociopathic personality.'

Lynn said her husband had admired Kleiman. And she admired him too: 'He loved life,' she said, 'and he had a brilliant mind, like Craig, but he had a gentler soul.' She remembered the Orlando conference. 'We stayed in a hotel that looked like a giant cartoon,' she told me. 'We met in one of the bars. He was a young guy, in his thirties or early forties, brown hair and moustache, average-looking. And boy, he loved to have a good time. It might have been his birthday. I went into the Disney store and bought some hats – Craig had Pluto, and Dave had one in the shape of a giant birthday cake.' Wright stepped out of himself for Kleiman: 'I'd never seen him like that with anybody. It was like, "I wanna grow up to be just like him." Dave softened Craig. A lot of what they wrote together was in his voice. I'd never seen Craig react like that to anybody. When he felt unsure of himself he went and talked to Dave. I think he wanted to be like Dave, but he knew he couldn't be.'

'In terms of having that kind of temperament?'

'Yeah. Dave was good for him. It made him realise that life doesn't go your way all of the time.'

I asked her if she thought he was a flawed person. 'Yes,' she said. 'He's starting to realise it. He knows he's done well in his work but he hasn't done well as a human being.' She stared into her cup. 'When we were at the farm,' she said, 'I was interested in finding four-leaf clovers. I would never find any, but Craig would just step out of the house and find three.'

In mid-2011 Satoshi suddenly disappeared from view. Apart from one or two emails denouncing fake Satoshis, he wasn't heard from again. Control of the network alert key is said to have been passed at this time to Andresen – possession of this key

makes its holder the closest thing bitcoin has to a chief. Wright sent Kleiman an email on 10 September 2011: 'It is recorded. I cannot do the Satoshi bit any more. They no longer listen. I am better as a myth. Back to my lectures and rants that everyone ignores as me. I hate this Dave, my pseudonym is more popular than I can ever hope to be.'

For some reason – possibly fear of the ATO – Wright set up a trust fund called the Tulip Trust in June 2011, and asked Kleiman to sign an agreement stating that he, Kleiman, would hold 1,100,111 bitcoin (then valued at £100,000, currently worth around $800 million). For clarity: there is no evidence that Kleiman ever took custody of that amount. However, there was a separate agreement that Kleiman would receive 350,000 bitcoin and this transaction was made. 'All bitcoin will be returned to Dr right on 1 January 2020,' it says in the trust document.

> No record of this arrangement will be made public at any time … Dr Wright MAY request a loan of bitcoin for the following reasons (and no others): Furthering research into peer to peer systems … commercial activities that enhance the value and position of bitcoin. In all events, all transactions in loaned funds will be concluded outside of Australia and the USA until and unless a clear and acceptable path to the recognition of bitcoin as currency has occurred … I lastly acknowledge that I will not divulge the identity of the Key with ID C941FE6D nor of the origins of the satoshin@gmx.com email.

Kleiman signed it. 'I think you are mad and this is risky,' he wrote in an email to Wright on 24 June 2011, perhaps spying a possible illegality. 'But I believe in what we are trying to do.' Wright meanwhile seemed to get more and more frustrated. He both wanted fame and repudiated it, craving the recognition he felt was his due while claiming his only wish was to get back to his desk. 'I have people who love my secret identity and hate me,' he wrote to Kleiman on 23 October that year. 'I have hundreds of papers. Satoshi has one. Nothing, just one bloody paper and I cannot associate myself with ME! I am tired of all these dicks Dave. Tired of academic attacks. Tired of tax fuckwits. Tired of having to do shenanigans like moving stuff overseas IN CASE it works.'

I came to feel that there were secrets between Wright and Kleiman that might never be revealed. Wright usually clammed up when asked about Kleiman and money. One day, in a fit of high spirits, he showed me a piece of software he said that US Homeland Security had ripped off from him and Kleiman. He smiled when I asked if they'd done government security work. The first thing most people ask about when you mention Satoshi is his alleged hoard of bitcoin: he invented the thing, and created the Genesis block, and mined bitcoin from the start, so where was Wright's money and where was Kleiman's? The emails, when I got them, seemed to clear this up slightly, but, during many dozens of hours of conversation with Wright, he never properly told me how many bitcoin he mined. I was aware – and he knew I was aware, because I told him several times – that he wasn't giving me a full account of everything that had occurred between him and Kleiman. He said it was complicated.

Somewhat more helpful are minutes taken during a meeting between the ATO and representatives from Wright's Australian companies in Sydney on 26 February 2014. According to the minutes, Wright's representative John Cheshire went into detail about the financial collaboration between Wright and Kleiman. This was a story that Wright, for some reason, didn't want to tell me. Cheshire said that Wright and Kleiman had set up a company called W&K Info Defense LLC (W&K), 'an entity created for the purpose of mining bitcoins'. Some of these bitcoins were put into a Seychelles trust and some into one in Singapore. Wright, according to Cheshire, 'had gotten approximately 1.1 million bitcoins. There was a point in time when he had around 10 per cent of all the bitcoins out there. Mr Kleiman would have had a similar amount.'

I asked Wright about this and he told me it was true that his and Kleiman's mining activity had led to a complicated trust. The trust question was persistently vague: not only how many trusts but the names of the trustees, and the dates of their formation. The only consistent thing is the amount of bitcoin Wright is said to have had at one time, 1.1 million. He said that his bitcoin could not now be moved without

the agreement of the (several) trustees. He also said that Kleiman had been given 350,000 bitcoin but had not moved them. He kept them on a personal hard drive.

Wright also set up a shell company in the UK. 'I know what you want and I know how impatient you can be,' Kleiman wrote on 10 December 2012, 'but really, we need to do this right. If you fail you can start again. That is the real beauty of what you have.' It's possible Kleiman was referring to their ability to mine bitcoins and then squirrel them away. But he was evidently worried about Wright's ability to cope with all the flak, and about Wright's kamikaze attitude to the tax authorities. 'I love you like a brother Craig,' he added, 'but you are a really difficult person to be close to. You need people. Stop pushing them away. You have over one million bitcoin now in the trust. Start doing something for yourself and this family you have.'

Around this time, an 18-year-old IT enthusiast called Uyen Nguyen began working with them. Very quickly, Kleiman made her a co-director of their company and she later became a powerful figure in the trust. It's unclear how such a young and inexperienced person came to have so much influence. Wright told me she was 'volatile, capricious and beyond control' and added that Kleiman liked young women and that she was loyal and trusted – but that 'she wants to help and this always leads to trouble.' While I was preparing this story, Wright began to seem worried about Nguyen. I always felt he was in the middle of a very complicated lie when he talked about her. '**My way of lying**,' he told me one day, 'is to let you believe something. If you stop questioning and then you go off, and I don't correct you – that's my lie.'

Towards the end of 2012, Dave began to fail. 'Paraplegics get sick a lot,' Lynn Wright had told me, speaking as a nurse. 'The bedsores get bad and they can't fight infections. Dave was in and out of hospital a lot and I don't know what his life was really like.' Wright told me that Kleiman had girlfriends, but admitted he didn't really know much about his life. Like Wright and his first wife, they had met in a chatroom. They met in the flesh no more than half a dozen times. Kleiman seems to have lived in front of his computer day and night, and the sicker he got the more isolated he

seemed to be. Just after 6 p.m. on 27 April 2013 he was found dead by a friend who'd been trying to contact him for several days. He was sitting in his wheelchair and leaning to the left with his head resting on his hand. Lying next to him on the bed was a 0.45 calibre semi-automatic handgun, a bottle of whisky and a loaded magazine of bullets. In the mattress a few feet from where he sat, a bullet hole was found, but Kleiman had died from coronary heart disease. There were prescription medicines in his bloodstream and a modest amount of cocaine.

'We never really thought that "we made Satoshi,"' Wright told me once. 'It was good. It was done. It was cool. But I don't think we realised how big it would be.'

'There was no conversation between you about how it was going over? That Satoshi was becoming a guru?'

'We thought it was funny.'

Wright paused, shook his head, and broke down. 'I loved Dave,' he said. 'I would have seen him more. I would have talked to him more. I would've made sure he had some fucking money to go to a decent hospital. I don't think he had the right to choose not to tell me.'

'What was happening to him?'

'Neither of us had any money, physical money. We had money in Liberty, an exchange in Costa Rica, but the Americans closed it down as a money-laundering operation. Dave had a number of bitcoins on the hard drive he carried with him. Probably about 350,000.'

'Hoping it would …'

'As I said, it wasn't worth that much then. Dave died a week before the value went up by 25 times.' Wright kept wiping his eyes and shaking his head. He emphasised something he said the commentators never understood: for a long time, bitcoin

wasn't worth anything, and they constantly needed money to keep the whole operation going. They feared that dumping their bitcoin hoard would have flooded the market and devalued the currency. One of the things Wright and Kleiman had in common is that they had a problem turning their ideas into cash and were always being chased by creditors. Kleiman died feeling like a failure. No one in his family has the passwords to release the bitcoins on his computer. After he died, his family didn't open probate on his estate because they believed it had no value. Kleiman's supposed personal bitcoin holdings are worth $260 million at today's prices.

**The London Office**

In January this year, on a rainy London afternoon, Wright took me to see the large office that was being set up for him as part of the deal with nCrypt. It hadn't taken long for the world to forget that they'd once thought Wright was Satoshi. One or two of the media organisations that had 'outed' him in December had taken down the original articles from their websites, stung by the cries of fraud. After only a few days' interest in the notion, most people had made up their minds that Wright had nothing to do with Satoshi. Wright – under strict advisement – had said nothing in response to the media reports accusing him of perpetrating a hoax, but when we were alone, which was most of the time, he would launch into point-by-point rebuttals of what his critics had been saying. In the end he would shrug, as if the most obscure things were actually obvious.

The press coverage of Wright and Wright himself had something in common: they succeeded in making him seem less plausible than he actually was, and, to me, that is a general truth about computer geeks. They are content to know what they know and not to explain it. They will answer a straightforward slur with an algorithm, or fail to claim credit for something big then spend all night trying to claim credit for something small. Many of the accusations of lying that were thrown at Wright last December were thrown by other coders. And that's what they're like – see Reddit, or any of the bitcoin forums. Much of what these people do they do in the dark, beyond scrutiny, and, just as it's against their nature to incriminate themselves, it is

equally unnatural for them, even under pressure, to de-incriminate themselves. They just shrug.

Coders call one another liars, when all they really mean is that they disagree about how software should work. During the time I was working with Wright in secret, I would text my colleague John Lanchester, who I knew I could trust to keep the secret but also to understand what was at stake in the story. 'Imagine a situation,' I wrote to John, 'where novelists were strangely invested in denying the plausibility of each other's books. There's no "proof" as such that one is right and the other is wrong, but they could argue fiercely and accuse each other of all sorts of things while not really settling the problem.'

'Edmund Wilson says somewhere that the reason poets dislike each other's books is because they seem wrong, false – a kind of lie,' John replied. 'If you were telling the truth you would be writing the same poems as me.'

So the world that Wright knew best thought he was a liar. And the day we visited his new offices he seemed resigned to the fact. Much later, he told me that these months were the high-point of his career in computer science: he was working in secret on material that seemed to be coming together beautifully and profitably. It irked him that people called him a fraud and it irked him, just as much, that his deal with nCrypt would require him to prove that he was Satoshi. He hated being accused of being a fraud *and* he hated having to prove that he wasn't a fraud. Having it both ways is a life, a life that requires a certain courage as well as shamelessness, and Wright was living his double life to the hilt.

Wright introduced me to Allan Pedersen, who'd been his project manager in Sydney. We were in the Workshop – a floor above MacGregor's office near Oxford Circus – standing at a glass workbench beside a whiteboard covered in writing. The opposite wall was stencilled with a quote from Henry Ford: 'Whether you think you can or think you can't, you are right.' Pedersen told me he had been brought over to direct a group preparing an initial batch of 32 patent applications, to be completed

by April. (This was in January.) Beyond that there were 'upwards of four hundred patents', ideas to do with using the blockchain to set up contracts that would come into action on specified dates years ahead, or using the blockchain to allow cars to tell their owners when they needed petrol and to debit the cost when they refuelled. At this point, and for several minutes afterwards, Wright spoke of himself in the third person. 'Craig has been given a big kick up the bum,' he said, 'because Craig, instead of doing tons of research and sticking it on a shelf, has to complete it and turn it into something.'

'How do you organise him?' I asked Pedersen.

'I'm the organised type,' he said. 'When Craig comes into the office he's always in the middle of a sentence. And I'm trying to work out what this sentence is and manage things around what he's saying. I'm sort of grounding his latest thoughts, placing them in what we're trying to do. I'm the glue between Craig and the developers.'

It had become obvious, mainly from things Wright himself had said, that he often found it difficult to get on with people who worked for him. He got rattled when they said things couldn't be done, or were too conventional in their thinking, or too stupid, as he saw it. Ramona told me that 40 per cent of his staff in Sydney had been in a state of rebellion. 'I'm an arsehole,' Craig said to me once again, 'and I know that.' Pedersen had the job of keeping things cool with the developers, whose job it was to turn Wright's ideas into a form in which they could be patented and eventually licensed. 'I'm making sure the ideas get executed,' he said. 'Craig's not that interested in that part. He's always moving on.'

'Craig's great at research,' Wright said, 'but his development and commercialisation sucks. I build it, and then it works, and then I walk off.'

'You're losing interest?'

'I've lost interest. I've proved it, and off I go.'

'It's getting easier,' Pedersen said, with a smile. 'It was quite complex in the beginning.' Wright had strong views about how the technology should develop, and how it could 'scale' to meet greater demand. 'It can go to any size,' Wright said that day. I've tested up to 340 gigabyte blocks, which is hundreds of thousands of times greater than it is now. It's every stock exchange, it's every registry rolled into one … Ultimately bitcoin is a 1980s program, because that's what I was trained in … The idea is good, the code is robust, it runs and does the job, but it's slow and cumbersome. There were some things early on that needed to be fixed and were, but it wasn't as perfect as everyone thinks. At the end of the day, it needs to be turned into professional code. It needs to move away from the home user network and into a server network environment. And then it can do much more and be faster.' There are those who feel it should remain small, and that making it bigger is a betrayal of its first principles.

'This is the future of the blockchain,' Pedersen said.

'People are saying, "It's not really something we can run yet,"' Wright said, 'but it's time that we grew up and that bitcoin becomes professional.'

Pedersen shook his head. 'We're not working in a world where we know exactly what we're doing,' he said. 'It's coming from Craig. And then I start establishing the ground rules and we begin rolling it out. I'm putting people on a certain track and I keep going back to Craig, saying, "We need to sort this or that out," and I'm constantly keeping them and him in the loop. The good thing about Craig is that he wants me to task him, so it's a very strange relationship we've got. I'm reporting to him but I'm tasking him at the same time and it seems to work beautifully.' He was tired, and so was the whole team, but they felt confident the patent applications would be filed on time.

When Craig left the room to take a phone call, Pedersen took pains to close the door properly. 'He's a really nice person,' he said, 'but he's a fucking nightmare. Every single morning he comes in and I think, "What is he talking about?"' Pedersen told me how he handled him, how he made him focus, and how he worked hard to keep him on track. 'When I've got new people here,' he said, and there were many new people, 'I have to train them how to talk to Craig. That's what I have to do. Sometimes, he can't explain things and this is where the anger comes from. It's the interesting part. You can't be in the same room with him. He's constantly telling you something. He's like Steve Jobs, you know – only worse.'

As we made our way to the new office – it was a building site that day, but would be up and running four weeks later – Wright presented himself as a man who was ready for anything. In a pinstripe suit and ruby tie, he looked like a hellbent 1980s bond dealer, except the cypherpunk glint in the eye suggested he was getting away with something. He wasn't the king of all he surveyed, he was the joker, and, crossing Oxford Street, he joked that he might be Moses. The traffic parted and he made his way to the promised land, a brand new suite of offices down a side street.

*

Pedersen had come along. 'This is how it works in this company,' he said. 'You're sitting in Vancouver in October' – Vancouver is where nTrust, the parent company, is based – 'and suddenly Rob MacGregor says: "We need these thirty-odd patents by April and when can you go to London?"' The hurry for the patents was to help with the giant sale to Google or whomever. The men behind the deal were very keen to beat other blockchain developers to the punch, especially the R3 consortium of banks and financial institutions which late last year started spending a fortune trying to deploy the technology. We were accompanied by a young Irish woman who had been put in charge of designing the new office. MacGregor's firm had invested millions in Wright. The new company, nCrypt, had pretty much been built around him, and its offices showed it. He was to have the enormous corner office with a view all the way along Oxford Street. MacGregor clearly believed in

Wright, however obnoxious he could be, but I never understood why he wasn't interrogating his uncertainties before spending his money. He was a lawyer, but he put trust in front of diligence, which is unusual in someone so intelligent. MacGregor never, incidentally, used the words 'off the record' with me – only once, later on, did he imply it, when he said something and then said he'd deny saying it if I quoted him – and he was a generous source of information. At no point, however, did he tell me where the money for this project was coming from.

The designer was waving a colour swatch. 'We've gone for a kind of Scandi look,' she said.

'This place will work,' Wright said, striding through the open space, 'mainly when it comes to protecting me from myself.' Amid the hammering and drilling, Wright stood in an office about 20 feet by 20 feet, with floor to ceiling windows and a view down into the heart of Soho.

'You remember J.R. Ewing in *Dallas*?' I asked.

Wright laughed. What he most enjoyed, he said, was that all this was going on in secret while the world outside had written him off as a mug and a fantasist. 'If Satoshi has to come out, he'll come out in style.' He turned back to the designer to tell her how the frosted glass should work in the meeting room. 'We do a lot of work on whiteboards,' he said. He pursed his lips, then smiled. 'Will the interactive whiteboards be set up so that I can contact the guys in Sydney?'

We spent an hour at the new office. 'And they say *nothing is going on*,' Wright said as we stepped back into the elevator. 'It's all a *figment of our imagination*. I'm not Satoshi, and none of this is real.' Out on the street again, he told me he had all the money he would ever need. 'And I'll have the monkeys off my back for ever and just get on with the one thing I'm good at, not business, not managing people, but doing research and honouring this thing we made.' Wright was enjoying himself, but nCrypt was already, as MacGregor told me repeatedly, negotiating the sale of the

whole package to the highest bidder: 'Buy in, sell out, make some zeroes,' as he had said, and he'd always been honest about that goal. Wright wasn't facing up to this. The next time I visited his corner office it was finished and decked out with claret-red leather armchairs and sofas flown in from Sydney. It looked, as I'd joked earlier, like the office of a Texan oil magnate. A host of management certificates were framed on the wall next to a signed photograph of Muhammad Ali.

I told Pedersen I thought Wright was struggling with the fine print of the deal – coming out. 'He's sold his soul,' Pedersen said. 'That's how simple this is. And the combination of Craig and Ramona is dangerous here. They can't just sign all these [legal] papers and think it's going to be all right, that they'll sort something out. It doesn't work that way. They now have to go to the end and live with it. But they're doing it on first class. When this Satoshi thing comes out I can see a lot of bad things happening, and they are not geared up for this, any of them.'

'I'm concerned for him,' I said.

'There's not really a happy ending here,' Pedersen said.

'Was it the same in Australia?'

'It was the exact same,' he said, 'except in Australia you could say he was in control. He's learned absolutely nothing. He's now in this box, he can't move, he can't do anything, and this box is getting smaller and smaller.'

'Do you think he wants to be outed as Satoshi?'

'Yes I do. It's in in his personality. He wants to be recognised. He says too much. After two weeks of working with him, I knew.'

'He and Ramona tell me they had a pact never to come out.'

'My feeling is that she doesn't want him to come out, but he does. He's been pushing for this to happen.'

I spoke to one of the scientists, a shy, unexcitable man in his late fifties, who has been working on this technology for several years. He and Pedersen are old-school IT people, quiet-spoken and completely uninterested in the limelight. Both of them thought Wright was working at a different level from everybody else. The scientist, who spoke to me from the beginning on condition that he wouldn't be named, worried about Wright's attention to detail and about his conspiratorial nature, but he had no doubts about Wright's command of the big picture. The scientist was helping to oversee all the white papers and patent applications and managing a large team of IT specialists and mathematicians. I asked him if he was worried about the R3 consortium's work on blockchain technology. 'They are going to fail,' he said. 'They don't have Satoshi. There is a panic out there, a misunderstanding about how the blockchain and bitcoin works. They hire people who know about bitcoin and are attempting to buy into it rather than being left behind. I've read some patent applications that are pending, applied for by the Bank of America. What I saw was ultimately unimpressive in comparison to what Craig is trying to do with the blockchain.'

The scientist described how the staff try to get the ideas out of Wright's head. 'You can't say: "Explain this to me." If you ask a question like that, he'll just go off on giant tangents. First, he'll have difficulty explaining what's in his head. Often he's just coming up with ideas on the spot that he'll throw into conversation. You want to try to get yes and no answers from him. We film him at the whiteboard and someone will type out the text.'

He described moments when everyone in the research team thought what Wright was saying was impossible. It couldn't be done, the software wasn't up to it, the blockchain couldn't scale to the task, and then suddenly everyone would understand what he was saying and appreciate its originality. 'I need to be able to go over what he's said,' the scientist told me, 'to find the pearls of wisdom and find out what the

hell he means. If I don't get it then I might have to make some guesses. I had to train my team to work in that mode. They have to be good researchers. They have to *understand* the technology as well as be able to work with it.'

Often, the scientist said, the staff were amazed by an unexpected turn in Wright's thinking. But he admitted to being amazed, too, by certain gaps in Wright's technical knowledge. It was bizarre. Wright had what the scientist and the team regarded as vast experience and command of the blockchain, which he spoke of as his invention and appeared to know inside out, but then he would file a piece of maths that didn't work. Or he would show a lack of detailed knowledge of something the team took for granted. Nobody I spoke to could explain this discrepancy. 'One of the problems with him is that he's a terrible communicator,' the scientist said. 'He's invented this beautiful thing – the internet of value. But sometimes he'll just talk in equations but can't or is unwilling to explain their content and application.' His mistakes could also, he implied, be a result of laziness and lack of attention to detail.

I knew this for myself, but I was, to some extent, vexed that the technologists had the same experience. At the same time, I was impressed that people like the scientist and Pedersen could live with such a high degree of ambivalence about their boss. When I asked Pedersen if he thought the work was truly revolutionary, a non-native weariness came into his blue eyes. 'I think so,' he said. 'But I don't think he'll get the Nobel Prize because he's too political. He's coming out as a street fighter and could end up in prison or whatever.'

\*

The main players in this story were keen to help me, to talk about what they knew and to show me the documents, but, in every case, there were topics they would avoid, and that were never cleared up. One of the most helpful individuals was Stefan Matthews. He pointed me in the direction of people from Wright's personal life, and sent me a typed history of his association with the man who would be Satoshi. Matthews noted that, when he signed the deal with MacGregor, Wright didn't have a feasible business plan for any of his companies. The Wrights' financial situation was dire. They couldn't pay their staff and a number had already left.

Pedersen and some others had stayed on without pay; Wright owed his lawyers $1 million. Superannuation remittances were overdue and loan repayments unpaid; the companies needed £200,000 just to make it to next week. Craig and Ramona had sold their cars. One of the companies was already in administration and, with the ATO closing in, 'all related entities were on the brink of collapse.' Before signing the deal, MacGregor, sources say, tried to assess the value of Wright's research, commissioning a 'high-level overview' of the companies. MacGregor instructed Matthews to be in Sydney on 24 June 2015, when a final appraisal of the businesses was undertaken and a draft arrangement negotiated for nTrust 'to acquire the intellectual property and the companies themselves'.

One night I went to have dinner with Matthews on my own. We met in the restaurant at the back of Fortnum & Mason, 92 Jermyn Street, and he seemed incongruous among the red banquettes – a large, bald Australian with a rough laugh and wearing a plaid shirt, keen to tell me everything he thought useful. Matthews seemed a much more affable character than MacGregor, both upfront and very loyal, without perhaps seeing how the two might cancel each other out. One of the tasks of the eager businessman is to make himself more sure of his own position, and Matthews spent a lot of time, as did MacGregor, selling the idea of Wright as Satoshi rather than investigating it. They drafted me into telling the world who Wright was, but they didn't really know for sure themselves, and at one point their seeming haste threatened to drive a wedge between us. It seemed odd that they would ask a writer to celebrate a truth without first providing overwhelming evidence that the truth was true. I took it in my stride, most of the time, and enjoyed the doubts, while hoping for clarity.

Matthews drank a little wine but not much. He was talking about the night in Sydney when they signed the deal. 'We pulled up outside Rob's hotel. He said: "Do you realise what you have just done? You have just done the deal of a career. This is a billion dollar deal. Fucking more. Billion dollars plus."'

'Why is Rob so convinced?'

'Don't know, don't know.' (MacGregor later told me he was convinced because Wright had shown Matthews the draft Satoshi white paper. 'I always had that,' MacGregor said.) 'If it turns out that he's a fraud, I don't know how he's managed to do it because you couldn't make this up.'

Matthews told me about a meeting at the Bondi Iceberg Club in Sydney that Wright had with Ross Ulbricht, the founder of Silk Road, now serving two life sentences. Silk Road used bitcoin to trade all kinds of contraband items because the transactions could be made anonymously. Wright later confirmed that this meeting took place, but said only that Ulbricht was full of himself and they didn't discuss bitcoin. Matthews seemed to think this was unlikely. He wondered whether Kleiman had had more to do with Ulbricht; other sources suggested the same.

'Wright signed a deal to come out as Satoshi,' I said to Matthews. 'Does he realise everything that involves?'

'You're gonna have criminal groups that paid him lots of money and there are people who know about that,' Matthews alleged. 'If they quack? You've got Ross Ulbricht who's in prison and apparently going to appeal trial this year or next. What happens when Ross sees Satoshi's name splashed everywhere and Craig's name everywhere? Is he going to say "I had lunch with that guy. We made a deal"? I'm not worried about what Craig has done, I worry about people who have associated with him.' It was very strange to do an interview with someone who would come out with this stuff, given that he was also trying to market the guy. In fairness to Wright, Matthews might just have been running his mouth off, and I've left out the worst of what he said, now and later.

We talked about some of the difficulties that had arisen between Wright and MacGregor. 'Craig and Ramona are in a state about the keys leaving the room,' I said. 'He feels it is an act of self-annihilation to let them go. Rob has a Hollywood ending in mind and it's looking incredibly unlikely. You can't go into a marketplace claiming full legitimacy when the proof hasn't been produced.' I told Matthews that

there were emails still missing between Wright and Kleiman, emails that the public would want to see before accepting him as Satoshi, because the correspondence would presumably go into the kind of detail about the invention that only the inventors could know. Wright had told me he would produce the missing emails by the following Wednesday, but he never did.

'I know what's in there,' Matthews told me. 'It will be chatter to do with illegal stuff that he and Dave were doing in Costa Rica – particularly around Costa Rican casinos where they got $23 million of income. And you don't get paid that amount just for doing a security review … He mined all those bitcoins himself using equipment that he bought with money that he got from Costa Rica.' Again: why was Matthews saying this? It was obvious to me that Wright was going to have a problem telling the full story, whatever it was. I wasn't even sure he'd told the full story to his wife, but perhaps he had, because she referred, several times, to the fact that there were things that she just couldn't tell me. 'They'll come after us,' she said, in a state of high emotion. 'They'll destroy us.' Matthews said he didn't know what that was about. He did tell me something he said he had told MacGregor when MacGregor asked him what he was getting out of the deal. 'Absolutely nothing,' Matthews said. 'I get what I get paid by Calvin. Calvin is the only allegiance I have, then and now.'

Calvin Ayre is one of the topics the team routinely went dark on. When I first met Wright, he called him 'the man in Antigua'. MacGregor never mentioned him at all during our early meetings. When I later told him that Ramona had mentioned a big man in Antigua, he said he didn't mind talking about him, but didn't bring his name up again. When, in February this year, they took Wright to Antigua for a pep talk, I emailed Matthews to ask if I could come too, and he didn't reply. Wright, in a low moment, later asked me if I'd told MacGregor they were the ones who let the cat out of the bag about Ayre. I said it wasn't them: Ayre's name had first been mentioned to me by Matthews. The Antigua meeting was being arranged when I went out for dinner with Matthews, and he referred to Ayre freely without ever asking that it be

off the record. MacGregor never went into detail about Ayre's involvement but both men's regular visits to Antigua made me wonder about the extent of the connection. Matthews, explicit as usual, always spoke about Ayre as if he was the *capo di tutti capi* of the entire affair, though I have no other evidence that Ayre was anything but an interested observer. Interestingly, nCrypt's only shareholder (one share worth one pound) is nCrypt Holdings, registered in Antigua.

Like MacGregor, Calvin Ayre is Canadian. His father, a pig-farmer, was convicted in 1987 of smuggling large amounts of Jamaican marijuana to Canada. When Calvin left college he went to work for a heart-valve manufacturer called Bicer Medical Systems and was later charged with insider trading, agreeing a deal where he was fined $10,000 and barred from running a public company listed on the Vancouver Stock Exchange until 2016. 'I clearly made some mistakes,' Ayre told the Vancouver *Sun*, 'but it was not a criminal issue and nobody got hurt from anything I did.' Ayre later started a software development company intended to help offshore betting companies take online bets. He relocated to Costa Rica in 1996, where he worked with two online casinos, WinSports and GrandPrix. Unlike most bookmakers, Ayre would send cheques directly, without using Western Union or an equivalent. He then set up Bodog, which would become the biggest name in the online gambling industry. (It's the company Matthews worked for after Centrebet.) Bodog was a huge success. In 2005, it handled more than $7 billion. Ayre appeared on the *Forbes* billionaires' list in 2006. In the same year, Bodog moved its global headquarters to Antigua. The IRS had started following the company in 2003 and US Customs and Immigration were also on his tail. A joint inquiry was started in 2006 and, in 2012, Ayre, along with two of the website's operators, was indicted on money-laundering charges. He entered no plea, but he maintains his innocence, seeing the indictment as 'an abuse of the criminal justice system'. In one profile of Ayre, we find him drinking coffee and paraphrasing Sun Tzu's *The Art of War*. 'I've put a lot of energy into finding ways not to fight my enemies,' he says. My researcher Josh showed me this interview, then remembered a note from my first meeting with MacGregor, in which he, too, had quoted Sun Tzu. 'You build your enemy a golden bridge to

retreat over,' MacGregor had said, drinking coffee. When he said this, I wasn't sure who the enemy was. The only person MacGregor had built a golden bridge for, so far as I knew, was Wright.

At the Jermyn Street dinner, Matthews didn't tell me any of Ayre's history, referring to him simply as a great guy. 'Do you know how many bitcoins Craig's got left of the original 1.1 million?' he asked later on. There are conflicting stories about the 'Satoshi millions'. Many people refer to a Satoshi-mined hoard that has never been spent, and the figure – always around a million bitcoin – is the same one admitted to by Wright and Kleiman. The difference is that Wright says he spent a lot of his. This was what Matthews was getting at. 'He told me last week,' Matthews said, 'and I've been having some sledgehammer conversations with Craig. I said to him: "Time for straight answers on this one, my friend. How many coins are left under the control of the Seychelles trust? And don't tell me you don't know because you're a grown man, and don't lie to me." And his answer was 100,000. I know that 650,000 was taken out to fund all the research and development stuff. And 350,000 is on Dave's hard drive. "Why has Dave got 350,000 of your coins on his encrypted hard drive?" Because he gave them to him. They're Dave's. Those wallets are encrypted on his hard drive, with three or four keys to his trust. Now, why did Dave die in squalor?'

'Why?'

'Because bitcoins weren't worth that much when Dave died. They skyrocketed around that time and in the weeks thereafter. But he was a man of principle apparently and wouldn't spend those coins unless Craig told him to.'

'And you don't think Dave mined coins himself?'

'Of course he did. No doubt. But how many? Who knows … We know they ran a business together based in Florida. They did stuff for contractors. We know that they lost money jointly in Liberty Reserve. And they would both have lost money in Mt Gox.'

Case 9:18-cv-80176-BB XD Document 9-1-3 Entered on FLSD Docket 03/25/2018 Page 95 of 308

Wright had told me he'd lost quite a bit when the bitcoin exchange Mt Gox was hacked and then collapsed. He also referred, in a later email, to information that was seeping from the collapsed Mt Gox database, some of it linking him to Ulbricht. 'The amount to a large wallet was me,' Wright told me. I took him to mean that there was evidence of a bitcoin transaction between him and Ulbricht. He wouldn't explain further.

As I was paying the bill, Matthews reared up. 'You know Craig has gone out and bought himself some cars? One hundred and eighty thousand dollars' worth of cars.' (When I checked this with Wright he said the cars were leased.) 'One of them stands out like the dog's balls in the proverbial moonlight, and this is from the man we're trying to keep fucking secret. How many custom BMW i8s are going around London? He's spending every fucking penny that we've paid him … Does he think this is just a game? You know, these guys have gone from being backyard scrappers and they've suddenly found themselves in a high-stakes poker game.' Matthews said he wouldn't take any rubbish from the Wrights, and that they'd end up on a plane back to Australia and jail if they didn't fulfil their end of the bargain, to reveal Satoshi. 'The people that I work with are capable of deciding this was a $30 million bad decision and write it off,' he said. I thought this a curiously revealing line, and wondered again just how he expected me to use such information.

'You haven't asked me why I'm doing this,' Matthews said at the end of the evening. He worked his way round to an answer, but it wasn't an answer, just more questions. 'Part of me,' he said, 'has asked over the past three or four months, why did I ever get involved in this? Why did Craig keep coming back to me? Why did he never shake out of my life? Why did he show me the Satoshi white paper in 2008? Why was he delivered back to me in 2015? I didn't go looking for it.'

*

Satoshi Nakamoto is not really a man; he is a manifestation of public acclamation, an entity made by technology, and a myth. Old-fashioned journalism might bring you

to him – or cause you to miss him altogether – but he was born of relationships that depend on concealment. A reporter was once a person who could rely on visible evidence, recordings, notes, statements of fact, and I gathered these assiduously, but this was a story that challenged the foundations on which reporting depends. I fought to uphold familiar standards of truth, and fought to discover new ways to uncover it in this underworld of companies with a vested interest in disclosing some things but not others, but it felt like the walls of virtual reality were forever pressing in on my notepad. It is standard practice in Silicon Valley for everyone, from bagel boy to research chief, to sign a Non-Disclosure Agreement. This is because every company – Apple or Microsoft or Google or Facebook – has a mission not only to make money but to control the narrative of who they are. A writer requires determination if he is to write anything about that world that isn't paid for or manufactured by a company. There is nothing particularly underhand about this: they offer you big money up front and ask you to sign over your allegiance. But when you turn down this offer and they don't banish you from the court, your version of reality might end up clashing with theirs. This happened several times during the months I was working on the Craig Wright story. Wright himself never mentioned rights or agreements or privacy – until the very end, when he asked for two particular aspects of his private life not to be discussed – but when I went to Australia at the end of February to talk with Wright's family and friends, the nCrypt men began insisting I sign an NDA.

Why they hadn't asked me to sign one at the beginning I'll never know. I had roamed freely for three months, noting and recording, going to meetings and interviewing everyone, and only now did they want me to sign. Early on, MacGregor told me in an email that he had advised Craig and Ramona to tell me 'everything'. He went on to express, on Wright's behalf, worries about how the material would be used. This was especially sensitive, I gathered, because of the government security work Wright had done. I replied that we would be judicious about what was published. MacGregor still wanted to discuss contractual issues, and I replied, on 6 March, that I would have to see proof that Wright was Satoshi, and see it presented

before his peers and selected journalists. MacGregor replied that the proof package was in train and that he didn't understand why I wouldn't sign. I replied on 7 March that I couldn't write the story, no matter how good my access, if there wasn't proof that Wright was Satoshi, and I was still waiting for evidence. 'My commitment is clear,' I wrote, 'but the book turns to dust if we do not have unanswerable and generous proof.' I insisted that I wouldn't sign any document and eventually MacGregor accepted this. We fell out over it, but I saw their point and I still do. Despite my refusal they continued, without binding agreements or legal constraints, to provide me with access to every meeting and every aspect of the story, which was set to change faster and in ways none of us could ever have prepared for. My story and nCrypt's deal seemed to be on the same track, aligned and friendly, but none of us discussed what would happen if the deal came unstuck.

**Proof**

When I asked Wright what kind of martial arts he did as a kid he gave the following answer. 'I did a few actually. I have studied in the Chinese forms Wing Chun, *Tánglángquán*, Kuo Shu, Duan Da, Zui Quan and *lóng xíng mó qiáo*. I have also mastered Muay Thai, Kenpo and Taekwondo and Chito-ryu style karate. I started with karate and Ninjutsu.' As with most things about him, it's not that it's not true, it just smells of self-doubt and a need not to hide anything positive about himself. It's the kind of truth-telling that expresses fear and gives rise to doubt, but it's not the same as a lie.

Wright's mother had told me about her son's long-standing habit of adding bits on to the truth, just to make it bigger. 'When he was a teenager,' she said, 'he went into the back of a car on his bike. It threw him through the window of a parked car. That's where his scar comes from. His sister accompanied him to the hospital and he's telling the doctor that he's had his nose broken twenty or so times, and the doctor is saying "You couldn't possibly have had it broken." And Craig says: "I sew myself up when I get injured."' What his mother said connected with something I'd noticed. In what he said, he often went further than he needed to; further than he

Case 9:18-cv-80176-BB Document 1-3 Entered on FLSD Docket 03/25/2018 Page 75 of 96

ought to have done. He appeared to start with the truth, and then, slowly, he would inflate his part until the whole story suddenly looked weak.

In the time since I'd last seen Matthews, he and MacGregor had been to Antigua with Wright and had agreed a 'proof strategy'. I had been pushing hard for the proof, and Ramona had asked me several times what Wright could do to prove to me that he was Satoshi. MacGregor asked the same thing during a meeting I attended with him and the public relations firm they'd hired, the Outside Organisation. 'It's not about proving it to me,' I said. 'It's about proving it – full stop. You just prove it for the whole world to see and then everybody goes home.' The nCrypt guys, pointing out that they had always intended to set up a proof session, organised a series of events with the help of the PR company, intended to bring Satoshi into the open. Originally, the plan was for the London School of Economics to host a panel discussion about the evidence and the findings, but someone seems to have blabbed to the *Financial Times*, which ran an article on 31 March. 'After nearly four months of silence,' the *FT* blogger Izabella Kaminska wrote, 'and a bitcoin community mostly resigned to the notion that the story was an elaborate hoax – conditional approaches are being made to media and other institutions in connection to an upcoming "big reveal" of Wright as Satoshi Nakamoto.' Her source was clearly inside the project. 'Wright will publicly perform a cryptographic miracle which proves his identity once and for all,' she wrote. MacGregor was outraged, and the LSE was sacked from the project. But the first and biggest of these proofs was to involve Wright using Satoshi's private encryption keys in sessions with key members of the bitcoin community. Jon Matonis, former head of the Bitcoin Foundation, agreed to take part. So did Gavin Andresen, one of the most respected bitcoin core developers, someone who had been there since its inception. These proof sessions would begin the denouement of this search for Satoshi.

Just before these sessions took place, in April, I asked Wright what had happened in Antigua. 'We discussed the whole PR strategy,' he said. 'The truth thing is going to happen.' He talked about Matonis and Andresen. 'We're going to bring them in on

reveal sessions in the next few weeks. I guess that's the way it has to be. Do I like it? No. But I haven't really been given a choice. I'm between a rock and a hard place because of whoever outed me last year.' He said very clearly at a meeting with me that he would not sign with the key in public. We agreed that he would do it for me at home, signing with the private key from one of Satoshi's original blocks. He would do for me what he was going to do for Matonis and Andresen, and this would prove beyond doubt, he said, that he was Satoshi. We made a plan, then Wright asked me to come to his office so he could draw something for me on his whiteboard, a new timelock encryption scheme he'd come up with. He wanted to add it to the list of patent applications. I didn't always know what he was talking about, but his expertise in certain areas was startling, and so were his obfuscations.

<p style="text-align:center">*</p>

It was exactly 9 a.m. when I turned up at his house in South London, on one of those clear mornings when the planes leave trails in the sky. I knew his house by the BMW in the driveway, and I pressed the bell. He opened the door and a cloud of cologne came to meet me. In his study, there were three computers and seven screens. *Options, Futures and Other Derivatives* by John C. Hull was sitting on a grey sofa. There were rows of computing books and seven dead laptops stacked on top of a bookshelf. Even after all these months, Wright couldn't really do small talk, finding it hard to summon anything easy in himself. I asked him about his sofa and told him about a pain in my shoulder and he just said: 'Very good.' He made me a cup of tea and then beckoned me over to his main computer: it was time for him to prove to me that he was Satoshi. His manner was still that of a man who mildly resented having to prove anything. He smiled and pointed to the screen. 'This is his wallet, which is open,' he said. I saw a list of transactions with addresses specified. 'The initial Genesis block was hardcoded,' he said. 'There are no conflicting Genesis blocks. If a piece of code crashed on this machine it would still start on another machine with the same Genesis block. Always.' As I was looking at the screen in front of me and watching his hand move the mouse, lines from the

Wikipedia entry on the blockchain came into my head. 'The blockchain consists of blocks that hold time-stamped batches of recent valid transactions. Each block includes the hash of the prior block, linking the blocks together. The linked blocks form a chain, with each additional block reinforcing those before it.'

'It can't be moved or changed?'

'No. It's hardcoded into the original program,' he said.

Everything on his screen was time-stamped. I was looking at transactions from early January 2009. 'I was officially canned from my job at BDO on 3 January,' he said. He told me he went to his house at Port Macquarie and settled down to do the final work to get the bitcoin software up and running. 'The original definition was published by Satoshi Nakamoto in 2008 and implemented in the original source code of bitcoin published in 2009,' the Wikipedia entry said. As he explained what was in front of me, he clicked through the sequential blocks, the transactions database that underlies bitcoin. He was looking at the very earliest ones and all included dates, amounts of bitcoin and addresses. A long list of transactions showed incoming small amounts to Satoshi's wallet. 'Lots of people send micro payments to me,' he said. 'They think so much of Satoshi that they want to burn their pennies.'

'So these fans are sending tiny payments to that known address? It is the first generated and the first known address?'

'Yes. They're hoping I'll do something – out myself.'

The address was 12c6DSiU4Rq3P4ZxziKxzrL5LmMBrzjrJX. I could see that people had left messages – 'public notes' – for Satoshi: 'Hey satoshi, change my life, send me some bitcoins!' 'God bless you, China.' 'If you are reading this, please take some time to remember those who died 12 years ago today in the WTC attacks.'

'The bitcoin blockchain can be used as a trusted timestamp for arbitrary messages,' Wikipedia said.

If you scroll back to the very first transaction associated with this address – 12c6DSiU4Rq3P4ZxziKxzrL5LmMBrzjrJX – you find that it is the first bitcoin transaction recorded. It was for 50 bitcoin and remains unspent. Anyone can enter that bitcoin address into a search engine and inspect the history of transactions associated with it. 'The Genesis block was hardcoded on 3 January 2009,' Wright said to me, 'and that was the first run. There was no previous block.' (Under the heading 'Previous Block', there is a line of 74 zeros.) 'Then the code was reworked,' he continued, 'and fired up and the first address that was ever created from the hardcoded Genesis block – the first mined address – is the one I'm sending you a message from.' He was about to use the original cryptographic key to sign a message to me and it was as if he was dropping a sugar lump into my tea. He typed the words, 'Here I am, Andrew,' and rested his fingers. 'This gives us that little block there,' he said, before verifying the signature. He looked sheepish and resigned in his blue checked shirt. 'Welcome to the bit I was hoping to bury,' he said. He leaned back and I noticed a samurai sword by the desk.

I shook his hand. Then I stared at the screen and considered how strange it would be to live with a secret for seven years and then feel no relief when it finally came out. Perhaps it never felt like a professional secret; it felt like a part of his being, and now he was giving it up. 'I want it in layman's terms,' I said. 'Explain what you just did.'

'I just digitally signed a message using the first ever mined address on bitcoin.'

If he had done what he appeared to have done, and what he said he'd done, then his claim to be Satoshi was strong. For a moment, the amassed unlikelihoods and dissemblings seemed circumstantial, and the case against him suddenly much more fanciful than the idea of him being the famously secret man who invented this protocol. An alternative Satoshi would have had to share his entire password hoard

with him, and synchronised his 'real world' timeline in order to be placed where Wright was placed and align with his email existence and his expertise. It wasn't merely that Wright had been in the right place at the right time: he had been in the only place at the only time, and that time was stamped not only into the blockchain but into his correspondence and the experiences of those around him. He sat back in his large black chair and asked me if I wanted more tea. 'I could have been working with Satoshi, I guess,' he said, 'who told me he was going to fire it up at this time and I had all my machines ready and just took over from him. But that would make me Satoshi anyway.' He stared into the bank of screens and seemed nostalgic for a more ghostly self, and I asked him if it felt overwhelming.

'I don't care – whatever,' he said. But of course he did care – care is what he did most. He was agitated through the whole process, mainly, I guessed, from an old cypherpunk embarrassment at having to bend to authority. He wasn't satisfied when he sat back in his chair, he was annoyed and already making his detractors' arguments for them. 'They'll say I killed Satoshi and stole the keys. Having them doesn't prove I created them. Maybe it was a collaboration between me, Dave, Hal and some random person. Maybe I compromised Hal's machine and stole everything and his family didn't know. Maybe, maybe, fucking maybe. All that bullshit. Those people don't believe in Occam's razor. I've seen Reddit. They want the most convoluted explanation. But they can say what they want; I've got nothing more to prove.'

There is a message embedded in the Genesis block, a headline from the *Times* of 3 January 2009, the day the block was mined: 'Chancellor on brink of second bailout for banks.' I later asked Wright why he'd chosen that particular headline. 'As you know, I am rather anti-central/reserve bank,' he wrote to me. 'I see them as the true cause of these issues and the bubbles and collapses. But the date was important as a timestamp. It means that I could not have been "pre-mining" and gaming the system. The first iteration of the code was *finalised* on 9 January 2009. The run was started when I was at the farm in Macquarie later that week. It means that I cannot have been mining for months ahead and had collected a pre-mined set of solved

hashes to game the system. I ran more than fifty machines, so the headline was a marker.'

The question of proof in a story about computer science is a question for the birds. If you can't check the maths, how can you be sure? I wrote to four Princeton and Stanford cryptocurrency experts during the preparation of this story and sent them some of Wright's white papers. These men, who are together about to publish a textbook on bitcoin and blockchain technology, are obsessed with who Satoshi is, and obsessed with who he isn't. But they behave like visitors to a funhouse: they see distorting mirrors everywhere and hear distant laughter and weird music. Some of them did want to see the evidence, but they didn't want to be seen responding to it and I never heard from them again. And that is the kind of attitude that pervades the not entirely adult world of new inventions in the highly contested world of computer science.

Another thing: when such people want to make a point, they often want to destroy those they disagree with. It's clear how paranoia-inducing it is to be constantly assaulted by people who hate you for thinking your thoughts. Geek culture in general is fantastically vitriolic: even an issue that seems pretty marginal to the rest of us – like the question of who might play Captain America's love interest – can easily spiral into death threats. In the world of cryptography, this has been a bar to invention and progress: developers are hung, drawn and quartered every day on the internet and they have to be unusually robust to take it. The question of how to take bitcoin forward has been riven with opposing views, and after Satoshi disappeared there was no central authority to lead the discussion or calm the waters. By increments, the task fell to Gavin Andresen, a Princeton graduate with experience in Silicon Valley. Andresen only gradually accepted the role of lead core bitcoin developer. This is not an official designation and he appears to have got none of the thanks and all the flak, but by general consensus he is the most level-headed thinker in the bitcoin world. One insider said there was an irony in Andresen's situation that few people realised. 'The word is that Satoshi passed the torch to

Gavin before he retired in 2011,' he said. 'In fact, it was more like Satoshi threw the torch at Gavin and ran away leaving him holding it.'

From time to time during those months, I wondered what if, in some brutally postmodern way, the true identity of Satoshi could never be fully ascertained? What if Wright had every single element necessary to prove himself, but somehow couldn't? Anonymity – or at least pseudonymity – is an essential part of the cryptographic world. I had a job on my hands – as did MacGregor and Matthews, as would the core developers, as would the press – to establish the truth. Any narrative that is dependent on 'outing' such secretive people is at the mercy of their basic hatred of being controlled or being known, and Wright was a spectacular example of this.

*

Andresen had been in touch with Satoshi in the early days and would have records of their conversations. He would presumably be able to ask Wright questions that only Satoshi could answer. In December, after *Wired* published the story about Wright possibly being Satoshi, Andresen told the magazine he'd never heard of Craig Wright. But he began to believe in Wright once he started corresponding with him by email in early April. At one point, Wright sent him two emails, one written in his own Craig Wright way, and another one, with essentially the same content, written as Satoshi would have written it. They discussed maths and the history of the invention and the problems it had faced. Within a week, Andresen was sufficiently convinced to get on a plane to London. He was ready to see Wright sign a message to him using the original Satoshi cryptographic keys.

At this point, I began talking to Andresen. He told me he had written an email to Wright before getting on the plane, asking for a little more of his backstory and for his thoughts on 'the state of bitcoin in 2016'. 'He replied with a longish email,' Andresen told me, 'on the state of bitcoin and why he decided to reveal his secret now, then followed up with a couple of in-progress research papers. The email

'sounded like' the Satoshi I worked with, and the papers matched his academic, math-heavy voice, too.'

Andresen crossed the Atlantic overnight, arriving at the Covent Garden Hotel at 11 a.m. on 7 April. He went to his room – which had been booked, as had his flight, by nCrypt – and had two hours' sleep, after which MacGregor and Matthews turned up. 'They gave me a lot of the background and explained their involvement,' Andresen told me. When Wright turned up at the hotel, Andresen found it easy to talk to him, 'although I was so jet-lagged at one point,' he wrote, 'I had to stop him from diving deep into a mathematical proof he'd worked out related to how blocks are validated in bitcoin.'

Matthews had booked a conference room in the basement, and MacGregor could see that Wright was very emotional when he entered the room. 'He knew this was it,' MacGregor said to me. 'It's one thing to prove his identity to you and me, but the bitcoin community is something else. He knew that they would believe Gavin. He knew this was it – that he would have no plausible deniability after he'd talked to Gavin and shown him the keys.' Before the meeting in the basement properly started, Andresen said to MacGregor – as he said to me – that some of the phrases Wright had used in their email exchange had been 'familiar' to him; he sounded like the Satoshi he had been in contact with before. Andresen asked MacGregor and Matthews a few questions about what nCrypt hoped to achieve with this in the future. They didn't go into detail about the company's business plans, but they spoke about the future of bitcoin and alternative projects. Wright and Andresen quickly started scribbling on pieces of paper. Wright was using his big laptop to show his access to certain addresses. It was a strange situation in all sorts of ways, and the main one, perhaps, was that Andresen, who had, once upon a time, left behind high-paying job opportunities to work on the bitcoin project for free, was possibly about to meet his hero. But he stuck to practical questions. He asked Wright about the trust and about his bitcoin holdings and what had happened to them. MacGregor later told me that his first question after Matthews told him that

Wright was Satoshi was: 'Well, why isn't he sitting on an island surrounded by piles of gold?'

Wright became quite relaxed. He explained what it had cost him to keep his companies alive and to pay for research and development, and the supercomputer. It was about 5.30 p.m. when he finally logged on to his laptop to do for Andresen what he had done for me in his office at home, sign a message with the key and have it verified. Andresen looked on. Wright had just used Satoshi's key. At that point, it seemed to some of those in the room that Andresen's body language had changed; he seemed slightly awed by the situation. He reached over to his bag and took out a brand-new USB stick and removed it from its wrapping. He took out his own laptop. 'I need to test it on my computer,' he said. He added that he was convinced, but that if people were going to ask him, he had to be able to say that he'd checked it independently. He pointed to Wright's laptop and said it could all have been pre-loaded on there, though he knew that was unlikely. But he had to check on his own computer and then they would be done. He said the key could be used on his laptop and saved to the memory stick and that Wright could keep it. But for his own peace of mind, and for due diligence, so that there wasn't a chance of fraud, he had to see it work on a computer that wasn't Wright's own.

Wright suddenly baulked. He had just signed a message to Andresen from Satoshi, he said, and had demonstrated his complete familiarity with their correspondence, but, in his mind, what Andresen was now asking for was of a different order. 'I had vowed,' Wright told me, 'never to show the key publicly and never to let it go. I trusted Andresen, but I couldn't do it.' Wright got up from the table and started pacing. He had clearly believed he would be able to get through the proof session without this. In fact, he had said in my presence several times over the preceding months that he would never hand the key over to anyone or allow it to be copied or used on someone else's machine. 'I do not want to categorically prove keys across machines,' he wrote to me in an email. To him, this would be to give Satoshi away and perhaps to dilute his own proclaimed connection to him. He went to a chair in

the corner of the room and looked up at Andresen. 'Maybe you and I could get to know each other better,' he said.

Andresen just nodded his assent. 'Like, trade more emails,' Wright said, 'and I can sign more messages to you.'

At this point, Matthews's blood ran cold. 'It was the only time during all the years that I thought: "Jesus Christ, has he been spinning us the whole time?"' MacGregor too felt this was a very risky moment. He glanced at Matthews. There was no way he was going to let Andresen get back on the plane with *that* as a punctuation mark. They all felt Wright's behaviour was ludicrous: he'd demonstrated that he was Satoshi and only had to let this be verified on Gavin's laptop. End of story. But Wright spoke to me later in a way that showed his old cypherpunk suspicion had reared its head: what if Gavin was a plant? What if the whole thing was a plot to rob him of Satoshi's keys and exploit him or deny him? Wright told me he felt strong-armed and that, for some reason, he couldn't let this thing go and remain himself.

Afterwards, Andresen was sanguine. 'The proof session took longer than expected,' he told me. 'I insisted that the verification happen on a computer that I was convinced hadn't been tampered with. And they' – Wright, Matthews and MacGregor – 'insisted that the signed message never touch a computer that could have been tampered with (the risk would be that the proof might leak out before the official announcement). So we waited a bit while an assistant went to a computer shop and got a brand-new laptop.' The idea had been MacGregor's. He said the tension in the room was unbelievably high. Wright was refusing to do the one thing that would guarantee the success of his mission. He hadn't seen it coming, but Andresen wouldn't blindly trust Wright's hardware, and Wright wouldn't blindly trust Andresen's. The solution had to be a fresh computer straight out of the box. MacGregor called his assistant and gave her the task. 'This is how you get your One,' he said to her. (In his company the best score you could get in a staff appraisal was a One.) It was just before 6 p.m. on a Friday night and they needed a

brand-new laptop in Covent Garden. The assistant got hold of one and rushed over from Oxford Circus to the hotel.

The new laptop was lifted out of the box. It took a while to connect it to the hotel's wifi and to load the basic software. 'During all that time,' Andresen told me, 'it was obvious Craig was still, even then, deeply hoping his secret identity could remain secret. It was emotionally difficult for him to perform that cryptographic proof.'

'It was tense and there was a bit of shouting. There were a few drops during the day about "the evil businessman in the room",' MacGregor said. 'He stopped short of accusing Gavin of having a key-logger, but he clearly wasn't going to do it. He said he had trust issues, and he'd been attacked, and it had been so long, and he just couldn't bring himself over the line today, but they should keep talking. And Gavin was willing to do that. But we were like: "No, no, no". I remember what I said. I said, "Look, Craig, you've just been alone for way too long. Gavin has dedicated a huge chunk of his life to what you invented. I think he has the right to see this. He is the friend you don't have: Stefan and I can't fill that role for you; Ramona can't. This is someone who really understands what you have been trying to do."'

There were long silences. 'He was on the edge,' MacGregor said. Matthews was practically holding his breath. He didn't want to say too much out loud, so he texted MacGregor. The text said: 'He should call Ramona.' While MacGregor was out of the room Wright phoned his wife, and she said: 'Do it.' Everyone waited with bated breath as Wright used the new laptop to open the Satoshi wallet and set about signing a new message to Andresen. It failed. It wouldn't verify. He tried it again and again, until Andresen remembered that Wright hadn't typed 'CSW' at the end of the message the way he had in the original, the one he was seeking to verify. When he put 'CSW' at the end of his message to Gavin it said: 'Verified'. Wright had demonstrated, on a brand-new laptop, that he held Satoshi's private key. They stood up and shook hands and Gavin thanked him for all he had done. There were tears in Wright's eyes. 'His voice was breaking,' MacGregor told me. 'Gavin could see he was going though something.' Both MacGregor and Matthews later said that

Wright was turned inside out by the session. 'I didn't want to just put him in a taxi,' MacGregor said. Andresen was wiped out, so he went to get some fish and chips, and then headed to bed. 'Craig broke down,' MacGregor told me. 'He said he thought he'd never have to do this. He said he never knew how to trust people in his life.' Wright and Matthews and MacGregor went off to find a bottle of wine. 'He was semi-apologising for being a pain in the ass,' MacGregor told me, 'but I understood more than ever, at that point, how hard the whole thing was for him.'

When I asked Andresen if he thought ending the Satoshi mystery might be good for the technology, he wasn't sure. 'On one hand,' he said, 'having a mysterious founder is a great creation myth. People love a creation myth. Knowing the real story might make bitcoin less interesting to people. On the other hand, money is supposed to be boring – something that "just works", used by most people without understanding how or why it works. I'm excited to see how Craig contributes to making bitcoin work even better than it does today.' I later met with Jon Matonis, who had been through his own proof session with Wright. He was equally impressed and relieved. He too believed the search for Satoshi had come to an end and he was looking forward to working with Wright, to seeing the patents and the new blockchain ideas. During our lunch in Notting Hill, Matonis suggested that this technology would change the world. One of the scientists said to me, 'This isn't Bitcoin 2.0. This is something magnificent that will change who we are. This is Life 2.0,' and Matonis agreed.

The idea was now to use the 'proofs' – the gathered papers, the testimonies of the two bitcoin experts, the use of the keys, plus solid, document-heavy answers to every criticism previously made of Wright – and roll them out to selected members of the press on a certain day. I told MacGregor and Matthews I didn't want to go first with the story. I wanted to sit in on the interviews and proof sessions with the media organisations, and fold their reports, and the response to their reports, into my story.

Wright began to fade as we entered the proof sessions. He went from being a man with a clear picture of himself, to being a fuzzy screen. He would email me at all

hours with a pressing sense of anxiety. He seemed to be losing it. Yet we all forged ahead to a conclusion that seemed much more conclusive to him than anything he had ever expected, or could ever bear. He had signed up for it and was now faced with a full-frontal assault of cameras and lights. I had once asked him if he felt happy hiding in the internet and he said yes, it was his home. On a good day it is the bright field that contains all souls but on a bad day it is the final darkness, where misery is gapingly exposed. I came to believe that Wright, this last year, was fighting for his soul on that plain, like Aeneas with his ships at his back and all hell in front of him, going down to an underworld where he might meet his own father. Wright told me, without demur, that his life had been an attempt to prove himself to his father. In the wee small hours, he seemed like a child whose fantasy had gone too far. And the fantasy was not that he is Satoshi. He may well be Satoshi. The fantasy was that he could live as Satoshi, and take his place among the great men, and forget the little boy who was slapped for losing at chess. Like Aeneas, he knew that his journey was as much ordeal as opportunity, and though, again like Aeneas, he had asked for it, the process was increasingly unendurable. 'It is easy to descend into Avernus,' the Sibyl in Seamus Heaney's translation of Book VI of the *Aeneid* tells Aeneas:

> Death's dark door stands open day and night.
>
> But to retrace your steps and get back to upper air,
>
> That is the task, that is the undertaking.
>
> Only a few have prevailed, sons of gods
>
> Whom Jupiter favoured, or heroes exalted to glory
>
> By their own worth.

**The Reveal**

By my last weeks with Craig Wright, I was in two minds about the money men, probably because I liked them. And while I wanted to assert my journalistic doubts – preserve my innocence, stand back from the parade – my wish for the reveal to turn out well was beginning to cajole my judgment. I was wise enough to say no to the world exclusive; I still wanted material I didn't have and I was convinced that the real proof of the pudding would be in the world's tasting of it. The internet is great at crowdsourcing facts and establishing the accuracy of stories, and I had always felt this could be important. But in the meantime, I had to fight to give my doubts the oxygen they needed. The nCrypt boys said they understood – but did they? They appeared to have no Plan B if Wright couldn't prove to the world that he was who he said he was. People can start off by saying, 'Write everything, warts and all,' and end by saying: 'I don't exist, maybe you shouldn't mention me.' In a conversation with MacGregor at this point, I allowed for the possibility that I might give him a made-up name in the story. I said it because he seemed anxious, and because, as I told him at the time, he had brought the story to me and I meant him no harm – but this possibility depended on its being proved that Wright was Satoshi. Our discussion about using real names was inconclusive – during a later meeting at Berners Tavern, Matthews expressed the view that I should put their names in and make a final decision later – but the decision was really made by what the story became. The men in black seemed not to have prepared for any of that. They believed that only one big thing was going to happen: Craig Wright was going to emerge as Satoshi Nakamoto, the great mystery figure of the digital age, and the evidence would be 'overwhelming'. In the final week, as the men prepared the reveal, I found my independence slipping. No doubt about it: I felt like part of the team. I wanted to please MacGregor – pleasing people is my chief vice as a man and my main virtue as a reporter – but I could have told him my work so far might only be fieldwork. I wouldn't know how the story would turn out until it had turned out. Only in public relations is the story straight in advance.

In private, Wright was still saying he wouldn't 'jump through hoops', but then I'd find him agreeing to do exactly what was asked of him. Only a few nights before the

media appointments, I was sitting with him in the Coach & Horses in Greek Street. The PR company, he told me, had asked if he wanted to go on TV, and he'd said there was no way in hell they'd get him in front of a TV camera. Yet it was all happening. I mentioned the fact that MacGregor, when I first met him, had spoken about all this ending with a TED talk in which Satoshi would be revealed.

'Rob always said "eventually",' Wright replied.

'But what does "eventually" mean?' I asked.

'It originally meant, "*if* you came out",' Craig said.

The PR team, at MacGregor's behest, had been in touch with a number of journalists; the ones who were interested were from the BBC, the *Economist* and *GQ*. The inclusion of *GQ* had irked Wright from the start (he sees himself as an academic), but the PR company, the Outside Organisation, had a connection there – their founder was a contributing editor – and said the magazine would love the story. But did the PR men explain to the editors there who was behind this project to out Satoshi, and who was paying their fee? I later asked them by email and one of them replied: 'It is not at all unusual to be instructed to represent an individual through an independent company. Our conversation with [*GQ*] and the other journalists was about the proposed story.'

I emailed him again. 'But did you tell them,' I wrote, 'that the outing of Satoshi was being done at the behest of a commercial company?' He didn't reply.

All the journalists had signed NDAs and embargos. They would each be allowed a brief interview with Wright after he had demonstrated to them his use of the Satoshi key. These meetings would take place at the offices of the PR company in Tottenham Court Road on Monday, 24 April and Tuesday, 25 April. I found all this a bit odd: Wright was being difficult, for sure, but the PR strategy was crazily old-fashioned. Everyone in the cryptography world knew that all Wright had to do was send an email from the famous Satoshi email address, alert people he was

going to sign a message using Satoshi's keys, do so online and move a single bitcoin from an early block, and the entire internet would light up like Coney Island for the World's Fair. The piecemeal feeding of 'proof' to these journalists was compelling but anachronistic. I supposed it was an attempt to get the story out of the world of crypto-gab and into the real media, but it was set up with an alarming sense of security paranoia. Wright could never have handled a celebration, but the journalists were being managed to an extent that might have raised more questions than it answered. I was just an observer, and was worried about Wright by then, and, though I believed in him, I felt distinctly that there was something missing and something wrong.

When I turned up at Starbucks in Tottenham Court Road, Wright, Ramona and Matthews were already there. Wright was sulking a little. It had been decided that, as well as the demonstration, the journalists would be given a memory stick to take away with them, showing the signed Satoshi message. (Wright later told me the stuff he put on it was fake. There wasn't anything on there they could understand, but it certainly bore no relation to any of Satoshi's keys.) Matthews was dressed smartly and wearing dark glasses and Wright was wearing a gold tie and a business suit. Ramona sat beside him stroking his ear. 'Let me know if you have trouble with the guys upstairs,' Matthews said. He meant the PR guys. 'Sometimes they forget their role.' As usual, I found Matthews likeable and easy to talk to, but he seemed not to appreciate the difference between his way of talking and the circus of manipulation surrounding us.

Rory Cellan-Jones, the BBC's technology correspondent, was led into a conference room with his producer, Priya Patel, and Mark Ward, a technology correspondent for the BBC News website. Wright sat at his laptop, hardly looking up, and a screen on the wall showed what he was looking at. Matonis was in the room, and so was Matthews. Ramona had gone upstairs. Cellan-Jones was decent and professional, ready to get to the bottom of the story. He appeared to feel the tension, with Wright already behaving as if being asked questions was grossly humiliating and the

questioner openly hostile. But Cellan-Jones was not hostile: if anything, he was mildly pre-convinced, and just going about capturing the story for the layman.

'When I started out I asked myself what I'd need to see to know if someone who claimed to be Satoshi was Satoshi,' Matonis said. 'And you can break down three distinct lines of evidence: the cryptographic line, the social line and the technical line. Obviously, the social and technical lines are going to be more subjective … On the cryptographic side, I'll explain what I witnessed personally and give you a lead up to what Craig's going to demonstrate this morning.'

He then went into more detail about the cryptographic proof. 'The Genesis block is block zero,' Matonis said. 'And you can't spend any of the blocks in that chain – which means that the ones that come after that (which are spendable) can be attributed to the creator of bitcoin.'

'And what would they be called?' Cellan-Jones asked.

'In succession they'd be called block 1, block 2 etc. Now this morning, Craig is going to demonstrate signing blocks 1 through 9. I personally witnessed the signing of blocks 1 and 9, so this is not going to be a transfer of bitcoins, it's going to involve a signing of a message, which he'll do with the private key and which will be verified by the public key. Are we clear on that?'

Eventually, Wright asked Cellan-Jones to give him a message. 'Um. "Hi, historic message to the BBC."' Wright typed the message and added a bit of commentary as he did so.

'This message will verify, but if I change a single digit, it won't,' Wright said as he signed the message using block 9.

'This is the only key that we know is definitely owned by Satoshi because it was used with Hal Finney,' Matonis added.

'So,' Cellan-Jones said, 'just getting this clear in my mind. We've seen Craig use a private key known to have been used with Hal Finney. And we've seen it verified with the public key.'

'Yes,' Craig said. Then he proceeded to sign a message with the key associated with the first ever mined bitcoin.

'Out of interest,' Cellan-Jones said. 'How many bitcoins do you have?'

'Well, that would be telling,' Wright said.

'Do you still mine bitcoins?'

'Only for fun.'

Wright then went into an aria about Sartre's speech when he turned down the Nobel Prize. He planned to use a hash function – which turns information into a unique set of letters and numbers – to attach Sartre's famous speech cryptographically to block 9, and then later verify it publicly on his blog. 'He gave up the prize,' Wright said, 'because "If I were to accept it, I'd become the institution." I never wanted to sign Craig Wright as Satoshi,' he continued. 'I haven't done this because it's what I wanted, I just can't refuse it. Because I've got staff, I've got family. It's what I am and I'm not going to deny it because that's not the truth. So I'm choosing to sign Sartre because it's not my choice, I'm not choosing to come out, I've been thrust into it.'

'In what way have you been forced into it?' Cellan-Jones asked, quite reasonably.

'I've got people mudslinging,' Wright said. But that wasn't true: he wasn't feeling forced because of what people said. He felt forced, or obliged, to come out because he'd signed the deal with nCrypt in June 2015. And he deepened the lie when Cellan-Jones asked him why he hadn't revealed himself before. 'I liked to go to

conferences, put out papers,' he said. 'I can't do that now. I can never just be Craig again.'

He was asked whether he wanted to be the public face of bitcoin.

'I don't want to be the public face of anything.' He paused and looked down. He then said that his blog would explain everything and help people to download the material and understand how the keys work.

'When does that go live?' Cellan-Jones asked.

'Monday or Tuesday.'

'There will be people out there who will try desperately to prove this isn't the case. Are you confident that there are no chinks in your armour?'

'They'll say I stole keys, that I buried Satoshi in a ditch, they'll say all sorts of things.'

The BBC planned to come back the next day with cameras. Then a man arrived from the *Economist*, Ludwig Siegele, a man in a grey suit. He was less immediately friendly but his questions were fine-grained. You could see he wasn't entirely comfortable with this very PR-managed way of outing Satoshi. Wright signed a message for Siegele using block 9, and had the private key verified by the computer. 'I'm sorry,' Siegele said, 'but I'm still a little unsure what that proves.'

'It proves I have the private keys,' Wright said. 'All the original private keys.'

'OK, so. The first question that my readers are going to ask is: "Why now?"'

Wright didn't hesitate. He was using his media training. 'I've tried to avoid media,' he said, 'but it's starting to affect other people. I'd prefer to stay quiet. Why now? I have staff, I have family … All the innuendo, the falsehoods.' He had never suggested to me, in all our months of interviews, that he was outing himself because of media misrepresentation. I accepted it, though, when he said it to these journalists,

imagining that perhaps he had realised that the tax office pressure was the real pressure in his life, the thing that forced the outing. I said this later to the nCrypt guys and they agreed.

'Why conceal your identity anyway?' Siegele asked.

'I don't want to be a public figure,' Wright said. 'I hope people don't listen to Craig Wright. They will look at the facts, not decide based on what Satoshi says.'

That afternoon, I went to another appointment while Wright went off to Parsons Green to have his photograph taken for *GQ*. The next morning, at Starbucks again, Matthews was ridiculing the whole business with the photographs, and making fun of the magazine's original idea that he wear a mask in one photograph and rip it off in another. Matthews described what happened at the interview with the magazine's senior commissioning editor, Stuart McGurk. 'It actually went quite well,' Wright told me. 'The journalist was nice, but he brought along this complete wanker of an "expert".'

The man they were talking about is a university lecturer in cryptology. McGurk brought him along to help verify the claims. 'It was hilarious,' Matthews said. 'Craig threw the guy out.' According to one witness, he'd questioned Wright quite forcefully about his understanding of public and private encryption keys. 'He was totally in the guy's face at one point.'

'He was telling me he was more qualified than I am,' Wright said. 'It became a nice interview but this guy was a complete idiot and I told him to get the fuck out.' Matonis – who was there – said the scene was intense. I wasn't sure it was wise to greet dissenters and opponents, even ones who might be wrong, that way, but Wright was roundly applauded for doing so. I confess I felt it was wrong to tell journalists only half of the story, allowing them to misunderstand the reason he was suddenly coming out as Satoshi.

That day, the BBC came back. Wright was more irate than he had been the day before and less co-operative now that the camera crew was here. He felt he had done much more than he had ever wanted to and he said so, mainly under his breath. The cameraman set up the camera and then Cellan-Jones got into position. 'So who are you? And what are you about to show me?' he asked.

'My name's Craig Wright, and I'm about to demonstrate the signing of the message with a key that is associated with the first transaction ever done on bitcoin – a transaction of ten bitcoin to Hal Finney.'

'And who did that first transaction?'

'I did.'

'And whose name is associated with that transaction?'

'The moniker is Satoshi Nakamoto.'

'So you're going to show me that Satoshi Nakamoto is you?' Craig looked bewildered for a second and hesitated.

'Yes,' he said.

'Are you confident that this will prove to the world that you are Satoshi?'

'It proves I have keys … other things we'll be releasing will help … Some people will believe and some people won't, and, to tell you the truth, I don't really care.'

'But you can say, hand on heart, I am Satoshi Nakamoto?'

'I was the main part of it. Other people helped. At the end of the day, none of this would have happened without Dave Kleiman, without Hal Finney, and without those who took over – like Gavin and Mike.'

'And this is going to have a huge effect on your life?'

'Unfortunately, yes.'

Something changed in Wright in those few minutes. With these direct questions about Satoshi, his sense of himself – I don't know how else to put it – had come unstuck and he became noticeably uncomfortable. He said that he wanted to make the point that people should stop looking to him for answers.

'Make that point upstairs,' Cellan-Jones said.

'Upstairs?'

'We're going to film a straightforward interview upstairs, without the computer.'

Wright muttered something and stared into the depths of his computer as if he wanted to escape into it and never come out. 'I just want the basis to be on the computer,' he said.

The female producer interjected. 'Because we haven't actually done that bit on camera yet,' she said.

The PR executive came over, a little red in the face. 'Can we do that bit upstairs?' he asked. 'Are we all right to do the "why now?" question upstairs? And we'll be done?'

'You know, I don't actually watch TV,' Wright said.

The BBC left the room to scout out the location for the proper 'sit-down' interview. Wright complained to me that he was being pushed. 'I just didn't want a big facial

shot of me,' he said to the PR man. 'I preferred to be behind the screen a little bit … I'm not against it, as long as I can hide behind the screen.' The PR man said he didn't have to do anything he didn't want.

'I'm just doing the one question,' Wright said. The PR man left the room leaving me alone with him.

'Does it feel completely against the grain of your nature to be asked, "Are you Satoshi?" like that?'

'Yes.'

'Is it a crude question to you?'

'Why does it matter, other than that you need someone to attack, someone to deify. I mean, fuck's sake. I'll do this. That's it. Fuck off. I can dance around saying "please believe me." But it's more than absurd, it's melting clocks on a landscape.' At that point, the door opened and the PR consultant came in.

'Craig,' he said, 'we've explained to the BBC that you want to stay down here, and they're all making the point that this is the last thing you'll ever do …'

Craig started shaking and pushed his chair back. 'No! No! No!' His face was pale. 'You see this door,' he said. 'I don't want to hear another word. It's here, it's my way.' Then he walked out and slammed the door, leaving me alone in the room with the PR boss.

'We're only doing our job,' the boss said, with a shrug. Wright came back a second later and his microphone pack was trailing behind him.

'It's my way or I don't come back. OK? I'm not doing this for fucking PR stuff, I'm not doing this for anyone else. I don't give a fucking shit about what people say, I'd rather not do it. One word about it and I'll never come back. Not exaggeration. I will

never enter this office again. I'll never answer an email again, and I'll never talk to another PR person in my life again … Got it?'

'Yeah,' the boss said.

'Thank you.'

He went out and I was alone with Wright again. 'They've already pushed me,' he said. 'I'm already beyond where I want to be: I'm already doing a TV thing. And everything is always: "Let's take it a little bit further, a little bit further." Which bit of "Go away" don't they get?'

I asked him if Kleiman would have handled it better. 'Better than I do,' he said. 'He would still have told them to fuck off. But in a nicer way. Hal would have done it far better.'

'What do you think they're talking about up there?' I asked.

'The fact that I don't want to jump through their fucking bloody crap. "This man has a big credibility gap he's got to overcome, I'm open to being convinced he's Satoshi but …"'

The BBC came back downstairs to ask their 'one question' and, naturally, Cellan-Jones asked more than one. In the panicked and hostile mood Wright was in, he needed scapegoats, and the PR weren't meat enough and Matthews was too much the boss. So he scapegoated the BBC, saying, as soon as they left the room, that they had broken their 'contract' with him, that they were liars. 'I'll never do any television interviews again in my life,' he said. 'Never.' And as he said it, I was imagining him with Fox News or the rottweiler interviewers. 'The whole thing was just an attempt to expose me as being something I'm not,' he said.

'That was actually a pretty softball interview, Craig,' I said. 'You can't blame them for turning up and asking for proof.'

'Are you talking about proof or evidence? You're conflating the two. They're not the same and that's one of the things I'm saying. I gave them proof. They want more.'

Wright was happy to lecture you day and night about algorithms, but he wouldn't name names, and he struggled to provide real-world evidence of Satoshi's footprints. The more I thought about it, the more I realised something was wrong, for him, with the footprints analogy, because if Satoshi was only one man he would only have one set of prints. The Satoshi who existed online could be any number of people. But there was something revealing about his treatment of the BBC – something not very nice in his attitude to people who make it their business to ask straight questions – and the handling of the proof sessions made it clear how much of a danger he was to his own credibility. A month later, when I asked Cellan-Jones if the PR company had ever explained to him that there was a commercial company behind the outing of Satoshi, he said he had never been given that information, 'just that they were representing the man who was Satoshi'.

**Life Rights**

At 7.51 A.M. on 2 May 2016 all was quiet on the Twitter front. Well, not quiet, but the names Satoshi Nakamoto and Craig Wright were nowhere to be seen. This was the day of reckoning, the day the embargo would lift and the media outlets could run their pieces and name Satoshi. At 7.55, *Game of Thrones* was trending and so was Gerry Adams, for allegedly using the word 'nigger'. Also trending was a wildfire in Fort McMurray and a bombing in West Bengal. There's a strange feeling of supreme calm before a storm breaks. At 8 a.m., Wright posted a blog containing the supposed hash of the Sartre speech and various postings about himself as Satoshi. At the same moment, Gavin Andresen posted a message to his blog. Title: 'Satoshi'. 'I believe Craig Steven Wright is the person who invented bitcoin,' it began.

I was flown to London to meet Dr Wright a couple of weeks ago, after an initial email conversation convinced me that there was a very good chance he was the same person

I'd communicated with in 2010 and early 2011. After spending time with him I am convinced beyond a reasonable doubt: Craig Wright is Satoshi.

Part of that time was spent on a careful cryptographic verification of messages signed with keys that only Satoshi should possess. But even before I witnessed the keys signed and then verified on a clean computer that could not have been tampered with, I was reasonably certain I was sitting next to the father of bitcoin.

During our meeting, I saw the brilliant, opinionated, focused, generous – and privacy-seeking – person that matches the Satoshi I worked with six years ago. And he cleared up a lot of mysteries, including why he disappeared when he did and what he's been busy with since 2011. But I'm going to respect Dr Wright's privacy, and let him decide how much of that story he shares with the world.

We love to create heroes – but also seem to love hating them if they don't live up to some unattainable ideal. It would be better if Satoshi Nakamoto was the codename for an NSA project, or an artificial intelligence sent from the future to advance our primitive money. He is not, he is an imperfect human being just like the rest of us. I hope he manages to mostly ignore the storm that his announcement will create, and keep doing what he loves – learning and research and innovating.

I am very happy to be able to say I shook his hand and thanked him for giving bitcoin to the world.

Also at 8 a.m., with the embargo lifted, the first tweet appeared, from Rory Cellan-Jones: 'Craig Wright tells BBC I am bitcoin inventor Satoshi Nakamoto, publishes evidence backing his claim.' One minute later, a tweet appeared from @CalvinAyre, naming Craig Wright as the proven Satoshi. The *Economist* went one minute later, with a link to Ludwig Seigele's open-minded piece asking for more and better evidence. At 8.09 a.m. Radio 4's *Today* programme broadcast Cellan-Jones's report. 'I'm about to demonstrate the signing of a message with a key that is associated with the first transaction ever done on bitcoin.' The report was brief and quoted Wright once. It said Wright hoped to disappear and that that would be

difficult. They played the part of the interview where Wright said he was part of the group behind Satoshi.

'He sounds plausible,' Justin Webb, the presenter, said, laughing. Then they played part of the interview with Matonis, who said he was '100 per cent convinced'.

'Why should people be excited by this?'

'I put it on the level of the Gutenberg printing press,' Matonis said.

'Quite a lot of people are saying that this is as important as the internet,' Cellan-Jones reported, 'and that this man – if he is the man – should be celebrated like Tim Berners-Lee.'

'Craig Wright has just outed himself as the leader of the Satoshi Nakamoto team,' the bitcoin insider Ian Grigg wrote on his blog:

> Sometime in summer of 2015 the secret started to spread, and the writing was on the wall. An extortionist and a hacker started attacking, perhaps together, perhaps apart; to add to the woes, Dr Wright and his companies were engaged in a long harsh bitter battle with the Australian Tax Office. Since then, the team has been more or less in hiding, guarded, at great expense and at some fear … Satoshi Nakamoto dies with this moment. Satoshi was more than a name, it was a concept, a secret, a team, a vision. Now Satoshi lives on in a new form – changed. Much of the secret is gone, but the vision is still there. Satoshi Nakamoto is dead, long live Satoshi. Yet, a warning to all. Satoshi was a vision, but Craig is a man. The two are not equal, not equivalent, not even close … It is true that Craig is the larger part of the genius behind the team, but he could not have done it alone.

Over the following two hours the words 'Craig Wright' were typed into search engines tens of thousands of times, and the Reddit forums and the cryptocurrency community got to work. Meanwhile, I was being copied into the emails sent from the PR company to nCrypt and the Wrights. It issued a press release spreading the news to less favoured outlets. 'Wright's decision to go public follows a series of

misleading statements that are circulating and which he seeks to set straight,' the release said. 'Wright has also launched a blog, with a vision to create a forum about bitcoin, which dispels myths and helps to unleash its full potential. He will create a space to provide developers and producers with the real facts about the technology so as to encourage the widespread use of bitcoin and the blockchain.'

'Great start!' the top PR man wrote to the group at 9.31 a.m.

'Ta. All going well,' Wright wrote just before ten.

'All going to plan,' the second PR man echoed a few minutes later.

'Right on course so far,' the first PR man wrote at 10.13 a.m. And that was the last of the good news to come from the world of public relations.

By midday the blog was receiving the wrong sort of attention. A number of researchers had studied what Wright had written and noticed that the explanation was fudged – worse than fudged, it was faked. Something that he said was signed with the Satoshi key had, in fact, been cut and pasted from an old, publicly available signature associated with Nakamoto. It was astonishing and the buzz quickly grew fierce. All those hours in secret flats scrolled through my head. There had always been something missing, something he hadn't wanted to show. But was that because he wouldn't, or because he couldn't? The thought that he would fake proof so publicly and so coarsely was hard to comprehend. He sent me an email. 'They changed my blog post,' he wrote. 'It will be back as I wanted. But first I need to negotiate with Stefan.' And I replied: 'How did they change it?'

I thought he was lying. He had lied before, but to lie so transparently and so publicly made me think he had lost his mind. There was no way to square such actions with his wish to have no publicity. He had faked his own proof, and now he was being ripped apart on the internet. I briefly wondered if he might be enjoying the cries of execration, but how could he do that to Andresen and Matonis? Suddenly his opponents seemed wiser and greater in number. It took me a few days to see that

Wright's action might be consistent with something deeper in his character. He never wanted to come out and when it came to it he flunked his own paternity test. But I had a feeling that that he was too close to the invention to be a simple hoaxer.

'I will explain why I think he's probably not Satoshi,' said Vitalik Buterin, a big wheel in the cryptocurrency scene, speaking at Consensus, a bitcoin conference in New York that day. A friend of mine was there. He said that men had started the day high-fiving and shouting 'Satoshi, baby', but that as the long day closed, his name became the punchline of every joke. Core developers and others were calling for him to sign something new and in public right away, using the Genesis block, which is unquestionably Nakamoto's. One of them, Peter Todd, was quoted by *Forbes*: 'All Wright needs to do, says Todd, is to provide a signature on the message "Craig Wright is Satoshi Nakamoto" signed by a key known to be Satoshi's. "This is *really* easy to do … if you're actually Satoshi. Also, you'll know sufficient proof has been provided when it actually happens, because cryptographers will be convinced."'

That was the strangest element of all: Wright must have known, having been a cryptographer all his adult life, that his fraud would be spotted immediately. But when I asked him about it he said it wasn't a fraud, it was a mistake. 'I cut and pasted something just for the time being but knew I would change it later,' he said. 'But then it went up.' That rang hollow to me, the words of a falling man. He intentionally faked it. I believed at that point that he had misled his colleagues and tried to get out of being Satoshi, which isn't necessarily the same thing as not being him. 'I can't think of a more convoluted way to go about claiming one is Satoshi than what Craig Wright has done so far,' Jerry Brito, the executive director of Coin Center, told the *Daily Beast*. 'He's provided no cryptographic evidence verifiable by the public, and many of his answers sound plain fishy.' Emin Gün Sirer, a Cornell professor who had criticised Wright before, referred to Wright's 'meta-modernist play'.

The next day, I turned up at MacGregor's office and found him sitting with Matthews in a dark meeting room. They were hunched over the desk, exhausted and

shellshocked. When I asked them what happened MacGregor shook his head. It was the first time in six months I'd heard him sounding incoherent. 'Craig happened,' he said. 'He got cute with the math. He has been trying to get consent from the trustees to get the private keys … But he wasn't allowed access to coin or to do anything other than that. So what he was trying to do was re-sign a message …' Matthews butted in, saying Wright never had authorisation from the trust to use the key publicly or let anyone take it away.

'Why didn't he just say that?' I asked.

'You tell me,' Matthews said. MacGregor went on to explain how a signed message can be used nefariously by people with enough computing power. He said the trustees didn't want anyone analysing those blocks. I'm not sure if he was grasping at straws, but what he said didn't explain the suddenness or the fraudulence of what Wright had done. MacGregor said that he and Matthews had since been with Wright and indicated that the encounter had been shouty and ugly. But he said it was OK now. 'We have verbal consent from the trustees to move coin, and we're just waiting on the written consent.'

MacGregor and Matthews had been in the meeting room for hours trying to work everything out. They thought it could all still be kept on track. MacGregor was writing new blog posts for Wright. He asked for my help with one of them and I explained that I had now to distance myself from the whole thing. I had got too close. MacGregor said they were going to 'flood the blog with evidence' and get Wright to 'move' some of the Satoshi bitcoin, to transfer it to someone else in a way that only someone in possession of Satoshi's private keys could do. Andresen had agreed to be on the other end of the coin transaction.

'Craig is being mauled out there,' I said.

Rob removed his glasses. 'The first meeting we had with him yesterday ended with: "You're fired. Buy a ticket to Sydney. You fucked us. Good luck with the ATO."'

'He didn't sleep last night,' Matthews said. 'He looks fucking terrible.'

'He risks destroying his entire reputation.'

'His and ours,' MacGregor said. 'I've been taking meetings with investment bankers for the last two months. I've pulled every string I know to get meetings with Google and Uber. If he goes down in flames, I'll go down with him. I mean, he's fucked me. Millions of dollars out of my pocket, nine months out of my life. But what we have now is a very pliant Craig Wright. We're going to drag this back from the brink.'

'It's a big task, Rob,' I said.

'We finally beat him to a pulp today. No more decisions. This is what we're going to do, because he knew the next move was pack your toothbrush and get on a plane and good luck in Australia.' MacGregor told me he'd started Monday morning on an unbelievable high. 'I can't believe we kept all the puppies in the box this whole time,' he'd thought to himself. 'Nobody broke embargo, holy shit this is going to work. And then … '

We spoke about Wright's possible lies. I said that all through these proof sessions, he'd acted this like this was the last thing he ever wanted.

'That's not true,' MacGregor said. 'He freaking loves it. Why was I so certain he'd do that BBC interview the next day? It's adoration. He wants this more than we want this, but he wants to come out of this looking like he got dragged into it.' He told me if everything had gone to plan, the groundwork was laid for selling the patents. It was a really big deal. He said Ramona had said that if Wright doesn't come out you still have this really smart guy who has made all these patents, who knows all about bitcoin. 'Yeah,' MacGregor said. 'You and five hundred other guys who have called today.' I shook their hands and wished them luck, thinking I would probably never see the men in black again. And as I descended in the lift, I thought I would miss their brio and their belief, despite everything.

Craig was lost in some labyrinth of his own making, or mostly of his own making. He didn't want to be Satoshi. And he didn't want to be Craig. And he didn't want to be a letdown. And yet the message boards lit up and the walls closed in. Over the next 24 hours, he agreed to move Satoshi's coin and his blog advertised the fact. It said, 'Extraordinary claims require extraordinary proof,' and he was set to provide it.

The next day, Wednesday, 4 May, Matthews was at Wright's house organising the movement of coin. The new (and final) proof session was intended to blow away the doubts created by the first. Many commentators felt it was too late, that Wright was beyond the pale, but Matthews and MacGregor had agreed with Andresen that the movement of coin, to Andresen and also to Cellan-Jones at the BBC, would undo the damage. Wright spoke to Andresen on the phone from his house – Andresen was in New York – and told him he was worried about a security flaw in the early blockchain, a problem in the way those first blocks were constructed that would make it dangerous for him to move coin, exposing him to exploitation or theft. My sources say that Andresen understood the problem and confirmed that it was all right, it had been fixed. But Wright continued to worry and was showing great reluctance about offering the final proof. Then he left the room abruptly and didn't come back.

The next day, he sent me an email. It linked to an article headlined 'UK Law Enforcement Sources Hint at Impending Craig Wright Arrest'. The article suggested that the father of bitcoin might be liable, under the Terrorism Act, for the actions of people who used bitcoin to buy weapons. Under the link, Wright had written an explanation: 'I walk from 1 billion or I go to jail. I never wanted to be out, but if I prove it, they destroy me and my family. I am the source of terrorist funds as bitcoin creator or I am a fraud to the world. At least a fraud is able to see his family. There is nothing I can do.'

He was devastated. He was the runner who failed twenty yards short of the finishing tape, the man who froze at the moment of truth, and started walking backwards. He said he feared prosecution on the one hand and humiliation on the other. The

borstal boy in Alan Sillitoe's 'The Loneliness of the Long Distance Runner' comes from a family who make much of running, 'especially running away from the police'. He hates being understood, feels authority is only there to grind you down, and holds on to his essential privacy, knowing 'they can't make an X-ray of our guts to find out what we're telling ourselves.' The boy lives on his own terms, which means not faking it for power, even when the pressure is high and the rewards are obvious. So he refuses to win. Representing the borstal in a championship race he is well ahead of the other runners, but he stops, and lets them pass, and at the end jogs up to the tape: 'I got to the rope,' Sillitoe writes, 'and collapsed, with a murderous-sounding roar going up through my ears while I was still on the wrong side of it.' In another email that day Wright wrote: 'Andrew, I don't know what I can say. If I was to do the proof and save myself, I damn myself.' That afternoon, he closed down the blog – the one that was intended to lead cryptocurrency fans into a new era – but left a final posting:

> I'm sorry. I believed that I could do this. I believed that I could put the years of anonymity and hiding behind me. But, as the events of this week unfolded and I prepared to publish the proof of access to the earliest keys, I broke. I do not have the courage. I cannot. When the rumours began, my qualifications and character were attacked. When those allegations were proven false, new allegations have already begun. I know now that I am not strong enough for this. I know that this weakness will cause great damage to those that have supported me, and particularly to Jon Matonis and Gavin Andresen. I can only hope that their honour and credibility is not irreparably tainted by my actions. They were not deceived, but I know that the world will never believe that now. I can only say I'm sorry.
>
> And goodbye.

*

The next morning I drove through the traffic to a London suburb. It was early in the day and the high streets were empty, the happy boutiques, the delis and the wicker-and-candle dens where people come to improve their mood or do something

about their lifestyle. Craig and Ramona were sitting in the corner of a popular café. They were holding hands and staring at the table. He was wearing his Billabong T-shirt – I remembered it from his description of the clothes he'd bought in Auckland when he began his long-distance run last December. He looked as he'd looked the first night I met him in Mayfair: unshaven, unslept, the scar on his face more livid, his pupils like pinpricks and his breathing heavy. He wasn't just white, he was empty-looking, and his hands were trembling. Ramona was crying. The light of the café seemed too much for the darkness enclosing them. I went to shake his hand but we hugged instead, and it was like embracing a drowning man. He hadn't really slept since Monday and this was Friday. He wasn't drinking his latte, he made clouds on the spoon, and stared.

'Well, it was worth about a billion dollars to them,' he said. Ramona talked about jail and I asked if they were afraid of being prosecuted.

'They say it'll never happen,' she said. 'Of course it will … So how can he? How can he?' He spoke of men he knew who had sold bitcoin and had been prosecuted for money-laundering and said they might try to do that to him. 'It was always a present danger,' Ramona said. MacGregor, Wright alleged, had always had a plan to move him if necessary to Manila or Antigua if it looked like he might be arrested.

'It's always been incremental,' Craig said. 'One step, one step, and nobody realises that eventually that takes you over a precipice.'

'That's the thing,' Ramona said. 'Your happiness doesn't count at all. But now we're stuck. You come out – you go to jail. You don't come out – you're a fraud. It's got to the point where it's almost better if he's a fraud.'

'So what happened on Monday,' I asked, 'when it came to writing that blog?'

'I gave them the wrong thing,' he said. 'Then they changed it. Then I didn't correct it because I was so angry. Which was stupid. I put up the wrong one. No one wants

SN. I will never be SN. I'm not personable. You can lock me in a room and I'll write papers, I'll never be personable.'

Ramona was crying. 'They could take us down,' she said. 'They could really take you down if they want to.'

They spoke about moneymaking ventures Wright was involved in a long time ago. Wright alleged Matthews knew about these activities, which was true, because Matthews had mentioned them to me.

'I just couldn't do things anymore,' he said. 'That's all.'

They wanted to talk about the trust, but they didn't really explain it. He said it was to hide the bitcoin. 'It's not meant to be spent,' he said. 'Too many problems.'

'It's also a guarantee that you can't flood the market,' Ramona said. 'That we can't use it to pay the bills, no matter how desperate things get.' When I asked who the trustees were they went quiet.

Ramona began to worry about my story. She tried to strong-arm me. She began to tell me what I should say and what I shouldn't say and how I should hide from MacGregor and Matthews the comments she and Wright had made about them. 'I want to write the truth,' I said.

She said I knew too much. She said that Craig would go to jail or harm himself if I told everything I knew. I was stunned. There were many things that were said to me by every party in this story that I would choose not to print. Not only things they said about one another, but business arrangements and unsubstantiated allegations about the past, and things I knew in the present. But I had been recording this as a documentary from the start, as I'd said I would when we met at Claridge's in December. Now I was being told that my material was too hot and my story posed a threat.

Craig suddenly got very upset. His face crumpled and he put his head in his hands. 'And the Brits have their equivalent of Guantánamo Bay as well,' he said. 'I'll never write, I'll never see anyone. I'll be in a little room. I won't even have a pen and paper. I won't see my wife again. I'll never see …' He sobbed and was inconsolable. 'I'll never write again.'

'They won't do that,' Ramona said. I suggested they might get a lawyer to advise them on the possible threats they faced. Ramona said it was too expensive. She said the bills would run into the millions. Craig talked about Ian Grigg and others who'd 'outed' him last year by nominating him for various awards. Satoshi was nominated for a Nobel Prize and a Turing Prize. Wright told me that people in the bitcoin community wanted him to come out and receive recognition. He said it had never been in his interest to come out, but in other people's interest. 'I don't care if people like my work,' he said. 'I just have to *do* my work. That's the only thing that'll keep me sane.'

'I would like that his reputation gets redeemed but I don't know if that's possible,' Ramona told me. 'This is what I propose, if you can do it, you do it, if you can't, it's up to you. If [you say] he didn't choose to come out … then the company gets put in the spotlight. If you say you know he is Satoshi then we're in trouble. If you say you have your doubts then he looks like a fool.'

I'm sure I looked at her disbelievingly. 'You're basically saying that every version of the truth of this story is untellable.'

'But if you say it, Andrew …'

'If you were sure that this could never be said in the end, then you should never have allowed it to happen.'

'It was one step, then one step …' Craig said, again.

'And you let a writer into your life?' I said.

'Do you know how much this meant to me?' Craig said. 'The company. The people. To be doing that. To get all these papers out. To be in that position. It's my idea of heaven, but the cost is hell.'

'If we didn't co-operate with you,' Ramona said, 'they'd stop …'

I reminded them that every time I'd tried to walk away from this story – like when they tried to make me sign an NDA – she'd begged me to come back. I told them that full disclosure was much less damaging than any other option. Naturally enough, that was my view.

'No one wants to believe me,' Craig said.

'And I think that's great,' Ramona said. 'It's great that no one wants to believe you.'

Craig said he'd **filed all these patents** and they were all from him, 'not just Dave'.

'What do you mean,' I asked. '"Not just Dave?"'

'I mean I wrote those patents,' he said. 'It means I knew all this shit.'

'Have you been able to talk to Matonis or Andresen?' I asked.

'No,' Ramona said. 'I don't know if they'll even talk to us.'

'I think you should have some crisis management advice.'

'From who?'

'From a therapist.'

'We don't have time for that,' she said.

I walked home with them and he slumped on a sofa, looking wan, gone. 'His mental health is fucked,' she said to me when he was out of the room. 'If he goes to jail, he'll kill himself. I can't leave him alone.'

When he returned he seemed almost paler than before. 'This is all because I wrote code,' Craig said. 'Not because I blew up something, because I wrote code.'

'Just out of interest,' I said. 'If you are a fraud … How hard a fraud would it have been to perpetrate?'

'It would be the best one in human history,' Craig said. 'It'd be Ronnie Biggs on steroids times a million. I invented a new form of money. Who has ever had anything to do with money that wasn't to do with government? Who has ever really succeeded?'

'You mean it's a thankless task?'

'It's always Prometheus,' he said.

<p style="text-align:center">*</p>

This was a story in which everybody wanted their story told, then untold, then hidden, back in the vaults. It seemed like a very new story, but, in fact, it was a very old one, a story of metamorphosis, and of Prometheus unbound. Craig Wright proved cryptographically that he had Satoshi's keys, his emails seemed to show his involvement, his science extrapolated on the technology of the blockchain, and he spent a full year engaged in a business plan to reveal it all. But, when it came to it, he behaved like a fraud, he shape-shifted and he dissolved.

I began to wonder whether Craig Wright might be a man who had never known who he was, a missing person, constantly in discussion with some inner lost boy, unable to bear the conditions which forced him to say definitively who he was. Some people, it could be said, *really* aren't anyone, in the sense that the complications of

being themselves have wiped them out. The internet eats its own ciphers, and Wright is one of them. He might have sabotaged his own proof or simply flunked the paternity test because he isn't the right man, but his own doubts about himself are the real drama. He was sick, he was brilliant, he was manipulative – but much of what he said was true. And as I drove away that morning, it was the sickness that seemed predominant. Wright was a clever man who had gone to the very end of himself to prove who he wasn't. 'We are all Satoshi now,' became a tagline for bitcoin's early fans. And in the end we all are Satoshi, and we'll begin to accept it as paper currency starts to look stale, and our minds merge with our computers. There are new networks up ahead that will have grown from the seed Satoshi planted, and it was odd, after all my travels, to believe that the only man who wanted to opt out of being Satoshi was Craig Wright. A week after his 'proof sessions' with the BBC and others, he was in complete disgrace, his corner office at nCrypt had been emptied and his leather sofas had disappeared, removed from the building with the signed Muhammad Ali picture and the rest of his stuff. Without ceremony, the best room in the office became a conference room and his name was spoken in whispers.

My last meeting with MacGregor and Matthews was a time of conjecture and anger, devastation and apology. They felt Wright had perjured himself, and for no good reason. He had never admitted to problems with the trust, problems that would, though he hadn't admitted it, make the Satoshi reveal very difficult for him. They still believe, as do Andresen and Matonis, that he is Satoshi. To them, there is just too much evidence to accept Wright's late attempt to cloak himself in deniability. But no matter. He was now fired, they said, and the deal with Google was off. 'He put a gun to our head and pulled the trigger,' MacGregor told me. 'The world is still going to think we got fooled, but I know the facts. He has the keys.' There was a moment in our meeting when I realised this had gone all the way to the bone with MacGregor. He said he never wanted to see Wright again. 'This was supposed to be so noble,' he said, 'and it became so dark.' Matthews told me that Wright's office, his house, his job, his work visa, everything, was set to go. They had spent as much as $15 million and maybe lost a billion. MacGregor said the PR company would never deal

with him again, and there were investment bankers who weren't picking up his calls. A way would be found, however, to continue developing the blockchain technology. The company would go on. MacGregor shook his head. The whole thing was unfathomable. It was baffling. For no obvious reason Wright had found a way to disappear back into the shadows.

**Coda**

He seemed to miss me. Craig wanted to meet. It was a few weeks after the abortive 'reveal' and I saw when I got to Patisserie Valerie that he was happy again and ready to take on the world. 'It was unfair of me to request you not to publish certain things about our situation,' Ramona had written to me in an email. 'As you said, you have a debt to the truth, and that is as it should be.' And yet, as we all know, the truth has more faces than the town clock.

Wright told me in Patisserie Valerie that he felt free again. He had lost a third share in a billion dollars but he felt unburdened. He was sorry to have let good people down but now he could work in peace. Sherlock Holmes's central precept came into my mind. 'When you have eliminated the impossible, whatever remains, however improbable, must be the truth.'

'Do you want to know what I think?' I said to him after he told me again that all would be well from now on.

'Yes.'

'What if you were 30 per cent Satoshi. You were there at its formation and you were part of a brilliant group. You coded and you synthesised other people's work and you shared in the encryption keys. Then, some time in the last year, you upgraded yourself to 80 or 90 per cent. You were already a lot more Satoshi than anybody else has been hitherto, but the deal, in your eyes, required you to be more and in the end you couldn't carry that off.'

'No,' he said. And he flew off on a tangent about elliptical curves and the nature of the blockchain and how he never wanted to be a deity. I turned off my recording head at that point and stared through him.

Outside the café, he shook my hand. I knew I would never see him again. For six months we had allowed each other to think we were friends – subjects need storytellers, and storytellers need subjects. There had been a time when he'd imagined that I could free him from his fictions and build him a new story in reality. I was a willing stenographer, thinking Wright was something perhaps bigger than Satoshi. He was the internet's habit of self-dramatisation and self-concealment all at once; its new sort of persona. What he actually did may never be known. Either he's one of the greatest computer scientists of his generation, or he's a reckless opportunist, or he's both. We can't be sure. But there he was, standing in Old Compton Street in the pouring rain, saying sorry.

# Exhibit 2

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L11000019904
FILED 8:00 AM
February 16, 2011
Sec. Of State
tcline

## Article I

The name of the Limited Liability Company is:

W&K INFO DEFENSE RESEARCH LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

3119 CONTEGO LANE
PALM BEACH GARDENS, FL. US  33418

The mailing address of the Limited Liability Company is:

4371 NORTHLAKE BLVD #314
PALM BEACH GARDENS, FL. US  33410

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

DAVID A KLEIMAN
3119 CONTEGO LANE
PALM BEACH GARDENS, FL.   33410

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   DAVE KLEIMAN

## Article V

The name and address of managing members/managers are:

L11000019904
FILED 8:00 AM
February 16, 2011
Sec. Of State
tcline

    Title:  MGRM
    DAVID A KLEIMAN
    4371 NORTHLAKE BLVD #314
    PALM BEACH GARDENS, FL.  33410  US

## Article VI

The effective date for this Limited Liability Company shall be:

    02/14/2011

Signature of member or an authorized representative of a member

Electronic Signature: DAVE KLEIMAN

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

Exhibit 3

 Gmail

---

## Fwd: Re: Dave

███████████████ @gmail.com>                                    ███████████████

---------- Forwarded message ----------
From: **Craig Wright** <craig@rcjbr.org>
Date: Sat, Feb 15, 2014 at 9:15 PM
Subject: RE: Re: Dave
To: Ira K ███████████████████

If Patrick can do it, that would be good.

I do not know what was going on with Dave at the end and I had no idea he had any troubles financially. He never shared that and I would have helped him with anything. A year ago, liquidity and other issues made spending Bitcoin difficult. There are still issues.

Dave owned 50% of a US company that controlled a Belize based trust. I have attached a little more of what we did together. We had several DHS research programs.

These projects are listed below and the R&D conducted here is a part of these as well:

| | | |
|---|---|---|
| TTA 01 - Software Assurance economic measures | $650,000 | Software assurance through |
| TTA 14 - Software Assurance MarketPlace (SWAMP) Information Security risk markets | $1,200,000 | Software derivative markets & |
| TTA 05 - Secure, Resilient Systems and Networks | $1,800,000 | SCADA Isolation |
| TTA 09 - Cyber Economics | $2,200,000 | Risk Quantification |

These are the types of research projects Dave was involved with.

We used the Dept of Homeland Security and Australian government for base research funding on some of it.

Nobody involved with this wants to ever (even after death be known). The myth is more powerful than all of us combined. I want Dave's family to know, but please understand, he would not have wanted the world knowing.

I am a moody, grumpy bastard who loved Dave as he was one of the few people who would give me the time of day, let alone be as much of a friend as he is. When you start looking through all of this, it starts to become more like the

Bond movie.

If the DHS and others had known what we were doing, they would have stopped it early. If others (public) know the DHS funded the research, it will be a huge problem.

The myth is a part of Dave's legacy.

…

**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553 | Mobile: + 61 417 683 914

http://www.rcjbr.org

cid:image001.jpg@01CCA14C.26B11E30    cid:image002.jpg@01CCA14C.26B11E30
cid:image003.jpg@01CCA14C.26B11E30

---

**3 attachments**

**A preamble into aligning Systems engineering and Information security ri....pdf**
1027K

**Safecomp2011.pdf**
549K

**W&K Info Defense Research LLC - 08.pdf**
118K

# Exhibit 4

# CONTRACT FOR THE SALE OF SHARES OF
# A COMPANY OWNING BUSINESS

**PARTIES**

**Dave Kleiman for W & K Info Defense LLC**
(Vendor)

**AND**

**Craig Wright R&D**
**ABN 97 481 146 384**
(Purchaser)

**AND**

**W&K Info Defense LLC**
(Company)

Ref: CEWK03

**THIS AGREEMENT** dated 02 day of April 2013

**BETWEEN**

  Dave Kleiman of W&K Info Defense LLC (Florida)

And                  (Vendor)

  Craig Wright of Craig Wright R&D
  ABN 97 481 146 384

And                 (Purchaser)

  W&K Info Defense LLC

                  (Company)

## RECITALS

A.  The vendor is the owner of all issued shares in the company being ordinary class shares. Ownership is 50% in the vendor's name and 50% in trust held for the purchaser.

B.  The company is the owner of and conducts the business known as Bitcoin mining and Software development / Research.

C.  The vendor has agreed to sell and the purchaser has agreed to purchase the vendor's shares for the price and upon the terms set out hereunder.

D.  As the purchaser will succeed to the business of the company on completion of the acquisition of these shares, the parties agree that they will incorporate into this agreement those agreements contained in the attached contract for the sale of a business to the intent that they shall in relation to the sale of the shares have the rights and obligations contained in such contract as part of this agreement.

E.  The company has consented to and agreed to be bound by the terms of this agreement.

F.  The company includes all software, research material and other aspects of the business.

G.  The parties wish to commit the terms of their agreement to writing in the manner hereinafter set out.

**OPERATIVE PART**

1. **Interpretation**

   This agreement is governed by the laws of the state of NSW, and the parties, submit to the non-exclusive jurisdiction of the courts of that state/country.

   In the interpretation of this agreement:

   (a) References to legislation or provisions of legislation include changes or re-enactments of the legislation and statutory instruments and regulations issued under, the legislation;

   (b) Words denoting the singular include the plural and vice versa; words denoting individuals or persons include bodies corporate and vice versa; references to documents or agreements also mean those documents or agreement as changed, novated or replaced, and words denoting one gender include all genders;

   (c) Grammatical forms of defined words or phrases have corresponding meanings;

   (d) Parties must perform their obligations on the dates and times fixed by reference to the capital city of the state of Sydney;

   (e) Reference to an amount of money is a reference to the amount in the lawful currency of the Commonwealth of Australia;

   (f) If the day on or by which anything is to be done is a Saturday, a Sunday or a public holiday in the place in which it is to be done, then it must be done on the next business day;

   (g) References to a party are intended to bind their executors, administrators and permitted transferees; and

   (h) Obligations under this agreement affecting more than one party bind them jointly and each of them severally.

2. The vendor hereby agrees to sell and the purchaser hereby agrees to purchase ordinary class shares in the company for the purchase price as noted below:

   (a) Two (2) loans issued under deed "CEWK01" are agreed to be repaid in full for the consideration of 300,000 Bitcoin agreed in the contract. The repayments as a one off of both loans for $20,000,000 with a total value of

$40,000,000 are deemed paid in full for the above value. This is noted as consideration from the purchaser and is issued in forbearance of the requirements of the contract signed 22 April 2011 between the Vendor/Company and the purchaser (designated CEWK01).

(b) The vendor agrees that the paper wallet with address "1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a" held in escrow will be released to the purchaser.

(c) Due to the unexpected rise in the value of Bitcoin, it is agreed that two transfers (in Bitcoin) of BTC 125,000 and BTC 125,500 when taken in conjunction with the supply of the software, will suffice to fulfil the contract.

3. Hence, the vendor will:

(a) Pay (transfer to) the purchaser 250,500 BTC on 30 April 2013,

(b) Accept transfer of the escrowed Bitcoin paper wallet to the purchaser,

(c) Transfer the ASC hardware to the purchaser,

(d) Release the source code to the purchaser,

(e) Transfer the Vistomail email account.

(f) Transfer all research materials from the four (4) DHS BAA research projects to the purchaser with all notes, data and results, and

(g) Transfer any shares in the company to the purchaser by 30 April 2013.

4. The Purchaser will:

(a) Accept the new terms in full satisfaction of the contract with Reference CEWK01 made between the vendor/company and the purchaser on 22 April 2013.

(b) Accept the vendor's 323,000 remaining "mined" Bitcoin as a 49.5% stake in a new venture to be formed in Australia (to be called Coin-Exch Pty Ltd) between the vendor and the purchaser for the exploitation of the joint and to be pooled Bitcoin

(c) Accept the transfer of the 323,000 Bitcoin (to be made on the 30th April 2013) as capital and note that shares in the new enterprise will be issued at this point.

(d) Provide $30,000,000 in capital into Coin-Exch Pty Ltd (to be formed) and the software developed in the prior venture.

5. Settlement shall be effected on 30 April 2013.

6. So far as they are relevant the agreements contained in the incorporated contract for the sale of a business shall be agreements between the parties herein.

7. In the event of either party failing to complete this agreement on the settlement date then the other shall be entitled at any time thereafter to serve a notice to complete requiring the other to complete within 14 days from the date of service of the notice, which time period is considered reasonable by both parties. For the purpose of this contract, such notice to complete shall be deemed both at law and in equity sufficient to make time of the essence of this contract.

8. On the settlement date the vendors shall:
   (a) Deliver up to the purchaser possession of the business conducted by the company and in all respects shall have complied with the terms of the business sale contract incorporated herein;
   (b) Deliver up to the purchaser duly executed instruments of transfer of their shares;
   (c) Cause a meeting of the directors of the company to be held at which the directors shall approve and consent to the sale and transfer by the vendors to the purchaser of the vendors' shares.
   (d) Send all software developed under the various DHS BAA filings to the purchaser (incl. source code and documentation).
   (e) Provide the location and access rights to the ASC mining hardware hosted at a site known to Mr Kleiman will be returned with this transfer. This has a nominal value of $8,828,571.29 before depreciation. This is a
   (f) Solutions to the Agent and Merkle Tree problems developed by Professor David Reese.
   (g) Bitcoin agent software and suit of C/C++/C# and Python Blockchain software source codes.

(h) Exchange Bitcoin holdings as noted in the contract.

9. The company hereby agrees to take all steps and carry out all acts to procure the registration on the settlement date of the purchaser as the registered holder of tile to the vendors' shares.

10. The purchaser will make all reasonable endeavours to have the new venture (Coin-Exch Pty Ltd) registered for GST and under the Australian Corporations act provisions before settlement on the 30th April 2013.

11. The parties hereto agree to execute and perform all such acts, deeds, documents and things whatsoever as may be necessary and desirable to better carry into effect the provisions of this agreement.

12. **Vendor's warranties**

(a) **Vendor's authority to sell**

(i) The vendors are the registered and beneficial owners of their shares in the company.

(ii) The vendors have full power and authority to sell and transfer to the purchaser good legal and equitable title to the shares without the consent or authorisation of any person except only consents required by the company.

(b) **The company's financial statements**

Other than matters disclosed to the purchaser in writing the books and accounts of the company truly and fairly reflect the company's affairs.

(c) **Books and records**

The company's books, records and registers are in the possession of the company, and accurately record the details of all of the company's transactions, finances, assets and liabilities.

(d) **Taxation**

(i) Other than disclosed to the purchaser in writing the company has lodged or filed all tax and duty returns for all taxes including GST, income tax, sales tax, fringe benefits tax, payroll tax, group tax and WorkCare levies.

(ii)    No claim has or will be made against the company for payment by the company pursuant to the provisions of the Income Tax Assessment Act 1936 of any tax which is not shown or included as a liability or provision in the balance sheet contained in the accounts.

(iii)    Neither the commissioner nor any federal, state or municipal body has any dispute with the company concerning the company's affair.

(e)   **Compliance with applicable laws**

(i)    Neither the vendor nor the company has breached, or caused a breach of the company's memorandum or articles of association; any contract, agreement or instrument which binds the company; or any judgment, order, injunction or decree of any court, commission or administrative body relating to the company or to the shares.

(ii)    Neither the company nor any of its officers, agents or employees (while performing their duties for the company) has breached the law. The company has not been notified that it has, or may have, breached the law regulating its affairs or the conduct of its business.

(f)   **Litigation and indebtedness**

Other than as disclosed to the purchaser in writing:

(i)    The company is not a party to, or threatened with, any claim, litigation, prosecution or arbitration in any court, tribunal or otherwise;

(ii)    There are no unsatisfied judgments or arbitral awards against the company;

(iii)    The company is not being investigated for any breach of the law. Neither the company nor any of its directors is aware of any breach of the law or of any circumstances, which would give rise to a breach of the law other than as disclosed to the purchaser in writing;

(iv)    The company has met all deadlines for repayment of its debts;

(v)    No petitions, notices or proceedings have come to the company's notice, which could result in it being wound up. No orders or resolutions have been made or passed to place the company in liquidation or provisional liquidation.

(g) **Accuracy of disclosed information**

    (i)    The vendor has disclosed to the purchaser all information, which would be material for a purchaser in forming a decision whether or not to purchase the shares.

    (ii)   If either the vendor or the company becomes aware of anything which may constitute a breach of, or be inconsistent with any representation, warranty or undertaking in this agreement, they will notify the purchaser of its particulars promptly in writing.

(h) **Warranties and indemnities**

    (i)    It is a condition of this agreement that each warranty is true and correct in every respect and shall be construed separately.

    (ii)   The vendor acknowledges that the warranties have been given with the intention and for the purpose of inducing the purchaser to enter into this agreement.

    (iii)  The purchaser has entered into this agreement and agreed to the purchase price payable for the shares on the basis of and in full reliance upon the warranties.

    (iv)  Prior to the settlement date the vendor will take all such steps and provide all such information and documents with regard to the company as the purchaser may reasonably require and will give the purchaser and its professional advisers full and free access to the records and accounts of the company (whether financial or otherwise) to enable them to fully investigate the accuracy of the warranties.

## 13. Notices

A communication required by this agreement, by a party to another, must be in writing and may be given to them by being:

(a) Delivered personally; or

(b) Posted to their address specified in this agreement, or as later notified by them, in which case it will be treated as having been received on the second business day after posting; or

    (c)   Faxed to the facsimile number of the party with acknowledgment of receipt received electronically by the sender, when it will be treated as received on the day of sending; or

    (d)   Sent by email to their email address, when it will be treated as received on that day.

## 14. Waiver or variation

    (a)   A party's failure or delay to exercise a power or right does not operate as a waiver of that power or right.

    (b)   The exercise of a power or right does not preclude:

        (i)   Its future exercise; or

        (ii)   The exercise of any other power or right.

    (c)   The variation or waiver of a provision of this agreement or a party's consent to a departure from a provision by another party will be ineffective unless in writing executed by the parties.

## 15. Counterparts

This agreement may be executed in any number of counterparts each of which will be an original but such counterparts together will constitute one and the same instrument and the date of the agreement will be the date on which it is executed by the last party.

## 16. Further assurance

Each party will from time to time do all things (including executing all documents) necessary or desirable to give full effect to this agreement.

## 17. Costs

Each party will pay their own costs in relation to this agreement.

**SIGNED AS AN AGREEMENT**

Executed by
W & K Info Defense LLC          )

Dave Kleiman
 DIRECTOR

Executed by
Craig Wright R&D (A.B.N. 97 481 146 384)

Craig S Wright

# Exhibit 5

# 2014 LIMITED LIABILITY COMPANY REINSTATEMENT

**FILED**
**Mar 28, 2014**
**Secretary of State**

## DOCUMENT# L11000019904

**Entity Name:** W&K INFO DEFENSE RESEARCH LLC

| | |
|---|---|
| **Current Principal Place of Business:** | **New Principal Place of Business:** |
| 3119 CONTEGO LANE<br>PALM BEACH GARDENS, FL 33418    US | 3128 MERCED AVE, EL MONTE<br>EL MONTE<br>PALM BEACH GARDENS, CA 91733    US |
| **Current Mailing Address:** | **New Mailing Address:** |
| 4371 NORTHLAKE BLVD #314<br>PALM BEACH GARDENS, FL 33410    US | 3128 MERCED AVE, EL MONTE<br>EL MONTE<br>PALM BEACH GARDENS, CA 91733    US |

| FEI Number: | FEI Number Applied For ( ) | FEI Number Not Applicable (X) | Certificate of Status Desired (X) |
|---|---|---|---|

| | |
|---|---|
| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
| KLEIMAN, DAVID A<br>3119 CONTEGO LANE<br>PALM BEACH GARDENS, FL 33410    US | NGUYEN, UYEN T<br>4371 NORTHLAKE BLVD #314<br>PALM BEACH GARDENS, FL 33410    US |

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE:   UYEN NGUYEN                                                                                    03/28/2014
_____
Electronic Signature of Registered Agent                                                        Date

**AUTHORIZED PERSONS:**

Title:          MS
Name:        NGUYEN, UYEN T MS
Address:    4371 NORTHLAKE BLVD #314
City-St-Zip:  PALM BEACH GARDENS, FL 33410 US

Title:          DR
Name:        COIN-EXCH PTY LTD
Address:    502 / 32 DELHI RD
City-St-Zip:  NORTH RYDE, NS  02113 AU

I hereby certify that the information indicated on this report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am authorized to execute this report as required by Chapter 605, Florida Statues.

SIGNATURE:   UYEN NGUYEN                                    MS                            03/28/2014
_____
Electronic Signature of Authorized Person                                            Date

Exhibit 6

*DLM = Sensitive – when completed*

# Record of client contact

☐ **Interview**            ☐ **Telephone call**            ☑ **Other meeting**

| | |
|---|---|
| **Person/s Interviewed** | Authorised contact, John Chesher |
| | Bookkeeper, Ann Wrightson |
| | |
| **Representatives for the ATO** | Andrew Miller and Jenifer Trinh |
| | |
| | |
| **Date:** | 26 February 2014 |
| **Location:** | Interview Room 1, ATO Parramatta Office |
| | 2-12 Macquarie Street |
| | Parramatta NSW 2150 |
| | |
| | |
| **Start time:** | 1:00PM |
| **End time:** | 2:50PM |

*Important: Interview notes are an important part in gathering evidence to support your decisions. Consider the following issues and ensure an accurate and contemporaneous record is kept.*

## Contact summary:

### *Purpose of the contact*
Meeting was for John Chesher to explain workings in the revised activity statements sent to the ATO on 25 February 2014

### Issues Discussed:

1. Craig Wright
2. Hotwire Preemptive Intelligence Pty. Ltd. (Hotwire)
3. The Trustee for the Wright Family Trust (DeMorgan)
4. Coin-Exch Pty. Ltd. (Coin-Exch)
5. Cloudcroft Pty. Ltd. (Cloudcroft)
6. Strasan Pty Ltd (Strasan)
7. Pholus Pty. Ltd. (Pholus)


## Record of Conversation:

ATO auditor, Andrew Miller (AM) brought authorised contact (John Chesher) and bookkeeper, Ann Wrightson (AW) into Interview Room 1 at 1:00pm on 26 February 2013.  AM and ATO auditor, Jenifer Trinh (JT) then introduced themselves to JC and AW.

After the introduction, the meeting commenced. To the best of my recollection, and

based on notes I made during the meeting, the conversation was as follows:

**JC:** Have you been able to have a chance to look at the briefing report sent earlier today?

**AM:** I did have a chance to look at the briefing before the meeting. I will be holding a meeting with Marina Dolevski and Hoa Do tomorrow and will raise the issues raised in the briefing at the meeting.

**JC:** We have gone through various stages of how the Bitcoins are viewed. We have gotten our legal adviser, Andrew Sommer to have a final look at it and he has advised us that our previous treatment of the Bitcoins was incorrect and that it should have been treated as an assignment of right of Bitcoins as no Bitcoins were actually physically exchanged between the related entities.

**AM:** I have had a brief look into the revised activity statements sent by you yesterday. Our meeting today is an opportunity for you to walk through the revisions made on the activity statements for the various entities.

**JC:** There is not much difference between the revised activity statements and the original activity statements. Initially, we treated the Bitcoins as money. Now, we will be treating them as an assignment of right of Bitcoins. The outcome to the ATO would not be much different. The focus on the audits should be on the external transaction, that is, the transactions made with MJF Consulting Pty Ltd (MJF).

**AM:** We will first start with the GST worksheet provided for Craig Wright himself. *AM then shows JC a relationship map titled 'Other Observations'.* This is my understanding of the relationship amongst the related entities. I may be making changes to it or adding things to the current diagram during the meeting. I can give you a copy of this as well.

*JC looks at the diagram and points at Craig Wright on the diagram.*

**JC:** This all starts with Craig Wright. Craig Wright started all this in 2009 when he started mining Bitcoins. There was a previous GST audit conducted on Craig Wright. The audit was in relation to transactions that occurred relating to Intellectual Property. The auditor took an adverse view. The auditor and Craig Wright had a difference of personality. The outcome of the audit resulted in allowable deductions and GST acquisitions revised to nil. Craig Wright couldn't save the two entities. We took the audits to objection but the objection officer agreed with the auditor. The decision was upheld in objections. We then took the matter to the AAT and the court allowed some of the deductions. The audit resulted in liabilities being raised and your debt department was onto us immediately. However, the AAT decision changed this. From owing the ATO hundreds of thousands, we were now allowed a net loss to be carried forward to future years.

We were apprehensive about director Des McMaster's involvement with the current audits due to his past involvement with the previous GST audit.

**AM:** That shouldn't be a problem. I am the auditor conducting the audit, not Des.

**JC:** We understand. Craig Wright took the Bitcoins that he had mined offshore. At the time, it was worth 3-4 cents. The total value of this was around $5000. He then started up W&K Info Defense LLC (W&K) with Mr Dave Kleiman. W&K was an entity created for the purpose of mining Bitcoins. Craig Wright is a forensic computer expert. He is constantly updating himself attending courses, workshops and training sessions. He is also a university lecturer at Charles Sturt University and conducts courses. He even provides services to some Australian government agencies including the ATO and the Defence Force. However, this is all done on a very high level.

2

Craig Wright had mined a lot of Bitcoins. Craig then took the Bitcoins and put them into a Seychelles Trust. A bit of it was also put into Singapore. This was run out of an entity from the UK. Craig had gotten approximately 1.1 million Bitcoins. There was a point in time, when he had around 10% of all the Bitcoins out there. Mr Kleiman would have had a similar amount. However, Mr Kleiman passed away during that time. He was a war veteran; he was wheel chair bound.

The deed between Craig Wright and W&K was created in 2012. W&K gave Craig Wrights rights to the Bitcoins and he has used the Bitcoins to do all this stuff.

Mr Kleiman and Craig Wright decided to start up W&K because they both wanted to get involved with Bitcoins. They recognised that this industry was not regulated and they wanted to start up a regulated Bitcoin bank. They knew they couldn't do this in the US so they wanted to do this in Australia.

In the agreement entered into, it was stated that Strasan Pty Ltd (Strasan) was to perform the ground work and create the e-learning package for them. W&K was responsible for providing funding. It was decided that one entity will also be created to be banking front. This was basically the reason why Coin-Exch Pty. Ltd. (Coin-Exch) was created. W&K then bought all the work done by Strasan.

A deed was then entered into with Hotwire. It is noted that at the time, Strasan did not belong to Craig Wright. It was an independent entity at the time. Panopticrypt is a shareholder of Strasan. Craig had a minor shareholding in Panopticrypt Pty Ltd (Panopticrypt). He was only a minor shareholder at the time and did not control have control of this entity at the time.

Strasan then got a person from the UK by the name of David Rees to create a pathway outline to go forward with the e-learning process.

Craig Wright was speaking in a conference in Melbourne. He was giving a talk about Bitcoins and mining. He was then approached by a man by the name of Mark Ferrier and that was how they met. This was how the relationship was formed. They started talking. Craig Wright told Mark Ferrier that he wanted to start up a Bitcoin bank. They then started emailing. Mark Ferrier told him that he knew someone who could help him start up the bank. This was all done in early June 2013. Everything was done very quickly- most of it was done in one weekend. Craig Wright, with the help of Mark Ferrier, agreed to purchase banking software from Al Baraka. Mark Ferrier also convinced him to purchase gold ore. He also offered Ian Ferrier's services to Mark Ferrier. Ian Ferrier is Mark Ferrier's father. Before engaging in Mark Ferrier's services, Craig Wright had conducted lots of checks on him and everything came up clean. So in essence, Craig Wright wanted the banking software and Mark Ferrier wanted Bitcoins.

Around mid-July/August, Craig Wright released funds from an entity located in the UK to MJF Consulting. This was all going through a server located in Central West Africa.

Mark Ferrier was then arrested in September 2013. Craig Wright then started to take action to protect his own rights. Your director, Des McMaster has informed us that ASIC documents show that Mark Ferrier was only put on as a director for one day. Craig Wright then contacted Pitcher Partners in Brisbane and asked them for an explanation. We found out that Mark Ferrier was never a director. The address that he had on ASIC was false as well.

Craig Wright was able to get hold of the banking software and automation system. He has everything but not the gold ore. He was expected to receive the gold ore in 2015 but now that's not happening as the gold can't be delivered. Craig Wright has also contacted Ian Ferrier. Ian Ferrier advised us that he has not spoken to Mark Ferrier for 2 years and wants nothing to do with him. We have a case against MJF Consulting with the Supreme Court of NSW and also the Federal Court. The case with the Federal Court is for deceptive conduct against Mark Ferrier

3

personally as an individual.

Due diligence was conducted on Mark Ferrier before we engaged him. We have done all we could to protect ourselves.

If you look at the transactions made, you will see that every transaction was pegged against the currency exchange rate at the time. Craig Wright has already advised you that the accounting method for this personal enterprise should be changed from cash to accruals. The accounts should be on accruals from the start of the 2013 income year. Craig Wright has previously informed the ATO of this.

We have previously been dealing with ATO officers from different sites at first, e.g. some initial work was being conducted from the Hurstville office, Brisbane office etc. But then Des McMaster made a decision for all the audits to be done from Parramatta. The audits were then being conducted by Celso. I am uncomfortable with the fact that Des McMaster is looking after these audits. We have had past dealings with him in the previous audits.

**AM:** That is why I'm coming in with a fresh pair of eyes.

**JC:** Des' judgment is tainted due to his involvement with the old audits. We don't want the current audits to be tainted by the past audits.

**AM:** Yes, I understand.

**JC:** We want to make sure that you are comfortable with all the transactions.

**AM:** We should have all the documents already provided on our systems. I have a question to ask. Were actual Bitcoins physically paid to MJF Consulting or Mark Ferrier?

**JC:** Yes. We paid Bitcoins to him. We paid the Bitcoins to where he directed for the Bitcoins to be paid into.

**AM:** Just to confirm, was it actual physical Bitcoins that was paid?

**JC:** Yes.

*JC then opened his folder and showed AM written communication between Craig Wright and Mark Ferrier. He first showed a letter dated 1 June 2013 from MJF Consulting. His second (dated 1 June 2013) and subsequent documents were email correspondence between Mark Ferrier and Craig Wright.*

**JC:** *(referring to an email correspondence between Mark Ferrier and Craig Wright)* After the deal was signed, Mark Ferrier signed the agreement. Popal *(the name was referenced in one of email correspondence between Craig Wright and Mark Ferrier showed to AM )* is the person responsible for bringing Mark Ferrier into the deal. From our correspondence and understanding of Mark Ferrier, it appears that the person behind this is much smarter than Mark Ferrier. There was a spike in the value of shares at the time from $2 to $6 in the weekend that we signed the deal. We believe that this was done intentionally. We are now dealing with Al Baraka ourselves. We are liaising with the people in Turkey. I hope that you've been able to get an understanding of how this all started now.

**AM:** I have an understanding of the background now.

**JC:** Craig Wright has a Blockchain view of this. In relation to the transactions done with Mark Ferrier, the Bitcoins left Doncaster in UK and was transferred to West Africa. Craig Wright

4

obtained the automation and banking software through Mark Ferrier. The software first goes to Craig Wright and then he transfers them into The Wright Family Trust (DeMorgan) for distribution. The banking software was transferred into Coin-Exch as this company is acting as the banking front. The automation and exchange software was transferred to Hotwire. Basically, everything goes through Craig Wright and then into the trust. The security work was performed by W&K.

In relation to the valuation of the software, Al Baraka determined the value of the software that was obtained from them. The Supreme Court of NSW determined the value of the software obtained from W&K. You should already have copies of the two Supreme Court of NSW judgments.

**AM:** When was the Supreme Court judgments made? On the invoices you provided us, they appear to be dated sometime in mid-to-late 2013?

**JC:** The W&K transactions were dated 1 September 2013. The judgments came through in November/ December 2013. There is a time difference of a few months here as Craig Wright had to demonstrate the value of the claims to the Court. He was dealing with this matter from 1 September 2013.

So essentially to sum it up, software and intellectual property were sitting in DeMorgan and was distributed out as follows:
- A third was distributed to Hotwire.
- A third went to Coin-Exch.
- A third went to Cloudcroft. Craig Wright may be the sole director of this entity at the moment but he was not the sole director at the time the company started. This company was responsible for performing security work at the time it was first established.

Most of the intellectual property and software were licensed to the three entities and not sold. The reason for this is because the licenses costs will be considered an expense and not an asset and this protects the R&D position.

Cloudcroft was actually started-up by his ex-wife, Lynn Wright. It was 100% owned by Lynn Wright at the time. They were separating at the time it started. He was dealing with clients including Hoyts in his security role. Lynn Wright had 100% ownership of the company until late 2012 when the company was put into liquidation. The liquidators decided to pursue Cloudcroft and Lynn Wright for the contract to sell from W&K to Cloudcroft. However, no deal came out of this.

Lynn Wright then went bankrupt. This was when Craig Wright took over Cloudcroft. It is possible that he may currently be the sole shareholder.

Coin-Exch is the banking front of the group and is holding the banking software.

Hotwire has the exchange and automation software and is also the R&D engine for the group. Hotwire came into existence because of the contract entered into between W&K and Strasan. It was stipulated in the contract, that a company would be created; and consequently, Hotwire was formed as a result. Hotwire is funded by a Deed of Assignment. The initial funding was by an equity distribution of rights in late July/ August.

1. **Craig Wright**

**AM:** I will start by going through the revised activity statement for Craig Wright.

**JC:** All the transactions made amongst the related entities are GST neutral. The overall GST

credit expected from the related entities is around $5.5 million. The sum total of the GST on the Al Baraka deal is around $5.346 million.

*(JC then looks at the revised GST ledger (sent on 25 February 2014) for Craig Wright)* You can see this at the bottom of page 3 and top of page 4 of the GST ledger. The total amount as stated on page 4 is $5.376 million.

**AM:** The original activity statement lodged for Craig Wright resulted in a GST payable amount of $2.3 million. The new revised activity statement results in an increased payable amount of around $4.2 million. Just to clarify, do you want this to be amended on our systems? Or are you just putting forward these figures for us to consider?

**JC:** I want you to revise the activity statements for us. The process for us to change the accounting method from cash to accruals and then to request a new activity statement to be generated on your system is just too complicated. We were not able to change to accruals on the Portal and we already requested many times for this to be changed to accruals. However, at the moment, the accounting method is still cash on your system.

**AM:** To confirm, the new revised statement is on accruals basis?

**JC:** Yes, it's on accruals. We have previously advised of this before. Craig Wright has been asking for this consistently.

You should also note that I have only come on board after October/November 2013. Jamie Wilson was previously responsible for the accounts for the entities. Jamie was responsible for introducing Xero. His role fell apart around October 2013 due to his personal situation. ██

**AM:** I had a quick look at the revised activity statements. It looks like the main difference between the two is that there is now an additional $31 million included under the accruals method. In the current statement, there are two lots of income received from DeMorgan of $34.1 million each. The cash version only showed one lot of $34.1 million. Why is there an additional sale made to DeMorgan in the current statement?

**JC:** *(JC checks this on his laptop for a few moments.)* I believe this is in relation to the international payments made. Those were external payments made. It came in externally and went out externally.

## 2. **The Trustee for Wright Family Trust (DeMorgan)**

**AM:** Let's move on to the second entity, The Trustee for Wright Family Trust (DeMorgan). Who is the trustee of the trust?

**JC:** I think it may be Panopticrypt or Craig Wright himself. I'm not uncertain of this though. I will get back to you on this.

**AM:** No changes were made from the original activity statement. There is nothing to discuss on this one.

## 3. **Hotwire Preemptive Intelligence Pty. Ltd. (Hotwire)**

**AM:** I'll move onto Hotwire now. The combined total of G10 and G11 has decreased. The end result is a slight increase in refund.

**JC:** *(JC checks this on his laptop for a few moments.)* This is for minor expenses, like general expenses. These were previously sitting in GST-free. We have moved all the computer equipment of the group to Pholus Pty. Ltd. (Pholus). Pholus will be providing the funding for the IT services. We initially went to the bank to get a lease. But the bank told us that they will give us $90,000 in return for $90,000. If we give them $90,000.00, they will lend us $90,000. That didn't make sense to me. We didn't get a lease from them. We are currently setting up Pholus to do the IT side of things. Our next task is to move the assets to Pholus. The leasing expenses for the equipment will be treated as a liability.

**AM:** There were four invoices issued from DeMorgan to Hotwire on the same day. Just out of curiosity, why was it separated into four tax invoices? The payments made added up to approximately $37 million. It was for tax invoices numbered 1, 2, 3 and 4.

**JC:** *(checks laptop for a few moments)* This is because they obtained a three year licence for the intellectual property. It was $10 million per annum. One tax invoice is for payment for the current year and the other two are prepaid payments made. They moved in as a lump. For the R&D side of things, it is considered to be a prepayment. A similar situation has occurred in Coin-Exch as well.

### 4. **Coin-Exch Pty. Ltd. (Coin-Exch)**

**AM:** We will now move on to Coin-Exch. The revised calculation shows a significant increase in capital purchases of $21.8 million. This is marked as a GST-free capital expense for Bitcoin Assignment. However, there is no change in the overall GST refund as the new $21.8 million is marked as GST-free.

**JC:** That is an assignment of right. It reflects the Bitcoin assignment made.

**AM:** Did Craig Wright make a Bitcoin right assignment to Coin-Exch?

**JC:** Yes.

**AM:** What was this in exchange for? If Craig Wright made an assignment to Coin-Exch, what did he get back in return?

**JC:** Let me check this. *(JC checks this on his laptop)*

**AM:** Could this be for the IP Licence obtained from DeMorgan?

**JC:** So what happened is that Coin-Exch has an assignment of right and the corresponding transaction made against it is marked as a loan. It is a loan from Craig Wright for the right to use it.

**AM:** This is different to what happened to Hotwire. Was there a written agreement between Craig Wright and Hotwire for the assignment? Were they both marked as GST-free?

**JC:** Yes. They were moving through as a series of loans made. The Deed moved from the UK to Craig Wright and then he distributes this.

**AM:** The word 'loan' was not used in the briefing paper that you sent earlier today. 'Loan' and 'Rights' have different meanings.

**JC:** They are not loans, they are Assignment of Rights. I got confused as the assignment of rights is categorised as a liability and consequently, I called it a loan. But it's not actually a loan.

7

**AM:** Okay. So to confirm, Coin-Exch acquired intellectual property from DeMorgan. The right to call BTC is then assigned to Coin-Exch?

**JC:** Yes.

**AM:** Jenifer do you have any questions to ask?

**JT:** No.

**JC:** She is too busy writing up the minutes.

**AM:** We can send you a copy of today's minutes if you like?

**JC:** Yes, that would be appreciated.

### 5. Cloudcroft Pty. Ltd. (Cloudcroft)

**AM:** We will now move onto Cloudcroft. Overall sales reported in the revised statement have decreased. The export sale on the original ledger is no longer included in the revised calculation. The previous statement showed export sales of $3.1 million. However, this does not affect the final GST amount.

**JC:** *(JC checks this on his laptop)* I have no reference on my report of this amount.

**AM:** If you go back to the original statement, you will see that there is export income of $3.1 million reported.

**JC:** That may have been a mistake. The only thing that jumps to me is the Strasan transaction which was also for $3.1 million.

**AM:** The amount is GST-free. For your record, GST refund remains the same.

**JC:** We have an entity in Singapore. The export sales may have been made to that entity.

**AM:** Was it for a sale of a software package to Singapore?

**JC:** This is possible, but I can't confirm.

### 6. Strasan Pty Ltd (Strasan)

**AM:** I have no more questions to ask in relation to Cloudcroft. I will now move on to Strasan. You provided us revised GST ledgers for the tax periods ended 30 June 2013 and 30 September 2013. However, I noticed just before the meeting that the two PDF documents are the same.

**JC:** I must have forgotten to change the header. I will send this to you again. Nothing happened in the first quarter of 2014 except for sales.

**AM:** As I only have the revised June 2013 quarter, I will just be asking questions in relation to that. I can see that the sales have been reduced to $nil.

**JC:** *(Checks his laptop)* This was for payment to Strasan from Hotwire for work performed. They issued a Deed of Assignment at the end of June 2013. It was paid out of the wallets given to you in July/August.

**AM:** Who were the expenses incurred to? Was it Hotwire or Craig Wright?

**JC:** Strasan got the benefit of 'DeMorgan Info Security Services' which was otherwise known as DISS. This entity does not exist anymore. Craig Wright was involved with this entity in early 2000s. DeMorgan is Craig Wright's grandmother's name. The company created a bunch of stuff. Craig had a dispute with the director and then got out even though he had 75% of the shareholding. They ended up stripping the company. Craig Wright then had a ten year court case against DISS and had legal fees incurred for the ten years. A judgement made in Court assigned the right of 4 projects to Craig Wright and Strasan got the benefit of the 4 different projects.

**AM:** In relation to the expenses reported, which entity is responsible for reporting the corresponding sales made for the June 2013 quarter?

**JC:** Strasan was working for Hotwire and received payment which was the Right of Assignment of $3.8 million.

**AM:** There is no income reported by Strasan in the revised statement. There were $5.3 million in sales reported in the original statement. The revised BAS has no sales but does have expenses.

**JC:** That's odd. I have the $5.3 million in sales on the laptop as well. This amount is not part of the GST audit so it must be GST-free. The amount was for export sales made.

**AM:** It would most likely be a G2 amount then.

*JC then shows AM the laptop screen.*

**JC:** This amount shows up as an export sale made. I will need to get back to you on this. In August, there was an invoice with a due date for payment as 30 October 2013. There was another amount to Hotwire but that was for the previous year. In the fourth quarter in 2013, there was a sale amount made of $3.2 million. There should be a corresponding amount in June for Hotwire for $3.2 million.

**AM:** In the original statement lodged, there was a GST-free amount of $5.3 million reported. The description provided for the transaction is 'Dallah Group (INV-0001)'.

*JC then checks this on his laptop.*

**JC:** That invoice was voided. *(JC then shows AM the invoice on the laptop.)* This was entered into the wrong entity. See the bottom note made here, it states that the invoice has been voided. Dallah has nothing to do with Strasan. You will see the transaction in another entity. It would be in either Coin-Exch or Hotwire.

**AM:** Let's have a look now. *(AM then looks at the revised statements provided for Hotwire and Coin-Exch.)* It doesn't appear to be in Hotwire or Coin-Exch.

**JC:** It was voided in November 2013 because it didn't exist and there was no Dallah at that point in time. Micropayment system was part of the stuff that came in. It if went anywhere, it would have gone to Coin-Exch or Hotwire. We are looking to do micropayments in Bitcoins. The micropayment system allows people to buy fractions of a Bitcoin. The smallest fraction is a satoshi. The micropayment system was about half the value of the software package.

9

### 7. **Pholus Pty Ltd (Pholus)**

**AM:** Now, we'll be moving onto the final entity, which is Pholus. Sales and export sales made have remained the same. Export purchase reported in original statement of $2.3 million has now decreased to nil. G10 was originally $2.3 million and has been revised to nil. The reverse has occurred for label G11. The amount reported was originally nil and has been revised to $2.3 million. The description provided is 'university software- install system design and deployment'.

**JC:** We had a bunch of chords as inventory. There are around a thousand of them. We moved them to Pholus as part of their inventory. These chords are similar to CPUs. Each chord is a data miner. We changed it from G10 to G11 as they are inventory and should have been classified as a non-capital purchase instead of a capital purchase as they are not capital. The other stuff reported was for accounting and consulting services.

**AM:** That's all the questions I have. Do you have any questions to ask Jenifer?

**JT:** No.

**JC:** After the meeting, we will get back to you on the following:
- Who the shareholders of Cloudcroft are;
- Clarification of the loan or rights issue;
- The discrepancy identified in relation to the Dallah Group invoice;
- The anomalies not appearing in Coin-Exch or Hotwire; and
- Who the trustee of DeMorgan is.

You should have the backup for everything with you. You can see that the fundamental issue is the external transaction made with MJF Consulting.

**AM:** I will be having a discussion tomorrow with our AC, Marina Dolevski and Hoa Do in relation to the Assignment of Rights. I am happy to relay the outcome back to you after the meeting.

**JC:** That would be much appreciated if you could do so. Craig Wright has been moving stuff around but if you look at in holistically, he isn't moving anything around at all. The only external transaction is with MJF Consulting and to David Rees. The transaction with David Rees was GST-free as it was for educational stuff.

So, what's next from here?

**AM:** I can't say at the moment. This will be dependent on the meeting to be held tomorrow. We will make a decision as to how to go forth from there.

**JC:** There is an amount coming our way. We want to propose receiving 20% of this amount first. I will be putting this forth to Marina. If this is not a reality, we will have further discussions but if it is, we want it released immediately. We have spent a lot of money during this process and we need the funds to ease our cash flow. The Bitcoin industry is very volatile and there is no clear picture as to the future. Our bank options are limited. Everything we have been doing is legitimate. If you were able to come out to our premise today to hold the meeting, you would have seen 40 to 50 people working out there. We have lots of activity happening at the moment. $5 million does make a difference. We need to recover the money already spent.

**AM:** I can't comment on this. This discussion is best held with Marina Dolevski.

**JC:** We need to be back in a position of control.

**AM:** I will be having a meeting with Marina and Hoa Do tomorrow at 2pm. I will let you know of the outcome of tomorrow's meeting.

*AM then thanked JC and AW for their time.*

Meeting concluded at 2:50pm.

**Include reference/hyperlink to main documents relied upon:**

Relationship_Diagram_No_Markings
Relationship_Diagram_with_Markings

**Author's name: Jenifer Trinh**
**Date of document:   27 February 2014**

_____



Exhibit 7

AUSCRIPT AUSTRALASIA PTY LIMITED

ABN 72 110 028 825



Level 22, 179 Turbot Street, Brisbane QLD 4000
PO Box 13038 George St Post Shop, Brisbane QLD 4003

**T:** 1800 AUSCRIPT (1800 287 274)    **F:** 1300 739 037
**E:** clientservices@auscript.com.au    **W:** www.auscript.com.au

## TRANSCRIPT OF PROCEEDINGS

TRANSCRIPT IN CONFIDENCE

O/N H-356057

**AUSTRALIAN TAXATION OFFICE**

**RECORD OF INTERVIEW**

| | |
|---|---|
| **INTERVIEWER:** | **DES McMASTER**<br>**MARINA DOLEVSKI**<br>**HOA DOA** |
| **INTERVIEWEE:** | **CRAIG WRIGHT**<br>**JOHN CHESTER**<br>**ANDREW SOMMER** |
| **CONDUCTED AT:** | **SYDNEY** |
| **DATE:** | **TUESDAY, 18 FEBRUARY 2014** |

**TRANSCRIBED BUT NOT RECORDED BY**
**AUSCRIPT AUSTRALASIA PTY LIMITED**

.WRIGHT 18.02.14

# Interview conducted with Craig WRIGHT

On the 18th February 2014

Sydney

Interviewers: Des McMaster, Marina Dolevski, Hoa Doa

| 5 | | |
|---|---|---|
| | Sommer | Okay, well, if everyone's happy, I really wanted to sort of – I know you've had a number of different discussions and I really wanted to sort of make this as productive as possible for everybody's time so I thought I would put as much as I can up on the slides and at least that way we've got a process for discussing things.  The agenda that John sent through to Marina yesterday afternoon, basically, I thought it would be useful just to highlight some of our current issues, go through quickly the history of development, our current state, vis a vis audits, the relevance of bitcoin treatment which I think is critical to where we are and what's going on;  looking at current transactions, both – at a high level.  So what I would like to do is agree, the in-principle treatment of various types of transactions and then – you know, it is undoubted that there is going to have to be revisions for the BASs that are lodged so a lot of the process and a lot of the grinding of wheels that's going on at the moment is information requests and stuff about BASs that have been lodged and simply they've got to be changed anyway.  So we're spending a lot of energy worrying about BASs that, on the Tax Office's view of the law, are wrong and so therefore we need to change those BASs anyway.  So if we can agree a process for actually the way in which those BASs should be filed what I would like to do is then have someone from a fresh team sit down with John and rebuild the BAS, so somebody from within the Tax Office who understands the way we've agreed the way that these transactions should be done sit down with John - it's only a hundred lines of transactions, rebuild the relevant BASs and resubmit them on the basis of – on an agreed basis so we can actually do something else without going - - - |
| 30 | Dolevski | So if I just understand that correctly, Andrew - - - |
| | Sommer | Yep. |
| | Dolevski | So just basically on the tax view, which is outlined in the private binding rulings you're saying - - - |
| | Sommer | Being singular, but we will get to that, yep. |
| 35 | Dolevski | Yep.  So you're saying that the BASs – you're accepting that the current BASs lodged are obviously not in line with the rulings and the ATO view so you're proposing - - - |
| | Sommer | I don't think that's controversial, is it? |
| | Dolevski | No. |
| 40 | Sommer | No. |
| | Dolevski | No. |
| | Sommer | Okay.  Yep. |
| | Dolevski | No, just wanting to clarify. |
| | Sommer | Yep |
| 45 | Dolevski | And therefore, based on that, you would be – you're proposing to revise the BAS, the BASs that have already been lodged? |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | If we can reach an agreed treatment about the way in which things need to be done, yeah, sure, let's just move on.  Do we think bitcoin is money?  Yes.  Can I stand here for four hours and argue with the three of you that I think bitcoin is money and, you know, it passes the test established by Emmett at Travelex, the landmark case referred to in the ruling of facility and all that sort of – the landfill case facility.  Yeah, I can do all that but that's not going to progress the issue and I want to get these guys back to doing business and we can have the esoteric discussion about the nature of bitcoin and whether or not it's money later but let's free up this process because it's drowning them in unproductive wheel-grinding, constantly frustrating on both sides and I would like today to break that cycle. |
| | Dolevski | So rather than having the changes made from a compliance perspective it would just be a revision of BAS that you would want some assistance? |
| | Sommer | Yes. |
| | Dolevski | Is that right?  Yep. |
| | Sommer | I think that - - - |
| | Chester | And rather than us ..... something and resubmitting it, let's just sit down and let's go, "Okay, tick, tick, tick, tick, done" and we can go, "That looks good.  That's good.  Fine.  We're done".  I think, as Andrew said, there's not many – it's not like there's thousands of transactions out there.  There's none. |
| | Dolevski | No, no. They're the first quarter BASs that were lodged. |
| | Sommer | Yeah.  That's right. |
| | Dolevski | And there's a couple – I think there's one that's post issue. |
| | Sommer | Yep. |
| | McMaster | There are a couple of post issues. |
| | Dolevski | That have gone through. |
| | Sommer | Yep.  And we will get to that. |
| | McMaster | Yeah. |
| | Dolevski | Yeah. |
| | Sommer | Okay.  So a simple without prejudice meeting intended to resolve the issues that can be resolved, narrow the scope of issues that are under review and focus on the areas in which we can agree rather than issues of general grievance I think, you know.  I get the impression from having looked at some of the stuff that there's a bit of frustration in the Tax Office.  I don't know from talking to my clients if there's a bit of frustration on our side.  You know, let's just put all that to one side and try and work on those things that we can agree on and move this along.  The current issues:  we've got formal notices regarding retention of refunds.  We've got a multiplicity of audits.  We've got the issue for these guys being cash flow as a new business.  We're really struggling from a cash flow perspective and also from a resources perspective.  We need to sort of ..... for the guys to do it.  Now, the retention of refunds is troubling because the current – we don't have any revised assessments yet and just from a process perspective a number of the documents that have been issued I think are wrong as a matter of law and we need to sort of tighten that process up.  So these are notices issued to Hotwire, Coin Exchange, Cloudcroft whereby – and I will show you an extract in a minute – whereby the decision to retain the refund is based on an |

Interview Conducted with Craig WRIGHT

|  | | interpretation of the law rather than the pending verification of information. Now, section 8AALZGA entitles you to retain a refund in certain circumstances pending verification of information. It doesn't entitle you to retain a refund without issuing an amended assessment in instances where you just happen to ..... the law. Now, you can go away and have a look at that. The notices that were issued purports to give the taxpayer an objection right. |
| 5 | | |
|  | Dolevski | An objection right? |
|  | Sommer | Against the - - - |
| 10 | Dolevski | It's retaining. |
|  | Sommer | Yeah. |
|  | Dolevski | Yeah. |
|  | Sommer | Now, the only – my only understanding is that you get – we hadn't looked into AALZGA ..... objection ..... process in relation to that decision doesn't apply generally and so even the decision to withhold it under that section ..... because there's no information verification referred to or it's not something else so it's just one of those process issues that I think needs to be cleaned up and it's a relatively new section. And certainly some of the ..... and some of the other notices refer to specific bits of information but the ones to Coin Exchange, Hotwire and Cloudcroft don't. |
| 15 | | |
| 20 | | |
|  | Dolevski | The actual retention and the notice - - - |
|  | Sommer | Yeah. So we've got a bit of a problem there because we haven't got anything we can object to. Now, I don't want to go down the objection and appeals path because it's too slow and, as I say, if we can agree a basis, excellent, we don't have to worry about it. |
| 25 | | |
|  | Dolevski | Well, the objection to hold isn't going to give you any technical clarity on the issue itself. |
|  | Sommer | No. Look, it's a bit - - - |
|  | Dolevski | There's just – yeah. But, I mean - - - |
| 30 | Sommer | It's a bit of a silly provision and I don't know why we put it in there in the first place. But we haven't got - - - |
|  | Dolevski | But in terms of us speeding the assessments, I mean, we're ready to go with the imposition papers that were issued. |
|  | Sommer | Yeah. No, no, but that's an interim ..... What I'm saying is - - - |
| 35 | Dolevski | We can get to final quite quickly. |
|  | Sommer | Yeah. Well, you probably shouldn't, on the basis of what they say, but the problem is the guys have got nothing to object against. They've got notices and they keep saying to me, "I've got this letter from the Tax Office that says I have an objection right" and I'm saying actually you don't have an objection right. There is nothing you can object to at the moment". There isn't. The assessment that was made when the return was lodged, the deemed self-assessment, is in accordance with their duty and there's nothing ..... to which they can object. |
| 40 | | |
|  | Dolevski | Well, we would say that under 8AAZLGA that that gives us the right to hold, under - - - |
| 45 | | |
|  | Sommer | For what purpose? |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | For us to substantiate that the refund is in fact valid. |
| | Sommer | I don't think it really says that. |
| | Dolevski | Well, I don't have the Act – we don't actually have it there - - - |
| | Doa | No, I've got the GST - - - |
| 5 | McMaster | What Marina is saying is the commonly-held view within the office, okay, and has been since the legislation came into being - you do have rights of objection on the private binding rulings which would go to the heart of issue. |
| 10 | Sommer | Yes, but not – true, but not for where there's an assessment that has been issued and our assessment doesn't line up with the private ruling and the private ruling was only issued on 23 September – December, I think. |
| | McMaster | Yeah. |
| | Sommer | So – anyway.  Have a look at 8AALZGA. |
| 15 | Wright | And the private ruling didn't actually align.  It was a totally separate thing to the companies, anyway, because it was unrelated and never was related, which was informed right back to the beginning, before Selso even came on. |
| | McMaster | Okay. |
| | Dolevski | So - - - |
| | Wright | So that private ruling had nothing to do with any of the other transactions. |
| 20 | Dolevski | So under those provisions the Commissioner may retain an amount and we go through and address all of the 10 factors under - - - |
| | Sommer | Yep.  And which one of them says because you formed a different view of the law? |
| 25 | Dolevski | So we say – so the first one, "The Commissioner may retain an amount that he or she otherwise would have to refund to an entity if the entity has given the Commissioner notification that affects or may affect the amount".  Sorry, I haven't gone into this - - - |
| | Sommer | Yep.  Anyway, I don't want to get tied up on that today.  You guys have a look at it. |
| | Dolevski | Yep. |
| 30 | Sommer | But I don't think those notices as they are issued to Cloudcroft Coin Exchange - - - |
| | Dolevski | I will check them. |
| | Sommer | - - - and Hotwire - - - |
| | Dolevski | So you're saying only three of them are defective as far as you're concerned? |
| 35 | Sommer | Yep.  Yep, those three. |
| | Dolevski | And the others, we've actually got it right? |
| | Sommer | Yep.  Well, the others - - - |
| | Dolevski | We need to check what letters - - - |
| | McMaster | I think they would have been identical letters. |
| 40 | Dolevski | That's right. |
| | Sommer | ..... I can check. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Okay.  I will double check.  That's okay. |
| | Sommer | Yep. That's okay. |
| | Dolevski | Unless we've used incorrect letters.  I don't know - - - |
| | McMaster | I would be surprised but I will double check. |
| 5 | Dolevski | Yep.  All right. |
| | Sommer | Okay.  So - - - |
| | Wright | There were three different people issued the three different initial letters and then Selso issued subsequent different ones. |
| | Sommer | Yeah. |
| 10 | McMaster | The initial ones would have been the retention of refund letter which would have come from, highly likely, the Refund Integrity Team.  The subsequent ones that Selso would have issued would be providing you with the objection rights to the decision to withhold because it met the various requirements of timeframes. |
| 15 | Sommer | Yep. |
| | Dolevski | But we will look into that. |
| | McMaster | Yep. |
| | Sommer | Good.  Okay.  So the objective is to try and free up the cash flow and try and free up the resources so we can get all these issues ..... rather than continually dealing with various ongoing issues.  So just to sort of – for those players who are new to it, I thought it was useful just to quickly walk through the chronology of where we got to, or how we got to here.  In 2009 the mining of bitcoin commences.  There's audit and ensuing disputes with the Tax Office regarding information defence ..... and Dr Wright personally back in 2009 and that dragged on for a couple of years.  2011, bitcoin was transferred overseas.  R and D then conducted in the US under – by a joint venture company formed as ..... effectively info defence research LOC.  Bitcoin mining continues throughout 2011.  The bitcoins are derived by companies in Singapore and the Seychelles or entities in Singapore and the Seychelles, and they're actually trusts.  Trustee companies and trusts established - or trustee companies in the United Kingdom and other trusts established in the Seychelles.  Further work was planned.  In early April 2013 unfortunately David ..... dies in the US towards the end of April 2013.  In July we have the MJF transactions which are germane to the returns that are being looked at currently.  They involve software services and ..... and in July discussions commenced between – with the Tax Office about the nature of bitcoin.  September, following the death of David ..... in the US, there was a transfer of intellectual property out of a US entity to Dr Wright pursuant to orders granted in the New South Wales Supreme Court.  Those orders in the New South Wales Supreme Court substantiated value of the claims being made for that intellectual property in the amounts shown there, roughly 28 million a piece.  2013, September, intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange ..... and so on.  2013, December, 23 December, while I was having Christmas with my family, private ruling issued on the nature of bitcoin and January 2014 we got the retention refund notices and so on.  And that's how we got to – all right.  So these are the entities that I think are the key players in these transactions.  So we've got the UK companies;  we've got Singaporean |

Interview Conducted with Craig WRIGHT

|  |  |  |
|---|---|---|
| | | companies; we've got Seychelles, so they're all on the outside of the dotted line. We've got Craig which we've referred to with the ..... as CSW ..... is the trustee of the Wright Family Trust. We've got Hotwire PE, Coin Exchange, Cloudcroft, Strasan, Denariuz and if you look at it ..... audit, audit, audit, |
| 5 | | refund to ..... and audit. So we're busy, and this is my point, that we're stretched in terms of our resources to answer these questions at the moment and it would be nice if we could wrap this up and get these audits sorted. So we've got copies of all those notices. I don't think anyone's worried about it but those are effectively the current drain on our compliance resources to deal |
| 10 | | with all these questions. Okay. This is the refund retention letter that I was referring to in relation to – this one's the Cloudcroft one and letters in the same form were issued to Hotwire and Coin Exchange. A couple of issues. One is, "We've decided retaining a refund for the following reasons: we are maintaining our interim position with treating the transfer of bitcoin to pay for |
| 15 | | your acquisitions in accordance with ....." etcetera. So it doesn't refer to any clarification of information. |
| | Dolevski | So that's our objection letter. |
| | Sommer | That's the objection letter, yeah. |
| | Dolevski | Yeah, but that's not the retention letter. |
| 20 | Sommer | Yeah, but this is saying – it also says, "How to object, and your objection", right? |
| | Dolevski | Yep. |
| | Sommer | Absent the mechanism provided by 8AALZGA how can I object to that notice? |
| | Dolevski | Why would you say "absent to 8AAALZGA"? |
| 25 | Sommer | Well, if the only – if you're – the reason you've decided to retain my refund - - - |
| | Dolevski | Is to verify - - - |
| | Sommer | No, no, it doesn't say verify, and we're just maintaining our view about the treatment of bitcoin. |
| | Dolevski | So - - - |
| 30 | McMaster | No, no. The reason that that objection letter has gone out is simply that we have exceeded the 75 days with the information held in the office and at that point in time there is a right to review the decision to retain the refund. |
| | Dolevski | Retain. That's right. |
| | McMaster | Within the office. |
| 35 | Sommer | I agree. I agree with that. |
| | Dolevski | So the objection - - - |
| | McMaster | The other part is actually irrelevant for the purpose of what we're looking at. |
| | Sommer | Well, the indication of a decision – well, that says to me that, "We have decided to retain your refund for the following reasons. We have a view of the |
| 40 | | law" and that bullet point is a view of the law, okay? I don't know how to object to that. |
| | Mr .......... | And the other problem is the private ruling was never issued - - - |
| | Sommer | Well, I will get to that. So I've got two problems with it. One is that that decision to maintain – to retain the refund because of a view of the law is not |
| 45 | | a decision ..... 8AALZGA, okay? The problem was that 30 – the other |

Interview Conducted with Craig WRIGHT

|  | | |
|---|---|---|
|  |  | problem is that 30 September 2013 ruling was never received.  It was never issued by the Tax Office and it was never received by the taxpayer.  Even if it had been, we've got a letter from Mr Walmsley dated 15 October 2013 specifically saying that he – oops, sorry – that we weren't going to be getting that ruling.  So it says in that highlighted paragraph, "However, any" – you know, "You may have got this ruling" in the first para.  "I understand that you have been told that a private ruling has issued or is about to issue on the questions you have asked but that is not correct".  The final sentence there, "However, any private ruling made on the basis of the existing application would be either invalid or worthless so the obtaining of additional information is unavoidable".  So both the – the notice refers to a ruling that was never issued and even if it had been issued it was – we got subsequent correspondence saying it was invalid or worthless in the Tax Office's view.  That - - - |
| 15 | Wright | And the actual ruling was actually created in November and backdated. |
|  | Sommer | So that being – even as recently as last Friday we've got the interim report still making reference to this private ruling that was never issued to us and even if it had been issued to us it was declared by Mr Walmsley that it would be invalid or worthless.  So I'm – it's just – there seems to be a bit of a - - - |
| 20 | Wright | I had the particular authorisation number investigated.  I have – I know people in the ATO because I've been training for years and that was actually issued on 29 November as a backdated ..... internally. |
|  | McMaster | Who provided that to you? |
|  | Dolevski | To who, worry? |
| 25 | McMaster | To you, Craig. |
|  | Wright | No one I will be saying until we go to court. |
|  | McMaster | So you've approached a personal contact in the office and obtained information? |
|  | Wright | No.  I went to Internal Fraud and Investigations. |
| 30 | McMaster | Okay. |
|  | Sommer | In any event – let's leave - - - |
|  | McMaster | Well, no, that's very important because you shouldn't be doing that and whoever gave you information should not be doing that either, okay? |
|  | Dolevski | Anyway, let's deal with this issue.  So we've made reference to a ruling dated 30 September. |
| 35 |  | |
|  | Wright | That was never issued. |
|  | Dolevski | It was never issued, and then was there something issued in December? |
|  | Sommer | Yes, so there – about 23 December 2013 the private ruling was.  But the important thing about that is, that was long after the first batch of BASs were submitted so it's a bit different getting one on 30 September and then lodging BASs on 28 October that are different to the one in which a private ruling was issued, which is the imputation that that carries, versus getting one two months after you've lodged the first quarter's BASs which is the way in which it seems to have happened.  So I'm – it's a bit – I think there's something strange going on where that private ruling keeps popping up in references there - - - |
| 40 |  | |
| 45 |  | |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | Well, it's still sitting on our records. |
| | McMaster | That's why. It's on the single case management system. |
| | Dolevski | On the – that's right. |
| 5 | McMaster | And it's sitting there as not withdrawn. It's sitting there as a valid PBR. Unfortunately, I don't recall seeing from Peter Walmsley - - - |
| | Dolevski | So, Andrew – sorry – that letter - - - |
| | Sommer | So that's the - - - |
| | Dolevski | That letter that you made reference to from Peter Walmsley, are you saying that it said disregard the previous, it's not accurate? |
| 10 | Sommer | Well, it says, "I understand that you have been told that a private ruling has issued or is about to issue on the questions you have asked, but that is not correct". That's the first paragraph. And then even if we had got one he's saying that, "Any private ruling we made would be invalid or worthless". |
| | Dolevski | Okay. |
| 15 | Wright | And the particular ruling there, if you read it, doesn't say "bitcoins"; it says "commodities". |
| | Dolevski | Okay. |
| | Sommer | So we've got some strange things going on there but that continued reference to 30 September is frustrating to the client because it was never received. However it's represented in your system, it wasn't sent to us and even if it had been sent to us we would have been instructed by Mr Walmsley's letter to ignore it. |
| 20 | | |
| | Dolevski | So, sorry, just that date from Peter Walmsley saying - - - |
| | Sommer | 15 October. |
| 25 | Dolevski | 15 October. |
| | Chester | We even met with him ..... Was it about that time, or shortly after that? Discussing bitcoin in general ..... |
| | Wright | The two rulings, if you actually read the public thing or whatever else – what has happened is the one on the 23rd has been copied and backdated. |
| 30 | Mr .......... | I think – I – I - - - |
| | Dolevski | Sorry, the one on 23 December you're saying has been - - - |
| | Wright | Has been copied. |
| | Dolevski | - - - copied. |
| | Wright | And ..... to look like it was issued before. |
| 35 | Dolevski | Well, it was authored by Peter Walmsley so I'm not sure that I can - - - |
| | McMaster | Sorry, could you re-state that please, Craig? I didn't quite understand - - - |
| | Dolevski | Craig is saying that the 23 December ruling is a copy of the September ruling yet he has got a letter from Peter Walmsley saying that the 30 September ruling is inaccurate. That's the statement you're making. |
| 40 | McMaster | Well, at that point in – okay. So at that point in - - - |
| | Wright | No, we've got nothing issued. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | Is it?  Sorry? |
| | Sommer | Nothing was issued so - - - |
| | McMaster | So not even the letter of 23 December? |
| | Sommer | No, no.  No, no, 23 December was certainly issued.  I remember this - - - |
| 5 | McMaster | Okay.  And it basically was verbatim of this other particular - - - |
| | Sommer | Well, we don't – we - - - |
| | Dolevski | They never received the 30 September. |
| | Sommer | We never received the 30 September ruling is my instruction. |
| | Ms .......... | Actually, yeah. |
| 10 | McMaster | I'm just trying to understand how, if you've never received it – how you know it's a copy. |
| | Sommer | I think Craig's saying that he publicly – the version that's on the public PBR - - - |
| | McMaster | Okay. |
| 15 | Sommer | - - - the register on the internet is verbatim to the version of 23 December ruling that – so it seems to be the same ruling. |
| | McMaster | Okay. |
| | Sommer | We never got it – based on the edited version on the website. |
| | McMaster | But you would accept that that ruling is a valid private binding ruling? |
| 20 | Sommer | Which one?  23 December? |
| | McMaster | Yes. |
| | Sommer | I'm not contesting that at all, no. |
| | McMaster | Okay. |
| | Sommer | I'm not accepting it but I'm not contesting it either. |
| 25 | McMaster | And that's fair enough.  And that's fair enough. |
| | Sommer | I don't accept anything that I don't have to but I'm not presently objecting to the form, content or otherwise of the 23 December ruling other than the fact that it's wrong as a matter of fact but we will get to that .....  Okay.  So treatment of bitcoin.  Wherever we go with that first quarter of transactions there is nothing more fundamental to it than the way in which we're going to end up treating bitcoin in one sense because it creates all these interdependencies between the various entities and the way in which things were moved around.  We've made submissions to the Tax Office regarding the fact that it's broad - the definition of money for GST purposes is broad enough.  For my part I think it's simpler, I think it's more certain, and I think it's more predictable to treat bitcoin like money.  I think it's almost inevitable that it's going to – if it hasn't crossed the threshold ..... we're going to have to do it ..... and treat it like money for the purposes of it, but this isn't the forum to do that.  You know, as I say, that's where I would rather devote my resources as to esoteric questions of law because that's far more interesting to me.  But, really, I mean, we've got three options and, you know, I've been working with friends of mine who are on the OECD and representing various countries and talking to them about bitcoin because we had nothing else to do over Christmas and, really, the world is looking at it in three different ways.  One, |

Interview Conducted with Craig WRIGHT

|   | | you're treating it like a taxable barter, which is the way in which the UK initially tried to treat it and then they've recanted, bless them.  I think in Europe there's an option to treat it as money but not input taxed and I think that's probably where this concept of private money which exists under European law, which is probably where the Germans are going, probably where the English will follow the Germans, and it will be effectively in our purposes not fiat currency but treated as an input tax for exempt supplier to avoid the problems that arose in the UK. |
| 5 | | |
| | Wright | The same as barter dollars. |
| 10 | Sommer | Yeah, with the HCMEU of it being a taxable barter that caused everybody to get upset and they seem to be moving inexorably and you don't know what it is, but it's exempt.  Under our system that's probably a little bit more complicated because of our exemption rules and I'm not entirely sure how we would make it exempt input tax if it's not money.  I don't know how we're going to do that but that's ..... and maybe one we will throw at the feet of Mr ..... in due course.  The other option is money.  Now, we have – and I think with all due respect to Mr Walmsley, Mr Walmsley is coming ..... from an income tax perspective and the income tax ..... he sees things like income tax and he sees things in delineation between Australian currency and foreign currency which is, you know, an all-encompassing – it has either got to be issued by the Australian Government or it has got to be the currency of another country, which I think is the way in which he sees the income tax world and I think that colours the way in which the definition of "money" is being approached.  But the definition of "money" for the GST purposes is very different and I think we owe to the issue to look at the GST definition of "money" rather than this notion of currency that we find in the income tax law.  I say that because of the references in the private ruling and in the – what I will call interim activity audit report that make reference to the New South Wales landfill case which is a stamp duty case which is – and the payment instrument in that case was found not to be money for stamp duty purposes but it would still be within the definition of money for GST purposes because it's a promissory note which is specifically picked up.  So I'm not quite sure why we're fixating on that case and saying, "Oh, see, it's not money" but it is money because that thing would have been ..... under our law but no bitcoin.  Anyway.  That's a question.  More relevant for present purposes is where are they?  How are they supplied?  What are consequences of ..... supplied?  The ATO view is expressed in the private ruling that it's not property.  Personally, I have the greatest difficulty accepting a proposition that bitcoin isn't property.  How the Tax Office can form the view that it's not property in any form I struggle with.  They say it's akin to confidential information because you need the private key.  Well, a private key attaches to the wallet not the bitcoin itself.  The bitcoins themselves, you know, aren't confident information.  The bitcoins are different to the wallets.  The bitcoins carry with them their own history of the wallets to which they've been allocated.  So I just think there's real problems in the private ruling about what bitcoin are and how they work and so on.  There's - - - |
| 15 | | |
| 20 | | |
| 25 | | |
| 30 | | |
| 35 | | |
| 40 | | |
| 45 | | |
| | Wright | And one of the other difficulties is at the moment we're looking at doing it in a trust.  We will hold that in Singapore and we will issue trust rights in Australia.  A trust is – you know, unit trusts are input taxed and I will automate them.  I will build the software the same as bitcoin, as a wrap-around bitcoin, and we will have a GST-free bitcoin because it's attached to a trust. |
| 50 | | |

Interview Conducted with Craig WRIGHT

| | Sommer | Yeah. So I think – as far as I'm concerned the bitcoins display the characteristics of property in the sense that they can be owned, they can be transferred, and you can work out who owns them. They're functionable like money because if they're stolen, you know, they're – you know, like – much like currency. If, you know, John was to pinch the $10 from my wallet the presumption would be that he owns that money because that's the way in which the property law acts on money and money is slightly different and bitcoins follow that path but they do ..... the characteristics of money and we can talk elements of property but for the sake of time we will skip on. Even if we were to perceive that bitcoin isn't money, which I think is – I can – you know, we're never going to agree a treatment for the BASs on the – if I – if we for the present purposes hold the line that we think bitcoin is money. We do think bitcoin is money but we might have to go with the Tax Office view for the sake of resolving these outstanding BASs. For the purposes of a without prejudice discussion, to move things along, we could adopt a view that a bitcoin is a form of intangible property which I think probably is a better view than trying to argue that bitcoin isn't property in any form. That – again, my reason for going over all of that is that we need to work where it is, how it's applied and those sorts of things. Even if we're going to adopt your view as to it not being money, we still need to work out the operation of the nexus test in 9-25, the operation ..... and so on in relation to bitcoin in order to get any traction or any progress at all. Mostly the bitcoin haven't been brought to Australia by Dr Wright so mostly bitcoin is subsisting in entities that exist outside of Australia. So you will recall that on those opening slides we talked about bitcoin mining commenced and then they were transferred out of Australia to other overseas entities. Mostly they have remained outside there. They are held in wallets owned by non-resident entities outside of Australia. An exception is the bitcoin brought to Australia for the purpose of the Denariuz transaction, which we will get to at the end. Now, I think, Marina, you were talking about – that there is one BAS for the second quarter. That is the one that I think has been – that is the one you're referring to, the Denariuz transaction, the Denariuz BAS that was lodged for the period ending 31.12.2013 and that contains a specific-purpose transaction which was done to demonstrate the way in which the Tax Office view of bitcoin ..... But as far as I know that's the one that you've got ..... in dispute with you guys. |
| | McMaster | There was a BAS lodged prior to 30 June for a previous quarter in which a refund claim was made and released for one of the entities. |
| | Sommer | Okay. |
| | Dolevski | Yeah. |
| | McMaster | And I just can't remember exactly which one it is. |
| | Sommer | Okay. |
| | Chester | That was the R and D claim that was released. |
| | Wright | That wasn't GST. |
| | Dolevski | No, that was - - - |
| | McMaster | There was a GST. |
| | Dolevski | Panopticrypt. |
| | Chester | Panopticrypt. |
| | Dolevski | Yep. So 157,368 refund was issued. |

Interview Conducted with Craig WRIGHT

| | Chester | Okay. |
|---|---|---|
| | McMaster | Okay. And - - - |
| | Doa | So you say they're held in wallets outside. You're saying that where the wallets are held is basically where the bitcoins are located? |
| 5 | Sommer | Well, yeah, I suppose. I mean, it's like an intangible asset sitting in a trust in the sense that if the trust is a non-resident, it has got no relevant connection with Australia and it's holding an intangible asset the assumption is that the intangible asset is sitting outside of Australia. Yeah - - - |
| | Doa | So all the private keys are being held - - - |
| 10 | Sommer | By the non - - - |
| | Doa | By the non-resident trust account. |
| | Sommer | True. |
| | McMaster | So how are you trading the bitcoins between the entities? |
| 15 20 25 30 35 | Sommer | This is the point to which we will soon come. Current transactions. Right. In my view they seem to break down into three types of transactions. There is – what I want to do, as I said, agree a basis for transaction in principle and then ..... All right How do we do it? Capitalisation of the ..... seems to happen in the following way. Craig holds an interest in – sorry, Craig holds an interest in the offshore trust which holds the bitcoins so Craig is there holding a bitcoin and sitting overseas. Craig has an equitable interest in that trust and what seems to be happening, because there is no physical transfer of the bitcoin, is that the equitable interest in the offshore trust is transferred to the subsidiary in consideration for the issuance of shares. So they are capitalised, not with actual bitcoin because as I understand it there is no transfer of the bitcoin into the vehicles and there is no movement of the bitcoin, except for the Denariuz transaction to which we will return, and Hotwire in this case – and I have to choose that as indicative of the others – receives that equitable interest in the offshore bitcoin which still sits out there and issues shares to Dr Wright in return. So the supply of shares is clearly going to be taxed. Dr Wright didn't supply actual bitcoin to the company, as I understand it. Rather, Dr Wright transferred some of the equitable interest that he holds in the offshore trust to the company in consideration for the shares. The company could then call for a transfer of bitcoin to it absolutely or it could direct the offshore trust to transfer the bitcoin to a third party purchaser at the company's direction. Now - - - |
| | McMaster | Excuse me ..... |
| | Sommer | Sure. |
| | McMaster | Do you have copies of this – Marina is busy drawing ..... |
| | Sommer | Yeah, I will give you copies afterwards if that's okay. |
| 40 | Dolevski | Okay. Terrific, yep. |
| | McMaster | Excellent. Thank you. |
| 45 | Sommer | Yeah. Des, you would be entitled to say that, "Andrew, you guys have always told us that we transferred bitcoin" and I think that's right and I think that's largely because we saw bitcoin as money and transferring balances around and ledger amounts of money from one entity to another entity if it's done on paper is done on paper and is still there, kind of – it's still money moving around. It doesn't change the character of it. But once you start saying, |

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| 5 |  | "Okay, bitcoin is some form of non-money, it's some form of intangible rights that subsist out there" you have to then start saying, "Well, did you actually get legal title to it or did you get something less than legal title to it?"  And we got – the problem is Dr Wright does not hold the legal title to those bitcoin.  They sit in the trust sitting in the UK or the Seychelles or in Singapore or wherever and so he couldn't transfer the actual bitcoin into the entities.  The rights that were transferred were the right to call for that bitcoin in accordance with the existing trust arrangements that are there. |
| 10 | McMaster | So Dr Wright would have the appropriate agreements etcetera with these entities that are overseas? |
|   | Sommer | I think they're – with the entities that overseas, absolutely. |
|   | McMaster | Because this is the first time - - - |
|   | Sommer | Yeah.  No, I - - - |
|   | McMaster | - - - I've heard of the overseas trusts. |
| 15 | Wright | Okay.  Well - - - |
|   | McMaster | I suspect it's probably the first time Michael Hardy would have heard of these. |
|   | Sommer | I don't think so, no.  I - - - |
|   | Wright | Yeah, it was emailed to Michael and it was emailed to the people before Michael on 17 July. |
| 20 | Sommer | Okay. |
|   | Wright | We have those emails where I communicated ..... |
|   | McMaster | Well, that would be nice to get hold of because I've not seen those emails. |
| 25 30 35 40 45 | Sommer | I understand all of that and I understand that unfortunately – because – I think the problem is because everybody has been around the bitcoin issue rather than tackling the bitcoin issue everything has become fragmented and so what I'm desperately trying to do with all this is to try and put it all together because I can't understand it until it's in a cohesive framework, which means I can't communicate it to you guys until it's in a cohesive framework, and I'm trying to put this in a way that I – I have come to terms with what seems to be happening.  I am totally conscious of the fact that some of this information and some of the way in which we're looking at this is different and it's because changing that – pulling out that peg of bitcoin as money and saying, "All right, well, it's not money"  fundamentally changes the way in which a lot of this is seen from a legal perspective.  And, as I said, I'm – you know, if we, you know, had a million years to resolve this, which Craig tells me I don't, I could happily with, you know, as many people from the Tax Office as possible and we could debate and go and get declaratory relief and all that sort of stuff, and that's stuff we will have to do if we can't reach some sort of agreement.  But I would – I owe it to my client to say, "Look, there is a way through this where we can agree a treatment with the Tax Office while we work on the treatment of bitcoin".  Now, the treatment of bitcoin is really, really important because without it our business model doesn't work, but that's a business problem, that's not a tax-compliance problem.  I'm here to try and solve the tax-compliance problem in the short term and then we can, you know, have agents dancing on pinheads for the purposes of working out the definition of "money" later.  Right.  Again, purchased by the Australian companies of third party suppliers in Australia.  So if we have a supply of goods and services in Australia from an Australian supplier, the box in the bottom right, to the |

Interview Conducted with Craig WRIGHT

companies – Hotwire again used as indicative – what seems to be happening – and, you know, we can go through the documentation with this – is that there is the supply that takes place here;  there is no transfer of bitcoin out of Hotwire because Hotwire aint got none.  What it does is it says to the
5        Australian supplier, "I will grant you a right which you can exercise against the offshore trust to have them transfer bitcoin to you in satisfaction of my interest in the trust".  It's something different to the intragroup transactions so as you go here, see what there is from Craig to Hotwire, is a supply of the interest in the overseas trust.  I don't think there's any intention to have the Australian
10      supplier a beneficiary of that but what it's doing is saying, "I will nominate you as the person to receive bitcoin in satisfaction of my interest in the trust" and the offshore trust then, you know, does what needs to be done in order to transfer the bitcoin out of the trust and at the direction of the Australian supplier.  Whether it goes to the Australian supplier there's ..... whatever, you
15      know, is a whole other question.

McMaster    By "Aus supply" do you mean a related entity or a totally unrelated - - -

Sommer      No, no, no.  So these are third-party suppliers.

McMaster    Okay.  So the only one that I'm reasonably certain of is MJF at the moment.

Sommer      MJF is the one - - -

20  McMaster    The prime one, obviously.

Sommer      The prime one, yeah.  So - - -

Wright      Some of the others  - - -

Sommer      Again, I'm trying to set up a framework for understanding when we do this - - -

McMaster    Sure.  Sure.  I understand.

25  Sommer      If we ever do this again.   But, yeah, MJF is the principal one that we're worried about for the purposes of the outstanding BASs.

McMaster    Okay.

Sommer      Supplied by the Australian supplier will be a taxable supply ..... payable.  A supply by the undertaking of ..... is not a supply of bitcoin because they aint
30      got any but there's a supply of right and supply is a right for use outside of Australia, the enforcement of transfer of bitcoin in accordance with agreement.  Supply of that right is probably GST free on the basis of section 38-190 item 4, you know, supply in relation to rights for use outside of Australia, much like Travelex and so on.  So that's where we would see that going.  Again,
35      purchased by an Australian company and the third-party supply is from an offshore supplier.  Again, very similar other than we have, you know, possibly – whether or not the supplier is connected with Australia is another approach under section 9-555 and all those sort of things – again, there is supply of a right as against the offshore trust by the Australian company to the offshore
40      supplier so again, you know, 38-190 item 4 or even 38-190 item 2(b) as well in relation to the GST-free treatment of a supply of that right.

Wright      And the IP ID which is ..... location information assigned to an IP address, for the date of the supply is matching all the emails to do with the transfers etcetera is – matches Doncaster, UK where the entity that manages the trust
45      happens to be sitting.

Sommer      So - - -

Wright      As are the dates and it's public information that can't be changed .....

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | So they're the different ways.  So the outstanding – a number of BASs that have been lodged by the various entities, they're held up and all that ..... numerous ..... variables which start to go crazy.  But if you look at Hotwire when it was lodged, right – so the basis underpinning the lodgement of the Hotwire was that there was an issue of shares;  there was a transfer of bitcoin but there was software coming from the Wright Family Trust in the far left of the screen;  there were transactions with Coin Exchange and Panopticrypt.  There are also some other little transactions that are immaterial and admitted for the purposes of the diagram.  I think – and, you know, I wasn't involved in the original lodgement and I'm coming to it with reasonably fresh eyes and going through the legal arrangements and so on.  This is the way I see it, that there's – at the top of the screen you see the capitalisation transaction that we have looked at and then you have a range of intragroup supplies across the bottom, Panopticrypt , Coin Exchange and the Wright Family Trust where there is a transfer of the equitable interest in the offshore trusts made in consideration for various supplies being made in and out of Hotwire.  Within the group, as Des is saying, there is a transfer of the equitable interests.  That's not intended to be the case for MJF Mining Services.  I think we've all had enough to do with Mark Ferrier that we don't want to provide him with any equitable interests in anything and so he got the right to have bitcoin transferred out of the offshore trust, which is what in fact happened but it was transferred to him in satisfaction of the invoices that were issued.  So that's the way I would see it working, that there are a whole lot of supplies being made between the related entities in consideration for basically rebalancing the ledger of the equitable interests held in those Seychelles' trusts, for example, so that, you know, there's very little that actually moves.  It just depends at which point who is entitled to how much of the interest in the bitcoin sitting in the Seychelles.  As regards third parties there is in fact a physical transfer of bitcoin out of those trusts to those third-party suppliers where there is, you know, something real happening.  Now, that something real that happens does not seem to have a relevant connection with Australia in the sense that things are moving out of the Seychelles' trusts to, you know, the wallets designated by the relevant contractual counter party.  There's nothing that touches Australia.  The only thing that happens in Australia is the grant of that right to have the bitcoin transferred out of the trust.  Bitcoin didn't move, except in relation to the Al Baraka transactions and the MJF transactions.  The capitalisation ..... were covered.  Intragroup payments are affected by the transfer of equitable interests in the offshore trust and Dr Wright acted as agent of Hotwire in negotiating the Al Baraka transaction which is, "Andrew, that's all very well but show me the proof" which we will come to in a minute.  As such, no acquisition ..... supply by Dr Wright or the Wright Family Trust in relation to the Al Baraka ..... software and that is different to the way in which the BAS was lodged. There was an assumption I think that there was an acquisition and a ..... supply.  Having looked at the agreement there and the parties, I don't think that's right.  So I think that, really, Dr Wright personally was in there as the negotiating party on behalf of the end recipients and that seems to be the clear agreement between the parties, that Hotwire PE is acting through its agent, Craig Wright, R and D. Craig Wright ..... is authorised to represent Hotwire, etcetera, etcetera.  So the contractual – the interpretation of that as a matter of law, when I come to have a look at that agreement, says there's an agreement between the contracting parties and there are agents in there acting on their behalf. |
| | Wright | If I can just show you something.  This is Mr Ferrier ..... you can take it down and copy it later.  You will notice the dates.  It's a Telstra thing.  I don't have |

Interview Conducted with Craig WRIGHT

|    |           |                                                                                                                                                                                                                                                                       |
|----|-----------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|    |           | any access to the Telstra systems. 1 June 2013 we talked about the contract which is .....                                                                                                                                                                             |
|    | Dolevski  | I think we've got that anyway.                                                                                                                                                                                                                                         |
|    | Wright    | This is an email. This is - - -                                                                                                                                                                                                                                        |
| 5  | Dolevski  | Have you been – have you sent .....                                                                                                                                                                                                                                    |
|    | Wright    | You probably have it.                                                                                                                                                                                                                                                  |
|    | McMaster  | There was an image of - - -                                                                                                                                                                                                                                            |
|    | Doa       | Yeah. I thought - - -                                                                                                                                                                                                                                                  |
|    | McMaster  | I think you've sent that image to Michael Harding.                                                                                                                                                                                                                     |
| 10 | Wright    | I have, yes.                                                                                                                                                                                                                                                           |
|    | Doa       | Yeah. Yep.                                                                                                                                                                                                                                                             |
|    | McMaster  | And Michael has provided that to us.                                                                                                                                                                                                                                   |
|    | Doa       | Yep.                                                                                                                                                                                                                                                                   |
|    | Wright    | Okay. I didn't know if you had or not.                                                                                                                                                                                                                                 |
| 15 | McMaster  | No, that's okay, because we've asked Michael to give us everything - - -                                                                                                                                                                                               |
|    | Wright    | Because - - -                                                                                                                                                                                                                                                          |
|    | McMaster  | So that we can form an appropriate opinion.                                                                                                                                                                                                                            |
| 20 | Wright    | What happened was the day before sort of everything else we did the contract exchange but I formed the company the day after, so we had an agreement that I would form this company, which I then did, but – so I was acting for a company I was going to form, which was sort of out there but not out there, if that makes sense. |
|    | McMaster  | A slight timing difference.                                                                                                                                                                                                                                            |
|    | Doa       | Yep.                                                                                                                                                                                                                                                                   |
| 25 | Wright    | Yes. But the idea was to bring it into the company, so to speak.                                                                                                                                                                                                       |
|    | McMaster  | I remember reading this and I formed the same view as you, Andrew, that the thing that sort of still sticks with me is the ..... contracting so obviously there must have been some contact between them and Al Baraka.                                                  |
|    | Sommer    | One would imagine.                                                                                                                                                                                                                                                     |
| 30 | McMaster  | But - - -                                                                                                                                                                                                                                                              |
|    | Sommer    | I don't know. My Saudi Islamic law is not so good so - - -                                                                                                                                                                                                             |
|    | McMaster  | No. Better than mine.                                                                                                                                                                                                                                                  |
| 35 | Sommer    | So I think that's the way I see that, and then I see no acquisition, no taxable supply by the Wright Family Trust into Hotwire or other stuff, so there are other transactions. Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire in consideration of the transfer of the interest in the offshore bitcoin trust so I think that filtered through. There's lots of reasons I understand that took place and that is that there – you know, the |
| 40 |           | combined 56 million worth of IP that came out of WK Info Defence was then broken up by Craig and put into different entities that were going to need the                                                                                                                |

Interview Conducted with Craig WRIGHT

|  | | |
|---|---|---|
| | | different bits.  That's the way I'm instructed that that happened and that seems - - - |
| 5 | Wright | I wasn't intending to make it messy.  It was just trying – I had a big pool of stuff and I wanted to split it into each of the things that we're doing, each of the bits, so that - - - |
| | Sommer | Messy was a by-product rather than an objective.  That's good. |
| | Chester | ..... |
| | Wright | But you will be happy to know I agreed that I don't touch any of these things ever again and Andrew and John and ..... |
| 10 15 | Chester | But one thing they were broken up for is – it wasn't just convenience;  it's that there was differential IP for – one was for security and it was all security-based stuff.  That went into the security entity and the stuff that was learning, that went into the learning environment.  There was – so each of those different things was – it was – it was – they were sectioned out based on content rather than, "Oh, let's throw some of that over here and some of that over there".  That was the idea, put them where they were going to be used. |
| | Sommer | So at this point we're really saying, "I can understand how this all got a little bit out of – confused between ..... auditors" and Craig, you know ..... quick responses and so it's very easy to misunderstand what's going on. |
| 20 | McMaster | Got a habit of ..... too much. |
| | Sommer | It's very confusing.   It has got to be done and try and put it in some sort of cohesive framework so if you've got any questions about that framework as we go, please let me know. |
| 25 | Dolevski | I think the fundamental difference in our understanding is that we actually thought bitcoins were being ..... |
| | Sommer | Me too, until recently. |
| | Dolevski | Whereas an interest now in bitcoins via a trust. |
| | Sommer | It was when I had a conversation with Dr Wright where he said that nothing has even moved because – and I've got - - - |
| 30 | Wright | Apart from the external stuff. |
| 35 40 | Sommer | Apart from the external stuff and then it's just, like, "Okay, look" – I then literally at that point – I went back – had to go back to the drawing board and reconstruct all the diagrams because until then I had, like you, assumed – and Des has assumed and we've probably, you know, caused you to believe that bitcoin had been moving around.  But it seems that part from the Denariuz transaction, which is different, we will get to that, nothing seems to have moved and so therefore we are dealing in subsidiary interests in these things that remain and that in one sense is consistent with the way in which it has been done, that it's effectively ledger entries in the equitable – moving around an equitable interest rather than actually conducting the transfers.  Okay.  Which then brings us to the - - - |
| | Wright | Just as an aside now I was going to say from all of that my assumption is that it's money. |
| | Sommer | Yeah. |
| 45 | Wright | So therefore if I treat it as money then it's how I move it so - - - |
| | Sommer | Yeah. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I just assumed that - - - |
| | Dolevski | I have to say it took me a while to get my head around bitcoins and them moving so you can imagine where I'm at at the moment. |
| | Sommer | Yeah.  See – no, you – this ..... |
| 5 | Dolevski | Which from an audit perspective of is – we were kind of having discussions about what's your starting point, your stops and blows, which is why we thought in your particular entity as a sole trader we would have to actually – or start from a point of how many do you own.  We thought yes, you've picked up some bitcoin ownership from the deceased director so we were trying to, you know, get the picture and connect all the dots. |
| 10 | | |
| | Wright | ..... and buckets. |
| | Dolevski | That's right, you know, but now I - - - |
| | Wright | Yeah.  After the first instance I moved everything offshore just because – well - - - |
| 15 | Dolevski | Well, I'm kind of now starting – if the trust actually is even offshore and it's all paper transaction what's the fundamental reason that you're moving around interests, really? |
| | Sommer | Oh, well, to pay for stuff.  It's not an unusual – I mean, if you think about a large corporate group that has got a single bank account you have a ledger of the transactions when those – you know, for intragroup transactions.  You know, one may rent property to another and the payment is on a ledger but no money actually leaves the account. |
| 20 | | |
| | Dolevski | I know.  There's actually no movement. |
| 25 | Sommer | That's exactly right, and that happens all the time.  It's just – and that's why I think there was – these things were documented in the way they were documented because, really, it was just a ledger interest between effectively related parties. |
| | Wright | And - - - |
| 30 | Sommer | And moving around those subsidiary interests of the offshore trusts so it's – I think of it much like that corporate group with a single bank account.  No money is moving but payment of consideration is clearly made;  just at any one point which company – the extent of each company's interest in that agglomerated bank account is then – can only be ..... by going through their individual accounting records so - - - |
| 35 | Wright | It was never the intention to make it more complex but when I spoke to you guys in July last year I said this is what I want to do and I was told I had to account for all these separately.  I said, "Why can't I just record ..... there" and I got sort of a blank look and – like I was the anti-Christ. |
| | Sommer | Yeah - - - |
| 40 | Dolevski | Well, we have to consider it separately because when you're moving it in different entities - - - |
| | Wright | Because they're – of course.  They're separate, yes. |
| | Dolevski | Every entity is a taxpayer so we have to separate it that way. |
| | Sommer | Yeah. |
| 45 | Wright | And they have different shareholders.  Not every company has - - - |

Interview Conducted with Craig WRIGHT

| | Dolevski | But, I mean, even the private binding ruling is based on bitcoins. |
|---|---|---|
| | Wright | Yeah. |
| | Dolevski | Certainly not on interest. |
| 5 | Wright | And the other issue is each of the companies has different shareholdings. Hotwire has other shareholders; Coin Ex has other shareholders. It's not just me in any of these so – I mean, that was the other thing when I was talking to people because what I've moved into Hotwire has nothing to do with any of the other companies so if for instance someone who has shares in Denariuz can't then claim against Hotwire or vice versa because I'm not the only shareholder. I might be the major shareholder in everything but I'm not the only one. |
| 10 | | |
| 15 | Sommer | Yeah. So that seems to be how all that has happened so – in terms of the transfer of those subsidiary interests because nothing seems to have moved. I mean, if nothing has moved I need to be able to tell you guys what it was that has moved. It seems to me that there's trusts, that there's an equitable interest in the trust, that the idea was that each of those persons could call directly for the transfer to them absolutely. As you see – you will see that they've effected payment by instructing that trust to make payment to third-party contractual counter parties and so there was a transfer of a beneficial interest in – or part of a beneficial interest held by Dr Wright or held by one of the other contractual counter parties to the other group companies. You know, these group companies ..... related companies, I suppose, is probably the ..... I should adopt. |
| 20 | | |
| 25 | Wright | I will interrupt and say the reason for the PR was on a wallet that I do hold in Australia and I've dealt with – that's the only one I hold in Australia but I haven't transferred it yet. |
| | Dolevski | So that has got nothing to - - - |
| | Wright | No. |
| | Dolevski | The private binding ruling on the 55,000 wallet - - - |
| 30 | Wright | I still have that one. |
| | Dolevski | - - - of bitcoins has nothing to do with these transactions. |
| | Wright | No. And that didn't go through because I – the private ruling. I want to use it and that's part of where we're trying to figure out for selling the damn things in Australia versus overseas versus all the rest. |
| 35 | Sommer | Yeah. So the relevance, the – our real need for clarification on the treatment of bitcoin isn't so much for some of these transactions, which are some of these transactions because they were conducted with actual bitcoins but most of those bitcoins were offshore. The Australian legal treatment of bitcoin is critical to the business model because you can't have - - - |
| 40 | Dolevski | But not in respect of these group entities. |
| | Sommer | No, not in relation to – yeah, not in relation to the intragroup transactions. |
| | Dolevski | But isn't this – aren't we now talking about a trust and group of entities that's actually paying the things out of an interest in a trust - - - |
| | Sommer | Sure. |
| 45 | Dolevski | - - - that owns property? |
| | Sommer | Yep. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | And fundamentally, if we're just talking theoretically - - - |
| | Sommer | It could be ..... |
| | Dolevski | It could be anything. |
| | Sommer | Exactly. |
| 5 | Dolevski | And so bitcoins is really a side issue which has perhaps confused us all but not relevant to - - - |
| | Sommer | Not relevant to the audits. |
| | Dolevski | No. |
| 10 | Sommer | But absolutely critical to what Dr Wright wants to do with his business because if you want to try and create a bitcoin exchange the whole liquidity and the convertibility of the currency is only going to be achieved if it's treated like money. |
| | Wright | If - - - |
| 15 | Sommer | The liquidity – if every time you transact, if every time I buy a bitcoin from you I have to pay you 110 per cent of its value because you've got a taxable supply then we've got a problem with the transactability of it. |
| | Wright | Which means you will go to Singapore or the US. |
| 20 | Dolevski | But, Andrew, if we raise these assessments or not release the refunds and revise the BASs, say – you know, whether the interim position paper read – I mean, if we take out that paragraph about the reference to the September ruling or whatever, it will clean up our system, but – so we take that out and our bottom line is not going to change with the revised – okay? |
| | Sommer | No. |
| 25 | Dolevski | That's still – even if you dispute that, that's still not going to get you your technical clarity on bitcoins because we literally have to walk away from here. |
| | Sommer | We're not dealing with bitcoin. |
| | Dolevski | We're not dealing with bitcoins here. |
| | Sommer | Except for Denariuz, and we will get to Denariuz because Denariuz is the answer. |
| 30 | Wright | Denariuz is – like, I did - - - |
| | Sommer | They actually did a physical transfer of bitcoin. |
| | Dolevski | So there has been lots of – and dare I say a lot of heated conversations amongst different people - - - |
| | Sommer | A lot of colour ..... movement but not a lot of progress and that's - - - |
| 35 | Dolevski | No. |
| | McMaster | But there was no clarity. |
| | Dolevski | No. |
| | Sommer | Hence why I wanted to – and that's why .... |
| | Wright | I apologise for that but - - - |
| 40 | Sommer | It's just that that's why – and I think there has been so much grinding of the wheels and that's why I really wanted to have this circuit-breaker meeting to |

Interview Conducted with Craig WRIGHT

|  | | actually say, "Let's just really try and put it in some sort of cohesive framework and actually understand at law what really happened" because that's why I ..... |
|---|---|---|
|  | Dolevski | Well, we're getting back to you and your facts of what has happened. |
|  | Sommer | Well, that kind of helps so - - - |
| 5 | Dolevski | It does. |
|  | Sommer | So this is where things start to get to where we really – so all of those intragroup transactions, intra-related party transactions, whether or not they produce – you know, if they're bitcoins that are taxable then they're taxable on both sides.  They're probably not taxable on both sides in the present circumstances because we're dealing with subsidiary interests in offshore bitcoin rather than actual bitcoin.  All of that nets out to a whole bunch of not very much.  So there's rats and mice stuff where we've paid for parking and rent and photocopiers and those sorts of things.  There's intragroup stuff.  The real refund that the guys need is in relation to the MJF transactions.  The rest of it is more a spinning of the wheels.  So these things are the things where we have paid GST-inclusive amounts to our supplier and they're considerable and we need those, you know, refunds ..... to us is to try and get those refunds back so they continue funding activities in Australia.   So that – that's – but this is the real pain of the retained refunds.  A lot of those – you know, there's 60 million here and you can flick through the BASs.  They're huge numbers but most of that is a lot of, you know, intragroup circling around of stuff and - - - |
|  | Dolevski | Plus ..... |
|  | Sommer | Exactly.  Moving stuff around between - - - |
| 25 | Dolevski | Yep. |
|  | Sommer | Moving those large lumps of IP around whereas these MJF ones are the ones that, you know, I'm particularly focused on making sure - - - |
|  | Dolevski | And so MJF – because obviously we can't discuss - - - |
|  | Sommer | No. |
| 30 | Wright | That's right. |
|  | Dolevski | It's a separate taxpayer but - - - |
|  | Sommer | Yep. |
|  | Dolevski | So where does this connect in terms of which of Craig Wright's entities? |
| 35 | Sommer | Okay.  So this was – and that's exactly where these lines are going.  So MJF contracting so the tax invoice that they issued and so there's two highlighted ones there, are acquisitions by Dr Wright personally.  So those acquisitions are valuation services by Ferrier for fifty five thousand or fifty thousand dollars in the top line there which – I'm sorry, you can't quite read. |
|  | Wright | Can we focus that any better, do you think? |
| 40 | Sommer | I will be gentle - - - |
|  | McMaster | We've seen that invoice today. |
|  | Wright | You should have it. |
|  | Dolevski | Yeah, the one that you showed me.  Yeah. |
|  | McMaster | Yep. |

Interview Conducted with Craig WRIGHT

| | Sommer | I will be gentle.  I will be gentle.  That's about the best we're going to do there. |
|---|---|---|
| | Dolevski | Yep. Yep. |
| | McMaster | Yeah. |
| | Sommer | Okay.  So - - - |
| 5 | Chester | And one of those is – the top one is Ferrier promising his Ian Ferrier services to ..... as a consultant ..... |
| | Dolevski | And we've got a copy of that. |
| | Sommer | Yeah. |
| | McMaster | Yeah, we've got - - - |
| 10 | Chester | You've got all the stuff. |
| | Dolevski | Yep, yep. |
| | McMaster | Yes, we do. |
| | Chester | You've got all the stuff. |
| 15 | Sommer | So this is why I say that I think some of Dr Wright's confusion related to just how these were transacted and so some of these are Dr Wright transacting on his own account;  some of these are Dr Wright transacting as agent of the other entities.  So these two are, as I understand it, personal transactions for Dr Wright.  They relate to the valuation services because I think they couldn't – they weren't going to be allocated to any particular entity at that point, where this was something to have up your sleeve, you know, if you need valuation services which, you know, in a world of intellectual property are always useful. |
| 20 | | |
| | McMaster | So was there any valuation done? |
| | Sommer | It was - - - |
| | Wright | No. |
| 25 | Sommer | It's due for March 2014 so it's prepayment against future delivered services so, as I understand it, they haven't been delivered as yet.  And the last one, the last line there, is gold ore. |
| | McMaster | That would have been the Payne - - - |
| 30 | Sommer | The Payne ..... gold transaction and that's clear from the last line of that tax invoice and, again, I think – sorry, when I say "I think", I'm instructed that that was a transaction that Dr Wright was doing for his own - - - |
| | Wright | And that was my trust. |
| | Sommer | That was to go into the Wright Family Trust, was it? |
| | Wright | Yes. |
| 35 | Sommer | Okay.  I apologise.  So that the right to that gold ..... so I will revise that – were to go into the Wright Family Trust.  Okay.  Then supply in 1B, so just working through that tax invoice – supply of the automation software was a supply made to Hotwire again for five – this one for $5.5 million including GST and that's from Siemens – is that right? |
| 40 | Wright | Yes. |
| | Sommer | And then it was supplied through MJF. |
| | McMaster | Sorry. |

Interview Conducted with Craig WRIGHT

|  | Sommer | Sorry? |
|---|---|---|
|  | McMaster | What did you say?  Siemens? |
|  | Sommer | Siemens. |
|  | Wright | Siemens. |
| 5 | Sommer | S-i-e-m-e-n-s, the - - - |
|  | Wright | They're a German software – or Germany everything group. |
|  | Sommer | That's - - - |
|  | Wright | I have that software sitting in the office at the moment. |
|  | McMaster | So how did you acquire that software? |
| 10 | Wright | We were given a licence key which was emailed – I believe John has got it – and a download link. |
|  | McMaster | Okay.  And that came from Siemens or from MJF? |
|  | Wright | That came through MJF. |
|  | McMaster | And it worked?  Okay. |
| 15 | Wright | It does ..... |
|  | McMaster | I accept what you're saying.  It's just given Mark's prior history I'm a little bit surprised. |
|  | Wright | We were very careful with the software.  When I did the software stuff I made sure I – the payments happened as I got the software. |
| 20 | McMaster | Okay. |
|  | Wright | And then what happened was - - - |
|  | McMaster | Wise. |
|  | Wright | Yeah.  And then I trusted them and the gold is a different issue. |
|  | McMaster | The gold futures.  Okay. |
| 25 | Chester | It was the classic works, works, works, doesn't work routine, yeah. |
|  | McMaster | Okay. |
|  | Wright | So I kept going through and, "Wow, this is good.  This is good.  This is – he's disappeared". |
|  | McMaster | Unfortunately. |
| 30 | Sommer | Okay.  And then my 1C, that's - - - |
|  | Wright | Which I just made the assumption if you keep paying someone and they keep coming through they must be trustworthy. |
|  | Sommer | That seems to be an acquisition by Coin Exchange through Dr Wright acting as its agent and eleven and a half million dollars plus GST.  That's - - - |
| 35 | McMaster | Is that the Al Baraka? |
|  | Sommer | That is from Al Baraka and that's clear on the tax invoice there.  In the last line of the highlighted section there it says "Dallah Al Baraka Group" so – and that's the Microfinance software so the accounting packages. |
|  | Chester | ..... my glasses ..... |
| 40 | Sommer | Okay.  And then - - - |

Interview Conducted with Craig WRIGHT

| | Wright | We will also admit that since everything we've spent an inordinate amount of time rather than building on our damn software at the moment going through it with a fine-tooth comb trying to make sure there's no back doors or such other such things after finding out what Mark Ferrier is actually like. |
| --- | --- | --- |
| 5 | Sommer | Yeah. |
| | McMaster | That would be a priority, I would suspect. |
| | Sommer | It's – yes. |
| | Wright | Yes.  We can't go live with it until we can trust it. |
| | Sommer | It has been a disappointing contractual experience - - - |
| 10 | Wright | Yes.  I don't want to run something that we have 100,000 bitcoin one day and the next day, oops, it's gone. |
| | McMaster | I know there has been some issues overseas with Mount  Cox. |
| | Sommer | Mount Cox. |
| | Wright | Mount Cox, yeah. |
| 15 | Sommer | Yeah, Mount Cox is causing us trouble for all other sorts of reasons at the moment. |
| | Wright | Yes.  The little buggers won't release my fucking money. |
| | Sommer | Acquisition by Coin Ex so this is – I think this is the second of the MJF contracting invoices and I've put this one as an acquisition by – well, I've got Coin Exchange but actually there is – some of that was broken up and apportioned to the other entities as well because there's a commitment fee in there and so from an audit perspective – and this is why I think it's really important to agree the principles and then go – have someone sit down with John and rebuild everything from scratch because it seems perfectly reasonable to apportion commitment fees from this one across some of the other acquisitions but it means none of the numbers line up neatly and, you know, I'm a ..... so I like things to match up really nicely and of course they don't.  So the idea is yes, some of that gets broken up and apportioned to the other acquisitions included on there which is why I think one of them is 5.3 in the accounts instead of five even but I – you know, if we can agree the big issues, minor issues about the apportionment of the commitment fees services and the basis on which that gets spread out, I don't think is going to be too controversial and there's certainly nothing too intellectually difficult about any of that;  it's just a matter of explaining why nothing particularly lines up.  Now - - - |
| | Wright | And that sort of thing, Alan .....  program manager, has been dealing with people in Turkey at Al Baraka.  It's definitely the Turkish Al Baraka website but whether they have any other dealings with Mr Ferrier I have no idea.  All I know is I've got this offer and I believe it's right and if they haven't – what they've done internally, I have no idea, but we have the people there and we have been dealing with the people there and I can pass all that info. |
| | Sommer | So we've got the software.  We've got that line 2 there, line 3 there we've got.  Line 1 is not due for performance yet.  Line 4 technically isn't due for performance yet but it would be fair to say that reasonable minds have suspicion as to whether or not that's going to be performed in accordance with the terms of that contract such that we've engaged litigators to secure what performance we can. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | What it looks like and what we have information from at the moment that we would be happy to hand over is there are three directors at Payne who ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Just on the first, when I signed my contract, they bought up massively. When it was depressed they issued a "everything's terrible" release. Then, when I signed my contract, on the day of, they started buying even though there was a stop order, so I don't know how they bought. So they weren't meant to be doing anything until releasing the fourth but they – whatever. And then when the final contract came through with Mark and everything like that, everyone did the – waited and then sold at really high prices and that was, like, a 300 per cent increase and they made about another 20 million that way. |
| | Sommer | Yeah. And that's the subject of ..... being taken. |
| | Chester | Which we're happy to help you with if you would like to explore. |
| | Wright | And from my point of view those action – you know, if we can get someone tied into Payne then we can try and recover something there because - - - |
| | Sommer | That's about making sure that we get the ..... We paid for it. It hasn't failed yet. We're a bit squeamish about it, given some of the changes in character and the disappearance with Ferrier at different banks. |
| | Wright | Again |
| | Sommer | And just to be clear, because Mr Ferrier – people by the name of Ferrier are, you know, scattered throughout the tax world. We're talking about a completely different Mark Ferrier to the one in charge of tax ..... or special projects and - - - |
| | Wright | The one whose dad's a rather high-profiled - - - |
| | Sommer | Yep. |
| | McMaster | Yeah. |
| | Sommer | So – right. So we have got those details of the payments that were made in satisfaction of those tax invoices so 245,000 bitcoin on 30 August and 135,000 bitcoin on 15 September. Again, no bitcoin transferred directly by Dr Wright to Hotwire and Coin Exchange. Bitcoin was transferred for a trust ..... the trustee of which I believe is the entity by the name of ..... Limited. |
| | Wright | Not any more. |
| | Sommer | Not any more. Right. |
| | Wright | We changed the names of the two companies. |
| | Sommer | Okay. So it's the - - - |
| | Wright | To ..... and Coin. |
| | Sommer | Right. So it's the same company, it has just got a less weird name. Yes? |
| | Wright | Now you've - - - |
| | Sommer | I'm not doubting it was designed by ..... It's just one of those names that - - - |
| | McMaster | So there was a separate transfer of bitcoin to Al Baraka? |
| | Sommer | There was a transfer of bitcoin to the wallets nominated by Ferrier so he nominated wallets into which the money should be transferred. We asked for confirmation and we received confirmation from Ferrier that all the transfers had gone through and all was tickety boo. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Okay. So that amount up there includes the Al Baraka? |
| | Sommer | All of it. |
| | McMaster | Okay. |
| | Wright | Yeah. That was - - - |
| 5 | Sommer | So - - - |
| | McMaster | And that all went to Ferrier? |
| | Sommer | Yep. |
| | Wright | My - - - |
| | Sommer | As I understand it those - - - |
| 10 | McMaster | Okay. |
| | Sommer | Those amounts should line up to the totals invoiced on each one. |
| | Wright | My understanding was Mr Ferrier didn't actually want any bitcoin. He wanted the monetary value that he was going to get from these other guys for doing all the stuff, these things, so he was going - - - |
| 15 | Sommer | We weren't involved in paying Ferrier. |
| | McMaster | Sure. |
| | Sommer | Whatever Ferrier got he got from Al Baraka. |
| | McMaster | Okay. |
| | Wright | All he had to do was ..... |
| 20 | Sommer | From the other people that we had paid into the wallets that were nominated by him, got confirmation we've got the software keys, got the downloads and the, you know, source code that we needed. |
| | McMaster | Exactly. So we would be able to get those wallet address, I would presume? |
| | Sommer | I've got them with but - - - |
| 25 | McMaster | Later on - - - |
| | Sommer | - - - subject to – in fact, I think they've been provided but again let's try and do it in a cohesive way and - - - |
| | McMaster | Yes. That's okay. |
| 30 | Wright | They go right back to July where I did the – these are my things and whatever and I did actually tell someone but it's like everything you tell random people at the Tax Office what you're doing and - - - |
| | Sommer | Unsurprisingly - - - |
| | Wright | - - - it goes randomly into buckets of - - - |
| 35 | McMaster | Well, there are 26-odd – well, 20,000-odd of us floating around so that could easily happen. |
| | Sommer | Because of the enforcement proceedings that we are preparing in case it's not – the gold one is not performed in accordance with ..... my litigation colleagues have all those records being dug out and - - - |
| | McMaster | Excellent. |

GIZMODO

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I'm happy to share all the litigation stuff that we have, that we are chasing ..... with, if we can actually find him again because he seems to have vanished again. |
| | Sommer | Okay. So any questions about any of that? Do you need to change - - - |
| 5 | McMaster | No, it's good for another 15 minutes. |
| | Sommer | Okay. Good. This is going to make riveting listening. |
| | McMaster | Well, the Aus transcript person is going to love it. |
| | Sommer | Excellent. I always – you know, my students sometimes hate my lectures and just cannot understand why it is unless they're suffering from, you know - - - |
| 10 | McMaster | Insomnia? |
| | Sommer | Sleep deprivation. |
| | Wright | I did my best to try and hide the fact that I've been running bitcoin since 2009 but I think it's getting – most – most – by the end of this I think half the world is going to bloody know. |
| 15 | Sommer | Yeah, well. |
| | McMaster | So your mining would have started at Lisarow, at the server farm? |
| | Wright | Lisarow was part of it where you have the garage full of computers and the other was at Bagnu. |
| | McMaster | Okay. |
| 20 | Wright | That's why we had that big fibre cabling put in and - - - |
| | McMaster | Yes, you want to speed. |
| | Wright | Yeah. And we changed the – the whole area. Like, Telstra is not going to do anything for the area. No wireless or whatever else it was – a community of 20 people so "stuff you" basically. |
| 25 | McMaster | Yeah. |
| | Wright | Until we put the fibre in and suddenly ADSL and everything ..... |
| | Sommer | Okay. So a similar situation. So we've been through Hotwire in detail. |
| | McMaster | Yep. |
| 30 35 | Sommer | So a similar situation now of understanding at lodgement – a revised understanding – oops, sorry. There's twitching in my fingers. I need more caffeine. Right to have bitcoin transferred, issue of shares, essentially the same. Exactly the same pattern in relation to it. It just seems that for – as you see there, which we did and those wallet addresses, I'm instructed, were overseas and were in Africa and seemed to have been effectively at the direction of Al Baraka and our informal – our contractual arrangements were with Al Baraka and it seems that the money that went to Ferrier went to Ferrier from Al Baraka. So they collected all the money and then, "Here's your cut" and - - - |
| 40 | Wright | I got told, "This is how, you know, we do it. This is how we check. This is where they go. This is what we're doing". |
| | Sommer | Yep. |
| | Wright | And my understanding - - - |
| | McMaster | So would that have – sorry to interrupt. Go on. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I was going to say my understanding was - somehow he got paid.  He got – I don't know what his cut was or anything like this but – or even if he got paid in Australia.  All I know is he supposedly got paid into a trust somewhere. |
| 5 | McMaster | Okay.  So the Siemens and the Al Baraka one would have went to different wallets and the personal services - - - |
| | Wright | ..... |
| | McMaster | - - - and the gold - - - |
| | Sommer | There's a series of recipients but they don't – as I understand it they don't line up with each of those line items there. |
| 10 | McMaster | Okay. |
| | Sommer | They line up – those two transfers there line up with the invoiced amounts. |
| | McMaster | Okay. |
| | Sommer | The total invoiced amounts rather than the line items. |
| | McMaster | Okay. |
| 15 | Sommer | So we were – because we were told, dealing with MJF, put the money here in satisfaction of the invoice that MJF had issued to us, and we did. |
| | McMaster | Okay. |
| | Wright | I could explain it slightly differently but I think I will confuse the buggery out of everyone. |
| 20 | Sommer | Is what I said right? |
| | Wright | Right at what level?  Right at my level or right at - - - |
| | McMaster | Let's try our level. |
| | Wright | It's sort of right.  It covers things and yes, but is it actual – exactly how the things occur? |
| 25 | Sommer | Does it correctly describe the legal relationships? |
| | Wright | From a lawyer's point of view, yes. |
| 30<br><br>35<br><br>40<br><br>45 | Sommer | Thank you.  I will take that as endorsement.  Right.  So again that's just the text describing what's on the previous slide so – all that.  I haven't finished this one yet.  Like I said, this is all a work in progress as I'm still trying to isolate the similar issues in relation to the Wright Family Trust.  I think there are clearly some software transactions between it and Hotwire Coin Exchange which is effectively the proceeds of the Supreme Court, New South Wales Supreme Court action which seems to have been broken up and transferred out of the Wright Family Trust.  My understanding, and we are being totally frank here – it is my understanding of those proceedings that they seem to be by Dr Wright personally and may have involved Dr Wright personally getting them and then on-supplying them to the Wright Family Trust.  I'm not entirely certain that's the case.  I would need to get clarification from my client as to that but I think that's one of the things – but that seems to be one of the inter-related party transactions that's going to go around in loops and circles and whichever way we look at it it's probably not going to produce any net tax across the different entities.  Yes, one entity might end up owing something and the other one will have an offsetting credit but I'm trying to aggregate stuff as much as possible for the purposes of resolving concepts and then we can try and line up ..... |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | And part of the whole finalising ..... and whatever else was my wife – now – made the comment that if I don't clean these up and get them out of the way then she doesn't marry me so – so we settled for – without going after any directors.  We settled without a whole lot of other things and with the understanding that if I wanted to get married I get the bullshit out of the way. |
| 5 | | |
| | Sommer | Fair enough.  Okay.  Denariuz.  Now, this is the only one where we've actually got an actual transfer of actual bitcoin, just to show that we actually do have them, and this is the one that was done as I understand it after the 23 December 2013 private ruling was issued to us.  And the intention of the parties was to demonstrate the way in which this would operate, and I think just by aside this does demonstrate why treating it as money is a much better idea.  So if you've got a sale of $38 million worth of bitcoin from the Wright Family Trust into an Australian registered entity it then takes that and then, you know, if you've got an output tax liability in relation – from the trust, input tax credit entitlement for the Australian company who then sells the bitcoin to a non ..... not carrying on an enterprise in Australia you've got an input tax credit entitlement in Denariuz that's not offset by any output tax liability because you've got a GST-free supplier on the way out and you've got a massive – like $19 million is a $1.9 million refund because you've sold half of the - - - |
| 10 | | |
| 15 | | |
| 20 | | |
| | Wright | ..... |
| | Sommer | - - - bitcoin rather than all of it.  If we had sold all of it we would have, you know, effectively a $4 million refund due to Denariuz and no output tax liability.  I just think that's inexorably the consequences of the 23 December ruling, that if you're going to treat it as a taxable supply, you know, you're going to have these very lumpy transactions that are going to give rise to a whole lot – you know, I could preach for hours on the fact that it's a consumption tax - - - |
| 25 | | |
| | Dolevski | So, Andrew - - - |
| 30 | Sommer | - - - and there has been no consumption so - - - |
| | Dolevski | So, so far in the Wright Family Trust only interest to the trust that actually owned or - - - |
| | Sommer | I can only assume - - - |
| | Dolevski | How did the bitcoins then get into the Wright Family Trust - - - |
| 35 | Sommer | This is the - - - |
| | Dolevski | - - - for them to be able to sell them - - - |
| | Sommer | This is a question I haven't asked, that I – I can only assume that they called for a transfer to them absolutely of part of the interest that they hold in those trusts. |
| 40 | Dolevski | Well, that's the part we would need substantiated for obvious reasons. |
| | Sommer | Understood but they haven't lodged their BAS for that tax period yet and so we will no doubt get to that in due course. |
| | Dolevski | So that will be in the January quarter? |
| | Sommer | No, no.  That will be in the December that - - - |
| 45 | McMaster | No. |
| | Sommer | It will be a 28 February BAS. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | Their quarter - - - |
| | Sommer | 28 February. |
| | Dolevski | Their quarterly lodges so, yeah, February. |
| | Sommer | Yeah, yep.  28 February.  28 February BAS. |
| 5 | McMaster | Yep. |
| | Sommer | So, yeah, that's something that will have to be addressed shortly, included in the return that's lodged for the 31 December - - - |
| | Wright | And the idea there was not to – just as a demonstration, yeah, and one that I think ..... the tourist refund scheme ..... |
| 10 | Dolevski | Well, I mean, with those export – I mean, we – you know, that's clear legislation in terms of - - - |
| | Sommer | I know, but - - - |
| | Dolevski | - - - products that are exported are entitled to the ITC scheme but - - - |
| 15 | Sommer | It's just - my point is this:  creating these lumpy supplies where there's no actual consumption where, you know, it's basically – you know, moneys are ..... value and what we've done is move a ..... value from one entity to another entity or a third entity where it retains its value without any consumption and you've got – the whole idea of the consumption tax is not to drag that sort of transaction into the system and by treating as something other than money, that's what we're doing.  And I take ..... entirely that, you know, that – refunds, sure.  And if it was $38 million worth of goods I wouldn't have a problem but it's $38 million of stuff that can't be consumed - - - |
| 20 | | |
| | Wright | But that's why I've made it a paper wallet so that it is a thing. |
| 25 | McMaster | But a paper wallet, if I understand it correctly, is the private key, okay, and you can - - - |
| | Wright | That stores within it, yes. |
| | McMaster | Okay.  And so you would have stored it on a USB stick or something like that or - - - |
| | Wright | No, no, actual paper wallet. |
| 30 | McMaster | - - - you physically wrote it down? |
| | Wright | I physically made a paper wallet containing the keys. |
| | McMaster | Okay. |
| 35 | Wright | And actually took that to the guys at the tourist fund scheme thing and sort of handed it over and said, "This is what it is.  This is how we can validate it and here's the QR code" and they went, "What's a QR code?"  And then I said, "Well, okay.  If we do our phone here, and what you do is you take a photo of it so that you can check later if you can't figure it now and here's what we do" and I stepped them all through it and they called their manager and said, "What the hell is this?" |
| 40 | McMaster | They would have been flustered. |
| | Wright | Yeah, and then we - - - |
| | McMaster | Okay. |

GIZMODO

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | Then we did the 10 million plus bit and then we – "There's no enough digits, sir" and called over someone else and then the whole team got over there and then I held up the line for half an hour and everyone must have hated me - - - |
| | Chester | Anything just to prove a point. |
| 5 | Sommer | I don't think it's – I don't - - - |
| | McMaster | Was that - - - |
| | Sommer | - - - think it's goods anyway. |
| | McMaster | Was that wallet registered anywhere, by the way?  With Blockchain, for instance? |
| 10 | Wright | Is it - - - |
| | McMaster | A registered wallet with Blockchain. |
| | Wright | Yes, yeah. |
| | McMaster | Because I had a look at the invoice you provided to the Customs people and unless I've mis-keyed it I can't locate it. |
| 15 | Wright | You should be able to. |
| | McMaster | Yeah.  It may be that I've mis-keyed it but I will have another go. |
| | Sommer | I don't think it matters in the sense that it's not goods.  I don't care what you – I don't care how much paper Craig creates, it's not goods.  It doesn't qualify but it was transferred between legal people. |
| 20 | McMaster | Yeah |
| | Wright | That's the number down the bottom if you want to take it. |
| | McMaster | That's okay.  I will go back to the invoice that you had on you at the time and if I still can't get it – and it could simply be that I'm keying it in - - - |
| | Wright | I could have typed it wrong in the invoice too because - - - |
| 25 | McMaster | You could have done. |
| | Wright | A capital in the wrong place or - - - |
| | McMaster | Yeah.  It's easy enough. |
| | Wright | But, yeah, the one we handed over had the correct thing. |
| | Chester | They're not like ..... PIN numbers ..... |
| 30 | McMaster | Yeah, they are. |
| | Dolevski | No, unfortunately. |
| | McMaster | Now, we're coming to the end of recording here. |
| | Sommer | Yeah. Do you want to change it and then I will wrap up? |
| | McMaster | Yeah.  I will wait till it stops first. |
| 35 | Sommer | Okay. |
| | McMaster | It has got to go through its process and then we can wrap.  I know, I know. |
| | Sommer | Even the CDs are bureaucratic here.  Sorry. |
| | McMaster | Well, you've got to write them.  What can I say? |
| | Sommer | Oh, that was recorded too. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | That's okay, Andrew.  It won't be held against you. |
| | Sommer | Don't tell James I said that.  Okay.  So Denariuz is the first BAS to be lodged after receiving a private ruling on the bitcoin transaction ..... blah, blah, blah, we've done all of that.  Transfer the supply from Denariuz Australia to Denariuz Singapore is going to be GST-free ..... liability ..... and all of that.  Okay.  So where are we?  Clearly, revisions are going to be necessary to all the BASs that we've lodged.  Some transactions are uncontroversial and should give rise to immediately available ..... day-to-day transactions ..... stuff and we intend to buy a lot of computers and we intend t buy, you know, a lot of those sorts of things in order to ..... but, you know.  Day-to-day transactions we paid cash out of the entities and it's all fairly simple. |
| | Wright | We just like ..... |
| | Sommer | Some transactions are more complicated but still give rise to the import tax credits and net input tax credits such as the MJF transactions, they need to be documented properly into the BASs.  Some transactions need to be removed .....  So where some of the ways in which I think the BASs have reflected some of the transactions needs to change.  So what would we want?  I would like to reach an agreed position in relation to these transactions that we can then sit down and it really should only be a matter of a couple of hours to sit down with someone to work through how these BASs should be re-lodged and have the Tax Office happy with them so we can say, "All right.  Here's the principles.  Let's apply them to these transactions".  As John said, I think there's about a hundred transactions and so get them into the right BASs.  Let's get them in and get them lodged and correct the issues and then we can then have the agreed principles for the lodging of future BASs so we don't have to do this again.  And then the third point there is to continue dialogue about the treatment of bitcoin, whether it should be treated as money, because that's not critical necessarily to the resolution of the BASs and I think subject to the discussion before we're probably happy to re-lodge the BASs on that basis, on the basis that bitcoin is money but because we've been dealing with subsidiary interests, apart from Denariuz, they're minimising a number of taxable supplies that actually occurred of bitcoin but, as I say, it's critical to the business that the guys want to do that we try and convince you guys that it's money, but that's more from a broad policy perspective rather than an immediate audit perspective.  And that's really it.  So - - - |
| | Wright | The other bit I've offered a few times is if you have anything that you want to do with Mr Ferrier – I know I can't get any information on other taxpayers but there's nothing stopping me from giving you information.  I'm happy for - - - |
| | Dolevski | True, there's nothing stopping you from giving us information. |
| | Wright | No.  So I'm happy for Nick - - - |
| | Dolevski | Everyone's entitled to make a dob – you know, dob in or whatever - - - |
| | McMaster | Well, they call them Turks. |
| | Dolevski | Dob in a Turk. |
| | Sommer | So - - - |
| | Wright | I'm not friendly with the guy at the moment so I'm happy to give over anything.  Trust me. |
| | McMaster | Understandable. |

GIZMODO

Interview Conducted with Craig WRIGHT

| | Sommer | And simply as a by-product if you like of some of the heat and light and frustration that seems to have gone on, I think we would like to have an independent person come in and assist with the preparation of those revised BASs. |
|---|---|---|
| 5 | Dolevski | So, Andrew, would you be proposing that your firm put the revised BASs together? |
| | Sommer | No, I'm not a BAS agent. I don't do that sort of stuff. |
| | Wright | Have someone who does it. |
| | Sommer | No. John will sit - - - |
| 10 | Dolevski | Well, it would actually need someone to provide the information and we've got – I mean, who I'm thinking of is Andrew. |
| | McMaster | Yeah. He would be a good person and he's independent of Selso so it's not a problem. |
| | Sommer | Andrew? |
| 15 | McMaster | Miller. |
| | Sommer | Okay. |
| | Dolevski | He's from Parramatta and he's from our audit area. |
| | Wright | What I would like to say is - - - |
| 20 | Dolevski | Because, I mean, I don't think it's – there's no bias here in terms of – let me put that on the table. |
| | Sommer | Yep. |
| 25 | Dolevski | There's certainly not bias in terms of the way these audits are being conducted. I think there has been a lack of clarity and understanding and even what we thought we actually had understood and we had put our own structure together from what we could put together - - - |
| | Sommer | Yep. |
| | Dolevski | But - - - |
| | McMaster | This is what we thought it was. |
| | Dolevski | But it was all pretty much around bitcoins. |
| 30 | Sommer | Yep. |
| | Dolevski | I have to say that I think we haven't been too off the mark in terms of - - - |
| | Wright | One for John. |
| | Dolevski | - - - how things have flowed. |
| | Sommer | Yep. |
| 35 | Wright | Yeah. |
| | McMaster | But obviously that's no longer the - - - |
| | Dolevski | But I think - - - |
| | Sommer | No, no, no. |
| | Dolevski | No. |
| 40 | Sommer | And we're not ..... |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | But I think from my perspective – and Andrew is the one that, you know, independently took all the information and, with another officer - - - |
| | McMaster | And prepared this flowchart. |
| 5 | Dolevski | - - - you know, assisted him and prepared this so I think with now at least having that background - - - |
| 10 | Sommer | Yep. I think my – I'm instructed to request as humbly as possible that we move away from Parramatta and that may simply be a matter of perception rather than anything else but given some of the complicated history and particularly given some of the difficulties with some of the previous interactions with the Tax Office prior to these issues we would ask if it's at all possible to have it transferred to an audit team in a different ..... |
| | Dolevski | Well, all of the audit teams reported to me so - - - |
| | Sommer | I don't - - - |
| | Dolevski | Yeah. |
| 15 | Sommer | That would be something we would appreciate. |
| | Dolevski | Okay. |
| | Sommer | With the greatest of respect to the team that has been doing it it would give an additional degree of comfort to the taxpayer to have it relocated to a different team. |
| 20 | Dolevski | Even though we're now talking about a pure revision of BASs? |
| | Sommer | Yep. |
| | Dolevski | Accepting the ATO view and purely - - - |
| | Sommer | Yep. |
| 25 | Dolevski | - - - advising the BAS is based on that, you would still feel uncomfortable with - - - |
| | Sommer | I wouldn't put it like that - - - |
| | Dolevski | We would remove Selsa as the - - - |
| | Sommer | - - - but I would say I would feel more comfortable - - - |
| | Dolevski | Well, your request – yep. |
| 30 | Sommer | - - - if it was in one of the other offices, is what we're requesting. |
| | Chester | But ..... what we can do, though, because we're using zero ..... base, we can do it anyway ..... we just sit there and do it, just – I don't know ..... It doesn't have to be one of these ..... We could do it in this room ..... |
| 35 | Wright | And, see, you've got here, "Have not even acquired it yet". I mean, I've already - - - |
| | Sommer | ..... |
| | Dolevski | Yeah. It has been – we acknowledge that it's – yeah. |
| | McMaster | Well, it's based on what information we had. |
| | Wright | Yeah. |
| 40 | Dolevski | We've had misunderstandings and - - - |

Interview Conducted with Craig WRIGHT

| | Sommer | Look, I would like not to have to do a, you know, line-by-line response to the interim audit report and all those sorts of things - - - |
|---|---|---|
| | Dolevski | No.  We were just - - - |
| | Sommer | If we can withdraw that and then, you know ..... |
| 5 | Wright | And the other bit is - - - |
| | Dolevski | So, Andrew, just on the interim report, though - - - |
| | Sommer | Yep. |
| | Dolevski | Well, I suppose it's riddled with reference to ..... isn't it? |
| 10 | McMaster | Well, it is. What has been presented today - - - |
| | Doa | Yeah. |
| | Dolevski | It's factually incorrect. |
| | McMaster | What has been presented today is factually incorrect, yeah. |
| | Dolevski | Instructions that have been put forward today ..... in light of those. |
| 15 | Sommer | Yeah. |
| | Dolevski | Agreed that the facts are wrong. |
| | McMaster | Totally. |
| | Dolevski | Okay.  I hear what you're saying and I still think it's a little bit unfair to judge the auditors based on the information they weren't given. |
| 20 | Sommer | No, no, no, it's not so much that.  It's just that the point – and we're not saying that they're – we're not making any allegation of impropriety.  It's merely – I think it would be seen as a nice fresh start if we could start in a different office ..... |
| 25 | Dolevski | It's just the timing aspect.  We would lose so much time with people that, you know - - - |
| | Sommer | I understand that but it would be - - - |
| | Dolevski | - - - have to come to grips of - - - |
| | Sommer | In many ways it would be nice to start with people who start afresh with what we now understand to be the way in which it happened ..... |
| 30 | Chester | But they're not going to review any of ..... confusion.  We're just going through an audit revision based on an agreed process ..... |
| | Dolevski | Well, leave that one with me. |
| | McMaster | Can I suggest we take it on advisement? |
| 35 | Dolevski | Yeah, absolutely.  We will have to look at it because, I mean, I have to look at what capacity auditors have and - - - |
| | Sommer | Sure.  Understood.  Resources. |
| | Dolevski | There is a – yeah.  There is an element of urgency in withholding refunds. |
| | Sommer | Yep. |
| | Chester | ..... so we would like to get that as quickly as possible. |
| 40 | Wright | And especially ..... of their money so - - - |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | ..... |
| | Dolevski | We will consider it. I mean, that's why I thought Andrew. You know, he's fresh. He hasn't done any of this. |
| 5 | Sommer | I mean, but if he prepared those on the basis of the previous submissions then he has already - - - |
| | Dolevski | Well, I mean, but - - - |
| | McMaster | Only the documents received. |
| | Dolevski | Yeah, absolutely. |
| 10 | Sommer | Yeah, and I'm not – and, as I say, I'm not - - - |
| | Dolevski | Yeah. And this is purely – I mean, we all in this room – we all thought it was bitcoins we're talking about so – I mean, this presentation has certainly shed quite a, you know, different light on things so - - - |
| | McMaster | Dramatically. |
| 15 | Dolevski | Yeah. |
| | Wright | See, but part of this is – I still see it as bitcoins. |
| | Dolevski | Shh. Yeah. |
| | Wright | You have the lawyer hassling. I mean, it's rights and - - - |
| | Dolevski | Yeah, but - - - |
| 20 | Wright | I have the technology - - - |
| 25<br>30 | Sommer | You see it as ..... until the point you say to me, "Andrew, nothing has ever moved and nothing has ever come to Australia" at which point I have to say, "Is there a taxable supply in Australia", and if nothing is here then I can't apply the nexus tests to that so what has actually transpired as the supply between those two entities? It can only be, you know, the – you know, what is it, the nemo dat principle, you can only supply what you've got. They don't have actual bitcoin. They've only got rights to call for bitcoin. Those rights came from you. Those rights subsist against the trusts and that's – again, that's how, you know, I've – I've – Craig's entirely right. This is my legal analysis of the facts as I understand them, based on what seems to have happened. |
| | Wright | See, I have the car in the UK and I had a piece of paper and whatever else and I sold – I – rather than say that I'm selling you a car, it may stay in the UK and everything like that and – but anyway. |
| | Dolevski | It has got nothing to do with tax in Australia then if you sold that car in the UK. |
| 35 | Sommer | ..... |
| 40 | Chester | What happened is that there's a whole treatment and the – I suppose the response that we got from Craig in terms of information generally has been a paranoia process based on prior experience and ..... taking things out or leave them, in 2010 or whatever it was, off to America and other places was a response to the experience that he had the last time ..... and the way he set things up was ..... |
| | McMaster | Well, the auditors that were involved in that prior one are nowhere near involved in this one. |
| | Chester | Well, you were involved in it. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Well, only as a director, but I wasn't an auditor. |
| | Wright | I guess I gained a little bit of paranoia on that one - - - |
| 5 | McMaster | Look, I can understand where you're coming from, okay, and I can also understand the communication confusion because you clearly see these things as bitcoins. |
| | Wright | I see them as money. |
| 10 | McMaster | You see them as currency and you treat them in the same way and when you talk to us about them, that's how you talk about them and, unfortunately, that has created a confusion around what actually occurred, and that's all that me as a director and Marina as my Assistant Commissioner are trying to clarify. What are the true facts here and if at the end of the day you've got a refund, you've got a refund. End of story. You're entitled. |
| 15 | Sommer | And all we're trying to do, all I'm trying to do is, you know – you know, if I was a nefarious litigator – and I know lots of them – there's nothing I would rather do than run a declaratory proceeding against you guys about ..... money. However, with Craig and John in their current situation that's going to tie more of their money up and, you know, I don't work for free, and that's not going to progress things. I would rather come to you guys and say, "Look, listen, the whole treatment of bitcoin is not what we anticipated but if we actually look at what you've said and try and make it work" – and I'm a big fan of trying to make things work as far as we can. We can always ..... you know, when you guys lose in the Federal Court and, you know, you decide not to appeal and bitcoin is money, we can always go back and revise the BASs again but at least we can make some progress and actually stop this business being strangled, and that's really what I want to achieve. I just want to actually let these guys escape from under six different audits and try and get back to the business. That's my objective. |
| 20 | | |
| 25 | | |
| | Chester | And whatever ..... so if Andrew's the guy and you vouch for Andrew. He's the guy? |
| 30 | McMaster | He is a very good top-notch person. |
| | Chester | And make no mistake, there's nothing wrong with Selsa. |
| | McMaster | Yep. |
| 35 | Chester | We've had some good work with Selsa. The problem is the way that he received things at the outset was ..... and we tried to explain on many different occasions and there was no – the difficulty is that it's – for all of us, that we're dealing in cyberspace and the problem with cyberspace is that it's out there some place but – and it doesn't exist, but it does exist; and it doesn't exist, but it does. It's like Europe. The Euro isn't fiat money either. It's just that people agree that it's money. |
| 40 | Dolevski | But, John, I don't think we actually even need to get confused by that. |
| | Chester | Yeah. We can ignore it. |
| | Dolevski | You know, I think if we just look at the documents and what they're telling us, that's what we need to form a view on. Just what Andrew has done, he has looked at, and that's what we need to do as tax administrators. |
| 45 | Wright | Yep. And unfortunately there was bad timing as well. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | What  - you guys get on with your business, we don't need to be involved in; we just need to understand the transactions and then we can see how they apply and what is the relevant tax, if any. |
| 5 | Wright | And unfortunately there was also a bad situation in that just as all this happened the guy who was the CFO of the company, Jamie, had ██████ and I'm the first to acknowledge I'm not good at getting things to you guys.  I just dump everything.  I don't structure anything properly and that's ..... job. |
| 10 | Dolevski | Look, I mean – you know.  Anyway, look, I will discuss it with Des but my preference still, and I would strongly recommend that you agree about Andrew.  He's an excellent auditor which is why we actually had him review this and, you know, a very different way of working so - - - |
| | McMaster | Why don't my clients confer and they can - - - |
| | Dolevski | Yep. |
| 15 | McMaster | They can confirm or disavow .....  But, yeah. |
| | Dolevski | But I would love your presentation, please. |
| | Sommer | Yeah, yeah.  I will just – I will clean it up and - - - |
| | Dolevski | I think that's certainly – yeah. |
| | Sommer | - - - get Craig's authority to provide it to you and then I will send it to you. |
| 20 | McMaster | That would be good because we will need that sort of information in what we're doing because we still need to run that past yourself. |
| | Sommer | Yep.  And we've built this up – I mean, John and I built this up yesterday afternoon from the documents so we can provide you with the documents and I've tried to, as much as possible, put them up on the screen for you. |
| 25 | McMaster | Sure. |
| | Sommer | So you can actually – because, you know, there's a difference between ..... and making assertions and actually giving you documents so where I've got easy extraction documents to show you I've tried to do that.  There are other documents behind all of that but I was pretty confident that once – if we could actually do this – and thank you for accommodating me with the projector because it – and I just thought if we could do it this way – I'm quite sure everything ..... |
| 30 | | |
| | McMaster | Visual is so much better. |
| | Sommer | Yeah, well, you know - - - |
| 35 | Dolevski | Which is why we tried to draw - - - |
| | Sommer | Yeah, exactly, and I've got – like, I could – I won't, but I could show you my notes going back from the start of January where I've completely scratched everything out and started again now that I understand what's going on, so - - - |
| 40 | McMaster | Which is what we've got to do. |
| | Sommer | Exactly.  All right.  Well - - - |
| | Wright | And I admit my problem is – I mean, I will point you to Economics 101 which says money is a stored value of blah blah blah and whether the – whatever you say, I will get stuck on that bit and ..... we will get nowhere. |

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | But we will do is we will drive Michael Harding mad with that and we will try and keep you sane and get the audits process - - - |
| | Dolevski | That would be good. |
| | Sommer | I always enjoy - - - |
| 5 | McMaster | Sounds reasonable to me. |
| | Dolevski | Yeah. |
| | Sommer | I thought you would like that. All right. |
| | McMaster | Okay. So any other discussion, because I will stop this and start recording it. |
| | Dolevski | Well, Hoa, have you got any questions considering you've come from Perth? |
| 10 | McMaster | Yeah, exactly. |
| | Doa | So did you want us to have another look at the objection right issues? |
| | Sommer | I think you should. I think you should have a look at those notices. |
| | Doa | Yeah. |
| | Dolevski | Yep. |
| 15 | Doa | Yeah - - - |
| | Sommer | Call for a copy of those notices and actually have a look at whether or not you're happy with them. |
| | Doa | Yeah. |
| 20 | Sommer | Because John sent an email saying, "I can't see where the objection rights are in this because you don't seem to be telling me you need any information. You're telling me you formed a view as to the operation of the law". |
| | Doa | Yep. |
| 25 | Sommer | Tell me where my objection right is and then we will – so don't ..... refer to 8AALZGA and then if you're happy with them, send me an email saying, you know, you've looked at them and you're happy with them and if you're not happy with them then, you know, at least give us something that we can choose to object to if we want to. |
| | Doa | Sure. Yep. |
| 30 | Sommer | But all of that, hopefully, if we can – my preference is just to raise that as a systems issue for you guys because I know it's a new provision. I've never seen these notices before but when I got them I said, "I don't think these work". But when – and I was involved in the drafting of it. When we drafted the part ..... you into that section I thought it was a waste of time anyway because, you know, with a good conscious how do I tell the client that they should spend their money on a procedural review rather than answering the damn questions. So it's always easier just to answer the questions. |
| 35 | | |
| | Doa | Yeah. |
| | Sommer | So, yeah. |
| | McMaster | Not a problem then. |
| 40 | Doa | Yeah. And if we could that, that would be really good to review the transactions based on the new understanding. And with the interim audit reports we will just leave them sitting to the side for a minute? |

Page 39 of 40

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Well, probably best to send the letter saying – if you don't mind just sending a letter saying - - - |
| | Doa | ..... withdrawn. |
| 5 | Sommer | "We will withdraw these to reconsider the additional information we've provided". |
| | Wright | And just on a different note, but you want a formal – I'm happy for Nick, who is the litigator, to give you all the evidence that we have ..... to tie that together too. |
| 10 | Sommer | I think that will just bury you guys but if – once we've prepared the brief, because we are – you know, the full brief. If you guys want a copy of the proof we have against ..... of MJF and so on because it may be of assistance to you in any action you may or may not choose to take in relation to a taxpayer who's not in the room - - - |
| | Wright | And you don't need to give me information about - - - |
| 15 | Sommer | - - - then I suppose we can do that but I think we're still working on putting all that together at the moment. And if you think that would be useful from a – can I say interest perspective – we can probably do that in due course. |
| | McMaster | Okay. |
| 20 | Wright | Because the current one is – we might have it against the company but we're trying to build a unconscionable conduct-type thing against the individual so that – because if you're just a director you ..... and - - - |
| | Sommer | Okay. Thank you so much. I really appreciate - - - |
| | McMaster | Not a problem. |

GIZMODO

Exhibit 7A

From: Craig Wright [mailto:craig@rcjbr.org]
Sent: Wednesday, 10 October 2012 4:55 PM
To: Dave Kleiman [mailto:dave@davekleiman.com]
Subject: FW: IFIP-WG11.9 CFP

We need to discuss the trsut and work out what the fuck we are doing with it all.

So, a good tax deductible way to have a visit and also write a paper.

# Exhibit 8

From: Craig S Wright
To: dave@davekleiman.com
Subject: This week
Date: Tue, 22 May 2012 09:45:31 +1000

Dave,
A recycled rant. I have done the same to Ramona.

It is not a good several weeks from now. Tomorrow I have the AAT and then teaching. Tonight changes and writing. Thursday, webinars and more. I return a week from now even busier. The following few months are basically hell with less heat.

CSU wants to expand what I can do and also have a backup, so they have moved me to a subject I do not like much from one I started and love next semester. I am not teaching the ethical hacking class next semester, but rather I am teaching windows domain management (A subject I know but find boring). Knowing I have to spend the next 4 months from when I return doing something I do not enjoy far less than I thought adds little to removing my stress.

I have missed my deadline with Hakin9 and will miss the journal for the first time in 9 months. I know I will not have time at all over the weekend to write, so I have until Thursday night to finish editing 172 pages for Bob and the book chapters. This is a hard deadline and I cannot miss it. Right now, I have 168 pages to go.

I am stressed right now. FUCKING ARGHHHH!

I still have not started reviewing my slides and I am no closer with the work for FASV. They have no real idea what, but it could be a way to help with funds as I find a means to make a Bitcoin extension that cannot be lost. One that is money you do not lose when you die, but is still all Bitcoin is. They still crap all over my paper and dismiss it. Bloody academic cryptographers. The Blockchain is better than they will ever do and they all fucking dismiss it. Fucking Scheiner stole my early ideas now the prick shits all over the new ones. One day.

The meeting with the AAT should have occurred weeks ago, but the ATO have stalled and put it off. John has all the materials and the ATO are simply BS'ing again. It costs me money and in a way I guess they want to get a result through attrition rather than honesty. They will drain all I have if they can. We do not touch the trusts. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions and let them try shit on us then. FUCKING DICKS. Bloody lying ATO cock sucking bastards! They lost evidence and use my temper against me. I hate their lies. I did everything right and I am STILL punished.

I am not spending time with family. I fail to talk with you Dave other thasn rants and work. I am sorry, but I have nothing much more than rants and work. This drives me.

I need more time. I need to have time to do what it takes.

I would sell my grandmother for banking code. I am not getting what I need. I have been doing core banking reviews and these help with the middle wear and the process, but I NEED code. NO TIME. NO access and a fucking recalcitrant bloody tax office who thinks I am the anti-christ.

I need a way to get something soon. I need an ERD at least. I will work for a bloody bank if I need to. I have friends in the Commonwealth Bank here, but I just want source code. why is it so hard to get? And again, it is the bloody ATO. They have made it so fucking hard with the closing of my companies.

Exhibit 9



---

# Fwd: FW: Bond villains

---

---------- Forwarded message ----------
From: **Ira K** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Date: Sat, Mar 1, 2014 at 2:42 PM
Subject: Re: FW: Bond villains
To: Craig S Wright <craig.wright@hotwirepe.com>

Just to clarify on thoughts from previous email... In one of the email exchanges between Dave and you, he mentioned that you had 1 million Bitcoins in the trust and since you said he has 300,000 as his part. I was figuring the other 700,000 is yours. Is that correct?

Ira

On Sat, Mar 1, 2014 at 9:23 AM, Ira K ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:
> Can you allocate 20% to my dad and 80% to myself?
>
> So if I understand correctly, you have the rights to the remaining portion of Bitcoins stored on one of Dave's drives here? If that's true we just need to figure out how to decrypt the drives.
>
> Ira

On Friday, February 28, 2014, Craig S Wright <craig.wright@hotwirepe.com> wrote:
> The trust Dave setup should have around 300,000
>
>
> We moved everything offshore as a result of my early fight with the Tax office. This was back in 2011. The BTC would be on a server or hard drive, just the rights are overseas.
>
>
> The price is displayed in the diagram below.



I do not know what was going on with Dave before he died, or if he was taking notice – he seemed distant and we did not talk much in April other than a couple company matters. In the couple months before the end, it finally started to be worth something. Then it crashed just before he died, then it recovered.

I need to allocate shares to Dave's estate. You need to tell me how.

Craig

**From:** Ira K ████████████████
**Sent:** Saturday, 1 March 2014 12:53 PM
**To:** Craig S Wright
**Subject:** Re: FW: Bond villains

Hi Craig,

I was just noticing the sentence where Dave mentioned Bitcoins were not worth much at the time. That must be why he never cashed any in.

Do you still have a million bitcoins in the trust he setup?  And do you think there is a chance of finding the bank holding them?  If I can be of help just let me know what you need.  Since Dave setup the trust, perhaps my identification is needed in order to gain access?

Do you know how the bitcoins are stored in the trust?  Are they on a hard drive? I don't quite understand why it was necessary to keep them in these offshore places.

And are there two seperate trusts?

1.) GICSR Trust in Belize.

2.) Design by Human in Seychelles.

Sorry if I sound a bit confused... it's because I am.  :-)

Ira

# Exhibit 10

## INTELLECTUAL PROPERTY LICENCE
## FUNDING AGREEMENT

**PARTIES**

**Craig Wright R&D**
**ABN 97 481 146 384**
(Financer)

**AND**

**W&K Info Defense LLC**
(Provider)

Ref: CEWK01

$K \ C$

**THIS DEED** dated 22nd day of April 2011

**BETWEEN**

      Craig Wright of Craig Wright R&D

                                                        (Financer)

And

      Dave Kleiman for W & K Info Defense LLC

                                                     (Provider)

## RECITALS

**A.** The Financer controls the following Bitcoin (BTC) addresses:

      (a)    12hRmmSda9qSSEH656zBaKEbeisH6ZhdTm.

      (b)    12C9c9VQLMrLi4Ffzq2wDvwrKnUPaAaNFp.

**B.** The Provider desires the intellectual property for the permitted use and to extend this for other purposes desirable to both parties.

**C.** The Provider will use the funding for the development of several software products.

**D.** The provider will return the loaned finances (in Bitcoin) on or before 01 July 2013 and 30 Dec 2013.

**E.** The Provider will remain completely confidential on all matters in this deed (including even that family members do not have knowledge of the transaction).

**F.** The financer will send the following amounts (in Bitcoin) to to following address by 30 April 2011:

      (a)    165,140 BTC

      (b)    1MSUvGS9BEjpL35CKu7feF4HaPCXv2cht7

**G.** The financer will send the following amounts (in Bitcoin) to toe following address by 30 August 2011:

      (a)    50,000 BTC

      (b)    1JjtxXmbC95sgn5kE2Hm92axA7hcbDkRhK

**H.** The Financer and the Provider wish to record the licence, which has been granted to the Provider to use the intellectual property in accordance with this deed.

**I.** The Financer is the absolute owner of the entire unencumbered copyright in the works described in the schedule when complete.

**J.** The Financer has agreed to license the works to the Provider and the Provider has agreed to accept such licence on the following terms and conditions.

**K.** The provider will fund the software development using Bitcoin.

2

**L.**   The Financer will provide 1,024 core Xeon and GPU based hardware solution.

  (a)   It is acknowledged that two SGI ICE XE310 – 512 core hosts have been provided and are in a data centre specified by the provider

  (b)   The provider will use these systems to mine Bitcoin

  (c)   The provider expects to earn 12,000 BTC per month using these systems for the period to 30 June 2013

  (d)   The systems will be hosted in the US at a facility managed by the provider.

**M.**   The provider will pay for the use of the systems and the loan as follows:

  (a)   250,000 BTC to be repaid on 30 June 2013

  (b)   50,000 BTC to be repaid on 30 Dec 2013

  (c)   The developed software will be exclusively licensed perpetually to the financer (as of 30 June 2013).

  (d)   The software may be used but not distributed by the provider.

**N.**   The contract is complete when 300,000 BTC have been repaid.

**O.**   It is agreed that the value of the loan to be repaid is $ AUD 20,000,000 in two parts (for a total of $40,000,000).

**P.**   The server systems will return to the Financer at the completion of the contract.

**Q.**   On default, the contract is to be repaid in full to the financer.

_K_

**OPERATIVE PART**

**1. Definitions**

In this deed:

(a) Business means the business operated by the Provider described as such in the schedule;

(b) Business day means a day, not being a Saturday, Sunday or gazetted public holiday, on which banks are open for commercial business where performance of an obligation under this deed is to take place;

(c) Claim means, in relation to a person, a claim, demand, remedy, suit, injury, damage, loss, cost liability, action, proceeding, right of action, chose in action, claim for compensation or reimbursement or liability incurred by or to be made or recovered by or against the person, however arising and whether ascertained or unascertained, or immediate, future or contingent;

(d) Commencement date means the date so specified in the schedule;

(e) Confidential information means all technical and other information and know how, including all information and know how in any eye or machine readable form or other format, disclosed or given to the Provider from any source in respect of or incidental to:

    (i) The product;

    (ii) The technology;

    (iii) The Financer; and

    (iv) Any other information disclosed or given to the Provider by the Financer which is declared by the Financer to be confidential information;

(f) Improvements means any improvement, modification, enhancement or derivative of the intellectual property arising during the term;

(g) Intellectual property means:

    (i) The confidential information;

    (ii) The improvements;

    (iii) The patent; and

    (iv) The trade mark;

(h) Licence fee means the amount calculated and paid by the Provider to the Financer specified in the schedule;

4

(i)    Notice means a written notice, consent approval, direction, order or other communication;

(j)    Obligation means any legal, equitable, contractual, statutory or other obligation, deed, covenant, commitment, duty, undertaking or liability;

(k)    Patent means the registered patent or patent application including the provisional and complete specifications described in the schedule;

(l)    Permitted use means to conduct the business to exploit market, promote, develop, integrate, research, sell and conduct and any other activity undertaken with respect to the product for profit or reward;

(m)   Product means the product described as such in the schedule;

(n)    Right includes a legal, equitable, contractual, statutory or other right, power, authority, benefit, privilege, remedy, discretion or cause of action;

(o)    Technology means all that technical information which relates to or forms part of the product, including, without limitation, methodology, techniques, drawings, outlines, notes, algorithms, detailed designs, flow charts, results, software: partial or intermediate versions and prototypes, data, formulae and other proprietary information and know how in the Provider's possession or control or which is revealed to the Provider which relates to the product;

(p)    Term means the term set out in the schedule; and

(q)    Trade mark means the registered trade mark, trade mark registration application and common law trademarks described in the schedule.

## 2.   Interpretation

This deed is governed by the law of NSW and the parties submit to the non-exclusive jurisdiction of the courts of that state.

In the interpretation of this deed:

(a)    References to legislation or provisions of legislation include changes or re-enactments of the legislation and statutory instruments and regulations issued under the legislation;

(b)    Words denoting the singular include the plural and vice versa; words denoting individuals or persons include bodies corporate and vice versa; references to documents or deeds also mean those documents or deeds

5

as changed, novated or replaced, and words denoting one gender include all genders;

(c)   Grammatical forms of defined words or phrases have corresponding meanings;

(d)   Parties must perform their obligations on the dates and times fixed by reference to the schedule;

(e)   Reference to an amount of money is a reference to the amount in the lawful currency of the Commonwealth of Australia;

(f)   If the day on or by which anything is to be done is a Saturday, a Sunday or a public holiday in the place in which it is to be done, then it must be done on the next business day;

(g)   References to a party are intended to bind their executors, administrators and permitted transferees; and

(h)   Obligations under this deed affecting more than one party bind them jointly and each of them severally.

## 3.   Licence

The Financer hereby grants to the Provider an exclusive licence to use the intellectual property for the permitted use on the terms of this deed.

In consideration of the licence fee payable hereunder the Financer grants to the Provider an exclusive transferrable licence to copy publish sell or otherwise use the works in the course of its business in Australia and/or Overseas in respect of the whole or any part of the works commencing on 01st July 2013.

In consideration of the licence hereby granted to the Provider the Provider must pay a one off licence fee of $20,000,000 (GST exclusive) to the Financer on or before the 30th June 2013. The provider will also transfer the designated account of the provider:

(a)      250,000 BTC to be repaid on 30 June 2013

(b)      50,000 BTC to be repaid on 30 Dec 2013

6

The payment is to be issued in Bitcoin as per the schedule.

**4.** **Provider's promises**

(a) **Undertakings**

The Provider undertakes to:

(i) Use its reasonable commercial endeavours to:

(1) Preserve the value and validity of the intellectual property; and

(2) Create, promote, retain, and enhance the goodwill in the intellectual property;

(ii) During the term and thereafter the termination of this deed not to allow or facilitate the use, nor exploit the intellectual property in a manner in any way detrimental to the Financer and not contravene, deny or contest the rights subsisting in the intellectual property, and take such steps as may be appropriate and available to the Provider to prevent the infringement of any and all the rights subsisting in the intellectual property;

(iii) In connection with the permitted use not give any warranty:

(1) Beyond that which the Provider is obliged in law to give; or

(2) Which has not been approved in writing by the Financer;

(iv) To use the intellectual property only for the permitted use and not for any other use;

(v) Treat as confidential the confidential information except that which at the time of its disclosure to the Provider was generally available, or subsequently became known to the public provided always that this covenant shall continue in full force and effect notwithstanding that this deed has terminated; and

(vi) Devote all reasonable commercial endeavours in the conduct and operation of the business.

(b) **Indemnity**

(i) The Provider hereby agrees to fully, effectually, and promptly indemnify the Financer against any loss, either direct or indirect, damage or expense whatsoever which the Financer may suffer or incur in respect of:

(1) Any breach by the Provider of the provisions of this deed; or

7

> (2) Any claim by any person against the Financer arising out of or in respect of the exploitation of the intellectual property by the Provider; and

(ii) The Provider hereby irrevocably releases the Financer and waives all claims which the Provider may have in the future against the Financer, in respect of any action claim or remedy whatsoever in any way attributable to the exploitation of the intellectual property by the Provider.

## 5. Improvements

If the Provider develops any improvements, the Financer hereby irrevocably:

(a) Grants to the Provider the right to apply for any incidental intellectual property rights available in respect of that improvement and in connection with such application, the Financer shall:

    (i) Make, supply and assist in the preparation of all models, plans, drawings or specifications necessary or convenient for the proper understanding or development of the improvements; and

    (ii) Grant and do all things necessary to give effect to an assignment of the intellectual property rights in respect of the improvements to the Provider;

(b) Assigns, transfers and sets over absolutely to the Provider all right title and interest to the improvements including all claims as they relate to the improvements.

## 6. GST

(a) GST means a goods and services tax as defined in A New Tax System (Goods and Services Tax) Act 1999.

(b) In respect of any taxable supply, the Provider must pay to the Financer an additional amount equal to the prevailing GST rate on the supply. The additional amount referred to in this clause is payable at the same time and in the same manner as the licence fee subject to the receipt by the Provider of a valid tax invoice, as defined in A New Tax System (Goods and Services Tax) Act 1999.

8

## 7. Term and termination

(a) **Term**

This deed begins on 01st July 2019 the commencement date and will continue for the term unless it is earlier terminated.

(b) **Termination on notice**

Either party may terminate this deed by notice in writing to the other if the other party commits any breach of any provision of this deed, and has failed to remedy such breach within fourteen days of receipt of notice specifying:

(i) The exact nature of the breach committed by the defaulting party; and

(ii) What is required by the defaulting party to remedy the breach;

## 8. Licence fee

(a) **Payment of licence fee**

The Provider must pay the licence fee specified in the schedule to the Financer during the term.

(b) **Late payment**

If the licence fee or any other monies payable by the Provider to the Financer remain unpaid for seven days after the due date for payment, whether or not formal demand has been made, then the Provider shall pay, in addition to any monies actually owing to the Financer, interest at the rate of 2% over the bank indicator lending rate nominated by the Financer on such monies from the date the payment actually fell due until such monies are recovered and paid to the Financer.

## 9. Warranties by Financer

The Financer warrants to the Provider that:

(a) The Financer has the power and authority to enter into this deed; and

(b) The intellectual property rights granted under this deed will not when used in accordance with this deed infringe the intellectual property rights of any person.

**10. Third party claim**

(a) Provided that the Provider is not in breach of its obligations under this deed, if a third party makes a claim against the Provider alleging that use of the intellectual property infringes its intellectual property rights, the Financer will defend, indemnify and hold harmless the Provider from such a claim provided that the:

    (i) The Provider notifies the Financer in writing promptly of the claim;

    (ii) The Provider provides such information, assistance and co-operation as the Financer may reasonably request and at its expense, from time to time; and

    (iii) The Financer has full discretion to defend, compromise or settle any such claim on such terms as the Financer deems fit.

(b) If the Financer cannot satisfactorily settle the claim so as to retain ownership of the intellectual property, its liability will be limited to terminating this deed, and refunding the Provider an amount equal to the portion of any licence fee paid for the period following termination.

(c) Nothing in this clause authorises the Provider to defend, compromise or settle any claim on the Financer's behalf.

**11. Limitation of liability**

(a) Other than in respect of a party's:

    (i) Breach of the confidentiality provisions of this deed; or

    (ii) Infringement of another party's intellectual property rights; or

    (iii) Indemnification obligations under this deed; or

    (iv) Wilful misconduct.

(b) Neither party will be liable to the other for any consequential, special or punitive damages arising out of this deed. Each party's cumulative direct damages will be limited to the licence fee payable under this deed in the prior twelve month period. This clause survives the termination or expiration of this deed.

## 12. Assignment

No party may assign its rights or obligations under this deed without the prior written consent of the other parties, which consent may be given or withheld, or given on conditions, in the absolute discretion of those other parties.

## 13. Time

The parties hereto agree that time shall in all respects be of the essence in regards this deed.

## 14. Notices

A communication required by this deed, by a party to another, must be in writing and may be given to them by being:

(a) Delivered personally; or

(b) Posted to their address specified in this deed, or as later notified by them, in which case it will be treated as having been received on the second business day after posting; or

(c) Faxed to the facsimile number of the party with acknowledgment of receipt received electronically by the sender, when it will be treated as received on the day of sending, or

(d) Sent by email to their email address, when it will be treated as received on that day.

## 15. Waiver or variation

(a) A party's failure or delay to exercise a power or right does not operate as a waiver of that power or right.

(b) The exercise of a power or right does not preclude:

    (i) Its future exercise; or

    (ii) The exercise of any other power or right; or

    (iii) The variation or waiver of a provision of this deed or a party's consent to a departure from a provision by another party will be ineffective unless in writing executed by the parties.

**16. Counterpart**

This deed may be executed in any number of counterparts each of which will be an original, but counterparts together will constitute one and the same instrument, and the date of the deed will be the date on which it is executed by the last party.

**17. Costs**

(a)   Each party will pay its own costs of and incidental to this deed.

(b)   The Provider will bear all duty payable on this deed and keep indemnified the Financer in respect of that liability.

(c)   The Provider will bear all GST payable in respect of any supply under this deed upon receipt of tax invoice issued by the Financer.

**18. Escrow**

(a)   The paper Bitcoin Wallet with address 1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a will be held by the financer as assurance or the contract and will convert to the ownership of the financer on default of the provider.

(b)   All source code and agreements are to be held in a manner that the financer can access on default.

## REFERENCE SCHEDULE

**Deed date:**          01st April 2011

**Licence fee:**        (a)      250,000 BTC to be repaid on 30 June 2013

                        (b)      50,000 BTC to be repaid on 30 Dec 2013

                        (ex GST) for exclusive perpetual assignment

**Product:**            Bitcoin and Exchange Software in C/C++/C#/R code

**Commencement date:**  01st July 2011

**Term:**               Two (2) years

**Trademark:**          All Marks Associated with C01N and associated marks

                        To be filed

**Patent:**             All IP under BAA-001 / 002 / 003 / 004

13

**SIGNED AS A DEED**

Executed by
W & K Info Defense LLC )
in accordance with s.127 )
Corporations Act 2001 (CTH) and its constitution )

Dave Kleiman

Dave Kleiman
  DIRECTOR

Executed by
Craig Wright R&D (A.B.N. 97 481 146 384)

Craig S Wright

# Exhibit 11

# DEED OF LOAN

**PARTIES**

**Design by Human Ltd (08248988) UK**
**(Mortgagee)**

**AND**

**Craig Wright R&D (ABN 97 481 146 384)**
**(Mortgagor)**

**AND**

**Denariuz Seychelles Trust**
(Guarantor)

CRAIG S WRIGHT

**Confidential**
Not to be disclosed.

Uyen T. Nguyen

**THIS DEED** dated 23 day of October 2012

**BETWEEN:**

Uyen Nguyen of Design by Human Ltd (08248988) UK

**(Mortgagee)**

And

Craig Steven Wright of Craig Wright R&D (ABN 97 481 146 384)

**(Mortgagor)**

And

Panopticrypt Pty Ltd for Denariuz Seychelles International Trust

**(Guarantor)**

**RECITALS**

A. The mortgagee has, at the request of the guarantor, if applicable, agreed to lend money (in the form of Bitcoin) to the mortgagor in accordance with and subject to the terms of this deed.

B. The guarantor, if any, and the mortgagor acknowledge that the money referred to in this deed has been received by the mortgagor.

C. It is noted that the Mortgagee holds a sum of Bitcoin (in wallets noted in appendix A) for a trust that wishes to extend the uptake and value of Bitcoin globally.

**OPERATIVE PART**

1. **Loan**

   (a) The mortgagee has at the request of the guarantor, agreed to lend to the mortgagor the principal sum shown in the first schedule on the drawdown date shown in the first schedule.

   (b) The mortgagee may at the request of the mortgagor lend further amounts of money to the mortgagor and all such amounts shall be deemed to be money lent by the mortgagee to the mortgagor pursuant to this clause provided always that the mortgagee shall not be obliged or required to lend such further money to the mortgagor hereunder.

2. **Interest**

   The mortgagor covenants with the mortgagee to pay to the mortgagee interest in respect of the principal sum calculated in accordance with the provisions of the second schedule at the time and in the manner therein set forth and to duly

   *Uyen T. Nguyen*

   Page 1 of 7

and punctually observe and perform every other obligation contained in the second schedule.

3. **Repayment**

(a) The mortgagor covenants with the mortgagee to repay the principal sum **or so much thereof as is then unpaid to the mortgagee on the due date** shown in the first schedule.

(b) **The mortgagor further covenants with the mortgagee that the money** owing will be repaid upon written demand being made by the mortgagee **at any time after the happening of any of the following events:**

    (i) Default being made by the mortgagor in the due or punctual payment to the mortgagee of any money which comprises part of the money owing;

    (ii) The failure of the mortgagor to rectify a default in the due or punctual **observance or performance of any other obligations on the part of** the mortgagor under this deed within 7 days of being requested to do **so by the mortgagee;**

    (iii) Any collateral security or any mortgage, charge or encumbrance **ranking in priority to or pari passu with any collateral security** becoming enforceable;

    (iv) **If any collateral security is or becomes wholly or partly void, voidable** **or unenforceable or is claimed to be so by the mortgagor; and**

    (v) If any event occurs that renders a collateral security enforceable.

4. **Early repayment**

The mortgagor shall be entitled to repay the whole of the principal sum or the amount then unpaid at any time with interest to the date of repayment.

5. **Security**

(a) In consideration of the mortgagee advancing money to the mortgagor under or pursuant to this deed each of the mortgagor and the guarantor, if any, agrees to execute or upon demand from the mortgagee procure the

Uyen T. Nguyen

execution in favour of the mortgagee of the securities referred to in the third schedule.

(b) The mortgagor and the guarantor, if any, agree that each of the securities described in the third schedule is a collateral security to the intent that the money owing is secured thereby. Default under any of the collateral securities shall constitute default under this deed.

(c) Collateral security means any mortgage, charge or other encumbrance affecting any real or personal property now in existence or which may in the future be given to the mortgagee by the mortgagor or any other person as security for the payment of the whole or any part of the money owing whether or not any other money is also secured thereby.

6. **Governing laws and jurisdiction**

The laws in force in Seychelles govern this deed.

7. **Guarantors guarantee and indemnity**

(a) The guarantor agrees that the guarantee and indemnity is a continuing guarantee, and extends to the ultimate balance owing under this deed, and that the guarantor remains fully liable under the guarantee and indemnity despite the fact that the mortgagee might have done something which may otherwise have the effect at law or in equity of varying or discharging the guarantor's liability.

(b) The mortgagee need not first exercise its rights against any of the mortgagors or against the mortgagors' security before exercising its rights under this guarantee against the guarantors.

8. **Costs**

The mortgagor shall pay all costs fees and duties in relation to this deed and any collateral security.

**THE FIRST SCHEDULE**

| Item 1 | **Principal sum 650,000 BTC** |
| Item 2 | **Due date** 30 June 2020 |
| Item 3 | **Drawdown date 01st July 2013** |

Uyen T. Nguyen

## THE SECOND SCHEDULE

**Interest only loan**

The mortgagor will pay to the mortgagee the principal sum, or so much thereof as **shall remain unpaid on 30 June 2020 and in meantime may pay multiples of BTC** 50,000 in reduction of the principal sum on any due day for payment and interest **shall reduce accordingly from the date of such partial reduction in the principal sum**.

In the meantime the mortgagor will pay interest only to the mortgagee on any amount payable under this deed at the rate of 0.05% per annum calculated on monthly rests and payable on the first day of each and every month commencing on the 30th day of July 2016 and compounding monthly from the date upon which the amount becomes **due until payment**. Such interest may be capitalised by the mortgagee as it deems appropriate and the mortgagor shall pay interest on the capitalised interest at the **same rate and calculated in the same manner. Provided always, and it is hereby** agreed and declared, that if the mortgagor shall on every day on which interest is **hereinbefore made payable under this security, or within 14 days after each such** days respectively, pay to the mortgagee interest on the principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum, and shall also duly observe and perform each and every covenant on the mortgagor's part herein contained or implied then the mortgagee shall accept interest on the said principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum in lieu of 0.05% per annum for every month **for which such interest shall be paid to the mortgagee within such 14 days aforesaid**.

The mortgagor agrees, as an independent obligation which will not merge in any **judgment or order, to pay interest on any judgement or order for the payment of all or** any part of the money secured at the higher of the rate payable under the judgment or order or interest calculated at the rate and in the manner set out in the preceding sub-clause.

OR

**Reducible mortgage principal and interest repayments**

Uyen T. Nguyen

The mortgagor will pay to the mortgagee the principal sum, or so much thereof as shall remain unpaid on 30 June 2018.

In the meantime the mortgagor will pay the principal and interest on the principal sum or on so much thereof as for the time being shall remain unpaid, and upon any judgment or order in which this or the preceding covenant may become merged at the rate of 0.05% per annum as follows, namely, by equal monthly payments on the first day of each and every month in each and every year until the principal sum and interest shall be fully paid and satisfied, the first of such payments computed from 01st July 2017 to be made on 01st July 2018 next. Provided always, and it is hereby agreed and declared, that if the mortgagor shall on every day on which principal and interest is hereinbefore made payable under this security, or within 14 days after each such days respectively, pay to the mortgagee interest on the principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum, and shall also duly observe and perform each and every covenant on the mortgagor's part herein contained or implied then the mortgagee shall accept interest on the said principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum in lieu of 0.05% per annum for every month for which such interest shall be paid to the mortgagee within such 14 days aforesaid.

The mortgagor agrees, as an independent obligation which will not merge in any judgment or order, to pay interest on any judgment or order for the payment of all or any part of the money secured at the higher of the rate payable under the judgment or order or interest calculated at the rate and in the manner set out in the preceding sub-clause.

## THE THIRD SCHEDULE

(COLLATERAL SECURITY) First/Second mortgage over PERMANENT SUCCESS LIMITED UK being the whole of the shares comprised in UK company reference 08260048 and all related trusts.

Uyen T. Nguyen

**EXECUTED AS A DEED**

**Design by Human Ltd (08248988) UK**
(Mortgagee)

By: Uyen Nguyen
016 Lô L, cư xá Thanh Đa, phường 27, quận Bình Thạnh, Thành phố Hồ Chí Minh

**Craig Wright R&D (ABN 97 481 146 384)**
(Mortgagor)

By: Craig Wright
7 Eastgate Ave Gordon NSW 2072

**Denariuz Seychelles Trust**
(Guarantor)

Appendix 1:
Bitcoin block addresses transferred:

| | |
|---|---|
| 12tLs9c9RsALt4ockxa1hB4lTCTSmxj2me | 10,000.00 |
| 1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a | 111,114.00 |
| 1FeexV6bAHb8ybZjqQMjJrcCrHGW9sb6uF | 79,957.05 |
| 1f1miYFQWTzdLiCBxtHHnNiW7WAWPUccr | 10,009.25 |
| 1MHdm5XZMrfoZFoUktEaGhYevmdiXoc4x4 | 12,950.00 |
| 18JPragfuDVHWWG8ABQ15cghJFetnXUJBD | 24,404.50 |
| 1LXc28hWx1t8np5sCAb2EaNFqPwqJCuERD | 34,512.80 |
| 1FpqQnKQCgDkJFMC94JL8FpRyHTZ3uRVZ1 | 10,689.03 |
| 1F34duy2eeMz5mSrvFepVzy7Y1rBsnAyWC | 10,770.52 |
| 1JtpgqCf3SSeCeYWEDJjkfYFH7Ruhy4Vp1 | 10,000.00 |
| 18k9tin39LKegFzHe8rxSgvJXDpuMriGJq | 10,000.00 |
| 1HtTw9zR9wWFfgV8Jy8MqsaeVl7ZXrjdq6 | 1,014.00 |
| 18pn4NQ7NgsJjeuFjazeTdVRnsmfw5ofTz | 750.00 |
| 12fZ2HxkLjG9zn1u44XYsFFYKHM4A2zCea | 23,249.04 |
| 12tkqA9xSoowkzoERHMWNKsTey55YEBqkv | 28,150.04 |
| 16Ls6azc76ixc9Ny7AB5ZPPq6oiEL9XwXy | 40,000.04 |
| 12HddUDLhRP2F8JjpKYeKaDxxt5wUvx5nq | 40,000.04 |
| 1P3S1grZYmcqYDuaEDVDYobJ5Fx85E9fE9 | 50,000.04 |
| 1MyGwFAJjVtB5rGJa32M6Yh46cGirUta1K | 30,000.04 |
| 145YHsQU7HMzkRnD5SBSuFAzQgCYnAnLkN | 10,000.00 |
| 16TPVCpvtJ6FkV5xNKBp35aMo4BWFGxiEY | 10,000.00 |
| 1KbrSKrT3GeEruTuuYYUSQ35JwKbrAWJYm | 10,000.00 |
| 1FLFnbN7m5psLfvLEwYfRUUjJ34YkmV3dM | 3,700.00 |
| 1A6SDef1TJAM8Saw2SqmqFGhkWR1y3qMx2 | 4.65 |
| 16cou7Ht6WjTzuFyDBnht9hmvXytg6XdVT | 53,000.00 |
| 12ib7dApVFvg82TXKycWBNpN8kFyiAN1dr | 31,000.04 |



Uyen T. Nguyen

Page 7 of 7



I Uyen Nguyen of:

**016 Lô L, cư xá Thanh Đa, phường 27, quận Bình Thạnh, Thành phố Hồ Chí Minh,**

Consent to act as director of the following companies from the later date of 30 June 2013:

- Design by Human Ltd (08248988) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)
- PERMANENT SUCCESS LIMITED (08260048) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)

I also accept the position of COO (Chief Operations Officer) of the following companies from 18 Oct 2012.

- Design by Human Ltd (08248988) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)
- PERMANENT SUCCESS LIMITED (08260048) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)

Signed:

Exhibit 12

GPO Box 9990 IN YOUR CAPITAL CITY



**Australian Government**
Australian Taxation Office

| | | |
|---|---|---|
| Coin-Exch Pty Ltd | | |
| C/- Clayton Utz | Reply to: | |
| Attn: Andrew Sommer | Our reference: | 1-526DVU8 |
| Level 15, 1 Bligh Street | Contact officer: | Andrew Miller |
| Sydney   NSW   2000 | Phone: | (02) 9354 6379 |
| | Fax: | (02) 6225 0929 |
| | | |
| | ABN: | 31 163 338 467 |

22 June 2015

**Completion of audit**
**For your information and action**

Dear Mr Sommer

We have completed the audit of Coin-Exch Pty Ltd for the period 1 July 2013 to 30 September 2013. Thank you for your time and cooperation during this audit.

The result of this audit is:

| | |
|---|---|
| Reduced activity statement credit | $3,787,429.00 |
| Administrative penalty (activity statement) | $1,893,714.50 |
| **Total amount payable** | **$5,681,143.50** |

**Our decision**
The reasons for our decision were explained in the audit position paper sent to you on 26 September 2015. We have also enclosed our administrative penalty decision.

A penalty amount of $1,893,714.50 also applies. You will also receive a notice of assessment of administrative penalty shortly.

**What will happen next**
Your objection to the amended assessment has been received and the officer managing your objection is speaking with you about this matter.

**Record keeping**
You need to keep your business records for five years, including all records examined as part of this audit. We don't intend to audit your activity statement for the period 1 July to 30 September 2013 again.  However, we may need to look at the records again if new information suggests the need for further enquiries.

**Your right to object**
You may object to:
■ the assessment of a tax shortfall penalty
■ a decision not to remit all of the tax shortfall penalty.

We understand that you have already objected to the assessment of revised GST amounts and another ATO officer is speaking with you in respect of this matter.

**How to lodge your objection**
Your objection needs to:
■ be in writing
■ be signed and dated

70122.005612-09-2013

- ■ state fully and in detail the grounds you are relying on, and
- ■ be sent via:
  - – the tax agent or business portals
  - – fax to **1300 139 031**, or
  - – mail to:
    - Australian Taxation Office
    - PO Box 3524
    - ALBURY  NSW  2640

Time limits of 60 days or four years apply when lodging an objection.

Objection forms and further information about how to lodge an objection, including advice on time limits, agent declarations and documents to send with your objection form, are available from our website at **ato.gov.au** by searching for 'objection' or by phoning **13 28 66** between 8.00am and 6.00pm, Monday to Friday.

**More information**
If you have any questions, please phone **13 28 69** between 8.00am and 5.00pm, Monday to Friday, and ask for Andrew Miller on extension **46379**.

Yours sincerely

James O'Halloran
Deputy Commissioner of Taxation

**Reasons for our Penalty Decision**
**Coin-Exch Pty Ltd**
**ABN: 31 163 338 467**

**Shortfall amount**
Section 284-75 of Schedule 1 to the *Taxation Administration Act 1953* (TAA) imposes an administrative penalty if you make a statement to us which is false or misleading in a material particular whether because of things in it or omitted from it. A material particular is something that is likely to affect a decision regarding the calculation of an entity's tax-related liability or an entitlement to a credit or payment.

Where a shortfall arises as a result of making a false or misleading statement, the penalty is assessed in four stages:
■ determine the shortfall amount,
■ work out the base penalty amount,
■ the base penalty amount may be increased and/or reduced, and
■ consider remission of the penalty amount.

You made a statement to the Commissioner by lodging your activity statement. The statement was false or misleading as it incorrectly stated the assessed net amount. The assessed net amount includes any amount of GST that you have to pay. This is explained in the issue relating to the shortfall.

Your shortfall amount for penalty purposes is $3,787,429.

Miscellaneous Taxation Ruling MT 2008/1 *Penalty relating to statements: meaning of reasonable care, recklessness and intentional disregard* explains that you are required to take the same level of care to fulfil your tax obligations that could be expected of a reasonable person in your position, taking into account your own personal circumstances, knowledge, experience, education and skill.

You are not liable to a penalty for making a false or misleading statement if you exercised reasonable care in making the statement.

**Base penalty Amount**
Where a false or misleading statement results in a shortfall amount, the base penalty amount is worked out according to the level of care taken by the taxpayer in making the statement.

Additionally, as you are responsible for the authorised actions of your employees and representatives, their behaviour may also be relevant to determining your behaviour for penalty purposes.

MT2008/1 explains that the reasonable care test requires that a taxpayer to take the same care in fulfilling their tax obligations that could be expected of a reasonable ordinary person in their position. The standard of care required is commensurate with a reasonable person with the same background as the person making the statement.

Please refer to the following paragraphs in our decision with regards to the level of care taken by you at the time of, and leading up to, the making of the false or misleading statement.

MT 2008/1 explains that recklessness is gross carelessness. You act recklessly when your conduct clearly shows disregard of, or indifference to, consequences that are foreseeable by a reasonable person as being a likely result of your actions.

We have determined that you are liable to an administrative penalty because you behaved recklessly when you made the statement. This is because the facts show that you should have reasonably foreseen that your actions may have led to a shortfall amount.

We have taken the following into consideration:

- On 30 September 2013, you made a statement to the Commissioner when you lodged your BAS for the quarter ended 30 September 2013;
- Your statement to the Commissioner included purported transactions for the acquisition of a software licence from the Trustee for the Wright Family Trust (DeMorgan) which is considered an entity related to you. In evidence of the purported transactions, you provided tax invoices prepared by Craig Wright on behalf of DeMorgan, issued on 1 July 2013. On 11 August 2014, during an interview with Counsel engaged by the ATO, your Director and controlling mind, Craig Wright, has admitted that he backdated these invoices.
- You claim that the purported acquisition of the software licence is evidenced by these invoices; and also by an 'IP Deed of Assignment' with DeMorgan dated 15 September 2013 and an 'Intellectual Property Licence' dated 22 August 2013. Under the intellectual property licence, you claim to have acquired a licence to use software, said to be owned by Craig Wright who 'has clear title internationally based on the judgement from NSWSC 2013/245661'. This is understood this to be a reference to a New South Wales Supreme Court Case (number 2013/245661) which was not finalised until 6 November 2013; after the deed date of 22 August 2013. That is, the licence agreement makes specific reference to an event which had not yet occurred, raising questions as to its validity.
- DeMorgan purports to have acquired the software (which it licenced to you) from Craig Wright, pursuant to a contract dated 15 July 2013, which predates its existence and establishment as a trust. DeMorgan cannot have licenced to you something which it did not validly own. Craig Wright, in acting on your behalf, would have known this as he created documents relating to the sales and licencing of the software, such as invoices and contracts; many of which are signed or dated before any valid transaction could have occurred;
- You also claim to have paid up share capital of $41,500,000, as disclosed to ASIC. Craig Wright initially advised the ATO that your share capital was paid in Bitcoin (not dollars) and later, on 18 February 2014, advised that your share capital is in the form of equitable interests in a Seychelles Trust which holds Bitcoin. You claim that this share capital was paid to you by Craig Wright under a 'Deed of Assignment of Equitable Interests', though this does not explain how the capital was paid, for shares owned by other entities. You purport to have expended a significant portion of this share capital as consideration paid to DeMorgan for purchase of the aforementioned software licence.
- Craig Wright purports to have received a loan of 650,000 Bitcoin from the Seychelles Trust pursuant to a Deed of Loan entered into with the Trustee for the Seychelles Trust; a company called Design by Human Ltd (DBH). However, records show Craig Wright was only informed of the existence of this company on a date after the purported Deed of Loan was entered into. Furthermore, the Deed of Loan was not validly executed by an authorised person, and signed on a date where DBH was merely a dormant shelf company. As it was Craig Wright who modified the Directorship of DBH in January 2014 (after the date you made this statement to the Commissioner) he had knowledge that the person purportedly signing the Deed of Loan on behalf of DBH did not have authority to do so and therefore that the deed was invalid.
- Craig Wright may claim that he was not reckless as he sought a private ruling from the Tax Office in relation to transactions involving you and your related entities. However, his ruling request related to the transfer of Bitcoin and therefore bears no resemblance to your purported transactions. There is clearly a difference between transferring Bitcoin and transferring interests in an offshore trust and Craig Wright would not have entered into the purported arrangement involving offshore trust interests if it did not offer a benefit of some kind. The private ruling issued to Craig Wright in December 2013 explained that GST would be levied on supplies of Bitcoin and therefore if you had acquired the purported software licence and paid in Bitcoin, you would not have been entitled to the GST refund you claimed. The effect of your purported arrangement involving transferring interests in an offshore trust is that, prima facie, you are entitled to claim a refund, removing the effect of GST on Bitcoin. This is understood to be the benefit Craig Wright was seeking to obtain.
- Furthermore, information obtained from Her Majesty's Revenue and Customs (HMRC) confirms that your Director, Craig Wright, only obtained control of DBH in January 2014 (after the ATO issued its private ruling) and had no prior involvement with the company. It also suggests he backdated the Directorship of Uyen Nguyen and Dave Kleiman. He would therefore have been

aware that the company could not have entered into the Deed of Loan on 23 October 2012 and as a result, that the purported rights could not have been transferred as consideration.

■ Your lodged BAS claimed a refund of $3,787,429; purported to be the GST paid on your acquisition of the aforementioned software licence from DeMorgan. In claiming such a substantial refund, a reasonable person would take necessary steps to ensure the statement they are making is correct. Craig Wright, as your representative, has not shown this level of care.

■ Craig Wright made the following statement to us on 28 March 2014 in response to questions asked of one of your related entities. '*The agreements are all centred on the following mantra: Bitcoin is not to be sold or transacted… in any country that is not free. The least free of any country is that which taxes money. Any country that taxes money is to be avoided. Fiat is not true money. Bitcoin and Gold are… If a value added tax is applied, we will create a system that undermines this through the use of legal avenues. We will create financial instruments based on the item we wish to promote, but as a derivative that undermines the effect of the tax*'. This mantra shows a level of indifference to the law. The arrangement involving interests in an offshore trust undermines the effects of tax which would otherwise be payable on transactions.

■ Additionally, you have not demonstrated an ability to earn income other than claiming ATO refunds, you have not traded with any third parties or employed any staff. As set out in our decision relating to the shortfall, your intended business activities could not turn a profit and there has not been any real or lasting contribution to your share capital by your purported shareholders. There is therefore, no evidence that you were conducting an enterprise during the period for which the statement was made.

This finding is consistent with paragraphs 28, 56, 61, 79, 92, 102, 105, 106 and example 8 contained in MT 2008/1.

Paragraph 56 says that '*in determining whether a person having special skill or competence has breached the standard of reasonable care, the appropriate benchmark is the level of care that would be expected of an ordinary and competent practitioner practising in that field and having the same level of expertise*'. Craig Wright, acting on your behalf, has a Masters Degree in Law, yet made this statement to the Commissioner despite knowledge of the facts and details in which the purported Deed of Loan was entered into. This includes the fact that it was only in January 2014 that he had any involvement with DBH, prior to which it was a dormant shelf company. Paragraph 79 explains that if an employee fails to meet the reasonable care standard, the employer is liable for that failure.

Paragraph 61 explains that reasonable care can be taken when an entity makes a genuine effort to research and support a position. However, as set out above, the private ruling sought by Craig Wright is not commensurate with your purported transactions as you claim to have dealt with equitable interests in a trust, not Bitcoin. Craig Wright has not made a genuine effort to research and support a position.

Paragraph 92 states that the size of the shortfall arising from the false or misleading statement indicates the magnitude of the risk. We consider your claimed refund of $3,787,429 to be significant and therefore requiring a higher standard of care. However, this standard of care has clearly not been taken.

In *Hart v FC of T*[1] the Full Federal Court endorsed the comments of Cooper J in *BRK (Bris) Pty Ltd v Federal Commissioner of Taxation*[2] who said:

> *Recklessness in this context means to include in a tax statement material upon which the Act or regulations are to operate, knowing that there is a real, as opposed to a fanciful risk that the material may be incorrect, or be grossly indifferent as to whether or not the material is true and correct, and a reasonable person in the position of the statement-maker would see there was a real risk that the Act and regulations may not operate correctly to lead to the assessment of the proper tax payable because of the content of the tax statement.*

---

[1] Hart v FC of T (2003) 131 FCR 2003
[2] BRK (Bris) Pty Ltd v Federal Commissioner of Taxation [2001] FCA 164

Paragraphs 105 and 106 of MT2008/1 summarise the issues in Hart explaining the finding that a reasonably informed person would address the possibility that no business was being carried on and that a rational consideration of the facts may assist in concluding whether a business is being carried on. You have not adequately addressed the possibility that no business was being conducted for the relevant tax period. You and Craig Wright knew there would be a real risk that your statement may be incorrect and, according to the 'mantra', were grossly indifferent to the application of the law.

Section 284-90 of Schedule 1 to the TAA sets a base penalty amount of 50% of your shortfall amount when the shortfall results from recklessness.

**Increase or reduction of the base penalty amount**
The base penalty amount is increased or reduced in accordance with criteria set out in the law. In your case there are no facts that warrant any change to the base penalty amount.

**Remission considerations**
Section 298-20 of Schedule 1 to the TAA enables us to remit all or part of the penalty in appropriate circumstances. To guide us in making these decisions, the Commissioner has issued several Law Administration Practice Statements.

Law Administration Practice Statement PS LA 2012/5 *Administration of penalties for false or misleading statement that result in shortfall amounts* outlines the circumstances in which the Commissioner considers it fair and reasonable to remit penalties applying to false or misleading statements resulting in shortfall amounts.

PS LA 2012/5 confirms that our remission decisions need to consider that a major objective of the penalty regime is to promote consistent treatment by reference to specified rates of penalty and that objective would be compromised if the penalties imposed at the rates specified in the law were remitted without just cause. Remission is only appropriate to the extent that the prescribed rates of penalty cause unintended or unjust results.

We have considered remission under PS LA 2012/5 which gives guidance on grounds for remission. Further, remission was also considered under the principles of the ATO compliance model and the Taxpayers' Charter. In your case we have decided that there are no facts that warrant any remission of penalty.

The following tables are a summary of the shortfall identified in the audit and the level of penalty to be applied to each.

## Issue List

| Issue # | Issue description | Tax type | Issue Shortfall $ | * Penalty Shortfall $ | Total Penalty $ |
|---------|-------------------|----------|-------------------|----------------------|-----------------|
| 1 | Overstated Acquisitions | Goods and services tax | 3,787,429 | 3,787,429 | 1,893,714.50 |
| | | **Total (all issues)** | **3,787,429** | **3,787,429** | **1,893,714.50** |

\* Credit offsets applied within the same tax period result in differences between the issue shortfall and penalty shortfall amounts. Credit offsets cannot be applied across different tax periods and may result in the total penalty shortfall being higher than the total issue shortfall. The *Summary of activity statement amendments* provides issue details for each tax period.

## Summary of penalty decision – net amount*

| Period | Issue # | Penalty Shortfall $ | Behaviour | Base Penalty % | Base Penalty Amount $ | Increase $ | Reduction $ | Remission $ | Penalty Payable $ |
|--------|---------|---------------------|-----------|----------------|-----------------------|-----------|-------------|-------------|-------------------|
| 1 July 2013 – 30 September 2013 | 1 | 3,787,429 | Recklessness | 50% | 1,893,714.50 | - | - | - | 1,893,714.50 |
| **Totals (all periods)** | | **3,787,429** | | | | | | | **1,893,714.50** |

\* **Net amount** includes any goods and services tax (activity statement labels 1A and 1B), wine tax (activity statement labels 1C and 1D) and luxury car tax (activity statement labels 1E and 1F) applicable to you. If you are a GST instalment payer, the total GST instalments paid by you (activity statement label 1H) are taken into account in working out your net amount.

Exhibit 13

FILED

1 3 AUG 2013

VO



Form 3B (version 4)
UCPR 6.2

# STATEMENT OF CLAIM

## COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General division / Common Law |
| List | General |
| Registry | Sydney |
| Case number | 2013 | 245661 |

## TITLE OF PROCEEDINGS

| | |
|---|---|
| Plaintiff | **Craig Steven Wright (ABN 97 481 146 384)** |
| Defendant | **W&K INFO DEFENSE RESEARCH LLC** |

## FILING DETAILS

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright (craigswright@acm.org) |

## TYPE OF CLAIM

Mercantile Law - Sale of Goods and Services – Contractual Dispute

~~Mercantile Law – Other – Money Lent~~

## RELIEF CLAIMED

1     That the defendant pay the plaintiff the total amount claimed below.

| | |
|---|---|
| Amount of claim | $ $28,533,016.79 |
| Interest | $ 0 |
| Filing fees | $ 999.00 |
| Service fees | $ 34.00 |
| Solicitors fees | $ 0.00 |
| **TOTAL** | **$ $28,534,049.79** |

## PLEADINGS AND PARTICULARS

1     Between 2011 and 2013 the plaintiff provided contract labour services to the defendant. The plaintiff loaned money to the defendant to the defendant at a set interest rate with a commercial expectation that the said monies would be repaid in full when a project was completed.

2     This was issued in Bitcoin. The value at the current date is $13,917,775.

3     The Software and SDK developed under this project is guaranteed against the amounts of this claim.

4     The defendant is a company that operates from Palm Beach, FL, USA and does research in homeland security research.

5     By contract dated 8 January 2009, the Defendant agreed to pay the Plaintiff for property and consulting services to complete research. The contract was bonded against the intellectual property of the defendant.

6     The material terms of the purchase contract were:

     a.  The Plaintiff was the contractor and financier

     b.  The Defendant was the Vendor

     c.  Completion was to take place on 30 June 2013.

     d.  Time was of the essence of the contract.

     e.  That in the event that the Purchaser breached the contract, the Seller could either affirm or terminate the contract with a full return of value.

7     The plaintiff conducted a project for the development of a Bitcoin SDK and exchange.



8      The contract was executed with an agreement that all created Intellectual property reverts to the ownership of the plaintiff with interest if the project concludes without assignment of shares in the defendant.

9      The contract set the interest rate at 12% calculated annually.

10     The exchange rate was contracted with a formula to be $1.12 at the point of breach.

11     The funding was supplied using Bitcoin and Gold bonds.

12     A bond of Au $20,000,000.00 was provided to cover funding aspects of the research and for the provision of ASC hardware as a pooled amount with a depreciated capitals value of $8,828,571.29 with straight line depreciation which has 5 years remaining.

13     The contract stated that a breach would lead to liquidated damages to the amounts stated as the project limits. If the liquidated amount is not paid all IP and systems returns to the sole ownership of the plaintiff.

14     The IP is software and code used in the creation of a Bitcoin system.

15     The defendant is unable to complete its responsibilities due to the death of its director, Mr Kleiman.

16     The total debt after depreciation of the hardware comes to $22,746,346.29 in Australian dollars. The Interest on this amount is calculated at $AU 5,786,670.50.

17     The plaintiff claims:

Debt of $ $28,533,016.79.

Interest pursuant to section 100 Civil Procedure Act 2005 from 01 July 2013 to judgement.

**SIGNATURE**

I acknowledge that court fees may be payable during these proceedings. These fees may include a hearing allocation fee.

Signature

Capacity                    Plaintiff

Date of signature      1 2 Aug 13

**NOTICE TO DEFENDANT**

**If you do not file a defence within 28 days of being served with this statement of claim:**

- **You will be in default in these proceedings.**
- **The court may enter judgment against you without any further notice to you.**

The judgment may be for the relief claimed in the statement of claim and for the plaintiff's costs of bringing these proceedings. The court may provide third parties with details of any default judgment entered against you.

**HOW TO RESPOND**

**Please read this statement of claim very carefully. If you have any trouble understanding it or require assistance on how to respond to the claim you should get legal advice as soon as possible.**

You can get further information about what you need to do to respond to the claim from:

- A legal practitioner.
- LawAccess NSW on 1300 888 529 or at www.lawaccess.nsw.gov.au.
- The court registry for limited procedural information.

You can respond in one of the following ways:

1   **If you intend to dispute the claim or part of the claim,** by filing a defence and/or making a cross-claim.

2   **If money is claimed, and you believe you owe the money claimed,** by:

- Paying the plaintiff all of the money and interest claimed.  If you file a notice of payment under UCPR 6.17 further proceedings against you will be stayed unless the court otherwise orders.
- Filing an acknowledgement of the claim.
- Applying to the court for further time to pay the claim.

3   **If money is claimed, and you believe you owe part of the money claimed**, by:

- Paying the plaintiff that part of the money that is claimed.
- Filing a defence in relation to the part that you do not believe is owed.

Court forms are available on the UCPR website at www.lawlink.nsw.gov.au/ucpr or at any NSW court registry.

**REGISTRY ADDRESS**

| | |
|---|---|
| Street address | 184 Phillip St, Sydney NSW 2000 |
| Postal address | Supreme Court of NSW, GPO Box 3, Sydney NSW 2001 Australia  2000 |
| Telephone | (02) 9377 5840 |

**#AFFIDAVIT VERIFYING**

| | |
|---|---|
| Name | Craig Steven Wright |
| Address | 43 St Johns Ave Gordon NSW 2072 |
| Occupation | Lecturer/Director |
| Date | 12 Aug 2013 |

I say on oath:

1.  I am the plaintiff.

2.  I believe that the allegations of fact in the statement of claim are true.

SWORN at                                  Gordon

Signature of deponent

Name of witness                        ~~Craig Steven Wright~~

Address of witness 818 Pacific Hwy
Gordon NSW 2072

Capacity of witness                   Justice of the peace

CHRISTIAN HOFMANN
Reg. No 195484
Justice of the Peace in and for
the State of New South Wales

And as a witness, I certify the following matters concerning the person who made this affidavit (the **deponent**):

1.  #I saw the face of the deponent. [OR, delete whichever option is inapplicable]
    ~~#I did not see the face of the deponent because the deponent was wearing a face covering, but I am satisfied that the deponent had a special justification for not removing the covering.*~~

2.  ~~#I have known the deponent for at least 12 months.~~ [OR, delete whichever option is inapplicable]
    #I have confirmed the deponent's identity using the following identification document:

NSW Driver Licence

Identification document relied on (may be original or certified copy) [†]

Signature of witness

Note: The deponent and witness must sign each page of the affidavit. See UCPR 35.7B.

---

[* The only "special justification" for not removing a face covering is a legitimate medical reason (at April 2012).]

[†"Identification documents" include current driver licence, proof of age card, Medicare card, credit card, Centrelink pension card, Veterans Affairs entitlement card, student identity card, citizenship certificate, birth certificate, passport or see Oaths Regulation 2011.]

#PARTY DETAILS

**PARTIES TO THE PROCEEDINGS**

**Plaintiff**                                          **Defendant**

Craig Steven Wright                          W&K INFO DEFENSE RESEARCH LLC

4371 Norhtlake Blvd #314

Palm Beach

FL 33410 - 6253 [Defendant]

**FURTHER DETAILS ABOUT PLAINTIFF[S]**

**Plaintiff**

Name                                          Craig Steven Wright

Address                                       43 St Johns Ave

Gordon NSW 2072

**Contact details for plaintiff acting in person or by authorised officer**

Address for service                          as above

Telephone                                     0417 683 914

Email                                         craigswright@acm.org

**DETAILS ABOUT DEFENDANT**

**Defendant**

Name                                          W&K INFO DEFENSE RESEARCH LLC

Address                                       4371 Norhtlake Blvd #314

Palm Beach

FL 33410 - 6253



Form 3B (version 4)
UCPR 6.2

FILED

2 5 JUL 2013

## STATEMENT OF CLAIM 

### COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General division  Common Law |
| List | General . |
| Registry | Sydney |
| Case number | 2013 / 225983 |

### TITLE OF PROCEEDINGS

Plaintiff  **Craig Steven Wright (ABN 97 481 146 384)**

Defendant  **W&K INFO DEFENSE RESEARCH LLC**

### FILING DETAILS

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright (craigswright@acm.org) |

### TYPE OF CLAIM

Mercantile Law - Sale of Goods and Services – Contract~~ual~~  Dispute -

~~Mercantile Law – Other – Money Lent~~

This action has been listed before the Court

30 October 2013

9:00am

Clerk of the Court



2

## RELIEF CLAIMED

1   That the defendant pay the plaintiff the total amount claimed below.

| | |
|---|---|
| Amount of claim | $ 28,253.633.00 |
| Interest | $ 0 |
| Filing fees | $ 999.00 |
| Service fees | $ 34.00 |
| Solicitors fees | $ 0.00 |
| **TOTAL** | **$ 28,254,666.00** |

## PLEADINGS AND PARTICULARS

1   Between 2011 and 2013 the plaintiff provided contract labour services to the defendant. The plaintiff loaned money to the defendant to the defendant at a set interest rate with a commercial expectation that the said monies would be repaid in full when a project was completed.

2   The defendant is a company that operates from Palm Beach, FL, USA and does research in homeland security research.

3   By contract dated 27 October 2008, the Defendant agreed to pay the Plaintiff for property and consulting services to complete research. The contract was bonded against the intellectual property of the defendant.

4   The material terms of the purchase contract were:

   a.  The Plaintiff was the contractor and financier

   b.  The Defendant was the Vendor

   c.  Completion was to take place on 30 June 2013.

   d.  Time was of the essence of the contract.

   e.  That in the event that the Purchaser breached the contract, the Seller could either affirm or terminate the contract with a full return of value.

5   The plaintiff conducted four (4) projects associated with the DHS (Dept. of Homeland Security USA) with the defendant under contract:

   a.  BAA 11-02-TTA 01-0127-WP: TTA 01 - Software Assurance: Software Assurance through Economic Measures



3

    b.  BAA 11-02-TTA 05-0155-WP: TTA 05 - Secure. Resilient Systems and Networks

    c.  BAA 11-02-TTA 09-0049-WP: TTA 09 - Cyber Economics

    d.  BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace (SWAMP)

6    In May 2013 the primary director of the defendant died leaving the project not transferred to the plaintiff and not returning funds. These funds were rated as:

    a.  TTA 01    US$ 650,000

    b.  TTA 05    US$ 1,8000,000

    c.  TTA 09    US$ 2,200,000

    d.  TTA 14    US$ 1,200,000

7    The contract was executed with an agreement that all created Intellectual property reverts to the ownership of the plaintiff with interest if the project concludes without assignment of shares in the defendant.

8    The contract set the interest rate at 8% calculated annually.

9    The exchange rate was contracted with a formula to be $1.12 at the point of breach.

10    The funding was supplied using Bitcoin and Gold bonds.

11    A bond of Au $20,000,000.00 was provided to cover funding aspects of the research.

12    The contract stated that a breach would lead to liquidated damages to the amounts stated as the project limits. If the liquidated amount is not paid all IP returns to the sole ownership of the plaintiff.

13    The IP is software and code used by the US Military, DHS and other associated parties.

14    The defendant is unable to complete its responsibilities due to the death of its director, Mr Kleiman.

15    The debt of US$ 5,850,000 comes to $6,552,000 in Australian $. The Interest on this amount is calculated at $AU 1,701,633.00.

16    The plaintiff claims:

Debt of $ 28,253,633.00



Interest pursuant to section 100 Civil Procedure Act 2005 from 01 July 2013 to judgement.

**SIGNATURE**

I acknowledge that court fees may be payable during these proceedings.  These fees may include a hearing allocation fee.

Signature

Capacity                                    Plaintiff

Date of signature                           25 Jul 13



5

**NOTICE TO DEFENDANT**

**If you do not file a defence within 28 days of being served with this statement of claim:**

- **You will be in default in these proceedings.**

- **The court may enter judgment against you without any further notice to you.**

The judgment may be for the relief claimed in the statement of claim and for the plaintiff's costs of bringing these proceedings. The court may provide third parties with details of any default judgment entered against you.

**HOW TO RESPOND**

**Please read this statement of claim very carefully. If you have any trouble understanding it or require assistance on how to respond to the claim you should get legal advice as soon as possible.**

You can get further information about what you need to do to respond to the claim from:

- A legal practitioner.

- LawAccess NSW on 1300 888 529 or at www.lawaccess.nsw.gov.au.

- The court registry for limited procedural information.

You can respond in one of the following ways:

**1**    **If you intend to dispute the claim or part of the claim,** by filing a defence and/or making a cross-claim.

**2**    **If money is claimed, and you believe you owe the money claimed,** by:

- Paying the plaintiff all of the money and interest claimed.  If you file a notice of payment under UCPR 6.17 further proceedings against you will be stayed unless the court otherwise orders.

- Filing an acknowledgement of the claim.

- Applying to the court for further time to pay the claim.

**3**    **If money is claimed, and you believe you owe part of the money claimed**, by:

- Paying the plaintiff that part of the money that is claimed.

- Filing a defence in relation to the part that you do not believe is owed.

Court forms are available on the UCPR website at www.lawlink.nsw.gov.au/ucpr or at any NSW court registry.

**REGISTRY ADDRESS**

| | |
|---|---|
| Street address | 184 Phillip St, Sydney NSW 2000 |
| Postal address | Supreme Court of NSW, GPO Box 3, Sydney NSW 2001 Australia  2000 |
| Telephone | (02) 9377 5840 |



6

## #AFFIDAVIT VERIFYING

| | |
|---|---|
| Name | Craig Steven Wright |
| Address | 43 St Johns Ave Gordon NSW 2072 |
| Occupation | Lecturer/Director |
| Date | 23 July 2012 |

I say on oath:

1    I am the plaintiff.

2    I believe that the allegations of fact in the statement of claim are true.

SWORN at                          Gordon

Signature of deponent

Name of witness                   ~~Craig Steven Wright~~          Karle Wiggins.

Address of witness                KARLIE WIGGINS
                                  Reg. No. 194194                  **Ku·ring·gai Council**
                                  A Justice of the Peace in and for the
                                  State of New South Wales          818 Pacific Highway, Gordon
Capacity of witness               Justice of the peace             Locked Bag 1056, Pymble, NSW 2073
                                                                   ABN: 86 408 856 411

And as a witness, I certify the following matters concerning the person who made this affidavit (the **deponent**):

1    #I saw the face of the deponent. [OR, delete whichever option is inapplicable]
     #I did not see the face of the deponent because the deponent was wearing a face covering, but I am
     satisfied that the deponent had a special justification for not removing the covering.*

2    #I have known the deponent for at least 12 months. [OR, delete whichever option is inapplicable]
     #I have confirmed the deponent's identity using the following identification document:

                    NSW D/L.  12510410 .

                    Identification document relied on (may be original or certified copy) †

Signature of witness

Note: The deponent and witness must sign each page of the affidavit. See UCPR 35.7B.

[* The only "special justification" for not removing a face covering is a legitimate medical reason (at April 2012).]

[†"Identification documents" include current driver licence, proof of age card, Medicare card, credit card,
Centrelink pension card, Veterans Affairs entitlement card, student identity card, citizenship certificate, birth
certificate, passport or see Oaths Regulation 2011.]



8

# #PARTY DETAILS

## PARTIES TO THE PROCEEDINGS

**Plaintiff**                          **Defendant**

Craig Steven Wright                    W&K INFO DEFENSE RESEARCH LLC

                                       4371 Norhtlake Blvd #314

                                       Palm Beach

                                       FL 33410 - 6253 [Defendant]

## FURTHER DETAILS ABOUT PLAINTIFF[S]

**Plaintiff**

Name                                   Craig Steven Wright

Address                                43 St Johns Ave

                                       Gordon NSW 2072

**Contact details for plaintiff acting in person or by authorised officer**

Address for service                    as above

Telephone                              0417 683 914

Email                                  craigswright@acm.org

## DETAILS ABOUT DEFENDANT

**Defendant**

Name                                   W&K INFO DEFENSE RESEARCH LLC

Address                                4371 Norhtlake Blvd #314

                                       Palm Beach

                                       FL 33410 - 6253



# Exhibit 14



U.S. Department of Homeland Security
Washington, DC 20528

July 25, 2017


**SENT BY ELECTRONIC MAIL TO: bluetap22@gmail.com**

Mr. Ira Kleiman
155 Bent Tree Drive
Palm Beach Gardens, Florida 33418

Re:  **2017-STFO-00078**

Dear Mr, Kleiman:

This is the electronic final response to your Freedom of Information Act (FOIA) request
to the Department of Homeland Security (DHS) Science and Technology Directorate
(S&T), dated July 13, 2017, and received by this office on July 13, 2017.  You are
seeking copies of the following records:

  -   BAA 11-02-TTA 01-0127-WP:  TTA 01
Software Assurance through Economic Measures - $650,000

  -   BAA 11-02-TTA 05-0155-WP: TTA 05
Secure Resilient Systems and Networks - $1,800,000

  -   BAA 11-02-TTA 09-0049-WP: TTA 09
Cyber Economics -  $2,200,000

A search of the Cyber Security Division for documents responsive to your request
produced a total of three pages.  Of those pages, I have determined that no (0) pages of
the records are releasable in their entirety, all (3) pages are partially releasable, and no (0)
pages are withheld in their entirety pursuant to Title 5 U.S.C. § 552 (b)(6).

**FOIA Exemption 6** exempts from disclosure personnel or medical files and similar files
the release of which would cause a clearly unwarranted invasion of personal privacy.
This requires a balancing of the public's right to disclosure against the individual's right
privacy.  In the present instance, a DHS Contracting Officer's signature was redacted as it
constitutes Personally-Identifiable Information (PII).  The privacy interests in that
individual's signature outweighs any minimal public interest in disclosure of the

information. Any private interest you may have in that information does not factor into the aforementioned balancing test.

You have a right to appeal the above withholding determination. Should you wish to do so, you must send your appeal and a copy of this letter, within 90 days of the date of this letter, to: Privacy Office, Attn: FOIA Appeals, U.S. Department of Homeland Security, 245 Murray Lane, SW, Mail Stop 0655, Washington, D.C. 20528-0655, following the procedures outlined in the DHS FOIA regulations at 6 C.F.R. Part 5 § 5.8. Your envelope and letter should be marked "FOIA Appeal." Copies of the FOIA and DHS FOIA regulations are available at www.dhs.gov/foia.

Provisions of FOIA allow DHS to charge for processing fees, up to $25, unless you seek a waiver of fees. In this instance, because the cost is below the $25 minimum, there is no charge.

If you need any further assistance or would like to discuss any aspect of your request, please contact the analyst below who processed your request and refer to **2017-STFO-00078**. You may send an e-mail to stfoia@hq.dhs.gov, call 202-254-5700, or you may contact our FOIA Public Liaison in the same manner.

Additionally, you have a right to right to seek dispute resolution services from the Office of Government Information Services (OGIS) which mediates disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974. You may contact OGIS as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

*Gina Goldblatt*

Gina Goldblatt
FOIA Officer (Acting)

Enclosures: Responsive Record, 3 pages
Inventory Sheet, 1 page



U.S. Department of Homeland Security
Science & Technology Directorate
Washington, DC 20528

May 31, 2011

W&K INFO DEFENSE RESEARCH LLC
ATTN: Craig S. Wright
4371 Norhtlake Blvd #314 Palm Beach, FL 33410-6253

Subject: Notification Regarding BAA 11-02-TTA 01-0127-WP

Dear Craig S. Wright:

This letter is in reference to the subject White Paper submitted in response to the Department of
Homeland Security (DHS), Science and Technology (S&T) Directorate, Broad Agency
Announcement (BAA) 11-02, which was initially published on the Federal Business Opportunities
website on January 26, 2011.

The subject White Paper has been evaluated by a panel of experts in accordance with the criteria set
forth in BAA 11-02. Based on this review, it has been determined DHS is not interested in pursuing
the technology development described in the submitted White Paper. As a result, you are not invited
to submit a Full Proposal for this technology.

If you are interested in the evaluation findings of the subject White Paper, you may provide a written
request to STCyberSecurityBAA@dhs.gov. The request must be received within three calendar
days of the date of this letter in order to be considered. Ensure all pertinent point of contact
information is included in your request, including the following:

    White Paper number (e.g., BAA 11-02-TTA XX-XXXX-WP), Type classification (I, II, or III)
    Name of and location of entity submitting request
    Name, phone number, and email address of point of contact

Thank you for responding to BAA 11-02. Your efforts to propose novel solutions to meet the
technical challenges required to keep our homeland secure are very much appreciated. I would like
to encourage you to monitor the Federal Business Opportunities website at www.fbo.gov, the
Homeland Security Advanced Research Projects Agency BAA website at https://baa2.st.dhs.gov,
and the Grants.gov website for notice of future opportunities as DHS intends to continue to provide
opportunities for prospective offerors to propose solutions to our many needs.

                              Sincerely,
                              (b)(6)

                              Cherita Thomas
                              Contracting Officer, DHS
                              Office of Procurement Operations
                              Science & Technology Acquisition Division

**U.S. Department of Homeland Security**
**Science & Technology Directorate**
Washington, DC 20528


Homeland Security

May 31, 2011

W&K INFO DEFENSE RESEARCH LLC
ATTN:  Dave Kleiman
4371 Norhtlake Blvd #314 Palm Beach,  FL 33410-6253

Subject:  Notification Regarding BAA 11-02-TTA 05-0155-WP

Dear Dave Kleiman:

This letter is in reference to the subject White Paper submitted in response to the Department of Homeland Security (DHS), Science and Technology (S&T) Directorate, Broad Agency Announcement (BAA) 11-02, which was initially published on the Federal Business Opportunities website on January 26, 2011.

The subject White Paper has been evaluated by a panel of experts in accordance with the criteria set forth in BAA 11-02.  Based on this review, it has been determined DHS is not interested in pursuing the technology development described in the submitted White Paper.  As a result, you are not invited to submit a Full Proposal for this technology.

If you are interested in the evaluation findings of the subject White Paper, you may provide a written request to STCyberSecurityBAA@dhs.gov.  The request must be received within three calendar days of the date of this letter in order to be considered. Ensure all pertinent point of contact information is included in your request, including the following:

   White Paper number (e.g., BAA 11-02-TTA XX-XXXX-WP), Type classification (I, II, or III)
   Name of and location of entity submitting request
   Name, phone number, and email address of point of contact

Thank you for responding to BAA 11-02.  Your efforts to propose novel solutions to meet the technical challenges required to keep our homeland secure are very much appreciated.  I would like to encourage you to monitor the Federal Business Opportunities website at www.fbo.gov, the Homeland Security Advanced Research Projects Agency BAA website at https://baa2.st.dhs.gov, and the Grants.gov website for notice of future opportunities as DHS intends to continue to provide opportunities for prospective offerors to propose solutions to our many needs.

Sincerely,

(b)(6)

Cherita Thomas
Contracting Officer, DHS
Office of Procurement Operations
Science & Technology Acquisition Division

**U.S. Department of Homeland Security**
**Science & Technology Directorate**
Washington, DC 20528



May 31, 2011

W&K INFO DEFENSE RESEARCH LLC
ATTN: Craig S. Wright
4371 Norhtlake Blvd #314 Palm Beach, FL 33410-6253

Subject: Notification Regarding BAA 11-02-TTA 09-0049-WP

Dear Craig S. Wright:

This letter is in reference to the subject White Paper submitted in response to the Department of Homeland Security (DHS), Science and Technology (S&T) Directorate, Broad Agency Announcement (BAA) 11-02, which was initially published on the Federal Business Opportunities website on January 26, 2011.

The subject White Paper has been evaluated by a panel of experts in accordance with the criteria set forth in BAA 11-02. Based on this review, it has been determined DHS is not interested in pursuing the technology development described in the submitted White Paper. As a result, you are not invited to submit a Full Proposal for this technology.

If you are interested in the evaluation findings of the subject White Paper, you may provide a written request to STCyberSecurityBAA@dhs.gov. The request must be received within three calendar days of the date of this letter in order to be considered. Ensure all pertinent point of contact information is included in your request, including the following:

   White Paper number (e.g., BAA 11-02-TTA XX-XXXX-WP), Type classification (I, II, or III)
   Name of and location of entity submitting request
   Name, phone number, and email address of point of contact

Thank you for responding to BAA 11-02. Your efforts to propose novel solutions to meet the technical challenges required to keep our homeland secure are very much appreciated. I would like to encourage you to monitor the Federal Business Opportunities website at www.fbo.gov, the Homeland Security Advanced Research Projects Agency BAA website at https://baa2.st.dhs.gov, and the Grants.gov website for notice of future opportunities as DHS intends to continue to provide opportunities for prospective offerors to propose solutions to our many needs.

Sincerely,

(b)(6)

Cherita Thomas
Contracting Officer, DHS
Office of Procurement Operations
Science & Technology Acquisition Division

U.S. Department of Homeland Security
Science and Technology Directorate
Inventory Sheet
2017-STFO-00078

| Document Number | Number of Pages | Name of Document/Description | Document Date | Exemption |
|---|---|---|---|---|
| 1 | 1 | Notification Regarding BAA 11-02-TTA 05-0155-WP | 5/31/2011 | 6 |
| 2 | 1 | Notification Regarding BAA 11-02-TTA 01-0127-WP | 5/31/2011 | 6 |
| 3 | 1 | Notification Regarding BAA 11-02-TTA 09-0049-WP | 5/31/2011 | 6 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Exhibit 15

FILED

2 8 AUG 2013

*(Supreme Court of New South Wales seal)*

Form 44 (version 2)
UCPR 36.1A

# CONSENT ORDER

## COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General Division Common Law |
| List | General |
| Registry | Sydney |
| Case number | 2013 / 245661 |

## TITLE OF PROCEEDINGS

| | |
|---|---|
| Plaintiff | **Craig Steven Wright (ABN 97 481 146 384)** |
| Defendant | **W&K INFO DEFENSE RESEARCH LLC** |

## PREPARATION DETAILS

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright (craigswright@acm.org) |

## TERMS OF ORDER MADE BY THE COURT BY CONSENT

Orders/Judgment:

1.     Judgment in the sum of $28,534,049.79 in favour of the plaintiff.

2.     No order as to costs.

3.     The court notes the agreement of the parties that the plaintiff will accept the transfer of Intellectual property held by the plaintiff in full and final satisfaction of the judgment.

## SIGNATURES

**Plaintiff**
The plaintiff consents.
Signature of plaintiff

Craig S Wright

Capacity                              Plaintiff

Date of signature           28th Aug 2013

**Defendant**

The defendant consents.

Signature of or on behalf of party
if not legally represented

Capacity                    Authorised officer

Date of signature           28th Aug 2013

\_\_\_\_J Wilson_____ consents.

**SEAL AND SIGNATURE**

Court seal

Signature                        _____

Capacity

Date made or given

Date entered

**NOTICE**

Subject to limited exceptions, no variation of a judgment or order can occur except on application made within 14 days after entry of the judgment or order.

Exhibit 16

Form 43
UCPR 36.11

## JUDGMENT/ORDER

### COURT DETAILS
| | |
|---|---|
| Court | Supreme Court of NSW |
| Division | Common Law |
| List | Common Law General |
| Registry | Supreme Court Sydney |
| Case number | 2013/00225983 |

### TITLE OF PROCEEDINGS
| | |
|---|---|
| First Plaintiff | Craig Steven Wright |
| First Defendant | W&K Info Defense Research LLC |

### DATE OF JUDGMENT/ORDER
| | |
|---|---|
| Date made or given | 6 November 2013 |
| Date entered | 6 November 2013 |

### TERMS OF JUDGMENT/ORDER
BY CONSENT
Orders/Judgment:
1. Judgment in the sum of $28,254,666.00 in favour of the plaintiff.
2. No order as to costs.
3. The court notes the agreement of the parties that the plaintiff will accept the transfer of Intellectual property held by the plaintiff in full and final satisfaction of the judgment.
4. A deed of transfer for the Intellectual Property is to be completed before 01 Sept 2013.

### SEAL AND SIGNATURE



Signature          N. Langi (l.s.)

If this document was issued by means of the Electronic Case Management System (ECM), pursuant to the Uniform Civil Procedure Rules (UCPR) 3.7, this document has taken to have been signed if the person's name is printed where his or her signature would otherwise appear.

| | |
|---|---|
| Capacity | Chief Clerk |
| Date | 8 November 2013 |

# Exhibit 17

 Gmail

---

## Fw: Re: Dave

---

**Lou K** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

----- Forwarded Message -----
**From:** Lou K < ▮▮▮▮▮▮▮▮ >
**To:** "craig.wright@hotwirepe.com" <craig.wright@hotwirepe.com>
**Sent:** Wednesday, February 12, 2014, 3:34:40 PM EST
**Subject:** Re: Dave

Craig:

After reviewing the information you sent , I want to thank you very much.

My home address is: ▮▮▮▮▮▮▮▮▮▮ , West Palm Beach, Florida 33417

I look forward to any information you can give me about my son DAVID. To me,

he was alway's someone special.        Lou Kleiman


On Tuesday, February 11, 2014 6:23 PM, Craig S Wright <craig.wright@hotwirepe.com> wrote:

> Hello Louis,
> Your son Dave and I are two of the three key people behind Bitcoin:
> https://bitcoin.org/
> http://www.motherjones.com/politics/2013/04/what-is-bitcoin-explained
>
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.
>
> Know also that Dave was a key part of an invention that will revolutionise the world:
> http://techcrunch.com/2014/02/10/bitcoin-wins-best-technology-achievement-but-satoshi-doesnt-show/
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.
>
> I will let you know when I am in the USA,
> _____
> **Dr. Craig S Wright GSE LLM**
> **Chief Executive Officer**
> **Hotwire Preemptive Intelligence (Group)**
> Mobile: + 61.417.683.914
> craig.wright@hotwirepe.com



Case 9:18-cv-80176-XXX Document 1-20 Entered on FLSD Docket 02/14/2018 Page 3 of 3

# Exhibit 18

 **Gmail**

## Fwd: Questions

██████████████████████                    ███████████████

---------- Forwarded message ----------
From: **Craig S Wright** <craig@rcjbr.org>
Date: Wed, Apr 23, 2014 at 8:56 PM
Subject: RE: Questions
To: Ira K████████████████████
Cc: Andrew <asommer@claytonutz.com>

Ira,

Andrew can give you a good idea of the history. The problems we have faced come to knowledge of what we have been doing. The Tax office know that Dave and I have been working on this since 2008.

Next week (Tuesday) I am attending a session to help people at the senior commission/commissioner level in the tax office come to terms with Bitcoin. I have been dragged before the Federal Police to teach them, state police, treasury.

I am being made to know my place.

The software Dave updated and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level. This is all good under the law. Basically, the GST (like a Vat) cancels as it is an international transfer. That stated, they can still use it as a means to make sure I am in my place.

The way this is working is,

- WK to me                    International and NO GST (all good)
- ME to company          GST cancels

In this, I have a GST debt, the company has a gain. On the software from WK to Coin-Exch, I have an overall GST debt owed of $3.7 million (give or take). The company gets a return of 3.7 million. The net outcome is zero tax as they cancel.

What the tax office can do is use this and hold payments back to the company. They are trying to fish. They want information that they are not legally entitled to have. So far, they have fabricated documents (and been caught), used half-truths to make it seem as if things are wrong to others and more.

One issue they have is that I will be reinvesting all of what I get for now. This means I do not pay taxes as I will be taking the gain and spending it exclusively on deductible areas that will grow the business. I live on an income less than half my staff but it is enough. What does matter is that by doing this, we can create something.

I will send you a timeline of events this weekend.

I do not know what your views are, but you will learn some more of Dave and I. I still do a lot of work with Casinos, Sport Betting and other gaming firms. Some of this is not really legal within the US, hence Panama. Much of that secrecy comes from the fact that the US government would have closed what we did down as well if they could have, gaming would have been a great excuse to kill off Bitcoin. The thing is, it paid the bills. I do not gamble myself at all, but the guys who run these sites pay well and we needed funds.

Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code. I have sent the software analysis to you already.

I have told you I would answer anything, but it is perhaps time I start just telling you everything.

Craig

**From:** Ira K [mailto:█████████████████]
**Sent:** Wednesday, 23 April 2014 7:37 PM
**To:** Craig S Wright
**Subject:** Re: Questions

i'd better get some sleep.. it's 5:30am here.

goodnight.

On Wed, Apr 23, 2014 at 5:35 AM, Ira K ████████████████████ wrote:

alright, thank you.

On Wed, Apr 23, 2014 at 5:33 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira, when I offered to tell you everything and involve you, I was serious.

I have told the solicitor (attorney) that you are able to ask anything. I do mean that.

Not just half-truths that others with agendas will state, but ANYTHING.

**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 7:32 PM
**To:** Craig S Wright
**Subject:** Re: Questions

alright, thanks for explaining things.

On Wed, Apr 23, 2014 at 5:31 AM, Craig S Wright <craig@rcjbr.org> wrote:

You will have it in the morning.

**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 7:30 PM
**To:** Craig S Wright
**Subject:** Re: Questions

yes, thanks.

On Wed, Apr 23, 2014 at 5:29 AM, Craig S Wright <craig@rcjbr.org> wrote:

I will put a spread sheet together that lets you see the impact of taking money early vs later tomorrow if this is OK?

Yearly amounts

500k, 1mill,... ,4 million.

**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 7:20 PM
**To:** Craig S Wright
**Subject:** Re: Questions

Would it be possilbe to sell just 1 year of my holdings and keep the rest?

On Wed, Apr 23, 2014 at 5:15 AM, Craig S Wright <craig@rcjbr.org> wrote:

And if it does work (and I believe it will) we change the world in a manner that has not been seen for a long time – even more than the Internet

**From:** Ira K [mailto: ███████████████]
**Sent:** Wednesday, 23 April 2014 7:05 PM
**To:** Craig S Wright
**Subject:** Re: Questions

If I stay the course Dave's estate is guaranteed 8 million in 2016?

or is that with risk?

On Wed, Apr 23, 2014 at 4:58 AM, Craig S Wright <craig@rcjbr.org> wrote:

He ran W&K

Uyen only started to help in Dec 2012 and we never completed moving things.

I moved everything in 2011 to Dave as I needed the development to be at "arms length". I could not be directly involved in it

I thought Dave would live forever. I know, a bad error.

**From:** Ira K [mailto:▇▇▇▇▇▇▇▇▇▇▇▇▇▇]
**Sent:** Wednesday, 23 April 2014 6:52 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Why did you choose to let him hold a seperate bitcoin wallet that you didn't have access to?

I thought all these assets belonged to W&K.

On Wed, Apr 23, 2014 at 4:46 AM, Craig S Wright <craig@rcjbr.org> wrote:

Denariuz will license from Coin-Exch.

The license will be paid is shares and the company will be owned by Coin-Exch over time. Trying to do it in a manner that is internationally tax advantageous.

Basically, I am not avoiding tax, but trying to make sure that we create a structure like Google uses to make the amount we pay as small as possible.

**From:** Ira K [mailto:▇▇▇▇▇▇▇▇▇▇▇▇▇▇]
**Sent:** Wednesday, 23 April 2014 6:45 PM
**To:** Craig S Wright
**Subject:** Re: Questions

and Denariuz?

On Wed, Apr 23, 2014 at 4:43 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I do not know what you have been led to believe. But I am not trying to take anything from Dave's estate.

The eLearning program is to create a new form of MooC. The idea is to have large scale adaptive learning to the world. Nearly free.

**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 23 April 2014 6:32 PM
**To:** Craig S Wright
**Subject:** Re: Questions

I'm certainly not going to do anything to stifle the growth of the business you and he worked

so hard at.

On Wed, Apr 23, 2014 at 4:14 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I have sold all the BTC that I plan to sell for now. In doing what we wanted to do, Dave and I arranged for the sale or around 500,000 BTC so that we could have access to Core Banking software. The rest that I hold are in trust. The terms of that trust are not met as yet and hence if I was to break it, I would also cause the tax liability to fall and that would result in over 50% of the total being owed in taxes – a result that would drop the price to about nothing and leave nothing. I will not do that. I will not collapse years of work for anyone or anything.

Dave  and I decided to start Coin-Exch so that we could lock in some of the value. When we started planning this, it was late 2012. We locked in the value of the software based on the price of BTC then, which was less than now and if it was a year later we would have been smarter, but we took the option to cash out. That was Dave. If we had waited even 3 months the value would have been 5 times more.

No, I am not doing this as I think it is going to make me a trillionaire. I am working to make a system that is fraud resistant. One that does not allow printing money and fractional reserve banking. No inflation and no federal reserve BS.

If you read the terms of the Judgement from the court, I did not receive Dave's Bitcoin. I accepted the software Dave was developing for me. We had already exchanged this before he died. It is software that I started working on in 2003. Dave completed it for me after we split things up. He did this contracting other people.

I locked in the R&D amounts based on Dave's convincing me that was best. I am willing to take risks far more than him, but to me, this will work or I will die trying.

I thought Dave just wanted to have some time to work less. That he was planning on taking some time off and doing some relaxing and travel. He told me repeatedly that he was fine. He said the VA Hospital was covered as he was a vet. He said that he was all good. He wanted some cash to be able to do some other things he planned and we did talk about the exoframe idea. I convinced him that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us time.

I told him again and again that the wait is worth it. I gave him the figures and stated that he could have sold the amount I would leave him with. I wanted the software. That is what this is and always was about for me. With it, I can complete what I have worked on for 11 years now.

My eggs are not all in one basket. They are now tied to the Research funding as well.

I did the court action to ensure that the value was accepted. Not to force you, the estate etc into giving me anything, but to ensure I had a value against the software that I had received already.

I assume you know nothing of how Dave funded W&K?

I sell myself to gaming companies. I am a security professional, cryptographer and programmer. I wrote software and designed systems that created and became Lasseter's OnLine Casino. I worked with Playboy Casino. I did coding for Centrebet, Sporting Bet, BetLife etc.

In 2010 I gave the source code for a good number of online casinos to Dave. Hence Panama. I put him in contact with the people at Playboy. He used this code to fund the work, research etc.

I have files of Dave's that I cannot access now. These are TrueCrypt partitions. We held backups for the other, but no passwords. I cannot access these. If I cannot finds a key or a password on these, I do not believe that I can on yours. Dave was smarter than I was in some ways. He broke his wallets into many 50BTC sized addresses. I left several large addresses that are not easy to move without making the world notice.

Dave estate is only worth 12 million IF you want to cash out right now.

IF you stay, you get the value AND the shares.

I will list these in coming years and THEN they are worth more.

"Craig's worth valued at $500 million"

There is a trust as I noted. Less than 200,000 Bitcoin remain. We need 100,000 to make the bank idea work. I cannot touch these yet even if I want to. And right now, I do. That stated, I will not move more now in any event. Dave held more and MtGox held some. I see both those sources as lost. Dave's drives are a one day possible. Each year, it is possible to crack more than double the key length that was previously possible. What I know of Dave's passwords places them at around 80 bits. We can expect them to be worth trying to crack in 10-12 years. Spending the next 5 years on this is going to cover 5-10% of the possibilities at a large cost. This is how crypto works.

What company owns right now is:

• Software – incl source code and perpetual licenses valued at over $50 million.

• Intellectual Property, design, codes etc

• Research claims

If we reinvest the Research rebates, we get 45% back in the following year. The program has been approved for three years and locked in using an advance finding. This means, if we take the existing spend, we will get the following each October:

• 2014    $12 million base

• 2015    $12 million base plus the 45% from 2014 reinvested = 17.4 million

• 2016    $12 million base plus 45 % of the 17.4 Million (prior year reinvested) = $20 Million

That comes to around $50 million cash over three years. Of this, I will drive 30 million back into the company and leave the last return as a wait and see if this all fails.

In 2016, Dave's estate gets 8 Million PLUS still has a share of the company.

IF you want, I will arrange that you can pull out. In this case, the following occurs:

• 2014    $12 million base – 4 million to Dave's Estate  after costs plus 4 million from share sale (well I will try).

• 2015    $12 million base plus the 45% from 2014 remaining million reinvested = 17.4 million and 4 million to Dave's Estate  after costs.

• 2016    $12 million base plus 45 % of the 17.4 Million (prior year reinvested) = $20 Million with 4 million to Dave's Estate  after costs.

Here, in 2014, 2015 and 2016 the estate gets $4 million a year, but that is it.

If you do the latter option – I will raise funds to cover the shortfall using your shares, so I end in the same position expenditure wise.

You can be a part of it and get paid. I offered this already.

You are talking of greed to me. Right now, I have told you that you can cash out at 4 million a year for three years or see where this goes and have a payment of over 8 million plus a large share of what will be a listed company. That is with risk. 12 Million without.

W&K used my software to fund everything.

If you think I will give up the software I have received from this and pull what Dave and I have worked years to put together you are mad. I will make this open source before I end it. If that happens, nobody makes anything. Not me, not you , no one.

I am working on this no matter what. The amounts are locked in ONLY because of Dave. He wanted certainty. He wanted to make sure we had something now. I did this and have structured it so that we have this money now. We did this early and the increase in BTC has been a loss really.

The software (including banking software) has cost over 50 million alone. When I contracted for it, it was when BTC was worth $116.

IF Dave and I did not start this when we did and waited 6 months (not that Dave could have) we could have used 10% of the Bitcoin we held to do this. So, NO I will not move more now. If you get access to Dave's drives, then you can move those. I am not in a rush. In the next few months, the company will get money in AUD$ and I will STILL not be taking it other than to repay bills used in this process.

When Dave and I planned this, the ENTIRE holding, his, mine and that in trust was worth 20 million.

What Craig is worth in 10 years is up in the air, but I WILL drive 99% of this (my share) back into the project. What you do is your choice. I will negotiate this, I will allow you to work with it as Dave's heir, but I WILL NOT give it up.

So Ira, the simple thing is do you want to be a part of it or to be paid out. I have spent the money. If you want, fight me and have a copy of software that will be of little use without the parts we have completed since.

ALL I have is in this. EVERYTHING. If you want to not be a part, then I will provide Dave's estate with its due. If you want to be a small part, then be a small part, if you want to be all in, then work as if you are.

There are no other options. Unless you can access Dave's drive, then the BTC Dave held remain locked away. The ones I spent in doing this are spent and there is NO way to unspend them. The ones in trust are there for a purpose

and I selected a jurisdiction that cannot be forced to give them over. Not even if the US government tries to make me.

So, as I have been saying, do you want to be a part of this? This is either as a silent shareholder or as a director. I have offered both. Or do you want to argue the point? There is no more to get and if you know my history, I will make sure that everything ends up completely worthless before I lose what I am doing.

Ave did not want to ta $4million a year from this. He wanted something to live on. He never asked for more. I am not taking that much, but that is YOUR choice. There are options, but one thing I will not do is give over the software or end this.

Dave bullshitted me about how he was doing and worked himself ragged. He lied to me about what he needed. There is NO WAY that I am stopping this now. I owe this to Dave and I will NOT give it up even to make Ramona's life simpler and I love her.

So, do you wan to know more and be involved or do you want to argue it and I will end up making it completely open source if I lose and then in place of the share I agreed with Dave you can have 100% of $0.

Craig

**From:** Ira K [mailto: ████████████████]
**Sent:** Wednesday, 23 April 2014 3:38 PM

**To:** Craig Wright
**Subject:** Re: Questions

Please explain to me what is stopping you from selling some?

Just because you think it will be worth trillions?

On Wed, Apr 23, 2014 at 1:37 AM, Ira K ███████████████ wrote:

It's not a matter of not believing in your abilities.  I absolutely do.

But that doesn't mean something shouldn't be taken off the table.

Just like trading stocks, you have to know when to take a profit

and let the rest ride.  No need for all eggs in one basket.

On Wed, Apr 23, 2014 at 1:33 AM, Craig Wright <craig@rcjbr.org> wrote:

And yes. Worst case

On 23/04/2014 3:31 pm, "Ira K" ███████████ wrote:

I am trying.  But from what I understand so far, you are placing his value

in a gambled situation and worst case scenario, 12 million?


On Wed, Apr 23, 2014 at 1:28 AM, Craig Wright <craig@rcjbr.org> wrote:

Before you go off on rash paths.... Try ans understand what. Is therre

On 23/04/2014 3:24 pm, "Ira K" ███████████ wrote:

54k of coins could be mined in a few months with your operation if you still have it running.

Or your new venture's success will recoup this payment.


On Wed, Apr 23, 2014 at 1:20 AM, Ira K ██████████████ wrote:

I don't understand your hesitancy.  You know he was worth the amount I am asking.


On Wed, Apr 23, 2014 at 1:19 AM, Ira K ██████████████ wrote:

I told you, I don't want to end up on the same sword as Dave.

He had faith.  It doesn't always pan out.


On Wed, Apr 23, 2014 at 1:18 AM, Craig Wright <craig@rcjbr.org> wrote:

Then have faith

On 23/04/2014 3:17 pm, "Ira K" ███████████ wrote:

He is worth more than that.


On Wed, Apr 23, 2014 at 1:16 AM, Craig Wright <craig@rcjbr.org> wrote:

Then take the 12 million and go

On 23/04/2014 3:12 pm, "Ira K" ███████████ wrote:

Look where it got Dave by holding on for too long.

Timing is Everything.


On Wed, Apr 23, 2014 at 1:11 AM, Craig Wright <craig@rcjbr.org> wrote:

We locked them into cash payment s

On 23/04/2014 3:09 pm, "Ira K" ███████████ wrote:

I simply want the fair share that Dave earned.

You told me you guys had 1 million bitcoins between you.

I was only asking for 54,910. and you could keep all

his drives which may contain more.

On Wed, Apr 23, 2014 at 1:04 AM, Craig S Wright <craig@rcjbr.org> wrote:

Would you prefer to know what you own or to argue it

You want assets list, balance sheets etc, then ask. You ARE a major shareholder.

You want to be a director and know it intimately – ask I have offered

You want to pull out – then do so and I will pay you out based on what Dave and I had been arranging.

If you want to stay, then do so and come to know more of what Dave and I did.

**From:** Ira K [mailto ███████████████████]
**Sent:** Wednesday, 23 April 2014 2:56 PM

**To:** Craig S Wright
**Subject:** Re: Questions

"You have the 40% of the refunds – I get any upside."

Can you explain that to me?

On Wed, Apr 23, 2014 at 12:54 AM, Craig S Wright <craig@rcjbr.org> wrote:

In 10 years I believe this will be 100 times bigger.

But I am serious, if you want to cash out, I will arrange something on the cash

**From:** Ira K [mailto: ███████████████████]
**Sent:** Wednesday, 23 April 2014 2:54 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Why not take some off the table?

On Wed, Apr 23, 2014 at 12:53 AM, Craig S Wright <craig@rcjbr.org> wrote:

You agree to that – I will have the lawyers draft something for you to have reviewed

I have NOT cashed out

I will not

**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 23 April 2014 2:51 PM

**To:** Craig S Wright
**Subject:** Re: Questions

I am open to arranging distribution of 10 million a year for 3 years,

but not through a new untested business that you just stated "worst

case scenarios 4 million".

On Wed, Apr 23, 2014 at 12:48 AM, Craig S Wright <craig@rcjbr.org> wrote:

This is WHY wed the software transfer!

It locked in payments starting in Oct this year of 10 million a year for 3 years – get it now!

That was Dave – his idea

We turn the BTC into R&D grants as cash!

YOU ARE his estate – I have added you!

**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 23 April 2014 2:47 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Dave would prefer to lock in secured gains that have already been made.


On Wed, Apr 23, 2014 at 12:46 AM, Ira K <█████████████> wrote:

There could be a new alternate crypto-currency that comes out and steals the thunder from Bitcoin

and the new business goes bankrupt.


On Wed, Apr 23, 2014 at 12:44 AM, Ira K <█████████████> wrote:

It wouldn't matter if I had 100%.  What if the business doesn't fly?


On Wed, Apr 23, 2014 at 12:43 AM, Craig S Wright <craig@rcjbr.org> wrote:

Ira – look at the balance sheet – you have 40% of the total worth in it


Do you get that?


NOT 10%


**From:** Ira K [mailto:████████████████]
**Sent:** Wednesday, 23 April 2014 2:41 PM


**To:** Craig S Wright
**Subject:** Re: Questions


I understand, but that is water under the bridge.  We can't do anything about that now.

But we can provide his estate with fair compensation for his assistance.  If he was

50% partner, or even 33% partner.. he would deserve more than 10% in a unproven

business and undisclosed coins.


On Wed, Apr 23, 2014 at 12:38 AM, Craig S Wright <craig@rcjbr.org> wrote:

One issue that you have been fed half-truths on.


And yes, there is a lot that is messy from the time. I had no idea Dave was as sick as he was. He told me he was on
top of it all. I believed him.

He said it was just a small operation and he would be up again soon, that we would present a paper in June that year. So, yes, lots that was missed.

**From:** Ira K [mailto:███████████]
**Sent:** Wednesday, 23 April 2014 2:35 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Like I said, that is just one issue.. there are so many more.

On Wed, Apr 23, 2014 at 12:33 AM, Craig S Wright <craig@rcjbr.org> wrote:

Check:

- Otto

- Otto Maurer

It is the font

Mine is an image

All that makes it a signature is PGP

**From:** Ira K [mailto:███████████]
**Sent:** Wednesday, 23 April 2014 2:30 PM

**To:** Craig S Wright
**Subject:** Re: Questions

It doesn't matter if you create a new font from scratch that looks exactly like the one on the contract.

Each contract has signatures with variations.  It is crystal clear to see.

On Wed, Apr 23, 2014 at 12:23 AM, Craig S Wright <craig@rcjbr.org> wrote:

I will need to dig through old emails and documents, but I can show it is a PDF type font.

http://www.adobe.com/content/dam/Adobe/en/products/acrobat/pdfs/adobe-acrobat-xi-esign-pdf-file-tutorial-ue.pdf

That will take time and I will need to look up what font was in there when Dave did this. I will also dig up the PGP signature for you. Dave's public key is out there on the web if you want to validate it.

I assume you know that Dave would not give ANYONE his private key – that includes me.

Andrew is a partner at Clayton Utz. I do not believe he will lie- for all people say about lawyers (sorry Andrew). Ask him – he has received the PGP singed versions.

http://www.claytonutz.com/

I will put all this together for you by the weekend. I will show the font (as noted I need to check what it was as I do not know what Dave's system defaulted to. I am really sorry you have been lead to believe this is something more than it was, but will this help?

Craig

**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 23 April 2014 2:15 PM

**To:** Craig S Wright
**Subject:** Re: Questions

It doesn't look like a type font.

There are 2 seperate contracts with the same style handwriting, but with slight variations.

On Wed, Apr 23, 2014 at 12:13 AM, Craig S Wright <craig@rcjbr.org> wrote:

Yes.

The PGP key is the signature.

The PDF just adds it.

**From:** Ira K [mailto:████████████]
**Sent:** Wednesday, 23 April 2014 2:10 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Are you saying that the signature was just computer generated, a type font?

Ira

On Wed, Apr 23, 2014 at 12:05 AM, Craig S Wright <craig@rcjbr.org> wrote:

The document was signed using PGP. That is the digital signature. The other was a PDF thing that gets applied. It was and never was handwritten. The signature is the PGP signing.

Dave's interest is in founder shares in Coin-Exch.

The sale of the software and its use leads to an Research & Development refund into the company. Coin-Exch receives the moved the software and uses it for an R&D claim. That is why it was done. This is 45% of the expense.

That is what is obtained from this. That is what the ATO do not like.

Craig

**From:** Ira K [mailto:████████████]
**Sent:** Wednesday, 23 April 2014 1:59 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

It's not about information that they fed me.  It's about contracts that you signed and agreements that don't seem logical.

I don't understand why Dave would make that agreement with you for a business divorce.  Why would a successful partnership suddenly seperate and leave one partner with everything of accountable value and the other(Dave) with only 10% in a future venture and a undisclosed amount of Bitcoins?  And the contract (CEWK01 and CEWK03) is signed the same month of his death and without his real signature.  Nor do I believe it to be a digital signature.

It doesn't even come close to his handwriting  That is obviously a females signature.   Things just don't make sense.

Ira

On Tue, Apr 22, 2014 at 11:48 PM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

Dave died. I did the actions to make sure that the court signed off on what Dave and I planned.

The reason for the transfer is to use the R&D tax credit on the value of the software Dave and I developed.

"I thought you appreciated Dave's contribution. "

More than I could express. This was not about screwing Dave or his estate, it was ensuring that we had something solid as Dave died. I did that action as accountants etc advised it was necessary.

I think they have mislead you as to what this is about. There is no GST (tax) on the software Dave transferred, but it is being used by the ATO as an excuse to try and not pay other amounts that are owed.

Craig

**From:** Ira K [mailto:████████████████]
**Sent:** Wednesday, 23 April 2014 1:37 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

The information I have to work with is what you have told me and the documents from the ATO office.

From those documents it appears clear to see a systematic transfer of assets out of W&K back to you.

Up until April 15 I was a complete believer in what you were telling me.  But you never mentioned

any of the actions you were taking against W&K prior to contacting us.

We could start by going step by step through the questionaire the ATO sent me.  But I really didn't think

you would want to get into those details.  I thought you appreciated Dave's contribution.  Helping you

get the government funding to start it all, etc.

If you have more information that I'm missing you are more than welcome to email it to me.


Regards,

Ira






On Tue, Apr 22, 2014 at 11:02 PM, Craig S Wright <craig@rcjbr.org> wrote:

Ira,

I do not know what you have been told, but I think there is a need to go into detail.


Andrew (CC'd) is a tax partner with Clayton Utz. I am happy for you to ask him anything. This is permission for that. I am sure he will give better truth than the tax office. At least more of it and without filtering things.


Dave signed electronically. I have not ever stated that these are his. If I had wanted to do that I would have dug up copies from the old company filings. The ATO and the court had the digitally signed documents. There is a wrapper as the signature.


Dave held his BTC, not me for him.


I do not know what Dave's resignation is. You mention a resignation, I do not know of one. I know what we planned – I  not know all of what was occurring in WK.




Craig








**From:** Ira K [mailto██████████████████]
**Sent:** Wednesday, 23 April 2014 11:49 AM

**To:** Craig S Wright
**Subject:** Re: Questions


Craig,


Just as Dave believed in your vision and abilities, I share that

same belief.   There is no doubt in my mind that you are capable of

achieving the goals you have set.  And I am still in awe of your brilliance.


However, since receiving the documents from the ATO and spending more time

reviewing them, I feel like there are questionable discrepancies in the

contracts between you and W&K such as Dave's signatures, his resignation,

transfer of all accountable value, Uyen's role of Director, BAA projects, etc.

No need to go into details.


I can understand how you may have felt pressured to take actions to secure

the business you and Dave started.  And the last thing I want to do is

stifle the growth of it.  But I do believe we need to remedy the lopsided

contractual exchange.


As the Executor for the Estate of the Director at W&K I propose we

reach an agreement that Dave himself would approve.


Good sir, my request equates to peace and prosperity for all:

1. Return 17% of the 323k bitcoins to Dave's estate.

2. Retain only half our current holdings in Coin-Exch.

3. Remain friends that avoid all taxing troubles henceforth.


And I would still welcome you to attempt gaining access to Dave's drives.

If you are able to find his bitcoin files I would gladly give you half

and invest Dave's other half into your new business.


Sincerely,

Ira

On Tue, Apr 15, 2014 at 9:41 PM, Ira K <​███████████████​> wrote:

Sure, that sounds good to me.


Thanks.


On Tue, Apr 15, 2014 at 9:28 PM, Craig S Wright <craig@rcjbr.org> wrote:

I would love you to be involved.


How about we add you once we get the tax audit out of the way and also get directors insurance for you?


**From:** Ira K [mailto:███████████████]
**Sent:** Wednesday, 16 April 2014 11:17 AM

**To:** Craig S Wright
**Subject:** Re: Questions


Honestly I don't know.  I'm not sure what obligations must be met as a director?

If it jallows me to follow what's going on in the business, that would be interesting.

But if you feel it's in my best interest not to be involved with it because it might expose

me to legal liablilities, then I will certainly understand.


Thanks,

Ira




On Tue, Apr 15, 2014 at 8:48 PM, Craig S Wright <craig@rcjbr.org> wrote:

Hi Andrew,

Can you help Ira with this please.


It is hostile everywhere right now. That stated, Dave

...

[Message clipped]

Exhibit 19

## Computer Forensics, LLC Operating Agreement

This Agreement executed on February 1, 2013 shall strictly state the activity governing Computer Forensics, LLC business operations.

Computer Forensics, LLC shall be owned equally by Carter Conrad, Dave Kleiman, and Patrick Paige. Each individual shall be a Managing Member of Computer Forensics, LLC, with a fiscal year of each calendar year (January to December). Each Managing Member shall possess, and own, a 33.33% interest of Computer Forensics, LLC. Gross revenue produced, and received, by Computer Forensics, LLC shall be distributed as follows: 20% of all gross proceeds shall go to Computer Forensics, LLC for expenses and overhead, the remaining 80% shall be distributed to each participating member based on a percentage of activity or work product, proportional to the production of the revenue or income. Upon the end of the fiscal year, should there be proceeds in excess of operation expenses remaining with in the accounts of Computer Forensics, LLC, each member shall be awarded an equal 33.33% share of income determined not to be bookmarked for expenses, by a majority of the Managing Members. All equipment, software, hardware, or other intellectual property, owned individually by each member shall remain in the ownership of that member. Any equipment, software, hardware, or other intellectual property purchased with Computer Forensics, LLC assets shall be owned by Computer Forensics, LLC, with all provisions as stated above.

This operating agreement shall be enforced from the date noted above and supersedes any and all previous agreements.

So witnessed by our hand and signature below,

_____

Carter Conrad

Digitally signed by Dave Kleiman
DN: cn=Dave Kleiman, o=DaveKleiman.com, ou=Forensics,
email=dave@davekleiman.com, c=US
Reason: I agree to the terms defined by the placement of
my signature on this document
Location: Miami, Florida
Date: 2013.02.13 11:49:04 -05'00'

_____

Dave Kleiman

_____

Patrick Paige

Exhibit 20

STATE OF FLORIDA        )
                               ) SS

COUNTY OF PALM BEACH    )

I, DAVID ALAN KLEIMAN declare to the officer taking my acknowledgment of this instrument, and to the subscribing witnesses, that I signed this instrument as my will.

_____, Testator

DAVID ALAN KLEIMAN

We, _____Marcia J. Varney_____ (Witness) and *Beverley Brownlee*
(Witness) have been sworn by the officer signing below, and declare to that officer on our oaths that the Testator declared the instrument to be the Testator's will and signed it in our presence and that we each signed the instrument as a witness in the presence of the Testator and of each other.

_____
Witness

_____
Witness

Acknowledged and subscribed before me by DAVID ALAN KLEIMAN, the Testator, who is personally known to me or who has produced _____ as identification, and sworn to and subscribed before me by_____Marcia J. Varney_____ (Witness) who is personally known to me or who has produced _____, as identification and *Beverly Brownlee* (Witness) who is personally known to me or who has produced _____, as identification, and subscribed by me in the presence of the Testator and the subscribing witnesses, all on July 30, 2003.

_____
Notary Public

Notary Seal

LAURA E. AHLERS
My Comm. Exp. 5/18/05
No. DD 006618
[ ] Personally Known [x] Other I.D.

My commission expires: _____



BOIES
SCHILLER
FLEXNER

Partner Ref: Fiona Huntriss
Our Ref: 09998.0029 / FH
Doc: 699213v1

16 February 2018

Mr Craig Steven Wright

<u>By hand</u>

Dear Mr Wright

Re:     **Ira Kleiman, as the personal representative of the Estate of Dave Kleiman v. Craig Wright**
        **Case 9:18-cv-80176-BB**

Please find enclosed by way of service:

(i)      Complaint and Jury Demand;

(ii)     Exhibits to the Complaint; and

(iii)    Summons in a Civil Action.

The Civil Cover Sheet is also enclosed.

As set out in the Summons, the name and address of the plaintiff's attorney, for the purposes of responding to the Complaint, is:

>   Velvel (Devin) Freedman
>   Boies Schiller Flexner LLP
>   100 SE Second Street, Suite 2800
>   Miami, FL 33131
>   1 (305) 539 8400
>   vfreedman@bsfllp.com

Yours faithfully

**BOIES SCHILLER FLEXNER (UK) LLP**
Encl.

BOIES SCHILLER FLEXNER (UK) LLP

5 New Street Square, London EC4A 3BF | (t) +44 (0)20 3908 0800 | (f) +44 (0)20 3908 0801 | www.bsfllp.com
Boies Schiller Flexner (UK) LLP is a Limited Liability Partnership registered in England and Wales (with registered number OC385463) and is authorised and regulated by the Solicitors Regulation Authority (with registered number 605717).
Our registered office is at 5 New Street Square, London EC4A 3BF. A list of members' names is open for inspection at our registered office.