**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 18-cv-80176**

IRA KLEIMAN,
as personal representative of
the estate of David Kleiman,

     plaintiff,

v.

CRAIG WRIGHT.
_____/

**<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

     Dr. Craig Wright moves to dismiss the amended complaint filed by plaintiff Ira Kleiman, brother of the late Dave Kleiman and personal representative of his estate. The complaint is a thin soup of supposition, speculation, conflicting allegations, hearsay and innuendo, all driven by Plaintiff's assumption that his late brother owned a great many bitcoins when he died, bitcoins Plaintiff cannot cash in because his brother failed to share the computer codes needed to access them. The complaint (and its exhibits) fairly scream these facts, but Plaintiff nonetheless tries to shakedown Dr. Wright for $11 billion or more. That action would require the Court to void two judgments of the Supreme Court of New South Wales, Australia, on grounds that they were procured by fraud, in abject violation of the fundamental rule that a court that supposedly was defrauded *is the court that gets to decide* whether it was defrauded. That rule is obeyed by courts of different districts, states, and nations, whether as a matter of interstate or international comity.

     But the amended complaint is inherently and fatally infirm for many other reasons, including because Plaintiff lacks standing, the Australian judgments preclude this action, Dr. Wright is not subject to personal jurisdiction, the complaint states no legally sufficient claims, and this action is entirely based on allegations of which Plaintiff has no personal knowledge.

To summarize, the complaint alleges that Dr. Wright and Dave Kleiman were involved in the creation of Bitcoin and had an oral "partnership" to mine bitcoins and create intellectual property. It alleges that, after Dave Kleiman died, his share of bitcoins and intellectual property allegedly owned by the purported partnership were improperly taken by Dr. Wright. Plaintiff has no personal knowledge of any of these allegations, because Dave Kleiman kept his involvement in Bitcoin a secret from his family, including Plaintiff. In fact, Plaintiff learned about Dave Kleiman's involvement in Bitcoin *from Dr. Wright*, who emailed condolences to Dave's father after Dave's death, and told him that Dave might have left a legacy in the form of bitcoins on hard drives held by the estate. No good deed goes unpunished.

After seeing Dr. Wright's email, Plaintiff searched for what he hoped was a fortune in bitcoins on his brother's hard drives, only to find that any possible fortune was inaccessible because Dave Kleiman, an encryption specialist, had failed to leave the passcodes the estate needed to access his encrypted hard drives. Unable to access Dave Kleiman's bitcoins, Ira Kleiman trained his sights on Dr. Wright's bitcoins. He then mined internet tabloids for the raw materials needed to cook up his stew of contradictory, absurd, and legally insufficient allegations.

Dr. Wright moves to dismiss the amended complaint because Plaintiff lacks standing to bring his claims, which, are not pleaded with legal sufficiency and are precluded by two prior judgments entered by the Supreme Court of New South Wales, Australia in 2013. Moreover, all of Plaintiff's claims are time barred and there is no personal jurisdiction over Dr. Wright in Florida.

The amended complaint failed to identify a single witness in Florida with personal knowledge of its allegations. In contrast, it identifies at least 19 potential witnesses, companies,

government officials, and documents located in Australia, the purported situs of Dr. Wright's allegedly wrongful conduct. None of those witnesses, companies, government officials, or documents are subject to compulsory process by any court located in Florida. Thus, even if Plaintiff had standing to bring his claims, even if the Court could exercise personal jurisdiction over Dr. Wright, even if Plaintiff had alleged legally sufficient claims, and even if those claims were not precluded by prior judgments of Australian courts, dismissal still would be required on grounds of forum non conveniens and international abstention.

## I.   THE ALLEGATIONS OF THE AMENDED COMPLAINT

Despite a second try, Plaintiff cannot muster a consistent story that makes sense in his amended complaint. By his own admission, he was not involved in any of the events alleged except for communications with Craig Wright from February 11, 2014, to October 9, 2015 (Amended Complaint ("AC") ¶¶ 133-140, 144-147, 150), and, at the time of his brother's death, was not aware of Dave Kleiman's alleged involvement in Bitcoin. *Id.* ¶ 12.[1] We do our best to put Plaintiff's secondhand allegations into an orderly narrative, taking as true—*only* for purposes of this motion—the amended complaint's meatless gruel lightly seasoned with hearsay, stolen emails, information published on unreliable internet web sites, and improperly leaked transcripts of secret Australian government investigative interviews. *See, e.g.*, *id.* ¶¶ 110, 139.

### A.  The Plaintiff

Ira Kleiman is the real-party-in-interest plaintiff ("Plaintiff") here. He is Dave Kleiman's brother and the personal representative of his estate (AC ¶ 49) and recently reincorporated W&K

---

[1] We adopt the amended complaint's use of the term "Bitcoin" to refer to "the protocol, software, and community," and the term "bitcoins" to refer to the "units of exchange." AC ¶ 3, n. 1.

(naming himself its managing member) to use it as a nominal plaintiff in this action.[2] Plaintiff concedes he does not have personal knowledge of the events alleged (*id*. ¶ 12, 181), except for the single Thanksgiving Day 2009 conversation with Dave Kleiman found at paragraphs 58 to 61 (which forms the basis for the hearsay conclusion stated at paragraph 10) and the later communications from February 11, 2014 to October 9, 2015. *Id*. 133-140, 144-47, 150.

### B.  Dr. Wright and Dave Kleiman's Personal Relationship

Dave Kleiman and Craig Wright met online in 2003. AC ¶ 52; Ex. 1 at 26. Both men were interested "in cyber security, digital forensics, and the future of money." *Id*. Ex. 1 at 26.[3] Craig Wright is an Australian computer scientist and businessman who lives in London. *Id*. ¶¶ 3, 50. Dave Kleiman was an IT security expert (*id*. ¶¶ 44-47) who died on April 26, 2013. *Id*. ¶¶ 11, 48. They kept their relationship hidden from most of their family and friends. *Id*. ¶ 12, 135.[4]

### C.  Dr. Wright and Dave Kleiman's Involvement in Bitcoin

The amended complaint suggests that Dr. Wright is "Satoshi Nakamoto," the pseudonymous inventor of Bitcoin, and that Dave Kleiman "was intimately involved in the creation of Bitcoin." AC ¶¶ 51, 154-57. During 2008, Wright asked Dave Kleiman to help in creating the Bitcoin blockchain. *Id*. ¶¶ 55-56. The following year, Dave told Plaintiff that he was helping a "relatively wealthy foreign man" create "digital money." *Id*. ¶¶ 58-61. Plaintiff claims that he "asked Dave why he didn't partner with this wealthy individual;" Plaintiff concluded

---

[2] http://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=flal-l11000019904-dce79b55-176a-4442-93a7-3c8896316aa2&transactionId=l11000019904-re-42d2ae10-fbd1-4902-8f7e-f57e746413cf&formatType=PDF

[3] The quoted language from paragraph 52 is lifted verbatim (without citation) from the *London Review of Books*. AC Ex. 1 at 26. Plaintiff's pleading is replete with cribbing from unreliable internet sources, stolen Australian government transcripts, pilfered hard drives, and hacked emails.

[4] The amended complaint does not allege that the two men ever met in person anywhere or that Wright has ever been in Florida.

from Dave's failure to respond that he was admitting that "they were already partners." *Id.* ¶ 61. The amended complaint alleges that Dr. Wright and Dave Kleiman mined more than a million bitcoins by the time of Kleiman's death (*id.* ¶ 65) and "accumulated a vast wealth of bitcoins from 2009 through 2013" (*id.* ¶¶ 10, 65) but that Dr. Wright told Plaintiff "that no one knew about their collaboration or W&K." *Id.* ¶ 135.

### D.  The Formation and Dissolution of W&K Info Defense and Research LLC

On February 14, 2011, Dave Kleiman formed W&K Info Defense Research LLC ("W&K") in Florida; he was listed as the registered agent and managing member. AC ¶ 69; Ex. 3. W&K has no operating agreement and its "ownership structure is unclear." *Id.* ¶¶ 70, 72. Plaintiff nonetheless alleges that Dave was the sole member of W&K, that Dr. Wright had "some form of" indirect or beneficial ownership interest in it (*id.* ¶¶ 70-71), and that Dr. Wright either did not have any direct voting interest or had a 50% voting interest in W&K. *Id.* ¶ 122. According to Plaintiff, Dr. Wright and Dave Kleiman "created [W&K] to mine bitcoin and develop intellectual property." *Id.* ¶¶ 72-74, 135 (W&K "involved in bitcoin mining"), 143; Exs. 26-28. W&K was administratively dissolved in September 2012. *Id.* ¶ 138.

### E.  Allegations About Business Between Dr. Wright, Dave Kleiman, and W&K

Plaintiff alleges that Wright and Dave Kleiman had a continuous collaboration, mining bitcoins and creating intellectual property from 2009 to April 26, 2013. AC ¶¶ 64, 66, 80, 94. Plaintiff claims that they were business partners from 2008 to February 2011 but that he does not know "the exact structure" of the partnership. *Id.* ¶ 67. He also alleges that, from February 2011 to April 26, 2013, Dr. Wright and Dave Kleiman changed their business arrangement so that they did their joint mining and intellectual property work through W&K. *Id.* ¶¶ 68, 76, 80, 94.

Plaintiff does not know how much intellectual property, or even which intellectual property assets, are attributable to either period or business arrangement. *Id*. ¶ 15, n. 12.

Though not sure how to apportion his claims between time periods, named plaintiffs, or alleged business arrangements (AC ¶ 66, n. 12; ¶ 67; ¶ 79, n. 15; ¶ 112), Plaintiff claims that the value of his lawsuit as of May 14, 2018, is more than $11,427,755,046.02 and that his claim was worth more than $27,332,125,781.93 at an earlier date. *Id*. ¶ 7.

### F.  The Alleged Scheme to Obtain Bitcoins and Intellectual Property

The gravamen of Plaintiff's claim is that Dr. Wright "perpetrated a scheme" (the "Scheme") to take "bitcoins and intellectual property owned by Dave and/or W&K . . ." (AC ¶¶ 12, 95) to steal them (*id*. ¶ 7), or "to try and justify certain tax positions he claimed in Australia" (*id*. ¶ 96), or maybe both. Plaintiff alleges that Dr. Wright executed the Scheme after Dave Kleiman's death on April 26, 2013. *Id*. ¶ 95 [and heading above]. According to Plaintiff, the Scheme consisted of wrongful acts by Dr. Wright, who is alleged to have:

1.      "forged a series of contracts" and backdated them, *id*. ¶¶ 13 and 89;

2.      made false statements to Ira Kleiman, *id*. ¶¶ 14-15 [and heading above], ¶ 32;

3.      filed two lawsuits in Australia to "launder the stolen title" to W&K's intellectual property, *id*. ¶ 117 [and heading above];

4.      revived W&K "to ensure he had control over it if necessary." *Id*. ¶ 138.

We summarize the allegations about these matters in turn below.

### 1.  The Allegedly Fabricated Contracts

The amended complaint alleges that, to accomplish the Scheme, Dr. Wright created a "fraudulent 'paper trail'" to establish that Dave Kleiman transferred bitcoins and intellectual property to him by drafting and backdating at least three contracts, and forging Dave Kleiman's

signature on at least two of them. *Id*. ¶ 97; *see also* ¶¶ 99-102 (alleging "forged" electronic signatures). The three contracts (the "Contracts") are attached to the amended complaint. *Id.* Exs. 5, 10, and 15. The first was an April 2011 deed between Dr. Wright and W&K entitled "Intellectual Property License Funding Agreement" (the "Deed"). *Id*. Ex. 10 at 2-3, 5 [¶ 1]. Under the Deed, Dr. Wright (1) transferred 215,140 bitcoins to W&K (*id.* Ex. 10 at 3 [¶ F]), (2) loaned hardware to W&K that it could use to mine bitcoins at an anticipated rate of 12,000 bitcoins (or "BTC") per month (*id.* Ex. 10 at 4 [¶¶ L, P]), and (3) licensed intellectual property to W&K, including software that W&K could improve and use in the course of its business "in Australia and/or Overseas . . . ." *Id*. Ex. 10 at 3 [¶ B-C, H-J], 7 [¶ 3], 9 [¶ 5]. The Deed values the software at 20 million AUD. *Id.* Ex. 10 at 7 [¶ 3].

The Deed required W&K to repay Dr. Wright 250,000 BTC by June 30, 2013, another 50,000 BTC by December 30, 2013 (*id.* Ex. 10 at 7 [¶ 3(a)-(b)]) and assign and transfer to Dr. Wright all "right title and interest to the improvements" to the software, "including all claims as they relate to the improvements." *Id.* Ex. 10 at 5 [¶ 1(e)]; 9 [¶ 5]. The Deed has choice-of-law and forum-selection clauses selecting the law of New South Wales, Australia, and specifying that the parties agreed to "submit to the non-exclusive jurisdiction of the courts of that state." *Id*. Ex. 10 at 6 [¶ 2].

The parties to the second contract are Dr. Wright, W&K, and Dave Kleiman. *Id.* Ex. 5. It is entitled "Contract for the Sale of Shares of a Company Owning Business," and is dated April 2, 2013 (the "New Venture Contract"). *Id.* Ex. 5 at 2-3. Like the Deed, the New Venture Contract includes choice-of-law and forum-selection clauses selecting the law of New South Wales, Australia, and specifying that the parties agreed to "submit to the non-exclusive jurisdiction of the courts of that state." *Id.* Ex. 5 at 4 [¶ 1].

The New Venture Contract reduces W&K's repayment amount under the Deed by 49,500 BTC (*id.* Ex. 5 at 5 [¶ 2(c)]) and creates a framework for a future venture in Australia between Dave Kleiman and Dr. Wright called Coin-Exch Pty Ltd ("Coin-Exch"). *Id.* Ex. 5 at 5 [¶ 4(b)-(d)]. It specifies that Kleiman would receive a 49.5% interest in Coin-Exch under the New Venture Contract, in exchange for transferring his shares in W&K and 323,000 BTC to Dr. Wright, who then would transfer them to Coin-Exch as capital. *Id.* Ex. 5 at 5 [¶ 4(b)-(c)].

The other allegedly fabricated contract is entitled "Deed of Loan" dated October 23, 2012. *Id.* Ex. 15. Plaintiff alleges the Deed of Loan demonstrates conflicts between the three contracts. *Id.* ¶ 105-6. Neither Dave Kleiman nor W&K is a party to the Deed of Loan (*id.* Ex. 15), which bears a handwritten note that says: "as agreed, all wallets to be held in UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW." *Id.* Ex. 15 at 9. The Deed of Loan has a choice-of-law clause selecting the law of the Seychelles (*id.* Ex. 15 at 3 [¶ 6]) and states that the signatories executed the contract in Ho Chi Minh City, Vietnam, and New South Wales, Australia. *Id.* Ex. 15 at 6.

Plaintiff alleges that, "on their face, these contracts are demonstrably fraudulent . . ." (*id.* ¶ 98) and in the following paragraphs purports to demonstrate the facial fraudulence of the Contracts. *Id.* ¶¶ 99-110. Neither the amended complaint nor the Contracts state that any of the Contracts were drafted, executed, backdated, forged, or designed for fraudulent purposes in the Southern District of Florida or, indeed, in the United States.

### 2. *The Judgments Rendered by the Supreme Court of New South Wales, Australia*

Dave Kleiman died before the New Venture Contract's deadline for W&K to repay Dr. Wright for the bitcoins he had transferred to W&K through the Deed and to transfer his interests in the 323,000 BTC to Wright as capital for Coin-Exch. *Id.* ¶ 11; Ex. 5 at 3 [¶ 2(c)-3(a), ¶ 4(a)].

The amended complaint alleges that Dr. Wright filed a statement of claim against W&K on July 25, 2013, in the Supreme Court of New South Wales, case number 2013/225983 (the "First Australian Lawsuit"). *Id*. Ex. 11 at 8 [¶ 3]. This First Australian Lawsuit states that, by a contract dated October 27, 2008, W&K agreed to pay Dr. Wright for property and consulting services to complete research. *Id*. at 9 [¶ 3]. The "contract was executed with an agreement that all created Intellectual property reverts to the ownership of [Wright] with interest if the project concludes without the assignment of shares in [W&K]." *Id*. at 10 [¶ 7].

On November 6, 2013, the Supreme Court of New South Wales entered a judgment against W&K in the First Australian Lawsuit, with the consent of the parties, finding that W&K owed Wright 28,254,666.00 AUD. *Id*. Ex. 22 at 5. The court noted "the agreement of the parties that the plaintiff will accept transfer of Intellectual property held by the plaintiff in full and final satisfaction of the judgment." *Id*.

According to Plaintiff, on August 13, 2013, Dr. Wright filed a second statement of claim against W&K in the Supreme Court of New South Wales, case number 2013/245661 (the "Second Australian Lawsuit"). *Id*. Ex. 11 at 2-7. The Second Australian Lawsuit states that Dr. Wright had loaned W&K money and that W&K had defaulted on a contract dated January 8, 2009, by which W&K had "agreed to pay [Wright] for property and consulting services to complete research." *Id*. at 3. The Second Australian Lawsuit alleged that the "contract was executed with an agreement that all created Intellectual property reverts to the ownership of [Wright] with interest if the project concludes without the assignment of shares in [W&K]," and that the "IP is software and code used in the creation of a Bitcoin system." *Id*. at 4. And the Second Australian Lawsuit alleged that W&K was "unable to complete its responsibilities due to

the death of its director, Mr. Kleiman," and, after depreciation for hardware provided to W&K, Dr. Wright was entitled to a judgment of 28,533,016.19 AUD. *Id*.

On August 28, 2013, the Supreme Court of New South Wales entered a judgment in the Second Australian Lawsuit against W&K of 28,534,049.79 AUD in favor of Dr. Wright. *Id*. Ex. 19 at 2; Ex. 22 at 8. The court "note[d] the agreement of the parties that [Dr. Wright] will accept transfer of Intellectual property held by [him] in full and final satisfaction of the judgment." *Id*.

The amended complaint alleges that: W&K was not validly served with the Australian lawsuits (AC ¶ 119); Wright filed a false acknowledgement of claim in each case (*id*. ¶ 120; Ex. 30); and W&K's consent to the Australian Judgments was invalid because of lack of authorized consent. *Id*. ¶ 121; Ex. 19. Plaintiff sets out a litany of what he says are "demonstrably false factual allegations" made to the courts in the Australian Lawsuits. *Id*. ¶¶ 124-131.

### 3. Alleged Communications Between Dr. Wright and Plaintiff

Plaintiff alleges that Wright made contact with the Kleiman family when he emailed Kleiman's father on February 11, 2014, telling him "if you have any of Dave's computer systems you need to save a file named wallet.dat. I will explain what this is later . . . ." AC ¶¶ 132-33, Ex. 23. Plaintiff says he took over the email exchanges with Dr. Wright shortly after the first email. *Id*. ¶ 134. It was in these email exchanges that Dr. Wright alerted Plaintiff to Dave Kleiman's activities, including his bitcoin mining, all of which were unknown to Plaintiff. *Id*. The amended complaint alleges that Dr. Wright told Plaintiff that Dave Kleiman's estate was entitled to and would receive shares in Coin-Exch. *Id*. ¶ 136. He further alleges that he was contacted by the Australian Tax Office (the "ATO") on April 15, 2014. *Id*. ¶ 141. An ATO employee told Plaintiff that the ATO was investigating Dr. Wright and gave him copies of various contracts. These statements and documents from the ATO representative made Plaintiff suspicious. *Id*. ¶ 123, 144.

10

Plaintiff and Wright exchanged emails with proposals and counter-proposals relating to Dave Kleiman's rights to assets. *Id*. ¶¶ 145-49; Ex. 24 at 10-15, 20-21. Plaintiff says that Dr. Wright promised him a multi-million-dollar payment by October 2014 but never paid (*id*. ¶ 149) and then ceased responding to his emails on October 9, 2015. *Id*. ¶ 150.

### 4.  *Reinstatement of W&K*

After the dates of the Contracts, and after the entry of the Australian Judgments, W&K was reinstated on March 28, 2014 by a person named Uyen Nguyen, who—allegedly acting as Dr. Wright's agent—removed Dave Kleiman as W&K's registered agent, listed herself as registered agent, manager, and secretary, and added Coin-Exch Pty Ltd. as director. *Id*. ¶ 139; Ex. 5 at 2. According to Plaintiff, Dr. Wright was the director and controlling mind of Coin-Exchange Pty Ltd. (*id*.) and concealed from Plaintiff the reinstatement of W&K. *Id*. ¶ 140.

On September 23, 2016, W&K was again administratively dissolved. Compl. [D.E. 1] ¶ 61.[5] On April 12, 2018, after learning that Dr. Wright was going to challenge Plaintiff's standing, Plaintiff reinstated W&K, listing himself as managing member.[6]

### G.  Allegations of Fraud on this Court

Plaintiff alleges that Dr. Wright's declaration, filed in support of his motion to dismiss the original complaint, falsely states that he was not involved in W&K. AC ¶¶ 8, 161-62, 165-66, 168. For his argument about inconsistent statements, Plaintiff cites: (1) the affidavit Dr. Wright gave in the Australian Lawsuits "to procure his fraudulent Australian judgements" (*id*. ¶ 163; Ex. 4); (2) documents attached to his Australian affidavit (*id*. ¶ 167); and (3) the "Acknowledgement of Liquid Claims" filings in the Australian Lawsuits. *Id*. ¶ 169.

---

[5] Plaintiff adopts a wide swath of allegations of his first complaint by explicit citation, using that earlier pleading as a sword and incorporating it by reference into this pleading. AC ¶ 160.
[6] *Supra* note 2.

## III.  ARGUMENT

### A.  Plaintiff Lacks Standing

Plaintiff alleges that he has standing to maintain this action because of his role as the personal representative of Dave Kleiman's estate. AC ¶ 1. But he lacks standing for two distinct reasons. First, for the time period after February 2011, the amended complaint makes clear that Dave Kleiman's alleged business relationship was conducted through W&K. *Id*. ¶ 68. Second, for the time period before February 2011, Plaintiff fails to plausibly allege a partnership between Dr. Wright and Dave Kleiman that would support his standing to sue.

 "Standing is 'the threshold question in every federal case.'" *In re Whittle*, 449 B.R. 427, 429 (Bankr. M.D. Fla. 2011) (quoting *Maverick Media Grp., Inc. v. Hillsborough Cnty. Fla.*, 528 F.3d 817, 819 (11th Cir.2008)). A plaintiff must prove that he possesses standing, which is determined as of "the time the plaintiff's complaint is filed." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1340 (11th Cir. 2014).

### 1.   *As Alleged, Only W&K Has Standing to Maintain An Action for Recovery of Intellectual Property Created or Bitcoins Mined After February 2011*

Plaintiff alleges quite specifically that, after February 2011, Dr. Wright and Dave Kleiman "conducted their bitcoin mining activities and intellectual property research and development through W&K." AC ¶ 68. Nowhere does Plaintiff allege that Dave Kleiman had a direct, personal partnership with Dr. Wright from February 2011 until his death in April 2013. (Plaintiff's attempt to allege a partnership for an earlier time period is addressed in the next section.) Thus, the complaint makes crystal clear that only W&K could have standing to assert claims for bitcoins mined and intellectual property created after February 2011.

### 2. Plaintiff Failed to Adequately Allege the Existence of a 2008 to 2011 Partnership Between Dr. Wright and Dave Kleiman

Plaintiff admits that he does not know what business arrangement Dr. Wright and Dave Kleiman had to create intellectual property and mine bitcoins, but he calls it a "partnership." AC ¶ 67 (quotation marks in original). Plaintiff's conclusory allegation that their business arrangement amounted to a "partnership" is insufficient to establish standing to recover purported assets supposedly belonging to it. And an alleged oral "partnership" agreement not reduced to writing is barred by the statute of frauds.

*Plaintiff Did Not Allege Four of the Five Elements Needed to Adequately Allege the Existence of a Partnership*

Plaintiff claims that Dr. Wright and Dave Kleiman were engaged in a partnership from 2008 to 2011 because they "associated to carry on as co-owners of a business for profit." AC ¶ 197. That statement, copied almost directly from Fla. Stat. § 609.8202, is a conclusion of law masquerading as an alleged fact, which does not support the existence of the alleged partnership, let alone state the five elements needed to adequately allege a partnership under Florida law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Under Florida law, a partnership "must arise from a contract that includes all of the following elements: "(1) a community of interest in the performance of the common purpose; (2) joint control or right of control; (3) a joint proprietary interest in the subject matter; (4) a right to share in the profits; and (5) a duty to share in any losses which may be sustained." *Stonepeak Partners*, 231 So. 3d at 553 (quoting *Jackson–Shaw Co. v. Jacksonville Aviation Auth.*, 8 So.3d 1076, 1089 (Fla. 2008)); *Vannamei Corp. v. Elite Int'l Telecomm., Inc.*, 881 So. 2d 561, 562–63

(Fla. 3d DCA 2004) ("[S]uch a contract is an indispensable prerequisite."). "If one element is absent it precludes the finding of a joint venture." *Stonepeak Partners*, 231 So. 3d at 553.

While Plaintiff concludes that Dr. Wright and Dave Kleiman had a partnership, he does not allege they had joint control over the supposed 2008-2011 partnership or that Dr. Wright had a proprietary interest in the bitcoins allegedly mined or intellectual property allegedly obtained as a result of this partnership. Moreover, Plaintiff failed to allege at all that Dr. Wright had "a right to share in the profits" or "a duty to share in any losses" of the supposed partnership. To plead those elements with legal sufficiency, Plaintiff was required to "allege a firm agreement to share in profits and losses in equality or in [a] definite proportion." *Ely v. Shuman*, 233 So. 2d 169, 170 (Fla. 3d DCA 1970). Plaintiff has not alleged a "firm agreement," let alone an agreement that specified how profits and losses were to be shared. *See* AC ¶ 67. Accordingly, the amended complaint fails to adequately allege the existence of the purported 2008-2011 partnership, precluding a finding that Plaintiff has standing to sue on its behalf, and requiring dismissal of Count VI's purported claims for breach of the partnership duties of loyalty and care.

*The Statute of Frauds Bars All Claims Brought on Behalf of the Supposed 2008-2011 Partnership*

A partnership must arise from a contract. *Stonepeak Partners, LP v. Tall Tower Capital, LLC*, 231 So. 3d 548, 553 (Fla. 2d DCA 2017). "Under well-settled Florida law, the statute of frauds bars the enforcement of [an oral] contract when the parties intended and contemplated that performance of the agreement would take longer than one year." *Dwight v. Tobin*, 947 F.2d 455, 459 (11th Cir. 1991). The Court may "infer[] from the 'surrounding circumstances' or the 'object to be accomplished'" whether the parties intended that an oral contact's performance would take more than one year. *Id*.

14

No such inference is required here. Plaintiff alleges the existence of a partnership that lasted more than two years (AC ¶¶ 67, 197) and does not allege the parties ever executed a written agreement for it. Thus, Plaintiff's claims arising from the alleged 2008-2011 partnership, including Count VI for purported breach of the partnership duties of loyalty and care, are legally insufficient and should be dismissed.

### B. Plaintiff Cannot Unilaterally Cause W&K to Sue Dr. Wright Directly and Has Failed to Allege a Derivative Claim Against Dr. Wright

After Plaintiff learned that Dr. Wright would challenge Plaintiff's standing to sue for W&K's purported assets (D.E. 10 ¶ 4), he reinstated W&K by representing to the Florida Division of Corporations that he is W&K's member manager.[7] Plaintiff then amended the complaint and added W&K as a plaintiff in this action. But Plaintiff's own allegations undermine his purported authority to act unilaterally to cause W&K to sue Dr. Wright.

Plaintiff admits uncertainty as to his authority—contrary to his representations to the Florida Department of Corporations—to cause W&K to sue Wright. AC ¶ 70. He concedes that W&K's ownership is "unclear" to him (*id*.), that Dave Kleiman may have owned only 50% of W&K's shares (*id*. ¶ 84), and that Wright may also have been a member of W&K with "a 50% voting interest in it." *Id*. ¶¶ 122, 194. As a 50% owner of W&K or a person with only a 50% voting interest in it, Dave Kleiman would not have had the power to cause W&K to sue Dr. Wright directly, and would only have possessed standing, if any, to bring derivative claims *after* satisfying the statutory requirements for doing so, including a pre-suit demand on W&K to bring direct claims, or by alleging demand futility. *See* Fla. Stat. § 605.0802. Plaintiff did not allege either, thus failing to adequately allege that W&K's claims are properly before the Court.

---

[7] *Supra* note 2.

**C. W&K's Claims Arising from Dr. Wright's Possession of the Alleged[8] Intellectual Property Are Barred by Res Judicata Because They Were Already Decided by the Supreme Court of New South Wales, Australia**

Plaintiff demands that the Court disregard two judgments against W&K rendered by the Supreme Court of New South Wales almost five years ago. Those judgments, entered by a common law court that employs procedural safeguards similar to this Court's, bar and preclude W&K's claims. *See* Expert Affidavit of G. Grieve, attached as Exhibit A, ¶¶ 30-39.

The Supreme Court of New South Wales decided that Dr. Wright is the rightful owner of the intellectual property that Plaintiff now claims is owned by W&K. W&K assigned that intellectual property to Dr. Wright in contracts between them and appeared as a defendant before the Supreme Court of New South Wales in two cases brought by Dr. Wright. In the Australian Lawsuits, W&K conceded that Dr. Wright was the owner of the intellectual property under the contracts and consented to transfer title to Wright, in full and final satisfaction of debts exceeding forty-million (40,000,000) AUD, in the Australian Judgments. Plaintiff's claims are barred by the res judicata effect of the Australian Judgments, which preclude any alleged claims of W&K arising from Dr. Wright's ownership and possession of W&K's intellectual property.

A federal court sitting in diversity applies forum law to determine whether claims are barred by a prior judgment. *Andreu v. HP Inc.*, 272 F. Supp. 3d 1329, 1332 (S.D. Fla. 2017). Under Florida law, claims are barred by a prior judgment if the following "four identities" are present: "1) identity of the thing sued for; 2) identity of the cause of action; 3) identity of the persons and parties to the actions; and 4) identity of the quality or capacity of the person for or

---

[8] The amended complaint fails to describe or identify the intellectual property assets allegedly owned by W&K. Thus, the term "intellectual property," as used in this motion, is not a defined term and shall refer to the "alleged" or "disputed" and unidentified intellectual property assets allegedly owned by W&K.

against whom the claim is made." *ICC Chem. Corp. v. Freeman*, 640 So. 2d 92, 93 (Fla. 3d DCA 1994); *Charles v. Citizens Prop. Ins. Corp.*, 199 So. 3d 495, 496 (Fla. 3d DCA 2016).

### 1. *There is Identity of the Thing Sued For*

The amended complaint seeks damages for Dr. Wright's purportedly wrongful possession of W&K's intellectual property, alleging that Dr. Wright wrongfully obtained the rights to that property in the Australian Lawsuits. *See* AC ¶¶ 130-31, 148. The intellectual property that W&K alleges as a basis for recovery in this action is the same intellectual property that was at issue in the Australian Lawsuits. *Id.* ¶ 179. Thus, there is "identity of the thing sued for."

### 2. *There is Identity of Parties*

As here, Dr. Wright and W&K were the parties to the Australian Lawsuits. AC Ex. 19.

### 3. *There is Identity of Causes of Action*

The test for identity of causes of action is the identity of facts necessary for the maintenance of the actions. *ICC Chemical Corp.*, 640 So.2d at 92. Although this test sounds extremely narrow, it is not. Identity of facts necessary for the maintenance of the actions is properly construed to mean that the evidence used to prove the claims in the second action would essentially be the same as the evidence used to prove the claims in the first action. *See Gordon v. Gordon*, 59 So.2d 40, 44-45 (Fla.), *cert. denied*, 344 U.S. 878 (1952). The legal claims alleged in the second action need not be the same as those alleged in the first. *E.g., Sodikart USA v. Geodis Wilson USA, Inc.*, 2014 WL 3928555, at *2 (S.D. Fla. 2014) ("Florida law does not require the causes of action to be duplicative . . ."); *see, e.g., ICC Chem. Corp.*, 640 So.2d at 92 (fraud claim held barred by res judicata, because the question whether a fax was fraudulent was related to the defense of bad faith and coercion claims in the first lawsuit).

The Australian Judgments against W&K were based on Dr. Wright's allegations that W&K owed him money and had breached other contractual duties. W&K's breach of those duties to Dr. Wright, gave him the contractual right to accept W&K's intellectual property in satisfaction of amounts owed him. Here, W&K alleges it is entitled to damages because Dr. Wright misappropriated W&K's intellectual property, wrongfully took possession of it, and was thereby unjustly enriched, all based on the theory that the contracts between Wright and W&K were invalid because they were fraudulent. To maintain its claims, W&K must re-litigate the validity of the same contracts on which the Australian Judgments are based.

The validity of the contracts at issue was as critical to the Australian Judgments as it would be to W&K's claims here. Their existence and validity are the central issues in resolving the key question in both actions: whether Dr. Wright is the rightful owner of the intellectual property. Because the contracts themselves hold the key to both actions, and because the evidence regarding their validity would be the same here as it was in the Australian Lawsuits, Plaintiff's claims meet the identity requirement.

### 4. *Identity of Quality and Capacity*

Finally, this action is brought against Dr. Wright, who was the plaintiff in the Australian Lawsuits and a party to the contracts he sought to enforce against W&K. W&K appeared in the Australian Lawsuits as a defendant and party to the contracts and conceded the validity of those contracts and its obligation to assign the intellectual property rights to Dr. Wright.

As it did in the Supreme Court of New South Wales, W&K appears here as a party to the contracts with Dr. Wright, but reverses its position on the contracts. In Australia, W&K conceded their validity and enforceability. Now—almost five years later, after being taken over by Plaintiff, who has no personal knowledge of the contracts or W&K's business relationship

with Dr. Wright—W&K is made to allege that the contracts were fraudulent and unenforceable. While W&K reverses its position on the contracts, the capacity in which it participated in the Australian Lawsuits is the same as here. Similarly, if this action were to proceed, Dr. Wright would be forced, once again, to establish the validity and enforce the terms of the contracts that W&K conceded, and the Supreme Court of New South Wales held, were enforceable. Thus, there is identity of the quality and capacity of the persons suing and being sued.

### 5.  *W&K Waived Claims It Did Not Raise in the Australian Cases*

"Res judicata applies to all matters actually raised and determined as well as to all other matters which could properly have been raised and determined in the prior action, whether they were or not." *ICC Chem. Corp. v. Freeman*, 640 So. 2d 92, 93 (Fla. 3d DCA 1994); *Gomez-Ortega v. Dorten, Inc.*, 670 So. 2d 1107, 1108 (Fla. 3d DCA 1996). W&K could have defended Dr. Wright's claim of rights to W&K's intellectual property on all possible grounds, including those it alleges in its amended complaint. Thus, W&K is barred from raising those claims in this action. *Charles v. Citizens Prop. Ins. Corp.*, 199 So. 3d 495, 496 (Fla. 3d DCA 2016) (party that failed to address dispositive issue in prior lawsuit was barred from bringing subsequent action); *Media Placement, Inc. v. Combined Broad., Inc.*, 659 So. 2d 1328, 1328 (Fla. 3d DCA 1995).

### D.  The Court Should Dismiss this Complaint Because of Forum Non Conveniens

Plaintiff chose a forum that is not convenient for the Court, Dr. Wright, or even himself, unless his objective is to obstruct access to relevant evidence and complicate this litigation beyond reason. *See Kolawole v. Sellers*, 863 F.3d 1361, 1369 (11th Cir. 2017) ("'[C]entral purpose'" of forum non conveniens doctrine is "'to ensure that the trial is convenient'") (quoting *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir. 1983)). The amended complaint's allegations are diffuse, scattered, and contradictory, but ineluctably lead to the

conclusion that most, if not all, of the evidence the Court would need to adjudicate the claims brought by Plaintiff lies outside the forum, outside Florida, outside the United States altogether, and is not subject to jurisdiction or compulsory process anywhere in this country.

This action was filed against a citizen of Australia, about alleged conduct in Australia, involving potential witnesses and documents in Australia (including Australian government officials and reports), and requiring the application of Australian law. Even if the purported claims hadn't already been adjudicated by the Supreme Court of New South Wales, this action would belong in Australia (if anywhere). This Court has broad discretion to dismiss an action on grounds of forum non conveniens when "(1) an adequate, alternative forum is available and (2) the public and private factors weigh in favor of dismissal." *Kolawole*, 863 F.3d at 1369. Here, the Supreme Court of New South Wales is an adequate, alternative forum, and the public and private interest factors weigh heavily in favor of dismissal. *See Banco Latino v. Gomez Lopez*, 17 F. Supp. 2d 1327, 1331 (S.D. Fla. 1998) (citing *Piper Aircraft Co.*, 454 U.S. 235, 240 (1981)).

### 1. *The Supreme Court of New South Wales is an Alternate Forum that is Both Available and Adequate*

"Demonstrating the availability of a forum is not an especially onerous burden for a defendant seeking dismissal for *forum non conveniens*." *Kolawole*, 863 F.3d at 1369; *Banco Latino*, 17 F. Supp. 2d at 1331. A forum is available if the defendant is amenable to process there. *See Banco Latino*, 17 F. Supp. 2d at 1331 ("Ordinarily, this requirement will be satisfied where the defendant is amenable to process in the other jurisdiction."). The Supreme Court of New South Wales is an available forum because Wright is amenable to service of process there. *See* Declaration of Craig Wright, dated June 14, 2018 (Exhibit C) ¶ 23; *Grieve* Aff. ¶¶ 49-56; Supplement to G. Grieve Aff., dated June 14, 2018 (Exhibit B) ¶ 5.

An alternate forum is adequate when its remedies are like those available in plaintiff's selected forum. *Kolawole*, 863 F.3d at 1370 (alternate forum adequate where expert testimony showed it could provide substantially similar remedies); *accord Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1314 (11th Cir. 2001); *Banco Latino*, 17 F. Supp. 2d at 1331 (An alternate forum is inadequate when its potential remedy is so "clearly . . . unsatisfactory that it is no remedy at all."); *Cleveland v. Kerzner Int'l Resorts, Inc.*, 2015 WL 5695276, at *5 (S.D. Fla. 2015), *aff'd,* 657 F. App'x 924 (11th Cir. 2016). The Supreme Court of New South Wales—an English-speaking, common-law court that has procedural safeguards like those of this Court—is an adequate forum and its laws provide legal and equitable remedies substantially similar to the remedies available here. *See Grieve* Aff. ¶¶ 57-58; *Grieve* Aff. Supp. ¶ 5.

### 2.  *The Private Interest Factors Overwhelmingly Favor Dismissal*

"The private interests courts may weigh include the 'ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing witnesses . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Kolawole*, 863 F.3d at 1372. Plaintiff has not identified a Florida-based witness with ***any*** relevant evidence or personal knowledge of Plaintiff's material allegations, ***including himself***. *See* AC ¶¶ 12, 181. The only Florida-based evidence the amended complaint cites are some corporate records (*id*. Exs. 3, 25), which anyone with an internet or telephone connection can obtain from anywhere in the world. *See* www.sunbiz.org.

Lacking any Florida-based witnesses or documents and any personal knowledge of his own allegations, Plaintiff relies heavily on online tabloids that purport to provide unlawful leaks of confidential ATO transcripts and stolen or hacked emails. *See* AC ¶¶ 75, 82-84, 110; Exs. 9, 12-13. The complaint also relies on Australian legal documents, including the Australian

Judgments, and the Deed and New Venture Contracts, which require the application of Australian law and contain the parties' agreement to submit any dispute to the jurisdiction of the courts of New South Wales, Australia. *See id.* Exs. 4, 10-11, 15, 18-19, 22, 30. This Court would not have authority to compel Australian citizens, hackers, or thieves, let alone the Australian government, to produce and authenticate confidential documents, or to compel Australian government officials or attorneys to testify about privileged or confidential matters. *See Cleveland v. Kerzner Int'l Resorts, Inc.*, 2015 WL 5695276, at *6, n. 8 (S.D. Fla. 2015), *aff'd,* 657 F. App'x 924 (11th Cir. 2016).

Even if Plaintiff had personal knowledge, he would be the ***only*** potential witness identified in the complaint who is located in Florida. Indeed, in his initial disclosure of individuals he "may use to support [his] claims," he has only two Florida witnesses, Patrick Paige and himself. *See* Pl. Initial Disclosures, attached as Exhibit D. But Plaintiff admited he has ***no personal knowledge*** of the matters at issue, as did Paige, who asked Wright to tell him the "story of how this all played out." *See* AC ¶ 12, 181; Ex. 8 at 4. Four of the other witnesses he lists on his initial disclosures are located outside the United States. Another, Uyen Nguyen, may be in California or in Vietnam. *See* Pl. Initial Discl. ¶¶ A(2), (4)-(6); *Wright* Dec. ¶¶ 3-4, 20(f)-(g). The last witness may be in Illinois. *See* Pl. Initial Discl. ¶ 7; *Wright* Dec. ¶ 20(i).

The amended complaint itself lists 24 potentially relevant witnesses, companies, and trusts (including the purported "Seychelles, Singapore, and UK trusts" (AC ¶ 94)) located outside of the United States, at least 19 of which are in Australia. *Wright* Dec. ¶ 20. Of those 19 potential Australian witnesses, five are current or former Australian government officials. *Id*. ¶ 20(a)-(b), (d), (e), (k). According to the amended complaint, Australian tax officials would be witnesses to statements taken during a confidential investigation they conducted, and potentially

would have access to related documents. *See* AC ¶¶ 75, 79, 82-84, 91, 96-97, 110, 123, 131-32, 141-42, 144, 149, 205, 212; Exs. 9, 12, 18. Those documents are confidential and protected from disclosure by Australian law. *Grieve* Aff. ¶¶ 9-22. Another witness located in Australia is Andrew Sommer, Dr. Wright's Australian attorney. His potential testimony is subject to an attorney-client privilege arising under Australian law.

Thus, even if this Court could compel the potential witnesses in Australia to appear in Florida, it would not have power to compel them to testify about privileged or confidential matters, unless ordered do so by an Australian court applying Australian law. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 242, 258 (1981) (forum non conveniens dismissal is appropriate where necessary witnesses are not subject to compulsory process in the forum.); *Ford v. Brown*, 319 F.3d 1302, 1308 (11th Cir. 2003) ("Perhaps the most important 'private interest' of the litigants is access to evidence."); *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1335 (11th Cir. 2011) (dismissing on grounds of forum non conveniens because district court's inability to compel defendants' "third-party witnesses or the production of documents from those witnesses . . . is both unusually extreme and materially unjust") (internal quotation marks omitted); *Montgomery v. Oberti*, 945 F. Supp. 2d 1367, 1376 (S.D. Fla. 2013) ("[N]o adequate substitute exists for the witnesses' live testimony and that lack of access to [] testimony . . . . strongly outweigh[s] Plaintiff's choice of a United States forum.").

Further, even if this Court could compel the Australian witnesses to appear (it cannot), and an Australian court were to compel them to testify, bringing them here from the other side of the world would be extremely costly and disruptive. Plaintiff, who cites few (if any) sources of evidence in Florida, cannot possibly justify needlessly asking or attempting to compel most of the relevant witnesses to spend more than 24 hours traveling more than 10,000 miles from

Australia to testify in Florida about events that happened in Australia. *See Ford,* 319 F.3d at 1308 (private interest factors supported dismissal where alleged acts occurred in Hong Kong and, as a result, "much of the evidence is likely to be in Hong Kong"). Moreover, this Court could not properly adjudicate any of Plaintiff's claims without disregarding, disrespecting, and undermining the Australian court that rendered the Australian Judgments, and that court's unique interest in determining whether its judgments were entered as a result of a fraud on it. *See Florida Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F. Supp. 2d 1239, 1271 (S.D. Fla. 2004), *aff'd,* 470 F.3d 1036 (11th Cir. 2006).

In contrast, this Court's dismissal of this action on forum non conveniens grounds would not prejudice Plaintiff. The amended complaint demonstrates that even if there is *any evidence* in Florida, it is minimal and easily transferrable to, or obtainable in, Australia. Further, even if this case were to proceed in this Court, Plaintiff would need Australian counsel to litigate, in Australia, the privacy and confidentiality issues arising from confidential communications and evidence located there and exclusively subject to Australian jurisdiction. *Grieve* Aff. ¶¶ 9-22; *Wright* Dec. ¶ 17. Finally, even if it were possible (it's clearly not) for the Court to conveniently adjudicate this case and render a judgment for Plaintiff, he still would need to retain foreign counsel for overseas proceedings to enforce it. *Grieve* Aff. ¶¶ 23-29; *Wright* Dec. ¶ 10.

The competent, common-law courts of Australia would allow Plaintiff to seek similar relief with similar procedural safeguards (*Grieve* Aff. ¶¶ 39, 57-58; *Grieve* Aff. Supp. ¶ 5), and discuss the case with his attorneys and testify in English. The private interest factors overwhelmingly support dismissal.

### 3.   *The Public Interest Factors Overwhelmingly Support Dismissal*

The public interest factors also overwhelmingly support dismissal of this action. They include: "(1) the administrative difficulties stemming from court congestion; (2) the interest in having localized controversies decided at home; (3) the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; (4) the avoidance of unnecessary problems of conflict of laws, or the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981).

The Southern District of Florida is one of the busiest districts in the United States. This action could take years to adjudicate and harshly (and completely unnecessarily) tax the Court's time and resources. *See Kalb v. Marriott Int'l, Inc.*, 2017 WL 6565243, at *4 (S.D. Fla. 2017) ("The Court notes that the Southern District of Florida has one of the busiest dockets in the country, and this factor, thus weighs in favor of dismissal."). Even if this case could be adjudicated here, it would require not only all the time and resources required by a complex local dispute, but an unknown and unknowable additional amount of time and resources arising from the need to obtain almost all of the evidence in Australia, in satellite proceedings subject to Australian law. The likelihood that a case will spawn significant satellite proceedings in a foreign jurisdiction heavily skews the public interest in favor of adjudicating the entire case there. *See Kolawole v. Sellers*, 863 F.3d 1361, 1372 (11th Cir. 2017).

For example, the complaint relies on tabloid reports of alleged admissions by Dr. Wright in documents purporting to be leaked transcripts of a confidential interview conducted by the ATO (AC Exs. 9, 12) so heavily that it tries to base claims on its self-serving interpretation of a purported statement by an ATO auditor about what that auditor may have been led to believe by

an unnamed person. *Id.* ¶ 82. The problems arising from that allegation alone are thorny and potentially insurmountable, because of the limits on the Court's jurisdiction over potential witnesses and documents. Those problems include the near impossibility of obtaining testimony from employees of a foreign sovereign about a confidential investigation. *Grieve* Aff. 7-22.

Plaintiff's claims are based entirely on alleged conduct that occurred outside of Florida, and the allegation that Dr. Wright committed fraud on an Australian court in two lawsuits.[9] The Supreme Court of New South Wales and its judges, who adjudicated the Australian Lawsuits, not only have the right, but are in the best position, to decide whether they were defrauded. *Tr. Int'l Corp. v. Nagy*, 2017 WL 5248425, at \*4–5 (S.D. Fla. 2017). Moreover, asking the Australian witnesses in those cases to appear here so Plaintiff can assail their testimony, then demand that this Court second-guess Australian judges or hold Australian procedures inadequate, would be terribly improper. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 242-43 (1981).

This action is the paradigm of a dispute not localized in Florida that should be adjudicated elsewhere. Ira Kleiman never participated in Dave Kleiman's or W&K's work or even knew about it. He invested nothing, in Florida or elsewhere, in creating Bitcoin, operating W&K, or developing intellectual property. Moreover, Dave's Florida apartment was merely a place where he kept computers that let him conduct international business activities in an international marketplace. AC ¶ 26. Dave Kleiman and Dr. Wright first met online. The amended complaint doesn't allege that Dr. Wright has been to Florida even once in his life. Indeed, Dave Kleiman told Ira Kleiman that he was working with a "*foreign* man" to create "digital money."

---

[9]As a matter of law, a court that allegedly was defrauded is the court that gets to decide if it was defrauded. *E.g., Florida Evergreen Foliage*, 336 F. Supp. 2d at 1271. This rule is ironclad, except in exceedingly rare cases where due process and fundamental fairness are lacking in the other court. *Id*. No allegation that the courts of Australia will not afford Plaintiff due process have (or could have) been made in the amended complaint.

*Id*. ¶¶ 60-61 (emphasis added). That foreign man was an Australian citizen and the foreign

judgments Plaintiff demands to relitigate and set aside were rendered by an Australian court. If

any relitigation is to occur, it should not be in the Southern District of Florida.

> **E. The Court Should Dismiss the Amended Complaint on Grounds of International Abstention Because This Dispute Was Adjudicated in 2013 by the Supreme Court of New South Wales, Australia**

The Supreme Court of New South Wales entered the Australian Judgments in 2013.

W&K appeared before the Supreme Court of New South Wales in both cases and conceded that

it owed Dr. Wright two contractual debts, each exceeding 20 million AUD. In his statements of

claim for the First and Second Australian Lawsuits, Dr. Wright alleged that under the contracts,

W&K agreed that "all created intellectual property reverts to the ownership of [Dr. Wright] with

interest if the project concludes without assignment of shares in [W&K]." AC Exs. 11 at 4, 10. In

each of the Australian Judgments, the Supreme Court of New South Wales noted "the agreement

of the parties that [Dr. Wright] will accept the transfer of Intellectual property held by [Dr.

Wright] in full and final satisfaction of the judgment." *Id*. Ex. 19 at 2, 5. In the Australian

Judgment concluding the First Australian Lawsuit, the court ordered that the "deed of transfer for

the Intellectual Property is to be completed before 01 Sept 2013." *Id*. Ex. 19 at 4.

Plaintiff alleges that Dr. Wright obtained the Australian Judgments by committing a fraud

on the Australian courts. AC ¶¶ 120-24, 129, 130-31. Plaintiff demands that this Court review

and void those judgments, substituting its own findings for those of the Supreme Court of New

South Wales rendered almost five years ago. The Court should abstain from this intrusion on the

sovereignty of Australia and its courts and should allow the Supreme Court of New South Wales

to decide whether its findings and judgments were correct, or whether a fraud was committed on

it.

27

Abstaining on grounds of international comity promotes: "(1) a proper level of respect for the acts of our fellow sovereign nations—a rather vague concept referred to in American jurisprudence as international comity; (2) fairness to litigants; and (3) efficient use of scarce judicial resources." *See Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994). Below, we demonstrate that the criteria relevant to these principles, *e.g., Tr. Int'l Corp.*, 2017 WL 5248425, at *4–5, all support abstention here.

### 1. Abstention Advances the Goal of International Comity with Australian Courts

The United States and Australia have long acknowledged and respected each other's legal systems and judgments. *See, e.g., Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 359 (10th Cir. 1996); *Auxer v. Alcoa, Inc.*, 406 F. App'x 600, 603 (3d Cir. 2011). The amended complaint did not and could not allege otherwise. Whether abstention advances the principle of international comity depends on: "(1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (3) whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is repugnant to fundamental principles of what is decent and just." *Turner Entm't Co.*, 25 F.3d at 1518 (internal citation omitted).

### a. The Amended Complaint Does Not Allege that the Australian Judgments Were "Rendered Via Fraud"

For abstention, whether a foreign judgment was "rendered via fraud" has nothing to do with whether a litigant committed a fraud on a foreign court. It concerns only "whether a foreign court was acting fraudulently and is a forum so incompetent in its standards that its procedures cannot be squared with the principles underlying the American legal system." *Tr. Int'l Corp.*, 2017 WL 5248425, at *6. The issue is not "whether the parties have acted deceptively or fraudulently." That is a question that should be answered by the foreign court that rendered the

judgment. *Id.* ("A party can act fraudulently before any court. If Defendant has used the Hungarian legal system in some way which was not above board, then the Hungarian forum was the correct place to address this concern.").

This unexceptional principle drives the unexceptional rule that a court which allegedly was defrauded is the court that gets to decide whether it was defrauded. This is the rule as to judgments of federal courts or the several states. *E.g., Florida Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F. Supp. 2d 1239, 1271 (S.D. Fla. 2004), *aff'd,* 470 F.3d 1036 (11th Cir. 2006) ("[T]he proper forum in which to assert that a party has perpetrated a fraud on the court is the court which allegedly was a victim of that fraud.") (internal quotation marks omitted). It also is the rule as to judgments of foreign courts. In short, courts of (or in) the United States do not look over another court's shoulder to decide whether the other court was defrauded. *Banco Latino v. Gomez Lopez*, 17 F. Supp. 2d 1327, 1332 (S.D. Fla. 1998) ("It is not the business of our courts to assume responsibility for supervising the integrity of the judicial system of another sovereign nation.") (quoting *Blanco v. Banco Indus. de Venezuela, S.A.,* 997 F.2d 974, 982 (2nd Cir. 1993) (internal quotation marks omitted).

Plaintiff alleges that Dr. Wright obtained the Australian Judgments through fraud on the Supreme Court of New South Wales. Whether there is any truth to that claim must be addressed to the court that rendered the judgments. *E.g., Banco Latino*, 17 F. Supp. 2d at 1332. What matters (and is dispositive) for international abstention is that Plaintiff did not (and could not) allege that the Supreme Court of New South Wales "was acting fraudulently and is a forum so incompetent in its standards that its procedures cannot be squared with the principles underlying the American legal system." *Tr. Int'l Corp.*, 2017 WL 5248425, at *6.

> b. *The Australian Judgments were Rendered by a Competent Court in Proceedings Consistent with Civilized Jurisprudence*

The Supreme Court of New South Wales is a competent, English-speaking, common-law court that employs procedural safeguards similar to those of this Court. *See Grieve* Aff. ¶¶ 30-39; *Auxer*, 406 F. App'x at 603 ("[N]umerous federal courts have found Australia to be an adequate alternative forum . . . ."); *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 1992 WL 398446, at *6 (S.D.N.Y. Dec. 21, 1992), *aff'd,* 994 F.2d 996 (2d Cir. 1993) (dismissing claims to be litigated in Australian courts); *Interpane Coatings, Inc. v. Australia & New Zealand Ltd.*, 732 F. Supp. 909, 918 (N.D. Ill. 1990) (dismissing claims to be heard by the Supreme Court of New South Wales).

> c. *The Foreign Judgments Do Not Violate American Public Policy as Repugnant to Fundamental Principles of What is Decent and Just*

A judgment entered on a defendant's unequivocal admission of liability does not violate American or Australian public policy and is not repugnant to fundamental principles of what is decent and just. *See Blanco GmbH ±Co. KG v. Vlanco Indus., LLC*, 992 F. Supp. 2d 1225, 1245 (S.D. Fla. 2014), *aff'd sub nom., Blanco GmbH ±Co. KG v. Laera*, 620 Fed. Appx. 718 (11th Cir. 2015) ("A consent judgment has the same effect as any other judgment rendered by a court."). In the Australian Lawsuits, Dr. Wright alleged that W&K had breached two contracts and that he owned the rights to the intellectual property. AC Ex. 11 at 4, 10. W&K conceded the breaches and Wright's rights to the intellectual property. *Id*. Ex. 19 at 2, 4. The Supreme Court of New South Wales entered the Australian Judgments finding that W&K had breached its contractual obligations, ordered W&K to transfer the deed for the intellectual property to Dr. Wright, and concluded that Wright would accept the intellectual property in full and final satisfaction of the Australian Judgments. *Id.* The Australian Judgments are final adjudications of the Australian Lawsuits on the merits. *Grieve* Aff. ¶ 37.

The Australian Judgments do not violate American public policy or fundamental principles of what is decent and just, because W&K's admissions and consent would have had the same effect before this Court. *See Mil-Tec USA, Inc. v. ABC Tool, Inc.*, 939 F. Supp. 853, 854 (M.D. Fla. 1996) (enforcing consent judgment where defendant admitted that plaintiff was the owner of intellectual property); *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1307 (11th Cir. 2008) (abstaining where foreign court enforced plain language of contract). Moreover, the Supreme Court of New South Wales permits a plaintiff to challenge the validity of judgments allegedly procured through a fraud on the court. *Grieve* Aff. ¶¶ 40-48. Thus, dismissal would not prejudice Plaintiff.

### d.   The Australian Interests Outweigh the American Interests

"Also relevant to considerations of international comity are the relative strengths of the American and [foreign jurisdiction's] interests." *Turner Entm't Co.*, 25 F.3d at 1521. Plaintiff seeks recovery for purported misconduct outside the United States relating to Dave Kleiman's alleged participation in overseas business activities, including allegedly having partnered with a "foreign man," who owned properties in Australia, to create a global, "decentralized digital currency." AC ¶¶ 20, 60-61, 63. Plaintiff alleges that Dave Kleiman stored his share of bitcoins in foreign trusts with the "foreign man" and gave him the private keys for the bitcoins. *Id*. ¶¶ 84, 88, 93-94.

There are no American interests implicated in this action other than Plaintiff's desire for a money judgment, evidently driven by his inability to learn the codes that would unlock Dave Kleiman's Bitcoin wallet. *Id*. Ex. 1 at 38-39; Ex. 8 at 4-5, Ex. 24 at 7-9, 20. On the other hand, there are strong Australian interests in protecting the integrity of proceedings and judgments of Australian courts in cases about an Australian citizen's business interests in Australia, and

Australian government investigations of those interests, including investigations by the ATO. *See Florida Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F. Supp. 2d 1239, 1271 (S.D. Fla. 2004), *aff'd*, 470 F.3d 1036 (11th Cir. 2006); *Piguet v. J.P. Morgan Chase Bank, N.A.*, 2017 WL 1655234, at *3 (S.D. Fla. May 2, 2017); *Manzaro v. D'Alessandro*, 229 So. 3d 843, 845 (Fla. 4th DCA 2017), *review denied*, 2018 WL 507417 (Fla. Jan. 23, 2018). These Australian interests plainly outweigh the solitary, personal interest of an American plaintiff seeking a money judgment for conduct that occurred in a far distant land, half a world away.

### 2.  *Abstention is Fair to the Litigants*

"With respect to the goal of fairness, relevant considerations include: (1) the order in which the suits were filed; (2) the more convenient forum; and (3) the possibility of prejudice to parties resulting from abstention." *Turner Entm't Co.*, 25 F.3d at 1521–22.

#### a.  *The Australian Lawsuits Were Filed First*

The Australian Lawsuits were filed and ended long before this action was started. For this action to proceed, the Court would have to void the Australian Judgments without giving the Australian court its rightful opportunity to decide if it was defrauded.

#### b.  *The Australian Courts are the More Convenient Forum*

As demonstrated above, none of the witnesses and relevant documents are found in Florida, except for corporate records that can be accessed by phone or online, anywhere in the world. In contrast, the amended complaint lists at least 19 potentially relevant witnesses and companies located in Australia. Of those, five are current or former employees of the ATO. The Court lacks jurisdiction over those parties and the authority to compel their presence here. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 242 (1981) ("[B]ecause crucial witnesses and evidence were beyond the reach of compulsory process . . . it would be 'unfair to make [the defendants] proceed

to trial in this forum.'"). Moreover, it would offend principles of fundamental fairness, convenience, and efficiency to require those potential witnesses to travel from Australia to testify in Florida about events that happened in Australia, especially when a competent, English-speaking, common-law court in Australia entered two judgments precluding Plaintiff's claims and would provide Plaintiff the opportunity to be heard on whether those Australian Judgments were, as he alleges, the result of a fraud on the Australian court. *Grieve* Aff. ¶¶ 40-48, 57-58; *see Florida Evergreen Foliage*, 336 F. Supp. 2d at 1271 ("[T]he proper forum in which to assert that a party has perpetrated a fraud on the court is the court which allegedly was a victim of that fraud."); *Banco Latino v. Gomez Lopez*, 17 F. Supp. 2d 1327, 1332 (S.D. Fla. 1998) (internal citation omitted); *accord Tr. Int'l Corp. v. Nagy*, 2017 WL 5248425, at *4–5 (S.D. Fla. 2017).

### c.   There Will be No Legally Cognizable Prejudice to the Parties from Abstention

There will be no legally cognizable prejudice to the parties from abstention, because under Australia's Uniform Civil Procedure Rules, Plaintiff can petition an Australian court to set aside the Australian Judgments (*Grieve* Aff. ¶¶ 39-48), and can bring causes of action that are the same or substantially similar to those in the amended complaint. *Grieve* Aff. ¶¶ 57-58; *Grieve* Aff. Supp. ¶ 5. In contrast, not abstaining would deny Dr. Wright access to potential witnesses and evidence he would need to rebut the allegations against him.

### d.   Abstention Will Promote the Efficient Use of Scarce Judicial Resources

To decide whether abstention will promote efficient use of scarce judicial resources, the Court should consider "(1) the inconvenience of the federal forum, (2) the desirability of avoiding piecemeal litigation, (3) whether the actions have parties and issues in common, and (4) whether the alternative forum is likely to render a prompt disposition." *ITL Int'l, Inc. v. Walton & Post, Inc.*, 741 F. Supp. 2d 1313, 1317 (S.D. Fla. 2010). Here, Dr. Wright has demonstrated the

punishing inconvenience of this forum, because the Court lacks authority to compel any of at least 19 potential witnesses in Australia to appear for trial or even to produce documents. And abstention will promote the policy of avoiding piecemeal litigation. If the Court were to retain jurisdiction, the parties still would have to litigate issues in Australian courts about documents and witnesses that are exclusively subject to its laws and jurisdiction. *Grieve* Aff. ¶¶ 11-29.

The Australian Judgments concluded disputes about Dr. Wright's rights to W&K's intellectual property, the same intellectual property Plaintiff demands this Court find was owned by W&K. The Supreme Court of New South Wales is the proper forum to adjudicate whether the Australian Judgments were entered as a result of a fraud on that court. *See Tr. Int'l Corp.*, 2017 WL 5248425, at *4–5. Moreover, it offers remedies to invalidate fraudulent judgments and can adjudicate W&K's claims without delay. *Grieve* Aff. ¶¶ 39-48, 57-58; *Grieve* Aff. Supp. ¶ 5.

## F.   There is No Personal Jurisdiction Over Dr. Wright

Plaintiff has not adequately alleged specific personal jurisdiction over Dr. Wright under Fla. Stat. §§ 48.193(1)(a)(1), (2), and (6). *Cf.* AC ¶ 6. To establish personal jurisdiction under Fla. Stat. § 48.193(1)(a)(1), Plaintiff was required to allege that Dr. Wright committed a wrongful act in the course of "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." Plaintiff attempted to satisfy that burden by alleging that Dr. Wright worked on certain information technology projects, mined bitcoin, and developed intellectual property with Dave Kleiman and W&K. AC ¶¶ 64-66. Those allegations do not show personal jurisdiction over Dr. Wright because Plaintiff did not and could not allege that Wright performed any of those acts while physically "in this state," Fla. Stat. § 48.193(1)(a)(1), or even in the United States. *Wright* Dec. ¶¶ 5-9, 11-16. On the contrary, he admits that "[a]nyone with internet access can 'mine bitcoin.'" AC ¶ 26.

Moreover, Plaintiff's claims for relief do not "arise from" any alleged work by Dr. Wright on IT projects, the mining of bitcoin, or the development of intellectual property with Plaintiff. Rather, his claims depend on allegations that, after Dave Kleiman's death, Dr. Wright (1) exercised control over bitcoins that Dave Kleiman, W&K, or both held in trusts with Dr. Wright outside of the United States, or the private keys needed to control those bitcoins, which Dave Kleiman allegedly gave to Dr. Wright (AC ¶¶ 93-95), and (2) the rights to intellectual property that Dr. Wright supposedly acquired by committing a fraud on the Supreme Court of New South Wales, which issued two judgments against W&K finding that Dr. Wright is the rightful owner of the intellectual property. *Id.* ¶ 130, Ex. 11. None of those allegations describe acts taken by Dr. Wright in Florida, let alone acts taken in the course of operating, engaging in, or carrying on any business in Florida. Thus, Plaintiff has (again) failed to establish personal jurisdiction under Fla. Stat. § 48.193(1)(a)(1).

Similarly, the amended complaint fails to allege that Dr. Wright "[c]ommitt[ed] a tortious act within this state" under Fla. Stat. § 48.193(1)(a)(2), because every purported wrongful act was alleged to have been committed outside Florida, and there was no allegation (nor could there have been)[10] that Dr. Wright committed any element of an alleged tort in Florida, let alone a "substantial aspect" that was "essential to the success of the tort." *E.g.*, *Live Face on Web, LLC v. Tweople, Inc.*, 2014 WL 12611357, at *2 (M.D. Fla. 2014) (citing *Cable/Home Commc'ns Corp. v. Network Prods., Inc.*, 902 F.2d 829, 857 (11th Cir. 1990)). Plaintiff did not and could not allege that Dave Kleiman ever gave Dr. Wright bitcoins or the private keys needed to use them in the United States, that Dr. Wright is holding the bitcoins or the private keys in the United States, or that Dr. Wright did anything in Florida to obtain the intellectual property. On the

---

[10] *See Wright* Dec. ¶¶ 5-9, 11-16.

contrary, they claim that Dr. Wright was holding the bitcoins in foreign trusts and that he obtained the intellectual property by committing a fraud on the Supreme Court of New South Wales in Australia. AC ¶¶ 84-88, 91-93, 130, Ex. 11. Thus, Plaintiff did not and cannot establish personal jurisdiction under Fla. Stat. § 48.193(1)(a)(2).

Finally, Plaintiff did not and could not establish personal jurisdiction under Fla. Stat. § 48.193(1)(a)(6), because Plaintiff (1) did not sue for physical injury to persons or property, and (2) did not allege that Dr. Wright caused personal injury or physical property damage while "engaged in solicitation or service activities within this state." *RMS Titanic, Inc. v. Kingsmen Creatives, Ltd.*, 2013 WL 12091142, at *4 (M.D. Fla. 2013), *aff'd*, 579 F. App'x 779 (11th Cir. 2014) (Fla. Stat. § 48.193(1)(a)(6) does not apply when the plaintiff alleges "only economic loss unaccompanied by personal injury or physical property damage.").

### G.  Plaintiff's Claims are Time Barred

A four-year statute of limitations period applies to all of Plaintiff's claims except for the misappropriation claims, which are subject to a three-year statute of limitations. 18 U.S.C.A. § 1836(d); Fla. Stat. § 688.007. Based on his allegations, Plaintiff's claims are all time barred.

### 1.  *Plaintiff's Claims for Conversion, Breach of Fiduciary Duty, Unjust Enrichment, and Permanent Injunction are Time Barred*

The Supreme Court of Florida has stated unequivocally that the "delayed discovery doctrine does not apply" to actions for conversion, breach of fiduciary duty, and unjust enrichment, or for a permanent injunction based on those claims. *Davis v. Monahan*, 832 So. 2d 708, 712 (Fla. 2002); *accord Laterza v. JPMorgan Chase Bank, N.A.*, 221 F. Supp. 3d 1347, 1351–52 (S.D. Fla. 2016). Accordingly, Plaintiff's claims would be time barred if they accrued by February 14, 2014, four years before the filing of the complaint. [D.E. 1]. Plaintiff admits that his conversion, breach of fiduciary duty, and unjust enrichment claims accrued in April 2013.

Under Fla. Stat. § 95.031(1), "[a] cause of action accrues when the last element constituting the cause of action occurs." Here, Plaintiff's claims for conversion, breach of fiduciary duty, and unjust enrichment rely on Dr. Wright's alleged theft of bitcoins and intellectual property belonging to Dave Kleiman and W&K. AC ¶¶ 171, 177, 213.

According to Plaintiff, the last act establishing these causes of action occurred when Dave Kleiman died or, at the latest, by November 2013. Plaintiff alleges that Dr. Wright's fiduciary duties to Dave Kleiman arose from business arrangements he had with Dave before his death. AC ¶¶ 64, 67-68. The allegation that Wright breached those duties is predicated on his alleged conversion of the bitcoins and intellectual property. *Id.* ¶ 195, 200. According to Plaintiff, Dr. Wright had possession and control of the bitcoins before Dave Kleiman's death because Dave "shared [with Dr. Wright] the private keys to the bitcoins they mined" (*id*. ¶ 94) and because Wright and Dave held their bitcoins jointly in trusts. *Id*. ¶ 93. Similarly, he alleges that Dr. Wright had the intellectual property by the time Dave Kleiman died (*id.* ¶ 171) and, in any case, by November 2013, when the Australian Judgments were entered. *Id.* Ex. 22. Thus, Plaintiff's claims for conversion, breach of fiduciary duty, and unjust enrichment accrued when Dr. Wright no longer had a right to possess the bitcoins and intellectual property. According to Plaintiff, that was "[o]n or about April 2013" (*id* ¶ 171) or, for the intellectual property, no later than November 2013, by which time Dr. Wright had allegedly completed the Scheme by obtaining the Australian Judgments. *Id.* ¶ 117 (and heading above). In either case, Plaintiff's claims for conversion, breach of fiduciary duty, unjust enrichment, and permanent injunction indisputably accrued before February 14, 2014 and, as a result, are time barred.

### 2. *Plaintiff's Fraud Claims Are Time-Barred Because He Should Have Discovered Them in the Exercise of Due Diligence by February 14, 2014*

Unlike claims for conversion, breach of fiduciary duty, and unjust enrichment, claims for fraud accrue from the time "the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence." Fla. Stat. § 95.031. Accepting the facts as alleged, Plaintiff should have, with almost no diligence, discovered his claim that Dave Kleiman's business partner was wrongfully in possession of Dave's assets.

Plaintiff says that he knew in November 2009 (more than seven years before bringing the complaint) that his brother was in a partnership with "a relatively wealthy foreign man," "working on 'something bigger' than Facebook." AC ¶¶ 58-61. Dave Kleiman told him "that he was 'creating his own money,'" specified that it was "digital money," and showed him the Bitcoin logo that he supposedly was working on with this foreign man. *Id*. ¶¶ 59-61. On Dave Kleiman's death, Plaintiff, as personal representative, was "required by law to pursue assets and claims of the estate." *Bookman v. Davidson*, 136 So. 3d 1276, 1279–80 (Fla. 1st DCA 2014). Like his other claims, Plaintiff's fraud claims are predicated on Dr. Wright's alleged theft of Dave Kleiman's bitcoins and intellectual property. AC ¶¶ 205, 212. Thus, as discussed above, Plaintiff's fraud claims accrued shortly after April 2013.

Plaintiff alleges that Bitcoin was "mainstream" within "mere months" of Dave Kleiman's death (AC ¶ 11), by which time the "wealthy foreign man" had "co-authored a paper on the mechanics of overwriting hard drive data" with Dave Kleiman (*id*. ¶ 53), and posted a tribute to Dave for the whole world to see on his YouTube channel. *Id*. ¶¶ 154, n. 23; *see also* Compl. ¶ 51. Thus, in even the most anemic exercise of due diligence, Plaintiff could have discovered (if he didn't know already) that his brother had created a "digital currency" "bigger than Facebook" that had a logo the same as the one Dave said he was using with the "wealthy foreign man."

Plaintiff had to be on notice that, despite being the creator of this groundbreaking, global currency, his brother did not have the corollary bitcoins or related intellectual property in his possession at his death in April 2013.

Based on the Thanksgiving 2009 story and his allegation that Dr. Wright had the bitcoins and intellectual property within a short time after Dave's death, Plaintiff should easily have discovered his claim that those assets were being held by the "wealthy foreign man." As Dave Kleiman's personal representative, Plaintiff had an affirmative legal duty to do so. Thus, well before February 14, 2014, Plaintiff should have, with the exercise of due diligence, discovered his alleged fraud claims. Thus, Plaintiff's fraud claims are time barred.

### 3. *Plaintiff's Misappropriation Claims are Time-Barred*

Plaintiff brings Counts V and VI under Florida's Uniform Trade Secrets Act ("FUTSA") and the Defense of Trade Secrets Act ("DTSA"). FUTSA's and DTSA's statutes of limitation are three years from the date that an alleged misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C.A. § 1836(d); Fla. Stat. § 688.007. Plaintiff filed the complaint on February 14, 2018, and his misappropriation claims are time-barred if, in the exercise of reasonable diligence, he should have discovered the alleged misappropriation before February 14, 2015. The emails attached to the amended complaint demonstrate that **ten months earlier**, in April 2014, Plaintiff already believed that Dr. Wright had misappropriated W&K's assets, including its intellectual property. *See* AC Ex. 24, at 2-10, 16-20 (documents purporting to be April 2013 email exchanges between plaintiff and Wright in which plaintiff calls Wright's honesty into question and claims **to have evidence of misappropriation**); *id.* Ex. 24 at 20 (Plaintiff's email dated April 23, 2014 stating that he had believed there were "**questionable discrepancies**" in documents provided to plaintiff by ATO,

including discrepancies relating to Department of Homeland Security project in which "trade secrets" purportedly were used.); *id.* Ex. 24 at 6 (Wright's email dated April 23, 2014, responding to plaintiff's email of the same date, stating, "I don't know what you have been led to believe. But I am not trying to take anything from Dave's estate"). Thus, Plaintiff not only should have known, but had reason to know—if not actual knowledge—of the alleged basis for his misappropriation claims more than three years before commencing this action. Accordingly, Plaintiff's misappropriation claims (Counts V and IV) should be dismissed with prejudice.

### H.  The Amended Complaint Fails to State Sustainable Claims

To survive a Rule 12(b)(6) motion, a complaint must make a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a), and giving the defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quote omitted). A complaint must offer more than "labels and conclusions or a formulaic recitation of the elements of a cause of action . . . ." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not do.

#### 1.  *The Complaint's Contradictory Allegations Demonstrate the Impossibility of Granting Any Relief on Plaintiff's Contrived, Implausible Story*

The amended complaint does not allege a coherent or justiciable basis for relief. It tells a tall tale, not only as improperly far-fetched and apparently fabricated as a Rube Goldberg contraption, but also contradicted by Dave Kleiman's own words and undermined by its 469 pages of exhibits. At bottom, it's a prolix, 214-paragraph tangle of confusion and contradictory "alternative pleading" that fails to satisfy *Twombly*.

The Supreme Court has mandated that district judges must scrutinize a complaint at the pleading stage and dismiss it unless it sets forth sufficient factual allegations to establish not just

a claim, but a plausible claim. *Twombly*, 550 U.S. at 544; *see Iqbal*, 556 U.S. at 662. Plausible means more likely than not, and is context specific. *Twombly*, 550 U.S. at 555-56. Alleging a mere possibility of wrongdoing is not enough. Plaintiff must plead facts, not "labels," "conclusions," or "formulaic recitation of the elements" to persuade this Court that a plausible claim exists. *Iqbal*, 556 U.S. at 678. This Court is "not required to 'accept factual claims that are internally inconsistent.'" *McMahon v. City of Riviera Beach*, 2008 WL 4108051, at *3 (S.D. Fla. Aug. 28, 2008) (quoting *Campos v. Immigration & Naturalization Serv.*, 32 F.Supp.2d 1337, 1343 (S.D. Fla. 1998)).

A district court's first order of business is to scrub the complaint of legal conclusions and conclusions masquerading as "facts," because neither are entitled to any weight. *See Iqbal*, 556 U.S. at 678-79. After cleansing the complaint of legal conclusions, the court must "draw on its judicial experience and common sense," and determine whether the plaintiff alleged a plausible claim, and whether alternative explanations of innocence are more likely than plaintiff's allegations of wrongdoing. *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) ("[T]he court's assessment of the pleadings is context-specific, requiring the reviewing court to draw on its judicial experience and common sense."). This analysis depends on the full factual picture, not facts in isolation, and a complaint should be dismissed if it cannot support a plausible claim or its alternative explanations make its claim unlikely. *See Twombly*, 550 U.S. at 570 (Plaintiffs failed to nudge their claims across the line from conceivable to plausible where defendants offered obvious alternative explanations.); *Iqbal*, 556 U.S. at 680 (underlying facts of alleged wrongdoing were more compatible with, and more likely explained by, lawful conduct).

Plaintiff asserts that, after Dave Kleiman died, Dr. Wright wrongfully took possession and control of Dave Kleiman's bitcoins. AC ¶ 12. Plaintiff says Dr. Wright got control of those

bitcoins because Dave Kleiman and Dr. Wright shared the private keys needed to use and control each other's bitcoins (*id.* ¶ 94), and that, on Dave's death, Dr. Wright executed "an elaborate scheme to assert dominion over Dave's and W&K's bitcoin and intellectual property" that includes fabricating the Contracts and getting the Australian Judgments by defrauding the Supreme Court of New South Wales. AC ¶¶ 93, 96, 115.

Plaintiff's story is contradicted by Dave Kleiman's own emailed words, which confirm the validity of the Deed and the New Venture Contract that Plaintiff claims are fraudulent. In the Deed, dated April 22, 2011, Dave Kleiman agreed to (1) repay 300,000 bitcoins loaned to him by Dr. Wright, (2) use Dr. Wright's intellectual property, and (3) assign all "right title and interest to the improvements" to that intellectual property to Dr. Wright. *Id.* Ex. 10 at 3-4, 9. Almost three years later, on April 2, 2013, Dr. Wright and Dave Kleiman executed the New Venture Contract, which established the framework for a new Australian venture between them called Coin-Exch. *Id.* Ex. 5 at 5. The New Venture Contract stated that Dave Kleiman's 300,000-bitcoin debt to Dr. Wright under the Deed would be reduced to 250,500 BTC due to the "rise in the value of Bitcoin," and that the 250,000 BTC, "when taken in conjunction with the supply of the software" (i.e. the now-improved) intellectual property described in the Deed), "will suffice to fulfil" the Deed. *Id.* The 250,000 BTC payment was due on April 30, 2013, along with Dave Kleiman's "323,000 remaining 'mined' Bitcoin as a 49% stake in a new venture to be formed in Australia [to be called Coin-Exch Pty, Ltd. (hereinafter "Coin-Exch.")] between [Dave Kleiman] and [Dr. Wright] for the exploitation of the joint and to be pooled Bitcoin." *Id.*

In a February 2, 2013 email to Wright (AC Ex. 4 at 24), Dave Kleiman wrote, "Once Coin-Exch is setup on your end, I will transfer the 300k BTC and the software as agreed." *Id.* Dave said also that he had mined bitcoin "under a 'Ficticious [sic] name registration' with

42

Sunbiz," urged Wright "to move quick" because the price of bitcoin "is on the rise and I see $200 by 30 Apr," and told Wright that once he had "the company setup in Au, I will transfer the extra with your amount." *Id.*

Thus, Dave Kleiman's February 2, 2013 email confirmed (1) that he was eager to establish Coin-Exch in Australia, (2) and owed Dr. Wright the 300,000 BTC referenced in the Deed and earlier contract, together with an extra amount, while also (3) demonstrating that Dave Kleiman and Wright had agreed to the April 30, 2013 settlement date of the New Venture Contract, and (4) explaining the reasoning behind the New Venture Contract provision that reduced the 300,000 BTC debt to 250,500 BTC because of the "rise in the value of Bitcoin." AC Ex. 5 at 5. Moreover, and contrary to Plaintiff's allegations, the email shows that Dave Kleiman either did not mine all his bitcoins through W&K after 2011, or that W&K was merely his own "'[f]icticious [sic] name registration' with Sunbiz," not a partnership with Wright.

Dave Kleiman's February 2, 2013 email, standing alone, undermines the plausibility of Plaintiff's claims and supports their dismissal. But even if the Court did not have Dave Kleiman's own words, Plaintiff's claims should be dismissed because they are based on allegations that are absurd, inexplicable, and contradictory, and cannot be reconciled with the exhibits on which they purportedly are based. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."); *Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) (affirming dismissal of complaint where exhibits refuted the plaintiff's "conclusory and speculative allegations," which were based in part on the exhibits); *accord Berry v. U.S. Bank Nat'l Ass'n*, 2015 WL 11233192, at *1 (S.D. Fla. 2015).

Plaintiff alleges that Dr. Wright fabricated the Deed and New Venture Contract to obtain and justify control over the bitcoins and intellectual. But Plaintiff also alleges that Dr. Wright **already had control of the bitcoins** when Dave Kleiman died, because he and Dave purportedly held **and shared the private keys** needed to access the alleged jointly-owned bitcoins. *Id.* ¶¶ 84, 86, 88, 93-94. After Dave Kleiman died, it is not plausible that Dr. Wright would have gone to the trouble of fabricating deeds and contracts to obtain control of bitcoins **if he already had the private keys**, because **he could have transferred those bitcoins anywhere, at any time**.

Even if it made a lick of sense to allege that Dr. Wright would fabricate contracts to obtain or justify control of bitcoins **he already controlled**, a glance at the Joint Venture Contract that Dr. Wright purportedly fabricated also demonstrates the fatal implausibility of that theory. Plaintiff alleges that Dr. Wright fabricated the Deed and New Venture Contract after Dave Kleiman died on April 26, 2013. *Id.* ¶¶ 6-7; 76. But the purportedly fabricated New Venture Contract has a settlement date of April 30, 2013, four days after Dave died. *Id.* Ex. 5 at 5. A rational tortfeasor fabricating a contract would choose a settlement date **before** the other party's death, to avoid all conceivable issues about the contract's obligations surviving the other party's death. Thus, Plaintiff's claims are based on the allegation that Dr. Wright gained control of bitcoins he already controlled, by fabricating a contract with a settlement date that would have complicated his contractual right to gain or justify control of the bitcoins.

But that's not all. After Dr. Wright allegedly fabricated the Deed and New Venture Contract to obtain or justify gaining control of assets he already controlled, Plaintiff alleges that Dr. Wright filed the Deed in support of claims he brought against W&K in the Australian Lawsuits. AC Ex. 4 at 10. The Australian Judgments attached to the amended complaint, however, show that Dr. Wright accepted his own intellectual property in full satisfaction of his

claims arising from the Deed, ***forgoing any rights to the bitcoins*** that Plaintiff claims Dr. Wright purloined, and is keeping, from Dave Kleiman's estate. *Id.* Ex. 22 ¶¶ 5, 8.

Plaintiff evidently realizes that alleging that Wright waived his right to bitcoins Dave Kleiman owed him is inconsistent with alleging that he fabricated the Deed to justify his "possession" of the bitcoins. Plaintiff tries to reconcile this inconsistency by saying that Wright filed the Australian Lawsuits to bolster a tax position he had taken in filings with the ATO. AC ¶¶ 96, 110, 132. But, assuming that were true, Plaintiff's allegation would not support a claim that he suffered any injury as a result of Dr. Wright's alleged conduct before the ATO. Instead, and at most, this allegation might imply that the ATO would have a claim against Dr. Wright, a claim that cannot be adjudicated in this District (or country), or pursued by this Plaintiff.

Instead of walking away quietly with intellectual property and a fortune in bitcoins, Plaintiff alleges that Dr. Wright tried to cover up his "theft" by emailing Dave and Ira Kleiman's father to tell him about the existence of Dave Kleiman's bitcoins and urge him to preserve the "wallet.dat" files on Dave's hard drives, which would have stored the private keys Plaintiff would need to use Dave's bitcoins. AC ¶¶ 22, 133 [and heading above ¶ 132]. It is absurd to allege that Dr. Wright would have put Plaintiff on notice of bitcoins he already controlled, and just as absurd to allege that Dr. Wright would have urged Plaintiff to go looking for bitcoins that he was trying to steal through some convoluted (and unnecessary) court process. It's even more Rube Goldberg to allege that someone who already had the private keys needed to control the bitcoins would have urged Dave's family to preserve a duplicate copy of those private keys on Dave Kleiman's hard drives instead of standing idly by until those hard drives were discarded.

Plaintiff also attaches emails to the amended complaint showing that Dr. Wright told Plaintiff about Dave Kleiman's shares in Coin-Exch, offered to make Plaintiff a director of Coin-

Exch, and offered to buy his shares in Coin-Exch. AC Ex. 24 at 12, 19-21. Those emails and the email to Dave Kleiman's father urging him to preserve the bitcoin files on Dave's hard drives contradict Plaintiff's allegations that Dr. Wright schemed to conceal the bitcoins he supposedly was trying to steal (over which he incongruously already had control). Plaintiff attempts to justify that contradiction with another implausible tale.

The amended complaint alleges that Dr. Wright told Plaintiff about the bitcoins and Coin-Exch only because Dr. Wright expected the ATO to contact Plaintiff in connection with its investigation of Dr. Wright. Thus, according to amended complaint, Dr. Wright contacted Plaintiff to help him "justify various tax positions he took in Australia." AC ¶ 132 [and heading above]. Even if this incongruous assertion could have been true, it would not support a claim for the damages Plaintiff pursues. At most, Plaintiff alleges that Dr. Wright gave him shares in Coin-Exch in the hopes that doing so would cause Plaintiff to help Dr. Wright justify tax positions he made in Australia, which might support an ATO claim against Dr. Wright in Australia, but cannot support a claim that could be brought by this Plaintiff anywhere, including this District.

The amended complaint simply makes no sense. Plaintiff nonetheless demands the Court accept its contradictory and implausible allegations in place of the simple, rational, and logical explanation that actually is supported by the exhibits—namely, that Dave Kleiman's email confirms the validity of the Deed and New Venture Contract, and that he died before giving Dr. Wright the private keys needed to control the bitcoins he had committed to Coin-Exch. AC Ex. 4 at 24.  Knowing that the private keys existed, and that he did not have them, Dr. Wright encouraged Plaintiff to preserve Dave Kleiman's hard drives so Dave's family could recover the bitcoins from those drives or retrieve them when technology evolved sufficiently to crack Dave's encryption.

This action would be due for dismissal even if it were based on the claims of a plaintiff who purported to have personal knowledge of his unbelievable allegations. But here, Plaintiff admits he has no personal knowledge and has made up an implausible story that defies logic and common sense, which is contradicted and undermined by the exhibits on which the amended complaint relies. It should be dismissed for that reason alone.

### 2. The Amended Complaint Fails to Adequately Allege a Claim for Conversion of Bitcoins Because It Did Not (and Could Not) Specifically Identify Any Bitcoins That Were Owned by Dave Kleiman

Plaintiff's conversion claim is legally insufficient because it did not (and could not) specifically identify any bitcoins that allegedly were owned by Dave Kleiman. Conversion is "an unauthorized act which deprives another of his property permanently or for an indefinite time." *Mattocks v. Black Entm't Television LLC*, 43 F. Supp. 3d 1311, 1321 (S.D. Fla. 2014) (citing *Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1291 (11th Cir. 2001)). A plaintiff must allege facts sufficient to show "ownership of the subject property and facts that the other party wrongfully asserted dominion over that property." *Id.*

When money is the subject of a purported conversion claim,[11] a plaintiff must allege "(1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so." *United States v. Bailey*, 288 F. Supp. 2d 1261, 1264 (M.D. Fla. 2003), *aff'd*, 419 F.3d 1208 (11th Cir. 2005). Moreover, conversion of money cannot lie "unless the money is a specifically identifiable fund such as an escrow account, a bag of gold coins, or the like." *In re Mouttet*, 493 B.R. 640, 662 (Bankr. S.D. Fla. 2013). Thus, alleged conversion of

---

[11] As alleged in the amended complaint, Bitcoin is a form of cryptocurrency (AC ¶ 9) and, therefore, bitcoins are a form of money. *E.g., United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014).

fungible money (or bitcoins) is legally insufficient. Money is identifiable where "it is delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit, or where wrongful possession of such property is obtained." *Batlle v. Wachovia Bank, N.A.*, 2011 WL 1085579, at *2 (S.D. Fla. 2011).

The amended complaint does not allege facts to demonstrate that Plaintiff represents the owner of any of the alleged bitcoins. Moreover, the complaint contradicts itself in numerous ways. First, it fails to allege exactly how many bitcoins Dave Kleiman supposedly owned at any time in the past. Second, the complaint alleges that W&K was solely owned by Dave Kleiman, but then alleges, in the alternative, that Dr. Wright also may have been a member of W&K. AC ¶¶ 71, 94. If the allegation that Kleiman is entitled to an unknown percent of some unknown number of bitcoins owned by W&K were accepted as true, then the unknown bitcoins mined by W&K belonged to **both** Kleiman and Dr. Wright. Plaintiff's allegations fail to demonstrate how Plaintiff ever claimed "ownership of the subject property." *Mattocks*, 43 F. Supp. 3d at 1321. For this reason alone, the conversion claim requires dismissal.

The conversion claim also should be dismissed because the amended complaint lacks anything more than a conclusory allegation that the unidentified bitcoins are specific and identifiable, *Bailey*, 288 F. Supp. 2d at 1264, or that Dave Kleiman ever delivered or transferred any specific sum of bitcoins to Wright. On the contrary, the complaint alleges that Kleiman and Wright owned and controlled more than 1,100,000 bitcoins that they purportedly mined and held in trusts outside of the United States. AC ¶¶ 79, 84, 93. Thus, Plaintiff only guesses about whether any of these alleged bitcoins ever belonged to Dave Kleiman, let alone how many or how any of them could represent anything other than fungible money. Plaintiff never could demonstrate which bitcoins belonged to Dave Kleiman, because, according to Plaintiff, he

cannot access the bitcoin wallets on Dave's hard drives, which are encrypted. Thus, there is no way of knowing whether any of the fungible bitcoins Plaintiff alleges were stolen by Dr. Wright are actually on hard drives in Plaintiff's hands.

It is a legal impossibility to specifically identify money or bitcoins that are comingled. *Fla. Desk, Inc. v. Mitchell Int'l, Inc.*, 817 So. 2d 1059, 1061 (Fla. 5th DCA 2002) (Unsegregated money placed in a general operating account not specific and identifiable.). The allegation that the purported "overseas trusts" contained "at least 300,000" bitcoins fails to specifically identify any bitcoins that purportedly were Dave's. AC ¶ 88. The case law is clear: "The fact that the amount is certain does not make an 'identifiable fund.'" *Fla. Desk, Inc.*, 817 So. 2d at 1061; *Walinbay S.A. v. Fresh Results, LLC*, 2014 WL 1259901, at *3 (S.D. Fla. 2014); *Guevara v. Republica Del Peru*, 2008 WL 11333432, at *3 (S.D. Fla. 2008). Because Plaintiff fails to allege that any of the purported bitcoins were specifically identifiable or that Dave Kleiman had exclusive ownership of any identifiable bitcoins, the Court should dismiss Count I.

### 3. Plaintiff Failed to Adequately Allege a Claim for Constructive Fraud Because He Failed to Adequately Allege the Existence of a Fiduciary Relationship Between Dr. Wright and Plaintiff

To state a claim for constructive fraud, Plaintiff was required to adequately allege the existence of a fiduciary or confidential relationship. *Am. Honda., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005). "A fiduciary relationship exists when there is a relationship of trust and confidence between parties, where confidence is given by one and trust is accepted by the other." *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 509–10 (S.D. Fla. 2000). It is not enough to allege that the plaintiff placed "trust and confidence" in the alleged fiduciary; the plaintiff must also allege that the fiduciary "recognized, accepted, or undertook the duties of a fiduciary—that of advising, counseling, and protecting."

*Amoco Oil Co.*, 125 F. Supp. 2d at 509–10; *Hogan v. Provident Life & Acc. Ins. Co.*, 665 F. Supp. 2d 1273, 1286–87 (M.D. Fla. 2009) ("[T]he plaintiff must allege both that the plaintiff placed trust in the defendant and the defendant accepted that trust."); *accord Lanz v. Resolution Tr. Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991). Merely reciting the elements of a fiduciary relationship does not "plausibly establish a fiduciary relationship." *Hogan v. Provident Life & Acc. Ins. Co.*, 665 F. Supp. 2d 1273, 1286–87 (M.D. Fla. 2009).

Plaintiff says that "a fiduciary relationship existed between . . . Craig and Ira," "Craig invited . . . Ira's utmost trust and loyalty," and Ira "reposed the utmost trust and loyalty in Craig." AC ¶ 206-08. This recital of some of the elements of a fiduciary relationship is unsupported by allegations of fact and would be legally insufficient even if the recital was complete. It is not complete because Plaintiff did not identify the fiduciary relationship that Dr. Wright purportedly breached other than to say that it was a "fiduciary" one, let alone allege that Dr. Wright ever "recognized, accepted, or undertook" any fiduciary duties to Ira Kleiman or W&K after Dave Kleiman died. Moreover, Plaintiff's claim that he put his "utmost trust and loyalty" in Dr. Wright is contradicted by Plaintiff's unequivocal admission that he did not trust Dr. Wright. AC Ex. 24 at 17. Accordingly, Plaintiff's claim for constructive fraud should be dismissed.

## IV.  CONCLUSION

For these compelling reasons, the Court should dismiss the amended complaint.

RIVERO MESTRE LLP
*Attorneys for Craig Wright*
2525 Ponce de Leon Boulevard,
Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: jmestre@riveromestre.com
Email: arolnick@riveromestre.com
Email: dsox@riveromestre.com
Email: receptionist@riveromestre.com

By: s/ Andres Rivero
ANDRES RIVERO
Florida Bar No. 613819
JORGE A. MESTRE
Florida Bar No. 88145
ALAN H. ROLNICK
Florida Bar No. 715085
DANIEL SOX
Florida Bar No. 108573

## CERTIFICATE OF SERVICE

I certify that on June 15, 2018, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

s/ Daniel Alvarez Sox
Daniel Alvarez Sox