**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

       Plaintiffs,

v.

CRAIG WRIGHT

       Defendant.

**CASE NO.: 9:18-cv-80176-BB**

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

## **<u>REQUEST FOR HEARING</u>**

Pursuant to Local Rule 7.1(b)(2), Plaintiffs respectfully request a hearing before this Court on their Opposition to Defendant's Motion to Dismiss. This matter involves the rightful ownership of billions of dollars' worth of digital assets. Plaintiffs respectfully believe oral argument may assist the Court in better understanding the factual and legal issues before it. Plaintiffs estimate that forty minutes will be sufficient.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

   I)   Bitcoin ...................................................................................................................... 2

   II)  The parties' involvement with the creation of Bitcoin ...................................... 2

   III) Craig steals the assets of Dave's estate after his death .................................... 3

   IV) Months after Craig commits his grand theft, he takes steps to cover it up and lull the estate's suspicions................................................................................. 3

   V)  Craig flees Australia to London and ousts himself and Dave as Satoshi Nakamoto .. 4

ARGUMENT ...................................................................................................................... 5

   I)   Both Ira Kleiman and W&K have standing to bring these claims............................. 5

      A)  The Amended Complaint states a claim for breach of partnership................................. 5

      B)  Dave's estate can cause W&K to sue .................................................................... 7

   II)  This Court has personal jurisdiction over Craig ................................................... 8

      A)  Craig committed multiple tortious acts in Florida by causing injury here ...................... 8

      B)  Craig committed tortious acts in Florida by sending communications into Florida to further his fraud ......................................................................................... 13

      C)  Craig engaged in business within Florida............................................................ 13

   III) This Court should not dismiss this action under forum non conveniens................... 16

      A)  There is a strong presumption in favor of Plaintiffs' home forum. .............................. 16

      B)  The private interest factors don't favor dismissal.................................................... 19

      C)  The public interest factors weigh strongly against dismissal. .................................... 26

      D)  Litigating this suit in Australia would cause Plaintiffs undue inconvenience and severe prejudice................................................................................................. 29

   IV) This suit is not barred by res judicata ............................................................... 30

      A)  The judgments are void because W&K was not served and thus the Australian court lacked jurisdiction ............................................................................................ 30

      B)  The judgment is void because it was procured by extrinsic fraud................................ 32

      C)  Even if valid, the Australian judgments didn't actually transfer the intellectual property, and involved different things, causes of action, and parties .......................... 34

   V)  There is no basis for abstention on the grounds of international comity ................. 35

   VI) Plaintiffs' claims are timely............................................................................. 38

      A)  Issues of Fact Predominate the Accrual of Plaintiffs' Claims .................................... 39

      B)  Plaintiffs' claims are tolled under the doctrine of fraudulent concealment ................... 40

C)   Craig is equitable estopped from asserting a statute of limitations defense .................. 41

D)   Craig's absence from the state of Florida bars a statute of limitations defense............ 43

**VII) Plaintiffs have plausibly alleged all claims .................................................... 43**

A)   The allegations in the amended complaint are factually consistent............................. 44

1)   Craig cannot use a single, likely forged, email to dismiss Plaintiffs' entire
complaint ............................................................................................ 44

2)   Craig used the fraudulent contracts to justify certain tax credits............................. 45

B)   The Amended Complaint Has Adequately Alleged a Claim for Conversion of
Bitcoins.. ........................................................................................... 46

1)   The complaint sufficiently states a claim for conversion by alleging that Dave and
W&K owned bitcoin and Craig wrongfully deprived him of that bitcoin................ 46

2)   Plaintiffs didn't need to allege the bitcoins were "specific and identifiable" because
bitcoins aren't money and the rule's rationale doesn't apply ................................... 47

3)   The complaint identifies the converted bitcoins with sufficient specificity ............. 48

C)   Plaintiffs adequately allege constructive fraud ............................................. 48

**CONCLUSION ................................................................................ 50**

Plaintiffs Ira Kleiman, as the personal representative of the estate of David Kleiman, and W&K Info Defense Research, LLC ("W&K") hereby respectfully submit this memorandum in opposition to Craig Wright's Motion to Dismiss the Amended Complaint ("AC").[1]

## PRELIMINARY STATEMENT

The estate and W&K bring this suit to recover the digital fortune Craig stole from them shortly after Dave died. Confronted with the fact that Plaintiffs have exposed his years-long fraud, Craig attempts to recast the AC as a "meatless gruel lightly seasoned with hearsay." Yet in advancing this overdone characterization, Craig ignores that the AC's allegations are largely supported by his own admissions. If Craig truly believed this action was comprised solely of "contradictory, absurd, and legally insufficient allegations," he would not have submitted demonstrably false testimony to this Court in an attempt to evade its jurisdiction.[2]

Recognizing his personal jurisdiction arguments lack merit without the support of his false testimony,[3] Craig's present motion tries to focus this Court on Australia by claiming Australian judgments require dismissal based on comity and res judicata and Australian witnesses require dismissal based on forum non conveniens. These arguments are classic red herrings. The Australian judgments are void, but even if valid, over $11 billion worth of bitcoin claims are still unaffected and pending in this Court. Further, the purported Australian witnesses have no knowledge about the issues at the heart of this action, *i.e.*, Craig's relationship with a Florida resident and a Florida LLC, their mining of an incredible number of bitcoins in Florida, their

---

[1] Plaintiffs' opposition uses first names due to the multiple Kleimans referenced.

[2] Notably, both Craig's motion and his new affidavit in support of his motion offer no explanation for the false statements he submitted in his original affidavit. D.E. 24-4.

[3] Craig truncated his personal jurisdictional attack on Plaintiffs' AC from nearly six pages in his original Motion to Dismiss to just over two pages in his present Motion.

development of significant intellectual property in Florida, and Craig's theft of those assets. Craig cannot identify *any* Australian witnesses with *any* personal knowledge of these issues. To the best of Plaintiffs' knowledge, the vast majority of the relevant witnesses in this matter reside either here in the United States or in the United Kingdom. Ex. 1 ¶¶ 12-15. This Court should deny Craig's Motion to Dismiss the Amended Complaint.

## FACTUAL BACKGROUND

### I)  Bitcoin

A central issue in this dispute involves the creation story of Bitcoin – the world's first and most valuable cryptocurrency. AC ¶ 20. Bitcoin was first introduced in October 2008 when "Satoshi Nakamoto" posted a white paper describing it to a cryptography mailing list. *Id.* ¶ 30. In January 2009, Satoshi launched the actual system and mined the first bitcoins. *Id.* ¶¶ 30-32. Satoshi mined approximately 1 million bitcoins. *Id.* ¶ 36.

Bitcoin is a public ledger (known as the *blockchain*), that tracks the ownership of every bitcoin in existence. *Id.* ¶ 20. To hold bitcoins, you must create a *bitcoin wallet*, like a bank account. *Id.* ¶ 21. Each wallet has a unique "*public key*" which functions as its account number, and a unique "*private key*" which acts like the PIN number to access its bitcoins. *Id.* ¶¶ 21-22.

### II)  The parties' involvement with the creation of Bitcoin

Craig admits he and Dave are two of the three people behind the moniker "Satoshi Nakamoto." *Id.* ¶¶ 54-57. On November 26, 2009, Dave corroborated this by telling his brother he was making "digital money" with a wealthy foreign man. *Id.* ¶¶ 58-62.

As detailed in the AC, Craig's multiple admissions paint a clear picture that together, he and Dave (personally and through W&K) mined bitcoin and developed *blockchain* based intellectual property from 2008 until 2013. *Id.* ¶¶ 55-65. His admissions also establish their effort was extremely successful and generated a digital fortune of over 1.1 million bitcoins. *Id.* ¶¶ 82-83.

This case will turn on the details surrounding the exact relationship between Craig and Dave, the extent of their collaboration as the "Satoshi team," the amount of bitcoins they mined in Florida, the type of intellectual property projects Dave created in Florida for W&K, the way they agreed to divide their digital fortune, and the way these assets were actually distributed.

### III)   Craig steals the assets of Dave's estate after his death

Dave was W&K's sole member, though Craig may have maintained an indirect ownership interest in W&K that he subsequently disclaimed. *Id.* ¶ 70-71. The bitcoins mined from 2009-2013 were stored in wallets that Dave and Craig shared the private keys to. *Id.* ¶ 93.

On April 26, 2013, Dave died after a long battle with MRSA. *Id.* ¶ 11. At that time, it seems not many people knew about the extent of their involvement with mining bitcoins or developing blockchain based intellectual property. *Id.* ¶ 12. Craig seized this opportunity and took exclusive possession of the bitcoins and intellectual property they mined/created together. ¶¶ 111-116.

### IV)   Months after Craig commits his grand theft, he takes steps to cover it up and lull the estate's suspicions

After Craig stole the digital assets, he got into trouble with the Australian Tax Office ("ATO") for claiming R&D tax credits he couldn't substantiate. *Id.* ¶ 96; AC Ex. 12. Craig realized he could use his and Dave's work in W&K to substantiate these credits and therefore needed to create a "paper trail" justifying his work and ownership of the intellectual property. AC ¶¶ 95-110.

To that end, he forged contracts purporting to show that Dave and W&K had agreed to pay him hundreds of thousands of bitcoins for services and funding he'd allegedly provided, and that Dave and W&K had "guaranteed" this payment with W&K's intellectual property as collateral. *Id.* Craig set the forged payment due date for a time shortly after Dave had died, thus putting Dave into automatic "default." AC Ex. 5 at 5. He then sued W&K in Australian court for the intellectual property. *Id.* ¶¶ 117-18. He never served W&K with process. *Id.* ¶ 119. Instead, he provided his

address as W&K's service address and filed documents for W&K claiming it had consented to judgment. *Id.* ¶¶ 120-21. The court "noted the agreement of the parties" and entered a *consent* order that Craig used to justify ownership of the intellectual property. *Id.* ¶¶ 130-31.

This was the perfect fraud. Craig had already stolen the bitcoins without anyone knowing. Consequently, the lawsuit allowed him to claim that Dave had died without paying him those already stolen bitcoins, was therefore in default as to the payment, and W&K was therefore obligated to give him the intellectual property.

After the ATO began to investigate his submissions to the Australian Courts, Craig realized they may reach out to the true owners of W&K, Ira. *Id.* ¶ 132. Craig therefore contacted Ira and, to elicit his trust, disclosed he had secretly partnered with Dave to invent Bitcoin, mine bitcoin, and create valuable intellectual property. *Id.* ¶¶ 133-35. To keep Ira from bringing claims on behalf of the estate and going public, Craig lulled Ira into inaction by promising multi-million-dollar payouts. *Id.* ¶¶ 136-37. When the payments did not come on time, he blamed the delay on the ATO investigation. *Id.* ¶ 149. After 18 months of email correspondence, Craig stopped responding to Ira on October 9, 2015. *Id.* ¶ 150.

**V) Craig flees Australia to London and ousts himself and Dave as Satoshi Nakamoto**

In late 2015, two tech publications outed Craig's and Dave's involvement in creating Bitcoin. *Id.* ¶ 154. Shortly thereafter, the ATO raided Craig's home and Craig fled Australia for London. *Id.* ¶ 16. In May 2016, Craig publicly revealed he and Dave created Bitcoin. *Id.*

Craig currently serves as Chief Scientist of nChain, a UK company purporting to be a global leader in research and development of blockchain technologies. *Id.* ¶ 17. He regularly flaunts the financial fruits of his theft on social media and recently bragged he had more money

than the country of Rwanda.[4] To date, Craig has not returned any of Plaintiffs' bitcoins or intellectual property. *Id.* ¶ 18.

## ARGUMENT

### I)  Both Ira Kleiman and W&K have standing to bring these claims

Ira, as the personal representative of Dave's estate, has standing to bring all claims for bitcoins Dave and Craig mined before the formation of W&K. For bitcoins mined after W&K was formed, Ira has caused W&K to sue as its sole member-manager. Ex. 1 ¶ 5.

Craig argues Ira and W&K lack standing because Ira (1) failed to allege the existence of a partnership, and (2) could not "cause W&K to sue Dr. Wright." Both arguments fail as a matter of law. As an initial matter, the estate has standing to bring the rest of its claims (*e.g.*, conversion, misappropriation, fraud, unjust enrichment) whether or not it properly alleged a partnership. Further, Craig's argument that the estate failed to allege a partnership is absurd in light of its allegation of, and attachment of, **Craig's express admission: "we did partner ;).**" AC ¶ 63. Second, Ira has authority to cause W&K to sue because he unambiguously alleged that "Dave was the sole member of W&K," (*id.* ¶ 71) and that "Craig did not have a direct ownership interest in W&K" (*id.* at ¶ 192.) As personal representative, Ira is now the sole member of W&K with authority to control its actions.

### A)  The Amended Complaint states a claim for breach of partnership

The estate has stated a claim against Craig for breach of the duties of loyalty and care arising from Craig's partnership with Dave. *Id.* ¶¶ 197-201. Under Florida law, a *partnership* is defined as "the association of two or more persons to carry on as co-owners of a business for profit,

---

[4] Josiah Wilmoth, '*I've Got More Money Than Your Country': Craig Wright tells Rwanda*, YAHOO! FINANCE (May 24, 2018), available at https://finance.yahoo.com/news/ve-got-more-money-country-144050021.html.

whether or not the persons intend to form a partnership." Fla. Stat. § 620.8202(1). That's all the estate must allege because "the existence vel non of a partnership [is] a question of fact" that looks at the "totality of relevant facts and circumstances" to prove partnership. *Perez v. Hernandez*, 323 So. 2d 4, 5 (Fla. 3d Dist. App. 1975) (finding partnership where testimony reflected the parties partnered including "testimony of witnesses that it was their impression that plaintiff and defendants were partners"); *Matter of Ward*, 6 B.R. 93, 95 (Bankr. M.D. Fla. 1980). Indeed, "[w]ritten articles are unnecessary to create a partnership, and a contract to create a partnership is equally valid even if oral." *Id.*

The estate alleges that "Craig and Dave associated to carry on as co-owners of a business for profit to create Bitcoin, mine bitcoins, and create other blockchain intellectual property." AC ¶ 197. Craig's assertion that this allegation is "a conclusion of law masquerading as an alleged fact" ignores (1) this allegation's clear delineation of what they partnered for and (2) the more detailed allegations that Craig said he and Dave partnered to become "Satoshi Nakamoto," created the Bitcoin protocol together, and therefore mined a fortune of bitcoins together. AC ¶¶ 52-66. Most importantly, his argument fails because he **expressly admitted the partnership existed**. In response to Ira's email about Dave mentioning a possible partnership with Craig, he stated, in no uncertain terms: "We did partner ;)." *Id.* ¶ 63; AC Ex. 2.

Craig's argument that the estate failed to allege the required elements confuses *joint ventures* with *partnership*s. Br at 13. A joint venture is not synonymous with a partnership. *Nautica International, Inc. v. Intermarine USA,* 5 F.Supp.2d 1333, 1342 (S.D. Fla. 1998) (*citing Kislak v. Kreedian*, 95 So.2d 510, 514-515 (Fla. 1957)) ("Florida state law recognizes a distinction between a partnership and a joint venture.") "Formation of a partnership does not require showing that the parties subjectively intended to create a partnership," let along the existence of a "firm agreement."

*Rafael J. Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams*, 856 So. 2d 1, 4 (Fla. 4th Dist. App. 2003). Craig's citations are irrelevant.

Craig's second argument that the statute of frauds bars all claims brought on behalf of the partnership similarly fails. (Br. at 14-15). "The general rule is that an oral contract for an indefinite time is not barred by the Statute of Frauds." *Pittman v. Postco*, Inc., 15-14100-CIV, 2015 WL 12556160, at *3 (S.D. Fla. Dec. 17, 2015). "Only if a contract could not be performed within one year would it fall within the statute." *Id.* But Craig and Dave actually created, released, and mined the first bitcoins in under a year.[5] Craig has pointed to no facts that demonstrate the parties specifically intended to partner for over a year. The statute of frauds is not a viable defense.

B) Dave's estate can cause W&K to sue

Craig claims the estate does not allege authority to cause W&K to sue. But Ira, as personal representative of Dave's estate, had authority under Florida law to reinstate W&K and bring this suit. W&K was formed by Dave and its Articles of Incorporation list him as the sole managing member and registered agent. AC Ex. 3. The AC alleges "Dave was the sole member of W&K," and that "Craig did not have a direct ownership interest in W&K." AC ¶¶ 71, 192. As personal representative, Ira is the sole member of W&K with authority to reinstate it and control its actions.

Further, Craig's only potential defense to Ira's reinstatement is that *he* was a member of W&K and didn't consent. But Craig swore to this Court that he wasn't a member: "I have never been a . . . member [or] shareholder . . . of W&K . . ." D.E. 12-2 at ¶ 12.

Finally, if this Court finds the claims pled on behalf of W&K are more properly situated as derivative claims (they're not), the AC's allegations evince that any demand would be futile. AC

---

[5] Craig first reached out to Dave concerning the idea for Bitcoin in March 2008. AC ¶ 55. They mined the first bitcoins on January 12, 2009. *Id.* ¶ 57.

¶71, n14; D.E. 12-2. Consequently, if necessary, the estate will seek this Court's leave to amend.

## II)   This Court has personal jurisdiction over Craig

When personal jurisdiction is challenged, courts must make a two-pronged inquiry. First, "it must be determined that the complaint alleges sufficient jurisdictional facts to bring the action within the ambit of [Florida's long-arm statute]; and if it does, the next inquiry is whether sufficient 'minimum contacts' are demonstrated to satisfy due process requirements." *Wendt v. Horowitz*, 822 So.2d 1252, 1256 (Fla. 2002). Here, however, **Craig does not raise any constitutional due process issues**,[6] so the only question for this Court is whether Craig's conduct fits within Fla. Stat. § 48.193. It plainly does, as Craig committed torts in Florida and operated a business here. His motion should be denied.[7]

Craig tacitly concedes his personal jurisdiction challenge is meritless. After Plaintiffs exposed the falsity of the sworn declaration he filed to support his original jurisdictional arguments, he removed – **without explanation** – many of the statements in his first declaration (*compare* D.E. 12-2 *with* D.E 33-3) and truncated his personal jurisdictional attack from nearly six pages in his original motion to just over two. *Compare* D.E. 12 at 31-37 *with* D.E. 33 at 34-36.

A)   Craig committed multiple tortious acts in Florida by causing injury here

A defendant is subject to the personal jurisdiction of the Florida courts for any cause of action "arising from" committing "a tortious act within this state." *Fla. Stat.* § 48.193(1)(a)(2).[8]

---

[6] Accordingly, he's waived them. *Herring v. Sec'y. Dept. of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, a arguments raised for the first time in a reply brief are not properly before a reviewing court."); *S.E.C. v. Lauer*, 478 F. App'x 550, 555 (11th Cir. 2012) ("Litigants . . . who only raise issues for the first time in a reply brief, have abandoned those issues.").

[7] On review, Plaintiffs agree jurisdiction cannot be premised on Fla. Stat. § 48.193(1)(a)(6).

[8] § 48.193 (1)(a)(2) was previously codified as § 48.193 (1)(b) without any substantive changes. For purposes of consistency, this brief references all citations to the statute as "(1)(a)(2)."

Craig claims Plaintiffs' allegations don't establish he "committed a tortious act within this state" because Plaintiffs never alleged Craig committed an *element* of the alleged torts, or a "substantial aspect that was essential to the success of the tort," in Florida. Br. at 35.

But "in order to 'commit a tortious act' in Florida, a defendant's physical presence is not required." *Wendt*, 822 So. 2d at 1260. Indeed, the Eleventh Circuit has *repeatedly* held that a court may assert jurisdiction over a "nonresident defendant who commits a tort *outside* of the state that causes injury *inside* the state." *Brennan v. Roman Catholic Diocese of Syracuse New York, Inc*., 322 F. App'x 852, 855 (11th Cir. 2009) *citing Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th Cir. 1999) (emphasis added). The focus of this test is *the place of injury*; jurisdiction is established if injury occurs in Florida. *Id*.

Applying this binding precedent, federal courts in Florida consistently hold that when an out of state defendant commits an intentional tort against a Florida citizen, the defendant has caused the necessary Florida injury and is subject to jurisdiction here. *Canadian Steel, Inc. v. HFP Capital Markets, LLC*, No. 11-23650-CIV, 2012 WL 2326119, at *4 (S.D. Fla. June 19, 2012) (following the "clear weight of binding Eleventh Circuit authority on this question" and holding plaintiffs' established personal jurisdiction under 1(a)(2) solely "on the basis of its allegations that it suffered injury in Florida from Defendants' intentional torts.")

Courts apply this rationale to claims for breach of fiduciary duty. When "an individual breaches a fiduciary duty to a company that has a principal place of business or place of incorporation in Florida the individual is subject to jurisdiction in Florida under . . . §[(1)(a)(2)]." *Elandia Int'l, Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1329 (S.D. Fla. 2010). The same is true for misappropriation. *Stateline Power Corp. v. Kremer*, 404 F. Supp. 2d 1373, 1378 (S.D. Fla. 2005) ("plaintiff alleges defendant "breached his fiduciary duty to the company and

9

misappropriated funds . . . [plaintiff] is a Florida corporation with its principle place of business located [in] Florida . . . As such, any injury suffered by [plaintiff] will be suffered in Florida.")

This Court has applied this rationale to conversion. *Sport Mgmt. Sys., LLC v. Woolley Grp., LLC*, No. 15-CIV-62224, 2016 WL 8793333, at *3 (S.D. Fla. Mar. 23, 2016) (Bloom, J.). In *Sports Mgmt.*, Plaintiff loaned money to defendant when *both* were not Florida residents. Plaintiff relocated to Florida, demanded payment, defendant refused, and plaintiff sued for conversion. Defendant had no other connection to Florida. Nevertheless, this Court applied Eleventh Circuit precedent and held plaintiff's "allegations of conversion [were] sufficient to invoke Florida long-arm statute" because defendant's default "financially injured" plaintiff in Florida, and "would cause harm to Plaintiff that would be suffered in Florida." *Id*. at *3-4.[9]

This approach is pervasive and federal courts throughout Florida find personal jurisdiction under 1(a)(2) when Florida plaintiffs assert the type of intentional torts claims Plaintiffs have, *i.e.,* conversion, breach of fiduciary duty, breach of the duty of loyalty, and fraud. *See e.g.*, *Black v. Bryant*, 905 F. Supp. 1046, 1053 (M.D. Fla. 1995) (intentional torts of fraud, conversion, and civil theft specifically designed to cause harm to Plaintiffs in state of Florida would bring defendant

---

[9] In D.E. 46, at 9, Craig argues his tortious conduct must be directed at, and its effects suffered in, Florida. Assuming that's true, jurisdiction exists. His acts were aimed at Plaintiffs (both Florida citizens) who then suffered in Florida. Inexplicably, Craig cites *Wiggins v. Tigrent, Inc.*, 147 So. 3d 76, 87 (Fla. 2d DCA 2014) a Florida *state court* case that held the defendant did not commit a tort in Florida because "the cause of action—conversion—arose from the alleged withdrawal of funds . . . [and it] occurred . . . where . . . dominion and control over the funds" was gained. *Id*. But as explained above, this test has been **rejected** by the Eleventh Circuit, which directs courts in this circuit to find *the place of injury* to determine whether a defendant committed a tort in this state. *Posner*, 178 F.3d 1209 (recognizing conflict among the state district courts of appeals and rejecting the narrower interpretation of 1(a)(2)). It would be absurd to argue that the place of injury occurred where Craig took possession of the assets; that's where *he* benefitted. But Plaintiffs, both exclusively Floridians, suffered injury in Florida when their Florida funds were stolen by Craig. Moreover, even *Wiggins* concedes jurisdiction might have been possible in the place the funds resided before conversion—in that case, Delaware, and here, Florida. *Wiggins*, 147 So. 3d at 87.

10

"squarely within the confines of Florida's Long-Arm State").[10]

Inexplicably, Craig fails to cite *any* of this overwhelming authority. Other courts have found this type of failure, "disturbing." *Mehlenbacher*, 2005 WL 4585859, at *11 n14.

The AC alleges Craig stole Plaintiffs' bitcoins and intellectual property assets and otherwise defrauded Plaintiffs. Both Plaintiffs are Florida citizens, incorporated here, with their primary place of business here. The AC asserts many causes of action against Craig to recover these assets. But almost all are intentional torts claims sounding in conversion, misappropriation, breach of fiduciary duty, breach of the duties of loyalty and care, and fraud.[11]

---

[10] *VAS Aero Servs., LLC v. Arroyo*, 868 F. Supp. 2d 1374, 1380 (S.D. Fla. 2012) (1(a)(2) satisfied for claims of misappropriation, breach of duty of loyalty, and conversion because defendant's "conduct was intentionally directed at . . . a Florida-based company, and the harm his actions caused was felt primarily – if not exclusively – in Florida."); *HME Providers, Inc. v. Heinrich*, No. 6:09CV2186, 2010 WL 557106, at *3 (M.D. Fla. Feb. 11, 2010) (court bound, under *Posner*, to conclude subsection 1(a)(2) satisfied when an out of state defendant misappropriated trade secrets and converted intellectual property belonging to Florida plaintiff as it caused pecuniary injury in Florida); *Office Depot, Inc. v. Pelletier*, No. 16-81170-CIV, 2016 WL 10932510, at *3 (S.D. Fla. Sept. 8, 2016) (subsection 1(a)(2) satisfied by non-resident defendant's intentional conversion, breach of fiduciary duty, misappropriation, and breach of the duty of loyalty that harmed Plaintiff in Florida); *LS Energia, Inc. v. Geva Eng'g Grp.,* No. 13-60296-CIV, 2013 WL 12145901, at *3 (S.D. Fla. Oct. 25, 2013) (finding Florida Plaintiff's claims for, inter alia, conversion, satisfied under section 1(a)(2) in part because the injury was suffered in Florida); *Montes v. Capitol Records, Inc.*, No. 02-CV-23074, 2003 WL 23163127, at *2 (S.D. Fla. Oct. 31, 2003) ("Plaintiff has alleged injuries in Florida resulting from Defendant's alleged tortious acts, [including conversion]. Thus, under Eleventh Circuit precedent, Plaintiff alleges sufficient facts to fall within the ambit of subsection [1(a)(2)]. . ."); *International Harvester Co. v. Mann*, 460 So.2d 580 (Fla.1st DCA 1984) (*accord Posner*, 178 F.3d at 1217 (subsection 1(a)(2) satisfied by non-resident defendant who breached fiduciary duty against Florida business because Plaintiff's "physical assets and its operation as a business were solely within the state of Florida. Therefore, any injury to its inventory or operation as a business concern, as alleged, must have occurred within Florida.")); *Mehlenbacher ex rel. Asconi Corp. v. Jitaru*, No. 6:04CV1118, 2005 WL 4585859, at *11 (M.D. Fla. June 6, 2005).

[11] Plaintiffs' only remaining claims are for unjust enrichment and permanent injunction. This court has jurisdiction over those claims too. "If the forum's long-arm statute provides jurisdiction over one claim, the district court has personal jurisdiction over the entire case so long as the claims arose from the same jurisdiction generating event." *Brennan*, F. App'x at 854. As mentioned, all

Plaintiffs' have alleged facts demonstrating they are located in Florida and that, therefore, if Craig committed these intentional torts, their injury occurred in Florida. Nothing in Craig's sworn declaration combats these assertions. Consequently, this Court must "accept the allegations stated in the complaint as true for purposes of resolving the jurisdictional issue under the requirements of the Florida long-arm statute and the Due Process Clause," and conclude that Craig is subject to this Court's jurisdiction under 1(a)(2). *Posner*, 178 F.3d at 1215. [12]

Craig's only contrary authority purports to require there be a "substantial aspect that was essential to the success of the tort" committed in Florida. Br. at 35. But as recognized by two courts in this circuit, including one whose opinion was affirmed by the Eleventh Circuit, this requirement has been rejected by the Florida Supreme Court and subsequent Eleventh Circuit decisions.[13]

---

claims seek recovery of the bitcoin and intellectual property taken in breach of Craig's fiduciary duties owed to Plaintiffs, etc.

[12]Craig does not raise any due process challenges because there aren't any. Craig targeted Florida Plaintiffs with intentional torts he knew would cause harm in Florida. *Inman v. Am. Paramount Fin.*, No. 10-80393-CIV, 2010 WL 11561202, at *2 (S.D. Fla. July 7, 2010) (due process satisfied by intentional act "expressly aimed" at, and knowingly causing injury in, the forum state); *citing Calder v. Jones*, 465 U.S. 783, 790 (1984); *Walden v. Fiore*, 571 U.S. 277 (2014) (personal jurisdiction requires direct and non-random contacts with forum); *cf. infra*, n13 and n14 (delineating Craig's numerous and substantial connections with, and contacts directed to, Florida).

[13] *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1345–46 (S.D. Fla.), *aff'd* 54 F. App'x 492 (11th Cir. 2002) ("the Eleventh Circuit found . . . plaintiff must demonstrate that . . . defendant committed a substantial aspect of the alleged tort in Florida . . . Nonetheless, the Florida Supreme Court did not include this . . . requirement . . . in *Execu–Tech.* . . . Thus, as this Court is required to interpret [1(a)(2)] as would the Florida Supreme Court . . . Plaintiff has . . . properly invoked . . . [(1)(a)(2)]"); *Susie's Structures, Inc. v. Ziegler*, No. 8:09-CV-975T33, 2010 WL 2136513, at *3 (M.D. Fla. May 27, 2010) ("Defendants argue [they must commit] a substantial aspect of the alleged tort in Florida . . . essential to the success of the tort. . . . However, this requirement was called into doubt by *Gen. Cigar Holdings* . . . [and] Eleventh Circuit case law has [held jurisdiction was established without it].")

B) <u>Craig committed tortious acts in Florida by sending communications into Florida to further his fraud</u>

Craig's emails and calls to Ira act as an independent ground for personal jurisdiction. Personal jurisdiction exists if, in a communication from outside Florida that is received within this state, the defendant makes intentional misrepresentations on which the Florida plaintiff relies. *Wendt*, 822 So. 2d at 1260; *Lorali, LLC v. SMK Assocs., LLC,* No. 13-CV-22204, 2013 WL 12093736, at *5 (S.D. Fla. Dec. 19, 2013). The foreign defendant should reasonably expect "to be haled into court in this state if 'caught.'" *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd*., 752 So. 2d 582, 586 (Fla. 2000). The same communications used to "exploit Floridians … may now be used by Floridians to establish a jurisdictional basis for recouping their losses . . ." *Id.* Craig's misrepresentations and nondisclosures in his emails to Florida and corporate record filings into Florida, were integral to his fraudulent scheme to loot Plaintiffs and conceal his looting from them.[14] These direct communications into Florida were tortious and justify jurisdiction.

C) <u>Craig engaged in business within Florida</u>

A defendant is subject to personal jurisdiction in Florida for any cause of action "arising from" the "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." Fla. Stat. § 48.193(1)(a)(1).

---

[14] Craig falsely told Dave's family he would help them "recover what Dave owned" when he had already stolen it. AC ¶ 133. To lull Ira into not questioning his acquisition of W&K's property, Craig falsely claimed W&K's assets had been transferred with Dave's approval, and promised Ira he would receive shares "worth millions." *Id*. ¶¶ 136-140. But Dave hadn't approved and the shares were worthless. *Id*. ¶¶ 95-109,144-50. Craig's emails concealed that he sued W&K for $56 million AUD, installed his own agent and company as W&K's manager, secretary, and director, and filed documents on W&K's behalf in Florida and Australia. *Id*. ¶¶ 117-131, 138-40. Subsequently, Craig falsely denied wrongdoing and promised Ira he'd receive the first of several multi-million-dollar payments by October 2014. *Id*. ¶¶ 144-50. Craig sent emails to Florida assuring people Ira trusted that "there is no way Dave will be left out." *Id*. ¶¶ 151-53. Finally, in a desperate salvo to avoid justice, Craig transmitted false testimony to this Court in a final attempt to deceive Plaintiffs and this Court into thinking he had nothing to do with Plaintiffs' Florida operations. *Id*. ¶¶ 160-70.

To avoid this Court's jurisdiction Craig initially, under penalty of perjury, proffered false testimony to this Court swearing to have had no involvement with Florida businesses. D.E. 12-2. Plaintiffs forced Craig to withdraw that claim when they exposed it as a lie and produced Craig's prior affidavit where he swore exactly the opposite. AC ¶¶ 160-170; AC Ex. 4.

Craig no longer contests Plaintiffs allegations that he "worked on certain information technology projects, mined bitcoin, and developed intellectual property with Dave Kleiman and W&K." Br. at 34. In fact, he no longer contests that these allegations generally satisfy the requirement that Craig was "[o]pertain[g], conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state."[15]

---

[15] Nor could he. Collectively, the evidence is overwhelming that Craig showed a "general course of business in the state for pecuniary benefit." *Dinsmore v. Martin Blumenthal Assocs., Inc.*, 314 So. 2d 561, 566 (Fla. 1975). The Amended Complaint clearly demonstrates Craig initiated contact with Dave in Florida to develop intellectual property and mine bitcoin (AC ¶ 55), that he partnered with a Florida resident to operate a business in Florida that mined bitcoin and developed intellectual property (*id.* ¶¶ 63-65), and that this personal partnership led to Craig and Dave forming a Florida company that continued to mine bitcoin and develop intellectual property in Florida (*id.* ¶¶ 67-69). Craig was in constant email and telephone contact with a Florida resident about these Florida business ventures. *Id.* ¶ 55-56 76, 86-87, 133. Craig himself claims to have personally engaged in Florida business by (1) delivering servers and other computer hardware to Florida for W&K's use, (2) providing "contract labour services" to W&K, (3) licensing software for W&K's use, and (4) loaning money to W&K for use in its Florida mining operation. *Id.* ¶ 78. The evidence also shows Craig engaged in, and carried out, W&K's business by having personally solicited contracts for W&K from DHS *while using W&K's Florida address*, and acting as W&K's "authorized representative," "lead researcher," and its "technical contact." *Id.* ¶ 77. The evidence also shows Craig maintained an office in Florida by claiming affiliation with W&K's Florida address as e.g., his "mailing address" *at least* 12 times. *Id.* ¶ 167. Further, Craig cannot deny that he (unlawfully and without authority) operated a Florida business by claiming to have called a W&K shareholder meeting where he "elected" J. Wilson as W&K's "director," and then ordered Wilson to execute "consent orders" purporting to oblige W&K into handing over its intellectual property. *Id.* ¶ 164. This purported operation of a Florida business continued by his filing court documents on W&K's behalf (without authority) as its purported "legal agent and representative" and "Director/Australian Agent." *Id.* ¶ 169. Finally, Craig again operated a Florida business by unlawfully directing his agent, Uyen Nguyen, to file W&K corporate documents with the Florida Division of Corporations that named her, and his company, as W&K's secretary, manager, and director. *Id.* ¶¶ 138-40.

14

Stripped of his false declaration and faced with overwhelming evidence he operated, engaged in, and carried out a Florida business, Craig shifted tactics. In his second motion to dismiss, Craig now claims the *sole* flaws in Plaintiffs' jurisdictional allegations under Fla. Stat. § 48.193(1)(a)(1) are that (1) Plaintiffs didn't allege Craig performed these "acts while physically in this state" and that (2) Plaintiffs' claims do not "arise from" the abovementioned acts. Br. at 34-35. Craig does not cite *a single case* to support these purported fatal flaws.

There is no physical presence requirement under Florida law. A defendant can operate a business in Florida, and be subject to personal jurisdiction here, even if he's never been physically present in Florida. There "need be no local office nor agent, no lease, no meeting, no presence of corporate offices in Florida to warrant a finding of engagement in a business venture." *Meyer v. Carnival Corp*., 938 F.Supp.2d 1251, 1263 (S.D. Fla. 2013) *quoting Bank of Wessington v. Winters Gov't Securities Corp*., 361 So.2d 760, 763 (4th DCA 1978) *citing Dinsmore*, 314 So. 2d at 566. In *Bank of Wessington,* the court found personal jurisdiction over an out of state defendant because of its business activity that consisted solely of a "phone call and an oral agreement as a result thereof" with a Florida resident. *Id*. at 759. The court acknowledged the defendant had no agent authorized to do business in Florida, no offices in Florida, held no meetings in Florida, made no purchases or sales in Florida, and derived no economic benefit from any transactions in Florida, but nonetheless upheld jurisdiction under *Dinsmore*. *Id*. at 758-760; see *Lorali,* 2013 WL 12093736, at *3 (summarizing same). Craig engaged in Florida business far more substantially than the defendant in *Bank of Wessington*; his physical presence is not required.

Second, the "term 'arising from' is broad; it does not mean 'proximately caused by,' but only requires a 'direct affiliation,' 'nexus,' or 'substantial connection' to exist between the basis

---

for the cause of action and the business activity." *Citicorp Ins. Brokers (Marine), Ltd. v. Charman*, 635 So. 2d 79, 82 (Fla. 1st DCA 1994) *citing Damoth v. Reinitz,* 485 So.2d 881, 883 (Fla. 2d DCA 1986); *Golant v. German Shepherd Dog Club of Am., Inc.*, 26 So. 3d 60, 62 (Fla. 4th DCA 2010). Stated differently, the defendant's activities in Florida must be related to the cause of action being litigated so there is a "substantial connection between the cause of action and the defendant's activities within the state." *Hesterly v. Royal Caribbean Cruises, Ltd.*, No. 06-22862-CIV, 2008 WL 516495, at *7 (S.D. Fla. Feb. 25, 2008). Craig's activities in Florida lead to the mining of the bitcoin and creation of intellectual property that are the focus of this dispute. His longstanding business relationship with Dave and W&K are what helped him develop the trust necessary to seize control of Dave's assets and the business. Further, his unlawful operation of W&K are what solidified his ability to steal the bitcoins and intellectual property. This is more than enough. *Ferguson v. Estate of Campana*, 47 So. 3d 838, 843 (Fla. 3rd DCA 2010).[16] Clearly there's a substantial connection between Craig's activities in Florida and the causes of action asserted. *Id*.

Thus, Craig's *only* two bases for resisting personal jurisdiction under Fla. Stat. § 48.193(1)(a)(1) are completely without merit. This Court has personal jurisdiction over Craig.[17]

### III) **This Court should not dismiss this action under *forum non conveniens***

A) There is a strong presumption in favor of Plaintiffs' home forum.

Long-standing Supreme Court precedent dictates that a "plaintiff's choice of forum should *rarely* be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (emphasis added).

---

[16] *Id.* (Non-resident defendant's "involvement . . . in [plaintiff's] Florida operations," his "work in the development" of their patents, and his "long-standing business relationship" with plaintiff "that allowed [defendant] to develop the trust necessary to be in a position to obtain control" over plaintiff's patents, satisfied Florida's nexus *and* operating a business requirements).

[17] In the unlikely event this Court believes it does not have personal jurisdiction over Craig, Plaintiffs have already served discovery, and request jurisdictional discovery to further supplement the jurisdictional allegations and evidence already presented.

"[D]eference given to a plaintiff's choice of forum is *especially* strong in the Eleventh Circuit," where courts are required to begin the analysis with "a strong presumption against disturbing plaintiffs' initial forum choice." *Wagner v. Island Romance Holidays, Inc.*, 984 F. Supp. 2d 1310, 1314 (S. D. Fla. 2013) (emphasis added). This presumption is "at its strongest when the plaintiffs are citizens, residents, or corporations of this country," and forbids dismissal unless (1) the defendant has presented "positive evidence of unusually extreme circumstances, and" (2) the court is "thoroughly convinced that material injustice is manifest." *SME Racks, Inc., v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101 (11th Cir. 2004).

Craig ignores this binding authority and proposes his own new standard, asserting without citation that "[t]his Court has broad discretion to dismiss on ground of forum non conveniens." Br. at 20. Inexplicably, he completely fails to mention this Court's unequivocal **obligation** "to apply the strong presumption that a United States citizen will not be ousted from the courts of this country." *SME Racks,* 382 F.3d 1097 at 1101. Had the Court relied on Craig's deficient analysis, then, it would have committed "a clear abuse of discretion" and per se reversible error. *Id*. at 1103, 1101. Craig compounds this error by overwhelmingly relying on inapposite cases: three brought by *foreign* plaintiffs who do not enjoy the same presumption,[18] *see TNT USA, Inc v. TrafiExpress, S.A. de C.V.*, 434 F. Supp. 2d 1322, 1332 (S.D. Fla. 2006) ("foreign plaintiff's choice of forum, however, is a weaker presumption and receives far less deference"); two with mixed groups of foreign and U.S. plaintiffs where only the foreign plaintiff's claims were dismissed;[19] and two where plaintiffs signed forum selection clauses, triggering a presumption in favor of the foreign

---

[18] *See Piper Aircraft*, 454 U.S. at 238; *Ford v. Brown*, 319 F.3d 1302, 1308-09 (11th Cir. 2003); *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1308 (11th Cir. 2001)).

[19] *See Kolawole v. Sellers*, 863 F.3d 1361, 1372 (11th Cir. 2017); *Banco Latino v. Gomez Lopez*, 17 F. Supp. 2d 1327, 1333 (S. D. Fla. 1998).

forum,[20] *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1029 (11th Cir. 2014 (a "forum-selection clause requires the court to find that the *forum non conveniens* private factors entirely favor the selected forum.")

While a "citizen's forum choice should not be given dispositive weight," *Piper Aircraft*, 454 U.S. at 255 n.23, the defendant bears "a heavy burden in opposing the plaintiff's chosen forum," *Wilson*, 590 F.3d at 1269. To obtain dismissal, Craig must demonstrate that despite this "strong presumption," (1) "all relevant factors of private interest favor the alternate forum," (2) the "factors of public interest tip the balance in favor of trial in the alternate forum;" and (3) the estate and W&K "can reinstate their suit in the alternate forum without undue inconvenience or prejudice." *Id*. To deny the estate and W&K access to the courts of this country, Craig must provide evidence that these factors overwhelmingly favor dismissal; the circumstances must be so "unusually extreme" that failure to dismiss would cause Craig to suffer obvious and "manifest" "material injustice." *SME Racks*, 382 F. 3d at 1100 n.5

Craig has failed to satisfy his heavy burden. He has not produced any evidence of unusually extreme circumstances, let alone that he – a billionaire who fled Australia for England – would suffer "manifest" and "material injustice" from litigating in the forum he stole from. He partnered with a Florida citizen and Florida company to mine bitcoins and develop intellectual property. D.E. 24 ¶¶ 52-78. After creating a digital fortune in this state, he stole those Florida assets and breached fiduciary duties owed to those Florida citizens, thereby victimizing Floridians. *Id*. at ¶¶ 95-116. It would not be unusually extreme or materially unjust for him to defend those actions here. On the contrary, it would be unjust to force Plaintiffs into chasing him half a world away.

---

[20] *See Kalb v. Marriott Int'l, Inc.*, No. 17-CV-20904, 2017 WL 6565243 (S.D. Fla. Oct. 5, 2017); *Cleveland v. Kerzner Int'l Resorts, Inc.*, No. 14-CV-23897, 2015 WL 5695276 (S.D. Fla. 2015).

As explained below, *none* of the private or public factors support dismissal, and Plaintiffs cannot reinstate their claims in Australia without incurring undue inconvenience and prejudice. Craig's motion should be denied.

B) The private interest factors don't favor dismissal

To weigh the private factors, courts review "(1) ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling [witnesses;] (3) the cost of obtaining attendance of willing witnesses[;] and (4) all other practical problems that make trial of a case, easy, expeditious and inexpensive." *Gulf Oil*, 330 U.S. at 508 (numbering added). "The relevant forum for purposes of the federal forum non conveniens analysis is the United States as a whole."[21] *Wilson*, 590 F.3d at 1271. As explained below, the relevant evidence is more easily and cheaply obtained in the United States than in Australia.

First, the majority of the witnesses and evidence necessary to prove the factual issues "at the core of Plaintiff's claims," are located in Florida and the United States. *Fresh Results, LLC v. ASF Holland, B.V.*, No. 17-CV-60949, 2018 WL 1702192, at *7 (S.D. Fla. Mar. 15, 2018). These core issues concern proving the exact relationship between Craig and Dave, the extent of their collaboration in the creation of Bitcoin, the amount of bitcoins they mined in Florida, the type of intellectual property projects they pursued in Florida for W&K, the way they agreed to divide their digital fortune, and the way these assets were actually distributed. The parties' relationship was centered in Florida where Dave lived, the bitcoins were mined, the intellectual property was developed, the company incorporated, and the duties owed. AC ¶¶ 5, 65-66.[22]

---

[21] Craig mischaracterizes the law by framing the analysis as limited to Florida. Br. at 21-24.

[22] This case is definitely not one where the claims all stemmed from a significant/tragic event in a foreign country, such that all the relevant evidence originated there. *C.f. Fresh Results*, 2018 WL 1702192, at *6 (recognizing that "every claim . . . centers on conduct that occurred in the

The following witnesses are in Florida and the U.S. will help establish these core facts:

**Florida:**

1) **Ira Kleiman** (Dave's brother, who communicated with Dave and Craig);

2) **Patrick Page** (Dave's business partner and confidant who knew of Dave's friendship with Craig and communicated with him);

3) **Global Institute for Cyber Security Research** ("GISCR") (Craig was a director of this Florida entity and stated that a GICSR trust was related to Dave's bitcoins (e.g., D.E. 24-1, 14));

4) **Deborah Kobza** (GICSR's CEO);

5) **Joseph Karp** (Dave's counsel, and Ira's prior counsel who had communications with Craig and his counsel);

6) **Carter Conrad** (Dave's business partner who also communicated with Craig);

7) **Kourtney Karr** (Dave's ex-fiancé);

8) **David Kuharcik** (Dave's accountant); and

9) **Computer Forensics, LLC** (Dave's computer forensics business along with its business records and vendors, e.g., Dave's email storage).

**United States:**

10) **Uyen Nguyen**;[23]

11) **Gavin Andresen**;[24]

12) **Bob Radvanovsky** (third person identified in Craig's submissions to DHS for W&K);

13) **U.S. Department of Homeland Security** (Craig claimed DHS funded the creation of bitcoin (D.E. 24-6));

14) **Ross Ulbricht** (creator of Silk Road, the illicit marketplace that launched Bitcoin's

---

Netherlands"); *Tazoe*, 631 F.3d at 1331 (plane crash); *Kolawole*, 863 F.3d at 1372 (plane crash); *Montgomery v. Oberti*, 945 F. Supp. 2d 1367, 1377 (S.D. Fla. 2013) (sexual battery).

[23] A "powerful figure in the trust" (AC Ex. 1 at 37), director of key companies (*id*.), signatory to a "Deed of Loan" document purporting to hold over 600,000 bitcoins in trust for Craig and Dave (AC Ex. 15), and close confidant/agent who assisted Craig's theft of W&K's assets (AC ¶¶138-39). Ms. Nguyen is likely one of the most important witnesses in this case.

[24] Craig claims to have been in communication with Mr. Andresen when he and Dave were developing Bitcoin. AC Ex. 1 at 32. Craig told him about the trust, his bitcoin holdings, and what happened to them. *Id.* at 63. Mr. Andresen claimed Craig "cleared up a lot of mysteries, including why he disappeared when he did and what he's been busy with since 2011. *Id.* at 81. Further, Mr. Andresen witnessed Craig's use of the private keys related to the bitcoins at issue in this case. *Id.* at 63-67.

value, who Craig claimed Dave was associated with (AC Ex. 1 at 26), and who met
with Craig at least once (*id.* at 49));

15) **Wei Dai** (Craig claimed to have been in communication with him while he and
David were developing Bitcoin (*id.* at 29)); and

16) **Michele Seven** (confidant of Craig who facilitated his first public appearance).

These are just some of the Florida and U.S. witnesses potentially relevant to this case. Ex. 1
¶¶12-13. In addition, U.S. nationals and residents located abroad are within this Court's subpoena
power and can be considered in the forum non conveniens analysis. *Barboza v. Drummond Co.*,
No. 06-61527-CIV, 2007 WL 8025825, at *5 (S.D. Fla. July 17, 2007); 28 U.S.C.A. § 1783.
**Jimmy Nguyen**, Craig's close friend and CEO of Nchain, is a US citizen living in the UK who
has intimate knowledge of Craig's intellectual property research projects. Ex. 1 ¶ 14.

Despite the prevalence of relevant witnesses and evidence in Florida and the United States,
Craig attempts to use the AC's references to Australian court filings, three ATO documents, and
some Australian witnesses to argue that "almost all of the evidence" is in Australia. Br. at 23-24.

But the AC's Australian references are overwhelmingly to events that occurred *after* the
assets were created by Dave in Florida and stolen by Craig. The Australian court filings (that
Plaintiffs *already* have) were Craig's attempt to defraud the ATO and conceal his *already*
*committed* theft. And while the ATO's investigation of Craig's tax fraud against the Australian
government uncovered some information relevant to Craig's torts against the estate and W&K,
any such evidence is not firsthand, resides in document form, and was supplied to the ATO *by*
*Craig* in the form of submissions and statements. In other words, Craig *was the source* of the
ATO's evidence and does not need this Court's compulsory process to obtain it. *See e.g.*, AC Ex's.
9, 12 (transcribing Craig's *own* statements and those of his agents); AC Ex. 18 (ATO letter given
to Plaintiffs by *Craig's wife*). Ex. 1 ¶ 15(a).

In arguing that this Court should dismiss Plaintiffs' case, Craig identifies nine "*potential*

witnesses" in Australia. Br. Ex. 3 (emphasis added). But he completely fails to carry his burden of demonstrating (1) why these witnesses are relevant to his defense and (2) whether they would be unwilling to testify voluntarily. *Either* failure is sufficient grounds to disregard these witnesses from the forum non conveniens analysis. *New Life Mgmt. Co. v. Sandy Lane Hotel Co., Ltd.*, No. 13-CV-60566, 2013 WL 12152494, at *6 (S.D. Fla. Aug. 20, 2013) (merely naming out of jurisdiction witnesses couldn't outweigh strong presumption because defendant did not make "a specific and particularized showing as to the content or importance of their testimony" or show "that these witnesses are unwilling or unable to attend a trial in a Florida court"); *Van Hoy v. Sandals Resorts Int'l, Ltd.*, No. 11-24580-CIV, 2013 WL 1192316, at *10 (S.D. Fla. Mar. 22, 2013) (no dismissal because "Defendants provide no specifics as to how the testimony . . . is material to the [case's] claims and defenses"). That's not to say Craig must provide detailed affidavits identifying the exact witnesses and their testimony. *Piper Aircraft*, 454 U.S. at 258. But he "must provide enough information to enable the District Court to balance the parties' interests." *Id*. Generic reference to "potential witnesses" without (1) an assertion that Craig would likely call these witnesses, (2) any explanation as to how these witnesses will assist the defense, or (3) any proof these witnesses wouldn't appear voluntarily, simply cannot satisfy Craig's "heavy burden" to overcome the strong presumption in favor of Plaintiffs' choice of their home forum. *Id*. at 258-59, n27.[25] In sum, Craig has made no showing that his potential Australian witness have knowledge

---

[25] Compulsory process should not be much of a consideration "when it has not been alleged or shown that any witness would be unwilling to testify." *Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006); *DiFederico v. Marriott Int'l, Inc*., 714 F.3d 796, 806-07 (4th Cir. 2013). Showing a witnesses' unwillingness is the movant's burden. *Id*.; *see also La Seguridad*, 707 F. 3d at 1309 (defendant has the "burden of showing that [evidence] is inaccessible or inconvenient to the forum").

of the issues "at the core of Plaintiff[s'] claims." *Fresh Results*, 2018 WL 1702192, at *7.

Even if he had met his burden to show the potential Australian witnesses had such knowledge, Craig could easily obtain it. Four of his nine potential Australian witnesses are his own agents or employees. Br. Ex. 3 ¶¶ 20(c), (h), (j), (m) (listing his lawyer and bookkeeper/advisor, and his company's manager and bookkeeper). Craig does not need compulsory process to compel their testimony. *Wagner*, 984 F. Supp. 2d at 1315 (foreign witnesses insufficient to overcome strong presumption because they were "at least arguably associated with or employees of [defendant]"); *Ward v. Kerzner Int'l Hotels Ltd.*, No. 03-23087-CIV, 2005 WL 2456191, at *1 (S.D. Fla. Mar. 30, 2005) (Jordan, J.) (foreign witnesses insufficient to override strong presumption because they were defendant's "own agents and employees"); *TNT USA Inc.*, 434 F. Supp. 2d at 1334 (no dismissal because foreign witnesses are "under the control" of defendant); *Doe v. Sun Int'l Hotels, Ltd.*, 20 F. Supp. 2d 1328, 1330 (S.D. Fla. 1998) (no dismissal because "key defense witnesses are employees of the defendant").

The remaining "*five*" potential Australian witnesses are all ATO investigators who lack personal knowledge of Plaintiffs' claims and therefore are, in actuality, all representatives of a single potential institutional witness: the ATO. But as stated above, the ATO's investigation and evidence focused on Craig's tax fraud, which was committed *after* he stole Plaintiffs' bitcoins and intellectual property. AC ¶¶ 15-16, 89, 110. Plaintiffs' claims do not directly concern that fraud. Further, to the extent Craig requires ATO documents, he either has them (he was the source), or can easily obtain them (under Australian law). Br. Ex. 1 ¶ 12(iii) (expert opining taxpayers can obtain ATO records); Br. Ex. 3 ¶18 (implying Craig's attorneys have ATO documents).

In yet another attempt to mischaracterize this action as one belonging in Australia, Craig references seven Australian companies that he claims are "relevant to this lawsuit" (*id*. ¶21(a)-(g))

and "trusts . . . located outside of the United States." Br. at 22. Craig again fails to explain why he needs these witnesses. But more importantly, he controls *all* these companies and has plenary access to their records.[26] Thus, their presence in Australia does not "inconvenience" him *at all*, let alone enough to render this case unusually extreme and unjust to a degree that outweighs the strong presumption in favor of Plaintiffs' home forum.

Furthermore, much of the evidence Craig identifies as foreign "can be displayed and printed from a computer with an Internet connection." *TNT USA,* 434 F. Supp. 2d at 1334. Documents like the Australian court file (which Plaintiffs already have), fraudulent contracts (Plaintiffs have those too), and submissions he provided to the ATO are in Craig's own records, his agent's records, or are records he can easily obtain or view in Florida. Br. Ex. 3 ¶18 (implying Craig's attorneys have ATO documents); *see City Pension Fund for Firefighters and Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1411 (S. D. Fla. 2011) (dismissal denied because "[a]lthough the majority of proof may be located in Brazil, many of the documents and records are likely electronically stored and can easily be transferred").

Moreover, even if Craig had met his burden to (1) identify definite foreign witnesses outside the Court's jurisdiction, (2) explain why he needed them, (3) prove they would not testify voluntarily, and (4) demonstrate they were not his agents, he still could not carry his heavy burden to overcome the strong presumption in Plaintiffs' favor because he has not explained why he could not obtain the evidence through the Hague Convention and/or letters rogatory. Both the U.S. and Australia are parties to the Hague Convention, which offers a "relatively straightforward and user

---

[26] *See* Br. Ex. 3 ¶¶ 20(c), 21; AC ¶¶ 84, 131, 136-48 (C01n, Cloudcroft, Coin-Exch, Demorgan, and Hotwire); https://steemit.com/bitcoin/@rizalmahrez/get-to-know-craig-wright-unexpected-creator-of-bitcoin (Panopticrypt and Pholus).

friendly" process for obtaining evidence in Australia for U.S. proceedings. S. Stuart Clark and Christina Harris, *Obtaining Evidence in Australia for use in the United States and Other Hague Convention Countries*, 73 Def. Couns. J. 235, 241 (2006). Many courts in this District have found it is the defendant's burden to prove this process is insufficient, and failure to do so results in denial of a motion to dismiss under forum non conveniens. *See Ward*, 2005 WL 2456191, at *1 ("defendants have failed to carry their burden of establishing . . . the necessary evidence could not be procured through videotaped depositions, letters rogatory, or some similar procedure"); *Belik v. Carlson Travel Grp.*, 26 F. Supp. 3d 1267, 1286 (S. D. Fla. 2013) ("even if testimony from certain Mexican witnesses . . . may be particularly relevant, [defendants] are silent as to why letters of request or letters rogatory could not be sent . . . pursuant to the Hague Convention to assist them in securing depositions in Mexico or obtaining other evidence"); *Sun Trust Bank*, 184 F. Supp. 2d at 1264 ("defendants have failed to carry their burden of establishing that . . . that the necessary evidence could not be procured through letters rogatory or some similar procedure").

Costs associated with obtaining willing witness' attendance also doesn't support dismissal from the U.S. to file a lawsuit in Australia. As noted above, most witnesses with information about the core issues in this case are in the U.S. Indeed, the only foreign witnesses that appear important are Craig, his wife, Robert McGreggor, and Andrew O'Hagan – all residents of the United Kingdom, not Australia. Notably, the U.K. is 4,000 miles from Florida, but 9,400 miles from Australia, thus making it cheaper and more convenient to have these witnesses come to Florida.[27]

Finally, Craig has not provided evidence of any practical problems that would preclude

---

[27] Craig's insistence that Australia is more convenient is particularly odd given he fled Australia to evade tax officials several years ago, and has lived and worked in London ever since. AC ¶ 16; *see Pacific All. Asia Opportunity Fund L.P. v. Kwok Ho Wan*, -- N.Y.S.3d --, Slip. Op. at *1 (N.Y. App. Div. 2018) (noting defendant's fugitive status in the foreign forum while overturning the trial court's dismissal under forum non conveniens).

this case from proceeding expeditiously in this Court. Unlike other cases, there is no need to view a location in Australia. *C.f. Fresh Results*, 2016 WL 1702192 at *8 (foreign premise view would assist). Nor has Craig claimed that litigating here would prevent him from impleading non-parties, a factor that "weighs in favor of dismissal." *Wagner,* 984 F. Supp. 2d 1310.

Given the parties' Florida-centered relationship, U.S. witnesses, and Craig's possession of, or ability to obtain, any "Australian" evidence that he *might* need (through his records, his agents, or by request under Australian law, the Hague convention, or letters rogatory), it's apparent that the private interest factors do not come anywhere close to presenting a circumstance so "unusually extreme" that failure to dismiss would cause Craig to suffer the "manifest," "material injustice" necessary before the courts of this country will close their doors to its citizens. *SME Racks*, 382 F.3d at 1101. This is certainly true when, as here, Craig has completely failed to carry his burden to identify witnesses he actually *needs*, to identify the import or content of the testimony they would proffer, and to show the witnesses have refused to appear voluntarily. *New Life,* 2013 WL 12152494 at *6; *Van Hoy*, 2013 WL 1192316 at *10; *supra* n25.

Said succinctly, "the existence of some witnesses in a foreign forum—the necessity of whose testimony has not been demonstrated—is not sufficient to defeat a plaintiff's choice of forum, especially where, as here, a significant number of witnesses reside in the United States." *Belik,* 26 F. Supp. 3d at 1285.

C) The public interest factors weigh strongly against dismissal.

The public interest analysis also "begins with the proposition that Plaintiffs (both U.S. citizens) should not be ousted from a U.S. forum." *Wagner*, 984 F. Supp. 2d at 1317. The court must then weigh (1) administrative issues of court congestion; (2) the United States' and Florida's interest in providing a forum for its citizens; (3) the appropriateness of using a forum familiar with the governing law; and (4) imposing jury duty on people with no relation to the litigation. *Id.* at

1316. The application of these factors is fatal to Craig's motion.

*First*, while this District is busy, "this factor generally does not warrant significant consideration" and should not be given "much weight." *Kalb*, 2017 WL 6565243 at *4.

*Second*, the United States and Florida both have a strong interest in adjudicating this dispute. There is a "strong federal interest in making sure that plaintiffs who are United States citizens generally get to choose an American forum for bringing suit, rather than having their case relegated to a foreign jurisdiction." *SME Racks*, 382 F.3d at 1104. This federal interest is "***very strong***" when, like here, "its citizens are allegedly victims and the injury occurs on home soil." *Id.* (emphasis added). Florida has an equally strong interest in adjudicating its citizens' disputes. *See id.* Indeed, both the United States and Florida have a strong interest in litigation involving "an allegedly predatory foreign [defendant] that actively solicited business and caused harm within the home forum." *Id.* This is especially true here, where Craig joined a Florida partnership, participated in a Florida LLC, identified himself as its director, agent, and representative, and then robbed their assets when Dave died. D.E. 24, ¶¶ 77, 117-31, 163-70.

*Third*, all of Plaintiffs' claims are brought under Florida and U.S. law, making this forum the one most familiar with applicable law, "which counsels against relegating these claims to adjudication in a foreign forum." *Belik*, 26 F. Supp. 3d at 1285. The claims are asserted by Florida citizens, in Florida, over assets created in Florida, for injuries occurring in Florida, and for breaches of fiduciary duties owed to Florida citizens. *C.f. Fresh Results*, 2016 WL 1702192 at *8 (dismissal proper because "claims contingent on activity that occurred near-exclusively" in Netherlands, and court would need to engage in complex choice of law questions and apply Dutch law).

Craig invokes void Australian consent judgments (*see infra* Section IV) procured by his own fraudulent actions to help convince this Court to deny U.S. plaintiffs access to U.S. courts.

AC ¶¶ 95-131. It cannot be that Craig, fraudulently acting through a Florida corporation to exercise unlawful control over its assets, *id.* at ¶¶ 67-78, 111, 117-140, can obtain dismissal under *forum non conveniens* by fraudulently manufacturing convenience in that foreign forum. Similarly, Craig's claim that this Court must honor a choice of law clause in a demonstrably forged document is specious and presupposes the validity of the very contracts Plaintiffs challenge.

Even if this Court must eventually decide some unidentified issues of foreign law from an English speaking common law country, that fact "cannot be too heavily considered," as federal courts "often" do this. *Wagner*, 984 F. Supp. 2d at 1317; *TNT USA Inc.*, 434 F. Supp. 2d at 1335 (potential application of foreign law not enough); *Ward*, 2005 WL 2456191, at *1 (noting federal courts often decide foreign law and emphasizing that burden diminished when dealing with English speaking common law system); *c.f. Fresh Results*, 2016 WL 1702192 at *8 (need to apply *Dutch* law militated toward dismissal).

*Finally*, jurors in this forum plainly have a connection to this dispute. A jury of Florida residents will be intimately concerned that Craig stole billions of dollars from a Florida company and a Florida estate. Florida citizens will have personal interest in ensuring their neighbors have a fair shot at resolving disputes with foreign wrongdoers that partner with them.

Accordingly, the public factors weigh heavily against kicking Plaintiffs out of this Court to litigate in a forum unfamiliar with the U.S and Florida causes of action, before a sovereign with little interest in the dispute, and before a fact finder with no kinship to Plaintiffs. *Wilson*, 590 F.3d at 1269. Here, the strong presumption in favor of Plaintiffs' chosen home forum, and the United States' and Florida's strong interests in providing a forum for Plaintiffs' claims, dictate that the public factors clearly *do not* support dismissal.

D) <u>Litigating this suit in Australia would cause Plaintiffs undue inconvenience and severe prejudice</u>

In making its forum non conveniens determination, the Court also "must ensure that plaintiffs can reinstate their suit in the alternate forum without undue inconvenience or prejudice." *Wilson*, 590 F.3d at 1272. "A party's claim of financial hardship . . . is a factor to be considered . . ." *Id*. Plaintiffs would suffer severe economic and personal inconvenience by being forced to litigate in a foreign jurisdiction that is, as Craig notes, 24 hours and more than 10,000 miles away from their home, where they suffered their injuries, and where the majority of witnesses reside. *See* Br. at 23-24. Unlike Craig, Ira is not wealthy. *See* AC ¶26; Ex. 1 ¶ 9. Further, if this Court dismisses this action to Australia, Plaintiffs will lose their access to the U.S. witnesses described herein and be forced to litigate in a country Dave likely never visited (*id*. at ¶ 4) and where none of the material witnesses with personal knowledge of Dave's and Craig's relationship reside. *See Robinson v. Giarmarco & Bill, P.C.*, 74 F. 3d 253, 260 (11th Cir. 1996) (transfer would "merely shift inconvenience from the defendants to the plaintiff"); *see also Reid-Walen v. Hansen*, 933 F.2d 1390, 1397 (8th Cir. 1991) ("In whichever forum the case is tried, witnesses will have to travel or testify by deposition.").

In sum, Plaintiffs have a "strong presumption" of entitlement to litigate in Florida, numerous witnesses are located here, the United States and Florida have strong interests in this case proceeding here, the law to be applied is from here, and there would be extreme prejudice in forcing Plaintiffs to litigate in Australia. In fact, Craig's location in the U.K. means it would be more convenient for him to litigate here as well. In truth, the *only* factor Craig can name to cut the other way is that there may be some "potential witnesses" in Australia. But Craig has not shown why these witnesses are relevant or that they would not willingly travel here to testify. Further, almost all of this "potential Australian evidence" is accessible to him through his own records and

agents, or under Australian law, international treaties, and letters rogatory. Given this landscape, and the near total alignment of the private and public factors in Plaintiffs' favor, Craig, a billionaire living in the U.K., cannot carry the "heavy burden" of overriding the "strong presumption" in favor of Plaintiffs' chosen forum necessary to close the doors of this Court to Plaintiffs.

**IV)** **This suit is not barred by *res judicata***

Craig asserts this suit is barred by *res judicata* because he procured two fraudulent Australian judgments against W&K without serving or notifying the company. As an initial matter, res judicata cannot bar the ***entire* suit.** The AC alleges Craig stole (1) $11 billion of bitcoins, and (2) hundreds of millions in intellectual property. AC ¶¶ 7, 11-15. The fraudulent Australian judgments, if valid (they're not), at best, *only* transferred title to some of the *intellectual property*. *Id.* ¶ 130. Consequently, their maximum preclusive effect **would only bar Plaintiffs claims to W&K's intellectual property**, leaving the **overwhelming majority** of Plaintiffs' claims, *i.e.*, recovery of over $11 billion dollars in stolen bitcoins, pending before this Court.

However, the *res judicata* defense is frivolous. The judgments are void because the Australian court lacked jurisdiction and because they were procured by *extrinsic* fraud. Moreover, the judgments don't actually transfer ownership of the intellectual property and the parties and claims are entirely distinct. Dave's estate and W&K had no knowledge at all of the Australian proceedings, and Craig cannot use them to shield his fraud.

A) <u>The judgments are void because W&K was not served and thus the Australian court lacked jurisdiction</u>

A judgment has no *res judicata* effect if it is void. *Ellis v. Dyson*, 421 U.S. 426, 442 (1975). A judgment is void if the issuing court lacked jurisdiction. *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc*., 734 F.2d 639, 640–41 (11th Cir. 1984) (no *res judicata* given to "judgment issued from a court lacking personal jurisdiction"); *Fla. Nat. Bank of Jacksonville v. Kassewitz*, 25

So.2d 271, 275, 156 Fla. 761, 767 (Fla. 1946) ("Judgments bind no one unless entered by a court having jurisdiction"). A court lacks jurisdiction if the complaint was not properly served on the defendant. *Hansberry v. Lee*, 311 U.S. 32, 40 (U.S. 1940) ("It is a principle of general application . . . that one is not bound by a judgment in personam in a litigation in which he … has not been made a party by service of process"); *see e.g. Arco Elecs. Control Ltd. v. Core Intern.*, 794 F. Supp. 1144, 1146 (S.D. Fla. 1992) (denying enforcement of Israeli judgment because "service was improper, it need not reach any other contention").

Here, neither of the two Australian suits were served on W&K, the sole defendant. AC ¶ 100. Craig did not want W&K or Dave's family to stop his misappropriation of W&K's property, so he failed to serve W&K with the suits. Instead, without any authority to do so, he filed papers in Australia *fraudulently purporting to appear for* W&K as its "Director/Australian Agent" and listed his Australian address as W&K's "[a]ddress for service." D.E. 24-30. Due to the lack of service, the judgments are void and have no *res judicata* effect.

Neither W&K nor Dave's estate was even aware of these suits until the ATO sent a copy of the complaints to Ira in April 2014, five months after the "consent judgments" had been entered. Ex. 1 ¶10. Ira then engaged Australian counsel and obtained a copy of the court files. The files reveal Craig falsely testified in an affidavit that W&K had been served by "mailing" a copy of the statement of claim to W&K's registered mailing address and by "leaving" a copy at W&K's registered address for service. AC Ex. 4 at 4. Both assertions are completely false. Ex. 1 ¶ 10; AC. ¶119.

But even if Craig had mailed or left the statement of claim (he did not), neither mailing nor leaving is valid service. Under the rules of the Australian court, foreign defendants may be served pursuant to the Hague Convention or as allowed by the law of the jurisdiction where the defendant

resides.[28] The Hague Convention requires service via the "Central Authority" of the defendant's state,[29] which did not happen, and Florida law requires service by the county sheriff, Fla. Stat. 48.011 *et seq.*, which also did not happen. Ex. 1¶ 10; AC. ¶119. The Australian rules further require that service on persons outside Australia include a specific notice on the alleged scope and grounds of jurisdiction,[30] but Craig did not serve this required notice. *Id*. Dave was deceased, no one else was living in his home, which was W&K's registered office, and there was no agent, manager, or other company representative there on whom process could be served. Ex. 1 ¶ 10; AC. ¶119.

Thus, even under Craig's false affidavit, W&K was not validly served, the Australian judgments are void, and Craig's *res judicata* argument should be rejected.

B) <u>The judgment is void because it was procured by *extrinsic* fraud</u>

A judgment also has no res judicata effect if it was procured by extrinsic fraud. *Burtoff v. Tauber*, 2011 WL 248547, at *2 (S.D. Fla. 2011). Extrinsic fraud exists where the defendant:

> has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff.

*United States v. Throckmorton*, 98 U.S. 61, 65-66 (1878); *Parker v. Parker*, 950 So.2d 388, 391

---

[28] New South Wales Uniform Civil Practice Rules ("UCPR"), Part 11, available at http://www9.austlii.edu.au/cgi-bin/viewdb/au/legis/nsw/consol_reg/ucpr2005305/. The UCPR allows service outside Australia under the Hague Convention or "in accordance with the law of the country in which service is effected." UCPR 11.8AC.

[29] Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, art. 5.

[30] UCPR § 11.7: "If a person is to be served outside of Australia with an originating process, the person must also be served with a notice in the approved form informing the person of: (a) the scope of the jurisdiction of the court in respect of claims against persons who are served outside Australia, and (b) the grounds alleged by the plaintiff to found jurisdiction, and (c) the person's right to challenge service of the originating process or the jurisdiction of the court or to file a conditional appearance."

(Fla. 2007) ("extrinsic fraud occurs where a defendant has somehow been prevented from participating in a cause" or where there is "fraudulent representation of a party without his consent"); *Inoue v. Bank of America, N.A.*, 692 Fed. Appx. 818, 819 (9th Cir. 2017) (no *res judicata* if extrinsic fraud, *i.e.*, fraud that "deprived the opposing party of the opportunity to appear and present his case"); *Lara v. Suntrust Mortgage Inc.*, 2016 WL 3753155, at *6 (D. Md. 2016) (no *res judicata* if defendant "was prevented from fully exhibiting her case by her opponent's extrinsic fraud or deception, such as by keeping her away from the court or keeping her in ignorance of the proceedings"); *In re Estate of O'Keefe*, 833 So.2d 157, 161 (Fla. 2 DCA 2002) (extrinsic fraud "prevents a party from defending in an action, raising issues, or otherwise presenting his or her case").[31]

This is precisely what happened here. To keep W&K out of court and ensure it could not participate in the case, Craig never served W&K. *See supra* Section IV(A). Craig further ensured W&K would never be notified of the suit by filing papers with the court listing *his Australian address* as W&K's "[a]ddress for service" and fraudulently purporting to appear for W&K as its "legal agent and representative" and "Director/Australian Agent." AC Ex. 30. To finish his *fait acompli*, Craig filed documents on W&K's behalf purporting to acknowledge the "debt" on behalf of W&K and give "consent" to the entry of judgment against W&K. AC Exs. 4, 19, 30. In fact, when Ira confronted Craig with this deception, he admitted he'd hidden his actions to "make sure the court signed off on what Dave and I planned." AC ¶ 123; AC Ex. 20 at 18.

This is black letter extrinsic fraud that defeats Craig's *res judicata* defense. *See*, *e.g.*, *E. &*

---

[31] In contrast, *intrinsic* fraud, which does not ordinarily prevent *res judicata*, is "fraudulent conduct that arises within a proceeding and pertains to the issues in the case that have been tried," such as the use of false testimony or other false evidence that was "submitted to and received consideration by the court." *Parker*, 950 So.2d at 391. Intrinsic fraud is left for the defrauded forum to unwind.

*J. Gallo Winery v. Gallo Cattle Co*., 967 F.2d 1280, 1287 (9th Cir. 1992) ("The classic example of extrinsic fraud is where the aggrieved party is kept in ignorance of the proceeding or is in some other way induced not to appear") (quotation omitted); *Lara*, *supra* at *6 (denying motion for *res judicata* dismissal where plaintiffs alleged extrinsic fraud because they had never "received notice of the foreclosure action until after the sale was scheduled"). Craig's motion should be denied.[32]

C) Even if valid, the Australian judgments didn't actually transfer the intellectual property, and involved different things, causes of action, and parties

The Australian judgments actually only enter a money judgment against W&K and simply "notes the agreement of the parties that the plaintiff will accept the transfer of intellectual property held by plaintiff in full and final satisfaction of the judgment." AC Ex. 22, at 5. Thus, even if valid, the judgments don't appear to transfer actual title to the intellectual property. The actual title transfer appears to be a private agreement between Craig and himself. Thus, if the judgments stand, they stand as money judgments against W&K that Craig can attempt to enforce against W&K in this country (which will fail for the reasons above).

To put it in clear legal terms, judgments only have *res judicata* effect if all "four identities" are present: "1) identity of the thing sued for; 2) identity of the cause of action; 3) identity of the persons and parties to the actions; and 4) identity of the quality or capacity of the person for or

---

[32] In D.E. 46, at 6, Craig argues his false submissions to the NSW courts are *intrinsic* and not *extrinsic* fraud because Plaintiffs claim Craig "filed papers in Australia purporting to appear for W&K . . . and then falsely consent[ed] to judgment" and that this constitutes allegations of "false evidence that was submitted to and received consideration by the court." Of course, this ignores his failure to serve and his providing his own address for service. Nevertheless, what Craig describes is in fact *black letter* extrinsic fraud from the seminal case on it. Extrinsic fraud occurs when, e.g., "an attorney fraudulently or without authority assumes to represent a party and connives at his defeat. . ." *Throckmorton*, 98 U.S. at 65-66. The true test for extrinsic fraud is when "there has never been a real contest in the trial or hearing of the case." *Id*. That's what Craig accomplished with his fraud, and that's why his Australian judgments are void.

against whom the claim is made." *Casines v. Murchek*, 766 F.2d 1494, 1499 (11th Cir. 1985). Here, the "thing sued for," the "causes of action," and the "parties" – are all different.

In Australia, the thing sued for was money. Craig fraudulently alleged W&K had breached a 2009 contract and therefore owed him approximately $56 million AUD plus interest. AC Ex. 11. Craig's statements of claim *did not include any request for intellectual property*, but ended with "the plaintiff claims: Debt of $28,533,016.79." *Id.* at 4. The court entered a "consent order" for monetary judgments, noting Craig *agreed* to accept intellectual property in satisfaction of the debt. AC Ex. 19 at 1. Here, in contrast, the thing sued for is intellectual property and $11 billion of bitcoin. Thus, there is no "identity of the thing sued for." This alone defeats any *res judicata* claim.

The causes of action are also different. In Australia, Craig sued for breach of the forged 2009 contract. Here, Plaintiffs are suing for conversion, misappropriation, and fraud. The parties are also different. In Australia it was Craig v. W&K, whereas here Dave's estate is also suing for the intellectual property. In light of the differences, Craig's motion must be denied.

**V)      There is no basis for abstention on the grounds of international comity**

As an initial matter, and as with res judicata, even if this defense is meritorious (it's not), it can, **at best, only bar Plaintiffs claims to W&K's intellectual property**, leaving the overwhelming majority of Plaintiffs' claims, *i.e.*, recovery of over $11 billion dollars in stolen bitcoins, pending before this Court.

Craig asserts this Court should abstain from adjudicating this case because an Australian court entered "consent orders" against W&K in two cases where W&K was never served, and where Craig actively prevented W&K's participation. Under Craig's argument, a wrongdoer can file suit against a U.S. citizen in a distant country, consent to judgment, thereby foreclose access to U.S courts, and thus force the U.S. citizen to travel around the world to reclaim his property. That is not the law and Craig's attempt to invoke this rare doctrine, under these egregious facts,

should be rejected by this Court.

"Federal courts have a virtually unflagging obligation to exercise the jurisdiction conferred upon them." *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994). Thus, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Cafaro v. Zois*, 2015 WL 3821752, at *5 (S.D. Fla. 2015) (Bloom, J.).

Where, as here, a defendant requests a stay or dismissal based on a prior foreign judgment, the dispositive factors are "(1) whether the foreign court was competent, (2) whether the foreign judgment was fraudulent, and (3) whether that judgment violated American public policy notions of decency and justice." *Ungaro–Benages v. Dresdner Bank AG,* 379 F.3d 1227, 1238 (11th Cir. 2004). Craig's request for comity must be rejected, as it fails all three prongs.

*First*, the Australian court was not competent because it lacked jurisdiction; Craig never served W&K with process. *See supra* Section IV(A); *see also Hilton v. Guyot*, 159 U.S. 113, 205 (1895) (comity only given to foreign judgment by a court "having jurisdiction of the cause and of the parties") (quoted in *Turner Entertainment Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994)); *Arco Elecs. Control Ltd.*, 794 F. Supp. at 1146 (S.D. Fla. 1992) (denying enforcement of Israeli default judgment and holding that because "service was improper, it need not reach any other contention" to deny enforcement).

*Second*, the judgment was fraudulent because it was obtained through extrinsic fraud. *See supra* Section IV(B); *Hilton*, 159 U.S. at 205 (no comity if foreign judgment was "affected by fraud or prejudice"). Craig asserts that fraud by a litigant is irrelevant and that only fraud by the foreign court itself affects the comity analysis. Br. at 28-29. That is incorrect, where, as here, Craig engaged in *extrinsic* fraud, as opposed to just *intrinsic* fraud, *i.e.*, where W&K "has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by

keeping him away from court . . . or where [W&K] never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff." *Throckmorton*, 98 U.S. at 65-66 (distinguishing between extrinsic and intrinsic fraud and holding only the former to be grounds to set aside judgment); *see also Assoun v. Assoun*, 14-CIV-1368, 2015 WL 110106, at *5 (S.D.N.Y. Jan. 7, 2015) ("The doctrine of comity holds that full faith and credit will be accorded to a judgment of a foreign country unless it is established that the judgment is violative of a strong public policy *or has been procured by extrinsic, as opposed to intrinsic, fraud*.") (emphasis added).[33]

*Third*, the judgments violated American public policy notions of decency and justice, because W&K had no opportunity to defend and judgment was rendered on the basis of egregious extrinsic fraud. *Hilton*, 159 U.S. at 205 (no comity if no "opportunity to defend") (quoted in *Turner Entertainment*, *supra*).

 To whatever extent Craig seeks prospective comity (that this Court should abstain and require Dave's estate and W&K to file a new suit in Australia), that would likewise be baseless. All types of abstention require extraordinary and "exceptional circumstances," *Cafaro*, *supra* at *5, and abstention based on prospective international comity is applied "[f]ar more rarely" than others. *GDG Acquisitions*, *supra*, 749 F.3d at 1030. The pertinent factors are: (1) the strength of the United States' interest in using a foreign forum, (2) the strength of the foreign governments' interests, and (3) the adequacy of the alternative forum. *Id.* (quotations omitted).

With respect to the first two factors, the U.S. and Florida have a "very strong" interest in

---

[33] Craig's reliance on *Tr. Intl. Corp. v. Nagy*, 15-80253-CIV, 2017 WL 5248425, at *6 (S.D. Fla. Mar. 28, 2017) is misplaced. There, no party ever claimed extrinsic fraud. In fact, both parties were well aware of the foreign proceedings having both filed multiple cases there. Thus, the *Nagy* court never considered extrinsic fraud.

adjudicating this dispute. *See supra* Section III. The Australian government has comparatively

weak interest as the victims, place of injury, and laws broken are all those of the U.S. and Florida.

With respect to the third prong, the adequacy of the Australian forum "is informed by *forum*

*non conveniens* analysis." *Ungaro-Benages*, 379 F.3d at 1238. As shown in detail above in Section

III, if the plaintiff is a U.S. citizen (as is the case here), a *forum non conveniens* dismissal requires

"positive evidence of unusually extreme circumstances" and manifest "material injustice." *SME*

*Racks*, 382 F.3d at 1101. This case is exactly the opposite: forcing Dave's estate and W&K to

litigate far from home in Australia simply due to Craig's unusually extreme fraud would result in

manifest injustice and fundamental unfairness. Accordingly, Craig's motion for dismissal on

grounds of international comity should be rejected.

## VI) Plaintiffs' claims are timely

Plaintiffs' claims were timely filed. Craig's arguments that these claims are time-barred

identify the wrong accrual dates and fails to mention the relevant Florida authority for tolling of

the statute of limitations. Craig's arguments for dismissal on these grounds are essentially a request

that this Court reward his years-long scheme to hide the actions he took to defraud Dave's estate.

"A statute of limitations bar is an affirmative defense, and plaintiffs are not required to

negate an affirmative defense in their complaint." *La Grasta v. First Union Securities, Inc.*, 358

F.3d 840, 845 (11th Cir. 2004) (internal citations and quotations omitted). "[A] Rule 12(b)(6)

dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the

complaint that the claim is time barred." *Id.*

Long standing Florida Supreme Court precedent sets forth multiple legal theories "that may

operate to deflect the statute of limitations" for a cause of action. *Major League Baseball v.*

*Morsani*, 790 So. 2d 1071, 1077. Craig's statute of limitations defense fails as a matter of Florida

law because (1) issues of fact predominate the accrual of Plaintiffs' claims; (2) he fraudulently

concealed his theft from the estate; (3) he is equitably estopped from asserting the defense; and (4) the claims are tolled pursuant to Fla. Stat. § 95.051(1)(a).

A) Issues of Fact Predominate the Accrual of Plaintiffs' Claims

Craig's statute of limitations arguments should be denied because there are significant issues of fact concerning the timing of his wrongful acts. Discovery is needed to determine when Craig in fact asserted wrongful dominion over all Plaintiffs' bitcoins. Even then, certain "forked assets," *e.g.,* Bitcoin Cash, did not come into existence until 2017. AC ¶¶ 37-41.[34] Obviously Craig could not convert an asset that did not yet exist.

Likewise, questions of fact predominate as to both the state and federal trade secret claims. In November 2015, Craig wrote to Dave's friend Patrick Page that most of the intellectual property developed by him and Dave was "yet to be completed and published." AC ¶¶ 151-52. Since these claims are premised, in part, on Craig's wrongful disclosure of Plaintiffs' intellectual property, discovery is needed to determine when these claims in fact accrued. Indeed, since 18 U.S.C. §§ 1836 does not reach misappropriation occurring before its enactment date, Plaintiffs' Defend Trade Secrets Act claim *cannot be* time barred. *Adams Arms, LLC v. Unified Weapon Sys., Inc.*, 8:16-CV-1503-T-33AEP, 2016 WL 5391394, at *6 (M.D. Fla. Sept. 27, 2016); *see also PDC Machines Inc. v. Nel Hydrogen A/S*, CV 17-5399, 2018 WL 3008531, at *3 (E.D. Pa. June 15, 2018) (DTSA claims possible for "defendant's continued use of trade secrets after the enactment date, even if the secrets were acquired earlier.").

Finally, even if discovery somehow revealed that all claims are time-barred – it won't – Plaintiffs' have notified Craig they plan to seek leave to amend and add a claim for civil theft. *See*

---

[34] Ben Popken, *Why Did Bitcoin 'Fork' Today and What is Bitcoin Cash?*, NBC NEWS (August 1, 2017), *available at* https://www.nbcnews.com/business/consumer/why-bitcoin-forking-today-what-bitcoin-cash-n788581.

D.E. 46-1. Civil theft has a five-year limitations period; it's certainly not barred. Fla. Stat. § 772.17.

B) <u>Plaintiffs' claims are tolled under the doctrine of fraudulent concealment</u>

Florida law permits the tolling of a statute of limitations "when a plaintiff alleges fraudulent concealment." *Razor Capital, LLC v. CMAX Fin. LLC*, 17-80388-CIV, 2017 WL 3481761, at *4 (S.D. Fla. Aug. 14, 2017); *see also Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1282 n.1 (11th Cir. 2003) ("Fraudulent concealment requires the defendants to engage in the willful concealment of the cause of action using fraudulent means to achieve that concealment.") (citing *Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809, 811-12 (Fla. 4th DCA 1995)); *Nardone v. Reynolds*, 333 So. 2d 25, 39 (Fla. 1976) ("[T]he statute of limitations will be tolled when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him for discovering his injury."); *Vargas By and Through Vargas v. Glades General Hosp.*, 566 So. 2d 282, 285 (Fla. 4th DCA 1990) ("[T]he courts will not protect defendants who are directly responsible for the delays of filing because of their own willful acts; it is a doctrine to prevent the court from participating in the fraud of the defendant").[35]

To show fraudulent concealment, a plaintiff must show "(1) successful concealment of the cause of action; (2) fraudulent means to achieve that concealment and (3) that the plaintiff exercised reasonable care and diligence in seeking to discover the facts that form the basis of the claim." *Razor Capital*, 2017 WL 3481761 at *4. "[W]hether or not fraudulent concealment is sufficient to toll the statute of limitations is a question of fact." *Id.* (citing *Walker v. Dunne*, 368 So. 2d 640, 641 (Fla. 2nd DCA 1979)).

This District's decision in *Razor Capital* is instructive. There, the plaintiff purchased a pool

---

[35] Some Florida case law mistakenly uses the term "equitable tolling" when they are in fact applying the doctrine of fraudulent concealment. *Razor Capital*, 2017 WL 3481761, at *4 n.9.

of default debt from the defendant. *Id*. at *1. Prior to the purchase, defendant had discovered multiple material defects with the underlying collateral and devised a plan to conceal these defects from plaintiff. *Id.* After plaintiff discovered these defects, it spoke with the defendant who averred that it was "similarly duped." *Id.* Plaintiff eventually received documents from a third party, discovered defendant's deception, and sued; defendant moved to dismiss on statute of limitations grounds. *Id.* at *1-2. Because defendant "concealed its true level of knowledge" from plaintiff, the *Razor Capital* court denied defendant's motion to dismiss on limitations grounds. *Id.* at *5.

Craig's fraudulent scheme to cover up his theft from Ira undoubtedly rises to the level of "willful concealment" necessary to show fraudulent concealment. To cover his theft, Craig forged at least three contracts to make it seem like Dave had willingly given him W&K's intellectual property and that Craig did not have W&K or Dave's bitcoins. AC ¶¶ 95-110, 135-36. Craig then actively concealed his theft of assets from Ira by making repeated misrepresentations to them like, e.g., "I don't know what you have been led to believe. But I am not trying to take anything from Dave's estate." AC. Ex. 24 at 6. And "[p]lease understand, I do not seek anything other than to give you information about [Dave] . . . I will also help you recover what Dave owned." AC ¶133; AC Ex. 24 at 6. To further ensure his actions weren't uncovered, Craig, through his agent Uyen Nguyen, reached into Florida to unlawfully seize control of W&K. *Id.* ¶ 139.

Craig's argument (Br. at 38) that Ira "should have, with almost no diligence, discovered" that Craig stole Dave's assets bears no legal merit. "[W]hether or not fraudulent concealment is sufficient to toll the statute of limitations is a question of fact." *Razor Capital*, 2017 WL 3481761 at *4. Like the defendant in *Razor Capitol* who disclaimed any knowledge of its tortious conduct, Craig's deliberate misrepresentations to Dave's estate foreclose his limitations defense now.

C) Craig is equitable estopped from asserting a statute of limitations defense

Under Florida law, Craig is equitably estopped from asserting a statute of limitations

defense. "It is well settled in Florida . . . that the statutes of limitation can be deflected by the doctrine of equitable estoppel." *Fla. Dept. of Health and Rehab. Services v. S.A.P*, 835 So. 2d 1091, 1097–98 (Fla. 2002). "Equitable estoppel is based on principles of fair play and essential justice and arises *when one party lulls another party into a disadvantageous legal position*." *Morsani*, 790 So. 2d at 1077 (emphasis added). "The rationale of . . . equitable estoppel . . . is that a defendant cannot be taken by surprise by the late filing of an action when the defendant's own conduct is responsible for the tardiness of the filing." *S.A.P*, 835 So. 2d 1102.

Here, Craig is directly responsible for Ira waiting to bring this case. Not only did Craig "lull" Plaintiffs from bringing claims, but he did so through fraudulent means. In February 2014, realizing the ATO would soon contact Dave's estate, and desiring to prevent Dave's family from taking action, Craig reached out to Dave's father and falsely promised "to help [him] recover what Dave owned." AC ¶ 133. Further attempting to lull Ira into not taking legal action, Craig assured Ira the fraudulent contracts were legitimate and said he'd be providing Ira with share certificates in a company he promised would be worth millions. *Id.* ¶¶ 136-137; Ex. 20. In April 2014, Craig continued this scheme to lull Ira into inaction by promising Ira he'd receive the first of many multi-million-dollar payments in October 2014. *Id.* ¶ 145. When this payment didn't arrive, Craig blamed the delay on the ATO investigation and continued to promise Ira he would see value when the investigation closed. ¶ 149. It wasn't until October 9, 2015, when Craig essentially stopped responding to Ira's requests for information that Ira realized he'd likely have to sue. ¶ 150.

Craig's conduct above is directly "responsible for the tardiness of the filing," if any. *S.A.P*, 835 So. 2d 1102. Because Craig's "behavior caused [Ira] to delay filing suit," Craig "is equitably estopped from raising the statute of limitations to bar [Ira]'s claim." *Acoustic Innovations, Inc. v. Schafer*, 976 So. 2d 1139, 1144 (Fla. 4th Dist. App. 2008). Further, the resolution of this issue is

a question of fact that cannot be resolved on a motion to dismiss. *Kelly v. Davis*, No. 3:10CV392, 2012 WL 967442, at *2 (N.D. Fla. Mar. 22, 2012); *Morris v. Bischoff*, No. 96-1384-CIV-T-17A, 1997 WL 128114, at *5 (M.D. Fla. Mar. 4, 1997).

D) <u>Craig's absence from the state of Florida bars a statute of limitations defense</u>

Fla. Stat. § 95.051 expressly identifies "[a]bsence from the state of the person to be sued" as a condition that tolls the statute of limitations. Courts apply this provision to defendants who are out-of-state at the time a cause of action begins to accrue. *See e.g. Abbott v. Kiser*, 654 So.2d 640 (Fla. 4th DCA 1995) (finding wife's suit timely filed because husband's absence from country tolled statute of limitations period applicable to wife's actions to enforce property settlement); *Hunt v. Enzo Biochem, Inc.*, 471 F. Supp. 2d 390, 403 n. 92 (S.D.N.Y. 2006) (tolling limitation "because defendants [were] not amenable to personal jurisdiction in" Florida). That said, the statute expressly states tolling "shall not apply if service of process or service by publication can be made in a manner sufficient to confer jurisdiction to grant the relief sought." Fla. Stat. § 95.051.

Craig's readily admits that "Fla. Stat. § 95.015(1)(a) plainly applies to defendants who have gone underground or are ducking service." D.E. 46 at 8. Service of process on Craig could not have been made during the period he fled Australia for London and concealed his whereabouts. AC ¶ 16; Ex. 1 at 6-8. Since the length of time Craig was a fugitive in hiding is an issue of fact, the time statutorily tolled from the accrual of Plaintiffs' claims cannot be decided at this time.

**VII)   Plaintiffs have plausibly alleged all claims**

Craig's claim that Plaintiffs are telling a "tall tale" when he submitted demonstrably false testimony to this Court, is ironic to say the least. *Compare* Br. at 40 *with* AC at ¶¶ 160-70. But his hyperbole cannot sidestep the fact that Plaintiff's complaint is primarily based on Craig's own admissions, emails, communications, and statements.

In reviewing a "Rule 12(b)(6) [motion] for failure to state a claim, [courts] accept[] the

factual allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiffs." *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1169 (11th Cir. 2014). The claim must be plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Put differently, the complaint must contain 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' of the required element[s]." *Wagner*, 984 F. Supp. 2d at 1313 (*quoting Twombly*, 550 U.S. 556).

A)  <u>The allegations in the amended complaint are factually consistent</u>

Plaintiffs' allegations are consistent and straight-forward: after Dave died, Craig stole bitcoins and related intellectual property belonging to W&K and Dave. AC ¶¶ 7-19. It's Craig's own forgeries, misrepresentations, and obfuscation – like the demonstrably false testimony to this Court – that have resulted in a years-long complex grand fraud. Remarkably, Craig now argues these same misrepresentations and false documents prevent this action from moving forward.

1)  *Craig cannot use a single, likely forged, email to dismiss Plaintiffs' entire complaint*

Craig argues a single "email" that Dave *allegedly* sent him so conclusively repudiates the overwhelming evidence of lies, deception, theft, and forgeries that this Court should deny Plaintiffs discovery.  Br. at 40. This argument is specious and conveniently ignores the fact that Craig, who has repeatedly demonstrated his propensity for forgeries, is the *sole source* of this alleged "email." It also ignores the fact that the email, unsurprisingly, contains numerous indicia of unreliability.

For example, as mentioned above, this email was produced solely by Craig who has a long history of forgeries to suit his ends. AC ¶ 110. Second, Craig produced this email as part of his Australian affidavit, which Plaintiffs have already shown to include forged contracts. Third, its production was a self-serving attempt to proffer evidence supporting claims Plaintiffs allege were themselves fraudulent. AC Ex. 4 at 10-24. Fourth, proof that *Craig* drafted the email, and not Dave, is apparent from the author's use of the European date format "30 Apr." instead of the American "Apr. 30." *Id.* at 24. Fifth, the email is incomplete as the "Subject" line indicates the alleged email

44

is a "reply," but the original message is missing. *Id.*

Under these circumstances, Craig's citation to an unverified "email" is not enough to "plainly show that the complaint's allegations are untrue" in a way that "foreclose[s] recovery as a matter of law." *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1245 (11th Cir. 2016).

### 2) *Craig used the fraudulent contracts to justify certain tax credits*

Craig argues Plaintiffs' claims are not plausible because if Craig had the private keys and intellectual property, he would have just taken them and never filed lawsuits or contacted Dave's family. Br. at 44. Further, he claims that if he forged the contracts, he would have chosen a payment date from before Dave died. *Id.*

But Plaintiffs have already explained Craig's gambit. Craig was in trouble with the ATO for claiming R&D tax credits he couldn't substantiate. *Id.* ¶ 96; AC Ex. 12. He decided to use his and Dave's work in W&K to substantiate these credits, but needed a "paper trail" justifying his work and ownership of the intellectual property. AC ¶¶ 95-110. To that end, he forged contracts purporting to show that Dave and W&K had agreed to pay him hundreds of thousands of bitcoins for services and funding he'd allegedly provided, and that Dave and W&K had "guaranteed" this payment with W&K's intellectual property as collateral. *Id.* Craig set the forged payment due date for a time shortly *after* Dave had died, thus putting Dave into automatic "default. AC Ex. 5 at 5. Craig then sued W&K in Australia for the collateralized intellectual property and consented to judgment for W&K. AC ¶¶ 117-21. This was the perfect fraud because (1) Craig already had the bitcoins, but this lawsuit allowed him to claim that (2) *he didn't have them* because Dave had died before paying him and (3) W&K was therefore *in default* and had to forfeit its intellectual property.

After the ATO began to investigate his submissions to the Australian Courts, Craig realized they may reach out to the true owners of W&K, Ira. *Id.* ¶ 132. Craig therefore beat them to the punch and elicited Ira's trust by revealing Dave's involvement in the creation of Bitcoin, the

promise of a fortune, and a "lost" treasure of Dave's bitcoins. *Id.* ¶¶ 133-37.

Craig argues he *really was* trying to help Plaintiffs. And while Plaintiffs claim *that's* not plausible given Craig's forgeries, misrepresentations, desperate false testimony to this Court, and waiting nearly a year to contact them, a motion to dismiss is not the appropriate time for this argument. At this stage, the court must "constru[e the facts] in the light most favorable to the plaintiffs." *Adinolfe*, 768 F.3d at 1169. Accordingly, Craig's motion must be denied.

B) <u>The Amended Complaint Has Adequately Alleged a Claim for Conversion of Bitcoins</u>

Craig argues that Plaintiffs' claim for conversion should be dismissed because Bitcoin is money, and the complaint does not "specifically identify" the stolen bitcoins or allege that Dave owned them. Br. at 47. Craig is wrong for several reasons. First, the complaint plainly states Dave owned the converted bitcoins. Second, bitcoins are not "money" nor were Dave's bitcoins functioning as money, so the additional requirements for conversion of money claims do not apply. Nevertheless, the complaint "specifically identifies" the bitcoins Craig converted.

1) *The complaint sufficiently states a claim for conversion by alleging that Dave and W&K owned bitcoin and Craig wrongfully deprived him of that bitcoin*

The elements of a conversion claim are (1) "ownership of the subject property" and (2) "that the other party wrongfully asserted dominion over that property." *Mattocks v. Black Entm't Television LLC,* 43 F. Supp. 3d 1311, 1321 (S.D. Fla. 2014). The AC sufficiently alleges both elements in regard to the bitcoins Craig converted from Plaintiffs. The AC first provides detailed allegations demonstrating Dave and W&K mined bitcoins, and owned hundreds of thousands of them, including an allegation that Craig admitted Dave owned 300,000. AC ¶¶ 65, 79-97, 111, 112, 116. Plaintiffs clearly allege that "the mined bitcoins were stored in wallets in the possession of Dave, Craig, W&K, and/or certain trusts." *Id.* ¶ 93. Further, the AC states in no uncertain terms that Craig "**converted to his own use, bitcoins** . . . **that was then the property of, and owned**

46

**by, the estate and/or W&K**. Id. ¶ 171. These allegations of ownership (when supplemented as Plaintiffs did with descriptions of the converted property) have the actual imprimatur of the Florida Supreme Court as sufficient to make out a claim for conversion. *See* Form 1.939, Fl. R. Civ. P.

   2) *Plaintiffs didn't need to allege the bitcoins were "specific and identifiable" because bitcoins aren't money and the rule's rationale doesn't apply*

Craig states bitcoins are money and that Plaintiffs must therefore have alleged their bitcoins were "specific and identifiable." Br. at 47. But this extra identification element doesn't apply here because bitcoins aren't "money," and the rule's rationale is wholly inapplicable.  As a general matter, Bitcoin is not legal tender, and Craig cannot make it so simply by invoking the term "cryptocurrency." (Br. at 47 n.11). Bitcoin is a unique computer file that the marketplace values and some accept in lieu of "money."  But utility as a medium of exchange does not make something "money." Indeed, its usefulness as a store of value is significantly undermined by its volatility. Numerous places, *e.g.*, Amazon.com, accept credit card points as payment for goods. No one claims credit card points are "money." Courts and regulators agree. *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 216-17 (E.D.N.Y. 2018) (Bitcoin is a commodity). The IRS characterizes cryptocurrencies as *property*, not money. IR-2014-36.

The one case Craig cites for support is inapposite. *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) is a criminal case applying federal money laundering/transmitting statutes against a criminal defendant who was using bitcoins, instead of money, to conduct illicit activity. The court held that in this instance, the statute's reference to money encompassed bitcoins. But "Bitcoin is not 'money' as people ordinarily understand that term." *United States v. Petix*, No. 15-CR-227A, 2016 WL 7017919, at *5 (W.D.N.Y. Dec. 1, 2016).

Most importantly, specificity for conversion of bitcoins doesn't make sense. The requirement seeks to prevent contract claims masquerading as tort claims. That is, it's purpose is

to "ensure[] that money actually exists to pay off a specific debt and the claimant is not merely trying to enforce a contract dispute by a conversion claim." *Ingle v. Janick*, No. 2:14-CV-544-FTM-38, 2014 WL 6476223, at *3 (M.D. Fla. Nov. 19, 2014) *citing Tambourine Comercio Internacional SA v. Solowsky*, 312 F. App'x 263, 272 (11th Cir. 2009) (requirement "ensures that a fund of money *actually exists to pay a specific debt owed* and the claimant is not merely transforming a contract dispute into a conversion claim") (emphasis in original). But Plaintiffs' allegations do not involve a breach of contract claim recast as conversion. Thus, the identification requirement is inapplicable here, and Plaintiffs' allegations are sufficient.

   3)  *The complaint identifies the converted bitcoins with sufficient specificity*

   Even if the specificity requirement for conversion of money claims applies, the AC sufficiently identifies the bitcoins Plaintiffs owned. First, bitcoins are intrinsically associated and stored in a digital "wallet" files, and the complaint plainly alleges that Plaintiffs' converted bitcoins were stored in these identifiable wallets. AC ¶¶ 20-21, 65, 91, 93. Second, Plaintiffs' allegations that the converted bitcoins were held in specific "trusts" (AC ¶¶ 84-88, 91-94) and that Craig owed fiduciary duties to Dave's estate with respect to those bitcoins (AC ¶¶ 192-196) sufficiently identifies the converted bitcoin. *See Batlle v. Wachovia Bank, N.A.*, 2011 WL 1085579, at *2 (S. D. Fla. 2011) ("Florida law establishes that claim of conversion of money in a bank account is proper where the money is deposited into an account designed to keep money segregated and identifiable, such as a trust or escrow account, or where there is an obligation or fiduciary duty to keep money segregated."); *see also Abromats v. Abromats,* No. 16-CV-60653, 2016 WL 4917153, at *11 (S.D. Fla. Sept. 15, 2016) (Bloom, J.) (denying motion to dismiss conversion claim where plaintiff alleged defendant transferred funds out of one trust account and into another).

   C)  Plaintiffs adequately allege constructive fraud

   Craig argues that Plaintiffs fail to allege constructive fraud because they do not (1) identify

the fiduciary relationship Craig breached or (2) allege that Craig recognized, accepted or undertook any fiduciary duties after Dave died. Br. at 50. He is wrong on both counts. "Constructive fraud exists where a duty arising from a confidential or fiduciary relationship has been abused, or where an unconscionable advantage has been taken." *Ducat Fla., LP v. Wells Fargo Bank, N.A.*, No. 12-23683-CIV, 2013 WL 6667038, at *7 (S.D. Fla. Oct. 24, 2013). The complaint alleges both. AC ¶¶ 209, 210; *see id.* at ¶¶ 119-121, 132-140, 144-153 (alleging facts demonstrating Craig took unconscionable advantage of Plaintiffs through material omissions and false promises that he would assist in recovering Dave's assets and pay them millions, while simultaneously looting those assets and concealing his fraud); But Craig does not challenge Plaintiffs' allegation that he took unconscionable advantage, and thus his motion must be denied. *Winstead v. Lafayette County Bd. Of Comm'rs*, 197 F. Supp. 3d 1334, 1341 (N. D. Fla. 2016) (challenge to only one of two theories underpinning a claim is insufficient for dismissal). Craig's motion should also be denied because he never challenges Plaintiffs' allegations that a fiduciary duty existed between him and W&K (AC ¶¶ 206, 192-194) and that Craig beached that duty by making fraudulent misrepresentations and omissions, (*id.* at ¶¶ 95-97, 111, 119-130, 138-139, 209). *See Levy v. Levy*, 862 So. 2d 48, 53 (Fla. 3rd DCA 2003) (constructive fraud claim properly alleged based on "a misrepresentation or concealment" with fiduciary duty);[36] *see also Stonecreek--AAA, LLC v. Wells Fargo Bank N.A.*, No. 12-CV-23850, 2013 WL 5416970, at *9 n.4 (S.D. Fla. Sept. 26, 2013). Finally, contrary to Craig's assertion, the AC adequately alleges (1) a fiduciary/confidential relationship between Craig and Dave's estate, (() that Craig made fraudulent misrepresentations and omissions to the

---

[36] The cases Craig cites requiring a defendant to undertake a fiduciary duty only apply when a fiduciary relationship does not already exist. *See Hogan v. Provident Life & Acc. Ins. Co.*, 665 F. Supp. 2d 1273, 1287 (M.D. Fla. 2009) (requiring allegations of placing and accepting trust where constructive fraud claim is based on an implied fiduciary duty arising from the parties' relationship); *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 509 (S.D. Fla. 2000) (same).

estate, and that (iii) he took advantage of the relationship at the estate's expense. AC ¶¶ 12, 119, 133, 136-140, 145-49, 207-12 (alleging Craig invited the estate's trust by making repeated false offers and promises to help it recover Dave's assets, that Craig lulled the estate to conceal his malfeasance, and that the estate accepted his statements); *see also Ducat Fla.*, 2013 WL 6667038, at *7 ("Florida courts have construed the term 'fiduciary or confidential relation' as being very broad."). These allegations suffice under Rule 8. *Eli Lilly & Co. v. Tyco Integrated Sec., LLC.*, No. 13-80371-CIV, 2015 WL 11251732, at *3 (S.D. Fla. Feb. 10, 2015) (Bloom, J.) (constructive fraud claim is subject to Rule 8); *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005) (finding sufficient allegations of "some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party"); *Harrell v. Branson*, 344 So. 2d 604, 607 (Fla. 1st DCA 1977) (finding fiduciary relation results from offer that's "naturally calculated" to repose confidence in the offeree, and that the duties can be moral/personal, but need not be legal).[37] For each of these independent reasons, the Court should deny Craig's motion.

## CONCLUSION

Plaintiffs respectfully submit for the foregoing reasons that the Court should deny Craig's Motion to Dismiss the Amended Complaint

---

[37] Craig suggests Exhibit 24 to the complaint contradicts Plaintiffs' allegation that they placed their trust and loyalty in Craig. Br. at 50. **It shows the opposite:** When Ira questioned some of Craig's statements (AC Ex. 24 at 17), Craig sought to dispel those concerns by continuing to advise and counsel Ira that Craig was telling the truth and was properly managing the assets owned by W&K and Dave's estate, and that Ira was wealthy due to the assets Craig was managing for him. *Id.* at 2-17. Ira was successfully deceived and lulled. In fact, Exhibit 24 alone is more than sufficient to support a claim for constructive fraud. *See e.g. Crusselle v. Mong*, 59 So.3d 1178, 1181 (Fla. 5th DCA 2011) ("An implied fiduciary relationship will lie when there is a degree of dependency on one side and an undertaking on the other side to protect and/or benefit the dependent party."); *Hepp v. Paul Revere Life Ins. Co.*, 120 F. Supp. 3d 1328, 1342 (M.D. Fla. 2015) ("One who is entrusted with the management of another's money owes a fiduciary relationship to that person.")

Respectfully submitted,

                        **BOIES SCHILLER FLEXNER LLP**

                        By: */s/Velvel Devin Freedman*
                            Velvel (Devin) Freedman
                            Bruce A. Weil
                            Stephen N. Zack
                            **BOIES SCHILLER FLEXNER LLP**
                            100 SE Second Street
                            Miami, FL 33131
                            Tel.    (305)539-8400
                            Fax.    (305)539-1307
                            Email: vfreedman@bsfllp.com; bweil@bsfllp.com;
                            szack@bsfllp.com

                            Kyle Roche
                            **BOIES SCHILLER FLEXNER LLP**
                            333 Main Street
                            Armonk, NY 10504
                            Tel.    (914)749-8200
                            Fax.    (914)749-8300
                            Email: kroche@bsfllp.com
                            *Admitted pro hac vice*

                            Attorneys for Plaintiffs
                            IRA KLEIMAN in his capacity as Personal
                            Representative of the Estate of David Kleiman and
                            W&K Info Defense Research, LLC

                        **CERTIFICATE OF SERVICE**

        I certify that I have served all counsel of record via ECF on this seventeenth day of July,
2018.

                                        /s/ Velvel (Devin) Freedman