# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE No. 18-CV-80176-BLOOM/Reinhart

IRA KLEIMAN, *et al.*,

      Plaintiffs,

v.

CRAIG WRIGHT,

      Defendant.

_____/

## ORDER ON MOTION TO DISMISS

**THIS CAUSE** is before the Court upon Defendant Craig Wright's ("Craig" or "Defendant") Motion to Dismiss, ECF No. [33] (the "Motion"). The Court has considered the Motion, the record, the parties' briefs, and the applicable law. For the reasons that follow, the Motion is granted in part and denied in part.

## I.  BACKGROUND

Plaintiff W&K Info Defense Research, LLC is a Florida limited liability company that was incorporated in 2011. ECF No. [24], at ¶ 2. Plaintiff Ira Kleiman is David Kleiman's ("Dave") brother and is the personal representative of his estate (the "Estate"), and is a resident of Palm Beach County, Florida. *Id.* at ¶ 1. Defendant Craig Wright is an Australian citizen who presently resides in London, England. *Id.* at ¶ 3.

Dave and Craig met in or around 2003. *Id.* at ¶ 52. Their relationship centered around their mutual interest in cyber security, digital forensics, and the future of money. *Id.* Around 2008, Dave and Craig began to speak about ways to use peer-to-peer file sharing to solve issues in cryptography. *Id.* at ¶ 54. The Amended Complaint alleges

that for the next several years, Dave and Craig worked together in developing Bitcoin, and that through their collaboration they mined over a million bitcoins together. *Id.* at ¶¶ 53-57, 65. These bitcoins were stored in specifically identifiable bitcoin wallets, over which Craig now asserts ownership. *Id.* at ¶ 65.

### A. Bitcoin

On October 31, 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto (the "Satoshi White Paper") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. *Id.* at ¶ 30. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust." *Id.* In May of 2016, Craig publicly claimed that he and Dave were the creators of Bitcoin. *Id.* at ¶ 16. Bitcoin is a decentralized digital currency that uses a ledger to track the ownership and transfer of every bitcoin in existence. *Id.* at ¶ 20. This ledger is called the "Bitcoin Blockchain." *Id.* In order to complete a transaction with bitcoins, you must have a bitcoin wallet. *Id.* at ¶ 21. "Wallets" are computer files dedicated to storing bitcoin information. *Id.* Each bitcoin wallet has a "public key" that is used as the "address" to receive bitcoin from others. *Id.* Each wallet is also assigned a "private key." *Id.* at ¶ 22. To send bitcoin out of a wallet, an individual must have the private key associated with that bitcoin wallet. *Id.*

There are two methods of acquiring bitcoins. The first is simply receiving bitcoins from someone. *Id.* at ¶ 23. The second way one can acquire a bitcoin is by "mining" them. *Id.* at ¶ 24. Bitcoin is designed without a centralized authority to curate the blockchain. *Id.* at ¶ 25. Therefore, "mining" is a process through which anyone with

internet access can update the ledger and "mine bitcoins" by employing computer power to solve a complex computer problem. *Id.* at ¶ 26. The first "miner" who solves the problem gets the right to update the ledger by adding a block of recent transactions to the blockchain. *Id.* The protocol pays the successful miner in newly minted bitcoins, the number of which is determined by a pre-existing algorithm. *Id.*

Since its beginning, Bitcoin has inspired the creation of over one thousand other digital currencies. *Id.* at ¶ 37. These new currencies often borrow from the initial Bitcoin program but make changes to the model in an attempt to create a new cryptocurrency with distinct functions or more suited to a specific market or niche. *Id.* In other cases, Bitcoin has been modified by individuals in a way they believed would improve the Bitcoin itself, such as by allowing more transactions into a single block of blockchain. *Id.* at ¶ 38. In these situations, the supporters of the new Bitcoin, have created a "fork" through which the original Bitcoin blockchain/ledger is divided into two distinct, but identical, copies, (i) the original Bitcoin, and (ii) the new Bitcoin. *Id.* at ¶ 39. The result is that any individual who owned the original Bitcoin now owns an identical amount of the new Bitcoin. *Id.*

### B. W&K Info Defense Research, LLC

On February 14, 2011, Dave formed W&K Info Defense Research LLC ("W&K") in Florida. *Id.* at ¶ 69. The Articles of Incorporation for W&K list Dave as the managing member and registered agent. *Id.* Dave and Craig allegedly created W&K to mine bitcoin and develop intellectual property. *Id.* at ¶ 72. W&K has no operating agreement, and Plaintiffs claim that due to receiving several conflicting statements from Craig, they are not certain of the exact ownership structure of W&K. *Id.* at ¶ 70. Dave, in

partnership with Craig, created intellectual property both in his individual capacity and through W&K. *Id.* at ¶ 66. Plaintiffs assert that the Estate and/or W&K own all of this intellectual property. *Id.*

W&K was used to solicit business from the United States Department of Homeland Security ("DHS"). *Id.* at ¶ 76. Craig acted in many different capacities on behalf of W&K, including authorized representative, lead researcher, technical contact, legal agent and representative and Director/Australian Agent. *Id.* at ¶ 77. Craig also used W&K's Florida address as his mailing address associated with W&K. *Id.*

### C. Dave Kleiman's Death

Dave passed away in April of 2013. *Id.* at ¶ 48. The Amended Complaint alleges that after Dave's death, Craig unlawfully and without permission took control of the bitcoins from the Estate and from W&K once he had exclusive possession over the private keys necessary to own, move, or sell the bitcoins belonging to Dave and/or W&K. *Id.* at ¶ 111. Craig used the private keys that Dave and Craig shared to move the bitcoins out of their wallets and then claimed to own bitcoins really owned by W&K and/or Dave by creating a series of fraudulent contracts and documents. *Id.* Craig then moved the stolen bitcoin into trusts only known and controlled by him for use in making large trades for his Australian businesses. *Id.* While the exact number of bitcoins stolen remains to be determined, the Amended Complaint contends that the Estate is entitled to at least 300,000 bitcoins, along with their forked assets. *Id.* at ¶ 112.

### D. The Australian Judgments

After Dave's death, in July and August of 2013, Craig filed two claims in the Supreme Court of New South Wales against W&K for approximately $28 million each.

*Id.* at ¶ 117. In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research," and that this contract was "bonded against the intellectual property of [W&K]." *Id.* at ¶ 118. In his pleadings filed before the Australian courts, Craig claimed that any breach of contract "would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]." *Id.* The statements of claim alleged that the intellectual property at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties." *Id.* Plaintiffs claim that W&K was never served with process for these proceedings in Australia. *Id.* at ¶ 119.

In both lawsuits, Craig filed an "Acknowledgment of Liquidated Claim" on behalf of W&K where he represented that W&K accepted and agreed to his claims. *Id.* at ¶ 120. In the Australian court filings, Craig apparently falsely identified himself as the "legal agent and representative for the defendant" and its "Director/Australian Agent." *Id.* Further, he falsely identified his Australian address and email as the "address for service" for W&K. *Id.* On August 28, 2013, Craig filed proposed consent orders in both cases. *Id.* at ¶ 121. These filings represented to the Australian courts that W&K consented to judgment being entered against it through the signature of its "authorised officer . . . J Wilson." *Id.* "J Wilson" was actually Craig's employee and was not an authorized officer for W&K. *Id.* Although Craig did not have direct or voting interest in W&K, Craig "elected" Wilson as a director during a "shareholder meeting" where only Craig was present. *Id.* at ¶ 122. On November 6, 2013, the Supreme Court of New South Wales entered judgments in favor of Craig for both claims (the "Australian Judgments"). *Id.* at ¶ 130.

### *E*. *The Australian Tax Office Investigation*

Sometime after Dave's death, the Australian Tax Office ("ATO") began investigating Craig. Plaintiffs claim Craig needed to use W&K and Dave's assets to justify tax positions he claimed in Australia. *Id.* at ¶ 96. To accomplish this, Craig forged and backdated several contracts to create a fraudulent "paper trail" purporting to show that Dave transferred bitcoins and intellectual property rights belonging to Dave and W&K to Craig. *Id.* at ¶ 97.

During the course of that investigation, the ATO conducted several meetings with Craig and his counsel in Australia, where Craig allegedly told the ATO officials that he had rightfully taken ownership of Dave's bitcoin upon his death. *Id.* at ¶¶ 82-84. During one of these meetings with the ATO, Craig's counsel indicated that W&K's bitcoins had been transferred into trusts located in Seychelles, Singapore, and the United Kingdom. *Id.* at ¶ 84.

Craig's attorney further represented to the ATO officials that intellectual property that had been acquired by Craig from W&K was "on-supplied to the Craig Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange . . . and so on." *Id.* at ¶ 131. Craig then provided the fraudulent contracts to the ATO in an attempt to substantiate his ownership of bitcoins and intellectual property that had originally belonged to Dave and/or W&K. *Id.* at ¶ 89.

### *F. The ATO Contacts the Kleiman Family*

On February 11, 2014, the Amended Complaint alleges that with the "ATO closely auditing Craig's activities," Craig grew concerned that the ATO would eventually contact the Kleiman family. *Id.* at ¶¶ 132-133. Craig decided to contact the Kleiman family

before the ATO did. *Id.* at ¶ 132. Craig reached out via email to Dave's elderly father. *Id.* at ¶ 133. He initially instructed him to save any wallet files found on Dave's computer and indicated that he would give additional information at a later date. *Id.* Craig also represented that he was not seeking "anything other than to give [Dave's father] information about [his] son," and that he would help the Estate "recover what Dave owned." *Id.* Ira Kleiman ("Ira"), Dave's brother, took over the correspondence with Craig. *Id.* at ¶ 134.

Craig told Ira that he was partners with Dave and no one knew about their collaboration or W&K. *Id.* at ¶ 135. Craig explained to Ira that W&K was involved in Bitcoin mining and that it was very successful. *Id.* Craig revealed that he and Dave were planning on starting a new company together called "Coin-Exch." *Id.* at ¶ 136. Craig told Ira that the Estate would receive shares in the new company "worth millions." *Id.*

On March 28, 2014, W&K was reinstated by Craig's agent, Uyen Nguyen ("Uyen"). *Id.* at ¶ 139. Uyen removed Dave as the registered agent for W&K and listed herself instead. *Id.* She then added herself as manager and secretary and an entity named "Coin-Exch Pty Ltd" as director. *Id.* Although he was in regular contact with them, Craig concealed the reinstatement of W&K from the Estate. *Id.* at ¶ 140.

In April of 2014, Ira first learned of the Australian Judgments, when an ATO auditor sent him some of the Australian court documents. *Id.* at ¶ 123. The auditor provided Ira copies of the allegedly fraudulent documents given to the ATO by Craig. *Id.* at ¶¶ 123, 141-142.

The ATO provided Ira with three deeds, each titled "IP Deed of Assignment" and each executed on September 15, 2013. *Id.* at ¶ 142. Each of these IP

Deeds of Assignments assigned various intellectual property rights from an Australian company named "DeMorgan Ltd" to three separate Australian entities: Coin-Exch Pty, Ltd., Hotwire Preemptive Intelligence Pty, Ltd., and Cloudcroft Pty, Ltd. *Id.* The deeds described the source and nature of the IP as consisting of "source code, algorithms and patentable materials that have been obtained by Craig . . . through the following unrelated entities . . . [W&K]." *Id.* at ¶ 143.

### G. Ira Confronts Craig

On April 22, 2014, Ira confronted Craig about the documents he had received from the ATO via email. *Id.* at ¶ 144. Ira told Craig that after reviewing the documents sent to him by the ATO, he "felt like there [were] questionable discrepancies in the contracts between [Craig] and W&K such as Dave's signatures, his resignation, transfer of all accountable value." *Id.* Craig responded that his actions were taken "to make sure that the court signed off on what Dave and [he] planned," and Craig then promised Ira that the Estate could be paid what was owed to it. *Id.* at ¶ 145.

On April 25, 2014, Craig sent Ira a chronology of his activities related to W&K and the development of its intellectual property. *Id.* at ¶ 147. In this document, Craig wrote "[t]here is a lot of IP and 'stuff' in the mix. All up, it's around a hundred million dollars' worth. This IP originates in work CSW has been doing for more than 10 years; it originates in things that came from W&K; it has to do with the software acquired. The values and distribution . . . amounts to a third each for Cloudcroft, Hotwire, and Coin exch." *Id.*

Craig's promise to Ira of the multi-million dollar payment never came true. *Id.* at ¶ 149. Craig blamed any delay on the ATO investigation and kept promising Ira he

would see value when the investigation closed. *Id.* By October 9, 2015, Craig essentially stopped responding to Ira's attempts to contact him. *Id.* at ¶ 150.

The ATO raided Craig's home in late 2015 and Craig fled Australia for London. *Id.* at ¶ 16. Craig currently serves as Chief Scientist of a UK company called nChain in London. *Id.* at ¶ 158. In 2016, Craig filed dozens of patents related to bitcoin and blockchain technology through nChain. *Id.* To date, neither the Estate nor W&K has received the assets allegedly belonging to them as a result of Dave's early involvement in bitcoin and bitcoin mining. *Id.* at ¶ 159.

The Defendant seeks to dismiss Plaintiffs' Amended Complaint on several grounds, including lack of standing, the failure to bring this action as a derivative suit, *res judicata*, forum non conveniens, the expiration of the applicable statute of limitations, international abstention, lack of personal jurisdiction and the failure to state legally sufficient claims. ECF No. [33].

## II.   LEGAL STANDARD

Rule 8 of the Federal Rules of Civil Procedure requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550

U.S. at 557 (alteration in original)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. These elements are required to survive a motion brought under Rule 12(b)(6), which requests dismissal for "failure to state a claim upon which relief can be granted."

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (*quoting Iqbal*, 556 U.S. at 682).

## III.   ANALYSIS

As stated *supra*, the Defendant moves to dismiss Plaintiffs' Amended Complaint on several grounds. The Court addresses Defendant's arguments in turn.

### A.  Standing

Defendant argues that only W&K has standing to maintain an action for the recovery of intellectual property created or bitcoins mined after February 2011 because the "amended complaint makes clear that Dave Kleiman's alleged business relationship

was conducted through W&K," and thus the Estate itself lacks standing to bring claims relating to these assets created during this time. ECF No. [33], at 12. Secondly, Defendant claims that Plaintiffs lack standing because they failed to adequately allege the existence of a 2008 to 2011 partnership between the Defendant and Dave. *Id.* The Court is unpersuaded by both arguments.

"Standing for Article III purposes requires a plaintiff to provide evidence of an injury in fact, causation and redress[a]bility." *Dermer v. Miami-Dade Cty.*, 599 F.3d 1217, 1220 (11th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Specifically, "[t]o have standing, a plaintiff must show (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to conduct of the defendant; and (3) it is likely, not just merely speculative, that the injury will be redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003); *see Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980 (11th Cir. 2005) (same).

Defendant claims that "[n]owhere does Plaintiff allege that Dave Kleiman had a direct, personal partnership with Dr. Wright from February 2011 until his death in April 2013." ECF No. [33], at 12. The Amended Complaint, however, includes allegations that Dave personally partnered with the Defendant (after 2011) to create the assets at issue in this lawsuit. For example, the Amended Complaint alleges that "[f]rom [Dave and Craig's] collaboration in 2008 until Dave's death in 2013, Craig and Dave mined over a million of the initial bitcoins together (*personally and through W&K*). *Id.* at ¶ 65 (emphasis added). The Amended Complaint also alleges that "Dave, in partnership with Craig, created intellectual property *both in his individual capacity and through W&K*."

*Id.* at ¶¶ 65-66 (emphasis added). Taking these allegations as true, as the Court must do for the purposes of analyzing the Motion to Dismiss, the Court finds that the Estate has sufficiently alleged that it sustained an injury for the loss of intellectual property and bitcoin, created and mined after February 2011, and therefore would have standing to bring claims for these assets.

Defendant also claims that Plaintiffs failed to adequately allege the existence of a partnership between the Defendant and Dave Kleiman. ECF No. [33], at 13. Fla. Stat. § 620.8202(1) states that "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." A party attempting to prove the existence of a partnership has the burden of demonstrating the satisfaction of the elements. *Kislak v. Kreedian*, 95 So. 2d 510, 515 (Fla. 1957). The Court notes that the statutory language does not require that a partnership be reduced to writing.[1]

Consistent with Fla. Stat. § 620.8202(1), the Amended Complaint alleges that "Craig and Dave associated to carry on as co-owners of a business for profit to create Bitcoin, mine bitcoins, and create other block chain intellectual property." ECF No. [24], at ¶ 197. Further, the Defendant is alleged to have expressly admitted to having engaged in this partnership with Dave. *Id.* at ¶ 63. The Amended Complaint also alleges that the Defendant and Dave, starting in 2008 through 2013, partnered together to research and

---

[1] Defendant also argues that because the "alleged oral "partnership" agreement was not reduced to writing [it] is barred by the statute of frauds." ECF No. [33], at 14. Defendant's sole factual support is the fact that the partnership between Dave and the Defendant was alleged to have lasted longer than two years. *Id.* The fact that a partnership lasts longer than one year does not mean that the parties originally "intended and contemplated that performance of the agreement would take longer than one year." *Yates v. Ball*, 132 Fla. 132, 181 So. 341, 344 (1937). Here, after a close review of the Amended Complaint, the Court cannot, as a matter of law, conclude that the terms of the oral partnership agreement, as pled, originally contemplated an agreement to be performed beyond one year.

complete a paper about bitcoin, and to help get the idea "operational." *Id.* at ¶¶ 55-56. Accordingly, the Court concludes that Plaintiffs have sufficiently alleged a partnership existed between Dave and the Defendant for the purposes of a Motion to Dismiss.

### B. Derivative Suit

Defendant also argues that the Amended Complaint should be dismissed because Plaintiffs' claim should have been brought as a derivative suit. *See* ECF No. [33], at 15. Defendant, however, has not provided the Court with any factual or legal analysis of how this principle may apply to the case at hand. *See Anderson v. Branch Banking & Tr. Co.*, 119 F. Supp. 3d 1328, 1345 (S.D. Fla. 2015) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. [The Court] will not do his research for him.") (citing *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) (Posner, J.)). Accordingly, this argument is denied.

### C. Res Judicata

Next Defendant argues that W&K's claims arising from the Defendant's alleged possession of the intellectual property is barred by the doctrine of res judicata because ownership of the intellectual property was already decided by the Supreme Court of New South Wales. ECF No. [33], at 16. A final judgment or order ***on the merits*** operates as res judicata in a subsequent proceeding between the parties on the same cause of action. *Albrecht v. State*, 444 So.2d 8 (Fla. 1984); *O'Brien v. Brickell Townhouse, Inc.*, 439 So. 2d 982 (Fla. 3d DCA 1983); *Sanchez v. Martin*, 416 So. 2d 15 (Fla. 3d DCA 1982). The doctrine of collateral estoppel, or issue preclusion, like res judicata, requires the existence

of a "final judgment on the merits" as a necessary element. *Papa John's International, Inc. v. Cosentino*, 916 So. 2d 977 (Fla. 4th DCA 2005).

Here, the prior judgments at issue and that form the basis of Defendant's *res judicata* defense are the Australian Judgments. The Australian Judgments were rendered subsequent to the Defendant's filing of the two consent orders in the two Australian lawsuits. ECF No. [24], at ¶ 121. These filings, which are alleged to have been submitted without authorization, represented to the Australian courts that W&K consented to the judgment being entered against it. *Id.* Plaintiffs have attached the "record of proceedings" for both of the Australian lawsuits to its Amended Complaint. ECF No. [24-22]. From a review of the record of proceedings the Court cannot readily determine what issues were decided by the Supreme Court of New South Wales in rendering the Australian Judgments. A court may not dismiss a claim on res judicata grounds where it is not apparent from the face of the order that it was issued as a final judgment on the merits of the case. *See Papa John's International, Inc. v. Cosentino*, 916 So. 2d 977, 984 (Fla. 4th DCA 2005) (finding that the circuit court erred in dismissing a plaintiff's claims where pleading did not demonstrate on its face that a consent order issued in a prior case was a final judgment on the merits of the claims). Here, the "record of proceedings" state only that money judgments have been entered in "favour of [Craig Wright]," and further noting "the agreement of the parties that [Craig Wright] will accept transfer of the intellectual property held by the plaintiff in full satisfaction of the judgment." ECF No. [24-22], at 4-5, 8. Ambiguity of a record that there was a final judgment on the merits covering a party's claims precludes dismissal on res judicata grounds. *See generally*, *Papa John's International, Inc.*, 916 So. 2d at 984. Here,

Defendant's argument for dismissal on res judicata grounds must fail because it is not clear from a review of the record that the Australian Judgments were decided by the Australian court on the merits of the case. In order for a court to dismiss a party's claims on the grounds of res judicata, the necessary element of a "final judgment on the merits" must be met.

Additionally, the Florida Supreme Court has held that res judicata does not apply when its application would defeat the ends of justice. *deCancino v. E. Airlines, Inc.*, 283 So. 2d 97, 98 (Fla. 1973) ("the doctrine will not be invoked where it will work an injustice."). Here, the Plaintiffs assert, and the Defendant allegedly admitted, that the Australian lawsuits were initiated by the Defendant in an attempt to "make sure the court signed off on what Dave and [Craig] planned." ECF Nos. [24]. at ¶ 123, [24-20], at 18. The Plaintiffs also contend that they were never served with process that these suits were underway. *Id.* at ¶ 119. In light of these facts, it would be an injustice to the Plaintiffs to allow the doctrine of res judicata to be invoked. Accordingly, the Court declines to dismiss Plaintiffs' claims on res judicata grounds.

### D. Forum Non Conveniens

Defendant argues that in the event the Court finds that the Plaintiffs have standing and that their claims are not barred by the doctrine of res judicata, dismissal would still be required on forum non conveniens grounds. The doctrine of forum non conveniens permits a court to decline to exercise jurisdiction when the convenience of the parties and the interests of justice weigh in favor of trying the action in an alternative forum. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S. Ct. 252, 70 L.Ed.2d 419 (1981). Analytically, the court's examination is three-pronged. *Id.* When moving to dismiss a

case on forum non conveniens grounds, the movant must show: (1) the availability of an alternative and adequate forum; (2) that public and private factors weigh in favor of dismissal; and (3) that the plaintiff can reinstate his suit in the alternative forum. *See Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001).

The Supreme Court has "characterized forum non conveniens as essentially, 'a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined.'" *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994)). "The doctrine of forum non conveniens permits a court with venue to decline to exercise its jurisdiction when the parties' and court's own convenience, as well as the relevant public and private interests, indicate that the action should be tried in a different forum." *Pierre-Louis v. Newvac Corp.*, 584 F.3d 1052, 1056 (11th Cir. 2009). "This tool 'is to be favored' for ensuring that federal courts only hear 'those cases where contacts with the American forum predominate.'" *Aldana v. Fresh Del Monte Produce, Inc.*, No. 01-3399-CIV, 2007 WL 3054986, at *3 (S.D. Fla. Oct. 16, 2007), *aff'd sub nom, Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283 (11th Cir. 2009) (quoting *Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512, 1519 n.10 (11th Cir. 1985)).

The defendant invoking forum non conveniens "bears a heavy burden in opposing the plaintiff's chosen forum." *Sinochem Int'l Co. Ltd.*, 549 U.S. at 430. In fact, at the outset, the scale tips in favor of a plaintiff's chosen forum when the plaintiff is a domestic citizen. *Duha v. Agrium, Inc.*, 448 F.3d 867, 874–75 (6th Cir. 2006). There is a strong presumption by the Supreme Court that forum non conveniens should only be employed

in "exceptional circumstances" and that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). The general rule, therefore, is that dismissal for forum non conveniens is proper only when a defendant "establish[es] such oppressiveness and vexation . . . as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947). To the extent that courts consider matters outside the complaint, courts must "draw all reasonable inference and factual conflicts in favor of the plaintiff." *OOO-RM Invest v. Net Element Int'l, Inc.*, No. 14-20903-CIV, 2014 WL 12613283, at *2–3 (S.D. Fla. Nov. 3, 2014) (citing *Webster v. Royal Caribbean Cruises, Ltd.*, 124 F. Supp. 2d 1317, 1320 (S.D. Fla. 2000) and *Wai v. Rainbow Holdings*, 315 F. Supp. 2d 1261, 1268 (S.D. Fla. 2004)).

### i. Availability and Adequacy of an Alternative Forum

"Availability and adequacy warrant separate consideration." *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001). Ordinarily, an alternative forum is available simply "when the defendant is amenable to process in the other jurisdiction." *Piper*, 454 U.S. at 255 n.22 (internal citation omitted). If the remedy offered in the other forum is unsatisfactory, this requirement may not be satisfied. *See Id.* "[T]he Supreme Court has instructed us that a remedy is inadequate when it amounts to 'no remedy at all.'" *Aldana*, 578 F.3d at 1290 (quoting *Piper*, 454 U.S. at 254).

Defendant's sworn declarations of Gordon Grieve ("Grieve"),[2] a lawyer admitted to practice in Australia, state that claims raised by Plaintiffs in the Amended Complaint

---

[2] The declarations of Gordon Grieve, ECF No. [33-1] and [33-2], are appropriately considered when determining a motion to dismiss based on the doctrine of forum non conveniens. *Ochoa v.*

may be filed in Australia if they are dismissed by this Court. *See* ECF No. [33-2], at ¶ 5. The Defendant also filed an affidavit in which he affirmed that he was amenable to service of process for litigation in New South Wales. ECF No. [33-3], at ¶ 23. Because the Court finds that Defendant is susceptible to suit in Australia, the "availability" prong is satisfied. *See Aldana,* 578 F.3d at 1290 ("In order to be available, the foreign court must be able to assert jurisdiction over the litigation sought to be transferred."). The "adequacy" consideration is similarly satisfied because all of Plaintiffs' claims are cognizable under Australian law. *See* ECF No. [33-2], at ¶ 5. Even when an alternate forum is available, however, the defendant still maintains a heavy burden in demonstrating the offsetting disadvantage to litigating in the plaintiff's chosen forum.

### ii.  Private Interest Factors

Once an adequate alternative forum has been established, the Supreme Court has directed district courts to consider the "private interest of the litigant." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S. Ct. 839, 91 L.Ed. 1055 (1947). If the court finds that private factors favor dismissal, the Court then determines whether or not factors of public interest tip the balance in favor of a trial in a foreign forum. *La Seguridad v. Transytur Line,* 707 F.2d 1304, 1307 (11th Cir. 1983). The private interest factors a court may consider in its forum non conveniens analysis include (1) ease of access to sources of proof and evidence; (2) availability and costs of obtaining willing and unwilling witnesses, and (3) "all other practical problems that make trial of the case easy, expeditious and inexpensive." *Id.* When plaintiffs are "citizens, residents, or corporations

---

*Empresas ICA, S.A.B. de C.V.*, Case No. 11-CIV-23898, 2013 WL 5674697 at *4 (S.D. Fla. Oct. 17, 2013) (relying on sworn declarations attached to a motion to dismiss of foreign attorneys in forum non conveniens analysis). Plaintiff has not filed any expert declaration opining on foreign law in opposition to Defendant's Motion.

of this country," the Eleventh Circuit mandates that a district court "'require positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion as may exist to deny a United States citizen access to the courts of this country.'" *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101–02 (11th Cir. 2004); *see also La Seguridad*, 707 F.2d at 1308 n.7.

The deference given to a plaintiff's choice of forum is especially strong in the Eleventh Circuit. Here, both Plaintiffs are residents of Florida and citizens of the United States. Therefore this Court gives Plaintiffs' choice of forum a high level of deference and presumption of convenience. *See TNT USA, Inc. v. TrafiExpress, S.A. de C.V.*, 434 F. Supp. 2d 1322, 1333 (S.D. Fla. 2006). Defendant claims that several factors weigh in favor of dismissal on forum non conveniens grounds, including the fact that Defendant's alleged conduct took place in Australia, that a number of witnesses may be in Australia (or abroad), and that Australian law may have to be analyzed. Additionally, the Defendant argues that "this Court could not properly adjudicate any of [Plaintiffs'] claims without disregarding, disrespecting, and undermining the Australian court that rendered the Australian Judgments," and that this factor weighs heavily in favor of dismissal. ECF No. [33], at 24.

As an initial matter, the Defendant is correct that this Court cannot invalidate or void the Australian Judgments, as it is without authority to do so. And the Defendant is also correct that the appropriate forum to address fraud on the court, would be the court in which the Plaintiffs claim the fraud was to have occurred. *Tr. Int'l Corp. v. Nagy*, No. 15-80253-CIV, 2017 WL 5248425, at *6 (S.D. Fla. Mar. 28, 2017) (finding that if a

defendant has used a foreign legal system in some way "which was not above board," then the foreign forum was the correct place to address this concern.). However, Plaintiffs have asserted that the Australian judgments, if valid, only transferred title to some of the intellectual property at issue in this case. ECF No. [50], at 30. Therefore, even if this Court found that the Australian Judgments somehow barred some of the Plaintiffs' claims the "maximum preclusive effect would only bar Plaintiffs claims to W&K's intellectual property, leaving the overwhelming majority of Plaintiffs' claims. . . pending before this Court." *Id.* To the extent that independent claims exist, there is no reason why this forum would not be the proper forum to adjudicate them. Moreover, while this Court does not have authority to invalidate the Australian Judgments, it can make a factual finding as to whether the contractual agreements used by the Defendant in procuring the Australian Judgments were fraudulent. Therefore, this Court finds that the existence of the Australian Judgments is not an "unusual and extreme factor" warranting dismissal on forum non conveniens grounds. *La Seguridad*, 707 F.2d at 1308 n.7.

The Court continues its forum non conveniens analysis by considering whether sources of proof are accessed with relative ease in Plaintiffs' chosen forum, "[p]erhaps the most important 'private interest' of the litigants is access to evidence." *Ford v. Brown*, 319 F.3d 1302, 1308 (11th Cir. 2003). The ease of access to sources of evidence in this case is another factor weighing in the Plaintiffs' favor. The Defendant claims that the majority of evidence relevant to this action is located abroad. The Plaintiffs, however, argue that the "majority of the witnesses and evidence necessary to prove the factual issues "at the core of Plaintiff's claims," are located in Florida and the United States." ECF No. [50], at 19.

In their opposition to Defendant's Motion, the Plaintiffs identified nine witnesses located in Florida alone and another five witnesses located in the United States that they claim will assist in the establishment of the core facts of their claim. *Id.* at 20. Conversely, the Defendant claims many his witnesses are located in Australia or abroad.[3] ECF No. [33], at 22-23. Nonetheless, the presence of witnesses outside of the United States is insufficient to overcome the strong presumption afforded to domestic plaintiffs. *Ward v. Kerzner International Hotels Ltd.,* 2005 WL 2456191 at *3 (S.D. Fla. Mar. 30, 2005); *Aldana,* 578 F.3d at 1293; *Esfeld v. Costa Crociere, S.P.A.,* 289 F.3d 1300, 1303 (11th Cir.2002)("[F]ederal courts, in the forum non conveniens context, do not focus on the connection between the case and a particular state, but rather on the connection of the case to the United States as a whole.").

Additionally, Defendant argues that the relevant witnesses and evidence related to this case are located in Australia and/or are confidential and protected from disclosure under Australian law, and thus not subject to the compulsory process of this forum. ECF No. [33], at 23. Plaintiffs claim that much of the evidence the Defendant has identified as foreign "can be displayed and printed from a computer with an Internet connection . . . [or] are in [Defendant's] own records, his agent's records, or are records he can easily obtain or view in Florida." ECF No. [50], at 24. These documents include the documents from the ATO investigation, the Australian court filings, and documents in the possession of the Defendant and/or his Australian companies. The Court agrees with the Plaintiffs that much of this evidence that the Defendant asserts is beyond the compulsory process of this Court, is under the direct control of the Defendant. The Defendant does

---

[3] Not even the Defendant himself is located in Australia, as he has since relocated to the United Kingdom. ECF No. [24], at ¶ 3. The Court notes that the United Kingdom is in closer proximity to the United States than to Australia.

not need compulsory process to compel the testimony of his own agents or employees. *Wagner*, 984 F. Supp. 2d at 1315 (foreign witnesses insufficient to overcome strong presumption because they were "at least arguably associated with or employees of [defendant]"); *Ward*, 2005 WL 2456191, at *1 (foreign witnesses insufficient to override strong presumption because they were defendant's "own agents and employees"); *TNT USA Inc.*, 434 F. Supp. 2d at 1334 (no dismissal because foreign witnesses are "under the control" of defendant); *Doe v. Sun Int'l Hotels, Ltd.*, 20 F. Supp. 2d 1328, 1330 (S.D. Fla. 1998) (no dismissal because "key defense witnesses are employees of the defendant").

Further, in today's advanced technological age the exchange of electronically stored evidence is not unduly burdensome, and the Court is confident that much of the evidence identified as foreign "can be displayed and printed from a computer with an Internet connection." *TNT USA*, 434 F. Supp. 2d at 1334; *see also City Pension Fund for Firefighters and Police Officers in City of Miami Beach v. Aracruz Cellulose S.A.*, 41 F. Supp. 3d 1369, 1411 (S. D. Fla. 2011) (dismissal denied because "[a]lthough the majority of proof may be located in Brazil, many of the documents and records are likely electronically stored and can easily be transferred.").

This Court finds that the Defendant has not satisfied his burden of setting forth "positive evidence of unusually extreme circumstances" sufficient to overcome the strong presumption in favor of Plaintiffs' choice of forum. *Ward,* 2005 WL 2456191, at *4. Defendant fails to provide arguments that "material injustice is manifest" such that the Court should be compelled to deny the Plaintiffs their access to United States courts. The Court therefore finds that the private interest factors weigh against granting dismissal on the grounds of forum non conveniens.

        iii.    <u>Public Interest Factors</u>

In the Eleventh Circuit, "[a] trial court will look at the private interests first and then, if the balance of the private interests are found 'to be in equipoise or near equipoise,' it will 'determine whether or not factors of public interest tip the balance in favor of a trial in a foreign forum.'" *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Cir. 2009) (quoting *La Seguridad*, 707 F.2d at 1307).  This Court has concluded that the private interest factors do not align in favor of Defendant's position for dismissal on forum non conveniens grounds and are thus not in equipoise.  Nonetheless, the public interest factors also weigh against dismissal. The Supreme Court has advised that the public factors for this Court's consideration are:

> [T]he administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft Co.*, 454 U.S. at 241 n.6 (internal quotations omitted).

Further, in *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.,* the Eleventh Circuit Court of Appeals made clear that the "United States has a strong interest in providing a forum for its citizens' grievances against an allegedly predatory foreign business." *Id.*  It is also worth noting that "although the Southern District of Florida has one of the busiest dockets in the United States" this factor should be accorded little or no weight in the analysis. *Morse v. Sun In'l Hotels Ltd.,* 2001 WL 34874967, at *6 (S.D. Fla. Feb. 26, 2001).

Additionally, it is clear that the instant action is in key respects a localized Florida controversy. This Court emphasizes that the federal interest is "very strong . . . [when] its citizens are allegedly victims and the injury occurs on home soil." *SME Racks,* 382 F.3d at 1104. This controversy concerns a Florida company, regarding Florida assets (bitcoins mined in Florida) and intellectual property developed by that Florida company, where both the injured parties are Florida citizens. Therefore, the Southern District of Florida undeniably has a strong interest in adjudicating a case in which its residents claim that harm was committed against them.

Additionally, Defendant argues that in allowing this case to proceed, the Court would be required to apply Australian law because the Amended Complaint relies on "Australian legal documents," and because certain contracts at issue "contain the parties' agreement to submit any dispute to the jurisdiction of the courts of New South Wales, Australia." ECF No. [33], at 21-22. Even if foreign law were to play a role in interpreting the contract provisions at issue, this alone is not enough to defeat the Plaintiffs ability to litigate the case here in the United States. *TNT USA, Inc v. TrafiExpress, S.A. de C.V.*, 434 F. Supp. 2d 1322, 1335 (S.D. Fla. 2006) (finding that foreign contractual provisions could be properly adjudicated within the American forum, and that the interpretation of foreign law within the contract provisions alone was not enough to take away the plaintiff's ability to litigate in its choice forum); *see also SME Racks, Inc.,* 382 F.3d at 1104–05 (finding that "while the application of foreign law is an important factor to be considered in weighing the public interests, this factor cannot be accorded dispositive weight."); *Burt v. Isthmus Development Co.,* 218 F.2d 353, 358 (5th Cir.1955) (finding the need to apply foreign law to decide a controversy does not amount

to a sound reason to dismiss the case). Accordingly, this Court finds that the public interest factors do not direct dismissal of this case. The Defendant has not met his heavy burden of opposing Plaintiffs, and dismissal on forum non conveniens grounds is therefore not warranted.

### E. International Abstention

Defendant also argues that dismissal is required in application of the international abstention doctrine. In general, federal courts have an obligation to exercise the jurisdiction conferred upon them. *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S. Ct. 1236, 1246, 47 L.Ed.2d 483 (1976). However, abstention from the exercise of jurisdiction is appropriate in some private international disputes. *Turner Entertainment Co. v. Degeto Film GmbH,* 25 F.3d 1512, 1518 (11th Cir. 1994). Abstention is the exception instead of the rule, and "courts regularly permit parallel proceedings in an American court and a foreign court." *Ortega Trujillo v. Conover & Co. Commc'ns*, 221 F.3d 1262, 1265 (11th Cir. 2000). The doctrine of *international abstention* enables courts to abstain and stay proceedings in this country in favor of litigation proceeding elsewhere. In examining whether abstention is appropriate, courts must consider issues of international comity, fairness to litigants, and the efficient use of scarce judicial resources. *See Turner Entm't Co. v. Degeto Film GmbH,* 25 F.3d 1512, 1518 (11th Cir. 1994). International comity "is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1223 n. 25 (11th

Cir.1999) (quoting *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)).  In considering the fairness to litigants, the court should consider the order in which the suits were filed, the more convenient forum, the possibility of prejudice resulting from abstention, and the risk of inconsistent judgments.  *See Turner,* 25 F.3d at 1521–22; *Posner,* 178 F.3d at 1224.  Finally, with regard to the efficient use of scarce resources, courts must consider the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, whether the actions have common parties and issues, and whether the alternative forum is likely to render a prompt resolution.  *Turner,* 25 F.3d at 1522.

The Court finds that the Amended Complaint should not be dismissed based on the doctrine of international abstention.  First, principles of international comity do not favor abstention.  This case is distinct from the proceedings brought in Australia, as those proceedings did not address any of the tort claims brought by the Plaintiffs in the instant action and Plaintiffs have alleged the Australian Judgments do not even begin to cover all of the assets and property sought in the Amended Complaint. ECF No. [50], at 34 (The Australian Judgments "maximum preclusive effect would only bar Plaintiffs claims to W&K's intellectual property, leaving the overwhelming majority of Plaintiffs' claims."). With regard to fairness to litigants, this factor also does not favor abstention. While the Australian lawsuits were undoubtedly filed first, Plaintiffs allege that the Defendant failed to serve the Plaintiffs or provide adequate notice that the lawsuits were underway. ECF No. [24], at ¶ 119.  Moreover, as discussed *supra,* the United States is the more convenient forum to adjudicate Plaintiffs' claims.  Finally, the Court does not believe the efficient use of judicial resources compels abstention. The proceedings in Australia were

ministerial in nature, in that they were never contested by W&K and were rendered as a result of consent judgments. Further, it is not readily apparent that the Supreme Court of New South Wales adjudicated the claims on the merits. Lastly, since the Australian lawsuits are currently closed, there is presently no parallel case to which this Court would abstain. In essence, the resolution of the instant matter will not result in piecemeal litigation or otherwise waste judicial resources. Accordingly, the Court rejects the argument that the Amended Complaint should be dismissed based upon the doctrine of international abstention.

### F.  Personal Jurisdiction

Defendant also argues that the Amended Complaint does not properly assert personal jurisdiction over the Defendant. He contends that the Plaintiffs have failed to establish personal jurisdiction under Fla. Stat. § 48.193(1)(a)(1-2), as the Amended Complaint fails to show that the Defendant committed the wrongful acts in the course of "[o]perating, conducting, engaging in, or carrying on a business" or "committed tortious acts" while physically in the state of Florida or in the United States. ECF No. [33], at 34.

Physical presence in the forum state is not required to establish personal jurisdiction under Fla. Stat. 48.193(a)(1-2). *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002); *see also Canadian Steel, Inc. v. HFP Capital Markets, LLC*, No. 11-23650-CIV, 2012 WL 2326119, at *4 (S.D. Fla. June 19, 2012) (following the "clear weight of binding Eleventh Circuit authority on this question" and holding plaintiffs' established personal jurisdiction under 1(a)(2) solely "on the basis of its allegations that it suffered injury in Florida from Defendants' intentional torts."). Indeed, the Eleventh Circuit has held that a court may assert jurisdiction over a "nonresident defendant who commits a

tort outside of the state that causes injury inside the state." *Brennan v. Roman Catholic Diocese of Syracuse New York, Inc.*, 322 F. App'x 852, 855 (11th Cir. 2009) (citing *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th Cir. 1999)). Thus when an out-of-state defendant commits an intentional tort against a Florida citizen, as the Plaintiffs have alleged occurred in the instant matter, the defendant has caused the necessary Florida injury and is subject to jurisdiction here. Therefore, the Court finds that Plaintiffs have alleged a prima facie case for jurisdiction over Defendant pursuant to Fla. Stat. § 48.193(1-2), based on the allegations of the Amended Complaint. In so finding, the Court follows the clear weight of binding Eleventh Circuit authority on this question. In particular, the Court is bound by the Eleventh Circuit's pronouncement in *Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008), that § 48.193(1)(b) of the Florida long-arm statute permits jurisdiction over an out-of-state defendant who commits an out-of-state tort, so long as that tort caused an injury in Florida. *See* 544 F.3d at 1283 (citing *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1216 (11th Cir.1999)).

### G. Statute of Limitations

Defendant further moves to dismiss all of Plaintiffs' claims arguing that they are barred by the applicable statute of limitations. Defendant asserts that a four-year statute of limitations applies to Plaintiffs' claims for conversion (Count I), Unjust Enrichment (Count II), breach of fiduciary duty (Count V), breach of partnership duties and loyalty of care (Count VI), fraud (Count VII), constructive fraud (VIII), and permanent injunction (IX). ECF [33], at 36. Concerning Plaintiffs' misappropriation claims (Counts III and IV), Defendant asserts that a three-year statute of limitations applies. *Id.* "Generally, whether a claim is barred by the statute of limitations should be raised as an affirmative

defense in the answer rather than in a motion to dismiss . . . However, if facts on the face of the pleadings show that the statute of limitations bars the action, the defense can be raised by motion to dismiss." *Spadaro v. City of Miramar*, 855 F. Supp. 2d 1317, 1328 (S.D. Fla. 2012) (citing Cabral v. City of Miami Beach, 76 So.3d 324, 326 (Fla. 3d DCA 2011)); *see also Keira v. U.S. Postal Inspection Serv.*, 157 Fed.Appx. 135, 136 (11th Cir. 2005) ("At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute.") (internal quotation marks and citation omitted). "A statute of limitations bar is an affirmative defense, and plaintiffs are not required to negate an affirmative defense in their complaint." *La Grasta v. First Union Securities, Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (internal citations and quotations omitted). "[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time barred." *Id.*

Concerning Plaintiffs' claims to which the four-year statute of limitations applies (Counts I, II, V, VI, VII, VIII and IX), Defendant claims that the last act establishing these causes of action occurred when Dave Kleiman died or, at the latest, by November 2013, when the Defendant obtained the Australian Judgments. *Id.* at 37. In their Opposition, Plaintiffs argue that the Defendant has identified the incorrect accrual dates, that issues of fact predominate the accrual of Plaintiffs' claims, and that the relevant Florida authority permits the tolling of the statute of limitations. ECF No. [50], at 43. The Court agrees that the wrong accrual date related to these claims has been identified by the Defendant and that Plaintiffs have alleged facts sufficient to demonstrate that

under the doctrine of fraudulent concealment, the statute of limitations could have been tolled.

Florida law permits the tolling of a statute of limitations "when a plaintiff alleges fraudulent concealment." *Razor Capital, LLC v. CMAX Fin. LLC*, 17-80388-CIV, 2017 WL 3481761, at *4 (S.D. Fla. Aug. 14, 2017); *see also Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1282 n.1 (11th Cir. 2003) ("Fraudulent concealment requires the defendants to engage in the willful concealment of the cause of action using fraudulent means to achieve that concealment.") (citing *Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809, 811-12 (Fla. 4th DCA 1995)); *Nardone v. Reynolds*, 333 So. 2d 25, 39 (Fla. 1976) ("[T]he statute of limitations will be tolled when it can be shown that fraud has been perpetrated on the injured party sufficient to place him in ignorance of his right to a cause of action or to prevent him for discovering his injury."); *Vargas By & Through Vargas v. Glades General Hosp.*, 566 So. 2d 282, 285 (Fla. 4th DCA 1990) ("[T]he courts will not protect defendants who are directly responsible for the delays of filing because of their own willful acts; it is a doctrine to prevent the court from participating in the fraud of the defendant."). To show fraudulent concealment, a plaintiff must show "(1) successful concealment of the cause of action; (2) fraudulent means to achieve that concealment and (3) that the plaintiff exercised reasonable care and diligence in seeking to discover the facts that form the basis of the claim." *Razor Capital*, 2017 WL 3481761 at *4. "[W]hether or not fraudulent concealment is sufficient to toll the statute of limitations is a question of fact." *Id.* (citing *Walker v. Dunne*, 368 So. 2d 640, 641 (Fla. 2nd DCA 1979)).

Here, Plaintiffs have alleged that the Defendant engaged in a fraudulent scheme to take control of assets belonging to the Estate and W&K by initiating lawsuits in Australia without giving any of the Plaintiffs notice that the suits were underway. In order to procure the Plaintiffs' property, the Plaintiffs claim that the Defendant forged several contracts to make it seem like Dave had willingly given the Defendant W&K's intellectual property and bitcoins. ECF No. [24], at ¶ 97. Plaintiffs assert that they only became aware of the facts that give rise to the claims asserts in Counts (Counts I, II, V, VI, VII, VIII and IX) in April 2014. *Id.* at ¶ 123. Further, when the Defendant was confronted by Ira about the Australian Judgments, Defendant admitted that he had taken such actions because "Dave died" and he wanted to "make sure that the court signed off on what [they had] planned. *Id.* Because the Court is required to assume all factual allegations as true, this is the time when the statute of limitations begins to run. As such, these claims were timely brought within the four-year period, and were not barred by the statute of limitations. If, during discovery, it becomes apparent that Plaintiffs became aware of the Defendant's conduct more than four years before the filing of the instant action, Defendant may raise the statute of limitations issue again in a motion for summary judgment. *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1293–94 (S.D. Fla. 2001).

Turning to the Plaintiffs' misappropriation claims (Count III and IV), section 688.007 of the Florida Statutes provides that "[a]n action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Fla. Stat. § 688.007. A proceeding under 18 U.S.C. §1836 must be commenced within 3 years after the date on which the

misappropriation is discovered or should have been discovered. *See* 18 U.S.C. §1836 (b)(3)(d). Dismissal on statute of limitations grounds is appropriate only if it is "apparent from the face of the complaint" that the claim is time-barred. *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004).

The Court has carefully reviewed the Amended Complaint, and finds that the Plaintiffs' misappropriation claims are barred by the three-year statute of limitations based on the facts as alleged on the face of the Amended Complaint. The instant action was filed on February 14, 2018. ECF No. [1]. The Amended Complaint directly states that Plaintiffs became aware of the Australian Judgments when an ATO auditor contacted Ira Kleiman on April 15, 2014 – which is well beyond the three-year statute of limitations period for Plaintiffs misappropriation claims. ECF No. [24], at ¶¶ 123, 141-143. The Amended Complaint alleges that on April 22, 2014, Ira confronted the Defendant via email and stated that he "felt like there [were] questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value . . . ." *Id.* at 144; ECF No. [24-24], at 20. Counts III and IV of the Amended Complaint relate directly to the trade secrets that are identified as "those Craig attempted to have transferred through the fraudulent Australian judgments." ECF No. [24], at 43. Thus, Plaintiffs have affirmatively stated that they were aware of the Defendant's conduct on April 22, 2014, which is the conduct that gives rise to their claims for misappropriation. Even if they did not know the extent of the harm, upon learning of the Defendant's conduct from the ATO auditor, the Plaintiffs should have discovered the Defendant's misapplication of the trade secrets through the "exercise of reasonable diligence."

In light of the fact that the Court can determine from the face of the Amended Complaint that the statute of limitations has run, Plaintiffs' claims for misappropriation in Count III and IV are dismissed. *See Caplen v. Guardian Life Ins. Co. of Am.,* 1996 WL 1057652 *4, No. 96–8359–CIV (S.D. Fla. Oct. 22, 1996) (stating that statute of limitations may be raised on motion to dismiss only if court can determine from face of complaint that limitations period has run).

### H. Failure to State Sustainable Claims

In his final argument for the dismissal of the Amended Complaint, the Defendant claims that the Amended Complaint fails to state "sustainable claims." ECF No. [33], at 40. Defendant claims that "the amended complaint does not allege a coherent or justiciable basis for relief" and instead "tells a tall tale," which is "far-fetched and apparently fabricated as a Rube Goldberg contraption." *Id.*

In reviewing a "Rule 12(b)(6) [motion] for failure to state a claim, [courts] accept[] the factual allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiffs." *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1169 (11th Cir. 2014). Accordingly, at this stage, the Court construes the facts alleged in the light most favorable to the Plaintiffs and disagrees with the Defendant that the Amended Complaint is "implausible" on its face.

The Defendant also argues that Plaintiffs have failed to adequately allege a claim for conversion (Count I) of the bitcoins at issue in this case, because as a form of money the Plaintiffs failed "to allege that any of the purported bitcoins were specifically identifiable or that Dave Kleiman had exclusive ownership of any identifiable bitcoins." ECF No. [33], at 49. Plaintiffs argue that bitcoin is not "money" but rather a commodity,

and regardless of whether it is money, they have identified the bitcoin with sufficient specificity. ECF No. [50], at 51.

Florida law defines the tort of conversion as "the wrongful exercise of dominion or control over property to the detriment of the rights of one entitled to possession." *United States v. Bailey*, 288 F. Supp. 2d 1261, 1269 (M.D. Fla. 2003) aff'd, 419 F.3d 1208 (11th Cir. 2005) (citing *Bel-Bel Int'l Corp. v. Cmty. Bank of Homestead*, 162 F.3d 1101, 1108 (11th Cir. 1998)); *see Deutsche Bank Nat. Trust Co. v. Foxx*, 971 F. Supp. 2d 1106, 1119 (M.D. Fla. 2013) ("Conversion is an unauthorized act that deprives a person of his property permanently or for an indefinite time"). To establish a claim for conversion of money under Florida law, a claimant must demonstrate: (1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so. *Bailey*, 288 F. Supp. 2d at 1264 (citing *Navid v. Uiterwyk Corp.*, 130 B.R. 594, 595-596 (M.D. Fla. 1991)). An action for conversion of money consists of three elements: specific and identifiable money, a deprivation of money belonging to another, and an unauthorized act, which deprives another of his money. *Navid*, 130 B.R. at 595 (M.D. Fla. 1991).

The Eleventh Circuit Court of Appeals has yet to decide whether bitcoin is considered "money" for the purposes of a claim of conversion in a civil context. As cited by the Defendant, however, courts in other districts have held that bitcoin qualified as money for the purposes of indicting and prosecuting a defendant on federal money laundering statutes. *See e.g., United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014); *see also SEC v. Shavers,* 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) ("It is

clear that Bitcoin can be used as money. It can be used to purchase goods or services....
[I]t can also be exchanged for conventional currencies...."). Plaintiffs argue that even if
"the specificity requirement for conversion of money claims applies, the [Amended
Complaint] sufficiently identifies the bitcoins Plaintiffs owned." *See* ECF No. [50], at
48. The Court agrees with the Plaintiffs.

Whether or not bitcoin is "money" for the purposes of a conversion claim, the
Court agrees with the Plaintiffs that they have sufficiently (and with specificity) alleged a
claim for conversion. In regards to the bitcoin's specificity and identity, Plaintiffs have
alleged that the bitcoin blockchain is "a giant ledger that tracks the ownership and
transfer of every bitcoin in existence and that every bitcoin wallet and the number of
bitcoin inside that particular wallet can be identified on the blockchain by referring to its
"public key." ECF No. [24], at ¶¶ 20-21. Further Plaintiffs claim that the bitcoin at issue
were "stored in specifically identifiable bitcoin wallets." *Id.* at ¶ 65. Defendant also
argues that Plaintiffs have failed to "allege exactly how many bitcoins Dave Kleiman
supposedly owned at any time in the past." ECF No. [33], at 48. Plaintiffs, however,
have directly alleged that Defendant admitted that Dave owned at "least 300,000 of the
1,000,000+ bitcoins allegedly held in trust." ECF No. [24], at ¶ 88. The Plaintiffs have
also alleged that the bitcoins were transferred to trusts located in "Seychelles, Singapore,
and [the] UK." ECF No. [33], at ¶ 84.

Here, the Court finds that Plaintiffs have sufficiently alleged a claim for
conversion. The Amended Complaint alleges that Defendant converted at least 300,000
bitcoins upon Dave's death and transferred them to various international trusts, which

was an unauthorized act that deprived the Plaintiffs of the bitcoins therein. Accordingly, Plaintiffs' claim for conversion (Count I) survives Defendant's Motion to Dismiss.

Lastly, Defendant argues that Plaintiffs failed to adequately allege a claim for constructive fraud because the Plaintiffs failed to identify the existence of a fiduciary relationship between the Defendant and Ira Kleiman. ECF No. [33], at 49-50. Under Florida law, constructive fraud occurs "when a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken." *Levy v. Levy*, 862 So. 2d 48, 53 (Fla. 3d DCA 2003). The Florida Supreme Court has stated that the relation and duties involved need not be legal; instead, "they may be moral, social, domestic, or personal." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). A fiduciary or confidential relationship exists where "confidence is reposed by one party and a trust is accepted by the other, or where confidence has been acquired and abused." *Id.* The origin of the confidence is immaterial. *See Id.* Thus, "[t]he term 'fiduciary or confidential relation' is a very broad one." *Am. Honda Motor Co. v. Motorcycle Info. Network*, Inc., 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005) (quoting *Quinn v. Phipps*, 113 So. 419, 420 (Fla. 1927) ).

To state a claim for breach of a fiduciary or confidential relationship, "a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Watkins v. NCNB Nat. Bank of Fla., N.A.*, 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993) (quoting *Bankest Imports, Inc. v. ISCA Corp.*, 717 F. Supp. 1537, 1541 (S.D. Fla. 1989)). "The fact that one party places trust or confidence in the other does not create a confidential relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the

part of the other party." *Lanz v. Resolution Trust Corp.*, 764 F. Supp. 176, 179 (S.D. Fla. 1991).

The Defendant argues that Plaintiffs have failed to adequately allege a claim for constructive fraud because Plaintiffs failed to "identify the fiduciary relationship that [the Defendant] purportedly breached other than to say that it was a "fiduciary" one, let alone allege that [the Defendant] ever "recognized, accepted, or undertook" any fiduciary duties to Ira Kleiman or W&K after Dave Kleiman died." ECF No. [33], at 50. As an initial matter, as this Court has previously noted, "[u]nless the relationship is formed through an express agreement, whether a fiduciary relationship exists is necessarily fact-specific to a particular case. "Therefore a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)' because it 'is often impossible to say that [a] plaintiff will be unable to prove the existence of a fiduciary relationship.'" *Hansen v. Premier Aviation Holdings, LLC*, No. 17-CV-61025, 2017 WL 8893119, at *4 (S.D. Fla. Nov. 21, 2017) (quoting *Reuss v. Orlando Health, Inc.*, 140 F. Supp. 3d 1299, 1304 (M.D. Fla 2015) (quoting *Childers v. N.Y. Presbyterian Hosp.*, 36 F. Supp. 3d 292, 300 (S.D.N.Y. 2014))).

Additionally, under Florida law, constructive fraud also occurs "where an unconscionable advantage has been taken" of a weaker party. Plaintiffs allege that the Defendant took advantage of a family (the Estate) who was unaware of its deceased's involvement in an invention that is alleged to have revolutionized the world and took control of property and assets that the Estate was unaware existed. Specifically, the Amended Complaint alleges that the Defendant reached out to Dave's elderly father 10-months after his son's passing, representing that he was not "seek[ing] anything other

than to give [him] information about [his] son," offering to help the Kleiman family recover what Dave owned. ECF No. [24], at ¶ 133. The Amended Complaint further alleges that the Defendant provided the Estate with details and insight on the new company (Coin-Exch.) that the Defendant and Dave had intended to start together, and told the Estate that they would receive shares in the company "worth millions." *Id.* at ¶ 136. The Amended Complaint, also claims that the Defendant made several fraudulent omissions and misrepresentations to the Estate related to the property and assets at issue in this action. *See Id.* at ¶¶ 14, 138-139, 149. At this stage of the pleadings, and accepting Plaintiffs' allegations as true, Plaintiffs have sufficiently asserted a claim for constructive fraud and the Court finds that Count VIII also survives Defendant's Motion to Dismiss.

## IV.    CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendant's Motion to Dismiss the Amended Complaint, **ECF No. [33]**, is **GRANTED in part and DENIED in part**. Counts III and IV of Plaintiffs' Amended Complaint, **ECF No. [33]**, are **DISMISSED WITH PREJUDICE**.

2.  Defendant shall answer Counts I, II, V-IX of the Amended Complaint, ECF No. [24], no later than **January 10, 2019**.

**DONE AND ORDERED** in Miami, Florida, this 27th day of December, 2018.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record