# EXHIBIT B

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC<br><br>        Plaintiffs,<br><br>v.<br><br>CRAIG WRIGHT<br><br>        Defendant. | **CASE NO.:  9:18-cv-80176-BB**<br><br>**SECOND AMENDED COMPLAINT AND**<br>**JURY DEMAND** |

Velvel (Devin) Freedman                Kyle Roche (*admitted pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**        **BOIES SCHILLER FLEXNER LLP**
100 SE Second Street                   333 Main Street
Miami, FL 33131                        Armonk, NY 10504
Tel.   (305)539-8400                   Tel.   (914)749-8200
Fax.   (305)539-1307                   Fax.   (914)749-8300
Email: vfreedman@bsfllp.com            Email: kroche@bsfllp.com

**ATTORNEYS FOR PLAINTIFFS**

**SECOND AMENDED COMPLAINT**

Plaintiff Ira Kleiman, as personal representative of David Kleiman's estate ("Ira"), and Plaintiff W&K Info Defense Research, LLC ("W&K") hereby sue Defendant Craig Steven Wright ("Craig") and state as follows:

**PARTIES**

1.      Plaintiff Ira Kleiman, as personal representative, is a resident of Palm Beach County, Florida.  He is David Kleiman's ("Dave") brother and the personal representative of his estate ("the estate").

2.      Plaintiff W&K Info Defense Research, LLC is a Florida limited liability company incorporated in 2011.  During the times relevant to this Second Amended Complaint, W&K operated in Florida.  This entity is one vehicle through which Defendant and Dave mined hundreds of thousands of bitcoins and created valuable blockchain intellectual property.

3.      Defendant Craig Steven Wright is a resident of London, United Kingdom. He is Dave's former business partner in W&K and otherwise.

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000; this Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because Plaintiffs' Defense of Trade Secrets Act claim arises under the laws of the United States.

2

5.     Venue lies within this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District.  These events include, but are not limited to: the wrongful taking of property belonging to a Florida estate and/or LLC within this District; the partnership of Dave and Craig within this District; the operation of W&K by Dave and Craig within this District; the mining of a substantial amount of bitcoins through the use of computer equipment located within this District and/or by equipment owned and/or operated by a Florida resident (Dave) or Florida LLC (W&K); the development of certain blockchain related intellectual property within this District; and the commission of a fraud against an estate in this District.

6.     This Court has personal jurisdiction over Craig pursuant to Fla. Stat. § 48.193 as he operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within this state; and caused injury to persons and property within this state at or about the time he was engaged in solicitation and service activities within this state.

## INTRODUCTION

7.     This matter concerns the rightful ownership of hundreds of thousands of bitcoins[1] and the valuable intellectual property rights of various blockchain technologies. As of the date of ~~this~~the Amended Complaint filing, the value of these assets far exceed $11,427,755,048.02 USD (before punitive or treble damages); at their highest value they

---

[1] The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoin" to label the units of exchange.

3

were worth over $27,332,125,781.93.  Plaintiffs allege Defendant has stolen these bitcoins and intellectual property assets from them.

8.      After Ira filed this claim, Craig committed a fraud on this Court in an attempt to circumvent its jurisdiction. As detailed in paragraphs 160 to 170 Craig filed a sworn declaration that is incontrovertibly false based on an affidavit (and supporting evidence) he previously submitted to an Australian court. The boldfaced misrepresentations Craig has told this Court demonstrate his desperation to avoid this suit.

9.      Bitcoin is the world's first decentralized cryptocurrency.  The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent the now famous protocol to a mailing list of cryptography enthusiasts.  That protocol has since spawned a system of value and exchange with a current market cap of ~$150 billion.

10.     Based on information Ira Kleiman received directly from Dave, it is undeniable that Craig and Dave were involved in Bitcoin from its inception and, together, had accumulated a vast wealth of bitcoins from 2009 through 2013.

11.     On April 26, 2013, mere months prior to Bitcoin's entry into the mainstream, Dave died after a battle with MRSA.

12.     Recognizing Dave's family and friends weren't aware of the extent of Dave's Bitcoin and blockchain related activities, Craig perpetrated a scheme against Plaintiffs to seize their bitcoins and their rights to certain blockchain related intellectual property.

13.     As part of this plan, Craig took control of Plaintiffs' bitcoins and forged a series of contracts that purported to transfer Plaintiffs' bitcoins and intellectual property

4

assets to Craig and/or companies controlled by him.  Craig backdated these contracts and forged Dave's signature on them.

14.    About a year after Dave's death, and under pressure from an Australian Tax Office investigation, Craig reached out to Ira, Dave's brother.  Craig disclosed he had partnered with Dave to create Bitcoin, mine bitcoin, and create valuable intellectual property.  But, he claimed Dave signed all these property rights away in exchange for a non-controlling share of a non-operational Australian company worth "millions."

15.    Craig told Ira he'd be able to sell Dave's stake in the company in a few months. This w aswas a lie in several respects.  First, Dave had not in fact traded his bitcoin and intellectual property rights for an interest in the Australian company.  Second, the company went bankrupt shortly after Craig misled the Australian Tax Office ("ATO").

16.    The ATO raided Craig's home in late 2015 and Craig fled Australia for London. Since fleeing to London, Craig has lived a life of fame and fortune. In May 2016, he publicly revealed himself and Dave as the alleged creators of Bitcoin.

17.    Craig currently serves as Chief Scientist of nChain, a UK company purporting to be the global leader in research and development of blockchain technologies. He also regularly posts pictures to his social media accounts of his lavish lifestyle.

18.    To date, Craig has not returned any of the mined bitcoins or intellectual property rights belonging to Plaintiffs.  This action is brought to rectify that injustice.

19.    As described in detail below, Craig's pattern of lies, deception, and fraudulent conduct continues even against this Court.  His fraud on this Court is simply the latest step taken in Florida to defraud the estate and W&K.

5

## FACTUAL ALLEGATIONS

### Bitcoin

20.     Bitcoin is a decentralized digital currency with a current market cap of ~$150 billion as of March 14, 2018.[2]  At its core, Bitcoin is simply a giant ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the bitcoin blockchain.

21.     In order to transact with bitcoins, you must have a bitcoin wallet.  Like a bank account number, each bitcoin wallet has a "public key" that is the "address" provided if one would like to receive bitcoin from others.  Every wallet can be identified on the blockchain (by referring to its "public key") along with the number of bitcoins inside that particular wallet.  Wallets are separate computer files dedicated to storing information about specific bitcoins.

22.     Each wallet is also assigned a "private key."  Unlike public keys, private keys are only known by the individual who creates the bitcoin wallet.  The private key is like the "password" to the wallet.  To send bitcoin out of a wallet, an individual must have the private key associated with the bitcoin wallet.  This is similar to the manner in which one must have a PIN to withdraw cash from an ATM.

23.     There are two methods of acquiring bitcoins.  The first involves simply receiving bitcoins from someone.  In fact, there are many businesses that operate "bitcoin

---

[2] https://coinmarketcap.com/.

6

exchanges," such as coinbase.com, which is a bitcoin marketplace where individuals can purchase bitcoins with their native currency from individuals looking to sell.

24.     The second way one can acquire bitcoins is by "mining" them.

25.     There is no centralized authority that curates the Bitcoin blockchain. Consequently, the protocol has to incentivize individuals to curate the blockchain, i.e., to update the "ledger" with new transactions as they take place.  This process is called "bitcoin mining."

26.     Anyone with internet access can "mine bitcoins" by employing computer power to solve a complex mathematical problem.  The first "miner" who solves the problem gets the right to add a block of recent transactions to the blockchain, i.e., the right to update the ledger.  In return for this work, the protocol pays the successful miner in newly minted bitcoins (the number of which is fixed by a pre-existing algorithm).  This process is repeated every 10 minutes or so, ensuring an accurate and up to date record of all bitcoin transactions.

27.     When the Bitcoin protocol was first launched in January 2009, the protocol paid the successful miner 50 bitcoins for each block of transactions added to the blockchain ledger.  The protocol cuts this mining reward in half every four years so that the maximum amount of bitcoin in existence will never exceed 21 million.  At the current mining rate and reward algorithm, this maximum circulation will be reached in circa 2140.

28.     Today, the mining reward is 12.5 bitcoins for each block added to the blockchain.  That, together with rising competition in mining bitcoins means it was easier to amass significant amounts of bitcoins in 2009, than now.

7

29.     To date, just over 17 million of the total 21 million bitcoins have been mined.

### History of Bitcoin

30.     On October 31, 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto ("Satoshi") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts.  This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."

31.     Less than three months later, the system outlined became a reality.  On January 3, 2009, Satoshi mined the first 50 bitcoins.  To place a timestamp on the occasion, Satoshi left a text message digitally encoded on these first 50 bitcoins that read, "The Times 3 January 2009 Chancellor on brink of second bailout for banks," referring to that day's headline in the British newspaper, *The Times*.

32.     Hal Finney, one of the first supporters and adopters of Bitcoin, downloaded the bitcoin software that same day, and received 10 bitcoins from Satoshi in the world's first bitcoin transaction.

33.     Satoshi also created a website under the domain name bitcoin.org and continued to collaborate with other developers on the Bitcoin protocol until mid-2010. Around this time, he handed control of the Bitcoin source code repository to Gavin Andresen, another active member of the bitcoin development community, and disappeared. The last confirmed email from Satoshi was sent on April 23, 2011.  It read, "I've moved on to other things. It's in good hands with Gavin and everyone."

8

34.     For most of its early history, bitcoins were of relatively little value. Famously, the first documented commercial bitcoin transaction occurred when developer Laszlo Hanyecz used 10,000 bitcoins to purchase two Domino's pizzas on May 22, 2010. At today's prices, those two pizzas would be worth approximately 1% of Domino's total market cap.

35.     During Bitcoin's early history, cryptocurrencies were a niche technology with a small development community. Consequently, there was little competition for maintaining the ledger or "mining bitcoins." Thus, individuals mining bitcoins through 2013 could expend relatively minor resources to accumulate large sums of bitcoins.

36.     It has been widely reported that Satoshi Nakamoto mined approximately 1 million bitcoins during this time.[3]

**Bitcoin "forks"**

37.     Since its inception in 2009, Bitcoin has inspired the creation of over one thousand other digital currencies. Many of these new cryptocurrencies use characteristics of the initial Bitcoin program, but have made significant changes to the original model in an attempt to create an entirely new cryptocurrency with distinct functions or ones better suited to a specific market niche.

---

[3]     *See*     *e.g.*     http://time.com/money/5002378/bitcoin-creator-nakamoto-billionaire/; http://www.businessinsider.com/satoshi-nakamoto-owns-one-million-bitcoin-700-price-2016-6; https://eklitzke.org/how-many-bitcoins-did-satoshi-nakamoto-mine.

9

38.     In other cases, individuals have taken the actual Bitcoin protocol and modified it in a way they believed would improve Bitcoin itself, *e.g.*, by allowing more transactions into a single "block" of the blockchain.

39.     If the "improved" Bitcoin protocol garners significant support, but less than a majority of support, a new version of "Bitcoin" is created. In these situations, the supporters of the new Bitcoin, have created a "fork" through which the original Bitcoin blockchain/ledger is divided into two distinct, but identical, copies, (i) the original Bitcoin, and (ii) the new Bitcoin. The result is that any individual who owned the original Bitcoin, now owns an identical amount of the new Bitcoin. After the point of the "fork," the ledgers will diverge as owners "spend" the two assets differently.

40.     This has happened numerous times to Bitocin. To date, however, the original Bitcoin protocol remains the most valuable in terms of its correlation to the US dollar, with a market capitalization of ~$150 billion at the time of filing. However, other noteworthy Bitcoin forks include Bitcoin Cash (market cap. of ~$25 billion), Bitcoin Gold (market cap. of ~$1.0 billion), Bitcoin Private (market cap of ~$510 million), and Bitcoin Diamond (market cap. of ~$650 million).

41.     As explained below, the bitcoins at the heart of this dispute were all mined prior to the creation of any of the aforementioned Bitcoin forks. Consequentially, Plaintiffs' claims of ownership over these original bitcoins necessarily implicates ownership over their "forked" counterparts ("forked assets").[4]

_____

[4] Consequently, where appropriate, the word "bitcoins" should be construed to include claims over the "forked assets" as well.

10

**Background on parties and key individuals**

42.     Dave Kleiman was born in 1967.  Obsessed with computers and technology at an early age, he joined the U.S. Army in 1986 as a helicopter technician.

43.     A few years after being honorably discharged, Dave got into a serious motorcycle accident which left him physically handicapped and wheelchair-bound.  After this accident, Dave's interest in computers intensified, and he began to build a reputation in computer forensics and secure network infrastructures.

44.     Dave began working in the information technology security sector in 1990. He was a frequent speaker at national security conferences and was a regular contributor for many security related newsletters, websites, and online forums.

45.     Dave was a member of several computer security organizations, including the International Association of Counter Terrorism and Security Professionals (IACSP), International Society of Forensic Computer Examiners (ISFCE), Information Systems Audit and Control Association (ISACA), High Technology Crime Investigation Association (HTCIA), Network and Systems Professionals Association (NaSPA), Association of Certified Fraud Examiners (ACFE), Anti-Terrorism Accreditation Board (ATAB), and ASIS International.

46.     Dave was also a Secure Member and Sector Chief for Information Technology at the FBI's InfraGard and a Member and Director of Education at the International Information Systems Forensics Association (IISFA).  When he attended conferences, he was known as "Dave Mississippi," a nickname referring to the long string

11

of three letter certificates that followed his name; which could literally be used to spell Mississippi.

47.    Dave co-authored and was the technical editor of numerous publications, including *Perfect Passwords: Selection, Protection and Authentication*,[5] and Security Log Management: Identifying Patterns in the Chaos.[6]

48.    In 2010, Dave was hospitalized.  He was in and out of medical facilities due to MRSA infected sores.  On March 22, 2013, Dave signed out of the hospital against medical advice.  He was unstable and nearing death.[7]  On April 26, 2013, Dave passed away.

49.    Ira is Dave's brother and the personal representative of his estate.

50.    Craig is a 46-year-old Australian computer scientist and businessman.  Craig began his career in information technology working for various entities in Australia, including the Australian Securities Exchange.  Craig claims to have many degrees, including doctorates, masters, and technical certifications; these claims are disputed.[8]

51.    In May 2016, Craig claimed that he and Dave were Satoshi Nakamoto—the venerated creator of Bitcoin.

---

[5]https://www.amazon.com/Perfect-Passwords-Selection-Protection-Authentication/dp/1597490415.

[6] https://www.amazon.com/Security-Log-Management-Identifying-Patterns/dp/1597490423.

[7] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

[8] https://www.forbes.com/sites/thomasbrewster/2015/12/11/bitcoin-creator-satoshi-craig-wright-lies-hoax/#12e524116794.

**Dave and Craig's early relationship**

52.     Dave and Craig met in or around 2003. Both men had a longtime interest in cyber security and digital forensics, and the future of money.  (Ex. 1 at 26).[9]

53.     For years, they communicated on various topics related to the internet and file sharing.  For example, in 2008 they co-authored a paper on the mechanics of overwriting hard drive data.[10]

54.     Around that time, they began to speak about ways to use peer-to-peer file sharing, infamously used by the Napster music sharing service, to solve some of the most difficult issues in cryptography.  (Ex. 1 at 27).

55.     In March 2008, just a few months before Satoshi's paper on the Bitcoin protocol was published, Craig emailed Dave saying:  "I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin . . . [y]ou are always there for me Dave.  I want you to be part of it all."  (Ex. 32).[11]

56.     After leaving his job in late 2008, Craig wrote to Dave:  "I need your help. You edited my paper and now I need to have you aid me build this idea."  (Ex. 1 at 31). For the next few months, Craig and Dave worked to get Bitcoin operational.

57.     On January 12, 2009, Craig, Dave, and two others sent each other bitcoin transactions recorded on the blockchain.  (Ex. 1 at 32).

---

[9] All Exhibit citations refer to the as filed ECF pagination.

[10] https://www.vidarholen.net/~vidar/overwriting_hard_drive_data.pdf.

[11] Craig sent a "copy" of this communication to Ira on March 6, 2014.

13

58.     On November 26, 2009 (Thanksgiving Day), Ira Kleiman and Dave met at their father's home for an early dinner.  He and Dave discussed Facebook's recent success and Ira asked Dave if he was working on anything interesting.  Dave responded by telling Ira he was working on "something bigger" than Facebook, that he was "creating his own money."

59.     Ira asked Dave to clarify and jokingly asked if Dave was making counterfeit money.

60.     Dave responded by saying he was making "digital money."  He then opened his wallet, took out a business card, flipped it over, drew a "B" with a line or two through it, and commented on how "we" were working on a logo.

61.     Dave told Ira he was working with a relatively wealthy foreign man who owned some properties. Ira asked Dave why he didn't partner with this wealthy individual. Dave was silent, which Ira understood to be Dave's concession they were already partners.

62.     On May 20, 2014, Ira shared this story with Craig via email.  (Ex. 2).

63.     Craig responded that same day stating "we did partner ;)".  (*Id.*). Craig then commented on the "properties" stating, *inter alia*, that he owned 550 acres.  (*Id.*).  He then said, "I will have to see what I can dig up.  The old Bitcoin logo we did is no longer used. I have a copy." (*Id.*).  Craig later provided Ira with a copy of this Bitcoin logo. (*Id.*).

64.     This independent verification that Dave was creating "digital money" with Craig in 2009, Craig's admissions that he and Dave were "partners" in this venture, part of the Satoshi team, and that they were mining bitcoin through W&K, all lead to the

14

inescapable conclusion that their collaboration in "creating" or "mining" bitcoin and intellectual property was continuous from 2009 until Dave's passing in 2013.

65.     From their collaboration in 2008 until Dave's death in 2013, Craig and Dave mined over a million of the initial bitcoins together (personally and through W&K).  These bitcoins were, as all bitcoin are, stored in specifically identifiable bitcoin wallets that Craig has now asserted ownership over.

66.     Further, Dave, in partnership with Craig, created intellectual property both in his individual capacity and through W&K. As Craig email to Ira on March 7, 2014, "I had an idea, but it would never have executed without Dave." The estate and/or W&K owns all this intellectual property.[12]

**Dave and Craig created W&K to mine bitcoin and develop blockchain related intellectual property**

67.     The exact structure of their joint mining activities, intellectual property development, and "partnership" from c. 2008 until February 2011 requires discovery to fully reveal.

68.     From February 2011, Craig and Dave conducted their bitcoin mining activities and intellectual property research and development through W&K.

---

[12] The exact division of intellectual property ownership between Dave's estate and/or W&K will be determined at trial. Accordingly, some counts contain a request for relief from both Plaintiffs, and it will be for the final finder of fact to determine what each Plaintiff is entitled to recover.

69.     On February 14, 2011, Dave formed W&K Info Defense Research LLC ("W&K") in Florida. The Articles of Incorporation for W&K list Dave as the managing member and registered agent. (Ex. 3).

70.     W&K has no operating agreement and its exact ownership structure is unclear due to Craig's contradictory statements.  In an affidavit Craig filed in Australian court proceedings, Craig stated he and Dave each owned 50% of W&K.  (Ex. 4 at 5).  But in a fake "contract" produced by Craig, he states Dave owned legal title to 100% of W&K, while holding 50% in trust for Craig.  (Ex. 5 at 3).  He doubled down on some form of this equal split in a 2014 email to Ira, where he represented that "Dave owned 50% of" W&K. (Ex. 6 at 2),[13] and when both he and his counsel referred to it as a "joint venture." (Ex. 4 at 50, 57, 64, 71, 77, 84; Ex. 9 at 6). In contrast, Craig has testified to this Court that he does not have, and never has had, any interest in W&K.[14]  (Ex. 29 ¶ 10).  But it makes sense Craig would have some form of indirect interest as the entity appeared to be named after them both: **W**right & **K**leiman.

71.     As best as can presently be discerned, Dave was the sole "member" of W&K, but Craig maintained some kind of beneficial ownership interest in W&K, which he subsequently disclaimed.

---

[13] This Second Amended Complaint attaches certain emails with timestamps from Australian time zones.  For consistency, the Second Amended Complaint has converted various timestamps to Eastern Standard Time.

[14] When confronted with the claims in this lawsuit, Craig didn't hesitate to continue his fraud against W&K and Dave's estate by perjuring himself in a sworn declaration filed with this Court, wherein he now swears, in absolute conflict with his Australian affidavit, that he never had any interest in W&K. See *Infra*, 160-170.  It seems that whatever interest he once held in W&K, he has disclaimed it.

72.     Regardless of its exact ownership structure, the purpose of W&K was clear: Craig and Dave created it to mine bitcoin and develop intellectual property.

73.     *First*, on telephone conversations with Ira, Craig admitted this was W&K's purpose.

74.     *Second*, Craig has admitted this in writing multiple times.  For example, in a "chronology" Craig sent to Ira, he wrote that that W&K "was set up to further statistical and risk mitigating algorithms, to develop some ideas around CBT learning methodologies, and to mine Bitcoin." (Ex. 7).  Craig also put this admission into legal documents he claims are valid stating that W&K "is the owner of and conducts the business known as Bitcoin mining and Software development / Research." (Ex. 5 at 3).  Finally, Craig has admitted this to third parties where, e.g., on February 12, 2014, he emailed Dave's former business partners stating "Dave and I had a project in the US.  He ran it there . . .  The company he ran there mined Bitcoin." (Ex. 8 at 5).

75.     *Third*, in leaked ATO transcripts, Craig's bookkeeper states that "W&K was an entity created for the purpose of mining Bitcoins." (Ex. 9 at 3).

76.     Dave and Craig collaborated within W&K to create intellectual property. Craig then used W&K and this intellectual property to personally solicit business from the United States Department of Homeland Security ("DHS").  (Ex. 4 at 40-43).

77.     Craig acted as W&K's "authorized representative," its "lead researcher," and its "technical contact."  (*Id.* at 45-46, 50, 56-57, 63-64, 70-71, 76-77, 83-84, 90).  Further, Craig repeatedly used W&K's Florida address as his own, *e.g.*, identifying it as his

17

"mailing address." (*Id.* at 50, 57, 64, 71, 77, 84). Craig has also held himself out as W&K's "legal agent and representative" and its "Director/Australian Agent." (Ex. 30).

78.    Craig also claimed to have (i) delivered servers and other computer hardware to Florida for W&K's use (Ex. 10 at 3 (Recital L)); (ii) provided "contract labour services" to W&K (Ex. 11 at 2); (iii) licensed software for W&K's use (Ex. 10 at 3 (Recital M)); and (iv) loaned money to W&K for use in its Florida mining operation (Ex. 10 at 3 (Recital L); Ex. 11 at 3).

**Dave and/or W&K owned a substantial amount of bitcoin**

79.    The exact number of bitcoins belonging to Dave's estate and/or W&K will be determined at trial.[15]   That said, various documents including emails, "contracts," spoken admissions, and transcripts from 2014 ATO meetings with Craig, his counsel, and his accountant evidence Dave and Craig owned and controlled approximately 1,100,111 bitcoins (either together personally or through their shared interest in W&K).

80.    As discussed above, Craig admitted that he "did partner" with Dave in 2009 to create/mine "digital money," i.e., bitcoins.  And Craig has also admitted in multiple documents that W&K (beneficially owned, at the time, and in some form, by Dave and Craig) mined bitcoin.  Due to the historically larger mining reward and low competition existing during that time, Craig and Dave's continuous joint bitcoin mining activity since 2009 would have resulted in an unparalleled fortune of bitcoins.

---

[15] Accordingly, some counts contain a request for relief for both Plaintiffs, and it will be for the final finder of fact to determine how much each Plaintiff is entitled to recover.

81.     Furthermore, in February 2014, Craig emailed two of Dave's other business partners stating Dave had mined an enormous amount of bitcoins, an amount *"far too large to email."*  (Ex. 8 at 5).

82.     In addition, a transcript of a February 18, 2014 meeting between the ATO and Craig demonstrates that Craig has led others to believe he took ownership of Dave's bitcoin.  The ATO investigator states:

> We thought yes, ***you've picked up some bitcoin ownership from the deceased director*** so we were trying to, you know, get the picture and connect all the dots.  (Ex. 12 at 20) (emphasis added).

83.     Minutes from a February 26, 2014 meeting between the ATO and Craig's bookkeeper (John Chester), document Craig's bookkeeper stating that Dave had an incredible amount of bitcoin, and implying that Craig assumed ownership of them when he died:

> Craig Wright had mined a lot of [b]itcoins . . . Craig had gotten approximately 1.1 million [b]itcoins. There was a point in time, when he had . . . around 10% of all the [b]itcoins out there.  Mr Kleiman ***would have had*** a similar amount. ***However***, Mr Kleiman ***passed away*** during that time. (Ex. 9 at 3) (emphasis added).

84.     At the February 18, 2014 meeting, Craig's counsel states that W&K's bitcoins were transferred to Seychelles, Singapore, and UK trusts.  As Dave owned between 50% to 100% of W&K, *at least* half of the bitcoins allegedly transferred to the trusts belong to Dave (and/or they all belong to W&K):

> In 2009 the mining of bitcoin commences *** 2011, bitcoin was transferred overseas. R and D then conducted in the US under – by a joint venture company formed as . . . effectively info defence research LOC. Bitcoin mining continues throughout 2011. The bitcoins are derived by companies in Singapore and the Seychelles or entities in Singapore and the Seychelles, and they're actually

19

trusts. Trustee companies and trusts established - or trustee companies in the United Kingdom and other trusts established in the Seychelles. Further work was planned. In early April 2013 unfortunately Dave . . . dies in the US towards the end of April 2013. (*Id.* at 6).

85. Years later, Craig admitted to Andrew O'Hagan that "his and Kleiman's mining activity ha[d] led to a complicated trust." (Ex. 1 at 36).

86. In a 2012 email Craig forwarded to Ira, Craig wrote to Dave reaffirming the joint nature of the bitcoin allegedly held in trust (emphasis added):

> From: Craig Wright [mailto:craig@rcjbr.org]
> Sent: Wednesday, 10 October 2012 4:55 PM
> To: Dave Kleiman [mailto:dave@davekleiman.com]
> Subject: FW: IFIP-WG11.9 CFP
>
> We need to discuss the trsut [sic] and work out what the [expletive] *we* are doing with it all. So, a good tax deductible way to have a visit and also write a paper. (Ex. 31)

87. In fact, Craig consistently referred to the "trust" as both Craig and Dave's, for example in another email Craig forwarded to Ira (emphasis added):

> From: Craig S Wright
> To: dave@davekleiman.com
> Subject: This week
> Date: Tue, 22 May 2012 09:45:31 +1000
>
> Dave,
> A recycled rant . . . the ATO are simply BS'ing again. It costs me money and in a way I guess they want to get a result through attrition rather than honesty. They will drain all I have if they can. **We do not touch the trusts**. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions and let them try [expletive] **on us** then. . . (Ex. 13) (bold emphasis added; profanity redacted).

20

88.     In  a 2014 email exchange with Ira, Craig *admitted* that at least 300,000 of

the 1,000,000+ bitcoins allegedly held in trust belong to Dave:

>           From: Ira K <REDACTED@REDACTED>
>           To: Craig S Wright <craig.wright@hotwirepe.com>
>           Subject: Bond villains
>           Date: Sat, Mar 1, 2014 at 2:42 PM
>
>           Just to clarify on thoughts from previous email... In one of the email
>           exchanges between Dave and you, he mentioned that you had 1
>           million Bitcoins in the trust and since you said he has 300,000 as his
>           part. I was figuring the other 700,000 is yours.  Is that correct?
>           Ira
>            ---
>           From: Craig S Wright <craig.wright@hotwirepe.com>
>           To: Ira K <REDACTED@REDACTED>
>           Subject: Re: Bond villains
>           Date: Sat, Mar 1, 2014 at 3:00 PM
>
>           Around that. Minus what was needed for the company's use
>           Sent from my HTC.  (Ex. 14).

89.     As discussed below in more detail, Craig provided fraudulent contracts to the

ATO in an attempt to substantiate his ownership of bitcoins and intellectual property assets

that belonged to Dave and/or W&K.  Their authenticity aside, however, these "contracts"

produced by Craig constitute his admission that Dave, Craig, and W&K collectively owned

hundreds of thousands of bitcoins.

90.     For example, a 2011 contract produced by Craig includes a provision stating

W&K expected to mine new bitcoin at a rate of 12,000 bitcoins per month for a period of

over two years (312,000 bitcoin).  (Ex.10).

21

91.     Further, a 2012 contract provided to Ira by the ATO lists Bitcoin wallets containing over 650,000 bitcoins (the "2012 Deed of Loan").  Next to the list of wallets and total bitcoin held, there is a handwritten annotation stating: "*as agreed, all wallets to be held in UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW.*"  (Ex. 15 at 9).  This annotation is in Craig's handwriting.

92.     As can be seen, Dave, in partnership with Craig, lawfully mined and possessed hundreds of thousands of bitcoins both in his individual capacity and through W&K.

93.     The mined bitcoins were stored in wallets in the possession of Dave, Craig, W&K, and/or certain trusts.  These wallets were not used for any purpose but to store the bitcoins for sale at some future date.

94.     As "partners" from c. 2008-2011, and then in some form of "co-owners/members" of W&K from 2011-2013, Dave and Craig shared the private keys to the bitcoins they mined.  As demonstrated from emails produced by Craig, his ability to control the bitcoins continued once they were, allegedly, placed in trust.

**After Dave's death, Craig fraudulently converted the bitcoin and intellectual property that belonged to, and was possessed by, Dave and/or W&K**

95.     After Dave's death, Craig took sole ownership/control of all bitcoins and intellectual property owned by Dave and/or W&K and those that were held in trust for Dave and/or W&K and refuses to return any bitcoins or intellectual property to the estate or W&K.

22

96.     It appears that Craig needed to use W&K and Dave's assets to try and justify certain tax positions he claimed in Australia.  To that end, he instituted an elaborate scheme to assert dominion over Dave's and W&K's bitcoin and intellectual property.

97.     To accomplish this scheme, Craig drafted and backdated at least three contracts, and forged Dave's signature on at least two, to create a fraudulent "paper trail" purporting to show that Dave transferred bitcoins and intellectual property rights that belonged to Dave and W&K, to Craig.  These fraudulent contracts include:

  a. 2011 contract titled "Intellectual Property License Funding Agreement" (the "2011 IP Agreement") (Ex. 10);

  b. 2012 contract titled "Deed of Loan" (the "2012 Deed of Loan") (Ex. 15); and

  c. 2013 contract titled "Contract for the Sale of Shares of a Company Owning Business" (the "2013 W&K Sale Agreement") (Ex. 5).

98.     On their face, these contracts are demonstrably fraudulent in a number of manners.

99.     *First*, the electronic signatures on these documents are not Dave's.  They are substantially different than known examples of Dave's electronic and written signatures:

23



| **Authentic Signatures**<br>**2/1/2013[16] & 7/30/2003[17] & 2/22/2012** | **Signature on Fraudulent Contracts**<br>**4/22/2011 & 04/2/2013** |
|---|---|

100.    In fact, this signature is a near identical copy of a computer-generated font called Otto, available here:  https://www.wfonts.com/font/otto.  When computer generated, this Otto font produces the signature:

101.    When confronted with this information by Ira, Craig admitted the signatures were computer generated, but claimed there were other ways to prove their veracity.

102.    Craig has never provided additional evidence of their legitimacy.

---

[16] See Ex. 16 (signature on Computer Forensics LLC Operating Agreement).

[17] See Ex. 17 (signature on Dave's last will and testament).

103.     *Second*, the "Purchaser" listed in the 2013 W&K Sale Agreement is "Craig Wright R&D" and is further identified by its Australian Business Number (ABN) 97 481 146 384.  However, the entity associated with this ABN was not identified as "Craig Wright R&D" until September 2, 2013 – over three months after Dave died.[18]

104.     *Third,* the terms of the 2011 IP Agreement are nonsensical.  While it purports to "finance" W&K through the transfer of around 215,000 bitcoin, and requires W&K to "fund the software development using bitcoin," there was essentially nothing that could be purchased with bitcoins at that time.  Thus, no one could "finance" or "fund" anything with bitcoins then.  This calls the 2013 W&K Sale Agreement's purported "release" of this nonsensical "financing arrangement" into question.

105.     *Fourth,* the 2011 IP Agreement, the 2012 Deed of Loan, and the 2013 W&K Sale Agreement conflict with each other.  The 2011 IP Agreement provides that Bitcoin wallet 1933***XY8a would be held by Craig in escrow and revert to Craig only if W&K defaulted, but the 2013 W&K Sale Agreement provides that it will be "released to" Craig *despite* satisfaction of the liability, and the 2012 Deed of Loan shows that same wallet being placed into a trust by Craig with a notation that it be held there until Dave and Craig can set up a joint-company later.

106.     *Fifth*, the 2013 W&K Sale Agreement references 250,000 bitcoin and then 250,500 bitcoin as the amount of bitcoin Dave was to transfer to Craig.

---

[18] https://abr.business.gov.au/SearchByAbnHistory.aspx?abn=97481146384

107.    *Sixth*, the fraudulent signatures aren't witnessed or notarized.  Even the most un-sophisticated parties would understand that a contract purporting to release and transfer property valued at eight figures should be substantiated in some way with witnesses and/or notaries.

108.    *Lastly*, many of the contractual terms are extremely convenient for Craig. For example, the 2011 IP Agreement provides for confidentiality even from family members, stipulates the value of 215,000 bitcoin at 40,000,000 AUD (when it was really worth around ~$250,000), and includes a "typo" showing the date as 2013, and amending it by hand to 2011 (likely because it was written in 2013).

109.    These red flags are rendered even more suspicious by the fact that the 2013 W&K Sale Agreement was purportedly signed a mere 10 days after Dave left the VA hospital, and no more than three weeks before he died.

110.    Craig has a documented history and habit of backdating contracts and documents to suit his needs.  During the February 18, 2014 interview with Craig by the ATO, Craig admitted that he backdated certain tax invoices.  (Ex. 12).  Further, Wired has written that Craig likely backdated numerous blog posts to further his claim of being Satoshi.[19]  Finally, in its 2015 audit of Coin-Exch, the ATO assessed tax liability and penalties against Craig for providing recklessly misleading tax information by, *inter alia*, backdating numerous documents.  (Ex. 18).

---

[19]    https://www.wired.com/2015/12/new-clues-suggest-satoshi-suspect-craig-wright-may-be-a-hoaxer/.

111.    As described herein, after Dave died, Craig unlawfully and without permission took control of the bitcoins from Dave's estate and from W&K by exercising exclusive possession over the private keys necessary to own, move, or sell the bitcoins belonging to Dave and/or W&K; actually using those private keys to move these bitcoins out of their wallets; claiming to own bitcoins really owned by W&K and/or Dave by virtue of fraudulent contracts Craig created; refusing to return bitcoins that belonged to the estate and W&K; moving them to, or holding these bitcoins in, "trusts" known only to him and controlled by him and preventing these assets from being returned to the estate and/or W&K; and using those bitcoins (or the "rights" to them) to make large trades for his Australian businesses.

112.    While the exact number of bitcoins stolen remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of *at least* 300,000 bitcoins that Craig controls in a trust (along with their forked assets).  But the estate may be entitled to even more bitcoins based on Dave and Craig's partnership from 2009 until 2011.

113.    Further, as Craig's admitted that the mining continued within W&K from 2011, W&K is entitled to the possession of all bitcoins mined through its operations since 2011 (along with their forked assets).

114.    To Plaintiffs' best knowledge, information, and belief, these bitcoins could number around ~1,100,111.[20]  Together, these bitcoins and their forked assets are worth

---

[20] Should discovery reveal additional bitcoin were mined, either by Dave individually, or by W&K after Dave died, Plaintiffs may amend their Complaint to assert a claim over those bitcoins and their forked assets as well.

27

approximately $11,427,755,048.02, though at their peak in December 2017 they were worth ~$27,332,125,781.68.

115.     Ira has requested Craig return these bitcoins, but Craig has not done so. In light of this refusal, demanding the return of the forked assets would be futile.

116.     Thus, Craig has wrongfully asserted dominion over Dave and W&K's bitcoins forked assets, and intellectual property in a way that is inconsistent with Dave and W&K's ownership of those bitcoins, forked assets, and intellectual property which has damaged them both.

**Craig attempts to launder the stolen title to W&K's intellectual property, by securing "consent judgments" against W&K, without serving W&K, falsely representing W&K's consent, and using fraudulent contracts**

117.     In July and August 2013, Craig filed two claims in New South Wales Supreme Court against W&K for ~$28 million each.  (Ex. 11).

118.     In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research" and that this contract was "bonded against the intellectual property of [W&K]."  (Ex. 11 at 3, 9).  The pleadings alleged that "the contract stated that a breach would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]."  (*Id.* at 4, 10).  The statements of claim allege that the intellectual property at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties."  (*Id.*).

119.     W&K was never served, validly or otherwise, with these proceedings; Dave's estate was not even aware of them until long after the judgments had been entered.

120.     Craig prevented W&K from participating in these proceedings as, *inter alia*, he filed, in both lawsuits, a false "Acknowledgment of Liquidated Claim" on behalf of W&K where he represented that W&K accepted and agreed to his claims.  (Ex. 30).  In these filings, Craig falsely identified himself as the "legal agent and representative for the defendant" and its "Director/Australian Agent" and falsely stated that "I acknowledge the whole of the amount being claimed by the plaintiff."  (*Id.*).  Further, he falsely identified his Australian address and email as the "Address for service" for W&K.  (*Id.*).

121.     Craig further prevented W&K from participating in the proceedings, by filing, on August 28, 2013, Consent Orders in both cases.  (Ex. 19).  These filings represent to the Australian courts that W&K consented to judgment being entered against it through the signature of its "authorised officer," a "J Wilson."  (*Id.* at 2).  But J Wilson – Craig's employee – was not authorized.  Instead, Craig "elected" him a director at a "shareholder meeting" where only Craig was present and only Craig voted.  (Ex. 4 at 5-6).

122.     Craig did this even though (i) Craig did not have any direct or voting interest in this Florida LLC (only an indirect or beneficial interest), (ii) Dave's estate (which held at least 50% of the interest in the LLC) was not notified of the meeting, and (iii) even if Craig had a 50% voting interest in W&K, the election of Wilson was void because the "meeting" lacked a quorum.

123.     In April 2014, Ira first learned of these court proceedings, when the ATO sent him some of the court documents.  Ira confronted Craig for taking Dave and W&K's assets and concealing the court proceedings from Dave's estate.  Craig admitted his subterfuge, but defended himself by claiming the ends justified the means:

29

Ira:  ". . . From [the] documents [I have] it appears clear to see a systematic transfer of assets out of W&K back to you . . . But you never mentioned any of the actions you were taking against W&K prior to contacting us."

Craig:  "Dave died.  I did the actions to make sure that the court signed off on what Dave and I planned."  (Ex. 20 at 18).

124.    Importantly, these Australian claims, like the sworn testimony he submitted to this Court, are based on demonstrably false factual allegations. Specifically:

125.    The July 2013 claim alleges the existence of an October 27, 2008 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services."  (*Id.* at 2).  However, W&K did not exist in 2008.

126.    Also, the July 2013 claim alleges:

"[Craig] conducted four projects associated with the DHS (Dept. of Homeland Security USA) with [W&K] under contract:

    a.  BAA 11-02-TTA 01-0127-WP  TTA 01 - Software Assurance: Software Assurance through Economic Measures

    b.  BAS 11-02-TTA 05-0155-WP TTA 05 - Secure Resilient Systems and Networks

    c.  BAA 11-02-TTA 09-0049-WP TTA 09 - Cyber Economics

    d.  BAA 11-02-TTA 14-0025-WP TTA 14 - Software Assurance MarketPlace (SWAMP)."  (*Id.* at 9-10).

127.    The July 2013 claim goes on to state that "these funds were rated as:

    a.  TTA 01     US$ 650,000

    b.  TTA 05     US$ 1,8000,000 (*sic*)

30

     c.  TTA 09     US$ 2,200,000

     d.  TTA 14     US$ 1,200,000." (*Id.* at 10).

128.    However, these statements were false.  The results of Freedom of Information Act requests by Ira to the DHS reveals that W&K's applications for TTA 01, TTA 05, TTA 09, and TTA 14 were all denied by the DHS.  (Ex. 21).

129.    The August 2013 claim also contains a demonstrably false allegation, alleging the existence of a January 8, 2009 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services."  (Ex. 11 at 2).  But again, W&K did not exist until 2011.

130.    On November 6, 2013, judgments appear to have been entered for both Australian claims.  (Ex. 22).  Craig's fraud to keep W&K and Dave's estate out of the litigation was successful as, in the judgment, the Court "**note[d] the agreement of the parties** that [Craig] will accept the transfer of the intellectual property held by the plaintiff in full and final satisfaction of the judgment."  (*Id.*) (emphasis added).

131.    To this day, Craig has used these fraudulently obtained judgments to assert ownership over the intellectual property assets developed by W&K and Dave.  For example, in the February 18, 2014 meeting with the ATO, Craig's attorney represented to the ATO that "intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange . . . and so on."  (Ex. 12 at 7).  And later again stating:  "Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust

31

into Hotwire . . ." (*Id*. at 18).  Further, as discussed in para 142-143, the ATO has provided

Ira with "deeds" drafted and executed by Craig which show that his companies have taken

ownership over the intellectual property created by W&K and "transferred" by virtue of

these fraudulently obtained "judgments."

**Craig reaches out to Ira to cover up his fraud, deceive Ira into believing him, and secure an ally in his fight against the ATO**

132.      With the ATO closely auditing Craig's activities, Craig knew he had to reveal

some of his and Dave's bitcoin mining and blockchain work to justify various tax positions

he took in Australia.  Realizing this would lead the ATO to contact the Kleimans, Craig

reached out first.

133.      Nearly ten months after Dave's death, on February 11, 2014, Craig reached

out to Dave and Ira's 94 year old father Louis, and wrote:

> Date: Feb. 11, 2014
> From: Craig Wright <Craig.Wright@hotwirepe.com>
> To: Louis <REDACTED@REDACTED>
>
> Hello Louis,
>
> Your son Dave and I are two of the three key people behind Bitcoin
> . . .
>
> If you have any of Dave's computer systems, you need to save a file
> named "wallet.dat". I will explain what this is later. Please
> understand, I do not seek anything other than to give you information
> about your son.
>
> Know also that Dave was a key part of an invention that will
> revolutionise the world . . .
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help
> you recover what Dave owned.

32

I will let you know when I am in the USA.  (Ex. 23).

134.   As Louis Kleiman was elderly, Ira took over the correspondence with Craig.

135.   Craig told Ira he was partners with Dave and that no one knew about their collaboration or W&K. He explained to Ira that W&K was involved in Bitcoin mining and that it was quite successful.

136.   Shortly after informing Ira about W&K, Craig told Ira that Craig and Dave were planning on starting a new company together called "Coin-Exch."  He explained to Ira that Dave's estate would receive shares in it worth millions.

137.   On April 23, 2014, Craig wrote to Ira:

Date: April 23, 2014 8:56pm
From: Craig <craig@rcjbr.org>
To: Ira <REDACTED@REDACTED.com>

The software Dave updated, and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level.  This is all good under the law.  Basically the GST (like a Vat) cancels as it is an international transfer

What company owns right now is:

- Software – incl source code and perpetual licenses valued at over $50 million.
- Intellectual Property, design, codes etc
- Research claims.  (Ex. 24).

138.   At the same time Craig was defrauding the Kleimans, Craig also reached into Florida though an agent, Uyen Nguyen, to revive W&K after it had been administratively dissolved – to ensure he had control over it if necessary.

139.   Consequently, on March 28, 2014, nearly a year after Dave died, W&K was reinstated by Craig's agent, Uyen Nguyen ("Uyen").  (Ex. 25).  Uyen removed Dave as the

registered agent for W&K and listed herself.  (*Id.*).  She then added herself as manager and

secretary and an entity named Coin-Exch Pty Ltd as director.  (*Id.*; ECF 12 at 11 n3).  But

Coin-Exch Pty Ltd was merely Craig seizing control of W&K from the shadows, as it's

well established "Craig Wright" was the "director and controlling mind" of Coin-Exch Pty

Ltd.  (Ex. 18 at 5).[21]

140.     Of course, despite Ira and Craig being in regular email contact at the time,

Craig concealed this action from Ira.

**The ATO reached out to Ira to verify Craig's allegations over W&K, and provided**
**Ira with documents that demonstrate Craig assumed control over intellectual**
**property that belonged to W&K and/or Dave**

141.     As Craig expected, on April 15, 2014, an auditor from the ATO, reached out

to Ira to inquire about his knowledge concerning the legal action Craig took against W&K.

The auditor provided Ira copies of the 2011 IP Agreement and the 2013 W&K Sale

Agreement.

142.     The ATO also provided Ira with three deeds, each titled "IP Deed of

Assignment" and each executed on September 15, 2013 – nearly four months after Dave's

death.  (Ex. 26; Ex. 27; & Ex. 28).  Each of these IP Deeds of Assignments assigned various

intellectual property rights from DeMorgan Ltd to three entities: Coin-Exch Pty Ltd (Ex.

26), Hotwire Preemptive Intelligence Pty Ltd (Ex. 27), and Cloudcroft Pty Ltd (Ex. 28).

143.     The deeds also described the source and nature of this IP: "The IP held in

total by DeMorgan consists of source code, algorithms and patentable materials that have

---

[21] https://www.arnnet.com.au/article/621503/australian-bitcoin-figure-supercomputing-company-enters-liquidation/.

been obtained by Craig Wright R&D (ABD 97 481 146 384) through the following
unrelated entities . . . W&K Information Defense Research LLC [as two batches]." (Ex. 26
at 4; Ex. 27 at 4; & Ex. 28 at 4).

### Craig continues to assure Ira and reveals the nature of the intellectual property owned by, and misappropriated from, W&K and Dave

144.    On April 22, 2014, Ira wrote to Craig that after he had time to review the
documents sent by the ATO, he "felt like there [were] questionable discrepancies in the
contracts between you and W&K such as Dave's signatures, his resignation, transfer of all
accountable value . . . ." (Ex. 24 at 20).

145.    To keep Ira from going public, Craig promised Ira that he could be paid out
of what was owed to Dave's estate "based on what Dave and I had been arranging." (*Id.*
at 12).  On April 23, 2014, Craig told Ira that he would receive the first $12 million payment
in October 2014.  (*Id.* at 8).

146.    On the same day, trying to further placate Ira, and further evidencing Dave
and the estate's claim to W&K's transferred intellectual property, Craig wrote Ira stating:

> The software Dave updated and which I have transferred back in
> OUR company, and it is OURs as you are Dave's heir, was done at
> a zero tax level . . . Dave took the 2 million lines of code that had in
> 2010 and transformed these into a documented set of over 6 million
> lines of code. (*Id.* at 2).

147.    On April 25, 2014, still trying to reassure Ira, Craig sent Ira a chronology of
his activities related to W&K and the development of its intellectual property.  In this
document, Craig wrote:

> There is a lot of IP and 'stuff' in the mix.  All up, it's around a
> hundred million dollars' worth.  This IP originates in work CSW

35

> has been doing for more than 10 years; it originates in things that
> came from W&K; it has to do with the software acquired. The
> values and distribution . . . amounts to a third each for Cloudcroft,
> Hotwire, and Coin exch. Cloudcroft gets the security related IP,
> Coin-Exch gets the banking and Hotwire gets all of the automation
> R&D based stuff. (Ex. 7).

148.    The nature of this intellectual property transferred from W&K to DeMorgan,

Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft was further explained by

Craig in a letter he published on DeMorgan's website in 2015. This letter demonstrates

that Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft were involved in

building out W&K's intellectual property with R&D efforts targeted at "the development

of smart contract and Blockchain based technologies" and "commercialisation of our

Blockchain and smart contract systems research."[22]

149.    Craig's promise of a multi-million dollar payment by October 2014, never

came true. Craig blamed the delay on the ATO investigation and kept promising Ira he

would see value when the investigation closed.

150.    On October 9, 2015, Craig essentially stopped responding to Ira.

151.    In November 2015, Dave's friend and business partner, Patrick Paige

reached out to Craig when a reporter called him inquiring about Craig and Dave's

involvement in Bitcoin. Craig responded:

> Thanks for the heads up. Reporters are always troubling. They
> ignored the stuff Dave and I did when he was alive. I don't know
> what has started to interest them now . . . as you know[, **Dave] did**

---

[22]http://www.businessinsider.com/craig-steven-wright-rumoured-bitcoin-creator-was-
commercialising-blockchain-research-and-reviving-company-hotwire-2015-12;
https://prwire.com.au/pr/51565/the-demorgan-ltd-group-of-companies-to-receive-up-to-54-
million-from-ausindustry-r-amp-d-tax-rebate-scheme-1.

**a fair amount of research with me.  Most yet to be completed and published**.  (Ex. 8 at 13 (emphasis added)).

152.    After Craig yet again confirmed Dave's involvement in Bitcoin and the intellectual property they developed, Patrick wrote back:

> . . . I think we both know Dave was a genius when it came to computers and I sure would like Dave to get recognition for his part if any in the development of bitcoins.  I realize there is a lot of things to consider releasing this information but my question is when?  (*Id.* at 12).

153.    Craig responded:  "When it all comes out, there is no way Dave will be left out.  **We need at least a year more**."  (*Id.* (emphasis added)).

### Craig claims that he and Dave are Satoshi Nakamoto

154.    On December 8, 2015, two popular tech publications, *Wired* and *Gizmodo*, outed Craig as Satoshi.[23]   Both articles also articulated Dave's integral role in the development of Bitcoin.  They described numerous details and leaked communications implicating Dave and Craig's roles in creating and developing Bitcoin; they also discussed Dave and Craig's accumulation of a vast hoard of bitcoin.

155.    On May 2, 2016, nearly five months after the *Wired* and *Gizmodo* publications, Craig published a blog post in which he claimed to be Satoshi.[24]

156.    Craig has readily admitted Dave was intimately involved in the creation of Bitcoin.  In numerous interviews with Andrew O'Hagan, documented in *The Satoshi Affair*,

---

[23] https://www.wired.com/2015/12/bitcoins-creator-satoshi-nakamoto-is-probably-this-unknown-australian-genius/;   https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

[24]   https://qz.com/674129/an-australian-nobody-claims-to-be-the-inventor-of-bitcoin-but-no-one-knows-for-sure/.

Craig told O'Hagan that "[Craig] did the coding and that Kleiman helped him to write the white paper."  (Ex. 1 at 31).

157.     Further, in numerous emails to Ira, Craig admitted the same.

158.     Craig currently serves as Chief Scientist of a UK company called nChain in London, where, in 2016, he filed dozens of patents related to Bitcoin and blockchain technology through this entity.[25]  The public filing of these patents disclosed to the public intellectual property belonging to Dave and W&K without the permission of Dave's estate and/or W&K.

159.     To date, neither Dave's estate nor W&K have received the assets belonging to them as a result of their early involvement in Bitcoin and bitcoin mining.

**Fraud on this Court**[26]

160.     In Ira's initial Complaint, as in this one, he alleged that (i) Craig and Dave held some form of interests in a Florida LLC called W&K, that (ii) through this LLC, and otherwise, they mined over 1.1 million bitcoins and developed extremely valuable intellectual property, that (iii) after Dave died, Craig took unlawful possession of all the bitcoins the Florida LLC mined and intellectual property it created (along with the bitcoin and intellectual property they mined/developed together personally), that (iv) Craig then tried to "launder" this stolen intellectual property by defrauding the Australian courts into

---

[25]   https://www.reuters.com/article/us-bitcoin-wright-fund-exclusive/exclusive-company-behind-bitcoin-creator-sold-to-private-investors-idUSKBN17F26V.

[26] The emphases appearing in this section have been added.

entering consent orders transferring clean title over W&K's intellectual property to Craig; and that (v) Craig needs to return the stolen property.

161.     In response to this Complaint, Craig filed a motion to dismiss alleging he has essentially **no** connection to Florida or W&K.  His motion stated Plaintiff's jurisdictional allegations were "frivolous" and "sanctionable."  (ECF D.E. 12 at 36).  Craig supported these assertions with a sworn declaration stating he was never a shareholder, member, agent, employee, or representative of W&K.  (Ex. 29 ¶¶ 11-12).  He swore, under penalty of perjury under the laws of the United States, that he's never exercised authority or control over W&K.  (*Id.* ¶ 13).

162.     He perjured himself.

163.     To procure his fraudulent Australian judgments, Craig submitted an affidavit to the Supreme Court of New South Wales where Craig affirmed that:

> "The **shareholding** of 'W&K Info Defense LLC' was:
>
> 1. **Craig S Wright**          **50.0%**
> 2. David A Kleiman          50.0%"

(Ex. 4 at 5).

164.     Craig then doubled down on this ownership structure affirming further that "W&K Info Defense LLC was an incorporated partnership. **All shares are held jointly**." (*Id.*).  He then affirmed that **he called a "shareholders meeting"** on August 16, 2013 at which only he and Jamie Wilson were present.  (*Id.*).  Craig affirmed **he was the sole vote**

that nominated Jamie Wilson to act as a director "for purposes of consenting to orders and the company to be wound down." (*Id*. at 5).[27]

165.    These affidavit statements directly contradict his sworn statements to this Court that (i) "I have never been a **. . . shareholder . . .** of W&K," (ii) "I have never been a **member** of W&K," and (iii) "I have never **exercised authority or control** over W&K **. . .**" (Ex. 29 ¶¶ 11-13).

166.    But the perjury doesn't end there.

167.    Craig attached voluminous records to his Australian affidavit. These attachments evidence Craig signed as the "**authorized representative**" of W&K six (6) times (Ex. 4 at 56, 63, 70, 76, 83, 90), identified himself as W&K's "**lead researcher**" twice (*id*. at 45-46), its "**technical contact**" six (6) times (*id*. 50, 57, 64, 71, 77, 84), affiliates himself with **W&K's Florida address** as, *e.g.*, his "**mailing address**" twelve (12) times (*id*. at 49, 56-57, 63-64, 70-71, 76-77, 83-84, 90), includes detailed descriptions of the computer programs and research Craig was **attempting to get DHS to fund** (*id*. at 50-94), and includes four (4) emails from DHS confirming Craig had **uploaded various proposals on behalf of W&K attempting to secure funding** (*Id*. at 40-43). Collectively, these documents clearly evidence Craig's participation in operating W&K from Florida to solicit business from the United States DHS.

---

[27] Under Florida law, there is no such thing as an "incorporated partnership" and an LLC does not have "shares" or "directors" or hold shareholders' meetings. The "owners" of an LLC are called "members."

168.    Obviously, these affidavit attachments are in direct conflict with Craig's sworn statements to this Court that (i) "I have never been a . . . **employee, or representative** of W&K," (ii) "I have never been an **agent** of W&K," (iii) "I have never . . . **developed software for** any purpose relating to a Florida business, including **W&K**," (iv) "I have never **advertised services in Florida**," (v) "I have never had an **office in Florida**," and (vi) "I have never **exercised authority or control over W&K** . . ."   (Ex. 29 ¶¶ 6, 8, 11-13, 15).

169.    As mentioned in ¶ 120, Craig also ~~filed~~ submitted two "Acknowledgment of Liquidated Claim" filings in Australia where he signed as the "**legal agent and representative**" of W&K and as its "**Director/ Australian Agent**." (Ex. 30). As set forth in ¶¶ 138-139 he also acted as the "**director**" of W&K when he had his agent put Coin-Exch, his company, as its director.  These also directly conflict with his sworn testimony above.

170.    Craig's boldfaced misrepresentations and perjury before this Court constitute a continuation of his grand fraud to unlawfully take Plaintiffs' assets.  Said differently, Craig's latest fraud on this Florida Court is simply one more action he's taken in Florida to defraud Dave's estate and W&K.

Formatted: Font: Not Bold

Formatted: Font: Bold

## **CLAIMS FOR RELIEF**

### **COUNT I**
### **Conversion**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

171.    On or about April 2013 through the present day, Defendant converted to his own use, bitcoins, forked assets, and intellectual properties that was then the property of, and owned by, the estate and/or W&K.

172.    The property was worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over it.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages in the amount of at least $11,427,755,048.02 and/or return of the wrongfully converted bitcoins with their forked assets. Plaintiffs demands the return of the IP, or its fair market value. Plaintiffs also demand punitive damages, together with court costs, interest, and any other relief this Court deems just and proper.

### **COUNT II**
### **Unjust Enrichment**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

173.    Plaintiffs have conferred a benefit on the Defendant, who has knowledge thereof.

174.    Defendant voluntarily accepted and retained the benefit conferred.

175.    The circumstances render Defendant's retention of the benefit inequitable unless the Defendant pays to Plaintiffs the value of the benefit.

42

176.    Defendant has been unjustly enriched at Plaintiffs' expense.

177.    Plaintiffs are entitled to damages as a result of Defendant's unjust enrichment, including disgorgement of all monies and or properties unlawfully accepted and retained by Defendant from Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant for the return of the wrongfully retained property or monetary damages equaling to the value thereof, together with court costs, interest, and any other relief this Court deems just and proper.

**COUNT III**
**Misappropriation**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

178.    After Dave's death, Craig unlawfully, willfully, and maliciously misappropriated trade secrets belonging to Dave and/or W&K relating to blockchain based technologies and smart contracts by using them for himself and using a series of fraudulent contracts, misrepresentations, and fraudulently obtained court judgments to transfer/acquire the property rights in these trade secrets to/for himself.

179.    These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts. These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

43

180.     These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. As evidence of the substantial economic value relating to these trade secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

181.     Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets.  Dave made no disclosures of these trade secrets to anyone but Craig.

182.     As a proximate result of Craig's unlawful misappropriation, Dave's estate and/or W&K have suffered actual losses consisting of the loss in economic value associated with the trade secrets.

183.     As a proximate result of Craig's unlawful misappropriation, Dave's estate and W&K are informed and believe that Craig has been unjustly enriched.

184.     As a proximate result of Craig's unlawful and willful misappropriation, Dave's estate is entitled to a recovery of damages pursuant to Fla. Stat. § 688.004.

WHEREFORE, Plaintiffs demand judgment against Defendant for all available damages caused by Craig's misappropriation, including exemplary damages, together with court costs, interest, attorney's fees pursuant to Fla. Stat. 688.005, and any other relief this Court deems just and proper.

**COUNT IV**
**Federal Defense of Trade Secrets Act**
(*Asserted by the Estate and W&K*)

Plaintiffs incorporate paragraphs 1 to 170.

185.    Craig's conduct described in this Second Amended Complaint constitutes misappropriation of trade secrets under the Defend Trade Secrets Act.  18 U.S.C. §§ 1832.

186.    These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts which is a product used and intended to be used in interstate and foreign commerce.  These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

187.    These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use. As evidence of the substantial economic value relating to these trade secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

188.    Craig caused many of these patents to be filed *after* May 11, 2016.

189.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets.  Dave made no disclosures of these trade secrets to anyone but Craig.

45

190.     As a proximate result of Craig's unlawful misappropriation, Dave's estate has suffered actual losses consisting of the loss in economic value associated with the trade secrets.

191.     As a proximate result of Craig's unlawful misappropriation, Dave's estate is informed and believes that Craig has been unjustly enriched.

WHEREFORE, Plaintiffs demand judgment against Defendant for the value of the wrongfully taken intellectual property, together with court costs, interest, attorney's fees, and any other relief this Court deems just and proper.

**COUNT V**
**Breach of Fiduciary Duty**
*(Asserted by the Estate and W&K)*

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

192.     Although Craig did not have a direct ownership interest in W&K, he owed fiduciary duties to the LLC, as, *inter alia*, its agent, its purported "authorized representative," "lead researcher," "technical contact," "legal agent and representative" and "Director/Australian Agent."  Although lacking any authority to do so, upon Dave's death Craig assumed *de facto* control and management of W&K and thereby incurred fiduciary duties to act in the LLC's, and its member's, best interests.

193.     In the alternative, just as the shareholders of a closely held corporation have partnership-like fiduciary duties to each other, Craig and Dave acted as partners in the management and operation of W&K, and thus Craig owed fiduciary duties of care, loyalty, and good faith to Dave, his estate, and W&K, by virtue of their joint venture.

46

194.    In the alternative, if Craig *was* an actual member in W&K Info Defense LLC, Craig owed fiduciary duties of care, loyalty, and good faith to W&K, Dave, and his estate pursuant to Fla. Stat. § 605.04091.

195.    Craig breached his fiduciary duty of loyalty and good faith, by, among other things, intentionally and wrongly transferring assets that belonged to Dave's estate and/or W&K to himself and/or companies controlled by him.

196.    Dave's estate and or W&K have been damaged by Craig's breach of his fiduciary duties.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages and/or return of the wrongfully taken bitcoins, forked assets, and intellectual property, together with court costs, interest, and any other relief this Court deems just and proper.

**COUNT VI**
**Breach of Partnership Duties of Loyalty and Care**
*(Asserted by the Estate)*

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

197.    From c. 2008 until at least the creation of W&K in 2011, Craig and Dave associated to carry on as co-owners of a business for profit to create Bitcoin, mine bitcoins, and create other block chain intellectual property. Pursuant to Fla. Stat. § 620.8202, and Craig's admission of same, this formed a partnership.

198.    Pursuant to Fla. Stat. § 620.8404(2), Craig owed Dave a duty of loyalty to, *inter alia,* "account to the partnership and hold as trustee for the partnership any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership

47

business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity.

199.   Pursuant to Fla. Stat. § 620.8404(3), Craig owed Dave a duty of care to refrain from engaging in intentional misconduct, or a knowing violation of law.

200.   Craig breached these duties of loyalty and care by, *inter alia*, stealing Dave's bitcoins and any intellectual property Dave owned and or designed during the c. 2008-2011 timeframe (or any other time they partnered).

201.   Pursuant to Fla. Stat. §§ 620.8405, Dave's estate brings this action for breach of the duties of loyalty and care owed under Fla. Stat. § 620.8404, including but not limited to its rights pursuant to Fla. Stat. §§ 620.8401, 620.8403, 620.8807, its right to have its partnership interest purchased pursuant to § 620.8701, and to otherwise enforce the rights and protect the interests of Dave's estate.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, and purchase of his partnership interest together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT VII
### Fraud
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

202.   As detailed above, Defendant made knowing false statements of fact, intentional omissions of material facts, and falsely promised future action with no intention of performing and/or specifically intending not to perform. These included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred,

48

sold, and/or returned to Craig pursuant to valid contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

203.   Defendant took these actions/omissions with the purpose of inducing Plaintiffs to rely on these fraudulent acts and omissions.

204.   Plaintiffs acted in reliance on Defendant's fraudulent representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

205.   As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

49

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

**COUNT VIII**
**Constructive Fraud**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170, and 192-205.

206.     As detailed above, a fiduciary relationship existed between Craig and W&K and Craig and Ira.

207.     Craig invited W&K and Ira's utmost trust and loyalty as their fiduciary.

208.     Plaintiffs reposed the utmost trust and loyalty in Craig.

209.     Craig intentionally violated Plaintiffs trust and confidence, took unconscionable advantage of Plaintiffs, abused and took improper advantage of their confidential and fiduciary relationship, and materially breached his fiduciary duties to them both by knowingly making false statements of fact, intentional omissions of material facts, remaining silent in light of a duty to speak, falsely promising future action with no intention of performing and/or specifically intending not to perform, and by engaging in unfair methods against them. These fraudulent representations/omissions included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred, sold, and/or returned to Craig pursuant to valid contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this

50

Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

210.    As detailed above, at the time Craig made those false statements and material omissions, and concealed his misconduct, a fiduciary relationship existed between Craig and Ira, and Craig and W&K, as Craig owed fiduciary duties and duties of care and loyalty to the estate and W&K.   Craig induced Ira's reliance and Craig took an improper/unconscionable/unfair advantage of, and abused, the fiduciary and confidential relationship at Ira and W&K's expense. Craig's misrepresentations and omissions were intentional, for the specific purpose of defrauding the estate and W&K of their property, but in any event, regardless of intent, Craig is liable for constructive fraud.

211.    Plaintiffs acted in reliance on Defendants fraudulent and unfair representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

212.    As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

51

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

**COUNT IX**
**Permanent Injunction**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

213.    Craig's unlawful taking of the bitcoins and intellectual property belonging to Plaintiffs has resulted in great and irreparable injury to them both as they have been deprived of unique, limited, and valuable digital assets.

214.    Neither Plaintiff can be fully compensated in damages and is without adequate remedy at law.

WHEREFORE, Plaintiffs request this Court enter an injunction ordering Defendant to return all bitcoins, forked assets, and intellectual property unlawfully taken from Plaintiffs.

**COUNT X**
**Civil Theft - § 772.11 Fla. Stat.,**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

52

215.    On or about April 2013 through the present day, Defendant knowingly and wrongfully took, with felonious criminal intent, bitcoins, forked assets, and intellectual properties that were then the property of, and owned by, the estate and/or W&K.

216.    Defendant took these with the intent to deprive Plaintiffs of the right to these properties and to appropriate the properties to his own use and the use of others not entitled to use the properties.

217.    Defendant also trafficked in, and endeavored to traffic in, properties that he knew were stolen and properties that he initiated, organized, planned, financed, directed, managed, and supervised, the theft of.

218.    The properties were worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over them.

219.    The actions taken by Defendant were done intentionally and maliciously as part of a scheme designed to defraud Plaintiffs of their assets.

220.    On June 19, 2018, pursuant to § 772.11 Fla. Stat., counsel for Plaintiffs sent the demand required by Florida Law required to initiate a claim for civil theft.  (Ex. C.)

221.    Defendant has not complied with that demand.

222.    Plaintiffs have been damaged as a result of Defendants actions.

223.    Plaintiffs have retained the undersigned to represent them in this action and in so doing have incurred an obligation for the payment of attorney's fees and costs.

WHEREFORE, Plaintiffs demand judgment against Defendant awarding damages, including treble damages and attorney's fees pursuant to § 772.11 Fla. Stat. as well as

ordering Defendant to divest himself of relevant enterprise(s), as well as granting such other relief as the Court deems just, equitable and proper.

**Plaintiffs demand a trial by jury for all issues triable by right.**

Formatted: Font: Not Bold

Dated:  May 14, 2018January 11, 2019

Respectfully submitted,

                             **BOIES SCHILLER FLEXNER LLP**

By: */s/Velvel Devin Freedman*
     Velvel (Devin) Freedman
     **BOIES SCHILLER FLEXNER LLP**
     100 SE Second Street
     Miami, FL 33131
     Tel.   (305)539-8400
     Fax.   (305)539-1307
     Email: vfreedman@bsfllp.com

     Kyle Roche
     **BOIES SCHILLER FLEXNER LLP**
     333 Main Street
     Armonk, NY 10504
     Tel.   (914)749-8200
     Fax.   (914)749-8300
     Email: kroche@bsfllp.com
     *Admitted pro hac vice*

54

Attorneys for Plaintiffs
IRA KLEIMAN in his capacity as Personal
Representative of the Estate of David Kleiman
and W&K Info Defense Research, LLC.