UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CV-80176-BB

IRA KLEIMAN,
as the Personal Representative
of the Estate of David Kleiman,
et al.,

                                        West Palm Beach, Florida
            Plaintiff(s),
                                        March 7, 2019
        vs.

CRAIG WRIGHT,

            Defendant(s).        Pages 1 – 64
------------------------------------------------------------

HEARING
TRANSCRIBED FROM DIGITAL AUDIO RECORDING
BEFORE THE HONORABLE BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):   DEVIN FREEDMAN, ESQ.
                        BOIES SCHILLER FLEXNER, LLP
                        100 SE 2nd Street
                        Miami, FL 33131
                        (305) 357-8438
                        vfreedman@bsfllp.com

                        KYLE ROCHE, ESQ.
                        BOIES SCHILLER FLEXNER, LLP
                        333 Main Street
                        Armonk, NY 10504
                        (914) 749-8324
                        kroche@bsfllp.com

```
 1   APPEARANCES (CONT'D)

 2   FOR THE DEFENDANT(S):    AMANDA M. MCGOVERN, ESQ.
                              RIVERO MESTRE, LLP
 3                            2525 Ponce de Leon Blvd.
                              Coral Gables, FL 33134
 4                            (305) 445-2500
                              amcgovern@riveromestre.com
 5
                              ZAHARAH R. MARKOE, ESQ.
 6                            RIVERO MESTRE, LLP
                              2500 Ponce de Leon Blvd.
 7                            Miami, FL 33134
                              (305) 445-2500
 8                            zmarkoe@riveromestre.com

 9   TRANSCRIBED BY:          Joanne Mancari, RPR, CRR, CSR
                              Court Reporter
10                            jemancari@gmail.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Thereupon,

2    the following proceedings were held:

3         THE COURT:  Kleiman and W&K Info Defense Research, LLC

4    v. Craig Wright.

5         Can I have counsel's appearance, starting with counsel

6    for the plaintiff.

7         MR. FREEDMAN:  Good afternoon, your Honor.  Doug

8    Freedman for plaintiff.

9         THE COURT:  Mr. Freedman, good afternoon.

10        MR. ROCHE:  Kyle Roche for the plaintiff.

11        THE COURT:  Mr. Roche, good afternoon.

12        MS. MCGOVERN:  Good afternoon, your Honor.  Amanda

13   McGovern for the defendant Craig Wright.

14        THE COURT:  Good afternoon.

15        MS. MARKOE:  Good afternoon, your Honor.  Zaharah

16   Markoe for defendant Craig Wright.

17        THE COURT:  Good afternoon.

18        MR. MODESITT:  Clint Modesitt for the defendant.

19        THE COURT:  Thank you, and good afternoon.

20        So we are here on the request for a joint discovery

21   hearing, but also I think I had set this down when we last met.

22   I told you guys to talk to each other and come back, and

23   hopefully you got some things narrowed here.  It sounds like

24   you did a great job of conferring and trying to narrow some

25   issues.

1      I did review the joint discovery memo that was filed
2  earlier this week.  Thank you.
3      Is there anything since that time that's been further
4  resolved from any of the issues that were left open?  Either
5  side.
6      Mr. Freedman, do you want to take the lead on that?
7  You're the plaintiff.
8      MR. FREEDMAN:  Sure, your Honor.  Plaintiff has gone
9  through -- we had a meet and confer again with the defendant
10  and were able to further narrow and withdraw additional
11  requests for production that are listed at, I think it's 8 of
12  the joint discovery memorandum.
13      THE COURT:  Great.
14      MR. FREEDMAN:  And we prepared our half of a joint
15  submission, but the defendant wanted to request an additional
16  hearing and have an opportunity to respond longer than one day,
17  which is understandable.
18      THE COURT:  Of course.
19      So as to No. 8, that issue may be more narrow, but 1
20  through 7 is still open for discussion, correct?
21      MR. FREEDMAN:  Based on -- I'm not sure, your Honor,
22  honestly.  We should maybe let defendant -- because defendant
23  had raised some issues that I didn't think were issues.  So
24  maybe once they express them, we can deal with them.
25      THE COURT:  Let me turn to the defense.  Are there any

1    issues that you believe have now been resolved that are listed

2    in the joint discovery memo?

3            MS. MCGOVERN:  I don't believe so, your Honor.

4            THE COURT:  Let's take them one at a time then and go

5    through them.

6            So the first issue -- I apologize.  As somebody saw, I

7    just got out of another one of these hearings, so I have to

8    shift my brain around a little.

9            Let me read this.  This has to do with the ESI numbers

10   and access.  I thought I ruled on this.

11           What is the disputed issue?

12           MS. MCGOVERN:  Your Honor, would you mind if I come up

13   here?

14           THE COURT:  Yes, of course.

15           MS. MCGOVERN:  Because I am leaning over and I feel

16   like a giant.

17           THE COURT:  You can come speak from the lectern.  Of

18   course.

19           MS. MCGOVERN:  Thank you, your Honor.

20           I also wanted to clarify in case there is any

21   misunderstanding.  Clint Modesitt is with AlixPartners.  He is

22   our ESI vendor.  He is not an attorney.

23           THE COURT:  Understood.

24           MS. MCGOVERN:  We have asked him to come here to the

25   extent that the court has any questions.  He participated in

1    the meet and confer that was held on February 25th.  Because

2    this is an issue that most concerned us, we wanted him to be

3    here to try to make this issue go forward as quickly as

4    possible.

5           THE COURT:  Understood.

6           MS. MCGOVERN:  With respect to the first --

7           MR. FREEDMAN:  Your Honor, can I just say we had no

8    notice that Mr. Modesitt would be here.  We did not bring our

9    own expert.  I am not sure it will matter.

10          THE COURT:  I am not going to take testimony or make

11   any rulings based upon testimony without giving you a chance to

12   be heard.  But to the extent that he can say something that you

13   agree to or can help clarify issues for them, I will allow them

14   to confer with him.  But I am not going to let him testify if

15   that is your concern.  That's fair.

16          Go ahead, please.

17          MS. MCGOVERN:  Your Honor, with the goal to being as

18   efficient as possible as we can this afternoon, your Honor, the

19   issue with respect to Dave Kleiman's electronic devices is one

20   of process.

21          THE COURT:  OK.

22          MS. MCGOVERN:  We had a meet and confer ordered.  A

23   meet and confer was held on February 20th.  Plaintiffs made

24   their expert or their ESI vendor available on the 25th.  We had

25   a meet and confer.  I participated in the meet and confer as

1   well as counsel for plaintiffs and my cocounsel Zaharah Markoe

2   and Clint Modesitt as well.

3          On that meet and confer, we addressed the question of

4   the imaging.  What came out of that meet and confer were two

5   things.  One, that the hard drives had been removed from some

6   of the computers and that the collection or the imaging of the

7   devices -- there were ten -- was done for the first time on

8   January 21, 2019.  This case was filed in February of 2018.

9   Dave Kleiman passed away in April of 2013.  The first imaging

10  that was done of Dave Kleiman's devices was this year, about

11  two months ago.

12          When we discussed the methodology that we would use,

13  it was our ESI vendor that requested sort of the basics.  The

14  first basic being the computer log.  And the computer log is

15  essentially giving information, nothing privileged, no content

16  base whatsoever, about exactly what was collected.

17          Those logs give initial or a pretty good indication of

18  whether in fact the imaging that was done was done properly.

19          So we requested those logs, and plaintiff indicated

20  that they would get back to us as to whether they would give

21  them to us.

22          We did not receive --

23          THE COURT:  Let me pause you there for just one

24  second.  I want to make sure I'm following your sequence.  So

25  there were hard drives that were physically removed from the

1  devices at some point.

2          MS. MCGOVERN:  Yes.

3          THE COURT:  So those exist here.

4          MS. MCGOVERN:  Yes.

5          THE COURT:  They did image over something else.

6          MS. MCGOVERN:  Yes.

7          THE COURT:  Earlier this year.

8          MS. MCGOVERN:  Yes.

9          THE COURT:  So the question is whether that imaging

10  was done in the way that has integrity and forensic value.

11          MS. MCGOVERN:  Correct.

12          THE COURT:  OK.  I'm with you so far.

13          The original devices still exist in their pristine

14  condition.

15          MS. MCGOVERN:  Those are issues that we are going to

16  have to drill down on, your Honor, but at least at this point

17  we know the hard drives in some instances were removed from the

18  computers.

19          THE COURT:  OK.

20          MS. MCGOVERN:  We followed up with an e-mail asking if

21  you could explain sort of the whys, why was that done, when was

22  that done, who did it, the circumstances surrounding it, and we

23  may also have to drill down on that in the deposition issue

24  that we are going to be addressing later today.  But the one

25  issue, sort of the base issue, the threshold issue that came

1    out was the logs.

2         So our ESI vendor said in order to determine whether

3    in fact these images were done properly, we would need the

4    computer logs, and plaintiffs' counsel said they would get back

5    to us.  We did not receive those computer logs until last

6    night, about 11:30 at night.

7         THE COURT:  OK.

8         MS. MCGOVERN:  So from February 25th to today, late

9    last night -- I didn't see it until this morning -- we haven't

10   received those computer logs.

11        We asked our ESI vendor to look at those logs as

12   quickly as possible -- because, again, we don't want to delay

13   this -- to say, OK, is there an issue with respect to the

14   imaging, was it done properly, do we have to do it again, that

15   sort of thing.

16        THE COURT:  I think that is what I instructed at the

17   last hearing, is that should be done first.

18        MS. MCGOVERN:  Exactly.

19        THE COURT:  Because if everybody agrees that they were

20   imaged in a way that has forensic integrity, we don't have to

21   go back to stage one.  We can start at stage two.

22        MS. MCGOVERN:  Correct.

23        We weren't able to confirm 100 percent because we got

24   them so late at the last minute, but for purposes of today and

25   where we are going to go today, because again we are on a short

1    discovery, the next issue became the images themselves and

2    looking at what the procedure would be in terms of looking at

3    the computer images themselves.

4         We were under the understanding that we would receive

5    both the image, the logs, the computer logs, to determine

6    whether the imaging was done properly and then to determine, to

7    get the images themselves which would allow an ESI vendor to

8    look and determine folic.

9         The activity on the device since Dave's death on April

10   26, 2013, the data that was deleted or overwritten from the

11   drive, because there was an issue with respect to Ira Kleiman's

12   statement that he deleted and overwrote data, and this is why

13   we're here, this is why we're talking about it, and then

14   essentially a description of the activity.  In other words, is

15   there evidence of wiping or deleting and that sort of thing.

16        It would also show file listings, which would show

17   when something was created, when something was modified, and

18   when something was accessed.

19        THE COURT:  Cookie-cutter stuff for your forensic

20   investigator.

21        MS. MCGOVERN:  Cookie-cutter stuff, and that is what

22   we wanted to be much farther along on today.

23        THE COURT:  OK.

24        MS. MCGOVERN:  We are not, because what happened after

25   the meet and confer was plaintiffs' counsel stated his client

1    is concerned about privilege and that our client -- if our ESI

2    vendor has the ability, even if the court has issued an order,

3    which it did -- and again, it is at pages 54 and 55 of the

4    transcript of the February 20th hearing, is exactly what you

5    did.  If in fact the order says all -- no content will be

6    released until further order of the court.  It will simply be

7    that the activity on the report, that the report that we're

8    looking for now so we can determine what we believe to be a

9    critical issue in this case, which is what does the deceased's

10   electronic devices demonstrate with respect to the existence,

11   the deletion, etc., of evidence, but plaintiffs' counsel

12   suggested, well, our client is concerned that in fact our ESI

13   vendor would theoretically be able to access the content and

14   seek privileged materials.

15             THE COURT:  They raised that last time, as I recall.

16             MS. MCGOVERN:  That is correct.  You overruled it.

17             What we stated to the plaintiffs' counsel was, because

18   we were under the impression that the -- they asked for a

19   neutral and they asked us to give names of a neutral expert

20   that would essentially do this second stage, which is the

21   report, the report of activity, the report that I have just

22   identified.  We said -- and they asked us to provide potential

23   neutrals who could provide that exercise.  They said they would

24   pay for half of it because they said their client is concerned

25   about privilege.

1         THE COURT:  Let me stop you because I'm looking at the

2    joint discovery report and they say there is no privileged

3    material.

4         So are you, Mr. Freedman, withdrawing any privilege

5    objection at this point?

6         MR. FREEDMAN:  Your Honor, there are two separate

7    things.  One is the privilege logs, which we just said we have

8    to verify.  We have verified and we produced them.

9         THE COURT:  Privilege logs or computer logs?

10        MR. FREEDMAN:  I apologize.  Imaging logs.

11        THE COURT:  Imaging logs, OK.

12        MR. FREEDMAN:  Imaging logs.  The imaging logs have

13   been produced.

14        THE COURT:  Right.

15        MR. FREEDMAN:  After we verified -- within a week or a

16   day after we verified there was no privileged material on it.

17        The second issue is that after the court ruled on the

18   privilege issue that I had raised at the hearing, my client

19   explained to me, and I can get into it if the court wants, that

20   there was extremely sensitive information on the drive and

21   there was a massive amount of it.

22        So what I told defense counsel was based on what my

23   client's told me we might have to go ask Judge Reinhart to

24   reconsider his prior ruling.  But we might have a way to just

25   expedite this along.  We'll pay for half of the forensic

 1   neutral.  We will get a neutral appointed and expedite

 2   everything.  They agreed, and then we're trying to agree on a

 3   forensic neutral.  I mean, that's where we are now.

 4          I'll hand it back over to Ms. McGovern.

 5          THE COURT:  I didn't mean to interrupt you,

 6   Ms. McGovern, but if there was no longer an issue, I just

 7   assume cut it off.

 8          So continue, Ms. McGovern.

 9          MS. MCGOVERN:  So where we are now, your Honor, is we,

10   in the interest of trying to expedite this and looking at

11   the --

12          THE COURT:  You realize the last case that you heard,

13   the whole issue in that case is there was extremely sensitive

14   information on the guy's computer, as in sex tapes of him and

15   his mistress.  So that is what that whole case is about.

16          MS. MCGOVERN:  It is our understanding that is not the

17   issue here.

18          THE COURT:  Good.  I am glad to hear.

19          MS. MCGOVERN:  So we were provided some names of some

20   neutrals.  We gave the names with the understanding that this,

21   these different --

22          THE COURT:  So you agree in principle to that

23   proposal?

24          MS. MCGOVERN:  No, we are not, and here's why we are

25   not.  It is not necessary.  This is not necessary.  It has been

1   two weeks, and I understand that they're saying it took a week

2   and a day to get computer logs.  If I showed you on this TV

3   screen what these computer logs look like, you would see in

4   five seconds that there is absolutely no privileged material on

5   there and it took until last night to get it.

6        At the same time that they are now wanting us to go

7   out and hire a neutral and go through this same exercise, your

8   Honor has already ordered an ESI -- the content, any content to

9   be held until further order of this court.  I can tell you, and

10  certainly Mr. Modesitt can tell you, that AlixPartners is not

11  going to put its entire corporate reputation on the line, be in

12  contempt of court for this case no matter how interesting it

13  might be.

14       So we are at a point, your Honor, we are ready to go.

15       At the same time as this issue has taken place, which

16  I think is going to delay it, they are pushing, pushing,

17  pushing for our client's deposition, which we are going to get

18  into later.

19       We are now at a point, in our opinion, we should

20  follow the court's ruling.  We should begin the imaging.  No

21  content should be released.  And we should look at the limited

22  reciprocal early depositions of Ira Kleiman and our client.

23  But we certainly can't do that exercise with this issue hanging

24  over everybody's heads.  And they want a deposition of our

25  client in March and we don't even have this issue moving

1   forward.

2           Our point is, it is not a necessary exercise.  We

3   understand that they're willing to pay for half of it, but that

4   is not the point.  What we want is what your Honor ordered and

5   we simply want to move this.  We have to find out what happened

6   with these devices.  Our ESI vendor is ready to do it.  It will

7   abide by the order of this court and we can move forward.

8           THE COURT:  OK.  Just so I'm clear, so are we at the

9   point now where you're agreeable to image their image and you

10  don't believe there is a need to go back to the raw hard drive?

11          MS. MCGOVERN:  We believe so, your Honor.

12          THE COURT:  That is what you are asking for at this

13  point, is to be able to image the image.

14          MS. MCGOVERN:  At this point we'd like to go and have

15  the report prepared with respect to the activity that I had

16  mentioned before.

17          Essentially, there's three things.  It is a report of

18  the activity of the device since Dave's death, which basically

19  means what happened to these devices, what was written, what

20  was overwritten, what was added, what was modified.

21          THE COURT:  I have seen in case and similar type, I

22  don't know what software your vendor uses, but I've seen in

23  case reports and other things that extract data forensically

24  from hard drives.

25          So are you asking at this time for an image of the

1  entire hard drive itself or just to be able to run that report

2  off of an image?  I just want to make sure I understand what

3  you are asking for.

4           MS. MCGOVERN:  We have the computer logs.  We do not

5  have the image.  We do not have the report for the image.

6           THE COURT:  So you need a full image so you can then

7  run the reports on the image, is that correct?

8           MS. MCGOVERN:  That is correct, your Honor.

9           THE COURT:  The objection from the plaintiff is simply

10  giving them the image without having it going to a neutral and

11  having a neutral run and extract the reports.

12           MR. FREEDMAN:  Right, your Honor.  That is in summary.

13  But the defendant, as of the joint filing the defendant

14  indicated that they were agreeable to a neutral.  This is the

15  first time I'm hearing they are not agreeable to a neutral.

16  Frankly, we would have filed a motion that laid out the basis

17  in an affidavit from our client that advised the court fully

18  why we would want to -- counsel, I just was not prepared to

19  tell the court the extent of the material on that drive.  So if

20  defendant is no longer agreeable to do a neutral, we'd like an

21  opportunity to move the court to appoint a neutral.

22           MS. MCGOVERN:  In response to that, your Honor, I'd

23  also like to point out that we provided -- plaintiffs' counsel

24  asked us for the neutral and provided information.  We

25  received -- they didn't like our neutrals.  They have proposed

1    our neutrals.  Their neutrals are smaller, they're local.

2          At this point our position is, your Honor, it is not

3    necessary to go through this exercise.  It is going to be a

4    delay.  At the same time that they want the depositions, this

5    issue has to be resolved at the same time so that the

6    depositions can be limited and they can be reciprocal.  But in

7    addition, there is another component to this, and that is --

8          THE COURT:  You keep saying these are somehow linked

9    to the depositions.  Explain to me how that is.

10          MS. MCGOVERN:  Well --

11          THE COURT:  I am not following you.

12          MS. MCGOVERN:  A limited deposition would be

13    reciprocal.  We would want to take the deposition of Ira

14    Kleiman as well.  Before we find out, before we get the

15    information with respect to these electronic devices, we

16    wouldn't be in a position to be able to meaningfully ask him

17    what happened here.  We have a report with respect to what

18    happened to the computers.  We'd like to ask Mr. Kleiman,

19    please explain to us exactly what happened if in fact data has

20    been overwritten, if it's been deleted, what happened with the

21    hard drives, why were they separated from the computer.  In

22    addition to that, if there was deleted material that can't be

23    recovered.

24          That is another component as well, your Honor, which

25    may -- we probably should raise, which is it's unclear -- there

1   was discussion in the meet and confer that there may have been

2   some devices in which data was not able to be recovered.  We

3   have information with respect to the ten devices where data was

4   able to be recovered and have received those logs.  But we

5   don't have any information with respect to the devices in which

6   data was not able to be recovered.

7          So that's another piece that we haven't received from

8   the plaintiff yet.  We were going to be receiving that, but we

9   haven't received it yet.

10          With respect to that deleted data, plaintiffs' ESI

11   vendor -- and we have confirmed with our ESI vendor, well, with

12   respect to potentially deleted data, what would be the best

13   procedure in order to recover that or attempt to recover that.

14   In fact, plaintiffs' ESI vendor can do that themselves and they

15   can provide us again with those documents so a report can be

16   done with respect to that material.  So that is another piece

17   that we haven't been able to recover.

18          Our concern about a neutral, your Honor, is that it is

19   going to add another layer, it is going to add more delay, and

20   it is simply not necessary.

21          At this point, your Honor, we have been waiting for

22   quite a while about their response to the ESI vendors we

23   proposed.  We received from them -- again, we are going back

24   and forth on which ESI neutral vendor we should use.  We don't

25   need to do this exercise.  We don't understand what the

1    pushback is.  There is absolutely no risk with respect to

2    looking at confidential data.  Your Honor is going to be

3    entering a court order to that respect, and certainly

4    AlixPartners is not going to be held in contempt.

5            THE COURT:  Let me just double back.  First you

6    mentioned ten devices.  Then you mentioned some additional.

7            How many devices total are we talking about in this

8    case, that you know of today?

9            MS. MCGOVERN:  Well, we know that there are ten and

10   then there are potentially others where the data was unable to

11   be imaged.

12           THE COURT:  How many of those?

13           MS. MCGOVERN:  We don't know, your Honor.

14           THE COURT:  So you know there's ten at least where

15   there was data recovered from -- yes, Mr. Roche.

16           MR. ROCHE:  The answer is nine devices, and those nine

17   devices include the devices that certain partitions within

18   those devices our ESI vendor was not able to access.  So the

19   defendant's counsel has all logs for all of Dave Kleiman's

20   electronic storage devices.

21           THE COURT:  OK.  So there are no mystery devices out

22   there that they haven't gotten a report for.

23           MR. ROCHE:  Not in our possession.

24           THE COURT:  OK.

25           MS. MCGOVERN:  OK.  Thank you.

```
 1              THE COURT:  So that's good.

 2              MS. MCGOVERN:  That was unclear to me, your Honor.

 3              THE COURT:  OK.  Let me hear from Mr. Freedman.

 4         Ms. McGovern, before you sit down, your request is

 5    that I simply order them, that I reaffirm my prior order, have

 6    them turn the image over to your vendor, let your vendor do

 7    whatever they need to do subject to my order?

 8              MS. MCGOVERN:  That is correct.  And, again, your

 9    order included that no data, no content would be released until

10    further order of the court.

11              THE COURT:  I understand.  I've heard you.

12         Mr. Freedman.

13              MR. FREEDMAN:  Thank you, your Honor.  Again, with the

14    caveat that this is the first I'm hearing of this request, I

15    started drafting a motion for reconsideration and then stopped

16    because we had this agreement.  So I can tell you what I was

17    starting to put into the motion.

18              THE COURT:  Tell me what you would say.

19              MR. FREEDMAN:  After I told my client that you had

20    ordered the production of the data and I told him, I expressed

21    his concern to you, he said to me, let me tell you what's on

22    this drive.  Every single piece of work product that I prepared

23    in this litigation is stored on those drives.  Everything.

24              THE COURT:  When you say "I," you mean?

25              MR. FREEDMAN:  Ira Kleiman.  This was him speaking to
```

1    me.  He said every single piece of work product --

2              THE COURT:  Don't waive your privilege.

3              MR. FREEDMAN:  This was going to go into an affidavit.

4              -- is on that drive.

5         In addition, there are recordings of attorney-client

6    conversations on that drive, as well as all the private photos

7    and medical records for all of his family members.  Everything

8    is on that drive.

9         So what he said to me was -- I said I didn't know

10   there was that extent of it.  He said, Look, I'm not saying

11   that AlixPartners is going to do anything intentional, but

12   AlixPartners is the defendant's hired expert who is going to be

13   their ESI vendor and there will be plenty of communication

14   between the defendant and AlixPartners over the course of this

15   litigation, and it just increases the odds that inadvertently

16   something will come through accidently or unintentionally.

17        So that was the intent, in a very broad stroke, that

18   was the intent of the motion for reconsideration.

19        In good faith we said, hey, we will pay for half of

20   the forensic neutral.  There is no need for delay here.  I

21   don't understand why AlixPartners can be any faster than the

22   neutral.  As soon as the neutral is appointed, we can go

23   forward.  If we can't agree on a neutral, we provided -- one,

24   two, three, four, five -- five names of potential neutrals, one

25   of which comes with a letter of recommendation on the data,

1   recover deleted data from a lawyer who was working with the

2   special master.  He was a forensic neutral there.

3          If we can't agree on it, then we are ready to submit a

4   one-page, two-page memo to the court on who we suggest and let

5   the court resolve it and it's over.  There is no need for

6   delay.

7          I mean, all I would ask is if the court is inclined to

8   reaffirm its order, it would give us an opportunity to file a

9   full memo on it, or if the court is willing to accept the

10  neutral, which is what defendant had agreed to as of 48 hours

11  ago, we are ready to -- I'll submit by the end of the day

12  today, I will submit a one page or two page on our neutrals and

13  the court can just pick it and we can move forward.

14         The only other thing I would add is we instructed our

15  clients not to touch those drives, and they're there.

16  Obviously we are on a tight time line.  We have to move

17  forward.  But I don't understand why it is an emergency that

18  this has to move forward -- it obviously has to move forward

19  expeditiously, but if it moves forward as of Monday instead of

20  Friday, I'm not sure what the prejudice is there.  That's the

21  only --

22         THE COURT:  Do you have a sense of how long the

23  process -- either side -- once the computer forensic person has

24  access to the device, how long it is going to take them to

25  extract the information that we're looking for?

```
 1              Mr. Roche.
 2              MR. ROCHE:  Yes.  I had spoken with the expert who we
 3    received the recommendation letter from the special master
 4    appointment and he said he could depending on the space -- I
 5    told him it was roughly nine drives, roughly amount of space --
 6    about a week.
 7              THE COURT:  OK.  Let me ask Ms. McGovern, does your
 8    expert agree roughly you need about a week to get it extracted?
 9              MS. MCGOVERN:  No.  He thinks it's two weeks, your
10    Honor.
11              THE COURT:  Two weeks.
12              MS. MCGOVERN:  He thinks that the reports that we are
13    talking about is two weeks.
14              The only thing I just want to add as well with respect
15    to the privilege information, your Honor, is that we are not
16    asking to receive the content of these images.  We are not
17    asking to receive that.  It is simply a report of the activity
18    of these devices.  It's not content.  The content will not be
19    released.  That was your order on page 54 of the transcript.
20              THE COURT:  When you say "we," you mean counsel.
21              MS. MCGOVERN:  Counsel.
22              THE COURT:  The expert would have access to the
23    content but would not be allowed to release it to counsel.
24              MS. MCGOVERN:  That is correct.
25              THE COURT:  I understand that.
```

```
 1              MS. MCGOVERN:  And they would not be looking at that
 2    because that is not the purpose for the exercise.
 3              THE COURT:  I understand.  I understand.
 4              Mr. Freedman, back to you.  Anything further?
 5              MR. FREEDMAN:  I have nothing to add, your Honor.
 6              THE COURT:  Do we have a 502?  I think we talked about
 7    it.  Do we have a clawback?
 8              MR. FREEDMAN:  Yes, your Honor.
 9              THE COURT:  Because when you talk about
10    attorney-client stuff, immediately that pops into my head.
11              Let me think about that one for a minute.  Let's move
12    on to the next one.  Let me think about how I want to deal with
13    that situation.
14              Document production.  That's never a good heading.
15              MR. FREEDMAN:  Your Honor, I can just give you a quick
16    update.
17              THE COURT:  Yes.
18              MR. FREEDMAN:  Last week the defendant produced 534
19    documents that totaled 2,165 pages.  Yesterday plaintiffs
20    produced 1,094 documents, so roughly 4,376 pages.  So the
21    parties are beginning to produce.
22              The only thing I would point out is the vast majority
23    of defendant's production was paper production.  So we're still
24    waiting for a substantial ESI production.
25              MS. MARKOE:  Your Honor, to that point, and we will
```

1  get to this shortly, the ESI production is very hard to get to

2  if we aren't on the same page with search terms.

3            THE COURT:  Understood.

4            MS. MARKOE:  So that is the reason for the hard copy.

5  We are trying to get them as much as we can as quickly as we

6  can.

7            THE COURT:  And I appreciate that.

8            MS. MARKOE:  Right now that's hard copy.

9            MR. ROCHE:  That makes sense.

10           THE COURT:  You all heard me clearly last time.  Good.

11  I'm glad you started.  Produce what you can as fast as you can.

12           So let's talk about search terms because that seems to

13  be the next topic.  So where are we on search term discussions?

14           MS. MARKOE:  So, your Honor, this is where we're at.

15  This is sort of a twofold issue.  It is the prioritization

16  issue, which you raised at our last conference, and it's also

17  the search term issue.

18           So on February 25th we provided opposing counsel with

19  sort of a brief description of the devices that we had imaged

20  and also letting them know what devices we had already

21  prioritized, and those were devices --

22           THE COURT:  These are Dr. Wright's devices?

23           MS. MARKOE:  Correct.  And those were devices that had

24  identifiable user profiles of Dr. Wright.  We are processing

25  the entire images of those.

1          On February 25th we had processed one of those devices

2     and we had also prepared search terms and had already run those

3     search terms through that one device and provided a search term

4     hits report to opposing counsel with those search term hits on

5     that similar device.

6          By February 28th -- I believe it was February 28th --

7     we had imaged five additional devices and had not yet heard

8     back from them on prioritization or search terms, gave them

9     those search term hits on those devices as well.

10          Plaintiffs' counsel got back to us on prioritization,

11     I believe it was on the 4th.  We immediately forwarded that

12     information to AlixPartners, and they are working on that

13     prioritization order.

14          With regard to the search terms, yesterday plaintiffs'

15     counsel got back to us on search terms except they didn't

16     really address our search terms.  They cross-talked us and gave

17     us completely different search terms, not redlining our search

18     terms or saying where they wanted additions with regard to our

19     search terms and just gave us a whole separate list, which

20     actually I have reviewed and, unfortunately, there's

21     significant issues with it.  And, also the methodology that

22     they propose using for search terms did not seem efficient to

23     me.  They want to go request by request and run search terms

24     per request.  It is not efficient.

25          What is efficient is you sort of look at what are you

1   supposed to be producing, what are you supposed to be looking

2   at, and what are the best search terms to get at that.  Then

3   you run those search terms across your data and do an analysis

4   of whether it seems like those search terms are working or

5   failing and you adjust accordingly.

6          Also, yesterday plaintiffs for the first time gave us

7   their proposed search terms of the data that they are going to

8   be looking at for production to us.  Again, they did it with

9   the same, I would call it inefficient methodology, and did not

10  provide a search term hit list at all.  So I have no way of

11  knowing whether those search terms, even if they made sense,

12  would be effective.  So there is no way for me to confer with

13  them on the utility of those search terms without additional

14  information.

15         Your Honor, frankly, it's very disturbing to us that

16  this has been delayed so long.  We would ask that whatever

17  ruling your Honor gives on sort of moving the search term

18  process along, because we want to get to the ESI, that, your

19  Honor, we request that this get completed within the next

20  couple of days efficiently.

21         THE COURT:  I mean, I don't know what the search terms

22  are.  I can't look at the search terms.  What are you asking me

23  to order?

24         MS. MARKOE:  I have the search terms here if you'd

25  like to look at them.

1          THE COURT:  I wouldn't know what I'm looking at.

2          MS. MARKOE:  I could give them to you and I have our

3     search term hits.  But I think that what we would need from

4     them with regard to their search terms is a properly syntaxed

5     search term list with search term hit reports on whether these

6     search terms are effective, and I think that we need a complete

7     set of search terms, not just for a single set of document

8     requests but for all of the requests.

9          Then with regard to our search terms that we have

10    provided to them, we'd like them to, by Friday at the latest,

11    give us a response to our actual search terms rather than

12    trying to cross-talk with us and just take what we've given

13    them and say this is where we think you need to expand this

14    search, you need to modify this search, and we will run those

15    searches and see if they work and continue that conversation.

16    But the way that they are trying to do this, we are just going

17    to be cross-talking, it is going to be completely inefficient,

18    and nothing will get accomplished.

19          THE COURT:  Plaintiffs.

20          MR. FREEDMAN:  Your Honor, I mean these are our

21    requests for production.  They proposed search terms for our

22    request for production.  We proposed the ones we thought should

23    work in our request for production.

24          We proposed them yesterday.  The reason, and I just

25    want to get to this.  We started the case with a different

1   mindset of trying to accomplish everything at once.  We heard

2   the court loud and clear last time.  Inside out discovery.

3   Start small.  Work out.

4          Mr. Roche and I have spent all this time narrowing

5   down our discovery requests.  We have withdrawn I think

6   approximately 20 or maybe even more of our requests for

7   production.  We have narrowed down way more than that, and

8   we're trying to restart this process.

9          So part of that process was a narrowing down of what

10  we were seeking.  The way you proposed doing that was saying,

11  hey, this is request for production number one, it seeks this

12  information.  That's why we are using these search terms

13  because we think it -- we just went request by request for our

14  first set of requests in an attempt to narrow them down.

15         We sent that over to them yesterday because it took

16  some time for us to kind of shift gears into the court's order

17  and we just haven't had time to discuss -- this is the first

18  I'm hearing from defense counsel about this.  I think this is

19  premature to raise with the court.

20         We are on the same page.  Everyone wants discovery to

21  start really as quickly as possible.  So I think we requested

22  another hearing to deal with the outstanding requests for

23  production, and that's what I said is much more narrower, and

24  it may make sense to revisit that whenever the court sets us

25  down.

 1          THE COURT:  OK.

 2          MR. ROCHE:  Your Honor, just if I may, one thing.

 3   We're happy to provide a hit list on these search terms that

 4   we've proposed.  I will send our ESI vendor a request for that

 5   as soon as we get out of this hearing.  That's not an issue.

 6   Just in the past we -- I think it is most efficient if both

 7   parties know which particular requests for production a

 8   particular search term is being tied to so that it can help, if

 9   there are disputes, it can help the court resolve those

10   disputes.

11          THE COURT:  I would assume, and I haven't seen, that

12   there was significant overlap amongst the terms for request

13   one, request three, request five, and request seven.

14          There's probably some overlapping terms, are there

15   not?

16          MR. FREEDMAN:  No, there are, your Honor.  But the way

17   the defendant proposed terms was a long list of terms without

18   any correlation to requests for production.  So we're left

19   guessing, well, what were they trying to capture with which

20   request.

21          Also, your Honor, if I may, it just seems backwards to

22   me that the party offering to produce is going to produce, is

23   going to make the first shot at search terms.  It seems the

24   party requesting the production should offer what they believe

25   will get those hits and then the responding party can object,

1    narrower, or talk about it.  The process proposed by the

2    defendant seems a little backwards to us.  We are happy to

3    engage in it.

4              THE COURT:  Ms. Markoe or Ms. McGovern.

5              MS. MCGOVERN:  Would you mind if I just make a

6    comment, your Honor?

7              THE COURT:  No.

8              MS. MCGOVERN:  If you take a look at this approach,

9    and I think it helps to do so, your Honor, every single request

10   for production is a separate search.  If there are over a

11   hundred --

12             THE COURT:  Don't the search terms overlap?  Aren't

13   there search terms that overlap for certain requests for

14   production?

15             MS. MCGOVERN:  But the way it is done is you have a

16   set of search term that's run against a database.

17             THE COURT:  OK.

18             MS. MCGOVERN:  It's one search with those hits and

19   that -- because it takes a long time.

20             THE COURT:  One of the terms is Bitcoin.  That may

21   apply to five different requests for production, but you're

22   only going to apply that term one time.

23             MS. MCGOVERN:  But what we would have to do, your

24   Honor, is segregate each request and have it run separately.

25             THE COURT:  I know that they are asking you to produce

1    the responses broken down by request by request.  I think they

2    are saying they gave you the search terms request by request

3    because that was their way to organize.  But you're not asking

4    for 20 --

5         MR. FREEDMAN:  No, your Honor.  You're 100 percent

6    right.

7         THE COURT:  One mass search.  Search each term one

8    time is what they're asking for.

9         MS. MCGOVERN:  Right.

10        THE COURT:  So it seems to me like you all should talk

11   some more about that because I can't rule on search terms en

12   masse.

13        MS. MCGOVERN:  It actually is a very difficult task to

14   impose upon the court.  I've actually never had a problem even

15   with millions and millions of documents of reaching search

16   terms.  So we are happy to work with plaintiffs' counsel to see

17   if we can try to narrow this, because our concern is these

18   search terms, the search terms that have been proposed, it's

19   going to take a very long time for it to even just process

20   through the computer.  But we are happy to continue talking to

21   the plaintiff about it.

22        THE COURT:  Here is what I can tell you.  As I said at

23   the last hearing, I'm familiar with both of your law firms and

24   I know you are both extraordinarily good law firms.  You know

25   how to do big documents cases and you have done this before.

1    So I have a lot of confidence that you can manage this process.

2           Search terms are tough.  I understand that.  It is

3    tough to get to agreement on some of that stuff.  If

4    anyone's -- I will tell you in advance if you're going to come

5    back to me and claim that it's unduly burdensome for us to do

6    A, B, C, have something to back that up.  Our vendor says by

7    adding these five terms it increases the cost by X, it

8    increases the time by Y.  That is the discussion you need to

9    have amongst yourself and then you can come back to me and I am

10   happy to referee at the margins.

11          My guess is when you all sit down -- I could probably

12   sit here off the top of may head having read the complaint and

13   the motions and the answers and come up with 50 search terms

14   that everybody would agree to.  There is a core that everybody

15   is going to agree to.  It is probably around the margins.

16   Maybe they sent it to you in a way that was confusing to you.

17   In an hour's conversation you will probably get through most of

18   it.  But if we need to come back, we will come back.

19          As I said last time -- and if I didn't, I'll say it

20   now -- I am more than happy to schedule weekly or biweekly

21   meetings where we can all meet together as you need me.  The

22   downside risk is whenever I provide a free service, people

23   overutilize it.  But that is what I get paid for.  I am happy

24   to work with you.  I know this is a tough case on all sides and

25   there's a lot to get through and you don't have a lot of time.

1    So I will work with you to get through it.

2              MS. MCGOVERN:  Thank you, your Honor.

3              THE COURT:  No problem.  Thank you, all.

4              No. 4, definition of Dr. Wright.  I wasn't sure what

5    that meant so help me out.  It says:  Plaintiffs agree to

6    withdraw this definition --

7              MR. FREEDMAN:  Your Honor, if I can help.

8              THE COURT:  Yes.  Mr. Freedman, please.

9              MR. FREEDMAN:  So this definition came about -- I'll

10   just give you a ten-second background and it might help frame

11   the issue.  This definition came about because during meet and

12   confers plaintiffs' position was if defendant has control over

13   the document, he has to produce it.  We kept getting met with

14   this statement, well, you sued in his individual capacity.  So

15   we propounded this request that basically said, hey, Craig

16   Wright means any capacity.

17             Then they objected to it and we looked at it and,

18   well, technically that is not the way the rules work.  So we

19   said, OK, we'll pull it down.  That brings us to the issue on

20   No. 7, which is the scope of, I guess the more normal way to

21   frame it, and that's why we pulled the request for production

22   is, what is within the scope, what is within the possession,

23   custody and control of Dr. Wright.

24             Just to be clear, this isn't a dispute about specific

25   documents.  It's a dispute about the universe of what defendant

1    has a duty to search for.

2         Plaintiffs' position is that defendant has a duty to

3    search for all documents in his possession, custody and

4    control.  Our definition of that, and I am not going to go

5    through all the precedent -- I'm sure the court is familiar

6    with it -- is that that means anything he has a right to obtain

7    regardless of whether it is in his pocket or his right hand.

8    If he has the right, the legal right to obtain it, he has to

9    give it back.  He has to produce it.

10        Interestingly, the defendants themselves in their

11   request for production to plaintiff define the word control as

12   anything within your attorneys have, anything that your agents

13   have, anything that your companies had, just what you'd expect.

14   Anything that is consistent with the law.

15        But now the defendant refuses to get documents from

16   Australia.  During the meet-and-confer process, the defense

17   counsel told us they are not going to ask Australian counsel

18   for relevant documents.  They're not going to ask Australian

19   accountants for relevant documents.  They're not going to ask

20   Australian companies for relevant documents.

21        Instead, the doctor walked through his house and

22   gathered all the ESI he has in the United Kingdom and whatever

23   was unleashed or lying around is the universe of documents

24   they're searching.

25        Now, what is particularly troublesome with this

1   approach, besides the fact that it ignores all the binding

2   precedent of what constitute possession and control and that it

3   is contrary to defendant's own definition of control, is that

4   the defendant swore that relevant information was in Australia.

5   So in the motion to dismiss, the defendant moved for a

6   dismissal based on forum non conveniens and submitted a sworn

7   affidavit saying all the relevant -- now this case is in

8   Australia.  So my Australian companies, my Australian

9   accountants, my Australian lawyers.  Judge, you have to dismiss

10  this case as to Australia because this is an inconvenient

11  forum.

12          Now that the case is staying here, all of the sudden

13  all the evidence in Australia is gone.  It just disappeared

14  from Australia.  Which brings me to my final point, which is in

15  rejecting the defendant's motion for dismissal based on forum

16  non conveniens, Judge Bloom specifically found that the

17  evidence in Australia is under his control.  So that's docket

18  entry 68, at pages 21 to 22.

19          THE COURT:  Hold on.  68.

20          MR. FREEDMAN:  68, 21 to 22.  It starts with

21  "additionally."

22          I can read it to the court.

23          THE COURT:  I am reading it right here.

24          (Pause)

25          MR. FREEDMAN:  Your Honor, if I may.  I have the

 1    affidavit of the defendant where he swore that all the

 2    Australian evidence is relevant.  Can I --

 3              THE COURT:  Yes.  Absolutely.

 4              Just for the record, what is the docket entry?

 5              MR. FREEDMAN:  It is docket entry 33-3.

 6              THE COURT:  OK.

 7              MR. FREEDMAN:  So Judge Bloom cites to it at -- right

 8    in the middle of page 21 there.

 9              THE COURT:  I see.

10              MR. FREEDMAN:  So if you look at paragraph -- it is

11    page 4 of docket entry 33-3 and it's paragraph No. 18.

12              "To the extent that my attorneys have any documents

13    related to the investigation, they would be located in

14    Australia."

15              THE COURT:  33-3, page 4.

16              MR. FREEDMAN:  Page 4, paragraph 18.

17              THE COURT:  Hold on.  My paragraph 18 is on page 3 --

18    page 4 at the top, not page 4 at the bottom.

19              MR. FREEDMAN:  I'm reading the Pacer ECF stamp.

20              THE COURT:  I see it.

21              MR. FREEDMAN:  Would you rather I use the --

22              THE COURT:  No.  That is the one I always use.  I

23    don't know why I have the wrong numbers.

24              MR. FREEDMAN:  So to the extent that my attorneys have

25    any documents from the ATO investigation, those documents would

1    be located in Australia.

2            Then 20:  As far as I know, all potential witnesses

3    relevant to this lawsuit are located outside of Florida,

4    including John Chesher, who is an adviser to me.  He is located

5    in Sidney, South Wales.

6            Des McMaster.  That is an ATO official.

7            If you drop down, Alan Pedersen, who is a manager of

8    Demorgan living in Australia.

9            Janifer Trinh, who is a bookkeeper located in

10   Australia.

11           Ann Wrightson, bookkeeper located in Australia.

12           I am on M.

13           Now if you drop to paragraph 21, on page 5:  As far as

14   I know, businesses relevant to this lawsuit are located outside

15   of the United States, including:  CO1n Pty, an Australian

16   company; Cloudcroft Pty, an Australian company; Coin Exchange

17   Pty, an Australian company; Demorgan, an Australian company;

18   Hotwire Preemptive Intelligence, an Australian company;

19   Panopticrypt, an Australian company; Pholus, an Australian

20   company.

21           This is saying to the court, dismiss this case because

22   everything is in Australia, and now the defendant says I'm not

23   going to Australia.  I'm sorry, your Honor.

24           THE COURT:  Thank you.

25           Ms. McGovern.  As to the definition, I guess they

1    withdrew the definition, but as to No. 7 as well.

2              MS. MCGOVERN:  Yes.  I think it's sort of a difference

3    without -- a distinction without any real difference, your

4    Honor.  Because essentially what they're saying is we want you

5    to go out and ask former advisers, attorneys, accountants for

6    information that we believe we have the right to request.

7              So our position is it's a very, very broad discovery

8    request.  We moved for forum non based upon the allegations in

9    their complaint.  The allegations in their complaint is

10   somehow, notwithstanding their knowledge and essentially

11   participation -- actually, not essentially.  Their

12   participation.  W&K was a participant in the South Wales

13   proceeding.  Notwithstanding their knowledge and participation

14   for years in those proceedings that somehow those proceedings

15   defrauded them.

16             Our position is that is what this case is about.  All

17   that information is in Australia.  In fact, they obtained the

18   information from Australia.  We didn't think that was

19   appropriate for you to do so and make it public, but you did

20   that.  You got that.  Somehow you got that.

21             It is not our position that that information is

22   relevant, your Honor.  Our position on the motion to dismiss

23   was to the extent that's what this case is about, the witnesses

24   and the documents are there.

25             We met with your Honor on February 20th.  We talked

1   about what this case is about, which is theft against

2   Dr. Wright.  We have -- and I understand that there's advocacy

3   going on here, but we didn't just walk around Dr. Wright's

4   house looking at different computer devices and gathering

5   things.  We had forensic ESI vendors go to Dr. Wright's

6   residence and image all of his devices.

7            THE COURT:  OK.

8            MS. MCGOVERN:  To tremendous expense.  We haven't even

9   got there yet because we can't even agree on the search terms,

10  which we will do.

11           THE COURT:  Let me cut to the chase on this one.

12           Once in someone's -- possession, custody and control,

13  we deal with this in every case.  If he had a domestic bank

14  account, I would order him to go get his bank statements.  If

15  he had a domestic stock transfer account, I'd order him to go

16  get his domestic stock transfer account.  If he is the director

17  of a closely held company, I would order him to turn over the

18  corporate records.

19           So if this is an issue that is going to turn on the

20  fact he has custody and control over all these different

21  entities, at your 30(b)(6) deposition you may spend as much

22  time as you want going through the entities with Dr. Wright and

23  if you establish that he has care, custody and control over

24  these materials, I'll order them produced.  And if you don't,

25  then I won't.

```
 1            MS. MCGOVERN:  Thank you, your Honor.

 2            MR. FREEDMAN:  Your Honor, can I just say some of

 3       these entities are his Australian lawyers who he clearly has

 4       authority over, and defense counsel has refused to ask them for

 5       all the documents, for example, for the Australian tax office

 6       investigation.

 7            THE COURT:  Ms. McGovern, the lawyer has an

 8       obligation.  The lawyer's documents are the client's documents.

 9       Doesn't Dr. Wright have an absolute ability to get whatever his

10       lawyers, accountants, and other professionals have?

11            MS. MCGOVERN:  Your Honor, if I could just step back.

12       He does and you're right and I'm not trying to be cute about

13       this at all.  I'm simply saying we have to begin with -- what I

14       was trying to do at the beginning of the response was I was

15       trying to begin with what's relevant here.

16            THE COURT:  That is a different question.

17            MS. MCGOVERN:  That is what I'm talking about.

18            THE COURT:  That is a different question.  I'm not

19       making a ruling on that.

20            MS. MCGOVERN:  For Dr. Wright to produce his

21       Australian tax returns dating back to 2009, we haven't

22       addressed that question.  To the extent that there's relevant

23       documents that are in Dr. Wright's current attorney's

24       possession and he has the right, and I believe he does -- I

25       don't know what Australian law is, but we can certainly figure
```

1   it out.  I can tell you that I was fooled or it kind of went

2   over my head with respect to some Dutch issues in that regard

3   and in fact our client did not have the right to get the

4   documents from his Dutch lawyer, and I made a very, very, very

5   big mistake in New York saying that he did.

6        So I'm going to be very careful right now, your Honor.

7   But you're right, if he has the right.  I'm not trying to

8   reargue the case law or the rule.  But we have to begin with

9   whether this information is relevant in the first instance.

10        THE COURT:  I think you have to begin with does it

11   exist.

12        MS. MCGOVERN:  Yes.  Yes.

13        THE COURT:  If it exists and he has it, then obviously

14   you have to do a relevance review and if you make a relevance

15   objection, I can deal with that.

16        MS. MCGOVERN:  OK.  Thank you, your Honor.

17        THE COURT:  I think Mr. Freedman's concern was that

18   you were taking a position you didn't have to try to obtain it

19   and you didn't have to review it.  It sounds to me like you

20   agree that you do but you're reserving any objections based on

21   relevance, privilege or anything else.

22        MS. MCGOVERN:  That is correct.

23        THE COURT:  OK.

24        MR. FREEDMAN:  Your Honor, if I could just clarify.

25   That goes also for the accountants in Australia.

1            MS. MCGOVERN:  I'm not sure, your Honor, because I

2    don't know what the law is in Australia, number one.

3            Number two, again, I don't want to be taken out of

4    context on the record and misquoted.  We're dealing with our

5    objection to proportionality, your Honor.

6            THE COURT:  This has nothing to do -- Ms. McGovern,

7    you're waiving anything.

8            MS. MCGOVERN:  OK.

9            THE COURT:  You preserve all your objections to the

10   production of any of this material.  All we are talking about

11   now is collection and review.

12           MS. MCGOVERN:  Thank you, your Honor.

13           THE COURT:  So all I'm saying is I think care, custody

14   and control means what it means and Dr. Wright has an

15   obligation to collect and review -- hold on.

16           MR. FREEDMAN:  We were told unequivocally in the meet

17   and confer that Dr. Wright would not go to anything or anyone

18   in Australia.  Maybe that position has changed and if so, I'm

19   glad to hear it.  But we need that clarified, your Honor.

20           MS. MCGOVERN:  Let me clarify, your Honor.  This is

21   not proportionate to the needs of the case.  We are talking in

22   a vacuum about whether Dr. Wright should go around the world

23   and ask everybody for documents.

24           What we have said is we need to determine what exactly

25   they are asking for, whether we believe it is relevant.  We are

1    not arguing with Dr. Wright's right to ask his attorney for

2    documents.

3          THE COURT:  Well, it is not his right; it is his

4    obligation.

5          MS. MCGOVERN:  Right.  We are not disputing the

6    obligation of Dr. Wright.  But what we -- we made this clear

7    from the beginning, that this case, for some reason we don't

8    want to deal, we don't want to start with the first tranche of

9    documents which are going to be a lot, which your Honor

10   ordered, anything referencing Dave, W&K, etc., and we moving

11   now into, well, there have been subpoenas issued that go

12   outside the court's order.  We believe we can deal with that at

13   the next hearing.  But our number one concern, your Honor, is

14   that this case go off to the left.

15         THE COURT:  OK.  That's what I'm here for.  I am going

16   to keep the case on track.

17         As to No. 7, just to be clear where we are on that,

18   what is in Dr. Wright's possession, custody and control as

19   controlled by existing case law.  He has the obligation, legal

20   obligations that he has.  If he wants to make an argument that

21   whatever his obligations are, the exercise of going through the

22   collection is unduly burdensome, he can file a motion for

23   protective order, support it however he wants to try to support

24   it.  I will let the other side answer.  I will impose Rule 37

25   if I feel it is appropriate based on my ruling on that motion.

```
 1              MS. MCGOVERN:  Thank you, your Honor.

 2              THE COURT:  Just to clarify.  You preserved all your

 3    objections, but if you want to assert that it is unduly

 4    burdensome to even do the collection process, you can file a

 5    motion to that effect.  OK.

 6              Back to number -- that was 4.

 7              MR. FREEDMAN:  Your Honor, and this could be my

 8    mistake.  I'm just trying to get some clarity because I do get

 9    confused between his obligation to identify relevant

10    repositories of information and collect them and actually

11    produce them.  I'm not talking about the production.

12              THE COURT:  As to the Rule 30(b)(6), you can ask him

13    about -- have him answer the question does this exist, does

14    this exist, do you have a lawyer here, a doctor there, an

15    accountant there.  I don't think they're arguing that is unduly

16    burdensome.

17              What they are arguing is now making him go to

18    Australia and review lawyer records, tax records, 25 years of

19    this, ten years of that, may be unduly burdensome and they are

20    reserving their right to make that objection.

21              MR. FREEDMAN:  I understand that.  The only thing I'd

22    add is the district court dealt with that as well in our motion

23    stating that in today's digital age this doesn't require

24    somebody to go to Australia.

25              THE COURT:  We will litigate that in the arguments
```

1    made as to burden.  I am not getting into the merits of their

2    motion because they haven't made their motion yet.  I am going

3    to let them make their motion and they can substantiate their

4    motion however they would like to substantiate it and you can

5    answer it however you would like to and if I have to rule, I

6    can rule at that point.

7              MS. MCGOVERN:  Thank you, your Honor.

8              If I can just state for the record that reference to

9    the motion to dismiss, which is a different standard and

10   different issue, really doesn't -- thank you, your Honor.

11             THE COURT:  So that is 4, 5.  Information requested by

12   the court.

13             MS. MARKOE:  Your Honor, at our last meeting you had

14   asked us to follow up with you and answer some questions that

15   you had with regard to, first of all, with regard to whether or

16   not there were any communications between Dr. Wright and Ross

17   Ulbricht related to Bitcoin transfers or the 1933 public

18   address.

19             THE COURT:  Right.

20             MS. MARKOE:  Based on what we have processed thus far,

21   which is really all we can do right now, and based on using

22   searches for Ross Ulbricht's various iterations of his name and

23   also various iterations of the Dread Pirates Roberts moniker,

24   we did not find any communications between them.

25             THE COURT:  OK.

1        MS. MARKOE:  With regard to Dr. Wright's companies and

2   trusts that are unrelated to Dave Kleiman or Dr. Wright.

3        THE COURT:  W&K.

4        MS. MARKOE:  Sorry.  I misspoke.  Thank you for the

5   correction.

6        THE COURT:  No problem.

7        MS. MARKOE:  We have identified at least 30 additional

8   companies and trusts.  We have run search terms based on those

9   company names against the data that did not hit on our search

10  terms and against the hard copy materials that were not -- that

11  were marked either not relevant or had not yet been reviewed.

12       What we discovered is that adding those multitude of

13  companies would merely double what we have to review.

14       The proposed search term hits are now at 81,000

15  documents, including families for our search terms.  It is

16  81,000 documents based on processing six and a half devices,

17  and the additional terms would add an additional 71,000

18  documents with families, again, just based on the six and a

19  half documents.

20       It would be our opinion and it's our position that

21  that is an undue added burden.

22       In addition, your Honor, if there is a document that

23  we come across that is one of those company's documents but

24  references Dr. Wright or references W&K or references Coin

25  Exchange or one of the trusts in which -- sorry, Dave, in which

1    Dave Kleiman was associated, they are getting that regardless

2    of whether or not that was a Cloudcroft document or a Demorgan

3    document.

4            THE COURT:  Got it.  I appreciate the information.

5            MS. MARKOE:  That is the additional information I have

6    for you.

7            THE COURT:  So at this point I will stick -- I think

8    my prior ruling was you didn't have to produce that yet without

9    prejudice -- yes, Mr. Freedman.

10           MR. FREEDMAN:  Can I just ask one thing, your Honor.

11   The trusts and companies were lumped together.  If we pull out

12   the trusts, what is the burden?  I'm not pushing the court now

13   to move forward in terms of push -- we will get there when we

14   get there, but I'm not clear --

15           THE COURT:  When you're talking about search terms,

16   have that conversation about how burdensome or expensive it

17   would be for them to run that information for you and if you

18   want to then file a motion to compel based upon that or just

19   put it on the next discovery status hearing, we can discuss

20   that.

21           Again, we all were just trying to work from the same

22   information.

23           So I appreciate, Ms. Markoe, you collecting that

24   information, placing it on the record, making it available for

25   everybody.  We have plenty of other stuff to review right now

```
 1  so we will put that one to the side.

 2           But yes, Mr. Freedman.

 3           MR. FREEDMAN:  My understanding is there is no hits on

 4  Mr. Ulbricht as of this point.  With the way that they've

 5  searched it, there would be no burden associated with producing

 6  anything that hits.  So we would get those --

 7           THE COURT:  I think they said nothing hit.

 8           MR. FREEDMAN:  Not yet.

 9           MS. MARKOE:  Based on what we've processed.  And our

10  position is still that materials related to Ross Ulbricht and

11  Silk Road are irrelevant.

12           THE COURT:  I understand that.

13           MS. MARKOE:  If you want us to continue to run that as

14  an alternate search on later data, I'm happy to do that.  That

15  is not burdensome.  But we reserve our right on the relevance

16  argument.

17           THE COURT:  Of course.  No problem.  So yes.

18           MR. FREEDMAN:  And, your Honor, can they share with us

19  the terms they are using to run on those alternate searches?

20           THE COURT:  Sure.

21           Tell him outside the court, if you can share with

22  Mr. Freedman the terms you're using.  And if there is a debate

23  over requests for additional terms, try to work that out with

24  each other.

25           At the end of the day I'm not ordering the production
```

1    yet.  So I am going to defer to Dr. Wright's choice of search

2    terms.  But cooperate in good faith.  If there is something he

3    asks for that is not terribly burdensome, I'm sure you will

4    agree to it.  I will leave that to the parties to work out.

5         OK.  The depositions of the parties.  I'm glad you

6    took me up on the suggestion.  So what is the issue?  Just the

7    scope of what should be done?

8         MR. FREEDMAN:  Yes, your Honor.

9         THE COURT:  So what is the dispute?  I will tell you

10   what.  My general feeling is these should be focused on things

11   other than the merits of the case.  It shouldn't be like did

12   you steal Dave's coins, but it should be what companies do you

13   have and those sorts of things.  But I'll hear from you.

14        MR. FREEDMAN:  That is kind of what we were hoping to

15   focus on.  We spent a lot of time trying to recalibrate the way

16   we're approaching this discovery.  What we realized was that

17   spending five hours with Dr. Wright or beyond to determine what

18   facts are really in dispute, not like did you steal coins from

19   Dave but which trusts, what was this trust, what was this for,

20   what did you use it for, and your Honor actually talked about

21   that in the last hearing saying, normally you'd say just ask

22   questions about all these trusts, get his description of what

23   they are and then we can come back and do a more focused

24   request.  But the court said but I am not going to order him to

25   come in from London.  So we said, hey, you know what, it will

1    be cheaper for our client if we fly to London and get it done

2    there.

3           The defendant is saying just ask about document

4    retention policies, where documents were kept.  Yes, it is an

5    important portion, but it's not going to advance the ball.

6           These five hours could save the parties thousands of

7    hours on document request time because after we get what's

8    really in dispute here, we can then go back and be like, OK, we

9    don't need anything from this, let's focus on this, or, hey, we

10   think he's lying about this, let's focus a little bit on that.

11          So it is our position that what the court said in the

12   last transcript, focus on what the facts are really in dispute

13   and on the joint submission, so at document 109, page 5, what

14   facts are in dispute, where things are, where you keep this

15   stuff, who knows about it, who was there in the beginning, how

16   far back to keep it and then what's with these trusts, what is

17   with this company.

18          The parties are, in the request for production -- I'm

19   not going to get into the merits of it, but there is a dispute

20   about this company called Integer.  We believe it is relevant.

21   They say it is not relevant.  Just asking questions of

22   Dr. Wright, well, what was this, what did you use it for, would

23   save literally thousands of hours and millions of dollars in

24   this case.

25          THE COURT:  OK.  Ms. McGovern, what is the objection?

1        MS. MCGOVERN:  Your Honor, the objection is a concern

2   because it is -- and it makes perfect sense to narrow the scope

3   of this case as early as we possibly can.  We also have to

4   balance that against the privacy issues of our client.

5        If the question is does X company -- did X company

6   have anything to do with W&K or Dave Kleiman, no, it did not.

7   That's fine.  But if the intent of the deposition is to go into

8   that company and ask questions about that company that are not

9   relevant to this case, because the answer is no and would

10  otherwise disclose information that would violate Dr. Wright's

11  right to privacy with respect to that information, it is not

12  appropriate.

13       What we don't want to do, your Honor, is we don't want

14  to go to London in good faith for the purpose of limiting both

15  discovery, which is I think the initial reason why your Honor

16  suggested this.  Because I appreciate the fact that they have

17  narrowed the scope of discovery, but when you start with 250

18  and you go down to 150, you know, you could have started with

19  20.

20       So it is just a question of the perspective that you

21  use in looking at exactly whether it is good faith or whether

22  it is just a rational limitation.

23       So when we got the e-mail -- and we want to make sure

24  that it's before the court on the record -- it wasn't just the

25  issues that, does this company -- did this company have

1   anything to do with Dave.  Because, again, this is not a

2   probate case in which everybody that had anything to do with

3   Dave Kleiman is lined up and asked questions to determine

4   whether there is any money under the rock.  This is a question

5   in which Dr. Wright has been sued for billions of dollars and

6   has been accused of fraud and theft, civil theft.

7          So the deposition has to be limited to questions

8   related to those claims with respect to the discovery that

9   would be relevant to those claims.  We have no objection to

10  that and we have said that.  In fact, the reciprocal deposition

11  of Ira Kleiman is going to do the same.

12         But here and in the e-mail in which they are basically

13  explaining what their intent is when they go to London to ask

14  questions, and again there is a time change, we can't just jump

15  on the phone with your Honor.  We do not want to terminate a

16  deposition in which people have gone to London and spent money

17  to go to London.

18         THE COURT:  Sorry to cut you off, but I have to move

19  along because I have people behind you.

20         Here is how I think is the best way to deal with this.

21         It is not a 30(b)(6) deposition, but maybe we should

22  treat it like one in the sense of give topics as you would for

23  a 30(b)(6) so that Mr. Kleiman and Dr. Wright can be prepared

24  in advance for that in which they intend to ask them.  You can

25  object or discuss with counsel ahead of time which topics you

 1   think are problematic.

 2        At the deposition, I know at the deposition you can

 3   only object to form or privilege.  In this situation I would

 4   allow a party to instruct the witness not to answer if you

 5   believe it is not relevant or it is whatever the protective

 6   order says, abusive, harassing or whatever.  Because I think

 7   the ultimate goal is -- because they are going to get another

 8   shot at Dr. Wright down the road and you're going to get a shot

 9   at Mr. Kleiman down the road.

10        So the question is, we have heard about this company.

11   What is that company?  The answer is that had nothing to do

12   with Bitcoin, that was a company I incorporated to do sheep

13   herding in South Wales.  There is no need to go beyond that.

14   But I think they are allowed to ask that.  Again, it just culls

15   it out.  Because then we are not going to get a discovery

16   request relating to any and all documents relating to the sheep

17   herding company and then we will get an objection and we are

18   going to have to fight about that.

19        MS. MCGOVERN:  We have no objection to that procedure,

20   and we appreciate it.  Thank you.

21        THE COURT:  Mr. Freedman, any objections to that?

22        MR. FREEDMAN:  Only in that we may need to go a little

23   deeper than that's just a company I established for sheep

24   herding.  Remember, as I said at the last hearing, this isn't

25   pretty, but there are substantial allegations of fraud and

```
 1   lying and perjury in the complaint.  So within reason, and I'm
 2   hopeful we can be reasonable about it, we may need to go a
 3   little deeper than just did this have to do with Dave Kleiman.
 4   No, it didn't.  I was sheep hearing with it.  OK.  Next
 5   company.
 6           THE COURT:  I think you are both professionals.  You
 7   are both experienced lawyers.  I have to give you some leeway.
 8   You're going to be there live.  I am not going to be there.
 9   You haven't offered to fly me to London, so I can't do that.
10           Again, whether it is Ms. McGovern or Ms. Markoe or
11   whether Mr. Rivero will probably jump in and take this one, but
12   if somebody is defending the deposition and they instruct the
13   witness not to answer, I'll address those after the fact and
14   review them for good faith.  If it is a good faith instruction,
15   no harm no foul.  If it is a bad faith instruction, there will
16   be sanctions.  That is all I can tell you.
17           MS. MCGOVERN:  Thank you, your Honor.
18           THE COURT:  OK.  That's reciprocal, by the way.  Do
19   the same for Mr. Kleiman's deposition.
20           MR. FREEDMAN:  It may make sense, your Honor, just
21   because we're all going to be in London, once we find a date we
22   can coordinate with the court, the court gives us like 20
23   minutes on that date.
24           THE COURT:  I will work with you to make myself
25   available at a time during the day so if you want to kind of
```

```
1    collect up your objections and I can rule on them, I will be
2    happy to work with you on that.
3              MR. FREEDMAN:  Perfect.
4              MS. MCGOVERN:  Perfect, your Honor.
5              THE COURT:  OK.  Good.  I applaud you.  This is a
6    process I have suggested to a lot of parties and you are the
7    first people that took me up on it.  So I hope you are going to
8    prove me right that it is a good idea.
9              We are up now to No. 8, which is the second, third and
10   last topic.  Second and third request for production.
11             MR. FREEDMAN:  Your Honor, we are pushing that off
12   until the next hearing.
13             THE COURT:  We resolved that.
14             MS. MCGOVERN:  That is it, your Honor.
15             MR. FREEDMAN:  Actually, your Honor, can we get a date
16   for you for the next hearing?  We propose the 12th or the 14th.
17             THE COURT:  OK.  I know on the 14th and the 12th in
18   the afternoon I am going to be on criminal duty in Fort Pierce.
19   So I can give you a hearing by phone or if you want to come to
20   Fort Pierce.  I can't imagine why.  I can be available by phone
21   to do the hearing on the 14th or the 12th in the afternoon.
22             Do you have a preference?
23             Maybe the 14th.  That will give you a little more time
24   to kind of work through some issues between now and the 14th.
25             MS. MCGOVERN:  The 14th is perfect, your Honor.
```

1          THE COURT:  My clerk reminds me we may have a conflict

2     that afternoon.  I'm presiding over a deposition in person that

3     day.

4          Let's set a tentative time for the 14th at 10:00 by

5     telephone.  Can we do that?  4:00 on the 14th by telephone.

6          If for whatever reason it turns out I can't

7     accommodate that, I have time on the -- do we have time on

8     Friday, the 15th or did I schedule something that afternoon?

9          THE DEPUTY CLERK:  Yes.

10         THE COURT:  No, that is going to take a while.

11         If we can't accommodate you in the afternoon of the

12    14th, I have time on the afternoon of the 13th or the afternoon

13    of the 12th.  So we will be in touch once I get back downstairs

14    and check what I've got on the 14th.

15         Let me go back to the image issue because that is the

16    only thing I left open.

17         I understand Mr. Kleiman's concern that all this

18    sensitive information is on there, but I am going to go ahead

19    and reinstate the procedure that I previously ordered.

20         I have heard you, Mr. Freedman.  I understand your

21    position on that.  I know what the case law is.  You have asked

22    for briefing, but I don't know that briefing would add to

23    anything you have already said.

24         I accept your representation that there are

25    attorney-client communications, work product and other

1    sensitive medical records on there.  But I think -- I have no

2    reason to believe that Apix won't treat it properly.  If not,

3    they will have much bigger issues to deal with than you.

4           So I am going to adhere to my prior ruling.  I know

5    your client won't be happy, but you can blame me for it.

6           MS. MCGOVERN:  Your Honor, can I simply ask when we

7    can get that started?  Can we have a date certain?  I think

8    that will be helpful.

9           MR. FREEDMAN:  Just to clarify, a date as far as?

10          MS. MCGOVERN:  The images, when we will receive the

11   information.

12          THE COURT:  So the image has to be copied and then

13   turned over?

14          MS. MCGOVERN:  Correct.

15          THE COURT:  How long is it going to take to make the

16   copy, first of all?

17          MR. FREEDMAN:  Right.  The other issue is, your Honor,

18   it can't be turned over until the court enters a

19   confidentiality order specifically governing this process,

20   which the court said it would.  We need one, actually.

21          THE COURT:  I didn't enter that already?

22          MR. FREEDMAN:  You entered a confidentiality order to

23   protect the parties from disclosing to outside parties, but we

24   don't have an effective order that establishes this process

25   where the defendant's expert will have access to this material

1   but cannot hand it over to the person that hired him.

2            THE COURT:  I thought that was in the confidentiality

3   order that I entered.

4            MR. FREEDMAN:  No, your Honor.

5            THE COURT:  Well, if you all submit one to me

6   immediately and I will enter it immediately.

7            MS. MCGOVERN:  We will do so, your Honor.

8            THE COURT:  Maybe you can ask the vendor or the vendor

9   is sitting here.

10           How long is it going to take to image the existing

11  image?  How long does that process take?

12           MR. MODESITT:  It's probably a couple of days, maximum

13  a week, for all the drives to be imaged.

14           THE COURT:  OK.  So let's shoot for -- today is the

15  6th.  How about we will shoot to turn over the hard drive on

16  the 14th.  If there's some issue, we can address it on the 14th

17  when we are back together again.  That way your vendor can get

18  started right away on the 14th.

19           MS. MCGOVERN:  Thank you, your Honor.

20           MR. FREEDMAN:  Your Honor, if I may, a couple of

21  housekeeping matters.

22           THE COURT:  Then I have one I wanted to cover as well.

23           Go ahead.

24           MR. FREEDMAN:  We submitted at the last hearing, your

25  Honor ordered us to resubmit interrogatories, to revise them

1     according to -- the defendant had a concern that he didn't want

2     to attest to something he couldn't be assured of.  So we

3     revised the interrogatory to say, to the best of your knowledge

4     or who you know, just tell us who you know, and those

5     interrogatories have been pending since before the motion to

6     dismiss -- before the court even stayed discovery.  They are

7     currently due on the 25th.  If we could get them a little

8     sooner.  We asked the defendant, but we never heard back.  It

9     would be very helpful to get them a little quicker.

10              THE COURT:  Ms. McGovern.

11              MS. MCGOVERN:  I'm sorry.  I was talking to our

12     expert.

13              Are you referring to who the witnesses in this case

14     are?

15              MR. FREEDMAN:  I mean that is part of it, yes.

16              MS. MCGOVERN:  I'm sorry.  I don't know which

17     interrogatory you're talking about.

18              MR. FREEDMAN:  It's the ones that say -- do you have a

19     copy of the interrogatories?  I think it is -- I don't want to

20     misquote it.

21              MS. MCGOVERN:  Your Honor, we can work this out with

22     counsel.  To the extent we can, we will work this out with

23     counsel.

24              THE COURT:  Work it out amongst yourselves.

25              Mr. Freedman, if there is no other issue -- was that

1   your housekeeping?  Do you have another one?

2           MR. FREEDMAN:  That, and the only thing I wanted to

3   clarify for the record, and we can talk to the defendant about

4   it again, was these in our view were reformulations of these

5   interrogatories and should be counted as additional ones.

6           MS. MCGOVERN:  We have already said we have no

7   objection to that.

8           MR. FREEDMAN:  Perfect.

9           THE COURT:  Great.  Thank you for cooperating.

10          Mr. Freedman, after our last hearing -- and you say

11  you heard me, and I heard you as well.  I know that one of the

12  issues that was of concern to you was the tracing question,

13  being able to trace forward.  I think I was struggling with and

14  we were all struggling with trying to find a starting point for

15  you.

16          When I went back through the complaint, I noticed at

17  docket entry 24-15, is the appendix to the, I think it is 2011

18  deed of some kind or another, which lists about 650,000

19  Bitcoin.

20          MR. FREEDMAN:  Yes.

21          THE COURT:  Isn't that, at least to get started, a

22  sufficient starting point?  Can't you trace those forward to

23  where they are today and back to where they started from?

24          MR. FREEDMAN:  Yes, your Honor.

25          THE COURT:  OK.  Again, I am not precluding you

1    getting more in the future.  I just want to make sure I didn't

2    leave you with none.  So when I saw that, I thought -- I think

3    the complaint says you estimate based on what you know today

4    that there's about 1.1 million Bitcoin that you claim were

5    misappropriated and this is about 650,000.  So I thought that

6    was more than half.

7         MR. FREEDMAN:  It's just about half.  I think it's

8    110,000, 111 or something like that.

9         MR. ROCHE:  Isn't it 1.1 million?

10        MR. FREEDMAN:  Sorry.  I said thousand.  1 million 100

11   and change.

12        THE COURT:  So I just want to make sure that I wasn't

13   leaving you completely in the dust on that one.

14        MR. FREEDMAN:  Your Honor, part of our revised request

15   for production is that we will deal with next with the tracing

16   forward question.  We have chosen -- we have moved everything

17   back to 2013, which is when Dave died.  Your Honor will have an

18   opportunity to hear from both sides, but we basically said give

19   us the information as of that date and then we will move

20   forward from there.  Because, as your Honor said, it is only

21   half.  But yes.  Yes.

22        THE COURT:  Half is better than none to at least get

23   started with.

24        MR. FREEDMAN:  100 percent.

25        THE COURT:  I just wanted to clarify that.  Thank you

1   very much.

2          MR. FREEDMAN:  If your Honor is presiding over

3   depositions, we would offer to fly your Honor to London.

4          THE COURT:  I will tell you the deposition I'm

5   presiding over is the -- it is in a case that was here right

6   before you.  It is the defendant's wife, son and

7   daughter-in-law who are going to be questioned about their

8   knowledge and exposure to his sex tape with his girlfriend.

9          MR. FREEDMAN:  Sounds like something that would

10  require your Honor.

11         THE COURT:  I thought that was something that needed a

12  little refereeing in person.

13         MS. MCGOVERN:  I don't understand why you need to be

14  there, your Honor.

15         THE COURT:  So when you have your expert deposed and

16  he is going to explain the original Bitcoin paper, I would love

17  to hear that.  I don't think I need to referee it, but I'd love

18  to hear it.

19         All right.  Anything else this afternoon?

20  Mr. Freedman.

21         MR. FREEDMAN:  No, your Honor.

22         THE COURT:  Ms. McGovern.

23         MS. MCGOVERN:  No, your Honor.

24         THE COURT:  Thank you both very much.

25         I know you are working hard on this.

```
 1               We will get it together and I will see you next week.

 2          (Adjourned)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


    I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


March 9, 2019          s/ Joanne Mancari
                       Joanne Mancari, RPR, CRR, CSR
                       Court Reporter
                       jemancari@ gmail.com