1
                   UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA

2
                 CASE NO. 18-CV-80176-BB

3

4
IRA KLEIMAN,
as the Personal Representative
of the Estate of David Kleiman,

5
et al.,

6
                             West Palm Beach, Florida
          Plaintiff(s),

7
                             February 20, 2019

8
      vs.

9
CRAIG WRIGHT,

10
              Defendant(s).     Pages 1 – 139
---------------------------------------------------------

11
                     HEARING
         TRANSCRIBED FROM DIGITAL AUDIO RECORDING

12
        BEFORE THE HONORABLE BRUCE E. REINHART
           UNITED STATES MAGISTRATE JUDGE

13

14
APPEARANCES:

15
FOR THE PLAINTIFF(S):  DEVIN FREEDMAN, ESQ.
                    BOIES SCHILLER FLEXNER, LLP

16
                    100 SE 2nd Street
                    Miami, FL 33131

17
                    (305) 357-8438
                    vfreedman@bsfllp.com

18
                    KYLE ROCHE, ESQ.

19
                    BOIES SCHILLER FLEXNER, LLP
                    333 Main Street

20
                    Armonk, NY 10504
                    (914) 749-8324

21
                    kroche@bsfllp.com

22

23

24

25

```
 1    APPEARANCES (CONT'D)

 2    FOR THE DEFENDANT(S):   AMANDA M. MCGOVERN, ESQ.
                              RIVERO MESTRE, LLP
 3                            2525 Ponce de Leon Blvd.
                              Coral Gables, FL 33134
 4                            (305) 445-2500
                              amcgovern@riveromestre.com
 5
                              ZAHARAH R. MARKOE, ESQ.
 6                            ZALMAN KASS, ESQ.
                              RIVERO MESTRE, LLP
 7                            2500 Ponce de Leon Boulevard
                              Miami, FL 33134
 8                            (305) 445-2500
                              zmarkoe@riveromestre.com
 9                            zkass@riveromestre.com

10    TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                              Court Reporter
11                            jemancari@gmail.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   Thereupon,

2   the following proceedings were held:

3           THE COURT:  We are here this afternoon on case No. 18

4   80176, the case of Ira Kleiman and W&K Info Defense Research,

5   LLC v. Craig Wright.

6           May I have counsel's appearances, starting with

7   counsel for the plaintiff, please.

8           MR. FREEDMAN:  Good afternoon, your Honor.  Devin

9   Freedman, counsel for the plaintiffs.

10          THE COURT:  Mr. Freedman, good afternoon.

11          MR. ROCHE:  Kyle Roche, Boies Schiller Flexner,

12   counsel for the plaintiffs.

13          THE COURT:  Mr. Roche, good afternoon.

14          MS. MCGOVERN:  Good afternoon, your Honor.  Amanda

15   McGovern on behalf of Dr. Craig Wright.

16          THE COURT:  Ms. McGovern, good afternoon.

17          MS. MCGOVERN:  Thank you.

18          MS. MARKOE:  Good afternoon, your Honor.  Zaharah

19   Markoe on behalf of Dr. Wright.

20          THE COURT:  Mr. Markoe, good to see you again.  Good

21   afternoon.

22          MR. KASS:  Good afternoon.  Zalman Kass on behalf of

23   the defendant, Dr. Wright.

24          OK.  So I have before me a number of discovery

25   memoranda and I'm prepared to help resolve -- I guess not help,

1    but I'm prepared to resolve your discovery disputes for you.

2            So I did review the complaint, the second amended

3    complaint, at docket entry 83, the amended answer at docket

4    entry 87, and the miscellaneous discovery pleadings at docket

5    entries 91, 92, 96, 97, and the attachments thereto.

6            Were there any other pleading -- 95 as well.

7            I did review the motion to strike the affirmative

8    defenses, although that's not pending before me, but at least

9    gave me a better flavor for some of the claims and defenses in

10    the case.

11            Were there any other discovery pleadings that either

12    party submitted from the plaintiffs' side?  Anything else you

13    think I should have reviewed?

14            MR. FREEDMAN:  I don't believe so, your Honor.

15            THE COURT:  From the defense side?

16            MS. MARKOE:  Yes, your Honor.  We have docket entry

17    No. 100, which was an exhibit that we attached that was

18    referenced in the initial discovery memorandum but was not

19    attached, and that motion was granted by Judge Bloom.

20            THE COURT:  And the exhibit was what?  If you can help

21    me.

22            MS. MARKOE:  Exhibit G.

23            THE COURT:  I don't believe I reviewed that.  Can you

24    just tell me what is, Ms. Markoe.

25            MS. MARKOE:  Sure.

1          THE COURT:  Was that the e-mail stream back and forth?

2          MS. MARKOE:  That was the e-mail stream back and forth

3     with the attachments of the proposed confidentiality order.

4          THE COURT:  I did review that.  I just handed it to my

5     clerk.  So it wasn't in my stack of paperwork that I have in

6     front of me.  I did review that.  That is on my agenda of

7     things I need to resolve.

8          MS. MARKOE:  Thank you.

9          THE COURT:  Thank you.

10         All right.  Before I turn to the specific issues that

11    the parties have before me, let me give you some general --

12    since I'm going to be managing the discovery in this case I

13    want to make sure that we get the case moving in the right

14    direction.

15         I understand you have a discovery cutoff of June, the

16    10th.  You are set for trial in September.  Having managed

17    litigation now for Judge Bloom for just about a year, I know

18    how firm those dates are.  So I view my mission as working with

19    you to make sure that you can get what you need to get within

20    the deadlines that Judge Bloom is going to stick you with and

21    you can be prepared for trial.

22         So let me give you some thoughts, kind of big picture

23    thoughts on that.

24         Fascinating case.  I will tell you it is a fascinating

25    case and at the same time to me not that complicated a case in

1    this regard.  While the underlying substantive issues, the

2    Bitcoins, the Blockchain, all the fraud allegations, the

3    Australian taxing authority and all these other things are very

4    interesting, to me at base this is a pretty straightforward

5    corporate divorce case.  I don't think the ultimate legal

6    issues, the ultimate legal issues in this case are that

7    complicated.  I think the factual issues may be complicated,

8    but the legal issues are not.

9         So for purposes of managing the discovery, of course

10   discovery is now under Rule 26 cabined by the claims and

11   defenses in the case.  So is the evidence relevant to the

12   claims and defenses and is it proportional applying the many

13   different factors that Rule 26(b) requires me to apply, and I

14   do take Rule 26's proportionality requirement very seriously.

15        I recognize in cases like this and in most cases there

16   comes a tipping point where discovery becomes somewhat

17   cumulative.  So what I want to work with you on today before we

18   are done is getting a better sense from you of what exactly,

19   not only what are the claims and defenses in the case, but what

20   are the facts that are really in dispute here.  What facts

21   really need to be resolved, what is the most probative evidence

22   going to be of that, and how do we get to that as efficiently

23   as possible.

24        The other big picture thought I will give you, having

25   managed lots of litigation now for the last year on the

1    discovery side, is the Federal Rules of Civil Procedure give

2    multiple tools for discovery -- requests for production,

3    interrogatories, requests for admission.  Parties tend to

4    utilize the most blunt tool the most, which is requests for

5    production.  And they tend to use the most targeted tools the

6    least.  So I am mindful of that.

7         What I try to do is work with the parties to get out

8    of that box.

9         The other box that I find parties getting themselves

10   into a lot in cases is that those of us who were brought up --

11   I'm probably older than all of you -- but brought up in the

12   late 1900s and early 2000s doing these cases in civil

13   litigation, we were taught you get all the documents first,

14   then you issue interrogatories, then you take your depositions,

15   and if there's a corporate defendant, then you take your Rule

16   30(b)(6) deposition at the very, very end to lock in the

17   corporate defendant.

18        The problem is that's not always the most efficient

19   way to get to the end point.  So what I will tell you, I am

20   open to -- I try to let the parties manage their own

21   litigation.  I try to let you manage your own discovery as long

22   as I'm comfortable that you're really focusing on the things

23   that are important.  But a couple of things that I regularly

24   will do if the parties ask me to.

25        One is, I think very early on in cases better use of

1    interrogatories would be a good thing.  So if you're trying to

2    prove a fact X, rather than saying we request production of any

3    and all documents going back to the beginning of time that have

4    some relationship to X and then we are going to cull through

5    that to establish X, why don't you just ask the other side if X

6    happened.  Maybe they are going to admit it and now we can

7    avoid a massive document production because the fact can be

8    established some other way.

9           Or better still, in a corporate context, take the Rule

10   30(b)(6) deposition of the corporate representative early and

11   ask them all the process questions.  Where do you keep this

12   stuff?  What do you keep?  Who knows about it?  How far back do

13   you keep it?  In an interaction session rather than, again, we

14   request production of any and all documents going back to this

15   or 93 interrogatories or 106 topics for the 30(b)(6) witness.

16          So a couple of things I'm happy to do.  One is, if you

17   want to do what I call a bifurcated Rule 30(b)(6) deposition,

18   take an early one for the topic I just discussed, sort of the

19   process and where's the evidence type questions to try to

20   narrow the focus, I'll give you a second one on the back end

21   and I won't count the first one against you.  So I'll replenish

22   your depositions.  I won't make you use up one of your precious

23   depos.  But if you are willing to do it early on, and I won't

24   claim later -- I won't let the other side argue later they

25   already had their corporate representative depo.  I find that's

1     often a very effective way for parties to narrow topics.  So if

2     either side thinks that's effective.

3           Likewise, I wouldn't limit it necessarily to a

4     corporate rep.  In this case we've got some individual

5     defendants.  Putting aside other burdens and other arguments as

6     to why people shouldn't have to be deposed twice, if it would

7     be more efficient to take a partial deposition of somebody

8     early on for the limited purpose that I just talked about, just

9     trying to establish what facts really are in dispute and where

10    things are and things like that, I would be open to allowing a

11    second deposition of that person later on more expansively.

12          So that's one thing.

13          Likewise, with interrogatories, I think, again, early

14    on the use of some targeted interrogatories to try to narrow

15    focus rather than broad-based requests for production is a very

16    efficient thing to do.  If the parties are willing to do that,

17    I will replenish your interrogatories on the back side.

18          My only rule on depositions and interrogatory

19    replenishment is everybody gets the same thing.  So if the

20    plaintiffs ask for five extra interrogatories, the defendants

21    are going to get five.  If the defendants want to take three

22    extra depositions because they think it's more efficient to do

23    so, the other side is going to get three extra.

24          So work that out amongst yourselves.

25          Generally speaking, my view is if anybody agrees we

```
 1    will give you five extra, we'll take five extra, great.  You

 2    know your case better than I do.  But I think a lot of lawyers

 3    either don't believe the magistrate judge will allow you to do

 4    that or they are afraid to ask because most often judges are

 5    like, no, why am I going to give you more discovery.  I'm open

 6    to it, but I will let you all come to me and tell me that

 7    that's something you want to do.

 8             All right.  For example, I will tell you I had a case,

 9    we had a hearing the other day, four, five days ago.  It is a

10    Lanham Act -- basically, it's a tortious interference case

11    where they allege that 400 some people were tortiously

12    interfered with and one side wanted 380 depositions.  I told

13    them they could have discovery on 40 people, that that was a

14    proportional and representative sampling of what they needed.

15    So I'm happy to kind of chop things down if we need to chop

16    things down, but hopefully you all can agree to that.

17             I'll address the stipulation, the confidentiality

18    stip, and those issues at the end.

19             In terms of ESI, I know there's some back and forth

20    and maybe you all have resolved.  Are we still -- where are we

21    on ESI?  Let me ask it that way.

22             Mr. Freedman.

23             MR. FREEDMAN:  I believe the parties have filed a

24    stipulated ESI order.

25             THE COURT:  Great.  Perfect.  But in terms of search
```

1   terms and custodians and all that, have you all sung kumbaya on

2   that yet?

3         MR. FREEDMAN:  The problem is there is this massive

4   diametrically opposed viewpoints on the scope of discovery.  So

5   search terms can't be worked out until the court resolves the

6   issue right now.

7         THE COURT:  OK.  I'm happy to do that today.

8         Ms. McGovern, do you agree?

9         MS. MCGOVERN:  I agree, your Honor, although we do

10   have proposed search terms.  I'm not sure the search terms are

11   necessarily going to change, but I agree that we need to reach

12   agreement on the scope.

13         THE COURT:  OK.  Let me talk to that.  I thank you

14   both, by the way.  You don't need to stand up during the course

15   of the hearing to speak to me.  The only thing I'd ask you to

16   do is, we don't have a court reporter here.  So the only way

17   you're going to get a record by using a tape recording system

18   is to speak into the microphones.

19         You can remain seated.  I'm perfectly fine with that.

20   You don't have to go to the lectern to speak.  But please make

21   sure whoever is speaking -- and multiple people can speak, I

22   don't care.  Mr. Roche, if you have something important to say

23   or Ms. Markoe, if you have something important to say, please

24   feel free, use the microphone.

25         I guess we will resolve scope issues at the end.

1          I will tell you one other thing I found very effective

2     in cases like this, particularly with ESI, is kind of staged

3     discovery.  Start with the core, the three or four custodians

4     that everybody agrees are important, the time frames and the

5     search terms that everybody agrees are important, and let's see

6     what you get.  And then based upon that, if you need more, we

7     can talk about kind of staging discovery out from that core.

8     Because that was my point earlier.

9          What we often find is by the time you get to the

10    second or third circle away from the center of the bull's-eye,

11    it's now become very cumulative and you're really not getting

12    marginally valuable discovery, and at that point I cut it off

13    under Rule 26.  I think you've reached your proportionality

14    limit at that point.  But we make sure we get the core stuff.

15         Oftentimes, again, the sooner you get to the core

16    stuff, then you really know what you're fighting about and we

17    can then wiggle around the edges, because there's going to be

18    something that the plaintiffs think is very, very important and

19    the defendant thinks isn't important and I'll have to -- I will

20    deal with that.  But let's carve out everything that everybody

21    agrees to.

22         All right.  So those are sort of my big picture

23    thoughts, since none of you had a case with me before to give

24    you some sense of how I try to manage these cases.

25         All right.  Before we turn to the specific

1   discovery -- the last thing.  I hope everyone read my standing

2   order.  I don't do it for my health.  It's intended to really

3   help move the case along, and I have found it does move the

4   case along.  So going forward, please, please be mindful of

5   that.

6        Before we turn to the specific topics that are raised

7   in the discovery pleadings, Mr. Freedman, anything further that

8   you want to talk about before we turn to the specifics?

9        MR. FREEDMAN:  If it would help, your Honor, Mr. Roche

10  and I spent some time trying to distill where the parties'

11  disagreement lies in the scope.

12        THE COURT:  OK.

13        MR. FREEDMAN:  If it would help the court, I would be

14  happy to take two minutes and kind of lay out our thoughts on

15  it the way we see this dispute.

16        THE COURT:  Yes.  And I guess what is helpful to me --

17  this was another note I had to myself, and thank you for

18  reminding me.  I know what the claims and defenses are.  But if

19  you want to give me a sense from your perspective of what are

20  the facts that are in dispute and given that those facts are in

21  dispute what the relevant scope of discovery ought to be, I'm

22  happy to give each side a chance to articulate that.

23        If you want to go first, Mr. Freedman, I'd be happy to

24  hear from you.

25        MS. MCGOVERN:  Thank you, your Honor.

1           MR. FREEDMAN:  Sure.

2           Your Honor, we filed this case a little over a year

3      ago.  The discovery disputes that are now pending in front of

4      the court were actually propounded before Judge Bloom stayed

5      discovery and then after the court denied the motion to

6      dismiss, they came back on.  So we have issued a bunch of

7      interrogatories and those have just recently been answered and

8      I'm sure hopefully the court's rulings today will help the

9      parties resolve these issues.

10           When we filed the case, the defendant moved to dismiss

11      the case alleging that the entire case was on, and I'm quoting,

12      a thin soup of supposition.  This court denied that defense.

13      Now we're supposed to have discovery over those claims and

14      defenses.  But when we're trying to seek this discovery, we've

15      been met with just a litany of objections to everything we're

16      seeking.

17           If you take our claim, if you just boil it down to its

18      essence, and I know the court's familiar so I'm not going to

19      belabor the point, we say that Craig and Dave partnered to

20      create Bitcoin, the entity, right, the actual technology to

21      mine Bitcoin and then developed intellectual property related

22      to Bitcoin.  They carried out this partnership personally until

23      about 2011 when they then formed W&K, which is the Florida LLC

24      that is a plaintiff, and continued their mining and developing

25      through W&K.  Then in 2013 Dave died and the defendant stole

1    all of Dave's assets.

2            We have pre-litigation documents that support that

3    narrative.  In fact, we've attached to the complaint an

4    admission from the defendant that 300,000 Bitcoin in trust, in

5    a 1 million Bitcoin trust, which is a little over $1.2 billion,

6    belongs to the defendant, and that is Exhibit 14 to the second

7    amended complaint.

8            THE COURT:  OK.

9            MR. FREEDMAN:  Defendant claims that he doesn't have

10   any of Dave's assets, which means, in our view, the fundamental

11   factual dispute at the heart of this case centers around the

12   scope of Dave and Craig's partnership, what assets they jointly

13   owned and what Craig did to steal those assets from Dave

14   Kleiman.

15           Despite this clear dispute over the scope of the

16   partnership, the scope of the assets created by the partnership

17   and whether or not there was a theft and plaintiffs right to

18   take discovery over any nonprivileged matter that relates to

19   those claims, the defendant claims we should only have -- that

20   he should only have to turn over documents that specifically

21   contemplated Dave Kleiman or W&K.  But that ignores the fact

22   that what contemplated Dave Kleiman and W&K is what is in

23   dispute.  That is the factual dispute that the parties need

24   discovery to resolve.

25           We say everything.  They say nothing.

1          So if we rely on the defendant to tell us what was

2     contemplated -- what contemplated Dave Kleiman and W&K, we

3     don't get anything.  Then they win just because they framed the

4     discovery along the lines of the way they're framing the story.

5          And then plaintiffs, just kind of to sum it up, the

6     court said that Rule 26(b)(1)'s proportionality test governs.

7     Every single factor of the test cuts in favor of the plaintiff

8     in this case.  The amount in controversy by reference to the

9     issues and just the pure amount cuts in plaintiffs' favor.

10          It is an $82 billion dispute that has issues that are

11     extremely important to the cryptocurrency community about who

12     mines some of the earliest Bitcoin and who owns some of the

13     major intellectual property assets that Craig's companies are

14     now patenting on a daily basis.

15          The parties relative access to information cuts

16     strongly in plaintiffs' favor because the plaintiffs --

17          THE COURT:  Before you go through the Rule 26

18     factors -- I know them -- but, more importantly, those have to

19     be evaluated.  I can't categorically say that they apply to

20     every piece of evidence in the case.  They have to be applied

21     on a individualized basis.  But I understand your position.

22          But I want to make sure I understand the last point

23     you made before you went to that and then I will certainly let

24     you finish.

25          You say the limitation that the defendant in your view

1    is trying to place on discovery is it should be limited only to

2    evidence relating to the relationship between Dave Kleiman and

3    Craig Wright and you think it should be broader than that.

4         Tell me again where the difference is as to the scope

5    question.

6         MR. FREEDMAN:  The scope is the defendant has said

7    that they will produce documents.  For example --

8         THE COURT:  Just give me the scope.  Just the scope

9    issue.

10        MR. FREEDMAN:  The scope issue is whether documents

11   need to be produced according to the plaintiff that relate to

12   Bitcoin, cryptocurrency, the early formation of the

13   partnership, witnesses that were part -- that witnessed that

14   partnership.  The defendant says the scope should be only

15   documents and people that contemplated Dave Kleiman or W&K Info

16   Defense Research.

17        THE COURT:  Where is the difference?  Help me out.

18   Where is the difference?  What would fall under your -- maybe

19   I'm not understanding your description of their view.  I'll let

20   them articulate their view in a second.

21        You say people who -- again, tell me your description

22   of the -- how you think the defendants are framing the issue.

23   People who knew Dave Kleiman?  What exactly --

24        MR. FREEDMAN:  It might help me be a little clearer if

25   I can just use one of the examples.

```
 1              THE COURT:  Please.

 2              MR. FREEDMAN:  Request for production No. 8 asks for,

 3    in essence -- it's written broadly to capture all forms of

 4    trust, but it essentially says, give us any trust that you're a

 5    beneficiary of that holds cryptocurrency for your benefit.

 6              THE COURT:  OK.

 7              MR. FREEDMAN:  The plaintiffs have said we need this

 8    in order to track -- this is essentially at bottom a theft case

 9    and we need it for forensic accounting purposes.

10              Essentially Bitcoin ledger is public, which means

11    we've already spoken with experts who will help us trace the

12    movement of Bitcoin, but we need to know who holds them and

13    where they are.

14              The defendant has responded saying, no, no, no, we're

15    only going to give you trusts that -- we're only going to give

16    you documents that relate to trusts and agreements that

17    specifically contemplated Dave Kleiman and W&K Info Defense

18    Research.

19              Now --

20              THE COURT:  So is the dispute that you view sort of

21    the issue being you should have access to kind of downstream

22    evidence, evidence of what occurred after the partnership was

23    formed and after you allege the theft occurred and kind of

24    where -- tracing the money, tracing the property and all that

25    stuff?
```

1          MR. FREEDMAN:  Correct.

2          THE COURT:  OK.

3          MR. FREEDMAN:  And witnesses that were privy.  So, for

4    example, plaintiffs have said -- when the defendant reached out

5    initially to the plaintiff, to Ira Kleiman and said, hey, your

6    brother's one of the three key people behind Bitcoin, me, Dave

7    Kleiman and an unnamed third party.  That third party -- we've

8    asked for the name of that third party who was a witness to the

9    early formation of the Craig Wright/Dave Kleiman partnership

10   and defendant has said that's irrelevant because it doesn't

11   relate to Dave Kleiman.

12         THE COURT:  OK.

13         MR. FREEDMAN:  That witness has relevant information

14   we need.

15         THE COURT:  And I will let you argue that specific one

16   when we get to that.  OK.

17         I think I understand how you are defining the

18   difference.  You will have a chance to flesh this out during

19   the hearing, but this is a helpful starting point to me.

20         Let me turn to Ms. McGovern and get her perspective.

21         MS. MCGOVERN:  Thank you, your Honor.

22         THE COURT:  Sure.

23         MS. MCGOVERN:  I always have a problem projecting and

24   I think I'm not going to have that problem today.

25         It is a pleasure to be here, your Honor.  Thank you

1    very much for your time.

2           THE COURT:  Sure.

3           MS. MCGOVERN:  The discussion regarding the scope and

4    the relevance of discovery in this case is extremely helpful to

5    us.  This is a case about an estate, a personal representative

6    of an estate.  The story here starts and ends with David

7    Kleiman, Dr. Craig's, Dr. Wright's long-time friend.

8           Our position is this is not about what Ira alleges

9    might have occurred without any indicia of evidence and that

10   the scope of discovery should therefore be defined by what Ira

11   believes might have happened.  There is not one indicia of

12   evidence in this case so far regarding the allegation of theft.

13          So from that, we're looking at a scope of discovery

14   that doesn't emanate from a particular document.  If it is

15   Exhibit 14 -- let's start with that.  But in this particular

16   case, and you just heard the plaintiffs' counsel articulate

17   this, in order to essentially retrofit discovery to an

18   allegation of theft without any documentation -- and there are

19   over 30 exhibits to this complaint.  They have asked for every

20   single transaction regarding cryptocurrency for Dr. Craig

21   Wright from the beginning until beyond, until today and

22   actually as we go forward on the theory that they can track an

23   unsubstantiated allegation of theft.

24          This is an allegation, your Honor.  This is the reason

25   why we believe the scope of discovery is so important in this

1   case.  That was never made during Dave Kleiman's lifetime.  The

2   allegation is being made four years after he died.  It's not

3   being made by the father.  It's being made by the personal

4   representative years after the fact.

5       What we said is first let's start with Dave Kleiman's

6   computer devices and let's look there for clues and documents

7   that perhaps can frame, speaking of staged discovery, frame the

8   relevant scope of discovery in this case because it is in fact,

9   your Honor, what Dr. Wright suggested should be done when he

10  contacted Dave Kleiman's father after Dave's death.  He wrote

11  to Louis Kleiman and said, Preserve the computer devices and

12  particularly the files that say wallet.

13      We have said let's begin, and I would imagine that any

14  plaintiff that is alleging theft with respect to Bitcoin, then

15  the information and the keys to which are stored on computer

16  devices would start there.  And what we have said with respect

17  to the discovery, our response to the discovery dispute has

18  focused on understanding Dave's story from the beginning

19  because he died alone.  He was found days later.  And there is

20  nothing around him or around his computers are evidence that

21  suggests, by the way, dad, or by the way, brother, go after

22  Dr. Wright, he has my Bitcoin.  It's nowhere.

23      So what we have said is, let's begin with David

24  Kleiman's computer devices, which Dr. Wright reached out

25  voluntarily and advised the father to preserve.  The response

1    to which, your Honor, was Ira Kleiman stating, I think I might

2    have deleted things.

3            THE COURT:  I will address the specifics of the

4    computer as part of today's hearing.

5            MS. MCGOVERN:  Your Honor, specifically, to answer

6    your question regarding the scope of Dr. Wright's discovery, we

7    leave it at the following.

8            We need to begin, after we look at what Dave Kleiman

9    has said in terms of relevant information regarding his

10   holdings in the estate years after that when we believe

11   evidence has already probably been destroyed, on a theft

12   allegation that is not substantiated, we must begin with the

13   parties to this case.

14           The parties to this case are Ira Kleiman, as personal

15   representative of the estate, and W&K as the plaintiff.

16           The defendant is an individual, Dr. Craig Wright,

17   whose entire life work is research and development regarding

18   cryptocurrency.

19           So the scope of the discovery, we believe, because it

20   involves allegations of theft of Bitcoin, should be limited to

21   David Kleiman, the company, any trusts, and we've said this,

22   any trusts in which Dave Kleiman was trustee -- that doesn't

23   mean he owns a Bitcoin -- or beneficiary of the trust to which

24   documents would be produced that would help identify Dave

25   Kleiman's Bitcoin.

1          And again, your Honor, part of the reason that our

2     emphasis on the scope of discovery, other than the fact that we

3     agree with the trial schedule and want to try this case in

4     September, is because Dave Kleiman at no point during his life

5     when he died, almost destitute, ever reached out to Dr. Wright

6     saying I'm in a bad state and I need my money back.

7          So we're against the backdrop of that.  What we

8     believe is, if we start with that scope of document production,

9     which is not insignificant -- it is not insignificant because

10    we have already begun gathering and upon the entry of the

11    confidentiality agreement are prepared to begin production.  We

12    have not been sitting around.  But there is a humongous cost

13    involved in the type and breadth of discovery plaintiffs are

14    requesting.

15         So if we begin with W&K, a party, and all documents

16    related, if we begin with Dave Kleiman and all documents

17    related, if we begin with any trusts in which he was a trustee

18    or a beneficiary and all documents related and we couple that

19    with the forensic full and meaningful image of Dave Kleiman's

20    computers, which will help further define the scope of

21    discovery, we are well underway to begin the kind of relevant

22    deposition discovery, your Honor, we believe will get us to the

23    meat of the coconut, which is if Dave Kleiman has Bitcoin,

24    let's find it.

25         THE COURT:  OK.  So let me ask you a couple of things.

```
 1    Is there a dispute in this case -- I will ask both parties
 2    this.  Is it going to be disputed in this case that Mr. Kleiman
 3    and Dr. Wright had some sort of business affiliation, some sort
 4    of partnership, some sort of agreement relating to Bitcoin at
 5    some point in their lives?
 6         MS. MCGOVERN:  The facts are these, your Honor.
 7    Dr. Craig Wright never mined Bitcoin.
 8         THE COURT:  Don't argue the issue.  I'm just asking
 9    you is that a disputed issue in this case.
10         MS. MCGOVERN:  The partnership issue is disputed, your
11    Honor.
12         THE COURT:  So whether there was a partnership -- hold
13    on.  I'm breaking in a path for you.  I know I interrupted you
14    and I apologize, but I want to focus on my question before I
15    forget it.
16         It seems to me there's multiple questions.  At a
17    minimum two.  Was there any partnership ever at all, first of
18    all.  And second of all, if there was, what was the scope.
19         So are both of those issues in dispute from the
20    defense's perspective?
21         MS. MCGOVERN:  The first issue regarding the
22    partnership is disputed, your Honor.  There was no partnership.
23         THE COURT:  OK.  So therefore obviously you would
24    argue the second is also in dispute, that since there never was
25    one -- or maybe you will -- since there never was one the scope
```

```
 1    is defined to be zero.

 2              MS. MCGOVERN:  That is correct.

 3              THE COURT:  OK.

 4              MS. MCGOVERN:  But we are not disputing, your Honor,

 5    that that discovery related to the company is relevant and we

 6    won't produce, and we are not disputing that there was a

 7    long-time friendship between these two individuals which is

 8    carried out beyond his death when he reached out to the father

 9    to try to help.

10              THE COURT:  OK.  But your position is that they were

11    long-time friends, they may have collaborated informally but

12    there was never any sort of legally binding joint entity

13    together and whatever Dr. Wright developed or Mr. Wright -- is

14    it Dr. Wright?

15              MS. MCGOVERN:  Doctor.

16              THE COURT:  -- developed is his, was his, has always

17    been his, never belonged to Mr. Kleiman.  That is a fair

18    summary of your position.

19              MS. MCGOVERN:  That is correct.  But I would like to

20    just make a caveat in that regard --

21              THE COURT:  Sure.

22              MS. MCGOVERN:  -- so that I don't appear to be

23    misrepresenting facts later developed.

24              THE COURT:  Sure.

25              MS. MCGOVERN:  We have this in our affirmative
```

1    defenses, your Honor.

2            There was a company in Australia called Coin Exchange,

3    and that company was the brainchild of Dr. Wright.  It was

4    going to be a Bitcoin bank.  He did ask Dave Kleiman to help

5    find individuals to help research with him.  Dave Kleiman was

6    ill during that period of time of Coin Exchange.

7            There were shares that Dr. Wright ultimately

8    transferred to Dave Kleiman's family.  In fact, the e-mail

9    communications attached to the complaint bear out that Ira had

10   in fact communicated with Dr. Wright, had requested that the

11   shares be issued in his own personal name as well as the

12   estate, for reasons unknown but we will find out later, and

13   that those shares were in fact issued and the evidence will

14   show that there was in fact an offer made for those shares

15   which Ira Kleiman refused.

16           That corporate relationship with respect to Coin

17   Exchange is not disputed as having existed between the two.

18           THE COURT:  OK.  What about W&K, do you dispute that

19   Mr. Kleiman was a member or had an ownership interest of any

20   kind in W&K?

21           MS. MCGOVERN:  We don't believe there's a dispute that

22   Mr. Kleiman had, Dave Kleiman had an interest in W&K.  In fact,

23   Dave Kleiman appointed different members to the LLC who will be

24   witnesses in this case.  But there was not a partnership, your

25   Honor.

```
 1              THE COURT:  OK.  I understand your position.

 2              Mr. Freedman, I will let you respond briefly.  Yes.

 3              MR. FREEDMAN:  So, your Honor, two things.  One is

 4    just to point out the issue here.  There's a sworn statement

 5    from the defendant submitted in Australia stating that he did

 6    own 50 percent of W&K.  But I don't want to step into what I

 7    think is the mistake that Ms. McGovern is making, which is I

 8    believe defense counsel is trying to relitigate the motion to

 9    dismiss.

10              THE COURT:  The motion to dismiss was denied.  Judge

11    Bloom found that the claims could go forward and I'm going to

12    give you discovery on the claims.  I don't think she is

13    disputing that.  She can dispute it on the merits ultimately

14    whether you can prove it or not, but for discovery purposes

15    those are extant claims and you're entitled to proportional

16    discovery as to those claims.

17              MR. FREEDMAN:  Thank you, your Honor.

18              We have a civil theft claim pending in the case, your

19    Honor.  We have a conversion claim pending in the case.

20    Ms. McGovern saying that discovery should be framed by the

21    defendant's story that Dave Kleiman died with the Bitcoin, Ira

22    deleted them, and let's find the Bitcoin, that's defendant's

23    story and they are entitled to seek discovery on that story and

24    we will not stand in their way.

25              But our story is there was a partnership.  There were
```

assets.  The assets were taken.  We have a civil theft claim

pending and we need discovery to flesh out that civil theft

claim.

          THE COURT:  I understand that as I hear from both

sides.  What I have to balance is not necessarily what you get

as much as when you get it.  You being both sides.  I'm not

just speaking to one side or the other.

          So before I get to that, let me turn back to

Ms. McGovern.

          Ms. McGovern, let's assume for the sake of discussion

that I ordered you as a first tranche to produce the discovery

that you are proposing.  So the discovery you have just

described, understanding you haven't had a forensic examination

of the computer so I'll take that off the table for a second,

but the documentary discovery that you've proposed as what you

believe to be the reasonable discovery.  Give me a sense of how

voluminous it is and how quickly it can be produced and in what

format it can be produced.

          MS. MCGOVERN:  With respect to the volume of the

discovery, your Honor, I'm going to make a statement and if you

don't mind, I would like to share my response with Ms. Markoe.

          THE COURT:  If you want to consult -- by the way, I'm

not trying to tie anybody to a number that I'm going to throw

back in your face later.  I want in a very general sense, are

we talking 500,000 documents, 50,000 documents, 5 million

1    documents, can they be produced in a week, a month, a year,

2    that sort of sense.

3         MS. MCGOVERN:  I think the answer to that depends in

4    part on the search terms, because what we have done is the

5    documents that we are collecting, have collected and are

6    collecting are not compartmentalized so that we can say, for

7    example, oh, we have the W&K file, and with ESI that tends to

8    be the case.

9         So what we've done is we have simply, because we want

10   to be ahead of this process and we understand the September

11   trial date and the discovery cutoff, we have actually sort of

12   probably gone overboard, but it's extremely voluminous.  So

13   what we would propose to do with respect to that scope, and we

14   are prepared to go forward with it, is sit down with

15   plaintiffs' counsel, formulate the search terms that would be

16   relevant to that scope.  We will not be overly difficult with

17   respect to those search terms.  We can give them hit counts.

18   We can tell them, OK, this is where we are with respect to this

19   and move forward as quickly as possible.

20        Your Honor, I'd also like to make another statement,

21   and that is that as we go forward, and this is why the

22   confidentiality agreement may be important as well, is in this

23   type of case at this type speed, we are not opposed to

24   predictive coding in this case for purposes of production,

25   particularly in light of your revised discovery standing order

1  or standing discovery order where you recognize that there

2  wouldn't be an imprudent waiver if we were to, for purposes of

3  expediting our production given the search terms, if there were

4  an inadvertent waiver that we wouldn't have waived it.

5       What we're simply trying to do is move ahead on

6  relevant scope of discovery and we have been reading a lot and

7  working a lot about predictive coding because it can just be

8  astronomically expensive to go document by document in cases

9  like this.

10      THE COURT:  OK.

11      MS. MCGOVERN:  That's my response.  I don't know if

12  Ms. Markoe would like to respond as well.

13      THE COURT:  Ms. Markoe, I'm happy to hear from you as

14  well.

15      MS. MARKOE:  If you wanted to know about the scope, in

16  terms of hard copy documents, we have collected approximately

17  6,000 documents.  That's not pages, that's documents.

18      We have been -- for the time being we have been going

19  through those document by document, but they are OCR'd and we

20  would be able to apply search terms to those and narrow this

21  down.

22      With regard to the ESI, we have collected a

23  significant amount of ESI.  We are in processing of that ESI

24  and we're planning on processing that ESI on a rolling basis,

25  prioritizing devices that we think will have the most relevant

1    material on it.  And based on the information that we're

2    getting from our experts and then once that is processed, we

3    can start applying search terms to them and then we can give a

4    much more educated and detailed description of what the scope

5    in terms of volume will be of the ESI.

6              THE COURT:  OK.

7              MS. MARKOE:  But today we don't have that information

8    for you.  We are working through it.

9              THE COURT:  You mentioned multiple devices.  What kind

10   of devices and what kind and how many are we talking about?

11             MS. MARKOE:  So we collected external hard drives.  We

12   collected laptop computers.

13             THE COURT:  These are from whom?

14             MS. MARKOE:  Dr. Wright.

15             THE COURT:  OK.

16             MS. MARKOE:  From his --

17             THE COURT:  So external hard drives.  I'm sorry.

18   Laptops?

19             MS. MARKOE:  Laptops.  Yes, that's pretty much what we

20   have collected.

21             THE COURT:  OK.

22             MS. MARKOE:  And we're working through -- we've imaged

23   those devices for the most part and are working through the

24   process of prioritizing what should be processed so that we can

25   sort of get moving on producing that as quickly and efficiently

```
 1    as possible.

 2               THE COURT:  OK.  Before I turn to the plaintiffs, let

 3    me pause for a second because Ms. McGovern said something that

 4    I wanted to make sure I discuss with everyone.

 5               I will or we will resolve the confidentiality order if

 6    not in this hearing shortly thereafter.  I will go back and

 7    reread after I hear from you both.  We will get that issue

 8    resolved.  So that will be in place tomorrow, if not before.

 9    Friday at the latest.  So that will be resolved.

10               One thing I would highly -- I can't order you to do

11    this, but I can urge you more strongly -- if it is in the

12    confidentiality other and I miss it, I apologize -- to do a

13    Rule 502 agreement.  Because as all parties I hope know, under

14    Rule 502 of the Rules of Evidence you can insulate yourselves

15    from attorney-client -- and waiver is attendant to inadvertent

16    disclosure of attorney-client and work product.  If we're

17    talking about massive amounts of discovery on both sides,

18    computers, ESI, search terms, the probability that something

19    that shouldn't be turned over will be turned over is high.

20               To the extent it's not privileged, the parties -- I'm

21    very comfortable.  I know both law firms in this case.  You're

22    extraordinarily highly ethical and outstanding law firms.  You

23    are going to comply with the Bar rules about notifying the

24    other side and turning back over and segregating anything you

25    shouldn't have gotten.  So I'm comfortable with that.
```

```
 1              But the Rule 502 issue, if you don't have a 502
 2     agreement, now we have to deal with waiver and the scope of
 3     waiver and we're going to waste a lot of time and spend a lot
 4     of energy and time that you don't have litigating that issue,
 5     and it can all be mitigated by a Rule 502 agreement.
 6              I will enter the order, but I can't order you to do
 7     it.  But if you present it to me, I'll sign it as fast as I
 8     can.
 9              Ms. McGovern.
10              MS. MCGOVERN:  Your Honor, we did include that in the
11     confidentiality order.
12              THE COURT:  Great.
13              MS. MCGOVERN:  But it's subject to dispute with the
14     plaintiffs.
15              THE COURT:  Is there a dispute simply as to scope or a
16     dispute as to whether to have it at all?
17              MS. MCGOVERN:  To have it at all, your Honor.
18              MR. FREEDMAN:  Your Honor, we were discussing it and
19     we were trying to reach agreement and it was easier to take it
20     out.  If the court thinks it is a good idea, we're happy to
21     revisit it.
22              THE COURT:  Again, I will put it this way.  I forget.
23     It is either Judge Grimm or Judge Peck -- Judge Grimm from
24     Maryland and Judge Peck from the Southern District of New
25     York -- who has opined that it is effectively legal malpractice
```

1    in a case like this not to have a Rule 502 clawback agreement.

2          Again, I can't order you to do it.  It is your case,

3    not my case.  If it were me, it doesn't cost you anything.  God

4    willing, we never have to use it because everybody's careful

5    and nothing privileged gets turned over.  It's like fire

6    insurance.  We all hope we never use it, but when we need it,

7    we are so glad we have it.

8          MR. FREEDMAN:  It wasn't an issue in principle.  It

9    was just an attempt to narrow the issues and get something

10   entered quickly.

11         THE COURT:  That's fine.  I will leave that to you

12   all.  But I strongly, strongly, strongly urge that.

13         OK.  Let me turn to Mr. Freedman for a question.

14   Again, I'll make a more global statement and then I'll turn to

15   Mr. Freedman.

16         Every discovery ruling I make in every case is without

17   prejudice.  I will say it again.  Every discovery ruling I make

18   is without prejudice.

19         The reason is, as I say in my standing order,

20   discovery is dynamic.  So what's proportional today may not be

21   proportional tomorrow.  So I may order disclosure of something

22   and then as discovery progresses somebody says, you know what,

23   this is getting unduly burdensome, it is unnecessary, it is

24   cumulative, I want to go back to the judge and limit it.  Or

25   someone may say, oh my goodness, we got something in discovery

1    which now suggests to me I should be getting a bunch of other

2    stuff that the judge wouldn't give me.  Come back to the judge

3    and prove to me you should get it and I'll reconsider my

4    orders.

5            So all my orders on discovery are without -- I don't

6    invite you to come back everyday, but I invite you to come back

7    as the case develops because you know the case better than I

8    do.  I'm not looking through terabytes and hundreds of

9    thousands of pages of documents.  You are.  So I understand

10   that.

11           So that being said, let me turn back to Mr. Freedman,

12   to the plaintiffs' side.

13           I assume you don't disagree that you should get

14   everything that Ms. McGovern says you should get as a starting

15   point.  As a starting point of a corpus, not as a starting

16   point temporally.

17           MR. FREEDMAN:  We agree what Ms. McGovern is offering

18   to turn over is relevant, yes.  I just want to caveat that

19   with, it wouldn't really help our claims all that much because

20   the allegations in the complaint are that the defendant forged

21   documents and so the documents that contemplate Dave Kleiman

22   are alleged in the complaint to be forged documents and there's

23   a comparison of signatures side by side.  So yes, they are

24   relevant, but when we're dealing with what a thief did with

25   stolen assets, the thief isn't going to store them in a trust

1    which says this trust stole -- this trust stores the stolen

2    assets I took from Dave Kleiman.

3         Look, I understand this is a disputed issue and I'm

4    not trying to be inflammatory.  I'm saying that's plaintiffs'

5    position.  So while the discovery is relevant, it's not going

6    to really advance the ball and I'm concerned --

7         THE COURT:  If it is not relevant, it's not going to

8    advance the ball, then it's not proportional.  So tell me what

9    it is she is offering that you don't need.  What is she

10   offering that you don't need because it's not proportional or

11   cumulative or not going to advance your case.  Because if it's

12   not going to advance your case, I'm not going to order her to

13   give it to you.

14        MR. FREEDMAN:  When I say it's not going to advance

15   the ball, I don't mean it's not going to advance the ball at

16   all.  That was an overstatement.  I mean that it won't resolve

17   the pending factual disputes.

18        THE COURT:  Well, will it help resolve the pending

19   factual disputes?

20        MR. FREEDMAN:  Yes, your Honor.  Of course.

21        THE COURT:  OK.  So let's start with that as a

22   starting principle that I'm going to order at a minimum, I'm

23   going to order the defense to turn over the categories of

24   documents that they have proposed.

25        Now, I'm not -- this is a longer discussion and it is

```
 1    going to continue right now, but at a minimum what I am also

 2    going to direct is, if you haven't already, meet and confer

 3    about -- I'm talking now to the defense side.  Be transparent

 4    about what you've got, where it is, what it is, the categories

 5    you have.  Because the more transparent you can be, then it is

 6    going to help Mr. Freedman and his team target in on what they

 7    want to prioritize.  To the extent we're going to prioritize, I

 8    think they should get the right to try to prioritize first.

 9          If you say to them, look, we have three external hard

10    drives that Dr. Wright hasn't really looked at or that he got

11    in 2015 and we got this laptop that he had in 2011, they may

12    very well say we want the 2011 laptop first, we don't really

13    care about the stuff that happened in '15, or they may say

14    whatever.  That sort of transparent dialogue both ways is going

15    to be very important in a case like this and helping to focus

16    in.

17          So first with that, and also in terms of search terms,

18    sort of prioritizing or working together, if predictive coding

19    makes sense, work amongst yourselves to come up with the most

20    efficient way to get the most important information out as fast

21    as possible.  But I'm not going to order that because I don't

22    know the case and all that.  Whatever tar you can come up with

23    that you can work with, work with it and make it work.

24    Because, again, I don't know if it is a lot of e-mail or if

25    it's very little e-mail and it's mostly going to be
```

1    documentation or if it's spreadsheet.  I don't know what it is.

2    Have your computer experts talk to each other.  Have your ESI

3    experts meet and talk to each other.  I really think this is a

4    case where the more you all -- the facts are what they are.

5    This is a historical case.  The facts are what they are.  The

6    faster you all come to that realization and work it out and get

7    the information exchanged, then you can really focus on the

8    things that are important in this case.

9           So I order the parties to do all of that.

10          OK.  Now, the next thing I want to talk about is the

11   computer.  I guess it's -- whose computer is it?  Mr. Kleiman's

12   computer that the defense wants access to?

13          MS. MCGOVERN:  That is correct.

14          THE COURT:  If I remember the pleadings -- and,

15   Mr. Freedman, you can correct me if I'm wrong -- you had a

16   forensic person image the computer and whatever externalities

17   go with it.

18          So you have a forensically-preserved copy.  Is that

19   correct?

20          Let me turn to the defense for a second.  From what

21   the defense understands -- I understand they have an image.

22   Are you satisfied that the image they've got is an image that

23   you can work with or are you asking to have your own person

24   start from first principles and take physical possession of the

25   device and image the device as a matter of first principles?

1              MS. MCGOVERN:  Your Honor, we didn't realize that

2    there was a computer image until we engaged in the memoranda

3    that were submitted to your Honor.  It is not that I am trying

4    to dig at the plaintiffs' counsel or anything.  I'm simply

5    saying that we have recently spoken with our expert with

6    respect to what they say.  We don't know who the expert is.  We

7    don't know what methodology --

8              THE COURT:  Who the plaintiffs' expert was?

9              MS. MCGOVERN:  Correct.

10             THE COURT:  OK.

11             MS. MCGOVERN:  We don't know what the methodology was.

12   And because there is an admitted issue, or at least if you're

13   going to go by the e-mails that we have and we have attached to

14   our memorandum, if you're going to go by what Ira Kleiman said

15   he did, which wasn't simply I think I might have deleted

16   things, it was, then I continued to use it, we don't want the

17   baby pictures on David Kleiman's computer devices and we don't

18   want the privileged communications that Ira Kleiman may have on

19   the computer device.  But what they can't do and can't agree to

20   is some sort of artificial limitation as to what Dave --

21             THE COURT:  And I'm going to address that question.

22             MS. MCGOVERN:  OK.

23             THE COURT:  You are getting to what we ought to take

24   off of and what you should be given access to from what they

25   have preserved.  I'm going one step farther back, which is are

1    you willing to accept that whatever image they have created is

2    an image that you can work from or do you want to start with

3    your own image from your own person?

4          MS. MCGOVERN:  In light of the critical nature of the

5    evidence that we are talking about, we have requested an

6    inspection by our own expert and/or we are willing to agree to

7    a mutually agreed upon neutral expert.  But we believe that we

8    need the exercise to be extremely carefully done, and our

9    experts have emphasized the importance of the methodology.  I

10   could reel off the different types of acronyms that were stated

11   to me, but --

12         THE COURT:  OK.  But let me interrupt you for a

13   second, though.  I hear what you are saying.

14         But let's say your expert talked to their expert and

15   based upon what their expert tells your expert your expert says

16   to you, no, they did it the right way, they got a good image

17   there, we can work with that.

18         MS. MCGOVERN:  We are willing to start with that, your

19   Honor.

20         THE COURT:  That was sort of where I was going.  So

21   thank you.  I think that's the right place to start.  Because I

22   think before we start talking about what you can get off of it

23   or how quickly you're going to get it or anything like that,

24   let's not -- let's start with something everybody agrees with.

25   So let's start with that.

1           I will direct the parties to have a meet and confer,

2    have your computer experts talk to each other, and if the

3    defense is satisfied that the image that is -- if the

4    plaintiffs' expert needs access to the image to do whatever

5    they do, try to work that out, to preserve the forensic

6    integrity of the image but yet allowing for access, do what you

7    can do to satisfy -- plaintiffs, do what you can do to satisfy

8    the defendants that the image you got is something they should

9    work with.

10          Assuming we get there, great.  If we can't get there,

11   I'm prepared to direct that a third-party neutral be selected,

12   that the parties split the cost, and we can discuss using the

13   third-party neutral to scrape out all the irrelevant materials,

14   in consultation with plaintiffs' side, and put a process in

15   place for that through a third-party neutral if we get there.

16          But if we don't, if there is an agreement amongst the

17   parties to live with the existing image, I want to talk now

18   about how do we get the defense what they want and what Rule 26

19   says they should get without improperly invading Mr. Kleiman's

20   privacy and individualized information.

21          So Mr. Freedman, do you have a proposal as to that?

22   What is your proposal as to how we could extract that

23   information?

24          MR. FREEDMAN:  Sure, your Honor.  We took two of the

25   suggestions from the Wiggins v. McHugh case in the Southern

1    District of Georgia, which was to -- I mean, I understand let

2    defendants verify whatever the word is, not the image,

3    whatever.  The sanctity of the image, whatever the word is, and

4    then to establish a process where their expert could come to

5    our expert's facilities, sign some kind of confidentiality

6    order about what he sees that's privileged, and then extract

7    anything he can from the deleted space and do what those

8    computer experts do and then take all of that that he's

9    recovered, give it to us, we'll review it for privilege and we

10   will produce what is not privileged and create a privilege log

11   on what's privileged.

12        THE COURT:  OK.  Ms. McGovern, any objection to that

13   procedure, or do you have an alternative procedure?

14        MS. MCGOVERN:  Yes, your Honor.  What we object to,

15   your Honor, is the exercise of all of the information regarding

16   the computer go to the plaintiffs' counsel to determine what is

17   privileged.

18        If I'm understanding correctly, they have this

19   information and have had this information for years.  So at

20   this juncture what we are requesting is, as quickly as

21   possible, is both experts to review what is on there and make

22   sure the methodology is correct so the forensic image is both

23   full and meaningful, get that information right away.  That is

24   not going to show the content of the data; it is simply going

25   to show what is on the computer now.

1              THE COURT:  And I think they are agreeable to that.  I

2      think that's what they agreed to earlier on, that your expert

3      can talk to their expert and they will give your expert access

4      to the device and your expert can look at the directories and

5      kind of give you a general sense of what's on there.

6              I don't want to speak for you, Mr. Freedman.

7              MR. FREEDMAN:  If the expert comes to our expert's

8      facilities and does not open documents, just kind of looks at

9      the architecture of the drive, no problem.

10             THE COURT:  OK.

11             MR. FREEDMAN:  If he wants to open documents --

12             THE COURT:  That has to do with the integrity of the

13     image.  That I always leave to the two experts.  I am sure

14     there is a way to do that.  They can make a secondary image.

15     There's ways to play with that.

16             MR. FREEDMAN:  And I'm just concerned about what

17     defense counsel has said they would like to do, and they're

18     entitled to do this I think.  There's the ability to limit

19     another party from accessing your own drives.  We're not even

20     saying that.  We're saying come look at it.  Just make sure

21     that we protect our privilege when you look at them.

22             What I'm saying is, they want to go in and recover

23     data from the deleted space of the drive.  As I understand it,

24     there are different techniques, there are different methods to

25     do it.  Let their expert come and do it.  Once he recovers

1    everything he wants to recover, we'll review it for privilege

2    and produce it over.  I'm not sure --

3          THE COURT:  Are you asking, just so I am clear, are

4    you asking for you to conduct that privilege review only what

5    is recovered from the deleted space or of everything that they

6    say they want?

7          MR. FREEDMAN:  So that gets down to the question of

8    we're happy to -- one of their discovery requests is all files

9    basically on Dave Kleiman's drive.

10         THE COURT:  Forget the discovery requests.  I will get

11   to those in a second.  Let's talk on a clean slate about what's

12   the best way to do this.

13         MR. FREEDMAN:  I don't have a problem getting them --

14   we can review the forensic image of the drive as well and

15   mark -- we prefer not to hand over the pictures of his minor

16   children.

17         THE COURT:  And they're not asking for that.

18         MR. FREEDMAN:  In our meet and confers they were, your

19   Honor.

20         THE COURT:  Ms. McGovern, are you asking for that?

21         MS. MCGOVERN:  I believe there may have been a

22   misunderstanding, your Honor.  We certainly don't care about

23   the minor children pictures in this case where they are

24   alleging billions of dollars of theft.

25         MR. FREEDMAN:  OK.  Perfect.  So then we can take the

```
1    forensic image, we're happy to review it for privilege and

2    produce -- the problem is you can't produce a forensic image

3    once you redact stuff from it.  Right.  So we're happy to

4    produce over the information that's relevant that's not

5    privileged or private pictures.  Just produce it.

6          To the extent they want the forensic image, and the

7    way I understood their expert declaration is to get into the

8    parts of the drive, you can't just produce over.  So to the

9    extent they want to do that, let their expert do it.  Let him

10   identify everything, put it on some drive, and then we will

11   review it for privilege and produce it over.

12         THE COURT:  OK.  So it's just the timing.  I

13   understand your proposal.  So let me break this down into

14   pieces.

15         It sounds to me that the plaintiff has the drive.  The

16   plaintiff tomorrow could go look at the drive and establish

17   there is certain information that we absolutely agree we are

18   going to give to them.  There is certain information we

19   absolutely agree and they agree, defendants agree, they don't

20   want.  They don't want the baby pictures, they don't want the

21   Mother's Day card, they don't want the e-mails to whoever.

22         MR. FREEDMAN:  Commercial movie files, commercial

23   music files.

24         THE COURT:  All that stuff, right.

25         So it seems to me we can do that first rough cut.  To
```

1    the extent there's stuff you, the plaintiffs, agree they can

2    get, they can get.  They may not get it in the forensic form

3    yet, but they can at least get it and start playing with it.

4         Then there's going to be this other category in the

5    middle which is, we don't know what it is because no one's

6    extracted it yet.  And then the plaintiff is saying, well, when

7    it's extracted, we'd like to have the same process where we get

8    to look at it first and then assuming we don't assert any

9    privilege, we'll turn it over.  And if we do assert a

10   privilege, we won't turn it over.

11        That's what you are asking for.

12        MR. FREEDMAN:  A hundred percent.

13        THE COURT:  Again I'm putting aside the whole question

14   of access to the device itself for the image.  But in terms of

15   information.

16        Ms. McGovern, what is your objection to that process?

17        MS. MCGOVERN:  Your Honor, the objection to the

18   process is completeness.  And here is the concern.  It may just

19   be that in the manner in which we're talking about this our

20   concern is not being addressed and because we are in front of

21   your Honor and because there is a record, and I have a feeling

22   we're going to be back in front of you on this.

23        THE COURT:  That's OK.

24        MS. MCGOVERN:  I want to make sure it's perfectly

25   clear and how important this full analysis of Dave Kleiman's

1    computer devices is done, and here's the issue.

2         It is not just that Ira Kleiman has stated in his

3    e-mail that he deleted files and threw away Dave Kleiman's

4    papers.  And again, we're defending a billion dollar case.  It

5    is that he then continued to reformat the computer.

6         What we need is a full analysis of what happened with

7    that computer device and everything that was done to that

8    computer device from the time of Ira Kleiman's access to it

9    when Dave Kleiman died to the present.

10        So I believe that we are getting hung up, and I find

11   it disturbing that we are getting hung up, on baby pictures and

12   unidentified privileged materials which arguably they would

13   know if they are on that computer or not because Ira Kleiman is

14   their client.  So Ira Kleiman was either writing communications

15   with his lawyers on that computer in sworn e-mails or he

16   wasn't.  And speaking about sort of just getting to the facts

17   and moving through this with a view towards identifying what's

18   really in dispute, we can't allow a concern over privilege

19   which may or may not exist.

20        THE COURT:  Well, I think you and I may be talking

21   past each other.  Let me explain where I'm coming from and if

22   I'm not understanding you, I apologize.

23        Clearly I know enough about computers and computer

24   forensics -- enough to be dangerous I suppose -- that when

25   someone says they've deleted things from the computer or

1    they've reformatted the hard drive, sometimes it's gone and

2    sometimes it's not.  The only way you can determine if it's

3    gone or if it's not is to dig all the way down into the zeros

4    and ones buried way, way down in the computer, and there's all

5    sorts of secrets hidden down there that normal human beings

6    like us can't find.  And that's why we pay computer forensic

7    experts a lot of money to go in and dig up and find that stuff.

8    OK.

9            Your position is you need to have access to that.

10           MS. MCGOVERN:  Correct.

11           THE COURT:  I don't know that the other side disagrees

12   that you need to have access to that.  You're going to get

13   access to that.  I'm telling you right now.  You're going to

14   get access to that.  But in order to do that, now you have to

15   look at everything that's on the computer.  So now we're not

16   talking about what is buried in the zeros and ones, we're

17   talking about the stuff that we can see at a relatively high

18   level of computer development.

19           The question becomes what should be the orderly

20   process so that you get the portions of that that are relevant

21   and proportional that you need to have and you don't get stuff

22   that's not relevant and proportional or otherwise privileged.

23           So I was talking about part two and I think you're

24   talking about part one.  So we bring those together.

25           You're going to get access somehow to the device, and

1   that's why I said the first thing I want you to do is have your

2   computer person talk to their computer person and determine

3   whether given the existing state of the mirror image that they

4   have can you get to the zeros and ones that you need to get to.

5   Because if you can't, then we'll go to the next step, which is

6   I will appoint or I will have the parties select a third-party

7   neutral who will get to the zeros and ones and create an image

8   that both sides will have eventual access to.  But I'm still

9   going to give the plaintiff the first shot, and plaintiff can

10  start to do this now.  Maybe they've already done it.  They

11  know with a high level, presumably, what files they think you

12  should get and what files you shouldn't get.  They've had it.

13  And I think they can probably tell you that relatively quickly.

14      So I don't think that's where the fight's going to be

15  in this case because I suspect to the extent it is at the

16  margin, it's probably not relevant enough to matter.  You guys

17  want to spend a lot of money to figure out that, God bless, but

18  I don't think that's really where this case turns.

19      In terms of what's buried, the only other question

20  becomes once we get into a format that somebody can pull out

21  the zeros and ones and convert those zeros and ones into

22  maybe -- I don't know.  Maybe they are only converted into a

23  log of some kind, which is what you are really looking for.

24  What was stuff deleted and what was deleted.  What's still

25  there that wasn't there before.  What files still exist.  Where

1    were they created.  If that's all it is, then I think the

2    parties can sit down and agree pretty quickly most of that's

3    probably not privileged and you can have it right away.

4         Now if it converts into, oh, there's a bunch of JPEGs

5    here that are baby pictures, then everybody can agree you don't

6    get those.  But I do think that -- again, whether -- what you

7    are suggesting to me is I should have the plaintiffs right now

8    go dig into the zeros and ones and conduct their own privilege

9    review before they give it to you as opposed to let somebody

10   dig in, pull out the zeros and ones, then give them the first

11   swing at it and then depending on what they say, if they are

12   purporting to hold anything back from the zeros and ones, then

13   you can come back and I'll referee that fight.

14        MS. MCGOVERN:  Your Honor, I think you clarified it

15   for me completely.  I apologize if I misunderstood you.  I just

16   wanted to emphasize the need for full access and a full

17   analysis.  But I think that the procedure that you've outlined

18   is perfect.

19        THE COURT:  OK.  Great.

20        Mr. Freedman, any objection to the procedure I'm

21   talking about?

22        MR. FREEDMAN:  No.

23        THE COURT:  Great.  OK.  I've talked a lot and I don't

24   listen when I'm talking.  Unfortunately, I don't write down

25   what I'm saying most of the time, which is why I keep my clerk

1    here, but she just left.

2         What I want you to do is to repeat back to me -- what

3    I do to my kids all the time.  Would you repeat back to what

4    you think it is I just agreed to let you do.

5         MR. FREEDMAN:  Your Honor, my understanding is that

6    you'd like plaintiffs to go through the high-level data that is

7    easily accessible to us mere humans and produce what is

8    relevant, responsive and not privileged.  We can create a

9    privilege log over whatever is privileged there.  And then as

10   for the zeros and ones data, we are going to have our experts

11   talk to each other to determine whatever that word is I can't

12   remember now, the appropriateness of the forensic imaging we

13   have.

14        THE COURT:  I think it is the integrity of the image.

15        MR. FREEDMAN:  Integrity.  That's the word.  Thank

16   you.

17        THE COURT:  Sure.

18        MR. FREEDMAN:  The integrity of the forensic image

19   that we have.  If the experts agree that it is a perfect image,

20   then there will be some process where defendant's expert can

21   come, review the forensic image.  Plaintiff was asking, and I'm

22   not sure the court was objecting, where he signs some kind of

23   confidentiality order that if he sees something that's

24   privileged, he can't turn it over or speak about it.  He will

25   gather everything he can from the zeros and ones and produce

1    that to the plaintiffs for their review for privilege.  Once

2    that's been done, we will turn over everything that needs to be

3    turned over and anything that needs the court's resolution, the

4    court will resolve.

5         THE COURT:  Ms. McGovern, do you agree that's the

6    procedure that is agreeable to you?

7         MS. MCGOVERN:  With a couple points.  I don't know

8    that it is going to be feasible for our expert to go to

9    plaintiffs' expert's lab and do the kind of work that might be

10   required.  It's probably going to be -- it may very well be

11   extensive and time-consuming.

12        This kind of work that our expert is contemplating is

13   not done in a couple of hours in somebody's room.  It requires

14   other equipment and other things.  So I think that -- and I'd

15   like to flip, if we could, your Honor, just for purposes of

16   expediting discovery, I'd like to flip the procedure where our

17   experts speak as soon as possible and obtain the information

18   regarding the methodology and the meaningful forensic image

19   that was done of the computer first and not wait for the

20   plaintiffs to go through it and produce it to us.

21        So I'd like the experts to be able to meet first and

22   get that moving.

23        THE COURT:  Mr. Freedman, any objection?

24        MR. FREEDMAN:  No, your Honor.

25        THE COURT:  Great.  Done.

1          MS. MCGOVERN:  And then with respect to the issue of

2     our experts going and doing that review in their offices, I

3     think we have to --

4          THE COURT:  I hear your point on that.  Before I get

5     to that, let's assume you figure out a way that your expert

6     gets a copy of the unredacted pure image.  Your only objection,

7     at least as an initial matter, having a confidentiality order

8     which says that he can conduct whatever forensic examination he

9     needs to do, but he can't share with you and your colleagues

10    what he's finding until after we complete the process we're

11    talking about.  Any objection to having that sort of initial

12    limitation on it, as to the content of the drive?

13         MS. MCGOVERN:  Agreed.

14         With respect to the content, your Honor, we absolutely

15    agree with you, but we do request as soon as possible upon our

16    expert being able to determine this, what actually happened,

17    what was deleted.

18         THE COURT:  Right.  What do you mean, that your expert

19    will be able to tell you?

20         MS. MCGOVERN:  Correct.

21         THE COURT:  We will get to that in a second.  Yes.

22    Again, I don't think Mr. Freedman is objecting to that.  But

23    again, to the extent that your fellow is doing anything and

24    some attorney-client thing pops up, we need to have an

25    agreement that he can't tell you that or, again, the baby

1   pictures or other things.  That's all.

2            MS. MCGOVERN:  Of course.

3            THE COURT:  Great.  Thank you for understanding.

4            Before we go, I'll set some timing, aspirational

5   deadlines on this.

6            In terms of where and all that, my limited experience

7   in this space is that once you have an agreed-upon image of

8   integrity, copies can be made.  They may take a little while.

9   You have to get a big enough hard drive and all that stuff.

10  But the computer experts working together presumably could make

11  an image of the image that is a usable image of integrity.

12           Again, I'll ask the plaintiff, but I don't imagine

13  they'd object, that if your expert wants to do that instead and

14  then just take that image back to his lab, as long as he is not

15  sharing anything with you, I don't see a problem with it.

16           Mr. Freedman, I'll hear from you.

17           MR. FREEDMAN:  Your Honor, we all answer to clients

18  and in this respect I have to object to the actual image of the

19  drive leaving our expert's control.  Their expert's welcome to

20  come -- your Honor, to be totally frank, we incurred expense of

21  around $60,000 to image the drives.  This is an expensive

22  litigation.  That is just what it is.  To object to their

23  expert coming to -- that's what the court ordered in Wiggins.

24  Their expert will have the image available to them.  They will

25  be able to do any tests they want, but they need to do it under

1    our supervision.

2              That is what Rule 34 says.  That is the Eleventh

3    Circuit In Re Ford Motor Company.  Rule 34 does not grant

4    unrestricted direct access to a respondent's database

5    compilations.

6              I'm going to get asked questions my client, who is the

7    expert, can we trust the expert.  I have no reason to not trust

8    the expert, but he is a very private individual and I think

9    that there's a compromise to be had here where they can get

10   access to the information they need, they just need to do it in

11   the way the Wiggins court ordered.

12             THE COURT:  I am going to overrule that objection.

13   You can tell your client it is my fault.

14             The experts can meet and confer and if the defense's

15   expert determines that the most efficient way for him or her to

16   provide their services is to -- now, I will order that any copy

17   that's made has to be made at the defense's expense.  I'm not

18   going to make your client pay to copy it.  If they want to make

19   a copy, if they want to take it back to their lab to work on

20   it, they are going to have to pay for the copy.

21             If they are willing to do that and their expert says

22   it's necessary, then I will order that they be given access and

23   the ability to take it subject to a confidentiality order, that

24   the expert not disclose the content of anything he finds on the

25   drive to defense counsel until either further order of the

1    court or the written consent of the plaintiff.

2          OK.  So that's my order as to that.

3          Let's talk timing.  Ms. McGovern, and, Mr. Freedman,

4    what do you think is a reasonable amount of time to allow for

5    the experts to at least meet and confer?

6          Let me turn to the defense.  Give me some time frames

7    from your perspective in getting this process moving and

8    getting it completed.

9          MS. MCGOVERN:  We are ready to go.

10         THE COURT:  Your person is ready to go.  OK.

11         Here's what I am going to do.  I am going to have

12   everybody sort of do -- you have a lot of meeting and

13   conferring to do.  It sounds to me like this is a case where

14   setting regular meetings with me is going to be important, that

15   we come back on a regular basis.

16         I understand everyone's come up from Miami.  You can

17   appear by phone.  Although the train is great.  If you want to

18   appear by phone, I will try to conserve costs there.  But I

19   think it is going to be valuable to set periodic status on

20   discovery because it sounds to me in very good faith both sides

21   have some really complicated issues to work through.

22         So what I am going to do is set another date maybe two

23   weeks out and give everybody a chance to have the experts talk

24   to each other and then we can operate from facts.  Then we can

25   come back and you can say, the experts tell us they need this

1   amount of time and this is how quickly they can get it to us

2   and this is the volume of what they think they're going to

3   extract given their experience with a hard drive this big and

4   this is how long we think we are going to need to review it

5   before we turn it over to you, and we can deal from facts.

6           So I think I've ordered the procedure that I want

7   followed, but we'll set another status conference and we will

8   pick a particular date to come back.  Then at that point we can

9   put some deadlines on X shall be completed by such and such a

10  date and Y should be done by such and such a date.

11          OK.  So I have dealt with the computer.

12          Likewise, between now and then I'd like the parties to

13  meet and confer about search terms and try to really focus

14  inasmuch as you can on search terms.  And again -- and on

15  prioritization.

16          As I said earlier, if the defendants are transparent

17  with the plaintiffs about what you have, then the plaintiffs

18  can prioritize what they want and then everybody can sit down

19  and refocus the search terms much more effectively.  So I'll

20  order the parties to do that and we'll revisit that issue in

21  two weeks when we all get back together.

22          Look, if you can agree on something between now and

23  then, get started.  Get started, please, both ways.  Let's

24  start getting some materials flowing back and forth.

25          Let me turn to the confidentiality stipulation.

1          MR. FREEDMAN:  Your Honor, are we going to go through

2     the objections to the various requests?

3          THE COURT:  Yes.  I find it is helpful for me when I

4     sort of can get my arms wrapped around some of these bigger

5     picture questions and then I have a sense of what's coming

6     when.  Some of the issues that you've raised and the objections

7     I'm going to defer until we see sort of the -- and some of it

8     I'm going to order today.

9          I will get to that in a second, Mr. Freedman.  I just

10    want to try to deal with these discretely.

11         MR. FREEDMAN:  On the confidentiality order, there was

12    an exhibit.  We have copies for the opposing counsel.

13         May I approach the bench?

14         THE COURT:  Of course.  You can hand it to the

15    marshals.

16         I guess my big picture question, and I'll confess I

17    didn't read this as carefully as I maybe should have word for

18    word.  But what are the areas of disagreement, the basic areas

19    of disagreement?  I know one was sort of who has to invoke Rule

20    5.4.  That was one issue as I recall.  One was can certain

21    documents be marked as attorneys' eyes only.

22         What else was really in dispute on the confidentiality

23    order from the plaintiffs' perspective?

24         MR. FREEDMAN:  Your Honor, it was the scope of what

25    types of documents can be designated as confidential, and that

1    relates to the exhibit we just passed up to the bench.

2            THE COURT:  Do you think that the confidentiality

3    order is over-inclusive or under-inclusive?

4            MR. FREEDMAN:  Over-inclusive, your Honor.

5            THE COURT:  So what kind of things do you think should

6    not be designated confidential that the other side does think

7    should be designated confidential?

8            MR. FREEDMAN:  That brings me to this exhibit.  We are

9    coming into the hearing, before yesterday morning we were

10   willing to concede that -- and this is docket entry 97-2 --

11   everything in A through H should be designated, would be able

12   to be designated confidential, which disputed certain broad

13   categories of documents like private corporate information that

14   the defendant wanted to be able to designate as confidential

15   and some of the personal identifying information we thought was

16   overly broad, like e-mail addresses, phone numbers, nonpublic

17   social media accounts.

18           But, your Honor, what we just passed up was a tweet

19   that the defendant tweeted yesterday morning, and it's a series

20   of tweets where the defendant is tweeting about the plaintiff

21   in this case.  It starts off:  There is one thing that is

22   perfectly effective against blackmailers, those who think they

23   can control and change the narrative and get something for

24   nothing.

25           THE COURT:  I see it.

1          MR. FREEDMAN:  Then the defendant starts talking about

2     certain warts, things he had to do to develop Bitcoin.  And

3     then if you look one, two, three, four down:  People such as

4     Ira Kleiman think they can profit in exploiting others.  The

5     simplest thing comes from 18, U.S.C., Section 371, which is the

6     conspiracy against the United States statute.  I created

7     software, and this was linked to the initial introduction of

8     Bitcoin.

9          If you drop down to a little further:  I placate

10    myself that I just wrote software.  I also allowed Dave to act

11    as an agent in dealing with people in Czech Republic and

12    Russia.  My not being a U.S. citizen was my shield, but Dave

13    was and he lived in Florida, USA.

14         Next tweet:  The funds Ira wants are not those from

15    when I was mining in 2009 but things Dave was dealing with in

16    2012 and on.  I know who some of these groups are and I ignored

17    it.  Mr. Kleiman will learn --

18         THE COURT:  OK.

19         MR. FREEDMAN:  -- that should he ever hope -- and this

20    is the most important part, your Honor, and I'm sorry for

21    reading it.

22         There should be ever hope to gain the slight win that

23    this applies, and then he cites to criminal, federal forfeiture

24    statutes and saying:  We will all be out soon.

25         So, your Honor, the plaintiffs' position has always

 1    been in this lawsuit that the defendant holds almost all the

 2    information that plaintiff is seeking in discovery.  Here, the

 3    defendant is asking for strict confidentiality and broad

 4    confidentiality terms but tweeting that the plaintiffs'

 5    deceased brother was involved in criminal actions which would

 6    result in forfeiture of the assets if they're ever recovered.

 7    And plaintiff --

 8              THE COURT:  I guess the question is this.  The

 9    confidentiality only applies to disclosure to third parties.

10    It doesn't impede your ability to prepare this lawsuit.

11              MR. FREEDMAN:  That's true, your Honor.  It is just

12    that the defendant is trying this lawsuit in the court of

13    public opinion in addition to this court, and the plaintiff --

14              THE COURT:  The confidentiality order also wouldn't

15    say that the plaintiff can't say anything the plaintiff wants

16    to say.  It would just say the plaintiff can't disclose

17    documents that it received in the litigation.

18              MR. FREEDMAN:  So it wouldn't be able to exonerate his

19    brother if that information comes forward.  The brother is

20    deceased and not able to defend himself.

21              THE COURT:  I hear you.  So you object to the scope of

22    the confidentiality order including things like e-mail and

23    communications?

24              MR. FREEDMAN:  Right.  We think that --

25              THE COURT:  What else?

```
 1            MR. FREEDMAN:  So the plaintiffs' position would be
 2    that only what is protected under the Federal Rules of Civil
 3    Procedure should be able to be designated confidential and the
 4    defendant should have to show why each thing --
 5            THE COURT:  Which rule are you pointing to?  I'm
 6    sorry.
 7            MR. FREEDMAN:  Hold on.  I'm sorry, your Honor.  Let
 8    me find it.
 9            THE COURT:  I know the federal rules allow for a
10    confidentiality order.  I wasn't clear that they categorized --
11            MR. FREEDMAN:  26(c), I think.
12            THE COURT:  -- what is or is not considered to be
13    confidential.
14            MR. FREEDMAN:  Right.  Well, I mean, something that is
15    an annoyance, embarrassment, oppression, undue burden or
16    expense.  And the plaintiffs' position is now the defendants
17    should have to show why each thing he wants to produce would
18    cause embarrassment, oppression, undue burden or expense.
19            THE COURT:  Hold on a second.  Generally speaking --
20    I'm just looking for it in this order -- every confidentiality
21    order I've ever seen allows a party to challenge another
22    party's designation and it allows the court to override the
23    party's designation.
24            Does that -- it is in there.  OK.  Yes.  We tried to
25    save a few trees and didn't print all the pages.  I got it.
```

```
 1              So that is in here, correct?

 2              MS. MARKOE:  Yes.  It is in paragraph 18.

 3              THE COURT:  Paragraph 18.  OK.

 4              I hear you, Mr. Freedman.  But here is my view on

 5    confidentiality orders.  It is intended to allow the exchange

 6    of information between the parties but limit disclosure to

 7    third parties of things that shouldn't be disclosed to third

 8    parties, like trade secrets and Social Security numbers and

 9    private financial information and things of that nature.

10              Again, that is at a categorical level.

11              At an individualized level, if there is a particular

12    document that either party wants, that's been marked as

13    confidential and the other party thinks shouldn't be marked as

14    confidential, I'm happy to referee those fights if I have to.

15              So I personally don't focus a whole lot or put a lot

16    of credence in carving the sharp edges on confidentiality

17    orders because that's what I'm here for and I will resolve it

18    if I have to.

19              So I mean, are there specific categories that the

20    parties do agree on?  That's what I'm looking at.  I'm looking

21    at 97-2 on page 5 where I guess is the language in question.

22              MR. FREEDMAN:  Your Honor, maybe just to help resolve

23    this.  As long as the plaintiffs wouldn't be prejudiced from

24    coming back to the court and showing why a specific document

25    doesn't cause undue burden or annoyance, basically the
```

1   plaintiff isn't bound that anything entered in this

2   confidentiality order can never be challenged as confidential,

3   then we'd be willing to concede to everything listed on the top

4   paragraph of page 97-2, page 5.

5           THE COURT:  Great.  OK.

6           MR. FREEDMAN:  In red.

7           THE COURT:  From the defense side.

8           MS. MCGOVERN:  So, your Honor, we sort of have two

9   competing versions at this point.

10          MS. MARKOE:  We thought we had a version.  They

11  entered a new version that we had not previously seen.

12          I'll work off of their version for convenience because

13  that's the one that they're talking about.

14          THE COURT:  That's docket entry 97, correct?

15          MS. MARKOE:  That's docket entry 97.  The version that

16  we had been working under the assumption we were working under

17  was docket entry No. 100.

18          THE COURT:  OK.

19          MS. MARKOE:  So let me first go to their point on

20  confidentiality designations.  They actually made some

21  significant changes.  One is they removed private corporate

22  information which had previously been in there, and we had

23  explained to them that what we meant by private corporate

24  information is information about a corporation that is not

25  publicly available but does not necessarily make it financial

```
 1    information, such as board minutes.  Board minutes are not
 2    generally publicly available.
 3              THE COURT:  Right.
 4              MS. MARKOE:  But they are also not always financial
 5    but may contain confidential information.
 6              MR. FREEDMAN:  Your Honor, we will just agree.
 7              THE COURT:  OK.  So I am going to direct a couple of
 8    things.
 9              First of all, thank you, Mr. Freedman, for clarifying
10    that.
11              I will resolve the issue on the sealing request in a
12    minute and then I'm going to have the parties meet one more
13    time and send me, if you can, an agreed, final agreed
14    confidentiality order.  If you can't, you need to submit your
15    proposal and I will pick one.  I'm not splitting the baby.
16    I'll pick the one that I think is more reasonable.  But I'm
17    confident you're going to agree on one.
18              Absolutely, to Mr. Freedman's point, anyone can
19    challenge -- and we'll order that whatever final provision sent
20    to me contain a provision that allows either party to challenge
21    whether the other party has properly designated anything as
22    confidential.  I will tell you that if I make a finding that a
23    designation was not done in good faith -- I don't expect I
24    would, but if I ever do, I have seen it in other cases where
25    parties now designate everything as confidential.  If I
```

1    determine that a party's done so in bad faith, then there will

2    be sanctions under Rule 37.  OK.  But I'm confident I'm not

3    going to get there.  But I want the parties to be on notice

4    that I will consider that.

5         I hope that resolves that issue as to confidentiality.

6         Same thing.  I think there was a dispute as to whether

7    one particular category of documentation could be designated as

8    attorneys' eyes only.

9         MS. MARKOE:  Correct.

10        THE COURT:  My feeling is it is the same order.  You

11   can appeal that to me and if it was not done in good faith or

12   not done properly, I will resolve that issue.

13        MR. FREEDMAN:  Your Honor, maybe I'm just not aware of

14   it, but part of what the parties were disputing was the

15   standard for what should appropriately be designated attorneys'

16   eyes only.

17        It was plaintiffs' position that because the plaintiff

18   doesn't compete with the defendant -- we would agree that trade

19   secrets should be able to be designated as confidential.  The

20   defendant was asking for highly sensitive non-public commercial

21   financial information to be kept from the plaintiff and this

22   case is about highly sensitive non-public commercial financial

23   information.  It's about the theft of Bitcoin which is a

24   financial asset.  So that would seem to allow a lot of things

25   to be kept from our client.

1          THE COURT:  OK.  Just so I'm clear, who is it who

2     wants to take a more expansive view of what is attorneys' eyes

3     only?

4          MR. FREEDMAN:  The defendant, your Honor.

5          THE COURT:  So let me hear from defendant on that.

6          MS. MARKOE:  So, your Honor, in addition to trade

7     secrets, what we did want to have as attorneys' eyes only, and

8     this has become sort of even more important right now as we

9     have discovered very recently that it appears that the

10    plaintiff has some sort of litigation type funding and it makes

11    it very unclear as to who the actual party at interest is in

12    this case.  And so that is a significant issue which impacts

13    our view on attorneys' eyes only.

14         THE COURT:  Let me just stop you right there for a

15    second, Ms. Markoe, if I could.

16         MS. MARKOE:  Yes.

17         THE COURT:  If that is your dividing point, then there

18    may be a solution to that problem.  Because when I see

19    attorneys' eyes only, my concern is that you're taking the

20    position they can't share it with their client and they can't

21    share with the person who is the party in interest in the

22    litigation.  I take a very limited view of what that should be

23    allowed for.

24         If you're taking the position that there's some

25    third-party funding entity and you want that limited, I will

1    hear from the plaintiff on that, but I would take a more

2    expansive view on that.

3            MS. MARKOE:  I think that I --

4            MR. FREEDMAN:  We want to show the documents to

5    Mr. Ira Kleiman and that's it.

6            THE COURT:  OK.

7            MS. MARKOE:  The other issue is, the only thing that

8    we wanted to add to this particular designation, in addition to

9    the trade secrets, was highly sensitive non-public commercial

10   financial information or highly sensitive private corporate

11   information relating to any current business in which a party

12   has an interest which it reasonably in good faith believes that

13   disclosure to persons other than those specified herein could

14   reasonably be expected to result in injury.

15           It wasn't so much that we wanted all commercial

16   financial information.  It's about what he is currently working

17   on.

18           THE COURT:  So the issue is he's got some current

19   entities that in your view have nothing to do with the time and

20   life when he was interfacing with Dave Kleiman and that they

21   shouldn't have access to that.  I expect that Mr. Freeman is

22   going to say but if the Bitcoins got somehow traced into that,

23   then we would have an interest.

24           Am I anticipating your argument?

25           MR. FREEDMAN:  No, absolutely, your Honor.  This is

1    just about sharing what was turned over in discovery with our

2    client who would be subject to a confidentiality order and not

3    able to turn everything over.  How could disclosure to the one

4    real party in interest hurt the defendant?  I mean, he is bound

5    by the confidentiality order just like everything else.

6          THE COURT:  Ms. Markoe.

7          MS. MARKOE:  Your Honor, to be perfectly frank, I

8    mean, I hear that point.  We do not intend to use it very

9    frequently.  However, this has been a case, and you can see

10   through the exhibits that were attached to the complaint, where

11   there have been a lot of leaks.  We don't know the source of

12   all of those leaks.

13         We have significant concerns about our client's

14   privacy and about private information having already been

15   leaked, such as ATO transcripts, which are the essential --

16   essentially the equivalent of IRS transcripts, which should not

17   be out in the public, have no right to be out in the public,

18   but are now there.

19         That's sort of where we're coming from in terms of

20   ensuring that we have adequate protections for our client and

21   particularly for our client's current business interests where

22   he can suffer significant financial harm that it is our opinion

23   that his current businesses have nothing to do with this case

24   whatsoever.

25         Now, if what we're talking about is a situation where

1    your Honor is going to be limiting the scope of discovery such

2    that those entities will have no bearing whatsoever on

3    discovery, then we can probably get rid of that provision.

4            THE COURT:  OK.

5            MS. MARKOE:  But we put that provision in based on the

6    broad scope of discovery requested by plaintiffs.

7            THE COURT:  OK.  At this point I'm not ruling as to

8    whether I'm going to allow discovery into those entities or not

9    because I don't know enough about the case to rule as to

10   whether I'm going to allow discovery on those entities or not

11   or when I'm going to allow discovery or to what extent I'm

12   going to allow discovery into those entities.

13           So really the question is, there is a confidentiality

14   order.  So whatever you turned over, even if it is disclosed to

15   Ira Kleiman, good luck to him if he leaks it and I find out

16   about it.  So then the question is, at the margin, what

17   additional protections would be encountered by being able to

18   mark that sort of information attorneys' eyes only.  That's how

19   I hear you.

20           Here's what I am going to do.  I think attorneys' eyes

21   only should be a very, very, very limited category.  I'm going

22   to give you, at this point I'm going to give the defendants a

23   little bit of leeway and the benefit of the doubt to at least

24   initially mark that sort of information as attorneys' eyes

25   only, but I don't like to rule in a vacuum when I haven't seen

```
1     the actual document itself.  So I will let you mark it that way

2     without prejudice to the plaintiff challenging that

3     designation.  And when I can actually see the documents in

4     question, I will rule as to whether they're properly marked as

5     attorneys' eyes only or whether they can be disclosed to

6     Mr. Kleiman.  But I'm giving you my sense that that ought to be

7     a very limited category.

8              MS. MARKOE:  Understood, your Honor.

9              THE COURT:  With that, have I now given the parties

10    enough clarity that you can sit down and craft a final

11    confidentiality order?

12             MS. MARKOE:  I think we have two more quick issues.

13             THE COURT:  You have the sealing issue.  I'm sorry.

14             MS. MARKOE:  There is the sealing issue and then

15    there's a preamble that plaintiffs had --

16             THE COURT:  I'm going to strike the preamble.  It's a

17    confidentiality order.  It doesn't need to have a discussion of

18    the law.  Everybody knows what the law is.  So if that's what

19    you are talking about --

20             MS. MARKOE:  Yes.

21             THE COURT:  -- I agree.  I don't need to have a

22    discussion of Rule 5.  I might use it in one of my orders.  It

23    was a very nice discussion of the rule.  So thank you all for

24    doing the research for me.

25             MR. FREEDMAN:  That's Judge Middlebrooks, your Honor.
```

1           THE COURT:  You stole it from Judge Middlebrooks.

2           MR. FREEDMAN:  Yes.  We took it from his

3    confidentiality order.

4           THE COURT:  Great.  Good.

5           Ms. Kenny, make a note to steal that from Judge

6    Middlebrooks.

7           But I don't think we need to do an order.  That is the

8    law.  It is an accurate statement of the law.  But I don't

9    think it needs to be in the confidentiality order.

10          So let me talk about sealing, just sort of sequencing

11   on sealing.

12          It seems to me this is the sequence -- this is the

13   context in which sealing is going to come up.  A turns over to

14   B some document that A marks as confidential.  B now wants to

15   file it as part of a pleading.  And the question is who has the

16   burden then to say it should be filed under seal.

17          It seems to me B does.  It seems to me the party who

18   is proposing to inject it into the public record knows what

19   they are going to inject into the public record and they should

20   in the first instance invoke the procedures under Rule 5.4.

21          Now, who has the burden at that point?  I will read

22   Judge Middlebrooks' order again and refresh my memory as to who

23   has the burden at that point.  But I think at least as to who

24   has the burden to initiate the issue, it is the party proposing

25   to bring the document into the public record.

```
1              OK.  I think under the order if anything -- I believe
2    it is like every other confidentiality order I've seen.  You
3    are signing off on an agreement that we will seek to file under
4    seal anything that's been marked as confidential unless the
5    other side agrees we don't have to.
6              So again, I think the burden is properly on the party
7    attempting to inject the confidential document into the public
8    record.  So that would be my order as to how that should be
9    sequenced and incorporated into the confidentiality order.
10             MR. FREEDMAN:  Your Honor, can I get some clarity on
11   how that works?
12             THE COURT:  Sure.
13             MR. FREEDMAN:  Instead of A and B, can we use
14   plaintiffs and defendants?
15             THE COURT:  Sure.
16             MR. FREEDMAN:  Defendant produces a document that it
17   marks as confidential.
18             THE COURT:  Right.
19             MR. FREEDMAN:  Plaintiff wants to file the
20   confidential document, defense confidential document.
21             THE COURT:  Right.
22             MR. FREEDMAN:  Plaintiff doesn't think this document
23   should be kept under seal even though it's been designated as
24   confidential.
25             THE COURT:  I'm sorry.  They give you something.
```

```
 1              MR. FREEDMAN:  They give us something.  We want to
 2    file it.  We don't think it should be sealed even though it's
 3    covered -- we're agreeing to broad confidentiality categories.
 4              THE COURT:  You don't think it should be sealed but
 5    they do.
 6              MR. FREEDMAN:  But they do.  But we're seeking to file
 7    it as part of our motion practice.
 8              THE COURT:  Right.  So you file it as part of your
 9    motion practice.  Well, you follow the procedures -- as to that
10    document, you follow the procedures proscribed in Rule 5.4,
11    saying that pursuant to the confidentiality order you are
12    obligated to present it to the court for possible sealing.
13    However, your position is it should not be sealed but your
14    opponent believes it should be sealed.
15              MR. FREEDMAN:  OK.  Then the designating party will
16    file why it should be sealed and we will have a chance to
17    respond?
18              THE COURT:  Yes.
19              MR. FREEDMAN:  That's fine with us.
20              THE COURT:  Ms. Markoe, or, Ms. McGovern, is that
21    confusing or do you understand?
22              MS. MARKOE:  No, I think that is generally the right
23    tact to take.  I think that it is sort of redundant because we
24    have a procedure in place for them challenging any
25    confidentiality designations.
```

```
1              THE COURT:  Right.  But confidentiality is different

2    from sealing.

3              MS. MARKOE:  That's fine.

4              The only other issue is there may be situations where

5    a nonparty or nonparty third party designates something as

6    confidential.

7              THE COURT:  Right, but they're not going to be filing

8    anything in the lawsuit.

9              MS. MARKOE:  Correct.

10             THE COURT:  You will be.

11             Here's my point.

12             MS. MARKOE:  And we're fine with the procedure that

13   you put forward.

14             THE COURT:  Let's make this as simple as we can.

15   Nobody wants anything filed in the public record that shouldn't

16   be in the public record.  We want to make sure that whatever

17   steps need to be taken to make sure that the court has a chance

18   to adjudicate someone's claim that the document shouldn't be

19   filed in the public record are followed before the document is

20   filed in the public record.

21             All I'm saying is the person who wants to inject it

22   into the public record is the person who knows what it is.  So

23   that person should at least have the initial burden to notify

24   the court that they are seeking to inject something into the

25   public -- seeking to inject something into the litigation that
```

1   has so far only been discovered and has been designated as

2   confidential.

3           It may well be everybody agrees it should be under

4   seal.  But the person who wants to inject it should in the

5   first instance pick up the phone and call the other side and

6   say, hey, guys, we're going to file our motion for summary

7   judgment and we plan to attach the e-mails that Mr. Kleiman

8   sent.  You marked them as confidential.  Do you still think

9   they need to be confidential and do you think they should still

10  be sealed.  Yeah, we do too.  Great.  Or no, we don't.  Or

11  whatever.

12          Like I said, I just want to avoid the situation that

13  unfortunately happens that something inadvertently gets filed

14  publicly that shouldn't be filed publicly.

15          So you're all grownups.  You'll figure this out.

16          OK.  That is it for the confidentiality order.

17          OK.  Have I now dealt with at least all the kind of

18  global big picture issues before we now dive down to the

19  specific topics?

20          MS. MARKOE:  Just one other thing.

21          THE COURT:  Sure.

22          MS. MARKOE:  And I think maybe we can work this out.

23  We talked about litigation funders and you said something

24  about --

25          THE COURT:  I think Mr. Freedman agreed.  The only

```
 1    person to whom they will disclose anything that is marked as

 2    confidential is to their client and I assume any contractors

 3    that are going to be working as part of the litigation team,

 4    substantive litigation team, and it is agreed that they will

 5    not make that disclosure to someone that is not involved in the

 6    substantive litigation of the case but is a mere funder.

 7              Correct, Mr. Freedman?

 8              MR. FREEDMAN:  Hundred percent.

 9              THE COURT:  Great.  Wonderful.

10              You said my favorite phrase, Ms. Markoe.  We think we

11    can work this out.  Judges love that phrase.

12              We have been at this for a while.  Do the parties want

13    to take a five-minute break and then we can all kind of look at

14    what we've got.  Maybe now I've made some of these rulings we

15    can all take a second, review what we've got, and perhaps

16    limit -- let's do that.  Let's take a five minute break.

17              MS. MARKOE:  Thank you, your Honor.

18              THE COURT:  Everybody can use the restrooms, have a

19    drink, and we will come back.

20              (Recess)

21              THE COURT:  Back on the record.

22              I'm going to go through, as I understand it, there's

23    objections to the plaintiffs' first request for production.

24    That is docket entry 91-1.  There were objections to the

25    interrogatories, plaintiffs' interrogatories at 91-2.
```

```
 1            Second round of interrogatories.  Are there objections
 2   to that as well, 91-3?
 3            And then as to the second and third, plaintiffs'
 4   second and third request for production there's been no
 5   response to those yet, is that correct?
 6            When was that served?
 7            MS. MCGOVERN:  That was served yesterday, your Honor.
 8            THE COURT:  OK.  So we are not going to deal with that
 9   today.  Put that aside for now.
10            Very good.  Let me go to, then, defendant's objections
11   to the plaintiffs' requests for production starting at docket
12   entry 91-1.
13            Let me ask, have any of these been resolved since
14   whenever this was filed, January 18th?  I should know this from
15   your joint order, but I couldn't distill it out to be honest
16   with you.  Are any of these resolved as to the defense
17   objections to the requests for production?
18            MS. MARKOE:  Yes, your Honor.
19            THE COURT:  Great.  Which ones?
20            MS. MARKOE:  So we had agreed to provide request No.
21   1, which was all communications between Craig Wright and Dave
22   Kleiman occurring during that time period.  We had agreed to do
23   that.
24            THE COURT:  OK.  So No. 1 is resolved.
25            MS. MARKOE:  Correct.
```

```
 1              THE COURT:  OK.

 2              MS. MARKOE:  We had agreed to request No. 2.

 3              THE COURT:  OK.

 4              MS. MARKOE:  Except for plaintiffs do not appear to be

 5   willing to put a limitation on what the present is, and our

 6   position is that that can't be an ever-shifting target.  So we

 7   had proposed initially a limitation of the date that the

 8   original complaint was filed.

 9              There might be some wiggle room on that date, but

10   we're not in a position to agree to an ever-shifting date that

11   requires an ever-shifting collection.

12              THE COURT:  Just so I'm clear, this is a request for

13   production for documents, communications or data that at one

14   point belonged to David Kleiman and is now in the possession of

15   Dr. Wright.

16              MS. MARKOE:  Right.

17              THE COURT:  That is what the request is.

18              MS. MARKOE:  Correct.

19              THE COURT:  You agree to provide that and your

20   proposal is up through the commencement of this litigation.

21              MS. MARKOE:  Correct, and I think that that should

22   suffice to get them everything that they want.

23              THE COURT:  Mr. Freedman, what is your position on

24   that?

25              MR. FREEDMAN:  Your Honor, we're ready to agree to
```

```
1    that limitation in some of the other disputes, but if our

2    deceased client somehow got additional information to the

3    defendant during the pendency of the litigation, I mean, I

4    don't think it's going to happen, but if it did, I think that

5    would be pretty relevant.

6          He's been dead since 2013.  So if somehow he now left

7    additional information, I mean --

8          THE COURT:  I guess -- I understand that's an abstract

9    theoretical possibility.

10          MR. FREEDMAN:  Yes.

11          THE COURT:  But how would that happen?

12          MR. FREEDMAN:  Well, actually, so this is interesting.

13          THE COURT:  He's been dead for a number of years.  How

14    suddenly is stuff going to pop up?

15          MR. FREEDMAN:  The Bitcoin protocol, your Honor,

16    actually allows for time locking of things, where things can be

17    locked for a certain period of time and then released on a date

18    certain.  In fact, the defendant has claimed that the 1.1

19    million Bitcoin that is being held in trust is time locked

20    until January of 2020 and can't be accessed.

21          So I mean, I don't think it's going to happen, but

22    it's technically possible.  And in the unlikely event it does

23    happen, we'd like to know about it.

24          THE COURT:  Right.  But I guess the burden then is how

25    often do they have to check to see if it happened.  That's kind
```

1   of the problem.

2        How do you do that?  Give me some thoughts.

3        MR. FREEDMAN:  Your Honor, can we set the date for a

4   month after the filing of the complaint and we'll come back to

5   you if we need more later.

6        THE COURT:  So you want an extra month.

7        Ms. Markoe, can you agree to an additional month?

8        MS. MARKOE:  We can agree to an additional month.

9        THE COURT:  Great.  Done.  So ordered as to request

10  No. 2.

11       MS. MARKOE:  That would also go for request No. 3.  We

12  were agreeable to that one as well.

13       THE COURT:  Great.  Thank you.

14       Next.

15       MS. MARKOE:  Then I believe that request No. 5 we were

16  agreeable to, particularly now that we have sort of an end

17  date.

18       THE COURT:  Great.

19       MS. MARKOE:  And if I recall, we also had agreed to

20  request No. 10.

21       THE COURT:  Great.

22       Any others?

23       MS. MARKOE:  Off the top of my head, I think that we

24  had some sort of objection or limitation to other ones --

25       THE COURT:  OK.

```
 1              MS. MARKOE:  -- that we specifically laid out in our

 2    responses --

 3              THE COURT:  Great.

 4              MS. MARKOE:  -- what we were willing to provide.

 5              THE COURT:  OK.  Let me stop for one second.

 6              As I look back at my notes, I think the only objection

 7    on the plaintiffs' side that related to a defense request had

 8    to do with the forensic examination of the computer, and I

 9    think I've resolved that.

10              Am I correct on that?  There's no additional

11    objections by the plaintiff to a request from the defendant?

12              MR. FREEDMAN:  None that's pending, your Honor.

13              THE COURT:  Great.  I just want to make sure I resolve

14    what I need to resolve.

15              Let's go back to --

16              MS. MCGOVERN:  The only issue there, your Honor, we

17    did put in our memorandum if we could just get a time frame on

18    when plaintiffs expect to begin producing documents to

19    defendant.

20              THE COURT:  OK.  Mr. Freedman, do you have a sense on

21    that?

22              MR. FREEDMAN:  I mean, as soon as the court resolves

23    these initial production issues.  I mean, plaintiff would ask

24    the same from defendant.  I'm sure we can work it out or if

25    not, the court can help us work it out.
```

1          THE COURT:  Here's what I am going to do.  We are

2     going to set another hearing on March 6th, which is two weeks

3     from today.  As in all cases I think rolling productions are a

4     good thing.  So as soon as either side has something everyone

5     agrees should be turned over and once we have the

6     confidentiality order in place, hopefully the spigots on both

7     sides will open and hopefully when I see you again on March

8     6th, there will have already been a moderately robust

9     production in bilateral directions here.

10          So at this point I don't want to set a final date.  I

11     think it's very difficult in cases like this to set a final

12     date, but I would hope that on or before March 6th the parties

13     would have begun a rolling production.

14          OK.  Let me go back to -- that would include anything

15     that I now order produced as a result of these materials.

16          So request 1 is resolved.

17          2 is resolved.

18          3 is resolved.

19          4.  So the first one in dispute is No. 4, which is all

20     documents or communications relating to the drafting or

21     publication of the original Bitcoin white paper.

22          The objection or the proposal from the defendant was

23     that -- I'm sorry, from the plaintiff -- I'm sorry.  From the

24     defendant was that you will provide things that relate to

25     Mr. Kleiman as opposed to -- so what would be excluded I

1    suppose under that theory.  What sort of things do you

2    envision, Ms. McGovern, Ms. Markoe, would exist but not be

3    turned over?

4         MS. MARKOE:  Your Honor, if there was a draft of the

5    paper that Dave Kleiman never saw or didn't review or didn't

6    comment on or didn't edit, had nothing to do with him, I don't

7    see why that would be remotely relevant.

8         THE COURT:  OK.  Mr. Freedman.

9         MR. FREEDMAN:  Your Honor, this paper was the very

10   first and beginning of the entire collaboration between the

11   decedent and the defendant and the drafts of that paper will

12   help show the contours of that partnership, help show the other

13   participants in that partnership, help identify additional

14   witnesses to that partnership.  It is clearly relevant to our

15   claim that they partnered to create Bitcoin with this paper and

16   then mine Bitcoin and develop intellectual property.

17        THE COURT:  Ms. Markoe, I will give you the last word.

18   Or Ms. McGovern.  I'm sorry.

19        MS. MCGOVERN:  If you don't mind, so the Bitcoin

20   protocol was publicly downloaded and made public and downloaded

21   in 2009.  The partnership that is at issue in this case

22   specifically is with respect to W&K.  To ask for every single

23   piece of paper, which is what they're asking for -- all

24   communications, all documents related to the drafting and

25   publication of that really goes beyond the claims in the case.

1          Again, if the argument is that that intellectual

2     property was stolen, it can't be stolen after it's made

3     publicly available in 2009, years before Dave Kleiman passed

4     away and without any claim by Dave Kleiman that it was stolen.

5          MR. FREEDMAN:  Your Honor, if I may.  That's not

6     entirely accurate.  There is a partnership claim both as

7     individuals and for the partnership that occurred in W&K, and

8     Judge Bloom's order upholds both claims.

9          THE COURT:  Correct.  OK.  I am going to order

10    production as described on page 21 of 91-1, that production of

11    drafts and other matters relating to that Bitcoin paper that

12    have some connection to Mr. Kleiman, to Dave Kleiman.

13          If in the reviewing of those the plaintiff can

14    establish that there's a reason to believe other drafts or

15    other materials exist that are also relevant and not

16    cumulative, I'll reconsider expanding the scope of that.

17          OK.  No. 6 is for all documents, agreements and

18    communications relating to the defendant's wife.

19          As I read this, the defendant is asserting the marital

20    communication privilege.  Is that correct?

21          MS. MARKOE:  That's one of our objections, yes.

22          THE COURT:  So let me parse that out.

23          So plaintiff, do you agree that at least to the extent

24    these are confidential communications between the defendant and

25    Ms. Watts during their marriage that that would be privileged

1   and not subject to production?

2          MR. FREEDMAN:  Yes, your Honor, except that it has to

3   be spousal communications because Ms. Watts was involved in the

4   business dealings of the defendant.

5          THE COURT:  All right.  It would be any confidential

6   communication between spouses.

7          MR. FREEDMAN:  Right.  But I believe there's case law,

8   and I'm not ready to brief it at the moment, I believe there's

9   case law that says husband and wife's business communications

10  are not confidential spousal communications.

11         THE COURT:  I'm not familiar with that case law, but

12  if it exists, I'd like to see it, if you believe it would

13  better inform my decision on No. 6.

14         MR. FREEDMAN:  We would obviously agree that they

15  should produce a privilege log for anything they wanted to hold

16  back under the spousal privilege and if we believe a

17  communication is not subject to privilege, we'll brief it.

18  Otherwise, we won't.

19         THE COURT:  OK.  What is your other, defendant, other

20  objection?

21         MS. MARKOE:  So our other objection is that this is

22  incredibly overbroad.  Not only are they asking for

23  communications that relate to Dave Kleiman, W&K, the white

24  paper, essentially -- we're willing to provide that.  If there

25  are communications between Dr. Wright and his spouse that are

1    not privileged and that relate to Dave Kleiman or W&K Info or

2    relate to any of the trusts that Mr. Kleiman was involved in,

3    we're happy to provide that.  But they're also asking for all

4    communications regarding the Bitcoin protocol, Bitcoins, Bit

5    Cash, any other cryptocurrency.  I mean, that's literally all

6    Dr. Wright talks about and it's his life's work.

7              THE COURT:  I understand.

8              MS. MARKOE:  It is just too broad.

9              THE COURT:  OK.  Mr. Freedman.

10             MR. FREEDMAN:  Your Honor, the case alleges Dave

11   Kleiman and Craig Wright formed a partnership to create Bitcoin

12   and mined it from 2007 when Satoshi Nakamoto came out and said

13   I was starting to work on this Bitcoin protocol.  They worked

14   together on it, they mined together on it, they developed

15   intellectual property based on it, all the way through until

16   his death in 2013.

17             I mean, I know that it's with the defendant's wife.

18   We're not seeking -- obviously what's privileged is privileged.

19   But if it relates to Bitcoin, if it relates to Bitcoin

20   protocol, that's the nature of this case.  It's about the

21   origin of Bitcoin.

22             THE COURT:  Well, it's about the origin of Bitcoin as

23   it evolved from the relationship between Dr. Wright and

24   Mr. Kleiman.  It is not as to Bitcoin generally or the

25   development of Bitcoin after the death of Mr. Kleiman, is it?

```
 1           MR. FREEDMAN:  It doesn't relate to Bitcoin after the

 2   death of Mr. Kleiman unless we have evidence that the

 3   partnership continued.  If the partnership continued mining --

 4           THE COURT:  Right.  I understand.  But No. 6 is asking

 5   for 2006 to the present.  Mr. Kleiman died in 2013.  So you're

 6   asking for almost six years worth of material that postdates

 7   Mr. Kleiman.  And you're asking for anything that relates to

 8   the Bitcoin protocol, Bitcoins, Bitcoin cash or any other

 9   cryptocurrency?

10           So if Dr. Wright last month talked to his wife about

11   investing in, I don't know what some other cryptocurrency is,

12   you want that?

13           MS. MARKOE:  Ethereum.

14           MR. FREEDMAN:  No.  I mean, that would be privileged,

15   your Honor.

16           THE COURT:  OK.  If he sent a note to his wife and his

17   stockbroker saying I want to buy Ethereum, do you think you get

18   that?  How is that relevant?

19           MR. FREEDMAN:  No, your Honor, that's not relevant.  I

20   agree.

21           THE COURT:  Here's what I am going to do, again

22   without prejudice to you seeking additional -- I think, and I

23   understand the plaintiff disagrees, I think the initial tranche

24   of discovery needs to be limited to interactions involving

25   Dr. Wright and Mr. Kleiman.
```

| | |
|---|---|
| 1 | I understand you have an argument as to this more |
| 2 | general need for discovery of things that happened after |
| 3 | Mr. Kleiman died and Mr. Wright's development of other things |
| 4 | having to do with Bitcoin, and I'm not saying you're never |
| 5 | going to get it, but I think the initial tranche of discovery, |
| 6 | the core of this case is what was the relationship between |
| 7 | David Kleiman and Craig Wright, and that's what we're going to |
| 8 | focus on for the first tranche of discovery. |
| 9 | So as to No. 6, I agree with the defense as to their |
| 10 | limitation on page 23 of document 91-1 and I will order the |
| 11 | production between March 12, 2008 and November 22, 2013 as |
| 12 | described there in the middle paragraph on page 23 of docket |
| 13 | entry 91-1. |
| 14 | MR. FREEDMAN:  Your Honor, can I just raise, Ms. Watts |
| 15 | communicated with Ira Kleiman, the plaintiff in this case, and |
| 16 | advised him about certain business dealings that were going on |
| 17 | in Australia, helped -- there is a count of fraud in the |
| 18 | complaint that deals with the fraud that was perpetrated by |
| 19 | Dr. Wright on the plaintiff.  And Ms. Watts was a participant |
| 20 | in that fraud.  So limiting it to 2013 would excise all the |
| 21 | communications that might relate to the fraud that was |
| 22 | orchestrated that way. |
| 23 | THE COURT:  What does the complaint say as to the |
| 24 | period of time when you believe the fraud occurred, when you |
| 25 | allege the fraud occurred? |

```
 1              MR. FREEDMAN:  I believe it was up until 2015 when she
 2    stopped talking to Ira Kleiman.
 3              THE COURT:  OK.  So I'll expand that --
 4              MS. MARKOE:  Your Honor, if I may.
 5              THE COURT:  Yes.
 6              MS. MARKOE:  If I recall correctly, Judge Bloom's
 7    order on the motion to dismiss stated that the parties -- that
 8    the plaintiffs were aware or should have been aware of their
 9    causes of action as of 2014.
10              THE COURT:  2000 and?
11              MS. MARKOE:  '14.
12              THE COURT:  That doesn't mean there couldn't have been
13    a continuing fraud into 2015.  If he was continuing to
14    communicate with the plaintiff, I'll give him that.
15              So I'll expand my ruling that the time period is March
16    12, 2008 until December 31, 2015.
17              MR. FREEDMAN:  Thank you, your Honor.
18              THE COURT:  No. 7 has to do with trust or trusts
19    involving the name Tulip.
20              Help me out, Mr. Freedman, what is the theory of
21    relevance?  What is Tulip?
22              MR. FREEDMAN:  I'm happy to address this, but I
23    believe in our communications the defendant withdrew their
24    objections to this request.
25              THE COURT:  No. 7?
```

```
 1          MR. FREEDMAN:  Except as to the end date, and then we
 2   just agreed that the end date would be one month after.
 3          The Tulip trust is the trust that --
 4          THE COURT:  Hold on.  If there is an agreement, I
 5   don't need to know that.
 6          Ms. Markoe, did you miss that when you were going
 7   through this?
 8          MS. MARKOE:  I might have forgotten to incorporate
 9   one.  I apologize.
10          THE COURT:  OK.  That's fine.  No issues.  We have a
11   lot to cover so I don't hold it against you.
12          So No. 7 is resolved.
13          MR. FREEDMAN:  Your Honor, without prejudice to come
14   back to you later for additional, further discovery.
15          THE COURT:  Everything is without prejudice.  I'll say
16   it again.  Every ruling I make as to discovery is without
17   prejudice as the case develops.
18          OK.  No. 8, is that still disputed?
19          MS. MARKOE:  Yes.
20          THE COURT:  OK.  Mr. Freedman, help me out.  It seems
21   awfully broad to me.  Any trust that you in any way were
22   involved in.
23          MR. FREEDMAN:  Your Honor, right.  That's because the
24   defendant has various trusts where he's described in various
25   places that the trusts had rights to Bitcoin but not actual
```

1    Bitcoin, and then there are trusts that are unidentified in the

2    complaint, there's allegations of a trust in the Seychelles,

3    trusts in the UK, trusts in -- actually, your Honor, I have a

4    little -- I have an exhibit that is from the exhibits filed in

5    the complaint that might help.

6         THE COURT:  I'm happy read it.

7         Quick question.  Where is Dr. Wright residing?  Where

8    is he physically present?

9         MS. MCGOVERN:  He's in London, your Honor.

10        THE COURT:  He's in London.  OK.

11        So ordinarily let me tell you how I would deal with

12   this sort of a request.  I would say to go ahead and you can

13   take his deposition and ask him all these questions about all

14   these trusts, find out, get his description of what they are

15   and then we can come back and do a more focused request.  But

16   I'm not going to make him fly here from London to be deposed

17   for that limited purpose.

18        MR. FREEDMAN:  Your Honor, the other issue, and this

19   is a delicate issue I understand, but the other issue is that

20   the plaintiff has put forward evidence that the defendant has

21   lied under oath.  I mean, that's part of the complaint.

22   There's conflicting sworn affidavits that are directly contrary

23   to each other.  So the plaintiff is very hesitant to rely on

24   the testimony of the defendant and for that reason needs the

25   documents to prove what's actually occurred.

```
 1              THE COURT:  I understand your argument.

 2              Help me out with No. 8.

 3              MR. FREEDMAN:  Yes.

 4              THE COURT:  Give me the binder.

 5              MR. FREEDMAN:  So in the amended complaint, your

 6    Honor, if you turn to -- and that's in the sleeve, yes.  If you

 7    turn to paragraph 88 of the amended complaint.  Let me just get

 8    there myself, your Honor.

 9              THE COURT:  It's got italics and bolding.  It must be

10    important.

11              MR. FREEDMAN:  This is an e-mail exchange between Ira

12    and the defendant, the personal representative of the

13    defendant, where the defendant admits that 300,000 Bitcoin that

14    is held in a trust is being held for the benefit of Dave

15    Kleiman.  So that first e-mail, I am happy to read it to the

16    court if that helps the court.

17              THE COURT:  No.  I can read it.  Hold on.

18              (Pause)

19              MS. MCGOVERN:  Your Honor, I think I can clarify the

20    fact that I don't believe there is a dispute on this.

21              MR. FREEDMAN:  And I --

22              MS. MCGOVERN:  If I could just finish.

23              We have agreed to provide documents related to any

24    trust relating to Dave as trustee, as beneficiary, or in any

25    other way relates to Dave.
```

1          The problem that we have in these discovery requests,

2     your Honor, is the tracking theory.  I can track Bitcoin

3     wherever it goes no matter what trust it's in, no matter what

4     Dr. Wright has done with it, because I've alleged that he's

5     stolen Bitcoin.  Our point is, let's start with the first

6     tranche of discovery and if there's evidence that comes out

7     that in fact that's occurred, then discovery could perhaps be

8     expanded.  But to begin with I get to see every single

9     transaction regarding any Bitcoin you ever had is not

10    proportional to the needs of the case in our opinion.

11         THE COURT:  I understand your argument.  You made that

12    argument earlier and I understand that.

13         So let me just go back to what you agreed to produce.

14    Let's start with that.

15         Mr. Freedman, obviously I don't think you would object

16    to them providing to you any trusts or information -- let me

17    ask Ms. McGovern.  Tell me again exactly what it is you're

18    proposing to produce.  Is it just the name of the trust?  Is it

19    how much is in the trust?  Is it whatever identifying numbers

20    go to the Bitcoin?  How detailed are you offering?

21         MS. MCGOVERN:  Your Honor, we'll produce all documents

22    and communications from January 2011 through February 2018 that

23    relates to any trust in which Dave Kleiman was a beneficiary or

24    trustee that holds or held any ownership or any rights to

25    cryptocurrency.  So we've stated that in our objection.  And,

1    again, speaking sort of from -- I don't know if the number is

2    30,000 or 60,000 feet, I always get that wrong.  But from the

3    perspective of reaching the meat of the coconut, we are willing

4    to provide documents related to any trust in which Dave in any

5    way had anything to do with.

6            THE COURT:  OK.  And so I am reading docket entry 91-1

7    at page 26, which is I think what you are referencing.  It's

8    always weird because the page numbers on the top are different

9    from the page numbers on the bottom.  So just so the record is

10   clear, when I reference a page number in a docket entry, I'm

11   talking about the page number assigned by the CM/ECF program at

12   the top.

13           So looking at page 26, your current offer seems to

14   chop off a further limitation that you had at the end of that

15   sentence.  I just want to make sure that is intentional, that

16   you're not seeking to further limit it to things that were

17   contemplated in any contract with David Kleiman or W&K Info

18   Research Defense, LLC.

19           MS. MARKOE:  No, we're not, and I believe we had

20   conveyed that during one of our meet and confers.

21           THE COURT:  OK.  All right.

22           Mr. Freedman, any final thoughts?

23           MR. FREEDMAN:  Your Honor, again, a trust that

24   contemplates Dave Kleiman -- this is an allegation of theft.

25   You don't transfer funds to a trust that contemplates the

1    victim of a theft.  It leaves a wide sloth of evidence that's

2    relevant to the claims unproduced.

3         THE COURT:  I understand that, but you have to pick a

4    starting point.  Tracing presumes a starting point, right?

5    Today it may be over here, but it started somewhere.  That's

6    what we're trying to figure out right now.  Where is the proper

7    starting point to at least look from.

8         If it were the real world with real bank accounts,

9    what you are coming to me and saying is I think a person

10   committed a fraud, I want every bank account he has anywhere in

11   the world so that I can figure out where he put my money.  And

12   I think that's too broad.

13        So I think this is a reasonable starting point.  Any

14   trust that ever had Mr. Kleiman's name on it that contemplated

15   Mr. Kleiman as a beneficiary or trustee is, I think, a

16   reasonable starting point.

17        Again, when you get that, presumably you can trace

18   outward.  You can then incrementally or try to trace outward

19   from those.  I'm happy to give you frequent hearings so that

20   you can articulate what you should get, and I'll put the

21   defense on a short leash to get you the stuff that you need as

22   fast as I can, but I think that's a reasonable starting point.

23        So as to request No. 8, I will order production for

24   the time period of January 1, 2011 through February 14, 2018 of

25   any and all documents or communications related to any trust

```
 1   for which David Kleiman was either the named beneficiary or

 2   trustee or was contemplated to be some sort of a beneficiary

 3   and that holds or held any ownership or rights in any

 4   cryptocurrency.

 5             MR. FREEDMAN:  Your Honor, you alluded to 2011, but

 6   the alleged partnership is alleged to have begun in January of

 7   2009.

 8             THE COURT:  Right.  But when was the first Bitcoin

 9   ever issued?

10             MR. FREEDMAN:  January 2009.

11             THE COURT:  January 2009?

12             MR. FREEDMAN:  Yes.

13             THE COURT:  When was the first trust created that

14   we -- let me turn back to Ms. McGovern.  I was just using your

15   number.

16             Why did you pick January 1, 2011?  Is there some

17   particular reason you picked that date?

18             MS. MCGOVERN:  Yes, your Honor.  We believe that is

19   when the first trust was created, in 2011.  To the extent

20   that --

21             THE COURT:  Let me extend it back to 2009.

22             MS. MCGOVERN:  That's fine.

23             THE COURT:  And if it is a null set from 2009 to 2011,

24   then so be it.  But I'll extend it back to whenever the first

25   Bitcoin was created, 2009.
```

```
 1              No. 9.

 2              MR. FREEDMAN:  Your Honor, obviously we accept your

 3    ruling.  I just wanted to flag, the reason that we have these

 4    requests is because the discovery closes in 110 days and the

 5    defendant has stated that they have -- I don't even remember

 6    the term -- petabytes, or something like that, of data that

 7    they are going to turn over.

 8              To get through it all -- and just to prepare the

 9    initial complaint, your Honor, took us months to sift through

10    the data that we had that was available.  It is extremely

11    complex.  I mean, obviously we accept the ruling.  We'll see

12    what we get and we'll come back to it.

13              The defendant's position is none of this belonged to

14    Dave Kleiman, so then none of the trust that he's formed and

15    holds Bitcoin in will be produced because they didn't

16    contemplate Dave Kleiman.  That's his narrative.

17              THE COURT:  Well, if it had Dave Kleiman's name on it

18    or Dave Kleiman was named as a beneficiary, they're going to

19    produce it.

20              Again, the alternative you're proposing to me is to

21    give you every single trust that Dr. Wright has ever created to

22    hold any cryptocurrency.  Right?  That's essentially what you

23    are asking me for.

24              MR. FREEDMAN:  What if we limit it to just Bitcoin?

25              THE COURT:  Here's what I am going to do.  I'm going
```

1    to ask the -- I'm sensitive to your point, but here is what I

2    am going to ask the defense to do and we will revisit this

3    issue in two weeks.  So at a minimum I am going to order the

4    production of this.

5         Defense, come back in two weeks and give me a sense of

6    the universe we're talking about here.  How many other trusts

7    are we talking about with Dr. Wright.  If we are talking about

8    three other trusts, if we are talking about 3,000 other trusts,

9    talk to me about the burden it would take to produce that.  I

10   want to have a more informed sense of that before I make a

11   final, final ruling.

12        So initially give them this and then when we revisit

13   this in two weeks, I want to explore that question.  OK.

14        No. 9 is the same thinking, just not as to trusts but

15   as to companies, corporations, or other legal entities.

16        Is that correct, Mr. Freedman?

17        MR. FREEDMAN:  That's correct, your Honor.

18        THE COURT:  I am going to adhere to the same basic

19   ruling and the same request, that to the extent Dr. Wright

20   controls other companies, corporations, or other legal entities

21   that hold or invest in Bitcoin -- not all cryptocurrencies but

22   Bitcoin -- that the defense be prepared at our next hearing to

23   provide me with some data on that and what the burden would be,

24   etc.

25        But in the short term, I'm going to order you to

1    produce responsive documents as limited to any company or

2    entity that either Mr. Kleiman had an interest in or that held

3    any Bitcoin or other cryptocurrency for the benefit of

4    Mr. Kleiman.

5              OK.  No. 10 -- No. 9 there was agreement on.  No. 10.

6              MR. ROCHE:  I believe No. 10 there was agreement on.

7              THE COURT:  Was there agreement?

8              MS. MCGOVERN:  Yes, there was, your Honor.

9              THE COURT:  One second.  I'm sorry.

10             MR. FREEDMAN:  Your Honor, for 11 and 12, it may just

11   make sense to hold off until the two-week hearing.

12             THE COURT:  OK.

13             MR. FREEDMAN:  Because they are just a narrow subset

14   of some of the previous documents.

15             THE COURT:  I tell you what, folks.  I need to take a

16   two-minute break because my wife just tried to call me.  So she

17   outranks all of you.

18             Let's take five minutes, let me call her back, and

19   then we will finish up.

20             (Recess)

21             THE COURT:  Mr. Freedman, you were suggesting that 11

22   and 12 we just pass those until the next hearing.

23             MR. FREEDMAN:  Yes, because your Honor's resolution at

24   the next hearing might resolve that.

25             THE COURT:  OK.  Very good.  Great.  I always

1    appreciate that.

2              OK.  13 is relating to entities in the Seychelles.

3              OK.  Mr. Freedman, again, they're proposing to limit

4    it only to entities in the Seychelles who have had some

5    connection to Mr. Kleiman and W&K Research.  I guess your

6    position is that since -- when you commit a fraud, you don't

7    hide it in something that is in somebody else's name.

8              MR. FREEDMAN:  Right.

9              THE COURT:  So you want any and all -- is Seychellean

10   a word?

11             MR. FREEDMAN:  I'm not sure how to even say it, your

12   Honor.

13             THE COURT:  Seychellean entities.

14             MR. FREEDMAN:  Your Honor, also, if I could direct you

15   in that binder you're holding, on Tab 2, and this is an e-mail

16   communication between Ira Kleiman and Craig Wright, and if you

17   look on the third page --

18             THE COURT:  OK.

19             MR. FREEDMAN:  -- and you go down to one, two, three,

20   four, five paragraphs down, the paragraph starts "there are no

21   other options."  The two last paragraphs:  The ones in trust

22   are there for a purpose, and I selected a jurisdiction that

23   cannot be forced to give them over not even if the U.S.

24   government tries to make me.

25             What I'm trying to bring to the court's attention is

1    this is an individual who purposely was hiding assets and

2    purposely keeping them away from jurisdictional reach of courts

3    and authorities.  That's why we're going to start with what the

4    court said we should start with and we will come back to the

5    court, but that's why it's been plaintiffs' position with the

6    close of discovery 110 days we should have a little bit more

7    open and robust discovery with a defendant like this.

8         THE COURT:  But if I follow your theory all the way to

9    it's end, he is not going to produce them anyway.  Your theory

10   is he's a crook, he's not going to produce them anyway.  So why

11   am I ordering it?

12        MR. FREEDMAN:  Your Honor, that's true to its final

13   extension, except there is counsel involved that has a stellar

14   reputation that is going to image the documents, that is going

15   to then review the documents and produce what's relevant.  So

16   we have to do what we have to do and rely on counsel.

17        MS. MCGOVERN:  Your Honor, if I could just make a

18   statement on the record because I am just imagining this record

19   of allegations by the plaintiffs' counsel regarding theft four

20   years after he died without Dave Kleiman ever substantiating it

21   and somehow our client is a crook and needs to turn over every

22   single bank account regardless of whether other jurisdictions

23   protect the privacy of it.

24        We have said to plaintiffs' counsel after very lengthy

25   meet and confers that he will get the documents related.  As we

 1  have said here, Dr. Wright will search for documents related to

 2  any company, corporation, legal entity or trust in which he has

 3  an interest that is located or incorporated in the Seychelles

 4  and that was contemplated in any contract with Dave Kleiman,

 5  W&K, through a certain period of time.

 6       We have not shut this request down saying first you

 7  need to prove that a theft occurred.  We haven't said that.

 8       I don't think reference to 110 days of discovery

 9  somehow changes whether something is proportional to the needs

10  of the case.  You don't get everything because we don't have

11  enough time go what's relevant.

12       The shorter the letter, as they say, the more to the

13  point.

14       THE COURT:  You have 110 days of discovery today.  You

15  can always ask Judge Bloom for more.  My experience with Judge

16  Bloom has been if there is a really good reason, she is a good

17  judge.  She will listen with an open mind.  If you need more

18  time and you can show that you're being prejudiced by not

19  having enough time, she stayed discovery in this case.  She has

20  a good sense of what this case is.  She understands the

21  complications involved in the discovery in this case, and I got

22  it.

23       All right.  So again, as to No. 13 I am going to

24  adhere to the process I followed on the other ones.  I am going

25  to extend it back to 2009, to the birth of the Bitcoin in 2009.

1    So I am going to extend the time period proposed on page 33 of

2    docket entry 91-1.  I am going to order Dr. Wright to produce

3    the materials as identified here.  I will again at the next

4    hearing, I will ask Dr. Wright through his counsel to be

5    prepared to discuss the burden, the specific burden that would

6    inure to having to produce the balance of what Dr. Wright has

7    in the Seychelles.

8         I'm not saying it's relevant and I'm not saying it's

9    proportional, but I think one of the very important factors

10   under Rule 26 is the burden.  The defendants have articulated

11   throughout the burden, the burden, the burden, the burden.  I

12   am sort of for today's purposes accepting that as a generic

13   principle given that I think what I am ordering is more than

14   enough to get started and that I am going to revisit this in

15   two weeks.

16        But I do think Dr. Wright needs to be prepared to come

17   back in two weeks with more specific data to substantiate the

18   burden issue.  Again, I am not saying at that point I will

19   conclude it's relevant.  I want to go back now that I have had

20   the benefit of our hearing today, I am going to go back and

21   reread the complaint, I am going to go back and reread Judge

22   Bloom's order, because I feel I am better informed and I may

23   want to reconsider some of these orders once I have a chance to

24   revisit that, which is another reason I want to get the parties

25   back quickly.

```
 1              I think there is more than enough that is going to

 2    happen in the next two weeks that we are making productive use

 3    of the time.

 4              So that is my order as to No. 13.

 5              No. 14.  Is that one still in dispute?  It looks like

 6    it is.

 7              MR. FREEDMAN:  Your Honor, if I could direct you to

 8    Tab 15, I believe it is.

 9              THE COURT:  OK.  Just tell me what is it that is being

10    requested in 14.

11              MR. FREEDMAN:  So Design by Human is a company that

12    plaintiffs have an agreement that shows 650,000 Bitcoin being

13    held in trust -- being held by the entity Design by Human.

14    What plaintiffs have alleged is Dr. Wright's handwriting there

15    is a notation by the schedule of the 650,000 Bitcoin which

16    says:  All Bitcoin to be held in trust until a joint company is

17    formed by Dave K. and CSW.

18              THE COURT:  OK.

19              MR. FREEDMAN:  This entity holds a fortune of Bitcoin.

20              THE COURT:  OK.

21              MR. FREEDMAN:  And I mean, it is probably one of the

22    most important entities in the case.  If I could find that --

23              THE COURT:  That's OK.  You keep looking and let me

24    turn to the defense.

25              MR. FREEDMAN:  It is Tab 6, your Honor.
```

 1          THE COURT:  Tab 6.  OK.  Great.  Thank you.

 2          Let me -- but the defense, it seems to me, is willing,

 3   is offering to produce documents, communications relating to

 4   that, to Design by Human Ltd.

 5          Let me ask the defense.  Is it a fact or is it a

 6   disputed fact in this case that Design by Human, Ltd. holds

 7   Bitcoin?

 8          MS. MARKOE:  Honestly, your Honor, I don't know the

 9   answer to that at this point in time.  I believe that entity is

10   defunct, but I cannot swear to it.

11          THE COURT:  OK.

12          MR. FREEDMAN:  Your Honor, if I may, that underscores

13   the issue I'm trying to talk about.

14          There is an entity that on the day it was signed held

15   650,000 Bitcoin in trust.  If you go to docket entry 83-15,

16   page 9, this is from the first amended complaint.  So on the

17   top it says 24-15.  It is Tab 6.

18          There is an Appendix I on page 9 that lists Bitcoin

19   Wallets with a total of 650,000 Bitcoin, and in writing that

20   they will be held as agreed.  All Wallets to be held in UK

21   trust until all regulatory issues solved and group company

22   formed with Dave K. and CSW, Craig Steven Wright.

23          THE COURT:  I see it.

24          MR. FREEDMAN:  Now the defendant is saying this might

25   be a defunct entity, which means 650,000 Bitcoin have now been

1    transferred out, and plaintiffs need to track it all in 110

2    days.

3              THE COURT:  OK.  I hear you.

4              MS. MARKOE:  Your Honor, if I may.  The company that

5    is referred to in that note is Coin Exchange, which we have

6    already determined is a relevant company and they are going to

7    be getting materials related to it, especially since their

8    clients received shares in that entity.

9              THE COURT:  Here is what I am going to do as to Design

10   by Human, Ltd.  I'm always just skeptical of a request that

11   says all documents relating to, and that could be anything.

12             I think I am going to order production of the

13   documents and communications relating to the creation and

14   dissolution, if there has been one, of Design by Human, Ltd.,

15   the ownership of that entity and its acquisition or disposition

16   of any Bitcoin.  It seems to me those are the relevant factors

17   that the plaintiff is really looking for here.  Who owned it,

18   who created it, who dissolved it, did Bitcoin go into it and

19   did Bitcoin come out of it.

20             So I think that's the starting point that I am going

21   to order it, and I will order it for the time period once again

22   from 2000 -- I'm sorry.

23             MR. FREEDMAN:  Nine.

24             THE COURT:  Because they were offering from March 12,

25   2008.  You want to take that or you want 2009?

1          MR. FREEDMAN:  If they're offering from 2008, maybe

2     they are aware it was formed earlier.

3          THE COURT:  March 12, 2008 through February 14, 2018.

4     And again, any documents or communications that relate to the

5     creation, ownership, dissolution of that entity or its

6     acquisition, holding or disposition of Bitcoin.  I think that

7     gets the plaintiffs what they're looking for.

8          That would include a listing of any Bitcoin that it

9     held and any records of acquisition or disposition if they

10    exist.

11         MR. FREEDMAN:  Your Honor, just to clarify, a record

12    of any Bitcoin transactions entered into by --

13         THE COURT:  Any Bitcoin that flowed through that

14    entity.

15         MR. FREEDMAN:  Right.

16         THE COURT:  Where did it come from, where did it go.

17    Where did it come from --

18         MR. FREEDMAN:  An accounting of the Bitcoin activity

19    owned by.  Is that fair?

20         THE COURT:  I'm sorry.

21         MR. FREEDMAN:  An accounting of the Bitcoin activity

22    owned by Design by Human.

23         THE COURT:  Yes.  That's what I ordered.  The

24    acquisition, holding or disposition, including the transaction

25    records.  If there are any.  I don't know.

1          As I sit here, I've taken your word for it that

2     Bitcoin went into it.  Maybe it did, maybe it didn't.  I don't

3     know.  But I'm ordering it produced if it did.

4          No. 15, communications between Uyen Nguyen.  Help me

5     out, folks, who is Uyen Nguyen?

6          MR. FREEDMAN:  I believe, your Honor, it is pronounced

7     Uyen Nguyen, but I can't swear to it.

8          Ms. Nguyen is one of the main witnesses in the case.

9     We have tried to track her down and have been unable to do so.

10          Shortly after Craig reached out to Ira, Ms. Nguyen

11     told Ira via e-mail that she knew Dave through her involvement

12     with a project she works on with Craig.

13          Ms. Nguyen in the complaint is identified as a

14     powerful figure in the trust.  She is a signatory to the Design

15     by Human deed of loan that we were just discussing.  That is

16     her name on the bottom, Uyen T. Nguyen.

17          THE COURT:  Right.  I see that.

18          MR. FREEDMAN:  She is a director of key companies that

19     are related to Dave, Craig, and Bitcoin, W&K.  She reached into

20     Florida through W&K.  She reestablished it behind Ira's back.

21     She is a shareholder in a company called Hot Wire that received

22     intellectual property that is alleged to have been stolen from

23     W&K, went into Hot Wire.  She works with Dr. Wright on at least

24     three other companies -- Panoptic, CO1N, Ltd and Cloudcroft.

25          She assisted Craig in his theft of W&K's assets by

```
1    reviving W&K, and there's a story attached to the complaint

2    which was an investigative piece done by a gentleman called

3    Andrew O'Hagan, when he wrote that it's unclear how such a

4    young inexperienced person came to have so much influence.

5            She is one of probably the star witnesses of this case

6    if we can find her.

7            THE COURT:  OK.  But this is not requesting her.  It

8    is communications.

9            Let me hear from the defense.

10           MS. MCGOVERN:  Interestingly, your Honor, she is not a

11   defendant in the case.

12           THE COURT:  I understand.

13           MS. MCGOVERN:  We do think that she is a member of W&K

14   which creates problems for subject matter jurisdiction if that

15   in fact turns out to be the case because she is not a U.S.

16   citizen.

17           In any event, your Honor, what we have, the statements

18   that have just been made, which appear to be internet based --

19   it's always dangerous to rely the internet, including looking

20   up if you don't feel well.  You might actually have a whole

21   bunch of diseases.  So I'm not going to comment about all of

22   those internet-based allegations which somehow made themselves

23   into the second amended complaint.

24           Discovery will ultimately challenge those and we will

25   see whether in fact there is evidence of theft.
```

```
 1           But in any event, what we have agreed to produce, your
 2   Honor -- again, we are not shutting these requests down.  We
 3   are not.  We are simply saying that because you have an
 4   untethered allegation of theft that you don't want to tailor to
 5   the documents that somehow suggest there might be Bitcoin there
 6   doesn't mean that you get everything under the sun.
 7           We've said we will search for communications with
 8   Nguyen relevant to David Kleiman.  Anything related to David
 9   Kleiman.  David Kleiman, he's the plaintiff.  Ira is standing
10   in the shoes of.  The company, that is also a plaintiff, that
11   are in the possession during this relevant time period.  We've
12   gone back to 2008 through February 14, 2018 when they filed the
13   complaint.  That's a very broad request in and of itself.
14           If there's nothing there, if there is not a single
15   e-mail -- and I hate to interject a war story, but I was
16   involved in the Madoff litigation.  Millions and millions and
17   millions of documents.  The point that I'm trying to make here
18   is, like you say, your Honor, you have to start somewhere.
19           But if the obligation is so broad, because that is
20   what is happening here.  It is the obligation to in good faith
21   comply.  You have to really uncover every single rock.  And why
22   the plaintiffs don't want to simply begin with what might
23   actually uncover relevant material, because that is the way it
24   worked there.  If you have an e-mail --
25           THE COURT:  I understand.  You've argued this point
```

1    before and I've heard you and I'm considering that argument and

2    I think I've been trying my best to balance the argument.

3           This is a different case from the Madoff case.  This

4    is overseas evidence.  There is a lot of other things here

5    that -- the Madoff case everybody knew where the starting point

6    was.  Everybody knew where the account to go to to start from.

7           MS. MCGOVERN:  Our clients were in Amsterdam, your

8    Honor.  So we actually were dealing with all of outside

9    discovery.

10          THE COURT:  I understand.  Everybody knew where the

11   starting account, the account that was churned was.  But your

12   point is taken.

13          MR. FREEDMAN:  Your Honor --

14          THE COURT:  Hold on.

15          Your point is taken.  However, look, they have their

16   theory of the case.  They have their plausible claims in the

17   complaint.  They have other claims in the complaint that --

18   they're in the complaint.  Whether they are factually

19   supportable or not, I don't know.  I didn't have to rule on

20   that motion.  Judge Bloom did.  So I'm just here to adjudicate

21   what is in the complaint.

22          Like I said, I'm going to go back and reread the

23   complaint now that I've heard from both sides and I have a much

24   better informed view of the parties' theories and what is out

25   there.  So all I can do today, again, keep getting us starting

```
 1    and try to get this moving because you are on a time clock from

 2    Judge Bloom.

 3          Here again, I think I'm going to adhere to the same

 4    procedure I have been taking with the prior ones.  I will order

 5    what is on page 36 of docket entry 91-1.  That is

 6    communications between Dr. Wright and/or Mr. Nguyen relevant to

 7    or related to -- look, folks, the truth of the matter is it is

 8    going to be based on search terms anyway, that mention

 9    Mr. Kleiman, W&K Info Defense and whatever other search terms

10    you all agree to that are supposed to ferret out communications

11    that relate to Mr. Kleiman and W&K for the time period that is

12    specified here without prejudice, again, to once that

13    production starts or if other evidence shows up that suggests

14    that there's other communications between, is it Ms. or

15    Ms. Nguyen?

16          MS. MCGOVERN:  Ms.

17          THE COURT:  Ms. Nguyen.  If there's other

18    communications relating to Ms. Nguyen that are relevant and

19    proportional, I'm happy to order those.  But right now that is

20    as good a starting point as I can find.

21          MR. FREEDMAN:  Your Honor, can I just ask, instead of

22    from 2008, Satoshi Nakamoto has publicly stated that he began

23    working on the Bitcoin protocol in 2007.

24          THE COURT:  OK.

25          MR. FREEDMAN:  Can we back it up to 2007?
```

```
 1              THE COURT:  Any objection?
 2              MS. MCGOVERN:  Only that that would make Nguyen I
 3     think about 18 years old.  But again, there are either
 4     responsive documents going back that far or there are not.
 5              THE COURT:  It's one additional year.  2007.
 6              MR. FREEDMAN:  Your Honor, this is one custodian.  It
 7     is a simple search from Craig to Uyen Nguyen, from Uyen Nguyen
 8     to Craig.  I mean, this is not a big deal.
 9              THE COURT:  I agree.  The marginal burden is de
10     minimis to me and I'm happy to order back to 2007 as to No. 15.
11              Finally, No. 16.  All communications between you and
12     Ross.  Who is Ross Ulbricht?
13              MR. FREEDMAN:  Your Honor, Ross Ulbricht is the
14     founder of the marketplace called Silk Road.
15              THE COURT:  Oh, yes.
16              MR. FREEDMAN:  Which is the marketplace that
17     regionally put Bitcoin on the map in terms of value.
18              THE COURT:  Mr. Ulbricht is in jail as I recall.
19              MR. FREEDMAN:  He is in jail, your Honor.
20              If you look at, I think it is seven -- if you look at
21     Tab 9, you will see that the Bitcoin, the largest Bitcoin
22     wallet in the Design by Human appendix, which is 1933.  It
23     starts off 1933 and holds 111,000 Bitcoin, which is over $1.2
24     billion in Bitcoin, was linked to Ross Ulbricht in this news
25     story.  Dread Pirate Roberts was Ross Ulbricht's user name.
```

```
 1              THE COURT:  Excellent Princess Bride reference.

 2              MR. FREEDMAN:  Craig himself admitted to meeting with

 3    Ross Ulbricht in the early days of Bitcoin, and that is Exhibit

 4    1 to the second amended complaint.  It is Tab 8 in your binder.

 5    He admitted to there being a large transaction between him and

 6    Ross Ulbricht.  So plaintiffs offered to limit their

 7    interrogatory to communications between Ross Ulbricht and Craig

 8    Wright that relate to Bitcoin.

 9              THE COURT:  OK.

10              Defense.

11              MS. MARKOE:  Your Honor, it is our position that this

12    is an attempt to inject scandalous material into this case that

13    really has nothing to do with anything.

14              We have already said that if there is a communication

15    essentially regarding Dave Kleiman -- as your Honor well

16    pointed out, there will be search terms in this case and we

17    will be reviewing documents based on those search terms which

18    to be sure will have Dave Kleiman's name in there.  But this

19    has nothing to do with this.  This has nothing to do with the

20    question, which is really the main issue at hand, of whether

21    Dave Kleiman and Craig Wright had a partnership together,

22    whether they mined Bitcoin together, and whether Dr. Wright

23    stole anything from Dave Kleiman.

24              So this request has nothing to do with that.  We think

25    it is harassing and scandalous and irrelevant and
```

```
 1    inappropriate.

 2               THE COURT:  OK.  Mr. Freedman, last word.

 3               MR. FREEDMAN:  Just that I'm not sure how it is

 4    scandalous.  There is a link between the largest Bitcoin wallet

 5    that is said to be held in trust for Dave K. and CSW is now

 6    under the control of Ross Ulbricht.  I don't understand how

 7    that's irrelevant.

 8               THE COURT:  I'm sorry.  Where is the allegation that

 9    it is held in trust for Dave K.?

10               MR. FREEDMAN:  In the binder I gave you.  It's Tab 6.

11               THE COURT:  Hold on one second.

12               MR. FREEDMAN:  It's Exhibit 15 to the second amended

13    complaint.

14               THE COURT:  Right.  Tab 6.

15               MR. FREEDMAN:  This is the -- page 9 of that tab is a

16    list of all Bitcoin wallets that are held in trust -- a list of

17    all Bitcoin wallets and appendix.

18               If you look on the right, this is the annotation we

19    read earlier about it being held in trust.  And the second

20    wallet down from the top, that holds 111 thousand 114 over 1.2

21    billion dollars worth of Bitcoin is the 1933 PHFH wallet which

22    on page 9.

23               THE COURT:  Tab 9.

24               MR. FREEDMAN:  Tab 9.  Sorry.  Tab 9 is publicly

25    acknowledged to have been under the control of Ross Ulbricht.
```

1   So here's the wallet being held by Ross Ulbricht.  Now it's

2   being held in trust for Dave Kleiman.

3        THE COURT:  Let me just understand your theory of

4   relevance here.  Your theory of this evidence is relevant -- is

5   this just a tracing -- not just.  This is a tracing issue?

6   You're trying to follow this money as it flows from one entity

7   to another?

8        MR. FREEDMAN:  Right, or that he gave some of them to

9   Ross Ulbricht to hold or that there was an agreement between

10  him and Ross Ulbricht on how to dispose of some of these

11  Bitcoin.

12       THE COURT:  What if they just designated that very

13  long address as a search term and searched for that across all

14  their platforms, wouldn't that get you the tracing that you're

15  looking for?

16       MR. FREEDMAN:  Right.  It's possible that the e-mail

17  communications wouldn't reference this specific wallet, just

18  you'll transfer me 111,000 Bitcoin until the transfer was

19  completed.

20       I mean the problem is, your Honor, as you pointed out,

21  we are operating in a vacuum.  But this is relevant to our

22  claim.  There's a wallet that was alleged to be held in trust

23  for Dave which is now under the control of Ross Ulbricht and

24  it's relevant to the claim that it was converted.

25       THE COURT:  But let's start with this.  I'm going to

1    give you some but not a lot here because, first of all, your

2    request is for all communications.  It seems to me it has to be

3    communications about Bitcoin.  Let's start with that.  It has

4    to be limited to communications about Bitcoin.  Maybe he's

5    talking to -- I don't know what he's talking to Mr. Ulbricht

6    about, but at least as a starting point, if you do a search

7    term of Ulbricht and Bitcoin or Ulbricht and transfer, things

8    along those lines, I think that's sufficient to try to identify

9    what you're looking for.

10        So I will order them to produce, based upon agreed

11   search terms, communications between Dr. Wright and

12   Mr. Ulbricht that relate to the acquisition or transfer of

13   Bitcoin from Dr. Wright to either Mr. Ulbricht or to Silk Road.

14        MS. MARKOE:  Your Honor, may I make one point on that?

15   That still won't get you stuff related to Dave Kleiman or W&K.

16        What I would propose, and this is something that we

17   would be willing to do, is to search for the -- to do searches

18   for the wallet and have that as a search term and anything

19   regarding that wallet will get produced.

20        THE COURT:  Well, but I think the other side --

21        MS. MARKOE:  It doesn't need to be that whole number.

22   We would do it, a truncated version.

23        THE COURT:  I hear you.  Here's what I am going to do.

24   Here is the way I think is a fair way to balance this.

25        I take Mr. Freedman's point.  I think he's right.

1    Just because they didn't -- they didn't necessarily put the

2    whole number into --

3              MS. MARKOE:  Agreed.

4              THE COURT:  -- each thing.  To try to parse that out,

5    you can only imagine how many combinations there can be of

6    subsets of that.  But I think it is fair to require Dr. Wright

7    to conduct searches using search terms that try to identify

8    this wallet or any other Bitcoin transfers between Mr. Wright

9    and Mr. Ulbricht during the relevant time period.

10             Now, I'm saying you have to conduct the search.  I'm

11   not saying at this point you have to produce it.  What I am

12   going to do is have you cull it.  I will allow you when we get

13   back together again to assert objections at that point based

14   upon either undue burden or excessive scope.  Once again, once

15   you know what we're talking about.  Because it may be that you

16   conduct the searches and you get nothing.  You may conduct the

17   searches and you come back to me and say, look, judge, there is

18   a ton of information there but it all relates to Bitcoin

19   transfers from somebody else and it is very clear this somebody

20   else has nothing to do with Dave Kleiman.

21             So I think it's fair to have the defendants collect

22   that information, but we will reserve ruling at this time as to

23   how much of that would be produced.  So once again, I can look

24   at actual documents rather than speculating as to what's out

25   there.  So that will be my order as to whatever that number

1    was, 16.

2         That's all the requests for production.

3         Interrogatories.  It seems interrogatories 1 through 4

4    are just iterations of more or less the same thing.

5         Help me out.  Mr. Freedman, if you can just parse

6    these out for me.

7         MR. FREEDMAN:  I think that what we were trying to do

8    here is what the court was suggesting earlier using

9    interrogatories to try to narrow the scope of what needs to be

10   done.  So here we said give us -- and they are in two buckets,

11   so to speak.  The first says give us all Bitcoin wallets that

12   at one time had a balance to them but no longer do, meaning

13   that at one point they had money in them and now they no longer

14   do.  And that is subdivided into two.  One says that you

15   yourself held the password to, meaning you had the key to get

16   the Bitcoin out of.  The other is that a trust held the key for

17   your benefit.

18        The second one says, give us all Bitcoin wallets that

19   you currently possess control over that actually have a balance

20   in them.  The reason we asked for this is because the nature of

21   Bitcoin is such that with proper and full disclosure of the

22   relevant Bitcoin holdings, we can trace them all -- we've

23   talked to experts -- we can trace them back and we will be able

24   to find out where the Bitcoins came from, how they got to where

25   they got, and prove our claims of theft and inappropriate

1    transfers.

2            THE COURT:  OK.  Does that also mean that you can

3    trace them forward?  If you had the Bitcoin keys from back in

4    2010, '11, '12, can you trace it forward to where it is today?

5            MR. FREEDMAN:  One second.  The answer to your

6    question, your Honor, I believe is yes.  They can be -- once we

7    have an address, the comings and goings of the address can be

8    tracked.

9            THE COURT:  OK.  I vote for B, not A.  I will let you

10   trace forward, not backward.

11           I am not going to order Dr. Wright to turn over all of

12   his current Bitcoin holdings and let you trace every single one

13   of them backward.  I don't think that's proportional or

14   necessary or -- I think that's unduly burdensome and overbroad.

15           What I have tried to do by my other rulings today is

16   to try to get you the front-end of these transactions, and you

17   can trace them forward.  But I'm not going to order

18   Dr. Wright -- if that's what you are asking for in

19   interrogatories 1 through 4 is Bitcoin that Dr. Wright

20   currently has, then I'm going to sustain the objection to that.

21   If you're asking for Bitcoin that he's ever had in his life, I

22   think that's overbroad as well.

23           So I appreciate the effort to try to -- now again, if

24   you want to try to narrow this down, for example, give us a

25   list of all the cryptocurrency you had on a fixed date in 2000

1    and whenever, maybe that is a better way to start, find a

2    starting date.  Again, what I would do is say to Dr. Wright,

3    well, because Dr. Wright is going to come back to me and say,

4    but that doesn't mean that any of that had anything to do with

5    Mr. Kleiman.  Again, the easiest way for me to resolve --

6             MS. MCGOVERN:  If he could even do that.  I don't

7    know.

8             THE COURT:  Well, if he could I don't know.  But I

9    don't know.  Presumably there is a realtime record of what

10   Bitcoin you have and when you have it.  I don't know the answer

11   to that.  But it seems to me that the proper way to trace is to

12   trace forward, not backward.  So to the extent that's what you

13   are asking for in these interrogatories, I'll deny that

14   request.

15            MR. FREEDMAN:  Just so I understand, I'm not quite

16   clear what the court -- I understand the court denied these

17   requests.  What I don't understand is what the forward-tracing

18   portion, could you explain to me --

19            THE COURT:  I've spent the afternoon ordering them to

20   produce all kinds of material to you with the idea that it is

21   going to disclose when Mr. -- if the evidence exists, it is

22   going to disclose the interactions between Mr. Kleiman and

23   Dr. Wright and presumably when they had Bitcoin and who they

24   sent Bitcoin to and where they deposited their Bitcoin and all

25   that other stuff, and presumably when you have that you can

1    figure out a way to trace it forward.

2           But I don't think it is appropriate to say the way to

3    properly trace a theft that hasn't been proven to be a theft is

4    to start with what everything the person has today and let's go

5    back and see if he or she can establish a legitimate source of

6    money.

7           MR. FREEDMAN:  Understood.

8           THE COURT:  OK.  No. 5 then, interrogatory No. 5.

9    Identify any persons -- so this is anybody who's had control

10   over the Satoshi Nakamoto accounts.

11          Defense, why shouldn't I order that?  It would seem to

12   me if Mr. Kleiman admittedly was involved in the Nakamoto

13   persona, why isn't people who were also involved in that

14   persona relevant and certainly probative?

15          MS. MCGOVERN:  Well, interestingly, your Honor,

16   plaintiffs' counsel has admitted that the identity of Satoshi

17   Nakamoto has absolutely nothing to do with the claims in their

18   case, and we haven't -- we took the position that whether

19   Satoshi Nakamoto was Dr. Craig Wright or not has nothing to do

20   with whether or not Dr. Craig Wright partnered with Dave

21   Kleiman or whether they mined together or whether in fact they,

22   Dr. Wright misappropriated Dave Kleiman's Bitcoin.

23          Again, as you said, all of the documents that we've

24   agreed to produce are for the purposes of essentially proving a

25   negative in this case.  It doesn't matter, Mr. Freedman said,

1    whether either of them were involved in the Satoshi team or are

2    Satoshi themselves.  So we take that position in this case as

3    well.

4            The problem when you're going back to determine

5    whoever controlled the e-mails is not necessarily something

6    within Dr. Wright's control.  So they're asking in an

7    interrogatory, sworn interrogatory to ask Dr. Wright to say

8    name every single person that ever had control over these

9    e-mails.  What does that have to do with any of the claims in

10   their case?

11           The problem that we have with this as well, your

12   Honor, is that it is an interrogatory.  It is extremely

13   difficult to answer.  I have a gmail account and last time I

14   checked, I think my son was buying his lacrosse equipment with

15   it.  So I didn't know that.  I got a phone call from the bank

16   saying did you just buy a whole bunch of lacrosse equipment

17   from California.

18           It's a request that at first blush, if we are sitting

19   here in this very respected courtroom and we're saying why

20   can't we just give this information, it would be so much easier

21   than sitting here and driving and complaining and fighting with

22   plaintiffs' counsel about it.  But when you then go to actually

23   answer the question, it's overbroad and there's no effort to

24   tailor it to the claims in the case.

25           I've stated our position.

1          The last thing I was going to say is Silk Road, Ross

2     Ulbricht, who is in jail, Satoshi Nakamoto and the identity of

3     Bitcoin, those are all very salacious topics.  The ATO in the

4     complaint is a very salacious topic.  But obviously Mr. Ira

5     Kleiman knew about that proceeding and didn't do anything about

6     it when apparently his rights were somehow being compromised as

7     a representative of the estate.

8          We have objected to this e-mail, because it is just

9     not relevant, and these are e-mail addresses, which if in fact

10    Dr. Wright is going to respond by saying only I did, what if

11    he's wrong.  In fact, his e-mail was hacked.  That's part of

12    the problem in the case, is that his e-mail was in fact hacked.

13         We are not dealing with Amanda McGovern's use of

14    gmail, which is extremely rudimentary and I don't think anybody

15    is hacking my e-mail.  But when you are dealing with Bitcoin

16    and the secrecy and the encryption that is involved in Bitcoin,

17    Dave Kleiman was a master encryptor.  If anybody had the public

18    keys and the private keys to Dave Kleiman's Bitcoin, it's Dave

19    Kleiman, and that's a big problem, as we have seen with some

20    other individuals who have passed away and that left the keys.

21         THE COURT:  You're making a wonderful argument.  You

22    can save it for the jury.  The issue here is simply relevance

23    and proportionality.

24         I'll hear from the plaintiff.

25         MR. FREEDMAN:  Your Honor, we're not asking to be

1    improvident.  The best of his knowledge whoever had access to

2    the accounts.  This is the account that formed the basis of the

3    very beginning of the partnership between Dave and Craig.

4    These people are relevant witnesses.  We need to be able to

5    speak to them.

6              MS. MCGOVERN:  May I respond, your Honor?

7              THE COURT:  Yes.

8              MS. MCGOVERN:  The answer is, I think, identify

9    everybody who was involved in the initial Bitcoin protocol,

10   which they've asked.

11             THE COURT:  OK.  And have you answered?

12             MS. MCGOVERN:  We are going to be answering by Monday,

13   February 25th.  Those are questions that are simply

14   identification of witnesses, relevant witnesses, but that is

15   not what this interrogatory asks for.  It asks for any and all

16   persons who have or whoever had control over these e-mail

17   accounts.

18             THE COURT:  OK.  Let me turn back to the plaintiff for

19   a second.  I haven't seen the other requests.  Is it an

20   interrogatory that you will be answering?

21             MS. MCGOVERN:  Yes, your Honor.

22             THE COURT:  I haven't seen that so I can't speak to

23   it.

24             Assuming that they answer that interrogatory, which is

25   they identify for you everyone who was involved in the

1   development of the original Bitcoin protocol and presumably

2   therefore has knowledge of the origins, the genesis of the

3   relationship between Mr. Wright and Mr. Kleiman, does that

4   render interrogatory No. 5 cumulative or is there something

5   additional that you are looking to get out of interrogatory No.

6   5?  Because I thought what we just said a second ago, and

7   that's fine, interrogatory 5 was directed to try to identify

8   witnesses who could testify about the origins of the

9   relationship.

10         MR. FREEDMAN:  That's right, your Honor.  Yes, because

11   even after the development of Bitcoin ended and Bitcoin, the

12   protocol was released in January of 2009, Satoshi Nakamoto

13   through these e-mail accounts continued to issue e-mails and

14   communications, meaning the original team, the Satoshi Nakamoto

15   team, continued to collaborate.  We don't know if that was on

16   the development of Bitcoin or that was on something else.

17         I don't understand what the burden is here.  I mean,

18   why is this a problem to turn over the information of relevant

19   witnesses?

20         THE COURT:  As I hear the argument, they are quibbling

21   or they are objecting to the control issue because they don't

22   want their client to swear to something under oath -- hold on.

23   I got it.

24         MR. FREEDMAN:  To the best of his knowledge.

25         THE COURT:  Well, but interrogatories are answered

1    under oath.  I get all that.

2         Ms. McGovern, if that is your objection, then it seems

3    to me what the plaintiff is trying to get to, and maybe they're

4    not asking the question in a way that is palatable to the

5    defense, but it seems to me what they're asking is there's an

6    origins story that relates to Mr. Wright, Dr. Wright and

7    Mr. Kleiman.  It was a long time ago and Mr. Kleiman's dead.

8    So who are the other people who might have information that

9    could discuss the origin story, how they got together, what

10   work they were doing together, what the nature was of the

11   mutual collaboration that I think everyone agrees there was a

12   mutual collaboration.

13        I think that is what the plaintiff is trying to get

14   to, identify witnesses they can go and talk to so they can fill

15   in that origins story.

16        Put aside whether they've asked the question the right

17   way and the fineties of how the interrogatory's asked.  Do you

18   have a general objection to them having that information as to

19   that universe of potential witnesses?

20        MS. MCGOVERN:  Your Honor, I think that the

21   identification of relevant witnesses is the first question you

22   always ask, but this interrogatory goes to anybody who ever

23   sent an e-mail.

24        THE COURT:  I'm putting aside this interrogatory as

25   written.  I'm asking you --

1          MS. MCGOVERN:  I do not.

2          THE COURT:  So it seems to me that all we have a

3     dispute about now is simply the phraseology of the question.  I

4     see heads nodding up and down.  It seems to me what you have

5     just agreed that you don't have an objection to giving them is

6     what they are trying to get to in these interrogatories.  So if

7     all we're having here is a failure to communicate about the

8     specific phraseology of the interrogatory, you all can work

9     that out.

10          I will order the defendant, because they're saying

11    they don't have an objection, to identify anyone who is known

12    to Dr. Wright, was involved with Dr. Wright and Mr. Kleiman

13    during their collaboration.

14          MR. FREEDMAN:  This is a little broader.  Your Honor,

15    what if we phrase it as all people who the defendant has

16    knowledge had access to these -- the defendant knows had access

17    to these e-mail accounts.

18          THE COURT:  Here is what I am going to do.  It is your

19    interrogatory.  You are entitled to have it answered and usable

20    as a trial document.  I think it's clear on the record what

21    they have agreed they don't object to.  I think it is clear on

22    the record what you are asking for.  I think you can work out

23    the exact phraseology of how to write it in a way that they can

24    truthfully answer and be comfortable that they can truthfully

25    answer and that you can get, plaintiff can get what they need.

1           So that is how I would like to resolve 5 and 6.

2           I think there is an agreement -- I'm sorry.  5.  I

3     think 6 probably gets swept into it too, does it not,

4     Mr. Freedman?  I don't want to jump ahead on you, but 6 again

5     is people who were involved in writing the papers.  So

6     presumably they would be part of the same universe of

7     individuals.

8           MR. FREEDMAN:  Your Honor, right, except I don't -- I

9     understand the issue with No. 5, that they are concerned that

10    there may be people who have unauthorized access to e-mail

11    accounts.  So we will rewrite it to carve that out.  But what

12    is the objection to answering 6?

13          THE COURT:  Well, I guess the question would be --

14    Ms. McGovern, I will let you respond.  I'm sorry.

15          MS. MCGOVERN:  I'm sorry.  Sometimes I have a problem,

16    your Honor, when Mr. Freedman rephrases what I believe you have

17    just said with respect to what you have ordered.  So we don't

18    have any objection in response to No. 5 to identify anyone who

19    Dr. Wright was involved with with Dave Kleiman during their

20    collaboration.  That is what we don't object to with No. 5.

21          THE COURT:  OK.

22          MS. MCGOVERN:  To the extent that No. 6 is also

23    seeking identity of witnesses with respect to -- who Dr. Wright

24    believes would have knowledge with respect to the subject

25    matter in No. 6, we also have agreed to produce the identity of

1    those individuals.

2            THE COURT:  OK.  Here is what I am going to do then.

3    In light of that I will sustain the objections to 5 and 6 as

4    drafted without prejudice to the plaintiff propounding a

5    revised interrogatory, which I will not count -- I want to make

6    this clear on the record, Mr. Freedman -- I'm not counting a

7    new interrogatory against your limited number of

8    interrogatories.  So I am going to sustain the objection to 5

9    and 6, but I am going to grant you an additional interrogatory

10   that you can use to substitute to request the information that

11   Ms. McGovern has just represented they don't object to.

12           You phrase the interrogatory the way you want to

13   phrase it.  Hopefully they don't object to it and you guys can

14   work out the exact phraseology and that way you will get the

15   information you want and you will get it in a format that is

16   sworn to by the defendant and usable against the defendant.

17   OK.

18           That's my ruling as to 5 and 6.

19           MS. MCGOVERN:  Thank you, your Honor.

20           I think that's it.

21           THE COURT:  That's everything.  We were just getting

22   warmed up.

23           What time on March 6th works well for everybody?  2:30

24   works well for us.  2:30 through the rest of the afternoon.  We

25   are not going to take that long.  Come on.

1          Does that work for you, plaintiffs' counsel?

2          MR. FREEDMAN:  Actually --

3          THE COURT:  If not, we can pick another day.  It's OK.

4          MR. FREEDMAN:  No, no.  Unfortunately, I have a

5    feeling you're going to need to resolve a lot of issues on the

6    6th.

7          THE COURT:  OK.

8          MR. FREEDMAN:  Maybe I'm wrong.  I have an appointment

9    but I'll move it.

10          THE COURT:  I can give you -- I've got time on the 5th

11    is pretty wide open.  I've got time on Friday -- Thursday, the

12    7th.  Yes, Thursday, the 7th is pretty open.  I'm on criminal

13    duty so my mornings that week are tied up.  Pretty much any

14    afternoon that week other than Wednesday.  I have a lengthy

15    oral argument in another matter on Wednesday.  Oh, that is a

16    status conference so it is open.  So pretty much any afternoon

17    that week.

18          Mr. Freedman, I don't want you to change your

19    appointment if you don't have to.

20          MR. FREEDMAN:  I appreciate it.  Monday afternoon, the

21    4th.  You can't do the 4th.  The 5th.

22          MS. MCGOVERN:  Monday, the 4th is fine.

23          MR. FREEDMAN:  It doesn't work for Mr. Roche.

24          THE COURT:  Mr. Roche, you don't need to fly back

25    down.  You're welcome to come if you want to.  But you can

1    appear by phone if you want to.  You can come if you want to.

2    I'm not excluding you for sure.

3          MR. FREEDMAN:  The 4th works then.

4          THE COURT:  I will be here.  You all are welcome to be

5    here as well.  If you think being here in person would be

6    more -- if it is going to be a lot of topics like it was today,

7    it is probably helpful to have somebody here on each side.

8          MS. MCGOVERN:  We will appear in person, your Honor.

9          THE COURT:  I don't need to have everybody from each

10   side, and certainly everyone is free to appear by phone if they

11   want to.

12         Plaintiffs' side, if you want to pick a day when

13   Mr. Roche can be physically present, I will certainly give you

14   that as well.

15         Hold on.  I have something much more important to

16   worry about.  My clerk is out of the office on the 4th.  I need

17   her here.  She is out the 4th and 5th.  That's why we were

18   offering you the 6th.  So the 6th is two weeks from today.  We

19   can do the 7th, which is that Thursday, or Friday, the 8th.

20         MR. FREEDMAN:  The 5th works for us.

21         THE COURT:  The 5th doesn't work for me because my

22   clerk's out that day.

23         MR. FREEDMAN:  Then we will do the 4th.

24         THE COURT:  The 4th doesn't work either.  I'm taking

25   back the 4th and 5th.  I apologize.

| | |
|---|---|
| 1 | MR. FREEDMAN:  Then I will reschedule my appointment |
| 2 | on the 6th. |
| 3 | THE COURT:  On the 6th.  OK. |
| 4 | So does the 6th work for the defense? |
| 5 | MS. MCGOVERN:  Yes, your Honor. |
| 6 | MS. MARKOE:  Yes. |
| 7 | THE COURT:  Does it make sense -- I think it does -- |
| 8 | does it make sense for the parties to submit something, a joint |
| 9 | status maybe by close of business on the 4th, that Monday, so |
| 10 | that I kind of have an agenda for what we are going to have to |
| 11 | deal with on Wednesday? |
| 12 | MS. MCGOVERN:  I think that's a great idea. |
| 13 | THE COURT:  Mr. Freedman, any objection? |
| 14 | MR. FREEDMAN:  No. |
| 15 | THE COURT:  I like those because it forces you all to |
| 16 | talk to each other and it gives me a nice agenda that I can |
| 17 | work off of when we all get together on the 6th. |
| 18 | Look, I appreciate everyone's time today.  As I said, |
| 19 | I'm going to go back and look at the complaint again and look |
| 20 | at Judge Bloom's ruling again.  I recognize this is a |
| 21 | complicated case.  I recognize this is a case that you're on a |
| 22 | tight schedule from Judge Bloom, and you have my word that I |
| 23 | will make myself available as often as you need me.  No one |
| 24 | ever has to apologize for asking for my time.  Now that we have |
| 25 | a budget, I actually get paid to be here.  So happy to be here. |

1          My feeling is we should probably just plan to schedule

2    status conferences every two weeks.  That way we will just keep

3    everything going.  It also makes you, I think it makes the

4    parties in a case like this life easier because you know you

5    are going to see me and so if issues come up, you don't have to

6    worry about finding me and getting a scheduled time.  We will

7    just mark it out and if it turns out you don't need me that

8    week, we will cancel the hearing.

9          MS. MCGOVERN:  Perfect.

10         THE COURT:  I have handled a number of cases like this

11   and I really do think that is going to be the best way.

12         I know it is after 6 p.m., but if you will spare me

13   five minutes, I will do my real quick case management

14   conference spiel for you and then I promise I will let

15   everybody go.  You will miss the Miami traffic because it will

16   be gone by then.

17         So a couple of things.  We talked about

18   confidentiality orders.  We actually covered most of the things

19   that I cover.

20         There are two things I do like to cover.  One is to

21   just review with you my discovery protocol.  I know it's in the

22   order, but I always like to review it with people because it is

23   a little different than some of the other judges do.

24         I don't allow the filing of motions to compel in the

25   first instance and I don't allow the filing of what I call

1    substantive motions for protective order.  You will agree

2    confidentiality orders, things like that, are fine.  But

3    basically I don't allow orders that you need to tell them to

4    give me or you need to tell me I don't have to give them.  I

5    don't allow those in the first instance.

6          What I have you do instead is you meet and confer and

7    then you just e-mail me and tell me we need a discovery hearing

8    and here's how much time we need.  We need 30 minutes, 45

9    minutes, an hour, whatever we need.  Here's three times in the

10   next two weeks when we are available.  So I accommodate your

11   schedule because I hate chasing lawyers.  I set a hearing,

12   somebody has a conflict, then somebody else has a conflict.  So

13   you give me the date and time.  I have never yet been unable to

14   accommodate the lawyers.

15         So you give me a date and time when you all are

16   available.  I will set an order setting a hearing and I will

17   order that 48 hours before the hearing the parties submit a

18   joint discovery report of less than five pages, and you just

19   attach to it all the pleadings, the objections, whatever.  I

20   don't need the law.  I know what the law is.  But just tee up

21   the issues.  We object to interrogatories 1, 3, 5 and 7 because

22   we think they're overbroad, unduly burdensome for the following

23   reasons.  We object to this because of that.  We disagree

24   because of this or that.  There is actually a form attached to

25   my order of how I like it.

1          And so the goal is from the minute you have a dispute

2     to the minute it's resolved is less than ten days.  And we

3     don't have to have a Rule 37 hearing on sanctions.  I don't

4     have to assess attorneys' fees.  I don't write the long

5     discovery orders.  You don't have to wait for that.  I rule

6     from the bench, we move on.  So that's how I handle discovery.

7          In our case it may work a little differently because

8     we're going to have these periodic schedules.  So it may just

9     be you can put it on the agenda for status conference but in

10    the interim if it needs quick resolution, we can do that.

11         So that is that topic.

12         The last topic is of course every district judge's

13    favorite topic, which is consent to the magistrate judge, which

14    Judge Bloom asks me to talk about, which is, of course, if you

15    want you can agree to consent and have me handle this case as

16    opposed to Judge Bloom.  Judge Bloom is a fabulous trial judge.

17    The next to the last case I tried as a practicing lawyer was in

18    front of Judge Bloom.  So I've had the experience and she's

19    great.

20         The difference, however, is Judge Bloom has a hefty

21    criminal docket and I have none.  So the benefit you get, so

22    this is my feeling, if you consent to the magistrate judge, you

23    ought to get something for it.  What you get for it is I will

24    give you a date certain for trial, which in a case like this

25    may be very significant because you have out-of-state lawyers,

1    out-of-state witnesses, things like that, and I'll let you pick

2    your trial date.  So you wouldn't be on 110 days for discovery.

3    You can come back to me and say we've jointly agreed to extend

4    the scheduling order and have discovery close in August and

5    have the trial in February.  I generally, unless you tell me

6    you want the trial in 2027, I'm generally pretty accommodating

7    for how you rejigger the schedule.

8         What I usually also tell people is, when they're not

9    people from Miami, is I'll give you the benefit of trying the

10   case in West Palm Beach so you won't have to go to Miami.  Now

11   in this case because you're all from Miami, I might flip that

12   around and say to you I will try to find a courtroom in Miami

13   and if we have to try the case, I would try the case in Miami

14   for you.  Or if you prefer to be here, we can try it here.  So

15   that's my offer.

16        If you want to consider consenting, feel free.  There

17   is a protocol on -- there is a form you fill out on the clerk's

18   web page.  What you do is if everybody agrees to consent, you

19   tell me.  If one side agrees and the other side doesn't agree,

20   you don't tell me.  And if nobody agrees, you don't tell me.

21   You just trundle on.

22        You can consent at any time you want up until -- I

23   think Judge Bloom actually puts a deadline on it in her

24   scheduling order.  I take that back.  Judge Rosenberg will let

25   you consent up until the day of trial.  She is happy to get rid

```
 1    of you.  But I think Judge Bloom wants to know a little bit
 2    more in advance.  So I leave that all to you how you want to
 3    play with that option.
 4              I think that's everything I had.
 5              For the plaintiffs' side, anything else while we're
 6    altogether this afternoon that you think we need to discuss?
 7              MR. FREEDMAN:  No, your Honor.
 8              THE COURT:  All right.  Thank you very much.
 9              From the defense side?
10              MS. MCGOVERN:  No, your Honor.
11              MS. MARKOE:  No, your Honor.
12              THE COURT:  Thank you all very much.  I will see you
13    then on -- we're back on the 6th.  Did we pick a date?  The 6th
14    at 2:30.
15              Thank you very much.
16              (Adjourned)
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


February 22, 2019          s/ Joanne Mancari
                           Joanne Mancari, RPR, CRR, CSR
                           Court Reporter
                           jemancari@gmail.com