1
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2
                       CASE NO. 18-CV-80176-BB
3
   IRA KLEIMAN,
4  as the Personal Representative
   of the Estate of David Kleiman,
5  et al.,

6                                        West Palm Beach, Florida
                     Plaintiff(s),
7                                        March 26, 2019
            vs.
8
   CRAIG WRIGHT,
9
                     Defendant(s).       Pages 1 – 99
10 ------------------------------------------------------------

11                            HEARING
              TRANSCRIBED FROM DIGITAL AUDIO RECORDING
12             BEFORE THE HONORABLE BRUCE E. REINHART
                   UNITED STATES MAGISTRATE JUDGE
13
   APPEARANCES:
14
   FOR THE PLAINTIFF(S):  DEVIN FREEDMAN, ESQ.
15                        BOIES SCHILLER FLEXNER, LLP
                          100 SE 2nd Street
16                        Miami, FL 33131
                          (305) 357-8438
17                        vfreedman@bsfllp.com

18                        KYLE ROCHE, ESQ.
                          BOIES SCHILLER FLEXNER, LLP
19                        333 Main Street
                          Armonk, NY 10504
20                        (914) 749-8324
                          kroche@bsfllp.com
21                        (by phone)

22

23

24

25

```
 1    APPEARANCES (CONT'D)

 2    FOR THE DEFENDANT(S):    AMANDA M. MCGOVERN, ESQ.
                               RIVERO MESTRE, LLP
 3                             2525 Ponce de Leon Blvd.
                               Coral Gables, FL 33134
 4                             (305) 445-2500
                               amcgovern@riveromestre.com
 5
                               ZAHARAH R. MARKOE, ESQ.
 6                             ZALMAN KASS, ESQ. (by phone)
                               RIVERO MESTRE, LLP
 7                             2500 Ponce de Leon Boulevard
                               Miami, FL 33134
 8                             (305) 445-2500
                               zmarkoe@riveromestre.com
 9                             zkass@riveromestre.com

10    TRANSCRIBED BY:          Joanne Mancari, RPR, CRR, CSR
                               Court Reporter
11                             jemancari@gmail.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    Thereupon,

2    the following proceedings were held:

3           THE COURT:  Good afternoon, everyone.

4           Please be seated.

5           Sorry to be a few minutes late.  I was downloading

6    some of your pleadings and they take a long time.

7           All right.  This is case No. 18 80176, Ira Kleiman v.

8    Craig Wright.

9           Let me start with counsel's appearances, starting with

10   counsel for the plaintiff.

11          MR. FREEDMAN:  Good afternoon, your Honor.  Devin

12   Freedman for the plaintiff.

13          THE COURT:  Mr. Freedman, good afternoon.

14          MS. MCGOVERN:  Good afternoon --

15          THE COURT:  Sorry.  Is there somebody else from the

16   plaintiff?  Go ahead.

17          MR. ROCHE:  Yes.  Kyle Roche, Boies Schiller &

18   Flexner.

19          THE COURT:  From the defense side.

20          MS. MCGOVERN:  Good afternoon, your Honor.  Amanda

21   McGovern on behalf of Dr. Craig Wright.

22          THE COURT:  Good afternoon, Ms. McGovern.

23          MS. MARKOE:  Good afternoon, your Honor.  Zaharah

24   Markoe on behalf of Dr. Wright.

25          THE COURT:  Ms. Markoe, good afternoon.
```

```
 1              Before we start, Ms. McGovern -- anyone else from the

 2    defense?

 3              MR. KASS:  Yes.  Zalman Kass, from the Rivero Mestre.

 4              THE COURT:  Pleased to have you.  Thank you.

 5              Anybody else?

 6              Before we start, Ms. McGovern, I know you had a health

 7    issue last time.  I hope you're better.

 8              MS. MCGOVERN:  I appreciate that, your Honor, and I am

 9    better.

10              THE COURT:  Glad to hear it.  Our health is more

11    important than anything else we do here.  So I'm glad to hear

12    that.

13              So we are here today for a continuation of our

14    discovery process.  I did receive the updated or new joint

15    discovery memo at docket entry 127, and I have reviewed that,

16    and I did go back as well and review the prior joint discovery

17    memorandum at docket entry 114.

18              Separately, Judge Bloom just referred me the motion to

19    strike affirmative defenses.  I am not going to rule on that

20    today.  I'm not going to take argument on that today.  But I

21    may have one or two questions at the end that I may ask of you.

22    But no need to worry.  I didn't tell you to be prepared to

23    argue that so you don't need to be prepared to argue that.  I

24    haven't decided if I need to have argument, but I did receive

25    it and I will get on it as fast as I can.
```

1         All right.  So I have the joint discovery memo at

2    docket entry 127.  But before we start, if I could turn to the

3    defense for a second.  I just had some -- I think I know the

4    answers to these questions, but I want to make sure because I

5    think it will help guide me in assessing the issues I have to

6    assess today.

7         I have read the complaint, second amended complaint.

8    I have reviewed the answer and amended -- I'm sorry.  The

9    answer and affirmative defenses.  So I just want to make sure I

10   understand from Dr. Wright's perspective, I'm just trying to --

11   I'm trying to make sure I understand exactly what your defense

12   is because I want to give discovery that is germane to any

13   defenses you may have and any claims they may have.  But if

14   you're not fighting about something, I don't want to have a lot

15   of people spending time and money chasing down an issue that is

16   not in dispute.  So as I said, I think I know the answer to

17   this, but I am going to ask Ms. McGovern or Ms. Markoe to

18   respond.

19        Is it Dr. Wright's position that he did or did not

20   have some collaboration with Mr. Kleiman -- collaboration, not

21   partnership; so I am going to be very careful -- collaboration

22   with Mr. Kleiman in the development of Bitcoin?

23        MS. MCGOVERN:  It is Dr. Wright's position, your

24   Honor, that Dave Kleiman assisted in editing the protocol

25   related to Bitcoin but did not create Bitcoin.

```
 1          THE COURT:  I understand that.  That's why I'm very
 2   careful not to use the word partner or anything like that.
 3          OK.  Just, again, a factual question, so, again, I
 4   just need to know what the answer is.  I don't really care one
 5   way or the other.  I just want to make sure I'm with you.
 6          Is it Dr. Wright's position that he and Craig Wright
 7   did or did not jointly mine Bitcoin and co-own Bitcoin?
 8          MS. MCGOVERN:  It is Dr. Wright's position
 9   unequivocally that he never mined Bitcoin with Dave Kleiman.
10          THE COURT:  OK.  So Dr. Wright's position is there are
11   no co-owned Bitcoin that ever existed.
12          MS. MCGOVERN:  That is correct.
13          THE COURT:  OK.  And it's Dr. Wright's position that
14   to the extent there is intellectual property associated with
15   Bitcoin or the Bitcoin protocol, Mr. Kleiman had no legal
16   rights to that intellectual property, is that correct?
17          MS. MCGOVERN:  That is correct.
18          THE COURT:  OK.  So I thank you.  I think that
19   clarifies some things that were -- I thought that was right,
20   but I just wanted to make sure.
21          The other question I have is, I have been reading your
22   pleadings and everything else about this Australian tax
23   investigation, and it's not really clear to me what was the
24   Australian tax authority investigating.  So if someone could
25   help me understand what the scope of that is.
```

1           I understand there is an argument from the plaintiffs'

2   side that kind of within the, whatever the overall topic was,

3   within that certain statements and documents may exist that are

4   relevant, and that's what I'm trying to assess.  But it would

5   help me understand that argument if I could understand a little

6   better what the grand ATO investigation was.

7           Ms. Markoe.

8           MS. MARKOE:  So I will address this to the best of my

9   ability because it is a massive undertaking and it appears,

10  based on what I have seen, that the ATO investigations began

11  sometime in the tax, I think the tax year 2009, 2010, and

12  essentially appeared to have touched every single company that

13  Dr. Wright was involved with.  And to the extent that any of

14  those documents refer to W&K or Dave Kleiman, those documents

15  from those ATO investigations relating to Mr. Kleiman or W&K

16  are being provided and are being produced.

17          Further, there was an ATO investigation into Coin

18  Exchange specifically.  Those documents are also being

19  produced.

20          THE COURT:  OK.  Help me out.  Coin Exchange was, I

21  think as I read this, that was what Dr. Wright says was -- I'm

22  trying to use the right legal terms -- a joint venture maybe in

23  the generic sense between Dr. Wright and Mr. Kleiman to set up

24  a Bitcoin exchange.

25          Is that essentially what Coin Exchange was supposed to

```
 1   be?
 2           MS. MARKOE:  Sort of.  From what I can gather, it was
 3   intended to be a company that was going to grow into an
 4   exchange of Bitcoin for various national currencies starting
 5   with the Australian dollar.
 6           THE COURT:  OK.
 7           MS. MARKOE:  And then expanding out into other
 8   currencies.
 9           The intention was that Dave Kleiman would have a
10   significant amount of shares in that company.  Dave Kleiman
11   died, I believe, shortly after the company was registered.  He
12   accepted a directorship before he died, but that was never
13   formalized.  So there is no paperwork regarding that, that I'm
14   aware of.
15           Then there was a brief period of time before
16   Dr. Wright located Dave Kleiman's heirs where Dr. Wright held
17   Dave Kleiman's shares in trust for those heirs, and then upon
18   finding the heirs provided those shares and turned those shares
19   over to Ira Kleiman and Louis Kleiman.
20           THE COURT:  OK.
21           MR. FREEDMAN:  Your Honor --
22           THE COURT:  Hold on one second.  I am going to give
23   you a chance, Mr. Freedman.  Just give me a second.
24           So to the extent when I was looking at Appendix N,
25   which was started as part of these materials, there appears to
```

1    be documentation about a transaction between, I believe it is

2    W&K and Coin Exchange with the transfer of Bitcoin.  Can you

3    explain to me what that is or what that was.

4              MS. MARKOE:  So Exhibit N --

5              THE COURT:  I know what Exhibit N was.  But within

6    Exhibit N there seemed to be documentation about a transfer of

7    Bitcoin from something.

8              MS. MARKOE:  So if you're talking about Exhibit N to

9    Exhibit 4 of the complaint --

10             THE COURT:  Exhibit N to the affidavit.  It is an

11   affidavit submitted by Dr. Wright.

12             MS. MARKOE:  So the affidavit was in relation to a

13   lawsuit brought in New South Wales, Australia, against W&K.

14             THE COURT:  OK.

15             MS. MARKOE:  The only -- Exhibit N is referenced only

16   at paragraph 27 of that affidavit.

17             THE COURT:  So who sued W&K in Australia?

18             MS. MARKOE:  I don't want to misspeak.  I know that

19   the --

20             THE COURT:  I'm catching you off guard.  So if you

21   don't know off the top of your head --

22             MS. MARKOE:  It's Craig Wright R&D.

23             THE COURT:  OK.

24             MS. MARKOE:  Was the plaintiff in that?

25             THE COURT:  OK.  So Craig Wright R&D sued W&K in

1    Australia and this affidavit is submitted as part of that

2    litigation.

3         MS. MARKOE:  Correct.  And Exhibit N is referred to at

4    paragraph 27 of that affidavit and simply references the

5    development of software that W&K worked on, was started in 2009

6    under a company called Integers Party, Ltd., Integers with an

7    S.

8         Then Exhibit N itself is a response to the ATO

9    regarding an audit or proceeding against Integers, with an S,

10   and referencing a whole bunch of documents that were provided

11   to the ATO in support of that investigation.

12        THE COURT:  OK.  So there is a response --

13        MS. MARKOE:  That investigation had nothing to do with

14   W&K.  The reference is simply regarding -- our position is that

15   investigation had nothing to do with W&K.  The reference to

16   Exhibit N was simply to explain that the original source and

17   software was provided by Integers to W&K and then some of that

18   product is the subject of the complaint.

19        THE COURT:  Got it.  OK.  Thank you.

20        Mr. Freedman, I'll let you respond to anything -- I've

21   read the complaint so I understand you don't agree with their

22   version of what this all is, but I will let you explain to me

23   anything you want to add to that.

24        MR. FREEDMAN:  If the court's familiar with the

25   complaint, then just very quickly, the plaintiffs' theory on

1   the ATO investigation is that we're not exactly sure what they

2   were exact -- well, the ATO, from what we have, the information

3   we have, the ATO was investigating R&D credits that had been

4   issued to Dr. Wright and in defending the R&D credits that he

5   claimed and received, Craig, Dr. Wright, tried to substantiate

6   the R&D by reference to work he had done with Dave Kleiman and

7   W&K in Florida.  And that's why some of these, a lot of these

8   documents mention the work that had been done there.

9        The investigations also centered heavily on Bitcoin

10  and the way that Bitcoin should be characterized, whether it

11  was a money or a commodity or an asset, and that appears to

12  have involved Dave Kleiman as well.

13       After the filing of the complaint, the plaintiffs were

14  contacted by the Australian tax office's criminal

15  investigations unit.

16       THE COURT:  The filing of which complaint?

17       MR. FREEDMAN:  This complaint.

18       THE COURT:  The complaint in this lawsuit?

19       MR. FREEDMAN:  Yes.

20       THE COURT:  Not the complaint in South Wales.

21       MR. FREEDMAN:  No, this lawsuit.

22       The plaintiffs were contacted by the Australian tax

23  office in their criminal investigations unit to find out

24  whether there was information we had that they were looking

25  for.  Evidently they are investigating a criminal action.

1          THE COURT:  I understand.  OK.  I don't need to know

2     too much about that.

3          MR. FREEDMAN:  OK.

4          THE COURT:  But basically your understanding is that

5     the auditor, what everyone wants to call it, the tax

6     investigation in Australia had something to do with R&D credits

7     and that Dr. Wright was attempting to substantiate those

8     credits by reference, at least in part, to work he had done

9     with Mr. Kleiman here in Florida.

10         MR. FREEDMAN:  Correct.  Part of the plaintiffs'

11    theory is that Dave Kleiman died in April of 2013 and despite

12    the fact that Dr. Wright claims that he died with a fortune of

13    Bitcoin on his drives, Dr. Wright did not reach out to

14    plaintiffs for almost a full year.  Ten months.

15         Just coincidentally, shortly before this the

16    Australian tax office reached out to Ira Kleiman to verify the

17    activity of W&K.  So as plaintiffs allege in the complaint,

18    this was an attempt to create an ally in the fight against the

19    Australian tax office.

20         THE COURT:  I understand your theory of the case.  I

21    just wanted to make sure for discovery purposes, this is very

22    helpful for me to understand a little bit more of the

23    background.  So I thank both parties for that.

24         The last thing before I turn to the specifics of your

25    requests, the issues in docket entry 127, I don't believe this

1    is an issue that requires my recusal or anything else, but I

2    just wanted to let the parties know I am familiar with

3    Mr. Conrad and Mr. Paige from my prior life as a prosecutor.

4         I worked with Mr. Paige when I was prosecuting child

5    pornography cases and he was working at the sheriff's office.

6         I worked with Mr. Conrad in my private practice,

7    including up to the time I took the bench.  I was involved in a

8    case where my cocounsel prior to my getting involved in the

9    case had retained Mr. Conrad as their forensic expert.  So I

10   know Mr. Conrad.  It is not going to affect my rulings in the

11   case.  Same with Mr. Paige, not going to affect my rulings in

12   the case.

13        But if either party thinks there is a basis for any

14   motion you need to file with Judge Bloom based upon that

15   disclosure, do what you need to do, but I wanted to make that

16   disclosure to both parties.

17        I was also looking at this and I realized Mr. Kleiman,

18   I didn't realize worked at the Palm Beach Sheriff's Office

19   probably during the period of time I was interacting with them.

20   I will tell you I have absolutely no recollection of ever

21   meeting Mr. Kleiman.  So if there is a case out there that he

22   worked on and I worked on, it's possible, but I have absolutely

23   no recollection of ever meeting him.

24        Again, I make that disclosure for whatever purpose the

25   parties choose to do with it.

```
1           All right.  With that, let me then turn to the joint

2   discovery memo and, as we usually do, just go through it and

3   see where we are and hopefully if you have reached on agreement

4   on some things, you can tell me that.

5           So the first issue appears to be production of

6   Mr. Kleiman's documents.  And, Mr. Freedman, I think your

7   response was you expected to be making a continuing production

8   as soon as prior to today's hearing.  So bring me up to date

9   where we are in production with what you all colloquially call

10  "Dave's documents."

11          MR. FREEDMAN:  Yes, your Honor.  There was continued

12  production off of -- so previously plaintiffs had been

13  producing off of keywords that the defendants said W&K, and

14  there was an initial production off that.  But as soon as we

15  heard the priority was changed to Dave Kleiman, we switched

16  gears.

17          I can tell you that yesterday evening we produced in

18  the ballpark of a little over 7,000 pages of documents from

19  Dave Kleiman.  There were -- the combined production was 13,399

20  because there was some legacy documents that still hit on the

21  W&K keywords.  But once we started turning over, we produced

22  over 7,000 of Dave Kleiman's, pages of Dave Kleiman's

23  documents.  I think it is around 1200 and change documents of

24  Dave Kleiman's.  And obviously we have a team of seven

25  reviewers reviewing the documents full time and can expect to
```

1   continue rolling productions, getting them out.

2          I know that Mr. Roche spent three hours on the phone

3   yesterday with Mr. Kass working on search terms.  So if the

4   court wants more, I'm sure Mr. Roche can speak to that.

5          THE COURT:  Just one question.  When you say Dave's

6   documents, this is documents retrieved from, and I know you've

7   told me in the past, any number of electronic devices,

8   computers, phones, hard drives, things like that that you

9   believe belong to Mr. Kleiman.  So this is the production off

10  of those electronic media?

11         MR. FREEDMAN:  His e-mail accounts as well as his

12  electronic media.

13         There is a slight complicating factor, and I think the

14  parties have come to agreement on it, in that some of these

15  electronic repositories, as the court knows because of our

16  objections to turning over the drives, contain both Dave

17  Kleiman documents and Ira Kleiman documents.  So the custodian

18  was Ira Kleiman because the collection took place from Ira

19  Kleiman.

20         But I believe the parties have come to an agreement

21  that any document that was last modified prior to the date of

22  Dave Kleiman's death would be characterized as a Dave Kleiman

23  document and priority would be pushed over those.

24         THE COURT:  OK.  So let me turn to the defense.

25  Recognizing you don't have everything that you've asked for, do

1  you at least feel like a process is under way that is moving in

2  the right direction and what if anything would you ask me to do

3  today to help speed things along?

4          MS. MCGOVERN:  Your Honor, I have two asks.

5          I was breathing heavily over the microphone.

6          Your Honor, we have two asks and it comes from an

7  underlying concern.  I respect Velvel's representation with

8  respect to what they are doing in the case, but it is March 26,

9  2019.  Dave died on April 26, 2013.  Many years have gone by

10  and we do not have a robust production from Dave Kleiman to

11  this date.

12          I can go over with you, but I don't know that it is

13  going to be very interesting, the buckets of documents we have

14  received so far.

15          We need, and this is the ask, we need to blow by our

16  back and forth on the search terms.  We have had so many

17  e-mails back and forth, red-lining Excel spreadsheets trying to

18  reach agreement on search terms.

19          Let me just get to the request.

20          We would like within ten days all documents that

21  reference Craig Wright, W&K or Bitcoin from Dave's devices and

22  from Dave's e-mails as a priority production.

23          THE COURT:  OK.

24          MS. MCGOVERN:  The reason that we ask for this, your

25  Honor, is because we have a bulk of documents that we have

1   received which should never have been a priority from Ira,

2   including junk mail, Craig's List, CoRA Forum, things that are

3   not helpful.  We don't have any relevant documents from Dave's

4   devices at this stage in the litigation.

5        I ask the court while we continue to work on the

6   finalization of our search terms, which we will do in good

7   faith and with as much patience as we need to, but while we do

8   that we get in ten days all documents relating to David -- I'm

9   sorry, Dr. Craig Wright or Craig Wright, W&K and Bitcoin.

10        THE COURT:  OK.

11        MS. MCGOVERN:  Those three categories.

12        THE COURT:  OK.  I understand that.

13        What is your second ask?

14        MS. MCGOVERN:  The second ask is that we would request

15   an identification, if that is the right word, or description of

16   the amount of data on Dave Kleiman's devices, e-mail, which

17   would be iCloud, and electronic devices, and the amount of data

18   on Ira's computers or Ira's devices and e-mails separated so

19   that we understand where this is coming from without having to

20   look necessarily at the day we have made this request before.

21   It should be a request.  It is just the amount of data.  The

22   reason that we ask for that --

23        THE COURT:  Why do you need that?

24        MS. MCGOVERN:  It gives us an idea of how much we're

25   dealing with.  What is the amount of information that we're

1  going to need to review and get through here.

2          For example, one of our concerns -- we know that

3  Dr. Wright has massive amounts of data that has to be

4  processed, reviewed, and search terms run through, and we are

5  providing the plaintiffs on a daily basis almost with the hit

6  counts on their changing search terms so they can have an idea

7  of how to prioritize their review.

8          We also have a lot of reviewers looking at documents.

9          Our concern is I don't know how much we're talking

10  about.  Sometimes I hear 40,000 documents from Dave Kleiman,

11  sometimes I hear 70,000 documents from Dave Kleiman.  And even

12  though we have the images with our experts, that isn't content

13  that we are receiving from our experts.

14          THE COURT:  But let me ask you.  Just knowing that

15  there's 80 gigabytes on a particular hard drive, how does that

16  help you know whether 1 gigabyte of that or 79 gigabytes of

17  that is relevant to this lawsuit?

18          MS. MCGOVERN:  It just provides us, your Honor, with

19  the universe of information that we're working against.

20          For example, if we have -- if the amount of documents

21  we're talking about are 70,000 documents, OK, we know that the

22  search terms that we're going to be running against that is

23  against a certain amount of data that we might have to get

24  through.  I agree, it's not all going to be relevant, but right

25  now we feel we are working completely in the dark.  We don't

know the amount of Dave's data, we don't know what we should be expecting.  We haven't been able to prioritize anything.  We are already in March.

We feel our defense has been severely compromised by these delays.  And I don't mean to be dramatic, but we have a June 10th discovery deadline.  While I know that there has sort of been some suggestions of continuances and that sort of thing, our client has absolutely no desire to continue this case.  There are a lot of other things that are affected by this litigation and are affecting him by this litigation and he wants to get it over with.

So we are trying to move as quickly as we can, but what we're finding, your Honor, and I'm taking advantage of the moment to be before you right now to tell you, what we're finding is we are mired in the minutia with is it going to be X within Y of Z in terms of a search term, which is why what we're trying to do is simply get the relevant data from Dave, which is not going to be privileged, it is going to help us get a handle on the defense in this case and start taking depositions.  Again, we're not going to wait until that's over with to start taking depositions.  But that's our ask.

THE COURT:  OK.

MS. MCGOVERN:  The first one is -- OK.  Thank you, your Honor.

THE COURT:  Thank you.

1          Let me turn to Mr. Freedman and you can respond to

2   those in whatever order you would like to.

3          MR. FREEDMAN:  Sure, your Honor.  If I may in the

4   reverse.

5          THE COURT:  Sure.

6          MR. FREEDMAN:  So I'm not sure why -- let me say this.

7   The search terms that the plaintiff has been handing over show

8   that the universe of documents is somewhere around a million

9   documents collected.  I think that's the entire universe.  I'm

10  not sure.  It seems to me that's about where Dr. Wright's

11  entire universe is too.  Maybe a little more.  Maybe 1.2, 1.3.

12         As part of the hit reports that we've been turning

13  over to the defendant, it shows the universe of documents

14  searched, and those searched reports were broken out by the

15  Dave Kleiman devices, Ira's e-mails and Dave's e-mails.  So the

16  defendant does have the total data amounts, I believe, of Dave

17  Kleiman's devices, Ira Kleiman's e-mails and Dave Kleiman's

18  e-mails, which is I think what they are asking for.

19         What we don't have is the exact division between when

20  you look at Dave Kleiman's devices, what of that is Ira's and

21  what of that is Dave's.  That's because we have just started

22  coming to agreement on how to do that because they were

23  commingled.

24         So I'm sure we could run a report that basically says

25  all data as before X date and probably hand that over.  I don't

1    think that would be too difficult.  I would be happy to.

2         Separately, and we will discuss this later, I guess,

3    but plaintiff has a similar concern that they are in the dark.

4    So I understand Ms. McGovern's concern and I am happy to work

5    with her and try to get her that information.  To the extent --

6    I just don't want to promise something the vendor can't

7    deliver.  But I think I can deliver all this and I don't have a

8    problem giving it.

9         THE COURT:  OK.  So as to the second ask, I hear you.

10        Why don't you talk to me about the first, the request

11   to have some defined universe of documents within a ten-day

12   period.

13        MR. FREEDMAN:  Yes.  So the problem is, your Honor,

14   there are literally hundreds of thousands of documents from

15   Dave Kleiman.  Those documents have to be reviewed for

16   privilege and they have -- somebody has to look at them before

17   they go out the door.  Like I said, we have seven people

18   reviewing it, but that is why search terms were invented,

19   right, so we don't have to review hundreds of thousands of

20   documents and just hand them over to the defendant.  I can't

21   hand over documents just like that.

22        THE COURT:  Well, OK.

23        MS. MCGOVERN:  May I respond?

24        THE COURT:  Yes.  Ms. McGovern, I am going to give you

25   the last thought on that.

1          MS. MCGOVERN:  Thank you, your Honor.

2          When we first met with your Honor on discovery in this

3     case, we talked about Dave Kleiman, W&K, and that's what we're

4     asking for now.

5          I understand that they're looking at a lot of data, as

6     are we, but we have produced 22,000 pages plus of relevant

7     documents in the case, following the robust production that

8     your Honor asked us to follow.  We have incorporated the

9     provision which allows us to -- an inadvertent production.

10    What privilege Dave Kleiman would have, I don't know.  But at

11    this juncture we cannot go back to the table, your Honor, and

12    start debating search terms and wait for documents that go to

13    the core essence of this case, namely, Dave Kleiman, the

14    company that he formed in the United States and his claims

15    against Craig Wright.

16         So at this point in March against five years, I guess

17    it is 2013, this case was filed in 2018, it's 2019, and we

18    don't have any relevant documents from the deceased.

19         THE COURT:  But when did Judge Bloom deny the motion

20    to dismiss and actually reopen this litigation?  Because that's

21    really the operative date for discovery purposes.  When was the

22    motion to dismiss denied?

23         MR. FREEDMAN:  I believe in January, your Honor --

24         MS. MCGOVERN:  Yes.

25         MR. FREEDMAN:  -- the motion for a stay was lifted.

```
 1              MS. MCGOVERN:  Yes, it was.  Yes, it was.

 2              THE COURT:  So it's been 60 days.  It hasn't been five

 3    years.  Let's use the right time frame when you talk about who

 4    is making a robust production and who is making a good faith

 5    effort to produce.

 6              MS. MCGOVERN:  I didn't mean five years since the --

 7    but we already have concerns, your Honor, about not having the

 8    documents that should have been preserved in the first

 9    instance.  So we have that concern and now we have the concern

10    that we are not getting the relevant documents.

11              That is our ask, your Honor.

12              THE COURT:  Look, I understand.  As I see it, here's

13    how I see it.  Right.  There's different phases to a document

14    production like this, and both sides have massive amounts of

15    data to go through.  This is all an issue you can feel free to

16    take up with Judge Bloom separately from me as to the discovery

17    cutoff or, as I mentioned before you can consent the case and

18    then talk to me about extensions.  I understand that is up to

19    you, and that's fine.

20              I see there are a couple of phases.  There is the

21    identification of what we are going to search.  Collection.

22    Let's find everything, which I think you have all done and done

23    relatively quickly.

24              There's searching.  There's coming up with terms and

25    doing the searches which produces now this universe which gets
```

1    us to the review stage, and it sounds to me like that's kind of

2    where we are on both sides, is in different, maybe different

3    phases of but in the review phase.

4         Then after that there is the production, right?  Once

5    it's reviewed and determined to be producible, it's produced.

6         What I mentioned before is I think the parties should

7    be on a schedule where -- if you've got seven people on both

8    sides reviewing this stuff, there is a mass of information

9    every day, that gets over the hurdle.  That gets out of the

10   review box and into the production box.  Maybe it's every 24

11   hours, maybe it's every 48 hours, maybe it's every 72 hours.  I

12   don't know your vendors.  You should work it out amongst

13   yourselves.  But you all should come up with a schedule where

14   every day or two or three you get whatever is coming out of

15   that process so we don't sit and wait and now you get 20,000

16   documents the end of next week when you could have gotten 3,000

17   tomorrow and 3,000 on Thursday and 3,000 on Friday, etc.

18        That seems to me in a case like this where you have a

19   tight time frame and you've got teams reviewing, the parties

20   ought to agree a production schedule that's kind of -- it's a

21   rolling production but it's a timed rolling production where we

22   agree that whatever we review by this point is getting turned

23   over the next day.  So I would strongly, strongly encourage the

24   parties to do that.

25        To the extent that the request is to try to identify

1  quickly things that are not privileged, it seems to me that

2  within the universe of what's been identified there are maybe

3  secondary searches that can be done -- again, on both sides --

4  to exclude documents that would be privileged.  Now, there are

5  certain third parties who are going to destroy any argument of

6  privilege, third parties on the e-mail between you and your

7  lawyer, everybody knows that destroys the privilege.  Or that

8  sort of thing.

9       Again, I can't micromanage that, but I would urge both

10  sides to prioritize.

11       That sounds to me, Mr. Freedman, what they are asking

12  to you do at this point, is within the universe of what you are

13  reviewing perhaps try to identify a way to cull out things that

14  everybody would agree more likely than not are not privileged

15  and if there's a privileged thing in there, we have the 502

16  provision in place.

17       So I am not going to order a specific deadline to get

18  that done.  I am going to order the parties to figure out some

19  sort of a robust rolling production schedule along the lines of

20  what I just talked about.

21       It sounds to me like there is an ongoing dialogue.  If

22  Mr. Roche and Mr. Kass were three hours on the phone yesterday

23  talking this through, it seems to me the parties are in good

24  faith in both directions trying to get this done.  So just

25  continue with those efforts.

```
1          I am not going to order a specific deadline to
2    complete the production, but I am going to order the parties to
3    begin a more robust rolling production.  I think that is all I
4    can do at this point.  Because I can say do it within ten days
5    and what I am going to hear is then you have to hire 50 other
6    people, we have to get them up to speed, we have to get them
7    cleared, it just can't be done.
8          So I have to trust both these law firms.  Both of your
9    law firms are much more experienced at these large document
10   productions than I am.  I just have to trust -- I know
11   Ms. Markoe has a lot of experience doing this.  I know
12   Mr. Freedman's firm has a lot of experience doing it.
13         From where I sit and what I see, I see good faith
14   efforts on both sides.  But I don't see it at the level that
15   you see it at.  So I think that's all I can do.
16         Ms. McGovern, I am not comfortable ordering anything
17   done to its finality within ten days, but we can set another
18   discovery status conference at the close of this one and if
19   that keeps everybody's feet to the fire, we will have another
20   discovery status conference and we can talk about where we are.
21   But it seems to me if they just gave you 7,000, that's a good
22   start.
23         But enough for me.  I've said what I said.
24         MS. MCGOVERN:  Your Honor, can I just make one
25   request --
```

```
 1              THE COURT:  Sure.

 2              MS. MCGOVERN:  -- in response to that?

 3              THE COURT:  I haven't dealt with the second issue.  Go

 4         ahead.

 5              MS. MCGOVERN:  Yes, I guess it is a request.

 6              THE COURT:  Sure.

 7              MS. MCGOVERN:  I completely understand what you just

 8         said, and I agree.  In light of that or within that, we would

 9         like, however, that these weekly rolling productions prioritize

10         while we are agreeing on search terms, which has taken a lot --

11         we don't have an agreement on search terms so we don't have hit

12         counts that we can say, please, run these search terms first

13         and produce this first.  We are not able to prioritize, which

14         is what they're doing with our documents.

15              THE COURT:  OK.

16              MS. MCGOVERN:  What I would request, your Honor, is

17         that the prioritization starts with Craig Wright, move to W&K,

18         and then move to Bitcoin so that we're not receiving Google

19         Ads, Craig's List ads, CoRA Forum reviews.  So that the next

20         production we get on Friday is going to be a subset of the

21         million documents of documents that are actually relevant to

22         their claims.

23              THE COURT:  All right.  Mr. Freedman, any problem

24         prioritizing it that way?

25              MR. FREEDMAN:  We already prioritized W&K.  Mr. Roche
```

1    can speak to what was agreed to on the phone yesterday.  But I

2    have no problem with that in theory, no.

3            MS. MCGOVERN:  Thank you, your Honor.

4            THE COURT:  I think, look, it sounds to me like that

5    is the discussion you all need to keep having -- what's your

6    biggest priority.  Once you have all got it on your platforms,

7    as I understand it, with these vendors, maybe you can't agree

8    on all search terms.  But clearly there have to be a subset of

9    the search terms that have been agreeable to both sides.  Start

10   running those.  Continue the dialogue and continue -- that's

11   all I can tell you to do.  Have a dialogue and continue to do

12   the prioritization.

13           I appreciate that, Mr. Freedman.

14           Ms. McGovern, I think he agreed to what you asked for.

15   So we are good there.

16           In terms of the data, Mr. Freedman, if it is not

17   unduly burdensome for you to produce the gigabyte count or

18   whatever everyone wants to call it, I would ask you to do that.

19   If you have a view that it is -- I would order to you do that.

20   If you have a reason to believe that it is unduly burdensome or

21   your vendor says that they can't do it or it is going to divert

22   you away from doing the other important things that I think

23   Ms. McGovern would probably agree are probably more important

24   than that, I will defer to you to talk amongst yourselves.  I

25   think you have agreed to provide it anyway so I would encourage

1    you to do that or order you to do that.

2          So I think we have dealt with that issue more or less.

3    That was issue one.

4          Issue two is Mr. Paige and Mr. Conrad.  So just help

5    me out procedurally there.  Have they been served with any

6    process?  Have they been served with deposition subpoenas?

7          MS. MCGOVERN:  Yes, they have, your Honor.  Their

8    counsel is actually trying to coordinate their depositions with

9    us, but plaintiffs are objecting to going forward with them.

10         THE COURT:  Let me talk that through.  One step at a

11   time.

12         So neither Mr. Paige nor Mr. Conrad is objecting under

13   Rule 45 to the subpoena, is that correct?

14         MS. MCGOVERN:  Not to my knowledge, your Honor.

15         THE COURT:  All right.  Mr. Freedman, I have just

16   dealt with this issue in another case so it is fresh in my

17   mind.  The case law says that the opposing party under Rule

18   26 -- not under Rule 45 but under Rule 26 -- can move for a

19   protective order.  So it's not really an objection; it is a

20   motion for protective order.  Same effect, different words.

21         Is that what you are requesting in this case?  And if

22   it is, help me out with what it is you are objecting to or why

23   you seek protection and what you seek protection from.

24         MR. FREEDMAN:  So, your Honor, I'm hesitant to call it

25   a motion for protective order.  The defendant reached out to

find a mutually convenient time to depose these two witnesses

and what plaintiff said was, well, technically the dates we're

free.  You know, a person is only allowed to be deposed once in

the case without leave of court.  And for the convenience of

the witness it is nice that both sides can do the deposition at

once.

Both Mr. Paige and Mr. Conrad were served with

subpoenas for production of documents by the plaintiff and I

believe by the defendant and their response date has not every

come yet.  I think it is in early April.

Both parties have been served with requests for

production that touch on Mr. Paige and Mr. Conrad because there

was discussion between the defendant and Mr. Paige after the

defendant reached out to the Kleimans to say that there was

this Bitcoin and there was this intellectual property and, in

fact, those e-mails are cited by the plaintiffs in the second

amended complaint in reliance.

So those search terms have not returned the documents

yet.  So plaintiffs' position is if you go depose them now,

yes, the defendant only needs to ask them about what happened

to Dave Kleiman's devices and that doesn't really require

document production.  But the plaintiffs have to get into what

was the substance of your relationship with the defendant.  We

received e-mails from the defendant showing there was a

relationship between Mr. Paige and Mr. Conrad and the defendant

1    going as far back as 2009.

2            THE COURT:  Let me just catch up for a second.  I will

3    make this easy if you want.

4            If your request is you want to depose them separately

5    from how they want to depose them, I will give you leave to

6    take their deposition a second time.  So if you want to wait to

7    get your documents and take Mr. Paige and Mr. Conrad's

8    deposition once you get your documents and they want to take

9    their depositions now, you have a short discovery in the case.

10   That is what I will give you both.

11           I can take judicial notice, Mr. Paige and Mr. Conrad

12   are local.  They are here in West Palm Beach.  If that's how it

13   has to work out in this case, I'm happy to do that.  So that

14   alleviates everyone's concerns.

15           I didn't mean to cut you off, Mr. Freedman.

16           MR. FREEDMAN:  No, it's fine.

17           THE COURT:  If I was going to give you what you

18   wanted, I figured I'd cut you off.

19           MR. FREEDMAN:  Absolutely, and obviously the court can

20   cut me off whenever it wants.

21           I did have one corollary to this, which is, and I know

22   this is not yet in the court's hands in terms of the discovery

23   cutoff in June.  So this does alleviate the issue of deposing

24   the parties.  However, the discovery cutoff is June 10th.

25   There are over a million documents.  I think we have received

1   under a hundred thousand produced.  I can't swear to that.

2   Maybe Ms. Markoe can testify to represent how many have been

3   produced.

4        The search terms in our second request for production

5   haven't even been agreed to yet.  We are still discussing

6   those.  I know we have meet and confers set up to discuss

7   these.  We haven't gotten to depose Dr. Wright yet, which we

8   hope to, and the deposition is set for April 4th.

9        The point is there's a lot to be done.  On our initial

10  call before Judge Bloom preempted all of us and entered a

11  scheduling order, the defendanat on our meet and confer asked

12  for 18 months for discovery.  We still have to ask this court

13  for letters rogatory to go to the United Kingdom, but the

14  English courts require very specific requests for documents.

15  So we can't get those letters rogatory filed until we get the

16  production to know what we have to look for.

17       So I guess this is the long way of saying the

18  plaintiff is going to be moving to continue the trial date and

19  the discovery deadline.

20       THE COURT:  All I can tell you in that regard is that

21  that's Judge Bloom, not me.  But I will tell both parties if

22  Judge Bloom asks me, I will tell her that I have been doing

23  everything I can, the parties have been doing everything they

24  can to move the case forward, but both sides recognize -- this

25  is a tight discovery schedule for a case this big.  If Judge

1    Bloom asks me -- she doesn't always ask me; sometimes she

2    does -- I will truthfully tell her that you all are trying

3    really hard to meet her discovery cutoff.

4         I know Dr. Wright doesn't want to continue it, so I am

5    not going to prejudice Dr. Wright by saying go ahead and do it.

6    But I will tell Judge Bloom the truth of the matter, which is

7    the parties have not been sitting on their hands.  I know that

8    much.

9         MR. FREEDMAN:  Thank you.

10        THE COURT:  But to the extent what you are talking

11   about is you are going to move to continue, unless you consent,

12   I have no authority over that.

13        All right.  So I have the numbers off from the defense

14   perspective.  Have we resolved the issues with Mr. Paige and

15   Mr. Conrad?

16        MS. MCGOVERN:  Yes, we have, your Honor.  Thank you.

17        THE COURT:  And Mr. Freedman as well?

18        MR. FREEDMAN:  Yes, your Honor.

19        THE COURT:  OK.  Great.  I like that.  Excellent.

20        By the way, I am going to take a brief aside.  So I

21   went to an E-discovery conference earlier this year in Fort

22   Lauderdale for magistrate judges and they had someone there who

23   spoke, who was working on the Qualcomm extensional litigation

24   in San Diego, and they talked about how Qualcomm, the initial

25   document preservation that Qualcomm did in that case was over 2

1    billion documents.  After they ran computer assisted and

2    everything else they got it down to, I think, 110,000.  They

3    did a manual review of 110,000 documents.  They turned over

4    just under 20,000.  And at deposition and at trial the parties

5    used 80.

6         So be careful -- just be mindful of what you are

7    asking for.  You are making a lot of noise, not a lot of

8    signal.  A lot of noise.  Again, I will give you the discovery

9    that the law entitles you to have.

10        All right.  So let me move to the next issue.  Second

11   request for production -- I doubled back on myself.  I went to

12   the old document.

13        OK.  I am now on page 5 of the docket entry 127.

14   Objection to revised interrogatories 5 and 6.

15        So 5 and 6 are the request to identify anybody else

16   who was involved as part of the Satoshi Nakamoto project.  Is

17   that correct, Mr. Freedman?

18        MR. FREEDMAN:  Plaintiffs would call it a partnership;

19   the defendant would call it a collaboration.  But yes, your

20   Honor.

21        THE COURT:  OK.  I'm trying to avoid terms that cause

22   everyone's heads to explode.

23        OK.  So what is the objection from the defense side?

24   I've read yours.  Anything else you want to add?

25        MS. MCGOVERN:  I'm sorry.  I was just looking at it.

1   This is with respect to the e-mails and everybody who

2   controlled the e-mails.

3          THE COURT:  Hold on.  Let me just doublecheck that I'm

4   looking at the same documentation you're looking at.

5          MR. FREEDMAN:  If I can help, it's 127-3, at page 4.

6          THE COURT:  Thank you.

7          Actually, let me go to the plaintiff.  What's your

8   theory of relevance?  Why is this information relevant to the

9   claims in this case?

10         MR. FREEDMAN:  Sure.  Your Honor, the plaintiffs have

11  alleged that in circa 2008 the defendant and Dave Kleiman

12  partnered, and I understand that is a disputed term, to create

13  Bitcoin, then mine Bitcoin, and then create Blockchain-based

14  intellectual property.

15         The name of that partnership, the plaintiffs have

16  alleged, is the -- it was Satoshi Nakamoto.  That is the second

17  amended complaint, paragraph 197.

18         The e-mails -- these are three e-mail addresses that

19  were known to be controlled by Satoshi Nakamoto or, as the

20  plaintiffs would say, by the Satoshi Nakamoto partnership.  The

21  individuals who had access to that -- so there are two reasons

22  why this is relevant.  The first is, plaintiff has the burden

23  to prove that the association of the Satoshi Nakamoto

24  partnership was an association of co-owners of the business for

25  profit.

1          To the extent the answer to this interrogatory is no

2     one had access besides Dave Kleiman and Craig Wright, it helps

3     prove plaintiffs' point that there was an association of owners

4     and the extent of that association.

5          To the extent the answer is five other people also had

6     access, plaintiffs need access to those individuals as relevant

7     witnesses and to know that they exist so it can defend its case

8     and don't get surprised at trial saying, you think it is

9     association of co-owners, well, there was 18 people with access

10    to Satoshi's account so this wasn't an association of co-owners

11    for profit.

12         The same goes for No. 6.  They are kind of

13    interrelated.  One just says that the partners -- basically,

14    this is the partnership's e-mail accounts, who had access to

15    the partnership's e-mail accounts.  No. 6 says:  Who assisted

16    the partnership in getting off the ground; who drafted the

17    white paper, which was literally the creation document of this

18    empire Dave Kleiman and Craig Wright created; who programmed

19    the computer program, which has created a market of trillions

20    of dollars that these people created together; and who had

21    access to the computers and servers that were used to mine the

22    Bitcoins of the partnership.

23         Again, I guess boiling it down to its essence is, one,

24    we need to know the information to see who was involved in this

25    association of co-owners for profit and, second, we need to

1    identify relevant witnesses.

2              THE COURT:  OK.  Thank you.

3              Ms. McGovern or Ms. Markoe.

4              MS. MCGOVERN:  Our position, your Honor, is that the

5    use of an e-mail address does not establish a business for

6    profit.  This is information that goes back many years.  It

7    doesn't relate to the claim against Dr. Wright, and there is

8    nothing -- there has been no evidence in the case that suggests

9    that the use of an e-mail address or, frankly, even the use of

10   a pseudonym could somehow be the basis for a partnership.

11             So instead, it's very much a fishing expedition which

12   essentially seeks to find absolutely any indicia of Dave and

13   Craig speaking to each other, working together in any way,

14   shape or form without pointing to any of the documents that

15   would otherwise form a corporation or form a partnership,

16   including a memorandum of understanding or share certificates

17   or otherwise.

18             We think this is a fishing expedition, your Honor, but

19   I will say this.  They are going to London.  They are going to

20   be deposing Dr. Wright on April 4th.  Part of the objection to

21   this type of information, I think, your Honor, has been

22   addressed by your Honor when you suggested the limited

23   deposition.  That hopefully will shut the door and not open

24   them on relevant information so that we actually can litigate

25   the case at hand.

1        So our position is that it isn't relevant, but we

2   understand, and in fact it is a deposition topic that they have

3   identified and that has the imprimatur of your Honor that they

4   are probably going to be asking on April 4th.

5        To put this in the form of an interrogatory

6   essentially requires Dr. Wright to go back in time, because

7   it's asking for finite information, and sort of piece together

8   everything that he's done in his life in this space, as it

9   were, in this cryptocurrency space, and we think it is

10  inappropriate.

11       THE COURT:  OK.  I am going to overrule the objection.

12  I do think it is relevant.  I do think it is information that

13  is germane to the case, and I think -- I encourage them to use

14  the deposition of Dr. Wright to limit the scope of the case.

15  But I think they don't have to wait that long if they don't

16  want to.  I think this is a targeted interrogatory.  It

17  shouldn't be that complicated to answer.

18       If Dr. Wright has to prepare the answer to the

19  question to the interrogatory and has to prepare the answer to

20  the question on April 4th at his deposition, it's not an undue

21  burden to ask him to write it down in response to the

22  interrogatory.  So Mr. Freedman can spend his seven hours on

23  April 4th of time covering other topics.  So I will overrule

24  the objection to interrogatories 5 and 6.

25       The next one is --

```
 1              MR. FREEDMAN:  Your Honor, if I may, can we just have
 2      a date by when --
 3              THE COURT:  Ms. McGovern, what is a reasonable date to
 4      respond?  Again, I still think the most important thing you
 5      should be doing is your production of documents.  But I assume
 6      Dr. Wright is going to have to do some research.
 7              I assume, Mr. Freedman, you'd like that at least in
 8      advance of the deposition.
 9              MR. FREEDMAN:  It would help, your Honor.
10              THE COURT:  Ms. McGovern, today is March --
11              MS. MCGOVERN:  Is April 2nd OK?
12              THE COURT:  Mr. Freedman, April 2nd?
13              MR. FREEDMAN:  Yes.
14              THE COURT:  April 2nd it is.
15              Thank you, Ms. McGovern.
16              OK.  So we are now on page 6, topic B.
17              Mr. Freedman, can you -- let me see.
18              Ms. McGovern, I read your answer.  Maybe there was a
19      word missing.  I apologize.  I tried to read that paragraph and
20      something was missing.
21              MS. MARKOE:  That was my mistake, your Honor.  It
22      should say Dr. Wright does not maintain e-mail messages as long
23      as the relevant time period.
24              THE COURT:  OK.  No problem.  You have other things to
25      do.  I won't beat you up over that one.
```

1          OK.

2          MS. MARKOE:  I will fall on that sword.

3          THE COURT:  That's fine.  If that is the worst thing

4    that I have to deal with in this case, then everybody is doing

5    a really good job.

6          MS. MARKOE:  Thank you, your Honor.

7          THE COURT:  No problem, Ms. Markoe.

8          Mr. Freedman, why don't you explain to me what the

9    issue is here and your theory again as to why you should get

10   what you want.

11         MR. FREEDMAN:  Yes, your Honor.  This goes back to

12   what Ms. McGovern was saying about kind of feeling around in

13   the dark.  Plaintiffs have two basic asks here.  One is give us

14   a list, please, of all the e-mail addresses that were relevant.

15   We don't have one.  We have put together one in footnote 5, but

16   the defendant had agreed to disclose as part of the ESI

17   stipulation all sources of relevant ESI and we still don't have

18   a list of what those e-mail addresses are.

19         So one is, please just give us a list of those e-mail

20   addresses.

21         The second request --

22         THE COURT:  Hold on.  It seems to me that is a

23   two-part -- if I can just make sure I understand -- like a

24   two-part ask.  One is tell us whether everything we have listed

25   in footnote 5 here is in fact an e-mail that Dr. Wright used

 1   during the relevant time period, and then, B, other e-mails

 2   that Dr. Wright used during the relevant time period.

 3          Do I understand you correctly.

 4          MR. FREEDMAN:  I didn't intend it to be that way, but

 5   that makes sense, your Honor.  I was just trying to demonstrate

 6   to the court that we have identified our own e-mails that we

 7   know are relevant.  So obviously they exist and the question is

 8   why haven't they been disclosed.

 9          But yes, I understand the court's --

10          THE COURT:  No, it is not my question.  I'm just

11   trying to understand.  Is that in fact what you are asking, you

12   want them to confirm whether some or all of these 18 were

13   e-mails Dr. Wright used during the relevant period and then you

14   want them to identify any other e-mails that Dr. Wright used

15   during the relevant period?

16          MR. FREEDMAN:  Yes.

17          THE COURT:  When I say e-mails, I mean communication

18   platforms.

19          MR. FREEDMAN:  Right.

20          THE COURT:  In other words, What's App or whether it

21   was Signal or whether it was something else.

22          MR. FREEDMAN:  And this Bitmessage, your Honor, which

23   I had not heard of before the case, is an encrypted

24   communications protocol and this actually, if I may, this is

25   Exhibit D that we didn't want to file because the defendant has

1    designated it confidential.

2            May I?

3            THE COURT:  Yes.  Absolutely.  Yes, of course.

4            Bitmessage.  You learn something new every day.  I

5    thought I was pretty good with Signal, but I've been lapped.

6            Just generically, Mr. Freedman -- this is marked

7    confidential -- what is it you handed me?

8            MR. FREEDMAN:  I have handed you an exhibit that was

9    produced by the defendant and it appears to be the inbox of a

10   Bitmessage account.

11           THE COURT:  OK.

12           MR. FREEDMAN:  I am not going to read the content of

13   the message underneath, even though it is very difficult to

14   read, because, again, it's been designated confidential.

15           If the court just looks at the to/froms -- does the

16   defendant have any objection to me discussing the to/froms on

17   the record?

18           MS. MCGOVERN:  No.

19           MR. FREEDMAN:  So they all go from Craig Wright to

20   Dave Kleiman, and then if the court looks at the topics -- may

21   I just --

22           THE COURT:  I can see what they are.

23           MR. FREEDMAN:  These topics relate to issues that some

24   of the intellectual property that plaintiffs have claimed are

25   owned by them, some of the trusts that the plaintiffs have

1  alleged hold the Bitcoin that they are entitled to, and so

2  there was a lot of communications.  And if the court flips

3  through, you can see there are just many, many.  This was not

4  disclosed by the defendant as part of its ESI protocol.  We

5  don't know what it is.  We don't know if they've collected it.

6  It's just --

7        THE COURT:  OK.  Let me, first of all, kudos to the

8  defense for turning it over.  Let's start with that.  They

9  didn't know about it, but they turned it over anyway.  So let's

10  give credit where credit is due.

11        So the question is you just want to drill down harder

12  on this and get a little more detail about exactly what

13  communications were going on through this Bitmessage protocol.

14        MR. FREEDMAN:  Your Honor, this was a paper production

15  of documents.  I believe, my understanding is Dr. Wright had

16  this printed out in like a binder in his house, but we'd

17  request actual collection of the underlying ESI.

18        THE COURT:  OK.  First of all, let me turn to either

19  Ms. Markoe or Ms. McGovern.

20        Does the underlying ESI still exist?  Because I

21  thought you said to me they didn't keep it back very far.

22        MS. MARKOE:  Right.  That's exactly why it wasn't

23  disclosed, your Honor.

24        THE COURT:  Put your microphone down.

25        MS. MARKOE:  That is exactly why it wasn't disclosed,

1    the e-mail addresses and the like.  Those e-mail addresses, as

2    far as I'm aware, either no longer exist or no longer contain

3    relevant information.  Therefore, what we do have and what they

4    are receiving, either paper copies of messages, PDFs of

5    messages.

6         We also have collected a large amount of PSTs from

7    Dr. Wright's electronic devices, and those PST's contain

8    e-mails and those e-mails, to the extent they are relevant, are

9    being produced.

10        THE COURT:  OK.  All right.  So, Mr. Freedman, what do

11   you say?  I mean, if it doesn't exist in electronic format,

12   they can't give it to you in electronic format.  What I just

13   heard Ms. Markoe say, to the extent it exists in hard copy

14   format they are going to provide that.  Certainly you can probe

15   this issue with Dr. Wright when he is deposed.

16        MR. FREEDMAN:  Your Honor, it's just, we're trying --

17   I guess the ask here, and this relates to I guess the next

18   issue, we're just trying to wrap our hands around the universe

19   of collected documents.  What was collected, what e-mails were

20   collected.

21        There are PST files.  That is just an archive file.

22   PSTs of what e-mail addresses?  We're trying to work with the

23   defendants so we can understand the universe and then narrow

24   our production down like the court asked.  But we're not

25   getting any information and -- that's an overstatement.  We're

1    not getting enough information flowing this way in terms of

2    what's been collected, how much of that has been collected.  We

3    just get barred.  You know, we can't tell you that, we're not

4    going to tell you that.  Then we have to raise it here and they

5    get ordered to tell it to us.  Hit reports, give us the hit

6    reports.  No.  And then we come to the court and the court says

7    hand over the reports.

8           We're trying to work, as the court told us to, to

9    narrow discovery.  But that's tough when we don't have somebody

10   basically -- so we need, you know, what are the e-mail

11   accounts.  So I guess verify -- in 5, the e-mail accounts.  You

12   collected PSTs.  What are those e-mail accounts.  Just gives

13   the details on these e-mail accounts.  Which ones exist, where

14   they are collected from.  Do any e-mails exist electronically

15   anymore.  We don't know any of this information.

16          THE COURT:  Ms. McGovern or Ms. Markoe.

17          MS. MARKOE:  Your Honor, if I may.

18          THE COURT:  Yeah.  Sure.

19          MS. MARKOE:  I would dispute the accuracy of

20   Mr. Freedman's statements.  First of all, I cannot tell you

21   what the PST e-mail -- what e-mail accounts the PSTs go to

22   without actually looking at the e-mails in those PSTs, and

23   that's what we're doing and we're producing them.

24          Further, I would like to hand up to your Honor the

25   disclosure that we did provide to plaintiffs' counsel regarding

1    what has been collected.  And further, I would say that every

2    single search term hit request that they have requested has

3    been provided to them.  Whether or not we think it was ordered

4    by the court and whether or not we think it is necessary or

5    relevant, we gave it to them.

6             THE COURT:  OK.  Let me see what you've got.

7             MS. MARKOE:  I will give you a copy.  Give me one

8    second.

9             I would like to point your Honor particularly to items

10   2 --

11            THE COURT:  Hold on one second.

12            MS. MARKOE:  Sure.  Sorry.

13            THE COURT:  You have all seen this before and I

14   haven't.  One second.

15            I've caught up to you now.

16            MS. MARKOE:  Item 2 lists all of the electronic

17   devices that were collected.  I believe it's footnote 1

18   specifies with regard to what's called a NAS device, which is

19   essentially a miniserver, what has been processed and how it's

20   been processed, because some of the data on that NAS device is

21   not proportional to the needs of the case, it would be to

22   collect all of the information I believe from the work folder

23   would be 2 terabytes of data and cost an additional $130,000.

24   So to suggest that we have not provided information about what

25   we have collected is just not accurate.

1          If Mr. Freedman would like information about what hard

2     copy documents we've collected, I'm happy to share that with

3     him.  I personally went and collected those materials myself

4     and did a cursory review of them before doing a more fulsome

5     review and prioritizing the actual binders that were the first

6     set of the production to make sure that they got the most

7     pertinent information as quickly as possible.

8          THE COURT:  OK.  Thank you.

9          So, Mr. Freedman, what is it you're asking me to

10    order?

11         MR. FREEDMAN:  What I'm hearing for the first time

12    today, your Honor, is that none of these e-mails exist on a

13    server anymore.  If that's true, I mean, we'll have to deal

14    with that when the time comes, but I didn't know that.  Are

15    there no -- none of the e-mails that we have listed in the

16    footnote 5, none of them still exist on a server?

17         THE COURT:  Are you asking me or asking them?

18         MR. FREEDMAN:  I'm asking for communications from the

19    defendant.  I guess what I am asking is to have the defendant

20    supplement its ESI production to state clearly, if any e-mails

21    addresses still exist on the server, if so, which ones those

22    are on the server, and so that we can -- for example, this

23    document that the defendant has just handed up starts off in 1,

24    there are no e-mail addresses that are potentially relevant to

25    the case.  I don't even understand what that means.  How can

1    that be?  That can't be true.

2            THE COURT:  I think, Ms. Markoe, do you mean there are

3    no extant e-mail addresses, that whatever e-mail addresses he's

4    currently using were opened up after the relevant time period

5    here and so there are no current e-mail addresses that are

6    relevant to the case?  Is that what that says?

7            MS. MARKOE:  There are no current e-mail addresses

8    that contain any relevant information.

9            THE COURT:  OK.

10           MS. MARKOE:  I'm not saying that he doesn't use some

11   of those e-mail addresses still, but what I'm saying is that

12   the relevant information that would have been from those e-mail

13   addresses does not exist on those e-mail addresses anymore

14   except the extent that they might be in the PSTs.

15           THE COURT:  OK.  I am issuing an opinion.

16           Did it go out yet?

17           We are issuing an opinion today or maybe first thing

18   tomorrow morning talking about the issue of, the extensional

19   question of what is an e-mail address or e-mail account.  The

20   e-mail account is just a bunch of files.  All an e-mail is is a

21   digital file just like anything else.  So whether that file

22   resides in a PST file that is connected to an operative e-mail

23   account, whether it is archived as an OST file, whether it is

24   saved as a separate MSG or EML file, it's a file.

25           But I'm hearing from both sides -- I'm confused, I

1   have to be honest with you.  I see a lot of work on both sides.

2   I see a lot of communication on both sides.  Yet what I hear

3   both sides saying is I don't really know what the other side

4   has.  To me, that is a fairly fundamental discussion that you

5   don't need me to be here today.  If you all are meeting and

6   conferring for hours at a time, it seems the first question

7   would be, all right, you just sent us whatever this was, your

8   disclosures, all these hard drives.  You said there's no e-mail

9   accounts for it.  Where did these PST files come from, which of

10   these many devices did the PST file come off of, and how many

11   e-mails are in the PST file.  Those sorts of questions.

12        I would expect that would be occurring as part of your

13   continuing meeting and conferring over production here.

14        So if that is really where we are, that both sides

15   feel like they just don't know what the other side has, please

16   don't make me order you to sit down and talk to each other and

17   make full disclosure of what you have and what you are looking

18   at.  That seems so obvious to me.  That information should be

19   exchanged.

20        Tell me -- again, I guess I have to ask.  What is

21   everyone asking me to order?

22        MS. MCGOVERN:  Your Honor, if I could just respond to

23   that particular point.  We have been talking about that before

24   the hearing internally.

25        THE COURT:  "We" being?

```
 1         MS. MCGOVERN:  Internally.

 2         THE COURT:  OK.  Talk to them about it.

 3         MS. MCGOVERN:  I wish it were a bigger we.

 4         I think the fundamental problem is the desire to truly

 5   get to the heart of the matter and drill down on what really

 6   matters.  So a lot of the discovery disputes that we find

 7   ourselves spending an inordinate amount of time on, and we do,

 8   and we want to address them because we want to act in good

 9   faith.  But at the end of the day it's not that we don't know

10   what they have.  We just want what they have.

11         THE COURT:  OK.

12         MS. MCGOVERN:  On our side, we do believe and we feel

13   that there's just sort of a fundamental refusal to accept what

14   we represent as accurate.  Ms. Markoe and I were talking about

15   that earlier today because -- I don't want to speak for her,

16   but we have explained this.  If there is a further drill down,

17   at this point there will be access to our client in a

18   deposition and those questions can be asked, because we have

19   explained this.

20         I think the other point I would like to raise, and

21   this is an ask, and that is the manner in which we bring these

22   discovery disputes to your Honor.  They are so helpful, but I

23   think they are too helpful.  What I mean by that is that if

24   you're not around, we are just kind of the gerbil on the wheel.

25         I think what we need to do in order to make this more
```

1    efficient, because Judge Bloom may not move this date and we

2    all need to prosecute and defend our claims.  So what our ask

3    is is that the procedure that we use, the protocol that we use

4    before we get your incredibly valuable time, is that we truly

5    sit down -- not at 5,000 meet and confers, but just on one.  It

6    is the one before we spend time preparing this joint submission

7    and giving it to your Honor.  So that by the time we get here,

8    we haven't received a last-minute production or we haven't --

9    we had a whole section on interrogatory responses.  We got the

10   amended answers on the eve and we took that out.  I don't think

11   we need to be doing that.

12        THE COURT:  Trust me, this case is a little -- first

13   of all, people overutilize free resources all the time.  So if

14   it is free to come and see me or keep coming to see me, and I

15   enjoy your company, but so be it.

16        The idea behind my stated protocol is what you just

17   said, that the parties should meet and confer and have a robust

18   meet and confer before you put together this memo and before

19   you come to me and all that.

20        Now in this case because of the time constraints and

21   because of the scope of what we're trying to do here, all of us

22   collectively, myself included, and trying to get our hands

23   around, I thought it would be helpful to make myself available

24   to you on these regularly-scheduled dates.  That doesn't mean

25   you have to use them.  If you haven't had time to meet and

1    confer and you haven't had time to go through my process and

2    really have a meaningful report for me to use as an outline and

3    identify the topics, cancel the hearing.  I just put the

4    hearings out there so they are available if you need them.

5         I didn't want to smack you down for not really

6    following my procedure because I think you are all acting in

7    good faith and there are a lot of complicated issues that need

8    to get decided here.  But truly going forward that is what we

9    should be doing.  We shouldn't be having these hearings until

10   the parties, on both sides, have had a chance to go through the

11   full process I've asked for.

12        Again, I'm not pointing the finger at either side

13   here.  Trust me.  I see both sides are working through a very

14   difficult situation together.  So I don't want to turn this

15   into finger pointing because it really isn't.

16        Mr. Freedman.

17        MR. FREEDMAN:  Yes, your Honor.  I just want to try to

18   get us back to this request.

19        THE COURT:  Sure.

20        MR. FREEDMAN:  I'm more than happy to try and sit down

21   again with the defendants and work it out.  Before I do so, if

22   I could direct the court's attention to skip over C for a

23   section and jump to D.

24        THE COURT:  D in the --

25        MR. FREEDMAN:  So this is page 8 of 127.

1          THE COURT:  OK.

2          MR. FREEDMAN:  I mean, the court has read the

3    submission, but the simple issue -- this is a demonstration of

4    the issue we're having.

5          The court's aware that the defendant came in and said

6    there's about 30 trusts or companies that are not related to

7    Dave Kleiman in this case and we're not producing based on

8    those documents.  So I think very reasonably plaintiff said,

9    OK, can you give us a list of the trusts and companies so we

10   can know what they are, we can prepare for the deposition.  We

11   have been met with you can ask our client at deposition, we're

12   not giving it to you.

13         So I mean, again, if we're supposed to be having open

14   meet and confers, that is not happening.

15         The second is, there is a dispute -- you know, your

16   Honor talked about there is identification of the universe of

17   documents, collection of that document, and then production.

18   There is a dispute over what has to be collected or not

19   collected.  And that is C, and I want to get back to that in a

20   minute.

21         But before we get to that, we've simply asked so we

22   can identify the dispute, please give us a list of all ESI that

23   you have collected from Australian companies, lawyers and

24   accountants.  If the answer is I haven't collected anything

25   from Australia, tell us.  If the answer is you have got from

1    accountants but not attorneys or attorneys but not accountants

2    or not companies, just tell us so we can know what we're

3    dealing with.  We don't get an answer.

4         So Ms. McGovern is saying we should have meet and

5    confers, but we do have meet and confers.  They end in impasse,

6    and that is why this court's hearings have been very helpful.

7         THE COURT:  OK.  Let's break this apart.  Let me go

8    back to B, which is the e-mail issues.

9         Turn to the defendants.  Ms. Markoe and Ms. McGovern,

10   any problem just identifying whether Dr. Wright has ever used

11   the e-mails listed in footnote 5?

12        I'm not saying that there is any relevant information

13   in them at all, but simply confirming yes or no that's an

14   e-mail address -- you don't have to do it right now -- that's

15   an e-mail address that Dr. Wright has used at some point in the

16   past.

17        MS. MCGOVERN:  Yes.  I think there is nothing wrong

18   with us conferring whether he's used -- I don't -- he's used

19   some of those.  I don't know about all of them.

20        THE COURT:  I understand.

21        Can we agree to do that?

22        MS. MCGOVERN:  Sure.

23        THE COURT:  Let's start with that.  To the extent that

24   there are other e-mail addresses here, I'm not saying if you

25   identify them I'm going to order you to produce it or I'm going

to order you to collect it or I'm going to order that it's

relevant, but I think it would be reasonable to direct you to

simply provide -- I'll point this in both directions.  Both

parties should inform the other side of any e-mail accounts

that they know that either Mr. Kleiman or Dr. Wright used

during the relevant time period.  Just so you both know what

you are working with.  So I will order both sides to do that.

Again, I am clearly not ruling that any of that is

going to be searchable, producible, or otherwise, just an

exchange of information.

In terms of -- let me jump ahead, then, to the issue

of the trusts and the D.  What is D here?

Ms. McGovern, Ms. Markoe, I will give you a chance to

respond.  I skipped over C.  I know that.  I will go back to C

in a second.

MS. MARKOE:  No.  Your Honor, again, Mr. Freedman -- I

hate to do this -- wasn't completely fulsome in his response to

you.  He makes it sound like we're not giving them any

information about the companies.  We have provided thousands of

pages of documents about the various companies.

THE COURT:  OK.

MS. MARKOE:  The compilation of the companies and

distinguishing companies from trusts, it is our position that

is work product and that is not something that needs to be

shared with the other side.

1         THE COURT:  OK.

2         MS. MARKOE:  That was collected in order to respond to

3    your Honor's questions.

4         They have documents sufficient to ask questions about

5    the various companies and trusts at the April 4th deposition.

6    They just have to look at them.

7         THE COURT:  Mr. Freedman, I think if that is going to

8    be their position, you can tender an interrogatory between now

9    and the 4th, but the response is not going to be in time, or I

10   will order Dr. Wright to answer all those questions at his

11   deposition.  If you want to prove this area with Dr. Wright,

12   you go at it and I will order him and he has to answer

13   questions related to this topic.  But I don't think I can

14   rule -- I think they are right that it is their work product.

15   If they distill down -- that's all I can do.

16        I will give you a last word on that, Mr. Freedman, but

17   I don't know that I can legally order them to do more than

18   they're doing.  If they want to stand on the work product

19   privilege, I guess can challenge the privilege.

20        MR. FREEDMAN:  No, I understand, your Honor.  The

21   issue is that they're withholding documents based on the fact

22   that these companies and trusts don't involve Dave Kleiman and

23   the court's allowed them to withhold documents based on the

24   mystery companies and trusts that allegedly don't involve Dave

25   Kleiman.

1    THE COURT:  If you find out on April 4th that they

2    have been withholding documents based upon -- for improper

3    purposes, then we will have a much more complicated proceeding

4    at that point that won't end well for somebody.

5    MR. FREEDMAN:  Your Honor -- we'll ask on April 4th,

6    your Honor.

7    THE COURT:  Ask on April 4th and see where we are.

8    Again, I pointed this out a couple of times to other

9    people this week.  Under Rule 26(g) when a party responds to

10   discovery and they give an answer, they are representing that

11   they have done a reasonable and diligent search and that the

12   answer is true and correct.

13   So if they're telling you there's nothing -- none of

14   these trusts have anything to do with Dave Kleiman or W&K, they

15   are experienced members of the bar, they are very professional

16   and ethical people, and I have to believe and I have to accept

17   that representation.  If it turns out when you probe their

18   client that that's incorrect, then we will deal with it as we

19   have to.  But that is all I can do.

20   Let me turn back to --

21   MR. FREEDMAN:  Your Honor, there is one other issue.

22   The list of what they have collected in Australia.

23   THE COURT:  In D.

24   MR. FREEDMAN:  And plaintiff is simply asking to

25   provide a list of Australian companies, attorneys, accountants

1   and employees that Dr. Wright has collected ESI from.

2          THE COURT:  Only ESI?

3          MR. FREEDMAN:  Well, you know what, instead of having

4   to come back to you, any Australian people, persons, that

5   Dr. Wright has collected.  Not whether it is relevant, not

6   whether he has to produce it.  We just want to know who have

7   you collected ESI from in Australia.

8          THE COURT:  Ms. McGovern or Ms. Markoe.

9          MS. MARKOE:  So, your Honor, what I will tell you

10  right now is that the ESI that is disclosed and that we have

11  collected, some of that -- some of those devices were from

12  Australia.  To be honest, I don't know how they went from

13  Australia to the UK.  I'm sure there was some mode of

14  transportation.

15         Some of those devices were company devices of various

16  companies.  Not all of them were identified as whatever it was.

17  Some of them were from former employees, as identified in our

18  disclosure.  We're providing the information that we have at

19  the current time.

20         In terms of collecting documents from attorneys and

21  accountants in Australia, we have not done that.

22         One of the things that we can say and that I can say,

23  and this sort of goes back a little bit to C so I'm not trying

24  to mesh them, but they are sort of meshed a little bit

25  anyway --

1      THE COURT:  Go ahead.

2      MS. MARKOE:  -- what I can say is that I did review

3  some of the privileged material because I was curious as to

4  why, when we were prioritizing their request for documents from

5  davekleiman.com, when we ran our searches -- there's 1500

6  privileged documents -- that makes no sense to me, let me go

7  look at those.

8      So you know what I did.  I did not look at all 1500.

9  I'm not going to make that representation.  But I looked at a

10  number of them, and what I found was a lot of those were

11  e-mails to his attorneys where Craig Wright attached documents,

12  some of which had Dave Kleiman's e-mail address, and that is

13  why they were coming up on our search term hits.  Those

14  documents -- they are satisfied for now for a privilege review.

15  But those attachments, we are not going to be asserting the

16  privilege over those attachments if they are not otherwise

17  privileged.  But the communication with his counsel in

18  Australia certainly will be.  That privilege will be asserted.

19      So one of our concerns is going to Australian

20  counsel -- and if we have to, we have to -- and getting a whole

21  bunch of redundant material that has to be reviewed and

22  produced and then they are going to say, oh, well, there's

23  500,000 documents.  There's 500,000 documents because you asked

24  us to go and get copies of stuff that we already have what was

25  sent to the attorneys.

1     MR. FREEDMAN:  Your Honor, if I may.

2     THE COURT:  Yes.

3     MR. FREEDMAN:  I think that's getting into the meat of

4  C, which I'm happy to get into.  But right now --

5     THE COURT:  Why don't we move C and D together because

6  I think they would be merged together.

7     MR. FREEDMAN:  In the first instance, in D we're just

8  asking for the list of what you've done and what you haven't

9  done.  I think the answer to that is we haven't done anything,

10  which brings us to C.

11     THE COURT:  That is not what she said.

12     MR. FREEDMAN:  That was a misstatement.  We haven't

13  gone to Australia and gotten the documents.

14     THE COURT:  All right.  What she said is they asked,

15  contacted any attorneys or accountants.  I think she said they

16  had contacted other people in Australia, possibly former

17  employees.  She wasn't exactly sure, if I'm remembering right,

18  wasn't exactly sure where some of these hard drives came from

19  or devices came from, but they clearly came from somebody in

20  Australia.  So I think -- I think what clearly is your request

21  is the attorneys and accountant information is really what you

22  are most interested in, and I think what Ms. Markoe said is

23  they haven't done that yet.

24     MR. FREEDMAN:  So then we jump to C.

25     THE COURT:  OK.

```
 1              MR. FREEDMAN:  I want to be clear before I start this,

 2    because I get a little heated about this issue, that there is

 3    no heat here being directed at the lawyers, at Rivero Mestre,

 4    that I think are extremely professional and great lawyers.

 5    However, Dr. Wright has exhibited a continued pattern of saying

 6    untruths under oath to this court.

 7              In the defendant's affidavit in support of his motion

 8    to dismiss, where he moved to dismiss a multibillion dollar

 9    lawsuit on grounds of forum non conveniens, he asserted that he

10    has no documents in his possession from any ATO investigation,

11    and to the extent that my attorneys have any documents from any

12    ATO investigation, they will be located in Australia.  That's

13    33-3.

14              THE COURT:  Got it.

15              MR. FREEDMAN:  I have a copy for the court.

16              THE COURT:  You cited it here and I have seen it

17    before.

18              MR. FREEDMAN:  OK.  So that is part of the reason why

19    plaintiffs were pushing the defendant to go to Australia to get

20    documents.

21              But then Ms. McGovern has told me that getting

22    documents from Australian lawyers would be duplicative.  When

23    this issue was raised, the defendant's response is simply it is

24    clear from the productions thus far -- I am at 127, at page 7,

25    second-to-last box -- clear from the production thus far that
```

```
 1    Dr. Wright was mistaken in his statement in the affidavit.

 2              That mistake could have resulted in the dismissal of a

 3    multibillion dollar dispute.  We would have never known about

 4    it.  Maybe it's just a mistake, but there's another mistake

 5    that Dr. Wright made to the court swearing that he never had

 6    any ownership interest in W&K, which plaintiffs then showed,

 7    they submitted a sworn affidavit exactly the opposite to the

 8    Australian courts.  And document production from the defendants

 9    has shown stock registers of W&K that show that Dr. Wright did

10    have an ownership at some point in W&K.

11              So --

12              THE COURT:  And you will have a lot of fun

13    cross-examining him at the trial.

14              MR. FREEDMAN:  But the problem is the court is

15    expecting us to rely on the representations of Dr. Wright about

16    what is and is not relevant and he has repeatedly demonstrated

17    that he cannot be trusted.

18              THE COURT:  Right, but I will again credit his counsel

19    that he and Ms. McGovern and Ms. Markoe apparently gave you

20    accurate information, which is we are producing these documents

21    and we have done our independent due diligence.  So I

22    understand you can have whatever feelings you have toward

23    Dr. Wright and, as I said, if he testifies and you want to try

24    to impeach him with all these prior statements, you will have a

25    good time trying to do that.  But I'm focused now on what are
```

1    we dealing with here.

2          It seems to me the argument that is being made is, we

3    have reviewed documents.  Ms. McGovern seems to be -- I will

4    let her speak for herself in a second -- but seems to be saying

5    that they have identified documents to be responsive to

6    whatever request generated this.  They have produced those

7    documents and that based on what they can figure out, the

8    Australian documents would be cumulative.

9          Ms. McGovern or Ms. Markoe, I will give you the last

10   word.  I don't mean to cut you off, but let me hear from

11   Ms. McGovern.

12         MS. MCGOVERN:  Am I safe in not responding to the

13   integrity of my client?

14         THE COURT:  You can defend the integrity of your

15   client if you want to, but it is not relevant to my decisions

16   today.

17         MS. MCGOVERN:  All right.  Thank you, your Honor.

18         THE COURT:  I just want to be clear, as far as I'm

19   concerned your integrity, Mr. Freedman's integrity,

20   Ms. Markoe's integrity is not a question to me.

21         MS. MCGOVERN:  Thank you, your Honor.

22         THE COURT:  Your client, that is for somebody else to

23   decide.

24         MS. MCGOVERN:  I have actually been communicating

25   directly with Velvel Freedman on this issue and we have

1   actually engaged Australian counsel to advise us on this issue

2   in response to your Honor's request that we inquire as to what

3   our client's legal rights are and in determining whether he has

4   custody and control of the documents that the plaintiffs have

5   requested us to get from former employees, corporations,

6   attorneys, and accountants.  I am not trying to broaden the

7   issue.  If you are not talking about the companies and the

8   former employees anymore with respect to the documents you're

9   asking us to represent to the court in good faith that we have

10  responded to in discovery, that's fine.  I just want to make

11  sure that we're talking about an issue that did originally

12  incorporate all of that.

13          We went out and we hired Australian counsel because

14  these are Australian companies.  Many of them are -- I think

15  actually all of them are in liquidation.  I've had several,

16  worked pretty deeply with Australian counsel just to figure out

17  exactly how we answer that question to your Honor.

18          The answer is the following.

19          These corporate documents are corporate documents.

20  Even if Dr. Wright were still a director of any of these

21  companies, which I do not believe that he is, but even if he

22  were, the documents requested under Australian law of an

23  Australian corporation would have to be requested in his

24  capacity as director.  The corporation would have the right to

25  determine whether in fact those documents are directly related

1    to Dr. Wright's position as a director in those companies.

2          If the company's in liquidation, it's a completely

3    different sort of quagmire.  In seeking documents, you have to

4    go directly to the liquidator, and it becomes more complicated.

5          It is a different issue with respect to attorneys and

6    accountants.  Clearly if the attorneys and the accountants have

7    documents that are Dr. Wright's in his individual capacity, not

8    his corporate capacity, then they would provide -- he would

9    have the right to provide it.  And in my response to --

10          THE COURT:  He would have the duty to produce them?

11          MS. MCGOVERN:  Yes, he would.  He would.  I am

12    obviously barring any past dues, but that is not the issue.

13          So in my e-mail of March 20th to Mr. Freedman on this

14    particular issue, I specifically said, in response to your

15    request that we sort of ferret out documents in Australia,

16    here's what we're doing.  We're looking to see whether we truly

17    have the legal right and it's within our custody and control to

18    get these documents from corporations of former employees, and

19    we'll get back to you.  But in the meantime, please know we are

20    producing documents, any documents, because we understand this

21    is part -- we don't think it's relevant.  I don't agree with

22    the analysis of the motion to dismiss on this discovery issue.

23    I think it conflates the issue.  But regardless, we are

24    producing them.  So it would -- we're not blocking anything.

25    It's not being delayed.  As soon as we know, I said once we

1   know whether Dr. Wright has a legal right to additional sources

2   of data, we will let you know.

3         I found out two days ago the final word, and here's

4   the answer.  It is not an answer anybody is going to be happy

5   with.  But the answer is it's complicated and -- I'm not

6   kidding -- there were five lawyers on the phone.  That's where

7   we are.

8         THE COURT:  OK.  All right.  Mr. Freedman, I will give

9   you a last chance to comment and then I have some thoughts as

10  well.

11        Go ahead, Mr. Freedman.

12        MR. FREEDMAN:  Just on the companies' issue, I thought

13  the court resolved that, that we would ask that at the

14  deposition and to the extent he has custody and control over

15  it, he would be required to produce it.  Maybe there is a fight

16  coming on who's definition of custody and control governs,

17  United States law or Australian law, but I'm not talking about

18  the companies at the moment.  Right now the focus is

19  accountants and lawyers.

20        THE COURT:  But let me -- actually, I said I wasn't

21  going to interrupt you, but I will interrupt you for a second.

22        I think prevalent within talking about the

23  custodian -- I'd like to drill down a little bit on what's the

24  information we're looking for regardless of whether it is an

25  accountant, a lawyer, an employee, a neighbor.  What is the

1   relevant information we're looking for.  I made some notes for

2   myself based on what I understand the case to be, and I'm

3   certainly not ruling that I'm limiting anything to this.  But

4   it seemed to me, for example, if in the Australian tax matter

5   Dr. Wright made statements that related to the ownership or

6   acquisition of Bitcoin or Bitcoin-related IP by either W&K and

7   Mr. Kleiman, that information would be relevant.  If Dr. Wright

8   made representations about any transactions he had with W&K or

9   with Mr. Wright that involved the transfer of IP or Bitcoins or

10  property rights -- again, what things Dr. Wright is saying to

11  the Australian tax authority seems to me arguably is relevant.

12      If there is conversations about money owed back and

13  forth.  Because I know one of the issues in the case is the

14  plaintiffs' view is there was a sham transaction.  The

15  defendant's view is it is not a sham transaction involving the

16  transfer of certain things.  So if he's making representations

17  about those sorts of transactions.

18      So it would seem to me, and this is why I asked

19  earlier about help me understand the ATO investigation, but at

20  a minimum it would seem to me that if there are statements that

21  Dr. Wright is making either to the Australian tax authorities

22  or in the context of talking to other people about the

23  Australian tax investigation that relate to those topics, it

24  seems to me -- I'm not ruling, so don't pull the transcript and

25  tell me you had to do this -- it seems to me that is kind of

1  the core of what the plaintiff seems to be looking for, but it

2  also seems to me that you're going to now tell me that's pretty

3  much what you are turning over anyway.

4          MS. MCGOVERN:  Correct.

5          THE COURT:  So it seems to me we may have targeted the

6  bull and the dart going to the same place and maybe we just

7  need to understand that.  And then the question just becomes,

8  at the margin, is there anything of value beyond that that is

9  worth looking for, is it unduly burdensome, is it cumulative,

10  etc.

11          Mr. Freedman, now I've given you my thoughts, I will

12  hear from you.

13          MR. FREEDMAN:  No, that is very helpful, your Honor.

14          I think the issue that plaintiffs are having -- I

15  think the court's crystallized the dispute -- is that the

16  defendant has gone from one extreme to the other, saying in the

17  first instance that he has nothing from the ATO and now saying

18  that he has so much from the ATO that going to his Australian

19  lawyers would be cumulative.

20          It seems to me that there is no way for -- because

21  Rivero Mestre is not involved as far as I'm involved in the ATO

22  investigation.  There is no way for them to know the universe

23  of the ATO documents and they would have to be relying on their

24  client's representation that there is nothing more with their

25  lawyers.

```
1          The district court has determined that it wouldn't be

2    a big deal to get documents from Australia because it comes

3    electronically in the order on the motion to dismiss, and as

4    far as I recall at the last hearing the court said that

5    Dr. Wright had to go to his Australian counsel and accountants

6    unless he filed a motion to show that it was too burdensome.

7    There's been no such motion.

8          So plaintiff asked for an order directing Dr. Wright

9    not to produce, to just collect from his Australian counsel and

10   accountants.

11         THE COURT:  Back to the -- go ahead, Ms. Markoe,

12   Ms. McGovern.  I will hear from you first.

13         I will rule on that.  Listen, I am not going to order

14   them to go get the information.  I think I will order them to

15   do what I think the rules already require them to do, which is

16   to engage in a due diligence process with Australian counsel,

17   accountants, and whatever, as they are required to do under

18   Rule 26, whatever due diligence they otherwise would be

19   required to do, to try to determine if discoverable material

20   exists.

21         I have laid out what I believe would be a reasonable

22   scope.  Again, I'm not necessarily ordering them to get that

23   from Australia because they can argue that it is cumulative or

24   that it is unduly burdensome.  But to the extent -- and I'm not

25   saying they have not done so.  Let the record be clear.  I am
```

1    not saying they have not already engaged or started to engage

2    in the due diligence process.  But I think that is all I can

3    order them to do.  I am not going to order them that they have

4    to go to Australia or tell the Australian lawyers give us your

5    entire file so we can look through it.  I think they are

6    entitled to rely to some extent on Australian counsel and

7    Australian accountants.

8            I understand you don't believe they should ever rely

9    on their own client.  I have been in practice for 30 years.  I

10   have learned the lesson sometimes you can rely on your client

11   and sometimes you can't.  But all I can do is direct them to

12   continue to engage in the due diligence process they have

13   engaged in.  You can certainly inquire of all of this when you

14   depose Dr. Wright.

15           I think that's all I can do today.

16           MR. FREEDMAN:  Your Honor, can I just ask one thing?

17           THE COURT:  Sure.

18           MR. FREEDMAN:  Can we get a date by which -- because,

19   as the defendant has pointed out multiple times, until an

20   extension is granted, we have got a trial date coming up.  So I

21   need to know whether these documents are coming or not coming

22   or are they in his possession.  Can we get a date by which

23   Dr. Wright has to take a position on the Australian documents?

24           THE COURT:  I think that date is April 4th because I

25   just told you, you can ask him about it.

```
1              MR. FREEDMAN:  Fair enough.

2              THE COURT:  So in advance of that, perhaps Ms. Markoe

3    or Ms. McGovern have their -- by April 2nd, because they agreed

4    to pick that date for something else, if you could just provide

5    Mr. Freedman with a status on what you have gotten from

6    Australia.  Just a status on this process.

7              I don't want to start enumerating categories, but

8    essentially do you expect more to be coming, have you sort of

9    finished your due diligence process and you believe anything

10   you could get from Australia would be cumulative to what you

11   already produced.  Just bring him up to date so when you go to

12   the deposition in England, we're not wasting a whole lot of

13   time on an issue that isn't really an issue.

14             I think that is a fair way to proceed with that.

15             April 2nd is the date, Mr. Freedman.

16             MR. FREEDMAN:  Thank you, your Honor.

17             THE COURT:  OK.  Have I now ruled on everything?  I

18   don't know.

19             MR. FREEDMAN:  No, your Honor.

20             THE COURT:  What is left that I didn't rule on?

21             MR. FREEDMAN:  There are disputes over search terms

22   and some of the outstanding requests for production.

23             THE COURT:  Hold on.  Let me go back to that.

24             Now you're cycling back to the prior --

25             MR. FREEDMAN:  I'm going to E.  So I'm at page 9, the
```

1    last page of the submission, your Honor.

2          THE COURT:  Search terms.  What do you want me to do

3    with search terms, guys?  You know this case.  I don't know

4    this case to the level of granularity that I can decide what

5    search terms you have to have and what search terms you don't.

6    Is that really what you are asking me to do?

7          MR. FREEDMAN:  Your Honor, we just are not getting

8    anywhere with trying to reach agreement on it.

9          MS. MCGOVERN:  Your Honor, if I could respond quickly

10   to that.  I had a conversation with Kyle Roche specifically

11   about this issue, because in trying to get a joint submission

12   to be five pages long and not continue to ask for more pages, I

13   called and asked whether we were going to bring the search term

14   issue before the judge.

15         We explained that the only reason we are disputing

16   search terms, to be very clear, is not because we care.  We are

17   using search terms and we are doing hit counts and we are not

18   deciding whether that hit count or that search term has any

19   value or whether we like the way it is worded.  It merely has

20   to do with the fact that some of these search terms are

21   triggering such a high hit count that in our cursory review the

22   false positives are so large that it is crazy.  Number one.

23         Number two, it is just not relevant because it deals

24   with the way they have sort of -- we are trying to explain, if

25   you have 95,000 hits on a particular search term when we have

1    already got all of this data.  Do you really want to pursue

2    that particular one?  Why can't we just table the disputed

3    search terms for now, because we have so much more we're

4    perusing with all your other search terms, table that search

5    term and then if you find as you're reviewing documents, and

6    it's been my experience that this has been very helpful, and

7    whenever I've had a problem with any of the lawyers at Boies on

8    some of these really big ESI cases, this is the way we've

9    resolved it, which is, if you find documents that suggest that

10   your other search term, which had a whole bunch of hits that

11   seemed like false positives and it was just going to be a big

12   waste in effort and money, come back, explain I just saw this

13   document, it has this particular material, I think we need to

14   run it.  But that exercise is not happening here.  And we

15   simply can't willy-nilly agree to all of these because we'll

16   never finish reviewing it.

17        MS. MARKOE:  Further, I just want to add one thing,

18   which is that we have undertaken the task of -- not with every

19   single one of these proposed search terms, but at least with

20   some of them -- going in and looking at them and looking at the

21   documents that hit on them before promoting them for review.

22        What we have found is that a lot of them really are

23   false positives.  And Dave is a really common name.  Ramona,

24   Craig's current wife, her ex-husband's name was Dave.  There

25   are many Dave's that were in Craig's life.  There are Davises

1    that were in Craig's life.  Because they don't want just Dave

2    or David.  They want D-A-V with an asterisks, meaning that it

3    will hit Dave, David, Davide, like a thousand things.  So

4    that's really where -- we want them to get what they are

5    entitled to because the facts are what they are.  That is the

6    great thing about litigation.  We're looking at something that

7    is historical.  It's already happened.  So I can't change that.

8    And documents aren't going to be changing.  So they are what

9    they are.

10          They are getting what they are getting, and we want to

11   get them the most targeted stuff.  Rather than dumping a bunch

12   of nonsense on them and us having to go through it and them

13   having to go through it, it just seems kind of silly when we

14   can really do very targeted searching, which is really what

15   we're trying to do.

16          I just wanted to explain to the court that we're not

17   taking these positions willy-nilly.  We have actually done the

18   work to go in and test some of these terms out and they just

19   don't work.

20          THE COURT:  OK.  Thank you.

21          Someone on the phone wanted to chime in?  Mr. Roche,

22   Mr. Kass.

23          MR. ROCHE:  Yes.  It is a little difficult for me to

24   follow.  I'm not sure -- I just want to clarify.  Yes, I did

25   speak with Ms. McGovern.  The term that was disputed was info

1    and research, which is the name of our plaintiff in this case.

2    So we of course think that that would be highly relevant even

3    if there are two false positives.

4            Just as a broader point, they are asserting that we

5    are being in some way unreasonable on certain terms.  We have

6    explained to the defendants on our call that we weren't going

7    to review certain terms because we also think they are overly

8    broad and they have said that they dispute that and will be

9    taking them up with the court.

10           So we are following the process that we believe has

11   been agreed upon by both parties.  So I think that there is a

12   little bit of a disconnect here.

13           THE COURT:  OK.  Here's what I'm going to do.  What is

14   the physical distance from 2525 Ponce de Leon Boulevard to 101

15   Southeast 2nd Street?

16           MS. MARKOE:  Probably about 8 and a half miles.

17           THE COURT:  I am going to order the parties to meet in

18   person in a conference room either at 2525 Ponce de Leon

19   Boulevard, suite 1000, or 100 Southeast 2nd Street, suite 2800,

20   before 5:00 on Thursday to resolve these issues of search

21   terms.  You are to start in that office and in that conference

22   room until these issues are resolved.

23           You can decide amongst yourselves or flip a coin as to

24   whether it is going to be at 2525 Ponce de Leon or at 100

25   Southeast 2nd Street.

1        I am not refereeing this issue because if I am asked

2   to referee this issue, I'm going to tell you how I'm going to

3   do it.  I am going to order each side to submit their proposed

4   order and I am going to pick one.  The way that I pick it may

5   very well be that I'm going to flip a coin.

6        So you all can work this out like the grownups that

7   you are or you can give it to me and I don't know anything

8   about your case at all.  I don't know anything about these

9   search terms.  I never had a case in my career where I had to

10  do tar, but I will make the decision for you.  You won't like

11  it, but I will make the decision.

12       So that is my order.  By 5:00 on Thursday I want this

13  resolved.

14       MS. MCGOVERN:  Your Honor, would you mind if we add

15  just both sides' search terms, that both sides resolve all

16  disputes regarding both sides' search terms?

17       THE COURT:  Yes.

18       MS. MCGOVERN:  Perfect.  Thank you, your Honor.

19       THE COURT:  Start as early in the day as you have to,

20  but I want it done.  I'm tired of this.

21       OK.  Let's turn to F, the remaining issues from the

22  last go-around.

23       So a number of these, 16 through -- 16 and then 18

24  through 27 all had to do with the Appendix N, which I have now

25  had a chance to review.  First of all, I couldn't find some of

1    these references in Exhibit N.  They were buried so far deep in

2    the appendix.  I think all those issues are best dealt with

3    after Dr. Wright's deposition.

4         Mr. Freedman, if you want to ask Dr. Wright about

5    these things, I think that's the best way to deal with it

6    rather than by a request for production.  Because I do think

7    there's been some objection to time frame and some of these

8    things don't relate at all to Bitcoin and other things.  So I

9    think the best way -- my ruling would be as to 16 and 18

10   through 27 that we will deal with all of that after his

11   deposition.

12        MR. FREEDMAN:  Just because, your Honor, I know that

13   there's going to be issues at the deposition, the court's

14   authorizing us to ask about those issues at the deposition?

15        THE COURT:  Yes.

16        MR. FREEDMAN:  Thank you.

17        THE COURT:  Yes.  Yes.  And to a reasonable level of

18   depth.  Obviously a logical question might be, for example, 21,

19   right, there is a reference to a loan from Lynn Wright.  What

20   was the loan for, how much was it, when did it occur, did it

21   have anything to do with Dave Kleiman.  No.  Thank you.  Let's

22   move on.

23        Or if it is yes, that was money Dave loaned to Liam,

24   then you can drill a little deeper than that.

25        Yes, you can ask about those topics to a reasonable

```
 1  level.

 2           All right.  36 and 37.  This I think gets back to what

 3  I was saying a second ago about the Australian tax office and

 4  what really should be relevant there, which is statements made

 5  either by -- statements made by Dr. Kleiman -- Dr. Wright or

 6  attributable to Dr. Wright relating to W&K and Mr. Kleiman, the

 7  IP, Bitcoin, etc.  So deal with it substantively like that.

 8           Again, I think 36 and 37 should pretty much resolve

 9  themselves once you all get the search terms resolved, I would

10  think.

11           Ms. Markoe, you are looking at me as if I'm missing

12  something.

13           MS. MARKOE:  No.  I just wanted to clarify what you

14  are saying because I could see it being interpreted one of two

15  ways.

16           THE COURT:  OK.

17           MS. MARKOE:  I could see it being interpreted as

18  anything regarding to IP and Bitcoin or anything regarding to

19  IP and Bitcoin and Dave Kleiman and W&K.

20           THE COURT:  Yes.

21           MS. MARKOE:  So that was just, I just wanted

22  clarification.

23           THE COURT:  Yes.  Obviously relevant to this case.  If

24  Dr. Wright made representations that he had somehow developed

25  the IP for the brakes on a Mazda vehicle, that is IP but that
```

1    has nothing to do with this case.  Or if he has Bitcoin that he

2    used to pay for the pizza at Dominoes, that's got nothing to do

3    with Dave Kleiman.  So yes.

4         My intention as to 36 and 37 is to get to the

5    plaintiff what I think is the core, the relevant information,

6    which is what I said earlier.  Statements that presumably could

7    be used at trial to impute to Mr. Wright either -- Dr. Wright

8    either admissions as to Mr. Kleiman's involvement in what is

9    alleged in this case or knowledge by Dr. Wright about

10   Mr. Kleiman's activities or things of that nature.

11        Discovery is supposed to be geared to helping the

12   parties in their claims and defenses.  So the idea is, I think

13   that's what is relevant.  Whether what Dr. Wright did with the

14   IP interest had Australian tax consequences has nothing to do

15   with this lawsuit.  Whether he hid money in an offshore trust

16   that he hid from the Australian tax office and had nothing to

17   do with Mr. Kleiman, it has nothing to do with this lawsuit.

18        So yes, my purpose was to -- what Ms. Markoe said.

19   That is a long way to say what Ms. Markoe said.

20        MS. MARKOE:  Thank you, your Honor.

21        MR. FREEDMAN:  Your Honor, only because you have

22   adopted Ms. Markoe's statement, all parties are on the same

23   page that it has to be relevant to the case.  I think the

24   fundamental disagreement between the plaintiffs and the

25   defendants is that the defendant has taken the position that

1    the only thing that's relevant to the case is if it mentions

2    Dave Kleiman or W&K and plaintiffs say, well, there are other

3    entities that are relevant as demonstrated by the defendant's

4    affidavit swearing that there are other companies that are

5    relevant.  So I just want to make sure you're --

6              THE COURT:  Again, I think to the extent -- look, it's

7    hard for me to look into a vacuum that I don't know.  But, for

8    example, if the allegation is that assets were devoided from

9    W&K into another entity ABC, then clearly ABC becomes relevant

10   because it ties back to W&K.  Or if the allegation is that

11   Mr. Kleiman's wife, girlfriend, brother, family member

12   authorized something, that doesn't directly tie to Mr. Kleiman

13   but it's close enough.  It's relevant to this lawsuit.

14             You are all grownups.  You know what I'm saying here

15   about what I think is relevant and not relevant, and I don't

16   think you all are that far apart on this.  Again, I think this

17   is going to be largely driven by the search terms that you are

18   all going to agree to anyway.

19             So that is my ruling on that.

20             40 I think also deals with the ATO, and I've actually

21   just ordered what you were talking about.  Now 40 is

22   conversations between Dr. Wright and people from the ATO.

23   Again, to the extent he's talking to people at the ATO about

24   Dave Kleiman, W&K, the transfers of Bitcoin IP, the mining of

25   Bitcoin with Dave Kleiman or Dave Kleiman-related entities, I

1    think that's relevant.  If it is other stuff, I don't think

2    that's relevant.

3          MR. FREEDMAN:  Your Honor, that is why plaintiffs'

4    inherently limited the interrogatory.  So I don't know if the

5    court has docket entry 114 in front of it.

6          THE COURT:  I do.  Which number?  114 dash?

7          MR. FREEDMAN:  No, actually just 114 itself.

8          THE COURT:  What page?

9          MR. FREEDMAN:  Page 5.

10          THE COURT:  OK.

11          MR. FREEDMAN:  This actually went for 36 and 37 as

12    well.  The plaintiffs have limited the request, both of these

13    requests to basically adopt the court's limitations.

14          THE COURT:  Give me the language that you've got in

15    here, Mr. Freedman, if you could.

16          MR. FREEDMAN:  Any document that makes a record of a

17    conversation between Craig and/or his agents and the ATO that

18    also references any of the individuals or entities listed in

19    numbers 36 and 37.  Those are the entities, primarily the

20    entities that Dr. Wright has sworn were relevant to the case in

21    the affidavit or entities that are patently relevant, like the

22    Tulip trading trust or the Seychelles trust and things like

23    that.

24          THE COURT:  OK.  Ms. Markoe, Ms. McGovern, any

25    objection to that being the scope of what you will look for?

1          MS. MARKOE:  Yes.

2          THE COURT:  OK.

3          MS. MARKOE:  First of all, we have told them that they

4    are getting everything regarding Tulip.

5          THE COURT:  OK.

6          MS. MARKOE:  So they are getting that.

7          What we would limit this request to is what our

8    response was to these requests, which was anything that

9    references Dave Kleiman or any trust which Dave Kleiman had any

10   involvement either as beneficiary or trustee.  Ira Kleiman,

11   Louis Kleiman, Coin Exchange Party, Ltd. or WK or W&K, which is

12   also WKID, and that's what we're -- those are the topics that

13   we think are relevant.

14         If it references an entity that we have discovered now

15   that Dave Kleiman was involved in, they're getting that too.

16   We're not trying to hide the ball from them.

17         To open this up to every single entity or every

18   single -- or a whole bunch of entities that don't, there's no

19   direct connection with at this point just is unduly burdensome

20   and not relevant to getting to the heart of this matter.

21         THE COURT:  But how do you deal with the fact that

22   your client swore they were relevant to the lawsuit?

23         MS. MARKOE:  Well, your Honor, I think -- I was not

24   involved in the case at that time.

25         THE COURT:  I understand.

```
 1              MS. MARKOE:  So I don't know about the genesis of that
 2       affidavit.
 3              THE COURT:  Well, I think your client is stuck with
 4       what he said.
 5              I am going to order what Mr. Freedman has asked for.
 6              Maybe your client will be a little more careful in the
 7       future when he swears out an affidavit.  But he swore these
 8       entities are relevant to the lawsuit and that's what I am going
 9       to order.
10              MS. MARKOE:  OK.
11              MR. FREEDMAN:  Your Honor, that is for -- there's a
12       lot of these interrogatories.
13              THE COURT:  36, 37, all the ones relating to the ATO.
14       36, 37, 40, 41, I think were the ones.
15              MR. FREEDMAN:  Your Honor, 45, which is also in front
16       of the court now --
17              THE COURT:  I haven't gotten to that one yet.  Hold
18       on.
19              MR. FREEDMAN:  -- has the same limitation.  Ties back
20       to these entities.
21              Your Honor, just for clarity, there's only eleven
22       entities.
23              MS. MCGOVERN:  Your Honor, we understand the ruling.
24              THE COURT:  On 45, I will issue the same ruling then.
25              Did we resolve those -- 88 is the only one left that I
```

1   think is here.

2          I will be candid.  I don't remember this.  I think at

3   the last meeting Mr. Rivero said, Ms. McGovern, you were the

4   one that had been dealing with this.

5          MS. MCGOVERN:  I apologize.  Can I just see 88 really

6   quick, your Honor?

7          THE COURT:  It is documents related to the agreement

8   involving Dr. Wright and Robert McCray or referenced in the

9   Satoshi affair.

10         Mr. Freedman, help me out.  Educate me again on what

11  this is.

12         MR. FREEDMAN:  Yes, your Honor.  The Satoshi affair is

13  an article written by Andrew O'Hagan, or story written by

14  Andrew O'Hagan that chronicles kind of the creation of Bitcoin,

15  the Satoshi Nakamoto story.

16         THE COURT:  Right.

17         MR. FREEDMAN:  As part of that story, Mr. O'Hagan

18  receives a call letting him know that the person on the other

19  end of the line had been contracted to sell the life rights of

20  Satoshi Nakamoto and Satoshi Nakamoto's intellectual property.

21         The entire engagement of Mr. O'Hagan and the entire

22  story that he tells in the story is basically an attempt by the

23  defendant to come out as Satoshi Nakamoto, use that fame and

24  celebrity status to then sell his intellectual property that

25  Satoshi Nakamoto created for billions of dollars, the article

1  says.

2       THE COURT:  OK.

3       MR. FREEDMAN:  And so the plaintiffs' position is that

4  admissions with regard to who owned the intellectual property

5  created by Satoshi Nakamoto and the story of Satoshi Nakamoto

6  are relevant to the case because it is plaintiffs' theory that

7  Satoshi Nakamoto is the name of a partnership between Craig

8  Wright and Dave Kleiman.

9       MS. MCGOVERN:  I recall the issue now.  For some

10  reason I didn't focus on No. 88 when I was looking at this.

11       I think our position is a sound position, your Honor,

12  that we have stated in response to the plaintiffs' request

13  here.  Essentially what we say is that there's nothing before

14  this court that suggests that the documents that they have

15  requested here relate to Dave Kleiman or W&K.  Nothing.

16       They are saying we have scoured the internet and we

17  have discovered certain things regarding Satoshi and we're

18  going to ask for all documents related to that to see whether

19  there's something that comes out of that that makes the Dave

20  Kleiman or Ira Kleiman, actually, argument regarding the

21  partnership sound.

22       What we have said in response to that is we disagree.

23  However, we will search for communications and documents that

24  relate to this alleged agreement to the extent that they

25  reference or in any way relate to Dave or WKID or W&K.

1          The reason that we believe that's a good compromise,

2    your Honor, is because if it doesn't reference W&K or Dave

3    Kleiman, they can argue anything they want to argue, that it

4    was expressly eliminated or this just goes to show you that

5    he's been cut out.  I don't know what they're going to say.

6    But it would only support their case if he were in fact

7    referenced in connection with this alleged agreement.

8          So to dive into another agreement with another person

9    simply because it refers to Satoshi and they've got at this

10   point a completely unsubstantiated partnership claim which is

11   the Satoshi partnership is a stretch that goes beyond anything

12   relevant to their claims in this case.

13         THE COURT:  OK.  I think at this point the first group

14   of the production they are asking for is disproportionate now,

15   today.

16         Ask Dr. Wright at his deposition if he ever

17   communicated with the author, whether he was in fact the person

18   who made these representations and he was the one who talked to

19   the author, and let's see where that takes us.

20         If he denies ever talking to this person, you will

21   have to go at it a different way.  If he admits it, maybe it

22   becomes more proportionate to try to value it.

23         MR. FREEDMAN:  Your Honor, Mr. O'Hagan writes in the

24   article that he has hours of the defendant on tape talking to

25   him about Satoshi in the early assessment, and that will be the

1    subject of a letters rogatory request because we don't want to

2    come to the court and then the English courts multiple times.

3    But that is with the author.

4          This is a targeted request that goes to the individual

5    who was buying the partnership's life rights.  So Robert McCray

6    is the individual referenced in 85 was the money man behind the

7    deal to buy the partnership's rights and the partnership's

8    intellectual property and then capitalize on the partnership's

9    fame and notoriety by selling it.

10         THE COURT:  Did the sale ever go through?

11         MR. FREEDMAN:  No, because when Dr. Wright was

12   supposed to come forward -- according to the article, when

13   Dr. Wright was supposed to come forward and prove that he was

14   Satoshi Nakamoto with cryptographic proof, he failed to do so

15   and the world turned on him as being a fraud.

16         THE COURT:  OK.  I will stand by my ruling.

17         You can ask Dr. Wright about all this when you depose

18   him and depending on his answers, we will take the next step at

19   that point if we need to.

20         MR. FREEDMAN:  Thank you, your Honor.

21         THE COURT:  Sure.

22         Have I now dealt with all of the discovery matters for

23   today?

24         MS. MCGOVERN:  Yes, your Honor.

25         THE COURT:  So a couple of things I want to just

```
 1    follow up on.  I am going to set another date, but I am going

 2    to sort of invite -- I think Ms. McGovern makes a good point,

 3    and, again, I'm not pointing fingers at either side here.  I am

 4    trying to balance making myself available to rule on what needs

 5    to be ruled on but not inviting you all to not go through the

 6    full process you need to go through and not giving you enough

 7    time to go through the full process.

 8           What I was going to suggest is that we set another

 9    date just to have it on the calendar but that either side can

10    unilaterally cancel it if you don't believe there's been

11    sufficient time to meet and confer.  So that way we won't have

12    a situation where one side or the other feels like why are you

13    dragging me in front of the judge, we haven't really had a

14    chance to talk about that, or before I spend the time to write

15    up this joint memo we should talk some more.

16           So that is what I am going to do going forward.  I

17    will set dates and I will allow either side to unilaterally

18    cancel them.  And if it turns out you need me, we can get you

19    back on a fast track pursuant to my normal protocol.

20           So how soon do you all think it would be helpful to

21    have a call?

22           MS. MCGOVERN:  Your Honor, if I could jump in on that.

23           THE COURT:  Sure.

24           MS. MCGOVERN:  So we have the deposition of Ira

25    Kleiman that's been scheduled for April 8th.
```

```
 1            THE COURT:  OK.
 2            MS. MCGOVERN:  I think it would be a good idea for us
 3   to see you before then.  We haven't heard from plaintiffs as to
 4   whether our proposed topics are OK.
 5            THE COURT:  OK.
 6            MS. MCGOVERN:  We just want to make sure that all
 7   issues related to Ira Kleiman's deposition are fleshed out
 8   before we go forward on the --
 9            THE COURT:  Dr. Wright's deposition is the 4th?
10            MS. MCGOVERN:  It is.
11            THE COURT:  In London?
12            MS. MCGOVERN:  In London.
13            THE COURT:  When are you all leaving for London?
14            MS. MCGOVERN:  I am not going to be going --
15            THE COURT:  You get the free trip, Ms. Markoe.
16            MS. MARKOE:  Yes.  My daughter is thrilled.  Her
17   birthday is that weekend.
18            So I am leaving the night of April 2nd and coming back
19   on April 5th.
20            THE COURT:  Mr. Freedman, when are you heading
21   overseas?
22            MR. FREEDMAN:  April 2nd, but I am coming back on
23   Friday, I believe.
24            MS. MARKOE:  April 5th.  We will be on the same
25   flight.
```

```
 1              THE COURT:  You are going to be on the same plane.
 2   You will get back for shabbat, I hope.
 3              MR. FREEDMAN:  Yes, your Honor.
 4              MS. MARKOE:  Yes.  Back in time for shabbat and my
 5   daughter's birthday party on Sunday.
 6              THE COURT:  That's important.
 7              I was going to say, does it make sense for us to do
 8   something even -- I know it is really soon.  It would be next
 9   Monday, the 1st.  But if anything is acute -- that is one word,
10   A-C-U-T-E, not two words -- anything is acute relating to
11   either of those depositions, I can address it before you all
12   fly off to England.
13              I also told you on the 4th I would make myself
14   available at a preset time if you all need me to rule on
15   particular objections.  I can never remember, is it later or
16   earlier in the day in London?  If you wait until the end of the
17   day in London to contact me, is it going to be --
18              MS. MARKOE:  It is four hours ahead of us.
19              THE COURT:  So 4:00 London --
20              MS. MARKOE:  It is 4 because they don't have Daylight
21   Savings Time.
22              THE COURT:  So 4:00 London time would be 8 p.m.
23   Florida time?
24              MS. MARKOE:  No.  4:00 London time would be noon
25   Florida time.
```

```
 1              THE COURT:  That works for me.

 2              All right.  So you all can let me know whether we need

 3       to get together on the 1st.  If we get together on the 1st,

 4       what time on the 4th you would like me to make myself

 5       available?  Thursday I'm pretty much available all day.  I just

 6       have a couple of status conferences that I can work around with

 7       you.

 8              Give me a sense of what time of day on the -- not that

 9       you are going to need me because you are going to resolve all

10       these issues, but I can be available on the 4th.

11              MR. FREEDMAN:  Maybe like 10 a.m. your time.

12              THE COURT:  10 a.m. my time, which is 2 p.m. your

13       time.  Is that's fine?

14              MS. MARKOE:  You have the deposition starting at 11:30

15       a.m.

16              MR. FREEDMAN:  We can do it earlier.  I wanted to make

17       sure there was time to get through a chunk of it so when the

18       court is available --

19              MS. MARKOE:  What I was suggesting is I don't know two

20       and a half hours into the deposition with lunch and everything

21       would really make sense.  I would do it later in the day.

22              THE COURT:  That's fine.

23              MS. MARKOE:  I would say 5 --

24              MR. FREEDMAN:  Do you want to start earlier?

25              MS. MARKOE:  It's your depo.
```

 1          MR. FREEDMAN:  I'm happy to work with you.

 2          MS. MARKOE:  I would suggest 5 p.m. perhaps London

 3   time, which would be 1 p.m. Florida time.

 4          THE COURT:  That is fine.  Start early and get as much

 5   time as you can.

 6          MR. FREEDMAN:  Sure.

 7          MS. MARKOE:  Then we would have like a few hours and

 8   whatever issues that have arisen we can resolve without it

 9   getting too late.

10          THE COURT:  Then you still have time to go back in

11   after I rule.

12          OK.  1:00 Eastern time.

13          MR. FREEDMAN:  Your Honor, April 1st is really tough

14   for me because I'm leaving on the 2nd.  So I packed like

15   everything --

16          THE COURT:  I understand.  Again, if you don't need

17   me --

18          MR. FREEDMAN:  I'm hopeful we won't need you, but if

19   you do need us, I'm not sure -- if the court orders it, the

20   court orders it.

21          THE COURT:  No.  I want to work with you all, but I'm

22   looking at the calendar.  You and Ms. Markoe aren't going to

23   fly back until the 5th.  Then the deposition of Ira Kleiman is

24   on the 8th, which is Monday.  So you're coming home on Friday,

25   the deposition is on Monday.  We're not going to really have a

1    window of time there if issues need to be resolved.

2           I mean --

3           MR. FREEDMAN:  How about a telephonic hearing on the

4    29th?  I am not sure we are going to object to any of the

5    topics, but I don't want to say that without reviewing it one

6    last time.

7           THE COURT:  The 29th would be this Friday.

8           MR. FREEDMAN:  Yes.  I don't think we need a lot of

9    time.

10          THE COURT:  Let me do this.  Talk amongst yourselves

11   and see if there is an issue.  If you need me to make myself

12   available, I have a settlement conference on Monday, but I can

13   take a break from that.  If you need to get together this

14   Friday, I can do that.  If you want to do it Tuesday morning

15   before you go to the airport, I can do that.  If you want to do

16   it Wednesday once you're in London, we can do it then.

17          I will make myself available to accommodate you all.

18   But maybe you don't need it.  If you don't need it, you don't

19   need it.

20          MS. MARKOE:  Thank you, your Honor.

21          The only other thing I would suggest is if we do need

22   you, perhaps given the tight nature of this, if it wouldn't be

23   too burdensome on you to do a 24-hour joint submission to you

24   rather than a 48 hour given the time frame.

25          THE COURT:  You can do a nonjoint submission to me if

```
 1    it is that quick and tight.

 2            Again, you all have gotten very good at -- you know

 3    the questions I'm going to ask you.  I always ask what you

 4    think is relevant, why is it disproportional, is it unduly

 5    burdensome.  So you have my catechism down now.

 6            Again, in the interest of time I would rather you all

 7    spend the time talking to each other rather than writing joint

 8    memos.  We can waive that for these purposes.

 9            But that all being said, let's just set another date

10    maybe for after Ira Kleiman's deposition to just have something

11    on the calendar.  How about the 11th?  How about Thursday, the

12    11th?  That will give you a chance to take Ira Kleiman's depo,

13    then talk amongst yourselves if there is any followup.

14    Everybody can get back on U.S. time.

15            So Thursday, the 11th, at 3?  Does that work?

16            Again, if either side feels like we don't need it,

17    either side can unilaterally cancel.  That's my way to try to

18    balance it.

19            Then finally, and I will let you all go because I hope

20    you took the train so you will have a nice relaxing trip back

21    to Miami.  I've looked at the motion to strike affirmative

22    defenses.  As I said, I'm not ruling on the merits at this

23    time.  I'm going to read it again and whether I will do oral

24    argument or just rule.  But I do have one question, I guess.  I

25    won't put an adjective in front of it.
```

```
 1          It seems to me there is a general -- what discovery in

 2    the case goes away, Mr. Freedman, if your motion is granted?

 3    It seemed to me that sort of the big argument was that the

 4    court should rule on these because if certain affirmative

 5    defenses are stricken, then we don't have to spend time and

 6    money doing discovery on those.  So I was just trying to get a

 7    sense, not that that's dispositive of my decision, but it would

 8    be helpful for me to understand better what the parties' sense

 9    is on that.

10          MR. FREEDMAN:  With the caveat that I haven't read the

11    motion in a while --

12          THE COURT:  Understood.

13          MR. FREEDMAN:  -- and that I'm not sure -- I think

14    that it doesn't have to get rid of discovery to be stricken,

15    but with that --

16          THE COURT:  And I accept that.  That's why I said it

17    is not going to be dispositive, but it is helpful for me when I

18    look at it to try to understand, particularly, for example, one

19    of the claims there is an argument that it is sort of

20    overlapping.  If striking one and leaving one is going to still

21    have the same amount of discovery, I just would like to know

22    that.

23          MR. FREEDMAN:  Again, I want to think about it, but

24    probably the overlapping ones have a reduced discovery

25    component.  For example, the one that comes to mind is the
```

1    defendant has asserted an unclean hands defense --

2             THE COURT:  Right.

3             MR. FREEDMAN:  -- arguing that Ira Kleiman misreported

4    items on his tax returns and did other untoward things with the

5    reporting of the estate's assets.

6             THE COURT:  Right.

7             MR. FREEDMAN:  And therefore can't collect against

8    Dave Kleiman -- against Dr. Wright.

9             Without commenting on the merits of that, my client's

10   position is there aren't any.  But I mean, we've received

11   discovery requests aimed at like all kinds of what did you do

12   with all the estate's assets, what did you report, and we have

13   agreed to give the tax returns to the estate just to get that

14   out of the way.

15            But there are much broader questions about what was

16   done with the estate, what was communicated about the estate.

17   There are search terms that are targeted at like probate,

18   administration, will, things like that.  All that will go away

19   if that is stricken.

20            THE COURT:  OK.

21            MR. FREEDMAN:  I don't have the motion in front of me

22   so I can't recall the --

23            THE COURT:  No, that is OK.  I will just quickly --

24   and again, I don't mean --

25            MS. MCGOVERN:  Your Honor, I don't think that it would

```
 1    go away.

 2             THE COURT:  You don't.

 3             MS. MCGOVERN:  No.  In any event.  Because this is an

 4    action brought by the estate, and how the estate was handled

 5    with respect to the assets in the estate are going to go to the

 6    basis for the claims.  This is a claim that was brought many,

 7    many years after he became personal representative of the

 8    estate and after Dave Kleiman died.

 9             So there are issues related to why he opened and

10    closed it, why he reopened it, why he reopened W&K.  I mean, he

11    is the personal representative.  And while he certainly stands

12    in the shoes of Dave Kleiman, he also stands in his own shoes

13    and whether or not these assets were identified in the probate,

14    whether they were pursued in the probate, why these claims are

15    being pursued now, why they weren't being pursued earlier.  So

16    I'm not sure that the unclean hands, if it is stricken, which I

17    don't believe it should be, but if it is stricken, I'm not sure

18    that discovery goes away.  In fact, we would argue that it

19    doesn't.

20             THE COURT:  OK.  I guess it is not dispositive

21    obviously of the ruling that I will make when I have a chance

22    to review it.  I was just curious as to whether the parties

23    have a sense of that one way or the other.  But I have heard

24    you on that.

25             All right.  Anything else this afternoon,
```

1    Mr. Freedman, from the plaintiffs' side that we need to deal

2    with?

3              MR. FREEDMAN:  I'm not going to respond to that last

4    point unless the court wants me to.

5              THE COURT:  No.  As I said --

6              MR. FREEDMAN:  I think we see that issue differently,

7    and certainly there are some questions there that would be

8    permitted, but we believe there are some that would not be

9    permitted if it was struck.

10             THE COURT:  Again, I'm going to deal with it as I must

11   simply by applying the law under Rule 12, which is what I have

12   to do.  Like I said, I just was curious as to whether the

13   parties had a consensus on that or not.

14             Any ruling I make -- even if I strike, it doesn't mean

15   defendants can't continue to seek discovery on certain topics

16   under whatever theory they may have.  And if I don't strike, it

17   doesn't mean the defendants are going to get all the discovery

18   that they ask for subject to whatever objections the plaintiffs

19   want to make.

20             To the extent either side was concerned that I was

21   prejudging the issue, I want you to understand I know how this

22   works and I'm not prejudging it.

23             OK.  Nothing else from the plaintiff then?

24             MR. FREEDMAN:  No, your Honor.

25             THE COURT:  From the defense, anything else?

```
1              MS. MARKOE:  No, your Honor.

2              THE COURT:  All right.  Well, thank you all very much.

3         We will be in recess.

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


March 28, 2019          s/ Joanne Mancari
                        Joanne Mancari, RPR, CRR, CSR
                        Court Reporter
                        jemancari@gmail.com