# EXHIBIT 5

1        THE UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA
2
           WEST PALM BEACH DIVISION
3
           CASE NO.:  18-cv-80176-BB
4

5

6
IRA KLEIMNAN, et al.,          )
7                              )
        Plaintiffs,            )         April 11, 2019
8                              )
v.                             )
9                              )         Pages 1 - 67
CRAIG WRIGHT,                  )
10                             )
        Defendant.             )
11 _____/

12

13

14
                 DISCOVERY HEARING
15
     BEFORE THE HONORABLE BRUCE E. REINHART
16         UNITED STATES MAGISTRATE JUDGE

17

18

19

20
APPEARANCES:
21
On behalf of the Plaintiffs:
22
                    BOIES SCHILLER FLEXNER
23                  100 SE 2nd Street
                    Suite 2800,
24                  Miami, FL 33131
                    BY:  DEVIN FREEDMAN, ESQ.
25                  BY:  KYLE ROCHE, ESQ.
                    BY:  JOHN MCADAMS, ESQ.

APPEARANCES CONTINUED:

On behalf of the Defendant:

                        RIVERO MESTRE LLP
                        2525 Ponce de Leon Boulevard
                        Suite 1000,
                        Coral Gables, FL 33134
                        BY:  AMANDA M. MCGOVERN, ESQ.
                        BY:  ZAHARAH R. MARKOE, ESQ.
(Telephonically)        BY:  BRYAN PASCHAL, ESQ.


Transcribed By:

                        BONNIE JOY LEWIS, R.P.R.
                        7001 SW 13 Street
                        Pembroke Pines, FL  33023
                        954-985-8875
                        caselawrptg@gmail.com

1          (Thereupon, the following proceeding was held:)

2          THE COURT:  Please be seated.

3          I know some of you got just came off of the train.  So

4  take a second and get settled in and make sure you get

5  organized if you need to be.

6          All right.  Let me call the case.  This is Case Number

7  18-80176; Ira Kleiman versus Craig Wright.

8          May I have counsel's appearances starting with counsel

9  for the Plaintiff.

10         MR. FREEDMAN:  Good afternoon, Your Honor.  Devan

11  Freedman for the Plaintiff.

12         THE COURT:  Mr. Freedman, good afternoon.

13         MR. ROCHE:  Kyle Roche for Plaintiffs.  And also with

14  me is John McAdams for the Plaintiffs.

15         THE COURT:  Mr. McAdams and Mr. Roche, good afternoon.

16         Anyone else for the Plaintiffs?

17         All right.  For the Defense.

18         MS. MCGOVERN:  Good afternoon, Your Honor.

19         Amanda McGovern from Rivero Mestre for Dr. Wright,

20  Defendant.

21         THE COURT:  Miss McGovern, good afternoon.

22         MS. MCGOVERN:  Good afternoon.

23         MS. MARKOE:  Zaharah Markoe on behalf of Dr. Wright.

24         THE COURT:  Miss Markoe, good afternoon.

25         MS. MARKOE:  Good afternoon.

1          THE COURT:  Do we have anybody on the phone?

2          MR. PASCHAL:  Bryan Paschal on behalf of Mr. Wright.

3          THE COURT:  Mr. Paschal, good afternoon.

4          MR. PASCHAL:  Good afternoon, Your Honor.

5          THE COURT:  Anybody else?  Even fight; three on each

6   side.  Okay.  Got it.

7          All right.  So we are here this afternoon on the

8   request for discovery hearing at Docket Entries 138 and 141.  I

9   did review Dr. Wright's memo.  I reviewed the Plaintiffs'

10  opposition to the memo.

11         I also have gone back and reviewed the pleadings and

12  my notes relating to the discovery hearings we had on February

13  20th, March 6th, March 14th, and March 26th.  As well as the

14  motions that were filed at Docket Entries 131, 133, 134

15  requesting discovery hearings, which I declined to have.

16         So I will note that means there actually have been our

17  fifth discovery hearing.  Plus two that I have declined to have

18  and this case has been pending for less than 90 days.

19         So with that, I will turn to Dr. Wright's team and

20  tell me what it is that you need me to rule on today.

21         MS. MCGOVERN:  Thank you, Your Honor.

22         THE COURT:  Sure.

23         MS. MCGOVERN:  I am going to remain seated.  I know

24  that we have done that in the past.

25         THE COURT:  No problem.

1      MS. MCGOVERN:  Your Honor, we filed our discovery

2  memorandum following the preliminary depositions of Dr. Wright

3  and Ira Kleiman, the Personal Representative of the Estate of

4  David Kleiman as well as the brother.

5           And we filed a memorandum because we are two months

6  away from discovery cutoff in this case.  And as Your Honor has

7  just noted, we are all very much aware that we have had the

8  benefit of your guidance from the very beginning of this case.

9           And with that guidance we believe we can complete

10  discovery within the remaining 90 days, but we need a little

11  more help.  And the purpose of today is not to cast aspersions

12  or impugn anybody.  It is to get it done and we think we have a

13  plan.  We have an asp **, as it were, regarding that plan.

14           And again, I want to do that against the backdrop of

15  the preliminary deposition that we took of the Plaintiff in

16  this case.  Because after taking that deposition it is

17  perfectly clear to us, in any event, that this is not a case

18  that cannot be done in 60 days as the Plaintiff has its burden

19  of proof regarding the allegations, which I think are in

20  essence theft.

21           Because when we asked about the witnesses, again, I

22  think typically it is difficult to get discovery squeezed in a

23  short period of time when there are depositions to take all

24  over the world.  That is not this case.

25           We typically asked the question of Ira Kleiman in the

1   deposition if there were any witnesses that have knowledge

2   about three primary points; the existence of Bit Coin, the

3   establishment of any partnership with Dr. Wright, and the theft

4   of Bit Coin and intellectual property.  And the answer to those

5   questions was, and understandably, you know, sitting here, I

6   don't recall.

7          I don't recall what those documents are, but when

8   pushed under oath the Plaintiff stated, sitting here today I

9   cannot recall other than the documents that we've seen attached

10  to the complaint documents that support the allegations in the

11  case or witnesses that would have information regarding the

12  case.

13         And Ira Kleiman, we understand he's the Personal

14  Representative and that typically puts the case in a different

15  situation, but he is also the brother.

16         And he has injected himself as a fact witness in the

17  case because one of the allegations in the amended complaint is

18  that at a Thanksgiving dinner in 2009, discussions were had

19  with Dave Kleiman about something that would be something big.

20         And that's an allegation that's in the complaint, but

21  he also testified under oath that he did not see his brother

22  after 2009.  Not once.  They lived five minutes away from each

23  other.  They had conversations, but they never saw each other

24  and he didn't see him before he died.

25         So why am I saying this now?  I understand this is not

1  had a merits issue.  We are not here on summary judgment.  And

2  I am certainly not trying to suggest that we should have some

3  sort of ruling on that, but we are 60 days out.

4        And we've had intimations in the last hearing, in the

5  hearing before that, and in the hearing before that, I believe,

6  that we are going to have to continue discovery in this case

7  according to Plaintiffs.

8        Our concern is this, Your Honor.  You know, filling up

9  the more time you have, the more time you take.  And our

10  concern is that without at least recognizing and acknowledging

11  where we are now after all the work that Your Honor has done,

12  and after all the work that the Plaintiffs have done, and after

13  all the work that we have done, without essentially stepping

14  back for a second and saying where are we?  And what can we do

15  to get this done?

16        We are going to make this litigation the end in and of

17  itself, which is the litigation until they find whatever it is

18  that they are looking for that can substantiate their claims.

19  It is becoming extremely time consuming and expensive.

20        So our request, Your Honor, is this.  We have tried to

21  provide a little background after the deposition of Ira because

22  we think it shut down a lot of avenues of discovery we don't

23  need to take.

24        We did not come away from that deposition, which we

25  believed was the purpose for the deposition, with any

1  additional source of documents or any additional source of

2  witnesses that we need to discovery.  So we just need the rest

3  of their documents and we are done.

4        THE COURT:  Okay.

5        MS. MCGOVERN:  We've produced -- and I know Miss

6  Markoe is going to be talking about this in connection with

7  other things, but if I am not mistaken, we have produced over

8  almost 8,000 documents.  And again, there is a big difference

9  between documents and pages, but it is approximately 35,000

10  pages, Your Honor.

11        And there are another 1100 documents coming.  So with

12  the initial sort of traunch that Your Honor created when we

13  first came to you with what we tried to do, which is to sort of

14  target the Bullseye.  Get the whole database and target the

15  Bullseye and look at W&K and look at Craig  Wright.  And look

16  at Dave Kleiman and look at Bit Coin exchange and look at the

17  terms that we are going to cull from that database the

18  documents that would be relevant to these claims.

19        We are continuing to produce those documents.  Those

20  documents are being produced.  We are trying to produce them as

21  quickly as we possibly can.  But that document production, in

22  fact, is being reviewed by the Plaintiffs and is going to be

23  utilized in deposition.  Are the documents necessary for the

24  Plaintiffs to have taken the depositions that they need or at

25  least to commence?

1     We have received documents from Plaintiff as well

2  again.  We stated before and again and we just received a

3  production as we were coming into this courtroom today and

4  certainly we have to continue to go through their documents.

5     And I want to address a footnote in their opposition

6  brief because it suggests that certain search terms are going

7  to require additional review of Ira's documents and we want to

8  nip that in the bud.

9     We want to target the documents we need.  Take the

10 depositions we need.  And again, I think there are very few

11 depositions in this case, Your Honor, and we want to try to

12 meet Judge Bloom's discovery schedule.  We think we can do it

13 if, in fact, the parameters are real.

14    And if, in fact, we are called upon to talk about what

15 it is we have.  What we have discovered.  What documents we

16 have received from these 35,000 pages that suggest additional

17 document production beyond the additional traunch is merited so

18 that we do not find ourselves sort of doing the egg beater.

19    And when I say egg beater, it is a water polo

20 expression.  My daughter is a water polo player where you can't

21 touch the ground.  Your feet can't touch the ground in that

22 game.  So you have to stay above water all the time and I am

23 feeling that I am in an internal water polo match.

24    And I think it is time, Your Honor, and it is the

25 reason for our memo.  The reason for our memo with 60 days

1  left, can we sit down and map out a deposition schedule of

2  relevant witnesses, including experts, Your Honor.

3      Because, again, we have an expert discovery deadline

4  or actually a disclosure of May 14th.  We need the names of

5  their experts to determine whether we need to even introduce

6  expert testimony in this case.

7      So we should, as cooperating good faith parties in

8  federal litigation, we should sit down and we should say these

9  are the expert witnesses on these topics we're going to take.

10     Regardless of the fact that the deadline isn't until

11 May 14th, given the schedule we have for the next 60 days, Your

12 Honor, we should work feverishly to meet Judge Bloom's

13 schedule.

14     Because I am very sensitive to the fact that her

15 schedule in this case affects a lot of other schedules in a lot

16 of other cases.  And to just blithely move it without

17 substantial justification, it isn't fair to us.  I don't think

18 it is fair to other litigants.  I don't think it is necessary.

19     We are prepared, Your Honor, to sit down with

20 Plaintiffs' counsel and map out the deposition schedule that we

21 need.  We have tried to do alternating weeks.  We have tried to

22 move that needle and it hasn't helped.

23     Saying we need this witness and you need the other,

24 including experts.  These are the witnesses.  And presumably,

25 they already know what expert witnesses they are going to be

1    using.  These are the witnesses that we are going to be using.

2           We can then respond by saying, okay, we're going to

3    have a rebuttal expert or we don't think we need one.  We need

4    a deposition schedule for experts.

5           THE COURT:  Sorry.  One second.

6           I need to take a quick phone call.  This is my air

7    conditioning contractor and getting air conditioning in my

8    house is important.  One second.

9           MS. MCGOVERN:  Okay.

10          THE COURT:  If my wife doesn't have air conditioning

11   tonight, I can't go home.  So I can happily report that we have

12   air conditioning in my home.

13          So I am sorry to interrupt you, Miss McGovern.  Please

14   continue with your argument.

15          MS. MCGOVERN:  No, not at all.

16          I was actually sort of going a little too fast for

17   myself anyway.  I just want to get it all in.

18          THE COURT:  Okay.

19          MS. MCGOVERN:  So I just want to take a deep breath

20   and just say, Your Honor, I know you understand the position we

21   are in because you have been involved in it.

22          I simply want to express the Defendant's desire and

23   good faith willingness to sit down with Plaintiffs' counsel and

24   in the next discovery hearing that we have next week, if we

25   have one, we bring before Your Honor the issues, the

1  identifiable issues that we need your resolution on so we can

2  meet the 60-day window.

3        I know that I have tried cases when the Judge has said

4  you are going and I haven't been ready.  We have depositions

5  and we have witnesses all over the world and we're thinking to

6  ourselves, this is impossible, and it is remarkable how it gets

7  done.

8        We can do this, Your Honor.  We can get this done.

9  Discovery can be completed.  We will do whatever we can, but

10  that does not mean the response has to be, well, if discovery

11  can be completed, Amanda, then you should just turn it all over

12  and put a whole bunch of people all over the world to get this

13  discovery.

14        In tandem with our request to get this done in 60 days

15  is to make sure that the request and what we are seeking to do

16  meets the proportion that meets the case.  So that's our asp

17  **, Your Honor.

18        We have a couple of other points that were raised in

19  the discovery memorandum that sort of go hand in glove with

20  that.  Including, you know, we definitely need to nip in the

21  bud the real party in interest here.

22        We have issues that came out of Ira Kleiman's

23  deposition, which suggests that there was an assignment of

24  these claims.  We don't know if it was for 60 percent or 99.9

25  percent, but we are entitled to know whose interest is being

1   served here, both for purposes of litigation as well as for

2   mediation.

3           I know we are court ordered to mediate.  We certainly

4   need to know who we are dealing with.  That question, there was

5   an objection, do not answer.  We don't know.

6           We also had a question at Ira Kleiman's deposition

7   whether the litigation funder has received documents in this

8   case that the Defendant has not received.

9           Not what documents.  Just whether and that question

10  was also shut down.  So from a production perspective, we also

11  don't know whether we have everything in that regard as well.

12          And then, finally, Your Honor, we have an issue that

13  came up with respect to W&K.  W&K is a Plaintiff in this case.

14  It was reinstated by Ira Kleiman.  And it is our position that

15  when it was reinstated, certain actions were taken with respect

16  to foreign directors in that company.

17          And we are trying to get to the bottom of it.  Those

18  questions what was the business purpose when W&K was reinstated

19  by Ira Kleiman, that question was shut down.  Whether, in fact,

20  the membership was changed.

21          That's an issue that's very important.  I know that

22  the Plaintiff's response to that request -- because we

23  proffered those questions in the deposition so Your Honor would

24  be aware of exactly what we are asking for.

25          I know the Plaintiffs' position in that response was

1   you can pose those in the form of interrogatories and we will

2   answer them for you.  That's fine.  We would accept that, but

3   we also, Your Honor, would like to have your assistance in

4   having a 30(b)(6) deposition of W&K scheduled within the next

5   two weeks.

6          I know we did the preliminary depositions with Dr.

7   Wright as well as with Ira Kleiman.  We did not include W&K in

8   that regard.  We thought perhaps Ira could sort of serve that

9   purpose.  We now know that we need a 30(b)(6) of the Plaintiff

10  as well.

11         THE COURT:  Okay.  I heard you.

12         So before I turn to the other side, just to be sure, I

13  understand the global asp ** and I will address that in a

14  second after I hear from Mr. Freedman, but let me make sure of

15  the specific items you want me to rule on today.

16         I am just reading on the discovery memo, Pages 3 and

17  4.  Is it the issues relating to the request for production 36,

18  37, 40, 41 and 45 as well as -- you said there were three

19  questions, but I think your memo only mentions two.  The

20  questions propounded to W&K as well as the issues related to

21  subject matter jurisdiction and real party in interest and you

22  mentioned the 30(b)(6) deposition.

23         Have I got that right?

24         MS. MCGOVERN:  The 30(b)(6), Your Honor, is actually

25  in response to W&K issue.

1          THE COURT:  I'll start with that.

2          And I will hear from Mr. Freedman, obviously, but you

3    are entitled to take the 30(b)(6) deposition of the Plaintiff.

4    Clearly it is just a question that you need to schedule it and

5    you need to provide a topic as you both know.  So I don't think

6    that's an issue.

7          But so let me turn to Mr. Freedman and let you respond

8    to all those issues that you would like to respond to.

9          MR. FREEDMAN:  Sure.  Good afternoon, Your Honor.

10         THE COURT:  Good afternoon.

11         MR. FREEDMAN:  I mean, I think the Court hit this on

12   the head starting this hearing out.  The case has been pending

13   for 90 days.

14         I just wanted to inject some hard numbers into this

15   case, which is that the Defendant is constantly accusing the

16   Plaintiff of slow walking discovery and I just wanted to make

17   the record clear on this.

18         Plaintiff has produced 12,512 documents, which amounts

19   to 65,222 pages to date.  That almost doubles the production

20   received from Defendant, which is 7,818 documents; 35,211

21   pages.

22         Now I am not saying that the Defendant is slow walking

23   production.  I think both parties are working very hard to

24   produce documents, but what I do want to say is that the

25   accusations of Plaintiff as slow walking are unfounded.

1       That being said, the Court has kept a tight ** rein on

2  discovery in this case.  The Plaintiff started off broad.  The

3  Court told the Plaintiff how to handle that and I think the

4  Court has seen how the Plaintiff has reacted and narrowed

5  discovery down.

6       Before we went to depose Dr. Wright, the Court ruled

7  on the request for production 36, 37, 40 and 41 and I don't

8  have the numbers -- the request for production.

9       THE COURT:  45.

10      MR. FREEDMAN:  45.  The Court ruled on them.

11      It said Dr. Wright swore they were relevant, or they

12  were otherwise patently relevant, agree to search terms and

13  produce them.  And the Court told the parties in no uncertain

14  terms to get in a room and not get out until those search terms

15  were agreed to and we heard the Court loud and clear.

16      And Mr. Roche, on the phone, flew from New York to

17  Rivero Mestro's office in Miami and sat for 13 hours straight

18  to meet and confer and agree on search terms.

19      Now, I just want to point out that was the final

20  meeting on search terms.  There were multiple three-hour meet

21  and confers before that.  And the parties reached agreement on

22  search terms and we thought we were done, but evidently, we are

23  here again.

24      So with regards to Defendant's request that the Court

25  revisit its rulings on the RFPs, we would ask the Court to deny

1    it.  The Court has already ruled on it.  They have been ordered

2    to produce it.  The parties have spent over 20 hours of meet

3    and confer to agree on those search terms.  We ask that the

4    Court enforce the parties agreement and make the parties

5    produce as they agreed.  That's the first thing.

6          The second is that it sounds like the Court's idea to

7    take early depositions to narrow discovery worked for Defendant

8    and I'm happy to hear that.  And I am happy to work with

9    Defendant to prioritize whatever they want.  Eliminate whatever

10   they want.  We certainly don't want to review documents if they

11   don't want them.  So we will work with them on that.

12         Unfortunately, and as reflected on the submission,

13   Dr. Wright didn't know anything and that's obviously an

14   overstatement.  I want to be careful.

15         He did not know anything, but he couldn't identify

16   trust and trustees.  He couldn't identify beneficiaries.  He

17   couldn't identify owners.  He admitted to purposely structuring

18   his companies in a way where he couldn't know any of that

19   information.

20         And so the Defendant, besides the fact that the Court

21   already ruled on these issues the Defendant's proposal that,

22   well, we will just have Dr. Wright identify where Dave Kleiman

23   was a trustee, or a trust, or a beneficiary is perplexing to me

24   because he claimed to not know himself.

25         Look, we're not asking the Court for more discovery.

1   As I said, we heard the Court loud and clear at the first

2   discovery hearing.  We are going to see what we get.  And once

3   we see what we get, we are going to either come back to the

4   Court and say, you know what, we actually need more or we are

5   going to say, you know what, the Court was right, we don't need

6   any more.

7          When the Court started this inside-out discovery

8   process, I raised the issue that it would take more time.

9   Certainly it would be more efficient, but it would take more

10  time.  The Court was aware of it.

11         We know now that we were hoping that the deposition of

12  Dr. Wright might somehow expedite our discovery process and we

13  wouldn't have to move to continue the trial.  We will be filing

14  to continue the trial date and the discovery date by the end of

15  the week.

16         Potentially by tomorrow.  I know that is not in front

17  of this Court, but we will be doing that.  The fact is it is

18  impossible to finish discovery in 60 days in this case.

19         For example, at Dr. Wright's deposition, he stated

20  that this atosha fair ** article, Exhibit 1 to the amended

21  complaint with numerous statements, quote, purporting to quote

22  Craig Wright by Andrew Hagan was, I believe the words were a

23  work of fiction.

24         So that leaves us with no choice, but to file letter

25  rogatory requests with the Court here in Miami.  Get that sent

1  to the courts out in England.  Get the English courts to order

2  Andrew Hagan to appear for a deposition and testify to whether

3  or not his work is a work of fiction or was, in fact, the

4  admissions of a party opponent.

5       There is just no way that happens in 60 days.  If

6  Judge Bloom tells me too bad, Judge Bloom tells me too bad and

7  there is nothing I can do about it.  But, you know, our ask **

8  is I guess just to sum up.  I don't want to go outside the

9  scope here.  Our ask is just order the parties to do what they

10  agreed to do.  Get moving on it.

11       Plaintiffs have seven full-time reviewers.  I don't

12  know how many Defendants are.  And just get the documents out

13  let's just keep this case moving as quickly as we possibly can,

14  which I think the parties are doing.

15       As for Something else that Miss McGovern said about

16  the assignment of claims, you can send us interrogatories, but

17  I will just tell you on the record, Mr. Kleiman is not assigned

18  any of his claims to anyone else and neither has W&K.  There

19  has been no assignment of claims.

20       As to the request for 30(b)(6) --

21       THE COURT:  Just to make the record clear, I will

22  allow you to -- any interrogatories you send for that purpose

23  do not count against your original list.  I've done the same

24  with Plaintiff and I will do the same for the Defense.  I

25  appreciate the use of those interrogatories to narrow topics

1  quickly and easily and I will be very generous in giving them

2  to you if that's how you want to use them.

3         So, Miss McGovern, you don't even have to ask.  I will

4  give them to you.

5         MS. MCGOVERN:  Thank you, Your Honor.

6         THE COURT:  Mr. Freedman, please continue.  I'm sorry.

7         MR. FREEDMAN:  As for the 30(b)(6) deposition, if the

8  Defendant wants to take it, I don't know the last time I had.

9  Certainly W&K is a Plaintiff.  Certainly W&K as a 30(b)(6)

10  witness will be Ira Kleinman.

11         THE COURT:  They just have to notice it.  They have to

12  give you the topics.

13         Mr. Kleiman has an obligation to educate himself.  He

14  has an affirmative obligation to either educate himself or find

15  somebody else who can answer on behalf of the corporation and

16  respond to the questions.  So it is no different than any other

17  30(b)(6) deposition.

18         And Miss McGovern, schedule it whenever you want to

19  schedule it.  You are entitled to take.

20         MR. FREEDMAN:  And we have no objection.

21         THE COURT:  Okay.

22         MR. FREEDMAN:  So I guess if there is anything else

23  the Court wants me to he address -- oh, the other, at the

24  deposition we were not able to ask any questions about Miss

25  Ramona Ross?  Watts?  And Miss Wright.

1          THE COURT:  I am going to follow up on the order that

2    I entered as --

3          MR. FREEDMAN:  And I appreciate that, Your Honor.

4          But my point is, there is so much outstanding here

5    that has to be answered and responded to.

6          The parties should have their heads down working on

7    getting discovery to each other.  Working on briefing these

8    issues and getting this to the forefront instead of traveling

9    up to West Palm every three days for a discovery hearing where

10   I don't even know why we're here.  I think we could have all

11   agreed on this.

12         THE COURT:  Again, it is not every three days.  It

13   looks like every week and-a-half.  It's okay and you can appear

14   by phone if you don't want to come all the way up here.  It's

15   quite all right.  I will let Miss McGovern respond in just one

16   second.

17         I will say this.  I do see the parties, both sides,

18   working very hard.  I see the amount of documents that both

19   sides have produced.  I have presided at these hearings.

20         And I see, Miss Markoe, you are working primarily on

21   that for your side.  I know Mr. Freedman, you have a team doing

22   it on your side.

23         So I want to actually commend the parties.  I think

24   you have accomplished -- I always tell people don't look at

25   where you are going.  Look at where you came from.  It's always

1    a good way to live your life.  You know, where we were 45 days

2    ago and where we are today, the parties have come a long way

3    and you have made a lot of progress in this case.

4              As to whether the case should be continued, I will

5    leave that to Judge Bloom.  File your motion and Judge Bloom

6    will rule on it.  Until she rules on it, I am going to act upon

7    what I have in front of me.

8              But, certainly, I don't want either party to think

9    that the Court does not notice the effort that is being made

10   here.  And not just the effort to physically to go through and

11   produce documents, but there has been a lot of cooperation.

12             We've had a lot of hearings.  You all disagree about

13   things.  That is going to happen.  And I think in a case like

14   this it happens a lot early on until we sort of get some ground

15   rules in place.

16             And I sort of threw you a curve ball by telling you to

17   go and take these depositions early on.  It sounds like at

18   least one of them was helpful.  Maybe the other one wasn't as

19   helpful as you wanted it to be, but I hope it was helpful even

20   in sort of narrowing some topics.

21             And trust me, I did communicate with Judge Bloom and

22   she is aware of the efforts that the parties are making.  So

23   for whatever that is worth, file your motion and we will deal

24   with that.

25             And in terms of coming up with a schedule going

1   forward, you all don't need me.  Talk to each other.  Come up

2   with a schedule.  Come up with a plan.  I mean, I am always

3   happy to visit with you and have you come up here to talk to me

4   about it.

5          You know, I think it is a great idea to come up with a

6   plan going forward.  If you need me to weigh in on anything, I

7   am happy to weigh in on it, but in the meantime, just talk

8   amongst yourselves and come up with a plan that continues to do

9   what you are doing.

10         With that, I will turn back to Miss McGovern, but I

11  will in second then rule on the very specific topics that you

12  requested, but if there is any other ask ** that you want to

13  make at this time, or any other rulings that you want me to

14  make, I am going to give you a chance to speak to that.

15         MS. MCGOVERN:  Your Honor, with respect to the plan, I

16  am a big believer in plans.  Especially when we have a tight

17  timeframe.

18         And I would like to, in light of the fact that they

19  are going to be filing a motion for a continuance, it really

20  can't be in a vacuum.  And sort of a request for whatever

21  extension they are going to have, it is unclear how much time

22  -- I mean, it is unclear, but I do think that if the Plaintiffs

23  will agree to sit down with us and with the time remaining, map

24  out the depositions that need to be taken on alternating weeks

25  as well as the deposition of the experts when they can be taken

24

1    so that we can accomplish that expeditiously that will go a

2    very, very long way.

3         Because the document production is going to be

4    happening, as we know, sort of along in tandem with what we do,

5    but we can't let the document production kind of stop us from

6    getting the other things done.

7         And the problem is we have tried to get an agreement

8    on depositions for alternating weeks and we would like to

9    include the expert issue in that because that's around the

10   corner.

11        We would like the Plaintiffs to agree to sit down with

12   us and agree upon alternating weeks for depositions and fact

13   expert witnesses.

14        THE COURT:  Here's what I am going -- I will hear from

15   you in a minute, Mr. Freedman, but let me give you my immediate

16   sort of reaction to that.

17        As with everything else I would prefer for you to take

18   a shot at it in the first instance.  I think conceptually the

19   idea of having a plan is always and good thing.

20        Not to coach Mr. Freedman because he's a very good

21   lawyer and he doesn't need me to tell him how to file his

22   motion.  I would suspect that if you file a motion with Judge

23   Bloom and you lay out this is the plan that we put together and

24   this is why we think we can't accomplish it in this amount of

25   time that might -- it would inform Judge Bloom's decision more

1  accurately.  Let me put it that way.

2        So if the parties want to try to work up a plan,

3  that's great.  If the parties are unable to agree upon a

4  specific plan, but you agree conceptually that the plan is a

5  good idea and you want to submit to me your proposed

6  alternative plans, I will either pick one or join them

7  together.

8        We can have a telephonic conference so you don't all

9  have to come all the way back up here, if you would like, but I

10  am not going to order the parties at this time to sit down and

11  come up with a discovery plan.

12        Again, Mr. Freedman's position very well might be I

13  cannot agree that there is no plan that could accomplish what

14  needs to be accomplished within the timeframe we've got.  So I

15  need to file my motion.  And if Judge Bloom rules against me or

16  if Judge Bloom tells me to come up with a plan, then I will

17  come up with a plan.

18        Again, I am not going to prejudge any of that.  I am

19  going to leave it to the parties.  So today I am going to deny

20  any request that I order the parties to come up with a plan,

21  but I would encourage the parties to talk about it and see what

22  you can agree to.  It's always a good idea.

23        So with that, then, let me rule on the very specific

24  issues and I know I have to turn to the time of the issues

25  that were raised on my order memorializing rulings at Docket

1    Entry 137.

2          MS. MARKOE:  Your Honor, if I may --

3          THE COURT:  Yes, Miss Markoe.

4          MS. MARKOE:  -- respond to a couple of things --

5          THE COURT:  Sure.

6          MS. MARKOE:  -- that Mr. Freedman said.

7          THE COURT:  Yes.

8          MS. MCGOVERN:  With regard to the search terms, to be

9    completely fair and honest, I was not in that 13-hour meet and

10   confer.  I was doing other things, but I can attest that did,

11   in fact, occur and both sides worked incredibly hard to try to

12   come up with agreed upon terms.

13         My understanding is for the most part that was

14   accomplished.  There were a couple of outstanding items that

15   have yet to be addressed.  And I've tried to address some of

16   them in e-mails to them.

17         I have actually gotten no response, but I have moved

18   ahead as if I have had a response and we are moving forward and

19   we have prioritized all the searches regarding Dave Kleiman

20   that they have proposed.

21         THE COURT:  Great.

22         MS. MARKOE:  But with regard to the FRPs, we are

23   asking for a reconsideration on that.

24         THE COURT:  Okay.

25         MS. MARKOE:  There are two reasons for that.

1           The first is that in preparing for these depositions,

2    it has been very useful because one of their topics was that

3    declaration.  And in preparing for this deposition, I learned a

4    lot about that declaration, which to be honest, I have not had

5    a --

6           THE COURT:  Just so I am clear and the record is

7    clear, that is the declaration of Dr. Wright filed in support

8    of the motion to dismiss for lack of jurisdiction?

9           MS. MARKOE:  Well, for lack of jurisdictions and on

10   forum non grounds.

11          THE COURT:  Forum non convenience, right.

12          MS. MARKOE:  And essentially, in listing particularly

13   entities that might have relevant information that list was, A,

14   for the purpose of the forum non grounds.

15          And also, those entities would have, yes, those

16   documents with that are relevant to this case.  Not that

17   everything that that entity has is relevant to that case.

18          And now what they are asking for is everything related

19   to it's your investigations of those specific entities even if

20   they are not related to Mr. Kleiman or W&K.

21          And we have already said that with regard to Mr.

22   Kleiman and W&K, they will get anything regardless of whether

23   another company is mentioned in it.  Regardless if another

24   document comes from another company.  We get it.

25          So this expansion is just unwarranted.  And in fact,

1    the search terms that they have proposed will increase the

2    number of documents that we would have to review and

3    potentially produce by 18,000 documents.

4              Not pages, documents.  And it is our position those

5    are just not proportional to the needs of the case.

6              THE COURT:  Okay.  Let me turn to Mr. Freedman.

7              MR. FREEDMAN:  Your Honor, I mean, you know my

8    position that we are not required to accept Dr. Wright's

9    representation of what was and what was not related to Dave

10   Kleiman that he has sworn these entities were relevant.  That

11   we are seeing many of the entities were, in fact, relevant.

12   And that the parties have spent upwards of 20 hours of meet and

13   confers and agreed on search terms.

14             THE COURT:  Can I stop you for a second?  That is

15   where I am getting a little confused here.

16             What is the universe of documents that the Defense

17   thinks should not be produced?  Because it seems to me the

18   request is for -- here I'm looking at the actual language of

19   the specific requests as narrowed.

20             For example, 37 is all documents and communications

21   submitted to the ATO in regards to -- and there is a whole

22   bunch of folk listed.

23             MS. MARKOE:  Right.

24             THE COURT:  Different companies.

25             The Defense's request is narrowed at only to documents

29

 1  submitted to the ATO which have some relationship to Dave

 2  Kleiman, W&K, Coin Exchange, and Lewis and Ira Kleiman.

 3          Am I roughly on target there?

 4          MS. MARKOE:  You are roughly on target there, Your

 5  Honor.

 6          THE COURT:  And the Plaintiffs' position is, no, you

 7  should just run the search terms and give us everything that

 8  comes up on the search terms relating to that topic, right?

 9          MR. FREEDMAN:  More or less, Your Honor, yes.

10          THE COURT:  Okay.  So help me out.

11          What's going to come up on the search terms that is

12  not going to be related to Dave Kleiman and vice-versa?

13          MS. MARKOE:  So that's the 18,000 documents that I'm

14  talking about.

15          THE COURT:  But what are they?

16          MS. MARKOE:  So they are essentially --

17          THE COURT:  Substantively what are they?

18          MS. MARKOE:  So the ATO, for instance in this one,

19  added and investigated each one of these companies --

20          THE COURT:  Okay.

21          MS. MARKOE:  -- for years.  Like for years.

22          And so there is a plethora of documents that would hit

23  on those search terms because not everything that were in those

24  companies referenced or talked about Dave Kleiman, or W&K, or

25  Coin Exchange, or the entity at issue in this matter.

1              THE COURT:  Okay.

2              MS. MARKOE:  And that's the issue.

3              THE COURT:  Okay.  But it seems to me, are you not

4    being able to run search terms against that universe?  You are

5    going to pull all documents relating to the ATM **

6    investigation of -- let me pull one for example; NT docs **

7    because that happens to be the one I see here..

8              MS. MARKOE:  Okay.

9              THE COURT:  So you are going to pull all the documents

10   that relate to the AT investigation in NT docs **, but you are

11   not going to produce them.  You are then going to run the

12   search terms over those, correct?  You are only going to

13   produce what the search terms spit out.

14             MS. MARKOE:  The 18,000 documents are using the search

15   terms that they had proposed to address these specific requests

16   as they limited them.

17             THE COURT:  Okay.

18             MS. MARKOE:  So my point -- and they didn't limit them

19   to documents related to Dave Kleiman and W&K.  They do not do

20   that.

21             And what we said in with regard to those search terms,

22   in concept if this is what the Court orders us to do, these are

23   the search terms we will use to do it.  We don't agree,

24   however, that we should be doing a search for all of these

25   documents on unrelated companies that do not relate to Dave

1   Kleiman and W&K.  We already said we would do that.

2          THE COURT:  Give me, not off the top of your head, but

3   sort of at a broad level.  What are some of the search terms

4   that you think they are asking you to use on that universe of

5   documents that would spit out material that you believe is not

6   relevant of disproportionate?

7          MS. MARKOE:  I don't actually have the entire search

8   terms in front of me, but something to the effect of ATO and

9   Australia within whatever of tax and cloud theft **.  So that

10  gets you all of the ATO documents related to cloud theft, for

11  instance.

12         THE COURT:  Okay.

13         MS. MARKOE:  Another example is with regard to request

14  number 45.  You know, they had a whole bunch of search terms

15  and, then, they would have a person's name such as -- what's

16  his name?  John Chesher **.

17         THE COURT:  Okay.

18         MS. MARKOE:  Okay.  And John Chesher a whole bunch of

19  issues and then let's say Hot-wire.  Well, John Chesher was in

20  their finance department at Hot-wire.  He's going to have a lot

21  of documents that relate to Hot-wire, for instance, similarly

22  with, you know, Jaime Wilson.  So, you know, they have people

23  on here who are employees of these companies.

24         And so there is going to be a lot of documents where

25  they are talking about the company or the e-mails of the

1   company is in there.  And it is just going to be casting a very

2   wide net to catch a very small minnow.

3          THE COURT:  Okay.  I hear you.  Let me turn to Mr.

4   Freedman and Mr. Roche.

5          MR. FREEDMAN:  I want to address it quickly, Your

6   Honor, but I am going to throw this mainly to Mr. Roche who

7   participated in the meet and confer.

8          THE COURT:  Sure.

9          MR. FREEDMAN:  I think that the issue here is that the

10  Defendants -- it seems to me the Defendant's view of how to

11  conduct discovery in this case is that any search term has to

12  include the word Dave Kleiman, Lewis Kleiman, or W&K.

13         And I just don't think it is reasonable that

14  Plaintiffs shouldn't be entitled to a document because it

15  doesn't say Dave Kleiman's name on it.

16         And the parties worked very hard to come up with

17  narrowed search terms, which would bring up what appears to be

18  the most relevant documents.  And I am going to hand this over

19  to Mr. Roche here, but that's what those hours of meet and

20  confer was about was to reach agreement on them and the parties

21  reached agreement on them.

22         And I feel like every time we take one step forward we

23  are taking two steps back.  Yes, there are a lot of documents.

24  I understand that.  We've reviewed a lot of documents.  We

25  still have a lot more documents to review.  If we can agree to

1  limit it that's great, but at some point, the parties just have

2  to bite the bullet and start producing documents so we can get

3  through this litigation.

4       But, Mr. Roche, please, if you could address

5  specifically.

6       MR. ROCHE:  Yes.  So, you know, we came in to that

7  search, that meet and confer on March 28th.  Bill and I worked

8  to propose a list of search terms.

9       You know, when I worked with Zull and Cost**  for 13

10 hours that day where I know there were a lot of search terms

11 that I wanted that I gave up.  And I said, you know, look, I

12 think this is relevant.  I think it is going to yield documents

13 that are relevant to our case.

14      Bill ** and I worked very hard to add a lot of

15 conditions to these search terms to narrow the subset.  And I

16 think the fact that we got it to only an additional 18,000,

17 which is I think about 20 percent more than what we had already

18 initially agreed to -- the Defense had already initially agreed

19 to produce, we think those 13 hours were very well spent.

20      You know, and likewise, you know, they had a bunch of

21 search terms that we felt were very broad and we showed why

22 they were very broad.  We spent a lot of hours, you know, going

23 back with our discovery vendors trying to figure out smart ways

24 to narrow it down.

25      And you know, I left that meeting feeling like, okay,

1   that was work well spent.  The parties have now a good set of

2   search terms that we can kind of march off and put documents in

3   discovery and put these search terms behind us.

4        I can't on this call really every single decision

5   point that Bill ** and I made over those 13 hours, but to go

6   back to the drawing board with Defendants and have to re-craft

7   all those search terms that we already agreed to, is going to

8   make more work than just reviewing the additional, you know, 20

9   percent more documents that we agreed to as a result of the

10  search terms on March 28th.

11       So, you know, respectfully, I think in order of

12  efficiency it makes sense for us to agree to the search terms

13  and for us to move on and produce documents in accord with the

14  search terms.

15       THE COURT:  Thank you.  Miss Markoe, I will give you

16  the last word.

17       MR. FREEDMAN:  Your Honor, could I?  I just want to

18  add one thing, which is just to put this into perspective.  As

19  I understand it, the universe of Defendant's documents are over

20  a million documents.

21       Which means 18,000 documents is like 1.8 percent of

22  the universe.  So it is just not a lot of documents when -- my

23  father is very fond of telling me that everything is relative,

24  right?  There is nothing in the objective.

25       So when looked in context, yes, it is a lot of

1   documents, but it is not really a lot of documents.

2          THE COURT:  Miss Markoe.

3          MS. MARKOE:  So let me take two of those points.

4          THE COURT:  Okay.

5          MS. MARKOE:  Let me start with Mr. Freedman's because

6   primacy and recency.

7          Yes, we have a lot of documents.  We collected a lot

8   of documents.  That does not mean that all of those documents

9   yield search terms.

10          The search terms have significantly narrowed that over

11   one million document pool to a much more manageable pool.  So I

12   don't think we are talking about a one percent issue here,

13   first of all.

14          And then, with regard to what Mr. Roche said, our

15   proposal is not that we revisit the search terms.  I don't want

16   to revisit the search terms.  I have no interest in it.  This

17   was a separate spreadsheet of search terms just related to

18   these specific topics.  That is what we are saying.  We don't

19   think that needs to be done.

20          The other search terms that we have agreed to, I think

21   that there is a couple of tweaks that need to be me because I

22   have taken this over from Mr. Cast **.  And, frankly, those

23   spreadsheets are not always entirely clear, so we are going to

24   have a tiny bit of work to do on those, but it is more about

25   clarification than anything else.  Those terms hit on all of

1   the topics that are sort of most important.

2           And then, my point is that it is not true that I want

3   to revisit all the topics.  It is one spreadsheet of just

4   related to these specific document requests that we believe is

5   not relevant and disproportionate to the needs of the case.

6           THE COURT:  Okay.  Thank you.

7           So I am reminded by my time in private practice when I

8   was doing criminal defense work, I would get subpoenas all the

9   time from the Government on behalf of clients and they would

10  ask for, of course, any and all the documents related to

11  anything that has anything to do with the history of the world.

12          And I would pick up the phone and call the prosecutor

13  and I would say, you really don't want what you are asking for.

14  Let me tell you, you just don't want that.

15          So if that is the conversation that you want to

16  continue to have with one another going forward, God bless, but

17  for the time being, I am not going to revisit my decision

18  previously.

19          There is a certain inefficiency in the use of search

20  terms.  Sometimes they are overbroad.  Sometimes they are under

21  broad.  Sometimes you get a lot of signals sometimes and you

22  get a lot of noise sometimes.  If you read Nate Silver's book

23  you will understand, but you know, sometimes you get a lot of

24  noise.  Maybe this is all noise and maybe Mr. Freedman will **

25  regret the day that he has to review these 18,000 documents.

1    And maybe when you start to produce them, he will call you up

2    on the phone and say enough already.  I will agree.  Let's cut

3    back on some of this nonsense.

4         MR. FREEDMAN:  I am open to that, Your Honor.

5         THE COURT:  And that's a dialogue that the parties can

6    continue to have, but for the time being, the search terms were

7    negotiated.

8         The search terms were agreed to.  I'm sure there was a

9    lot of horse trading in negotiating the search terms.  I am

10   going to stick with the search terms that I extorted you into

11   agreeing to and we will stick to where we are and I will deny

12   the motion to reconsider my ruling.

13        So I think that the only remaining issue that I have

14   to rule upon that we have to talk about is the timing for the

15   motions that I had given leave to file in the course of Dr.

16   Wright's deposition, but that is where I think we are.

17        But before I do that question, Mr. Freedman, do you

18   agree that's where we are now?  I have ruled on whatever

19   disputed issues there are.  We just have to do some timing; is

20   that correct?

21        MR. FREEDMAN:  Yes, Your Honor.

22        THE COURT:  Miss McGovern, Miss Markoe, do you agree

23   that's where we are?

24        MS. MCGOVERN:  Yes.

25        THE COURT:  We are not waiving your objection to my

```
 1    rulings.  So let's talk.  The Plaintiffs provided a proposed
 2    schedule for briefing in merit joint memo.
 3            Defense, what is your feeling on that proposal?
 4            MS. MCGOVERN:  So, Your Honor, in looking at the
 5    numbers one through four, we are okay with the proposed
 6    briefing schedules set forth in Paragraph 2.
 7            THE COURT:  Okay.
 8            MS. MCGOVERN:  So by April 19th the Defendant will
 9    file a motion in the production of Dr. Wright's Bit Coin
10    ownership.
11            THE COURT:  Okay.
12            MS. MCGOVERN:  And we are also okay with the timing of
13    number 46, but we wanted to address that separately.  We wanted
14    to not revisit the issue, but talk about it.
15            THE COURT:  Okay.
16            MS. MCGOVERN:  If you don't mind, Your Honor.
17            THE COURT:  I am happy to talk about it.
18            I understand some of these I was having you lodge
19    objections on the fly after a long day in London after a long
20    phone call.  So I am happy to have further discussion.  Not
21    necessarily argument, but the party's discussion about the
22    parties' position on these issues, but if you could address one
23    in three as to the briefing of these issues.
24            MS. MCGOVERN:  We would appreciate that, Your Honor.
25            So it is actually one, three, and four is what we
```

1   would like to talk to you about in terms of the briefing

2   schedule, whether that is the best approach for addressing

3   these issues.

4            THE COURT:  Okay.  I will hear you on that now.

5            MS. MCGOVERN:  So just very candidly, Your Honor, we

6   are coming at this from a different perspective.

7            THE COURT:  Okay.

8            MS. MCGOVERN:  I would like to be start with the

9   wives.

10           THE COURT:  Okay.

11           MS. MCGOVERN:  In Paragraphs 3 and 4, the issues that

12  were posed that really compose the briefing schedules for those

13  has to do with Dr. Wright's position that he doesn't want to

14  talk about his wives.

15           He doesn't want to talk about his first wife.  They

16  divorced years ago.  And with respect to his current wife, he

17  doesn't want to talk about his first wife.

18           If the issue -- and part of the problem with briefing

19  these issues, Your Honor, is that -- and we have spoken with

20  Australian counsel about it with respect to the scope of the

21  testimony and privilege under Australian law, but when we did

22  that and when we talked about it we thought about the following

23  things.

24           And that is what exactly are the questions that

25  Plaintiff want to ask?  We didn't get that far in the

1   deposition of Dr. Wright because after the first question his

2   position was with respect to my divorce, you know, I took an

3   oath that I would not talk about my ex-wife and she would not

4   talk about me.

5           Unfortunately, when you look at the transcript we

6   don't have -- and I don't think it is unfortunately, but for

7   whatever reason, we don't have a proffer of questions that the

8   Plaintiffs, in fact, would have asked about his ex-wife.

9           We think the better approach is sort of like the

10  approach that came out of the deposition of Ira Kleinman when

11  Plaintiffs suggested why don't you proffer the question in the

12  form of an interrogatory and we will answer them.

13          Without knowing exactly how deep the dive is with

14  respect to Dr. Wright's first marriage, it is difficult to say

15  really whether there is a privileged objection.  Whether there

16  is a relevance objection because we also had the ability in

17  this deposition to instruct the client not to answer on

18  relevance grounds.  Because if it is not related to W&K and

19  Dave Kleiman it is invasive.  It is personal questions about

20  someone's relationship and it is not appropriate.

21          Now, if the question is did Lynn Wright meet with,

22  speak with Dave Kleiman or does she have any information with

23  respect to our argument that there was a partnership

24  (inaudible) to, ** well, that is a different question, but that

25  wasn't the question.

1          And then, if we go to the current wife, the questions

2     that triggered a bit of ire, if I could put it that way,

3     involved when he met her.  When she changed her name from her

4     first marriage and other things like that.

5          So, again, we don't have questions that we can show

6     Your Honor in the form of a Q and A that would make it

7     perfectly clear that these questions are either appropriate and

8     not privileged or privileged, or just simply inappropriate.

9          THE COURT:  And why wasn't that record made?

10         MS. MCGOVERN:  Because the objection was made and that

11    was the end of it.

12         We think the best way to go here and particularly

13    because, as Plaintiff's counsel has said before with respect to

14    Ira's deposition when certain questions were unanswered, you

15    know, save it for the next depo.  I don't think it is discovery

16    related.  You could ask it in during the merits depo.

17         I think in this particular situation, instead of

18    having a briefing schedule and having us utilize our resources

19    on privilege and everything else, especially when we don't know

20    what the questions would have been, that Plaintiffs simply set

21    forth a series of interrogatories regarding Dr. Wright's first

22    wife and Dr. Wright's current wife.

23         And then, we can actually address it question by

24    question and it could become apparent, I think, by the question

25    itself whether it merits an answer in this case.

1        THE COURT:  I hear you.

2        MS. MCGOVERN:  That's our position with respect to

3    three and four, Your Honor.

4        THE COURT:  Talk to me about the national security

5    objection.

6        MS. MCGOVERN:  The national security objection is a

7    logistical nightmare and we've come to that conclusion after

8    looking at the amount of time that has gone by.

9        This is -- and Miss Markoe will probably jump in and

10   correct me and I think she's ready to do that at any moment

11   right now.  She's giving me a little leeway.  I am sort of

12   coming at it more from a conceptual issue.  I wasn't in London.

13   I wasn't at the deposition although I have read it.

14       And it basically comes to this question, Your Honor,

15   the individual, the identity of the individual that had some, I

16   guess involvement early on, involves issues of personal safety.

17       And there are individuals that and because transcripts

18   -- apparently this case is being watched extremely closely and

19   is on the Internet whenever it can be, including transcripts,

20   deposition transcripts, and anything else.  So anything that

21   gets filed is all over the place.

22       There is a legitimate concern about identification of

23   individuals that have been incarcerated as a result of things

24   that have happened and some of those related parties are not

25   incarcerated.  So there is a safety concern.

1        Being able to justify the request to Your Honor to be

2   able to disclose that information *in camera* by getting

3   Government corroboration on it, I am not sure it is even

4   possible at this point.

5        But it doesn't mean that we simply want to go to our

6   client and say, okay, fine.  We don't have the same concerns.

7   So, you know, answer the question.  There is a confidentiality

8   order.

9        We are not comfortable doing that, Your Honor, because

10  the confidentiality order is not bulletproof, for lack of a

11  better expression, number one.

12       And number two, we have already seen that the

13  information can leak and so we are concerned about it.

14       THE COURT:  What is your client's standing?  How does

15  your client have standing to somebody else's name coming out in

16  the public?

17       MS. MARKOE:  Well, We are not being asked to disclose

18  that name.

19       MS. MCGOVERN:  And this is one of the issues that I

20  want to just finish quickly and I will let Miss Markoe answer.

21       This is an individual who was involved before Dave

22  Kleiman was involved.  So this is really it goes back to Dr.

23  Wright's initial involvement.  And you know, in order to be

24  completely candid about every single person that was involved,

25  it would require disclosure of this individual.  So the

1  standing simply is not wanting to disclose that information for

2  personal safety.

3          THE COURT:  There are lots of reasons people don't

4  want to disclose things, but the law recognizes privileges and

5  it doesn't recognize privileges and people have a right to

6  complain and people who don't.

7          Why does your client have a right to complain about

8  somebody else's name being disclosed, or why does your client

9  have a privilege not to disclose the answer to this question?

10         MS. MARKOE:  So it wasn't just one question.

11         It was actually several questions.  And the concern,

12  as I understand it, that the client has is there is involvement

13  among himself and others in activities that resulted in the

14  incarceration of an international crime lord, if you will, who

15  has associates that are not incarcerated.

16         And there are safety concerns about the disclosure of

17  his own involvement and the involvement of others in those

18  efforts to bring this individual into custody.

19         THE COURT:  Okay.  And so that gives him privilege

20  how?

21         MS. MARKOE:  We are not saying it is privileged.

22         THE COURT:  Okay.  Then what is his basis not to

23  answer the question other than I don't want to?  He has been

24  asked a question.  He's under oath and he's in a deposition.

25  He has to have a reason not to answer the question other than I

1  don't want to.

2          So I am trying to discern from you -- and that's why I

3  was going to give you a chance to brief -- what is his legal

4  basis not to answer these questions aside from I don't want to?

5  Because I say it has to do with this super secret international

6  drug lord.

7          MS. MARKOE:  Correct.

8          And we have spoken with the client about that and we

9  said, look, you've got to give us something.  You've got to

10  give us names and contact information, or you've got to give us

11  a contract that says you're not allowed to talk about this.

12          You've got to give us something.  And we're efforting

13  to get that.  That is something that might take a little bit of

14  time.  So I think perhaps one thing to do on this one is to

15  give us a little bit of time.  Two weeks or so.

16          Hopefully two weeks to come back to you with whether

17  those efforts have bourne ** fruit.  If they have not bourne

18  fruit, we will deal with that.  If they have bourne fruit, we

19  will be in a position to give you a lot more information that

20  is concrete and that is viable.  And we have made that ask **

21  to get that concrete information.

22          But also to the extent if we are going to have to deal

23  with government officials regarding events that occurred many,

24  many moons ago that, A, may take some time; and, B, the

25  bureaucracy, as you well know, Your Honor, could be a

 1  logistical nightmare as well.

 2          So I think probably the best thing to do, number one,

 3  is to perhaps table it so we can get more information and give

 4  you a much firmer grasp on whether we are going to be able to

 5  give you something substantial on this.  And if we can't, we

 6  will deal with that in two weeks.  And if we can, we will deal

 7  with that in two weeks.

 8          THE COURT:  All right.  Let me hear from Mr. Freedman

 9  on the marital issue and on the national security issue.

10          MR. FREEDMAN:  Okay.  So copying Miss Markoe's primacy

11  and recency, I am going to start with the national security

12  issue.

13          THE COURT:  Okay.

14          MR. FREEDMAN:  It was unclear to me just now whether

15  or not Dr. Wright is backing off his national security

16  objection.  Is it still a national security objection?

17          MS. MARKOE:  It's a personal security issue.

18          MR. FREEDMAN:  And I understand it's a personal

19  security issue.  Well, let me strike that.  I understand Dr.

20  Wright is saying it's a personal security issue.

21          But what I'm hearing now is that under oath -- well,

22  let me take a step back.  The parties flew to London to conduct

23  this discovery and spent a lot of money doing that.  There were

24  a lot of questions that Dr. Wright refused to answer based on

25  national security, but one of the most important ones -- and I

1    don't want to diminish the importance of the other -- but the

2    one that stands out in my mind is that on February 11th of 2014

3    Dr. Wright wrote to Lewis Kleiman, Ira and Dave's father:

4            "Hello Lewis, your son Dave and I are two of the three

5    key people behind Bit Coin."

6            And the question was:

7            "QUESTION:  What is the identify of number three?"

8            And the answer was:

9            "ANSWER:  I can't answer that on national security

10   grounds."

11           Which is an objection I had never heard before, but

12   okay, I wasn't prepared to deal with it and I got the Court on

13   the line.  And the Court said -- and it never occurred to me

14   but it makes perfect sense -- the United States Government is

15   the only person who can resolve that objection.

16           THE COURT:  Who can assert that objection.

17           MR. FREEDMAN:  Sorry.  Who can with assert that

18   objection.  Thank you, Your Honor.

19           Now I am finding out that that was at best a

20   misrepresentation under oath again by Dr. Wright about why he

21   couldn't respond to the question.

22           We spend an inordinate amount of money flying to

23   London, taking the deposition, ordering the transcript for the

24   purpose of narrowing discovery.  I don't know even know who

25   that witness is anymore.

1          So, I mean, that will have its own consequences and we

2    will have to figure out what we are going to do with it, but it

3    is just misrepresentation after misrepresentation, but that

4    aside for a second.

5          Your Honor, at the beginning of this conference, the

6    Defendant says we have to go to trial in 60 days.  We have to

7    move everything forward and now we're asking for two weeks and

8    then we will check back in.

9          Plaintiffs propose that the Defendant file a motion

10   for protective order in five days, or five business days, or

11   seven days.  I don't know.  Something very quickly.  Either

12   file the motion for protective order or not and answer the

13   question.

14         And we would ask the Court to authorize us to

15   re-depose him on this question because this is an important

16   question.  That third person could be the star witness of the

17   trial who could say Dave Kleiman and Craig Wright told me they

18   partnered up to be **.  They had joint mining activity.  They

19   created all the intellectual property together and then they

20   formed W&K.  I mean, he was one of the three key people behind

21   Bit Coin.

22         THE COURT:  Okay.  Let me turn back to the Defense.

23         MS. MCGOVERN:  Your Honor, may I respond?

24         THE COURT:  Yes.

25         MS. MCGOVERN:  To the extent I think we have to tone

1   it down a bit.  This was not intended to be misrepresentation.

2   I think to the extent that there is a misunderstanding as to

3   the purpose behind it.  We are simply going to have to proof

4   it.

5          If Plaintiffs are insisting that it be five days, we

6   will do it in five days.  There is no intention to delay it at

7   all.  There is an answer to this question and we are simply

8   wanting to do it in a manner that would protect our client's

9   personal safety and we were hoping to be able to do that

10  *in camera.*

11          It is not that he doesn't want to answer the question.

12  He simply wants to do it in a forum that he will be protected.

13  And if there is not a mechanism to do that, then, we will

14  certainly brief that.

15          I think perhaps the legal issue might be other

16  circumstances in which information is so sensitive that if

17  disclosed could cause, you know, concern and personal safety

18  issues, then it can be produced in a different manner, which is

19  all we are asking.

20          Maybe that can be briefed and we can do that in five

21  to seven days, Your Honor.  We don't want this to become now

22  the justification of an extension of discovery in this case.

23  And certainly, I don't think it is appropriate to continue the

24  misrepresentations.

25          I could sit here, Your Honor, today in this hearing

1 and talk about all the misrepresentations that took place in

2 Ira Kleiman's seconded amended and sworn interrogatories and I

3 am not doing that.

4         THE COURT:  All right.  So let's start with a couple

5 of things.

6         First of all, clearly a party, any party can seek a

7 protective order to protect that person from annoyance,

8 embarrassment, oppression, undue burden, or expense.

9         So, clearly, if the man's life is at stake, I think

10 that would fall under the category, if I find that it is.  That

11 could certainly fall under the category of oppression or some

12 other legitimate basis for any protective order, which is what

13 I gave you leave to file was a protective order.

14         Now, the Supreme Court of the United States recently

15 adjudicated a case arising out of the Muller ** investigation

16 where the names of the parties never became public.

17         It went all the way through the DC Circuit, the DC

18 Court of Appeals, all the way to the Supreme Court, got three

19 cert petitions were filed, ** mediums written, and to this day

20 nobody knows the names of the parties at all.  So the Court

21 system is clearly set up to securely maintain the secrecy of

22 filings.

23         If Dr. Wright, in support of his motion for protective

24 order, wants to file under seal a sworn declaration explaining

25 why he does not believe he should have to answer these

1   questions, I would be happy to review that under seal and it

2   will remain under seal.  And the folks on the Internet can try

3   all they want, but they are not getting it.

4          Okay.  So that is as to the factual issue.  You could

5   file your motion for protective order and you can support it

6   with whatever memorandum of law you want to support asserting

7   legal grounds for the objection.

8          And if it's a personal safety issue with the factual

9   basis that Dr. Wright is concerned about his personal safety

10  that's one thing.  If the Dr. Wright is attempting to assert

11  the rights of other people to not have their identities

12  disclosed for their safety, then, you have a standing problem

13  and I need to have briefing on standing, but I can't do that

14  until you file your motion.

15         So I will order by the scheduled proposed here.  By

16  April 19th, which I think is a week from tomorrow before

17  sundown because it is the first night of Passover, isn't it?

18  So before sundown before 3:00 on April 19th so everybody can

19  read it and do it in their Seder, I take that back.

20         I didn't mean in their Seder, but can have something

21  to read before Seder hits, but the Defendant can file whatever

22  motion for protective order they want filed with respect to the

23  national security issues.

24         And I will authorize the Plaintiff to respond on or

25  before April 29th as requested here.  So that's the national

1   security issue.

2          Mr. Freedman, I don't believe you addressed the issues

3   related to the spouse that Miss McGovern is proposing develop a

4   more robust record of what the questions were, the categories

5   of questions would be a way for the Court to -- also I will

6   order that if you do file a motion for protective order

7   relating to the national security, please attach whatever

8   aspects of the transcript are that identify the specific

9   questions that were asked.

10          Because I do agree with Miss McGovern there may be a

11  situation where if I look at the questions and determine that I

12  wouldn't order to answer those questions anyway and reach the

13  issue, but I can't judge that until I see the questions and the

14  answers.  All right.  So that's as to the national security

15  issue.

16          As to the marital issues, Mr. Freedman, I don't

17  believe I heard from you on that.

18          MR. FREEDMAN:  I'm sorry, Your Honor.

19          THE COURT:  No, no, we dealt with the other issues.

20  So we're going back.

21          MR. FREEDMAN:  Can I actually just add one thing, Your

22  Honor?  Could we just put a time because sundown --

23          THE COURT:  I said 3:00, I think.

24          MR. FREEDMAN:  Okay.  I missed that; 3:00.  Thank you,

25  Your Honor.

1    THE COURT:  Hopefully you will all have better things
2 to do that afternoon than read whatever filings come in, but IF
3 for some reason you want to have some fun reading before the
4 Seder, then, you could read that instead of Agutta, but that
5 would be interesting.
6    MR. FREEDMAN:  I think like the Court was saying that
7 about the air conditioning, if I tried to read legal papers on
8 the eve of Passover, I take my life in my hands so.
9    THE COURT:  Right.  But it comes on a Friday afternoon
10 and some poor associate at your firm can spend their weekends,
11 someone who is not observing Passover, would get to spend their
12 weekend starting to work on the brief.  So that is why I would
13 have it filed on a Friday so you have the extra weekend to work
14 on it.  All right.
15    MR. FREEDMAN:  So as to the marital privilege, Your
16 Honor, the reason why the question was not proffered because we
17 had a lot of material to get through as is we didn't get
18 through a lot of it.
19      If the Court ever goes through the transcript, the
20 Court will find that the witness plays a lot of word games to
21 avoid answering questions and so things just took a really long
22 time.  When it became apparent that the witness was just
23 repeatedly -- I think the mantra was like, I will not answer
24 any questions about my wife.  It was just the same exact answer
25 over and over again.  We just decided it wasn't worth --

1          THE COURT:  My question was not meant to criticize

2   either party for not making a more robust record on that issue.

3          I've been in that situation and it is fine line

4   because if you keep asking the questions, then the witness or

5   the witness' counsel is going to, rightfully so, perhaps claim

6   that you are just badgering the witness by continuing to ask

7   and the witness made clear they don't want to talk about it.

8   You want to make your record.

9          I understand that dynamic.  I have been in the middle

10  of that dynamic.  So, again, I didn't mean to criticize either

11  party for the fact that a robust record was not made, but I

12  think either side making a proposal, which is whether it is at

13  the level of interrogatory or by some other mechanism.

14         Perhaps you could identify the general categories of

15  the questions or area of questions you had wanted to pursue

16  that would allow the Court to at least make some preliminary or

17  perhaps some other rulings, but I'm not saying you have to do

18  that.  I think I am summarizing their proposal more or less.  I

19  just wanted to get your feelings on that.

20         MR. FREEDMAN:  No, I understand, Your Honor.

21         And frankly, it is the first time hearing and I am

22  thinking out loud not a good thing to do on the record.

23         But the questions when did you meet, when the name

24  change, those were for purposes of identifying timeframes and

25  potential sources of information about the witnesses.

```
 1              For Miss Lynn Wright --

 2              THE COURT:  And help me out.  I apologize.  She is

 3    the --

 4              MR. FREEDMAN:  She's the ex-wife.

 5              THE COURT:  Ex-wife.  Okay.

 6              I was also trained never to use the phrase this is my

 7    current wife.

 8              MR. FREEDMAN:  That's right, Your Honor.

 9              THE COURT:  This is my first wife.

10              MR. FREEDMAN:  All right.  So for the ex-wife, Your

11    Honor, for clarity -- and I mean no offense to Dr. Wright by

12    referring to her that way.

13              But for the ex-wife, we've seen documents that she was

14    a party to communications between Dave Kleiman and Craig Wright

15    (sic).  The purpose of the questions at the deposition were to

16    determine her role in those communications.

17              We've also seen documents produced by the Defendant

18    that demonstrate she, I believe, owned some of the companies

19    that are at issue in the litigation at some points in time.

20    That she lent Dr. Wright money to further some of the work he

21    was doing and it was unclear what that work was.

22              And so what we were trying to do at the deposition is

23    just what the Court asked to do, which is get to the bottom of

24    that and find out where it is.  It seems to me that would be

25    very tough to find out in an interrogatory.
```

1        You need more of an interactive session where I can

2   ask a question and you can respond.  And then, I can react to

3   that question by saying, okay, you've closed off that line of

4   inquiry, let me go here.  We can pose an interrogatory, but I

5   don't think it would be help all that much.

6        If a solution would be to go back and take a limited

7   deposition of Miss Wright, the ex-wife, and let me segway for a

8   second to not the current wife, but Miss Ramona Watts, who he

9   is married to at the moment, it was the same issue.

10       We've seen Miss Watts on many communications related

11  to the business where she's been cc'd with other people.  You

12  know, the marital communication privilege relates to

13  communications and the content of private communications within

14  the marriage.  That's not what -- there's way more than that.

15       Miss Romona Watts got on the phone with Dr. Wright to

16  Ira Kleiman to extend an offer to purchase the shares that he

17  had been allegedly issued and Bit Coin Exchange.

18       She was heavily involved in the business.  And so,

19  again, the questions were aimed at what was the scope of her

20  participation?  What was the scope of her knowledge?  There

21  are --

22       THE COURT:  I apologize for cutting you off.

23       But I understand completely and essentially you are

24  doing probably what I am going to order you to do.

25       MS. MARKOE:  Can I clarify the record for a moment?

1        THE COURT:  Sure.

2        MS. MARKOE:  Mr. Freedman did not ask those questions

3  at the deposition.

4        THE COURT:  I understand.

5        MS. MARKOE:  And he didn't even try.

6        Where he got to is when did you meet your wife?

7        The questions that really -- and I said, please, tie

8  this to one of the topics.  Tie this to how it is related to

9  the case and he will answer those questions he didn't do it.

10       And one of the questions was, it wasn't when did Miss

11 Watts change her name.  It was what was her maiden name.  He

12 answered that question.

13       It was when did her name change from her maiden name

14 to Watts.  It is not relevant.  It is intrusive.  It is talking

15 about the prior marriage.

16       That's where things went off the rails.  And instead

17 of trying to bring it back on to the rails -- and there were

18 questions later about Miss Watts in relation to the companies.

19 And he answered those questions saying, yes, she had

20 involvement in the companies.  I don't recall all of it.  It is

21 public record.

22       THE COURT:  Thank you.

23       Let me pull apart the two issues here because I think

24 you all think contesting the issue that I am not addressing

25 right now.

1          The first issue is deal with the second issue first,

2     which is what's the remedy?

3          Let's assume that I find that there are certain

4     questions that Dr. Wright should be required to answer relating

5     to his former wife and his current wife.

6          You know, should that be done by reconvening this

7     deposition?  Could that be referred to his later deposition?

8     Could that be referred to by interrogatory?

9          I'm not reaching that question today.  We will deal

10    with that question if we have to do that, but I think -- and

11    again, I don't fault Mr. Freedman for moving onto other topics.

12    If someone were asking me about my wife and I was hellbent not

13    to answer it, you could ask me all day and I would be wasting

14    everybody's time.

15         Dr. Wright is not a lawyer and he doesn't understand

16    necessarily some of what is going on there that he is required

17    to answer or whatever.  Put it aside.

18         I think what would make sense, I am not going to

19    require Mr. Freedman, at this point, to reduce everything to

20    interrogatories.  For some of the reasons he has articulated, I

21    think it needs to be more fluid, which is why I wanted it done

22    by deposition.

23         That might be the ultimate remedy that I agree upon if

24    that is the ultimate remedy, but I am not deciding that today.

25    But, Mr. Freedman, I think what you would do, in the courtroom

1   is probably appropriate thing to do is simply to file -- again,

2   find the portions of the transcript where these topics were at

3   least approached or raised, so I can see the context of Mr.

4   Markoe is talking and you are talking about because I wasn't

5   there.

6          And then, perhaps submit a briefing.  It doesn't have

7   to be a sworn statement.  It doesn't have to be a declaration

8   from -- or anyone else.  Just a brief of some kind seeing

9   generally speaking these were the topics I would ask Mr. Wright

10  about that touch upon current wife, former wife.

11         And since you know my favorite questions what's the

12  theory of relevance if you want to make an argument in there as

13  to why it is relevant and why I should be allowed to ask those

14  questions, I think that tees it up enough.

15         I don't think we have to get down to the granular

16  level of how would you phrase the particular question in order

17  to at least address the high level topic that I have to

18  address.

19         And then, that will allow Dr. Wright's counsel to say,

20  oh, okay, you are currently not asking him or you wouldn't be

21  asking him about communications with his wife.

22         You are asking about things that clearly wouldn't be

23  within any privilege.  We agree to relevance.  We will answer

24  those.  Things we have an objection to.  At least we understand

25  your theory of relevance.

1         When they file their response they could explain why

2    they would disagree.  So that will tee it up for me

3    sufficiently that I can then look at the transcript and look at

4    the topics and hopefully rule on that.

5         If we, however, separately be helpful to me just as a

6    legal matter because -- I don't know the answer to this

7    question.  I think I know the answer to this question, but I

8    think I want you to be an able to be heard on the answer to

9    this question.

10        I'm not sure that the marital testimonial privilege

11   applies if the wife is not a party to the litigation.  And I

12   understand the marital -- I will give you the benefit of the

13   research I did in another case that I had this in.

14        Obviously there is two marital privileges recognized

15   in different places in the federal system.  There is the

16   marital communications privilege which is, you know, what

17   spouses say to one another during the marriage and that is

18   accepted everywhere in confidence.

19        Confidential marital communications.  That one may be

20   it applies.  Maybe it doesn't apply.  I don't know factually,

21   but I think legally it could apply in this case.

22        Then there is *Travel* versus which is the matrimonial

23   privilege, where the question is the ** the ** of having the

24   spouse testify against the other spouse something that the law

25   should allow.  And *Travel* says that's a decision for the non

1   Defendant spouse to make.

2           If the non defendant spouse wants to testify against

3   the former or against the current spouse and talk about things

4   that were not communications, or what they saw, or what they

5   heard, or what they did, that's up to them.  That's *Travel* v.

6   United States.

7           There is other case law in the Grand Jury context.  I

8   think it is In Re:  Malfitano, which I think is in the Third

9   Circuit and In Re:  Hannah Kochler, which I believe is in the

10  Second Circuit.

11          They may be the same case.  It is merged within my

12  brain.  It's been a while, but what they talk about is in those

13  cases -- it happened to be the wife.  The wife is called before

14  the Grand Jury and wants to invoke the marital testimonial

15  privilege saying I don't want to testify against my husband.

16          And the Government's argument was her husband is not

17  here.  And the response was, yeah, but you are going to use it

18  against my husband.  And the Court said, yeah, if you are going

19  to use it against the other spouse, then, you can invoke.  But

20  if you are not going to use it against the other spouse, you

21  can't.

22          So, in this case, I don't think there's a theory under

23  which Dr. Wright's testimony is going to be used in this case

24  against either his current or former spouse because they are

25  not parties.

 1          So that is, as far as I know on that issue, but if
 2   anyone wants to brief that issue separately if they are still
 3   invoking that privilege.
 4          I think Miss Markoe, if you are still on the phone, I
 5   invited you to make that objection and you hadn't had time to
 6   think about it, but if you want to continue to assert that
 7   objection I now share with you the knowledge that I have and
 8   feel free if you have a good faith basis to assert it and to do
 9   so and to brief it.
10          Miss McGovern.
11          MS. MCGOVERN:  So separate and apart from the
12   privilege issue the deposition, at least the preliminary
13   deposition had --
14          THE COURT:  Which one?
15          MS. MCGOVERN:  The preliminary deposition of Dr.
16   Wright and --
17          THE COURT:  Before you get to that, let me just set
18   the same timeframes for what I just talked about.
19          Mr. Freedman, can you from a week from tomorrow, file
20   that brief we talked about the topics that you wanted to cover
21   and whatever portions of the deposition that I need to see.
22          MR. FREEDMAN:  Yes, Your Honor].
23          THE COURT:  And then I will give opposing counsel
24   until the 29th to respond.
25          Now Miss McGovern.

1      MS. MCGOVERN:  Of Dr. Wright, we talked about

2  objection to relevance to the topic regarding third parties

3  sort of crossed the Rubicon in beyond the relevance of the

4  case.

5           And it is a little bit in of a conundrum in the sense

6  that we have completed a preliminary deposition and there's

7  going to be another deposition that is going to be on the

8  merits.

9           And in that regard we have typically the same and

10 relevance isn't a ground to instruct the witness not to the

11 answer, but we do have here some sensitive issues regarding the

12 just the personal relationship with your ex-wife and your, you

13 know, your present marriage.

14      THE COURT:  Sure.

15      MS. MCGOVERN:  So, you know, to the extent that

16 questions are asked regarding that are personal and have no tie

17 to the claims in this case, you know, we object to diving into

18 and invading that personal space, Your Honor.

19      THE COURT:  I understand.

20           And I think the procedure that I am putting in place

21 is going to give you the opportunity to object now.

22           And presumably, the good news that I have in this case

23 you are not going to sit here for a couple of months listening

24 and make rulings on relevance and then go into a deposition and

25 start asking questions that I have ruled are not relevant.  I I

1  don't think that's going to happen.

2          MS. MCGOVERN:  You're right.

3          THE COURT:  So my goal is that by the time you circle

4  back again and by the time you are taking second depositions of

5  these people, you will have a very clear understanding of what

6  I think is relevant and what I think is not relevant.

7          And again, we can figure out -- the many reasons that

8  I allowed the relevance objections in these depositions were

9  first of all, with from Wright he was traveling so far to do it

10  that, I thought it was important to make that kind of a record

11  and that's why I made myself available so that we really did

12  make the most efficient use of Dr. Wright's time and counsel's

13  money and time.

14          And I do hope that was a positive exercise and you

15  will tell me after the case is over and I will very much be

16  interested if you think that was a good idea or bad idea, but

17  after the case is over.

18          Same thing with Mr. Kleiman.  It was a preliminary

19  topic.  And it was almost like a 30(b)(6) depo to try to keep

20  those on track and minimize the objections.  When you get back

21  to the merits depo the rules will apply, but hopefully by then

22  you will understand my relevance theories of the case.

23          All right.  Have I now ruled on everything that was

24  before me today, Mr. Freedman?

25          MR. FREEDMAN:  The only thing I just wanted to clear

1  for the record, I think the Defendant agreed to do it, but I

2  just want to make sure it is clear, the Defendant will move for

3  a protective order on burdensome grounds for Bit Coin wallet

4  issue by April 19th as well.

5          THE COURT:  Let me make this real simple for

6  everybody.  As to all four of the topics that were listed in my

7  order and listed on Page 5 of Docket Entry 41, initial

8  briefings due April 19 by 3:00 p.m.

9          Responsive briefing is due April 29th by close of

10 business 5:00 and if I need a reply I will request a reply at

11 that time, but no one should file a reply unless I ask for it.

12 So everything is moving in tandem forward.

13         MS. MCGOVERN:  Thank you, Your Honor.

14         THE COURT:  Thank you both.

15         Like I said, I see the parties working hard so I want

16 to try to work with you.

17         All right.  Where do we go from here, folks, Mr.

18 Freedman?

19         MR. FREEDMAN:  Do you mean generally, Your Honor?

20         THE COURT:  I always shudder to ask this, but do you

21 want me to overly my own question.  Seek the proving I get

22 April 19 and 29 and I will just decide at that point if there

23 is anything else I need to do.

24         In the meantime, I understand, Mr. Freedman, you are

25 going to file your motion with Judge Bloom.  Maybe that will

1   change things.  Maybe it won't.  I don't know.

2           But in the meantime if as soon as comes up, you all

3   know how to reach me and we will all get back together again.

4           Anything else that this afternoon?

5           MR. FREEDMAN:  No, Your Honor.

6           THE COURT:  From the Defense?

7           MS. MCGOVERN:  No, Your Honor.

8           MS. MARKOE:  No, Your Honor.

9           THE COURT:  Thank you all very much.  We will be in

10  recess.

11           (Thereupon, the proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                CERTIFICATE

3

4         I hereby certify that the foregoing transcript is an

5    accurate transcript of the audio recorded proceedings in the

6    above-entitled matter.

7

8

9

10
     04/12/19                          Bonnie Joy Lewis,
11                           Registered Professional Reporter
                                 CASE LAW REPORTING, INC.
12                                7001 Southwest 13 Street,
                                Pembroke Pines, Florida 33023
13                                    954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25