```
 1              THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                    WEST PALM BEACH DIVISION
 3
                  CASE NO.:  18-cv-80176-BB
 4

 5

 6
    IRA KLEIMAN, et al.,          )
 7                               )
             Plaintiffs,          )          April 11, 2019
 8                               )
    v.                           )
 9                               )          Pages 1 - 68
    CRAIG WRIGHT,                 )
10                               )
             Defendant.          )
11  _____/

12

13

14
                      DISCOVERY HEARING
15
           BEFORE THE HONORABLE BRUCE E. REINHART
16              UNITED STATES MAGISTRATE JUDGE

17

18

19

20
    APPEARANCES:
21
    On behalf of the Plaintiffs:
22
                        BOIES SCHILLER FLEXNER LLP
23                      100 SE 2nd Street
                        Suite 2800,
24                      Miami, FL 33131
                        BY:  DEVIN FREEDMAN, ESQ.
25  (Telephonically:)   BY:  KYLE ROCHE, ESQ.
                        BY:  JOHN MCADAMS, ESQ.
```

```
 1
    APPEARANCES CONTINUED:
 2

 3   On behalf of the Defendant:

 4                          RIVERO MESTRE LLP
                           2525 Ponce de Leon Boulevard
 5                          Suite 1000,
                           Coral Gables, FL 33134
 6                          BY:  AMANDA M. MCGOVERN, ESQ.
     (Telephonically:)      BY:  ZAHARAH R. MARKOE, ESQ.
 7                          BY:  BRYAN PASCHAL, ESQ.

 8

 9

10   Transcribed By:

11                          BONNIE JOY LEWIS, R.P.R.
                           7001 SW 13 Street
12                          Pembroke Pines, FL  33023
                           954-985-8875
13                          caselawrptg@gmail.com

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Thereupon, the following proceeding was held:)
 2               THE COURT:  Please be seated.
 3               I know some of you got just came off of the train.  So
 4   take a second and get settled in and make sure you get
 5   organized if you need to be.
 6               All right.  Let me call the case.  This is Case Number
 7   18-80176; Ira Kleiman versus Craig Wright.
 8               May I have counsel's appearances starting with counsel
 9   for the Plaintiffs.
10               MR. FREEDMAN:  Good afternoon, Your Honor.  Devin
11   Freedman for the Plaintiffs.
12               THE COURT:  Mr. Freedman, good afternoon.
13               MR. ROCHE:  Kyle Roche for Plaintiffs.  And also with
14   me is John McAdams for the Plaintiffs.
15               THE COURT:  Mr. McAdams and Mr. Roche, good afternoon.
16               Anyone else for the Plaintiffs?
17               All right.  For the Defense.
18               MS. MCGOVERN:  Good afternoon, Your Honor.
19               Amanda McGovern from Rivero Mestre for Dr. Craig
20   Wright, Defendant.
21               THE COURT:  Miss McGovern, good afternoon.
22               MS. MCGOVERN:  Good afternoon.
23               MS. MARKOE:  Zaharah Markoe on behalf of Dr. Wright.
24               THE COURT:  Miss Markoe, good afternoon.
25               MS. MARKOE:  Good afternoon.
```

1          THE COURT:  Do we have anybody on the phone?

2          MR. PASCHAL:  Bryan Paschal on behalf of Dr. Wright.

3          THE COURT:  Mr. Paschal, good afternoon.

4          MR. PASCHAL:  Good afternoon, Your Honor.

5          THE COURT:  Anybody else?  Even fight; three on each

6   side.  Okay.  Got it.

7          All right.  So we are here this afternoon on the

8   request for discovery hearing at Docket Entries 138 and 141.  I

9   did review Dr. Wright's memo.  I reviewed the Plaintiffs'

10  opposition to the memo.

11         I have also gone back and reviewed the pleadings and

12  my notes relating to the discovery hearings we had on February

13  20th, March 6th, March 14th, and March 26th.  As well as the

14  motions that were filed at Docket Entries 131, 133, 134

15  requesting discovery hearings, which I declined to have.

16         So I will note that means there have actually been --

17  this is our fifth discovery hearing, plus two that I have

18  declined to have, and this case has been pending for less than

19  90 days.

20         So with that, I will turn to Dr. Wright's team and

21  tell me what it is that you need me to rule on today.

22         MS. MCGOVERN:  Thank you, Your Honor.

23         THE COURT:  Sure.

24         MS. MCGOVERN:  I am going to remain seated.  I know

25  that we have done that in the past.

1          THE COURT:  No problem.

2          MS. MCGOVERN:  Your Honor, we filed our discovery

3   memorandum following the preliminary depositions of Dr. Wright

4   and Ira Kleiman, the Personal Representative of the Estate of

5   David Kleiman, as well as the brother.

6          And we filed a memorandum because we are two months

7   away from a discovery cutoff in this case.  And as Your Honor

8   has just noted, and we are all very much aware, that we have

9   had the benefit of your guidance from the very beginning of

10  this case.

11         And with that guidance we believe we can complete

12  discovery within the remaining 60 days, but we need a little

13  more help.  And the purpose for today is not to cast aspersions

14  or impugn anybody.  It is to get it done and we think we have a

15  plan.  We have an ask, as it were, regarding that plan.

16         And again, I want to do that against the backdrop of

17  the preliminary deposition that we took of the Plaintiff in

18  this case.  Because after taking that deposition it is

19  perfectly clear to us, in any event, that this is not a case

20  that cannot be done in 60 days as the Plaintiff has its burden

21  of proof regarding the allegations which I think are, in

22  essence, theft.

23         Because when we asked about the witnesses, again, I

24  think typically it is difficult to get discovery squeezed in a

25  short period of time when there are depositions to take all

1    over the world.  That is not this case.

2         We typically asked the question of Ira Kleiman in the

3    deposition if there were any witnesses that have knowledge

4    about three primary points; the existence of Bitcoin, the

5    establishment of any partnership with Dr. Wright, and the theft

6    of Bitcoin and intellectual property.  And the answer to those

7    questions was and, understandably, you know, sitting here, I

8    don't recall.

9         I don't recall what those documents are, but when

10   pushed under oath the Plaintiff stated, sitting here today I

11   cannot recall other than the documents that we've seen attached

12   to the complaint documents that support the allegations in the

13   case or witnesses that would have information regarding the

14   case.

15        And Ira Kleiman, we understand he's the Personal

16   Representative and that typically puts the case in a different

17   situation, but he is also the brother.

18        And he has injected himself as a fact witness in the

19   case because one of the allegations in the amended complaint is

20   that at a Thanksgiving dinner in 2009, discussions were had

21   with Dave Kleiman about something that would be something big.

22        And that's an allegation that's in the complaint, but

23   he also testified under oath that he did not see his brother

24   after 2009.  Not once.  They lived five minutes away from each

25   other.  They had conversations, but they never saw each other

1   and he didn't see him before he died.

2           So why am I saying this now?  I understand this is not

3   a merits issue.  We are not here on a summary judgment.  And I

4   am certainly not trying to suggest that we should have some

5   sort of ruling on that, but we are 60 days out.

6           And we've had intimations in the last hearing, in the

7   hearing before that, and in the hearing before that, I believe,

8   that we are going to have to continue discovery in this case

9   according to Plaintiffs.  Our concern is this, Your Honor.  You

10  know, filling up the more time you have, the more time you

11  take.

12          And our concern is that without at least recognizing

13  and acknowledging where we are now after all the work that Your

14  Honor has done, and after all the work that the Plaintiffs have

15  done, and after all the work that we have done, without

16  essentially stepping back for a second and saying where are we?

17  And what can we do to get this done.

18          We are going to make this litigation the end in and of

19  itself, which is the litigation until they find whatever it is

20  that they are looking for that can substantiate their claims.

21  It is becoming extremely time-consuming and expensive.

22          So our request, Your Honor, is this.  We have tried to

23  provide a little background after the deposition of Ira because

24  we think it shut down a lot of avenues of discovery we don't

25  need to take.

1        We did not come away from that deposition, which we

2   believed was the purpose for the deposition, with any

3   additional source of documents or any additional source of

4   witnesses that we need to discover.  So we just need the rest

5   of their documents and we are done.

6            THE COURT:  Okay.

7            MS. MCGOVERN:  We've produced -- and I know Miss

8   Markoe is going to be talking about this in connection with

9   other things, but if I am not mistaken, we have produced over

10  almost 8,000 documents.  And again, there is a big difference

11  between documents and pages, but it is approximately 35,000

12  pages, Your Honor.

13       And there are another 1100 documents coming.  So with

14  the initial sort of traunch that Your Honor created when we

15  first came to you with what we tried to do, which is to sort of

16  target the Bullseye.

17       Get the whole database and target the Bullseye and

18  look at W&K and look at Craig Wright.  And look at Dave Kleiman

19  and look at Bitcoin Exchange and look at the terms that we are

20  going to cull from that database the documents that would be

21  relevant to these claims.

22       We are continuing to produce those documents.  Those

23  documents are being produced.  We are trying to produce them as

24  quickly as we possibly can.  But that document production, in

25  fact, is being reviewed by the Plaintiffs and is going to be

1  utilized in deposition.  Are the documents necessary for the

2  Plaintiffs to have taken the depositions that they need or at

3  least to commence?

4       We have received documents from Plaintiff as well

5  again.  We stated before and again and I think we just received

6  a production as we were coming into this courtroom today and

7  certainly we have to continue to go through their documents.

8       And I want to address a footnote in their opposition

9  brief because it suggests that certain search terms are going

10 to require additional review of Ira's documents and we want to

11 nip that in the bud.

12      We want to target the documents we need.  Take the

13 depositions we need.  And again, I think there are very few

14 depositions in this case, Your Honor, and we want to try to

15 meet Judge Bloom's discovery schedule.  We think we can do it

16 if, in fact, the parameters are real.

17      And if, in fact, we are called upon to talk about what

18 it is we have.  What we have discovered.  What documents we

19 have received from these 35,000 pages that suggest additional

20 document production beyond the additional traunch is merited so

21 that we do not find ourselves sort of doing the eggbeater.

22      And when I say eggbeater, it is a water polo

23 expression.  My daughter is a water polo player where you can't

24 touch the ground.  Your feet can't touch the ground in that

25 game.  So you have to stay above water all the time and I am

 1  feeling that I am in an internal water polo match.

 2          And I think it is time, Your Honor, and it is the

 3  reason for our memo.  The reason for our memo is to say with 60

 4  days left can we sit down and map out a deposition schedule of

 5  relevant witnesses, including experts, Your Honor.

 6          Because, again, we have an expert discovery deadline

 7  or actually a disclosure of May 14th.  We need the names of

 8  their experts to determine whether we need to even introduce

 9  expert testimony in this case.

10          So we should, as cooperating good faith parties in

11  federal litigation, we should sit down and we should say these

12  are the expert witnesses on these topics we're going to take.

13          Regardless of the fact that the deadline isn't until

14  May 14th, given the schedule we have for the next 60 days, Your

15  Honor, we should work feverishly to meet Judge Bloom's

16  schedule.

17          Because I am very sensitive to the fact that her

18  schedule in this case effects a lot of other schedules in a lot

19  of other cases.  And to just blithely move it without

20  substantial justification, it isn't fair to us.  I don't think

21  it is fair to other litigants.  I don't think it is necessary.

22          We are prepared, Your Honor, to sit down with

23  Plaintiffs' counsel and map out the deposition schedule that we

24  need.  We have tried to do alternating weeks.  We have tried to

25  move that needle and it hasn't helped.

1        Saying we need this witness and you need the other,

2   including experts.  These are the witnesses.  And presumably,

3   they already know what expert witnesses they are going to be

4   using.  These are the witnesses that we are going to be using.

5        We can then respond by saying, okay, we're going to

6   have a rebuttal expert or we don't think we need one.  We need

7   a deposition schedule for experts.

8        THE COURT:  Sorry.  One second.

9        I need to take a quick phone call.  This is my air

10  conditioning contractor and getting air conditioning in my

11  house is important.  Hold on one second.

12        MS. MCGOVERN:  Okay.

13        THE COURT:  If my wife doesn't have air conditioning

14  tonight, I can't go home.

15  (Back on the record:)

16        THE COURT:  Okay.  We're good.  So I can happily

17  report that we have air conditioning in my home.

18        So I am sorry to interrupt you, Miss McGovern.  Please

19  continue with your argument.

20        MS. MCGOVERN:  No, not at all.

21        I was actually sort of going a little too fast for

22  myself anyway.  I just want to get it all in.

23        THE COURT:  Okay.

24        MS. MCGOVERN:  So I just want to take a deep breath

25  and just say, Your Honor, I know you understand the position we

1   are in because you have been involved in it.

2          I simply want to express the Defendant's desire and

3   good faith willingness to sit down with Plaintiffs' counsel.

4   And in the next discovery hearing that we have next week, if we

5   have one, we bring before Your Honor the issues, the

6   identifiable issues that we need your resolution on so we can

7   meet the 60-day window.

8          I know that I have tried cases when the Judge has said

9   you are going and I haven't been ready.  We have depositions

10  and we have witnesses all over the world and we're thinking to

11  ourselves, this is impossible, and it is remarkable how it gets

12  done.

13         We can do this, Your Honor.  We can get this done.

14  Discovery can be completed.  We will do whatever we can, but

15  that does not mean that the response has to be, well, if

16  discovery can be completed, Amanda, then you should just turn

17  it all over and put a whole bunch of people all over the world

18  to get this discovery.

19         It is in tandem with our request to get this done in

20  60 days is to make sure that the request and what we are

21  seeking to do meets the proportion that meets the case.  So

22  that's our ask, Your Honor.

23         We have a couple of other points that were raised in

24  the discovery memorandum that go sort of hand-in-glove with

25  that.  Including, you know, we definitely need to nip in the

1  bud the real party in interest here.

2        We have issues that came out of Ira Kleiman's

3  deposition, which suggests that there was an assignment of

4  these claims.  We don't know if it was for 60 percent or 99.9

5  percent, but we are entitled to know whose interest is being

6  served here, both for purposes of litigation as well as for

7  mediation.

8        I know we are court ordered to mediate.  We certainly

9  need to know who we are dealing with.  That question, there was

10  an objection, do not answer.  We don't know.

11        We also had a question at Ira Kleiman's deposition

12  whether the litigation funder has received documents in this

13  case that the Defendant has not received.

14        Not what documents.  Just whether and that question

15  was also shut down.  So from a production perspective, we also

16  don't know whether we actually have everything in that regard

17  as well.

18        And then, finally, Your Honor, we have an issue that

19  came up with respect to W&K.  W&K is a Plaintiff in this case.

20  It was reinstated by Ira Kleiman.  And it is our position that

21  when it was reinstated, certain actions were taken with respect

22  to foreign directors in that company.

23        And we are trying to get to the bottom of it.  Those

24  questions what was the business purpose when W&K was reinstated

25  by Ira Kleiman, that question was shut down.  Whether, in fact,

1   the membership was changed.

2          That's an issue that's very important.  I know that

3   the Plaintiffs' response to that request -- because we

4   proffered those questions in the deposition so Your Honor would

5   be aware of exactly what we are asking for.

6          I know the Plaintiffs' position in that response was

7   you can pose those in the form of interrogatories and we will

8   answer them for you.  That's fine.  We would accept that, but

9   we also, Your Honor, would like to have your assistance in

10  having a 30(b)(6) deposition of W&K scheduled within the next

11  two weeks.

12         I know we did the preliminary depositions with Dr.

13  Wright as well as with Ira Kleiman.  We did not include W&K in

14  that regard.  We thought perhaps Ira could sort of serve that

15  purpose.  We now know that we need a 30(b)(6) deposition of the

16  Plaintiff as well.

17         THE COURT:  Okay.  I heard you.

18         So before I turn to the other side, just to be sure, I

19  understand your global ask, and I will address that in a second

20  after I hear from Mr. Freedman, but let me just make sure of

21  the specific items you want me to rule on today.

22         I am just reading from the discovery memo on Pages 3

23  and 4.  Is it the issues relating to the request for production

24  36, 37, 40, 41 and 45 as well as -- you said there were three

25  questions, but I think your memo only mentions two.  The

 1   questions propounded to W&K as well as the issues relating to

 2   subject matter jurisdiction and real party in interest and you

 3   mentioned the 30(b)(6) deposition.

 4          Have I got that right?

 5          MS. MCGOVERN:  The 30(b)(6), Your Honor, is actually

 6   in response to the W&K issue.

 7          THE COURT:  I'll start with that.

 8          And I mean, I will hear from Mr. Freedman, obviously,

 9   but you are entitled to take the 30(b)(6) deposition of the

10   Plaintiff.  Clearly it is just a question that you need to

11   schedule it and you need to provide a topic as you both know.

12   So I don't think that's an issue.

13          But so let me turn to Mr. Freedman and let you respond

14   to all those issues that you would like to respond to.

15          MR. FREEDMAN:  Sure.  Good afternoon, Your Honor.

16          THE COURT:  Good afternoon.

17          MR. FREEDMAN:  I mean, I think the Court hit this on

18   the head starting this hearing out.  The case has been pending

19   for 90 days.

20          I just wanted to inject some hard numbers into this

21   case, which is that the Defendant has constantly accused the

22   Plaintiff of slow-walking discovery and I just wanted to make

23   the record clear on this.

24          Plaintiff has produced 12,512 documents, which amounts

25   to 65,222 pages to date.  That almost doubles the production

1   received from Defendant, which is 7,818 documents; 35,211

2   pages.

3          Now I am not saying that the Defendant is slow-walking

4   production.  I think both parties are working very hard to

5   produce documents, but what I do want to say is that the

6   accusations of Plaintiffs as slow-walking are unfounded.

7          That being said, the Court has kept a tight rein on

8   discovery in this case.  The Plaintiffs started off broad.  The

9   Court told the Plaintiffs how to handle that and I think the

10  Court has seen how the Plaintiffs have reacted and narrowed

11  discovery down.

12         Before we went to depose Dr. Wright, the Court ruled

13  on the request for productions 36, 37, 40 and 41 and I don't

14  have the numbers -- the request for production.

15         THE COURT:  45.

16         MR. FREEDMAN:  45.  The Court ruled on them.

17         It said Dr. Wright swore they were relevant, or they

18  were otherwise patently relevant, agree to search terms and

19  produce them.  And the Court told the parties, in no uncertain

20  terms, to get in a room and not get out until those search

21  terms were agreed to and we heard the Court loud and clear.

22         And Mr. Roche, on the phone, flew from New York to

23  Rivero Mestre's office in Miami and sat for 13 hours straight

24  to meet and confer and agree on search terms.

25         Now, I just want to point out that was the final

1  meeting on search terms.  There were multiple three-hour meet

2  and confers before that.  And the parties reached agreement on

3  search terms and we thought we were done, but evidently, we are

4  here again.

5       So with regards to Defendant's request that the Court

6  revisit its rulings on the RFPs, we would ask the Court to deny

7  it.  The Court has already ruled on it.  They have been ordered

8  to produce it.

9       The parties have spent over 20 hours of meet and

10  confers to agree on those search terms.  We ask that the Court

11  enforce the parties agreement and make the parties produce as

12  they agreed.  That's the first thing.

13       The second is that it sounds like the Court's idea to

14  take early depositions to narrow discovery worked for Defendant

15  and I'm happy to hear that.  And I am happy to work with

16  Defendant to prioritize whatever they want.  Eliminate whatever

17  they want.  We certainly don't want to review documents if they

18  don't want them.  So we will work with them on that.

19       Unfortunately, and as reflected in the submission,

20  Dr. Wright didn't know anything and that is obviously an

21  overstatement.  I want to be careful.

22       He did not know anything, but he couldn't identify

23  trusts or trustees.  He couldn't identify beneficiaries.  He

24  couldn't identify owners.  He admitted to purposely structuring

25  his companies in a way where he couldn't know any of that

18

1   information.

2        And so the Defendant, besides the fact that the Court

3   already ruled on these issues the Defendant's proposal that,

4   well, we will just have Dr. Wright identify where Dave Kleiman

5   was a trustee, or a trust, or a beneficiary is perplexing to me

6   because he claimed to not know himself.

7        Look, we're not asking the Court for more discovery.

8   As I said, we heard the Court loud and clear at the first

9   discovery hearing.  We are going to see what we get.  And once

10  we see what we get, we are going to either come back to the

11  Court and say, you know what, actually we do need more or we

12  are going to say, you know what, the Court was right.  We don't

13  need any more.

14       When the Court started this inside-out discovery

15  process, I raised the issue that it would take more time.

16  Certainly it would be more efficient, but it would take more

17  time.  The Court was aware of it.

18       We know now that we were hoping that the deposition of

19  Dr. Wright might somehow expedite our discovery process and we

20  wouldn't have to move to continue the trial.  We will be filing

21  to continue the trial date and the discovery date by the end of

22  the week.

23       Potentially by tomorrow.  I know that is not in front

24  of this Court, but we will be doing that.  The fact is it is

25  impossible to finish discovery in 60 days in this case.

1      For example, at Dr. Wright's deposition, he stated

2  that this Satoshi Affair article, Exhibit 1 to the amended

3  complaint with numerous statements, purporting to quote Craig

4  Wright by Andrew O'Hagan was, I believe the words were a work

5  of fiction.

6      So that leaves us with no choice, but to file letters

7  rogatory requests with the Court here in Miami.  Get that sent

8  to the courts out in England.  Get the English courts to order

9  Andrew O'Hagan to appear for a deposition and testify to

10  whether or not his work is a work of fiction or was, in fact,

11  the admissions of a party opponent.

12      There is just no way that happens in 60 days.  If

13  Judge Bloom tells me too bad, Judge Bloom tells me too bad and

14  there is nothing I can do about it.  But, you know, our ask is

15  -- I guess just to sum up.  I don't want to go outside the

16  scope here.  Our ask is just order the parties to do what they

17  agreed to do.  Get moving on it.

18      Plaintiffs have seven full-time reviewers.  I don't

19  know how many Defendants are.  And just get the documents out

20  let's just keep this case moving as quickly as we possibly can,

21  which I think the parties are doing.

22      As for something else that Miss McGovern said about

23  the assignment of claims, you can send us interrogatories, but

24  I will just tell you on the record, Mr. Kleiman is not assigned

25  any of his claims to anyone else and neither has W&K.  There

1  has been no assignment of claims.

2          As to the request for 30(b)(6) --

3          THE COURT:  Just to make the record clear, I will

4  allow you to -- any interrogatories you send for that purpose

5  do not count against your original list.

6          I've done the same for the Plaintiffs and I will do

7  the same for the Defense.  I appreciate the use of those

8  interrogatories to narrow topics quickly and easily and I will

9  be very generous in giving them to you if that's how you want

10 to use them.

11         So, Miss McGovern, you don't even have to ask.  I will

12 give them to you.

13         MS. MCGOVERN:  Thank you, Your Honor.

14         THE COURT:  Mr. Freedman, please continue.  I'm sorry.

15         MR. FREEDMAN:  As for the 30(b)(6) deposition, if the

16 Defendant wants to take it, I don't know the loss time I had.

17 Certainly W&K is a Plaintiff.  Certainly W&K as a 30(b)(6)

18 witness will be Ira Kleiman.

19         THE COURT:  They just have to notice it.  They have to

20 give you the topics.

21         Mr. Kleiman has an obligation to educate himself.  He

22 has an affirmative obligation to either educate himself or find

23 somebody else who can answer on behalf of the corporation and

24 respond to the questions.  So it is no different than any other

25 30(b)(6) deposition.

```
1            And Miss McGovern, schedule it whenever you want to
2    schedule it.  You are entitled to take.
3            MR. FREEDMAN:  And we have no objection.
4            THE COURT:  Okay.
5            MR. FREEDMAN:  So I guess if there is anything else
6    the Court wants me to address -- oh, the other, at the
7    deposition we were not able to ask any questions about Miss
8    Ramona Watts and Miss Lynn Wright.
9            THE COURT:  I am going to followup on the order that I
10   entered as --
11           MR. FREEDMAN:  And I appreciate that, Your Honor.
12           But my point is just there is so much outstanding here
13   that has to be answered and responded to.
14           The parties should have their heads down working on
15   getting discovery to each other.  Working on briefing these
16   issues and getting this to the forefront instead of traveling
17   up to West Palm every three days for a discovery hearing where
18   I don't even know why we're here.  I think we could have all
19   agreed on this.
20           THE COURT:  Again, it is not every three days.
21           It looks like every week and-a-half.  It's okay and
22   you can appear by phone if you don't want to come all the way
23   up here.  It's quite all right.  I will let Miss McGovern
24   respond in just one second.
25           I will say this.  I do see the parties, both sides,
```

22

 1 working very hard.  I see the amount of documents that both

 2 sides have produced.  I have presided at these hearings.

 3          And I see, Miss Markoe, you are working primarily on

 4 that for your side.  I know, Mr. Freedman, you have a team

 5 doing it on your side.

 6          So I want to actually commend the parties.  I think

 7 you have accomplished -- I always tell people don't look at

 8 where you are going.  Look at where you came from.  It's always

 9 a good way to live your life.  You know, where we were 45 days

10 ago and where we are today, the parties have come a long way

11 and you have made a lot of progress in this case.

12          As to whether the case should be continued, I will

13 leave that to Judge Bloom.  You will file your motion and Judge

14 Bloom will rule on it.  Until she rules on it, I am going to

15 act upon what I have in front of me.

16          But, certainly, I don't want either party to think

17 that the Court does not notice the effort that is being made

18 here.  And not just the effort to physically to go through and

19 produce documents, but there has been a lot of cooperation.

20          We've had a lot of hearings.  You all disagree about

21 things.  That is going to happen.  And I think in a case like

22 this it happens a lot early on until we sort of get some ground

23 rules in place.

24          And I sort of threw you a curve ball by telling you to

25 go and take these depositions early on.  It sounds like at

1   least one of them was helpful.  Maybe the other one wasn't as

2   helpful as you wanted it to be, but I hope it was helpful even

3   in sort of narrowing some topics.

4          And trust me, I did communicate with Judge Bloom and

5   she is aware of the efforts that the parties are making.  So

6   for whatever that is worth, file your motion and we will deal

7   with that.

8          And in terms of coming up with a schedule going

9   forward, you all don't need me.  Talk to each other.  Come up

10  with a schedule.  Come up with a plan.  I mean, I am always

11  happy to visit with you and have you come up here to talk to me

12  about it.

13         You know, I think it is a great idea to come up with a

14  plan going forward.  If you need me to weigh in on anything, I

15  am happy to weigh in on it, but in the meantime, just talk

16  amongst yourselves and come up with a plan that continues to do

17  what you are doing.

18         So with that let me just address these.  I will turn

19  back to Miss McGovern, but I will in second then rule on the

20  very specific topics that you have requested, but if there is

21  any other ask that you want to make at this time, or any other

22  rulings that you want me to make, I am going to give you a

23  chance to speak to that.

24         MS. MCGOVERN:  Your Honor, with respect to the plan, I

25  am a big believer in plans.  Especially when we have a tight

1    timeframe.  And I would like to, in light of the fact that they

2    are going to be filing a motion for a continuance, it really

3    can't be in a vacuum.

4          And sort of a request for whatever extension they are

5    going to have, it is unclear how much time -- I mean, it is

6    unclear, but I do think that if the Plaintiffs will agree to

7    sit down with us and with the time remaining, map out the

8    depositions that need to be taken on alternating weeks, as well

9    as the deposition of the experts when they can be taken so that

10   we can accomplish that expeditiously that will go a very, very

11   long way.

12         Because the document production is going to be

13   happening, as we know, sort of along in tandem with what we do,

14   but we can't let the document production kind of stop us from

15   getting the other things done.

16         And the problem is we have tried to get an agreement

17   on depositions for alternating weeks and we would like to

18   include the expert issue in that because that's around the

19   corner.

20         We would like the Plaintiffs to agree to sit down with

21   us and agree upon alternating weeks for depositions of fact and

22   expert witnesses.

23         THE COURT:  Here's what I am going -- I will hear from

24   you in a minute, Mr. Freedman, but let me give you my immediate

25   sort of reaction to that.

1          As with everything else, I would prefer for you to

2    take a shot at it in the first instance.  I think conceptually

3    the idea of having a plan is always and good thing.

4          Not to coach Mr. Freedman because he's a very good

5    lawyer and he doesn't need me to tell him how to file his

6    motion.  I would suspect that if you file a motion with Judge

7    Bloom and you lay out this is the plan that we put together and

8    this is why we think we can't accomplish it in this amount of

9    time that might -- it would inform Judge Bloom's decision more

10   accurately.  Let me put it that way.

11         So if the parties want to try to work up a plan,

12   that's great.  If the parties are unable to agree upon a

13   specific plan, but you agree conceptually that the plan is a

14   good idea and you want to submit to me your proposed

15   alternative plans, I will either pick one or join them

16   together.

17         We can have a telephonic conference so you don't all

18   have to come all the way back up here, if you would like, but I

19   am not going to order the parties at this time to sit down and

20   come up with a discovery plan.

21         Again, Mr. Freedman's position very well might be I

22   cannot agree.  That there is no plan that could accomplish what

23   needs to be accomplished within the timeframe we've got.  So I

24   need to file my motion.  And if Judge Bloom rules against me or

25   if Judge Bloom tells me to come up with a plan, then I will

1  come up with a plan.

2       Again, I am not going to prejudge any of that.  I am

3  going to leave it to the parties.  So today I am going to deny

4  any request that I order the parties to come up with a plan,

5  but I would encourage the parties to talk about it and see what

6  you can agree to.  It's always a good idea.

7       So with that, then, let me rule on the very specific

8  issues and I know I have to turn to the timing of the issues

9  that were raised on my order memorializing rulings at Docket

10 Entry 137.

11         MS. MARKOE:  Your Honor, if I may --

12         THE COURT:  Yes, Miss Markoe.

13         MS. MARKOE:  -- respond to a couple of things --

14         THE COURT:  Sure.

15         MS. MARKOE:  -- that Mr. Freedman said.

16         THE COURT:  Yes.

17         MS. MARKOE:  With regard to the search terms, to be

18 completely fair and honest, I was not in that 13-hour meet and

19 confer.  I was doing other things, but I can attest that did,

20 in fact, occur and both sides worked incredibly hard to try to

21 come up with agreed upon search terms.

22         My understanding is for the most part that was

23 accomplished.  There were a couple of outstanding items that

24 have yet to be addressed and I've tried to address some of them

25 in e-mails to them.

1          I have actually gotten no response, but I have moved

2    ahead as if I have had a response and we are moving forward.

3    And we have prioritized all the searches regarding Dave Kleiman

4    that they have proposed.

5          THE COURT:  Great.

6          MS. MARKOE:  But with regard to the RFPs, we are

7    asking for a reconsideration on that.

8          THE COURT:  Okay.

9          MS. MARKOE:  There are two reasons for that.

10         The first is that in preparing for these depositions,

11   it has been very useful because one of their topics was that

12   declaration.  And in preparing for this deposition, I learned a

13   lot about that declaration, which to be honest, I have not had

14   a --

15         THE COURT:  Just so I am clear and the record is

16   clear, that is the declaration Dr. Wright filed in support of

17   the motion to dismiss for lack of jurisdiction?

18         MS. MARKOE:  Well, for lack of jurisdiction and on

19   *forum non* grounds.

20         THE COURT:  *Forum non conveniens*, right.

21         MS. MARKOE:  And essentially, in listing particularly

22   entities that might have relevant information that list was, A,

23   for the purpose of the *forum non* grounds.

24         And also, those entities would have, yes, documents

25   that are relevant to this case.  Not that everything that that

 1  entity has is relevant to that case.

 2          And really what they are now asking for is everything

 3  related to it's your investigations of those specific entities

 4  even if they are not related to Mr. Kleiman or W&K.

 5          And we have already said that with regard to Mr.

 6  Kleiman and W&K, they will get anything regardless of whether

 7  another company is mentioned in it.  Regardless if whether that

 8  document comes from another company.  We get it.

 9          So this expansion is just unwarranted.  And in fact,

10  the search terms that they have proposed will increase the

11  number of documents that we would have to review and

12  potentially produce by 18,000 documents.

13          Not pages, documents.  And it is our position those

14  are just not proportional to the needs of the case.

15          THE COURT:  Okay.  Let me turn to Mr. Freedman.

16          MR. FREEDMAN:  Your Honor, I mean, you know my

17  position that we are not required to accept Dr. Wright's

18  representation of what was and what was not related to Dave

19  Kleiman that he has sworn these entities were relevant.  That

20  we are seeing many of the entities are, in fact, relevant.  And

21  that the parties have spent upwards of 20 hours of meet and

22  confers and agreed on search terms.

23          THE COURT:  Can I stop you for a second?  Because that

24  is where I am getting a little confused here.

25          What is the universe of documents that the Defense

1  thinks should not be produced?  Because it seems to me the

2  request is for -- here I'm looking at the actual language of

3  the specific requests as narrowed.

4          For example, 37 is all documents and communications

5  submitted to the ATO in regard to -- and there is a whole bunch

6  of folk listed.

7          MS. MARKOE:  Right.

8          THE COURT:  Different companies.

9          The Defense's request is narrowed at only to documents

10  submitted to the ATO, which have some relationship to Dave

11  Kleiman, W&K, Coin Exchange, and Lewis and Ira Kleiman.

12          Am I roughly on target there?

13          MS. MARKOE:  You are roughly on target there, Your

14  Honor.

15          THE COURT:  And the Plaintiffs' position is, no, you

16  should just run the search terms and give us whatever comes up

17  in the search terms relating to that topic, right?

18          MR. FREEDMAN:  More or less, Your Honor, yes.

19          THE COURT:  Okay.  So help me out.

20          What is going to come up on the search terms that is

21  not going to be related to Dave Kleiman and vice-versa?

22          MS. MARKOE:  So that's the 18,000 documents that I am

23  talking about.

24          THE COURT:  But what are they?

25          MS. MARKOE:  So they are essentially --

1          THE COURT:  Substantively what are they?

2          MS. MARKOE:  So the ATO, for instance in this one,

3   audited and investigated each one of these companies --

4          THE COURT:  Okay.

5          MS. MARKOE:  -- for years.  Like years.

6          And so there is a plethora of documents that would hit

7   on those search terms because not everything that was in those

8   companies reference or talk about Dave Kleiman, or W&K, or

9   Bitcoin Exchange, or the entities that are at issue in this

10  matter.

11         THE COURT:  Okay.

12         MS. MARKOE:  And that's the issue.

13         THE COURT:  Okay.  But it seems to me, are you not

14  being able to run search terms against that universe?  You are

15  going to pull all documents relating to the ATO investigation

16  of -- let me pull one.

17         For example, Mt. Gox because that happens to be the

18  one that I see here.

19         MS. MARKOE:  Okay.

20         THE COURT:  So you are going to pull all the documents

21  that relate to the ATO investigation in Mt. Gox, but you are

22  not going to produce them.  You are then going to run the

23  search terms over those, correct?  You are only going to

24  produce what the search terms spit out.

25         MS. MARKOE:  The 18,000 documents is using the search

1    terms that they had proposed to address these specific requests

2    as they limited them.

3            THE COURT:  Okay.

4            MS. MARKOE:  So my point -- and they didn't limit them

5    to documents related to Dave Kleiman and W&K.

6            They do not do that.  And what we said in with regards

7    to those search terms, in concept if this is what the Court

8    orders us to do, these are the search terms we will use to do

9    it.

10           We don't agree, however, that we should be doing a

11   search for all of these documents on unrelated companies that

12   do not relate to Dave Kleiman and W&K.  We already said we

13   would do that.

14           THE COURT:  Give me, not off the top of your head, but

15   sort of at a broad level.

16           What are some of the search terms that you think they

17   are asking you to use on that universe of documents that would

18   spit out material that you believe is not relevant or

19   disproportionate?

20           MS. MARKOE:  I don't actually have the entire search

21   terms in front of me, but something to the effect of ATO and/or

22   Australia within whatever of tax and cloudcroft.  So that gets

23   you all of the ATO documents related to cloudcroft, for

24   instance.

25           THE COURT:  Okay.

1    MS. MARKOE:   Another example is with regard to request

2    number 45.   You know, they had a whole bunch of search terms.

3    And then, they would have a person's name such as -- what's his

4    name?   John Chesher.

5    THE COURT:   Okay.

6    MS. MARKOE:   Okay.   And John Chesher a whole bunch of

7    issues and then, let's say, Hotwire.

8    Well, John Chesher was in their finance department at

9    Hotwire.   He's going to have a lot of documents that relate to

10   Hotwire, for instance.   Similarly with, you know, Jaime Wilson.

11   So, you know, they have people on here that are employees of

12   these companies.

13   And so there is going to be a lot of documents where

14   they are talking about the company or the e-mail of the company

15   is in there.   And it is just going to be casting a very wide

16   net to catch a very small minnow.

17   THE COURT:   Okay.   I hear you.   All right.   Let me

18   turn to Mr. Freedman and Mr. Roche.

19   MR. FREEDMAN:   I want to address it quickly, Your

20   Honor, but I am going to throw this mainly to Mr. Roche who

21   participated in the meet and confer.

22   THE COURT:   Sure.

23   MR. FREEDMAN:   I think that the issue here is that the

24   Defendants -- it seems to me the Defendant's view of how to

25   conduct discovery in this case is that any search term has to

 1  include the word Dave Kleiman, Lewis Kleiman, Ira Kleiman, or

 2  W&K.

 3          And I just don't think it is reasonable that

 4  Plaintiffs shouldn't be entitled to a document just because it

 5  doesn't say Dave Kleiman's name on it.

 6          And the parties worked very hard to come up with

 7  narrowed search terms, which would bring up what appears to be

 8  the most relevant documents.  And I am going to hand this over

 9  to Mr. Roche here, but that's what those hours of meet and

10  confer was about was to reach agreement on them and the parties

11  reached agreement on them.

12          And I feel like every time we take one step forward we

13  are taking two steps back.  Yes, there are a lot of documents.

14  I understand that.  We've reviewed a lot of documents.  We

15  still have a lot more documents to review.  If we can agree to

16  limit it that's great, but at some point, the parties just have

17  to bite the bullet and start producing documents so we can get

18  through this litigation.

19          But, Mr. Roche, please, if you could address

20  specifically.

21          MR. ROCHE:  Yes.  So, you know, we came in to that

22  search, that meet and confer on March 28th.  Bill and I worked

23  to propose a list of search terms.

24          You know, when I worked with Zalman Kass for 13 hours

25  that day where I know there were a lot of search terms that I

1    wanted that I gave up.  And I said, you know, look, I think

2    this is relevant.  I think it is going to yield documents that

3    are relevant to our case.

4         But Bill and I worked very hard to add a lot of

5    conditions to these search terms to narrow the subset.  And I

6    think the fact that we got it to only an additional 18,000,

7    which is I think about 20 percent more than what we had already

8    initially agreed to -- the Defense had already initially agreed

9    to produce, we think those 13 hours were very well spent.

10        And likewise, you know, they had a bunch of search

11   terms that we felt were very broad and we showed why they were

12   very broad.  We spent a lot of hours, you know, going back with

13   our discovery vendors trying to figure out smart ways to narrow

14   it down.

15        And you know, I left that meeting feeling like, okay,

16   that was work well spent.  The parties have now a good set of

17   search terms that we can kind of march off and put documents in

18   discovery and put these search term battles behind us.

19        I can't on this call really every single decision

20   point that Bill and I made over that 13 hours, but I think we

21   also have to go back to the drawing board with Defendant and

22   have to re-craft all those search terms that we already agreed

23   to, is going to make more work than just reviewing the

24   additional, you know, 20 percent more documents that we agreed

25   to as a result of the search terms on March 28th.

1          So, you know, respectfully, I think in order of

2   efficiency it makes sense for us to agree to these search terms

3   and for us to move on and produce documents in accord with the

4   search terms.

5          THE COURT:  Thank you.  Miss Markoe, I will give you

6   the last word.

7          MR. FREEDMAN:  Your Honor, could I?

8          I just want to add one thing, which is just to put

9   this into perspective.  As I understand it, the universe of

10  Defendant's documents are over a million documents.

11         Which means 18,000 documents is like 1.8 percent of

12  the universe.  So it is just not a lot of documents when -- my

13  father is very fond of telling me that everything is relative,

14  right?  There is nothing in the objective.

15         So when looked in context, yes, it is a lot of

16  documents, but it is not really a lot of documents.

17         THE COURT:  Okay.  I hear you.

18         Miss Markoe.

19         MS. MARKOE:  So let me take two of those points.

20         THE COURT:  Okay.

21         MS. MARKOE:  Let me start with Mr. Freedman's because

22  primacy and recency.

23         Yes, we have a lot of documents.  We collected a lot

24  of documents.  That does not mean that all of those documents

25  yield search terms.

1          The search terms have significantly narrowed that over

2    one million document pool to a much more manageable pool.  So I

3    don't think we are talking about a one percent issue here,

4    first of all.

5          And then, with regard to what Mr. Roche said, our

6    proposal is not that we revisit the search terms.  I don't want

7    to revisit the search terms.  I have no interest in it.  This

8    was a separate spreadsheet of search terms just related to

9    these specific topics.  That is what we are saying.  We don't

10   think that needs to be done.

11         The other search terms that we have agreed to, I think

12   that there is a couple of tweaks that need to be made because I

13   have taken this over from Mr. Kass.  And, frankly, those

14   spreadsheets are not always entirely clear.  So we are going to

15   have a tiny bit of work to do on those, but it is more about

16   clarification than anything else.  Those terms hit on all of

17   the topics that are sort of most important.

18         And then, my point is that it is not true that I want

19   to revisit all the topics.  It is one spreadsheet of just

20   related to these specific document requests that we believe is

21   not relevant and disproportionate to the needs of the case.

22         THE COURT:  Okay.  Thank you.

23         So I am reminded by my time in private practice when I

24   was doing criminal defense work, I would get subpoenas all the

25   time from the Government on behalf of clients and they would

1   ask for, of course, any and all the documents related to

2   anything that has anything to do with the history of the world.

3          And I would pick up the phone and call the prosecutor

4   and I would say, you really don't want what you are asking for.

5   Let me tell you, you just don't want that.

6          So if that is the conversation that you want to

7   continue to have with one another going forward, God bless, but

8   for the time being, I am not going to revisit my decision

9   previously.

10         There is a certain inefficiency in the use of search

11  terms.  Sometimes they are overbroad.  Sometimes they are under

12  broad.  Sometimes you get a lot of signals sometimes and you

13  get a lot of noise sometimes.  If you read Nate Silver's book

14  you will understand, but you know, sometimes you get a lot of

15  noise.  Maybe this is all noise and maybe Mr. Freedman will rue

16  the day that he has to review these 18,000 documents.  And

17  maybe when you start to produce them, he will call you up on

18  the phone and say enough already.  I will agree.  Let's cut

19  back on some of this nonsense.

20         MR. FREEDMAN:  I am open to that, Your Honor.

21         THE COURT:  And that's a dialogue that the parties can

22  continue to have, but for the time being, the search terms were

23  negotiated.

24         The search terms were agreed to.  I'm sure there was a

25  lot of horse trading in negotiating the search terms.  I am

1  going to stick with the search terms that I extorted you into

2  agreeing to.  And we will stick to where we are and I will deny

3  the motion to reconsider my ruling.

4       So I think that the only remaining issue that I have

5  to rule upon that we have to talk about is the timing for the

6  motions that I had given leave to file in the course of Dr.

7  Wright's deposition, but that is where I think we are.

8       But before I do that question, Mr. Freedman, do you

9  agree that's where we are now?  I have ruled on whatever

10 disputed issues there are.  We just have to do some timing; is

11 that correct?

12      MR. FREEDMAN:  Yes, Your Honor.

13      THE COURT:  Miss McGovern, Miss Markoe, do you agree

14 that's where we are?

15      MS. MCGOVERN:  Yes.

16      THE COURT:  We are not waiving your objection to my

17 rulings.  So let's talk.  The Plaintiffs provided a proposed

18 schedule for briefing in merit joint memo.

19      Defense, what is your feeling on that proposal?

20      MS. MCGOVERN:  So, Your Honor, in looking at the

21 numbers one through four, we are okay with the proposed

22 briefing schedules set forth in Paragraph 2.

23      THE COURT:  Okay.

24      MS. MCGOVERN:  So by April 19th the Defendant will

25 file a motion in the production of Dr. Wright's Bitcoin

1  ownership.

2          THE COURT:  Okay.

3          MS. MCGOVERN:  And we are also okay with the timing of

4  number 46, but we wanted to address that separately.  We wanted

5  to not revisit the issue, but talk about it.

6          THE COURT:  Okay.

7          MS. MCGOVERN:  If you don't mind, Your Honor.

8          THE COURT:  I am happy to talk about it.

9          I understand some of these I was having you lodge

10  objections on the fly after a long day in London after a long

11  phone call.  So I am happy to have further discussion.  Not

12  necessarily argument, but the party's discussion about the

13  parties' position on these issues, but if you could address one

14  in three as to the briefing of these issues.

15          MS. MCGOVERN:  We would appreciate that, Your Honor.

16          So it is actually one, three, and four is what we

17  would like to talk to you about in terms of the briefing

18  schedule, whether that is the best approach for addressing

19  these issues.

20          THE COURT:  Okay.  I will hear you on that now.

21          MS. MCGOVERN:  So just very candidly, Your Honor, we

22  are coming at this from a different perspective.

23          THE COURT:  Okay.

24          MS. MCGOVERN:  I would like to be start with the

25  wives.

1        THE COURT:  Okay.

2        MS. MCGOVERN:  In Paragraphs 3 and 4, the issues that

3   were posed that really compose the briefing schedules for those

4   has to do with Dr. Wright's position that he doesn't want to

5   talk about his wives.

6        He doesn't want to talk about his first wife.  They

7   divorced years ago.  And with respect to his current wife, he

8   doesn't want to talk about his first wife.

9        If the issue -- and part of the problem with briefing

10  these issues, Your Honor, is that -- and we have spoken with

11  Australian counsel about it with respect to the scope of the

12  testimony and privilege under Australian law, but when we did

13  that and when we talked about it we thought about the following

14  things.

15       And that is what exactly are the questions that

16  Plaintiff want to ask?  We didn't get that far in the

17  deposition of Dr. Wright because after the first question his

18  position was with respect to my divorce, you know, I took an

19  oath that I would not talk about my ex-wife and she would not

20  talk about me.

21       Unfortunately, when you look at the transcript we

22  don't have -- and I don't think it is unfortunately, but for

23  whatever reason, we don't have a proffer of questions that the

24  Plaintiffs, in fact, would have asked about his ex-wife.

25       We think the better approach is sort of like the

1  approach that came out of the deposition of Ira Kleiman when

2  Plaintiffs suggested why don't you proffer the question in the

3  form of an interrogatory and we will answer them.

4       Without knowing exactly how deep the dive is with

5  respect to Dr. Wright's first marriage, it is difficult to say

6  really whether there is a privileged objection.  Whether there

7  is a relevance objection because we also had the ability in

8  this deposition to instruct the client not to answer on

9  relevance grounds.  Because if it is not related to W&K and

10  Dave Kleiman it is invasive.  It is personal questions about

11  someone's relationship and it is not appropriate.

12       Now, if the question is did Lynn Wright meet with,

13  speak with Dave Kleiman, or does she have any information with

14  respect to our argument that there was a partnership among

15  those two, well, that is a different question, but that wasn't

16  the question.

17       And then, if we go to the current wife, the questions

18  that triggered a bit of ire, if I can put it that way, involved

19  when he met her.  When she changed her name from her first

20  marriage and other things like that.

21       So, again, we don't have questions that we can show

22  Your Honor in the form of a Q and A that would make it

23  perfectly clear that these questions are either appropriate and

24  not privileged, or privileged, or just simply inappropriate.

25       THE COURT:  And why wasn't that record made?

1        MS. MCGOVERN:  Because the objection was made and that

2   was the end of it.

3        We think the best way to go here and particularly

4   because, as Plaintiffs' counsel has said before with respect to

5   Ira's deposition when certain questions were unanswered, you

6   know, save it for the next depo.  I don't think it is discovery

7   related.  You could ask it in during the merits depo.

8        I think in this particular situation, instead of

9   having a briefing schedule and having us utilize our resources

10   on privilege and everything else, especially when we don't know

11   what the questions would have been, that Plaintiffs simply set

12   forth a series of interrogatories regarding Dr. Wright's first

13   wife and Dr. Wright's current wife.

14        And then, we can actually address it question by

15   question and it could become apparent, I think, from the

16   question itself whether it merits an answer in this case.

17        THE COURT:  Okay.  I hear you.

18        MS. MCGOVERN:  That's our position with respect to

19   three and four, Your Honor.

20        THE COURT:  Talk to me about the national security

21   objection.

22        MS. MCGOVERN:  So the national security objection is a

23   logistical nightmare and we've come to that conclusion after

24   looking at the amount of time that has gone by.

25        This is -- and Miss Markoe obviously will jump in and

1  correct me and I think she's ready to do that at any moment

2  right now.  She's giving me a little leeway.  I am sort of

3  coming at it more from a conceptual issue.  I wasn't in London.

4  I wasn't at the deposition, although I have read it.

5          And it basically goes to this question, Your Honor,

6  that the individual, the identity of the individual that had

7  some, I guess involvement early on, involves issues of personal

8  safety.

9          And there are individuals that and because transcripts

10 -- apparently this case is being watched extremely closely and

11 is on the Internet whenever it can be, including transcripts,

12 deposition transcripts, and anything else.  So anything that

13 gets filed is all over the place.

14         There is a legitimate concern about identification of

15 individuals that have been incarcerated as a result of things

16 that have happened and some of those related parties are not

17 incarcerated.  So there is a safety concern.

18         Being able to justify the request to Your Honor to be

19 able to disclose that information *in camera* by getting

20 Government corroboration on it, I am not sure it is even

21 possible at this point.

22         But it doesn't mean that we simply want to go to our

23 client and say, okay, fine.  We don't have the same concerns.

24 So, you know, answer the question.  There is a confidentiality

25 order.

1         We are not comfortable doing that, Your Honor, because

2    the confidentiality order is not bulletproof, for lack of a

3    better expression, number one.

4         And number two, we have already seen that the

5    information can leak and so we are concerned about it.

6         THE COURT:  What is your client's standing?  How does

7    your client have standing to somebody else's name coming out in

8    the public?

9         MS. MARKOE:  Well, We are not being asked to disclose

10   that name.

11        MS. MCGOVERN:  And this is one of the issues that I

12   want to just finish quickly and I will let Miss Markoe answer.

13        This is an individual who was involved before Dave

14   Kleiman was involved.  So this is really it goes back to Dr.

15   Wright's initial involvement.  And you know, in order to be

16   completely candid about every single person that was involved,

17   it would require disclosure of this individual.  So the

18   standing simply is not wanting to disclose that information for

19   personal safety.

20        THE COURT:  There are lots of reasons people don't

21   want to disclose things, but the law recognizes privileges and

22   it doesn't recognize privileges and people have a right to

23   complain and people who don't.

24        Why does your client have a right to complain about

25   somebody else's name being disclosed, or why does your client

1  have a privilege not to disclose the answer to this question?

2         MS. MARKOE:  So it wasn't just one question.

3         It was actually several questions.  And the concern,

4  as I understand it, that the client has is there is involvement

5  among himself and others in activities that resulted in the

6  incarceration of an international crime lord, if you will, who

7  has associates that are not incarcerated.

8         And there are safety concerns about the disclosure of

9  his own involvement and the involvement of others in those

10  efforts to bring this individual into custody.

11         THE COURT:  Okay.  And so that gives him privilege

12  how?

13         MS. MARKOE:  We are not saying it is privileged.

14         THE COURT:  Okay.  Then what is his basis not to

15  answer the question other than I don't want to?  He has been

16  asked a question.  He's under oath and he's in a deposition.

17  He has to have a reason not to answer the question other than I

18  don't want to.

19         So I am trying to discern from you -- and that's why I

20  was going to give you a chance to brief -- what is his legal

21  basis not to answer these questions aside from I don't want to?

22  Because I say it has to do with this super secret international

23  drug lord.

24         MS. MARKOE:  Correct.

25         And we have spoken with the client about that and we

1    said, look, you've got to give us something.  You've got to

2    give us names and contact information, or you've got to give us

3    a contract that says you're not allowed to talk about this.

4         You've got to give us something.  And we're efforting

5    to get that.  That is something that might take a little bit of

6    time.  So I think perhaps one thing to do on this one is to

7    give us a little bit of time.  Two weeks or so.

8         Hopefully two weeks to come back to you with whether

9    those efforts have borne fruit.  If they have not borne fruit,

10   we will deal with that.  If they have borne fruit, we will be

11   in a position to give you a lot more information that is

12   concrete and that is viable.  And we have made that ask to get

13   that concrete information.

14        But also to the extent if we are going to have to deal

15   with government officials regarding events that occurred many,

16   many moons ago that, A, may take some time; and, B, the

17   bureaucracy, as you well know, Your Honor, could be a

18   logistical nightmare as well.

19        So I think probably the best thing to do, number one,

20   is to perhaps table it so we can get more information and give

21   you a much firmer grasp on whether we are going to be able to

22   give you something substantial on this.  And if we can't, we

23   will deal with that in two weeks.  And if we can, we will deal

24   with that in two weeks.

25        THE COURT:  All right.  Let me hear from Mr. Freedman

1  on both the marital issue and on the national security issue.

2      MR. FREEDMAN:  Okay.  So copying Miss Markoe's primacy

3  and recency, I am going to start with the national security

4  issue.

5      THE COURT:  Okay.

6      MR. FREEDMAN:  It was unclear to me just now whether

7  or not Dr. Wright is backing off his national security

8  objection.  Is it still --

9      MS. MARKOE:  No, he's not.

10      MR. FREEDMAN:  -- a national security objection?

11      It still is a national security objection?

12      MS. MARKOE:  It's a personal security issue.

13      MR. FREEDMAN:  Okay.  And I understand it's a personal

14  security issue.  Well, let me strike that.  I understand

15  Dr. Wright is saying it's a personal security issue.

16      But what I'm hearing now is that under oath the

17  parties -- well, let me take a step back.  The parties flew to

18  London to conduct this discovery and spent a lot of money doing

19  that.

20      There were a lot of questions that Dr. Wright refused

21  to answer based on national security, but one of the most

22  important ones -- and I don't want to diminish the importance

23  of the other -- but the one that stands out in my mind is that

24  on February 11th of 2014 Dr. Wright wrote to Lewis Kleiman, Ira

25  and Dave's father:

1        "Hello Lewis, your son Dave and I are two of the three

2   key people behind Bitcoin."

3        And the question was:

4        "QUESTION:  What is the identity of number three?"

5        And the answer was:

6        "ANSWER:  I can't answer that on national security

7   grounds."

8        Which is an objection I had never heard before, but

9   okay, I wasn't prepared to deal with it.  We got the Court on

10  the line.  And the Court said -- and it never occurred to me

11  but it makes perfect sense -- the United States Government is

12  the only person who can resolve that objection.

13        THE COURT:  Who can assert that objection.

14        MR. FREEDMAN:  Yes, sorry.  Who can with assert that

15  objection.  Thank you, Your Honor.

16        Now I am finding out that that was at best a

17  misrepresentation under oath again by Dr. Wright about why he

18  couldn't respond to the question.

19        We spent an inordinate amount of money flying to

20  London, taking the deposition, ordering the transcript for the

21  purposes of narrowing discovery.  I don't know even know who

22  that witness is anymore.

23        So, I mean, that will have its own consequences and we

24  will have to figure out what we are going to do with it.  I

25  know it is not in front of the Court now, but it is just

1    misrepresentation after misrepresentation.

2          THE COURT:  Okay.

3          MR. FREEDMAN:  But that aside for a second.

4          Your Honor, at the beginning of this conference, the

5    Defendant says we have to go to trial in 60 days.  We have to

6    move everything forward and now we're asking for two weeks and

7    then we will check back in.

8          Plaintiffs propose that the Defendant file a motion

9    for protective order in five days, or five business days, or

10   seven days.  I don't know.  Something very quickly.  Either

11   file the motion for protective order or not and answer the

12   questions.

13         And we would ask the Court to authorize us to

14   re-depose him on these subjects because this is an important

15   question.  That third person could be the star witness of the

16   trial who could say Dave Kleiman and Craig Wright told me they

17   partnered up to be Satoshi Nakamoto.  They had joint mining

18   activity.  They created all the intellectual property together

19   and then they formed W&K.  I mean, he was one of the three key

20   people behind Bitcoin.

21         THE COURT:  Okay.  Let me turn back to the Defense.

22         MS. MCGOVERN:  Your Honor, may I respond?

23         THE COURT:  Yes.

24         MS. MCGOVERN:  To the extent I think I have to tone

25   it down a little bit.  This was not intended to be a

1   misrepresentation.  I think to the extent that there is a

2   misunderstanding as to the purpose behind it.  We are simply

3   going to have to brief it.

4           If Plaintiffs are insisting that it be five days, we

5   will do it in five days.  There is no intention here to delay

6   anything at all.  There is an answer to this question and we

7   are simply wanting to do it in a manner that would protect our

8   client's personal safety and we were hoping to be able to do

9   that *in camera*.

10          If that's not possible -- it is not that he doesn't

11  want to answer the question.  He simply wants to do it in a

12  forum that it will be protected.  And if there is not a

13  mechanism to do that, then, we will certainly brief that.

14          I think perhaps the legal issue might very well be

15  other circumstances in which information is so sensitive that

16  if disclosed could cause, you know, concern and personal safety

17  issues, then it can be produced in a different manner, which is

18  all we are asking.

19          Maybe should be briefed and we can do that in five to

20  seven days, Your Honor.  We don't want this to become now the

21  justification of an extension of discovery in this case.  And

22  certainly, I don't think it is appropriate to continue the

23  misrepresentations.

24          I could sit here, Your Honor, today in this hearing

25  and talk about all of the misrepresentations that took place in

1    Ira Kleiman's seconded amended and sworn interrogatories and I
2    am not doing that.
3              THE COURT:  All right.  So let's start with a couple
4    of things.
5              First of all, clearly a party, any party can seek a
6    protective order to protect that person from annoyance,
7    embarrassment, oppression, undue burden, or expense.
8              Okay.  So, clearly, if the man's life is at stake, I
9    think that would fall under the category, if I find that it is.
10   That could certainly fall under the category of oppression or
11   some other legitimate basis for any protective order, which is
12   what I gave you leave to file was a protective order.
13             Now, the Supreme Court of the United States recently
14   adjudicated a case arising out of the Mueller investigation
15   where the names of the parties never became public.
16             It went all the way through the DC Circuit, the DC
17   Court of Appeals, all the way to the Supreme Court, got
18   briefed, cert petitions were filed, opinions were written, and
19   to this day nobody knows the names of the parties involved.  So
20   the Court system is clearly set up to securely maintain the
21   secrecy of filings.
22             If Dr. Wright, in support of his motion for protective
23   order, wants to file under seal a sworn declaration explaining
24   why he does not believe he should have to answer these
25   questions, I would be happy to review that under seal and it

1  will remain under seal.  And the folks on the Internet can try

2  all they want, but they are not getting it.

3      Okay.  So that is as to the factual issue.  You could

4  file your motion for protective order and you can support it

5  with whatever memorandum of law you want to support asserting

6  legal grounds for the objection.

7      And if it's a personal safety issue with the factual

8  basis is that Dr. Wright is concerned about his personal safety

9  that's one thing.  If the Dr. Wright is attempting to assert

10 the rights of other people to not have their identities

11 disclosed for their safety, then, you have a standing problem

12 and I need to have briefing on standing, but I can't do that

13 until you file your motion.

14     So I will order by the scheduled proposed here.  By

15 April 19th, which I think is a week from tomorrow before

16 sundown because it is the first night of Passover, isn't it?

17 So before sundown.  Before 3:00 on April 19th so everybody can

18 read it and ruin their Seder.  I take that back.

19     I didn't mean ruin their Seder, but can have something

20 to read before Seder hits, but the Defendant can file whatever

21 motion for protective order they want filed with respect to the

22 national security issues.

23     And I will authorize the Plaintiff to respond on or

24 before April 29th as requested here.  So that's the national

25 security issue.

1        Mr. Freedman, I don't believe you addressed the issues

2   related to the spouse that Miss McGovern is proposing develop a

3   more robust record of what the questions were.  The categories

4   of questions would be a way for the Court to -- also I will

5   order that if you do file a motion for protective order

6   relating to the national security, please attach whatever

7   aspects of the transcript are that identify the specific

8   questions that were asked.

9        Because I do agree with Miss McGovern there may be a

10  situation where if I look at the questions and determine that I

11  wouldn't order an answer to those questions anyway.  And we may

12  have to reach the issue, but I can't judge that until I see the

13  questions and the answers.  All right.  So that's as to the

14  national security issue.

15       As to the marital issues, Mr. Freedman, I don't

16  believe I heard from you on that.

17            MR. FREEDMAN:  I'm sorry, Your Honor.

18            THE COURT:  No, no, we dealt with the other issues.

19  So we're going back.

20            MR. FREEDMAN:  Can I actually just add one thing, Your

21  Honor?  Could we just put a time because sundown --

22            THE COURT:  Yes.  I said 3:00, I think.

23            MR. FREEDMAN:  Oh, okay.  I missed that; 3:00.

24            THE COURT:  I changed it to 3:00.

25            MR. FREEDMAN:  Okay.  3:00.  Thank you, Your Honor.

54

1     THE COURT:  Hopefully you will all have better things

2  to do that afternoon than read whatever filings come in, but if

3  for some reason you want to have some fun reading for the

4  Seder, maybe you could read that instead of Haggadah.  I don't

5  know, but that would be interesting.

6     MR. FREEDMAN:  I think like the Court was saying about

7  the air conditioning, if I tried to read legal papers on the

8  eve of Passover, I take my life in my hands so.

9     THE COURT:  Right.  But it comes on a Friday afternoon

10 and some poor associate at your firm can spend their weekends,

11 someone who is not observing Passover, would get to spend their

12 weekend starting to work on the brief.  So that is why I would

13 have it filed on a Friday so you have the extra weekend to work

14 on it.  All right.

15     MR. FREEDMAN:  So as to the marital privilege, Your

16 Honor, the reason why the question was not proffered because we

17 had a lot of material to get through as is we didn't get

18 through a lot of it.

19          If the Court ever goes through the transcript, the

20 Court will find that the witness plays a lot of word games to

21 avoid answering questions and so things just took a really long

22 time.

23          When it became apparent that the witness was just

24 repeatedly -- I think the mantra was like, I will not answer

25 any questions about my wife.  You know, it was just the same

1  exact answer over and over again.  We just decided it wasn't

2  worth --

3          THE COURT:  My question was not meant to criticize

4  either party for not making a more robust record on that issue.

5          I've been in that situation and it is fine line

6  because if you keep asking the questions, then the witness or

7  the witness' counsel is going to, rightfully so perhaps, claim

8  that you are just badgering the witness by continuing to ask

9  and the witness made clear they don't want to talk about it.

10  You want to make your record.

11          I understand that dynamic.  I have been in the middle

12  of that dynamic.  So, again, I didn't mean to criticize either

13  party for the fact that a more robust record was not made, but

14  I think the other side is making a proposal, which is whether

15  it is at the level of interrogatory or by some other mechanism.

16          Perhaps you could identify the general categories of

17  questions or areas of questions you had wanted to pursue, which

18  would then allow the Court to at least make some preliminary,

19  perhaps relevance or some other rulings, but I'm not saying you

20  have to do that.  I think I am summarizing their proposal more

21  or less.  I just wanted to get your feelings on that.

22          MR. FREEDMAN:  No, I understand, Your Honor.

23          And frankly, it is the first time hearing and I am

24  thinking out loud, which is probably not a good thing to do on

25  the record.

1            But the questions that were being asked, when did you

2    meet, when did the name change, those were for purposes of

3    identifying timeframes and potential sources of information

4    about the witnesses.

5            For Miss Lynn Wright --

6            THE COURT:  And help me out.  I apologize.  She is

7    the --

8            MR. FREEDMAN:  She's the ex-wife, Your Honor.

9            THE COURT:  Ex-wife.  Okay.

10           I was also trained never to use the phrase this is my

11   current wife.

12           MR. FREEDMAN:  That's right, Your Honor.

13           THE COURT:  This is my first wife.

14           MR. FREEDMAN:  All right.  So for the ex-wife, Your

15   Honor, for clarity -- and I mean no offense to Dr. Wright by

16   referring to her that way.

17           But for the ex-wife, we've seen documents that she was

18   a party to communications between Dave Kleiman and Craig

19   Wright.  The purposes of the questions at the deposition were

20   to determine her role in those communications.

21           We've also seen documents produced by the Defendant

22   that demonstrate she, I believe, owned some of the companies

23   that are at issue in the litigation at some points in time.

24   That she lent Dr. Wright money to further some of the work he

25   was doing and it is unclear what that work was.

1          And so what we were trying to do at the deposition is

2   just what the Court asked to do, which is get to the bottom of

3   that and find out where it is.  It seems to me that would be

4   very tough to find out in an interrogatory.

5          You need more of an interactive session where I can

6   ask a question and you can respond.  And then, I can react to

7   that question by saying, okay, you've closed off that line of

8   inquiry.  Let me go here.  We can pose an interrogatory, but I

9   just don't think it would be help all that much.

10         If the solution is to go back and take a limited

11  deposition of Miss Wright, the ex-wife -- and let me segway for

12  a second to, not the current wife, but Miss Ramona Watts who he

13  is married to at the moment, it was the same issue.

14         We've seen Miss Watts on many communications related

15  to the business where she's been cc'd with other people.  You

16  know, the marital communication privilege relates to

17  communications and the content of private communications within

18  the marriage.  That's not what -- there's way more than that.

19         Miss Ramona Watts got on the phone with Dr. Wright to

20  Ira Kleiman to extend an offer to purchase the shares that he

21  had been allegedly issued in Bitcoin Exchange.  She was heavily

22  involved in the business.

23         And so, again, the questions were aimed at what was

24  the scope of her participation?  What was the scope of her

25  knowledge?  There are --

1     THE COURT:  I apologize for cutting you off, but I

2 understand completely.  And essentially, you are doing probably

3 what I am going to order you to do.

4     MS. MARKOE:  Your Honor, may I just clarify the record

5 for a moment?

6     THE COURT:  Sure.

7     MS. MARKOE:  Mr. Freedman did not ask those questions

8 at the deposition.

9     THE COURT:  I understand.

10    MS. MARKOE:  And he didn't even try.  Where he got to

11 is when did you meet your wife?

12    The questions that really -- and I said, please, tie

13 this to one of the topics.  Tie this to how it is related to

14 the case and he will answer those questions.  He didn't do it.

15    And one of the questions was, it wasn't when did Miss

16 Watts change her name.  It was what was her maiden name?  He

17 answered that question.

18    It was when did her name change from her maiden name

19 to Watts?  It is not relevant.  It is intrusive.  It is talking

20 about her prior marriage.  That's where things went off the

21 rails.

22    And instead of trying to bring it back on to the rails

23 -- and there were questions later about Miss Watts in relation

24 to the companies.  And he answered those questions saying, yes,

25 she had involvement in the companies.  I don't recall all of

1  it.  It is public record.

2         THE COURT:  Thank you.

3         Let me pull apart the two issues here because I think

4  you all may be contesting an issue that I am not addressing

5  right now.

6         Okay.  The first thing is -- let's pull it apart and

7  deal with the second issue first, which is what is the remedy?

8         Let's assume that I find that there are certain

9  questions that Dr. Wright should be required to answer relating

10 to his former wife and his current wife.

11        You know, should that be done by reconvening this

12 deposition?  Could it maybe be deferred to his later

13 deposition?  Should that be an interrogatory?

14        I'm not reaching that question today.  We will deal

15 with that question if we have to do that, but I think -- and

16 again, I don't fault Mr. Freedman for moving onto other topics.

17 If someone were asking me about my wife and I was hellbent not

18 to answer it, you could ask me all day and I would be wasting

19 everybody's time.

20        Dr. Wright is not a lawyer and he doesn't understand

21 necessarily some of what is going on there that he is required

22 to answer or whatever.  Put it aside.

23        I think what would make sense, I am not going to

24 require Mr. Freedman, at this point, to reduce everything to

25 interrogatories.  For some of the reasons he has articulated, I

1  think it does need to be more fluid, which is why I wanted it

2  done by deposition.  That may be the ultimate remedy that I

3  agree upon if a remedy is necessary, but I am not deciding that

4  today.

5        But, Mr. Freedman, I think what you were doing here in

6  the courtroom is probably the appropriate thing to do is simply

7  to find the portions of the transcript where these topics were,

8  at least approached or raised, so I can see the context of what

9  Miss Markoe is talking about and you are talking about because

10  I wasn't there.

11        And then, perhaps just submit a briefing.  It doesn't

12  have to be a sworn statement.  It doesn't have to be a

13  declaration from you or anyone else.  Just a brief of some kind

14  saying, generally speaking, these are the topics that I want to

15  do or I would like to ask Mr. Wright about that touch upon

16  current wife, former wife.

17        And since you know my favorite question is what's the

18  theory of relevance, if you want to make an argument in there

19  as to why it is relevant and why you should be allowed to ask

20  those questions, I think that tees it up enough.

21        I don't think we have to get down to the granular

22  level of how would you phrase the particular question in order

23  to at least address the high level topic that I have to

24  address.

25        And then, that will allow Dr. Wright's counsel to say,

1  oh, okay, you are clearly not asking him or you wouldn't be

2  asking him about communications with his wife.

3        You are asking about things that clearly wouldn't be

4  within any privilege.  We agree to relevance.  We will answer

5  those.  These we have an objection to.  At least we understand

6  your theory of relevance.

7        When they file their response they could explain why

8  they would disagree.  So that will tee it up for me

9  sufficiently that I can, then, look at the transcript and look

10  at the topics and hopefully rule on that.

11        It would, however, separately be helpful to me just as

12  a legal matter because -- I don't know the answer to this

13  question.  I think I know the answer to this question, but I

14  think I want you to be an able to be heard on the answer to

15  this question.

16        I'm not sure that the marital testimonial privilege

17  applies if the wife is not a party to the litigation.  And I

18  understand the marital -- I will give you the benefit of the

19  research I did in another case that I had this in.

20        Obviously there are two marital privileges recognized

21  in different places in the federal system.  There is the

22  marital communications privilege which is, you know, what

23  spouses say to one another during the marriage and that is

24  pretty well accepted everywhere in confidence.

25        Confidential marital communications.  That one maybe

1  it applies.  Maybe it doesn't apply.  I don't know factually,

2  but I think legally clearly it can apply in this case.

3         Then there is *Travel, Travel v. United States*, which

4  is the marital testimonial privilege where the question is the

5  mere spectacle of having the spouse testify against the other

6  spouse something that the law should allow.  And *Travel* says

7  that that's a decision for the non defendant spouse to make.

8         If the non defendant spouse wants to testify against

9  the former or against the current spouse and talk about things

10  that were not communications, or what they saw, or what they

11  heard, or what they did, that's up to them.  That's *Travel v.*

12  *United States*.

13         There is other case law in the Grand Jury context.  I

14  think it is *In Re: Malfitano,* which I think is in the Third

15  Circuit and *In Re: Hannah Koehler*, which I believe is in the

16  Second Circuit.

17         They may be the same case.  It is merged within my

18  brain.  It's been a while, but what they talk about is in those

19  cases -- it happened to be the wife.  The wife is called before

20  the Grand Jury and wants to invoke the marital testimonial

21  privilege saying I don't want to testify against my husband.

22         And the Government's argument was her husband is not

23  here.  And the response was, yeah, but you are going to use it

24  against my husband.  And the Court said, yeah, if you are going

25  to use it against the other spouse, then, you can invoke.  But

 1  if you are not going to use it against the other spouse, you

 2  can't.

 3          So, in this case, I don't think there is a theory

 4  under which Dr. Wright's testimony is going to be used in this

 5  case against either his current or former spouse because they

 6  are not parties.

 7          So that is, as far as I know on that issue, but if

 8  anyone wants to brief that issue separately if they are still

 9  invoking that privilege.

10          I think Miss Markoe, if you are still on the phone, I

11  may have invited you to make that objection and you hadn't had

12  time to think about it, but if you want to continue to assert

13  that objection, I have now shared with you the knowledge that I

14  have.  Feel free if you believe you have a good faith basis to

15  assert it and to do so and to brief it.

16          Miss McGovern.

17          MS. MCGOVERN:  Yes, Your Honor.

18          So separate and apart from the privilege issue the

19  deposition, at least the preliminary deposition had --

20          THE COURT:  I'm sorry.  Which one?

21          MS. MCGOVERN:  The preliminary deposition of Dr.

22  Wright and --

23          THE COURT:  Before you get to that, let me just set

24  the same timeframes for what I just talked about.

25          Mr. Freedman, can you by a week from tomorrow, file

1  that brief we talked about the topics that you wanted to cover

2  and a copy of whatever portions of the transcript that I need

3  to see.

4       MR. FREEDMAN:  Yes, Your Honor.

5       THE COURT:  And then, I will give opposing counsel

6  until the 29th to respond.

7       MS. MCGOVERN:  Thank you, Your Honor.

8       THE COURT:  Okay.  Now Miss McGovern.

9       MS. MCGOVERN:  I just wanted to raise really quickly

10  that I know in the preliminary deposition of Dr. Wright and Ira

11  Kleiman we talked about an objection to relevance if the topic

12  regarding third parties sort of crossed the Rubicon in beyond

13  the relevance of the case.

14       And we are sort of a little bit in a conundrum in the

15  sense that we have completed a preliminary deposition, but

16  there's going to be another deposition that is going to be on

17  the merits.

18       And in that regard, we have typically the same sort of

19  form objections and relevance isn't a ground to instruct the

20  witness not to the answer, but we do have here some sensitive

21  issues regarding just the personal relationship with your

22  ex-wife and your, you know, your present marriage.

23       THE COURT:  Sure.

24       MS. MCGOVERN:  So, you know, to the extent that

25  questions are asked regarding that are personal and have no tie

1   to the claims in this case, you know, we object to diving into

2   and invading that personal space, Your Honor.

3          THE COURT:  I understand.

4          And I think the procedure that I am putting in place

5   today is going to give you the opportunity to make that

6   objection now.

7          And presumably, the good lawyers that I have in this

8   case are not going to sit here for a couple of months listening

9   to me make rulings on relevance and, then, go into a deposition

10  and start asking questions that I have ruled are not relevant.

11         MS. MCGOVERN:  I agree with you on that, Your Honor.

12         THE COURT:  I don't think that's going to happen.

13         MS. MCGOVERN:  You're right.  You're absolutely right.

14         THE COURT:  So my goal is that by the time you circle

15  back around again and if you are taking a second deposition of

16  these people, you will have a very clear understanding of what

17  I think is relevant and what I think is not relevant.

18         And again, we can figure out -- the main reason that I

19  allowed the relevance objections in these depositions were,

20  first of all, with Dr. Wright, people were traveling so far to

21  do it that I thought it was important to be able to make that

22  kind of a record.  And that's why I made myself available to

23  rule on any of them so that we really did make the most

24  efficient use of Dr. Wright's time and counsel's money and

25  time.

1        And I do hope that was a positive exercise and you

2   will tell me after the case is over.  I will very much be

3   interested if you think that was a good idea or a bad idea, but

4   after the case is over.

5        Same thing with Mr. Kleiman.  It was a preliminary

6   topic.  I would certainly give you almost like a 30(b)(6) depo.

7   Give each other the topics so that we could try to keep those

8   on track and minimize the objections.

9        When you get back to the merits depos at the end of

10  the case, the normal rules will apply, but hopefully by then

11  you will understand my relevance theories of the case.

12       All right.  Have I now ruled on everything that was

13  before me today, Mr. Freedman?

14       MR. FREEDMAN:  The only thing I just wanted clear for

15  the record is, I think the Defendant agreed to do it, but I

16  just wanted to make sure it is clear, the Defendant will move

17  for a protective order on burdensome grounds for the Bitcoin

18  wallet issue by April 19th as well.

19       THE COURT:  Let me make this real simple for

20  everybody.  As to all four of the topics that were listed in my

21  order and that are listed on Page 5 of Docket Entry 141,

22  initial briefing is due April 19th by 3:00 p.m.

23       Responsive briefing is due April 29th by close of

24  business 5:00.  And if I need a reply, I will request a reply

25  at that time, but no one should file a reply unless I ask for

1   it.  Okay.  So that makes it clear.  So everything is moving in

2   tandem forward.

3         MS. MCGOVERN:  Thank you, Your Honor.

4         THE COURT:  Thank you both.

5         Like I said, I see the parties working hard so I want

6   to try to work with you.

7         All right.  Where do we go from here, folks, Mr.

8   Freedman?

9         MR. FREEDMAN:  Do you mean generally, Your Honor?

10         THE COURT:  I always shudder to ask this, but do the

11   parties need me to set -- do you want me to set another status

12   check-in date?

13         I'm going to overrule my own question.  Let me wait to

14   see the briefing I get on April 19th and April 29th and I will

15   decide at that point if there is anything else I need to do.

16         In the meantime, I understand, Mr. Freedman, you are

17   going to file your motion with Judge Bloom.  Maybe that will

18   change things.  Maybe it won't.  I don't know.

19         But in the meantime, if something comes up, you all

20   know how to reach me and we will all get back together again.

21         All right.  Anything else from the Plaintiffs this

22   afternoon?

23         MR. FREEDMAN:  No, Your Honor.

24         THE COURT:  From the Defense?

25         MS. MCGOVERN:  No, Your Honor.  Thank you.

1          MS. MARKOE:  No, Your Honor.

2          THE COURT:  Thank you all very much.  We will be in

3    recess.

4             (Thereupon, the proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              CERTIFICATE

3

4           I hereby certify that the foregoing transcript is an

5    accurate transcript of the audio recorded proceedings in the

6    above-entitled matter.

7

8

9

10
     04/12/19                          Bonnie Joy Lewis,
11                            Registered Professional Reporter
                                 CASE LAW REPORTING, INC.
12                                 7001 Southwest 13 Street,
                               Pembroke Pines, Florida 33023
13                                    954-985-8875

14

15

16

17

18

19

20

21

22

23

24

25