**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

      plaintiffs,

v.                                                                    **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

      defendant.

_____/

**DR. CRAIG WRIGHT'S OBJECTION**
**TO MAGISTRATE ORDER "DEEMING" CERTAIN FACTS**
**ESTABLISHED AND "STRIKING" CERTAIN AFFIRMATIVE DEFENSES**

## INTRODUCTION

A two-day evidentiary hearing yielded uncontroverted testimony and other evidence establishing that (1) it was impossible for Dr. Craig Wright to produce a complete list of all bitcoin that he mined nearly a decade ago, and (2) even though producing such a list was impossible, Dr. Wright had taken extraordinary steps to create a list of the most probable Bitcoin addressees that he had mined. In those two days, plaintiffs failed to rebut either of these facts, or demonstrate that a list of Dr. Wright's mined Bitcoin addresses would have any connection to any allegation in their complaint. Instead, plaintiffs focused on purported bad acts they allege Dr. Wright committed, none of which had anything to do with the discovery issue that was the subject of the evidentiary hearing.

Despite this, the Order [D.E. 277] (the "Order") rejected uncontroverted evidence of the impossibility of producing a list of all bitcoin that Dr. Wright mined nearly a decade ago. Compounding this plain error, the Order obliterated the boundaries of the limited discovery issue before the Magistrate, by making four findings of fact and purporting to strike eight of Dr. Wright's affirmative defenses, despite confirming that it had no jurisdiction to do so. *See* Order at n.1 (stating that "magistrate judges have jurisdiction to enter sanctions orders for discovery failures which ***do not*** strike claims, completely preclude defenses or generate litigation-ending consequences.") (citing *Wandner v. Am. Airlines*, 79 F. Supp. 3d 1285, 1295 (S.D. Fla. 2015) (emphasis added)).

The Order's findings would deprive Dr. Wright of his fundamental rights to procedural due process, and to have a jury resolve factual disputes in this case. Moreover, the Order would operate to turn inconceivable "facts" that are wholly unrelated to the discovery issue, into

indisputable "facts" that are diametrically opposed to the actual evidence. The Order's resolution of a narrow discovery issue may not establish "facts" that otherwise never would exist.

As more fully demonstrated below, the Order was (1) wholly without evidentiary support, (2) improperly exceeded the scope of the matters before the Magistrate and the Magistrate's jurisdiction, and (3) would improperly deprive Dr. Wright of fundamental due process rights and a fair trial. It should be vacated to prevent a miscarriage of justice.

### <u>DISCUSSION</u>

### A. There Is Absolutely No Basis for Imposing Any Sanctions on Dr. Wright, Because the Uncontroverted Evidence Shows that He is Unable to Access a Listing of the Bitcoin that He Mined

There was only *one narrow discovery issue* before the Magistrate: Dr. Wright's stated inability to comply with the Court's discovery order to "produce a complete list of all bitcoin that he mined prior to December 31, 2013." D.E. 217 at 5.  On that single issue, Dr. Wright unequivocally testified in detail as to why he was unable to comply. The algorithm necessary to generate a complete list of his Bitcoin public addresses is in an encrypted file that is protected by a Shamir encryption scheme.[1] June 28, 2019, Hr. Tr. 11:13-12:20. To unlock the encrypted file, Dr. Wright would need at least 8 of the 15 key slices, but he has only 7. *Id.*107:20-108:4; 122:4-17; 126:16-17. His best friend, Dave Kleiman, set up a system whereby Dr. Wright would, at the

---

[1] A Shamir encryption scheme is an additional layer of encryption that can be used to protect sensitive information, such as cryptographic keys. The scheme works by generating a pre-determined number of "key slices," and defining the number of slices required to reveal the original secret, known as the threshold. Without enough key slices to meet the threshold, the original secret will not be divulged. In practice, one would first encrypt a file with a cryptographic key. That encryption key would then be further encrypted using the Shamir encryption scheme, resulting in multiple key slices. To decrypt the file, one would need to combine enough key slices to meet the threshold and reveal the original encryption key. The revealed key can then be used to decrypt the file. *See* Adi Shamir, How to Share a Secret, Communications of the ACM, Vol 22, No. 11, Nov. 1979, at 612.

earliest, start to receive the remaining key slices in January of 2020 by bonded courier, at which point, Dr. Wright would be able to comply with the Court's order. *Id.* at 23:23-24:7. Dr. Wright is unable to circumvent this system to obtain the eighth key slice at an earlier date because he was not involved in setting up the courier system and because Dave Kleiman is no longer alive. *Id.* at 125:20-126:3.

Dr. Wright also testified as to his substantial good faith efforts to comply with the Court's order. The bitcoin that Dr. Wright mined can be identified by six select criteria, such as the node values and date mined. Aug. 5, 2019, Hr. Tr. 16:3-20:2. At Dr. Wright's direction, Steve Shadders, the Chief Technology Officer of nChain, created a computer script to analyze the blockchain for bitcoin that met those six criteria, identifying approximately 27,000 matching Bitcoin addresses.[2] June 28, 2019, Hr. Tr. 172:10-173:9; Aug. 5, 2019, Hr. Tr. 13:17-25:11. Dr. Wright produced a list of those bitcoin to plaintiffs in June of 2019. Dr. Wright also provided plaintiffs a list of all bitcoin that he definitively knows he mined, which includes the first 3,500 bitcoin mined and bitcoin that he sent to Mike Hearn. D.E. 211 at 3; June 25, 2019 email from Z. Markoe to V. Freedman, attached as Exhibit A. Dr. Wright also produced all non-privileged documents (more than 2,500) that contained the word "Tulip" or "Seychelles" and were related to trusts or bitcoin.[3] D.E. 211 at 3; June 3, 2019 email from Z. Kass to V. Freedman, attached as Exhibit B.

---

[2] The list is overinclusive because there are a number of bitcoin that may match the six characteristics but were not mined by Dr. Wright. What is certain, however, is that all bitcoin Dr. Wright mined are on the list he produced, excluding a few he mined on his laptop. Aug. 5, 2019, Hr. Tr. 25:15-22.

[3] The documents produced included documents plaintiff used in the evidentiary hearing to try and show that certain other documents were altered. If Dr. Wright had been trying to deceive this Court, as the Order suggests, one would have expected him to withhold the supposedly incriminating documents. Dr. Wright did not.

It is well-established in the 11th Circuit that there is no basis for sanctioning a party unable to comply with a court order. *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (citing *Citronelle–Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1301 (11th Cir.1991); *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir.1988)). A party shows that it is unable to comply by demonstrating that it has "made 'in good faith all reasonable efforts to comply.'" *Id.* (quoting *Watkins*, 943 F.2d at 1301). Specifically, that demonstration can be made through the party's testimony. *United States v. Rizzo,* 539 F.2d 458, 466 (5th Cir. 1976) (There was no basis for contempt sanctions after the noncompliant party testified that he searched for, and was unable to locate, patient forms that the court ordered produced.); *United States v. Spilotro*, 1985 WL 384, at *4 (N.D. Ill. 1985) ("Respondent has satisfied his burden of production with regard to his defense that he is unable to comply with the production order," by testifying that the records were destroyed by the "fire and flood that struck his home."); *United States v. Barnette*, 902 F. Supp. 1522, 1538 (M.D. Fla. 1995) ("[T]he Court finds that [the non-compliant party] has satisfied his burden of production by introducing evidence supporting his claim of inability to comply with the court order," namely his own testimony as to his "attempts to obtain the stock" that the court ordered produced.); *United States Commodity Futures Trading Comm'n v. Capital Blu Mgmt., LLC*, 2010 WL 11508136, at *2 (M.D. Fla. 2010) (The court "cannot find, on this record, that these Defendants are likely in contempt for failing" to produce the computers ordered by the court when the noncompliant party has "testified that all of the computers from the Melbourne office . . . were turned over to the United States Attorney's Office."); *In re Coastal Land Dev. Corp.,* 2009 WL 2985700, at *3–4 (Bankr. S.D. Miss. 2009); *Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp.*, 2009 WL 10697338, at *3-4.  (S.D. Fla. 2009).

5

Dr. Wright unequivocally testified that he was unable to comply with the Court's order, explained in detail why compliance was not possible, and testified about his good faith efforts to comply. *That testimony stands unrebutted by plaintiffs*. While plaintiffs challenge the veracity of certain documents related to the formation of the Tulip Trusts, they have not introduced *any evidence* challenging Dr. Wright's testimony regarding his inability to produce a complete list of all bitcoin that he mined prior to December 31, 2013, *which was the only issue before the Magistrate*. Plaintiffs have neither introduced any evidence showing that Dr. Wright can access a complete list of bitcoin that he mined, nor have they introduced any evidence that he didn't make good-faith reasonable efforts to comply with the Court's order by providing an overinclusive list of Bitcoin addresses, providing his best, a partial list of the bitcoin that he mined, and producing the documents related to the Tulip trusts. For these reasons, there simply was no basis to sanction Dr. Wright, and the sanctions imposed by the Order are contrary to law.

This conclusion is unchanged by the supposedly "inconceivable" nature of Dr. Wright's testimony, which supposedly defies "real-life experience." *See* Order at 19 (Making a "finding" that no one would set up a system where they could potentially lose "billions" of dollars "if [a] bonded courier does not appear."). Moreover, as a factual matter, Dr. Wright's testimony is not inconceivable.

The Order failed to consider five important facts. First, it failed to consider that the bitcoin were worth around a million dollars—not billions—when Dr. Wright started the process of putting them in the trust.[4] Second, the Order failed to consider the redundant nature of the Shamir

---

[4] In the end of April 2011, the value of one bitcoin ranged from $1.18 to $2.03. https://99bitcoins.com/bitcoin/historical-price/  (last visited Nov. 21, 2019). Thus, the 821,050 bitcoin in the Tulip Trust were worth between $968,839 and $1.6 million dollars when the trust was created, as opposed to the approximately 8 billion dollars they were worth when the Order

Scheme. Dr. Wright testified that there were 15 available key slices, of which, only a threshold number of 8 were necessary to decrypt the files. June 28, 2019, Hr. Tr. 106:17-108:4. As such, *even if 7 keys were permanently lost*, Dr. Wright still would be able to decrypt the file—so long as he received the other 8 keys. Third, the Order failed to consider that when Dr. Wright asked Dave Kleiman to set up the courier system, he had no way of knowing that Dave would die only a few years later, which would make Dr. Wright totally reliant on the system Dave set up.  Fourth, the Order fails to consider that the Bitcoin blockchain contains 1.3 million bitcoin that share the six unique characteristics to which Mr. Shadders testified, and that those unique characteristics make it probable that one person mined a vast majority of those bitcoin—yet those bitcoin have not been spent in almost ten years. Those bitcoin *must belong to somebody*, and that somebody likely has a good reason for having not spent them. Dr. Wright's testimony as to his inability to access his bitcoin and their addresses fits perfectly with this provable (and proven) reality. Fifth, as to what's conceivable or not, the Order fails to consider that the Magistrate's life experience and, frankly, most people's life experience, may not correspond to that of the inventor of Bitcoin.

It is beyond dispute that the inventor of Bitcoin is not a typical person. Bitcoin is a pseudonymous, revolutionary digital currency that is not reliant on a central institution to control it. Instead, it is secured by powerful encryption comprised of public and private key pairs and maintained by miners. In other words, the Bitcoin system was set up by a security-conscious contrarian. Against that backdrop, it is not at all inconceivable that Dr. Wright (the professed inventor of Bitcoin), would use powerful and complex encryption to protect his bitcoin—even if a typical person might not. In fact, the idea of using a Shamir scheme to protect bitcoin has recently

---

was issued, when one bitcoin was worth approximately $10,000. Further, when the trust was created, the very concept of cryptocurrency was extremely novel, and it was far from certain that the bitcoin would even maintain their value—let alone appreciate nearly ten thousand-fold.

gone mainstream in the Bitcoin community. *See* Trezor Blog, *Shamir Backup—Our Newest Security Standard,* https://blog.trezor.io/shamir-backup-the-revolution-of-private-keys-backup-is-here-858687ed7fe7 (last visited Oct. 10, 2019).

### B. The Draconian Sanctions the Order Purported to Impose Would Violate Dr. Wright's Due Process Rights Because They Improperly Went Far Beyond the Single, Narrow, Discovery Issue Before the Magistrate and Amounted to a Determination of Liability Without an Opportunity to Defend on the Merits

There was only *one, narrow discovery issue* before the Magistrate: Dr. Wright's asserted inability to "produce a complete list of all bitcoin that he mined prior to December 31, 2013." D.E. 217 at 5. Nonetheless, citing Rule 37, the Order imposed draconian sanctions in the form of deemed facts (the "Deemed Facts")[5] that went *far beyond* the one, narrow discovery issue before the Magistrate, made extensive purported findings on the merits of the case, and purported to strike eight affirmative defenses for being "inconsistent" with the Deemed Facts. *See* Order at 29. The Deemed Facts would establish that: 1) a partnership existed between Dr. Wright and Dave; 2) plaintiffs have an ownership interest in the bitcoin that Dr. Wright mined prior to Dave's death; and 3) plaintiffs have an ownership interest in Dr. Wright's bitcoin-related intellectual property developed prior to Dave's death. *See* Order at 28-29.

---

[5] The Magistrate "deemed" the following facts established:

> (1) Dr. Wright and David Kleiman entered into a 50/50 partnership to develop Bitcoin intellectual property and to mine bitcoin;
> (2) any Bitcoin-related intellectual property developed by Dr. Wright prior to David Kleiman's death was property of the partnership,
> (3) all bitcoin mined by Dr. Wright prior to David Kleiman's death ("the partnership's bitcoin") was property of the partnership when mined; and,
> (4) Plaintiffs presently retain an ownership interest in the partnership's bitcoin, and any assets traceable to them.

Order at 28-29.

In imposing sanctions that far exceeded the scope of the single, narrow discovery issue before the Magistrate, the Order violated Dr. Wright's due process rights. More than sixty years ago, the Supreme Court made clear that the "provisions of Rule 37 . . . must be read in light of the provisions of the Fifth Amendment that ***no person shall be deprived of property without due process of law . . . .***" *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 209 (1958) (emphasis added). "[T]here are constitutional limitations upon the power of courts, even in aid of their own valid processes, to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause." *Id.* Under Rule 37(b)(2), "the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 708 (1982). In other words, there must be a "nexus between the information [] not produced" and the sanction imposed. *C & M Oil Co. v. CITGO Petroleum Corp.*, 2007 WL 9751801, at *5 (S.D. Fla. 2007); *Preferred Care Partners Holding Corp. v. Humana, Inc.*, 2009 WL 982460, at *4 (S.D. Fla. 2009).

There is no nexus between the single, narrow discovery issue before the Magistrate and the broad sanctions the Order purported to impose through the Deemed Facts. Starting with the Deemed Facts regarding ownership of Dr. Wright's intellectual property and a purported partnership between Dr. Wright and Dave, there is absolutely ***no evidence*** that a listing of the bitcoin ***that Dr. Wright mined*** would have aided plaintiffs in establishing that Dave had any ownership interest in any of Dr. Wright's intellectual property or that there was any partnership between them to do anything. In fact, there is no logical connection between the two subjects.

As for the Deemed Facts granting plaintiffs an ownership interest in Dr. Wright's bitcoin, there is no record evidence showing that a listing of bitcoin ***that Dr. Wright mined*** would have

helped plaintiffs prove that Dave had an ownership interest in those bitcoin, let alone that Dave

mined them. Bitcoin is a pseudonymous currency, which does not contain the names of the bitcoin

miners or owners. [6]  Aug. 5, 2019, Hr. Tr. 26:14-27:2. At most, the discovery ordered would have

shown that bitcoin Dr. Wright had mined were moved from one pseudonymous public address to

another pseudonymous public address.[7] Even if plaintiffs knew the identity of Dave's public

addresses (they have failed to introduce *any* such evidence) and were able to strip away the

pseudonymity, showing that bitcoin *Dr. Wright mined* were later transferred into Dave's public

addresses[8] would not show that Dr. Wright stole bitcoin from Dave. If anything, ***it would show***

***that Dave stole bitcoin from Dr. Wright***.

### C. The Draconian Sanctions the Order Purported to Impose Also are Improper Because There is No Record Evidence of Any Prejudice to Plaintiffs, which is an Essential Requirement for Imposing Sanctions under Rule 37(b)

As shown above, the Order's draconian sanctions would violate Dr. Wright's due process

rights, because there is no nexus between the discovery ordered and the sanctions imposed for

being unable to provide it. Those sanctions also are improper because there is no evidence of any

prejudice to plaintiffs—and this is evident from the face of the Order.

"The severe sanctions permitted by Rule 37(b) are usually only imposed" when "the party

seeking sanctions was prejudiced by the violation." *Dude v. Cong. Plaza, LLC*, 2018 WL

---

[6] Further, there are no "accounts" on the Bitcoin network. Bitcoin are cryptographically locked on the blockchain and can be identified by their public addresses, which is a template used to represent the unlocking script for the bitcoin.

[7] That is assuming that the bitcoin were in fact moved. Dr. Wright testified that they were not, and plaintiffs have not introduced *any* evidence to the contrary.

[8] As stated in the Bitcoin white paper, Bitcoin public addresses are designed to be only used one time. *See* D.E. 238-1 at 6 ("a new key pair should be used for each transaction to keep them from being linked to a common owner"). As such, it is highly unlikely that Dave would have reused his Bitcoin addresses, which would make plaintiffs hypothetical tracing impossible—even if they knew some of his Bitcoin addresses.

4203888, at *5 (S.D. Fla. 2018), *report and recommendation adopted*, *Dude v. Cong. Plaza. LLC*, 2018 WL 4203886 (S.D. Fla. 2018) (citations omitted); *Wouters v. Martin Cty., Fla.*, 9 F.3d 924, 934 (11th Cir. 1993) (The district court abused its discretion in dismissing 14 plaintiffs because "plaintiffs' noncompliance with the discovery order did not prejudice defendant.").

The 29-page Order dedicates *just one conclusory line* to discussing plaintiffs' purported prejudice, stating that "plaintiffs have also been prejudiced by not being able to try and trace the bitcoin that was mined." Order at 28. The lack of any detail is telling.

At the evidentiary hearing, plaintiffs failed to introduce any evidence as to 1) how their purported bitcoin tracing would work, 2) how it would help them prove any of their claims, or 3) how they would be prejudiced in its absence. Like the Order, plaintiffs merely assumed that this purported tracing was important, without providing any logical, much less factual, basis for that assumption.

As the parties and the Court are aware, Bitcoin is a pseudonymous currency, which does not contain the names of the bitcoin miners or owners. There is nothing in the record that even hints at how tracing[9] bitcoin that Dr. Wright mined, from one pseudonymous public address to another pseudonymous public address, would aid plaintiffs in establishing that Dr. Wright stole any bitcoin from Dave, let alone that they mined any bitcoin together.

In dispositive contrast, Dr. Wright **did submit evidence** at the evidentiary hearing which showed that bitcoin tracing would be useless to plaintiffs because of the pseudonymous nature of Bitcoin. Steve Shadders testified that the Bitcoin public addresses would not provide the identity of the owner or miner of a bitcoin. Aug. 5, 2019, Hr. Tr. 26:14-27:2. That testimony stands

---

[9] Again, plaintiffs' "tracing" theory assumes that the bitcoin was moved from one public address to another public address and could thus be traced. But Dr. Wright testified that the bitcoin never was moved. That testimony has not been contradicted.

unrebutted, and demonstrates that the Order's conclusory statement about purported prejudice to plaintiffs is contradicted by the *only evidence* on this issue.

Further, even if there were a way to somehow trace Dr. Wright's bitcoin to Dave (there isn't), and also assuming that tracing would somehow help plaintiffs establish their claims (it wouldn't), plaintiffs could simply perform that analysis on the overinclusive list of Bitcoin addresses that Dr. Wright provided. As noted above, in a good faith effort to comply with the Magistrate's order, Dr. Wright had the Chief Technology Officer of nChain, Steve Shadders, prepare a list of Bitcoin addresses using select criteria that Dr. Wright provided. *See* Aug. 5, 2019 Hr. Tr. 11:6-28:16. Mr. Shadders was able to compile a list of 1,263,650 bitcoin,[10] which includes all of the 821,050 bitcoin that Dr. Wright mined. Aug. 5, 2019, Hr. Tr. 25:15-22. There is no reason why plaintiffs could not conduct their "tracing" on that list of 1,263,650 bitcoin, nor is there any reason why they could not conduct "tracing" on the Bitcoin addresses Dr. Wright already had provided.[11] In fact, plaintiffs failed to introduce *any evidence* at the hearing that they *even tried* to conduct any tracing—despite having had the overinclusive list of bitcoin for more than a month.

---

[10] The list of bitcoin that was introduced as defendants Exhibit 2 contained 27,973 Bitcoin addresses. D.E. 266-1. Mr. Shadders testified that he was able to further reduce that list by 2,700 addresses. Aug. 5, 2019 Hr. Tr. 23:8-24:19. Thus, the total amount of Bitcoin addresses identified by Mr. Shadders was 25,273 (27,973-2,700=25,273). Each of the Bitcoin addresses contained 50 bitcoin, which resulted in a total of 1,263,650 bitcoin (25,273x50=1,263,650).

[11] The possibility that the Magistrate might not have believed that the overinclusive list contained Dr. Wright's Bitcoin address (despite the fact that the criteria matched the Tulip Trust documents), begged the question whether the Magistrate would have believed that any list of Bitcoin addresses were Dr. Wright's. It well may be that the Magistrate only would have been satisfied if Dr. Wright had produced a list of Bitcoin addresses that showed a large number of bitcoin transfers between April 2013 (Dave's death) and December 31, 2013 (the cut-off date ordered by the Magistrate). Of course, that would be putting the cart before the horse, as it would assume such transfers demonstrated a theft.

Finally, Dr. Wright testified that he should be receiving, at the earliest, the missing key slices that would enable him to generate a list of his bitcoin holdings in January of 2020. June 28, 2019, Hr. Tr. 23:23-24:7. At a minimum, Dr. Wright should have been afforded the opportunity to wait until that date to see if he receives the key slices to generate the list of his bitcoin holdings, which he could then provide to plaintiffs. At that point, even plaintiffs would have to concede that Dr. Wright's inability to do the impossible and comply with the discovery order caused them absolutely no prejudice.

**D. The Order's Attack on Dr. Wright's Character Has no Bearing on Whether he Could Produce the List of Bitcoin Addresses, and is Without Record Support**

It is undisputed that there was only *one, narrow discovery issue* before the Magistrate: Dr. Wright's stated inability to "produce a complete list of all bitcoin that he mined prior to December 31, 2013." D.E. 217 at 5. Moreover, it also is undisputed that Dr. Wright's testimony regarding his inability to provide a list of his bitcoin holdings is uncontroverted and unchallenged by any record evidence. Yet, the vast majority of the Order focuses on supposed "bad acts" by Dr. Wright ***that had absolutely nothing to do with whether he could access a list of his bitcoin holdings***. For that reason, those purported "bad acts" are simply irrelevant. Yet, despite their irrelevance, Dr. Wright is compelled to address those purported "bad acts" due to the extreme nature of the Order's findings and the extreme prejudice those findings would cause him.

According to the Order, Dr. Wright is a conniving and uncooperative defendant who "changed his story," provided the Court with "inconsistent," "intentionally misleading," and "perjurious" statements, and who "intentionally submitted fraudulent documents to the Court," as "part of a sustained and concerted effort to impede discovery into his bitcoin holdings." Order at 17-28.  Yet, in reaching those "conclusions," the Order overlooked critical evidence and misstated

the record. Specifically, it cited six instances of purported "bad conduct" by Dr. Wright. They are

as follows:

i)     "Inconsistencies" as to the identities of the Tulip Trust trustees [Order at 22-23];

ii)    "Inconsistencies" in the manner that Dr. Wright described the transfer of the bitcoin holdings into the Tulip Trust [Order at 23];

iii)   The "lack" of record support for the encrypted file containing Dr. Wright's Bitcoin addresses [Order at 21];

iv)   Dr. Wright's "intentional submission" of fraudulent documents [Order at 20-21, 26-28];

v)    Dr. Wright's failure to tell the Court prior to the evidentiary hearing that a list of public addresses would not aid plaintiffs' case [Order at 25-26]; and,

vi)   Dr. Wright's failure to tell the Court in March that a list of his bitcoin holdings was inaccessible [Order at 21-22].

We address each of these purposed instances of "bad conduct" below.

### i.    The Purported "Inconsistencies" as to the Identities of the Tulip Trust Trustees

The Order found that Dr. Wright made "irreconcilable statements about the Tulip Trust,"

stating that "[t]he April 18 Motion stated it was a blind trust and he was not a trustee. His sworn

declaration three weeks later stated that he is one of the trustees of the Tulip Trust." Order at 22.

In making this finding, the Order failed to consider that there are two Tulip Trusts. *See* D.E. 237-

22; 237-9. As shown by the trust documents, Dr. Wright is the trustee of one of the Tulip Trusts

but is not a trustee of the other.

### ii.    Purported "Inconsistencies" in the Manner that Dr. Wright Described the Transfer of Bitcoin Holdings to the Tulip Trust

The Order found that Dr. Wright "changed his story" as to what assets were transferred

into the trusts, and that he provided an "intentionally false" representation on that issue. Order at

23.  According to the Magistrate, Dr. Wright "unequivocal[y]" stated in his April 18th motion and

May 8th declaration that the "trust held bitcoin," but "testified at his deposition and the

evidentiary hearing that "the trust only holds keys," not actual bitcoin. *Id.*

14

Having purportedly "caught" Dr. Wright in this inconsistency, the Order then speculated as to Dr. Wright's purported motivation. It speculated that Dr. Wright "belatedly realized that any transactions(s) transferring bitcoin into the alleged Tulip Trust would be reflected on the Bitcoin master blockchain . . . so he changed his story to say only the keys had been transferred." Order at 23-24.

This finding reflects a misunderstanding of Bitcoin technology and is unsupported by the record. First, it is impossible to hold or store bitcoin. The bitcoin *always remains on the Bitcoin blockchain*. In common parlance, when someone states that their bitcoin is stored on a hard drive, what they mean is that the hard drive contains the private keys that can be used to transact with corresponding bitcoin on the Bitcoin blockchain. Thus, there is no basis for attempting to distinguish between a trust holding bitcoin or Bitcoin keys. *They are the same thing.*

For that reason, there also is no difference between bitcoin transferred on the blockchain into a new set of public addresses controlled by a trust, and bitcoin transferred off the blockchain by transferring the Bitcoin private keys. In both instances, *the only thing held by the trust would be private keys*.

Second, even assuming arguendo that there were a difference between holding actual bitcoin and holding Bitcoin private keys (there is not), the Order's conclusion that Dr. Wright made inconsistent statements as to the trust holdings is unsupported by the record. The Order reached its conclusion by cherry-picking sentences from two documents, Dr. Wright's May 8th Declaration and his April 18th motion, but those very same documents contain other sentences that undermine the Order's conclusion.

In Dr. Wright's May 8, 2019 declaration (produced long before the evidentiary hearing where Dr. Wright supposedly "changed his story), Dr. Wright stated that "I later transferred the

15

encrypted files that control access to these bitcoin in 2011 . . . " and that "access to the encrypted file that contains the ***public addresses and their associated private keys to the bitcoin that I mined***, requires myself and a combination of trustees referenced in Tulip Trust 1 to unlock based on a Shamir scheme." D.E. 222 at 1, 2, 4 (emphasis added). Dr. Wright's declaration was unequivocal. The trust contained the ***private keys*** associated with the ***bitcoin that he mined***—not the "actual" bitcoin (which have no physical existence in the usual sense).[12] Additionally, Dr. Wright's April 18th motion states that he "transferred *ownership* of all his Bitcoin into a blind trust." D.E. at 184 at 2 (emphasis added). Transferring "ownership" of bitcoin is accomplished by transferring the private keys.

Further, there are additional documents that undermine with the Order's speculation that Dr. Wright "changed his story" because he "belatedly realized that any transactions(s) transferring bitcoin into the alleged Tulip Trust would be reflected on the Bitcoin master blockchain." Order at 23, 24. The trust documents (also produced long before the evidentiary hearing) make it clear that the bitcoin never moved (*i.e.,* were not transferred on the blockchain). One document describes the trust assets as follows: 1) "the settlor has had paid the trustee the sum of XBT 821,050" and 2) "the XBT (bitcoin) have ***never been spent or moved*.**" D.E. 237-22 at 2 (emphasis added).  And if the bitcoin "never moved," the only other method of transfer could have been an off-blockchain transfer of the private keys—to which Dr. Wright testified.

---

[12] We emphasize that Dr. Wright stated in the declaration that he transferred the private keys to *the bitcoin that he mined*, not the private keys to the ***bitcoin that were currently in the trust***. If Dr. Wright had meant to state that he'd transferred the bitcoin on the blockchain into the trust, as the Order incorrectly concluded [Order at 23, 24], then the correct terminology would have been the latter, not the former. This is so, because transferring the bitcoin on the blockchain would have required ***a new set of public addresses and corresponding private keys***.

### iii.    The Purported "Lack" of Record Support for the Encrypted File Containing Dr. Wright's Bitcoin Addresses

The Order found that "notably absent" from the trust documents "is any encrypted file, software, public or private keys," and that there was no "other credible evidence" that the file existed. Order at 21, 24. Thus, the Order concluded that the "file does not exist." Order at 24.

The Order's conclusion is unsupported and contradicted by the record evidence. First, one of the trust documents refers to an encrypted file that can be accessed by private keys. *See* 237-9. This document states that the trust is "DAC formed using a split key cryptographic process," which is controlled by the distribution of keys. *Id.* at 2. That high-level description fits perfectly with a split-key Shamir-Scheme encryption of the software necessary to generate Dr. Wright's Bitcoin addresses.

Second, numerous documents that were produced early on in discovery and introduced during the evidentiary hearing make reference to the Shamir Scheme for protecting the trust assets. For example, a document that appears to be a Bitmessage exchange between Dr. Wright and Dave states "[t]he keys are divided using the SSSS (Shamir's secret sharing scheme) scheme you had us work on." D.E. 237-16 at 8.[13]

Third, plaintiffs' counsel is currently in possession of the encrypted file that Dr. Wright stated contains the software necessary to generate his public Bitcoin addresses.[14] Dr. Wright's

---

[13] Plaintiffs claim that the received date on the Bitmessage pre-dates the public release of the Bitmessage software, however, Jonathan Warren, the creator of Bitmessage, testified that the software was stored on an unprotected server in his parents' home and that it may have been released on the dark web prior to the public release. D.E. 261-1 at 89:24-90:2; 104:22-107:19.

[14] Dr. Wright's discovery vendors produced the file to plaintiffs on August 27, 2019, the same day the Court issued its Order. Dr. Wright had not previously produced the file to plaintiffs because his discovery vendors had not been able to decrypt it, making it of little use to anyone, including plaintiffs. Upon receiving the Magistrate's order that doubted the existence of the encrypted file, Dr. Wright promptly produced that file to plaintiffs.

discovery vendor also is in possession of that file and has been working on decrypting the file (so far without any success).

### iv.      Dr. Wright's Purported "Intentional Submission" of Fraudulent Documents

The Order repeatedly found that Dr. Wright "intentionally submitted fraudulent documents to the Court." Order at 28, 27, 26, 21, and 20. This conclusion appears to be based on the testimony of plaintiffs' expert, Matthew Edman, who testified as to inconsistencies with several documents. However, Edman *also testified* that he was unable to conclude who had created these inconsistencies, he conceded that many of them could have innocent explanations, and he failed to analyze the original ESI emails.[15]

Notably, the Order addresses only one of the supposedly "fraudulent documents," a document dated October 23, 2012 establishing one of the Tulip Trusts. D.E. 237-9. According to the Order, "computer forensic analysis indicated that the Deed of Trust presented to the Court was backdated." Order at 21.  The Order appears to be relying on the testimony of Edman, who testified that the font files embedded in the document were copyrighted in 2015, implying that the document really was drafted in 2015. Aug. 5, 2019, Hr. Tr. 181:11-184:20. However, Edman conceded that the document could have been drafted in 2012, but simply OCR'd in 2015, which could have embedded the 2015 fonts into the document. *Id.* at 239:16-240:16. As such, Edman's testimony is not conclusive of anything.

---

[15] The timing inconsistencies in the PGP signatures could have been caused by a poorly configured computer clock. The supposed issues with the PGP version histories could have been caused by an Alpha or Beta version of the software. The supposed timing issues with the Bitmessages could be due to a pre-release version of the Bitmessage software. The supposed changes to the Tulip Trust email could have been caused by forwarding the original native email and then PDFing it. Each of these plausible explanations contradicts the "Fraudulent documents" accusation. None of them even were considered by the Order.

Further, even if there were no innocent explanations for the purportedly "fraudulent" documents (there are), the mere fact that a document may be altered—does not make that document "fraudulent." "Fraud" is a legal term of art that requires four elements to be met. "The elements of fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement is false; (3) defendant's intent that the statement induce the plaintiff to act; and (4) plaintiffs' reliance on the statement." *JPMorgan Chase Bank, N.A. v. Hayhurst Mortg., Inc.*, 2010 WL 2949573, at *3 (S.D. Fla., 2010) (citing *Parham v. Fla. Health Scis. Ctr., Inc.*, 35 So.3d 920, 928 (Fla. 2d DCA 2010)).

Here, the only evidence introduced at the evidentiary hearing was that certain documents purportedly were altered. There was absolutely no evidence as to any of the other elements of fraud.[16] The Order fails to even address the elements of fraud, let alone analyze whether the purportedly altered documents satisfied any of those elements.

> ### v.  Dr. Wright's Purported Failure to Tell the Court Prior to the Evidentiary Hearing that a List of Public Addresses Would Not Aid Plaintiffs' Case

The Order chastises Dr. Wright for "changing his story" at the evidentiary hearing regarding the utility of public addresses, where he purportedly "argued for the first time that a list of public addresses was meaningless." Order at 25. The Order found this "particularly disturbing because it was Dr. Wright who first injected the idea of public addresses into this discovery matter," and "the Court did not order production of a list of public addresses." *Id.* at 25, 5, 10.

---

[16] In fact, the Magistrate ruled at the evidentiary hearing that he would not permit plaintiffs' expert to testify that a document was purportedly "fraudulent" because the expert could not know Dr. Wright's "state of mind, which is what is necessary for testimony that it was fraudulent." Aug. 5, 2019, Hr. Tr. 112:22-113:19. Further, while many of the documents were produced by Dr. Wright in this case as part of his discovery obligations, his document production included documents from computers and servers that were used and maintained by others in Dr. Wright's various companies. Thus, even if one were able to ascertain a "state of mind," there is no basis to concluded that it was ***Dr. Wright's state of mind***.

The Order stated that the Court had ordered Dr. Wright to produce "a listing of [his] bitcoin holdings." *Id.* at 7 (internal quotations omitted). That statement is contradicted by the record, misconstrues Dr. Wright's arguments, and reflects a lack of understanding as to the workings of Bitcoin.

*First,* it was plaintiffs—not Dr. Wright—who injected the idea of public addresses into this discovery matter. In January 2019, Plaintiffs asked Dr. Wright to "identify the public keys and *public addresses* for any cryptocurrency that (i) you possess the private keys to . . . ." D.E. 91-2 at 8 (emphasis added). It was *this very discovery request* that formed the basis of plaintiffs' motion to compel, and which then led to the evidentiary hearing that resulted in the Order. *See* D.E. 210 at 2.

*Second,* in adjudicating plaintiffs' motion to compel, the Magistrate *did in fact order* Dr. Wright to produce a list of Bitcoin addresses:

> "So back in March -- March 14th, I think it was – I ordered Dr. Wright to produce a listing of the ***public addresses*** of his Bitcoin holdings as of December 31, 2013."

> "I will give Dr. Wright until June 17, 2019 to produce a complete list of the ***public addresses*** of all Bitcoin that he mined prior to December 31, 2013."

June 11, 2019 Hearing Tr. at 5:1-4, 31:13-15 (emphasis added).[17]

*Third,* Dr. Wright did not wait until the hearing to argue "for the first time" that the list of public addresses was irrelevant. Order at 25. Dr. Wright raised that objection in *February 2019,* in responding to Plaintiffs' interrogatory asking for a listing of public addresses. *See* D.E. 91-2 at 15. Dr. Wright's counsel further articulated his relevancy objection at the March 14, 2019,

---

[17] Further, the Order again reveals that the central issue was the public addresses of Dr. Wright's bitcoin, and not his bitcoin holdings. On page 20, the Order speculates about his "powerful motive not to identify his bitcoin," for "as long as the ***relevant addresses*** remain secret, he can transfer the bitcoin without the Plaintiffs being able to find them." Order at 20 (emphasis added).

hearing. *See* March 14, 2019, Hearing Tr. at 20:11-22:8. But the Magistrate overruled those objections, stating "I think it's relevant," and ordered Dr. Wright to produce the listing of his bitcoin or to file a motion arguing undue burden. *Id.* at 22:10-23:7 (emphasis added). Dr. Wright filed that motion on April 18, 2019. D.E. 155. In light of the Magistrate's ruling, Dr. Wright reasonably concluded that it would be inappropriate to again raise relevancy objections in his motion.

Dr. Wright did, however, again raise relevancy objections at the next appropriate moment. On June 11, 2019, plaintiffs filed their motion to compel, arguing—for the first time—that the list of Bitcoin addresses went to "the heart of Plaintiffs' case," and that not having the list of Bitcoin addresses was "frustrating Plaintiffs' ability to prove their case," two statements plaintiffs never supported with evidence (because there isn't any). *See* D.E. 210 at 2, 4.  In responding to that motion, Dr. Wright argued that plaintiffs had neither demonstrated any harm, nor "how they will use those addresses to determine which particular bitcoin were purportedly mined by Dave or belonged to Dave." D.E. 211 at 6. In other words, plaintiffs' claim of "harm" was unfounded because they had not demonstrated how the Bitcoin addresses even were relevant.

Dr. Wright's counsel further elaborated at the June 11th hearing before the Magistrate:

> Let's assume we had the addresses that contained the Bitcoin that was mined during the relevant time period. What information would the plaintiffs be able to discern? Specifically, would they be able to discern the information they're claiming they desperately need and we are stonewalling to give. That is to say, **evidence that would show the Bitcoin in those public addresses was mined in partnership.**
>
> Without wanting to raise an objection, so I'll say it myself, **counsel has been able to confirm unequivocally that having that public address is not going to give plaintiffs that information**, and we've actually asked to do the following study of our experts. All Bitcoin mined during the relevant time period that did not move.

June 11, 2019, Hr. Tr. 20:8-20 (emphasis added). Nonetheless, the Magistrate ruled that he wasn't "going to resolve that issue today," and summarily ordered Dr. Wright to produce a list of his Bitcoin addresses for bitcoin he mined prior to December 31, 2013. *Id.* at 30: 9-10, 31:13-15.

Dr. Wright again raised the relevancy issue at the evidentiary hearing that resulted in the Order, when Steve Shadders testified that the Bitcoin public addresses would not provide the identity of the owner or miner of a bitcoin. Aug 5, 2019, Hr. Tr. 26:14-27:2. Dr. Wright's counsel raised it yet again in closing arguments. Aug 26, 2019, Hr. Tr. 11:2-12:1.

*Fourth*, putting aside the fact that 1) it was *plaintiffs* that initially asked for a list of public addresses, 2) the Magistrate *did order* Dr. Wright to produce a list of Bitcoin addresses, and 3) Dr. Wright objected *long before* the evidentiary hearing on the basis of relevancy and lack of prejudice to plaintiffs, the Order's attempt to split hairs and distinguish between ordering a list of Bitcoin addresses and a list of bitcoin holdings not only reflects a lack of understanding of how Bitcoin works, but is a distinction without a difference.

There are only four ways to identify a list of Bitcoin holdings: 1) a list of public addresses; 2) a list of public keys; 3) a list containing bitcoin block height and transaction number; or 4) a transaction ID. Even if it were true (it isn't) that the Magistrate ordered only a listing of Dr. Wright's bitcoin holdings, the only way Dr. Wright could have complied with that order would have been by providing one of these four datapoints. And regardless of which datapoint he chose, that information still would be meaningless (and useless) to plaintiffs—because none of those datapoints contain personally identifying information.[18] Moreover, none of them would show who mined or owns the bitcoin.

_____

[18] See Exhibit C, showing what a Bitcoin transaction looks like. Regardless of which datapoint one chooses, the fact remains that nowhere does it contain any personally identifying information.

### vi.    *Dr. Wright's Purported Failure to Tell the Court in March 2019 that a List of His Bitcoin Holdings was Inaccessible*

The Order claims that Dr. Wright failed to promptly inform the Court that he was unable to provide plaintiffs with a list of his bitcoin holdings. Order at 21-22. Specifically, the Order cites the one-month period between the March 14th hearing[19] and the April 18th motion when Dr. Wright informed the Court that the bitcoin was held in trust and that he did not have access to their addresses.[20]

Dr. Wright acknowledges that a sooner response would have aided the Court and apologizes for the delay. He notes, however, that the one-month delay occurred during an extremely busy discovery period. His counsel was preparing him for his deposition, which occurred on April 4, 2019 in London. Moreover, after the deposition, the Court ordered Dr. Wright to file multiple motions on issues related to that deposition. *See* D.E. 137.

### E.  **The Magistrate Improperly Relied on Inadmissible Hearsay Evidence in Issuing the Sanctions**

As noted above, the Order repeatedly labels documents that Dr. Wright produced as "fraudulent" based on metadata that plaintiffs' expert claims to have extracted from documents produced by Dr. Wright.[21] Those documents, and the metadata that Edman extracted, are inadmissible hearsay. Dr. Wright made that very objection during the evidentiary hearing, but the Magistrate overruled it, finding the documents and metadata to be business records. Aug. 5, 2019, Hr. Tr. 155:5-15. But that ruling was contrary to law. "Business records are only admissible if the

---

[19] The Order states "May 14th", but that hearing actually occurred on March 14th.

[20] As for the time period between December 2018 and March 14th, 2019, the Order gave Dr. Wright the benefit of the doubt, because "Plaintiffs were seeking information that went beyond a list of his bitcoin holdings on December 31, 2013." Order at 22.

[21] Those Exhibits are: 3, 4, 7, 8, 27, 28, 29, 31, 33, 34, 35, 37, 39; 40 and 43, which can be found at D.E. 237-3; 237-3; 237-7, 237-8; 268-4; 268-5; 268-6; 268-8; 268-10; 268-11; 268-12; 268-14; 268-16; 268-17; 268-20.

record (1) was made at or about the time of the event it describes; (2) was made by a person with knowledge of that event; (3) was made and kept in the course of a regularly conducted business activity; and (4) has an indicia of trustworthiness." *Acciard v. Whitney*, 2011 WL 13294620, at *2 (M.D. Fla. 2011) (citing Fed. R. Evid. 803(6); *United States v. Fernandez*, 392 Fed. Appx. 743, 746 (11th Cir. 2010)) (emphasis added). "A party lays the proper foundation for the trustworthiness of computer generated business records and the records are admissible, in the following circumstances: '(1) The records must be kept pursuant to some routine procedure designed to assure their accuracy, (2) they must be created for motives that would tend to assure accuracy (preparation for litigation, for example, is not such a motive), and (3) they must not themselves be mere accumulations of hearsay or uninformed opinion.'" *Fernandez*, 392 F. App'x at 745–46 (citing *United States v. Glasser*, 773 F.2d 1553, 1559 (11th Cir.1985)).

Plaintiffs did not establish that the computer-generated documents were trustworthy, nor did they establish the remaining elements of the business record exception. *First*, plaintiffs introduced no evidence as to how the documents were stored or the motivation for creating the documents. More importantly, plaintiffs affirmatively argued that the electronically stored documents and their associated metadata ***were not trustworthy***. In fact, Plaintiffs' *own expert testified that the metadata was altered and manipulated*. For example, Edman testified that the metadata he extracted from Exhibit 2 and introduced as Exhibit 3 was altered in the following method: "a significant portion of the mail transport header had been truncated or removed," and the "data in the mail transport header . . . contain[ed] the date Thursday, June 24th, 2011," when that date really was a Friday. Aug. 5, 2019, Hr. Tr. 148:18-149:11. After having "established" that the documents contain altered metadata, there simply is no way that plaintiffs could simultaneously establish that the metadata was trustworthy.

*Second*, plaintiffs failed to introduce evidence as to the remaining elements of the business record exception, nor could they. Plaintiffs contend that the documents were backdated, so they clearly couldn't ever establish that this document was "made at or about the time of the event it describes." *Acciard,* 2011 WL 13294620, at *2. They also contend that the communications never occurred, so the document couldn't have been "made by a person with knowledge of that event." *Id.* They further contend that the documents were intentionally altered, and there is no evidence that altering records was a "regularly conducted business activity." *Id.*

Of course, plaintiffs introduced these documents and metadata for *the truth of the matter asserted*, and thus they are inadmissible absent a hearsay exception. Continuing with the example of the metadata extracted from Exhibit 2, plaintiffs relied on the metadata to suggest that the email was modified in 2014 by Dr. Wright. According to Edman, "the modified date and metadata dates on lines 12 and 14 indicate that the document was modified October 22nd, 2014" and the email return path "contain[s] the e-mail address craig@panopticrypt.com." Aug. 5, 2019, Hr. Tr. 148:3-5; 149:24-150:2.

Finally, the Magistrate also erred when he permitted plaintiffs to introduce as exhibits hearsay documents that plaintiffs' expert found online,[22] on the basis that the documents fell under Rule 803(18)'s exception for learned treatises, periodicals, or pamphlets. Aug. 5, 2019, Hr. Tr. 135:1-138:15. First, that exception only permits statements to be read into evidence. It does not permit a document to be introduced as an exhibit—as the Magistrate permitted here. Second, it is highly unlikely that most of those documents, consisting of website printouts, are reliable authorities.

---

[22] The Exhibits are: 25, 26, 41, and 44, which can be found at D.E. 268-2; 268-3; 268-18; 268-21.

**F. The Court Should Reverse and Vacate the Order Because It Exceeded the Magistrate's Jurisdiction and Authority by Issuing Case-Ending Dispositive Sanctions in a Discovery Order**

Magistrate judges have limited authority, pursuant to Rule 72 of the Federal Rules of Civil Procedure. As to non-dispositive matters, a magistrate may issue a ruling in an order. Fed. R. Civ. P. 72(a). As to dispositive matters, a magistrate may issue only a recommended disposition, usually termed a Report and Recommendation, and only after an assignment of those dispositive matters by a district judge. Fed. R. Civ. P. 72(b).

Thus, magistrates exceed their authority by issuing dispositive sanctions in discovery orders. This is so, *even if* the magistrate has the authority to hear the underlying discovery dispute. *Burns v. Imagine Films Entm't, Inc.*, 164 F.R.D. 594, 599–600 (W.D.N.Y. 1996) ("Discovery is clearly a pretrial matter, and magistrate judges have general authority to order discovery sanctions, however, a magistrate judge cannot issue sanctions which fall within the eight so-called dispositive motions[23]. . . ."); *Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1462 (10th Cir. 1988) ("Discovery is clearly a pretrial matter, and magistrates thus have general authority to order discovery sanctions. They may not do so, however, if those sanctions fall within the eight dispositive motions . . . ."); *Bennett v. Gen. Caster Serv. of N. Gordon Co.*, 976 F.2d 995, 998 (6th Cir. 1992).

---

[23] The eight dispositive motions are set out in 28 U.S.C.A. § 636. They are motions for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action. Many courts also have included in the list of "dispositive motions," any motion that would have the same effect as those eight dispositive motions. *E.g., Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1462-63 (10th Cir. 1988) (Striking pleadings with prejudice has the same effect as dismissing an action and thus "constitutes an involuntary dismissal . . . .").

The Order exceeded the Magistrate's authority because it imposed dispositive sanctions. Starting with the most obvious, the Magistrate purported to strike eight of Dr. Wright's affirmative defenses. *See* Order at 29. It is well-settled that "strik[ing] an affirmative defense is clearly 'dispositive of a ... defense of a party.'" *Specialty Minerals, Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 111 (S.D.N.Y. 2005) (citing *United States v. Davis,* 794 F. Supp. 67, 68 (D.R.I.1992)); *Jeeper's of Auburn, Inc. v. KWJB Enter., L.L.C.*, 2011 WL 1899195, at *1 (E.D. Mich. 2011), *report and recommendation adopted,* 2011 WL 1899531 (E.D. Mich. 2011) (collecting cases)).

Further, even if the Order hadn't exceeded the Magistrate's authority by striking eight of Dr. Wright's affirmative defenses, the Deemed Facts would have the same effect as striking the affirmative defenses. This is so, because if those facts were to be deemed established without trial (or even a summary judgment motion), it would be futile for Dr. Wright to put on evidence in support of those defenses, which renders them effectively stricken.[24] In fact, these improper "findings of fact" were the very basis for the Magistrate's *ultra vires* decision to "strike" eight of Dr. Wright's affirmative defenses: "these affirmative defenses are inconsistent with the facts *as I have deemed them*, *so they are stricken*." *Id.*; August 26, 2019, Hr. Tr. 89:4-8 (emphasis added); Order at 16 ("To confirm to these established facts, the Court strikes . . . .").

Finally, if the Court were to ignore this reversible error, the standard of review would be de novo. Rule 72(a) provides that orders on non-dispositive matters (e.g., discovery disputes) are reviewed for clear error or for being contrary to law, while Rule 72(b) subjects reports and

---

[24] For example, one of Dr. Wright's affirmative defenses is accord and satisfaction, based on the plaintiffs' having received corporate shares from Dr. Wright as compensation for rights of David Kleiman. D.E. 87 at 33. This defense plainly is inconsistent with the Magistrate's Deemed Facts that half of Dr. Wright's bitcoin and intellectual property (as of a certain date) belong to plaintiffs. The affirmative defenses that would be vitiated by the Deemed Facts are on page 29 of the Order.

recommendations on dispositive matters to de novo review. The Order doesn't cleanly fit into either rule, because it exceeded the Magistrate's jurisdiction and authority, and purported to issue dispositive sanctions in a discovery order (a legal impossibility). However, because the Magistrate attempted to impose dispositive sanctions, the proper reference would be to Rule 72(b), which requires de novo review. *Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1463 (10th Cir. 1988); *Boxer F2, L.P. v. Bronchick,* 722 F. App'x 791, 796 (10th Cir. 2018).

### CONCLUSION

For all the foregoing reasons, the Court should reverse and vacate the Order, which amounted to a judgment of liability without trial in the guise of a discovery order. There was no basis for the Order's sanctions of Dr. Wright, which far exceeded the scope of the single, limited discovery issue before the Magistrate and would violate Dr. Wright's due process rights.

### CERTIFICATE OF GOOD FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3), I certify that counsel for the movant has conferred with all parties who may be affected by the relief sought in this motion. Plaintiffs' counsel does not agree with the relief sought.

*Attorneys for Dr. Craig Wright*

RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: arolnick@riveromestre.com
Email: amcgovern@riveromestre.com
Email: zkass@riveromestre.com
Email: receptionist@riveromestre.com

By: s/ Andres Rivero
ANDRES RIVERO

Florida Bar No. 613819
JORGE MESTRE
Florida Bar No. _____
AMANDA MCGOVERN
Florida Bar No. 964263
ALAN ROLNICK
Florida Bar No. 715085
SCHNEUR KASS
Florida Bar No. 100554

## **CERTIFICATE OF SERVICE**

I certify that on November 25, 2019, I electronically filed this document with the Clerk of

the Court using CM/ECF. I also certify that this document is being served today on all counsel of

record by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

 /s/ Andres Rivero_____
ANDRES RIVERO
Florida Bar No. 613819