UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


-----------------------------)
                             )
                             )
                             )
IRA KLEIMAN, as the personal )CASE NO:
representative of the Estate )9:18-cv-80176-BB/BR
of David Kleiman, and W&K Info)
Defense Research, LLC        )
                             )
          Plaintiffs,        )
                             )
v.                           )
                             )
                             )
CRAIG WRIGHT                 )
                             )
          Defendant.         )
                             )
                             )
-----------------------------)




Videotape Deposition of
CRAIG STEVEN WRIGHT

On Thursday, 4th April 2019


Taken at the offices of:

Boies Schiller Flexner LLP
5 New Street Square,
London EC4A 3BF

Reported by:  Paula Foley



```
 1              A P P E A R A N C E S
 2    On behalf of the Plaintiffs:
 3            VELVEL (DEVIN) FREEDMAN, ESQ.
              Boies Schiller Flexner LLP
 4            100 SE Second Street, Suite 2800,
              Miami, Florida 33131
 5
              KYLE W. ROCHE, ESQ.
 6            Admitted Pro Hac Vice
              Boies Schiller Flexner LLP
 7            333 Main Street
              Armonk, NY 10504
 8
 9    On behalf of the Defendant:
10            ANDRÉS RIVERO
              ZAHARAH R. MARKOE
11            Rivero Mestre LLP
              2525 Ponce de Leon Blvd.
12            Ste. 1000 Miami,
              FL 331134
13
14
      Court Reporter:
15
              PAULA FOLEY
16            Magna Legal Services
              1635 Market Street,
17            Philadelphia,
              PA 19103
18            United States
19
      Also Present:
20
              PHILIP HILL (Videographer, Magna Legal
21            Services)
22            ANDREW S. BRENNER, ESQ (Boies Schiller
              Flexner LLP) for the Plaintiff By Telephone
23
              JOHN MCADAMS, ESQ (Boies Schiller Flexner
24            LLP) By Telephone
25            IRA KLEIMAN (Plaintiff) By Telephone
```



Page 3

```
 1                    I N D E X
 2
     Deponent                              Page
 3
     DR. CRAIG STEVEN WRIGHT
 4
     Questions by MR. FREEDMAN           5 - 385
 5
 6
 7              - - - - - - - - - -
 8
 9       Exhibits marked during this deposition
10          Exhibit                       Page
11             1                            78
               2                           126
12             3                           189
               4                           227
13             5                           239
               6                           259
14             7                           296
               8                           314
15             9                           333
              10                           347
16
17
18
19
20
21
22
23
24
25
```



Page 4

1                    THE VIDEOGRAPHER:  We are now on the

2      record.  This begins the video card number 1, volume 1,

3      in the video deposition of Dr. Craig Wright.  This is

4      taken in the matter of Ira Kleiman et al versus Craig

5      Wright.  This case is being heard in the United States

6      District Court Southern District of Florida.  Case

7      number 9:18-cv-80176-BB/BR.  Today's date is April 4,

8      2019.  The time on the video screen is 10.37 a.m.  Local

9      time is London.  This video deposition is taking place

10     at the London offices of Boies Schiller Flexner at the

11     request of Boies Schiller Flexner. The videographer is

12     Philip Hill representing Magna Legal Services and the

13     court reporter is Paula Foley, also representing Magna

14     Legal Services.  Please will counsel introduce

15     themselves and state whom they represent at the Boies

16     Schiller offices in London and those present via the

17     telephone conference link.  Thank you.

18                    MR. FREEDMAN:  Vel Freedman for the

19     plaintiffs.

20                    MR. ROCHE:  Kyle Roche for the

21     plaintiffs.

22                    MR. RIVERO:  Andrés Rivero for Craig

23     Wright.

24                    MS. MARKOE:  Zaharah Markoe for

25     Dr. Wright.



Page 5

1                    MR. BRENNER:  (By Telephone) Andrew

2      Brenner for the plaintiff.

3                    MR. FREEDMAN:  Did we loose Mr. McAdams?

4                    MR. BRENNER:  John McAdams is here.

5                    THE VIDEOGRAPHER:  Please will the court

6      reporter swear in the witness.

7               DR. CRAIG STEVEN WRIGHT, SWORN

8                 QUESTIONS BY MR. FREEDMAN

9                    MR. FREEDMAN: Thank you very much.

10                    MS. MARKOE:  Point of order before we get

11      started.  We are going to mark the entire deposition

12      confidential and then once we have the transcript we

13      will de-designate.

14                    MR. FREEDMAN:  That is fine.

15           Q.     Good morning, Dr. Wright.

16           A.     Good morning.

17           Q.     We met earlier.  My name is Vel Freedman.

18      I represent the plaintiffs in this action.

19           A.     Hello Vel.

20           Q.     Can you please state your name and date

21      of birth for the record?

22           A.     My name is Craig Steven Wright.  I was

23      born in Brisbane, Australia, on 23rd October 1970.

■■       ■■       ■■■■■■■■■■■■■■■■■■

■■       ■■       ■■■■■■■■■■■■■■■■■■



2          Q.     And your work address?

3          A.     I mainly work from home.  To tell you the

4    truth I do not know the office address, I just walk

5    there, it is in Oxford Circus at nChain.  There is

6    another one at Golden Square.  I do not actually know,

7    I am sorry.

8          Q.     That is fine.  Doctor, you understand

9    today that you are under oath and that you have taken an

10   oath to tell the truth?

11         A.     I understand perfectly well the meaning

12   of an oath.

13         Q.     You understand that your examination

14   today is being recorded both via stenographer and

15   videographer and that at some point this testimony may

16   be shown to a jury?

17         A.     I understand that perfectly, thank you.

18         Q.     Are you taking any medication today?

19         A.     No.  I do not take medication.

20         Q.     Is there anything today that I do not

21   know about that would -- let me strike that.  Is there

22   anything today that would in fact affect your ability to

23   tell the truth at this deposition?

24         A.     No, nothing will affect my ability to

25   tell the truth.



Page 7

```
 1          Q.     If I ask you a question and you do not
 2     understand it, please let me know, and I will repeat it
 3     or rephrase it?
 4          A.     I shall.
 5          Q.     If you do not ask me to do that, I will
 6     assume you understand the question and I will rely on
 7     your response?
 8          A.     (The witness nodded)
 9          Q.     In deposition-taking, it is not
10     intuitive, but we need you to verbally say your
11     responses on the record, so that the court reporter can
12     take them, so I will try to remind you to do it, and if
13     you could just try to answer with an affirmative yes or
14     no?
15          A.     Yes.
16          Q.     Thank you.  If at any time today you need
17     to take a break or you feel like you need to get a drink
18     or stretch your legs, just let me know and we will stop;
19     okay?
20          A.     Shall do.  Thank you.
21          Q.     You said you were born in Australia.  Did
22     there come a time when you stopped living in Australia?
23          A.     I am not living in Australia at the
24     moment.
25          Q.     When did you stop living in Australia?
```



Page 8

```
 1           A.      We moved from Australia in October 2015.

 2           Q.      Let me go back to about 2006.  In 2006

 3     where were you living in Australia?

 4           A.      In Wimbledon.

 5           Q.      In Wimbledon.  Did there come a time when

 6     you moved from Wimbledon?

 7                   MS. MARKOE:  Objection.  This is not part

 8     of the deposition topics that we agreed to.  This is a

 9     limited deposition.  I am not really sure how this line

10     of questioning fits in with any of the topics that you

11     proposed.

12                   MR. FREEDMAN:  So, we are trying to

13     establish where Dr. Wright was so we can identify the

14     location of computers, locations of servers and

15     locations of all kinds of other things he may have used

16     to create Bitcoin to collaborate with David Kleiman.

17                   THE WITNESS:  Anything that I have moved

18     with has moved with me in full.  I have only had one

19     residence at any location, so anywhere I have been is

20     irrelevant.  Everything has moved, full stop.

21     BY MR. FREEDMAN:

22           Q.      Dr. Wright, I am going to ask, if it is

23     possible, if you could wait until I ask a question to

24     respond.  I know you know where I may be going and you

25     know what I may be getting at, you want to try to
```



Page 9

1    short-circuit it, but unfortunately I have to ask the

2    question and you have to respond.  You were living in

3    Wimbledon in 2006.  Did there come a time when you moved

4    from Wimbledon?

5           A.    Yes.

6           Q.    When did you move from Wimbledon?

7                 MS. MARKOE:  I am continuing to object to

8    this line of question.

9                 MR. FREEDMAN:  Are you instructing him

10   not to answer or are you noting an objection?

11                MS. MARKOE:  I am noting an objection and

12   I am giving you a little bit of leeway.  If we get to a

13   point where I feel you are abusing that leeway then

14   I will instruct him not to answer.

15                MR. FREEDMAN:  Okay.

16          Q.    When did you move after 2006?

17          A.    I do not remember the exact date.

18          Q.    Where did you move to?



10          Q.     I am confused.  This may be my fault.  In

11   2006 you were living in the UK?

12          A.     I am sorry, that is my fault I was

13   thinking 2016.  2006 I was living in Australia.

14          Q.     Okay, where in Australia?

15          A.     A number of different locations.

16          Q.     Can you let me know where those were?

17          A.     I do not remember.  I know approximate

18   locations.  I have had several houses.

19          Q.     Can you give me the approximate

20   locations?

21          A.     New South Wales.

22          Q.     From 2006 -- did there come a time when

23   you left New South Wales for another part of Australia,

24   or were you in New South Wales until you moved to the UK

25   in 2015?



Page 11

```
 1          A.     I was in New South Wales until then.

 2          Q.     But you do not recall the exact

 3    addresses?

 4          A.     Not off the top of my head, no.

 5          Q.     Do you have those records available that

 6    you could look up and then tell your counsel later?

 7                 MS. MARKOE:  Objection.

 8                 THE WITNESS:  I have no computers in any

 9    other residence.  Everything I have had moved with me.

10    There is nothing to be found, there are no computers

11    there, and, no, I do not try and remember addresses.

12    BY MR. FREEDMAN:

13          Q.     So you took every computer storage

14    device, every system you had, has moved with you and you

15    currently have it with you in London?

16                 MS. MARKOE:  Objection:  mischaracterises

17    the testimony.

18                 THE WITNESS:  No, that is not what

19    I said.  I do not keep machines.  The average age of my

20    computers is one year.  After a year, quite often

21    I trash them.  I have a new phone every single year.

22    I have a new computer, at maximum, 18 months.

23    BY MR. FREEDMAN:

24          Q.     What do you do with the old equipment?

25          A.     In the past I used to donate those to
```



Page 12

1    charity.  Now, sometimes they go to charity, sometimes

2    they just get trashed.

3             Q.     What do you do with the data on those old

4    computers or hardware?

5             A.     It is wiped.

6             Q.     Do you save a copy of it?

7             A.     Not always, no.  If I do not need it, I

8    do not save it.

9             Q.     But whatever you need, you save?

10            A.     Yes.

11            Q.     Were you employed between 2006-2015, when

12   you left Australia?

13            A.     Yes.

14                   MS. MARKOE:  Objection.

15   BY MR. FREEDMAN:

16            Q.     Where were you employed?

17            A.     At what point?

18                   MS. MARKOE:  Objection.

19   BY MR. FREEDMAN:

20            Q.     From 2006, I guess in 2006, where were

21   you employed?

22            A.     I worked for a company or a partnership

23   called BDO, which was an accounting firm.

24            Q.     How long were you with BDO?

25            A.     From some time in 2005 until December



Page 13

1    2008, when I left.

2            Q.    When you left BDO in 2008, were you

3    employed by another organisation or employer?

4            A.    No.

5            Q.    Did there come a time when you were,

6    again, employed by an employer?

7                  MS. MARKOE:  Objection.

8                  THE WITNESS:  I am nominally employed by

9    nChain.

10   BY MR. FREEDMAN:

11           Q.    That was the next time after BDO?

12           A.    I was a director of my own company, so if

13   you want to call that employment, then ----

14           Q.    That is a good critique and a bad

15   question.  Besides working for your own companies and

16   yourself, have you worked for anyone else besides BDO

17   and nChain ----

18           A.    No.

19           Q.    ---- from 2006 on.  Where did you

20   maintain -- so you said that between 2008 you left BDO,

21   and then in 2000 -- when did you begin working for

22   nChain?

23           A.    Well, I did not really begin working for

24   nChain, I founded nChain.

25           Q.    When did you found nChain?



Page 14

```
 1          A.     nChain was founded effectively in a

 2   number of different forms in around May 2015.

 3          Q.     So between December of 2008 and May of

 4   2015, you worked for yourself in companies that you

 5   created?

 6          A.     I worked for the companies I created,

 7   yes.  I did not work for myself per se, I was not

 8   working for my own business, if that is what you are

 9   asking.

10          Q.     Did these companies have offices in

11   Australia?

12          A.     Yes, some of them did.

13          Q.     Do you recall the addresses of those

14   offices?

15          A.     In North Ryde I do not remember the exact

16   address.

17          Q.     Were there more than one address?

18          A.     In some of them, yes.

19          Q.     Were they all in North Ryde?

20          A.     No.

21          Q.     Where else were they?

22          A.     I honestly do not remember.  I do not try

23   and remember addresses.  I do not remember, as I said,

24   the address at Oxford Circus where I drive into work

25   every week.  I just go there.
```



Page 15

```
 1           Q.     Do you have records that you could look

 2    this up and let your counsel know later?

 3                  MS. MARKOE:  Objection.

 4                  THE WITNESS:  No, but I am sure it is on

 5    the internet.

 6    BY MR. FREEDMAN:

 7           Q.     How many times have you been married?

 8           A.     Twice.

 9                  MS. MARKOE:  Objection.

10    BY MR. FREEDMAN:

11           Q.     What is the name of your first wife?

12           A.     Carol Lynne Wright.

13           Q.     What was her maiden name?

14           A.     Black.

15           Q.     When did you first meet her?

16                  MS. MARKOE:  Objection.  What is the

17    relevance of when he met an ex-wife?  And how does that

18    relate to any of the topics that you have purported that

19    you are planning on covering today?

20                  MR. RIVERO:  Instruct not to answer.

21    Next question, please.

22                  MR. FREEDMAN:  Andrés?

23                  BY MR. RIVERO:  Please ask the next

24    question.  That we will take up with the court if you

25    wish to.
```



MAGNA
LEGAL SERVICES

Page 16

1               MR. FREEDMAN:  Okay.  Are you going to

2       instruct him not to answer any question about his first

3       wife?

4               MR. RIVERO:  Mr. Freedman, you have the

5       right to ask questions.  Ask the questions.  You are

6       wasting your own time.  If you want to take up that

7       question with the court I am ready to call now if you

8       want to find the judge.  When did he meet his first

9       wife?  Please, move on.

10              MR. FREEDMAN:  We will deal with it in

11      the court.

12              MR. RIVERO:  Please move on.  Next

13      question.

14      BY MR. FREEDMAN:

15          Q.     When did you get married to

16      Ms. Lynne Black?

17          A.     In the '90s.  I have an oath, as part of

18      my divorce settlement, that I will not discuss anything

19      about my wife or my former marriage.  I will not break

20      that.  Thank you.

21          Q.     When did you get divorced?

22          A.     I have an oath with my wife that I am

23      divorced from that I will not discuss anything about her

24      or my former marriage that is part of our settlement.

25      Thank you.



Page 17

1          Q.     Including the date of the divorce?

2          A.     I have an oath with my former wife that

3    I will not discuss anything about her or my former

4    marriage.  I will not break that.

5          Q.     Have you stayed in touch with your

6    ex-wife after the date of the divorce?

7                 MS. MARKOE:  Objection.

8                 THE WITNESS:  I have an oath with my

9    former wife that I will not discuss anything about her

10   in any way or my marriage, and I will not break an oath.

11   BY MR. FREEDMAN:

12         Q.     So we do not have to go through every

13   single question.  Are you refusing to answer any

14   questions about Ms. Lynne Black?

15         A.     I am not refusing to answer questions.

16   I have an oath that has been filed within a court in

17   Australia.  I will not breach oath and perjure myself or

18   break oath.  You are asking me to break oath, and unless

19   instructed by a judge, etcetera, etcetera, I will not do

20   that.

21         Q.     What is the name of your second wife?

22         A.     My second wife is called Ramona.

23         Q.     When did you meet Ramona Wright?

24                MS. MARKOE:  Objection.

25   BY MR. FREEDMAN:



Page 18

1          Q.     What is her last name?

2          A.     Watts.

3          Q.     Was it always Watts?

4          A.     No.

5          Q.     What was it before it was Watts?

6          A.     It was Ang.

7          Q.     Can you spell that, please?

8          A.     A-N-G.

9          Q.     When did it change to Watts?

10             MS. MARKOE:   Objection.

11             THE WITNESS:   I am not answering

12    questions about my wife.  My wife is privileged in the

13    UK.  My marriage is privileged.  You should know that,

14    as a lawyer.  Are you seeking to have me breach marital

15    privilege?

16   BY MR. FREEDMAN:

17          Q.     Dr. Wright, it will not be productive for

18    us to have a conversation about whether or not the time

19    of when your wife's name changed from Ang to Watts is

20    covered by spells of privilege, but ----

21          A.     I do not discuss my family, full stop.

22          Q.     Dr. Wright, you understand that you are

23    being sued in this case?

24          A.     I understand perfectly well that a con

25    man in America has made up a fraudulent claim, yes.



Page 19

1          Q.    And you understand that you tried to

2    dismiss this case?

3                 MS. MARKOE:  Objection.  Sir, Vel, we

4    have a lit of topics.  These were approved by the court.

5    This is not part of your list of topics.

6                 MR. FREEDMAN:  It certainly is,

7    Ms. Markoe.

8                 MS. MARKOE:  Explain to me in what way.

9                 MR. FREEDMAN:  Because the list of topics

10   approved by the court approved the inquiry into

11   witnesses and Ms. Ramona Watts is heavily and was

12   heavily involved with Dr. Wright's businesses.

13                MS. MARKOE:  That topic says:

14   "Identification of witnesses, including information

15   about their whereabouts and roles in the subject matter

16   of the pleadings".  Your questions do not go ----

17                MR. FREEDMAN:  Sure they do.

18                MS. MARKOE:  ---- to those issues.  Your

19   questions do not go to those issues.  Ask questions that

20   go to those issues and he will answer the questions that

21   go to those issues to the extent that they are not part

22   of a privilege.  Continue.

23                MR. FREEDMAN:  We are trying to determine

24   at what point she entered into this circle of companies

25   and this helps us determine that.



Page 20

1                    MS. MARKOE:  When her name changed from

2     Ang to Watts helps you determine ----

3                    MR. FREEDMAN:  Helps us identify her and

4     her history and learn about her, so that we can

5     eventually, if possible, take her deposition, yes.

6                    MS. MARKOE:  And that has nothing to do

7     with these topics.  That has absolutely nothing to do

8     with these topics.  You can ask the questions that go to

9     these topics and go to the specific issues, period.

10                    MR. FREEDMAN:  We will take it up with

11    court.

12                    MS. MARKOE:  Take it up with the court.

13    BY MR. FREEDMAN:

14         Q.    Dr. Wright, do you have any computers

15    that existed as of 2006 that are still in your

16    possession today?

17                    MS. MARKOE:  Objection: asked and

18    answered.

19                    MR. FREEDMAN:  Ms. Markoe, I would if you

20    would just limit your objection to form as per the

21    rules.

22                    THE WITNESS:  No.

23    BY MR. FREEDMAN:

24         Q.    Do you have any computers in your

25    possession from 2007?



Page 21

```
 1          A.     No.

 2          Q.     2008?

 3                 MS. MARKOE:  Objection.

 4                 THE WITNESS:  Any computer that I have

 5     had has been imaged and taken.  I do not know if there

 6     is any old hard drives or whatever else from any

 7     particular date.  Every single computer has been taken,

 8     imaged, etcetera.

 9          Q.     I understand, but that is not my

10     question.  My question is if you have any -- let me

11     rephrase it, maybe it is easier.  What is the oldest

12     computer that you have in your possession?

13          A.     I do not know.

14          Q.     What is the oldest hard drive that you

15     have in your possession?

16          A.     I do not know.

17          Q.     What is the oldest media device that you

18     have in your possession?

19          A.     I do not know.

20          Q.     Did you use any cloud storage services in

21     the 2006 -- in 2006?

22          A.     Yes.

23          Q.     What were those services?

24          A.     I do not remember.

25          Q.     Did you use any cloud storages in 2007?
```



Page 22

```
 1          A.      Yes.

 2          Q.      What were the names of those storage

 3     services?

 4          A.      I do not remember.

 5          Q.      Did you use cloud storages in 2008?

 6          A.      Yes.

 7          Q.      What were the names of those storages?

 8          A.      I do not remember.

 9          Q.      Did you use cloud storages in 2009?

10          A.      Yes.

11          Q.      What were the names of those cloud

12     storages?

13          A.      I do not remember.

14          Q.      Did you use cloud storages in 2010?

15          A.      Yes.

16          Q.      What were the names of those cloud

17     storages?

18          A.      I do not remember.

19          Q.      Did you use cloud storages in 2011?

20          A.      Yes.

21          Q.      What were the names of those cloud

22     storages?

23          A.      I do not remember.

24          Q.      Did you use cloud storage services in

25     2012?
```



Page 23

1          A.     Yes.

2          Q.     What were the names of those cloud

3     storages?

4          A.     I do not remember.

5          Q.     Did you use cloud storages in 2013?

6          A.     Yes.

7          Q.     What were the names of those cloud

8     storages?

9          A.     I do not remember.

10          Q.     From 2006 until 2013, did you ever use

11     cloud computing services?

12               MS. MARKOE:  Objection.

13               THE WITNESS:  Yes.

14     BY MR. FREEDMAN:

15          Q.     What were the names of those cloud

16     computing services?

17          A.     I do not remember.

18          Q.     What did you use cloud computing services

19     for?

20               MS. MARKOE:  Objection.

21               THE WITNESS:  To store data, to analyse

22     data.

23     BY MR. FREEDMAN:

24          Q.     What data did you store?

25          A.     A wide variety of all different things



Page 24

1    I was analysing.

2            Q.    Can you list for me the types of data you

3    stored?

4                  MS. MARKOE:  Objection.

5                  THE WITNESS:  0s and 1s.

6    BY MR. FREEDMAN:

7            Q.    And at a higher level?

8                  MS. MARKOE:  Objection.

9                  THE WITNESS:  I do not remember the exact

10   composition of data that I had at any period.  I do not

11   try and remember these things.

12   BY MR. FREEDMAN:

13           Q.    Do you remember any of the data that you

14   stored during that period?

15           A.    I, at most of these periods that you are

16   talking about, have staff.  I ask for things to happen,

17   things happen.

18           Q.    So, is it your testimony today that from

19   2006 until 2013, you do not recall any of the data that

20   you stored on cloud storage devices?

21                 MS. MARKOE:  Objection:  mischaracterises

22   the testimony.

23                 MR. FREEDMAN:  I asked him if that was

24   his testimony.  I would ask again, Ms. Markoe, that you

25   limit your objection to form.



Page 25

1          MS. MARKOE:  And I would ask that you ask

2     proper questions.  Continue.

3          THE WITNESS:  Very simply, you have tried

4     to twist my words, that is not what I said.

5          MR. FREEDMAN:  Ms. Markoe, this is the

6     issue with objecting beyond form, because you are

7     coaching the witness and it is inappropriate under the

8     local rules.

9          MS. MARKOE:  I am not coaching the

10    witness at all.

11         THE WITNESS:  I would have said that

12    either way.

13         MS. MARKOE:  I am telling you what my

14    objection is and I am allowed to record my objection for

15    the record.

16         MR. FREEDMAN:  Just to form.  It is part

17    of the local rules.  It is quite clear.  You are only

18    allowed to object to form.

19         MS. MARKOE:  Take it up with the judge,

20    then.

21         MR. FREEDMAN:  I will, but I am hoping I

22    do not have to.

23    Q.    Dr. Wright, is it your testimony today

24    that from 2006-2013 that you do not recall any of the

25    data you stored on cloud storage devices?



Page 26

1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  I do not recall the data,

3      no.

4      BY MR. FREEDMAN:

5           Q.     Is it your testimony today that from

6      2006-2013 you do not recall any of the functions that

7      you used cloud computing services for?

8                    MS. MARKOE:  Objection.

9                    THE WITNESS:  That is not what I actually

10     said.  I said I do compute and storage.  They are

11     functions.

12     BY MR. FREEDMAN:

13          Q.     Do you recall what data you computed

14     during the 2006-2013 time period?

15                   MS. MARKOE:  Objection.

16                   THE WITNESS:  The purpose of storing data

17     and doing compute is so that I do not need to recall it.

18     BY MR. FREEDMAN:

19          Q.     So do you recall what you stored from

20     2006-2013?

21                   MS. MARKOE:  Objection.

22                   THE WITNESS:  Again, I do not recall,

23     because I do not need to.  The whole purpose of storing

24     information is so that you do not need to think about

25     it.



Page 27

1   BY MR. FREEDMAN:

2           Q.      So you do not recall?

3                   MS. MARKOE:  Objection.

4                   THE WITNESS:  I just said that.

5   BY MR. FREEDMAN:

6           Q.      Did any of the data stored, or any of the

7   cloud computing services used, relate to Bitcoin?

8           A.      Yes.

9                   MS. MARKOE:  Objection.

10  BY MR. FREEDMAN:

11          Q.      Do you recall how it related to Bitcoin?

12                  MS. MARKOE:  Objection.

13                  THE WITNESS:  Define that.  Define what

14  you mean by how it related to Bitcoin.

15  BY MR. FREEDMAN:

16          Q.      Did it relate to the mining of Bitcoin?

17                  MS. MARKOE:  Objection.

18                  THE WITNESS:  No.

19  BY MR. FREEDMAN:

20          Q.      Did it relate to blockchain-based

21  intellectual property?

22                  MS. MARKOE:  Objection.

23                  THE WITNESS:  Define what

24  blockchain-based intellectual property means, please.

25  BY MR. FREEDMAN:



Page 28

1          Q.     What does the term blockchain mean to

2     you?

3          A.     Blockchain is a misrepresentation of the

4     use of timechain that is defined within the word

5     Bitcoin.  It is effectively, people not understanding

6     what the technology is, and calling it something that it

7     is not.

8          Q.     So would timechain be a more accurate

9     term to use?

10               MS. MARKOE:  Objection.

11               THE WITNESS:  For the general

12     representation, yes.

13     BY MR. FREEDMAN:

14          Q.     Did any of the cloud computing and cloud

15     storage services that you used between 2006 until 2013

16     relate to timechain intellectual property?

17               MS. MARKOE:  Objection.

18               THE WITNESS:  Again, what you are trying

19     to do is multiple things, and are you talking about the

20     development of what became Bitcoin, or are you talking

21     about something else, such as documenting or writing

22     papers on the topic?

23     BY MR. FREEDMAN:

24          Q.     Let us start with the development of

25     Bitcoin.  Did any of those cloud storages and cloud



Page 29

1    computing services relate to the development of what

2    became Bitcoin?

3                    MS. MARKOE:  Objection.

4                    THE WITNESS:  The cloud storages did not

5    relate to the development of Bitcoin.  The development

6    of Bitcoin was not done by cloud storages.

7    BY MR. FREEDMAN:

8            Q.    What was the development of it being done

9    by?

10                   MS. MARKOE:  Objection.

11                   THE WITNESS:  Humans.

12   BY MR. FREEDMAN:

13           Q.    Was any of the information relating to

14   the development of Bitcoin stored on cloud computing

15   services?

16           A.    Yes.

17           Q.    Do you recall what those cloud computing

18   services were called?

19                   MS. MARKOE:  Objection.

20                   THE WITNESS:  No.

21   BY MR. FREEDMAN:

22           Q.    Do you still have access to those cloud

23   computing services?

24           A.    No.

25           Q.    Do you have copies of the data that were



Page 30

```
 1    on those cloud computing services?
 2              A.      The data that I have at my house has been
 3    analysed.  I do not recall what every bit of that data
 4    is.  The analysis of that data has either been taken or
 5    not.  I have not gone through what the lawyers have
 6    copied, so I cannot answer that question.
 7              Q.      So, sitting here today, you do not know
 8    whether the data that was on the cloud computing storage
 9    -- strike that.  Sitting here today, you do not know
10    whether the data that was on the cloud storage services
11    resides on the data that was imaged by your lawyers?
12                   MS. MARKOE:  Objection.
13                   THE WITNESS:  I do not know what my
14    lawyers imaged, so I cannot answer that question.
15                   May I have a glass of water, please?
16                   MS. MARKOE:  Yes.
17                   MR. RIVERO:  Sparkling or still?
18                   THE WITNESS:  Sparkling, thank you.
19    BY MR. FREEDMAN:
20              Q.      Dr. Wright, how did you identify for your
21    lawyers what devices to image?
22                   MS. MARKOE:  Can you repeat the question,
23    I am sorry?
24    BY MR. FREEDMAN:
25              Q.      How did you identify for your lawyers
```



1    what devices they should image for this litigation?

2                    MR. RIVERO:  Dr. Wright, you cannot go

3    into conversations with your lawyers, because that would

4    be privileged.  So I am instructing you on that, but

5    answer to the extent that you can without going into any

6    communications with counsel.

7                    THE WITNESS:  I was given a set of

8    instructions.  I told the people what matched the

9    instructions.

10   BY MR. FREEDMAN:

11             Q.    Are there devices at your home or office

12   here in the United Kingdom that have not been imaged?

13                   MS. MARKOE:  Objection.

14                   THE WITNESS:  Yes.

15   BY MR. FREEDMAN:

16             Q.    Can you list those devices for me?

17                   MS. MARKOE:  Objection.

18                   THE WITNESS:  No.

19   BY MR. FREEDMAN:

20             Q.    Why not?

21             A.    I do not know them.

22             Q.    Would you be able to provide a list of

23   those devices to your lawyers?

24                   MS. MARKOE:  Objection.

25                   THE WITNESS:  No.



```
 1   BY MR. FREEDMAN:

 2          Q.     Why not?

 3          A.     My wife has machines, they are not mine,

 4   they have nothing to do with Bitcoin or this case.

 5   I will not list her machines.  I will not ask her to

 6   list her machines.

 7          Q.     Do you have access to your wife's

 8   machines?

 9          A.     No.

10          MS. MARKOE:  Objection.

11   BY MR. FREEDMAN:

12          Q.     Did your wife use those machines for the

13   ----

14          A.     No.

15          Q.     Sorry?

16          A.     There are no machines at my house that

17   are that old.  There are no machines that have been

18   older than 2015, as you are trying to imply.  So, the

19   data that I had was copied to companies.  Those

20   companies in Australia have been imaged by the

21   Australian Tax Office for whatever they have done.  I do

22   not have them.

23          Q.     From 2006 until 2014, did you make any

24   trips to the United States?

25          A.     Yes.
```



Page 33

1               MS. MARKOE:  Objection.

2    BY MR. FREEDMAN:

3          Q.     How many trips did you make to the United

4    States?

5          A.     I do not know.

6          Q.     Did you travel to the United States in

7    2006?

8               MS. MARKOE:  Objection.  Again, we are

9    talking about ----

10               THE WITNESS:  I do not know.

11               MS. MARKOE:  ---- a list of topics.  This

12   is not related to your list of topics.  Stick to the

13   topics that you agreed to.  There were ten of them.

14   This is not one of them.

15               MR. FREEDMAN:  This relates to the

16   formation of the partnership with Dave Kleiman, so ----

17               MS. MARKOE:  How does it relate to the

18   formation of the partnership with Dave Kleiman when you

19   are asking about his trips to the United States from

20   2006-2014?

21               MR. FREEDMAN:  Because that is when we

22   allege the formation of the partnership eventually took

23   place.

24               MS. MARKOE:  Why do not you ask about the

25   formation of the partnership rather than random trips



Page 34

```
 1    that he might have taken to the United States.
 2                   MR. FREEDMAN:  Ms. Markoe, I do not have
 3    to ask the questions the way you would like me to ask
 4    the questions.  If you instruct the witness not to
 5    answer we will take it up with the court.  Otherwise
 6    please either object or instruct.
 7           Q.    In 2006, did you travel to the United
 8    States?
 9                   MS. MARKOE:  Objection.
10                   THE WITNESS:  I do not know.
11    BY MR. FREEDMAN:
12           Q.    In 2007, did you travel to the United
13    States?
14           A.    I do not know.
15                   MS. MARKOE:  Objection.
16    BY MR. FREEDMAN:
17           Q.    In 2008, did you travel to the United
18    States?
19                   MS. MARKOE:  Objection.
20                   THE WITNESS:  Yes.
21                   THE COURT REPORTER:  Slow down, please.
22    I cannot keep up.
23                   MR. FREEDMAN:  Sorry.
24           Q.    In 2008, you travelled to the United
25    States?
```



MAGNA
LEGAL SERVICES

Page 35

1              MS. MARKOE:  Objection.

2              THE WITNESS:  Yes.

3     BY MR. FREEDMAN:

4         Q.    Where in the United States did you

5     travel?

6              MS. MARKOE:  Objection.

7              THE WITNESS:  I do not remember.

8              MR. RIVERO:  Dr. Wright, the most

9     important person is actually the court reporter, who

10    makes the official record.  So you have to allow a beat

11    for objections, because our court reporter cannot take

12    you and the objection simultaneously, so I think it is

13    helpful if we all take a breath.  I speak very quickly,

14    so I have to take a breath.  It is very natural.

15    BY MR. FREEDMAN:

16        Q.    Do you recall the purpose of travel in

17    2008?

18              MS. MARKOE:  Objection.

19              THE WITNESS:  I went to various different

20    trips around the world.  I have been to over 100

21    countries.  I travel, even now, probably 30-50 countries

22    every year.  I do six countries a month, some months.  I

23    do not remember my trips.  I know I do presentations,

24    I met with government officials, I met with the FBI at

25    one point, I met with people in a number of three-letter



```
1    agencies.  If you are asking did I meet with Dave

2    Kleiman then, no.

3    BY MR. FREEDMAN:

4         Q.    You remember very specifically to have

5    taken a trip to the United States in 2008?

6              MS. MARKOE:  Objection.

7    BY MR. FREEDMAN:

8         Q.    How do you recall that you were

9    travelling to the United States in 2008?

10        A.    One of my trips was to meet people at

11   Microsoft.

12        Q.    Where did you meet people at Microsoft?

13             MS. MARKOE:  Objection.

14             THE WITNESS:  At Microsoft.

15   BY MR. FREEDMAN:

16        Q.    Where at Microsoft?  At Microsoft

17   headquarters?

18             MS. MARKOE:  Objection.

19             THE WITNESS:  At Microsoft headquarters.

20             MS. MARKOE:  I am going to instruct the

21   witness not to answer this.  It has absolutely nothing

22   to do with this case and it has nothing to do with topic

23   number 3 which you are purporting this line of

24   questioning is related to.  He has already answered your

25   question that he did not meet with Mr. Kleiman during
```



Page 37

```
 1   any of his trips to the United States in 2008,

 2   I believe, but the record will state what he said.

 3                MR. FREEDMAN:  Ms. Markoe, I am not going

 4   to argue with you about it but we were given some leeway

 5   to press Dr. Wright's initial representation of what he

 6   did and did not do.

 7                MS. MARKOE:  And he answered your

 8   question by telling you that he met with people at

 9   Microsoft.  That is enough pressing.

10   BY MR. FREEDMAN:

11        Q.     In 2009, did you travel to the United

12   States?

13        A.     Yes.

14        Q.     For what purpose?

15        A.     I do not remember all the conferences,

16   etcetera, that I went to in 2009.

17        Q.     Where in the United States did you travel

18   to?

19                MS. MARKOE:  Objection.

20                THE WITNESS:  I do not have my travel

21   records in front of me.  I cannot answer that.

22   BY MR. FREEDMAN:

23        Q.     Did you travel to Florida in 2009?

24        A.     Either then or 2010, I cannot remember

25   the exact dates.
```



Page 38

```
 1          Q.     Did you travel to Florida in 2008?

 2                 MS. MARKOE:  Objection.

 3                 THE WITNESS:  No.  I do not believe

 4    I did.

 5    BY MR. FREEDMAN:

 6          Q.     When you travelled to Florida in 2009 or

 7    2010, did you meet with Dave Kleiman?

 8          A.     Yes.

 9          Q.     What did you discuss with Dave Kleiman?

10          A.     We drank.

11          Q.     Where did you drink?

12          A.     A pub.

13          Q.     Where was the pub located?

14          A.     I do not know.

15          Q.     In what city was the pub located?

16          A.     It was somewhere that Dave drove to, with

17    another person called Paul Henry.

18          Q.     Did you discuss anything related to

19    Bitcoin?

20          A.     No.

21          Q.     Did you discuss anything related to

22    blockchain or timechain?

23          A.     No.

24                 MS. MARKOE:  Objection.

25    BY MR. FREEDMAN:
```



Page 39

1          Q.     How long did you meet with Dave Kleiman

2     for?

3                 MS. MARKOE:  Objection.

4                 THE WITNESS:  I do not remember.  We

5     drank a lot.

6     BY MR. FREEDMAN:

7          Q.     Was that the only time you saw

8     Dave Kleiman?

9          A.     No.

10          Q.     That was a bad question.  Strike that.

11     Was that the only time you saw Dave Kleiman on that

12     trip?

13          A.     Yes.

14          Q.     Did you travel to the United States in

15     2010?

16                 MS. MARKOE:  Objection.

17                 THE WITNESS:  As I said, 2009/10.

18     BY MR. FREEDMAN:

19          Q.     Sorry, yes, you are right.  Beyond the

20     2009/2010 trip to the United States where you met with

21     Dave Kleiman, was there another time that you travelled

22     to the United States and met with Dave Kleiman?

23          A.     No.

24          Q.     In 2011, did you travel to the United

25     States?



Page 40

1                    MS. MARKOE:  Objection.  You can answer.

2                    THE WITNESS:  Yes.

3       BY MR. FREEDMAN:

4            Q.    Did you meet with Dave Kleiman in 2011?

5                    MS. MARKOE:  Objection.

6                    THE WITNESS:  Briefly.

7       BY MR. FREEDMAN:

8            Q.    Where did you meet with Dave Kleiman?

9            A.    I need to obstruct -- this is one of

10      those matters.

11                   MS. MARKOE:  Okay.  This is a matter that

12      I am going to instruct him not to answer.  He will

13      discuss the basis for his refusing not to answer in

14      camera with the court.  It involves issues of national

15      security and he is not permitted to answer these

16      questions.  He can give a more fulsome explanation to

17      the court in camera and the court can make a ruling

18      based on that in camera discussion.

19                   Can I just consult with my client for one

20      second to see if I can get you some sort of an answer

21      that might be of assistance to you?

22                   MR. FREEDMAN:  Sure.

23                   MS. MARKOE:  Let us go off the record.

24                   MR. FREEDMAN:  You want to take a break?

25                   THE VIDEOGRAPHER:  Going off the record.



Page 41

The time is 11.12.

              (A Short Break)

              THE VIDEOGRAPHER:  Going back on the record.  The time is 11.23.  Thank you.

BY MR. FREEDMAN:

      Q.    Dr. Wright ----

              THE VIDEOGRAPHER:  Sorry, sir ----

              MR. FREEDMAN:  Oh, my mic!

              MS. MARKOE:  Why do we not read back that last question before the objection and we can take it from there.

              MR. FREEDMAN:  Actually, before we go there, I just want to double back on something I left out initially, which is earlier you told me that you instructed employees how to store things on cloud storage devices; do you recall that?

              MS. MARKOE:  Objection.

              THE WITNESS:  No, that is not what I said.

BY MR. FREEDMAN:

      Q.    What did you say?

      A.    I said I instruct employees to do things and things happened.

      Q.    Who were those employees?

      A.    I do not remember the names of all my



Page 42

1      employees.

2              Q.      Do you remember the names of the

3      employees that dealt with cloud storage devices?

4              A.      No.

5              Q.      Cloud storage services?

6              A.      No.

7              Q.      Cloud computing services?

8              A.      No.

9              Q.      In 2011 you met with Dave Kleiman?

10             MR. RIVERO:  Objection.

11             Paula, would you please go back.  As we

12     requested, there was a pending question at which point

13     there was a request to take a break.  We asked that the

14     last question be read back.  I will read back but

15     I would ask the court reporter to confirm.  The next to

16     last question:  "Did you meet with Dave Kleiman in

17     2011?"  The witness:  "Briefly".  Next question:  "Where

18     did you meet with Dave Kleiman?"  That is where that

19     took up.  We would like to go back so it is clear on the

20     record what he is and is not answering.  So if you can

21     read it.  We want to do this formally.  That is where we

22     were.

23             MR. FREEDMAN:  Mr. Rivero, this is my

24     deposition.  I strike the question.  We will go back

25     now.



Page 43

1              MR. RIVERO:  No, Mr. Freedman ----

2              MR. FREEDMAN:  Mr. Rivero, this is my

3    deposition.  I ask the questions I would like to ask.

4              MR. RIVERO:  Mr. Freedman, you need to

5    hear me on this.  There was a pending question.  We

6    asked for and took time to address it.  We want to

7    respond so it is clear to the court what our position is

8    on your pending question.  Please, let us go back and do

9    it right.

10             MR. FREEDMAN:  I do strike the question

11   and you can take up my striking the question with the

12   court, Mr. Rivero.

13             MR. RIVERO:  We are not going to ----

14             MR. FREEDMAN:  Mr. Rivero, I am not going

15   to continue arguing.

16             MR. RIVERO:  Mr. Freedman, there was a

17   pending question.  We asked for permission to break to

18   address the pending question.  If you are withdrawing

19   the line of questioning, I am perfectly happy to go on,

20   but I am not going to have an unclear record.  He is

21   prepared to answer the last question.

22             MR. FREEDMAN:  In the interests of time,

23   let us go back.  Can you please read back the question.

24      (The court reporter read back as requested)

25             THE WITNESS:  I had a video conference



Page 44

1   while in New York that involved Mr. Kleiman.

2   BY MR. FREEDMAN:

3         Q.      Where was Mr. Kleiman when you video

4   conferenced him?

5         A.      Exactly where I do not know.

6         Q.      How long did the video conference last?

7         A.      Probably 30-45 minutes.

8         Q.      Did the video conference have anything to

9   do with Bitcoin?

10              MS. MARKOE:  Objection.

11              THE WITNESS:  The video conference was

12   not about Bitcoin.

13   BY MR. FREEDMAN:

14         Q.      Did the video conference have anything to

15   do with blockchain or timechain technology?

16              MS. MARKOE:  Objection.

17              THE WITNESS:  The video conference was

18   not about those topics.

19   BY MR. FREEDMAN:

20         Q.      Was there anyone else on the conference?

21         A.      Yes.

22         Q.      Who else was on the conference?

23         A.      I cannot answer that.  That is part of

24   what we need to ----

25         Q.      Okay.



Page 45

```
 1          A.      That individual has nothing to do with
 2     Bitcoin in any way.
 3          Q.      Can you tell me the subject matter of the
 4     discussion?
 5          A.      No.
 6               MS. MARKOE:  That is the in camera part.
 7     BY MR. FREEDMAN:
 8          Q.      Was there any other time in 2011 that you
 9     met with Dave Kleiman?
10          A.      No.
11          Q.      In 2012, did you meet with Dave
12     Kleiman -- strike that.  In 2011, was there any other
13     time when you travelled to the United States?
14               MS. MARKOE:  Objection.
15               THE WITNESS:  I do not know.  I travel a
16     lot.  I cannot remember exactly where I travel when.
17     I have been to the US many times.  I do not know when
18     I have and have not been at particular times.
19     BY MR. FREEDMAN:
20          Q.      In 2012, did you travel to the United
21     States?
22               MS. MARKOE:  Objection.
23               THE WITNESS:  Again, I travelled a lot.
24     I do not remember.
25     BY MR. FREEDMAN:
```



Page 46

```
 1          Q.     Did you travel to Florida in 2012?

 2          A.     No.

 3          Q.     Did you travel a lot between ----

 4          A.     I travelled a lot.

 5          Q.     ---- 2006 and 2013?

 6                 MS. MARKOE:  Objection.

 7                 THE WITNESS:  I have travelled a lot all

 8    my life.

 9    BY MR. FREEDMAN:

10          Q.     In 2013, did you travel to the United

11    States?

12                 MS. MARKOE:  Objection.

13                 THE WITNESS:  I believe so.  I did not

14    travel to Florida, however.

15    BY MR. FREEDMAN:

16          Q.     Why did you travel to the United States

17    in 2013?

18                 MS. MARKOE:  Objection.

19                 THE WITNESS:  I travel a lot.

20    I presented conferences.  I meet government officials.

21    I do all sorts of things.

22    BY MR. FREEDMAN:

23          Q.     Did you meet with Dave Kleiman in 2013?

24          A.     Physically, no.

25          Q.     Did you meet with Dave Kleiman via video
```



1    conference in 2013?

2          A.    Yes.

3          Q.    How many times in 2013 did you meet with

4    Dave Kleiman via video conference?

5          A.    More than I can remember.

6          Q.    Approximately how frequently would you

7    meet with Dave Kleiman via video conference in 2013?

8          A.    There was only a small amount of time

9    before he died.

10          Q.    How many times a week approximately would

11    you meet with Dave Kleiman via video conference in 2013?

12                MS. MARKOE:  Objection.

13                THE WITNESS:  Not many.  Dave died.  He

14    was sick.

15    BY MR. FREEDMAN:

16          Q.    Dave died in April of 2013?

17          A.    Yes.

18          Q.    So, between January of 2013 and April of

19    2013, approximately how many times did you meet with

20    Dave Kleiman via video conference?

21          A.    Not many.

22                MS. MARKOE:  Objection.

23    BY MR. FREEDMAN:

24          Q.    Ten times?

25                MS. MARKOE:  Objection.



Page 48

1               THE WITNESS:  Less.

2   BY MR. FREEDMAN:

3         Q.    Five times?

4         A.    I do not remember.

5         Q.    Some amount of times between five and ten

6   to the best of your recollection?

7               MS. MARKOE:  Objection.

8               THE WITNESS:  Somewhere around less than

9   ten.

10  BY MR. FREEDMAN:

11        Q.    Okay.  In 2012, did you meet via video

12  conference with Dave Kleiman?

13        A.    Yes.

14        Q.    Approximately how often would you meet

15  via video conference with Dave Kleiman in 2012?

16              MS. MARKOE:  Objection.

17              THE WITNESS: Dave was my best friend.  We

18  talked a lot.

19  BY MR. FREEDMAN:

20        Q.    So, once a week?

21              MS. MARKOE:  Objection.

22              THE WITNESS:  I do not recollect.  I do

23  not try to think about these things.  I work.  I work

24  100 hour weeks.  At the moment my work is 108 hours.

25  I work less now than I used to.  I call people, I do



Page 49

1    things, I produce.  I do not sit there recording and

2    remembering what I did.  I do not remember how many

3    times I have called my mother.  I do not remember how

4    many times I have talked to my wife.  I do not remember

5    any of these things.

6    BY MR. FREEDMAN:

7         Q.    In 2011, besides from the video

8    conference we have just discussed that you want to talk

9    to the court about in camera, how many times did you

10   meet via video with Dave Kleiman?

11        A.    I do not know.

12             MS. MARKOE:  Objection.

13   BY MR. FREEDMAN:

14        Q.    Is it safe to say a lot?

15             MS. MARKOE:  Objection.

16             THE WITNESS:  Define "a lot".

17   BY MR. FREEDMAN:

18        Q.    You said you met with him a lot in 2013.

19   Was the frequency of meeting with Dave Kleiman via video

20   conference in 2012 the same as it was in 2013?

21             MS. MARKOE:  Objection.  The record will

22   speak for itself.

23             MR. FREEDMAN:  Let me strike that and

24   start again.

25        Q.    Approximately how many times did you meet



Page 50

1    with Dave Kleiman via video conference in 2011?

2                    MS. MARKOE:  Objection.

3                    THE WITNESS:  I do not know.

4    BY MR. FREEDMAN:

5          Q.    More than ten times?

6                    MS. MARKOE:  Objection.

7                    THE WITNESS:  I believe so.

8    BY MR. FREEDMAN:

9          Q.    More than 20 times?

10         A.    I do not know.

11         Q.    Is it safe to say it was somewhere

12   between ten to 20 times?

13                   MS. MARKOE:  Objection.

14                   THE WITNESS:  I do not know.

15   BY MR. FREEDMAN:

16         Q.    Could it have been more than 20 times?

17                   BY MS. MARKOE:  Objection: calls for

18   speculation.

19                   MR. FREEDMAN:  Please, Ms. Markoe, limit

20   your objections to form.

21                   MR. RIVERO:  Proceed.

22                   THE WITNESS:  Could this be the Cartesian

23   abstraction, a projection, yes, that is a possibility.

24   The possibility of my putting my hand through the wall

25   exists.  Is that a probability: no.  Please ask me



Page 51

1    something that is not fluffy.

2    BY MR. FREEDMAN:

3           Q.      Was it probable that you spoke with Dave

4    Kleiman more than 20 times in 2011?

5                  MS. MARKOE:  Objection.

6                  THE WITNESS:  I do not know.  It was

7    definitely more than 10 times.

8    BY MR. FREEDMAN:

9           Q.      In 2010, how many times did you meet with

10   Dave Kleiman via video conference?

11                 MS. MARKOE:  Objection.

12                 THE WITNESS:  Again, even less

13   recollection.  I do not know.

14   BY MR. FREEDMAN:

15          Q.      More than 10 times?

16                 MS. MARKOE:  Objection.

17                 THE WITNESS:  I do not know.

18   BY MR. FREEDMAN:

19          Q.      Do you have any recollection at all of

20   the frequency in which you talked to Dave Kleiman via

21   video conference in 2010?

22          A.      I could not even answer the recollection

23   of what I have talked to my wife in the last six months,

24   so, no.  What I do recollect is I wrote 64 papers that

25   will go to patent last month.



Page 52

```
 1            Q.    Doctor ----

 2            A.    I wrote 18 papers that have been

 3     published last month.  That I recollect.  I recollect my

 4     work.

 5            Q.    If you could try to answer the question

 6     that is posed, that would help us move quicker.  Did you

 7     speak with Dave Kleiman via video conference in 2010

 8     routinely?

 9                  MS. MARKOE:  Objection.

10                  THE WITNESS:  Define the word "routine".

11     BY MR. FREEDMAN:

12            Q.    As you understand the word "routine"?

13                  MS. MARKOE:  Objection.

14                  THE WITNESS:  I have a full 21 volume

15     copy of the Oxford greater dictionary.  "Routine" is

16     actually about 1.5 pages worth of definitions going back

17     to the 16th century.  Which particular use of "routine"

18     would you like me to have?  As in per route, as in as a

19     directed, something that is not a common used word, or

20     what?

21     BY MR. FREEDMAN:

22            Q.    Let us just jump to 2009.  Do you recall

23     how many times you spoke with Dave Kleiman via video

24     conference in 2009?

25                  MS. MARKOE:  Objection.
```



1           THE WITNESS:  As with everyone else, I do

2    not recall exact details.  I do not even remember how

3    many times I have spoken to my mother in the last six

4    months.

5    BY MR. FREEDMAN:

6           Q.    You did not create Bitcoin with your with

7    mother, did you?

8           MS. MARKOE:  Objection.  Move to strike.

9    BY MR. FREEDMAN:

10          Q.    In 2008, do you recall how many times you

11   met with Dave Kleiman via video conference?

12          MS. MARKOE:  Objection.

13          THE WITNESS:  The same answer applies

14   with even less recollection.  I think about my work.

15   People do not always like it, but I do not think about

16   people.

17   BY MR. FREEDMAN:

18          Q.    In 2008, do you recall how many times you

19   had video conferences with Dave Kleiman?

20          MS. MARKOE:  Objection.

21          THE WITNESS:  Again, I do not recollect

22   exactly how many times.

23   BY MR. FREEDMAN:

24          Q.    When did you first meet Dave Kleiman?

25          A.    Exactly when, I do not remember.  Define



1    "meet".

2            Q.      What year?

3            A.      Physically meet, meet online, meet by

4    e-mail, meet by video conference, meet by phone.

5            Q.      When were you first introduced to Dave

6    Kleiman in any capacity, in what year?

7            A.      I was never introduced to Dave Kleiman.

8            Q.      How did you come to meet Dave Kleiman in

9    any capacity?

10           A.      We started talking on mailing lists, IRC

11   chats and other such things.

12           Q.      When did you begin that conversation?

13                   MS. MARKOE:  Objection.

14                   THE WITNESS:  I do not remember exactly.

15   It has been 15 years.

16   BY MR. FREEDMAN:

17           Q.      Do you remember the year?

18           A.      No.

19           Q.      How did you communicate during that time?

20                   MS. MARKOE:  Objection: vague.

21                   THE WITNESS:  In English.

22   BY MR. FREEDMAN:

23           Q.      From 2006, were you in regular contact

24   with Dave Kleiman?

25                   MS. MARKOE:  Objection.



Page 55

```
 1                    THE WITNESS:  Define "regular".
 2   BY MR. FREEDMAN:
 3            Q.     Once a week?
 4            A.     No.
 5            Q.     Twice a week -- once a month?
 6            A.     Most likely, yes.
 7            Q.     How were you in contact with him
 8   approximately once a month in 2006?
 9            A.     We spoke over IRC, we spoke over video
10   chats, we spoke over chats.
11            Q.     You said "chats".  Can you drill down on
12   that for me; what do you mean by chats?
13            A.     Digital chat media.  IRC is an example of
14   an early chat format.  It has rooms, some of those are
15   public, some of those are private.  Would you like me to
16   detail the format of the protocol any more?
17            Q.     No, but would I like you to drill down a
18   little more on the type of chats besides IRC that you
19   used to discuss with Dave Kleiman?
20                    MS. MARKOE:  Objection.
21                    THE WITNESS:  I do not remember.  These
22   things have changed.
23   BY MR. FREEDMAN:
24            Q.     Do you have access to any of these IRC
25   chats?
```



```
1           A.      No, that is the nature of IRC.

2           Q.      Do you have access to any of these video

3   chats?

4           A.      No, that is nature of video chats.

5           Q.      Do you have access to any of the other

6   chat forms that you used to discuss with Dave Kleiman in

7   2006?

8           A.      No, we made sure we talked on things that

9   were chats.

10          Q.      Meaning there was no record?

11          A.      Meaning that there was no record.

12          Q.      In 2007, did the frequency with which you

13  spoke to Dave Kleiman increase?

14          A.      No.

15          MS. MARKOE:  Objection.

16  BY MR. FREEDMAN:

17          Q.      Did it stay the same?

18          A.      I do not have a record of how many times

19  I spoke to him.  As a statistician, I would have to

20  analyse that as a hypothesis taking one versus the

21  other, but I do not have the data.

22          Q.      Did you speak to Dave Kleiman

23  approximately once a month in 2007?

24          A.      I have no idea how many times I spoke to

25  anyone at any of those times.  Very simply, I am not
```



Page 57

1    able to answer that.

2             Q.    You have no recollection of the frequency

3    with which you spoke to Dave Kleiman in 2007; is that

4    correct?

5                   MS. MARKOE:  Objection.

6                   THE WITNESS:  I remember talking to

7    people.  I do not remember each of the talks.

8    BY MR. FREEDMAN:

9             Q.    But I am asking you to give me your best

10   recollection of the frequency with which you spoke to

11   Dave Kleiman in 2007?

12                  MS. MARKOE:  Objection.

13                  THE WITNESS:  I do not have a best

14   recollection.  I do not think about people that way.

15   I think about numbers.  I think about algorithms.

16   I remember those.

17   BY MR. FREEDMAN:

18            Q.    How often did you speak to Dave Kleiman

19   in 2008?

20                  MS. MARKOE:  Objection.

21                  THE WITNESS:  I do not remember.  The

22   same thing applies.  The same thing will apply to 2009.

23   BY MR. FREEDMAN:

24            Q.    How often did you speak to Dave Kleiman

25   in 2010?



Page 58

```
 1                    MS. MARKOE:  Objection.

 2                    THE WITNESS:  I do not know.

 3   BY MR. FREEDMAN:

 4          Q.    How often did you speak to Dave Kleiman

 5    in 2011?

 6          A.    I do not know.

 7          Q.    How often did you speak to Dave Kleiman

 8    in 2012?

 9          A.    I do not know.

10          Q.    How often did you speak to Dave Kleiman

11    in 2013?

12          A.    Not terribly much.

13          Q.    When I say "speak to Dave Kleiman",

14    I also mean telephonically.  Does that change any of

15    your answers?

16          A.    No, I do not use telephone much at all.

17          Q.    Did there come a time when you began

18    e-mailing Dave Kleiman?

19                    MS. MARKOE:  Objection.

20                    THE WITNESS:  Yes.

21   BY MR. FREEDMAN:

22          Q.    When did you begin e-mailing Dave

23    Kleiman?

24          A.    I do not remember.

25          Q.    Did you e-mail Dave Kleiman in 2006?
```



MAGNA

LEGAL SERVICES

Page 59

```
 1              A.     I would have to say most likely, yes.

 2              Q.     Did you e-mail Dave Kleiman in 2007?

 3              A.     Definitely yes.

 4              Q.     What about?

 5              A.     I do not remember all the topics that

 6      I spoke to Dave in 2007.  I did discuss a cookie recipe.

 7              Q.     Why did you say "definitely yes" in 2007?

 8              A.     Because there was a cookie recipe

 9      discussed in 2007 that was published.

10              Q.     Whose cookie recipe was it?

11              A.     Mine.

12              Q.     Why did you discuss a cookie recipe with

13      Dave Kleiman?

14                     MS. MARKOE:  Objection.

15                     THE WITNESS:  He was asking about

16      cookies.

17      BY MR. FREEDMAN:

18              Q.     Did you e-mail Dave Kleiman in 2008?

19              A.     Yes.

20              Q.     Do you know how frequently you e-mailed

21      him in 2008?

22              A.     No.

23              Q.     Do you know what you spoke about with

24      Dave Kleiman in 2008?

25                     MS. MARKOE:  Objection.
```



Page 60

1                    THE WITNESS:  I do not know the range of

2    topics I spoke to Dave in 2008, no.

3    BY MR. FREEDMAN:

4          Q.    Did you speak to Dave Kleiman -- did you

5    e-mail Dave Kleiman in 2009?

6          A.    Yes.

7          Q.    From 2006 until 2009, what e-mails did

8    you use to communicate with Dave Kleiman?

9          A.    I do not remember.

10         Q.    Do you remember the e-mails you used to

11   communicate with Dave Kleiman?

12         A.    No.

13         Q.    Do you remember the e-mails Dave Kleiman

14   used?

15         A.    No, I have used multiple e-mail

16   addresses, I do not try and remember them.

17         Q.    In 2010, did you e-mail Dave Kleiman?

18         A.    Yes.

19         Q.    In 2011, did you e-mail Dave Kleiman?

20         A.    Yes.

21         Q.    Do you remember the frequency of e-mails

22   that you -- strike that.  Do you remember how frequently

23   you e-mailed Dave Kleiman in 2010?

24         A.    No.

25         Q.    Do you remember the frequency with which



Page 61

1    you e-mailed Dave Kleiman in 2011?

2         A.    No.

3         Q.    Do you remember what you spoke to Dave

4    Kleiman in 2010 and 2011 about?

5         A.    Again, I spoke with a number of topics.

6    I do not try and recollect all the things that are

7    spoken about.

8         Q.    What can you recollect?

9              MS. MARKOE:  Objection.

10             THE WITNESS:  We spoke about his problems

11   and going into hospital quite a number of times.

12   BY MR. FREEDMAN:

13        Q.    In 2012 -- did you e-mail Dave Kleiman in

14   2012?

15        A.    Yes.

16        Q.    Did you e-mail Dave Kleiman in 2013?

17        A.    I do not remember.

18        Q.    Do you remember the frequency with which

19   you e-mailed Dave Kleiman in 2012?

20        A.    No.

21        Q.    Do you remember the topics you e-mailed

22   Dave Kleiman about in 2012?

23        A.    No.

24        Q.    None of them?

25        A.    I know there were a couple of things



Page 62

```
 1    about companies that I wanted to set up but none of them
 2    is not do I remember them all, no.
 3              Q.    Which companies do you recall speaking
 4    about in 2012 with Dave Kleiman?
 5              A.    I spoke to him about a company called
 6    Design by Human that he was supposed to set up for me,
 7    which he did not end up paying for.
 8              Q.    What do you mean "paying for"?
 9              A.    To set up a company you need to pay for
10    it.  The exchange of goods and services generally
11    requires the exchange of money.  The exchange of money
12    is generally considered paying for something.
13              Q.    Do you mean a registration?
14              A.    Yes.
15              Q.    Did you e-mail Dave Kleiman about
16    timechain, blockchain or Bitcoin in 2006?
17              A.    Yes.
18              Q.    How did you communicate with Dave --
19    strike that.  What method did you use to communicate
20    with Dave Kleiman in 2006 about blockchain ----
21              A.    Sorry, 2006, no, I did not.  I was
22    thinking about the last year, sorry, about that,
23    I thought it was 2012.  In 2006, no, I did not talk
24    about blockchain or timechain or anything like that with
25    Dave.
```



Page 63

1          Q.     In 2007, did you speak with Dave Kleiman?

2     And when I say "speak", I want you to include any form

3     of communication; do we understand each other?

4          A.     Yes.

5          Q.     In 2007, did you speak with Dave Kleiman

6     about blockchain, timechain or Bitcoin?

7          A.     I do not remember the first time that

8     I actually mentioned it to Dave.

9          Q.     It could have been in 2007?

10          A.     It was either 2007 or 2008.  There's an

11     e-mail that I believe people have a copy of.  I do not

12     remember the date of the e-mail.

13          Q.     What does the e-mail say?

14               MS. MARKOE:  Objection.

15               THE WITNESS:  I do not remember what the

16     e-mail says.  I think it speaks for itself.

17     BY MR. FREEDMAN:

18          Q.     What was the purpose of e-mailing Dave

19     Kleiman?

20               MS. MARKOE:  Objection.

21               THE WITNESS:  I wanted Dave to give me

22     some help with editing a paper.

23     BY MR. FREEDMAN:

24          Q.     Which paper?

25          A.     In this particular e-mail that I believe



Page 64

1    you are saying, the Bitcoin white paper.

2         Q.    The date of that e-mail -- does it help

3    you recollect if I tell you that that e-mail is in March

4    of 2008?

5         A.    Yes, I will believe that that is the

6    date, then, and the date about that was March 2008 if

7    that is what it says.

8         Q.    Was that e-mail the very first time you

9    spoke to Dave Kleiman about Bitcoin, blockchain or

10   timechain technology?

11              MS. MARKOE:  Objection.

12              THE WITNESS:  I had not been talking to

13   Dave before that point, so those topics were not

14   something I discussed with Dave before that e-mail.

15   BY MR. FREEDMAN:

16        Q.    So that was the very first time you spoke

17   to Dave Kleiman about Bitcoin, blockchain or timechain

18   technology?

19        A.    I do not recollect whether I talked about

20   BlackNet at any point before that, I do not know.

21        Q.    What is BlackNet?

22        A.    BlackNet is a research project I started

23   in 1998.

24        Q.    What about?

25        A.    Digital electronic cash.



Page 65

```
 1              Q.      I am looking at an e-mail from you to

 2    Dave Kleiman dated 12th March 2008.  The subject is

 3    "Forward deformation and the difficulties of law on the

 4    internet".  It states:  "I need your help editing a

 5    paper I am going to release later this year.  I have

 6    been working on a new form of electronic money, BitCash,

 7    Bitcoin ..."  And the e-mail goes on.  Is that the

 8    e-mail you are referring to?

 9                  MS. MARKOE:  Objection.  If you want to

10    show him a document, you can show him a document.

11                  MR. FREEDMAN:  Zaharah, please limit your

12    objection to form.

13                  MS. MARKOE:  If you want to show him a

14    document, show him a document.

15                  BY MR. FREEDMAN:  Zaharah, this is my

16    deposition.

17                  MS. MARKOE:  If you want to have him

18    presume ----

19                  THE WITNESS:  Can I see the document.

20                  MS. MARKOE:  ---- that what you are

21    reading on a screen is accurate and correct, then he can

22    make that presumption if you ask him to, but if you are

23    going to be referencing a document you have to show the

24    witness the document.

25                  MR. FREEDMAN:  Thank you, Zaharah.
```



Page 66

```
 1          Q.     Is that the e-mail that we are referring
 2    to?
 3          A.     Can I see the e-mail?
 4          Q.     Not at this time.
 5                 MS. MARKOE:  Objection.  I am going to
 6    instruct him not to answer the question.
 7                 MR. FREEDMAN:  Then instruct him and just
 8    instruct him.  Zaharah, either object to form or
 9    instruct him not to answer.  There is no need for
10    dialogue between us.  We can take it up with the court
11    once you instruct him not to answer.
12                 MS. MARKOE:  He can answer if you give
13    him the document.  He has asked for the document and you
14    are refusing to give it to him.
15                 MR. FREEDMAN:  Zaharah, just instruct him
16    not to answer or object.
17          Q.     Does the e-mail I quoted to you refresh
18    your recollection of the date of the e-mail?
19          A.     Will you show me the e-mail?
20          Q.     Not at this time.
21          A.     Then I cannot answer that question.
22          Q.     So it does not refresh your recollection?
23                 MS. MARKOE:  Objection.  You cannot have
24    a recollection refreshed without showing a document.
25    That is basic evidence.
```



Page 67

```
 1                    MR. FREEDMAN:  Zaharah, limit your

 2     objection to form.

 3                    THE WITNESS:  If you wish to show me the

 4     document, I will comment on the document.

 5     BY MR. FREEDMAN:

 6          Q.     In 2009, did you communicate with Dave

 7     Kleiman about Bitcoin, blockchain or timechain

 8     technology?

 9          A.     Yes.

10          Q.     Do you recall the method of

11     communication?

12          A.     Are we talking e-mail or chats?

13          Q.     However you communicated with him about

14     Bitcoin, blockchain or timechain, please tell me all

15     methods.

16          A.     I do not remember all methods.  We used

17     IRC.  We used e-mail.  We used other -- I cannot even

18     remember the chats at the time.  It could have been

19     Facebook.  I do not have that Facebook account any more.

20          Q.     What was the account with Facebook?

21                    MS. MARKOE:  Objection.

22                    THE WITNESS:  I do not remember.  It is

23     been gone four or five years now.

24     BY MR. FREEDMAN:

25          Q.     Do you remember the name?
```



Page 68

1          A.     Yes, Dr. Craig Wright.

2          Q.     What e-mails did you use to communicate

3    with Dave Kleiman?

4               MS. MARKOE:  Objection.

5               THE WITNESS:  I do not remember.

6    BY MR. FREEDMAN:

7          Q.     Not even one.

8          A.     No, I had many e-mails.  I do not

9    remember which ones I actually used to communicate with

10   Dave.

11         Q.     Do you remember what e-mails Dave used to

12   receive these communications?

13              MS. MARKOE:  Objection.

14              THE WITNESS:  No, I do not.

15   BY MR. FREEDMAN:

16         Q.     Not even one?

17              MS. MARKOE:  Objection.

18              THE WITNESS:  I do not type in things in

19   my e-mail and bring up the whole name, I have contacts.

20   BY MR. FREEDMAN:

21         Q.     So you do not remember any e-mails?

22              MS. MARKOE:  Objection.

23              THE WITNESS:  I do not remember phone

24   numbers.  I do not remember e-mails.  I save those in

25   context.



MAGNA
LEGAL SERVICES

Page 69

1  BY MR. FREEDMAN:

2        Q.    You do not remember any of Dave Kleiman's

3  e-mails that you communicated with to him about Bitcoin,

4  blockchain or timechain technology ----

5        A.    I even cannot tell you ----

6        Q.    Dr. Wright, if you could let me finish so

7  we have a clean record, I am sorry.  Do you recall any

8  of the e-mails Dave Kleiman used to receive

9  communications about Bitcoin, blockchain or timechain

10  technology from you in 2009?

11              MS. MARKOE:  Objection: asked and

12  answered.

13              MR. FREEDMAN:  Please limit your

14  objection to form.

15              MS. MARKOE:  I am allowed to preserve my

16  objection for the record.

17              MR. FREEDMAN:  By form, Zaharah.

18              MS. MARKOE:  And I am describing what the

19  form of the objection is.

20              MR. FREEDMAN:  No, that is not permitted

21  by the local rules.

22              MS. MARKOE:  Show me the local rule you

23  are referring to, then.

24              MR. RIVERO:  Please show us the local

25  rule.



Page 70

1              MR. FREEDMAN:  Okay.  We will show it to

2      you at the break.

3              MR. RIVERO:  There is no such local rule.

4              MR. FREEDMAN:  There certainly is.  Even

5      the Federal Civil Procedure require you to limit your

6      objection.

7              MR. RIVERO:  Show us ----

8              MR. FREEDMAN:  No, we will do this off

9      the record because I am not going to waste my time with

10     it.

11             MR. RIVERO:  I am not wasting my time

12     with foolishness.  Please show us the rule.  If you say

13     this again show us the rule.

14     BY MR. FREEDMAN:

15         Q.    Did we get an answer to that question?

16     (Pause) Do you recall any of the e-mails Dave Kleiman

17     used to receive communications about Bitcoin, blockchain

18     or timechain technology from you in 2009?

19             MS. MARKOE:  Objection: asked and

20     answered.

21             MR. FREEDMAN:  You can answer.

22             THE WITNESS:  I do not remember my

23     mother's e-mail address.  I do not remember my son's

24     e-mail address.  I do not remember either of their phone

25     numbers.  I do not remember friends over here's e-mail



Page 71

1    addresses today.  If I was asked to swear or lose

2    everything I have, I could not even give you my sister's

3    e-mail address right now.

4         Q.    Dr. Wright, if you could answer the

5    question posed it would help us move forward.

6         A.    I believe I did.

7         Q.    No, actually, I do not have an answer.

8         A.    That is my total recollection ever on

9    e-mails.

10         Q.    You do not recall any of the e-mails Dave

11    Kleiman used to receive communications from you about

12    Bitcoin, blockchain or timechain technology in 2009?

13              MS. MARKOE:  Objection: asked and

14    answered.

15              THE WITNESS:  I have answered that.

16    BY MR. FREEDMAN:

17         Q.    Do you recall any of the e-mails Dave

18    Kleiman used to receive communications about Bitcoin,

19    blockchain or timechain technology from 2010 through

20    2013?

21              MS. MARKOE:  Objection.

22              THE WITNESS:  I cannot answer what Dave

23    received anything on.  Dave is an independent person.

24    He was never my partner.  I have never had any

25    relationship that way with him.  He was just a friend.



MAGNA
LEGAL SERVICES

Page 72

1    I have never formed a partnership.  I will never form a

2    partnership.  I hate the whole concept of partnership.

3    I will never be a partner.  I will never have a partner.

4    The only partner I have is my wife.  That is the form of

5    partnership I am in.  I have never been in a

6    partnership.  I do not want to know what other people

7    do.  I do not care what other people do.  I do not ask

8    what other people do.  I do not ever go into any details

9    of what other people do.

10   BY MR. FREEDMAN:

11        Q.     Did you communicate with Dave Kleiman on

12   Bitmessage?

13        A.     Yes.

14        Q.     What was your Bitmessage user name?

15        A.     There is not a Bitmessage user name.

16        Q.     What is there?

17        A.     Addresses.

18        Q.     What is your Bitmessage address?

19        A.     I cannot, from the top of my head, tell

20   you a many, many character long address.  That is not

21   how the thing works.

22        Q.     Do you recall Dave Kleiman's address on

23   Bitmessage?

24        A.     Again, no.  If I cannot recall an e-mail,

25   I definitely cannot recall a 30-something character



MAGNA ▶
LEGAL SERVICES

Page 73

1    address.

2           Q.    Could you look the addresses up and

3    inform your counsel of them after this deposition?

4                 MS. MARKOE:  Objection.

5                 THE WITNESS:  No, I could not.

6    BY MR. FREEDMAN:

7           Q.    Why not?

8           A.    I do not have Bitmessage any more.

9           Q.    When did you lose Bitmessage?

10                MS. MARKOE:  Objection.

11                THE WITNESS:  I did not lose Bitmessage.

12   BY MR. FREEDMAN:

13          Q.    Why do not you have Bitmessage any more?

14                MS. MARKOE:  Objection.

15                THE WITNESS:  I stopped using it in 2015.

16   BY MR. FREEDMAN:

17          Q.    Why did you stop using it in 2015?

18                MS. MARKOE:  Objection.

19                THE WITNESS:  Because I decided to stop

20   using it.

21   BY MR. FREEDMAN:

22          Q.    What did you do with all of the

23   Bitmessage communications that were in Bitmessage?

24                MS. MARKOE:  Objection.

25                THE WITNESS:  I do not keep all those



Page 74

1    communications.

2    BY MR. FREEDMAN:

3           Q.     What do you do with them?

4           A.     I do not do anything with them.

5           Q.     So?

6           A.     So they do not exist.

7           Q.     In 2015, did any Bitmessages exist?

8           A.     Yes.

9                  MS. MARKOE:  Objection.

10   BY MR. FREEDMAN:

11          Q.     What happened to them?

12          A.     I do not know.

13          Q.     Did you delete them?

14                 MS. MARKOE:  Objection.

15                 THE WITNESS:  I wiped hard drives.

16   BY MR. FREEDMAN:

17          Q.     When, in 2015, did you wipe hard drives?

18          A.     I wiped hard drives all the time.

19   I worked as a digital forensic expert for a part of my

20   time.  I donated my time to working on child

21   exploitation cases, etcetera.  I did many of those.

22   Every time I did something like that, I wiped my hard

23   drive.

24          Q.     Have you wiped any hard drives since the

25   beginning of this litigation?



1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  No.

3    BY MR. FREEDMAN:

4         Q.    So, in 2015, you wiped a hard drive and

5    destroyed all electronic records of Bitmessage?

6                    MS. MARKOE:  Objection.

7                    THE WITNESS:  I do not know whether all

8    electronic messages have been destroyed.

9    BY MR. FREEDMAN:

10        Q.    Where would they be if they still resided

11   on a computer?

12        A.    I do not know.  Dave could have a copy.

13   That would be given on his drive.

14        Q.    Let us limit your responses to your

15   drives for now.  In 2015, you wiped all electronic

16   Bitmessages from all of your electronic media?

17                   MS. MARKOE:  Objection:  mischaracterises

18   testimony.

19                   MR. FREEDMAN:  Go ahead.  You can answer.

20                   THE WITNESS:  My media, yes.  My media

21   has been wiped.  I wipe my media.

22   BY MR. FREEDMAN:

23        Q.    When did you begin discussing Bitcoin --

24   strike that.  Did you discuss Bitcoin, blockchain or

25   timechain technology with Dave Kleiman on Bitmessage?



Page 76

1          A.      Yes.

2          Q.      When did those discussions begin on

3     Bitmessage?

4          A.      I do not know.

5          Q.      In 2009?

6          A.      Bitmessage did not exist in 2009.

7          Q.      When did Bitmessage begin to exist?

8                  MS. MARKOE:  Objection.

9                  THE WITNESS:  I cannot remember.

10    BY MR. FREEDMAN:

11         Q.      In 2010?

12         A.      I do not remember when Bitmessage

13    started.

14         Q.      It started some time after 2009.

15                 MS. MARKOE:  Objection.

16                 THE WITNESS:  Bitmessage was based on

17    Bitcoin.  Bitcoin was launched in 2009.  Nobody knew

18    about Bitcoin prior to its public launch.  Developers

19    were unable to take the technology in Bitcoin and create

20    something that they did not know existed.  So, I would

21    say it would be rather difficult for someone to invent

22    something using technology that they have never heard

23    of.  That is what you call magic.  I do not believe in

24    magic.

25    BY MR. FREEDMAN:



Page 77

1          Q.     Just so you know where I am going, I am

2    going to switch gears now to start talking about the

3    various entities that have been touched on in the

4    litigation.

5               MS. MARKOE:  Why do we not take a

6    restroom break now ----

7               MR. FREEDMAN:  Sure.

8               MS. MARKOE:  ---- if this is a good time

9    to stop.

10              MR. FREEDMAN:  That is fine.  Let us go

11   off the record.

12              THE VIDEOGRAPHER:  Going off the record.

13   The time is 11.57.  End of video card number 1, volume 1

14   of the video deposition of Dr. Craig Wright.

15                   (A Short Break)

16              THE VIDEOGRAPHER:  This is the beginning

17   of video card number 2, volume 1, in the video

18   deposition of Dr. Craig Wright.  Going on the record.

19   The time is 12.11.  Thank you.

20              MR. FREEDMAN:  Just a small housekeeping

21   matter before we get back to the line of questioning.

22   I figured out an easy way to resolve our objection

23   issue.  I am giving you on the record a standing

24   objection to form to every single one of my questions at

25   this deposition, so you no longer need to object to



Page 78

1    anything.  You can instruct the witness not to answer

2    obviously by the court's directive, but you have an

3    objection preserved as to every single question.

4               MS. MARKOE:  I do not think that that is

5    how it works, and I appreciate the effort, but I will

6    still make objections as I feel and deem necessary.

7               MR. FREEDMAN:  And we will raise with the

8    court that the only reason you are doing so is to coach

9    the witness.

10               MS. MARKOE:  It is not, it is because not

11    every single one of your questions is objectionable.  I

12    have not objected to every single one of your questions.

13               MR. FREEDMAN:  We will let the judge

14    decide.

15          Q.     Dr. Wright, before we took a break -- can

16    you mark this as Plaintiff's Exhibit 1.

17    (Plaintiff's Exhibit 1 marked for identification)

18          Q.     -- we were discussing ----

19               MR. RIVERO:  Sorry, I have a housekeeping

20    question myself.  I want the citation on the rule.

21               MR. FREEDMAN:  Sure.  Do you know what, I

22    will give it to you in the break.  I have it but I am

23    not going to waste my time on the record for it.  I will

24    give it to you.

25               MR. RIVERO:  Please.  I want it on the



1   record ----

2                   MR. FREEDMAN:  Do problem, we will give

3   it to you on the next break.

4                   MR. RIVERO:  Please.

5   BY MR. FREEDMAN:

6          Q.     I am handing you what is marked as

7   Plaintiff's Exhibit 1.  This purports to be an e-mail

8   from you to Dave Kleiman dated 12th March 2008.  Do you

9   recognise this e-mail?

10         A.     I recognise what you have there.

11         Q.     Is this the e-mail that you sent?

12                MS. MARKOE:  Objection.

13                THE WITNESS:  No.

14  BY MR. FREEDMAN:

15         Q.     Why is it not the e-mail you sent?

16         A.     Because this is an import into a

17  different mail server that existed at a later time.

18         Q.     Is this an identical copy of the e-mail

19  you sent to Dave Kleiman?

20                MS. MARKOE:  Objection.

21                THE WITNESS:  No, because when you import

22  something from one exchange server to another it is not

23  identical.

24  BY MR. FREEDMAN:

25         Q.     Is the text of the e-mail identical?



Page 80

 1                    MS. MARKOE:  Objection.

 2                    THE WITNESS:  I am unable to say whether

 3    it is identical.  It looks the same.

 4    BY MR. FREEDMAN:

 5          Q.    Did you send this original e-mail on 12th

 6    March 2008?

 7                    MS. MARKOE:  Objection.

 8                    THE WITNESS:  This is not an e-mail.

 9    BY MR. FREEDMAN:

10          Q.    Did you send an e-mail that looks the

11    same as this on 12th March 2008?

12                    MS. MARKOE:  Objection.

13                    THE WITNESS:  I sent an e-mail that

14    contains the body that was approximately like that, if

15    not like that.  I cannot say exactly because this is a

16    copy and whatever else, but that is very familiar, and

17    that would appear to be the e-mail I sent, yes.

18    BY MR. FREEDMAN:

19          Q.    On 12th March 2008?

20                    MS. MARKOE:  Objection.

21                    THE WITNESS:  Yes.

22    BY MR. FREEDMAN:

23          Q.    Do you have the original copy of this

24    e-mail?

25          A.    No, the original was moved from a former



Page 81

1    exchange mailbox by one of my staff, Nicholas, I do not

2    remember his last name; hence the change in e-mail

3    address.

4           Q.     What do you mean change in e-mail

5    address?

6           A.     The "from" address changes when you move

7    OST files within Microsoft Exchange.  When you preserve

8    exchange of information but change the domains, because

9    you move companies, it alters the sort of domain record

10   within exchange.

11          Q.     So, if I am understanding you correctly,

12   and correct me if I am wrong, the original e-mail was

13   not sent from craig.wright@information-defense.com?

14          A.     That would be correct.

15          Q.     What was the original e-mail it was sent

16   from?

17          A.     I cannot remember which domains I had

18   back then.

19          Q.     Do you have the OST file that was moved

20   by Nicholas?

21          A.     No.

22          Q.     What happened to it?

23          A.     I have no idea.

24          Q.     Did you not think this was an important

25   e-mail to preserve?



Page 82

1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  No, I did not.

3    BY MR. FREEDMAN:

4         Q.     Why not?

5                    MS. MARKOE:  Objection.

6                    THE WITNESS:  Why would I?  It does not

7    add any value to anything I am doing.

8    BY MR. FREEDMAN:

9         Q.     Do you recall Nicholas's last name?

10        A.     It might be Desmond.  I do not remember.

11        Q.     D-E-S-M-O-N-D?

12        A.     You are asking me to spell someone's name

13   that I can barely remember.

14        Q.     How would we find Nicholas's last name,

15   if we needed to?

16        A.     Look up old records on the internet.

17        Q.     What company did he work for?

18        A.     The question you are, I believe, asking

19   is, which of my companies did he work for, which

20   I believe he worked for Hotwire, Integers and maybe

21   Pholus, P-H-O-L-U-S.  It is one the Greek gods.  He

22   was a centaur.  He was a wise centaur.

23        Q.     Please, Dr. Wright, if we could have this

24   discussion on the break.  It is interesting but I want

25   to get us through.



Page 83

1          A.      Certainly.

2          Q.      Do you have records from Hotwire,

3    Integers and Pholus that would enable us to look up

4    Nicholas's last name?

5          A.      Unless there is something that the

6    lawyers have captured.  I have never looked at the

7    records in those boxes.  They were delivered to me and

8    they remained sealed until the lawyers opened them.

9          Q.      What boxes are you referring to?

10          A.      The boxes that they took copies of

11   documents from.

12          Q.      You said you received sealed boxes?

13          A.      Yes.

14          Q.      Where did you receive sealed boxes from?

15          A.      When the companies in Australia were shut

16   down, boxes of information were sent to me.

17          Q.      By whom?

18          A.      Someone in Australia, to do with the old

19   company.  I do not know.

20          Q.      I do not recall, I may have asked this:

21   the date of this e-mail, 12th March 2008, was this the

22   first time you reached out to Dave Kleiman about

23   Bitcoin, blockchain or timechain technology?

24          A.      I may have talked to him about BlackNet;

25   I do not recall.



Page 84

1          Q.      This is the first written communication?

2          A.      Again, I do not recall.

3          Q.      There is a company called Craig Wright

4     R&D?

5          A.      There were multiple companies.  There are

6     no longer those companies.

7          Q.      There were multiple companies called

8     Craig Wright R&D?

9          A.      There are multiple companies called Craig

10    Wright R&D.

11         Q.      When was the first Craig Wright R&D

12    founded?

13         A.      In the '90s.

14         Q.      When did it cease to exist?

15         A.      A variety of these companies have ceased

16    at different times.

17         Q.      How many of Craig Wright R&Ds have there

18    been?

19         A.      Seychelles, Panama, Belize, Kenya,

20    Australia, Singapore, a couple of Eastern European ones,

21    Hungary, Hong Kong.  More than that, I do not remember.

22         Q.      Okay.  Craig Wright R&D in the

23    Seychelles, when was it formed?

24         A.      A long time ago.  We are talking

25    20 years.



Page 85

```
 1            Q.      When was the one in Panama formed?

 2            A.      About 1998.  My exact recollection of

 3     time is ----

 4            Q.      When did the one in the Seychelles cease

 5     to exist?

 6            A.      Somewhere between 2011 and 2013.

 7            Q.      When did the one in Belize -- when was

 8     the Craig Wright R&D in Belize formed?

 9            A.      I do not remember.

10            Q.      When did it cease to exist?

11            A.      I do not exactly remember.

12            Q.      When did Craig Wright R&D in Kenya --

13     strike that.  When was Craig Wright R&D in Kenya formed?

14            A.      Again, I do not remember the exact times

15     on that one.

16            Q.      Approximate year do you recall?

17            A.      Not off the top of my head, no.

18            Q.      Do you have any way to look that up?

19            MS. MARKOE:  Objection.

20            THE WITNESS:  No.

21     BY MR. FREEDMAN:

22            Q.      When did it cease to exist?

23            A.      I do not remember.

24            Q.      What was the purpose of Craig Wright R&D

25     in the Seychelles?
```



Page 86

```
 1          A.      The purpose of all of these was to hold

 2    intellectual property.

 3          Q.      What type of intellectual property were

 4    they holding?

 5                  MS. MARKOE:  Objection.

 6                  THE WITNESS:  Any type of intellectual

 7    property I held.

 8    BY MR. FREEDMAN:

 9          Q.      Were they patents?

10          A.      No.

11                  MS. MARKOE:  Objection.

12    BY MR. FREEDMAN:

13          Q.      Were they trade secrets?

14                  MS. MARKOE:  Objection.

15                  THE WITNESS:  Define what you mean by

16    "trade secrets".  That is a very wide area.  I have a

17    masters in intellectual property law, I could spend a

18    long time detailing that if you wish, but please define

19    what you actually mean by "trade secrets" or I will just

20    have to say yes and leave it at that.

21    BY MR. FREEDMAN:

22          Q.      Were they all computer related?

23          A.      No.

24                  MS. MARKOE:  Objection.

25    BY MR. FREEDMAN:
```



Page 87

```
 1          Q.     Did they relate to Bitcoin?

 2          A.     Which one?

 3          Q.     You said the purpose of all of these

 4   entities -- strike that.  Did any of them hold Bitcoin

 5   related intellectual property?

 6                 MS. MARKOE:  Objection.

 7                 THE WITNESS:  That, again, is a very wide

 8   question.  Did they hold any assets relating to Bitcoin

 9   in any way: yes.

10   BY MR. FREEDMAN:

11          Q.     Which ones?

12          A.     Panama, Costa Rica, Australia.  The

13   others I could not say off the top of my head.

14          Q.     Did any of these Craig Wright R&D

15   entities hold blockchain or timechain-related

16   intellectual property?

17                 MS. MARKOE:  Objection.

18                 THE WITNESS:  It is the same question.

19   Just ask me Bitcoin, because the only thing I do is

20   Bitcoin.

21   BY MR. FREEDMAN:

22          Q.     So, when I say "Bitcoin", you will take

23   it to mean Bitcoin, blockchain and timechain?

24                 MS. MARKOE:  Objection.

25                 THE WITNESS:  Yes.  I will answer per
```



1  Bitcoin.  I only work on Bitcoin.  Some of the things

2  I do apply to any blockchain, but I do not develop for

3  Ethereum, I do not develop for other things.  I never

4  have, I never will.  I solely do one single system which

5  is Bitcoin.

6  BY MR. FREEDMAN:

7       Q.    Why did you create multiple entities to

8  hold Bitcoin-related intellectual property in different

9  countries?

10              MS. MARKOE:  Objection.

11              THE WITNESS:  I create multiple entities

12  all the time so that I can protect my assets.  I have

13  what people have called a web of companies because that

14  is the best way to ensure that when someone is doing

15  something that governments may not like, to protect

16  those assets and ensure that they remain protected.

17  BY MR. FREEDMAN:

18       Q.    In what way were you seeking to protect

19  these intellectual property assets?

20              MS. MARKOE:  Objection.  You are going

21  beyond the scope of the topics in this deposition.

22              MR. FREEDMAN:  Zaharah, just instruct him

23  not to answer.

24              MS. MARKOE:  The judge said you can get

25  some leeway with regard to entities that do not relate



Page 89

```
 1    to Dave Kleiman.

 2                 MR. FREEDMAN:  Zaharah, either instruct

 3    him not to answer or object.  That is it.  Well,

 4    actually, do not object because ----

 5                 MS. MARKOE:  I can explain the basis of

 6    my objection.

 7                 MR. FREEDMAN:  I do not need to hear it.

 8    I give you a standing objection.

 9                 MS. MARKOE:  But the court does.  But the

10    court needs to hear it and I need to make my record.

11                 MR. FREEDMAN:  So write it down.

12                 MS. MARKOE:  So I am entitled to make my

13    record on the record.

14                 MR. FREEDMAN:  Okay, we are going to move

15    on.

16                 MS. MARKOE:  You are not permitted to

17    stop me.  I will not allow you to stop me.  I am

18    instructing the witness not to answer that question.

19    You have gone beyond the scope.

20                 MR. FREEDMAN:  Which question are you

21    instructing him not to answer?

22                 MS. MARKOE:  The last question, I

23    believe, which was -- if the court reporter could kindly

24    read it back to me I would appreciate it.

25       (The court reporter read back as requested)
```



Page 90

1    BY MR. FREEDMAN:

2              Q.    Did any of these Craig Wright R&Ds

3     involve Dave Kleiman?

4                    MS. MARKOE:  Objection.

5                    THE WITNESS:  No.

6    BY MR. FREEDMAN:

7              Q.    Did they involve W&K?

8                    MS. MARKOE:  Objection.

9                    THE WITNESS:  No.

10   BY MR. FREEDMAN:

11             Q.    Did they ever enter into transactions

12    with Dave Kleiman or W&K?

13                   MS. MARKOE:  Objection.

14                   THE WITNESS:  They enacted transactions

15    with W&K, of which Dave was a member.

16   BY MR. FREEDMAN:

17             Q.    What were the transactions they entered

18    into W&K with?

19             A.    They had contracts with W&K.

20             Q.    Which entities specifically had contracts

21    with W&K?

22             A.    I do not remember each of the contracts.

23             Q.    Which entity had the contract?

24                   MS. MARKOE:  Objection.

25                   THE WITNESS:  I do not remember each of



Page 91

1    the contracts.

2   BY MR. FREEDMAN:

3          Q.      Was the ownership of all these Craig

4   Wright R&D entities identical?

5                  MS. MARKOE:  Objection.

6                  THE WITNESS:  No.

7   BY MR. FREEDMAN:

8          Q.      Who owned the Craig Wright R&D in the

9   Seychelles?

10                 MS. MARKOE:  Objection.

11                 THE WITNESS:  I am unable to answer the

12  "who owned" because each of the companies, or whatever

13  else I have, has a complex ownership structure.  At the

14  end of the day, I own nothing.  I do not own a single

15  share in any company that I know of.  I do not own a

16  single disposition of a trust that I know of.  I have no

17  ownership of anything, which is what you are trying to

18  get at.  I have very carefully constructed something

19  where I get to direct my research and own nothing.

20  BY MR. FREEDMAN:

21         Q.      So I appreciate, again, that you are

22  anticipating where I am going, but please just answer

23  the question.

24         A.      I believe that was answering the

25  question.



Page 92

1           Q.    Actually, I just want to know who owns

2    them, not if you own them.  Who owns them?

3                 MS. MARKOE:  Objection.

4                 THE WITNESS:  I believe I was ----

5                 MS. MARKOE:  You may answer.

6                 THE WITNESS:  I believe I was answering.

7    My answer is I have set up something so that I do not

8    need to know who owns them.  I do not know who owns

9    nChain now.

10   BY MR. FREEDMAN:

11          Q.    Who knows who owns Craig Wright R&D?

12                MS. MARKOE:  Objection.

13                THE WITNESS:  I have ensured that I know

14    nothing about the ownership of the companies I am with.

15   BY MR. FREEDMAN:

16          Q.    Who did you make that arrangement with?

17                MS. MARKOE:  Objection.

18                THE WITNESS:  Other individuals.

19   BY MR. FREEDMAN:

20          Q.    What are the names of those individuals?

21                MS. MARKOE:  Objection.

22                THE WITNESS:  I do not remember all of

23    their names.  Those people are no longer part of my

24    life.

25   BY MR. FREEDMAN:



Page 93

1        Q.      Do you remember any of their names?

2                MS. MARKOE:  Objection.

3                THE WITNESS:  Yes.

4    BY MR. FREEDMAN:

5        Q.      Can you tell me the names that you do

6    recall?

7                MS. MARKOE:  Objection.

8                THE WITNESS:  There was a Mark in High

9    Secured in Panama.

10   BY MR. FREEDMAN:

11       Q.      Anyone else?

12       A.      I am thinking.  (Pause) No, I do not

13   remember the names.

14       Q.      Do you remember Mark's last name?

15       A.      No, I do not.

16       Q.      Mark was part of the people that took

17   care of the ownership of Craig Wright R&D for you?

18                MS. MARKOE:  Objection.

19                THE WITNESS:  I do not know exactly what

20   they did.  People set up structures.

21   BY MR. FREEDMAN:

22       Q.      You trusted these people to set up

23   structures for your companies?

24                MS. MARKOE:  Objection.

25                THE WITNESS:  High Secured was a law



1    firm.

2    BY MR. FREEDMAN:

3           Q.    So you trusted a law firm to set up

4    ownership structures for your companies?

5           A.    Yes.

6           Q.    And you have no way to get those records

7    today?

8           A.    Not that I know of.

9           Q.    Did Craig Wright R&D ever mine Bitcoin?

10               MS. MARKOE:  Objection.

11               THE WITNESS:  No.

12   BY MR. FREEDMAN:

13          Q.    Was Craig Wright R&D ever audited by the

14   Australian Tax Office?

15               MS. MARKOE:  Also, I just want to make

16   sure for the court reporter, it is High Secured.

17   BY MR. FREEDMAN:

18          Q.    Were any of the Craig Wright R&D entities

19   ever audited by the Australian Tax Office?

20          A.    No.

21          Q.    Were they ever the subject of an

22   Australian Tax Office investigation?

23          A.    I do not know what the tax office

24   investigates.

25          Q.    I just want to know what you know.  Are



Page 95

1    you aware of ----

2         A.    I do not know what the tax office

3    investigates.

4         Q.    Are you aware of any Australian Tax

5    Office investigation over any of the Craig Wright R&D

6    entities?

7         A.    I do not know what the tax office

8    investigates.

9         Q.    So you are not aware of any such

10   investigation?

11              MS. MARKOE:  Objection.

12              THE WITNESS:  I do not know what the tax

13   office investigates.  I will not speak for the tax

14   office.

15   BY MR. FREEDMAN:

16        Q.    I am not asking you to speak for the tax

17   office, I am just ask you to tell me if you are aware of

18   an investigation?

19              MS. MARKOE:  Objection.

20              THE WITNESS:  You are asking me to

21   express awareness of a federal body's investigations.

22   I have no interest in those unless it involves me

23   personally, in which case they will audit me first or do

24   something else.  I will not speculate as to the nature

25   of what a government body will do.



Page 96

1          Q.     Did any of these Craig Wright R&D

2     entities ever go by another name?

3          A.     No.

4          Q.     I am going to the next entity.  It is

5     called Chaos and Non-Linear FNE & Finance.

6          A.     That is not the correct company name.

7          Q.     What is the correct company name?

8          A.     The exact reference I cannot remember,

9     but that is not it.

10          Q.     When was it founded?

11          A.     I do not remember.  The records will be

12     on ASIC, A-S-I-C.

13          Q.     What was the purpose of this entity?

14          A.     To use non-linear forecasting, which is

15     probably the word, in the creation of models for

16     determining different linear risk effects.

17          Q.     Does this have to do with Bitcoin?

18          A.     No.

19          Q.     Does it have to do with blockchain or

20     timechain?

21               MS. MARKOE:  Objection.

22               THE WITNESS:  Again, the same question.

23     BY MR. FREEDMAN:

24          Q.     Who owns Chaos and Non-Linear FNE &

25     Finance?



Page 97

1          A.     Nobody as far as I know.  I believe it is

2    already liquidated.  If not, it is in the process of

3    being liquidated.

4          Q.     Who owned it at the time it was

5    established?

6          A.     You would need to look at the

7    shareholding.

8          Q.     How do I obtain the shareholding?

9          A.     I do not know.

10          Q.     Do you have access to the shareholding?

11          A.     If those records that the lawyers have

12    copied has any copy, then that would have it, otherwise

13    I do not know.  I have not looked at those records.

14    I do not intend to.

15          Q.     Did you use lawyers to form that entity?

16          MS. MARKOE:  Objection: relevance.

17          THE WITNESS:  You are asking whether I --

18    that would be a privileged thing, whether I used lawyers

19    or not and what I use them for, so are you asking me to

20    breach privilege?

21    BY MR. FREEDMAN:

22          Q.     Dr. Wright, you have to allow your own

23    counsel to object.  You cannot object as a witness.

24          A.     I did not object.  I just said, are you

25    asking me to ----



Page 98

1           Q.     I am asking ----

2                  MR. RIVERO:  Let me step in a second.

3    Dr. Wright, the question as posed is, did you use

4    lawyers?  You may answer that, but please avoid going

5    into any communications with the lawyers.

6                  THE WITNESS:  Mmm-hmm, okay.  I do not

7    remember.

8    BY MR. FREEDMAN:

9           Q.     Did W&K or Dave Kleiman ever own a

10   percent of this entity?

11          A.     No.

12          Q.     Did this entity ever enter into a

13   relationship with Dave Kleiman or W&K?

14                 MS. MARKOE:  Objection.

15                 THE WITNESS:  It was formed after

16   Mr. Kleiman died.

17   BY MR. FREEDMAN:

18          Q.     Do you remember when it was formed?

19          A.     No.

20          Q.     Did this entity ever go by another name?

21          A.     No.

22          Q.     Did this entity ever mine Bitcoin?

23                 MS. MARKOE:  Objection.

24                 THE WITNESS:  No.

25                 MS. MARKOE:  He has already said that



Page 99

1    this entity was established after Mr. Kleiman's death.

2    Therefore, I am going to instruct him not to answer any

3    further questions about this entity.  I believe you have

4    asked all the questions that are sort of permitted under

5    sub-(2) as envisioned by the court, as I understood it.

6                    MR. FREEDMAN:  Your recollection is

7    wrong, but we will take it up with the court.

8            Q.    I am going to move on to the next entity,

9    Cloudcroft.  When was Cloudcroft founded?

10           A.    I do not remember the date on any of

11   these companies.  All of them would be listed on ASIC.

12   It is a public record.  You can pay for it.  I am not

13   going to pay for it to hand it to you.

14           Q.    What was the purpose of this entity?

15           A.    Cloudcroft was designed -- well, created

16   for the development of large storage in high compute

17   devices.  It was so that you would have machines that

18   could hold multiple petabytes of data and process those

19   using an optical backend at high speed.

20           Q.    Did this entity ever mine Bitcoin?

21                    MS. MARKOE:  Objection.

22                    THE WITNESS:  No.

23   BY MR. FREEDMAN:

24           Q.    Did this entity ever create intellectual

25   property related to Bitcoin?



Page 100

1              MS. MARKOE:  Objection.  You may answer.

2              THE WITNESS:  The nature of Bitcoin goes

3     to what we have dubbed Metanet.  That requires storage.

4     To do that, to have large blocks and to scale Bitcoin

5     requires the creation of machines that can handle very

6     large transaction volumes and eventually be able to send

7     terabyte and larger block sizes in milliseconds.

8     BY MR. FREEDMAN:

9         Q.    So, did the entity ever create

10    intellectual property that relates to Bitcoin?

11             MS. MARKOE:  Objection.

12             THE WITNESS:  I believe I just said yes,

13    even if you did not understand it.

14    BY MR. FREEDMAN:

15        Q.    Was this entity ever audited by the

16    Australian Tax Office?

17        A.    Yes.

18        Q.    When?

19        A.    I do not remember the dates of the

20    audits.

21        Q.    Were there multiple audits?

22             MS. MARKOE:  Objection: vague.

23             THE WITNESS:  I have accountants in the

24    past, and I have them now.  They do these things.  I do

25    not necessarily, apart from when I am pulled up to



Page 101

1    things, go in and I definitely do not try to remember

2    the dates of when all this happened.

3    BY MR. FREEDMAN:

4        Q.    So your accountants would be aware of

5    this information?

6            MS. MARKOE:  Objection.

7            THE WITNESS:  I do not know.

8    BY MR. FREEDMAN:

9        Q.    Which accountants did you use to handle

10   the Australian Tax Office investigations?

11           MS. MARKOE:  Objection.  Are you

12   referring to this entity or are you referring to

13   generally?  It is just very unclear what you are talking

14   about and we need to have a clear record so that there

15   are no misunderstandings.

16   BY MR. FREEDMAN:

17       Q.    What accountants did you use to handle

18   Australian Tax Office investigations and audits of

19   Cloudcroft?

20       A.    If you are going to ask it that way,

21   I will say I do not remember.

22       Q.    What accountants do you recall using to

23   handle any Australian Tax Office investigation or audit?

24       A.    I did not use accountants to handle tax

25   office audits; I used accountants to be accountants and



Page 102

1    auditors.  Would you like me to answer that?

2            Q.      Yes, please.

3            A.      During the time that we were there, we

4    used KPMG, we used Ernst & Young, we used Harry

5    something, I do not remember the name exactly, which is

6    in the records, and we had internal audit and accounts.

7            Q.      What are the names of the internal

8    auditing accounts?

9                    MS. MARKOE:  Objection.

10                   THE WITNESS:  I do not know what the

11   auditing accounts are, but if you are asking what is the

12   name of the person who was the CFO or accountant, at one

13   point that was John Cheshire, and we had a bookkeeper

14   Ann, and I do not remember her last name.  I am sure it

15   is on record somewhere.

16   BY MR. FREEDMAN:

17           Q.      Is that Ann Wrightson?

18           A.      That would be it, yes.

19                   MR. RIVERO:  Can I just say to keep the

20   record clear, I believe he said "internal audit and

21   accounts", as opposed to "internal auditing accounts",

22   although I have old ears.

23                   THE WITNESS:  That is correct.

24   BY MR. FREEDMAN:

25           Q.      Was there anyone else that worked



Page 103

```
 1    internally as an accountant or CFO for your companies?

 2            A.      Yes.

 3            Q.      What were their names?

 4            A.      I do not remember.

 5            Q.      Did Jamie Wilson ever work as an

 6    accountant for you?

 7            A.      Very briefly.

 8            Q.      What time period was that?

 9            A.      I dealt with Jamie Wilson some time

10    between -- some time in 2012 into 2013.

11            Q.      Why did he stop working for you?

12                    MS. MARKOE:  Objection.

13                    THE WITNESS:  He was fired.

14    BY MR. FREEDMAN:

15            Q.      Why was he fired?

16                    MS. MARKOE:  Objection.  This is really

17     going beyond the scope now.

18    BY MR. FREEDMAN:

19            Q.      Why was he fired?

20                    MS. MARKOE:  I am going to instruct the

21    witness not to answer.  It goes beyond the scope.

22    BY MR. FREEDMAN:

23            Q.      Did KPMG interact with the Australian Tax

24    Office -- strike that.  When your companies were under

25    audit by the Australian Tax Office, did KPMG handle
```



MAGNA
LEGAL SERVICES

Page 104

1    interactions with the tax office?

2           A.     No.

3           Q.     Same question for Ernst & Young?

4           A.     No.

5                  MS. MARKOE:  Objection.

6    BY MR. FREEDMAN:

7           Q.     Did Harry, and we do not recall his last

8    name, interact with the ATO in regard to their audits?

9           A.     He interacted, but that is different than

10   your former question.

11          Q.     I know.  Did he interact -- he did?

12          A.     Interact means he communicated in some

13   way.  He e-mailed, he phoned, he had lunch, he passed

14   them in the street and said "Hi".  So, being an auditor,

15   I would say he interacted with the ATO many times.

16          Q.     Did Harry handle the Australian Tax

17   Office investigation on your behalf or your companies'

18   behalf?

19          A.     No.

20                 MS. MARKOE:  Objection.

21   BY MR. FREEDMAN:

22          Q.     Did John Cheshire handle the Australian

23   Tax Office investigation for you or your companies'

24   behalf?

25          A.     He did some of that.



Page 105

1          Q.      Did Ann Wrightson?

2          A.      No.

3          Q.      Did Jamie Wilson?

4          A.      No.

5          Q.      What time period did John Cheshire work

6     for your companies or yourself?

7                  MS. MARKOE:  Objection: compound.

8     BY MR. FREEDMAN:

9          Q.      What time period did John Cheshire work

10    for you?

11                 MS. MARKOE:  Objection.

12                 THE WITNESS:  John, I believe, would have

13    first been about 2008 until 2015, in different roles.

14                 MS. MARKOE:  Can you please just spell

15    for the record how you spell Cheshire, because I think

16    it is being misspelt right now, if you remember.

17                 THE WITNESS:  I am sorry, I cannot tell

18    you how I would spell John Cheshire.  I could make a

19    guess, but then I am just guessing.

20                 MR. RIVERO:  Do not guess.

21    BY MR. FREEDMAN:

22         Q.      Did Ray Hong work for you at Cloudcroft?

23         A.      He worked in one of my companies.

24         Q.      Do you recall which company?

25         A.      No.



Page 106

1          Q.      Do you recall what he did for your

2     companies?

3          A.      Yes.

4          Q.      What did he do for your companies?

5          A.      He was a programer and graphic designer.

6          Q.      What did he program for you?

7          A.      Code.

8                  MS. MARKOE:  Objection.

9     BY MR. FREEDMAN:

10         Q.      Did it relate to Bitcoin?

11                 MS. MARKOE:  Objection.

12                 THE WITNESS:  Yes.

13                 MR. RIVERO:  One moment.  Dr. Wright,

14    I can only instruct you.  I would be happy to instruct

15    everyone else.  The court reporter can only take one of

16    us at a time.  You have to pause a beat to allow the

17    objection.

18                 THE WITNESS:  Certainly.

19                 MR. RIVERO:  I do not mean to single you

20    out because everyone is doing it.

21                 THE WITNESS:  Yes.  My apologies.

22    BY MR. FREEDMAN:

23         Q.      Who owned Cloudcroft on its founding?

24         A.      You would have to look at the records.  I

25    do not remember.



Page 107

1          Q.     Did the ownership ever change?

2          A.     I would believe so, but again you would

3    have to look at the records.  I do not remember.

4          Q.     Was Cloudcroft ever owned by

5    Tulip Trading?

6          A.     You would have to look at the records.  I

7    do not remember.  I do not do the company secretarial.

8          Q.     Do you have any recollection of the

9    ownership of Cloudcroft at any point in time?

10         A.     I do not speculate on these things.

11   I instruct people to do stuff.  I hire company

12   secretarial when I need to.  I do not remember.

13         Q.     Did Lynne Wright ever own any portion of

14   Cloudcroft?

15         A.     I do not remember.

16         Q.     Was this entity related to Dave or W&K in

17   any way?

18         A.     Not at any point.

19         Q.     Did this entity ever go by another name?

20         A.     I do not remember.

21         Q.     Is this entity still in existence?

22         A.     I have not checked.

23         Q.     I am going to move to the next entity.

24   This is ----

25                MS. MARKOE:  Before we move to the next



Page 108

```
 1    entity, it is getting on to be about 1 o'clock.  Do you

 2    want to go till 1 o'clock and then I do not know if we

 3    are breaking for lunch, if they are bringing lunch in,

 4    what the story is, but ----

 5                    MR. FREEDMAN:  Let us go off the record.

 6                    THE VIDEOGRAPHER:  Going off the record.

 7    The time is 12.45.

 8                    (A Short Break)

 9                    THE VIDEOGRAPHER:  Going back on the

10    record.  The time is 12.46.  Thank you.

11    BY MR. FREEDMAN:

12          Q.    Did a woman with the first name of Ellen

13    ever work at any of your companies?

14                    MS. MARKOE:  Objection.

15                    THE WITNESS:  I do not know all the staff

16    at my companies now, so I cannot answer that.

17    BY MR. FREEDMAN:

18          Q.    You have no recollection of a woman named

19    Ellen working at your companies?

20                    MS. MARKOE:  Objection.

21                    THE WITNESS:  Do you have a last name?

22    BY MR. FREEDMAN:

23          Q.    I do not.

24          A.    I have no idea.

25          Q.    No recollection?
```



1          A.     You realise that I have companies across

2     the world, and I meet people all the time in my

3     companies, and have no idea about all the people.

4     I shake hands, I speak in front of staff, I do all this

5     sort of stuff and people go, "Hey, I am such and such",

6     and a year later I do not remember.

7          Q.     Doctor, I am a bit confused because

8     earlier I thought you told me you do not own any

9     companies and now you have referring to your companies

10    so can you explain how that works?

11              MS. MARKOE:  Objection.

12              THE WITNESS:  I founded them.  You are

13    trying to confuse or confound people with the notion

14    that a company that I own shares of, or the company that

15    I have set up to do my research, are separate.  The fact

16    that I do not own, that I have set up trusts and

17    whatever else out of my control, does not remove the

18    fact that I will call them "my companies".

19    BY MR. FREEDMAN:

20          Q.     Okay.  I am going to move to the next

21    entity.  This is called C01N.

22          A.     C01N.

23          Q.     When was C01N founded?

24              MS. MARKOE:  Objection.

25              THE WITNESS:  I do not remember the date



Page 110

1    and which C01N in particular you are talking about.

2    BY MR. FREEDMAN:

3         Q.    Is there more than one C01N?

4         A.    Yes.

5         Q.    Please list them for me?

6         A.    I do not remember them all.  I would need

7    to look at records.

8         Q.    Please list the ones you recall?

9         A.    UK, Australia.

10        Q.    When was the UK C01N formed?

11        A.    Under a different name, that is either

12   Permanent Success or Design by Human or whatever else, I

13   do not remember which exactly it was, which would have

14   been 2012.

15        Q.    So, why did you change the name in 2012?

16             MS. MARKOE:  Objection:  mischaracterises

17   the record.

18             THE WITNESS:  I did not change the name

19   in 2012.

20   BY MR. FREEDMAN:

21        Q.    Why was the name changed in 2012?

22             MS. MARKOE:  Objection:  mischaracterises

23   the testimony.

24             THE WITNESS:  As I just said, I did not

25   change the name in 2012, the name was not changed in



Page 111

```
 1    2012.  Nor did I say ----

 2    BY MR. FREEDMAN:

 3            Q.      How did Permanent Success Limited or

 4    Design by Human become C01N?

 5            A.      The name was changed.

 6            Q.      Who changed the name?

 7            A.      I instructed a person in the UK to change

 8    the name.

 9            Q.      When did you make that instruction?

10            A.      After Dave's death.

11            Q.      Do you have ----

12            A.      I do not have the records in front of me.

13    I do not remember.

14            Q.      Who did you instruct to change the name?

15            A.      I have no idea.

16            Q.      You said a person in the UK?

17            A.      Yes.

18            Q.      But you do not recall who it was?

19            A.      I do not have the records in front of me.

20    If it is company secretarial, then all those records

21    would have been there at the time.  I have no idea.

22            Q.      What was the purpose of Permanent Success

23    Limited or Design by Human when it was formed?  You know

24    what, strike that.  What was the purpose of Permanent

25    Success Limited when it was formed?
```



Page 112

1          A.     Is that C01N?  I cannot remember if that

2     is the exact one.  I do not remember which one is which.

3          Q.     Let us forget about C01N for a moment.

4     I am talking about Permanent Success Limited.

5          A.     Is that separate to C01N?  I am asking

6     that question.  I do not remember otherwise.

7          Q.     I do not know.  It is your companies.

8          MS. MARKOE:  Objection:  mischaracterises

9     the testimony.

10    BY MR. FREEDMAN:

11         Q.     When Permanent Success Limited was

12    formed, what was its purposes?

13         A.     What was the rename of that company?  I

14    do not know otherwise.  I did not name it.

15         Q.     Permanent Success Limited and Design by

16    Human were both renamed?

17         A.     Yes.

18         Q.     What were the two renames?

19         A.     You would need to tell me.  I do not

20    remember off the top of my head.  One of them became

21    C01N.  If you can give me the name that you are talking

22    about that it later became, I could give you

23    information.

24         Q.     The one that later became C01N?

25         A.     Yes.



Page 113

```
 1              Q.      What was the purpose at formation?

 2              A.      The purpose was to hold assets because

 3       I wanted to eventually form something as a wallet for

 4       Bitcoin.  So a custodial wallet service.

 5              Q.      What assets did it hold?

 6              A.      None.

 7              Q.      Did it ever hold assets?

 8              A.      It never held assets.

 9              Q.      So what purpose did C01N serve?

10              A.      I believe I have said exactly what it

11       served.

12              Q.      You said why you formed it.  Did it end

13       up serving the purpose you formed it for?

14              A.      No.

15              Q.      So what purpose did it serve?

16              A.      It was there while I was creating.  We

17       did not end up launching C01N as a wallet.

18              Q.      So did C01N ever hold assets -- any type

19       of asset?

20              A.      Hold?  No.

21              Q.      Did it ever own assets?

22              A.      Yes.

23              Q.      What assets did it own?

24              MS. MARKOE:  Objection.

25              THE WITNESS:  It owned rights.
```



1    BY MR. FREEDMAN:

2            Q.      It owned rights to what?

3            A.      It owned rights to other assets.

4            Q.      What assets did it own rights to?

5            A.      I would need to look up the list.

6            Q.      Was it Bitcoin?

7            A.      Was what Bitcoin?

8            Q.      Did it own rights to Bitcoin?

9            A.      In part.

10                   MS. MARKOE:  Objection.

11   BY MR. FREEDMAN:

12           Q.      Did it own rights to intellectual

13    property?

14                   MS. MARKOE:  Objection.

15                   THE WITNESS:  I would need to look at the

16    list of what was actually deposited into that company to

17    answer that question.

18   BY MR. FREEDMAN:

19           Q.      Who has the list of what was deposited

20    into that company?

21           A.      Unless it is in any of the records that

22    have been given to the lawyers, I cannot answer.

23           Q.      So are those assets lost to you now?

24                   MS. MARKOE:  Objection.

25                   THE WITNESS:  What assets?



Page 115

1    BY MR. FREEDMAN:

2            Q.    The Bitcoin assets?

3                  MS. MARKOE:  Objection.

4                  THE WITNESS:  What Bitcoin are you

5    referring to?

6    BY MR. FREEDMAN:

7            Q.    C01N holds rights to Bitcoin; is that

8    correct?

9                  MS. MARKOE:  Objection.

10                 THE WITNESS:  No, C01N does not hold

11   rights to Bitcoin.

12   BY MR. FREEDMAN:

13           Q.    What does C01N hold rights to?

14           A.    C01N is a liquidated company.  It holds

15   rights to nothing.

16           Q.    When C01N was operational?

17           A.    I have already stated C01N was never

18   operational.

19           Q.    At some point in time C01N owned rights;

20   is that a correct statement?

21                 MS. MARKOE:  Objection.

22                 THE WITNESS:  That is a correct

23   statement.

24   BY MR. FREEDMAN:

25           Q.    When did it own those rights -- during



Page 116

1    what period of time?

2                    MS. MARKOE:  Objection.

3                    THE WITNESS:  I would need to look at the

4    records.  I do not know the date of the transfers off

5    the top of my head.

6    BY MR. FREEDMAN:

7          Q.    Before Dave died or after Dave died?

8                    MS. MARKOE:  Objection.

9                    THE WITNESS:  After Dave died.

10   BY MR. FREEDMAN:

11         Q.    When was it liquidated?

12         A.    I do not know that.

13         Q.    Was it operational in 2008?

14                   MS. MARKOE:  Objection.

15                   MR. FREEDMAN:  Sorry, 2018.

16                   THE WITNESS:  The company has never been

17   operational.

18   BY MR. FREEDMAN:

19         Q.    Was it in existence in 2018?

20         A.    I do not believe so, but you would need

21   to look at the records.  Companies House in the UK holds

22   records.  You can obtain them.

23                   MR. RIVERO:  I think the last question

24   was in existence in 2018, but I do not want to misstate

25   it.  The record is showing 2008.



1                    MS. MARKOE:  He corrected it.

2                    MR. RIVERO:  I apologise, sorry about

3     that.

4     BY MR. FREEDMAN:

5           Q.    In 2013, C01N was in existence?

6                    MS. MARKOE:  Objection.

7                    THE WITNESS:  It was not called C01N at

8     that time, I believe.  I do not know when the change was

9     made to the name, but the company had been formed.

10    BY MR. FREEDMAN:

11          Q.    Once it had been formed, it held rights?

12          A.    No.

13                   MS. MARKOE:  Objection.

14    BY MR. FREEDMAN:

15          Q.    When did it obtain rights?

16          A.    Again, I would need to look at the

17    accounts and records to say when rights were issued.

18          Q.    But at some point it held rights?

19          A.    Yes.

20          Q.    It held rights to Bitcoin?

21          A.    At some point it held rights to Bitcoin.

22          Q.    What does that mean?

23          A.    The term "rights" is defined in property

24    law rather succinctly.  Would you like me to start

25    quoting maybe Black's Law Dictionary on the nature of



Page 118

1    rights?

2         Q.    I would like you to tell me what was the

3    nature of the rights C01N held?

4              MS. MARKOE:  Objection.

5              THE WITNESS:  It had rights.  I do not

6    have the records.  I cannot read the exact stipulations.

7    BY MR. FREEDMAN:

8         Q.    So, in your own terms, describe to me

9    what C01N was able to do with its rights?

10             MS. MARKOE:  Objection.

11             THE WITNESS:  C01N cannot do anything.

12   It is a legal entity, which means by itself it cannot

13   actually do anything.  An individual, a person, needs to

14   direct and make things happen.

15   BY MR. FREEDMAN:

16        Q.    Yes, but they did so under the auspices

17   of C01N?

18             MS. MARKOE:  Objection.

19             THE WITNESS:  Did what under the auspices

20   of C01N exactly, please?  Be specific.

21   BY MR. FREEDMAN:

22        Q.    Should C01N have exercised its rights --

23   strike that.  If an individual of the appropriate

24   authority directed C01N to exercise its rights to

25   Bitcoin, what could they have done with it?



Page 119

1                    MS. MARKOE:  Objection: calls for

2        speculation.

3                    MR. FREEDMAN:  You can answer.

4                    THE WITNESS:  If someone has rights to an

5        asset, they can do all sorts of things.  As a

6        speculative dive, someone with assets can destroy

7        assets, move assets, give them away.  So on a pure

8        speculative form in the way that you are asking this,

9        what could be done?  They could be made into a

10       charitable trust.  They could be shot into space as a

11       certain Tesla is believed to be up there.  They could be

12       given away to children's charities in Africa.

13       BY MR. FREEDMAN:

14            Q.    So, how much Bitcoin did C01N hold rights

15       over?

16                    MS. MARKOE:  Objection.

17                    THE WITNESS:  I would need to look at the

18       accounts.  I do not know off the top of my head.

19       BY MR. FREEDMAN:

20            Q.    Who has the accounts?

21            A.    I do not know.  It is a liquidated

22       company.  It has been closed.

23            Q.    So, where did the rights that C01N had

24       go?

25            A.    They have been moved.  I would need to



Page 120

1    look at the individual records to say what transfers

2    have occurred.  What you are trying to ask is about

3    Mr. Kleiman.  Mr. Kleiman had no ownership in that

4    company at any point.  He no assets in that company.

5    Nothing of his ever transferred to that company, or out

6    of that company.  He had no shareholding.  He had no

7    employee nature.  There was no contracts with

8    Mr. Kleiman.  There was no depositing of assets, removal

9    of assets, there was nothing that he owned ever went

10   into it.  A cent of his money or more never was involved

11   with anything to do with it.  He did not pay for the

12   formation.  He was asked to, he did not, because he got

13   sick, and that never occurred.

14           Q.     Did W&K have any relationship with C01N?

15                  MS. MARKOE:  Objection.

16                  THE WITNESS:  No.

17   BY MR. FREEDMAN:

18           Q.     Did C01N ever mine Bitcoin?

19                  MS. MARKOE:  Objection.

20                  THE WITNESS:  No.

21   BY MR. FREEDMAN:

22           Q.     Was C01N ever audited by the ATO?

23           A.     I do not know how that would be possible.

24   If you are talking about C01N UK, then C01N UK is a

25   British entity.



MAGNA ▶
LEGAL SERVICES

Page 121

1          Q.     Was it ever audited?  A simple yes or no

2     suffices.

3          A.     I would not be able to answer that.

4     I have no idea how the Australian government could ever

5     audit a British company, and if they did it would not

6     involve me.

7          Q.     You told me there is a UK entity C01N and

8     an Australian entity C01N?

9          A.     And I was very specific because we were

10    talking about the UK entity, you had not switched back

11    to the Australian entity, and I answered saying the UK

12    C01N.

13         Q.     So the Australian C01N, did it ever mine

14    Bitcoin?

15                MS. MARKOE:  Objection.

16                THE WITNESS:  No.

17    BY MR. FREEDMAN:

18         Q.     Was the Australian C01N ever audited by

19    the ATO?

20         A.     Yes.

21         Q.     When did that audit begin?

22         A.     I do not have the records in front of me.

23    I cannot answer any of those details.

24         Q.     Where do those records exist?

25                MS. MARKOE:  Objection.



Page 122

1                    THE WITNESS:  I have no idea, other than
2      the documents that have been handed to my lawyers.  That
3      is all I have.
4      BY MR. FREEDMAN:
5           Q.     Who were the directors of C01N?
6                    MS. MARKOE:  Objection.
7                    THE WITNESS:  Again, I do not remember
8      which directors were directors at any particular time.
9      I do not do company secretarial.  I pay other people to
10     do company secretarial.  As such, other people,
11     including professional companies that were there doing
12     that, would know these things, not me.
13     BY MR. FREEDMAN:
14          Q.     Who are those companies, so we can reach
15     out to them?
16                   MS. MARKOE:  Objection.
17                   THE WITNESS:  If you look up the records
18     on ASIC you will see a record that notes a company.
19     I am not going to pay for the record for you to download
20     one that anyone can go and pay for.
21     BY MR. FREEDMAN:
22          Q.     Who owned C01N Australia when it was
23     founded?
24          A.     Again, I do not have the shareholding
25     structure in front of me.  I will not speculate on which



Page 123

1   particular company out of which one I set up was owned

2   in what way.

3       Q.     Who owned C01N UK when it was initially

4   set up?

5       A.     Again, I do not have the records in front

6   of me.  If you are asking about either of those having

7   anything to do with W&K or Dave, zero.  Dave owned zero

8   in either C01N, nothing, nada, null, blank.

9       Q.     Did either C01N UK or C01N Australia have

10  ownership over Bitcoin IP?

11          MS. MARKOE:  Objection.  He has already

12  responded this had nothing to do with Dave Kleiman.  You

13  have gotten some leeway into your questions about this

14  topic, and I am going to instruct him not to answer any

15  further questions about the assets of companies that had

16  nothing to do with Dave Kleiman or W&K.

17          MR. RIVERO:  It is just after one, and

18  I think we are wearing our court reporter out.  At a

19  good stopping point, let us take a break.

20          MR. FREEDMAN:  That is fine, we can stop

21  now.

22          THE VIDEOGRAPHER:  Going off the record.

23  The time is 13.02.  End of video card number 2, volume

24  1, in the video deposition of Dr. Craig Wright.

25          (Luncheon adjournment)



1                    THE VIDEOGRAPHER:  This is the beginning

2     of video card number 3, volume 1, in the video

3     deposition of Dr. Craig Wright.  Going on the record.

4     The time is 14.07.  Thank you.

5     BY MR. FREEDMAN:

6          Q.    Good afternoon, Dr. Wright.  Welcome

7     back.  I had one last question about C01N.  You were

8     referring me to ASIC.  Who has the non-public records of

9     C01N?

10                    MS. MARKOE:  Objection.  You may answer.

11                    THE WITNESS:  Anything that I do not have

12    in that pile, I do not know.

13    BY MR. FREEDMAN:

14         Q.    So if you did not give it to your

15    lawyers, you do not know where it is?

16         A.    I have no idea.

17         Q.    Whose idea was it to create Bitcoin?

18                    MS. MARKOE:  Objection.

19                    THE WITNESS:  I have been working on this

20    since 1998.

21    BY MR. FREEDMAN:

22         Q.    So it was your idea?

23         A.    Other people have wanted to create

24    digital money beforehand.  Bitcoin differs in that

25    everyone wanted an anonymous cash system.  I made sure



Page 125

```
 1    that it was a legal system.  I have had other ideas that
 2    were different to create what is Bitcoin meant
 3    blockchain and that required being different than things
 4    like e-cash, in a completely different way.
 5              Q.    When did you decide to go from working on
 6    it to bringing it public?
 7                    MS. MARKOE:  Objection.
 8                    MR. FREEDMAN:  You can answer.
 9                    THE WITNESS:  2008.
10    BY MR. FREEDMAN:
11              Q.    In 2008, did you believe what you were
12    doing would be successful?
13              A.    I had no idea.
14              Q.    Did you hope it would be successful?
15              A.    Of course you hope, or you would not work
16    on it otherwise.
17              Q.    Did you believe it would become a real
18    alternate currency?
19                    MS. MARKOE:  Objection.
20                    THE WITNESS:  I do not know; it is still
21    not a currency.  I hope.
22    BY MR. FREEDMAN:
23              Q.    Did you believe it would become a real
24    alternate method of exchange?
25                    MS. MARKOE:  Objection.
```



Page 126

1                    THE WITNESS:  I always hoped.

2    BY MR. FREEDMAN:

3            Q.    Do you recall reaching out to

4    Louis Kleiman in February 2014?

5            A.    I do not remember the exact date, but

6    some time around then, yes.

7            Q.    I am handing you what we can mark as

8    Plaintiff's Exhibit 2.

9    (Plaintiff's Exhibit 2 marked for identification)

10   This is docket entry 83-23.  Do you recognise the

11   e-mail on the second half of page 2?

12                   MS. MARKOE:  Objection.  You may answer.

13                   THE WITNESS:  I recognise the printout of

14   the e-mail.

15   BY MR. FREEDMAN:

16           Q.    And it says:  "Hello Louis, your son Dave

17   and I are two of the three key people behind Bitcoin."

18   Did you write that?

19           A.    I typed that.

20           Q.    Who is the third person?

21                   THE WITNESS: Is it one of those things?

22                   MS. MARKOE:  Okay.  Dr. Wright is not in

23   a position to answer that question.  He will provide a

24   fulsome explanation to the court in camera.

25                   MR. FREEDMAN:  Do we know the basis for



Page 127

1    refusing to answer?

2                    MS. MARKOE:  My understanding -- and he

3    will correct me if I am wrong -- is security.

4                    MR. FREEDMAN:  National security?

5                    MS. MARKOE:  Yes.

6                    MR. FREEDMAN:  Of which country?

7                    THE WITNESS:  In this particular case,

8    the USA.

9    BY MR. FREEDMAN:

10          Q.    Do you have a formal security clearance

11   from the USA?

12          A.    I am not going to be discussing any of

13   this stuff.

14                  MS. MARKOE:  Okay, so he will discuss

15   details regarding that in camera with the court, and the

16   court will make a determination as to what parts of that

17   he can answer, if any.

18   BY MR. FREEDMAN:

19          Q.    Is the third person still alive?

20          A.    I do not know.

21          Q.    Is the third person a member of the US

22   government?

23          A.    If I do not know if they are alive I do

24   not know if they are a member of the US government.

25          Q.    Were they ever a member of the US



Page 128

```
 1   government?

 2                MS. MARKOE:  If you can answer, answer.

 3   If you cannot answer, then you will answer ----

 4                THE WITNESS:  Yes.

 5   BY MR. FREEDMAN:

 6        Q.    What body of the government?

 7                MS. MARKOE:  Answer until you feel that

 8   you need to answer in front of the court ----

 9                THE WITNESS:  I will leave that one for

10   the court.

11                MS. MARKOE:  ---- in camera.

12   BY MR. FREEDMAN:

13        Q.    Was Dave aware of this third person's

14   involvement?

15                MS. MARKOE:  Objection.

16                THE WITNESS:  Again, I will leave that to

17   the court.

18   BY MR. FREEDMAN:

19        Q.    Was this third person aware of Dave's

20   involvement?

21        A.    Again, I am going to leave any of this to

22   the court.

23        Q.    Between 1998 and 2008, when you decided

24   to take Bitcoin public, who did you speak to about the

25   idea?
```



Page 129

```
 1              A.     The idea is a very wide topic.  Who did
 2    I speak to between 1998 and 2008?  Apart from e-mails to
 3    Wei Dai and others who were seemingly public, such as
 4    Hal Finney and John MacDonald and Bear ----
 5              Q.     I am sorry?
 6              A.     Bear.
 7              Q.     Bear?  Is that a first name or a last
 8    name?
 9              A.     That is his nickname.  Also Cryptonaut.
10    If you search up you will find who it is.  That is Ray.
11              Q.     Ray who, I am sorry?
12              A.     Do a search on big time talk and say the
13    name, but "Bear Cryptonaut", you will find it.
14              Q.     This is a user name?
15              A.     Yes.
16              Q.     And Cryptonaut and Bear are the same
17    people?
18              A.     Yes.
19              Q.     I apologise, because I did not catch
20    Bear, but I interrupted you.
21              A.     B-E-A-R.
22              Q.     Thank you.  Wei Dai, Hal Finney, John
23    MacDonald, Bear Cryptonaut; was there anyone else you
24    spoke to during that time?
25              A.     In a 20-year period there were lots of
```



Page 130

1    other people.

2           Q.     I am talking just about 10 years from

3    1998-2008?

4           A.     Yes.

5           Q.     Were there any others that you recalled,

6    besides these four?

7           A.     I discussed things with Allan Granger.

8           Q.     Who is Allan Granger?

9           A.     He is a former partner of BDO.

10          Q.     Is Mr. Granger still alive?

11          A.     Yes.

12          Q.     When did you contact Mr. Granger about

13   Bitcoin?

14          A.     I worked for Mr. Granger.

15          Q.     What time did those communications with

16   Mr. Granger take place?

17          A.     Between times when we were working

18   together.

19          Q.     So 2008?

20                 MS. MARKOE:  Objection.

21   BY MR. FREEDMAN:

22          Q.     When was the timeframe you worked at BDO?

23   Remind me, I forget.

24          A.     2005.

25          Q.     2005-2008.  Do you have contact



Page 131

1    information for Mr. Granger?

2           A.    I do not know.  I am not sure.  He is not

3    at BDO any more.  I do not know if he is still where he

4    was.

5           Q.    Does he still live in Australia?

6           A.    I have not talked to him in a couple of

7    years.

8           Q.    When was the last time you spoke to

9    Mr. Granger?

10          A.    2016, I believe.

11          Q.    At that time, was he living in Australia?

12          A.    Yes.

13          Q.    Do you have contact information for

14    Wei Dai?

15          A.    Just the e-mail.

16          Q.    Do you know that e-mail by heart?

17          A.    No.

18          Q.    Can you provide it to your lawyers?

19          A.    I will just do an internet search.

20          Q.    Do you have contact information for John

21    MacDonald?

22          A.    Again, I would do an internet search.

23          Q.    Do you have contact information for Bear?

24          A.    Again, I would do an internet search, and

25    he has not changed his address.



Page 132

1          Q.      When you contacted Bear, did you contact

2     him as Dr. Craig Wright or in some alias?

3                  MS. MARKOE:  Objection.

4                  MR. FREEDMAN:  You can answer.

5                  THE WITNESS:  Both.

6     BY MR. FREEDMAN:

7          Q.      What method do you use to communicate

8     with Bear?

9          A.      Bitcointalk, IRC, e-mail.

10         Q.      Do you have any of those records still?

11         A.      Bitcointalk is public, IRC does not have

12    records, unless someone has captured them, and, no, I do

13    not have those e-mails, although some of them are still

14    available.

15         Q.      What was the user name on Bitcointalk

16    that you used?

17         A.      Satoshi.

18         Q.      Do you still have access to the Satoshi

19    account on Bitcointalk?

20                 MS. MARKOE:  Objection.  You can answer.

21                 THE WITNESS:  I have not tried logging in

22    in a long time.

23    BY MR. FREEDMAN:

24         Q.      Do you have the old credentials?

25         A.      I have not even looked whether I would.



Page 133

```
1          Q.      Where would they be, if you had them?

2          A.      Most likely in my head.

3          Q.      Can you look now and tell me if they are

4     there?

5          A.      I would need to try and see if I do not

6     log myself out.  I have used a lot of passwords in the

7     past and I can remember some of  the mnemonics from some

8     of them.  Have I tried: no; would I want to: no.

9          Q.      Did anyone else have access to the

10    Satoshi account on Bitcoin.com?

11                 MS. MARKOE:  Objection.

12                 MR. FREEDMAN:  Sorry, Bitcointalk, is it?

13                 THE WITNESS:  Bitcointalk.  Yes.

14    BY MR. FREEDMAN:

15         Q.      Who else had access?

16         A.      Dave.

17         Q.      When did Dave have access to the Satoshi

18    account?

19         A.      The exact set-up time, I do not remember,

20    but we stopped using it in December 2010.

21         Q.      Why did you stop using it in December

22    2010?

23         A.      I was disillusioned with Bitcoin and

24    I needed to test whether I had completely fucked up.

25         Q.      So did you have a conversation with Dave?
```



Page 134

1    How did you mutually come to the agreement not to use it

2    any more?

3                  MS. MARKOE:  Objection:  mischaracterises

4    the testimony.

5                  MR. FREEDMAN:  You can answer.

6                  THE WITNESS:  It was my account, so there

7    is no -- should not be used any more.  Did I go off and

8    stop interacting: yes.  A number of things had occurred.

9    WikiLeaks, Silk Road and a number of other dark websites

10   were starting to be created.  The reason I created

11   Bitcoin was to ensure a form of money that had an

12   evidence trail stopped all that.  And what I saw was my

13   creation being used for everything I hated and nothing

14   valid at the time, and I thought I had failed.

15   BY MR. FREEDMAN:

16          Q.    Did Dave share this  disappointment?

17                  MS. MARKOE:  Objection.

18                  MR. FREEDMAN:  You can answer.

19          A.    No.  Dave was the reason I kept going.

20   BY MR. FREEDMAN

21          Q.    Did you ask Dave to stop -- strike that.

22   Did Dave ever communicate with the Satoshi account on

23   Bitcointalk?

24                  MS. MARKOE:  Objection.

25                  MR. FREEDMAN:  You can answer.


MAGNA ►
LEGAL SERVICES

Page 135

1                    THE WITNESS:  You are asking, did he

2     communicate with the account?

3    BY MR. FREEDMAN:

4          Q.    Did he ever write a post?  Did he ever

5     send a message as Satoshi?

6                    MS. MARKOE:  Objection.

7                    THE WITNESS:  That is a different

8     question again.  Did he send a message as Satoshi is not

9     did he answer on the Bitcoin account.

10   BY MR. FREEDMAN:

11         Q.    You are right.  Bad question. Strike it.

12    Did Dave ever post as Satoshi on the Bitcointalk forum?

13         A.    No.

14         Q.    Did Dave ever send a message as Satoshi

15    on the Bitcointalk forum?

16         A.    No.

17         Q.    What did Dave do with his access?

18                    MS. MARKOE:  Objection.

19                    THE WITNESS:  He checked what I was

20    doing.

21   BY MR. FREEDMAN:

22         Q.    Why did you give Dave access to the

23    Bitcointalk Satoshi account?

24         A.    Because I can be hot-headed.

25         Q.    And?



Page 136

1          A.    Dave is -- Dave was a rambunctious bugger

2     at times too, but Dave did the e-mail rule of reread

3     before you send.

4          Q.    So how did his access facilitate that?

5          A.    He cut out a whole lot of stupid things

6     that I would have sent to people.

7          Q.    So he edited the communications before

8     you sent them?

9                MS. MARKOE:  Objection.

10               THE WITNESS:  Not all, some.

11    BY MR. FREEDMAN:

12          Q.    Did you have a process in place where you

13    would draft responses, he would review  it and then you

14    would send it?

15               MS. MARKOE:  Objection.

16               THE WITNESS:  No, there was no formal

17    anything like that.

18    BY MR. FREEDMAN:

19          Q.    How did he see what you were going to

20    send to edit it?

21               MS. MARKOE:  Objection.

22               THE WITNESS:  If you have an account you

23    can see things.

24    BY MR. FREEDMAN:

25          Q.    You would save drafts?



Page 137

```
 1           A.    If I was annoyed, I was able to contact
 2    him and say I was annoyed before I sent something.
 3           Q.    Did there come a time in December 2010
 4    you asked Dave to stop using the account?
 5                 MS. MARKOE:  Objection.
 6                 THE WITNESS:  No.
 7    BY MR. FREEDMAN:
 8           Q.    You just never called him to log into the
 9    account again?
10                 MS. MARKOE:  Objection.
11                 THE WITNESS:  No.
12    BY MR. FREEDMAN:
13           Q.    So, do you know if he stopped logging in?
14           A.    No one was logging in.
15           Q.    How do you know that he was not logging
16    in?
17           A.    The account has account details.  You can
18    log in and have a look at those if you want.
19           Q.    Do those account details exist today?
20           A.    Yes.
21           Q.    Are those public?
22           A.    Yes.
23           Q.    Did anyone else have access to the
24    Satoshi account at Bitcointalk?
25           A.    Yes.
```



Page 138

```
 1          Q.     Who else?

 2          A.     It's run on a common forum, so

 3   administrators, whatever else, could have gained access.

 4          Q.     Administrators could view the private

 5   account of Satoshi?

 6                 MS. MARKOE:  Objection.

 7                 THE WITNESS:  A Google administrator

 8   could view Google e-mail from anyone.  Whether they get

 9   fired for doing it is another question.  You said

10   "could".

11   BY MR. FREEDMAN:

12          Q.     Who were the administrators of Bitcoin --

13   strike that.  Whose idea was it to write the Bitcoin

14   white paper?

15          A.     Mine.

16          Q.     When did you begin drafting the Bitcoin

17   white paper?

18          A.     2002.

19          Q.     Did you speak with anybody about the

20   Bitcoin white paper?

21                 MS. MARKOE:  Objection.

22                 THE WITNESS:  Yes, I have spoken to

23   people about the Bitcoin white paper.  I was on a call

24   last night doing just that.

25   BY MR. FREEDMAN:
```



Page 139

1          Q.     Did you send a draft of the Bitcoin white

2     paper to anyone from 2002 until 2007?

3                    MS. MARKOE:  Objection.

4                    THE WITNESS:  It was not complete at that

5     stage.

6     BY MR. FREEDMAN:

7          Q.     But did you share any form of any draft

8     of the white paper from 2002 until 2007?

9          A.     Yes.

10         Q.     With who?

11         A.     The Australian government.

12         Q.     How did you share it with the Australian

13    government?

14         A.     I sought funding from ITOL.

15         Q.     From, I am sorry?

16         A.     I-T-O-L.

17         Q.     What does that stand for?

18         A.     Off the top of my head, I have no idea.

19    It has been a long time.

20         Q.     Do you have the records of that

21    submission?

22         A.     Some exist, yes.

23         Q.     Do you have them?

24         A.     I know they are on ITOL.

25         Q.     Is ITOL publicly available?



Page 140

1      A.      No.

2      Q.      Can you request them from ITOL?

3      A.      I do not know.  I have not done that.

4      Q.      Did you get the funding?

5      A.      No.

6      Q.      Why not?

7              MS. MARKOE:  Objection:  foundation.

8              THE WITNESS:  The government decided not

9   to fund it.

10  BY MR. FREEDMAN:

11     Q.      Did you share the white paper with anyone

12  else from 2002-2007?

13     A.      Other people had helped me.

14     Q.      Who?

15     A.      In parts, I do not know.  I have talked

16  to many people in the past.  There are bits of things

17  that I have given over.  I cannot remember all the

18  details of that.

19     Q.      Do you remember anyone?

20     A.      In whole, no.

21     Q.      What do you mean "in whole"?

22     A.      You asked me if I have sent paragraphs to

23  people and things like this.

24     Q.      Who did you send paragraphs to?

25             MS. MARKOE:  Objection.  Vel, I would ask



Page 141

1    that you limit your questions to the timeframe of this

2    litigation, which begins, I think per your request, in

3    2006 or 2007.  So, anything prior to those years are

4    irrelevant, and beyond the scope.  I will instruct the

5    witness not to answer.

6    BY MR. FREEDMAN:

7         Q.    In 2006, did you share drafts of the

8    white paper with anyone?

9         A.    I do not know.  I discussed it.

10        Q.    Who did you discuss it with?

11        A.    I discussed some of the concepts that

12   became Bitcoin with Allan Granger, with Stefan Matthews,

13   with a person called Joseph Vaughn Perling.

14        Q.    How did you make those ----

15             MR. RIVERO:  He has not finished.

16             THE WITNESS:  Michael Shehadie.

17             MR. FREEDMAN:  Can you spell that for me.

18             THE WITNESS:  No.  S-H-E-H-A-D-I-E,

19   I believe, but quote me, it could have more Hs!

20   BY MR. FREEDMAN:

21        Q.    Anyone else?

22        A.    Yes, I am thinking, sorry.  (Pause)

23   Sorry, I just need to -- it has been a long time. A

24   person from the Australian Federal Police, I cannot

25   remember his name, he is in the financial crime



Page 142

1    division.

2                    MR. RIVERO:  Can I ask for the court

3    reporter, is Mr. Granger's first name Allan or Allen, if

4    you know?

5                    THE WITNESS:  It is an AN, not an EN, but

6    I cannot remember off the top of my head whether it is a

7    LL or a single L.

8    BY MR. FREEDMAN:

9         Q.    Is there anyone else?

10        A.    Yes, but I cannot remember.  I know there

11   were a couple of people that I spoke to when I was doing

12   some financial crime work with BDO, and it was loosely

13   about not Bitcoin but the topics in there and I cannot

14   remember their name off the top of my head.

15        Q.    You showed these individuals drafts of

16   the white paper?

17        A.    I had shown them aspects.

18        Q.    Aspects.  How did you share aspects of

19   the white paper with Joseph Vaughn Perling?

20        A.    Exactly how I do not remember.  I met him

21   in person, exactly where back then I cannot remember.

22   It has been a long time.  I have been to a lot of

23   conferences, I do not remember each one.  I think other

24   people remember more than I do, because, as I said, I go

25   to so many conferences each month that when you are



Page 143

1    asking me more than 10 years ago, I do not remember

2    which particular conference or which particular paper.

3           Q.     How did you ----

4           A.     Likely on a tablet.

5           Q.     How did you share portions of the white

6    paper with Michael Shehadie?

7           A.     He is my lawyer.

8           Q.     Okay.  Where does he work?

9           A.     Australia.

10          Q.     What law firm?

11          A.     Michie Shehadie and Co.

12          Q.     Without revealing anything about your

13   discussions between yourself and Mr. Shehadie, why did

14   you discuss it with him?

15                 MS. MARKOE:  Objection.  If you can

16   answer that question without revealing the contents and

17   legal purpose of your communication with him, then do

18   so.  If you cannot then I would instruct you not to

19   answer.

20                 THE WITNESS:  It was all to do with legal

21   stuff.

22   BY MR. FREEDMAN:

23          Q.     Did you ever consider patenting the white

24   paper?

25          A.     Yes.



Page 144

1          Q.      When did you consider patenting the white

2    paper?

3                  MS. MARKOE:  Objection.  I think we are

4    sort of getting beyond, again, the topics.  This is a

5    limited deposition.  Can you please explain to me how

6    that question relates to any one of these topics.

7                  MR. FREEDMAN:  It has to do with -- well,

8    my next question was going to be, if it was Dave's idea

9    to patent it ----

10                 MS. MARKOE:  I am asking about this

11   question, I am not asking about the next question.

12                 MR. FREEDMAN:  Zaharah, I do not have

13   time, so either instruct him not to answer or object.

14   Choose.

15                 MR. RIVERO:  We are asking you to connect

16   it up to the topics, and that is a fair question.

17   Connect it up if you have another question.

18                 MR. FREEDMAN:  It has to do with quickly

19   details surrounding Craig and Dave's partnership to

20   create Satoshi Nakamoto.

21                 MR. RIVERO:  Ask the question that makes

22   the connection of a predicate to why this is relevant.

23   We are not trying to stop you.  Go ahead.

24                 MR. FREEDMAN:  I am not going to do it.

25          Q.      When did you contemplate patenting the



Page 145

1    white paper?

2              MS. MARKOE:  Objection.  You can answer.

3              THE WITNESS:  I considered patenting

4    Bitcoin in 2002.

5    BY MR. FREEDMAN:

6         Q.    Did you consider patenting it in 2008?

7              MS. MARKOE:  Objection.

8              THE WITNESS:  I considered patenting it

9    in 2007, but not in 2008.

10   BY MR. FREEDMAN:

11        Q.    When did Dave first become involved with

12   the white paper?

13        A.    2008.

14        Q.    Why did you decide not to patent Bitcoin?

15             MS. MARKOE:  Objection.

16             THE WITNESS:  Because ----

17             MS. MARKOE:  How does this relate in any

18   way to any purported partnership between Dave and

19   Dr. Wright?

20             MR. FREEDMAN:  I do not yet know the

21   answer.  Once I know I will let you know.

22             MS. MARKOE:  You have to actually

23   establish any sort of connection between the limited

24   topics.  I am giving you leeway here but this is not a

25   merits deposition on every topic that you want to ask



Page 146

```
 1    about.  It is a limited deposition on ten specific

 2    topics.  I have given you plenty of leeway but if you

 3    cannot connect how a particular question, after that

 4    leeway, relates to one of these topics then I will

 5    instruct the witness not to answer.

 6    BY MR. FREEDMAN:

 7          Q.    Did you speak to anyone about patenting

 8    Bitcoin?

 9                MS. MARKOE:  Objection.  Do not answer

10    that.

11                THE WITNESS:  Lawyers.

12    BY MR. FREEDMAN:

13          Q.    Did you speak to anyone besides lawyers?

14                MS. MARKOE:  Objection.  Do not answer

15    that, except as it relates to Dave Kleiman.

16                MR. RIVERO:  Can you answer that, as

17    instructed by Ms. Markoe.

18                THE WITNESS:  No relation to Mr. Kleiman,

19    only to do with lawyers.

20    BY MR. FREEDMAN:

21          Q.    When did Dave become involved in the

22    white paper?

23                MS. MARKOE:  Objection: asked and

24    answered.

25                THE WITNESS:  2008.
```



Page 147

```
 1   BY MR. FREEDMAN:

 2           Q.      How did he become involved with the white

 3   paper?

 4           A.      That is a rather wide question.  How do

 5   you -- sorry, how do you become involved with the white

 6   paper?  Can you clarify that a bit please?

 7           Q.      How did Dave find out about the white

 8   paper?

 9           A.      You have already given me an e-mail that

10   I have sent.  The white paper was not public before

11   that, so ----

12           Q.      Did you attach the white paper to that

13   e-mail?

14           A.      No.

15           Q.      So how did he obtain the white paper?

16           A.      It was put online.

17           Q.      When was it put online?

18           A.      2008.

19           Q.      Where was it put online?

20           A.      A server in Melbourne upload.ae.

21           Q.      How did he find the location of the white

22   paper?

23                   MS. MARKOE:  Objection.  You can answer

24   if you understand the question.

25                   THE WITNESS:  How did he find it?  Well,
```



1    he typed in a link into a browser and it magically came

2    from the ether of the internet.

3    BY MR. FREEDMAN:

4         Q.    And he magically found out about the

5    hyperlink?

6              MS. MARKOE:  Objection:  argumentative.

7              MR. FREEDMAN:  Withdrawn.

8         Q.    How did he find the specific URL he was

9    supposed to type in?

10        A.    As I have been saying, we discussed

11   things over IRC.

12        Q.    Did you give him the address over IRC?

13        A.    Yes.

14        Q.    When did that take place?

15        A.    Shortly after that e-mail.

16        Q.    Why did you e-mail him the initial

17   communication and follow up with IRC?

18             MS. MARKOE:  Objection: compound.

19             MR. FREEDMAN:  You can answer.

20             THE WITNESS:  I sent him that original

21   e-mail because I wanted his help.  I then followed up

22   because I would chat with him live over IRC.

23   BY MR. FREEDMAN:

24        Q.    How long was the Bitcoin white paper when

25   you contacted Dave in 2008?



Page 149

```
 1                    MS. MARKOE:  Objection.  You can answer
 2      if you can.
 3                    THE WITNESS:  The same length as it is
 4      now, approximately.
 5      BY MR. FREEDMAN:
 6            Q.    Why did you reach out for Dave's help
 7      about the white paper?
 8                    MS. MARKOE:  Objection.  You can answer.
 9                    THE WITNESS:  I was not so much asking
10      for his help about the white paper.
11      BY MR. FREEDMAN:
12            Q.    What were you reaching out for?
13            A.    His help in other ways.
14            Q.    What were the ways you were seeking Dave
15      Kleiman's help?
16            A.    I am not a likeable person.  Dave was.
17      I put people off.  I care about my business, my work, my
18      maths, my papers, my patents, and not much more, so
19      unfortunately dealing with people and dealing with
20      people in open source communities is something I am
21      very, very bad at.
22            Q.    This was something Dave was good at?
23            A.    That is something Dave could help me
24      with.
25            Q.    Did he help you with that?
```



Page 150

1                    MS. MARKOE:  Objection.  You can answer.

2                    THE WITNESS:  Dave has helped me with

3      that many times in the past.  The e-mail that you are

4      referencing, I believe I saw the defamation and whatever

5      is the title.

6                    MS. MARKOE:  Exhibit 1.  I believe it is

7      right in front of you.

8                    THE WITNESS:  "Defamation and the

9      difficulties of law on the Internet".  Around the same

10     time I was having other troll fights as I have had many

11     times, and Dave helped there as well.

12   BY MR. FREEDMAN:

13        Q.    Why did Dave need to review the white

14     paper to help you interact with open source communities?

15                    MS. MARKOE:  Objection.  You may answer.

16                    THE WITNESS:  Dave was not the only

17     person who reviewed the white paper.

18   BY MR. FREEDMAN:

19        Q.    Who else reviewed the entire white paper,

20     as uploaded to upload.ae?

21                    THE WITNESS:  I do not know.

22                    BY MS. MARKOE:  Objection.

23   BY MR. FREEDMAN:

24        Q.    Who else did you give the upload.ae

25     address to?



1          A.      It was put on a public mailing list.

2          Q.      Which public mailing list?

3          A.      The cryptography mailing list, it was put

4    on the Usenet sites.  It was in an IRC chat group.  It

5    was sent to Wei Dai.  It was sent to Adam Back.

6          Q.      Did Dave put it on the cryptography

7    mailing list?

8          A.      No.

9          Q.      Who did?

10         A.      Me.

11         Q.      Did Dave put it on IRC?

12         A.      Yes.

13         Q.      Was there a chat on IRC?

14         A.      There were multiple chats on IRC.

15         Q.      Do you remember the chats he put them on?

16         A.      You have not used IRC, have you?

17         Q.      I have not.

18         A.      I suggest you look at how IRC works and

19   then you will see why I am sighing when you ask that.

20         Q.      Did Dave send it to Adam Back?

21                 MS. MARKOE:  Objection.

22                 THE WITNESS:  No.

23   BY MR. FREEDMAN:

24         Q.      Who did?

25         A.      I already said.



Page 152

```
 1            Q.    I missed it.  Can you repeat it?

 2            A.    Me.

 3            Q.    When did you send it to Adam Back?

 4                  MS. MARKOE:  Objection.  You may answer.

 5                  THE WITNESS:  2008.

 6   BY MR. FREEDMAN:

 7            Q.    Did Adam Back comment on the white paper?

 8                  MS. MARKOE:  Objection.  You are getting

 9   beyond the scope again.

10                  MR. FREEDMAN:  Okay.

11                  MS. MARKOE:  So, I would instruct the

12   witness not to answer.  You are going beyond the scope.

13   BY MR. FREEDMAN:

14            Q.    Did Dave interact with Adam Back?

15                  MS. MARKOE:  Objection:  foundation.  You

16   can answer.

17                  THE WITNESS:  Yes.

18   BY MR. FREEDMAN:

19            Q.    Did Dave interact with Adam Back about

20   the white paper?

21                  MS. MARKOE:  Objection.  If you know.

22                  THE WITNESS:  I do not know exactly what

23   Dave wrote.  I am not Dave.

24   BY MR. FREEDMAN:

25            Q.    How do you know that Adam Back
```



Page 153

1    communicated with Dave?

2                 MS. MARKOE:  Objection:  mischaracterises

3    the testimony.

4                 MR. FREEDMAN:  You can answer.

5                 THE WITNESS:  I spoke with Dave.

6    BY MR. FREEDMAN:

7         Q.    And what did Dave say about Adam Back?

8                 MS. MARKOE:  Objection.

9                 THE WITNESS:  Do I have to say it?

10                MR. RIVERO:  Yes, go ahead.

11                MS. MARKOE:  Just answer.

12                THE WITNESS:  He said something along the

13   lines of, to characterise what you bloody Aussies say,

14   he is a wanker and we got the wrong person.

15   BY MR. FREEDMAN:

16        Q.    What did he mean by saying you have the

17   wrong person?

18                MS. MARKOE:  Objection.

19                THE WITNESS:  Hal Finney wrote the R

20   proof of work code that I used as a basis, not Adam.

21   BY MR. FREEDMAN:

22        Q.    Did you confuse the R proof of work code

23   as having been authored by Adam Back?

24                MS. MARKOE:  Objection.  You can answer.

25                THE WITNESS:  I did not check.  I chucked



Page 154

1    in a reference after doing a quick search.  The work by

2    Aurora et al had been implemented by a site I saw

3    referenced as Adam Back.  I put that down.  I did not

4    check that that did not actually work, and that it was

5    Hal Finney who actually fixed it and had it working.

6   BY MR. FREEDMAN:

7        Q.    Did Dave have any further interactions

8    with Adam Back about the white paper that you are aware

9    of?

10              MS. MARKOE:  Objection.  You can only

11   state stuff that you know.

12              THE WITNESS:  I do not know.

13   BY MR. FREEDMAN:

14        Q.    Did Dave reach out to Hal Finney about

15   the R proof of work?

16              MS. MARKOE:  Objection:  foundation.

17   BY MR. FREEDMAN:

18        Q.    Withdrawn.  Do you know whether Dave he

19   reached out to Hal Finney about the R proof of work

20   code?

21        A.    No, he would not need to reach out to

22   Hal Finney.

23        Q.    Why not?

24        A.    Because Hal Finney reached out to us.

25        Q.    How did Hal Finney reach out to you and



Page 155

1    Dave?

2                    MS. MARKOE:  Objection.

3                    MR. FREEDMAN:  You can answer.

4         A.    He talked over public forums, IRC and

5    e-mail.

6    BY MR. FREEDMAN:

7         Q.    What did he say, in his initial

8    communication?

9                    MS. MARKOE:  Objection.

10                    THE WITNESS:  He thought Bitcoin could

11   work but there would be a few problems.

12   BY MR. FREEDMAN:

13        Q.    Did you and Dave work on those problems?

14                    MS. MARKOE:  Objection: assumes facts not

15   in evidence.

16                    MR. FREEDMAN:  You can answer it.

17                    THE WITNESS:  There were no problems.

18   Actually ----

19   BY MR. FREEDMAN:

20        Q.    Hal Finney was wrong?

21        A.    There were problems but not the problems

22   he was stating.  So, yes, Hal Finney was wrong.

23        Q.    What were the problems Hal Finney thought

24   were with the protocol?

25                    MS. MARKOE:  Objection: relevance.  This



Page 156

1    is now again, you are getting beyond the scope.  I am

2    going to ask him not to answer that question.

3    BY MR. FREEDMAN:

4         Q.    Do you maintain any of the correspondence

5    with Hal Finney back in 2008?

6         A.    No.

7         Q.    Did Dave edit the white paper?

8         A.    A few people edited the white paper,

9    including Dave.

10        Q.    What were Dave's edits to the white

11   paper?

12        A.    I do not exactly remember.  There were

13   six different versions.

14        Q.    Sorry?

15        A.    There were six different versions.

16        Q.    When did version 1 come out?

17              MS. MARKOE:  Objection.

18              THE WITNESS:  2002.

19   BY MR. FREEDMAN:

20        Q.    When did version 2 come out?

21              MS. MARKOE:  Objection.

22              THE WITNESS:  I do not remember the exact

23   dates of all of these.

24   BY MR. FREEDMAN:

25        Q.    Do you recall when version 3 came out?



Page 157

1           MS. MARKOE:  Objection.

2           THE WITNESS:  Again, I do not remember

3    all of it.  I had multiple versions, all simultaneously

4    running.  If you ask any of my staff, my document

5    management is shit.  I save and then update the old

6    version sometimes and then go back to the first one.

7    I then re-edit a later one.  I have people bitch at me

8    and I have been banned from document management

9    altogether by my staff, who have basically just about

10   threatened to walk out if I am allowed to touch a

11   document ever again.

12   BY MR. FREEDMAN:

13           Q.    Did Dave help you keep track of the six

14   different versions of the white paper?

15           MS. MARKOE:  Objection.

16           THE WITNESS:  No; hence why it was a

17   fucking mess.

18   BY MR. FREEDMAN:

19           Q.    How did you compile all versions into

20   one?

21           MS. MARKOE:  Objection.

22           THE WITNESS:  I did not.

23   BY MR. FREEDMAN:

24           Q.    Who did?

25           A.    Nobody.



Page 158

1          Q.      So how did you get the final version?

2          A.      The same way I do every single time,

3     I finish up a version.

4          Q.      Which is the version that is public?

5                  MS. MARKOE:  Objection.

6                  THE WITNESS:  It is the one that is still

7     public as the Bitcoin white paper.

8     BY MR. FREEDMAN:

9          Q.      Of the six, which one was that?

10                 MS. MARKOE:  Objection.

11                 THE WITNESS:  Exactly where each bit

12    came, I could not answer.

13    BY MR. FREEDMAN:

14         Q.      If you had a copy of the white paper in

15    front of you, would it help identify Dave's

16    contributions?

17         A.      No.  More than anything else, what Dave

18    helped me with was, it is like legal things.  I have

19    been an expert witness many, many times, and that is way

20    easier than being your own witness.  There is no emotion

21    in talking about someone else's things.  It is easy to

22    make mistakes when you are doing your own thing.  And it

23    is critical to get rid of the metadata.  If you want to

24    not be found, not have something point back, then it is

25    absolutely critical to strip anything that can identify



Page 159

1    a document.  Dave was also very good at that.  Dave

2    helped double-check that all the PDFs, etcetera, had

3    nothing to tie anything back.

4           Q.    Was there anyone else besides Dave that

5    you could have used to do those two functions?

6                 MS. MARKOE:  Objection.

7                 THE WITNESS:  I believe there is a world

8    full of editing services, so if you are saying anyone

9    could do that, then of course there are.  There are

10   commercial companies, but then if I am going to someone

11   and going, "Hey, I have this supersecret document that

12   I want you to sort of sit on", it does not work too

13   well.

14   BY MR. FREEDMAN:

15          Q.    Was there anyone you could trust to keep

16   it secret and who had these abilities besides Dave?

17                MS. MARKOE:  Objection.

18                MR. FREEDMAN:  You can answer.

19                THE WITNESS:  Yes.

20   BY MR. FREEDMAN:

21          Q.    Who?

22          A.    I have a lot of friends in the computer

23   forensics industry.

24          Q.    Why did you not use them?

25                MS. MARKOE:  Objection.



Page 160

1                    THE WITNESS:  Because I asked Dave.

2   BY MR. FREEDMAN:

3          Q.    Was it because Dave was your best friend?

4          A.    In part, yes.

5          Q.    I want to direct your attention back to

6   Plaintiff's Exhibit 1, which is the 2008 e-mail.  When

7   did you settle on the name Bitcoin?

8                    MS. MARKOE:  Objection.  You can answer.

9                    THE WITNESS:  I thought about the name

10   Bitcoin for a while.  It was actually B-i-t-C-o-i-n,

11   which I got a lot shit for.  I believed we discussed

12   that sort of thing when naming.  Other people over here

13   in Britain seemed to like to capitalising in the middle

14   of things.  Americans think I am stupid for doing it.

15   BY MR. FREEDMAN:

16          Q.    So Dave eventually talked you into not

17   capitalising the C?

18                    MS. MARKOE:  Objection: mischaracterises

19   the testimony.

20                    THE WITNESS:  No, it was capitalised in

21   many places.

22   BY MR. FREEDMAN:

23          Q.    Did Dave prefer BitCash or Bitcoin?

24                    MS. MARKOE:  Objection.  You can answer.

25                    THE WITNESS:  Bitcoin.



Page 161

1    BY MR. FREEDMAN:

2            Q.    Did Dave prefer capital C or lower case

3    C?

4                 MS. MARKOE:  Objection.

5                 THE WITNESS:  Dave was American.

6    BY MR. FREEDMAN:

7            Q.    He liked lower case C?

8            A.    Yes.

9            Q.    Did you ultimately decide on a version?

10           A.    No, I used both.

11           Q.    When you sent this file to Ira, where did

12    you get the actual file from?

13                MS. MARKOE:  Objection.

14                THE WITNESS:  Which file?

15                MS. MARKOE:  Are you referring to a

16    different e-mail or Exhibit 1?

17                MR. FREEDMAN:  We are still on Exhibit 1.

18           Q.    When you sent Exhibit 1 to Ira, where did

19    you get the e-mail from to send to Ira?

20           A.    That would have been on our server.

21           Q.    Which server is "our" server?

22           A.    The company at the time.  That was

23    Hotwire, I believe.  We are talking about Hotwire time,

24    so it would have been on a Hotwire server.

25           Q.    Do you still have access to Hotwire



Page 162

1     servers?

2              A.      It does not exist.

3              Q.      Does anyone still have access to Hotwire

4     servers?

5              A.      I do not know.

6              Q.      Are you aware of anyone who has access to

7     a Hotwire server?

8              A.      No, I am not.  Actually, strike that, it

9     is possible that there are copies, because we had a

10    member of staff who stole information, but I do not know

11    whether they have it still or not.

12             Q.      What are the names of the staff that

13    stole information?

14                     MS. MARKOE:  Objection.

15                     MR. FREEDMAN:  Potential witnesses,

16    Zaharah.

17                     MS. MARKOE:  I did not instruct him not

18    to answer.  Are you objecting to my objections now?

19                     MR. FREEDMAN:  I am anticipating.

20                     THE WITNESS: I would need to double-check

21    that.  I do not want to go on record defaming someone

22    who has not been formally charged or anything like this.

23    BY MR. FREEDMAN:

24             Q.      I understand that it is not confirmed,

25    but who do you recall at the moment as being those



Page 163

```
 1    witnesses?

 2                  MS. MARKOE:  Objection.  You can answer,

 3    if you can.

 4                  THE WITNESS:  I am trying to remember his

 5    name.  There were two people in particular.  Both of

 6    them were systems engineers.  I really do not remember

 7    their names.

 8    BY MR. FREEDMAN:

 9         Q.    How would you look them up to confirm

10    them?

11                  MS. MARKOE:  Objection.

12                  THE WITNESS:  I would not.

13    BY MR. FREEDMAN:

14         Q.    Is there any way to find out their names?

15         A.    I am sure there is.

16         Q.    Are you aware of any way to find out

17    their names?

18         A.    One can do lots of searches for a start.

19    I mean, there is lots of stuff about me, my company,

20    people complaining, liquidation documents, etcetera, all

21    on the internet, that would list all the staff.

22         Q.    Are the names of these two staff members

23    and their potential taking of information publicly

24    available?

25                  MS. MARKOE:  Objection.  You can answer.
```



Page 164

1                    THE WITNESS:  If you consider public

2     includes liquidation files that would be publicly

3     available, then yes.

4     BY MR. FREEDMAN:

5          Q.     What liquidation files would have these

6     two ----

7          A.     Hotwire.

8          Q.     Would Ms. Watts know the name of these

9     two individuals?

10                   MS. MARKOE:  Objection.

11                   THE WITNESS:  I am not going to bring

12    anything about my wife into this.  I am not going to

13    answer anything about my wife's state of mind, my wife's

14    anything.  I have already noted that my family is

15    something I will not touch.

16    BY MR. FREEDMAN:

17         Q.     Was Ms. Watts involved with Hotwire?

18                   MS. MARKOE:  Objection.

19                   THE WITNESS:  You can check those

20    records.

21    BY MR. FREEDMAN:

22         Q.     How?

23         A.     They are public.

24         Q.     Are all of Hotwire's records are public?

25                   MS. MARKOE:  Objection:  mischaracterises



Page 165

1    the testimony.

2    BY MR. FREEDMAN:

3         Q.    Are all of Hotwire's records public?

4         A.    No.

5         Q.    When did you decide to start programing

6    the Bitcoin protocol?

7         A.    Can you be a bit more specific about what

8    you are saying there.  That is actually a wider question

9    and more nebulous than you seem to think.

10        Q.    When did you start writing the code that

11   became the Bitcoin protocol?

12        A.    Again, do you mean the node software?

13        Q.    When I say "Bitcoin protocol", what does

14   that mean to you?

15        A.    Bitcoin protocol is a set of rules that

16   nodes will interact by.  It will be not things like

17   block size, but rather the real sets that allow a

18   transaction signed, and not settled, to chain now to be

19   valid in 20-year time.  So, it is like the internet

20   protocol itself has a set of rules as well as

21   structures.  So things can happen within protocols but

22   also be dictated differently in rules.  For instance,

23   the limitation of HTML for Apple and Microsoft, although

24   on the same protocol, have different rule sets.  That

25   could be constructed such that the rules for one miner



```
 1   would allow something to be offered or rejected, but a
 2   protocol would be the same for all systems and nodes.
 3          Q.    If going forward I use the word "Bitcoin"
 4   protocol to refer to all of those things, will you
 5   understand what I mean?
 6                MS. MARKOE:  Objection.
 7                THE WITNESS:  No.
 8   BY MR. FREEDMAN:
 9          Q.    What is the way I should refer to the
10   code and programing that became the Bitcoin client?
11          A.    If you were talking about the original
12   one then I would say the node software.
13          Q.    When did that turn into something besides
14   the node software?
15                MS. MARKOE:  Objection.
16                THE WITNESS:  When did what turn into
17   something?
18   BY MR. FREEDMAN:
19          Q.    Going forward, if I use the word "node"
20   software, would you understand that to mean the computer
21   protocols and codes that people downloaded and used to
22   mine and use Bitcoin?
23                MS. MARKOE:  Objection.
24                THE WITNESS:  In the original version?
25   BY MR. FREEDMAN:
```



Page 167

1          Q.     In the original version.

2          A.     So we are talking the Satoshi client,

3    yes.

4          Q.     The Satoshi client.  That was made public

5    in 2009?

6          A.     In some parts it was actually made public

7    in, as early -- the first distribution was August 2008.

8          Q.     So before we get there, when did you

9    decide to start writing that node software, the Satoshi

10   client?

11         A.     In 2002.

12         Q.     How did you make it public in August of

13   2008?

14         A.     It was given to a few people.

15         Q.     Who was it given to?

16         A.     Parts were given to Wei Dai.

17         Q.     Wei Dai, is that his legal name or is

18   that a screen name?

19         A.     I have never really asked.  He publishes

20   papers under that.  So he could be a pseudonym like me,

21   but the thing is he has worked for companies under that.

22   I believe that is his real name.  I have never

23   physically -- actually, I have met him once, but that

24   was in the '90s, and I did not ask whether he used a

25   pseudonym or not.



Page 168

1          Q.      Who else besides Wei Dai?

2          A.      In August, there were other people, I do

3     not remember the names.

4          Q.      Did you give it to Dave in August?

5          A.      No.

6          Q.      When did Dave first receive it?

7          A.      May, end of, beginning of June.

8          Q.      May/June of 2008?

9          A.      Yes.

10         Q.      What did Dave do to develop the Satoshi

11    client?

12                 MS. MARKOE:  Objection:  foundation.

13                 THE WITNESS:  Dave did not develop the

14    Satoshi client.

15    BY MR. FREEDMAN:

16         Q.      Did Dave edit the Satoshi client code at

17    all?

18         A.      It is an open source project.

19         Q.      Prior to it becoming public -- strike

20    that.  When did the Satoshi client become publicly

21    available to everyone?

22                 MS. MARKOE:  Objection: vague.

23                 THE WITNESS:  I am sorry, "everyone" is

24    too vague.

25    BY MR. FREEDMAN:



Page 169

1          Q.     When was the first time you publicly

2   posted the Satoshi client?

3                 MS. MARKOE:  Objection: asked and

4   answered.  You can answer.

5                 THE WITNESS:  In full, was not until

6   January 2009.

7   BY MR. FREEDMAN:

8          Q.     What should we call that event so we know

9   we are talking about the same thing?

10         A.     You could say the public publishing of

11  the Bitcoin node software.

12         Q.     Can I call it Satoshi client so we are

13  consistent?

14         A.     Yes.

15         Q.     Did Dave edit the Satoshi client at any

16  point before the public posting of the Satoshi client?

17                MS. MARKOE:  Objection.

18                THE WITNESS:  Him and others could have,

19  yes.  Did I review whose changes: no.

20  BY MR. FREEDMAN:

21         Q.     Where did you publicly post it so that

22  others could contribute to it?

23         A.     It was given privately after a post that

24  was public.

25         Q.     Where was the public post made?



Page 170

1          A.      The public post was made on the mailing

2    list.

3          Q.      What was the mailing list?

4          A.      It is the cryptography mailing list.

5    There are other ones as well, but that was the main one.

6          Q.      Where were the other ones?

7          A.      I do not remember.

8          Q.      Did Dave post it on other ones or did you

9    post it on other ones?

10                 MS. MARKOE:  Objection.

11                 THE WITNESS:  I do not know what Dave

12   did.

13   BY MR. FREEDMAN:

14         Q.      Are you aware of Dave posting it on other

15   mailing lists?

16         A.      No.

17         Q.      After you posted it on a mailing list,

18   you then hosted the Satoshi client somewhere for others

19   to collaborate on?

20                 MS. MARKOE:  Objection.

21                 THE WITNESS:  I am not sure what you are

22   asking, sorry.

23   BY MR. FREEDMAN:

24         Q.      You told me that people collaborated on

25   this open source software?



Page 171

1                  MS. MARKOE:  Objection.

2                  THE WITNESS:  The full software was not

3      given.  I said that.

4      BY MR. FREEDMAN:

5            Q.     So where did you post parts of the

6      software?

7                  MS. MARKOE:  Objection: mischaracterises

8      the testimony.

9      BY MR. FREEDMAN:

10           Q.     I am just trying to figure out ----

11           A.     I said they were e-mailed or given, I did

12     not say they were posted.  There is a big difference.

13           Q.     Okay, so then you e-mailed Dave portions

14     of the Satoshi client; is that correct?

15           A.     Yes.

16           Q.     And he e-mailed you back edits?

17           A.     No, he communicated with other people.

18           Q.     Who did he communicate with?

19           A.     I do not know.  That would be Dave.

20           Q.     How did Dave get you back his edits to

21     the Satoshi client?

22                  MS. MARKOE:  Objection.

23                  THE WITNESS:  We discussed things over

24     IRC.

25     BY MR. FREEDMAN:



Page 172

```
 1        Q.     So his feedback was through IRC?

 2        A.     Yes.

 3        Q.     So there is no record of his feedback?

 4        A.     No, not that I know of.  There could be.

 5   It is not impossible for IRC to be recorded and kept.

 6        Q.     You kept no record of his ----

 7        A.     I do not keep my IRC chats, no.

 8        Q.     Do you know if Dave kept them?

 9        A.     I do not know what Dave did with his IRC

10   chats.  If you are asking for every line of code Dave

11   changed, there would be at least 100 changes by

12   Hal Finney, there would be at least 80 changes by Bear,

13   etcetera.  There would be at least 1,000 changes by

14   other people for every one that Dave did.  So 0.1%.

15        Q.     0.1% of the edits are attributable to

16   Dave?

17        A.     Yes.  That was not the primary task that

18   Dave did.

19        Q.     Is it possible that it is more than 1%?

20               MS. MARKOE:  Objection: calls for

21   speculation.

22   BY MR. FREEDMAN:

23        Q.     You have a clear recollection of it being

24   exactly 1% of the code that Dave edited?

25               MS. MARKOE:  Objection.  You can answer.
```



1                    THE WITNESS:  I did not say exactly 1%.

2     And Dave was not a C++ coder.

3     BY MR. FREEDMAN:

4          Q.    Could it have been 5%?

5                    MS. MARKOE:  Objection.

6                    THE WITNESS:  No.

7     BY MR. FREEDMAN:

8          Q.    Could it have been 2%?

9                    MS. MARKOE:  Objection.

10                   THE WITNESS:  You are calling for

11    speculation on probabilities of that where other people

12    did far more code.  Basically you want to characterise

13    Dave as having written a lot more of the software.  That

14    is not what Dave did.

15                   MS. MARKOE:  Can we take a bathroom

16    break?

17                   MR. FREEDMAN:  Sure.

18                   THE VIDEOGRAPHER:  Going off the record.

19    The time is 15.04.  End of video card number 3, volume 1

20    of the video deposition of Dr. Craig Wright.

21                   (A Short Break)

22                   THE VIDEOGRAPHER:  This is the beginning

23    of video card number 4, volume 1, in the video

24    deposition of Dr. Craig Wright.  Going on the record.

25    The time is 15.20.  Thank you.



Page 174

1              MR. RIVERO:  Yes, please, identification

2     of persons on the line.

3              MR. BRENNER:  (By Telephone) Sure.  This

4     is Andrew Brenner of Boies Schiller and to my knowledge

5     I have been on the line for all of the time that the

6     deposition has been in session.

7              MR. RIVERO:  Thank you, Mr. Brenner.

8              MR. BRENNER:  You are welcome.

9              MR. MCADAMS:  (By Telephone) This is John

10    McAdams, also from Boies Schiller, and also have been on

11    the line for all sessions.

12             MR. KLEIMAN:  (By Telephone) This is Ira

13    Kleiman.  I have been on the line since the beginning.

14             MR. RIVERO:  Anyone else?

15             MS. MARKOE:  Is there a reason why,

16    Mr. Kleiman, you failed to identify yourself previously?

17             MR. FREEDMAN:  Ira, do not answer that.

18    I think they asked for lawyers to make their

19    appearances.  I am not sure he knew.

20             THE WITNESS:  That is not correct.

21             MR. FREEDMAN:  Either way, we can deal

22    with this later, obviously.  He has been on the line, we

23    have disclosed it and you can do what you like with it.

24             MR. RIVERO:  Note our objection.

25             MS. MARKOE:  I would like to note our



1    objection and I would also like to note that Mr. Kleiman

2    I am instructing you that this deposition is

3    confidential and you are bound by the confidentiality

4    order in this case.  We presume that you are aware of it

5    and will abide by it.

6                   MR. FREEDMAN:  Okay.

7                   MR. KLEIMAN:  Yes.

8    BY MR. FREEDMAN:

9         Q.    Dr. Wright, the A Back cited in the

10   Bitcoin white paper, is that a reference to the same

11   Adam Back we were previously discussing?

12                  MS. MARKOE:  Objection.

13                  THE WITNESS:  Yes.

14   BY MR. FREEDMAN:

15        Q.    Is it your testimony here today that that

16   is a mis-cite and it should instead be to Mr. Finney?

17                  MS. MARKOE:  Objection.  You can answer.

18                  THE WITNESS:  It should have Aurora in

19   the R PoW, that is R as in R, PoW should be cited to

20   Mr. Finney.

21   BY MR. FREEDMAN:

22        Q.    In response to interrogatory requests,

23   Dr. Wright, you said that "there was an individual who

24   helped me in the very early stages of my research well

25   before the release of the Bitcoin protocol.  As far as



Page 176

1    I know, that individual never met or interacted with

2    Dave Kleiman."  Who was that individual?

3                   MS. MARKOE:  Objection.

4                   MR. FREEDMAN:  You can answer.

5                   THE WITNESS:  No, I cannot.

6                   MS. MARKOE:  This is part of what you

7    need to discuss with the court in camera?

8                   THE WITNESS:  Yes.

9                   MS. MARKOE:  Okay.

10   BY MR. FREEDMAN:

11          Q.    Dr. Wright, whose idea was it to register

12   the Bitcoin.com domain name?

13          A.    Mine.

14          Q.    When did you first register that domain?

15          A.    I would have to look up the date.  I do

16   not remember.

17          Q.    Do you still have the records associated

18   with that original registration?

19                   MS. MARKOE:  Objection.  You may answer.

20                   THE WITNESS:  They are online.

21   BY MR. FREEDMAN:

22          Q.    Where are they online?

23                   MS. MARKOE:  Objection.  You may answer.

24                   THE WITNESS:  Again, I assume you do not

25   know technical name records or how these are



Page 177

1    constructed.  They are public records.

2    BY MR. FREEDMAN:

3         Q.    That is all right but you can still

4    explain it to me.  Where are they publicly available?

5         A.    Whois.

6         Q.    And what information did you give -- did

7    you do it under a private Whois registration or did you

8    do it publicly, and I give identification to Whois?

9              MS. MARKOE:  Objection: compound.

10             THE WITNESS:  There is no such thing as a

11   private versus a public Whois.

12   BY MR. FREEDMAN:

13        Q.    There is no way to privately register

14   domain names?

15             MS. MARKOE:  Objection.  You may answer.

16             THE WITNESS:  Define what you mean by

17   "private".

18   BY MR. FREEDMAN:

19        Q.    Is there a way to not give identifying

20   information for the owner of the domain name or the

21   registrant of the domain name?

22             MS. MARKOE:  Objection.

23             THE WITNESS:  Define what you mean by

24   that.  You are doing a whole lot of waffly fluffy crap,

25   excuse the language, that says private when you probably



Page 178

1    mean anonymous.  And can you do something about that

2    phone, please, or I am going to have to throw it out of

3    a window because it keeps flashing and it is really,

4    really annoying.

5                    MR. FREEDMAN:  My apologies.

6         Q.     What information did you give Whois when

7    you registered the Bitcoin.com domain name?

8                    MS. MARKOE:  Objection.

9                    THE WITNESS:  If you have a look at it,

10   you will see the information from the Vistomail or

11   anonymousspeech.com server.  That is provided from that

12   server and the Whois that they allow goes across into

13   the Whois that is, or was there.  I do not know about

14   the updates that have occurred since.

15   BY MR. FREEDMAN:

16        Q.     Did you communicate with Dave Kleiman

17   about the domain name?

18                    MS. MARKOE:  Objection.

19                    THE WITNESS:  Define what you mean by

20   "communicate about the domain name".

21   BY MR. FREEDMAN:

22        Q.     Did you communicate with him about the

23   registration of the domain name?

24        A.     I am not sure what you would be asking?

25        Q.     Did you send any communications to Dave



Page 179

1      Kleiman about the registration of Bitcoin.com?

2              A.      I did not register Bitcoin.com.

3              Q.      Who registered Bitcoin.com?

4              A.      It was not me.

5              Q.      Who was it?

6              A.      You are now asking me who registered

7      random e-mail -- sorry, domain name dot com, and expect

8      me to know.

9              Q.      Do you know who registered Bitcoin.com?

10             A.      No.

11             Q.      Do you know who registered

12     Bitcointalk.com?

13             A.      No.  I mean, I am dot org.  I think you

14     have those wrong.

15             Q.      It could be.  Did you register

16     Bitcoin.org?

17             A.      Yes.

18             Q.      Let me ask all the questions over because

19     I may have misspoken.  When did you first register

20     Bitcoin.org?

21             A.      Again, that is public record on Whois and

22     I do not remember the exact date.

23             Q.      Any answers you gave before about the

24     Vistomail account apply to Bitcoin.org?

25                     MS. MARKOE:  Objection.



Page 180

1                    THE WITNESS:  Yes.

2    BY MR. FREEDMAN:

3          Q.     Did you ever communicate with

4    Dave Kleiman about Bitcoin.org registration?

5          A.     No.  I registered my first domain name in

6    the '80s.  I do not need help registering domains.

7          Q.     Did there come a time when you

8    transferred ownership of the Bitcoin.org domain name?

9                    MS. MARKOE:  Objection.

10                   THE WITNESS:  There is not really

11   ownership of that domain.

12   BY MR. FREEDMAN:

13         Q.     Control of the domain?

14                   MS. MARKOE:  Objection.

15                   THE WITNESS:  Yes.

16   BY MR. FREEDMAN:

17         Q.     When did you transfer control of the

18   Bitcoin.org domain name?

19         A.     When I stopped being involved with the

20   community.

21         Q.     Which was?

22         A.     2011.  It was actually a little bit

23   before that that information had been handed over.

24         Q.     Information had been handed over, what do

25   you mean by that?



Page 181

```
1            A.      Domain keys, etcetera.

2            Q.      Who did you hand them over to?

3            A.      That was to Theymos, originally.

4            Q.      Did Dave Kleiman ever have the control

5    over the Bitcoin.org domain name?

6                    MS. MARKOE:  Objection.  You can answer.

7                    THE WITNESS:  No.

8    BY MR. FREEDMAN:

9            Q.      Who is Theymos?

10                   MS. MARKOE:  Objection.  This is again

11   now you are going beyond the scope.  We have already

12   established that Dave Kleiman did not have control over

13   the Bitcoin.org domain name and you can move on now.

14   BY MR. FREEDMAN:

15           Q.      Who is Theymos?

16                   MS. MARKOE:  Objection.  I will instruct

17   you not to answer.  Beyond the scope.

18   BY MR. FREEDMAN:

19           Q.      Why did you transfer the Bitcoin.org

20   domain name?

21                   MS. MARKOE:  Objection: beyond the scope.

22   Do not answer.

23   BY MR. FREEDMAN:

24           Q.      Who mined the genesis block of the

25   Bitcoin timechain?
```



Page 182

1                    MS. MARKOE:  Objection.

2                    MR. FREEDMAN:  You can answer.

3                    MS. MARKOE:  Can you connect that to one

4      these topics, please.

5                    MR. FREEDMAN:  Formation of the Satoshi

6      Nakamoto partnership.  It is literally the first block

7      of Bitcoin.

8                    THE WITNESS:  It is not mine.

9                    MS. MARKOE:  The question you asked does

10     not make that connection, so why do you not try to make

11     that connection and then we can have a conversation.

12                   MR. FREEDMAN:  Do not tell me how to ask

13     my questions.  Instruct him not to answer or object.

14          Q.     Who mined the genesis block of the

15     Bitcoin timechain?

16                   THE WITNESS:  Nobody.

17                   MS. MARKOE:  Objection.

18  BY MR. FREEDMAN:

19          Q.     I am sorry?

20          A.     Nobody.

21          Q.     Who programed the genesis block of the

22     Bitcoin timechain?

23                   MS. MARKOE:  Objection.

24                   THE WITNESS:  Nobody, because that is

25     again wrong.



Page 183

1   BY MR. FREEDMAN:

2          Q.     How did the Bitcoin genesis block come

3   into existence?

4                 MS. MARKOE:  Objection.

5                 THE WITNESS:  Answer or not? Instruction?

6   Do I answer this or not?

7                 MS. MARKOE:  My suggestion would be that

8   someone relate this ----

9                 MR. FREEDMAN:  Please do not suggest ----

10                MS. MARKOE:  ---- to Dave Kleiman or

11  I will strict him not to answer.

12                MR. FREEDMAN:  Then do what you will.  We

13  will raise it with the court.

14                MS. MARKOE:  Relate your question to Dave

15  Kleiman and whether or not there was a partnership or

16  I will strict him not to answer.

17                MR. FREEDMAN:  Do what you will.

18                MS. MARKOE:  Okay.  Then ask your

19  questions properly related to the scope as you prepared

20  this.

21  BY MR. FREEDMAN:

22         Q.     How did the genesis block come into

23  existence?

24                MS. MARKOE:  Objection.  Do not answer

25  that.



Page 184

1   BY MR. FREEDMAN:

2          Q.     What was the first Bitcoin block Satoshi

3    mined?

4                 MS. MARKOE:  You can answer that.

5                 THE WITNESS:  Block one.

6   BY MR. FREEDMAN:

7          Q.     Is that also referred to as the genesis

8    block?

9          A.     No.

10         Q.     Is it the second block?

11                MS. MARKOE:  Objection.

12                THE WITNESS:  It is the first block -- it

13   is block one.

14  BY MR. FREEDMAN:

15         Q.     Block one.  Do you know what computer

16   mined block one?

17         A.     I know what, out of a group of computers,

18   mined block one.

19         Q.     Where was that group of computers

20   located?

21         A.     Port Macquarie just outside a small town

22   called Bagnoo.

23                MS. MARKOE:  Can you spell those names

24   for the court reporter, please.

25                THE WITNESS: B-A-G-N-O-O.



Page 185

```
 1   BY MR. FREEDMAN:

 2           Q.     How many computers were in Bagnoo?

 3                  MS. MARKOE:  Objection.

 4                  THE WITNESS:  I do not know how many

 5   computers I had in Bagnoo.  I do not know how many

 6   computers I have now.

 7   BY MR. FREEDMAN:

 8           Q.     Did anyone else know about the computer

 9   set-up in Bagnoo?

10                  MS. MARKOE:  Objection.

11                  MR. FREEDMAN:  You can answer.

12                  THE WITNESS:  Yes.

13   BY MR. FREEDMAN:

14           Q.     Who else?

15           A.     Many people knew that I had a computer

16   set-up in Bagnoo.  I had spent a lot of money getting

17   fibre laid into a completely rural area, that basically

18   was never going to have fibre, that opened up maybe

19   50,000 people in the community to low cost, high-speed

20   internet, because I had the whole road ripped up and

21   paid for to lay fibre to my home, the power run into it,

22   etcetera, so many would have known.

23           Q.     You had a home in Bagnoo?

24           A.     Yes.

25           Q.     Is it Bagnoo in New South Wales?
```



Page 186

```
 1              A.     Yes.
 2              Q.     Satoshi mined block one.  Were you the
 3    one acting as Satoshi to mine block one?
 4              MS. MARKOE:  Objection.
 5              THE WITNESS:  There is no Satoshi that
 6    way.  I was.
 7    BY MR. FREEDMAN:
 8              Q.     I am sorry?
 9              A.     I was.  I used the pseudonym.  It did not
10    flip round like Dread Pirate Roberts or something like
11    this.  It was just me.  And it was not Satoshi mining
12    per se.  There was not any, other than me, apart from
13    block nine, which was then referenced by a transfer
14    I did.
15              Q.     So you mined block one?
16              A.     Yes.
17              Q.     Did you also mine block two?
18              A.     Relevance, please, give me ----
19              MS. MARKOE:  Look, connect it up with a
20    relationship with Dave Kleiman or do not.
21              THE WITNESS:  There were mining pools,
22    there were no shared mining.  Dave Kleiman and I could
23    not physically mine in any way.  Mining pools were not
24    developed until years after I disappeared, so there is
25    no joint mining.
```



Page 187

1   BY MR. FREEDMAN:

2          Q.     That was not my question.  It was just

3   whether ----

4          A.     Yes, it is, basically you are trying to

5   find out what I do and do not have, which is none of

6   your God damn business.  There is nothing to do with

7   Dave Kleiman.  Dave Kleiman never had a machine access

8   code.  He never went on those machines.  He never

9   accessed those machines.  He never touched those

10  machines.  Nothing.

11         Q.     Are you aware of anyone else who mined

12  Bitcoin in January of 2009?

13                MS. MARKOE:  Objection.  That is again

14  well beyond the scope of what this deposition is about.

15                MR. FREEDMAN:  To witnesses.

16                MS. MARKOE:  Of anyone who mined Bitcoin?

17                MR. FREEDMAN:  It literally came out days

18  ago, Zaharah; it came out in January 2009, so anybody

19  who was mining then was ----

20                MS. MARKOE:  Okay.  How would he know who

21  is doing what?

22                MR. FREEDMAN:  If he does not know he

23  does not know.

24                THE WITNESS:  The whole nature of the

25  system is that you do not register.



Page 188

1    BY MR. FREEDMAN:

2         Q.    Do you know anyone who was mining in

3    January 2009?

4              MS. MARKOE:  Objection.

5              THE WITNESS:  Yes.  Hal Finney.

6    BY MR. FREEDMAN:

7         Q.    Besides Hal Finney, was there anyone

8    else?

9              MS. MARKOE:  Objection.

10             THE WITNESS:  No, I do not know.  I did

11   not even ask Dave if he was doing it.

12   BY MR. FREEDMAN:

13        Q.    You do not know if Dave was mining in

14   January 2009?

15        A.    No, I do not.

16        Q.    Did he ever tell you if he was mining in

17   January 2009?

18             MS. MARKOE:  Objection: asked and

19   answered.

20             MR. FREEDMAN:  You can answer.

21             THE WITNESS:  No idea.

22   BY MR. FREEDMAN:

23        Q.    Dr. Wright, did there come a time when

24   you discussed Satoshi Nakamoto and the origin of Bitcoin

25   with a gentleman named Andrew O'Hagan?



Page 189

```
 1                    MS. MARKOE:  Objection.  What exactly
 2      does this have to do with the topic?  I presume you are
 3      talking about topic 3.  So can you please explain to me
 4      what this has to do with any of the subtopics under
 5      topic 3.
 6                    MR. FREEDMAN:  Yes.  I am handing you
 7      what has been marked as Plaintiff's Exhibit 4.
 8                    MS. MARKOE:  Please explain it.
 9                    MR. FREEDMAN:  I will.  One second.
10      I think this is 4; right?  Is it 3 or 4?  3.  This goes
11      to relevant witnesses.
12                    MS. MARKOE:  What goes to relevant
13      witnesses?
14                    MR. FREEDMAN:  You will see when the
15      question comes.  Mr. O'Hagan himself is a relevant
16      witness if the answer is yes.
17      (Plaintiff's Exhibit 3 marked for identification)
18           Q.    Can you take a look at page 32, please.
19      The page numbering is in the upper right-hand corner of
20      the document.
21                    MR. RIVERO:  You are referring to 32 of
22      96?
23                    MR. FREEDMAN:  Correct.  This is docket
24      entry 83-1.
25           Q.    About halfway down that first paragraph
```



Page 190

1   it starts off with:  "Satoshi also sent four other

2   transactions on the same day.  I asked Wright who the

3   recipients were -- who the four addresses belonged to.

4   'Hal, Dave, myself', he replied.  'And another I cannot

5   name as I have no right to do so'."  Do you recognise

6   this conversation?

7                    MS. MARKOE:  Objection.

8                    THE WITNESS:  I remember a half-truth

9   version of this conversation.

10  BY MR. FREEDMAN:

11           Q.    What was the truth of the conversation?

12                    MS. MARKOE:  Objection.  You are going

13  beyond the scope.  I am going to instruct him not to

14  answer.

15                    MR. FREEDMAN:  You are not going to let

16  me find out who the name of the other person is?

17                    MS. MARKOE:  I am going to instruct him

18  not to answer your question which, if I can see it,

19  says, "What was the truth of the conversation?"  You are

20  limited to the details surrounding Craig and Dave's

21  partnership to create Satoshi Nakamoto, in your words,

22  the general process of their collaboration, in your

23  words, the accounts that they held to collaborate

24  technological and money, in your words, methods of

25  communication they used during that period, in your



Page 191

1   words ----

2            MR. FREEDMAN:  Zaharah, you do not need

3   you to read the entire -- I am familiar with it.

4            MS. MARKOE:  ---- and to identify the

5   computers and servers Satoshi Nakamoto used to draft the

6   white paper ----

7            MR. FREEDMAN:  I am going to ask you to

8   stop wasting my time.

9            MS. MARKOE: ---- program Bitcoin and mine

10   the first few Bitcoin.  Your question does not go to any

11   of those topics.

12            MR. FREEDMAN:  It goes to the first one.

13            MS. MARKOE:  I am instructing the witness

14   not to answer.

15            MR. FREEDMAN:  Then just instruct him not

16   to answer, Zaharah.  That is all you need to do and I

17   will move on.

18            MS. MARKOE:  I will also put on the

19   record my objection which I am entitled to do and you

20   are not entitled to stop me from doing.  As to the first

21   question, you have already identified, and he has

22   already said, he had a conversation with Mr. O'Hagan,

23   this is not an accurate representation of that

24   conversation.  That is your identity of your witness.

25   You are done now.


MAGNA ▶
LEGAL SERVICES

Page 192

1            MR. FREEDMAN:  Zaharah, if you continue

2    speaking we are going to ask the court for more time.

3            MS. MARKOE:  Ask the court for more time.

4    I am allowed to state my objection for the record and

5    the basis for it so that I have an accurate record to

6    share with the court.

7            MR. FREEDMAN:  We will.

8        Q.    On January 12th, 2009, did you send

9    Bitcoin to anyone?

10        A.    Yes.

11        Q.    Who did you send it to?

12        A.    Hal Finney.

13        Q.    Who else?

14            MS. MARKOE:  Answer if you can.

15            THE WITNESS:  I do not actually remember.

16    BY MR. FREEDMAN:

17        Q.    Did you send Bitcoin to Dave Kleiman on

18    January 12th, 2009?

19            MS. MARKOE:  Objection, but you may

20    answer if you remember.

21            THE WITNESS:  I cannot remember.

22    BY MR. FREEDMAN:

23        Q.    Did you send Bitcoin to yourself on

24    January 12th, 2009?

25            MS. MARKOE:  Objection.  You can answer



Page 193

1    if you remember.

2              THE WITNESS:  I cannot remember.

3  BY MR. FREEDMAN:

4         Q.    Do you know who is being referred to in

5    Plaintiff's Exhibit 3:  "... and another I cannot name

6    as I have no right to do so"?

7              MS. MARKOE:  I just want to read the

8    question back.  (Pause) You can answer the question.  If

9    you need a read back, ask for a read back.

10             THE WITNESS:  What I will say is this

11   work of fiction -- (Witness indicates Exhibit 3) -- was

12   created because Mr. O'Hagan refused to sign the

13   non-disclosure agreement, and basically took what he

14   thought would be a great story and created one.  It is

15   fiction.

16  BY MR. FREEDMAN:

17        Q.    Your position is the entire article is

18   fiction?

19             MS. MARKOE:  Objection:  mischaracterises

20   his testimony.

21  BY MR. FREEDMAN:

22        Q.    Is it your position that the entire

23   article is fiction?

24        A.    No.

25        Q.    Did Mr. O'Hagan record sessions --



Page 194

```
 1    interview sessions with you?

 2         A.    No, and if he did so that would be a

 3    criminal act.

 4         Q.    There are no recordings that you are

 5    aware of?

 6         A.    If he did so, that would be a criminal

 7    act.

 8         Q.    In January of 2009, until 2011, was there

 9    anywhere you mined Bitcoin besides Bungaloo -- help me

10    please?

11         A.    Bagnoo.

12         Q.    Bagnoo?

13         A.    Yes.

14         Q.    Where else?

15         A.    At one stage, I had mining software I was

16    playing with on my phone.  It did not actually mine any

17    Bitcoin.

18         Q.    Was there any other locations of

19    computers that you mine Bitcoin in?

20         A.    No.

21         Q.    Only Bungaloo?

22         A.    Bagnoo.

23         Q.    Bagnoo.  Only Bagnoo?

24         A.    Yes.

25         Q.    That started in January 2009.  When did
```



Page 195

1    you stop, if ever, mining Bitcoin in Bagnoo?

2          A.    I stopped everything to do with Bagnoo in

3    December.

4          Q.    Of?

5          A.    2010.  Or probably not everything to do

6    with because I still owned part of the property and

7    whatever else, but I was not doing any IT stuff there at

8    all.

9                MR. RIVERO:  I want to note that we are

10   giving a lot of leeway, even though there is already

11   testimony disconnecting the subject of these questions

12   from Dave Kleiman.  But go ahead with your next

13   question.

14   BY MR. FREEDMAN:

15         Q.    In December of 2010 -- strike that.  Did

16   you stop mining entirely in December of 2010?

17         A.    No.

18         Q.    Where did the mining continue?

19         A.    The mining restarted later, by me, with

20   pools that I now run.

21         Q.    When did that start up?

22         A.    2016 on.

23         Q.    So is it your testimony here today that

24   from December of 2010 until the mining pools in 2016,

25   you never mined Bitcoin?



Page 196

1          MS. MARKOE:  Objection.

2          THE WITNESS:  That is not correct.  I did

3    not earn any Bitcoin because running a node in certain

4    configurations means that you are also mining.

5    BY MR. FREEDMAN:

6          Q.    Okay.  So ----

7          A.    Running testnet is also mining.  This is

8    not public Bitcoin.

9          Q.    So as I understand it, from December of

10   2010, until 2016, you never earned the mining reward for

11   mining a block of Bitcoin; is that correct?

12         MS. MARKOE:  Objection.  You can answer.

13         THE WITNESS:  That is correct.

14   BY MR. FREEDMAN:

15         Q.    At any point in time, was Dave involved

16   in the mining that took place in Bagnoo from 2009 until

17   to 2010?

18         A.    Nobody was ever involved in that.

19         Q.    Approximately how much Bitcoin were mined

20   from 2009 ----

21         MS. MARKOE:  Objection.  I am going to

22   instruct you not to answer.

23         MR. RIVERO:  I instruct you not to

24   answer.

25   BY MR. FREEDMAN:



Page 197

1          Q.     I am going to ask you another question.

2    Your attorneys may instruct you not to answer so take a

3    second ----

4                    MS. MARKOE:  Do not ask it.

5                    MR. FREEDMAN:  I do not think you are

6    right to instruct him not to answer but I am going to

7    ask it.

8          Q.     Do you know the amount of Bitcoin that

9    was mined from 2009 until 2010 in Bagnoo?

10                   MS. MARKOE:  Objection.

11                   MR. RIVERO:  Same instruction.

12   BY MR. FREEDMAN:

13         Q.     Have you ever mined Bitcoin out of

14   Australia?

15         A.     No.

16                   MS. MARKOE:  Objection.  You can answer.

17                   THE WITNESS:  Well, back then, no.  Now,

18   the pools are outside of Australia, but that is 2016 on.

19   So, when I say no to mining or anything like this,

20   I will just make it clear now I am talking about before

21   2016.

22   BY MR. FREEDMAN:

23         Q.     I understand.  Thanks for the

24   clarification.  I know we understood each other, but it

25   is important that the record is clear.



Page 198

```
 1          A.    I got told to make sure I am clear,

 2    so ----

 3          Q.    From 2009 until 2010, when you were

 4    mining in Bagnoo, was that a full-time job for you?

 5                MS. MARKOE:  Objection.

 6                THE WITNESS:  It was not a job at all.

 7    BY MR. FREEDMAN:

 8          Q.    Did it take any time?

 9                MS. MARKOE:  Objection.

10                THE WITNESS:  Sneezing takes time.

11    BY MR. FREEDMAN:

12          Q.    Touché.  Did it take a significant amount

13    of your time?

14                MS. MARKOE:  Objection.

15                THE WITNESS:  No.

16    BY MR. FREEDMAN:

17          Q.    Did you discuss the details of your

18    mining activity with Dave Kleiman?

19          A.    Define what you mean by "discuss the

20    details of my mining activity".

21          Q.    Did you discuss the Bagnoo computers and

22    servers with Dave Kleiman?

23          A.    No.

24          Q.    To the best of your recollection, did

25    Dave Kleiman have any knowledge of the mining you were
```



Page 199

1    doing in Bagnoo?

2                    MS. MARKOE:  Objection.

3                    THE WITNESS:  Yes, he did.

4    BY MR. FREEDMAN:

5        Q.    How did he come to find out about that?

6        A.    He knew I had a property in Bagnoo and

7    that I was running Bitcoin nodes.

8        Q.    Did you discuss the amount of Bitcoin you

9    had amassed with Dave Kleiman?

10                   MS. MARKOE:  Objection.  Again, I am

11   going to instruct the witness not to answer these

12   questions.  You are now going well beyond the scope of

13   what is permitted in this deposition.

14                   MR. FREEDMAN:  Communication between him

15   and Dave Kleiman.

16                   MS. MARKOE:  You are not asking about

17   every communication that he had between himself and Dave

18   Kleiman.  That is not one of your topics.  Look at your

19   topics again.  This is not a merits deposition.  That

20   has been made very clear by the court.

21   BY MR. FREEDMAN:

22       Q.    Did Dave Kleiman mine any of the first 50

23   Bitcoin ----

24                   MS. MARKOE:  Objection.  You can answer

25   if you know.



Page 200

1    BY MR. FREEDMAN:

2          Q.      ---- blocks.

3          A.      Thank you for the clarification,

4    otherwise I would have to say no, because no one mined

5    the first 50 Bitcoin.

6          Q.      I saw that look.

7          A.      I cannot help rolling my eyes,

8    I apologise.  I do not know.

9          Q.      Did there come a time when Dave Kleiman

10   began mining Bitcoin?

11         A.      Yes.

12         Q.      When did he begin mining Bitcoin?

13         A.      I do not know.

14         Q.      Do you know approximately when he began

15   mining Bitcoin?

16         A.      I did not ask him.

17         Q.      Do you know what computer he used to mine

18   Bitcoin?

19         A.      No.

20         Q.      Do you know what hardware he used to mine

21   Bitcoin?

22         A.      Not really, no.

23         Q.      How do you know that he eventually began

24   mining Bitcoin?

25         A.      Because eventually we spoke about it and



Page 201

1    he had told me he had mined Bitcoin.

2          Q.     Where did that communication take place?

3          A.     Most of my communications, including this

4    one, were on IRC.

5          Q.     There is no record of it?

6                 MS. MARKOE:  Objection.

7                 THE WITNESS:  I cannot answer that one, I

8    do not know.

9    BY MR. FREEDMAN:

10         Q.     You have no record of it?

11         A.     I do not have any records of many of

12   these things, as I have already stated.  That is why

13   I used IRC.

14         Q.     Do you know if Dave Kleiman ever used

15   cloud computing to mine Bitcoin?

16         A.     I do not know -- actually, we are talking

17   about a period where nobody used cloud computing to mine

18   Bitcoin.  There was no cloud computing to mine Bitcoin

19   at that stage.  Pool software did not exist.  The person

20   who created some of the first pool software was after

21   I disappeared the first time, and ----

22                MR. RIVERO:  Please finish.

23                THE WITNESS:  ---- that person had

24   nothing to do with Dave or anything like that, and

25   created pool mining and I am sorry to tell you that



Page 202

1    there was no cloud mining at that stage.

2              MR. RIVERO:  Just to make sure the record

3    is clear, I heard at line 23 of the prior page, I heard

4    "many".  I think it is transcribed as "any".  I just

5    would like clarification.

6              MR. FREEDMAN:  It is the hour.

7              MR. RIVERO:  I am looking at the record

8    to make sure.

9              MR. FREEDMAN:  It is rough.

10        Q.    Do you know how Dave stored any of the

11   Bitcoins he mined?

12        A.    No.

13        Q.    And remind me, I do not recall if I asked

14   this, do you have any idea when Dave began mining

15   Bitcoin?

16        A.    No, I do not.

17        Q.    Was it before 2011?

18        A.    I do not know.

19        Q.    Do you recall when he told you he had

20   began mining Bitcoin?

21        A.    Not exactly, no.

22        Q.    Was it early on, after ----

23        A.    It would have been early on, yes.

24        Q.    Did Dave ever share the private keys of

25   Bitcoin with you?



Page 203

1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  You do not share private

3      keys, ever.

4      BY MR. FREEDMAN:

5           Q.    So is the answer no?

6           A.    The answer is no.

7           Q.    Did you ever share private keys with

8      Dave?

9                    MS. MARKOE:  Objection: asked and

10     answered.

11                   THE WITNESS:  I do not share private keys

12     with my wife.

13     BY MR. FREEDMAN:

14          Q.    What is a paper wallet?

15                   MS. MARKOE:  Objection.  I am going to

16     give you a little bit of leeway here, but again we are

17     going beyond the scope of this deposition.  You get

18     another shot at him.  I will certainly instruct him, if

19     you continue along these lines, to not answer those

20     questions at the later deposition, if you get answers to

21     them now.

22                   THE WITNESS:  A paper wallet is a key

23     that is printed on a piece of paper.

24     BY MR. FREEDMAN:

25          Q.    Have you ever used a paper wallet?



Page 204

1           A.      Yes.

2           Q.      Did you ever use a paper wallet with Dave

3    Kleiman?

4                   MS. MARKOE:  Objection.

5                   THE WITNESS:  Please explain what you

6    actually mean in that fluffy nebulous sentence.

7    BY MR. FREEDMAN:

8           Q.      Did you ever exchange a printed -- strike

9    that.  Did you ever exchange a key that is printed on a

10   piece of paper with Dave Kleiman?

11                  MS. MARKOE:  Objection.

12                  THE WITNESS:  Mr. Kleiman and I had been

13   in the country together once since the creation of

14   Bitcoin, where neither of us handed over any Bitcoin on

15   paper wallets, neither of us handed pieces of paper

16   together as we were drinking and getting drunk, to each

17   other on that day, and the value of the entire Bitcoin

18   market at that stage, when we got together, was,

19   I think, about $100, which was millions of Bitcoin, for

20   the entire value $100 was it.  So, did I hand him a

21   piece of paper when we were in foreign countries:  I do

22   not know how I could possibly do that.

23   BY MR. FREEDMAN:

24          Q.      I am going to ask you just concisely, did

25   you ever exchange a key that is printed on a piece of



Page 205

1    paper with Dave Kleiman in any way?

2             MS. MARKOE:  Objection.  I am going to

3    instruct the witness not to answer at this point.  We

4    have given you a lot of leeway.  These questions are not

5    going to subjects 3 or 4 which are the only ones I could

6    possibly see any relevance to.  If you would like to

7    explain how they relate to those topics or any other

8    topics, I would reconsider my objection, but at this

9    point in time I just do not see it.

10            MR. FREEDMAN:  It goes to the methods --

11   it goes to 4.

12            MS. MARKOE:  Explain how whether he ever

13   exchanged a paper wallet goes to 4.  4 relates to mining

14   of Bitcoins, not paper wallets.  There is a distinction.

15            MR. FREEDMAN:  It goes to the general

16   process of their collaboration.

17            MS. MARKOE:  We have already established

18   that there was no mining together.

19            MR. FREEDMAN:  I am just trying to figure

20   out whether or not they collaborated in another way.

21            MS. MARKOE:  How does one collaborate in

22   terms of holding a paper wallet or sharing information

23   about a paper wallet?  I am instructing the witness not

24   to answer.  You can move on.

25   BY MR. FREEDMAN:



Page 206

```
 1              Q.      Did you ever use any other methods for

 2      the offline exchange of Bitcoins with Dave?

 3                      MS. MARKOE:  Objection.

 4                      THE WITNESS:  Again, I did not exchange

 5      Bitcoins with Dave the way you are suggesting.  The way

 6      that you exchange Bitcoin is you a send transaction from

 7      one address to another.  I would never exchange private

 8      keys with Dave.

 9      BY MR. FREEDMAN:

10              Q.      Did you ever send Bitcoin to public

11      addresses that you knew controlled?

12                      MS. MARKOE:  Objection.

13                      THE WITNESS:  I do not know what

14      addresses Dave controlled, so how could I do that?

15      BY MR. FREEDMAN:

16              Q.      Did Dave ever provide you with public

17      addresses that he controlled?

18                      MS. MARKOE:  Objection.  You can answer.

19                      THE WITNESS:  One.

20      BY MR. FREEDMAN:

21              Q.      Which one?

22              A.      I do not remember.

23              Q.      Why did he provide it to you?

24                      MS. MARKOE:  Objection.

25                      THE WITNESS:  It was for testing.
```



Page 207

1   BY MR. FREEDMAN:

2            Q.      When did he provide it to you?

3            A.      2009.

4            Q.      What were you testing?

5            A.      Testnet.

6            Q.      What is testnet?

7            A.      Testnet is the development version of

8    Bitcoin, that runs alongside, that we had our own

9    version of in the world to create a test of Bitcoin.

10   So, when I am saying "we" there, I mean the Bitcoin

11   community.  I started with my own multiple versions,

12   which I firewalled off, and eventually they became a

13   public testnet which was a second version of Bitcoin,

14   you could say, but a valueless version of Bitcoin that

15   was easier to mine, so you could test the software and

16   the code.

17            Q.      Who had access to testnet?

18            A.      Everyone.

19                    MS. MARKOE:  Objection.

20                    THE WITNESS:  It is possible.

21   BY MR. FREEDMAN:

22            Q.      And Dave's public address was a testnet

23   address.

24                    MS. MARKOE:  Objection: mischaracterises

25   the testimony.



1           THE WITNESS:  Testnet addresses are real

2    addresses and vice-versa, blah, blah, blah.  There is no

3    distinction.

4    BY MR. FREEDMAN:

5           Q.    What were the primary ways Satoshi

6    Nakamoto communicated with people?

7           A.    Which people?

8           Q.    What is the primary way Satoshi Nakamoto

9    communicated?

10          A.    Again, which people?  So, how did

11   I communicate?  Which people?  I mean, if you are

12   getting the "I am Satoshi", then that could be anything.

13   I primarily communicate with people without saying I am

14   Satoshi and I walk up like I am now and I open my mouth

15   and words come out.

16          Q.    I understand that.  When I say Satoshi

17   Nakamoto now, I am referring to the internet presence of

18   Satoshi Nakamoto.

19          A.    So you mean the pseudonym?

20          Q.    The pseudonym.

21          A.    Can you please be explicit in saying

22   that.

23          Q.    What was the primary way in which you

24   communicated through the pseudonym?

25          MS. MARKOE:  Objection.  You can answer.



1             THE WITNESS:  Well, by definition, the

2    pseudonym was primarily done depending on which one it

3    was, by e-mail, or the Bitcoin forums, or the P2P

4    forums, or those other things.  So, it depends on which

5    one you are talking about, but online things that are

6    there, so ----

7    BY MR. FREEDMAN:

8         Q.    What are the e-mail addresses that you

9    used as the pseudonym Satoshi Nakamoto?

10        A.    They are all public.  The GMX account and

11   the Vistomail accounts are all public.

12        Q.    Please state them for the record.

13             MS. MARKOE:  If you recall.

14             THE WITNESS:  I do not remember which one

15   is Satoshi or Satoshi N off the top of my head.  I have

16   not used them in years.  I do not look at them any more.

17   And I am not going to even try and think about it.  They

18   are there.  Everyone knows them.  Look it up.

19   BY MR. FREEDMAN:

20        Q.    Was there a third account?

21        A.    Used for public communications?

22        Q.    What was that third account?

23        A.    There was not a third -- sorry.  What

24   third account?  I did not say there was a third account.

25        Q.    I asked if there was a third -- strike



Page 210

```
 1    that.  It may be I misunderstood your answer.  Did

 2    Satoshi Nakamoto, the pseudonym, have a third e-mail

 3    account, besides GMX and Vistomail?

 4                    MS. MARKOE:  Objection.  Answer if you

 5    can recall.

 6                    THE WITNESS:  I used multiple e-mail

 7    accounts.

 8    BY MR. FREEDMAN:

 9          Q.    Can you list what they were?

10                    MS. MARKOE:  Objection.

11                    THE WITNESS:  No.

12    BY MR. FREEDMAN:

13          Q.    Did you use an e-mail account

14    satoshi@anonymousspeech.com?

15          A.    Yes, that one sounds about right.

16          Q.    Do you still have access to these

17    accounts?

18                    MS. MARKOE:  Objection: vague.

19                    THE WITNESS:  As I stated earlier, no.

20    I stopped accessing them a long time.

21    BY MR. FREEDMAN:

22          Q.    Do you have the ability to access these

23    accounts?

24          A.    I very much doubt it.

25          Q.    Why do you doubt it?
```



Page 211

1           A.      Because GMX has been compromised and the

2       other one has been compromised.  They have been reset

3       over time.  So, I do not actually want to access them.

4           Q.      Have you tried to access them?

5           A.      No.

6           Q.      Does that go for the GMX account, the

7       Vistomail account and the Anonymous Speech accounts?

8           A.      Yes.

9           Q.      Do you know who has control over these

10      accounts now?

11          A.      No.  If anyone.

12          Q.      Did there come a time when you provided

13      Dave Kleiman with access to any of these accounts?

14          A.      Yes.

15          Q.      Which accounts?

16          A.      Dave was given the GMX account access for

17      a little while.

18          Q.      When was he given access to the account?

19          A.      I do not remember exactly.

20          Q.      Who gave him access to the account?

21          A.      If I am the person with it, then it has

22      to be me.

23          Q.      You gave him access to the GMX account?

24          A.      Yes.

25          Q.      Why?



Page 212

1           A.      Because I asked him to check it for me.

2           Q.      For what?

3           A.      To read an e-mail.

4           Q.      Which e-mail?

5                   MS. MARKOE:  Objection.  You can answer

6       if you recall.

7                   THE WITNESS:  I do not recall which

8       e-mail.

9    BY MR. FREEDMAN:

10          Q.      How many times did Dave access the GMX

11      account?

12                  MS. MARKOE:  Objection:  foundation.

13                  THE WITNESS:  How many hairs do you have

14      in your beard?

15   BY MR. FREEDMAN:

16          Q.      Did you provide access to anyone else --

17      strike that.  Did anyone else -- strike that.  Did you

18      ever give anyone else access to the GMX account?

19          A.      No.

20          Q.      Did you ever give anyone else access to

21      the Vistomail account?

22          A.      Yes.

23          Q.      Who?

24          A.      I think the only other person who had

25      access at that stage for a little bit was Uyen.



Page 213

```
 1            Q.     Can you spell that?

 2            A.     No.

 3            Q.     Is that Uyen Nguyen?

 4            A.     Yes.

 5            Q.     Who gave Uyen access to the Vistomail

 6     account?

 7                   MS. MARKOE:  Objection: asked and

 8     answered.

 9                   THE WITNESS:  I am not sure of the exact

10     details.  It was Uyen -- what is his name -- I cannot

11     remember his name -- the old Japanese guy, the one that

12     they pulled up as Satoshi?

13     BY MR. FREEDMAN:

14            Q.     Dorian.

15            A.     Dorian, that is it.  Sorry, I had

16     forgotten his name.  I instructed people to send a

17     message saying "I am not Dorian" because he was getting

18     a lot of shit.

19            Q.     You instructed Uyen Nguyen to do that?

20            A.     Yes.

21            Q.     And provided her with the log in

22     credentials?

23            A.     I gave her some, yes.

24            Q.     Did you ever provide anyone else with

25     access to the Anonymous Speech account?
```



Page 214

```
 1          A.     No.
 2          Q.     Did you ever use these accounts to
 3    communicate with Dave Kleiman?
 4          A.     I do not remember.
 5          Q.     Did you ever ask Dave Kleiman to stop
 6    accessing the GMX account?
 7          A.     No.
 8          Q.     Even when you stepped back from the
 9    community you still did not ask him to stop accessing
10    the account?
11               MS. MARKOE:  Objection.
12               THE WITNESS:  It was not used at that
13    stage -- by anybody.
14    BY MR. FREEDMAN:
15          Q.     You trusted Dave Kleiman?
16          A.     Dave was my friend.
17          Q.     Best friend?
18          A.     Fairly much, yes.
19          Q.     Did you trust Uyen Nguyen?
20               MS. MARKOE:  Objection: you are going
21    beyond the scope.  I am going to instruct him not to
22    answer.
23               MR. FREEDMAN:  We agree for once!
24               MS. MARKOE:  I am sorry.  What?
25               MR. FREEDMAN:  We agree for once!
```



Page 215

1            BY MS. MARKOE:  That is a miracle in and

2    of itself.

3    BY MR. FREEDMAN:

4        Q.    After the creation of Bitcoin, what was

5    the first Bitcoin-related intellectual property you

6    worked on with Dave?

7            MS. MARKOE:  Objection: assumes facts not

8    in evidence.

9            THE WITNESS:  I did not ever work on

10   Bitcoin IP with Dave.

11   BY MR. FREEDMAN:

12       Q.    Did you ever work on any intellectual

13   property with Dave?

14       A.    Yes.

15       Q.    What were those projects, in short?  What

16   were the names?  Strike that.  What were the names of

17   those projects?

18       A.    SWAMP, software assurance marketplace.

19   Basically, there are a number of projects that are all

20   public and all have had their papers published.

21       Q.    Is one of them a metered payment system?

22       A.    No.

23       Q.    Do you know what I am referring to when

24   I say a metered payment system?

25       A.    I know what a metered payment system is.



Page 216

1        Q.     Is there value to intellectual property

2    about a metered payment system?

3              MS. MARKOE:  Objection.  I am going to

4    instruct the witness not to answer.  He has already

5    stated he did not create any intellectual property with

6    Dave Kleiman on metered payment systems and therefore

7    any discussion of that would go beyond the scope of this

8    deposition.

9    BY MR. FREEDMAN:

10       Q.     Did you collaborate with Dave Kleiman on

11   intellectual property entitled "Software Derivative

12   Markets and Information Security Risk Systems"?

13       A.     I did not collaborate with Dave on

14   anything.  I created software and Dave, who was a vet,

15   was able to try and file, so that he would have had some

16   money to help him out.  Dave was not a mathematician.

17   Dave had no knowledge of that area, so there was no

18   collaboration at all in that way for research.

19       Q.     Did there come a time when Dave Kleiman

20   took two millions lines of code and turned it into six

21   million lines of code?

22             MS. MARKOE:  Objection.  But you can

23   answer if you recall.

24             THE WITNESS:  No one could actually do

25   that.  Four million lines of code would be approximately



Page 217

1    4,000 years worth of work.

2    BY MR. FREEDMAN:

3          Q.    So, Dave Kleiman never turned two

4    millions lines of code into six million lines of code;

5    is that your testimony?

6          A.    No person can change four million

7    themselves into six million.

8          Q.    Did Dave Kleiman cause two million lines

9    of code to turn into six million lines of code?

10               MS. MARKOE:  Objection.

11               THE WITNESS:  Is Dave, in your

12    assumption, a wizard?

13    BY MR. FREEDMAN:

14          Q.    If you could just answer the question,

15    Dr. Wright.

16          A.    I believe I just did.

17          Q.    The answer is no?

18          A.    The answer is unless he is already 4,000

19    years old and he started coding at the time of the sort

20    of exodus or whatever else, then probably not.

21          Q.    Was it possible he supervised the

22    creation of four million lines of code?

23               MS. MARKOE:  Objection.  You can answer.

24               THE WITNESS:  Yes.

25    BY MR. FREEDMAN:



Page 218

1          Q.     Did he supervise the creation of four

2    million lines of code?

3                 MS. MARKOE:  Objection.  You can answer

4    if you know.

5                 THE WITNESS:  I do not know.

6    BY MR. FREEDMAN:

7          Q.     Whose idea was it to create W&K US?

8          A.     Dave's.

9          Q.     How did that idea get initially

10   communicated to you by Dave?

11                MS. MARKOE:  Objection.  You can answer.

12                THE WITNESS:  I do not really remember.

13   BY MR. FREEDMAN:

14         Q.     Was anyone else involved in the initial

15   communications about W&K?

16         A.     Yes.

17         Q.     Who?

18         A.     My ex-wife.

19         Q.     What was the purpose of starting W&K?

20         A.     Dave was a vet.  As a vet, he was able to

21   theoretically access funding from the US government.

22   I was working on a number of different projects that

23   aligned with what the Department of Homeland Security

24   was seeking to be developed.  I said I would aid Dave

25   because he was in a bit of trouble, and that we could do



Page 219

1    a few different projects together, including that, that

2    would enable him to hopefully get some money to be able

3    to work less, as he was in the hospital.

4            Q.     What was your involvement in W&K?

5            A.     Very little.

6            Q.     How much was your involvement?  What was

7    your involvement in W&K?

8            A.     Talking about it and then going off and

9    writing some papers, full stop.

10           Q.     Did you have any ownership in W&K?

11           A.     No.

12           Q.     Who owned W&K?

13           A.     The records for W&K exist.  I do not know

14   if the records are accurate.

15           Q.     Who owned W&K in reality?

16           A.     Not me.

17                  MS. MARKOE:  Objection.

18   BY MR. FREEDMAN:

19           Q.     Who?

20           A.     Who owns BHP Billiton in reality?  It is

21   not my company.  I do not care.

22           Q.     You have no idea who owns W&K?

23           A.     I do not know that.

24                  MS. MARKOE:  Objection.

25                  THE WITNESS:  If I do not own it, I do



Page 220

1    not care about it.

2    BY MR. FREEDMAN:

3         Q.    Did W&K ever mine Bitcoin?

4         A.    I do not know what other companies that

5    are not mine do.

6         Q.    Did you ever tell anyone that W&K mined

7    Bitcoin?

8              MS. MARKOE:  Objection.  You can answer

9    if you remember.

10             THE WITNESS:  I have no idea.

11   BY MR. FREEDMAN:

12        Q.    Is there a reason you would have told

13   somebody why W&K mined Bitcoin?

14             MS. MARKOE:  Objection.  If he does not

15   know if he has told anyone then the question lacks a

16   predicate.

17             MR. FREEDMAN:  He does not recall.  I am

18   asking if there is a reason why he might have said it.

19             MS. MARKOE:  Answer if you can, but I am

20   objecting.

21             THE WITNESS:  The nature of Bitcoin is a

22   predicate-based system.  It either fails true or false.

23   If it is true, a transaction is valid.  If it is false,

24   it is rejected and never talked of again.  This will be

25   never talked of again.



Page 221

```
 1                    Can we have a break in a moment?

 2                    MR. FREEDMAN:  Absolutely.  Let us take

 3      one now.

 4                    THE VIDEOGRAPHER:  Going off the record.

 5      The time is 16.14.  End of video card number 4, volume

 6      1, in the video deposition of Dr. Craig Wright.

 7                         (A Short Break)

 8                    THE VIDEOGRAPHER:  This is the beginning

 9      of video card number 5, volume 1, in the video

10      deposition of Dr. Craig Wright.  Going back on the

11      record.  The time is 16.29.  Thank you.

12      BY MR. FREEDMAN:

13           Q.    Do you feel better, Dr. Wright, for the

14      break?

15                    MS. MARKOE:  Objection.

16                    THE WITNESS:  Mmm-hmm, definitely.

17      BY MR. FREEDMAN:

18           Q.    Did W&K ever work on Bitcoin IP?

19           A.    What do you mean by did W&K ever work on

20      Bitcoin IP?

21           Q.    Did the company W&K ever work with you in

22      any way on Bitcoin IP?

23           A.    No.

24                    MS. MARKOE:  Objection.  You can answer.

25      BY MR. FREEDMAN:
```



Page 222

```
 1          Q.     Did you work with W&K on any IP?

 2          A.     No.  I did not work with W&K at all.

 3          Q.     Did you create intellectual property

 4   called a metered payment system?

 5          A.     No.

 6          Q.     Did you create intellectual property

 7   called Software Derivative Markets and Information

 8   Security Risk Systems?

 9          A.     Yes.

10                 MS. MARKOE:  Objection.

11   BY MR. FREEDMAN:

12          Q.     Do you know who created a metered payment

13   system's intellectual property?

14                 MS. MARKOE:  Objection.  I am going to

15   instruct the witness not to answer.  It has no relevance

16   to either Dave Kleiman, W&K or even the witness.  He

17   said he had not create that intellectual property called

18   a metered payment system.

19   BY MR. FREEDMAN:

20          Q.     Did Dave Kleiman create a metered payment

21   system?

22                 MS. MARKOE:  Objection.  Answer if you

23   know.

24                 THE WITNESS:  I do not know what Dave

25   Kleiman created.
```



Page 223

1    BY MR. FREEDMAN:

2         Q.    The intellectual property Software

3    Derivative Markets and Information Security Risk

4    Systems, is it valuable?

5              MS. MARKOE:  Objection.

6              THE WITNESS:  It is put out open source

7    and the paper was published in an academic conference.

8    BY MR. FREEDMAN:

9         Q.    Does that mean it has no private value?

10             MS. MARKOE:  Objection.  You can answer

11   if you can.

12             THE WITNESS:  I am not an IP valuer.

13   BY MR. FREEDMAN:

14        Q.    Do you have a claim to it, a title, a

15   patent?

16        A.    No.  It is public.

17        Q.    Did you create intellectual property

18   called Software Assurance Marketplace?

19        A.    Yes.

20        Q.    Who has title to this intellectual

21   property now?

22             MS. MARKOE:  Objection.

23             THE WITNESS:  Public domain.

24   BY MR. FREEDMAN:

25        Q.    Did you create intellectual property



Page 224

1    called Software Assurance Through Economic Measures and

2    Anti-Fraud System?

3                    THE WITNESS:  Yes.

4                    MS. MARKOE:  Objection.

5    BY MR. FREEDMAN:

6            Q.      Who has title to it now?

7            A.      Public domain.

8            Q.      Did you create intellectual property

9    called Risk Quantification System for Financial

10   Modelling in Bitcoin?

11                   MS. MARKOE:  Objection.  Look, can you

12   tell me what topics this relates to?

13                   MR. FREEDMAN:  The collaboration in W&K.

14                   MS. MARKOE:  But you have not connected.

15   You are asking has he created things.  Connect it to W&K

16   or I will instruct him not to answer.

17                   MR. RIVERO:  Let me stop one second.

18   What topic about the collaboration on W&K?  I see W&K

19   referred to in a couple of spots.  Which topic?

20                   MR. FREEDMAN:  You know what, we will

21   look it up and we will get back to you after the break

22   because I do not want to just waste time on the record

23   for now.  We will skip it.

24                   THE WITNESS:  Can I just say there have

25   been no collaborations.



```
 1                    BY MR. RIVERO:  I just want to say very
 2      inefficient to do a series of questions and when you ask
 3      you specifically what topics so we can figure it out, it
 4      is not there.  That is the problem.  Just as the rule
 5      that you referred to is not there.  You are wasting
 6      time.  Let us get going.
 7                    MR. FREEDMAN:  No, we are not going to
 8      keep going because I am going to respond to that on the
 9      record.
10                    MR. RIVERO:  State the rule.
11                    MR. FREEDMAN:  I told you it is  rule 30
12      of the Rule of Civil Procedure and the local rule 30.1
13      which was amended and specifically stated that this was
14      not meant to take away the fact that you cannot lead the
15      witness.  There are many court opinions on point which
16      say you cannot make speaking objections because it leads
17      the witness.  Second of all ----
18                    MR. RIVERO:  Let me respond to that.
19                    MR. FREEDMAN:  No, no, I am  responding
20      to everything.
21                    MR. RIVERO:  Let me respond to number 1.
22      Despite repeated statements on the record that a local
23      rule prohibited ----
24                    MR. FREEDMAN:  It does.
25                    MR. RIVERO: ---- any statement beyond
```



Page 226

1    form, you are entirely wrong.  I have asked repeatedly.

2    There is no rule, it is not in the discovery handbook

3    and the case authority is definitely not the way you

4    describe it.  So let us keep going.  Number two.

5                    MR. FREEDMAN:  I am not going to waste my

6    time but I will tell you the case authority you can look

7    up.

8                    MR. RIVERO:  That already answers that

9    when you stated there was a rule prohibiting it you were

10   absolutely wrong.

11                   MR. FREEDMAN:  No, that is not true.  It

12   is cites ----

13                   MR. RIVERO:  It is not in 30.1, it is not

14   in 30, it is not in the discovery handbook.

15                   MR. FREEDMAN:  It certainly is.

16                   MR. RIVERO:  No, it is not.

17                   MR. FREEDMAN:  Let us just put it on the

18   record.  It is Flexiteek Americas Inc v Plastique Inc.

19                   MR. RIVERO:  We are now way off in case

20   law which is in dispute.

21                   MR. FREEDMAN:  The citation would be 2009

22   WL 10667524.

23                   THE WITNESS:  I am the only person with a

24   British legal degree in ----

25                   THE COURT REPORTER:  You are both



Page 227

1    speaking at the same time.  I cannot do that.

2                    MR. FREEDMAN:  That is all right.  The

3    videographer got it.  That is all I needed.  You will

4    get it later.

5                    MR. RIVERO:  I object to the process that

6    has been conducted.  Next question.

7    (Plaintiff's Exhibit 4 marked for identification)

8    BY MR. FREEDMAN:

9         Q.    I have handed you what we have marked as

10   Plaintiff's Exhibit 4.  Can you go to the bottom,

11   please, of page 4.  Do you recognise what this document

12   is?

13        A.    Yes.  This was a document put together by

14   staff at one of my companies.

15        Q.    Did you send this document to

16   Ira Kleiman?

17        A.    I presume so, seeing as it is chronology

18   of Craig Wright to Ira K.

19        Q.    Can you look at the bottom of page 4,

20   where it says:  "There is a lot of IP and 'stuff' in the

21   mix.  All up, it's about a hundred million dollars'

22   worth.  This IP originates in work CSW has been doing

23   for more than 10 years; it originates in things that

24   came from W&K; it has to do with the software acquired."

25   Do you see that?



Page 228

1              MS. MARKOE:  Objection.  Can you re-point

2      us to where you are.

3              MR. FREEDMAN:  Bottom of page 4.

4              MS. MARKOE:  Bottom of page 4.

5              MR. FREEDMAN:  Last paragraph, page 4.

6              MS. MARKOE:  Okay.  I will just state

7      that the document speaks for itself.  I was unable to

8      track what you were saying, so the document will speak

9      for itself.

10  BY MR. FREEDMAN:

11          Q.    Can you break down that $100 million

12  worth for me into the three buckets that you have put

13  forward in that chronology: the work you have been doing

14  for 10 years, the work that originates from W&K and the

15  software acquired?

16              MS. MARKOE:  Objection.

17              THE WITNESS:  I did not put forth the

18  chronology.

19  BY MR. FREEDMAN:

20          Q.    So is it inaccurate?

21          A.    Yes.  You will note that work for more

22  than 10 years and originates in W&K, which was not 10

23  years old, so therefore there is a discrepancy in that

24  very sentence you are pointing out.  I did not create

25  the document.



Page 229

```
 1            Q.    So was there not $100 million worth of IP

 2     in the mix?

 3                  MS. MARKOE:  Objection.

 4                  THE WITNESS:  Which mix?

 5     BY MR. FREEDMAN:

 6            Q.    It says "'stuff' in the mix".  You tell

 7     me.

 8            A.    What is the mix?

 9            Q.    I am asking you, it is your staff that

10     did it.  What did they mean by "IP and 'stuff' in the

11     mix"?

12                  MS. MARKOE:  Objection.

13                  THE WITNESS:  I do not know the state of

14     mind of my staff at all times.

15     BY MR. FREEDMAN:

16            Q.    You sent this to Ira without knowing what

17     it meant?

18                  MS. MARKOE:  Objection.

19                  THE WITNESS:  I sent quite a few things

20     to Ira.  I did not check all of them for all the details

21     at any point.

22     BY MR. FREEDMAN:

23            Q.    So W&K had no IP of value?

24                  MS. MARKOE:  Objection.

25                  THE WITNESS:  I am not W&K.
```



Page 230

1    BY MR. FREEDMAN:

2           Q.    To the best of your knowledge did W&K

3    ever have valuable intellectual property?

4                MS. MARKOE:  Objection.  You can answer.

5                THE WITNESS:  I have stated before,

6    I care about my own companies.  I really do not care

7    about any other in existence anywhere on the planet that

8    has nothing to do with my companies, or cannot hand me

9    something.

10   BY MR. FREEDMAN:

11          Q.    Did you ever obtain valuable intellectual

12   property from W&K?

13               MS. MARKOE:  Objection.  You can answer.

14               THE WITNESS:  Yes.

15   BY MR. FREEDMAN:

16          Q.    How?

17          A.    I paid for work to be done through my

18   companies.

19          Q.    Was W&K your company?

20               MS. MARKOE:  Objection.

21               THE WITNESS:  No.

22   BY MR. FREEDMAN:

23          Q.    So how did you get W&K's valuable

24   intellectual property?

25               MS. MARKOE:  Objection: asked and



Page 231

1    answered.

2              THE WITNESS:  As I have just stated,

3    companies I own dealt with W&K.  W&K provided

4    intellectual property.

5    BY MR. FREEDMAN:

6         Q.    What was the intellectual property W&K

7    provided?

8         A.    Source code.

9         Q.    For?

10        A.    Primarily it enhanced some of the gaming

11   operations I was doing.  It improved upon a lot of the

12   poker operations.  We built a back door so that we could

13   get through the Chinese firewall.  That enabled a number

14   of Costa Rica gaming operations to basically deal with

15   online casinos in a number of places, not just sort of

16   in Costa Rica, but America and China.  It enabled

17   Sportsbooks to access things without putting their IP

18   better than Tor.  It enabled us to have monitoring and

19   software that was put onto WebMoney, and Liberty

20   Reserve.  It enabled the capture of information from

21   many of these networks.

22        Q.    What was the value of this intellectual

23   property?

24        A.    I am not an intellectual property valuer.

25        Q.    Who created this intellectual property?



Page 232

```
 1          A.      Which part?

 2          Q.      Who created the intellectual property

 3    that enhanced some of the gaming operations you were

 4    doing?

 5          A.      I do not know.

 6          Q.      Who created the intellectual property

 7    that improved upon a lot of the poker operations?

 8          A.      I do not know.

 9          Q.      Who created the intellectual property

10    that built the back door so that you could get through

11    the Chinese firewall?

12          A.      Who built it or who enhanced it or who

13    distributed it?  They are different things.

14          Q.      Tell me who built it?

15          A.      Me.

16          Q.      Who enhanced it?

17          A.      People Dave was dealing with out of

18    Russia.

19          Q.      Who distributed it?

20          A.      Quite a number of sites, including some

21    associated with the US government.

22          Q.      Can you list those sites for me?

23                  MS. MARKOE:  Objection.

24                  THE WITNESS:  No.

25    BY MR. FREEDMAN:
```



1          Q.      Because you do not know them?

2          A.      Some I do.  Those ones we will have to

3    deal with in camera.  Other ones, no.

4          Q.      The distribution of these technologies

5    relates to national security?

6          A.      The poker stuff, no.  The back doors,

7    some could.

8          Q.      Can you tell me about Dave's interaction

9    with the folks in Russia?

10                 MS. MARKOE:  Objection.  Answer if you

11   can.

12                 THE WITNESS:  I do not know about what

13   other people do.  I do not follow my own staff at the

14   moment, so you are asking me -- I mean, do you actually

15   know the size of my operations?

16   BY MR. FREEDMAN:

17         Q.      No.

18         A.      Then that is why you have no idea what

19   you are asking.  Do you know how many countries I have

20   operations in now?

21         Q.      I want you to focus on what you had in

22   2013 and before.

23         A.      In Australia, do you know how many people

24   I had at the end of 2013?

25         Q.      How many?



Page 234

```
 1            A.      Over 50.  Do you know how many countries

 2    I had operations in in 2013?

 3            Q.      No.

 4            A.      Around 60.

 5            MS. MARKOE:  Guys, seriously, Vel is

 6    taking this deposition.  You are not taking the

 7    deposition.  Let him ask his questions.

 8    BY MR. FREEDMAN:

 9            Q.      Who created the intellectual property

10    that enabled Sportsbooks to access things without

11    putting their IP better than Tor?

12            A.      Again, I did not follow up who was

13    individually creating anything.

14            Q.      Was Dave responsible for the creation of

15    this intellectual property?

16                    MS. MARKOE:  Objection.

17                    THE WITNESS:  Can you specify that in a

18    better, more clear manner.

19    BY MR. FREEDMAN:

20            Q.      W&K created all this intellectual

21    property; is that correct?

22            A.      A lot of that, yes.

23            Q.      Who was responsible for W&K's operations?

24                    MS. MARKOE:  Objection.

25                    THE WITNESS:  Again, you are asking me
```



Page 235

1    something -- who was responsible for the operations in

2    this office.

3    BY MR. FREEDMAN:

4         Q.    So you do not know who was responsible

5    for the operations at W&K to create this intellectual

6    property?

7              MS. MARKOE:  Objection.

8              THE WITNESS:  I have already said I do

9    not know who is responsible for half the things that

10   happen in my own office right at the moment, nor do

11   I intend to be.

12   BY MR. FREEDMAN:

13        Q.    Who was your contact at W&K to create all

14   this intellectual property?

15             MS. MARKOE:  Objection: mischaracterises

16   the testimony.

17             MR. FREEDMAN:  You can answer.

18             THE WITNESS:  Dave.  By Dave, I mean Dave

19   Kleiman.

20   BY MR. FREEDMAN:

21        Q.    Did the Sportsbooks program intellectual

22   property enable betting with -- strike that.  Did any of

23   the poker-related technology involve the use of Bitcoin?

24             MS. MARKOE:  Objection.  You can answer

25   if you can.



Page 236

```
 1                    THE WITNESS:  Yes.
 2   BY MR. FREEDMAN:
 3           Q.     How did it involve Bitcoin?
 4           A.     You could take Bitcoin and bet.
 5           Q.     What was this called, this intellectual
 6   property?
 7                    MS. MARKOE:  Objection: vague.
 8                    THE WITNESS:  Texas hold'em.
 9   BY MR. FREEDMAN:
10           Q.     Did you file a patent?  Was it a code?
11   How did you -- strike that.
12           A.     Do you understand that this is ----
13                    MS. MARKOE:  There is no question
14   pending.  He struck his question.  Let him ask a
15   question and you can answer it.
16   BY MR. FREEDMAN:
17           Q.      How did you obtain the intellectual
18   property that relates to poker?
19                    MS. MARKOE:  Objection:  mischaracterises
20   the testimony.
21                    THE WITNESS:  Can you ask something a bit
22   less vague.
23   BY MR. FREEDMAN:
24           Q.     How did you obtain -- strike that.  You
25   obtained intellectual property from W&K that involved
```



MAGNA
LEGAL SERVICES

Page 237

1    poker and Bitcoin; is that correct?

2                  MS. MARKOE:  Objection.

3                  THE WITNESS:  Are you talking about me or

4    a company that I owned?

5    BY MR. FREEDMAN:

6         Q.    Or a company that you -- I thought you

7    did not own any companies.

8         A.    I said owned.  And that is not own.

9         Q.    Which company did you own previously but

10   no longer do?

11                 MS. MARKOE:  Objection.

12        A.    There are over 100 of those.

13   BY MR. FREEDMAN:

14        Q.    Over 100 companies that you owned but no

15   longer do?

16        A.    Yes.

17        Q.    Who owns them now?

18        A.    I do not know.

19                 MS. MARKOE:  Objection.

20   BY MR. FREEDMAN:

21        Q.    This is because you put in place a

22   structure so you do not know who owns them?

23                 MS. MARKOE:  Objection.  This question is

24   overbroad and is going to result in a very unclear

25   answer when you are talking about over 100 companies.



Page 238

1    They cannot possibly all have the same answer.

2                    MR. FREEDMAN:  Maybe it does.

3                    THE WITNESS:  It does not.

4                    MR. RIVERO:  What topic does it relate

5    to?

6                    MR. FREEDMAN:  The court has specifically

7    directed us to be able to ask all about Dr. Wright's

8    entities at hearings and even beyond here.

9                    MR. RIVERO:  No.

10                   MR. FREEDMAN:  But at subsequent hearings

11   and you can ask Ms. Markoe about this.  He specifically

12   authorised inquiry into the companies.

13                   MS. MARKOE:  He authorised limited

14   inquiry into those companies and it needs to be clear

15   inquiry, so if you would like to ask a question that

16   will result in a clear answer I am sure he can answer on

17   a limited basis.  You are limited, if my recollection is

18   correct, in asking questions about those once we have

19   established that those companies do not relate to Dave

20   Kleiman or W&K.

21                   MR. FREEDMAN:  I am not sure that is

22   correct, but let us not waste time on that.

23         Q.     When was the first time you contracted

24   with W&K?

25         A.     I do not know.  You would have to look at



Page 239

1    the date of the contract.  (Pause).

2    (Plaintiff's Exhibit 5 marked for identification)

3         Q.    I have just handed you Plaintiff's

4    Exhibit 5.  Do you recognise this contract?

5         A.    I recognise this contract.

6         Q.    What is the date of this contract?

7         A.    22nd April 2011.

8         Q.    Can you tell me in your own words what

9    the bargain in this contract was?

10             MS. MARKOE:  Objection.  You can answer.

11             THE WITNESS: This is an agreement between

12   Craig Wright R&D, a company, and W&K Info Defense, an

13   LLC in the US, for provision of services.

14   BY MR. FREEDMAN:

15        Q.    On page 15 of this document is that your

16   signature?

17             MS. MARKOE:  Do you mean 15 at the top?

18             MR. FREEDMAN:  15 at the top.

19             THE WITNESS:  That is signed by me, yes.

20   BY MR. FREEDMAN:

21        Q.    Can you go back to page 3, please.

22   Sorry, take that back, can you go to page 4.  I am

23   looking at L.

24             MS. MARKOE:  You are referring to page 4

25   at the top.  There is just different paginations.



Page 240

1          MR. FREEDMAN:  Always at the top.

2          MS. MARKOE:  Okay.  I just want to make

3    sure we have a clear record.

4    BY MR. FREEDMAN:

5          Q.    This is docket entry 83-10.  Do you need

6    a second to familiarise yourself with paragraph L?

7          A.    I have read it.

8          Q.    What is going on here?

9          A.    Sorry, what do you mean what is going on?

10   It is a piece of paper.  Nothing is going on.

11         Q.    Can you tell me, as I read this paragraph

12   of the contract, you are providing, you are the

13   financier; is that correct?

14         MS. MARKOE:  Objection.

15         THE WITNESS:  No.

16   BY MR. FREEDMAN:

17         Q.    Craig Wright R&D is the financier?

18         A.    That is what it states, yes.

19         Q.    Craig Wright R&D is providing 1,024 core

20   Xeon and GPU based hardware solution.  (a) It is

21   acknowledged that two SGI ICE XE310-512 core hosts have

22   been provided and are in a data centre specified by the

23   provider."  What is SGI ICE XE310?

24         A.    A computer.

25         Q.    Is it a special computer or just a



Page 241

1    regular computer?

2           A.     It is an HPC, high memory, high core

3    computer.

4           Q.     (b) states the purpose of the provision

5    of these hardware systems; is that correct?

6           A.     It is a possible use that by the time

7    that this was implemented was not available.

8           Q.     So (b) says -- can you read (b) for me?

9           A.     "The provider will use these systems to

10   mine Bitcoin."

11          Q.     And then (c) says the expected amount of

12   the Bitcoin; is that correct?

13          A.     No.

14          Q.     Well, can you read (c) for me?

15          A.     "The provider expects to earn" -- that is

16   not correct because by the time this was implemented,

17   ASICs, FPGAs and other things had been developed which

18   would make this about one Bitcoin a year.

19          Q.     (c) says that you expect it to earn

20   12,000 Bitcoin per month; is that correct?

21                 MS. MARKOE:  Objection: misstates what

22   the document says.

23                 THE WITNESS:  I did not expect to earn

24   anything.

25   BY MR. FREEDMAN:



Page 242

1          Q.     M states that W&K are supposed to pay for

2     these systems with 300,000 Bitcoin; is that correct?

3          A.     That is what it states.

4          Q.     Did W&K ever pay 300,000 Bitcoin?

5          A.     No.

6          Q.     Why not?

7          A.     David died.

8          Q.     How did W&K get 300,000 Bitcoin if

9     this -- strike that.  Did W&K put these computers listed

10    in L to work to mine Bitcoin?

11               MS. MARKOE:  Objection: foundation and

12    you are going beyond the scope again.  Would you like to

13    connect it to one of the topics, please.

14               MR. FREEDMAN:  This is 4, the location

15    and duration of Dave, W&K and Craig's mining of Bitcoin

16    from 2009 till April 2013.

17               MS. MARKOE:  You can answer the question

18    if you know the answer.

19               THE WITNESS:  There was no mining of

20    Bitcoin between myself and Dave ever.  There was no

21    mining at all in any way that I know of on those

22    machines, ever.

23    BY MR. FREEDMAN:

24         Q.     So, as far as you are aware, Dave never

25    used those machines to mine Bitcoin?



Page 243

1          A.      It would be totally stupidly foolish to

2     mine anything once ASICs came out on those machines.   It

3     would probably set me back around $4 million a month for

4     something, at the time, worth less than $12,000.

5          Q.      What was the purpose of this clause at

6     the time the contract was entered into?

7          A.      Which clause?

8          Q.      L?

9               MS. MARKOE:   Objection.

10               MR. RIVERO:   You may answer.

11               THE WITNESS:   The clause was there to

12     have machines that would be run and managed.   The

13     primary purpose would be I was using scaling tests and

14     other such things.   Those machines were running enhanced

15     versions of Bitcoin that I was creating, the node

16     software, so that I could see how far I could scale

17     Bitcoin as a blockchain.   Any other side use, while not

18     being used, was originally envisioned that others could

19     mine Bitcoin with.

20     BY MR. FREEDMAN:

21          Q.      In clause B, on page 3, the contract

22     states that "The provider desires the intellectual

23     property for the permitted use ..."  What was the

24     intellectual property referred to here?

25               MS. MARKOE:   Objection.   You can answer.



Page 244

```
 1                    THE WITNESS:  Some of that is the things

 2    we have already talked about, including gaming software.

 3    Dave was running operations that I helped set him up in

 4    Costa Rica.

 5    BY MR. FREEDMAN:

 6         Q.    Craig Wright R&D paid for this

 7    development in paragraphs F and G; is that correct?

 8                    MS. MARKOE:  Objection.  You can answer.

 9                    THE WITNESS:  I instructed people who

10    were with the company to pay for machines to be

11    purchased.

12    BY MR. FREEDMAN:

13         Q.    Where did this Bitcoin come from?

14                    MS. MARKOE:  Objection.  I am going to

15    instruct the witness not to answer.  It goes beyond the

16    scope.

17                    MR. FREEDMAN:  Of 10 as well?

18                    MS. MARKOE:  Where in 10 does it

19    reference ----

20                    MR. FREEDMAN:  Inquiry into the entities

21    and projects referenced in Exhibits 5, 10 and 15 in a

22    second I am going to complain.

23                    MS. MARKOE:  Right, and your question, if

24    I recall correctly -- let me just see -- actually, would

25    you mind reading it back; I cannot locate it at the
```



Page 245

1    moment.

2      (The court reporter read back as requested)

3                    MR. RIVERO:   Just give us a moment.

4                    MR. FREEDMAN:   Let me take a break

5    because I have to use the restroom.

6                    THE VIDEOGRAPHER:   Going off the record.

7    The time is 16.58.

8                        (A Short Break)

9                    THE VIDEOGRAPHER:   Going back on the

10   record.   The time is 17.09.   Thank you.

11   BY MR. FREEDMAN:

12       Q.    Before the break, Dr. Wright, I asked you

13   where the Bitcoin mentioned in paragraphs F and G --

14   sorry, take that back.

15                    MS. MARKOE:   It might be easier just to

16   have her read back the last question.

17                    MR. FREEDMAN:   I looked at it, though.   I

18   just said:   "Where did this Bitcoin come from?"   Let us

19   start again with a clear record.

20                    MS. MARKOE:   Okay.

21   BY MR. FREEDMAN:

22       Q.    Let us look at paragraph A.   Paragraph A,

23   Dr. Wright, says:   "The Financier controls the following

24   Bitcoin (BTC) addresses."   How did Craig Wright R&D come

25   to possess these Bitcoin addresses?



Page 246

1          A.     I do not know.

2          Q.     Paragraph F says that the financier will

3    send 165,140 Bitcoin to the 1MSU address by 30th April

4    2011.  Did Craig Wright R&D send 165,140 Bitcoin to the

5    1MSU address?

6          A.     I do not know.

7          Q.     Did you cause or request that Craig

8    Wright R&D make this transfer?

9          A.     I requested that people pay the amounts

10   that they are meant to pay, yes.

11         Q.     Where did this request go to?

12         A.     It went to Craig Wright R&D.

13         Q.     Who at Craig Wright R&D?

14                MS. MARKOE:  Objection.  You can answer.

15                THE WITNESS:  I do not know.  This is

16   years ago.  I do not remember the people in that

17   company.

18   BY MR. FREEDMAN:

19         Q.     Which company was it?

20         A.     Craig Wright R&D.

21         Q.     But there were many of them.

22         A.     Which Craig Wright R&D is I believe what

23   you are asking.

24         Q.     Mmm-hmm.

25         A.     That was in Panama.



Page 247

1          Q.     And Craig Wright R&D Panama had control

2    over these Bitcoin addresses?

3                 MS. MARKOE:  Objection.  You can answer

4    if you know.

5                 THE WITNESS:  I told people what to do.

6    They told me they had done it.  That is as far as I go.

7    BY MR. FREEDMAN:

8          Q.     And then did Craig Wright R&D deliver the

9    50,000 Bitcoin referenced in paragraph G?

10         A.     Again, I do not have much to do with

11   finance in the companies other than people giving me

12   reports saying it has all been done or not, and if I do

13   not get complaints about finance by creditors or debtors

14   or whatever else going, "Why the hell it has not

15   happened", etcetera, then I am a happy guy and I stay

16   out of people's way.

17         Q.     Can you go to page 13 for me, please,

18   Dr. Wright.

19                MS. MARKOE:  Again, just for clarity's

20   sake, that is 13 at the top.

21   BY MR. FREEDMAN:

22         Q.     Top of the page.  I am looking at

23   paragraph 18(a).

24         A.     Mmm-hmm.

25         Q.     It says:  "The paper Bitcoin Wallet with



Page 248

1    address 1933ph", and so on ----

2         A.    Yes.

3         Q.    ---- "will be held by the financier as

4    assurance or the contract and will convert to the

5    ownership of the financier on default of the provider."

6    So, Craig Wright R&D held the 1933 wallet as collateral?

7              MS. MARKOE:  Objection.  You can answer.

8              THE WITNESS:  That would be the finance

9    people over in Panama, not me.

10   BY MR. FREEDMAN:

11        Q.    Who were the finance people at Panama?

12        A.    Some of those were associated with a

13   company called High Secured, and there were other people

14   who used to work for Liberty Reserve.

15        Q.    So the folks at High Secured and Liberty

16   Reserve controlled this Bitcoin wallet address?

17             MS. MARKOE:  Objection: mischaracterises

18   the testimony.

19   BY MR. FREEDMAN:

20        Q.    Did the folks at High Secured and Liberty

21   Reserve control this wallet address?

22        A.    I have stated my involvement with finance

23   which is exactly as it is now, is, I say do things;

24   things either happen or do not happen.  If they do not

25   happen Craig gets all yelly and screamy and everyone



Page 249

1    gets upset, and when they do happen, things are good.

2         Q.    So the folks at finance controlled the

3    wallets listed at A on page 3; is that correct?

4              MS. MARKOE:  Objection: mischaracterises

5    the testimony.  You can answer.

6              THE WITNESS:  Again, I basically go to

7    finance people, they tell me things, I trust what my

8    people tell me, and if no one complains, no one says it

9    is not real, then I have to believe what I am told by

10   people I contract or paid.

11   BY MR. FREEDMAN:

12        Q.    How did this amount of Bitcoin end up in

13   these wallets?

14             MS. MARKOE:  Objection.  You can answer

15   if you know.

16             THE WITNESS:  There are two problems with

17   what you have just said.  This amount of Bitcoin in

18   18(a) is not -- that is an address, not an amount of

19   Bitcoin, and, secondly, they are an address, not a

20   wallet.

21   BY MR. FREEDMAN:

22        Q.    How did Bitcoin end up in the wallets

23   listed at A(a) and A(b)?

24             MS. MARKOE:  Objection.

25             THE WITNESS:  My assumption is that a



Page 250

1    transaction would be sent to the Bitcoin ledger.  Miners

2    would take that transaction and send into a block which

3    would be mined, updating the ledger.

4    BY MR. FREEDMAN:

5           Q.     Did you cause the Bitcoin to end up in

6    those wallets?

7                  MS. MARKOE:  Objection.

8                  THE WITNESS:  These are not wallets.

9    BY MR. FREEDMAN:

10          Q.     Addresses.  Did you cause the Bitcoin to

11   end up in these addresses?

12                 MS. MARKOE:  Objection.  Answer if you

13   can.

14                 THE WITNESS:  If you are saying did

15   I tell someone to do something and things happened, to

16   the best of my knowledge, no one complained.  I told

17   people in a group of companies in Panama to do things to

18   make sure Dave was happy.  Things happened.  No one

19   complained.  Dave did not complain to me.  I am happy.

20   Everyone is happy.

21   BY MR. FREEDMAN:

22          Q.     I am trying to figure out how the folks

23   in Panama ended up with that much Bitcoin at their

24   disposal?

25                 MS. MARKOE:  Objection.



Page 251

1              THE WITNESS:  Sorry, what is that much

2      Bitcoin?

3      BY MR. FREEDMAN:

4          Q.    It is 165,140 and then 50,000, so a total

5      of 215,140.

6          A.    You are asking how an organisation that

7      was turning over probably $20 million a month managed to

8      obtain $80,000 worth of Bitcoin?

9          Q.    Yes.

10         A.    Well, if you had offered someone 100,000,

11     they would have given you no questions asked.  You could

12     have gone to LocalBitcoins.  You could have gone to

13     Mt. Gox.  You could have gone to a number of criminal

14     organisations that were selling it.  Libya Reserves had

15     quite a number of Bitcoin.  How would you do that?

16     Well, people exchange goods and services.  You take US

17     dollars and you make a trade.

18              MR. RIVERO:  There is a question from the

19     court reporter.

20              THE WITNESS:  Mt. Gox.

21     BY MR. FREEDMAN:

22         Q.    In April of 2011, was it possible to

23     acquire 165,000 Bitcoin on the open market?

24         A.    Yes.  In fact, around that sort of time,

25     50,000 Bitcoin was swapped for two pizzas.



Page 252

```
1              Q.     Do you have any information on how the

2     165,140 and 50,000 ended up in the two addresses at A(a)

3     and A(b)?

4                     MR. RIVERO:  Objection.  Did you say A(a)

5     and A(b)?

6                     MR. FREEDMAN:  Yes, on page 3.

7                     MR. RIVERO:  I am sorry, I do not

8     understand the question.  I do not understand your

9     question.  I cannot form an objection.  Do you mean F(b)

10    and G(b)?  Oh, I see.  Withdraw.  Go ahead.  Yes?

11                    THE WITNESS:  My statement is very

12    simple: they are addresses; no amount is claimed at

13    those addresses.

14    BY MR. FREEDMAN:

15             Q.     These addresses transferred these

16    amounts -- sorry, let us make that clear.  The 12h

17    address transferred 165,140 Bitcoin to the 1MSU address?

18                    MR. RIVERO:  Objection: mischaracterises

19    the testimony.  You may answer.

20                    MR. FREEDMAN:  Do you mind, I did not

21    quite finish yet.

22                    MR RIVERO:  Oh!

23    BY MR. FREEDMAN:

24             Q.     Do you know how the Bitcoin ended up in

25    the 12h address?
```



Page 253

1          A.     Well, a transaction would be sent to the

2     blockchain.  Miners will take their transaction for

3     transaction fees.

4          Q.     Let me be clear, doctor, because you

5     explained this before.  I am not asking for the

6     technical explanation of how the Bitcoin ends up, I am

7     asking for the practical explanation.  Everyday people

8     like me would say, how did the Bitcoin end up in that

9     wallet address, or that public address; who sent it

10    there?

11               MR. RIVERO:  Objection.

12               THE WITNESS:  I am saying, where is a

13    block explorer to tell me it actually went on any

14    particular date?

15    BY MR. FREEDMAN:

16         Q.     Sitting here today -- strike that.  Did

17    any of the Bitcoin you mined in Australia end up at

18    these public addresses?

19         A.     No.

20               MR. RIVERO:  Object to the form.  Just

21    give me one moment to state the objection.  (Pause)

22    BY MR. FREEDMAN:

23         Q.     Can you go with me to page 14 at the top.

24    Can you look at the definition of "Product", or the

25    listing of what product is.  Can you read that for me,



Page 254

1    please.

2              A.      "Bitcoin and Exchange Software in

3    C/C++/C#/R code."

4              Q.      How did Bitcoin and Exchange Software fit

5    into this contract?

6                      MR. RIVERO:  Misstates the document.

7    Objection.

8                      MR. FREEDMAN:  You can answer.

9                      THE WITNESS: Sorry, how did Bitcoin and

10   Exchange Software fit into this document?

11   BY MR. FREEDMAN:

12             Q.      Yes.  It just says "Product".  What does

13   that mean?

14             A.      It means exactly what it says there.

15             Q.      Is this the product that Dave Kleiman was

16   producing for you at W&K?

17                     MR. RIVERO:  Objection.

18                     THE WITNESS:  I need more of an

19   explanation than that.  Exchange Software, I mean that

20   is a very wide -- that is like saying ----

21   BY MR. FREEDMAN:

22             Q.      You do not know what the contract means?

23             A.      I do not know what you are trying to

24   classify it as.

25             Q.      You tell me what the contract you signed



Page 255

1    means.  It says: "Product:  Bitcoin and Exchange

2    Software in C/C++/C#/R code."  What does that mean?

3            A.    If you want to cherry pick, that is a

4    different thing than saying this line means something

5    out of sort of the rest.  What the contract was about

6    was the production of code at the end.

7            Q.    For Bitcoin?

8            A.    Define "for Bitcoin".

9            Q.    I do not know, it says "Bitcoin",

10   "Product: Bitcoin"?

11           A.    Mmm-hmm.

12           Q.    Is that because the contract was creating

13   Bitcoin?

14           A.    No, Bitcoin was already created.

15           Q.    Is that because the contract was for the

16   purpose of creating mining Bitcoin?

17           A.    No, you cannot mine Bitcoin that way.

18   I have already stated this.

19           Q.    Was it for a Bitcoin exchange?

20           A.    No.  There were certain things that were

21   to do with a Bitcoin exchange, and some other aspects of

22   poker software, other aspects of the software I have

23   mentioned before, and the other stuff, intellectual

24   property, under the unawarded DHS projects.

25           Q.    Can you go with me to page 15.



Page 256

```
 1              A.     Yes.
 2              Q.     Do you see Dave Kleiman's name about a
 3     quarter of the way down from the top of the page?
 4              A.     Yes.
 5              Q.     Do you see the signature there?
 6              A.     What I see is his name written there,
 7     yes.
 8              Q.     Is that Dave Kleiman's signature?
 9              A.     The definition of signature, if we take,
10     for instance, Salinger v Golden Mining, what you will
11     see is if I type "Regards, Craig", that is deemed a
12     signature under the law.  That was upheld in 2011 in the
13     British courts to be a signature.  A signature is an
14     attestation.  If I tell my EA, as I do every now and
15     again, "Please send in this document, I cannot get into
16     the office, I have noted in this e-mail I am authorising
17     you to sign", and she puts my name at the bottom, that
18     is legally a signature.  When I go "Regards, Dr. Craig
19     Wright" on an e-mail and it is typed, that is legally a
20     signature.  If I have a video attestation and I say, "I,
21     Craig Wright, agree to this contract", that is legally a
22     signature.  A signature in writing, basically,
23     incorporates, in this country at least, and as well
24     Australia, the incorporation of anything in any media,
25     including video attestation, that will allow one to
```



Page 257

1    prove that they agreed to be bound.  The definition of

2    signature is actually an agreement to be bound.  So,

3    what you are saying is, did Dave agree to be bound?  And

4    if he was part of this contract that would be that he

5    agreed to be bound.  If he was not, then he had no part

6    in the contract, and then has no rights under that

7    contract.  Which would you prefer to choose?

8            Q.    Actually, I would just prefer you to

9    answer the question.  Is that Dave Kleiman's signature?

10           A.    I have answered the question in detail.

11           Q.    I do not think so.  Can you give me a yes

12   or no; is that Dave Kleiman's signature?

13                 MS. MARKOE:  Objection.  You can answer.

14                 THE WITNESS:  I have answered the

15   question.

16   BY MR. FREEDMAN:

17           Q.    How did that mark get to be made on the

18   page?

19           A.    I do not really care.  If someone sends

20   me a contract and I haven't witnessed it personally or

21   noted that I witnessed it, then I have not witnessed it.

22   I am not going to give a rat's rectum about the origin

23   of something that someone does not dispute.  Dave had

24   many years to say, "Hey, I did not sign".  At some point

25   he could have put his hand up and said, "I do not agree


MAGNA
LEGAL SERVICES

Page 258

1    with this".  At no point did he.  Of course, the

2    argument here when we were talking about the creation of

3    software that is legal in Australia, but illegal in the

4    USA, brings into a difficult position with contracts.

5    Although it is a legal contract in New South Wales, one

6    could argue that the creation of a prohibitive product,

7    that is actually a crime for an American citizen to

8    create, or be involved with, or distribute, or actually

9    fairly much anything to do with, would actually

10   invalidate Dave's contract but that is a different

11   issue.

12        Q.    Did you witness Dave Kleiman sign this

13   contract?

14        A.    It does not say witnessed at any point.

15        Q.    So you did not witness him sign the

16   contract?

17        A.    I believe I have noted that I was never

18   in Australia -- sorry, Dave was not in Australia, and

19   that I was not on the signing date of this contract in

20   the US.  At the time, witnessing over video was not

21   legal, and although the law has been updated and now in

22   the UK and Australia that is possible, it was not

23   possible at the time.  So, without being in the same

24   room as Dave, I would not be able to witness.

25        Q.    Dr. Wright, it would help us get through



Page 259

1      this deposition if you gave shorter answers that address

2      the exact question targeted.

3            A.      I do not believe I can without being

4      vague.

5            Q.      If I asked you to, how could you prove to

6      me that Dave Kleiman signed this contract?

7                  MS. MARKOE:  Objection.

8                  THE WITNESS:  I do not need to.

9      BY MR. FREEDMAN:

10           Q.      List to me all the ways in which you

11     could demonstrate Dave Kleiman signed this contract?

12                 MS. MARKOE:  Objection.

13                 MR. RIVERO:  Objection.

14                 MS. MARKOE:  I am going to instruct the

15     witness not to answer unless you can show me where in

16     the topics this relates.

17     (Plaintiff's Exhibit 6 marked for identification)

18                 MR. FREEDMAN:  We believe this question

19     relates to section 10 that authorises us to ask about

20     the projects referenced in 5, 10 and 15, but if you are

21     instructing the witness not to answer, in the interests

22     of time, we will move on.

23                 MS. MARKOE:  Can we go back and look at

24     the question again, based on what he said.  (Pause) The

25     last question by Mr. Freedman was:  "List to me all the



Page 260

1  ways in which you could demonstrate Dave Kleiman signed

2  this contract."  I objected and instructed you not to

3  answer.  I will remove my instruction not to answer and

4  you can answer if you can.

5            MR. RIVERO:  We maintain the objection.

6            MS. MARKOE:  We maintain the objection,

7  correct.

8            MR. RIVERO:  The form is completely

9  defective, but answer if you can.

10           THE WITNESS:  I have just published to

11  two papers on electronic signatures that were presented

12  in Oxford last month.  That involves an analysis of many

13  ways of signing digitally.  So, basically, any way that

14  you can say that someone signed.  Now, a signature is

15  very simple.  It does not need to be a handwritten

16  thing, and in fact a handwritten thing is the antithesis

17  of the idea of what it was.  The history of signatures

18  goes back to allowing Jews to sign with their name and

19  Christians would put an X.  In fact, only those who were

20  literate signing with Xs in medieval England.  So, the

21  reason for that is that you were taking an attestation

22  or an oath.  So, the history of signatures is such that

23  you are saying that you agree to be bound.  Can you say

24  that you agree to be bound?  Was there any evidence to

25  the contrary where someone could bring up saying there



Page 261

1    was no evidence of agreement to be bound?  In the case

2    of someone like Mr. Kleiman, did Mr. Kleiman ever stand

3    up and say, "I do not agree to be bound"?  In years of

4    dealing, contracting, etcetera, did he say, "No, this

5    was not my contract"?  You would want to show the

6    absence of anything like that.  You would want to show

7    the absence of e-mails saying, "I disagree with this

8    thing.  I did not agree to be bound by the contract.

9    That is not my signature".

10          Of course, that is a signature not being

11   this handwritten thing that people try and say, but

12   rather the agreement to be bound.  I would look for the

13   absence, and hope that if you were trying to contest a

14   signature, and say that someone did not agree to be

15   bound, there would be something, some evidence, in the

16   wide swathe of communications that can occur over years,

17   of anyone at any point going, "I do not agree with

18   this", that there were some communications with other

19   people saying, "I do not agree", where Dave would say,

20   "I did not agree to this contract", where maybe Ira or

21   whatever else had been communicating and going, "Dave,

22   what do you mean he says you are under contract?"  And

23   then Dave would go, "No, I did not actually sign that".

24   BY MR. FREEDMAN:

25          Q.    Okay, I am going to cut you up.



1                    MR. RIVERO:  Wait, do not cut the

2     witness -- hold on.  You ask about tell me all the ways

3     you can prove it and he is answering your question.  He

4     is going to finish his answer.  Whenever you feel like

5     it, Dr. Wright.  You asked the question.  We objected to

6     it because it is a completely defective question.  You

7     answer it until you feel satisfied.

8                    THE WITNESS:  So, I would start by

9     analysing every bit of media Dave has ever had.  Was

10    there any social media where Dave had online -- and he

11    was very prolific online -- stated, "I do not agree to

12    this contract.  Someone is saying I am bound but I am

13    not".  So, you would go through all of his Facebook

14    posts, all of his Twitter, all of his communications

15    with other partners that he had in Australia, because

16    Dave did have partners.  I was not one of them, but Page

17    and Connor and things like that, maybe he would go to

18    them and say, "I was not bound by this", or mutual

19    friends we had, like Paul Henry, would Dave talk to

20    these guys, who were really good friends with us, who

21    had been in the industry a long time, "I did not agree

22    to this", he would say.  He would go up there and go,

23    "I did not agree to this contract and yet people are

24    claiming that I did".  You would find some evidence.

25    You would analyse all his hard drives, all his e-mails.



Page 263

1    You would look to what other people might say.  You
2    would find somewhere where someone had said, "I do not
3    agree to be bound", or Dave had gone to them, "I do not
4    agree to be bound"; why?  You would find something in
5    communications where that has occurred.  Thank you.
6              MR. FREEDMAN:  Thank you.  If you do that
7    again, Dr. Wright, Andrés, we will bring it up with the
8    court.  It is purposely wasting time.
9              MR. RIVERO:  The question asked for
10   proof.  The witness has answered exactly.  But you
11   allowed him to finish, so we are going to continue.
12   BY MR. FREEDMAN:
13        Q.    I believe we handed you Plaintiff's
14   Exhibit 6.  Do you recognise this exhibit?
15        A.    I do.
16        Q.    What is this exhibit?
17        A.    It is a contract.
18        Q.    Made between who and who?
19        A.    Between W&K Info Defense in Florida and
20   Craig Wright R&D, which would be an Australian entity.
21        Q.    Is there another party to the contract?
22        A.    And W&K Info Defense LLC company.
23        Q.    I think you have misstated the first
24   party to the contract.  Perhaps take a look again at the
25   first party to the contract.



Page 264

1              MS. MARKOE:  Objection.

2              THE WITNESS:  W&K Info Defense LLC.

3    BY MR. FREEDMAN:

4         Q.    I believe it says Dave Kleiman of W&K

5    Info Defense LLC.

6              MS. MARKOE:  Objection.

7              THE WITNESS:  That is still the company,

8    which, under Commonwealth law means the legal entity

9    being represented by Dave Kleiman, not Dave Kleiman, is

10   being bound.  Dave Kleiman is not being bound by this

11   contract in any way.  Sorry, I do have a masters degree

12   and I am a legal scholar, and I am doing my doctor of

13   law at the moment.  If you want to discuss British or

14   Australian law I am quite happy to.

15             MS. MARKOE:  I would also like to note

16   for the record that it actually says that the entirety

17   of that first party, which is defined as the vendor, is

18   "Dave Kleiman of W&K Info Defense LLC (Florida)".

19   BY MR. FREEDMAN:

20        Q.    Can you take a look at paragraph B for

21   me, please, Dr. Wright.

22        A.    Yes.

23        Q.    Can you read that out loud for the

24   record?

25        A.    "The company is the owner of and conducts



Page 265

```
1    business known as Bitcoin mining and Software

2    Research/development (sic)."

3            Q.     I think it says "Software

4    development/Research"?

5            A.     Correct, I am sorry about that error.

6            Q.     Dr. Wright, this contract was signed two

7    years after, approximately, the last contract we just

8    looked at?

9            A.     Where is the date?  Yes.

10           Q.     You told me the April 2011 contract,

11   although it provides for Bitcoin mining hardware, could

12   not be used for Bitcoin mining hardware because ASIC

13   miners came along and rendered that technology obsolete;

14   is that correct?

15               MS. MARKOE:  Objection: the record will

16   speak for itself.

17               MR. FREEDMAN:  You can answer.

18               THE WITNESS:  I told you exactly as

19   I told you, yes.

20   BY MR. FREEDMAN:

21           Q.     Now two years later you are signing a

22   contract that says that the company does conduct the

23   business as Bitcoin mining.  Can you explain that to me?

24               MS. MARKOE:  Objection.

25   BY MR. FREEDMAN:
```



Page 266

```
 1          Q.      Did something change?

 2          A.      I do not have any care about what Dave

 3   said his business was.

 4          Q.      Can you go with me to page 11 of the

 5   contract up on the top page.

 6          A.      Yes.

 7          Q.      Down the bottom, it says "Craig S

 8   Wright"; is that your signature?

 9          A.      Yes.

10          Q.      How do you know that Dave Kleiman has

11   entered into this contract?

12                  MS. MARKOE:  Objection.  Answer if you

13   can.

14                  THE WITNESS:  We communicated.

15   BY MR. FREEDMAN:

16          Q.      How did you communicate about it?

17          A.      As I have noted before, we would talk

18   over IRC and Skype.

19          Q.      So you have no record of those

20   communications?

21          A.      I do not have many records of anything

22   from that period.

23          Q.      Or a record of those communications?

24          A.      I do not have a record of practically

25   anything from that period.
```



Page 267

1          Q.     Do you have a record of the communication

2    between yourself and ----

3          A.     I do not know.  Unless my lawyers ----

4          Q.     Dr. Wright, please let me finish the

5    question.  Do you have a record of the communication

6    between yourself and Dave Kleiman where he assented to

7    the terms of this contract?

8                 MS. MARKOE:  Objection.

9                 THE WITNESS:  If my lawyers have any

10   record of what they have imaged, etcetera, then yes,

11   otherwise no.  I do not know.

12   BY MR. FREEDMAN:

13         Q.     Can you go with me to page 5, please.

14                MS. MARKOE:  Again, for the record, that

15   is page 5 at the top.

16                THE WITNESS:  Yes.

17   BY MR. FREEDMAN:

18         Q.     Can you look at (b) of paragraph 2.  Let

19   me know when you have familiarised yourself with it.

20         A.     Yes.

21         Q.     This is the 1933 wallet that we saw in

22   the 2011 contract?

23         A.     Yes.

24         Q.     In the 2011 contract it was being held by

25   Craig Wright R&D as a collateral?



Page 268

1          A.     In Panama, yes.

2          Q.     Can you explain to me why it is being

3   released to Craig Wright R&D if there is no default on

4   the contract?

5                 MS. MARKOE:  Objection.

6                 THE WITNESS:  The contract speaks for

7   itself.

8   BY MR. FREEDMAN:

9          Q.     I am trying to understand the negotiation

10  that went on.  The wallet was a collateral in 2011 and

11  now it is being given to the holder of the collateral.

12  I do not understand why.  Why?

13                MS. MARKOE:  Objection.

14                THE WITNESS:  It is a negotiation, it is

15  a contract.  You are saying, why did we negotiate

16  something?

17  BY MR. FREEDMAN:

18         Q.     Yes.  It was held as collateral.  Usually

19  collateral is returned at the fulfillment of the

20  contract.  Why are you keeping the collateral?

21                MS. MARKOE:  Objection.

22                THE WITNESS:  I did not keep the

23  collateral.

24  BY MR. FREEDMAN:

25         Q.     Who kept the collateral?



Page 269

```
 1          A.     Again you will note that I am not the

 2     person here, sorry.

 3          Q.     You signed the contract?

 4          A.     I signed for a legal entity.  Please be

 5     specific.

 6          Q.     Who owned Craig Wright R&D at the time

 7     you signed this contract -- Craig Wright R&D Panama at

 8     the time you signed this contract?

 9          A.     I do not remember.

10          Q.     Have you any way to look that up?

11          A.     Not now, no.

12          Q.     Was it a trust?

13          A.     No.

14          Q.     It was people or corporations?

15                 MS. MARKOE:  Objection.  You can answer.

16                 THE WITNESS:  Companies are always

17     people.

18     BY MR. FREEDMAN:

19          Q.     Natural persons?

20          A.     Companies always have natural persons.  I

21     do not know any unnatural persons that can actually act.

22          Q.     Dr. Wright, my question was, did natural

23     persons own Craig Wright R&D Panama?

24                 MS. MARKOE:  Objection.  You can answer.

25                 THE WITNESS:  I do not remember.  I have
```



Page 270

1    already stated I do not have any involvement with the

2    company structures or whatever else after I have set

3    them up and handed them off to be mixed up and created

4    so that we have companies.

5    BY MR. FREEDMAN:

6            Q.     Can you look at paragraph 3(a).

7            A.     Yes.

8            Q.     Was the 250,5000 -- well, tell me if you

9    are familiar with 3(a) and I can ask you questions on

10   it.

11           A.     It is right in front of me.

12           Q.     Can you tell me, did this 250,500

13   Bitcoin, was it ever transferred?

14           A.     No.

15           Q.     Can you tell me 3(b), did Craig Wright

16   R&D accept the 1933 paper Bitcoin wallet?

17           A.     I am not Craig Wright R&D.  I cannot

18   speak for other people.

19           Q.     Do you know if Craig Wright R&D  accepted

20   the paper Bitcoin wallet?

21               MS. MARKOE:  Objection.

22               THE WITNESS:  I am not Craig Wright R&D.

23   I cannot speak for other people.

24   BY MR. FREEDMAN:

25           Q.     I am just asking what your knowledge is,



Page 271

1    Dr. Wright.  Please tell me only what your knowledge is.

2    If you know, you do not know.  If you know, let me know.

3            A.      I do not know.

4            Q.      Can you look at 3(c)?

5            A.      Yes.

6            Q.      Can you read that for me?

7            A.      "Transfer the ASC hardware to the

8    purchaser".

9            Q.      What is "ASC hardware"?

10           A.      It should be ASIC.

11           Q.      It is ASIC mining hardware?

12                   MS. MARKOE:  Objection.

13                   THE WITNESS:  Yes.

14   BY MR. FREEDMAN:

15           Q.      What ASIC mining hardware is it referring

16   to?

17           A.      I do not know.

18           Q.      It says in 3(d):  "Release the source

19   code to the purchaser."  What source code is it talking

20   to?

21           A.      That was a variety of source code that

22   I already had in my possession as well as other source

23   code that I did not.

24           Q.      What was the source code you had in your

25   possession?



Page 272

1          A.     That includes all the things we have

2     already detailed, I would need to look through the list

3     to go through without missing anything, but it included

4     the covert channel software, the recording software, the

5     poker software, etcetera.

6          Q.     Were you authorised to enter contracts

7     for Craig Wright R&D Panama?

8          A.     Yes.

9          Q.     How did you come to be authorised to

10    enter into contracts for Craig Wright R&D Panama?

11               MS. MARKOE:  Objection.  But you can

12    answer.

13               THE WITNESS:  I set up the system so that

14    I would be.

15    BY MR. FREEDMAN:

16          Q.     You set up Craig Wright R&D Panama?

17               MS. MARKOE:  Objection.

18               THE WITNESS:  That is not what I said.

19    BY MR. FREEDMAN:

20          Q.     You said:  "I set up the system so that

21    I would be".

22          A.     Correct.

23          Q.     Can you look at 3(e)?

24          A.     Yes.

25          Q.     Can you read it for the record, please.



Page 273

1          A.      "Transfer the Vistomail e-mail account."

2          Q.      Which Vistomail e-mail account is it

3   referring to?

4          A.      I think it was Sakura.

5                  BY MS. MARKOE:  Can you spell that, if

6   you can.

7                  THE WITNESS:  It is the name of the

8   Japanese flowers, the ones with the cherry blossoms in

9   spring.

10  BY MR. FREEDMAN:

11         Q.      Sakura; is that correct?

12         A.      Yes, I am not going try and spell it.

13         Q.      I think it is S-A-K-U-R-A.  What was

14  Sakura used for?

15         A.      Discussing some of the work that was

16  being done.

17         Q.      By whom?

18         A.      By people in Panama.

19         Q.      Did you get access to the Vistomail

20  e-mail account?

21         A.      I did.

22         Q.      Do you still have access to the Sakura

23  Vistomail e-mail account?

24         A.      No, I do not.

25         Q.      What happened to the access?



Page 274

```
 1            A.     No one paid for the account so it lapsed.

 2            Q.     And Vistomail delete it if you do not

 3      pay?

 4            A.     I have no idea.

 5                   MS. MARKOE:  Objection.

 6  BY MR. FREEDMAN:

 7            Q.     When did it lapse?

 8            A.     I don't know.

 9            Q.     Have you tried to get the account back

10      from Vistomail?

11                   MS. MARKOE:  Objection.

12                   THE WITNESS:  Why would I do that?

13  BY MR. FREEDMAN:

14            Q.     Because you have been sued in this

15      lawsuit.

16                   MS. MARKOE:  Objection.

17                   THE WITNESS:  You are saying you want me

18      to pay to get evidence that you want.

19  BY MR. FREEDMAN:

20            Q.     All right, going back to 3(c), did you

21      obtain the ASIC hardware back from the purchaser?

22            A.     No, I specifically, when I went to the

23      court, etcetera, said I do not really care about

24      anything other than the IP, and said that anyone there

25      could keep it because I do not want it.
```



Page 275

```
 1           Q.      What was the ASIC hardware worth?

 2           A.      I do not know.

 3           Q.      Did you get the source code back?

 4                   MS. MARKOE:  Objection.

 5                   THE WITNESS:  I had the source code that

 6      I had.  I did not get any extra.

 7      BY MR. FREEDMAN:

 8           Q.      3(f), can you read that for me, please.

 9           A.      "Transfer all research materials from the

10      four (4) DHS BAA research projects to the purchaser with

11      all notes, data and results."

12           Q.      Did this transfer occur?

13           A.      No.

14           Q.      What are the four DHS BAA projects that

15      are being referred to?

16           A.      They are the ones that have been noted

17      before, SWAMP, the other software risk ones, etcetera.

18           Q.      Did Dave build those out for you?

19                   MS. MARKOE:  Objection: asked and

20      answered.  You can answer.

21                   THE WITNESS:  I do not know, because

22      I did not get it.

23      BY MR. FREEDMAN:

24           Q.      Can you look at 4(b) for me?

25           A.      Yes.
```



Page 276

```
 1          Q.      Tell me when you are familiar with it?

 2          A.      It is right in front of me.

 3          Q.      Craig Wright R&D is to accept the

 4     vendor's 323,000 remaining mined Bitcoin as a 49.5%

 5     stake in a new venture, and that venture was called

 6     Coin-Exchange; is that correct?

 7          A.      Yes.

 8          Q.      Did you get the 323,000 Bitcoin?

 9          A.      No.

10          Q.      So you were now aware that there were

11     323,000 Bitcoin mined by Dave Kleiman?

12                  MS. MARKOE:  Objection.

13                  THE WITNESS:  He had stated that.

14     BY MR. FREEDMAN:

15          Q.      Did he use the ASIC mining hardware --

16     strike that.  The ASIC mining hardware referred to at

17     3(c), did you provide that to Dave Kleiman?

18          A.      No.

19          Q.      Do you know how he obtained that

20     hardware?

21          A.      I knew people who developed chips and

22     I put them in contact with Dave.

23          Q.      Who are those people?

24                  MS. MARKOE:  Objection.  You can answer

25     if you know.
```



MAGNA ▶
LEGAL SERVICES

Page 277

1                    THE WITNESS:  I do not remember their

2    name.

3    BY MR. FREEDMAN:

4         Q.     Do you remember anything about them?

5         A.     Yes.

6         Q.     Can you tell me any contact details you

7    have about them?

8         A.     No.

9         Q.     Do you remember any identifying features

10   about them?

11                   MS. MARKOE:  Objection.  Like a tattoo?!

12                   MR. FREEDMAN:  Judging by Dr. Wright's

13   previous answers, if I asked him what he remembered he

14   would launch into an irrelevant tirade about all kinds

15   of other things.

16                   MR. RIVERO:  Please ask your questions.

17   BY MR. FREEDMAN:

18        Q.     Can you go to page 6 for me.

19        A.     Yes.

20        Q.     Top of page 6, 4(d).  Can you read that

21   for me.

22        A.     "Provide $30,000,000 in capital into

23   Coin-Exch Pty Ltd (to be formed) and the software

24   developed in the prior venture."

25        Q.     This is an obligation by Craig Wright R&D



Page 278

1      to provide $30 million to Coin-Exchange?

2              A.      In capital.

3              Q.      Did Craig Wright R&D provide $30 million

4      in capital to Coin-Exchange?

5              A.      Yes.

6              Q.      How?

7                      MS. MARKOE:  Objection.  Can you tie this

8      to one of your topics in the scope?

9                      MR. FREEDMAN:  We are allowed to ask

10     about the projects in Exhibits 5, 10 and 15.  This is

11     Exhibit 10 -- 5.

12                     MS. MARKOE:  Right, but this is not a

13     project.  This is a capital infusion into a company that

14     did not ----

15                     MR. FREEDMAN:  It is part of the project,

16     it is part of the contractual agreement of the project.

17                     THE WITNESS:  It was not part of a

18     project.

19                     MS. MARKOE:  What project?  This is not

20     referring to a project, so can you tie it.

21                     MR. FREEDMAN:  This is the Coin-Exchange

22     project.  This is an agreement with Coin-Exchange ----

23                     THE WITNESS:  There is no such thing as a

24     Coin-Exchange project.

25                     MS. MARKOE:  It does not say the



Page 279

1    Coin-Exchange project.

2                    MR. FREEDMAN:  Okay, we will take it with

3    the court if you instruct him not to answer.  So, just

4    choose if you will or not.

5                    MS. MARKOE:  I am not instructing him not

6    to answer.  I am asking you ----

7                    MR. FREEDMAN:  I am not going to alter my

8    questions any more.  The question is what it is.

9                    MR. RIVERO:  You have to give the court

10   reporter a break.  Again I am as guilty as everyone

11   else.

12                   THE WITNESS:  I am starting to see smoke.

13   BY MR. FREEDMAN:

14        Q.    How did Craig Wright R&D provide the $30

15   million in capital to Coin-Exchange?

16                   MS. MARKOE:  Objection.

17                   THE WITNESS:  You would need to go to the

18   financial records and accounts of the companies.

19   BY MR. FREEDMAN:

20        Q.    Which companies?

21                   MS. MARKOE:  Objection.

22                   THE WITNESS:  Coin-Exch for a start.

23   BY MR. FREEDMAN:

24        Q.    Who has access to Coin-Exchange records?

25        A.    I do not know.



Page 280

```
 1            Q.     Sitting here today you have no idea
 2     whether or not Craig Wright R&D -- how Craig & Wright
 3     R&D provided the $30 million in capital to
 4     Coin-Exchange?
 5                   MS. MARKOE:  Objection.
 6                   THE WITNESS:  If you go through the
 7     records you will be able to track all that.
 8     BY MR. FREEDMAN:
 9            Q.     I do not have the records.  I am not
10     asking you for what is in the records.  I am asking you
11     for what you recollect.  Do you ----
12                   MS. MARKOE:  Objection.  Vel do not
13     testify.
14     BY MR. FREEDMAN:
15            Q.     Are you sitting here today able to
16     recollect anything about how Craig Wright R&D
17     transferred $30 million in capital to Coin-Exchange?
18                   MS. MARKOE:  Objection.
19                   THE WITNESS:  I instruct people to do
20     things.  Things happened.
21     BY MR. FREEDMAN:
22            Q.     Did you instruct someone to transfer?
23                   MS. MARKOE:  Objection.  You can answer.
24                   THE WITNESS:  I would need to look at the
25     records.
```



Page 281

1  BY MR. FREEDMAN:

2          Q.      Sitting here today, you do not know

3  whether that 30 million was provided?

4                  MS. MARKOE:  Objection.

5                  THE WITNESS:  That is not what I said.

6  You are again misstating what I said.  I said all of

7  this had been completed, the company had been set up.  I

8  do not know the exact process off the top of my head.  I

9  do not try and remember my finances.  I instruct people

10  to do things.  They get paid.  I instruct my lawyers to

11  get paid.  Magic happens, they get paid.

12  BY MR. FREEDMAN:

13          Q.      Was the $30 million provided in cash or

14  in Bitcoin?

15                  MS. MARKOE:  Objection.

16                  THE WITNESS:  Again, I would need to look

17  at the accounts.  I do not know the breakdown of what

18  the capital per company was.

19  BY MR. FREEDMAN:

20          Q.      Can you take a look at 8(e) for me.

21          A.      Yes.

22          Q.      Let me know when you are familiar with

23  it.

24          A.      I am fine with it.

25          Q.      This indicates that the ASIC mining



Page 282

1    hardware will be returned with this transfer.  You told

2    me Craig Wright R&D did not provide it?

3                    MS. MARKOE:  Objection.

4                    THE WITNESS:  I do not know what happened

5    with companies.  You are asking whether I did.  Return

6    can be taken in many ways.  It could be returned to

7    other people or myself.  I do not really care.  I did

8    not get, it was never given back, and if you notice "at

9    a site known to Mr. Kleiman", who died before anything

10   occurred.  Unfortunately, post his death Mr. Kleiman was

11   not forthcoming in giving up that information.

12   BY MR. FREEDMAN:

13          Q.     So, sitting here today, do you know

14   whether or not Craig Wright R&D provided Mr. Kleiman

15   with ASIC mining hardware?

16                    MS. MARKOE:  Objection: asked and

17   answered.  You may answer.

18                    THE WITNESS:  I do not know.  I do not

19   look at the records of companies.  I do not believe so.

20   And I do not believe that "returned" means what you are

21   saying it does.  And I think you are miscategorising the

22   contract.

23   BY MR. FREEDMAN:

24          Q.     Can you explain to me what 8(f) means?

25          A.     "Solutions to the Agent and Merkle tree



Page 283

```
 1   problems development by Professor David Reese."  It is

 2   saying the vendors shall deliver up and it means that

 3   certain problems to do with agent-based software and

 4   Merkle tree problems, which are mathematical constructs

 5   that can be put into code, that had originally been

 6   worked on by David Reese and were to be formulated into

 7   code, David Reese having written these, not so much the

 8   -- it was -- I think the language was CoCo if I remember

 9   it right.  Dr. Reese or Professor Reese had created

10   software in mathematics in a language earlier called

11   CoCo.  CoCo was a horrendous, awful, awful piece of --

12   I will not even go there -- that needed to be changed

13   into something usable and constructed into something

14   that could actually be deployed.  There are a number of

15   interesting things that can be done with Merkle trees.

16   So, the solutions would be taking something that

17   Dr. Reese had developed around 2004, back when he was a

18   lot, sharper, I am not trying to sound mean or anything

19   like that, but he was old at the end, and then taken by

20   others and constructed into software.

21                   MS. MARKOE:  I think the court reporter

22   needs a break.

23                   MR. FREEDMAN:  Let us take a break.

24                   THE VIDEOGRAPHER:  Going off the record.

25   The time is 17.55.  End of video card number 5, volume
```



MAGNA ▶
LEGAL SERVICES

Page 284

1    1, in the video deposition of Dr. Craig Wright.

2                    (A Short Break)

3                    THE VIDEOGRAPHER:  This is the beginning

4    of video card number 6, volume 1, in the video

5    deposition of Dr. Craig Wright.  Going on the record.

6    The time is 18.08.  Thank you.

7    BY MR. FREEDMAN:

8          Q.     Dr. Wright, before the break we were

9    looking at Plaintiff's Exhibit 6.  Can you look at page

10   6.  I am looking at 8(g) at the very bottom.

11                   MS. MARKOE:  That is 6 at the top, for

12   the record.

13   BY MR. FREEDMAN:

14         Q.     Can you read that sentence for me.

15         A.     "Bitcoin agent software and suit of

16   C/C++/C# and Python Blockchain software source codes."

17         Q.     Did you receive these?

18         A.     I already had those.

19         Q.     Why were they included in the contract,

20   then?

21                   MS. MARKOE:  Objection.  You may answer,

22   if you know.

23                   THE WITNESS:  Because, quite simply, the

24   fact that you own -- so you have a copy of source code

25   does not mean that you own copy of source code.



Page 285

1    BY MR. FREEDMAN:

2              Q.     Doctor, I would like to talk you a little

3    bit about Ms. Uyen Nguyen.  Do you know who I am

4    referring to when I say that?

5              A.     I do.

6              Q.     How did you first meet or come to know

7    Ms. Nguyen?

8              MS. MARKOE:  Objection.  You can answer.

9              THE WITNESS:  I do not remember when

10   I first met her.  I came to know her because she tracked

11   me down way back.  I cannot remember exactly when.  Like

12   2011, 2012.  Because of my background and history in

13   information security, she wanted to learn from myself

14   and Dave.  She knew about all of the courses I have done

15   with SANS, all of the publications I had been doing, and

16   came to the belief that I was Satoshi.

17   BY MR. FREEDMAN:

18             Q.     Ms. Nguyen deduced on her own that you

19   were Satoshi?

20             MS. MARKOE:  Objection.  Again you are

21   going beyond the scope.  Please tell me what topic it is

22   that you are referring to.

23             MR. FREEDMAN:  I am trying to determine a

24   relevant witness and what her knowledge is.

25             MS. MARKOE:  That is not within the



Page 286

1    scope.  The scope of number 1, which is the one that you

2    are referring to:  "The location and existence of

3    documents along with the identification of witnesses,

4    including information about their whereabouts, and roles

5    in the subject matter of the pleadings."

6                    MR. FREEDMAN:  Roles in the subject

7    matter of the pleadings.

8                    MS. MARKOE:  So, let me see the question.

9    (Pause) Fine, you can answer that one.  I am going to

10   give you some limited scope here, but let us keep it

11   tight everyone.

12                   THE WITNESS:  Can you ask that again,

13   please.

14   BY MR. FREEDMAN:

15        Q.    Sure.  Did Ms. Nguyen determine on her

16   own that you were Satoshi?

17                   MS. MARKOE:  Objection.  You can answer.

18                   THE WITNESS:  I do not know.

19   BY MR. FREEDMAN:

20        Q.    When did she first meet -- sorry, when

21   did she first come to know Dave Kleiman?

22                   MS. MARKOE:  Objection.  You can answer

23   if you know.

24                   THE WITNESS:  I do not know.

25   BY MR. FREEDMAN:



1          Q.      You said she reached out to you and Dave

2     Kleiman in 2011 or 2012?

3                  MS. MARKOE:  Objection.

4                  THE WITNESS:  Yes.

5     BY MR. FREEDMAN:

6          Q.      How did she reach out to you both?

7                  MS. MARKOE:  Objection.

8                  THE WITNESS:  I am not trying to sound

9     rude, but the only way to put it she cyberstalked me.

10    BY MR. FREEDMAN:

11         Q.      Can you drill down on that a little bit?

12         A.      Cyberstalking is well developed as a sort

13    of discipline.  She followed me on every bit of social

14    media, e-mailed me a lot, kept asking and talking about

15    what I was doing.  Asked lots of questions.

16         Q.      Did Ms. Nguyen have a role in W&K?

17         A.      W&K is not my company.  I cannot talk

18    about W&K.

19         Q.      So you are not aware of any role she

20    played with W&K?

21                 MS. MARKOE:  Objection: mischaracterises

22    his testimony.

23    BY MR. FREEDMAN:

24         Q.      Are you aware of any role she played with

25    W&K?



Page 288

1          A.      I believe she was a director.

2          Q.      Was Ms. Nguyen ever appointed as a

3     director of any of your companies?

4          A.      I believe so.

5               MS. MARKOE:  Objection.

6     BY MR. FREEDMAN:

7          Q.      Which companies?

8          A.      I would need to look at the records.

9          Q.      Sitting here today, you are not aware

10    which companies she was a director of?

11              MS. MARKOE:  Objection.

12              THE WITNESS:  I have no idea what the

13    directorships of each of my companies were multiple

14    years ago.  I do not know what the directorship of

15    nChain is today.

16    BY MR. FREEDMAN:

17         Q.      Did Ms. Nguyen ever become a trustee for

18    you?

19              MS. MARKOE:  Objection.

20              THE WITNESS:  In what sense?

21    BY MR. FREEDMAN:

22         Q.      Was she ever a trustee that you were --

23    strike that.  Was she ever the trustee over a trust that

24    you were the beneficiary of?

25         A.      What sort of trust are we talking about?



Page 289

```
 1          Q.      Any.

 2          A.      Then yes.

 3          Q.      Can you tell me what that trust was

 4   about?

 5                  MS. MARKOE:  Objection.  You can answer.

 6                  THE WITNESS:  That trust was holding a

 7   number of slices of early Bitcoin keys.

 8   BY MR. FREEDMAN:

 9          Q.      Does that mean that it controlled

10   Bitcoin?

11                  MS. MARKOE:  Objection.

12                  THE WITNESS:  Nobody controls Bitcoin.

13   BY MR. FREEDMAN:

14          Q.      Does that mean it owned Bitcoin?

15                  MS. MARKOE:  Objection.

16                  THE WITNESS:  No, that does not mean it

17   owned Bitcoin.

18   BY MR. FREEDMAN:

19          Q.      What was the name of the trust?

20          A.      Which trust?

21          Q.      How many was Uyen a trust on?

22          A.      I do not know.

23          Q.      How many are you aware of her being a

24   trustee on?

25          A.      At least one.
```



Page 290

```
 1          Q.     What is the name of that trust?

 2          A.     There was a trust called the Tulip Trust.

 3          Q.     Is that trust no longer in existence?

 4          A.     The trust was formalised early on and is

 5   not the informal thing from 2011.

 6          Q.     I am not following. When was the

 7   Tulip Trust created?

 8          A.     2011.

 9          Q.     Who created it?

10          A.     Me.

11          Q.     Who were the trustees when you created

12   it?

13          A.     I do not remember.  I would need to look

14   at the document.

15          Q.     Where are the documents?

16          A.     I do not have the documents.

17          Q.     Who has the documents?

18          A.     I do not know.

19          Q.     Who were the beneficiaries of the

20   Tulip Trust in 2011?

21          A.     I do not have the document.  I cannot

22   answer that.

23          Q.     What assets were controlled by the

24   Tulip Trust in 2011?

25          A.     Companies that I hold overseas, such as
```



Page 291

1   Wright International Investments that I founded in 2009,

2   and Tulip Trading.

3            Q.      What is Tulip Trading?

4            A.      It is a company.

5            Q.      So, when it was founded in 2011, it never

6   controlled the rights to any Bitcoin?

7                   MS. MARKOE:  Objection: vague.

8                   THE WITNESS:  That is not what I said.

9   The rights ----

10  BY MR. FREEDMAN:

11           Q.      How did -- sorry, go ahead.

12           A.      The rights to Bitcoin and controlled are

13  different.  You are mixing all your bits and pieces,

14  yes.

15           Q.      Did the Tulip Trust own any Bitcoin at

16  any point from 2011 until 2013?

17           A.      The trust does not own generally.  A

18  trust holds in trust.

19           Q.      I do not want to get into an argument

20  with you about the structure of trusts, I am just trying

21  to get to the bottom of, did the trust have control over

22  Bitcoin?

23           A.      Which Bitcoin?

24           Q.      Any Bitcoin.

25           A.      Yes.



Page 292

1          Q.     How much Bitcoin did the trust control

2     between 2011 and 2013?

3               MS. MARKOE:  Objection.  Where is this

4     related to the scope of this deposition?

5               MR. FREEDMAN:  Ms. Nguyen is a trustee of

6     the trust and we are authorised under number 6:

7     "Inquiry into the scope of knowledge and information

8     possessed by the individuals."  So, I am trying to

9     determine what her scope of knowledge was.

10              MS. MARKOE:  Her scope of knowledge is

11    not related to how much Bitcoin the trust controlled.

12    If you would like to ask, do you know if Ms. Nguyen

13    knows how much Bitcoin the trust controlled, you can ask

14    that question and he can answer that question.  However,

15    I will instruct him not to answer the question as asked.

16              MR. FREEDMAN:  You instruct how you need

17    to instruct.

18         Q.     Was Dave Kleiman ever involved with the

19    Tulip Trust?

20              MS. MARKOE:  Objection.  You may answer.

21              THE WITNESS:  Dave Kleiman was not

22    involved in the Tulip Trust as it is.  What you are

23    trying to get at was because I asked him to hold

24    documents for a while does that make him part of the

25    trust.  Dave was never a beneficiary of the trust.  Dave



Page 293

```
 1   never put money into the trust.  Dave never had any
 2   Bitcoin in the trust.  Dave never mined any Bitcoin that
 3   had anything to do with the trust.  None of the Bitcoin
 4   was ever involved with any mining in the US.  No Bitcoin
 5   was post 2010 from that trust.  No company Dave owned
 6   was involved with the trust.  No shares Dave owned was
 7   involved with the trust.  Nothing Dave owned was
 8   involved with the trust.  Dave had no rights to the
 9   trust, no ownership of the trust, no knowledge of the
10   set-up of the trust.  He did not know about the
11   companies in the trust.  He did not know about Wright
12   International Investments that I set up in 2009.  Dave
13   did not know about any of those details.  Dave was asked
14   simply to hold a part of some documents and keys that
15   were split using Shamir's Secret Sharing scheme so that
16   he did not even know what he was actually holding.
17              MS. MARKOE:  Can you spell Shamir's for
18   the court reporter, please.
19              THE WITNESS:  S-H-A-M-I-R-S.
20   BY MR. FREEDMAN:
21         Q.    Did you put Bitcoin into the trust in
22   2011?
23              MS. MARKOE:  Objection.  You may answer.
24              THE WITNESS:  I founded the trust.
25   BY MR. FREEDMAN:
```



Page 294

1          Q.     Did you put Bitcoin into the trust in

2    2011?

3                 MS. MARKOE:  Objection.

4                 THE WITNESS:  No.

5    BY MR. FREEDMAN:

6          Q.     Did you put Bitcoin into the trust in

7    2012?

8                 MS. MARKOE:  Objection.

9                 THE WITNESS:  No.

10   BY MR. FREEDMAN:

11         Q.     Did you ever put Bitcoin into the trust?

12                MS. MARKOE:  Objection.

13                THE WITNESS:  No.

14   BY MR. FREEDMAN:

15         Q.     Did anyone ever put Bitcoin into the

16   trust?

17                MS. MARKOE:  Objection.

18                THE WITNESS:  No.

19   BY MR. FREEDMAN:

20         Q.     Did the Tulip Trust ever come to hold

21   private keys to Bitcoin wallets?

22         A.     No.

23         Q.     Did it ever come to own or possess

24   private keys to Bitcoin addresses?

25         A.     No.



Page 295

1          Q.     What is the relationship between the

2     Tulip Trust and Bitcoin?

3               MS. MARKOE:  Objection.  Again, where are

4     we on the topics?

5               THE WITNESS:  What the hell does that

6     question even mean?

7               MR. FREEDMAN:  We are permitted to

8     enquire into Dr. Wright's companies.

9               THE WITNESS:  That is not a company.

10              MR. RIVERO:  Hold on, Dr. Wright.  Tell

11    us what topic or tell us where in the transcripts

12    because we can review the transcript.

13              MR. FREEDMAN:  Number 10.

14              MS. MARKOE:  Number 10?  Can you point

15    out where the Tulip Trust is referenced in the exhibits

16    that are referenced in topic 10?  It could be there.

17    I just do not recall.

18              MR. FREEDMAN:  We just do not have time,

19    so I guess you are going to instruct him not to answer?

20              MR. RIVERO:  If we do not get some

21    connection ----

22              MR. FREEDMAN:  The court has authorised

23    us.  I do not know which number it is because I do not

24    have it in front of us.  I believe Ms. Markoe has been

25    at many hearings where the court has authorised us to



Page 296

1   enquire into -- let me finish -- Dr. Wright's various

2   entities and trusts.  Specifically at the last hearing

3   he authorised us to do because Ms. Markoe refused to

4   turn over a compilation of those entities on

5   work-product grounds and he specifically authorised me

6   to enquire into the trust and companies.

7                   MR. RIVERO:  With respect ----

8                   MS. MARKOE:  Right, but ----

9                   MR. RIVERO:  Let me please address.

10  Counsel today has referred to a rule that does not

11  exist.  He has referred to it without a number.  Now he

12  refers to transcripts without a certain page number.

13  I have been reviewing transcripts.  I do not find the

14  reference.  Unless there is a basis, the instruction is

15  do not answer.  Let us move on to the next question.

16                  MR. FREEDMAN:  We will just move on.  We

17  will raise it with the court.

18  (Plaintiff's Exhibit 7 marked for identification)

19                  MR. FREEDMAN:  For the record,

20  Mr. Rivero, you can look this over later, but just so

21  the record reflects, it is at the last hearing,

22  transcript pages 55 and 56, and I will give you the ----

23                  MR. RIVERO:  I have the transcript.

24                  MR. FREEDMAN:  It is for your own

25  knowledge and for the record, we can look at it and



Page 297

1    discuss it later.

2                   MR. RIVERO:  Now you have identified a

3    page I will review it and we will come back to it.

4                   MR. FREEDMAN:  We will return to it.

5                   MR. RIVERO:  Yes.

6    BY MR. FREEDMAN:

7           Q.    Dr. Wright, do you recognise Plaintiff's

8    Exhibit 7 which has been just marked and placed before

9    you?

10          A.    I recognise two documents joined

11   together, yes.

12          Q.    What are the two documents that are

13   joined together?

14          A.    You have deed of loan as a front page.

15   Page 1 of 7, 2 of 7, 3 of 7, 4 of 7, 5 of 7, 6 of 7 of a

16   document, and then page 7 of 7 of a separate document.

17   So, potentially two, if not three, documents, put

18   together as one.

19          Q.    Page 7 of 7 belongs to what document?

20          A.    Not this one.

21          Q.    Do you know what document it does belong

22   to?

23          A.    I would need to look at records.  I do

24   not know.

25          Q.    Looking at the first six pages, which you



Page 298

1   say are one document; is that correct?

2           A.      The first six pages, you mean not the

3   first six, but the cover page does not have a thing, and

4   then that starts at page 1.  So, page 2, which is on

5   here as page 3 of 10, page 4 of 10, page 5 of 10, page 6

6   of 10, page 7 of 10, and page 8 of 10 are parts of the

7   same document that is not complete.

8           Q.      Sitting here today you have no idea what

9   page 9 of 10 document is -- strike that.  Sitting here

10  today you have no idea what page 9 of 10 -- strike that

11  again.  Sitting here today you have no idea what

12  document page 9 of 10 belongs to; is that correct?

13          A.      That is not what I said.

14          Q.      What document does page 9 of 10 belong

15  to?

16          A.      A different document that is not this

17  one.

18          Q.      Which document?

19          A.      I do not have documents in front of me.

20  I cannot match them.

21          Q.      So, sitting here today you do not know

22  what that document -- what that page -- what document

23  that page belongs to?

24          A.      I cannot match them, no, and page 10 of

25  10 is a separate document as well.  You will notice no


MAGNA
LEGAL SERVICES

1    page numbers or anything like that, so that is also out

2    of -- so there are possibly four documents constructed

3    into one.

4              Q.    Who has all the originals of these

5    documents?

6                    MS. MARKOE:  Objection.

7                    THE WITNESS:  I do not know.

8    BY MR. FREEDMAN:

9              Q.    Do you have the originals of these

10   documents?

11             A.    Unless my lawyers have gone through and

12   found things in boxes, then I do not know.

13             Q.    Does Ms. Nguyen have the originals of

14   this document?

15                   MS. MARKOE:  Objection.

16                   THE WITNESS:  I do not know what

17   Ms. Nguyen has.  I have not spoken to Ms. Nguyen in

18   three plus years.

19   BY MR. FREEDMAN:

20             Q.    Can you look at page 9 of 10.

21             A.    Yes.

22             Q.    There is a signature at the bottom; is

23   that your signature?

24             A.    Yes.

25             Q.    And there is a signature above that; is



Page 300

1    that Ms. Nguyen's signature?

2            A.      I believe so.

3            Q.      The handwriting on the right-hand side of

4    all the Bitcoin wallets listed there, whose handwriting

5    is that?

6            A.      That looks like mine.

7            Q.      Do you recognise what this appendix list

8    of Bitcoin is?

9            MS. MARKOE:  Objection.  Answer if you

10   can.

11           THE WITNESS:  I think you are confounding

12   two different things.  There is a random note talking

13   about wallets and a set of addresses.  Where I talk

14   about wallets, wallets are files, computer files,

15   etcetera, so you have done a typical error that most

16   people do in calling Bitcoin addresses wallets.  So, you

17   have taken two completely separate things, because

18   I have this habit of writing wherever the hell I feel

19   like it, usually over documents people complain that

20   I write on, because I write notes whenever I feel like

21   writing notes, and saying that they are related.

22   BY MR. FREEDMAN:

23           Q.      So, is it your testimony here today that

24   the note in your handwriting on the right-hand side of

25   this document is completely unrelated to the list of



Page 301

1   Bitcoin block addresses on the left-hand side of the

2   document?

3              MS. MARKOE:  Objection.

4              THE WITNESS:  I cannot say what it is.

5   It is all wallets, and then there is a list of

6   addresses.  They are two different things.  I have made

7   a note.  I would need to look at records to be able to

8   match up what that was.  I have left myself a note at

9   some point.  I cannot necessarily say what my note was.

10  BY MR. FREEDMAN:

11             Q.    Do you have those records that you could

12  look that up?

13             MS. MARKOE:  Objection.  You can answer.

14             THE WITNESS:  My lawyers have all the

15  records I have.  If anything is in there that goes to

16  further, then that would be there.

17  BY MR. FREEDMAN:

18             Q.    Did you have counsel help you draft this

19  document?

20             MS. MARKOE:  Objection.  He has already

21  testified that this appears to be a compilation of

22  multiple documents that were put together in error.

23  BY MR. FREEDMAN:

24             Q.    Did counsel help you draft page 9 of the

25  document?



Page 302

1                    MS. MARKOE:  Objection.  Answer if you

2       can.

3                    THE WITNESS:  There is no page 9 of the

4       document.  This is a compilation of multiple documents.

5    BY MR. FREEDMAN:

6          Q.    Exhibit.  Did counsel help you draft page

7       9 of the exhibit?

8                    MS. MARKOE:  He is referring to page 9 at

9       the top.

10                   THE WITNESS:  By "counsel", do you mean

11      my lawyers?

12   BY MR. FREEDMAN:

13         Q.    Yes.

14         A.    Possibly.  I had lists of different

15      addresses done by lawyers at different times.

16         Q.    Which lawyers created lists of different

17      addresses?

18                   MS. MARKOE:  Objection.  You can answer.

19                   THE WITNESS:  I do not know which lawyers

20      produced different lists at different times.  I have had

21      more lawyers than birthdays!

22   BY MR. FREEDMAN:

23         Q.    Can you list all the lawyers that you

24      have had that helped you draft lists of Bitcoin

25      addresses?



Page 303

```
 1                    MS. MARKOE:  Objection.  You can answer,
 2      to the extent you remember.
 3                    THE WITNESS:  That would be Clayton Utz.
 4      There would be M & K.  There would be the split off from
 5      M & K that I cannot remember the name of -- one of the M
 6      & K partners split off and formed his own firm -- and
 7      I used both those firms.  There would be High Secured.
 8      There would be -- I should remember the name.  The most
 9      famous law firm in Panama that got into the Panama
10      papers, I used them too.
11   BY MR. FREEDMAN:
12           Q.     Do you recall the name?
13           A.     No, I do not.  I should do, because it
14      was a big thing of discussion including everyone, and
15      I think I blocked it out of my mind because of that.
16      There were more law firms than I care to remember.
17           Q.     Can you tell me what you meant by your
18      handwritten note:  "As agreed.  All wallets ..."  What
19      do you mean "All wallets"?
20                    MS. MARKOE:  Objection.  You can answer.
21                    THE WITNESS:  "All wallets" means all
22      wallets, as in files, computer files, or other such
23      things, that hold Bitcoin.
24   BY MR. FREEDMAN:
25           Q.     And you say "As agreed".  Agreed with
```



Page 304

```
 1    who?

 2         A.    I would need to look at the rest of the

 3    document.  I am not going to speculate what a page out

 4    of a mysterious document, where this is page 7 of 7 that

 5    has been attached incorrectly to a different document,

 6    means.

 7         Q.    So, sitting here today you do not recall

 8    what "As agreed" means; is that correct?

 9              MS. MARKOE:  Objection: mischaracterises

10    his testimony.

11              THE WITNESS:  I understand what

12    "As agreed" means.

13    BY MR. FREEDMAN:

14         Q.    You do not recall who the agreement was

15    made with?

16         A.    This is a note written on a thing that

17    may or may not have any relationship to the original

18    document, that I have one page of addresses, that I do

19    not memorise all the addresses from, that has been

20    constructed between four other documents and handed to

21    me.

22         Q.    And:  "... held in UK in trust ..."  Are

23    you aware, sitting here today, of moving wallets to be

24    held in a UK trust?

25              MS. MARKOE:  Objection.  Answer if you
```



Page 305

1    can.

2              THE WITNESS:  No UK trust was ever set

3    up.

4    BY MR. FREEDMAN:

5         Q.    Can you go to page 2 of 10 for me at the

6    top.

7         A.    Yes.

8         Q.    Do you see where it says the last party,

9    Denariuz Seychelles Trust?

10        A.    Yes.

11        Q.    Who are the trustees of this trust?

12        A.    I do not know.

13        Q.    Who are the beneficiaries of this trust?

14        A.    Another trust.

15        Q.    What is the trust's name that is a

16   beneficiary?

17        A.    I would need to look at records.

18        Q.    Do you have those records?

19        A.    Not on me.

20        Q.    Have you given those records to your

21   lawyers?

22        A.    I have a box of -- well, actually, I had,

23   I do not know how many boxes.  There were many, many

24   boxes that they spent many days going through, and if it

25   is in there, it would be there.



Page 306

1        Q.     And if it is not there?

2        A.     When things get closed down, the

3    requirement is for Australian records to be kept for a

4    number of years afterwards and British records to be

5    kept for a number of years afterwards.  The Seychelles

6    records requirement is under a year, and once anything

7    hits a period of one year, and the Seychelles trust is

8    no more, it goes the way of anything that is no longer

9    needed to be held, which generally means the shredder.

10       Q.     The Denariuz Seychelles Trust, does it no

11   longer exist?

12       A.     It no longer exists.

13       Q.     When did it cease to exist?

14       A.     Probably around December 2013.

15       Q.     And the wallet existed, what assets did

16   it hold?

17       A.     Again, I could not answer that.

18              MS. MARKOE:  Objection.

19   BY MR. FREEDMAN:

20       Q.     So, sitting here today, you have no idea

21   what assets the Denariuz Seychelles Trust held?

22       A.     Sitting here today, I could not answer

23   what assets the companies I founded hold.

24       Q.     Okay.  At the top, "Design by Human Ltd"?

25       A.     Yes.



1          Q.      What is this?

2                  MS. MARKOE:  Objection.  You can answer.

3                  THE WITNESS:  It is a company name.

4    BY MR. FREEDMAN:

5          Q.      Was it a trust?

6          A.      It is a company.

7          Q.      Did it ever change its name?

8          A.      You have already covered that one.  Yes,

9    Design by Human had changed its name.

10         Q.      To?  What did it change its name to?

11         A.      Again, I do not remember which one is

12   which.  We covered that as well.  I do not remember

13   which particular one changed its name to C01N or

14   Denariuz, so I would need the records to check those

15   facts, otherwise I will be saying it changed to C01N

16   when in fact it changed to Denariuz and I will get it

17   wrong, and I do not want to do that.

18         Q.      Dr. Wright, you keep saying you checked

19   the records but then tell me that you do know where the

20   records are.  What would you do if you needed to figure

21   this information out?

22         A.      I do not need to figure this information

23   out.

24         Q.      Why not?

25                 MS. MARKOE:  Objection.  You can answer.



Page 308

1                        THE WITNESS:  Because we are talking

2      about companies that have been liquidated and no longer

3      need to hold records.

4   BY MR. FREEDMAN:

5            Q.     The assets held by the Denariuz

6      Seychelles Trust where are they currently held?

7                        MS. MARKOE:  Objection.

8                        THE WITNESS:  Again, I do not even know

9      where the current assets of my current things that

10     I have founded happen to be right now.  So you are

11     asking me when I do not know my current company, and

12     what it holds in four continents, where did this other

13     trust that has now gone years ago, where does it have

14     assets that you cannot even tell me what they are.

15  BY MR. FREEDMAN:

16           Q.     Under this trust document, Dr. Wright,

17     you are entitled to borrow 650,000 Bitcoin; is that

18     right?

19                        MS. MARKOE:  Objection.

20                        THE WITNESS:  Which trust document?

21     There is no full document here.

22  BY MR. FREEDMAN:

23           Q.     Sorry, I misspoke.  I strike that.  Under

24     this deed of loan you are entitled to borrow up to

25     650,000 Bitcoin; is that correct?



Page 309

```
 1          A.      The partial deed of loan, yes.

 2          Q.      Did you in fact borrow 650,000 Bitcoin?

 3          MS. MARKOE:  Objection.

 4          THE WITNESS:  How does this relate to

 5   anything, sorry?

 6   BY MR. FREEDMAN:

 7          Q.      Dr. Wright, please answer the question

 8   unless you are instructed otherwise by your counsel.

 9          A.      I did not borrow 650,000 Bitcoin.

10          Q.      How much did you borrow?

11          MS. MARKOE:  Objection.

12          THE WITNESS:  I do not know how much

13   I actually borrowed.

14   BY MR. FREEDMAN:

15          Q.      To take these loans, did you have to

16   communicate with Ms. Nguyen?

17          A.      No.

18          Q.      Who was the one who you spoke to in order

19   to take the loans?

20          A.      I do not remember his last name.  He

21   worked for a company called High Secured.  His first was

22   Mark.

23          Q.      Was it Mark Ferrier?

24          A.      No.  He had nothing to do with anything

25   in Panama, nor did he have anything to do with High
```



1    Secured.

2            Q.     Can you go to page 7 of 10 for me.

3                   MS. MARKOE:  At the top again for the

4    record.

5                   MR. FREEDMAN:  Yes, at the top, thank

6    you.

7                   THE WITNESS:  Yes.

8    BY MR. FREEDMAN:

9            Q.     Do you see the reference at the bottom to

10   Permanent Success Limited?

11           A.     Yes.

12           Q.     What was Permanent Success Limited?

13           A.     A company.

14           Q.     Was it related to a trust in any way?

15           A.     I do not know.

16           Q.     Can you let me know what it says at the

17   bottom there, "and all related trusts"; what does that

18   mean?

19                  MS. MARKOE:  Objection.

20                  THE WITNESS:  It means any related

21   trusts.

22   BY MR. FREEDMAN:

23           Q.     Were there trusts related to Permanent

24   Success Limited?

25                  MS. MARKOE:  Objection: rule of



Page 311

1    completeness.

2             MR. FREEDMAN:  You can answer.

3             THE WITNESS:  I do not know.  I cannot

4    take part of a document, and part of other things, and

5    incomplete records and then construct everything you

6    expect me to know.  As I have stated before, I do not

7    know the structure of BITC or nChain or nChain Holdings

8    or any other company that exists right now, so I cannot

9    actually even tell you what I have now, and yet you are

10   saying, "What happened years ago?"

11   BY MR. FREEDMAN:

12            Q.    Do you have any way of contacting Mark

13   from High Secured?

14            A.    He is in a federal penitentiary in the

15   USA.

16            Q.    Which federal penitentiary?

17            A.    I do not know.  I did not follow his

18   case.

19            Q.    Is there a way you can determine his last

20   name and let us know what it is later?

21            MS. MARKOE:  Objection.

22            THE WITNESS:  You can do searches on High

23   Secured.  There is this thing called Google.  You go

24   into this task bar, you type in "High Secured", and

25   search.



Page 312

```
1    BY MR. FREEDMAN:

2              Q.    Did you pay back the loans that you took

3    under this deed of loan?

4                    MS. MARKOE:  Objection.  You may answer.

5                    THE WITNESS:  None of your God damn

6    business.  This has nothing to do with anything there.

7    Does it say that it has to be paid back?  Does it say

8    what it is?  You are asking about the management of a

9    trust that has no relationship to Mr. Kleiman, no

10   relationship to a company Dave Kleiman has worked for,

11   no relationship to anyone who has ever been in the USA

12   as a resident or a citizen at any point in human

13   history, no relationship to anyone who has been in North

14   America from Mexico up in human history, that entire

15   continent.  No person who has ever been anything to do

16   with residing or citizenship in that part of the world

17   has had anything at all to do with this trust, assets in

18   this trust, management of this trust, control of this

19   trust, etcetera.  And then you want me to talk about

20   incomplete records that have been constructed in bits

21   and chucked together from four different documents as if

22   this is real evidence.

23   BY MR. FREEDMAN:

24             Q.    Did you pay back the loans that you took

25   from under this deed of loan, Dr. Wright?
```



Page 313

1              MS. MARKOE:  Objection.  You can answer

2      if you can.

3              THE WITNESS:  I do not have any records

4      in front of me.  I do not have the rest of the records

5      for this, so ----

6      BY MR. FREEDMAN:

7          Q.    So?  Could you finish your response,

8      please.

9          A.    So when you can give me all the financial

10     records of things, I will answer against them.

11             MS. MARKOE:  Objection.  Okay, withdrawn.

12     I strike my own.

13     BY MR. FREEDMAN:

14         Q.    Do you go where Ms. Nguyen is now,

15     Dr. Wright?

16         A.    Earth.

17         Q.    Do you know where on earth she is?

18         A.    I am assuming land.

19         Q.    Dr. Wright, I would appreciate if you

20     would co-operate with me so we could get this done.  Do

21     you know the whereabouts of Ms. Nguyen?

22         A.    I stated earlier I have not had any

23     contact with Ms. Nguyen for over three years.  That

24     would generally mean I do not have any knowledge.  I can

25     restate in other forms if you want or I can be narky



Page 314

1    about it.

2            Q.    Does Ms. Nguyen still maintain a trust

3    role in relation to companies that are related to you?

4                  MS. MARKOE:  Objection.  You can answer.

5                  THE WITNESS:  No.

6    BY MR. FREEDMAN:

7            Q.    She is no longer a trustee of any trusts

8    related to you?

9                  MS. MARKOE:  Objection.  You may answer.

10                  THE WITNESS:  That is what I just said.

11    BY MR. FREEDMAN:

12            Q.    When did she stop becoming a trustee of

13    trusts related to you?

14            A.    2015.

15            Q.    Did you help Ms. Nguyen disappear?

16                  MS. MARKOE:  Objection.

17                  THE WITNESS:  You are presuming that she

18    has disappeared.  I do not know.  You are asking me

19    about someone I have not had contact with.  My sister --

20    I have not had contact with my older sister in four

21    years.  She has not disappeared.  She is a hippy, and

22    I am a hypercapitalist.  We get on like oil, water,

23    petrol and a match.  But my mother would know so she has

24    not actually disappeared.

25    (Plaintiff's Exhibit 8 marked for identification)



Page 315

1    BY MR. FREEDMAN:

2          Q.    Dr. Wright, I am handing you what has

3    been marked now as Plaintiff's Exhibit 8.  This is some

4    exchange of e-mails between you and Ira Kleiman; do you

5    recognise that?

6          A.    Yes.

7          Q.    Can you go to 3 of 5 of the document?

8          A.    Yes.

9          Q.    Do you see there at the bottom it says:

10   "1.)  GICSR Trust in Belize"?

11         A.    Yes.

12         Q.    Can you explain to me what the GICSR

13   trust in Belize is?

14         A.    It was a trust set up in Belize.

15         Q.    By whom?

16         A.    I do not know.

17         Q.    Why did you give this information to Ira?

18               MS. MARKOE:  Objection.

19   BY MR. FREEDMAN:

20         Q.    Why was this information relevant to Ira?

21               MS. MARKOE:  Objection.

22               MR. FREEDMAN:  You can answer.

23               THE WITNESS:  There was a person

24   I thought would be interested in Dave's past, which was

25   his father, who then put me onto Ira, who was a greedy



Page 316

1    person who wished not to have shares that would vest

2    over a long time but instructed me to hide assets

3    because he would have to pay tax.  So, I stopped talking

4    to Ira because basically I had this fraud, con man,

5    trying to take money that he was not owed and trying to

6    hide things from the tax office in America and lying and

7    cheating and whatever else to make up things to try and

8    get more.

9   BY MR. FREEDMAN:

10          Q.    Dr. Wright, I do not understand how that

11   is related to my question, so let us try ----

12          A.    It is related perfectly well.

13          Q.    Let us try one more time.  Did Dave

14   Kleiman have anything to do with the GICSR trust in

15   Belize?

16          A.    Yes.

17          Q.    What was his relationship to the GICSR

18   trust in Belize?

19          A.    We organised putting information onto

20   computers because of it.

21          Q.    I am sorry, what type of information?

22          A.    This is, again, something we will need to

23   talk about with the judge.

24          MS. MARKOE:  Okay.  That is going to be

25   one of the in camera conversations.



Page 317

1   BY MR. FREEDMAN:

2          Q.     Okay, Dr. Wright, are there  reasons ----

3          A.     What I will say is there a reason if you

4   look at the GICSR website that used to be up in the

5   past, it had Department of Homeland Security, NSA and

6   other things on the website.

7          Q.     Do you know Deborah Kobza from GICSR?

8          MS. MARKOE:  Can you spell that for the

9   court reporter.

10          MR. FREEDMAN:  D-E-B-O-R-A-H -- I could

11   not tell you.  K-O-B-Z-A, I think.

12          THE WITNESS:  Not personally.

13   BY MR. FREEDMAN:

14          Q.     Can you look at page 2 of 5, please.

15          A.     Yes.

16          Q.     Can you look at the message that comes

17   from Ira to you at March 2nd, 2014.  Can you read that

18   for the record?

19          A.     "From: '----'".

20          Q.     Dr. Wright, please just read the body of

21   the e-mail.

22          A.     "Just to clarify on thoughts from

23   previous e-mail... In one of the email exchanges between

24   Dave and you, he mentioned that you had 1 million

25   Bitcoins in the trust and since you said he has 300,000



Page 318

1    as his part I was figuring the other 700,000 is yours.

2    Is that correct?  Ira."

3            Q.    Can you read above that your response at

4    March 1st, 2014 at 3 p.m.?

5            A.    Mine.  "Around that.  Minus what was

6    needed for the company's use."

7            Q.    So, where is the 300,000 that belonged to

8    Dave?

9            MS. MARKOE:  Objection.  Can you tie that

10   to one your topics, please?

11           MR. FREEDMAN:  4: "The location and

12   duration of Dave, W&K and Craig's mining of Bitcoin from

13   2009 until 2013."

14           MS. MARKOE:  You are not talking about

15   mining now, you are talking about actual Bitcoin.  Those

16   are two separate topics.  This does not relate to number

17   4.

18           MR. FREEDMAN:  Okay, so either instruct

19   him not to answer or allow the question.

20           MS. MARKOE:  I am going to instruct him

21   not to answer.

22   BY MR. FREEDMAN:

23           Q.    Can you go down to the February 28th,

24   2014 e-mail.

25           A.    Mmm-hmm.



Page 319

1          Q.     You say:  "The trust Dave setup should

2    have around 300,000."  Do you see that?

3          A.     Yes.

4          Q.     Is that 300,000 Bitcoin?

5          A.     Yes.

6          Q.     Where is the trust Dave set up?

7          A.     Dave set up a series of trusts as well.

8    One was in Belize, which was not GICSR, he also had one

9    in Panama and companies in Costa Rica.

10         Q.     Do you have any information on who helped

11   him set those up?

12         A.     No.

13         Q.     Can you read the next sentence for me?

14         A.     "We moved everything offshore as a result

15   of my early fight with the Tax office.  This was back in

16   2011.  The BTC would be on a server on hard drive, just

17   the rights are overseas."

18         Q.     Here you say:  "We moved everything

19   offshore"?

20         A.     I use a royal "we" all the time, so if

21   you are taking "we", "we" rarely means, for me, multiple

22   people.  I talk.  As my lawyers keep instructing me,

23   stop saying "we".

24               MS. MARKOE:  Objection.

25               THE WITNESS:  I say "we" all the time.



Page 320

1                      MS. MARKOE:  Do go into what we talked

2      about.

3                      THE WITNESS:  Sorry.

4                      MS. MARKOE:  Our conversations are

5      privileged.  And there is just a correction.

6                      THE WITNESS:  I was not talking just

7      about you!

8                      MS. MARKOE:  Nonetheless, any

9      conversations you have with lawyers are privileged, the

10     contents thereof.

11                     MR. RIVERO:  Move to strike your client's

12     testimony.

13                     MR. FREEDMAN:  Any move to just strike is

14     objected to.

15                     MS. MARKOE:  Also, I would just like to

16     point out that there is an error in the transcript.  It

17     says "really means", and he said "rarely means".

18     BY MR. FREEDMAN:

19             Q.     So is it your testimony here today,

20     Dr. Wright, that when you used "we" here, you were

21     referring only to yourself?

22             A.     Independently Dave set up his own trust.

23             Q.     I am talking about your use of the word

24     "we".

25             A.     I am talking, and explaining this.



Page 321

1    I moved my things, Dave moved his things, independently.

2    We did not do it together.  It was a quick, flippant

3    e-mail to a con man who will take things out of context.

4    Basically, as this says, BTC would be on a server or

5    hard drive.  My suspicion is that it is the one Dave had

6    with him at nearly all time.

7            Q.    Can you go to page 4 for me.  Can you

8    look at, toward the bottom of the page, it says:  "Look

9    up Wotty - it is not a mistake"; do you see that?

10           A.    Yes.

11           Q.    What is Wotty?

12           A.    It is a word.

13           Q.    Why is it not a mistake?

14                 MS. MARKOE:  Objection.

15                 THE WITNESS:  What do you mean, why is it

16   not a mistake?

17   BY MR. FREEDMAN:

18           Q.    This is an e-mail that Dave Kleiman sent

19   to you; is that correct?

20           A.    That is what it appears to be.

21           Q.    Did you know what Dave Kleiman meant when

22   he wrote to you:  "Look up Wotty - it is not a mistake"?

23                 MS. MARKOE:  Objection.  Answer if you

24   can.

25                 THE WITNESS:  I am being told to look up



Page 322

1    the word "Wotty".

2    BY MR. FREEDMAN:

3        Q.    Did you know what Dave Kleiman meant when

4    he told you this?

5        A.    Yes, he asked me to look up the word

6    "Wotty."

7        Q.    Did you understand the implication of

8    what that meant?

9        A.    Yes, it meant I would go to probably

10   volume 20 of the Oxford greater dictionary.

11       Q.    Dr. Wright, I mean what Dave Kleiman

12   meant when he -- let me phrase it another way.  Why did

13   Dave Kleiman want you to look up the word "Wotty"?

14           MS. MARKOE:  Objection.  Answer if you

15   can.

16           THE WITNESS:  You are asking me why

17   someone else asked me to look up something.

18   BY MR. FREEDMAN:

19       Q.    Do you know?  If the answer is no, then

20   just say no.

21       A.    Because he did silly things like that and

22   so did I.  So, my suspicion is without looking it up and

23   trying to figure out, because I cannot remember what

24   Wotty actually is, I would need to look up the word

25   again and try and guess what he was saying.



Page 323

1                    MR. FREEDMAN:  Can we take a five-minute

2    break.  I need a drink of water.

3                    MS. MARKOE:  Sure.

4                    THE VIDEOGRAPHER:  Going off the record.

5    The time is 18.50.

6                    (A Short Break)

7                    THE VIDEOGRAPHER:  This is the beginning

8    of video card number 7, volume 1, in the video

9    deposition of Dr. Craig Wright.  Going on the record.

10   The time is 19.05.  Thank you.

11   BY MR. FREEDMAN:

12        Q.    Dr. Wright, who is Ian Grigg?

13        A.    Ian Grigg is a person currently involved

14   with the cryptocurrency called EOS.

15        Q.    Have you ever met Ian Grigg?

16        A.    Yes.

17        Q.    Did Ian have any involvement in the

18   development of the Bitcoin protocol or the Satoshi

19   client?

20        A.    Involvement, as I said, is a big word.

21   Ian Grigg wrote a whole lot of things, like Ricardian

22   contracts.  I have used some of Ian Grigg's writings.

23   I have used contacts I got from Ian.  I have used other

24   such things.  Bitcoin was not developed because of Ian

25   but I used some of the things that Ian had published.



Page 324

1          Q.     Did you converse directly with Ian before

2     the public posting on the Satoshi client?

3               MS. MARKOE:  Objection, but you can

4     answer.

5               THE WITNESS:  I talked to Ian in the

6     '90s, which had nothing to do with Bitcoin.

7     BY MR. FREEDMAN:

8          Q.     Did you talk to Ian about -- strike that.

9     Was Ian aware that you were Satoshi Nakamoto?

10              MS. MARKOE:  Objection:  foundation.

11              THE WITNESS:  I cannot state his state of

12    mind.

13    BY MR. FREEDMAN:

14         Q.     Did you reveal yourself as Satoshi

15    Nakamoto to Ian Grigg?

16              MS. MARKOE:  Objection.

17              THE WITNESS:  I did not reveal myself to

18    anyone.  It was revealed.

19    BY MR. FREEDMAN:

20         Q.     Did you tell Ian Grigg that you were the

21    creator of Bitcoin?

22              MS. MARKOE:  Objection.

23              THE WITNESS:  I did not tell anyone until

24    this year that I was the creator of Bitcoin.

25    BY MR. FREEDMAN:



Page 325

1          Q.     Do you know when Ian Grigg came to learn

2     that you were Satoshi Nakamoto?

3                   MS. MARKOE:  Objection.

4                   THE WITNESS:  Strike the last one.

5     I have talked to my wife, but that is a different

6     matter, and I have talked to Dave, so they are anyones,

7     but, I mean, outside of the people that we are not

8     talking about, generally, in public, I did not talk to

9     anyone.  Ian Grigg came to believe that some time on his

10    own.  I do not remember the exact timing of that.

11    I know I had been talking to him about Bitcoin before

12    all the outing, etcetera.  I do not know when he decided

13    that I was.

14    BY MR. FREEDMAN:

15         Q.     Do you know whether Ian Grigg knew Dave

16    Kleiman?

17         A.     I believe he did.  I do not know.

18         Q.     Do you know whether Ian Grigg and Dave

19    Kleiman had any direct correspondence?

20         A.     I do not know.  Dave was known by

21    practically everyone in the industry.

22         Q.     To your best knowledge, does Ian Grigg

23    have any personal knowledge concerning the use of the

24    Satoshi e-mail addresses?

25         A.     I do not know what Ian knows.  I have not



Page 326

1    talked to Ian since he started bloody EOS.

2          Q.    When you first met Joseph Vaughn Perling,

3    did you introduce yourself as Satoshi Nakamoto?

4          A.    I do not remember what I said I was.

5    I used a number of silly pseudonyms in the past, Satoshi

6    being one of them, Toshi being another one, Toshi Gati

7    being another one.  Yes, I used a lot of Japanese

8    pseudonyms.

9          Q.    Did Mr. Vaughn Perling have any

10   involvement in the development of the Satoshi client?

11              MS. MARKOE:  Objection.

12              THE WITNESS:  I do not know what he did

13   online.  I believe he probably did.  He was very

14   interested in this.  He was one of the reasons that

15   I stayed secret as long as I did.

16   BY MR. FREEDMAN:

17         Q.    Mr. Vaughn Perling knew you were Satoshi

18   before the world did?

19              MS. MARKOE:  Objection.

20              THE WITNESS:  That is not what I said.

21   BY MR. FREEDMAN:

22         Q.    Did Mr. Vaughn Perling know you were

23   Satoshi Nakamoto before the world did?

24              MS. MARKOE:  Objection.

25              THE WITNESS:  I do not know.



Page 327

1    BY MR. FREEDMAN:

2         Q.    Do you know whether Mr. Vaughn Perling

3    knows Uyen Nguyen?

4              MS. MARKOE:  Objection.

5              THE WITNESS:  I believe he does.

6    BY MR. FREEDMAN:

7         Q.    Do you know when they came to meet?

8         A.    I do not know that.

9         Q.    Do you know whether Mr. Vaughn Perling

10   knows about the Tulip Trust?

11        A.    I believe he does.

12        Q.    Is Mr. Vaughn Perling a trustee of the

13   Tulip Trust?

14        A.    No, he is not.

15        Q.    Is he a trustee of any trust related to

16   you?

17        A.    No.

18        Q.    Do you know a gentleman named G Mark

19   Hardy?

20        A.    G Mark Hardy?  The name is familiar.

21        Q.    Do you ever e-mail with him?

22        A.    If I have in the past, I do not any more.

23        Q.    Do you know whether G Mark Hardy is a

24   trustee of any trust related to you?

25        A.    He is not.  Oh, Mark Hardy he is from the



Page 328

1    tax office.

2          Q.     No, this is a different Mark Hardy.   G

3    Mark Hardy I am talking about.

4          A.     G Mark Hardy?

5          Q.     Did Nick Szabo have any involvement in

6    the development of the Bitcoin protocol?

7                MS. MARKOE:  Objection.

8                THE WITNESS:  Nick Szabo ----

9    BY MR. FREEDMAN:

10         Q.     Let me clarify that though before, and I

11   do not mean that you used his prior work.  I mean, did

12   Nick Szabo have any direct involvement in the programing

13   of the Satoshi client?

14               MS. MARKOE:  Objection.  You can answer

15   if you can.

16               THE WITNESS:  Nick Szabo could not

17   program himself out of a wet paper bag if he was given

18   his children about to be hung and he had to save himself

19   by getting out of the wet paper bag, and having to type

20   a simple one-line C code.  He did not have anything to

21   do with Bitcoin.  He does not understand Bitcoin.  He

22   has no clue about what Bitcoin is, how it works or

23   anything more.  He is probably the most clueless guy who

24   has latched on to Bitcoin ever.

25   BY MR. FREEDMAN:



Page 329

```
 1            Q.      Am I understanding you correctly, that

 2    Satoshi Nakamoto would have to have a deep understanding

 3    of C computer language?

 4                    MS. MARKOE:  Objection.

 5                    THE WITNESS:  C++.

 6    BY MR. FREEDMAN:

 7            Q.      C++; is that correct?

 8            A.      Yes.

 9                    MS. MARKOE:  Objection.

10    BY MR. FREEDMAN:

11            Q.      Did you ever e-mail with Jeff Garzik

12    about the Satoshi client?

13            A.      Yes.

14            Q.      Before it was released or after it was

15    released?

16            A.      I do not believe Jeff was e-mailed before

17    it was released.  I do not think he was on that list.

18            Q.      Did there come a time -- strike that.

19    Did Mr. Garzik learn you were Satoshi before the world

20    learned you were Satoshi?

21                    MS. MARKOE:  Objection.

22                    THE WITNESS:  I do not know.  I did not

23    ever tell him.

24    BY MR. FREEDMAN:

25            Q.      Did you ever discuss the amount of
```



Page 330

```
1    Bitcoin you had with Mr. Garzik?

2              MS. MARKOE:  Objection.

3              THE WITNESS:  No.

4    BY MR. FREEDMAN:

5         Q.    Did you ever discuss the Tulip Trust with

6    Mr. Garzik?

7         A.    No.

8              MS. MARKOE:  Objection.

9    BY MR. FREEDMAN:

10        Q.    Did you discuss any trust with

11   Mr. Garzik?

12        A.    No.

13        Q.    Do you know whether Mr. Garzik and Dave

14   Kleiman had any direct communication between 2009 and

15   2013?

16        A.    Dave was on IRC groups that Jeff was on.

17   More than that, I could not say.

18        Q.    Have you ever met with Gavin Andresen?

19        A.    I have.

20        Q.    Did you ever speak with Gavin Andresen

21   about you being Satoshi Nakamoto?

22              MS. MARKOE:  Objection.  You can answer.

23              THE WITNESS:  I did.

24              MS. MARKOE:  Craig, just give me a minute

25   to object before you answer so we are not driving the
```



Page 331

1   court reporter crazy, please.

2                    THE WITNESS:  Sorry, yes.

3   BY MR. FREEDMAN:

4        Q.     Did you ever discuss the amount of

5   Bitcoin that you have with Mr. Andresen?

6                    MS. MARKOE:  Objection.  You may answer.

7                    THE WITNESS:  No.

8   BY MR. FREEDMAN:

9        Q.     Did you ever discuss the Tulip Trust with

10  Mr. Andresen?

11       A.     I do not believe so.

12       Q.     Did you ever discuss any other trusts

13  with Mr. Andresen?

14                   MS. MARKOE:  Objection.  You may answer.

15                   THE WITNESS:  No, and I do not discuss my

16  trusts with anyone outside my family, unless I am

17  required to by law.

18  BY MR. FREEDMAN:

19       Q.     Do you know if Uyen Nguyen ever reached

20  out to Mr. Andresen?

21                   MS. MARKOE:  Objection: foundation.

22                   THE WITNESS:  No.

23  BY MR. FREEDMAN:

24       Q.     Do you know if she would have a reason to

25  reach out to Mr. Andresen?



Page 332

```
1               MS. MARKOE:  Objection:  foundation.

2               THE WITNESS:  I do not know.

3   BY MR. FREEDMAN:

4        Q.     Doctor, I want to direct your attention

5   the Australian Tax Office investigations.  How many

6   investigations were undertaken by the tax office of

7   yourself personally?

8        A.     I do not know.

9        Q.     How many investigations were undertaken

10  by the tax office of your companies?

11       A.     I do not know.

12       Q.     Are you -- let me rephrase that question.

13  How many investigations are you aware that the tax

14  office has conducted against yourself?

15       A.     I do not know.  I do not know.

16       Q.     And are you aware of how many

17  investigations the tax office has conducted against your

18  companies?

19       A.     No.  What I do know is, for instance, on

20  myself, they have taken me to court multiple times, and

21  multiple times they have been forced basically to

22  apologise.  Multiple times they have doctored records.

23  They have constructed records.  They have done anything

24  possible, since the time I told them about Bitcoin,

25  before it was called Bitcoin, to basically find
```



Page 333

1    something to get me on.  Because little things like

2    where I said Bitcoin means we do not need as many

3    auditors because it gets rid of fraud, means that they

4    do not like what it is.

5          Q.    Dr. Wright, you swore to the court in the

6    Southern District of Florida that you do not have any

7    Australian Tax Office documents; do you recall that?

8          A.    No, I do not.  Can you show me the

9    document.

10               MR. FREEDMAN:  Sure.  Let us take a

11   break.  I will go get it for you.

12               THE VIDEOGRAPHER:  Going off the record.

13   The time is 19.15.

14                    (A Short Break)

15   (Plaintiff's Exhibit 9 marked for identification)

16               THE VIDEOGRAPHER:  Going back on the

17   record.  The time is 19.31.  Thank you.

18   BY MR. FREEDMAN:

19         Q.    Dr. Wright, before the break we were

20   discussing a sworn statement you submitted to the court,

21   and now you have what has been marked as Plaintiff's

22   Exhibit 9.

23         A.    I do.

24         Q.    If you would turn, please, to page 4.

25         A.    Page 4 of 7.



Page 334

```
 1          Q.     Okay.  If you read for me ----
 2                 MS. MARKOE:  And that is at the top;
 3   correct?
 4   BY MR. FREEDMAN:
 5          Q.     Do you recognise this as your sworn
 6   statement?
 7          A.     I do.
 8          Q.     Do you recognise that at the very
 9   beginning of this statement you swore:  "I, Craig
10   Wright, declare under penalty of perjury under the laws
11   of United States of America that the following is true
12   and correct"?
13          A.     I do.
14          Q.     And if you see on page 4 of this
15   document, paragraph 18, can you read that for me?
16          A.     Sorry, number 19?
17          Q.     Number 18.
18          A.     18.  "I have no documents in my
19   possession from any ATO investigation.  To the extent
20   that my attorneys have any documents from any ATO
21   investigation related to me, those documents would be
22   located in Australia."
23          Q.     So, Dr. Wright, here you have sworn that
24   you have no documents in your possession from any ATO
25   investigation; is that correct?
```



Page 335

1          A.      That is correct.

2          Q.      But that is not entirely true; is that

3     not right?

4                  MS. MARKOE:  Objection.

5                  THE WITNESS:  I am sorry, I object to the

6     fact personally that you are implying that I have

7     perjured myself or lied.  I do not have documents from

8     any ATO investigation at all.  I do not have them now;

9     I did not have them in the past.

10    BY MR. FREEDMAN:

11         Q.      Dr. Wright, are you aware that your

12    lawyers have produced documents from the Australian Tax

13    Office investigation that they collected from your

14    house?

15                 MS. MARKOE:  Objection.

16                 THE WITNESS:  No, they have corporate

17    documents and e-mails back and forwards from the ATO.

18    You are saying that I have investigation files.  I do

19    not.

20    BY MR. FREEDMAN:

21         Q.      Okay, so I am trying to understand

22    exactly what you have and what you do not have.  Can you

23    tell me what it is you do have in regards to the

24    Australian Tax Office investigation?

25         A.      I have what my lawyers have, which is not



Page 336

```
 1    ATO documents, or documents from an investigation.
 2           Q.    In this you say that to the extent that
 3    your attorneys have documents from the ATO, those
 4    documents would be located in Australia.  Which
 5    attorneys are those?
 6                 MS. MARKOE:  You can identify the names
 7    of the attorneys.  You cannot identify the contents of
 8    the conversations.
 9                 THE WITNESS:  I do not know which
10    documents would be with which attorneys.
11    BY MR. FREEDMAN:
12           Q.    You swore that you have no documents in
13    your possession from any ATO investigation.  What
14    documents did you mean that you do not have and what
15    documents do you have?
16                 MS. MARKOE:  Objection: compound.
17    BY MR. FREEDMAN:
18           Q.    What documents do you not have in your
19    possession from the ATO?
20                 MS. MARKOE:  Objection.
21           A.    I am a scientist, I cannot answer a
22    negative.  I do not know what documents I do not have.
23    BY MR. FREEDMAN:
24           Q.    You said: "I have no documents in my
25    possession from any ATO investigation."  What did you
```



Page 337

1    mean?

2        A.    An ATO investigation is where a group of

3    federal investigators decide to investigate.  That would

4    be material from what the ATO has.  That would be things

5    such as records of the ATO.  They can be given to you

6    after an investigation has happened.  You can ask for

7    them.  For instance, I could have, when I won the case

8    in 2012, asked for records.  I did not.

9        Q.    So you have the ability to ask the

10   Australian Tax Office for records?

11            MS. MARKOE:  Objection: mischaracterises

12   the testimony.

13   BY MR. FREEDMAN:

14       Q.    Do you have the ability to ask the

15   Australian Tax Office for records?

16       A.    I am an Australian citizen and I have my

17   rights under Australian law which includes asking

18   government officials, including freedom of information

19   and personal records, to be delivered to me, yes.

20       Q.    Did you ask for those records to be

21   collected from the Australian Tax Office when responding

22   to discovery requests in this lawsuit?

23            MS. MARKOE:  Objection.

24            THE WITNESS:  No.

25   BY MR. FREEDMAN:



1          Q.     I believe the witness answered the

2     question.  Can you answer again?

3          A.     No.

4          Q.     Dr. Wright, have you asked your attorneys

5     to collect documents from -- have you asked your

6     attorneys whether they hold any Australian Tax Office

7     documents?

8               MR. RIVERO:  Objection.

9               MS. MARKOE:  Objection.  I am instructing

10    the witness not to answer.  Communications between

11    counsel are privileged and are not to be disclosed.

12               MR. FREEDMAN:  Requesting whether or not

13    his lawyers have documents in the investigation?

14               MS. MARKOE:  Your question was:

15    "Dr. Wright, have you asked your attorneys to collect

16    documents ..."  That is ----

17               MR. FREEDMAN:  I disagree, but let me see

18    if I can make it so you do not object.

19          Q.     Dr. Wright, have you contacted your

20    Australian counsel to determine whether they have

21    documents in their possession from an Australian Tax

22    Office investigation?

23          A.     No.

24               MS. MARKOE:  Objection.

25               THE WITNESS:  And nor would I be sort of



Page 339

1     able to at the moment, because I resigned as a director

2     of all those companies before the end of those

3     companies.

4     BY MR. FREEDMAN:

5              Q.     Who took over the directorship after you

6     resigned?

7                    MS. MARKOE:  Objection.  You can respond

8     if you recall.

9                    THE WITNESS:  That would be in public

10    records.

11    BY MR. FREEDMAN:

12             Q.     So you do not know sitting here today?

13             A.     I do not follow-up these things.  I did

14    not look at the shareholding after I left.  Again, as

15    I said, I really do not care what it is after I have

16    done whatever else, as long as things get run and things

17    happened.  I do not care.  It is magic.

18             Q.     Dr. Wright, have you ever met

19    Ross Ulbricht in person?

20                    MS. MARKOE:  Objection.

21                    MR. RIVERO:  Can we ask what ----

22                    MR. FREEDMAN:  Identification of the

23    witnesses and their knowledge base.

24                    MS. MARKOE:  It has already been pretty

25    well established that Ross Ulbricht has no relevance.  I



Page 340

1   will allow him to answer this question.  Tread lightly,

2   please.

3              THE WITNESS:  Yes, once.

4   BY MR. FREEDMAN:

5        Q.    What was that meeting about?

6              MS. MARKOE:  Objection.  You do not need

7   to answer that question.

8   BY MR. FREEDMAN:

9        Q.    Did that meeting involve Bitcoin?

10             MS. MARKOE:  Objection.  You may answer.

11             THE WITNESS:  I mentioned Bitcoin.

12  BY MR. FREEDMAN:

13       Q.    In what way did you mention Bitcoin?

14             MS. MARKOE:  Objection.  I am going to

15  instruct the witness not to answer.  It goes beyond the

16  scope, unless you can point me to something.

17             MR. FREEDMAN:  To determine

18  Ross Ulbricht's knowledge.  It is clearly within the

19  scope.

20             MS. MARKOE:  It talks about his role in

21  the subject matter, not about his ----

22             MR. FREEDMAN:  No, no.  Where is the

23  list?  6.  Sorry, that is the wrong one, my apologies.

24  It is 1.  So, the question was:  "In what way did you

25  mention Bitcoin?"



Page 341

1            MS. MARKOE:  Right, and I am instructing

2    him ----

3            MR. FREEDMAN:  You are instructing him

4    not to answer.

5            MS. MARKOE:  I am instructing him not to

6    answer.

7    BY MR. FREEDMAN:

8       Q.    When did this meeting take place?

9            MS. MARKOE:  If you can recall, you can

10   answer.

11           THE WITNESS:  I do not recall exactly.

12   It was at the Bondi Icebergs, so therefore I pretty much

13   say not in the middle of winter.

14   BY MR. FREEDMAN:

15      Q.    Do you know what year it was?

16      A.    It would be 2010 off the top of my head.

17      Q.    Did Dave know you discussed Bitcoin with

18   Ross Ulbricht?

19           MS. MARKOE:  Objection.

20           THE WITNESS:  Dave's not my wife.  I do

21   not sit there and go, "Hey, Dave, I discussed something

22   with this guy who one day will be famous for doing shit

23   because he is a criminal."

24   BY MR. FREEDMAN:

25      Q.    I just asked the question, Dr. Wright,



Page 342

1    whether or not Dave knew you had spoken with Ross

2    Ulbricht about Bitcoin.  If the answer is no, it is no.

3    If it is yes, it is yes.  Please answer the question?

4                 MS. MARKOE:  Objection ----

5                 THE WITNESS:  I do not know.

6                 MS. MARKOE:  ---- you are asking him to

7    get into someone else's head.  He can answer if he

8    knows.

9                 THE WITNESS:  I do not know.

10   BY MR. FREEDMAN:

11        Q.    You do not know; okay.  Did you ever tell

12   him you spoke to Ross Ulbricht about Bitcoin?

13        A.    No.  I did not like Ross Ulbricht.

14        Q.    Why did you not like Ross Ulbricht?

15                 MS. MARKOE:  Objection.

16                 MR. FREEDMAN:  He said he did not like

17   him.

18                 MS. MARKOE:  I am going to instruct the

19   witness not to answer.

20   BY MR. FREEDMAN:

21        Q.    Have you ever communicated with Ross

22   Ulbricht by e-mail or other communications protocol?

23                 MS. MARKOE:  Objection.  You may answer.

24                 THE WITNESS:  No, I did not like him.

25   I did not really try and communicate with people I do



Page 343

1    not like.

2    BY MR. FREEDMAN:

3         Q.    Did you use Liberty Reserve with Dave

4    Kleiman?

5         A.    No.

6         Q.    Did you ever send money to Dave Kleiman

7    through Liberty Reserve?

8         A.    I sent money to a -- well, I instructed a

9    group to send money to a group that Dave Kleiman was

10   involved.

11        Q.    Which group did you instruct?

12        A.    Craig Wright R&D.

13        Q.    Which one?

14        A.    Panama.

15        Q.    And you instructed Craig Wright R&D

16   Panama to send money to who?

17        A.    Dave's company in Panama.

18        Q.    Which was?

19        A.    I cannot remember off the top of my head.

20   I would need to see the record.

21        Q.    Where do those records exist?

22              MS. MARKOE:  Objection.  You may answer

23   if you know.

24              THE WITNESS:  I believe the lawyers have

25   taken a copy.



1   BY MR. FREEDMAN:

2           Q.      How many times did you instruct Craig

3   Wright R&D to send money to Dave's company in Panama?

4                   MS. MARKOE:  Objection.  You can answer

5   if you know.

6                   THE WITNESS:  I do not know.

7   BY MR. FREEDMAN:

8           Q.      How much money did you instruct Craig

9   Wright R&D to send to Dave's company in Panama?

10                   MS. MARKOE:  Objection.  Is this at a

11   particular time or is this overall or over the course of

12   a period time?  Your question is unclear.

13   BY MR. FREEDMAN:

14           Q.      You said that you instructed Craig Wright

15   R&D, so at all times, how many times -- well, you know

16   what, strike that.  How much money in total did you

17   instruct Craig Wright R&D to transfer to Dave's company

18   in Panama in the transaction you referenced earlier?

19                   MS. MARKOE:  Objection.  You can answer

20   if you understand.

21                   THE WITNESS:  I do not remember the exact

22   amount.  It was like, I think it was about US$5 million.

23   BY MR. FREEDMAN:

24           Q.      Why did you have Craig Wright R&D make

25   this transfer?



Page 345

1          A.     To have machines built.

2          Q.     What type of machines?

3          A.     HPCs.

4          Q.     What purpose were you building HPCs for?

5          A.     To test scaling.

6          Q.     Scaling for what?

7          A.     Bitcoin.

8          Q.     And when you say scaling, does that mean

9     bigger blocks?

10         A.     That is the only way Bitcoin scales.

11         Q.     Did Dave make the machines?

12         A.     No.

13                MS. MARKOE:  Objection.

14    BY MR. FREEDMAN:

15         Q.     Why not?

16                MS. MARKOE:  Objection.

17    BY MR. FREEDMAN:

18         Q.     Do you know why Dave did not make the

19    machines?

20         A.     Because to make the machines would

21    basically mean that you have a company that goes out

22    there and smelts iron and forms that into shapes and

23    then has silicon fabs and ----

24         Q.     Dr. Wright, did he cause them to be made?

25    I think you understood what I meant.



1              MS. MARKOE:  Objection.  You cannot

2     testify as to what our client understood.

3              MR. RIVERO:  And you cannot cut-off the

4     answer.

5     BY MR. FREEDMAN:

6         Q.    Did Dave cause the machines to be built?

7         A.    You want to know if Dave or Dave's

8     company bought them and I am going to have to interrupt

9     this way because I cannot stand this any more.  He did

10    not cause them to be built.  That would be an incorrect

11    characterisation, because companies make machines and

12    then they sell them.  He caused a number of machines to

13    be sent through grey markets from SGI, and then people

14    put them together.

15        Q.    And what happened to those machines?

16        A.    The last I know of, the American

17    government has them.

18        Q.    How did the American government come to

19    possess the machines?

20        A.    The American government started a number

21    of investigations.  One was into High Secured where they

22    have arrested the founders, another was into Arthur

23    Budovsky in Liberty Reserve, and due to money laundering

24    charges, a lot of people were arrested.

25        Q.    So, of the 5 million that you caused to



Page 347

1    be transferred, do you know approximately how much of it

2    Dave Kleiman spent on purchasing these machines?

3            A.    All of my machines ended up costing

4    around 60 million.

5            Q.    So the full 5 million was spent?

6                  MS. MARKOE:  Objection:  mischaracterises

7    the testimony.

8    BY MR. FREEDMAN:

9            Q.    Was the full 5 million spent?

10                 MS. MARKOE:  Objection.  You may answer

11   if you understand.

12                 THE WITNESS:  I would assume so, but

13   I did not actually do that, and Dave obviously managed

14   to get something somewhere and other people got money

15   together to put, well, all those machines together.  So,

16   therefore, someone spent money.  Either that or there is

17   a debt, and which I do not care because it is not my

18   company.

19   (Plaintiff's Exhibit 10 marked for identification)

20   BY MR. FREEDMAN:

21           Q.    Mr. Wright, I have handed you what has

22   been marked now as Plaintiff's Exhibit 10.

23           A.    Yes.

24           Q.    Do you recognise what these are?

25           A.    Yes, they are a statement of claim.



Page 348

```
 1          Q.     Who is the plaintiff in this action?

 2          A.     The plaintiff is Craig Steven Wright.

 3          Q.     Is that yourself?

 4          A.     Yes, via ---

 5                 MS. MARKOE:  Objection.  You can answer.

 6                 THE WITNESS:  Yes, via a business trust.

 7   BY MR. FREEDMAN:

 8          Q.     What business trust?

 9          A.     The one associated with ABN 97 481 146

10   384.

11          Q.     Can you go with me to page 3?

12                 MS. MARKOE:  Are we talking about on the

13   top?

14                 MR. FREEDMAN:  On the top.

15                 MS. MARKOE:  On the top.

16   BY MR. FREEDMAN:

17          Q.     Paragraph 1 says that "the plaintiff",

18   Craig Steven Wright, "provided contract labour services

19   to the defendant."  Do you see that?

20          A.     I see that.

21          Q.     What were the labour services you

22   provided?

23          A.     The document is badly drafted.

24          Q.     Who drafted this document?

25          A.     Myself.
```



Page 349

1          Q.     What does it mean to say, or why is it

2     badly drafted?

3          A.     Because some of the things were in error,

4     it was rushed, I was trying to get through a document so

5     that I could simply just state the intellectual property

6     that I had and start moving forward.

7          Q.     So, is the sentence, "Between 2011 and

8     2013 the plaintiff provided contract labour services to

9     the defendant" incorrect?

10               MS. MARKOE:  Objection.  What topic are

11    we talking about now?

12               MR. FREEDMAN:  These are the Australian

13    tax proceedings -- sorry, the Australian court

14    proceedings.

15               MS. MARKOE:  The Australian court

16    proceedings, so that would be number 7, allows inquiry

17    into individuals and entities identified in the

18    proceedings, along with what documents exist relevant to

19    the lawsuit and where those documents are held.  These

20    questions do not address those topics.

21               MR. FREEDMAN:  He is saying the contract

22    was badly drafted, so I am trying to understand what it

23    was about so I can ask ----

24               THE WITNESS:  I did not say contract.

25               MR. FREEDMAN:  Sorry, statement of claim.


MAGNA
LEGAL SERVICES

Page 350

1              MS. MARKOE:  Objection.  I am going to

2     instruct him not to answer.  Your inquiry can be limited

3     to those specific topics.

4              MR. FREEDMAN:  Okay.

5         Q.    Can you go down to paragraph 5, please.

6         A.    Yes.

7         Q.    "By contract dated" -- can you read

8     paragraph 5 for me, please?

9         A.    "By contract dated 8 January 2009, the

10    Defendant agreed to pay the Plaintiff for property and

11    consulting services to complete research.  The contract

12    was bonded against the intellectual property of the

13    defendant."

14        Q.    Where is that contract between Craig

15    Steven Wright and W&K Info Defense Research?

16              MS. MARKOE:  Objection.  You may answer.

17              THE WITNESS:  As stated, there was an

18    error in drafting.

19    BY MR. FREEDMAN:

20        Q.    So there is no contract?

21              MS. MARKOE:  Objection: mischaracterises

22    the testimony.  You may answer.

23              THE WITNESS:  No, I have the wrong date.

24    BY MR. FREEDMAN:

25        Q.    What date was it supposed to be?



Page 351

```
 1          A.     I do not remember the date of the
 2   contract.
 3          Q.     Is it one of the contracts we looked at
 4   today?
 5          A.     Yes.
 6          Q.     Is there anything else wrong with the
 7   document?
 8                 MS. MARKOE:  Objection.
 9                 THE WITNESS:  I do not know.  I would
10   need to read through everything line-by-line and match
11   it all up.
12   BY MR. FREEDMAN:
13          Q.     Can you look at paragraph 7, please.
14          A.     Yes.
15          Q.     Can you read it for me?
16          A.     "The plaintiff conducted a project for
17   the development of a Bitcoin SDK in exchange".
18          Q.     What is SDK?
19          A.     Software development kit.
20          Q.     Do any documents exist as to this
21   development, software development kit?
22          A.     Again, this is an error.  The plaintiff
23   is mixed up with the defendant.
24          Q.     So, W&K conducted a project for the
25   development of the Bitcoin SDK?
```



Page 352

1          A.      Again what you are doing is the initial

2     horrible, horrible statement of claim that I had to go

3     into court and have multiple other documents done to

4     correct because we were not expecting anything fought,

5     it was just to basically end a contract saying anything

6     that W&K has they can keep; the things I have got,

7     I keep.  We all move on, happy, the end.

8          Q.      So is it fair to say that you were trying

9     to get this done and it is not accurate?

10              MS. MARKOE:  Objection.

11              THE WITNESS:  This is part of a

12     proceedings.

13   BY MR. FREEDMAN:

14          Q.      Why did you file a statement of claim

15     that was inaccurate?

16              MS. MARKOE:  Objection.  I am going to

17     instruct the witness not to answer.  You are limited in

18     this deposition.  You are going to get another bite at

19     this apple in terms of a full merits deposition of

20     Dr. Wright.  Move on.  Limit your questions to the

21     topics you identified to the court and the court

22     approved.

23   BY MR. FREEDMAN:

24          Q.      Can you go to page 9, please, for me and

25     paragraph 1.



Page 353

1          A.     And again, the same errors were made when

2     these were filed.

3          Q.     I need to know if any documents exist, so

4     I am trying to understand what it is really supposed to

5     say.  So you say it is an error.  What should it say?

6          A.     I do not know what the court may or may

7     not have document-wise.  A lot of documents were

8     produced for the court.  A lot of changes were made.

9     The register required that I went back several times and

10    corrected things.  I handed all those documents to the

11    register.  I do not know what the court has or has not

12    kept.

13         Q.     I want to know what you have kept?

14         A.     If my lawyers have it, I have it.

15         Q.     Which lawyers would this be?

16         A.     These ones right here.

17         Q.     Can you go down to paragraph 3, please.

18    You said -- can you read paragraph ----

19              MR. RIVERO:  This I think ----

20              MR. FREEDMAN:  Let us go off the record.

21              THE VIDEOGRAPHER:  Going off the record.

22    The time is 19.53.

23              (A Short Break)

24              THE VIDEOGRAPHER:  Going back on the

25    record.  The time is 19.55.



Page 354

1    BY MR. FREEDMAN:

2          Q.    Can I direct your attention to paragraph

3    3.

4          A.    Yes.

5          Q.    And can you read that for me?

6          A.    Again, this is the same error as before.

7    The wrong date is in this version of the statement of

8    claim.

9          Q.    Did you take the 27th October 2008 date

10   from a document?

11         A.    There is no 27th October 2008 document

12   that I know of.  It could have been taken from a

13   different document and put in in error.  This does not

14   refer to that document.

15         Q.    Can you go to 6, please, on page 10 at

16   the top.

17         A.    Yes.

18         Q.    Can you read 6 for me?

19         A.    "In May 2013 the primary director of the

20   defendant died leaving the project not transferred to

21   the plaintiff and not returning funds.  These funds were

22   rated as: a. TTA 01 ----"

23         Q.    That is fine.  Just 6, not the a, b, c,

24   d.  There is then a list of funds below that in a, b, c

25   and d; is that not correct?



Page 355

1          A.     Yes.

2          Q.     Do any documents exist that validate that

3    these funds were provided?

4               MS. MARKOE:  Objection: mischaracterises

5    the document and what it states.  You can answer.

6               MR. FREEDMAN:  You can answer.

7               THE WITNESS:  Basically, this says funds

8    were meant to be given from Department of Homeland

9    Security if Dave had gone through with things.

10   Unfortunately Dave did not continue with the filing

11   after he went into hospital, so the payment lapsed.

12   This was not funds from me, this was funds that would

13   have been completed.  I completed those things, the

14   papers are published, and the other material was

15   produced.

16   BY MR. FREEDMAN:

17          Q.     You said the payment lapsed.  What

18   payment are you referring to?

19               MS. MARKOE:  Objection.  You can answer.

20               THE WITNESS:  The Department of Homeland

21   Security fund that Dave was there, which was because he

22   was a veteran.  None of that can be filed on a veteran

23   who is dead, and I believe part of the problem was he

24   did not file any taxes at all in any of the companies,

25   which invalidated any of the things he was going for.



Page 356

1   BY MR. FREEDMAN:

2          Q.     Could you look at 8 for me?

3          A.     Yes.

4          Q.     Can you read it for the record?

5          A.     "The contract set the interest rate at 8%

6   calculated annually."

7          Q.     Can you tell me what contract sets the

8   interest rate at 8% annually?

9                 MS. MARKOE:  Objection.  You may answer.

10                THE WITNESS:  When you are talking about

11  New South Wales, the New South Wales contract rate was

12  about 8%.  It fluctuates between 7 and 9%.  This is a

13  court proceeding-type thing and if you are talking about

14  setting government mandated things we have high interest

15  rates in Australia because we have a crappy banana

16  republic-type economic.

17  BY MR. FREEDMAN:

18                Q.     So, "the contract" is not a reference to

19  the actual contract that is between you and W&K?

20                MS. MARKOE:  Objection.  You may answer.

21                THE WITNESS:  When you are stating that

22  certain things apply as in jurisdiction in Australia and

23  this sort of X, Y, Z, then it also implies interest,

24  which, when you are putting interest -- when you are

25  doing this sort of stuff, has to be put into court for



Page 357

```
 1   statement of claim.

 2   BY MR. FREEDMAN:

 3         Q.    Can you look at 13 for me, please?

 4         A.    Yes.

 5         Q.    Can you read it for the record?

 6         A.    "The IP is software and code used by the

 7   US Military, [Department of Homeland Security] and other

 8   associated parties."

 9         Q.    Do any documents exist that substantiate

10   that this ----

11         A.    I will have to take this offline.

12         Q.    Does this relate to the matters you want

13   to speak to the court about in camera?

14         A.    Yes.

15         Q.    Can you go to page 13 for me.  The

16   signature in the middle of the page, is that your

17   signature?

18         A.    Yes.

19         Q.    Can you go to page 6 for me.  Is that

20   signature in the middle of the page your signature?

21         A.    Yes.

22               MR. FREEDMAN:  I need a drink and a

23   bathroom break.  If we could ----

24               THE VIDEOGRAPHER:  Going off the record.

25   The time is 19.59.
```



Page 358

1                    (A Short Break)

2                    THE VIDEOGRAPHER:  Going back on the

3      record.  The time is 20.09.  Thank you.

4                    THE JUDGE: (By Telephone) Okay, counsel,

5      what can I do for you today?

6                    MR. FREEDMAN:  Your Honour, this is

7      Mr. Freedman.  We had a couple of questions that the

8      witness has either just refused to answer or has been

9      instructed not to answer, and there is one particular

10     issue that I will let defence counsel talk to you about,

11     but ----

12                    THE JUDGE:  Okay.

13                    MR. FREEDMAN:  ---- if I could raise the

14     questions that the witness has refused to answer or has

15     been instructed not to answer.  There are only a couple

16     of them.

17                    THE JUDGE:  Sure.

18                    MR. FREEDMAN:  We asked Dr. Wright --

19     and, your Honour, just so you are aware Dr. Wright is

20     here in the room.

21                    THE JUDGE:  Okay.  Hello, Dr. Wright.

22                    THE WITNESS:  Hello.  How are you?

23                    MR. FREEDMAN:  We asked Dr. Wright how

24     much Bitcoin he mined from January of 2009 until

25     December of 2010, which was his testimony on the time he



Page 359

1    mined Bitcoin.  He was instructed not to answer the

2    question.  We believe this goes to the tracing forward

3    issue and we were told this morning that we were not

4    receiving the list of Bitcoin wallets we were supposed

5    to receive before the deposition.  We never got the

6    list.

7                    THE JUDGE:  Okay, so I am clear, the

8    question is, how much Bitcoin did he mine in 2009 and

9    2010?

10                    MR. FREEDMAN:  Correct.  That is the

11   first question.

12                    THE JUDGE:  Why do you not give me all

13   the questions.  That way I can have Mr. Rivero or

14   Ms. Markoe respond to all of them, then I will have you

15   address all of them and then I will come to a conclusion

16   about all of them.

17                    MR. FREEDMAN:  Sure.

18                    MR. RIVERO:  Judge, just before the

19   listing -- this is Andrés Rivero -- I believe by

20   telephone as well we have Mr. Brenner and Mr. McAdams

21   who are lawyers at Boies Schiller and, at least as of

22   some point during the deposition, the plaintiff Ira

23   Kleiman also by telephone.

24                    MR. BRENNER:  That is right.  This is

25   Andrew Brenner for Boies Schiller by telephone.



Page 360

1                    MR. MCADAMS:  John McAdams by telephone.

2                    MR. KLEIMAN:  (By Telephone) Ira Kleiman.

3                    THE JUDGE:  Thank you all very much.

4                    MR. FREEDMAN:  The second question, your

5        Honour, was, did you ever tell Dave Kleiman how much

6        Bitcoin you had mined, and the witness was instructed

7        not to answer.  The witness informed us ----

8                    THE JUDGE:  I am sorry, was there a

9        timeframe attached to that question?  During what time

10       period did he mine it or just general?

11                   MR. FREEDMAN:  I would have to check the

12       record, your Honour, but the question is just from 2009

13       until 2010, because Dr. Wright's testimony was that he

14       stopped mining and then did not begin again until 2016

15       when Dave Kleiman was already dead.

16                   THE JUDGE:  Okay.

17                   MR. FREEDMAN:  The third question was

18       that Dr. Wright had testified that his ex-wife, Lynne

19       Wright, had been on e-mail communications with Dave

20       Kleiman about the founding of W&K, but then refused to

21       answer any questions about Lynne Wright due to -- and if

22       I am misstating this please correct me defence

23       counsel -- an oath that he filed with the courts in

24       Australia not to talk about his ex-wife.

25                   THE JUDGE:  Okay.



1            MR. FREEDMAN:  And then Dr. Wright also

2   refused to answer any questions about his current wife,

3   Ms. Ramona Watts, who is listed as a director of many

4   different companies.  He was not instructed not to

5   answer, he just refused to answer the questions.

6            THE JUDGE:  Okay.

7            MR. FREEDMAN:  Those are the four

8   questions that do not touch on this other issue.

9   Briefly, there are other questions that Dr. Wright has

10  refused to answer, on national security grounds, and

11  defence counsel has requested an in camera discussion

12  with you about them.  I will let them talk to that, but

13  those first four are the questions the plaintiff is

14  raising now.

15           THE JUDGE:  Again, so our record is

16  clear, the plaintiff is asking me to compel Dr. Wright

17  to provide truthful answers to those four areas of

18  questioning?

19           MR. FREEDMAN:  Correct.

20           THE JUDGE:  Okay.  Let me hear from

21  counsel for Dr. Wright.

22           MS. MARKOE:  Your Honour, this is Zaharah

23  Markoe.  How are you this afternoon?  For us very late

24  in the evening.

25           THE JUDGE:  I am fine, Ms. Markoe.  Thank



Page 362

 1    you.  Good afternoon.

 2              MS. MARKOE:  Good afternoon.  Your

 3    Honour, it is our position that this is a

 4    limited-in-scope deposition, primarily targeted at

 5    discovery issues, opening doors, closing doors, the

 6    location of documents, and the location and

 7    identification of witnesses, with some leeway, which we

 8    believe we have been more than fair in providing.

 9              With regard to the first question, which

10    is how much Bitcoin did Dr. Wright mine between 2009 and

11    2010, that goes beyond the scope.  We allowed him to

12    answer questions about the location of the computers

13    that were used to mine, and we also allowed him to

14    answer questions about whether or not he mined in any

15    way in conjunction with either Dave Kleiman or W&K.  And

16    the answer was there was no mining with Dave Kleiman or

17    with W&K.  Therefore, it is our position that how much

18    he mined on his own between 2009 and 2010 is both beyond

19    the scope and further irrelevant.

20              THE JUDGE:  Okay.  His testimony was that

21    he never mined anything with Mr. Kleiman?

22              MS. MARKOE:  Correct.

23              THE JUDGE:  Okay.

24              MS. MARKOE:  With regard to the second

25    question, did you ever tell Dave Kleiman how much



Page 363

1    Bitcoin you mined between 2009 and 2010, again this is a

2    limited-in-scope deposition, as I understood it.  It is

3    not going to the merits and we believe that that

4    question went too far into the merits, and is not

5    appropriate for this deposition.

6                    THE JUDGE:  Okay.

7                    MS. MARKOE:  With regard to the questions

8    about Lynne Wright, I believe specifically one of those

9    questions was how did they meet; (a) that is irrelevant

10   and then, (b), Dr. Wright has testified in this

11   deposition that he has in his divorce settlement

12   agreement agreed not to discuss Lynne Wright, so he

13   believes he is bound by that agreement, and that divorce

14   settlement.  With regard to his current wife, his

15   position is that he made an oath to his wife not to

16   discuss her, so he would like to honour that oath.

17   Again, one of the specific questions that was objected

18   to further goes beyond the scope in terms of how did he

19   meet.  These witnesses have already been identified.

20   There is no further information that is required as it

21   relates to this deposition, which again limited in

22   scope.  So, that is my response to those four questions.

23                    THE JUDGE:  Let me start off with one or

24   two follow-up questions I have for you.  As to his

25   current wife, Ramona Wright, are you invoking any sort



Page 364

1    of marital privilege under US law or are you simply

2    relying upon some other basis upon which he is legally

3    bound?

4              MS. MARKOE:  I believe it depends on the

5    question.  I think that there were a couple of questions

6    that went into spousal communications, certainly, and

7    again as I said, I think that the question regarding how

8    they met certainly is, (a), irrelevant, and (b) goes

9    beyond the scope of this deposition.

10             THE JUDGE:  Okay, put aside the spousal

11   communications, are you also invoking the spousal

12   testimonial privilege?

13             MS. MARKOE:  Yes.

14             THE JUDGE:  In terms of his ex-wife,

15   Lynne Wright -- and I understand there may be some sort

16   of court proceeding in Australia that he feels bound

17   by -- what is your position as to whether I can order

18   him to do something even if the Australian court has

19   said or his agreement in Australia said that he cannot,

20   even if I have that authority?

21             MS. MARKOE:  It would be our position

22   that you do not have that authority, your Honour,

23   respectfully, of course.

24             THE JUDGE:  That is why I am asking.

25   What about the issue -- we have had so many hearings in



Page 365

1    this case that I do not remember everything, but I do

2    recall that I had ordered the production of a list of

3    Bitcoin.  Was that not done?

4              MS. MARKOE:  Your Honour, you had ordered

5    production of a list of his Bitcoin at a particular

6    point in time or allow us the opportunity to make an

7    objection probably by formal motion as to

8    burdensomeness.  We will probably be filing that motion

9    soon.  There is no such document that exists regarding

10   his list of public addresses at, I believe it was

11   December 31st, 2013, and to compile that list would be

12   incredibly burdensome.  We will be filing a motion to

13   that effect.

14             However, more importantly, with regard to

15   the questions that were at issue in this deposition,

16   they did not relate to addresses.  The questions were

17   about how much Bitcoin Dr. Wright mined and whether he

18   ever told Dave Kleiman how much Bitcoin he mined, and it

19   was our position, and remains our position, that those

20   go beyond the scope of this deposition.

21             THE JUDGE:  Okay.  I have heard you on

22   that.  Let me turn back to Mr. Freedman before I make my

23   rulings.  Mr. Freedman?

24             MR. FREEDMAN:  Your Honour, this is

25   Mr. Freedman.  First of all, I do not know if the court



Page 366

1    recalls, but the court set a deadline on when that

2    motion for burdensomeness would have had to have been

3    filed and it was purposely set in advance so that this

4    issue could be dealt with in advance of this deposition.

5    The motion was never filed.  We thought it would be

6    coming.  The list never came.

7              MS. MARKOE:  I would like a point of

8    clarification.  We had actually asked  Mr. Freedman for

9    an extension of time to file that motion, because that

10   motion was contemplated to be filed after our last

11   hearing.  Mr. Freedman needed to move that last hearing

12   for religious purposes and we accommodated that request.

13   We asked for a similar extension of time with regard to

14   filing our motion.  To be frank, Mr. Freedman never got

15   back with us and I think this is just something that

16   slipped through the cracks.

17             THE JUDGE:  No problem.  I know counsel

18   in this case have a lot going on and are working very

19   hard.  I hear you as to that, but the fact is it was not

20   yet produced and you are asking for leave to file a

21   motion.  I understand the structure of where we are.

22   Mr. Freedman, is there anything else you want to address

23   on the merits of these four things -- areas?

24             MR. FREEDMAN:  Yes, your Honour,

25   absolutely.  As the court is aware, it is our contention



Page 367

```
 1    that the Bitcoin mined by Dr. Wright from 2009, and he

 2    testifies until the end of 2010, was done in partnership

 3    with Dave Kleiman, and so the amount of Bitcoin that was

 4    mined during that period is relevant to plaintiff's

 5    claims.   Whether or not he informed Dave Kleiman about

 6    this amount is relevant, again, to the partnership and

 7    in particular for this deposition, whether those

 8    communications still exist anywhere.

 9             As to questions about Ms. Wright, there

10    were initial questions about how they had met to

11    determine the timeframe of when she came in.  Obviously

12    I am happy not to ask those questions.  The purpose

13    would be to understand what she knows about and what she

14    does not know about to see whether or not she is a

15    witness for the case.

16             As to questions about Ms. Watts,

17    obviously if counsel invokes spousal privilege that is

18    one thing, but questions were not about communications,

19    they were questions about what companies she was a

20    director on, I believe, and certainly we would explore

21    that topic, but after asking a few questions and being

22    given the same mantra, "I will not discuss anything

23    about my wife", we moved on, so we never got a chance to

24    fully explore those topics.

25             THE JUDGE:  Okay, thank you.  Anything
```



Page 368

1    further, Mr. Freedman?

2                 MR. FREEDMAN:  No, your Honour.

3                 THE JUDGE:  Thank you.  Let me rule.  As

4    to the first area, which is enquiring of Dr. Wright

5    under oath how much Bitcoin he mined in 2009/2010,

6    I will defer that.  I will not require him to answer

7    that question today because I believe if I determine

8    that as a proper subject matter area, that can be

9    responded to through a targeted interrogatory and if

10   I determine that it is relevant, I would require him to

11   respond to that interrogatory under oath as if he were

12   asked the question live.  Since that is simply a fairly

13   straightforward question of how much Bitcoin that should

14   not be too burdensome to respond to, but I will deal

15   with that in the context of any motion and I will grant

16   leave for the defence to file a motion relating to

17   providing a list of the Bitcoin, because again obviously

18   if I order him to provide the list you are going to get

19   a lot more detail than just the final number.  So, as to

20   that issue, I will not require him to answer those

21   questions today.

22                 As to the area of questioning about

23   whether he told Dave Kleiman how much he mined, I will

24   direct him to answer those questions.  I believe that

25   is not unduly burdensome.  I believe it is relevant to



Page 369

1    the plaintiff's theory that there was a partnership

2    here, and his answers are what they are.  If he told

3    Mr. Kleiman what he was doing he should answer that and

4    if he did not he can answer that.

5                    As to the issues relating to the ex-wife,

6    Lynne Wright, I will allow the defence to file a

7    briefing as to whether, as a matter of law, I am

8    precluded from compelling this testimony.  I will not

9    opine as to whether -- I would probably be inclined to

10   compel the testimony if the law allows me to do so, but

11   I cannot claim to be an expert on Australian law or the

12   interactions between US law and Australian law on this

13   issue.  Given that I have already said that Dr. Wright

14   can be deposed a second time, I will defer that issue

15   and allow the defence time to file any motion they want

16   to file on that.

17                    My ruling will be the same as to the

18   questions relating to any communications or testimony

19   relating to his current wife.  Again I will allow the

20   defence to flush out any privilege arguments they want

21   to make.  I will allow the plaintiffs to respond only to

22   any privilege arguments as to either the current or past

23   wife and I will rule on that at a later time.

24                    I think I have now dealt with the four

25   areas that were raised.



Page 370



17          THE JUDGE:  Okay.  Mr. Freedman?

18          MR. FREEDMAN:  Yes, your Honour, I think

19   Mr. Markoe laid it out, but just to give a little bit of

20   gloss on it, the identity of the first person was when

21   Dr. Wright first reached out to Louis Kleiman, which is

22   Dave and Ira's father.  He said to him: "Your son Dave

23   and I are two of the three key people behind Bitcoin."

24   We asked the identity of the third person and were told

25   we were not able to know that information for national



Page 372

 1    security reasons.

 2              The second is that in response to an

 3    interrogatory request that the court ordered Dr. Wright

 4    to respond to at the last hearing, Dr. Wright wrote:

 5    "There was an individual who helped me in the very early

 6    stages of my research, well before the release of the

 7    Bitcoin protocol.  As far as I know, that individual

 8    never met or interacted with Dave Kleiman."  And the

 9    defendant refused to identify that individual on

10    national security grounds.

11              THE JUDGE:  Okay.

12              MR. FREEDMAN:  The statement of claim

13    that Ms. Markoe was talking about is the Australian

14    statement -- a lawsuit where Dr. Wright sued W&K and

15    collected its consent judgment on its intellectual

16    property valued at tens of millions of dollars, and as

17    part of that statement of claim said that part of the IP

18    at issue was IP of software and code used by the US

19    Military, DHS and other associated parties.  It was

20    intellectual property that title was taken, as

21    I understand it, from W&K pursuant to these consent

22    judgments, and so it is directly relevant to the

23    intellectual property claims that plaintiff have brought

24    in this case.

25              Then finally, I do not have the e-mail in



Page 373

```
1    front of me, your Honour, but when Ira Kleiman was
2    conversing with Dr. Wright before the lawsuit was
3    initiated, Dr. Wright told him that there was a GICSR
4    trust that would be related to Dave's Bitcoin holdings
5    or intellectual property -- I do not have it in front of
6    me -- and when Dr. Wright was questioned about the trust
7    and who set it up, he refused to answer questions on
8    national security grounds.
9                 MS. MARKOE:  Just one point of clarity.
10   We believe that Mr. Freedman incorrectly stated that
11   title was taken.  It is not quite that simple, and it is
12   certainly not entirely accurate, but that is the only
13   clarification I have for the moment.
14                THE JUDGE:  Okay.  Any further argument,
15   Ms. Markoe?
16                MS. MARKOE:  No, we just request that
17   Dr. Wright be permitted to speak with you in camera in a
18   separate room, without counsel for plaintiffs present,
19   without plaintiff on the phone, and without the court
20   reporter and you can get more information about this and
21   then render your decision.
22                THE JUDGE:  Okay.  I will respectfully
23   decline to have an off-the-record conversation with
24   Dr. Wright.  These are all topics that if I determine
25   that the information needs to be turned over, it can
```


MAGNA
LEGAL SERVICES

Page 374

1    either be turned over in the nature of an interrogatory

2    response, or a continuation of this deposition by video

3    teleconference, or in the subsequent deposition of

4    Dr. Wright.  What I am going to do is I am going to not

5    rule on any of these national security arguments,

6    because I think there is one and only one person I need

7    to hear from as to whether there is a national security

8    interest here, and it is not Dr. Wright, it is the

9    United States Government.

10            So, I will defer ruling, I will give the

11   defence leave to file a motion with any sort of

12   supporting affidavits or whatever else you want to

13   supply me with that comes from a responsible party of

14   the US government who tells me that US national security

15   interests require that these questions not be answered.

16   That obviously is not going to happen today.

17            I think I have now ruled on all the

18   issues that were presented this afternoon.  I know you

19   all worked very hard to get this accomplished and get it

20   done and I appreciate everyone's efforts.  Counsel, when

21   you are back in the country or while you are there and

22   you have some time, talk about how much time you think

23   is appropriate for the filing of the motions that we

24   discussed today, and when you get back we can do a quick

25   phone call and I can enter an order with an operational



Page 375

1    schedule.

2                    Is there anything further I need to rule

3    on this afternoon?  Mr. Freedman?

4                    MR. FREEDMAN:  No, your Honour.

5                    THE JUDGE:  Ms. Markoe?  Mr. Rivero?

6                    MR. RIVERO:  No, your Honour, and thank

7    you so much for helping us with these issues.

8                    THE JUDGE:  No, like I said, thanks to

9    the parties.  I know this is a really heavy effort to

10   get this done but I really think it is going to help

11   move this case forward.  I will get off the phone.  You

12   can continue with whatever is left of the deposition.

13   Everyone have a safe trip home and we will be in touch

14   when you get back.  Thank you.

15                   MS. MARKOE:  Thank you, your Honour.

16                   MR. RIVERO:  Thank you.

17                   MR. FREEDMAN:  I think the only thing we

18   are entitled to ask about now is whether Dr. Wright

19   communicated -- okay.

20                   MS. MARKOE:  How much Bitcoin he mined,

21   yes.

22                   MR. RIVERO:  One subject.

23                   MR. FREEDMAN:  One subject, yes.

24                   MR. RIVERO:  Dave Kleiman did.  So let us

25   do this.  Because they have been running -- I think it



Page 376

```
 1    was 30 left at that time.  Why do we not just run -- it

 2    is going to be -- as a matter of fact just ask your

 3    question and it is 30 minutes.

 4                 MR. FREEDMAN:  I have 30 minutes?  I am

 5    going to use 30 minutes.

 6                 MR. RIVERO:  No, no, I am not going to

 7    count ----

 8                 MS. MARKOE:  Let us just move on so that

 9    we can get everyone out of here.

10                 MR. RIVERO:  Just do it and we will say

11    it is 30 minutes.

12                 MS. MARKOE:  Let us just get it done.

13    BY MR. FREEDMAN:

14         Q.    Dr. Wright, did you ever tell Dave

15    Kleiman how much Bitcoin you mined?

16         A.    No.

17                 MR. RIVERO:  30 minutes left.

18                 MR. FREEDMAN:  30 minutes, okay.

19                 MS. MARKOE:  29:46.

20    BY MR. FREEDMAN:

21         Q.    Dr. Wright, do you have a trust that is

22    based in Singapore?

23         A.    No.

24         Q.    Have you ever had a trust that is based

25    in Singapore?
```



Page 377

```
 1          A.      No, I have never had a Singapore trust.

 2          Q.      Do you have a trust based in the

 3   Seychelles?

 4          A.      Yes.

 5          Q.      How many?

 6          A.      I do not know.

 7          Q.      Dr. Wright, do you remember telling Ira

 8   Kleiman that you have back-up files of Dave's drives?

 9          A.      No, I told Ira Kleiman that he needed to

10   keep back-up files of Dave's drives.

11              MR. RIVERO:  Just a point of order,

12   I have got 29 minutes, but are you going to reserve some

13   time against a ruling by the court?

14              MR. FREEDMAN:  I do not think that would

15   -- no.

16              MR. RIVERO:  So your position is you get

17   this time plus more time?

18              MR. FREEDMAN:  I think if the court rules

19   we get more time, yes.

20              MR. RIVERO:  I do not agree.

21              MR. FREEDMAN:  Okay.  Understood.  Noted.

22              MR. RIVERO:  We object and we think you

23   should reserve time in case you win something.

24   BY MR. FREEDMAN:

25          Q.      Dr. Wright, do you have a Twitter
```



MAGNA ▶
LEGAL SERVICES

Page 378

```
 1   account?

 2          A.      Not any more, no.

 3          Q.      Did you have a Twitter account?

 4          A.      Yes.

 5          Q.      What was it called?

 6                  MS. MARKOE:  Objection.  You may answer.

 7                  THE WITNESS:  I have had multiple Twitter

 8   accounts.

 9   BY MR. FREEDMAN:

10          Q.      What was the last Twitter account you

11   had?

12          A.      Dr. Craig S Wright.

13          Q.      What happened to Dr. Craig S Wright

14   Twitter account?

15          A.      I got suspended after I threatened Jack

16   with DMCA violations.

17          Q.      Who is Jack?

18          A.      One of the founders of Twitter.

19          Q.      What was the name of that handle?  Was it

20   at ----

21          A.      At probably Dr. Craig S Wright.  I do not

22   remember exactly.  I do not type the things in.

23          Q.      Does that "@ProfFaustus" mean anything?

24          A.      It was before that, yes.

25          Q.      Before Dr. Craig S Wright you had
```



Page 379

1    @ProfFaustus?

2           A.     Professor Faustus, yes.

3           Q.     And what happened to Professor Faustus?

4           A.     I started complaining about the fact that

5    I had bots on the account.

6           Q.     Okay.  And?

7           A.     And Twitter will not take them down and

8    I started complaining and now I have suspended accounts.

9           Q.     So Twitter suspended your @ProfFaustus

10   account?

11          A.     The account went up, down, and all over

12   the place, so I do not know what is happening with it,

13   and I do not particularly want an account full of bots

14   back.

15          Q.     Did you take down the account?

16                 MS. MARKOE:  Objection.  You may answer.

17                 THE WITNESS:  I threatened Twitter with a

18   lawsuit.

19   BY MR. FREEDMAN:

20          Q.     And Twitter suspended your account?

21          A.     I do not know what has happened with that

22   account.  I cannot access it.

23          Q.     Did you save copies of your direct

24   messages in that account?

25          A.     No.



Page 380

1                MS. MARKOE:  Objection.

2    BY MR. FREEDMAN:

3         Q.     Did you give your lawyers copies of the

4    direct messages in that account?

5         A.     No.

6                MS. MARKOE:  Objection.

7    BY MR. FREEDMAN:

8         Q.     Did you save messages in the Dr. Craig S

9    Wright account?

10        A.     It was up for a day.  There was no direct

11   messages that I know of.

12        Q.     When did the @ProfFaustus account start?

13        A.     It was originally started, I think, in

14   2011, but no posts were done until 2016.

15        Q.     Did you have a Twitter account when Dave

16   Kleiman was alive before 2013?

17        A.     Yes.

18        Q.     What was it called?

19        A.     Dr. Craig S Wright, I believe.

20        Q.     Do you still have access to that account?

21        A.     No.  That account was cancelled in

22   December 2015 when I was exposed to the media.

23        Q.     Dr. Wright, do you an individual called

24   Marco Bianchi?

25        A.     Marco is a familiar name.



Page 381

1                    MS. MARKOE:  That is my name!

2    BY MR. FREEDMAN:

3            Q.    Was there a Marco Bianchi who helped you

4     set up trusts?

5            A.    What trusts, sorry?

6            Q.    Are you familiar with a Marco Bianchi

7     helping you set up any trusts?

8            A.    No.

9            Q.    Dr. Wright, do you have a supercomputer

10    called C01N?

11           A.    No.

12           Q.    Do you have any supercomputer?

13           A.    No.

14           Q.    Have you ever had a supercomputer?

15                 MS. MARKOE:  Objection.

16                 THE WITNESS:  Yes.

17    BY MR. FREEDMAN:

18           Q.    When did you have a supercomputer?

19           A.    Back in 2013.  Sorry, end of 2012, but it

20     was not working.  2013, 2014, 2015.

21           Q.    What was it called?

22           A.    Tulip and C01N.  There were two.

23           Q.    So, you did have a supercomputer called

24     C01N?

25           A.    That is what I just said.



Page 382

1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  You before that said "do

3     I have".  "Did I have" and "do I have" are different.

4     BY MR. FREEDMAN:

5          Q.    When did you get rid of these

6     supercomputers?

7                    MS. MARKOE:  Objection.

8                    THE WITNESS:  I did not.

9     BY MR. FREEDMAN:

10         Q.    You still have them?

11         A.    I do not have them.

12         Q.    Who has them?

13         A.    I do not know.

14         Q.    What happened to them at the end of 2015?

15                   MS. MARKOE:  Objection.

16                   THE WITNESS:  I do not know.

17    BY MR. FREEDMAN:

18         Q.    Did you ever discuss your supercomputers

19    with Dave?

20         A.    Dave basically died before I had

21    everything built and operating, so I discussed creating

22    them, but it is hard to discuss something, I do not

23    believe in seances, with dead people.

24         Q.    Dr. Wright, in 2016 you came forward and

25    claimed to be Satoshi Nakamoto; is that correct?



Page 383

1                    MS. MARKOE:  Objection.

2                    THE WITNESS:  I did not come forward.

3    BY MR. FREEDMAN:

4         Q.    You gave an interview to the BBC where

5    you said you were Satoshi Nakamoto; is that correct?

6                    MS. MARKOE:  Objection.  Can you tie this

7    to one our topics, please.

8                    MR. FREEDMAN:  Yes, request for

9    production 88 goes into the relationship with

10   Robert MacGregor and the court said we should ask about

11   the deferred ruling in advance of the deposition.

12                   MR. RIVERO:  Hearing transcript

13   citements?

14                   MR. FREEDMAN:  I do not have time.  Look

15   for it if you can find it.  86, 16-19.

16                   MR. RIVERO:  Which date?

17                   MS. MARKOE:  It is this one.

18                   MR. FREEDMAN:  Last one.  In the meantime

19   we will keep moving.

20        Q.    As a consequence of coming out, you

21   provided cryptographic proof that you were in fact

22   Satoshi Nakamoto?

23                   MS. MARKOE:  Objection: goes beyond the

24   scope.

25                   THE WITNESS:  I did not come out.



Page 384

1    BY MR. FREEDMAN:

2          Q.    And people have tried to debunk your

3    claim of being Satoshi Nakamoto?

4                MS. MARKOE:  Objection: goes beyond the

5    scope.

6                MR. FREEDMAN:  Are you instructing him

7    not to answer?

8                MS. MARKOE:  Can we just get out of here.

9    Will it make it move faster if he can answer?

10               MR. FREEDMAN:  Yes, it is going to go

11   pretty quick.

12               MS. MARKOE:  This is beyond the scope.

13   It is public information.  This is a colossal waste of

14   our time.

15               MR. FREEDMAN: I do not agree.

16               MS. MARKOE:  But if you would like you

17   may answer.

18               THE WITNESS:  There is public information

19   to say that.

20   BY MR. FREEDMAN:

21         Q.    And they have called you Faketoshi

22   because of that?

23               MS. MARKOE:  Objection.  First of all,

24   I am going to instruct him not to answer.  You are

25   harassing him now.  It is offensive.  It is very late.



Page 385

1  You have limited topics.  This does not go to any of

2  these topics.

3           MR. RIVERO:  Can I say another thing, Ms.

4  Markoe.  Especially giving that you are not reserving

5  time against disputes, this kind of harassment is not

6  appropriate.  We are going to argue very forcefully that

7  you wasted time you could have reserved for things the

8  court may rule on.

9           MR. FREEDMAN:  We will reserve the rest

10  of our time, then.  Thank you.

11           MS. MARKOE:  Okay.  Great.  Thank you.

12           MR. FREEDMAN:  How much time is left?

13  Let us note it on the record.

14           MS. MARKOE:  22 minutes, 19 seconds.

15           MR. ROCHE:  That is what I have.

16           MR. FREEDMAN:  Great.

17           THE VIDEOGRAPHER:  Are we off the record?

18           MR. RIVERO:  We are off the record.

19           MS. MARKOE:  Off the record.

20           THE VIDEOGRAPHER:  Going off the record.

21  The time is 20.42.  End of the hearing card number 7,

22  volume 1.  This is the end of volume 1 video deposition

23  of Dr. Craig Wright.

24                ----------

25



Page 386

```
1              CERTIFICATE OF WITNESS

2

3         I, Craig Steven Wright, am the deponent in

4    the foregoing deposition.  I have read the

5    foregoing deposition and, having made such changes

6    and corrections as I desired, I certify that the

7    transcript is a true and accurate record of my

8    responses to the questions put to me on 4th April,

9    2019.

10

11

12

13

14

15

16

17

18

19   Signed .........................

20          Craig S. Wright

21

22

23

24   Dated this ....... day of ............. 2019

25
```



Page 387

1                    CERTIFICATE OF COURT REPORTER

2

3          I, Paula Foley, Accredited Court Reporter,

4    do hereby certify that I took the Stenograph Notes

5    of the foregoing, and that the transcript thereof

6    is a true and accurate record transcribed to the

7    best of my skill and ability.

8

9          I further certify that I am neither

10   counsel for, related to, nor employed by any of

11   the parties to the action in which the deposition

12   was taken and that I am not a relative or employee

13   of any attorney or counsel employed by the parties

14   hereto, nor financially or otherwise interested in

15   the outcome of the action.

16

17

22

23   Signed ................................

24          Paula Foley

25



Page 388

1                    E R R A T A

2

3           (Please make any corrections here,

4                 not in the transcript)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

