1      Q.    That's her legal name?

2      A.    I suppose so.  Sasithorn.

3      Q.    Sasithorn is her legal name?

4      A.    Yes.

5      Q.    What is your wife's occupation?

6      A.    She doesn't work.

7      Q.    You have two other siblings; right?

8      A.    Yes, I had two siblings, yes.

9      Q.    Was that Dave and Leonard Kleiman?

10     A.    Yes.

11     Q.    How did Leonard pass away?

12     ████████████████████████████████

13     Q.    Did you speak with him often?

14     A.    Not too often, no.

15     Q.    Do you know why Dave excluded Leonard from his

16  will?

17     A.    They were --

18         MR. FREEDMAN:  Hold on, you're outside the

19     scope of your deposition unless you can tell me

20     what topic you're tied to then I'm happy to let you

21     proceed.  Otherwise I think you're outside the

22     scope.

23         MR. PASCHAL:  You're going to instruct him not

24     to answer?

25         MR. FREEDMAN:  Unless you tell me what topic,

```
 1        yes.
 2              MR. PASCHAL:  I think this ties into location
 3        of evidence of the case.  I think that was a
 4        general order from the Court.
 5              MR. FREEDMAN:  How does the reason Dave
 6        Kleiman did or did not exclude one of his brothers
 7        tie into the --
 8              MR. PASCHAL:  This is my deposition.  I'm
 9        asking him.
10              MR. FREEDMAN:  Don't answer the question.
11   BY MR. PASCHAL:
12        Q.    Have you ever been sued?
13        A.    No.
14        Q.    Have you ever sued someone or an entity
15   excluding this lawsuit?
16        A.    Yes.
17        Q.    What lawsuit was that?
18        A.    A case against Computer Forensics, LLC.
19        Q.    What is currently happening in that case?
20        A.    It's still ongoing.
21        Q.    There's another lawsuit here it might not be
22   you it says Steve Kleiman vs. Metropolitan Health
23   Networks?
24        A.    Not me.
25        Q.    Sometimes you go by your middle name Steven?
```

1       A.    Yes.

2       Q.    Is there a reason you --

3       A.    Certain amount of years I went by Steve and

4  earlier people that know me from a younger age always

5  call me Ira.

6       Q.    So it's interchangeable?

7       A.    Yes.

8       Q.    Have you ever been charged or accused of a

9  crime?

10      A.    No.

11      Q.    What schools have you attended?

12      A.    Palm Beach Gardens High School and Palm Beach

13  Community College.

14      Q.    Was the community college, that was the last

15  school attended?

16      A.    Yes.

17      Q.    What degrees and certifications do you have?

18      A.    I just have a high school diploma.

19      Q.    So you didn't graduate from the community

20  college?

21      A.    No.

22      Q.    Did you get any certifications from the

23  community college?

24      A.    No.

25      Q.    Do you have any professional licenses?

1    A.    No.

2    Q.    What is your current profession?

3    A.    Self employed, web site designer, affiliate

4    marketing.

5    Q.    What type of web sites do you design?

6    A.    Basically I just design my own type of web

7    sites that are related to affiliate marketing.

8    Q.    What's affiliate marketing?

9    A.    Like take Amazon as an example.  Put up a web

10   site and you advertise other people's products and if

11   someone clicks through you would -- you receive a

12   commission when someone purchases.

13   Q.    So do you typically do work for companies or

14   individuals?

15   A.    Just myself.

16   Q.    I guess the way that you get -- how do you

17   charge people, it's by the clicking?

18   A.    I receive commission.  That's it.

19   Q.    Do you work from home or an office?

20   A.    From home.

21   Q.    Is that your primary source of income?

22   A.    And trading stocks.

23   Q.    How much money more or less do you make from

24   trading stocks?

25   MR. FREEDMAN:  Wait, stop.  You're outside the

```
 1        scope of your deposition.  Instruct him not to
 2        answer unless you tie it to a topic.
 3             MR. PASCHAL:  These are background questions
 4        trying to find out.
 5             MR. FREEDMAN:  Don't answer the question.
 6             MR. PASCHAL:  I can't find out about his
 7        professional --
 8             MR. FREEDMAN:  Not unless you tie it to topic
 9        you disclosed.  Tie it to a topic and I'll give it
10        to you.
11             MR. PASCHAL:  Are you instructing him not to
12        answer?
13             MR. FREEDMAN:  Yes, unless you tie it to a
14        topic.
15   BY MR. PASCHAL:
16        Q.   How much -- what was your income for your
17   affiliate marketing?
18             MR. FREEDMAN:  Same instruction.
19             MR. PASCHAL:  Not to answer?
20             MR. FREEDMAN:  Don't answer unless you tie it
21        to a topic.
22   BY MR. PASCHAL:
23        Q.   From 2012 to today relatively what was your
24   income?
25             MR. FREEDMAN:  Again don't answer unless he
```

1    ties it to a topic.

2    BY MR. PASCHAL:

3        Q.    **What was your previous occupations?**

4        A.    The last time I worked for somebody I think it

5    was for a company called Active Frame.  I was also doing

6    web design for them.  Prior to that just like part-time

7    jobs, florist delivery, stock person at pharmacy.  For

8    the most part I've pretty much always worked for myself.

9        MR. FREEDMAN:  Just one housekeeping matter.

10       I forgot to do this before we started we're going

11       the mark the whole deposition transcript

12       confidential and then we'll go through it obviously

13       with the timeframe.  For now everything is

14       confidential.

15       MS. MCGOVERN:  We disagree with that position.

16       MR. FREEDMAN:  The same for Dr. Wright just so

17    you know.

18       MS. MCGOVERN:  I think it was a different

19    situation.

20       MR. FREEDMAN:  Is it your position that you'll

21    disclose things from the deposition immediately?

22       MS. MCGOVERN:  Not taking any position with

23    respect to Dr. Wright's deposition.

24       MR. FREEDMAN:  I need to know if you intend to

25    disclose things from the deposition immediately or

```
 1        if you're going to give me time to dictate a

 2        report?

 3             MS. MCGOVERN:  Absolutely, no.  Would never do

 4        that.  Not going to disclose anything.  I don't

 5        think a blanket confidential stamp over the

 6        plaintiff's deposition is appropriate in this case.

 7        Just stating that for the record.

 8             MR. FREEDMAN:  Okay.  Just so it's clear --

 9        the record is clear I'm saying it's temporary.

10        We're just saying don't disclose anything, we'll go

11        through it and then we'll --

12             MR. PASCHAL:  That's fine.  I want to go back

13        to the questions you told him not to answer.  We

14        did ask for his technical experience and how much

15        money he was making off this technical experience.

16             MR. FREEDMAN:  Disagree with that.  Take that

17        up with the judge.

18             MR. PASCHAL:  So you did not object in your

19        e-mail but you're going to tell him not to --

20        instruct him?

21             MR. FREEDMAN:  Don't agree this goes to the

22        technical experience.  The amount of money they

23        make doesn't go to technical experience.

24   BY MR. PASCHAL:

25        Q.   Have you ever been fired from a job?
```

```
 1        A.    No.

 2        Q.    Have you ever been asked to resign from a job?

 3        A.    No.

 4        Q.    I want to ask you about a few companies you've

 5   been involved with.  What was the business purpose of

 6   The Gigabyte Connection?

 7        A.    I set that company up a long time ago.  I

 8   don't even remember what I was doing with that.  I'm not

 9   even sure I actually used it or not.

10        Q.    How long ago did you set it up?

11        A.    I think it was in the '90s.

12        Q.    Do you know how long it lasted?

13        A.    No, I don't remember.

14        Q.    Did you set it up with any business partners?

15        A.    No, it was my own company.  Probably going to

16   do some kind of computer related type of business with

17   it.

18        Q.    So Future World Shopper, Inc.  What was the

19   business purpose of that company?

20        A.    I intended on setting up like an online

21   portal.  I guess at the time I think they only had like

22   BBSs.  I don't think the internet existed and I was

23   thinking of creating a portal where people could log

24   into it and purchase products.  I guess similar to what

25   people do with Amazon today.  It never got off the
```

1      Q.    So there's a Facebook message where you

2   responded to her?

3      A.    Yes, I think so.  No, I just e-mailed her.

4   She left a Facebook posting and then I e-mailed her.

5      Q.    When did you e-mail her?

6      A.    I think it could have been like a year, year

7   and a half ago.

8      Q.    What did the Facebook posting say, do you

9   remember?

10      A.    No.

11      Q.    What did you discuss with Angela?

12      A.    We talked about David a little bit.

13      Q.    What did you talk to her about, talking about

14   David?

15      A.    At first just general things I think.

16      Q.    We'll get into that a little later.  When did

17   you learn that Dave was appointed as the representative

18   of -- or that Dave appointed you as the representative

19   of his estate, sorry?

20      A.    After he passed away.

21      Q.    So Dave never discussed that with you before

22   he passed away?

23      A.    No.

24      Q.    Were you surprised to learn --

25          MR. FREEDMAN:  Objection, don't answer the

```
 1    question.

 2        MR. PASCHAL:  What's the reason for

 3    instructing him?

 4        MR. FREEDMAN:  Don't see how it has anything

 5    to do with your topics.

 6        MR. PASCHAL:  Just asking --

 7        MR. FREEDMAN:  His state of mind when he found

 8    out whether or not Dave Kleiman appointed him as

 9    the personal representative.  Where is that any of

10    your topics?

11        MR. PASCHAL:  I am going to say for the record

12    that these topics are helpful but the judge mandate

13    was really that hey, I want to have a depo so you

14    can figure out what discovery is and a number of

15    times you shut down inquiries because you just

16    don't think that these match the topic which isn't

17    helpful for us to.  It will force us to have to go

18    to the Court unnecessarily and bring Ira back here

19    for another deposition to do that.  Purpose to find

20    out where documents are and find out where evidence

21    is.  I just don't think it's helpful for the record

22    for you to instruct him not to answer background

23    questions, very basic questions.

24        MR. FREEDMAN:  Just so the record is complete

25    the parties set the tone that we had to stay
```

```
 1        strictly by the disclosed topics at Dr. Wright's

 2        deposition where we were held strictly to the

 3        topics --

 4             MR. PASCHAL:  And I don't believe you did

 5        so --

 6             MR. FREEDMAN:  If it's the defendant's

 7        position that refusing to answer background

 8        questions should necessitate a second deposition we

 9        might just able to agree to reach a second

10        deposition.  Do you want to agree to a second

11        deposition?

12             MR. PASCHAL:  I'm just moving on with you.

13        Just --

14             MR. FREEDMAN:  Okay.

15             MR. PASCHAL:  I want to ask you about what

16        you're alleging in the complaint so we know what

17        documents we're looking for.  I'm going to give you

18        a copy of the complaint.

19             (Defendant's Exhibit No. 2 was

20             marked for identification.)

21   BY MR. PASCHAL:

22        Q.  Can you turn to page 37.  Under Count I you

23   have a claim for conversion.  Do you see that?

24        A.  Yes.

25        Q.  If you go down to paragraph 171 you allege
```

1    Q.    But you reinstated it; correct?

2    A.    Yes.

3    Q.    When you reinstated W&K what was its business

4    purpose?

5          MR. FREEDMAN:  Hold on.  Where are you in your

6          topics?

7          MR. PASCHAL:  W&K, information regarding W&K.

8          MR. FREEDMAN:  I don't see a general

9          information regarding W&K.  Maybe I'm missing it.

10          MR. PASCHAL:  I guess this is going to go to

11          the location of W&K's proprietary documents and

12          information slips identified W&K purchases, bit

13          message account, Panama and also W&K's membership.

14          MR. FREEDMAN:  What was the question?  Can you

15          read it back?

16          (Thereupon, a portion of the record

17          was read back by the reporter.)

18          MR. FREEDMAN:  Don't answer the question.

19    BY MR. PASCHAL:

20    Q.    Can you tell me what W&K's business purpose

21    ever was?

22          THE WITNESS:  According to Craig it was for

23          research purposes and mining of Bitcoin.

24    BY MR. PASCHAL:

25    Q.    Based on your personal knowledge what was the

```
 1    business purpose of W&K?

 2         A.    Like I said according to Craig --

 3         Q.    Not according to Craig.  Based on your own

 4    personal knowledge?

 5         A.    My own personal knowledge about W&K came from

 6    Craig Wright.

 7         Q.    So you have no testimony, documents or

 8    evidence other than Craig Wright?

 9         A.    Correct.

10         Q.    About W&K?

11         A.    What's that?

12         Q.    About W&K?

13         A.    Yes.

14         Q.    When you reinstated W&K you removed Coin

15    Exchange and Ms. Uyen as its publicly identified

16    members, do you recall that?

17              MR. FREEDMAN:  Can you repeat the question?

18         Sorry, I didn't hear.

19              (Thereupon, a portion of the record

20              was read back by the reporter.)

21              MR. FREEDMAN:  Don't answer the question.  I

22         don't see where it connects to your topics about

23         W&K's e-mail addresses, bit message accounts or W&K

24         Panama.

25              MR. PASCHAL:  I'm asking about proprietary
```

1       documents about W&K.  That includes W&K's

2       membership and its filings with Sunbiz.org.  That

3       is the definition of proprietary documents.

4           MR. FREEDMAN:  And the location.

5           MR. PASCHAL:  Also very basic allegation in

6       the second amended complaint.

7           MR. FREEDMAN:  You'll have another chance to

8       depose Ira when you can go to the merits.  Right

9       now you're supposed to be asking location

10      proprietary documents.

11  BY MR. PASCHAL:

12      Q.   Do you have documents establishing W&K's

13  membership?

14      A.   From like SunBiz?

15      Q.   Do you have any documents establishing W&K's

16  membership?

17      A.   The only documents would be whatever I found

18  on the SunBiz web site.

19      Q.   Does SunBiz.org list every member of a

20  company?

21      A.   I don't know.

22           (Thereupon, a portion of the record

23           was read back by the reporter.)

24           THE WITNESS:  No, I don't know.

25

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 130

1        Q.    Did you take out any loans on W&K's behalf?

2        A.    Not that I'm aware of.

3        Q.    Are you paying -- are there any tax returns

4   right now for W&K or any tax information for W&K?

5        A.    No.

6        Q.    Are you paying W&K's taxes?

7        A.    No.

8        Q.    Do you know who last paid W&K's taxes?

9        A.    No.

10       Q.    Does W&K have any revenue for this year?

11       A.    Not that I'm aware of.

12       Q.    Does W&K have any revenue from last year?

13       A.    Not that I'm aware of.

14       Q.    Are you conducting any business on behalf of

15   W&K?

16       A.    Me personally?

17       Q.    Yes.

18       A.    No.

19       Q.    Is anyone conducting business on behalf of

20   W&K?

21       A.    No.

22       Q.    Has W&K assigned any of its rights in this

23   lawsuit to anyone else?

24            MR. FREEDMAN:   Hold on.   What topic are you

25       on?

```
 1   BY MR. PASCHAL:

 2       Q.    Are there any documents showing whether or not

 3   W&K assigned any of its interest in its lawsuit to

 4   anyone else?

 5            MR. FREEDMAN:  Don't answer the question.

 6            MR. PASCHAL:  Under what basis?

 7            MR. FREEDMAN:  If such documents exist they

 8       would be work product.

 9            MR. PASCHAL:  An assignment of a claim?  That

10       would be work product?

11            MR. FREEDMAN:  You don't like the instruction

12       bring it to the judge.

13            MR. PASCHAL:  I'm just trying to get it.  I

14       just want the record to be complete on the

15       objection.  So you're saying that an assignment of

16       claim is going to be protected by work product?

17            MR. FREEDMAN:  Either work product or

18       attorney-client privilege or the common interest

19       privilege, yes.

20   BY MR. PASCHAL:

21       Q.    We'll skip this.  Have the allegations that

22   you made in this lawsuit or this second amended

23   complaint or the amended complaint or its original

24   complaint been given to any third party other than your

25   attorneys?
```

```
 1              MR. FREEDMAN:  Objection.

 2              THE WITNESS:  I believe so.

 3   BY MR. PASCHAL:

 4       Q.   Who are those third parties?

 5       A.   A company that assists in funding litigation

 6   cases.

 7       Q.   What's the name of that company?

 8       A.   Parabelum.

 9       Q.   Can you say that again?

10       A.   Parabelum.

11       Q.   When did you give that complaint to Parabelum?

12       A.   I don't remember the date.

13       Q.   When did you first meet Parabelum?

14       A.   I don't remember the date.

15       Q.   Was it 2016?

16       A.   I would have to go look at the records.

17       Q.   Did Parabelum give you any money?

18              MR. FREEDMAN:  Hold on.  What topic are you

19       on?

20              MR. PASCHAL:  This goes to -- this really goes

21       to 31 but he just answered something different so

22       I'm --

23              MR. FREEDMAN:  How does it go into 31?  I

24       don't see how it ties into 31.  If you want to ask

25       it with a tie in to 31 I'm happy to listen to it,
```

```
 1          A.   I would have to check.  I don't remember.

 2          Q.   Would it sound about right if you purchased

 3     that home -- the finalized closing was in March of 2014?

 4               MR. FREEDMAN:  Objection.

 5               THE WITNESS:  I would have to check.  I know

 6          it was 2014.

 7     BY MR. PASCHAL:

 8          Q.   Then Craig first reached out to you in about

 9     February 2014?

10          A.   Right.

11          Q.   Telling you about Bitcoin?

12          A.   Yes.

13          Q.   You paid $450,000 cash for that house?

14               MR. FREEDMAN:  Objection, don't answer.

15     BY MR. PASCHAL:

16          Q.   Did the purchase of that house have anything

17     to do with the administration of the estate or Bitcoin?

18          A.   No.

19          Q.   Do you have documents reflecting that?

20               MR. FREEDMAN:  Objection.  You can answer.

21               THE WITNESS:  Showing that it didn't have

22          anything to do with --

23     BY MR. PASCHAL:

24          Q.   Yes.  That the source of funds for that house

25     did not come from Dave's possession, Bitcoin?
```

 1          A.    I probably do.

 2          Q.    **What documents would that be?**

 3          A.    I guess a check written by myself for the

 4     house.

 5          Q.    **What about the underlying funds for that**

 6     **check?**

 7              MR. FREEDMAN:  Objection.  I don't understand

 8          your question and it's touching on this area I've

 9          been instructing him not to answer so could you try

10          to clarify what you mean?

11     BY MR. PASCHAL:

12          Q.    **Were there any documents to show that the**

13     **underlying funds to write a $450,000 check for that**

14     **house are there any documents showing it didn't come**

15     **from Dave's estate, from Bitcoin, from Dave's**

16     **possession?**

17              MR. FREEDMAN:  So I don't want to instruct him

18          not to answer if I can avoid it.  The problem is

19          you're asking him about proving a negative.  Are

20          you asking whether -- obviously you don't have to

21          adopt my formulation just to see if I can get you

22          the information you want.  Are you asking whether

23          there's documents that identify where the funds

24          actually came from?

25              MR. PASCHAL:  I've asked that you've told him

```
 1        not to answer so I'm asking a different one.
 2              MR. FREEDMAN:  If you ask if there are
 3        documents that exist to show where the funds came
 4        from I'll allow him to answer.
 5              MR. PASCHAL:  Can you repeat my question,
 6        Mr. Court reporter, and then you can answer?
 7              (Thereupon, a portion of the record
 8              was read back by the reporter.)
 9              MR. FREEDMAN:  Don't answer.
10   BY MR. PASCHAL:
11        Q.   Are there any documents showing the source of
12   the funds to purchase the house came from?
13        A.   I imagine yes, there should be.
14        Q.   What documents would those be?
15              MR. FREEDMAN:  You can describe the types of
16        documents.  Don't go beyond that.
17              THE WITNESS:  Checks.
18   BY MR. PASCHAL:
19        Q.   That's it?
20        A.   Yes.  Personal checks.
21        Q.   Did the purchase of the house have anything to
22   do with the financing of this lawsuit?
23        A.   No.
24              MR. PASCHAL:  I think we're almost done so can
25        we take a break?
```