Applicants
Velvel (Devin) Freedman
First VDF1
11 November 2019

**IN THE HIGH COURT OF JUSTICE**  <span style="float:right">Claim No.: [●]</span>
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**BETWEEN:**

*IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC*   **Applicants**

-and-

*RAMONA WATTS*   **Respondent**

---

**FIRST WITNESS STATEMENT OF VELVEL (DEVIN) FREEDMAN**

---

**I, Velvel (Devin) Freedman,** of Roche Freedman LLP, 200 South Biscayne Boulevard, Suite 5500, Miami, Florida 33131, United States of America **WILL SAY** as follows:

1. **INTRODUCTION**

1.1   I am a Partner of Roche Freedman LLP, which acts for Ira Kleiman, as the personal representative of the Estate of David Kleiman, and for W&K Info Defense Research, LLC (the "**Applicants**"), who are the plaintiffs in litigation in the United States District Court Southern District of Florida (the "**SDF Court**") against Dr Craig Wright (the "**Defendant**") as defendant (Case No.: 9:18-cv-80176-BB) (the "**SDF Proceedings**").

1.2   In the SDF Proceedings, the Applicants allege that the Defendant has unlawfully withheld Bitcoins and intellectual property assets rightfully belonging to the Applicants. I am the attorney with knowledge of the conduct of the SDF Proceedings on behalf of the Applicants and am duly authorised to make this witness statement on their behalf.

1.3   Save where otherwise stated, the facts and matters contained in this witness statement are based upon information provided to me by the Applicants and are true to the best of my knowledge and belief. Nothing in this witness statement is intended to constitute any waiver of privilege.

1.4   There is now shown to me marked "**VDF1**" a bundle of copy documents to which I refer in this statement by page numbers in square brackets.

2. **APPLICATION**

2.1 This Application (the "**Application**") is made pursuant to s.1 of the Evidence (Proceedings in Other Jurisdictions) Act 1975 (the "**1975 Act**") and Part 34 of the Civil Procedure Rules (the "**CPR**") in pursuance of a request issued by the SDF Court by way of a sealed Letter of Request dated 22 July 2019 (the "**Letter of Request**") [**VDF1/1-16**], for an order that Ms. Ramona Watts:

   (a) Be examined by way of deposition in a manner consistent with the US Federal Rules of Civil Procedure before an examiner of the Court to be appointed pursuant to CPR 34.18(1)(b), at the offices of Boies Schiller Flexner (UK) LLP, 5 New Street Square, London EC4A 3BF (the "**Watts Deposition**"); and

   (b) Produce certain categories of documents (described more fully at paragraphs 4.4 to 4.8 below, pursuant to s. 2(2)(b) of the 1975 Act (the "**Watts Documents**") (together, the "**Watts Evidence**").

2.2 I believe that the Hon. Bruce E. Reinhart, United States Magistrate Judge has fully considered the matters in dispute and the requests as set out in the Letter of Request and considers the evidence sought to be relevant to the proceedings. As Judge Reinhart noted in the first page of the Letter of Request: "*The Court has presided over this matter since February 2018 and has carefully reviewed the categories of evidence listed below and considers the evidence sought is directly relevant to the issues in dispute and is not discovery within the meaning of Article 23 of the Hague Evidence Convention, that is, discovery 'for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries.'*" [**VDF1/1**]

2.3 In this Witness Statement, I set out the following:

   (a) A short background to the SDF Proceedings for which the Watts Evidence is required to be taken (paragraphs 3.1 to 3.4);

   (b) The expected contents and nature of the Watts Evidence and how it will be relevant for trial in the SDF Proceedings (paragraphs 4.1 to 4.13);

   (c) Why an order to take the Watts Evidence would be proportionate in respect of the Court's overriding objective (paragraphs 5.1);

   (d) Why the relevant US rules on spousal privilege are not applicable (paragraphs 6.1 to 6.10); and

   (e) An explanation of the relevant US federal rules relating to evidence in federal civil actions, and why the Watts Deposition would be permitted as evidence at trial under those rules (paragraphs 7.1 to 7.16).

3. **BACKGROUND TO THE SDF PROCEEDINGS**

3.1 By a Complaint in the SDF Proceedings dated 14 February 2018 (the "**Complaint**" [**VDF1/17-54**], and by an amended Complaint dated 14 May 2018 (the "**Amended Complaint**") [**VDF1/55-107**], and a second amended Complaint dated 14 January 2019 (the "**Second Amended Complaint**") [**VDF1/108-156**], the Applicants commenced an action for damages and other equitable relief in the SDF Court against Dr Wright.

3.2 The Applicants allege that Dr Wright has unlawfully taken bitcoins and intellectual property assets rightfully belonging to the Applicants, and claim that his actions amount to conversion, unjust enrichment, breach of fiduciary duty, breach of partnership duties of loyalty and care, and fraud. As at the date of filing the Second Amended Complaint, the value of these assets exceeded $11.4 billion; at their highest potential value, they could be worth more than $27 billion (before punitive or treble damages, which may be available in the SDF Court).

3.3 The full details of the claims set forth in the SDF Proceedings are set out in the Second Amended Complaint. In brief:

(a) The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent a protocol to a mailing list of cryptography enthusiasts. The Defendant has alleged that he is Satoshi Nakamoto [**VDF1/140-141**].

(b) Mr David Kleiman and the Defendant were friends and business partners. Together, they developed the Bitcoin technology, and between 2009 and 2013 mined a large amount of Bitcoin for their joint benefit [**VDF1/111, 120, 121-127, 256-265**].

(c) Mr David Kleiman died on 26 April 2013 [**VDF1/111**]. At that point, the Bitcoin mined by the Defendant and Mr Kleiman was not worth as much as it is today.

(d) The Defendant then took possession and control of the Bitcoins and bitcoin-related intellectual property which rightfully belonged to the Applicants. [**VDF1/111**] He did so through various means, including by forging a series of contracts that purported to transfer all the bitcoins and intellectual property assets to the Defendant and/or companies controlled by him. [**VDF1/111, 131**]

(e) In May 2014, the Defendant disclosed to Mr Ira Kleiman that he had partnered with Mr David Kleiman to create Bitcoin, to mine Bitcoin, and to create valuable intellectual property, but claimed that Mr David Kleiman had signed all these property rights away in exchange for a non-controlling share of a non-operational Australian company [**VDF1/111-112, 120, 157-160**]. The Second Amended Complaint alleges that the Defendant knew this to be untrue. [**VDF1/112**]

(f) From at least 2014, the Defendant's companies and business activities were subject to an investigation by the Australian tax Office ("**ATO**"), culminating in a raid on the Defendant's premises in December 2015 [**VDF1/161, 195**]. During the investigation, the defendant and/or his agents provided information to the ATO about his collaboration with Mr David Kleiman. [**VDF1/195**]

(g) In June 2015, the Respondent and the Defendant entered into a business deal whereby the Defendant and companies controlled by him would transfer to the respondent and companies controlled by him the "*life rights*" of Satoshi Nakamoto and various Bitcoin-related intellectual property which the Applicants allege were jointly owned by the Defendant and themselves. [**VDF1/171, 256-265**]

(h) In May 2016, the defendant publicly revealed himself and Mr David Kleiman as the creators of Bitcoin. [**VDF1/118**]

    (i)    In June 2016, author Andrew O'Hagan published a book-length article entitled *The Satoshi Affair* discussing, *inter alia*, many of the events noted above. [**VDF1/161-255**]

    (j)    To date, the Defendant has not returned any of the mined bitcoins or intellectual property rights belonging to the Applicants. [**VDF1/112**]

3.4    The pleadings in the SDF Proceedings have closed, and trial has been set for March 2020. The current deadline for disclosure (known as "discovery" in the United States) is set for 3 January 2020. The Applicants have not made this Application before now because until recently the parties were engaged in good faith settlement discussions and had reached a non-binding settlement in principle [**VDF1/266-268, 269-271**], for which reason the SDF Court had partially granted the parties' joint requests for extensions of time. [**VDF1/272-273, 274-275**]. On 30 October 2019, the Applicants were informed that the Defendant could not finance the settlement [**VDF1/499**], and the parties have returned to active litigation. The Applicants therefore request that this Application be granted as a matter of urgency.

4.    **EXPECTED CONTENTS AND NATURE OF THE WATTS EVIDENCE**

4.1    Ramona Watts is the Defendant's second wife and has been involved in his companies since at least 2013 [**VDF1/281, 293-294**]. She was involved in business dealings with the Defendant, Mr MacGregor and Mr Matthews which involved the sale of Satoshi Nakamoto's "*life rights*" and intellectual property that the Defendant was working on [**VDF1/300, 177, 249, 254**]. She had close knowledge of the investigation by the ATO into the Defendant's affairs, and which led to the Defendant and Ms Watts fleeing Australia for London. [**VDF1/302-306**] She is also involved in the "Tulip Trusts", which the Defendant alleges were created to hold Bitcoins that the Applicants allege belong, at least in part, to them [**VDF1/283, 131**]: she purportedly exercises the power of a trustee of Tulip Trust 1 and is involved in the operations of Panopticrypt Pty Ltd [**VDF1/283, 308-309**], one of the beneficiaries of Tulip Trust 2 [**VDF1/283, 310**], and acts for Panopticrypt as the purported Appointor of at least one of the Tulip Trusts [**VDF1/283**].

4.2    In those roles, Ms Watts is and has been privy to information since at least 2013 relating to the creation of Bitcoin by the Defendant and Mr David Kleiman [**VDF1/281-282**].

4.3    It is clear that Ms Watts has extensive knowledge of the purpose and history of the Defendant's relationship with Mr David Kleiman, Satoshi Nakamoto, the creation of Bitcoin, the mining of Bitcoin prior to 2014, and the Tulip Trusts. Ms. Watts therefore has knowledge and documents that will be useful to the Applicants at trial for two main purposes.

    (a)    First, the knowledge and documents will enable the SDF Court to understand better the relationship between the defendant and Mr David Kleiman, what arrangements were made about the ownership of the bitcoins and intellectual property, the nature of the intellectual property, and the existence or non-existence of the alleged Trusts.

    (b)    Second, the knowledge and documents will enable the SDF Court to check the veracity of the Defendant's statements, including in previously delivered depositions [**VDF1/295-301, 396-400**] and may be used to impeach him.

**Documentary Evidence**

4.4 The Applicants seek the production of certain documents or limited categories of documents, all of which fall within the scope of the Letter of Request [**VDF1/1-16**]. The Applicants expect these documents to be used in trial, as they are likely to be highly probative of numerous elements of the Second Amended Complaint.

4.5 The Letter of Request seeks categories of documents rather than identifying individual documents. As a matter of US federal law, this is standard and permissible. By issuing the Letter of Request, the SDF Court has shown that it considers the categories in the Letter of Request to be relevant, appropriate, and proportionate to the matter. I also understand that requests for documents from the English courts in aid of foreign proceedings, whether set out as single documents or categories, should be as specific as possible. In certain instances, therefore, the Applicants propose alternative, narrower categories than those articulated in the Letter of Request.

4.6 I set out here the categories described in the Letter of Request [**VDF1/6**], explain why each category of documents is relevant, and where appropriate propose alternative, narrower categories.

4.7 I understand that the English High Court case of *Atlantica Holdings, Inc et al v Sovereign Wealth Fund et al* [2019] EWHC 319 (QB) states at paragraph 80 that "[i]*f an examination of the terms of the [Letter of Request] and any other relevant material shows that the matter has been considered on the merits by the requesting court, and the topics found by it to be relevant, then the English Court should respect that determination because the requesting court is in the best position to judge relevance*". As noted above at paragraph 2.2, Judge Reinhart, who has extensive knowledge of the SDF Proceedings, considered the evidence requested and determined that the evidence sought is directly relevant to the issues in dispute.[1] Given that, I consider this Court should respect Judge Reinhart's determination and grant this Application. Nonetheless, in order to help the Court consider the Application, I set out in detail why the requested categories (and later, the subjects for questioning in deposition) are relevant.

4.8 The topics are as follows:

  (a) *All documents and communication between Ms Watts and Mr David Kleiman.*

   (i) The Applicants no longer seek documents in this category.

  (b) *All documents and communications between the Defendant and Ms Watts that predate her marriage to the Defendant and relate to W&K Info Defense Research, Mr David Kleiman, Satoshi Nakamoto, or the Tulip Trusts.*

---

[1] Cf. *Atlantica Holdings, Inc et al v Sovereign Wealth Fund et al* [2019] EWHC 319 (QB) at paragraphs 99-100 ("*These paragraphs are an explicit statement that Judge Furman considered the topics and found them to be relevant. I completely reject the suggestion that I should infer he merely rubber-stamped the Plaintiffs' application without applying his mind to the merits. Ms Fatima at one point in her submissions said that there was 'no evidence' that the judge had considered relevance. The short answer is that there did not need to be. The LORs are, as I have said, written by the judge in the first person and they contain his reasoning and conclusions that the topics are relevant. Nothing more is required, any more than it would be if this Court were to issue an LOR to Judge Furman setting out a list of topics said to be relevant to litigation here. In conclusion, I am entirely satisfied that the issue of relevance was considered on the merits by Judge Furman and the topics found by him to be relevant, and thus that as a matter of comity I must respect that determination because he was in the best position to judge relevance.*")

*(c)*   *All documents and communications, dated prior to 14 February 2018, between Ms Watts and either (i) Mr Robert MacGregor, (ii) Mr Stefan Matthews, (iii) Mr Calvin Ayre, (iv) or their agents that relate to W&K Info Defense Research, Mr David Kleiman, Satoshi Nakamoto, or the Tulip Trusts.*

*(d)*   *All documents and communications, dated prior to 14 February 2018, between Ms Watts and Mr Andrew O'Hagan that relate to W&K Info Defense Research, Mr David Kleiman, Satoshi Nakamoto, or the Tulip Trusts.* [2]

   (i)   These categories can be considered together as they concern the same topics.

   (ii)  The reason that only pre-marriage communications with the Defendant are requested is in order not to intrude on the spousal communications privilege recognised in Florida. This is described further beneath at paragraphs 6.1-6.6.

   (iii) As noted, these documents and communications will enable the SDF Court to understand better how Bitcoins were mined and intellectual property created by the Defendant and Mr David Kleiman, the relationship between the Defendant and Mr David Kleiman, what arrangements were made about the ownership of the bitcoins, and the nature and existence of the Trusts. They may also be used to impeach the Defendant's evidence.

   (iv)  **Alternatively**, if the Court determines that the topic of Satoshi Nakamoto may be too broad, the Court may require that the topics be further limited as follows: "*All documents and communications … that relate to W&K Info Defense Research, Mr David Kleiman, Satoshi Nakamoto <u>(insofar as they relate to the creation of Bitcoin, development of intellectual property or Mr David Kleiman)</u> or the Tulip Trusts.*"

   (v)   I consider that documents in the above categories are expected to be in Ms Watts's possession.

      (A)  First, Ms Watts has corresponded by email with each of the correspondents named. See, for example [**VDF1/311-313, 314, 315, 254**].[3]

      (B)  Second, she will have evidence relating to each of the named topics for the following reasons:

         (aa) *W&K Info Defense Research, Mr David Kleiman, Satoshi Nakamoto*: Ms Watts was involved in written discussions about disclosing Satoshi's identity and selling Satoshi's life rights and the intellectual property, which would have included information about the topics listed above; for example, she was forwarded emails discussing Mr David

---

[2]   The Applicants are seeking a separate order from the court under CPR 34 to acquire evidence from Mr O'Hagan.

[3]   The address c@wyno.ca is the email address of Calvin Ayre. [**VDF1/352-358, 359-360**].

       Kleiman's role in minting the first bitcoins. [**VDF1/345, 346-348, 349, 350-351**].

   (bb) *The Tulip Trusts*: Ms Watts was noted as exercising the powers of trustee, beneficiary and/or appointor in various trust documents produced to the Applicants by Dr Wright, so would be expected to have documentation about them [**VDF1/283, 310**].

(vi) The Respondent may consider that she does not need to produce certain communications with the Defendant because the Defendant has disclosure obligations in the SDF Proceedings which would include producing relevant emails between himself and the Respondent (and he has in fact produced some emails). Nonetheless, we do not consider this request will duplicate what the Applicants already have received in discovery, for the following reasons.

 (A) *First*, the Defendant has not always conducted himself honestly in the SDF Proceedings, including in regard to documents. The Applicants therefore consider it likely that he has not honestly and diligently observed his disclosure obligations. I understand this is a serious allegation to make, but it is supported by the evidence, including findings of both a US Magistrate Judge and a District Judge.

 (B) In March 2019, after the Defendant moved to dismiss the case[4] based on new allegations as to who the members of the W&K Applicant were,[5] United States District Judge Beth Bloom denied the Defendant's motion, stating the following: "*Indeed, the Court notes that the defendant has made **several conflicting statements** regarding even his own ownership of W&K.… Unfortunately, the record is replete with instances in which the defendant has proffered conflicting sworn testimony before this Court. In weighing the evidence, the Court simply does not find the defendant's testimony to be credible.*" (emphasis in the original) [**VDF/1 364, 365, 370**]

  There was credible evidence that the Defendant attempted to use at least two forged documents in support of his allegations.[6]

---

4 In US terms, he moved for judgment on the pleadings.

5 If it could be shown that there were non-American members of the W&K Applicant, that would have shown there was not complete "*diversity of citizenship*" and would have defeated the subject matter jurisdiction of the US federal court.

6 The first document (referred to in the relevant papers as "Exhibit A") purported to be an email between Mr David Kleiman and Uyen Nguyen sent on 20 December 2012. A computer science expert retained by the Applicants found the following, which he testified in two sworn affidavits to the SDF Court: "*This email [Exhibit A] includes a digital signature allegedly belonging to Dave Kleiman as an attempt to prove its authenticity. Based on my analysis of this document and the signature on it, this document was digitally signed in early 2014, almost a year after Dave Kleiman died.… I have also conducted a forensic analysis of Exhibit F to Defendant's Motion for Judgment on the Pleadings (ECF No. [144-6], hereafter referred to as "Exhibit F") and determined that it was created by further modifying Exhibit A to make it appear as if Exhibit F is actually a separate email sent from Dave Kleiman to Uyen Nguyen, when, in my opinion, it is simply another revision to the PDF created from an email the Defendant sent to himself on or about April 16, 2014. In sum, Exhibit A and Exhibit F, which appear to be emails sent from Dave Kleiman to Uyen Nguyen on December 20, 2012, are manipulations of a PDF created from an email the Defendant sent from himself to himself on or about*

(C) Further, in an order dated 27 August 2019 sanctioning the Defendant for failing to comply with an earlier court order, US Magistrate Judge Reinhart found: "*There was substantial credible evidence that documents produced by Dr. Wright to support his position in this litigation are fraudulent. There was credible and compelling evidence that documents had been altered… [T]here is a strong, and unrebutted, circumstantial inference that Dr. Wright willfully created the fraudulent documents.*" [**VDF1/335**]. Further, "*the evidence establishes that he has engaged in a willful and bad faith pattern of obstructive behavior, including submitting incomplete or deceptive pleadings, filing a false declaration, knowingly producing a fraudulent trust document, and giving perjurious testimony at the evidentiary hearing . . . I have found that Dr. Wright intentionally submitted fraudulent documents to the Court, obstructed a judicial proceeding, and gave perjurious testimony.*" [**VDF1/342-343**]

(D) If the Defendant is willing to submit fraudulent documents in order to help his defence, there is a good chance that he will conceal documents that do exist in order to avoid harming his defence. Therefore, the Court should require the Respondent to produce the requested emails.

(E) *Second*, in the ordinary course of things, emails are sometimes deleted, mislaid, or not found when looked for (perhaps because of being poorly located or not including expected keywords). Therefore, it is to be expected that the sets of responsive emails held by the Respondent and the Defendant would not be identical.

**Deposition**

4.9   The Applicants seek to take a deposition of Ms Watts, over a period of one day not to exceed seven hours, at the offices of Boies Schiller Flexner (UK) LLP in London, or another venue convenient for Ms Watts and suitable for the taking of a deposition.

4.10  The Applicants expect to use the Watts Deposition as evidence at trial. As explained at paragraph 7.10 below, the relevant United States federal laws of evidence would allow the Applicants to use portions of the Watts Deposition as part of their evidence if Ms Watts is unavailable to testify at trial.

4.11  The deposition of Ms Watts will be limited to the issues set out in the Letter of Request. In each case, I explain why each issue is relevant:

---

*April 16, 2014.*" (footnote omitted) [**VDF1/382-395, 374**],The Court was not required to determine whether the expert was correct, because the Defendant, after including both documents as exhibits to his motion to dismiss the case, then withdrew both documents, one at the hearing to decide the motion. [**VDF1/366**]. But the Court nonetheless indicated its concerns about the Defendant's behaviour thus: "*The Court also notes that the emails in question were produced by the defendant during discovery. The defendant, however, is not the sender, recipient, nor copied to the emails. At the Hearing, given that the Defendant claims he has not been in contact with Nguyen "in years," the Court questioned how the defendant came into possession of the emails. The Defendant claimed he received them as "records" from companies when he left Australia.*" [**VDF1/366-367**]

(a) *Ms Watts's educational background, employment history, professional qualifications, personal preparation for the deposition (to include any contact she may have had with the parties, their lawyers, insurers or representatives, but excluding any privileged content of such communications).*

  (i) This evidence will be useful for the SDF Court in determining the reliability and trustworthiness of Ms Watts.

(b) *Non-privileged[7] statements made by Defendant about W&K Info Defense Research, LLC, Mr David Kleiman, Satoshi Nakamoto, the creation of Bitcoin, the Defendant's and/or Mr David Kleiman's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the Bitcoin/intellectual property at issue in this litigation, the ATO Investigations, Uyen Nguyen, and the business deal between Mr MacGregor, Mr Matthews and Mr Ayre.*

(c) *Ms Watts's knowledge of the issues in (b) above through other means, including through review of relevant documents.*

  (i) These categories can be considered together as they concern the same topics.

  (ii) To the extent it is not clear, the request seeking evidence about the statements made by the Defendant seeks only statements: (a) made before the Defendant and the Respondent were married; (b) made simultaneously to others as well as the Respondent; or (c) business-related communications made between the spouses as business associates. Such evidence is not protected by the spousal privilege recognised in Florida. This is described further beneath at paragraphs 6.1-6.10.

  (iii) This evidence will be useful at trial for the reasons set out above at paragraphs 4.1-4.8.

  (iv) It may also be used to impeach the Defendant, who has now, for example, denied that Mr David Kleiman was his partner or that they mined Bitcoin together, and has claimed that *The Satoshi Affair* is a work of fiction [**VDF1/157-160, 399**].

  (v) The reasons for certain categories may require further explanation:

    (A) Documents relating to the ATO Investigation are likely to be relevant to the trial because the Defendant and/or his agents made statements regarding the collaboration between the Defendant and Mr David Kleiman as part of the investigation. [**VDF1/195**]

    (B) Uyen Nguyen colluded with the Defendant in deceiving the Applicants, including by removing Mr Dave Kleiman as the registered agent of the W&K Applicant, without the knowledge of the Estate. [**VDF1/137, 401**]. She is also named as a trustee of one or more of the Trusts [**VDF1/402-406**]. Documents relating to her

---

7   See Section 6 below.

        and her activities are expected to contain information useful at trial regarding topics including the relationship between the Defendant and Mr David Kleiman, W&K Info Defense Research, and the Trusts.

(C)    The business deal with Messrs MacGregor, Matthews and Ayre is the deal referred to above at paragraph 3.3(g). Mr Matthews set up the deal [**VDF1/170**], and Mr Ayre, Mr Matthews' erstwhile employer, was also involved [**VDF1/209-210**]. As noted, the deal consisted of the purchase of (i) the life rights of Satoshi and (ii) the intellectual property developed. Documents relating to the first portion will be relevant because the story of Satoshi necessarily includes the story of how and on what basis the Defendant and Mr David Kleiman worked together. Documents relating to the second portion will be relevant because documents relating to the purchase of intellectual property will necessarily include details of how the intellectual property was developed, by whom, and who currently owns or claims ownership in it.

(vi)    **Alternatively**, the Court may require that the topics of the Respondent's deposition be further limited as follows: "*Statements made … about W&K Info Defense Research, Mr David Kleiman, Satoshi Nakamoto (insofar as they relate to the creation of Bitcoin, Bitcoin-related intellectual property, or Mr David Kleiman), the creation of Bitcoin, the Defendant and/or Mr David Kleiman's mining of bitcoins prior to 2014, the trusts at issue in this litigation, the ownership of the bitcoins/intellectual property at issue in this litigation, the ATO Investigation (insofar as they relate to Mr David Kleiman, the Trusts or the disposition of bitcoins mined or intellectual property developed before Mr Kleiman's death), Uyen Nguyen (insofar as they relate to W&K Info Defense Research, Mr David Kleiman or the Trusts), and the business deal with Mr MacGregor, Mr Matthews and Mr Ayre (insofar as they relate to Satoshi Nakamoto, Mr David Kleiman or the development or ownership of the intellectual property purchased) and Ms Watts's knowledge of the issues … through other means, including through review of relevant documents.*"

(vii)    I expect that Ms Watts has such information because the Defendant has stated that he talked to Ms Watts "*about everything, including my past*" prior to marrying her [**VDF1/ 296**]. In addition, as noted above at paragraph 4.1, Ms Watts has been involved in the Defendant's businesses, was involved in the 2015-16 sales process and has multiple connections to the Trusts, so would by virtue thereof have personal knowledge about the topic listed above, derived independently from communications with the Defendant. She provided a good deal of information to Mr O'Hagan for *The Satoshi Affair*. [**VDF1/177, 249, 254**].[8]

4.12    In accordance with the English case cited previously, *Atlantica Holdings, Inc et al v Sovereign Wealth Fund et al* [2019] EWHC 319 (QB), I believe that the issues are sufficiently specific and certain.

---

[8]    The Applicants are seeking a separate order from the court under CPR 34 to acquire evidence from Mr O'Hagan.

4.13   I also consider that all these issues are within Ms Watts's personal knowledge since they relate to her personal background and professional background.

5.  **PROPORTIONALITY**

5.1   I understand that the courts in England and Wales look, under CPR 1.1, to the overriding objective of ensuring that cases are dealt with justly and at proportionate cost. Granting the Applicants' Application would, in my view, meet this objective for the following reasons:

   (a)   **Equal footing**:

      (i)   Ms Watts is married to the Defendant, who has publicly claimed to be extremely wealthy **[VDF1/504-507]**, earned a substantial amount through the business deal he made, and is represented by a respected law firm. She will not be at a disadvantage vis-à-vis the Applicants.

      (ii)   Ms Watts will not need to fear widespread disclosure of her documents. A protective order has been entered in this case by the SDF Court allowing any party to designate testimony or documents as confidential, if appropriate, in order to protect confidentiality and privacy [**VDF1/407-424**]. To the extent necessary, the Applicants are willing to work with Ms Watts to see if any such material requires such designation.[9]

      (iii)   By contrast, the Applicants would be seriously disadvantaged in their pursuit of justice in the SDF Proceedings if they were unable to obtain the Watts Documents and testimonial evidence.

   (b)   **Saving expense**:

      (i)   Ordering production of the Watts Documents will not create disproportionate expense for Ms Watts (or any party) as these documents should already be in her possession. The Applicants seek to depose Ms Watts for a maximum of seven hours, on a mutually convenient date. The Applicants propose that the Deposition take place at the offices of their solicitors in London. I understand that Ms Watts resides in Cobham, which is a 40-minute train journey from Waterloo Station, so this will this not pose an inconvenience for her.

      (ii)   The Applicants, on the other hand, have already incurred substantial expense in the SDF Proceedings, in obtaining the Letter of Request and in bringing this present application, in order to recover the assets which the Defendant has unlawfully taken. It would also be more expensive for the Applicants to seek to procure the information from each named source, especially as many of the sources will not have taken notes or recorded the conversation.

   (c)   **Proportionality**: An order from this Court to obtain the Watts Documents is proportionate for the following reasons:

---

[9]   The materials will of course not be confidential as to the Defendant or the SDF Court.

(i) <u>Amount of money involved</u>: the Applicants allege that the Defendant has unlawfully taken assets worth at least $11 billion.

(ii) <u>Importance of the case</u>: this case is plainly a significant case, involving very large sums of money and the genesis of one of the most important financial and technological innovations of our time. The case has generated significant media attention.

(iii) <u>Financial position of each party</u>: Given the Defendant's statements about his wealth, and the amount he has made through the business deals, I expect that Ms Watts is comfortably off. In any event, complying with an order from the Court should not significantly affect her, as the Applicants would pay for the reasonable costs of copying and transmitting the Watts Documents (and will pay Ms Watts's costs of attending the deposition, as per CPR 34.8(6)). Mr Ira Kleiman is not wealthy [**VDF1/426**], and W&K Info Defense Research, LLC has no assets available to it.

(d) **Ensuring the application is dealt with expeditiously and fairly**: The Applicants are willing to provide all necessary assistance to Ms Watts in order to facilitate the production of the Watts Documents and the taking of the Watts Deposition.

6.  **SPOUSAL PRIVILEGE**

6.1 I consider that it is possible the Respondent will argue that she does not need to provide these documents because of the spousal privilege recognised by Florida law. (I understand that there is no extant English spousal privilege that would apply in this situation.) I do not consider such arguments would have any merit. However, for the sake of full and frank disclosure, I set out the law here, and explain why she cannot rely on this privilege.

6.2 The privilege is set out in Florida Statutes § 90.504, entitled "*Husband-wife privilege*". The statute provides: "*A spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be in confidence between the spouses while they were husband and wife.*" [**VDF1/433-435**]

6.3 As a preliminary matter, since it is clear that this privilege protects only communications between the husband and wife, it does not protect communications between the spouse and a third party, or information not related to communications between spouses. Therefore, the documents requested at paragraphs 4.8(c) and 4.8(d), and the deposition testimony required at paragraphs 4.11(a) and 4.11(c), do not fall within the ambit of the privilege.

6.4 As for communications between spouses, it is clear from the statute, and the case law described below, that the privilege does not protect:

(a) Communications between the spouses before they were married;

(b) Communications between spouses in the presence of third parties, and thus not intended to be confidential; or

(c) Communications between spouse business associates that is business-related.

**Pre-marriage communications**

6.5    The spousal privilege is inapplicable to communications between spouses that occurred *before* marriage. *See State v. Norris*, 352 So. 2d 875, 876-77 (Fla. Dist. Ct. App. 1977) [**VDF1/436-437**] ("*The privilege is created to encourage marital confidences and is limited to them. Consequently, communications between husband and wife before they were married or after their divorce are not privileged.*" (quoting *Ex parte Beville*, 50 So. 685, 688 (Fla. 1909)).

**Non-confidential communications**

6.6    "[T]he Florida legislature has expressly provided that only communications [between spouses] intended to be confidential are privileged." *Hanger Orthopedic Grp., Inc. v. McMurray*, 181 F.R.D. 525, 529-30 (M.D. Fla. 1998) (emphasis in original) [**VDF1/438-445**]. For this reason, communications between spouses that are made "*in the presence of a third person*" are not protected by the spousal privilege. *Lynch v. State*, 2 So. 3d 47, 65-66 (Fla. 2008) [**VDF1/446-474**].

**Business-related communications**

6.7    "*Although private communications between spouses are generally presumed to be confidential, … the presumption of confidentiality is generally rebutted as to business-related communications between spouses who are business associates.*" *DHA Corp. v. Hardy*, No. 15-MC-80201, 2015 WL 3707378, at *2 (S.D. Fla. June 15, 2015) (applying Florida law) [**VDF1/475-477**]. As one court explained: "*To cloak [business-related spousal communications] with privilege when the transactions come into litigation would be productive of special inconvenience and injustice.*" *Lamport v. Williams*, No. 14-mc-14126, 2014 WL 12605141, at *3 (S.D. Fla. May 30, 2014) (applying Florida law) (quoting McCormick on Evidence, § 80 (4th ed. 1992)) [**VDF1/478-480**].

6.8    Based on these standards, none of the information sought by the Applicants is protected by the Florida spousal privilege.

6.9    The only documentary communications sought between the Defendant and the respondent, as set out in paragraph 4.8(b) above, are those that *predated* their marriage. Such communications are not protected by the spousal privilege.

6.10   Likewise, the only deposition category potentially relating to communications between the Respondent and the Defendant, as set out in paragraph 4.11(b) above, seeks evidence about such communications only to the extent that (a) they occurred prior to the marriage, (b) they were simultaneously made to others and thus were not meant to be confidential as between husband and wife, or (c) were business-related communications between business associates, none of which categories of communication are protected by the privilege.

7.     **RELEVANT US FEDERAL EVIDENCE RULES**

**Federal Rules of Civil Procedure**

7.1    The Applicants seek an order that Ms Watts's evidence should be taken as a deposition in accordance with the US Federal Rules of Civil Procedure. CPR 34.18(2)(a) permits the Court to order a deposition under rules other than the CPR. It is my understanding that the English courts will usually allow foreign rules for evidence-taking so long as they do not conflict with

|     |     |
| --- | --- |
|     | basic English principles. It may therefore assist the Court if I explain the nature of US depositions briefly, albeit that I anticipate the Court will already enjoy considerable familiarity therewith. |
| 7.2 | I emphasise that in this section, and in the section of my statement below addressing the differences between the English and US procedural rules, I am seeking to provide an overview only; this does not purport to be an exhaustive analysis, which would of course run to many pages. |
| 7.3 | In civil litigation in the United States, depositions are routinely employed as a way to procure admissible evidence to be used at trial and obtain relevant information related to the case. In the federal court system, both parties have an automatic right and power to subpoena 10 witnesses each, and to take their deposition. |
| 7.4 | Specifically, for litigation in the federal courts, Rule 30(a)(1) of the Federal Rules of Civil Procedure ("**Fed. R. Civ. P.**") states: |

*"A party may, by oral questions, depose any person, including a party, without leave of court except as provided in Rule 30(a)(2). The deponent's attendance may be compelled by subpoena under Rule 45."*

[**VDF1/481-485**]

|     |     |
| --- | --- |
| 7.5 | Rule 30(a)(2), Fed. R. Civ. P. states: |

*"A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(1) and (2): (A) if the parties have not stipulated to the deposition and: (i) the deposition would result in more than 10 depositions being taken under this rule or Rule 31 by the plaintiffs, or by the defendants, or by the third-party defendants; (ii) the deponent has already been deposed in the case; or (iii) the party seeks to take the deposition before the time specified in Rule 26(d), unless the party certifies in the notice, with supporting facts, that the deponent is expected to leave the United States and be unavailable for examination in this country after that time; or (B) if the deponent is in prison."*

[**VDF1/481-485**]

|     |     |
| --- | --- |
| 7.6 | Under Rule 45(a)(3), subpoenas are issued from the court where the action is pending. Alternatively, "*[a]n attorney also may issue and sign a subpoena if the attorney is authorized to practice in the issuing court.*" Accordingly, attorneys for each party can issue subpoenas under the relevant court's authority to take the deposition of up to 10 people without leave of court [**VDF1/494**]. |
| 7.7 | A subpoena must "*command each person to whom it is directed to the following a specified time and place: attend and testify; produce designated documents, electronically stored information, or tangible things in that person's possession, custody or control; or permit the inspection of premises*" (Rule 45(a)(1)(A)(iii)) [**VDF1/493**]). |
| 7.8 | Subpoenas may be served not only on parties to the proceedings, but also non-parties, thereby allowing for depositions of, and discovery of documents from, non-parties such as Ms Watts (Rule 30(a)(1)) [**VDF1/481**]. |

7.9   Under Rule 32(a)(1), a deposition may be used at trial against a party if: (a) the party was represented at or had reasonable notice of the deposition; (b) the deposition is used to the extent it would be admissible if the deponent were testifying; and (c) the use is allowed by one of the provisions of Rule 32(a)(2)-(8) [**VDF1/486-488**].

7.10  In this case, either of two provisions of Rule 32(a)(2)-(8) will apply.  If Ms Watts testifies, under Rule 32(a)(2) the deposition may be used "*to contradict or impeach*" his testimony.  If Ms Watts does not testify, under Rule 32(4)(B) the deposition may be used "*for any purpose…if the court finds…that the witness…is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition.*" [**VDF1/486**]

**Distinction Between English and US Procedural Rules**

7.11  The English and US procedural rules for the taking of evidence by way of deposition are similar in most respects.  In both instances, the deposition must be conducted on oath, before an officer appointed by the court,[10] as if the deponent were giving evidence at trial (CPR 34.9(1); Fed. R. Civ. P., Rule 30(c)(1) [**VDF1/481-485**]).  The deponent may be required to produce documents (CPR 34.8(4); Fed. R. Civ. P., Rule 30(b)(2) [**VDF1/481-485**]).  The deposition must be recorded in full and the recording provided to the deponent (CPR 34.9(4)&(6); Fed. R. Cv. P., Rules 30(c)(1), 30(e)(1) [**VDF1/481-485**]).

7.12  Under both English and US rules, a deponent may not be required to answer any question (or produce any document) which is subject to privilege (CPR 34.20; Fed. R. Civ. P., Rule 30(c)(2) [**VDF1/481-485**]).  As the deposition will be taken in England, I understand English as well as Florida privilege laws will apply (Evidence (Proceedings in Other Jurisdictions) Act 1975, s. 3).

7.13  The primary distinction between the English and US rules is the manner in which the rules deal with objections.  In England, if there is an objection to a deponent answering a question, the party requiring the deposition may apply to the Court for an order requiring the deponent to answer (CPR 34.10(1); see also *R v Rathbone ex parte Dikko* [1985] QB 630).  Under the US Federal Rules, where there is an objection, the objection will be noted in the record but the deponent must answer anyway, unless the objection is: (a) to preserve a privilege; (b) to enforce a limitation ordered by the court; or (c) based upon an allegation of bad faith, unreasonably annoying or embarrassing questioning, or oppression (Fed. R. Civ. P., Rule 30(c)(2) [**VDF1/481-485**]).

7.14  This difference is more formal than real.  The carve-out under the US Federal Rules for oppressive or unreasonably annoying or embarrassing questions protects the deponent from irrelevant or vexatious lines of questioning.  So too does the carve-out for any limitations imposed by the court.  In the present case, the Applicants are seeking an order to question Ms Watts only on limited categories of questions, so that under either the English or US rules, the Applicants could not require answers on wholly irrelevant questions.  Moreover, under the Federal Rules, deposition testimony may only be used at trial to the extent that the testimony would otherwise be admissible under the Federal Rules of Evidence. (Fed. R. Civ. P., Rule 32(a)(1)(B) [**VDF1/486-488**]).  Finally, under both the English and US rules, the court has the power to hold a deponent in contempt of court where he or she refuses to answer a

---

[10]   Under CPR 34.18, a deposition taken in England for use in foreign proceedings may also be taken before "*any fit and proper person*" nominated by the applicant. In the present case, however, the Applicants ask the Court to order deposition before an examiner of the Court under CPR 34.18(1)(b).

      question without any valid ground for refusal (CPR 34.10(2), 81(4); Fed. R. Civ. P., Rule 37(b)(1) [**VDF1/489-492**]).

### Depositions in the SDF Proceedings

7.15    The case has already had numerous depositions.  To date, the Applicants have taken the deposition of Dr Wright (twice), Mr Jonathan Warren, Mr James Wilson, and the Defendant has taken the deposition of Mr Ira Kleiman. The Defendant has also set the depositions of other witnesses in this case to take place at a later date. It is therefore understood by all parties that depositions, including those of non-parties, are necessary in this case.

7.16    In view of the above, the Applicants make the present Application to this Court so that the Evidence may be obtained for use at trial.  As noted, the trial is currently scheduled for March 2020 and the discovery period is due to close on 3 January 2020 (though extensions can be applied for) [**VDF1/272-273**]. The Applicants therefore seek to obtain the Evidence as soon as possible.  For that reason, time is of the essence in respect of this Application.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

*Devin Freedman*

Name: Devin Freedman
Dated: 11/11/2019