```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                      CASE NO. 18-CV-80176-BB
 3
      IRA KLEIMAN,
 4    as the Personal Representative
      of the Estate of David Kleiman,
 5    et al.,

 6                                     West Palm Beach, Florida
                     Plaintiff(s),
 7                                     March 5, 2020

 8            vs.

 9    CRAIG WRIGHT,

                     Defendant(s).     Pages 1 - 116
10    ----------------------------------------------------------

11                             HEARING
                  TRANSCRIBED FROM DIGITAL AUDIO RECORDING
12                BEFORE THE HONORABLE BRUCE E. REINHART
                     UNITED STATES MAGISTRATE JUDGE
13
      APPEARANCES:
14
      FOR THE PLAINTIFF(S):  ANDREW S. BRENNER, ESQ.
15                           BOIES SCHILLER FLEXNER, LLP
                             100 SE 2nd Street
16                           Miami, FL 33131
                             (305) 357-8438
17                           abrenner@bsfllp.com

18                           DEVIN FREEDMAN, ESQ. (by phone)
                             JOSEPH M. DELICH, ESQ.
19                           ROCHE CYRULNIK FREEDMAN, LLP
                             200 South Biscayne Boulevard
20                           Miami, Florida 33131
                             (305) 357-3861
21                           vel@rcfllp.com
                             jdelich@rochefreedman.com
22
                             KYLE ROCHE, ESQ. (by phone)
23                           ROCHE FREEDMAN, LLP
                             185 Wythe Avenue
24                           Brooklyn, NY 11249
                             (646) 970-7509
25                           kyle@rcfllp.com
```

```
 1
       APPEARANCES (CONT'D)
 2
       FOR THE DEFENDANT(S):    AMANDA M. MCGOVERN, ESQ.
 3                              RIVERO MESTRE, LLP
                                2525 Ponce de Leon Blvd.
 4                              Coral Gables, FL 33134
                                (305) 445-2500
 5                              amcgovern@riveromestre.com

 6
                                ZALMAN KASS, ESQ.
 7                              MONIFA HALL, ESQ.
                                RIVERO MESTRE, LLP
 8                              2500 Ponce de Leon Boulevard
                                Miami, FL 33134
 9                              (305) 445-2500
                                zkass@riveromestre.com
10                              mhall@riveromestre.com

11

12     TRANSCRIBED BY:          Joanne Mancari, RPR, CRR, CSR
                                Court Reporter
13                              jemancari@gmail.com

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    Thereupon,

2    the following proceedings were held:

3            THE COURT:  Good afternoon, everybody.

4            We are here on case No. 18 80176, Ira Kleiman and W&K

5    Info Research v. Craig Wright.

6            Let me start with appearances.  I'll start with

7    counsel for the plaintiffs, please.

8            MR. BRENNER:  Your Honor, Andrew Brenner, from Boies

9    Schiller, on behalf of the plaintiffs.

10           MR. DELICH:  And Joseph Delich, from Roche Cryulnik &

11   Freedman.

12           THE COURT:  Mr. Delich, good to see you.

13           Thank you, gentlemen.

14           Is somebody on the phone?

15           MR. FREEDMAN:  Yes.  That was Kyle Roche.

16           THE COURT:  So Mr. Freedman and Mr. Roche are both on

17   the phone.  Good afternoon, gentlemen.

18           Anybody else on the phone for the plaintiffs?

19           MR. ROCHE:  Good afternoon, your Honor.

20           THE COURT:  No one on the phone for the plaintiffs.

21           MR. FREEDMAN:  I don't believe so, your Honor.  But it

22   is a little tough to hear Mr. Brenner.  If everybody can try to

23   talk into the microphone to the extent possible, it would be

24   helpful.

25           THE COURT:  OK.
```

```
 1              MS. MCGOVERN:  Good afternoon, your Honor.  Amanda

 2    McGovern on behalf of Dr. Craig Wright.

 3              THE COURT:  Good afternoon.

 4              MR. KASS:  Good afternoon, your Honor.  Zalman Kass on

 5    behalf of Dr. Craig Wright.

 6              THE COURT:  Mr. Kass.

 7              MS. HALL:  Good afternoon, your Honor.  Monifa Hall on

 8    behalf of the defendant Dr. Wright.

 9              THE COURT:  Ms. Hall, good to see you.  I don't think

10    I've had you here before.

11              MS. HALL:  No.

12              THE COURT:  Welcome.

13              MS. HALL:  Thank you.

14              THE COURT:  OK.  So I have a number of discovery

15    matters pending.

16              What I'd like to do is just take -- I'd like to take

17    the interrogatory issues first and then I'll move to the

18    production and the attorney-client privilege issues related to

19    the production.  Then if we have time -- I am not going to rule

20    on this because I told the defense they could have a chance to

21    respond, but if we want to just take up 30 seconds on the

22    letter rogatory request -- again, I'll let the defense file

23    what they want to file and I'll certainly consider it -- but I

24    just have a couple of questions I'd like to ask about that

25    before we leave.
```

```
 1              All right.  Well, let me start then with the, I guess
 2     what I would construe as Dr. Wright's -- I guess it is the
 3     plaintiffs' motion to compel better answers to the
 4     interrogatories.
 5              So I don't know who is going to take that on on behalf
 6     of the plaintiff, but since I'm deeming that to be your motion
 7     to compel, I'll let you go first and go last.
 8              MR. BRENNER:  OK.
 9              THE COURT:  Mr. Brenner, thank you.
10              MR. BRENNER:  Although I normally appreciate to have
11     the first and last bite at the apple, I thought where we left
12     this last week -- this is the one we were here on, I think on
13     the 29th.
14              THE COURT:  We were briefly here, yes.  That's right.
15              MR. BRENNER:  And we had -- just to reset a bit, this
16     is the interrogatories that Judge Bloom gave us leave to serve
17     regarding the bonded courier --
18              THE COURT:  Right.
19              MR. BRENNER:  -- to shorthand it.
20              THE COURT:  Yes.
21              MR. BRENNER:  What happened was we served those
22     interrogatories.  The defendant, Dr. Wright, timely responded
23     to them.  We filed effectively a motion to compel through your
24     normal procedures.
25              THE COURT:  Right.
```

```
1            MR. BRENNER:  What we challenged was that they had,
2   the defendant had raised relevance and privilege objections,
3   and then we had a hearing on that on the 29th.
4            What your Honor ruled, at least my recollection of
5   what your Honor ruled, was your Honor overruled the relevance
6   objections and then said you would give the defendant an
7   opportunity to substantiate the privilege assertions, and, to
8   my knowledge, nothing has happened since then.
9            THE COURT:  That's right.
10           MR. BRENNER:  So I'm not sure -- I'd love to go first,
11  but I'm not sure what I'm supposed to say.
12           THE COURT:  I understand.  Thank you for reminding me,
13  Mr. Brenner.
14           MR. BRENNER:  Yes.
15           THE COURT:  You're right.  So I think where we are is,
16  I think what I said is that I would give Dr. Wright a chance --
17  it is his burden to establish that there is a valid privilege.
18  I said I would give his team an opportunity to meet that burden
19  today.
20           So you're right.  So since I am putting the burden on
21  Dr. Wright's team, I will let them go first and last.
22           Mr. Kass, are you up to that?
23           MR. KASS:  Yes, I am, your Honor.
24           THE COURT:  All right.  I am happy to hear any
25  evidence or argument you would like to make.
```

```
 1              MR. KASS:  Your Honor, since we had the last hearing
 2    we had --
 3              THE COURT:  Just talk into the microphone so we can
 4    hear you.
 5              MR. KASS:  Your Honor, since the last hearing we have
 6    gone out to obtain additional evidence to substantiate the
 7    attorney-client privilege claim, and if your Honor would permit
 8    me, I do have a declaration from Mr. Mayaka, which I would like
 9    to present to the court.
10              THE COURT:  Sure.  If you want to just mark it as
11    Exhibit 1 for today's hearing and give a copy to Mr. Brenner if
12    you haven't already.
13              MR. BRENNER:  For the record, your Honor, I have not
14    seen that.
15              THE COURT:  Why don't you hand a copy to the other
16    side as well and I will ask if they have any objection to it
17    being received in evidence at this time.
18              Take your time, Mr. Brenner.  I know you haven't seen
19    it before.
20              MR. BRENNER:  Your Honor, I guess my position is
21    that --
22              THE COURT:  I guess I should ask you the predicate
23    question.  Do you have any objection to this being received in
24    evidence and being considered by the court?
25              MR. BRENNER:  I guess to the -- I don't only to the
```

1    extent that, to the extent necessary, I would be given an

2    opportunity to I guess by telephone examine Mr. Mayaka, which I

3    can't do today.  I have just seen this.  I guess I have an

4    objection to you reviewing it without any opportunity to

5    cross-examine the witness.

6            THE COURT:  OK.  So your objection is, I guess -- OK.

7    You want an opportunity to cross-examine him.

8            MR. BRENNER:  Yes.  It is essentially hearsay that I

9    have no chance to confront the witness on.  Normally I wouldn't

10   make a hearsay objection in an evidentiary hearing before the

11   court.  The problem is it's -- I would have a lot of questions

12   of Mr. Mayaka.

13           THE COURT:  I understand.

14           Mr. Kass, isn't this hearsay?

15           MR. KASS:  Your Honor, Mr. Mayaka is in, I believe,

16   Kenya, and just the nature of the matter is -- and our client's

17   in London -- to get somebody here to testify in person simply

18   isn't practical.

19           At this point we just really need to make a *prima*

20   *facie* showing that there is an attorney-client privilege.  I'm

21   not sure how much -- I believe this is sufficient to at least

22   make a *prima facie* showing that he is an attorney and that he

23   does have an attorney-client relationship with Dr. Craig

24   Wright.

25           In addition, I do have additional evidence which I am

1    prepared to submit, which is the LinkedIn page of Mr. Mayaka,
2    which, again, shows that he has gone to law school, if your
3    Honor would permit me.
4           THE COURT:  I will overrule the objection at this time
5    based on hearsay.
6           Again, I think what Mr. Brenner is saying between the
7    lines is I am the finder of fact, I can give this the weight
8    that it needs.  So I will allow it for now.
9           I mean, is there any dispute -- let me ask.
10   Mr. Brenner, is there any dispute that Mr. Mayaka is a lawyer
11   or is the dispute really going to be is he providing legal
12   services in a way that they can invoke a privilege in this
13   case?
14          MR. BRENNER:  Certainly the latter.  As to the former,
15   your Honor, I just don't know.  I really have no way to know
16   that.
17          THE COURT:  All right.  So then I guess it is in
18   dispute.  That's fine.
19          MR. BRENNER:  Yes.
20          THE COURT:  Mr. Kass, I will allow you to mark and
21   offer your next exhibit.
22          MR. KASS:  I am going to introduce as Exhibit 2 --
23   and, your Honor, on Exhibit 2, I believe it is on page No. 2,
24   it has Mr. Mayaka's education and it has Moi University
25   bachelors of laws, commercial law, LLB.

```
 1              THE COURT:  OK.  All right.
 2              Mr. Brenner, have you had a chance to review Exhibit
 3    2?  Any objection to the court considering Exhibit 2?
 4              MR. BRENNER:  I have the same objection, your Honor,
 5    that I made to the first one.
 6              THE COURT:  That it's hearsay.
 7              MR. BRENNER:  Other than that I don't want to
 8    cross-examine LinkedIn.
 9              THE COURT:  I understand.  But it's hearsay is the
10    objection?
11              MR. BRENNER:  Yes, it's hearsay.
12              THE COURT:  Give me one second, folks.
13              MS. MCGOVERN:  Your Honor, may I add one point?
14              THE COURT:  Hold on just one second.  I'm just looking
15    at Rule 1101 which talks about where the federal Rules of
16    Evidence are applicable.
17              So I'm not sure if this proceeding qualifies as a
18    court's determination under Rule 104(a) on a preliminary
19    question of fact governing admissibility.
20              All right.  I will admit Exhibit 2 over the hearsay
21    objection.
22              (Court 2 received in evidence).
23              THE COURT:  But, Ms. McGovern, if you have anything
24    else you'd like to add, I'm happy to hear you.
25              MS. MCGOVERN:  I simply would like to add, and I
```

1    simply don't mean to step on Mr. Kass' toes in this regard, but

2    I simply want to add that it was our understanding that the

3    issue that was raised with respect to the privilege regarding

4    Denis Mayaka was whether in fact he was an attorney.

5         He is an attorney in Kenya.  He has attested to that

6    fact, and we believed that was the best way to demonstrate to

7    the court that there's an attorney and that he is also

8    attesting to the fact that he has an attorney-client

9    relationship with Dr. Wright.

10        We note, your Honor, that there have been privilege

11   objections that have been made throughout this discovery

12   process, which has gone on for almost two years, against

13   Dr. Wright, and there's been no instance in which an attorney's

14   validity has been challenged vis-a-vis Ira Kleiman regardless

15   of the fact that he has alleged attorney-client privileged

16   communications with many lawyers but they simply happen to be

17   here in Florida.

18        THE COURT:  OK.

19        MR. BRENNER:  May I just --

20        THE COURT:  Look, folks, I can only rule on the issues

21   that are raised.  This issue has been raised.  I'll rule on the

22   issue that's been raised.  That's all I can do.

23        Mr. Kass, what else have you got?

24        MR. KASS:  In addition, your Honor, I have the

25   interrogatory responses of Dr. Craig Wright that I believe were

1    provided to the court under seal.

2              THE COURT:  I have those.  I have those under seal.

3    OK.

4              MR. KASS:  And these are sworn by Dr. Craig Wright.

5    On page No. 4, in response to interrogatory No. 1, it says:

6    Denis Mayaka, LLB, solicitor.  There Dr. Wright is asserting

7    that he is an attorney.

8              Then also on page 5, the final last full paragraph,

9    again it says:  The communications between the counsel and the

10   trust, the counsel for the trust and Ms. Watts and Dr. Wright.

11   Again, the counsel for the trust is referring to Denis Mayaka.

12             So again you have Dr. Wright attesting that Denis

13   Mayaka was his counsel with regards to the issue that

14   plaintiffs are requesting more information.

15             THE COURT:  OK.

16             MR. KASS:  And, your Honor, based on that I believe we

17   at least have shown the *prima facie* evidence that the

18   communications were protected attorney-client communications

19   between Dr. Wright and Mr. Mayaka.

20             Again, I just want to emphasize that the specifics as

21   to what happened during that transaction, they're listed in

22   interrogatory responses.  We know how that list of Bitcoin

23   addresses was received.  It was received from Ms. Watts from

24   Denis Mayaka.  Ms. Watts provided that to Dr. Wright.

25   Dr. Wright provided it to us.  We did some due diligence and we

1    produced it to plaintiffs.

2          It is not entirely clear what additional information

3    plaintiffs are seeking.  And in a vacuum it's also hard to give

4    the exact contours of a conversation or a question when we

5    don't really have the question --

6          THE COURT:  I think what they want to know is what did

7    Mr. Mayaka say to Ms. Watts when he sent her the trust document

8    and what did Ms. Watts say to Dr. Wright when she gave it to

9    him.

10         Mr. Brenner, have I correctly summarized at a high

11   level what you are looking for?

12         MR. BRENNER:  At a high level, that's pretty good,

13   Judge.

14         THE COURT:  OK.

15         MR. KASS:  Well, your Honor, what Mr. Mayaka told Ms.

16   Watts, it is not clear that Dr. Wright is privy to that

17   information or if he was a party to that communication.

18         As to what Ms. Watts told Dr. Wright, they are spouses

19   and under Florida law spousal communications are privileged.

20         THE COURT:  Confidential.

21         MR. KASS:  Confidential, yes, your Honor.

22         THE COURT:  Yes.  OK.

23         MR. KASS:  And then I would suggest that to the extent

24   there are additional questions as to what exactly was said by

25   who and under what circumstances, Dr. Wright's deposition is

1    taking place in less than two weeks in front of your Honor and

2    plaintiffs could kind of lay the foundation and really be more

3    specific as to what they were looking for, and Dr. Wright could

4    testify right there as to the contours of the relationship to

5    that specific question and your Honor would be able to rule on

6    the spot.

7                THE COURT:  OK.  Anything further?

8                MR. KASS:  That's all.

9                THE COURT:  Mr. Brenner, I'll hear from you.

10               MR. BRENNER:  I'm just going to use the lectern.

11               THE COURT:  Yes.  Sure.

12               Actually, Mr. Kass, let me ask you this.

13               MR. KASS:  Sure.

14               THE COURT:  In the response to the interrogatory you

15   say that the communications between counsel for the trust and

16   Ms. Watts and Dr. Wright are attorney-client privileged and --

17   are attorney-client communications and privileged.

18               When I read that, I take that to mean that Dr. Wright

19   knows what Mr. Mayaka said to Ms. Watts.  He may know it

20   because Ms. Watts told him.  I don't take that to be that

21   Dr. Wright doesn't know.

22               MR. KASS:  Your Honor, that is a factual question,

23   which I believe Dr. Wright could answer that better.

24               THE COURT:  Well, if he doesn't know, he ought not be

25   invoking a privilege because there is nothing to invoke.

1          MS. MCGOVERN:  Let me interject, your Honor, on this

2     particular point.

3          The statement in the interrogatory I believe is meant

4     to state that the communications between Dr. Wright and Denis

5     Mayaka are privileged because Denis Mayaka is Dr. Wright's

6     counsel and was Dr. Wright's counsel in connection with the

7     preparation of the 2017 trust.

8          To the extent that there are communications that are

9     requested of him by Denis Mayaka regarding the creation of the

10    2017 trust, those would be privileged.

11         Dr. Wright is not a trustee of the trust and takes the

12    firm position that he does not have the right to the

13    communications that would take place between Ramona as trustee

14    and Denis Mayaka as counsel for the trust.

15         What Dr. Wright knows about the communications between

16    Denis Mayaka and Ramona Watts is -- the statement was not meant

17    to suggest that he knows, because our understanding, your

18    Honor, is counsel -- and I'm simply trying to clarify the

19    record so it doesn't appear that we are trying to be cute or

20    hide the ball or anything like that.

21         It is simply that Dr. Wright received this

22    information, the trust and the Bitcoin addresses from Ramona

23    Watts because she is trustee of the trust, and communications

24    separately with Denis Mayaka as counsel would be privileged.

25    It is not meant to suggest that he in fact knows the

1    communications between Ramona Watts and Denis Mayaka.

2        THE COURT:  OK.  And I'm not accusing you of anything,

3    trust me.

4        As I read the interrogatory No. 2, I felt what they

5    were asking you was, were there direct communications between

6    Dr. Wright and anybody else relating to how this, what they

7    call it "the event," but how he got the trust document in

8    December of 2019.

9        If the answer is the only person he spoke to about

10   that directly is Ms. Watts in her capacity as trustee of the

11   trust and he never spoke to Mr. Mayaka directly, Mr. Mayaka as

12   the counsel to the trust spoke to Ms. Watts, if that's your

13   position, that's fine.  I was just trying to clarify that.

14       MS. MCGOVERN:  I think that's correct, your Honor.

15       THE COURT:  OK.  Mr. Brenner, I'll hear from you.

16       MR. BRENNER:  Let me start by saying much of what you

17   just heard is what you heard last week on the relevance issue.

18   So I don't think we're here to decide whether -- the arguments

19   they made to you last week is, why do they need to know this,

20   can't they just ask Dr. Wright at his deposition, and you

21   overruled all that.

22       With the court's permission, I am going to focus my

23   comments on the privilege issues, which is what I understand is

24   still an open issue.

25       Judge, it's a little bit of a strange case where --

 1    one that I believe I have never encountered -- where you sort

 2    of have to question everything, and I do have to question

 3    everything here.  So I think it makes sense to back up and

 4    really give context to what happened, that I don't think any of

 5    this -- I don't think what I say will be in dispute, but if I

 6    get to a part where I think it is in dispute, I will notify the

 7    court that I think that is an issue that the parties don't

 8    agree on.

 9               THE COURT:  OK.

10               MR. BRENNER:  So here is what happened.  Here's the

11    defendants' narrative of what happened.

12               The defendants' narrative is that in July of 2017

13    Dr. Wright and his wife Ramona -- in the documents she's

14    referred to as Ramona Ang.  I think a lot of times we refer to

15    her as Ramona Wright.  I'm pretty sure that is the same person.

16               THE COURT:  Ramona Watts.

17               MR. BRENNER:  I'm sorry.  Ramona Watts.  She is in

18    this document as Ramona Ang.  I think it is the same person.

19               They are the grantors, settlors and beneficiaries of

20    this trust.  What the defendant says happened is that in July

21    of 2017 they took literally everything they own and put it into

22    this trust.

23               Now, just to back up one step before, remember, your

24    Honor, that when we had our hearings in the summer no one

25    mentioned this trust.  The hearings were all about what is in

1    the trusts.  And Dr. Wright was here -- he actually was not

2    here for the whole hearing.  He was here for the first day, at

3    least my recollection, and then he was here for the third day.

4    I think the day that Mr. Shaders testified Dr. Wright was on

5    business and was not here.  At least that is my recollection.

6             THE COURT:  Mine as well.

7             MR. BRENNER:  At no point did anyone say, hey, by the

8    way, these trusts that we're talking about, none of them

9    matter; they've all been folded into a third trust.

10            Now interestingly, Denis Mayaka inserted himself into

11   those proceedings by way of an affidavit.  He is supposedly the

12   person who wrote or helped write the Tulip III trust.  I call

13   it the Tulip III.  It is the July 2017 trust.

14            But Denis Mayaka on behalf of the defendant in this

15   case submitted a declaration to your Honor in May of 2019, on

16   the eve of the hearings, and said, hey, this trust, which I

17   think was the Tulip II -- it is the October 2012 trust -- it's

18   authentic.  Never bothering to mention, hey, court, by the way,

19   you should know I later wrote another trust that revoked that

20   trust in its entirety.

21            So when your Honor asked me what do I know about

22   Mr. Mayaka, do I know he is a lawyer?  I have no idea.  Do I

23   think Mr. Mayaka is sort of a detached third-party player here?

24   No, I don't.  I don't think the record would support that.

25            So anyway, to take the defense narrative a bit further

1    and why the suspicion arises, so this trust is executed in

2    2017.  In the trust it has language that essentially says that

3    Dr. Wright cannot have possession of the document from July

4    2017 until mid-December 2019.  OK.  Ms. Watts has to have

5    possession of the document.  She is the sole trustee for the

6    entire assets of her family.  But the defendants' position is,

7    no, she doesn't have it; she has no idea.  Dr. Wright, the

8    story has to be, he forgot about it because otherwise he would

9    have had to have told your Honor at the hearings about it.

10         So this idea that, well, Dr. Wright gets a

11   get-out-of-jail-free card because he didn't have the

12   document -- forget if he had the document; his wife clearly

13   did.  But he pretends like he doesn't know it existed.

14         All of his assets have been transferred into a trust

15   that he conveniently forgot even exists.  OK.

16         So then what happens?  By the way, none of that I

17   think is disputable, whether it is disputed.  I don't know if

18   it is disputed.  It is not really disputable.

19         So then what happens?  Then the defendant says, and

20   now I'm going to the interrogatory answers, and I think

21   probably the best one to look at in the most detail is

22   interrogatory No. 2.

23         THE COURT:  Yes.

24         MR. BRENNER:  OK.  So there's a list of -- and I don't

25   mean it in a pejorative way.  I'm going to say there are

```
1    boilerplate objections -- but there's a list of objections.

2    Then we get to the heart of the answer, and it is on the bottom

3    of page 5 or the bottom third.

4             So here's what it said:  In mid-December 2019, the

5    trust agreement for the Tulip Trust, which is referring to

6    Tulip Trust III, was delivered to Ramona Ang May Fong ("Ramona

7    Watts") by counsel responsible for the trust.

8             OK.  Let's stop there.

9             When we got the document in early January, I think --

10   early January?  When we got the document in early January we

11   said, wow, this is kind of crazy, right?  There's these other

12   trusts and all of the sudden, lo and behold, there is a third

13   trust.  We said, Can we have electronic copies of that

14   document?  They said none exists.  We said, That's OK.  Can we

15   have the hard copy?  They said, No, can't have that either.

16            So the first part to then argue is how did Ms. Fong

17   get this document.  You can't tell by reading the

18   interrogatory.  Do you know if Mr. Watts showed up at her door

19   and handed it to her?  I don't know.  Do you know if Mr. Watts

20   e-mailed it to her?  I don't know.

21            THE COURT:  You mean Mr. Mayaka.

22            MR. BRENNER:  Mr. Mayaka.  None of us know.  I have no

23   idea.  She got it somehow.  She either had to get it by hard

24   copy or electronic.  At least I don't know a third way.  OK.

25            So he delivers it to her.
```

```
 1            By the way, his declaration says that he is the
 2     counsel for Dr. Wright and Wright International Investments,
 3     not that he is the counsel for Ramona Watts nor is it that he
 4     is the counsel for the trust.  He says he helped write the
 5     trust, but I don't know if he means he wrote it.  He says:  I
 6     represented Dr. Wright and Wright International Investments in
 7     connection with the Tulip Trust documents.
 8            I don't know what that means.  I would love to ask
 9     Mr. Mayaka.
10            So we have no idea what was given to Mr. Watts -- Ms.
11     Watts or how it was given to her.
12            Then it says:  Under the express terms of the trust --
13     this is what I covered before -- Dr. Wright did not have, could
14     not have a copy of it before December 2019.
15            There is no reason and it is a virtual impossibility
16     and it would make Ms. Watts doing something she probably can't
17     do or shouldn't do, there is no way she doesn't have it, right.
18     She is the sole trustee.  It is worth looking, your Honor, the
19     trust -- do you have that in front of you, your Honor?
20            THE COURT:  I do.  I do.  404-3 under seal.
21            MR. BRENNER:  OK.  I have it by Bates number.
22            THE COURT:  I think it's Bates No. 1518379.
23            MR. BRENNER:  8378.  I have the cover page.
24            THE COURT:  OK.
25            MR. BRENNER:  Close enough.
```

```
 1              If you look at what is in this trust, this is Schedule

 2   A, which is on page 15 or Bates that ends in 93.

 3              THE COURT:  93.  OK.

 4              MR. BRENNER:  What is in the trust?  All the shares of

 5   Wright International Investments, which are held by --

 6              MS. MCGOVERN:  Your Honor, excuse me.  I am going to

 7   object to this entire statement by Mr. Brenner.  It is not

 8   relevant to the issue that is before you with respect to

 9   whether or not the privilege was properly asserted.  It is

10   again an ongoing opening statement or closing argument with

11   respect to impeachment material that they are fabricating for

12   Dr. Wright, and we object to these proceedings, these discovery

13   proceedings --

14              THE COURT:  OK.

15              MS. MCGOVERN:  -- being converted into this type of

16   declaration that everything Dr. Wright does can't possibly be

17   so.

18              THE COURT:  Well, I think, Mr. Brenner, given that

19   this is at least for the time being under seal we probably

20   shouldn't talk about what is in it.  But you have made the

21   blanket statement and I can see the nature of what is in

22   Schedule A to this.

23              MR. BRENNER:  I actually meant to ask you if I need

24   to --

25              THE COURT:  I mean, I think you haven't crossed any
```

1   lines.  I think you are making sufficiently generic statements.

2   I haven't heard an objection yet, but I think we ought to be a

3   little careful about talking about the terms of the document.

4            MR. BRENNER:  I think that's --

5            MS. MCGOVERN:  If I could just make one statement,

6   your Honor.

7            THE COURT:  Yes.

8            MS. MCGOVERN:  With respect to disclosure of this

9   trust, there is a real concern, which we have been advised by

10  UK counsel, that disclosure of the terms of the trust would be

11  a breach of the Act of the Seychelles.  We are in the process

12  of obtaining legal opinions and affidavits from counsel in the

13  Seychelles because this is in fact a registered trust in the

14  Seychelles, and the trustee, to the extent that the trustee

15  provided this information to Dr. Wright, and we have produced

16  it in this case because we thought we had to do so in good

17  faith, turns out to be a disclosure of this trust agreement,

18  particularly on the internet, it would be a serious breach of

19  the Seychelles Act of the trust.

20           Again, all of these arguments by Mr. Brenner that he

21  is making on the record are not necessary because the only

22  thing we are determining at this point is whether Dr. Wright

23  has properly asserted an attorney-client privilege with the

24  Kenya lawyer.

25           THE COURT:  OK.  I agree with that.

```
 1              I think -- so, first of all, this is under seal.  So I
 2     think, if I haven't issued it yet, I'm issuing an order to show
 3     cause asking if the parties can at least file some redacted
 4     version of it.
 5              And it may well be, Ms. McGovern, that it is the cover
 6     sheet and everything else is redacted.  I just don't like
 7     having things on the docket that there is no indication to the
 8     public they exist at all.
 9              MS. MCGOVERN:  We completely understand that.  In
10     fact, we were reserving that point for the end of the hearing
11     so we could just address this with you because we were very
12     concerned that we are participating now in a process where a
13     lot of attorneys right now are very concerned about what is
14     being disclosed on the internet --
15              THE COURT:  Sure.
16              MS. MCGOVERN:  -- for the beneficiaries and for the
17     trustee.
18              THE COURT:  No, understood.  Understood.
19              So I think, Mr. Brenner, I think that is right.  I
20     think we should stay away from the content of the trust.
21              MR. BRENNER:  Fair enough.
22              THE COURT:  You have made your point.  This was never
23     disclosed before.  Somebody had to have it.
24              MR. BRENNER:  OK.
25              THE COURT:  Your interest, and I guess one of the
```

1   things you were driving at in the interrogatory, was just to

2   find out how Ms. Watts got it, how physically did it come to

3   her possession.  Was it e-mailed to her, did somebody hand it

4   to her, was it Fed-Exed to her.  Just how did she get it.

5           MR. BRENNER:  Yes.  And if we're --

6           THE COURT:  I guess more specifically, what does

7   Dr. Wright know about -- because he is the person responding to

8   the interrogatory.

9           MR. BRENNER:  Right.

10          THE COURT:  Does he know about how she got it, when

11  she got it, who she got it from, etc.

12          MR. BRENNER:  Right.

13          MS. MCGOVERN:  If I could also just clarify for the

14  record, because to the extent there is a dispute, your Honor,

15  and I don't mean to interrupt your flow.

16          THE COURT:  It is all right.

17          MS. MCGOVERN:  But there is an answer in this

18  interrogatory that explains how Ms. Watts got it.  There is a

19  statement that is being made on the record that we have simply

20  stated in a vacuum she got it and we didn't say how, and we

21  specifically state on page 3 that thereafter, on or about

22  December 17, 2019, after Ms. Watts made an inquiry to

23  Mr. Mayaka, Ms. Watts received through Vista mail -- I'm sorry.

24  I don't have my reading glasses on.

25          THE COURT:  I remember seeing that.

```
 1              MS. MCGOVERN:  All right.
 2              THE COURT:  I remember seeing that.
 3              MR. BRENNER:  I'm going to get there, Judge.
 4              MS. MCGOVERN:  -- encrypted files.
 5              So we have provided the date, by whom, and in what
 6    form this was received.  So that would be an inaccurate
 7    statement on the record.
 8              THE COURT:  OK.  I understand your position.
 9              Yes.  So, Mr. Brenner, go on.
10              MR. BRENNER:  Can we back up just a little bit?
11              THE COURT:  Yes.
12              MR. BRENNER:  In that attempt to --
13              THE COURT:  I'm just trying to keep my papers
14    straight.
15              MR. BRENNER:  -- interlope an objection, we had an
16    accusation of fabrication and misstatement of the record.
17              What Ms. McGovern pointed you to on page 5 is not how
18    she received the trust.  OK.  At least the way that we
19    understand it.
20              See, you really need to go through this line by line
21    to understand what they're claiming is privileged.
22              THE COURT:  Trust me -- when you say "this," you mean
23    the trust or the interrogatory answer?
24              MR. BRENNER:  No, no, no.  The interrogatory answer,
25    not the trust.
```

```
 1              THE COURT:  Trust me, I've read it a dozen times.

 2              MR. BRENNER:  Yes.  Not the trust.  And, your Honor,

 3    I'm not trying to reveal the terms of the trust.  I actually

 4    thought that we had jointly filed proposed redactions, but I

 5    could be wrong.

 6              THE COURT:  I think you did, and I haven't ruled on

 7    that yet.

 8              MS. MCGOVERN:  Well, your Honor, actually, if I could

 9    just state, we had a hearing on the issue regarding unsealing

10    the trust --

11              THE COURT:  Right.

12              MS. MCGOVERN:  -- on January 29th, and your Honor made

13    the argument -- well, excuse me.  Let me correct that.  Your

14    Honor made the, or explained, and we agreed with, the analysis

15    that attaching a discovery document to a notice does not

16    trigger the public right to know, and therefore the trust

17    should not be unsealed.

18              What's happened since then, your Honor, is they have

19    attached this trust document to every single document they

20    filed.  I don't know if that is making it somehow a

21    merits-based document and thereby now we're under the motion to

22    seal standard.  But your Honor did rule.

23              What happened was we had previously provided competing

24    redactions, because there was a due date, but then the argument

25    was actually made on the 29th and your Honor said it should
```

1    stay sealed.

2         THE COURT:  Right.  I'm aware.  Yes.  You're correct.

3    So if it is under seal, we will stay away from the sealed

4    document.

5         MR. BRENNER:  I think the point regarding the contents

6    of the sealed document are sufficient at this point, but -- so

7    let's just address the actual interrogatory.

8         So where I left off, under the terms of the trust it

9    could not be provided to Dr. Wright before December 15th.  OK.

10   That is in the interrogatory answer.

11        Then it says:  The communication -- and by the way,

12   this is the delivery not of the encrypted file.

13        THE COURT:  Right.

14        MR. BRENNER:  This is the delivery of the sealed

15   document, which I'll try to refer to it as.

16        THE COURT:  OK.

17        MR. BRENNER:  OK.

18        THE COURT:  I think you can refer to it as Tulip Trust

19   III.  I don't think anyone's objecting to that.

20        MR. BRENNER:  OK.  I'm trying to be careful.

21        THE COURT:  I appreciate that.

22        MR. BRENNER:  OK.  So let's make sure we're keeping

23   separate what we know and what we don't know.

24        So we don't know how the Tulip Trust III got to Ms.

25   Watts.  At least I don't know and the interrogatory doesn't

1    tell you, so I don't think your Honor knows.  Then it says:

2    The communications between counsel for the trusts and Ms. Watts

3    and Dr. Wright are attorney-client communications and

4    privileged.

5          OK.  So first assertion of a specific privilege as

6    opposed to sort of a general calling for information privilege.

7          First of all, I don't know if Mr. Mayaka is the

8    lawyer, but I can't prove that he is not.  So our argument does

9    not rest on the idea of Mr. Mayaka not being a lawyer.  But I

10   just can't stipulate that he is because I have no idea.

11         I know on his LinkedIn page he clearly does not seem

12   to be acting as a lawyer; he is acting as a -- he identifies

13   himself as the chief executive officer at the Offshore House,

14   Ltd.  But he has a law degree, apparently, according to his

15   LinkedIn.  I guess that technically makes you a lawyer.

16         I do note in his declaration that he has a spot for

17   his legal identification number and it's blank.  A little odd,

18   but that is OK.

19         OK.  So the communication is counsel for the trust and

20   Ms. Watts and Dr. Wright are attorney-client communications and

21   privileged.  OK.

22         The fact that a lawyer talks to a client, and I don't

23   see any basis that Ms. Watts is a client -- I don't even see

24   Mr. Mayaka saying that -- that doesn't make it privileged.

25   Lawyers and clients have conversations about lots of things

1    that are not privileged.  Also acts by lawyers in front of

2    their client don't become privileged.  For example, did he send

3    it to her by e-mail or did he hand deliver it.  Not privileged.

4         There is no confidential communication seeking legal

5    advice.  That is just not a privilege thing.

6         MS. MCGOVERN:  Your Honor, I can clarify.  We are not

7    asserting privilege over how she received the document.  It is

8    my understanding it was by e-mail.

9         THE COURT:  OK.  I understand.

10        MR. BRENNER:  OK.  So we would obviously -- I assume

11   Dr. Wright will affirm that.

12        OK.  So that would be interesting only because

13   Dr. Wright filed a declaration today saying he does not have an

14   electronic copy of this document.

15        THE COURT:  I haven't seen that.

16        MR. KASS:  Your Honor, if I can address that.  You

17   could attach a TIF -- the document existed in a TIF, which is a

18   scanned version.  If it goes through an e-mail, it doesn't

19   automatically create metadata in the attachment.

20        THE COURT:  Understood.

21        MS. MCGOVERN:  Just to be clear on the record as

22   well -- I'm so sorry -- but when I say it was received by

23   e-mail, it was not received by e-mail by Dr. Wright.  He is not

24   the trustee.  It was received by e-mail by Ramona Watts.

25        THE COURT:  So let's try to break it apart this way,

1    Mr. Brenner.  The interrogatory would require Dr. Wright to

2    tell you --

3              MR. BRENNER:  Right.

4              THE COURT:  -- what he knows --

5              MR. BRENNER:  Correct.

6              THE COURT:  -- about how Ms. Watts got this.  What he

7    is saying is that's a spousal communication between my wife and

8    me, on the outside of the M&M, and on the inside of the M&M, it

9    is a privileged communication from her lawyer to her.  And so

10   it is privileged inside as well.

11             So I think you were just addressing -- I don't know

12   which one you were addressing there when you said --

13             MR. BRENNER:  Right.

14             THE COURT:  -- it's not an attorney-client, it is not

15   privileged.

16             MR. BRENNER:  Right.  I'm doing both.

17             THE COURT:  Because different standards for spousal

18   and marital.

19             MR. BRENNER:  Yes.

20             THE COURT:  For spousal and attorney-client.

21             MR. BRENNER:  Yes, but they have some similarities.

22             THE COURT:  Very much so.

23             MR. BRENNER:  So the spousal privilege is for

24   confidential communications, but there is an exception under

25   Florida law and exception if it is really regarding business.

```
 1              I have the case, the seminal case on it out of the

 2    Middle District of Florida.

 3              THE COURT:  Which one is that?

 4              MR. BRENNER:  Hanger Orthopedic.

 5              THE COURT:  Yes, I've read it.

 6              MR. BRENNER:  They actually went through a whole

 7    analysis because the statute doesn't actually say that

 8    exception, but I don't think -- I think it's pretty clear there

 9    is that exception.

10              Ms. Watts -- if I could just approach, your Honor.

11              THE COURT:  Sure.

12              MR. BRENNER:  What I am handing your Honor is a

13    three-page document.  It is three pages I've handed you, but

14    let me explain to you what it is.

15              THE COURT:  So we will mark this as Exhibit 3.

16              MR. BRENNER:  Right.

17              MS. MCGOVERN:  And that document has been marked

18    confidential.  So for purposes of referring to it, your Honor,

19    we'd simply note that the document has been marked

20    confidential.

21              THE COURT:  OK.  So generically speaking, Mr. Brenner,

22    what am I looking at?

23              MR. BRENNER:  Right.  Just so the record is clear,

24    what I've handed you, the first page is a produced e-mail dated

25    July 27th.  The second page is just telling you that the third
```

1    page was produced electronically, and that's why there is no

2    actual Bates number on the bottom.

3            THE COURT:  Understood.

4            MR. BRENNER:  But this is a produced document, the

5    third page.  My only alteration to the third page is I blew it

6    up because I assumed your eyesight is probably about as good as

7    mine.

8            The only reason I'm showing you this document is these

9    are some, but I don't know, these are at least some of the

10   companies that Dr. Wright has used to run his businesses and

11   his intellectual property.  As you can see, Ramona Watts is a

12   director in -- what, on this one she is one, two, three, four,

13   five, six, seven, eight, nine, ten, 11, 12 of these.

14   Mrs. Wright is Dr. Wright's business part.  She is his wife

15   too.  I think, but I don't know, Judge, I think that they had a

16   business relationship before they had a husband-and-wife

17   relationship, but I'm not positive of that.  But that doesn't

18   really matter.

19           Clearly Ms. Watts is not a -- she is clearly his

20   business partner, and that is what the Hanger case goes to.

21   Things don't become privileged because you go into business

22   with your spouse.

23           Because I can't go through the sealed document, I

24   would just encourage your Honor -- I don't know the best way to

25   do this.  I don't want to reveal the contents.  I would

```
1    encourage your Honor to review it to see that it is in fact --
2    I don't know how to do it, Judge.
3         THE COURT:  What I think I hear you saying is go
4    through it and just look at the structure and the role that Ms.
5    Watts plays within that structure.
6         MR. BRENNER:  What the trustee is charged with doing.
7         THE COURT:  Understood.  OK.
8         MR. BRENNER:  Is that good enough?
9         THE COURT:  That is generic enough for me.
10        I still haven't heard an objection from Mr. Kass or
11   Ms. McGovern.  So I think we are good so far.
12        MR. BRENNER:  OK.  OK.  So it's our position that none
13   of the conversations regarding the sealed document are
14   spousally privileged because they have nothing to do with the
15   fact that they are husband and wife; they have to do with the
16   fact of her position as reflected in the document.
17        THE COURT:  Understood.
18        MR. BRENNER:  I think Hanger pretty squarely supports
19   that, although I was not able to find any case in the context
20   of a trust.
21        THE COURT:  If I think what you are trying to dance
22   around is the fact that Ms. Watts is the trustee, I think
23   Ms. McGovern said that earlier.  So if that's what you are
24   trying to avoid, I think you're OK to say that much.
25        MR. BRENNER:  OK.  The trustee, yes, and the duties of
```

```
 1      the trustee are -- your Honor can review them.

 2                  THE COURT:  OK.

 3                  MR. BRENNER:  If I can't -- I'll walk you through

 4      them.

 5                  MS. MCGOVERN:  Your Honor, if I could just note,

 6      however, that the sealed document does not reflect that she is

 7      a trustee of any of the corporations that have been handed to

 8      you on the confidential document.

 9                  THE COURT:  Understood.  The corporations are the next

10      topic we are going to get to when we talk about the privilege

11      issues, but I understand.

12                  MR. BRENNER:  I'm not sure I understand.  Corporations

13      don't have trustees.  She's the director of --

14                  THE COURT:  Whatever her role may be in those

15      entities, I understand what her role is in the Tulip Trust III,

16      I understand what his position is within the Tulip Trust III,

17      and to the extent you're making an argument that the

18      intersection of those relationships is not a spousal one, I

19      understand the argument.

20                  MR. BRENNER:  Right.  And let's just assume -- I think

21      none of it is spousal.

22                  Let's now go through the rest of the interrogatory.

23                  On December 17, 2019 -- so that is presumably -- by

24      the way it's drafted, I think it's after the first one.

25                  THE COURT:  Hold on.  The next privilege objection --
```

 1    we are only here on privilege objections.

 2              MR. BRENNER:  Yes.

 3              THE COURT:  The next privilege objection is the next

 4    paragraph down that he objects to specific details regarding

 5    the receipt of the information necessary to produce the list,

 6    etc.

 7              MR. BRENNER:  Right.  I'm just trying to show what is

 8    asked and what they answered.  When you say next paragraph

 9    down, which page are you on?

10              THE COURT:  On page 6.  I'm going from 5 page to 5, 6.

11              MR. BRENNER:  Right.  I was just going to read what

12    happened on page 5 so we understand what is taking place and

13    what is being withheld.

14              THE COURT:  Again, the response to the interrogatory

15    is marked confidential and it is filed under seal.  So I don't

16    want to have it being read into the record.

17              MR. BRENNER:  OK.

18              THE COURT:  I mean, I can see it.  I understand the

19    sequencing here.  I've read it before.  It says that Ms. Watts

20    got something by Vista mail and she provided it to -- did what

21    she did with it.

22              MR. BRENNER:  Right.

23              THE COURT:  It says it right there what she did with

24    it.  OK.

25              MR. BRENNER:  So the interrogatory asked basically

1    what happened in both these events, meaning what I'll call the

2    mid-December event, as it is identified in the interrogatory,

3    and the December 19th event.

4            THE COURT:  17th.

5            MR. BRENNER:  17th, yes, you're right.  December 17th

6    event.  None of which -- the physical delivery, what was said,

7    none of that is going to be attorney-client privilege.

8            I actually didn't read -- I'm not sure from reading

9    the interrogatory whether there is a claim that -- it's unclear

10   to me who Mr. Mayaka spoke to or conversed with.  That is

11   unclear to me.

12           The first one, the mid-December event, seems to be

13   with Ms. Watts.  The second one, as your Honor read, seems to

14   be with both, but I don't hear the defendant saying that

15   Mr. Mayaka and Dr. Wright actually communicated this time.  I

16   just don't know.

17           THE COURT:  Right.  As I read the paragraph at the

18   bottom of page 5 folding over into page 6 --

19           MR. BRENNER:  Yes.

20           THE COURT:  -- as I read that, it's that Ms. Watts had

21   a bilateral discussion with Mr. Mayaka without Dr. Wright, that

22   as a result of that conversation something was sent to her and

23   then thereafter she gave something to Dr. Wright.

24           MR. BRENNER:  Right.

25           THE COURT:  So --

```
 1              MR. BRENNER:  That's how I read it.
 2              THE COURT:  What is it that is missing that you still
 3    want to know?
 4              MR. BRENNER:  So I want to know, first of all, how did
 5    this sort of out of the blue happen, right?  How did Mr. Mayaka
 6    sort of almost -- well, how did Mr. Mayaka on December 15th --
 7    well, I don't know it is the 15th -- mid-December, just out of
 8    the blue send the trust to Ms. Watts?  No idea.
 9              I know what was going on here, but I have no idea how
10    that happened.  I have no idea what he said.  It would be
11    strange for the counsel for the trust two years after the --
12    I'm trying not to -- it would be strange for the counsel to the
13    trust to send the trustee the document, that she is the sole
14    trustee for, two years later and just there is no
15    communication.  That doesn't make any sense to me.  And the
16    defendant is shielding all those communications under both
17    attorney-client, because presumably they're saying Mr. Mayaka
18    and Ms. Watts is attorney-client, which the declaration does
19    not say, and then they are further shielding it because clearly
20    Ms. Watts had to have conversations with her husband because
21    otherwise there would be no spousal communication privilege.
22              So what happened?  Right?  That is a big deal in this
23    case.
24              Just to be clear, without getting into what -- well,
25    I'm just hamstrung on how to say it.  It plays a central role
```

```
 1   in the case.

 2             THE COURT:  Right, and I've said it is relevant.

 3             MR. BRENNER:  Right.

 4             THE COURT:  I understand why you're arguing what you

 5   are arguing, but really we need to focus on the privilege

 6   questions.  What privilege issues are we dealing with here?

 7             MR. BRENNER:  Right.  Well, without knowing what -- I

 8   don't know.  I don't think there is any privilege issue

 9   between --

10             THE COURT:  But the "I don't know" is not they won't

11   tell me because it's privileged.  What I need to know is what

12   you think -- what you've asked for that they are saying we

13   won't tell you because it's privileged.  Is it what did Ms.

14   Watts say to the counsel for the trust; is it what did Ms.

15   Watts tell Dr. Wright she said to the counsel for the trust and

16   the counsel for the trust told her.

17             MR. BRENNER:  Both.

18             THE COURT:  OK.  I don't think you can get the first

19   one from Dr. Wright.  He is not Ms. Watts.  You can only ask

20   Dr. Wright what he knows about what Ms. Watts said.  You can't

21   ask Ms. Watts in an interrogatory to tell you what she did.

22             MR. BRENNER:  Only to the extent Dr. Wright knows it.

23             THE COURT:  Correct.

24             MR. BRENNER:  Yes.  I think that's the point your

25   Honor is making.
```

```
 1              THE COURT:  OK.  And that bumps up against their
 2     argument which is even if he does know it, he knows it because
 3     his wife told him.  That's spousal privilege.
 4              You can't have that.  To the extent she had a
 5     conversation with counsel for the trust, that's attorney-client
 6     privilege, so you can't have that either.
 7              MR. BRENNER:  Right.  So that's why I keep going back
 8     to the underlying attorney-client privilege, although I take
 9     your Honor's point which is it is not an interrogatory to Ms.
10     Watts.
11              THE COURT:  OK.
12              MR. BRENNER:  But they're incorporating it.  They are,
13     as you say, the two layers of the M&M.  So I sort of have to
14     address both.
15              It is hard for me to say what they're not telling me
16     because they're not telling me.
17              THE COURT:  I understand.
18              MR. BRENNER:  Right.  In fact, at the last hearing
19     your Honor overruled the relevance objections and said you were
20     going to hear privilege, and I asked, Well, can we at least
21     have the stuff that is being withheld on relevance, and they
22     said, No, everything's privileged, everything has been withheld
23     on privilege.
24              MS. MCGOVERN:  Your Honor, if I could please correct
25     that statement.  What I said was we have not withheld
```

1   information based on relevance.  We have answered the questions

2   to the best of Dr. Wright's ability without invading privilege.

3        We don't have a nugget of information that we are

4   withholding based on relevance.  I said the absolute opposite

5   at the last hearing.

6        MR. BRENNER:  I actually think what she said is right.

7        THE COURT:  Folks, the transcript says what it says.

8        MR. BRENNER:  I agree.

9        THE COURT:  OK.

10       MR. BRENNER:  I think we are agreeing.  I think what

11   your Honor did is you said there was a Venn diagram.

12       MS. MCGOVERN:  I said there was a Venn diagram.

13       MR. BRENNER:  Oh.

14       THE COURT:  Sounds like something I would say, but

15   I'll give it to you.

16       MR. BRENNER:  Well, there you go.  The transcript will

17   say what it says.

18       THE COURT:  Exactly right.

19       MR. BRENNER:  I don't think we're disagreeing.

20       THE COURT:  OK.

21       MR. BRENNER:  I don't think we're disagreeing.

22       THE COURT:  Look, as I understand the issue presented

23   by interrogatory 2, it's what I just said.  You want to know

24   what did Ms. Watts and the counsel for the trust say to each

25   other.  They say that's attorney-client privilege.  You want to

1    know what did Ms. Watts say to the doctor.  If Dr. Wright knows

2    what Ms. Watts and the counsel said to each other, they say

3    that is attorney-client privilege.  You want to know what did

4    Ms. Watts say to him.  They say that is spousal privilege.  OK.

5           MR. BRENNER:  Right.

6           THE COURT:  OK.  What else do you want to know that

7    you want them to tell you?

8           MR. BRENNER:  Right.  So I guess that distills it,

9    right.  I want to know what Ms. Watts told Dr. Wright about the

10    areas covered in the interrogatory.  That could be two things.

11    It could be what Mr. Mayaka told her or it could just be what

12    she told him, right?  She may have said, here's the stuff --

13    and I don't know that she ever mentioned Mr. Mayaka.  The

14    interrogatory is a little unclear, as your Honor has pointed

15    out, whether there are also conversations between Mr. Mayaka

16    and Dr. Wright.

17           THE COURT:  OK.

18           MR. BRENNER:  There seem to be at least in some of the

19    interrogatory answers.

20           THE COURT:  To the extent there are, I believe their

21    position is they also had an attorney-client relationship and

22    therefore those would be attorney-client privileged.

23           Right, Mr. Kass?

24           MR. KASS:  Yes.  Correct, your Honor.

25           THE COURT:  And -- I'm sorry.  Let me just turn to Mr.

1    Kass on that one.

2         What is the attorney-client relationship that

3    Dr. Wright has with Mr. Mayaka?  Is it through his status as a

4    beneficiary -- if I can say that out loud -- through his status

5    relating to the Tulip Trust, or is it an independent

6    attorney-client relationship outside of the Tulip Trust?

7         MS. MCGOVERN:  I would like to answer that, if I

8    could, your Honor.

9         THE COURT:  Sure.

10        MS. MCGOVERN:  It is independent of the Tulip Trust.

11        Mr. Mayaka has attested in the affidavit that he

12   represented and provided advice to Dr. Wright with respect to

13   the creation and the registration of the Tulip Trust in 2017.

14   That is an independent relationship.

15        With respect to the actual beneficiary status, again,

16   I think that goes to advice that he would have received in the

17   creation of the trust that I certainly can't attest to.

18        To the extent that there are specific clarifying

19   questions with respect to the interrogatory about what you've

20   just said, I just note we are going to be in front of your

21   Honor in London on Monday and Wednesday for a very long period

22   of time and we are going to be with Ms. Ramona Watts under the

23   UK proceedings and the deposition and I'm sure there will be

24   lengthy questions on this issue then as well.

25        THE COURT:  OK.  I hope it is a week from Monday

1     because I'm not planning --

2            MS. MCGOVERN:  Yes, it is a week from Monday.

3            THE COURT:  You scared me there.

4            MR. BRENNER:  There you go.

5            THE COURT:  All right.  Look, there is a point at

6     which, Mr. Brenner, I think I am going to rule -- I will

7     rule -- I'm not sure I am going to rule from the bench today,

8     but I will rule as to whether or not there is a viable

9     attorney-client privilege claim that can be made by Ms. Watts,

10    whether there is a viable attorney-client privilege claim that

11    can be made by Dr. Wright, and whether there is a viable

12    spousal privilege claim that can be made.

13           I think once we get beyond that I can either order

14    them to produce a more fulsome response and/or you can probe

15    this, assuming I allow you to get into this whole area, you can

16    certainly probe it at the depositions.

17           I think what I'd like to do is frame that, those legal

18    issues, so I can give you all guidance on that.  Because if I'm

19    going to say, look, it is a privilege, then you're not going to

20    waste time preparing for it.  And if I say there is a

21    privilege, then they are going to do an expedited appeal to

22    Judge Bloom, and we need to get it teed up.

23           MR. BRENNER:  At the risk of not answering a

24    question --

25           THE COURT:  Sure.

| | |
|---|---|
| 1 | MR. BRENNER:  -- I'm not sure what -- I didn't follow |
| 2 | what you are asking me to do. |
| 3 | THE COURT:  Well, no, I'm just trying to frame the |
| 4 | issue, and I think you've framed it for me. |
| 5 | Your position is -- here's the questions I think that |
| 6 | I need to resolve today. |
| 7 | MR. BRENNER:  OK. |
| 8 | THE COURT:  When Ms. Watts talks to Mr. Mayaka, are |
| 9 | those privileged communications?  What is your position as to |
| 10 | that, A. |
| 11 | B, when she, assuming she repeats some or all of that |
| 12 | to Dr. Wright, even if it is just, here's a copy of a document, |
| 13 | are those privileged? |
| 14 | And separate and apart from that, if Dr. Wright is |
| 15 | having direct conversations with Mr. Mayaka about things |
| 16 | related to this trust but outside the structure of the trust, |
| 17 | are those privileged, and if not, why not. |
| 18 | MR. BRENNER:  The third one is spousal privilege. |
| 19 | THE COURT:  The first one is attorney-client. |
| 20 | MR. BRENNER:  Attorney-client. |
| 21 | THE COURT:  Between Ms. Watts and counsel for the |
| 22 | trust. |
| 23 | MR. BRENNER:  Got it. |
| 24 | THE COURT:  In her capacity as trustee. |
| 25 | MR. BRENNER:  Got it. |

```
 1              THE COURT:  Second one is spousal, and third one is,

 2   Ms. McGovern just said, Dr. Wright is asserting an independent

 3   attorney-client relationship outside of the trust.

 4              MR. BRENNER:  OK.

 5              THE COURT:  I think your position is none of those

 6   exist and I should compel them to answer those questions.

 7              MR. BRENNER:  Yes.

 8              THE COURT:  So I'm just focused on that.

 9              MR. BRENNER:  Yes.  That's great.  That's great.

10              THE COURT:  I think as to the spousal you've cited me

11   to the Hanger case.

12              MR. BRENNER:  I have cited you to the Hanger case,

13   which I -- yes, I cited the Hanger case.  I think it pretty

14   well sets out the law in Florida.

15              THE COURT:  Yes.

16              MR. BRENNER:  I guess my answer to the way you framed

17   the issue, which I think is the correct way to frame it, which

18   is could there be -- assuming your Honor accepts or is willing

19   to accept at this point that Dr. Mayaka -- Mr. Mayaka, not

20   doctor -- Mr. Mayaka has some sort of derivative

21   attorney-client relationship with Ms. Watts -- I don't know

22   what it is; no one has really asserted that, even in his

23   declaration.

24              THE COURT:  No, I think they said she is the trustee

25   and he is the counsel to the trust.  Ordinarily the counsel to
```

```
 1    the trust and the trustee might have an attorney-client

 2    relationship.

 3              MR. BRENNER:  Right.  What I'm saying is the

 4    interrogatory does say that.  The declaration says he is

 5    Dr. Wright's counsel, Wright International Investments'

 6    counsel, and the way I read it he is involved in the drafting

 7    of the trust documents.  But I don't know exactly how to read

 8    that.

 9              THE COURT:  All right.

10              MR. BRENNER:  It just says he was, in connection with

11    the Tulip Trust documents.  That's what it says.

12              THE COURT:  OK.

13              MR. BRENNER:  So I'm not sure what that means.

14              So the answer is could the -- if your Honor accepts

15    that there is some sort of -- that she has an attorney-client

16    relationship with Mr. Mayaka through the sealed document, if

17    your Honor accepts that, then the question is -- so could there

18    be privileged communications?  Then there could be privileged

19    communications.  Are there communications that are talked about

20    and asked for in the interrogatory?  No, there are not

21    privileged communications.  They're not seeking legal advice.

22    They are talking about an act, the mechanical act of how, why,

23    when this sort of thing showed up out of the blue.  That's not

24    privileged.

25              So when your Honor framed it as could there be a
```

1  privilege, I think the answer to that is yes, there probably

2  could be a privilege.  From the face of what the defendant has

3  presented in their interrogatory and today, none of that would

4  be privileged.

5  Then the second question is Ms. Watts to Dr. Wright

6  either repeating what the lawyer said or something else in

7  connection with the response, right?

8  My answer to that is, as the Hanger case makes clear,

9  yes, Florida recognizes a spousal communications privilege,

10  like I would assume most states do.  Yes, there are exceptions

11  to that privilege.  All this is an exception to privilege and

12  that is why I wanted you to look at what role she's playing

13  vis-a-vis what I handed you today, all the companies and the

14  sealed document.

15  So again, blanket question, could there be a

16  privilege?  The answer is there always can be a spousal

17  communications privilege.  Is there any indication that any of

18  this is privileged?  The indications are it's clearly not.

19  Then the third thing is independent, an independent

20  attorney-client communication from Mr. Mayaka to Dr. Wright,

21  right, that is our third one?

22  THE COURT:  Yes.  I think that's the only -- the third

23  leg on the triangle.

24  MR. BRENNER:  The third bucket.  The third leg of the

25  stool.

```
1              THE COURT:  Right.

2              MR. BRENNER:  Before we even get into a lot of the

3    theoretical discussion about that, I thought what Ms. McGovern

4    said earlier is there were none in this instance.  So if there

5    aren't any communications between Mr. Mayaka and Dr. Wright

6    regarding this whole chain of events in mid-December, then

7    there is no privilege but there is nothing to reveal.

8              THE COURT:  OK.

9              MR. BRENNER:  If they did have conversations, again,

10   it comes down to, again, so could it be privileged, yes.  The

11   stuff we asked for does not appear to be privileged.  We are

12   not asking for any sort of legal advice.  We're just trying to

13   figure out how these things showed up out of the blue.  That is

14   really what we want to know.  And I think -- I don't think it's

15   a leap to say that that's why we asked Judge Bloom to grant us

16   the right to serve these interrogatories and she granted it.

17             So do I know what was going through Judge Bloom's

18   mind?  No.  But I think it is not a leap of faith to say that

19   Judge Bloom found that sort of chain of events to be worthy of

20   discovery and it just wouldn't be privileged.  It's not legal

21   advice or anything about that.

22             THE COURT:  I don't know that Judge Bloom was ruling

23   on the privilege issue.

24             MR. BRENNER:  No, no, for sure not.

25             THE COURT:  But I gave great weight to her views in
```

1    deciding that it is relevant and that it is discoverable.

2         MR. BRENNER:  For sure she did not weigh in on the

3    privilege issue.

4         THE COURT:  Let me turn back to the other side now

5    that I think I've framed the issue.

6         Mr. Kass, Ms. McGovern.

7         MS. MCGOVERN:  Yes, your Honor.  I guess with respect

8    to the communications between Ramona Watts and Denis Mayaka, I

9    think that the declaration of Mr. Mayaka, which is attested to,

10   and the affidavit or the answers to interrogatories by

11   Dr. Wright, which are sworn, makes it clear that Denis Mayaka

12   is counsel for the trust.  So to the extent that Ramona Watts

13   as sole trustee of the trust is communicating with Mr. Mayaka,

14   those communications would fall under the attorney-client

15   privilege.

16        With respect to communications between Ramona Watts

17   and Dr. Wright, they're married.  It is undisputed that they're

18   married.  She is not a director in any of those corporations

19   that are contained within the exhibit that Mr. Brenner provided

20   to your Honor.  She is the sole trustee of a trust which deals

21   with the family investments.  That clearly is confidential, and

22   communications between Ramona Watts and Dr. Wright we believe

23   should be held in confidence.

24        With respect to the communications between Dr. Wright

25   and Mr. Denis Mayaka, Denis Mayaka has sworn to the fact that

 1     he is a lawyer.  He's sworn to the fact that he is Dr. Craig

 2     Wright's lawyer.  So to the extent that Dr. Wright had

 3     communications with Denis Mayaka independent or as counsel in

 4     connection with the trust, to the extent that those

 5     communications fall within the attorney-client privilege, we

 6     don't see how they should be disregarded in this instance.

 7          The one question that came up between your Honor and

 8     Mr. Brenner, which I want to make sure the record is very, very

 9     clear on so there is no question that we are not creating a

10     whole bunch of obstacles to thereby then say, well, there's

11     nothing.  That is not what the intent is here.

12          I think the problem sometimes with interrogatories and

13     when you're asking your client to respond to interrogatories is

14     that it's a single question and you're trying to provide the

15     answers to the best of your knowledge.  It is not a deposition.

16     It is not intended to be a deposition.  They are going to have

17     two days to do that and I'm sure, notwithstanding this hearing,

18     they are going to take two days to do it.

19          So my feeling, your Honor, with respect to the

20     questions as to what Dr. Wright spoke to Mr. Mayaka about in

21     connection with Tulip Trust III, I think that should be

22     addressed on a question-by-question basis to determine whether

23     in fact an attorney-client privilege protects that

24     communication.

25          The issue before your Honor is one of privilege.  I

1    don't see how that privilege has been effectively challenged in

2    this instance.  And with respect to the answers that were

3    provided in the interrogatories in this case, you know, I don't

4    mean to state the obvious, your Honor -- you said it -- these

5    are not interrogatories for Ramona Watts.  These are

6    interrogatories to Dr. Craig Wright.  In no instance were we

7    asking Dr. Wright to provide information that would have

8    separately substantiated attorney-client communications between

9    Ramona Watts and Mr. Denis Mayaka.

10         We note that the -- we understand that the use of the

11   interrogatory right before a deposition, that is going to take

12   place for two days, presided over by your Honor, and wanting

13   further questions asked of Dr. Wright under oath are because

14   there is a feeling that everything is happening out of the

15   blue, it's suspicious, it doesn't make sense and they have to

16   question everything doesn't mean there is not a privilege,

17   doesn't mean Dr. Wright hasn't done his best to answer these

18   questions, and certainly doesn't change the fact that he is

19   sitting for deposition for the third and fourth time in this

20   case.

21         Your Honor will be able to address whether the

22   question calls for privilege or not.  If it doesn't, it will be

23   answered.

24         THE COURT:  I understand.  But I do have to note for

25   the record that the reason he had to sit the second time is

1   because he made frivolous objections at the first one.

2           MS. MCGOVERN:  Yes.  I understand, your Honor.

3           THE COURT:  So --

4           MS. MCGOVERN:  And I'm simply trying to --

5           THE COURT:  Some of this is the problems of his own

6   making.

7           MS. MCGOVERN:  I don't mean to be speaking with

8   impunity.  I'm simply suggesting that when you are talking

9   about interrogatories, and Mr. Brenner has stood up and said

10  things don't make sense, they're not answering fully, why is

11  this out of the blue, we simply want to note for the record

12  that we're concerned about the use of discovery as a means to

13  somehow do a gotcha where the sentence doesn't make sense and

14  therefore it becomes inconsistent.

15          They have the opportunity to talk to Dr. Wright.  But

16  for today's purposes what we wanted to do was simply establish

17  for the record that Mr. Mayaka is counsel for the trust, is

18  counsel for Dr. Wright, and the communications regarding --

19  that were objected to under privilege were objections that were

20  well made.

21          THE COURT:  Understood.  I understand that.  I haven't

22  decided yet what remedy I would impose if I find that there is

23  no privilege here, which I haven't made.

24          Help me out, though, with one thing, Ms. McGovern or

25  Mr. Kass, because I'm looking carefully at the interrogatory

1    and I just want to make sure I'm not missing something here.

2          So interrogatory No. 1 asks you to identify the third

3    party.  As I recall the notice of compliance, it simply said a

4    third party sent this to, or it was provided by a third party,

5    which you identify Mr. Mayaka.  OK.

6          Then in the interrogatory it says that Ms. Watts

7    received something from counsel responsible for the trust.  It

8    doesn't identify who that is.

9          Then in the next paragraph it says, later she made an

10   inquiry to Mr. Mayaka.  So it doesn't actually say that

11   Mr. Mayaka is the trust's lawyer nor does his declaration say

12   that.

13         MS. MCGOVERN:  Your Honor, if I can clarify.  Counsel

14   for the trust was meant to refer to Mr. Mayaka.  Mr. Mayaka

15   being identified in response to No. 1 is the third party, and

16   references to counsel for the trust was meant to refer to

17   Mr. Mayaka.

18         THE COURT:  OK.  I just wanted to make sure.  I'm

19   clearly not going to play gotcha on that.  I think we all

20   understand that is who it was meant to be, but I wanted to be

21   sure.

22         MR. BRENNER:  Your Honor, can I just ask you to look

23   at one other thing.

24         THE COURT:  Yes, of course.

25         MR. BRENNER:  If you could go to this claim that you

```
 1   should just accept --
 2           THE COURT:  What are we pointing to?  I'm sorry.
 3           MR. BRENNER:  I am going to get to the microphone.
 4           This idea that we should just say Mr. Mayaka's a
 5   lawyer and he's the counsel for the trust, if you look at page
 6   5 of the sealed document --
 7           THE COURT:  Yes.
 8           MR. BRENNER:  -- if you look at paragraph 4.
 9           THE COURT:  The one starting with, In mid, in
10   mid-December?
11           MR. BRENNER:  No, of the sealed document.
12           THE COURT:  The sealed document.
13           MR. BRENNER:  The other sealed document.
14           THE COURT:  Page 5?  Sorry.
15           MR. BRENNER:  We have multiple sealed documents.
16           THE COURT:  OK.
17           MR. BRENNER:  If you go and look at --
18           THE COURT:  I see it.
19           MR. BRENNER:  -- paragraph 4.
20           THE COURT:  Yes, sir.
21           MR. BRENNER:  If you look at the only part that is
22   bolded in paragraph 4.
23           THE COURT:  I see that.
24           MR. BRENNER:  You see who is identified, what their
25   role is.  And if you go to the last -- page 14, there's only
```

```
1    two signatures on this document.
2             THE COURT:  Understood.
3             MR. BRENNER:  OK.  What his role was --
4             THE COURT:  I understand.
5             MR. BRENNER:  But anyway, that is --
6             MS. MCGOVERN:  Your Honor, if I could also make
7    another statement on the record.
8             THE COURT:  Sure.
9             MS. MCGOVERN:  There are other counsel for the trust
10   in connection with the drafting of the trust.  The answers to
11   the interrogatories were directed with respect to the receipt
12   of the trust document and, therefore, Mr. Mayaka was identified
13   in that regard.
14            I don't mean to suggest on the record that Mr. Mayaka
15   is the only attorney that worked on this.  There are counsel
16   around the world that worked on this document.  I just want to
17   make that clear.
18            THE COURT:  OK.  Thank you.  I appreciate you
19   clarifying that.
20            I think I understand the issue.  I've received -- any
21   other evidence either side wanted to introduce on this issue?
22   I have Exhibits 1, 2, and 3, which have been admitted.  Exhibit
23   3 has been marked confidential prior to today, so I'll treat it
24   as such for purposes of the hearing.
25            MR. BRENNER:  I think for recordkeeping purposes, for
```

```
 1    the record evidence at the hearing, the sealed document would
 2    probably be marked as an exhibit.
 3              THE COURT:  Yes, that is what I'm saying.  Not only
 4    the sealed and the trust document.
 5              MR. BRENNER:  Yes, and --
 6              THE COURT:  That's docket entry 404-3.  It's already
 7    been filed under seal in the record.  So I will consider that
 8    as an exhibit for purposes of this hearing.
 9              MR. BRENNER:  And I guess the interrogatory answers.
10              THE COURT:  Correct, which are 404-3 under seal.  I'm
11    sorry.  404 dash something under seal.
12              MR. BRENNER:  You said you had --
13              THE COURT:  1.
14              MR. BRENNER:  -- the Hanger case or you want it?
15              THE COURT:  No, I have it.  I've read it.  I read it
16    yesterday.  I'm familiar with it.
17              MR. BRENNER:  OK.
18              THE COURT:  OK.  I'm going to take that issue under
19    advisement.  Thank you both.  Very well argued, and you've
20    clarified the issues for me.  Thank you.
21              Let's then turn --
22              MR. FREEDMAN:  Your Honor, can I --
23              THE COURT:  Who have we got?
24              MR. FREEDMAN:  I have one last point.
25              THE COURT:  Hold on.  Hold on.  For the record, this
```

1    is Mr. Freedman?

2              MR. FREEDMAN:  Yes.

3              THE COURT:  I just want to make sure the record is

4    clear who is talking.

5              Go ahead, Mr. Freedman.

6              MR. FREEDMAN:  I just wanted to add one last point to

7    the argument, which is the defendants testified multiple times

8    that this bonded courier was a mail service hired by Dave

9    Kleiman, and then years later when questions start being asked

10   he morphs into a lawyer that was counsel to the trust.

11             THE COURT:  You can argue that to the jury.  OK.

12             MR. FREEDMAN:  I just think that the court is

13   assessing the credibility of whether or not Mr. Mayaka is in

14   fact a lawyer.

15             THE COURT:  I have not made any credibility findings

16   as to anything.  I've just accepted as evidence the declaration

17   of Mr. Mayaka, the LinkedIn page for Mr. Mayaka, what

18   Mr. Brenner proposed to me and the interrogatory answers sworn

19   to by Dr. Wright.  That doesn't mean I'm going to believe any

20   of it or I'm going to believe none of it.  I haven't made a

21   credibility finding yet.

22             MR. FREEDMAN:  My point is --

23             THE COURT:  Go ahead.  Go ahead, Mr. Freeman.

24             MR. FREEDMAN:  My point is just that I think this is a

25   relevant consideration for the court when it makes its decision

1    about these issues.  That's it.

2          THE COURT:  OK.  I understand your argument.  Thank

3    you.

4          Let's turn then to what is potentially the much

5    meatier issue, which is the privilege objections related to the

6    requests for production.

7          So let me again turn to the defense since it's your

8    burden to establish the privilege here.  So I don't know how

9    you want to deal with it, whether you want to deal with it sort

10   of categorically or how -- Ms. McGovern, are you going to take

11   this one or Mr. Kass?

12         MS. MCGOVERN:  Actually, Mr. Kass is going to take

13   over from now on.

14         THE COURT:  Very good.  All right.

15         Mr. Kass, happy to hear from you.

16         Let the record reflect I have read docket entry 389,

17   which was the plaintiffs' memorandum, docket entry 394, along

18   with the attachment, the declaration of Mr. Greave.  I read

19   396, which was the reply memo.  And I don't believe there was

20   anything else that was submitted with regard to those

21   objections.

22         I will be honest, I did not review the privilege log

23   of 1100 pages.  I actually opened it on my computer and, after

24   I stopped hyperventilating, I closed it.

25         So Mr. Kass.

1         MR. KASS:  Your Honor, first I just want to address

2    two issues.  As far as the specific, I'll call them just

3    deficiencies or issues that plaintiffs have raised with regard

4    to our privilege log, that is one of the attachments that were

5    in your e-mail.  One had, I think 1,600 issues that they wanted

6    to raise.  We actually went through -- we spent a lot of time

7    on this and went through every single one of them to address

8    every single issue that they have raised.

9         In response to that we gave them last night -- it took

10   us a long time to put it together, but they did have this last

11   night, and it lets them know which corporation is implicated in

12   that document.  It also lets them know, for example, if they

13   said previously Dr. Wright is not on this e-mail, I don't see

14   the attorney, and we explained that that was a formatting

15   issue.  We manually took it and inputted it.

16        So I think as far as the factual nitty gritty issues,

17   I hope by doing that we have streamlined a lot of these issues.

18   But of course the plaintiffs will let us know what we missed.

19        THE COURT:  I am going to guess they haven't had a

20   full chance to review that.  So if we maybe want to table that

21   part of it for a minute, we can come back to that at the end.

22        So Ms. Markoe is not here.  Her eyes have bled from

23   having to do all of that.

24        MR. KASS:  And, your Honor, with regards to the

25   specific issues that they raise in their briefing, which your

1    Honor previously recognized, that is a legal issue.  I am more

2    than able to address any specific questioning that your

3    Honor --

4         THE COURT:  I think the issues that have been raised

5    are whether as a matter of law a dissolved -- here's how I

6    would sort of look at it.  Whether a dissolved corporation can

7    ever have a privilege under Florida law.  If it can under

8    Florida law is Dr. Wright -- is he required to invoke that

9    privilege affirmatively.  If it is, can Dr. Wright do it for

10   the corporations at issue here.

11        I think those were the -- and if he can't, is it

12   unduly burdensome to require him to go find somebody who can.

13   I think that is how I would sort of in my own mind have kept

14   track of this.  So if you disagree or there are other issues

15   you want to address, feel free.  Those are the ones as I kind

16   of think it through.

17        MR. KASS:  Your Honor, we agree with you that is a

18   good way to address this issue.

19        THE COURT:  OK.  Like I said, I've read your

20   pleadings, but I will be happy to hear any argument or evidence

21   you want to submit.

22        MR. KASS:  I am going to go high level as to those

23   four individual topics and if your Honor has any additional

24   questioning, I will be happy to do my best to respond.

25        THE COURT:  Thank you.

```
 1           MR. KASS:  With regards to can a corporation ever have
 2      a privilege after it's dissolved, the answer is, in Florida or
 3      federal court, based on diversity, which -- based on diversity,
 4      which we are, which goes under Florida law, the answer is
 5      clearly yes.  The Florida statute is clear that a privilege can
 6      be asserted on behalf of a corporation that no longer exists.
 7      And if you're going to be able to assert a privilege, then
 8      obviously a privilege could exist.
 9           THE COURT:  And your view on that is textual.  You
10      just look at the language of Section 90.502.
11           MR. KASS:  Yes.
12           THE COURT:  The language at the end which says,
13      whether or not in existence, and that's superfluous.  If it
14      can't be for a corporation -- OK.  Got it.
15           MR. KASS:  Exactly.
16           THE COURT:  So then move to question No. 2, which is
17      does that corporation have to affirmatively invoke the
18      privilege or what.  Because I think you took the position you
19      don't have to affirmatively invoke the privilege.
20           MR. KASS:  Your Honor, there is one just little subset
21      that I would like to address.
22           THE COURT:  Sure.
23           MR. KASS:  Is that also under Australia law the
24      privilege also does exist, and we do have the declaration from
25      Gordon Greave who is an attorney, who has been practicing for
```

1    many years in Australia.  He also attached Australia case law

2    stating that the privilege does not -- is not extinguished upon

3    the corporation's dissolution.

4          So there is the separate issue of not forcing

5    Dr. Wright to do an action that would violate Australian law

6    also, and I just did want to mention that.

7          THE COURT:  Well, OK.  I can come back to that.  But

8    what I read in the materials you submitted under Australian

9    law, it seems to me if a court orders him to do it, he is going

10   to do it, he has to do it under Australian law, because the

11   guidance that was attached to one of the cases from the ASIC

12   was -- I will read it.  Hold on.

13         The ASIC, which, as I understand it, is the holder of

14   the privilege for these dissolved corporations, does not object

15   to parties seeking a court order that the documents sought do

16   not attract a legal, professional privilege and that the party

17   in possession produce the documents to the applicant.

18         So it is seems to me if I order him to do it, he is

19   not violating Australian law; he is doing what a judge tells

20   him to do.

21         MR. KASS:  Your Honor, with regards to that, that

22   point in particular, yes, a court and a judge in Australia has

23   the authority to order Dr. Wright to produce them, but as far

24   as the specific cases, essentially what -- going through the

25   cases, it is stated -- so after the corporation's dissolved it

1    goes onto ASIC, which is the holder of the privilege.

2            It's our stated position that they will neither waive

3    it nor will they assert it.  And when that happens, I believe

4    there's two or three cases exactly on that point that courts

5    say, well, this privilege exists unless it is waived, and since

6    they are not waiving it, we are not going to order the person

7    who has the documents to then produce it.

8            So in this particular circumstance there are

9    Australian courts that have addressed it and said, then we are

10   not going to obligate you to do it because there has been no

11   waiver and it exists from the moment it's created.

12           THE COURT:  OK.  I don't know why that is binding on

13   me, but I understand.

14           MR. KASS:  Your Honor, the issue is judicial comity

15   and that as a general rule courts should try not to issue

16   orders that would run afoul of the laws of other nations unless

17   there is a specific need for the document.

18           THE COURT:  Which way does that door swing?  If I

19   agree with you, they're standing in the way of me enforcing the

20   rules of discovery that the Congress of the United States says

21   apply in a U.S. court.  They're stopping me from enforcing my

22   law.

23           MR. KASS:  Your Honor, I understand that.  I'm simply

24   noting that there is a doctrine of judicial comity and at least

25   before we get to that stage, I think some sort of analysis

1   should be done as to the necessity for those documents.  Of

2   course your Honor is entitled to --

3           THE COURT:  Well, since you raised Australia law --

4           MR. KASS:  Sure.

5           THE COURT:  -- address their question as to why I

6   should even consider it.  You didn't give a formal 44.1 notice

7   that you were going to rely on Australian law.  Hasn't that

8   been waived?

9           MR. KASS:  Your Honor, two things, is that, first of

10  all, this issue came up as -- we raised it at the first time

11  this issue came up and that is with regards to their challenge

12  of the asserting of the privilege.  Right when they filed their

13  motion to compel, we raised it.

14          The second issue is that we're not saying that

15  Australia law needs to be applied in this case and that it

16  governs the decision; we're simply stating that this court

17  should not make a ruling that would obligate Dr. Wright to

18  violate Australia law.

19          THE COURT:  But here's the problem I have with this.

20  I have a declaration from someone who can't be cross-examined

21  in my courtroom telling me what Australian law is, which in the

22  U.S. we wouldn't allow a witness to testify to what the law is,

23  but he's telling me what the law is.  I have no idea who he is.

24  I have no ability to have Mr. Brenner cross-examine him.  I

25  have no ability to make any sort of credibility finding.

1    Mr. Brenner hasn't had a chance to get his own expert to try to

2    introduce counter-testimony.  I'm not saying I won't consider

3    it, but that concerns me.

4         MR. KASS:  Of course, your Honor.  We understand.  But

5    we just do want to point out logistical issues.  He is an

6    Australia attorney and Mr. Brenner did have an opportunity when

7    filing his reply to submit his own declaration from an

8    Australia counsel.

9         THE COURT:  OK.  I understand.

10        So I think I took you off track.  You were talking

11   about whether a defunct corporation can have a privilege, and

12   you said that certainly under Florida law as a textual matter

13   it can but also under Australian law it would.

14        MR. KASS:  Yes.

15        THE COURT:  OK.  So my next question is, assume that

16   to be the case, don't they have to assert it?  Doesn't somebody

17   have to come forward and say, hey, wait, that's privileged, and

18   doesn't that person have to have -- I wouldn't use the word

19   standing because that has all sorts of other implications, but

20   doesn't that person have to have the legal authority to come

21   forward and say, hey, wait a minute, there is a privilege here,

22   it's my privilege and I'm not -- I'm asserting it, I'm

23   affirmatively asserting it?

24        MR. KASS:  Your Honor, I want to address that by first

25   addressing a slightly more nuanced question, is that the second

1    there is a communication let's say between an attorney and a

2    client for the purpose of legal advice, essentially if it fits

3    all the elements under the Florida statute, we'd all agree that

4    is privileged.  Maybe it hasn't been asserted yet, but it would

5    be a privilege from the second it was created.

6           The issue is in this case is that plaintiffs are

7    essentially -- one way to look at it is we are asking

8    Dr. Wright to just take all those documents and throw it into

9    the public realm before those other parties would even have the

10   opportunity to say, hey, wait, that's privileged.

11          THE COURT:  Well, who are these other parties?

12          MR. KASS:  So, your Honor, that's part of --

13          THE COURT:  It seems to me from the chart I've got

14   that about 17 of them of the 19 are ASIC.  That would require

15   one communication to ASIC.  ASIC holds the privilege for all of

16   the dissolved companies.

17          MR. KASS:  Right.

18          THE COURT:  How complicated is that?

19          MR. KASS:  Your Honor, so the issue with that, that

20   gets us back to ASIC, their policy is that they will not assert

21   it, they will not deny it.  If we go to the Florida statute on

22   privilege, there are other people who can assert the privilege

23   other than ASIC, and that would be the client or the attorney.

24          There are over, I believe, 60 attorneys that would --

25          THE COURT:  Wait, wait.  Under Florida law --

1    MR. KASS:  Yes.

2         THE COURT:  -- you have a dissolved entity, and under

3    your reading of the statute the person who can assert it is a

4    successor, assignee, trustee in dissolution or any similar

5    representative.  That's the only part of the text that talks

6    about in existence of a corporation.

7         MR. KASS:  So, your Honor, I'm referring to E, where

8    it says "the lawyer."

9         THE COURT:  The lawyer for the corporation.

10        MR. KASS:  Right.  So if the corporation is not going

11   to give an answer because they're resolved and ASIC is holding

12   it and they're saying we're not saying yes, we are not saying

13   no, the next person Dr. Wright would have to go to is the

14   lawyer on the communication.

15        THE COURT:  Maybe.  Why?

16        MR. KASS:  The point is if he doesn't --

17        THE COURT:  He notified somebody who has the ability

18   to assert the privilege.  That person has decided not to assert

19   the privilege.  He is off the hook.  He did what he is required

20   to do.  Right?

21        The only reason he is required to talk to these people

22   is presumably he has some feeling he has some fiduciary

23   obligation or some other reason why he even has these documents

24   in the first place, that he owes some duty back to these

25   defunct corporations and he wants to just fulfill that duty.

1     Doesn't he just fulfill that duty by notifying ASIC?

2  If ASIC doesn't do anything, he's off the hook.  He did what he

3  is supposed to do.  ASIC had the right to produce --

4     MR. KASS:  No.

5     THE COURT:  Remember, he is not allowed to invoke the

6  privilege to protect himself.  He is allowed to invoke the

7  privilege to protect the defunct corporation.  If the

8  representative of the defunct corporation doesn't want to come

9  forward and do anything about it, Dr. Wright's done what he's

10 required to do, isn't he?

11    MR. KASS:  Your Honor, I understand what you are

12 saying.  Our concern is, though, that could still leave him

13 opened up to liability because ASIC is not taking a position

14 either way, because what they say is we don't know enough about

15 these communications to know whether -- because they do

16 recognize while they hold the privilege, they are not actually

17 the people who made the communications; they weren't the

18 parties involved.

19    I believe Australia courts have said -- like you have

20 to speak to the other parties, and they're the ones who would

21 be able to do it.  In this case it is either, A, it is going to

22 be Dr. Wright because he was the original client in these

23 cases, and we would say he does have the standing to do it.

24    THE COURT:  No, no.  The original client is the

25 corporation.

```
 1              MR. KASS:  I'm sorry.  A representative of the

 2    corporation.

 3              THE COURT:  Where is that in the record?  First of

 4    all, which are the corporations that he's invoking privilege

 5    for?  I have a list from the other side.  I have nothing from

 6    you telling me which corporations he's invoking privilege on

 7    behalf of.

 8              Can we start with that?

 9              MR. KASS:  Yes.  If you give me one moment, I can just

10    get it from my --

11              THE COURT:  That would be great.  Thank you.

12              MR. KASS:  Your Honor, this is part of the exercise,

13    what we did when we went through all those 1600.

14              Would your Honor like me to read into the record --

15              THE COURT:  No.  You can mark it and hand it to me.

16              MR. KASS:  OK.

17              THE COURT:  I'm looking at page 6 of the other side's

18    response.  If you tell me those are the corporations, I'll work

19    off of those.  Because the next question is going to be what is

20    the evidence in the record before me right now that Dr. Wright

21    had the appropriate position in any of these corporations such

22    that he can invoke the privilege on their behalf.

23              MR. KASS:  All right.  So, your Honor, at least at

24    this point in time we're trying to avoid the disclosure of

25    documents, of attorney-client communications that should not be
```

1  in the public record, that should not be reproduced.  So if

2  your Honor determines that additional evidence is necessary to

3  establish his relationship to all those corporations, which I

4  don't believe plaintiffs are contesting, that is definitely

5  that something we can supplement it with.

6          THE COURT:  Well, today is your day.  Today is your

7  hearing.  I made that clear last week.  Today was your chance

8  to meet your burden.

9          If you want to tell me that Dr. Wright as the

10 successor, assignee, trustee in dissolution or other similar

11 representative of each of those entities has the right to

12 invoke the privilege, you need to point me to the evidence that

13 tells me that.

14         MS. MCGOVERN:  Your Honor, I think if I could just

15 consult with Mr. Kass for a second.

16         THE COURT:  Yes.

17         (Pause)

18         THE COURT:  If he wants to invoke the privilege on

19 behalf of corporate entities, you need to put on the record

20 which corporate entities he is invoking the privilege on behalf

21 of and then you need to tell me why he has the right to do

22 that.

23         MR. KASS:  OK.  Your Honor, the best we could state is

24 that at this point it wasn't -- we didn't believe this was a

25 contested issue.

1          The separate issue is that, your Honor, throughout

2     this case, even throughout this production, is that plaintiffs

3     have taken the position any documents that Dr. Wright has

4     related to any of his corporations he should just produce them

5     because they are essentially one in the same entity.  They

6     didn't go subpoena each of those individual corporations.  They

7     were treating Dr. Wright and those corporations as one in the

8     same.  So I think --

9          THE COURT:  Did you object to that?

10         MS. MCGOVERN:  Yes.

11         THE COURT:  Did I rule on it?

12         MR. KASS:  I believe we did object, and your Honor

13    said to the extent we had them, they had to have been produced,

14    which led us to believe, at least that as far as the court was

15    treating this matter, that they were treated kind of as one

16    unit.  And based on that same logic, it seems that it is only

17    fair that Dr. Wright should also be able to assert the

18    corporation considering he is the same unit as those

19    corporations.

20         THE COURT:  OK.  I don't think -- I have to go back

21    and look, but that is probably not what my ruling was.  I'm

22    sure what my ruling was, which it usually is in this situation,

23    if it is in his care, custody and control, he has to produce

24    it.  And you never came back to me and said these aren't in his

25    care, custody and control.  That is a completely different

```
 1    question from whether --

 2              MS. MCGOVERN:  Your Honor.

 3              THE COURT:  Hold on.

 4              If I'm some low-level an employee at a company, I'm

 5    not in the control group, I never had anything to do with

 6    privilege and I happen to take a bunch of documents that belong

 7    to the company and leave and I'm later in a lawsuit and I

 8    produce those documents because I have them, that doesn't give

 9    me the right to invoke the privilege.  I never had the right to

10    invoke the privilege in the first place.

11              So unless Dr. Wright had the right -- just because he

12    has the documents doesn't translate to he has the right to

13    invoke a privilege.  That's a completely different question.

14              MR. KASS:  I understand, your Honor.  Well, in that

15    instance we would raise the objection that they're -- if he is

16    not a former director of the corporation, then he is also not

17    in possession, custody and control for the purpose of producing

18    those privileged documents.

19              THE COURT:  OK.  All right.  I will let the other side

20    address that.

21              MR. KASS:  I just do want to note, your Honor, that

22    was a footnote in our brief.

23              THE COURT:  Which was what?  I'm sorry.

24              MR. KASS:  The argument that the plaintiffs cannot

25    have it both ways, argue that he is not part of -- that he is
```

1   not the person to assert privilege while at the same time state

2   that Dr. Wright is the right person to produce them to

3   plaintiffs.  That's docket entry 395 -- 394, page 7, footnote

4   3.

5           THE COURT:  OK.  That is not how I read your footnote,

6   but I understand.

7           OK.  So your position is, though, that either he can

8   invoke it or they're not in his care, custody and control and

9   he doesn't have to produce them then.

10          MR. KASS:  Yes.

11          THE COURT:  They belong to somebody else.

12          MR. KASS:  Your Honor, correct.

13          THE COURT:  That's your position.  OK.

14          All right.  What was the next thing on my cascading

15  thing?  Does he have the legal authority.

16          MR. KASS:  Oh, too much burden, your Honor.

17          THE COURT:  Right.  I think we sort of intermixed that

18  in the conversation, but if you want to address that

19  specifically, feel free.

20          MR. KASS:  Yes.  Your Honor, again, the argument would

21  be that the privilege may be claimed by, it has a whole list of

22  people.  One of those is the attorneys.

23          To the extent the corporations themselves are not

24  taking a position, this is not your typical case where you're

25  going to the actual board of directors, and he's like, I don't

```
 1   really care, do what you want.  This is more you're going to
 2   the current holder in Australia, which is ASIC, and they're
 3   saying we don't know how these documents were created, we don't
 4   know the reasoning behind them, so we're just not going to take
 5   a position.  So the person who would be actually able to say
 6   that would be the attorneys involved in the communications, and
 7   that would be unduly burdensome.
 8           THE COURT:  The attorneys for the corporations.
 9           MR. KASS:  Yes.  The communications between the
10   corporations and the attorneys, and that would be, your Honor,
11   simply too burdensome to reach out to all those attorneys and
12   have them review the documents.  It would be a bear, your
13   Honor.
14           THE COURT:  OK.  Do we know who these attorneys are?
15           MR. KASS:  Yes, I do.
16           THE COURT:  Have we made an effort?  Have you reached
17   out to them and tried to see if they -- maybe their position is
18   going to be, it's a defunct company, we don't care, we'll waive
19   the privilege, we're not going to waste our time.
20           MR. KASS:  Your Honor, we have counted, I believe,
21   over 60 attorneys all over the globe and just simply reaching
22   out to 60 different attorneys in itself is a burden -- you have
23   to explain what the issue is, where we are right now -- and not
24   proportionate to the needs of the case.
25           Your Honor, I do want --
```

```
 1              THE COURT:  Ms. McGovern wants to chat with you, which
 2      is fine.
 3              (Pause)
 4              MR. KASS:  Your Honor, continuing from where I was.
 5              THE COURT:  Yes.
 6              MR. KASS:  Again, so, your Honor, at this point,
 7      discovery has been ongoing for a long time.  It's almost been
 8      two years.  A lot of documents have been produced.  At last
 9      count in our last motion I think it was 187,000.  I believe
10      we're at over 200,000 now.  A lot of documents.
11              There's been no statement as to what particular
12      document plaintiffs are looking for, what's the missing puzzle
13      that they need.  It really just seems to be, we want more
14      documents.  So we really have to balance what is the need for
15      these documents and the burden involved in producing these
16      documents.
17              I also want to make clear, your Honor, that to the
18      extent that they're looking for ATO documents and
19      communications that ultimately went to the ATO, to the extent
20      the document was a communication to the ATO, they got it
21      because that was with a third party.
22              What is in some of these documents are the
23      conversations with the attorney preparing the communications,
24      which then ultimately went to the ATO.  So they are getting a
25      lot of the documents that would be relevant to this issue.  And
```

1    then also, your Honor, there are a lot of documents that may

2    not be relevant at all that relate to some third party, Lynn

3    Watts --

4           THE COURT:  I understand, but we crossed that bridge a

5    long time ago.  We had the discussion about we had search terms

6    for a reason and I locked you and Mr. Roche in a room for a day

7    to come up with search terms, and you did, and my position is

8    and continues to be if it fell within the search terms, I'm not

9    revisiting that question.  I am not going to revisit a

10   relevance question based on that.

11          Because everybody gave up something when they agreed

12   to the search terms.  Everybody agreed not to get some stuff

13   that might be relevant.  Everybody agreed maybe we're going on

14   get a bunch of junk.  But that's what happens when you do

15   search terms.  So I understand your argument, but I am not

16   going to revisit a relevance objection at this time.

17          MR. KASS:  I understand, your Honor.  It was just

18   really as it pertains to burden, but I am not going to

19   continue.

20          THE COURT:  I understand.

21          MR. KASS:  I'm sorry.  Then just one last thing.

22   Again, your Honor, I just want to again mention that up until

23   this point in time no one has ever challenged Dr. Wright's

24   authority over those corporations and his role in those

25   corporations, and I will leave it at that unless your Honor has

1    any further questioning.

2         THE COURT:  No.  I understand.  I understand your

3    argument.  Thank you very much.

4         Mr. Brenner, I will let you respond.

5         MR. BRENNER:  I think Mr. Delich.

6         THE COURT:  Mr. Delich, OK.  You are usually on the

7    phone, Mr. Delich, or by e-mail, so it is good to meet you in

8    person.

9         MR. DELICH:  I'm happy to be here, your Honor.

10        THE COURT:  We warmed you up a little bit.

11        MR. DELICH:  It is a nice reprieve.

12        THE COURT:  OK.  I will let you go any order you want

13   to go in, but I mean -- I will let you go whatever order you

14   want to go in and then I will ask you the questions as we go.

15        MR. DELICH:  Don't hesitate to jump in if there is a

16   pressing question.

17        THE COURT:  They will assure you that I am not

18   bashful.

19        MR. DELICH:  I think -- the first point I want to make

20   is I agree with the sort of cascading legal framework that was

21   just discussed, kind of a four-step process, except I would

22   tweak it just a little bit and add kind of a step zero.  It is

23   the issue of whose burden it is to establish that this

24   privilege exists and that it's been validly asserted.

25        THE COURT:  Theirs.

1          MR. DELICH:  And it is not necessary to decide these

2     questions of Australian law and a lot of these other issues

3     when the reality is in this case we have not even known whose

4     privilege it is that we are talking about.

5          Now, the defendants, to their credit, last night

6     produced kind of tweaks to the spreadsheet.  We had produced *in*

7     *camera* to your Honor.

8          I did have some time to review it and I think it just

9     kind of goes to our point that the burden has simply not been

10    met here.

11         There's first a question of waiver.  To go from our

12    motion through their response through our reply with no

13    indication of what companies we were talking about cannot

14    possibly be enough to make the showing that this privilege

15    exists and it's been validly asserted.  If we just look at the

16    spreadsheet that they have now given us and I believe handed up

17    to the bench --

18         THE COURT:  No.

19         MR. DELICH:  Do you not have a copy?  OK.  With your

20    Honor's permission, I'll hand up --

21         THE COURT:  Although I think this might have been the

22    issue we were going to put aside until the end, but I'm happy

23    to hear you now.

24         MR. DELICH:  I spared you the full gamut of it, which

25    was quite long and I pulled out a few pages of it which kind of

1  illustrate what is problematic here.

2           For one thing, for a number of documents, that company

3  that is identified is W&K, our client.  So what appears to be

4  going on for those documents is that Dr. Wright is asserting

5  our privilege in order to avoid producing documents to us.

6  Frankly, that seems like it can't be right.

7           THE COURT:  To the extent he is, do you waive the

8  privilege so they can give them back to you?

9           MR. DELICH:  Absolutely, your Honor.

10          THE COURT:  OK.

11          MR. DELICH:  We will absolutely authorize them to

12  produce any and all documents in his privilege log that he

13  thinks he is withholding for our benefit.

14          THE COURT:  OK.

15          MR. DELICH:  And while they have identified a number

16  of other entities, you mentioned our brief had a list, and it

17  had a list of 17 companies.  There was another company

18  mentioned in our brief, which was nChain, and we got some of

19  them right.  Looking through what they produced to us, it looks

20  like we got 15 of those right.  Three of them are not, and

21  they've also identified another six or seven additional

22  companies that we had not identified, which means up until last

23  night around 7:30 we had no idea whose privilege it is we were

24  even talking about.

25          So whatever issues in Australian law or Florida law or

1    these kinds of things that might exist, it cannot possibly be

2    enough to meet the defendants' burden here to not even identify

3    whose privilege it is that we are talking about.  So I would

4    see that as a step zero that potentially avoids the need to get

5    into steps one, two, three and four.

6            THE COURT:  OK.  I understand.

7            MR. DELICH:  I think the only other point that I want

8    to make here is there's been a lot of talk about how burdensome

9    it would be.

10           As your Honor pointed out, for many of these companies

11   there would be a single point of contact over at ASIC, and

12   there is no evidence in the record that the defendant has even

13   tried to contact ASIC.  There's been a lot of talk in terms of

14   hypotheticals about what might happen in that scenario, but

15   there's no indication they have tried, despite the fact that

16   just today we've had two attorneys with declarations that are

17   at issue.  We have a Kenyan attorney and we have an Australian

18   attorney that the defendant has had no issue getting in touch

19   with in order to gather support for his arguments.

20           I think that the lack of evidence from the defendant

21   about efforts to contact ASIC and get to the bottom of this is

22   a glaring hole that speaks volumes about the likely inability

23   to get ASIC to assert privilege in this case.

24           I think the last point that I will make, and then I'm

25   happy to answer any questions your Honor might have, is there

```
1    is a reference to treating Dr. Wright and these companies as a

2    single entity.  Ultimately that kind of goes to the heart of

3    what is going on here, which is what appears to be largely an

4    abuse of the corporate forum for Dr. Wright's personal gain.

5    That is not a valid basis to assert privilege.  It is a valid

6    basis for things like alter ego liability.  It is a valid basis

7    for a lot of other things.  But it is not a valid basis to

8    wield as a shield against disclosing documents that Dr. Wright

9    would otherwise be obligated to disclose.

10        THE COURT:  Well, how do you respond, though, to their

11   argument today about you can't have it both ways?  Either these

12   are not in his care, custody and control and he doesn't have to

13   produce them or if you're going to deem him to be able to act

14   on behalf of the corporation for one purpose, he should be able

15   to act on behalf of the corporation for other purposes.

16        MR. DELICH:  Your Honor, I think that is a false

17   binary.  I think care, custody and control, the question is

18   does he have the documents.  And they appear to have the

19   documents.  They appear to know what is in the documents and

20   what they say.  There doesn't seem to be any obstacle to him

21   being in possession of the documents or him producing the

22   documents other than his privilege objection.

23        THE COURT:  Well, but isn't there an argument that if

24   he is in possession of the documents, he's in possession of

25   them as the bailee or the agent of the corporation, not in his
```

1  individual capacity, and he is a party to this lawsuit in his

2  individual capacity, so that he could -- and he didn't, and I

3  would have ruled on it if he had, and I don't know what I would

4  have ruled, but he could make an argument that because, yes, I

5  technically have them in my possession, but the me who has

6  possession of them is not the me who is the party to this

7  lawsuit.

8          MR. DELICH:  Your Honor, I think --

9          THE COURT:  Because I think that is a logical

10  extension of where their argument goes.

11          MR. DELICH:  I think it is an interesting question,

12  your Honor.  I don't know that there is any evidence that he is

13  a bailee.  I frankly don't think there is any evidence about

14  what these documents really are, what companies they came from

15  and what they're really about up until last night.  And I will

16  also mention what we got last night was only for 1600 of the

17  documents.  There's 11,000 documents in the privilege log which

18  the defendants have, defendants conceded are almost entirely

19  withheld on the basis of these third-party privileges.  So for

20  8500 or 8600 of them, I mean, I don't know if he is the bailee.

21  I don't even know what companies they might potentially be

22  associated with.  So it is hard to say in that respect.

23          But I also think if we look at the Florida statute and

24  we look at the text of the Florida statute, it doesn't say

25  bailee.  It says successor, assignee, trustee or similar

1    representative.  I think that there's a very clear candidate

2    for that for a lot of the dissolved companies, and that's ASIC.

3    For the two companies that are still going through the

4    liquidation process, it is very clear that that would be the

5    liquidators.

6         There seems to me to be no argument that Dr. Wright

7    himself is a successor, an assignee or trustee or a similar

8    representative.  I suppose maybe that's the catchall that

9    they're trying to bring it in under, but there simply -- I'm

10   unaware of any evidence in the record that suggests he is

11   serving in any role akin to a trustee for any of these entities

12   at this point.

13        In fact, the reason many of these documents are so

14   relevant is in 2015, at a time when Dr. Wright is engaged in

15   correspondence with Ira Kleiman, and there's going to be a

16   dispute about the significance of some of those communications,

17   but from our perspective there's a lot of representations made

18   about what's going on, what kind of assets exist, and the whole

19   time Dr. Wright is arranging a sort of global deal to transfer

20   all of his intellectual property into a brand new entity.

21        Our position, which the defendant will disagree with,

22   is that half of that belonged to our clients.  But raiding

23   intellectual property out of all of his former entities to

24   leave behind a bunch of shells that were liquidated and

25   dissolved in order to put it into a new entity that would

1    continue to operate free and clear does not suggest that

2    Dr. Wright has been acting as a successor, assignee or trustee

3    for any of those entities for quite some time.

4          THE COURT:  All right.  I know your position was that

5    I don't have to reach the Australian law question, but reach it

6    for me for a second just so I give you a chance to be heard on

7    that if you want to be heard on that.

8          In your written submission you kind of made a

9    procedural objection that they hadn't complied with Rule 44,

10   but I take Mr. Kass' point.  That pleading was filed on

11   February the 2nd.  So it's been a month, I mean, in which --

12   this was an active big firm.  You could have found somebody in

13   Australia if you wanted to get somebody to give you an opinion

14   of your own.

15         Are you prejudiced -- let me take it a piece at a

16   time.  You made the Rule 44 argument, 44.1 argument that

17   basically you didn't get proper notice.  It would seem to me

18   you've known for a month.  What articulable prejudice can you

19   give me if I just wanted to start there at Rule 44?  Then we

20   can go to the substantive question of if I even consider

21   Australian law where does that take me.  But I wanted to

22   separate that for you.

23         MR. DELICH:  Your Honor, I think the prejudice would

24   be that we have not had an opportunity to retain an Australian

25   expert.  But I think the bigger prejudice is just that it turns

1    the burden on its head.  It is not our burden to show that

2    these privileges exist.  If they're able to go find a lawyer in

3    Australia to submit a declaration with 50 pages of exhibits, or

4    whatever it was, and provide all that analysis, it seems just

5    as easy to go talk to a lawyer at ASIC, and that would have

6    been the more appropriate course of action.

7            So in terms of the Rule 44 objection, I don't think we

8    need to hang our hat on that entirely.  I'm happy to kind of

9    talk through this on the merits itself.

10           THE COURT:  OK.  Before we get to that, though, I

11   think Mr. Kass' answer to they should go talk to ASIC is we

12   don't need to talk to them, we know what they're going to tell

13   us, which is we don't waive, we don't assert.  We're

14   Switzerland.  We're neutral on this one.  So we could call them

15   but we're going to waste our time.  So I think that would be

16   the answer there.

17           All right.  Talk to me on the merits.  To what extent

18   do you think I should consider or can consider or must consider

19   whether if I order Dr. Wright to disclose these things it might

20   be a violation of Australian law?

21           MR. DELICH:  Can I actually back up a little bit to

22   the ASIC point real fast?

23           THE COURT:  Yes.

24           MR. DELICH:  So ASIC, I think your Honor pointed out,

25   says if there is a court order, that's fine.  So I don't know

1    that it's fair to read into ASIC neutrality necessarily that

2    there is just a default assertion of privilege for all defunct

3    Australian companies.  I don't know that that is the correct --

4         THE COURT:  Well, no.  Their position is there is no

5    assertion nor is there a waiver.  They're just kind of neutral

6    on it.  They're not doing anything.

7         MR. DELICH:  I think it ultimately comes back on that

8    point to this isn't about protecting the company.  It's about

9    protecting Dr. Wright.  That is simply not the point of the

10   corporate forum, it is not the point of the attorney-client

11   privilege in the corporate context.

12        The fact that ASIC is uninterested or disinterested or

13   as a default kind of stays out of it really just goes to the

14   fact that a defunct corporation doesn't have any skin in the

15   game here, which is why every court in the United States seems

16   to have found that the privilege does not survive dissolution

17   and defunct.  It may survive through liquidation because

18   there's simply no interest to protect.  There's nothing served

19   by continuing to recognize and honor the privilege.

20        THE COURT:  Do you have a case, though, that says that

21   an otherwise valid invocation of the corporate attorney-client

22   privilege can be invalidated because it's being done for an

23   improper purpose, that is, to shield a third party?  Basically

24   it's being used as an improper shield as opposed to for the

25   best interest of the corporation.

1          I think I read some case where there was some

2     principle like that, but I want to say that was in the spousal

3     privilege, but maybe I've got them confused.  I read a lot of

4     cases.

5          MR. DELICH:  There were a lot of cases, your Honor.

6     There are a number of cases that say something like that.  I'm

7     trying to find the exact quote here.  I believe the Supreme

8     Court case in Weintraub --

9          THE COURT:  OK.

10         MR. DELICH:  -- by implication -- I want to make sure

11    I get the quote right.  But the lesson many courts have drawn

12    from that Supreme Court decision is precisely that, that the

13    corporate privilege cannot be asserted or invoked or utilized

14    solely for the personal gain of its directors or former

15    directors.

16         THE COURT:  I'm not sure I agree with you that that is

17    how to read Weintraub, but I understand.

18         I read Weintraub as a structural case.  It just says

19    who has the power.  Somebody has to have the power and we're

20    not going to let the former officers do it because they don't

21    make the decisions for the company now; we make the decisions.

22    So maybe implicit in that is they don't make the decisions in

23    the best interest of the company.  So OK.  I see where you go.

24         MR. DELICH:  That is precisely it, your Honor.  I

25    didn't mean to characterize it --

```
 1              THE COURT:  No.
 2              MR. DELICH:  -- as being -- that is the lesson that
 3    multiple courts have drawn from it.
 4              So, for example, the Cox case, which had a longer name
 5    at one point, but it's --
 6              THE COURT:  That's a Louisiana case?
 7              MR. DELICH:  So it is a Middle District of Florida
 8    case, and this is the quote:  A "former manager" cannot assert
 9    an attorney-client privilege on behalf of a corporation as a
10    shield to protect his self-interest.
11              That's 2015 WL 13741738, at page 5.
12              THE COURT:  Right.  I follow that.
13              I guess the question I was asking you is a slightly
14    different question, which is, let's assume for the sake of
15    argument that Dr. Wright did fall into the category of other
16    similar representative.  I know you disagree with that as a
17    premise, but accept that premise for purposes of my question,
18    that he would otherwise be able to invoke the privilege, but I
19    found based on the evidence before me that he was doing it not
20    in the corporation's best interest but in his own best
21    interest.  Could I look beyond the text of the statute?  Do you
22    have a case that says anything on that one way or the other?
23              I will tell you I didn't see any one way or the other.
24    So if you found one, I'd appreciate it, but I don't recall any.
25              MR. DELICH:  So I actually think it is that same Cox
```

1    case that is probably the most analogous.  I don't know if it

2    is perfect.

3           I believe there either the DOJ or the SEC was

4    prosecuting a rather bad actor who had a company that was his

5    alter ego that he used to commit a variety of financial frauds,

6    etc. and it dissolved at some point.  The prosecution came

7    along and they wanted to use those documents against him at

8    trial and he arranged for a law firm to go out and reinstate

9    the company in order to have it intervene in the case and try

10   and assert privilege.

11          Now at that point the company had been reinstated, it

12   intervened in the case, it appeared in the case in its own

13   right and was clearly able to assert its own privilege.  And

14   the court looked at that and said, that's not going to work.

15   That is not the reason we have the corporate forum.  It's an

16   abuse of the corporate forum to allow those things to proceed

17   that way.

18          That's why what the defendants proposed here just

19   turns all of that law completely on its head.  Because the

20   whole body of law surrounding individual's relationships to the

21   corporate forum preserves that distinction, and it collapses

22   entirely if Dr. Wright is allowed to invoke that privilege for

23   his own benefit.  Again, there may be other implications to the

24   fact that he was using the corporate forum for his own benefit,

25   but none of them should accrue to his benefit.

 1           THE COURT:  OK.  I understand.  All right.

 2           I'm switching gears slightly.  I know -- I shudder to

 3      ask this question at 4:15, but I'll ask it anyway.  Are there

 4      individualized objections on the spreadsheet that you want to

 5      address now or do you want to digest that a little bit, see how

 6      I rule on these kind of big categorical questions?

 7           Let me just tell you, here's what I'm thinking.  I'm

 8      not going to rule today.  Both sides have given me a lot to

 9      think about and I want to go back and read some more of these

10      cases.  I want to give it some more thought.  But my

11      expectation is I will get an order out first thing next week.

12      I am going to spend some time this weekend on this issue

13      because I know it's really important.  You have the depositions

14      coming up and the case is moving quickly.  So I want to get you

15      an order, but I don't want to rule today.

16           I don't know whether me ruling on these big

17      categorical issues ultimately resolves all of the objections

18      that the plaintiffs have to the privilege log.  I suspect it

19      will resolve the vast, vast majority of them.

20           So I guess my question is, do you want to try to take

21      up the other individualized ones today or I'd be happy to give

22      you another hearing date to take those up once you've had a

23      chance to get my ruling and look at the spreadsheet?  I'll do

24      it either way.

25           MR. DELICH:  I think your Honor is correct that the

1    bigger, more global issues have the potential to greatly

2    simplify this.  The list we provided was really more intended

3    to be illustrative than anything else, to give a sense of what

4    the 11,000 document privilege log looked like and some of the

5    issues that were going on inside of it.

6          THE COURT:  I guess here's my question.  Let's assume

7    I rule Dr. Wright can invoke the privilege.  Dead corporations

8    have privileges.  Dr. Wright can invoke it.  He's properly

9    invoked it here.  I overrule all your objections as to those,

10   as to the corporate entity third-party assertions of privilege.

11   Are there still other objections laying around that I'll have

12   to deal with or, vice versa, if I recall the opposite, the

13   corporation doesn't have a privilege or they do, Dr. Wright

14   can't assert it or some other reason I sustain all your

15   objections, I order them to give it all to you, all the

16   corporate third-party assertions.  Are there still, I guess we

17   call it first-party privilege objections laying around that

18   need to be resolved or is that something you-all think you can

19   work through at that point?

20         MR. DELICH:  It's possible.  I would be hopeful we

21   would be able to work through it at that point.

22         THE COURT:  It seems to me that is a small, using

23   Ms. McGovern's Venn diagram, that is a very small circle in the

24   middle of the big Venn diagram.

25         OK.  So it sounds to me like if it is OK with you,

1    we'll put that aside for today, let me rule on the big stuff.

2            But let me hear from the other side.

3            MS. MCGOVERN:  Your Honor, if you don't mind, just for

4    the record --

5            THE COURT:  Yes.

6            MS. MCGOVERN:  -- I would just like to make a couple

7    of points.

8            THE COURT:  I'm going to give you a chance to be heard

9    after Mr. Delich is done.

10           MS. MCGOVERN:  Thank you.

11           THE COURT:  On that particular question, do you have

12   any objections to that procedure?

13           MS. MCGOVERN:  I didn't know there were any others.

14           THE COURT:  OK.  Good.  Maybe there aren't.

15           Back to you, Mr. Delich.  Any last words you want to

16   share with me?

17           MR. DELICH:  I don't think so, your Honor.  I would

18   just leave the court again with my initial point, which is it's

19   the defendants' burden here, and it's been very hard, frankly,

20   to even set up our arguments when we don't even know whose

21   privilege is getting talked about.

22           I'd encourage you -- I don't think it is necessary to

23   look at the specific objections we made or some of these

24   specific issues.  I do encourage you to look at the defendants'

25   attempt to resolve some of those in the document that they gave

1    us last night because to me it speaks more to the global issues

2    than it does to resolving some of the specific issues.

3         THE COURT:  Before we get there, you handed me a

4    document which I have not marked or admitted as an exhibit.  If

5    you want me to even look at and consider this, I do need to

6    mark it as an exhibit.  I guess it would be Exhibit 5.

7         Any objection from the defense to me considering this

8    document?

9         MR. KASS:  Your Honor, we don't have a copy of it.

10   That's a composite, I believe, of what we produced to them.  So

11   to send us not even the original document, I would at least

12   have to look at it.

13        THE COURT:  OK.  Why don't we give that to you.  When

14   the hearing is over, you can just let me know, once you've had

15   a chance to look at it, if you object to me -- I can assure

16   you, I think the only point that Mr. Delich is asking me to do

17   is look at the column all the way on the right which identifies

18   who is or is not the corporate entity involved.  Trust me, I'm

19   going to focus my time on researching interesting legal issues,

20   not reading a spreadsheet this weekend.

21        I will look at it to the extent you ask me to.

22        MR. DELICH:  That's exactly right, your Honor, it is

23   just that far right-hand column.

24        THE COURT:  I will let Mr. Kass take a look at that

25   and I'll reserve ruling as to whether I will consider that.

```
 1              All right.  Thank you, Mr. Delich.  I appreciate that.
 2              MR. DELICH:  Thank you, your Honor.
 3              THE COURT:  Let me turn back to Ms. McGovern.  You are
 4   going to bat cleanup.  I'm happy to hear from you.
 5              MS. MCGOVERN:  If you don't mind.
 6              THE COURT:  Not at all.
 7              I will say, first of all, let me applaud both of the
 8   partners here for giving the less-experienced lawyers an
 9   opportunity to argue here today.  I can tell you both you did
10   an outstanding job.  So thank you to both of your firms for
11   doing that and to both of you for doing an excellent job.
12              Ms. McGovern, I'll give you the last word.
13              MS. MCGOVERN:  OK.  I'm not saying that I want to see
14   you again in a discovery dispute, but next time I hope we get
15   to hear from Ms. Monifa Hall.
16              THE COURT:  I would look forward to it.
17              I will tell you all that, let's see, 12 days from now
18   will be the two-year anniversary of me becoming a judge and I
19   think I've had this case from day one.  So you may hold the
20   record of most discovery hearings with me.
21              MS. MCGOVERN:  I didn't realize that.
22              THE COURT:  Time flies when you're having fun.
23              MS. MCGOVERN:  Wow.
24              Just a couple of really quick points.
25              THE COURT:  Of course.
```

```
 1              MS. MCGOVERN:  And I make them on the record.

 2              THE COURT:  Yes.  Sure.

 3              MS. MCGOVERN:  And I apologize if I state the obvious

 4    and the mundane.

 5              THE COURT:  You never have to apologize to me,

 6    Ms. McGovern.  You are a forceful advocate and you advocate the

 7    way you want to advocate for your client.  You don't have to

 8    ever apologize for that.

 9              MS. MCGOVERN:  Thank you.

10              THE COURT:  Feel free.

11              MS. MCGOVERN:  Thank you.

12              The first thing I want to say is with respect to

13    evidence on the record and the last exchange between counsel

14    and your Honor, there's absolutely no evidence in this record

15    that when counsel went through all of the documents that were

16    retrieved in this case in a good faith effort to produce them

17    and went document by document redacting what we thought was

18    privileged, producing what we could produce and preserving

19    privilege on a privilege log and providing it to the

20    plaintiffs, engaging in lengthy discussions about why that

21    privilege existed, that it was because it was somehow a means

22    to coverup what Dr. Wright wanted to produce in this case.

23              There was an absolute belief that he had the

24    obligation to produce what he believed to be privileged

25    communications.  Again, we have already stated that in many
```

1    instances their drafts of internal communications with counsel

2    about questions from the ATO, and a lot of these corporations

3    were involved in ATO proceedings, which were tax proceedings in

4    Australia, which went on for a very long time.

5         The second point I'd like to make is with respect to

6    whether in fact Dr. Wright has standing.

7         I think it's important to note that, as Mr. Kass

8    artfully stated, plaintiffs have taken the position in this

9    case that Dr. Wright is tantamount to the corporation itself,

10   that the corporation collapses onto Dr. Wright and that he

11   really doesn't even have the argument that there is a corporate

12   shield with respect to anything.  But even in the document that

13   was provided to your Honor today with respect to the privilege

14   issue and Ms. Watts' position as a director in some of those

15   corporations years ago, Dr. Wright is also reflected as

16   director of the corporations that are involved in the invoking

17   of the privilege here.  So I don't think there is a

18   substantiated basis to dispute Dr. Wright's role with these

19   corporations and belief that he had to assert the privilege.

20        And then secondly, with respect to the going to

21   Australia and asking for a waiver, there are also liquidators

22   involved.  It is not just one entity that has already stated it

23   wouldn't take a position one way or the other.  Some of these

24   corporations are in liquidation.  The question isn't simply can

25   I produce the document.  As we all know with lawyers, it's

1   never that simple.  Let me see it.  Please send it to me.  Did

2   you send it to me?  I didn't get it.  Can you resend it again?

3   The Dropbox isn't working.  What's the password?  Everything

4   takes a tremendous amount of time.

5         With respect to all of the documents that have been

6   produced, there is a subset of documents Dr. Wright believes in

7   good faith are privileged.  We believe we've met that burden.

8   We don't think it's ever been disputed.

9         To the extent that Australia law is something to

10  persuade the court with respect to the good faith basis and the

11  establishment of the privilege, we would ask the court to

12  consider it, although we do not in any means suggest that in

13  fact your Honor doesn't have the absolute discretion to do what

14  you think is in the best interest of this case.

15        Thank you.

16        THE COURT:  Thank you.  I will just make one comment

17  in response to Ms. McGovern's argument.

18        I don't ascribe at this point any bad motive to

19  Dr. Wright for invoking these privileges.  I accept for

20  purposes of everything I've seen that he on advice of extremely

21  good counsel in this case is invoking these privileges in good

22  faith.

23        So I know there's been arguments made that this is

24  manipulative and all that.  I listened to those arguments, but

25  I just want Ms. McGovern and Mr. Kass and Ms. Hall to know I

1    certainly don't ascribe -- on the record before me there is not

2    evidence that makes me conclude that Dr. Wright is doing

3    anything here without it really being a good faith invocation

4    of privilege on advice of counsel.

5        Look, I used to represent clients.  We all represent

6    clients.  As a lawyer, you take a very expansive view of

7    privilege.  You want to protect your clients.  That's your job.

8    I get it.  I understand certainly this situation.  We have

9    someone who has possession of documents that he believes may be

10   privileged as to some other entity and he may believe he fears

11   or faces some personal liability if he discloses those

12   documents, he may believe he has a legal obligation under the

13   laws of another country to invoke.

14       So I accept all of that.  So I do not ascribe any bad

15   faith to his invocation of privilege.  I may not ultimately --

16   after I go through my exercise I may disagree with him that he

17   has this privilege, but it will not be because I conclude that

18   it is a bad faith act on his part.  But thank you.

19       All right.  While we're all here then, let me turn

20   quickly to the letters rogatory.

21       I know I told you you'll get a chance to file a

22   response, but let me tell you what I'm thinking and maybe that

23   will influence how you respond.

24       I'm waiting to hear back from Judge Bloom because I

25   want to be sure that whatever I do is consistent with her

 1    views, but it's my inclination to allow the letters rogatory to

 2    go forward.  However, if they don't get the documents in time,

 3    Judge Bloom is not -- I am going to recommend to Judge Bloom

 4    she not continue the trial, she not continue the motions for

 5    summary judgment.  And if they get them in a way and at a time

 6    that the defense feels they are being prejudiced by a late

 7    arrival of these documents, you would reserve the right to

 8    argue to Judge Bloom that the documents not be allowed to be

 9    used at the trial.

10         The reason I'm inclined to go that direction is sort

11    of, where's the greatest risk factor here.  If we allow the

12    letters rogatory to go forward, we all know there's a 50/50

13    chance the Brits are not going to give us anything in time

14    anyway, right.  I'm not saying they shouldn't, but this is --

15    as Ms. McGovern just said, we're dealing with lawyers in

16    another country; they have other priorities; there may be

17    objections that have to be resolved by judges in the UK.

18         But it seems to me there is less harm in letting the

19    process go forward with the fail-safes that allow -- that

20    doesn't really prejudice Dr. Wright, allows him to reserve his

21    objections, but also allows the plaintiffs to at least make

22    their best efforts to get what they want to get as opposed to

23    saying they can't get it and then later you-all go to trial,

24    everything goes a particular way, and then the Eleventh Circuit

25    tells us all I should have let the letters rogatory go forward

1    and now you will be seeing me again at discovery hearings but

2    it will be years from now.

3             Anyway, that is my inclination.

4             Ms. McGovern, you can reflect on this, talk to your

5    client.

6             MS. MCGOVERN:  Sure.  Thank you.

7             THE COURT:  But in terms of how you draft your

8    response tomorrow, if that is a proposal that makes sense to

9    you and you want to just sort of say, we'd be good with that, I

10   will take it under advisement.

11            But like I said, I am not going to presume that, until

12   I hear back from Judge Bloom, I am not going to presume that I

13   can put those conditions on because, again, I don't want to

14   tell you, I don't want to tell the plaintiffs there is a chance

15   you're going to get to use these if Judge Bloom is going to

16   tell me no, no, there is no universe on which I'm going to let

17   these in and vice versa, or if she says, look, if it comes in

18   time, I'm going to let them use it.  So I do want to get some

19   guidance from Judge Bloom on that.

20            So that's the letters rogatory.

21            What else do we have to play with while we're all here

22   today?  We always have stuff to play with.

23            Mr. Kass.

24            MR. KASS:  Your Honor, we have some issues with

25   plaintiffs' privilege log that we would like to address.

```
1              THE COURT:  OK.  I have to have paper.

2              Is this new or is this something you put in the joint

3    memo and I'm just not focused on?

4              MR. KASS:  Your Honor, there wasn't a joint memo filed

5    here.

6              THE COURT:  OK.

7              MR. KASS:  We didn't submit it to you because really

8    it is a very discrete issue that I wanted to raise.

9              THE COURT:  OK.  Please.

10             MR. KASS:  Your Honor, the good thing is that we have

11   been able to resolve with plaintiffs the vast majority, I would

12   say almost all of the issues that we had with plaintiffs'

13   privilege log.  We identified issues.  We sent it to them.

14   They sent us a bunch of documents.  So we really were able to

15   avoid burdening the court.  There is just one small issue that

16   is left and we would like your guidance on.

17             THE COURT:  Great.  Mazeltov to all of you.

18             MR. BRENNER:  I guess it depends on how small the

19   issue is, right?

20             THE COURT:  What is the old saying, there are no small

21   issues, just small people.

22             OK.  Mr. Kass.

23             MR. KASS:  Your Honor, throughout plaintiffs'

24   privilege log there are sort of two subsets of documents.

25   There is one where there are communications with counsel,
```

1   between Ira and various counsel, and it is under attorney work

2   product.  We are not raising any issues with regard to that.

3            Our only issue is that there are a number of

4   documents, 100, 200, approximately, where it appears to be just

5   a document created by Ira.  It's not communicated with anybody.

6   It is just a standalone document.  And the description that

7   plaintiffs have is work product created by Ira Kleiman in

8   anticipation of litigation.

9            THE COURT:  OK.

10           MR. KASS:  Our issue with that is, your Honor, we

11   believe that that description is not sufficient for plaintiffs

12   to meet their burden to show that that in fact is work product.

13   We don't know the circumstances.  We don't know what case it

14   relates to.  So we are simply requesting additional details to

15   enable us to better understand the basis of their privilege,

16   which is their burden.

17           THE COURT:  All right.  Let me hear from them.

18           I do recall in the deep recesses of my mind we had an

19   issue at one point in this case where there were documents that

20   I think Mr. Kleiman had written.  There were like handwritten

21   notations.  And the question was could they be redacted.  we

22   had a whole discussion about whether it was feasible to

23   redact -- are these the same kind of documents?  Is that what

24   we're talking about?  I shouldn't ask you.  You don't know.

25           Let me turn to -- Mr. Freedman is hiding on the other

 1   end of the phone line, but let me turn to somebody on the

 2   plaintiffs' team.  Maybe they can help me with that.

 3          MR. KASS:  Your Honor, can I just make one thing

 4   clear?

 5          THE COURT:  Sure, Mr. Kass.

 6          MR. KASS:  Again, if that is the case, all we would

 7   want as a statement is attorney work product by Ira Kleiman in

 8   anticipation of litigation with Dr. Wright.  Let us know what

 9   case it is about.  We are not really digging much further.

10          THE COURT:  OK.  Very good.  Let me hear from

11   Mr. Brenner.

12          MR. BRENNER:  Your Honor, I actually just heard about

13   this issue right before we came in.

14          THE COURT:  No issue.

15          MR. BRENNER:  My instinct is that is not something --

16   I think revealing what the type of litigation or type of action

17   you are contemplating or Mr. Kleiman's contemplating is

18   privileged in and of itself.  But I do want to have an

19   opportunity to do the research on it.

20          THE COURT:  All right.  I think what Mr. Kass, and

21   maybe this is -- let me ask Mr. Kass this as a question.

22          Are you really just looking for a distinction whether

23   it was in anticipation of this case as opposed to other cases

24   that Ira Kleiman might have been involved in separate and apart

25   from his fights with Dr. Wright?

1          MR. KASS:  Yes, your Honor.  That's exactly the issue.

2          THE COURT:  Mr. Brenner, do the research and see

3     whether that's something you --

4          MR. BRENNER:  Yes

5          THE COURT:  -- that's the hill you want to die on.

6          MR. BRENNER:  Sure.

7          THE COURT:  And if it is --

8          MR. BRENNER:  I don't want to die on it.  I can assure

9     you that.  But I still may say it's privileged.

10         THE COURT:  As I say, you in good faith have to assert

11    the privileges you have to assert.  You don't want to have a

12    waiver issue.  I understand all that.  But if we're talking

13    100, 200 documents and it is really just a question of -- I

14    suspect if I am sitting at their table and they say, look, this

15    has nothing to do with this litigation, we're not going to

16    spend any time looking at it.  But if you tell me it has to do

17    with this litigation, we might take a slightly deeper dive and

18    try to challenge it.

19         MR. BRENNER:  I'm take a look at the law.

20         THE COURT:  Take a look at the law.  Whatever the law

21    allows you to do and I trust you will do.

22         What else?  Anything else from the plaintiffs?  You're

23    the plaintiffs.  I always get it backwards.  Nothing from the

24    plaintiffs.

25         From the defense.

```
 1              MS. MCGOVERN:  No.

 2              THE COURT:  You're not going to let Ms. Hall talk at

 3    all?

 4              MS. HALL:  I have nothing to say, your Honor.

 5              THE COURT:  You have nothing to say.

 6              MS. HALL:  They covered everything.

 7              THE COURT:  Mr. Freedman or Mr. Roche, anything else?

 8              MR. ROCHE:  Not from me, your Honor.

 9              MR. FREEDMAN:  Nothing else.

10              THE COURT:  Thank you all very much then.  I will take

11    the matters under advisement.

12              We will be in recess.

13              I will try to get an order out as fast as I can.

14              MR. BRENNER:  Thank you, Judge.

15              MS. MCGOVERN:  Your Honor, can I ask you a quick

16    question with respect to the sealed document?

17              THE COURT:  Are we still on the record?

18              MS. MCGOVERN:  I think so, yes.

19              If you wouldn't mind, we had a question regarding the

20    sealed document.  We had -- there was a ruling --

21              THE COURT:  You mean the trust document or other

22    sealed document?

23              MS. MCGOVERN:  Yes, trust document.

24              THE COURT:  I think you can call it the trust

25    document.
```

```
 1                MS. MCGOVERN:  Yes, we can.

 2                THE COURT:  OK.

 3                MS. MCGOVERN:  So we had a question regarding the

 4     trust document.  We believe your Honor ruled that it should

 5     remain sealed.  We had competing proposed redactions.  You

 6     entered an order yesterday, I believe --

 7                THE COURT:  Right.

 8                MS. MCGOVERN:  -- stating, Please provide by March

 9     20th, I believe, an unredacted -- the redacted, proposed

10     redacted trust agreement that defendants have proposed, but we

11     would like to know what the next step is with respect to

12     that --

13                THE COURT:  OK.

14                MS. MCGOVERN:  -- document.

15                THE COURT:  So you're reminding -- and so I didn't

16     recall, candidly, coming back around to that issue and ruling

17     that it could just remain under seal in total.  I remember that

18     we had --

19                MR. BRENNER:  Judge --

20                THE COURT:  Hold on a second, Mr. Brenner.

21                MR. BRENNER:  Yes.

22                THE COURT:  I remembered, because my clerk went back

23     and we actually found the e-mails.  I realized I had never

24     ruled on that issue.  Maybe the reason I never ruled on it was

25     because I had subsequently said it could just stay under seal
```

1    in total.

2          So now having been reminded of that, what I intended

3    by my order yesterday was I was agreeing with you that you can

4    redact it the way that you proposed and just directing you to

5    file it with the redactions that you had proposed so we now

6    have a document in the record.

7          If you want me to go back and look at the question of

8    whether I have ruled it should stay under seal in total, I will

9    certainly do that.

10          MS. MCGOVERN:  Yes, your Honor, and to the extent that

11    we would be permitted to submit anything that would -- for

12    example, from the Seychelles, because it is a Seychelles trust,

13    and with respect to the disclosure of any of the terms of the

14    trust agreement, which are of heightened concern at this point,

15    we would welcome the opportunity to be able to submit that to

16    your Honor for purposes of being able to, if you believe that

17    it falls within the sealed document standard, overcome that

18    presumption that the public has the right to know.

19          THE COURT:  Again, to the extent -- I know Mr. Brenner

20    is being very patient.  Thank you.  To the extent it is

21    discovery related, the public doesn't have a right.  My concern

22    is -- and I know Mr. Brenner has been in the district long

23    enough.  I don't know, Ms. McGovern, how long you've been

24    practicing and I will never ask because there is derivative

25    information from that I'm not allowed to ask.

1          MR. BRENNER:  But you don't mind asking me.

2          THE COURT:  I know Mr. Rivero was practicing in the

3   district.

4          If you-all remember, we had the whole dustup maybe 15

5   years ago about secret dockets, that people were filing

6   paperwork in the dockets in the Southern District of Florida

7   and they just disappeared and the media couldn't find them and

8   no one could find them.

9          I think the upshot of that -- I think Judge Moreno was

10  the chief judge at the time.  The upshot was there at least has

11  to be a motion to seal that's not under seal.  Right.  There

12  could be a motion saying, attached is a sensitive document

13  relating to his personal property which we believe should be

14  sealed and the court seals it.  So at least if somebody looks

15  at the docket, they know the thing exists.  They may not be

16  able to get to it --

17         MS. MCGOVERN:  Right.

18         THE COURT:  -- but they just have to know it exists.

19         So that is my first principle, is I always want to

20  make sure there is something in the record.

21         So I think in this case all the motions to seal and

22  the orders to seal are not under seal.  So I have satisfied

23  that principle.

24         To the extent it is discovery material, that may be as

25  far as we need to go.  Now, where that line sort of crosses

1    over for me is we have discovery materials that we then talk

2    about in a discovery hearing, and I think once we're talking

3    about it in a hearing, it is silly to say it is under seal but

4    we're talking about it in public, which is why I appreciate

5    everyone being so careful today about that particular document.

6         So that is why sometimes you will get an order from me

7    saying I want it redacted and filed and sometimes we'll just

8    sort of let it go.

9         So if this is one where your position is if I've

10   already ruled, let it go, and you can point me to where I said

11   that, I'm good.  If you want me to reconsider that, I'm happy

12   to reconsider that.  And then going forward, same thing.  If it

13   is a discovery-related thing, just in your motion to seal add

14   the extra line that says, pursuant to the laws of such-and-such

15   country, this should not be disclosed.

16        MS. MCGOVERN:  So if I understand correctly, we are

17   permitted to file a motion to seal the trust document with an

18   explanation as to why we would like it to remain sealed in its

19   entirety.

20        THE COURT:  Well, it is under seal right now.

21        MS. MCGOVERN:  It is.  It is.

22        THE COURT:  It is under seal by order, I think of

23   Judge Bloom, it is under seal.  But her order was pending

24   further order of the court.

25        So I think I issued -- so yes, in response to my, I

1    guess the most recent order I gave you on that was to go ahead

2    and file what you proposed.

3          MS. MCGOVERN:  Yes.

4          THE COURT:  You're asking me ore tenus right now to

5    reconsider that order.

6          MS. MCGOVERN:  That is correct.

7          THE COURT:  Let me hear from Mr. Brenner.

8          MR. BRENNER:  So let me first give you my recollection

9    of how we got here.

10         THE COURT:  Yes.

11         MR. BRENNER:  It was a hearing sometime in January.

12   What you said about the document at that point was there was

13   going to be -- both sides were sort of loaded for bear on

14   whether it should be sealed or unsealed.  You, as you sometimes

15   have a knack of doing, cut to the chase and said, well, wait a

16   second.  If this was just a discovery document -- I think you

17   turned to the plaintiffs.  I think it was all by phone.  At

18   least I was by phone.  You essentially said, you shouldn't have

19   filed in the first place so I don't really need to deal with

20   the substantive issue of whether it should be sealed because it

21   shouldn't have been filed in the first place and, therefore,

22   I'm not going to rule on the merits of it.  Right now it's

23   still sealed because -- sort of unfile it.

24         THE COURT:  That sounds like me.

25         MR. BRENNER:  Yes.

1          So the problem is, as your Honor has just put the

2     point on it, which is -- I mean, let's be frank with each

3     other.  This document is going to be pervasive in the case.  It

4     is not just some random discovery document that we have to

5     decide, well, no one can really talk about it.  In fact, I

6     understand why your Honor did it.  I will tell you that I felt

7     a little hamstrung today in some of the points I was trying to

8     make because it's really an important document.

9          THE COURT:  I understand.

10         MR. BRENNER:  Maybe it wasn't so important for the

11    privilege necessarily and maybe we were able to communicate it,

12    but we need to have this debate, right.  We need to have

13    this -- and whether you want them to file a motion to seal or

14    us a motion to unseal, I don't think it really matters, but I

15    don't think you made a definitive ruling on the merits of

16    sealing it.  You made a definitive ruling at that point it

17    shouldn't have been in there in the first place.

18         THE COURT:  OK.

19         MR. BRENNER:  So I think we need to have that -- it

20    does hamstring all of our ability to really air out some of the

21    issues.

22         THE COURT:  Fair point.

23         First of all, I'll grant the motion.  I will just

24    leave it under seal.  So you can ignore my order to file the

25    redacted document.  OK.  I will rescind that order and we will

1    do a minute entry reflecting that I've reconsidered and

2    reversed that order.

3            So now it is filed in the record.  It is under seal.

4            Moving to a slightly larger perspective on that, there

5    are a number of documents in this case that one side or the

6    other -- and it's marked confidential.  So there are a number

7    of documents in this case that have been marked confidential,

8    eyes only, whatever.  Some day we will confront the question of

9    whether they have been properly marked, whether for trial

10   purposes that designation should be changed, etc.

11           It seems to me this is one of those documents that

12   should be in that universe of documents.  And I am more than

13   happy to give you a date, find one after you-all get back from

14   the UK and you've washed with Purell, that we will -- I can set

15   aside a day or half a day or whatever we need to just rule on

16   all those questions.

17           I suspect by now, although we have half a million

18   documents in this case, you-all pretty much are probably

19   focused on the 50 or 100 or 200 documents that really you're

20   going to want to use that -- let me phrase it different.  That

21   there are probably, my guess is, maybe a couple of hundred

22   documents at the most that are marked as confidential that

23   somebody is going to want to use at the trial, and I think the

24   sooner we can, as Mr. Brenner suggests, let's address that

25   issue, let's have that debate, let's frame it properly where

1    each side kind of identifies the documents they're going to

2    look at.  You can submit them to me ahead of time.  We can all

3    do the research that needs to be done, and then we can look at

4    it.

5              Does that make sense, Mr. Brenner?

6              MR. BRENNER:  Yes.  I just --

7              MS. MCGOVERN:  It does for the defense.

8              MR. BRENNER:  Yes, it does.  The sort of first

9    principles are where we -- right now we're already creating a

10   record that if someone were to try to figure out what was going

11   on in these proceedings would, I don't know, would have a lot

12   of gapping holes and a lot of questions.  So I don't have any

13   problem with the procedure.

14             What I do have a -- I think what may not be realistic

15   is that we do it all in one fell swoop because I think, as you

16   know, as you prepare for trial, you find things you decide you

17   want to use and, frankly, you decide you don't want to use

18   things that you thought you wanted to use in April.

19             THE COURT:  Sure.

20             MR. BRENNER:  So what I think would be a good process

21   to follow is we should pick a date in which each side makes a

22   good faith effort to tee up what they want to tee up at that

23   point but just not that the door closes for either side.

24             THE COURT:  Oh, no.  If you read me that way, please

25   no.

```
 1                    MR. BRENNER:  No, I didn't.  I just want to be clear.

 2                    THE COURT:  No.  Look, I'm happy to do that.  You can

 3       talk about that.  Or if in particular the plaintiffs just want

 4       to tee up this one document, that's fine.  We can have a

 5       hearing just on this one document.

 6                    MR. BRENNER:  OK.

 7                    THE COURT:  I will let Ms. Hall argue that and we will

 8       go from there.

 9                    MR. BRENNER:  Excellent.

10                    THE COURT:  It is teed up.

11                    Same thing, if the defense has one or two or three

12       that are kind of -- that we all know are going to be appended

13       for the motions for summary judgment, we all are going to be

14       asked at the depositions, we all know are going to be in play

15       here, even if it is three or four, that's fine.

16                    MR. BRENNER:  Right.

17                    THE COURT:  Just notice that up and we'll deal with

18       that.

19                    MR. BRENNER:  We are in full agreement with that

20       process.

21                    THE COURT:  Great.

22                    What else while we're all here?

23                    MS. MCGOVERN:  Thank you, your Honor.  That's all for

24       us.

25                    THE COURT:  You're good.  For the plaintiffs?
```

```
 1    Mr. Freedman, Mr. Roche, anything?  Everybody hung up.

 2              MR. ROCHE:  No, your Honor.

 3              THE COURT:  I knew they were still there.

 4              Thanks, everybody.  We will be in recess.

 5              (Adjourned)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


    I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


March 10, 2020          s/ Joanne Mancari
                        Joanne Mancari, RPR, CRR, CSR
                        Court Reporter
                        jemancari@gmail.com