```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
                      CASE NO. 18-CV-80176-BB
 3
      IRA KLEIMAN,
 4    as the Personal Representative
      of the Estate of David Kleiman,
 5    et al.,

 6                                     West Palm Beach, Florida
                     Plaintiff(s),
 7                                     April 9, 2020
              vs.
 8
      CRAIG WRIGHT,
 9

10              Defendant(s).        Pages 1 - 24

11    -----------------------------------------------------------

12                            HEARING
               TRANSCRIBED FROM DIGITAL AUDIO RECORDING
13              BEFORE THE HONORABLE BRUCE E. REINHART
                    UNITED STATES MAGISTRATE JUDGE
14
      APPEARANCES:
15
      FOR THE PLAINTIFF(S):  ANDREW S. BRENNER, ESQ.
16                           BOIES SCHILLER & FLEXNER, LLP
                             100 SE 2nd Street
17                           Miami, FL 33131
                             (305) 357-8438
18                           abrenner@bsfllp.com

19
      FOR THE DEFENDANT(S):  AMANDA M. MCGOVERN, ESQ.
20                           RIVERO MESTRE, LLP
                             2525 Ponce de Leon Blvd.
21                           Coral Gables, FL 33134
                             (305) 445-2500
22                           amcgovern@riveromestre.com

23
      TRANSCRIBED BY:        Joanne Mancari, RPR, CRR, CSR
24                           Court Reporter
                             jemancari@gmail.com
25
```

1   Thereupon,

2   the following proceedings were held:

3            (Telephone conference)

4            THE COURT:  This is case No. 18 80176, Ira Kleiman and

5   W&K Info Research v. Craig Wright.

6            Let me start with appearances.  I will start with

7   counsel for the plaintiffs, please.

8            MR. BRENNER:  Good afternoon, your Honor.  Andrew

9   Brenner, from Boies Schiller, on behalf of the plaintiffs.

10           THE COURT:  Good afternoon.

11           And on behalf of Dr. Wright.

12           MS. MCGOVERN:  Good afternoon, your Honor.  Amanda

13   McGovern, from Rivero Mestre, on behalf of Dr. Wright.

14           THE COURT:  Good afternoon, everybody.

15           OK.  So I have before me the parties' joint discovery

16   memo.  It is very helpful.  Thank you.

17           OK.  It looks like there are three issues that have

18   been raised.  So let me just deal with them one after the

19   other.

20           So the first issue it looks like the plaintiff's

21   objection to the defendant's request for admission and, as I

22   understand it, Mr. Brenner, the objection is relevance.  But

23   let me allow you to be heard fully.

24           MR. BRENNER:  Right.  Well, it's sort of -- it is

25   relevance and to the extent it's some of these request

admissions about degrees, that I don't even think exist -- I
sort of put in the pleading what my concern is.  For example,
there is one that is like project management or something.

        Requests for admission are always so dangerous because
the only thing they are really useful for is if you admit it,
then your opposing party stands up before the jury or can stand
up before the jury and say, And the plaintiff has admitted that
he doesn't have any documents showing that Dave Kleiman had X
degree, and I'm saying, well, I don't even know if such degree
exists and what is the relevance to that degree to the issues
in the case.  I did answer -- I apologize.  My dog is not
behaving.

        THE COURT:  That is OK.

        MR. BRENNER:  I did answer the two that I thought
were -- it is really six of them, because for each of the
requests the defendant requested an undergraduate degree, a
master's degree, a doctorate degree.  So I answered as to the
two that I thought were most sort of closest, to the extent you
can make a tangential argument of relevance, and I think those
were -- was it cryptography and maybe software development.

        MS. MCGOVERN:  That is correct.

        MR. BRENNER:  So that is really my objections, Judge.
My experience with the requests for admissions is they are
really hard to draft.  You have to get them exactly right.  And
I just don't think it is fair to ask me if he had a degree that

1    I don't even know exists.

2           It is not a big deal, but that is sort of what I was

3    trying to accomplish, trying to answer what I thought was

4    arguably relevant, because I don't think formal education

5    really necessarily is, but I can understand the defense

6    argument.  So that is really my objection.

7           THE COURT:  I appreciate that.  Let me turn to

8    Ms. McGovern.

9           Ms. McGovern, I guess I had two thoughts on that, and

10   I will let you address anything you want to.  But the two

11   primary questions I had were -- and at some point there are, I

12   won't say it is infinite but an extremely large number of

13   things that Mr. Kleiman doesn't have degrees in.  So at some

14   point, where does that lead us.

15          In terms of the other, I think -- and I will preempt a

16   little bit I think of what Mr. Brenner's concern is.

17   Ultimately I think this is really more an issue for Judge Bloom

18   at the trial, whether she is going to allow the defense to get

19   up and argue all these things that Mr. Kleiman doesn't have.

20          So I'm less concerned about that aspect of it.  If it

21   is admissible at trial, Judge Bloom will decide that.  I'm

22   looking at it more from a discovery perspective.  But let me

23   turn to Ms. McGovern and let her be heard.

24          MS. MCGOVERN:  Thank you, your Honor.  The reason that

25   we asked these questions, and they actually are quite specific

1    in terms of what our expert is going to testify.  It goes into

2    really the background and sort of the academic skill set

3    predicate that would be required to invent the Bitcoin

4    blockchain, and the plaintiffs have made clear in their

5    depositions and in this case that they believe Satoshi Nakamoto

6    is -- I am not sure how they are going to articulate at trial,

7    but really sort of like a joint venture.

8         There have been questions that have been posed to

9    Dr. Wright about essentially the joint creation of the Bitcoin

10   blockchain, and there's been a lot of discussion in discovery

11   and in deposition about who's role -- of sort of creating a

12   role for Dave Kleiman that is not your typical joint venture in

13   terms of you do this, I do this, you mark it, and I do that.  I

14   mean, it's quite amorphous.

15        So one of the things we're simply trying to eliminate,

16   and we think it falls within the direct purpose for a request

17   for admission, is we're trying to eliminate any dispute that

18   Dave Kleiman had no degrees.  He had no degrees in math, he had

19   no degrees in law, he had no degrees in things that our expert

20   is going to say is absolutely necessary to have been able to

21   create this.

22        If that were not an issue at trial, if the question

23   regarding the creation of the Bitcoin blockchain were not an

24   issue at trial so that there wouldn't be confusion in front of

25   the jury about that, then I would agree with Mr. Brenner that

1    they're not claiming that.  They're saying that the joint

2    venture was something else, although we're still unclear as to

3    exactly what it is.

4           But they are definitely sort of laying their stakes,

5    through discovery and through deposition, and suggesting with

6    Ramona Watts, wife, and through Andrew O'Hagan and through the

7    ATO proceedings and through Craig Wright, that the decedent in

8    fact created the Bitcoin blockchain with Dr. Wright.  So as a

9    result, we feel that it is directly relevant to establish what

10   exactly Dave Kleiman's background is and actually what it's

11   not, without having to go through all of that at trial.

12          So, for example, if we're looking at the very specific

13   requests for admissions that we have included in our joint

14   discovery memorandum, No. 28 states, admit that, essentially

15   admit that the decedent didn't receive a bachelor's degree in

16   mathematics.  The objection is relevance.  A degree in

17   mathematics, our position is going to be at trial, goes to the

18   skill set and the academic knowledge and background that would

19   be necessary to do what they're claiming Dave Kleiman did.

20          We have also asked for a bachelor's degree in computer

21   science, which is No. 29, and again objected to on relevance.

22          Basically, it's our position, your Honor -- and I

23   could go on.  There's not a lot of them that we have identified

24   here.  But a bachelor's degree in law.  I mean, law is critical

25   to the ability to legitimize a cryptocurrency.

1          Economics, statistics, information security.  These

2     are things that we don't believe -- engineering, finance, game

3     theory.  It's our position that the Bitcoin blockchain is

4     essentially a game-theory-derived invention.  And they have all

5     been objected to.

6          It really is an admit or deny, and it should be

7     admitted.  I mean, I don't think there is a dispute or there

8     shouldn't be a factual dispute that the decedent had no

9     undergraduate, masters, or graduate degrees in anything.  But

10    we don't want to have to spend what we believe is going to be

11    an already very lengthy trial debating that sort of in banter.

12         I think this fits within the purpose for a request for

13    admission, which is to streamline evidence that you think you

14    need or you don't need.  I mean, if these are admitted

15    requests, which they should be, we won't have to go into all of

16    that.

17         So we don't think it is burdensome.  We think the

18    answer is admit.  And the fact that they have chosen to -- no

19    bachelor's degree in cryptology, no bachelor's degree in

20    software development, but then denied the other core elements

21    of what went into really a life's work for purposes of really

22    inventing the first token system and a legitimate

23    cryptocurrency that can actually buy stuff in the world, to

24    deny the ability to ask those questions in the requests for

25    admission for the purpose of streamlining appears to be really

1    without merit.

2          So, your Honor, we think these are legitimate requests

3    for admissions.  We have received over 200 of them from the

4    plaintiff.  We're answering them.  We don't think these

5    objections should be sustained.

6          THE COURT:  All right.  Thank you.

7          Let me turn back to Mr. Brenner and give him the final

8    word.

9          MR. BRENNER:  Yes.  I did point out procedurally, I

10   don't actually agree that this is the proper way to use a

11   request for admission, to ask a party whether they have

12   documents that show X, Y, Z.  You either ask for a document

13   request or, which I was actually struck by, I went back and

14   looked at the deposition and I said, it seems like an easy way

15   to do this would have been to ask Ira Kleiman what degrees does

16   your brother have or are you aware of.  They didn't do that.

17         I don't feel that strongly about this.  I have given

18   you the reasons why I think this was an improper way to do it,

19   the requests for admission.

20         THE COURT:  All right.  Well --

21         MR. BRENNER:  You tell me you need to answer and we

22   can preserve the ability, which I guess we have but I would

23   probably spell it out in an answer, preserve the ability to

24   object to admissibility at trial, then that is what we will do.

25   You just tell me what to do.

1          THE COURT:  All right.  Well, I appreciate that.  I

2     agree.  I think, first of all, these are proper topics in the

3     sense that they're relevant.  Having personally paid for

4     several of these degrees for my children, I can assure you they

5     are real degrees.  So I am OK with that.  And I do think

6     they're relevant.

7          I am only ruling on discovery, as I said.  So I will

8     overrule the objection.  I will direct the plaintiff to respond

9     to them without prejudice, of course, to you raising any

10    objections in front of Judge Bloom as to whether they ought to

11    be admitted at trial.

12         So that will be my ruling as to the first topic.

13         MR. BRENNER:  OK.

14         THE COURT:  Let me turn to the second topic, which

15    is -- I am scrolling through your thing here.  I'm sorry.  I am

16    scrolling through the wrong part.

17         MR. BRENNER:  Page 5.  Page 5.

18         THE COURT:  Thank you.  I was into the request for

19    admission.  I kept scrolling down and couldn't understand why I

20    didn't get to the next topic.

21         Page 5.  Thank you, Mr. Brenner.  Page 5 of docket

22    entry 449.

23         All right.  The issue relating to Wing Commander

24    Lynam.

25         All right.  I think, Ms. McGovern, this was your

1   objection based upon work product.  I'll let you respond, but,

2   again, let me just give you my initial thoughts on reading the

3   submission, was this seems to me to be a factual question as to

4   whether or not it was prepared at the direction of counsel, and

5   I would give you an opportunity to make that record if you

6   believe that's relevant here.

7        I mean, if we were able to go to the courthouse, I

8   would let you introduce exhibits and evidence and whatever you

9   need to introduce to establish that this was work product.  But

10  obviously we can't do that during the coronavirus situation.

11  But I would give you an opportunity to make your record if you

12  agree that it is a factual question.  But if you have other

13  legal argument, I'm happy to hear you on that.

14       MS. MCGOVERN:  Thank you, your Honor.  Let me clarify

15  for the record that I agree with Mr. Brenner that Mr. Lynam

16  testified clearly that he prepared the witness statement

17  without our, Rivero Mestre's, participation.  So I want to make

18  it perfectly clear that that is also my understanding.

19       I did not ask Mr. Lynam to prepare the witness

20  statement.  This was not prepared at my instruction or at

21  anyone in our law firm's instruction.

22       What happened was, and this is the conundrum that

23  Mr. Brenner and I actually discussed before this hearing

24  earlier this morning -- I was unable to get back to him because

25  I had to deal with the UK and I just couldn't get the answer in

1    time for the joint discovery memorandum, which I apologize for.

2    But here's what happened, and I've confirmed this with

3    Mr. Lynam and with counsel.

4         There is a lawsuit that is pending in the UK.  It is a

5    lawsuit that is filed by Dr. Wright against another party.  It

6    is for defamation.  We are in a joint defense agreement with

7    that law firm.  In large part we have not appeared in that

8    lawsuit, we are not taking an active role in that lawsuit, but

9    we have a joint defense agreement in that lawsuit because

10   there's been such a slew of documents produced in the United

11   States.  We're trying to avoid multiple duplicate collections

12   and searches and productions in connection with other things,

13   including with respect to the deposition of Ramona Watts, where

14   she produced documents as well, but we were just trying to

15   avoid multiple productions.

16        So we have a joint defense agreement with a law firm

17   called SCA Ontier in the UK.  They requested the witness

18   statement of Mr. Lynam.  So Mr. Lynam testified in his

19   deposition that for purposes of helping with the deposition

20   taken in our case, because I did not engage in discussion with

21   Mr. Lynam, as he testified, telling him about the case and what

22   we wanted him to testify, but I simply said would you be able

23   to be deposed and appear.

24        He sent us that witness statement that had been

25   prepared at the instruction of counsel in the UK.  It is not

1    signed.

2              My concern, as I expressed this to Mr. Brenner, is

3    that it is work product with respect to what was requested by

4    UK counsel.  We are in a joint defense agreement with them, and

5    my concern was giving him an unsigned witness statement that

6    was prepared in connection with litigation but not this one.

7              THE COURT:  OK.

8              MS. MCGOVERN:  That is my position.

9              THE COURT:  Well, having just researched that issue in

10   a related case where I did an order -- I can't find the order.

11   Because after I did my work product order in your case, I had

12   another one.  I did the research on that question.

13             I think the question there is, it is work product even

14   if it is created in a different litigation as long as there's

15   been nothing about the way that it's been handled since then

16   that would be deemed a waiver.  I believe that would be the way

17   we'd have to analyze this.  But that is my own personal

18   research.  I don't know if you have any law that is any

19   different from that.

20             MS. MCGOVERN:  That is my understanding as well, your

21   Honor.

22             THE COURT:  OK.  So let me hear from Mr. Brenner on

23   that.

24             MR. BRENNER:  Right.  So I think where you started was

25   the right place, which is what's the record here.  I actually

1    should have attached the deposition for you, and frankly I was

2    doing it at the last minute.  I didn't know if it was sealed

3    and I didn't want to deal with that.  So I didn't attach it.  I

4    don't think it's sealed.  In any event, here's how this came

5    up.

6              Ms. McGovern took the first part of the deposition.

7    This is a gentleman that was in Australia.  So she took, I

8    don't know, half hour, 45 minutes, whatever it was, and then I

9    started my questioning, and he just sort of immediately offered

10   to me that he had -- I was trying to go into the conversations

11   he had had with Rivero Mestre immediately after his deposition

12   and say, you know what they were talking about, and he out of

13   the blue said, I did send them a statement, and I'm just

14   reading it to you.  I said:  "You did?"

15             And he says:

16   "A.  Yes."

17             And my question:  "You sent the attorneys for Rivero

18   Mestre a written statement?"

19             Now, here's where he describes what the statement is.

20   He says:  "Yes.  Well, it was marked as a draft, but I sent

21   that to them in an outline much of what we spoke about today,

22   that I was Craig's uncle, that he did have a relationship with

23   me and his grandfather, and that I was -- I knew about his

24   documents.  He normally sent me his documents.  And that I was

25   involved in the launch of the Bitcoin in the beginning of 2009.

1    It was a short statement to the effect that this was the case.

2    They did not ask me for the statement, though.  In order to get

3    quickly to the nub of it I decided I would send them a

4    statement and that would avoid a whole line of inquiry as to

5    how I was involved and what I knew and that -- and I assume

6    there were no further discussions because I hadn't made a

7    statement."

8         So to me what he clearly testified to was I sent them

9    these -- I sent Rivero Mestre the statement so they would know

10   what I was going to testify about in this case, which he had

11   just got done testifying about.  So to me it is not work

12   product at all; it is a statement by a witness.

13        He doesn't make any mention of any case in the UK.  In

14   fact, I even said when did you do it, and I think he said

15   shortly before this depo.  I was actually just trying to look

16   for that.  It was pretty clearly, at least by what he testified

17   to, that it was a statement he crafted about this depo, leading

18   up to this depo.

19        What Ms. McGovern told me today is that she's had

20   followup conversations, I assume it was with SCA Ontier or

21   maybe it was with the witness himself, I'm not sure, or maybe

22   both.

23             MS. MCGOVERN:  It was both.

24             MR. BRENNER:  It's just not what he testified to.

25             So I don't know where that leaves us.  I think what he

1    testified to, you're right, you have to look at the facts.  By

2    those facts it's not work product.  And it's not -- I would

3    have loved to have it before the depo.  I don't have it before

4    the depo, and maybe it won't do me much good because I doubt

5    Mr. Lynam is coming in from Australia for trial.  So I probably

6    had the one shot.

7         It is just the kind of thing that I think you're

8    entitled if a witness has made a written statement about the

9    case, which he clearly did, quoting himself, on his own

10   volition, although I guess -- I didn't ask him if other lawyers

11   asked him to do it.  But if you read what I just read you,

12   there's no hint that it was lawyer inspired or lawyer involved.

13        THE COURT:  OK.

14        MR. BRENNER:  That is sort of where we come out on the

15   issue.

16        THE COURT:  I understand.

17        MS. MCGOVERN:  Could I just --

18        THE COURT:  Let me let Ms. McGovern be heard.

19        MS. MCGOVERN:  -- respond very quickly, your Honor.

20        THE COURT:  Absolutely.

21        MS. MCGOVERN:  Thank you so much.

22        THE COURT:  Let me just give you again, Ms. McGovern,

23   I always try to give both sides my initial thoughts as it comes

24   to me.

25        It seems to me it would be helpful -- again, this is a

1  factual determination I have to make as to whether this is work

2  product.  It would probably -- unless you tell me the statement

3  is hundreds of pages long.  If it is simple enough to submit

4  the statement *in camera*, submit the deposition *in camera*, and

5  then -- not again.  Yes, because this is a discovery hearing so

6  it shouldn't be in the public hearing.

7          MS. MCGOVERN:  Exactly.

8          THE COURT:  So you can submit the deposition under

9  seal with the statement, ex parte under seal, and then to the

10  extent, Ms. McGovern, there is any other sort of an affidavit

11  or declaration --

12          MS. MCGOVERN:  Yes.

13          THE COURT:  -- or anything else that you want to

14  submit, obviously you will want to wordsmith.  I know you and

15  your firm are extraordinarily careful.  You are going to want

16  to be careful that that doesn't waive privilege in any way.  I

17  will allow to you do that.  And then I can review all of that

18  evidence.  And then depending on what's in the declaration, if

19  Mr. Brenner wants to respond to it, I can then rule on that

20  record.

21          But that is my initial thought.  But, Ms. McGovern, I

22  will hear you further.

23          MS. MCGOVERN:  I have nothing else to add, your Honor.

24  If we follow that procedure, I would be -- I completely agree

25  with that, particularly because my concern isn't the content of

1    the witness statement.  It's taking a step that would somehow

2    prejudice the UK proceeding because Mr. Lynam did confer with

3    me by phone he did it at the instruction of the UK counsel.

4    That's the issue for me.

5        THE COURT:  I understand completely.  No, I hear you

6    completely.

7        So that will be my order.

8        I am going to order Dr. Wright to submit under seal

9    and *in camera* the statement prepared by Mr. Lynam.  I will

10   instruct, whichever one of you -- you can decide between the

11   two of you -- somebody should submit to me the deposition.

12   That should be under seal but not *in camera*.  Obviously you

13   both have it anyway, but it should be under seal so the public

14   doesn't get it.  And then any other declaration that either

15   side would like to submit, and I guess I will have Ms. McGovern

16   go first and then if Mr. Brenner wants to respond.

17       So how much --

18       MR. BRENNER:  Judge, just so I am clear, and I think

19   the procedure you outlined is perfect and appropriate.  Just so

20   I'm clear, the declaration or additional evidence that

21   Ms. McGovern tenders, that will be under seal but not *in*

22   *camera*.

23       THE COURT:  Well, I'm struggling with that, candidly.

24   Let's talk that through.  Because here's what I'm struggling

25   with.  I'm thinking if I were a lawyer trying to establish to a

1    judge that something was work product, I've got to disclose

2    things that might otherwise be attorney-client privileged or

3    might be covered by my duty of confidentiality.  But on the

4    other hand, I have to make a record.  So I have to somehow be

5    able to put evidence before this judge, but I also have to

6    be -- I, as the judge, then have to be fair to the plaintiffs

7    that the other side doesn't get to ex parte the judge and they

8    don't get a chance to at least respond to whatever is asserted

9    in that declaration.

10           So I guess in the first instance I am going to leave

11   that to Ms. McGovern.  Let her wordsmith the declaration.

12   Obviously to the extent it can be done in a way that they don't

13   have to ask me to consider it ex parte, that would be better,

14   but I am not going to limit that at this time.  If they believe

15   it should be considered ex parte, they can file it that way.

16   They can file a pleading to argue why I should consider it,

17   without allowing the other side to respond, and then I will

18   make a ruling.

19           MR. BRENNER:  That is fine with me, Judge.

20           MS. MCGOVERN:  Fine.

21           MR. BRENNER:  Would you find when you submit the

22   statement that you submit the depo also?

23           MS. MCGOVERN:  Yes, I will.

24           THE COURT:  Great.

25           MR. BRENNER:  OK.  That would solve that problem.

```
1              THE COURT:  Yes.  Exactly.

2              All right.  Let me turn to then the last issue we have

3    here, which is -- it is like finding Nemo.  Finding Mr. Nguyen.

4              MR. BRENNER:  Nguyen, Y-E-N.

5              MS. MCGOVERN:  Your Honor, is it OK if we submit all

6    these things for Lynam next week?

7              THE COURT:  Yes.

8              MS. MCGOVERN:  I've lost some help here because of the

9    holidays.  Not the holiday, because of Passover and so forth.

10             THE COURT:  I am perfectly fine.  It sounds to me

11   like, look, the issue with Mr. Lynam, I guess, and I appreciate

12   again Mr. Brenner's candor, is even if I order that that should

13   be turned over to the plaintiffs -- yes, to the plaintiffs --

14   they really can't make any meaningful use of it other than

15   maybe in a motion for summary judgment or at trial.

16             MS. MCGOVERN:  Right.

17             THE COURT:  So discovery closes in a couple of weeks.

18   Unless, Mr. Brenner, you tell me there's some other time

19   urgency, I was going to give Ms. McGovern until the end of next

20   week to submit whatever she wants to submit on this issue.

21             MR. BRENNER:  That's perfectly fine.

22             THE COURT:  OK.  Fine.

23             Ms. McGovern, so close of business a week from

24   tomorrow.  The 17th at 5?

25             MS. MCGOVERN:  Yes.
```

1          MR. BRENNER:  Perfect.  No problem.

2          THE COURT:  So now Mr. Nguyen.  So let's see.

3     Plaintiffs want the defendants to help them find and the

4     defendant says we don't have to do that.

5          Mr. Brenner, other than if they want to out of the

6     goodness of their heart, what is their legal obligation to help

7     you?

8          MR. BRENNER:  I was going to say that is a good issue

9     frame, Judge.  I don't know it is out of the goodness of their

10    heart.  I don't have a legal, I don't have a legal rule that

11    says that they have to do it.  There seems something

12    untoward -- I mean, all we're trying to do is serve the guy

13    with process, and the only reason not to give that information

14    is to -- I'm comfortable saying that, at least based on my

15    professional judgment and experience, that Mr. Nguyen is

16    actively evading service.  Now, he may say something different,

17    his lawyer may say something different, and Ms. McGovern

18    doesn't represent him so it is not her job to defend that

19    charge or not, but from what I see he has been evading service.

20          I think we ask each other in discovery all the time

21    for contact information regarding witnesses.  So it would be a

22    perfectly fine interrogatory -- give me the name and address of

23    this witness.  I think everyone agrees Mr. Nguyen would at

24    least, at least on the threshold for relevancy, would have

25    information relevant to the lawsuit.  So I think it is a

1    perfectly -- normally I guess I would send an interrogatory and

2    I'd wait 30 days.  I don't have that time.

3              THE COURT:  I understand.  But if I'm reading --

4              MR. BRENNER:  That's basically it.

5              THE COURT:  OK.  Sorry to interrupt you.  If I'm

6    reading the joint submission, at least on page 7, they say

7    that, at least this is what I understood from reading it, that

8    you have contact information for him.  He just won't take your

9    calls and he won't respond to your e-mails and all that stuff.

10             MR. BRENNER:  Sort of.  Sort of.  The email address,

11   which I think is probably the most, would be the easiest way to

12   effect service, although I will not hold myself as an expert on

13   alternate forms of service, but my understanding is what

14   happened with the email address is we actually had Mr. Nguyen's

15   email address in the past and my understanding is there's been

16   communications with Mr. Nguyen in the past between -- it may

17   have been by and between everyone, but certainly we had

18   communications with him.

19             As soon as he understood that he was trying to be

20   served -- I think, actually, he formally admitted, clear to him

21   by responding to his Twitter handle, and as soon as we did

22   that, that email address no longer works, or at least we're

23   blocked on it.  So we have an email address that either has

24   been changed by him or is no longer accessible to us.

25             So that's the issue on the contact information we

1    already have.  Believe me, if we had an easier way to serve

2    him, we would do it.

3         THE COURT:  I understand.  I don't know that I need to

4    hear from Mrs. McGovern.  I just don't think I have any legal

5    authority to order them to give you that information even

6    assuming they have it.  I just don't think I have any legal

7    authority to order them to produce that.  So I will deny your

8    request in that regard.

9         I will point you to you your partner, Ms. McCawley, up

10   in Fort Lauderdale.  I think she's become the world's expert on

11   effectuating service on people who don't want to be served.

12        MR. BRENNER:  That may be accurate, Judge.

13        THE COURT:  Having represented one of those in a case

14   against her, I can tell you with certainty she is quite agile

15   at that skill set.

16        All right.  With that, is there anything else -- first

17   of all, my two usual exit questions, which I am sure you-all

18   are sick of by now.  Have I now at least ruled on everything

19   the parties wanted presented, nobody waiving any objections you

20   may have to my rulings?

21        The plaintiff.

22        MR. BRENNER:  For the plaintiff, you have either ruled

23   on or set the procedure by which you're going to rule.

24        THE COURT:  Ms. McGovern.

25        MS. MCGOVERN:  Yes, your Honor.

```
 1              THE COURT:  OK.  Great.

 2              As long as we're together, anything else we can or

 3    should talk about to try to move this case forward?  I will

 4    tell you, I think my law clerk has a count-down clock on her

 5    desk that tells her there are now 21 days, 8 minutes and 4

 6    seconds before the discovery deadline in this case.

 7              MR. BRENNER:  Is that right?  OK.  I think we are,

 8    both sides, are moving along and it's been a little -- some of

 9    it's been a little challenged with the quarantines and the

10    coronavirus and we had a little bit of an extension from that,

11    but I think we are on track as we can be as far as I know.

12              THE COURT:  I must tell you-all, I have used you as

13    the example.  Everybody who comes to me and says, well, Judge,

14    we can't do a deposition.  He's in Tampa.  And I say, I had a

15    call where the deponent was in London, one lawyer was in Miami,

16    another lawyer was in another part of Miami, one lawyer was in

17    another part of Miami, one lawyer was in D.C., and we did it

18    for two days and it worked just fine.

19              MR. BRENNER:  It was four days, Judge.  So your war

20    story will get better on the other cases.  It was actually four

21    days.  We had two days with Dr. Wright and then we had

22    Dr. Wright's wife and we had a general by the name of Andrew

23    O'Hagan.  So four straight days.

24              THE COURT:  I was only sentenced by Judge Bloom to two

25    of those days.  So I can only testify from personal knowledge
```

1    as to two of those days.

2         MR. BRENNER:  She did not show such leniency on us.

3    We were sentenced to four.

4         THE COURT:  There you go.

5         All right, folks, listen, thank you both very much.

6    Well argued for both sides.  And everybody go wash your hands

7    and be safe and we will be in recess.

8         Thank you very much.  Have a good day, everyone.

9         (Adjourned)

C E R T I F I C A T E


    I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


April 20, 2020        s/ Joanne Mancari
                    Joanne Mancari, RPR, CRR, CSR
                    Court Reporter
                    jemancari@gmail.com