Ira Kleiman
January 10, 2020

1                  UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF FLORIDA

3                  CASE NO. 9:18-cv-80176-BB/BR

4
     IRA KLEIMAN, as the personal representative
5    of the Estate of David Kleiman, and
     W&K Info Defense Research, LLC,
6
               Plaintiffs,
7
     -vs-
8
     CRAIG WRIGHT,
9
               Defendant.
10

11   * * * * * * * * * * * * * * * * * *

12   VIDEOTAPED DEPOSITION OF IRA KLEIMAN

13   DATE TAKEN: January 10, 2020

14   TIME: 8:49 a.m. - 2:45 p.m.

15   PLACE: 2525 Ponce de Leon Boulevard

16   Miami, Florida 33134

17
     TAKEN BEFORE: RICK E. LEVY, RPR, FPR
18                 AND NOTARY PUBLIC

19

20   * * * * * * * * * * * * * * * * * *

21

22

23

24

25

Kleiman
January 10, 2020                                    2

```
 1   APPEARANCES:

 2   On behalf of the Plaintiff:

 3        VEL FREEDMAN, ESQUIRE
          ROCHE FREEDMAN, P.A.
 4        200 S. Biscayne Boulevard
          Suite 5500
 5        Miami, Florida 33131

 6        ANDREW BRENNER, ESQUIRE
          BOIES SCHILLER & FLEXNER, P.A.
 7        100 S.E 2nd Avenue
          Suite 2800
 8        Miami, Florida 33131
          abrenner@bsfllp.com
 9

10   On behalf of the Defendant:

11        BRYAN PASCHAL, ESQUIRE
          JULIO PAEZ, ESQUIRE
12        RIVERO MESTRE, P.A.
          2525 Ponce de Leon Boulevard
13        Suite 1000
          Coral Gables, Florida 33134
14
     Also Present: Raul Torres, The Videographer
15

16

17

18

19

20

21

22

23

24

25
```

Ira Kleiman
January 10, 2020                                    3

```
 1                         -   -   -
                        I N D E X
 2                         -   -   -

 3   WITNESS:        DIRECT    CROSS    REDIRECT    RECROSS
     IRA KLEIMAN
 4   BY MR. PASCHAL:      4
     BY MR. FREEDMAN:           171
 5

 6                         -   -   -
                        E X H I B I T S
 7                         -   -   -

 8
     NUMBER                            PAGE
 9   DEFENDANT'S EX. 1                  13
     DEFENDANT'S EX. 2                  24
10   DEFENDANT'S EX. 3                  27
     DEFENDANT'S EX. 4                  40
11   DEFENDANT'S EX. 5                  52
     DEFENDANT'S EX. 6                  57
12   DEFENDANT'S EX. 7                  66
     DEFENDANT'S EX. 8                  69
13   DEFENDANT'S EX. 9                  76
     DEFENDANT'S EX. 10                 88
14   DEFENDANT'S EX. 11                119
     DEFENDANT'S EX. 12                129
15   DEFENDANT'S EX. 13                130
     DEFENDANT'S EX. 14                134
16   DEFENDANT'S EX. 15                149

17

18

19

20

21

22

23

24

25
```

```
 1                  P R O C E E D I N G S

 2                         - - -

 3        Deposition taken before Rick E. Levy,

 4   Registered Professional Reporter and Notary Public

 5   in and for the State of Florida at Large, in the

 6   above cause.

 7                         - - -

 8             THE VIDEOGRAPHER:  Good morning.  Today is

 9        Friday the 10th day of January.  The time is 8:49.

10        We are at 2525 Ponce De Leon Boulevard, Suite 1000.

11        Case number 9:18-cv-80176-BB/BR.  Would all counsel

12        please state their appearances for the record?

13             MR. PASCHAL:  Bryan Paschal for Dr. Craig

14        Wright.

15             MR. PAEZ:  Julio Paez for Dr. Craig Wright.

16             MR. FREEDMAN:  Vel Freedman for the plaintiff.

17             THE WITNESS:  Yes.

18                         - - -

19   Thereupon,

20                      (IRA KLEIMAN)

21                  having been first duly sworn or

22   affirmed, was examined and testified as follows:

23                    DIRECT EXAMINATION

24   BY MR. PASCHAL:

25        Q.   Good morning, Mr. Kleiman.
```

```
 1          A.   Good morning.

 2          Q.   You understand this is my second time deposing

 3     you?

 4          A.   Yes.

 5          Q.   The first time I think was back in April?

 6          A.   Right.

 7          Q.   A lot has happened since then; right?

 8          A.   Yes.

 9          Q.   We've had several depositions?

10          A.   Yes.

11          Q.   And you were able to listen in on those

12     depositions; correct?

13          A.   Yes.

14          Q.   We missed you on the W&K deposition.  You

15     didn't listen to that one, right?

16          A.   I didn't listen to that one, no.

17          Q.   Do you know who the W&K corporate rep was?

18          A.   I don't recall his name.

19          Q.   Did you ever speak with the W&K corporate rep?

20          A.   Did I -- I don't -- I don't recall.

21          Q.   Do you recall any phone conversations with the

22     corporate rep?

23          A.   I may have.

24          Q.   You may have?

25          A.   Yes.  I don't remember.
```

```
 1        Q.   You don't remember?

 2        A.   No.

 3             MR. FREEDMAN:  For the record he may not have

 4        been identified as the corporate rep to

 5        Mr. Kleiman.

 6   BY MR. PASCHAL:

 7        Q.   Even though I deposed before and just to be

 8   clear you understand the rules for deposition; right.

 9   It's the same as before.  You need me to go over them?

10        A.   I appreciate if you do.

11        Q.   I'm going to ask you a question and I would

12   need a verbal response so our court reporter can take

13   down your response.  So you can't shake your head or say

14   no or anything, has to be a verbal response.  Counsel,

15   your counsel, will object at times but you still need to

16   answer the question unless your counsel instructs you

17   not to answer the question.

18             If you need to take a break at any time you

19   let me know and we'll take a break.  If you need to go

20   back on an answer you remembered something let me know

21   we can go back so you can revise your answer.  If you

22   don't know something I don't want you to guess.  I don't

23   want you answer the question.  Are you on any medication

24   today that may prevent you from giving testimony?

25        A.   Medication, no.
```

```
 1        Q.   Is there any reason why you cannot give your
 2   best testimony today?
 3        A.   My state of mind isn't as clear as it probably
 4   could be.  If your client would probably stop accusing
 5   me of things online and --
 6             MR. FREEDMAN:  Ira, just answer the question.
 7             THE WITNESS:  I am.  I would be able to think
 8        a little bit clearer if he would refrain from some
 9        of those things.
10   BY MR. PASCHAL:
11        Q.   How is that affecting your testimony today?
12        A.   It just makes me more nervous than usual.
13        Q.   Are you able to testify today?
14        A.   I believe so.
15        Q.   Even though I deposed you before I'm going to
16   ask some questions that might be the same so just bear
17   with me.  So first I am going to talk about Dave
18   Kleiman.  What was your relationship with Dave Kleiman?
19        A.   He was my older brother.
20        Q.   Excuse me?
21        A.   Dave Kleiman was my older brother.
22        Q.   Was Dave Kleiman adopted in your family?
23        A.   Yes.
24        Q.   When was he adopted?
25        A.   1967.
```

January 10, 2020                                          8

1        Q.   How old were you when he was adopted?  Were
2   you born?
3        A.   No, he's older than me.
4        Q.   So you weren't born when he was adopted?
5        A.   Correct.
6        Q.   Do you know anything about Dave's adopted --
7   adopted parents?
8             MR. FREEDMAN:  Objection.
9   BY MR. PASCHAL:
10       Q.   His previous parents?
11            MR. FREEDMAN:  Biological.
12            MR. PASCHAL:  Biological, thank you.
13            THE WITNESS:  Not much, no.
14   BY MR. PASCHAL:
15       Q.   What do you know of them?
16       A.   I think his father passed away -- I think his
17   mother has also passed away.  I think he may have
18   communicated with his biological mom a couple of times.
19   But other than that I don't know much about them.
20       Q.   Do you know the circumstances of how your
21   parents chose to adopt Dave?
22       A.   No.
23       Q.   What was Dave's relationship with your
24   parents?
25       A.   It was fine.

David Kleiman
January 10, 2020                                    9

1       Q.   What was your relationship with Dave?

2       A.   Fine.

3       Q.   Were you close to Dave?

4            MR. FREEDMAN:  Objection.

5            THE WITNESS:  You have to define close.

6    BY MR. PASCHAL:

7       Q.   Did you speak every day to Dave?

8       A.   Every day?

9       Q.   Yes.

10      A.   As kids we probably did.

11      Q.   What about as teenagers?

12      A.   Teenagers, yes.

13      Q.   What about as adults?

14      A.   As adults, you know, he was more independent

15   and he was doing his own thing so no, we didn't talk

16   every day as adults.

17      Q.   How far apart did you live from Dave Kleiman

18   as adults?

19      A.   He moved around a bit, you know.  What's years

20   are you talking about specifically?

21      Q.   Let's say from 2008 to 2010 before he was

22   hospitalized.

23      A.   I think at that time he was living in like

24   Riviera Beach.  I was living in Palm Beach Gardens so

25   like maybe like 15 minutes away or something.

Kleiman
January 10, 2020                                    10

1      Q.   So in the last depo you testified that you

2   lived five to ten minutes away.  What period was that --

3      A.   Since then I -- I noticed that you made a big

4   deal about the five minutes so then I went online and I

5   looked it up it's further than five minutes.

6      Q.   So your testimony now is based on online

7   research?

8      A.   Yes.

9      Q.   So he lived 15 minutes away or ten or 15

10   minutes away.  How many times did you visit his house?

11      A.   Several.  I mean I don't remember like an

12   exact amount.

13      Q.   Do you remember who lived in his house?

14      A.   For the most part it was him.  At one time his

15   girlfriend I believe moved in for a short time and I

16   think her son did as well.

17      Q.   Did he ever tell you he was engaged to his

18   girlfriend?

19      A.   He never mentioned that.  I think I heard her

20   mention that to Craig but I never heard him mention

21   that.

22      Q.   Would it surprise you if both the fiancee and

23   the son said they never saw you or Dave never spoke

24   about you?

25           MR. FREEDMAN:  Objection.

 1          THE WITNESS:  I did see them.

 2    BY MR. PASCHAL:

 3        Q.   They rarely saw you?

 4        A.   I rarely saw David.

 5          MR. FREEDMAN:  Objection.

 6    BY MR. PASCHAL:

 7        Q.   When David was in the Miami V.A. you realized

 8    he was hospitalized for two years, 2011 to 2013?

 9        A.   No, I realized that he would go back and forth

10    to the hospital on a routine basis but as far as him

11    like staying for any long period of time I wasn't aware

12    of that.

13        Q.   So his medical records showed he was admitted

14    from 2011 to 2013 and I understand that they would give

15    him a day pass to go home but only under doctor's

16    approval.  Are you saying that they would let him out or

17    they actually cleared him to leave the hospital and go

18    home?

19          MR. FREEDMAN:  Objection.  Ira, just hold on a

20      second.  When Mr. Paschal asks a question just

21      pause a second so I can get a chance to object and

22      as he said before unless I instruct you not to

23      answer you can then answer.

24          MR. PASCHAL:  Go ahead.

25          THE WITNESS:  I don't know.

Kleiman
January 10, 2020                              12

1    BY MR. PASCHAL:

2         Q.   How many times did you visit him in the

3    hospital?

4         A.   I didn't visit him in the hospital.  He never

5    asked me to.

6         Q.   You only visited if he asked you to visit?

7         A.   Well, when it comes to like medical issues and

8    financial issues we just kind of refrained from

9    discussing that kind -- I don't think he ever felt

10   comfortable like telling me about any weaknesses and I

11   didn't discuss my weaknesses with him either.  I have

12   medical conditions that he never knew about and he

13   didn't discuss his stuff with me either.

14        Q.   He didn't discuss his finances with you

15   either?

16        A.   No.

17        Q.   Did he discuss his work with you?

18        A.   Little bit.  I knew that he was working in

19   computer forensics.

20             MR. PASCHAL:  I'm handing you what we're

21        marking as Exhibit 1.

22             MR. FREEDMAN:  Counsel, can I get a copy?

23             MR. PASCHAL:  It's right here.

24             THE WITNESS:  Thank you.

25

```
 1              (Defendant's Exhibit No. 1 was

 2              marked for identification.)

 3   BY MR. PASCHAL:

 4       Q.   You know what this document is; right?

 5       A.   Yes.

 6              MR. FREEDMAN:  Ira, if you need to take a

 7         minute to familiarize yourself with the document go

 8         ahead and do that.

 9   BY MR. PASCHAL:

10       Q.   Can you turn to page two?

11       A.   Yes.

12       Q.   I asked you this question before but you were

13   unable to answer.  The seventh paragraph Dave Kleiman

14   leaves out Leonard Kleiman.  Do you know why?

15       A.   He didn't speak too much with my oldest

16   brother.  They just didn't have like a close

17   relationship.  My oldest brother he had a lot of issues

18   like drug problems and yes, he -- they just didn't

19   communicate much.

20       Q.   I want to turn to the first page.  Go to the

21   second paragraph.

22       A.   Okay.

23       Q.   You see in this where Dave Kleiman he writes

24   that at the time of my death if I'm owner or co-owner of

25   any insurance settlement, bank account, government bond,
```

1   security instrument, indebtedness, blah, blah, blah that

2   he is a joint owner with someone else it doesn't pass in

3   his will.  Go on and read the paragraph.

4        A.   The type is a little -- okay.

5        Q.   Do you know why David would put that in his

6   will?  Did he ever discuss that with you?

7        A.   No.

8        Q.   So you alleged in your complaint that the

9   first time David told you about Bitcoin was during a

10  Thanksgiving dinner 2009?

11       A.   Yes.

12       Q.   Who was at that dinner?

13       A.   My wife, my dad, myself and my six

14  month-year-old daughter.

15       Q.   Was Dave sitting next to you at the

16  Thanksgiving dinner?

17       A.   Across from me.

18       Q.   Across from you?

19       A.   (Indicating).

20       Q.   Who was sitting next to Dave?

21       A.   No one.  My mom would usually sit on that

22  side.

23       Q.   So from across the table Dave tells you -- you

24  ask him what is he working on; right?

25       A.   Well, this was after dinner.  My wife and my

Kleiman
January 10, 2020                                    15

1   dad were doing the dishes in the kitchen.  My daughter
2   was like in a car seat on the floor like 20 feet away
3   from the dining table we were sitting at and that's when
4   we had the conversation.
5        Q.   What was that conversation?
6        A.   I asked him -- I think there was some news on
7   Facebook at the time I said why don't you create
8   something like that Zuckerberg kid and he said I'm doing
9   something bigger.  I'm creating my own money.
10        Q.   Did he ever use the word Bitcoin?
11        A.   No.  I believe he said digital money.
12        Q.   Did he show you pictures of what the Bitcoin
13   looked like?
14        A.   At the time I didn't know what it was.  I mean
15   it just looked like a letter B with some lines through
16   it.
17        Q.   What did the Bitcoin symbol look like?
18             MR. FREEDMAN:  Objection.
19             MR. PASCHAL:  Just describe it.  You can
20        answer.
21             MR. FREEDMAN:  Go ahead.
22             THE WITNESS:  Do you mean the symbol that he
23        drew?
24   BY MR. PASCHAL:
25        Q.   Yes.

```
 1        A.   He took out a business card and he flipped it
 2   over and on the back of it it just to me it just looked
 3   like the letter B with a couple lines through it.
 4        Q.   Are you familiar with cryptocurrency?
 5             MR. FREEDMAN:  Objection.
 6             THE WITNESS:  I mean I am now.
 7   BY MR. PASCHAL:
 8        Q.   When did you first become familiar with
 9   cryptocurrency?
10        A.   Once -- after Craig contacted me.
11        Q.   When was the first time you heard about
12   Bitcoin?
13        A.   When Craig contacted me in February 2014.
14        Q.   So from 2009 until Dave's death did you ever
15   ask him about the digital money that he was creating?
16        A.   No.
17        Q.   Did you ever ask him about his reference he
18   was creating his own money?
19        A.   Excuse me?
20        Q.   Did you ever ask him about any reference to
21   I'm creating my own money?
22        A.   No.  I mean it was such a brief conversation
23   that I never thought of it again because if it had
24   turned into something successful he probably would have
25   mentioned it to me but if it was a secretive project
```

Ira Kleiman
January 10, 2020                               17

1   that he wasn't supposed to mention when he would have

2   kept it to himself.

3         Q.   Do you think that his alleged involvement in

4   Bitcoin was secretive?

5         A.   According to what Craig told me.

6         Q.   Do you think that?

7              MR. FREEDMAN:  Objection.

8              THE WITNESS:  Yes, I believe so.

9   BY MR. PASCHAL:

10        Q.   But he told you?

11        A.   He didn't tell me specifically.  He just told

12  me in a very vague way.

13        Q.   I want to go through this really quick.  You

14  mentioned -- you know who Patrick Paige is, right?

15        A.   Yes.

16        Q.   You know he was very close to Dave?

17        A.   Yes.

18        Q.   You do realize Dave never told him about

19  Bitcoin or creating digital money or anything like that?

20             MR. FREEDMAN:  Objection.

21             THE WITNESS:  I thought his testimony was that

22        they did --

23             MR. FREEDMAN:  Ira, there's no question

24        pending.

25             MR. PASCHAL:  Actually there was but go ahead.

Kleiman
                    January 10, 2020                    18

```
 1              MR. FREEDMAN:  I don't know -- maybe you can
 2         re-ask it then.  You said you do realize that Dave
 3         never told him.
 4              MR. PASCHAL:  I asked and he was answering.
 5         You stopped him from answering.
 6              MR. FREEDMAN:  There's no question pending.
 7         You can re-ask the question.
 8    BY MR. PASCHAL:
 9         Q.   The question I just asked you you do realize
10    Dave never told him meaning Patrick Paige about Bitcoin
11    or creating digital money or anything like that?
12         A.   "Uh-uh."
13              MR. FREEDMAN:  No question pending.
14    BY MR. PASCHAL:
15         Q.   Right?
16         A.   You want me to answer?
17         Q.   Yes, you have to answer.
18         A.   I thought that I heard that Patrick mentioned
19    that they did -- that Dave briefly did mention it to
20    him.
21         Q.   When did he -- Patrick tell you that?
22         A.   Either it's in e-mail or I thought he
23    testified to it.
24         Q.   His testimony was -- you heard his testimony
25    was that Dave never said a word to him.
```

Kleiman
January 10, 2020                            19

```
 1        A.   Okay, then I believe I do have an e-mail
 2   referring to he like briefly mentioned it.
 3        Q.   You do realize that Dave's fiancee who lived
 4   with him also mentioned that Dave never mentioned
 5   anything about digital money or Bitcoin or anything like
 6   that?
 7             MR. FREEDMAN:  No question pending.
 8   BY MR. PASCHAL:
 9        Q.   Right?
10        A.   That I'm not aware of.
11        Q.   Do you realize that the son -- do you know his
12   name?
13        A.   No.  No, I don't.
14        Q.   His name is Caleb Jones.
15        A.   I heard that.
16        Q.   He considered Dave a father of his.  They
17   spoke often, they played video games, do you know that?
18        A.   I did hear about it.
19        Q.   In fact Caleb went on to be in the military
20   and study cyber security because of Dave?
21        A.   Right.
22        Q.   All their discussions they never once and Dave
23   mentioned his work to him.  Caleb -- Dave never said to
24   Caleb I'm working on Bitcoin or digital money?
25        A.   Well --
```

Kleiman
January 10, 2020                                    20

```
 1            MR. FREEDMAN:  There's no question pending.
 2            MR. PASCHAL:  You can answer.
 3            MR. FREEDMAN:  There's nothing to answer.
 4       There's no question pending, Bryan.
 5            MR. PASCHAL:  You can answer.
 6            THE WITNESS:  What's the question?
 7  BY MR. PASCHAL:
 8       Q.  Do you realize -- that Dave never mentioned to
 9  Caleb that he is working on digital money or
10  cryptocurrency or Bitcoin; right?
11            MR. PASCHAL:  I've never spoken to Caleb so I
12       don't know.
13  BY MR. PASCHAL:
14       Q.  Do you find it odd that you're the only person
15  that he ever told he is working on digital money or
16  working on his own digital money?
17       A.  Like I said he told me in a very vague way
18  that he was working on Bitcoin.  He didn't specifically
19  say Bitcoin so I could never go back and attach it to
20  him.  During those next 2010, 2011 if I had heard of
21  Bitcoin I wouldn't have thought oh, that's what Dave was
22  working on.
23       Q.  None of his closest friends or fiancee or
24  anyone he had extremely close relationships with is
25  going to testify that Dave said he was working on
```

Kleiman
January 10, 2020                                        21

 1    digital money except you; is that correct?

 2            MR. FREEDMAN:  Objection.

 3            THE WITNESS:  I don't know what they'll

 4        testify to.  I hadn't spoken to them.

 5    BY MR. PASCHAL:

 6        Q.   So when Dave tells you he is working on

 7    something that's as big as what, Facebook?

 8        A.   Bigger.

 9        Q.   Bigger than Facebook?

10        A.   (Indicating).

11        Q.   That's important; right?

12        A.   Yes.

13        Q.   What is Facebook, billions of dollars?

14        A.   I suppose.

15        Q.   So if it's bigger it could be hundreds of

16    billions of dollars?

17        A.   Maybe.

18        Q.   I need an answer.

19        A.   Maybe.

20        Q.   It could be trillions?

21            MR. FREEDMAN:  Objection, calls for

22        speculation.

23            THE WITNESS:  Do you want me to speculate?

24    BY MR. PASCHAL:

25        Q.   I want you to answer my question.

```
1        A.    Whether it could be trillions?

2        Q.    Yes.

3        A.    It could be worth anything.

4        Q.    Anything bigger than Facebook; right?

5        A.    Right.

6        Q.    And you don't talk to him about it again in

7   2010?

8        A.    I don't talk to him about it?

9        Q.    Digital money he is working on in 2010?

10       A.    No.

11       Q.    You don't talk about this project that's

12   bigger than Facebook in 2011?

13       A.    No.

14       Q.    You don't talk about this project that's

15   bigger than Facebook in 2012?

16       A.    No.

17       Q.    And you don't talk about this project that's

18   bigger than Facebook in 2013 before he died?

19       A.    A secretive project he wouldn't be disclosing

20   it to me.

21            MR. FREEDMAN:  Ira, just answer the question

22       he's asking.

23            THE WITNESS:  No.

24   BY MR. PASCHAL:

25       Q.    You didn't ask him about it?
```

Kleiman
                    January 10, 2020                    23

```
 1        A.   Right.  I had no reason to.
 2        Q.   In 2009 when he told you about this project
 3   bigger than Facebook he didn't tell you it's a secret,
 4   did he?
 5        A.   No.
 6        Q.   In fact in 2013 I guess the time -- well, in
 7   2013 did you -- before he died did you ever visit his
 8   house?
 9        A.   Before 2013?
10        Q.   In 2013 before Dave Kleiman died did you visit
11   his house?
12        A.   In 2013 within the year, no.
13        Q.   The first time you visit Dave Kleiman's house
14   is after he died; right?
15        A.   No.
16        Q.   In 2013?
17        A.   Yes, in 2013, yes.
18        Q.   When you visit his house you're there to go
19   through his things; right?
20        A.   Yes.
21             MR. FREEDMAN:  Is this a good time to take
22        bathroom break?
23             MR. PASCHAL:  Let me finish this line.
24   BY MR. PASCHAL:
25        Q.   When you're in his house you start throwing
```

```
 1    away his work papers; right?
 2              MR. FREEDMAN:  Objection.
 3              THE WITNESS:  I go through his things and I
 4         discard whatever I don't think needs to be kept.
 5         Not just randomly throwing stuff away.
 6    BY MR. PASCHAL:
 7         Q.   Let me just ask.  Did you look for evidence of
 8    this project that's bigger than Facebook?
 9         A.   That stuff wasn't even on my mind, no.
10              MR. PASCHAL:  Handing you Exhibit 2.
11              (Defendant's Exhibit No. 2 was
12              marked for identification.)
13    BY MR. PASCHAL:
14         Q.   This is an e-mail you sent to Craig Wright on
15    February 17, 2014.  Do you recall this?
16         A.   Yes.
17         Q.   In it -- in the second paragraph you say "as
18    mysterious and exciting as all this news is I also feel
19    nervous about making mistakes.  I very well could have
20    already made some."  I guess some you mean mistakes "go
21    by throwing away a bunch of Dave's papers and formatting
22    drives I could not access."
23         A.   Yes.
24         Q.   So you threw away a bunch of Dave's papers?
25         A.   I threw away a bunch of things that I didn't
```

Kleiman
January 10, 2020                                    25

1   believe needed to be kept.

2        Q.   And --

3        A.   I can't possibly store everything in his house

4   in my small two bed two bath -- I don't have the garage

5   or anything.  I just don't have space to keep

6   everything.

7        Q.   So how long did it take you to throw away his

8   papers?

9        A.   I don't remember how much time I spent.

10       Q.   Did you spend a day?

11       A.   I probably spent several days going through

12  everything.

13       Q.   I think last time you testified was that you

14  didn't go through his furniture to look for any

15  documents.

16       A.   You mean like flipping up the couch seats?  I

17  would go through all his desks.

18       Q.   So now you're saying that you went through his

19  desk?

20       A.   I went through yes, everything.

21            MR. PASCHAL:  I have to get his depo

22       transcript from last time.

23            MR. FREEDMAN:  Take a break.

24            THE VIDEOGRAPHER:  Off record 9:16.

25            (Thereupon, a brief recess was taken.)

                              Kleiman
                    January 10, 2020                    26

```
 1             THE VIDEOGRAPHER:  On the record 9:22.
 2    BY MR. PASCHAL:
 3        Q.   Mr. Kleiman, you just testified that you went
 4    through Dave Kleiman's furniture and his drawers to look
 5    for stuff?
 6        A.   Yes.
 7        Q.   You do know that you're testifying under the
 8    penalty of perjury today?
 9        A.   Yes.
10        Q.   You do know how important it is to tell the
11    truth?
12        A.   Yes.
13        Q.   You do know how important it is especially
14    because you're suing for billions of dollars from
15    someone living in London?
16        A.   Yes.
17        Q.   You need to give truthful testimony?
18        A.   Yes.
19        Q.   If you don't remember something you should I
20    don't remember?
21        A.   Yes.
22        Q.   Now, the last time I deposed you you were also
23    under the penalty of perjury; correct?
24        A.   Yes.
25        Q.   You wouldn't have lied in that depo; right?
```

Kleiman
January 10, 2020                                    27

```
 1        A.   Not intentionally.
 2             (Defendant's Exhibit No. 3 was
 3             marked for identification.)
 4   BY MR. PASCHAL:
 5        Q.   Here is the transcript from the deposition
 6   that you took in April; right?  Can you please turn to
 7   page 112.
 8        A.   Okay.
 9        Q.   Starting at line seven the question was "but
10   there was still stuff in the house; right" and you
11   answered "like furniture?"  Then I asked "did you check
12   all the furniture to see what was in them?"  You said --
13   your answer was "I don't remember."
14             My question then was "so if something was
15   important in some of his furniture you wouldn't be able
16   to tell us; right?  You wouldn't be able to tell us;
17   right?"  Your answer was "I don't remember searching
18   through his furniture."  I then clarified said "sorry,
19   what did you say?"  You again said under penalty of
20   perjury "I don't remember searching through his
21   furniture."  Is there a reason why your testimony
22   changed today?
23        A.   I think in my mind for some reason I was like
24   thinking of like his furniture in his living room like
25   not like in his office in his bedroom.  I thought you
```

Ira Kleiman
January 10, 2020                                    28

1   meant like his sofas and stuff like that I gave away.

2        Q.   So is your testimony that that his office desk

3   isn't furniture?

4        A.   That's the stuff that I went through.

5        Q.   That's not my question.  Is his office disk

6   his furniture?

7        A.   Yes, that's also, yes.  I'm just --

8        Q.   Is his bedroom night stand furniture?

9        A.   Yes.

10       Q.   Is the --

11       A.   I'm saying at that moment in time for some

12  reason I was thinking of the stuff in his living room.

13            MR. FREEDMAN:  Ira, you have to wait until

14       there's a question pending.

15  BY MR. PASCHAL:

16       Q.   Why were you able to give a different answer

17  today?

18       A.   Because I thought you may have meant something

19  different.

20       Q.   You thought --

21       A.   Or today.  I just -- I visualized it

22  different.  I was encompassing all his furniture not

23  just things contained in his living room.

24       Q.   When I said all furniture you thought I just

25  meant his couch?

1      A.    Yes.

2      Q.    So to be clear back then you just testified

3  you didn't know what Bitcoin was; right?

4      A.    Back when?

5      Q.    Back in 2013.

6      A.    Not until Craig contacted me, yes.

7      Q.    So just answer my question.  In 2013 you

8  didn't know what Bitcoin was; right?

9      A.    Are you saying prior to February of -- I'm

10 sorry, I'm getting the dates.  Yes, 2013 I did not know,

11 yes.

12     Q.    So you didn't know what a public address was,

13 did you?

14     A.    I didn't know -- no.

15     Q.    You didn't know what a private key was; right?

16     A.    No.

17     Q.    You didn't know what a hash code was?

18     A.    No.

19     Q.    I don't know if that's the right term.  If

20 there were a bunch of numbers and letters on a document

21 would you have thought that was important?

22     A.    I don't know.  If it was on a document that

23 may have looked important worth keeping then perhaps I

24 may have kept it but if it was on just a random piece of

25 paper perhaps not.

Ira Kleiman
January 10, 2020                              30

1        Q.   You know what a public address looks like now;
2   right?
3        A.   Yes.
4        Q.   So -- you know that it's a bunch of numbers,
5   random letters, it doesn't spell out anything, you know
6   that?
7        A.   Yes.
8        Q.   So if there was a paper just a white piece of
9   paper with a public address on it in 2013 would you have
10  thrown it away?
11       A.   I don't know.
12           MR. PASCHAL:  Can we take a break for a
13       second?
14           MR. FREEDMAN:  Sure.
15           THE VIDEOGRAPHER:  Going off the record 9:28.
16           (Thereupon, a brief recess was taken.)
17           THE VIDEOGRAPHER:  On record 9:36.
18  BY MR. PASCHAL:
19       Q.   So we were just talking about the work papers
20  that you threw away.  So let me get into -- you said
21  that if there was a document that may have looked
22  important or worth keeping then perhaps I may have kept
23  it.  What documents did you keep?
24       A.   I don't remember all of them.
25       Q.   Where are those documents stored?

 1        A.   I have some of them in my house.

 2        Q.   Did you ever give those documents to your

 3   attorney?

 4        A.   I believe so.  At least whatever was like

 5   relevant to this case I did.

 6        Q.   So were those documents produced in this case?

 7        A.   The relevant documents, yes.

 8        Q.   You determined whether they were relevant;

 9   right?

10        A.   If there were like things like just

11   certificates or like I'm supposed to hand over all his

12   books he authored, I don't know.  What are you asking?

13        Q.   Let me go back to my question.  You determined

14   whether something was relevant; right?

15             MR. FREEDMAN:  Let me just inject here for a

16        second.  If you can answer that question without

17        revealing conversations you've had with counsel

18        then go ahead.  Otherwise don't answer the

19        question.

20             THE WITNESS:  I turned over whatever documents

21        I believed was necessary.

22   BY MR. PASCHAL:

23        Q.   You mentioned certificates; right?

24        A.   Yes.

25        Q.   Did you turn those over?

Kleiman
                    January 10, 2020                    32

 1          A.    I'm not sure.

 2          Q.    You mentioned books.  Did you turn over the

 3    books?

 4          A.    Books, no.

 5          Q.    Would they be books that he authored?

 6          A.    Authored or co-authored.

 7          Q.    You didn't turn over any of those?

 8          A.    No.

 9          Q.    What else did you not turn over?

10          MR. FREEDMAN:  Objection.

11          THE WITNESS:  I don't know.

12    BY MR. PASCHAL:

13          Q.    And you've received a subpoena also in this

14    case, haven't you?

15          A.    Subpoena?  I don't remember.

16          Q.    Mr. Kleiman, I'm concerned.  I want to express

17    the concern to you but then -- so you understand where

18    I'm coming from.  This is an important case and you're

19    suing a defendant for billions of dollars.  You

20    understand you threw out papers -- I think your

21    testimony before was you just threw out the documents

22    but now you're saying you kept documents.

23          MR. FREEDMAN:  Objection, mischaracterizes.

24          MR. PASCHAL:  We can do the -- go back through

25      the depo.

Kleiman
January 10, 2020                                    33

```
 1              MR. FREEDMAN:  We could if you want.
 2    BY MR. PASCHAL:
 3         Q.   But Mr. Kleiman, today is the first time
 4    you're telling us you kept important stuff from Dave.  I
 5    need to know what was not produced in this litigation
 6    and what was produced in this litigation.
 7              MR. FREEDMAN:  Objection and there's no
 8         question pending.
 9    BY MR. PASCHAL:
10         Q.   Where are these documents being stored in your
11    house?
12              MR. FREEDMAN:  Objection.
13              THE WITNESS:  Just in a bedroom.
14    BY MR. PASCHAL:
15         Q.   Which bedroom?
16         A.   I just -- I have a storage room where I keep
17    like most of Dave's stuff.
18         Q.   How big is the storage room?
19         A.   Just a small room like I don't know maybe
20    10 feet by 10 feet.
21         Q.   So it's basically a bedroom?
22         A.   Yes.
23         Q.   How much stuff is in that room?
24         A.   I don't know.  Define it.
25         Q.   How much -- is the room full of Dave's stuff?
```

Kleiman
January 10, 2020                                        34

```
 1        A.   It has belongings of some of Dave's, some of

 2   mine, some of my parents.  Just full of stuff from my

 3   family.

 4        Q.   The stuff you have not produced you're not

 5   prepared to tell us today what hasn't been produced?

 6        A.   I just told you I didn't turn over his books.

 7        Q.   Was it just books and certificates?

 8        A.   For the most part.

 9        Q.   What else was there?

10        A.   You mean -- are you talking about paper

11   documents or are you talking about like all of his

12   belongings.

13        Q.   Talking about documents.  So this is a

14   physical document.

15        A.   Any piece of paper -- any single piece of

16   paper he may have been attached to?

17        Q.   Yes, every single paper.  I'm going to break

18   it down.  So papers, documents, what did you not

19   produce?

20        A.   Could be like magazines that he had, stuff

21   going back years when he worked for company -- his old

22   companies like Security Doc or something.

23        Q.   Magazines so you thought magazines were

24   important enough to keep?

25        A.   They were important to him.  So I kept them.
```

1    He liked guns and gun magazines.

2              MR. PASCHAL:  We'll get done by four I need to

3        take a break.

4              MR. FREEDMAN:  As long as you're aware of the

5        deadline.

6              THE VIDEOGRAPHER:  Off the record at 9:42.

7              (Thereupon, a brief recess was taken.)

8              THE VIDEOGRAPHER:  On record 9:46.

9    BY MR. PASCHAL:

10        Q.   Mr. Kleiman, we were just talking about the

11   documents you did not produce.  You said there were

12   documents related to his old companies, Security Doc or

13   something, you didn't produce that?

14        A.   I was just like guessing as to what -- I mean

15   I remember seeing like a Security Doc disk.  I'm not

16   sure if I had like paperwork attached to it or not.

17        Q.   But you have documents related to his old

18   companies?

19        A.   I'm not sure.  I can check.

20        Q.   Did you keep any of Dave's research papers or

21   any of that?

22        A.   Research papers?

23              MR. FREEDMAN:  Objection.

24              MR. PASCHAL:  Yes.

25              THE WITNESS:  Research papers about what?

1    BY MR. PASCHAL:

2         Q.   About anything.

3         A.   I don't recall seeing research papers.

4         Q.   Did you -- what about his work papers, did you

5    keep that?

6              MR. FREEDMAN:  Objection.

7              THE WITNESS:  I never came across his work

8         papers.

9    BY MR. PASCHAL:

10        Q.   So when you say I threw out -- in your e-mail

11   when you say I may have made a mistake I threw out a

12   bunch of Dave's papers what papers are you referring to

13   that you threw out and why would you --

14             MR. FREEDMAN:  Objection, mischaracterizes the

15        document.

16             THE WITNESS:  I just threw out papers that I

17        thought were unnecessary.

18   BY MR. PASCHAL:

19        Q.   Why were you concerned that you made a

20   mistake?

21             MR. FREEDMAN:  Objection.

22             THE WITNESS:  Because once he told me Dave was

23        attached to Bitcoin at that point I thought any

24        belonging of his -- throwing out any belonging

25        could be a mistake.

Kleiman
January 10, 2020                          37

 1    BY MR. PASCHAL:

 2         Q.   Because it could have been related to Bitcoin;

 3    right?

 4         A.   Right.

 5         Q.   Here today you couldn't tell us if you threw

 6    something away related to Bitcoin, can you?

 7         A.   No.

 8         Q.   I want to talk about the hard drives.  So you

 9    testified I think there was like five hard drives that

10    you had?

11         A.   Yes.

12         Q.   You gave two hard drives to Patrick Paige and

13    Carter Conrad?

14         A.   I don't recall how many hard drives I gave

15    them.

16         Q.   You testified in your last deposition that you

17    gave two hard drives?

18         A.   I specifically said two?  Okay.

19         Q.   Is there a reason why you're not remembering

20    that today but you remembered in April?

21         A.   I don't know.  I don't remember saying that --

22    I might have -- I remember saying that I formated two

23    drives but I also said that I gave -- yes, I don't

24    know --

25         Q.   Do you know how many drives you gave to

 1    Patrick Paige and Carter Conrad?

 2         A.   At this moment I don't remember the exact

 3    number.

 4         Q.   Was it more than one?

 5         A.   I believe it was.

 6         Q.   More than two?

 7         A.   That I don't know.

 8         Q.   Why did you give those drives to Patrick Paige

 9    and Carter Conrad?

10         A.   Patrick said they were related to their

11    computer forensics company.

12         Q.   And you later sued Patrick Paige and Carter

13    Conrad; right?

14         A.   Yes.

15         Q.   In that lawsuit you alleged that they had

16    Bitcoin as well?

17              MR. FREEDMAN:  Objection.

18              THE WITNESS:  In the amended complaint after

19         they produced an e-mail that looked like they may

20         have been holding Dave's Bitcoin at that point we

21         asked them if they were.

22    BY MR. PASCHAL:

23         Q.   Let's talk about that.  What e-mail did they

24    produce that suggested that they were holding Dave's

25    Bitcoin?

1    A.   I don't remember the specifics of it.  You

2    would have to show it to me.

3    Q.   Was Vel your lawyer for that lawsuit against

4    Patrick Paige and Carter Conrad?  Mr. Freedman was he

5    your lawyer against Patrick Paige and Carter Conrad?

6    A.   No.

7    Q.   Who was your lawyer?

8    A.   I think it was Matthew Saralson.

9    Q.   After seeing this document from Patrick Paige

10   and Carter Conrad you and your lawyer crafted a

11   complaint, an amended complaint as you said alleging

12   that Patrick Paige and Carter Conrad had Dave's Bitcoin?

13        MR. FREEDMAN:  Objection, mischaracterizes the

14        document.

15        THE WITNESS:  I don't recall the exact draft

16        of what my attorney wrote.

17   BY MR. PASCHAL:

18   Q.   Have you spoken to Patrick Paige and Carter

19   Conrad prior to this depo?

20   A.   I believe we had a meeting with them about the

21   lawsuit.

22   Q.   About which lawsuit?

23   A.   The lawsuit that I had against them.

24   Q.   When was that meeting?

25   A.   I don't remember.  Maybe a couple years ago.

Kleiman
January 10, 2020                              40

1      Q.   Have you spoken to them since I last deposed

2   you?

3      A.   No.

4            (Defendant's Exhibit No. 4 was

5            marked for identification.)

6   BY MR. PASCHAL:

7      Q.   Is this the first amended complaint that you

8   and your lawyer filed against Patrick Paige and Carter

9   Conrad?  I'm handing you what's marked as Exhibit 4.  Is

10  this the First Amended Complaint that you and your

11  lawyers filed against Patrick Paige and Carter Conrad?

12     A.   It appears so.

13     Q.   Can you turn to paragraph 32.  Can you look at

14  the last sentence of that allegation, that paragraph?

15     A.   Okay.

16     Q.   Here you allege that Dave Kleiman created and

17  maintained Bitcoin wallets which were his personal

18  property during the time he was a member of Computer

19  Forensics.

20           MR. FREEDMAN:  No question pending.

21  BY MR. PASCHAL:

22     Q.   Right?

23     A.   Where is that?

24     Q.   Paragraph 32, the last sentence.

25     A.   Further upon?

 1        Q.    Is this your allegation "further upon

 2    information and belief David Kleiman created and

 3    maintained Bitcoin wallets which were his personal

 4    property during the time he was a member of Computer

 5    Forensics?"

 6        A.    Okay, yes.

 7        Q.    That's your allegation?

 8        A.    This was drafted --

 9            MR. FREEDMAN:  It's a yes or no question, Ira.

10            THE WITNESS:  Yes, if that's what it says.

11    BY MR. PASCHAL:

12        Q.    Now, paragraph 35 you ask that the Court

13    enjoin Computer Forensics or Paige and Conrad from

14    monetizing, transferring or otherwise converting such

15    Bitcoin to the use of its principals or third parties?

16            MR. FREEDMAN:  Objection, mischaracterizes the

17        document.  Can you read the entire sentence please

18        for the record?

19    BY MR. PASCHAL:

20        Q.    Do you see that in your amended complaint?

21            MR. FREEDMAN:  I'm going to read the entire

22        sentence for the record if you won't, Bryan.  "To

23        the extent that Computer Forensics, Paige or Conrad

24        --"

25            MR. PASCHAL:  Vel, this is --

Kleiman
January 10, 2020                                        42

1            MR. FREEDMAN:  Let me make the record.

2       "Conrad have retained any Bitcoin wallets that were

3       the personal property of David Kleiman, Computer

4       Forensics should be enjoined from monetizing,

5       transferring, otherwise converting such Bitcoin to

6       its use of the use of its principals or third

7       parties."

8            MR. PASCHAL:  Vel, you can do that on

9       redirect.  I'm moving to strike what you just said

10      because it's improper.  If you continue to do that

11      sort of tactic and coaching making this depo even

12      more useless than it's already becoming I'm going

13      to make a motion on that, okay?

14           MR. FREEDMAN:  Make a motion.

15  BY MR. PASCHAL:

16      Q.   Is this your allegation in paragraph 35?

17      A.   Yes.

18      Q.   And you made this allegation against Patrick

19  Paige and Carter Conrad you had counsel; right?

20      A.   Yes.

21      Q.   You ultimately just abandoned that lawsuit;

22  right?

23      A.   My primary reason for that lawsuit was --

24           MR. FREEDMAN:  Don't say anything that has to

25      do with advice from counsel.  So if you can answer

Kleiman
January 10, 2020                                    43

1          the question without getting into your advice from
2          counsel then answer the question.  If not don't
3          answer it.
4                    THE WITNESS:  What was the question?
5     BY MR. PASCHAL:
6          Q.   And you made this allegation together -- you
7     abandoned the lawsuit with your counsel or you and your
8     counsel abandoned this lawsuit against Patrick Paige and
9     Carter Conrad; right?
10         A.   Yes.
11         Q.   Did you ever get back the hard drives from
12    Patrick Paige and Carter Conrad?
13         A.   No.
14         Q.   And why did you abandon the lawsuit?
15                   MR. FREEDMAN:  I'm going to instruct you not
16         to answer unless you can answer in a way that does
17         not relate to advice received from counsel.  If the
18         reason you abandoned the lawsuit is on advice of
19         counsel then don't answer the question.
20                   THE WITNESS:  I obtained what I initially
21         wanted from the lawsuit.  That's why I abandoned
22         it.
23    BY MR. PASCHAL:
24         Q.   So you never had a basis to make this
25    allegation in the complaint, this first amended

Kleiman
January 10, 2020                              44

 1   complaint?

 2           MR. FREEDMAN:  Objection.  There's no question

 3       pending, Ira.

 4   BY MR. PASCHAL:

 5       Q.   I said -- so you never had a basis to make

 6   this allegation in the complaint; right?

 7       A.   No, we did have a basis.

 8       Q.   And you abandoned that basis; right?

 9           MR. FREEDMAN:  Objection.  You can answer it

10       if you can.

11           THE WITNESS:  Once we were given an

12       explanation about the e-mail then we abandoned it.

13   BY MR. PASCHAL:

14       Q.   So the two hard drives you reformatted, can

15   you walk me through the steps of how you reformatted the

16   hard drives?

17       A.   It appeared to be an empty drive.  I guess

18   when you attach it it prompts you -- it says the drive

19   needs to be formated so then I click on the button and

20   it does its thing.

21       Q.   Is that what Dave's computer prompted you to

22   do is reformat the drive?

23       A.   Yes.

24       Q.   Are you aware that Dave had a password system

25   on his computer that would look like you were loading in

Kleiman
January 10, 2020                            45

```
 1    DOS but you had to enter a password so you can get to
 2    the login screen?
 3              MR. FREEDMAN:  Objection.  There's no question
 4         pending.  There is.  Strike it.  Strike it.  Answer
 5         the question.
 6              THE WITNESS:  I was only aware of one computer
 7         that prompted a password to access it.  That was
 8         his Dell -- his Dell laptop.
 9    BY MR. PASCHAL:
10         Q.   Do you have that password?
11         A.   I think at one time I did figure it out but
12    there was no hard drive in that laptop.  It would let me
13    log in but then couldn't do anything with it.
14         Q.   How were you able to figure out the password?
15         A.   It's been a while.  I don't remember.
16         Q.   So the two hard drives that you reformatted,
17    why did you reformat them?
18         A.   I think at the time I was looking to use like
19    Windows 7 and Windows 8 for something.  So I installed
20    those operating systems on those drives.
21         Q.   Before you reformatted the hard drives did you
22    seek any professional help to recover data on those hard
23    drives?
24         A.   No.
25         Q.   Did you seek any help recovering the data
```

1  relating to what Dave referred to as being bigger than

2  Facebook?

3       A.   At the time that I formated these drives Craig

4  had not contacted me.  There was no reason for me to be

5  concerned that I was deleting anything.

6            MR. FREEDMAN:  Ira, you didn't answer the

7       question.  Just answer the question he's asking,

8       please.

9            THE WITNESS:  What was the question?

10 BY MR. PASCHAL:

11      Q.   Before you reformatted these hard drives did

12 you get any help, professional or otherwise to look for

13 the data --

14      A.   No.

15      Q.   -- or information related to what Dave

16 referred to as being bigger than Facebook?

17      A.   No.

18      Q.   Are you still using Windows 7 or Windows 8 on

19 those hard drives?

20      A.   I haven't used those hard drives since.  So I

21 guess it's still on there.

22      Q.   Well, you reformatted -- what year did you

23 reformat those hard drives?

24      A.   I thought it was the end of 2013.

25      Q.   Did you use those hard drives and the Windows

Kleiman
January 10, 2020                                        47

1    software on them in 2014?

2         A.    I don't remember.

3         Q.    Did you use the hard drives in 2015?

4         A.    I don't remember.

5         Q.    So you don't recall using those hard drives

6    from 2013 to 2019?

7         A.    No.

8         Q.    Mr. Kleiman, can you turn to your deposition

9    transcript from April.  Before I get into that I also

10   want to remind you you are under the penalty of perjury

11   today; right?

12        A.    Yes.

13        Q.    You wouldn't intentionally give false

14   testimony, would you?

15        A.    No.

16        Q.    You're -- you were under the penalty of

17   perjury when you testified in April; right?

18        A.    Yes.

19        Q.    Can you turn to page 53 of your April

20   transcript?

21        A.    Okay.

22        Q.    So at line 11 my question was "and you were

23   concerned you were using them.  Did you continue to use

24   them in 2014?"  Your answer was "yes."  Did -- when I

25   say them it's referring to the hard drives.  "Did you

1   continue to use them in 2015?  Yes.  Did you continue to

2   use them in 2016?  Yes.  Did you continue to use them in

3   2017?  Yes.  Did you continue to use them in 2018?  I

4   believe so.

5           After you filed the lawsuit you continued to

6   use Dave's devices, right?  Yes.  When did you stop

7   using Dave's devices?  I don't remember exactly.  Was it

8   maybe like a few months ago a few weeks ago?  In the

9   range of this lawsuit."

10          MR. FREEDMAN:  Ira, there's no question

11      pending.  Wait for Mr. Paschal to ask you a

12      question.

13  BY MR. PASCHAL:

14      Q.   Is there any reason why your testimony today

15  conflicts with your testimony in April?

16      A.   There's so many different devices that Dave

17  has.  Maybe I might have been thinking of you were

18  referring to his thumb drives or -- because I regularly

19  did use a lot of his drives.  So I don't know maybe I

20  just got confused.

21      Q.   What was the basis for your confusion, can you

22  say that again?

23      A.   Because he has so many different devices.

24      Q.   Which devices are you using?

25      A.   Excuse me?

                                    Kleiman
                         January 10, 2020                        49

1          Q.   Which devices are you using?

2               MR. FREEDMAN:  Objection.

3               THE WITNESS:  Which devices of Dave's?

4     BY MR. PASCHAL:

5          Q.   Are you using?

6               MR. FREEDMAN:  Objection.

7               THE WITNESS:  You mean were using or currently

8     using?

9     BY MR. PASCHAL:

10         Q.   Were using, currently using, were using.

11         A.   Primarily I think it was the thumb drives.

12         Q.   So when you testify here and we're talking

13    about and we can go back now to page 52 my question was

14    "you were concerned that you were throwing work papers

15    out and formated certain drives?"

16         A.   "Uh-uh."

17         Q.   Then I just asked you a bunch of questions

18    about your using them and you said yes.

19         A.   I may have used those drives as well.  I may

20    have used the ones I installed Windows 7 and Windows 8.

21    I just don't recall exactly what I used them for.

22         Q.   It's not even using them for.  Mr. Kleiman,

23    you've now given me three sets of testimony.  You

24    testified you did not use them.  You testified in April

25    that you did use them and now you're again saying that

Kleiman
January 10, 2020                              50

1   maybe you did use them.

2          MR. FREEDMAN:  Objection, mischaracterizes the

3      testimony.

4   BY MR. PASCHAL:

5      Q.   I need to know which path -- which answer is

6   true.

7      A.   Well, I don't remember exactly what devices I

8   used.  I know that I used his thumb drives, the hard

9   drives I installed Windows 7 Windows 8.  I know that I

10  did that but I just don't remember exactly how often I

11  used them and what specifically I used them for.

12     Q.   Well, in your April deposition you said that

13  you did know what you were using them for.  You were

14  using them to store personal files on them.

15     A.   Okay, maybe I did.

16     Q.   Is there a reason why your testimony today

17  conflicts with your testimony in April on that point?

18         MR. FREEDMAN:  Objection.

19         THE WITNESS:  I don't know.

20  BY MR. PASCHAL:

21     Q.   Why did you stop using Dave's devices -- when

22  did you stop using Dave's devices?

23     A.   I don't remember exactly.

24     Q.   Why did you stop using Dave's devices?

25         MR. FREEDMAN:  If you can answer that question

Kleiman
January 10, 2020                               51

```
 1        without getting into instructions with your
 2        attorneys then you can answer the questions.  If
 3        you have to have resort to instructions from your
 4        attorneys then don't answer.  Just say I can't
 5        answer.
 6             THE WITNESS:  Can you repeat the question?
 7   BY MR. PASCHAL:
 8        Q.   Why did you stop -- why did you stop using
 9   Dave's devices?
10        A.   I guess --
11             MR. FREEDMAN:  Don't guess Ira, just answer
12        the question.
13             THE WITNESS:  As litigation was approaching I
14        didn't want to appear that I was tampering with
15        Dave's files.
16   BY MR. PASCHAL:
17        Q.   You say as litigation was approaching.  I want
18   to just clarify.  In your testimony -- in your prior
19   deposition you said that you were using them until 2019.
20        A.   Okay.
21        Q.   Is there some reason --
22        A.   Around then.  It's close.
23        Q.   Why were you able to remember that in your
24   April deposition but you can't remember that today?
25        A.   I don't know.
```

1       Q.   And 2019 is almost a year after you filed this

2    case.

3       A.   Okay.

4            (Defendant's Exhibit No. 5 was

5            marked for identification.)

6    BY MR. PASCHAL:

7       Q.   You know Dave wrote a lot of papers; right?

8       A.   Yes.  I've seen a few.

9       Q.   He was an expert in his field; right?

10      A.   Yes, I believe so.

11      Q.   He actually wrote this paper together with

12   Craig Wright?

13      A.   Yes.

14      Q.   And the title -- could you say the title?

15      A.   "Overwriting Hard Drive Data, The Great Wiping

16   Controversy."

17      Q.   When did you first read this article?

18      A.   I probably heard about it after Craig

19   contacted me.  He may have sent me like a link to it or

20   something.

21      Q.   Do you remember what year that was?

22      A.   Craig contacted me in 2014.

23      Q.   So he sent you this article in 2014?

24      A.   He may have sent me a link to it, yes,

25   possibly.

Kleiman
January 10, 2020                                        53

1          Q.   Did you read the article?

2          A.   It's too confusing for me to understand.

3          Q.   About overwriting hard drive data?

4          A.   About any very technical computer stuff like

5     this.

6          Q.   You know in the conclusion they say that

7     reformatting and placing new data on a hard drive means

8     you can't recover the data?

9          A.   (Indicating).

10         Q.   You never read this?

11         A.   No.  I remember seeing the title.  I don't

12    think I would take the time to read something I don't

13    understand.

14         Q.   What steps have you taken to recover data from

15    Dave Kleiman's hard drives?

16              MR. FREEDMAN:  Answer that to the extent it

17         doesn't get into what you've done with your

18         lawyers.

19              THE WITNESS:  I haven't done anything.

20    BY MR. PASCHAL:

21         Q.   You haven't done anything?

22         A.   To recover data?  I may have -- I'm trying to

23    remember.  I may have installed like a recovery software

24    program to see if I could -- to see he ever like deleted

25    pictures or something like that but aside from that I

```
 1   don't think I did anything.  I never gave the drives to
 2   like an expert to examine them.  I only offered that to
 3   Craig.
 4        Q.   And you're familiar with computers; right?
 5        A.   Yes, I'm familiar with computers.
 6        Q.   You work in an occupation that makes you deal
 7   with computers all the time?
 8        A.   Yes.
 9        Q.   You're a web designer?
10        A.   Yes.
11        Q.   Is it Steve's Web Design, is that one of your
12   companies?
13        A.   I registered that name -- I don't think I ever
14   used it.
15        Q.   You're able to install a recovery tool on the
16   computer?
17        A.   Yes, I know how to install software.
18        Q.   Your testimony today is that it's too
19   technical for you to read an article that tells you
20   reformatting hard drive?
21        A.   I can read it.  As far as understanding it
22   probably not.
23        Q.   So if I told you reformatting a hard drive and
24   then continuing to use it would permanently delete data
25   do you understand what that means?
```

David Kleiman
January 10, 2020                                          55

```
 1         A.   Yes.
 2         Q.   What about -- are you aware Dave used to carry
 3    a USB drive very close to him at all times?
 4         A.   I heard maybe Patrick say that.
 5         Q.   You never saw Dave with that drive?
 6         A.   No.
 7         Q.   Well, I'll proffer that every witness will
 8    testify that Dave had a very unique drive on him and
 9    that's your understanding too; right?
10              MR. FREEDMAN:  Objection.
11              THE WITNESS:  I never noticed a unique drive
12         on him, no.
13    BY MR. PASCHAL:
14         Q.   But his friends at least told you?
15         A.   I only recall Patrick saying that.
16         Q.   Do any of those USB drives contain any
17    encrypted files?
18         A.   I believe there's a True Crypt file that was
19    encrypted, yes.
20         Q.   Are there any encrypted partitions on Dave
21    Kleiman's hard drives?
22         A.   That I don't know.
23         Q.   And that's because you haven't had
24    professional help to examine the drives?
25         A.   Yes.
```

Kleiman
January 10, 2020                              56

1        Q.   So -- have you taken any steps to try and

2   access the True Crypt file?

3        A.   I tried to run the True Crypt software.  I'm

4   not like really familiar with it.  I tried like putting

5   in some like random passwords that I thought Dave might

6   have used but aside from that I haven't done anything

7   with it.

8        Q.   Did you get any professional help to try to

9   access the True Crypt file?

10       A.   No.

11       Q.   So sitting here today you couldn't tell the

12  jury if -- whether or not Dave Kleiman's private keys or

13  alleged private keys are on the encrypted files?

14            MR. FREEDMAN:  Objection, calls for

15       speculation.

16            THE WITNESS:  I don't know what's on the file.

17       It could be his Computer Forensic work.

18  BY MR. PASCHAL:

19       Q.   You don't know?

20       A.   I don't know.

21       Q.   It could also be Bitcoin private keys; right?

22            MR. FREEDMAN:  Objection, speculation.

23            THE WITNESS:  Yes, I don't know.

24  BY MR. PASCHAL:

25       Q.   Can you repeat that, I didn't hear?

Kleiman
January 10, 2020                          57

1          A.   I don't know.

2          Q.   If Dave had any passwords to unlock the True

3    Crypt file that was stored on the hard drives that were

4    reformatted and erased or -- they could have been

5    erased; right?

6          A.   I heard Dave only kept his passwords in his

7    head.  He is a security expert.  He wouldn't keep

8    passwords on a drive or a piece of paper.

9          Q.   Going back to my question.  If there were

10   passwords on an encrypted partition on his hard drive

11   you wouldn't know; right?

12              MR. FREEDMAN:  Objection, speculation.

13              THE WITNESS:  I don't know.

14              (Defendant's Exhibit No. 6 was

15              marked for identification.)

16   BY MR. PASCHAL:

17         Q.   I'm handing you what we're marking as Exhibit

18   6.  Have you seen this document before?

19         A.   I believe so.

20         Q.   Can you please turn to -- it's not numbered

21   but can you turn to page two.

22         A.   Okay.

23         Q.   What information do you believe Patrick Paige

24   will testify to at trial?

25         A.   Can you say that again?

Kleiman
January 10, 2020                          58

1          Q.   What information do you believe Patrick Paige
2    will testify at trial?
3               MR. FREEDMAN:   Objection to the extent
4          you're -- don't answer that if it goes into
5          discussions you've had with your attorneys.
6               THE WITNESS:   What information do I believe
7          Patrick --
8    BY MR. PASCHAL:
9          Q.   Patrick Paige will testify to at trial?
10         A.   I don't know.
11         Q.   What information do you think Carter Conrad
12   will testify to at trial?
13         A.   I don't know.
14         Q.   What information do you think GICSR will
15   testify to at trial?
16         A.   I don't know.
17         Q.   What information do you think Debra Cobser
18   will testify to at trial?
19         A.   I don't know.
20         Q.   What information do you think Nguyen Nguyen
21   will testify to at trial?
22         A.   I don't know.
23         Q.   What information do you think Gavin Anderson
24   will testify to at trial?
25         A.   I don't know.

Kleiman
January 10, 2020                            59

```
 1        Q.   What testimony do you think Bob Rendowski will
 2  testify to at trial?
 3        A.   I don't know.
 4        Q.   What testimony do you think Courtney --
 5        A.   Carr.
 6        Q.   Carr I'm guessing you spelled her name wrong?
 7        A.   What's that?
 8        Q.   Did you spell her name wrong?
 9        A.   No, that's how you spell it.
10        Q.   It's not Kirsten?
11        A.   Yes, the first name, yes.  It is Kirsten.
12  It's not Courtney.
13        Q.   That's Dave's fiancee; right?
14        A.   I heard that -- Dave never mentioned that to
15  me, yes.
16        Q.   What information do you think she'll testify
17  to at trial?
18        A.   I don't know.
19        Q.   Do you know what Mr. Karp is going to testify
20  to at trial?
21        A.   No.
22        Q.   Do you know what Mr. David Kurick will testify
23  to at trial?
24        A.   No.
25        Q.   Do you know what Mr. Andrew Hagen will testify
```

Kleiman
January 10, 2020                          60

1   to at trial?

2        A.   No.

3        Q.   Do you know what Ramona Watts will be

4   testifying to at trial?

5        A.   No.

6        Q.   Do you know what Mr. Jimmy Nguyen will be

7   testifying to at trial?

8        A.   No.

9        Q.   Do you know what Robert McGregor will be

10  testifying to at trial?

11       A.   No.

12       Q.   Do you know what Jamie Wilson will be

13  testifying to at trial?

14       A.   No.

15       Q.   Do you know what Jonathan Wynn will be

16  testifying to at trial?

17       A.   No.

18       Q.   Do you know what Brendan Sullivan will be

19  testifying to at trial?

20       A.   No.

21       Q.   Can you turn to page to section C.

22       A.   Okay.

23       Q.   Here you say "plaintiff's investigation is

24  ongoing and plaintiff reserves the right to supplement

25  information provided concerning damages."  You then

1    allege that your damages are somewhere between

2    201 billion -- 21,728,000,000?

3              MR. FREEDMAN:  Million, Bryan.

4    BY MR. PASCHAL:

5         Q.   Million.  That is a big number, million.

6    Before punitive and treble damages and exclusive of

7    attorney's fees and costs but you don't have an expert

8    who is going to testify to damages at trial; is that

9    accurate?

10        A.   I guess if that's what it says.

11        Q.   You testified earlier that Dave didn't talk

12   about his finances to you?

13        A.   Yes.

14        Q.   When was the first time you learned that

15   Patrick Paige and Carter Conrad had to pay Dave's cell

16   phone bill because he could not?

17        A.   I don't remember.

18        Q.   Was it during the deposition or did you learn

19   before that?

20        A.   I don't know.

21        Q.   When did you first learn that Dave's house was

22   in foreclosure?

23        A.   After he passed away I think.

24        Q.   But you knew it was in foreclosure before he

25   passed away; right?

1        A.   No.  Did I know that it was in foreclosure

2   before he passed away?

3        Q.   Testifying today with everything you know did

4   you know his house was in foreclosure before he passed

5   away?

6        A.   I don't think I did.  I don't remember.

7        Q.   I'm not asking past tense.  As you're sitting

8   here right now did you -- do you know that Dave

9   Kleiman's house was in foreclosure before he passed

10  away?

11       A.   No, I didn't know before he passed away.

12       Q.   So today is the first time you're hearing that

13  Dave Kleiman's house was in foreclosure before he passed

14  away?

15       A.   Now I'm getting confused.  I knew he was in

16  foreclosure after he passed away.  My attorney let me --

17            MR. FREEDMAN:  Please don't discuss anything

18       your attorney told you.

19  BY MR. PASCHAL:

20       Q.   I'm asking you sitting here today can you say

21  yes or no was Dave Kleiman's house in foreclosure before

22  he passed away?

23       A.   That I don't know.

24       Q.   Do you know that he was -- his mortgage was

25  past due before he passed away?

Kleiman
January 10, 2020                            63

1       A.    I don't know.

2       Q.    You've been sitting in most of the depos in

3  this case; right?

4       A.    Yes.

5       Q.    Did you know that he tried to refinance his

6  home before he passed away but couldn't?

7            MR. FREEDMAN:  Objection.

8            THE WITNESS:  I think I heard someone say

9       that.

10  BY MR. PASCHAL:

11      Q.    Did you know that his electricity was getting

12  cut off because he couldn't afford to pay his

13  electricity?

14      A.    I didn't know that.

15      Q.    He couldn't afford to pay his water bill?

16      A.    I didn't know that.

17      Q.    His cable and internet, it was getting cut

18  off?

19            MR. FREEDMAN:  Objection.

20            THE WITNESS:  I didn't know that.

21  BY MR. PASCHAL:

22      Q.    Have you ever seen Dave's credit report?

23      A.    I don't think so.

24      Q.    So as the personal representative of the

25  estate of Dave Kleiman what steps have you taken to

Ira Kleiman
                    January 10, 2020                    64

```
 1    locate assets of Dave Kleiman?
 2         A.   Well, my attorney was assisting me with that.
 3    I think we --
 4              MR. FREEDMAN:  Ira, do not go into discussions
 5         you've had with your lawyers.  Just say that I've
 6         hired lawyers to handle that.
 7              MR. PASCHAL:  That's coaching.  You can't --
 8              MR. FREEDMAN:  Let me revise.
 9              MR. PASCHAL:  That was coaching.
10              MR. FREEDMAN:  To the extent I'll give you
11         clear instructions.
12              MR. PASCHAL:  You just told him --
13              MR. FREEDMAN:  Let me answer the question.
14         Let me tell the witness what he can do.  To the
15         extent you can answer the question without going
16         into things you've done with your lawyers then you
17         certainly should answer the questions.  To the
18         extent what you -- you were going to say goes into
19         what you hired lawyers to do or what you have
20         lawyers to do for you do not answer that question.
21         Let me clarify my previous instruction because
22         Mr. Paschal is right, it was misstated.  Go ahead.
23              MR. PASCHAL:  Just to be clear I reserve my
24         right to move to reopen this deposition for what
25         Mr. Freedman just did and been doing on several
```

Kleiman
January 10, 2020                                65

```
 1        occasions.
 2               THE WITNESS:  I recall like reaching out to I
 3        think a couple of his banks to just see if there
 4        was any funds in them.
 5   BY MR. PASCHAL:
 6        Q.   Which banks did you reach out to?
 7        A.   I don't remember the exact -- I think one was
 8   maybe Wells Fargo.
 9        Q.   Do you remember if there were any funds in
10   that bank?
11        A.   I don't remember.  If there was it wasn't
12   much.
13        Q.   Are you aware that on April -- do you know the
14   day that Dave Kleiman died?
15        A.   Yes, April 26.
16        Q.   That was when he was found; right?
17        A.   Yes.  So I imagine that he died several days
18   or maybe a week earlier.
19        Q.   Do you know that on April 22nd he applied for
20   credit or a loan from Spring Leaf Financial?
21        A.   I didn't know that.
22        Q.   Have you ever heard of Spring Leaf Financial?
23        A.   No.
24        Q.   Do you know they're kind of like a payday
25   lender?
```

Kleiman
January 10, 2020                                         66

```
1        A.   Okay.
2        Q.   We don't know the exact date he died but we
3   know he was alive on April 22nd; right?
4        A.   I don't know.
5        Q.   Well, if he is applying for credit from Spring
6   Leaf Financial he is alive; right?
7             MR. FREEDMAN:  Objection.
8             THE WITNESS:  I don't know.  I wasn't aware of
9        any activities he had done or maybe someone did on
10       his behalf, I don't know.
11  BY MR. PASCHAL:
12       Q.   Do you have any reason to believe that
13  somebody would apply for a payday loan on his behalf?
14       A.   I don't know what kind of communications he
15  had with other people.
16       Q.   Do you know why would apply for a payday loan
17  on what might have been the day that he died?
18       A.   No.
19            (Defendant's Exhibit No. 7 was
20            marked for identification.)
21  BY MR. PASCHAL:
22       Q.   We're going to use one of your e-mails --
23  going to go back over some of your testimony you just
24  gave.  Going to mark this as Exhibit 7.  Who is Andy
25  Kush?
```

Kleiman
January 10, 2020                                    67

1        A.   I think he was a reporter for Gizmodo Magazine

2    or a writer or something.

3        Q.   What is the date of this e-mail?

4        A.   December 4, 2015.

5        Q.   Can you look at that last paragraph I want to

6    go through it?

7        A.   Okay.

8        Q.   Did you send this to Mr. Andy Kush?

9        A.   I believe so.

10       Q.   The first sentence you said "if my brother had

11   Bitcoin of any value he wouldn't have died with only

12   debts."  Is that an accurate statement?

13       A.   It's an accurate statement here in this

14   e-mail, yes.

15       Q.   Then you just testified a moment ago that you

16   didn't learn about his foreclosure until after he died

17   but you're telling Mr. Andy Kush who is a reporter that

18   and shortly before he died I learned his house was in

19   foreclosure.  Is your testimony today accurate or is

20   your e-mail to this reporter accurate?

21       A.   I think the testimony that I gave you today is

22   accurate.  I could have been mistaken in this e-mail.

23       Q.   This e-mail that's what over four years ago?

24       A.   "Uh-uh."

25       Q.   Closer in time to when Dave had died?

Kleiman
January 10, 2020                                    68

1          A.    Yes.

2          Q.    Your memory improved since then?

3          A.    Possibly.  I mean I know a lot more

4    information now than I did then.  I didn't have

5    documents and a lot of information that I do now.

6          Q.    I'm not asking about documents or information.

7    I am just asking you a simple question when did you know

8    that Dave Kleiman's house was in foreclosure and you

9    said shortly before he died I learned his house was in

10   foreclosure.  Today under the penalty of perjury you

11   told me that it was after he died, I asked you several

12   times.

13         A.    Yes, I believe the testimony I gave you today

14   is accurate.

15         Q.    Your memory improved since 2015 to today?

16         A.    I believe the testimony I gave is accurate.

17         Q.    I asked if your memory improved from 2015 to

18   today?

19         A.    I don't know.

20         Q.    I'm trying to figure out how the answers are

21   different and what changed?

22         A.    I can't tell you.

23         Q.    Then you said "if David owned a great number

24   of Bitcoin why wouldn't he sell a few to help pay off

25   his bills."  Is that an accurate statement?

```
 1        A.   Yes.

 2             MR. FREEDMAN:  Objection.

 3             MR. PASCHAL:  Form?

 4             (Defendant's Exhibit No. 8 was

 5             marked for identification.)

 6   BY MR. PASCHAL:

 7        Q.   I'm handing you what we're marking as Exhibit

 8   8.  Is Joseph Karp your lawyer?

 9        A.   Yes, he was.

10        Q.   He was not currently your lawyer?

11        A.   I don't know if he's still my active -- he's

12   like my estate planner.

13        Q.   He is authorized to speak on your behalf,

14   isn't he?

15             MR. FREEDMAN:  Objection.

16             THE WITNESS:  I don't know.

17   BY MR. PASCHAL:

18        Q.   Joseph Karp he is a family friend; right?

19        A.   Yes.

20        Q.   You've known him for a very long time, right?

21        A.   Yes.

22        Q.   And if you needed legal advice would you call

23   him?

24        A.   Yes.

25        Q.   He wouldn't send out false statements on your
```

1  behalf, would he?

2           MR. FREEDMAN:  Objection.

3           THE WITNESS:  I don't believe so.

4  BY MR. PASCHAL:

5      Q.   This letter to the Department of Treasury of

6  the IRS is dated June 18, 2015?

7      A.   Okay.

8      Q.   It's addressed to Mr. Tosi?

9      A.   Okay.

10      Q.   This is from the Karp Law Firm which is

11  Mr. Karp's law firm.  He says in the very first line

12  "I'm writing on behalf of Ira Kleiman."  In the third

13  paragraph last sentence you say -- he says his and he is

14  referring to you "only knowledge was that David was

15  financially strapped and had limited resources."  Is

16  that accurate?

17           MR. FREEDMAN:  Objection.

18           THE WITNESS:  I believe so.

19  BY MR. PASCHAL:

20      Q.   The last paragraph on this same page can you

21  go to the -- third sentence.

22      A.   Okay.

23      Q.   It says "there was no formal probate

24  proceeding whatsoever.  The reason for this was quite

25  simple.  After checking records David was deep in debt

Kleiman
                    January 10, 2020                          71

```
 1   and had outstanding mortgage and liens on his home which

 2   exceeded his assets and it made no sense."  Is that an

 3   accurate statement?

 4            MR. FREEDMAN:  Objection.

 5            THE WITNESS:  I believe so.

 6   BY MR. PASCHAL:

 7        Q.   Did you ever open a probate for the estate of

 8   Dave Kleiman?

 9        A.   I think in 2000 -- around 2016 I think so.

10        Q.   Are you a member of W&K?

11        A.   Yes.

12        Q.   Are you the member of W&K or is the estate the

13   member of W&K?

14            MR. FREEDMAN:  Objection, calls for a legal

15        conclusion.

16            THE WITNESS:  I believe the estate.

17   BY MR. PASCHAL:

18        Q.   Are on the SunBiz.org it only lists you as a

19   member, are you aware of that, as the managing member?

20        A.   I don't know.

21        Q.   Let me proffer to you it lists only you as the

22   manager on SunBiz.org?

23        A.   Okay.

24        Q.   Is it your understanding that you are the

25   managing member?
```

Ira Kleiman
January 10, 2020                                    72

```
 1          A.   I believe so.
 2          Q.   Was any interest in W&K passed through the
 3     probate proceedings?
 4          A.   That I don't know.
 5          Q.   Who would know?
 6          A.   What's that?
 7          Q.   Who would know?
 8          A.   Perhaps the individual you spoke to yesterday
 9     about W&K.
10          Q.   He didn't know.
11          A.   Okay.
12          Q.   And you don't know.  And this letter that
13     Mr. Karp is sending to the IRS this is after you've
14     already learned about Dave's potential involvement in
15     Bitcoin; right?
16          A.   Can you repeat the question?
17          Q.   This letter that Mr. Karp is sending on your
18     behalf to the IRS is dated after you learned that Dave
19     may have had some involvement in Bitcoin; right?
20          A.   Yes.
21          Q.   Can you go to the second to last paragraph on
22     page two?
23          A.   Okay.
24          Q.   I think this is the second sentence.  It says
25     "please understand Ira's position he is not the executor
```

```
 1   of Dave's estate.  He was designated as a personal
 2   representative but no probate occurred and he did not
 3   open up an estate."  At the time that was an accurate
 4   statement; right?
 5              MR. FREEDMAN:  Objection.
 6              THE WITNESS:  I believe so.
 7   BY MR. PASCHAL:
 8       Q.   Mr. Karp says "the reason no estate was opened
 9   up is the information that was had at the time was that
10   David had only debts and a homestead property which was
11   mortgaged in excess of its fair market value and had
12   also outstanding obligations to its homeowners
13   association.  There may have been other minor assets
14   which were not worth pursuing under the circumstances."
15       A.   Okay.
16       Q.   Is that an accurate statement?
17              MR. FREEDMAN:  Objection.
18              THE WITNESS:  These are all statements from
19   Joe Karp.
20   BY MR. PASCHAL:
21       Q.   On your behalf?
22       A.   I believe so.
23       Q.   So back to my question is that an accurate
24   statement?
25              MR. FREEDMAN:  Objection.
```

Ira Kleiman
January 10, 2020                              74

```
 1              THE WITNESS:  At the time I guess that's what
 2       I believed.
 3  BY MR. PASCHAL:
 4       Q.   Ira, would you ever tell a lie to a federal
 5  agency?
 6       A.   No.
 7       Q.   If you had misled a federal agency in any way
 8  would you correct the information that you told them?
 9       A.   Yes.
10       Q.   You understand that's your obligation?
11       A.   "Uh-uh."
12       Q.   You understand there would be some criminal
13  action --
14              MR. FREEDMAN:  Objection.
15  BY MR. PASCHAL:
16       Q.   With giving false information to --
17       A.   Yes.
18       Q.   Federal agency --
19              MR. FREEDMAN:  Objection.
20              THE WITNESS:  Yes.  Okay.
21  BY MR. PASCHAL:
22       Q.   Are there any letters to the IRS that says I
23  believe Dave Kleiman has billions of dollars worth of
24  Bitcoin?
25       A.   I don't remember sending the IRS any letters
```

1   like that, no.

2        Q.   So you have never supplemented or amended this

3   letter in any way, have you?

4        A.   I think I did send a separate letter to the

5   IRS.  Actually I don't think I was aware that Joe sent

6   this letter because I think I sent my own letter that

7   did vary from this one.  It's quite different.

8        Q.   Have you produced that letter in this

9   litigation?

10       A.   I would imagine.

11       Q.   Mr. Karp was authorized to send this letter on

12   your behalf; right?

13       A.   I don't believe I was involved in this letter

14   but yes, he was my authorized attorney at the time.

15            MR. FREEDMAN:  Objection.

16   BY MR. PASCHAL:

17       Q.   On the last page he is CC'd there?

18       A.   Yes.

19       Q.   I want to have a clear record because you said

20   you sent a separate letter but did you ever tell the IRS

21   that Dave Kleiman was in possession or W&K was in

22   possession of billions of dollars worth of Bitcoin?

23       A.   I don't believe I ever mentioned billions of

24   dollars.

25       Q.   Or any Bitcoin, any Bitcoin?

Kleiman
January 10, 2020                                    76

1        A.   I don't believe so.

2             (Defendant's Exhibit No. 9 was

3             marked for identification.)

4   BY MR. PASCHAL:

5        Q.   I'm handing you what we're marking as Exhibit

6   9.  These are your responses to interrogatories.  Can

7   you please turn to the last page?  On this last page are

8   you swearing under penalty of perjury that the foregoing

9   information in this document is correct?

10       A.   Yes.

11       Q.   Is that your signature?

12       A.   I think we're on different pages.

13       Q.   No, the very last page.

14       A.   I don't have my signature -- okay, yes.

15       Q.   It's dated March 21, 2019; right?

16       A.   Yes.

17       Q.   Can you turn to page three.  Do you see where

18  it says e-mail accounts?

19       A.   Yes.

20       Q.   Are all those e-mail accounts associated with

21  Dave Kleiman?

22       A.   I believe so.

23       Q.   What efforts have you made to access the first

24  e-mail account?

25       A.   I may have tried to log in to it.  I don't

1   recall if I did or not.

2       Q.   Did you ever contact Yahoo to get access?

3       A.   I don't remember.

4       Q.   Did you issue a subpoena to Yahoo to get

5   access?

6       A.   No, I never subpoenaed Yahoo.

7       Q.   Did you ever seek a court order to get access

8   to the e-mail account?

9       A.   No.

10      Q.   The second e-mail

11  Dave'sdigitalforensics@███████████.  What did you do to

12  access that e-mail account?

13      A.   Probably -- I did the same with all of these

14  accounts.  If I thought that I had a password to it I

15  would access it.

16      Q.   I need to drill down what you did to get to

17  these e-mail accounts.  Again you're suing somebody

18  alleging theft.

19      A.   Right.

20      Q.   So for none of these accounts did you seek a

21  court order or subpoena or contact them to access Dave

22  Kleiman's e-mail accounts?

23      A.   No, I didn't seek --

24      Q.   If this is a private key or information about

25  a private key that Dave Kleiman may have had and it's on

Kleiman
January 10, 2020                              78

1    one of these e-mail accounts you wouldn't know; right?

2        A.   The one that I was primarily concerned was the

3    address that he used the most was Dave@DaveKleiman.com.

4    That's what I focused.

5        Q.   Back to my question.  I really need you to

6    answer my question.  Okay?  Because you are alleging

7    theft.  If there is a private key, Dave Kleiman private

8    key if there is information about how to get to his

9    private key, information about Bitcoin and it's on one

10   of these e-mail accounts you can't tell us one way or

11   the other whether it's there?

12           MR. FREEDMAN:  Objection.

13           THE WITNESS:  Yes, I don't know.

14   BY MR. PASCHAL:

15       Q.   You can't tell us whether it's there; right?

16           MR. FREEDMAN:  Objection.

17   BY MR. PASCHAL:

18       Q.   I need a clear answer.

19       A.   No, I can't tell you.

20       Q.   The only steps you took to access any of these

21   accounts were tried a couple passwords?

22       A.   Well, a lot of these accounts I think the

23   bottom two aren't even active.  The third one I got

24   access to after spending a long time trying to get it

25   and the other two I don't recall -- I -- yes, I don't

Kleiman
January 10, 2020                          79

1    remember if I got access to them or not.

2         Q.   When you say Dave used just one primarily if

3    Dave was keeping it a secret there's Bitcoin out there

4    you don't know what he was using these other e-mails

5    for, do you?

6         A.   No.

7         Q.   You don't know if there's any more e-mail

8    addresses out there that Dave Kleiman may have used;

9    right?

10        A.   No, I don't know.

11        Q.   Can you turn to page five.  Can you look at

12   request number five.  You see they were asking to

13   identify public addresses you believe belong to Dave

14   Kleiman or his estate.  You see that question?

15        A.   Yes.

16        Q.   Below subject to the discovery of ongoing and

17   your right to reserve you list 26 public addresses.

18        A.   Okay.

19        Q.   And you have never supplemented this answer in

20   any way; right?

21        A.   No.  At least not that I'm aware of.

22        Q.   And discovery ends as you may know next week?

23   I think next week.

24        A.   Yes.

25        Q.   Do you believe that these 26 addresses belong

Kleiman
January 10, 2020                                    80

1   to the estate of Dave Kleiman or W&K?

2        A.   I believe at least a portion of them do

3   since --

4             MR. FREEDMAN:  Objection.

5             THE WITNESS:  W&K was a partnership.

6   BY MR. PASCHAL:

7        Q.   So they belong to W&K or the estate of Dave

8   Kleiman; right?  They have some ownership over these 26

9   addresses?

10       A.   I believe Bitcoin mined prior to February 2011

11   belonged to the estate.

12       Q.   Say that again, that belonged what?

13       A.   The Bitcoin mined prior to February -- prior

14   to the establishment of W&K should belong to the estate.

15       Q.   You believe the Bitcoin mined prior to the

16   establishment of W&K --

17       A.   From the beginning date that Bitcoin when they

18   started mining it, when it was invented up until the

19   formation of W&K at least Dave should be entitled to --

20       Q.   Before 2011 should belong to W&K?

21       A.   Yes.

22       Q.   But you gave me -- I want to go back to my

23   question, okay?  You've given me 26 public addresses.

24   Discovery ends next week.  Are these the public

25   addresses you believe belong to the estate or W&K?

Kleiman
January 10, 2020                                          81

1            MR. FREEDMAN:  Objection.

2            THE WITNESS:  I believe at least a portion of

3      them do.

4   BY MR. PASCHAL:

5       Q.   And that's also because -- would you -- is it

6   your position that Craig Wright had mined these

7   addresses as well?

8            MR. FREEDMAN:  Objection.

9            THE WITNESS:  That I don't know.

10   BY MR. PASCHAL:

11      Q.   What if I were to tell you all 26 -- a good

12   portion of these public addresses were created after

13   Dave died, would the estate believe that it's entitled

14   to those public addresses?

15            MR. FREEDMAN:  Objection, calls for expert

16      testimony.

17            THE WITNESS:  Are you saying that these

18      addresses were created after Dave died?

19   BY MR. PASCHAL:

20      Q.   I believe an expert will say that but I'm not

21   asking for that.  I'm asking for what the plaintiff, the

22   estate, is claiming belongs to it.

23            MR. FREEDMAN:  Objection.

24   BY MR. PASCHAL:

25      Q.   If a public address was mined after Dave died

1   so first came in existence after Dave's death is the

2   estate claiming that belongs to Dave Kleiman?

3          MR. FREEDMAN:  Objection, calls for expert

4       testimony and a legal conclusion.

5          THE WITNESS:  That might belong to W&K.

6   BY MR. PASCHAL:

7       Q.   So W&K would have --

8       A.   Yes, if it was after.

9       Q.   What if all of these addresses it could be

10  proven that they never had any connection to W&K, Dave

11  Kleiman or Craig Wright and in fact they belong to other

12  people?

13      A.   That I don't know.

14      Q.   If that were proven would you still claim

15  ownership over these?

16          MR. FREEDMAN:  Objection, calls for

17      speculation.  Please let me object and then answer.

18      Go ahead, answer.

19          THE WITNESS:  If it had nothing to do with W&K

20      or Craig or Dave then no.  We're not entitled to

21      it.

22  BY MR. PASCHAL:

23      Q.   I believe the addresses were taken from

24  documents that Craig Wright created and sent to you;

25  right?

 1        A.    Yes.

 2        Q.    Let me clarify.  That he -- lawyers or whoever

 3   drafted and sent to you?

 4        A.    Yes, this was in the contracts that the ATO

 5   sent me.

 6        Q.    Let's take address number two.  If I could

 7   prove that or if it was just obvious and public

 8   knowledge this 1933 address never belonged to Dave

 9   Kleiman or Craig Wright you're not asserting ownership

10   over that; right?

11             MR. FREEDMAN:  Objection, calls for a legal

12        conclusion and speculation.

13             THE WITNESS:  So you're saying the contract

14        Craig provided to me would be false?

15   BY MR. PASCHAL:

16        Q.    Not getting into that.  I'm just asking

17   hypothetical.  If an expert said whether it was false or

18   not separate the address because the bottom line is we

19   want to know whether they are Bitcoin or not Bitcoin.

20   Number two, this 1933 address if it could be proven it

21   belongs to an entity called Mount Gox and it was mined

22   after Dave died are you claiming ownership over that?

23             MR. FREEDMAN:  Objection, calls for a legal

24        conclusion and speculation.

25             THE WITNESS:  I don't know because I don't

                                    Kleiman
                      January 10, 2020                              84

1          know if it was originally owned by Craig or Dave

2          and perhaps sold to another individual or --

3     BY MR. PASCHAL:

4          Q.   What I'm telling you it was mined by Mount

5     Gox.

6               MR. FREEDMAN:  Objection.

7     BY MR. PASCHAL:

8          Q.   Are you claiming ownership over that address?

9          A.   That I don't know.  I don't know the specifics

10    of it.

11         Q.   And you know Bitcoin -- you know about Bitcoin

12    now, right?

13         A.   (Indicating).

14         Q.   You've studied it?

15         A.   Yes, I've read about it.

16         Q.   Do you own any Bitcoin?

17         A.   A little bit.

18         Q.   How much?

19              MR. FREEDMAN:  Objection.  Why do you need to

20         know how much Bitcoin he is holding?  Don't answer

21         the question until Mr. Paschal engages me on this.

22         Why do you need to know how much Bitcoin he is

23         holding?

24              MR. PASCHAL:  I'm not doing that.  If you're

25         asserting a privilege you can instruct him not to

Kleiman
January 10, 2020                                          85

```
 1   answer.  You have no basis.

 2       MR. FREEDMAN:  I certainly do.  You're not

 3   allowed to ask harassing questions.  I need to know

 4   why you need to know the amount of Bitcoin he

 5   currently has.  Why is that relevant to the suit?

 6   If you don't answer the question and you're not

 7   willing to explain to me your theory of relevance

 8   and why it's not harassing then I will instruct him

 9   not to answer.

10       MR. PASCHAL:  Vel, I don't need to explain

11   relevance and --

12       MR. FREEDMAN:  I believe that that question is

13   harassment so unless you tell me a reason why you

14   need to know it that's legitimate.

15       MR. PASCHAL:  Vel, I am going to have to file

16   a motion.

17       MR. FREEDMAN:  Okay.

18       MR. PASCHAL:  I don't want to get on the phone

19   with the Court.  Reinhart said he doesn't normally

20   do it.  I think this is an issue where this is a

21   clear example and there's plenty -- I think

22   Mr. Kleiman will have to come back for his depo.

23   Waste of time.  Can you write 10:58.

24       MR. FREEDMAN:  I'm asking you to state your

25   reasons.  You're refusing to do so.  You can bring
```

1    it up with the Court.

2         MR. PASCHAL:  Mr. Freedman, in a deposition

3    there's no requirement for me to explain relevance.

4         MR. FREEDMAN:  It's harassment.

5         MR. PASCHAL:  And relevance is not a basis for

6    you to instruct the witness not to answer.

7         MR. FREEDMAN:  I'm allowed to instruct the

8    witness not to answer questions that I deem to be

9    harassing the witness.

10        MR. PASCHAL:  On what privilege?

11        MR. FREEDMAN:  It's not a privilege, Bryan.

12        MR. PASCHAL:  I'm trying to figure out his

13   familiarity with Bitcoin.

14        MR. FREEDMAN:  You asked him how much Bitcoin

15   he has.  That's like asking how much money he has

16   in his bank account.  You're not entitled to ask

17   that question unless you can show me why it's not

18   harassment.

19        MR. PASCHAL:  You know Vel, I have to take

20   this to Court.  We are on a tight schedule for

21   discovery and it's unfortunate you would force

22   that.  Are you instructing him not to answer?

23        MR. FREEDMAN:  I am instructing him not to

24   answer.

25        MR. PASCHAL:  On harassing?

Ira Kleiman
January 10, 2020                                    87

1      MR. FREEDMAN:  Yes.  Unless you can tell me a

2  grounds for why it's not harassment to know what

3  his amount of Bitcoin is.

4      MR. PASCHAL:  Let's go off the record for a

5  second.

6      THE VIDEOGRAPHER:  Off record 10:57.  We're

7  off.

8      (Thereupon, a brief recess was taken.)

9      THE VIDEOGRAPHER:  On record 11:02.

10      MR. FREEDMAN:  As I said just before off the

11  record I had an opportunity to talk with Ira.  He

12  disclosed to me how much Bitcoin he has and that he

13  does not mind telling you the amount as long as we

14  designate it confidential under the transcript so

15  with that I will allow him to answer that question.

16      MR. PASCHAL:  And Vel, I think your objection

17  you had no basis to instruct the witness not to

18  answer the amount of Bitcoin that he has.  It's

19  holding up this deposition.

20      We made an agreement that we can make a hard

21  stop at 4:00.  I make that as a last minute request

22  that you made of me but it's not fair the

23  deposition is getting held up because of objections

24  because of that have and we reserve our right to

25  file a motion to recall this witness.

Kleiman
                    January 10, 2020                          88

1            MR. FREEDMAN:  You can reserve your right.

2       We'll obviously oppose it.  The five minutes it

3       took to take this is a lot less than the breaks

4       you've been taking to work out your computer

5       issues.  The record will be what it will be and the

6       Court will rule what it will rule.

7            (Defendant's Exhibit No. 10 was

8            marked for identification.)

9   BY MR. PASCHAL:

10       Q.   I just handed you what we're marking as

11  Exhibit 10.  What do you recognize this document to be?

12       A.   The second amended complaint.

13       Q.   That you filed?

14       A.   Yes.  That my attorneys filed.

15       Q.   On your behalf; right?

16       A.   Yes.

17       Q.   Could you turn to paragraph two?

18       A.   Okay.

19       Q.   Actually skip that one.  Can you turn to

20  paragraph five?

21       A.   Okay.

22       Q.   On page three paragraph five goes into page

23  three.  You allege that -- you allege that certain

24  events happen in this district but one of them you say

25  that there was mining of a substantial amount of Bitcoin

1    the use of computer equipment located within this

2    district.  You see that?

3         A.   Yes.

4         Q.   What computer equipment is located in this

5    district?

6         A.   I don't know.

7         Q.   Did you know when you filed this complaint?

8         A.   Based off of information that Craig provided

9    he said they did Bitcoin mining in the U.S.

10        Q.   When did Craig tell you that?

11        A.   I don't have the document in front of me.

12        Q.   Was it in an e-mail?

13        A.   I don't know.  I remember seeing some kind of

14   produced document stating that the mining took place.

15        Q.   Produced document.  When this document was

16   filed nothing had been produced.  What was your basis

17   for alleging there's a computer equipment located in

18   this district that mined substantial Bitcoin?

19        A.   It might be in an e-mail but I just don't

20   remember it.

21        Q.   Can you describe the computer equipment?

22        A.   I have never seen the computer equipment.

23        Q.   Have you done any -- have you taken any steps

24   to locate the computer equipment?

25        A.   No.



1    Q.   Let me ask a question about B.  Can you go to

2   paragraph 23.  You allege there are two methods of

3   acquiring Bitcoin.

4    A.   Okay.

5    Q.   How did you acquire your Bitcoin?

6    A.   You mean how did my brother?

7    Q.   How did you acquire your Bitcoin?

8    A.   I purchased my Bitcoin.

9    Q.   When did you purchase your Bitcoin?

10    A.   Several months after Craig contacted me.

11    Q.   How much Bitcoin did you purchase?

12         MR. FREEDMAN:   ███████████████████

13    ████████████████

14         THE WITNESS:   ████████████

15   ████████████████

16   BY MR. PASCHAL:

17    Q.   ██████

18    A.   █████████████   ███████████

19   █████████

20    Q.   ██████

21    A.   ██████

22    Q.   █████████████████████

23   ███

24    A.   ██████

25    Q.   █████████████

1 ▬▬▬▬▬▬▬▬▬▬▬

2          MR. FREEDMAN: ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

3      ▬▬▬▬▬▬▬▬▬▬

4          MR. PASCHAL: ▬▬▬

5          MR. FREEDMAN: ▬▬▬▬▬▬▬▬▬

6     ▬▬▬▬▬▬▬▬

7 BY MR. PASCHAL:

8      Q.   So in paragraph 23 basically you say you can

9 purchase Bitcoin from someone; right?  I don't want to

10 read the whole thing but you can purchase Bitcoin from

11 someone.  Do you agree with that?

12      A.   Yes, I believe so.

13      Q.   I guess the second way is to mine the Bitcoin;

14 right?

15      A.   Right.

16      Q.   For purposes of this lawsuit is W&K or the

17 estate seeking Bitcoin that were purchased or mined?

18          MR. FREEDMAN:  Objection.

19          THE WITNESS:  If there was participation -- if

20      there was participation involving W&K then whether

21      it was mined or purchased.

22 BY MR. PASCHAL:

23      Q.   Which of your claims do you allege -- which of

24 your claims do you assert a claim for purchased Bitcoin?

25          MR. FREEDMAN:  Objection, calls for a legal

Ira Kleiman
January 10, 2020                              92

```
 1        conclusion.
 2             THE WITNESS:  I don't know.
 3   BY MR. PASCHAL:
 4        Q.   So if Craig Wright purchased Bitcoin in 2016
 5   does that belong to Bitcoin that W&K mined?
 6             MR. FREEDMAN:  Objection, calls for a legal
 7        conclusion.
 8             THE WITNESS:  I don't know if that purchase
 9        stemmed from funds that originated from W&K so I
10        don't know.
11   BY MR. PASCHAL:
12        Q.   Can you turn to paragraph 32?
13        A.   Okay.
14        Q.   You talk about Hal Finney.  Have you ever met
15   Hal Finney?
16        A.   No.
17        Q.   Have you ever spoken with him?
18        A.   No.
19        Q.   To your knowledge did Dave Kleiman ever meet
20   Hal Finney?
21        A.   Not that I'm aware of.
22        Q.   Did he ever speak to Hal Finney?
23        A.   Not that I'm aware of.
24        Q.   Can you turn to paragraph 48.  In the
25   second -- third sentence you allege that on March 22nd
```

Kleiman
January 10, 2020                               93

1   2013 Dave signed out of the hospital against medical

2   advice.  He was unstable and nearing death.  How did you

3   know that?

4        A.   I think I received some reports from the

5   hospital and I also from word of mouth.

6        Q.   When did you receive the reports from the

7   hospital?

8        A.   I think I may have requested them sometime

9   after 2016.  I don't recall the exact date.

10       Q.   Did you ever learn why Dave checked himself

11  out of the hospital?

12       A.   I can only guess.  I don't know why.

13       Q.   Is it your understanding that Dave did not

14  like being in the Miami V.A.?

15       A.   I would imagine anyone wouldn't want to be in

16  the hospital for a long period of time.

17       Q.   Can you go to paragraph 52.

18       A.   Okay.

19       Q.   You allege that Dave had a long time interest

20  in cyber security, digital forensics and in the future

21  of money.  What is your basis to say that Dave had a

22  long time interest in the future --

23       A.   I don't think I'm on the same --

24       Q.   52?

25       A.   Page 52?

Kleiman
January 10, 2020                                    94

1        Q.   No, paragraph 52.  I'm going to go by

2   paragraphs.

3        A.   Dave and Craig met in and around --

4        Q.   Yes.  You say both men had a long time

5   interest in cyber security and digital forensics and the

6   future of money?

7        A.   Okay.

8        Q.   What is your basis to allege that Dave had an

9   interest in the future of money?

10       A.   Based on the story that he told me in 2009

11   that he was creating his own money.

12       Q.   So from that one story you determined that he

13   had a long time interest in the future of money?

14       A.   Not just that.  Then after Craig contacted me

15   and told me about their partnership it appeared they

16   both had interest in it.

17       Q.   So the only time Dave ever told you he had an

18   interest in the future of money is at the Thanksgiving

19   dinner?

20       A.   Yes.

21       Q.   He's never mentioned that to you before?

22       A.   No.

23       Q.   He never mentioned that to you afterwards?

24       A.   No.

25       Q.   Can you go to paragraph 62.  You say that on

1    May 20th 2014 Ira shared this story with Craig via mail.

2    Isn't it true Craig reached to you first or your father

3    and then you?

4         A.   Yes, he reached out to my father I think a

5    couple days first, yes.

6         Q.   Dr. Wright was the one who actually informed

7    you that Dave may have Bitcoin?

8         A.   I think the first person was Patrick Paige.

9         Q.   Because Craig contacted Patrick Paige?

10        A.   Yes.

11        Q.   Then Craig contacted you?

12        A.   Then I contacted Craig.

13        Q.   So Craig reached out to Dave's best friend to

14   tell him that Dave may have some involvement with

15   Bitcoin?

16        A.   Yes.

17        Q.   Then Patrick tells you --

18        A.   He first reached out to my dad.  He realized

19   my dad is I.T. illiterate.  That's why he reached out to

20   Patrick because Patrick knows computers.  So Patrick

21   could possibly help my dad.

22        Q.   So it was Craig Wright who told -- through

23   Craig Wright that you learned that Dave may have some

24   involvement in Bitcoin?

25        A.   Yes.

Kleiman
January 10, 2020                                        96

1          Q.   If Craig never reached out to you would you

2    have learned about Dave's potential involvement in

3    Bitcoin?

4               MR. FREEDMAN:  Objection, calls for

5          speculation.

6               THE WITNESS:  I don't know.

7    BY MR. PASCHAL:

8          Q.   Can you go to paragraph 65.  "From the

9    collaboration in 2008 until Dave's death in 2013 Craig

10   and Dave mined over a million of initial Bitcoin

11   together personally and through W&K."  What is your

12   basis that Craig and Dave mined over a million initial

13   Bitcoin together?

14         A.   The basis is again falls back on Dave's story

15   to me telling me that he was creating his own money back

16   when Bitcoin was first being created.

17         Q.   Okay.  So your basis for this allegation --

18         A.   And based upon he said he was working with a

19   foreign individual and that when Craig contacted me it

20   matched up with his story.

21         Q.   And again have you identified any other

22   witness who heard or could testify that Dave said he was

23   working on creating digital money?

24         A.   No, I haven't.

25         Q.   None of his friends?

Kleiman
January 10, 2020                                        97

```
 1        A.   Not that I'm aware of.

 2        Q.   Not his fiancee?

 3        A.   I don't know.  You would have to ask her.

 4        Q.   Not the child that lived with Dave?

 5        A.   You would have to ask him.

 6        Q.   None of his best friends; right?

 7        A.   You would have to ask them.

 8        Q.   Did anybody else at the Thanksgiving dinner

 9   hear this?

10        A.   Like I said my wife and my dad was in the

11   kitchen and my daughter is six months years old.

12        Q.   Did you tell your dad and your wife what --

13        A.   Did I --

14        Q.   -- what Dave told you?

15        A.   No.

16        Q.   So the only person who could testify that Dave

17   Kleiman told you about digital currency is you?

18        A.   It was a very brief conversation.

19        Q.   That somehow serves the basis for you to

20   allege that he mined a million Bitcoin?

21        A.   Yes.

22        Q.   At the end of this allegation you allege that

23   Craig has now -- Bitcoin is stored in specifically

24   identifiable Bitcoin wallets that Craig has now asserted

25   ownership over.  How has Craig asserted ownership over
```

Kleiman
January 10, 2020                                        98

```
 1    those Bitcoin wallets?
 2         A.   He's taken control of them.  He's never
 3    returned anything to the estate.
 4         Q.   How has he taken control over them?
 5         A.   Transferring them out of W&K.
 6         Q.   The Bitcoin wallets?
 7         A.   Or he already had access to them.  That he
 8    shared with Dave.
 9         Q.   Do you think he took Dave's private keys?
10         A.   It's a possibility.
11         Q.   Do you have any evidence of that?
12         A.   I don't know.
13         Q.   You said it's a possibility but isn't it a
14    possibility that the private keys could be in the
15    encrypted files?
16              MR. FREEDMAN:  Objection, calls for
17         speculation.
18              THE WITNESS:  I don't know.
19    BY MR. PASCHAL:
20         Q.   So you have no evidence that Craig took the
21    private keys.  I need to understand what is your basis?
22    What are you going to tell the jury to establish that
23    Craig is now asserted ownership over?
24              MR. FREEDMAN:  Objection, mischaracterizes his
25         testimony.
```

Kleiman
January 10, 2020                                    99

```
 1              THE WITNESS:  Can you repeat the question?
 2   BY MR. PASCHAL:
 3       Q.    If this was a jury what are you going to tell
 4   them to explain that Craig Wright asserted ownership
 5   over Bitcoin wallet?
 6              MR. FREEDMAN:  Objection, calls for a legal
 7        conclusion.
 8              THE WITNESS:  I believe W&K was a partnership
 9        between Craig and Dave and I believe they mined
10        Bitcoin from the very beginning and my brother is
11        entitled to at least a portion of them.
12   BY MR. PASCHAL:
13       Q.    Where are the Bitcoin now?
14       A.    I believe Craig controls them.
15       Q.    You believe Dave and Craig created Bitcoin
16   together?
17       A.    Yes.
18       Q.    Would that make them Satoshi Nakamoto?
19       A.    I believe so.
20       Q.    So -- I don't know do you know that Satoshi
21   mined Bitcoin and never moved?
22       A.    Yes.
23       Q.    So how is Craig moving those Bitcoin if
24   they've never been moved?
25       A.    Just because they haven't moved yet doesn't
```

Ira Kleiman
January 10, 2020                                    100

1    mean he doesn't control them.

2         Q.   So we're in 2020.  So for seven years they

3    never moved and you think he controls them?

4         A.   Yes.

5         Q.   Based on what evidence?

6         A.   I don't know.

7         Q.   This is a jury trial.  What evidence can you

8    tell the jury that Craig Wright stole Bitcoin that have

9    never moved for seven years?

10        A.   I don't know.

11        Q.   And you know Craig Wright has an interest in

12   proving he is Satoshi Nakamoto; right?

13        A.   Yes.

14        Q.   Wouldn't it make sense for him to move one of

15   those Bitcoin if he could?

16             MR. FREEDMAN:  Objection.

17             THE WITNESS:  Not necessarily.

18   BY MR. PASCHAL:

19        Q.   Well, he would want to prove that those are

20   his Bitcoin.

21        A.   He might have reasons --

22             MR. FREEDMAN:  There's no question pending,

23        Ira.

24   BY MR. PASCHAL:

25        Q.   He would want to prove that he wanted to move

Kleiman
January 10, 2020                                      101

```
 1   those Bitcoin and prove he is Satoshi; right?
 2             MR. FREEDMAN:  Objection.
 3             THE WITNESS:  I don't know.
 4   BY MR. PASCHAL:
 5        Q.   So in this partnership -- let me ask you.
 6   Dave was obviously a very smart guy; right?
 7        A.   Yes.
 8        Q.   If Craig and Dave secured their Bitcoin
 9   together don't you think Dave would have a key too to
10   access that Bitcoin?
11        A.   I don't know.
12             MR. FREEDMAN:  Objection.
13   BY MR. PASCHAL:
14        Q.   And do you have any evidence to suggest that
15   Dave never had any keys to access this Bitcoin fortune?
16        A.   I don't know.
17        Q.   You're familiar with a safety deposit box;
18   right?
19        A.   Yes.
20        Q.   It takes two keys to open up the box?
21        A.   Yes.
22        Q.   What happens if you can't have one of the keys
23   you can't open the box, can you?
24        A.   Right.
25        Q.   So if Craig Wright had a key to the Satoshi
```

```
 1   blocks and Dave had a key to the Satoshi blocks do you

 2   know where Dave's key is?

 3              MR. FREEDMAN:  Objection, calls for

 4        speculation.

 5              THE WITNESS:  I don't know where Dave's key

 6        is.

 7   BY MR. PASCHAL:

 8        Q.   Could it be on the encrypted file?

 9        A.   I don't know.

10              MR. FREEDMAN:  Objection.

11   BY MR. PASCHAL:

12        Q.   Could it be on the drives that you

13   reformatted?

14              MR. FREEDMAN:  Objection.

15              THE WITNESS:  I don't know.

16   BY MR. PASCHAL:

17        Q.   Could it be on any of the encrypted partitions

18   of the hard drives that Dave Kleiman has?

19              MR. FREEDMAN:  Objection, speculation.

20              THE WITNESS:  I don't know.

21   BY MR. PASCHAL:

22        Q.   But you could say possibly it's there?

23              MR. FREEDMAN:  Objection, speculation.

24              THE WITNESS:  Did you want me to guess?

25
```

Kleiman
January 10, 2020                                    103

1    BY MR. PASCHAL:

2        Q.   No, I'm just asking.  Do you have any evidence

3    to say that it's definitely not there?

4        A.   I don't know.

5        Q.   You don't know if you have evidence to say

6    that it's not there?

7        A.   I don't know.  It could be -- you're asking

8    about what's on the encrypted file?  Anything could be

9    on the file.

10       Q.   Can you turn to paragraph 66.

11       A.   Paragraph what?

12       Q.   Paragraph 66.

13       A.   Okay.

14            MR. PASCHAL:  Off the record real quick.

15            (Discussion held off the record.)

16            MR. PASCHAL:  Back on the record.

17   BY MR. PASCHAL:

18       Q.   Paragraph 66 okay you allege that Dave in

19   partnership with Craig created intellectual property

20   both in his individual capacity and through W&K.  Can

21   you please -- let me say this.  You understand that this

22   case is filed in 2018; right?

23       A.   Yes.

24       Q.   We've had about a year of discovery; right?

25       A.   Yes.

Kleiman
January 10, 2020                                    104

```
 1        Q.    There's been ten -- hundreds of thousands of
 2   documents produced in this case?
 3        A.    Yes.
 4        Q.    And discovery ends next week?
 5        A.    Yes.
 6        Q.    We have deposed numerous individuals?
 7        A.    Yes.
 8        Q.    Please identify the intellectual property that
 9   Dave and Craig created.
10             MR. FREEDMAN:  Objection.
11             THE WITNESS:  I believe it was any block chain
12        Bitcoin related I.P. that was created prior to
13        mining Bitcoin and any I.P. that originated -- that
14        had to take place with the Australian judgment
15        against W&K.
16   BY MR. PASCHAL:
17        Q.    Okay.  Again we're at the close of discovery
18   and there's a jury trial.  Can you please explain to the
19   jury specifically what is it that was stolen, what
20   intellectual property was stolen, was it a trade secret?
21             MR. FREEDMAN:  Objection, calls for a legal
22        conclusion.
23             THE WITNESS:  I don't have the specific
24        details in front of me.  I believe there are some
25        documents that explain what the I.P. is.
```

Kleiman
January 10, 2020                          105

```
 1   BY MR. PASCHAL:
 2        Q.   What is the I.P. worth?
 3             MR. FREEDMAN:  Objection, calls for expert
 4        testimony.
 5             THE WITNESS:  An expert would have to evaluate
 6        it.
 7             MR. PASCHAL:  Didn't we have an agreement that
 8        it was objection to form?
 9             MR. FREEDMAN:  I thought we did but nobody
10        respected it on your side so.
11             MR. PASCHAL:  So that agreement is gone I
12        guess.
13   BY MR. PASCHAL:
14        Q.   So today you have no idea what the value of
15   the intellectual property would be?
16        A.   I could only guess.
17             MR. FREEDMAN:  If you give me a standing
18        objection to all questions I won't object.
19             MR. PASCHAL:  Whatever you want to do.  I
20        just --
21             MR. FREEDMAN:  Okay.
22             MR. PASCHAL:  Let's do that.  Standing -- I
23        don't mind.
24             MR. FREEDMAN:  Okay.
25
```

Kleiman
January 10, 2020                          106

1    BY MR. PASCHAL:

2        Q.   Then the next paragraph you allege that the

3    exact structure of the joint mining activities,

4    intellectual property development partnership from 2008

5    to 2011 -- February 2011 requires discovery to fully

6    reveal.  Discovery again is ending next week.  What is

7    the exact structure of their joint mining activities,

8    intellectual property development and partnership from

9    2008 through February 2011?

10       A.   What paragraph?

11       Q.   67.

12       A.   What's the question?

13       Q.   You say the exact structure of the joint

14   mining activities, intellectual property development and

15   partnership from 2008 until February 2011 requires

16   discovery to fully reveal.

17            As you know discovery ends next week.  Can you

18   please state the exact structure of their joint mining

19   activity intellectual property development and

20   partnership from 2008 until February 2011?

21       A.   I don't know the inside details of how they

22   structured things but whatever mining occurred I believe

23   they both had rights to it.  Whatever I.P. was created

24   they both had rights to it.

25       Q.   But you don't know what an I.P. is?

 1        A.   I don't have the details right in front of me
 2   but yes, I believe there are documents that detail some
 3   of it.
 4        Q.   What documents would that be?
 5        A.   I don't recall at this moment what was on
 6   them.
 7        Q.   Since filing the complaint what evidence have
 8   you obtained to support this allegation?
 9        A.   What allegation?
10        Q.   The one we're talking about, 67.
11        A.   Like I said I believe there are documents that
12   refer to the I.P. that they created.
13        Q.   You don't know what documents those are?
14        A.   Not offhand.
15        Q.   Your next allegation in 68 you say "from
16   February 2011 Craig and Dave conducted their Bitcoin
17   mining activities, intellectual property research and
18   development through W&K."  In February 2011 was Dave in
19   the Miami V.A. hospital?
20        A.   I don't know.  I just knew it was routine for
21   him to go there and then return home but I don't know if
22   he was in the hospital on that date.
23        Q.   You said you got his medical records; right?
24        A.   Yes, but I don't remember all the details of
25   it.

1    Q.   In your complaint you alleged earlier in your
2    complaint you said earlier you got the medical records.
3    He was in the hospital continuously 2011 to 2013?
4    A.   He was in the entire time from -- what's that?
5    Q.   He would get a day pass to leave every once in
6    a while from 2011 to 2013 he was in the hospital.
7    A.   Okay.
8    Q.   I mean I'm asking you is that portion of your
9    complaint accurate, is the medical record accurate, I'm
10   not sure your understanding?
11   A.   You just don't remember.
12   Q.   So is it your position that Dave was
13   conducting Bitcoin mining activities and developing
14   intellectual property while he was in the Miami V.A.?
15   A.   I know that he kept his computer with him the
16   entire time that he was in the hospital so he could
17   certainly remotely log in to access mining server that's
18   stored wherever.
19   Q.   Let's break that down.  Mining server.  Where
20   is the mining server?
21   A.   I don't know.
22   Q.   Do you have any evidence that Dave had a
23   mining server?
24   A.   Well, if they were mining I would imagine they
25   had some kind of mining equipment.

1      Q.   Do you have any evidence that they have mining

2   equipment?

3      A.   I don't know.  I don't know if I've seen

4   documentation that refers to mining equipment or not.

5      Q.   Have you ever seen the mining equipment?

6      A.   Have I personally, no.

7      Q.   You're saying he is on his computer remoting

8   into this hypothetical mining equipment --

9      A.   That's just speculation.

10     Q.   You're guessing?

11     A.   Yes.

12     Q.   Dave his expertise was being a computer

13  forensic analyst or computer forensic expert; right?

14     A.   Yes.

15     Q.   So he would have to do work on his computer,

16  right?

17     A.   Yes.

18     Q.   When he was in the hospital he couldn't do his

19  work, could he?

20     A.   I don't know what he was doing.

21     Q.   Well, he couldn't make money to pay his bills.

22     A.   I don't know.  He didn't discuss his bills

23  with me.  I don't know what was occurring in his

24  financial situation.

25     Q.   Well, I mean -- he charged $450 an hour to be

Kleiman
January 10, 2020                              110

1    an expert don't you think he would do a couple hours of

2    work so he can pay his cell phone bill; right?

3         A.   I don't know.

4         Q.   But your position he was in the Miami V.A.

5    developing intellectual property and mining Bitcoin on

6    some hypothetical mining server that's located I don't

7    know where?

8         A.   The I.P. could have been created long before

9    he was in the hospital.

10        Q.   Here you're alleging in February 2011 is that

11   allegation wrong?

12        A.   Not necessarily because I don't know exactly

13   what he was doing in the hospital.

14        Q.   Under the penalty of perjury today can you say

15   that from its inception Dave Kleiman or you were the

16   only member of W&K?

17        A.   I believe Dave was the only member and that

18   I'm currently the only member.

19        Q.   Based on what evidence?

20        A.   Based on the documents.

21        Q.   What documents?

22        A.   When you go to the SunBiz Web site I thought

23   it listed Dave as the only member.

24        Q.   You're aware that not all members are required

25   to be listed on SunBiz.org, right?

Kleiman
January 10, 2020                                  111

1       A.    I don't know.

2       Q.    So SunBiz and we'll find the e-mail.  Do you

3   recall sending an e-mail to the Department of Finance?

4       A.    No.

5       Q.    We'll get that for you in a second.  You don't

6   recall the Department of Finance telling you that all

7   members do not need to be listed on --

8       A.    They may have.

9       Q.    Okay.

10       A.    I won't rely just on the SunBiz stuff.  I

11   think there was also some other document stating Dave

12   was the only member.

13       Q.    What document is that?

14       A.    I'm not sure if it had -- I don't remember.

15       Q.    What did it look like?

16       A.    I don't remember but I do believe -- I did see

17   something stating Dave was the only member.

18       Q.    But you can't tell us anything about that

19   document?

20       A.    I don't have it in front of me.  I have to go

21   look for it.

22       Q.    Come back to W&K in a second.  Can you go to

23   paragraph 93?

24       A.    Okay.

25       Q.    You say "the mined Bitcoin was stored in

Kleiman
January 10, 2020                                      112

1   wallets in possession of Craig, Dave and W&K and certain

2   trusts."  Where are those trusts?

3        A.   I only know the trusts that Craig has

4   mentioned.

5        Q.   You have no other evidence of trusts; right?

6        A.   No.

7        Q.   Then you say "these wallets were not used for

8   any purpose but store the Bitcoins for sale at a future

9   date."  What is your basis for that allegation?

10       A.   What number?

11       Q.   Same one, 93.

12       A.   These wallets were not used for any purpose.

13  I don't know what the exact purpose the wallets were

14  used for.

15       Q.   Since you made this you don't know -- so you

16  have no basis for this allegation?

17       A.   Well, I'm getting a little confused.  Which

18  wallets are we talking about?

19       Q.   The wallets that you are alleging in this

20  paragraph.

21       A.   Which wallets are those?

22       Q.   You say the mined Bitcoins are stored on

23  wallets in the possession of Dave, Craig, W&K and also

24  in trust.  These wallets were not used for any purpose

25  but to store the Bitcoin for sale at some future date.

Kleiman
January 10, 2020                                    113

1   That second sentence what basis do you have to make that

2   allegation?

3        A.   Are we talking about the Bitcoin that has

4   never moved?

5        Q.   Whatever Bitcoin you're referring to in this

6   allegation.  Sir, this is your complaint.

7        A.   Yes, if they've never moved then perhaps there

8   was a purpose for not moving them.

9        Q.   So you're guessing in this allegation that

10   these wallets were not used for any purpose but to store

11   the Bitcoin for sale at some future date.  Was that a

12   guess?

13        A.   I don't know.

14        Q.   Sir, I just need the basis for the allegation

15   that you made against Dr. Craig Wright in this complaint

16   and you know discovery is one week away.  We need an

17   answer.  Either there's a basis or there is not.  You

18   allege these wallets were not used for any purpose but

19   to store the Bitcoins for sale at some future date.

20        A.   Yes, I don't know.  I don't have an answer.

21        Q.   So there's no basis for this allegation?

22        A.   I didn't say that.  I just said --

23        Q.   I'm asking --

24        A.   I don't know what the purpose.

25        Q.   Are you saying you don't know what the basis

Kleiman
                    January 10, 2020                    114

 1   is?

 2        A.   No.  I'm saying I don't know what the purpose

 3   of storing.

 4        Q.   Mr. Kleiman, I need an answer to my question,

 5   okay.  Just my question and it was a very narrow one.

 6   What is the basis for the second sentence in this

 7   allegation?  What evidence do you have to make this

 8   allegation?

 9        A.   I don't have an answer for it.

10        Q.   Do you understand in this deposition you have

11   to answer the question?

12        A.   Yes.

13        Q.   So you made an allegation and I'm asking you

14   what is the basis, what is the evidence for the

15   allegation that you've made against Dr. Craig Wright.

16   Sorry, in a deposition you can't say "I don't have an

17   answer for you?"

18           MR. FREEDMAN:  Not true.  Witness told you

19        multiple times he doesn't know the answer.  You can

20        ask one more time and then I'll ask you to move on.

21           THE WITNESS:  My answer is the same.  I don't

22        know.

23   BY MR. PASCHAL:

24        Q.   You don't know the basis for the allegation?

25        A.   No, I don't know what the -- what the purpose

 1   of -- why they stored the Bitcoin.

 2        Q.   Mr. Kleiman, that's not my question.  I'm not

 3   asking you the purpose.  That is not my question, okay?

 4   My question is what is the evidence and what is the

 5   basis for the second sentence in this allegation?

 6        A.   I don't know.

 7        Q.   That's an answer.  In the next allegation you

 8   say, 94, you say "as partners from 2008 to 2011 and then

 9   in some form of co-owners, members of W&K from 2011 to

10   2013 Dave and Craig shared the private keys of the

11   Bitcoin they mined."  What is the basis for this

12   allegation?

13        A.   Because they -- they were mining from the very

14   beginning.  They had a partnership.

15        Q.   When you say they shared private keys do you

16   mean that Craig gave Dave his private keys or Dave gave

17   his private keys or they both had private keys?

18        A.   It was probably vice versa.

19        Q.   Can you explain?

20        A.   That you probably shared one another's keys.

21   They probably shared access somehow.

22        Q.   Why do you think they would both share that,

23   their own private keys with each other?

24        A.   I didn't say they -- the Bitcoin were owned by

25   both of them.  Therefore they both shared access to



1    them.

2         Q.   How did they share access to them?

3         A.   There is multiple ways they can share access

4    to them.

5         Q.   Is one a Shamir Scheme?

6         A.   I don't know.

7         Q.   Because that's kind of like a safety deposit

8    box; isn't it?

9         A.   I don't really know what the Shamir Scheme is.

10        Q.   ████████████████████████████████████████████

11   ███████████████████

12        A.   ██████████████████

13             MR. FREEDMAN:  ████████  ██████████████

14   ███████████████████████████████████████  █

15   ████████████████████████

16             THE WITNESS:  ████████████████████████

17   BY MR. PASCHAL:

18        Q.   █████████████████████████████████████████

19        A.   ████████████████████████████████  ████

20   ████████████████████

21        Q.   ██████████████████████████████

22        A.   ████████

23             MR. FREEDMAN:  ████████████████████████

24             MR. PASCHAL:  ████

25             MR. FREEDMAN:  ████████████████████████

1   ███████████████████████████████████████

2   BY MR. PASCHAL:

3       Q.   To be clear you don't have any evidence that

4   Dave and Craig shared the private keys to the Bitcoin

5   they mined?

6       A.   I believe they did share.

7       Q.   Since filing this complaint through all the

8   discovery we've done what is that belief based on?

9       A.   I believe there are documents that refer to

10  them.

11      Q.   That refer to the private keys?

12      A.   Possibly.

13      Q.   What documents are those?

14      A.   May have been something documents produced to

15  us.

16      Q.   What document supports that allegation?

17      A.   I don't have the document in front of me.

18      Q.   You said you don't have the document in front

19  of you.  Can you tell us what any of these documents

20  look like that you're saying support this allegation?

21      A.   No.

22      Q.   So if you're testifying in front of a jury

23  right now your testimony would be there are documents I

24  just don't know what they are?

25      A.   If I was testifying in front of a jury I would

1   probably have the documents with me.

2        Q.   I'm asking you -- that's the purpose of this

3   deposition.  I'm trying to figure out what evidence do

4   you have to support this?

5        A.   Yes, I believe I've seen documents that refer

6   to it.  I just don't have them with me.

7        Q.   And you have no idea what those documents look

8   like?

9        A.   They look like the thousands of other

10  documents that were produced to us.

11       Q.   So you have these unidentified documents that

12  would support this allegation.  Do you have any witness

13  testimony?

14       A.   Witness testimony?

15       Q.   Yes.

16       A.   Not that I'm aware of.

17       Q.   Can you go to paragraph 70 so you have to go

18  back a few pages.  You've seen the e-mails between Craig

19  Wright and Lynn Wright and Dave Kleiman; right?

20       A.   Yes, I've seen some of them.

21       Q.   You saw the ones that were exchanged the day

22  before -- actually I think the same day of W&K's

23  formation; right?

24       A.   I'm not sure which specific one you're talking

25  about.

```
 1              MR. PASCHAL:  Julio is going to get the

 2         attachment to this document but just assume the

 3         attachment is the draft of the articles of

 4         incorporation and I'll show it to you as soon as he

 5         gets it.

 6              (Defendant's Exhibit No. 11 was

 7              marked for identification.)

 8   BY MR. PASCHAL:

 9         Q.   You see this e-mail from Dave Kleiman it's to

10   CraigWright@███████████████████████  and

11   LynnWright@███████████████████████   Do you see the date

12   on this e-mail?

13         A.   Yes.

14         Q.   February 15, 2011.  W&K was created on

15   February 16, 2011; right?

16         A.   Yes, I believe so.

17         Q.   You see Dave saying last page of the attached

18   "do you think I can list you as an MGR or MGRM with a

19   foreign address or do you think they would kick it

20   back?"  What do you think MGR means?

21         A.   Like manager.

22         Q.   What do you think MGRM means?

23         A.   Managing member.

24         Q.   Who is Dave asking this question to?

25         A.   Where is the -- where is it being -- who is
```

1   sending it?

2        Q.   At the top.  It says from Dave Kleiman.

3        A.   To Craig.

4        Q.   Craig and who?

5        A.   And Lynn.

6        Q.   You see the domain name for Craig and Lynn?

7        A.   Yes.

8        Q.   What is the domain name?

9        A.   ███████████████████

10       Q.   Are you familiar with Information Defense PTY?

11       A.   I think I've heard of it.

12       Q.   You understand that was Craig and Lynn's

13  company?

14       A.   I believe so.

15       Q.   Dave was asking this of them right before --

16  the day before he files the articles of incorporation

17  for W&K; right?

18       A.   Yes.  Yes.

19       Q.   Now, we just spoke about Information Defense

20  PTY.  It would be helpful if you gave me the documents.

21  Do you realize there's a Court settlement divorce

22  settlement between Craig Wright and Lynn Wright?  Have

23  you heard of it?

24       A.   I've heard of it.  I don't know when it

25  occurred.

Kleiman
January 10, 2020                                        121

1        Q.   Do you realize in that settlement Information

2   Defense PTY and W&K, any interest in W&K Craig disclaims

3   it?

4        A.   I don't know.

5        Q.   This is a public document, a part of their

6   divorce?

7        A.   Okay.

8        Q.   Now, Dave is talking to Craig and Lynn about

9   forming W&K Information Defense.  You see that?

10       A.   Yes.

11       Q.   Why is he asking him whether or not they can

12   be listed as a manager or managing member?

13       A.   I don't know.

14       Q.   Why is there a court settlement stating that

15   Lynn Wright would have anything to do with W&K and

16   Information Defense that's a part of the settlement?

17       A.   I don't know.

18       Q.   I need to know the answer to these questions

19   because in papers you've called my client a fraud

20   because you said he has no interest in W&K.  And here

21   and as soon as Julio comes back we're going to show you

22   the court settlement that says Lynn Wright has an

23   interest and he told Dave Kleiman that Lynn is going to

24   take this over, I don't want this.  Did you contact Lynn

25   Wright before you reinstated W&K?

Kleiman
January 10, 2020                              122

1        A.   Did I, no.

2        Q.   You had this document though, right?

3        A.   Yes.  I have many documents from Craig.

4        Q.   You had --

5             MR. FREEDMAN:  Let the witness finish the

6        statement.

7   BY MR. PASCHAL:

8        Q.   Were you finished?

9        A.   Many of them are fraudulent e-mails.

10       Q.   Okay.  Do you have any reason to doubt this

11   e-mail?

12       A.   I don't know.  You would have to ask an expert

13   about it.

14       Q.   Are any of the fraudulent e-mails or

15   fraudulent -- purported fraudulent e-mails or fraudulent

16   documents, aren't they the same document you're using to

17   support your claims?

18       A.   I don't know.  There's a lot of e-mails and

19   documents.

20       Q.   I know.  I know you said that.  If there's a

21   lot of forged documents, a lot of false testimony and a

22   lot of forged documents how are they also supporting

23   your claims that Craig Wright and Dave or Satoshi with

24   millions of Bitcoin out there?  I want the jury to know

25   which truth -- which falsehood -- what should the jury

Kleiman
January 10, 2020                                    123

1    believe?

2         A.   It's up to the jury.

3         Q.   I need to understand from you though because

4    so far what I've gathered is the only evidence you have

5    comes from Craig Wright.  Do you agree with that?

6         A.   No.  Some of the evidence comes from what my

7    brother told me.

8         Q.   That conversation that nobody else heard and

9    nobody else has spoken about and none of his friends,

10   his fiancee or the son -- the young man who calls him

11   father can corroborate?  Other than that is the only

12   evidence you have Craig Wright or stuff that Craig

13   Wright said?

14        A.   Yes.  Most of the evidence is from Craig and

15   my brother.

16        Q.   I need to break that up because there's one

17   conversation you claim to have had with your brother,

18   right?

19        A.   Yes.

20        Q.   That nobody heard; right?

21        A.   That I heard, yes.

22        Q.   And -- but that conversation didn't include

23   having millions of Bitcoin, did it?

24        A.   At that point they weren't worth anything.

25        Q.   I said millions of Bitcoin, doesn't matter

```
 1    what they're worth.
 2         A.   I don't think they had millions of Bitcoin
 3    even in -- I mean in late 2009.
 4         Q.   Sorry, go ahead.
 5         A.   By that time.  They probably didn't mine that
 6    much yet.
 7         Q.   But in that conversation about digital money
 8    you did testify that he didn't mention a word about
 9    Bitcoin.
10         A.   Can you say that again?
11         Q.   In that conversation you testified he didn't
12    mention anything about Bitcoin?
13         A.   Yes, correct, yes, digital currency or digital
14    money.
15         Q.   So he never told you anything about Bitcoin?
16         A.   Aside from the logo he drew, no.
17         Q.   So the other rest of the evidence comes from
18    Craig Wright?
19         A.   Yes.
20         Q.   Your documents, all of your documents --
21    evidence comes from Craig Wright?
22         A.   Yes, from his word.  He told me they were
23    partners.  They mined a lot of Bitcoin.
24         Q.   Now, if you're saying that Craig Wright and
25    you just said it and it is your belief and your
```

Kleiman
January 10, 2020                                        125

1   counsel's argued it that he is lying, he is forging

2   documents why should the jury believe those documents or

3   what he is saying then?  I want to know which is --

4        A.   Because he has everything.  My brother's left

5   with nothing.  He's creating fraudulent documents that

6   benefit himself.

7        Q.   I mean some of the documents the fraudulent

8   documents they're attached to your complaint to support

9   your claims.

10       A.   I don't know exactly what specific documents

11  you're talking about.

12       Q.   What document do you have to show that there's

13  a million Bitcoin or any Bitcoin?

14       A.   I don't have the documents in front of me.

15       Q.   Can you name any document?

16       A.   Not off the top of my head, no.

17       Q.   You have hundreds of thousands of documents.

18  Sir, we've been litigating for two years.  You have --

19  you've been investigating this yourself for many years,

20  right?

21       A.   Yes.

22       Q.   You can't tell the jury a single one document

23  that says there's a lot of Bitcoin out there?

24       A.   Not at this moment.  I don't have them with

25  me.

Kleiman
January 10, 2020                          126

1      Q.   When you look at -- could you go to paragraph

2   70.  You say "W&K has no operating agreement and its

3   exact ownership structure is unclear due to Craig's

4   contradictory statements."  Since you made this

5   allegation what evidence do you have to establish that

6   you are the sole owner of W&K?

7      A.   Based on the document that I saw that listed

8   my brother as the only member.

9      Q.   That document was attached with this

10   complaint.  So you had that document when you made this

11   statement that it's unclear -- that its ownership

12   structure is unclear.  Since you made that allegation

13   what evidence have you obtained to say that you are the

14   owner of W&K?

15      A.   I don't know.  Again I would have to go look

16   at all the documents.  I don't have them with me.

17      Q.   You can't name a single document that says you

18   own W&K?

19      A.   No.

20      Q.   And if Lynn Wright had an interest in W&K did

21   you on rob her of her interest when you reinstated the

22   company?

23      A.   Again I don't know if this is a fraudulent

24   e-mail or not.

25      Q.   Let's assume that it's an accurate e-mail,

Kleiman
January 10, 2020                                    127

 1  okay.

 2        A.   You're asking me to speculate?

 3        Q.   Not asking you to speculate.  If Lynn Wright

 4  has an interest in the company did you steal her

 5  interest in the company when you reinstated W&K?

 6        A.   I'm not going to speculate.  I don't know what

 7  Lynn Wright's situation is.

 8        Q.   Since you made this allegation that it's

 9  unclear the ownership structure of W&K what steps did

10  you take to investigate whether or not you are really in

11  fact the owner of W&K?

12        A.   Based on the information that my brother was

13  the sole managing member.

14        Q.   And again what information was that?

15        A.   I don't have the documents with me.

16        Q.   You can't name a single document?

17        A.   I don't remember thousands of documents.

18        Q.   You think there's thousands of documents that

19  show that you are the sole member of W&K?

20        A.   No.  No, I'm talking about everything that was

21  produced to us and just the totality of everything.

22  Just it's confusing stuff.  I don't remember all these

23  documents but don't worry, we'll produce it.

24        Q.   I don't care about producing documents.

25  You're here to testify.  We're done producing documents.

Kleiman
January 10, 2020                                      128

```
 1   I need to know what you know based off those documents
 2   what evidence do you have to support these allegations.
 3   I mean if your answer is I don't know then just --
 4   that's what it is.  Is it, I don't know?
 5          MR. FREEDMAN:  Just for the record I don't
 6      think you are done producing documents.
 7          MR. PASCHAL:  Huh?
 8          MR. FREEDMAN:  I don't think you are done
 9      producing documents.  Are you making that
10      representation on the record?
11          MR. PASCHAL:  You know what I mean, Vel.
12          MR. FREEDMAN:  I want the record to be clear
13      that you're not done.
14          MR. PASCHAL:  Still producing documents.
15          MR. FREEDMAN:  Okay.  I understand the point.
16      I want the record to be clear.
17          MR. PASCHAL:  This is deposition time, not
18      document producing.
19          MR. FREEDMAN:  You told the witness we're done
20      producing documents.  That's not an accurate
21      statement.
22          MR. PASCHAL:  Guys want to take a break?
23          MR. FREEDMAN:  Sure.
24          THE VIDEOGRAPHER:  Off the record at 12:03.
25          (Thereupon, a brief recess was taken.)
```

```
 1              THE VIDEOGRAPHER:  On the record at 12:59.

 2              (Defendant's Exhibit No. 12 was

 3              marked for identification.)

 4   BY MR. PASCHAL:

 5        Q.    Mr. Kleiman, I'm handing you what we're

 6   marking as Exhibit 12.  Do you recognize this document?

 7        A.    Yes.  Yes.

 8        Q.    This document was filed on February 16, 2011,

 9   right?

10        A.    Yes.

11        Q.    This is the day after Dave Kleiman sent the

12   e-mail to Lynn Wright and Craig Wright asking whether

13   they can be managers and managing members.

14        A.    Okay.

15        Q.    What is this document?

16        A.    Registration of W&K.

17        Q.    On the street address of principal office

18   of -- do you recognizes that first address?

19        A.    ███████████████████?

20        Q.    Yes.

21        A.    Yes, that's where my brother lived.

22        Q.    Do you recognize the second address?

23        A.    That's the address of the UPS store I think he

24   shared access to with Patrick.

25        Q.    You heard Carter Conrad's testimony that that
```

```
 1    mailbox was where Dave used for all of his business and

 2    some of his personal items; correct?

 3         A.   I don't recall that but --

 4              (Defendant's Exhibit No. 13 was

 5              marked for identification.)

 6    BY MR. PASCHAL:

 7         Q.   I'm handing you Exhibit 13.  Can you turn to

 8    the second page.  This envelope -- what is the address

 9    that's listed on the envelope?

10         A.   ███████████████████.

11         Q.   Is that the same address that's listed on the

12    Articles of Incorporation for W&K mailing address?

13         A.   Yes.

14         Q.   Then on the top left corner what entity is

15    sending this envelope?

16         A.   Supreme Court of New South Wales.

17         Q.   The handwriting, what does that say?

18         A.   Received October 10, 2013.

19         Q.   Do you recognize that to be Carter Conrad's

20    handwriting?

21         A.   I have never seen Carter Conrad's handwriting.

22         Q.   Can you go to the first page.  At the top of

23    the -- at the top of the page in the top left corner

24    what does that logo say?

25         A.   Supreme Court of New South Wales.
```

1      Q.    The top right corner it has the contact

2    information for the Supreme Court of New South Wales?

3      A.    Yes.

4      Q.    What -- who is this letter addressed to?

5      A.    W&K Info Defense Research.

6      Q.    Again it has W&K mailing address, right?

7      A.    Yes.

8      Q.    What is the date on this letter?

9      A.    September 3rd 2013.

10     Q.    What is the case title?

11     A.    Craig Steven Wright vs. W&K Info Defense

12   Research.

13     Q.    In the body of this letter it instructs you

14   that if you do not appear in court this may be dealt

15   with in your absence; right?

16     A.    Yes.

17     Q.    Gives you the date and time for a court

18   hearing?

19     A.    Yes.

20     Q.    As the personal representative of the estate

21   of Dave Kleiman did you check the mailbox, the business

22   and sometimes personal mailbox of David Kleiman?

23     A.    I didn't have access to that mailbox.

24     Q.    Why didn't you have access to the mailbox?

25     A.    I was never given access to the mailbox.

Kleiman
January 10, 2020                                         132

1      Q.   Somebody prevented you from having access?

2      A.   I think Patrick just retained control of it.

3      Q.   Did he ever keep you from accessing the

4  mailbox?

5      A.   No.

6      Q.   Did you ever ask him?

7      A.   I'm trying to remember if I even -- at what

8  date I even knew about it.  I have to go back and look

9  at the records to see when I first found out about it.

10     Q.   When did you know about Computer Forensics,

11  LLC, let me ask you that?

12     A.   That I knew about before -- well, I don't know

13  the exact date but I knew my brother was operating it.

14     Q.   And you knew Patrick Paige and Carter Conrad;

15  right?

16     A.   Yes.

17     Q.   You knew that Patrick Paige and Carter Conrad

18  shared a business with Dave Kleiman; right?

19     A.   Yes.

20     Q.   As the personal representative of the estate

21  of Dave Kleiman did you ask Patrick Paige or Carter

22  Conrad about where Dave was receiving all of his

23  business mail?

24     A.   No.

25     Q.   As the personal representative of the estate

1    of David Kleiman -- strike that.  Checking all of his

2    business mail as the personal representative that would

3    be pretty important; right?

4         A.   Well, I was led to believe that Dave just

5    didn't have any assets and that included whatever was

6    conducted at Computer Forensics.

7         Q.   How were you led to believe that?

8         A.   That involved communications with my attorney.

9         Q.   The only way you would have wanted to check

10   the mailbox is if there were assets?

11        A.   No, I thought you meant if I was looking into

12   Computer Forensics assets.

13        Q.   I just want to know the personal -- the

14   mailbox?

15        A.   Yes.

16        Q.   My question to you was as the personal

17   representative of the estate of Dave Kleiman it's pretty

18   important you check the mailbox and have all his

19   business affairs and personal items?

20        A.   I thought the mailbox was only connected to

21   his business affairs tied to Computer Forensics and

22   that's why Patrick is the only one that I knew of that

23   had access to it.  So I wasn't going to ask Patrick if I

24   could access mail going to Computer Forensics.

25        Q.   What makes you think that it was just only

1    Computer Forensics that had access?

2        A.   Because Patrick was the only other person who

3    had access to it.

4              (Defendant's Exhibit No. 14 was

5              marked for identification.)

6              MR. PASCHAL:   I'm showing you what we're

7         marking as Exhibit 13 --

8              MR. FREEDMAN:   14.

9              MR. PASCHAL:   14.

10   BY MR. PASCHAL:

11       Q.   This is an e-mail exchange between you and

12   Patrick Paige; right?

13       A.   Yes.

14       Q.   That's your e-mail address DAX561@███████?

15       A.   Yes.

16       Q.   If you turn to the second page that's where

17   the e-mail starts.   So there's an automatic send from

18   the UPS store to Dave Kleiman's e-mail address.   It's

19   saying that the payment or that the mailbox needed to be

20   renewed by a certain date.

21            So then on the first page on May 1st 2014

22   Patrick tells you "I don't think we're going to renew

23   the mailbox.   I wanted to check to see if you wanted to

24   take it over.   Let me know if you do and I can meet you

25   there and transfer it to you.   Otherwise I think we will

Kleiman
January 10, 2020                                    135

1  not renew it."  Then you responded "there's no need to
2  renew the mailbox."
3       A.  Yes.  If -- since I thought it was related to
4  just Computer Forensics related stuff that why would I
5  need to renew it.
6       Q.  Well, did you ask Patrick Paige and Carter
7  Conrad if it was only related to Computer Forensics
8  stuff?
9       A.  No, but just being that Patrick's the only
10 person who had access to it I guess that's what I
11 assumed.
12      Q.  I get you assumed but as a personal
13 representative you know you spoke to Carter Conrad and
14 Patrick Paige; right?
15      A.  Yes.
16      Q.  And did you ever ask them whether or not --
17 where Dave's business mail was going to?
18      A.  Did I ever specifically ask.  No, I don't
19 think so.  I imagine that Patrick was receiving it and
20 if he received anything of importance then he would
21 forward it to either me or my attorney.
22      Q.  I want to get this straight.  Did you ever
23 check the mailbox?
24      A.  No.  I never had access to it.
25      Q.  I want to clarify when you say you never had

Kleiman
January 10, 2020                                  136

```
 1    access so it's because you never asked?
 2         A.   I never had --
 3         Q.   If you would have went to Patrick Paige and
 4    said can I get a key so I can look at Dave's mail?
 5         A.   I didn't feel I needed to because Patrick had
 6    access to it and if there was mail in there he would
 7    then give it to me.
 8         Q.   Is Patrick the personal representative of the
 9    estate of Dave Kleiman?
10         A.   No.
11         Q.   You are, right?
12         A.   Yes.
13         Q.   So you would be sitting in the shoes of Dave
14    Kleiman in that capacity?  That is his mailbox where he
15    gets all of his business mail?
16         A.   As far as I knew it was just Computer
17    Forensics.  I didn't know of any other company.  So why
18    would I be asking for a Computer Forensics mail?
19         Q.   Well, it could have been mail related to --
20    even though he was in Computer Forensics; right?
21         A.   In the field, yes.
22         Q.   Wouldn't you want to know his business
23    dealings in Computer Forensics?
24         A.   As far as I knew they were just solely based
25    in Computer Forensics, LLC.
```

Kleiman
                    January 10, 2020                           137

```
 1        Q.   What if there was a check for $10,000 for work
 2   he did before he died and it went to the mailbox.  You
 3   didn't want to check for that?
 4        A.   Then Patrick would notify me if part of that
 5   was entitled to Dave.
 6        Q.   Was Patrick under any legal obligation to
 7   handle the affairs of the estate of David Kleiman?
 8        A.   No.
 9        Q.   You were actually under legal obligation to do
10   that; right, as the personal representative?
11        A.   Yes.
12        Q.   And you didn't check his mailbox?
13        A.   Again I didn't have access to it.
14        Q.   Because you didn't ask?  I want to define
15   access.  Let's work on access because I'm trying to
16   figure out how you consider access.  So is it I don't
17   feel like walking to my mailbox and opening it up does
18   that mean I don't have access to my mailbox?
19        A.   I didn't have a key to open the locked
20   mailbox.
21        Q.   So if Patrick is ready and obviously willing
22   to give you a key because he wants you to take it over
23   and you just simply didn't care to ask is that somehow
24   denying you access?
25        A.   No, it's not denying me access but I just
```

Kleiman
January 10, 2020                                        138

```
1    assumed he would tell me if there was mail and being
2    that he had access so it he would tell me if there was
3    mail there.
4         Q.   Was the first time you heard about Craig
5    Wright from Patrick Paige?
6         A.   Yes.
7         Q.   Did you ever know that Craig Wright -- when
8    did you infer that Craig Wright was the wealthy
9    foreigner that stemmed from the purported conversation
10   you had with Dave Kleiman in 2009?
11        A.   When Craig told me the story of them working
12   together on Bitcoin.
13        Q.   Did you ever ask --
14        A.   Go ahead.
15        Q.   Carter Conrad, Patrick Paige or any of Dave's
16   friends about Craig Wright -- strike that.  Did you ask
17   any of Dave's close friends about Craig working with a
18   wealthy foreigner?
19        A.   I don't think so.
20        Q.   Did you ask any of his friends if Dave knew a
21   wealthy foreigner?
22        A.   No.
23        Q.   Did you ask any of Dave's friends, business
24   partners, other family members whether Dave was working
25   with the wealthy business partner on something bigger
```

David Kleiman
January 10, 2020                                  139

```
1    than Facebook?
2         A.   No.  I mean that memory of him working with a
3    foreigner only came back to me after some exchanges that
4    I had with Craig and I believe it was Craig I was first
5    to inform him about it.
6         Q.   So your brother telling you that he is working
7    on something bigger than Facebook -- strike that.  Dave
8    Kleiman was a very, very smart man, wasn't he?
9         A.   Yes.
10        Q.   He was one of the foremost experts in his
11   field; right?
12        A.   Yes.
13        Q.   And him telling you that he is working on
14   something bigger than Facebook it's your testimony that
15   you forgot all the way until Craig Wright told you
16   something?
17        A.   Yes.
18        Q.   So in 2010 did you remember that your brother
19   said he is working on something bigger than Facebook?
20        A.   No.
21        Q.   You remember then?
22        A.   No, I didn't remember until I had e-mail
23   exchanges with Craig.
24        Q.   I want to figure out exactly when you forgot.
25   Did you forget the day after the Thanksgiving?
```

Kleiman
January 10, 2020                                    140

1       A.   It's not that I forgot the memory.  It's just

2   that I just didn't think about it.  It was nothing to

3   think about.  It would be different if I knew that Dave

4   had suddenly come into a lot of money in 2010, 2011,

5   2012 but that wasn't the case.

6       Q.   So it was only important to you if he had a

7   lot of money?

8       A.   No, it was just there was no reason for me to

9   reflect on his mentioning that he was working on a big

10  business if he wasn't generating anything from it.

11      Q.   So as the personal representative of the

12  estate of Dave Kleiman you didn't think it was important

13  to follow up on David Kleiman's purported claim to you

14  that he was working on something bigger than Facebook

15  with a wealthy foreigner?

16      A.   Again that memory didn't come back until Craig

17  contacted me.

18      Q.   Well, let me -- so you never really visited

19  Dave when he was in the hospital; right?

20      A.   Right, correct.

21      Q.   Did you ever see him when he had the passes

22  where he can leave for a day or two?

23      A.   I didn't see --

24      Q.   Okay.  Did you see or speak -- did you see

25  Dave in 2010?

```
 1        A.    I don't believe so.
 2        Q.    So the last time -- so from 2009 the
 3   Thanksgiving dinner all the way to his death the last
 4   time you saw Dave Kleiman was at the Thanksgiving
 5   dinner?
 6        A.    Yes.
 7        Q.    When he dies did you think about the memories
 8   you had with Dave?
 9        A.    Yes, I thought of lots of memories, yes.
10        Q.    Did you think about the last time you saw your
11   brother alive?
12        A.    I may have.
13        Q.    That would have been the time when he told you
14   he was working on something bigger than Facebook; right?
15        A.    Yes.
16        Q.    So how is it that you only remember in 2014
17   when Craig tells you that Dave may have been working on
18   Bitcoin?
19        A.    Because he was the foreigner that Craig had
20   mentioned.
21        Q.    When Dave died and you go back and you're
22   thinking of that memory this is the last time I saw my
23   brother and he told me he was working on something
24   bigger than Facebook what steps did you take to figure
25   out what it was that he was working on?
```

Kleiman
                    January 10, 2020                    142

 1        A.   Can you repeat that?

 2        Q.   When you find out that your brother has died

 3   and you're thinking about the memories, the last memory

 4   you saw him where he told you he is working on something

 5   bigger than Facebook and as the personal representative

 6   of the estate of Dave Kleiman what steps did you take to

 7   find out what Dave Kleiman meant by he is working on

 8   something bigger than Facebook with a wealthy foreigner?

 9        A.   Yes, again because that recollection didn't

10   come back to me until Craig contacted me.  When I was

11   the personal representative like I said I had

12   communications with my attorney and I was led to believe

13   that --

14             MR. FREEDMAN:  Don't discuss anything that you

15        had your attorney.  It's privileged.

16   BY MR. PASCHAL:

17        Q.   Are you aware of the e-mail that Joseph Karp's

18   wife sent out to Dave's closest friends advising them

19   that Dave had died?

20        A.   No.

21        Q.   You're aware that subsequently there's a chain

22   of e-mails with Dave's closest friends speaking about

23   Dave's death?

24        A.   That one I recall.

25        Q.   And you recall that Craig Wright is on that

Kleiman
January 10, 2020                        143

1    e-mail?

2        A.   Yes.

3        Q.   That list of friends I mean -- I don't have it

4    in front of me have there were at least ten.  In fact I

5    remember now it was 14 because I tried to contact all

6    14.  14 did you ask any one of them about a wealthy

7    foreigner that Dave Kleiman was working on -- working

8    with about -- on something that was bigger than

9    Facebook?

10       A.   That e-mail was still in 2013.

11       Q.   Yes.

12       A.   My memory didn't come back until 2014.

13       Q.   So your memory got better as time went on?

14       A.   My recollection of Dave's story it just once

15   Craig the foreigner came back into the picture I said

16   ah, that's the guy Dave was talking about.

17            MR. PASCHAL:  Mind if I take a five minute

18       break?

19            MR. FREEDMAN:  Your depo.

20            THE VIDEOGRAPHER:  Off record 1:20.

21            (Thereupon, a brief recess was taken.)

22            THE VIDEOGRAPHER:  On record 1:28.

23   BY MR. PASCHAL:

24       Q.   Mr. Kleiman, can you go back to Mr. Karp's

25   letter to the IRS?

Kleiman
January 10, 2020                                144

```
 1               MR. FREEDMAN:  What exhibit number?
 2               MR. PASCHAL:  That I don't know.
 3               MR. FREEDMAN:  8.
 4     BY MR. PASCHAL:
 5          Q.   If you go to the second page.  Mr. Karp says
 6     "with regard to W&K, LLC or Bitcoins Ira had no personal
 7     knowledge of any of this and has no proof or evidence of
 8     what Bitcoins David may own or any information."
 9               Why didn't you tell the IRS that Dave told you
10     in 2009 that he was working on something bigger than
11     Facebook that was digital money with a wealthy
12     foreigner?
13          A.   I didn't participate in this -- in this
14     communication.
15          Q.   So your lawyer sent this without your
16     authorization?
17          A.   I don't recall.
18          Q.   Did your lawyer show it to you before sending
19     it to the IRS?
20               MR. FREEDMAN:  Hold on a second.  Don't answer
21          the question yet.  I just want to think about this
22          Bryan because --
23               MR. PASCHAL:  I don't want communications --
24               MR. FREEDMAN:  I get what you're doing.  I'm a
25          little uncomfortable with it.  I'll let you go a
```

Kleiman
January 10, 2020                                145

```
1         little bit here but -- go ahead, you can answer if

2         he showed it to you before he sent it out.

3    BY MR. PASCHAL:

4         Q.   Did your lawyer show this letter to you?

5         A.   I don't remember.

6         Q.   When your lawyer says he CC'd you on this

7    communication is that false?

8         A.   No, he may have but whether I took the time to

9    read it I don't remember.

10        Q.   So is this statement to the IRS that you have

11   no personal knowledge of any of this, is that false?

12        A.   "No personal knowledge with regard to W&K."

13   It would appear to be inaccurate.  We had a little bit

14   of knowledge by this time, yes.

15        Q.   So at what point or did you ever make your

16   lawyer aware that this is inaccurate?

17            MR. FREEDMAN:  Don't answer that.  That's

18        asking for -- you're asking for direct

19        communications with counsel.

20            MR. PASCHAL:  I'm asking did he.

21            MR. FREEDMAN:  Did you tell your lawyer X, Y

22        or Z or is a direct communication with counsel.

23        Don't answer the question.

24            MR. PASCHAL:  This is not seeking legal

25        advice.
```

```
 1            MR. FREEDMAN:  That's not true.  If he said to
 2       Mr. Karp hypothetically saying to him hey, this is
 3       inaccurate do we need to do anything about it?
 4  BY MR. PASCHAL:
 5       Q.   To your knowledge did Mr. Karp send any
 6  supplement to the IRS to correct this letter on your
 7  behalf?
 8       A.   Not that I'm aware of.
 9       Q.   Did you send a letter to the IRS saying hey
10  that's not true, I do have personal knowledge?
11       A.   No.  But I did send my own -- I think a
12  separate letter because I don't remember this one being
13  sent.  That's why I think I followed up on my own
14  letter.
15       Q.   You sat -- you heard the deposition of
16  Mr. Karp; right?
17       A.   Yes.
18       Q.   You heard him testify that this was sent?
19       A.   I don't remember that particular portion
20  but --
21       Q.   So are there any follow up e-mails with the
22  IRS where you correct this statement?
23       A.   I don't remember this letter being sent.
24  That's why I sent my own letter.
25            MR. FREEDMAN:  Ira, you have to answer the
```

Kleiman
January 10, 2020                          147

```
 1        question.  He said is there follow up letters the
 2        answer is yes or no.  Otherwise he has to ask a
 3        million times.
 4               THE WITNESS:  Sorry.  Can you repeat the
 5        question?
 6   BY MR. PASCHAL:
 7        Q.   Are there any follow up letters with the IRS
 8   that corrects this statement?
 9        A.   No.
10        Q.   You said you sent some separate letter.  In
11   that separate letter did you tell the IRS that your
12   brother was working on something bigger than Facebook
13   digital money with a wealthy foreigner?
14        A.   I don't recall using those words.
15        Q.   And again you know that there are laws against
16   making misrepresentations to the IRS; correct?
17        A.   Yes.
18        Q.   You said yourself it's inaccurate for this
19   statement to be made; right?
20        A.   Yes.
21        Q.   Can you go to paragraph 119?
22        A.   Of what exhibit?
23        Q.   The complaint.  I don't know what exhibit that
24   is.
25               MR. FREEDMAN:  10.
```

Kleiman
January 10, 2020                          148

```
 1              MR. PASCHAL:  It's 10.

 2              THE WITNESS:  Paragraph?

 3   BY MR. PASCHAL:

 4       Q.   Paragraph 119.

 5       A.   Okay.

 6       Q.   On this allegation you say "W&K was never

 7   served validly or otherwise with these proceedings."

 8   Pause for that second.  I just showed you the envelope

 9   from the Australian court; right?

10       A.   Yes.

11       Q.   That was sent to -- we established that

12   envelope was sent to the mailbox that Dave listed for

13   W&K Info Defense Research; right?

14       A.   Yes.

15       Q.   That's the mailbox that Dave uses for his

16   business affairs and sometimes for his personal items;

17   right?

18       A.   As I was aware of it it was being used for

19   Computer Forensics, LLC, yes.

20       Q.   You heard -- you know Carter Conrad testified

21   that it was for all his business and his personal

22   affairs?

23       A.   I don't remember that testimony.

24       Q.   But knowing that the envelope was actually

25   sent to that address and that it was received by Carter
```

Kleiman
January 10, 2020                        149

1    Conrad is this allegation accurate?

2         A.   Yes, because if I was the member of W&K I was

3    never served.

4         Q.   On this day you were a member of W&K?

5         A.   No, but I mean if -- whoever was in control of

6    W&K or to take over Dave's role I would imagine they

7    would need to be served.  I never received service.

8         Q.   And the estate of Dave Kleiman would have been

9    the member of W&K; right?

10        A.   Yes.

11        Q.   Sitting in Dave Kleiman's shoes that mailbox

12   was the mailbox that Dave Kleiman used for his business;

13   right?

14        A.   As I was aware for his Computer Forensics

15   business, yes.

16        Q.   Computer Forensics was his business; right?

17        A.   Computer Forensics, LLC company, yes.

18        Q.   Can you turn to paragraph 171?

19        A.   Okay.

20             MR. PASCHAL:  Actually before we do that.  I'm

21        handing you what we're going to mark as Exhibit 15.

22             (Defendant's Exhibit No. 15 was

23             marked for identification.)

24   BY MR. PASCHAL:

25        Q.   Can you turn to the second page.

```
 1        A.    Okay.

 2        Q.    Clocktime2020@███████, is that your e-mail

 3   address?

 4        A.    Yes.

 5        Q.    You sent this e-mail I guess it's February 15,

 6   2014?

 7        A.    2015?

 8        Q.    '14.

 9        A.    Yes.

10        Q.    You say "knowing my brother if there was more

11   than a thousand dollars in the account he would have

12   sold it."  Was that the type of person Dave was?

13        A.    Yes.  He was not a saver.

14        Q.    If he had money he would spend it; right?

15        A.    Usually.

16        Q.    In fact at one point he had racked up $20,000

17   in debt?

18        A.    I don't know the specifics of what his debts

19   were.

20        Q.    Your father and Joseph Karp actually cleaned

21   the debt up for him; right?

22        A.    They may have.  Probably.

23        Q.    As soon as he got the debt cleaned up he went

24   out and bought a motorcycle; right?

25        A.    Yes.
```

Kleiman
January 10, 2020                              151

1          Q.   You recall that?

2          A.   Yes.

3          Q.   You mentioned earlier that you weren't unaware

4     that Dave had asked Patrick for money before he died?

5          A.   I remember Patrick mentioning to me I think

6     that he loaned Dave money once in a while.

7          Q.   The next sentence you say "he didn't like

8     asking people for help but during the last few months he

9     borrowed money from both my dad and Patrick."

10         A.   Yes.

11         Q.   Also mentions in here he didn't mention the

12    account -- when you say account are you referring to

13    Bitcoin wallets?

14         A.   Can you point me to --

15         Q.   Second paragraph, the same e-mail.

16         A.   He didn't mention the account.  Yes, I guess I

17    was referring to the Bitcoin account.

18         Q.   So he didn't mention it to anyone or leave

19    some kind of note about it?

20         A.   Right.

21         Q.   That's true?

22         A.   Yes.

23         Q.   Then you say "I truly believe there's no

24    treasure to be found there."

25         A.   Right.

Kleiman
January 10, 2020                                    152

```
1        Q.   Did you know anything about Dave Kleiman using

2   drugs?

3        A.   No.

4        Q.   When did you learn that he used drugs?

5        A.   I never knew him to use drugs.

6        Q.   But you learned that he did use drugs?

7        A.   No.  I didn't learn that.

8        Q.   Did you see his autopsy report?

9        A.   Yes.

10       Q.   What was in his system when he died?

11       A.   Cocaine.

12       Q.   So if I told you that he used drugs frequently

13  through the years that would be a surprise for you?

14       A.   Definitely.

15       Q.   Before Dave was a computer forensics expert do

16  you know any of his other jobs?

17       A.   I mean there were mostly computer related.

18  Prior to the computer work he worked for the Palm Beach

19  police and I think he worked as like a bouncer at a

20  club.  Maybe some other jobs I don't remember.

21       Q.   That club is that where he met his fiancee?

22       A.   That I don't know.

23       Q.   What was the name of the club?

24       A.   I don't know.

25       Q.   How long was Dave a police officer?
```

Kleiman
January 10, 2020                                    153

```
 1        A.   I think just a few years.  Before he was in an
 2   accident.
 3        Q.   Do you know of any lawsuits that Dave Kleiman
 4   was involved in?
 5        A.   No.
 6        Q.   Do you know about a lawsuit -- do you know
 7   about a lawsuit that his fiancee had brought against
 8   him?
 9        A.   I remember Patrick mentioning that I think
10   they did have some kind of dispute.  I wasn't sure
11   exactly what it was about.
12        Q.   What happened in that dispute?
13        A.   That I don't -- I don't know.
14        Q.   Did Dave Kleiman throw a burning hot of grease
15   at her?
16        A.   I don't know.
17        Q.   The court documents show that there was a
18   settlement in that case the trust was set up for an
19   undisclosed amount.  Do you know anything about that?
20        A.   No.
21        Q.   Did Dave ever talk to you about his fiancee?
22        A.   No.
23        Q.   Did he talk to you about any of his
24   girlfriends?
25        A.   No, not really.
```

```
 1        Q.   We established already before Dave died the
 2   last time you saw him in person was in 2009; right?
 3        A.   Yes.
 4        Q.   Did you exchange e-mails with him over that
 5   time?
 6        A.   Yes.
 7        Q.   Did you have any phone calls with him?
 8        A.   Yes.
 9        Q.   What did you talk about?
10        A.   Just I guess random stuff.  I don't remember
11   exactly.
12        Q.   Did you ever follow up with him on his
13   statement that he was working on something bigger than
14   Facebook?
15        A.   No.
16        Q.   Did you ever follow up with him on the
17   statement he was working with a wealthy foreigner?
18        A.   No.
19        Q.   Did you ever follow up with him that he was
20   working on digital money?
21        A.   No.
22        Q.   Let's go to paragraph 171.
23        A.   Okay.
24        Q.   You there?
25        A.   Yes.
```

Kleiman
January 10, 2020                                    155

1        Q.   This is your Count I for conversion.  171 you
2    allege that "on or about April 2013 to the present day
3    defendant converted to his own use Bitcoins forked
4    assets and intellectual properties that was then the
5    property of and owned by the estate and/or W&K."  For
6    this count can you please explain how the defendant
7    converted to his own use Bitcoin, forked assets and
8    intellectual properties?
9        A.   From my understanding W&K -- well, actually
10   before W&K they were partners.  Whatever I.P. was
11   created Bitcoin was mined.  They both had rights to
12   Craig ends up controlling all of it.  Dave controls none
13   of it.
14       Q.   Well, I'm trying to figure out how -- what
15   evidence do you have to show that Craig controls all of
16   it?
17       A.   I believe it's in the documents.
18       Q.   What documents?
19       A.   I don't have them with me.
20       Q.   You're the plaintiff and suing for conversion
21   and civil theft against my client.  I need to know what
22   evidence establishes your belief that my client who is
23   the defendant in this case converted or took Bitcoin,
24   forked assets or intellectual properties?
25       A.   I think I answered.

1          Q.   Is it you don't know?

2          A.   No, they both shared an interest in I.P. and

3     Bitcoin.  Craig has stated that he controls it and

4     Dave's estate does not.

5          Q.   When did Craig say that he controls -- do you

6     have an e-mail where Craig says I control all of this

7     Bitcoin?

8          A.   He said he is a billionaire.

9          Q.   That's not my question.  That's not my

10    question.  My question to you is is there an e-mail that

11    shows that he has control over all of this Bitcoin?

12         A.   I'm not sure.  I have to go back and look at

13    the documents, e-mails, everything.

14         Q.   Do you have any -- are there any telephone

15    conversations where Craig Wright said I have control

16    over all of these Bitcoins, mind and Dave's?

17         A.   No, I don't have any telephone calls.

18         Q.   Did you have any Skype communications where

19    Craig Wright said I have control over my Bitcoin, Dave's

20    Bitcoin, our Bitcoin, the partnership's Bitcoin?

21         A.   No.

22         Q.   I've asked you this before I'm going to ask

23    you again.  What is the intellectual property you're

24    suing my client for?

25         A.   It's whatever block chain related Bitcoin

Kleiman
January 10, 2020                              157

```
 1   related I.P. that was created prior to their mining of
 2   Bitcoin.  Things related to the Australian Court
 3   judgment against W&K, whatever banking I.P. metered
 4   payment system I.P. and the other details I just don't
 5   recall.
 6        Q.   What are the total amount of Bitcoins that you
 7   believe belong to the estate and W&K?
 8        A.   At least like 300,000.
 9        Q.   When you say at least you think it could be
10   more?
11        A.   Yes.
12        Q.   How much more?
13        A.   I have to look at the documents to -- again to
14   see the exact amounts.
15        Q.   So testifying in front of a jury today and
16   sitting here today your only answer is you have to look
17   at documents to know how much Bitcoin you're suing for?
18        A.   Yes.
19        Q.   What documents would that be?
20        A.   Documents in our e-mail exchanges and
21   documents that have been produced to us.
22        Q.   E-mail exchanges with who?
23        A.   With Craig.
24        Q.   And documents produced from who?
25        A.   From Craig.
```

1          Q.   Do you believe everything Craig says?

2          A.   No.

3          Q.   Count II unjust enrichment, you say that

4     "plaintiffs have conferred a benefit to defendant.

5     Defendant voluntarily accepted and retained the

6     benefit."  Then you have damages.  Is this count seeking

7     anything different than your Count I?

8          A.   I don't know.  My attorneys assisted --

9          Q.   Let me change that.  Is there any different

10    intellectual property at issue in Count II or is it the

11    same intellectual property?

12         A.   Again I don't know.  My attorneys assisted me

13    in all of this.

14         Q.   So in that wherefore clause where you say that

15    you want a judgment against the defendant for the return

16    of wrongfully obtained property monetary damages

17    equaling the value thereof.  What is the wrongfully

18    retained property?

19         A.   Where are you reading that?

20         Q.   In the next page under paragraph 177.

21         A.   Okay.

22         Q.   Where you see -- you see the wherefore at the

23    top right on 177?

24         A.   Yes.

25         Q.   You say "plaintiffs demand judgment against

```
 1    defendant for the return of the wrongfully retained
 2    property or monetary damages equaling to the value
 3    thereof."  Can you please explain what is the wrongfully
 4    obtained property?
 5         A.   Again my attorneys assisted me in drafting
 6    this.
 7         Q.   I understand but you're the plaintiff and
 8    you're suing my client.  I need to know what you're
 9    suing him for.
10              MR. FREEDMAN:  He already answered the
11         question.
12              MR. PASCHAL:  He didn't answer the question.
13              MR. FREEDMAN:  He said he didn't know.  His
14         attorneys helped him answer.
15              MR. PASCHAL:  He didn't say he didn't know.
16              MR. FREEDMAN:  Okay.  Take it back, you're
17         right.
18              MR. PASCHAL:  Please answer the question.
19              THE WITNESS:  Let me read it again.  I don't
20         know.  My attorneys assisted me.
21              MR. PASCHAL:  Vel, that's the fourth or fifth
22         time.  That's coaching.  You just told him what to
23         say.
24              MR. FREEDMAN:  Bryan, the clear implication of
25         my attorney assisted me was I don't know, my
```

Kleiman
January 10, 2020                                        160

```
1    attorneys know.
2         MR. PASCHAL:  You said I don't so he testified
3    I don't know.
4         MR. FREEDMAN:  Oh, please, he doesn't know.
5    You're asking him highly complex legal issues.
6    You're asking him for legal conclusions.  The
7    objections are objectionable.  Only reason I'm not
8    objecting is you gave me a standing objection.
9         MR. PASCHAL:  You can object if you want.
10        MR. FREEDMAN:  Okay.  So I'll start objecting
11   again.  The point is the questions you're asking
12   are highly technical and the statement my attorneys
13   drafted for me was clearly meant to imply I don't
14   know.  You're right, he didn't say the words I
15   don't know.  I let him answer the question.  You
16   can't then be upset he then said what he said
17   previously.
18        MR. PASCHAL:  Vel, stop.  There is no more
19   coaching.  Let him answer the question.
20        MR. FREEDMAN:  It's not coaching.
21        MR. PASCHAL:  Make an objection or instruct
22   him not to answer.
23        MR. BRENNER:  Bryan, you asked him.  He is
24   answering your question.  If you don't want him to
25   talk don't ask him a question.  Pretty simple.
```

     1    BY MR. PASCHAL:

     2         Q.   Can you go to count three paragraph 178.

     3         A.   Okay.

     4         Q.   Here you allege that Craig unlawfully,

     5    willfully and maliciously misappropriated trade secrets

     6    belonging to Dave and or W&K.  What are the trade

     7    secrets?

     8         A.   I don't know.  I'll leave it at I don't know.

     9         Q.   The next paragraph you say "these trade

    10    secrets are generally described as programming methods,

    11    techniques and process relating to block chain based

    12    technologies and smart contracts."  My question to you

    13    is this -- you mentioned earlier block chain technology

    14    and intellectual property.  Would this refer to the

    15    intellectual property that you described?

    16              MR. FREEDMAN:  Objection, calls for a legal

    17         conclusion.

    18              THE WITNESS:  I don't know.

    19    BY MR. PASCHAL:

    20         Q.   Is the intellectual property that you

    21    testified to earlier block chain based technologies?

    22              MR. FREEDMAN:  Objection, calls for a legal

    23         conclusion and expert testimony.

    24              THE WITNESS:  Can you repeat that?

    25

Kleiman
January 10, 2020                              162

1   BY MR. PASCHAL:

2      Q.   Yes, you testified earlier that intellectual

3   property included block chain based technologies?

4      A.   Yes.

5      Q.   Here you're saying the trade secrets relate to

6   block chain based technologies?

7           MR. FREEDMAN:  Objection, calls for a legal

8       conclusion and expert testimony.

9           THE WITNESS:  I don't know.

10  BY MR. PASCHAL:

11     Q.   You don't know what you just testified to?

12     A.   I don't know if the block chain technology is

13  referring to these trade secret stuff.

14     Q.   Is the block chain based technology a part of

15  the intellectual property?

16          MR. FREEDMAN:  Objection, calls for a legal

17      conclusion, expert testimony.

18          THE WITNESS:  I don't know.

19  BY MR. PASCHAL:

20     Q.   Can you turn to paragraph 185.  This is a

21  count under the Federal Defense of Trade Secrets Act.

22  186 you again mention trade secrets and block chain

23  based technologies and smart contracts.  You see that?

24     A.   Yes.

25     Q.   Do you know what a smart contract is?

```
 1        A.   I have heard of the term.  I don't really know
 2   what it's used for.
 3        Q.   What is your understanding of the smart
 4   contract?
 5        A.   I guess it's -- it's a more advanced type of
 6   contract that somehow exists in the digital space.
 7        Q.   Then can you go to 191.  In the wherefore
 8   clause you say "plaintiffs demand judgment against the
 9   defendant for the value of the wrongfully taken
10   intellectual property."  Do you see that?
11        A.   Yes.
12        Q.   So does the block chain based technology refer
13   to in this count intellectual property?
14             MR. FREEDMAN:  Objection, calls for expert
15        testimony, legal conclusion.
16             THE WITNESS:  I don't know.
17   BY MR. PASCHAL:
18        Q.   But it is alleged here, right?
19        A.   Yes.
20        Q.   Is this an inaccurate allegation?
21        A.   I don't know.
22        Q.   Can you go to paragraph 202.
23        A.   Okay.
24        Q.   So in 202 you're alleging that Craig made
25   false statements and other stuff.  You see that; right?
```

1         A.   Yes.

2         Q.   Then 203 you allege that the defendant took

3    these acts or these actions, omissions with purpose of

4    inducing plaintiffs to rely on these fraudulent acts and

5    omissions.  See that?

6         A.   Yes.

7         Q.   The next paragraph -- let me ask you.  What

8    were you induced in doing and relying on Craig's false

9    statements?

10             MR. FREEDMAN:  Objection.

11             THE WITNESS:  Again my attorneys assisted me

12        in drafting this.

13   BY MR. PASCHAL:

14        Q.   That doesn't answer my question.  My question

15   is you're saying that Craig made false statements and

16   induced you into doing certain things.  What did he

17   induce you into doing?

18        A.   I guess -- well, I don't want to speculate.  I

19   don't know.

20        Q.   Can you go to paragraph 215.

21        A.   Okay.

22        Q.   215 you allege that on or before -- on or

23   about April 2013 through the present day.  I want to

24   clarify.  You're not -- your claim doesn't center or

25   allege there's been any theft when Dave Kleiman was

1   alive; right?

2        A.   That I don't know.

3        Q.   Did Dave ever tell you that somebody stole

4   from him?

5        A.   No.

6        Q.   Do you have any evidence that suggests that

7   defendant stole anything from Dave while he was alive?

8        A.   That I don't know.

9        Q.   Then you allege "defendant knowingly and

10  wrongfully took with felonious criminal intent Bitcoins,

11  forked assets, intellectual properties that were then

12  the property of and owned by the estate and/or W&K."

13  Can you please explain how defendant knowingly and

14  willfully took with felonious criminal intent the items

15  that you've listed here?

16            MR. FREEDMAN:  Objection, calls for a legal

17       conclusion.

18            THE WITNESS:  I don't know.

19            MR. PASCHAL:  Let's take a break.

20            THE VIDEOGRAPHER:  Off the record at 2:04.

21            (Thereupon, a brief recess was taken.)

22            THE VIDEOGRAPHER:  On the record 2:21.

23  BY MR. PASCHAL:

24       Q.   Mr. Kleiman, you are aware that in this case

25  the Court has entered an order finding that there is a

Kleiman
January 10, 2020                                    166

```
 1    partnership between Dave Kleiman and Craig Wright;
 2    correct?
 3         A.   Yes.
 4         Q.   What is your understanding of a partnership?
 5              MR. FREEDMAN:  Objection, calls for a legal
 6         conclusion.
 7              THE WITNESS:  I believe they equally had
 8         rights to intellectual property and mined Bitcoin.
 9    BY MR. PASCHAL:
10         Q.   What personal knowledge do you have of a
11    partnership between Dave Kleiman and Craig Wright?
12         A.    Information given to me by Craig and based
13    upon Dave's story to me that he was working with a
14    foreign individual.
15         Q.   What personal knowledge do you have of Craig
16    Wright mining Bitcoin?
17         A.   I think there are e-mails or documents stating
18    that he mined Bitcoin.
19         Q.   What e-mails or documents?
20         A.   I don't have them with me.
21         Q.   What I want to focus on is not what Craig told
22    you.  I'm asking what is your personal knowledge that
23    Craig Wright mined Bitcoin?
24         A.    That would come from the e-mails and documents
25    that I don't have with me.
```

Kleiman
January 10, 2020                            167

1      Q.   Well, other than what Craig told you or

2  e-mails that he shared with you is it fair to say that

3  you have no personal knowledge of Craig Wright mining

4  Bitcoin?

5      A.   Outside of his e-mails there is other

6  documents that I believe state that he and Dave mined

7  Bitcoin.

8      Q.   What are those other documents?

9      A.   I don't have them with me.

10     Q.   So just going back to my question though other

11 than what Craig shared with you what personal knowledge

12 do you have of Craig Wright mining any Bitcoin?

13     A.   My personal knowledge comes from the

14 documents.

15     Q.   I just want a clean record so that's why I'm

16 trying to get an answer to the question.

17     A.   I thought that was an answer.

18     Q.   I'll rephrase it.  Do you have any personal

19 knowledge of Craig Wright mining Bitcoin?

20         MR. FREEDMAN:  Objection, asked and answered.

21         THE WITNESS:  My knowledge comes from the

22     documents that I've seen.

23 BY MR. PASCHAL:

24     Q.   Sir, that's -- other than those documents do

25 you have any other personal knowledge?

1      A.   Dave's story about him creating his own money

2  leads me to believe that meant mining Bitcoin.

3      Q.   So in that 2009 Thanksgiving dinner discussion

4  Dave told you that Craig Wright was mining Bitcoin?

5      A.   No.  He said he was creating his own money.

6      Q.   So how does that statement equal you having

7  personal knowledge of Craig Wright ever mining Bitcoin?

8      A.   Dave said he was creating his own money with a

9  foreign individual.  2014 that foreign individual

10  contacts me, tells me he was mining Bitcoin with my

11  brother.

12      Q.   Again that was back in 2009?

13      A.   David's story to me yes, 2009.

14      Q.   What personal knowledge do you have of Craig

15  Wright developing any intellectual property?

16      A.   That is also based on the documents that I've

17  seen.

18      Q.   Are those documents from Craig Wright?

19      A.   I believe some of them are and what was

20  produced to me from the ATO.

21      Q.   Again you've been investigating this whole

22  situation for many years, right?

23      A.   Yes.

24      Q.   We've been litigating for two years, right?

25      A.   Yes.

Ira Kleiman
January 10, 2020                                169

```
1        Q.   We've been in discovery for a year?
2        A.   Yes.
3        Q.   Sitting here today through all the depositions
4    and all the documents that have been produced what is
5    the intellectual property that you are suing Craig
6    Wright for?
7             MR. FREEDMAN:  Objection, asked and answered,
8        calls for a legal conclusion and expert testimony.
9             THE WITNESS:  Do you want me to answer it
10       again?
11   BY MR. PASCHAL:
12       Q.   I want an answer, yes.
13       A.   Any block chain or Bitcoin related I.P that
14   they created together prior to their start of mining it
15   in 2009 and anything related to the Australian court
16   proceedings against W&K and I think W&K had possession
17   of some banking software and metered payment software
18   and I don't remember the rest of the details.
19       Q.   Do you have any personal knowledge of the
20   banking software, meter payment software that you just
21   spoke of?
22       A.   I have documentation referring to it, yes.
23       Q.   From Craig Wright?
24       A.   From multiple sources I think.
25       Q.   What are the multiple sources?
```

Kleiman
January 10, 2020                                    170

```
 1          A.   Either from Craig or the ATO.

 2          Q.   The ATO got their information from who, Craig

 3     Wright, right?

 4          A.   Yes.

 5          Q.   Are there any other sources?

 6          A.   I don't remember.

 7          Q.   Have you spoken to any reporters about this

 8     case?

 9          A.   I may have.

10          Q.   Do you recall which reporters you spoke to?

11          A.   I think Andy Kush and I forget -- there was

12     another one.  I forgot her name.  Maybe Andy Greenberg.

13     I know there was a bunch of Andys.

14          Q.   Just based on this order that the Court

15     entered can you tell me today what are the partnership

16     assets?

17          A.   I thought we just -- the I.P. and the Bitcoin.

18          Q.   How much Bitcoin?

19          A.   At least 300,000.

20          Q.   But you said it could be more?

21          A.   It could be more.

22          Q.   What steps have you taken to figure out how

23     much Bitcoin are the partnership's assets?

24          A.   From reviewing documents and being that if

25     they were the team of Satoshi then it's publicly known
```

Ira Kleiman
January 10, 2020                                    171

1    that Satoshi mined a lot more than 300,000 Bitcoin.

2         Q.   Is it publicly known that none of Satoshi's

3    Bitcoin have ever moved?

4         A.   Yes.

5         Q.   I asked you what does a partnership mean but I

6    want to clarify.  You said there are equal rights to an

7    asset in a partnership?

8         A.   Yes.

9         Q.   That's like joint ownership?

10        A.   Yes.

11             MR. PASCHAL:  I'm done.

12             MR. FREEDMAN:  You want to give us like five

13        minutes and then we'll either close it or ask some

14        questions?

15             THE VIDEOGRAPHER:  Off record 2:31.

16             (Thereupon, a brief recess was taken.)

17             THE VIDEOGRAPHER:  On record 2:43.

18                    CROSS (IRA KLEIMAN)

19   BY MR. FREEDMAN:

20        Q.   Mr. Kleiman, a moment ago Mr. Paschal

21   mentioned Judge Reinhart's order to you.  Do you recall

22   that?

23        A.   Yes.

24        Q.   Do you remember Mr. Paschal asking you about a

25   partnership?

Kleiman
                    January 10, 2020                         172

```
 1        A.   Yes.
 2        Q.   Is it your understanding that Dave and Craig
 3   had a partnership?
 4        A.   Yes.
 5        Q.   And that partnership mined Bitcoin?
 6        A.   Yes.
 7        Q.   And that partnership created intellectual
 8   property?
 9        A.   Yes.
10        Q.   Is it your claim that the estate is entitled
11   to half of the Bitcoin and intellectual property created
12   by that partnership?
13        A.   Yes.
14        Q.   No matter the time that intellectual property
15   was created?
16             MR. PASCHAL:  Objection to form.
17             MR. FREEDMAN:  It's okay.  You can answer.
18             THE WITNESS:  Yes.
19   BY MR. FREEDMAN:
20        Q.   Even if that intellectual property was created
21   by the partnership after the mining of the first
22   Bitcoin?
23             MR. PASCHAL:  Objection, form.
24             THE WITNESS:  Yes.
25
```

Ira Kleiman
January 10, 2020                                    173

```
 1    BY MR. FREEDMAN:
 2         Q.   Ira, earlier in this deposition you testified
 3    that you didn't try to locate any computer equipment in
 4    this district.  Do you recall that?
 5         A.   Yes.
 6         Q.   That's not quite accurate; right?
 7              MR. PASCHAL:  Objection, form.
 8              THE WITNESS:  That I didn't try to locate?
 9    BY MR. FREEDMAN:
10         Q.   Did you look through your brother's house for
11    computer equipment?
12              MR. PASCHAL:  Objection to form.
13              THE WITNESS:  Yes.
14    BY MR. FREEDMAN:
15         Q.   Did you talk to his partners?
16         A.   Yes.
17         Q.   Did you talk to Craig?
18         A.   Yes.
19         Q.   Have you reviewed Dave's documents?
20         A.   Yes.
21         Q.   And his e-mails?
22         A.   Yes.
23         Q.   Mr. Kleiman, there are a lot of documents that
24    have been produced in this litigation.  Is that an
25    accurate statement?
```

Kleiman
January 10, 2020                         174

```
 1        A.   Yes.
 2             MR. PASCHAL:  Object to the form.
 3   BY MR. FREEDMAN:
 4        Q.   Do you know all those documents by heart?
 5        A.   No.
 6             MR. PASCHAL:  Object to the form.
 7   BY MR. FREEDMAN:
 8        Q.   Are you rely on your team of lawyers to
 9   identify evidence in this case?
10             MR. PASCHAL:  Objection, form.
11             THE WITNESS:  Yes.
12   BY MR. FREEDMAN:
13        Q.   Mr. Kleiman, Mr. Paschal showed you a bunch of
14   documents that relate to W&K and Lynn Wright's purported
15   membership in W&K, do you remember that?
16        A.   Yes.
17        Q.   Those documents to the extent they aren't
18   forgeries were all created before you even knew what W&K
19   was; is that correct?
20             MR. PASCHAL:  Objection, form.
21             THE WITNESS:  Yes.
22             MR. FREEDMAN:  No further questions.
23             THE VIDEOGRAPHER:  Off record 2:45.
24             MR. FREEDMAN:  We'll read.
25             MR. PASCHAL:  Need it expedited.
```

1    MR. FREEDMAN:  We need it ASAP as well.

2              (Witness excused.)

3         (Deposition was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        CERTIFICATE OF REPORTER

3              THE STATE OF FLORIDA

4              COUNTY OF DADE

5

6         I, Rick Levy, Registered Professional Reporter
   and Notary Public in and for the State of Florida at
7  large, do hereby certify that I was authorized to
   and did report said deposition in stenotype of IRA
8  KLEIMAN; and that the foregoing pages, numbered from
   1 to 174, inclusive, are a true and correct
9  transcription of my shorthand notes of said
   deposition.
10
        I further certify that said deposition was
11 taken at the time and place hereinabove set forth
   and that the taking of said deposition was commenced
12 and completed as hereinabove set out.

13        I further certify that I am not attorney or
   counsel of any of the parties, nor am I a relative
14 or employee of any attorney or counsel of party
   connected with the action, nor am I financially
15 interested in the action.

16        The foregoing certification of this transcript
   does not apply to any reproduction of the same by
17 any means unless under the direct control and/or
   direction of the certifying reporter.
18
        IN WITNESS WHEREOF, I have hereunto set my hand
19 this 19TH day of January, 2020.

20

21  _____

22        Rick Levy, RPR, FPR, Notary Public
          in and for the State of Florida
          My Commission Expires:  12/8/2023
23        My Commission No.:  GG937684

24

25

```
1                     CERTIFICATE OF OATH

2    THE STATE OF FLORIDA

3            COUNTY OF DADE

4

5       I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,

6    Notary Public, State of Florida, certify that IRA

7    KLEIMAN personally appeared before me on the 10TH

8    day of JANUARY, 2020 and was duly sworn.

9

10           Signed this 19th day of January, 2020.

11

12

13

14

15       _____

16           Rick Levy, RPR, FPR
             Notary Public - State of Florida
17           My Commission Expires:  12/8/2023
             My Commission No.:  GG937684

18

19

20

21

22

23

24

25
```

Ira Kleiman
January 10, 2020                                          178

```
 1              E R R A T A    S H E E T

 2   IN RE:  IRA KLEIMAN VS CRAIG WRIGHT

 3   DEPOSITION OF:  IRA KLEIMAN

 4   TAKEN: 1/10/2020

 5      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 6   PAGE #  LINE #   CHANGE               REASON

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   Please forward the original signed errata sheet to
     this office so that copies may be distributed to all
18   parties.

19   Under penalty of perjury, I declare that I have read
     my deposition and that it is true and correct
20   subject to   any changes in form or substance
     entered here.

21

22   DATE: _____

23

24   SIGNATURE OF
     DEPONENT:_____
25
```

```
 1    DATE:        January 19, 2020

 2    TO:  VEL FREEDMAN, ESQUIRE
             ROCHE FREEDMAN, P.A.
 3           200 S. Biscayne Boulevard
             Suite 5500
 4           Miami, Florida 33131

 5    IN RE:     Ira Kleiman vs Craig Wright

 6    Dear Mr. Freedman:

 7    Enclosed please find the original errata page with
      your copy of the transcript so IRA KLEIMAN may read
 8    and sign their transcript.  Please have him/her make
      whatever changes are necessary on the errata page
 9    and sign it.  Then place the original errata page
      back into the original transcript.  Please then
10    forward the original errata page back to our office
      @1080 Woodcock Road, Suite 100, Orlando, Florida
11    32803.

12    If the errata page is not signed by the witness
      within 30 days after this letter has been furnished,
13    we will then process the transcript without a signed
      errata page.  If your client wishes to waive their
14    right to read and sign, please have him/her sign
      their name at the bottom of this letter and send it
15    back to the office.

16        Your prompt attention to this matter is

17    appreciated.

18    Sincerely,

19    _____
      RICK E. LEVY, RPR
20
      I do hereby waive my signature:
21
      _____
22    IRA KLEIMAN

23    cc via transcript:  Bryan Paschal, Esq.
                          Vel Freedman, Esq.
24    file copy

25
```

**$**

$10,000   137:1
$20,000
 150:16
$450   109:25

**1**

1   12:21 13:1
10   33:20
 88:7,11
 90:19,20
 130:18 147:25
 148:1
1000   4:10
10:57   87:6
10:58   85:23
10th   4:9
11   47:22
 119:6
112   27:7
119   147:21
 148:4
11:02   87:9
12   129:2,6
12:03   128:24
12:59   129:1
13   130:4,7
 134:7
14   134:4,8,9
 143:5,6 150:8
15   9:25 10:9
 119:14
 149:21,22
 150:5
16   119:15
 129:8
17   24:15
171   149:18
 154:22 155:1
177   158:20,23
178   161:2
18   70:6

185   162:20
186   162:22
191   163:7
1933   83:8,20
1967   7:25
1:20   143:20
1:28   143:22
1st   134:21

**2**

2   24:10,11
20   15:2
 90:19,20
2000   71:9
2008   9:21
 96:9 106:4,9,
 15,20 115:8
2009   14:10
 16:14 23:2
 94:10 124:3
 138:10 141:2
 144:10 154:2
 168:3,12,13
 169:15
201   61:2
2010   9:21
 20:20 22:7,9
 139:18 140:4,
 25
2011   11:8,14
 20:20 22:12
 80:10,20
 106:5,9,15,20
 107:16,18
 108:3,6
 110:10 115:8,
 9 119:14,15
 129:8 140:4
2012   22:15
 140:5
2013   11:8,14
 22:18 23:6,7,
 9,10,12,16,17
 29:5,7,10
 30:9 46:24
 47:6 93:1

96:9 108:3,6
 115:10 130:18
 131:9 143:10
 155:2 164:23
2014   16:13
 24:15 47:1,24
 52:22,23 95:1
 134:21 141:16
 143:12 150:6
 168:9
2015   47:3
 48:1 67:4
 68:15,17 70:6
 150:7
2016   48:2
 71:9 92:4
 93:9
2017   48:3
2018   48:3
 103:22
2019   47:6
 51:19 52:1
 76:15
202   163:22,24
2020   100:2
203   164:2
20th   95:1
21   76:15
21,728,000,000
 61:2
215   164:20,22
22nd   65:19
 66:3 92:25
23   90:2 91:8
2525   4:10
26   65:15
 79:17,25
 80:8,23 81:11
2:04   165:20
2:21   165:22
2:31   171:15
2:43   171:17
2:45   174:23

**3**

3   27:2
300,000   157:8
 170:19 171:1
3119   129:19
32   40:13,24
 92:12
35   41:12
 42:16
3rd   131:9

**4**

4   40:4,9 67:4
4371   130:10
48   92:24
4:00   87:21

**5**

5   52:4
52   49:13
 93:17,24,25
 94:1
53   47:19

**6**

6   57:14,18
62   94:25
65   96:8
66   103:10,12,
 18
67   106:11
 107:10
68   107:15

**7**

7   45:19 46:18
 49:20 50:9
 66:19,24
70   118:17
 126:2

**8**

**8** 45:19 46:18
49:20 50:9
69:4,8 144:3
**8:49** 4:9

**9**

**9** 76:2,6
**93** 111:23
112:11
**94** 115:8
**9:16** 25:24
**9:18-cv-80176-
bb/br** 4:11
**9:22** 26:1
**9:28** 30:15
**9:36** 30:17
**9:42** 35:6
**9:46** 35:8

**A**

**abandon** 43:14
**abandoned**
42:21 43:7,8,
18,21 44:8,12
**able** 5:11
7:7,13 27:15,
16 28:16
45:14 51:23
54:15
**about** 7:17
8:6,19 9:11,
13,20 10:4,24
12:10,12 14:9
16:11,15,17,
20 17:18
18:10 19:5,18
22:6,8,11,14,
17,25 23:2
24:19 30:19
34:10,11,13
35:10,25
36:2,4 37:8

38:23 39:20,
22 44:12
49:13,18
52:18 53:3,4
55:2 61:12
67:16 68:6
72:9,14 77:24
78:8,9 84:11,
15 90:1 92:14
94:15 96:2
97:17 103:8,
24 107:10
111:18 112:18
113:3 118:25
120:19 121:8
122:13 123:9
124:7,8,12,15
125:11
127:20,24
132:8,9,10,
12,22 138:4,
16,17 139:5
140:2,3
141:7,10
142:3,22
143:6,8,16
144:21 146:3
151:19 152:1
153:6,7,11,
19,21,23
154:9 155:2
164:23 168:1
170:7 171:24
**above** 4:6
**absence**
131:15
**accepted**
158:5
**access** 24:22
45:7 56:2,9
76:23 77:2,5,
7,12,15,21
78:20,24 79:1
98:7 101:10,
15 108:17
115:21,25
116:2,3
129:24
131:23,24,25

132:1 133:23,
24 134:1,3
135:10,24
136:1,6
137:13,15,16,
18,24,25
138:2
**accessing**
132:3
**accident**
153:2
**According**
17:5
**account** 13:25
76:24 77:8,12
86:16 150:11
151:12,16,17
**accounts**
76:18,20
77:14,17,20,
22 78:1,10,
21,22
**accurate** 61:9
67:12,13,19,
20,22 68:14,
16,25 70:16
71:3 73:3,16,
23 108:9
126:25 128:20
149:1 173:6,
25
**accusing** 7:4
**acquire** 90:5,
7
**acquiring**
90:3 91:1
**across** 14:17,
18,23 36:7
**Act** 162:21
**action** 74:13
**actions** 164:3
**active** 69:11
78:23
**activities**
66:9 106:3,7,
14 107:17
108:13

**activity**
106:19
**acts** 164:3,4
**actually**
11:17 17:25
52:11 75:5
88:19 95:6
118:22 137:9
148:24 149:20
150:20 155:9
**address** 29:12
30:1,9 78:3
81:25 83:6,8,
18,20 84:8
119:19
129:17,18,22,
23 130:8,11,
12 131:6
134:14,18
148:25 150:3
**addressed**
70:8 131:4
**addresses**
79:8,13,17,25
80:9,23,25
81:7,12,14,18
82:9,23
**admitted**
11:13
**adopt** 8:21
**adopted** 7:22,
24 8:1,4,6,7
**adults** 9:13,
14,16,18
**advanced**
163:5
**advice** 42:25
43:1,17,18
69:22 93:2
145:25
**advising**
142:18
**affairs**
133:19,21
137:7 148:16,
22
**affecting**
7:11

Bravianamar

affirmed 4:22
afford 63:12, 15
after 14:25 16:10 23:14 38:18 39:9 48:5 52:1,18 61:23 62:16 67:16 68:11 70:25 72:13, 18 78:24 81:12,18,25 82:1,8 83:22 90:10 93:9 94:14 129:11 139:3,25 172:21
afterwards 94:23
again 16:23 22:6 27:19 48:22 49:25 57:25 77:17 80:12 96:14, 21 104:17 106:6 124:10 126:15,23 127:14 131:6 137:13 140:16 142:9 147:15 156:23 157:13 158:12 159:5, 19 160:11 162:22 164:11 168:12,21 169:10
against 39:3, 5,23 40:8,11 42:18 43:8 93:1 104:15 113:15 114:15 147:15 153:7 155:21 157:3 158:15,25 163:8 169:16
agency 74:5, 7,18
ago 39:25 48:8 67:15,23

171:20
agree 91:11 123:5
agreement 87:20 105:7, 11 126:2
ahead 11:24 13:8 15:21 17:25 31:18 64:22 82:18 116:15 124:4 138:14 145:1
alive 66:3,6 141:11 165:1, 7
all 4:11 19:22 24:18 25:17 27:12 28:22,24 30:24 31:11 34:11 54:7 55:3 73:18 76:20 77:13 81:11 82:9 105:18 107:24 110:24 111:6 117:7 124:20 126:16 127:22 130:1 132:22 133:1,18 136:15 139:15 141:3 143:5 148:21 155:12,15 156:6,11,16 158:13 169:3, 4 174:4,18
allegation 40:14 41:1,7 42:16,18 43:6,25 44:6 96:17 97:22 107:8,9,15 110:11 112:9, 16 113:2,6,9, 14,21 114:7, 8,13,15,24 115:5,7,12 117:16,20

118:12 126:5, 12 127:8 148:6 149:1 163:20
allegations 128:2
allege 40:16 61:1 88:23 90:2,25 91:23 92:25 93:19 94:8 97:20,22 103:18 106:2 113:18 155:2 161:4 164:2, 22,25 165:9
alleged 14:8 17:3 38:15 56:13 108:1 163:18
alleging 39:11 77:18 78:6 89:17 110:10 112:19 163:24
allow 87:15
allowed 85:3 86:7
almost 52:1
already 24:20 42:12 72:14 98:7 154:1 159:10
also 8:17 19:4 24:18 26:22 28:7 32:13 37:23 47:9 56:21 73:12 81:5 93:5 111:11 112:23 122:22 151:11 168:16
am 7:7,17 16:6 68:7 85:15 86:23
amended 38:18 39:11 40:7,10 41:20 43:25 75:2 88:12

amount 10:12 85:4 87:3,13, 18 88:25 153:19 157:6
amounts 157:14
analyst 109:13
and 4:4,5,22 5:11 6:7,11, 19 7:5 9:15 10:4,15,22 11:9,14,17,21 12:7,10,12 13:8,18 14:3, 13,25 15:3,8 16:1,2 18:4 19:20,22 20:19 22:6,17 24:3,18,21 25:2 26:4 27:10 28:1 29:20 32:13, 18 33:6,7 34:7 35:1 36:13 37:12 38:1,9,12 39:4,5,10,12, 18 40:8,10, 11,16 41:2,13 42:11,18,19 43:6,7,8,12, 14 44:8,19 45:19 46:25 47:22 49:12, 13,15,18,20, 25 50:11 52:1,14 53:7 54:4,23 55:8, 23 56:1 57:4 60:24 61:6,7, 15 63:17 64:25 67:18 68:5,8,21 69:22 70:13, 15 71:1,2 72:12 73:2, 10,11 77:25 78:9,25

79:16,19,22
81:5 82:4,11,
17,24 83:3,7,
12,21,24
84:2,11 85:6,
8,11,21 86:5,
21 87:12,16,
24 88:5
90:19,20
93:2,5,20
94:3,5,15
95:3 96:10,
11,12,18,19,
21 97:10,11,
12 99:9,10,
15,21 100:3,
11 101:1,8,14
102:1 103:20
104:4,9,13,18
106:8,14,19
107:16,17,21
108:13 110:5,
17 111:2
112:1,23
113:16 114:5,
13,20 115:4,
8,10 116:15
117:4 118:7,
19 119:4,10
120:4,5,6,12,
22 121:2,8,
15,20,21,23
122:18,21,23
123:8,9,14,22
124:24,25
126:2,20
127:14,21
129:12,13
130:1 131:17,
22 132:8,14,
17 133:5,18,
19,21 134:11,
24,25 135:6,
13,16,19
136:3,6
137:2,12,17,
21,23 138:1
139:4,13
141:21,23

142:3,5,12,25
144:7 147:15
148:16,21,25
149:8 150:20,
24 151:9
152:19 155:4,
5,7,20,21
156:2,3,12,16
157:4,7,15,
20,24 158:5
159:7 160:12
161:5,6,11,
12,14,23
162:8,22,23
163:25 164:4,
8,15 165:9,
12,13 166:1,
8,11,12,24
167:6,20
168:19 169:4,
7,8,15,16,17,
18 170:11,17,
24 171:13
172:2,5,7,11
173:21 174:14
and/or  155:5
165:12
Anderson
58:23
Andrew  59:25
Andy  66:24
67:8,17
170:11,12
Andys  170:13
another  84:2
170:12
another's
115:20
answer  6:16,
17,20,21,23
7:6 11:23
13:13 15:20
18:16,17
20:2,3,5
21:18,25
22:21 27:13,
17 28:16 29:7
31:16,18
42:25 43:2,3,

16,19 44:9
45:4 46:6,7
47:24 50:5,25
51:2,4,5,11
53:16 58:4
64:13,15,17,
20 78:6,18
79:19 82:17,
18 84:20
85:1,6,9
86:6,8,22,24
87:15,18
113:17,20
114:4,9,11,
17,19,21
115:7 116:15
121:18 128:3
144:20 145:1,
17,23 146:25
147:2 157:16
159:12,14,18
160:15,19,22
164:14
167:16,17
169:9,12
172:17
answered
27:11 155:25
159:10 167:20
169:7
answering
18:4,5 160:24
answers  68:20
any  5:21
6:18,23 7:1
11:11 12:10
13:25 16:20
25:14 32:7
34:15 35:20,
21 36:23,24
42:2 45:22,25
46:12 48:14
53:4 55:16,20
56:1,8 57:2
65:4,9 66:9,
12 67:11 72:2
74:7,22,25
75:3,25 78:20
79:7,20 82:10

84:16 89:23
96:21 98:11
101:14,15
102:17 103:2
104:11,13
108:22 109:1
112:8,12,24
113:10,18
116:12,16
117:3,19
118:12 121:2
122:10,14
125:13,15
133:5 136:17
137:6 138:15,
17,20,23
143:6 144:7,8
145:11 146:5,
21 147:7
152:16 153:3,
23 154:7
156:14,17,18
158:9 164:25
165:6 167:12,
18,25 168:15
169:13,19
170:5,7 173:3
anybody  97:8
anyone  20:24
93:15 151:18
anything  6:14
8:6 17:19
18:11 19:5
22:3,4 25:5
30:5 36:2
42:24 45:13
46:5 53:19,21
54:1 56:6
62:17 98:3
103:8 111:18
121:15 123:24
124:12,15
135:20 140:10
142:14 146:3
152:1 153:19
158:7 165:7
169:15
apart  9:17

appear  51:14
131:14 145:13
appearances
4:12
appeared
44:17 94:15
appears  40:12
applied  65:19
apply  66:13,
16
applying  66:5
appreciate
6:10
approaching
51:13,17
approval
11:16
April  5:5
27:6 37:20
47:9,17,19
48:15 49:24
50:12,17
51:24 65:13,
15,19 66:3
155:2 164:23
are  4:10 6:23
7:13 9:20
11:16 16:4
29:9 30:25
31:12 33:10
34:10,11
36:12 44:24
46:18 47:10
48:24 49:1,5
55:2,20 56:13
61:1 65:13
68:20 71:10,
12,18,19,24
73:18 74:22
76:6,7,20
78:6 80:24
81:17 83:19,
22 84:8
86:20,22 90:2
98:22 99:3,13
100:19 104:24
107:2,11,13
110:24 112:2,

18,19,21,22
113:3,25
117:9,13,23,
24 120:10
122:9,14,22
126:6,13
127:10,19
128:6,8,9
136:11 142:17
146:21 147:7,
15 151:12
156:14 157:6
158:19 160:7,
12 161:6,10
165:24 166:17
167:8 168:18,
19 169:5,25
170:5,15,23
171:6 173:23
174:8
aren't  78:23
122:16 174:17
argued  125:1
around  9:19
51:22 71:9
94:3
article
52:17,23 53:1
54:19
articles
119:3 120:16
130:12
as  4:22 6:4,9
7:3 9:10,11,
13,14,16,18
10:16 11:10,
22 12:21 21:7
24:17,18
35:4,14 38:16
39:11 40:9
46:1,16 49:19
51:13,17
54:21 57:17
62:7 63:24
66:24 69:7
71:18,19,21
73:1 76:5
79:22 81:7
87:10,13,21

88:10 106:17
110:23 115:8
119:4,18
121:12,21
126:8 129:6
131:20
132:20,25
133:2,16
134:7 135:12
136:16,24
137:10 140:11
142:5 143:13
148:18
149:14,21
150:23 152:19
161:10 175:1
ASAP  175:1
aside  53:25
56:6 124:16
ask  6:11 7:16
14:24 16:15,
17,20 22:25
24:7 41:12
48:11 85:3
86:16 90:1
97:3,5,7
101:5 114:20
122:12 132:6,
11,21 133:23
135:6,16,18
137:14,23
138:13,16,20,
23 143:6
147:2 156:22
160:25 164:7
171:13
asked  12:5,6
13:12 15:6
18:4,9 27:11
38:21 49:17
68:11,17
86:14 136:1
151:4 156:22
160:23 167:20
169:7 171:5
asking  22:22
31:12 46:7
62:7,20 68:6,
7 79:12 81:21

83:16 85:24
86:15 103:2,7
108:8 113:23
114:13 115:3
118:2 119:24
120:15 121:11
127:2,3
129:12 136:18
145:18,20
151:8 160:5,
6,11 166:22
171:24
asks  11:20
assert  91:24
asserted
97:24,25
98:23 99:4
asserting
83:9 84:25
asset  171:7
assets  64:1
71:2 73:13
133:5,10,12
155:4,7,24
165:11
170:16,23
assisted
158:8,12
159:5,20,25
164:11
assisting
64:2
associated
76:20
association
73:13
assume  119:2
126:25
assumed
135:11,12
138:1
at  4:5,10
6:15,18 9:23
10:14 13:24
14:12,15
15:3,7,14
27:9 28:11
31:4 35:6

36:23 38:2,20
40:13 45:11,
18 46:3 47:22
55:3,14 57:24
58:2,9,12,15,
18,21,24
59:2,17,20,23
60:1,4,7,10,
13,16,19 61:8
67:5 73:3,9
74:1 75:14
79:11,21
80:2,19 81:2
87:21 94:18
97:8,22 99:11
104:17 107:5
112:8,25
113:11,19
120:2 123:24
125:24 126:1,
16 128:24
129:1 130:22,
23 132:7,9
133:6 136:4
141:4 143:4
145:15 150:16
152:19 153:15
156:12 157:8,
9,13,17
158:10,22
161:8 165:20
170:19
**ATO**   83:4
168:20 170:1,
2
**attach**   20:19
44:18
**attached**
34:16 35:16
36:23 119:17
125:8 126:9
**attachment**
119:2,3
**attorney**   31:3
39:16 62:16,
18 64:2 75:14
133:8 135:21
142:12,15
159:25

**attorney's**
61:7
**attorneys**
51:2,4 58:5
88:14 158:8,
12 159:5,14,
20 160:1,12
164:11
**Australian**
104:14 148:9
157:2 169:15
**authored**
31:12 32:5,6
**authorization**
144:16
**authorized**
69:13 75:11,
14
**automatic**
134:17
**autopsy**   152:8
**aware**   11:11
19:10 35:4
44:24 45:6
55:2 65:13
66:8 71:19
75:5 79:21
92:21,23 97:1
110:24 118:16
142:17,21
145:16 146:8
148:18 149:14
165:24
**away**   8:16,17
9:25 10:2,9,
10 15:2 24:1,
5,21,24,25
25:7 28:1
30:10,20 37:6
61:23,25
62:2,5,10,11,
14,16,22,25
63:6 113:16

---

### B

**back**   5:5
6:20,21 11:9

16:2 20:19
29:2,4,5
31:13 32:24
34:21 43:11
49:13 57:9
66:23 73:23
78:5 80:22
85:22 96:14,
15 103:16
111:22 118:18
119:20 121:21
132:8 139:3
140:16 141:21
142:10
143:12,15,24
156:12 159:16
167:10 168:12
**bank**   13:25
65:10 86:16
**banking**   157:3
169:17,20
**banks**   65:3,6
**based**   10:6
89:8 94:10
96:18 100:5
110:19,20
117:8 126:7
127:12 128:1
136:24
161:11,21
162:3,6,14,23
163:12 166:12
168:16 170:14
**basically**
33:21 91:8
**basis**   11:10
43:24 44:5,7,
8 48:21 85:1
86:5 87:17
89:16 93:21
94:8 96:12,
14,17 97:19
98:21 112:9,
16 113:1,14,
17,21,25
114:6,14,24
115:5,11
**bath**   25:4

**bathroom**
23:22
**Beach**   9:24
152:18
**bear**   7:16
**because**   16:23
19:20 26:14
28:18 36:22
37:2 42:10
48:18,23
55:23 61:16
63:12 64:21
75:6,19 78:6
81:5 83:18,25
87:23,24
95:9,20 99:25
110:12 115:13
116:7 121:19,
20 123:3,16
125:4 134:2
136:1,5
137:14,15,22
141:19 142:9
143:5 144:22
146:12 149:2
**become**   16:8
**becoming**
42:12
**bed**   25:4
**bedroom**   27:25
28:8 33:13,
15,21
**been**   4:21 6:4
34:5,16 37:2
38:20 45:15
48:17 57:4
63:2 64:25
66:17 67:22
73:13 88:4
89:16 99:24
104:1 110:8
117:14
125:18,19
136:19
141:13,17
149:8 157:21
164:25
168:21,24
169:1,4

173:24

**before** 4:3
6:7,9 7:15
9:21 11:22
13:12 22:18
23:7,9,10
32:21 45:21
46:11 47:9
57:18 61:6,
19,24 62:2,4,
9,11,13,21,25
63:6 67:18
68:9 80:20
87:10 94:21
110:8 118:22
120:15,16
121:25 132:12
137:2 144:18
145:2 149:20
151:4 152:15
153:1 154:1
155:10 156:22
164:22 174:18

**beginning**
80:17 99:10
115:14

**behalf** 66:10,
13 69:13
70:1,12 72:18
73:21 75:12
88:15 146:7

**being** 33:10
46:1,16 93:14
96:16 109:12
119:25 135:9
138:1 146:12,
23 148:18
170:24

**belief** 41:2
117:8 124:25
155:22

**believe** 7:14
10:15 15:11
17:8 19:1
25:1 31:4
38:5 39:20
48:4 52:10
55:18 57:19,
23 58:1,6

66:12 67:9
68:13,16
70:3,18 71:5,
16 72:1 73:6,
22 74:23
75:13,23
76:1,22
79:13,25
80:2,10,15,25
81:2,13,20
82:23 85:12
91:12 99:8,9,
14,15,19
104:11,24
106:22 107:2,
11 110:17
111:16 117:6,
9 118:5
119:16 120:14
123:1 125:2
133:4,7 139:4
141:1 142:12
151:23 155:17
157:7 158:1
166:7 167:6
168:2,19

**believed**
31:21 74:2

**belong** 79:13,
25 80:7,14,
20,25 82:5,11
92:5 157:7

**belonged**
80:11,12 83:8

**belonging**
36:24 161:6

**belongings**
34:1,12

**belongs** 81:22
82:2 83:21

**Below** 79:16

**benefit** 125:6
158:4,6

**best** 7:2
95:13 97:6

**better** 143:13

**between** 61:1
90:19 99:9

118:18 120:22
134:11 166:1,
11

**big** 10:3 21:7
33:18 61:5
140:9

**bigger** 15:9
21:8,9,15
22:4,12,15,18
23:3 24:8
46:1,16
138:25 139:7,
14,19 140:14
141:14,24
142:5,8 143:8
144:10 147:12
154:13

**bill** 61:16
63:15 110:2

**billion** 61:2

**billionaire**
156:8

**billions**
21:13,16
26:14 32:19
74:23 75:22,
23

**bills** 68:25
109:21,22

**biological**
8:11,12,18

**bit** 7:8 9:19
12:18 84:17
145:1,13

**Bitcoin** 14:9
15:10,12,17
16:12 17:4,19
18:10 19:5,24
20:10,18,19,
21 29:3,8
36:23 37:2,6
38:16,20,25
39:12 40:17
41:3,15 42:2,
5 56:21 67:11
68:24 72:15,
19 74:24
75:22,25 78:9

79:3 80:10,
13,15,17
83:19 84:11,
16,20,22 85:4
86:13,14
87:3,12,18
88:25 89:9,18
90:3,5,7,8,9,
11,17 91:1,9,
10,13,17,24
92:4,5 95:7,
15,24 96:3,
10,13,16
97:20,23,24
98:1,6 99:5,
10,13,15,21,
23 100:8,15,
20 101:1,8,
10,15 104:12,
13 107:16
108:13 110:5
111:25 112:25
113:3,5,11
115:1,11,24
116:10,18
117:4 122:24
123:23,25
124:2,9,12,
15,23 125:13,
23 138:12
141:18
151:13,17
155:7,11,23
156:3,7,11,
19,20,25
157:2,17
166:8,16,18,
23 167:4,7,
12,19 168:2,
4,7,10 169:13
170:17,18,23
171:1,3
172:5,11,22

**Bitcoins**
112:8,22
113:19 144:6,
8 155:3
156:16 157:6
165:10

blah  14:1
block  104:11
 156:25
 161:11,13,21
 162:3,6,12,
 14,22 163:12
 169:13
blocks  102:1
Bob  59:1
body  131:13
bond  13:25
books  31:12
 32:2,3,4,5
 34:6,7
born  8:2,4
borrowed
 151:9
both  10:22
 94:4,16
 103:20
 106:23,24
 115:17,22,25
 151:9 155:11
 156:2
bottom  78:23
 83:18
bought  150:24
Boulevard
 4:10 130:10
bouncer
 152:19
box  101:17,
 20,23 116:8
break  6:18,19
 23:22 25:23
 30:12 34:17
 35:3 108:19
 123:16 128:22
 143:18 165:19
breaks  88:3
Brendan  60:18
BRENNER
 160:23
brief  16:22
 25:25 30:16
 35:7 87:8
 97:18 128:25

143:21 165:21
 171:16
briefly  18:19
 19:2
bring  85:25
brother  7:19,
 21 13:16,17
 67:10 90:6
 99:10 123:7,
 15,17 126:8
 127:12 129:21
 132:13 139:6,
 18 141:11,23
 142:2 147:12
 150:10 168:11
brother's
 125:4 173:10
brought  153:7
Bryan  4:13
 20:4 41:22
 61:3 86:11
 144:22 159:24
 160:23
bunch  24:21,
 24,25 29:20
 30:4 36:12
 49:17 170:13
 174:13
burning
 153:14
business  16:1
 130:1 131:21
 132:18,23
 133:2,19,21
 135:17
 136:15,22
 138:23,25
 140:10
 148:16,21
 149:12,15,16
but  6:15 8:19
 10:20 11:10,
 15 13:12
 16:25 17:10,
 25 27:9 29:24
 32:17,22 33:3
 35:17 37:20,
 23 45:1,11,13

50:10 51:24
 53:25 55:14
 56:6 57:21
 61:7,24 63:6
 66:2 67:17
 73:2 75:14,20
 80:22 81:20
 87:22 88:24
 89:19 91:10
 98:13 102:22
 105:9 106:22,
 25 107:2,21,
 24 110:4
 111:16,18
 112:8,25
 113:10,18
 116:10 119:2
 123:22 124:7
 127:23 130:3
 132:13 135:9,
 12 137:25
 140:5 145:1,8
 146:11,20
 148:24 149:5
 151:8 152:6
 159:7 163:18
 170:20 171:5
button  44:19
by  4:24 6:6
 7:10 8:9,14
 9:6 11:2,6
 12:1 13:3,9
 15:24 16:7
 17:9 18:8,14
 19:8 20:7,13
 21:5,24 22:24
 23:24 24:6,
 13,21 26:2
 27:4 28:15
 30:18 31:22
 32:12 33:2,9,
 14,20 35:2,9
 36:1,9,18
 37:1 38:22
 39:17 40:6,21
 41:11,19
 42:15 43:5,23
 44:4,13 45:9
 46:10 48:13

49:4,9 50:4,
 20 51:7,16
 52:6 53:20
 55:13 56:18,
 24 57:16 58:8
 61:4 62:19
 63:10,21 65:5
 66:11,21
 69:6,17 70:4,
 19 71:6,17
 73:7,20 74:3,
 15,21 75:16
 76:4 78:14,17
 80:6 81:4,10,
 19,24 82:6,22
 83:15 84:1,3,
 4,7 88:9
 90:16 91:7,22
 92:3,11 94:1
 96:7 98:19
 99:2,12
 100:18,24
 101:4,13
 102:7,11,16,
 21 103:1,17
 104:16 105:1,
 13 106:1
 114:23 115:24
 116:17 117:2
 119:8 122:7
 124:5 129:4
 130:6 134:10,
 20 142:7,16
 143:23 144:4
 145:3,14
 146:4 147:6
 148:3,25
 149:24 155:5
 161:1,19
 162:1,10,19
 163:17 164:13
 165:12,23
 166:9,12
 167:23 169:11
 171:19
 172:12,19,21
 173:1,9,14
 174:3,4,7,12

Ira Kleiman

## C

cable  63:17
Caleb  19:14,
  19,23,24
  20:9,11
call  69:22
called  83:21
  121:19
calls  21:21
  56:14 71:14
  81:15 82:3,16
  83:11,23
  91:25 92:6
  96:4 98:16
  99:6 102:3
  104:21 105:3
  123:10 154:7
  156:17
  161:16,22
  162:7,16
  163:14 165:16
  166:5 169:8
came  36:7
  82:1 139:3
  143:15
can  6:12,21
  11:21,23
  12:22 13:10
  15:19 18:1,7
  20:2,5 27:6
  30:12 31:16
  32:24 35:19
  37:6 40:13
  41:17 42:8,25
  43:16 44:9,
  10,14 45:1
  47:8,19 48:21
  49:13 50:25
  51:2,6 54:21
  56:25 57:20,
  21,25 60:21
  62:20 64:14,
  15 67:5 70:20
  72:16,21
  76:6,17 79:11
  84:25 85:23,

25 86:17
87:1,20 88:1,
19 89:21 90:1
91:5,8,10
92:12,24
93:12,17
94:25 96:8
99:1 100:7
101:23
103:10,20
104:18 106:17
110:2,14
111:22 114:19
115:19 116:3,
13 117:1,19
118:17 119:18
121:11 123:11
124:10 125:15
129:13 130:7,
22 134:24
136:4 140:22
142:1 143:24
145:1 147:4,
21 149:18,25
151:14 155:6
159:3 160:9
161:2,24
162:20 163:7,
22 164:20
165:13 170:15
172:17
can't  6:13
  25:3 51:4,24
  53:8 64:7
  68:22 78:10,
  15,19 101:22,
  23 111:18
  114:16 125:22
  126:17 127:16
  160:16
cannot  7:1
capacity
  103:20 136:14
car  15:2
card  16:1
care  127:24
  137:23
Carr  59:5,6

carry  55:2
Carter  37:13
  38:1,9,12
  39:4,5,10,12,
  18 40:8,11
  42:19 43:9,12
  58:11 61:15
  129:25
  130:19,21
  132:14,17,21
  135:6,13
  138:15
  148:20,25
case  4:11
  31:5,6 32:14,
  18 52:2 63:3
  103:22 104:2
  131:10 140:5
  153:18 155:23
  165:24 170:8
  174:9
cause  4:6
CC'D  75:17
  145:6
cell  61:15
  110:2
center  164:24
certain  49:15
  88:23 112:1
  134:20 164:16
certainly
  64:17 85:2
  108:17
certificates
  31:11,23 34:7
chain  104:11
  142:21 156:25
  161:11,13,21
  162:3,6,12,
  14,22 163:12
  169:13
chance  11:21
change  158:9
changed  27:22
  68:21
charged
  109:25

check  27:11
  35:19 131:21
  133:9,18
  134:23 135:23
  137:1,3,12
checked  93:10
checking
  70:25 133:1
child  97:4
chose  8:21
circumstances
  8:20 73:14
civil  155:21
claim  82:14
  91:24 123:17
  140:13 164:24
  172:10
claiming
  81:22 82:2
  83:22 84:8
claims  91:23,
  24 122:17,23
  125:9
clarified
  27:18
clarify  51:18
  64:21 83:2
  135:25 164:24
  171:6
clause  158:14
  163:8
clean  167:15
cleaned
  150:20,23
clear  6:8 7:3
  29:2 64:11,23
  75:19 78:18
  85:21 117:3
  128:12,16
  159:24
cleared  11:17
clearer  7:8
clearly
  160:13
click  44:19
client  7:4
  121:19

155:21,22
156:24 159:8
**Clocktime2020@**
**g-mail.com**
150:2
**close** 9:3,5
13:16 17:16
20:24 51:22
55:3 91:5
104:17 138:17
171:13
**Closer** 67:25
**closest** 20:23
142:18,22
**club** 152:20,
21,23
**co-authored**
32:6
**co-owner**
13:24
**co-owners**
115:9
**coaching**
42:11 64:7,9
159:22
160:19,20
**Cobser** 58:17
**Cocaine**
152:11
**code** 29:17
**collaboration**
96:9
**come** 85:22
111:22 140:4,
16 142:10
143:12 166:24
**comes** 12:7
121:21 123:5,
6 124:17,21
167:13,21
**comfortable**
12:10
**coming** 32:18
**communicate**
13:19
**communicated**
8:18

**communication**
144:14 145:7,
22
**communications**
66:14 133:8
142:12 144:23
145:19 156:18
**companies**
34:22 35:12,
18 54:12
**company** 34:21
38:11 120:13
126:22 127:4,
5 136:17
149:17
**complaint**
14:8 38:18
39:11 40:7,10
41:20 43:25
44:1,6 88:12
89:7 107:7
108:1,2,9
113:6,15
117:7 125:8
126:10 147:23
**complex** 160:5
**computer**
12:19 38:11
40:18 41:4,
13,23 42:3
44:21,25 45:6
53:4 54:16
56:17 88:4
89:1,4,17,21,
22,24 108:15
109:7,12,13,
15 132:10
133:6,12,21,
24 134:1
135:4,7
136:16,18,20,
23,25 148:19
149:14,16,17
152:15,17,18
173:3,11
**computers**
54:4,5,7
95:20

**concern** 32:17
**concerned**
32:16 36:19
46:5 47:23
49:14 78:2
**concerning**
60:25
**concluded**
175:3
**conclusion**
53:6 71:15
82:4 83:12,24
92:1,7 99:7
104:22
161:17,23
162:8,17
163:15 165:17
166:6 169:8
**conclusions**
160:6
**conditions**
12:12
**conducted**
107:16 133:6
**conducting**
108:13
**conferred**
158:4
**confidential**
87:14 90:13
91:3,6 116:14
117:1
**conflicts**
48:15 50:17
**confused**
48:20 62:15
112:17
**confusing**
53:2 127:22
**confusion**
48:21
**connected**
133:20
**connection**
82:10
**Conrad** 37:13
38:1,9,13
39:4,5,10,12,

19 40:9,11
41:13,23
42:2,19 43:9,
12 58:11
61:15 132:14,
17,22 135:7,
13 138:15
148:20 149:1
**Conrad's**
129:25
130:19,21
**consider**
137:16
**considered**
19:16
**contact** 77:2,
21 121:24
131:1 143:5
**contacted**
16:10,13 29:6
46:4 52:19,22
90:10 94:14
95:9,11,12
96:19 140:17
142:10
**contacts**
168:10
**contain** 55:16
**contained**
28:23
**Contego**
129:19
**continue**
42:10 47:23
48:1,2,3
**continued**
48:5
**continuing**
54:24
**continuously**
108:3
**contract**
83:13 162:25
163:4,6
**contracts**
83:4 161:12
162:23

contradictory
126:4
control  98:2,
 4 100:1 132:2
 149:5 156:6,
 11,15,19
controlling
 155:12
controls
 99:14 100:3
 155:12,15
 156:3,5
Controversy
 52:16
conversation
 15:4,5 16:22
 97:18 123:8,
 17,22 124:7,
 11 138:9
conversations
 5:21 31:17
 156:15
conversion
 155:1,20
converted
 155:3,7,23
converting
 41:14 42:5
copy  12:22
corner
 130:14,23
 131:1
corporate
 5:17,19,22
 6:4
correct  5:12
 8:5 21:1
 26:23 74:8
 76:9 124:13
 130:2 140:20
 146:6,22
 147:16 166:2
 174:19
corrects
 147:8
corroborate
 123:11

costs  61:7
couch  25:16
 28:25
could  7:4
 20:19 21:15,
 20 22:1,3
 24:19,22 33:1
 34:20 36:25
 37:2 52:14
 53:24 56:17,
 21 57:4 61:16
 67:22 82:9
 83:6,20 88:17
 95:21 96:22
 97:16 98:14
 100:15 102:8,
 12,17,22
 103:7,8
 105:16 108:16
 109:19 110:8
 126:1 133:24
 136:19 157:9
 170:20,21
couldn't  37:5
 45:13 56:11
 63:6,12,15
 109:18,21
counsel  4:11
 6:14,15,16
 12:22 31:17
 42:19,25
 43:2,7,8,17,
 19 145:19,22
counsel's
 125:1
count  155:1,6
 158:3,6,7,10
 161:2 162:21
 163:13
couple  8:18
 16:3 39:25
 65:3 78:21
 95:5 110:1
court  6:12
 41:12 77:7,21
 85:19 86:1,20
 88:6 120:21
 121:14,22
 130:16,25

131:2,14,17
 148:9 153:17
 157:2 165:25
 169:15 170:14
Courtney
 59:4,12
crafted  39:10
Craig  4:13,15
 10:20 16:10,
 13 17:5 24:14
 29:6 46:3
 52:12,18,22
 54:3 81:6
 82:11,20,24
 83:9,14 84:1
 89:8,10 90:10
 92:4 94:3,14
 95:1,2,9,11,
 12,13,22,23
 96:1,9,12,19
 97:23,24,25
 98:20,23
 99:4,9,14,15,
 23 100:8,11
 101:8,25
 103:19 104:9
 107:16 112:1,
 3,23 113:15
 114:15
 115:10,16
 117:4 118:18
 120:3,4,6,12,
 22 121:2,8
 122:3,23
 123:5,12,14
 124:18,21,24
 129:12 131:11
 138:4,7,8,11,
 16,17 139:4,
 15,23 140:16
 141:17,19
 142:10,25
 143:15
 155:12,15
 156:3,5,6,15,
 19 157:23,25
 158:1 161:4
 163:24 164:15
 166:1,11,12,

15,21,23
 167:1,3,11,
 12,19 168:4,
 7,14,18
 169:5,23
 170:1,2 172:2
 173:17
Craig's  126:3
 164:8
Craigwright@
informationdef
ense.com
 119:10
create  15:7
created  40:16
 41:2 81:12,18
 82:24 96:16
 99:15 103:19
 104:9,12
 106:23 107:12
 110:8 119:14
 155:11 157:1
 169:14 172:7,
 11,15,20
 174:18
creating  15:9
 16:15,18,21
 17:19 18:11
 94:11 96:15,
 23 125:5
 168:1,5,8
credit  63:22
 65:20 66:5
criminal
 74:12 165:10,
 14
CROSS  171:18
Crypt  55:18
 56:2,3,9 57:3
cryptocurrency
 16:4,9 20:10
currency
 97:17 124:13
currently
 49:7,10 69:10
 85:5 110:18
cut  63:12,17

cyber  19:20
 93:20 94:5

---

D

dad  14:13
 15:1 95:18,
 19,21 97:10,
 12 151:9
damages  60:25
 61:1,6,8
 158:6,16
 159:2
data  45:22,25
 46:13 52:15
 53:3,7,8,14,
 22 54:24
date  66:2
 67:3 80:17
 93:9 107:22
 112:9,25
 113:11,19
 119:11 131:8,
 17 132:8,13
 134:20
dated  70:6
 72:18 76:15
dates  29:10
daughter
 14:14 15:1
 97:11
Dave  7:17,18,
 21,22 8:21
 9:1,3,7,17
 10:23 13:13,
 23 14:15,20,
 23 17:16,18
 18:2,10,19,25
 19:4,16,20,
 22,23 20:8,
 21,25 21:6
 23:10,13 26:4
 33:4 36:22
 40:16 44:24
 46:1,15 48:16
 52:7 53:15
 55:2,5,8,20
 56:5,12 57:2,

6 59:14 61:11
 62:8,13,21
 63:25 64:1
 65:14 67:25
 68:8 71:8
 72:18 74:23
 75:21 76:21
 77:21,25 78:7
 79:2,3,8,13
 80:1,7,19
 81:13,18,25
 82:2,10,20
 83:8,22 84:1
 92:19 93:1,
 10,13,19,21
 94:3,8,17
 95:7,14,23
 96:10,12,22
 97:4,14,16
 98:8 99:9,15
 101:6,8,9,15
 102:1,18
 103:18 104:9
 107:16,18
 108:12,22
 109:12
 110:15,17,23
 111:11,17
 112:1,23
 115:10,16
 117:4 118:19
 119:9,17,24
 120:2,15
 121:8,23
 122:23 129:11
 130:1 131:21
 132:18,21,22
 133:4,17
 134:18 136:9,
 13 137:5
 138:10,20,24
 139:7 140:3,
 12,19,25
 141:4,8,17,21
 142:6,7,19
 143:7,16
 144:9 148:12,
 15 149:8,11,
 12 150:12

151:4,6
 152:1,15,25
 153:3,14,21
 154:1 155:12
 161:6 164:25
 165:3,7
 166:1,11
 167:6 168:4,8
 172:2
Dave's  8:6,23
 16:14 19:3
 24:21,24
 33:17,25 34:1
 35:20 36:12
 38:20,24
 39:12 44:21
 48:6,7 49:3
 50:21,22,24
 51:9,15 59:13
 61:15,21
 63:22 72:14
 73:1 82:1
 95:13 96:2,9,
 14 98:9
 102:2,5
 135:17 136:4
 138:15,17,23
 142:18,22,23
 143:14 149:6
 156:4,16,19
 166:13 168:1
 173:19
Dave'
 sdigitalforens
 ics@g-mail.
 com.  77:11
Dave@
 davekleiman.
 com.  78:3
David  11:4,7
 14:5,9 41:2
 42:3 59:22
 68:23 70:14,
 25 73:10
 131:22 133:1
 137:7 140:13
 144:8
David's
 168:13

DAX561@YAHOO.
 COM  134:14
day  4:9 9:7,
 8,16 11:15
 25:10 65:14
 66:17 108:5
 118:21,22
 120:16 129:11
 139:25 140:22
 149:4 155:2
 164:23
days  25:11
 65:17 95:5
De  4:10
deadline  35:5
deal  10:4
 54:6
dealings
 136:23
dealt  131:14
death  13:24
 16:14 82:1
 93:2 96:9
 141:3 142:23
Debra  58:17
debt  70:25
 150:17,21,23
debts  67:12
 73:10 150:18
December  67:4
deem  86:8
deep  70:25
defendant
 32:19 155:3,
 6,23 158:4,5,
 15 159:1
 163:9 164:2
 165:7,9,13
defendant's
 13:1 24:11
 27:2 40:4
 52:4 57:14
 66:19 69:4
 76:2 88:7
 119:6 129:2
 130:4 134:4
 149:22

**Defense**
 120:10,19
 121:2,9,16
 131:5,11
 148:13 162:21
**define**  9:5
 33:24 137:14
**definitely**
 103:3 152:14
**delete**  54:24
**deleted**  53:24
**deleting**  46:5
**Dell**  45:8
**demand**  158:25
 163:8
**denying**
 137:24,25
**Department**
 70:5 111:3,6
**depo**  10:1
 25:21 26:25
 32:25 39:19
 42:11 85:22
 143:19
**depos**  63:2
**deposed**  6:7
 7:15 26:22
 40:1 104:6
**deposing**  5:2
**deposit**
 101:17 116:7
**deposition**
 4:3 5:14 6:8
 27:5 37:16
 47:8 50:12
 51:19,24
 61:18 64:24
 86:2 87:19,23
 114:10,16
 116:14 118:3
 128:17 146:15
 173:2 175:3
**depositions**
 5:9,12 169:3
**describe**
 15:19 89:21
**described**

 161:10,15
**Design**  54:11
**designate**
 87:14 90:12
**designated**
 73:1
**designer**  54:9
**desk**  25:19
 28:2
**desks**  25:17
**detail**  107:2
**details**
 104:24 106:21
 107:1,24
 157:4 169:18
**determined**
 31:8,13 94:12
**developing**
 108:13 110:5
 168:15
**development**
 106:4,8,14,19
 107:18
**devices**  48:6,
 7,16,23,24
 49:1,3 50:7,
 21,22,24 51:9
**did**  5:19,20
 9:7,10,17
 10:10,16,17
 11:1 12:2,17
 14:6 15:10,
 12,17 16:8,
 14,17,20
 17:22 18:19,
 21 19:18
 23:4,7,10
 24:7 25:7,10
 27:11,19
 29:10,13
 30:23 31:2,5,
 25 32:2,9
 34:18 35:11,
 20 36:4 38:8,
 23 43:11,14
 44:7 45:11,
 17,21,25
 46:11,22,25

 47:3,23,24,25
 48:1,2,3,6,19
 49:24,25
 50:1,10,13,
 15,21,22,24
 51:8 52:17
 53:1 54:1
 56:8 59:8
 61:18,21
 62:1,3,6,8
 63:5,11 64:25
 65:6 66:9
 67:8 68:4,7
 71:7 73:2
 75:4,7,20
 77:1,2,4,7,
 11,13,16,20
 89:7,9,10
 90:5,6,7,9,11
 92:19,22
 93:2,6,10,13
 97:8,12,13
 102:24 105:9
 111:15,16
 116:2 117:6
 121:24 122:1
 123:23 124:8
 126:20 127:4,
 9 131:21
 132:3,6,10,21
 135:6,16,18,
 22 137:2
 138:7,8,13,
 16,20,23
 139:18,25
 140:21,24
 141:7,10,24
 142:6 143:6
 144:18 145:4,
 15,20,21
 146:5,9,11
 147:11 152:1,
 4,6,8 153:10,
 14,21,23
 154:4,7,9,12,
 16,19 156:5,
 18 164:16
 165:3 173:10,
 15,17

**didn't**  5:15,
 16 9:15 12:4,
 11,13,14
 13:15,16,18
 15:14 17:11
 20:18 22:25
 23:3 24:25
 25:14 29:3,8,
 12,14,15,17
 32:7 34:6
 35:13 46:6
 51:14 56:25
 61:11 62:11
 63:14,16,20
 65:21 67:16
 68:4 72:10
 77:23 105:7
 109:22 113:22
 115:24 123:22
 124:5,8,11
 131:23,24
 133:5 136:5,
 17 137:3,12,
 13,14,19,23
 139:22 140:2,
 12,16,23
 142:9 143:12
 144:9,13
 151:7,11,16,
 18 152:7
 159:12,13,15
 160:14 173:3,
 8
**died**  22:18
 23:7,10,14
 65:14,17
 66:2,17
 67:11,16,18,
 25 68:9,11
 81:13,18,25
 83:22 137:2
 141:21 142:2,
 19 151:4
 152:10 154:1
**dies**  141:7
**different**
 28:16,19,22
 48:16,23
 68:21 75:7

76:12 140:3
158:7,9
**digital** 15:11
16:15 17:19
18:11 19:5,24
20:9,15,16
21:1 22:9
93:20 94:5
96:23 97:17
124:7,13
144:11 147:13
154:20 163:6
**dining** 15:3
**dinner** 14:10,
12,16,25
94:19 97:8
141:3,5 168:3
**direct** 4:23
145:18,22
**discard** 24:4
**disclaims**
121:2
**disclosed**
87:12
**disclosing**
22:19
**discovery**
79:16,22
80:24 86:21
103:24 104:4,
17 106:5,6,
16,17 113:16
117:8 169:1
**discuss**
12:11,13,14,
17 14:6 62:17
109:22 142:14
**discussing**
12:9
**discussion**
103:15 168:3
**discussions**
19:22 58:5
64:4
**dishes** 15:1
**disk** 28:5
35:15

**dispute**
153:10,12
**district**
88:24 89:2,5,
18 173:4
**divorce**
120:21 121:6
**do** 5:17,21
6:10 8:6,15,
20 10:13
13:8,14 14:5
15:22 17:3,6,
18 18:2,9
19:1,3,11,17
20:8,14 21:23
24:15 26:7,
10,13 32:24
37:25 41:20
42:8,10,25
44:22 45:10,
13 52:21
54:25 55:16
57:23 58:1,6,
11,14,17,20,
23 59:1,4,16,
19,22,25
60:3,6,9,12,
15,18 62:8,24
64:4,14,19,20
65:9,13,19,24
66:12,16 68:5
76:17 77:11
79:5,25 80:2
81:3 82:19
84:16,19,22
85:2,20,25
88:11 91:11,
23,24 98:9,11
99:20 101:14
102:1 103:2
105:19,22
108:22 109:1,
15,18 110:1
111:2,7,16
113:1 114:7,
10 115:15,22
116:11 118:3,
12 119:11,18,
19,20,22

120:21 121:1,
15 122:10
123:5 125:12
126:5 128:2
129:6,18,22
130:19 131:14
134:24 137:9
146:3,10
149:20 152:15
153:3,6,19
155:15 156:5,
14 158:1
162:25 163:10
165:6 166:10,
15 167:12,18,
24 168:14
169:9,19
170:10
171:21,24
173:4 174:4,
15
**Doc** 34:22
35:12,15
**doctor's**
11:15
**document**
13:4,7 29:20,
22 30:21
34:14 36:15
39:9,14 41:17
57:18 76:9
88:11 89:11,
14,15 111:11,
13,19 117:16,
17,18 119:2
121:5 122:2,
16 125:12,15,
22 126:7,9,
10,17 127:16
128:18 129:6,
8,15
**documentation**
109:4 169:22
**documents**
25:15 30:23,
25 31:2,6,7,
20 32:21,22
33:10 34:11,
13,18 35:11,

12,17 68:5,6
82:24 104:2,
25 107:2,4,
11,13 110:20,
21 117:9,13,
14,19,23
118:1,5,7,10,
11 120:20
122:3,16,19,
21,22 124:20
125:2,5,7,8,
10,14,17
126:16
127:15,17,18,
23,24,25
128:1,6,9,14,
20 153:17
155:17,18
156:13
157:13,17,19,
20,21,24
166:17,19,24
167:6,8,14,
22,24 168:16,
18 169:4
170:24
173:19,23
174:4,14,17
**does** 43:16
44:20 87:13
92:5 130:17,
24 137:17
156:4 163:12
168:6 171:5
**doesn't** 14:2
30:5 53:17
85:19 99:25
100:1 114:19
123:25 160:4
164:14,24
**doing** 9:15
15:1,8 64:25
84:24 109:20
110:13 144:24
164:8,16,17
**dollars**
21:13,16
26:14 32:19
74:23 75:22,

24 150:11

**domain** 120:6, 8

**don't** 5:18, 20,25 6:1,22 8:19 10:11 11:25 12:9 15:7 18:1 19:13 20:12 21:3 22:6,8, 11,14,17 24:4 25:4,5,9 26:19,20 27:13,17,20 29:19,22 30:11,24 31:12,18 32:11,15 33:19,24 36:3 37:14,21,23 38:2,7 39:1, 15,25 42:24 43:2,19 45:15 47:2,4,5 48:7,19 49:21 50:7,10,19,23 51:4,11,25 53:11,12 54:1,13 55:22 56:16,19,20, 23 57:1,13 58:4,10,13, 16,19,22,25 59:3,18 61:7, 17,20 62:6, 17,23 63:1,23 65:7,11 66:2, 4,8,10,14 68:19 69:11, 16 70:3 71:20 72:4,12 74:25 75:5,13,23 76:1,14,25 77:3 78:13,25 79:4,7,10 81:9 82:13 83:25 84:9,20 85:6,10,18 89:6,11,13,19

90:14,22 91:9 92:2,8,10 93:9,12,23 96:6 97:3 98:12,18 99:20 100:6, 10 101:3,9, 11,16 102:5, 9,15,20 103:4,5,7 104:23 105:23 106:21,25 107:1,5,13, 20,21,24 108:11,21 109:3,20,22, 23 110:1,3,6, 12 111:1,5, 14,16,20 112:13,15 113:13,20,24, 25 114:2,9, 16,21,24,25 115:6 116:6, 9,12,16,18,20 117:3,17,18, 24 118:6 120:24 121:4, 13,17,24 122:12,18 124:2 125:10, 14,24 126:15, 16,23 127:6, 15,17,22,23, 24 128:3,4,5, 8 130:3 132:12 134:22 135:18 137:16,18 138:19 141:1 142:14 143:3 144:2,17,20, 23 145:5,9, 17,23 146:12, 19,23 147:14, 23 148:23 150:18 152:20,22,24 153:13,16

154:10 155:19 156:1,17 157:4 158:8, 12 159:19,25 160:2,3,13, 15,24,25 161:8,18 162:9,11,12, 18 163:1,16, 21 164:18,19 165:2,8,18 166:20,25 167:9 169:18 170:6

**done** 35:2 53:17,19,21 56:6 64:16 66:9 89:23 91:2 116:23, 25 117:8 127:25 128:6, 8,13,19 171:11

**DOS** 45:1

**doubt** 122:10

**down** 6:13 34:18 77:16 108:19

**Dr** 4:13,15 95:6 113:15 114:15

**draft** 39:15 119:3

**drafted** 41:8 83:3 160:13

**drafting** 159:5 164:12

**drawers** 26:4

**drew** 15:23 124:16

**drill** 77:16

**drive** 44:17, 18,22 45:12 52:15 53:3,7 54:20,23 55:3,5,8,11 57:8,10

**drives** 24:22 37:8,9,12,14, 17,23,25 38:8 43:11 44:14, 16 45:16,20, 21,23 46:3, 11,19,20,23, 25 47:3,5,25 48:18,19 49:11,15,19 50:8,9 53:15 54:1 55:16, 21,24 57:3 102:12,18

**drug** 13:18

**drugs** 152:2, 4,5,6,12

**due** 62:25 126:3

**duly** 4:21

**during** 14:9 20:20 40:18 41:4 61:18 151:8

---

**E**

**e-mail** 18:22 19:1 24:14 36:10 38:19, 23 44:12 67:3,14,20, 22,23 76:18, 20,24 77:8, 10,12,17,22 78:1,10 79:7 89:12,19 111:2,3 119:9,12 122:11 126:24,25 129:12 134:11,14,17, 18 139:22 142:17 143:1, 10 150:2,5 151:15 156:6, 10 157:20,22

e-mails 66:22
79:4 118:18
122:9,14,15,
18 142:22
146:21 154:4
156:13
166:17,19,24
167:2,5
173:21
each 115:23
earlier 61:11
65:18 108:1,2
151:3 161:13,
21 162:2
173:2
efforts 76:23
either 12:11,
13,15 18:22
113:17 135:21
170:1 171:13
electricity
63:11,13
else 14:2
32:9 34:9
97:8 123:8,9
empty 44:17
encompassing
28:22
encrypted
55:17,19,20
56:13 57:10
98:15 102:8,
17 103:8
end 46:24
91:2 97:22
117:1
ending 106:6
ends 79:22
80:24 104:4
106:17 155:12
engaged 10:17
engages 84:21
enjoin 41:13
enjoined 42:4
enough 34:24
enrichment
158:3

enter 45:1
entered
165:25 170:15
entire 41:17,
21 108:4,16
entitled
80:19 81:13
82:20 86:16
99:11 137:5
172:10
entity 83:21
130:14
envelope
130:8,9,15
148:8,12,24
equal 168:6
171:6
equaling
158:17 159:2
equally 166:7
equipment
89:1,4,17,21,
22,24 108:25
109:2,4,5,8
173:3,11
erased 57:4,5
especially
26:13
establish
98:22 126:5
established
148:11 154:1
establishes
155:22
establishment
80:14,16
estate 63:25
69:12 71:7,
12,16 73:1,3,
8 79:14 80:1,
7,11,14,25
81:13,22 82:2
91:17 98:3
131:20
132:20,25
133:17 136:9
137:7 140:12
142:6 149:8

155:5 156:4
157:7 165:12
172:10
evaluate
105:5
even 6:7 7:15
24:9 42:11
49:22 78:23
124:3 132:7,8
136:20 172:20
174:18
events 88:24
ever 5:19
10:17 12:9
14:6 15:10
16:14,17,20
20:15 23:7
31:2 43:11
53:24 54:13
63:22 65:22
71:7 74:4
75:20,23
77:2,7 92:14,
17,19,22
93:10 94:17
109:5 132:3,6
135:16,18,22
138:7,13
140:21 145:15
153:21
154:12,16,19
165:3 168:7
171:3
every 9:7,8,
16 34:17 55:7
108:5
everything
25:3,6,12,20
62:3 125:4
127:20,21
156:13 158:1
evidence 24:7
98:11,20
100:5,7
101:14 103:2,
5 107:7
108:22 109:1
110:19 112:5
114:7,14

115:4 117:3
118:3 123:4,
6,12,14
124:17,21
126:5,13
128:2 144:7
155:15,22
165:6 174:9
exact 10:12
38:2 39:15
65:7 66:2
90:14 93:9
106:3,7,13,18
112:13 126:3
132:13 157:14
exactly 48:7
49:21 50:7,
10,23 110:12
125:10 139:24
153:11 154:11
EXAMINATION
4:23
examine 54:2
55:24
examined 4:22
example 85:21
exceeded 71:2
except 21:1
excess 73:11
exchange
116:19,21
134:11 154:4
exchanged
118:21
exchanges
139:3,23
157:20,22
exciting
24:18
exclusive
61:6
Excuse 7:20
16:19 48:25
excused 175:2
executor
72:25
exhibit 12:21

13:1 24:10,11
27:2 40:4,9
52:4 57:14,17
66:19,24
69:4,7 76:2,5
88:7,11 119:6
129:2,6
130:4,7
134:4,7 144:1
147:22,23
149:21,22
**existence**
82:1
**exists** 163:6
**expedited**
174:25
**expert** 52:9
54:2 57:7
61:7 81:15,20
82:3 83:17
105:3,5
109:13 110:1
122:12 152:15
161:23 162:8,
17 163:14
169:8
**expertise**
109:12
**experts**
139:10
**explain** 85:7,
10 86:3 99:4
104:18,25
115:19 155:6
159:3 165:13
**explanation**
44:12
**express** 32:16
**extent** 41:23
53:16 58:3
64:10,15,18
174:17
**extremely**
20:24

**F**

**Facebook** 15:7
21:7,9,13
22:4,12,15,18
23:3 24:8
46:2,16
139:1,7,14,19
140:14
141:14,24
142:5,8 143:9
144:11 147:12
154:14
**fact** 19:19
23:6 82:11
127:11 143:4
150:16
**fair** 73:11
87:22 167:2
**falls** 96:14
**false** 47:13
69:25 74:16
83:14,17
122:21 145:7,
11 163:25
164:8,15
**falsehood**
122:25
**familiar**
16:4,8 54:4,5
56:4 101:17
120:10
**familiarity**
86:13
**familiarize**
13:7
**family** 7:22
34:3 69:18
138:24
**far** 9:17
11:10 54:21
123:4 136:16,
24
**Fargo** 65:8
**father** 8:16
19:16 95:2,4
123:11 150:20

**February**
16:13 24:15
29:9 80:10,13
106:5,9,15,20
107:16,18
110:10
119:14,15
129:8 150:5
**federal** 74:4,
7,18 162:21
**feel** 24:18
136:5 137:17
**fees** 61:7
**feet** 15:2
33:20
**felonious**
165:10,14
**felt** 12:9
**few** 48:8 52:8
68:24 118:18
151:8 153:1
**fiancee** 10:22
19:3 20:23
59:13 97:2
123:10 152:21
153:7,21
**field** 52:9
136:21 139:11
**fifth** 159:21
**figure** 45:11,
14 68:20
86:12 118:3
137:16 139:24
141:24 155:14
170:22
**file** 55:18
56:2,9,16
57:3 85:15
87:25 102:8
103:8,9
**filed** 40:8,11
48:5 52:1
88:13,14
89:7,16
103:22 129:8
**files** 50:14
51:15 55:17
56:13 98:15

120:16
**filing** 107:7
117:7
**Finance**
111:3,6
**finances**
12:14 61:12
**financial**
12:8 65:20,22
66:6 109:24
**financially**
70:15
**find** 20:14
111:2 142:2,7
**finding**
165:25
**fine** 8:25 9:2
**finish** 23:23
122:5
**finished**
122:8
**Finney** 92:14,
15,20,22
**firm** 70:10,11
**first** 4:21
5:5 7:17
13:20 14:9
16:8,11 23:13
33:3 40:7,10
43:25 52:17
59:11 61:14,
21 62:12
67:10 70:11
76:23 82:1
95:2,5,8,18
96:16 129:18
130:22 132:9
134:21 138:4
139:4 172:21
**five** 10:2,4,5
37:9 79:11,12
88:2,20,22
143:17 171:12
**flipped** 16:1
**flipping**
25:16
**floor** 15:2

**Florida** 4:5
**focus** 166:21
**focused** 78:4
**follow** 140:13
 146:21 147:1,
 7 154:12,16,
 19
**followed**
 146:13
**follows** 4:22
**for** 4:5,12,
 13,15,16 6:3,
 8 10:14,15
 11:8,11 13:2
 21:21 24:7,12
 25:14 26:5,14
 27:3,23 28:11
 30:12 31:15
 32:19 34:8,21
 39:3 40:5
 41:18,22
 42:23 45:19
 46:4,12
 48:11,21
 49:21,22
 50:11,13 52:5
 53:2 54:19
 56:14 57:15
 64:20,24
 65:19 66:5,
 13,16,20 67:1
 69:5,20 70:24
 71:7,14 76:3
 77:20 79:5
 81:15,21
 82:3,16
 83:11,23
 85:22 86:3,5,
 20 87:2,4
 88:8 89:17
 90:23 91:16,
 24,25 92:6
 93:16 96:4,17
 97:19 98:16
 99:6 100:2,9,
 14 102:3
 104:21 105:3
 107:20 111:5,
 21 112:7,8,9,

 12,14,16,24,
 25 113:8,10,
 11,14,18,19,
 21 114:6,9,
 14,17,24
 115:5,11
 119:7 120:6,
 17 125:18,19
 128:5 129:3
 130:1,5,12
 131:2,17
 134:5 136:18
 137:1,3
 140:8,22
 145:18 147:18
 148:8,12,15,
 16,18,21
 149:12,14,23
 150:21 151:4,
 8 152:13,18
 153:18 155:1,
 5,20 156:24
 157:17 158:15
 159:1,9
 160:6,13
 161:16,22
 162:7,16
 163:2,9,14
 165:16 166:5
 168:22,24
 169:1,6,8
 173:10
**force** 86:21
**foreclosure**
 61:22,24
 62:1,4,9,13,
 16,21 67:16,
 19 68:8,10
**foregoing**
 76:8
**foreign** 96:19
 119:19 166:14
 168:9
**foreigner**
 138:9,18,21
 139:3 140:15
 141:19 142:8
 143:7,15
 144:12 147:13

 154:17
**foremost**
 139:10
**forensic**
 56:17 109:13
**forensics**
 12:19 38:11
 40:19 41:5,
 13,23 42:4
 93:20 94:5
 132:10 133:6,
 12,21,24
 134:1 135:4,7
 136:17,18,20,
 23,25 148:19
 149:14,16,17
 152:15
**forged**
 122:21,22
**forgeries**
 174:18
**forget** 139:25
 170:11
**forging** 125:1
**forgot**
 139:15,24
 140:1 170:12
**forked** 155:3,
 7,24 165:11
**form** 69:3
 105:8 115:9
 172:16,23
 173:7,12
 174:2,6,10,20
**formal** 70:23
**formated**
 37:22 44:19
 46:3 49:15
**formation**
 80:19 118:23
**formatting**
 24:21
**forming** 121:9
**forth** 11:9
**fortune**
 101:15
**forward**

 135:21
**found** 65:16
 132:9 151:24
**four** 35:2
 67:23
**fourth** 159:21
**fraud** 121:19
**fraudulent**
 122:9,14,15
 125:5,7
 126:23 164:4
**Freedman** 4:16
 6:3 7:6 8:8,
 11 9:4 10:25
 11:5,19 12:22
 13:6 15:18,21
 16:5 17:7,20,
 23 18:1,6,13
 19:7 20:1,3
 21:2,21 22:21
 23:21 24:2
 25:23 28:13
 30:14 31:15
 32:10,23
 33:1,7,12
 35:4,23 36:6,
 14,21 38:17
 39:4,13 40:20
 41:9,16,21
 42:1,14,24
 43:15 44:2,9
 45:3 46:6
 48:10 49:2,6
 50:2,18,25
 51:11 53:16
 55:10 56:14,
 22 57:12 58:3
 61:3 62:17
 63:7,19 64:4,
 8,10,13,25
 66:7 69:2,15
 70:2,17 71:4,
 14 73:5,17,25
 74:14,19
 75:15 78:12,
 16 80:4 81:1,
 8,15,23 82:3,
 16 83:11,23
 84:6,19 85:2,

12,17,24
86:2,4,7,11,
14,23 87:1,10
88:1 90:12
91:2,5,18,25
92:6 96:4
98:16,24 99:6
100:16,22
101:2,12
102:3,10,14,
19,23 104:10,
21 105:3,9,
17,21,24
114:18
116:13,23,25
122:5 128:5,
8,12,15,19,23
134:8 142:14
143:19 144:1,
3,20,24
145:17,21
146:1,25
147:25
159:10,13,16,
24 160:4,10,
20 161:16,22
162:7,16
163:14 164:10
165:16 166:5
167:20 169:7
171:12,19
172:17,19
173:1,9,14
174:3,7,12,
22,24 175:1
**frequently**
152:12
**Friday** 4:9
**friend** 69:18
95:13
**friends** 20:23
55:14 96:25
97:6 123:9
138:16,17,20,
23 142:18,22
143:3
**from** 6:24 7:8
9:17,21 11:14
12:8 14:17,

18,23 15:3
16:14 18:5
25:22 26:14
27:5 32:18
33:4 34:2
39:9 41:13
42:4,25 43:1,
11,17,21
47:6,9 51:3
53:14,25 56:6
65:20 66:5
68:17 70:10
73:18 75:7
80:17 82:23
91:9,10 92:9
93:4,5,6
94:12 96:8
99:10 106:4,
8,15,20
107:15 108:4,
6 110:15
115:8,9,13
119:9 120:2
122:3 123:3,
5,6,14
124:16,17,21,
22 132:1,3
134:17 138:5,
9 140:10
141:2 148:9
151:9 155:9
157:24,25
165:4,7
166:24
167:13,21
168:18,20
169:23,24
170:1,2,24
**front** 89:11
104:24 107:1
111:20
117:17,18,22,
25 125:14
143:4 157:15
**full** 33:25
34:2
**fully** 106:5,
16

**funds** 65:4,9
92:9
**furniture**
25:14 26:4
27:11,12,15,
18,21,24
28:3,6,8,22,
24
**further** 10:5
40:25 41:1
174:22
**future** 93:20,
22 94:6,9,13,
18 112:8,25
113:11,19

---

## G

**games** 19:17
**garage** 25:4
**Gardens** 9:24
**gathered**
123:4
**gave** 28:1
37:12,14,17,
23,25 54:1
66:24 67:21
68:13,16
80:22 115:16
120:20 160:8
**Gavin** 58:23
**generally**
161:10
**generating**
140:10
**get** 11:21
12:22 25:21
30:20 35:2
43:11 45:1
46:12 47:9
53:17 56:8
77:2,4,7,16
78:8,24 85:18
108:5 111:5
119:1 135:12,
22 136:4
144:24 167:16

**gets** 119:5
136:15
**getting** 29:10
43:1 51:1
62:15 63:11,
17 83:16
87:23 112:17
**GICSR** 58:14
**girlfriend**
10:15,18
**girlfriends**
153:24
**give** 7:1
11:14 26:17
28:16 31:2
38:8 47:13
64:10 105:17
136:7 137:22
171:12
**given** 44:11
49:23 80:23
131:25 166:12
**Gives** 131:17
**giving** 6:24
74:16
**Gizmodo** 67:1
**go** 6:9,19,21
11:9,15,17,24
13:7,20 14:3
15:21 17:13,
25 20:19
23:18 24:3,20
25:14,17
31:13,18
32:24 49:13
64:4,22 66:23
67:6 70:21
72:21 80:22
82:18 87:4
90:1 93:17
94:1,25 96:8
107:21 110:22
111:20,22
116:14 118:17
124:4 126:1,
15 130:22
132:8 138:14
141:21 143:24

144:5,25
145:1 147:21
154:22 156:12
161:2 163:7,
22 164:20
**goes** 58:4
64:18 88:22
**going** 6:11
7:15,17 20:25
25:11 30:15
34:17,21
41:21 42:12
43:15 57:9
59:19 61:8
64:15,18
66:22,23,24
85:15 91:2
94:1 98:22
99:3 116:23
119:1 121:21,
23 127:6
133:23,24
134:22 135:17
149:21 156:22
167:10
**gone** 105:11
**good** 4:8,25
5:1 23:21
81:11
**got** 48:20
78:23 79:1
107:23 108:2
143:13 150:23
170:2
**government**
13:25
**Gox** 83:21
84:5
**grease** 153:14
**great** 52:15
68:23
**Greenberg**
170:12
**grounds** 87:2
**guess** 6:22
23:6 24:20
44:17 46:21
51:10,11

61:10 74:1
91:13 93:12
102:24
105:12,16
113:12 135:10
150:5 151:16
154:10 163:5
164:18
**guessing**
35:14 59:6
109:10 113:9
**gun** 35:1
**guns** 35:1
**guy** 101:6
143:16
**Guys** 128:22

---

### H

**had** 5:9 13:17
15:4 16:23
20:20,24 23:1
31:17 34:20
35:16 37:10
38:15 39:12,
20,23 42:19
43:24 44:5,24
45:1 46:4
55:8,23 57:2
58:5 61:15
64:5 66:9,15
67:10,25
70:15 71:1
72:19 73:9,
10,11 74:7
77:14,25 81:6
82:10,19
87:11,17
89:16 93:19,
21 94:4,8,13,
16,17 98:7
101:15,25
102:1 103:24
104:14
106:23,24
108:22,25
111:14
115:14,17

122:2,4
123:17 124:2
126:10,20
133:23 134:1,
3 135:10,24,
25 136:2,5
138:2,10
139:4,22
140:4,6,21
141:8,19
142:11,15,19
144:6 145:13
150:14,16
151:4 153:7
155:11 166:7
169:16 172:3
**hadn't** 21:4
**Hagen** 59:25
**Hal** 92:14,15,
20,22
**half** 172:11
**hand** 31:11
**handed** 88:10
**handing** 12:20
24:10 40:9
57:17 69:7
76:5 129:5
130:7 149:21
**handle** 64:6
137:7
**handwriting**
130:17,20,21
**happen** 88:24
**happened** 5:7
153:12
**happens**
101:22
**harassing**
85:3,8 86:9,
25
**harassment**
85:13 86:4,18
87:2
**hard** 37:8,9,
12,14,17
43:11 44:14,
16 45:12,16,
21,22 46:11,

19,20,23,25
47:3,5,25
50:8 52:15
53:3,7,15
54:20,23
55:21 57:3,10
87:20 102:18
**has** 5:7 6:14
8:17 34:1
42:24 48:17,
23 74:23 85:5
86:15 87:12,
18 97:23,24,
25 98:4
100:11 102:18
112:3 113:3
121:20,22
123:9 125:4
126:2 127:4
131:1,6 142:2
144:7 147:2
156:3,11
165:25
**hash** 29:17
**hasn't** 34:5
**have** 5:23,24
6:3 8:17 9:5
12:11 13:16
16:24 17:1
18:17 19:1
20:21 24:19
25:4,5,21
26:25 28:13,
18 29:21,23,
24 30:9,21,22
31:1 33:16
34:4,16 35:17
36:11 37:2,22
38:20 39:2,18
40:1 42:2
44:7 45:10
48:17 49:19,
20 51:3
52:19,24
53:14,22,23
56:1,6 57:4,
18 61:7
63:22,25
64:19 65:22

66:12,17
67:11,22 68:4
72:19 73:13
75:2,3,8,19
76:14,23,25
77:25 79:8,19
80:8 82:7
85:1,15,22
86:19 87:24
89:11,22,23
92:14,17 93:8
95:7,14,23
96:2,21 97:3,
5,7 98:11,20
100:8,21
101:9,14,22
103:2,5
104:6,23
105:5,7,14
107:1,7
108:22 109:1,
5,6,15 110:8
111:8,20
112:5,16
113:1,20
114:7,9,10,16
116:10,11,12,
16,18,21
117:3,14,17,
18 118:1,4,6,
7,11,12,17
120:22 121:15
122:3,10,12
123:4,12,17
125:12,14,17,
18,24 126:5,
13,15,16
127:15 128:2
130:21
131:23,24
132:8 133:5,
9,18 136:3,19
137:13,18,19
141:12,13,17
143:3,4
145:8,10
146:10,25
149:8 150:11,
22 153:10

154:7 155:15,
19 156:6,12,
14,15,17,18,
19 157:13,16,
21 158:4,6
163:1 165:6
166:10,15,20,
25 167:3,9,
12,18,25
168:14 169:4,
19,22 170:7,
9,22 171:3
173:19,24
**haven't**  32:14
46:20 53:19,
21 55:23 56:6
96:24 99:25
**having**  4:21
123:23 132:1
168:6
**he**  6:3 7:8,
19,24 8:1,4,
17 9:14,15,
19,21,23
10:9,17,19
11:8,9,13,22
12:4,6,9,12,
14,17,18
13:15,17,18,
23 14:2,6,24
15:8,10,11,
12,22 16:1,
15,17,24
17:1,10,11,16
18:4,21,22
19:2,16 20:9,
15,17,18,24,
25 21:6 22:9,
18,19 23:2,3,
4,7,14 31:12
32:5 34:16,
20,21 35:1
36:22 39:4
40:18 41:4
48:23 52:9,
11,19,23,24
53:24 57:7
61:16,23,24
62:2,4,9,11,

13,15,16,22,
24,25 63:5,6,
12,15 64:14
65:16,17,19
66:2,3,5,6,9,
14,17 67:1,
11,16,18
68:9,11,24
69:9,10,13,
14,18,25
70:1,11,13
72:10,25
73:1,2 75:14,
17 78:3 79:4
83:2 84:20,22
85:4,19 86:15
87:11,12,18
89:9 92:22
93:2 94:10,
11,12,17,23
95:4,18,19
96:15,18,22
97:20 98:4,7,
9 100:1,3,12,
15,19,21,25
101:1 107:22
108:3,4,5,6,
14,15,16
109:7,15,18,
19,20,21,22,
25 110:1,2,4,
9,13 114:19
119:4 120:16
121:11,20,23
124:8,11,15,
16,22 125:1,
3,4 129:23
132:3 135:20
136:6,14,20
137:2,22
138:1,2
139:6,8,10,
13,19 140:6,
9,10,14,19,
21,22 141:7,
13,14,19,23,
25 142:4,7
144:10 145:2,
6,8,20 146:1

147:1,2
150:11,13,14,
16,23 151:4,
6,7,8,11,16,
18 152:4,6,
10,12,18,19,
21 153:1,23
154:13,17,19
156:3,5,8,11
159:10,12,13,
15 160:2,4,
14,16,23
164:16 165:7
166:13,18
167:2,6
168:5,8,10
**he's**  8:3
22:22 46:7
69:11 94:21
98:2 125:5
**head**  6:13
57:7 125:16
**hear**  19:18
56:25 97:9
**heard**  10:19,
20 16:11
18:18,24
19:15 20:20
52:18 55:4
57:6 59:14
63:8 65:22
96:22 120:11,
23,24 123:8,
20,21 129:25
138:4 146:15,
18 148:20
163:1
**hearing**  62:12
131:18
**heart**  174:4
**held**  87:23
103:15
**help**  45:22,25
46:12 55:24
56:8 68:24
95:21 151:8
**helped**  159:14

**helpful**
  120:20
**her**  10:16,19
  59:6,8 97:3
  126:21 127:4
  153:15 170:12
**here**  12:23
  27:5 31:15
  37:5 40:16
  49:12 56:11
  60:23 62:8,20
  67:13 110:10
  121:20 127:25
  145:1 151:11
  157:16 161:4
  162:5 163:18
  165:15 169:3
**hey**  146:2,9
**highly**  160:5,
  12
**him**  10:14,20
  11:10,15,16,
  17 12:2,4,11
  14:24 15:6
  16:15,17,20
  17:18 18:3,5,
  10,20,25
  19:4,23 20:20
  22:6,8,25
  34:25 55:3,8,
  12 64:12
  69:20,23
  84:25 85:8
  86:14,22,23
  87:15 92:17
  95:14 97:5
  100:14 107:21
  108:15 121:11
  123:10 132:6
  139:2,5,13
  140:21 142:4
  146:2,18
  150:21 152:5
  153:8 154:2,
  4,7,12,16,19
  159:9,14,22
  160:5,6,15,
  19,22,23,24,
  25 165:4

  168:1
**himself**  17:2
  93:10 125:6
**hired**  64:6,19
**his**  5:18
  8:10,16,18
  9:15 10:10,
  13,14,17
  11:13 12:13,
  14,17 14:3,5
  16:17,18
  17:3,21 18:24
  19:11,14,16,
  23 20:16,23
  23:7,11,18,
  19,25 24:1,3
  25:3,7,14,17,
  18,21 26:4
  27:15,18,20,
  24,25 28:1,2,
  5,6,8,12,22,
  23,25 31:11
  34:6,11,21
  35:12,17
  36:4,7,24
  40:17 41:3
  44:25 45:8
  48:18,19 50:8
  52:9 55:14
  56:17 57:6,10
  61:12 62:4,24
  63:5,11,12,
  15,17 65:3
  66:10,13
  67:16,18
  68:9,25 70:13
  71:1,2 78:8
  79:14 85:22
  86:12,16 87:3
  94:11 96:15,
  20,25 97:2,6
  98:24 100:20
  103:20 107:23
  108:15 109:7,
  12,15,18,21,
  22,23 110:2
  115:16,17
  123:9,10
  124:22 130:1,

  2 132:22
  133:1,18,21
  136:14,15,22
  137:12 138:20
  139:10 140:9
  141:3 148:15,
  16,21 149:12,
  14,16 150:18
  152:8,10,16,
  21 153:7,21,
  23 154:12
  155:3,7
  159:13 167:5
  168:1,5,8
  173:15,21
**hold**  11:19
  116:13 144:20
**holding**
  38:20,24
  84:20,23
  87:19
**home**  11:15,18
  63:6 71:1
  107:21
**homeowners**
  73:12
**homestead**
  73:10
**hospital**
  11:10,17
  12:3,4 93:1,
  5,7,11,16
  107:19,22
  108:3,6,16
  109:18 110:9,
  13 140:19
**hospitalized**
  9:22 11:8
**hot**  153:14
**hour**  109:25
**hours**  110:1
**house**  10:10,
  13 23:8,11,
  13,18,25 25:3
  27:10 31:1
  33:11 61:21
  62:4,9,13,21
  67:18 68:8,9

  173:10
**how**  7:11 8:1,
  20 9:17 10:10
  12:2 25:7,9
  26:10,13
  33:18,23,25
  37:14,25
  44:15 45:14
  50:10 54:17
  59:9 68:20
  78:8 84:18,
  20,22 86:14,
  15 87:12
  90:5,6,7,11,
  22 93:2 97:25
  98:4 99:23
  106:21 116:2,
  10 122:22
  133:7 137:16
  141:16 152:25
  155:6,14
  157:12,17
  165:13 168:6
  170:18,22
**Huh**  116:24
  128:7
**hundreds**
  21:15 104:1
  125:17
**hypothetical**
  83:17 109:8
  110:6
**hypothetically**
  146:2

---

**I**

**I'LL**  55:7
  64:10 114:20
  119:4 144:25
  160:10 161:8
  167:18
**I'M**  6:11 7:15
  12:20 13:24
  15:8,9 16:21
  19:10,24
  28:7,11 29:9,
  10 31:11

32:1,16,18
34:17 35:15,
19 40:9 41:21
42:9,12 43:15
53:22 54:5
56:3 57:17
59:6 62:7,15,
20 68:6,20
69:7 70:12
76:5 79:21
81:20,21
83:16 84:4,24
85:24 86:7,12
91:2 92:21,23
93:23 94:1
97:1 103:2
108:8,9
110:18 111:14
112:17 113:23
114:2,13
115:2 116:23
118:2,3,16,24
127:6,20
129:5 130:7
132:7 134:6
137:15 144:24
145:20 146:8
149:20 155:14
156:12,22
160:7 166:22
167:15 171:11
**I'VE**  20:11
52:8 64:5
84:15 109:3
118:5,20
120:11,24
123:4 156:22
167:22 168:16
**I.p**  169:13
**I.P.**  104:12,
13,25 105:2
106:23,25
107:12 110:8
155:10 156:2
157:1,3,4
170:17
**I.T.**  95:19
**idea**  105:14
118:7

**identifiable**
97:24
**identification**
13:2 24:12
27:3 40:5
52:5 57:15
66:20 69:5
76:3 88:8
119:7 129:3
130:5 134:5
149:23
**identified**
6:4 96:21
**identify**
79:13 104:8
174:9
**if**  6:10,18,
19,21 7:4,8
10:22 12:6
13:6,24
16:23,25
20:20 21:15
26:19 27:14
29:19,22,24
30:8,21
31:10,16 33:1
35:16 37:5
38:21 41:10,
22 42:10,25
43:2,17 44:10
50:25 51:2
53:24 54:23
56:12 57:2,9
58:4 61:10
65:3,9,11
66:5 67:10
68:17,23
69:11,22 74:7
77:1,14,24
78:7,8 79:1,
2,7 81:11,25
82:8,9,14,19
83:6,7,17,20
84:1,24 85:6
91:2,19 92:4,
8 96:1 99:3,
23 100:15
101:8,22,25
103:5 105:17

107:21 108:24
109:3 111:14
113:7 116:19,
23,25 117:22,
25 120:20
122:20 124:24
126:20,23
127:3 128:3
131:14 132:7
133:10,11,23
134:16,23,24
135:3,7,20
136:3,6
137:1,4,21
138:1,2,20
140:3,6,10
143:17 144:5
145:1 146:1
149:2,5
150:10,14
152:12 160:9,
24 162:12
170:24 172:20
**II**  158:3,10
**illiterate**
95:19
**imagine**  65:17
75:10 93:15
108:24 135:19
149:6
**implication**
159:24
**imply**  160:13
**importance**
135:20
**important**
21:11 26:10,
13 27:15
29:21,23
30:22 32:18
33:4 34:24,25
133:3,18
140:6,12
**improper**
42:10
**improved**
68:2,15,17

**in**  4:5 5:5,11
7:22 9:23,24
10:1,13,15
11:7 12:2,4,
18 13:23
14:2,5,8
15:1,2 16:13
17:3,12 18:22
19:19 20:17
22:6,9,12,15,
18 23:2,6,10,
12,16,17,25
24:17 25:3,4
26:15,25
27:6,10,12,
15,23,24,25
28:11,12,23
29:5,7 30:9
31:1,6 32:13
33:5,6,10,13,
23 36:10
37:16,20
38:15,18
41:20 42:16
43:16,25
44:6,25
45:12,13
47:1,3,17,24
48:1,2,3,8,15
49:24 50:12,
17 51:18,23
52:9,22,23
53:6 54:6
56:5 57:6
61:22,24
62:1,4,9,13,
15,21 63:2
65:4,9 67:13,
18,22,25
68:8,9 70:11,
12,25 71:9
72:2,14,19
73:11 74:7
75:3,8,13,21
76:9,25 79:19
82:1,11 83:4
86:2,16 88:24
89:4,9,11,12,
17,19 90:18

91:8 92:4,24
93:14,15,20,
22 94:3,5,9,
10,13,16,18
95:24 96:2,9
97:10,23
98:14 100:2,
11 101:5
103:18,20,22
104:2,24
107:1,15,18,
22 108:1,3,4,
5,6,14,16,17
109:18,23
110:4,9,10,13
111:5,20,22,
25 112:1,19,
23,24 113:5,
9,15 114:6,
10,16 115:5,
7,9 117:17,
18,22,25
121:1,2,19,20
124:3,7,11
125:14 126:20
127:4,5,10
130:23
131:13,14,15
136:6,13,14,
20,21,23,25
138:10
139:10,18
140:4,19,25
141:16 143:4,
10 144:10,13
147:10 149:5,
11 150:11,16,
17 151:6,11
152:10 153:1,
4,12,18 154:2
155:17,23
156:2 157:15,
20 158:10,13,
14,20 159:5
163:6,7,13,24
164:8,12
165:24 168:3,
12 169:1,15
171:7 173:2,

3,24 174:9,15
**inaccurate**
145:13,16
146:3 147:18
163:20
**inception**
110:15
**include**
123:22
**included**
133:5 162:3
**incorporation**
119:4 120:16
130:12
**indebtedness**
14:1
**independent**
9:14
**Indicating**
14:19 21:10
53:9 84:13
90:21
**individual**
72:8 84:2
96:19 103:20
166:14 168:9
**individuals**
104:6
**induce** 164:17
**induced**
164:8,16
**inducing**
164:4
**infer** 138:8
**Info** 131:5,11
148:13
**inform** 139:5
**information**
41:2 46:15
57:23 58:1,6,
11,14,17,20,
23 59:16
60:25 68:4,5,
6 73:9 74:8,
16 76:9 77:24
78:8,9 89:8
120:10,19
121:1,9,16

127:12,14
131:2 144:8
166:12 170:2
**Informationdef
ense.com.**
120:9
**informed** 95:6
**initial**
96:10,12
**initially**
43:20
**inject** 31:15
**inside** 106:21
**install**
54:15,17
**installed**
45:19 49:20
50:9 53:23
**instruct**
11:22 43:15
84:25 85:8
86:6,7 87:17
160:21
**instructing**
86:22,23
**instruction**
64:21
**instructions**
51:1,3 64:11
**instructs**
6:16 131:13
**instrument**
14:1
**insurance**
13:25
**intellectual**
103:19 104:8,
20 105:15
106:4,8,14,19
107:17 108:14
110:5 155:4,
8,24 156:23
158:10,11
161:14,15,20
162:2,15
163:10,13
165:11 166:8
168:15 169:5

172:7,11,14,
20
**intent**
165:10,14
**intentionally**
27:1 47:13
**interest** 72:2
93:19,22
94:5,9,13,16,
18 100:11
121:2,20,23
126:20,21
127:4,5 156:2
**internet**
63:17
**interrogatorie
s** 76:6
**into** 16:24
30:20 43:1
47:9 51:1
53:17 58:4
64:4,16,18
83:16 88:22
109:8 133:11
140:4 143:15
164:16,17
**invented**
80:18
**investigate**
127:10
**investigating**
125:19 168:21
**investigation**
60:23
**involved**
75:13 133:8
153:4
**involvement**
17:3 72:14,19
95:14,24 96:2
**involving**
91:20
**ira** 4:20 7:6
11:19 13:6
17:23 22:21
28:13 41:9
44:3 46:6
48:10 51:11

64:4 70:12
74:4 87:11
95:1 100:23
144:6 146:25
171:18 173:2

**Ira's** 72:25

**IRS** 70:6
72:13,18
74:22,25
75:5,20
143:25 144:9,
19 145:10
146:6,9,22
147:7,11,16

**is** 4:8,9 5:2
7:1,11 10:6
13:4 14:2,4,
24 17:14
19:14 20:9,
15,24 21:1,6,
13 22:9
23:14,21
24:14,18
26:10,13
27:5,21 28:2,
5,8,10 32:18
33:3,18,23,25
34:13 37:19
40:7,9,23
41:1,25 42:16
43:18 44:21,
22 45:4 48:14
50:5,16 51:21
52:1 54:11,18
57:7 59:11,19
60:23 61:5,8
62:12 64:22
66:5,6,24
67:3,12,17,
19,21 68:14,
16,25 69:8,
13,18 70:6,
10,13,15
71:2,12,24
72:13,17,18,
24,25 73:9,
16,23 75:17
76:9,11 77:24
78:7,8 81:5,

22 82:1 83:18
84:20,22
85:5,12,20
86:5 87:3,23
88:3 89:4
91:13,16
93:13,21
94:8,18 95:19
96:11,14
97:11,17,23
98:21,23
99:10,23
100:7,12
101:1 102:2,6
103:22
104:19,25
105:2,11
106:6,25
108:8,9,12,20
109:7 110:10
111:13 112:9
113:6,16,17
114:1,6,14,21
115:3,4,11
116:3,5,9
117:8 119:1,
3,24,25 120:8
121:5,8,11,
14,23 123:4,
11,14 124:25
125:1,3
126:3,12,23
127:7 128:3,
4,17 129:11,
15 130:8,11,
14 131:4,8,10
133:10,22
134:11 136:8,
14 137:16,21,
23 139:6,13,
19 141:16,22
142:4,7,25
145:7,10,11,
16,22,24
146:2 147:1,
2,24 149:1
150:2 152:21
155:1,22
156:1,8,10,23

157:16 158:6,
9,10,17 159:3
160:8,11,18,
23 161:13,20
162:12,14,20,
25 163:3,18,
20 164:15
165:25 166:4,
21,22 167:2,5
168:16 169:4
171:2 172:2,
10 173:24
174:19

**isn't** 7:3
28:3 69:14
95:2 98:13
116:8

**issue** 77:4
85:20 158:10

**issues** 12:7,8
13:17 88:5
160:5

**it** 7:3,12
8:25 10:5,14,
22 12:7 14:2
15:14,15,16,
19 16:1,2,3,
22,23,25 17:2
18:2,19,23
19:2,18
20:14,19
21:15,20
22:1,3,6,8,
20,25 24:17
25:7 26:10,13
28:21 29:22,
24 30:5,9,10,
23 33:24
34:1,7,18
35:16 37:2
38:4,5 39:1,
2,8 40:12
41:10 43:3,22
44:9,12,17,
18,20 45:4,7,
11,12,13
46:24 48:7
49:11 52:18,
19,24 53:16

54:11,14,21,
24 56:4,7,17,
21 58:4 59:9,
11 61:10,18,
24 62:1 63:17
64:22 65:11
67:6 68:11
70:23 71:2,
18,21,24
72:24 76:18,
25 77:14,15
78:24 79:3
80:18 81:5,22
82:8,9,19,21
83:7,17,20,21
84:1,4,10,14,
15 85:14,20
86:1 87:14
88:2,5,6
89:12,19,20
90:18 91:21
93:13 94:15,
16 95:2,22
96:19 97:18
98:13 100:14
101:20 102:8,
12,17 103:7
104:11,19,20
105:6,8,10
106:23,24
107:3,20,25
108:12 110:23
111:14,15,20,
21 114:5,9
115:18 116:8
118:6 119:4,
5,19,25
120:1,2,11,
20,23,24
121:3 122:13
123:23 124:25
125:1 127:23
128:4 131:1,
6,13 132:2,8,
9,13 133:23,
25 134:3,24,
25 135:1,3,5,
7,10,19,21,24
136:6,7,16,19

137:2,13,16,
17,22 138:2
139:4,5
140:2,3,6,8,
10,12 141:16,
25 143:3,5,14
144:18,19,25
145:2,9,13
146:3 148:18,
21,25 150:12,
14 151:18,19
153:11
155:12,13,16
156:1,3 157:9
158:10
159:16,19
161:8 163:18
167:2,18
169:9,14,22
170:20,21
171:2,13
172:2,10
174:25 175:1

**it's**  6:9 10:5
12:23 18:22
21:15 23:3
30:4 33:21
41:9 42:10,12
45:15 46:21
47:25 49:22
51:22 53:2
54:18 57:20
59:10,12
67:13 70:8
75:7 76:15
77:25 78:9,
11,15 81:13
85:8 86:4,11,
17,21 87:2,
18,22 98:10,
13 102:22
103:3,6 119:9
123:2 126:11,
25 127:8,22
133:17 134:18
136:1 137:25
139:14 140:1
142:15 147:18
148:1 150:5

155:17 156:25
160:20 163:2,
5 170:25
172:17
**items**  130:2
133:19 148:16
165:14
**its**  41:15
42:6 44:20
73:11,12
110:15 126:2,
11

---

## J

**Jamie**  60:12
**January**  4:9
**Jimmy**  60:6
**jobs**  152:16,
20
**Joe**  73:19
75:5
**joint**  14:2
106:3,7,13,18
171:9
**Jonathan**
60:15
**Jones**  19:14
**Joseph**  69:8,
18 142:17
150:20
**Judge**  171:21
**judgment**
104:14 157:3
158:15,25
163:8
**Julio**  4:15
119:1 121:21
**June**  70:6
**jury**  56:12
98:22 99:3
100:7,8
104:18,19
117:22,25
122:24,25
123:2 125:2,
22 157:15

**just**  6:7 7:6,
12,16 11:19,
20 12:8
13:16,18
15:15,19 16:2
17:11 18:9
22:21 24:5,7
25:5 26:3
28:7,21,23,24
29:2,7,24
30:8,19
31:10,15
32:21 33:13,
16,19 34:2,6,
7 35:10,14
36:16 42:9,21
46:7 48:20
49:17,21
50:10 51:4,
11,18 64:5,
12,23,25 65:3
66:23 67:15
68:7 79:2
83:7,16 87:10
88:10 89:19
94:14 99:25
103:2 105:20
107:20 108:11
109:9 111:10
113:14,22
114:5 116:13
117:24 118:6
119:2 120:19
124:25
127:21,22
128:3,5 132:2
133:4,13,25
135:4,9
136:16,24
137:23,25
140:1,2,8
143:14 144:21
148:8 153:1
154:10 157:4
159:22 162:11
167:10,15
169:20
170:14,17

---

## K

**Karp**  59:19
69:8,18 70:10
72:13,17
73:8,19 75:11
144:5 146:2,
5,16 150:20
**Karp's**  70:11
142:17 143:24
**keep**  25:5
30:23 33:16
34:24 35:20
36:5 57:7
132:3
**keeping**  29:23
30:22 79:3
**kept**  17:2
24:4 25:1
29:24 30:22
32:22 33:4
34:25 57:6
108:15
**key**  29:15
77:24,25
78:7,8,9
101:9,25
102:1,2,5
136:4 137:19,
22
**keys**  56:12,
13,21 98:9,
14,21 101:15,
20,22 115:10,
15,16,17,20,
23 116:11,16,
18 117:4,11
**kick**  119:19
**kid**  15:8
**kids**  9:10
**kind**  12:8,9
65:24 66:14
89:13 108:25
116:7 151:19
153:10
**Kirsten**
59:10,11

kitchen   15:1
  97:11
Kleiman   4:20,
  25 6:5 7:18,
  21,22 9:17
  13:13,14,23
  23:10 26:3
  32:16 33:3
  35:10 40:16
  41:2 42:3
  47:8 49:22
  63:25 64:1
  65:14 70:12
  71:8 74:23
  75:21 76:21
  77:25 78:7
  79:8,14 80:1,
  8 82:2,11
  83:9 85:22
  92:19 97:17
  102:18 110:15
  114:4 115:2
  118:19 119:9
  120:2 121:23
  129:5,11
  131:21,22
  132:18,21
  133:1,17
  136:9,14
  137:7 138:10
  139:8 140:12
  141:4 142:6,7
  143:7,24
  149:8,12
  152:1 153:3,
  14 164:25
  165:24 166:1,
  11 171:18,20
  173:23 174:13
Kleiman's
  23:13 26:4
  53:15 55:21
  56:12 62:9,
  13,21 68:8
  77:22 134:18
  140:13 149:11
knew   12:12,18
  61:24 62:15
  107:20 132:8,

12,13,14,17
133:22
136:16,24
138:20 140:3
152:5 174:18
know   5:17
  6:19,20,22
  8:6,15,19,20
  9:14,19 11:25
  13:4,14 14:5
  15:14 17:14,
  16 18:1
  19:11,17
  20:12 21:3
  26:7,10,13
  29:3,8,10,12,
  14,15,17,19,
  22 30:1,4,5,
  11 31:12
  32:11 33:5,
  19,24 37:21,
  24,25 38:7
  48:19 50:5,8,
  9,13,19 51:25
  52:7 53:6
  54:17 55:22
  56:16,19,20,
  23 57:1,11,13
  58:10,13,16,
  19,22,25
  59:3,18,19,
  22,25 60:3,6,
  9,12,15,18
  61:20 62:1,3,
  4,8,11,23,24
  63:1,5,11,14,
  16,20 65:13,
  19,21,24
  66:2,3,4,8,
  10,14,16
  68:3,7,19
  69:11,16
  71:20 72:4,5,
  7,10,12 78:1,
  13 79:4,7,10,
  22 81:9 82:13
  83:19,25
  84:1,9,11,20,
  22 85:3,4,14

86:19 87:2
89:6,7,13
92:2,8,10
93:3,12 96:6
97:3 98:12,18
99:20 100:6,
10,11 101:3,
11,16 102:2,
5,9,15,20
103:4,5,7
106:17,21,25
107:13,20,21
108:15,21
109:3,20,22,
23 110:3,7,12
111:1 112:3,
13,15 113:13,
16,20,24,25
114:2,19,22,
24,25 115:6
116:6,9
117:24 120:24
121:4,13,17,
18 122:12,18,
20,24 125:3,
10 126:15,23
127:6 128:1,
3,4,11
132:10,12
133:13 134:24
135:13
136:17,22
138:7 144:2
147:15,23
148:20 150:18
152:1,16,22,
24 153:3,6,
13,16,19
155:21 156:1
157:17 158:8,
12 159:8,13,
15,20,25
160:1,3,4,14,
15 161:8,18
162:9,11,12,
18,25 163:1,
16,21 164:19
165:2,8,18
170:13 174:4

knowing
  148:24 150:10
knowingly
  165:9,13
knowledge
  70:14 83:8
  92:19 144:7
  145:11,12,14
  146:5,10
  166:10,15,22
  167:3,11,13,
  19,21,25
  168:7,14
  169:19
known   69:20
  170:25 171:2
knows   95:20
Kurick   59:22
Kush   66:25
  67:8,17
  170:11

L

Lane   129:19
laptop   45:8,
  12
Large   4:5
last   10:1
  25:13,22
  26:22 37:16
  40:1,14,24
  67:5 70:13,20
  72:21 75:17
  76:7,13 87:21
  119:17 141:2,
  3,10,22 142:3
  151:8 154:2
late   124:3
later   38:12
law   70:10,11
laws   147:15
lawsuit   38:15
  39:3,21,22,23
  42:21,23
  43:7,8,14,18,
  21 48:5,9
  91:16 153:6,7

**lawsuits**
153:3
**lawyer** 39:3,
5,7,10 40:8
69:8,10
144:15,18
145:4,6,16,21
**lawyers** 40:11
53:18 64:5,6,
16,19,20 83:2
174:8
**leads** 168:2
**Leaf** 65:20,22
66:6
**learn** 61:18,
21 67:16
93:10 152:4,7
**learned** 61:14
67:18 68:9
72:14,18
95:23 96:2
152:6
**least** 31:4
55:14 79:21
80:2,19 81:2
99:11 143:4
157:8,9
170:19
**leave** 11:17
108:5 140:22
151:18 161:8
**leaves** 13:14
**led** 133:4,7
142:12
**left** 125:4
130:14,23
**legal** 69:22
71:14 82:4
83:11,23
91:25 92:6
99:6 104:21
137:6,9
145:24 160:5,
6 161:16,22
162:7,16
163:15 165:16
166:5 169:8

**legitimate**
85:14
**lender** 65:25
**Leon** 4:10
**Leonard** 13:14
**less** 88:3
**let** 6:19,20
11:16 23:23
24:7 30:20
31:13,15 42:1
45:12 62:16
64:8,13,14,21
71:21 82:17
83:2 90:1
101:5 103:21
122:5 132:11
134:24 140:18
144:25 158:9
159:19
160:15,19
164:7
**Let's** 9:21
38:23 83:6
87:4 105:22
108:19 126:25
137:15 154:22
165:19
**letter** 15:15
16:3 70:5
72:12,17
75:3,4,6,8,
11,13,20
131:4,8,13
143:25 145:4
146:6,9,12,
14,23,24
147:10,11
**letters** 29:20
30:5 74:22,25
147:1,7
**Levy** 4:3
**lie** 74:4
**lied** 26:25
**liens** 71:1
**like** 9:23,25
10:11 11:11
12:7,10
13:16,18

15:2,8,13,15,
17 16:3 17:19
18:11 19:2,5
20:17 25:16
27:11,23,24,
25 28:1 30:1
31:4,10,11
33:17,19
34:11,20,22
35:14,15,16
37:9 38:19
44:25 45:18
48:8 52:19
53:4,23,24,25
54:2 56:4,5
65:2,24 69:12
75:1 86:15
93:14 97:10
107:11 111:15
116:7 117:20
118:8,9
119:21 137:17
142:11 151:7
152:19 157:8
171:9,12
**liked** 35:1
**limited** 70:15
**line** 23:23
27:9 47:22
70:11 83:18
116:25
**lines** 15:15
16:3
**link** 52:19,24
**list** 79:17
119:18 143:3
**listed**
110:23,25
111:7 121:12
126:7 130:9,
11 148:12
165:15
**listen** 5:11,
15,16
**lists** 71:18,
21
**litigating**
125:18 168:24

**litigation**
33:5,6 51:13,
17 75:9
173:24
**little** 7:8
12:18 14:4
84:17 112:17
144:25 145:1,
13
**live** 9:17
**lived** 10:2,9,
13 19:3 97:4
129:21
**living** 9:23,
24 26:15
27:24 28:12,
23
**LLC** 132:11
136:25 144:6
148:19 149:17
**loading** 44:25
**loan** 65:20
66:13,16
**loaned** 151:6
**locate** 64:1
89:24 173:3,8
**located** 89:1,
4,17 110:6
**locked** 137:19
**log** 45:13
76:25 108:17
**login** 45:2
**logo** 124:16
130:24
**London** 26:15
**long** 11:11
25:7 35:4
69:20 78:24
87:13 93:16,
19,22 94:4,13
110:8 152:25
**look** 15:17
24:7 25:14
26:4 40:13
44:25 46:12
67:5 79:11
111:15,21
117:20 118:7,

9 126:1,15
132:8 136:4
156:12
157:13,16
173:10
**looked** 10:5
15:13,15 16:2
29:23 30:21
38:19
**looking** 45:18
133:11
**looks** 30:1
**lot** 5:7 13:17
48:19 52:7
68:3,5 78:22
88:3 122:18,
21,22 124:23
125:23 140:4,
7 171:1
173:23
**lots** 141:9
**lying** 125:1
**Lynn** 118:19
120:5,6,22
121:8,15,22,
23,24 126:20
127:3,7
129:12 174:14
**Lynn's** 120:12
**Lynnwright@**
**informationdef**
**ense.com.**
119:11

———————

**M**

**made** 10:3
24:20 36:11,
19 42:18 43:6
71:2 76:23
87:20,22
112:15 113:15
114:13,15
126:4,10,12
127:8 147:19
163:24 164:15
**Magazine** 67:1

**magazines**
34:20,23 35:1
**mail** 95:1
132:23 133:2,
24 135:17
136:4,6,15,
18,19 138:1,3
**mailbox** 130:1
131:21,22,23,
24,25 132:4
133:10,14,18,
20 134:19,23
135:2,23
136:14 137:2,
12,17,18,20
148:12,15
149:11,12
**mailing**
130:12 131:6
**maintained**
40:17 41:3
**make** 42:1,13,
14 43:24 44:5
87:20,21
99:18 100:14
109:21 113:1
114:7 145:15
160:21
**makes** 7:12
54:6 133:25
**making** 24:19
42:11 128:9
147:16
**maliciously**
161:5
**man** 123:10
139:8
**manager** 71:22
119:21 121:12
**managers**
129:13
**managing**
71:19,25
119:23 121:12
127:13 129:13
**many** 10:10
12:2 37:14,25
48:16,23

116:10 122:3,
9 125:19
168:22
**March** 76:15
92:25
**mark** 66:24
116:13 149:21
**marked** 13:2
24:12 27:3
40:5,9 52:5
57:15 66:20
69:5 76:3
88:8 119:7
129:3 130:5
134:5 149:23
**market** 73:11
**marking** 12:21
57:17 69:7
76:5 88:10
129:6 134:7
**matched** 96:20
**matter** 123:25
172:14
**Matthew** 39:8
**may** 5:23,24
6:3,24 8:17
28:18 29:23,
24 30:21,22
34:16 36:11
38:19 49:19
52:19,24
53:22,23
72:19 73:13
76:25 77:25
79:8,22 93:8
95:1,7,14,23
111:8 117:14
131:14 134:21
141:12,17
144:8 145:8
150:22 170:9
**maybe** 9:25
18:1 21:17,19
33:19 39:25
48:8,17,19
50:1,15 55:4
65:8,18 66:9
152:20 170:12

**Mcgregor** 60:9
**me** 6:9,19,20
7:5,12,17,20
8:3 12:5,10,
13 14:17
16:2,10,13,
19,25 17:5,
11,12 18:16
20:17 21:23
22:20 23:23
24:7 29:6
30:20 31:13,
15 36:22 39:2
42:1 44:15
45:12 46:4
48:25 49:23
52:19,22,24
53:2 59:15
62:16 64:2,8,
13,14,21
68:11 71:21
80:22,23
82:17 83:2,5,
14 84:21
85:7,13 86:3,
17 87:1,12,22
89:11 90:1,10
94:10,14,15
96:15,19
101:5 102:24
103:21 104:24
105:17 107:1
109:23 111:20
117:17 118:1,
6 120:20
123:7 124:22
125:14,25
126:16 127:2,
15 132:11
134:24 135:21
136:7 137:4,
25 138:1,2,11
139:3 140:8,
17,18 141:23
142:10 143:4
151:5,14
155:19 158:9,
12 159:5,19,
20,25 160:8,

13 164:7,11
166:12,13,20,
25 167:9
168:2,10,13,
20 169:9
170:15
**mean** 10:11
15:14,22
16:6,22 24:20
25:16 34:10
35:14 49:7
68:3 90:6
100:1 108:8
109:25 115:16
124:3 125:7
128:3,11
137:18 139:2
143:3 149:5
152:17 171:5
**meaning** 18:10
**means** 53:7
54:25 119:20,
22
**meant** 28:1,
18,25 133:11
142:7 160:13
168:2
**medical** 11:13
12:7,12 93:1
107:23 108:2,
9
**medication**
6:23,25
**meet** 92:19
134:24
**meeting**
39:20,24
**member** 40:18
41:4 71:10,
12,13,19,25
110:16,17,18,
23 111:12,17
119:23 121:12
126:8 127:13,
19 149:2,4,9
**members**
110:24 111:7
115:9 129:13

138:24
**membership**
174:15
**memories**
141:7,9 142:3
**memory** 68:2,
15,17 139:2
140:1,16
141:22 142:3
143:12,13
**men** 94:4
**mention** 10:20
17:1 18:19
124:8,12
151:11,16,18
162:22
**mentioned**
10:19 16:25
17:14 18:18
19:2,4,23
20:8 31:23
32:2 59:14
75:23 94:21,
23 112:4
141:20 151:3
161:13 171:21
**mentioning**
140:9 151:5
153:9
**mentions**
151:11
**met** 92:14
94:3 152:21
**meter** 169:20
**metered** 157:3
169:17
**methods** 90:2,
25 161:10
**MGR** 119:18,20
**MGRM** 119:18,
22
**Miami** 11:7
93:14 107:19
108:14 110:4
**might** 7:16
37:22 48:17
56:5 66:17
82:5 89:19

100:21
**military**
19:19
**million** 61:3,
5 96:10,12
97:20 125:13
147:3
**millions**
122:24
123:23,25
124:2
**mind** 7:3 24:9
27:23 87:13
105:23 143:17
156:16
**mine** 34:2
91:13 124:5
**mined** 80:10,
13,15 81:6,25
83:21 84:4
89:18 91:17,
21 92:5
96:10,12
97:20 99:9,21
111:25 112:22
115:11 117:5
124:23 155:11
166:8,18,23
167:6 171:1
172:5
**mining** 80:18
88:25 89:9,14
104:13 106:3,
7,14,18,22
107:17
108:13,17,19,
20,23,24,25
109:1,4,5,8
110:5,6
115:13 157:1
166:16 167:3,
12,19 168:2,
4,7,10 169:14
172:21
**minor** 73:13
**minute** 13:7
87:21 143:17

**minutes** 9:25
10:2,4,5,9,10
88:2 171:13
**misappropriate
d** 161:5
**mischaracteriz
es** 32:23
36:14 39:13
41:16 50:2
98:24
**misled** 74:7
**misrepresentat
ions** 147:16
**missed** 5:14
**misstated**
64:22
**mistake**
36:11,20,25
**mistaken**
67:22
**mistakes**
24:19,20
**mom** 8:18
14:21
**moment** 28:11
38:2 67:15
107:5 125:24
171:20
**monetary**
158:16 159:2
**monetizing**
41:14 42:4
**money** 15:9,11
16:15,18,21
17:19 18:11
19:5,24 20:9,
15,16 21:1
22:9 86:15
93:21 94:6,9,
11,13,18
96:15,23
109:21 124:7,
14 140:4,7
144:11 147:13
150:14 151:4,
6,9 154:20
168:1,5,8

month-year-old
  14:14
months   48:8
  90:10 97:11
  151:8
more   7:12
  9:14 38:4,6
  42:12 68:3
  79:7 90:18
  114:20 150:10
  157:10,12
  160:18 163:5
  170:20,21
  171:1
morning   4:8,
  25 5:1
mortgage
  62:24 71:1
mortgaged
  73:11
most   10:14
  33:17 34:8
  63:2 78:3
  123:14
mostly   152:17
mother   8:17
motion   42:13,
  14 85:16
  87:25
motorcycle
  150:24
Mount   83:21
  84:4
mouth   93:5
move   64:24
  100:14,25
  114:20
moved   9:19
  10:15 99:21,
  24,25 100:3,9
  113:4,7 171:3
moving   42:9
  99:23 113:8
Mr   4:13,15,
  16,24,25 6:3,
  5,6 7:6,10
  8:8,9,11,12,
  14 9:4,6

10:25 11:2,5,
6,19,20,24
12:1,20,22,23
13:3,6,9
15:18,19,21,
24 16:5,7
17:7,9,20,23,
25 18:1,4,6,
8,13,14 19:7,
8 20:1,2,3,5,
7,11,13 21:2,
5,21,24
22:21,24
23:21,23,24
24:2,6,10,13
25:21,23
26:2,3 27:4
28:13,15
30:12,14,18
31:15,22
32:10,12,16,
23,24 33:1,2,
3,7,9,12,14
35:2,4,9,10,
23,24 36:1,6,
9,14,18,21
37:1 38:17,22
39:4,13,17
40:6,20,21
41:9,11,16,
19,21,25
42:1,8,14,15,
24 43:5,15,23
44:2,4,9,13
45:3,9 46:6,
10 47:8
48:10,11,13
49:2,4,6,9,22
50:2,4,18,20,
25 51:7,11,16
52:6 53:16,20
55:10,13
56:14,18,22,
24 57:12,16
58:3,8 59:19,
22,25 60:6
61:3,4 62:17,
19 63:7,10,
19,21 64:4,7,

8,9,10,12,13,
22,23,25 65:5
66:7,11,21
67:8,17 69:2,
3,6,15,17
70:2,4,8,11,
17,19 71:4,6,
14,17 72:13,
17 73:5,7,8,
17,20,25
74:3,14,15,
19,21 75:11,
15,16 76:4
78:12,14,16,
17 80:4,6
81:1,4,8,10,
15,19,23,24
82:3,6,16,22
83:11,15,23
84:3,6,7,19,
21,24 85:2,
10,12,15,17,
18,22,24
86:2,4,5,7,
10,11,12,14,
19,23,25
87:1,4,10,16
88:1,9 90:12,
16 91:2,4,5,
7,18,22,25
92:3,6,11
96:4,7 98:16,
19,24 99:2,6,
12 100:16,18,
22,24 101:2,
4,12,13
102:3,7,10,
11,14,16,19,
21,23 103:1,
14,16,17
104:10,16,21
105:1,3,7,9,
11,13,17,19,
21,22,24
106:1 114:4,
18,23 115:2
116:13,17,23,
24,25 117:2
119:1,8

122:5,7
128:5,7,8,11,
12,14,15,17,
19,22,23
129:4,5 130:6
134:6,8,9,10
142:14,16
143:17,19,23,
24 144:1,2,3,
4,5,20,23,24
145:3,17,20,
21,24 146:1,
2,4,5,16,25
147:6,25
148:1,3
149:20,24
159:10,12,13,
15,16,18,21,
24 160:2,4,9,
10,18,20,21,
23 161:1,16,
19,22 162:1,
7,10,16,19
163:14,17
164:10,13
165:16,19,23,
24 166:5,9
167:20,23
169:7,11
171:11,12,19,
20,24 172:16,
17,19,23
173:1,7,9,12,
14,23 174:2,
3,6,7,10,12,
13,20,22,24,
25 175:1
much   8:13,19
13:15,19 25:9
33:23,25
65:12 84:18,
20,22 86:14,
15 87:12
90:11,22
124:6 157:12,
17 170:18,23
multiple
114:19 116:3
169:24,25

**my** 5:2 7:3,
19,21 12:11
13:15,17,24
14:13,21,25
15:1,9 16:21
21:25 24:9
25:4 27:14,23
28:5 29:7
31:1,13 34:2
39:16 42:23
47:22 49:13
57:9 62:16
64:2,21,23
67:10 69:11,
12 73:23
75:6,14 76:14
78:5,6 80:22
88:14 90:6,8
95:4,18,19,21
97:10,11
99:10 114:4,
5,21 115:2,3,
4 121:19
123:6,15
125:4,16
126:8 127:12
129:21 132:13
133:8,16
135:21
137:17,18
141:22 142:12
143:12,14
146:11,13,24
150:10 151:9
155:9,21,22
156:9,10,19,
24 158:8,12
159:5,8,20,25
160:12 161:12
164:11,14
167:10,13,21
168:10
**myself** 14:13
**mysterious**
24:18

---

**N**

---

**Nakamoto**
99:18 100:12
**name** 5:18
19:12,14
54:13 59:6,8,
11 120:6,8
125:15 126:17
127:16 152:23
170:12
**narrow** 114:5
**nearing** 93:2
**necessarily**
100:17 110:12
**necessary**
31:21
**need** 6:9,12,
15,18,19 13:6
21:18 26:17
33:5 35:2
50:5 77:16
78:5,18
84:19,22
85:3,4,10,14
98:21 111:7
113:14,16
114:4 116:20
121:18 123:3,
16 128:1
135:1,5 146:3
149:7 155:21
159:8 174:25
175:1
**needed** 25:1
69:22 134:19
136:5
**needs** 24:4
44:19
**nervous** 7:12
24:19
**never** 10:19,
20,23 12:4,12
16:23 17:18
18:3,10,25
19:4,22,23
20:8,11,19

36:7 43:24
44:5 53:10
54:1 55:5,11
59:14 75:2
77:6 79:19
82:10 83:8
89:22 94:21,
23 96:1 98:2
99:21,24
100:3,9
101:15 113:4,
7 124:15
130:21 131:25
135:24,25
136:1,2
140:18 148:6
149:3,7 152:5
**new** 53:7
130:16,25
131:2
**news** 15:6
24:18
**next** 14:15,20
20:20 79:22,
23 80:24
104:4 106:2,
6,17 107:15
115:7 151:7
158:20 161:9
164:7
**Nguyen** 58:20
60:6
**night** 28:8
**no** 5:16 6:2,
14,25 8:3,13,
22 9:15 11:9
12:16 13:1
14:7,21 15:11
16:16,22
17:23 18:6,13
19:7,13 20:1,
4 22:10,13,
16,23 23:1,5,
12,15 24:9,11
27:2 29:14,
16,18 32:4,8
33:7 37:7
39:6 40:3,4,
20 41:9 43:13

44:2,7 45:3,
12,24 46:4,
14,17 47:7,15
48:10 52:4
53:11 55:6,12
56:10 57:14
59:9,21,24
60:2,5,8,11,
14,17,20
62:1,11,21
65:23 66:18,
19 69:4 70:23
71:2 73:2,8
74:6 75:1
76:2,13 77:6,
9,23 78:19
79:6,10,21
82:20 85:1
86:3 87:17
88:7 89:25
92:16,18
94:1,22,24
96:24 97:15
98:20 100:22
103:2 105:14
109:6 111:4
112:5,6,16
113:21 114:2,
25 117:21
118:7 119:6
121:20 122:1
123:6 124:16
125:16 126:2,
19 127:20
129:2 130:4
132:5,24
133:11 134:4
135:1,9,18,24
136:10 137:8,
25 138:22
139:2,20,22
140:8 142:20
144:6,7
145:8,11,12
146:11 147:2,
9 149:5,22
151:23 152:3,
7 153:5,20,
22,25 154:15,

18,21 156:2,
17,21 158:2
160:18 165:5
167:3 168:5
172:14 174:5,
22
**nobody** 105:9
123:8,9,20
**none** 20:23
77:20 96:25
97:6 123:9
155:12 171:2
**normally**
85:19
**Northlake**
130:10
**not** 6:3,17
8:13 11:22
19:10 24:5,22
27:1,25 28:5,
22 29:6,10,25
32:1,9 33:5
34:4,18
35:11,15,16,
19 37:19
43:2,15,17
46:4 49:22,24
54:22 56:4,12
57:20 59:10,
12 61:16 62:7
64:4,20 68:6
69:10 72:25
73:2,14 77:1
79:1,21 81:20
82:20 83:9,
16,18,19
84:24,25
85:2,6,8,9
86:5,6,8,11,
16,17,22,23
87:2,13,17,22
90:24 92:21,
23 93:13
94:14 97:1,2,
4 100:17
103:3,6
107:14 108:10
109:4 110:12,
24 111:7,14

112:7,12,24
113:8,10,17,
18 114:18
115:2,3
116:19
118:16,24
121:11
125:16,24
126:24 127:3,
6,10 128:13,
17,20 131:14
135:1,16
137:25 140:1
145:24 146:1,
8,10 150:13
153:25 156:4,
9,12 160:7,
20,22 164:24
166:21 173:6
**Notary** 4:4
**note** 151:19
**nothing** 20:3
82:19 89:16
125:5 140:2
**noticed** 10:3
55:11
**notify** 137:4
**now** 10:6 16:6
25:18 26:22
30:1 32:22
41:12 49:13,
23,25 62:8,15
68:4,5 84:12
97:23,24
98:23 99:13
117:23 120:19
121:8 124:24
143:5
**number** 4:11
38:3 61:5
68:23 79:12
83:6,20 90:15
112:10 144:1
**numbered**
57:20
**numbers** 29:20
30:4

**numerous**
104:6

## O

**object** 6:15
11:21 82:17
105:18 160:9
174:2,6
**objecting**
160:8,10
**objection** 8:8
9:4 10:25
11:5,19 15:18
16:5 17:7,20
21:2,21 24:2
32:10,23
33:7,12 35:23
36:6,14,21
38:17 39:13
41:16 44:2,9
45:3 49:2,6
50:2,18 55:10
56:14,22
57:12 58:3
63:7,19 66:7
69:2,15 70:2,
17 71:4,14
73:5,17,25
74:14,19
75:15 78:12,
16 80:4 81:1,
8,15,23 82:3,
16 83:11,23
84:6,19 87:16
91:18,25 92:6
96:4 98:16,24
99:6 100:16
101:2,12
102:3,10,14,
19,23 104:10,
21 105:3,8,18
160:8,21
161:16,22
162:7,16
163:14 164:10
165:16 166:5
167:20 169:7
172:16,23

173:7,12
174:10,20
**objectionable**
160:7
**objections**
87:23 160:7
**obligation**
74:10 137:6,9
**obligations**
73:12
**obtained**
43:20 107:8
126:13 158:16
159:4
**obvious** 83:7
**obviously**
88:2 101:6
137:21
**occasions**
65:1
**occupation**
54:6
**occurred** 73:2
106:22 120:25
**occurring**
109:23
**October**
130:18
**odd** 20:14
**of** 4:5,9 7:3,
5,9 8:15,18,
20 11:11,12
12:8 13:17,24
15:12 16:2,23
19:10,16,20
20:20,23
21:13,15,16
24:7,21,24,25
26:8,14,23
27:15,19,24
28:12 29:9,
20,24 30:4,8,
24 31:1 32:7,
19 33:17,25
34:1,2,11,15
35:4,20,21
36:12,24
39:1,16

40:14,18
41:4,15 42:3,
6,11 43:18
44:15 45:6
46:24 47:10,
16,19 48:9,
17,19 49:3,
17,23 52:7
54:11 55:16
57:8 61:6
63:2,24,25
64:1 65:3,22,
24 66:8,14,
22,23 67:3,11
68:5,10,24
70:5,12 71:7,
10,12,13,19
73:1,11 74:23
75:22,23 76:8
77:13,20
78:1,10,20,22
79:16,21
80:1,2,7,14,
16,19 81:2,12
82:9 84:10
85:4,7,23
87:3,18,22,
23,24 88:24,
25 89:1,8,11,
13 90:2,12,
19,25 91:16,
23 92:21,23
93:1,5,11,16,
21 94:6,9,13,
18 96:10,25
97:1,6,22
98:2,5,11
99:11 100:14
101:22
102:17,18
103:24 104:1,
17,24 105:14
106:3,7,13,
18,21 107:1,
3,24 108:8,25
110:1,14,16
111:3,6,20
112:1,5,23
114:3 115:1,

9,10,25
116:7,14
117:17,19,22,
25 118:2,9,
16,20,22
119:3,17
120:11,15,16,
23,24 121:5,
16 122:9,14,
18,21,22,24
123:6,9,14,
23,25 124:2,
17,20,23
125:7,14,16,
17,23 126:6,
14,21 127:9,
11,17,18,19,
21 129:16,17,
18,23 130:1,
2,12,16,22,
23,25 131:2,
13,20,21,22
132:2,20,21,
22,25 133:1,
17,22 135:20
136:8,9,13,
15,17 137:4,7
138:11,15,17,
20,23 139:2,
10 140:4,7,
11,12 141:9,
22 142:6,17,
22 143:3,4,6,
14 144:7
145:11,14
146:8,15
147:22 148:18
149:2,4,5,8,9
150:12,18
151:19
152:16,23
153:3,10,14,
23 155:5,12,
13,15 156:6,
11,16 157:1,
6,15 158:13,
16 159:1,24
162:14,21
163:1,3,5,9

164:3 165:12
166:4,10,15
167:3,5,12,19
168:7,14,19
169:14,17,18,
19,21 170:13,
25 171:2
172:11,21
173:23 174:8,
13
**off**   25:24
30:15 35:6
63:12,18
68:24 87:4,6,
7,10 89:8
103:14,15
125:16 128:1,
24 143:20
165:20 171:15
174:23
**offered**   54:2
**offhand**   90:24
107:14
**office**   27:25
28:2,5 129:17
**officer**
152:25
**often**   19:17
50:10
**oh**   20:21
160:4
**okay**   13:22
14:4 19:1
27:8 37:18
40:15 41:6
42:13 47:21
50:15 51:20
52:3 57:22
60:22 66:1
67:7 70:7,9,
22 71:23
72:11,23
73:15 74:20
76:14 78:6
79:18 80:23
85:17 88:18,
21 90:4 92:13
93:18 94:7
96:17 103:13,

18 104:17
105:21,24
108:7 111:9,
24 114:5
115:3 121:7
122:10 127:1
128:15 129:14
140:24 148:5
149:19 150:1
154:23 158:21
159:16 160:10
161:3 163:23
164:21 172:17
**old**   8:1 34:21
35:12,17
97:11
**older**   7:19,21
8:3
**oldest**   13:15,
17
**omissions**
164:3,5
**on**   5:11,14
6:20,23 10:6
11:10,19
14:3,21,24
15:2,6 16:2
19:19,24
20:9,15,16,
18,22,25 21:6
22:9 24:9,14
26:1 29:20,
22,24 30:9,17
35:8 42:8,13
43:18 44:19,
25 45:20,22
46:18,21 47:1
50:14,17 53:7
54:15 55:8,
12,20 56:13,
16 57:3,8,10
64:25 65:13,
19 66:3,9,13,
17 69:13,25
70:12,20
71:1,18,22
72:17,21
73:21 75:11,
17 76:7,12

77:25 78:9
84:21 85:18
86:10,20,25
87:9 88:15,22
92:25 93:23
94:10,25
96:14,23
100:5 102:8,
12,17 103:8,
9,16 105:10
107:5,22
109:7,15
110:5,19,20,
25 111:7,10
112:22 114:20
116:13,19,21
117:8 119:12,
14 126:7,21
127:12 128:10
129:1,8,17
130:9,11,14
131:8 134:21
137:15
138:12,25
139:7,13,19
140:9,13,14
141:14,17,23,
25 142:4,7,25
143:7,8,13,22
144:10,20
145:6 146:6,
13 147:12
148:6 149:4
154:12,13,16,
20 155:2
158:23 164:4,
8,22 165:22
166:21 168:16
170:14 171:17
174:8

**once** 16:10
19:22 36:22
44:11 108:5
143:14 151:6

**one** 5:15,16
10:14 14:21
38:4 45:6,11
54:11 65:7
66:22 75:7

78:1,2,9,10,
23 79:2
88:19,24
90:17 94:12
95:6 100:14
101:22 107:10
112:11 113:16
114:5,20
115:20 116:5
118:24 123:16
125:22 133:22
139:10 142:24
143:6 146:12
150:16 170:12

**ones** 49:20
118:21

**ongoing** 60:24
79:16

**online** 7:5
10:4,6

**only** 11:15
12:6 20:14
45:6 54:2
55:15 57:6
67:11 70:14
71:18,21
73:10 78:20
93:12 94:17
97:16 105:16
110:16,17,18,
23 111:12,17
112:3 123:4,
11 126:8
133:9,20,22,
25 134:2
135:7,9 139:3
140:6 141:16
157:16 160:7

**open** 71:7
73:3 101:20,
23 137:19

**opened** 73:8

**opening**
137:17

**operating**
45:20 126:2
132:13

**opportunity**

87:11

**oppose** 88:2

**or** 4:21 6:13,
14 9:25 10:9,
23 11:16
13:24 17:19
18:11,22
19:5,24 20:9,
10,15,23 25:5
28:21 30:22
31:11 32:6
34:11,22
35:12,16,20
41:9,13,14,
15,23 42:6
43:7 46:12,
15,18 48:18
49:7 52:19
53:25 56:12
57:4,8 61:18
62:21 64:19
65:18,20 66:9
67:2,19 68:6
71:12 75:2,
21,25 77:1,
21,24 78:10
79:1,14 80:1,
7,25 82:11,20
83:2,7,9,17,
19 84:1,2
91:16,17,21
95:2 96:22
98:7 109:4,13
110:15 113:17
115:16,17
119:18,19
121:11,12
122:14,15,23
123:10,12
124:13 125:2,
13 126:24
127:10 132:21
134:19
135:16,21
138:15
140:22,24
144:6,7,8
145:15,22
147:2 148:7

149:6 151:18
155:2,23,24
158:10 159:2,
21 160:21
161:6 164:3,
22,24 166:17,
19 167:1
169:13 170:1
171:13

**order** 77:7,21
165:25 170:14
171:21

**originally**
84:1 90:15

**originated**
92:9 104:13

**other** 8:19
66:15 73:13
78:11,25 79:4
82:11 96:21
111:11 112:5
115:23 118:9
123:11 124:17
134:2 136:17
138:24
152:16,20
157:4 163:25
167:1,5,8,10,
24,25 170:5

**otherwise**
31:18 41:14
42:5 46:12
134:25 147:2
148:7

**our** 6:12
87:24 156:20
157:20

**out** 11:16
13:14 16:1
30:5 32:20,21
36:10,11,13,
16,24 45:11,
14 49:15
65:2,6 68:20
69:25 79:3,8
86:12 88:4
93:1,11 95:4,
13,18,19 96:1
98:5 118:3

122:24 125:23
132:9 137:16
139:24 141:25
142:2,7,18
145:2 150:24
155:14 170:22
Outside   167:5
outstanding
71:1 73:12
over   6:9 16:2
31:11,20,25
32:2,7,9 34:6
66:23 67:23
80:8 82:15
83:10,22 84:8
96:10,12
97:25 98:4,23
99:5 121:24
134:24 137:22
149:6 154:4
156:11,16,19
overwriting
52:15 53:3
own   9:15 15:9
16:18,21
20:16 75:6
84:16 94:11
96:15 115:23
126:18 144:8
146:11,13,24
155:3,7
168:1,5,8
owned   68:23
84:1 115:24
155:5 165:12
owner   13:24
14:2 126:6,14
127:11
ownership
80:8 82:15
83:9,22 84:8
97:25 98:23
99:4 126:3,11
127:9 171:9

---

P

---

Paez   4:15

page   13:10,20
27:7 47:19
49:13 57:21
60:21 70:20
72:22 75:17
76:7,13,17
79:11 88:22
93:25 119:17
130:8,22,23
134:16,21
144:5 149:25
158:20
pages   76:12
118:18
Paige   17:14
18:10 37:12
38:1,8,12
39:4,5,9,12,
18 40:8,11
41:13,23
42:19 43:8,12
57:23 58:1,9
61:15 95:8,9
132:14,17,21
134:12 135:6,
14 136:3
138:5,15
Palm   9:24
152:18
paper   29:25
30:8,9 34:10,
15,16,17
52:11 57:8
papers   24:1,
21,24 25:8
30:19 32:20
34:18 35:20,
22,25 36:3,4,
8,12,16 49:14
52:7 121:19
paperwork
35:16
paragraph
13:13,21 14:3
24:17 40:13,
14,24 41:12
42:16 67:5
70:13,20
72:21 88:17,

20,22 90:2
91:8 92:12,24
93:17 94:1,25
96:8 103:10,
11,12,18
106:2,10
111:23 112:20
118:17 126:1
147:21 148:2,
4 149:18
151:15 154:22
158:20 161:2,
9 162:20
163:22 164:7,
20
paragraphs
94:2
parents   8:7,
10,21,24 34:2
part   10:14
34:8 121:5,16
137:4 162:14
participate
144:13
participation
91:19,20
particular
146:19
parties   41:15
42:7
partition
57:10
partitions
55:20 102:17
partner
138:25
partners
115:8 124:23
138:24 155:10
173:15
partnership
80:5 94:15
99:8 101:5
103:19 106:4,
8,15,20
115:14 166:1,
4,11 170:15
171:5,7,25

172:3,5,7,12,
21
partnership's
156:20 170:23
Paschal   4:13,
24 6:6 7:10
8:9,12,14 9:6
11:2,6,20,24
12:1,20,23
13:3,9 15:19,
24 16:7 17:9,
25 18:4,8,14
19:8 20:2,5,
7,11,13 21:5,
24 22:24
23:23,24
24:6,10,13
25:21 26:2
27:4 28:15
30:12,18
31:22 32:12,
24 33:2,9,14
35:2,9,24
36:1,9,18
37:1 38:22
39:17 40:6,21
41:11,19,25
42:8,15 43:5,
23 44:4,13
45:9 46:10
48:11,13
49:4,9 50:4,
20 51:7,16
52:6 53:20
55:13 56:18,
24 57:16 58:8
61:4 62:19
63:10,21
64:7,9,12,22,
23 65:5
66:11,21
69:3,6,17
70:4,19 71:6,
17 73:7,20
74:3,15,21
75:16 76:4
78:14,17 80:6
81:4,10,19,24
82:6,22 83:15

84:3,7,21,24
85:10,15,18
86:2,5,10,12,
19,25 87:4,16
88:9 90:16
91:4,7,22
92:3,11 96:7
98:19 99:2,12
100:18,24
101:4,13
102:7,11,16,
21 103:1,14,
16,17 104:16
105:1,7,11,
13,19,22
106:1 114:23
116:17,24
117:2 119:1,8
122:7 128:7,
11,14,17,22
129:4 130:6
134:6,9,10
142:16
143:17,23
144:2,4,23
145:3,20,24
146:4 147:6
148:1,3
149:20,24
159:12,15,18,
21 160:2,9,
18,21 161:1,
19 162:1,10,
19 163:17
164:13
165:19,23
166:9 167:23
169:11
171:11,20,24
172:16,23
173:7,12
174:2,6,10,
13,20,25
pass  11:15
14:2 108:5
passed  8:16,
17 61:23,25
62:2,4,9,11,
13,16,22,25

63:6 72:2
passes  140:21
password
44:24 45:1,7,
10,14 77:14
passwords
56:5 57:2,6,
8,10 78:21
past  62:7,25
path  50:5
Patrick  17:14
18:10,18,21
37:12 38:1,8,
10,12 39:4,5,
9,12,18 40:8,
11 42:18
43:8,12 55:4,
15 57:23
58:1,7,9
61:15 95:8,9,
17,20 129:24
132:2,14,17,
21 133:22,23
134:2,12,22
135:6,14,19
136:3,5,8
137:4,6,21
138:5,15
151:4,5,9
153:9
Patrick's
135:9
pause  11:21
148:8
pay  61:15
63:12,15
68:24 109:21
110:2
payday  65:24
66:13,16
payment
134:19 157:4
169:17,20
penalty  26:8,
23 27:19
47:10,16
68:10 76:8
110:14

pending  17:24
18:6,13 19:7
20:1,4 28:14
33:8 40:20
44:3 45:4
48:11 100:22
people  66:15
82:12 151:8
perhaps
29:23,25
30:22 72:8
84:2 113:7
period  10:2
11:11 93:16
perjury  26:8,
23 27:20
47:10,17
68:10 76:8
110:14
permanently
54:24
person  20:14
95:8 97:16
134:2 135:10
150:12 154:2
personal
40:17 41:3
42:3 50:14
63:24 73:1
130:2 131:20,
22 132:20,25
133:2,13,16,
19 135:12
136:8 137:10
140:11 142:5,
11 144:6
145:11,12
146:10
148:16,21
166:10,15,22
167:3,11,13,
18,25 168:7,
14 169:19
personally
96:11 109:6
phone  5:21
61:16 85:18
110:2 154:7

physical
34:14
picture
143:15
pictures
15:12 53:25
piece  29:24
30:8 34:15
57:8
place  89:14
104:14
placing  53:7
plaintiff
4:16 60:24
81:21 155:20
159:7
plaintiff's
60:23
plaintiffs
158:4,25
163:8 164:4
planner  69:12
played  19:17
please  4:12
27:6 41:17
46:8 57:20
62:17 72:25
76:7 82:17
103:21 104:8,
18 106:18
117:1 155:6
159:3,18
160:4 165:13
plenty  85:21
point  36:23
38:20 50:17
123:24 128:15
145:15 150:16
151:14 160:11
police
152:19,25
Ponce  4:10
portion  80:2
81:2,12 90:12
91:3,6 99:11
108:8 116:14
117:1 146:19

position
  72:25 81:6
  108:12 110:4
possession
  75:21,22
  112:1,23
  169:16
possibility
  98:10,13,14
possibly  25:3
  52:25 68:3
  95:21 102:22
  117:12
potential
  72:14 96:2
prepared  34:5
present  155:2
  164:23
pretty  133:3,
  17 160:25
prevent  6:24
prevented
  132:1
previous  8:10
  64:21
previously
  160:17
primarily
  49:11 78:2
  79:2
primary  42:23
principal
  129:17
principals
  41:15 42:6
prior  29:9
  39:19 51:18
  80:10,13,15
  104:12 152:18
  157:1 169:14
private  29:15
  56:12,13,21
  77:24,25
  78:7,9 98:9,
  14,21 115:10,
  15,16,17,23
  116:10,16,18
  117:4,11

privilege
  84:25 86:10,
  11
privileged
  142:15
probably  7:3,
  4 9:10 16:24
  25:11 52:18
  54:22 77:13
  90:18 115:18,
  20,21 118:1
  124:5 150:22
probate  70:23
  71:7 72:3
  73:2
problems
  13:18
proceeding
  70:24
proceedings
  72:3 148:7
  169:16
process
  161:11
produce  34:19
  35:11,13
  38:24 127:23
produced  31:6
  33:5,6 34:4,5
  38:19 75:8
  89:14,15,16
  104:2 117:14
  118:10 127:21
  157:21,24
  168:20 169:4
  173:24
producing
  127:24,25
  128:6,9,14,
  18,20
professional
  4:4 45:22
  46:12 55:24
  56:8
proffer  55:7
  71:21
program  53:24

programming
  161:10
project  16:25
  22:11,14,17,
  19 23:2 24:8
prompted
  44:21 45:7
prompts  44:18
proof  144:7
properties
  155:4,8,24
  165:11
property
  40:18 41:4
  42:3 73:10
  103:19 104:8,
  20 105:15
  106:4,8,14,19
  107:17 108:14
  110:5 155:5
  156:23
  158:10,11,16,
  18 159:2,4
  161:14,15,20
  162:3,15
  163:10,13
  165:12 166:8
  168:15 169:5
  172:8,11,14,
  20
prove  83:7
  100:19,25
  101:1
proven  82:10,
  14 83:20
provided
  60:25 83:14
  89:8
proving
  100:12
PTY  120:10,20
  121:2
public  4:4
  29:12 30:1,9
  79:13,17
  80:23,24
  81:12,14,25
  83:7 121:5

publicly
  170:25 171:2
punitive  61:6
purchase
  90:9,11 91:9,
  10 92:8
purchased
  90:8,15,22
  91:17,21,24
  92:4
purported
  122:15 138:9
  140:13 174:14
purpose
  112:8,12,13,
  24 113:8,10,
  18,24 114:2,
  25 115:3
  118:2 164:3
purposes
  91:16
pursuing
  73:14
put  14:5
putting  56:4

                Q

question
  6:11,16,17,23
  7:6 11:20
  13:12 17:23
  18:6,7,9,13
  19:7 20:1,4,6
  21:25 22:21
  27:9,14 28:5,
  14 29:7
  31:13,16,19
  33:8 40:20
  41:9 43:1,2,
  4,19 44:2
  45:3,5 46:7,9
  47:22 48:10,
  12 49:13
  50:25 51:6,12
  57:9 64:13,
  15,20 68:7
  72:16 73:23

78:5,6 79:14
80:23 84:21
85:6,12 86:17
87:15 90:1
99:1 100:22
106:12 114:4,
5,11 115:2,3,
4 116:15
119:24 133:16
144:21 145:23
147:1,5
156:9,10
159:11,12,18
160:15,19,24,
25 161:12
164:14
167:10,16
**questions**
7:16 49:17
51:2 64:17
85:3 86:8
105:18 121:18
160:11 171:14
174:22
**quick** 17:13
103:14
**quite** 70:24
75:7 173:6

---

R

**racked** 150:16
**Ramona** 60:3
**random** 29:24
30:5 56:5
154:10
**randomly** 24:5
**range** 48:9
90:18
**rarely** 11:3,4
**re-ask** 18:2,7
**reach** 65:6
**reached** 95:2,
4,13,18,19
96:1
**reaching** 65:2
**read** 14:3
41:17,21

52:17 53:1,
10,12 54:19,
21 84:15
91:10 145:9
159:19 174:24
**reading**
158:19
**ready** 137:21
**real** 103:14
**realize** 17:18
18:2,9 19:3,
11 20:8
120:21 121:1
**realized**
11:7,9 95:18
**really** 17:13
56:4 78:5
116:9 127:10
140:18 153:25
163:1
**reason** 7:1
23:1 27:21,23
28:12 37:19
42:23 43:18
46:4 48:14
50:16 51:21
66:12 70:24
73:8 85:13
122:10 140:8
160:7
**reasons** 85:25
100:21
**recall** 5:18,
20,21 24:15
36:3 37:14
39:15 47:5
49:21 55:15
65:2 77:1
78:25 87:25
93:9 107:5
111:3,6 130:3
142:24,25
144:17 147:14
151:1 157:5
170:10 171:21
173:4
**receive** 93:6

**received**
32:13 43:17
93:4 130:18
135:20 148:25
149:7
**receiving**
132:22 135:19
**recess** 25:25
30:16 35:7
87:8 128:25
143:21 165:21
171:16
**recognize**
88:11 129:6,
22 130:19
**recognizes**
129:18
**recollection**
142:9 143:14
**record** 4:12
6:3 25:24
26:1 30:15,17
35:6,8 41:18,
22 42:1 75:19
87:4,6,9,11
88:5 103:14,
15,16 108:9
128:5,10,12,
16,24 129:1
143:20,22
165:20,22
167:15
171:15,17
174:23
**records** 11:13
70:25 107:23
108:2 132:9
**recover** 45:22
53:8,14,22
**recovering**
45:25
**recovery**
53:23 54:15
**redirect** 42:9
**refer** 107:12
117:9,11
118:5 161:14
163:12

**reference**
16:17,20
**referred**
46:1,16
**referring**
19:2 36:12
47:25 48:18
70:14 113:5
151:12,17
162:13 169:22
**refers** 109:4
**refinance**
63:5
**reflect** 140:9
**reformat**
44:22 45:17
46:23
**reformatted**
44:14,15
45:16,21
46:11,22 57:4
102:13
**reformatting**
53:7 54:20,23
**refrain** 7:8
**refrained**
12:8
**refusing**
85:25
**regard** 144:6
145:12
**registered**
4:4 54:13
**Registration**
129:16
**regularly**
48:18
**Reinhart**
85:19
**Reinhart's**
171:21
**reinstated**
121:25 126:21
127:5
**relate** 43:17
162:5 174:14

related
  35:12,17
  37:2,6 38:10
  46:15 104:12
  135:3,4,7
  136:19 152:17
  156:25 157:1,
  2 169:13,15
relating  46:1
  161:11
relationship
  7:18 8:23 9:1
  13:17
relationships
  20:24
relevance
  85:7,11 86:3,
  5
relevant
  31:5,7,8,14
  85:5
rely  111:10
  164:4 174:8
relying  164:8
remember  5:25
  6:1 10:11,13
  25:9 26:19,20
  27:13,17,20
  30:24 32:15
  35:15 37:21,
  22 38:2 39:1,
  25 45:15
  47:2,4 48:7
  50:7,10,23
  51:23,24
  52:21 53:11,
  23 61:17 62:6
  65:7,9,11
  74:25 77:3
  79:1 89:13,20
  90:14,22
  107:24 108:11
  111:14,16
  127:17,22
  132:7 139:18,
  21,22 141:16
  143:5 145:5,9
  146:12,19,23
  148:23 151:5

152:20 153:9
154:10 169:18
170:6 171:24
174:15
remembered
  6:20 37:20
remembering
  37:19
remind  47:10
remotely
  108:17
remoting
  109:7
Rendowski
  59:1
renew  134:22
  135:1,2,5
renewed
  134:20
reopen  64:24
rep  5:17,19,
  22 6:4
repeat  51:6
  56:25 72:16
  99:1 142:1
  147:4 161:24
rephrase
  167:18
report  63:22
  152:8
reporter  4:4
  6:12 67:1,17,
  20
reporters
  170:7,10
reports  93:4,
  6
representation
  128:10
representative
  63:24 73:2
  131:20
  132:20,25
  133:2,17
  135:13 136:8
  137:10 140:11
  142:5,11

request  79:12
  87:21
requested
  93:8
required
  110:24
requirement
  86:3
requires
  106:5,15
research  10:7
  35:20,22,25
  36:3 107:17
  131:5,12
  148:13
reserve  64:23
  79:17 87:24
  88:1
reserves
  60:24
resort  51:3
resources
  70:15
respected
  105:10
responded
  135:1
response
  6:12,13,14
responses
  76:6
rest  124:17
  169:18
retained  42:2
  132:2 158:5,
  18 159:1
return  107:21
  158:15 159:1
returned  98:3
reveal  106:6,
  16
revealing
  31:17
reviewed
  173:19
reviewing
  170:24

revise  6:21
  64:8
Rick  4:3
right  5:6,7,
  15 6:8 12:23
  13:4 14:24
  17:14 18:15
  19:9,21 20:10
  21:11 22:4,5
  23:1,14,19
  24:1 26:25
  27:6,10,16,17
  29:3,8,15,19
  30:2 31:9,14,
  23 37:3,4
  38:13 40:22
  42:19,22 43:9
  44:6,8 47:11,
  17 48:6 52:7,
  9 54:4 55:9
  56:21 57:5,11
  59:13 60:24
  61:25 62:8
  63:3 64:22,24
  65:16 66:3,6
  69:18,20
  72:15,19 73:4
  75:12 76:15
  77:19 78:1,15
  79:9,17,20
  80:8 82:25
  83:10 84:12
  87:24 88:1,15
  91:9,14,15
  97:6 100:12
  101:1,6,18,24
  103:22,24
  107:1,23
  109:13,16
  110:2,25
  112:5 116:10
  117:23
  118:19,23
  119:15
  120:15,17
  122:2 123:18,
  20 125:20
  129:9 131:1,
  6,15 132:15,

18 133:3
134:12 135:14
136:11,20
137:10 139:11
140:19,20
141:14 146:16
147:19 148:9,
13,17 149:9,
13,16 150:14,
21,24 151:20,
25 154:2
158:23 159:17
160:14
163:18,25
165:1 168:22,
24 170:3
173:6

**rights**
106:23,24
155:11 166:8
171:6

**Riviera**  9:24
**rob**  126:21
**Robert**  60:9
**role**  149:6
**room**  27:24
28:12,23
33:16,18,19,
23,25
**routine**  11:10
107:20
**rule**  88:6
**rules**  6:8
**run**  56:3

———————

S

———————

**safety**  101:17
116:7
**said**  10:23
11:22 15:7,8,
11 18:2,25
19:23 20:17,
25 27:12,18,
19 28:24
30:20 35:11
37:18,23
38:10 39:11

42:9 44:5
49:18 50:12
51:19 67:10
68:9,23 75:19
83:17 85:19
87:10 89:9
96:18,22
97:10 98:13
107:11,23
108:2 113:22
117:18 121:20
122:20
123:13,25
124:25 136:4
139:19 142:11
143:15 146:1
147:1,10,18
156:8,15,19
159:13 160:2,
16 168:5,8
170:20 171:6

**sale**  112:8,25
113:11,19

**same**  6:9 7:16
70:20 77:13
93:23 112:11
114:21 118:22
122:16 130:11
151:15 158:11

**Saralson**  39:8
**sat**  146:15
**Satoshi**
99:18,20
100:12 101:1,
25 102:1
122:23 170:25
171:1

**Satoshi's**
171:2

**saver**  150:13
**saw**  10:23
11:3,4 55:5
118:21 126:7
141:4,10,22
142:4 154:2

**say**  6:13 9:21
20:19 24:17
27:19 36:10,

11 42:24
47:25 48:22
51:4,17 52:14
53:6 55:4
57:25 60:23
62:20 63:8
64:5,18 70:13
79:2 80:12
81:20 88:24
91:1,8 93:21
94:4,25
102:22 103:3,
5,21 106:13
107:15 110:14
111:25 112:7,
22 113:22
114:16 115:8,
15,24 124:10
126:2,13
130:17,24
135:25 148:6
150:10 151:7,
12,23 156:5
157:9 158:3,
14,25 159:15,
23 160:14
161:9 163:8
167:2

**saying**  11:16
25:18 28:11
29:9 32:22
37:21,22
49:25 55:15
81:17 83:13
109:7 113:25
114:2 117:20
119:17 124:24
125:3 134:19
146:2,9 162:5
164:15

**says**  41:10
44:18 61:10
70:11,13,23
72:24 73:8
74:22 76:18
120:2 121:22
125:23 126:17
144:5 145:6
156:6 158:1

**schedule**
86:20
**Scheme**  116:5,
9
**screen**  45:2
**searching**
27:17,20
**seat**  15:2
**seats**  25:16
**second**  5:2
11:20,21
13:21 24:17
30:13 31:16
72:21,24
77:10 87:5
88:12 91:13
92:25 111:5,
22 113:1
114:6 115:5
129:22 130:8
134:16 144:5,
20 148:8
149:25 151:15

**secret**  23:3
79:3 104:20
162:13
**secretive**
16:25 17:4
22:19
**secrets**
161:5,7,10
162:5,21,22
**section**  60:21
**secured**  101:8
**security**  14:1
19:20 34:22
35:12,15 57:7
93:20 94:5
**see**  11:1
13:23 27:12
41:20 53:24
65:3 76:17
79:12,14 89:2
111:16 119:9,
11,17 120:6
121:9 132:9
134:23
140:21,23,24

152:8 157:14
158:22 162:23
163:10,25
164:5
**seeing** 35:15
36:3 39:9
53:11 89:13
**seek** 45:22,25
77:7,20,23
**seeking** 91:17
145:24 158:6
**seen** 52:8
57:18 63:22
89:22 109:3,5
118:5,18,20
130:21 167:22
168:17
**sell** 68:24
**send** 67:8
69:25 75:4,11
134:17 146:5,
9,11
**sending**
72:13,17
74:25 111:3
120:1 130:15
144:18
**sense** 71:2
100:14
**sent** 24:14
52:19,23,24
75:5,6,20
82:24 83:3,5
129:11 142:18
144:15 145:2
146:13,18,23,
24 147:10
148:11,12,25
150:5
**sentence**
40:14,24
41:17,22
67:10 70:13,
21 72:24
92:25 113:1
114:6 115:5
151:7

**separate**
75:4,20 83:18
146:12
147:10,11
**September**
131:9
**served** 148:7
149:3,7
**server**
108:17,19,20,
23 110:6
**serves** 97:19
**service** 149:7
**set** 153:18
**sets** 49:23
**settlement**
13:25 120:21,
22 121:1,14,
16,22 153:18
**seven** 27:9
100:2,9
**seventh** 13:13
**several** 5:9
10:11 25:11
64:25 65:17
68:11 90:10
**shake** 6:13
**Shamir** 116:5,
9
**share** 115:22
116:2,3 117:6
**shared** 95:1
98:8 115:10,
15,20,21,25
117:4 129:24
132:18 156:2
167:2,11
**she'll** 59:16
**shoes** 136:13
149:11
**short** 10:15
**shortly** 67:18
68:9
**should** 26:19
42:4 64:17
80:14,19,20
122:25 125:2

**show** 15:12
39:2 86:17
119:4 121:21
125:12 127:19
144:18 145:4
153:17 155:15
**showed** 11:13
145:2 148:8
174:13
**showing** 134:6
**shows** 156:11
**side** 14:22
105:10
**signature**
76:11,14
**signed** 93:1
**simple** 68:7
70:25 160:25
**simply** 137:23
**since** 5:7
10:3 40:1
46:20 68:2,15
80:3 107:7
112:15 117:7
126:4,12
127:8 135:3
**single** 34:15,
17 125:22
126:17 127:16
**Sir** 113:6,14
125:18 167:24
**sit** 14:21
**site** 110:22
**sitting**
14:15,20 15:3
56:11 62:7,20
63:2 136:13
149:11 157:16
169:3
**situation**
109:24 127:7
168:22
**six** 14:13
97:11
**skip** 88:19
**Skype** 156:18

**small** 25:4
33:19
**smart** 101:6
139:8 161:12
162:23,25
163:3
**so** 6:12,13,21
7:14,16,17
8:4 9:15,24
10:1,4,6,9
11:13,21
14:8,23 16:14
17:8 20:11,19
21:6,15 24:24
25:7,18 27:14
28:2 29:2,7,
12 30:4,8,19,
20 31:4,6
32:17 33:21
34:13,18,23,
25 36:10 37:8
40:12 42:25
43:24 44:5,
14,19 45:1,
16,19 46:20
47:5,22 48:4,
16,19,23
49:12 52:10,
23 54:23
56:1,11 57:19
62:12 63:23,
24 65:17 67:9
70:3,18 71:5,
9 72:1 73:6,
22,23 75:2
76:1,22 77:20
80:7 82:1,7
83:13 85:13,
25 87:14
91:8,12 92:4,
9 94:12,17
95:13,20,22
96:17 97:16
98:20 99:19,
20,23 100:2
101:5,25
105:10,11,14
108:12,16
109:15 110:2

111:2 112:15
113:9,21
114:13 117:22
118:11,17
119:16 120:14
123:4 124:15,
17 126:10
133:23
134:17,21
135:19 136:1,
4,13,17
137:16,21
138:2,19
139:6,18
140:6,11,18
141:1,2,16
143:13 144:15
145:10,15
146:21 151:18
152:12 157:15
158:14 160:2,
10 163:12,24
167:10,15
168:3,6
**sofas** 28:1
**software** 47:1
53:23 54:17
56:3 169:17,
20
**sold** 84:2
150:12
**sole** 126:6
127:13,19
**solely** 136:24
**some** 7:8,16
15:6,15 24:20
27:15,23
28:11 31:1
34:1,2 51:21
56:5 66:23
72:19 74:12
80:8 89:13
93:4 95:14,23
104:24 107:2
108:25 110:6
111:11 112:25
113:11,19
115:9 118:20
123:6 125:7

130:2 139:3
147:10 151:19
152:20 153:10
168:19 169:17
171:13
**somebody**
66:13 77:17
132:1 165:3
**somehow** 97:19
115:21 137:23
163:6
**someone** 14:2
26:15 63:8
66:9 91:9,11
**something**
6:20,22 9:25
15:8,9 16:24
21:7 26:19
27:14 28:18
31:14 34:22
35:13 37:6
45:19 52:20
53:12,25 67:2
111:17 117:14
138:25 139:7,
14,16,19
140:14
141:14,23
142:4,8 143:8
144:10 147:12
154:13
**sometime** 93:8
**sometimes**
131:22 148:16
**somewhere**
61:1
**son** 10:16,23
19:11 123:10
**soon** 119:4
121:21 150:23
**sorry** 27:18
29:10 114:16
124:4 147:4
**sort** 42:11
**sources**
169:24,25
170:5

**South** 130:16,
25 131:2
**space** 25:5
163:6
**speak** 5:19
9:7 13:15
69:13 92:22
140:24
**speaking**
142:22
**specific**
104:23 118:24
125:10
**specifically**
9:20 17:11
20:18 37:18
50:11 97:23
104:19 135:18
**specifics**
39:1 84:9
150:18
**speculate**
21:23 127:2,
3,6 164:18
**speculation**
21:22 56:15,
22 57:12
82:17 83:12,
24 96:5 98:17
102:4,19,23
109:9
**spell** 30:5
59:8,9
**spelled** 59:6
**spend** 25:10
150:14
**spending**
78:24
**spent** 25:9,11
**spoke** 10:23
19:17 72:8
120:19 135:13
169:21 170:10
**spoken** 20:11
21:4 39:18
40:1 92:17
123:9 170:7

**Spring** 65:20,
22 66:5
**stand** 28:8
**standing**
105:17,22
160:8
**start** 23:25
160:10 169:14
**started** 80:18
**Starting** 27:9
**starts** 134:17
**state** 4:5,12
7:3 85:24
106:18 167:6
**stated** 156:3
**statement**
67:12,13
68:25 71:3
73:4,16,24
122:6 126:11
128:21 145:10
146:22 147:8,
19 154:13,17
160:12 168:6
173:25
**statements**
69:25 73:18
126:4 163:25
164:9,15
**stating** 89:14
111:11,17
121:14 166:17
**staying** 11:11
**steal** 127:4
**stemmed** 92:9
138:9
**steps** 44:15
53:14 56:1
63:25 78:20
89:23 127:9
141:24 142:6
170:22
**Steve's** 54:11
**Steven** 131:11
**still** 6:15
27:10 46:18,
21 69:11

82:14 128:14
143:10
**stole** 100:8
165:3,7
**stolen**
104:19,20
**stop** 7:4 48:6
50:21,22,24
51:8 87:21
160:18
**stopped** 18:5
**storage**
33:16,18
**store** 25:3
50:14 112:8,
25 113:10,19
129:23 134:18
**stored** 30:25
33:10 57:3
97:23 108:18
111:25 112:22
115:1 116:19
**storing** 114:3
**story** 94:10,
12 95:1
96:14,20
138:11 143:14
166:13 168:1,
13
**straight**
135:22
**strapped**
70:15
**street** 129:17
**strike** 42:9
45:4 133:1
138:16 139:7
**structure**
106:3,7,13,18
126:3,12
127:9
**structured**
106:22
**studied** 84:14
**study** 19:20
**stuff** 12:13
24:5,9 26:5

27:10 28:1,4,
12 33:4,17,
23,25 34:2,4,
20 53:4
111:10 123:12
127:22 135:4,
8 154:10
162:13 163:25
**subject** 79:16
**subpoena**
32:13,15
77:4,21
**subpoenaed**
77:6
**subsequently**
142:21
**substantial**
88:25 89:18
**successful**
16:24
**such** 16:22
41:14 42:5
**suddenly**
140:4
**sued** 38:12
**suggest**
101:14
**suggested**
38:24
**suggests**
165:6
**suing** 26:14
32:19 77:17
155:20 156:24
157:17 159:8,
9 169:5
**suit** 85:5
**Suite** 4:10
**Sullivan**
60:18
**Sunbiz** 110:22
111:2,10
**Sunbiz.org**
71:18,22
110:25
**supplement**
60:24 146:6

**supplemented**
75:2 79:19
**support** 107:8
117:20 118:4,
12 122:17
125:8 128:2
**supporting**
122:22
**supports**
117:16
**suppose** 21:14
**supposed** 17:1
31:11
**Supreme**
130:16,25
131:2
**sure** 30:14
32:1 35:16,19
108:10 111:14
118:24 128:23
153:10 156:12
**surprise**
10:22 152:13
**swearing** 76:8
**sworn** 4:21
**symbol** 15:17,
22
**system** 44:24
152:10 157:4
**systems** 45:20

---

**T**

**table** 14:23
15:3
**tactic** 42:11
**take** 6:12,18,
19 13:6 23:21
25:7,23 30:12
35:3 53:12
83:6 86:19
88:3 104:14
121:24 127:10
128:22 134:24
137:22 141:24
142:6 143:17
149:6 159:16

165:19
**taken** 4:3
25:25 30:16
35:7 53:14
56:1 63:25
82:23 87:8
89:23 98:2,4
128:25 143:21
163:9 165:21
170:22 171:16
**takes** 101:20
**taking** 88:4
**talk** 7:17
9:15 22:6,8,
11,14,17 37:8
38:23 61:11
87:11 92:14
153:21,23
154:9 160:25
173:15,17
**talking** 9:20
30:19 34:10,
11,13 35:10
49:12 107:10
112:18 113:3
118:24 121:8
125:11 127:20
143:16
**tampering**
51:14
**team** 170:25
174:8
**technical**
53:4 54:19
160:12
**techniques**
161:11
**technologies**
161:12,21
162:3,6,23
**technology**
161:13
162:12,14
163:12
**teenagers**
9:11,12
**telephone**
156:14,17

tell 10:17
17:11 18:21
23:3 26:10
27:16 34:5
37:5 56:11
64:14 68:22
74:4 75:20
78:10,15,19
81:11 85:13
87:1 89:10
95:14 97:12
98:22 99:3
100:8 111:18
117:19 125:22
138:1,2 144:9
145:21 147:11
165:3 170:15

telling 12:10
33:4 67:17
84:4 87:13
96:15 111:6
139:6,13

tells 14:23
21:6 54:19
95:17 134:22
141:17 168:10

ten 10:2,9
104:1 143:4

tense 62:7

term 29:19
163:1

testified
4:22 10:1
18:23 25:13
26:3 29:2
37:9,16 47:17
49:24 61:11
67:15 124:11
148:20 160:2
161:21 162:2,
11 173:2

testify 7:13
20:25 21:4
49:12 55:8
57:24 58:2,9,
12,15,18,21,
24 59:2,16,
19,22,25 61:8
96:22 97:16

124:8 127:25
146:18

testifying
26:7 60:4,7,
10,13,16,19
62:3 117:22,
25 157:15

testimony
6:24 7:2,11
10:6 17:21
18:24 26:17
27:21 28:2
32:21 47:14
48:14,15
49:23 50:3,
16,17 51:18
54:18 59:1,4
66:23 67:19,
21 68:13,16
81:16 82:4
98:25 105:4
117:23
118:13,14
122:21 129:25
139:14 148:23
161:23 162:8,
17 163:15
169:8

than 7:12
8:3,19 10:5
21:9 22:4,12,
15,18 23:3
24:8 38:4,6
42:12 46:1,16
68:4 88:3
90:18 123:11
139:1,7,14,19
140:14
141:14,24
142:5,8 143:8
144:10 147:12
150:11 154:13
158:7 167:1,
11,24 171:1

thank 8:12
12:24

Thanksgiving
14:10,16
94:18 97:8

139:25 141:3,
4 168:3

that 5:15,16
6:24 7:11,16
8:19 9:23
10:1,2,3,19,
20,21 11:9,
12,14,16
12:9,12,18
13:8,24 14:1,
5,6,8,12,21
15:5,8,22
16:15,23
17:1,3,6,19,
21 18:2,11,
18,19,21,25
19:3,4,6,10,
11,15,17
20:8,9,14,15,
18,25 21:1
24:9,25
25:13,18
26:3,7,25
27:6 28:1,2,
4,11 29:21,22
30:4,6,20,21
31:16 32:5
33:23 34:20
35:13,21
36:5,13,16,
19,23 37:9,
16,20,21,22,
23 38:7,15,
19,20,23,24
39:3,12,23,24
40:7,10,14,
16,23 41:12,
20,23 42:2,8,
10,13,21,23,
24 43:16
44:8,21,24,25
45:7,10,12,16
46:3,5 47:9
48:16,22
49:14,25
50:8,9,10,12,
17,25 51:14,
19,23,24
52:21 53:6,

16,25 54:2,6,
11,13,18,19,
25 55:4,5,7,
8,15,18,22
56:5,6,25
57:3,25 58:4
59:7,14 61:1,
5,8,11,14,19,
21 62:1,8,12,
23,24 63:5,9,
11,14,16,20
64:2,5,6,9,20
65:10,13,14,
16,17,19,21
66:12,17
67:5,12,15,
17,21 68:5,8,
11,25 70:14,
16 71:2,19,24
72:4,6,12,17,
18 73:3,9,16,
23 74:8,22
75:1,5,6,8,21
76:8,11
77:12,14,25
78:2,3 79:8,
14,21,25
80:12,17
81:6,9,13,17,
20,21 82:2,5,
10,13,14,24
83:2,4,7,10,
16,22 84:8,9,
24 85:5,12
86:8,17,22
87:12,15,18,
20,21,22,24
88:13,14,19,
23,25 89:2,8,
10,14,18
90:15,18
91:11,17
92:5,8,9,21,
23,25 93:3,
13,19,21
94:8,10,11,
12,14,21,23,
25 95:7,14,23
96:12,15,19,

22 97:1,4,16,
19,20,22,24
98:7,11,14,
20,22 99:4,
18,20 100:8,
19,25 101:10,
14 102:12,18
103:3,6,18,21
104:8,12,13,
19,25 105:7,
11,22 106:2
107:2,4,11,
12,22 108:4,
8,12,15,16,
19,22 109:1,4
110:10,15,17,
24 111:5,6,
13,18 112:3,
9,19 113:1,3,
9,11,15,22
114:15 115:3,
16,20,22
116:25 117:3,
8,9,11,16,20
118:5,10,11,
16,21 120:12
121:1,9,14,
22,23 122:20,
23 123:5,8,
11,12,16,20,
21,22,24
124:5,7,8,10,
11,24 125:1,
5,12,23
126:5,7,9,10,
11,12,13,17,
25 127:8,12,
14,18,19,20
128:9,13
129:18,25
130:3,11,17,
19,24 131:14,
23 132:11,12,
17 133:1,2,4,
5,7,8,22,25
134:1,19
135:4,9,19
136:14 137:3,
4,10,18,23

138:2,7,8,9,
16 139:2,3,6,
7,13,14,18
140:1,2,3,5,
9,14,16
141:13,16,17,
19,22,25
142:1,2,9,13,
14,17,19,21,
24,25 143:3,
7,8,10 144:2,
9,10,11
145:7,10,11,
16,17 146:8,
18,19 147:8,
11,15,23
148:8,11,12,
15,21,23,24,
25 149:11,12,
20 150:2,12
151:1,3,4,6
152:1,4,6,7,12,
13,21,22
153:3,7,9,12,
13,17,18,19
154:4,13,19
155:2,4,15,22
156:3,5,10,11
157:1,6,19,21
158:3,9,14,19
161:4,15,20,
24 162:2,23
163:6,10,24,
25 164:2,5,
14,15,22
165:2,3,6,8,
11,15,24,25
166:13,18,22,
24,25 167:2,
6,17,22
168:2,3,4,6,
9,12,16
169:4,5,13,20
170:14,24
171:1,2,22
172:2,5,7,10,
12,14,20
173:3,4,8,23,
24 174:14,15,

19
**that's**  15:3
20:21 21:7,11
22:11,14,17
24:8 28:4,5,7
29:19 41:7,10
43:21 55:9,23
59:9,13 61:10
64:7 67:23
74:1,10 78:4
81:5 85:14
86:15 95:19
108:17 109:9
110:6 115:2,7
116:7 118:2
121:16 128:4,
20 129:21,23
130:9,11
133:22
134:14,16
135:10 143:16
145:17 146:1,
10,13,24
148:15 151:21
156:9 159:21,
22 167:15,24
171:9 173:6
**theft**  77:18
78:7 155:21
164:25
**their**  4:12
19:22 38:10
94:15 101:8
106:7,18
107:16 115:23
121:5 157:1
169:14 170:2
**them**  6:9
8:15,19 11:1
21:4 27:12
30:24 31:1
34:25 37:15
38:21 39:20,
23 40:1 45:17
47:1,23,24,25
48:1,2,3
49:18,21,22,
24,25 50:1,
11,13,14

51:19 54:2
65:4 74:8
77:21 79:1
80:2 81:3
88:24 90:22
93:8 97:7
98:2,4,5,7
99:4,11,14,18
100:1,3 107:6
113:8 115:25
116:1,2,4,20
117:10 118:6,
20 120:15
122:9 125:24
126:16 135:16
138:11 142:18
143:6 155:19
166:20 167:9
168:19
**then**  5:7
10:3,4 11:23
18:2 19:1
27:11,14,18
29:2,23 30:22
31:18 32:17
43:2,19
44:12,19
45:13 49:17
51:2,4,22
54:24 60:25
64:16 67:15
68:2,4,23
82:17,20 85:8
91:5,20 94:14
95:3,11,12,17
106:2 107:21
112:7 113:7
114:20 115:8
125:3 128:3
130:14 134:21
135:1,20
136:7 137:4
139:21 151:23
155:4 158:6
160:16 163:7
164:2 165:9,
11 170:25
171:13

theory  85:7
there  7:1
  15:6 17:25
  23:18 27:10,
  21 29:20
  30:8,21 31:10
  34:9 35:11
  37:9,19 45:4,
  12 46:4,21
  48:14 50:16
  51:21 55:20
  57:9 65:3,9,
  11 70:23
  73:13 74:12,
  22 75:17
  78:7,8,11,15
  79:3,8 88:25
  90:2 91:19,20
  102:22 103:3,
  6 104:24
  107:2,11,21
  111:11 113:7,
  17 116:3
  117:9,23
  121:14 122:24
  125:23 133:10
  134:25 136:6
  137:1 138:1,
  2,3 140:8
  143:4 146:21
  147:1,7,15
  150:10 151:24
  152:17 153:17
  154:24
  156:10,14
  158:9 160:18
  165:25 166:17
  167:5 170:5,
  11,13 171:6
  173:23
there's  17:23
  18:6 20:1,3,4
  28:14 33:7
  44:2 45:3
  48:10,16
  55:18 79:3,7
  85:21 86:3
  89:17 90:25
  100:22 104:1,

18 113:17,21
  120:21
  122:18,20
  123:16
  125:12,23
  127:18 134:17
  135:1 142:21
  151:23 164:25
Therefore
  115:25
thereof
  158:17 159:3
thereupon
  4:19 25:25
  30:16 35:7
  87:8 128:25
  143:21 165:21
  171:16
these  33:10
  46:3,11 73:18
  76:6 77:13,
  17,20 78:1,
  10,20,22
  79:4,25 80:8,
  24 81:6,12,17
  82:9,15
  112:7,12,24
  113:10,18
  117:19 118:11
  121:18 127:22
  128:2 148:7
  156:16 161:9
  162:13 164:3,
  4
they  10:23
  11:3,14,16,17
  13:16,18
  17:22 18:19
  19:16,17,22
  31:8 32:5
  34:25 38:10,
  15,19,21,23,
  24 53:6 57:4
  79:12 80:7,8,
  17 82:10,11
  83:19 89:9
  94:15 99:9,25
  100:2 106:21,
  23,24 107:12

108:24 109:1
  111:8 115:1,
  11,13,14,15,
  17,21,22,24,
  25 116:2,3
  117:5,6,24
  118:9 119:19
  121:11
  122:16,22
  123:24 124:2,
  5,22,23
  129:13 136:24
  149:6 150:22
  153:10
  155:10,11
  156:2 166:7
  169:14 170:25
  174:17
they'll  21:3
they're  65:24
  116:19 124:1
  125:8
they've  99:24
  113:7
thing  9:15
  44:20 91:10
things  7:5,9
  23:19 24:3,25
  28:23 31:10
  64:16 106:22
  157:2 164:16
think  5:5 7:7
  8:16,17 9:23
  10:16,19 12:9
  15:6 17:3,6
  24:4 25:13
  27:23 32:20
  37:9 39:8
  45:11,18
  49:11 53:12
  54:1,13
  58:11,14,17,
  20,23 59:1,4,
  16 61:23 62:6
  63:8,23 64:3
  65:3,7 67:1,
  21 71:9 72:24
  75:4,5,6
  76:12 78:22

79:23 85:20,
  21 87:16
  93:4,8,23
  95:4,8 98:9
  100:3 101:9
  110:1 111:11
  115:22 116:20
  118:22
  119:18,19,20,
  22 120:11
  124:2 127:18
  128:6,8
  129:23 132:2
  133:25
  134:22,25
  135:19 138:19
  140:2,3,12
  141:7,10
  144:21
  146:11,13
  151:5 152:19
  153:1,9
  155:25 157:9
  166:17
  169:16,24
  170:11
thinking
  27:24 28:12
  48:17 141:22
  142:3
third  41:15
  42:6 70:12,21
  78:23 92:25
this  5:2
  13:4,12,23
  14:25 17:13
  22:11,14,17
  23:2,21,23
  24:8,14,15,18
  31:5,6 32:13,
  18 33:5,6
  34:13 38:2
  39:9,19 40:7,
  10 41:1,8,25
  42:11,16,18
  43:6,8,24,25
  44:6 48:9
  52:1,11,17,23
  53:5,10 57:18

63:3 64:24
66:24 67:3,8,
13,20,22,23
70:5,10,20,24
72:12,13,17,
24 75:2,6,7,
8,11,13 76:7,
9 77:24 79:19
83:4,8,20
84:21 85:20
86:20 87:19,
25 88:3,11,24
89:1,4,7,15,
18 90:12
91:16 95:1
96:17 97:9,22
99:3 100:7
101:5,15
103:21 104:2
107:5,8 109:8
112:15,16,19
113:5,6,9,15,
21 114:6,7,10
115:5,11
116:14 117:7,
20 118:2,4,12
119:2,9,12,24
120:15 121:5,
24 122:2,10
125:19,24
126:4,9,10,23
127:8 128:17
129:6,8,11,15
130:8,15
131:4,8,13,14
134:11 135:22
141:22 144:7,
13,15,21
145:4,6,10,
11,14,16,24
146:2,6,12,
18,22,23
147:8,18
148:6 149:1,4
150:5 155:1,
6,23 156:6,
11,22 158:6,
13 159:6
161:13,14

162:20
163:13,20
164:12 165:24
168:21 170:7,
14 173:2,4,24
174:9
**those** 5:11
7:9 20:20
30:25 31:2,6,
25 32:7 38:8
45:20,22
46:19,20,23,
25 47:5 49:19
55:16 76:20
81:14 98:1
99:23 100:15,
19 101:1
107:13 112:2,
21 117:13
118:7 125:2
128:1 147:14
167:8,24
168:18 174:4,
17
**though** 6:7
7:15 122:2
123:3 136:20
167:10
**thought** 16:23
17:21 18:18,
22 20:21
27:25 28:18,
20,24 29:21
34:23 36:17,
23 46:24 56:5
77:14 105:9
110:22
133:11,20
135:3 141:9
167:17 170:17
**thousand**
150:11
**thousands**
104:1 118:9
125:17
127:17,18
**three** 49:23
76:17 88:22,
23 161:2

**threw** 24:24,
25 30:20
32:20,21
36:10,11,13,
16 37:5
**through** 15:15
16:3 17:13
23:19 24:3
25:11,14,17,
18,20 26:4
27:18,20 28:4
32:24 44:15
67:6 72:2
95:22 96:11
103:20 106:9
107:18 117:7
152:13 164:23
169:3 173:10
**throw** 25:7
153:14
**throwing**
23:25 24:5,21
36:24 49:14
**thrown** 30:10
**thumb** 48:18
49:11 50:8
**tied** 133:21
**tight** 86:20
**time** 4:9 5:2,
5 6:18 9:23
10:14,15
11:11 13:24
14:9 15:7,14
16:11 23:6,
13,21 25:9,
13,22 26:22
28:11 33:3
40:18 41:4
45:11,18 46:3
53:12 54:7
61:14 62:12
67:25 69:20
73:3,9 74:1
75:14 78:24
85:23 93:16,
19,22 94:4,
13,17 108:4,
16 114:20
124:5 128:17

131:17 138:4
141:2,4,10,
13,22 143:13
145:8,14
154:2,5
159:22 172:14
**times** 6:15
8:18 10:10
12:2 55:3
68:12 114:19
147:3
**title** 52:14
53:11 131:10
**to** 5:11,15,16
6:4,7,9,11,
14,15,17,18,
19,22 7:7,13,
15,17 8:21
9:3,5,7,21
10:2,17,20
11:8,10,14,
15,17,21,22
12:5,6,7
13:6,7,10,13,
20 14:15,20
16:2,20,25
17:1,2,5,13,
16 18:16,17,
19,23,25
19:2,19,23
20:3,8,11,19,
25 21:4,23,25
22:6,8,20
23:1,18,21
24:4,14 25:1,
5,7,14,21
26:4,10,17
27:6,12,16
28:13,16
29:2,9 31:2,
5,11,13
32:16,17 33:5
34:5,16,17,
24,25 35:2,
12,14,16,17
36:12,23
37:2,6,8,12,
25 38:8,10
39:2,18,19

40:1,13
41:15,21,22
42:5,9,10,13,
24 43:15,16,
17,24 44:5,
17,19,21
45:1,7,14,18,
22 46:1,4,12,
15,16 47:6,8,
10,19,23,25
48:1,2,3,5,
11,18 49:13
50:5,14 51:3,
14,18,23
52:19,24
53:2,12,14,
16,22,24
54:1,2,15,17,
19,24 55:2,3,
24 56:1,3,8
57:2,9,20,21,
24 58:3,9,12,
15,18,21,24
59:2,14,17,
19,20,23
60:1,4,7,10,
13,16,19,21,
24 61:8,12,15
63:5,12,15,25
64:6,10,14,
17,18,19,20,
23,24 65:2,3,
6 66:12,22,
23,24 67:5,8,
20,25 68:15,
17,20,24
69:13 70:5,8,
14,21 71:21
72:8,13,18,21
73:12,23
74:4,16,22
75:4,11,19
76:6,7,17,23,
25 77:2,4,7,
8,11,14,16,21
78:5,8,20,24
79:1,11,12,
13,16,17
80:1,7,10,11,

13,14,15,19,
20,22,25
81:11,14,22
82:2,5,10,11,
19,20,24
83:3,8,14,19,
21 84:2,19,
22,25 85:3,4,
5,7,9,10,14,
15,18,22,24,
25 86:3,6,7,
8,12,16,19,
20,22,23
87:2,11,12,
15,17,24,25
88:3,4,11,17,
19 89:24 90:1
91:2,9,13
92:5,12,19,
22,24 93:15,
17,21 94:1,8,
21,23,25
95:2,4,13,18,
19 96:1,8,15
97:3,5,7,19
98:3,7,21,22
99:3,4,11
100:14,19,25
101:9,14,15,
20,25 102:1,
24 103:3,5,10
104:12,14,18
105:5,8,18,19
106:5,16,23,
24 107:8,12,
21 108:3,5,6,
17 109:4,15,
21,25 110:22,
25 111:3,7,
20,22 112:25
113:1,5,10,19
114:4,7,11,20
115:8,9,25
116:2,4,18
117:3,4,9,11,
14 118:3,4,6,
10,17 119:1,
2,4,9,24
120:3 121:8,

15,18,21,23
122:10,12,16,
24 123:2,3,
16,17 125:3,
8,12 126:1,3,
5,13,15
127:2,3,6,10,
21,25 128:1,
2,12,16,22
129:12,24
130:7,19,22
131:4,23,24,
25 132:7,8,9
133:4,7,9,13,
16,20,21,23,
24 134:3,16,
18,19,22,23,
25 135:1,3,5,
7,10,13,17,
21,22,24,25
136:3,5,6,7,
19,22 137:2,
3,5,6,9,13,
14,15,17,18,
19,22,23
139:3,5,24
140:2,6,8,13
141:3,24
142:6,10,12,
18 143:5,24,
25 144:5,6,
18,19,21
145:2,4,8,10,
12,13 146:1,
2,3,5,6,9,25
147:2,16,19,
21 148:11,12,
25 149:6,7,
18,21,25
151:5,12,14,
17,18,24
152:5,18
153:21,23
154:22 155:2,
3,7,11,14,15,
21 156:10,12,
22 157:1,2,7,
13,16,17,21
158:4 159:2,

8,22 160:13,
22,24 161:2,
6,11,12,14,21
162:5,11,13,
20 163:7,13,
22 164:4,18,
20,23 166:8,
12,13,21
167:2,10,16
168:2,13,20
169:9,14,15,
22 170:7,10,
22 171:6,12,
21 172:11,16
173:3,8,12,
15,17 174:2,
6,8,14,17
**today**  4:8
6:24 7:2,11,
13 26:8 27:22
28:17,21 33:3
34:5 37:5,20
47:11 48:14
50:16 51:24
54:18 56:11
62:3,12,20
67:19,21
68:10,13,15,
18 105:14
110:14
157:15,16
169:3 170:15
**together**  43:6
52:11 96:11,
13 99:16
101:9 138:12
169:14
**told**  14:9
17:5,10,11,18
18:3,10
20:15,17 23:2
34:6 36:22
54:23 55:14
62:18 64:12
68:11 74:8
94:10,15,17
95:22 97:14,
17 114:18
121:23 123:7

124:15,22
128:19 138:11
139:15
141:13,23
142:4 144:9
152:12 159:22
166:21 167:1
168:4
**too** 13:15
53:2 54:18
55:9 101:9
**took** 16:1
27:6 78:20
88:3 89:14
98:9,20 145:8
155:23 164:2
165:10,14
**tool** 54:15
**top** 120:2
125:16
130:14,22,23
131:1 158:23
**Tosi** 70:8
**total** 157:6
**totality**
127:21
**trade** 104:20
161:5,6,9
162:5,13,21,
22
**transcript**
25:22 27:5
47:9,20 87:14
90:13
**transfer**
134:25
**transferring**
41:14 42:5
98:5
**treasure**
151:24
**Treasury** 70:5
**treble** 61:6
**trial** 57:24
58:2,9,12,15,
18,21,24
59:2,17,20,23
60:1,4,7,10,

13,16,19 61:8
100:7 104:18
**tried** 56:3,4
63:5 76:25
78:21 143:5
**trillions**
21:20 22:1
**true** 50:6
55:18 56:2,3,
9 57:2 95:2
114:18 146:1,
10 151:21
**truly** 151:23
**trust** 112:24
153:18
**trusts** 112:2,
3,5
**truth** 26:11
122:25
**truthful**
26:17
**try** 56:1,8
173:3,8
**trying** 53:22
68:20 78:24
86:12 118:3
132:7 137:15
155:14 167:16
**turn** 13:10,20
27:6 31:25
32:2,7,9 34:6
40:13 47:8,19
57:20,21
60:21 76:7,17
79:11 88:17,
19 92:12,24
103:10 130:7
134:16
149:18,25
162:20
**turned** 16:24
31:20
**two** 11:8
13:10 25:4
37:12,17,18,
22 38:6 44:14
45:16 57:21
72:22 78:23,

25 83:6,20
88:17 90:2,25
101:20 125:18
140:22 168:24
**type** 14:4
150:12 163:5

---

**U**

---

**U.S.** 89:9
**Uh-uh** 18:12
49:16 67:24
74:11 116:22
**ultimately**
42:21
**unable** 13:13
**unaware** 151:3
**unclear**
126:3,11,12
127:9
**uncomfortable**
144:25
**under** 11:15
26:7,23 27:19
47:10,16
68:10 73:14
76:8 87:14
110:14 137:6,
9 158:20
162:21
**understand**
5:2 6:8 11:14
32:17,20
53:2,13 54:25
72:25 74:10,
12 98:21
103:21 114:10
120:12 123:3
128:15 159:7
**understanding**
54:21 55:9
71:24 93:13
108:10 155:9
163:3 166:4
172:2
**undisclosed**
153:19

**unfortunate**
86:21
**unidentified**
118:11
**unique** 55:8,
11
**unjust** 158:3
**unlawfully**
161:4
**unless** 6:16
11:22 43:16
85:13 86:17
87:1
**unlock** 57:2
**unnecessary**
36:17
**unstable** 93:2
**until** 16:14
28:13 29:6
51:19 67:16
80:18 84:21
96:9 106:15,
20 139:15,22
140:16 142:10
143:12
**up** 10:5 25:16
73:3,9 80:18
86:1 87:19,23
96:20 101:20
123:2,16
137:17 140:13
146:13,21
147:1,7
150:16,21,23
153:18
154:12,16,19
155:12
**upon** 40:25
41:1 96:18
166:13
**UPS** 129:23
134:18
**upset** 160:16
**us** 27:16 33:4
34:5 37:5
78:10,15
111:18
117:15,19

118:10 127:21
157:21 171:12
**USB** 55:3,16
**use** 15:10
41:15 42:6
45:18 46:25
47:3,23 48:1,
2,3,6,19
49:24,25 50:1
54:24 66:22
89:1 152:5,6
155:3,7
**used** 46:20
49:19,20,21
50:8,11 54:14
55:2 56:6
78:3 79:2,8
112:7,12,14,
24 113:10,18
130:1 148:18
149:12 152:4,
12 163:2
**useless** 42:12
**uses** 148:15
**using** 46:18
47:5,23 48:7,
24 49:1,5,7,
8,10,18,22
50:13,14,21,
22,24 51:8,19
79:4 122:16
147:14 152:1
**usual** 7:12
**usually** 14:21
150:15

———————

V

———————

**V.A.** 11:7
93:14 107:19
108:14 110:4
**vague** 17:12
20:17
**validly** 148:7
**value** 67:11
73:11 105:14
158:17 159:2
163:9

**vary** 75:7
**Vel** 4:16 39:3
41:25 42:8
85:10,15
86:19 87:16
128:11 159:21
160:18
**verbal** 6:12,
14
**versa** 115:18
**very** 17:12,16
20:17 24:19
53:4 55:3,8
69:20 70:11
76:13 97:18
99:10 101:6
114:5 115:13
139:8
**via** 95:1
**vice** 115:18
**video** 19:17
**VIDEOGRAPHER**
4:8 25:24
26:1 30:15,17
35:6,8 87:6,9
128:24 129:1
143:20,22
165:20,22
171:15,17
174:23
**visit** 10:10
12:2,4,6
23:7,10,13,18
**visited** 12:6
140:18
**visualized**
28:21
**voluntarily**
158:5

———————

W

———————

**W&k** 5:14,17,
19 71:10,12,
13 72:2,9
75:21 80:1,5,
7,14,16,19,
20,25 82:5,7,

10,19 91:16,
20 92:5,9
96:11 98:5
99:8 103:20
104:15 107:18
110:16 111:22
112:1,23
115:9 119:14
120:17 121:2,
9,15,20,25
126:2,6,14,
18,20 127:5,
9,11,19
129:16 130:12
131:5,6,11
144:6 145:12
148:6,13
149:2,4,6,9
155:5,9,10
157:3,7 161:6
165:12 169:16
174:14,15,18
**W&k's** 118:22
**wait** 28:13
48:11
**Wales** 130:16,
25 131:2
**walk** 44:15
**walking**
137:17
**wallet** 99:5
**wallets** 40:17
41:3 42:2
97:24 98:1,6
112:1,7,12,
13,18,19,21,
23,24 113:10,
18 151:13
**want** 6:22,23
13:20 17:13
18:16 21:23,
25 32:16 33:1
37:8 47:10
51:14,17 67:5
75:19 80:22
83:19 85:18
91:9 93:15
100:19,25
102:24 105:19

121:24 122:24
125:3 128:12,
16,22 133:13
135:22,25
136:22 137:3,
14 139:24
144:21,23
158:15 160:9,
24 164:18,23
166:21 167:15
169:9,12
171:6,12
**wanted** 43:21
100:25 133:9
134:23
**wants** 137:22
**was** 4:22 5:5,
17 7:18,19,
21,22,24 8:1,
4,23,25 9:1,
14,15,21,23,
24 10:2,14,17
11:7,8,13
12:18 13:1
14:9,12,15,
20,25 15:2,5,
6,14 16:11,
15,18,22,25
17:4,16,21,25
18:4,24,25
20:18,21,25
24:11 25:13,
25 27:2,9,10,
12,13,14,17,
23 28:12,22
29:3,8,12,15,
17,21,22,24
30:8,16,21
31:4,14,21
32:21 33:5,6
34:7,9 35:7,
14 36:22 37:9
38:4,5 39:3,
4,7,8,24
40:4,18 41:4,
8 42:23 43:4
45:6,7,12,18
46:4,5,9,24
47:22,24

48:7,21
49:11,13
51:13,14,17
52:4,9,21
55:18 57:3,14
61:14,18,21,
24 62:1,4,9,
13,15,21,24
63:11,17
64:2,9,22
65:4,7,11,16
66:3,19 67:1,
18 68:8,9,11
69:4,9,10
70:14,23,24,
25 72:2 73:1,
3,8,9,10
75:5,11,13,
14,21 76:2
78:2,3 79:3,4
80:5,18 81:25
82:8 83:4,7,
17,21 84:1,4
87:8 88:7,25
89:12,15,16
90:18 91:19,
20,21 93:2
94:11 95:6,8,
22 96:15,16,
18,22 97:10,
18 99:3,8
101:6 104:11,
12,19,20
105:8 106:23
107:5,18,20,
22 108:3,4,6,
12,14,16
109:12,18,20,
23 110:4,9,
13,17 111:11,
12,17,25
113:8,11
114:5 115:18
117:25 119:6,
14 120:12,15
126:9 127:12,
14,20 128:25
129:2,8
130:1,4

131:25
132:13,22
133:4,5,11,
16,20,25
134:2,4
135:3,7,17,19
136:6,16,20
137:1,5,6
138:1,2,4,8,
24 139:4,8,10
140:2,6,8,9,
12,14,19
141:4,14,19,
23,25 142:10,
12 143:5,7,8,
10,16,21
144:10,11
146:18 147:12
148:6,11,12,
18,21,24,25
149:2,5,12,
14,16,22
150:10,12,13
151:17
152:10,15,23,
25 153:1,4,
11,17,18
154:2,13,17,
19 155:4,10,
11 157:1
159:25 160:13
164:25 165:7,
21 166:13
167:17 168:4,
5,8,10,12,19
170:11,13
171:16
172:15,20
174:19 175:3
**wasn't** 11:11
17:1 24:9
65:11 66:8
133:23 139:8
140:5,10
153:10
**Waste** 85:23
**water** 63:15
**Watts** 60:3

**way** 17:12
20:17 43:16
74:7 75:3
78:10 79:20
91:13 133:9
139:15 141:3
**ways** 116:3
**we** 4:10 5:14
6:21 9:10,15
12:8 15:3,4
30:12,19
32:24 33:1
35:10 38:20
39:20 44:7,
11,12 49:13
64:3 66:2
83:18 86:20
87:13,20,24
91:5 104:6
105:7,9
112:18 113:3,
16 117:1
120:19 134:25
145:13 146:3
148:11 149:20
154:1 170:17
175:1
**we'll** 6:19
35:2 88:2
111:2,5
127:23 171:13
174:24
**we're** 12:20
49:12 57:17
66:22 69:7
76:5,12 82:20
87:6 88:10
100:2 104:17
107:10 121:21
127:25 128:19
129:5 134:6,
22 149:21
**we've** 5:9
103:24 117:8
125:18 168:24
169:1
**weaknesses**
12:10,11

**wealthy**
138:8,18,21,
25 140:15
142:8 143:6
144:11 147:13
154:17
**web** 54:9,11
110:22
**week** 65:18
79:22,23
80:24 104:4
106:6,17
113:16
**weeks** 48:8
**well** 10:16
12:7 14:25
19:25 23:6
24:19 38:16
46:22 49:19
50:7,12 55:7
64:2 66:5
78:22 81:7
100:19 108:24
109:21,25
112:17 132:12
133:4 135:6
136:19 140:18
155:9,14
164:18 167:1
175:1
**Wells** 65:8
**went** 10:4
19:19 25:18,
20 26:3 28:4
136:3 137:2
143:13 150:23
**were** 5:11 8:1
9:3 13:12
15:1,3 26:22
28:16 29:20
30:19 31:6,8,
10 34:23,25
35:10,11
36:17,19
38:10,21,24
40:17 41:3
42:2 44:11,25
45:14 47:16,
22,23 48:17

49:7,10,14
50:13 51:19,
23 57:3,9
64:18 65:9
73:14 78:21
79:12 81:11,
12,18 82:14,
23 91:17
108:24 110:15
112:7,12,13,
24 113:10,18
115:13,24
118:10,21
122:8 124:22
133:7,10
136:24 137:9
143:4 149:4
150:19 152:17
155:10 164:8
165:11 170:25
174:18

**weren't** 8:4
123:24 151:3

**what** 7:18
8:15,23 9:1,
11,13 10:2
12:20 13:4
14:24 15:5,
12,14,17 17:5
20:21 21:3,7,
13 27:12,19
29:3,8,12,15,
17 30:1,23
31:12 32:9
33:5,6 34:5,
9,18 35:14,25
36:4,12 38:23
39:16 41:10
42:9 43:4,20
44:21 46:1,9,
15,22 48:21
49:21 50:7,
11,13 52:21
53:14,17
54:25 55:2
57:17,23
58:1,6,11,14,
17,20,23
59:1,4,16,19,

22,25 60:3,6,
9,12,15,18
61:10 63:25
64:14,18,19,
24 66:14,17
67:3,23 68:21
69:7 74:1
76:5,23
77:11,16 78:4
79:4 80:12
81:11,21 82:9
84:4 86:10
87:2 88:5,6,
10,11 89:4,16
93:21 94:8
96:11 97:12,
14 98:21,22
99:3 100:5,7
101:22 103:11
104:19,25
105:2,14
106:6,10,25
107:4,5,7,9,
13 109:20,23
110:13,19,21
111:13,15
112:9,10,13
113:1,24,25
114:2,6,7,14,
25 115:4,11
116:9 117:8,
13,16,19,24
118:3,7
119:20,22
120:8 122:25
123:4,6 124:1
125:3,10,12
126:5,13
127:6,9,14
128:1,2,4,11
129:5,15
130:8,14,17,
24 131:4,8,10
132:7 133:25
134:6 135:10
137:1 141:24,
25 142:6,7
144:1,8,24
145:15

147:22,23
149:21 150:18
152:10,23
153:11,12
154:9 155:14,
18,21 156:23
157:6,19
158:17 159:3,
8,22 160:16
161:6 162:11,
25 163:2,3
164:7,16
166:4,10,15,
19,21,22
167:1,8,11
168:14,19
169:4,25
170:15,22
171:5 174:18

**what's** 9:19
20:6 40:9
56:16 59:7
72:6 103:8
106:12 108:4

**whatever** 24:4
31:4,20
105:19
106:22,23
113:5 133:5
155:10 156:25
157:3

**whatsoever**
70:24

**when** 7:24
8:1,4 11:7,20
12:7 15:3
16:8,11,13
17:1 18:21
21:6 23:2,18,
25 28:24 29:4
34:21 36:10,
11 39:24
44:18 47:17,
24 48:6 49:12
50:21 52:17
61:14,21
65:16 67:25
68:7 79:2
80:17,18

89:7,10,15
90:9,25 93:6
96:16,19
109:18 110:22
115:15 120:24
126:1,10,21
127:5 132:9,
10 135:25
138:7,11
139:24
140:19,21
141:7,13,17,
21 142:2,10
145:6 151:12
152:4,10
156:5 157:9
164:25

**where** 13:23
30:25 32:17
33:10,16
40:23 76:17
85:20 99:13
102:2,5
108:19 110:7
112:2 119:25
129:21 130:1
132:22 134:16
135:17 136:14
140:22 142:4
146:22 152:21
156:6,15,18
158:14,19,22

**wherefore**
158:14,22
163:7

**wherever**
108:18

**whether** 22:1
31:8,14 56:12
78:11,15
83:17,19
91:20 121:11
127:10 129:12
135:16 138:24
145:8

**which** 33:15
39:22 40:17
41:3 48:24
49:1,3 50:5

65:6 70:10
71:1 73:10,14
91:23 112:17,
21 118:24
122:25 125:3
170:10
**while** 45:15
108:6,14
151:6 165:7
**white** 30:8
**who** 5:17
10:13 14:12,
20 17:14 19:3
39:7 61:8
66:24 67:17
72:5,7 95:6,
22 96:22
97:16 119:24,
25 120:4
123:10 131:4
134:2 135:10
155:22
157:22,24
170:2
**whoever** 83:2
149:5
**whole** 91:10
168:21
**why** 7:1 13:14
14:5 15:7
27:21 28:16
36:13,19
37:19 38:8
43:14,21
45:17 48:14
50:16,21,24
51:8,23 66:16
68:24 84:19,
22 85:4,5,8,
13 86:17 87:2
93:10,12
95:19 115:1,
22 121:11,14
125:2 131:24
133:22 135:4
136:17 144:9
146:13,24
167:15

**wife** 14:13,25
97:10,12
142:18
**will** 6:15
14:3,6 55:7
57:24 58:2,9,
12,14,18,21,
24 59:1,22,25
60:3,6,9,12,
15,18 81:20
85:8,22 87:15
88:5,6 134:25
**willfully**
161:5 165:14
**willing** 85:7
137:21
**Wilson** 60:12
**Windows** 45:19
46:18,25
49:20 50:9
**Wiping** 52:15
**with** 5:19,21
7:17,18 8:18,
23 9:1 12:11,
13,14,17
13:7,15 14:2,
6 15:15 16:3,
4,8 19:4
20:24 30:9
31:17 39:20
42:25 43:7
45:13 48:15
50:17 51:1,14
52:11 53:17
54:4,5,7 55:5
56:4,7 58:5
62:3 64:2,5,
16 66:15
67:11 74:16
76:20 77:13
82:19 85:19
86:1,13
87:11,15
91:11 92:17
95:1,14
96:18,20 97:4
98:8 101:17
103:19 104:14
108:15 109:23

115:23 116:25
118:1,6
119:18 120:10
121:15 122:23
123:5,17
125:5,24
126:9,16
127:15 129:24
131:15 132:18
133:8 138:10,
17,25 139:2,
4,23 140:15
141:8 142:8,
12,22 143:8
144:6,11,25
145:12,19,22
146:21 147:7,
13 148:7
154:4,7,12,
16,17,19
155:19
157:22,23
164:3 165:10,
14 166:13,20,
25 167:2,9,11
168:8,10
**within** 23:12
89:1
**without** 31:16
43:1 51:1
64:15 144:15
**witness** 4:17
7:7 8:13 9:5
11:1,25 12:24
15:22 16:6
17:8,21 20:6
21:3,23 22:23
24:3 31:20
32:11 33:13
35:25 36:7,
16,22 38:18
39:15 41:10
43:4,20 44:11
45:6 46:9
49:3,7 50:19
51:6,13 53:19
55:7,11
56:16,23
57:13 58:6

63:8,20 64:14
65:2 66:8
69:16 70:3,18
71:5,16 73:6,
18 74:1,20
78:13 80:5
81:2,9,17
82:5,19
83:13,25
86:6,8,9
87:17,25
90:14 91:19
92:2,8 96:6,
22 98:18
99:1,8 100:17
101:3 102:5,
15,20,24
104:11,23
105:5 114:18,
21 116:16
118:12,14
122:5 128:19
147:4 148:2
159:19
161:18,24
162:9,18
163:16 164:11
165:18 166:7
167:21 169:9
172:18,24
173:8,13
174:11,21
175:2
**won't** 41:22
105:18 111:10
**word** 15:10
18:25 93:5
124:8,22
**words** 147:14
160:14
**work** 12:17
19:23 24:1
30:19 36:4,7
49:14 54:6
56:17 88:4
109:15,19
110:2 137:1,
15 152:18

worked   34:21
  152:18,19
working   12:18
  14:24 19:24
  20:9,15,16,
  18,22,25 21:6
  22:9 96:18,23
  138:11,17,24
  139:2,6,13,19
  140:9,14
  141:14,17,23,
  25 142:4,7
  143:7 144:10
  147:12
  154:13,17,20
  166:13
worry   127:23
worth   22:3
  29:23 30:22
  73:14 74:23
  75:22 105:2
  123:24 124:1
would   4:11
  6:11 7:4,7,8
  10:22 11:9,
  14,16 14:5,21
  16:24 17:1
  25:17 29:21
  30:9 32:5
  36:13 39:2
  44:25 45:12
  47:14 53:12
  54:24 66:13,
  16 69:22 70:1
  72:5,7 74:4,
  8,12 75:10
  77:15 81:5,13
  82:7,14 83:14
  86:21 93:15
  96:1 97:3,5,7
  99:18 100:19,
  25 101:9
  105:5,15
  107:4 108:5,
  24 109:15
  110:1 115:22
  117:23,25
  118:12 119:19
  120:20 121:15

122:12 126:15
  133:2,9
  135:4,20
  136:3,6,13,18
  137:4 138:1,2
  140:3 141:13
  145:13 149:6,
  7,8 150:11,14
  152:13 157:19
  161:14 166:24
wouldn't
  20:21 22:19
  26:25 27:15,
  16 47:13
  57:7,11 67:11
  68:24 69:25
  78:1 93:15
  100:14 136:22
Wright   4:14,
  15 24:14
  52:12 81:6
  82:11,24 83:9
  92:4 95:6,22,
  23 99:4
  100:8,11
  101:25 113:15
  114:15 118:19
  120:22
  121:15,22,25
  122:23 123:5,
  12,13 124:18,
  21,24 126:20
  127:3 129:12
  131:11 138:5,
  7,8,16 139:15
  142:25
  156:15,19
  166:1,11,16,
  23 167:3,12,
  19 168:4,7,
  15,18 169:6,
  23 170:3
Wright's
  127:7 174:14
write   85:23
writer   67:2
writes   13:23
writing   70:12

wrong   59:6,8
  110:11
wrongfully
  158:16,17
  159:1,3 163:9
  165:10
wrote   39:16
  52:7,11
Wynn   60:15

_____

Y

Yahoo   77:2,4,
  6
year   23:12
  46:22 52:1,21
  103:24 169:1
years   9:19
  11:8 34:21
  39:25 67:23
  97:11 100:2,9
  125:18,19
  152:13 153:1
  168:22,24
yes   4:17 5:4,
  8,10,13,25
  7:23 9:9,12
  10:8 13:5,11,
  18 14:11
  15:25 17:8,
  15,17 18:17
  21:12 22:2
  23:17,20
  24:16,23
  25:20 26:6,9,
  12,16,18,21,
  24 28:7,9
  29:1,6,10,11
  30:3,7 31:7,
  24 33:22
  34:17 35:24
  37:11,23
  38:14 41:6,9,
  10 42:17,20
  43:10 44:23
  47:12,18,24
  48:1,2,3,6
  49:18 52:8,

10,13,24
  54:5,8,10,17
  55:1,19,25
  56:23 59:11,
  15 61:13
  62:21 63:4
  65:15,17
  67:14 68:1,13
  69:1,9,19,21,
  24 71:11
  72:20 74:9,
  17,20 75:14,
  18 76:10,14,
  16,19 78:13,
  25 79:15,24
  80:21 82:8
  83:1,4 84:15
  87:1 88:14,16
  89:3 91:4,12
  94:4,20 95:4,
  5,10,16,25
  97:21 99:17,
  22 100:4,13
  101:7,19,21
  103:23,25
  104:3,5,7
  107:2,24
  109:11,14,17
  113:7,20
  114:12 118:5,
  15,20 119:13,
  16 120:7,18
  121:10 122:3
  123:14,19,21
  124:13,19,22
  125:21 129:7,
  10,20,21
  130:13 131:3,
  7,16,19
  132:16,19
  133:15
  134:13,15
  135:3,15
  136:12,21
  137:11 138:6
  139:9,12,17
  141:6,9,15
  142:9 143:2,
  11 145:14

146:17 147:2,
17,20 148:10,
14,19 149:2,
10,15,17
150:4,9,13,25
151:2,10,16,
22 152:9
154:3,6,8,25
157:11,18
158:24 162:2,
4,24 163:11,
19 164:1,6
166:3 168:13,
23,25 169:2,
12,22 170:4
171:4,8,10,23
172:1,4,6,9,
13,18,24
173:5,13,16,
18,20,22
174:1,11,16,
21

**yesterday**
72:8

**yet** 99:25
124:6 144:21

**you** 5:2,3,11,
14,17,19,21,
24 6:1,8,9,
10,11,13,15,
16,18,19,20,
21,22,23,24
7:1,13,15
8:1,2,4,6,12,
15,20 9:3,5,
7,14,17,19,20
10:1,3,10,13,
17,22,23,24
11:3,7,16,22,
23 12:2,6,14,
17,20,24
13:4,6,10,12,
14,23 14:5,6,
8,9,15,18,23
15:7,12,19,22
16:4,8,11,14,
17,20 17:3,6,
10,13,14,16,
18 18:1,2,5,

7,9,16,17,21,
24 19:3,11,17
20:2,5,8,14
21:1,6,23,25
22:6,11,14,
17,25 23:2,3,
7,10,13,18,25
24:7,10,14,
15,17,20,24
25:7,10,13,
16,18 26:3,7,
10,13,17,19,
22,25 27:6,
10,11,12,15,
16,19,25
28:13,16,18,
20,24 29:2,3,
7,9,12,13,15,
17,21 30:1,4,
5,9,20,23
31:2,8,12,13,
16,23,25
32:2,7,9,14,
17,19,20,21,
22 33:1,4
34:4,6,10,11,
18,23 35:11,
13,17,20
36:4,10,11,
12,13,19
37:5,6,8,10,
12,16,20,25
38:8,12,15
39:1,10,11,18
40:1,2,7,9,
10,13,16
41:12,17,20,
22 42:8,9,10,
18,19,21,25
43:6,7,11,14,
15,16,18,24
44:5,8,9,10,
14,15,18,21,
24,25 45:1,
10,14,16,17,
21,25 46:6,
11,12,18,22,
25 47:3,5,8,
10,13,14,16,

17,19,22,23,
25 48:1,2,3,
5,6,11,17,21,
24 49:1,5,7,
12,14,17,18,
23,24,25
50:1,12,13,
21,22,24,25
51:2,3,6,8,
17,19,23,24
52:1,7,14,17,
21,23 53:1,6,
8,10,14,21
54:6,19,23,25
55:2,5,14,23
56:1,8,11,19,
25 57:11,17,
18,20,21,23,
25 58:1,11,
14,17,20,23
59:1,4,6,8,9,
16,19,22,25
60:3,6,9,12,
15,18,21,23,
25 61:7,11,
12,14,18,21,
24 62:3,4,8,
18,20,24
63:5,11,22,25
64:7,10,12,
15,16,18,19,
20 65:6,9,13,
19,22,24
66:12,16,23
67:5,8,10,15,
21 68:7,8,10,
11,13,22,23
69:7,22
70:13,14,20
71:7,10,12,
18,19,21,24
72:8,12,16,
18,21 74:4,7,
8,10,12 75:2,
3,8,19,20
76:5,7,8,17,
23 77:2,4,7,
11,16,20
78:1,5,6,10,

15,19,20
79:2,4,5,7,
11,12,13,14,
17,19,22,25
80:15,22,25
81:5,11,17
82:14,24
83:3,22 84:4,
8,11,16,19,
22,25 85:1,4,
6,13,23,24,25
86:6,14,17,
19,21,22
87:1,13,17,22
88:1,10,11,
13,17,19,23,
24 89:2,7,10,
21,23 90:1,2,
5,6,7,9,11,
22,25 91:1,8,
10,11,23,24
92:12,14,17,
24,25 93:2,6,
10,17,19
94:4,12,17,
21,23,25
95:2,3,7,11,
17,23 96:1,8,
21 97:3,5,7,
12,14,17,19,
22 98:9,11,
13,20,22
99:1,3,15,20
100:3,7,11
101:5,9,14,
22,23 102:1,
12,22,24
103:2,5,10,
18,21 104:18
105:14,17,19
106:2,13,17,
25 107:8,13,
15,23 108:1,
2,8,11,22
109:1,5
110:1,14,15,
22 111:2,5,6,
18,22,25
112:5,7,15,

19,22 113:1,
15,16,17,25
114:7,10,13,
16,17,18,19,
20,24 115:3,
7,8,15,19,20,
22 116:10,11,
13,18,19,21
117:3,18,19
118:2,4,7,11,
12,17,21
119:4,9,11,
17,18,19,20,
22 120:6,10,
12,20,21,23
121:1,9,20,
21,24,25
122:2,4,8,10,
12,20 123:3,
4,5,12,17
124:8,10,11,
15,25 125:12,
15,17,18,22
126:1,2,4,5,
6,10,12,13,
17,21 127:3,
4,5,8,10,16,
18,19 128:1,
2,6,8,9,11,19
129:5,6,18,
22,25 130:7,
19,22 131:13,
14,17,21,24
132:1,3,6,10,
11,14,17,21
133:7,9,11,
16,18,25
134:6,11,16,
22,23,24,25
135:1,6,12,
13,16,22,25
136:1,3,11,
13,22 137:2,
9,12,14,16,
22,23,24
138:4,7,8,10,
13,16,20,23
139:6,13,15,
18,21,24,25

140:6,12,13,
18,21,24
141:4,7,8,10,
13,16,17,21,
24 142:1,2,4,
6,14,17,25
143:6,24
144:5,9,18,25
145:1,2,4,6,
10,15,21
146:9,15,18,
22,25 147:4,
10,11,15,18,
21 148:6,8,20
149:4,18,21,
25 150:5,10
151:1,3,7,12,
14,23 152:1,
4,6,8,12,13,
16 153:3,6,
19,21,23
154:2,4,7,9,
12,16,19,24
155:1,6,15
156:1,5,10,
14,18,22,23
157:6,9,16
158:1,3,6,14,
15,19,22,25
159:3,22
160:2,8,9,15,
23,24 161:2,
4,9,12,13,15,
20,24 162:2,
11,20,22,23,
25 163:7,8,
10,22,25
164:2,7,8,16,
17,20,22
165:3,6,9,13,
24 166:10,15,
22 167:1,2,3,
11,12,18,25
168:4,6,14
169:5,9,19,20
170:7,10,15,
20,22 171:5,
6,12,21,24
172:17 173:2,

3,4,10,15,17,
19 174:4,8,
13,15,18

**you're** 20:14
23:18,25
25:18 26:7,14
32:18,22 33:4
34:4 35:4
37:19 47:16
49:25 54:4,9,
15 58:4 62:7,
12 67:17
77:17 83:9,13
84:24 85:2,6,
25 86:16 91:2
101:17 103:7
109:7,10
110:10,24
113:5,9
116:23,25
117:20,22
118:24 122:16
124:24 125:11
127:2,25
128:13 141:21
142:3,21
144:24 145:18
155:20 156:23
157:17 159:7,
8,16 160:5,6,
11,14 162:5
163:24
164:15,24

**you've** 31:17
32:13 49:23
53:17 58:5
63:2 64:5,16
69:20 72:13
80:23 84:14
88:4 114:15
118:18 121:19
125:19 165:15
168:21

**young** 123:10

**your** 6:13,15,
16,21 7:1,4,
11,18,22
8:20,23 9:1
10:6 14:8

27:13,17,21
28:2 31:2
32:20 33:10
36:10 37:16
39:3,5,7,10
40:8,10 41:1,
7,20 42:16
43:1,7 47:8,
19,24 48:14,
15,21 49:18
50:12,16,17
51:1,3,18,23
53:17 54:11,
18 55:9 58:5
61:1 62:18
64:5,16
66:22,23
67:19,20
68:2,15,17
69:8,10,13,25
71:24 72:17
73:21 74:10
75:12 76:6,11
79:17 81:6
85:7,24 87:16
88:1,4,15
89:16 90:5,7,
9 91:23,24
92:19 93:13,
21 94:8 95:2
96:11,17
97:12 98:21
105:10 107:15
108:1,8,10,12
110:4 112:9
113:6 116:18
117:23
122:17,23
123:17
124:20,25
125:8,9 128:3
131:15 134:14
139:6,14,18
141:10 142:2,
15 143:13,19
144:15,18
145:4,6,15,21
146:5,6
147:11 150:2,

```
 20 155:1,22
 157:16 158:7
 160:24 163:3
 164:24 166:4,
 22 172:2,10
 173:10 174:8
```

**yours**  116:21
**yourself**  13:7
 125:19 147:18

---

**Z**

---

**Zuckerberg**
 15:8

50  2013 CP 0 0 5 0 6 0 XXXX NB





COPY

NORTH COUNTY CIVIL DIV.
ORIGINAL RECEIVED

OCT 25 2013

SHARON R. BOCK
CLERK & COMPTROLLER
PALM BEACH COUNTY

FILE ORIGINALS AND
RETURN STAMPED
COPIES TO

This

**LAST WILL**

prepared for

**DAVID ALAN KLEIMAN**

THE KARP LAW FIRM
A Professional Association

Palm Beach Gardens
(561)625-1100
(800)893-9911

Boynton Beach
(561)752-4558
(800)893-9911

Port St. Lucie
(772)343-8411
(800)893-9911

© The Karp Law Firm, P. A.
All Rights Reserved



EXHIBIT
1
1/10/20

Will 07-30-03.max

# Last Will

## of

# DAVID ALAN KLEIMAN

I, DAVID ALAN KLEIMAN, residing in Palm Beach County, Florida, do hereby make, publish and declare this to be my Last Will and Testament, and do hereby revoke any and all former Wills and Codicils heretofore made by me.

**FIRST**: I direct that my Personal Representative, hereinafter named, pay all my just debts and funeral expenses as soon after my death as may be practicable.

**SECOND**: In the event that, at the time of my death, I am the owner, or co-owner of any real estate, insurance settlement, bank account, government bond, or security or instrument of indebtedness (whether issued by a private corporation, a government, a governmental agency, or an individual) which is registered or issued in the names of myself and another person or persons as tenants by the entirety or as joint tenants with right of survivorship, or which is registered or issued in my name but is payable to or apparently payable to a named beneficiary on my death, I declare it to be my intention that all my right, title, and interest in any such property shall immediately pass to the joint owner, co-owner, or beneficiary named in any instrument pertaining to such property, whether or not my right, title or interest in any such property would, by operation of law upon my death, vest in or pass to such surviving person. I make this provision in order to eliminate any doubt or question as to the right of any such person apparently entitled thereto to succeed to the full possession and ownership of such property upon my death, and to provide for the possible contingency of an ineffective attempt to create a joint tenancy, with right of survivorship, or an estate by the entirety.

**THIRD**: In the event that any devisee shall die with me in a common accident or disaster or under such circumstances as may make it impossible or difficult to determine which of us died first, or within thirty days after my death, then I direct that said devisee shall be conclusively deemed not to have survived me.

**FOURTH**: I give certain items of the tangible personal property owned by me at the time of my death in the manner described in the last dated writing made for this purpose and signed by me that is in existence at the time of my death.

1

FIFTH: I give and devise to my brother, IRA STEVEN KLEIMAN, all of the rest, residue and remainder of my estate, of whatsoever kind and wheresoever situate, which I may own or have the right to dispose of at the time of my death, to be his absolutely and forever.

SIXTH: In the event that my brother, IRA STEVEN KLEIMAN, shall predecease me, or shall be deemed not to have survived me in accordance with the provisions of Paragraph THIRD, then all of the rest, residue and remainder of my estate, of whatsoever kind and wheresoever situate, which I may own or have the right to dispose of at the time of my death, I give and devise to my parents, LOUIS L. KLEIMAN and REGINA KLEIMAN, OR THE SURVIVOR. In the event that both of my parents, LOUIS L. KLEIMAN and REGINA KLEIMAN, should predecease me, then I give and devise the rest, residue and remainder of my estate to JOSEPH S. KARP and DEBORAH C. KARP, OR THE SURVIVOR, per stirpes.

I recognize that JOSEPH S. KARP is my attorney and I asked him to draft this Last Will. However, he has been a lifelong friend of my family, and has known my mother since his birth.

SEVENTH: For reasons known unto myself, I make no provision herein this Last Will for my brother, LEONARD KLEIMAN.

EIGHTH: If any principal of my estate shall become distributable to a minor, my Personal Representative may, in his or her absolute discretion, pay over such principal at any time to the Guardian of the Property of such minor, or retain the same for such minor during minority. In the case of such retention, my Personal Representative may apply such principal and the income therefrom to the support, maintenance and education of such minor, either directly or by payments to the Guardian of the Property or Person of such minor, or to be the person with whom such minor may reside, and the receipt of any such Guardian or person shall become a complete discharge to my Personal Representative who shall not be bound to see to the application of any such payment. Any unapplied principal and income shall be paid over to such beneficiary upon attaining the age of majority, or if he or she shall die before attaining the age of majority, to his or her estate. In holding any funds for any minor, my Personal Representative shall have all the powers and discretion hereinafter conferred upon him or her.

NINTH: I hereby nominate and appoint my brother and my mother, IRA STEVEN KLEIMAN and REGINA KLEIMAN, OR THE SURVIVOR, Co-Personal Representatives of my Estate. In the event both IRA STEVEN KLEIMAN and REGINA KLEIMAN fail, refuse or are unable to act as Personal Representatives, then the following person shall serve as Successor Personal Representative:

JOSEPH S. KARP

I direct that none of them shall be required to furnish bond or other surety for the faithful performance of his or her duties hereunder.

2

TENTH. The personal representatives named in this Will, and their successors and parties serving in their stead, shall be governed by the provisions of Sections 733.612 and 737.402 and Chapter 738, Florida Statutes, that are not in conflict with this instrument, and shall have all additional powers and protection granted by statute to them and to trustees at the time of application that are not in conflict with this instrument. In addition and not in limitation of any common-law or statutory authority, and without application to any court, they also shall have the powers and responsibilities described below to be exercised in their absolute discretion.

ELEVENTH: I hereby authorize my Personal Representative, with respect to my estate, in his or her sole and absolute discretion, to retain any property in my estate; to sell any real or personal property of my estate for cash or on credit, at public or private sale, or to exchange any such property for other property; to collect, pay, contest, compromise, or abandon claims of or against my estate; to execute contracts, conveyances, and other instruments; to make any distribution or division of my estate in cash or in kind or both; and to execute and to deliver any and all instruments which he or she may deem advisable to carry out any of the foregoing powers. All of the foregoing powers may be exercised without leave of court.

TWELFTH: Throughout this Will, the masculine gender shall be deemed to include the feminine, and the singular the plural, and vice versa.

I signed this, my last will, on   July 30, 2003  .

DAVID ALAN KLEIMAN

Signed, sealed, published and declared to be as and for his Last Will and Testament, by the above-named Testator, in our presence, who at his request, in his presence, and in the presence of each other, have hereunto subscribed our names as attesting witnesses at Palm Beach Gardens, Florida, on July 30, 2003.

| | Business Address: | 2875 PGA Boulevard, Ste. 100 Palm Beach Gardens, FL 33410 |
| | Business Address: | 2875 PGA Boulevard, Ste. 100 Palm Beach Gardens, FL 33410 |
| | Business Address: | 2875 PGA Boulevard, Ste. 100 Palm Beach Gardens, FL 33410 |

3

STATE OF FLORIDA                                    )
                                                           SS
COUNTY OF PALM BEACH                     )

I, DAVID ALAN KLEIMAN declare to the officer taking my acknowledgment of this instrument, and to the subscribing witnesses, that I signed this instrument as my will.

_____ , Testator
DAVID ALAN KLEIMAN

We, ____ Marcia J. Varney _____ (Witness) and *Beverley Brownlee* _____
(Witness) have been sworn by the officer signing below, and declare to that officer on our oaths that the Testator declared the instrument to be the Testator's will and signed it in our presence and that we each signed the instrument as a witness in the presence of the Testator and of each other.

_____
Witness

_____
Witness

Acknowledged and subscribed before me by DAVID ALAN KLEIMAN, the Testator, who is personally known to me or who has produced _____ as identification, and sworn to and subscribed before me by __ Marcia J. Varney _____ (Witness) who is personally known to me or who has produced _____, as identification and *Beverly Brownlee* (Witness) who is personally known to me or who has produced _____, as identification, and subscribed by me in the presence of the Testator and the subscribing witnesses, all on July 30, 2003.

_____
Notary Public

Notary Seal

LAURA E. AHLERS
My Comm. Exp. 5/18/05
No. DD 006618
_____ Other I.D.
My commission expires: _____

4

Will 07-30-03.max

| | |
|---|---|
| **From:** | Ira K |
| **Sent:** | Monday, February 17, 2014 4:16 PM |
| **To:** | Craig Wright |
| **Subject:** | Re: FW: AGMO COE in IPv6.pptx |

Hi Craig,

I would like to ask for your advice if I may. After everything you have shared with me I feel like I can completely trust you.

As mysterious and exciting as all this news is, I also feel nervous about making mistakes.
I very well could have already made some months ago by throwing away a bunch of Dave's papers and formating drives that I couldn't access.

Patrick and his partner emailed me the other day and would like me to bring over his drives.
I haven't spoken with them about what would happen next if they did manage to access his account. And I assume that anything in it cannot be traced when there is a withdrawl?.
Being that I have only met Patrick a couple times in my life I was wondering if there any safety measures you can recommend to me so I don't make another mistake?

Thanks,
Ira


On Mon, Feb 17, 2014 at 4:31 AM, Craig S Wright                                    wrote:



**From:** Craig S Wright
**Sent:** Monday, 12 September 2011 3:28 PM
**To:** 'Craig S Wright'
**Subject:** AGMO COE in IPv6.pptx



EXHIBIT
2
1/10/20

KLEIMAN_00177455

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

```
 1                  UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF FLORIDA

 3                   CASE NO. 9:18-cv-80176-BB/BR

 4
     IRA KLEIMAN, as the personal
 5   representative of the Estate of
     David Kleiman, and W&K Info Defense
 6   Research, LLC

 7
             Plaintiffs,
 8
     -vs-
 9
     CRAIG WRIGHT
10
             Defendant.
11

12   * * * * * * * * * * * * * * * * * * * *

13   VIDEOTAPED DEPOSITION OF IRA KLEIMAN

14   DATE TAKEN: April 8, 2019

15   TIME: 10:10 - 2:55 p.m.

16   PLACE:100 S.E. 2nd Street

17   Miami, Florida 33131

18
     TAKEN BEFORE: RICK E. LEVY, RPR, FPR
19                 AND NOTARY PUBLIC

20

21   * * * * * * * * * * * * * * * * * * * *

22

23

24

25
```

EXHIBIT

3

1/10/20

```
 1    APPEARANCES:

 2    On behalf of the Plaintiff:

 3         KYLE ROCHE, ESQUIRE
           BOIES, SCHILLER & FLEXNER LLP
 4         333 Main Street
           Armonk, NY 10504
 5
           VEL FREEDMAN, ESQUIRE
 6         ANDREW BRENNER, ESQUIRE
           BOIES, SCHILLER & FLEXNER LLP
 7         100 S.E. 2nd Street
           Suite 2800
 8         Miami, Florida 33131

 9

10    On behalf of the Defendant:

11

           BRYAN PASCHAL, ESQUIRE
12         AMANDA MCGOVERN, ESQUIRE
           ANDRES RIVERO, ESQUIRE (VIA PHONE)
13         RIVERO MESTRE, LLP
           2525 Ponce de Leon Boulevard
14         Suite 1000
           Coral Gables, Florida 33134
15

16

17    Also Present: Rene Lavandera, The Videographer

18

19

20

21

22

23

24

25
```

```
 1                              -   -   -
                              I N D E X
 2                              -   -   -

 3    WITNESS:         DIRECT    CROSS   REDIRECT   RECROSS
      IRA KLEIMAN
 4    BY MR. PASCHAL    5

 5                              -   -   -
                          E X H I B I T S
 6                              -   -   -

 7
      NUMBER                          PAGE
 8    DEFENDANT'S EX. 1               6
      DEFENDANT'S EX. 2               29
 9    DEFENDANT'S EX. 3               34
      DEFENDANT'S EX. 4               37
10    DEFENDANT'S EX. 5               39
      DEFENDANT'S EX. 6               45
11    DEFENDANT'S EX. 7               56
      DEFENDANT'S EX. 8               58
12    DEFENDANT'S EX. 9               59
      DEFENDANT'S EX. 10              63
13    DEFENDANT'S EX. 11              82
      DEFENDANT'S EX. 12              84
14    DEFENDANT'S EX. 13             90
      DEFENDANT'S EX. 14             108
15    DEFENDANT'S EX. 15             115
      DEFENDANT'S EX. 16             123
16    DEFENDANT'S EX. 17             122
      DEFENDANT'S EX. 18             138
17    DEFENDANT'S EX. 19             139

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                         -  -  -

 3        Deposition taken before Rick E. Levy,

 4   Registered Professional Reporter and Notary Public

 5   in and for the State of Florida at Large, in the

 6   above cause.

 7                    -   -   -

 8             THE VIDEOGRAPHER:  Good morning.  We are now

 9        on the record in the matter of Kleiman, Ira and the

10        estate of David Kleiman vs. Wright, Craig.  Today

11        is April 8th 2019.  The time is now 10:10 a.m.

12             This is the video recorded deposition of

13        Mr. Ira Kleiman being taken here at 100 Southeast

14        2nd Street, Suite 2800, Miami, Florida 33131.  My

15        name is Rene Lavandera representing First Choice

16        Reporting located in Orlando, Florida.

17             The court reporter this morning is Mr. Rick

18        Levy.  Will all counsel present please introduce

19        yourselves for the record?

20             MR. PASCHAL:  Bryan Paschal for Dr. Craig

21        Wright and Amanda McGovern for Dr. Craig Wright as

22        well.

23             MR. RIVERO:  Andres Rivero on the telephone

24        also representing Dr. Craig Wright.

25             MR. ROCHE:  Kyle Roche of Boies, Schiller &
```

```
 1          Flexner representing plaintiffs.

 2              MR. FREEDMAN:  Vel Freedman, Boies, Schiller

 3          representing plaintiff.

 4              THE VIDEOGRAPHER:  Mr. Court reporter, you may

 5          swear in the witness.

 6    Thereupon,

 7                          (Ira Kleiman)

 8          having been first duly sworn or affirmed,

 9    was examined and testified as follows:

10                      DIRECT EXAMINATION

11              THE WITNESS:  Yes.

12    BY MR. PASCHAL:

13          Q.   Could you please state your full name?

14          A.   Ira Kleiman.

15          Q.   Ira, have you ever been deposed before?

16          A.   No.

17          Q.   I'll go over a few basics how a deposition is

18    going to work today.  We need you to provide clear, oral

19    responses so the court reporter, this is the court

20    reporter, can hear you.  Please keep in mind the court

21    reporter can only take down one person at a time so only

22    one person can talk at a time.  Do you understand?

23          A.   Yes.

24          Q.   If at any time I ask you a question that you

25    do not understand please let me know right away
```

1   otherwise I'll assume that you understood the question;

2   okay?

3        A.   Yes.

4        Q.   If at any point you remember something or want

5   to clarify an answer you previously gave please do so.

6   You understand?

7        A.   Yes.

8        Q.   If you need to take a break at any point just

9   let me know, okay?

10       A.   (Indicating).

11       Q.   Is there any reason preventing you from giving

12   your best deposition testimony today?

13       A.   No.

14       Q.   Are you currently on any prescribed

15   medication?

16       A.   No.

17       Q.   Is there any medical condition or other reason

18   why it might be difficult for you understand my

19   questions today?

20       A.   No.

21            MR. PASCHAL:   This is going to be Exhibit 1.

22            (Defendant's Exhibit No. 1 was

23            marked for identification.)

24   BY MR. PASCHAL:

25       Q.   If you turn to page two of that exhibit this

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                        Page 7

1    is the topics that you're to -- you're here for today in

2    this deposition.

3         A.    Okay.

4         Q.    When did you first see this list?

5         A.    When did I first receive this list?

6         Q.    When did you review this list?

7         A.    I believe my attorneys sent it to me maybe --

8              MR. FREEDMAN:  One second.  Don't discuss

9         anything that we spoke with you.  If you can answer

10        the question by just giving a date, good.  If not

11        you can't recall you can't recall.

12             THE WITNESS:  I don't remember exactly.

13   BY MR. PASCHAL:

14        Q.    Did you see this list before today?

15        A.    Yes.

16        Q.    Are you prepared to discuss these topics

17   today?

18        A.    Yes.

19        Q.    What did you do to prepare?

20             MR. FREEDMAN:  Again don't discuss anything

21        you spoke about with your attorneys but to the

22        extent you've done preparation you should answer

23        the question.

24             THE WITNESS:  I haven't done anything to

25        prepare.

 1              MS. MCGOVERN:  Can you speak up a little bit?

 2              THE WITNESS:  Yes, I haven't done anything.

 3    BY MR. PASCHAL:

 4        Q.   Did you look at any documents?

 5        A.   I reviewed some of my old e-mails, yes.

 6        Q.   About how many e-mails did you review?

 7        A.   I don't know.

 8        Q.   You met with your attorneys, right?

 9        A.   Yes.

10        Q.   What's your date of birth?

11        A.   ███████████ 1970.

12        Q.   Where were you born?

13        A.   New Jersey.

14        Q.   When did you move to Florida?

15        A.   1975.

16        Q.   Have you always lived in Palm Beach Gardens?

17        A.   No.

18        Q.   Where else did you live?

19        A.   Hollywood, Florida.

20        Q.   How long did you live in Hollywood, Florida?

21        A.   Maybe two or three years.

22        Q.   Is that right after you moved from Jersey?

23        A.   Yes -- no.  We went from New Jersey to

24    California for I think just about one year and then

25    Hollywood.

1      Q.    So when did you move to Palm Beach Gardens?

2      A.    Probably around 1978.

3      Q.    From 1998 -- I show that you purchased the

4   home in 1998.  Was that your first home that you

5   purchased?

6      A.    Yes.

7      Q.    Then you have that home until 2014 and it was

8   located at ███████████████████ in Palm Beach Gardens; is

9   that right?

10     A.    Yes.

11     Q.    2014 through today you have a home that's

12  located at ████████████████ in Palm Beach Gardens; is

13  that correct?

14     A.    Yes.

15     Q.    How long have you been married?

16     A.    Since 2009.

17     Q.    What is your wife's name?

18     A.    Ju.

19     Q.    Ju Kleiman?

20     A.    Yes.

21     Q.    Did she go by the name of Sasithorn?

22     A.    Yes.

23     Q.    When did she change her name?

24     A.    I guess Sasithorn would be her official Thai

25  name.  Ju is what she goes by in the States.

1      Q.   That's her legal name?

2      A.   I suppose so.  Sasithorn.

3      Q.   Sasithorn is her legal name?

4      A.   Yes.

5      Q.   What is your wife's occupation?

6      A.   She doesn't work.

7      Q.   You have two other siblings; right?

8      A.   Yes, I had two siblings, yes.

9      Q.   Was that Dave and Leonard Kleiman?

10     A.   Yes.

11     Q.   How did Leonard pass away?

12     A.   I believe a drug overdose.

13     Q.   Did you speak with him often?

14     A.   Not too often, no.

15     Q.   Do you know why Dave excluded Leonard from his

16   will?

17     A.   They were --

18          MR. FREEDMAN:  Hold on, you're outside the

19     scope of your deposition unless you can tell me

20     what topic you're tied to then I'm happy to let you

21     proceed.  Otherwise I think you're outside the

22     scope.

23          MR. PASCHAL:  You're going to instruct him not

24     to answer?

25          MR. FREEDMAN:  Unless you tell me what topic,

1       yes.

2              MR. PASCHAL:  I think this ties into location

3       of evidence of the case.  I think that was a

4       general order from the Court.

5              MR. FREEDMAN:  How does the reason Dave

6       Kleiman did or did not exclude one of his brothers

7       tie into the --

8              MR. PASCHAL:  This is my deposition.  I'm

9       asking him.

10             MR. FREEDMAN:  Don't answer the question.

11  BY MR. PASCHAL:

12      Q.    Have you ever been sued?

13      A.    No.

14      Q.    Have you ever sued someone or an entity

15  excluding this lawsuit?

16      A.    Yes.

17      Q.    What lawsuit was that?

18      A.    A case against Computer Forensics, LLC.

19      Q.    What is currently happening in that case?

20      A.    It's still ongoing.

21      Q.    There's another lawsuit here it might not be

22  you it says Steve Kleiman vs. Metropolitan Health

23  Networks?

24      A.    Not me.

25      Q.    Sometimes you go by your middle name Steven?

1        A.    Yes.

2        Q.    Is there a reason you --

3        A.    Certain amount of years I went by Steve and

4    earlier people that know me from a younger age always

5    call me Ira.

6        Q.    So it's interchangeable?

7        A.    Yes.

8        Q.    Have you ever been charged or accused of a

9    crime?

10       A.    No.

11       Q.    What schools have you attended?

12       A.    Palm Beach Gardens High School and Palm Beach

13   Community College.

14       Q.    Was the community college, that was the last

15   school attended?

16       A.    Yes.

17       Q.    What degrees and certifications do you have?

18       A.    I just have a high school diploma.

19       Q.    So you didn't graduate from the community

20   college?

21       A.    No.

22       Q.    Did you get any certifications from the

23   community college?

24       A.    No.

25       Q.    Do you have any professional licenses?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 13

1        A.    No.

2        Q.    What is your current profession?

3        A.    Self employed, web site designer, affiliate

4    marketing.

5        Q.    What type of web sites do you design?

6        A.    Basically I just design my own type of web

7    sites that are related to affiliate marketing.

8        Q.    What's affiliate marketing?

9        A.    Like take Amazon as an example.  Put up a web

10   site and you advertise other people's products and if

11   someone clicks through you would -- you receive a

12   commission when someone purchases.

13       Q.    So do you typically do work for companies or

14   individuals?

15       A.    Just myself.

16       Q.    I guess the way that you get -- how do you

17   charge people, it's by the clicking?

18       A.    I receive commission.  That's it.

19       Q.    Do you work from home or an office?

20       A.    From home.

21       Q.    Is that your primary source of income?

22       A.    And trading stocks.

23       Q.    How much money more or less do you make from

24   trading stocks?

25             MR. FREEDMAN:  Wait, stop.  You're outside the

```
 1        scope of your deposition.  Instruct him not to
 2        answer unless you tie it to a topic.
 3             MR. PASCHAL:  These are background questions
 4        trying to find out.
 5             MR. FREEDMAN:  Don't answer the question.
 6             MR. PASCHAL:  I can't find out about his
 7        professional --
 8             MR. FREEDMAN:  Not unless you tie it to topic
 9        you disclosed.  Tie it to a topic and I'll give it
10        to you.
11             MR. PASCHAL:  Are you instructing him not to
12        answer?
13             MR. FREEDMAN:  Yes, unless you tie it to a
14        topic.
15   BY MR. PASCHAL:
16        Q.   How much -- what was your income for your
17   affiliate marketing?
18             MR. FREEDMAN:  Same instruction.
19             MR. PASCHAL:  Not to answer?
20             MR. FREEDMAN:  Don't answer unless you tie it
21        to a topic.
22   BY MR. PASCHAL:
23        Q.   From 2012 to today relatively what was your
24   income?
25             MR. FREEDMAN:  Again don't answer unless he
```

1      ties it to a topic.

2  BY MR. PASCHAL:

3      Q.    What was your previous occupations?

4      A.    The last time I worked for somebody I think it

5  was for a company called Active Frame.  I was also doing

6  web design for them.  Prior to that just like part-time

7  jobs, florist delivery, stock person at pharmacy.  For

8  the most part I've pretty much always worked for myself.

9          MR. FREEDMAN:  Just one housekeeping matter.

10         I forgot to do this before we started we're going

11         the mark the whole deposition transcript

12         confidential and then we'll go through it obviously

13         with the timeframe.  For now everything is

14         confidential.

15         MS. MCGOVERN:  We disagree with that position.

16         MR. FREEDMAN:  The same for Dr. Wright just so

17         you know.

18         MS. MCGOVERN:  I think it was a different

19         situation.

20         MR. FREEDMAN:  Is it your position that you'll

21         disclose things from the deposition immediately?

22         MS. MCGOVERN:  Not taking any position with

23         respect to Dr. Wright's deposition.

24         MR. FREEDMAN:  I need to know if you intend to

25         disclose things from the deposition immediately or

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                               Page 16

```
 1        if you're going to give me time to dictate a
 2        report?
 3             MS. MCGOVERN:  Absolutely, no.  Would never do
 4        that.  Not going to disclose anything.  I don't
 5        think a blanket confidential stamp over the
 6        plaintiff's deposition is appropriate in this case.
 7        Just stating that for the record.
 8             MR. FREEDMAN:  Okay.  Just so it's clear --
 9        the record is clear I'm saying it's temporary.
10        We're just saying don't disclose anything, we'll go
11        through it and then we'll --
12             MR. PASCHAL:  That's fine.  I want to go back
13        to the questions you told him not to answer.  We
14        did ask for his technical experience and how much
15        money he was making off this technical experience.
16             MR. FREEDMAN:  Disagree with that.  Take that
17        up with the judge.
18             MR. PASCHAL:  So you did not object in your
19        e-mail but you're going to tell him not to --
20        instruct him?
21             MR. FREEDMAN:  Don't agree this goes to the
22        technical experience.  The amount of money they
23        make doesn't go to technical experience.
24   BY MR. PASCHAL:
25        Q.   Have you ever been fired from a job?
```

```
 1        A.    No.

 2        Q.    Have you ever been asked to resign from a job?

 3        A.    No.

 4        Q.    I want to ask you about a few companies you've

 5   been involved with.  What was the business purpose of

 6   The Gigabyte Connection?

 7        A.    I set that company up a long time ago.  I

 8   don't even remember what I was doing with that.  I'm not

 9   even sure I actually used it or not.

10        Q.    How long ago did you set it up?

11        A.    I think it was in the '90s.

12        Q.    Do you know how long it lasted?

13        A.    No, I don't remember.

14        Q.    Did you set it up with any business partners?

15        A.    No, it was my own company.  Probably going to

16   do some kind of computer related type of business with

17   it.

18        Q.    So Future World Shopper, Inc.  What was the

19   business purpose of that company?

20        A.    I intended on setting up like an online

21   portal.  I guess at the time I think they only had like

22   BBSs.  I don't think the internet existed and I was

23   thinking of creating a portal where people could log

24   into it and purchase products.  I guess similar to what

25   people do with Amazon today.  It never got off the
```

1    ground.

2        Q.   What about Hackers, Inc.?

3        A.   That wasn't my company.  That was my

4    brother's.

5        Q.   Which brother?

6        A.   David.

7        Q.   Did you work with Dave in that company?

8        A.   No.

9        Q.   Do you know what was the purpose of that

10   company?

11       A.   I think he was doing some kind of computer

12   consulting with a partner.

13       Q.   Do you know who that partner was?

14       A.   I think his name was Scott Howell.

15       Q.   What's the status of that company?

16       A.   That was closed many years -- that was like

17   early '90s.

18       Q.   It was closed?

19       A.   Yes.

20       Q.   What about Steve's Web Design?

21       A.   I don't think I ever did anything with it.

22       Q.   You just created it?

23       A.   Yes.

24       Q.   Did you have any partners in that?

25       A.   No.

1        Q.    Ira, how many computers do you own?

2        A.    Primarily one laptop.

3        Q.    Do you own any computers from Dave?

4        A.    Oh, yes, if you're including Dave's.

5        Q.    In all how many computers do you own?

6        A.    I think Dave had three laptops.

7        Q.    What was his three laptops?

8        A.    Two of them were Alienware.  One was a Dell

9    laptop.

10       Q.    What's the one computer that you own?

11       A.    I believe it's an ASIS.

12       Q.    ASIS.  What year did you purchase that

13   computer?

14       A.    I don't remember.

15       Q.    Was it after 2013?

16       A.    I don't know.

17       Q.    Did you purchase it with a credit card?

18       A.    I'm not sure.  I may have got it like from one

19   of my affiliate marketing web sites where it's possible

20   I didn't need a credit card to purchase it.

21       Q.    Do you own any Bitcoin or crypto currency?

22       A.    Yes.

23       Q.    How much?

24            MR. FREEDMAN:  Don't answer the question.

25       You're outside the scope of your deposition.

1        MR. PASCHAL:  How much Bitcoin he has is

2    outside the scope?

3        MR. FREEDMAN:  You tell me where the topics

4    that list the amount of crypto assets that are

5    being held.

6        MR. PASCHAL:  I don't know.  Let me ask this

7    then.  That was your topic we put it on here and

8    you guys asked that question so is it your position

9    that's not -- that asking how much Bitcoin somebody

10   has is outside the scope?  I'm fine if that's your

11   response.

12       MR. FREEDMAN:  Is it in yours?

13       MR. PASCHAL:  I copied yours.  I put that in

14   and you had no objection.

15       MR. FREEDMAN:  Where is the topic that says

16   the amount of Bitcoin mined or owned I think is the

17   question.

18       MR. PASCHAL:  One of them and you asked that

19   question.

20       MR. FREEDMAN:  If you show it to me I can read

21   it.  If you don't show it to me --

22       MR. PASCHAL:  Let me ask this question.  If

23   you asked that at your depo are you saying it was

24   outside the scope of your deposition topics?

25       MR. FREEDMAN:  My questions were different --

1        my list of topics are different than your list of

2        topics.  I had just off the top of my head I

3        remember I had the words Satoshi Yakamoto in mine

4        and I don't see it in yours.  This isn't an

5        identical copy of my list.

6            MR. PASCHAL:  So you're instructing him not to

7        answer the question?

8            MR. FREEDMAN:  Correct.

9   BY MR. PASCHAL:

10       Q.   Are you familiar with how Bitcoin is stored on

11  a device?

12       A.   Not really.

13       Q.   Have you read any literature on Bitcoin and

14  crypto currency?

15       A.   I've read articles about it.

16       Q.   If you own Bitcoin how are you not familiar in

17  the manner in which it's owned?

18           MR. FREEDMAN:  Hold on a second.  Can you

19       repeat the question?

20           MR. PASCHAL:  Want me to repeat it or want the

21       reporter?

22           MR. FREEDMAN:  You can repeat it or the

23       reporter, whatever your preference.

24  BY MR. PASCHAL:

25       Q.   If you own Bitcoin how are you not familiar

1    with how it's stored?

2              MR. FREEDMAN:  Objection.  You can answer the

3         question.

4              THE WITNESS:  I don't know the technical

5         workings of how it works.  I just know you can

6         purchase it.

7    BY MR. PASCHAL:

8         Q.    Is it stored on your computer?

9              MR. FREEDMAN:  Objection, hold on.  If you

10        know what the question means you can answer.

11             THE WITNESS:  Is it --

12             MR. PASCHAL:  You can have a standing

13        objection to form but we're not going to have

14        speaking objections so let's not do that today,

15        okay?

16             MR. FREEDMAN:  Isn't that ironic?

17             MR. PASCHAL:  You can answer the question.

18             THE WITNESS:  I've heard that it can be stored

19        on a computer.

20    BY MR. PASCHAL:

21        Q.    So as you own Bitcoin do you know how it's

22    held?

23             MR. FREEDMAN:  Objection.  Go ahead and

24        answer.

25             THE WITNESS:  Not really.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 23

```
 1    BY MR. PASCHAL:
 2        Q.   I want to ask you a few questions about your
 3    relationship with Dave.  Before Dave passed away when
 4    was the last time you spoke with him?
 5             MR. FREEDMAN:  Hold on, Ira.  What topic does
 6        this relate to?
 7             MR. PASCHAL:  His communications with Dave.
 8             MR. FREEDMAN:  I think you're a little bit
 9        outside.  I'll give you some leeway.  Go ahead Ira,
10        answer the question.
11             THE WITNESS:  2009 November.
12    BY MR. PASCHAL:
13        Q.   That was the last time you spoke with him?
14        A.   No, that's the last time I saw him.  The last
15    time I spoke with him would probably be sometime late
16    2012.
17        Q.   Was that by phone or e-mail?
18        A.   I think I have an e-mail around that date and
19    I also think I spoke with him on the phone around then
20    too.
21        Q.   What did you talk about?
22        A.   I would have to go back and look at the
23    e-mail.  On the phone I don't remember.
24        Q.   Do you remember what his mood was like when
25    you spoke to him?
```

1           A.    I --

2                 MR. FREEDMAN:  Objection.

3                 THE WITNESS:  Not really.

4     BY MR. PASCHAL:

5           Q.    So in 2009 you met Dave in person -- or you

6     saw him in person.  From then though just relatively how

7     many times would you speak with him per year, was it

8     monthly, weekly?

9                 MR. FREEDMAN:  Objection.

10                THE WITNESS:  It would vary.

11    BY MR. PASCHAL:

12          Q.    I just want to be clear the last time that you

13    saw your brother was 2009; right?

14          A.    I believe so.

15          Q.    Under what circumstances was that?

16          A.    We were having Thanksgiving dinner.

17          Q.    Did you have any other business ventures with

18    Dave?

19          A.    No.

20          Q.    Did you ever work together with Dave in any

21    business?

22          A.    No.

23          Q.    Dave's autopsy report showed that he had

24    cocaine in his system.  Did you know anything about

25    that?

```
 1            MR. FREEDMAN:  Objection.  What topic is this
 2       relating to?
 3            MR. PASCHAL:  If he is not going to answer
 4       tell him.
 5            MR. FREEDMAN:  You can't tell me which topics
 6       this relates to?
 7            MR. PASCHAL:  This goes to background
 8       information.  Trying to find documents that was the
 9       general mandate from the Court.
10            MR. FREEDMAN:  I just don't see how Ira's
11       knowledge of cocaine in Dave's system has anything
12       to do with the --
13  BY MR. PASCHAL:
14       Q.   Do you have any documents showing that Dave
15  had cocaine in his system?
16       A.   I would have to look at the autopsy report
17  again.
18       Q.   That's the only document that you have?
19       A.   Yes, that's the only one I have.
20       Q.   Are there any communications between you and
21  Dave when you spoke about cocaine?
22       A.   No.
23       Q.   Do you know any of Dave's girlfriends?
24       A.   Not personally -- I mean I've heard of them.
25  I don't personally know them.
```

1    Q.    Which ones have you heard of?

2    A.    One named Kirsten and another named Lynada and

3    a very old girlfriend named Angela.

4    Q.    How did you learn about these girlfriends?

5    A.    Angela we knew -- he was like dating her in

6    high school.  Kirsten I believe I met once at my

7    parent's wedding anniversary and Lynada I only found out

8    after he passed away.

9    Q.    Have you been in contact with any of these

10   three girlfriends?

11   A.    I think I spoke with Angela a little bit.

12   Q.    You didn't speak to Lynada?

13   A.    No.

14   Q.    Who was the last girlfriend that you know that

15   Dave had?

16   A.    That would be Lynada.

17   Q.    You haven't spoken to her?

18   A.    No.

19   Q.    When did you speak with Angela?

20   A.    Maybe like a year ago.

21   Q.    What circumstances did you speak with her,

22   what were the circumstances?

23   A.    I think I saw her -- she left like a Facebook

24   posting on my dad's web site -- I mean my dad's Facebook

25   page and then I responded to her Facebook posting.

1       Q.    So there's a Facebook message where you

2   responded to her?

3       A.    Yes, I think so.  No, I just e-mailed her.

4   She left a Facebook posting and then I e-mailed her.

5       Q.    When did you e-mail her?

6       A.    I think it could have been like a year, year

7   and a half ago.

8       Q.    What did the Facebook posting say, do you

9   remember?

10      A.    No.

11      Q.    What did you discuss with Angela?

12      A.    We talked about David a little bit.

13      Q.    What did you talk to her about, talking about

14  David?

15      A.    At first just general things I think.

16      Q.    We'll get into that a little later.  When did

17  you learn that Dave was appointed as the representative

18  of -- or that Dave appointed you as the representative

19  of his estate, sorry?

20      A.    After he passed away.

21      Q.    So Dave never discussed that with you before

22  he passed away?

23      A.    No.

24      Q.    Were you surprised to learn --

25            MR. FREEDMAN:  Objection, don't answer the

1   question.

2        MR. PASCHAL:   What's the reason for

3   instructing him?

4        MR. FREEDMAN:   Don't see how it has anything

5   to do with your topics.

6        MR. PASCHAL:   Just asking --

7        MR. FREEDMAN:   His state of mind when he found

8   out whether or not Dave Kleiman appointed him as

9   the personal representative.   Where is that any of

10  your topics?

11       MR. PASCHAL:   I am going to say for the record

12  that these topics are helpful but the judge mandate

13  was really that hey, I want to have a depo so you

14  can figure out what discovery is and a number of

15  times you shut down inquiries because you just

16  don't think that these match the topic which isn't

17  helpful for us to.   It will force us to have to go

18  to the Court unnecessarily and bring Ira back here

19  for another deposition to do that.   Purpose to find

20  out where documents are and find out where evidence

21  is.   I just don't think it's helpful for the record

22  for you to instruct him not to answer background

23  questions, very basic questions.

24       MR. FREEDMAN:   Just so the record is complete

25  the parties set the tone that we had to stay

```
 1            strictly by the disclosed topics at Dr. Wright's

 2            deposition where we were held strictly to the

 3            topics --

 4                 MR. PASCHAL:  And I don't believe you did

 5            so --

 6                 MR. FREEDMAN:  If it's the defendant's

 7            position that refusing to answer background

 8            questions should necessitate a second deposition we

 9            might just able to agree to reach a second

10            deposition.  Do you want to agree to a second

11            deposition?

12                 MR. PASCHAL:  I'm just moving on with you.

13            Just --

14                 MR. FREEDMAN:  Okay.

15                 MR. PASCHAL:  I want to ask you about what

16            you're alleging in the complaint so we know what

17            documents we're looking for.  I'm going to give you

18            a copy of the complaint.

19                 (Defendant's Exhibit No. 2 was

20                 marked for identification.)

21   BY MR. PASCHAL:

22       Q.   Can you turn to page 37.  Under Count I you

23   have a claim for conversion.  Do you see that?

24       A.   Yes.

25       Q.   If you go down to paragraph 171 you allege
```

```
 1    that Dr. Wright converted to his own use, Bitcoins,

 2    forked assets and intellectual properties that were the

 3    property of, and owned by, the estate and/or W&K.  Do

 4    you see that?

 5         A.   Yes.

 6         Q.   If you can turn to 46 and 47.

 7              MR. FREEDMAN:  Bryan, I think you just asked

 8         the witness to turn to two pages.  Which one?

 9              MR. PASCHAL:  I said page 46 and 47.

10              MR. FREEDMAN:  Which one do you want him to

11         start at?

12    BY MR. PASCHAL:

13         Q.   Start at 46.  It's Count X, 46 and 47.  You

14    have a claim for civil theft, you see that?

15         A.   Yes.

16         Q.   In that claim you allege that Dr. Wright took

17    with felonious criminal intent Bitcoins, forked assets

18    and intellectual properties that were the property of

19    and owned by the estate and/or W&K.  You see that?

20         A.   Yes.

21         Q.   Ira, is it your position that Dr. Wright stole

22    from Dave?

23              MR. FREEDMAN:  Hold on a second.  Go ahead

24         answer the question.

25              THE WITNESS:  I believe so.
```

```
 1    BY MR. PASCHAL:
 2        Q.    You believe so?
 3        A.    Yes.
 4        Q.    I want you to turn to page 16 of your
 5    complaint.  There you have a bold heading saying -- are
 6    you there?
 7        A.    Yes.
 8        Q.    You have a bold heading saying Dave and/or W&K
 9    owned a substantial amount of Bitcoin.  You see that?
10        A.    Yes.
11        Q.    Ira, do you have any e-mails from Dave where
12    he told you he had a substantial amount of Bitcoin?
13        A.    No.
14        Q.    Do you have any text messages from Dave where
15    he said that he had a substantial amount of Bitcoin?
16        A.    No.
17        Q.    Do you have any handwritten letters where Dave
18    says to you I have a substantial amount of Bitcoin?
19        A.    No.
20        Q.    Did he put that in his personal will -- let me
21    say it differently.  Did Dave put in his will that he
22    has a substantial amount of Bitcoin?
23        A.    No.
24        Q.    Are there any documents from Dave to you
25    stating that he has a substantial amount of Bitcoin?
```

```
 1        A.    No.

 2        Q.    After Dave died did you go through his

 3   possessions?

 4        A.    Yes.

 5           MR. FREEDMAN:   Objection.

 6   BY MR. PASCHAL:

 7        Q.    Did you find any mention of a substantial

 8   amount of -- any evidence to suggest there was a

 9   substantial amount of Bitcoin?

10        A.    No.

11        Q.    Do you have any documents where Dave tells you

12   about W&K and Info Defense Fund Research, LLC?

13        A.    No.

14        Q.    After Dave died did you find any documents at

15   his house regarding W&K?

16        A.    No.

17        Q.    When you became the personal representative

18   for Dave's estate did you look on SunBiz.org?  Are you

19   familiar with that web site?

20        A.    Yes.

21        Q.    Did you look on SunBiz.org to see if he owned

22   any companies?

23        A.    I was only aware of Computer Forensics

24   Company.

25        Q.    But just my question was did you go on
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Page 33

1    SunBiz.org to search to see if he owned any companies?

2        A.    I don't think so.

3        Q.    Did you first learn of W&K from Dr. Wright?

4        A.    Yes.

5        Q.    Ira, you're aware that Dave was receiving debt

6    collection calls in mid 2012?

7        A.    2012, I was not aware of it.

8        Q.    Do you have documents reflecting Dave's debt?

9        A.    The autopsy report.

10       Q.    Sorry.  Do you have documents reflecting

11   Dave's debt?

12       A.    Oh, debt.  Sorry.

13       Q.    My mistake, sorry.

14       A.    I don't think so.

15       Q.    Do you know how much debt Dave had when he

16   died?

17       A.    I remember getting some kind of paperwork.  I

18   may have handed it over to my estate attorney so he

19   might have the actual number but I don't remember.

20       Q.    Is that attorney Joseph Karp?

21       A.    Yes.

22       Q.    Do you remember what that document was?

23       A.    No.  I didn't really look at it.

24       Q.    Do you have any bank account statements for

25   Dave?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 34

```
 1         A.    Bank account statement, I don't think so.

 2         Q.    What efforts did you take to locate any bank

 3    accounts?  Did you take any efforts?

 4         A.    I believe so.

 5         Q.    What did you do?

 6         A.    I think I contacted Joe Karp about that.

 7         Q.    Sorry, what did you say?

 8         A.    I think I contacted Joe Karp about that.  I

 9    think he looked into it to see if Dave had any -- what

10    bank accounts.

11         Q.    Was Joe Karp was he your attorney at that

12    time?

13         A.    Yes.

14         Q.    So we went over documents regarding the

15    substantial Bitcoin.  Have you spoken to any witnesses

16    that told you that Dave had a substantial amount of

17    Bitcoin?

18              MR. FREEDMAN:  Objection to form.

19              THE WITNESS:  No.

20    BY MR. PASCHAL:

21         Q.    So just to clarify then.  There are no

22    witnesses -- no testimony that says that Dave has a

23    substantial amount of Bitcoin that you have?

24              MR. FREEDMAN:  Objection.

25              THE WITNESS:  Not that I'm aware of.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                  Page 35

1              MR. PASCHAL:   Ira, I'm showing you a complaint

2         that was filed against Dave by Wells Fargo Bank.

3              (Defendant's Exhibit No. 3 was

4              marked for identification.)

5              MR. FREEDMAN:   Do you have a copy for us?

6              MR. PASCHAL:   (Indicating).

7    BY MR. PASCHAL:

8         Q.   Can you go to page two of that complaint.   If

9    you look at paragraph five Wells Fargo alleges that

10   there's been a default under the note and mortgage held

11   by plaintiff and that payment due October 1, 2012 and

12   all subsequent payments have not been made?

13             MR. FREEDMAN:   Bryan, where are you?

14             MR. PASCHAL:   Page two, paragraph five.

15             MR. FREEDMAN:   Page two, paragraph five I

16        don't see that.

17             MR. PASCHAL:   Not page numbered.   Just turn to

18        the next page.

19             MR. FREEDMAN:   There is a number on the bottom

20        page.

21             THE WITNESS:   Five up top.

22             MR. PASCHAL:   Yes, paragraph five.

23   BY MR. PASCHAL:

24        Q.   Do you see that?

25        A.   Where it says there's been a default?

1      Q.    Yes.  Are you aware that Dave stopped making

2   payments on his house October 1st 2012?

3      A.    I wasn't aware.

4      Q.    So Dave never told you that?

5      A.    No.

6      Q.    When was the first time that you learned this?

7      A.    I think after he passed away.

8      Q.    Ira, did you speak to Dave while he was in the

9   V.A. Hospital?

10     A.    I think couple times, yes.

11     Q.    About how many?

12     A.    Don't remember.

13     Q.    You say less than ten?

14     A.    Maybe.

15     Q.    Did you visit him while he was in the V.A.?

16     A.    No.

17     Q.    Did you exchange e-mails with him while he was

18   in the V.A.?

19     A.    Yes.

20     Q.    How many e-mails did you exchange roughly?

21     A.    I would have to go look.  Couldn't tell you

22   off the top of my head.

23     Q.    What e-mail account did you use to e-mail him,

24   do you remember?

25     A.    Mostly Dex561@▮▮▮▮▮▮▮

```
 1        Q.    What e-mail did you send to Dave -- I mean not

 2   e-mail but what e-mail address was -- for Dave would you

 3   send it to?

 4        A.    Are you talking about that period of time when

 5   he was in the V.A.?

 6        Q.    When you sent those e-mails in the V.A.

 7        A.    I think at that time he was probably using

 8   Dave@██████████████████

 9        Q.    Do you remember what you talked about with

10   Dave?

11        A.    No.   I would have to go back and look.

12              MR. FREEDMAN:   Are you done with this?

13              MR. PASCHAL:   Yes.

14              MR. FREEDMAN:   Don't want to lose them.

15              MR. PASCHAL:   May want to keep them close

16        because I may go back.

17              MR. FREEDMAN:   Just keep them right here.

18   BY MR. PASCHAL:

19        Q.    Did Dave ever ask you for money in 2012?

20        A.    I don't think so.

21        Q.    Do you know if anyone made any personal loans

22   to Dave?

23        A.    I remember his friend Patrick mentioning that

24   he may have loaned Dave money like once in a while but

25   as far as like an amount I don't know.
```

1    Q.    Do you have any documents related to those

2    loans or no?

3    A.    No.

4    Q.    Did Dave ever tell you he needed help paying

5    V.A. bills?

6    A.    Paying V.A. bills, no.

7    Q.    So you -- did you ever help him pay any V.A.

8    bills?

9    A.    No.

10   MR. PASCHAL:   Mark this as Exhibit 4.

11   (Defendant's Exhibit No. 4 was

12   marked for identification.)

13   BY MR. PASCHAL:

14   Q.    Showing you an e-mail from Dave to Dr. Wright

15   dated October 11, 2012.  In that e-mail Dave says to

16   Dr. Wright, "Craig, if you don't mind please do transfer

17   in USD from Liberty.  If you can handle it that way I

18   would be grateful.  I have been in the V.A. again.

19   Nothing to worry about more of a routine as we have to

20   live with.  But I am not sure when I'll be able to get

21   back home for enough time to manage all the exchanges.

22   The cost of the hospital also comes as the reason for

23   this request.  Nothing I need help on but the funds in

24   USD will make my life easier right now."  Have you seen

25   this e-mail before?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

```
 1              MR. FREEDMAN:  Objection.  Go ahead.

 2              THE WITNESS:  I recently saw it in one of the

 3        produced documents that Craig turned over, yes.

 4        But I have never seen it before.

 5   BY MR. PASCHAL:

 6        Q.    In this case?

 7        A.    Yes, in this case.

 8        Q.    Do you know if Dr. Wright helped Dave with his

 9   V.A. bills?

10        A.    No.

11        Q.    Ira, do you have any communications or

12   documents or anything from Dave to Dr. Wright accusing

13   him of theft?

14        A.    No.

15        Q.    Do you still have the October -- going back to

16   the October 11th e-mail do you have any documents -- do

17   you have any documents showing that Dave had a foreign

18   account with the bank called Liberty Reserve?

19        A.    No.

20        Q.    Did you know that Liberty Reserve was seized

21   by the United States Government?

22        A.    I remember hearing that from Craig.

23        Q.    When did you hear that from Craig?

24        A.    In one of the e-mails that he sent me.  I

25   don't remember when it was.
```

1    Q.   Have you done any research on Liberty Reserve?

2    A.   I looked it up to see what it was.

3    Q.   What did you learn?

4    A.   It was some kind of like money exchange

5    business.

6         MR. PASCHAL:  Can you mark that as the next

7         exhibit?

8         (Defendant's Exhibit No. 5 was

9         marked for identification.)

10   BY MR. PASCHAL:

11   Q.   Showing you the unsealed indictment for the

12   United States Government versus Liberty Reserve.  Can

13   you turn to page -- paragraph 20 and that's going to be

14   on page nine?  If you look at the second sentence there

15   it starts "with the merchants who accepted."  Do you see

16   that?

17   A.   Did you say the second sentence?

18   Q.   Yes, on paragraph 20 "the merchants who

19   accepted."  You can read the whole paragraph but I'm

20   starting with "the merchants who accepted."

21   A.   "To further enable to use of Liberty Reserve"

22   on 20.

23   Q.   I'll just read the whole thing.  "To further

24   enable the use of Liberty Reserve for criminal activity,

25   its website offered shopping cart interface that

1　merchant web sites could use to access LR, which means

2　Liberty Reserve, currency as a form of payment. The

3　merchants who accepted LR, being Liberty Reserve,

4　currency was overwhelmingly criminal in nature. They

5　included, for example traffickers of stolen credit card

6　data and personal identity information, peddlers of

7　various types of online Ponzi and get-rich-quick

8　schemes, computer hackers for hire, unregulated gambling

9　enterprises and underground drug dealing web sites."

10　　　　MR. FREEDMAN: Objection.

11　BY MR. PASCHAL:

12　　　Q. Aside from any documents we produced to you do

13　you have any documents showing that Dave was involved in

14　developing software for gambling activities?

15　　　A. No.

16　　　Q. Do you have any knowledge of that?

17　　　A. No. Knowledge of him creating gambling type

18　software, no.

19　　　Q. Have you heard that he was doing that before

20　today?

21　　　A. I heard of Craig mentioned that he was

22　involved in that type of stuff but -- and I think he

23　mentioned that Dave may have assisted him in some

24　capacity but I don't have any evidence of Dave ever

25　doing that type of stuff.

1      Q.    Did you learn from any third parties that --
2    aside from Craig that Dave may have been involved in
3    online gambling activities?
4      A.    I don't believe so, no.
5      Q.    Is that your testimony today?
6      A.    Yes.
7      Q.    One second --
8      A.    I think the ATO may have mentioned something
9    about Liberty Reserve but I don't know if they were
10   specifically saying that Dave was involved or not but
11   yes, I think I did get a document from ATO.
12     Q.    Let me ask you this.  Did you ever exchange an
13   e-mail with Patrick Paige where you mentioned you were
14   surprised to find out that Dave was --
15     A.    Yes.
16     Q.    Let me finish that question.  E-mail with
17   Patrick Paige where you said you were surprised to learn
18   that Dave was involved with gambling activities?
19     A.    Yes.
20         MR. FREEDMAN:  You have to wait until he
21       finishes the question and then answer so that he
22       has a clean record.
23   BY MR. PASCHAL:
24     Q.    Have you made any efforts to find the Liberty
25   Reserve account that Dave had?

1       A.    No.

2       Q.    Have you spoken to the Southern District of

3   New York about Liberty Reserve?

4       A.    No.

5       Q.    Have you spoken to the FBI agents that were

6   investigating Liberty Reserve?

7       A.    No.

8       Q.    So you mentioned the Thanksgiving dinner

9   earlier and you allege in your complaint so let's talk

10  about that.  The 2009 Thanksgiving dinner.  Who was at

11  that dinner?

12      A.    Myself, my wife, my six month old daughter,

13  Dave and my father.

14      Q.    Now, in your complaint I don't know if you

15  want a copy but you say at paragraph 61 that Dave told

16  you that he was working on something bigger than

17  Facebook by creating his own digital money.  Do you

18  remember that?

19      A.    Yes.

20      Q.    Do you have any pictures from that day?

21      A.    Yes.

22      Q.    Do you know if they were produced in

23  discovery?

24      A.    I'm not sure.

25      Q.    After the Thanksgiving dinner did you have any

1    communications with Dave in 2009 regarding the digital

2    money that he said would be bigger than Facebook?

3          A.    No.

4          Q.    Do you have any communications with Dave in

5    2010 regarding the digital money that Dave said would be

6    bigger than Facebook?

7          A.    No.

8          Q.    Do you have any communications with Dave in

9    2011 regarding the digital money that Dave said would be

10   bigger than Facebook?

11         A.    No.

12         Q.    Do you have any communications with Dave in

13   2012 regarding the digital money that Dave said would be

14   bigger than Facebook?

15         A.    No.

16         Q.    Do you have any communications with Dave up

17   until April 2013 regarding the digital money that Dave

18   said would be bigger than Facebook?

19         A.    No.

20         Q.    After Dave died I understand that you formated

21   some of Dave's hard drives and threw out a bunch of his

22   work papers; is that correct?

23              MR. FREEDMAN:  Objection.

24              THE WITNESS:  I did discard some papers and

25         hard drives I first examined to see if there was

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 45

1            anything on them and once I found out that there

2            wasn't I believe there were two hard drives that I

3            formated.

4    BY MR. PASCHAL:

5        Q.    Before you formated and before you threw those

6    papers away did you find any evidence of the digital

7    currency that Dave said would be bigger than Facebook?

8        A.    No.

9            MR. PASCHAL:  I want to show you an e-mail

10           exchange that you had with Dr. Wright.

11           (Defendant's Exhibit No. 6 was

12           marked for identification.)

13   BY MR. PASCHAL:

14       Q.    So if you look at the bottom of page one and

15   you sent this e-mail -- do you remember this e-mail?  Go

16   ahead and read it.

17           MR. FREEDMAN:  What exhibit number is this?

18           MR. PASCHAL:  I think it's 6.

19           THE WITNESS:  Yes, I remember.

20   BY MR. PASCHAL:

21       Q.    You remember this e-mail?

22       A.    Yes.

23       Q.    At the bottom you'll say "hi Craig, I would

24   like to ask for your advice if I may.  After everything

25   you have shared with me I feel like I can completely

1   trust you.  As mysterious and exciting as all this news

2   is I also feel nervous about making mistakes.  I very

3   well could have already made some mistakes months ago by

4   throwing away of bunch of Dave's papers and formating

5   drives that I could not access."  Do you remember that

6   statement?

7              MR. FREEDMAN:  Objection.

8              THE WITNESS:  Yes.

9              MR. FREEDMAN:  Wait one second let me object

10       and then go ahead and answer the question.

11  BY MR. PASCHAL:

12       Q.   Do you remember that statement?

13       A.   Yes.

14       Q.   I just want to go over this e-mail.  First you

15  say that you may have made some mistakes some months

16  ago.  When you say "some months ago" what timeframe are

17  you talking about, how many months ago?

18       A.   Sometime in 2013.

19       Q.   Was it before Thanksgiving, after

20  Thanksgiving?

21              MR. FREEDMAN:  Objection.

22              THE WITNESS:  You're talking about 2013?

23  BY MR. PASCHAL:

24       Q.   Yes, November 2013 Thanksgiving.

25       A.   It could have been before that.

1    Q.    Our analysis shows that two drives were

2    formated and installed with Windows on November 10, 2013

3    would that date be about right?

4        A.    Possibly, yes.

5        Q.    Did you purchase the Windows software

6    installed on those drives?

7        A.    I don't remember.

8        Q.    You don't remember?

9        A.    (Indicating).

10        Q.    Would any -- do you have any documents like

11    credit card receipts showing you purchased the Windows

12    software?

13        A.    I don't know.

14        Q.    You don't know?

15        A.    Could have been a version of Windows that my

16    brother had.

17        Q.    You also say that you threw out a bunch of

18    Dave's work papers.  How much is a bunch?

19        A.    Just when I was cleaning out his house.  I

20    don't remember exactly how many.

21        Q.    When you threw these papers out was it the

22    same day November 10th 2013 or November of 2013?

23        A.    No.  This was like shortly after he passed

24    away when I was going through his house, going through

25    his stuff.

1      Q.    Did you keep any of the documents that he had,

2  any of his work papers?

3      A.    I couldn't really find any like work papers.

4  I only found things like related to the certificates

5  that he earned like security related certificates.

6      Q.    You threw away his certificates?

7      A.    No, I'm saying I kept --

8      Q.    You kept those?

9      A.    Right.

10     Q.    When you say the working papers you threw away

11 what are you referring to?

12     A.    Actually I'm not even sure they were work

13 papers.  I guess they looked like things that didn't

14 look relevant to keeping.

15     Q.    Did you read all the papers before you threw

16 them away?

17     A.    Briefly.

18     Q.    So I guess none of it seemed important?

19     A.    Exactly.

20     Q.    Let me ask you.  If any of those documents had

21 a random set of numbers and letters and just random

22 gibberish you would haven't considered that important,

23 would you?

24          MR. FREEDMAN:  Objection.

25          THE WITNESS:  I don't know.  I don't know.

1    BY MR. PASCHAL:

2        Q.   So what did you do to determine whether or not

3    something was important?

4        A.   Just whatever I looked at -- I don't know

5    specifically.  I mean like I was just going through

6    papers quickly and if something looked like it was

7    connected to him I would keep it.

8        Q.   Say the last part again, I couldn't hear you.

9        A.   If something looked like it was connected to

10   him I would keep it.  Like certificates, things he

11   earned, anything personal.

12       Q.   So --

13       A.   Like a lot of stuff I threw out could have

14   just been like junk mail.  That was unimportant I didn't

15   need to keep it.

16       Q.   How would you consider something junk mail?

17       A.   Like advertisement type stuff.

18       Q.   Let me just -- when you were formating or when

19   you threw out the papers were you already the personal

20   representative of the estate?  Let me rephrase that.  Do

21   you know -- do you know that you were the personal

22   representative of the estate when you --

23       A.   I'm not sure if I knew at that time.

24       Q.   Okay.

25            MR. FREEDMAN:  We've been going an hour.  Can

```
 1        we take a break?

 2              MR. PASCHAL:  Can we --

 3              MR. FREEDMAN:  If you have more questions go

 4        ahead.

 5              MR. PASCHAL:  Few more questions and then we

 6        can take a break.

 7   BY MR. PASCHAL:

 8        Q.   So you said if it was connected to Dave you

 9   would keep it.  So if something I'm just trying to

10   figure out what the measurement that was.  If there was

11   scribbling on papers would you just throw that away?

12              MR. FREEDMAN:  Objection.

13              THE WITNESS:  I don't know.  Possibly.

14   BY MR. PASCHAL:

15        Q.   When did you become familiar with Bitcoin?

16              MR. FREEDMAN:  Do you think maybe we can take

17        a break here?  Sounds like you're going to a

18        different topic.

19              MR. PASCHAL:  Let's take a break.

20              THE VIDEOGRAPHER:  The time is 11:03 a.m. and

21        we're off the record.

22              (Thereupon, a brief recess was taken.)

23              THE VIDEOGRAPHER:  The time is now 11:17 a.m.

24        and we're back on the record.

25
```

1    BY MR. PASCHAL:

2        Q.   Sorry.  Just briefly before we left off and

3    earlier today.  I have some follow-up questions.  Did

4    Dave live in Palm Beach Gardens?

5        A.   It might be officially called like Riviera

6    Beach.

7        Q.   It's in the area, right?

8        A.   Yes.

9        Q.   Palm Beach County?

10       A.   Yes.

11       Q.   Last time you saw Dave was in 2009?

12       A.   Yes.

13       Q.   And you guys lived in the same county?

14       A.   Yes.

15       Q.   About how far apart did you guys live from

16   each other?

17       A.   Five to ten minutes.

18       Q.   When we left off we were talking about on the

19   e-mail where you formated and you said you formated

20   threw out some of Dave's work papers so I think we were

21   talking about the work papers.  Why were you throwing

22   the papers away?

23       A.   Like I said it just looked like it was

24   unimportant stuff.  Everyday stuff you get in the mail

25   just advertisements, news clipping type and things.

1       Q.   So if you go back to that e-mail in front of

2   you you say that you were concerned that you made a

3   mistake?

4       A.   Yes.

5       Q.   How were you concerned?

6            MR. FREEDMAN:   You said how or what?

7   BY MR. PASCHAL:

8       Q.   Why?  Why were you concerned?

9       A.   What's that?

10      Q.   Why were you concerned?

11      A.   Because I had just discarded some of his

12  stuff.

13      Q.   But you said the stuff you discarded was junk

14  mail?

15      A.   Right.  And I was using his drives.

16      Q.   So you were concerned because you were using

17  his drives, not because you threw out his work papers?

18      A.   No.  I was concerned about a little of

19  everything.

20      Q.   But sitting here today you can't tell us the

21  content of the papers that you threw out?

22           MR. FREEDMAN:   Objection.

23           THE WITNESS:   No.

24  BY MR. PASCHAL:

25      Q.   But you were concerned that you were throwing

1    them out and formated certain drives?

2          MR. FREEDMAN:  Objection.

3          THE WITNESS:  Well, the drives that I formated

4      there was nothing on them.

5    BY MR. PASCHAL:

6      Q.   We're going to talk about that more but you

7    said you were concerned because you were using the

8    drives; right?

9      A.   Yes.  After -- after he passed away yes, I

10   started using them.

11     Q.   And you were concerned you were using them.

12   Did you continue to use them in 2014?

13     A.   Yes.

14     Q.   Did you continue to use them in 2015?

15     A.   Yes.

16     Q.   Did you continue to use them in 2016?

17     A.   Yes.

18     Q.   Did you continue to use them in 2017?

19     A.   Yes.

20     Q.   Did you continue to use them in 2018?

21     A.   I believe so.

22     Q.   After you filed the lawsuit you continued to

23   use Dave's devices; right?

24     A.   Yes.

25     Q.   When did you stop using Dave's devices?

```
 1        A.   I don't remember exactly.

 2        Q.   Was it maybe like a few months ago, few weeks

 3   ago?

 4             MR. FREEDMAN:  Objection.

 5             THE WITNESS:  In the range of like around this

 6        lawsuit but --

 7   BY MR. PASCHAL:

 8        Q.   Sorry, go ahead.

 9        A.   I was just putting my personal files on them.

10   I never touched Dave's stuff.

11        Q.   Let me break that statement down.  So what

12   caused you to stop using the devices?

13             MR. FREEDMAN:  If you can answer this question

14        without going into conversation you had with your

15        lawyers then answer it.

16             THE WITNESS:  Well, I just didn't want to

17        tamper with anything.

18   BY MR. PASCHAL:

19        Q.   So you were using them in 2018 you were

20   tampering with it?

21             MR. FREEDMAN:  Objection.

22             THE WITNESS:  No.  I mean I -- I was just

23        using it for my own personal use.

24   BY MR. PASCHAL:

25        Q.   I want to go back two questions ago and you
```

1   just said that you stopped using the devices because you

2   didn't want to tamper with anything.  So were you

3   concerned that you were tampering with anything in 2018?

4       A.    I was never concerned about tampering with

5   anything of Dave's.  I was concerned about tampering

6   with my own personal things like -- like through the

7   lawsuit you might view that I was somehow like deleting

8   my own stuff or something that might be a bad thing but

9   I wasn't --

10      Q.    Let me say it this way.  Because of the

11  lawsuit you were concerned that it would appear that you

12  were trying to delete things by using the devices; is

13  that fair to say?

14          MR. FREEDMAN:  Objection.

15          THE WITNESS:  Can you repeat that?

16  BY MR. PASCHAL:

17      Q.    Yes, was it because of the lawsuit that you

18  stopped using the devices because you were concerned

19  that it would appear that you were trying to delete

20  things?

21          MR. FREEDMAN:  Objection.

22          THE WITNESS:  I guess that's part of it.

23  BY MR. PASCHAL:

24      Q.    When do you remember that you first considered

25  suing or bringing this action against Dr. Wright?

```
 1              MR. FREEDMAN:  Hold on.  What topic are you
 2        in?
 3              MR. PASCHAL:  That goes to the facts alleged
 4        in the amended complaint.
 5              MR. FREEDMAN:  Which number?
 6              MR. PASCHAL:  That goes to the facts alleged
 7        in the alleged complaint.  Goes to preservation of
 8        device, chain of custody.  I think it goes to
 9        several topics.  You want to go through them all?
10              MR. FREEDMAN:  Where -- can you show me the
11        number?
12              MR. PASCHAL:  Preservation of devices I think
13        that's like the first five.  That's the very
14        purpose of this deposition.
15              MR. FREEDMAN:  I don't think so.  He can
16        answer.  I'll allow the question but keeping an eye
17        on you.
18              MR. PASCHAL:  Can you read my question back?
19              (Thereupon, a portion of the record
20              was read back by the reporter.)
21              THE WITNESS:  I don't remember the exact date.
22   BY MR. PASCHAL:
23        Q.   Was it 2016?
24        A.   I don't know.
25        Q.   Could it have been after that?
```

1        A.    It could have been after that.

2        Q.    So I'm going to show you an e-mail that you

3    had with Patrick Paige, March 31st 2016.

4              (Defendant's Exhibit No. 7 was

5              marked for identification.)

6    BY MR. PASCHAL:

7        Q.    If you turn to the second page and you can

8    look at what you said before but you say there are a lot

9    of details left out -- you're discussing Craig and

10   things you think about Dr. Wright.  "There are a lot of

11   details left out that I may have to reserve until

12   litigation."  You see that?

13       A.    Yes.

14       Q.    So this was March 31st 2016.  So as early at

15   least March 31st 2016 you were considering litigation?

16             MR. FREEDMAN:  Objection.

17             THE WITNESS:  I'm not sure about that.

18   BY MR. PASCHAL:

19       Q.    So what were you considering to reserve until

20   litigation when you were talking to Patrick Paige?  Who

21   were you planning on litigating against?

22             MR. FREEDMAN:  Ira, if you need to read the

23        whole e-mail read the whole e-mail and answer the

24        question.

25             MR. PASCHAL:  Take your time.

```
1              THE WITNESS:  Yes, I guess --

2              MR. FREEDMAN:  Don't guess Ira.  Answer the

3         question if you know it.  Not going to help them if

4         you guess.

5              THE WITNESS:  I may have been considering

6         litigation against him at that time.

7    BY MR. PASCHAL:

8         Q.   March 31st 2016?

9         A.   I don't believe I filed anything -- it was

10   just --

11        Q.   Just asking --

12        A.   I was thinking about it, yes.

13        Q.   Are there any documents to reflect an earlier

14   date than that?

15        A.   I don't know.

16        Q.   You don't know?  Sorry, I didn't hear you.

17        A.   I don't know.

18             MR. PASCHAL:  Showing you an article that

19        Dr. Wright and your brother wrote.

20             (Defendant's Exhibit No. 8 was

21             marked for identification.)

22   BY MR. PASCHAL:

23        Q.   It's called Overwriting Hard Drive Data: The

24   Great Wiping Controversy.  You produced this document to

25   us, do you recall that?
```

1          A.    I guess if we produced it we --

2          Q.    Have you read this?

3          A.    No.

4          Q.    You have what, 20 plus years of experience

5    with computers; right?

6          A.    Just general use, yes.

7          Q.    You're generally familiar with how to

8    preserve, overwrite or delete data on a hard drive?

9          A.    I don't have any special training in that.  I

10   just have general computer use.

11         Q.    To my question you have general experience

12   with how to overwrite, preserve or delete data from a

13   hard drive?

14         A.    Not preserve.  If you're talking about like

15   how a forensic specialist might know how to secure data

16   I don't have any training in that type of thing.  I just

17   know how to general --

18         Q.    Generally do you know how to preserve,

19   overwrite and delete data from a hard drive?

20               MR. FREEDMAN:  Objection.

21               THE WITNESS:  I just know how to generally

22          store data on a hard drive.

23   BY MR. PASCHAL:

24         Q.    You understand you're under oath today;

25   correct?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 60

```
 1          A.   Yes.

 2          Q.   You understand the importance when you're

 3     under oath you have to give complete and truthful

 4     answers to the best of your ability; correct?

 5          A.   Yes.

 6               MR. PASCHAL:   I'm showing you your responses

 7          to our interrogatories.   This is going to be number

 8          eight?

 9               MR. FREEDMAN:   9.

10               (Defendant's Exhibit No. 9 was

11               marked for identification.)

12               MR. FREEDMAN:   Do you have a copy for us?

13               MR. PASCHAL:   Yes.

14     BY MR. PASCHAL:

15          Q.   If you turn to page six a response to request

16     it should be interrogatory number 20 at the second

17     sentence you say "additionally Ira has been employed in

18     web site design and affiliate marketing for the past 22

19     years and uses computers extensively as a part of his

20     work.   During this time Ira became generally familiar

21     with how to preserve, overwrite or erase data on

22     electronic devices."   Is that your statement?

23          A.   Yes.

24          Q.   And you swore this under penalty of perjury

25     just like you did here today; correct?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                   Page 61

1        A.    Yes.

2        Q.    So do you know or do you have general

3    experience with how to preserve, overwrite or delete

4    data from a hard drive?

5        A.    That's just general every day use.  Just like

6    an average computer --

7        Q.    With that general knowledge you were in

8    possession of overwriting paper that Dave and Dr. Wright

9    wrote from March of 2016 you continued to use Dave's

10   electronic devices for your personal use until well

11   after -- almost a year after this litigation was filed;

12   is that correct?

13            MR. FREEDMAN:  Objection.

14            THE WITNESS:  Yes.

15   BY MR. PASCHAL:

16       Q.    So could we go back to the February 2014

17   e-mail that you had with Craig?

18            MR. FREEDMAN:  What exhibit number?

19            MR. PASCHAL:  I wasn't writing them down.  I

20        think that might be three.

21            MR. FREEDMAN:  No, three is the verified

22        complaint.

23            MR. PASCHAL:  Four?  Maybe it's five.

24            MR. FREEDMAN:  Four is the 11th October 2012

25        e-mail.

1          MR. PASCHAL:  Yes, that's it, four.

2    BY MR. PASCHAL:

3       Q.   So we talked about the work papers.  Let's

4    talk about the formating of the drives.  You said in

5    that e-mail that you couldn't --

6          MR. FREEDMAN:  Give me one second to grab it

7       myself.  Okay.  Go ahead.

8    BY MR. PASCHAL:

9       Q.   So you said in that e-mail that you formated

10   drives you could not access.  You see that?

11      A.   Yes.

12      Q.   What did --

13         MR. FREEDMAN:  Wait, this is the wrong e-mail.

14      This is not that e-mail.  This is from Dave Kleiman

15      to Craig Wright.  What's the date on it?

16         MR. PASCHAL:  You know what, you can borrow

17      mine and give it back to me after this question.

18         MR. FREEDMAN:  He doesn't have it in front of

19      him either.  This is Exhibit 4.

20         THE WITNESS:  I know what you're talking

21      about.

22         MR. FREEDMAN:  Hold on a second.

23      February 14th.  It's Exhibit 6.

24   BY MR. PASCHAL:

25      Q.   Ira, you said you know what I'm talking about.

1  So you said that you couldn't -- you formated drives you

2  couldn't access?

3      A.    I formated drives that prompted me that they

4  could only be formated.

5      Q.    Sorry, say that again.

6      A.    When I tried to access the drive the pop up

7  screen appears and it says that the drive needs to be

8  formated.  So I take that as the drive's empty and I

9  could format it.

10     Q.    Let's break that down then.  So before you

11 formatted the drive did you ask for any professional

12 help in recovering any data from the drive?

13     A.    No.

14     Q.    When you say I take that as the drive is empty

15 what are you basing that -- your -- that statement on?

16     A.    Just my general computer use.

17     Q.    Your general -- what I discussed before your

18 general knowledge of preserving, deleting and

19 overwriting data?

20         MR. FREEDMAN:  Objection.

21         THE WITNESS:  My general use of hard drives,

22     computers.

23 BY MR. PASCHAL:

24     Q.    So Ira, I mean in 2009 Dave tells you that he

25 is working on something that's bigger than Facebook,

1    this digital currency, you have two hard drives and you

2    format them; right?

3        A.    Yes.

4        Q.    And then you continue to use them for several

5    years; right?

6        A.    Yes.

7             MR. PASCHAL:   I'm showing you your second

8        amended responses and objections to our first set

9        of interrogatories.   This is going to be number

10       ten.

11            (Defendant's Exhibit No. 10 was

12            marked for identification.)

13   BY MR. PASCHAL:

14       Q.    Can you look at response number two and that

15   interrogatory two is identify all electronic devices

16   that Dave Kleiman owned or possessed at the time of his

17   death.   You see that?

18       A.    Yes.

19       Q.    Is this a complete list or is there anything

20   else that needs to be added to this list?

21       A.    I believe that's a complete list.

22       Q.    So these were all electronic devices that Dave

23   had?

24       A.    Yes.

25       Q.    Which of these drives did you format?

1        A.    I believe it was two of the Seagate Momentus.

2        Q.    So there's the first one, right the Seagate

3   Momentus 500GB, that one?

4        A.    I think so.

5        Q.    Then it said the amount of data currently

6   stored is 17.6 GBs.  You see that?

7        A.    Yes.

8        Q.    Now, you said that you took the prompt as to

9   format the drive there was no information on the drives.

10  Is this entire 17.6 GBs your personal information?

11       A.    I think that's probably mostly the operating

12  system that I installed on it.

13       Q.    And then the next Seagate would be the -- I

14  think three down it's a Seagate Momentus 500 GB.  Are

15  those the same types of drive, just two of them?

16       A.    I believe so.

17       Q.    The third one that's the other one that you

18  formated?

19       A.    I think so.

20       Q.    Did you format the drives so that you could

21  use them personally?

22       A.    Yes.

23       Q.    Well, now if you've been using them for so

24  long why is it saying on the third one the amount of

25  data currently stored is zero?

1    A.   I'm not sure the amount of data on that one is

2    accurate.  I'm not sure if that one was reported

3    accurately.

4    Q.   Would that be for the same one -- scratch

5    that.  Strike that.  Would that be the same for the

6    first one where you said 17.6 GB was for the operating

7    system alone; is that accurate?

8    A.   I believe so.

9    Q.   You've been using that device for years you

10   haven't stored anything on it?

11   A.   I don't think I really used it that much.  I

12   remember installing operating systems on those two

13   drives but I never really used it much.

14   Q.   So you formated them so you could use them;

15   right?

16   A.   Yes.  I may have not used it for a very

17   limited amount of time.

18   Q.   When was that limited amount of time?

19   A.   I don't remember.

20   Q.   What are you storing on those devices?

21   A.   I think just the operating systems.  I may

22   have also put like maybe some web site design program on

23   there.

24   Q.   That's it?

25   A.   As far as I can recall.

1      Q.   Ira, are you storing any commercial videos on

2   those devices?

3      A.   Commercial videos?   I don't know.

4      Q.   Are you storing any commercial music files on

5   those devices?

6           MR. FREEDMAN:  Objection.

7           THE WITNESS:  I would have to look at that, I

8      don't know.

9   BY MR. PASCHAL:

10     Q.   Are you storing any personal photos of your

11   family on those devices?

12          MR. FREEDMAN:  Objection.

13          THE WITNESS:  Are you talking about just the

14      Seagate?

15   BY MR. PASCHAL:

16     Q.   On these two you formated.

17     A.   I don't know.  I don't think so.  I don't

18   think I put any photos on there.

19     Q.   Were you able to access the remainder of all

20   of Dave's drives?

21     A.   No.

22          MR. FREEDMAN:  Objection.

23   BY MR. PASCHAL:

24     Q.   That's in this list.

25     A.   Yes, right.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Page 68

1      Q.   You weren't able to access them?

2      A.   I think there might be one or two that we

3  weren't able to access.

4      Q.   What were those?

5      A.   I think the Hitachi Travelstar.

6      Q.   What was the other one?

7      A.   I don't remember.

8      Q.   What did you do to access the Hitachi

9  Travelstar 100 GB?

10     A.   I think I just plugged it in.

11     Q.   You haven't done anything else to it?

12     A.   No.

13     Q.   There's no forensic image of it?

14     A.   There was like you mean after litigation

15  started?  Not prior to litigation.

16     Q.   There was none.  There was one done after the

17  litigation?

18     A.   Yes.

19     Q.   When was that done?

20     A.   I don't remember the date.

21     Q.   Was it this year?

22     A.   Yes.

23     Q.   Are you storing any commercial videos on any

24  of these devices?

25     A.   I don't remember.

```
 1        Q.   Are you storing any commercial music files on
 2   any of these devices?
 3        A.   I would have to look at them.  I don't know.
 4        Q.   You didn't look at them before today?
 5        A.   Yes, I've looked at them before today but I
 6   don't remember it exactly what was on them.
 7        Q.   Do you remember storing any pictures of your
 8   family on any of those devices?
 9        A.   I think -- yes, I think I put some photos.  I
10   mean I would imagine that some of these drives have
11   photos.
12        Q.   Which drives have photos?
13        A.   I don't know specifically.
14        Q.   Can you look at I think it's seven down where
15   you say four to five hard drives that are no longer in
16   the estate's possession.  You see that?
17        A.   Yes.
18        Q.   Then a footnote you say "Ira gave three or
19   four drives that were possessed by Dave Kleiman at the
20   time of his death to Patrick Paige (Dave's business
21   partner in Computer Forensics LLC) as Patrick informed
22   him they were Computer Forensic LLC drives with business
23   data stored on them.  There was one other drive that was
24   on Dave's bedroom counter.  This drive was broken and
25   would not power on.  Ira disposed of this drive in
```

```
 1    2013."  Do you recall that?

 2         A.   Yes.

 3         Q.   I'm going to just break that down.  Can you

 4    tell me today whether it's three or four drives that you

 5    gave to Patrick Paige and Carter Conrad?

 6         A.   I don't remember.

 7              MR. FREEDMAN:  Objection.

 8    BY MR. PASCHAL:

 9         Q.   Can you say your answer again?

10         A.   I don't remember the exact number.

11         Q.   Do you recall when you gave him those drives?

12              MR. FREEDMAN:  Objection.

13              THE WITNESS:  I believe it was maybe within

14         like a month after Dave passed away.

15    BY MR. PASCHAL:

16         Q.   Did they ever give those drives back to you?

17         A.   No.

18         Q.   I want to go into that but let me ask you

19    this.  You said you found this drive on the bedroom

20    counter.  Did Dave have an office at his house?

21         A.   Yes, he had a room in the back, yes.

22         Q.   Was this -- were the three or four drives you

23    you gave to Patrick Paige, were those in his bedroom or

24    were they in his office?

25         A.   They were in his office.
```

1    Q.    Before you gave those drives to Patrick Paige

2  did you get any professional analysis to see what was on

3  the drives?

4    A.    No.

5    Q.    Did you look in the drives yourself?

6    A.    No.

7    Q.    Did you access the drives?

8    A.    No.

9    Q.    How was Patrick able to access the drives?

10   A.    Repeat that.

11   Q.    How was Patrick able to access the drives?

12   A.    I don't know.

13   Q.    So how did Patrick know that -- well, did

14 Patrick tell you how did you know that those drives

15 belonged to Computer Forensics?

16   A.    He told me that they belonged to Computer

17 Forensics.

18   Q.    Did you --

19   A.    I don't remember if they were labeled or not.

20   Q.    But so other than Patrick's word they belonged

21 to Computer Forensics did you have anything else to show

22 that they may have not been belonged to Computer

23 Forensics?

24        MR. FREEDMAN:   Objection.

25        THE WITNESS:   No.

1    BY MR. PASCHAL:

2        Q.    You don't know what was stored on those

3    drives, do you?

4        A.    Correct.

5        Q.    So if a Bitcoin wallet was on that drive you

6    wouldn't know?

7        A.    Yes, I don't know -- I never looked at the

8    drives.

9        Q.    Have you asked for those drives back from

10   Patrick?

11       A.    No.

12       Q.    Now, you say that there was a drive on the

13   bedroom counter that you couldn't power on and you

14   disposed of it.  Do you recall that?

15       A.    Yes.

16       Q.    Dave had an office so was this the only drive

17   that was in his bedroom?

18       A.    No.  I believe there were -- he kept his

19   backpack.

20       Q.    So let me do this then.  I'm not going to show

21   you the photo but on his counter he had a backpack, a

22   blue backpack?

23       A.    Not on the counter.  In his bedroom.  You

24   asked if there were other hard drives in his bedroom.

25       Q.    Okay.  Were there any hard drives in his

```
 1   bedroom?

 2        A.   Yes.

 3        Q.   What other drives were in his bedroom?

 4        A.   I believe most of the drives that you have

 5   listed here.

 6        Q.   So he kept all of his drives in his bedroom?

 7        A.   In a backpack, yes.

 8        Q.   But the three or four drives that he didn't

 9   have in the backpack they were in his office?

10        A.   Yes.

11        Q.   Now, this one drive was on the bedroom

12   counter; right?

13        A.   Yes.

14        Q.   It was the only drive that was on the bedroom

15   counter?

16        A.   Yes.

17        Q.   What was on his bedroom counter?

18             MR. FREEDMAN:  Objection.

19             THE WITNESS:  I don't remember exactly.

20   BY MR. PASCHAL:

21        Q.   What did this drive look like?

22        A.   I just remember it was an external drive.

23        Q.   Do you remember what color it was?

24        A.   No.

25        Q.   You don't know what type it was either?
```

```
 1        A.    Not offhand.

 2        Q.    Do you remember how big it was?

 3        A.    Maybe like six or seven inches high by a

 4   couple inches wide.

 5        Q.    So like --

 6        A.    Yes.

 7        Q.    It was a big hard drive?

 8        A.    I don't --

 9        Q.    It wasn't like a laptop hard drive, let me ask

10   that?

11        A.    No, it wasn't a laptop drive.  It was an

12   external drive.

13        Q.    For like a tower computer?

14        A.    For a tower computer?

15        Q.    For like a regular computer?  For like a

16   desktop computer?

17        A.    It could be used with anything.

18        Q.    You just plug it in?

19        A.    You can connect it to any type of computer.

20        Q.    I'm not going to show the picture but on

21   Dave's countertop he had a blue backpack, he had a

22   yellow shirt, he had another bag, he had a bottle of

23   beer.  There was a wine glass that was empty and then he

24   had his glass mirror here.  There was a cell phone on

25   the top of a white box and then right below it there was
```

1   a very, very small black box, that doesn't fit the

2   description of the hard drive you're talking about but

3   could that have been the hard drive?

4         MR. FREEDMAN:  Objection.

5         THE WITNESS:  Where are you getting this

6      picture?  I don't even -- I don't understand the

7      picture that you're just painting.

8   BY MR. PASCHAL:

9      Q.   The pictures that the police took after when

10  they --

11     A.   You have actual photos?

12     Q.   Yes.  I can show them.

13     A.   Yes, it would help if I could see the photo

14  then I might -- I don't know.

15        MR. PASCHAL:  Can we print here?

16        MR. FREEDMAN:  Yes.

17        MR. PASCHAL:  So on our next break I'll print

18     it and show you.  I don't know -- the reason why I

19     did not show you is because it's -- it is graphic.

20     So I don't know if -- at the next break you guys

21     decide if you want to see it and I can point it out

22     to you, okay?

23        THE WITNESS:  Okay.

24  BY MR. PASCHAL:

25     Q.   So the pictures that the police took from the

1    day that they went to Dave's house you haven't seen any

2    of those pictures?

3         A.    No.

4         Q.    On the drive that you -- you threw away you

5    wouldn't be able to tell us today one way or another

6    whether or not there was Bitcoin wallets or Bitcoin

7    information on that drive?

8         A.    I was never able to access it.

9         Q.    So you wouldn't be able to tell us today

10   whether or not Bitcoin wallets or Bitcoin were on that

11   drive?

12           MR. FREEDMAN:  Objection.

13           THE WITNESS:  Again I wasn't able to access

14      it.

15   BY MR. PASCHAL:

16        Q.    Is it a yes or no?

17        A.    Anything could have been on it.

18        Q.    But you wouldn't know?

19        A.    I wouldn't know because I couldn't access it.

20        Q.    And you threw it away?

21        A.    Yes.  It was -- it didn't work.

22        Q.    Just going back.  So when you came in

23   possession of Dave's computers did you have your own

24   personal computer?

25        A.    Yes.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 77

1        Q.    So why did you format Dave's devices so that
2   you could use those computers?
3        A.    I guess I needed more storage space.  Maybe my
4   computer was full with stuff, other stuff.
5        Q.    So sitting here today you can't tell us why
6   you decided to use Dave's computers, you're speculating,
7   are you?
8        A.    Why I couldn't use --
9        Q.    Why did you use Dave's computers rather than
10  your own?
11       A.    I put the operating systems on there because
12  my computer might have had a different operating system.
13  For one reason or another I needed to use like Windows 7
14  or Windows 8 so that's why I formated those two and put
15  those operating systems on there.
16       Q.    Why didn't you just get another hard drive or
17  computer?
18            MR. FREEDMAN:  Objection.
19            THE WITNESS:  His were laying around and
20       they -- they said they could be formated.
21  BY MR. PASCHAL:
22       Q.    Who said they could be formated?
23       A.    When I plugged them in the pop up screen said
24  that the drives need to be formated.  So that to me that
25  appears that the drives were empty.

1     Q.   When you had the drive that was broken what

2  made you think it was broken?

3     A.   It wouldn't turn on.  You didn't hear like the

4  platter spinning or anything.

5     Q.   Did you ask for any professional help trying

6  to get it to start, to turn on?

7     A.   No.

8     Q.   So just -- you tried turning it on it didn't

9  turn on so you threw it away?

10    A.   Yes.

11         MR. FREEDMAN:  Objection.

12  BY MR. PASCHAL:

13    Q.   So when you became the personal representative

14  of the estate of Dave Kleiman what steps did you take to

15  preserve the assets of the estate?

16    A.   Well, I reached out to my attorney --

17         MR. FREEDMAN:  Ira, if you can answer the

18         question without revealing what you discussed with

19         your attorney then answer it.  But don't discuss

20         anything that you discussed with your attorney.

21         MR. PASCHAL:  Your objection is don't talk

22         about Karp?

23         MR. FREEDMAN:  Just discussions with your

24         lawyer.

25         MR. PASCHAL:  Don't tell me about your

1              conversations with Karp.

2      BY MR. PASCHAL:

3          Q.    When you became the personal representative

4      what did you do to preserve the assets of the estate?

5          A.    My attorney assisted me with doing that.

6          Q.    But what did you do like did you -- what did

7      you do personally to preserve whatever was in Dave's

8      house?

9              MR. FREEDMAN:  Objection.

10             THE WITNESS:  I collected his personal things.

11     BY MR. PASCHAL:

12         Q.    And what did you collect?

13         A.    Well, his computer equipment, some guns in his

14     gun safe.  Some of his clothing.  Just personal items.

15     Like I said, his computer certificates, things like

16     that.

17         Q.    Can you go back to the February 2014 e-mail

18     that you had with Dr. Wright where you discussed

19     formating the drives?

20             MR. FREEDMAN:  Which exhibit number?

21             MR. PASCHAL:  I didn't write it down.  Do you

22         have it?

23             MR. FREEDMAN:  I think it's Exhibit 6.

24     BY MR. PASCHAL:

25         Q.    So if you go to the second page that's the

1   second paragraph where you start with Patrick.  You say

2   "Patrick and his partner e-mailed me the other day and

3   would like me to bring over his, I guess that means

4   Dave's, drives.  I haven't spoken with them about what

5   happened if they did manage to access his account.  I

6   assume that anything in it cannot be traced when there

7   is a withdrawal.  Being that I've only met Patrick a

8   couple times in my life I was wondering if there are any

9   safety measures you can recommend to me so I don't make

10  another mistake."  So let's break this down.  What did

11  you mean by another mistake?

12      A.   I guess I was thinking that if I discarded

13  anything that could have been important or related to

14  Bitcoin.

15      Q.   Then the section before you say "being that

16  I've only met Patrick a couple times in my life I was

17  wondering if there were any safety measures to

18  recommended to me again so I don't make another

19  mistake."  This is in February 2014 and you're saying

20  that you have only met Patrick a couple times in my

21  life?

22          MR. FREEDMAN:  Objection.

23  BY MR. PASCHAL:

24      Q.   Is that correct?

25          MR. FREEDMAN:  Objection.

1          THE WITNESS:  Yes.

2     BY MR. PASCHAL:

3          Q.    But one month after Dave died you gave him

4     three or four of Dave's hard drives; right?

5          A.    Correct.

6          Q.    That was only based on him telling you these

7     belong to Computer Forensics?

8          A.    Yes.

9          Q.    I want to be clear you take any images of the

10    drives that you gave to Patrick; right?

11         A.    No.

12         Q.    So you have no copies?

13         A.    No.

14         Q.    So if you go back to the e-mail you say you're

15    going to give certain drives to Patrick and Conrad for

16    them to analyze.  Do you see that?

17         A.    Yes.

18         Q.    Did you give them drives?

19         A.    No.

20         Q.    Why didn't you give them any drives excluding

21    the three or four that you had already given him why

22    didn't you give him drives at this point?

23         A.    I didn't -- what date are we talking about

24    again?

25         Q.    So in February of 2014 you told Craig that you

1  were going to give Patrick and Conrad some of Dave's

2  electronic devices to analyze.  Did you give Patrick and

3  Conrad Dave's --

4      A.   No.

5      Q.   The answer is no?

6      A.   No, I didn't.

7           MS. MCGOVERN:  Just finish the question.

8  BY MR. PASCHAL:

9      Q.   And why didn't you give Patrick and Conrad the

10 drives?

11     A.   I thought that the best idea would be to allow

12 Craig to examine them.

13     Q.   So you didn't give any drives to Patrick

14 Paige?

15     A.   No.

16     Q.   Except for the three or four; right?

17     A.   Right.

18          MR. PASCHAL:  I'm showing you the first

19          amended complaint you filed against Patrick Paige

20          and Carter Conrad.  This is going to be what

21          exhibit?

22          THE COURT REPORTER:  11.

23          (Defendant's Exhibit No. 11 was

24          marked for identification.)

25

1  BY MR. PASCHAL:

2      Q.   Can you turn to paragraph 18?  Let me know

3  when you're there.

4      A.   Okay.

5      Q.   So at paragraph 18 you say "shortly after

6  David Kleiman's passing plaintiff, and that's you, also

7  entrusted Computer Forensics and Patrick Paige with a

8  smart phone owned by decedent, being Dave, which was

9  provided the defendants for the purpose of unlocking the

10  phone as it was password protected in aid of plaintiff's

11  efforts to develop information as to assets of the

12  estate.

13         The phone has never been returned to plaintiff

14  and defendant Paige has since claimed that he, a

15  computer forensic consultant, had thrown away the phone

16  after he had dropped the phone and cracked the screen."

17  Do you recall making this allegation?

18      A.   Yes.

19      Q.   So you attempted to access the device being

20  the phone by giving it to Patrick Paige; correct?

21      A.   Yes.

22      Q.   But he never gave you any information from

23  that device?

24      A.   Correct.

25      Q.   Did he ever give it back to you?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 84

1        A.    No.

2        Q.    When did you give that phone to -- that device

3   to Patrick?

4        A.    It was the same time that I handed him -- when

5   he took the three drives from Dave's home.

6        Q.    Why did you give him something?

7        A.    Because I couldn't access it and he is a

8   computer forensics expert I thought he would have a

9   better chance at it than I would.

10            MR. PASCHAL:   Showing you your response and

11       objections to our first set of interrogatories.

12            (Defendant's Exhibit No. 12 was

13            marked for identification.)

14   BY MR. PASCHAL:

15       Q.    Can you turn to the last page of this

16   document?  Can you read that statement that you made?

17       A.    "I, Ira Kleiman declare under penalty of

18   perjury under the laws in the United States and the

19   State of Florida that the foregoing is true and

20   correct."

21       Q.    Can you turn to interrogatory response number

22   three?

23       A.    Okay.

24       Q.    We ask you "describe with specificity all

25   attempts you have made to access Dave Kleiman's

1   electronic devices."  Your response was "Ira did not

2   keep a record of every attempt he made to access Dave

3   Kleiman's electronic devices.  That said, Ira states

4   that he personally reviewed all drives that were

5   accessible.  During this review Ira looked through each

6   individual folder and each individual file contained on

7   these drives to find anything of importance."

8           You didn't mention in here that you gave a

9   device the cell phone to Patrick Paige for them to

10  access; is that correct?

11      A.   Well, those drives from what I believe --

12      Q.   Not the drives I'm asking you -- go ahead.

13      A.   What are you referring to?

14      Q.   The phone, the device, the one that you allege

15  in the Computer Forensic lawsuit.

16      A.   Yes, I didn't give him the cell phone.  I just

17  asked him to access it.

18      Q.   So in your amended complaint for Computer

19  Forensics you didn't allege that you gave the phone to

20  Patrick to access the phone and that he told you that he

21  cracked the screen and threw it away?

22      A.   I handed the phone to him with an expectation

23  that it would be returned to me.

24      Q.   But you gave it to him so he could access the

25  phone; right?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 86

```
 1        A.    Yes.

 2        Q.    Your testimony earlier was you gave it to him

 3   because he is a computer forensic expert so you can

 4   access the device?

 5        A.    Yes.

 6        Q.    I'm asking you you gave this answer under the

 7   penalty of perjury.  When we asked you describe with

 8   specificity all attempts you made to access Dave

 9   Kleiman's devices.  You did not say in this answer that

10   you gave an electronic device, being the phone, to

11   Patrick to access?

12        A.    I thought we listed that phone on here.

13        Q.    I'm looking just this one interrogatory right

14   here.  You can go through them but nowhere in there do

15   you say you gave the phone to Patrick Paige.

16        A.    Okay.

17        Q.    So is this an untruthful response?

18        A.    It's possible we just missed including the

19   cell phone.

20        Q.    Can you go to your amendment to this

21   interrogatory which is second amended response and

22   objection to Dr. Wright's first set of interrogatories.

23   That's Exhibit 10.

24             MR. FREEDMAN:  Are you done with 12?

25             MR. PASCHAL:  We're going to use it again.
```

1    BY MR. PASCHAL:

2        Q.   Can you turn to page 11, that's the last page.

3    You took an oath to the court reporter today and you

4    also signed this verification.  Can you read it out to

5    me?

6        A.   "I, Ira Kleiman, declare under penalty of

7    perjury under the law of the United States and State of

8    Florida that the foregoing is true and correct."

9        Q.   Can you go back to that same interrogatory

10   request number three.  In the first paragraph you say

11   the same thing that you said -- just so I'm clear on

12   these you revised them you served us on March 21, 2019,

13   okay?  Your first interrogatory responses the first

14   version of this you served on March 7th 2019.  So two

15   weeks later we get this revised response.  If you look

16   in the second paragraph you add one paragraph to this

17   response.  You want to go ahead and read that?

18       A.   Where are you?

19       Q.   Interrogatory three, the same one we're

20   talking about.  It says request number three but it

21   should be -- you say describe with specificity?

22       A.   "Describe with specificity all the attempts

23   you have made to access Dave Kleiman's electronic

24   devices."

25       Q.   Now, that first paragraph it's the same

```
 1   paragraph you had in your previous version to this
 2   interrogatory; right?
 3        A.   Yes.
 4        Q.   Now, if you turn the page you added the
 5   paragraph.  In this paragraph you mention that you gave
 6   an electronic device to Patrick Paige to access?
 7        A.   Apparently not.
 8        Q.   So in the two week span that you revised you
 9   did not include that additional information in this
10   interrogatory response; correct?
11        A.   I guess we missed it.
12        Q.   In the two weeks that you served the first
13   response and the second response what information did
14   you get to remember that you installed Windows operating
15   systems on two drives in an effort to gain access to the
16   drives in 2013?  What caused you to remember that that
17   information was missing?
18             MR. FREEDMAN:  Objection.
19             THE WITNESS:  Can you repeat that again?
20   BY MR. PASCHAL:
21        Q.   Yes, you give us a response on March 7th 2019;
22   right?
23        A.   Yes.
24        Q.   You supplement that response two weeks later
25   to add a new paragraph in that second paragraph here
```

```
 1   where you're saying you installed windows on the drives

 2   which you didn't include in your first version to these

 3   interrogatories.

 4        A.    I don't know.

 5              MR. FREEDMAN:  Objection.

 6   BY MR. PASCHAL:

 7        Q.    Are there any documents that shows why you

 8   remembered that your first answer was incomplete?

 9              MR. FREEDMAN:  Objection.

10              THE WITNESS:  I don't know.

11   BY MR. PASCHAL:

12        Q.    Is this a truthful answer?

13        A.    At the time I believe it was.

14        Q.    Is it truthful today?

15        A.    It's possible some information was missed.

16        Q.    Is it truthful?

17              MR. FREEDMAN:  Objection.

18              THE WITNESS:  If it's missing some information

19        I guess it's not completely.

20   BY MR. PASCHAL:

21        Q.    While we're on the interrogatories I'm showing

22   you an e-mail that you had with Patrick Paige and this

23   is June 27, 2015.  I think that's Exhibit 12.

24              MR. ROCHE:  13.

25
```

```
 1              (Defendant's Exhibit No. 13 was
 2              marked for identification.)
 3    BY MR. PASCHAL:
 4        Q.    In this e-mail you start by saying "hi
 5    Patrick, I don't think I'm going to be able to meet up
 6    this week.  Need to finish a client's web site.  But for
 7    now I stored the drives in a safe deposit box so they'll
 8    remain safe and as Craig mentioned there's no time limit
 9    with this stuff so we have time to figure it all out."
10    Do you remember this e-mail?
11        A.    Yes.
12        Q.    Just as an initial matter is there any
13    reason -- what computer did you send this e-mail from?
14        A.    I guess my personal computer.
15        Q.    Is there a reason why the date is set for the
16    day to go first then the month and then the year?
17        A.    Can you repeat that?
18        Q.    If you look at the sent the time where it says
19    Saturday and then it says the date 27 and then it says
20    the month 6 and then the year 2015?
21        A.    Right.
22        Q.    Is there -- was is it unusual to you that it's
23    set like that?
24        A.    I never really paid attention to it.
25        Q.    Your e-mail is -- your e-mail sends out using
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 91

```
 1   that date format; right?

 2            MR. FREEDMAN:  Objection.

 3            THE WITNESS:  I don't know.  I never paid

 4       attention to it.

 5   BY MR. PASCHAL:

 6       Q.    There's no cause for concern let me ask you

 7   that that your e-mails are sending out --

 8            MR. FREEDMAN:  Objection.

 9   BY MR. PASCHAL:

10       Q.    No, right?

11       A.    No.

12       Q.    Would it be surprising to you if Dave had

13   e-mails that also had -- used that same date

14   configuration?

15            MR. FREEDMAN:  Objection.

16   BY MR. PASCHAL:

17       Q.    Date, month, year?

18       A.    I suppose not.

19       Q.    In the February 2000 -- February 15, 2014

20   e-mail you told Patrick that you put the drives in a

21   safe deposit box; correct?

22            MR. FREEDMAN:  Objection.

23            THE WITNESS:  Yes.

24   BY MR. PASCHAL:

25       Q.    Now, can you turn to your responses and
```

```
 1    objections to the second set of interrogatories.  I

 2    don't have an exhibit number on that but you guys have

 3    it.

 4           MR. FREEDMAN:  Second amended?

 5           MR. PASCHAL:  Not the second amended, the

 6       second set of interrogatories.

 7           MR. FREEDMAN:  I have responses objections to

 8       Wright's first set of interrogatories to plaintiff.

 9       I have plaintiff's second amended responses and

10       objection to Wright's first set of interrogatories.

11           MR. PASCHAL:  Is it in that stack?

12           MR. FREEDMAN:  It should be identical.  One is

13       marked and one is not.

14           MR. ROCHE:  Plaintiff's responses and

15       objections to plaintiff's second set?

16           MR. FREEDMAN:  What number?

17           MR. ROCHE:  Nine.

18    BY MR. PASCHAL:

19       Q.   So at 14 we ask you to describe with

20    specificity all efforts you made to preserve Dave

21    Kleiman's electronic devices and data contained on them.

22    Do you see that interrogatory?

23       A.   Yes.

24       Q.   Under the penalty of perjury again you said "I

25    restored all of Dave Kleiman's electronic devices in the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                        Page 93

1   exact same place that he found them in Dave's computer

2   backpack?"

3        A.   Yes.

4        Q.   Are they in a backpack or safety deposit box?

5        A.   In a back pack.

6        Q.   So you never put them in a safe deposit box?

7        A.   I was thinking about them putting them in a

8   save deposit.  Then I decided to keep them where I found

9   them.

10        Q.   You said when Ira reviewed these devices he

11   found nothing of importance or out of ordinary but you

12   did find the true crypt file on the drive which you

13   could not access.  You made copies of these files?

14        MR. FREEDMAN:  Objection.

15   BY MR. PASCHAL:

16        Q.   You see that?

17        A.   Yes.

18        Q.   How did you determine what was of importance

19   or whether something was out of the ordinary?

20        A.   I basically kept everything of Dave's, all of

21   his files.  But are you -- are you asking me about the

22   true crypt file specifically?

23        Q.   I'm asking in that sentence.  "When I reviewed

24   Dave's devices he found nothing of importance or out of

25   the ordinary."  These are Dave's work laptops; correct,

1   some of them were his personal laptops, work laptops;

2   right?

3           MR. FREEDMAN:  Objection.

4           THE WITNESS:  I don't know what drives were in

5       his laptops.

6   BY MR. PASCHAL:

7       Q.   But these drives had Dave's work on them;

8   right?

9       A.   It had forensic related software on them.  I

10  don't know.

11      Q.   How did you determine that there was nothing

12  of importance or out of the ordinary on Dave's drives?

13      A.   I kept all of his stuff.

14      Q.   That's not my question.  My question is how

15  did you determine whether something was of importance or

16  out of the ordinary?

17      A.   Being that I didn't delete any of his

18  things -- I just kept everything.

19      Q.   You made a statement here that he found or you

20  found nothing of importance out of the ordinary.  What

21  were you looking for in those drives to determine

22  whether anything was of importance or was out of the

23  ordinary?

24      A.   I don't know.

25      Q.   I'm sorry, could you say that again?

1      A.   I don't know.

2      Q.   The true crypt file, what have you done to

3  access that file?

4      A.   I just stored it -- I just made copies of it.

5  There's been no attempt to access it.

6           THE VIDEOGRAPHER:   The time is 12:18 p.m. and

7      we're off the record.

8           (Thereupon, a brief recess was taken.)

9           THE VIDEOGRAPHER:   The time is now 1:11 p.m.

10      and we are now back on the record.

11  BY MR. PASCHAL:

12      Q.   So Ira, when we left off we were talking about

13  where Dave's devices were located, whether they were in

14  a safety deposit box or computer bag.   You said they're

15  in the computer bag?

16      A.   Yes.

17      Q.   Where is that computer bag located?

18      A.   In my home.

19      Q.   So you have the hard drives and the bag?

20      A.   Yes.

21      Q.   What type of bag is it?

22      A.   Just a large backpack.

23      Q.   Do you know the brand?

24      A.   Not offhand.

25      Q.   Where in your house are you keeping it?

 1          A.    I think it's in my bedroom.

 2          Q.    You think or -- are you guessing, do you know

 3     for sure?

 4          A.    Well, I sometimes move around.  Sometimes if I

 5     was like using the drives it would be in my bedroom.

 6     Other times I would store it in an extra room.

 7          Q.    You said when you use the drives, what are you

 8     using the drives for?

 9          A.    Just my personal files.

10          Q.    What personal files?

11          A.    I don't recall exactly.

12          Q.    Because earlier we spoke and on the drives

13     you -- strike that.  So I'm going back to Computer

14     Forensics, the complaint you filed against Computer

15     Forensics and Patrick Paige.  Do you have that in front

16     of you?

17                MR. FREEDMAN:  11, right?

18                MR. PASCHAL:  Yes.  Do you have it?

19                MR. FREEDMAN:  Yes.

20     BY MR. PASCHAL:

21          Q.    So if you go to paragraph 32 on page eight.

22     That's a Count III and you're seeking a permanent

23     injunction.  Do you see that?

24          A.    32?

25          Q.    The heading Count III seeking a permanent

1   injunction?

2       A.   Yes.

3       Q.   If you go to paragraph 32 and you look at the

4   last sentence you say "further upon information and

5   belief David Kleiman created and maintained Bitcoin

6   wallets which were his personal property during the time

7   he was a member of Computer Forensics."  Do you recall

8   making that allegation?

9       A.   I don't remember saying those exact words

10  but --

11      Q.   But this is your complaint; right?

12      A.   Yes.

13      Q.   Now, if you go to paragraph 35 at the last

14  sentence as a part of your permanent injunction you say

15  to the extent that Computer Forensics, Paige or Conrad

16  have retained any Bitcoin wallets that were the personal

17  property of David Kleiman Computer Forensics should be

18  enjoined from monetizing, transferring or otherwise

19  converting such Bitcoin to its use and that's a typo it

20  should be or it says of or the use of its principals or

21  third parties.  Do you see that allegation that you

22  made?

23      A.   Yes.

24      Q.   So can you turn to your second amended

25  responses to our first interrogatories I think that's

```
 1   ten.

 2           MR. FREEDMAN:  Second amended responses?

 3           MR. PASCHAL:  Yes.

 4           MR. FREEDMAN:  It is ten.

 5           MR. PASCHAL:  10.

 6   BY MR. PASCHAL:

 7      Q.   Can you turn to page four?  You ready?  You

 8   say "describe with specificity all attempts you made to

 9   determine the identity and location of any crypto

10   currency that David Kleiman owned or possessed at the

11   time of his death."

12           In your answer under the penalty of perjury

13   you did not make any mention that you're seeking a

14   permanent injunction against Computer Forensics, Patrick

15   Paige, Carter Conrad for the return of David Kleiman's

16   personal Bitcoin wallets, do you?

17      A.   Could you repeat that?

18      Q.   Yes.  Can you read it back?

19           (Thereupon, a portion of the record

20           was read back by the reporter.)

21           THE WITNESS:  I don't know -- I suppose we

22      missed that.

23   BY MR. PASCHAL:

24      Q.   Ira, so can you go to the last page of this

25   interrogatory.  This is your signature, right?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 99

1        A.    Yes.

2        Q.    And you are swearing the under penalty of

3    perjury that the foregoing answers are true and correct;

4    correct?

5        A.    Yes.

6        Q.    And the question we're asking is whether all

7    attempts that you've made to find or locate or access

8    David Kleiman's Bitcoin, right?

9        A.    Yes.

10       Q.    Isn't it important to mention that you're

11   seeking a permanent injunction against three or two

12   people in a company to get those very Bitcoin?

13            MR. FREEDMAN:  Objection.

14            THE WITNESS:  We didn't know if they possessed

15       any Bitcoin.

16   BY MR. PASCHAL:

17       Q.    You made the allegation without knowing?

18       A.    I don't know.

19       Q.    You don't know if you made the allegation in

20   this complaint without knowing whether it was true or

21   not?

22            MR. FREEDMAN:  Objection.

23            THE WITNESS:  I don't remember.

24   BY MR. PASCHAL:

25       Q.    But aside from whether it's true or not you

```
 1    did not mention that you were seeking an injunction in

 2    the sworn interrogatory?

 3            MR. FREEDMAN:  Objection.

 4    BY MR. PASCHAL:

 5        Q.   Did you?

 6            MR. FREEDMAN:  Objection.

 7            THE WITNESS:  I don't know.

 8    BY MR. PASCHAL:

 9        Q.   Is that a yes or no?

10        A.   I don't know.

11        Q.   You don't know in this interrogatory response

12    whether you make any mention of the injunction that

13    you're seeking against Patrick Paige, Carter Conrad and

14    Computer Forensics?

15            MR. FREEDMAN:  Objection.

16            THE WITNESS:  I don't know.

17    BY MR. PASCHAL:

18        Q.   Ira, you can turn to the interrogatory and

19    read it if you would like.

20        A.   What page?

21        Q.   It's on page four.

22        A.   What is your question?

23        Q.   Nowhere in here do you mention that you're

24    seeking a permanent injunction for David Kleiman's

25    Bitcoin for Patrick Paige, Carter Conrad and Computer
```

1   Forensics?

2           MR. FREEDMAN:  Objection.

3           THE WITNESS:  I don't know.

4   BY MR. PASCHAL:

5       Q.   Ira, it's really a yes or no.  In this answer

6   do you mention that you're seeking an injunction against

7   Patrick Paige, Carter Conrad and Computer Forensics?

8   You're under oath today just like you were under oath

9   under these interrogatories.

10          MR. FREEDMAN:  Objection.

11          THE WITNESS:  My attorneys drafted this and I

12      don't -- I don't completely understand what an

13      injunction is.

14  BY MR. PASCHAL:

15      Q.   Well, without understanding what an injunction

16  is you do allege here in Computer Forensics' complaint

17  that to the extent that Computer Forensics, Paige,

18  Conrad have retained any Bitcoin wallets that were the

19  personal property of David Kleiman, Computer Forensics

20  should be enjoined from monetizing, transferring or

21  otherwise converting Bitcoin to its use or its use to

22  third parties.  Do you understand the allegation you

23  made?

24          MR. FREEDMAN:  Objection.

25          THE WITNESS:  No.

```
 1   BY MR. PASCHAL:

 2       Q.   So if there is a similar allegation in the

 3   Second Amended Complaint which you filed against

 4   Dr. Wright you wouldn't understand that allegation

 5   either, would you?

 6            MR. FREEDMAN:  Objection.

 7            THE WITNESS:  I didn't draft the complaints.

 8   BY MR. PASCHAL:

 9       Q.   Did you look at them?

10       A.   Yes.

11       Q.   Did you review them?

12       A.   Yes.

13       Q.   Did you say it's okay to file this?

14       A.   Yes.

15       Q.   Are did you look at these interrogatories?

16       A.   Yes.

17       Q.   Did you review them?

18       A.   Yes.

19       Q.   Did you swear under the penalty of perjury

20   that these answers are correct?

21       A.   Yes.

22            MR. FREEDMAN:  Objection.

23   BY MR. PASCHAL:

24       Q.   Are they correct?

25            MR. FREEDMAN:  Objection.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

```
 1              THE WITNESS:  I don't know entirely.
 2    BY MR. PASCHAL:
 3       Q.   So do you have any basis to support the
 4    allegation you're making here in the Computer Forensics
 5    complaint?
 6              MR. FREEDMAN:  Objection.
 7              THE WITNESS:  I believe so at the time.
 8    BY MR. PASCHAL:
 9       Q.   And what was that?  What evidence?  What
10    documents?
11       A.   I thought it was possible that they retain --
12    being that they were partners with Dave they may have
13    shared equipment, they may have had access to Dave's
14    property.
15       Q.   So Ira, just -- your testimony today is that
16    you made that allegation because they were partners with
17    Dave and they had access to Dave's information?
18              MR. FREEDMAN:  Objection.  There's no question
19         pending.
20              MR. PASCHAL:  There is a question.
21              MR. FREEDMAN:  What's the question?  Do you
22         want to read it back?
23              MR. PASCHAL:  Read the question back.
24              (Thereupon, a portion of the record
25              was read back by the reporter.)
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 104

```
 1              MR. FREEDMAN:  It's not a question.

 2   BY MR. PASCHAL:

 3       Q.    Add a question mark.  That's a question.  Is

 4   that your testimony today?

 5       A.    We're talking about Computer Forensics?

 6       Q.    Computer Forensics, this allegation.

 7       A.    Yes, because I believe that they had access to

 8   Dave's --

 9       Q.    Sorry, go ahead.

10       A.    To Dave's -- well, property that they shared

11   with Dave.

12       Q.    That was enough for you to file a complaint

13   against Computer Forensics?

14              MR. FREEDMAN:  Objection.

15              THE WITNESS:  That's not what solely the

16       complaint was about.

17   BY MR. PASCHAL:

18       Q.    I'm talking about this very sentence, these

19   two sentences I mentioned.

20              MR. FREEDMAN:  Objection.

21              THE WITNESS:  I suppose so.

22   BY MR. PASCHAL:

23       Q.    Getting back to this though are there any

24   communication aside from with your lawyers or any

25   documents showing why you decided to leave out this
```

1  injunction or mention of the injunction in your

2  interrogatories?

3         MR. FREEDMAN:  Objection.

4         THE WITNESS:  I don't know.

5  BY MR. PASCHAL:

6     Q.   We talked about three or four hard drives

7  earlier that you gave to Dr. Wright after Dave died.

8  Let me repeat the question.  That there were three to

9  four hard drives you gave to Patrick one month after

10  Dave died?

11     A.   (Indicating).

12     Q.   Could Bitcoin address, Bitcoin wallets have

13  been on those hard drives?

14         MR. FREEDMAN:  Objection.

15         THE WITNESS:  I was told that they were just

16     work related drives.

17  BY MR. PASCHAL:

18     Q.   And who told you that?

19     A.   Patrick.

20     Q.   The person you're suing?

21     A.   Yes.

22     Q.   And that lawsuit is still active today?

23     A.   Yes.

24     Q.   Ira, did you ever notify this court in this

25  action that you have a separate action where you're

1    seeking the same stuff against three other people?

2              MR. FREEDMAN:  Hold on.  Where are you in your

3        topics?

4              MR. PASCHAL:  I'm just asking him.

5              MR. FREEDMAN:  Don't answer the question.

6    BY MR. PASCHAL:

7        Q.    Ira, let's talk about as a personal

8    representative when you came in possession of Dave's

9    stuff.  When did you learn that Dave passed away?

10       A.    Around April -- I think it was 27, 28 of 2013.

11       Q.    So if Dave passed on the 26th you learned the

12   day after, two days after?

13       A.    I think so.

14       Q.    Where were you?

15       A.    I don't exactly recall.  Probably home.

16       Q.    Do you remember what you were doing when you

17   found out that Dave died?

18       A.    No.

19       Q.    Do you remember what time of the day it was?

20       A.    No.

21       Q.    Do you remember who told you?

22       A.    Yes, my dad.

23       Q.    Did you go to his house right away?

24       A.    Go to whose house?

25       Q.    Your brother, Dave.

1      A.    No.

2      Q.    When did you go to Dave's house after you

3  learned that he died?

4      A.    Probably maybe two or three weeks afterwards.

5      Q.    Did you go to your dad's house right after you

6  learned that Dave died?

7      A.    I don't remember.

8      Q.    Do you remember what you did after you learned

9  that Dave died?

10         MR. FREEDMAN:  Objection.

11         THE WITNESS:  I just remember talking to my

12     dad about it.

13  BY MR. PASCHAL:

14     Q.    But you don't remember anything else?

15     A.    No.

16     Q.    Ira, would it be fair to say that you weren't

17  really close with Dave?

18         MR. FREEDMAN:  Objection, stop.  What does

19     this go to?

20  BY MR. PASCHAL:

21     Q.    Let me rephrase.  You don't have personal

22  knowledge relating to Dave's business activities, do

23  you?

24     A.    No.

25     Q.    I'm showing you an e-mail exchange you had

```
 1   with Angie Ojea, is that how you say her last name?

 2        A.   Angie Ojea.

 3             (Defendant's Exhibit No. 14 was

 4             marked for identification.)

 5   BY MR. PASCHAL:

 6        Q.   Can you turn to -- do you remember this

 7   e-mail?  Take a look at it.

 8        A.   The one at the very top?

 9        Q.   Do you remember this e-mail in general?  Do

10   you remember having this e-mail conversation with

11   Angela?

12        A.   I remember having a few e-mail exchanges.

13        Q.   If you go to page six.

14        A.   Okay.

15             MR. FREEDMAN:  These aren't Bates stamped.

16             MR. PASCHAL:  No, these are the ones you

17        produced to us.  I guess when I printed them out

18        they didn't have the Bates stamp.

19   BY MR. PASCHAL:

20        Q.   Not important.  Somewhere in this e-mail you

21   mentioned you hired a cleaning crew?

22        A.   Yes.

23        Q.   The cleaning crew found bullet casing?

24        A.   Yes.

25        Q.   Did you take out Dave's work papers and
```

```
 1    electronic devices before the cleaning crew cleaned the

 2    house?

 3         A.   No.  I definitely did not.

 4         Q.   Can you tell me the name of the cleaning crew?

 5         A.   I don't have it off --

 6         Q.   Do you have any documents showing who the

 7    cleaning crew is?

 8         A.   I think I can get the name.

 9              MR. PASCHAL:  Can you give us that?

10              MR. FREEDMAN:  (Indicating).

11    BY MR. PASCHAL:

12         Q.   Did the cleaning crew find anything else other

13    than the bullet casing that they mentioned to you?

14         A.   That was the only thing they mentioned.

15         Q.   So how -- when did the cleaning crew clean

16    Dave's house?

17         A.   Maybe -- I don't remember exactly.  I'm

18    thinking maybe one or two weeks after.

19         Q.   Do you know when Dave's house was foreclosed?

20         A.   No.

21         Q.   Did you go by his house and check on his

22    things or did you already remove everything from the

23    house?

24              MR. FREEDMAN:  Objection.

25              THE WITNESS:  What time are you talking about?
```

```
 1   BY MR. PASCHAL:
 2        Q.   After he died -- before the house was
 3   foreclosed on did you already remove Dave's belongings
 4   from the house?
 5        A.   I don't know exactly.  Are you talking like
 6   after the cleaning crew?
 7        Q.   No.  So before Wells Fargo finished the
 8   foreclosure sale --
 9        A.   I don't know when that was.
10        Q.   I know but let's say it's this date.  Any time
11   before that date did you remove Dave's electronic
12   devices, his papers, his possessions?
13             MR. FREEDMAN:  Objection.
14   BY MR. PASCHAL:
15        Q.   Or were they foreclosed with his stuff still
16   in the house?
17             MR. FREEDMAN:  Objection.
18             THE WITNESS:  I don't know when they
19        foreclosed.
20   BY MR. PASCHAL:
21        Q.   Did you ever take all of Dave's stuff out of
22   the house?
23        A.   I don't think I took everything.
24        Q.   Stuff was left in the house though?
25        A.   Yes.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 111

1        Q.   Who else had access to Dave's house?

2        A.   I think his girlfriend at the time, Lyneda.

3        Q.   What about after his death who had access to

4   the house?

5        A.   I'm not sure if -- I'm not sure if anyone

6   else -- I had his key.

7        Q.   Did you change his locks?

8        A.   No.

9        Q.   Did you have a security system on the house?

10       A.   I think he did.

11       Q.   Was it active after he died?

12       A.   I don't remember using a security system to

13   get in.  I just used the key.

14       Q.   Were you paying the electrical bill for the

15   house?

16       A.   I didn't.  I don't believe.

17       Q.   Was anybody paying the electric bill for the

18   house?

19       A.   Not that I'm aware of.

20       Q.   So there was no electricity in the house as

21   far as you're aware after he died?

22       A.   I'm trying to -- I don't remember.

23       Q.   So if there was no electricity in the house

24   the house was going into foreclosure -- strike that.

25   Can you definitively say whether or not there was any

1    other electronic devices in the house you may have not

2    known about?

3              MR. FREEDMAN:  Objection.

4              THE WITNESS:  I believe I collected all of the

5         equipment that I visibly saw.

6    BY MR. PASCHAL:

7         Q.   But there was still stuff in the house; right?

8         A.   Like furniture.

9         Q.   Did you check all the furniture to see what

10   was in them?

11        A.   I don't remember.

12        Q.   So if something was important in some of his

13   furniture you wouldn't be able to tell us that; right?

14             MR. FREEDMAN:  Objection.

15             THE WITNESS:  I don't remember searching

16        through his furniture.

17   BY MR. PASCHAL:

18        Q.   Sorry, what did you say?

19        A.   I don't remember searching through his

20   furniture.

21        Q.   When you saw -- so Dave had two Alienware

22   computers and a laptop?

23        A.   Yes.

24        Q.   Was the Alienware -- was it -- was the

25   Alienware computer was it the color black?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                           Page 113

```
 1        A.   Yes.

 2        Q.   One of them was, right?

 3        A.   I believe both.

 4        Q.   Were the hard drives in the computer or were

 5   they out of them when you got the Alienware computer?

 6        A.   They were out of them.

 7        Q.   Was there any evidence in the house showing

 8   why the hard drives were removed from the computers?

 9             MR. FREEDMAN:  Objection.

10             THE WITNESS:  No.  I don't think so.

11   BY MR. PASCHAL:

12        Q.   Did Dave typically keep his hard drives out of

13   his computer?

14        A.   I don't know what he did.

15        Q.   On the ESI disclosure you listed one phone but

16   you said that Patrick had destroyed Dave's phone so what

17   phone -- did Dave have two phones?

18        A.   Yes.

19        Q.   What phone -- do you remember the make and

20   model of the phone you gave to Patrick Paige?

21        A.   I believe it was a Samsung Galaxy.  I don't

22   remember the model.  It's probably listed in --

23        Q.   It's in the disclosures.  No, it's not

24   actually.  It's a Samsung Galaxy?

25        A.   That's all it says?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Page 114

1       Q.    I'm asking you.

2       A.    Yes, it was a Samsung Galaxy.

3       Q.    Did you see any devices used for Bitcoin

4  mining, Bitcoin servers, anything?

5       A.    Not that I'm aware of.  I wouldn't know what a

6  Bitcoin mining server would look like.

7       Q.    Would you have known what a Bitcoin wallet

8  looks like?

9       A.    No.

10      Q.    So if you saw one you wouldn't have thought it

11  was important, would you?

12           MR. FREEDMAN:  Objection.

13           THE WITNESS:  If I saw one?  I suppose not.  I

14      wouldn't know how to detect what a Bitcoin wallet

15      was.

16  BY MR. PASCHAL:

17      Q.    If he had a wallet for example on paper and it

18  just had random letters and numbers on it you wouldn't

19  have known that was a Bitcoin wallet; right?

20           MR. FREEDMAN:  Objection.

21           THE WITNESS:  I suppose not.

22  BY MR. PASCHAL:

23      Q.    So when you threw papers away that you thought

24  weren't important you could have thrown away one of

25  those papers that had a Bitcoin wallet on it; right?

```
 1              MR. FREEDMAN:  Objection.

 2              THE WITNESS:  It's possible, yes.

 3              MR. PASCHAL:  Let's go to the ESI disclosure.

 4        I haven't given that to you, I'm sorry.

 5              (Defendant's Exhibit No. 15 was

 6              marked for identification.)

 7   BY MR. PASCHAL:

 8        Q.   On this ESI disclosure under number one you

 9   list David Kleiman's e-mail accounts.  You list five.

10   You see that?

11        A.   Yes.

12        Q.   Do you have access to all five e-mail

13   accounts?

14        A.   I don't believe so.

15        Q.   Which ones do you not have access to?

16        A.   I would have to check.  I don't remember

17   offhand.

18        Q.   Do you know which e-mail account you do have

19   access to?

20        A.   I have access to Dave@███████████.

21        Q.   But you're not sure about the rest?

22        A.   I don't believe I have access to the two on

23   the bottom.  The two at the top I'm not sure about.

24        Q.   Have you tried to log into those?

25        A.   I may have.
```

1        Q.    When did --

2        A.    I just don't remember at the present time.

3        Q.    So you don't remember any efforts you took to

4    access those e-mail accounts, do you?

5               MR. FREEDMAN:  Objection.

6               THE WITNESS:  Like I said I do recall

7         accessing Dave@█████████

8    BY MR. PASCHAL:

9        Q.    The first two and last two?

10       A.    The first two I don't remember.

11       Q.    The last two what did you do to access those

12   accounts?

13       A.    I think I recovered the domain names to those

14   but I don't think I ever like set up an active account

15   for them.  So I don't think those e-mail addresses work.

16       Q.    So when you say you have the domain name you

17   should be able to get access then to the e-mail address,

18   right?

19       A.    No, not unless you set up an account for it.

20       Q.    You haven't set up an account for these?

21       A.    I don't believe so.

22       Q.    Could you set up an account?

23       A.    Yes.

24       Q.    Why haven't you?

25       A.    Just there's no purpose.  If I set up an

1    account it's not going to suddenly give me access to

2    e-mails that were sent to those addresses a long time

3    ago.

4        Q.   Why not?

5        A.   It's just because his e-mails were hosted

6    elsewhere.

7        Q.   Where were they hosted?

8        A.   I think they were hosted with Patrick's

9    company, Computer Forensics LLC.

10       Q.   All five of his e-mail addresses were hosted

11   by Patrick?

12       A.   I believe so.

13       Q.   Did Patrick give you access to these e-mail

14   accounts?

15       A.   It's possible after the litigation with

16   Patrick that he gave me those.  I would to check the

17   records.

18       Q.   You said through the litigation, through the

19   lawsuit?

20       A.   Yes.

21       Q.   When do you think you got access -- when do

22   you think that Patrick may have given you access to

23   those e-mail accounts?

24       A.   I would have to go back and look at the

25   records.

1      Q.   I just want to know the process.  For

2  Patrick -- it would just be Patrick he can access the

3  e-mail accounts and give you the documents in them?

4      A.   I'm not exactly sure what access he had to

5  those accounts after Dave passed.

6      Q.   Did you request from Patrick access to those

7  e-mails before you filed this lawsuit?

8      A.   Before this lawsuit?

9      Q.   Before this lawsuit.

10     A.   I believe so.

11     Q.   And he never gave them to you?

12     A.   I think eventually yes, he did.

13     Q.   So we haven't received any production from

14  these e-mail addresses.  Why haven't we?

15        MR. FREEDMAN:  Objection.

16        THE WITNESS:  I don't know if we've -- if

17     they're currently active.  Like I said the only one

18     that I know for certain is Dave@&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

19     The others I have to check.

20  BY MR. PASCHAL:

21     Q.   So Patrick obviously can help get access to

22  these two e-mail address; right?

23        MR. FREEDMAN:  Objection.

24        THE WITNESS:  I don't know.  I don't know what

25     access he had to them.  For Dave@&#9608;&#9608;&#9608;&#9608;&#9608;&#9608; yes.

1    BY MR. PASCHAL:

2        Q.    Did you access Dave Kleiman -- the one you can

3    access before you filed this lawsuit?

4        A.    Well, it only allowed me to set up a new

5    account.  Like once I received the domain name from that

6    point forward I start getting new e-mail to it.

7    BY MR. PASCHAL:

8        Q.    Not old e-mails?

9        A.    Not old e-mail.

10       Q.    What about the Dave@ ████████ ?

11       A.    That's what I'm talking about.  Once I

12   received the domain at that point --

13       Q.    Do you have any old e-mails?  I'm sorry.  Do

14   you want me to repeat the question because I wasn't

15   finished?

16       A.    I may have some old that Patrick produced.  I

17   have to check.

18       Q.    So the only -- I want to break this down.  So

19   the only e-mails that you have from Dave are coming from

20   Patrick; right?

21             MR. FREEDMAN:  Objection.

22             THE WITNESS:  Yes.

23   BY MR. PASCHAL:

24       Q.    So none of them are coming from these five

25   e-mail addresses directly?

1      MR. FREEDMAN:  Objection.

2      THE WITNESS:  Like I said I would have to go

3    back and look at those accounts to see if I have

4    access to them.  Like I said the two at the bottom

5    I'm certain I never accessed.  The two at the top I

6    have to check.

7    BY MR. PASCHAL:

8      Q.    Just back on my question.  Did you review any

9    documents from these e-mail accounts before you filed

10   this lawsuit?

11     MR. FREEDMAN:  Obviously don't answer anything

12    to the extent it involves conversations with your

13    attorneys.

14     THE WITNESS:  I have to go back and look at

15    what records were produced.

16   BY MR. PASCHAL:

17     Q.    What e-mail account is verifymail@▮▮▮▮▮?

18     A.    Which one?

19     Q.    Verifymail@▮▮▮▮▮

20     A.    I think it was just like a temporary account

21   that I set up for my attorneys.

22     Q.    Them being them?

23     A.    Yes.

24     Q.    Do you have separate attorneys in the Computer

25   Forensics lawsuit?

1        A.    I had separate, yes.

2        Q.    Do you have attorneys in the lawsuit now?

3        A.    Currently, no.

4        Q.    So I think you have about 35 e-mail addresses

5    give or take, I don't know.   Why so many?

6        A.    I don't know.

7        Q.    I want to ask you about one e-mail address in

8    particular.   It's on the second page and I don't know

9    what number it is but it's WrightKleiman@ ███████

10   What's the purpose of that e-mail account?

11       A.    It probably had something to do with the

12   litigation but I would have to look at it to see.   I

13   don't remember offhand.

14       Q.    Have you produced documents from that e-mail

15   account?

16       A.    I don't know.

17       Q.    I think we have one document which you

18   produced to us where you communicated with the ATO which

19   is this e-mail address?

20       A.    Maybe that's what it was.

21       Q.    Do you recall in this e-mail asking ATO if

22   they're continuing to investigate your brother and

23   Craig?

24       A.    Can you repeat that?

25       Q.    Do you remember if in that e-mail if you asked

1    the ATO whether they're investigating your brother as in

2    Dave Kleiman and Craig Wright?

3         A.    I don't specifically remember what I discussed

4    with them.

5         Q.    Did the ATO ever tell you we're not

6    investigating David Kleiman?

7         A.    They never mentioned that to me.

8              MR. PASCHAL:   I'm showing you your e-mail to

9         Michael Hardy on June 30th 2015.

10             (Defendant's Exhibit No. 16 was

11             marked for identification.)

12   BY MR. PASCHAL:

13        Q.    At the bottom you say "dear Mr. Hardy, I

14   understand that you are investigating a case involving

15   my brother David Kleiman and his partner Craig Wright.

16   Could you tell me if you are still seeking new

17   information regarding this case or if it was closed can

18   you tell me when.   Thank you, Ira Kleiman."   Do you

19   remember that?

20        A.    Yes.

21        Q.    And at the top -- I guess he doesn't give you

22   an answer but at the top you say "what you can confirm

23   there is presently no investigation of Dr. Craig Wright

24   and my brother."   You see that?

25        A.    Yes.

1      Q.   Did Mr. Hardy ever tell you one way or the

2   other or give you an answer to that question one way or

3   another?

4      A.   I guess if there's no e-mail to it probably

5   not.

6      Q.   So was WrightKleiman@▮▮▮▮▮▮ was it used

7   for any other reason?

8      A.   Not that I remember.

9      Q.   Let's talk about Coin Exchange briefly.  You

10  had 10.5 million shares in Coin Exchange; right?

11     A.   Yes.

12     Q.   Now, you understand that Coin Exchange is

13  under the control of an Australian liquidator; right?

14     A.   I didn't know who took control of it.

15     Q.   Is it your testimony today that you don't know

16  who took control of it?

17     A.   Yes, I wasn't sure what happened with Coin

18  Exchange.  I knew a liquidator was trying to find out

19  information about Coin Exchange but I'm not exactly sure

20  what activity they did.

21          MR. PASCHAL:  I'm showing you an e-mail with

22     Mr. Jeremy Mudford.  And these are August 31st

23     2017.

24          (Defendant's Exhibit No. 17 was

25          marked for identification.)

```
 1    BY MR. PASCHAL:

 2        Q.    Is Jeremy Mudford, is he the liquidator for

 3    Coin Exchange?

 4        A.    That's what he told me, yes.

 5        Q.    I want you to look at his e-mail to you

 6    August 29, 2017.  Do you recall discussing W&K that you

 7    believe that Dr. Wright transferred assets from W&K to

 8    Coin Exchange and then to other various entities?

 9        A.    Are you referring to an e-mail?

10        Q.    I'm just asking.  Do you remember telling

11    Jeremy Mudford that, yes or no?

12        A.    Can you repeat that?

13        Q.    Do you remember telling Jeremy Mudford that

14    Dr. Wright transferred from W&K assets to Coin Exchange

15    and then to other entities that he was involved in?

16        A.    I don't remember specifically saying that but

17    if you show me the e-mail --

18        Q.    I'll show it to you in a second.  Let's go to

19    the bottom here.  On Jeremy Mudford's e-mail to you

20    August 29, 2017?

21        A.    First page?

22        Q.    Yes.

23        A.    Of course.

24        Q.    It says "dear Ira, I referred to your e-mail

25    below in your prior e-mail correspondence regarding the
```

1  company.  Besides the information provided which

2  predominately has consisted of various blog site

3  articles it would be appreciated if you could provide

4  any tangible evidence that the company, being Coin

5  Exchange, and/or its related entities" and you were

6  talking about W&K "that we have been appointed over any

7  IP which may include related to Bitcoin.  In the interim

8  our preliminary investigations do not reveal any

9  trademark registration to the company name" and then he

10 refers you to two links supporting his conclusion.  Do

11 you recall that e-mail?

12      A.   Yes.

13      Q.   This is in 2017.  In 2018 do you have any

14 communications with Jeremy Mudford?

15      A.   Do you have any e-mails that --

16      Q.   I don't.  That's why I'm asking.

17      A.   I don't know.

18      Q.   Do you have any e-mails for 2019?

19      A.   Pretty sure, no.

20      Q.   Let's talk about W&K.  You said you first

21 learned of W&K through Dr. Wright; is that correct?

22      A.   Yes.

23      Q.   At the time -- well, you reinstated W&K as a

24 company in I think it was March of 2018; correct?

25      A.   I don't remember the date.

1       Q.   But you reinstated it; correct?

2       A.   Yes.

3       Q.   When you reinstated W&K what was its business

4   purpose?

5            MR. FREEDMAN:  Hold on.  Where are you in your

6       topics?

7            MR. PASCHAL:  W&K, information regarding W&K.

8            MR. FREEDMAN:  I don't see a general

9       information regarding W&K.  Maybe I'm missing it.

10           MR. PASCHAL:  I guess this is going to go to

11      the location of W&K's proprietary documents and

12      information slips identified W&K purchases, bit

13      message account, Panama and also W&K's membership.

14           MR. FREEDMAN:  What was the question?  Can you

15      read it back?

16           (Thereupon, a portion of the record

17           was read back by the reporter.)

18           MR. FREEDMAN:  Don't answer the question.

19   BY MR. PASCHAL:

20      Q.   Can you tell me what W&K's business purpose

21   ever was?

22           THE WITNESS:  According to Craig it was for

23      research purposes and mining of Bitcoin.

24   BY MR. PASCHAL:

25      Q.   Based on your personal knowledge what was the

1   business purpose of W&K?

2       A.   Like I said according to Craig --

3       Q.   Not according to Craig.  Based on your own

4   personal knowledge?

5       A.   My own personal knowledge about W&K came from

6   Craig Wright.

7       Q.   So you have no testimony, documents or

8   evidence other than Craig Wright?

9       A.   Correct.

10      Q.   About W&K?

11      A.   What's that?

12      Q.   About W&K?

13      A.   Yes.

14      Q.   When you reinstated W&K you removed Coin

15  Exchange and Ms. Uyen as its publicly identified

16  members, do you recall that?

17          MR. FREEDMAN:  Can you repeat the question?

18      Sorry, I didn't hear.

19          (Thereupon, a portion of the record

20          was read back by the reporter.)

21          MR. FREEDMAN:  Don't answer the question.  I

22      don't see where it connects to your topics about

23      W&K's e-mail addresses, bit message accounts or W&K

24      Panama.

25          MR. PASCHAL:  I'm asking about proprietary

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Page 128

 1          documents about W&K.  That includes W&K's

 2          membership and its filings with Sunbiz.org.  That

 3          is the definition of proprietary documents.

 4              MR. FREEDMAN:  And the location.

 5              MR. PASCHAL:  Also very basic allegation in

 6          the second amended complaint.

 7              MR. FREEDMAN:  You'll have another chance to

 8          depose Ira when you can go to the merits.  Right

 9          now you're supposed to be asking location

10          proprietary documents.

11   BY MR. PASCHAL:

12       Q.   Do you have documents establishing W&K's

13   membership?

14       A.   From like SunBiz?

15       Q.   Do you have any documents establishing W&K's

16   membership?

17       A.   The only documents would be whatever I found

18   on the SunBiz web site.

19       Q.   Does SunBiz.org list every member of a

20   company?

21       A.   I don't know.

22              (Thereupon, a portion of the record

23              was read back by the reporter.)

24              THE WITNESS:  No, I don't know.

25

```
 1   BY MR. PASCHAL:

 2        Q.    Do you have any documents from the Department

 3   of Finance telling you that SunBiz.org you cannot rely

 4   on it to determine the membership of a company?

 5             MR. FREEDMAN:   Objection.

 6             THE WITNESS:   No.

 7   BY MR. PASCHAL:

 8        Q.    You do not -- is it your testimony you do not

 9   have a document stating that?

10        A.    The Department of Finance -- say that again?

11        Q.    From the Department of Finance stating that

12   you cannot rely on SunBiz.org to determine membership of

13   the company?

14        A.    I'm not aware of it.

15        Q.    Before you filed this lawsuit or before you

16   filed your amended complaint in this lawsuit are there

17   any documents with Jeremy Mudford where you discussed

18   removing Coin Exchange as a member of W&K?

19        A.    Discussing with Jeremy Mudford?

20        Q.    The liquidator for Coin Exchange.

21        A.    I don't believe so.

22        Q.    Do you have any documents that are resignation

23   letters from any members of W&K before you reinstated

24   and listed yourself as the member of W&K?

25        A.    No.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                     Page 130

1      Q.   Did you take out any loans on W&K's behalf?

2      A.   Not that I'm aware of.

3      Q.   Are you paying -- are there any tax returns

4  right now for W&K or any tax information for W&K?

5      A.   No.

6      Q.   Are you paying W&K's taxes?

7      A.   No.

8      Q.   Do you know who last paid W&K's taxes?

9      A.   No.

10     Q.   Does W&K have any revenue for this year?

11     A.   Not that I'm aware of.

12     Q.   Does W&K have any revenue from last year?

13     A.   Not that I'm aware of.

14     Q.   Are you conducting any business on behalf of

15  W&K?

16     A.   Me personally?

17     Q.   Yes.

18     A.   No.

19     Q.   Is anyone conducting business on behalf of

20  W&K?

21     A.   No.

22     Q.   Has W&K assigned any of its rights in this

23  lawsuit to anyone else?

24          MR. FREEDMAN:   Hold on.   What topic are you

25     on?

1  BY MR. PASCHAL:

2      Q.    Are there any documents showing whether or not

3  W&K assigned any of its interest in its lawsuit to

4  anyone else?

5          MR. FREEDMAN:  Don't answer the question.

6          MR. PASCHAL:  Under what basis?

7          MR. FREEDMAN:  If such documents exist they

8      would be work product.

9          MR. PASCHAL:  An assignment of a claim?  That

10     would be work product?

11         MR. FREEDMAN:  You don't like the instruction

12     bring it to the judge.

13         MR. PASCHAL:  I'm just trying to get it.  I

14     just want the record to be complete on the

15     objection.  So you're saying that an assignment of

16     claim is going to be protected by work product?

17         MR. FREEDMAN:  Either work product or

18     attorney-client privilege or the common interest

19     privilege, yes.

20  BY MR. PASCHAL:

21     Q.    We'll skip this.  Have the allegations that

22  you made in this lawsuit or this second amended

23  complaint or the amended complaint or its original

24  complaint been given to any third party other than your

25  attorneys?

```
 1              MR. FREEDMAN:  Objection.

 2              THE WITNESS:  I believe so.

 3    BY MR. PASCHAL:

 4         Q.   Who are those third parties?

 5         A.   A company that assists in funding litigation

 6    cases.

 7         Q.   What's the name of that company?

 8         A.   Parabelum.

 9         Q.   Can you say that again?

10         A.   Parabelum.

11         Q.   When did you give that complaint to Parabelum?

12         A.   I don't remember the date.

13         Q.   When did you first meet Parabelum?

14         A.   I don't remember the date.

15         Q.   Was it 2016?

16         A.   I would have to go look at the records.

17         Q.   Did Parabelum give you any money?

18              MR. FREEDMAN:  Hold on.  What topic are you

19         on?

20              MR. PASCHAL:  This goes to -- this really goes

21         to 31 but he just answered something different so

22         I'm --

23              MR. FREEDMAN:  How does it go into 31?  I

24         don't see how it ties into 31.  If you want to ask

25         it with a tie in to 31 I'm happy to listen to it,
```

1   otherwise don't answer the question.

2       MR. PASCHAL:  Let me break that down in two

3   things.  One, we asked questions about this

4   regarding interrogatories, you objected.  We spoke

5   on the phone yesterday we told you we would lay the

6   record here so the judge could make a ruling based

7   on the record and we wrote these topics what we

8   knew.  I can't give exact topics on events because

9   I just didn't know your witness would say that.  I

10  can't -- I mean --

11      MR. FREEDMAN:  I had the same problem deposing

12  Dr. Wright.

13      MR. PASCHAL:  That's the problem.  That's not

14  here right now.  I wasn't there.

15      MR. FREEDMAN:  Just saying the parties kept

16  each other to their topics.  Your team members kept

17  me to my topics so keeping you to your topics.

18  Goose gander provision.

19      MR. PASCHAL:  Did Parabelum give you any

20  money?

21      MR. FREEDMAN:  Don't answer the question.

22      MR. PASCHAL:  What's the basis?

23      MR. FREEDMAN:  First of all, I think you're

24  outside the topic.  Second of all -- I think you're

25  outside the topic.  I'm just going to rely on you

1          being outside the topic.

2     BY MR. PASCHAL:

3          Q.    Who is BTCN1610491, LLC?

4          A.    I think that's a company related to the entity

5     that assists in litigation funding.

6          Q.    Is that Parabelum?

7          A.    Yes.

8          Q.    So when did you first speak with Parabelum?

9          A.    Like I said I would have to check the records.

10         Q.    Did BTCN or Parabelum give you any money?

11              MR. FREEDMAN:  Hold on.  We're going to

12         instruct Ira not to answer the question.

13              MR. PASCHAL:  On what basis?

14              MR. FREEDMAN:  A, on relevance and -- stay

15         with relevance for now.

16    BY MR. PASCHAL:

17         Q.    Under what circumstances did BTCN give you

18    money?

19              MR. FREEDMAN:  Stop.  Hold on a second.

20         Trying to figure out the position to take on your

21         question.  If you want to just stop or you want

22         take a break?

23              MS. MCGOVERN:  Let's take five minutes.

24              THE VIDEOGRAPHER:  The time is 2:08 p.m. and

25         we're off the record.

1           (Thereupon, a brief recess was taken.)

2           THE VIDEOGRAPHER:  The time is now 2:23 p.m.

3       and we are now back on the record.

4           MR. FREEDMAN:  So we just spoke with our

5       client.  I'm going to state for the record that

6       BTCN is owned by Parabelum Capital which is an

7       entity that provides litigation financing

8       assistance.  Parabelum has provided litigation

9       financing assistance in this case.

10          I am not going to allow Ira to answer any

11      other questions about that topic because I believe

12      it will invade either work product privilege,

13      attorney-client privilege or common interest

14      privilege.  If you want more you have to go to the

15      court but I think your record is clear now what's

16      going on and what more you would want.

17          MR. PASCHAL:  There are a few things I want.

18          MR. FREEDMAN:  You can ask but I most likely

19      will instruct him not to answer.

20   BY MR. PASCHAL:

21      Q.   When did you first speak to Parabelum?

22          MR. FREEDMAN:  That you can answer.

23          THE WITNESS:  I would have to go back and

24      check the records.

25

1   BY MS. MCGOVERN:

2        Q.   What records would you have to check?

3        A.   I guess e-mail exchanges with them.

4        Q.   Did you give Parabelum documents relating to

5   this case?  You don't have to say what documents?

6             MR. FREEDMAN:  Go ahead.

7             THE WITNESS:  I would have to check my

8        records.

9   BY MR. PASCHAL:

10       Q.   What records would you have to check?

11       A.   E-mail.

12       Q.   E-mail?  Did you sign any documents with

13   Parabelum?

14             MR. FREEDMAN:  That's fine.  Go ahead and

15       answer that question.

16             THE WITNESS:  I don't remember.  I have to

17       check that too.

18   BY MR. PASCHAL:

19       Q.   Did W&K or the estate of Dave Kleiman --

20   strike that.  Are there any documents showing that Dave

21   Kleiman or the estate of Dave Kleiman or W&K assigned

22   any portion or any right in this lawsuit to Parabelum or

23   any third party?

24             MR. FREEDMAN:  Don't answer the question.

25             MR. PASCHAL:  What's the basis?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 137

1              MR. FREEDMAN:  I told you the basis.

2       BY MR. PASCHAL:

3           Q.   Are there any documents that give your right

4       to recovery of any money to Parabelum or BTCN?

5              MR. FREEDMAN:  Don't answer the question.

6       BY MR. PASCHAL:

7           Q.   In connection with getting funding from

8       Parabelum did you provide any documents to support any

9       of the allegations of the complaint?

10             MR. FREEDMAN:  Don't answer that.  Well, the

11         answer yes or no you can answer.  Just don't

12         identify what, if any, documents you provided.

13             THE WITNESS:  Yes.

14      BY MR. PASCHAL:

15          Q.   What documents did you provide?

16             MR. FREEDMAN:  Don't answer that.

17      BY MR. PASCHAL:

18          Q.   Are there any documents that you provided to

19      them that you haven't produced in this case?

20             MR. FREEDMAN:  Don't answer that.

21             MR. PASCHAL:  I'm showing you an e-mail you

22         had with Patrick Paige on March 24th 2016.

23             (Defendant's Exhibit No. 18 was

24             marked for identification.)

25

1    BY MR. PASCHAL:

2         Q.    In the e-mail you say "hey Patrick, I haven't

3    heard back from you about the hosting file stuff.

4    Anyway, there is another issue I was wondering if you

5    can help me with.  I'm trying to locate any documents

6    related to the W&K business Dave operated.  I remember

7    we had a conversation at Dave's house shortly after he

8    passed away.  You were mentioning to me how my dad was

9    asking for the return of a file cabinet he bought for

10   Dave and you said something like what does your dad need

11   another file cabinet.  I was like I don't know I guess

12   he just wants it because he bought it.  Of course I

13   didn't think anything of it at the time but it just

14   donned on me maybe inside that cabinet is where Dave

15   stored his W&K related stuff.  You didn't possibly come

16   across any papers mentioning W&K."  Do you remember this

17   e-mail?

18        A.    Yes.

19        Q.    Did you ever recover that file cabinet?

20        A.    No.

21        Q.    Did you ever see what was in that file

22   cabinet?

23        A.    No.

24        Q.    Why did you believe that Dave may have kept

25   his W&K stuff in that file cabinet?

```
 1                    MR. FREEDMAN:  Objection.

 2                    THE WITNESS:  I didn't know what was kept in

 3          the file cabinet.

 4     BY MR. PASCHAL:

 5          Q.   Well, I'm asking -- so --

 6          A.   I wanted to determine what was --

 7                    MR. FREEDMAN:  There's no question pending,

 8          Ira.

 9     BY MR. PASCHAL:

10          Q.   Are there any documents showing or any

11     documents evidencing or supporting your belief that W&K

12     documents may have been inside that cabinet?

13          A.   No.

14                    MR. PASCHAL:  I'm showing you an e-mail with

15          Patrick Paige on March 17, 2017.

16                    (Defendant's Exhibit No. 19 was

17                    marked for identification.)

18     BY MR. PASCHAL:

19          Q.   If you go on the second page on March 28th

20     2016 Patrick Paige says "what would Appriver support do

21     for us," question mark.  "Also I found the original

22     court mailing about W&K.  Has a case number, see

23     attached."

24                    You respond -- you respond by saying I don't

25     know -- only relevant part is when did you find that W&K
```

1   filing question mark.  Were you ever contacted by the

2   girl Uyen that took over David's position as director

3   for W&K?  Patrick responds "I just found the filing

4   today and I was looking for something else.  I was never

5   contacted by anyone about W&K and never heard the girl."

6          Then you respond on the first sentence in the

7   next e-mail responding to Patrick "can you keep the

8   letter and envelope in a safe place for me?  I would

9   like to check it out some time."

10          Then Patrick responds "yes, I will keep it.

11   It seems weird that the address of the envelope is

12   handwritten considering it came from the Supreme Court."

13   How did Patrick get the original envelope from the

14   Australian case?

15          MR. FREEDMAN:  Objection.

16   BY MR. PASCHAL:

17     Q.    Strike that.  Do you know where Patrick found

18   the original court mailing about W&K?

19     A.    I assume it would be to the mailing address --

20   the Computer Forensics mailing address that they shared.

21     Q.    Was that the address that was listed for W&K

22   on SunBiz.org as the registered agent?

23     A.    I would have to check.  I don't remember what

24   that address is.

25     Q.    Could this envelope had been -- you sent this

1    e-mail four days after you asked about the file cabinet.

2    Could this envelope have been in the file cabinet?

3         A.   I never asked Patrick where he found it.

4         Q.   Did you ever recover the envelope from

5    Patrick?

6         A.   No, I think he just e-mailed me like a scan of

7    it.

8         Q.   What was the document?  What was the contents

9    of the document?

10        A.   I would have to look at it.  I don't remember.

11        Q.   Was it the statement of claim in Australia?

12        A.   I would have to look at it.  I remember seeing

13   like an envelope but I don't remember what the contents

14   inside of it was.

15        Q.   So is it fair to say that something was mailed

16   from Australia with the W&K court case to a mailing

17   address in Palm Beach from either Computer Forensics or

18   Dave's house?

19             MR. FREEDMAN:  Objection.

20             THE WITNESS:  Again I would have to go look at

21        it to make sure what it was.

22   BY MR. PASCHAL:

23        Q.   Well, in your Second Amended Complaint you

24   allege that W&K was never served with the filings in the

25   Australian court.  Do you recall that?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Page 142

```
 1          A.    I believe --

 2                MR. FREEDMAN:  Objection.

 3                THE WITNESS:  I believe so.

 4     BY MR. PASCHAL:

 5          Q.    Did you make the allegation -- well,

 6     obviously -- you sent this e-mail before you made that

 7     allegation; correct?

 8          A.    I think so.

 9          Q.    And you never bothered -- sorry, you never

10     read that document before you filed the complaint?

11                MR. FREEDMAN:  Objection.

12                THE WITNESS:  I'm pretty sure I did.

13     BY MR. PASCHAL:

14          Q.    But you just don't remember what it says?

15          A.    I don't remember now.  I have to look at it.

16          Q.    Just earlier I asked you about two homes you

17     had.  I think one was on ███████ that's the one you

18     you live in now?

19          A.    Yes.

20          Q.    Then you had one on █████?

21          A.    ████████.

22          Q.    You didn't sell your first home when you

23     purchased your second home; right?

24          A.    Correct.

25          Q.    You kept it until about 2018?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Page 143

```
 1        A.   I would have to check.  Possibly.
 2        Q.   On your second home there's no mortgage
 3   recorded for that house?
 4             MR. FREEDMAN:  Don't answer the question.
 5             MR. PASCHAL:  On what basis?
 6             MR. FREEDMAN:  What basis are you asking?
 7        Where does this tie into your topics?
 8             MR. PASCHAL:  Several of my topics.
 9             MR. FREEDMAN:  Which one of them, name one?
10             MR. PASCHAL:  Goes to the administration of
11        the estate and goes into --
12             MR. FREEDMAN:  Whether or not Ira Kleiman has
13        a mortgage on his house goes to the administration?
14             MR. PASCHAL:  That's my question.
15             MR. FREEDMAN:  I instruct him not to answer
16        unless you can convince me it comes into a topic.
17             MS. MCGOVERN:  We're just going to make the
18        record.
19   BY MR. PASCHAL:
20        Q.   Are there any documents showing where the
21   source of funds came to purchase the second home?
22             MR. FREEDMAN:  Don't answer.
23   BY MR. PASCHAL:
24        Q.   Did you purchase that home two or three weeks
25   after Craig first reached out to you?
```

1        A.    I would have to check.  I don't remember.

2        Q.    Would it sound about right if you purchased

3    that home -- the finalized closing was in March of 2014?

4              MR. FREEDMAN:  Objection.

5              THE WITNESS:  I would have to check.  I know

6        it was 2014.

7    BY MR. PASCHAL:

8        Q.    Then Craig first reached out to you in about

9    February 2014?

10       A.    Right.

11       Q.    Telling you about Bitcoin?

12       A.    Yes.

13       Q.    You paid $450,000 cash for that house?

14             MR. FREEDMAN:  Objection, don't answer.

15   BY MR. PASCHAL:

16       Q.    Did the purchase of that house have anything

17   to do with the administration of the estate or Bitcoin?

18       A.    No.

19       Q.    Do you have documents reflecting that?

20             MR. FREEDMAN:  Objection.  You can answer.

21             THE WITNESS:  Showing that it didn't have

22       anything to do with --

23   BY MR. PASCHAL:

24       Q.    Yes.  That the source of funds for that house

25   did not come from Dave's possession, Bitcoin?

```
 1        A.    I probably do.

 2        Q.    What documents would that be?

 3        A.    I guess a check written by myself for the

 4   house.

 5        Q.    What about the underlying funds for that

 6   check?

 7             MR. FREEDMAN:  Objection.  I don't understand

 8        your question and it's touching on this area I've

 9        been instructing him not to answer so could you try

10        to clarify what you mean?

11   BY MR. PASCHAL:

12        Q.    Were there any documents to show that the

13   underlying funds to write a $450,000 check for that

14   house are there any documents showing it didn't come

15   from Dave's estate, from Bitcoin, from Dave's

16   possession?

17             MR. FREEDMAN:  So I don't want to instruct him

18        not to answer if I can avoid it.  The problem is

19        you're asking him about proving a negative.  Are

20        you asking whether -- obviously you don't have to

21        adopt my formulation just to see if I can get you

22        the information you want.  Are you asking whether

23        there's documents that identify where the funds

24        actually came from?

25             MR. PASCHAL:  I've asked that you've told him
```

```
1            not to answer so I'm asking a different one.

2                 MR. FREEDMAN:  If you ask if there are

3            documents that exist to show where the funds came

4            from I'll allow him to answer.

5                 MR. PASCHAL:  Can you repeat my question,

6            Mr. Court reporter, and then you can answer?

7                 (Thereupon, a portion of the record

8                 was read back by the reporter.)

9                 MR. FREEDMAN:  Don't answer.

10   BY MR. PASCHAL:

11            Q.   Are there any documents showing the source of

12   the funds to purchase the house came from?

13            A.   I imagine yes, there should be.

14            Q.   What documents would those be?

15                 MR. FREEDMAN:  You can describe the types of

16            documents.  Don't go beyond that.

17                 THE WITNESS:  Checks.

18   BY MR. PASCHAL:

19            Q.   That's it?

20            A.   Yes.  Personal checks.

21            Q.   Did the purchase of the house have anything to

22   do with the financing of this lawsuit?

23            A.   No.

24                 MR. PASCHAL:  I think we're almost done so can

25            we take a break?
```

```
 1              MR. FREEDMAN:  Sure.

 2              THE VIDEOGRAPHER:  The time is now 2:38 p.m.

 3         and we're off the record.

 4              (Thereupon, a brief recess was taken.)

 5              THE VIDEOGRAPHER:  The time is 2:49 p.m. and

 6         we're back on the record.

 7    BY MR. PASCHAL:

 8         Q.   Ira, could you go back to your second amended

 9    complaint and that's probably Exhibit 2 or 3?

10              MR. FREEDMAN:  2.

11    BY MR. PASCHAL:

12         Q.   Can you go to page 46.  From 46 to 47 you

13    allege that Dr. Wright stole or committed theft of

14    Dave's Bitcoin, forked assets and intellectual

15    properties.  Do you see that?

16         A.   Yes.

17         Q.   Ira, you don't have any documents showing that

18    Dr. Wright stole Dave's Bitcoin, do you?

19              MR. FREEDMAN:  Objection.

20              THE WITNESS:  Documents?  Well, I have

21         documents that lead me to believe that he stole

22         Dave's Bitcoin.

23    BY MR. PASCHAL:

24         Q.   Well, let me break that down in two parts.  Do

25    you have documents that actually show that Dr. Wright
```

1    stole Dave's Bitcoin?

2           MR. FREEDMAN:  Objection.

3           THE WITNESS:  I don't have like a document

4       with the kind of evidence like showing that he

5       withdrew funds like from a bank account, no.

6       Nothing like that, no.

7    BY MR. PASCHAL:

8       Q.    What documents led you to believe that

9    Dr. Wright stole from Dave?

10      A.    Lots of e-mails from Craig Wright.

11      Q.    Are the e-mails that you produced to us?

12      A.    Should be.

13      Q.    In none of those e-mails does Dr. Wright say I

14   took Dave's Bitcoin; right?

15      A.    He may not have said that, no.  I would

16   imagine he wouldn't say that.

17      Q.    Other than communications with Craig do you

18   have any other documents evidencing that Dr. Wright

19   stole Bitcoin from Dave?

20      A.    I would have to check.  I don't know off the

21   top of my head.

22      Q.    Sitting here today do you have any knowledge

23   of any documents that evidence that Dr. Wright stole

24   Bitcoin from Dave?

25      A.    Again I would have to go back and look at all

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Page 149

 1   my documents.

 2        Q.   Right now today can you recall any of them?

 3        A.   At this moment, no.

 4        Q.   Do you have testimony from anyone or

 5   statements saying that -- or evidencing that Dr. Wright

 6   stole Bitcoin or intellectual property from Dave?

 7        A.   Testimony from other people?

 8        Q.   Or statements.

 9        A.   Not that I remember.

10        Q.   So today in this deposition you can't recall

11   any testimony or documents?

12        A.   No.

13        Q.   That last question to be clear is about

14   Bitcoin and intellectual property?

15             MR. FREEDMAN:  Objection.

16             THE WITNESS:  Okay.

17   BY MR. PASCHAL:

18        Q.   The answer is still the same; right?

19        A.   Yes.

20        Q.   The answer is no?

21        A.   No.

22             MR. PASCHAL:  I think that's about it.

23             MR. FREEDMAN:  Okay.

24             THE VIDEOGRAPHER:  Read or waive?

25             MR. FREEDMAN:  We'll read.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Page 150

```
1          THE VIDEOGRAPHER:   The time is now 2:54 p.m

2    and this concludes the video deposition.   We're off

3    the record.

4          THE COURT REPORTER:   Do you want to order?

5          MR. PASCHAL:   Yes.

6          MR. FREEDMAN:   Take a copy as well.

7          MR. PASCHAL:   As soon as possible.

8          MR. ROCHE:   Can we get a rough of that?

9          THE COURT REPORTER:   Yes.

10         MR. ROCHE:   You guys as well?

11         MR. PASCHAL:   Yes.

12               (Witness excused.)

13           (Deposition was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 151

```
 1

 2                     CERTIFICATE OF REPORTER

 3            THE STATE OF FLORIDA

 4            COUNTY OF DADE

 5

 6       I, Rick Levy, Registered Professional Reporter
     and Notary Public in and for the State of Florida at
 7   large, do hereby certify that I was authorized to
     and did report said deposition in stenotype of IRA
 8   KLEIMAN; and that the foregoing pages, numbered from
     1 to 148, inclusive, are a true and correct
 9   transcription of my shorthand notes of said
     deposition.
10
         I further certify that said deposition was
11   taken at the time and place hereinabove set forth
     and that the taking of said deposition was commenced
12   and completed as hereinabove set out.

13       I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative
14   or employee of any attorney or counsel of party
     connected with the action, nor am I financially
15   interested in the action.

16       The foregoing certification of this transcript
     does not apply to any reproduction of the same by
17   any means unless under the direct control and/or
     direction of the certifying reporter.
18
         IN WITNESS WHEREOF, I have hereunto set my hand
19   this 10TH day of April, 2019.

20   _____

21

22       Rick Levy, RPR, FPR, Notary Public
         in and for the State of Florida
         My Commission Expires:  12/7/19
23       My Commission No.:  FF 939483.

24

25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Page 152

1                        CERTIFICATE OF OATH

2    THE STATE OF FLORIDA

3            COUNTY OF DADE

4

5        I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,

6    Notary Public, State of Florida, certify that IRA

7    KLEIMAN personally appeared before me on the 8th day

8    of April, 2019 and was duly sworn.

9

10           Signed this 11th day of April, 2019.

11

12

13

14

15           _____

16                    Rick Levy, RPR, FPR
                       Notary Public - State of Florida
                       My Commission Expires:  12/7/19
17                     My Commission No.:  FF 939483

18

19                        RICK LEVY
                   Notary Public - State of Florida
20                   Commission # FF 939483
                   My Comm. Expires Dec 7, 2019
21                 Bonded through National Notary Assn

22

23

24

25

```
 1              E R R A T A   S H E E T

 2    IN RE:  IRA KLEIMAN VS CRAIG WRIGHT

 3    DEPOSITION OF:  IRA KLEIMAN

 4    TAKEN: 4/8/2019

 5       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 6    PAGE #  LINE #   CHANGE              REASON

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    Please forward the original signed errata sheet to
      this office so that copies may be distributed to all
18    parties.

19    Under penalty of perjury, I declare that I have read
      my deposition and that it is true and correct
20    subject to  any changes in form or substance
      entered here.

21

22    DATE: _____

23

24    SIGNATURE OF
      DEPONENT:_____
25
```

```
1   DATE:        April 11, 2019

2   TO:   VEL FREEDMAN, ESQUIRE
          BOIES, SCHILLER & FLEXNER LLP
3         100 S.E. 2nd Street
          Suite 2800
4         Miami, Florida 33131

5   IN RE: IRA KLEIMAN VS CRAIG WRIGHT

6   Dear Mr. Freedman:

7   Enclosed please find the original errata page with
    your copy of the transcript so IRA KLEIMAN may read
8   and sign their transcript.  Please have him/her make
    whatever changes are necessary on the errata page
9   and sign it.  Then place the original errata page
    back into the original transcript.  Please then
10  forward the original errata page back to our office
    @1080 Woodcock Road, Suite 100, Orlando, Florida
11  32803.

12  If the errata page is not signed by the witness
    within 30 days after this letter has been furnished,
13  we will then process the transcript without a signed
    errata page.  If your client wishes to waive their
14  right to read and sign, please have him/her sign
    their name at the bottom of this letter and send it
15  back to the office.

16      Your prompt attention to this matter is

17  appreciated.

18  Sincerely,

19  _____
    RICK E. LEVY, RPR
20
    I do hereby waive my signature:
21
    _____
22  IRA KLEIMAN

23  cc via transcript:  Bryan Paschal, Esq.
                        Vel Freedman, Esq.
24  file copy

25
```

Filing # 61672693 E-Filed 09/18/2017 05:58:20 PM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVL DIVISON AN
CASE NO. 50-2016-CA-013045-XXXX-MB

IRA KLEIMAN, individually, and as
Personal Representative of the
Estate of David Kleiman,

     Plaintiff,

v.

COMPUTER FORENSICS LLC,
CARTER CONRAD, individually, &
PATRICK PAIGE, individually.

     Defendants.

_____/

### FIRST AMENDED COMPLAINT

Plaintiff Ira Kleiman, individually and as personal representative of the Estate of David

Kleiman, hereby sues Computer Forensics LLC, a Florida limited liability company, and Carter

Conrad, and Patrick Paige, and alleges as follows:

### PARTIES, JURISDICTION & VENUE

1.    Plaintiff Ira Kleiman is a resident of Palm Beach County, Florida.  He is the sole heir

to the Estate of David Kleiman (Ira's late brother, and referred to herein as "DAVID") and is the

Personal Representative of the Estate of David Kleiman ("Plaintiff").  See Letters of Administration

Appointing Ira Kleiman as Personal Representative of the Estate of David Kleiman, attached hereto

as Exhibit 1.  As sole heir, Ira Kleiman is also a beneficiary of any property of David Kleiman.

David Kleiman was, at the time of his passing on April 26, 2013, a one-third owner of Defendant

Computer Forensics, LLC.  See Computer Forensics, LLC Operating Agreement, attached hereto

as Exhibit 2.  Upon the death of David Kleiman, his one-third ownership interest was assumed by

his Estate and its Personal Representative, and the Personal Representative has standing to pursue this action.   Alternatively, Ira Kleiman also became the sole beneficiary of the decedent, and any benefits or monies owed to David Kleiman by some or all of the Defendants in this action are due and owing to Ira Kleiman, subject to expenses/costs of the Estate.

2.      Defendant Computer Forensics LLC ("Computer Forensics") is a Florida limited liability company with its principal place of business in Boynton Beach, Florida.  At the time of its formation in 2012, the LLC's two Managing Members were David Kleiman and Defendant Carter Conrad ("Conrad").      Defendant Patrick Paige ("Paige") thereafter was added as a Managing Member and three Managing Members executed the Operating Agreement on or about February 13, 2013.  See Exhibit 2, attached hereto.

3.      Defendant Conrad is, upon information and belief, a resident of Palm Beach County, Florida.   He owns one-third of Defendant Computer Forensics LLC and is a Managing Member, pursuant to the Operating Agreement, attached as Exhibit 2, hereto.

4.      Defendant Paige is, upon information and belief, a resident of Palm Beach County, Florida.  He owns one-third of Defendant Computer Forensics LLC and is a Managing Member.

5.      Jurisdiction is proper because this is an action in excess of $ 15,000.00, exclusive of interests, costs and fees.

6.      Venue is proper because the underlying facts occurred in Palm Beach County, Florida and because all parties are residents of Palm Beach County, Florida.

## FACTS COMMON TO ALL COUNTS

7.      On February 13, 2012, Computer Forensics LLC was created.   Its two founding managing members were David Kleiman and Carter Conrad.   Both had a one-half ownership

interest in the LLC. Sometime thereafter, Paige became a Managing Member of Computer Forensics.

8.      On or about February 13, 2013, David Kleiman, Conrad, and Paige executed an Operating Agreement, attached hereto as Exhibit 2, which provided, among other things, that:

a.      Each Managing Member would possess and own a 33.33% interest of Computer Forensics;

b.      Gross revenue produced and received by Computer Forensics, LLC would be distributed pursuant to a specific formula: 20% of all gross proceeds would be paid to Computer Forensics for expenses and overhead, and the remaining 80% of proceeds would be distributed to each participating member based on a percentage of activity or work product, proportional to the production of the revenue or income;

c.      At the end of each fiscal year, and if proceeds in excess of operating expenses remained in Computer Forensic's accounts, each Managing Member would be awarded an additional 33.33% share of income not bookmarked for expenses.

9.      The Operating Agreement further provided that "[a]ll equipment, software, hardware, or other intellectual property, owned individually by each Member" would remain in the ownership of that Member. See Exhibit 2, attached hereto.

10.     On April 26, 2013, David Kleiman passed away.

11.     Plaintiff was David Kleiman's sole heir and is the personal representative of David Kleiman's estate.

12.     David Kleiman's interest has never been transferred, sold or other disposed of and, upon information and belief, the Estate of David Kleiman still owns one-third of Computer Forensics.

13.     On May 10, 2013, two weeks after David Kleiman died, Defendant Conrad filed an amended annual report indicating that Computer Forensics had two managing members – Defendants Conrad and Paige. Any record of David Kleiman's (or his Estate's) ownership of the Computer Forensics was removed from the LLC's publicly-filed corporate records.

14.     Prior to the execution of the Operating Agreement, David Kleiman had created, registered, and owned at least two personal websites, www.davidakleiman.com and www.davekleiman.com, among others (hereinafter referred to as the "Kleiman Websites"). These websites were created before the formation of Computer Forensics or the execution of the Operating Agreement, and, as per the terms of the Agreement, remained in the ownership of David Kleiman and are now the rightful property of David Kleiman's Estate. Upon information and belief David Kleiman never transferred the Kleiman Websites to the ownership of Computer Forensics or any other party, individual, or entity. Upon information and belief, the Kleiman Websites are now in the control of the Defendants and the websites redirect to and mirror www.computerforensicsllc.com.

15.     Upon information and belief, prior to his death, David Kleiman had carried out computer forensic expert services on behalf of multiple clients of Computer Forensics, including conducting such services as an expert in litigation matters. Up to the date of his death (April 26, 2013), David Kleiman had been entitled to distributions based on his percentage of activity or work product, as per the terms of Operating Agreement, attached as Exhibit 2, hereto. After his death,

David Kleiman's estate was entitled to any such distributions for activity conducted or for work product created by David Kleiman while he was alive.  Upon information and belief, subsequent to David Kleiman's death, Patrick Page assumed all client files that had been worked on by David Kleiman, including several litigation matters.

16.    Upon information and belief, in the course of his assumption of said files/matters, Patrick Paige presented some or all of the work that had been conducted by Decedent David Kleiman as his own.   Neither the Estate or the Personal Representative of the Estate of David Kleiman were advised of Paige's activities on David Kleiman's files, and similarly provided no accounting or distributions to Personal Representative Ira Kleiman for activity conducted by or work product created by David Kleiman, and, as such has been deprived of such payments, and have suffered damages as a result.

17.    Similarly, following the death of David Kleiman, Computer Forensics seized control of the Kleiman Websites, and/or converted them to its own use, depriving David Kleiman's estate and Ira Kleiman, as beneficiary, of the use of these websites, or any income derived by Computer Forensics and/or by Conrad and Paige.

18.    Shortly after David Kleiman's passing, Plaintiff also entrusted Computer Forensics and Patrick Paige with a smartphone owned by Decedent, which was provided to these Defendants for the purpose of unlocking the phone (as it was password protected),  in aid of Plaintiff's efforts to develop information as to assets of the Estate.   The phone has never been returned to Plaintiff and Defendant Paige has since claimed that he, a computer forensic consultant, had thrown away the phone after he had dropped the phone and cracked the screen.

19.     As a consequence of the above activities, Plaintiff has sustained damages and seeks relief under law and equity.

**COUNT I**
**CONVERSION OF PROPERTY**
**BELONGING TO PLAINTIFF**
**(AGAINST COMPUTER FORENSICS)**

20.     The allegations of paragraphs 1 through 19 are realleged and incorporated as if fully set forth herein.

21.     As a course of its dealings with David Kleiman, Defendant Computer Forensics has taken illegal possession of the property of David Kleiman, namely certain websites that were created and initially registered by David Kleiman, and which are identified as www.davidakleiman.com and www.davekleiman.com.   In addition, said sites direct traffic to Computer Forensics' own website, which allows Computer Forensics and its principals to benefit from the name and property and David Kleiman.   In addition, the smartphone belonging to David Kleiman has never been returned to Plaintiff and, per Defendant Paige, has been discarded due to a "cracked screen," with no further explanation.

22.     Such acts deprive and continue to deprive David Kleiman's Estate and survivor, the Plaintiff, of the benefit of such property.

23.     The deprivation by Computer Forensics is inconsistent with Plaintiff's ownership rights, in that Defendant has no right to this property, and has benefitted by such illegal conversion.

24.     As a result of such conversion by Computer Forensics, Plaintiff has suffered and continues to suffer damages in relation to being deprived of the use of his property.

WHEREFORE, Plaintiff demands judgment for damages against Defendant plus interest thereon at the legal rate from date such became due, and any such other relief as the Court deems just and proper.

## COUNT II
## CONSTRUCTIVE TRUST
### (As to all Defendants)

25.    The allegations of paragraphs 1 through 19 are realleged and incorporated as if fully set forth herein.

26.    Conrad, Paige, and David Kleiman executed the Computer Forensics Operating Agreement (attached hereto as Exhibit 2) on or before February 13, 2013, whereby the parties agreed, among other things, that gross revenue produced and received by Computer Forensics, LLC would be distributed pursuant to a specific formula: 20% of all gross proceeds would be paid to Computer Forensics for expenses and overhead, and the remaining 80% of proceeds would be distributed to each participating member based on a percentage of activity or work product, proportional to the production of the revenue or income.

27.    David Kleiman was and his estate (and therefore Plaintiff, by operation of the law) remains a one-third owner of Computer Forensics.

28.    Plaintiff has been denied his equal share of Computer Forensics' profits and revenue that has been generated by virtue of Defendants' use of and trading off the David Kleiman name and website without compensation, and which have been distributed to Paige and Conrad.

29.    Equity demands that the Court place a constructive trust over one-third of all past and future profits and assets of Computer Forensics, or portions of any such profits and assets that have been distributed by Computer Forensics to Paige and/or Conrad.

30.     Equity similarly demands that the websites www.davekleiman.com and www.davidakleiman.com be placed in trust for the Plaintiff.

WHEREFORE, Plaintiff demands that a constructive trust be imposed as to the Defendants, to ensure that any and all properties or monies due to Plaintiff are safeguarded, and any other remedy this Court may deem appropriate and just.

**COUNT III**
**PERMANENT INJUNCTION DUE TO BREACH OF OPERATING AGREEMENT**
**AS TO ALL DEFENDANTS**

31.     The allegations of paragraphs 1 through 19 are realleged and incorporated as if fully set forth herein.

32.     As a course of its dealings with David Kleiman, Defendant Computer Forensics has taken illegal possession of the property of David Kleiman, namely certain websites that were created and initially registered by David Kleiman, and which are identified as www.davidakleiman.com and www.davekleiman.com.   In addition, said sites direct traffic to Computer Forensics' own website, which allows Computer Forensics, Paige, and Conrad to benefit from the name and property of David Kleiman.   Further, upon information and belief, David Kleiman created and maintained bitcoin wallets which were his personal property during the time he was a member of Computer Forensics.

33.     Pursuant to the terms of the Operating Agreement at issue, all such property was personal property of David Kleiman and is not property of Computer Forensics or any of its principals.   See Exhibit 2, attached hereto.

34.     By operation of the law, Plaintiff is entitled to receive and control any property of the Decedent, as Decedent's Personal Representative, heir, and beneficiary.

35.     Defendants should be enjoined from further use of any websites that were created by David Kleiman and which are therefore the property of the Estate, heir and beneficiary (the Plaintiff).   To the extent that Computer Forensics, Paige, or Conrad have retained any bitcoin wallets that were the personal property of David Kleiman, Computer Forensics should be enjoined from monetizing, transferring or otherwise converting such bitcoin to its use of the use of its principals or third parties.

WHEREFORE Plaintiff demands judgment for temporary and permanent injunction against Defendant Computer Forensics, enjoining it from further use or operation of any websites of David Kleiman, and from monetizing, transferring or otherwise converting any bitcoin that belonged to David Kleiman to its use of the use of its principals or third parties, and any other remedy this Court may deem appropriate and just.

**COUNT IV**
**ACCOUNTING & INSPECTION OF RECORDS**
**PURSUANT TO SECTION 608.4101 OF THE FLORIDA STATUTES**
**(AS TO COMPUTER FORENSICS)**

36.     The allegations of paragraphs 1 through 19 are realleged and incorporated as if fully set forth herein.

37.     Computer Forensics is a limited liability company that was created on February 13, 2012, and is therefore subject to the Florida Limited Liability Act, which was in effect at the time. See Florida Stat. Section 608 et seq. (2012).

38.     Plaintiff, by operation of law and as personal representative of the Estate of David Kleiman, has now and has had a one-third interest in Computer Forensics, LLC since the passing of David Kleiman.

39.    Fla. Stat. § 608.4101(3) provides that a "limited liability shall furnish to a member, and to the legal representative of a deceased member or member under legal liability: (a) without demand, information concerning the limited liability company's business or affairs reasonably required for the proper exercise of the member's rights and performance of the member's duties under the operating agreement or this chapter."

40.    Plaintiff has learned of a sworn statement filed in federal court earlier this year (February 2017), stating that Patrick Paige presented some or all of the work that had been conducted by Decedent David Kleiman as his own.    Plaintiff had received no prior notification or information regarding this issue from Computer Forensics, and requires a full review of information concerning how David Kleiman's work was used and/or billed for following his death in April 2013, and said information is reasonably required for Plaintiff to exercise his rights as a one third member, as well as to enforce performance of the Operating Agreement executed in February 2013, based on this newly-discovered information.

41.    Fla. Stat. § 608.4101(6) provides that "any action to enforce any right arising under this section shall be brought in the appropriate court," and this action is properly brought in the Circuit Court of Palm Beach County.

42.    Plaintiff requests an accounting of Computer Forensics, to include the production of the following documents, which are reasonably required for Plaintiff to exercise his rights pursuant to Fla. Stat. § 608.4101(3) :

    a.    File materials and work records for all client matters handled by David Kleiman before his death in 2013, including time sheets, or other means of recording his activity and work product;

    b.      Emails issued by David Kleiman on all client matters to allow Plaintiff to assess the Decedent's activity and work product, and calculate distributions that should have been made to decedent and/or his estate.

    c.      Records of any payments received by Computer Forensics for all matters that were assigned to or worked on at any time by David Kleiman;

    d.      Records of distributions made to Paige or Conrad arising out of any matters that were assigned to or worked on at any time by David Kleiman;

    e.      All registrations and/or ownership documents for the website domain www.davidakleiman.com.

    f.      All registrations and/or ownership documents for the website domain www.davekleiman.com.

43.     Plaintiff requests any attorney fees and costs awardable to Plaintiff pursuant to Fla. Stat. § 608, in bringing this action.

WHEREFORE, Plaintiff demands that Computer Forensics provide a complete and transparent accounting and inspection of records of any income generated from any client files assigned to or worked on by David Kleiman, and all other information reasonably required for Plaintiff to exercise his rights as a one third member, as well as to enforce performance of the Operating Agreement, and entry of any other remedy this Court may deem appropriate and just.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

CASE NO. 50-2016-CA-013045-XXXX-MB
Page 12 of 12

## RESERVATION OF RIGHT TO FURTHER AMEND

Plaintiff reserves the right to further amend the Complaint if new information arises via discovery that gives rise to new or enhanced claims against the Defendants.

## PRAYER FOR RELIEF

Plaintiff prays for the following relief: (a) Enter a final judgment in favor of the Plaintiff and against the Defendants on all claims; and (b) Grant any further relief the Court deems proper.

Dated this 18th day of September 2017.

**LUBELL & ROSEN, LLC**
*Attorney for Plaintiff*
*Ira Kleiman, individually and as*
*Personal Representative of the*
*Estate of David Kleiman*
1 Alhambra Plaza, Suite 1410
Coral Gables, Florida 33134
Phone: (305) 655-3425
Fax: (305) 442.9047
Primary:    aml@lubellrosen.com
Secondary:maria@lubellrosen.com

By: *Aldo M. Leiva*
    ALDO M. LEIVA, ESQUIRE
    Florida Bar #116424

NOT A CERTIFIED COPY

NOT A CERTIFIED COPY

EXHIBIT 1

CFN 20160043050
OR BK 28090 PG 1377
RECORDED 02/08/2016 11:13:05
Palm Beach County, Florida
AMT
Sharon R. Bock
CLERK & COMPTROLLER
Pg 1377; (1Pgs)

IN THE CIRCUIT COURT FOR PALM BEACH
COUNTY, FLORIDA      PROBATE DIVISION

IN RE: ESTATE OF

DAVID ALAN KLEIMAN

Deceased.

File No.
502013CP005060XXXXNB

Division IH

**LETTERS OF ADMINISTRATION**
(single personal representative)

TO ALL WHOM IT MAY CONCERN

    WHEREAS, David Alan Kleiman, a resident of Palm Beach County, Florida, died on April 26, 2013, owning assets in the State of Florida, and

    WHEREAS, Ira Steven Kleiman has been appointed personal representative of the estate of the decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate,

    NOW, THEREFORE, I, the undersigned circuit judge, declare Ira Steven Kleiman duly qualified under the laws of the State of Florida to act as personal representative of the estate of David Alan Kleiman, deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will permit and the law directs; and to make distribution of the estate according to law.

    ORDERED on _____ 2-4- _____, 2016.

Circuit Judge

NOT A CERTIFIED COPY

EXHIBIT 2

Computer Forensics, LLC Operating Agreement

This Agreement executed on February 1, 2013 shall strictly state the activity governing Computer Forensics, LLC business operations.

Computer Forensics, LLC shall be owned equally by Carter Conrad, Dave Kleiman, and Patrick Paige. Each individual shall be a Managing Member of Computer Forensics, LLC, with a fiscal year of each calendar year (January to December). Each Managing Member shall possess, and own, a 33.33% interest of Computer Forensics, LLC. Gross revenue produced, and received, by Computer Forensics, LLC shall be distributed as follows: 20% of all gross proceeds shall go to Computer Forensics, LLC for expenses and overhead, the remaining 80% shall be distributed to each participating member based on a percentage of activity or work product, proportional to the production of the revenue or income. Upon the end of the fiscal year, should there be proceeds in excess of operation expenses remaining with in the accounts of Computer Forensics, LLC, each member shall be awarded an equal 33.33% share of income determined not to be bookmarked for expenses, by a majority of the Managing Members. All equipment, software, hardware, or other intellectual property, owned individually by each member shall remain in the ownership of that member. Any equipment, software, hardware, or other intellectual property purchased with Computer Forensics, LLC assets shall be owned by Computer Forensics, LLC, with all provisions as stated above.

This operating agreement shall be enforced from the date noted above and supersedes any and all previous agreements.

So witnessed by our hand and signature below,

_____
Carter Conrad

_____
Dave Kleiman

Digitally signed by Dave Kleiman
DN: cn=Dave Kleiman, o=DaveKleiman.com, ou=forensics, email=dave@davekleiman.com, c=US
Reason: I agree to the terms defined by the placement of my signature on this document
Location: Miami, Florida
Date: 2013.02.13 11:49:54 -05'00'

_____
Patrick Paige

Page 1 of 1

# Overwriting Hard Drive Data: The Great Wiping Controversy

Craig Wright[1], Dave Kleiman[2] and Shyaam Sundhar R.S[3].

[1] BDO Kendalls, Sydney, Australia. Craig.Wright@bdo.com.au,
2 ComputerForensicExaminer.com, Florida, US. dave@davekleiman.com,
3 Symantec, USA, shyaam@gmail.com

**Abstract.** Often we hear controversial opinions in digital forensics on the required or desired number of passes to utilize for properly overwriting, sometimes referred to as wiping or erasing, a modern hard drive. The controversy has caused much misconception, with persons commonly quoting that data can be recovered if it has only been overwritten once or twice. Moreover, referencing that it actually takes up to ten, and even as many as 35 (referred to as the Gutmann scheme because of the 1996 Secure Deletion of Data from Magnetic and Solid-State Memory published paper by Peter Gutmann) passes to securely overwrite the previous data. One of the chief controversies is that if a head positioning system is not exact enough, new data written to a drive may not be written back to the precise location of the original data. We demonstrate that the controversy surrounding this topic is unfounded.

**Keywords:** Digital Forensics, Data Wipe, Secure Wipe, Format

## 1   Introduction

Often we hear controversial opinions on the required or desired number of passes to utilize for properly overwriting, sometimes referred to as wiping or erasing, a modern hard drive. The controversy has caused much misconception, with persons commonly quoting that data can be recovered if it has only been overwritten once or twice. Moreover, referencing that it actually takes up to ten, and even as many as 35 (referred to as the Gutmann scheme because of the 1996 Secure Deletion of Data from Magnetic and Solid-State Memory published paper by Peter Gutmann, [12]) passes to securely overwrite the previous data.

One of the chief controversies is that if a head positioning system is not exact enough, new data written to a drive may not be written back to the precise location of the original data. This track misalignment is argued to make possible the process of identifying traces of data from earlier magnetic patterns alongside the current track.

This was the case with high capacity floppy diskette drives, which have a rudimentary position mechanism. This was at the bit level and testing did not take into account accumulated error.

The basis of this belief is a presupposition is that when a one (1) is written to disk the actual effect is closer to obtaining a 0.95 when a zero (0) is overwritten with one

BEV_00050641



EXHIBIT

5

DEF_00004139

2

(1), and a 1.05 when one (1)  is overwritten with one (1). This we can show is false and that in fact, there is a distribution based on the density plots that supports the contention that the differential in write patterns is too great to allow for the recovery of overwritten data.

The argument arises from the statement that "each track contains an image of everything ever written to it, but that the contribution from each "layer" gets progressively smaller the further back it was made". This is a misunderstanding of the physics of drive functions and magneto-resonance. There is in fact no time component and the image is not layered. It is rather a density plot.

This is of prime importance to forensic analysts and security personal. The time needed to run a single wipe of a hard drive is economically expensive. The requirements to have up to 35 wipes [12] of a hard drive before disposal become all the more costly when considering large organisations with tens of thousands of hosts. With a single wipe process taking up to a day to run per host through software and around an hour with dedicated equipment, the use of multiple wipes has created a situation where many organisations ignore the issue all together – resulting in data leaks and loss.

The inability to forensically recover data following a single wipe makes the use of data wiping more feasible. As forensic and information security professionals face these issues on a daily basis, the knowledge that a single wipe is sufficient to remove trace data and stop forensic recovery will remove a great deal of uncertainty from the industry and allow practitioners to focus on the real issues.

## 1.1  What is Magnetic Force Microscopy[1]

Magnetic force microscopy (MFM) images the spatial variation of magnetic forces on a sample surface. The tip of the microscope is coated with a ferromagnetic thin film. The system operates in non-contact mode, detecting changes in the resonant frequency of the cantilever induced by the magnetic field's dependence on tip-to-sample separation. A MFM can be used to image naturally occurring and deliberately written domain structures in magnetic materials. This allows the device to create a field density map of the device.

## 1.2   MFM imagery of overwritten hard disk tracks

The magnetic field topography (Fig. 2A below) was imaged with an MFM to measure the magnetic force density. This image was captured using the MFM in Lift Mode (lift height 35 nm). This results in the mapping of the shift in the cantilever resonant frequency.

The acquisition time for 1 byte is about 4 minutes (this would improve with newer machines). The image displays the:

- track width and skew.

---

[1] The MFM senses the stray magnetic field above the surface of a sample. A magnetic tip is brought into close proximity with the surface and a small cantilever is used to detect the force between the tip and the sample. The tip is scanned over the surface to reveal the magnetic domain structure of the sample at up to 50 nm resolution.

DEF_00004140

3

- transition irregularities, and
- the difference between written and overwritten areas of the drive.



**Fig. 1.** The concepts of how Partial Response Maximum Likelihood (PRML) (a method for converting the weak analog signal from the head of a magnetic disk or tape drive into a digital signal) (and newer Extended Partial Response Maximum Likelihood (EPRML) drive) encoding is implemented on a hard drive. The MFM reads the unprocessed analog value.  Complex statistical digital processing algorithms are used to determine the "maximum likelihood" value associated with the individual reads.

Because of the misconception, created by much older technologies (such as floppy drives) with far lower densities, many believe that the use of an electron microscope will allow for the recovery of forensically usable data. The fact is, with modern drives (even going as far back as 1990) that this entire process is mostly a guessing game that fails significantly when tested. Older technologies used a different method of reading and interpreting bits than modern hard called *peak detection*. This method is satisfactory while the peaks in magnetic flux sufficiently exceed the background signal noise. With the increase in the write density of hard drives (Fig. 3), encoding schemes based on peak detection (such as Modified Frequency Modulation or MFM) that are still used with floppy disks have been replaced in hard drive technologies. The encoding of hard disks is provided using PRML and EPRML encoding technologies that have allowed the write density on the hard disk to be increased by a full 30-40% over that granted by standard peak detection encoding.

Additionally, hard disk drives use zoned bit recording (Fig 2B) which differs from floppy drives and similar technologies. Older technologies (including floppy disks) used a single zone with a write density that is several orders of magnitude larger than that used with hard disks. We have not tested recovery from a floppy disk using these

BEV_00050641

DEF_00004141

4

methods, but it would be expected that the recovery rate would be significantly greater than with respect of that of a hard disk platter - although still stochastically distributed.

 

A.                                                                                                    B.

**Fig. 2. A.** This image was captured and reconstructed at a 25 µm scan from an Atomic Force Microscope [15]. The image displays the residual from overwrites and alignment.
**Fig. 2. B.** This image from PCGuide.com displays the configuration of a 20 track hard drive. These tracks are separated into five zones which are displayed in a separate color as follows. 5 x 16 sector tracks in the blue zone, 5 x 14 sector tracks in the cyan zone, 4 x 12 sector tracks in the green zone, 3 x 11 sectors tracks in the yellow zone, and 3 x 9 sector tracks in the red.

The fact is many people believe that this is a physical impression in the drive that can belie the age of the impression. This is a misconception that is commonly held as to the process used to measure the magnetic field strength. Using the MFM in Tapping Mode[2], we get a topography image that represents the physical surface of the drive platter.

The magnetic flux density follows a function known as the hysteresis loop. The magnetic flux levels written to the hard drive platter vary in a stochastic manner with variations in the magnetic flux related to head positioning, temperature and random error. The surfaces of the drive platters can have differing temperatures at different points and may vary from the read/write head. This results in differences in the expansion and contraction rates across the drive platters. This differential can result in misalignments. Thermal recalibration is used on modern drives to minimize this variance, but this is still results in an analogue pattern of magnetic flux density.

One of ways used to minimize the resultant error has come through the introduction of more advanced encoding schemes (such as PRML mentioned previously). Rather than relying on differentiating the individual peaks at digital maxima, magnetic flux reversals are measured by hard drive heads and processed using an encoding process (PRML or EPRML) that is based on determining maximum likelihood for the flux value using a digital signal sampling process. Complex statistically based detection algorithms are employed to process the analog

---

[2] Tapping mode can also be called Dynamic Force mode, intermittent contact mode, non-contact mode, wave mode, and acoustic AC mode by various microscope vendors. When operating in tapping mode the cantilever is driven to oscillate up and down at near its resonance frequency by a small piezoelectric element.

DEF_00004142

5

data stream as it is read the disk. This is the "partial response" component. This stochastic distribution of data not only varies on each read, but also over time and with temperature differentials. This issue has only grown as drive densities increase.



**Fig. 3.** This graph from IBM demonstrates how the bit size used with modern hard drives is shrinking. This has resulted in a dramatic increase in the density of hard disks which has resulted in the error rate from movement and temperature remaining an issue even with the improvements in compensating technologies.

A Track is a concentric set of magnetic bits on the disk. Each track is commonly divided into 512 bytes sectors. The drive sector is the part of each track defined with magnetic marking and an ID number. Sectors have a sector header and an error correction code (ECC).

A Cylinder is a group of tracks with the same radius.

Data addressing occurs within the two methods for data addressing:

- CHS (cylinder-head-sector) and
- LBA (logical block address).

The issue from Guttmann's paper [12] is that we can recover data with foreknowledge of the previous values, but not with any level of accuracy. The issues with this are twofold. First, to have any chance of recovery it is necessary to have perfect knowledge of what was previously written to the drive. This situation most often never occurs in a digital forensic investigation. In fact, if a perfect copy of the data existed, there would be no reason to recover data from the wiped drive. Next, the level of recovery when presented with a perfect image is too low to be of use even on a low density pristine drive (which does not exist in any actual environment). Carroll and Pecora (1993a, 1993b) demonstrated this effect and how stochastic noise results in a level of controlled chaos. The Guttmann preposition [12] is true based on a

BEV_00050641

DEF_00004143

6

Bayesian a-prior model assuming that we have the original data and the pattern from the overwrite, but of course this defeats the purpose of the recovery process and as noted is still not sufficiently accurate to be of any use. Stating that we can recover data with a high level of accuracy, given that we have the original data, is a tautology, and there would be no reason to do the recovery.



**Fig. 4.** The hysteresis loop[3] demonstrates the relationship between the induced magnetic flux density (B) and the magnetizing force (H). It is often referred to as the B-H loop. This function varies with a number of prevalent conditions including temperature.

The previously mentioned paper uses the determination that the magnetic field strength is larger or smaller than that which would be expected from a write suggests the prior overwritten value. This is that a factored magnetic field strength of 0.90 or 1.10 (where 1.0 is a "clean" write with no prior information) would represent the previous information written to the drive that has been overwritten. This is postulated to be a means through which the use of an electron microscope could be deployed to recover data from a drive that has been wiped. The problem with this theory is that there are both small write errors on an unwritten sector and remnant magnetic field densities from prior use of the drive sector.

Magnetic signatures are not time-stamped, accordingly there is no "unerase" capability [15]. Figure 4 displays the B-H loop for magnetic flux. Starting at a zero flux density for a drive platter that has not been previously magnetized, the induced flux density created when the drive head writes to the platter follows the dashed line (displayed in Fig. 4) as the magnetizing force is increased. Due to a combination of power constraints, timing issues and write density, modern hard drives do not saturate the magnetic flux on the drive to point "a". Rather, they use sophisticated statistical

---

[3] Image sourced from Iowa's State University Center for Nondestructive Evaluation NDT (Non Destructive Testing).

DEF_00004144

7

measures (PRML and EPRML) to determine the maximum likelihood of the value stored on the drive. In demagnetizing a drive (reducing H to zero) the curve moves from point "a" to point "b" on Figure 4. Some residue from the prior magnetic flux remains in the material even though the magnetizing force is zero. This phenomenon is known as remanence. The retentivity of disk platter will not reach the maxima (defined by points "b" and "d" in figure 4) as the drive heads do not reach saturation. Further, fluctuations in temperature, movement and prior writes influence the permeability[1] of the platter. Jiles [21] notes that in the event that the temperature of a drive platter is increased from, 20 to 80 centigrade then a typical ferrite can become subject to a 25% reduction in the in permeability of the platter.

 

Fig. 5. This example displays the experimentally derived magnetic field density functions for hard drive rewrites where "A" displays the measured distribution of binary "1" values on initial copy. "B" displays the distribution of values associated with a binary "1" value following an overwrite with another binary "1".

Consequently, the B-H curve does not go back to the originating point when the magnetic flux is rewritten and the B-H curve will vary with use due to temperature fluctuations. On subsequent writes the hysteresis curve follows a separate path from position "f" in Figure 4. As drive heads to not cause the hard drive platter to reach the saturation point, the resultant B-H loop will vary on each write.

A common misconception concerning the writing of data to a hard drive arises as many people believe that a digital write is a digital operation. As was demonstrated above, this is a fallacy, drive writes are analogue with a probabilistic output [6], [8], [10]. It is unlikely that an individual write will be a digital +1.00000 (1). Rather - there is a set range, a normative confidence interval that the bit will be in [15].

What this means is that there is generally a 95% likelihood that the +1 will exist in the range of (0.95, 1.05) there is then a 99% likelihood that it will exist in the range (0.90, 1.10) for instance. This leaves a negligible probability (1 bit in every 100,000

---

[1] Permeability is a material property that is used to measure how much effort is required to induce a magnetic flux within a material. Permeability is defined the ratio of the flux density to the magnetizing force. This may be displayed with the formula: $\mu = \mathbf{B/H}$ (where $\mu$ is the permeability, B is the flux density and H is the magnetizing force).

DEF_00004145

8

billion or so) that the actual potential will be less than 60% of the full +1 value. This error is the non-recoverable error rating for a drive using a single pass wipe [19].



**Fig. 6 (A and B). This** example displays the magnetic field density functions that were experimentally obtained following a rewrite (wipe) of the prior binary unit on the hard drive. Plot "A" displays the density distribution associated with "1" values following an overwrite with a "0". Plot "B" displays the density function for an initial "0" value that has been overwritten with a "1".

As a result, there is no difference to the drive of a 0.90 or 1.10 factor of the magnetic potential. What this means is that due to temperature fluctuations, humidity, etc the value will most likely vary on *each* and *every* pass of a write. The distributions of these reads are displayed as histograms in Fig. 5. The distribution is marginally different to the original, but we cannot predict values. From Fig. 6 it is simple to see that even with the prior data from the initial write we gain little benefit. These images display the differences in the voltage readings of the drives (which are determined through the magnetic field strength). Clearly, some values that are more distantly distributed than would be expected in the differenced results (Fig. 6 B) with voltage values that are significantly greater then are expected. The problem is that the number of such readings is far lower than the numbers that result through shear probability alone.

Resultantly, there is no way to even determine if a "1.06" is due to a prior write or a temperature fluctuation. Over time, the issue of magnetic decay would also come into play. The magnetic flux on a drive decays slowly over time. This further skews the results and raises the level of uncertainty of data recovery.

Consequently, we can categorically state that there is a minimal (less than a 0.01% chance) of recovering any data on a NEW and unused drive that has a single raw wipe pass (not even a low-level format). In the cases where a drive has been used (even being formatted for use) it is not possible to recover the information – there is a small chance of bit recovery, but the odds of obtaining a whole word are small.

The improvement in technology with electron microscopes will do little to change these results. The error from microscope readings was minimal compared to the drive error and as such, the issue is based on drive head alignment and not the method used for testing.

DEF_00004146

9

## 1.3 Read Error Severities and Error Management Logic

A sequence of intricate procedures are performed by the hard drive controller in order to minimise the errors that occur when either writing data to or reading data for a drive. These processes vary with each hard drive producer implementing their own process. Some of the most common error management processes have been listed below.

**ECC Error Detection**: A drive sector is read by the head. An error detection algorithm is used to determine the likelihood of a read error. In the event that an error state is considered to be unlikely, the sector is processed and the read operation is considered as having been concluded successfully.

**ECC Error Correction**: The controller uses the ECC codes that it has interpreted for the sector in order to try and correct the error. A read error can be corrected very quickly at this level and is usually deemed to be an "automatic correction".

**Automatic Retry**: The next phase involves waiting until the drive platter has completed a full spin before attempting to read the data again. Stray magnetic field variances are a common occurrence leading to drive read error. These fluctuations may result due to sudden movement and temperature variations. If the error is corrected following a retry, most drives will judge the error condition to be "corrected after retry".

**Advanced Error Correction**: Many drives will, on subsequent retries after the first, invoke more advanced error correction algorithms that are slower and more complex than the regular correction protocols, but have an increased chance of success. These errors are "recovered after multiple reads" or "recovered after advanced correction".

**Failure**: In the event that the drive is incapable of reading the sector, a signal is sent to the drive controller noting a read error. This type of failure is an unrecoverable read error.

Modern encoding schemes (PRML and EPRML) have a wide tolerance range allowing the analogue values that the drive head reads from and writes to a hard disk to vary significantly without loss of data integrity. Consequently, the determination of a prior write value is also a stochastic process.

## 2 Data and method

In order to completely validate all possible scenarios, a total of 15 data types were used in 2 categories. Category A divided the experiment into testing the raw drive (this is a pristine drive that has never been used), formatted drive (a single format was completed in Windows using NTFS with the standard sector sizes) and a simulated used drive (a new drive was overwritten 32 times with random data from /dev/random on a Linux host before being overwritten with all 0's to clear any residual data).

The experiment was also divided into a second category in order to test a number of write patterns. Category B consisted of the write pattern used both for the initial write and for the subsequent overwrites. This category consisted of 5 dimensions:

- all 0's,
- all 1's,

DEF_00004147

10

- a "01010101" pattern,
- a "00110011" pattern, and
- a "00001111" pattern.

The Linux utility "dd" was used to write these patterns with a default block size of 512 (bs=512). A selection of 17 models of hard drive where tested (from an older Quantum 1 GB drive to current drives dated to 2006). The data patterns where written to each drive in all possible combinations.

1. The data write was a 1 kb file (1024 bits).
2. Both drive skew and the bit was read.
3. The process was repeated 5 times for an analysis of 76,800 data points.

The likelihood calculations were completed for each of the 76,800 points with the distributions being analyzed for distribution density and distance. This calculation was based on the Bayesian likelihood where the prior distribution was known. As has been noted, in real forensic engagements, the prior distribution is unknown. This presents this method with an advantage to recovering the data that would not be found when conducting a forensic examination and recovery of a drive.

Even on a single write, the overlap at best gives a probability of just over 50% of choosing a prior bit (the best read being a little over 56%). This caused the issue to arise, that there is no way to determine if the bit was correctly chosen or not. Therefore, there is a chance of correctly choosing any bit in a selected byte (8-bits) – but this equates a probability around 0.9% (or less) with a small confidence interval either side for error.

Resultantly, if there is less than a 1% chance of determining each character to be recovered correctly, the chance of a complete 5-character word being recovered drops exponentially to 8.463E-11 (or less on a used drive and who uses a new raw drive format). This results in a probability of less than 1 chance in 10Exp50 of recovering any useful data. So close to zero for all intents and definitely not within the realm of use for forensic presentation to a court.

Table 1 below, shows the mapped out results of probable recovery with a pristine drive of a similar make and model[5] to that which would have been used in the paper by Dr. Gutmann. This drive had never been used and was had raw data written to it for the first time in this test. The other drive was a newer drive[6] that has been used (I used this for my daily operations for 6 months) prior to the wiping procedure. A total of 17 variety of drives dated from 1994 to 2006 of both the SCSI and IDE category where tested for this process. A total of 56 drives where tested. On average only one (1) drive in four[7] (4) was found to function when the platter had been returned after an initial reading with the MFM.

## 3    Data Relationships

The only discernable relationship of note is between an initial write of a "1" on a pristine drive that is overwritten with a "0". This is a function of the drive write head

---

[5] SEAGATE: ST51080N MEDAL 1080 1080MB 3.5"/SL SCSI2 FAST

[6] Western Digital WD1200JS

[7] 23.5% of drives where able to be used for an overwrite following an initial MFM scan.

DEF_00004148

and has no correlation to data recovery, so this is a just point of interest and noting to aid in data extraction from a forensic perspective. All other combinations of wipes displayed comparative distributions of data that where suggestive of random white noise.

## 3.1   Distributions of Data

The tables used in this section display the probabilities of recovery for each of the drives tested. Although the chances of recovering any single bit from a drive are relatively good, the aim in any forensic engagement is to recover usable data that can be presented in court.

**Table 1.** Table of Probability Distributions for the older model drives. Note that a "used" drive has only a marginally better chance of any recovery than tossing a coin. The Pristine drive is the optimal case based on an early Seagate 1Gb drive.

| Probability of recovery | Pristine drive | Used Drive (ideal) |
|---|---|---|
| 1 bit | 0.92 | 0.56 |
| 2 bit | 0.8464 | 0.3136 |
| 4 bit | 0.71639296 | 0.098345 |
| 8 bits[8] | 0.51321887 | 0.009672 |
| 16 bits | 0.26339361 | 9.35E-05 |
| **32 bits** | **0.06937619** | **8.75E-09** |
| 64 bits | 0.00481306 | 7.66E-17 |
| 128 bits | 2.3166E-05 | 5.86E-33 |
| 256 bits | 5.3664E-10 | 3.44E-65 |
| 512 bits | 2.8798E-19 | 1.2E-129 |
| 1024 bits | 8.2934E-38 | 1.4E-258 |

These tests where run as a series of 4 tests on each of 17 types of drives. The reported (Table 1) recovery rate of 92% this was the optimal rate (which was itself stochastically distributed). The results were in distributed over a wide range of values with the use of the drive impacting on the capacity to recover data.

This clearly shows that any data recovery is minimal and that no forensically sound recovery is possible. The recovery of a single 32 bit value (such as an IP address) is highly unlikely. It has been stated[9], that the smallest fragment of usable digital forensic evidence is a 32 bit field (the IP address). To be used in a Civil court case, the evidence needs to be subjected to the balance of probability (usually 51%). In a criminal matter, the preponderance is set at between 95% and 99% to account for all reasonable doubt. The rate at which evidence may be recovered using this technique is too low to be useful. In fact, with the optimal recovery under 7% for a single IP address on an older drive. This is an event that cannot occur outside the lab.

The bit-by-bit chance of recovery lies between 0.92 (+/- 0.15)[10] and 0.54 (+/- 0.16)[11]. We have used the higher probability in the calculations to add an additional

---

[8] This represents one (1) ASCII character.

[9] Rob Lee, SANS Forensics 508

[10] For the optimal recovery on an old drive.

[11] On a used "new" drive.

DEF_00004149

12

level of confidence in our conclusions. This demonstrates that the chances of recovering a single 8-bit character on the pristine drive are 51.32%. The recovery rate of a 32-bit word is 0.06937619 (just under 7%). As such, the chances of finding a single 4 letter word correctly from a Microsoft Word document file is 2.3166E-05 (0.00002317%)

**Table 2.** Table of Probability Distributions for the "new" model drives.

| Probability of recovery | Pristine drive (plus 1 wipe) | Pristine drive (plus 3 wipe) |
|---|---|---|
| 1 bit | 0.87 | 0.64 |
| 2 bit | 0.7569 | 0.4096 |
| 4 bit | 0.57289761 | 0.16777216 |
| 8 bits | 0.328211672 | 0.028147498 |
| 16 bits | 0.107722901 | 0.000792282 |
| **32 bits** | **0.011604223** | **6.2771E-07** |
| 64 bits | 0.000134658 | 3.9402E-13 |
| 128 bits | 1.81328E-08 | 1.55252E-25 |
| 256 bits | 3.28798E-16 | 2.41031E-50 |
| 512 bits | 1.08108E-31 | 5.8096E-100 |
| 1024 bits | 1.16873E-62 | 3.3752E-199 |

Table 2 below is a table that further illustrates the wiping fallacy. We tested this by completing a single pass wipe, to simulate minimal use we repeated the process.

Once again, we can see the data recovery is minimal.

The standard daily use of the drive makes recovery even more difficult, without even considering a wipe, just *prior* use. In this case, the 3 former wipes are used to simulate use (though minimal and real use is far more intensive). The chances of recovering a single 8-bit word (a single character) are 0.0281475 (or 2.8%) – which is actually lower than randomly selecting the character.

The calculated probability of recovering data from any used drive that uses a newer encoding scheme (EPRML) and high density was indistinguishable from a random guess. When recovering data from the 2006 model drive, the best determination of the prior write value was 49.18% (+/- 0.11)[12] from the "all 0's" pattern when overwritten with the "all 1's" pattern. The other overwrite patterns actually produced results as low as 36.08% (+/- 0.24). Being that the distribution is based on a binomial choice, the chance of guessing the prior value is 50%. In many instances, using a MFM to determine the prior value written to the hard drive was less successful than a simple coin toss.

### 3.2 Distribution of recovered data

The following is a retrieval pattern from the drive. Where the 8-bit word is correctly read, a "1" is listed. Where the value did not match the correct pattern that was written to the drive, a "0" is displayed.



---

[12] This is reported at a 99% confidence level.

DEF_00004150

13

[1 0 1 1 0 ...binary data block...]

As an example, the following is the start of the paper by Peter Gutmann [12], first displayed accurately, and next at an optimal retrieval level.

### 3.2.1 Correct display

*Secure deletion of data - Peter Gutmann - 1996*

*Abstract*

*With the use of increasingly sophisticated encryption systems, an attacker wishing to gain access to sensitive data is forced to look elsewhere for information. One avenue of attack is the recovery of supposedly erased data from magnetic media or random-access memory.*

### 3.2.2 Display from recovery (optimal)

‰
'cKræ‡d8ÇEeti²n•of0daË10Ptr0G§t1VÇit  !»Å1u960eb8tÈñutlV00000lDç□Î#Î
0
H/S00`000%£z0`0ã0000ã0ãà«it tpÛ0u'e□Ef°î™%|eàsinqTyøiopÙ''È:i‡aze0
®Mcryption0siÛtems?DKtÀ''cÐJ0+çsin(E0toK~ai2z+c(ns~0ttó0;e
¹zitie'''dà.Eä~s0foóce¸ÑtÒll2o
iell¶'Seöe>Yr'''inf~rm‰ion.0OnRtavem~egoN0~tRÂ''1i
      läβh=0''eÛoìe~y0C'z-
su□|s~1Ù¦era¹Jd0dataF~ro>□magne';&£õãÉàã%or*r%»ndo°-Qcc«ÇÝ0mà
@ryl00000000000000000

Although on the perfect drive some words could be recovered, there is little of forensic value.

### 3.2.3 Display from recovery (expected)

¿АuÛtÐdMã°''''îFnFã:à□ÀÒÎ¹:¹L:¿öPÙ!!!¨~×I,'ÙÆ!mC
2³»¸‡ ¡NŽÿ̃ñẽZÒ^¹Ù©pì® ãOÇEv¿°æ°0TI∫TÍŸBs,ð
7zö¹»öèO¹'''''¡̧ò̧À‡¸kR¿xt, ~Ì2SÍã'''¨ÑÙ%TõÀ¹OoxÈSt
WÍ̧^™ĸoÈS²Ç,Ȩ́%ñ OeS» euB¥Ek¸ YrÍȨ̀¶~ÍlSÂ¸opÝD
õÈŽ''ñÙ¸16¸æ~ÙÙ¸§µMc;Öæ•ÍÍMÀ̃ñæç̧#□Q
_____~î̧Ù'''' ~OX''h
ÍvkÈùÈ`Ā''WS5À~rB+5•ö~GβÛá9õ̃Ne-β Yä¨~i%×Ò¿Ò̧[Mãu
†Í¸f¸¸¸¡À¸KÐmFJ¨×¸ÁŒ¿êad¸sPOì8'v0æ#¹)ÝÐù¸E©
k~¹HÀ¹oS°□O°Ìm¸Wìc@¿Ù»Î'',zbip00000000000000000

DEF_00004151

14

On the drive that had been wiped 3 times (prior) to the data being written and then added, the results are worse. What needs to be noted is that small errors in the calculations lead to wide discrepancies in the data that is recovered. Further, it needs to be noted that any drive recovered is not likely to be in a pristine state. The daily use of a drive reduces the chances of recovery to a level that is truly insignificant.

## 4    Conclusion

The purpose of this paper was a categorical settlement to the controversy surrounding the misconceptions involving the belief that data can be recovered following a wipe procedure. This study has demonstrated that correctly wiped data cannot reasonably be retrieved even if it is of a small size or found only over small parts of the hard drive. Not even with the use of a MFM or other known methods. The belief that a tool can be developed to retrieve gigabytes or terabytes of information from a wiped drive is in error.

Although there is a good chance of recovery for any individual bit from a drive, the chances of recovery of any amount of data from a drive using an electron microscope are negligible. Even speculating on the possible recovery of an old drive, there is no likelihood that any data would be recoverable from the drive. The forensic recovery of data using electron microscopy is infeasible. This was true both on old drives and has become more difficult over time. Further, there is a need for the data to have been written and then wiped on a raw unused drive for there to be any hope of any level of recovery even at the bit level, which does not reflect real situations. It is unlikely that a recovered drive will have not been used for a period of time and the interaction of defragmentation, file copies and general use that overwrites data areas negates any chance of data recovery. The fallacy that data can be forensically recovered using an electron microscope or related means needs to be put to rest.

## References

1.   Abramowitz, M., & Stegun, I. A. (1965), "Handbook of Mathematical Functions" (Dover, New York).
2.   Amit, D. J., (1984), "Field Theory", The Renormalization Group and Critical Phenomena (World Scientific, Singapore).
3.   Braun, H. B. (1994) "Fluctuations and instabilities of ferromagnetic domain-wall pairs in an external magnetic field", Phys. Rev. B. 50 (1994), 16485–16500.
4.   Brown, G., Novotny, M. A. & Rikvold, P. A. (2001) "Thermal magnetization reversal in arrays of nanoparticles", J. Appl. Phys. 89, 7588–7590.
5.   Bulsara, A., S. Chillemi, L. Kiss, P. V. E. McClintock, R. Mannella, F. Marchesoni, G. Nicolis, and K. Wiesenfeld, (1995), Eds., "International Workshop on Fluctuations in Physics and Biology: Stochastic Resonance, Signal Processing and Related Phenomena", published in Nuovo Cimento 17D, 653.
6.   Carroll, T. L., &Pecora, L. M. (1993a), Phys. Rev. Lett. 70, 576.
7.   Carroll, T. L., & Pecora, L. M. (1993b), Phys. Rev. E 47, 3941.
8.   Gomez, R., A. Adly, I. Mayergoyz, E. Burke, (1992), "Magnetic Force Scanning Tunnelling Microscope Imaging of Overwritten Data", IEEE Transactions on Magnetics, (28/5), 3141.

9.  Gammaitoni L., Ha¨nggi P., Jung P., & Marchesoni F. (1998) "Stochastic resonance", Reviews of Modern Physics, Vol. 70, No. 1, January 1998, The American Physical Society

10. Gomez, R., E.Burke, A. Adly, I. Mayergoyz, J. Gorczyca. (1993). "Microscopic Investigations of Overwritten Data", Journal of Applied Physics, (73:10), 6001.

11. Grinstein G. & Koch, R. H. (2005) "Switching probabilities for single-domain magnetic particles, to appear" Phys. Rev. B 71, 184427, USA

12. Gutmann, P. (1996) "Secure Deletion of Data from Magnetic and Solid-State Memory", Proceedings of the Sixth USENIX Security Symposium. July 22-25, San Jose, CA., 77-90. (http://www.cs.auckland.ac.nz/~pgut001/pubs/secure_del.html)

13. Ha¨nggi, P., and R. Bartussek, (1996), in Nonlinear Physics of Complex Systems: "Current Status and Future Trends", edited by J. Parisi, S. C. Mu¨ ller, and W. Zimmermann, Lecture Notes in Physics 476 (Springer, Berlin, New York), p. 294.

14. Liu, D. (2003) "Topics in the Analysis and Computation of Stochastic Differential Equations", Ph. D. thesis, Princeton University.

15. Mayergoyza, I.D., Tse, C., Krafft, & C., Gomez, R. D. (2001) "Spin-stand imaging of overwritten data and its comparison with magnetic force microscopy", JOURNAL OF APPLIED PHYSICS VOLUME 89, NUMBER 11

16. Moss, F., (1994), in Contemporary Problems in Statistical Physics, edited by G. H. Weiss (SIAM, Philadelphia), pp. 205–253.

17. Ren, W. E, W. & Vanden-Eijnden, E. (2003) "Energy landscape and thermally activated switching of submicron-size ferromagnetic elements", J. Appl. Phys. 93, 2275–2282.

18. Reznikoff, M. G. (2004) "Rare Events in Finite and Infinite Dimensions", Ph. D. thesis, New York University.

19. Rugar, D. H. Mamin, P. Guenther, S. Lambert, J. Stern, I. McFadyen, and T. Yogi. (1990). "Magnetic Force Microscopy: General Principles and Application to Longitudinal Recording Media", Journal of Applied Physics, (68:3), 1169

20. Nikola Tesla *The Great Radio Controversy*. http://en.wikipedia.org/wiki/Invention_of_radio

21. Jiles, David, (1998) *"Introduction to magnetism and magnetic materials"*, 2nd. Ed., Chapman & Hall

DEF_00004153

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Civil Action No. 18-cv-80176-BLOOM-Hopkins

IRA KLEIMAN, as the personal
representative of the Estate of David
Kleiman, and W&K Info Defense
Research, LLC

        *Plaintiffs,*

vs.

CRAIG WRIGHT,

        *Defendant.*

## PLAINTIFFS' RULE 26 (A)(1) SECOND AMENDED INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Plaintiffs Ira Kleiman as personal representative of the estate of David Kleiman, and W&K Info Defense Research, LLC ("W&K") provide the following second amended initial disclosures:

## PRELIMINARY STATEMENT

These disclosures are based upon information available to Plaintiffs as of the date of this document. By making these disclosures, Plaintiffs do not represent they are identifying each and every document, individual, or other evidence they may use in support of their claims. Rather, Plaintiffs have made a good faith effort to gather and provide information subject to disclosure under Rule 26(a)(1) and Plaintiff reserves the right to supplement or modify these disclosures as additional information is discovered.

These disclosures are also not intended to waive any right to object to the production of any document or tangible thing disclosed on the basis of any privilege, work-product doctrine, relevancy, undue burden, or any other valid objection. No incidental or implied admissions are intended by the disclosures herein.



EXHIBIT

6

1/16/20

A.    **Individuals Plaintiffs may use to support their claims (Fed. R. Civ. P. 26(a)(1)(A)(i))**

Plaintiffs' investigation is ongoing and Plaintiff reserves the right to supplement the list of individuals disclosed below. Plaintiff provides the name and, if known, the likely address and/or location and telephone number of each individual likely to have discoverable information that Plaintiff may use to support his claims or defenses, unless solely for impeachment, identifying the subjects of the information, as follows:

1. **Ira Kleiman, Plaintiff.** Information related to Craig Wright ("Craig") and David Kleiman's ("Dave") collaboration on creating Bitcoin, mining bitcoins, and developing valuable intellectual property, as well as Craig's subsequent theft of these assets. Mr. Kleiman may be contacted through undersigned counsel.

2. **Craig Wright, Defendant.** Information related to the relationship between himself, Dave, and W&K, including the extent and nature of Dave and Craig's partnership and collaboration in creating Bitcoin, mining bitcoins, and developing various valuable intellectual properties/trade secrets, and the agreements understandings, and ownership structure that arose from those collaborations and partnerships; the actions taken by Craig before and after the time Dave died to take control over bitcoins, intellectual property, and trade secrets belonging to Dave's estate and/or W&K; how Craig has subsequently used and/or saved these assets; and various trusts where Plaintiffs' bitcoins may be held; and the actual and constructive fraud perpetuated by Craig against Plaintiffs. Craig may be contacted care of his counsel.

3. **Patrick Paige**. Information related to Craig and Dave's collaboration in creating Bitcoin, mining bitcoins, and Craig's use of intellectual property developed by Dave. Mr. Paige's office is located at 933 S. Military Trl., Suite E8, West Palm Beach, Florida 33415. His

phone number is 561.404.3074.

4. **Carter Conrad**. Information related to Craig and Dave's collaboration in creating Bitcoin, mining bitcoins, and Craig's use of intellectual property developed by Dave. Mr. Conrad's office is located at 933 S. Military Trl., Suite E8, West Palm Beach, Florida 33415.

5. **Global Institute of Cyber Security Research ("GICSR")**. Information related to Craig and Dave's collaboration in creating Bitcoin, mining bitcoins, and Craig's use of intellectual property developed by Dave; how Craig has subsequently used and/or saved these assets; and various trusts where Plaintiffs' bitcoins may be held. GICSR's office is located at the Kennedy Space Center in Merritt Island, Florida 32920.

6. **Deborah Kobza.** Information related to Craig and Dave's collaboration in creating Bitcoin, mining bitcoins, and Craig's use of intellectual property developed by Dave; how Craig has subsequently used and/or saved these assets; and various trusts where Plaintiffs' bitcoins may be held. Ms. Kobza is located in Merritt Island, Florida.

7. **Uyen Nguyen**. Information related to the relationship between Craig, Dave, and W&K, including the extent and nature of their partnership and collaboration in creating Bitcoin, mining bitcoins, and developing various valuable intellectual properties/trade secrets, and the agreements understandings, and ownership structure that arose from those collaborations and partnerships; the actions taken by Craig to take control over bitcoins, intellectual property, and trade secrets belonging to Dave's estate and/or W&K; how Craig has subsequently used and/or saved these assets; and various trusts and wallets where Plaintiffs' bitcoins may be held. Ms. Nguyen is located in California.

8. **Gavin Andresen.** Information related to the relationship between Craig, Dave, and W&K, including the extent and nature of their partnership and collaboration in creating Bitcoin,

mining bitcoins, and developing various valuable intellectual properties/trade secrets; the actions taken by Craig to take control over bitcoins, intellectual property, and trade secrets belonging to Dave's estate and/or W&K; how Craig has subsequently used and/or saved these assets; and various trusts and/or wallets where Plaintiffs' bitcoins may be held. Mr. Andresen is located in Springfield, Massachusetts.

9. **Bob Radvanovky.** Information related to the formation and purpose of W&K and its activities. Mr. Radvanovky's phone number is ████████████

10. **Kourtney Karr.** Information related to Craig and Dave's collaboration in creating Bitcoin and mining bitcoins. Ms. Karr is located in Florida.

11. **Joseph Karp.** Information related to Craig and Dave's collaboration in creating Bitcoin, mining bitcoins, and Craig's use of intellectual property developed by Dave; how Craig has subsequently used and/or saved these assets; various trusts where Plaintiffs' bitcoins may be held; and the actual and constructive fraud perpetuated by Craig against Plaintiffs. Mr. Karp's offices are located at 2875 PGA Blvd., Suite 100 Palm Beach Gardens, FL 33410.

12. **David Kuharcik.** Information related to Dave's financial condition and Craig and Dave's collaboration in creating Bitcoin, mining bitcoins, and various trusts where Plaintiffs' bitcoins may be held. Mr. Kuharcik is located at ████████████████████, North Palm Beach, Florida ██████ and his phone number is ████████████

13. **Andrew O'Hagan**. Information related to the relationship between Craig, Dave, and W&K, including the extent and nature of their partnership and collaboration in creating Bitcoin, mining bitcoins, and developing various valuable intellectual properties/trade secrets, and the agreements understandings, and ownership structure that arose from those

collaborations and partnerships; the actions taken by Craig before and after Dave died to take control over bitcoins, intellectual property, and trade secrets belonging to Dave's estate and/or W&K; how Craig has subsequently used and/or saved these assets; and various trusts where Plaintiffs' bitcoins may be held. Mr. O'Hagan is located in London, England.

14. **Ramona Watts.** Information related to the relationship between Craig, Dave, & W&K, including the extent and nature of their partnership and collaboration in creating Bitcoin, mining bitcoins, and developing various valuable intellectual properties/trade secrets, and the agreements understandings, and ownership structure that arose from those collaborations and partnerships; the actions taken by Craig before and after the time Dave died to take control over bitcoins, intellectual property, and trade secrets belonging to Dave's estate and/or W&K; how Craig has subsequently used and/or saved these assets; and various trusts where Plaintiffs' bitcoins may be held; and the actual and constructive fraud perpetuated by Craig against Plaintiffs. Ms. Watts can be contacted at ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Surrey, ▮▮▮▮▮ England.

15. **Jimmy Nguyen.** Information related to the relationship between Craig, Dave, & W&K, including the extent and nature of their partnership and collaboration in creating Bitcoin, mining bitcoins, and developing various valuable intellectual properties/trade secrets, and the agreements understandings, and ownership structure that arose from those collaborations and partnerships; the actions taken by Craig before and after the time Dave died to take control over bitcoins, intellectual property, and trade secrets belonging to Dave's estate and/or W&K; how Craig has subsequently used and/or saved these assets; and various trusts where Plaintiffs' bitcoins may be held; and the actual and constructive

fraud perpetuated by Craig against Plaintiffs. Mr. Nguyen is the CEO of nChain, whose registered office address is Coddan Cpm, 3rd Floor 120 Baker Street, London, England, W1U 6TU.

16. **Robert MacGregor.** Information related to the relationship between Craig, Dave, & W&K, including the extent and nature of their partnership and collaboration in creating Bitcoin, mining bitcoins, and developing various valuable intellectual properties/trade secrets, and the agreements understandings, and ownership structure that arose from those collaborations and partnerships; the actions taken by Craig before and after the time Dave died to take control over bitcoins, intellectual property, and trade secrets belonging to Dave's estate and/or W&K; how Craig has subsequently used and/or saved these assets; various trusts Plaintiffs' bitcoins may be held; and the actual and constructive fraud perpetuated by Craig against Plaintiffs. Mr. MacGregor is located in England.

17. **Jamie Wilson**. Information related to the relationship between Craig, Dave, & W&K, including the extent and nature of their partnership and collaboration in creating Bitcoin, mining bitcoins, and developing various valuable intellectual properties/trade secrets, and the agreements understandings, and ownership structure that arose from those collaborations and partnerships; the actions taken by Craig before and after the time Dave died to take control over bitcoins, intellectual property, and trade secrets belonging to Dave's estate and/or W&K; how Craig has subsequently used and/or saved these assets. Mr. Wilson is located in Sydney Australia.

18. **Jonathan Warren**. Information related to Bitmessage. Mr. Warren is located in New York.

19. **Brenden Sullivan.** Information related to Craig's admissions related to bitcoin, Dave

Kleiman, and trusts. Mr. Sullivan is located in New York.

**B.     Documents in Plaintiff's Custody, Possession or Control that May Be Used to Support His Claims (Fed. R. Civ. P. 26(a)(1)(A)(ii))**

Plaintiffs' investigation is ongoing and Plaintiffs reserves the right to supplement the list of categories disclosed below.  Plaintiffs provides the following description by category and location (Plaintiffs' counsel's office) of all documents, data compilations, and tangible things in their possession, custody, or control that they  may use to support their claims or defenses, unless solely for impeachment as follows:

1.  Documentation Plaintiffs attached to the complaint and amended complaint filed in this action;

2.  Documentation received from the court of New South Wales relating to Craig and Plaintiffs' bitcoins, relationship, intellectual property, trade secrets, and Craig's claims and actions related to them;

3.  Documentation received from the Australian Tax Office relating to Craig and Plaintiffs' bitcoins, relationship, intellectual property, trade secrets, and Craig's claims and actions related to them;

4.  Documentation received from Craig.

5.  Documents received from third parties subpoenaed in this litigation

**C.     Damages (Fed. R. Civ. P. 26(a)(1)(A)(iii))**

Plaintiffs' investigation is ongoing and Plaintiffs reserve the right to supplement the information provided concerning damages.  As set forth in the Amended Complaint, Plaintiffs have suffered significant damages in the form of Craig having stolen their bitcoins and intellectual property rights. During the time these assets were, and are, held by Craig, they have been worth between ~$201,728,340.04 and more than $27,332,125,781.68, before punitive or treble damages and exclusive of attorney's fees and costs. Plaintiffs have also been damaged as a result of Craig's actual and constructive fraud, but have not yet calculated the precise amount of those damages. Plaintiffs have not yet identified an expert or experts to be called to testify as to damages at trial

and to assist in the calculation of the amount of damages Plaintiff will seek at trial. As discovery in this matter has not yet commenced, Plaintiffs will supplement this initial disclosure statement with any additional information uncovered regarding damages.

**D.      Insurance Agreements (Fed. R. Civ. P. 26(a)(1)(A)(iv))**

Plaintiffs are not aware of any insurance agreement under which any insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

**E.      Reservation of Rights**

Discovery is ongoing. Plaintiffs reserve: (a) their right to supplement any information in this disclosure; (b) all objections to the admissibility of documents and/or witnesses disclosed by any party; and (c) their right to use as evidence any documents and/or witness testimony disclosed by any party or filed in this action.

Dated: January 5, 2020                     Respectfully submitted,

                                           *s/ Velvel (Devin) Freedman*
                                           Velvel (Devin) Freedman, Esq.
                                           **ROCHE FREEDMAN LLP**
                                           200 S. Biscayne Blvd, Suite 5500
                                           Miami, Florida 33131
                                           Telephone: (305) 357-3861
                                           vel@rochefreedman.com
                                           nbermond@rochefreedman.com

                                           Kyle W. Roche, Esq.
                                           Joseph M. Delich, Esq.
                                           *Admitted Pro Hac Vice*
                                           **ROCHE FREEDMAN LLP**
                                           185 Wythe Avenue F2
                                           Brooklyn, NY 11249
                                           kyle@rochefreedman.com
                                           jdelich@rochefreedman.com

                                           Andrew S. Brenner, Esq.
                                           **BOIES SCHILLER FLEXNER LLP**
                                           100 SE 2nd Street, Suite 2800
                                           Miami, Florida 33131
                                           abrenner@bsfllp.com

                                           *Counsel to Plaintiffs Ira Kleiman as Personal*

*Representative of the Estate of David Kleiman and*
*W&K Info Defense Research, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 5, 2020, a true and correct copy of the foregoing was served via e-mail on all counsel of record.

/s/ Velvel (Devin) Freedman
Velvel (Devin) Freedman

**From:**       Dave K2 - <span style="background:black">███████</span>
**Sent:**       Friday, December 4, 2015 6:18 PM
**To:**         Andy Cush
**Subject:**    story

At the moment I just don't see much of an upside for participating in your story aside from satisfying my own curiousity about the information you have on my brother.

I can only see downsides such as unwanted media coverage resulting in a upheaval of my family's life. I need you to assure me that there is nothing published suggesting that I may contain drives with bitcoin on them.   That's the kind of public information that concerns me.  News like that could draw the wrong kind of attention.

Did you read the article last month about the Taiwanese guy kidnapped and held for bitcoin ransom?  I don't care to put my family at risk of being abducted for bitcoins that likely don't even exist. If Craig wasn't already able to access the bitcoin wallets that he shared with David, he would have asked to see the drives I have, but he didn't.  I believe whatever hidden bitcoins exist out there are in Craig's possession.  It is likely that some of them have been used to build his various companies and supercomputers.

If my brother had bitcoin of any value he wouldn't have died with only debts.  He was in and out of the VA hospital for about 2 years before he passed away so he didn't have a steady income.  And shortly before he died I learned that his house was in foreclosure.  If David owned a great number of bitcoin, why wouldn't he sell a few to help pay off his bills?  There are a lot of missing pieces.  I want to learn the truth about it all just as much as you, but I don't think I'm ready to meet with you right now.  If you want to corroborate some things, you can ask me online and I'll do what I can.

Ira



KLEIMAN_00179300



# THE KARP LAW FIRM
*A Professional Association*

Elder Law • Estate Planning & Administration • Probate • Disability, Special Needs, Medicaid & Veterans Benefits Planning

*Please Reply to:*
*Palm Beach Gardens*

**JOSEPH S. KARP**
Florida Certified Elder Law Specialist
Certified Elder Law Attorney, Natl. Elder Law Foundation
Member, FL & NY Bar

**ADMINISTRATOR**
Audrey L. Yeager, CP

**GENNY BERNSTEIN**
Florida Certified Elder Law Specialist
**GINA GRANDINETTE**
**ADELE SMALL HARRIS**
**CHAD L. STESKAL, LL.M.**

Of Counsel
**RACHEL GOLDSTEIN ZETOUNI**

June 18, 2015

Department of the Treasury
Attn: Mr. Michael Tosi
1111 Constitution Ave, NW M4-331
Washington, DC 20224

RE:    Case #362215

Dear Mr. Tosi:

I am writing on behalf of Ira Kleiman. I represent him with regard to any affairs of the Estate of David Kleiman.

I would like to respond to your letter dated May 20th as best as we can to provide you with complete information as we know it.

Ira is David's brother. He had limited contact and personal knowledge as to David's financial affairs throughout David's life. Most particularly, prior to January 1 , 2012 through David's date of death of April 26, 2013. David spent most of his time in the VA Hospital in Miami during which time Ira never saw him at the hospital. He may have seen David one time when David took a leave from the hospital. At no time did Ira ever discuss David's financial affairs with him and was never aware of them. His only knowledge was that David was financially strapped and had limited resources.

I am enclosing a copy of David's will which was filed with the court as required. The only probate documents which were done were done under Florida Law to reimburse David's father for the compensation for the funeral. There was no formal probate proceeding whatsoever. The reason for this was quite simple. After checking records, David was deep in debt and had outstanding mortgages and liens on his home which exceeded his potential assets and it made no sense.

Quantum Park, Suite 203
2500 Quantum Lakes Drive
Boynton Beach, FL 33426
(561) 752-4550  Fax: (561) 625-0060

2875 PGA Boulevard, Suite 100
Palm Beach Gardens, FL 33410-2910
(561) 625-1100  Fax: (561) 625-0060
(Main Office)

Seacoast Banking Centre
Suite 102
1109 S. W. St. Lucie West Boulevard
Port St. Lucie, FL 34986
(772) 343-8411  Fax: (561) 625-0060

E-mail: klf@karplaw.com     On the web: www.karplaw.com



**EXHIBIT**

8

KARP_00000052

Letter dated June 18, 2015
Page 2

With regard to W&K LLC or bitcoins, Ira had no personal knowledge of any of this, and has no proof or evidence of what bitcoins David may own or any information. Although, he did hear from Dr. Craig Steven Wright that David did have an interest in Bitcoins, Dr. Wright was totally unaware of how to locate them, identify them or track them. Ira has taken no formal steps to do that himself, either.

Ira has no personal knowledge of any trusts that David may have had and never heard any of it from David. Dr. Wright has communicated with Ira at Dr. Wright's initiation.

With regard to any dealings with Dr. Craig Steven Wright, the only information Ira has is that information which was transmitted by Dr. Wright. He never heard of Dr. Wright from David, nor in cleaning up David's papers or affairs were anything located which indicated Dr. Wright, bitcoins, or any of the business dealings that he may have had with Dr. Wright. The only indications that he would have of any agreements between David and Dr. Wright, or W&K LLC would have been transmitted to him by Dr. Wright. He has no independent recollection of any of the documents or transmissions that were provided. Those records have not been destroyed by him and would be available if required to provide same.

With regard to the financial statements of W&K LLC, again, if they exist, he believes he may have received some and they would, too, have been attached to emails which he received. If you can advise of the legal requirement to provide same, he shall. He does not mean to be obstructive, but he wishes to ensure he is doing everything he is required to do. If you contact me we may discuss this so that we can facilitate the turning over of the information.

With regard to anything with W&K LLC's business activities, again, any information that Ira has would not be as a result of any source other than Dr. Wright. There were no records left by David that which Ira was aware, nor did Ira receive any other third party confirmation other than questions raised by the Australian authorities several years ago.

Once again, with regard to consent orders and transfers, Ira has not gone through all of the paperwork for a long period of time and has no independent recollection of what they say and again, would be willing to provide them appropriately. Please understand Ira's position. He is not the executor of David's estate. He was designated as the personal representative, but no probate occurred, and he did not open up an estate. The reason no estate was opened up is the information that was had, at the time, was that David had only debts and a homestead property which was mortgaged in excess of its fair market value and had also outstanding obligations to its homeowners association. There may have been other minor assets which were not worth pursuing under the circumstances.

Any information that Ira received was initiated by contact by Dr. Wright to Ira, whom he had never heard of before David's death and had been contacted by Dr. Wright.

**THE KARP LAW FIRM**

Elder Law • Estate Planning & Administration • Probate • Disability, Special Needs, Medicaid & Veterans Benefits Planning
E-mail: klb@karplaw.com • On the web: www.karplaw.com • Out of area toll-free: (800) 893-9911

KARP_00000053

Letter dated June 18, 2015
Page 3

Again, there is no desire to impede any appropriate investigation. In fact, if it could be found that David was entitled to significant assets, bitcoins or otherwise, Ira would be the ultimate beneficiary even after any taxes and other obligations so he looks forward to assisting you, especially if it can assist him.

Very truly yours,

JOSEPH S. KARP

JSK/jjm

cc:    Ira Kleiman

**THE KARP LAW FIRM**   *A Professional Association*

Elder Law • Estate Planning & Administration • Probate • Disability, Special Needs, Medicaid & Veterans Benefits Planning
E-mail: klf@karplaw.com   •   On the web: www.karplaw.com   •   Out of area toll-free: (800) 893-9911

KARP_00000054

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC

CASE NO.: 9:18-cv-80176-BB/BR

     *Plaintiffs,*

v.

CRAIG WRIGHT

     *Defendant.*

## PLAINTIFFS' SECOND AMENDED RESPONSES AND OBJECTIONS TO WRIGHT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF, IRA KLEIMAN

PLEASE TAKE NOTICE that, pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs hereby responds to Wright's First Set of Interrogatories to Plaintiff, Ira Kleiman as follows:

### SPECIFIC OBJECTIONS TO TIME FRAME

Plaintiffs' object to the time period requested as it is inconsistent with what the Defendant himself has argued is appropriate at this stage of the litigation. Accordingly, unless indicated otherwise, Plaintiffs' will treat the relevant time period for all Interrogatories as one month after the filing of the Initial Complaint. If the parties reach an agreement to expand the relevant time period, or if Defendant demonstrates a specific reason to exceed that timeframe for an individual interrogatory, Ira will supplement his responses to the extent necessary.

### SPECIFIC RESPONSES AND OBJECTIONS

### REQUEST NO. 1:

Identify of [sic] all persons that were present at the November 26, 2009, Thanksgiving dinner referenced in paragraphs 58 through 62 of the Second Amended Complaint.

### RESPONSE TO REQUEST NO. 1:



EXHIBIT

9

1/10/20

The following individuals were present at the November 26, 2009 Thanksgiving dinner referenced in paragraphs 58 through 62 of the Second Amended Complaint:

- Louis Kleiman;
- Dave Kleiman;
- Ira Kleiman (███████████ Palm Beach Gardens, FL. ████ phone: ████████ self-employed in website design / affiliate marketing);
- Ju Kleiman (███████████ Palm Beach Gardens, FL. ████ phone: ████ ████ salesperson at LG Electronics, Thailand); and
- Ira's six-month year old child.

## REQUEST NO. 2:

Identify all electronic devices that Dave Kleiman owned or possessed at the time of his death.

## RESPONSE TO REQUEST NO. 2:

Ira objects to this Request to the extent it seeks knowledge he doesn't possess.

Notwithstanding that objection, the following is a list of the electronic devices that Ira believes to have been owned or possessed by Dave Kleiman at the time of his death:

| Device Description | Type | Amount of Data currently stored  (GB) |
|---|---|---|
| Seagate Momentus 500GB | External HDD | 17.6 |
| WD Scorpio Blue 750GB | External HDD | 119.2 |
| Seagate Momentus 500GB | External HDD | 0 |
| Hitachi Travelstar 100GB | External HDD | 0 |
| WD Scorpio Black 320GB | External HDD | 0 |
| Four to five hard drives that are no longer in the estate's possession.[1] | External HDD | n/a |
| HTC T7373X Touch Pro2 | Mobile Phone | .01 |

---

[1] Ira gave three or four drives that were possessed by Dave Kleiman at the time of his death, to Patrick Page (Dave's business partner in Computer Forensics LLC) as Patrick informed him they were Computer Forensic LLC's drives with the business's data stored on them.  There was one other drive that was on Dave's bedroom counter. This drive was broken, and would not power on. Ira disposed of this drive in 2013.

| Samsung Galaxy Note SGH-I717 | Mobile Phone | N/A |
| Corsair Survivor Stealth TD Black | Thumb Drive | 25.7 |
| Corsair Survivor Stealth TD Gray Orange | Thumb Drive | 2.09 |
| Corsair Survivor Stealth TD Gray Blue | Thumb Drive | 58 |
| Corsair Survivor Stealth TD Gray Blue 2 | Thumb Drive | 48.7 |
| IACIS TD | Thumb Drive | 0.35 |
| Micro Vault Tiny 4GB | Thumb Drive | .1 |
| Sandisk Cruzer Micro 8GB | Thumb Drive | 2.81 |
| CEIC 2009 2GB | Thumb Drive | 2.79 |
| Key Thumbdrive 8GB | Thumb Drive | 1.03 |
| Two Alienware m9700i R1 series laptops | Laptop | n/a |
| 1 Dell Laptop (Precision M65) | Laptop | n/a |
| 1 Toshiba micro tower (Magnia Z310) | Desktop | n/a |
| Various CD-ROM containing various software programs | CD-ROM | n/a |

**Email Accounts**
1. kleimandave███████████
2. davesdigitalforensics@███████
3. dave@███████████
4. dave@████████
5. dave@████████

## REQUEST NO. 3:

Describe with specificity all attempts you have made to access Dave Kleiman's electronic devices.

## RESPONSE TO REQUEST NO. 3:

Ira did not keep a record of every attempt he made to access Dave Kleiman's electronic devices. That said, Ira states that he personally reviewed all drives that were accessible. During this review, Ira looked through each individual folder and each individual file contained on these drives to find anything of importance.

3

Ira successfully installed Windows operating systems on two of the drives in an effort to gain access to those drives in November 2013. He successfully installed Windows 7 on the Seagate Momentus 500 GB drive (Serial No. ███████) on November 10, 2013. He installed Windows 8 on the WD Scorpio Blue 750 GB drive on November 17, 2013.

## REQUEST NO. 4:

Describe with specificity all attempts you have made to determine the identity and location of any cryptocurrency that Dave Kleiman owned or possessed at the time of his death apart [sic].

## RESPONSE TO REQUEST NO. 4:

Ira objects to this request to the extent it seeks privileged information protected by the attorney client privilege and work product privilege. Notwithstanding that objection, Ira states that he personally reviewed all accessible electronic devices that he believed Dave owned or possessed. During this review, Ira looked through each individual folder and each individual file contained on these drives to find anything of importance.

Furthermore, Ira spoke to the following individuals in an effort to identify the identity and location of the cryptocurrency that Dave Kleiman owned at the time of his death:

- Craig Wright;

- Patrick Paige;

- Carter Conrad;

- Angela Ojea (cell-phone: ███████ home phone: ███████); and

- Kimon Andreou (phone: ███████).

Finally, Ira has reviewed numerous documents provided by the Defendant, Ramona Watts, the Australian Tax Office, as well as documents obtained from the public domain, from the Australian Courts, and as a result of subpoenas served in this litigation to try and identify the cryptocurrency and location of the cryptocurrency the Defendant stole from Dave and W&K Info

Defense Research, LLC.

**REQUEST NO. 5:**

Identify by public address all cryptocurrency that you claim rightfully belongs to Dave Kleiman or his estate.

**RESPONSE TO REQUEST NO. 5:**

Discovery is still ongoing and Plaintiffs currently lack sufficient knowledge to identify the public addresses of *all* cryptocurrency belonging to Dave Kleiman or his estate. Plaintiffs will supplement the response to this Request as more information is made available during the discovery process.

Based on information available to Plaintiff today, however, Plaintiffs believe that any cryptocurrency held in the following addresses (or any bitcoin transferred out of these wallets), belongs at least in part, to Plaintiffs:





## REQUEST NO. 6:

Identify with specificity all intellectual property that you claim rightfully belongs to Dave Kleiman or his estate.

## RESPONSE TO REQUEST NO. 6:

Discovery is still ongoing and Plaintiffs currently lack sufficient knowledge to identify *all* intellectual property belonging to them. Plaintiffs will supplement the response to this Request as more information is made available during the discovery process.

Based on information available to Plaintiffs today, however, Plaintiffs believe that the estate and/or W&K have an ownership interest in source code, compiler code, Machine Language

(MASM/NASM), algorithms, manuals, trademarks, pending patents, granted patents, and other external filings associated with the following IP items:

1. A metered payments system;

2. Software derivative markets & information security risk systems;

3. Software assurance marketplace;

4. Software assurance through economic measures and anti-fraud system;

5. Risk quantification system (for financial modeling in Bitcoin);

6. SCADA measurements suite of software; and

7. Scriptable money.

More generally, Plaintiffs believe that the Defendant has taken intellectual property belonging to the estate and W&K that was created by Dave and Craig's partnership through research Dave Kleiman conducted with Craig Wright that was not completed or published as of 2015. Further discovery is needed to uncover the exact nature of this intellectual property, including discovery to uncover the exact nature of the 6,000,000 lines of code the Defendant has admitted David Kleiman created.

Furthermore, Plaintiffs believe they hold an interest in the security, banking, and automation intellectual property distributed to Cloudcroft, Hotwire, and Coin-Exch. Finally, Plaintiffs believe they hold an interest in the intellectual property, source code, algorithms, and patentable materials claimed by DeMorgan which relates to the development of smart contract and Blockchain based technologies and the commercialization of Blockchain and smart contract system research.

**REQUEST NO. 7:**

Describe with specificity how you first came to possess copies of the documents that are attached as exhibits 9, 12 15, and 18 to the Second Amended Complaint, and Exhibit A to Plaintiffs' First Request

for Production, including by identifying the first person who provided you with copies of those documents.

**RESPONSE TO REQUEST NO. 7:**

Ira first reviewed Exhibit 9 to the Second Amended Complaint when it was released online by John Cook of Gawker. *See* https://www.documentcloud.org/documents/2644013-20140226-Meeting-Minutes-Redacted.html. Ira first reviewed Exhibit 12 of the Second Amended Complaint when it was released online by Gizmodo. https://gizmodo.com/heres-all-the-evidence-that-craig-wright-invented-bitco-1747059371. Ira first reviewed Exhibit 15 of the Second Amended Complaint when Craig emailed it to him on May 11, 2014. Ira first reviewed Exhibit 18 of the Second Amended Complaint when Ramona Watts emailed it to him on July 2, 2015.

**REQUEST NO. 8:**

Identify all persons at news agencies with whom you have spoken about any of the facts that you have alleged in the Second Amended Complaint.

**RESPONSE TO REQUEST NO.**

Ira or his attorneys had discussions or correspondence with the following persons at news agencies about the facts alleged in the Second Amended Complaint:

1.  Andy Cush ███████████████████

2.  Sam Biddle ████████████████

3.  Andy Greenberg (Wired); ████████████

4.  Jordan Pearson (vice); ████████████

5.  Ryan Browne (NBC Universal); ██████████████

6.  Ritika Shah (NBC Universal); █████████████

7.  Michelle Caruso-Cabrera (NBC Universal) ████████ ████████

8.  Cyrus Farivar (arstechnica); █████████████

8

9.  MP McQueen (ALM); ███████████

10. Will Yakowicz (Inc.com); ███████████

11. Olga Kharif (Bloomberg); ███████████

12. Jef Feeley (Bloomberg); ███████████

**REQUEST NO. 9:**

Identify the auditor from the ATO who allegedly reached out to you as referenced in paragraph 141 of the Second Amended Complaint.

**RESPONSE TO REQUEST NO. 9:**

Ira states that the auditor referenced in paragraph 141 of the Second Amended Complaint

is Andrew Miller (Phone: ███████████

Dated: March 21, 2019                           Respectfully submitted,

*s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman, Esq.
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida  33131
Telephone:  (305) 539-8400
Facsimile:  (305) 539-1307
vfreedman@bsfllp.com

Kyle W. Roche, Esq.
*Admitted Pro Hac Vice*
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300
kroche@bsfllp.com

*Counsel to Plaintiff Ira Kleiman as Personal*
*Representative of the Estate of David Kleiman*
*and W&K Info Defense Research, LLC.*

**CERTIFICATE OF SERVICE**

9

I HEREBY CERTIFY that on March 21, 2019, a true and correct copy of the foregoing was served on all counsel of record identified on the Service List below via e-mail:

Andres Rivero, Esq.
Jorge A. Mester, Esq.
Alan H. Rolnick, Esq.
Amanda McGovern, Esq.
Zaharah Markoe, Esq.
Zalman Kass, Esq.
RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard
Suite 1000
Coral Gables, FL 33134
305-445-2500
(305) 445-2505 (fax)
arivero@riveromestre.com
jmestre@riveromestre.com
arolnick@riveromestre.com
receptionist@riveromestre.com
zkass@riveromestre.com
zmarkoe@riveromestre.com
amcgovern@riveromestre.com

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman

I, Ira Kleiman, declare under penalty of perjury under the laws of the United States and the State of Florida, that the foregoing is true and correct.

Executed on March 21, 2019 at West Palm Beach, Florida.

_____
Ira Kleiman

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC<br><br>     Plaintiffs,<br><br>v.<br><br>CRAIG WRIGHT<br><br>     Defendant. | **CASE NO.:  9:18-cv-80176-BB**<br><br>**SECOND AMENDED COMPLAINT AND JURY DEMAND** |

Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.   (305)539-8400
Fax.   (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche (*admitted pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.   (914)749-8200
Fax.   (914)749-8300
Email: kroche@bsfllp.com

**ATTORNEYS FOR PLAINTIFFS**



## SECOND AMENDED COMPLAINT

Plaintiff Ira Kleiman, as personal representative of David Kleiman's estate ("Ira"), and Plaintiff W&K Info Defense Research, LLC ("W&K") hereby sue Defendant Craig Steven Wright ("Craig") and state as follows:

## PARTIES

1.      Plaintiff Ira Kleiman, as personal representative, is a resident of Palm Beach County, Florida.  He is David Kleiman's ("Dave") brother and the personal representative of his estate ("the estate").

2.      Plaintiff W&K Info Defense Research, LLC is a Florida limited liability company incorporated in 2011.  During the times relevant to this Second Amended Complaint, W&K operated in Florida.  This entity is one vehicle through which Defendant and Dave mined hundreds of thousands of bitcoins and created valuable blockchain intellectual property.

3.      Defendant Craig Steven Wright is a resident of London, United Kingdom.  He is Dave's former business partner in W&K and otherwise.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000; this Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because Plaintiffs' Defense of Trade Secrets Act claim arises under the laws of the United States.

5.      Venue lies within this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District.  These events include, but are not limited to: the wrongful taking of property belonging to a Florida estate and/or LLC within this District; the partnership of Dave and Craig within this District; the operation of W&K by Dave

and Craig within this District; the mining of a substantial amount of bitcoins through the use of computer equipment located within this District and/or by equipment owned and/or operated by a Florida resident (Dave) or Florida LLC (W&K); the development of certain blockchain related intellectual property within this District; and the commission of a fraud against an estate in this District.

6.      This Court has personal jurisdiction over Craig pursuant to Fla. Stat. § 48.193 as he operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within this state; and caused injury to persons and property within this state at or about the time he was engaged in solicitation and service activities within this state.

## INTRODUCTION

7.      This matter concerns the rightful ownership of hundreds of thousands of bitcoins[1] and the valuable intellectual property rights of various blockchain technologies. As of the date of the Amended Complaint filing, the value of these assets far exceed $11,427,755,048.02 USD (before punitive or treble damages); at their highest value they were worth over $27,332,125,781.93. Plaintiffs allege Defendant has stolen these bitcoins and intellectual property assets from them.

8.      After Ira filed this claim, Craig committed a fraud on this Court in an attempt to circumvent its jurisdiction. As detailed in paragraphs 160 to 170 Craig filed a sworn declaration that is incontrovertibly false based on an affidavit (and supporting evidence) he previously submitted to an Australian court. The boldfaced misrepresentations Craig has told this Court demonstrate his desperation to avoid this suit.

---

[1] The term "bitcoin" can refer to both a computer protocol and a unit of exchange. Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoin" to label the units of exchange.

3

9.      Bitcoin is the world's first decentralized cryptocurrency.  The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent the now famous protocol to a mailing list of cryptography enthusiasts. That protocol has since spawned a system of value and exchange with a current market cap of ~$150 billion.

10.     Based on information Ira Kleiman received directly from Dave, it is undeniable that Craig and Dave were involved in Bitcoin from its inception and, together, had accumulated a vast wealth of bitcoins from 2009 through 2013.

11.     On April 26, 2013, mere months prior to Bitcoin's entry into the mainstream, Dave died after a battle with MRSA.

12.     Recognizing Dave's family and friends weren't aware of the extent of Dave's Bitcoin and blockchain related activities, Craig perpetrated a scheme against Plaintiffs to seize their bitcoins and their rights to certain blockchain related intellectual property.

13.     As part of this plan, Craig took control of Plaintiffs' bitcoins and forged a series of contracts that purported to transfer Plaintiffs' bitcoins and intellectual property assets to Craig and/or companies controlled by him.  Craig backdated these contracts and forged Dave's signature on them.

14.     About a year after Dave's death, and under pressure from an Australian Tax Office investigation, Craig reached out to Ira, Dave's brother.  Craig disclosed he had partnered with Dave to create Bitcoin, mine bitcoin, and create valuable intellectual property.  But, he claimed Dave signed all these property rights away in exchange for a non-controlling share of a non-operational Australian company worth "millions."

Case 9:18-cv-80176-BB   Document 488-13   Entered on FLSD Docket 05/08/2020   Page 457 of
513
Case 9:18-cv-80176-BB   Document 83   Entered on FLSD Docket 01/14/2019   Page 5 of 49

15.     Craig told Ira he'd be able to sell Dave's stake in the company in a few months. This was a lie in several respects. First, Dave had not in fact traded his bitcoin and intellectual property rights for an interest in the Australian company. Second, the company went bankrupt shortly after Craig misled the Australian Tax Office ("ATO").

16.     The ATO raided Craig's home in late 2015 and Craig fled Australia for London. Since fleeing to London, Craig has lived a life of fame and fortune. In May 2016, he publicly revealed himself and Dave as the alleged creators of Bitcoin.

17.     Craig currently serves as Chief Scientist of nChain, a UK company purporting to be the global leader in research and development of blockchain technologies. He also regularly posts pictures to his social media accounts of his lavish lifestyle.

18.     To date, Craig has not returned any of the mined bitcoins or intellectual property rights belonging to Plaintiffs. This action is brought to rectify that injustice.

19.     As described in detail below, Craig's pattern of lies, deception, and fraudulent conduct continues even against this Court. His fraud on this Court is simply the latest step taken in Florida to defraud the estate and W&K.

## FACTUAL ALLEGATIONS

### Bitcoin

20.     Bitcoin is a decentralized digital currency with a current market cap of ~$150 billion as of March 14, 2018.[2] At its core, Bitcoin is simply a giant ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the bitcoin blockchain.

21.     In order to transact with bitcoins, you must have a bitcoin wallet. Like a bank account number, each bitcoin wallet has a "public key" that is the "address" provided if one would

---

[2] https://coinmarketcap.com/.

like to receive bitcoin from others. Every wallet can be identified on the blockchain (by referring to its "public key") along with the number of bitcoins inside that particular wallet. Wallets are separate computer files dedicated to storing information about specific bitcoins.

22.     Each wallet is also assigned a "private key." Unlike public keys, private keys are only known by the individual who creates the bitcoin wallet. The private key is like the "password" to the wallet. To send bitcoin out of a wallet, an individual must have the private key associated with the bitcoin wallet. This is similar to the manner in which one must have a PIN to withdraw cash from an ATM.

23.     There are two methods of acquiring bitcoins. The first involves simply receiving bitcoins from someone. In fact, there are many businesses that operate "bitcoin exchanges," such as coinbase.com, which is a bitcoin marketplace where individuals can purchase bitcoins with their native currency from individuals looking to sell.

24.     The second way one can acquire bitcoins is by "mining" them.

25.     There is no centralized authority that curates the Bitcoin blockchain. Consequently, the protocol has to incentivize individuals to curate the blockchain, i.e., to update the "ledger" with new transactions as they take place. This process is called "bitcoin mining."

26.     Anyone with internet access can "mine bitcoins" by employing computer power to solve a complex mathematical problem. The first "miner" who solves the problem gets the right to add a block of recent transactions to the blockchain, i.e., the right to update the ledger. In return for this work, the protocol pays the successful miner in newly minted bitcoins (the number of which is fixed by a pre-existing algorithm). This process is repeated every 10 minutes or so, ensuring an accurate and up to date record of all bitcoin transactions.

27.      When the Bitcoin protocol was first launched in January 2009, the protocol paid the successful miner 50 bitcoins for each block of transactions added to the blockchain ledger. The protocol cuts this mining reward in half every four years so that the maximum amount of bitcoin in existence will never exceed 21 million. At the current mining rate and reward algorithm, this maximum circulation will be reached in circa 2140.

28.      Today, the mining reward is 12.5 bitcoins for each block added to the blockchain. That, together with rising competition in mining bitcoins means it was easier to amass significant amounts of bitcoins in 2009, than now.

29.      To date, just over 17 million of the total 21 million bitcoins have been mined.

### History of Bitcoin

30.      On October 31, 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto ("Satoshi") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."

31.      Less than three months later, the system outlined became a reality. On January 3, 2009, Satoshi mined the first 50 bitcoins. To place a timestamp on the occasion, Satoshi left a text message digitally encoded on these first 50 bitcoins that read, "The Times 3 January 2009 Chancellor on brink of second bailout for banks," referring to that day's headline in the British newspaper, *The Times*.

32.      Hal Finney, one of the first supporters and adopters of Bitcoin, downloaded the bitcoin software that same day, and received 10 bitcoins from Satoshi in the world's first bitcoin transaction.

33.     Satoshi also created a website under the domain name bitcoin.org and continued to collaborate with other developers on the Bitcoin protocol until mid-2010.  Around this time, he handed control of the Bitcoin source code repository to Gavin Andresen, another active member of the bitcoin development community, and disappeared.  The last confirmed email from Satoshi was sent on April 23, 2011.  It read, "I've moved on to other things. It's in good hands with Gavin and everyone."

34.     For most of its early history, bitcoins were of relatively little value.  Famously, the first documented commercial bitcoin transaction occurred when developer Laszlo Hanyecz used 10,000 bitcoins to purchase two Domino's pizzas on May 22, 2010.  At today's prices, those two pizzas would be worth approximately 1% of Domino's total market cap.

35.     During Bitcoin's early history, cryptocurrencies were a niche technology with a small development community. Consequently, there was little competition for maintaining the ledger or "mining bitcoins." Thus, individuals mining bitcoins through 2013 could expend relatively minor resources to accumulate large sums of bitcoins.

36.     It has been widely reported that Satoshi Nakamoto mined approximately 1 million bitcoins during this time.[3]

### Bitcoin "forks"

37.     Since its inception in 2009, Bitcoin has inspired the creation of over one thousand other digital currencies. Many of these new cryptocurrencies use characteristics of the initial Bitcoin program, but have made significant changes to the original model in an attempt to create

---

[3]     *See*     *e.g.*     http://time.com/money/5002378/bitcoin-creator-nakamoto-billionaire/; http://www.businessinsider.com/satoshi-nakamoto-owns-one-million-bitcoin-700-price-2016-6; https://eklitzke.org/how-many-bitcoins-did-satoshi-nakamoto-mine.

an entirely new cryptocurrency with distinct functions or ones better suited to a specific market niche.

38.    In other cases, individuals have taken the actual Bitcoin protocol and modified it in a way they believed would improve Bitcoin itself, *e.g.*, by allowing more transactions into a single "block" of the blockchain.

39.    If the "improved" Bitcoin protocol garners significant support, but less than a majority of support, a new version of "Bitcoin" is created. In these situations, the supporters of the new Bitcoin, have created a "fork" through which the original Bitcoin blockchain/ledger is divided into two distinct, but identical, copies, (i) the original Bitcoin, and (ii) the new Bitcoin. The result is that any individual who owned the original Bitcoin, now owns an identical amount of the new Bitcoin. After the point of the "fork," the ledgers will diverge as owners "spend" the two assets differently.

40.    This has happened numerous times to Bitocin. To date, however, the original Bitcoin protocol remains the most valuable in terms of its correlation to the US dollar, with a market capitalization of ~$150 billion at the time of filing. However, other noteworthy Bitcoin forks include Bitcoin Cash (market cap. of ~$25 billion), Bitcoin Gold (market cap. of ~$1.0 billion), Bitcoin Private (market cap of ~$510 million), and Bitcoin Diamond (market cap. of ~$650 million).

41.    As explained below, the bitcoins at the heart of this dispute were all mined prior to the creation of any of the aforementioned Bitcoin forks. Consequentially, Plaintiffs' claims of

ownership over these original bitcoins necessarily implicates ownership over their "forked" counterparts ("forked assets").[4]

## Background on parties and key individuals

42.     Dave Kleiman was born in 1967. Obsessed with computers and technology at an early age, he joined the U.S. Army in 1986 as a helicopter technician.

43.     A few years after being honorably discharged, Dave got into a serious motorcycle accident which left him physically handicapped and wheelchair-bound. After this accident, Dave's interest in computers intensified, and he began to build a reputation in computer forensics and secure network infrastructures.

44.     Dave began working in the information technology security sector in 1990. He was a frequent speaker at national security conferences and was a regular contributor for many security related newsletters, websites, and online forums.

45.     Dave was a member of several computer security organizations, including the International Association of Counter Terrorism and Security Professionals (IACSP), International Society of Forensic Computer Examiners (ISFCE), Information Systems Audit and Control Association (ISACA), High Technology Crime Investigation Association (HTCIA), Network and Systems Professionals Association (NaSPA), Association of Certified Fraud Examiners (ACFE), Anti-Terrorism Accreditation Board (ATAB), and ASIS International.

46.     Dave was also a Secure Member and Sector Chief for Information Technology at the FBI's InfraGard and a Member and Director of Education at the International Information Systems Forensics Association (IISFA). When he attended conferences, he was known as "Dave

---

[4] Consequently, where appropriate, the word "bitcoins" should be construed to include claims over the "forked assets" as well.

Mississippi," a nickname referring to the long string of three letter certificates that followed his name; which could literally be used to spell Mississippi.

47.      Dave co-authored and was the technical editor of numerous publications, including *Perfect Passwords: Selection, Protection and Authentication*,[5] and Security Log Management: Identifying Patterns in the Chaos.[6]

48.      In 2010, Dave was hospitalized.  He was in and out of medical facilities due to MRSA infected sores.  On March 22, 2013, Dave signed out of the hospital against medical advice. He was unstable and nearing death.[7]  On April 26, 2013, Dave passed away.

49.      Ira is Dave's brother and the personal representative of his estate.

50.      Craig is a 46-year-old Australian computer scientist and businessman.  Craig began his career in information technology working for various entities in Australia, including the Australian Securities Exchange.  Craig claims to have many degrees, including doctorates, masters, and technical certifications; these claims are disputed.[8]

51.      In May 2016, Craig claimed that he and Dave were Satoshi Nakamoto—the venerated creator of Bitcoin.

---

[5]https://www.amazon.com/Perfect-Passwords-Selection-Protection-Authentication/dp/1597490415.

[6] https://www.amazon.com/Security-Log-Management-Identifying-Patterns/dp/1597490423.

[7] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

[8]  https://www.forbes.com/sites/thomasbrewster/2015/12/11/bitcoin-creator-satoshi-craig-wright-lies-hoax/#12e524116794.

### Dave and Craig's early relationship

52.     Dave and Craig met in or around 2003. Both men had a longtime interest in cyber security and digital forensics, and the future of money.  (Ex. 1 at 26).[9]

53.     For years, they communicated on various topics related to the internet and file sharing.  For example, in 2008 they co-authored a paper on the mechanics of overwriting hard drive data.[10]

54.     Around that time, they began to speak about ways to use peer-to-peer file sharing, infamously used by the Napster music sharing service, to solve some of the most difficult issues in cryptography.  (Ex. 1 at 27).

55.     In March 2008, just a few months before Satoshi's paper on the Bitcoin protocol was published, Craig emailed Dave saying: "I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin . . . [y]ou are always there for me Dave. I want you to be part of it all."  (Ex. 32).[11]

56.     After leaving his job in late 2008, Craig wrote to Dave: "I need your help.  You edited my paper and now I need to have you aid me build this idea."  (Ex. 1 at 31).  For the next few months, Craig and Dave worked to get Bitcoin operational.

57.     On January 12, 2009, Craig, Dave, and two others sent each other bitcoin transactions recorded on the blockchain.  (Ex. 1 at 32).

58.     On November 26, 2009 (Thanksgiving Day), Ira Kleiman and Dave met at their father's home for an early dinner.  He and Dave discussed Facebook's recent success and Ira asked

---

[9] All Exhibit citations refer to the as filed ECF pagination.

[10] https://www.vidarholen.net/~vidar/overwriting_hard_drive_data.pdf.

[11] Craig sent a "copy" of this communication to Ira on March 6, 2014.

Dave if he was working on anything interesting. Dave responded by telling Ira he was working on "something bigger" than Facebook, that he was "creating his own money."

59.     Ira asked Dave to clarify and jokingly asked if Dave was making counterfeit money.

60.     Dave responded by saying he was making "digital money." He then opened his wallet, took out a business card, flipped it over, drew a "B" with a line or two through it, and commented on how "we" were working on a logo.

61.     Dave told Ira he was working with a relatively wealthy foreign man who owned some properties. Ira asked Dave why he didn't partner with this wealthy individual. Dave was silent, which Ira understood to be Dave's concession they were already partners.

62.     On May 20, 2014, Ira shared this story with Craig via email. (Ex. 2).

63.     Craig responded that same day stating "we did partner ;)". (*Id.*). Craig then commented on the "properties" stating, *inter alia*, that he owned 550 acres. (*Id.*). He then said, "I will have to see what I can dig up. The old Bitcoin logo we did is no longer used. I have a copy." (*Id.*). Craig later provided Ira with a copy of this Bitcoin logo. (*Id.*).

64.     This independent verification that Dave was creating "digital money" with Craig in 2009, Craig's admissions that he and Dave were "partners" in this venture, part of the Satoshi team, and that they were mining bitcoin through W&K, all lead to the inescapable conclusion that their collaboration in "creating" or "mining" bitcoin and intellectual property was continuous from 2009 until Dave's passing in 2013.

65.     From their collaboration in 2008 until Dave's death in 2013, Craig and Dave mined over a million of the initial bitcoins together (personally and through W&K). These bitcoins were, as all bitcoin are, stored in specifically identifiable bitcoin wallets that Craig has now asserted ownership over.

13

66.     Further, Dave, in partnership with Craig, created intellectual property both in his individual capacity and through W&K. As Craig email to Ira on March 7, 2014, "I had an idea, but it would never have executed without Dave." The estate and/or W&K owns all this intellectual property.[12]

### Dave and Craig created W&K to mine bitcoin and develop blockchain related intellectual property

67.     The exact structure of their joint mining activities, intellectual property development, and "partnership" from c. 2008 until February 2011 requires discovery to fully reveal.

68.     From February 2011, Craig and Dave conducted their bitcoin mining activities and intellectual property research and development through W&K.

69.     On February 14, 2011, Dave formed W&K Info Defense Research LLC ("W&K") in Florida. The Articles of Incorporation for W&K list Dave as the managing member and registered agent. (Ex. 3).

70.     W&K has no operating agreement and its exact ownership structure is unclear due to Craig's contradictory statements. In an affidavit Craig filed in Australian court proceedings, Craig stated he and Dave each owned 50% of W&K. (Ex. 4 at 5). But in a fake "contract" produced by Craig, he states Dave owned legal title to 100% of W&K, while holding 50% in trust for Craig. (Ex. 5 at 3). He doubled down on some form of this equal split in a 2014 email to Ira,

---

[12] The exact division of intellectual property ownership between Dave's estate and/or W&K will be determined at trial. Accordingly, some counts contain a request for relief from both Plaintiffs, and it will be for the final finder of fact to determine what each Plaintiff is entitled to recover.

where he represented that "Dave owned 50% of" W&K. (Ex. 6 at 2),[13] and when both he and his counsel referred to it as a "joint venture." (Ex. 4 at 50, 57, 64, 71, 77, 84; Ex. 9 at 6). In contrast, Craig has testified to this Court that he does not have, and never has had, any interest in W&K.[14] (Ex. 29 ¶ 10). But it makes sense Craig would have some form of indirect interest as the entity appeared to be named after them both: **W**right & **K**leiman.

71.     As best as can presently be discerned, Dave was the sole "member" of W&K, but Craig maintained some kind of beneficial ownership interest in W&K, which he subsequently disclaimed.

72.     Regardless of its exact ownership structure, the purpose of W&K was clear:  Craig and Dave created it to mine bitcoin and develop intellectual property.

73.     *First*, on telephone conversations with Ira, Craig admitted this was W&K's purpose.

74.     *Second*, Craig has admitted this in writing multiple times.  For example, in a "chronology" Craig sent to Ira, he wrote that that W&K "was set up to further statistical and risk mitigating algorithms, to develop some ideas around CBT learning methodologies, and to mine Bitcoin." (Ex. 7).  Craig also put this admission into legal documents he claims are valid stating that W&K "is the owner of and conducts the business known as Bitcoin mining and Software development / Research." (Ex. 5 at 3).  Finally, Craig has admitted this to third parties where, e.g.,

---

[13] This Second Amended Complaint attaches certain emails with timestamps from Australian time zones.  For consistency, the Second Amended Complaint has converted various timestamps to Eastern Standard Time.

[14] When confronted with the claims in this lawsuit, Craig didn't hesitate to continue his fraud against W&K and Dave's estate by perjuring himself in a sworn declaration filed with this Court, wherein he now swears, in absolute conflict with his Australian affidavit, that he never had any interest in W&K. See *Infra*, 160-170.  It seems that whatever interest he once held in W&K, he has disclaimed it.

on February 12, 2014, he emailed Dave's former business partners stating "Dave and I had a project in the US. He ran it there . . . The company he ran there mined Bitcoin." (Ex. 8 at 5).

75.     *Third*, in leaked ATO transcripts, Craig's bookkeeper states that "W&K was an entity created for the purpose of mining Bitcoins." (Ex. 9 at 3).

76.     Dave and Craig collaborated within W&K to create intellectual property.  Craig then used W&K and this intellectual property to personally solicit business from the United States Department of Homeland Security ("DHS"). (Ex. 4 at 40-43).

77.     Craig acted as W&K's "authorized representative," its "lead researcher," and its "technical contact." (*Id.* at 45-46, 50, 56-57, 63-64, 70-71, 76-77, 83-84, 90). Further, Craig repeatedly used W&K's Florida address as his own, *e.g.*, identifying it as his "mailing address." (*Id.* at 50, 57, 64, 71, 77, 84). Craig has also held himself out as W&K's "legal agent and representative" and its "Director/Australian Agent." (Ex. 30).

78.     Craig also claimed to have (i) delivered servers and other computer hardware to Florida for W&K's use (Ex. 10 at 3 (Recital L)); (ii) provided "contract labour services" to W&K (Ex. 11 at 2); (iii) licensed software for W&K's use (Ex. 10 at 3 (Recital M)); and (iv) loaned money to W&K for use in its Florida mining operation (Ex. 10 at 3 (Recital L); Ex. 11 at 3).

### Dave and/or W&K owned a substantial amount of bitcoin

79.     The exact number of bitcoins belonging to Dave's estate and/or W&K will be determined at trial.[15]  That said, various documents including emails, "contracts," spoken admissions, and transcripts from 2014 ATO meetings with Craig, his counsel, and his accountant

---

[15] Accordingly, some counts contain a request for relief for both Plaintiffs, and it will be for the final finder of fact to determine how much each Plaintiff is entitled to recover.

evidence Dave and Craig owned and controlled approximately 1,100,111 bitcoins (either together personally or through their shared interest in W&K).

80.     As discussed above, Craig admitted that he "did partner" with Dave in 2009 to create/mine "digital money," i.e., bitcoins. And Craig has also admitted in multiple documents that W&K (beneficially owned, at the time, and in some form, by Dave and Craig) mined bitcoin. Due to the historically larger mining reward and low competition existing during that time, Craig and Dave's continuous joint bitcoin mining activity since 2009 would have resulted in an unparalleled fortune of bitcoins.

81.     Furthermore, in February 2014, Craig emailed two of Dave's other business partners stating Dave had mined an enormous amount of bitcoins, an amount *"far too large to email."* (Ex. 8 at 5).

82.     In addition, a transcript of a February 18, 2014 meeting between the ATO and Craig demonstrates that Craig has led others to believe he took ownership of Dave's bitcoin. The ATO investigator states:

> We thought yes, ***you've picked up some bitcoin ownership from the deceased director*** so we were trying to, you know, get the picture and connect all the dots. (Ex. 12 at 20) (emphasis added).

83.     Minutes from a February 26, 2014 meeting between the ATO and Craig's bookkeeper (John Chester), document Craig's bookkeeper stating that Dave had an incredible amount of bitcoin, and implying that Craig assumed ownership of them when he died:

> Craig Wright had mined a lot of [b]itcoins . . . Craig had gotten approximately 1.1 million [b]itcoins. There was a point in time, when he had . . . around 10% of all the [b]itcoins out there. Mr Kleiman ***would have had*** a similar amount. ***However***, Mr Kleiman ***passed away*** during that time. (Ex. 9 at 3) (emphasis added).

84.     At the February 18, 2014 meeting, Craig's counsel states that W&K's bitcoins were transferred to Seychelles, Singapore, and UK trusts. As Dave owned between 50% to 100% of

Case 9:18-cv-80176-BB   Document 488-13   Entered on FLSD Docket 05/08/2020   Page 470 of
513
Case 9:18-cv-80176-BB   Document 83   Entered on FLSD Docket 01/14/2019   Page 18 of 49

W&K, *at least* half of the bitcoins allegedly transferred to the trusts belong to Dave (and/or they

all belong to W&K):

> In 2009 the mining of bitcoin commences *** 2011, bitcoin was
> transferred overseas. R and D then conducted in the US under – by a joint
> venture company formed as . . . effectively info defence research LOC.
> Bitcoin mining continues throughout 2011. The bitcoins are derived by
> companies in Singapore and the Seychelles or entities in Singapore and
> the Seychelles, and they're actually trusts. Trustee companies and trusts
> established - or trustee companies in the United Kingdom and other trusts
> established in the Seychelles. Further work was planned. In early April
> 2013 unfortunately Dave . . . dies in the US towards the end of April 2013.
> (*Id.* at 6).

85.      Years later, Craig admitted to Andrew O'Hagan that "his and Kleiman's mining

activity ha[d] led to a complicated trust." (Ex. 1 at 36).

86.      In a 2012 email Craig forwarded to Ira, Craig wrote to Dave reaffirming the joint

nature of the bitcoin allegedly held in trust (emphasis added):

> From: Craig Wright [mailto:craig@rcjbr.org]
> Sent: Wednesday, 10 October 2012 4:55 PM
> To: Dave Kleiman [mailto:dave@davekleiman.com]
> Subject: FW: IFIP-WG11.9 CFP
>
> We need to discuss the trsut [sic] and work out what the [expletive] *we* are
> doing with it all. So, a good tax deductible way to have a visit and also
> write a paper. (Ex. 31)

87.      In fact, Craig consistently referred to the "trust" as both Craig and Dave's, for

example in another email Craig forwarded to Ira (emphasis added):

> From: Craig S Wright
> To: dave@davekleiman.com
> Subject: This week
> Date: Tue, 22 May 2012 09:45:31 +1000
>
> Dave,
> A recycled rant . . . the ATO are simply BS'ing again. It costs me money
> and in a way I guess they want to get a result through attrition rather than
> honesty. They will drain all I have if they can. **We do not touch the trusts**.
> Not yet. Not even for this. ONE DAY, they will change the world. Not
> millions, not billions. If I am right, they will be trillions and let them try

[expletive] **on us** then. . . (Ex. 13) (bold emphasis added; profanity redacted).

88.     In a 2014 email exchange with Ira, Craig *admitted* that at least 300,000 of the 1,000,000+ bitcoins allegedly held in trust belong to Dave:

> From: Ira K <REDACTED@REDACTED>
> To: Craig S Wright <craig.wright@hotwirepe.com>
> Subject: Bond villains
> Date: Sat, Mar 1, 2014 at 2:42 PM
>
> Just to clarify on thoughts from previous email... In one of the email exchanges between Dave and you, he mentioned that you had 1 million Bitcoins in the trust and since you said he has 300,000 as his part. I was figuring the other 700,000 is yours. Is that correct?
> Ira
> ---
> From: Craig S Wright <craig.wright@hotwirepe.com>
> To: Ira K <REDACTED@REDACTED>
> Subject: Re: Bond villains
> Date: Sat, Mar 1, 2014 at 3:00 PM
>
> Around that. Minus what was needed for the company's use
> Sent from my HTC. (Ex. 14).

89.     As discussed below in more detail, Craig provided fraudulent contracts to the ATO in an attempt to substantiate his ownership of bitcoins and intellectual property assets that belonged to Dave and/or W&K. Their authenticity aside, however, these "contracts" produced by Craig constitute his admission that Dave, Craig, and W&K collectively owned hundreds of thousands of bitcoins.

90.     For example, a 2011 contract produced by Craig includes a provision stating W&K expected to mine new bitcoin at a rate of 12,000 bitcoins per month for a period of over two years (312,000 bitcoin). (Ex.10).

19

91.    Further, a 2012 contract provided to Ira by the ATO lists Bitcoin wallets containing over 650,000 bitcoins (the "2012 Deed of Loan"). Next to the list of wallets and total bitcoin held, there is a handwritten annotation stating: "*as agreed, all wallets to be held in UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW.*" (Ex. 15 at 9). This annotation is in Craig's handwriting.

92.    As can be seen, Dave, in partnership with Craig, lawfully mined and possessed hundreds of thousands of bitcoins both in his individual capacity and through W&K.

93.    The mined bitcoins were stored in wallets in the possession of Dave, Craig, W&K, and/or certain trusts. These wallets were not used for any purpose but to store the bitcoins for sale at some future date.

94.    As "partners" from c. 2008-2011, and then in some form of "co-owners/members" of W&K from 2011-2013, Dave and Craig shared the private keys to the bitcoins they mined. As demonstrated from emails produced by Craig, his ability to control the bitcoins continued once they were, allegedly, placed in trust.

**After Dave's death, Craig fraudulently converted the bitcoin and intellectual property that belonged to, and was possessed by, Dave and/or W&K**

95.    After Dave's death, Craig took sole ownership/control of all bitcoins and intellectual property owned by Dave and/or W&K and those that were held in trust for Dave and/or W&K and refuses to return any bitcoins or intellectual property to the estate or W&K.

96.    It appears that Craig needed to use W&K and Dave's assets to try and justify certain tax positions he claimed in Australia. To that end, he instituted an elaborate scheme to assert dominion over Dave's and W&K's bitcoin and intellectual property.

97.    To accomplish this scheme, Craig drafted and backdated at least three contracts, and forged Dave's signature on at least two, to create a fraudulent "paper trail" purporting to show

that Dave transferred bitcoins and intellectual property rights that belonged to Dave and W&K, to

Craig.  These fraudulent contracts include:

      a.    2011 contract titled "Intellectual Property License Funding Agreement"

(the "2011 IP Agreement") (Ex. 10);

      b.    2012 contract titled "Deed of Loan" (the "2012 Deed of Loan") (Ex. 15);

and

      c.    2013 contract titled "Contract for the Sale of Shares of a Company Owning

Business" (the "2013 W&K Sale Agreement") (Ex. 5).

98.    On their face, these contracts are demonstrably fraudulent in a number of manners.

99.    *First*, the electronic signatures on these documents are not Dave's.  They are

substantially different than known examples of Dave's electronic and written signatures:

| Authentic Signatures 2/1/2013[16] & 7/30/2003[17] & 2/22/2012 | Signature on Fraudulent Contracts 4/22/2011 & 04/2/2013 |
| --- | --- |
|  |  |

---

[16] See Ex. 16 (signature on Computer Forensics LLC Operating Agreement).

[17] See Ex. 17 (signature on Dave's last will and testament).

100.     In fact, this signature is a near identical copy of a computer-generated font called Otto, available here: https://www.wfonts.com/font/otto.  When computer generated, this Otto font produces the signature:

Otto.ttf

*Dave Kleiman*

101.     When confronted with this information by Ira, Craig admitted the signatures were computer generated, but claimed there were other ways to prove their veracity.

102.     Craig has never provided additional evidence of their legitimacy.

103.     *Second*, the "Purchaser" listed in the 2013 W&K Sale Agreement is "Craig Wright R&D" and is further identified by its Australian Business Number (ABN) 97 481 146 384. However, the entity associated with this ABN was not identified as "Craig Wright R&D" until September 2, 2013 – over three months after Dave died.[18]

104.     *Third,* the terms of the 2011 IP Agreement are nonsensical.  While it purports to "finance" W&K through the transfer of around 215,000 bitcoin, and requires W&K to "fund the software development using bitcoin," there was essentially nothing that could be purchased with bitcoins at that time.  Thus, no one could "finance" or "fund" anything with bitcoins then.  This calls the 2013 W&K Sale Agreement's purported "release" of this nonsensical "financing arrangement" into question.

105.     *Fourth,* the 2011 IP Agreement, the 2012 Deed of Loan, and the 2013 W&K Sale Agreement conflict with each other.  The 2011 IP Agreement provides that Bitcoin wallet 1933***XY8a would be held by Craig in escrow and revert to Craig only if W&K defaulted, but

---

[18] https://abr.business.gov.au/SearchByAbnHistory.aspx?abn=97481146384

the 2013 W&K Sale Agreement provides that it will be "released to" Craig *despite* satisfaction of the liability, and the 2012 Deed of Loan shows that same wallet being placed into a trust by Craig with a notation that it be held there until Dave and Craig can set up a joint-company later.

106.     *Fifth*, the 2013 W&K Sale Agreement references 250,000 bitcoin and then 250,500 bitcoin as the amount of bitcoin Dave was to transfer to Craig.

107.     *Sixth*, the fraudulent signatures aren't witnessed or notarized.  Even the most un-sophisticated parties would understand that a contract purporting to release and transfer property valued at eight figures should be substantiated in some way with witnesses and/or notaries.

108.     *Lastly*, many of the contractual terms are extremely convenient for Craig.  For example, the 2011 IP Agreement provides for confidentiality even from family members, stipulates the value of 215,000 bitcoin at 40,000,000 AUD (when it was really worth around ~$250,000), and includes a "typo" showing the date as 2013, and amending it by hand to 2011 (likely because it was written in 2013).

109.     These red flags are rendered even more suspicious by the fact that the 2013 W&K Sale Agreement was purportedly signed a mere 10 days after Dave left the VA hospital, and no more than three weeks before he died.

110.     Craig has a documented history and habit of backdating contracts and documents to suit his needs.  During the February 18, 2014 interview with Craig by the ATO, Craig admitted that he backdated certain tax invoices.  (Ex. 12).  Further, Wired has written that Craig likely backdated numerous blog posts to further his claim of being Satoshi.[19]  Finally, in its 2015 audit

---

[19]     https://www.wired.com/2015/12/new-clues-suggest-satoshi-suspect-craig-wright-may-be-a-hoaxer/.

of Coin-Exch, the ATO assessed tax liability and penalties against Craig for providing recklessly misleading tax information by, *inter alia*, backdating numerous documents. (Ex. 18).

111.     As described herein, after Dave died, Craig unlawfully and without permission took control of the bitcoins from Dave's estate and from W&K by exercising exclusive possession over the private keys necessary to own, move, or sell the bitcoins belonging to Dave and/or W&K; actually using those private keys to move these bitcoins out of their wallets; claiming to own bitcoins really owned by W&K and/or Dave by virtue of fraudulent contracts Craig created; refusing to return bitcoins that belonged to the estate and W&K; moving them to, or holding these bitcoins in, "trusts" known only to him and controlled by him and preventing these assets from being returned to the estate and/or W&K; and using those bitcoins (or the "rights" to them) to make large trades for his Australian businesses.

112.     While the exact number of bitcoins stolen remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of *at least* 300,000 bitcoins that Craig controls in a trust (along with their forked assets). But the estate may be entitled to even more bitcoins based on Dave and Craig's partnership from 2009 until 2011.

113.     Further, as Craig's admitted that the mining continued within W&K from 2011, W&K is entitled to the possession of all bitcoins mined through its operations since 2011 (along with their forked assets).

114.     To Plaintiffs' best knowledge, information, and belief, these bitcoins could number around ~1,100,111.[20]   Together, these bitcoins and their forked assets are worth approximately

---

[20] Should discovery reveal additional bitcoin were mined, either by Dave individually, or by W&K after Dave died, Plaintiffs may amend their Complaint to assert a claim over those bitcoins and their forked assets as well.

$11,427,755,048.02, though at their peak in December 2017 they were worth ~$27,332,125,781.68.

115.   Ira has requested Craig return these bitcoins, but Craig has not done so. In light of this refusal, demanding the return of the forked assets would be futile.

116.   Thus, Craig has wrongfully asserted dominion over Dave and W&K's bitcoins forked assets, and intellectual property in a way that is inconsistent with Dave and W&K's ownership of those bitcoins, forked assets, and intellectual property which has damaged them both.

### Craig attempts to launder the stolen title to W&K's intellectual property, by securing "consent judgments" against W&K, without serving W&K, falsely representing W&K's consent, and using fraudulent contracts

117.   In July and August 2013, Craig filed two claims in New South Wales Supreme Court against W&K for ~$28 million each.  (Ex. 11).

118.   In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research" and that this contract was "bonded against the intellectual property of [W&K]."  (Ex. 11 at 3, 9).  The pleadings alleged that "the contract stated that a breach would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]."  (*Id.* at 4, 10).  The statements of claim allege that the intellectual property at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties." (*Id.*).

119.   W&K was never served, validly or otherwise, with these proceedings; Dave's estate was not even aware of them until long after the judgments had been entered.

120.   Craig prevented W&K from participating in these proceedings as, *inter alia*, he filed, in both lawsuits, a false "Acknowledgment of Liquidated Claim" on behalf of W&K where he represented that W&K accepted and agreed to his claims.  (Ex. 30).  In these filings, Craig falsely identified himself as the "legal agent and representative for the defendant" and its

25

"Director/Australian Agent" and falsely stated that "I acknowledge the whole of the amount being claimed by the plaintiff." (*Id*.). Further, he falsely identified his Australian address and email as the "Address for service" for W&K. (*Id*.).

121.    Craig further prevented W&K from participating in the proceedings, by filing, on August 28, 2013, Consent Orders in both cases. (Ex. 19). These filings represent to the Australian courts that W&K consented to judgment being entered against it through the signature of its "authorised officer," a "J Wilson." (*Id*. at 2). But J Wilson – Craig's employee – was not authorized. Instead, Craig "elected" him a director at a "shareholder meeting" where only Craig was present and only Craig voted. (Ex. 4 at 5-6).

122.    Craig did this even though (i) Craig did not have any direct or voting interest in this Florida LLC (only an indirect or beneficial interest), (ii) Dave's estate (which held at least 50% of the interest in the LLC) was not notified of the meeting, and (iii) even if Craig had a 50% voting interest in W&K, the election of Wilson was void because the "meeting" lacked a quorum.

123.    In April 2014, Ira first learned of these court proceedings, when the ATO sent him some of the court documents. Ira confronted Craig for taking Dave and W&K's assets and concealing the court proceedings from Dave's estate. Craig admitted his subterfuge, but defended himself by claiming the ends justified the means:

> Ira: ". . . From [the] documents [I have] it appears clear to see a systematic transfer of assets out of W&K back to you . . . But you never mentioned any of the actions you were taking against W&K prior to contacting us."
>
> Craig: "Dave died. I did the actions to make sure that the court signed off on what Dave and I planned." (Ex. 20 at 18).

124.    Importantly, these Australian claims, like the sworn testimony he submitted to this Court, are based on demonstrably false factual allegations. Specifically:

125.    The July 2013 claim alleges the existence of an October 27, 2008 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (*Id.* at 2).  However, W&K did not exist in 2008.

126.    Also, the July 2013 claim alleges:

"[Craig] conducted four projects associated with the DHS (Dept. of Homeland Security USA) with [W&K] under contract:

   a.  BAA 11-02-TTA 01-0127-WP  TTA 01 - Software Assurance:  Software Assurance through Economic Measures

   b.  BAS 11-02-TTA 05-0155-WP TTA 05 - Secure Resilient Systems and Networks

   c.  BAA 11-02-TTA 09-0049-WP TTA 09 - Cyber Economics

   d.  BAA 11-02-TTA 14-0025-WP TTA 14 - Software Assurance MarketPlace (SWAMP)." (*Id.* at 9-10).

127.    The July 2013 claim goes on to state that "these funds were rated as:

   a.  TTA 01        US$ 650,000

   b.  TTA 05        US$ 1,8000,000 (*sic*)

   c.  TTA 09        US$ 2,200,000

   d.  TTA 14        US$ 1,200,000." (*Id.* at 10).

128.    However, these statements were false.  The results of Freedom of Information Act requests by Ira to the DHS reveals that W&K's applications for TTA 01, TTA 05, TTA 09, and TTA 14 were all denied by the DHS.  (Ex. 21).

129.    The August 2013 claim also contains a demonstrably false allegation, alleging the existence of a January 8, 2009 contract between Craig and W&K, claiming that "[W&K] agreed

to pay [Craig] for property and consulting services." (Ex. 11 at 2). But again, W&K did not exist until 2011.

130.    On November 6, 2013, judgments appear to have been entered for both Australian claims. (Ex. 22). Craig's fraud to keep W&K and Dave's estate out of the litigation was successful as, in the judgment, the Court "**note[d] the agreement of the parties** that [Craig] will accept the transfer of the intellectual property held by the plaintiff in full and final satisfaction of the judgment." (*Id.*) (emphasis added).

131.    To this day, Craig has used these fraudulently obtained judgments to assert ownership over the intellectual property assets developed by W&K and Dave. For example, in the February 18, 2014 meeting with the ATO, Craig's attorney represented to the ATO that "intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange . . . and so on." (Ex. 12 at 7). And later again stating: "Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire . . ." (*Id.* at 18). Further, as discussed in para 142-143, the ATO has provided Ira with "deeds" drafted and executed by Craig which show that his companies have taken ownership over the intellectual property created by W&K and "transferred" by virtue of these fraudulently obtained "judgments."

### Craig reaches out to Ira to cover up his fraud, deceive Ira into believing him, and secure an ally in his fight against the ATO

132.    With the ATO closely auditing Craig's activities, Craig knew he had to reveal some of his and Dave's bitcoin mining and blockchain work to justify various tax positions he took in Australia. Realizing this would lead the ATO to contact the Kleimans, Craig reached out first.

133.    Nearly ten months after Dave's death, on February 11, 2014, Craig reached out to

Dave and Ira's 94 year old father Louis, and wrote:

> Date: Feb. 11, 2014
> From: Craig Wright <Craig.Wright@hotwirepe.com>
> To: Louis <REDACTED@REDACTED>
>
> Hello Louis,
>
> Your son Dave and I are two of the three key people behind Bitcoin . . .
>
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.
>
> Know also that Dave was a key part of an invention that will revolutionise the world . . .
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.
>
> I will let you know when I am in the USA.  (Ex. 23).

134.    As Louis Kleiman was elderly, Ira took over the correspondence with Craig.

135.    Craig told Ira he was partners with Dave and that no one knew about their

collaboration or W&K. He explained to Ira that W&K was involved in Bitcoin mining and that it

was quite successful.

136.    Shortly after informing Ira about W&K, Craig told Ira that Craig and Dave were

planning on starting a new company together called "Coin-Exch." He explained to Ira that Dave's

estate would receive shares in it worth millions.

137.    On April 23, 2014, Craig wrote to Ira:

> Date: April 23, 2014 8:56pm
> From: Craig <craig@rcjbr.org>
> To: Ira <REDACTED@REDACTED.com>

The software Dave updated, and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level. This is all good under the law. Basically the GST (like a Vat) cancels as it is an international transfer

What company owns right now is:

- Software – incl source code and perpetual licenses valued at over $50 million.
- Intellectual Property, design, codes etc
- Research claims. (Ex. 24).

138.    At the same time Craig was defrauding the Kleimans, Craig also reached into Florida though an agent, Uyen Nguyen, to revive W&K after it had been administratively dissolved – to ensure he had control over it if necessary.

139.    Consequently, on March 28, 2014, nearly a year after Dave died, W&K was reinstated by Craig's agent, Uyen Nguyen ("Uyen"). (Ex. 25). Uyen removed Dave as the registered agent for W&K and listed herself. (*Id.*). She then added herself as manager and secretary and an entity named Coin-Exch Pty Ltd as director. (*Id.*; ECF 12 at 11 n3). But Coin-Exch Pty Ltd was merely Craig seizing control of W&K from the shadows, as it's well established "Craig Wright" was the "director and controlling mind" of Coin-Exch Pty Ltd. (Ex. 18 at 5).[21]

140.    Of course, despite Ira and Craig being in regular email contact at the time, Craig concealed this action from Ira.

**The ATO reached out to Ira to verify Craig's allegations over W&K, and provided Ira with documents that demonstrate Craig assumed control over intellectual property that belonged to W&K and/or Dave**

141.    As Craig expected, on April 15, 2014, an auditor from the ATO, reached out to Ira to inquire about his knowledge concerning the legal action Craig took against W&K. The auditor provided Ira copies of the 2011 IP Agreement and the 2013 W&K Sale Agreement.

---

[21] https://www.arnnet.com.au/article/621503/australian-bitcoin-figure-supercomputing-company-enters-liquidation/.

142.     The ATO also provided Ira with three deeds, each titled "IP Deed of Assignment" and each executed on September 15, 2013 – nearly four months after Dave's death.  (Ex. 26; Ex. 27; & Ex. 28).  Each of these IP Deeds of Assignments assigned various intellectual property rights from DeMorgan Ltd to three entities: Coin-Exch Pty Ltd (Ex. 26), Hotwire Preemptive Intelligence Pty Ltd (Ex. 27), and Cloudcroft Pty Ltd (Ex. 28).

143.     The deeds also described the source and nature of this IP: "The IP held in total by DeMorgan consists of source code, algorithms and patentable materials that have been obtained by Craig Wright R&D (ABD 97 481 146 384) through the following unrelated entities . . . W&K Information Defense Research LLC [as two batches]." (Ex. 26 at 4; Ex. 27 at 4; & Ex. 28 at 4).

**Craig continues to assure Ira and reveals the nature of the intellectual property owned by, and misappropriated from, W&K and Dave**

144.     On April 22, 2014, Ira wrote to Craig that after he had time to review the documents sent by the ATO, he "felt like there [were] questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value . . . ."  (Ex. 24 at 20).

145.     To keep Ira from going public, Craig promised Ira that he could be paid out of what was owed to Dave's estate "based on what Dave and I had been arranging."  (*Id.* at 12).  On April 23, 2014, Craig told Ira that he would receive the first $12 million payment in October 2014.  (*Id.* at 8).

146.     On the same day, trying to further placate Ira, and further evidencing Dave and the estate's claim to W&K's transferred intellectual property, Craig wrote Ira stating:

> The software Dave updated and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level . . . Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code. (*Id.* at 2).

147.    On April 25, 2014, still trying to reassure Ira, Craig sent Ira a chronology of his activities related to W&K and the development of its intellectual property. In this document, Craig wrote:

> There is a lot of IP and 'stuff' in the mix. All up, it's around a hundred million dollars' worth. This IP originates in work CSW has been doing for more than 10 years; it originates in things that came from W&K; it has to do with the software acquired. The values and distribution . . . amounts to a third each for Cloudcroft, Hotwire, and Coin exch. Cloudcroft gets the security related IP, Coin-Exch gets the banking and Hotwire gets all of the automation R&D based stuff. (Ex. 7).

148.    The nature of this intellectual property transferred from W&K to DeMorgan, Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft was further explained by Craig in a letter he published on DeMorgan's website in 2015. This letter demonstrates that Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft were involved in building out W&K's intellectual property with R&D efforts targeted at "the development of smart contract and Blockchain based technologies" and "commercialisation of our Blockchain and smart contract systems research."[22]

149.    Craig's promise of a multi-million dollar payment by October 2014, never came true. Craig blamed the delay on the ATO investigation and kept promising Ira he would see value when the investigation closed.

150.    On October 9, 2015, Craig essentially stopped responding to Ira.

151.    In November 2015, Dave's friend and business partner, Patrick Paige reached out to Craig when a reporter called him inquiring about Craig and Dave's involvement in Bitcoin. Craig responded:

---

[22]http://www.businessinsider.com/craig-steven-wright-rumoured-bitcoin-creator-was-commercialising-blockchain-research-and-reviving-company-hotwire-2015-12; https://prwire.com.au/pr/51565/the-demorgan-ltd-group-of-companies-to-receive-up-to-54-million-from-ausindustry-r-amp-d-tax-rebate-scheme-1.

> Thanks for the heads up.  Reporters are always troubling.  They ignored the stuff Dave and I did when he was alive.  I don't know what has started to interest them now . . . as you know[, **Dave] did a fair amount of research with me.  Most yet to be completed and published**.  (Ex. 8 at 13 (emphasis added)).

152.    After Craig yet again confirmed Dave's involvement in Bitcoin and the intellectual

property they developed, Patrick wrote back:

> . . . I think we both know Dave was a genius when it came to computers and I sure would like Dave to get recognition for his part if any in the development of bitcoins.  I realize there is a lot of things to consider releasing this information but my question is when?  (*Id.* at 12).

153.    Craig responded:  "When it all comes out, there is no way Dave will be left out. **We need at least a year more**."  (*Id.* (emphasis added)).

### Craig claims that he and Dave are Satoshi Nakamoto

154.    On December 8, 2015, two popular tech publications, *Wired* and *Gizmodo*, outed

Craig as Satoshi.[23]  Both articles also articulated Dave's integral role in the development of

Bitcoin.  They described numerous details and leaked communications implicating Dave and

Craig's roles in creating and developing Bitcoin; they also discussed Dave and Craig's

accumulation of a vast hoard of bitcoin.

155.    On May 2, 2016, nearly five months after the *Wired* and *Gizmodo* publications,

Craig published a blog post in which he claimed to be Satoshi.[24]

156.    Craig has readily admitted Dave was intimately involved in the creation of Bitcoin.

In numerous interviews with Andrew O'Hagan, documented in *The Satoshi Affair*, Craig told

---

[23] https://www.wired.com/2015/12/bitcoins-creator-satoshi-nakamoto-is-probably-this-unknown-australian-genius/;  https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

[24]  https://qz.com/674129/an-australian-nobody-claims-to-be-the-inventor-of-bitcoin-but-no-one-knows-for-sure/.

O'Hagan that "[Craig] did the coding and that Kleiman helped him to write the white paper." (Ex. 1 at 31).

157.    Further, in numerous emails to Ira, Craig admitted the same.

158.    Craig currently serves as Chief Scientist of a UK company called nChain in London, where, in 2016, he filed dozens of patents related to Bitcoin and blockchain technology through this entity.[25] The public filing of these patents disclosed to the public intellectual property belonging to Dave and W&K without the permission of Dave's estate and/or W&K.

159.    To date, neither Dave's estate nor W&K have received the assets belonging to them as a result of their early involvement in Bitcoin and bitcoin mining.

### Fraud on this Court[26]

160.    In Ira's initial Complaint, as in this one, he alleged that (i) Craig and Dave held some form of interests in a Florida LLC called W&K, that (ii) through this LLC, and otherwise, they mined over 1.1 million bitcoins and developed extremely valuable intellectual property, that (iii) after Dave died, Craig took unlawful possession of all the bitcoins the Florida LLC mined and intellectual property it created (along with the bitcoin and intellectual property they mined/developed together personally), that (iv) Craig then tried to "launder" this stolen intellectual property by defrauding the Australian courts into entering consent orders transferring clean title over W&K's intellectual property to Craig; and that (v) Craig needs to return the stolen property.

161.    In response to this Complaint, Craig filed a motion to dismiss alleging he has essentially **no** connection to Florida or W&K.  His motion stated Plaintiff's jurisdictional

---

[25]  https://www.reuters.com/article/us-bitcoin-wright-fund-exclusive/exclusive-company-behind-bitcoin-creator-sold-to-private-investors-idUSKBN17F26V.

[26] The emphases appearing in this section have been added.

allegations were "frivolous" and "sanctionable." (ECF D.E. 12 at 36). Craig supported these assertions with a sworn declaration stating he was never a shareholder, member, agent, employee, or representative of W&K. (Ex. 29 ¶¶ 11-12). He swore, under penalty of perjury under the laws of the United States, that he's never exercised authority or control over W&K. (*Id.* ¶ 13).

162.    He perjured himself.

163.    To procure his fraudulent Australian judgments, Craig submitted an affidavit to the Supreme Court of New South Wales where Craig affirmed that:

> "The **shareholding** of 'W&K Info Defense LLC' was:
>
> 1. **Craig S Wright**            **50.0%**
> 2. David A Kleiman        50.0%"

(Ex. 4 at 5).

164.    Craig then doubled down on this ownership structure affirming further that "W&K Info Defense LLC was an incorporated partnership. **All shares are held jointly**." (*Id.*). He then affirmed that **he called a "shareholders meeting"** on August 16, 2013 at which only he and Jamie Wilson were present. (*Id.*). Craig affirmed **he was the sole vote** that nominated Jamie Wilson to act as a director "for purposes of consenting to orders and the company to be wound down." (*Id.* at 5).[27]

165.    These affidavit statements directly contradict his sworn statements to this Court that (i) "I have never been a . . . **shareholder** . . . of W&K," (ii) "I have never been a **member** of W&K," and (iii) "I have never **exercised authority or control** over W&K . . ." (Ex. 29 ¶¶ 11-13).

166.    But the perjury doesn't end there.

---

[27] Under Florida law, there is no such thing as an "incorporated partnership" and an LLC does not have "shares" or "directors" or hold shareholders' meetings. The "owners" of an LLC are called "members."

167.     Craig attached voluminous records to his Australian affidavit. These attachments evidence Craig signed as the "**authorized representative**" of W&K six (6) times (Ex. 4 at 56, 63, 70, 76, 83, 90), identified himself as W&K's "**lead researcher**" twice (*id*. at 45-46), its "**technical contact**" six (6) times (*id*. 50, 57, 64, 71, 77, 84), affiliates himself with **W&K's Florida address** as, *e.g.*, his "**mailing address**" twelve (12) times (*id*. at 49, 56-57, 63-64, 70-71, 76-77, 83-84, 90), includes detailed descriptions of the computer programs and research Craig was **attempting to get DHS to fund** (*id*. at 50-94), and includes four (4) emails from DHS confirming Craig had **uploaded various proposals on behalf of W&K attempting to secure funding** (*Id*. at 40-43). Collectively, these documents clearly evidence Craig's participation in operating W&K from Florida to solicit business from the United States DHS.

168.     Obviously, these affidavit attachments are in direct conflict with Craig's sworn statements to this Court that (i) "I have never been a . . . **employee,** or **representative** of W&K," (ii) "I have never been an **agent** of W&K," (iii) "I have never . . . **developed software for** any purpose relating to a Florida business, including **W&K**," (iv) "I have never **advertised services in Florida**," (v)  "I have never had an **office in Florida**," and (vi) "I have never **exercised authority or control over W&K** . . ."  (Ex. 29 ¶¶ 6, 8, 11-13, 15).

169.     As mentioned in ¶ 120, Craig also submitted two "Acknowledgment of Liquidated Claim" filings in Australia where he signed as the "**legal agent and representative**" of W&K and as its "**Director/ Australian Agent**." (Ex. 30). As set forth in ¶¶ 138-139 he also acted as the "**director**" of W&K when he had his agent put Coin-Exch, his company, as its director.  These also directly conflict with his sworn testimony above.

170.     Craig's boldfaced misrepresentations and perjury before this Court constitute a continuation of his grand fraud to unlawfully take Plaintiffs' assets.  Said differently, Craig's latest

fraud on this Florida Court is simply one more action he's taken in Florida to defraud Dave's estate and W&K.

## CLAIMS FOR RELIEF

### COUNT I
**Conversion**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

171.    On or about April 2013 through the present day, Defendant converted to his own use, bitcoins, forked assets, and intellectual properties that was then the property of, and owned by, the estate and/or W&K.

172.    The property was worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over it.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages in the amount of at least $11,427,755,048.02 and/or return of the wrongfully converted bitcoins with their forked assets. Plaintiffs demands the return of the IP, or its fair market value. Plaintiffs also demand punitive damages, together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT II
**Unjust Enrichment**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

173.    Plaintiffs have conferred a benefit on the Defendant, who has knowledge thereof.

174.    Defendant voluntarily accepted and retained the benefit conferred.

175.    The circumstances render Defendant's retention of the benefit inequitable unless the Defendant pays to Plaintiffs the value of the benefit.

176.    Defendant has been unjustly enriched at Plaintiffs' expense.

177.     Plaintiffs are entitled to damages as a result of Defendant's unjust enrichment, including disgorgement of all monies and or properties unlawfully accepted and retained by Defendant from Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant for the return of the wrongfully retained property or monetary damages equaling to the value thereof, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT III
### Misappropriation
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

178.     After Dave's death, Craig unlawfully, willfully, and maliciously misappropriated trade secrets belonging to Dave and/or W&K relating to blockchain based technologies and smart contracts by using them for himself and using a series of fraudulent contracts, misrepresentations, and fraudulently obtained court judgments to transfer/acquire the property rights in these trade secrets to/for himself.

179.     These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts. These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

180.     These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. As evidence of the substantial economic value relating to these trade

secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

181.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets. Dave made no disclosures of these trade secrets to anyone but Craig.

182.    As a proximate result of Craig's unlawful misappropriation, Dave's estate and/or W&K have suffered actual losses consisting of the loss in economic value associated with the trade secrets.

183.    As a proximate result of Craig's unlawful misappropriation, Dave's estate and W&K are informed and believe that Craig has been unjustly enriched.

184.    As a proximate result of Craig's unlawful and willful misappropriation, Dave's estate is entitled to a recovery of damages pursuant to Fla. Stat. § 688.004.

WHEREFORE, Plaintiffs demand judgment against Defendant for all available damages caused by Craig's misappropriation, including exemplary damages, together with court costs, interest, attorney's fees pursuant to Fla. Stat. 688.005, and any other relief this Court deems just and proper.

## COUNT IV
### Federal Defense of Trade Secrets Act
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

185.    Craig's conduct described in this Second Amended Complaint constitutes misappropriation of trade secrets under the Defend Trade Secrets Act. 18 U.S.C. §§ 1832.

186.    These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts which is a product used

and intended to be used in interstate and foreign commerce. These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

187.    These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use. As evidence of the substantial economic value relating to these trade secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

188.    Craig caused many of these patents to be filed *after* May 11, 2016.

189.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets. Dave made no disclosures of these trade secrets to anyone but Craig.

190.    As a proximate result of Craig's unlawful misappropriation, Dave's estate has suffered actual losses consisting of the loss in economic value associated with the trade secrets.

191.    As a proximate result of Craig's unlawful misappropriation, Dave's estate is informed and believes that Craig has been unjustly enriched.

WHEREFORE, Plaintiffs demand judgment against Defendant for the value of the wrongfully taken intellectual property, together with court costs, interest, attorney's fees, and any other relief this Court deems just and proper.

**COUNT V**
**Breach of Fiduciary Duty**
(*Asserted by the Estate and W&K*)

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

192.     Although Craig did not have a direct ownership interest in W&K, he owed fiduciary duties to the LLC, as, *inter alia*, its agent, its purported "authorized representative," "lead researcher," "technical contact," "legal agent and representative" and "Director/Australian Agent." Although lacking any authority to do so, upon Dave's death Craig assumed *de facto* control and management of W&K and thereby incurred fiduciary duties to act in the LLC's, and its member's, best interests.

193.     In the alternative, just as the shareholders of a closely held corporation have partnership-like fiduciary duties to each other, Craig and Dave acted as partners in the management and operation of W&K, and thus Craig owed fiduciary duties of care, loyalty, and good faith to Dave, his estate, and W&K, by virtue of their joint venture.

194.     In the alternative, if Craig *was* an actual member in W&K Info Defense LLC, Craig owed fiduciary duties of care, loyalty, and good faith to W&K, Dave, and his estate pursuant to Fla. Stat. § 605.04091.

195.     Craig breached his fiduciary duty of loyalty and good faith, by, among other things, intentionally and wrongly transferring assets that belonged to Dave's estate and/or W&K to himself and/or companies controlled by him.

196.     Dave's estate and or W&K have been damaged by Craig's breach of his fiduciary duties.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages and/or return of the wrongfully taken bitcoins, forked assets, and intellectual property, together with court costs, interest, and any other relief this Court deems just and proper.

41

## COUNT VI
### Breach of Partnership Duties of Loyalty and Care
*(Asserted by the Estate)*

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

197.    From c. 2008 until at least the creation of W&K in 2011, Craig and Dave associated to carry on as co-owners of a business for profit to create Bitcoin, mine bitcoins, and create other block chain intellectual property. Pursuant to Fla. Stat. § 620.8202, and Craig's admission of same, this formed a partnership.

198.    Pursuant to Fla. Stat. § 620.8404(2), Craig owed Dave a duty of loyalty to, *inter alia*, "account to the partnership and hold as trustee for the partnership any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity.

199.    Pursuant to Fla. Stat. § 620.8404(3), Craig owed Dave a duty of care to refrain from engaging in intentional misconduct, or a knowing violation of law.

200.    Craig breached these duties of loyalty and care by, *inter alia*, stealing Dave's bitcoins and any intellectual property Dave owned and or designed during the c. 2008-2011 timeframe (or any other time they partnered).

201.    Pursuant to Fla. Stat. §§ 620.8405, Dave's estate brings this action for breach of the duties of loyalty and care owed under Fla. Stat. § 620.8404, including but not limited to its rights pursuant to Fla. Stat. §§ 620.8401, 620.8403, 620.8807, its right to have its partnership interest purchased pursuant to § 620.8701, and to otherwise enforce the rights and protect the interests of Dave's estate.

42

WHEREFORE, Plaintiff demands judgment against Defendant for damages, and purchase of his partnership interest together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT VII
### Fraud
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

202.   As detailed above, Defendant made knowing false statements of fact, intentional omissions of material facts, and falsely promised future action with no intention of performing and/or specifically intending not to perform. These included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred, sold, and/or returned to Craig pursuant to valid contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

203.   Defendant took these actions/omissions with the purpose of inducing Plaintiffs to rely on these fraudulent acts and omissions.

204.   Plaintiffs acted in reliance on Defendant's fraudulent representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

43

205.    As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT VIII
### Constructive Fraud
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170, and 192-205.

206.    As detailed above, a fiduciary relationship existed between Craig and W&K and Craig and Ira.

207.    Craig invited W&K and Ira's utmost trust and loyalty as their fiduciary.

208.    Plaintiffs reposed the utmost trust and loyalty in Craig.

209.    Craig intentionally violated Plaintiffs trust and confidence, took unconscionable advantage of Plaintiffs, abused and took improper advantage of their confidential and fiduciary relationship, and materially breached his fiduciary duties to them both by knowingly making false statements of fact, intentional omissions of material facts, remaining silent in light of a duty to speak, falsely promising future action with no intention of performing and/or specifically intending not to perform, and by engaging in unfair methods against them. These fraudulent representations/omissions included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred, sold, and/or returned to Craig pursuant to valid

44

contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

210.    As detailed above, at the time Craig made those false statements and material omissions, and concealed his misconduct, a fiduciary relationship existed between Craig and Ira, and Craig and W&K, as Craig owed fiduciary duties and duties of care and loyalty to the estate and W&K.  Craig induced Ira's reliance and Craig took an improper/unconscionable/unfair advantage of, and abused, the fiduciary and confidential relationship at Ira and W&K's expense. Craig's misrepresentations and omissions were intentional, for the specific purpose of defrauding the estate and W&K of their property, but in any event, regardless of intent, Craig is liable for constructive fraud.

211.    Plaintiffs acted in reliance on Defendants fraudulent and unfair representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

212.    As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court

45

judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT IX
### Permanent Injunction
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

213.   Craig's unlawful taking of the bitcoins and intellectual property belonging to Plaintiffs has resulted in great and irreparable injury to them both as they have been deprived of unique, limited, and valuable digital assets.

214.   Neither Plaintiff can be fully compensated in damages and is without adequate remedy at law.

WHEREFORE, Plaintiffs request this Court enter an injunction ordering Defendant to return all bitcoins, forked assets, and intellectual property unlawfully taken from Plaintiffs.

### COUNT X
### Civil Theft - § 772.11 Fla. Stat.,
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

215.   On or about April 2013 through the present day, Defendant knowingly and wrongfully took, with felonious criminal intent, bitcoins, forked assets, and intellectual properties that were then the property of, and owned by, the estate and/or W&K.

216.     Defendant took these with the intent to deprive Plaintiffs of the right to these properties and to appropriate the properties to his own use and the use of others not entitled to use the properties.

217.     Defendant also trafficked in, and endeavored to traffic in, properties that he knew were stolen and properties that he initiated, organized, planned, financed, directed, managed, and supervised, the theft of.

218.     The properties were worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over them.

219.     The actions taken by Defendant were done intentionally and maliciously as part of a scheme designed to defraud Plaintiffs of their assets.

220.     On June 19, 2018, pursuant to § 772.11 Fla. Stat., counsel for Plaintiffs sent the demand required by Florida Law required to initiate a claim for civil theft.  (Ex. 33.)

221.     Defendant has not complied with that demand.

222.     Plaintiffs have been damaged as a result of Defendants actions.

223.     Plaintiffs have retained the undersigned to represent them in this action and in so doing have incurred an obligation for the payment of attorney's fees and costs.

WHEREFORE, Plaintiffs demand judgment against Defendant awarding damages, including treble damages and attorney's fees pursuant to § 772.11 Fla. Stat. as well as ordering Defendant to divest himself of relevant enterprise(s), as well as granting such other relief as the Court deems just, equitable and proper.

**Plaintiffs demand a trial by jury for all issues triable by right.**

Dated:  January 14, 2019

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: */s/Velvel Devin Freedman*
Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.    (305)539-8400
Fax.    (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.    (914)749-8200
Fax.    (914)749-8300
Email: kroche@bsfllp.com
*Admitted pro hac vice*

Attorneys for Plaintiffs
IRA KLEIMAN in his capacity as Personal
Representative of the Estate of David Kleiman and
W&K Info Defense Research, LLC.

48

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 14, 2019, a true and correct copy of the foregoing

was filed with CM/ECF, which caused a copy to be served on all counsel of record.

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman

**From:** Dave Kleiman
**Sent:** Tuesday, February 15, 2011 12:29 PM
**To:** craig.wright@ ▮▮▮▮▮▮▮ /ynn.wright@ ▮▮▮▮▮▮▮
**Subject:** RE: Registration - TTA1
**Attachments:** 001-Print-cr2e047.pdf

**Importance:** High

Last page of attached. Do you think I can list you as mgr or mgrm with a foreign address, or you think they would kick it back?

Dave

-----Original Message-----
From: Dave Kleiman
Sent: Tuesday, February 15, 2011 06:35
To: 'craig.wright@ ▮▮▮▮▮▮ /ynn.wright@ ▮▮▮▮▮▮
Subject: RE: Registration - TTA1

Did you already create a username and password?

-----Original Message-----
From: Craig S Wright ▮▮▮▮▮▮▮▮▮▮
Sent: Tuesday, February 15, 2011 04:48
To: Dave Kleiman, lynn wright @ ▮▮▮▮▮▮▮
Subject: Registration - TTA1

The first is to do with the attached papers...



White paper title Software assurance through economic measures

This also leads to the following one with

White paper title Software derivative markets

And

Information Security risk markets

Greyfog (last email) should also come under ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dr. Craig S Wright http://gse-compliance.blogspot.com > GSE-Malware, GSE-Compliance, LLM. &

Information Defense http://www.info-def.com.au > Pty Ltd

Mobile ▮▮▮▮▮▮

Description: Logo4

EXHIBIT
tabbies®
[ 1 ]

DEF_00009657

## Electronic Articles of Organization
### For
## Florida Limited Liability Company

L11000019904
FILED 8:00 AM
February 16, 2011
Sec. Of State
tcline

### Article I

The name of the Limited Liability Company is:

W&K INFO DEFENSE RESEARCH LLC

### Article II

The street address of the principal office of the Limited Liability Company is:

3119 CONTEGO LANE
PALM BEACH GARDENS, FL. US  33418

The mailing address of the Limited Liability Company is:

4371 NORTHLAKE BLVD #314
PALM BEACH GARDENS, FL. US  33410

### Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

### Article IV

The name and Florida street address of the registered agent is:

DAVID A KLEIMAN
3119 CONTEGO LANE
PALM BEACH GARDENS, FL.   33410

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:   DAVE KLEIMAN



EXHIBIT
12

## Article V

The name and address of managing members/managers are:

Title: MGRM
DAVID A KLEIMAN
4371 NORTHLAKE BLVD #314
PALM BEACH GARDENS, FL.  33410  US

**L11000019904**
**FILED 8:00 AM**
**February 16, 2011**
**Sec. Of State**
tcline

## Article VI

The effective date for this Limited Liability Company shall be:

02/14/2011

Signature of member or an authorized representative of a member

Electronic Signature: DAVE KLEIMAN

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.



Law Courts Building, Queens Square   Level 5 184  Phillip Street SYDNEY
NSW 2000
General Post Office Box 3 SYDNEY NSW 2001
DX 829, Sydney

Telephone: 1300 679 272
Facsimile:
TTY Phone: (02) 9230 8011

Email: supremecourt.enquiries@courts.nsw.gov.au
Website: www.lawlink.nsw.gov.au/sc

**Supreme Court**
of New South Wales

ABN: 77 057 165 500

W & K Info Defense Research LLC
4371 Norhtlake Blvd 314
Palm Beach
FL 33410 - 6253
United States of America



D0000FGTI2

Your Ref:                                                3 September 2013

## NOTICE OF LISTING

Case number     2013/00245661
Case title      Craig Steven Wright v W & K Info Defense Research LLC

The matter is listed for Directions (Common Law Registrar) on 30/10/2013 at 09:00
AM, Supreme Court - Civil, Supreme Court Sydney Court 9C Queens Square Sydney

If you do not appear at Court, this matter may be dealt with in your absence.

### Listing Inquiries

Judicial Officers and Court Rooms are generally not allocated to cases until the day
before the case is listed.

Listing details for cases are:
- published on the internet at http:\\www.lawlink.nsw.gov.au on the
  afternoon before the case is listed;
- published in the Sydney Morning Herald in the Law Notices section on the
  morning of the case (for Supreme Court and Sydney District Court only);
- available on notice boards in the foyer of the Court each morning.

Principal Registrar

vortak2



1 of 1

EXHIBIT

13

PAIGE_00001908
PAIGE_00001908

POSTAGE
PAID
AUSTRALIA

N 2 I K Info Defense Research, LLC
13711 Northlake Blvd 314
Palm Beach
FL 33410 - 6253
UNITED STATES OF AMERICA

Recvd 10/10/13

AIR MAIL



**Supreme Court**
of New South Wales

GPO Box 3, Sydney 2001

PAIGE_00001909
PAIGE_00001908

Message

| | |
|---|---|
| **From:** | Patrick Paige |
| **Sent:** | 5/8/2014 5:13:42 PM |
| **To:** | Carter Conrad ██████████████████ |

**Subject:** FW: Mailbox Renewal Reminder

fyi

*Patrick Paige* EnCE SCERS
1880 North Congress Ave. Ste 333
Boynton Beach FL 33426
Office: 561.404.3074
Cell: ████████
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Dex████████████████
**Sent:** Thursday, May 08, 2014 12:30 AM
**To:** Patrick Paige
**Subject:** Re: Mailbox Renewal Reminder

Hey Patrick,

I don't think there's any need to renew the mailbox.

So far nothing has come from the Bitcoin stuff. There's a lot more to the story and it's complicated. Hopefully one day if anything ever comes of it, I'll make sure you guys get a piece of it.

Ira

On Thursday, May 1, 2014 4:02 PM, Patrick Paige ███████████████████ wrote:
I don't think we are going to renew this mailbox so I wanted to check to see if you want to take it over... Let me know if you do and I can meet you over there and transfer it to you otherwise I think we will not renew it.

Patrick Paige EnCE SCERS
1880 North Congress Ave. Ste 333
Boynton Beach FL 33426
Office: 561.404.3074
Cell: ████████
www.computerforensicsllc.com

Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the mes... deleting it from your computer. Thank you.

EXHIBIT
14
IK 1/10/2020

-----Original Message-----
From: donotreply@theupsstore.com [mailto:donotreply@theupsstore.com]
Sent: Thursday, May 01, 2014 1:07 PM
To: Dave Kleiman
Subject: Mailbox Renewal Reminder

Dear David,

This email notification is to inform you that your mailbox is or was due to be renewed on 3/11/2014.
Please come into our center by this date so that we may renew your mailbox and avoid any service
interruptions.

Please call (561) 622-7117 if you have any questions.

Thank you,

The UPS Store (#4067)
4371 Northlake Boulevard
Palm Beach Gardens, FL 33410 USA
(561) 622-7117 Tel


Please Do Not Respond to this email.

PAIGE_00002953
PAIGE_00002952

**From:**       Craig Wright ███████████
**Sent:**       Saturday, February 15, 2014 10:11 PM
**To:**         Ira K
**Subject:**    RE: Re: Dave

The next thing for you to discover is that Dave may have been cash poor, but he was not poor.

I hold shares in trust for him. It is pre-ipo but with a capitalisation of around 40 million $Au. He owns 10% of it.

And I am not kidding.

...
**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: +███████████
http://www.rcjbr.org
  

**From:** Ira K ████████████████
**Sent:** Sunday, 16 February 2014 5:52 AM
**To:** Craig Wright
**Subject:** Re: Re: Dave

Hi Craig,

Thanks for the links.  It certainly appears that you were very close with him.

I apologize if I am asking too many questoins and don't mean to frighten you away
with them.  It's just that since hearing this news about Dave it kind of shocked me.
Yesterday I was feeling skeptical about the whole story, because it sounds like
something out of a James Bond movie.  But after our email exchange and seeing
the video you left about him after his passing. I feel that you are genuine and that
you guys really did work closely together,  I hope we can chat more sometime
about him.  I bet there are many things you know about him that I don't and
vice versa.

Anyway, in regards to the password business, for now I think I will store his drives
in a safe deposit box until we figure out what to do with them.  Do you think I should
let Patrick try to decrypt them or should  I wait for you to send someone? Or perhaps
the person you send could cooperate with him in this effort?

Do you know if Dave stored a passord/key anywhere that would requires his identification
to retrieve it?  If something like that was the case then I could easily grant the authorization
to get it.

Thanks,
Ira

1


EXHIBIT
15
IK 1/10/2020

On Sat, Feb 15, 2014 at 1:41 AM, Craig Wright ██████████ wrote:
Attached – this is an academic paper Dave and I did.
http://link.springer.com/chapter/10.1007%2F978-3-540-89862-7_21#page-2

We also di the following together:
http://www.amazon.com/Official-CHFI-Study-Guide-312-49/dp/1597491977

More, Dave edited most of my books and papers.

Regards
...
**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org
Tel: + 612 8003 7553  |  Mobile: ████████
http://www.rcjbr.org


**From:** Ira K ████████████
**Sent:** Saturday, 15 February 2014 5:11 PM
**To:** Craig Wright
**Subject:** Re: Re: Dave

Understandable.

You mentioned that you and Dave co-authored some books and papers together.
Are there any on Amazon or elsewhere that I can read?

On Sat, Feb 15, 2014 at 12:56 AM, Craig Wright ████████████ wrote:

I will one day. But I cannot yet.

To precarious still.

On 15/02/2014 4:54 pm, "Ira K" ████████████████ wrote:
Knowing my brother, if there was more than a thousand dollars in the account he would have sold it.  He didn't like asking people for help, but during the last
few months he borrowed money from both my Dad and Patrick.  That's what leads me to believe there is not much value in the account if any.  Also the fact
that he didn't mention the account to anyone or leave some kind of note about it.  I truly believe there's no treasure to be found there, but if you could provide
some kind of hard proof that he was involved in creating Bitcoin, that would be a nice consolation.  I'm not exactly sure how you can proove it?

On Sat, Feb 15, 2014 at 12:15 AM, Craig Wright ██████████ wrote:

2

I know he had a lot. I do not know if he spent them early on when they were not worth much or if he had other ideas

On 15/02/2014 4:08 pm, "Ira K" ████████████████ > wrote:
I guess what I'm saying is since Dave never took the time to cash the bitcoins in, do you believe their is enough value in
trying to decrypt drives to find the keys?  He was hard up for money and if he didn't cash them in I find it hard to believe
there is anything of worth in his account.


On Fri, Feb 14, 2014 at 11:56 PM, Craig Wright ████████████ wrote:

Hi Uyen,
Its is Dave's brother.

If you can help him at all. Please do so. I fear Dave may have made things difficult. In any event. Please ensure we cover all we can for Ira.

Its. Uyen works with me.

Craig

---------- Forwarded message ----------
From: "Ira K" ████████████████ >
Date: 15/02/2014 3:47 pm
Subject: Re: Dave
To: "Craig Wright" <craig@██████ >
Cc:

Actually that's the only .asc I could find.  Wasn't able to locate other related files.  And the other drive and dongles are encrypted.
I have the feeling that the keys needed will be so encrypted they won't be retrievable.  But hypothetically if Patrick or myself
found one, how would we proceed to access his account?  Patrick mentioned something about an account being located offshore.
Can you tell me what that's all about?  Sorry, I have so many questions.  I still don't understand why Dave didn't cash in
these Bitcoins if they were of any value.  His house was in foreclosure and he certainly could have used the money.

Thanks,
Ira



On Fri, Feb 14, 2014 at 10:51 PM, Craig Wright ████████████ > wrote:

Likely just a PvP public key. But collect all these.

I will get a person to help with more details over there for you soon.

On 15/02/2014 2:45 pm, "Ira K" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮> wrote:
I just found one .asc file.  it's labeled sdean12.org.asc

inside it shows "-----BEGIN PGP PUBLIC KEY BLOCK-----"
and then a long list of letters and numbers.

what do you think?

On Fri, Feb 14, 2014 at 10:08 PM, Craig Wright ▮▮▮▮▮▮▮▮▮▮ wrote:

Yes.
As small as 1 k

On 15/02/2014 2:05 pm, "Ira K" ▮▮▮▮▮▮▮▮▮▮▮▮> wrote:
Another question...  Could any of these files be stored on floppy disk or CD's?
And do you know approx what size the files could be?

Ira

On Fri, Feb 14, 2014 at 7:48 PM, Craig Wright ▮▮▮▮▮▮▮▮▮▮ wrote:
Hi Ira,
Dave and I had completed several papers and books and had a company together.

I cannot say much right now, but yes, Dave was involved with that PDF. He had the vistomail account, I had the gmx one.

The following pages will help.

- http://www.forensicfocus.com/c/aid=54/reviews/2013/internet-evidence-finder-ief/

- http://www.panamacarsrental.com/images/wallet/BackupBitcoin/bitcoin-walletdat-location.php

- http://www.magnetforensics.com/bitcoin-forensics-a-journey-into-the-dark-web/

You will be looking for Private keys and wallet.dat files. Also look for *.wallet and *.asc. If the drives and phones are encrypted, then that will make this difficult to say the least.

Any QR files and images could also help.

Talk more soon,
...
**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile ▮▮▮▮▮▮▮▮▮▮
http://www.rcjbr.org

  

**From:** Ira K███████████████████]
**Sent:** Saturday, 15 February 2014 3:31 AM
**To:** craigswright@████████
**Subject:** Dave

Hi Craig,

I am Dave's brother, Ira.

I heard via Patrick that you and my brother worked on some tech projects together.
If what he told me is true I would be very impressed.

As the person in charge of his estate, I have most of his belongings and hard
drives, aside from the few Patrick has.  The drives I have are encrypted so
am not sure yet if they can be decrypted.

Can I ask you if Dave played a part in writing the original PDF under the asian alias?
Any info you can share would be most interesting.  I certainly would not disclose
it to anyone outside our circle.  I have no interest in public attention from it.  I just
think it would be cool to know that David played a part in creating something so incredible.

Sincerely,
Ira