08:38:02

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
~~~~~~~~~~~~~~~~~~~~

IRA KLEIMAN, as the personal ) CASE NO.:
representative of the Estate )
of David Kleiman, and W&K Info ) 9:18-cv-8016-BB/BR
Defense Research, LLC )
                                     )
             Plaintiffs,              )
                                     )
                                     )
v.                                   )
                                     )
                                     )
CRAIG WRIGHT                          )
                                     )
             Defendant.               )
_____ )


VIDEOTAPED DEPOSITION OF MS LYNN CARROLL WRIGHT


ON:           Monday, January 13, 2020

AT:           8.57am (Australian Eastern Daylight Savings
                    Time)


TAKEN AT:     95 Woodview Avenue,
                  Lisarow, NSW, 2250


COURT REPORTER:   Sally Hicks, JP

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2      ON BEHALF OF THE PLAINTIFFS:

 3              ROCHE FREEDMAN LLP
                185 WYTHE AVENUE
 4              BROOKLYN, NY11249
                PH:  +1 716 348-6003
 5
        BY:     MR KYLE W. ROCHE
 6
                BOIES SCHILLER FLEXNER LLP
 7              100 SE 2ND STREET, SUITE 2800
                MIAMI, FLORIDA 33131
 8              PH:  +1 305 539-8400

 9      BY:     MR ANDREW S.  BRENNER

10

        ON BEHALF OF THE DEFENDANT:
11
                RIVERO MESTRE LLP
12              2525 PONCE DE LEON BOULEVARD,
                SUITE 1000,
13              MIAMI, FLORIDA 33134
                +1 305 445-2500
14
        BY:     MS ZAHARAH R. MARKOE
15

16

17      ALSO PRESENT:

18              (IN AUSTRALIA)
                Mr Wayne Matthews, Videographer
19              Ms Sati Nagra (Solicitor) King & Wood Mallesons
                Mr Nathan Sexton (Solicitor) Piper Alderman
20
                (IN THE USA)
21              Mr Joe Delich (with Mr Kyle Roche)
                Ms Amanda McGovern (with Ms Zaharah Markoe)
22

23

24

25
```

1                           **WITNESS INDEX**

2       Deponent                 Examined by          Page

3       Lynn Carroll Wright      Ms Zaharah Markoe      6
                                 Mr Kyle Roche         40
4                                Ms Zaharah Markoe    138

5

6                        **E X H I B I T   I N D E X**

7       No.            Description                    Page

8       1       Series of emails dated February 15, 2015    10
                commencing with Bates stamp DEF_00009663

9       2       Email dated February March 24, 2014         13
                commencing with Bates stamp DEFAUS_00706832
10

11      3       Agreed Property Settlement and Terms        22
                commencing with Bates stamp DEFAUS_01518187

12      4       Plaintiffs' Cross-Notice of Taking Video    85
                Deposition Duces Tecum (not Bates stamped)
13

14      5       Series of emails dated April 20 2015         86
                Bates stamp DEFAUS_00640897

15      6       Affidavit of Lynn Wright dated November 5,   93
                2013 commencing with Bates stamp
16              DEFAUS_01070641

17      7       Agreement between Craig Steven Wright and   101
                Carroll Lynn Wright dated June 30, 2009
18              (Bates stamp reference not provided)

19      8       Email dated October 23, 2013 commencing    109
                with Bates stamp ending 75974
20

21      9       Paper titled "How can the Australian Tax    109
                Office benefit from Bitcoin Currency?"
22              commencing with Bates stamp ending 75975

23      10      Series of emails dated October 18, 2011    113
                and October 19, 2011 commencing with
24              Bates stamp ending 01210717

25      11      Series of emails dated February 4, 2014    119
                commencing with Bates stamp ending
                01559220

1

2   12        Email dated November 21, 2011,              121
              Bates stamped DEFAUS_00698432

3   13        Sale Agreement between Information Defense   131
              Pty Ltd and Lynn Wright/Cloudcroft Pty Ltd
4             commencing with Bates stamp ending 01212940

5   14        Letter from Lynn Wright to the Australian    138
              Taxation Office dated March 22, 2011
6             commencing with Bates stamp DEFAUS_01559250

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (8.57am)

08:57:46  2      THE VIDEOGRAPHER:   This is videotape number 1 in

08:57:48  3    the deposition of Lynn Carroll Wright in the matter of

08:57:52  4    Ira Kleiman, as the personal representative of the Estate

08:57:56  5    of David Kleiman, and W&K Info Defense Research, LLC,

08:58:05  6    versus Craig Wright, in the United States District Court,

08:58:08  7    Southern District of Florida.  The case number is

08:58:15  8    9:18-cv-80176-BB/BR.  Today's date is the 13th day

08:58:26  9    of January 2020, and the time on the video monitor is

08:58:30 10    8.58am.

08:58:31 11        This deposition is taking place at 95 Woodview

08:58:35 12    Avenue, Lisarow, in New South Wales, Australia.  The

08:58:39 13    videographer today is Wayne Matthews from Epiq Australia.

08:58:43 14    Would counsel please identify yourselves and state whom

08:58:45 15    you represent.

08:58:49 16      MS MARKOE:   Zaharah Markoe on behalf of

08:58:52 17    Dr Craig Wright, and with me is my colleague,

08:58:55 18    Amanda McGovern, also on behalf of Dr Craig Wright, in

08:58:59 19    Florida from Rivero Mestre.

08:59:00 20      MR ROCHE:   Kyle Roche, on behalf of plaintiffs.

08:59:01 21    I'm here with Joe Delich.

08:59:05 22      MR BRENNER:   Andrew Brenner on behalf of the

08:59:07 23    plaintiffs.

08:59:09 24      THE VIDEOGRAPHER:   Do we have anybody else in the

08:59:11 25    USA on the phone?  No?  All right.  In Australia we have

LYNN CARROLL WRIGHT                    6                    January 13, 2020

| | |
|---|---|
| 08:59:15 | 1 | in the room --
| 08:59:19 | 2 |     MR SEXTON:   Nathan Sexton from Piper Alderman.
| 08:59:25 | 3 |     MS NAGRA:   Sati Nagra from King & Wood Mallesons.
| 08:59:27 | 4 |     THE VIDEOGRAPHER:   The court reporter today is

08:59:15  1    in the room --

08:59:19  2         MR SEXTON:   Nathan Sexton from Piper Alderman.

08:59:25  3         MS NAGRA:   Sati Nagra from King & Wood Mallesons.

08:59:27  4         THE VIDEOGRAPHER:   The court reporter today is

08:59:29  5    Sally Hicks from the firm of Epiq Australia.  Would the

          6    court reporter please swear in the witness.

          7              (The witness was sworn)

          8         THE VIDEOGRAPHER:   Proceed, ladies and gentlemen.

08:59:51  9         MR ROCHE:   I also just wanted to declare that Ira -

08:59:55 10    I didn't hear it.  Ira Kleiman is also on.  He informed

08:59:59 11    me he tried to speak up, but I don't know if the court

09:00:04 12    reporter caught it.

         13         THE COURT REPORTER:   No, I didn't.  Thank you.

         14                   **LYNN CARROLL WRIGHT,**

         15                   **having been duly sworn,**

         16                   **testified as follows:**

         17    **DIRECTION EXAMINATION BY MS MARKOE:**

09:00:06 18         Q.   Good morning, Lynn - if that's okay, that

09:00:12 19    I call you Lynn?

09:00:14 20         A.   Yes, yes.

09:00:16 21         Q.   My name is Zaharah Markoe.  I'm with the law

09:00:17 22    firm of Rivero Mestre in Miami, Florida, United States of

09:00:21 23    America.  My firm represents Dr Craig Wright.  I am going

09:00:24 24    to ask you some questions.  If you do not understand my

09:00:26 25    questions, please let me know, and I will try to clarify

LYNN CARROLL WRIGHT                          January 13, 2020

09:00:29  1      or rephrase my question for you.

09:00:32  2           A.   Yes.

09:00:33  3           Q.   If I have got something wrong in my question,

09:00:35  4      you correct it.  If you need a break for any reason,

09:00:40  5      please let me know and we can take a break at any time

09:00:43  6      you wish, but I would request that the - if there is a

09:00:46  7      question pending, that prior to taking a break, you

09:00:50  8      answer the question that is currently pending.

09:00:53  9           A.   Yes, okay.

09:00:55 10           Q.   Are you represented by counsel here today?

09:00:58 11           A.   No.

09:01:00 12           Q.   Do you understand that you are here to provide

09:01:02 13      testimony in a case pending in the United States District

09:01:06 14      Court, for the Southern District of Florida in the United

09:01:09 15      States, titled "Ira Kleiman, as the personal

09:01:11 16      representative for the Estate of David Kleiman, and

09:01:14 17      W&K Information Defense Research Limited (Plaintiffs),

09:01:17 18      versus Craig Wright (Defendant)"?

09:01:21 19           A.   Yes, I'm aware of that.

09:01:23 20           Q.   And do you understand that the testimony you

09:01:24 21      provide today may be used in that trial and presented

09:01:27 22      before the jury?

09:01:28 23           A.   Yes, I'm aware of that.

09:01:34 24           Q.   Your only job today is to provide truthful and

09:01:36 25      accurate testimony, based on your personal knowledge.

LYNN CARROLL WRIGHT                                    January 13, 2020

09:01:39   1    Please do not speculate or guess.  If you don't know the

09:01:43   2    answer to the question, just say you don't know or don't

09:01:46   3    recall.  Whatever answer is accurate is all you need to

09:01:48   4    do.  I am providing you some of this information because

09:01:52   5    you are not represented here by counsel.

09:01:54   6            Do you have any medical conditions that affect

09:01:56   7    your ability to provide truthful and accurate testimony

09:01:58   8    today?

09:01:59   9        A.    No.

09:02:06  10        Q.    Have you and I met personally before?

09:02:08  11        A.    Never.

09:02:10  12        Q.    Have you met my colleague, Ms McGovern, in

09:02:12  13    person before?

09:02:13  14        A.    No.

09:02:13  15        Q.    Have we spoken by telephone before?

09:02:16  16        A.    Yes.

09:02:18  17        Q.    And have you spoken with my colleague,

09:02:19  18    Ms McGovern, by telephone before?

09:02:24  19        A.    Yes.

09:02:25  20        Q.    Approximately how many times have you spoken

09:02:26  21    with either or both of us collectively?

09:02:31  22        A.    Three, maybe four times.  I'm not - I don't

09:02:33  23    recall.

09:02:42  24        Q.    Can you please state your legal name for the

09:02:45  25    record?

LYNN CARROLL WRIGHT                                January 13, 2020

09:02:46  1          A.    Lynn Carroll Wright.

09:02:49  2          Q.    Are you a resident of Australia?

09:02:51  3          A.    Yes.

09:02:55  4          Q.    Were you previously married to Dr Craig Steven

09:03:00  5    Wright?

09:03:00  6          A.    Yes.

09:03:01  7          Q.    From when to when were you married to Craig?

09:03:06  8          A.    End of '96 to - 2011 I think was the divorce.

09:03:19  9          Q.    Was that when you had a formal separation or

09:03:23 10    was that when you had a formal divorce decree, or do you

09:03:26 11    not recall?

09:03:27 12          A.    The formal separation, I believe, started in

09:03:37 13    November of 2010.

         14                (Muffled discussion heard through Skype link)

         15          MR ROCHE:   Oh, sorry.

         16          MS MARKOE:   Kyle, we can hear you.

         17          MR ROCHE:   Yeah, I'll make  sure to mute next time.

         18    BY MS MARKOE:

09:04:09 19          Q.    Are you familiar with a company called

09:04:13 20    W&K Information Defense Research, LLC?

         21          A.    Yes.

09:04:20 22          Q.    Do you have personal knowledge of the formation

09:04:23 23    of - I'm going to - if you don't mind, I will just call

09:04:25 24    it "W&K", it's a little shorter --

09:04:28 25          A.    No, no, that's fine.

LYNN CARROLL WRIGHT                10                    January 13, 2020

```
        1           Q.    -- than that whole long spiel.
09:04:29 2           A.    Yeah, okay.
09:04:30 3           Q.    Do you have personal knowledge of the formation
09:04:32 4      of that company?
09:04:34 5           A.    Yes.
09:04:38 6           Q.    Do you recall approximately when W&K was
09:04:41 7      formed?
09:04:44 8           A.    Oh, it - I - I don't know the date.  It's
09:04:54 9      probably around 2008/2009.  I'm not really sure.
09:05:02 10          Q.    So it could have been in 2008/2009, it could
09:05:05 11     have been later than that.  You just - you don't have a
09:05:07 12     good recollection for the date of when it was formed?
09:05:09 13          A.    That's - that's right, yes.
09:05:14 14          Q.    I'm going to have - and this may help refresh
09:05:21 15     your recollection a little bit, hopefully.  I'm going to
09:05:25 16     have counsel from Piper Alderman - I believe they have
09:05:30 17     hard copies of some documents for you, to show you.  I'm
09:05:33 18     going to have them show you what I have called "tab 4",
09:05:37 19     but we will mark it as exhibit 1 for this exhibit -
09:05:41 20     exhibit 1 to this deposition.
        21              (Exhibit 1 marked for identification)
09:05:46 22          MS MARKOE:   Counsel, I believe we have sent these
09:05:48 23     documents over to you by email, but if you prefer it,
09:05:50 24     I will read out the Bates number, if that's easier for
09:05:54 25     you guys, too?
```

LYNN CARROLL WRIGHT                                    January 13, 2020

| | |
|---|---|
| 09:05:55 1 | MR BRENNER:   Yeah, can you read out the Bates |
| 09:05:57 2 | number? |
| 09:05:58 3 | MS MARKOE:  Sure.  DEF_00009663 through 4. |
| 4 | BY MS MARKOE: |
| 09:06:12 5 | Q.   Lynn, do you have that document in front of |
| 09:06:14 6 | you? |
| 09:06:15 7 | A.   Yes, I do.  It's - I'm just going over it. |
| 09:06:17 8 | It's just very small print. |
| 09:06:19 9 | Q.   It is very small print.  I apologize for that. |
| 09:06:23 10 | If you take a moment and just read over it, you start at |
| 09:06:28 11 | the bottom and read from the top, because it is an email |
| 09:06:31 12 | chain. |
| 09:06:31 13 | A.   Oh, okay. |
| 09:06:32 14 | Q.   And just let me know when you're done. |
| 09:07:28 15 | A.   Okay. |
| 09:07:37 16 | Q.   Ms Wright, before I actually turn to this |
| 09:07:39 17 | document, I have another quick question for you.  You |
| 09:07:44 18 | said you're familiar with the company named W&K |
| 09:07:50 19 | Information Defense Research and you have personal |
| 09:07:51 20 | knowledge of its formation? |
| 09:07:52 21 | MR ROCHE:   Objection.  Form. |
| 22 | BY MS MARKOE: |
| 09:08:00 23 | Q.   Do you know what the "W" in W&K Information |
| 09:08:05 24 | Defense Research stood for? |
| 09:08:06 25 | A.   For Wright. |

LYNN CARROLL WRIGHT                                          January 13, 2020

12

09:08:10  1        Q.    Okay.  And did that stand for Craig Wright or

09:08:14  2   Lynn Wright?

09:08:16  3        A.    Lynn Wright.

09:08:20  4        Q.    For Lynn Wright?

09:08:20  5        A.    Yes.

09:08:23  6        Q.    And what did the "K" stand for?

09:08:26  7        A.    For Dave Kleiman.

09:08:29  8        Q.    And what did "Information Defense" stand for?

09:08:33  9        A.    That was Craig.

09:08:37 10        Q.    So the company W&K Information Defense Research

09:08:42 11   stood for Lynn Wright, Dave Kleiman and Craig Wright; is

09:08:47 12   that correct?

09:08:47 13        A.    Yes.

09:08:52 14        Q.    Turning back to what has been marked as

09:08:54 15   exhibit 1, does this document refresh your recollection

09:09:01 16   that W&K was formed in or about February of 2011?

09:09:08 17        A.    It doesn't.  I - I - honestly, I don't remember

09:09:12 18   it, seeing it, but that doesn't mean I didn't see it.

09:09:21 19   I - I - I thought that we - I guess it's - it's hard to

09:09:25 20   say for me.  I think we did some work together before

09:09:30 21   that date but they only, I guess, got - got together

09:09:39 22   with - to - to establish on that date.

09:09:45 23        Q.    Do you see in the second part of the email

09:09:49 24   down, from Dave Kleiman to Craig Wright and Lynn Wright,

09:09:55 25   it says:

LYNN CARROLL WRIGHT                    13                     January 13, 2020

> *Last page of attached.  Do you think I can*
> *list you as mgr or mgrm with a foreign*
> *address, or do you think they would kick it*
> *back?*
> *Dave.*

Do you see that part?

    A.   Yes.

    Q.   Do you know if you were ever - or if you or

Craig were ever listed as a manager or managing member in

W&K Information Defense?

    A.   I - no, I - I don't recall that.  Sorry, I -

I - I mean, I just don't have any memory of that.

    Q.   I'm going to just have them show you what is in

tab 21.  I'm going to mark that as exhibit 2.

       (Exhibit 2 marked for identification)

    THE DEPONENT:   Again, I read from the bottom up,

do I?

BY MS MARKOE:

    Q.   Yes, you do.  And actually - yes, from the

bottom up.  Read from the bottom and then go to the

second page and then you can continue back to the first

page and read up.

    A.   Yes.

    MR BRENNER:   Zaharah, I'm sorry, can you - sorry,

which Bates stamp is this?

    MS MARKOE:   Yes, it's DEFAUS_00706832.

    MR BRENNER:   Thank you.

09:11:52  1      MS MARKOE:   Kyle, do you want to just forward

09:11:55  2   Andrew the email that I sent you with the documents?

        3   That might be easier.

09:12:00  4      MR BRENNER:   I just - no, I have it, I have

09:12:01  5   everything, I just didn't know which - because there was

09:12:01  6   three documents, I just didn't know which one you went

09:12:04  7   to.  I have it, though, thank you.

09:12:26  8      THE DEPONENT:   Question for the - just something

09:12:28  9   about the email, and you guys would probably be able to

09:12:30 10   tell me.  When he - when Dave states, "I have files [in]

09:12:35 11   3 fictitious business names", is that like shelf

09:12:39 12   companies?

        13   BY MS MARKOE:

09:12:43 14      Q.   I can't speak for Dave Kleiman.  If you have

09:12:47 15   any idea of what you think that means, I'm happy to ask

09:12:52 16   you that question, but you are the star witness here,

09:12:57 17   Lynn.

09:12:59 18      A.   Yeah.  Okay, I don't - I don't know what that

09:13:01 19   means, so.  Okay.

09:13:44 20      Q.   Okay.  Do you recognize this email?

09:13:51 21      A.   No, I don't.  I mean - no, I don't remember it.

09:13:54 22   I don't recall it.  But there's a lot of things back then

09:14:02 23   I don't recall.

09:14:05 24      Q.   Okay.  Fair enough.  You may not recall, but do

09:14:17 25   you dispute anything that's on the email itself?

LYNN CARROLL WRIGHT                    15                    January 13, 2020

09:14:18  1        A.    Sorry, what was that?

09:14:19  2        Q.    Do you dispute anything that's on the email

09:14:21  3    itself?  I understand you don't specifically recall this

09:14:24  4    email, because, you know, it was nine years ago almost.

09:14:28  5        A.    Yeah, no, I - I --

09:14:30  6        MR ROCHE:   Objection.  Form.

09:14:31  7        THE DEPONENT:   No, I don't dispute anything that's

09:14:33  8    there.  As I said, I just don't recall it.

          9    BY MS MARKOE:

09:14:56 10        Q.    Do you recall that Dave would email you

09:15:00 11    sporadically about W&K, particularly during its formation

09:15:08 12    period?

09:15:09 13        A.    I - I have a very - I remember only a - one

09:15:15 14    particular email, and it had nothing to do with W&K.

09:15:20 15    Other ones that - that were sent I really don't remember;

09:15:28 16    at least these ones I don't.

09:15:32 17        Q.    Okay.  What was your role in W&K?  It was the

09:15:44 18    three of you, but what was your particular role within

09:15:47 19    it - within it?

09:15:48 20        MR ROCHE:   Objection.

09:16:03 21        MS MARKOE:   Kyle, what's wrong with that question?

09:16:04 22        MR ROCHE:   You - I mean, you're, I guess,

09:16:06 23    testifying for her; you're saying, "it was the three of

09:16:08 24    you", and I don't believe the witness testified to that.

         25    BY MS MARKOE:

LYNN CARROLL WRIGHT                    16                    January 13, 2020

09:16:15  1          Q.    Lynn, what was your role in W&K?

09:16:17  2          A.    My role was as an - administration, really.

09:16:24  3     I did all the, I guess, research for - for tenders, for -

09:16:35  4     that we thought that the company could do.  And, in fact,

09:16:40  5     it was through one of the tenders that - that we worked -

09:16:49  6     that we included Dave in, because it was a - it was

09:16:53  7     tenders that were put out by Homeland Security.  And for

09:16:59  8     obvious reasons, they - they wanted to have it - an

09:17:05  9     American company with, you know, represented in the -

09:17:10 10     from the States, obviously.  So we - that's when - to the

09:17:14 11     best of my knowledge, that's when we included Dave in,

09:17:19 12     and they - in the proceedings.  Because it would look

09:17:25 13     better for any tender to come from the US, from a vet,

09:17:31 14     and from a disabled vet as a result of his service.  So -

09:17:38 15     and he - that's what - when he sort of came on board.

09:17:45 16          Q.    When you say "tender", what do you mean by the

09:17:48 17     term "tender"?  What does that term mean?

09:17:52 18          A.    There was an information - I - I went on the

09:17:54 19     Homeland Security site and they had asked for - well,

09:18:01 20     I call them a tender when they ask for work to be done

09:18:04 21     and you have to submit the - the outline of the work and

09:18:11 22     how you can accomplish it and that sort of thing.

09:18:21 23          Q.    What was the purpose - just - let me just make

09:18:27 24     sure I understand what you've said.

09:18:28 25          A.    Yes.

LYNN CARROLL WRIGHT                           January 13, 2020

17

09:18:28  1        Q.   Is it fair to say that the purpose of W&K, when

09:18:35  2    it was formed, was to prepare tenders, as you call them,

09:18:43  3    for the Department of Homeland Security?

09:18:47  4        MR ROCHE:   Objection.  Form.

09:18:56  5        THE DEPONENT:   Have we lost you guys?

09:18:58  6    BY MS MARKOE:

09:19:01  7        Q.   Did you hear me?

09:19:02  8        A.   No, you went quiet and then the - both pictures

09:19:05  9    froze for a second.

09:19:06 10        Q.   Okay.  I will reframe my question.  I just want

09:19:12 11    to make sure I understand what you just testified about.

09:19:21 12    Is it fair to say that, to the best of your knowledge,

09:19:28 13    W&K was formed to present or respond to tenders by the

09:19:37 14    Department of Homeland Security?

09:19:39 15        MR ROCHE:   Objection.  Form.

         16    BY MS MARKOE:

09:19:48 17        Q.   Did I break up again?

09:19:51 18        A.   Yes, you did.  We got - I heard the objection

09:19:53 19    but then I don't know if you said anything

09:19:55 20        Q.   I just said, "Is that correct"?

09:20:01 21        A.   Yes, that's - to the best of my knowledge, that

09:20:04 22    was - that was the reason for W&K, it was to be able to

09:20:07 23    apply for or respond to requests for tenders in the US,

09:20:14 24    and it was for information security purposes.

09:20:19 25        Q.   What do you mean by "information security

LYNN CARROLL WRIGHT                    18                    January 13, 2020

09:20:21  1    purposes"?

09:20:22  2         A.   Well, like - like we - what we did over here

09:20:27  3    was 24/7 monitoring for secure - to secure companies'

09:20:38  4    Internet - Internet presence, I guess, if you will,

09:20:41  5    because - like anti-hacking stuff, that sort of thing.

09:20:46  6         Q.   So what was your understanding of Dave's role

09:20:49  7    in W&K, or what did you know Dave's role to be?  Can I

09:20:54  8    just - let me strike that.  Let me reframe the question.

09:20:56  9    Based on your personal knowledge, what was Dave's role in

09:20:59 10    W&K?

09:21:01 11         A.   Dave was - he was - he was there to submit the

09:21:08 12    tenders.  He did, from time to time - Craig would throw -

09:21:15 13    would sort of throw ideas off of - you know, between the

09:21:19 14    two of them.  Dave was not an academic, and Craig would

09:21:27 15    do all of the writing of the tenders and then I would

09:21:38 16    edit them, or - or "proofread" them is a better word, and

09:21:42 17    then we would send them off to Dave and he would then

09:21:47 18    send them to the appropriate companies.  In this case,

09:21:51 19    there was two tenders that went to Homeland Security.  So

09:21:55 20    he would send them off - off - and provided, basically,

09:22:00 21    an American presence in the - in the tender process.

09:22:10 22         Q.   What was Craig's role in W&K?

09:22:12 23         A.   He wrote - he responded to the tenders.  He

09:22:15 24    wrote the - he wrote everything up.  He did all the -

09:22:24 25    responding to the type of questions and the type of work

09:22:27  1    that was needed, how it would be done, effectively how

09:22:34  2    much it would cost, that sort of thing.

09:22:40  3         Q.   During this time period when W&K was preparing

09:22:45  4    these tenders, through Craig preparing them and you

09:22:49  5    editing them and Dave submitting them, were you and Craig

09:22:54  6    submitting tenders in other places and through other

09:22:59  7    companies?

09:23:01  8         A.   No, not that I'm - I - not that I worked on,

09:23:04  9    no, and being the administration person, I think I would

09:23:14 10    have known that anything was done.  But the two big ones

09:23:17 11    were the two with Homeland Security, and that was all

09:23:22 12    that I'm aware of.

09:23:27 13         Q.   Are you aware whether or not the tenders were

09:23:30 14    accepted by the Department of Homeland Security?

09:23:33 15         A.   It took a long time.  We never heard back, and

09:23:38 16    we could - we tried and tried and tried to get in touch

09:23:41 17    with Dave, and he was not responding to phone messages

09:23:50 18    and - or to emails that I'm aware of, because at that

09:23:53 19    point he was very sick and he was in hospital.  But he

09:23:57 20    didn't let anybody know.  So to be - we don't know if the

09:24:02 21    tender was even submitted on his part.  But we never

09:24:07 22    heard anything back from - from them.

09:24:17 23         Q.   So - pardon me.  Excuse me a moment.  Lynn,

09:24:26 24    I want to sort of shift gears for a quick second.  What

09:24:29 25    is your academic background and professional background?

LYNN CARROLL WRIGHT                    January 13, 2020
                              20

09:24:39  1        A.    My - I started out as a nurse.  I worked in a

09:24:43  2   hospital here in Australia after we were married.  Then

09:24:48  3   study - I - then Craig started the - the original company

09:24:52  4   and I went to work for the original company.  At the same

09:24:56  5   time I started doing an MBA in International Business and

09:25:00  6   Marketing.  Previous to our marriage, I had done a

09:25:03  7   Masters in Education, and - I didn't really want to

09:25:14  8   mention this, but I also studied law here, and I - I left

09:25:25  9   one course shy of graduating, because I just had no

09:25:30 10   interest in it any more.

09:25:35 11        Q.    You mentioned an original company.  What

09:25:37 12   company are you referring to?

09:25:38 13        A.    DeMorgan Proprietary Limited.

09:26:05 14        Q.    You mentioned a few minutes ago that you never

09:26:11 15   heard back from Dave, or you had a very difficult time

09:26:14 16   getting in touch with him.  I will let the - your

09:26:16 17   testimony speak for itself, it is just me paraphrasing.

09:26:21 18   Did Dave ever talk to you about his health, you know,

09:26:24 19   given your background as a nurse?

09:26:26 20        A.    He emailed me once about a medical device,

09:26:35 21   I guess, that was in the process of being developed,

09:26:37 22   like, I think it was - the best way to describe it is an

09:26:39 23   exoskeleton, where they attach devices, because he was a

09:26:47 24   quadriplegic.  This would - they - they'd put devices on

09:26:51 25   him.  It's like a - I guess sort of like casting, except

09:26:55 1    it's metal and they have joints and it would - it would

09:27:01 2    able - enable him to move around.  He just - he

09:27:04 3    basically - it surprised me, and I remember this well,

09:27:10 4    because I was quite - I hadn't heard about those, let's

09:27:16 5    put it that way, and so I did some research into it and

09:27:20 6    then sent an email back to him saying, "Look, you know,

09:27:23 7    let me - if it works, go for it", and I said - I asked

09:27:27 8    him - I think I asked him to let me know what happens,

09:27:30 9    and I just never heard back from him.

09:27:33 10       Q.    Did you ever come to learn why he was in the

09:27:36 11   hospital during this general time frame?

09:27:38 12       A.    Sorry, did I ever what?

09:27:39 13       Q.    Come to learn why he was in the hospital during

09:27:44 14   this general time frame?

09:27:45 15       A.    No.  I - well, I heard that he had infections,

09:27:50 16   but that doesn't surprise - that didn't surprise me,

09:27:52 17   because I knew that - that quadriplegics get pressure

09:27:59 18   sores.  The pressure sores get very infected and they

09:28:02 19   become quite septic.  So it wasn't something that

09:28:05 20   surprised me.

09:28:22 21       Q.    Do you have any understanding as to why

09:28:24 22   Dave Kleiman didn't share with you and Craig, in

09:28:27 23   real time, that he was in the hospital and unable to

09:28:33 24   respond to your emails and calls and attempts to reach

09:28:36 25   out to follow up on the tenders?

LYNN CARROLL WRIGHT                                    January 13, 2020

09:28:40  1        A.    No, I - I don't know why.  I mean, you know,
09:28:43  2   I could suppose things, but that's - that's not what
09:28:46  3   should be done.  I - I don't know why he - he didn't
09:28:51  4   respond, other than he was - we had heard that he was
09:28:55  5   very ill.
09:28:59  6        Q.    All right.  How did you hear he was very ill,
09:29:10  7   if you recall?
09:29:11  8        A.    I don't recall.  I know - it was Craig that
09:29:14  9   told me, and it may be that - it may have been that he
09:29:19 10   got in touch with Craig.  I don't know.
09:29:31 11        Q.    Are you aware of any assets, IP, or anything of
09:29:35 12   value that W&K ever had?
09:29:38 13        A.    No.
09:29:45 14        Q.    Are you a shareholder in W&K?
09:29:48 15        A.    Yes.
09:29:51 16        Q.    Do you know how you became a shareholder in
09:29:54 17   W&K?
09:29:56 18        A.    When I - when the - the company was originally
09:29:59 19   set up, I think it was just divided between the three of
09:30:04 20   us, I guess.
09:30:09 21        Q.    I'm going to have the folks at Piper hand you
09:30:16 22   what I call tab 17.  It is - for the benefit of the
09:30:22 23   plaintiffs' counsel, it is DEFAUS_01518187 and through
09:30:38 24   188.  I'm going to have this marked as exhibit 3, please
09:30:42 25        (Exhibit 3 marked for identification)

LYNN CARROLL WRIGHT                23                    January 13, 2020

09:30:45  1          THE DEPONENT:  Yes, okay.

          2     BY MS MARKOE:

09:30:48  3          Q.   On the first page, is that your signature on

09:30:51  4     that page?

09:30:52  5          A.   Yes, it is.

09:30:55  6          Q.   And I'd like to turn your attention to the

09:30:57  7     second page of the document.  Actually, go back to the

09:31:05  8     first page.  Who was Michael Shehadie?

09:31:08  9          A.   Michael Shehadie was our solicitor from - like,

09:31:17 10     we had retained him for quite a few years, and then

09:31:21 11     during the - our divorce, he represented - he - I thought

09:31:26 12     he was representing me, but I - I - I don't know, to be

09:31:31 13     honest.

09:31:44 14          Q.   And can you turn to the second page of the

09:31:47 15     document, which is actually page 1 of 2, it's just the

09:31:53 16     way the --

         17          A.   Yes.

09:31:54 18          Q.   -- document was Bates-stamped.  And what is

09:31:56 19     this document?

09:32:00 20          A.   This document is the settlement, our divorce

09:32:05 21     settlement.

09:32:11 22          Q.   And does this appear to be a true and accurate

09:32:14 23     representation of the division of assets that you and

09:32:17 24     Craig agreed to in or about June of 2011, as is noted at

09:32:23 25     the bottom of the document, the date?

LYNN CARROLL WRIGHT                                    January 13, 2020

24

```
09:32:26   1        A.    Yes.

09:32:38   2        Q.    And the document states at the top - actually,

09:32:41   3   can you read what the document states at the very top,

09:32:44   4   after "Appendix"?

           5        A.

09:32:46   6            The following documents the agreed property
09:32:49        split for the Family law settlement between
09:32:51   7            Craig and Lynn Wright.

09:32:54   8        Q.    And under "Lynn Wright", the first, I guess,

09:33:01   9   row under "Lynn Wright" says, "Cloudcroft Party Limited";

09:33:07  10   am I correct?

09:33:08  11        A.    "Proprietary Limited", yes

09:33:11  12        Q.    Proprietary Limited, okay.  What was Cloudcroft

09:33:18  13   Proprietary Limited?

09:33:18  14        A.    Cloudcroft was - was the company - it was

09:33:20  15   "Cloudcroft Proprietary Limited trading as Information

09:33:26  16   Security" - I can't recall what the whole name was back

09:33:29  17   then, but it was - it had been sort of like - this is

09:33:33  18   what I was asking you:  it was like a shelf company that

09:33:38  19   we bought from the Australian Securities Commission and

09:33:45  20   named it then "Cloudcroft", and then you could - here you

09:33:52  21   can have a company that is "trading as" and a different

09:33:58  22   name.  Do you understand?  Does that make sense to you?

09:34:03  23        Q.    Yes.  What was the business of Cloudcroft

09:34:14  24   Proprietary Limited?

09:34:16  25        A.    It was information security.  We had - it was
```

LYNN CARROLL WRIGHT                    25                    January 13, 2020

09:34:20  1    the same - it was the same as DeMorgan - DeMorgan

09:34:27  2    Information Defense Systems and Information - and then

09:34:31  3    Information Defense.  It was always the same.  We did

09:34:37  4    24/7 monitoring of - for security purposes for companies

09:34:42  5    like the Australian stock exchange, some credit unions,

09:34:50  6    that sort of thing.

09:35:03  7         Q.    Did Cloudcroft Proprietary Limited have to do -

09:35:09  8    have anything to do with bitcoin or blockchain?

09:35:14  9         A.    Not that I'm aware of, no.

09:35:26 10         Q.    Under the terms of your family law settlement,

09:35:32 11    what happened to Cloudcroft Proprietary Limited?

09:35:40 12         A.    It went - it went back to Craig as - as -

09:35:47 13    I signed it back over to Craig because of financial

09:35:52 14    reasons that I was having.

09:36:03 15         Q.    Before you signed it back to Craig --

09:36:05 16         A.    Yes.

09:36:06 17         Q.    -- under the terms of the family law

09:36:08 18    settlement, was it your company?

09:36:12 19         MR BRENNER:   Objection.

09:36:19 20         THE DEPONENT:   Do I answer, or no?

09:36:21 21         MR BRENNER:   Yes.

         22    BY MS MARKOE:

09:36:23 23         Q.    You do answer; correct.

09:36:26 24         A.    Yes, okay.  Yes, it was - I was listed as the

09:36:29 25    managing director.

LYNN CARROLL WRIGHT                  26                    January 13, 2020

09:36:35  1        Q.   And at a later date, due to certain personal

09:36:41  2   financial issues you were having, you signed it over to

09:36:44  3   Craig Wright; is that correct?

09:36:45  4        A.   That's correct, yes.

09:36:47  5        MR ROCHE:   Object.   Form.

09:36:50  6        THE DEPONENT:   Sorry, we didn't hear that, Kyle,

09:36:52  7   could you repeat, please?

09:36:56  8        MR ROCHE:   Yes.   Objection.   Form.

          9   BY MS MARKOE:

09:36:59 10        Q.   On the "Craig Wright" column, on the same row

09:37:01 11   involving Cloudcroft, do you see where it says, "All IP

09:37:06 12   to remain with Craig Wright".

09:37:09 13        A.   Yes.

09:37:13 14        Q.   Cloudcroft "to retain a right to use existing
09:37:15
09:37:16 15   IP"?
              A.   Yes.

09:37:16 16        Q.   Do you know what IP that's referencing, or do

09:37:21 17   you recall what IP - strike that.   Do you recall what IP

09:37:23 18   that is referencing?

09:37:25 19        A.   I - I - yeah, it was - it was the IP that was

09:37:29 20   involved with development of security systems.   We were -

09:37:36 21   we - Craig was developing, and it's listed further down,

09:37:40 22   "Spyder".   It was a hardware/software device that could

09:37:45 23   be plugged into a client's network.   It was like a

09:37:47 24   firewall type thing, but his own - he developed it

09:37:52 25   himself.

LYNN CARROLL WRIGHT                          January 13, 2020

27

09:37:59  1        Q.   Did Dave Kleiman have anything to do with

09:38:02  2   Spyder?

09:38:04  3        A.   No, not to - not that I'm aware of, no.

09:38:08  4        Q.   Did Dave Kleiman have anything to do with

09:38:10  5   Cloudcroft Proprietary Limited?

09:38:13  6        A.   No.

09:38:14  7        Q.   Did Dave Kleiman have anything to do with

09:38:17  8   Information Defense Proprietary Limited?

09:38:19  9        A.   No.

09:38:21 10        Q.   Did Dave Kleiman have anything to do with

09:38:23 11   DeMorgan Proprietary Limited or DeMorgan Information

09:38:28 12   Defense Systems?

09:38:28 13        A.   No.

09:38:31 14        Q.   As far as you are - as far as you are aware,

09:38:36 15   did Dave Kleiman have anything to do with any company -

09:38:48 16   strike that.  As far as you are aware, did Dave Kleiman

09:38:55 17   have anything to do with any company other than W&K?

09:39:03 18        A.   Not that I'm - not that I'm aware of, no.

09:39:10 19        Q.   Sorry.  Under Cloudcroft Proprietary Limited,

09:39:14 20   in your column, it also says, "Use of Greyfog IP".  Do

09:39:21 21   you know what the Greyfog IP was?

09:39:24 22        A.   Greyfog was the company that we worked with who

09:39:27 23   was building the Spyder boxes.  They - they - you know,

09:39:33 24   it's - we're talking about geeks here.  They are all out

09:39:38 25   there - you know, he - he could put together the boxes,

LYNN CARROLL WRIGHT                28                January 13, 2020

09:39:42  1     the hardware, and then between him and Craig, they would

09:39:49  2     download all the software and stuff, so that was

09:39:52  3     considered the IP from Greyfog as well.

09:39:58  4          Q.   Did Dave Kleiman have anything to do or any

09:40:01  5     interest in Greyfog?

09:40:03  6          A.   No.

09:40:16  7          Q.   In the "Intellectual Property" section, which

09:40:18  8     is I guess about - a few more rows down?

09:40:22  9          A.   Yes.

09:40:23 10          Q.   On the "Craig Wright" side, right below

09:40:26 11     "Spyder", it says "Blacknet"?

09:40:30 12          A.   Yes.

09:40:31 13          Q.   What was Blacknet, if you recall?

09:40:33 14          A.   I have no recollection of that at all.  I -

09:40:40 15     it's - I don't know.  I - I could assume things, but

09:40:43 16     that's - that's just silly.

09:40:46 17          Q.   Okay.  A few lines up, it says, "W&K

09:40:53 18     Information Defense, LLC"?

09:40:57 19          A.   Yes.

09:40:57 20          Q.   Do you see that?

09:40:58 21          A.   Yes.

09:40:59 22          Q.   And under the "Lynn Wright" section it says,

09:41:01 23     "50% of shares from Craig Wright"?

09:41:03 24          A.   Yes.

09:41:04 25          Q.   And then under the "Craig Wright" section it

29

09:41:05  1    has a similar entry:

09:41:08  2         *Existing shares to be split and divided -*
09:41:11            *50% to go to Lynn Wright.*
          3

09:41:15  4    Do you see that?

09:41:16  5         A.   Yes.

09:41:22  6         Q.   Do you recall if that's the way that you

09:41:25  7    received the - your shares in W&K?

09:41:31  8         A.   Yeah.  I - that - I - look, when I - to -

09:41:36  9    I don't recall ever getting any paper, anything on, you

09:41:42 10    know, paper, other than this, saying that I - you know,

09:41:45 11    that - I mean, I knew I had had some interest in it, but

09:41:48 12    this is the first time that I saw it written down.

09:42:17 13         *Q.   Given that you have shares in W&K, have you

09:42:21 14    expressed any concern about those shares or anything that

09:42:29 15    you are owed by W&K before?

09:42:36 16         MR ROCHE:   Objection, form.

         17    BY MS MARKOE:

09:42:38 18         Q.   You can answer.

09:42:38 19         A.   Oh, can I?  Okay.  Sorry, what was that - what

09:42:41 20    was the question again?

         21         MS MARKOE:   Court reporter, do you mind reading

         22    that question back?

         23         (Question marked * read)

09:43:00 24         THE DEPONENT:   I didn't have any concerns until now

09:43:02 25    because I didn't think it was worth anything.

LYNN CARROLL WRIGHT                              January 13, 2020

                                    30

1   BY MS MARKOE:

09:43:11  2        Q.    Did Ira Kleiman or anyone from Dave's estate

09:43:14  3   ever contact you about your shares in W&K after Dave

09:43:20  4   died?

09:43:22  5        A.    No.

       6        Q.    Okay.

09:43:24  7        A.    Having said that, I did get some emails

09:43:31  8   from a - and then letters, physical snail mail, from -

09:43:39  9   two from Dave himself, which was rather upsetting for me

09:43:43 10   because he had been dead for quite a while, and another

09:43:47 11   one from a Gareth - I can't remember his last name - who

09:43:51 12   I later learned was also dead.  So it had nothing to do

09:43:58 13   with the shares but it had to do with - I don't know,

09:44:02 14   it's - it was - I don't know if it's mining of bitcoin or

09:44:06 15   what, but it meant nothing to me.

09:44:26 16        Q.    Has any lawyer, or someone purporting to be a

09:44:30 17   representative of Ira Kleiman, contacted you --

09:44:37 18        A.    No.

09:44:37 19        Q.    -- about - let me finish my question.

09:44:39 20        A.    Oh, sorry.

09:44:40 21        Q.    No, that's okay - contacted you about your

09:44:42 22   shares in W&K?

09:44:43 23        A.    Nobody, no.

09:44:58 24        Q.    Separate and apart from W&K, I'm going to ask

09:45:00 25   you some questions about your relationship with Dave and

LYNN CARROLL WRIGHT                                    January 13, 2020

| | |
|---|---|
| 09:45:03 | 1 | Craig's relationship with Dave.  Is that all right with |
| 09:45:05 | 2 | you? |
| 09:45:05 | 3 | A.    Yes, yes. |
| 09:45:19 | 4 | Q.    Did you ever meet Dave Kleiman in person? |
| 09:45:21 | 5 | A.    Yes.  I think we've met on two occasions. |
| 09:45:29 | 6 | Definitely one time Craig and I were at a conference in |
| 09:45:32 | 7 | Orlando and we met him, and then I believe he came out to |
| 09:45:38 | 8 | Las Vegas for what's - for a SANS conference, which is a |
| 09:45:43 | 9 | big outfit in the States, a big company - well, it's |
| 09:45:48 | 10 | worldwide - on information security and stuff like that. |
| 09:45:56 | 11 | Q.    And in addition to meeting him in person on |
| 09:46:03 | 12 | some - one - at least one, perhaps two occasions -- |
| 09:46:05 | 13 | A.    Yes. |
| 09:46:06 | 14 | Q.    -- did you correspond with him or talk on the |
| 09:46:11 | 15 | phone with him periodically? |
| 09:46:13 | 16 | A.    If he called - if he called Craig or if Craig |
| 09:46:17 | 17 | called him and it wasn't at an insane hour, I - I would |
| 09:46:22 | 18 | just, you know, say, "Hi" and that sort of thing, but not |
| 09:46:26 | 19 | for any big, heavy, long conversations or anything. |
| 09:46:35 | 20 | Q.    How frequently - do you know when Craig and |
| 09:46:41 | 21 | Dave first met? |
| 09:46:44 | 22 | A.    No, I don't.  I - I think they met in a - in a |
| 09:46:50 | 23 | security chat room type thing, where all the security |
| 09:46:55 | 24 | geeks go. |
| 09:47:04 | 25 | Q.    Did Dave ever speak to you about his family? |

LYNN CARROLL WRIGHT                    32                    January 13, 2020

09:47:10  1        A.   Yes.  When we were in Orlando.  He - he didn't

09:47:19  2   like to speak about his family.  I, you know, just as a -

09:47:22  3   as a kind of - I guess the type of person I am is I may

09:47:26  4   be a sticky beak, but I always ask people, you know, when

09:47:29  5   you're trying to get to know them more, I ask them about

09:47:32  6   their family and stuff, and he didn't like to speak about

09:47:35  7   his family.  He - so I didn't push it.

09:47:41  8        Q.   What did he tell you about his family?

09:47:43  9        A.   That he didn't get along with them.  He didn't

09:47:49 10   hold - I guess it's - no, that would be me assuming.  He

09:47:53 11   told me that he didn't get along with them.

09:47:58 12        Q.   Did he mention anything specifically about his

09:48:01 13   brother, Ira Kleiman?

09:48:06 14        A.   That he didn't care for him, but, again,

09:48:14 15   I didn't push too hard because I felt him getting upset.

09:48:22 16        Q.   Did he say anything about why he didn't like

09:48:26 17   his brother, Ira Kleiman?

09:48:29 18        A.   No.

09:48:32 19        Q.   Did you get the impression that Dave Kleiman

09:48:37 20   had a close relationship with Ira Kleiman or a distant

09:48:41 21   relationship with Ira Kleiman?

09:48:42 22        A.   I got the impression that there was no

09:48:45 23   relationship between them.

09:48:55 24        Q.   And that conversation, that happened during

09:48:57 25   your in-person meeting with him in Orlando in about 2009;

LYNN CARROLL WRIGHT                     33                    January 13, 2020

09:49:03  1    is that correct?

09:49:03  2         A.    Yes.

09:49:11  3         Q.    Based on your understanding of Dave's

09:49:13  4    relationship with Ira Kleiman, would you be surprised if

09:49:15  5    he left Ira Kleiman substantial assets with he died?

09:49:20  6         MR ROCHE:    Objection, form.

09:49:23  7         THE DEPONENT:    Can I answer?

          8    BY MS MARKOE:

09:49:24  9         Q.    Yes.   Whenever anyone says, "Objection.  Form",

09:49:28 10    you can answer.

09:49:29 11         A.    Okay.

09:49:30 12         Q.    The only time you should not answer a question

09:49:33 13    is when it would reveal communications between you and an

09:49:40 14    attorney or spousal communications while you were

09:49:43 15    married.

09:49:43 16         A.    Oh, okay.  So, yes - yeah, I was - I would have

09:49:51 17    been very surprised if he had left anything to - to his

09:49:55 18    brother.

09:50:07 19         MS MARKOE:    Can we take a five-minute break?

09:50:13 20         THE VIDEOGRAPHER:    Sure.  Going off the record at

09:50:14 21    9.49am.  Tape stopped.

         22    (9.49am)

         23         (A short break)

         24    (10.04am)

10:04:41 25         THE VIDEOGRAPHER:    Going back on the record at

10:04:43   1    10.04am.  Proceed.

          2    BY MS MARKOE:

10:04:50   3        Q.    You mentioned when we were - when I asked you

10:04:54   4    some questions earlier about you would participate - and

10:04:59   5    again I'm just paraphrasing your testimony, just to get

10:05:02   6    you back to where you were --

10:05:04   7        A.    Okay.

10:05:09   8        Q.    -- that, you know, you'd sometimes say "Hi" to

10:05:12   9    Dave when he and Craig were speaking, when Craig called

10:05:17  10    Dave or Dave called Craig, if it wasn't an insane hour of

10:05:20  11    the day or evening.  What did you mean by that?

10:05:26  12        A.    What, just to say "Hi" or the time-wise?

10:05:29  13        Q.    The time-wise, thank you.

10:05:31  14        A.    Well, time-wise, if - generally, if we - Craig

10:05:38  15    wouldn't call Dave during our day because it would be his

10:05:43  16    night, okay?  So they would usually speak - I think when

10:05:49  17    they did speak it would be in the middle of our night so

10:05:53  18    that it was an easier time frame for David.

10:05:58  19        Q.    Did Craig typically stay up very, very late at

10:06:02  20    night?

10:06:03  21        A.    Yes, yes.  He - he would - I think at the time,

10:06:09  22    he probably slept about four hours at the most every

10:06:12  23    night.  He'd just always - he - you know, he'd wake up in

10:06:18  24    the middle of the night with an idea and rather than, you

10:06:20  25    know, just write it down on a piece of paper, he had to -

10:06:23  1   he didn't believe in paper, or writing, for that matter,

10:06:26  2   he had to put it down on, you know - put ideas down on -

10:06:31  3   on his computer.

10:06:38  4        Q.    Speaking of computers, did Craig have a lot of

10:06:42  5   computers?

10:06:43  6        A.    Yes, he did.  Well, we had to have servers in

10:06:51  7   here and at the farm that we had, because of the 24/7

10:06:57  8   monitoring of our clients.  He had to be available, if

10:07:02  9   something happened with one of the clients, that he could

10:07:06  10  do remote work from.

10:07:10  11       Q.    Do you recall approximately how many servers

10:07:13  12  you had at the farm?

10:07:16  13       A.    There was - what constitutes a server?  You

10:07:22  14  know, we had - we had a fair number of what I guess

10:07:25  15  I would call "desktops", but he used them as - as - he

10:07:30  16  would interconnect them all and use them as a - as

10:07:38  17  servers.  So at the farm, I'm just trying to - we'd keep

10:07:42  18  mine separate, because it wasn't hooked up to his

10:07:44  19  network, but he probably had about four or five, and then

10:07:49  20  he had his laptop.

10:07:56  21       Q.    What was Dave and Craig's relationship like?

10:08:02  22       A.    Craig had a great deal of respect for Dave.  He

10:08:06  23  respected his knowledge, his ability to intuitively solve

10:08:16  24  security issues, and just - they were good friends.

10:08:26  25       Q.    You said that Craig respected Dave's knowledge.

LYNN CARROLL WRIGHT                    36                    January 13, 2020

| | |
|---|---|
| 10:08:29 1 | Do you know what of Dave's knowledge he respected? |
| 10:08:34 2 | A.   The ability - well, the information security |
| 10:08:38 3 | side of things.  You know, firewalling, anti-hacking, |
| 10:08:45 4 | anything like that.  They'd talk - like, I mean, they |
| 10:08:48 5 | could talk for hours about that sort of thing, I think. |
| 10:08:57 6 | Q.   Did you ever hear them talk about bitcoin? |
| 10:09:03 7 | A.   No. |
| 10:09:09 8 | Q.   Do you have any personal knowledge of Craig |
| 10:09:12 9 | referring to Dave as his business partner? |
| 10:09:14 10 | A.   No. |
| 10:09:15 11 | Q.   Do you have any personal knowledge of Dave |
| 10:09:17 12 | referring to Craig as his business partner? |
| 10:09:20 13 | A.   No. |
| 10:09:23 14 | Q.   You mentioned that you were involved in a bunch |
| 10:09:25 15 | of Craig's businesses.  In fact, you sort of left your |
| 10:09:29 16 | nursing in order to get involved in his businesses; is |
| 10:09:32 17 | that right? |
| 10:09:32 18 | A.   Yes. |
| 10:09:35 19 | Q.   Do you have personal knowledge of how Craig |
| 10:09:38 20 | entered into business relationships? |
| 10:09:43 21 | MR ROCHE:   Objection.  Form. |
| 10:09:45 22 | THE DEPONENT:   No.  Can you clarify that, though? |
| 10:09:49 23 | I don't quite know what you mean. |
| 24 | BY MS MARKOE: |
| 10:09:52 25 | Q.   Yes.  So what I mean by that is did he enter |

LYNN CARROLL WRIGHT                         January 13, 2020

37

10:09:55  1   into business relationships formally, with contracts and

10:09:59  2   corporate structures, or did he do things more

10:10:04  3   informally, with handshake deals?

10:10:08  4        MR ROCHE:   Objection, form.

10:10:10  5        THE DEPONENT:   He - no, he was - I - he was

10:10:13  6   informal.  Like, he - there was never anything put in

10:10:17  7   writing except between him and myself when - like I would

10:10:23  8   be marked down as a director of the companies - until our

10:10:29  9   divorce, obviously.  But otherwise, the only time that

10:10:36 10   anything was put in writing was when we were hiring

10:10:40 11   people.  So - and then they weren't clients or anything,

10:10:45 12   they were employees.

10:10:59 13        Q.   In any of your communications with Dave, did

10:11:02 14   Dave ever mention bitcoin?

10:11:06 15        A.   No.

10:11:17 16        Q.   Do you recall a time where Craig was shot?

10:11:23 17        A.   Yes.

10:11:27 18        Q.   Do you know - do you remember approximately

10:11:29 19   when that was?

10:11:33 20        A.   I'm just trying to think.  I think it was - it

10:11:41 21   might have been 2010, because I think we were still -

10:11:49 22   I think we were still in the house in - living together

10:11:52 23   here.  Because I remember getting the phone call and then

10:12:00 24   when he got back, so - but we - that was coming close to

10:12:03 25   the time we were separating.

LYNN CARROLL WRIGHT         38         January 13, 2020

10:12:08 1        Q.    Do you know where he got shot? And by "where",

10:12:15 2   I don't mean where on his body, I mean where in the world

10:12:19 3   was he when he got shot?

10:12:21 4        A.    South America, I believe. Either South or

10:12:26 5   Central America. I can't - I can't --

10:12:29 6        Q.    Do you know what he was doing in South or

10:12:31 7   Central America when he got shot?

10:12:33 8        A.    No, not really. I mean, he - he went to do

10:12:35 9   some work but I - I don't know what it was as, again, we

10:12:40 10   were - we were pretty much having trouble communicating

10:12:46 11   about anything, then.

10:13:00 12        Q.    Give me one second, please.

10:13:02 13        A.    Yep.

10:13:59 14        Q.    Lynn, I think I'm going to have just one or two

10:14:02 15   more questions for you.

10:14:03 16        A.    Yes, okay.

10:14:04 17        Q.    To the best of your knowledge and recollection,

10:14:06 18   aside from W&K, which is a more formal arrangement, did

10:14:13 19   Craig and Dave have any informal business relationship

10:14:18 20   regarding anything?

10:14:19 21        MR ROCHE:    Objection, form.

10:14:24 22        THE DEPONENT:    No, I don't believe - I mean, they

10:14:26 23   would bounce ideas off of each other over the phone and

10:14:29 24   stuff, but as for any arrangements, no.

25   BY MS MARKOE:

10:14:43  1       Q.   Do you know what they bounced ideas about off

10:14:44  2   of each other?

10:14:46  3       A.   Usual - well, I assumed it was about

10:14:47  4   information security.  That's - you know, that's - he -

10:14:49  5   Craig liked to write articles, and I think he would

10:14:52  6   include Dave's input and stuff in the articles on

10:14:58  7   information security.

10:15:06  8       Q.   Do you know if they had any informal

10:15:08  9   arrangement regarding bitcoin?

10:15:10 10       A.   No, I don't.

10:15:11 11       Q.   Do you know if they had any kind of informal

10:15:13 12   arrangement regarding intellectual property?

10:15:15 13       A.   No, I don't know.

10:15:32 14       Q.   During your relationship with Craig, did you

10:15:35 15   ever hear either him or Dave talking about any informal

10:15:40 16   relationship they had whatsoever regarding any

10:15:43 17   intellectual property, bitcoin or other project?

10:15:47 18       A.   No.

10:16:06 19       Q.   All right, Lynn, thank you very much.

10:16:08 20   I actually have no further questions right now.

10:16:11 21   Depending on Mr Roche's questions, I may have a couple of

10:16:13 22   follow-ups thereafter, but thank you very much for your

10:16:16 23   time.

10:16:17 24       A.   You're welcome.

10:16:22 25       MR ROCHE:   Can we just take a quick five-minute

LYNN CARROLL WRIGHT                                40                              January 13, 2020

10:16:23  1      break and then we'll come back?

10:16:25  2          THE VIDEOGRAPHER:   Yes.

10:16:25  3          MR ROCHE:   It's quarter past the hour.  Let's come

10:16:28  4      back at 20 past the hour?

10:16:30  5          THE VIDEOGRAPHER:   Okay.  This is the videographer.

10:16:31  6      I will change tapes.  Going off the record at 10.16.  End

10:16:36  7      of tape 1.

          8      (10.16am)

          9              (A short break)

          10     (10.21am)

10:21:41  11         THE VIDEOGRAPHER:   Going back on the record at

10:21:43  12     10.21am.  Commencement of tape 2.  Proceed.

          13     **EXAMINATION BY MR ROCHE:**

10:21:48  14         Q.   Good morning, Ms Wright.  My name is

10:21:53  15     Kyle Roche.  I represent the plaintiffs in this matter.

10:21:55  16     And just as a housekeeping, so that we have the record

10:21:58  17     clear, Vel Freedman is either on the line now - I know

10:22:04  18     he's in a spot where his connection is a little spotty,

10:22:08  19     so he will be in and out of the call.

10:22:19  20             Ms Wright I've got a few questions to ask you

10:22:22  21     about your testimony today and a few other topics.  To

10:22:24  22     start, you testified earlier that you had approximately

10:22:28  23     three or four communications with Rivero Mestre; is that

10:22:35  24     correct?

10:22:35  25         A.   Yes.

LYNN CARROLL WRIGHT                    41                    January 13, 2020

10:22:36  1        Q.    When was the first of those communications?

10:22:40  2        A.    When I received the - one of the - the -

10:22:47  3    I guess the first or second email or - from Dave and this

10:22:56  4    Gareth fellow, I - I didn't know what to do with it, so

10:23:00  5    I got in touch with Craig and he said to give it to - to

10:23:12  6    his solicitors.  Actually, I think I was - before then,

10:23:18  7    I was in - they were in touch with me, I think, because

10:23:22  8    they, for some - oh, they needed some information or

10:23:25  9    something, and I - and they sent me an email asking for

10:23:33 10    the information, and I said, "No", I would not give them

10:23:36 11    the information until I had permission from Craig,

10:23:39 12    because I'm just not going to speak to somebody I don't

10:23:42 13    know.  And so Craig then gave me permission to speak to

10:23:48 14    them, and I think it was Andres, Andreas, that called the

10:23:58 15    first time, or it might have been Amanda.  I can't

10:24:01 16    recall.

10:24:02 17        Q.    Okay.  And you say you needed permission from

10:24:04 18    Craig.  Why did you need permission from Craig?

10:24:06 19        A.    Because I'm not going to give information on

10:24:08 20    him or I'm not going to respond to questions about him

10:24:13 21    for all - because I was being harassed by - by

10:24:18 22    journalists and everything every time something came up

10:24:21 23    about - on the technical websites and stuff about

10:24:31 24    bitcoin.  People were calling saying, "I'm so-and-so.

10:24:34 25    Can you tell me this?" or, "Can you tell me that?", and

LYNN CARROLL WRIGHT                    42                    January 13, 2020

10:24:37  1    I wasn't going to do it.

10:24:38  2         Q.   When was the last time a reporter reached out

10:24:41  3    to you regarding Craig Wright?

10:24:45  4         MS MARKOE:   Objection.   Relevance.

          5    BY MR ROCHE:

10:24:50  6         Q.   You can answer.

10:24:51  7         A.   Okay.   Probably about five months ago now.

10:24:57  8         Q.   Okay.   And who - what reporter was that?

10:25:01  9         A.   It was a --

10:25:02 10         MS MARKOE:   Objection.   Relevance.   You can answer.

10:25:04 11         THE DEPONENT:   Okay.   It was the fellow that was -

10:25:07 12    I can't recall his name offhand.   He's - he's writing a

10:25:11 13    book about it.

         14    BY MR ROCHE:

10:25:14 15         Q.   Okay.   And did you provide any information to

10:25:16 16    him?

10:25:18 17         A.   I --

10:25:19 18         MS MARKOE:   Objection again.   Relevance.

         19    BY MR ROCHE:

10:25:25 20         Q.   Ms Wright, did you hear?

10:25:30 21         A.   I - yep, no, I - I heard.   Sorry, my mouth was

10:25:32 22    just dry.   Yes, I did.   After - after permission from

10:25:35 23    Craig, basically, you know, saying that, yeah, it's okay.

10:25:40 24         Q.   What information did you provide to the

10:25:41 25    reporter?

LYNN CARROLL WRIGHT                    43                    January 13, 2020

10:25:42  1        A.    Oh, he just asked questions about - about his -
10:25:47  2    sorry, the coffee machine is just going off in the
10:25:49  3    background.
10:25:52  4        Q.    That's okay.
10:25:52  5        A.    He just - it was - it was more about his life
10:25:55  6    and stuff, you know, that - that he wanted the
10:25:58  7    information.
10:26:00  8        Q.    Did he ask you - and are you aware that Craig
10:26:04  9    is a defendant in this litigation?
10:26:07 10        A.    Yes, I'm aware of that.
10:26:09 11        Q.    When did you first become aware of this
10:26:11 12    litigation?
10:26:15 13        A.    God, I don't know.  I have a sister-in-law up
10:26:19 14    in Ottawa that every time she sees anything about - about
10:26:22 15    bitcoin or anything, she sends me the information, and
10:26:25 16    I don't read half of it, I just delete it, so - but it's
10:26:30 17    been - it's probably been about six months, I guess, that
10:26:35 18    I've known about it.
10:26:39 19        Q.    Okay.  And you earlier, when you received those
10:26:42 20    emails from Gareth - and is that Gareth Williams?  Is
10:26:47 21    that the individual?
10:26:49 22        A.    Could be.  I think - I - it might be.  This
10:26:52 23    individual is dead now, I think.
10:26:55 24        Q.    Okay.  How do you know he's dead?
10:26:58 25        A.    Craig told me.

LYNN CARROLL WRIGHT                                          January 13, 2020

                                      44

10:27:00  1        Q.    Okay.  Do you have written communications with

10:27:03  2    Craig regarding these emails?

10:27:07  3        A.    No.

10:27:10  4        Q.    How did you communicate with Craig?

10:27:12  5        A.    By phone.

10:27:14  6        Q.    Okay.  When would - how often do you speak with

10:27:16  7    Craig by phone?

10:27:18  8        A.    Very, very infrequently.

10:27:21  9        Q.    When was the last time you spoke with Craig by

10:27:25 10    phone?

10:27:27 11        A.    Just try - oh, probably about last month some

10:27:30 12    time.

10:27:32 13        Q.    And what did you talk about last month?

10:27:35 14        A.    His --

10:27:36 15        MS MARKOE:    Objection.

10:27:37 16        THE DEPONENT:    Can I answer?

10:27:41 17        MR ROCHE:    Yes.

10:27:42 18        MS MARKOE:    Yes.  Unless you are instructed not to

10:27:43 19    answer, you should answer.

10:27:45 20        THE DEPONENT:    Okay.  I - his mum was in the

10:27:47 21    hospital and had been in the hospital for a while, and

10:27:51 22    I - we discussed how she was.

         23    BY MR ROCHE:

10:27:55 24        Q.    Okay.  Did you talk about this litigation when

10:27:57 25    you were on that phone call with Craig?

LYNN CARROLL WRIGHT                    45                    January 13, 2020

| | | |
|---|---|---|
| 10:28:00 | 1 | A.   He mentioned it, but he did not go into detail |
| 10:28:06 | 2 | about it. |
| 10:28:08 | 3 | Q.   What did he mention about the litigation? |
| 10:28:10 | 4 | MS MARKOE:   Objection. |
| 10:28:12 | 5 | THE DEPONENT:   He mentioned that he - it was |
| 10:28:14 | 6 | ongoing. |
| | 7 | BY MR ROCHE: |
| 10:28:16 | 8 | Q.   Okay.  Anything else besides that, the fact |
| 10:28:20 | 9 | that it was still going? |
| 10:28:21 | 10 | A.   No. |
| 10:28:22 | 11 | MS MARKOE:   Objection. |
| 10:28:23 | 12 | BY MR ROCHE: |
| 10:28:24 | 13 | Q.   Okay.  So he just told you, "I'm still involved |
| 10:28:26 | 14 | in a lawsuit", and that was that? |
| 10:28:30 | 15 | A.   Yes. |
| 10:28:31 | 16 | MS MARKOE:   Objection.  Asked and answered. |
| 10:28:33 | 17 | BY MR ROCHE: |
| 10:28:34 | 18 | Q.   Okay.  I'd like to go back to the first time |
| 10:28:35 | 19 | you spoke with Rivero Mestre.  What was the - what was |
| 10:28:38 | 20 | that discussion about? |
| 10:28:41 | 21 | MS MARKOE:   Objection.  Asked and answered.  You |
| 10:28:43 | 22 | can answer. |
| 10:28:43 | 23 | THE DEPONENT:   I don't recall.  I mean, honestly, |
| 10:28:49 | 24 | I don't recall what it was about.  I think it was - well, |
| 10:28:53 | 25 | it's - no point in saying "I think", but I - I - I don't |

LYNN CARROLL WRIGHT                          46                          January 13, 2020

10:29:00  1    recall what it was about.

       2    BY MR ROCHE:

10:29:02  3        Q.    Okay.  Do you recall what any of your

10:29:05  4    conversations with Rivero Mestre were about?

10:29:11  5        A.    I - when we were - Amanda - I spoke to Amanda

10:29:15  6    when we were setting up this, this teleconference, and

10:29:20  7    why I couldn't travel to the States or to the UK, and

10:29:27  8    basically deciding on when it would be a good time.

10:29:32  9        Q.    Okay.  And when was that conversation?

10:29:36 10        A.    Last week some time.

10:29:39 11        Q.    Last week?  Do you recall what day?

10:29:43 12        A.    No, I don't.

10:29:45 13        Q.    Okay.  And when you say "last week", do you

10:29:48 14    mean - so it's Sunday our time.  I know it's Monday your

10:29:52 15    time?

10:29:53 16        A.    Okay, yeah.  All right, well it probably would

10:29:55 17    have been - actually, it probably would have been before

10:30:06 18    New Year's, then, because - I'm just trying to think when

10:30:10 19    it would have been.  May have been before New Year's.

10:30:12 20        Q.    Okay.  And why was - why did you decide this

10:30:15 21    time was a good time to have this deposition?

10:30:20 22        MS MARKOE:   Objection.  Relevance.

10:30:23 23        THE DEPONENT:   Because I have some health issues

10:30:26 24    that are interfering.

       25    BY MR ROCHE:

10:30:34  1        Q.   I'm sorry, I didn't get the answer.  You broke

10:30:36  2   up?

10:30:37  3        A.   Sorry, I have - I have health issues that are

10:30:38  4   being investigated.

10:30:43  5        Q.   Okay.  And do you have any emails with

10:30:46  6   Rivero Mestre?

10:30:51  7        A.   Just the - I - I think it was just the one that

10:30:53  8   they sent me with the - the date for the - for the

10:31:01  9   deposition.  I don't recall any others.

10:31:05 10        Q.   Okay.

10:31:09 11        A.   I --

10:31:10 12        Q.   And I should --

10:31:11 13        A.   Sorry, there --

10:31:12 14        Q.   You go ahead.

10:31:13 15        A.   There may have - there may have been one from

10:31:15 16   Andres, the initial one, wanting some - requesting

10:31:21 17   information, from him - for, you know.  That would be the

10:31:25 18   first time I got - I was approached by them.

10:31:30 19        Q.   And what information was requested?

10:31:33 20        A.   Just - I - they - he just wanted some

10:31:39 21   information about Craig and I guess about the - the

10:31:41 22   business, like the Information Defense and stuff like

10:31:46 23   that.  But, again, my memory - I can't recall.

10:31:49 24        Q.   Okay.  Did you provide them any documents?

10:31:51 25        A.   No.  The only things I - I sent on to them were

LYNN CARROLL WRIGHT                    48                    January 13, 2020

| | |
|---|---|
| 10:31:55 1 | the - were copies of those emails that I got with the - |
| 10:32:00 2 | and I scanned the hard copies. |
| 10:32:04 3 | Q.   Okay.  And in any of your conversations with |
| 10:32:07 4 | Rivero Mestre did you discuss any documents? |
| 10:32:12 5 | A.   No.  I think they asked me about the - they |
| 10:32:15 6 | asked if - about the - our divorce settlement. |
| 10:32:20 7 | Q.   And what did they ask you about your divorce |
| 10:32:21 8 | settlement? |
| 10:32:22 9 | A.   Just that - asked me about it and if I - if |
| 10:32:25 10 | I had a copy of it. |
| 10:32:27 11 | Q.   Did they ask you about W&K Info Defense? |
| 10:32:32 12 | A.   They mentioned W&K but they weren't asking me |
| 10:32:37 13 | definitive questions about it. |
| 10:32:38 14 | Q.   What did they mention about W&K? |
| 10:32:42 15 | A.   It was involved in the - that it was involved |
| 10:32:45 16 | with the lawsuit. |
| 10:32:48 17 | Q.   And did they discuss W&K - did they discuss the |
| 10:32:51 18 | membership of W&K with you? |
| 10:32:54 19 | A.   They asked if I was part of W&K. |
| 10:32:58 20 | Q.   Okay.  And what did you tell them? |
| 10:33:01 21 | A.   I told them, "Yes". |
| 10:33:04 22 | Q.   And how - what did you tell them about your |
| 10:33:06 23 | involvement in W&K? |
| 10:33:07 24 | A.   I told them that I was administrative - the - |
| 10:33:11 25 | an administrator. |

LYNN CARROLL WRIGHT                49                    January 13, 2020

10:33:13  1         Q.   Okay.  And did you - and was that the - your

10:33:16  2    only relationship with W&K was that you were an

10:33:19  3    administrator?

10:33:20  4         A.   Yeah.  Well --

10:33:22  5         MS MARKOE:   Objection.

10:33:26  6         THE DEPONENT:   -- plus - plus the work I did.

          7    BY MR ROCHE:

10:33:28  8         Q.   Plus the work you did.  Okay.  And you said you

10:33:30  9    had had about approximately three to four conversations

10:33:33 10    with Rivero Mestre?

10:33:34 11         A.   If that, yeah.  At the outside it probably

10:33:38 12    would have been four.

10:33:47 13         Q.   Have you ever been deposed before?

10:33:49 14         A.   No.

10:33:51 15         Q.   Have you ever been involved in a litigation?

10:33:57 16         MS MARKOE:   Objection.

10:33:59 17         THE DEPONENT:   No, not for anything like this.

10:34:02 18    From a - from a - an old company that we had.

          19   BY MR ROCHE:

10:34:08 20         Q.   And was that a company that you and Craig had?

10:34:10 21         A.   Yes.

10:34:11 22         Q.   What company was that?

10:34:13 23         A.   DeMorgan Information Security Systems.

10:34:17 24         Q.   And what was that litigation about?

10:34:20 25         MS MARKOE:   Objection.  Relevance.  You can answer.

LYNN CARROLL WRIGHT                    January 13, 2020

|  |  |
|---|---|
| 10:34:23 | 1 |
| 10:34:26 | 2 |
| 10:34:37 | 3 |
| 10:34:40 | 4 |
| 10:34:43 | 5 |
| 10:34:51 | 6 |
| 10:34:54 | 7 |
| 10:35:01 | 8 |
| 10:35:09 | 9 |
| 10:35:15 | 10 |
| 10:35:23 | 11 |
| 10:35:26 | 12 |

1    THE DEPONENT:   Okay.  The company - we had brought

2  in a - an investor who then did some what Craig

3  considered, I guess, illegal, where he was giving out

4  information and stuff about - so - about it, so we

5  resigned as directors.  We resigned from the company to -

6  working for the company, but we never gave up our

7  shareholding in the company, and they kept us from

8  working in the industry and then, basically, they were -

9  they were suing - the guy that took over sold the

10  business of that company to another company, and it's -

11  so that was the litigation that was - that was involved

12  for that.

13  BY MR ROCHE:

14    Q.   Okay.  And do you know if you were plaintiffs

15  or defendants in that litigation?

16    MS MARKOE:   Objection.  Relevance.

17    THE DEPONENT:   We were defendants.

18  BY MR ROCHE:

19    Q.   Okay.  And how was that litigation resolved?

20    A.   That --

21    MS MARKOE:   Again, objection.  You can answer.

22    THE DEPONENT:   Okay.  The - he had brought suit

23  against both Craig and myself as separate entities.  The

24  case against me was dropped by the court and the case

25  against Craig, he was - he was - he had to - I guess he

10:36:10  1    had to - he lost the case, I guess, and he had to do -

10:36:17  2    make some payment - legal payments and stuff for the

10:36:21  3    other guys.

          4    BY MR ROCHE:

10:36:23  5        Q.   Do you know how much those legal payments were?

10:36:26  6        MS MARKOE:   Objection.  Relevance.

10:36:29  7        THE DEPONENT:   Offhand, no, I can't recall.

          8    BY MR ROCHE:

10:36:31  9        Q.   Okay.  Do you know if Craig was held in

10:36:33 10    contempt as part of that litigation?

         11        A.   I think he was.

10:36:38 12        MS MARKOE:   Objection.  Relevance.

10:36:42 13        THE DEPONENT:   Yes, he was.

         14    BY MR ROCHE:

10:36:44 15        Q.   And what was the result of that?

10:36:47 16        MS MARKOE:   Objection.  Relevance and confusing.

         17    BY MR ROCHE:

10:36:50 18        Q.   You can answer.

10:36:51 19        A.   He had to - he had to do community work.

10:36:54 20        Q.   Why was Craig held in contempt?

10:36:57 21        MS MARKOE:   Objection.

10:36:58 22        THE DEPONENT:   I don't know, to be honest.  I -

10:37:04 23    it - I - honestly, I can't tell - I don't know - I didn't

10:37:09 24    understand why it was - he would have been held in

10:37:11 25    contempt.

| | |
|---|---|
| 1 | BY MR ROCHE: |
| 10:37:12  2 | Q.   Okay.  And what was the general time frame that |
| 10:37:15  3 | all this happened with DeMorgan and the litigation? |
| 10:37:26  4 | A.   Oh, God, it's probably about 2010, but it |
| 10:37:32  5 | started before then, because - yeah.  I think it resolved |
| 10:37:39  6 | around 2010. |
| 10:37:43  7 | Q.   Okay.  And just as the - Rivero Mestre was - |
| 10:37:49  8 | showed you documents, I'm also going to introduce some |
| 10:37:52  9 | documents. |
| 10:37:52 10 | A.   Yes. |
| 10:37:53 11 | Q.   I've got my colleague, Sati, there and she's |
| 10:37:55 12 | going to - I'm going to refer to particular documents and |
| 10:37:58 13 | she's going to hand them to you. |
| 10:38:00 14 | MR ROCHE:   Sati, can you hand Ms Wright tab OO. |
| 10:38:04 15 | MS MARKOE:   Kyle, we haven't - we actually, about |
| 10:38:10 16 | five minutes ago, received your email with the documents. |
| 10:38:13 17 | I'm currently having them printed out.  Can you please |
| 10:38:17 18 | provide us with Bates numbers and we can try to look on |
| 10:38:20 19 | our Relativity database?  Otherwise, the other |
| 10:38:23 20 | alternative is we take a five-minute break while these |
| 10:38:25 21 | documents are printing out, because we don't have them in |
| 10:38:29 22 | front of us right now. |
| 10:38:32 23 | MR ROCHE:   So you - I'm just reviewing the subpoena |
| 10:38:37 24 | right now, so it doesn't have a Bates stamp on it.  Did |
| 10:38:40 25 | you want to take five minutes now and print everything up |

LYNN CARROLL WRIGHT                    53                    January 13, 2020

10:38:44  1    or --

10:38:45  2          MS MARKOE:   I'm having it printed up.  If it's just

10:38:47  3    the subpoena, I don't think that I need to have that in

10:38:50  4    front of me, but if we start getting into more

10:38:52  5    substantive documents we may need to take a break,

10:38:55  6    because we just received these documents I think five,

10:38:58  7    maybe 10 minutes ago.

10:39:00  8          MR ROCHE:   Okay.

10:39:02  9          MS MARKOE:   Thanks.  And I'm not really sure how

10:39:04  10   many documents you sent us.

10:39:06  11         MR ROCHE:   Okay.

10:39:09  12         MS MARKOE:   Actually, how many are there?

10:39:10  13         MR ROCHE:   How many documents did I send through?

10:39:13  14         MS MARKOE:   Yeah.

10:39:14  15         MR ROCHE:   I think there's about - north of 50

10:39:19  16   documents in there.

10:39:20  17         MS MARKOE:   So we might need to take a longer

10:39:22  18   break, because that might take some time to print out,

10:39:25  19   given that we got it in the midst of the deposition.

10:39:29  20         MR ROCHE:   Okay.

          21   BY MR ROCHE:

10:39:32  22         Q.   Ms Wright, do you have the document that Sati

10:39:34  23   just handed to you in front of you?

10:39:36  24         A.   Yes, I do.

10:39:37  25         Q.   Do you recognize this document?

LYNN CARROLL WRIGHT                54                    January 13, 2020

| | |
|---|---|
| 10:39:38 1 | A.    Yes, I got it via email. |
| 10:39:42 2 | Q.    Okay.  And you understand that this is a notice |
| 10:39:49 3 | of our taking your deposition today? |
| 10:39:52 4 | A.    Yes. |
| 10:39:54 5 | Q.    And did you - if you can go to the last page, |
| 10:39:58 6 | page 3, "Schedule A"? |
| 10:40:00 7 | A.    Yes. |
| 10:40:01 8 | Q.    Did you review this in advance of today's |
| 10:40:03 9 | deposition? |
| 10:40:04 10 | A.    Yes, I did. |
| 10:40:07 11 | Q.    Okay.  And have you gathered or taken any |
| 10:40:13 12 | efforts to gather documents responsive to this request? |
| 10:40:16 13 | A.    No, because I'm not submitting any to you. |
| 10:40:18 14 | Q.    And why?  Why are you not submitting any to us? |
| 10:40:21 15 | A.    Because - because I'm doing this voluntarily, |
| 10:40:24 16 | and I don't - I don't have to submit anything to you. |
| 10:40:28 17 | Q.    Okay.  And if we had to get a court order for |
| 10:40:34 18 | Australia to have these documents submitted, would you |
| 10:40:36 19 | comply with the court order? |
| 10:40:38 20 | A.    I would comply with it as far as I possibly |
| 10:40:41 21 | could, yes. |
| 10:40:42 22 | Q.    Okay.  So I want to focus on the first |
| 10:40:48 23 | documents, because it requests, "Any and all documents |
| 10:40:50 24 | evidencing communications between you and Craig Wright". |
| 10:40:52 25 | Do you have your communications between you and |

LYNN CARROLL WRIGHT                    55                January 13, 2020

10:40:56  1      Craig Wright dating back to 2007?

10:40:59  2          A.   No, I don't.  I have --

10:41:01  3          Q.   What did you do --

10:41:02  4          A.   I have had multiple computers and the - I can't

10:41:08  5      afford a huge big computer, and the one that I have has

10:41:13  6      no emails on it from him at all.

10:41:16  7          Q.   Okay.  Do you have access to your emails on a

10:41:19  8      web-based platform?

10:41:22  9          A.   No.  No - well, I have - no, I don't.

10:41:26  10         Q.   Okay.  So you have no emails between you and

10:41:30  11     Craig Wright from 2007 to the present?

10:41:32  12         A.   Not that I'm aware of, no.

10:41:36  13         Q.   Okay.  But did you look, before today, to

10:41:39  14     confirm whether or not you had any emails from

10:41:42  15     Craig Wright?

10:41:43  16         A.   I - I did a very basic, very cursory look.

10:41:48  17         Q.   Okay.  And what did that look reveal?

10:41:52  18         A.   Well, I think it brought up stuff that - that

10:41:56  19     had his name in it, but nothing directly - there might

10:42:01  20     have been a couple of things directly from him, but that

10:42:06  21     were after we split up.

10:42:13  22         Q.   Okay.  So you have no emails dating back to

10:42:16  23     2007 in your possession?

10:42:18  24         A.   No, not that I can find.

10:42:21  25         Q.   Okay.  And if you go to the second topic, "Any

LYNN CARROLL WRIGHT                56              January 13, 2020

10:42:29  1    and all documents evidencing any communications between

10:42:31  2    you and counsel for Craig Wright", do you have those

10:42:34  3    communications?

10:42:35  4         A.   I have - I have a couple.  There wasn't a lot.

10:42:41  5         Q.   Okay.  And would you produce those documents in

10:42:49  6    response to the subpoena?

10:42:50  7         A.   Yes, I would.

10:42:51  8         Q.   Okay.  Would you mind sending those documents

10:42:53  9    along to us after this deposition is over?

10:42:59 10         A.   If I - no, I'm not unless you get a court

10:43:04 11    order.

10:43:04 12         Q.   Okay.  And, "Any and all documents referring" -

10:43:11 13    looking at topic 3 here - "Any and all documents

10:43:14 14    referring or related to W&K Info Defense Research, LLC".

10:43:17 15    Do you have any documents relating to W&K Info Defense

10:43:20 16    Research, LLC?

10:43:22 17         A.   No.

10:43:27 18         Q.   And topic 4, "Any and all documents referring

10:43:30 19    or relating to David Kleiman".  Do you have any documents

10:43:33 20    or communications relating to David Kleiman?

10:43:36 21         A.   No.

10:43:38 22         Q.   Okay.  Topic number 5, "Any and all documents

10:43:43 23    referring or relating to Ira Kleiman"?

10:43:45 24         A.   No.

10:43:46 25         Q.   Do you have any documents relating --

LYNN CARROLL WRIGHT                                57                    January 13, 2020

10:43:47  1       A.    No.

10:43:49  2       Q.    Okay.  "Any and all documents referring or

10:43:50  3   relating to Bitcoin".  Do you have any documents

10:43:53  4   referring or relating to bitcoin?

10:43:57  5       A.    No.  Nothing other than what's been printed,

10:44:00  6   you know, in articles.

10:44:04  7       Q.    Okay.  So you have nothing other than articles,

10:44:10  8   publicly available articles --

          9       A.    That's correct?

10:44:11 10       Q.    -- when it comes to anything relating to

10:44:14 11   bitcoin?

10:44:14 12       A.    That's right.

10:44:15 13       Q.    Do you own any bitcoin?

10:44:16 14       A.    No.

10:44:17 15       Q.    Do you own any cryptocurrency whatsoever?

10:44:19 16       A.    None.

10:44:20 17       MS MARKOE:    Objection.    Relevance.

         18   BY MR ROCHE:

10:44:23 19       Q.    Okay.  And the topic number 7, "Any and all

10:44:26 20   documents related to trusts established by Craig Wright

10:44:30 21   to hold bitcoin or bitcoin related intellectual property

10:44:34 22   that was mined and/or created prior to 2014".  Do you

10:44:37 23   have any documents related to that request?

10:44:40 24       A.    None.

10:44:41 25       Q.    Okay.  Topic number 8.

LYNN CARROLL WRIGHT                    58                    January 13, 2020

*Any and all documents that relate to*
*Satoshi Nakamoto, bitcoin mined by any*
*party to this suit ... or bitcoin related*
*intellectual property created and/or*
*developed by any party to this suit prior*
*to 2014.*

Do you have any documents related to that?

    A.    None.

    Q.    When was the first time you heard the term

"Satoshi Nakamoto"?

    A.    Probably around 2012.

    Q.    2012.  How did you hear about that term?

    A.    In an article that my sister-in-law sent me.

    Q.    Okay.  Did Craig ever mention the term

"Satoshi Nakamoto" to you?

    A.    No.

    Q.    And then the last one, "Any and all documents

relating to your divorce from Craig Wright".  Do you have

any documents relating to that?

    A.    Well, you saw the document that was - that we

looked - we discussed this morning.

    Q.    And did you have that document before today?

    A.    Yes.

    Q.    Okay.  And where - do you have other documents

relating to your divorce from Craig?

    A.    No.

    Q.    So is the document we looked at today the only

documents you have relating to your divorce from

LYNN CARROLL WRIGHT                    59                    January 13, 2020

10:46:05   1    Craig Wright?

10:46:06   2        A.   Other than the divorce decree itself, yes,

10:46:08   3    that's the only one.

10:46:10   4        Q.   Okay.  So the only two things you have are the

10:46:14   5    divorce decree and the document we looked at today?

10:46:16   6        A.   Yes.

10:46:18   7        Q.   What's - do you have a copy of the divorce

10:46:20   8    decree?

10:46:21   9        A.   Yeah.

10:46:23  10        Q.   And would you be willing to provide that to the

10:46:28  11    law firms in this litigation?

10:46:32  12        A.   Yeah, if I - if you get the court order.

10:46:36  13        MR ROCHE:    Okay.

10:46:38  14        MS MARKOE:   Kyle, we produced a copy to you of the

10:46:43  15    divorce decree many, many months ago.

          16        MR ROCHE:    Okay.

          17    BY MR ROCHE:

10:46:49  18        Q.   But absent a court order, you wouldn't produce

10:46:53  19    to us your copy of the divorce decree?

10:46:55  20        A.   Well, yeah, I could - that I don't mind sending

10:46:57  21    off to you.  I just have to locate it again.

10:47:00  22        Q.   Okay.  So we will have somebody, after this

10:47:02  23    deposition, send you a follow-up email, and if you could

10:47:05  24    please send that information back to that person, it

10:47:09  25    would be greatly appreciated.  I will have someone from

LYNN CARROLL WRIGHT                60                    January 13, 2020

10:47:12  1    my firm send that email.

10:47:13  2         A.    Okay.  I just - to say, too, that I don't - my

10:47:17  3    scanner doesn't work, so it's going to be hard to scan it

10:47:21  4    and send it off to you.

10:47:23  5         Q.    Okay.  If - you know, obviously --

10:47:26  6         A.    What I can do is take a picture, a photo with

10:47:29  7    my phone?

10:47:30  8         Q.    That would be - if you could take a picture of

10:47:34  9    the pages and - with your phone and send it, that would

10:47:36 10    be appreciated.

10:47:36 11         A.    Okay.

10:47:47 12         Q.    Maybe we talked about your educational

10:47:49 13    background when Ms Markoe was questioning you.  What is

10:47:54 14    your employment history?

10:47:56 15         A.    For how long?

10:47:57 16         Q.    Let's start with when - what was your

10:48:03 17    employment when you first met Craig?

10:48:06 18         A.    I was nursing.

10:48:08 19         Q.    Okay.  And how long - are you still a nurse?

10:48:14 20         A.    I'm retired now, but you can never stop being a

10:48:17 21    nurse.

10:48:19 22         Q.    I have family members who are nurses and I can

10:48:22 23    relate to that.  So did you stay a nurse - when did you

10:48:28 24    retire from being a nurse, in the official capacity?

10:48:31 25         A.    Well, I stopped nursing in '98 when I went to

LYNN CARROLL WRIGHT                                    January 13, 2020
61

10:48:35  1    work for - for the initial company, and then, over the

10:48:41  2    years, when - you know, when the companies were not going

10:48:46  3    that well, I also went out and worked, not so much as a

10:48:51  4    nurse, but utilized my nursing working with insurance

10:48:57  5    claims companies.

10:49:01  6        Q.    Okay.  And I want to just quickly go back to

10:49:05  7    the divorce documents.  You said that there is a - you

10:49:12  8    have the divorce decree and the schedule that we looked

10:49:15  9    at today; correct?  Those are the two documents that you

10:49:18  10   have?

10:49:19  11       A.    Yes, yes.

10:49:21  12       Q.    And is the one that Rivero Mestre provided to

10:49:26  13   you the same as the one you have in your possession?

10:49:30  14       A.    Yes.

10:49:31  15       Q.    Okay.  There is no difference?

10:49:34  16       A.    No.

10:49:41  17       Q.    Okay.  And do you have a copy of that agreement

10:49:43  18   signed by Craig?

10:49:46  19       A.    I - I don't think so, because I think probably

10:49:54  20   Michael Shehadie may have that copy.

10:50:00  21       Q.    And why would he have that copy?

10:50:02  22       A.    Well, he was - he was acting for me in the

10:50:06  23   divorce.  But he --

10:50:10  24       Q.    Okay.  Was - go ahead, I'm sorry.

10:50:14  25       A.    He knew Craig as well, so that may be the

LYNN CARROLL WRIGHT                          62                      January 13, 2020

10:50:17   1   reason why.

10:50:19   2           Q.   Was he acting for both of you?

10:50:23   3           A.   I think - I think he - he - I was - I thought

10:50:27   4   he was acting for me, but I think that was more - see, we

10:50:34   5   didn't - we did the divorce ourselves.  We - we didn't go

10:50:39   6   through a solicitor to go - to go to, you know, through

10:50:44   7   the courts for us.  We put the paperwork in ourselves,

10:50:49   8   and then the agreement was brought up - was developed

10:50:57   9   with Michael Shehadie.

10:51:01   10          Q.   So you submitted documents to Michael Shehadie

10:51:04   11  and he prepared that document?

10:51:06   12          A.   We submitted divorce - request for divorce to

10:51:11   13  the courts ourselves.

10:51:14   14          Q.   Okay.  And was the document we looked at

10:51:16   15  earlier, the Schedule A - was that filed with the courts?

10:51:22   16          A.   I assume Michael did it.  I - I - look, I - I

10:51:26   17  never asked a lot - I suppose I didn't ask a lot of

10:51:31   18  questions I should have, but there was a lot of things

10:51:36   19  happening at the time.

10:51:38   20          Q.   Why do you think you should have asked

10:51:40   21  questions?

10:51:41   22          A.   Well, it probably would have been better for my

10:51:44   23  future.

10:51:45   24          Q.   Why?  Why do you think that?

10:51:49   25          MS MARKOE:   Objection.  Relevance.

LYNN CARROLL WRIGHT                    63                    January 13, 2020

10:51:51  1          THE DEPONENT:   Yeah, just - just for my own peace

10:51:53  2      of mind, I guess.

          3      BY MR ROCHE:

10:51:56  4          Q.   And what things about the divorce agreement

10:52:02  5      have affected your peace of mind?

10:52:05  6          MS MARKOE:   Objection.   Relevance.

          7      BY MR ROCHE:

10:52:10  8          Q.   You can answer.

10:52:11  9          A.   Nothing, really.   I - look, I was happy enough

10:52:17  10     with that.   I still am.   You know, my - my concern at the

10:52:23  11     time, I guess, was, "Where am I going to go?"   Because

10:52:28  12     I don't have family here; I don't - like, Craig got all

10:52:33  13     the friends in the divorce, too, so - I think it was just

10:52:39  14     a matter of my own insecurities.

10:52:48  15         Q.   Okay.   I want to switch gears here for a

10:52:53  16     second.   We talked a little bit about your history with

10:52:56  17     Craig, and when did you - you said you first met Craig in

10:53:00  18     1996?

10:53:01  19         A.   Yes.

10:53:02  20         Q.   What was his occupation at the time?

10:53:05  21         A.   He was working for a company called OzEmail,

10:53:15  22     which was a - I guess a - a web-based company here in

10:53:20  23     Sydney.   And he - I - I am not sure - I'm not sure what

10:53:26  24     he did for them.   I think he was - was a client manager -

10:53:34  25     client manager.   I'm not sure.

LYNN CARROLL WRIGHT                64                   January 13, 2020

10:53:36  1          Q.    And at the time you met Craig, what was his

10:53:39  2     educational background?

10:53:42  3          A.    I believe he had an undergraduate degree which

10:53:48  4     he got through - through the military, because he was a

10:53:50  5     member of the military for a short time.

10:53:55  6          Q.    And this was before you met him?

10:53:56  7          A.    Yes.

10:53:57  8          Q.    Was he a member of the military when you met

10:53:59  9     him in 1996?

10:54:00 10          A.    No, he was not.

10:54:01 11          Q.    Okay.  And what was his degree in?

10:54:06 12          A.    I couldn't tell you.  I - I assume it was

10:54:09 13     probably some sort of science-based thing, but - because

10:54:13 14     he liked science and things like that.

10:54:17 15          Q.    And when did you get married?

10:54:20 16          A.    Late December '96.

10:54:24 17          Q.    Okay.  And do you know who Calvin Ayre is?

10:54:34 18          MS MARKOE:   Objection.  Relevance.  You can answer

10:54:37 19     it.

10:54:39 20          THE DEPONENT:   I don't know, no.  I don't know who

10:54:41 21     he is.  Oh, wait a minute.  Wait a minute.  That's the -

10:54:45 22     that's the Canadian guy with the bad hair, isn't it?

         23     BY MR ROCHE:

10:54:51 24          Q.    He is Canadian.

10:54:52 25          A.    Yeah, I've - I only - I'm only aware of him

LYNN CARROLL WRIGHT                    65                    January 13, 2020

10:54:55  1    through - through the articles that I've seen.

10:55:04  2         Q.   Okay.  Has Craig ever mentioned Calvin Ayre to

10:55:09  3    you?

10:55:09  4         A.   No.

10:55:10  5         Q.   Do you know who Steven Matthews is?

10:55:12  6         A.   He was a client of ours through - I forget if

10:55:19  7    he was working with a credit union or - I think it was

10:55:23  8    with a credit union.  But we did - we did - whatever

10:55:28  9    company he was working for at the time, we did - we did

10:55:35 10    monitor - 24/7 monitoring for his - for that company, if

10:55:41 11    it was the one that I'm thinking of.

10:55:43 12         Q.   Okay, Lynn, what's the one you're thinking of?

10:55:46 13         A.   I'm thinking of the credit union.

10:55:47 14         Q.   Okay.  And do you know approximately when you

10:55:51 15    met Steven Matthews?

10:55:53 16         A.   I've never met him in person.  I've only dealt

10:55:55 17    with him through - through the work and through - like,

10:56:02 18    through emails and stuff.

10:56:04 19         Q.   And when did you first email with

10:56:07 20    Steven Matthews?

10:56:11 21         A.   God, I don't know.  It's been a long, long

10:56:14 22    time, because it had to do with - with work, and mostly

10:56:21 23    invoices that weren't paid or something.

10:56:26 24         Q.   Invoices that weren't paid by Steven Matthews?

10:56:29 25         A.   By that - by his company.

LYNN CARROLL WRIGHT                    66                    January 13, 2020

10:56:31  1        Q.    What was his company?

10:56:32  2        A.    I can't recall if it was - if it was a credit

10:56:38  3    union or if it was an online casino that we did work for,

10:56:43  4    and that was one of our clients.  I can't recall which

10:56:46  5    one he worked for.

10:56:48  6        Q.    Okay.  What online casinos did Craig's

10:56:52  7    companies do work for?

10:56:54  8        A.    Lasseters.  It's the only legal online casino

10:56:58  9    in Australia - at that time.  I don't know if there is

10:57:02 10    any more that have been added to it.

10:57:05 11        Q.    Okay.  And are you aware of whether or not

10:57:09 12    Craig had any other dealings with Steven Matthews outside

10:57:14 13    of his role as a client?

10:57:18 14        MS MARKOE:   Objection.

10:57:19 15        THE DEPONENT:   I - can I answer that?

10:57:22 16        MR ROCHE:   Yes.

10:57:23 17        MS MARKOE:   You can answer any question unless

10:57:25 18    someone tells you not to.

10:57:27 19        THE DEPONENT:   Okay.  I couldn't - I was trying to

10:57:29 20    get a hold of Craig.  This is - oh, no, I wasn't trying

10:57:36 21    to get a hold of him, I had an email, I think, from

10:57:40 22    Steven Matthews when Craig went to the UK, and I just -

10:57:46 23    this email, I think it was just - I just - you know, he

10:57:51 24    was just letting me know that Craig had gone, I guess had

10:57:55 25    gone to the UK.  I guess because at the time there was

LYNN CARROLL WRIGHT                    67                    January 13, 2020

10:57:58  1    stuff in - in the news down here about it, and he wanted

10:58:04  2    to let me know that Craig was okay, and I - I - I hadn't

10:58:08  3    even heard the news, so it didn't bother me if he was

10:58:10  4    okay or not.

10:58:12  5         Q.    And was that the news relating to Craig and

10:58:14  6    bitcoin?

10:58:14  7         A.    Yeah - well, it was the news relating to the

10:58:18  8    ATO, the Australian Tax Office.

10:58:24  9         Q.    What news was that?

10:58:26 10         A.    The Australian Tax Office was auditing Craig

10:58:30 11    and the companies that we - that he had in - in the - in

10:58:37 12    Australia.  So that's what - like I don't know the extent

10:58:44 13    of what was going on, and I never asked, because I didn't

10:58:47 14    want to know.

10:58:49 15         Q.    Why didn't you want to know?

10:58:52 16         A.    Because I just didn't.  I had no interest.

10:58:56 17         Q.    Okay.  Did you have involvement in any of these

10:58:58 18    companies at that time?

10:58:59 19         A.    I had an - well, not the - what do you call

10:59:04 20    it - Information Security, my - by then, my involvement

10:59:10 21    was pretty well over, but the ATO was still - was still

10:59:17 22    interested in Craig.

10:59:20 23         Q.    Okay.  Do you still have a copy of that email

10:59:28 24    that Steven Matthews sent you?

10:59:31 25         A.    I don't know.

LYNN CARROLL WRIGHT                    68                    January 13, 2020

10:59:33  1          Q.    Okay.   Is it possible that you do?

10:59:40  2          A.    Possible.   "Probable" I'm not sure, because

10:59:47  3    my - my computer crashed and I had to get a new one a

10:59:50  4    couple of years ago.   So that would have been more than a

10:59:53  5    couple of years ago.

10:59:54  6          Q.    Okay.   And what email service do you use?

11:00:01  7          A.    Well, my - my Internet service is from Telstra,

11:00:05  8    which is the telephone company over here, but I - the

11:00:08  9    only other email thing I have is - is Gmail.

11:00:14 10          Q.    Okay.   Have you ever deleted your Gmail

11:00:18 11    documents?

11:00:20 12          A.    Only to - only to put - what do you call it? -

11:00:25 13    to make room on my computer, because I have such a crappy

11:00:30 14    amount of memory on it.

11:00:33 15          Q.    Does Gmail store the - your documents on your

11:00:38 16    computer?

11:00:40 17          MS MARKOE:   Objection.   Foundation.

11:00:44 18          THE DEPONENT:   I honestly couldn't tell you.

11:00:46 19    I mean, I can go in and bring up some emails, like, you

11:00:50 20    know, do a search on them, but I don't know if - how much

11:00:53 21    is stored.

         22    BY MR ROCHE:

11:00:56 23          Q.    Okay.

11:00:56 24          A.    I am not - I am by - I am the furthest thing

11:01:00 25    from computer savvy you would ever want to meet.

LYNN CARROLL WRIGHT                    January 13, 2020

69

1    Q.   Okay.   Understood.   Do you know who Robert

2   MacGregor is?

3        MS MARKOE:   Objection.   Relevance.

4        THE DEPONENT:   The name rings a bell, but I'm not

5   sure.   I'm not sure if - is - is - he may have been the

6   one that did an article on Craig?

7   BY MR ROCHE:

8        Q.   No, I'm asking --

9        A.   I'm not sure if - I know I did talk to somebody

10   that was doing an article, and he had a - he had a nice

11   Scottish accent, and "MacGregor" sounds Scottish, but

12   I couldn't - I don't know if it's the same person.

13        Q.   And when was the last time you received any

14   sort of financial payment from Craig?

15        A.   I - he pays me a monthly, I guess, sort of -

16   I don't know what you want to call it, but support, you

17   know, like alimony type thing.

18        Q.   And how much is the monthly support?

19        A.   Five to six --

20        MS MARKOE:   Objection.

21        THE DEPONENT:   Five to six thousand a month, but

22   that would involve for the total care of this house and

23   stuff, so --

24   BY MR ROCHE:

25        Q.   Has Craig ever - strike that.   Has Craig ever

| | | |
|---|---|---|
| 11:02:29 | 1 | given you bitcoin? |
| 11:02:30 | 2 | A.    No. |
| 11:02:33 | 3 | Q.    And are you currently financially dependent on |
| 11:02:35 | 4 | Craig? |
| 11:02:36 | 5 | A.    Yes. |
| 11:02:39 | 6 | Q.    Has Craig ever been accused of theft? |
| 11:02:44 | 7 | MS MARKOE:   Objection. |
| 11:02:46 | 8 | THE DEPONENT:   Of theft?  No. |
| | 9 | BY MR ROCHE: |
| 11:02:49 | 10 | Q.    Of theft? |
| 11:02:50 | 11 | A.    No.  Not that I'm aware of. |
| 11:02:52 | 12 | Q.    Okay. |
| 11:02:53 | 13 | A.    And it would surprise me, to be honest, if he |
| 11:02:55 | 14 | was. |
| 11:02:57 | 15 | Q.    Why would it surprise you? |
| 11:02:59 | 16 | A.    Because he was just - he never struck me as the |
| 11:03:02 | 17 | type that would steal anything. |
| 11:03:10 | 18 | Q.    Okay.  I'd like to move on.  When did you first |
| 11:03:19 | 19 | learn of Craig's relationship with Ramona Watts? |
| 11:03:24 | 20 | MS MARKOE:   Objection.  Relevance. |
| 11:03:28 | 21 | THE DEPONENT:   In late 2010. |
| | 22 | BY MR ROCHE: |
| 11:03:32 | 23 | Q.    How did you learn about it? |
| 11:03:36 | 24 | MS MARKOE:   Objection.  Relevance. |
| 11:03:40 | 25 | THE DEPONENT:   I saw some - some pictures that one |

January 13, 2020

| | |
|---|---|
| 11:03:46 1 | of her kids drew for him, and -- |
| 2 | BY MR ROCHE: |
| 11:03:52 3 | Q.    Okay.  And did you - I'm sorry, go ahead? |
| 11:03:55 4 | A.    I - I knew her kids, I knew her and her |
| 11:03:58 5 | husband, or her now ex-husband, so -- |
| 11:04:01 6 | Q.    How did you know Ms Watts? |
| 11:04:06 7 | MS MARKOE:   Objection. |
| 11:04:07 8 | THE DEPONENT:   We met through - just socially, you |
| 11:04:10 9 | know? |
| 11:04:10 10 | BY MR ROCHE: |
| 11:04:13 11 | Q.    Socially.  And you met in Australia? |
| 11:04:14 12 | A.    Yes, yes. |
| 11:04:16 13 | Q.    Did she live near you in Australia? |
| 11:04:19 14 | A.    She -- |
| 11:04:21 15 | MS MARKOE:   Again, objection.  Relevance. |
| 11:04:23 16 | THE DEPONENT:   She - well, not "near".  I mean, you |
| 11:04:26 17 | know, about - about probably an hour or so away.  I mean, |
| 11:04:30 18 | she lived down on - in the northern parts of Sydney, and |
| 11:04:34 19 | I'm up in the Central Coast, which is, you know, a while |
| 11:04:39 20 | away. |
| 21 | BY MR ROCHE: |
| 11:04:44 22 | Q.    And did you confront - and I'm sorry, you know, |
| 11:04:46 23 | that these questions bring up - if they bring up any |
| 11:04:50 24 | memories, but it is my job to ask them.  Did you confront |
| 11:04:57 25 | Craig on -- |

LYNN CARROLL WRIGHT                          72                          January 13, 2020

11:04:59  1        A.    Yes.

          2        Q.    And what --

11:05:01  3        MS MARKOE:    Kyle.  Kyle.  Kyle.  Kyle.  These are

11:05:04  4   completely irrelevant.  They are incredibly personal and

11:05:09  5   invasive and they have no place whatsoever in this case

11:05:12  6   or in this deposition.  I have given you a lot of leeway.

11:05:15  7   I think you need to stop now, because you are going well

11:05:20  8   beyond the bounds and this is actually getting to the

11:05:22  9   point of harassing her.

11:05:24 10        MR ROCHE:    Okay.

11:05:31 11        MS MARKOE:    You're going to - because I've made

11:05:31 12   objections that strike this entire line of questioning.

11:05:36 13   This is entirely inappropriate.  We will bring it in

11:05:39 14   front of the court.  Stop it now.

11:05:41 15        MR ROCHE:    Okay.  I would ask that you object when

11:05:42 16   you have any issues with my questions, but otherwise

11:05:45 17   allow me to answer the - ask the questions.  This is my

11:05:47 18   part of the deposition.  I did not interrupt you during

11:05:48 19   your part.

         20   BY MR ROCHE:

11:05:52 21        Q.    And how - what was the nature of that

11:05:53 22   confrontation?

11:05:57 23        A.    What do you think it was?  Of course I brought

11:05:59 24   it up to him.  And I - and I - be honest with you, I'm

11:06:04 25   getting a little pissed off right now with this.

LYNN CARROLL WRIGHT                    73                    January 13, 2020

11:06:07  1         Q.    Okay.  Did - is it that conversation and

11:06:14  2    Craig's relationship with Ms Watts - is that what

11:06:18  3    triggered your separation with Craig?

11:06:19  4         A.    Yes.

11:06:20  5         MS MARKOE:    Objection.

          6    BY MR ROCHE:

11:06:23  7         Q.    Did Ms Watts ever work with Craig?

11:06:28  8         A.    Not that I'm aware of.

11:06:37  9         Q.    And how long did you stay married to Craig

11:06:39 10    after you discovered the relationship with Ms Watts?

11:06:46 11         A.    I don't know.  She wasn't the first one that he

11:06:52 12    was mucking about with, and no doubt won't be the last,

11:06:57 13    but probably I found out about her in December - or in

11:07:04 14    November, and we separated then.

11:07:10 15         Q.    So you separated in November of 2010?

11:07:14 16         A.    Yes.

11:07:16 17         Q.    Okay.  When did Craig first mention bitcoin to

11:07:23 18    you?

11:07:25 19         A.    He never really mentioned it at all to me.

11:07:28 20    He - he - I don't recall him ever using that term.  What

11:07:36 21    I do recall is, years before, like around 2004/2005, he

11:07:47 22    said to me one day, he said, "You know that the way of

11:07:51 23    the future is digital currency?" and I said, "Well, what

11:07:56 24    do you mean, 'digital currency'?" and he kind of

11:07:59 25    explained it, "You know, just money sort of over the -

11:08:06  1    like in - on computers, type thing, rather than cash in

11:08:13  2    hand", and I --

11:08:19  3         Q.    And - I'm sorry?

11:08:21  4         A.    And I said, "Well, you know, that's fine, you

11:08:22  5    know, that's great for people that trust computers", but

11:08:27  6    I didn't.

11:08:30  7         Q.    Did - would you say that Craig had a strong

11:08:32  8    interest in digital money in 2004?

11:08:37  9         A.    Well, Craig had a strong - his - I think his

11:08:40 10    primary interests were security at that point, but you

11:08:43 11    never knew what was going through his mind.  He was

11:08:46 12    always coming up with different ideas for stuff.  So, you

11:08:51 13    know, wouldn't - it - yeah, he - he probably was thinking

11:08:54 14    of ways of developing it.

11:08:57 15         Q.    And when was the - so you said you had - the

11:09:01 16    first conversation, time, he mentioned this was in

11:09:04 17    2004/2005.  When was the next time you recall Craig

11:09:08 18    mentioning bitcoin?

11:09:10 19         A.    He - not again.  I don't ever remember him

11:09:16 20    saying the word "bitcoin".  I know it's written in the -

11:09:20 21    into the divorce thing, but all - I just - there's a lot

11:09:26 22    of - you know, there was a lot of things that I guess

11:09:31 23    I just didn't put too much stock in, and that was one of

11:09:36 24    them.

11:09:40 25         Q.    So between 2004 and the divorce, there was no

11:09:48  1    mention of bitcoin --

11:09:49  2         A.   No.

11:09:50  3         Q.   -- by Craig to you?

11:09:51  4         A.   No.  I don't --

11:09:53  5         MS MARKOE:   Objection.

11:09:55  6         THE DEPONENT:   I don't ever remember him mentioning

11:09:57  7    it again after that "digital currency" remark that he

11:10:00  8    made.

         9    BY MR ROCHE:

11:10:04  10        Q.   Do you know if Craig had any other projects

11:10:07  11   that he didn't mention to you?

11:10:11  12        MS MARKOE:   Objection.   Foundation.

11:10:16  13        THE DEPONENT:   He had that Spyder thing, but I knew

11:10:19  14   about it.  No, I don't - I - I don't - I don't recall

11:10:27  15   anything else.

         16   BY MR ROCHE:

11:10:33  17        Q.   Did Craig ever tell you he was writing a paper

11:10:36  18   related to digital money?

11:10:39  19        A.   I don't recall that.  He was always writing

11:10:42  20   papers, but I don't ever recall him writing one about -

11:10:48  21   about  digital money or anything.

11:10:58  22        Q.   And did Craig ever tell you about a -

11:11:03  23   Dave Kleiman's involvement in bitcoin?

11:11:06  24        A.   No.

11:11:07  25        MS MARKOE:   Objection.   Asked and answered.

11:11:09  1        THE DEPONENT:   No, he never told me that there was

11:11:11  2    any involvement.

          3    BY MR ROCHE:

11:11:16  4        Q.   And when did Craig first mention Dave Kleiman

11:11:19  5    to you?

11:11:24  6        A.   Oh, I knew he - I - you know, when he first

11:11:30  7    started chatting with him.  It was mostly - I guess,

11:11:34  8    probably, most of it was online, and then they would

11:11:37  9    call, you know, and he would - I knew about him, and then

11:11:41 10    when we went to the States he said, "Oh, we're going to

11:11:44 11    meet him."  So --

11:11:48 12        Q.   So did he tell you before you were going to the

11:11:51 13    States that you were going to meet Dave Kleiman?

11:11:53 14        A.   Yes.  Yes.  Before - specifically, before we

11:11:56 15    went to Orlando, to the Orlando conference, because we

11:12:04 16    knew that he - that Dave lived relatively close to there.

11:12:10 17        Q.   Okay.  And so did Dave drive up to - did you

11:12:12 18    meet Dave at the conference itself?

11:12:14 19        A.   Yes, at the hotel, yes.

11:12:16 20        Q.   Okay.  And how many nights did you or - strike

11:12:20 21    that.  Did you just meet with Dave once or was it over

11:12:23 22    multiple days?

11:12:25 23        A.   It was over multiple days.  I think two or

11:12:27 24    three times we met with him for - you know, for supper or

11:12:32 25    for just - even just to sit around and chat and have

LYNN CARROLL WRIGHT                              January 13, 2020

77

11:12:37   1    drinks, that sort of thing.

11:12:39   2         Q.   Was this at a restaurant?

11:12:41   3         A.   Was at the hotel.

11:12:44   4         Q.   At the hotel that you and Craig were staying

11:12:46   5    at?

11:12:46   6         A.   Yes, yes.  And Dave - we went out driving with

11:12:52   7    him because, having been from Canada, I - and we don't

11:12:57   8    have Walmart over here - I had to have a Walmart hit, so

11:13:03   9    he took me to a Walmart.

11:13:06  10         Q.   Okay.  And you discussed earlier that Dave

11:13:12  11    discussed his relationship with his brother to you;

11:13:16  12    correct?

11:13:17  13         A.   Yes.  Not in depth.

11:13:20  14         Q.   And which brother?

11:13:23  15         A.   Well, he - I didn't ask for names.  I wasn't

11:13:27  16    sure if - which - I - I knew that he had two siblings.

11:13:35  17    I thought that the other sibling - I knew he had a

11:13:38  18    brother and I thought the other one was a sister, but

11:13:42  19    it - I - I guess it was another brother that he had.

11:13:46  20         Q.   Okay.  So you don't know which brother Dave was

11:13:51  21    mentioning when he discussed the relationship?

11:13:55  22         A.   No, no.  I didn't ask.  He didn't sound -

11:14:00  23    I didn't want to go into it because it upset him.

11:14:04  24         Q.   Understood.  Did Craig and Dave discuss any of

11:14:14  25    their business - businesses - when they were down in

LYNN CARROLL WRIGHT                  78                    January 13, 2020

11:14:17  1    Florida?

11:14:18  2         A.   Not in front of me, but --

11:14:19  3         Q.   And do you know if they had conversations

11:14:22  4    between themselves?

11:14:24  5         A.   No, I don't know.

11:14:26  6         Q.   You don't know.  Did Craig ever tell that you

11:14:31  7    he was mining bitcoin?

11:14:33  8         A.   He never said anything, no.

11:14:40  9         Q.   Did Craig ever discuss any businesses he had in

11:14:43 10    Florida?

11:14:47 11         A.   Not - not other than W&K and --

11:14:52 12         Q.   Did he - go ahead.

11:14:54 13         A.   Any businesses?  No, I don't - he never

11:14:58 14    mentioned anything.

11:15:06 15         Q.   Did he discuss any business activity he had in

11:15:10 16    Costa Rica?

11:15:12 17         A.   No.  No, not at all.

11:15:16 18         Q.   Did Craig discuss any businesses he had in any

11:15:19 19    other country besides Australia?

11:15:24 20         A.   No.  I mean, we did work for a company in

11:15:28 21    India, but it was only as DeMorgan Information Security

11:15:35 22    Systems that we did the work.  He didn't - he didn't

11:15:37 23    start companies over there.

11:15:43 24         Q.   DeMorgan was - had operations in India or did

11:15:48 25    work with clients in India?

LYNN CARROLL WRIGHT                    79                January 13, 2020

11:15:49   1          A.    No, clients in India.

11:15:52   2          Q.    Okay.  And what was the nature of that work?

11:15:54   3          A.    Security - we did a security assessment of

11:15:56   4    their networks.

11:15:59   5          Q.    Okay.  And at any point in time, and this is up

11:16:07   6    to present day, has Craig ever told you how many - how

11:16:12   7    much bitcoin he has?

11:16:13   8          A.    No.

11:16:14   9          Q.    Have you ever asked him?

11:16:15  10          A.    No.

11:16:18  11          Q.    Do you - has Craig ever discussed his net worth

11:16:21  12    with you?

11:16:21  13          A.    No.

11:16:24  14          Q.    Has Craig ever discussed any of his current

11:16:26  15    business dealings with you?

11:16:27  16          A.    No.

11:16:33  17          Q.    What were your impressions of Dave Kleiman?

11:16:37  18          A.    I had so much respect for him.  I - I describe

11:16:46  19    him as a gentle soul, and the respect for him comes from

11:16:50  20    the fact that he was willing to serve his country, he

11:16:56  21    went over to the Gulf War, was horrendously wounded and

11:17:01  22    came back a quadriplegic, and he, to me, never seemed to

11:17:06  23    hold it against anybody.  Like he - he - you know, he -

11:17:13  24    it was sort of - I think it frustrated him at times, but

11:17:18  25    that's just my opinion.  But, again, he was a very gentle

11:17:24  1    soul.

11:17:26  2         Q.    And did Craig tell you that Dave was injured in

11:17:31  3    the Gulf War or did somebody else, or did Dave, excuse

11:17:37  4    me, tell you?

11:17:38  5         A.    Craig did, after - before the first time we

11:17:44  6    met, he said, "You know, Craig's in a" - "Dave's in a

11:17:50  7    wheelchair.  He's a quadriplegic", and he said that he

11:17:56  8    thinks that it had happened in the - in the Gulf War.

11:18:01  9         Q.    Okay.  And when you say Dave was a

11:18:07 10    quadriplegic, he was paralyzed from the neck down?

11:18:09 11         A.    Well, yes, he could use his arms but he didn't

11:18:12 12    have fine motor control of his hands.

11:18:16 13         Q.    Okay.  And did Craig admire Dave?

11:18:27 14         A.    Yes, he did.  He had --

11:18:31 15         Q.    And what --

11:18:32 16         A.    He had a lot of respect for Dave.

11:18:33 17         Q.    Okay.  And, you know, you mentioned one reason,

11:18:38 18    are there any other reasons why you understand Craig

11:18:41 19    admired Dave?

11:18:42 20         A.    Well, I think that - for his knowledge, too, in

11:18:47 21    information security, because that was Dave's field as

11:18:51 22    well.  So, you know, I think they had sort of a - a

11:18:55 23    mutual admiration club going on there.

11:19:03 24         Q.    Was Dave a brilliant person?

11:19:09 25         A.    Well, I mean, when it came to - when it came to

LYNN CARROLL WRIGHT                    81                    January 13, 2020

11:19:15  1    information security, I would say "Yes".  But then

11:19:18  2    that's - I mean, that's coming from somebody that, you

11:19:21  3    know, has trouble turning her computer on.

11:19:25  4        Q.   And so what's the basis of your understanding

11:19:27  5    that Dave was brilliant in computer security?

11:19:31  6        A.   I guess just, you know, talking to him when

11:19:35  7    I was over there.  They discussed a lot of - somebody

11:19:39  8    else joined the group, and I can't remember this man's

11:19:43  9    name, but he was also in information security, and the -

11:19:48 10    just the - I'd just sit back and listen to them talk

11:19:52 11    technical stuff.  So --

11:20:03 12        MR ROCHE:   Okay.  If we can - how about we take a -

11:20:07 13    at some point, Zaharah - it's our dinner time here.  Have

11:20:11 14    you guys eaten?  It might make sense for us to take a

11:20:15 15    break now, because I think we're going to get into

11:20:18 16    documents, and if we take maybe a 20-, 25-minute break

11:20:21 17    for us to grab some food and you guys can print off the

11:20:24 18    documents?

11:20:24 19        MS McGOVERN:   Kyle this is Amanda McGovern.  We

11:20:29 20    have the documents printed and, frankly, they are quite

11:20:32 21    voluminous.

         22        MR ROCHE:   Okay.

11:20:34 23        MS McGOVERN:   Do you intend to go over every single

11:20:36 24    document in this deposition today?

11:20:39 25        MR ROCHE:   I don't intend to go over every single

LYNN CARROLL WRIGHT                    82                    January 13, 2020

11:20:41  1    document.  I wanted to make sure you had them all so that

11:20:44  2    if I refer to one you can - it's there handy.

          3        MS McGOVERN:   Okay.  Well, just --

11:20:47  4        MR ROCHE:   But I have to admit, it's late over

11:20:51  5    here.

11:20:53  6        MS McGOVERN:   Yeah.  It's late, well, we're in the

11:20:55  7    same time zone.  Yeah.  So we're - you and I, we're in

11:20:57  8    the same time zone.

          9        MR ROCHE:   Yeah.

11:20:59 10        MS McGOVERN:   So it's late.  And so the question

11:21:01 11    is, it's 7.20pm.  We've spent time on Lynn's personal

11:21:04 12    relationship with Craig and the manner in which they got

11:21:07 13    divorced, which we find totally inappropriate.  We have

11:21:11 14    seen some documents here which further go into that,

11:21:13 15    which are going to be completely inappropriate.  How long

11:21:16 16    are you going to take with Ms Wright in this deposition?

11:21:22 17        MR ROCHE:   I imagine it will be a number of hours.

11:21:23 18    It's not going to be seven, but I imagine it will be a

11:21:26 19    number of hours.

11:21:29 20        MS McGOVERN:   What is "a number of hours", Kyle?

11:21:31 21    It's 7.30 in the evening --

11:21:33 22        MR ROCHE:   Amanda, I can't predict that.  You know,

11:21:37 23    I can - I'm trying to give you a rough ballpark, but I

11:21:40 24    can't predict.  I think we should take a break now and

11:21:42 25    then I can - we'll be good to go, and when the

11:21:44   1    deposition's over, it's over.

11:21:49   2         MS McGOVERN:   Okay.   Look, we're going to reserve

11:21:50   3    our rights on the record for any areas of testimony that

11:21:53   4    are personal in nature and that do not go to the issues

11:21:55   5    in this case regarding bitcoin and IP.   Just stating that

11:22:04   6    now.

           7         MR ROCHE:   Okay.

11:22:06   8         MS McGOVERN:   Particularly since it's 7.30 in the

11:22:08   9    evening on a Sunday, and you've already spent a lot of

11:22:11  10    time on stuff that's nothing to do with this case.

11:22:14  11    We're reserving our rights in front of judge -

11:22:17  12    Magistrate Reinhart.

11:22:17  13         MR BRENNER:   Amanda, just so the record is clear,

11:22:20  14    you guys did set the depo for 5 o'clock on a Sunday, so

11:22:23  15    let's not cry about it being 7.30.   And we objected to

11:22:29  16    it, by the way.   So we can - let's just - let's just be

          17    clear with each other.

          18         MS McGOVERN:   Andrew - yeah, I'm not - Andrew, I'm

11:22:33  19    not - I'm not crying, Andrew.   Don't refer to me as

11:22:36  20    "crying" on the record.   I find that highly insulting.

          21         MR BRENNER:   Those are crocodile tears.   Let's not

          22    get all sensitive.   You did set a deposition for

11:22:43  23    5 o'clock on a Sunday.   To start objecting after - and

11:22:43  24    you spent about an hour and a half on direct, I think.

11:22:47  25    To start objecting to the time and the date of it is just

LYNN CARROLL WRIGHT                84                  January 13, 2020

11:22:49  1    not going to work.  We wanted you to get a normal time of

11:22:53  2    the day.  So --

          3              MS McGOVERN:   Talking to Lynn about the personal --

          4              MR BRENNER:   We've got seven hours to take the

          5    depo, hopefully it will take less.

          6              MS McGOVERN:   That's just not going to work.  Stop

          7    there right now.

11:23:00  8              MR BRENNER:   What are you telling me right now?

11:23:04  9    What are you talking about?

11:23:04 10              MS McGOVERN:   What is not going to work is some of

11:23:07 11    these deposition exhibits that go into the personal

11:23:10 12    circumstances surrounding the divorce between Lynn and

11:23:14 13    Craig Wright that have zero to do with bitcoin and IP and

11:23:20 14    are clearly meant to harass the witness.  That is not

11:23:23 15    going to work.

11:23:24 16              MR BRENNER:   That we'll take up as it happens.  But

11:23:26 17    the time is - the time is what it is.  It's not good for

11:23:28 18    anyone, but we will power through.

11:23:31 19              MR ROCHE:   All right.  Ms Wright --

11:23:34 20              MS McGOVERN:   Okay, Mr Brenner, let's go.

11:23:38 21              MR ROCHE:   -- I believe it's 23 minutes past the

11:23:40 22    hour.  Let's plan on reconvening at 50 minutes past the

11:23:44 23    hour and I will try to move the deposition along as

11:23:46 24    quickly as I can.

11:23:50 25              THE VIDEOGRAPHER:   Okay.  Going off the record at

LYNN CARROLL WRIGHT                    85                    January 13, 2020

11:23:54  1    11.23.  End of tape 2.

          2    (11.23am)

11:53:15  3         (A short break)

          4    (11.53am)

11:53:19  5         THE VIDEOGRAPHER:   Going back on the record at

11:53:21  6    11.53am.  Commencement of tape 3.  Proceed.

11:53:28  7         MR ROCHE:   Sati, if you could introduce tab 38.

          8    BY MR ROCHE:

11:53:32  9         Q.   Ms Wright, let me know when you have the

11:53:34 10    document that Sati is about to hand you in front of you.

         11         A.   Yes.

11:53:39 12         MR ROCHE:   For the record, this is document with

11:53:42 13    Bates stamp ending in 640897.

11:53:51 14         THE VIDEOGRAPHER:   USA, this is the videographer.

11:53:54 15    You are introducing documents.  Are you giving them

11:53:56 16    exhibit numbers for our court reporter?

11:54:00 17         MR ROCHE:   Yes.  Are you - what exhibit number are

         18    we on?

         19         THE COURT REPORTER:   You didn't tender the document

         20    that was the subpoena, you just produced it.  Do you want

         21    that marked as exhibit 4?

         22         MR ROCHE:   Yes.  Please mark that as exhibit 4,

11:54:23 23    and, for the record, exhibit 4 is the subpoena served by

11:54:24 24    plaintiffs to Miss Lynn Wright.

         25         (Exhibit 4 marked for identification)

11:54:32  1          MR ROCHE:    And exhibit 5 is the document ending in

11:54:33  2     Bates stamp 640897.

11:54:45  3               (Exhibit 5 marked for identification)

11:54:45  4     BY MR ROCHE:

11:54:49  5          Q.    Ms Wright do you recognize this document?

11:54:51  6          A.    No, I don't remember it.

11:54:54  7          Q.    Okay.  So I'm just going to read - it is an

11:54:55  8     email, it looks - it is an email chain between

11:54:59  9     craig.wright@███████████ - do you recognize that email

11:55:04 10     address?

11:55:08 11          A.    No.  I - I - very vaguely.  I have some vague

11:55:14 12     memory of the - of the - not the email address so much as

11:55:17 13     the "███████" name.

11:55:22 14          Q.    Okay.  And is Lynn - "lynnbw14@████████████" - is

11:55:28 15     that you?

11:55:29 16          A.    Yes, it is.

11:55:30 17          Q.    Okay.  And in this email, it's dated April

11:55:33 18     20th, 2015, Craig writes,

11:55:36 19          *Hi,*
11:55:37         *I own the... 'DeMorgan' etc again... It*
11:55:42 20      *took some time but I won.*

11:55:47 21          *What I will get you to confirm.*

11:55:48 22          *1.  That I dealt with Dave offshore from*
11:55:51         *2010 on.*
         23

11:55:51         *2.  That Dave setup companies for me.*
         24

11:55:53         *3.  That I had banking in Panama and*
11:55:58 25      *Guatemala before 2009.*
11:55:59

LYNN CARROLL WRIGHT                    87                January 13, 2020

```
11:55:59   1            4.   That I was working on markets, Bitcoin
11:56:01                     and other areas in 2009 on.
           2

11:56:04   3       A.   Mmm-hmm.

11:56:04   4       Q.   And then you write back:

11:56:07   5       Will DeMorgan be taking over all the other
11:56:09           companies you have?  What exactly do you
11:56:11   6       [know] now?

           7
11:56:13       And then:
           8
11:56:14            Did we not start dealing with Dave in 2009?
           9

11:56:18  10   So, first, what is this document in relation to?

11:56:23  11       A.   I cannot - I don't know.  I have - I don't have

11:56:26  12   any memory of this.

11:56:30  13       Q.   Okay.  Do you have any idea why Craig would

11:56:33  14   reach out to you in April 2015, to get you to confirm --

11:56:37  15       MS MARKOE:   Objection.  Calls for speculation.

11:56:41  16       THE DEPONENT:   Do I answer?

11:56:44  17       MR ROCHE:   Yes.

11:56:45  18       MS MARKOE:   Yes, you can answer the question unless

11:56:46  19   you are instructed not to.

11:56:48  20       THE DEPONENT:   Okay.  Sorry, do I have - what was

11:56:49  21   the question again, Kyle?

          22   BY MR ROCHE:

11:56:52  23       Q.   Yes, do you know why Craig was reaching out to

11:56:54  24   in 2015?

11:56:55  25       A.   No, I don't.
```

LYNN CARROLL WRIGHT                 88                    January 13, 2020

11:56:57 1          Q.    Okay.  Do you not know why he wrote:

11:57:00 2              *Did we not start dealing with Dave in 2009?*

11:57:04 3          MS MARKOE:   Objection.

11:57:06 4          THE DEPONENT:   No, I have - I have no memory of

11:57:07 5      this at all.

6      BY MR ROCHE:

11:57:09 7          Q.    Okay.  Do you know what you're referring to

11:57:11 8      when - "banking stuff" - when you use the term "banking

11:57:17 9      stuff"?

11:57:18 10         MS MARKOE:   Objection.

11:57:21 11         MR ROCHE:   I - I would - no.  I would assume that

11:57:24 12     it had to do with bank accounts for - but 2015 doesn't

11:57:29 13     make sense, because I wasn't involved with anything then.

11:57:34 14         Q.    Okay.  So you don't know what banking stuff

11:57:39 15     Craig is referring to in this email?

11:57:41 16         A.    No.

11:57:42 17         MS MARKOE:   Objection.  She is referring to

11:57:44 18     "banking stuff".  You are misstating the document.

11:57:49 19         MR ROCHE:   Understood.

20      BY MR ROCHE:

11:57:52 21         Q.    You don't know why - Ms Wright, do you know why

11:57:53 22     you used the term "the banking stuff".

11:57:57 23         MS MARKOE:   Objection.  Asked and answered.

11:57:59 24         THE DEPONENT:   No, I don't.

25      BY MR ROCHE:

LYNN CARROLL WRIGHT          89          January 13, 2020

11:58:00   1      Q.   Do you know what dealings Craig had with Dave

11:58:02   2   in 2009?

11:58:06   3      A.   No.   No, I don't.   I could only assume, and

11:58:11   4   that's - I won't.

11:58:14   5      Q.   Okay.   And you - do you have any understanding

11:58:18   6   of what dealings Dave had with Craig in 2009?

11:58:25   7      MS MARKOE:   Objection.   Asked and answered.

11:58:28   8      THE DEPONENT:   No.   Again, I could only assume, but

11:58:29   9   that's not what you want.

          10   BY MR ROCHE:

11:58:37   11      Q.   Well, what do you mean, you can "only assume"?

11:58:41   12      A.   Well, I would just - I would assume that it

11:58:43   13   had - it would have to do with information security, or -

11:58:51   14   or possibly the tenders that we put in.

11:58:58   15      Q.   Okay.   And it says at the bottom:

11:59:02   16        *I do remember you working privately on*

11:59:05         *Bitcoin and such well before 2009.*

          17

11:59:08   18   Do you know what that statement is in reference to?

11:59:11   19      A.   No.

11:59:15   20      Q.   Okay.   So you don't know what you were talking

11:59:17   21   about in this email with Craig?

11:59:20   22      A.   I don't remember it.

11:59:27   23      Q.   And does the email refresh your recollection at

11:59:29   24   all?

11:59:30   25      A.   No.

LYNN CARROLL WRIGHT                            January 13, 2020

90

11:59:31  1          MS MARKOE:   Objection.   She's already answered that

11:59:33  2      question.

11:59:33  3          THE DEPONENT:   No, it confuses me more.

          4      BY MR ROCHE:

11:59:50  5          Q.   Do you have --

          6          MS MARKOE:   Can I just --

          7      BY MR ROCHE:

11:59:53  8          Q.    Do you believe this email is forged?

11:59:56  9          MS MARKOE:   Objection.

11:59:58 10          THE DEPONENT:   I wouldn't - I don't know.

12:00:00 11      I wouldn't - I wouldn't think it is, but I can't - I -

12:00:10 12      I don't understand the time frame.

         13      BY MR ROCHE:

12:00:18 14          Q.   What --

12:00:23 15          MS MARKOE:   Kyle, what exhibit number is this?

         16          THE DEPONENT:   I'm sorry?

         17          MS MARKOE:   What exhibit number is this?

         18      BY MR ROCHE:

12:00:27 19          Q.   What didn't you understand?

12:00:29 20          A.   Just the - the 2015 time frame.  Because it

12:00:40 21      was - I - I don't remember if - was he in - I don't know

12:00:46 22      if he was in the UK then or not.  It might have been when

12:00:51 23      he was still here.  What surprises me most is that we

12:00:59 24      rarely - we rarely communicated, he and I, so --

12:01:05 25          Q.   Okay.

LYNN CARROLL WRIGHT                    91                    January 13, 2020

12:01:06  1          A.    And I guess I just tend to just forget
12:01:09  2    everything that he had to say.
12:01:13  3          Q.    And you rarely communicated after you
12:01:16  4    separated; correct?
12:01:17  5          A.    Yes.
          6          MS MARKOE:    Objection.
          7    BY MR ROCHE:
12:01:19  8          Q.    And that separation occurred in November 2010?
12:01:23  9          A.    Yes.  Officially, November 2010, but he didn't
12:01:29 10    leave the premises until May 2011.
12:01:36 11          Q.    Okay.  You didn't discuss business dealings
12:01:40 12    with him after you separated?
12:01:43 13          MS MARKOE:    Objection.
12:01:44 14          THE DEPONENT:    No, not unless it had directly to do
12:01:46 15    with what - well, I was working some place else by then
12:01:51 16    so, no, not that I recall about anything.
         17    BY MR ROCHE:
12:02:02 18          Q.    Where was W&K Info Defense Research
12:02:07 19    incorporated?
12:02:09 20          A.    I would assume that it was where Craig was
12:02:14 21    living.  He always worked from home.
12:02:19 22          Q.    When was it, W&K Info Defense Research,
12:02:23 23    incorporated?
12:02:24 24          A.    It wasn't --
12:02:26 25          MS MARKOE:    Objection.  Asked and answered.

12:02:29  1          THE DEPONENT:   It wasn't - it wasn't incorporated.

        2     BY MR ROCHE:

12:02:31  3          Q.   What was it?

12:02:32  4          A.   It was just - just W&K Information Defense.  It

12:02:38  5     was - it was not like - over here, it would have had to

12:02:41  6     have been a "proprietary limited" to be incorporated, and

12:02:43  7     it wasn't.

12:02:47  8          Q.   Okay, so what did - what type of entity was W&K

12:02:52  9     Info Defense Research?

12:02:53 10          A.   Part of Cloudcroft, as far as I know.

12:02:59 11          Q.   What was W&K's business purpose?

12:03:04 12          MS MARKOE:   Objection.  Asked and answered.

12:03:07 13          THE DEPONENT:   If you recall back to the tenders

12:03:09 14     that we were putting in, it would always - if we were

12:03:14 15     putting in a tender for an American firm or - or company

12:03:19 16     or - or government entity over there, that we could do

12:03:23 17     work for, it always - we would put it through Dave in the

12:03:28 18     US as - as the contact, because then, it comes from a US

12:03:37 19     company, I guess, for lack of a better term.

        20     BY MR ROCHE:

12:03:41 21          Q.   And that's because Dave ran it, the company in

12:03:43 22     the US?

12:03:45 23          MS MARKOE:   Objection.

12:03:46 24          THE DEPONENT:   No.  Craig ran the company.  Dave

12:03:48 25     was sort of the contact.  And he - I mean, I'm not - I'm

LYNN CARROLL WRIGHT                93                    January 13, 2020

| | |
|---|---|
| 12:03:52 1 | not saying he didn't have input into things, but he was |
| 12:03:56 2 | the central contact figure there. |
| 12:04:02 3 | MR ROCHE:   Could we introduce tab 2, please. |
| 4 | Please mark that as exhibit 6. |
| 12:04:29 5 | (Exhibit 6 marked for identification) |
| 12:04:32 6 | BY MR ROCHE: |
| 12:04:33 7 | Q.   Ms Wright, do you recognize this document? |
| 12:04:43 8 | MR BRENNER:   Kyle, can you read out the Bates |
| 12:04:45 9 | stamp, please? |
| 12:04:47 10 | MR ROCHE:   It's not Bates stamped. |
| 11 | MR BRENNER:   Okay. |
| 12:04:48 12 | MR ROCHE:   Oh, strike that.  The Bates stamp is - |
| 12:04:50 13 | it's not marked on the document that I can present.  The |
| 12:04:54 14 | Bates stamp is DEFAUS_01070641. |
| 15 | BY MR ROCHE: |
| 12:05:08 16 | Q.   Miss Wright, I apologize for interrupting.  Do |
| 12:05:11 17 | you recognize this document? |
| 12:05:14 18 | A.   No, I don't.  And it - no, I don't.  And |
| 12:05:20 19 | I don't know this Verne Tongood. |
| 12:05:24 20 | Q.   Okay. |
| 12:05:25 21 | A.   But -- |
| 12:05:26 22 | Q.   Pardon me? |
| 12:05:27 23 | A.   But then that - they would - I don't know if |
| 12:05:29 24 | they were just a - a witness to it.  I don't know. |
| 12:05:35 25 | Q.   Okay.  If you could turn to page 2 of the |

LYNN CARROLL WRIGHT     94     January 13, 2020

| | |
|---|---|
| 12:05:38 | 1 |

```
12:05:38   1    document?

12:05:39   2         A.   Yes.

12:05:41   3         Q.   Is that your signature?

12:05:42   4         A.   It certainly looks like it, yes.

12:05:45   5         Q.   Okay.  And is that how - is that how you sign

12:05:50   6    your name?

12:05:51   7         A.   Yes.

12:06:08   8         Q.   Do you recall signing this affidavit?

12:06:10   9         A.   No.

12:06:12  10         Q.   Are you aware that Craig filed claims in

12:06:17  11    Australia against W&K?

12:06:19  12         A.   Sorry, what was that?

12:06:20  13         Q.   Are you aware that Craig filed legal claims in

12:06:25  14    Australia against W&K Info Defense?

12:06:30  15         A.   No, I wasn't.

12:06:40  16         Q.   Okay, in this, your affidavit, you write - I'm

12:06:46  17    on page - the second page of the document at paragraph 6:

12:06:50  18              Mr Kleiman and Dr Wright engaged in
12:06:53                 contracts under the US Dept of Homeland
12:06:57  19              Security BAA program through W&K Info
12:07:04                 Defense LLC.
          20

12:07:05  21    Sorry, I didn't even see the second page.  Hang on a

12:07:07  22    second.

12:07:11  23         Q.   I'm looking at paragraph 6.  Have you reviewed

12:07:28  24    paragraph 6?

12:07:29  25         A.   Yes, I have.  To the best of my knowledge, we -
```

LYNN CARROLL WRIGHT                    95                    January 13, 2020

12:07:32  1    yes, we put tenders in but we didn't get the tenders.

12:07:43  2         Q.    And do you know what those tenders were in

12:07:45  3    relation to?

12:07:52  4         A.    Information security.  I don't know the -

12:07:59  5    I can't remember what the specifics are, and I wouldn't

12:08:02  6    have understood them anyway.

12:08:05  7         Q.    Okay.  Have you read any of the filings related

12:08:11  8    to the litigation here in the United States against

12:08:15  9    Craig Wright?

12:08:16 10         A.    No.

12:08:16 11         Q.    Okay.

12:08:17 12         A.    I have - I don't think I - I haven't had access

12:08:20 13    to any of them and I haven't asked for any of them.

12:08:23 14         Q.    Understood.  And are you aware that Craig has

12:08:26 15    sworn that he never had any ownership in W&K?

12:08:30 16         MS MARKOE:    Objection.  Foundation.

12:08:36 17         THE DEPONENT:    Yeah, I think - I - yeah, he - I am

12:08:40 18    aware that he - that he didn't have - that he stated that

12:08:44 19    he hasn't had ownership in it.

         20    BY MR ROCHE:

12:08:52 21         Q.    Okay.  Do you know who Uyen Nguyen is?

12:08:56 22         A.    No.

12:08:57 23         Q.    And I will spell her name, just because I could

12:08:59 24    be butchering it, it is a Vietnamese name.  Uyen -

12:09:03 25    U-Y-E-N space N-G-U-Y-E-N.

LYNN CARROLL WRIGHT                96                    January 13, 2020

12:09:06  1        A.    Yeah.

12:09:07  2        Q.    Have you heard that name before?

12:09:08  3        A.    No, not to the best of my knowledge, but - you

12:09:12  4    know.

12:09:14  5        Q.    Do you have any idea of whether or not she was

12:09:15  6    involved in W&K Info Defense Research?

12:09:20  7        MS MARKOE:    Objection.  Foundation.

12:09:23  8        THE DEPONENT:    I have no knowledge of that.

          9    BY MR WRIGHT:

12:09:29 10        Q.    And if somebody was involved in W&K Info

12:09:35 11    Defense Research, would you have not - would you know

12:09:38 12    whether or not they were involved?

12:09:41 13        MS MARKOE:    Objection.  Calls for speculation.

12:09:46 14        THE DEPONENT:    I think I probably would, but,

12:09:51 15    again, after we split up and after he was out of the

12:09:55 16    house, I was working some place else by then and didn't -

12:10:01 17    didn't pay a lot of attention.

         18    BY MR ROCHE:

12:10:06 19        Q.    Okay.  Besides yourself, Craig and Dave, were

12:10:10 20    there any other individuals involved in W&K, at any point

12:10:13 21    in time?

12:10:15 22        MS MARKOE:    Objection.  She's already said that

12:10:19 23    after a certain point she may not know.

12:10:24 24        MR ROCHE:    Ms Markoe, I have asked you not to use

12:10:26 25    speaking objections.

LYNN CARROLL WRIGHT         97         January 13, 2020

1    BY MR ROCHE:

12:10:29   2       Q.   And you can answer.

12:10:30   3       A.   To the best of my knowledge, there was nobody

12:10:33   4   else that was involved in it.

12:10:38   5       Q.   And if you could look at that, I'm on the

12:10:41   6   second page of that exhibit 6?

12:10:43   7       A.   Yeah.

12:10:44   8       Q.   If you could look at the eighth bullet, it

12:10:47   9   states:

12:10:48   10
12:10:50
12:10:53   11
12:10:55
12:10:58   12

> *Between the start of 2011 and when*
> *Mr Kleiman died in 2013, Dr Wright had*
> *engaged significantly with Mr Kleiman in*
> *the development of several software*
> *products.*

12:11:00   13   Is that an accurate statement?

12:11:03   14       A.   I don't know.  He was gone from here, so it -

12:11:09   15   Craig - Craig was --

12:11:10   16       Q.   I'm sorry, can I --

12:11:12   17       A.   Sorry, Craig - I don't know if this is an

12:11:14   18   accurate statement, because Craig was - had left the

12:11:17   19   house.  He had - he moved, like, to a separate place, and

12:11:22   20   we didn't discuss a lot of the business stuff.

12:11:27   21       Q.   Did Craig Wright draft this document,

12:11:32   22   exhibit 6?

12:11:33   23       A.   I don't know.

12:11:38   24       MS MARKOE:   Objection.

25    BY MR ROCHE:

LYNN CARROLL WRIGHT                 98                    January 13, 2020

12:11:45  1        Q.   And when did you - when did you get ownership

12:11:50  2   in W&K?

12:11:52  3        MS MARKOE:   Objection.

12:11:55  4        THE DEPONENT:   I guess when - when they - they

12:12:01  5   first started the - the discussions on - on putting the

12:12:07  6   tenders in.  At that point, there was the three of us

12:12:12  7   that were still working on it.

        8   BY MR ROCHE:

12:12:23  9        Q.   Okay.  And - but you don't have any

12:12:25 10   documentation, outside the divorce settlement, related to

12:12:27 11   your ownership?

12:12:29 12        A.   That's right.

12:12:32 13        Q.   And just going back to exhibit 3 again --

12:12:38 14        A.   Yes.

12:12:39 15        Q.   -- you signed this affidavit; correct?

12:12:41 16        A.   Yes, I did.  It looks like my signature.

12:12:47 17        THE COURT REPORTER:   Did you mean exhibit 3 or the

        18   current document, which is exhibit 6?

12:12:53 19        MR ROCHE:   Exhibit 6, page 3.

        20        THE COURT REPORTER:   Thank you.

        21   BY MR ROCHE:

12:13:02 22        Q.   And do you still own W&K?

12:13:09 23        A.   I guess I'm - I guess that I still have some

12:13:12 24   interest in it, but I never thought it would amount to

12:13:16 25   anything so I didn't pursue very - you know, anything

12:13:21  1    about it.

12:13:23  2        Q.    And what's your basis for assuming you still

12:13:26  3    have ownership in W&K?

12:13:28  4        A.    The - nothing has changed, as far as I know,

12:13:35  5    from the divorce settlement.

12:13:38  6        Q.    Did you ever advance money to Craig Wright?

12:13:42  7        A.    Not for W&K.

12:13:46  8        Q.    And in any - in any capacity?

12:13:49  9        A.    Oh, we had --

12:13:51 10    MS MARKOE:    Objection.  Relevance.

         11    THE DEPONENT:    Sorry, what?

         12    MS MARKOE:    Objection.  Relevance.

12:13:58 13    THE DEPONENT:    Look, I - we - we would - not - not

12:14:02 14    huge amounts of money, no.  When I was - when we were

12:14:08 15    working separately and he wanted to set up the company

12:14:10 16    and stuff, and then we - we did a - we had a hobby farm,

12:14:18 17    and we were going to start doing some - what do you call

12:14:24 18    it? - climate, stuff for the - to prevent climate change

12:14:32 19    on the farm, like erosion, land erosion and things like

12:14:36 20    that, I - I bought from Craig the business of --

12:14:48 21    BY MR ROCHE:

12:14:48 22        Q.    The?

12:14:49 23        A.    The business.  The - the - like the equipment

12:14:51 24    and stuff for the farm.  But, again, that went nowhere

12:14:58 25    real quick.

LYNN CARROLL WRIGHT                    100                    January 13, 2020

12:15:00  1        Q.   About how much money was that?

12:15:03  2        A.   Oh, God --

12:15:04  3        MS MARKOE:   Objection.  Relevance.

12:15:06  4        THE DEPONENT:   I - I can't remember, to be honest.

          5   BY MR ROCHE:

12:15:09  6        Q.   Okay.

12:15:09  7        A.   It - like I --

12:15:11  8        Q.   Was there a --

12:15:12  9        A.   It wasn't huge, huge amounts, and it was - it

12:15:15 10   was - yeah.  I mean, I can't - I can't recall what it

12:15:19 11   was.

12:15:28 12        Q.   Do you have any record of those advancements?

12:15:30 13        MS MARKOE:   Objection.  Relevance.

12:15:32 14        THE DEPONENT:   Not that I can - not that I remember

12:15:33 15   having, no.  We never - we never - I - I can't remember

12:15:37 16   if we ever even wrote it down.  I - I - no, I - I'm

12:15:45 17   sorry, I wish I could, but --

12:15:47 18   BY MR ROCHE:

12:15:48 19        Q.   Understood.  And is there - are you aware of a

12:15:52 20   company called Information Defense Pty?

12:15:58 21        A.   Yes, that was - that was the one that was

12:16:03 22   Cloudcroft Proprietary Limited trading as Information

12:16:08 23   Defense.

12:16:09 24        Q.   Okay.  Did there ever come a time when Craig

12:16:12 25   transferred shares of Information Defense Pty to you?

12:16:16  1        A.   He transferred --

12:16:18  2        MS MARKOE:   Objection.

12:16:19  3        THE DEPONENT:   -- shares at the beginning of it,

12:16:21  4   because - at the start of it, because - at the start of

12:16:27  5   Cloudcroft, because I was the managing director for a

12:16:30  6   short period of time.

12:16:32  7        MR ROCHE:   Okay.  If we could hand the witness,

12:16:35  8   Ms Wright, tab 19?

12:16:44  9        MS MARKOE:   Kyle, can you give me a few minutes,

12:16:47 10   just - it is very difficult, given the late stage in

12:16:52 11   which you gave these to me, for me to pull them up so

12:16:57 12   quickly.  So give me a couple of seconds while she is

12:17:01 13   looking at it.

12:17:01 14        MR ROCHE:   We will mark this exhibit 7.

         15        (Exhibit 7 marked for identification)

         16   BY MR ROCHE:

12:17:40 17        Q.   And if you see at the top, it states:

12:17:45 18             *Over a number of years since 2002 Lynn has*
12:17:48               *advanced moneys to Craig to assist Craig to*
12:17:50 19             *operate and maintain various businesses*
12:17:52               *owned and operated by him.*
         20

12:17:56 21   Is that reference to the hog farm?

12:18:03 22        A.   The hobby farm?

12:18:03 23        Q.   Yes.

12:18:05 24        A.   Yes.  I would - I would - yeah, plus it may

12:18:08 25   have been other things, too.  But, yeah, I would say -

LYNN CARROLL WRIGHT                    102                    January 13, 2020

12:18:16  1    with the - with that being the date, I'd say that, yeah,

12:18:20  2    that's probably right.

12:18:22  3         Q.   Okay.  And if you look at paragraph D, it says:

12:18:24  4              *Craig wishes to secure in favour of Lynn*
12:18:28                 *all monies owned to Lynn and all assets*
12:18:30  5              *owned by Lynn which have been excused as*
12:18:32                 *security for loans made to Craig or Craig's*
12:18:34  6              *businesses.*

12:18:40  7         MS MARKOE:   Paragraph - pardon me, did you say in

12:18:41  8    paragraph C or paragraph D?

12:18:44  9         MR ROCHE:   D.

12:18:49 10         MS MARKOE:   Paragraph C?

12:18:51 11         MR ROCHE:   D.  Yes.

         12         MS MARKOE:   Oh, D.

         13    BY MR ROCHE:

12:18:53 14         Q.   And then, below that, it says

12:18:54 15              *Craig shall do all things and sign all*
12:18:57                 *documents necessary to transfer to Lynn all*
12:18:59 16              *shares owned by Craig in the companies*
12:19:01                 *Information Defense ... and Integyrs Pty*
         17              *Limited.*

12:19:07 18    Was that transfer made?

12:19:14 19         A.   I - I - look, I - I don't know.  I - this is

12:19:20 20    just confusing me.

12:19:24 21         Q.   Okay.  So you don't recognize this document?

12:19:30 22         A.   It's vaguely - it feels vaguely familiar,

12:19:42 23    but --

12:19:43 24         Q.   Okay.  If you could go to the last page of the

12:19:47 25    document.

12:19:48  1        A.     Mmm-hmm.

12:19:49  2        Q.     Page 4 of exhibit 7.

12:19:51  3        A.     Page 4?

12:19:53  4        Q.     Yes.

12:19:55  5        A.     Yeah.

12:19:58  6        Q.     Can you see it says, "Spyder", "Redback" - do

12:20:06  7    you recognize what "Spyder" is?

12:20:08  8        A.     "Spyder" is the hardware/software unit that

12:20:12  9    Craig developed in conjunction with Greyfog, who put the

12:20:19 10    units together, that were basically his sort of version

12:20:24 11    of a - of an upgraded firewall, I guess.

12:20:28 12        Q.     Okay.  And do you - do you see that there is a

12:20:33 13    valuation there?

12:20:35 14        A.     Yeah.

12:20:37 15        Q.     Do you have any understanding of where that

12:20:39 16    valuation originated?

12:20:43 17        A.     No.  I think that it was probably sort of

12:20:55 18    looking - you know, looking at the - the numbers, the

12:20:59 19    units sold times the continued 24/7 monitoring, that sort

12:21:06 20    of thing.  But where that specific number came from --

12:21:11 21        Q.     But did you own - is it your understanding that

12:21:15 22    Craig transferred to you the rights to Spyder?

12:21:18 23        A.     He didn't transfer - he - I think he

12:21:21 24    transferred the IP.  I could use the IP, I think, if I -

12:21:27 25    if - do you have the divorce settlement thing?  Hang on a

LYNN CARROLL WRIGHT                    104                    January 13, 2020

12:21:45  1    second.

2        Q.    Mmm-hmm.

12:21:45  3        A.    Yeah, I think that's it.  Yeah.  If you'll -

12:21:46  4    under "Intellectual Property", he gave - he gave me the

12:21:51  5    rights for five years to use the IP.  But that - I didn't

12:21:56  6    use it because I very - I shortly - shortly thereafter

12:22:00  7    turned over the company back to him.

12:22:05  8        Q.    Okay.  And why did you turn the company back

12:22:07  9    over to him?

12:22:08 10        A.    Because I was having financial problems.

12:22:10 11        Q.    Okay.  Did he pay you for the company when you

12:22:14 12    turned it back over?

12:22:15 13        A.    No.

12:22:17 14        Q.    Okay.  So why - why did you turn it over

12:22:23 15    without consideration?

12:22:26 16        MS MARKOE:   Objection.  Asked and answered.

12:22:32 17        THE DEPONENT:   Because I was - I was - I had to

12:22:34 18    declare bankruptcy, and in Australia, you can't be a

12:22:39 19    director of a company and be bankrupt.

20    BY MR ROCHE:

12:22:45 21        Q.    Okay.

12:22:45 22        A.    So everything went back to him.

12:22:48 23        Q.    Can you own any part of a company and be

12:22:51 24    bankrupt?

12:22:53 25        A.    I'm not sure.  Can you?  I guess you can own it

LYNN CARROLL WRIGHT                    105                    January 13, 2020

12:22:58  1    but you can't be a director - or own part of it but you

12:23:02  2    can't be a director.  I don't know.

12:23:04  3         Q.    When did you declare bankruptcy?

12:23:09  4         A.    It started - well, it started in 2011 and then

12:23:17  5    went - it was - it finalized by the courts in

12:23:24  6    2012, January of 2012.

12:23:28  7         Q.    And as part of that bankruptcy, did you have to

12:23:32  8    list the assets that you - that you personally owned?

12:23:38  9         A.    Yes.

12:23:39 10         Q.    Okay.  Did you identify W&K as one of those

12:23:41 11    assets?

12:23:42 12         A.    No, because everything had been handed back to

12:23:44 13    Craig.  Basically, I had - what I listed was my - I was

12:23:51 14    working outside of the - outside of - like, outside of

12:23:56 15    the house, with an insurance company, so I listed my

12:24:00 16    salaries and plus stuff that was in the house against the

12:24:04 17    mortgages, and things like the mortgage and stuff like

12:24:07 18    that.

12:24:11 19         Q.    You were managing director at one point of

12:24:14 20    Information Defense Party - Pty; correct?

12:24:19 21         A.    Yes.

12:24:19 22         Q.    And when did you stop becoming director?

12:24:22 23         A.    I handed everything back to Craig, I believe it

12:24:25 24    was in December of - of 2011.  To be quite honest, I was

12:24:32 25    happy to hand everything back to him.  I didn't want to

LYNN CARROLL WRIGHT                    106                    January 13, 2020

12:24:34  1    have anything to do with any --

12:24:37  2         Q.   Who else was employed at the company?

12:24:42  3         MS MARKOE:   Objection.

          4         THE DEPONENT:   We had a - sorry?

          5         MS MARKOE:   Objection.

          6    BY MR ROCHE:

12:24:46  7         Q.   Who else was employed at that company?

12:24:49  8         A.   We had a - a tech - information security

12:24:52  9    technician, or, you know, specialist, I guess, if you

12:24:57 10    will, but he was working as a contractor.

12:25:01 11         Q.   Okay.  And after Information Defense Pty, you

12:25:08 12    went on to work at Cloudcroft; is that correct?

12:25:10 13         A.   No.  Cloudcroft --

12:25:12 14         MS MARKOE:   Objection.  That is not the testimony.

12:25:18 15         THE DEPONENT:   Cloudcroft was the parent company.

12:25:20 16    It was Cloudcroft Proprietary Limited trading as

12:25:25 17    Information Defense.  So it was - they --

12:25:29 18    BY MR ROCHE:

12:25:30 19         Q.   So they were essentially the same company?

12:25:32 20         A.   Yes.

12:25:34 21         Q.   Did Cloudcroft ever receive intellectual

12:25:37 22    property belonging to W&K?

12:25:39 23         A.   No.

12:25:44 24         Q.   What IP did Cloudcroft own?

12:25:47 25         A.   We didn't own any.  We had the right to use -

LYNN CARROLL WRIGHT          107          January 13, 2020

12:25:54  1    mostly, the thing that I was trying to, I guess - that

12:25:57  2    I thought had the most promise, was Spyder.  But we

12:26:03  3    never - it went to a couple of clients, but never

12:26:10  4    really - I wanted to try to - to work on it to get it off

12:26:14  5    the ground - sorry, oh - to get it off the ground,  but

12:26:19  6    things fell apart for me.

12:26:21  7         Q.    And who worked for Cloudcroft?

12:26:24  8         A.    Hector --

12:26:26  9         MS MARKOE:   Objection.  Can we get a time frame on

12:26:28 10    some of this stuff?  Because you are asking these very

12:26:31 11    broad questions, and I think that to make the record

12:26:33 12    clear it would be useful to have a time frame in

12:26:38 13    which they're --

12:26:39 14         MR ROCHE:   I'm asking the questions.  If the - we

12:26:44 15    can establish the time frame.  If the witness needs

12:26:47 16    clarification, I will certainly provide clarification.

         17    BY MR ROCHE:

12:26:51 18         Q.    Who - let's start over, Ms Wright.  What

12:26:56 19    employees - when did you work for Cloudcroft?

12:27:03 20         A.    From the date of its - from - from I guess the

12:27:07 21    date of its inception to around - well, till I handed it

12:27:11 22    back to Craig.  Not that it - it wasn't a - it wasn't -

12:27:15 23    there wasn't any big successful company.

12:27:19 24         Q.    Understood.  And during that period of time,

12:27:23 25    did anybody else work at Cloudcroft besides yourself?

LYNN CARROLL WRIGHT                108                January 13, 2020

12:27:26  1      A.    We had a contractor that would go out and do

12:27:29  2   work.

12:27:32  3      Q.    What was the contractor's name?

12:27:35  4      A.    Hector.  I'm - it starts - I can't pronounce

12:27:42  5   his last name.  He's a Filipino fellow.  I think it's

12:27:46  6   "Moorabang", or something like that.

12:27:51  7      Q.    Okay.  Did Cloudcroft have any clients?

12:27:53  8      A.    Yeah, we had the Qantas Credit Union.  I'm just

12:28:02  9   trying to - they were on - they were 24/7 monitoring.

12:28:07 10   I'm just trying to think.  We did - Craig I think did

12:28:11 11   some work still at that time with the Australian stock

12:28:16 12   exchange, although we weren't - they - we were no longer

12:28:21 13   in - no longer doing 24 by 7 monitoring.  He basically

12:28:26 14   would go out for - what do you call it? - like if they

12:28:30 15   called and asked for a consultant to come out.

12:28:34 16      Q.    And during the time that you worked at

12:28:37 17   Cloudcroft, what was its yearly revenue?

12:28:42 18      A.    God, not a huge amount, hence why I had to go

12:28:48 19   out and find another job anyway.  I - I - honestly,

12:28:53 20   I don't recall.  Craig --

12:28:54 21      Q.    Okay.

12:28:55 22      A.    You know, Craig did the - the work on that.

12:29:00 23      MR ROCHE:    Okay.  Sati, if we could hand Ms Wright

12:29:04 24   tabs 24 and 25?

12:29:31 25      THE COURT REPORTER:  Separate exhibits, Mr Roche, or

LYNN CARROLL WRIGHT                    109                    January 13, 2020

12:29:32  1    one exhibit?

12:29:33  2         MS MARKOE:  Can we wait a second until I can get

12:29:36  3    these documents?  It's just going to take a couple of

12:29:39  4    seconds.

          5         MR ROCHE:   Yep.  Are we on exhibit 8?

          6         THE COURT REPORTER:   Yes.

12:29:45  7         MR ROCHE:   Okay, so exhibit 8 is the

12:29:46  8    one-page document.  It ends in Bates stamp 75974.

          9              (Exhibit 8 marked for identification)

12:29:56 10         MR ROCHE:   And exhibit 9 is Bates stamp ending in

12:29:58 11    75975.

         12              (Exhibit 9 marked for identification)

12:30:08 13         MS MARKOE:   Can you read exhibit 9 again?

         14    BY MR ROCHE:

12:30:15 15         Q.   Ms Wright, do you recognize the - I want to

12:30:18 16    start with exhibit 8.  Do you recognize this email?

12:30:26 17         A.   I have a vague recollection of that,

12:30:28 18    specifically because it didn't open - I couldn't open it

12:30:31 19    up on my computer.

12:30:34 20         Q.   Okay.

12:30:36 21         MR BRENNER:   Can you just read the Bates stamp on

12:30:38 22    this one again, the one you are doing now?

12:30:41 23         MR ROCHE:   Yes.  I read into the record the Bates

12:30:43 24    stamp.  The one we are doing now is ending in 75974.

12:30:48 25         MR BRENNER:   Thank you.

LYNN CARROLL WRIGHT                110                    January 13, 2020

12:30:50  1    BY MR ROCHE:

12:30:51  2         Q.    And if you - so this is an email from you to

12:30:53  3    Craig?

12:30:55  4         A.    Yeah - looks like it, yeah.

12:30:58  5         Q.    And you write:

12:30:59  6             *I have attached what I have so far and will*
12:31:02               *try to get more when I come home tomorrow*
12:31:04  7             *after the interview.  I know it doesn't*
12:31:07               *look like much but I have worked hard on*
12:31:09  8             *making it look professional and get as much*
12:31:11               *information as possible while keeping it*
12:31:13  9             *simple.*

12:31:19  10   What were - the date on this email is October 23rd, 2013?

12:31:22  11        A.    Yeah.

12:31:23  12        Q.    Do you know what this document is in relation

12:31:24  13   to?

12:31:24  14        A.    Yeah, actually, I think it's - it sort of

12:31:29  15   clicked something in my mind.  Craig had asked me to do

12:31:35  16   some research into how the ATO, or the Australian Tax

12:31:44  17   Office, how - I guess how bitcoin could be taxed.

12:31:51  18   I think it --

12:31:53  19        Q.    When did Craig - oh, go ahead, sorry.

12:31:56  20        A.    I think the - I think that was the - one of -

12:31:58  21   one of the problems between Craig and the ATO was this

12:32:00  22   bitcoin thing, and I think he asked me - their big issue

12:32:05  23   was, "How can we tax it?" and so I just did - I - I did

12:32:12  24   some research into it, into taxation more than - than -

12:32:22  25   you know, I - he sent - I think he sent me through some

12:32:26   1   of the stuff about what bitcoin is, and I put it

12:32:35   2   together, and I think - if this is the one, I think - I'm

12:32:45   3   just trying to - I don't remember the article that

12:32:52   4   I wrote being this long, but I think he probably

12:32:59   5   incorporated stuff that I said, I guess, into - into

12:33:07   6   the - into his article.

12:33:11   7         Q.   Okay.   When did Craig ask you to work on this

12:33:15   8   article?

12:33:16   9         A.   Would have been around that time, because he

12:33:18   10   always never gave me a whole lot of - of - a long time

12:33:24   11   frame to get things done.

12:33:28   12         Q.   And what did he tell you about - in relation to

12:33:31   13   his - his interaction with the ATO and bitcoin, at that

12:33:36   14   time?

12:33:38   15         A.   He - he told me very little.   I - I - the big

12:33:43   16   thing that I think was they wanted to know - like, they

12:33:51   17   were dead-set against bitcoin, because it couldn't be

12:33:54   18   taxed.   So that was my - that's the extent of my

12:33:59   19   knowledge of it, that I - you know.

12:34:06   20         Q.   And --

12:34:06   21         A.   Sorry, go ahead?

12:34:07   22         Q.   And what was your reason for agreeing to do

12:34:10   23   this research and write the paper?

12:34:12   24         MS MARKOE:   Objection.   Relevance.

12:34:18   25         THE DEPONENT:   Look, it - probably because Craig

LYNN CARROLL WRIGHT                112                January 13, 2020

12:34:22  1    was supporting me and I didn't want to run the risk of

12:34:37  2    him saying, "I will just stop giving you the money".

12:34:41  3    BY MR ROCHE:

12:34:41  4         Q.    Okay.  So besides - strike that.  Did you do

12:34:45  5    other work for Craig after the divorce because you were

12:34:50  6    afraid that he would stop giving you the money?

12:34:53  7         MS MARKOE:   Objection.

12:34:56  8         THE DEPONENT:   No, very little.  Very, very little.

12:34:59  9    We got further and further apart in the - and it had been

12:35:06 10    a long time between the - well, the whole - whenever he

12:35:11 11    went to the UK, I never heard from him until recently.

         12    BY MR ROCHE:

12:35:18 13         Q.    Okay.  And did Craig tell you he had bitcoin at

12:35:20 14    this time?

12:35:23 15         MS MARKOE:   Objection.

12:35:25 16         THE DEPONENT:   Well, he intimated that he had lost

12:35:31 17    a lot of bitcoin when that Japanese company - when that

12:35:34 18    guy in Japan, I think the - the bitcoin - I don't know if

12:35:41 19    it was a bank or what sort of outfit it was, but he,

12:35:47 20    I guess, absconded with all the money, and Craig had kept

12:35:51 21    some of his - had - well, "some of it", I think he kept

12:35:55 22    all of his bitcoin there, and --

12:35:58 23    BY MR ROCHE:

12:35:59 24         Q.    And what's - and this is Mt. Gox?  Is that what

12:36:03 25    you're referring to?

LYNN CARROLL WRIGHT                113                    January 13, 2020

12:36:03  1        A.    It might be.  That name sounds familiar.

12:36:07  2        Q.    And what's your basis for your understanding

12:36:10  3    that he kept a lot of his bitcoin there?

12:36:12  4        A.    Because he said he lost a fair - lost a fair

12:36:14  5    bit of money.

12:36:15  6        Q.    When did he tell you this?

12:36:17  7        A.    I don't know.  When we talk, I don't look at

12:36:19  8    the date and time.

12:36:21  9        Q.    Okay.  I understand.

12:36:43 10        MS ROCHE:   Okay, if we could hand Ms Wright

12:36:46 11    exhibit - tab 32, which will be marked as exhibit 10.

12:37:02 12            (Exhibit 10 marked for identification)

12:37:10 13    BY MR ROCHE:

12:37:10 14        Q.    And this is Bates stamp ending in 01210717.

12:37:23 15    Ms Wright, if you look at the top of this email, its

12:37:30 16    subject, "Integyrs Pty Limited"?

12:37:33 17        A.    Yes.

12:37:33 18        Q.     "Liquidation".  Let's start with "Integyrs".

12:37:37 19    What was Integyrs?

12:37:38 20        A.    Integyrs was another company that - that we had

12:37:41 21    started.  He wanted a name that sounded like a number, so

12:37:49 22    that's where "Integyrs" comes from.  And I - I don't have

12:37:56 23    a great deal of knowledge of what was done in that

12:37:58 24    company.

12:38:01 25        Q.    Do you know if Integyrs had revenue?

LYNN CARROLL WRIGHT                114                    January 13, 2020

12:38:04  1        A.   I - no, I don't.  I - I would have been - I'd
12:38:07  2   be surprised if it did.
12:38:09  3        Q.   Okay.  Do you know if anyone else worked at
12:38:12  4   Integyrs besides Craig?
12:38:13  5        A.   No, I - I think it was just him.
12:38:17  6        Q.   And it says, in the subject, "(In
12:38:22  7   Liquidation)".
12:38:23  8        A.   Yeah.
12:38:23  9        Q.   Why was Integyrs in liquidation?
12:38:26 10        MS MARKOE:   Objection.  Foundation.
12:38:29 11        THE DEPONENT:   I don't - I - you know, look, my
12:38:32 12   first response would be a bit flip, so I'm not going to
12:38:35 13   respond to that, because I don't really know.
         14   BY MR ROCHE:
12:38:40 15        Q.   And what was your first response?
12:38:43 16        MS MARKOE:   Objection.
12:38:44 17        THE DEPONENT:   Probably because it wasn't making
12:38:45 18   any money.
         19   BY MR ROCHE:
12:38:48 20        Q.   Okay.
12:38:49 21        A.   But that's an - that's a personal opinion, so
12:38:52 22   it really doesn't belong in this.
12:38:54 23        Q.   I understand.  And if you look at, "Just" - I'm
12:39:00 24   on the first two sentences, "Just a question."
         25        A.   Yep.

LYNN CARROLL WRIGHT                  115                    January 13, 2020

12:39:03  1          Q.    "Why are you asking me to cop the points?"

12:39:06  2     What are you referring to when you say, "Why are you

12:39:09  3     asking me to cop the points"?

12:39:11  4          A.    He was caught speeding on a - on a speed

12:39:15  5     camera, and he only had - he - it was speeding in a

12:39:20  6     school zone, and he only had one - we have 12 points on

12:39:25  7     our licenses over here.  He only had 1 point left.  And

12:39:30  8     he was coming over here to - from - from Sydney to the

12:39:36  9     house here, to - for - for some meeting.  I think it was,

12:39:42 10     you know, something to do with - with Cloudcroft and -

12:39:50 11     and quite - because Hector was meeting us as well here.

12:39:53 12     So he got done - not that specific date, but he got done

12:39:59 13     earlier, and he wrote me this asking me to say it was

12:40:07 14     my - it was - I was driving the car.

12:40:10 15          Q.    Did you cop the points?

12:40:11 16          A.    Yes, I did.

12:40:14 17          Q.    Okay.

12:40:20 18          MR ROCHE:    If you could - if we could hand

12:40:22 19     Ms Wright tab 53, and this is Bates ending in 01559220.

12:40:56 20     I believe we're on exhibit 11 now.

12:41:01 21          MS NAGRA:    Can I just confirm that that was tab 53?

12:41:06 22          MR ROCHE:    Tab 53, yes.  An email.

12:41:08 23          MS NAGRA:    We do not have that available here.

12:41:10 24     Could you please send that through?

12:41:13 25          MR ROCHE:    Yes.  We will send that over in a

LYNN CARROLL WRIGHT                 116                    January 13, 2020

12:41:17  1    second.

12:41:18  2         MS NAGRA:    Thank you.

12:41:19  3         MR ROCHE:    We'll work on it.

          4    BY MR ROCHE:

12:41:28  5         Q.   Were you ever under investigation by the

12:41:30  6    Australian tax authorities?

          7         A.   Me --

12:41:33  8         MS MARKOE:   Objection.   Relevance.

          9         THE DEPONENT:   Sorry?

         10         MS MARKOE:   Objection.

         11    BY MR ROCHE:

12:41:36 12         Q.   Were you ever investigated by the Australian

12:41:38 13    tax authorities?

12:41:40 14         A.   I think once, I think, as - as sort of an

12:41:44 15    extension of Craig, but the - with the farm stuff, they

12:41:50 16    disallowed a lot of the transfer of - of - we - like

12:41:59 17    the - the - they disallowed the - I don't know if it's

12:42:06 18    interest or whatever on the transfer of the equipment

12:42:09 19    from - from Craig to me.  So then for - obviously I had

12:42:17 20    to - I was - I was unable to - we were unable to complete

12:42:23 21    the --

12:42:27 22         Q.   Transaction?

12:42:27 23         A.   The transaction, yeah.

12:42:30 24         Q.   Were you interviewed by somebody from the ATO?

12:42:33 25         A.   No.  No, it was all - I - we may have - I may

LYNN CARROLL WRIGHT                                    January 13, 2020

117

| | |
|---|---|
| 12:42:38 1 | have had a phone call, but it was usually if - I'm just |
| 12:42:44 2 | trying to think back.  It was usually about specific - |
| 12:42:50 3 | something that I had - some information that I had sent |
| 12:42:52 4 | them.  But a formal interview, no. |
| 12:42:59 5 | Q.  Okay.  And are you aware that Craig Wright was |
| 12:43:01 6 | investigated by the ATO? |
| 12:43:04 7 | A.  Yes. |
| 12:43:05 8 | Q.  What is your knowledge of that investigation? |
| 12:43:08 9 | MS MARKOE:  Objection. |
| 12:43:12 10 | THE DEPONENT:  Look, it - it had to do, as far as |
| 12:43:23 11 | I am aware, with some research and development that they |
| 12:43:26 12 | were - that they - not the ATO, but the company that - |
| 12:43:32 13 | that did - gave research and development grants did give |
| 12:43:38 14 | us - give us a grant, or gave Craig a grant.  There was |
| 12:43:45 15 | also at that time - oh, God, there's - it was - it was |
| 12:43:50 16 | all to do with - with - as far as I knew, it was all to |
| 12:43:58 17 | do with the - the grant and transfer - the transfer of |
| 12:44:05 18 | businesses, or this - of - that happened had nothing to |
| 12:44:10 19 | do with bitcoin.  I didn't really understand or know too |
| 12:44:18 20 | much about bitcoin, and I just - I didn't even - you |
| 12:44:23 21 | know, like, until Craig asked me to do that article, and |
| 12:44:28 22 | it was just - it was so cursory, it was just, you know, |
| 12:44:32 23 | "Figure out how the ATO could benefit from this, and how |
| 12:44:37 24 | can they - how can they tax bitcoin?"."  But I didn't |
| 12:44:42 25 | know the - the meat about everything. |

LYNN CARROLL WRIGHT                    118                        January 13, 2020

1    BY MR ROCHE:

12:44:48   2        Q.   Okay.  Do you know how much the grant was?

12:44:56   3        A.   Oh, no, I could - I could say a number, but I'm

12:44:59   4   not sure it's accurate.

12:45:02   5        Q.   Is it more than $100,000?

12:45:04   6        A.   Yes, I - I believe so.

12:45:06   7        Q.   More than a million dollars?

12:45:08   8        A.   Oh, God, no.

12:45:10   9        Q.   Okay.  More than $500,000?

12:45:12  10        A.   No, it was --

12:45:13  11        MS MARKOE:   Objection.

12:45:14  12        THE DEPONENT:   It was less than that.  It - I think

12:45:16  13   it was between a hundred thousand and 200,000.  I'm not -

12:45:21  14   I think around there.  But I never saw the - I never saw

12:45:24  15   the checks, so --

12:45:27  16   BY MR ROCHE:

12:45:28  17        Q.   And did the grant have to do with

12:45:30  18   bitcoin-related intellectual property?

12:45:32  19        A.   To the best of my knowledge, no.

12:45:34  20        MS MARKOE:   Objection.

21   BY MR ROCHE:

12:45:36  22        Q.   So how did bitcoin become involved with the ATO

12:45:39  23   investigation?

12:45:39  24        A.   I don't know.

12:45:41  25        MS MARKOE:   Objection.

LYNN CARROLL WRIGHT                 119                      January 13, 2020

12:45:42  1        THE DEPONENT:   I don't know.  It may have been

12:45:47  2    through Craig, you know, doing his - just trying to - to

12:45:58  3    develop it.  I don't know how it got involved with them.

4    BY MR ROCHE:

12:46:05  5        Q.   Did you ever produce documents to the ATO?

12:46:07  6        A.   No, not that I recall.

12:46:12  7        MR ROCHE:   Sati, do you have tab 53 on your

12:46:17  8    computer that we can show Ms Wright?

12:46:19  9        MS NAGRA:   We have a copy available, yes.

10        MR ROCHE:   Oh, you printed - you got a copy printed

11    off?

12:46:26 12        THE DEPONENT:   Yes, she was smart.  She brought her

12:46:27 13    own printer.

12:46:30 14        MR ROCHE:   She's very smart.  Okay.  And this is -

15    are we on exhibit 12?

16        THE COURT REPORTER:   This will be exhibit 11.

12:46:44 17            (Exhibit 11 marked for identification)

18    BY MR ROCHE:

12:46:47 19        Q.   Ms Wright, you have exhibit 11 in front of you.

12:46:50 20    The Bates stamp is 01559220.  Do you recognize this

12:46:56 21    document?

12:47:02 22        A.   Yeah.  I don't know what - I don't know what

12:47:06 23    the "At least as bitcoin" meant.

12:47:10 24        Q.   Okay.  Who is - it says "Eris" - "I had to

12:47:16 25    delay Eris' dental surgery".  Who is Eris?

LYNN CARROLL WRIGHT                120                    January 13, 2020

```
12:47:19  1        A.   Oh, Eris is - Eris is my cat.  She's - I was
12:47:23  2   going to apologize, because she was roaming around here
12:47:26  3   crying before.  So --
12:47:28  4        Q.   The last time I did one of these depositions
12:47:30  5   I had a cat jump up on the table, and --
12:47:34  6        A.   Mine know they are not allowed on the table, so
12:47:36  7   they only do it when I'm not here.
12:47:39  8        Q.   And so this document is dated February 4th,
12:47:44  9   2014?
12:47:45 10        A.   Yes.
12:47:45 11        Q.   Do you see that?
12:47:46 12        A.   Yes.
12:47:47 13        Q.   And it states:
12:47:49 14            Just checking that things will be ok for
12:47:51               the money going into my account on the
12:47:53 15            15th ...
12:47:54 16        A.   Yes.
12:47:55 17        Q.   Does Craig pay you every month on the 15th?
12:47:58 18        A.   Yes.
12:48:00 19        Q.   Has he ever missed a payment?
12:48:02 20        A.   He's - he's not missed it, he's - it's been
12:48:07 21   delayed, sometimes for up to about - well, a couple of
12:48:11 22   times for up to about three months, in which case, you
12:48:16 23   know, I had to apply for assistance, and then I went out
12:48:20 24   and found work.
12:48:23 25        Q.   Okay.  And he writes you back, "At least as
```

LYNN CARROLL WRIGHT                121                January 13, 2020

12:48:27  1    bitcoin"?

12:48:28  2        A.   I don't know what - I don't know what that is.

12:48:31  3    I never got any bitcoin from him.  I never wanted any

12:48:34  4    bitcoin from him, mainly because I didn't trust it.

12:48:40  5        Q.   Understood.  So he didn't pay you in bitcoin?

12:48:43  6        A.   Oh, God, no.  I - even if he offered it to me,

12:48:47  7    I would not take it, because, as I - as I said, I don't

12:48:52  8    trust - I don't trust computers.  I'm old-school.

12:48:59  9        Q.   And do you understand that he had - strike

12:49:07  10   that.  How much bitcoin did you understand Craig had at

12:49:09  11   this point in time?

12:49:11  12       A.   I had no idea.  I still have no idea.

          13       THE COURT REPORTER:   Was that an objection,

          14   Ms Markoe?

          15       MS MARKOE:  Yes.  He's asked this question several

          16   times and she has answered it several times, so --

12:49:27  17       MR ROCHE:  If we can hand Ms Wright tab 39?  This

12:49:50  18   is - we're on exhibit 12 now.  This is Bates stamp ending

12:49:54  19   in 698432.

12:49:58  20           (Exhibit 12 marked for identification)

          21   BY MR ROCHE:

12:50:01  22       Q.   Ms Wright, do you recognize this email?

12:50:05  23       A.   Hang on a second, I'm just reading it.

12:50:08  24       Q.   Take your time.

12:50:33  25       A.   Okay, yeah, vaguely recall it, yes.

LYNN CARROLL WRIGHT                    122              January 13, 2020

12:50:36  1         Q.    Okay.  What is a BAS statement?

12:50:38  2         A.    A BAS statement is a business - how do

12:50:43  3   I describe it?  It's - over here, you can have a business

12:50:48  4   number and not be incorporated.  So a BAS statement is -

12:50:54  5   is done either monthly or quarterly, and it's to pay - to

12:50:59  6   pay tax on the money that you've - the company has

12:51:02  7   earned, or the business has earned.

12:51:08  8         Q.    Okay.  And what are you referring to when you

12:51:10  9   say, "they are disallowing my claim and fining me 50% of

12:51:14 10   the claim"?

12:51:16 11         A.    Probably the - that had to do with the farm

12:51:19 12   equipment and business, the one that I was telling --

12:51:27 13         Q.    There was a slight disconnection there.  Can

12:51:29 14   you repeat your answer?

12:51:30 15         A.    Oh, yeah.  That had to do with the - with the

12:51:33 16   farm, the business that I spoke about earlier.

12:51:38 17         Q.    Understood.

12:51:39 18         A.    And they disallowed it anyway, but I wasn't

12:51:41 19   fined.

12:51:42 20         Q.    Do you know who John Chesher is?

12:51:46 21         A.    Yes, John was a - he did the finances.  He was

12:51:53 22   an accountant for the company.  He worked with Craig most

12:51:58 23   of the time.  He went through all the documents and

12:52:03 24   everything and - with Craig and the ATO.

12:52:13 25         Q.    Did you coordinate at all with Mr Chesher with

LYNN CARROLL WRIGHT                123                January 13, 2020

12:52:16  1    respect to the ATO investigation?

12:52:19  2        MS MARKOE:    Objection.   Which investigation?   And

12:52:24  3    foundation.

4    BY MR ROCHE:

12:52:27  5        Q.    You can answer.

12:52:27  6        A.    He - he would come - he came here once because

12:52:30  7    there was going to be a conference call.   He wanted me to

12:52:33  8    sit in on it because Craig would lose his temper quite

12:52:42  9    frequently with the ATO, and so I would try to, I don't

12:52:52 10    know, mitigate things, I guess.   But, look, you know,

12:52:56 11    I hate to say it, but a lot of the stuff that went on

12:52:59 12    I didn't have - like I didn't have a big understanding of

12:53:02 13    it, so - but I think John - I knew John.   I mean, we

12:53:10 14    had - he was also involved in some of the meetings with

12:53:13 15    Greyfog.   But --

12:53:19 16        Q.    Did you sign any documents related to the ATO?

12:53:24 17        A.    I don't know.   I can't remember.   They were

12:53:28 18    focusing - they were focusing on Craig, mostly because

12:53:35 19    the - in my opinion, mostly because the guy that was

12:53:40 20    working at the ATO hated Craig.   They didn't get along,

12:53:45 21    so he would - you know what tax people are like, if they

12:53:49 22    don't like you, they will pick on everything.

12:53:53 23        Q.    Don't want to make an enemy of the taxman.

12:53:55 24        A.    No, this is true.

12:53:58 25        Q.    And when you sign documents, do you sign them

LYNN CARROLL WRIGHT                124                      January 13, 2020

12:54:02  1    in pen?

12:54:04  2        A.   Yes.   Ballpoint pen, yes.   Never pencil, that

12:54:09  3    I can recall.   If I - if I'm going to be signing a

12:54:14  4    document, I'm smart enough to know that it doesn't go in

12:54:16  5    in pencil, I think.

12:54:28  6        MS MARKOE:   Kyle, can we take a break in a couple

12:54:31  7    minutes to use the restrooms?

12:54:33  8        MR ROCHE:   That's actually good.   I was just about

12:54:36  9    to suggest the same.   Can we take a - it is 54 minutes

12:54:38 10    past the hour.   Let's take a five-minute break and we

12:54:42 11    will come back on the hour.

12:54:44 12        THE VIDEOGRAPHER:   Going off the record at 12.54.

12:54:46 13    End of tape 3.

         14    (21.54pm)

13:00:52 15        (A short break)

         16    (1.07pm)

13:05:39 17        THE VIDEOGRAPHER:   Going back on the record at

13:08:06 18    1.07pm.   Commencement of tape 4.   Proceed.

13:08:11 19        MS MARKOE:   Kyle, just a point for the record.   The

13:08:14 20    way that the documents were sent to us and printed, they

13:08:18 21    don't have any confidentiality stamps on them.   So to the

13:08:21 22    extent that you are going to be showing or intend to show

13:08:25 23    Ms Wright any document that she is not specifically on,

13:08:30 24    we're going to need time to check the confidentiality

13:08:32 25    stamp and determine if that's an appropriate document for

| | |
|---|---|
| 13:08:34 1 | her to look at under the confidentiality order. |
| 13:08:39 2 | MR ROCHE:   I don't - I don't intend to use any such |
| 13:08:42 3 | document. |
| 13:08:44 4 | MS MARKOE:   Okay.  That's good.  I just wanted to |
| 13:08:50 5 | make sure that - I'll just need some time, if you do, to |
| 13:08:54 6 | check it out. |
| 13:08:55 7 | MR ROCHE:   I will let you know if I'm going to use |
| 13:08:57 8 | any such document. |
| 13:08:59 9 | MS MARKOE:   Fantastic.  Thank you. |
| 13:09:01 10 | MR ROCHE:   No problem. |
| 11 | BY MR ROCHE: |
| 13:09:07 12 | Q.   Ms Wright, was there ever a formal settlement |
| 13:09:09 13 | agreement between you and Craig? |
| 13:09:11 14 | A.   Other than the one that you've already shown |
| 13:09:15 15 | me, there is - there's just been a verbal agreement for |
| 13:09:25 16 | the - the monthly payments. |
| 13:09:28 17 | Q.   And when was that verbal agreement made? |
| 13:09:35 18 | A.   It was made probably about - I'm just trying to |
| 13:09:39 19 | think.  Probably about five years ago.  And it was - it |
| 13:09:48 20 | was never put through the courts or put an addendum onto |
| 13:09:55 21 | the - the written agreement. |
| 13:09:59 22 | Q.   What was the - how did that agreement come to |
| 13:10:06 23 | be? |
| 13:10:08 24 | MS MARKOE:   Objection.  Relevance. |
| 13:10:11 25 | THE DEPONENT:   Well, I - I'm older than Craig by |

LYNN CARROLL WRIGHT                126              January 13, 2020

13:10:16  1   about 18 years, and I think he was concerned that - and

13:10:25  2   I was concerned, too, about my future, you know, like,

13:10:32  3   financially and - and everything like that.  So that's

13:10:36  4   why he - he came to that - that's why --

13:10:43  5   BY MR ROCHE:

13:10:44  6        Q.   And --

13:10:45  7        A.   Yeah, go ahead.

13:10:46  8        Q.   Did you reach out to him or did he reach out to

13:10:48  9   you?

13:10:48 10        A.   No, he reached out to me.

13:10:50 11        Q.   Okay.  And if we could - I believe exhibit 3 is

13:10:58 12   the settlement agreement?

13:11:09 13        A.   Yes.

13:11:12 14        Q.   Hold on, I'm just getting it up myself.  Did

13:11:23 15   you have the original of this document in your

13:11:26 16   possession?

13:11:27 17        A.   No, I have a copy.

13:11:30 18        Q.   You have a copy.  Do you know who has the

13:11:33 19   original?

13:11:35 20        A.   I don't know if it's Michael Shehadie or if

13:11:38 21   it's Craig.

13:11:41 22        Q.   Okay.  And if you see at the top, it says

13:11:43 23   "Appendix"?

13:11:44 24        A.   Yes.

13:11:45 25        Q.   What is this an appendix to?

LYNN CARROLL WRIGHT                    127                    January 13, 2020

13:11:49  1        A.    I couldn't tell you.  I don't know.  This is

13:11:54  2    all I have, these two pieces.

13:12:01  3        Q.    You have a copy of it; correct?

13:12:03  4        A.    Yes.

13:12:03  5        Q.    And when did you get the copy of it?

13:12:07  6        A.    It was sent to me by Craig's solicitor a week

13:12:14  7    or so ago.  Because I - I guess I said I didn't have

13:12:21  8    any - I didn't have a copy of it.  I just had my divorce

13:12:25  9    decree.

13:12:27 10        Q.    Okay.  And if you can go to the second page of

13:12:36 11    this document?

13:12:37 12        A.    Yes.

13:12:42 13        Q.    Is that your signature?

13:12:45 14        A.    Yes.

13:12:49 15        Q.    And is that - did you sign that signature

13:12:51 16    yourself?

13:12:52 17        A.    Yes.  It looks like it, yep.

13:12:55 18        Q.    And did you sign that in pen?

13:12:58 19        A.    Yeah.

13:12:59 20        Q.    Okay.  Who reached out to you a week ago?

13:13:07 21        A.    I - I'm not sure.  I can't - I think - I think

13:13:09 22    it - I may have spoken to Amanda.  I guess it was during

13:13:16 23    the time of - of trying to arrange this, this deposition,

13:13:25 24    and something - I think somebody asked me if I had the -

13:13:29 25    my divorce decree, and I - I said I had the copy - I had

LYNN CARROLL WRIGHT                128                January 13, 2020

13:13:39  1    a divorce decree, but I didn't have the settlement, or

13:13:42  2    that I - I couldn't find a settlement, anyway.  So

13:13:47  3    I think that's when they sent that through to me.

13:13:49  4        Q.   Okay.  And do you have a copy of that email

13:13:53  5    from - with the document attached?

13:13:57  6        A.   Yeah.

13:13:59  7        Q.   Okay.  And that was Amanda who sent you the

13:14:04  8    email?

13:14:05  9        A.   I - I'm not sure who it was.  It might -

13:14:07  10   I think it was Amanda, but it could have been Zaharah.

13:14:14  11   Somebody from that office.

13:14:16  12       Q.   Understood.  And if we could go to the first

13:14:20  13   page of the document?

13:14:21  14       A.   Yeah.

13:14:25  15       Q.   Okay.  So as I understand it, the column on the

13:14:29  16   left is your property; correct?  And the column on the

13:14:33  17   right is Craig's property?

13:14:35  18       A.   Yes.

13:14:36  19       Q.   Okay.  And if we can go down, then, to W&K

13:14:42  20   Information Defense?

13:14:43  21       A.   Yes.

13:14:45  22       Q.   Okay.  And it says,

13:14:48  23            *Existing shares to be split and divided -*
13:14:50       *50% to go to Lynn Wright.*
13:14:53  24

13:14:53  25   And on the left, that's the 50 per cent of shares you

LYNN CARROLL WRIGHT                  129                    January 13, 2020

13:14:56  1    received from Craig Wright?

13:14:59  2         A.   Yeah, I guess so.

13:15:02  3         Q.   Okay.  And so you didn't have any shares until

13:15:06  4    Craig gave you the shares as part of the divorce?

13:15:13  5         A.   I don't - no, I - I don't know.  I guess -

13:15:17  6    I guess he was making it more explicit in here, but, like

13:15:23  7    I said, I didn't pay too much attention, because not a

13:15:28  8    lot - in my - in my understanding, not a lot came from

13:15:32  9    the company.

13:15:35 10         Q.   Okay.

13:15:35 11         A.   Or came --

13:15:37 12         Q.   But there was no - I'm sorry, go ahead?

13:15:39 13         A.   Or came from the association, I should say, you

13:15:41 14    know, because - because of Dave's illness.

13:15:46 15         Q.   Understood.  And - but this document, the

13:15:53 16    divorce settlement between you and Craig, doesn't

13:15:56 17    identify any shares that you had prior to the divorce;

13:15:58 18    correct?

13:15:58 19         A.   No, that's correct.  No.

13:16:16 20         Q.   And so you first got the shares as part of the

13:16:19 21    divorce - the formalized divorce?

13:16:23 22         MS MARKOE:   Objection.

13:16:26 23         THE DEPONENT:   I don't know - no, I think - I think

13:16:30 24    that I - I got a portion of the company when it was set

13:16:38 25    up, but this sort of puts it in writing, type thing.

LYNN CARROLL WRIGHT                    130                    January 13, 2020

BY MR ROCHE:

1

13:16:46  2      Q.   Understood.  And do you always - when did you

13:16:53  3  get your MBA?

13:16:54  4      A.   I finished the MBA in 2005 - 2004, I think,

13:17:00  5  2005 - around there.

13:17:02  6      Q.   Where did you get your MBA from?

13:17:05  7      A.   University of New England.

13:17:08  8      Q.   Is that in Australia?

13:17:10  9      A.   That's - yes, it's in - it's not the American

13:17:11 10  one; it's the Australian one.  Although the American one

13:17:15 11  sounds a whole lot more prestigious, doesn't it?

13:17:18 12      Q.   I don't know.  Australia - I know there is a

13:17:22 13  lot of good schools in Australia.  And do you always sign

13:17:27 14  your name with the MBA?

13:17:29 15      A.   I used to.  I don't anymore, because it's a

13:17:33 16  little bit stupid now.

13:17:46 17      Q.   Okay.  And if you go to the bottom of this

13:18:05 18  document - sorry, I'm just reading it, there is a lot of

13:18:08 19  text.  The very last box?

13:18:10 20      A.   Yeah.

13:18:11 21      Q.   It says:

13:18:13 22         *A formal property settlement may be drafted*
13:18:15            *to formalise these [agreements] but may not*
13:18:17 23         *materially alter this agreement.*

13:18:21 24  Was a formal property settlement ever drafted?

13:18:24 25      A.   Not to my knowledge, no.

LYNN CARROLL WRIGHT                131                January 13, 2020

13:18:42  1        Q.    Sorry, I'm just - there is a lot of documents
13:18:45  2    I've got on my end and - yeah.
13:18:50  3        MR ROCHE:    Sati, if you could please introduce
13:18:57  4    tab 35, and I believe this - are we on exhibit 13 or 14.
13:19:11  5        THE COURT REPORTER:    Thirteen.
          6            (Exhibit 13 marked for identification)
13:19:15  7        MR BRENNER:    Kyle, which tab was that?
13:19:18  8        MR ROCHE:    Tab 35.
13:19:21  9        MR BRENNER:    Thank you.
13:19:28 10        MR ROCHE:    And this is Bates starting in - excuse
13:19:33 11    me, ending 01212940.
         12    BY MR ROCHE:
13:19:46 13        Q.    Do you recognize this document?
13:19:50 14        A.    Yes, it's - yeah, that was - that was when he
13:20:04 15    was turning over, sort of, Information Defense, so that
13:20:13 16    it will be - come under - it would come under Cloudcroft.
13:20:18 17    I think, you know, this would - this is mostly - looks
13:20:21 18    like it comes from a textbook.
13:20:25 19        Q.    The agreement comes from a textbook?
13:20:27 20        A.    No, it looks like it comes - a lot of it comes
13:20:30 21    from our - our - some of our textbooks and stuff over
13:20:37 22    here.
13:20:38 23        Q.    Okay.  And if we go to the second page of the
13:20:41 24    document?
13:20:43 25        A.    Yeah.

LYNN CARROLL WRIGHT                132                January 13, 2020

Q.   It says:

> The parties have entered into an agreement
> for THE PURCHASER to purchase the business
> of THE SELLER and not to obtain shares in
> the Company.  This includes the IP and an
> agreement to maintain the existing client
> services.

So let's focus on it.  So what's the IP that this

agreement refers to?

A.   Probably for Spyder and - and for the other -

the other - the security IP and stuff that Craig

developed, that came under Information Defense.  And he -

he - as - as you saw from the divorce, the settlement, it

was on loan, basically.  The IP was on loan to Cloudcroft

for five years.  But as far as - the only - the only IP

that - that came over, that I was aware of --

Q.   Okay, and --

A.   -- was --

Q.   I'm sorry, go ahead.

A.   Is, like, the Spyder, "Security and risk" - he

puts his university studies as IP, but --

Q.   Okay.  And if we could go back to exhibit 3,

which is the settlement --

A.   Yes.

Q.   -- and under the very - the first big box says:

> Craig Wright to provide services ... to
> Cloudcroft for 2 years.

> ALL IP to remain with Craig Wright.

LYNN CARROLL WRIGHT                    133                January 13, 2020

1

Does that relate to this agreement?

2        MS MARKOE:  Kyle, you have missed a couple of words

3    there, but the document will speak for itself.

4        THE DEPONENT:   So I answer?

5    BY MR ROCHE:

6    Q.   You can answer.

7    A.   Yes.  Yeah, it would - because this was the -

8    yes, it would pertain to this agreement, because it was

9    when Information Defense was coming under Cloudcroft

10   umbrella.

11       MR ROCHE:   Understood.  Okay.  I don't have many

12   more questions, but let's take a quick break and let me

13   just check my notes and we'll come back and I think we'll

14   be pretty close to wrapping up.

15       THE DEPONENT:   Okay.

16       THE VIDEOGRAPHER:   Going off the record at 1.23pm.

17       MR ROCHE:   And - it's 9.23.  Let's come back at 30

18   minutes after the hour.

19       MS MARKOE:   Sounds good.

20       THE VIDEOGRAPHER:   Tape stopped.

21   (1.23pm)

22           (A short break)

23   (1.32pm)

24       THE VIDEOGRAPHER:   Going back on the record at

25   1.32.  Proceed.

13:32:42  1          MR ROCHE:    Sati, do you have tab 54 printed up?

13:32:53  2          MS NAGRA:    I do indeed.  I'm just retrieving it.

          3          MR ROCHE:    If you can hand - yes.

          4     BY MR ROCHE:

13:32:57  5          Q.    Okay.  You have been handed what has been

13:32:58  6     marked as Bates ending in 01559250.  Do you see the first

13:33:09  7     page, it says:

13:33:10  8              Dear Mr Westwood;
13:33:12                 Please be advised that I, Lynn Wright, have
13:33:16  9              taken over the business of Information
13:33:17                 Defense.  I acquired the business of the
13:33:19 10              company as part of a separation agreement
13:33:20                 with Dr ... Wright.
13:33:22 11              Sincerely,
13:33:23                 Lynn Wright.
          12

13:33:24 13     Do you recognize this document?

13:33:26 14          A.    Yes.

13:33:31 15          Q.    Okay.  And at the time this document was sent,

13:33:33 16     was your separation agreement with Craig Wright complete?

13:33:39 17          A.    It was on its - I guess it was on its way to

13:33:42 18     being - I didn't know what we were - what the separation

13:33:45 19     agreement was going to be.  He - we discussed Information

13:33:55 20     Defense, because he - he was going to hand that over to

13:33:57 21     me to try to give me some sort of an income stream.

13:34:03 22          Q.    Okay.

13:34:03 23          A.    But - but it didn't eventuate that way.

13:34:08 24          Q.    Was the agreement that - exhibit 3, was that

13:34:15 25     completed at the time this was sent to Mr Westwood?

LYNN CARROLL WRIGHT                135              January 13, 2020

13:34:21  1          A.   Well, the date on this, on the - what do you

13:34:28  2     call it? - the agreement, is "June 2011", so this -

13:34:36  3     that - and this says "March 2011".  So it was in the

13:34:40  4     process of becoming complete, I guess.

13:34:43  5          Q.   Okay.  So was there any separation agreement

13:34:47  6     before March 2011?

13:34:50  7          A.   Nothing on paper.

13:34:54  8          Q.   Understood.  And I just - I wanted to talk

13:35:00  9     briefly about your communications with Dave Kleiman?

13:35:04 10          A.   Yes.

13:35:05 11          Q.   Did you communicate with Dave Kleiman over the

13:35:08 12     phone about W&K?

13:35:10 13          A.   No.

13:35:13 14          Q.   Did you communicate with him via email?

13:35:16 15          A.   No, not about W&K, no.

13:35:19 16          Q.   Okay.  Did you communicate with --

13:35:22 17          A.   I - hang on a second.  I'm just thinking.  It

13:35:24 18     didn't - it - I think I emailed him a couple of times

13:35:29 19     asking if he had gotten a response to the tenders that

13:35:34 20     were put in, but it didn't - I never heard back from him.

13:35:42 21     And it - it - I think it was just, "Hey, Dave, how are

13:35:46 22     you?  Have you heard anything?"

13:35:49 23          Q.   Understood.  Outside of that communication, was

13:35:51 24     there any other communications between you and Dave

13:35:54 25     related to W&K?

LYNN CARROLL WRIGHT                136                    January 13, 2020

13:35:55  1         A.    No.

13:36:05  2         Q.    Ms Wright, are you available at all, the rest

13:36:11  3    of the week, if the court orders another deposition?

13:36:15  4         A.    No.  I --

13:36:18  5         Q.    Okay.  Just so we can inform the court, maybe,

13:36:20  6    what are your conflicts for the rest of the week?

13:36:24  7         A.    I have medical issues that I'm going to be in -

13:36:28  8    I had - I had a positive mammogram, so I have to be in

13:36:33  9    for further tests and to see where we're going to go.

13:36:40 10         Q.    Okay.  And just so I know for scheduling

13:36:44 11    purposes, when - and I'm sorry to hear that - when - you

13:36:50 12    know, when are those anticipated to be complete?

13:36:53 13         A.    Well, it depends on what they need to do.

13:36:58 14         MS MARKOE:   Kyle, that's personal medical history,

13:37:00 15    and she has told that you she doesn't have availability.

13:37:03 16    What I'd like to understand also is why you think you are

13:37:07 17    entitled to another deposition under any circumstance,

13:37:11 18    when you have had an opportunity to ask her questions

13:37:14 19    now.

13:37:17 20         MR ROCHE:   I am not --

         21    BY MR ROCHE:

13:37:18 22         Q.    You can answer the question.

13:37:23 23         A.    I don't know.  I don't know.  It - as I said,

13:37:26 24    it depends on what they have planned and if I have to

13:37:30 25    have surgery or if I have to start chemo or anything like

LYNN CARROLL WRIGHT                    137                    January 13, 2020

13:37:33   1    that.

13:37:36   2          Q.   Understood.  Were you - did you have any

13:37:37   3    medical appointments last week?

13:37:41   4          MS MARKOE:   Kyle, enough.  I mean, really?

13:37:42   5    BY MR ROCHE:

13:37:45   6          Q.   Ms Wright, you can answer the question.

13:37:47   7          MS MARKOE:   Why wouldn't you just ask her this

13:37:49   8    question --

           9    BY MR ROCHE:

          10          Q.   Ms Wright --

13:37:49  11          MS MARKOE:   -- did she give any other date prior to

          12    today's --

          13    BY MR ROCHE:

          14          Q.   Ms Wright --

13:37:53  15          MS MARKOE:   -- prior to this deposition.  That's

13:37:54  16    really what your question is, and she can answer that

13:37:56  17    question.  We all know the answer to that question.

          18    BY MR ROCHE:

13:38:01  19          Q.   Okay.  Were you available at all last week for

13:38:03  20    a deposition?

13:38:05  21          A.   I'm just trying to think what went on last

13:38:08  22    week.  I think for two days I wasn't.

13:38:17  23          MR ROCHE:   Okay.  Understood.  No further

          24    questions.

          25          THE COURT REPORTER:   Mr Roche, you didn't mark that

LYNN CARROLL WRIGHT                138                January 13, 2020

 1    last document.  Is that to be exhibit 14?

 2         MR ROCHE:   That would be exhibit 14, yeah.  So,

13:38:34  3    yeah.  Let's just clean up the record.  Exhibit 14 is

13:38:36  4    Bates DEFAUS_01559250.

 5              (Exhibit 14 marked for identification)

13:38:46  6         THE VIDEOGRAPHER:   This is the videographer.  Do we

13:38:48  7    have any other questions?

13:38:50  8         MS MARKOE:   I have a few very short follow-up

13:38:51  9    questions for you, and I promise I will be very, very

13:38:54 10    quick.

13:38:55 11         THE DEPONENT:   Okay.

12    EXAMINATION BY MS MARKOE:

13:38:57 13         Q.   I think with some of the names of the

13:38:59 14    companies, it gets a little confusing.  So we've talked

13:39:02 15    about two very similarly named companies - at least two

13:39:07 16    very similarly named companies - and the two that I want

13:39:10 17    to talk to you about right now are W&K Information

13:39:17 18    Defense - W&K Information Defense, LLC, and then there is

13:39:23 19    another company which is Information Defense Proprietary

13:39:32 20    Limited?

13:39:32 21         A.   Yes.

13:39:33 22         Q.   I understand - where was Information Defense

13:39:39 23    Proprietary Limited set up?

13:39:43 24         A.   When or where?

13:39:45 25         Q.   Where?

LYNN CARROLL WRIGHT                139            January 13, 2020

13:39:47  1          A.   It was set up here, and was - it was - it ran

13:39:57  2    sort of as a separate entity, and then it came under the

13:40:05  3    auspices, if you will, of Cloudcroft when it switched

13:40:11  4    over to me.

13:40:15  5          Q.   And W&K Information Defense, LLC, by contrast -

13:40:18  6    where was that set up?  In what country was that set up?

13:40:22  7          A.   As far as I know, it was set up here as well.

13:40:27  8          Q.   Are you aware - well, you testified that one of

13:40:32  9    the reasons for W&K - and let's just call it "W&K" to

13:40:39 10    avoid confusion --

13:40:40 11          A.   Yeah.

13:40:41 12          Q.   -- was so that you would have a US presence for

13:40:43 13    the tenders that you were submitting to the Department of

13:40:47 14    Homeland Security?

13:40:47 15          A.   Yeah.  Oh I see --

13:40:51 16          Q.   I think that's what your testimony was?

13:40:52 17          A.   Okay, I see what you are getting at now.  I -

13:40:55 18    it - I guess it - it was discussed between Craig and -

13:40:57 19    and Dave, and I - and Dave - I guess they - well,

13:41:03 20    obviously it's probably more beneficial if it had been

13:41:06 21    set up there, but that's something that you would have to

13:41:12 22    discuss with Craig, because I honestly don't know.

13:41:19 23          Q.   Okay.  All right.  Give me one quick second.

13:41:24 24          A.   Yep.

13:41:26 25          MS MARKOE:   All right.  I don't have any further

LYNN CARROLL WRIGHT                    140                    January 13, 2020

13:41:27  1    questions.

13:41:31  2          THE VIDEOGRAPHER:   Okay.

13:41:35  3          MR ROCHE:    I have no further questions as well.

13:41:37  4          THE VIDEOGRAPHER:   Okay.  Going off the record at

13:41:39  5    1.41pm.  End of video-taped deposition of Lynn Wright.

13:41:45  6    Total number of tapes, four.

13:41:48  7    Tape stopped.

        8    (1.41pm)

        9              **(Deposition hearing concluded)**

       10          **(Exhibits retained by the court reporter)**

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

LYNN CARROLL WRIGHT                    141                    January 13, 2020

1                    CERTIFICATE OF WITNESS

2

3       I, *Lynn Carroll Wright*, hereby certify that I have read
        the foregoing pages of my deposition of testimony taken
        in these proceedings on January 13, 2020, and with the
4       exception of the changes listed below and/or corrections,
        if any, find them to be a true and accurate transcription
5       thereof.

6

7                          ERRATA

8       Page/Line No.      Description         Reason for Change

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23       Signed............................

24

25       Date..............................

1             **CERTIFICATE OF COURT REPORTER**

2

3       I, *Sally Hicks of Epiq, hereby certify that the foregoing*
        *testimony was recorded by me stenographically and*
4       *thereafter transcribed by me, and that the foregoing*
        *transcript is a true and accurate verbatim record of the*
5       *said testimony, to the best of my skill and ability.*

6
        *I further certify that I am not a relative, employee,*
7       *counsel or otherwise financially involved with any of the*
        *parties of the within cause, nor am I an employee or*
8       *relative of any counsel for the parties, nor am I in any*
        *way interested in the outcome of the within cause.*

9

10

11

12

13

14
        *Signed .............................*
15                        *Sally Hicks*

16

17

18      *Date...................................*

19

20

21

22

23

24

25

**From:** Dave Kleiman
**Sent:** Tuesday, February 15, 2011 7:13 PM
**To:** craig.wright@█████████████ lynn.wright@█████████████
**Subject:** RE: Registration - TTA1

It is under vendor registration that it requested DUNS see: https://www.fbo.gov/?s=main&mode=list&tab=register&subtab=step1

Dave

-----Original Message-----
From: Dave Kleiman
Sent: Tuesday, February 15, 2011 07:29
To: 'craig.wright@████████████'; 'lynn.wright@█████████████
Subject: RE: Registration - TTA1
Importance: High

Last page of attached. Do you think I can list you as mgr or mgrm with a foreign address, or you think they would kick it back?

Dave

-----Original Message-----
From: Dave Kleiman
Sent: Tuesday, February 15, 2011 06:35
To: 'craig.wright@████████████ lynn.wright@█████████████
Subject: RE: Registration - TTA1

Did you already create a username and password?

-----Original Message-----
From: Craig S Wright
Sent: Tuesday, February 15, 2011 04:48
To: Dave Kleiman; lynn.wright@███████████
Subject: Registration - TTA1

The first is to do with the attached papers...

TTA 01 <https://baa2.st.dhs.gov/portal/action/processRequest.action?
eurl=AAAAAAEytBoAAAEuKK8xRgAUQUVTL0NCQy9QS0NTNVBhZGRpbmcAgAAQABAAAQIDBAUGBwgJCgsMDQ4PAAAAYMUP8ssYOu8SxeEfopmq%2F31zhM%
2F3rhjRC7iE1fh3qm1MXOKybn1NrHVavYBx1eeYUN3%2F6NSLR8PelSRUj0y6y6leWkXCDFPvq9gwzP%2BL6NeP3DCcUZ%2FjCxvXo415tuR%2Bt1gAU7aqi30%2B%
2FBa8MygMsXUmvQKEcJuQ%3D#0> - Software Assurance

White paper title Software assurance through economic measures

This also leads to the following one with:

TTA 14 <https://baa2.st.dhs.gov/portal/action/processRequest.action?
eurl=AAAAAAEytBoAAAEuKK8xRgAUQUVTL0NCQy9QS0NTNVBhZGRpbmcAgAAQABAAAQIDBAUGBwgJCgsMDQ4PAAAAYMUP8ssYOu8SxeEfopmq%2F31zhM%
2F3rhjRC7iE1fh3qm1MXOKybn1NrHVavYBx1eeYUN3%2F6NSLR8PelSRUj0y6v6leWkXCDFPvq9gwzP%2BL6NeP3DCcUZ%2FjCxvXo415tuR%2Bt1gAU7aqi30%2B%
2FBa8MygMsXUmvQKEcJuQ%3D#13> - Software Assurance MarketPlace (SWAMP)

White paper title Software derivative markets

And

Information Security risk markets

Greyfog (last email) should also come under TTA 05 <https://baa2.st.dhs.gov/portal/action/processRequest.action?
eurl=AAAAAAEytBoAAAEuKK8xRgAUQUVTL0NCQy9QS0NTNVBhZGRpbmcAgAAQABAAAQIDBAUGBwgJCgsMDQ4PAAAAYMUP8ssYOu8SxeEfopmq%2F31zhM%
2F3rhjRC7iE1fh3qm1MXOKybn1NrHVavYBx1eeYUN3%2F6NSLR8PelSRUj0y6v6leWkXCDFPvq9gwzP%2BL6NeP3DCcUZ%2FjCxvXo415tuR%2Bt1gAU7aqi30%2B%
2FBa8MygMsXUmvQKEcJuQ%3D#4> - Secure, Resilient Systems and Networks

...

Dr. Craig S Wright <http://gse-compliance.blogspot.com/> GSE-Malware, GSE-Compliance, LLM, & ...

Information Defense <http://www.information-defense.com/> Pty Ltd

Mobile: ███████████

Description: Logo4

EXHIBIT

1

Jan 13, 2020

DEF_00009664

**From:**     Lynn Wright ███████████████████████
**Sent:**     3/24/2014 1:54:02 PM
**To:**       craig.wright@███████████████
**Subject:**  FW: Link to R&D site

EXHIBIT
2
Jan 13, 2020

-----Original Message-----
From: Craig S Wright █████████████████████████████████
Sent: Tuesday, 15 February 2011 3:33 PM
To: lynn.wright@████████        'Dave Kleiman'
Subject: RE: Link to R&D site

W&K Info Defense Research

-----Original Message-----
From: Lynn Wright [mailto:lynn.wright@███████████████
Sent: Tuesday, 15 February 2011 1:17 PM
To: 'Dave Kleiman'
Cc: craig.wright@██████████████████
Subject: RE: Link to R&D site

Either or.... you choose

-----Original Message-----
From: Dave Kleiman ████████████████████████
Sent: Tuesday, 15 February 2011 11:46 AM
To: craig.wright@████████████
Cc: lynn.wright@██████████████
Subject: RE: Link to R&D site

Wright Kleiman Information Security ....... W&K Info Defense   ......

-----Original Message-----
From: craig.wright@████████████████████████████████
Sent: Monday, February 14, 2011 19:43
To: Dave Kleiman
Cc: lynn.wright@███████████████
Subject: Re: Link to R&D site

Lynn?

sent from my Telstra NEXTG™ handset

----- Reply message -----
From: "Dave Kleiman" █████████████████
Date: Tue, Feb 15, 2011 11:35
Subject: Link to R&D site
To: "craig.wright@██████████ █████████████████████
Cc: "lynn.wright@██████████████████

I sent an email to see if there is an expedited or online way to accomplish.

In any case, how about a name?

-----Original Message-----
From: Dave Kleiman
Sent: Monday, February 14, 2011 19:13
To: 'craig.wright@███████████
Cc: 'lynn.wright@██████████████
Subject: RE: Link to R&D site

Hmmm. I am all ears on suggestions. But I see no way of filing for LLC or Non profit in time, you have
any ideas?

I have files 3 fictitious business names I can easily apply for another if needed:

http://www.sunbiz.org/scripts/ficidet.exe?action=DETREG&docnum=G06303900172&rdocnum=G06303900172

DEFAUS_00706832

http://www.sunbiz.org/scripts/ficidet.exe?action=DETREG&docnum=G98287000005&rdocnum=G98287000005

Let me know.

Dave

DEFAUS_00706833

Appendix.

Signed for Lynn Wright

*Lynn Wright MBR*

Signed for Craig Wright

Witness:

*[signature]*

Michael Shehadie (Solicitor)

EXHIBIT

3

Jan 13, 2020

Page 2 of 2
Agreed Property settlement and terms
June 2011

CONFIDENTIAL

DEFAUS_01518187

Appendix.

| The following documents the agreed property split for the Family law settlement between Craig and Lynn Wright | |
|---|---|
| **Lynn Wright** | **Craig Wright** |
| Cloudcroft Pty Ltd | |
| Cloudcroft Pty Ltd<br>• Business of Information Defense PL<br>• All income<br>• Craig Wright to work on loan with no repayment before Jan 2013<br>• Craig Wright to provide Training and consulting<br>• Use of GreyFog IP | Craig Wright to provide services (at rate) to Cloudcroft for 2 years<br><br>ALL IP to remain with Craig Wright.<br>Cloudcroft to retain a right to use existing IP |
| W&K Information Defense LLC | |
| 50% of shares from Craig Wright | Existing shares to be split and divided – 50% to go to Lynn Wright |
| Other | |
| Wine collection | Rydal Glasses |
| Intellectual Property | |
| Lynn Wright will have rights to use IP needed for Cloudcroft and associated with Information Defense PL for 5 years. | Craig Wright is to maintain and retain ownership of any and all IP developed by or with himself including (but not limited to):<br>• Spyder<br>• Blacknet<br>• Greyfog<br>• Security and risk<br>• Bitcoin<br>• University Studies |
| | Any and ALL Bitcoin, private keys, trusts and software associated with Bitcoin. |
| Household | |
| First choice at Lisarow | First Choice at 51 Cownagarra Rd |
| Property – to remain with existing split | |
| Lynn Wright to maintain property | Craig Wright to pay for rates and mortgage |
| Personal items | |
| No change to ownership | No change to ownership |
| Conditions<br>• If either party dies, becomes incapacitated or bankrupt, the other will retain rights to either the Real property, company, IP or both. | |
| Loan | |
| Lynn Wright is to repay Craig Wright for the time and services to Cloudcroft in full starting in Jan 2013 at an agreed rate from the profit derived in this company. | The property mortgage will be used for Cloudcroft and the funding of this business. The payments will be made under loan by Craig Wright until the company is in a position to complete and repay this arrangement. |
| A formal property settlement may be drafted to formalise these agreed terms but may not materially alter this agreement. | |

Page 1 of **2**
Agreed Property settlement and terms
June 2011

CONFIDENTIAL                                                                 DEFAUS_01518188



**EXHIBIT**
4
Jan 13, 2020

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal
representative of the Estate of David
Kleiman, and W&K Info Defense
Research, LLC

       *Plaintiffs,*

v.

CRAIG WRIGHT

       *Defendant.*

CASE NO.:  9:18-cv-80176-BB/BR

### PLAINTIFFS' CROSS-NOTICE OF TAKING VIDEO DEPOSITION *DUCES TECUM*

TO:    ALL COUNSEL OF RECORD

      **PLEASE TAKE NOTICE** that the undersigned attorney will take the following video

deposition at the place, date, and time indicated below.:

| NAME | DATE AND TIME | LOCATION |
|---|---|---|
| Lynn Wright | Tuesday, January 13, 2020<br>9:00 AM<br>(Australia Time) | Gosford Resort and<br>Conference Centre<br>512 Pacific Highway<br>Wyoming NSW 2250<br>Australia |

      The deposition will be upon oral examination before a notary public or any other officer

authorized by law to take depositions.  Plaintiff intends to record the testimony of the deponent by

audio and/or video technology in addition to stenographically. The oral examination will continue

from day to day until completed.  This deposition is being taken for the purpose of discovery, for

use at trial, or both of the foregoing, or for such other purposes as permitted under the Federal

Rules of Civil Procedure.

**PLEASE TAKE FURTHER NOTICE** that Ms. Wright is requested to produce at the time of her scheduled deposition the documents identified in Schedule A attached hereto.

Dated: January 3, 2020

Respectfully submitted,

s/ Velvel (Devin) Freedman
Velvel (Devin) Freedman, Esq.
**ROCHE FREEDMAN LLP**
200 S. Biscayne Blvd, Suite 5500
Miami, Florida 33131
Telephone: (305) 357-3861
vel@rochefreedman.com
nbermond@rochefreedman.com

Kyle W. Roche, Esq.
Joseph M. Delich, Esq.
*Admitted Pro Hac Vice*
**ROCHE FREEDMAN LLP**
185 Wythe Avenue F2
Brooklyn, NY 11249
kyle@rochefreedman.com
jdelich@rochefreedman.com

Andrew S. Brenner, Esq.
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

*Counsel to Plaintiffs Ira Kleiman as Personal Representative of the Estate of David Kleiman and W&K Info Defense Research, LLC.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 3, 2020, a true and correct copy of the foregoing was served via e-mail on all counsel of record and by Federal Express on Lynn Wright at 95 Woodview Avenue, Lisarow NSW 2250, Australia.

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman

2

## SCHEDULE A

1.      Any and all documents evidencing communications between you and Craig Wright from January 1, 2007 through the present.

2.      Any and all documents evidencing any communications between you and counsel for Craig Wright.

3.      Any and all documents referring or related to W&K Info Defense Research, LLC.

4.      Any and all documents referring or relating to David Kleiman.

5.      Any and all documents referring or relating to Ira Kleiman.

6.      Any and all documents referring or relating to Bitcoin.

7.      Any and all documents related to Trusts established by Craig Wright to hold bitcoin or bitcoin related intellectual property that was mined and/or created prior to 2014.

8.      Any and all documents that relate to Satoshi Nakamoto, bitcoin mined by any party to this suit prior to 2014, or bitcoin related intellectual property created and/or developed by any party to this suit prior to 2014.

9.      Any and all documents relating to your divorce from Craig Wright.

3

| | |
|---|---|
| **From:** | Lynn Wright ████████ |
| **Sent:** | 4/20/2015 3:02:54 PM |
| **To:** | Craig S Wright ████████ |
| **Subject:** | Re: Note |

Will DeMorgan be taking over all the other companies you have?   What exactly do you do now?   Still information security?

Did we not start dealing with Dave in 2009?

The banking stuff .....should I relate it to our off shore clients and payments they made into them?   Not sure if they did or not or is it related to the company work with Dave?

What were the names of the companies set up with Dave?

Lynn

I do remember you working privately on Bitcoin and such w2ell before 2009.

On Mon, Apr 20, 2015 at 2:45 PM, Craig S Wright ████████ wrote:

Hi

I own the name "DeMorgan" etc again… It took some time, but I won.

What I will get you to confirm.

1.   That I dealt with Dave offshore from 2010 on.

2.   That Dave setup companies for me.

3.   That I had banking in Panama and Guatemala before 2009.

4.   That I was working on markets, Bitcoin and other areas in 2009 on.

Regards,

-----------------------------------

**Dr. Craig S Wright GSE LLM**

**Chief Executive Officer**

**DeMorgan Limited** (ACN 601 560 525)

Aust ████████

EXHIBIT
5
Jan 13, 2020

DEFAUS_00640897

USA: + █████████████

Mobile: + █████████

craig.wright@ ███████████



DE MORGAN

CONFIDENTIAL

DEFAUS_00640898

Form 40 (version 2)
UCPR 35.1

# AFFIDAVIT OF Lynn Wright – 05th Nov 2013

## COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General Division Common Law |
| List | General |
| Registry | Sydney |
| Case number | 2013 / 225983 & |
| | 2013 / 245661 |

## TITLE OF PROCEEDINGS

| | |
|---|---|
| Plaintiff | **Craig Steven Wright (ABN 97 481 146 384)** |
| Defendant | **W&K INFO DEFENSE RESEARCH LLC** |

## FILING DETAILS

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright ████████████ |

**EXHIBIT**

6

Jan 13, 2020

## AFFIDAVIT DETAILS

Name          Lynn Wright/Black

Address       ███████████████████████

Occupation    Director / Lecturer

Date          05 Nov 2013

I affirm:

1. I know both the plaintiff and the defendant.

2. I believe that the information contained in this affidavit is true.

3. The plaintiff and the defendant entered into an agreement (the contract) to provide research services and to develop various educational, security and financial products.

4. I knew Mr Kleiman for more than 5 years.

5. Mr Kleiman represented W&K Information Defense LLC.

6. Mr Kleiman and Dr Wright engaged in contracts under the US Dept. of Homeland Security BAA program through W&K Info Defense LLC.

7. Mr Kleiman died unexpectedly in late April 2013.

8. Between the start of 2011 and when Mr Kleiman died in 2013, Dr Wright had engaged significantly with Mr Kleiman in the development of several software products.

3

AFFIRMED at                          , NSW

Signature of deponent

Name of witness

Address of witness

Capacity of witness

And as a witness, I certify the following matters concerning the person who made this affidavit (the **deponent**):

1~~          I saw the face of the deponent [OR, delete whichever option is inapplicable]~~

2          I have confirmed the deponent's identity using the following identification document:

BUSINESS OWNER                    DRIVERS LICENSE

Identification document relied on (may be original or certified copy)[1]

Signature of witness

Note: The deponent and witness must sign each page of the affidavit.  See UCPR 35.7B.

---

[[1] "Identification documents" include current driver licence, proof of age card, Medicare card, credit card, Centrelink pension card, Veterans Affairs entitlement card, student identity card, citizenship certificate, birth certificate, passport or see Oaths Regulation 2011 or JP Ruling 003 - Confirming identity for NSW statutory declarations and affidavits, footnote 3.]

EXHIBIT

7

Jan 13, 2020

THIS AGREEMENT IS made  21 day of May                    30 June 2009

BETWEEN CRAIG STEVEN WRIGHT of 95 Woodview Avenue, Lisarow in the State of New South Wales ("Craig") of the one part AND CARROLL LYNN WRIGHT of                                          in the State of New South Wales of the other part ("Lynn")

WHEREAS:

A. Over a number of years since 2002 Lynn has advanced monies to Craig to assist Craig to operate and maintain various businesses owned and operated by him.

B. Over a number of years since 2002 Lynn has worked in businesses owned and operated by Craig and in lieu of payment of wages or salary, has received and accepted promises of payment from Craig to assist the survival of those businesses.

C. Lynn and Craig have entered into mortgages secured over their properties at
                                                    and at
          to secure loans made to Craig from time to time for use by Craig in his various businesses.

D. Craig wishes to secure in favour of Lynn all monies owed to Lynn and all assets owned by Lynn which have been used as security for loans made to Craig or Craig's businesses.

NOW THIS DEED WITNESSES THAT in consideration of the premises and the loans and

contributions made by Lynn from time to time to Craig and to Craig's businesses:

1. Craig shall do all things and sign all documents necessary to transfer to Lynn all shares owned by Craig in the companies Information Defense Pty Limited ABN 90135141347 and Integyrs Pty Limited ABN 95 137 033 535

2. Craig shall do all things and sign all documents necessary to execute mortgages in favour of Lynn over                        being lot 77 in deposited plan No. 841027, and
          being lot 1 in deposited plan No. 436044.

IN WITNESS WHEREOF the parties hereunto have hereunto set there hands and seals on the

date hereinbefore written.

SIGNED SEALED AND DELIVERED           )

by the said CRAIG STEVEN WRIGHT   )

in the presence of:                              )

Michael Shehadie
Level 2, 88 Pitt Street Sydney NSW 2000
Solicitor

30 June 2009

SIGNED SEALED AND DELIVERED                )        Michael Shehadie
                                                    Level 2, 88 Pitt Street Sydney NSW 2000
                                                    Solicitor

by the said CARROLL LYNN WRIGHT             )        30 June 2009

in the presence of:                         )        ...........................................................................


..............................................................................

**Schedule of Debt**

Interest is agreed at a 7% interest rate. The total comes to $815,803.61 as of 01 Jul 2009.

The amounts are covered as follows in the following spreadsheet under the following headers:

<u>Conferences and Travel</u>

Lynn paid monies for attendance at conferences by Craig Wright.

These where for business and education (e.g. SANS) by Craig Wright and paif by Lynn Wright.

<u>Monthly Contributions</u>

Lynn helped Craig Wright pay the loans used for the legal costs defending the IP and business.

As per 'Farrugia v The Official Receiver (1982) 43 ALR 700' The Doctrine of Exoneration should also apply to the jointly owned property and both parties agree to this. The loans where for Craig Wright's purpose at Lynn Wright's detriment. These amounts are monies she paid towards the loan each month and are hence loaned to Craig Wright.

<u>Debt - Purchased contract</u>

DeMorgan Pty Ltd had a contract for $105,000 pa in payments to Lynn on sale. This debt was incorporated and purchased this in order to by the business of DeMorgan and start DeMorgan Information Security Systems P/L by Craig Steven Wright from Lynn Wright. The IP value is included below.

| Loan - Lynn | Monthly Contributions | | Conferences and travel | |
|---|---|---|---|---|
| 2008-2009 | 13500 | $13,500.00 | 8500 | $8,500.00 |
| 2007-2008 | 18000 | $19,260.00 | 9500 | $10,165.00 |
| 2006-2007 | 18000 | $20,608.20 | 8500 | $9,731.65 |
| 2005-2006 | 12000 | $14,700.52 | 0 | $0.00 |
| 2004-2005 | 12000 | $15,729.55 | 0 | $0.00 |
| 2003-2004 | 15000 | $21,038.28 | 0 | $0.00 |
| 2002-2003 | 15000 | $22,510.96 | 0 | $0.00 |
| | 103500 | $127,347.50 | 26500 | $28,396.65 |

| Total Current Debt (2009) | $815,803.61 |
|---|---|
| Monthly Payments | $127,347.50 |
| Conferences and Travel | $28,396.65 |
| Contract debt | $660,059.46 |

Debt - Purchased contract (1000$)

| 2005 | 105.000 | |
|---|---|---|
| 2004 | 112.350 | $550,000.00 |
| 2003 | 128.630 | $265,803.61 |
| 2002 | 157.577 | |
| | $660,059.46 | (2006-2009 interest) |

Intgerest rate
7.00%

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | |
|---|---|---|---|---|---|---|---|---|
| DeMorgan - R and D Assets | 1430000 | 1430000 | 1430000 | 1430000 | 1430000 | 1430000 | 1430000 | $1,430,000.00 |
| Debt - DeMorgan unpaid | 780000 | 780000 | 780000 | 780000 | 780000 | 780000 | 780000 | $780,000.00 |
| Legal Costs (defending rights) | 125000 | 120000 | 100000 | 50000 | 80000 | 0 | 0 | $475,000.00 |
| | | | | | | | | $2,685,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| PR01 | Spyder | 23-Oct-01 | 30-Jun-03 | $750,000 | |
| PR02 | Redback | 1-Feb-02 | 30-Jun-03 | $90,000 | |
| PR03 | TripleS | 1-Nov-01 | 30-Jun-03 | $275,000 | |
| PR04 | Black Net | 1-Jul-02 | 30-Jun-04 | $315,000 | |
| | | | | $1,430,000 | |

Software

| | Hours | Value | Market Rate $74.50 Purchases | | 75 |
|---|---|---|---|---|---|
| 2003 | 871 | $64,889.50 | $36,131.00 | | |
| 2004 | 1542 | $114,879.00 | $64,548.00 | | |
| 2005 | 1325 | $98,712.50 | $46,126.00 | | |
| 2006 | 1326 | $98,787.00 | $38,411.00 | | |
| 2007 | 1126 | $83,887.00 | $51,482.00 | | |
| 2008 | 1235 | $92,007.50 | $15,481.00 | | |
| | 7425 | $553,162.50 | $252,179.00 | | |

| Total | $3,490,341.50 | | | | |

**To:** Craig Wright@
**From:** Lynn Wright
**Sent:** Wed 10/23/2013 3:01:30 PM (UTC)
**Subject:** ATO paper
Bitcoins and their impact on taxation.docx

That website you sent me did not open up very well and I still could not locate any specific cases.
I have attached what I have so far and will try to get more when I come home tomorrow after the interview.
I know it doesn't look like much but I have worked hard on making it look professional and get as much information as  possible while keeping it simple.
Let me know what you think.

*Lynn Wright*
*Ph:*

EXHIBIT

8

Jan 13, 2020

EXHIBIT

a

Jan 13, 2020

## How can the Australian Tax Office benefit from Bitcoin Currency?

### Introduction

In this article we will be looking at the following:

- What are Bitcoins
- Mining of Bitcoins.
- Taxation on transactions (income tax and GST) in Australia.
- The benefits which can realised to the economy through recognition and acceptance of Bitcoins by the Australian government.

### Purpose

This paper was developed and written to add impact to the argument in favour of recognition of Bitcoins as a legitimate digital currency in Australia and as such the government's right and obligation to regulate and tax this currency.

What are Bitcoins?

This section must look at two differing yet related areas of the digital community.  In order to understand what Bitcoins are you must first understand the meaning of cryptography and this leads directly to cryptocurrency.

1) Cryptography:  A system of writing in cypher; secret writing.[1]
2) Cryptocurrency:

> "A cryptocurrency is a peer-to-peer, decentralized, digital currency whose implementation relies on the principles of cryptography to validate the transactions and generation of the currency itself."[2] [3]

So then let us now answer the above question: What are Bitcoins?

A Bitcoin is a cryptocurrency created and based on an open source cryptographic protocol, which at this point is not under the control of a central authority.[4]

Bitcoins can be transferred and exchange hands on a peer to peer basis through any digital medium from computers to internet enabled phones thus excluding any central financial institutions or clearing houses.  Nobody owns or controls them and thus anyone can participate in the transactions.

### Mining of Bitcoins

Development and processing of Bitcoin transactions is conducted through servers called Bitcoin miners.  This is done through the communication over a network which then confirms the transactions by adding them to a ledger which is updated regularly and archived periodically.[5]

---

[1]  Arthur Hayward & John Sparkes, The Concise English Dictionary 1984.

[2]  Wary of Bitcoin? A guide to some other cryptocurrencies, ars technica, 26-05-2013.

3  What does Cryptocurrency mean?, technopedia, 01-07-2013.

[4]  BITCOIN A Primer for Policymakers (http://mercatus.org/sites/default/files/Brito_BitcoinPrimer.pdf)

[5]  Nakamoto, Satoshi (1 Nov 2008), "Bitcoin: A Peer to Peer Electronic Cash System" (http://bitcoin.org/bitcoin.pdf).

## Taxation on transactions (income tax and GST) in Australia.

### Bartercard vs. Bitcoin

Bartercard is a barter trading exchange. Bartercard enables member businesses to exchange goods and services with other member businesses without using cash or cash equivalents, or having to engage in the direct two-way swap of goods and/or services.[6] The biggest drawback with Bartercard is that it is business to business and there are only 55,000 in use around the world with only seven countries still using them.

Bitcoin is not restricted to businesses only and there is not the cost involved in trading them as it is done at arm's length and on an anonymous basis.  As well, the number of users will be far greater incurring a larger number of transactions and the opportunity to increase the intake in taxes by Australian Tax Office.  This intake will be twofold:

1) Income tax charged on income of businesses and personal income by the users of Bitcoin. Income to be defined and controlled by the taxation legislation as noted in *Tennant v Smith* [1892] AC 150.  This case considered the issue of ordinary income and whether or not rent free accommodation provided to an employee was income according to ordinary concepts of taxation.

2) With the increase in commerce between nations, which will be fostered by Bitcoin, and these nations are considered to be fiscally sovereign.  This being the case they have the power to impose tax within their self-defined jurisdictional reach virtually unfettered by principles of international law.[7]  This is seen in *Thorpe Nominees Pty Ltd v FCT* 88 ATC 4886 which considered the issue of the source of income and whether or not a transaction for the sale of land in Australia was sourced in Australia or Switzerland.  Another international transaction was seen in the following case, *Picton Finance Limited v Commissioner of Taxation* [2013] AATA 116.  In this case the Applicant was a company incorporated in Vanuatu. Its only activity was to invest in an Australian resident company.
Between September 2004 and October 2007, the Applicant acquired a substantial number of shares in the Australian resident company in three off market transactions. From about May to October 2007, the Applicant sold most of those shares in another three off market transactions.
Between August 2007 and April 2008, the Applicant bought and sold more shares in the Australian resident company on the Australian Stock Exchange. The transactions were carried out by an Australian stockbroker.
The Commissioner issued default assessments under section 167 of the Income Tax Assessment Act (ITAA 1936) to the Applicant for the 2007 and 2008 income tax years and imposed penalties. The Applicant was assessed on the profit from the sale of the shares, on the basis that it was Australian sourced income derived in the course of a share trading business, or otherwise for the purpose of profit making.

The Applicant objected to the Commissioner's assessments. The Commissioner disallowed the Applicant's objection to the 2007 income year but partly allowed the objection to the

---

[6] http://en.wikipedia.org/wiki/Bartercard.

[7] Michelle Wills,  THE INCOME TAX IMPLICATIONS OF A FOREIGN INDIVIDUAL CONTRACTING TO DO BUSINESS IN AUSTRALIA, WITH PARTICULAR REFERENCE TO THE CONCEPTS OF RESIDENCE AND SOURCE.
(http://epublications.bond.edu.au/cgi/viewcontent.cgi?article=1122&context=blr).

2008 income year. The Applicant applied to the AAT for a review of the objection decision.[8]

## Legislation and Implications

### Income Tax Assessment Act 1936 – Sect 21A

This section of the *Act* demonstrates the circumstances where a non-cash benefit is still considered an income by the person receiving the benefits and is therefore taxable.[9]

We must keep in mind that residents of Australia are taxed on the ordinary and statutory income from **all sources** from which they derive that income.

Further, the Australian Tax Office can and should tax Bitcoins in two ways, as is done in Canada:

   a) Transactions made for goods and services are treated under its barter transaction rules and
   b) Profits made on commodity transactions could be income or capital.[10]

There are multiple implications for taxation including income tax, capital gains taxes, and the plethora of goods and services which are being taxed today through the regular currency systems. This can bring in a great deal more revenue for the Australian government.

---

[8]  Decision Impact Statement (http://law.ato.gov.au/atolaw/view.htm?docId=%22LIT%2FICD%2F2011-2379-2380%2F00001%22).

[9]  *Income Tax Assessment Act 1936* – Sect 21A

[10]  http://www.coindesk.com/information/is-bitcoin-legal/.

**To:** craig.wright@
**From:** Lynn Wright
**Sent:** Wed 10/19/2011 3:04:36 AM (UTC)
**Subject:** RE: Integyrs Pty Limited (In Liquidation) [PPS-clients.FID173950]

Just a question. Why are you asking me to cop the points? Why not ask Ramona.....you are with her now not me. Not being bitchy about it just careful. I guess I just feel like I am being taken advantage of by too many men lately. Just a logical non-aggressive answer ok?
Lynn

**From:** Craig S Wright
**Sent:** Wednesday, 19 October 2011 9:10 AM
**To:** lynn.wright@
**Subject:** FW: Integyrs Pty Limited (In Liquidation) [PPS-clients.FID173950]

> **EXHIBIT**
> 10
> Jan 13, 2020

**Dr. Craig Wright GSE GSM LLM**
Director, Australia -- Asia Pacific
**GICSR | Global Institute for Cyber Security + Research**
Exploration Park, Kennedy Space Center
100 Spaceport Way, Cape Canaveral, FL 32920
Tel: +          | Mobile: +
http://www.gicsr.org



**From:** Simon Chiou
**Sent:** Wednesday, 19 October 2011 8:45 AM
**To:** Craig@
**Subject:** RE: Integyrs Pty Limited (In Liquidation) [PPS-clients.FID173950]

**From:** Dr. Craig S. Wright
**Sent:** Tuesday, 18 October 2011 5:29 PM
**To:** Simon Chiou
**Subject:** RE: Integyrs Pty Limited (In Liquidation) [PPS-clients.FID173950]

Hello.
There is no attachment.

Thanks
    **Craig Wright GSE GSM LLM**
Director, Australia – Asia Pacific
**GICSR | Global Institute for Cyber Security + Research**
Exploration Park, Kennedy Space Center
100 Spaceport Way, Cape Canaveral, FL 32920
Tel: +          | Mobile: +
http://www.gicsr.org

 



**From:** Simon Chiou
**Sent:** Tuesday, 18 October 2011 3:12 PM
**To:** craig.wright@
**Subject:** Integyrs Pty Limited (In Liquidation) [PPS-clients.FID173950]

Craig

As discussed, please find attached the penalty notice.

Should you have any further queries, please contact me using the information below.

Kind Regards

**Simon Chiou**  | Accountant

**Pitcher Partners NSW Pty Limited**
GPO Box 1615, Sydney NSW 2001  | www.pitcher.com.au
Level 22 MLC Centre, 19 Martin Place, Sydney NSW 2000
T: ▮▮▮▮    F: 02 9223 1762 | schiou@▮▮▮▮

Please consider the environment, **before** printing this email.

This e-mail and any attachment(s) transmitted with it are for its intended recipient(s) only and may contain legally privileged or confidential information. If this e-mail has been sent to you in error, you must not copy, use or distribute this information and you must delete the e-mail and notify the sender immediately. This email and any attachment(s) are also subject to copyright. Any views expressed in this communication are those of the individual sender, except where the sender specifically states them to be the views of Pitcher Partners NSW Pty Limited. Except as required at law, Pitcher Partners NSW Pty Limited does not represent, warrant and/or guarantee that the integrity of this communication has been maintained nor that the communication is free of errors, virus, interception or interference and does not accept liability for any loss or damage that results from a computer virus or a defect in the transmission of the email and any attachment(s). Liability limited by a scheme approved under Professional Standards Legislation. Pitcher Partners, including Johnston Rorke, is an association of independent firms. An independent member of Baker Tilly International.

This e-mail and any attachment(s) transmitted with it are for its intended recipient(s) only and may contain legally privileged or confidential information. If this e-mail has been sent to you in error, you must not copy, use or distribute this information and you must delete the e-mail and notify the sender immediately. This email and any attachment(s) are also subject to copyright. Any views expressed in this communication are those of the individual sender, except where the sender specifically states them to be the views of Pitcher Partners NSW Pty Limited. Except as required at law, Pitcher Partners NSW Pty Limited does not represent, warrant and/or guarantee that the integrity of this communication has been maintained nor that the communication is free of errors, virus, interception or interference and does not accept liability for any loss or damage that results from a computer virus or a defect in the transmission of the email and any attachment(s). Liability limited by a scheme approved under Professional Standards Legislation. Pitcher Partners, including Johnston Rorke, is an association of independent firms. An independent member of Baker Tilly International.

**To:**       'lynn.wright@ █████████████████████████

**From:**     Craig S Wright

**Sent:**     Tue 2/4/2014 9:52:27 AM (UTC)

**Subject:**  RE:

At least as Bitcoin.

**From:** Lynn Wright ███████████████████████

**Sent:** Tuesday, 4 February 2014 8:01 PM

**To:** craig.wright@ █████████████

**Subject:**

Hi Craig,

Just checking that things will be ok for the money going into my account on the 15<sup>th</sup> of this month? I had to delay Eris' dental surgery as I had my rego to pay last month.

Thanks

*Lynn Wright*

*Ph:* ███████████



| From: | Lynn Wright |
|-------|-------------|
| Sent: | 11/21/2011 4:36:16 PM |
| To: | craig.wright@ |
| Subject: | a |

ATO called today. Unless you file your BAS statements for the money paid on the invoices by wednesday they are disallowing my claim and fining me 50% of the claim. I cannot email you from my ID mail as outgoing is not working. I am not home right now so will talk to you in the morning.
Lynn



EXHIBIT

12

13 Jan 2020

CONFIDENTIAL

DEFAUS_00698432

SALE AGREEMENT

THE SELLER:        INFORMATION DEFENSE Pty Ltd
                                ABN 90 135 141 347
                                         ('the seller)

THE PURCHASER:     Lynn Wright / Cloudcroft Pty Ltd
                                ABN  94 149 732 365
                                ('the buyer or 'Cloudcroft)

                   DATED        March 2010

EXHIBIT

13

Jan 13, 2020

THIS AGREEMENT dated 1st March                     2010

THE PARTIES:

              THE SELLER:        INFORMATION DEFENSE Pty Ltd

                                 ABN 90 135 141 347

                                 ('the seller)


              THE PURCHASER:     Lynn Wright / Cloudcroft Pty Ltd

                                 ABN 94 149 732 365

                                 ('the buyer or 'Cloudcroft)


INTRODUCTION

A. The Company is registered pursuant to the Corporations Act 2001.

B. The parties have entered into an agreement for THE PURCHASER to purchase the business of the SELLER and not to obtain shares in the Company. This includes the IP and an agreement to maintain the existing client services. This agreement is in exchange and in consideration of and for debt owed by the seller to the purchaser.

C. The Parties have agreed to enter into and be bound by the terms and conditions of this Agreement.

D. The Seller agrees to stop trading as of 1st March and to transfer all existing and future revenue to the Purchaser.

2

IT IS AGREED

1.      INTERPRETATION

1.1.In this Agreement, unless otherwise indicated by the context:

"**Accounting Firm**" means appointed accounts of the Company from time to time;

"**Agreed Share Value**" means the value of the Ordinary Shares as determined pursuant to clause 6.2(c);

"**Agreement**" this Shareholders Agreement;

"**Associate**" has the meaning given to it by sections 10 to 17 of the Corporations Act;

"**Board**" means the board of Directors of the Company;

"**Business**" means the development and sale of the Product in Australia and overseas; "**Business Day**" means a day that is not a Saturday, Sunday, public holiday or bank holiday in New South Wales;

"**Corporations Act**" means *Corporations Act* 2001; "**Confidential Information**" means all information, forms, specifications, processes, statements, formulae, trade secrets, drawings and data (and copies and extracts made of or from that information and data) concerning:

(a)     the operations and dealings of the Company, the Business or a Shareholder;

(b)     the organisation, finance, customers, markets, suppliers, intellectual property and know-how of the Company or a Shareholder; and

(c)     those operations and transactions of a Shareholder concerning the Business and that Shareholders shareholding in the Company;

3

(d)     which is not in the public domain, (except by the failure of a party to perform and observe its covenants and obligations under this Agreement) and which has been obtained through or by being a member of the Company.

**"Directors"** means the directors of the Company for the time being and **Director** means one of them;

**"Encumber"** means to mortgage, pledge, charge, assign as security or otherwise encumber;

**"Insolvency Event"** means the occurrence of any one or more of the following events in relation to a Shareholder:

(a)     an application is made to a court for an order that it be wound up, declared bankrupt or that a provisional liquidator or receiver or receiver and manager be appointed, unless the application is withdrawn, struck out or dismissed within 7 days of it being made;

(b)     a liquidator or provisional liquidator is appointed;

(c)     an administrator or a controller is appointed to any of its assets;

(d)     it enters into an arrangement or composition with one or more of its creditors, or an assignment for the benefit of one or more of its creditors;

(e)     it proposes a reorganisation, moratorium, agreement of company arrangement or other administration involving one or more of its creditors, or its winding-up or dissolution;

(f)     it becomes an insolvent under administration as defined in section 9 of the Corporations Act or action is taken which could result in that event;

4

(g)     it is taken to have failed to comply with a statutory demand as a result of section 459F(1) of the Corporations Act;

(h)     a writ of execution is levied against it or its property.

**"Intellectual Property Rights"** means all intellectual property rights, including but not limited to:-

(a)     patents, copyright, registered designs, trade marks, and any right to have Confidential Information kept confidential;

(b)     any application or right to apply for registration of any of the rights referred to in paragraph (a) of this definition.

**"Ordinary Shares"** means all of the issued ordinary shares in the Company;

**"Parties"** means the Ordinary Shareholders and their respective successors and permitted assigns;

**"Related Body Corporate"** of a Party or the Company means a corporation that is related to that party or the Company under the Corporations Act.

**"Shareholding Proportion"** means in relation to a Shareholder, the proportion which the number of Shares held by that Shareholder bears to the total number of Shares then on issue expressed as a percentage;

**"Shareholder"** means and includes a person holding Ordinary Shares in the Company;

**"Transfer"** means to sell, assign, transfer, convey or otherwise dispose.

1.2. In this Agreement, unless otherwise indicated by the context:

   (a)    words importing the singular include the plural and vice versa;

   (b)    headings are for convenience only and do not affect interpretation of this Agreement;

   (c)    a reference to a clause, paragraph or schedule is a reference to a clause, paragraph or schedule of this Agreement;

   (d)    where any word or phrase is given a definite meaning in this Agreement, any part of speech or other grammatical form of that word or phrase has a corresponding meaning;

   (e)    an expression importing a natural person includes a body corporate, partnership, joint venture, association or other legal entity;

   (f)    a reference to a statute, statutory provision or regulation includes all amendments, consolidations or replacements thereof;

   (g)    a reference to a party to a document includes that party's successors and permitted assigns;

   (h)    a covenant or agreement on the part of two or more persons binds them severally; and

   (i)    a reference to a body, whether statutory or not;

       (i)    which ceases to exist; or

       (ii)   whose powers or functions are transferred to another body;

6

is a reference to the body which replaces it or which substantially succeeds to its powers or functions.

## 2.    MANAGEMENT PROVISIONS

2.1. The Seller must comply with the provisions of this Agreement notwithstanding anything to the contrary in the Constitution of the Company and must so far as is lawful exercise their rights as Directors and Shareholders of the Company in accordance with the provisions of this Agreement.

## 3.    MANAGEMENT OF THE SELLER

The PURCHASER will appoint a Chief Executive Officer who is responsible for:-

(a)    Winding down the SELLER and any management of all activities of the SELLER in the conduct of a non-trading Business,

(b)    the general administration of the Company including stopping trading; and

(c)    Transfer of all client obligations and the maintenance of these relationships.

## 4.    FINANCIAL INFORMATION

4.1.    The SELLER shall at all reasonable times provide and make available to the PURCHASER upon request all books, records, bank statements, loan account statements, invoices, orders, wages and salary records, or other financial or business records or documents of the SELLER that the PURCHASER may reasonable require.

4.2.    The SELLER shall provide unaudited management accounts as soon as practicable after the end of the quarter (unless agreed to the contrary by the PURCHASER) and until the business and company are dissolved.

5.      OBLIGATIONS OF SELLER

The SELLER must:

(a)      diligently attend to the business of the Company as transferred to the PURCHASER for a period of at least 12 months;

(b)      use the SELLER's best skills and endeavours to carry out the business of the Company for the advantage of the PURCHASER;

(c)      promptly pay into the Company bank account all money, cheques and negotiable instruments received by the SELLER on account of the Business now transferred to the purchaser;

(d)      promptly advise the PURCHASER of any matter or material information concerning the Company assets which may come to the SELLER's notice;

(e)      at all times give to the other SELLER a full and proper account of any action the PURCHASER proposes to take in respect of the Company which has not been authorised by the SELLER or its representatives and at the reasonable request of the other SELLER furnish a full and accurate explanation of any action the SELLER takes which affects the PURCHASER in any way;

(f)      ensure that the SELLER leaves the PURCHASER in a position to carry on its business in a proper and efficient manner in accordance with sound business practice, for its own benefit and so as to give effect to this Agreement;

(i)      ensure that the SELLER and PURCHASER complies with all its obligations under this Agreement and any other material agreement;

8

6.      CONFIDENTIALITY

During the term of the Shareholding of each Shareholder and the term of appointment as a director of each Director, and for a period of two (2) years thereafter each Shareholder and Director agrees that except as required by law it shall keep secret and confidential and not publicly disclose or divulge, nor use or attempt to use any confidential information relating to the Company and the Company's business including:

(a)     financial information regarding the business including the Company pricing structure, finances and financial documents;

(b)     information, customer details and past or current negotiations or transactions relating to customers or the business; and

(c)     information relating to the Company's intellectual property, technology, techniques, concepts, operations or business methods which are not known or available outside the Company.

7.      CONSIDERATION

7.1     IT is noted that the SELLER owes the PURCHASER (though assignments made by Lynn Wright to the PURCHASER) an amount of $890,000.

7.2     Consideration is made by the PURCHASER for the sum of $250,000 to be immediately removed from the debt owed by the SELLER to the PURCHASER.

7.3     The PURCHASER shall immediately start to manage and maintain all existing client relationships made by the SELLER (Including those where the seller has already received compensation).

7.4     The SELLER transfers all Intellectual Property to the PURCHASER immediately.

## 8.    DISPUTE RESOLUTION

8.1. The parties acknowledge that all questions, differences or disputes (**"Dispute"**) which may arise between the parties concerning this Agreement or its subject matter or arising out of or in relation thereto, whether as to interpretation or otherwise may be resolved by negotiation between the parties.  To that end the parties shall enter into such negotiation in good faith before seeking an alternative resolution of any Dispute.

8.2.    If any Dispute is not resolved by negotiation and evidenced by written agreement between the parties within five (5) business days of one party giving notice to the other party of a proposal for resolution of the Dispute then either party may refer the Dispute to mediation pursuant to this clause.

8.3.    Each party agrees not to commence arbitration pursuant to this Agreement in relation to the Dispute unless it had complied with the following:-

(a)    On written notice by one party to the other party of the failure of negotiation between the parties pursuant to this clause in respect of the Dispute, and its decision to apply for mediation, the parties shall in good faith endeavour to resolve the Dispute expeditiously using informal dispute resolution techniques such as mediation, expert evaluation or determination or similar techniques agreed by them.

(b)    The parties shall within five (5) business days of receipt of notice (or such further period as agreed in writing by them) agree as to:

(i)    the dispute resolution technique and procedures to be adopted;

(ii)    the timetable for all steps and those procedures, and

(iii)    the selection and compensation of the independent person required for such technique.

10

    (c)    If the parties are unable to agree upon any or all of the matters set out in the prior clause then the parties shall mediate the Dispute in good faith and in accordance with the mediation rules of the New South Wales Law Society and jointly they will select the mediator and determine the remuneration of the mediator.

8.4. If the Dispute is not resolved by mediation in accordance with this clause then one party may give notice to the other parties of a proposal for resolution of the Dispute by arbitration in accordance with this clause 16.

8.5. Provided that a party to this Agreement has complied with the prior provisions of this clause, then if a Dispute has not been resolved, that party may require the Dispute to be arbitrated. The parties shall appoint a single arbitrator. If the parties cannot agree on the arbitrator, then the arbitrator may be appointed by the solicitor for the Company for the time being. Failure to agree upon the arbitrator within the business days of a party giving written notice requiring the arbitration, shall be deemed to be failure to agree on the arbitrator. Where a party fails to appoint an arbitrator within ten (10) business days of receiving notice requiring arbitration, then the other party shall be notified to call upon the Law Society to appoint a single arbitrator to arbitrate the dispute.

9.    NOTICES

9.1. A notice or other communication required or permitted to be given by one party to another must be in writing and:

(a) delivered personally;

(b) sent by pre-paid mail to the address of the addressee specified in this Agreement; or

(c) sent by facsimile transmission to the facsimile number of the addressee with acknowledgment of receipt from the facsimile machine of the addressee.9.2.      A notice or other communication is taken to have been given (unless otherwise proved):

(a) if mailed, on the second Business Day after posting; or

(b) if sent by facsimile before 4 pm on a Business Day at the place of receipt, on the day it is sent and otherwise on the next Business Day at the place of receipt.

9.3. A party may change its address for service by giving notice of that change in writing to the other parties.

10.    GENERAL

10.1.  **Governing Law**

This Agreement is governed by the laws of the State of New South Wales. The parties submit to the exclusive jurisdiction of the Courts of the State of New South Wales.

10.2.  **Invalidity**

If any part of this Agreement is for any reason declared invalid or unenforceable, the validity of the remaining portion is not to be affected and the remaining portion is to remain in full effect as if this Agreement has been signed with the invalid portion eliminated.

10.3.  **Waiver and Consents**

(a)    No failure on the part of a party to exercise, or delay on its part in exercising, any of the rights or remedies provided by this Agreement or by law operates as a waiver of them.  Any single or partial exercise of any of the rights or remedies does not preclude any further or other exercise of such right or remedy or the exercise of any other of the rights or remedies.

12

(b)     Any waiver or consent by a party is effective only if it is in writing signed by or on behalf of that party and then only to the extent expressly stated in writing and in the specific instance and the purpose for which it is given.

10.4.   Remedies

(a)     The rights and remedies contained in this Agreement are cumulative and are not exclusive of any rights and remedies provided by law.

(b)     Any right or remedy which may be exercised, or any determination which may be made, under this Agreement by a party may be exercised or made (or declined to be exercised or made) in the absolute discretion of that party who is not under any obligation to do so or to give reasons for its decision.

(c)     A party is not liable or accountable for any loss occasioned by or arising out of or in connection with its omission to exercise any right or remedy or to make any determination, or any delay in exercising any right or remedy or in making any determination, or the exercise or partial exercise of any right or remedy.

(d)     Each indemnity in this Agreement:

(i)     is a continuing obligation, separate from the other obligations of a party; and

(ii)    survives termination of this Agreement.

10.5.   Further Assurances

Each party must do and perform all such other acts matters and things as may be necessary or convenient to implement the provisions of this Agreement so as to give effect to the intentions of the parties as expressed in this Agreement.

10.6.   Assignment

A party may not assign the benefit of or its obligations under this Agreement without the prior written approval of each other party.

### 10.7. Whole Agreement

(a)    The contents of this Agreement record the entire agreement between the parties in relation to its subject matter. It supersedes all previous negotiations, understandings or agreements in relation to the subject matter.

(b)    All understandings, agreements, warranties or representations (whether express or implied) are excluded other than those which are set out in writing in this Agreement.

### 10.8. Amendment

No modification or amendment of this Agreement is to be binding unless it is in writing and signed by or on behalf of each party.

### 10.9. Counterparts

This Agreement may be executed in any number of counterparts. All counterparts will be taken to constitute one instrument.

### 10.10. Legal Advice

Each party acknowledges that it has received independent legal advice about this Agreement or has had the opportunity of receiving independent legal advice.

SCHEDULE

ITEM 1:

All Intellectual property (including but not limited to Trademarks, designs and processes) developed by the Seller.

ITEM 2:

Ongoing client obligations of the SELLER.

EXECUTED as an Agreement.

SIGNED  SEALED  AND  DELIVERED   )

by the said CRAIG STEVEN WRIGHT   )

for the SELLER:                          )

                                        )

01 Mar 2011

..............................................................

Signature

SIGNED  SEALED  AND  DELIVERED   )

by  the  said  LYNN  WRIGHT  for  the   )

PURCHASER.                          )

                                        )

..............................................................

Signature

Australian Taxation Office
Attn: Adam Westwood
PO Box 9990
Parramatta, NSW 2123

March 22, 2011

Re:  Information Defense Audit Interim Response

Dear Mr Westwood;

Please be advised that I, Lynn Wright, have taken over the business of Information Defense.  I acquired the business of the company as part of a separation agreement with Dr Craig Wright.

Sincerely,

Lynn Wright

Information Defense
95 Woodview Ave,
Lisarow, NSW 2250



**EXHIBIT**

14

Jan 13, 2020

## Response to Interim Report

## Material Facts

For the GST supply the ATO are arguing both the inadmissibility of the GST supply and on a separate but related audit the validity of the same. This is a logically inconsistent position and cannot be upheld under Australian law. The ATO is seeking payment through legal action against Dr Wright personally while rejecting the same invoices for Information Defense.

This is not a logically or legally defensible position and demonstrates the vexatious nature displayed throughout this action. Attachment A provided by Dr Wright provides proof of this discrepancy.

The attachment supplied provides proof that Information Defense had sought both advice from the ATO and had displayed a willingness to rectify discrepancies. It should be noted that representatives of the ATO had been requested to update the GST filings of Information Defense but refused to do so. Evidence is supplied in the same attachment.

It was noted by a representative of the ATO that Dr Wright could not be allowed or permitted to update any GST filings and all requests to do this were ignored or overlooked.

As a consequence any assertions concerning Dr Wright not fixing discrepancies are both false and vexatious in nature.

The tact taken by the representatives of the ATO and the severe negligence displayed in both ignoring or failing to check supplied facts is reprehensible at best and is criminally negligent at worst case.

### Point 1

The statement noted at point 1 is materially correct.

### Point 2

Dr Wright was the previous director of the company and acted for the company in all material points of the audit. The company is in a transitional phase at present and Dr Wright will not be acting as director for the company (Information Defense Pty Ltd) on an ongoing basis.

Further details will be available within the following two weeks.

### Point 3

The material fact stated in the interim audit report that notes that the principal place of business for Information Defense Pty Ltd is not 51 Cowangarra Road, Bagnoo, NSW 2446. This is materially false.

Information Defense has maintained the principal place of business as:

> Information Defense Pty Ltd
> 95 Woodview Ave,
> Lisarow, NSW 2250.

At no point of the audit was Information Defense principally based at the address noted in point 3.

## Point 4

The original shareholding listed in ASIC was based on the ongoing negotiations with other individuals. This was rectified when the contracts for Intellectual Property rights and other sundry items used by the company had been finalised.

The listed "material fact" does not and did not reflect the true share holdings in Information Defense Pty Ltd.

This information was supplied to the ATO early in the audit process and has not been noted in the review.

## Point 5

The research conducted by Information Defense was approved under Section s39J of *the Industry Research and Development Act 1986*. This fact is materially correct.

## Point 6

This material fact is only partially correct.

Dr Wright was conducting a set of research projects, one of which included creating quantitative models for information security.

As will be seen from a review of the AusIndustry project submissions, this was in fact a minor part of the overall research efforts. The creation and development of a Hardware based appliance for the secure transmission of Internet traffic was the major component of this research. This product has in fact been developed and is now in the early phases of commercialisation. This product has been built and is used in Hoyts in the running of their recently deployed digital cinema project. This product has the potential to sell and be deployed internationally.

A funding proposal for $1,200,000 US has been loaded with the Dept. Of Homeland Security (DHS) in the USA for further commercial development of this device. The total value of all proposals lodged with the DHS total $6,000,000 US over a period of three (3) years starting July 2011.

See Appendix A for details of this device.

## Point 7

The material fact noted in the Interim Report is factually incorrect.

 At no point did Information Defense form or intend to form a joint venture partnership with Integyrs Pty Ltd.

At no point in time did Information Defense form or intend to form a joint venture partnership with HCL.

Dr Wright did not state these points as a material fact at any phase of the audit.

The Intellectual Property of Information Defense is not and was not subject to sale or contract with HCL.  This has never been an objective of the company.  At no point was the ATO ever notified of any

such intent.  The material facts noted at this point are materially false and incorporate material gathered from separate and unrelated entities that have no ongoing relationship with Information Defense.

The lack of care and accuracy displayed by the various auditors from the ATO shows a level of unprofessional recklessness that belies comprehension.

There is a severe level of confusion that has been displayed by the various auditors that have been involved with separate entities including those materially unrelated to Information Defense. The confusion between the various entities being independently audited at the same time seems to be the likely explanation. However, the severe lack of professionalism displayed by those representing the ATO is irreconcilable with the obligations under both the Taxpayers Charter and the legislation governing the professional management of the ATO's audit process.

### Point 8

It was requested that the amounts noted be changed.  A request was made to an officer of the ATO prior to the current audit to change these amounts.  A discrepancy occurred in moving our software from the old ECI System to the web portal.

It was noted that Dr Wright was disallowed from making any changes to the lodged amount despite repeated requests for the same.  A response was received from an officer of the ATO stating that the ATO had to make the changes themself after the audit and no changes would be made before that despite Dr Wright's multiple requests.

Despite multiple requests to the Australian tax office for advice on filing these amounts and what was allowable the best result was a comment "this is complicated and I don't know".  Despite repeated requests to the ATO no further information was provided on this matter.

Requests were made both in writing and over the phone.  Written notes concerning the phone calls have been logged and recorded.  Written responses supporting this claim from officers of the ATO have been maintained and filed.

### Point 9

It is stated that Information Defense signed a Services Agreement with HCL.  This services agreement was for a provision of personnel to Integyrs Pty Ltd on a commercial basis.

Integyrs Pty Ltd, a separate commercial entity to Information Defense, was entering an agreement with HCL for reasons unrelated to Information Defense.  The facts noted at Point 9 are materially incorrect.

### Point 10

It was requested that the amounts noted be changed.  A request was made to an officer of the ATO prior to the current audit to change these amounts.  A discrepancy occurred in moving our software from the old ECI System to the web portal.

It was noted that Dr Wright was disallowed from making any changes to the lodged amount despite repeated requests for the same.  A response was received from an officer of the ATO stating that the

ATO had to make the changes themself after the audit and no changes would be made before that despite Dr Wright's multiple requests.

Despite multiple requests to the Australian tax office for advice on filing these amounts and what was allowable the best result was a comment "this is complicated and I don't know".  Despite repeated requests to the ATO no further information was provided on this matter.

Requests were made both in writing and over the phone.  Written notes concerning the phone calls have been logged and recorded.  Written responses supporting this claim from officers of the ATO have been maintained and filed.

### Point 11

It was requested that the amounts noted be changed.  A request was made to an officer of the ATO prior to the current audit to change these amounts.  A discrepancy occurred in moving our software from the old ECI System to the web portal.

It was noted that Dr Wright was disallowed from making any changes to the lodged amount despite repeated requests for the same.  A response was received from an officer of the ATO stating that the ATO had to make the changes themself after the audit and no changes would be made before that despite Dr Wright's multiple requests.

Despite multiple requests to the Australian tax office for advice on filing these amounts and what was allowable the best result was a comment "this is complicated and I don't know".  Despite repeated requests to the ATO no further information was provided on this matter.

Requests were made both in writing and over the phone.  Written notes concerning the phone calls have been logged and recorded.  Written responses supporting this claim from officers of the ATO have been maintained and filed.

### Point 12

It was requested that the amounts noted be changed.  A request was made to an officer of the ATO prior to the current audit to change these amounts.  A discrepancy occurred in moving our software from the old ECI System to the web portal.

It was noted that Dr Wright was disallowed from making any changes to the lodged amount despite repeated requests for the same.  A response was received from an officer of the ATO stating that the ATO had to make the changes themself after the audit and no changes would be made before that despite Dr Wright's multiple requests.

Despite multiple requests to the Australian tax office for advice on filing these amounts and what was allowable the best result was a comment "this is complicated and I don't know".  Despite repeated requests to the ATO no further information was provided on this matter.

Requests were made both in writing and over the phone.  Written notes concerning the phone calls have been logged and recorded.  Written responses supporting this claim from officers of the ATO have been maintained and filed.

### Point 13

We are unsure what you mean by "AS claims".

The document noted was received on Monday 22nd February 2010.  The envelope that this document was sent in was postmarked 18th February 2010.

The request for documents to be supplied by the 19th February 2010 is beyond unreasonable.

A request form the ATO to supply documents at a date prior to the expected delivery date of the request is both unreasonable and vexatious.

### Point 14

Due to the unreasonable level of the request and the limited amount of time proffered by the ATO's representative, Ms S Lagan, an extension was requested.  Over 200 pages of information had to be compiled and sent to the ATO in this time period.  This request consumed 188 hours of time that could have been used in either research or other business pursuits.

Despite multiple requests, no indication was supplied by Ms Lagan that she had received and could access the materials supplied to the ATO on DVD and email.

The request for an extension was granted.  All information was supplied in the extended timeframe.

### Point 15

The material fact noted is incomplete.

Information Defense supplied hundreds of documents on DVD and via email.  These documents included but were not limited to the documents listed at point 15.

Over 1000 pages of documents were sent to MS Lagan as the representative of the ATO.

Ms Lagan was contacted multiple times by email and phone requesting acknowledgement and receipt of documents and despite having copied these communiqués to the company's solicitor Ms Lagan did not respond to answer that she had received these documents or had any trouble accessing same.

The material fact indicating what was contained in the body of the email accompanying these documents is materially correct

### Point 16

The share structure of the company was updated in ASIC on the date noted.

This change reflected a previous contractual agreement and the share structure took effect contractually in 2009.

### Point 17

The emails noted as a material fact are part of over 200 documents and correspondences to both Ms Lagan and four other ATO auditors.  Despite repeated requests for acknowledgement of these documents no acknowledgement was forthcoming.

It is believed that Ms Lagan did not access these documents as she repeatedly made comments that would have been settled had she accessed this material.

On numerous occasions Ms Lagan made false and misleading statements saying:

1. The ATO does not receive documents by email
2. The ATO does not have to receive electronic documents including those on DVD (this is in direct contravention of the 1999 Electronic Transactions Act Cth and is hence a direct violation of Commonwealth law).
3. Repeated requests for information that had been sent electronically had been made by Ms Lagan.  This information was provided on a total of seven (7) DVD's that had been issued to the ATO.

## Point 18

The material facts stated in this point are only partially correct.

Dr Wright did attend an interview at 266 King Street, Newcastle NSW 2300 on 19 July 2010.

Present at this interview were Dr Wright, Ms S Lagan, Mr Jeff Shen and Ms Karen Potts.  Despite multiple requests as to what the interview would cover no one was forthcoming with the necessary information in order to prepare for this meeting.  This was not an interview it was an interrogation where multiple parties asked conflicting information and provided their own answers despite Dr Wright's protestations to the same.

There was a sale of joint Intellectual Property owned by multiple parties that included Dr Wright.

At no point did Information Defense form or intend to form a joint venture partnership with Integyrs Pty Ltd.  This was not asserted during the interview or at any other point during the audit.

At no point in time did Information Defense form or intend to form a joint venture partnership with HCL. This was not asserted during the interview or at any other point during the audit.

Dr Wright did not state these points as a material fact at any phase of the interview or at any other point in the audit.  The inability to treat separate legal entities individually has led to both a failure to comprehend the basic facts of this matter as well as being an egregious breach of the Taxpayer Charter.  This failure to apply recognised audit practices has led to a situation where material facts have either been excluded or confused at best.  At worst this has led to an instance of gross negligence on the part of the ATO audit staff.

Material facts from separate entities with radically different business structures, goals and ownership have been consolidated into a factual blender that has left no truth whatsoever on what the ATO representatives have used to make their decisions.

The Intellectual Property of Information Defense is not and was not subject to sale or contract with HCL.  This has never been an objective of the company.   This was not asserted during the interview or at any other point during the audit.

At no point was the ATO ever notified of any intent to become subject to a sale or partnership with HCL. The material facts noted at this point are materially false and incorporate material gathered from separate and unrelated entities that have no ongoing relationship with Information Defense.

The material fact stating "No diary notes or other records were kept" is materially false. Diary notes were kept electronically and provide to the ATO on several occasions. Detailed records of all research activity are maintained due to both business record keeping requirements and the requirements to maintain records for research and publication purposes.

A total of seven (7) peer reviewed papers have already been published as a result of this research. This research has led to the formal deployment of information security equipment that is used to protect digital cinema devices at Hoyts and other SCADA deployments. The commercialisation of this project would lead to international sales of several of the developed products. Currently, funding applications have been lodged with the US Department of Homeland Security (DHS) for a total value of $6 million US from July 2011 covering a period of three (3) years.

The material fact noted concerning Dr Wright as a sole trader and as to the source of the IP is false and was never reported to the ATO in this manner. There are a number of sources involved with the creation of the Intellectual Property.

SANS has never been involved with this research. Both a CRCS and Charles Sturt University research endeavour are directly related to the source of the Intellectual Property. These are not the exclusive sources of the IP.

A loan covering the creation and development of the IP from Lynn Wright exists and has been filed with Michie Shehadie and Co.

Hector Mabborang is a contractor and not an employee. He does not have any set working arrangement or hours. He is contracted to provide services to Information Defense. There is no time component associated with these services.

The statement that: "The method used to calculate time spent on R&D work, was captured by a software program that records movements of the mouse. No diary notes or other records were kept" is materially false. That particular software is one of many applications and other data sources.

Contrary to the above statement voluminous diary records have been kept including:

1) Research data
2) Publication data and papers
3) Testing data
4) Deployment data
5) Configuration data

Several peer reviewed papers have been published at highly respected academic conferences as a result of this research. Peer reviewed scientific papers do not get published without supporting data. The requirements for scientific validity and the requirements for publication are far more onerous than the ATO record keeping requirements. This information was supplied to Ms Lagan

who it is believed did not maintain the required skills necessary to access it and refused to respond to inquiries as to whether she was successfully able to do so.

### Point 19

Information of GST activity statements followed several requests to the ATO by Dr Craig Wright, for information; no one was able to provide consistent answers.

Information and facts relating to several companies have been merged even though these are unrelated businesses.  There was never any intention to merge Information Defense and Integyrs, nor was it told to the ATO at any point in time.

It was requested that the amounts noted be changed.  A request was made to an officer of the ATO prior to the current audit to change these amounts.  A discrepancy occurred in moving our software from the old ECI System to the web portal.

It was noted that Dr Wright was disallowed from making any changes to the lodged amount despite repeated requests for the same.  A response was received from an officer of the ATO stating that the ATO had to make the changes themselves after the audit and no changes would be made before that despite Dr Wright's multiple requests.

Despite multiple requests to the Australian Tax Office for advice on filing these amounts and what was allowable the best result was a comment "...this is complicated and I don't know".  Despite repeated requests to the ATO no further information was provided on this matter.

Requests were made both in writing and over the phone.  Written notes concerning the phone calls have been logged and recorded.  Written responses supporting this claim from officers of the ATO have been maintained and filed.

The information provided to the ATO by Information Defense on the GST detailed report is correct.


### Decision

Based on the discrepancies in the material facts no valid decision can be made.


### Page 7

The ATO stated: "You made no attempts to correct your mistakes, either by seeking professional advice or approaching the ATO for assistance, even after being prompted by the commissioner to review your claims", this statement is fallacious.

Dr Wright, acting for Information Defense Pty Ltd., sought and received advice from several outside advisors including  Deloittes (an auditing firm), as well as requesting information and advice from the ATO.

Dr Wright contacted the Australian Tax Office by email (copies sent to our solicitor) and phone over 50 times with no satisfactory response.  No one with whom Dr Wright spoke knew the answers to his queries, nor did they know with whom he might speak to gain a satisfactory provision of the requested information.

## Page 8

The ATO stated: "In an interview, your director, Craig Wright advised us that Lynn Wright performed services to you which included conducting research, patent and information researches. Your director, Craig Wright further explained that the payments were made not for services, but to repay a $1.18mil loan to you. To date no information has been forthcoming regarding this loan as requested. We consider these payments as remuneration for services, until proven otherwise."

In response to the above statement, no information was ever requested of Dr Wright

The ATO stated: "You incorrectly made a payment free of GST to Hector Mabborang on 15 October 2009 totalling $2149, when known to you (from a previous payment made) that Hector Mabborang was registered for GST."

It was requested that the amounts noted be changed. A request was made to an officer of the ATO prior to the current audit to change these amounts. A discrepancy occurred in moving our software from the old ECI System to the web portal.

It was noted that Dr Wright was disallowed from making any changes to the lodged amount despite repeated requests for the same. A response was received from an officer of the ATO stating that the ATO had to make the changes themself due to the audit and no changes would be made before that despite Dr Wright's multiple requests.

Despite multiple requests to the Australian tax office for advice on filing these amounts and what was allowable the best result was a comment "this is complicated and I don't know". Despite repeated requests to the ATO no further information was provided on this matter.

Requests were made both in writing and over the phone. Written notes concerning the phone calls have been logged and recorded. Written responses supporting this claim from officers of the ATO have been maintained and filed.

## Page 10

The ATO stated: "...we started the audit within a reasonable time, there were no unreasonable periods of inactivity during the audit..."

This statement is false as the ATO was contacted innumerable times by Dr Wright to inquire as to the progress of the audit. On multiple occasions he was given different information. This information included; the auditor was on leave and would not be returning until a specific date or that the auditor had been changed.

This audit has, thus far, been conducted by five (5) separate auditors at the ATO who have each taken a different view of the material facts. There was, apparently, no communication between these auditors.

## Page 13

The material facts & evidence are confused between companies; all other issues apply.

The material fact noted in the Interim Decision relating to the audit Period of Review 1 July 2008 to 30 June 2009 at Issue 7 is factually incorrect.

At no point did Information Defense form or intend to form a joint venture partnership with Integyrs Pty Ltd.

At no point in time did Information Defense form or intend to form a joint venture partnership with HCL.

The Intellectual Property of Information Defense is not and was not subject to sale or contract with HCL.  This has never been an objective of the company.  At no point was the ATO ever notified of any such intent.  The material facts noted at this point are materially false and incorporate material gathered from separate and unrelated entities that have no ongoing relationship with Information Defense.

## Pages 14 & 15

### Issue 10

The document noted was received on Monday 22$^{nd}$ February 2010.  The envelope that this document was sent in was postmarked 18$^{th}$ February 2010.

The request for documents to be supplied by the 19$^{th}$ February 2010 is beyond unreasonable.

A request form the ATO to supply documents at a date prior to the expected delivery date of the request is both unreasonable and vexatious.

### Issue 11

Due to the unreasonable level of the request and the limited amount of time proffered by the ATO's representative, Ms S Lagan, an extension was requested.  Over 200 pages of information had to be compiled and sent to the ATO in this time period.  This request consumed 188 hours of time that could have been used in either research or other business pursuits.

Despite multiple requests, no indication was supplied by Ms Lagan that she had received and could access the materials supplied to the ATO on DVD and email.

The request for an extension was granted.  All information was supplied in the extended timeframe.

### Issue 12

The material fact noted is incomplete.

Information Defense supplied hundreds of documents on DVD and via email.  These documents included but were not limited to the documents listed at point 15.

Over 1000 pages of documents were sent to MS Lagan as the representative of the ATO.

Ms Lagan was contacted multiple times by email and phone requesting acknowledgement and receipt of documents and despite having copied these communiqués to the company's solicitor Ms

Lagan did not respond to answer that she had received these documents or had any trouble accessing same.

The material fact indicating what was contained in the body of the email accompanying these documents is materially correct.

### Issue 13

The share structure of the company was updated in ASIC on the date noted.

This change reflected a previous contractual agreement and the share structure took effect contractually in 2009.

### Issues 14

The emails noted as a material fact are part of over 200 documents and correspondences to both Ms Lagan and four other ATO auditors.  Despite repeated requests for acknowledgement of these documents no acknowledgement was forthcoming.

It is believed that Ms Lagan did not access these documents as she repeatedly made comments that would have been settled had she accessed this material.

On numerous occasions Ms Lagan made false and misleading statements saying:

1. The ATO does not receive documents by email
2. The ATO does not have to receive electronic documents including those on DVD (this is in direct contravention of the 1999 Electronic Transactions Act Cth and is hence a direct violation of Commonwealth law).
3. Repeated requests for information that had been sent electronically had been made by Ms Lagan.  This information was provided on a total of seven (7) DVD's that had been issued to the ATO.

### Issue 15

The material facts stated in this point are only partially correct.

Dr Wright did attend an interview at 266 King Street, Newcastle NSW 2300 on 19 July 2010.

Present at this interview were Dr Wright, Ms S Lagan, Mr Jeff Shen and Ms Karen Potts.  Despite multiple requests as to what the interview would cover no one was forthcoming with the necessary information in order to prepare for this meeting.  This was not an interview it was an interrogation where multiple parties asked conflicting information and provided their own answers despite Dr Wright's protestations to the same.

There was a sale of joint Intellectual Property owned by multiple parties that included Dr Wright.

At no point did Information Defense form or intend to form a joint venture partnership with Integyrs Pty Ltd.  This was not asserted during the interview or at any other point during the audit.

At no point in time did Information Defense form or intend to form a joint venture partnership with HCL. This was not asserted during the interview or at any other point during the audit.

Dr Wright did not state these points as a material fact at any phase of the interview or at any other point in the audit. The inability to treat separate legal entities individually has led to both a failure to comprehend the basic facts of this matter as well as being an egregious breach of the Taxpayer Charter. This failure to apply recognised audit practices has led to a situation where material facts have either been excluded or confused at best. At worst this has led to an instance of gross negligence on the part of the ATO audit staff.

Material facts from separate entities with radically different business structures, goals and ownership have been consolidated into a factual blender that has left no truth whatsoever on what the ATO representatives have used to make their decisions.

The Intellectual Property of Information Defense is not and was not subject to sale or contract with HCL. This has never been an objective of the company. This was not asserted during the interview or at any other point during the audit.

At no point was the ATO ever notified of any intent to become subject to a sale or partnership with HCL. The material facts noted at this point are materially false and incorporate material gathered from separate and unrelated entities that have no ongoing relationship with Information Defense.

The material fact stating "No diary notes or other records were kept" is materially false. Diary notes were kept electronically and provide to the ATO on several occasions. Detailed records of all research activity are maintained due to both business record keeping requirements and the requirements to maintain records for research and publication purposes.

A total of seven (7) peer reviewed papers have already been published as a result of this research. This research has led to the formal deployment of information security equipment that is used to protect digital cinema devices at Hoyts and other SCADA deployments. The commercialisation of this project would lead to international sales of several of the developed products. Currently, funding applications have been lodged with the US Department of Homeland Security (DHS) for a total value of $6 million US from July 2011 covering a period of three (3) years.

The material fact noted concerning Dr Wright as a sole trader and as to the source of the IP is false and was never reported to the ATO in this manner. There are a number of sources involved with the creation of the Intellectual Property.

SANS has never been involved with this research. Both a CRCS and Charles Sturt University research endeavour are directly related to the source of the Intellectual Property. These are not the exclusive sources of the IP.

A loan covering the creation and development of the IP from Lynn Wright exists and has been filed with Michie Shehadie and Co.

Hector Mabborang is a contractor and not an employee. He does not have any set working arrangement or hours. He is contracted to provide services to Information Defense. There is no time component associated with these services.

The statement that: "The method used to calculate time spent on R&D work, was captured by a software program that records movements of the mouse. No diary notes or other records were kept" is materially false. That particular software is one of many applications and other data sources.

Contrary to the above statement voluminous diary records have been kept including:

1) Research data
2) Publication data and papers
3) Testing data
4) Deployment data
5) Configuration data

Several peer reviewed papers have been published at highly respected academic conferences as a result of this research. Peer reviewed scientific papers do not get published without supporting data. The requirements for scientific validity and the requirements for publication are far more onerous than the ATO record keeping requirements. This information was supplied to Ms Lagan who it is believed did not maintain the required skills necessary to access it and refused to respond to inquiries as to whether she was successfully able to do so.

The ATO stated "further it is noted that there is no contact with the ATO to seek advice." This is completely false as detailed records of phone calls and emails have been kept, and as stated on many occasions previously the emails were copied to our solicitor.

## Page 19
The ATO stated: "...we consider, in all probability, that the purported transactions to acquire your director's IP and the purported R & D expenditure, would not have taken place, if they were between your director and an independent third party, as at the time of making the transactions, consideration could not be provided by you."

Despite your considerations this IP is valuable and is presently linked to four (4) Department of Homeland Security grant applications in the USA with a potential value of up to 6 million dollars ($6,000,000.00).

## Page 21
### Issue 3.2

Documentation was provided to the ATO.

Despite repeated requests to the ATO no further information was provided on this matter.

Requests were made both in writing via email and over the phone. Written notes concerning the phone calls have been logged and recorded. Written responses supporting this claim from officers of the ATO have been maintained and filed.

Page 24

The ATO stated: "You entered into an agreement with your director to acquire his personal IP and on sell to HCL..."

The Intellectual Property of Information Defense is not and was not subject to sale or contract with HCL. This has never been an objective of the company. At no point was the ATO ever notified of any such intent. The material facts noted at this point are materially false and incorporate material gathered from separate and unrelated entities that have no ongoing relationship with Information Defense.

A total of seven (7) peer reviewed papers have already been published as a result of this research. This research has led to the formal deployment of information security equipment that is used to protect digital cinema devices at Hoyts and other SCADA deployments. The commercialisation of this project would lead to international sales of several of the developed products.

## Page 25
### Part 4

Requests for information and advice were made both in writing via email (copied to our solicitor) and over the phone. Written notes concerning the phone calls have been logged and recorded. Written responses supporting this claim from officers of the ATO have been maintained and filed.

Accurate records have been kept, including scans of all invoices.

### Part 6

This statement by the ATO is fallacious and inflammatory.

Dr Wright, acting for Information Defense Pty Ltd., sought and received advice from several outside advisors including Deloittes (an auditing firm), as well as requesting information and advice from the ATO.

Dr Wright contacted the Australian Tax Office by email (copies sent to our solicitor) and phone over 50 times with no satisfactory response.

No one with whom Dr Wright spoke knew the answers to his queries, nor did they know with whom he might speak to gain a satisfactory provision of the requested information.

## Conclusion

Based on the negligence and lack of care displayed by the various representatives of the ATO during the audit of Information Defense none of the resulting conclusions stated in the interim audit response can be upheld. The lack of concern coupled with the failure to correctly attribute the material facts supplied show a severe lack of care if not negligence. The incomprehensible dismissal

and obvious failure to review at least 99% of the material documents supplied to the ATO reflects an unacceptably high level of unprofessionalism that when coupled with the lack of due care is almost if not actually criminal in nature.  The lack of response to innumerable queries, the material misstatement of facts and the continuous display of unprofessionalism in such activities as requesting documents be delivered prior to a postmarked date shows a level of vexatiousness that would not be expected in a corrupt 3<sup>rd</sup> world country let alone from a representative of the Australian government.

The negligent misstatement of fact and level of error is beyond a level of unprofessionalism and represents a gross level of failure in the conduct of activities displayed throughout the audit process.

We hope that the inability to correctly note material facts is simply a result of gross negligence and unprofessionalism by the ATO and does not actually constitute a misstatement of fact and materially false statements.