**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

       plaintiffs,

v.                                                                                    **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

       defendant.

_____/


**DR. WRIGHT'S MOTION TO EXCLUDE THE OPINION TESTIMONY**
**OF PLAINTIFFS' EXPERT WITNESSES**

## INTRODUCTION

Plaintiffs seek to present opinion testimony from five purported expert witnesses. These reports and testimony are inadmissible because, *inter alia*, they are products of methods of inquiry that are not generally accepted as valid in their fields. They are inadmissible under Fed R. Evid. 702, and *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993) and progeny. All of them improperly seek to influence the jury with unsupported, results-driven conclusions and flawed methodologies. The Court should not let that happen.

First is Mr. Gordon I. Klein, a California lawyer with 40 years of experience who teaches at UCLA. Plaintiffs retained him to testify about the legal requirements of a Florida partnership. His so-called "opinion testimony" is not testimony at all, but improper, cumulative legal argument disguised as an expert report. The only "legal expert" at trial will be this Court, and no others need apply. *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) ("The only legal expert in a federal courtroom is the judge."); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977) ("[E]xpert testimony on law is excluded because 'the tribunal does not need the witness' judgment . . . [to determine issues that] [t]he judge (or the jury instructed by the judge) can determine equally well.").

Second is Dr. Mathew Edman, who opines that he has looked at the metadata in various documents to determine if they were "altered" or "forged" by someone who just might fit Dr. Wright's description. Dr. Edman is not a forensic examiner and has neither the training nor expertise to render any such opinions. Further, even if he knows best practices for forensic examinations, he failed to follow them, his methodology is not established in the scientific community, and it lacks reliability. His proffered testimony also will improperly confuse the jury because he uses a definition of "forgery" that conflicts with both legal and dictionary definitions.

According to Dr. Edman, a document that was altered or modified in any way is a "forgery," regardless of the modification or reason(s) for it.

Third is Mr. Andreas Antonopoulos who (1) purports to have knowledge of bitcoin, (2) declares himself an "expert" on bitcoin, and (3) makes a living posting about bitcoin on the internet. Plaintiffs proffer him as a damages expert, a subject about which he is unqualified to testify. His posting activity features slandering Dr. Wright, whom he claims was not involved in creating bitcoin and refers to as "Faketoshi." In addition to his lack of qualifications and personal animus, his testimony should be excluded because plaintiffs hope to use it as a backdoor through which to introduce inadmissible non-evidence of purported historical bitcoin "prices."

In his report, Antonopoulos, who has extensive experience browsing the internet (a less than special skill), copied and pasted an inadmissible internet webpage supposedly listing the "price" of bitcoin on December 3, 2019 (a date irrelevant to this action). He intends to proffer other such internet postings as "evidence" of historical bitcoin "prices," which in deposition he conceded were not actual "prices." Plaintiffs should not be permitted to use his "report" and testimony to gin up a purported damages amount. Mr. Antonopoulos is wholly unqualified to testify about anyone's damages in any case. He has no basis for opining about any supposed bitcoin "prices" (which he admits aren't really "prices"), let alone proffering inadmissible website pages as "evidence" of those purported prices. He failed to verify any of the purported data on which he relied (or hopes to rely) and failed to do the necessary analysis regarding bitcoin prices (which he couldn't have done for lack of qualifications). His testimony should be excluded because of his personal animus, lack of qualifications to testify about damages, and his failure to analyze, or use any methodology to calculate, plaintiffs' purported damages.

Fourth, plaintiffs hired a statistician, Mr. Stefan Boedeker, to "analyze" Dr. Wright's list of bitcoin public addresses. During his deposition, it became obvious that there were serious problems with his methodology, rendering it unreliable and inadmissible under *Daubert*. Boedeker opined that Dr. Wright's list of bitcoin was "manipulated" because there were purported "gaps" in the listed bitcoin transaction IDs. This conclusion rests on the faulty premise that alphanumeric bitcoin IDs should consist of randomly distributed letters and integers. He did no testing to confirm this premise, and relied on an e-book and class handout that he found on the internet.

After his deposition and long after the deadline passed for exchanging expert and rebuttal reports, plaintiffs decided that they were entitled to a do-over, and served an untimely "supplemental report" that purported to clean up Boedeker's methodology, but still suffers from the same infirmities as the original. It still failed to demonstrate that a list alphanumeric bitcoin IDs should consist of randomly distributed letters and integers, and failed to consider explanations for the purported "gaps" other than deliberate "manipulation" (his conclusion). The data that would fill in the "gaps" is on the bitcoin blockchain, but Mr. Boedeker never analyzed any data from the blockchain, and has no explanation for creation of those "gaps," who created them, or why. His conclusion is unsupported and goes far beyond his expertise as a statistician.

Finally, Dr. Robert Leonard, a forensics linguistics professor, proffered an opinion consisting of a purported "authorship" analysis, based on no reliable methodology and insufficient data. His "authorship" analysis was based on a handful of documents consisting of e-mails that Dr. Wright denies authoring. From the millions of pages of documents produced in this case, he relied on approximately 8,200 words from cherry-picked documents. Dr. Leonard

should not be allowed to testify because his opinions are not based on a reliable methodology and because his opinions are not based on sufficient facts or data.

## ARGUMENT

Under Federal Rule of Evidence 702, a witness can be "qualified as an expert by knowledge, skill, experience, training, or education" and may only testify in the form of an opinion if all of the following factors are present:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Because experts are permitted to testify to opinions and matters outside of their firsthand knowledge or observation, a district court's gatekeeping function is critical to ensuring that such testimony is both relevant and reliable. *E.g., United States v. Frazier*, 387 F.3d 1244, 1275 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 589 n.7); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). The party proffering an expert report bears the burden of laying a proper foundation for its admission and must demonstrate admissibility by a preponderance of the evidence. *E.g., Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1306 (11th Cir. 1999).

In determining whether the purported expert witness testimony is reliable, the Court should consider the following factors:

> (1) whether the theory or technique underpinning the expert's opinion 'can be (or has been) tested'; (2) whether the theory or technique 'has been subjected to peer review and publication'; (3) whether, with respect to particular theory or technique, there is a high 'known or potential rate of error,' and whether there are 'standards controlling the technique's operation'; and (4) whether the theory or technique enjoys 'general acceptance' within the "relevant scientific community.'

*Frazier*, 387 F.3d at 1275 (Tjoflat, J., concurring) (citing *Daubert*, 509 U.S. at 593–95, and *Kumho*, 526 U.S. at 137).

In determining the admissibility of expert testimony based solely on experience, as opposed to scientific processes, the Eleventh Circuit requires a rigorous three-part inquiry considering whether: (1) the expert is qualified to testify competently regarding the matters intended to be addressed; (2) the methodology used to reach the conclusions is sufficiently reliable, as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of specialized knowledge, to understand the evidence or to determine a fact in issue. *E.g., Torres v. Carnival Corp.*, 635 F. App'x. 595, 599 (11th Cir. 2015). An expert's methodology, though not necessarily scientific, still must be reliable.

Finally, while Rule 703 permits experts to state the underlying basis for their opinions (if the information is of the type *reasonably* relied upon by experts), that basis information is still subject to exclusion under the balancing test of Rule 403. *E.g., Allison,* 184 F.3d at 1310. The Court "must consider the information's probative value in assisting the jury to weigh the expert's opinion on the one hand, and the risk of prejudice resulting from the jury's potential misuse of the information for substantive purposes on the other." *Williams v. Consol. City of Jacksonville*, 2006 WL 305916, at *8 (M.D. Fla. 2006) (*quoting* Fed. R. Evid. 403 advisory committee notes and 2000 amendments.) (internal quotation marks omitted). The admission of speculative and potentially confusing testimony is at odds with the purposes of expert testimony envisioned by Fed. R. Evid. 702. *E.g., Hull v. Merck & Co., Inc.,* 758 F.2d 1474, 1477 (11th Cir. 1985). In weighing possible prejudice against probative value under Rule 403, the Court exercises more control over experts than over lay witnesses. *E.g., Salem v. U.S. Lines Co.,* 370 U.S. 31 (1962). "Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors,

and therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." *United States. v. Masferrer,* 367 F.Supp.2d 1365, 1374 (S.D. Fla. 2005) (citing *Frazier,* 387 F.3d at 1263).

1.    **Mr. Gordon I. Klein**

Mr. Klein is a California lawyer with approximately 40 years of experience.  *See* Klein Report ¶ 3, dated April 10, 2020, attached as **Exhibit A**.[1] Among other things, he teaches law classes at UCLA and was a faculty member from 1987 to 2000 at UCLA's School of Law. *Id.* He states that he was retained by plaintiffs to "examine the evidence and opine on whether the course of conduct and communications between Dave Kleiman, Wright and other relevant parties is consistent with a partnership and/or joint venture having been formed by Kleiman and Wright." *Id.* ¶ 11. Thus, Klein admits that he was retained to give so-called "legal opinion" testimony, which purports to state legal standards (the Court's province), and then weigh the evidence to determine if those standards were met (the jury's province). All of this is improper *vel non.* There is only one "legal expert" in a federal court, and that expert is the judge. *Caputo,* 517 F.3d at 942 (Easterbrook, J.).

A.    ***The Klein Report and Proffered Testimony Contain Improper Legal Conclusions***

Expert testimony may not include legal conclusions. *E.g., Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) ("[T]estifying experts may not offer legal conclusions."); *In re Rosenberg*, 2012 WL 3870351, at *2 (S.D. Fla. Bankr. 2012) (An expert may not "testify" about legal opinions, because that would usurp the court's role and could confuse the jury). Nor may an expert witness testify to the legal

---

[1] Exhibit A is an excerpt of the Klein Report.

implications of a party's conduct. *E.g., Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (Expert's "testimony" that defendant had a legal duty was an impermissible, inadmissible legal conclusion.). The D.C. Circuit has held that ***"[e]ach courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards."*** *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (citing *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 509–10 (2nd Cir.), *cert. denied,* 434 U.S. 861 (1977) (emphasis added).

Mr. Klein's "report" proffers numerous legal arguments and conclusions masquerading as "analysis." *See*, *e.g.*, Ex. A ¶ 30. In an obvious attempt to conceal the fact that his proffered opinion is nothing more than improper legal argument, he gins up a misleading term, and refers to what he argues are the legal elements of an oral partnership, as "guideposts." *Id.* ¶ 17. This laughable subterfuge should fool no one, and his "guideposts" are not the elements that Florida courts have articulated in applying Florida partnership law, which will be provided to the jury in this Court's instructions. In short, and as noted above, "[t]he only legal expert in a federal courtroom is the judge." *Caputo*, 517 F.3d at 942 (Easterbrook, J.).

Florida law provides strictly construed elements for an oral partnership[2], and the Court will provide instructions applying that law. *Konikov v. Orange Cnty., Fla*, 290 F. Supp. 2d 1315, 1318 (M.D. Fla. 2003) ("***[I]n the Eleventh Circuit, the judge is the jury's only source of law***. The judge decides the content of the law, and instructs the members of the jury on the applicability of the law to the facts of the case.") (emphasis added).

---

[2] A joint venture, like a partnership, may be created by express or implied contract, and the contractual relationship must consist of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty to share losses, and (4) joint control or right of control. *Pinnacle Port Cmty. Ass'n., Inc. v. Orenstein,* 872 F.2d 1536, 1539 (11th Cir.1989); *Kislak v. Kreedian,* 95 So.2d 510, 515 (Fla.1957).

In derogation of applicable law, Mr. Klein purports to apply his own legal "guideposts" to opine on what he thinks are the legal implications of the parties' communications and conduct. All of this is improper legal argument disguised as an "expert opinion," which alone renders it inadmissible. Without more, Mr. Klein's proffered "report" and "testimony" should be excluded.

### B.   Klein's Proffered Testimony Should Be Excluded Because It Will Not Assist the Trier of Fact

As we have seen, in this Court, "the judge is the jury's only source of law." *Konikov*, 290 F. Supp. 2d at 1318. The Klein "report" is a collection of inadmissible legal arguments and legal conclusions masquerading as an expert opinion.

But even if the argument had to be made from the ground up, expert testimony regarding *the facts of a case* may be admitted only "if it concerns matters that are beyond the understanding of the average lay person." *Whelan v. Royal Caribbean Cruises Ltd.*, 976 F. Supp. 2d 1328, 1332 (S.D. Fla. 2013) (internal quotation omitted). The Eleventh Circuit has held that "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Cook*, 402 F.3d at 1111. Similarly, expert testimony that merely recounts the facts and then offers a conclusion it urges the jury to reach is not permitted. *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006). An expert witness may not testify as to "knowledge, intent, or state of mind because such testimony invades the province of a jury, which is capable of deciding such matters without an expert's help." *Ocasio v. C.R. Bard, Inc.*, 2015 WL 2062611, at *4 (M.D. Fla. 2015).

In addition to usurping the Court's role as "legal expert," the Klein "report" usurps the jury's role as finder of fact. It improperly weighs evidence and draws conclusions by applying its own so-called "guideposts" to what it views as evidence. *See*, *e.g.*, Ex. A ¶ 30 ("This statement by Wright to Ira Kleiman, and Wright's acknowledgement that he had informed a third party, the

taxing authority, about the existence of his business relationship with Dave Kleiman, further corroborates my conclusion that the conduct and communications of Wright were consistent with Wright and Dave Kleiman having been longstanding partners in a partnership and/or joint venture."); Ex. A ¶ 59 ("This statement concerning Wright's mining of bitcoin with his 'partner' confirms that the acquisition of bitcoin through mining was an integral activity of their joint enterprise."); Ex. A ¶ 71 ("This apparent pursuit of 'real money' wealth is once again consistent with the SN Enterprise having a substantial profit-seeking motive.").

Every one of these co-called expert opinions is improper. *E.g., United States v. Falcon*, 245 F. Supp. 2d 1239, 1245 (S.D. Fla. 2003) ("It is well-settled in this Circuit that, absent extreme or unusual circumstances, expert scientific testimony concerning the truthfulness or credibility of a witness is inadmissible because it invades the jury's province in determining credibility.") (citing *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996)). Determining the credibility of witnesses is not "beyond the ordinary understanding of the average lay person," and no expert testimony is needed (or permitted). *Whelan*, 976 F. Supp. 2d at 1332.

### C.    *Klein's Report Contains Improper Opinions on Intent and Improper Factual Narratives*

Experts may not give opinion testimony regarding the motives, state of mind or intent of a party. *See In re Trasylol Products Liab. Litig.,* 2010 WL 4259332, at *8 ("The question of intent or motive is a classic jury question and not one for experts."). The Klein "report" ignores Florida law, then makes numerous statements as to the states of mind, motives or intent of Dr. Wright and others, then makes inadmissible legal conclusions dressed up as purported opinions. *See*, *e.g.*, Ex. A ¶ 36 ("The conduct and communications between Wright and Dave Kleiman also

reveal mutual decision-making by the men in their business activities as evidenced by Wright's explanation to Ira Kleiman of the reasoning behind starting Coin-Exch . . . .").[3]

It is improper for an expert "to become a vehicle for factual narrative." *Ohio State Troopers Ass'n, Inc. v. Point Blank Enter., Inc.*, 2020 WL 1666763, at *15 (S.D. Fla. 2020) (internal quotation omitted). The Klein "report" improperly does just that. *See*, *e.g.*, Ex. A ¶ 33 ("The communications I reviewed not only are consistent with and indicative of the joint business relationship between Wright and Dave Kleiman, but they also are consistent with their joint efforts having included the creation of Satoshi Nakomoto").

Make no mistake about Mr. Klein's opinion testimony in this case. Mr. Klein recognizes that his opinion goes to a core issue – if not the main issue – in this case, *i.e.* the existence of an alleged partnership between Dave Kleiman and Dr. Wright. Klein Depo. Tr. at 250:22-25; 252:1-2, April 30, 2020, attached as **Exhibit O**[4] ("I believe that is certainly one of the critical issues, yes."). And, the Klein "report" reads like the fact section of a lawyer's brief or plaintiffs' closing argument. It should be excluded, and Mr. Klein should be precluded from testifying at trial.

## 2.     Dr. Matthew Edman

Dr. Edman intends to testify that certain documents produced by defendant during discovery were altered, modified, or forged. M. Edman Reports dated July 29, 2019, December 13, 2019, January 13, 2020, attached as composite **Exhibit B**.[5]  Walking an extremely fine line,

---

[3] Moreover, they fail to acknowledge the unassailable fact that plaintiffs' claims are not about Coin-Exch. Indeed, the Estate received shares in Coin-Exch.

[4] With respect to the citations to deposition transcripts in this motion, the corresponding exhibits only include the referenced transcript pages, including additional pages for context, and any deposition exhibits that are specifically referenced herein. Any additional portions of the transcripts will be provided to the Court upon request.

[5] With respect to the expert reports referenced in this motion, the corresponding exhibits do not include the exhibits to the reports as in some cases they are voluminous and will be provided to

Dr. Edman asserts that he is not opining that Dr. Wright made the alterations or forgeries. He simply intends to testify that the purported alterations and forgeries are "consistent" with having been made by Dr. Wright, with the "clear" "implication" that he did it. *See* M. Edman, Depo. Tr. 14:6-16:1, April 29, 2020, attached as **Exhibit C.**

Dr. Edman's Report and testimony should be excluded. He lacks the requisite expertise to opine about the forensic analysis of documents, his opinions are not based on a reliable methodology, and his testimony will serve only to confuse the jury.

Dr. Edman lacks the requisite expertise to conduct the forensic analysis of documents to determine whether they are altered or forged. He is a computer scientist with expertise in computer security, who previously has analyzed documents to detect malware.  He *has virtually no training in the forensic analysis of documents to determine whether they were altered or forged*. M. Edman, Depo. Tr. 51:10-55:18, January 16, 2020, attached as **Exhibit D**. At most, he took a software manufacturer's online exam which certified that he knows how to use some basic forensic software tools. *Id*. Notably absent is any SANS or GIAC certification.[6] As for previous experience, he is unable to state with any certainty the number of times he previously conducted a forensic analysis of documents to determine whether they were altered (other than to detect malware) or forged. *Id*. at 36:5-44:20 (testifying that it was some number between 1 and 10, but that it could also be between 1 and 2).

---

the Court upon request.  In each instance, the curriculum vitae of the expert is, however, included with the corresponding expert report.

[6] SANS, EnCase, and GIAC are the leading organization that certify forensic examiners. *See* https://www.sans.org/; https://www.opentext.com/products-and-solutions/services/training-and-learning-services/encase-training/examiner-certification; https://www.giac.org/certification/certified-forensic-analyst-gcfa.

Dr. Edman's lack of expertise in the forensic analysis of documents is reflected in his failure to use industry best practices when conducting his "forensic analysis" of the documents.[7] He failed to use a clean workstation and write blocker to ensure that he didn't inadvertently alter the documents when conducting his "analysis," and he failed to maintain a log of the document hash values that he generated in doing his "analysis." Ex. D at 90:17-94:17; 79:3-81:23.

Dr. Edman's lack of expertise in the forensic analysis of documents also is demonstrated by his complete lack of knowledge of the most basic terms and concepts of forensic analysis. Dr. Edman didn't know what the acronym "ESI" stood for, was under the impression that a scanned hard-copy document was no longer a "hard copy" but was magically transformed into an electronic document, and appeared confused that documents introduced in the deposition had "footers" on the bottom (bates numbers). Ex. D at 70:10-72:24; Ex. C at 119:5-120:6.

As for Dr. Edman's methodology, he describes it generally as analyzing a document's metadata and human readable text (Ex. C at 83:7-84:9) but he was incapable of describing with specificity his process for analyzing the metadata. *Id.* at 84:10-90:16. In any event, the metadata artifacts that Dr. Edman considered do not have the required indicia of scientific reliability.

The primary metadata that on which Dr. Edman relies on is the "Touchup Text" edits, which Dr. Edman opines is a marker for PDF edits. He was unable to point to any specific

---

[7] There are many resources that set out the bare minimum standards that a forensic examiner should adhere to. *See e.g.*, https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-86.pdf (last visited May 8, 2020); https://www.interpol.int/content/download/13501/file/INTERPOL_DFL_GlobalGuidelinesDigitalForensicsLaboratory.pdf+&cd=1&hl=en&ct=clnk&gl=us pdf (last visited May 8, 2020); https://drive.google.com/file/d/1KeEI1DUkSE2DSPZyPFEFIGfzbZS3-zZC/view pdf (last visited May 8, 2020); https://drive.google.com/file/d/1zP4OgpRrj-t9sVGNcqndqIgsemq7u5XQ/view pdf (last visited May 8, 2020); https://drive.google.com/file/d/12z6Vrtmts6oxg9HHORFkHrwUPa7cGAck/view pdf (last visited May 8, 2020).

documentation or studies that might support this assertion. Ex. C at 96:17-97:14. He also couldn't state with any certainty whether he had tested this theory by making edits to a PDF and then checking if any Touchup Text edits appeared, and he was unable to state whether there was any known error rate. *Id.* at 93:14-95:25, 97:20-25. He also couldn't identify any other courts that had accepted this purported methodology. *Id.* at 96:7-10.

Similarly, the methodology Dr. Edman used to opine that the purported "alterations" and "forgeries" were consistent with having been made by Dr. Wright, also rests on a non-existent foundation. Dr. Edman relies on geographic locations that currently are associated with certain IP addresses (Ex. C at 17:24-18:10), but has little or no basis for hypothesizing as to what geographic locations were associated with those IP addresses six years ago, when the purported "alterations and forgeries" supposedly occurred. *Id.* at 160:24-169:3. Moreover, the current location for those IP addresses are thousands of miles away from where Dr. Wright then lived in Australia. He also cannot rule out the possibility that a virtual private network ("VPN") was used (*Id.* at 160:2-23), and gave no thought to the documents' chains of custody. Ex. D at 95:5-99:1. He also made no effort to determine who had (or has) access to the servers and computers on which the documents originally resided. Ex. C at 17:1-19:12, 39:19-40:12.

Finally, Dr. Edman's testimony would confuse the jury. He considers virtually any document edit to be a "forgery," regardless of the intent behind the edit, and if one edited a PDF to make it reflect the correct date, he would call it a "forgery." Ex. C at 55:13-59:23. It also would be a "forgery" to edit a PDF or Word document to correct the amount owed on an invoice prior to sending it. *Id.* at 59:24-63:9. This is not the law, which requires an intent to defraud or deceive. *United States v. London*, 714 F.2d 1558, 1563 (11th Cir. 1983) ("Common law forgery can be defined as the false making or materially altering, with intent to defraud, of a

writing which, if it was genuine, might be of legal efficacy.") (citations omitted). His report and testimony should be excluded.

3.      **Mr. Andreas Antonopoulos**

    A.      *Mr. Antonopoulos is not qualified to opine on purported damages*

In Mr. Antonopoulos' expert report dated April 10, 2020, attached as **Exhibit E**, he states what he believed to be the "market price" for bitcoin on December 3, 2019, and also states that he "reserves the right" to testify about bitcoin's 'market price" on other, unspecified dates. *Id.* ¶ 87. The Court should exclude his "report" and testimony regarding bitcoin "prices" because (1) his opinion about 2019 bitcoin prices is irrelevant, (2) he is not qualified to testify regarding damages, and (3) even if he were qualified, he did no market analysis to determine the realized value of the purported bitcoin to which plaintiffs believe that they are entitled.

As a threshold matter, Antonopoulos does not explain why he chose to give us the purported price for bitcoin as of December 3, 2019. He provided no explanation for this or any supposed relevance of that date, which is not helpful to the trier of fact.

Moreover, he is not qualified to testify as to damages. He admitted that he is not an economist and has only a very basic understanding of economics. *See* A. Antonopoulos Depo. Tr. 250:15-251:19, January 7, 2020, attached as **Exhibit F**. In this case involving bitcoin, which has significant liquidity issues, is highly volatile, and whose price varies on different markets,[8] it is necessary to have a background in complex economic analysis to testify about the price of bitcoin. *Cf. Sloan Valve Co. v. Zurn Indus., Inc.*, 2013 WL 5645353, at *8-9 (N.D. Ill. 2013)

---

[8] *E.g. SEC v. Shavers*, 2014 WL 4652121, at *1 (E.D. Tex. 2014) ("Since its introduction in 2009, bitcoin's value has been volatile, ranging from less than $2 per bitcoin to more than $1,200 per bitcoin."); "Here's Why Bitcoin Prices are Different on Each Exchange," available at https://www.cnbc.com/2017/12/12/why-bitcoin-prices-are-different-on-each-exchange.html.

(excluding expert witness testimony, because the witness "may have decades of experience in the flush valve industry, [but] he is not an economist and does not have any experience in conducting economic analyses."). Such qualifications are unusually important where, as here, plaintiffs seek a large amount of bitcoin whose liquidation would significantly affect bitcoin values across the many markets where it is traded. *See* W. Choi Rebuttal Report, April 17, 2020, attached as **Exhibit H**.

With no expertise in economics, let alone financial markets, Antonopoulos simply copied and pasted an inadmissible internet website's listing of bitcoin price as of December 3, 2019, while failing to verify any of the purported data on which that website relied. *See* Ex. F at 249:10-15. He did not know whether that data was "actionable" because he testified it was dependent on many factors such as market conditions, liquidity, and market movements. *Id*. at 249:16-21. Even if he were qualified to testify about these purported factors, and even assuming that an actual economist would agree that an analysis of these factors could provide a reliable price, it would make no difference, because Mr. Antonopoulos never performed any analysis to determine the actual realized value of a bitcoin transaction at any point in time. *Id*. The Court should not allow Mr. Antonopoulos to "guesstimate" plaintiffs' damages.

### B.    *Antonopoulos has a deeply rooted bias against Dr. Wright*

Mr. Antonopoulos should be prevented from testifying because he has made chronic, derogatory and defamatory statements about Dr. Wright in public forums, including his personal assessment of Dr. Wright's credibility (referring to him as a con artist and Faketoshi), prior to being engaged as an "expert" by plaintiffs.

For instance, when Gavin Andresen wrote on May 2, 2016 that he believed Dr. Wright was the creator of Bitcoin, after receiving proof from Dr. Wright being criticized for that belief

and acceptance of that proof, Antonopoulos tweeted on May 5, 2016: "Avoid schadenfreude. Con artists can fool even the smartest people. What happened to Gavin and Jon could happen to anyone." Ex. F at Ex. 30. In a podcast, he and his co-host repeated purported rumors that Dr. Wright was a fraud who had "produced fraudulent proofs of their identity as Satoshi . . . They produced a forged signature." Ex. F at Tr. 170:5-171:6. Then, on November 16, 2018, he tweeted this in response to a tweet about Dr. Wright's possession of the @satoshi Twitter account: "LOL. Every message Faketoshi writes disproves his attempted fraud…" (Ex. F at Ex. 32). He again calls Dr. Wright Faketoshi near the end of the tweet. *Id.*[9]

To allow this person to testify as if he were an expert, with the Court's imprimatur as an expert, would amount to allowing him to testify as to Dr. Wright's character and credibility, which would be impermissible even if he were a qualified expert.[10] It also would present Dr. Wright with a "choice" between useless cross-examination demonstrating Antonopoulos' bias outside the jury's hearing, or cross examination that would damage his credibility by letting the jury hear the "Faketoshi" comments, which would amount to impaling himself on Morton's Fork.[11]

---

[9] While during his deposition, Mr. Antonopoulos either did not recall who he was referring to in the tweets or made semantic statements about referring to an account, instead of the person being associated with the account (namely defendant) (Ex. F at 162:21-166:11, 172:16-176:16), the context of the tweets makes clear that he was referring to defendant.

[10] It is blackletter law that "experts may not opine on credibility. Credibility is an issue for the jury." *United States v. Barnard*, 490 F.2d 907, 912-13 (9th Cir. 1973). Indeed, in this Circuit, "[w]itness credibility is the sole province of the jury." *Snowden v. Singletary*, 135 F.3d 732, 739 (11th Cir. 1998). "As such, '[c]redibility is not a proper subject for expert testimony; the jury does not need an expert to tell it whom to believe, and the expert's stamp of approval on a particular witness' testimony may unduly influence the jury.'" *Dugas v. 3M Co.*, 2016 WL 7327666, at *7 (M.D. Fla. Mar 30, 2016) (quoting *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)).

[11] A Morton's Fork is "a choice between two equally unpleasant alternatives." *Centennial Bank v. Adams St. Lofts, LLC*, 2013 WL 12161864, at *2 (N.D. Fla. 2013) (internal quotations

Moreover, for nonscientific expert testimony, "the trial judge must have considerable leeway in deciding . . . whether particular expert testimony is reliable[]." *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009). Thus, in evaluating nonscientific experts' testimony, their bias is an element to consider in evaluating the proposed testimony's reliability. *E.g., Hall v. C.I.A.*, 538 F. Supp. 2d 64, 73 (D.D.C. 2008) ("[T]he necessity of having the expert testify is driven by the need to have the benefit of his specialized expertise. Central to that equation is the presumed objectivity of the expert; an expert with a partisan axe to grind is of no use to the finder of fact and becomes just another advocate for a party."). Here, Mr. Antonopoulos's public statements about Dr. Wright's character and credibility undermine the reliability of his proposed testimony.

### C.    *Antonopoulos Report's Section Chronicling Public Statements of Satoshi Nakamoto Will Not Be Helpful to the Jury*

Mr. Antonopoulos chronicles certain communications that he believes were authored by Satoshi Nakamoto and certain bitcoin transactions that he believes were made by Satoshi. Ex. E at sec. XI. But Mr. Antonopoulos concedes that he doesn't know who (or how many people) Satoshi is/are. A. Antonopoulos Depo. Tr. at 33:15-34:21, 55:5-9, 57:6-16, 65:14-22, April 24, 2020, attached as **Exhibit G**. All he knows is that Satoshi "is one or more humans" (*Id.* at 54:22-55:13), and Antonopoulos' "methodology" consists of reading unidentified emails that he found in the public record and regurgitating their contents. *Id.* at 49:24-50:8, 52:13-53:25, 74:11-75:5.

---

omitted). "Morton's Fork, the Oxford English Dictionary explains, was: [Archbishop of Canterbury, Cardinal, and Minister of Henry VII] John Morton's (supposed) method of levying forced loans by arguing that those who were obviously rich could afford to pay, and those who lived frugally must have amassed savings.... Hence in extended and allusive use [it is]: a practical dilemma, [especially] one in which both of the choices or alternatives available disadvantage or discredit the chooser." *United States v. Johnson*, 482 F. App'x 137, 145 n. 14 (6th Cir. 2012) (citing Oxford English Dictionary (Online Ed., March 2012)).

In fact, Mr. Antonopoulos simply provides a timeline of Satoshi Nakamoto communications with no analysis or connection to any opinion he renders. This is not helpful to the jury.

First, reading unidentified emails found online that one believes to be from someone and "opining" on their contents is not a reliable methodology (or any methodology at all), especially when one doesn't know who Satoshi is/are. Second, the jury is quite capable of reading emails and forming their own conclusions. No expert is needed to tell jurors what an email says.

### D. Plaintiffs Should Not Be Permitted to Use Mr. Antonopoulos' Report And Testimony As a Backdoor Through Which to Introduce Inadmissible Non-Evidence Of Purported Bitcoin Prices

The Federal Rules of Evidence do not permit the admission of inadmissible evidence "on the *pretense* that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements *other than transmitting them to the jury.*" *Gulf Underwriters Ins. Co. v. Margaret and Kenneth Heath*, 2006 WL 2319140, *1 (S.D. Fla. 2006). Mr. Antonopoulos "analyzed" and relied on documents from an anonymous source that cannot be authenticated (Ex. E at sec. XII), in an attempt to improperly present inadmissible evidence. As plaintiffs well know, but apparently didn't tell Mr. Antonopoulos, the "CW" and "DK" lists were received anonymously in encrypted form and were decrypted using information also received anonymously. For that reason, the lists cannot be authenticated and are inadmissible. The last section of the Antonopoulos' "report," discussing a message connected to a particular bitcoin address that Dr. Wright never claimed to have mined, is inadmissible, unauthenticated hearsay because its author's identity cannot be determined. The message purportedly was "created on or before May 4th 2019" and states "Address [bitcoin address] does not belong to Satoshi or to Craig Wriight. Craig is a liar and a fraud." Ex. E at p. 30. To assert that this is a "basis" document for the Antonopoulos "report" is an attempt to use that "report" as a backdoor through

which to introduce inadmissible evidence, further smear Dr. Wright and improperly attack his credibility.

Moreover, "[n]o expert worth his salt would base his opinion on internet and documentary sources without assuring himself that they are reliable." *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 716 (7th Cir. 2008) (concurring opinion). Since these materials cannot be authenticated and their reliability cannot be ascertained, plaintiffs are not permitted to use the Antonopoulos "report" as a backdoor through which they come and are presented to the jury in so-called "expert testimony." Rule 703 "cannot be used as a backdoor to get evidence before the jury." *Chayegan v. L'Oreal, S.A.*, 2004 WL 1714040 (S.D.Fla. 2004); *accord In re Lake States Commodities, Inc.,* 271 B.R. 575, 585 (Bankr. N.D. Ill. 2002) (Otherwise inadmissible evidence relied upon by an expert "is not somehow transmogrified into admissible evidence simply because expert relies on it.").

### 4.     Mr. Stefan Boedeker

Mr. Boedeker opines that defendant's list of public addresses was "manipulated" because Mr. Boedeker observed "gaps" in the transaction IDs. This conclusion rests on the premise that SHA 256 hashes and bitcoin transaction IDs are always randomly evenly distributed across their range. Yet, Mr. Boedeker has no expertise in SHA 256 hashing or bitcoin, and thus, he has no basis to establish the baseline of his analysis, *i.e.,* what a list of bitcoin transaction IDs should look like. Further, the bitcoin transactions that would fill in the "gaps" are in fact a matter of public record. They exist on the bitcoin blockchain. Mr. Boedeker makes no attempt to analyze those bitcoin. S. Boedeker Depo. Tr. 40:23-42:5, April 22, 2020, attached as **Exhibit J**. He simply concludes that because there is a "gap" on defendant's list of bitcoin, that there was some sort of "manipulation." *Id.* at 42:15-21. That conclusion is unsupported.

As noted above, Mr. Boedeker has no expertise in SHA 256 hashes or the hashing process. In fact, in his report, he simply presumes that SHA 256 hashes are always randomly evenly distributed across their range because "any good cryptographic hash ought to have these properties."[12] S. Boedeker Expert Declaration at 6, April 10, 2020, attached as **Exhibit I**. That presumption is based on an e-book and a class handout that Mr. Boedeker found through a Google search. Ex. J at 71:5-79:1; 103:6-104:1. Unsurprisingly, Mr. Boedeker was unable to establish that those sources are authoritative and appropriate to rely on.

Mr. Boedeker was unaware of the credentials of the professor who is presumed to have prepared the handout, nor was he able to identify what course the professor taught (Ex. J at 111:21-112:22) and he knew nothing about the e-book's author or his expertise. Ex. J at 184:9-22.

But more to the point, the handout never even mentions the SHA-256 hash, nor does it conclude that a hash output should be randomly uniformly distributed. *Id.* at 112:23-114:16.[13]

Also, as noted above, Mr. Boedeker is wholly unqualified to establish whether transaction IDs should be randomly evenly distributed across their range. He doesn't know anything about bitcoin mining or the data that serves as the input for the bitcoin transaction IDs.

---

[12] While Mr. Boedeker also states in his report that he "tested the hypothesis that that [sic] SHA-256 hashes are approximately uniformly randomly distributed over their fully range and independent," he "clarified" in his deposition that he only tested that hypothesis on Dr. Wright's list of bitcoin. Ex. J at 99:10-100:20. But that would actually result in the opposite conclusion—that the transaction IDs are not uniformly distributed across their full range—as Boedeker later finds that defendant's bitcoin addresses have a gap in the transaction IDs. *Id.* at 100:21-101:3.

[13] Further, had Mr. Boedeker spent a bit more time googling, he would have noticed that his presumption was far from assured. *See e.g.*, https://michiel.buddingh.eu/distribution-of-hash-values; https://sensepost.com/blog/2017/a-distinguisher-for-sha256-using-bitcoin-mining-faster-along-the-way/; https://pdfs.semanticscholar.org/0e24/c64245fa9783319fbb958ee0e96443c73359.pdf.

Ex. J at 19:20-23:12. As such, he didn't consider whether somebody who is mining on the Bitcoin blockchain could prefer certain transaction IDs (Ex. J at 104:13-17), nor did he consider whether one would expect to find an uneven distribution of data if a miner chose to only mine bitcoin with certain transaction ranges. *Id.* at 104:18-111:3.[14]

Plaintiffs attempt to fix this fatal flaw by filing a supplemental opinion the day after Mr. Boedeker was deposed (and when the many flaws in his opinions were exposed). But the supplemental report is untimely, and it still does not cure Boedeker's lack of expertise as to SHA-256 hashing, the bitcoin mining process, and his inability to conclude as a matter of fact that something was manipulated.

In the supplemental report, Mr. Boedeker states that he analyzed the Shadders' List[15] and can thus conclude that SHA 256 hashes and transaction IDs are randomly evenly distributed across their range. S. Boedeker Supplemental Report at 4, April 23, 2020, attached as **Exhibit K**. But Mr. Boedeker fails to consider that the Shadders List may not be representative of all mined bitcoin. He also fails to consider that while bitcoin mined by different miners may look randomly evenly distributed when aggregated on one list, that does not mean the bitcoin mined by each of the individual miners follows that pattern.

Mr. Boedeker is simply not qualified to opine that data was "manipulated." Mr. Boedeker is a statistician, not a hashing expert or a determiner of fact. As such, while he may be qualified

---

[14] Though, were one to rely on google research, it appears that it would not be a novel concept. *See*: https://github.com/jgarzik/cpuminer/issues/82; http://availableimagination.com/exploiting-ripple-transaction-ordering-for-fun-and-profit/; https://patents.google.com/patent/US20150269570A1/en

[15] The Shadders List is a list of bitcoin public addresses from the blockchain that met certain criteria and was an effort to provide an over-inclusive probabilistic list of Dr. Wright's mined bitcoin prior to him gaining access to the list of mined bitcoin that he produced in January 2020.

to testify whether a list of transaction IDs is (or isn't) randomly evenly distributed across its range,[16] he isn't qualified to testify whether the list *in fact should have been* randomly evenly distributed across its range, nor is he qualified to testify as a matter of fact that because something isn't evenly distributed across its range that it is "manipulated."

This is demonstrated by Mr. Boedeker's inability to provide any specifics as to the claimed "manipulation." He doesn't know how it happened, when it happened, or who caused it to happen. Ex. J at 36:18-38:1. The Court should not permit Mr. Boedeker to provide any testimony that goes beyond pure statistics, but he does not purport to provide pure statistics.

As for the untimeliness of Mr. Boedeker's supplemental report, that too is sufficient basis for the Court to strike the opinions contained within it. Federal Rule of Civil Procedure 37(c)(1) "instructs that where 'a party fails to provide information . .. as required by Rule 26(a) or (e), *the party is not allowed to use that information or witness . . . unless the failure was substantially justified or harmless*." *All-Tag Corp. v. Checkpoint Sys., Inc.*, 408 F. Supp. 3d 1347, 1353 (S.D. Fla. 2019) (emphasis added).

Plaintiffs' untimely disclosure of the supplemental opinions was neither justified nor harmless. There is no valid reason why Mr. Boedeker could not have timely disclosed the all of his opinions by the April 10, 2020 deadline, before rebuttal reports were due and counsel deposed him on opinions that would later be modified and supplemented. *See Cook v. Royal Caribbean Cruises, Ltd.*, 2012 WL 2319089, at *3 (S.D. Fla. 2012) ("Because Defendant has already taken the depositions of these two experts and does not now have the ability to . . . to arrange for supplemental opinions from its own witnesses, permitting Plaintiff to use these

---

[16] An expert statistician is not needed to show the jury that some transaction ranges don't have transaction IDs. Reading and counting are well within the abilities (and responsibilities) of jury members, not the subject of expert testimony.

supplemental expert witness opinions would unduly prejudice Defendant."). Mr. Boedeker bases

the supplemental opinions on additional analysis that he conducted on a file named the

"Shadders List," but plaintiffs have possessed that file for nine months, and Mr. Boedeker had

the Shadders List when drafting his original April 10, 2020 report. Ex. J at 60:8-14. Plaintiffs

evidently made a strategic decision to not have Mr. Boedeker timely analyze that file or offer an

opinion on it. *Id.* at 57:8-58:16. They should now be required to live with that decision.

**5.     Dr. Robert Leonard**

Plaintiff's proffered expert, Dr. Robert Leonard, is a Professor of Linguistics at Hofstra

University. *See* R. Leonard Report, April 10, 2020, attached as **Exhibit L**.

Dr. Leonard opines on whether a handful of documents consisting of e-mails that Dr.

Wright has denied authoring (i.e., the "questioned" or "Q" documents) have "language patterns"

that are consistent with certain e-mails known to have been authored by Dr. Wright (i.e., the

"known" or "K" documents). Dr. Leonard claims that he conducted an "authorship analysis by

posing competing hypotheses" and determining "which hypothesis best explains the non-random

distribution of language data." *Id.* He goes on to provide three competing hypotheses and decides

on Hypothesis 1, that is, "the language patterns of the Q documents are consistent with the

language patterns found in the documents known to have been written by Dr. Wright." *Id.*

Dr. Leonard bases his opinion and methodology on "pattern analysis," in which he

examines small portions of text and selects certain textual features that he refers to as "linking

features." Ex. L at 6, 8. In his report, Dr. Leonard identifies twelve such "linking features." Ex. L

at 9. Notably, most of these features are not particularly rare or distinctive, and are largely

standard, high frequency expressions in the use of the English language.

## A.     Dr. Leonard's Report is Not Based on Sufficient Facts or Data

Federal Rule of Evidence 702 requires an expert's testimony to be based on sufficient facts or data. The entire data set on which Dr. Leonard relies is miniscule. Of the millions of words available in this case through production of documents, Dr. Leonard's report analyzes approximately 4,200[17] words in the *known* documents, and less than 4000 words in the *questioned* documents, *see* Ex. L at 6. Dr. Leonard does not make any effort to explain why this small data set for the *known* documents is sufficient for conducting his analysis, nor does he indicate in his report that the data set utilized by him is a representative sample. This brings into question the reliability of the method utilized by Dr. Leonard.

An extension of this problem presents itself in the number of occurrences of Dr. Leonard's linking features in the data set. Although Dr. Leonard claims that his analysis is based on the aggregate of the twelve linking features identified in his report, it should be noted that the frequency of the occurrences that he cites for each linking feature is barely significant. For example, *four out of Leonard's twelve linking features have less than three occurrences*[18] in both the known and the questioned documents. Additionally, four out of Dr. Leonard's twelve linking features have more than twice as many occurrences *in the questioned documents than in the known documents* which would suggest inconsistent patterns, but rather than explaining this trend Dr. Leonard ignores it.

Further, Dr. Leonard claims that none of the "linking features" standing alone might be probative, but that together they form a distinctive pattern. R. Leonard Depo. Tr. 51:12-20, April 24, 2020, attached as **Exhibit M**. However, if Dr. Leonard is relying on the aggregate, it flows

---

[17] The total word count stated in table 3 of the R. Leonard Report is 4,360; however, Tag2.jpg and Tag3.png were not considered. *See* Ex. M at Ex. G.

[18] Ex. L at sec. VI, ¶¶ 1, 3, 7, 9.

that the aggregate can only be as "probative" as the strength (or weaknesses) of its individual components, and there is no evidence that the resulting aggregate here has any deterministic connection to the conclusion.

> **B.**    **_The Leonard Report and Testimony Do Not Meet the Requirements of Rule 702 or the Reliability Standard of Daubert_**

There are fundamental issues with Dr. Leonard's method. As noted by Dr. William G. Eggington[19], that although Dr. Leonard's report does not reference a method known as "forensic stylistics," the method used by Dr. Leonard in fact "consists of applying forensic stylistics."[20] Dr. Carole E. Chaski, a leading forensic linguist, has pointed out various shortcomings of forensic stylistics, one in particular is that it does not offer a standard reference set of stylemarkers to be reviewed in each case. This, according to her, is:

> …especially important because it means that the method allows the examiner to pick and choose stylemarkers without predictability.  *This fundamental methodological flaw enables a host of problems, all rooted in subjectivity.*  On the one hand, it is essentially impossible to replicate a forensic stylistics analysis, while on the other hand, it is always possible to find an alternative analysis and opposing conclusion.  This is the dilemma of any 'pick and choose' method.

Carole E. Chaski, *Best Practices and Admissibility of Forensic Author Identification*, 21 J.L. & Pol'y 333, 363 (2013) (emphasis added).

Additionally, forensic authorship analysis of this type has drawn criticism from other forensic linguists. Professor Ronald Butters, retired President of the International Association of Forensic Linguists, has complained that "forensic authorship attribution lacks not only a set of

---

[19] Dr. William G. Eggington is defendant's rebuttal expert who has submitted a report in response to Dr. Leonard's report. W. Eggington Rebuttal Report, April 17, 2020, attached as **Exhibit N**. It is defendant's position that none of Dr. Leonard's testimony is appropriate or necessary for trial.

[20] Ex. L at ¶ 21.

agreed understandings about methodology but also lacks, and is in need of, standards sufficient to ensure the exclusion of bogus conclusions based on inadequate data."[21]

The above analysis is key as it goes directly to the heart of the methodology employed by Dr. Leonard in his report and demonstrates that it is not a product of a reliable method. Dr. Leonard does not specify, in precise terms, the methodology or guidelines utilized by him in identifying and selecting each linking feature other than a one-sentence explanation that "linking features represent similar instances of variation of language use in more than one data set." Ex. L at 8. Further, Dr. Leonard does not cite to any standards controlling the methodology that he has implemented in his report, nor does he identify any parameters as to the reliability and validity of his "linking features." Within the analysis for each "linking feature", there appear scant references to the fact that Dr. Wright speaks Australian English.[22] There are a projected 25,677,778 individuals who live in Australia,[23] and even more living abroad, and a substantial percentage of them are speakers of Australian English. In citing to the use of Australian English, Dr. Leonard attempts to provide a brush of validity to his flawed methodology by referencing the Australian English subcorpus in the GloWbE database.[24]

Dr. Leonard has cherry-picked textual features, without stating why, and this presents another methodological flaw.[25] As noted by Dr. Eggington in his report, "by selecting

---

[21] Lawrence M. Solan, *Intuition Versus Algorithm: The Case of Forensic Authorship Attribution*, 21 J.L. & Pol'y 551, 554 (2013).

[22] Ex. L at sec. VI, ¶¶ 1, 2, 3, 10.

[23] https://www.abs.gov.au/ausstats/abs%40.nsf/94713ad445ff1425ca25682000192af2/164750 9ef7 e25faaca2568a900154b63?OpenDocument (last accessed on May 4, 2020).

[24] GloWbE refers to the Corpus of Global Web-Based English database located at https://www.english-corpora.org/glowbe/

[25] "High-level features of language (such as markers of authorial intent or stance) are sufficiently subjective so that there can be substantial disagreement about how to assess the

determinative style markers, [Dr.] Leonard … disregards substantial sociolinguistics variation research which indicates that adult speakers and writers of any language have a repertoire of genre and register styles available to them that vary according to cultural and situational contexts involving the norms of the speech, or discourse community one is addressing, the topic one is writing about, the relationship between writers and their audience, and the mode or vehicle of transmission (e.g., spoken, written, telephone, email, text)."[26] Other than certain exclusions noted on page 8 of Dr. Leonard's report for documents that were likely to have been "co-authored," "edited (the blog posts)," or those "dissimilar in language type," his report does not identify any cultural or situational contexts which linguists have shown to contribute significantly to individual variation in language behavior.

Dr. Leonard's analysis is also plagued by a confirmation bias. A confirmation bias is defined as "the seeking or interpreting of evidence in ways that are partial to existing beliefs, expectations, or a hypothesis at hand."[27] Such confirmation bias can play a role in forensic linguistic analysis.[28]  In his report, Dr. Leonard opines that language patterns in a handful of questioned documents (those that Dr. Wright denies having authored) are consistent with

---

significance of a noticed feature, or even whether it is a feature at all.  If one of the hallmarks of a reliable forensic science is that its analytic processes are objective and its results independently reproducible by other forensic experts, courts will be stymied in appropriately assessing techniques that are inherently dependent on the perspicuity of the analyst rather than by objective testing." Janet Ainsworth & Patrick Juola, *Who Wrote This?: Modern Forensic Authorship Analysis As A Model for Valid Forensic Science*, 96 Wash. U.L. Rev. 1159 (2019).

[26] Here, it is important to note that Dr. Leonard *does not refer* to the method used in his report as "forensic stylistics," even though his method is similar, if not identical, to the known parameters of forensic stylistics. *See* Ex. N at ¶¶ 14-15, 21.

[27] Raymond S. Nickerson, *Confirmation Bias: A Ubiquitous Phenomenon in Many Guises*, 2 Rev. Gen. Psychol. 175-220 (1998).

[28] Lawrence M. Solan, *Intuition Versus Algorithm: The Case of Forensic Authorship Attribution*, 21 J.L. & Pol'y 551, 555–56 (2013).

language patterns found in the known documents (a handful of documents that he was told were known to be authored by Dr. Wright). Immediately apparent in Dr. Leonard's report is a confirmation bias in that there is no suggestion anywhere in the report that Dr. Leonard considered (and rejected) any alternative hypotheses. Dr. Leonard ignores evidence that tends to support the alternative hypotheses, namely Hypothesis 2 (that the language patterns were inconsistent between the Q and the K) and Hypothesis 3 (that the data was insufficient to reach a conclusion either way); *for example*, Dr. Eggington discusses the analysis of Leonard's fifth "linking feature" stating "Leonard claims that exemplars consisting of one, two or three items are indicators of the Q documents being written by Craig Wright, then surely a 2K/17Q imbalance indicates that Dr. Craig Wright did not write the Q documents." Ex. N at ¶ 27(e).

For the reasons set forth above, the method utilized by Dr. Leonard fails to meet the requirements of Federal Rule of Evidence 702 or the reliability standard of *Daubert*.

### C. *Leonard's Testimony Should Be Precluded Because it Will Serve to Mislead or Confuse the Jury.*

Under Rule 403, exclusion is appropriate "if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury." *Frazier,* 387 F.3d at 1263. A critical question here is whether Dr. Leonard's report, in light of its unreliability, offers any probative value. This in turn leads to the question of whether the proposed expert testimony is even "relevant to the task at hand," i.e. how "it logically advances a material aspect of the proposing party's case." *Allison*, 184 F.3d at 1312. In taking a closer look at Dr. Leonard's report, one fails to see how his opinion and analysis contribute to any material aspect of plaintiffs' case. The only apparent objective in plaintiffs offering this evidence is to improperly suggest to the jury that Dr. Wright is the author of the questioned documents, and to showcase their skewed version of the case using Dr. Leonard as a conduit for same.

If allowed to testify, Leonard's imprecise opinion, slender methodology and even leaner data set will serve to mislead and confuse the jury, particularly where the only apparent purpose of Dr. Leonard's opinion is to question the credibility of Dr. Wright. In his report, Dr. Leonard concludes that "the language patterns in the Q documents are consistent with the language patterns found in the Known documents of Dr. Wright,"[29] thus suggesting that Dr. Wright's denial that he authored the questioned documents is false. Any probative value of Dr. Leonard's pattern analysis is outweighed by its clear potential of misguiding the jury.

## **CONCLUSION**

For all of the foregoing good and sufficient reasons, Dr. Wright respectfully requests that the Court grant this motion to exclude the opinion testimony of plaintiffs' expert witnesses.

## **S.D. FLA. L.R. 7.1 CERTIFICATION**

In accordance with S.D. Fla. L.R. 7.1(a)(3), counsel for Dr. Wright has conferred with plaintiffs' counsel. Plaintiffs have objected to the relief requested here.

Respectfully submitted,

RIVERO MESTRE LLP
*Attorneys for Dr. Craig Wright*
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: amcgovern@riveomestre.com
Email: arolnick@riveromestre.com
Email: bpaschal@riveromestre.com
Email: zmarkoe@riveromestre.com
Secondary: receptionist@riveromestre.com

By: s/ Andres Rivero
ANDRES RIVERO
Florida Bar No. 613819

---

[29] Ex. L at 6.

AMANDA MCGOVERN
Florida Bar No. 964263
ALAN H. ROLNICK
Florida Bar No. 715085
BRYAN L. PASCHAL
Florida Bar No. 091576
ZAHARAH MARKOE
Florida Bar No. 504734

## CERTIFICATE OF SERVICE

I certify that on May 8, 2020, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record either by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

/s/ Andres Rivero
ANDRES RIVERO