UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:18-cv-80176-BB

EXPERT REPORT OF GORDON L. KLEIN

April 10, 2020

I.  **Qualifications**

1. I am over the age of eighteen (18), not a party to this action, and currently reside in California. My education and experience fully qualify me to make the statements contained in this Report.

2. I am a faculty member at UCLA's Anderson School of Management, where, since 1981, I have taught 15 different courses in the undergraduate program and MBA program in financial and management accounting, entrepreneurship, financial statement analysis, taxation, enterprise valuation, profit forecasting and measurement, business plan development, closely-held business management, venture capital, financing transactions, goodwill valuation, and general business law, including partnership and LLC formation, operation, dissociation, and fiduciary duties.

3. I was a faculty member from 1987 to 2000 at UCLA's School of Law, where I taught courses in accounting, damages calculation, taxation, and financial analysis in the legal process. I taught similar courses as an Adjunct Professor in the LLM in Taxation Program at Loyola Law School in Los Angeles, California, during fall 2001 and 2002.

4. I am a member of the California Bar (inactive), admitted in 1980, and a Certified Public Accountant ("CPA"), registered in the state of Illinois in 1976. I have conducted executive education seminars in financial and tax aspects of business management for, among other entities, partners at PricewaterhouseCoopers, members of the German Bundestag governing body, and the Finance Committee of the People's Republic of China. I have trained in excess of 8,000 CPA candidates to become CPAs in the state of California, and I have conducted training seminars for all of the Big 4 CPA firms. I have authored course materials utilized by UCLA law and MBA students in various courses in accounting, taxation, business law, and entrepreneurship. These courses cover, among other topics, business plan development, profit forecasting, goodwill measurement, business valuation, and asset and funds tracing.

5. I have authored several books on accounting, taxation, related party transactions, business ethics, trustee's duties, and fiduciary duties. I also have authored course materials on the formation and operation of partnerships under the Uniform Partnership Act and the Revised Uniform Partnership Act. I earned a B.B.A. from the University of Michigan Business School in 1976, graduating Phi Beta Kappa, and I earned a J.D. from the University of Michigan Law School in 1979.

6. My full curriculum vitae is attached as Appendix A.

7. I have served as an arbitrator through the auspices of the American Arbitration Association, served as a Superior Court referee, and served as an expert witness in numerous cases in Federal District Court, U.S. Tax Court, the Delaware Court of Chancery, various California Superior Courts, and Superior Court in Australia. These matters related to, among other subjects, partnership valuation, the scope of a partnership's activities, the usurpation of a partnership opportunity by one of the partners

        in a partnership, a partner's breach of fiduciary duties, tax return preparation, taxpayer penalties, related party transactions, fraudulent conveyances, fraud schemes, and Australian principles of accounting, taxation, and valuation.

8. I have been a partner in various general partnerships in the fields of publishing, data transmission technology, social media, and electric vehicle charging station installation. Additionally, I have been adviser to numerous start-up joint business ventures.

9. In addition, I have substantial experience as a derivatives trader and consultant in analyzing the business models and financial performance of closely held businesses and entrepreneurs.

10. Matters in which I have provided testimony at either deposition or trial or in which I have submitted an expert report during the past four years are listed in Appendix B.

## II. SCOPE OF ASSIGNMENT

11. I have been asked by counsel for Ira Kleiman as personal representative of the Estate of Dave Kleiman and W&K Info Defense Research LLC, which are suing Dr. Craig Wright ("Wright"),[1] to examine the evidence and opine on whether the course of conduct and communications between Dave Kleiman, Wright, and other relevant parties is consistent with a partnership and/or joint venture having been formed by Kleiman and Wright. I was asked to analyze the information based on my education, knowledge, experience, and training, as summarized above and in my curriculum vitae. I have not been asked to give a legal opinion and do not purport to give one herein.

12. I am being compensated at my normal and customary rate of $990 per hour and am being assisted in this matter by professionals from Compass Lexecon working under my direction. My compensation is not contingent upon the outcome of this matter.

## III. SUMMARY OF OPINION

13. Based on my review of the documents I have considered, which are listed in Appendix C, as well as my own education, knowledge, experience, and training, I have reached the following opinion:

    - The conduct of and communications by and between Dave Kleiman, Wright and other parties, including but not limited to communications by and between Wright (and those associated with him) and the Kleiman family following Dave Kleiman's death, communications with governmental entities, communications with third parties and public statements and writings by Wright, are consistent with and indicative of a partnership and/or joint venture between Dave Kleiman and Wright. For ease of reference, I refer to this venture as the Satoshi Nakamato Enterprise ("SN Enterprise"). The SN Enterprise appears to have been formed for multiple

---

[1] Second Amended Complaint and Jury Demand, Ira Kleiman v. Craig Wright, United States District Court Southern District of Florida, Case No.: 9:18-cv-80176-BB, January 14, 2019. (Hereafter "Second Amended Complaint")

purposes, including the mining of bitcoin and the development of software and intellectual property related to bitcoin and blockchain technologies.

### IV. BACKGROUND ON SATOSHI NAKAMOTO AND THE BEGINNINGS OF BITCOIN

14. To put the business relationship between Wright and Dave Kleiman into context, a review of the history of Bitcoin and Satoshi Nakamoto is helpful.

15. On October 31, 2008, a message from "Satoshi Nakamoto ("Satoshi")" was posted to The Cryptography Mailing List.[2] In this message, Satoshi wrote "I've been working on a new electronic cash system that's fully peer-to-peer, with no trusted third party" and Satoshi also provided a link to a paper titled "Bitcoin: A Peer-to-Peer Electronic Cash System" ("Bitcoin White Paper").[3] On January 3, 2009, the first activity was recorded on the Bitcoin blockchain – 50 bitcoins were mined and were recorded in Block 0.[4] Five days later, on January 8, 2009, Satoshi posted another message to The Cryptography Mailing List stating, "Bitcoin v0.1 released."[5] In doing so, Satoshi welcomed others to download the Bitcoin software, join the Bitcoin network, and mine bitcoin. On that same day, a second block was added to the Bitcoin blockchain (Block 1), and the Bitcoin blockchain has continued to grow up to the present.[6]

16. Since 2009, the most famous mystery in the Bitcoin community has been "who is Satoshi?".[7] However, that question is actually shorthand for a series of questions that include "was Bitcoin created by an individual or a team?", "who controlled the Satoshi Nakamoto Cryptography Mailing List account?", "who wrote the Bitcoin White Paper?", "who wrote the Bitcoin software?", and "who mined the first 50 bitcoins in Block 0?", among others. Wright has claimed to be one of the creators of Bitcoin and has acknowledged that Dave Kleiman was his partner in these efforts.[8]

### V. GUIDEPOSTS CONSISTENT WITH AND INDICATIVE OF THE FORMATION OF JOINT BUSINESS RELATIONSHIPS

17. Based on my decades of professional experiences in academia, as a consultant to start-up and development-stage businesses, and as an active co-participant in such businesses, I

---

[2] "Bitcoin P2P e-cash paper," email from "satoshi at vistomail.com," October 31, 2008; http://www.bitcoin.org/bitcoin.pdf.
[3] "Bitcoin P2P e-cash paper," email from "satoshi at vistomail.com," October 31, 2008; http://www.bitcoin.org/bitcoin.pdf.
[4] Second Amended Complaint, ¶ 31; https://www.blockchain.com/btc/block/0.
[5] "Bitcoin v0.1 released," email from "satoshi at vistomail.com," January 8, 2009.
[6] https://www.blockchain.com/btc/block/1.
[7] https://news.bitcoin.com/satoshi-nakamoto-founder-of-bitcoin/
[8] Media Training Session 1, March 18, 2016, pp. 1, 6–7, 16, 20. (DEF_00172528–555 at 528, 533–4, 543, 547) I understand that this document was attached to an email from Nick Caley to Craig Wright saying that it was "notes and transcripts from the first two media training session [sic]" in preparation for Craig's revealing himself as Satoshi. (DEF_00172509); Andrew O'Hagan, "The Satoshi Affair: Andrew O'Hagan on the many lives of Satoshi Nakamoto," Exhibit 1 to Second Amended Complaint.

am aware of various characteristics, or guideposts, that commonly are present in, and indicative of the formation of, a partnership and/or joint venture.

18. Although not all partnerships and/or joint ventures will exhibit each such guidepost, my education, training, and experience allow me to identify and analyze the presence or absence of such guideposts and render an opinion concerning whether the set of guideposts present is consistent with, and indicative of, a joint business relationship having been created.

19. One such guidepost is the joint pursuit of a common goal or set of interrelated goals. Typically, this goal is to achieve financial rewards for the co-participants. In addition, the co-participants may want to pursue nonmonetary rewards, such as a sense of pride in accomplishing a task or improving society. As an example, the first business partnership that I started, called Westin Communications, was focused on not only achieving financial rewards for my partner and me, but also achieving personal fulfillment from providing valuable business information that would assist business students and aspiring entrepreneurs in being more successful in their business and professional lives. Other joint enterprises in which I have been a partner have focused on nonmonetary pursuits in addition to financial ones, such as providing acne care to individuals who cannot afford visits to a dermatologist and assisting older family members to bond more closely with younger relatives who live in distant geographic areas.

20. This guidepost often is accompanied by the development of a trade name or trademark that reflects the unity of goals or purpose being pursued. Such a guidepost provides a single word or phrase that makes a jointly owned business more readily identifiable to the target audience as being a distinct unit separate from its individual co-contributors. A recent business partnership co-founded by me, for example, selected the trade name "Stop My Pimples" and the related domain name "stopmypimples.com" to identify our activities and purpose with a clear, identifiable name.

21. When individuals establish a joint endeavor, a common guidepost for them is to select co-venturers who provide complementary skills in the hope of creating synergistic results. For example, when I started a business focused on the installation of tax-subsidized electric vehicle charging stations, I selected a partner who had the energy and self-confidence to aggressively pursue distribution opportunities, while I had greater acumen in raising capital and navigating the tax and regulatory environment that impacted the marketing of such charging stations. As another example, I formed the business referenced above with a medical doctor because he possessed scientific skills and experience in the pharmaceutical industry that I lacked, and he joined with me because I had certain business skills that he lacked.

22. When individuals share ownership of a business with others as partners or co-venturers, they usually enter into a co-ownership relationship only if their co-participant possesses essential, unique skills, as opposed to commonplace, ministerial skills. As a result, if individuals render valuable skills and devotion to a business enterprise, or at least are perceived and recognized as having these qualities, others are more likely to have made them a co-owner than if their services are trivial or require little skill.

23. The joint ownership of a successful business also involves the guidepost of shared decision-making. When individuals having differing viewpoints reach compromises in their decisions or when one co-owner prevails in a decision sometimes and another co-owner prevails at other times, individuals exhibit conduct indicative of joint control and ownership. Another guidepost of a joint business endeavor therefore is that partners discuss their views and preferences and either reach a shared consensus that incorporates all of their views or reach a decision in which one partner persuades the other of the merits of his or her viewpoint and the others defer to that view.

24. An additional guidepost is the language used by individuals in characterizing their endeavor. When individuals use a collective word such as "we," "us," "our," or "team" in describing their business activities or refer to one another as "partner" or a "key participant," their language is consistent with them having formed a partnership or joint venture. This is especially true when such language is used in official communications to law enforcement or a government agency because such communications, if untrue, often can have serious ramifications.

25. A final guidepost indicative of a partnership or joint venture is adherence to formalities, such as the creation of an executed partnership agreement. Such a document would be especially important as a guidepost if the parties are strangers at the time of business formation, are numerous, or wish to share profits in some manner other than equally. In my experience, however, individuals creating a partnership or joint venture often do not formalize such an agreement when they are longstanding friends or family members, are few in number, or have a mutual understanding that they will each share equally in the success of their partnership. In such situations, the absence of a formal agreement is not a meaningful guidepost that militates against a partnership or joint venture having been formed. In my personal experience of starting partnerships with friends and relatives, I never have commenced the partnership with a formal agreement, but rather have relied upon my trust in my co-owners and later formalized our business arrangement when other independent investors previously unknown to me became involved as co-owners.

VI. **ANALYSIS OF THE ABOVE-DESCRIBED GUIDEPOSTS IN RELATION TO THE RELATIONSHIP BETWEEN CRAIG WRIGHT AND DAVE KLEIMAN**

26. Having identified above the key guideposts that are indicative of a partnership or joint venture having been formed, I now will examine whether the communications between Craig Wright and Ira Kleiman, law enforcement agencies, the public, and others were consistent with and indicative of a partnership or joint venture having been formed between Craig Wright and Dave Kleiman.

    A. **The Words and Actions of Wright and Dave Kleiman Are Consistent With the Words and Actions of Close Friends Who Have Formed a Partnership or Joint Venture**

27. Various words and actions by or between Wright and others are consistent with the types of communications I typically observe in the context of a partnership and/or joint venture.

*Confidential*                                                                                              5

For organizational convenience, I present this information based on the recipient or forum of the communication.[9]

### 1. Wright's communications with Ira Kleiman and Dave Kleiman's father are consistent with the types of communications typically seen when referring to a partnership and/or joint venture relationship

28. Following Dave Kleiman's death, Wright initiated communications with Ira Kleiman and Dave's father, Louis Kleiman.

29. Almost a year after Dave Kleiman's death, Wright wrote to Louis Kleiman about his work with Louis's son Dave.[10] He wrote that Dave Kleiman was "[one] of the three key people behind Bitcoin" and "was a key part of an invention that w[ould] revolutionise the world."[11] Wright promised to share additional information soon to "let" the Kleiman family "know much more of Dave" and "recover what Dave owned."[12] One partner's characterization of another as being a critical, or "key," co-contributor is typical of the praise that partners bestow on one another in a partnership or joint venture and consistent with Dave Kleiman having merited an equity stake as a co-owner of a joint business enterprise with Wright.

30. Highlighting their shared enterprise, Wright wrote to Ira Kleiman in April 2014, "The Tax office know *[sic]* that **Dave and I have been working on** this since 2008."[13] This statement by Wright to Ira Kleiman, and Wright's acknowledgment that he had informed a third party, the taxing authority, about the existence of his business relationship with Dave Kleiman, further corroborates my conclusion that the conduct and communications of Wright were consistent with Wright and Dave Kleiman having been longstanding partners in a partnership and/or joint venture.

---

[9] Counsel has asked me not to rely on purported communications directly between Wright and Dave Kleiman based on many of those communications being forgeries by Wright. I note, however, that many of those communications – if authentic – would be strongly consistent with the types of communications between co-venturers typical of partnerships or joint venture relationships. *See* March 12, 2008 Email from Craig Wright to Dave Kleiman ("I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin… You are always there for me Dave. I want you to be a part of it all.") (DEFAUS_00081546); December 27, 2008 Email from Craig Wright to Dave Kleiman, ("I need your help. You edited my paper and now I need to have you aid me build this idea.") (DEFAUS_00115579); March 28, 2011 Email from Dave Kleiman to Craig Wright, ("Are we ever going to get a wage on this? Just kidding I trust you.") (DEFAUS_00115700); May 22, 2012 Email from Craig Wright to Dave Kleiman, ("We do not touch the trusts. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions and let them try shit on us then.") (DEF_00013808); October 10, 2012 Email from Craig Wright to Dave Kleiman, ("We need to discuss the trsut *[sic]* and work out what the fuck we are doing with it all.") (DEF_00028003)

[10] February 11, 2014 Email from Craig Wright to Louis Kleiman, Exhibit 23 to Second Amended Complaint.
[11] February 11, 2014 Email from Craig Wright to Louis Kleiman, Exhibit 23 to Second Amended Complaint.
[12] February 11, 2014 Email from Craig Wright to Louis Kleiman, Exhibit 23 to Second Amended Complaint.
[13] April 15–23, 2014 Email chain between Craig Wright and Ira Kleiman, Exhibit 20 to Second Amended Complaint. (Emphasis added)

31. In another email to Ira Kleiman following Dave Kleiman's death, Wright stated, "I have attached a little more of what *we* did together."[14]  This expression of a shared enterprise, built through shared effort, is consistent with and indicative of the joint business relationship between them.

32. In response to an email from Ira Kleiman speculating that "[m]aybe [Dave Kleiman] didn't want to directly come out and say you guys were already partners," Wright wrote, "*We did partner* ;)."[15]

33. The communications I reviewed not only are consistent with and indicative of the joint business relationship between Wright and Dave Kleiman, but they also are consistent with their joint efforts having included the creation of Satoshi Nakamoto.

34. For example, Wright wrote to Ira Kleiman that "Dave could edit his way through hell and back.  I am not a team player.  I am a terrible boss and slave driver, but with Dave I was far more.  *Satoshi was a team*.  Without [Dave Kleiman as] the other part of that *team*, he [Satoshi] died."[16]  As set forth in Section V above, Wright's description of his work with Dave Kleiman as a "team" effort, and specifically identifying that "team" as the figures behind the Satoshi Nakamoto pseudonym, is consistent with and indicative of the joint business relationship between the parties, referred to herein as the SN Enterprise.  This statement also is indicative of Dave Kleiman having had unique skills that were complimentary to Wright's, which is another important guidepost observed in partnerships and joint ventures.

35. Further statements by Wright support the idea that Dave Kleiman and Craig Wright were jointly controlling the pseudonym of Satoshi Nakamoto.  For example, in an email to Ira Kleiman, Wright wrote that Dave Kleiman had control of the email account satoshi@vistomail.com that was used to publish the initial Bitcoin White Paper and to send out the initial Bitcoin client program.[17]  As detailed in Section V above, joint pursuit of a common goal and joint control are guideposts that are consistent with and indicative of a joint business relationship.

36. The conduct and communications between Wright and Dave Kleiman also reveal mutual decision-making by the men in their business activities as evidenced by Wright's explanation to Ira Kleiman of the reasoning behind starting Coin-Exch:

---

[14] February 15, 2014 Email from Craig Wright to Ira Kleiman, Exhibit 6 to Second Amended Complaint. (Emphasis added)

[15] May 20, 2014 Email chain between Craig Wright and Ira Kleiman, Exhibit 2 to Second Amended Complaint. (Emphasis added)

[16] March 7, 2014 Email from Craig Wright to Ira Kleiman. (DEFAUS_00115950)  (Emphasis added) After saying that he would deliver certain documents to Ira Kleiman, Wright again strongly implied that Dave Kleiman was part of the Satoshi Nakamoto enterprise with him, asking Ira Kleiman to "[l]eave others to be Satoshi and Dave not to be." (March 6, 2014 Email from Craig Wright to Ira Kleiman. (DEFAUS_00115950))

[17] February 15, 2014 Email from Craig Wright to Ira Kleiman. (DEFAUS_00112712)

> ***Dave and I*** decided to start Coin-Exch so that ***we*** could lock in some of the value. When we started planning this, it was late 2012. ***We*** locked in the value of the software based on the price of BTC [bitcoin] then, which was less than now and if it was a year later we would have been smart, but ***we took the option to cash out***.[18]

Such joint decision-making is another guidepost that is consistent with and indicative of them having formed a partnership and/or joint venture.

37. The joint nature of Wright and Dave Kleiman's business undertaking is also reflected in their shared development of a "Bitcoin" logo.[19] Wright explained to Ira Kleiman that the "old Bitcoin logo ***we did*** [was] no longer used."[20] In the business world, logos tend to express a unity of purpose or undertaking that is indicative of a partnership and/or joint venture relationship and are a commonly seen feature in such relationships.

38. Indeed, Wright wrote to Ira Kleiman that Wright and Dave Kleiman had worked together to create the first version of Bitcoin. When Ira Kleiman asked Wright if Dave Kleiman had compiled the code for the first version of Bitcoin, Wright wrote back, "Yes. ***We both played***. Dave compiled."[21] Evidence of joint creation and complementary skills enhancing the success of an endeavor are further guideposts that are consistent with and indicative of a joint business relationship.

39. Wright also described to Ira Kleiman his development of software together with Dave Kleiman, stating "The reason for the transfer is to use the R&D tax credit on the value of the software ***Dave and I*** developed."[22] He later elaborated, referring to a software transfer structure in which he was involved, "That was Dave – his idea."[23] Again, joint creation and the joint dedication of funds in pursuit of a joint effort are consistent with, and indicative of, a joint business relationship.

40. Further evidence of Wright's and Dave Kleiman's conduct being consistent with a partnership or joint venture having been formed between them is the recognition that each was contributing significant services to their joint effort. For example, Wright wrote to Ira Kleiman, "Dave took the 2 million lines of code that had in 2010 and

---

[18] April 23, 2014 Email from Craig Wright to Ira Kleiman. (DEFAUS_00119167) (Emphasis added)
[19] May 20, 2014 Email chain between Craig Wright and Ira Kleiman, Exhibit 2 to Second Amended Complaint.
[20] May 20, 2014 Email chain between Craig Wright and Ira Kleiman, Exhibit 2 to Second Amended Complaint. (Emphasis added) Wright also stated in the same email chain, "Neither of us were graphic artists," further suggesting a shared development of the logo.
[21] May 10, 2017 Email from Craig Wright to Ira Kleiman. (KLEIMAN_00004288) (Emphasis added)
[22] April 15–23, 2014 Email chain between Craig Wright and Ira Kleiman, Exhibit 20 to Second Amended Complaint. (Emphasis added)
[23] April 15–23, 2014 Email chain between Craig Wright and Ira Kleiman, Exhibit 20 to Second Amended Complaint. Note that here and elsewhere, Wright appears to use the present tense to refer to his work with Dave Kleiman, notwithstanding Dave Kleiman's passing.

        transformed these into a documented set of over 6 million lines of code. I have sent the software analysis to you already."[24]

41. Wright recognized in correspondence with Ira Kleiman that Dave Kleiman's interest in their partnership and/or joint venture now resided with Ira Kleiman as the personal representative of Dave Kleiman's estate. In an April 2014 email to Ira Kleiman, Wright emphatically reiterated, using upper case letters, that Dave Kleiman's part of their joint business activities would naturally flow to his estate, specifically stating that after Dave Kleiman's death Wright and Dave Kleiman's interest is "OURS as you [Ira Kleiman] are Dave's heir."[25] The emphatic use of words like "OUR" and "OURS" is again indicative of Wright's recognition that Wright and Dave Kleiman were co-owners of a business enterprise.

42. I understand from counsel that Wright has produced no written partnership or joint venture agreement with Dave Kleiman. However, as set forth above, the dealings between Wright and Dave Kleiman are consistent with and indicative of a joint business relationship between them. Moreover, the evidence I reviewed reveals that their dealings were largely informal and not extensively documented in detail.[26] This is not at all uncommon, especially when partners have longstanding family or friendship relationships with one another, the number of partners is small, or partners are working on innovative, development-stage projects. I have observed numerous partnerships in which classmates, friends, and relatives form partnerships and never formalize their relationship in writing, especially when they intend for all such co-owners to have equal rights and duties.

        ***2. Dr. Wright acknowledged the existence of his joint business relationship with Dave Kleiman to the Australian Tax Office and in other communications with law enforcement***

43. Although voluminous evidence consistent with, and indicative of, a partnership and/or joint venture relationship appears in correspondence directly from Wright to the Kleiman family, Wright also made various statements to law enforcement and taxing authorities that are in accord with this. As set forth below, these admissions by Wright of the existence of his joint business activities with Dave Kleiman are particularly notable because the communications were made in a government proceeding that might have significant consequences to Wright if his statements were made recklessly or falsely.

---

[24] April 15–23, 2014 Email chain between Craig Wright and Ira Kleiman, Exhibit 20 to Second Amended Complaint.
[25] April 15–23, 2014 Email chain between Craig Wright and Ira Kleiman, Exhibit 20 to Second Amended Complaint. (Emphasis in original)
[26] *See, e.g.*, Record of Interview of CRAIG Wright, Australian Tax Office, August 11, 2014, p. 9. (DEF_00068665–8710 at 8674)

Section V above, some joint business relationships do not use or rely on formal documentation.

### 3. Dr. Wright's public statements are consistent with and indicative of his joint business relationship with Dave Kleiman

52. Wright's statements to the Kleiman family and to law enforcement, described above, are consistent with what Wright has said publicly about his joint business relationship with Dave Kleiman. Publicly identifying and associating oneself with a joint business relationship, as discussed earlier, is consistent with and indicative of such a relationship. Some examples of these public statements are set forth below.

53. When Wright was asked in a podcast interview whether he had claimed to be Satoshi Nakamoto, he responded, "I also said if you have a partnership and someone dies, it's no longer a partnership."[35] Asked for further details on whether "Satoshi Nakamoto" was "a pseudonym for a group of at least 2 or more people that [he was] a part of," Wright responded "umm, I had help from Dave."[36]

54. In a book by Wright that compiled various writings of his expressed elsewhere, Wright pointed to a hidden meaning behind the Satoshi Nakamoto name that again connected it to his work with Dave Kleiman, writing:

> There was a secondary part of the name Satoshi. Satoshi Sugiyama was adopted by an American and given the name David Phillips. It comes from a book, The House of Morgan. David was adopted in both cases. David Kleiman was adopted, and so was Satoshi.[37]

55. When Wright was asked in a recorded and transcribed media training session whether he was "trying to claim all the credit" for Bitcoin or if, instead, Satoshi Nakamoto was a "combination of people and minds," Wright responded, "I had a lot of help. In particular a friend of mine who died a few years ago, Dave Kleiman, gave me a lot of help."[38]

56. Wright reiterated the point, stating, "Dave was a key part of everything that I did."[39]

57. When Wright was asked in that same session "how many people were involved in creating Bitcoin," Wright responded, "In creating Bitcoin? A lot. How many people were involved in Satoshi is probably a better question. That was *two of us*."[40]

58. From other comments in that same session, it is clear that the two people involved in the entity Wright refers to as Satoshi were Dave Kleiman and himself, Craig Wright. Wright

---

[35] Bad Crypto Podcast, *Is Craig Wright the Real Satoshi?*, February 20, 2019.
[36] Bad Crypto Podcast, *Is Craig Wright the Real Satoshi?*, February 20, 2019.
[37] Craig S. Wright, Satoshi's Vision at 5 (2019).
[38] Media Training Session 1, March 18, 2016, p. 1. (DEF_00172528–555 at 528)
[39] Media Training Session 1, March 18, 2016, p. 7. (DEF_00172528–555 at 534)
[40] Media Training Session 1, March 18, 2016, p. 6. (DEF_00172528–555 at 533) (Emphasis added)

explained that "Dave spoke as Satoshi."[41]  Moreover, Wright said that he and Dave Kleiman had formulated the Satoshi Nakamoto pseudonym and that "Dave was the nice version of Satoshi."[42]

59. Wright was clear that his joint business relationship with Dave Kleiman included the mining of bitcoin, explaining, "I mined quite a number [of bitcoin] and ***I was with my partner, so to speak, in all of this, Dave, we mined quite a lot***."[43]  This statement concerning Wright's mining of bitcoin with his "partner" confirms that the acquisition of bitcoin through mining was an integral activity of their joint enterprise.

60. Wright has stated that his "life goal is to increase the value of the bitcoin I mined as Satoshi in 2009/2010 to be as great as possible, this will take decades."[44]  It is notable that Wright identifies the bitcoin as mined by Satoshi, *i.e.* the joint work with Dave Kleiman.  This statement further confirms the profit motive for their work.

61. Similarly, Wright testified at his deposition regarding the profit motive behind Bitcoin:

> Q. In 2008, did you believe what you were doing would be successful?
> A. I had no idea.
>
> Q. Did you hope it would be successful?
> A. Of course you hope, or you would not work on it otherwise.
>
> Q. Did you believe it would become a real alternate currency?
> [OBJECTION]
> THE WITNESS: I do not know; it is still not a currency.  I hope.
>
> BY MR. FREEDMAN:
> Q. Did you believe it would become a real alternate method of exchange?
> [OBJECTION]
> THE WITNESS: I always hoped.[45]

### 4.  *Dr. Wright's non-public statements to others also are consistent with and indicative of Wright and Dave Kleiman having created a joint business relationship*

62. In addition to his communications with Dave Kleiman, his family, law enforcement, and taxing authorities, as well as his public statements, Wright also acknowledged the

---

[41] Media Training Session 1, March 18, 2016, p. 7. (DEF_00172528–555 at 534)
[42] Media Training Session 1, March 18, 2016, p. 20. (DEF_00172528–555 at 547)
[43] Media Training Session 1, March 18, 2016, p. 6. (DEF_00172528–555 at 533) (Emphasis added)
[44] Cryptofan, Twitter, June 24, 2019, available at https://twitter.com/crypto_daze/status/1143303417609089024. Wright authenticated this document as a post from his Slack group during his March 18, 2020 deposition.  (March 18, 2020 Deposition of Craig S. Wright, p. 75.)
[45] April 4, 2019 Deposition of Craig S. Wright, pp. 125:11–126:1.

existence of a partnership with Dave Kleiman in his communications with third parties. As with all of the other communication groupings discussed above, Wright's repeated assertions of the existence of his joint business relationship with Dave Kleiman are consistent with and indicative of the existence of that relationship. I set forth some examples below.

63. In February 2014, Wright told two friends and business associates of Dave Kleiman that "***Dave and I*** had a project in the US. He ran it there. We kept what ***we did*** secret."[46]

64. One of those individuals then told the press that Wright had described Dave Kleiman as the creator or one of the creators of Bitcoin.[47] That same individual confirmed at his deposition in this case that Wright had told him on the phone that "Dave was the creator of Bitcoin" and that "it was a group of people but that Dave was involved in it."[48]

65. To another person, Wright explained, "***David Kleiman was my best friend and business partner***. He died a couple years ago now, but as I had known him since the 90's we have many shared secrets."[49]

66. That same view of Wright's joint business relationship with Dave Kleiman is reflected in a series of Skype messages Wright sent to another individual involved with bitcoin mining and the subject of the police investigation discussed above, Mark Ferrier. Wright told Ferrier, "***my partner Dave and I*** have been working on something of a while now," referred to Dave as his "business partner," and explained that his "best friend and ***business partner [had] died*** a few days back."[50]

67. In interviews for a long form article called "The Satoshi Affair" in one of the world's leading publications, Wright made a series of representations about his partnership with Dave Kleiman.[51]

68. For example, Wright told the author about working with Dave Kleiman under the pseudonym Satoshi Nakamoto, stating, "'If I'd come out originally as Satoshi without Dave, I don't think it would have gone anywhere.'"[52] He explained, "'We never really

---

[46] February 12–17, 2014 Email chain between Craig Wright and Patrick Paige re: Difficult, Exhibit 8 to Second Amended Complaint. (Emphasis added)
[47] Sam Biddle & Andy Cush, *This Australian Says He and His Dead Friend Invented Bitcoin*, Gizmodo, May 2, 2016, available at https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.
[48] December 10, 2019 Deposition of Patrick Paige, p. 48:4–9.
[49] May 20, 2015 Email from Craig Wright to Michele Seven. (DEFAUS_00550141) (Emphasis added)
[50] February 23, 2013–April 30, 2013 Skype Chain Between Craig Wright and Mark Ferrier (DEF_01667372) (Emphasis added) (attached to June 16, 2014 Email from Craig Wright to Kathryn Unger and others (NSW Police). (DEF_01667258))
[51] I am informed by counsel that the author of the article verified under oath the accuracy of his transcription of Wright's statements.
[52] Andrew O'Hagan, "The Satoshi Affair: Andrew O'Hagan on the many lives of Satoshi Nakamoto," Exhibit 1 to Second Amended Complaint at 27.

thought that "*we made Satoshi*," . . . It was good. It was done. It was cool. But I don't think we realised how big it would be."[53]

69. When asked to show the article's author the trail of ideas that led to the collaboration between Dave Kleiman and him, Wright pointed to his thesis on his computer.[54] Wright told the author that Dave Kleiman helped him write the Bitcoin White Paper and make the language "serene."[55] This statement further confirms the synergistic nature of the relationship between Wright and Dave Kleiman and is consistent with them having chosen to work together in forming a joint business relationship.

70. With respect to the Genesis block, the first block of bitcoin, Wright explained that it had failed a few times and "*we* reviewed it a few times."[56] Wright also identified two of the earliest transactions on the blockchain as sending bitcoin to Dave Kleiman and himself.[57]

71. In describing his collaboration with Dave Kleiman, Wright told the author with respect to the mining of bitcoins, "'That was where the real money started rolling in.'"[58] This apparent pursuit of "real money" wealth is once again consistent with the SN Enterprise having a substantial profit-seeking motive.

### B. The Relevant Conduct and Communications Are Consistent With, and Indicative of, The Joint Business Relationship Between Wright and Dave Kleiman

72. Viewed individually, the various communications analyzed above are consistent with and indicative of a joint business relationship between Wright and Dave Kleiman.

73. Viewed collectively, the numerous consistent statements by Wright to a variety of audiences lead me to conclude that the activities engaged in by Wright and Dave Kleiman, including the activities relating to developing and mining bitcoin and related intellectual property, are highly consistent with, and indicative of, a partnership and/or joint venture relationship between Wright and Dave Kleiman, which I have referred to herein as the SN Enterprise.

---

[53] Andrew O'Hagan, "The Satoshi Affair: Andrew O'Hagan on the many lives of Satoshi Nakamoto," Exhibit 1 to Second Amended Complaint at 38. (Emphasis added)
[54] Andrew O'Hagan, "The Satoshi Affair: Andrew O'Hagan on the many lives of Satoshi Nakamoto," Exhibit 1 to Second Amended Complaint at 28–29.
[55] Andrew O'Hagan, "The Satoshi Affair: Andrew O'Hagan on the many lives of Satoshi Nakamoto," Exhibit 1 to Second Amended Complaint at 31.
[56] Andrew O'Hagan, "The Satoshi Affair: Andrew O'Hagan on the many lives of Satoshi Nakamoto," Exhibit 1 to Second Amended Complaint at 32. (Emphasis added)
[57] Andrew O'Hagan, "The Satoshi Affair: Andrew O'Hagan on the many lives of Satoshi Nakamoto," Exhibit 1 to Second Amended Complaint at 32.
[58] Andrew O'Hagan, "The Satoshi Affair: Andrew O'Hagan on the many lives of Satoshi Nakamoto," Exhibit 1 to Second Amended Complaint at 32. At a deposition, Wright further confirmed that he hoped in 2008 what he was doing would be successful and "always hoped" that Bitcoin "would become a real alternate method of exchange." (April 4, 2019 Deposition of Craig S. Wright, pp. 125:14–126:1.)

## VII.  RESERVATION OF RIGHTS

74. I reserve all rights to modify or supplement this Report if I become aware of any errors or misstatements, or if I become aware of other data or other evidence relevant to my position. I also reserve all rights to respond to any statements made by the Defendant or his witnesses or expert witnesses to which a response is appropriate.

75. I understand that there may be depositions that remain to be taken in this matter. I may also modify or supplement my opinions in view of opinions or arguments made by any person, including Defendant's counsel and anyone engaged by Defendant to provide opinions. I may also modify or supplement my opinions if the Court provides litigants with any pertinent additional rulings.

76. I may expand or modify my opinions as my investigation and study continues and supplement my opinions in light of any relevant orders from the Court or in response to any additional information I review, matters the Defendant raises, or any opinions Defendant's experts may provide.

77. I may prepare and use graphics, images, photographs, video recordings, test data, animations, and other presentation aids to help me explain my opinions. I may also use images, photographs, graphics, animations, and other presentation aids prepared by other witnesses to help me explain my opinions.

*[Signature]*

Gordon L. Klein

Dated: April 10, 2020

# Appendix A: Gordon L. Klein Curriculum Vitae

UCLA Anderson School
Los Angeles, CA 90095                                    gkl    

## SUMMARY

Gordon Klein has been a faculty member at UCLA's Law School and Anderson School of Management, court-appointed referee, arbitrator, State Bar ethics consultant, and television commentator. Mr. Klein has participated in several highly publicized matters, including serving as the Trustee's accounting expert in General Motors' bankruptcy, Apple's expert in a major acquisition dispute, the U.S. Department of Justice's expert in a banking fraud matter, the testifying expert in a landmark Delaware case concerning enterprise solvency, a consultant on the Michael Jackson wrongful death case, and the testifying expert in a set of mortgage-backed securities matters that the *Financial Times* heralded as "this century's biggest case against Wall Street." He has extensive experience teaching and testifying in the areas of accounting, damages, finance, intellectual property, enterprise governance, professional responsibilities, unfair trade practices, valuation, and entrepreneurship. He also has testified about international accounting principles in effect in Abu Dhabi, Egypt, France, Guatemala, Hong Kong, Korea, Singapore, and Mexico.

## PROFESSIONAL DESIGNATIONS

- Certified Public Accountant  (registered in Illinois)
- Attorney  (non-practicing, California)

## EDUCATION

University of Michigan Law School   (J.D.)

University of Michigan Business School  (B.B.A.)

## HONORS

- Phi Beta Kappa
- Beta Alpha Psi
- Burroughs Corporation Scholar
- Branstrom Scholar
- California Society of CPAs Accounting Education Committee appointee

# Appendix A: Gordon L. Klein Curriculum Vitae

**EMPLOYMENT**

**University of Michigan Ross School of Business**

Part-time faculty member. Taught introductory accounting.

**UCLA, Anderson School of Management**

Has taught 15 different courses in accounting, business law, tax planning, and financial statement analysis. Topics include compensation planning, cost accounting, quantitative aspects of marketing, financial derivatives, LLC and partnership dissolution, investments, valuation, new venture initiation, contracts, profit forecasting, and entrepreneurship.

**UCLA School of Law**

Taught Law and Financial Analysis and Accounting for Lawyers. Courses emphasize how financial and statistical data should be analyzed and presented. Topics include damage calculations, profit forecasting, valuation, and bankruptcy.

**Loyola Law School**

Adjunct Professor, LL.M. in Taxation Program. Tax Planning and Accounting for Lawyers. Taught courses focused on structuring corporate, partnership, and LLC transactions, financial statement analysis, and professional and fiduciary duties.

**Court Referee/Expert Witness/Arbitrator**

Appointed to serve as an LA Superior Court referee and Orange County Superior Court referee.

Has served as an arbitrator in over 150 commercial cases, involving contract, securities, and partnership disputes. Member of the Accounting, Commercial Arbitration, and IRS Tax Shelter Dispute Panels of the American Arbitration Association.

**Public Speaker/Media Commentator**

Conducted seminars for numerous organizations, including the California Society of CPAs, Deloitte, the Finance Ministry of the People's Republic of China, members of the German Bundestag (Parliament), Head Start Advanced Management Conference, JP Morgan, KPMG, Merrill Lynch, and PricewaterhouseCoopers.

Expert on the CPA exam and accountant liability. Has trained over 8,000 California financial professionals to pass the CPA exam.

Nationally recognized investment and accounting expert who frequently has appeared on CNBC and CNN Radio. Has also has appeared in the <u>Wall Street Journal</u>, <u>New York Times</u>, <u>Forbes</u>, <u>Fortune</u>, <u>Business Week</u>, <u>Los Angeles Times</u>, <u>People</u>, and Bloomberg News, and on CNN, NPR, MTV, and ABC Nightly News.

# Appendix A: Gordon L. Klein Curriculum Vitae

**Corporate Officer/Director**

Co-founder, director, or CFO of various closely-held enterprises, including BackupNet International, a data backup software licensor; eTeamz, and Westin Communications, a financial publishing company.

**Investment and Banking Consultant**

Expert consultant to investment banks, hedge funds, and other pooled investment organizations. Advisor to Clarium Capital (Peter Thiel), Goldman Sachs Asset Management, Goldman Sachs Investment Partners, JP Morgan, McKinsey and Co., Monarch Capital, Morgan Stanley, Stark Capital, Serengeti Capital, and Trust Company of the West.

**California State Bar Enforcement Division**

Forensic investigator. Evaluated whether suspended attorneys had complied with the financial and ethical requirements to merit reinstatement.

## TEXTBOOKS AND PROFESSIONAL PUBLICATIONS

- Author Gordon Klein, *Ethics in Accounting: A Decision-Making Approach,* 1st Edition (John Wiley and Sons, 2015)

- Technical consultant, *Advanced Accounting*, 1st Edition, Hamlen, et al (Cambridge Business Publishers, 2010)

- Contributing Editor, *The Knowledge Exchange's Encyclopedia of Business (Reference Essentials)*, 1st Edition, Spurge, Lorraine (Knowledge Exchange, 1998)

- Author Gordon Klein, *Introductory Economics*, 1st Edition, The Westin Study Review Series

- Author Gordon Klein, *Statistics for Business and Economics*, 1st Edition, The Westin Study Review Series

- Author Gordon Klein, *Introductory Finance*, 1st Edition, The Westin Study Review Series (Westin Communications, 1984)

- Author Gordon Klein, *Business Law,* 1st Edition, The Westin Study Review Series

- Author Gordon Klein, *Cost Accounting*, 1st Edition, The Westin Study Review Series

- Author Gordon Klein, *Introductory Accounting*, 1st Edition, The Westin Study Review Series

- Author Gordon Klein, *Managerial Accounting*, 1st Edition, The Westin Study Review Series

## Appendix A: Gordon L. Klein Curriculum Vitae

**UNIVERSITY COURSES TAUGHT / EXPERTISE**

**Accounting for Lawyers**

The record-keeping process, auditor's liability, asset valuation, financial ratios, liability determination, discount rate determination, contract interpretation of financial covenants and accounting, usury and interest rate analysis, cash flow analysis, and accrual determinations of income and expense.

**Advanced Accounting**

Merger and acquisition techniques, earn-outs, contingent price adjustments, and goodwill determination. Consolidated reporting, professional responsibilities, fiduciary reporting, foreign currency transactions, international accounting principles, bankruptcy and insolvency reporting, partnership accounting, intangibles valuation, derivatives and risk management, and governmental accounting.

**Business Plan Development**

The venture capital process, structuring the marketing, sales, and business strategy of an emerging or expanding business enterprise. Forecasting and profit planning.

**Cost Accounting**

Sales and operational budgeting, profit forecasting, cost behaviors and allocations, breakeven analysis, net present value analysis, evaluating division and executive performance.

**Intermediate Accounting I**

Revenue recognition, accounting estimates, intangibles valuation including goodwill, contingent liabilities, realization and matching principles, royalty income, accounting theory, asset swaps, depreciation, time value of money, research and development, patents, and trademarks.

**Intermediate Accounting II**

Bonds and other financing instruments, convertible securities, stock options, equity, Statement of Cash Flows, operating and capital leases, common accounting fraud techniques, real estate financing techniques, pensions, international accounting, professional ethics, and deferred taxes.

**Law and Financial Analysis**

Time value of money, capital accounts, partnership accounting, discounted cash flows, valuation, ratios, community property, funds tracing, forensic accounting, cost of capital, leverage, debt instruments, equity instruments, and derivatives.

## Appendix A: Gordon L. Klein Curriculum Vitae

**Law for Entrepreneurs**

Contract liability and remedies, enterprise organization, agency, secured financing, bankruptcy, debt collection, the Uniform Commercial Code, unfair competition, price discrimination, antitrust, and the rights and duties of partners, officers, directors and shareholders.

**Managerial Accounting**

Core principles of accounting. Required of all MBA candidates.

**Small Business Management**

Quantitative analysis with imperfect information, market analysis, statistical analysis of data, Internet and e-commerce opportunities, workers' compensation, independent contractors, intellectual property, business strategy, franchises, goodwill valuation and determination, OSHA, personnel issues, labor relations, wrongful termination, employment contracts, and the regulatory environment.

**Structuring Entrepreneurial Deals**

Valuation and organization of closely-held enterprises, bootstrap financing, ownership and profit allocation, nontraditional valuation techniques, valuing unproven technologies, valuing intellectual property, the cost of capital, capital structure decisions, estate planning, retirement planning, securities laws, insider trading, and Section 1244 stock.

**Tax Principles and Policy**

Individual tax planning, tax return preparation, the alternative minimum tax, tax aspects of real estate investing and financing, timing asset acquisitions and dispositions, like-kind exchanges, capital gains versus ordinary income characterizations, professional duties of tax preparers, retirement planning, tax aspects of employment and independent contractor relationships, and deferred compensation.

**Taxation and Management Decisions**

The formation and liquidation of enterprises, dividend distributions, stock redemptions, acquisition techniques, entrepreneurial deal structuring and related judicial doctrines, and analyzing partnership, S corporation, and LLC agreements.