Dr. Matthew Edman
April 29, 2020

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3              CASE NO. 9:18-cv-80176-BB/BR

4
    IRA KLEIMAN, as the personal representative
5   of the Estate of David Kleiman, and
    W&K Info Defense Research, LLC,
6
              Plaintiffs,
7
    -vs-
8
    CRAIG WRIGHT,
9
              Defendant.
10

11   * * * * * * * * * * * * * * * * * *

12   TELECONFERENCE DEPOSITION OF DR. MATTHEW EDMAN

13   DATE TAKEN: April 29, 2020

14   TIME: 10:10 a.m. - 4:40 p.m.

15
    TAKEN BEFORE: RICK E. LEVY, RPR, FPR
16                AND NOTARY PUBLIC

17

18   * * * * * * * * * * * * * * * * * *

19

20

21

22

23

24

25

Dr. Matthew Edman
April 29, 2020                                    13

```
 1        A.    Yes.

 2        Q.    Are you opining that Dr. Wright manipulated

 3   any documents?

 4        A.    Same answer.

 5        Q.    And by "same answer" you mean everything we

 6   discussed with regards to the other question would apply

 7   by switching -- modified, manipulated you'll have the

 8   same answer; correct?

 9             MR. ROCHE:  Objection, form.  Dr. Edman, just

10        to the extent you can answer the question I would

11        just instruct you to answer the question as opposed

12        to referring back to your last answer.

13   BY MR. KASS

14        Q.    I'll re-ask the question and then we'll see

15   how Dr. Edman does it.  Are you opining that Dr. Wright

16   has manipulated any documents?

17        A.    I am opining that a number of documents were

18   manipulated in a manner that would be consistent with

19   the defendant having performed those manipulations.

20        Q.    Are you opining that it in fact was Dr. Wright

21   who made those manipulations?

22        A.    I don't believe that's explicitly stated in my

23   report but the implication suggests that it would be

24   consistent with the defendant having performed those

25   manipulations.
```

Dr. Matthew Edman
April 29, 2020                                    14

1       Q.   Right but that's not your actual final

2   conclusion; correct?

3            MR. ROCHE:  Objection, form.

4            THE WITNESS:  Can you restate the question?

5   BY MR. KASS

6       Q.   Sure.  I believe you stated the implication

7   was that it was Dr. Wright who made those modifications

8   but do you actually conclude that it in fact was

9   Dr. Wright who made those modifications?

10      A.   Again I don't believe in my report I conclude

11  decisively that it was Dr. Wright who made the

12  modifications but the implication is that the

13  modifications are consistent with the defendant having

14  done them.

15      Q.   And that would be your same opinion at trial;

16  correct?

17      A.   Yes.

18      Q.   Are you opining that Dr. Wright has altered

19  any documents?

20      A.   Again I don't believe that's stated explicitly

21  in my report but the implication is clear that the

22  modifications would be consistent or alterations would

23  be consistent with the defendant having performed that.

24      Q.   But you're not actually opining that it was

25  Dr. Wright in fact who made those alterations; correct?

Dr. Matthew Edman
April 29, 2020                                    15

```
 1        A.   Yes, I don't believe I explicitly state so in
 2   my report.
 3        Q.   And that would be your same opinion at trial;
 4   correct?
 5        A.   Yes.
 6        Q.   Are you opining that Dr. Wright has done
 7   anything to make certain documents unauthentic?
 8             MR. ROCHE:  Repeat that.  I didn't hear the
 9        end of the question.
10   BY MR. KASS
11        Q.   Are you opining that Dr. Wright has done
12   anything to make certain documents unauthentic?
13        A.   Again I don't believe I explicitly state that
14   in the report.
15        Q.   Will you -- but will you be opining that it in
16   fact was Dr. Wright who made the documents unauthentic?
17             MR. ROCHE:  Objection, form.
18             THE WITNESS:  Again I don't believe I stated
19        that explicitly in my report but the implication
20        the evidence suggests the alterations to make the
21        documents unauthentic would be consistent with the
22        defendant having performed.
23   BY MR. KASS
24        Q.   Is that going to be your same opinion at
25   trial?
```

Dr. Matthew Edman
April 29, 2020                                    16

1        A.    Yes.

2        Q.    When you say an alteration -- let me back up.

3   I just used four different synonyms; modified,

4   manipulated, altered, unauthentic.  So is there one word

5   you feel comfortable using that kind of encompasses all

6   four just to kind of simplify this a little bit?

7             MR. ROCHE:  Objection, form.

8             MR. KASS:  I am just trying to make the

9        deposition easier.  I don't mind having to repeat

10        my questions four times.

11             MR. ROCHE:  Dr. Edman, to the extent you --

12        you think you can consolidate it like that without

13        losing any accuracy in your answers I'm fine with

14        that.

15             THE WITNESS:  If you want to use manipulation

16        as a common term for those synonyms for purposes of

17        this deposition I'm fine with that.

18   BY MR. KASS

19        Q.    And we'll even make it a little more narrow.

20   Let's just say for the next few questions and then I'll

21   let you know when we're not going to use that any more.

22   My next couple minutes of testimony we're going to refer

23   to manipulation; correct, is that the word you like to

24   use?

25        A.    Sure.

Dr. Matthew Edman
April 29, 2020                              17

1      Q.   When you stated that these manipulations were
2   consistent with having been made by Dr. Wright what do
3   you mean by consistent?
4      A.   I mean that the evidence available to me
5   suggests that defendants would have at least had the
6   means to create those manipulations.
7      Q.   Could those manipulations also have been
8   consistent with other people having made them?
9      A.   The evidence available to me doesn't suggest
10   anyone else having created those manipulations.
11      Q.   So are you opining that Dr. Wright is the only
12   person who is consistent with having made those
13   manipulations?
14          MR. ROCHE:   Objection, form.
15          THE WITNESS:   Based on the evidence available
16      to me it appears that -- at least I don't have
17      anyone else who would be consistent with performing
18      those manipulations.
19   BY MR. KASS
20      Q.   So do you have an opinion as to whether it was
21   likely that Dr. Wright made those manipulations?
22      A.   Can you be more specific on what you mean by
23   likely?
24      Q.   Right.  Before you said it's consistent.  The
25   way I understand consistent it could be consistent with

Dr. Matthew Edman
April 29, 2020                                    18

1    Dr. Wright.  It could also be consistent -- let's just

2    back up.  What's your basis for stating that those

3    manipulations are consistent with having been done by

4    Dr. Wright?

5         A.   The basis as stated in my report but in

6    general includes accounts associated with Dr. Wright,

7    computers and IP addresses associated with Dr. Wright.

8    Certain metadata that references the defendant.  There

9    may be other things cited in my report that I don't

10   recall as I sit here right now but high level review.

11        Q.   That's fine.  Going with the high level

12   overview with the understanding that there may be some

13   other things you're also relying on.  My question is

14   conceivably there could be other people consistent who

15   possibly have access to accounts, same IP address area

16   that could also have been behind these manipulations.

17   Do you agree with that premise?

18             MR. ROCHE:  Objection, form.

19             THE WITNESS:  Anything is possible but I don't

20        have evidence available to me to support that.

21   BY MR. KASS

22        Q.   Right.  So based on that lack of evidence do

23   you believe it's likely that Dr. Wright was the person

24   behind the manipulations?

25             MR. ROCHE:  Objection, form.

Dr. Matthew Edman
April 29, 2020                                    19

```
 1              THE WITNESS:  I don't have any evidence to
 2        suggest someone other than Dr. Wright performed
 3        those manipulations.
 4   BY MR. KASS
 5        Q.   So is it your opinion that all the evidence
 6   suggests that Dr. Wright made those manipulations?
 7        A.   Again that's my opinion that the manipulations
 8   are consistent with Dr. Wright --
 9        Q.   And the only person you're aware of that was
10   consistent -- that fits the consistency of having made
11   those manipulations is Dr. Wright?
12        A.   To the best of my knowledge, yes.
13        Q.   Is that going to be your opinion at trial?
14        A.   Yes.
15        Q.   Are you going to be providing an opinion as to
16   whether Dr. Wright is a forgerrer?
17              MR. ROCHE:  Objection, form.
18              THE WITNESS:  Could you be more specific?
19   BY MR. KASS
20        Q.   Sure.  Are you going to be giving an opinion
21   as to whether Dr. Wright has forged any documents?
22        A.   Again my opinion is that the manipulations
23   that I observed are consistent with the defendant having
24   made them.
25        Q.   Are you going to be -- just to clarify now as
```

Dr. Matthew Edman
April 29, 2020                              20

 1    far as I'm going away from the manipulations meaning

 2    those four different words so now I am going to be using

 3    more specific terms going forward.  You understand that?

 4         A.   Yes.

 5         Q.   Okay.  Are you going to be providing an

 6    opinion that Dr. Wright in fact forged documents?

 7              MR. ROCHE:  Objection.  Seems like we're

 8         splicing words here Zalman.  To the extent you want

 9         to define what you mean by these words that might

10         be --

11              MR. KASS:  I'm using the word forged which he

12         uses in his report.  I think that's fair game.

13         We'll get to asking what his definition of forgery

14         is but now I'm using a word that's in his report.

15         Dr. Edman, however you understand forgery to mean

16         that's my question.

17              THE WITNESS:  Okay.  Could you please restate

18         the question?

19    BY MR. KASS

20         Q.   Sure.  Are you giving any opinion that Dr.

21    Wright forged documents?

22         A.   Again that's my opinion that forgeries were at

23    least consistent with the defendant having created them.

24         Q.   Are you opining that it was Dr. Wright in fact

25    who made that forgery?

Dr. Matthew Edman
April 29, 2020                                    38

1   report?

2        A.   I don't recall the exact date.  Probably early

3   March, late February perhaps.

4        Q.   And your prior reports, do you recall when you

5   had written those?

6        A.   Late 2019, early 2020.

7        Q.   So is it fair to say about three months give

8   or take?

9             MR. ROCHE:  Objection to form.

10            THE WITNESS:  Can you restate the question?

11   BY MR. KASS

12        Q.   Sure.  Between when you wrote your first two

13   reports which are Exhibit 1 and 2 and when you rehashed

14   the documents about two to three months had passed?

15        A.   I think that's fair to say.

16        Q.   And is it also accurate to say that you don't

17   in fact have a list of the actual hash values that you

18   generated for Exhibits 1 and 2?

19        A.   I don't believe that's entirely accurate.

20        Q.   What part of it is accurate?

21        A.   We had previously provided to you a list of

22   hashes associated with certain files that were provided

23   by plaintiff's E-discovery vendor which I understand was

24   as provided by your E-discovery vendor.

25        Q.   Okay.  Is there anything else?

Dr. Matthew Edman
April 29, 2020                                    39

1        A.    No, not as I sit here today.

2        Q.    So as far as the actual hash values that you

3    generated when you were analyzing those documents we

4    don't have an actual list of the hashes that you

5    generated?

6        A.    The hashes are the documents that I analyzed

7    are in Exhibit 3.

8        Q.    Right.  But the actual hashes that you

9    generated at the time of your analysis are not saved?

10       A.    For one and two.  For three obviously it's

11   recorded and saved in that report.

12            MR. KASS:  Okay.  That works.  Kyle, we can

13        take a break.  You want to take a ten minute break?

14            MR. ROCHE:  Sure, sounds good.

15            THE WITNESS:  Do I just mute?

16            MR. KASS:  Just mute.  You can stop your

17        video.  I'll leave the meeting running.

18   BY MR. KASS

19       Q.    Dr. Edman, do you remember testifying earlier

20   on today that certain alterations, modification,

21   forgeries or changes to documents are consistent with

22   having been done by Dr. Craig Wright?  Sorry, didn't

23   catch that?

24       A.    Yes.

25       Q.    You also testified that he is the only person

Dr. Matthew Edman
April 29, 2020                                      40

1   that you're aware of consistent with having done those

2   actions?

3        A.   Correct.

4        Q.   What have you done to determine whether other

5   people -- whether those actions would also be consistent

6   with other people?

7        A.   I've simply reviewed the other documents that

8   are available to me.

9        Q.   The documents that are available to you are

10  what?

11       A.   Listed in my report.  At least that I have

12  reviewed.

13            MR. KASS:  Just Dr. Edman, I'm not sure if

14       you're aware -- you're good, nevermind.  Strike

15       that.  I'm going to introduce as Exhibit number 4 a

16       document, Excel that is titled Dr. Edman Relativity

17       Documents and has a date of February 3rd 2020.

18            (Defendant's Exhibit No. 4 was

19            marked for identification.)

20            MR. ROCHE:  Zalman, are you representing that

21       this is the same document we produced to you?

22            MR. KASS:  Yes, that you had sent me by

23       e-mail, correct.  Let me ask you to send it -- I'm

24       going to unscreen share and I'm going to drop it

25       into the chat box so everybody has a copy.

Dr. Matthew Edman
April 29, 2020                                    41

1        MR. ROCHE:  Would you mind doing that for

2    every document that you introduce as opposed to

3    dropping it in the box?

4        MR. KASS:  Did you get it because I got a

5    weird message?  Wait a second.  I am going to

6    resend it.  I don't know if it's the size but for

7    some reason it's not letting me do it.  I can

8    e-mail it to you if you want.

9        MR. ROCHE:  Yes, that would be helpful.

10       MR. KASS:  Sure.  Going to send it to you

11   right now.

12       MR. ROCHE:  I'm going to forward it on to Dr.

13   Edman.  You can e-mail it to him too.

14       MR. KASS:  I think I may know what the problem

15   is.  Give me one second, let me try something.  It

16   wouldn't let me share because it was opened.  Now

17   it's in the chatbox so you could have it.

18       MR. ROCHE:  Got it.

19       THE WITNESS:  This is Exhibit 4?

20       MR. KASS:  Yes.  I'm going to do a screen

21   share.

22       THE WITNESS:  Apologies, just for consistency

23   with my numbering do you anticipate there being

24   more than 100 exhibits?

25       MR. KASS:  No, I do not.

Dr. Matthew Edman
April 29, 2020                                        54

```
 1        Q.   Now I just want to understand a little bit
 2   more as to the structure of your report and just I want
 3   to try and summarize it and then just let me know if
 4   it's accurate or if you want to make any changes.  The
 5   way I understand your report to work is that you'll
 6   start off with a Roman numeral number and a header of a
 7   Bates number of a certain document and I understand that
 8   to be the document that you're going to be analyzing in
 9   that section.  Is that correct?
10        A.   Yes, I believe that's generally the structure.
11        Q.   And then if we scroll down until the next
12   Roman numeral header there is generally going to be a
13   last paragraph in this particular case on page number
14   three it is going to be paragraph number six and it says
15   accordingly and it gives an opinion; is that correct?
16        A.   Yes.
17        Q.   So and in this particular case it's your
18   opinion that the document's not authentic and it has
19   been manipulated?  Sorry, are you waiting for me?
20        A.   My apologies, I don't believe you asked a
21   question.
22        Q.   I'm sorry.  My question was is it your opinion
23   that -- your opinion in paragraph six is that the
24   document is not an authentic invoice but instead has
25   been manipulated; correct?
```

Dr. Matthew Edman
April 29, 2020                                        55

1      A.   Correct.

2      Q.   And so is it fair to say that all the

3  paragraphs between the Roman numeral header and your

4  conclusion which is the last paragraph of that section

5  is the basis and the facts that support your conclusion?

6      A.   In the section, yes.

7      Q.   That's generally throughout your report?

8      A.   That is generally throughout my reports.

9      Q.   Are you relying -- throughout your report are

10 you relying on any bases that are not identified in

11 those paragraphs?

12     A.   No.

13     Q.   Dr. Edman, do you recall providing an opinion

14 that certain documents are forgeries?

15     A.   Yes.

16     Q.   What does a forgery mean to you?

17          MR. ROCHE:  Objection, asked and answered.

18          THE WITNESS:  Again forgery to me is a

19      document that has been manipulated to appear to be

20      something other than what it actually is.

21 BY MR. KASS

22     Q.   So what's the difference between a forgery and

23 a manipulated document?

24          MR. ROCHE:  Objection, form.

25          THE WITNESS:  I believe that we had previously

Dr. Matthew Edman
April 29, 2020                                    56

1        agreed that they were all synonyms.

2   BY MR. KASS

3        Q.   Well, I just wanted to make sure that was

4   actually your opinion.  It appears like it is?

5        A.   Yes, my opinion forgery is a document that has

6   been manipulated to appear to be something other than

7   what it is thus it's a manipulated document.

8        Q.   If a document was manipulated but you don't

9   know what the intention was can that document be a

10  forgery?

11           MR. ROCHE:  Objection.

12           THE WITNESS:  Again as we discussed previously

13       I don't opine on the reason for any of these

14       manipulations or at least the ultimate purpose of

15       the manipulated documented.

16  BY MR. KASS

17       Q.   Here is my question.  My understanding of what

18  you just testified is that a forgery is when a document

19  has been manipulated to appear to be something than what

20  it actually is.  Is that accurate?

21       A.   I agree with your definition.

22       Q.   So it seems to me that there is some sort of

23  intent because you're opining when something is forged

24  that somebody was trying to make this look like it was

25  something else, correct?

Dr. Matthew Edman
April 29, 2020                                              57

1    A.   Correct.  The document was changed but as for

2  why specifically that document was changed for example

3  an e-mail from 2014 to 2011 I don't generally opine on

4  why this specific date that was chosen.

5    Q.   Let me ask you.  If I have an invoice -- this

6  is a hypothetical I'm being very clear.  If I have an

7  invoice that I prepared yesterday and I was planning on

8  sending it to a third party and I didn't get around to

9  it I'm going to send it today so I changed the date, I

10  went into PDF I used the text editor, I changed

11  yesterday's date to today's date and then I sent it out.

12  Would you agree that document has been manipulated?

13    A.   Yes.

14    Q.   Has it been altered?

15    A.   Yes.

16    Q.   Has it been modified?

17    A.   Yes.

18    Q.   Has it been forged?

19    A.   Based on your hypothetical the description it

20  was an invoice dated yesterday that was made to look

21  like an invoice dated today so in some sense you could

22  consider that a forgery.

23    Q.   Would you consider it a forgery?

24    A.   I think it depends on the context in your

25  hypothetical but based on the definitions we've agreed

Dr. Matthew Edman
April 29, 2020                              58

1    on I believe that would be a forgery.

2         Q.   When you used the word forgery throughout your

3    report are you using that type of understanding of the

4    word forgery?

5         A.   Again I used that term to refer to a document

6    that's been manipulated to appear to be something other

7    than what it is.

8         Q.   So if we were to apply that to my hypothetical

9    the forgery is because I'm making it appear as if it was

10   actually sent today -- sent today but really I did it

11   yesterday and I updated the date?

12        A.   Again I would need to see this hypothetical

13   document how these modifications were made but again

14   it's --

15        Q.   We can do it right now if you want.  I can do

16   a screen share and modify a PDF right in front of you if

17   that's necessary.  I don't believe it is, right?  My

18   question is I don't understand -- you can give me the

19   scenarios in one situation where you would call it a

20   forgery and one where you wouldn't.  I just don't

21   understand where the doubt is.

22        A.   Sorry, could you restate the question?

23        Q.   Sure.  We have my hypothetical I drafted the

24   invoice yesterday.  Today I went into the PDF I changed

25   the date with the text editor, PDF text editor, and sent

Dr. Matthew Edman
April 29, 2020                           59

1    it out.  I had asked you is that a forgery and I'm not

2    sure I got a totally clear answer.  What would your

3    answer be in that situation?

4         A.   If it were in your hypothetical example a

5    document that let's say an invoice in your hypothetical

6    example that were created yesterday.

7         Q.   Yes.

8         A.   And you modified or manipulated that document

9    to make it appear as if it were an invoice created

10   today.

11        Q.   Correct.

12        A.   By the literal definition you could consider

13   that are a forgery.

14        Q.   Would it matter what my intentions were?

15        A.   It may.

16        Q.   In what sense?

17        A.   I take that back.  The literal definition I

18   think your intentions are irrelevant to your

19   hypothetical.  It's still an invoice that was created

20   yesterday and then modified to make it look as if it

21   were created today.

22        Q.   So your definition that's a forgery?

23        A.   For the purposes of this hypothetical, yes.

24        Q.   Now, what if I created an invoice and I wrote

25   that my total fees were $100 and made it into PDF $100,

Dr. Matthew Edman
April 29, 2020                                    60

1  wrote it today today's date.  Then I realized afterwards
2  I made a mistake.  It really should have only been $75
3  so I go back into the PDF, I change the PDF to make it
4  $75 so actually reflects the work that I did.  I send
5  out that invoice.  Is that a forgery?
6       A.   I mean again by the literal definition that
7  we're using for the purpose of these hypotheticals you
8  could consider it a forgery.  It was an invoice for $100
9  that was made to look like the invoice for $75.
10      Q.   It doesn't matter to you that actually the
11 first invoice was incorrect and by making this
12 alteration I actually made the document accurate?
13           MR. ROCHE:  Objection, form.
14           THE WITNESS:  I don't see why you couldn't
15      simply regenerate the invoice.
16           MR. KASS:  I'm lazy, right.
17 BY MR. KASS
18      Q.   Hypothetically.
19      A.   You're hypothetically lazy?
20      Q.   Yes.
21      A.   Okay.  Can you restate the question?
22      Q.   Sure.  You stated that you don't see why
23 someone could have regenerated the invoice.  Let me ask
24 you.  If I were to regenerate the invoice with the right
25 amount then it would not be a forgery; correct?

Dr. Matthew Edman
April 29, 2020                                    61

1       A.    Correct.  The document was not manipulated.

2       Q.    But if I were to use a PDF editor to change

3  the $100 to be $75 then it would be a forgery?

4       A.    For purposes of this hypothetical based on the

5  definitions we've discussed it would be an invoice for

6  an amount other than what it was intended to be.

7       Q.    And the definitions we discussed for forgery

8  those are the same definitions that you used throughout

9  your three reports which are Exhibit 1, 2 and 3;

10  correct?

11            MR. ROCHE:  Objection, form.

12            THE WITNESS:  In general yes, I believe so.

13  BY MR. KASS

14       Q.    Is there any time when you're not using that

15  definition?

16       A.    Not that I recall but I don't recall each and

17  every paragraph of my reports as I sit here today.

18       Q.    My other question for you is going through

19  your reports sometimes you state that it's a forgery,

20  sometimes you state that it's manipulated and sometimes

21  that it was not authentic.  Do you agree you change

22  your -- the verbiage you use in your conclusions?

23       A.    Yes, though the implication is consistent.

24       Q.    So in your mind it doesn't matter which

25  verbiage you use, you could have used manipulated

Dr. Matthew Edman
April 29, 2020                                        62

1  throughout and that wouldn't have changed your opinion?

2       A.   Correct.

3       Q.   Let me ask you a question, a new hypothetical.

4  This time I'm talking about Word, not talking about --

5  this is a hypothetical where I'm using a Word document.

6  I draft my invoice.  I put the $100 on it and I hit

7  save.  I close the Word document.  I reopen the Word

8  document then I realize no it should have been 75.

9  Reopen the Word document and I change it to $75.  Is

10 that a forgery?

11      A.   In the hypothetical it seems like your

12 original document was a draft and you modified your

13 draft.

14      Q.   Why do you state that it seems like my

15 document was a draft?

16      A.   Maybe I missed that part of your hypothetical.

17 It sounded like you drafted a new invoice, saved it,

18 closed it, opened it, updated your draft and then

19 created your invoice based on the document.  Is that

20 accurate?

21      Q.   Well, yes, I didn't define it as draft but the

22 actual mechanics you got correct.  So let me ask you a

23 different question.  So is it your opinion that once the

24 document's PDF'd then it comes final or is a final Word

25 document?

Dr. Matthew Edman
April 29, 2020                                          63

```
 1        A.   I mean I imagine you can have final Word
 2   document.
 3        Q.   So I would modify my hypothetical that I
 4   create my invoice, made it $100, I saved it.  I even put
 5   final in the file name.  Saved it.  Invoice, final,
 6   closed it.  Ten minutes later I realized it should be
 7   $75 I opened it back up I modified it to $75, is that
 8   document a forgery now?
 9        A.   The literal definition I suppose so.
10        Q.   Okay.  Now another hypothetical.
11        A.   Are you okay, Zalman?
12             MR. KASS:  Just give me a second.  It's hot in
13        here.  Give me like two minutes.  Let's take a two
14        minute break, Kyle.
15             MR. ROCHE:  Let's take a five minute break.
16             MR. KASS:  Five minute break, okay.
17             (Thereupon, a brief recess was taken.)
18   BY MR. KASS
19        Q.   Dr. Edman, one more hypothetical.  I open a
20   Word document.  I put it in the invoice that the amount
21   is going to be $100.  Then I don't even close the Word
22   document, I don't save it.  Right after I typed it where
23   I wrote 100 I said no, it actually should be 75.  I just
24   delete it, click the 100, put in the 75 is that a
25   document a forgery?
```

Dr. Matthew Edman
April 29, 2020                                      64

1        A.    In your hypothetical it seems like you are

2   still in the process of drafting the document.

3        Q.    And therefore?

4        A.    The document isn't complete and you are simply

5   drafting it and I don't believe that based on the

6   definitions we've discussed that would be considered

7   forgery.

8        Q.    So if I'm still in the process of drafting

9   then it's not a forgery; is that accurate?

10       A.    Yes.  You're at the time still drafting the

11  document.

12       Q.    How do you determine whether someone is still

13  drafting the document?

14       A.    If it's saved, it's transmitted seems like --

15  depending on the context that could indicate that the

16  document is finalized or the representation is made

17  about the document that could influence whether it's a

18  draft or not one way or another.

19       Q.    Dr. Edman, do you have an opinion as to

20  whether it is appropriate to rely on a forged document?

21       A.    That's a very general question.  I think in

22  general it's probably not reasonable to rely on a forged

23  document but I think it would depend on the context that

24  you're -- you have in mind here.

25       Q.    Well, let's go back to -- in what context

Dr. Matthew Edman
April 29, 2020                                                82

1    reference the instance -- scrap this.  Would you write

2    in your opinion that you did an analysis of the document

3    ID?

4         A.   I apologize, that was a very confusing

5    question.  Could you restate it?

6         Q.   Yes.  Give me one second.  Let me think about

7    a better way to do this.  Okay.  I have a much easier

8    way to do this.  Okay.  Document, human readable text

9    says the date on the top of the document human readable

10   text says January 1, 2020.  You look at the date

11   modified, date created January 1st 2020.  But in touch

12   up text edits you see a different part of the document

13   was changed.  In that situation what would you list in

14   your report?

15        A.   I think it would depend on the specific

16   document.  Again if you want to point me if you have

17   questions about specific documents and artifacts that I

18   include or did not include in my report I'm happy to

19   address those.

20        Q.   We'll definitely get to specific documents.  I

21   want to understand your methodology how you would go

22   about it.

23        A.   Looking at the specific document.

24        Q.   Well, I gave you a specific hypothetical

25   document; correct?

Dr. Matthew Edman
April 29, 2020                                          83

1        A.    Yes.  So then again I would want to review

2    that specific hypothetical document.

3        Q.    So you can't state without looking at the

4    document what your methodology would be; is that

5    accurate?

6            MR. ROCHE:  Objection, form.

7            THE WITNESS:  My methodology at a high level

8        would be what's described in my report.

9    BY MR. KASS

10       Q.    Which part of your report?

11       A.    The methodology section in my December 2018.

12       Q.    Possibly 2019, Exhibit 1, is that what you're

13   referring to?

14       A.    Yes, Exhibit 1, my apologies.

15       Q.    That's fine.

16       A.    Did I say 2017?

17       Q.    I think you said '18.

18       A.    My apologies, 2019.

19       Q.    I'm going to actually do a screen share and we

20   can go through it together.  Now, I'm looking at your --

21   here it says on page six is your methodology.  So you

22   have two paragraphs that -- is it accurate to state that

23   paragraphs 16 and 17 state your methodology?

24       A.    Yes, those paragraphs outline the methodology

25   that I applied for reviewing the various documents

Dr. Matthew Edman
April 29, 2020                                    84

```
 1    analyzed and described in my report.
 2         Q.   In paragraph 16 you state that generally
 3    comprises the following components; correct?
 4         A.   Yes.
 5         Q.   That reviewing the human readable context and
 6    then you analyzed internal machine readable code or
 7    structure and then you identify extracting metadata
 8    about the documents; correct?
 9         A.   Correct.
10         Q.   But you don't specify in particularity what
11    artifacts you considered; correct?
12         A.   This is a high level methodology that I
13    applied to the various types of files that I reviewed.
14    The specific artifacts depend on the particular type of
15    file being reviewed.
16         Q.   I want to know if there is any specific
17    guidelines you can give me for when you will consider
18    certain artifact a certain types of documents?
19              MR. ROCHE:  Objection, asked and answered.
20              THE WITNESS:  I consider -- I consider
21         whatever artifacts are available within that
22         document which may include mail transport headers,
23         time stamps within those headers, time stamps
24         within certain metadata.  In your hypothetical
25         example I would consider document ID.  Does that
```

Dr. Matthew Edman
April 29, 2020                                            85

```
 1           answer your question?
 2   BY MR. KASS
 3       Q.   That answers part of my question.  I guess my
 4   question is though is it -- is it a set methodology or
 5   process that you do for every document or sit more I
 6   look at the document and then I decide how I want to
 7   approach it, that's what I'm trying to understand?
 8           MR. ROCHE:  Objection, form.
 9           THE WITNESS:  Yes, in general there is a set
10       methodology.  Not all artifacts within a particular
11       document necessarily are interesting though.
12       Because again going back to an example you
13       discussed earlier not every single time stamp say
14       for example in the mail transport header is
15       noteworthy for describing or listing in the report.
16           They're in the documents cited in my report
17       but not necessarily, you know, explicitly stated or
18       written out or listed in the report.
19   BY MR. KASS
20       Q.   Would that be because that metadata is not
21   necessarily consistent with the document having been
22   manipulated or altered?
23       A.   I don't think that's necessarily true.
24       Q.   So are you stating that there are additional
25   alterations or modifications that you found on these
```

Dr. Matthew Edman
April 29, 2020                                    86

1    documents but you didn't list because they weren't

2    interesting?

3              MR. ROCHE:  Objection, form.

4              THE WITNESS:  I don't believe that's what I'm

5         stating.

6    BY MR. KASS

7         Q.   So could you clarify what you are stating?

8         A.   Could you clarify your question?

9         Q.   Sure.  My question is -- give me one second.

10   Let me try to formulate it.

11             MR. ROCHE:  Zalman, it's 12:30 so --

12             MR. KASS:  I think give me five more minutes

13        and I think I'll wrap up with this.

14             MR. ROCHE:  Good.

15   BY MR. KASS

16        Q.   Going back to my hypothetical there is a

17   document there's create date, modify date consistent

18   with the human readable date on the document.  You found

19   touch up text edits that relate to different parts of

20   the documents.

21             In your report would you only list the touch

22   up text edits or also note the modified date, create

23   date and note that it was consistent with the human

24   readable date?

25        A.   Again I think it depends on the specific

Dr. Matthew Edman
April 29, 2020                                    87

1   documents.  I mean if the touch up text edits were for

2   example in your hypothetical indicated that the human

3   readable date was modified to be consistent with the

4   metadata dates then I may list both in my report.

5        Q.   What if the touch up text edit only indicates

6   that signature line was changed and the portion that is

7   the signature not the date related to the signature

8   line, what would you list in your report?

9        A.   Again I think it would depend on the specific

10  document.

11       Q.   So is it fair to state that you cannot give me

12  a clear methodology -- a clear outline of your

13  methodology without reviewing a specific document?

14       A.   My methodology is listed in paragraphs 16 and

15  17 of my 2019 report which is a high level approach to

16  analyzing the variety of types of documents.  Specific

17  artifacts that I reviewed and the methods for extracting

18  them are listed -- the methods are listed in my report.

19        The artifacts that I looked at varied

20  depending on the type of document and whether those

21  artifacts are present and whether other artifacts within

22  the document suggest we're looking at other sources of

23  information.

24       Q.   So however, the specifics as to your -- would

25  you agree the specific way you implement your

Dr. Matthew Edman
April 29, 2020                                        88

1    methodology is not outlined in your report?

2            MR. ROCHE:  Objection, form.

3            THE WITNESS:  No, my methodology at a high

4        level for conducting analysis of these files is

5        listed on my 2019 report.  Further details are also

6        listed in the report.

7    BY MR. KASS

8        Q.   Those further details are as you apply

9    methodology to specific documents; correct?

10       A.   Sorry, could you restate that?

11       Q.   Sure.  You state that you have a high level

12   methodology in your report which is Exhibit 1 in

13   paragraph 16 and 17; correct?

14       A.   Yes, and that methodology is applicable to a

15   variety of file types.

16       Q.   But as far as a detailed methodology that -- I

17   believe you're stating is stated in this specific bases

18   for your opinions throughout the report; is that

19   accurate?

20       A.   The specific methodology if you're referring

21   to for example tools used?

22       Q.   Yes.  Or artifacts.

23       A.   To extract certain artifacts is listed in my

24   report.  Whether a specific artifact is written out in

25   my report again I don't explicitly include each and

Dr. Matthew Edman
April 29, 2020                                      89

1   every time stamp contained within each and every file.

2   I include the ones that are interesting, relevant to my

3   opinion and indicating that the document has been

4   manipulated.

5        Q.   And would that apply to the other artifacts in

6   addition to time stamps?

7        A.   I believe that's what I just answered that a

8   review artifacts including time stamps within these

9   documents.  But not necessarily each and every time

10  stamp contained within a file referenced in my report

11  would be copied into my report because the example

12  e-mail file could have a dozen time stamps not all of

13  which are relevant to my analysis.

14       Q.   Right.  So is it fair to say you included all

15  the artifacts that you deem were relevant and supported

16  your conclusion in your report?

17       A.   If an artifact were relevant to my conclusion

18  then I would include it in the report.  If there were

19  artifacts that -- I'll leave it there.

20       Q.   My only question is and this may just be a

21  semantics issue I want to make sure we're on the same

22  page.  When you say relevant does that mean supportive

23  of your opinion?

24       A.   Yes, relevant and ones that are contradictory

25  to -- so for example if there are two time stamps in the

Dr. Matthew Edman
April 29, 2020                                    90

1   report again this depends on the specific file if you

2   want to discuss specific files I'm happy to but say

3   there is a discrepancy between time stamp unless certain

4   files I would likely note that as an indicator or as a

5   potential indicator this document has been manipulated.

6        Q.   And the flip side if those time stamps are

7   consistent then you wouldn't note that?

8        A.   It depends on which specific time stamps and

9   which specific document you're talking about.  There

10  could be multiple time stamps within a file that are

11  consistent with each other that I wouldn't necessarily

12  list each and every one.

13       Q.   And there could also be artifacts that are

14  consistent with the human readable text that you also

15  wouldn't note; correct?

16       A.   Again it depends on the particular file.

17            MR. KASS:  Kyle, I think that's it.  Want to

18       take an hour break?  What works for everybody?

19       Whatever.

20            MR. ROCHE:  Let's come back at 1:20.

21            MR. KASS:  Sure, that works.

22            MR. ROCHE:  Great.

23            MR. KASS:  See you all then.

24            (Thereupon, a brief lunch recess was taken.)

25

Dr. Matthew Edman
April 29, 2020                                    91

```
 1              (Defendant's Exhibit Nos. 7 & 8 were
 2              marked for identification.)
 3              MR. KASS:  I am going to drop into the chat
 4         box Exhibit 7, Exhibit 8 and I'm going to describe
 5         them.  So Exhibit 7 is what appears to be Dr.
 6         Edman's invoice from February 3, 2020 and Exhibit 8
 7         is what appears to be Dr. Edman's invoice from
 8         April 14, 2020.
 9    BY MR. KASS
10         Q.   Dr. Edman, have you received those two files?
11         A.   Yes, I have them.
12         Q.   Now, I want to look at the one that's titled
13    EX791653 and it's dated February 3rd 2020.  You see
14    that?
15         A.   Yes.
16         Q.   We're going to call that Exhibit 7.  What does
17    this invoice reflect?
18         A.   The invoice reflects amounts due to BRG from
19    Boies, Schiller.
20         Q.   And those amounts are due to BRG due to your
21    work on this case?
22         A.   Yes.
23         Q.   And the total amount is $10,864?
24         A.   For professional services.
25         Q.   Correct.  Then there is additional expenses of
```

Dr. Matthew Edman
April 29, 2020                                    92

1    about three-and-a-half thousand give or take?

2        A.   Yes.

3        Q.   Now I'm going to go to document which I've

4    marked as Exhibit 8 and what does this document reflect?

5        A.   Again this is an invoice to Boies, Schiller

6    for my work on this case.

7        Q.   How much is for professional services?

8        A.   $35,672.

9        Q.   And this relates to the drafting of your most

10   recent report which is Exhibit 3?

11       A.   Yes.

12       Q.   If you go to the third page of the -- page

13   three of four there is a description under the time

14   entries, under the description entry.  You see that?

15       A.   Yes.

16       Q.   Is that an accurate reflection of the work

17   that you did in those time periods?

18       A.   Yes, I believe so.

19       Q.   Dr. Edman, do you recall before the lunch

20   break we were talking about different artifacts that you

21   consider?

22       A.   Yes.

23       Q.   Do you place any weight -- do you place

24   different weights to those different artifacts?

25       A.   You have to be more specific.

Dr. Matthew Edman
April 29, 2020                                    93

1      Q.   Are some of the artifacts more determinative

2  of a document being forged, altered or manipulated?

3      A.   Not necessarily.  I think it would depend on

4  the specific artifact of the document.

5      Q.   What do you mean it would depend on the

6  specific artifact of the document?

7      A.   I think it depends exactly what I said which

8  artifact and which document you're talking about.

9      Q.   As a general rule you can't tell me whether

10 one of those 16 are very strong indicators and one

11 possibly being weaker, it really just depends on the

12 situation?

13     A.   Yes.  I think it depends on the situation.

14     Q.   Have you tried to replicate your findings?

15     A.   Yes.

16     Q.   How have you done that?

17     A.   By repeating my analysis.

18     Q.   So let me ask you.  There is a document that

19 you found there was a touch up text edit; right,

20 hypothetical document?  Do you understand that premise?

21     A.   Yes.

22     Q.   Based upon the touch up text edits you

23 determined that certain parts of the document has been

24 manipulated; yes?

25     A.   In general, yes.

Dr. Matthew Edman
April 29, 2020                              94

1        Q.   How do you replicate that touch up text edit?

2        A.   I don't understand your question.

3        Q.   Well, you said -- you stated you replicated

4   your results; correct?

5        A.   I think we were talking about two different

6   things here.  Can you be more specific?

7        Q.   Sure.  When I asked you if you replicate your

8   results what does that mean to you?

9        A.   That means that I have reviewed the documents

10  listed in my report in the secret environments and

11  confirmed my previous results are consistent.

12       Q.   Did you -- did you -- so is it fair to say

13  that based on certain artifacts you determine there to

14  be a manipulation; correct, in general?

15       A.   In general, yes.

16       Q.   Did you then take a PDF and do those

17  manipulations you believe occurred to see if it results

18  in same artifacts?

19       A.   No.

20       Q.   Have you done any error rate testing?

21       A.   I don't know what you're talking about in this

22  context.

23       Q.   Well, do you know if 100 percent of the time

24  that someone does a touch up text edit it's going to

25  result in a modification?

Dr. Matthew Edman
April 29, 2020                                    95

```
 1              MR. ROCHE:  Objection, form.
 2              THE WITNESS:  That's my understanding of how
 3         the software works.  I don't understand there's any
 4         probability associated with it such that only a
 5         percentage of the time would the software create a
 6         touch up text in the marker.
 7    BY MR. KASS
 8         Q.   Have you tested to find out if it's
 9    100 percent or different percentage?
10         A.   No, based on my experience though if the
11    document's modified there is a touch up text edit marker
12    assuming that the documents in question was a PDF and
13    was modified using Adobe Acrobat's text edit tool.
14         Q.   Has anybody reviewed your work?
15         A.   I believe so.
16         Q.   Who?
17         A.   I believe you hired multiple experts to review
18    my work.
19         Q.   Has anybody in BRG reviewed your work?
20         A.   No, not to my knowledge.  At least not with
21    respect to this case.
22         Q.   Have you shown your work to any other person
23    who you consider to be an expert in this field to review
24    your work?
25         A.   No.
```

Dr. Matthew Edman
April 29, 2020                                    96

1       Q.   Do you have any understanding as to whether

2  touch up text edits are accepted in the forensic

3  industry as being reliable?

4       A.   I have no reason to think otherwise.  It's

5  certainly something that I've encountered before

6  reviewing other matters.

7       Q.   But do you know of any courts that have

8  accepted touch up text edits as a reliable indicator of

9  a document modification?

10      A.   I can't say.  I don't know.

11      Q.   Have you ever submitted any report to a Court

12  that they relied on touch up text edits as a reliable

13  indicator of modifications?

14      A.   Outside of this case?

15      Q.   Yes.

16      A.   Outside of this case, no.

17      Q.   Are you aware of any studies that consider

18  touch up text edits as an indicator of modifications?

19      A.   Not off the top of my head.

20      Q.   Are you aware of any books that address that

21  type of modification?

22      A.   It's my understanding the Adobe Acrobat

23  specification may reference more content points.

24  Whether it addresses touch up text edit markers in

25  particular I don't recall.  I don't believe so.

Dr. Matthew Edman
April 29, 2020                                        97

1     Q.   What's your understanding how touch up text
2  edits markers are created?
3     A.   My understanding is that the Adobe software
4  inserts the marker into the document where the document
5  is modified using the Adobe text edit tool.
6     Q.   Is that limited to certain versions of the
7  software?
8     A.   It may be.
9     Q.   Well, do you know which versions of the
10 software do create that marker?
11    A.   No, I don't have an exhaustive list of which
12 software versions create that marker.
13    Q.   Do you know of any list that's not exhaustive?
14    A.   No.
15    Q.   How do you know that edits with Adobe's text
16 editor creates a touch up text marker?
17    A.   Because in the context we used patterns seen
18 PDF documents that were modified that contain the same
19 marker.
20    Q.   Did you open up the Adobe text editor making
21 an edit in the document to confirm that it left that
22 marker?
23    A.   Not in the context of this case.  I may have
24 at a previous point in time but I didn't do that for
25 this matter.

Dr. Matthew Edman
April 29, 2020                                          98

1        Q.   Would you agree that the metadata and PDF is

2    malleable?

3        A.   Yes.

4        Q.   And that people co go into the object code or

5    behind the human readable code and make edits?

6        A.   Yes.

7        Q.   And sometimes you've determined that you're

8    able to identify those edits; correct?

9        A.   Yes.

10       Q.   Could it be possible that edits were made that

11   you were unable to identify?

12       A.   I would say that's possible.

13       Q.   So if the document create date says

14   hypothetically January 1st 2020 doesn't necessarily mean

15   the document was created on January 1st 2020; correct?

16       A.   That alone maybe.  I think it would depend on

17   specific documents.  If there are other artifacts within

18   that document.

19       Q.   You would look to see if there's some sort of

20   corroborating evidence in the document or corroborating

21   artifact; is that fair to say?

22       A.   Corroborating or some evidence that disputes

23   that date.

24       Q.   Do you consider lie detection to be within

25   your area of expertise?

Dr. Matthew Edman
April 29, 2020                                    118

```
 1    to Bitcoin mining?
 2         A.    I don't.
 3         Q.    Do you know how this document is related to
 4    the ownership of Bitcoin?
 5         A.    I don't.
 6         Q.    Do you know how this document is related to a
 7    partnership between Dave Kleiman and Dr. Wright?
 8         A.    I don't.
 9         Q.    Do you know how your testimony as to this
10    document is going to be helpful to the jury?
11         A.    I don't know.
12         Q.    To the extent modifications were made to this
13    document what's your opinion as to when the
14    modifications were made?
15         A.    I believe the modifications were made in 2014.
16         Q.    On page six of your report you reference a
17    document that is under Roman numeral 5 DEFAUS underscore
18    00519695.  Do you see that?
19         A.    Yes.
20              MR. KASS:  I am going to introduce that as
21         Exhibit 14.
22              (Defendant's Exhibit No. 14 was
23              marked for identification.)
24    BY MR. KASS
25         Q.    Have you received the document?
```

Dr. Matthew Edman
April 29, 2020                                   119

1      A.    Yes.

2      Q.    Do you know what this document -- what

3   connection this document has to the development of

4   intellectual property?

5      A.    No.   May I ask one clarifying question though?

6      Q.    Sure.

7      A.    The document cited in my report that I

8   analyzed I don't believe carried the footers shown in

9   the documents you've sent me.

10      Q.    What do you mean by the footers?

11      A.    They reference the Bates number in the lower

12   right, confidential in the lower left and then a CW for

13   example Exhibit 14 CW.001.008.3165.  I don't believe

14   those were in the native documents that I analyzed.

15      Q.    That's correct because inherently the native

16   documents are not going to have the Bates stamp numbers

17   on it.   They're done after it's kind of imaged -- when

18   it's imaged it's put the Bates stamps.   So considering

19   when I'm asking the document I mean the version of the

20   native document that you looked at, not specifically the

21   PDF as represented here.   Does that make sense?

22      A.    You're representing to me that the documents

23   that you're sending me the Bates number corresponds to

24   native document that I analyzed?

25      Q.    It should be, correct.   To the extent you have

Dr. Matthew Edman
April 29, 2020                              120

1   a native document of it.  What happens is in your report

2   you reference a document by Bates number we pull it.

3   Sometimes there is another native version that would

4   have the Bates stamp and we pull the version that has

5   the Bates stamp on it.  Kyle, are fine with that?  Just

6   want to make sure.

7        MR. ROCHE:  So the only question is there

8        seems to be two different Bates stamps an extra

9        Bates stamp on the document.  So what is that extra

10       Bates stamp?

11       MR. KASS:  Honestly I'm not sure.  I didn't

12       pull it from there.  I don't know -- it could be

13       sometimes documents are produced I know like

14       sometimes when stuff like the confidential stuff

15       then we reproduce sometimes you'll end up having

16       cross referenced Bates numbers.  I don't know the

17       exact history of it.  This is a representation of

18       the document he saw it may not have the Bates stamp

19       on it.

20       MR. ROCHE:  Understood.

21       MR. KASS:  Are we all on the same page?  I

22       don't want to later on be some sort of confusion.

23       MR. ROCHE:  No.  You're making a

24       representation that any -- that the Bates stamp

25       located on the document corresponds to the Bates

```
1         stamp cited in his report?
2             MR. KASS:  Exactly, yes.
3             MR. ROCHE:  Okay.  Then as long as we have
4         that representation we're good.
5    BY MR. KASS
6         Q.   With that clarification Dr. Edman, do you have
7    an understanding as to whether this document is related
8    to the development of intellectual property?
9         A.   I don't and my apologies for the earlier
10   digression.
11        Q.   That's fine.  If you need clarification that's
12   totally okay.  Do you have any understanding as to
13   whether this document is related to Bitcoin mining?
14        A.   I don't know.
15        Q.   Do you know if this document has any
16   relationship to the ownership of Bitcoin?
17        A.   I don't know.
18        Q.   Do you know if this document has any
19   relationship to a partnership between Dave Kleiman and
20   Dr. Wright?
21        A.   I don't know.
22        Q.   To the extent this document was altered what's
23   your opinion as to when that alteration took place?
24        A.   I think the document was modified in 2014.
25        Q.   Now, I am going to turn to page seven of your
```

Dr. Matthew Edman
April 29, 2020                        159

1    development or ownership of intellectual property?

2         A.   No.

3         Q.   Do you know how this document relates to a

4    purported partnership between Dave Kleiman and Dr.

5    Wright?

6         A.   No.

7         Q.   Do you know how your testimony will be helpful

8    to the jury?

9         A.   I don't.

10             MR. ROCHE:  Just as to that question?

11             MR. KASS:  Yes.

12   BY MR. KASS

13        Q.   To the extent modifications were made what is

14   your testimony as to the date -- what is your opinion as

15   to the date the modifications were made?

16        A.   The modifications appear to have been made in

17   2014.

18             MR. KASS:  Kyle, I think I need five minutes

19        to just to go through my notes to make sure I

20        didn't miss anything and just have a short

21        continuation after that if possible.  Does that

22        work.

23             MR. ROCHE:  All right.  Sounds good.

24             (Thereupon, a brief recess was taken.)

25

Dr. Matthew Edman
April 29, 2020                    160

1   BY MR. KASS

2        Q.   Dr. Edman, throughout your three reports you

3   testified as to the IP addresses associated with certain

4   actions.  Is that fair to say?

5             MR. ROCHE:  Objection to form.

6             THE WITNESS:  Yes.

7   BY MR. KASS

8        Q.   Did you consider that a VPN was used when

9   those actions were taken?

10       A.   Yes.

11            MR. ROCHE:  Lack of foundation.

12   BY MR. KASS

13       Q.   And how did you consider the possibility that

14   a VPN was used?

15       A.   So for at least the Max Mind exhibits that I

16   produced those typically identify when an IP address is

17   associated with a VPN or some sort of itemizer.  That

18   doesn't appear to be the case.

19       Q.   When do you mean -- when you say that

20   typically list does that mean sometimes they don't?

21       A.   I don't believe it's possible for a database

22   like Max Mind to identify each and every proxy VPN or

23   Max Mind for the exhibit.

24       Q.   Did you also consider that IP addresses are

25   not static?

Dr. Matthew Edman
April 29, 2020                              161

```
 1        A.   Could you be more specific?

 2        Q.   Sure.  Is the same IP address always assigned

 3   to the same physical location?

 4        A.   I'm not your question is exactly technically

 5   accurate.

 6        Q.   Let me ask you let me see if I can ask it a

 7   different way.  I'm sitting in my house right now I'm

 8   hooked up in the computer I presume there's an IP

 9   address associated with my computer, correct?

10        A.   Probably.

11        Q.   Is there also one associated with my router?

12        A.   Probably.

13        Q.   And presumably if we go to Max Mind and we put

14   in the IP address of my router it would show somewhere

15   in Florida; correct?

16        A.   Probably.

17        Q.   Has this IP address always been assigned to my

18   router?

19        A.   I don't know.

20        Q.   Well, typically is the same IP address always

21   assigned to the same router?

22        A.   I can't speak to your home internet

23   connection.

24        Q.   I'm just asking you as someone who I

25   understand has deep expertise in internet security and
```

Dr. Matthew Edman
April 29, 2020                                      162

```
 1   specific IP addresses.  I believe you do have a lot of
 2   expertise in this.  I'm just asking you as a general
 3   rule how does it work as far as IP addresses being
 4   assigned to specific devices?
 5        A.   It depends on the particular provider.
 6   Certain types of services give you a static IP address
 7   which doesn't change.  Others provide you a dynamic
 8   address which could change.  Not guaranteed to be the
 9   same but doesn't necessarily mean that it changes.
10        Q.   So if it's a static IP address and I just
11   purchased a new router -- I just moved into a new home I
12   just purchased a new router.  They're going to assign me
13   a static IP address; correct?
14        A.   I don't know.  That would depend on your
15   service agreement with your internet service provider.
16        Q.   But in order to get online I will need an IP
17   address, do we agree with that at least?
18        A.   Yes, most likely.
19        Q.   And that IP address is going to come from
20   somewhere?
21             MR. ROCHE:  Objection to form.
22             THE WITNESS:  It could be an IP address
23        assigned by your internet service provider or it
24        could be one you entered yourself.  Depends on your
25        home network configuration.
```

Dr. Matthew Edman
April 29, 2020                    163

1    BY MR. KASS
2        Q.    Now, is that IP address created new for me or
3    could it be recycled from somebody else?
4        A.    It could be recycled from someone else
5    previously.
6        Q.    And could that someone else previously have
7    lived somewhere else other than Florida?
8        A.    In the realm of anything's possible sure.
9        Q.    Are you saying it's more probable they lived
10   in Florida previously?
11       A.    Again this is very much depends on the
12   specifics of your internet service provider but in
13   general I would think that that IP address is more
14   likely if it were previously assigned to someone would
15   be previously assigned to someone in similar geographic
16   region as you.
17       Q.    And that's -- what's the basis for that
18   opinion or understanding?
19       A.    My experience.
20       Q.    Now, let me ask you.  What do you know about
21   Dr. Craig Wright's ISP or internet provider?
22       A.    I would say I don't know the specifics of his
23   internet service provider or his relationship with that
24   provider.
25       Q.    Do you know if that provider used static or

Dr. Matthew Edman
April 29, 2020                                    164

```
 1    dynamic IP addresses?
 2         A.   I don't know.
 3         Q.   If it was -- it's possible that he got a
 4    recycled IP address; is that fair enough?
 5         A.   Again I think I would need more specifics.
 6    Can you be more specific in your question?
 7         Q.   Sure.  So the IP addresses that are associated
 8    with the documents you've looked at, do you know if
 9    those IP addresses were created specifically for
10    Dr. Craig Wright?
11         A.   I don't know.
12         Q.   Now, when you're looking at the Max Mind and
13    it's telling you the geographic location of those IP
14    addresses what timeframe is Max Mind referring to?
15         A.   Max Mind is referring to my understanding is
16    it's referring the timeframe of when I performed the
17    look up.
18         Q.   Is it fair to say it's sometime in 2019 or
19    2020; correct?
20         A.   Yes.
21         Q.   So do you have any basis to state what
22    location those IP addresses were associated with at the
23    time you believe the documents were manipulated or
24    modified?
25         A.   Yes.
```

Dr. Matthew Edman
April 29, 2020                                            165

1        Q.   What's your basis?

2        A.   My basis is I also have other documents or

3   other e-mails identified in my third report that are

4   associated with the same IP address and in my experience

5   look ups from Max Mind while they may not necessarily

6   provide an exact latitude and longitude of the device or

7   the computer or the user associated with the IP address

8   in general the geographic region didn't change

9   significantly over time.

10       Q.   And that's the same even if six years have

11  passed?

12       A.   That's at least been my experience.

13       Q.   How many times have you looked into Max Mind

14  and checked over time as to the movement of an IP

15  address?

16            MR. ROCHE:  Objection, form.

17            THE WITNESS:  I believe it's come up in a few

18       cases before.

19  BY MR. KASS

20       Q.   How many cases?

21       A.   I don't know the exact number.

22       Q.   Do you know if it's between --

23            MR. ROCHE:  Do you want to take a break?

24            THE WITNESS:  I think we are good.

25            MR. KASS:  Give me a minute.  One second.  I

Dr. Matthew Edman
April 29, 2020                    166

1        think I got it.  Give me one second.  Give me a one

2        minute break.

3               MR. ROCHE:  Take a minute break.

4               (Thereupon, a brief recess was taken.)

5    BY MR. KASS

6        Q.   Dr. Edman, when you state that you've done it

7    before -- when you state you've done it before do you

8    have an approximation as to how many times you've done

9    it?

10       A.   Could you please restate the question?

11       Q.   Yes.  I believe I asked you how many times

12   have you look at Max Mind to see how IP address

13   locations change over time and I believe you stated

14   you've done it a number of times in the past.  Does that

15   sound accurate?

16       A.   Yes.  In general I believe it could be more

17   accurately characterized as this -- I've looked into

18   this issue on previous cases before.

19       Q.   Have you found any authoritative source that

20   discusses how Max Mind -- sorry, let me back up.  Strike

21   that.  Isn't Max Mind a directory that shows where IP

22   addresses are assigned, their geographic location; is

23   that accurate?

24       A.   Max Mind is a database that associates a

25   geographic location with an IP address or range of IP

Dr. Matthew Edman
April 29, 2020                              167

 1    addresses.
 2         Q.   But the actual IP address is assigned by the
 3    internet service provider or as you said many
 4    possibilities; correct?
 5         A.   Yes.
 6         Q.   So it's possible that if you look on Max Mind
 7    and you look at my IP provider maybe they're always
 8    assigning it to the same area but a different internet
 9    provider could be using IP addresses from all over the
10    country or globally; correct?
11         A.   I don't think I understand your question.
12         Q.   Sure.  My understanding of your testimony is
13    that Max Mind -- is that the geographic locations of IP
14    addresses normally stay in the same geographic region;
15    correct?
16         A.   Yes.
17         Q.   And that's based on your prior use of Max
18    Mind; correct?
19         A.   Yes.
20         Q.   But my question is wouldn't it depend on who
21    the internet provider of the IP addresses are that
22    you're looking up on Max Mind?
23         A.   I'm sure that's a factor.
24         Q.   Have you ever looked -- had a case where you
25    were looking up IP addresses that currently are

1   associated with Australia?

2        A.   I don't believe so.  I don't recall every IP

3   address that I've ever looked up and I can't say whether

4   every IP address I've ever looked up is currently

5   associated with Australia according to Max Mind.

6        Q.   Do you understand how Max Mind determines the

7   location of an IP address?

8        A.   I think exactly how they do that is a

9   proprietary algorithm but my understanding is they

10  aggregate information from a number of sources including

11  the providers.

12       Q.   But again that's all information related to

13  the current geographic location?

14       A.   Correct.

15       Q.   And do you have any information as to who was

16  the internet service provider of the IP addresses you

17  looked at in the timeframe of 2013, '14 or '15?

18       A.   I'm sorry, are you asking if I know who the

19  internet service provider associated with the IP address

20  as identified in our report was in 2014 or '15?

21       Q.   Correct.

22       A.   I don't believe I have that information.  I

23  just have what Max Mind provided me.

24       Q.   And do you know who assigned those IP

25  addresses that you note in your report in the years that

Dr. Matthew Edman
April 29, 2020                                    169

```
 1    you note that?
 2         A.   I don't know specifically who assigned those
 3    IP addresses.
 4         Q.   Dr. Edman, you have various opinions related
 5    to the times certain events occurred?
 6              MR. ROCHE:  Objection, form.
 7              MR. KASS:  I could be more specific if you
 8         want.  Just trying to keep it --
 9    BY MR. KASS
10         Q.   Your opinion sometimes you state this document
11    was sent the exact same time as another document.  Does
12    that sound familiar?
13         A.   Yes.
14         Q.   Do you know what time that document was
15    actually sent?
16         A.   I'm sorry, which document specifically are you
17    talking about?
18         Q.   We could find one in your report if you would
19    like but I'm saying generally when you use that phrase
20    are you stating that that's the time when it was
21    actually sent or that's the time that the metadata
22    shows, just wondering what your opinion was?
23         A.   It depends on the specific document.  In the
24    context of e-mails it would be the time that was shown
25    in the metadata.
```

Dr. Matthew Edman
April 29, 2020                                        170

1        Q.   Now, does the time that was shown in the
2    metadata always reflect the time the sender clicks send?
3        A.   Not necessarily.
4        Q.   In what situation would it not reflect the
5    time that the sender clicked send?
6        A.   If it could reflect a different time if the
7    time on the computer that was used to send the e-mail
8    were manipulated.
9        Q.   Could it also be if the sender of the e-mail
10   didn't have internet connection, he click send, he was
11   on an airplane, he landed, he got Wi-Fi and sent the
12   e-mail when he connected to Wi-Fi?
13       A.   I suppose that would depend on the particular
14   e-mail client used to send the e-mail.
15       Q.   Is that because depending on the client some
16   clients will time stamp it when the button sent is
17   clicked while other ones will time stamp it based on
18   when it leaves the inbox?
19       A.   Presumably.
20       Q.   Have you done any analysis as to what client
21   was used when the e-mails were sent that you analyzed?
22       A.   Are you asking if I did any analysis to
23   identify which e-mail clients were used?
24       Q.   Yes.
25       A.   Or if I analyzed the e-mail clients