Matthew Edman
January 16, 2020

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF FLORIDA

 3               CASE NO. 9:18-cv-80176-BB/BR

 4

 5    IRA KLEIMAN, as the personal representative
      of the Estate of David Kleiman, and
 6    W&K Info Defense Research, LLC,

 7            Plaintiffs,

 8    -vs-

 9    CRAIG WRIGHT,

10            Defendant.

11    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

12    VIDEOTAPED DEPOSITION OF DR. MATTHEW EDMAN

13    DATE TAKEN: January 16, 2020

14    TIME: 10:10 a.m.  -  2:50 p.m.

15    PLACE: 2525 Ponce de Leon Boulevard

16    Miami, Florida 33134

17
      TAKEN BEFORE: RICK E. LEVY, RPR, FPR
18                  AND NOTARY PUBLIC

19

20    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

21

22

23

24

25
```

Matthew Edman
January 16, 2020                          35

```
 1        Q.   As it stands now your testimony doesn't
 2   involve Bitcoin; is that accurate?
 3        A.   Yes, I haven't offered any expert opinions
 4   related to Bitcoin.
 5        Q.   I guess it would be the same answer with
 6   regards to tracing of Bitcoin, you haven't offered any
 7   opinions in this case to date?
 8        A.   Correct.
 9        Q.   How about Bitcoin valuation, would that be the
10   same answer?
11        A.   Correct.
12        Q.   How about the Bitcoin protocol?
13             MR. FREEDMAN:  Objection.
14             THE WITNESS:  Can you be more specific?
15   BY MR. KASS:
16        Q.   Sure.  To date have you offered any testimony
17   about the Bitcoin protocol?
18        A.   No.
19        Q.   I just want to clarify.  For all those last
20   three questions where I asked about testimony I'm also
21   including reports in this case.  Would your answer be
22   the same with that clarification?
23        A.   To my recollection I haven't submitted any
24   written reports related to the Bitcoin protocol.
25        Q.   Or the valuation of Bitcoin or tracing
```

Matthew Edman
January 16, 2020                                    36

1    Bitcoin; correct?

2              MR. FREEDMAN:  Objection, compound.

3              THE WITNESS:  Correct.

4    BY MR. KASS:

5        Q.   Have you ever been recognized as an expert in

6    the forensic examination of documents?

7              MR. FREEDMAN:  Objection, ambiguous.

8              THE WITNESS:  Do you mean specifically within

9        a court?

10   BY MR. KASS:

11       Q.   Let's break it down.  Let's start off within a

12   court.

13       A.   So my expertise related to the case I

14   testified about in 2017 involved a review of certain Web

15   sites.  To the extent you consider that a document then

16   yes.

17       Q.   How about documents that aren't Web sites?

18       A.   To the best of my recollection it also

19   involved a review of e-mails.

20       Q.   What were you trying to do with those e-mails

21   in that case?

22       A.   In that case I believe it related to

23   identifying the origin of some of the e-mails.

24       Q.   All right.  Were you trying to identify

25   whether those e-mails were forged?

Matthew Edman
January 16, 2020                              37

1        A.    No.

2        Q.    Were you trying to identify whether they were

3   manipulated?

4        A.    That was a certain part of the analysis but

5   not the ultimate objective.

6        Q.    Have you ever been recognized as an expert in

7   forensic examination of documents not in a court

8   setting?

9        A.    To the extent I understand the question not to

10  my knowledge.

11       Q.    Prior to this engagement and that other 2017

12  cases have you ever engaged in the forensic examination

13  of documents?

14       A.    Yes.

15       Q.    Where?  Let's start with when?

16       A.    So certain consulting engagements from I would

17  estimate 2014 to the present involved forensic

18  collection and examination of certain documents.

19       Q.    And how many times would you estimate you've

20  done that?

21       A.    I don't recall.  I would estimate probably on

22  the order of one to two dozen times.

23       Q.    And when you were forensically examining those

24  documents what was your ultimate goal?

25            MR. FREEDMAN:   Objection.

Matthew Edman
January 16, 2020                                    38

1           THE WITNESS:  So much of the subject matter of

2      those particular investigations related to

3      identifying one of the particular type of

4      manipulations that may have been done to those

5      documents often with malicious purposes as well as

6      attempting to identify from whom those documents

7      originated.

8   BY MR. KASS:

9      Q.   Now, when you state malicious purposes is that

10  akin to looking for mal ware?

11     A.   Yes, that was certainly part of it.

12     Q.   And did any of those engagements involve

13  determining whether a document was forged?

14     A.   Certainly we were looking for identifiers that

15  the documents may or may not have been manipulated.

16     Q.   But the manipulations you were looking for

17  primarily related to whether something malicious was

18  inserted into that document?

19     A.   That's certainly part of it.

20     Q.   Dr. Edman, what's your -- how would you

21  characterize your expertise?

22     A.   I would characterize my expertise in general

23  as a computer scientist with particular focuses on

24  computer security which includes digital forensic

25  investigations and applied cryptography.

1          MR. KASS:  Are your investigations primarily

2      related to -- let's back up.  Let's return to a

3      previously introduced exhibit which was your expert

4      report dated December 2013 of the previous year

5      which I believe is Exhibit -- maybe we did not

6      introduce it.  We did not introduce it yet.  It

7      will be Exhibit 11.

8          (Defendant's Exhibit No. 11 was

9          marked for identification.)

10   BY MR. KASS:

11      Q.   Dr. Edman, do you recognize Exhibit 11?

12      A.   Yes.

13      Q.   What is it?

14      A.   It is an expert report that I submitted in

15   this matter.

16      Q.   Did you submit it on December 13, 2019?

17      A.   Yes.

18      Q.   If you look to page four of that expert

19   report.  Does that lay out your expertise in general or

20   your working history?

21      A.   I would just like to note for the record that

22   I did previously state that this was my expert report

23   but it does appear to contain handwritten notes that I

24   did not make.

25      Q.   Let's swap that out.  I mistakenly gave you my

Matthew Edman
January 16, 2020                                    40

1    version.  Now looking at Exhibit 11 does this appear to

2    be a clean copy?

3        A.   I will check.  Yes.

4        Q.   Can you turn to page four.  Is that a summary

5    of the work you have done -- of your work history?

6             MR. FREEDMAN:  When you said page four do you

7        mean paragraph one?

8             MR. KASS:  Page four.

9             THE WITNESS:  Page three also includes some of

10       my work history.

11   BY MR. KASS:

12       Q.   On page three and four is a summary of your

13   work history and is that accurate?

14       A.   Yes.

15       Q.   Could you show me where it refers to the

16   forensic examination of documents?

17       A.   That would be generally covered by

18   investigative analysis noted in paragraph six as well as

19   paragraph seven forensic evidence collection and

20   analysis.

21       Q.   And that would be when you worked at FTI?

22       A.   Paragraph six refers to my current employer.

23       Q.   Paragraph seven where you reference forensic

24   evidence collection analysis is that when you were

25   working at FTI?

1      A.   Yes.

2      Q.   And what was that forensic evidence collection

3  and analysis related to?

4      A.   It was similar to what I described before,

5  responding to requests from clients regarding potential

6  incidents.

7      Q.   So what do you mean by potential incident?

8      A.   Potential security related incidents such as

9  an intrusion or some type of attack or attempts to

10  defraud the company.

11      Q.   Can we go step by step how that works.  I

12  assume somebody calls you up and says I believe

13  someone's intruding my system.  How does it work if you

14  can just take me step by step?

15      A.   To be clear are you asking how we get work?

16      Q.   Well, what I mean what your work is starting

17  from when someone contacts you.  Would it be fair to say

18  sometimes people contact you and state I believe someone

19  has intruded my network or on to my network; correct?

20          MR. FREEDMAN:  Objection.

21          THE WITNESS:  Yes, they may contact me.  They

22      may contact somebody that I work with.

23  BY MR. KASS:

24      Q.   But the nature of the request is I believe we

25  had an intrusion?

Matthew Edman
January 16, 2020                    42

1        A.    That would be the nature of some of the

2    requests.  I wouldn't say that's the nature of all

3    requests that we get.

4        Q.    Could some of your requests be related to I

5    want make sure that my systems are secure so somebody

6    can't get in?

7        A.    Yes, that may be part of it as well.

8        Q.    Are there any other requests that you receive

9    or received and I'm specifically relating to paragraph

10   seven just to be clear work you did at FTI?

11       A.    Yes.

12       Q.    So after you get one of those requests what do

13   you do?

14            MR. FREEDMAN:  Objection.

15            THE WITNESS:  Well, depends on the particular

16        nature of the request.  It could be an

17        investigation that may include collection of

18        relevant forensic artifacts such as forensic

19        images, documents, logs and the such.

20   BY MR. KASS:

21       Q.    What are you trying to determine after

22   collecting those documents?

23       A.    Generally trying to determine, you know,

24   whether there was a breach, the extent of the breach,

25   perhaps the source, the cause and so on.

1       Q.   Did it ever involve determining whether

2   documents were forged as a result of that intrusion?

3       A.   Yes, that may be a component of some types of

4   these investigations.

5       Q.   How many times do you estimate that has

6   happened?

7            MR. FREEDMAN:  Objection.

8            THE WITNESS:  I don't recall exactly.

9   BY MR. KASS:

10      Q.   Was it more than once?

11      A.   I would estimate again I would put the number

12  between one and ten.

13      Q.   Would it also be between one and five?

14      A.   I don't recall.

15           MR. FREEDMAN:  Objection.

16  BY MR. KASS:

17      Q.   Have you ever determined that documents were

18  in fact modified as a result of an intrusion?

19      A.   Yes.

20      Q.   When you're doing your examination of those

21  documents were you focusing -- was one thing that you

22  were looking at was whether mal ware was placed into

23  certain documents?

24      A.   Can you say that again?

25      Q.   In those assignments where you were

Matthew Edman
January 16, 2020                              44

1    investigating a potential breach and you stated you

2    analyzed some documents; correct?

3         A.    Yes.

4         Q.    Was your analysis to determine whether mal

5    ware was installed in certain documents?

6         A.    That is part of the analysis.

7         Q.    Did your analysis include determining whether

8    certain documents were forged?

9         A.    Yes.

10             MR. FREEDMAN:  Objection.

11   BY MR. KASS:

12        Q.    How many times did you determine that a

13   document was forged?

14        A.    Again I would put my recollection sometime

15   somewhere between one and ten.

16        Q.    Would it also be between one and three?

17        A.    I don't recall.

18        Q.    Between one and two?

19             MR. FREEDMAN:  Objection.

20             THE WITNESS:  Same answer.

21   BY MR. KASS:

22        Q.    So you just know it was more than one and not

23   more than ten but any number in between could be?

24        A.    To the best of my recollection, yes.

25             MR. KASS:  I want to just take a really quick

1        break.  Let's go off the record for a minute.

2              THE VIDEOGRAPHER:  Off the record at 11:05.

3              (Discussion held off the record.)

4              THE VIDEOGRAPHER:  Back on the record 11:12.

5   BY MR. KASS:

6        Q.   Dr. Edman, we were previously talking about

7   the work that you had done in FTI; correct?

8        A.   Yes.

9        Q.   And I specifically asked you how many times

10  you had conducted forensic analysis of a document to

11  determine whether it was a forgery; correct?

12       A.   To the best of my recollection, yes.

13       Q.   Now I want to ask you about your work at BRG,

14  the Berkeley Research Group.  How many times have you

15  conducted analysis to determine whether a document is a

16  forgery?

17       A.   Again I think I would have the same answer,

18  approximately between one and ten.

19       Q.   Could it be also between one and two?

20       A.   I don't recall.

21       Q.   Is there a way for you to refresh your

22  recollection?

23       A.   Yes.  I believe I could go through possibly

24  notes related to previous cases to the extent they

25  exist.

 1        A.    Yes.

 2        Q.    Is there any reason why you truncated the

 3   sentence in Exhibit 11, paragraph seven?

 4        A.    Not that I recall.

 5        Q.    Did you want the Court to think you had a

 6   broader expertise in forensic evidence, collection and

 7   analysis?

 8        A.    No.  I don't recall why I removed that

 9   particular part of the sentence.

10        Q.    But it was removed?

11             MR. FREEDMAN:  Objection.

12             THE WITNESS:  I can't say whether it was

13        removed from this document or -- all I can say is

14        that it is in Exhibit 12 and not in Exhibit 11.

15   BY MR. KASS:

16        Q.    And you don't know the reasons for the

17   removal?

18        A.    Not that I recall.

19             MR. FREEDMAN:  Objection.

20   BY MR. KASS:

21        Q.    You don't know the intention as to why it was

22   removed?

23             MR. FREEDMAN:  Objection.

24             THE WITNESS:  Not that I recall.

25             MR. FREEDMAN:  Mischaracterizes the testimony.

Matthew Edman
January 16, 2020                          51

1    BY MR. KASS:

2        Q.    And these are both documents you drafted?

3        A.    Yes.

4        Q.    Have you ever published any papers related to

5    the forensic analysis of documents?

6        A.    No.   I don't believe so.

7        Q.    Have you ever given any presentations related

8    to the forensic analysis of documents?

9        A.    Not that I recall.

10       Q.    Do you have any training related to the

11   forensic analysis of documents?

12       A.    Yes.

13       Q.    What type of training?

14       A.    Well, I have a PhD. in Computer Science which

15   provides the foundation for that sort of analysis.   I

16   have significant work experience that we discussed

17   related to that type of analysis.   I am also an access

18   data certified examiner which is a type of forensic

19   certification.

20       Q.    All the experience you have related to

21   forensic examination of documents we've already

22   discussed that.   There's nothing else out there that I

23   missed; is that accurate?

24       A.    Not that I recall as I sit here.

25       Q.    As a PhD. in computer forensics is there a

```
 1   course on how to detect forgeries?

 2        A.   I don't know.  I don't have a PhD. in computer

 3   forensics.

 4        Q.   I'm sorry, in computer sciences you stated.

 5   What's your PhD. in?

 6        A.   I stated my PhD. is in Computer Science.

 7        Q.   In Computer Science is there any course or any

 8   subject related to determining if a document is a

 9   forgery?

10             MR. FREEDMAN:  Objection.

11             THE WITNESS:  I wouldn't say there is a

12        specific course related to that to my knowledge.

13        At least at the school that I attended.

14   BY MR. KASS:

15        Q.   Did you have any focus in your PhD.?

16        A.   Yes.

17        Q.   What was your focus?

18        A.   My focus generally was on computer security.

19   My masters was focused on both related to applied

20   cryptography.  My masters was focused on anonymous

21   communication systems and my PhD. was focused on

22   wireless security.

23        Q.   You stated that you have a certification

24   related to the forensic analysis of documents?

25        A.   I don't believe that's what I stated.
```

Matthew Edman
January 16, 2020                                    53

1        Q.   Let's see exactly.  You stated that you have

2   an access data -- you are an access data certified

3   examiner which is a forensic certification.  Is that

4   what you stated?

5        A.   Yes.

6        Q.   What do you mean by a forensic certification?

7        A.   It relates to the forensic collection and

8   analysis of forensic artifacts which includes documents.

9        Q.   As part of that certification to they teach

10  you how to identify whether a document is a forgery?

11       A.   No.

12            MR. FREEDMAN:  Objection.

13  BY MR. KASS:

14       Q.   Do they teach you how to identify whether a

15  document has been altered?

16       A.   No.

17       Q.   How long does that certification take?

18       A.   Not that long.

19       Q.   If you had to guess around how long,

20  approximate?

21       A.   To be clear --

22       Q.   Let's break it down.  How long did you have to

23  study -- is there an exam to receive that certification?

24       A.   Yes.

25       Q.   How long does that exam take?

Matthew Edman
January 16, 2020                        54

1        A.    I don't recall exactly.  I believe there was a

2   time limit.  I think it's something like three hours.

3        Q.    Did you -- do you have to take any classes

4   before taking that exam?

5        A.    The classes -- there are classes offered but

6   to my knowledge it's not required.

7        Q.    So what do you need to do prior to taking that

8   exam?

9             MR. FREEDMAN:  Objection.

10             THE WITNESS:  You need to know the subject

11        matter before taking the exam.

12   BY MR. KASS:

13        Q.    Well, is the exam open to anybody?

14        A.    I don't recall exactly.  I believe so but I

15   don't know the exact requirements.

16        Q.    Do they test whether you know the subject

17   matter before taking the exam?

18        A.    To the extent I understand your question no,

19   there is no pretest before you take the test.

20        Q.    What do they test on the exam?

21        A.    To the best of my recollection they test the

22   forensic processing, review of certain forensic images,

23   extraction of documents, review of those documents for

24   particular information.

25        Q.    Are they testing that you know how to use the

1    software?

2         A.   Yes, that's part of it.

3         Q.   Do you know what percentage of it it is?

4         A.   Not that I recall.

5         Q.   So in addition to testing whether you know how

6    to use the software what else are they testing?

7         A.   Your ability to extract certain information

8    from forensic artifacts.

9         Q.   How do they test your ability to do that?

10             MR. FREEDMAN:  Objection.

11             THE WITNESS:  They provide you with a forensic

12        image and then you have to -- they ask you

13        questions regarding artifacts within that image.

14   BY MR. KASS:

15        Q.   Using their software; correct?

16        A.   I believe the questions are designed that way

17   but I also don't believe that you have to use their

18   software to answer those questions.

19        Q.   Did you use their software to answer the

20   questions?

21        A.   Yes.

22        Q.   Did you use that software in this engagement?

23        A.   Yes.

24        Q.   Did you use any additional software in this

25   engagement?

Matthew Edman
January 16, 2020                                    56

1       A.    Yes.

2       Q.    What additional software did you use in this

3   engagement?

4       A.    I used a lot of types of software.  I used

5   Microsoft Windows for example.

6       Q.    Okay.  What other software did you use?

7       A.    I'm not sure I can provide you an exhaustive

8   list.  Microsoft Word was relevant.

9       Q.    Let me make this a little easier.  In your

10  determining whether a document was forged or altered

11  what software did you use, not in drafting the report

12  that's what I'm trying to make the distinction?

13      A.    To the extent I understand your question so to

14  determine whether a document was manipulated I needed to

15  extract certain features or artifacts from those

16  documents.  In order to do that I used a number of

17  tools.  One of them is a HEX Editor.  That HEX Editor is

18  called 010 editor.  For reviewing certain e-mail files I

19  used Microsoft Outlook.  For extracting certain

20  information from PDF files in addition to 010 editor I

21  used a few common tools one is called PDFparcer.PY.

22  Another called PDF Extreme Number.

23      Q.    Do you recall any additional software that you

24  used?

25      A.    I used GNU PG for the validation of certain

1    parse relevant bits of the PDF and then searched for

2    this particular marked content point.

3         Q.   Were you looking for any other marked content

4    points or any other -- was there any other method that

5    you used to identify documents that you wanted to look

6    at further?

7         A.   Yes.

8         Q.   What methods did you use?

9         A.   Based on documents that I've already reviewed

10   and determined that they are likely forgeries I also

11   searched for document I.D.s associated with those

12   particular documents.

13        Q.   But would it be fair to state that the first

14   process in all of this is that you run some software to

15   identify the touch up text edits and then having after

16   having identified the document you used the document

17   I.D.s to identify related documents?

18        A.   I wouldn't say that's an exact description of

19   the process.  Different parts of the process.

20        Q.   Can you just state for the record what the

21   process actually was?

22        A.   Sure so as I described the process for

23   initially reviewing the natives include parsing them

24   using PS Parcer.PY and searching for that particular

25   marked content point.

1              Separate from that there are certain documents

2      that I had reviewed prior to having access to Relativity

3      and for which we would identify document I.D.s

4      associated with those documents and then searched within

5      these native files for those document I.D.s.

6          Q.   Got it.  How did you obtain those documents

7      before you had access to Relativity?

8          A.   Those documents would have been provided by

9      counsel for the plaintiffs.

10         Q.   Were those hard copy documents?

11         A.   No.

12         Q.   Did they include any hard copy documents?

13         A.   No.  Not to my knowledge.

14         Q.   Could you turn to page six of Exhibit 11 and

15     if you could look at paragraph 18 I would like you to

16     look at the last sentence that actually starts at the

17     beginning of page seven and what does it state the last

18     sentence right above the image?

19         A.   "I also understand that this document was

20     produced by the defendant as a scan of a hard copy paper

21     document in this litigation."

22         Q.   Does that refresh your recollection whether

23     you did in fact look at hard copy documents?

24         A.   I did not look at any hard copy documents that

25     I recall.

Matthew Edman
January 16, 2020                                    71

1          Q.    So how do you know that that document was a

2     scan of a hard copy document?

3          A.    That was represented to me by counsel for the

4     plaintiffs.

5          Q.    If you can turn to page eight.

6          A.    Of Exhibit 11?

7          Q.    Yes, please.  You see at the top of the page

8     it says "the two documents is identical to the version

9     attached to the paper scans as Bates numbers 0002414-15

10    that the defendants swore were authentic?"

11         A.    Yes.

12         Q.    How did you determine that they were

13    identical?

14         A.    I visually compared them.

15         Q.    The "them" being those documents in the hard

16    copy document?

17         A.    Them being I had an electronic copy of the

18    hard copy document and also the electronic copies that I

19    extracted from 13451 and 14589.

20         Q.    Dr. Edman, what is a hard copy document?

21         A.    Hard copy document is a physical paper

22    document.

23         Q.    If I scan a hard copy document what do you

24    call that?

25         A.    I would call that a digital copy of the hard

Matthew Edman
January 16, 2020                          72

1    copy document.

2         Q.   Is that standard industry use?

3         A.   I'm sorry, could you be a little more

4    specific?

5         Q.   Your nomenclature calling a printed document

6    that was later scanned a digitally scanned version and

7    no longer a hard copy is that industry standard?

8         A.   To the extent I understand your question yes,

9    I believe that's the common nomenclature.

10        Q.   Do you know whether any hard copy documents

11   were produced in this litigation?

12        A.   I understand that some may have been but I

13   don't know for certain.

14        Q.   Would you consider a hard copy document that

15   was later scanned an ESI document?

16             MR. FREEDMAN:   Objection.

17             THE WITNESS:   Could you please define what you

18        mean by ESI document?

19   BY MR. KASS:

20        Q.   What does ESI document mean to you?

21        A.   I don't know what the abbreviation means in

22   this context.

23        Q.   Do you know what it means in any context?

24        A.   Not that -- not to my recollection.

25        Q.   When you looked -- once you identified -- once

Matthew Edman
January 16, 2020                    73

1    you identified a document that you wanted to look at for

2    example a PDF that you wanted to look at further what

3    would you look at, what was your process?

4              MR. FREEDMAN:  Objection.

5              THE WITNESS:  The methodology for reviewing a

6         particular document such as PDF is described in my

7         report which includes reviewing the content of the

8         document, the internal structure, metadata

9         associated with that document and the content of

10        the document may include other things for further

11        review such as cryptographic signature.

12             MR. FREEDMAN:  For the record I objected to

13        question but I don't see it on the record.

14             MR. KASS:  Objection noted.

15   BY MR. KASS:

16        Q.   Do PDFs have multiple data streams?

17        A.   They can.

18        Q.   Are there data streams that you looked at but

19   did not include as exhibits to your report?

20        A.   I'm sure there were unrelated data streams

21   contained in the PDF that aren't included in my report.

22        Q.   How did you determine they were unrelated?

23        A.   They didn't contain any information that

24   influenced the opinion stated in my report.

25        Q.   But it is something that you looked at?

Matthew Edman
January 16, 2020                                    78

```
 1   sending you hash values?

 2       A.   In one instance I believe there was and in

 3   another instance I believe this was included with the

 4   documents that they gave me.

 5            MR. KASS:  So I'm also requesting the e-mail

 6       with the hash values that's something Dr. Edman

 7       considered in his report.

 8   BY MR. KASS:

 9       Q.   Is there anything stopping you from providing

10   that e-mail with the hash values?

11       A.   Not to my knowledge.

12       Q.   Did you have -- did you calculate your own

13   hash values with regard to these documents?

14       A.   Again as I stated previously I used open SSL

15   which is a tool for performing a number of cryptographic

16   activities including hashing files.

17       Q.   So I'm just trying to understand how that tool

18   works.  Would it be accurate to state that that tool

19   generates a hash of those documents?

20       A.   That tool generates a hash of yes, one or more

21   documents.

22       Q.   And then did you compare that hash with the

23   hash you had provided by plaintiff's discovery vendors?

24       A.   Yes.

25            MR. KASS:  I will request all the hashes you
```

1       generated using that tool.

2   BY MR. KASS:

3       Q.   Is there anything stopping you from providing

4   those hashes that you calculated?

5       A.   I don't believe that I have the hashes that I

6   generated then but I can certainly generate hashes of

7   documents as I have them now.

8       Q.   Why don't you have hashes of documents that

9   you generated then?

10      A.   Because it was just a comparison at the time

11  between a CSV and the output of open SSL.

12      Q.   When that output is -- in what form is the

13  output generated?

14      A.   Wouldn't have been any output unless there was

15  a difference.

16      Q.   Let's just back up.  My understanding of your

17  testimony is you generated your own hashes for those

18  documents; correct?

19      A.   Yes.

20      Q.   And you compared those hashes with the hashes

21  that were provided by plaintiff's vendor; correct?

22      A.   Yes.

23      Q.   Were -- the hashes that you generated how are

24  they stored?

25      A.   To the best of my recollection they weren't

 1    stored.

 2        Q.   So when the computer -- when the software

 3    generates the hash do you see that hash?

 4        A.   In some instances, yes.

 5        Q.   How do you see it?

 6        A.   It prints it in a command prompt.

 7        Q.   Did you save your command prompts?

 8        A.   No.

 9        Q.   Do you have any record of the steps that you

10    took when you were validating these documents?

11        A.   To the best of my knowledge I don't have any

12    contemporaneous record, no.

13        Q.   Is it possible for someone to replicate your

14    work?

15        A.   I believe so, yes.

16        Q.   How would somebody replicate your work?

17        A.   By using -- well, by reviewing the same

18    documents that I reviewed.  By looking at the same

19    metadata that I reviewed.  Extracting the same

20    cryptographic signatures.

21        Q.   But is there any way someone can be certain

22    they're looking at the same exact version of the

23    document that you were looking at when you conducted

24    your analysis?

25        A.   I mean they could compare the hash values.

1      Q.   We wouldn't know the hash values of the

2   document that you looked at?

3      A.   They were consistent with what the Relativity

4   vendor provided me.

5      Q.   Right, but they can't independently verify the

6   actual hash values of the documents you had looked at?

7      A.   Not to my knowledge.  I'm sure there's some

8   central source of truth from access -- I forget Alex

9   Partners from when they were collected.

10      Q.   I'm just concerned about when you were sitting

11   at your computer doing your analysis we cannot know

12   definitively what the hash value of that document was at

13   that point in time because we do not have those hash

14   values.  Is that correct?

15      A.   Again the hash values that I computed were

16   consistent with what was provided to me so the hash

17   values of those documents would have been what was

18   provided to me.

19      Q.   But if someone wanted to verify that they were

20   in fact the same they wouldn't be able to?

21      A.   Not without the list of hash values.

22      Q.   Which we don't have; correct?

23      A.   Correct.

24      Q.   Would it be accurate to state that in your

25   report which is Exhibit 11 you referenced many documents

Matthew Edman
January 16, 2020                                    82

```
 1   that appear to be communications between Dr. Wright and
 2   Dave Kleiman?
 3        A.   Yes.
 4        Q.   Did you analyze the documents that were
 5   produced by Dr. Wright to reach an opinion as to whether
 6   those documents were forged; correct?
 7        A.   I don't know specifically who produced these
 8   documents.
 9        Q.   Well, have you looked at the Bates numbers on
10   the documents that you looked at?
11        A.   Yes.
12        Q.   Did you analyze any documents that came from
13   Dave Kleiman's device to see whether he had the other
14   side of the e-mail?
15        A.   These would have been included in searches
16   that I ran to -- in Relativity to the extent -- to the
17   best of my recollection.
18        Q.   Do you know if Dave Kleiman's e-mails were
19   included in Relativity?
20        A.   I believe so but I don't know for certain.
21        Q.   What's the basis for your belief that it was
22   included in relativity?
23        A.   I observed e-mails as a result of some of my
24   searches that were sent by Dave Kleiman and to the best
25   of my recollection didn't include Craig Wright as a
```

Matthew Edman
January 16, 2020                                    89

```
 1        A.    Yes.

 2        Q.    What does it mean to you?

 3        A.    It means following reasonable forensic

 4   processes and procedures when handling forensic

 5   evidence.

 6        Q.    What are reasonable forensic processes when

 7   handling forensic evidence?

 8        A.    I believe that would depend on the type of

 9   evidence.

10        Q.    How about e-mails and PDFs?

11        A.    With respect to -- can you be more specific?

12        Q.    To determine whether they were altered or

13   forged.

14        A.    So I believe that the methodology that I've

15   described here is reasonable forensic process in

16   reviewing these documents.

17        Q.    So in your mind is forensic process the same

18   thing as forensic methodology?

19        A.    As you're describing them yes, I believe so.

20        Q.    Are you aware of any best practices when it

21   comes to not even the methodology but reviewing

22   documents to ensure that referring to the methodology

23   that what you're doing is -- can be traced, that it's

24   recorded and they're not -- you're not inadvertently

25   altering anything throughout to your investigation?
```

Matthew Edman
January 16, 2020                                    90

1        A.    Can you restate the question, sorry?

2        Q.    That's fine.  Are you aware of any best

3   practices that somebody should take when they are

4   forensically investigating documents to ensure that they

5   are not inadvertently modifying the documents and

6   nothing on their workstation is contaminating the

7   documents throughout their analysis?

8        A.    Other than the reasonable and typical forensic

9   practices such as verifying that the documents received

10  was as was intended.  In some instances it may involve

11  verifying that the output of for example extracting data

12  from a document is consistent between two tools.

13       Q.    Are those all the processes that you're aware

14  of?

15       A.    As I sit here today and as it relates to the

16  analysis that I performed, yes.

17       Q.    Where did you perform your analysis on these

18  documents?

19       A.    In numerous places.

20       Q.    Could you give me locations?

21       A.    New York, New York.  Miami, Florida.  I

22  believe I created some exhibits while in Lanai, Hawaii.

23       Q.    What computer did you work on when you

24  performed this analysis?

25       A.    My BRG issued computer.

Matthew Edman
January 16, 2020                                      91

1          Q.    All three times?  All three locations was on

2    your BRG issued computer?

3          A.    Yes.  I'm trying to recall whether I had a

4    different BRG computer in mid 2019.  I believe I may

5    have but it was still a BRG issued computer.

6          Q.    And was this computer used for other work

7    aside from your work in connection with Exhibit 11 which

8    is your expert report?

9          A.    Yes.

10         Q.    Do you know what a clean test environment is?

11         A.    I believe so.

12         Q.    What is it?

13         A.    An environment such as a computer or virtual

14   machine that is in some known fixed state.

15         Q.    If you're using a machine for other things,

16   other projects is that going to be a clean test

17   environment?

18         A.    No, unlikely.

19         Q.    Is there a reason why you didn't use a clean

20   test environment when you performed your analysis?

21         A.    No particular reason.  It didn't seem to be a

22   requirement for this type of analysis.

23         Q.    Although the result of the analysis you're

24   determining certain documents were forged; correct?

25         A.    That is part of my opinion, yes.

Matthew Edman
January 16, 2020                              92

1        Q.   And altered?

2        A.   Sorry, can you restate?

3        Q.   And altered?

4        A.   Yes, I believe certain documents were altered.

5        Q.   And not authentic?

6        A.   Correct.

7        Q.   All that was done on a non-clean work

8   environment?

9             MR. FREEDMAN:  Objection.

10            THE WITNESS:  It was done on my BRG issued

11       laptop.

12  BY MR. KASS:

13       Q.   Which was a non-clean work environment,

14  correct?

15            MR. FREEDMAN:  Objection.

16            THE WITNESS:  Sure.

17  BY MR. KASS:

18       Q.   Did you use a write blocker when you obtained

19  those documents?  Let's back up.  Do you know what a

20  white blocker is?

21       A.   Yes.

22       Q.   What's a white blocker?

23       A.   A white blocker is a device that prevents

24  modifications to a hard drive such as when removed from

25  a computer.

Matthew Edman
January 16, 2020                                   93

1        Q.    Did you use a white blocker when you were

2   analyzing those documents?

3        A.    That question doesn't even make any sense.

4        Q.    Well, you obtained documents from another

5   source; correct?

6        A.    Yes.

7        Q.    Then one source of that was through the

8   internet as an e-mail attachment?

9        A.    Yes.

10       Q.    You downloaded it on to your computer?

11       A.    Yes.

12       Q.    And you did your analysis; correct?

13       A.    Yes.

14       Q.    Would another way have been to obtain those

15   documents from the discovery vendor on a USB drive?

16       A.    Yes, I suppose that's possible.

17       Q.    They could have e-mailed it to you?

18            MR. FREEDMAN:   Objection.

19   BY MR. KASS:

20       Q.    Mailed it to you?

21       A.    Restate the question.

22       Q.    Sure.  The discovery vendor could have mailed

23   you that USB drive?

24       A.    I don't know the capabilities but I imagine

25   that that's possible.

Matthew Edman
January 16, 2020                                    94

1      Q.    And you could have plugged that USB drive into

2   a white blocker?

3      A.    Yes.

4      Q.    And then you could have used the white blocker

5   to take those documents from the USB drive to your

6   computer?

7      A.    Yes.

8      Q.    And in doing that you would ensure you didn't

9   inadvertently modify any of those documents while

10  transferring them on to your computer?

11     A.    The process you described would just make sure

12  I'm not doing inadvertently modifying documents that are

13  on the USB drive that the vendor sent me.

14     Q.    It would also enable you to confirm at the end

15  that your process didn't modify anything; correct?

16          MR. FREEDMAN:  Objection.

17          THE WITNESS:  Yes.

18  BY MR. KASS:

19     Q.    Would you agree that the method of storing the

20  document could impact the integrity of its metadata?

21     A.    I don't know.

22     Q.    Do you consider yourself to be an expert in

23  document metadata?

24     A.    I consider myself to be an expert in digital

25  forensic investigation which may in some instances may

1    involve a review of metadata, yes.

2         Q.   You have no knowledge as to whether the manner

3    in storing a document could impact the metadata?

4         A.   Again can you give me an example?

5         Q.   I'm just asking you.  I want to know if

6    metadata is static or if the way it's stored could

7    somehow impact it.

8         A.   I imagine it's possible to store data in a way

9    that could impact that data.

10        Q.   Do you have any information as to how the

11   documents were stored from the date they were first

12   created until they appeared on your computer?

13        A.   No.

14        Q.   Do you have any knowledge as to the chain of

15   custody from when the document was collected until when

16   you analyzed it?

17        A.   Obviously I have some knowledge of the

18   Relativity vendor providing me with documents or

19   obtaining them from relativity but the chain of custody

20   how they got from the original device to the Relativity

21   vendor I can't say.

22        Q.   And you don't know for certain -- and you

23   don't know for certain who collected the data, do you?

24        A.   Can you be more specific on which data?

25        Q.   For all the documents that you looked at that

Matthew Edman
January 16, 2020                           96

```
1   were obtained from Relativity, plaintiff's counsel,
2   plaintiff's vendor do you know who collected that
3   data -- data originally?
4        A.   No.
5        Q.   If a document was moved from one server to
6   another server could that impact its metadata?
7        A.   I imagine it would depend on how that document
8   is moved.
9        Q.   Well, could you tell me a scenario where it
10  would impact its data?
11       A.   Sorry, did you say would or would not?
12       Q.   Where it would.
13       A.   Depending on how that data is transferred
14  perhaps there is some method for -- that would alter
15  that data but I don't know exactly.  I can't hypothesize
16  what that would necessarily be.
17       Q.   But you would agree that there could be a
18  scenario where transferring data from one server to
19  another could alter its metadata?
20            MR. FREEDMAN:  Objection, speculation.
21            THE WITNESS:  Anything is possible.
22            MR. FREEDMAN:  When you get to a next break
23       maybe we can stop for lunch.
24            MR. KASS:  Actually we're getting very close.
25
```

Matthew Edman
January 16, 2020                                    97

 1    BY MR. KASS:

 2        Q.   When you state anything is possible do you

 3    have any idea as to what is the likelihood that that

 4    could happen?

 5             MR. FREEDMAN:  Objection.

 6             THE WITNESS:  Again I think it would depend on

 7        the particular method as to whether it would be

 8        likely that data would be corrupted or not.

 9    BY MR. KASS:

10        Q.   But you're not able to tell me what methods

11    would in fact result in corrupting the data as you call

12    it?

13             MR. FREEDMAN:  Objection.

14             THE WITNESS:  No, not as I sit here today.

15    BY MR. KASS:

16        Q.   Do you have any idea whether any of the

17    documents you reviewed were in fact moved from one

18    server to another server?

19        A.   I have no knowledge of that.

20        Q.   You have no knowledge if they were moved how

21    many times they were moved?

22        A.   That's correct.

23        Q.   Removing one document from one storage media

24    to another storage media could that also affect

25    metadata?

Matthew Edman
January 16, 2020                                    98

```
 1        A.    I think it would depend on the particular
 2   metadata that you're talking about.  I would say that
 3   it's possible but again it would depend on the
 4   particular situation that was used.
 5        Q.    Could it change document dates like create
 6   date?
 7        A.    I think it would be unlikely to change
 8   document dates embedded in the document such as create
 9   date in the document metadata.
10        Q.    But could it happen?
11        A.    Anything's possible.
12        Q.    And you can't rule that out?
13            MR. FREEDMAN:  Objection.
14            THE WITNESS:  I have no reason to believe that
15        that occurred but again anything is possible.
16   BY MR. KASS:
17        Q.    What if one file -- what if a document was
18   moved from one file system to another file system could
19   that impact its metadata?
20        A.    The metadata embedded in the documents I think
21   it's unlikely that that metadata would be impacted.
22        Q.    But you can't rule that out?
23        A.    Again anything is possible.
24        Q.    That's why you can't rule it out; correct?
25            MR. FREEDMAN:  Objection.
```

Matthew Edman
January 16, 2020                              99

1        THE WITNESS:  Same answer.

2        MR. KASS:  I think we can go off the record

3    for now.

4        THE VIDEOGRAPHER:  Off the record at 12:30.

5        (Thereupon, a brief lunch recess was taken.)

6        THE VIDEOGRAPHER:  On record 1:20.

7        MR. KASS:  All right.  Vel, this is just

8    continuing from the conversation we had before.  I

9    would like to put this on the record.

10        We are terminating Dr. Edman's deposition.  As

11    a basis for that discovery has been extended and

12    it's my understanding that you cannot state with

13    certainty that Dr. Edman will not be submitting

14    additional or any amendments to his report.  If

15    that's not accurate I will let you correct that

16    after I'm done stating my basis.

17        I also want to note Mr. White is here.  His

18    deposition was scheduled for tomorrow.  We already

19    moved it once from today to tomorrow to accommodate

20    and supplemental report that was submitted by Dr.

21    Edman on Monday and now plaintiff has stated

22    because of the extension of discovery they are

23    canceling Mr. White's deposition which is scheduled

24    for tomorrow.  We are doing the same.

25        Vel, if you would like to put anything on the

1    record now is your chance.

2        MR. FREEDMAN:  Yes, we object.  Dr. Edman is

3    here.  His deposition has started for I think it's

4    two hours and 20 minutes already.  That is

5    different than Mr. White's deposition who has

6    not -- it has not even started yet.

7        Also we cannot state with certainty that Dr.

8    Edman will not supplement his report.  That's

9    partly due to the fact that you have dumped 20,000

10   documents on us yesterday.  Also due to the fact

11   that we have agreed with you, we offered to you

12   that if he does supplement his opinion that we

13   would attempt to reach agreement on the amount of

14   time you would be able to re-depose him.

15       It is our position that terminating an ongoing

16   deposition is inappropriate; that by terminating

17   this deposition you are waiving the right to depose

18   him again and we also argue that because you won't

19   represent on the record that you are done

20   questioning him you're preventing me from taking a

21   cross examination or redirect examination of Dr.

22   Edman.

23       There are things that need to be cleaned up in

24   this deposition that you are preventing me from

25   doing and therefore our position is also that you