Confidential

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| IRA KLEIMAN, as the personal representative ) | |
| of the Estate of David Kleiman, and W&K Info ) | |
| Defense Research, LLC, ) | **CASE NO.: 9:18-cv-80176-BB** |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| CRAIG WRIGHT, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |

# REBUTTAL REPORT OF WILLIAM S. CHOI, PH.D.

**April 17, 2020**

Confidential

## I.    Introduction

1.    I have been retained by Rivero Mestre LLP in the matter of *Ira Kleiman and W&K Info Defense Research, LLC v. Craig Wright* on behalf of Craig Wright to rebut Plaintiffs' claim of damages as set out in the Second Amended Complaint, dated January 11, 2019 ("Complaint") and certain sections of the Amended Expert Report of Andreas M. Antonopoulos, dated April 10, 2020 ("Antonopoulos Report").[1]

2.    Plaintiffs have not properly quantified damages, and they have not proffered a methodology that would allow the finder of fact to ascertain the reliability of their damages estimate.  Plaintiffs have not explained how they determined which assets they are allegedly entitled to, or how they determined the value of these assets. The limited information provided by Plaintiffs suggests that they may have relied on Bitcoin values at around the time of the Complaint.  Such an approach would overcompensate Plaintiffs because it ignores the significant risk of holding bitcoins. The Complaint and the Antonopoulos Report do not provide evidence to support the assertion that Plaintiffs would have continued to hold bitcoins through the date of the Complaint, and statements by Ira Kleiman do not reconcile with this proposition. Moreover, liquidating the assets claimed by Plaintiffs would likely require a sizable discount from observed market prices.

---

[1] Specifically, I have been asked to review paragraphs 80 through 87 of the Antonopoulos Report.

Confidential

## II.   Qualifications

3.      I am a Managing Director in the professional services firm AlixPartners, LLC ("AlixPartners").   I have extensive experience in economic, financial, and statistical analyses, and over the course of my professional career, I have worked on issues relating to the assessment of economic damages and statistical methods, including on the issues of finance and statistics.   I also have provided consulting services to large corporations, privately held companies, and the U.S. government, including on issues relating to econometrics, statistics, market structure, market share, pricing, and marketing.

4.      With regards to statistical and econometric methods, I have been retained by the Securities and Exchange Commission and the Department of Justice to conduct statistical analysis to assist in their respective investigations of mortgage-related fraud resulting in some of the largest settlements in U.S. history.   I also have testified on several matters related to finance and statistical methods.

5.      I received my doctorate in economics from Duke University.   I received from the same institution an M.A. in economics.   I also received my M.A. in business economics with a concentration in managerial accounting from the University of California, Santa Barbara, and my B.S. in economics from the University of California, Riverside.   I have authored articles and given presentations related to market structure, game theory, licensing, structured finance, and econometrics.   **Exhibit 1** is my most recent curriculum vitae and includes my recent testimony.

6.      AlixPartners is being compensated at the rate of $1,015 per hour for my work in this matter.   I utilized a team of AlixPartners' personnel who worked under my

Confidential

direction.  AlixPartners is being compensated for time incurred by other professionals who have supported my analysis in this matter at $420 to $830 per hour.

7.    This report is a statement of opinions I expect to express in this matter and the basis and reasons for those opinions.  In forming the opinions expressed in this report I relied upon my education, experience, and knowledge of the subjects discussed. I have also relied upon a number of documents and other materials, which are cited herein or listed in **Exhibit 2**.  To the extent that additional information relevant to my analysis is made available, I maintain the right to update and supplement my opinions.

## III.   Background

8.    Plaintiffs allege Dr. Wright deprived them of hundreds of thousands of bitcoins and "valuable intellectual property rights of various blockchain technologies" ("Assets").[2]  Bitcoin was introduced by Satoshi Nakamoto in October 2008, offering a currency[3] that used no paper or metal but approximately 31,000 lines of code.  A key innovation of Bitcoin was the introduction of the blockchain, which is, in simplest terms, a ledger of all Bitcoin transactions that is corroborated by a network of computers running Bitcoin software and is freely available to the public for inspection. Users can acquire bitcoins by validating transactions on the blockchain ("mining") or by selling goods or services in exchange for bitcoins.   For example, bitcoins are

---

[2] Complaint, ¶ 7.

[3] I use the term currency to refer to "any commodity [that] is capable of being used as a medium of exchange."  See Gregory, C.A. "Currencies" in *The New Palgrave Dictionary of Economics*, 3rd. ed. Palgrave McMillan, 2018 p. 2538.

Confidential

commonly traded for conventional currencies at exchanges such as Bitstamp, Coinbase, and Kraken.[4]  The first such exchange was opened in March 2010.[5]

9.    According to Plaintiffs, Dr. Wright and David Kleiman "were involved in Bitcoin from its inception and, together, had accumulated a vast wealth of bitcoins from 2009 through 2013."[6]  Following David Kleiman's death on April 26, 2013, Plaintiffs assert that Dr. Wright "took sole ownership/control" of intellectual property assets[7] and at least 300,000 bitcoins[8] that belonged to David Kleiman and should have accrued to his estate.  Plaintiffs also assert that the Assets include bitcoins mined through W&K from 2011.[9]  According to Plaintiffs, "these bitcoins could number around ~1,100,111 [sic]."[10]  They further assert that the value of these bitcoins and their forked assets is approximately $11.4 billion, "though at their peak in December 2017" their "worth" was approximately $27.3 billion according to Plaintiffs.[11]  Mr. Antonopoulos states that the value of bitcoins was approximately $7,400 per BTC on December 3, 2019.[12]  He further states that owners of Bitcoin funds recorded on the blockchain prior to a "hard fork" also "own coins on *both* forks" and that "at least 3 forks have significant market value and liquidity," specifically Bitcoin Cash (BCH), Bitcoin Satoshi Vision (BSV), and

---

[4] Bitcoin.org. "Bitcoin Exchanges."
https://bitcoin.org/en/exchanges
[5] Sedgwick, Kai. "Bitcoin History Part 6: The First Bitcoin Exchange." Bitcoin.com. December 25, 2018.
https://news.bitcoin.com/bitcoin-history-part-6-the-first-bitcoin-exchange/
[6] Complaint, ¶ 10.
[7] Complaint, ¶ 95.
[8] Complaint, ¶ 112.
[9] Complaint, ¶¶ 68, 113.
[10] Complaint, ¶ 114.
[11] Complaint, ¶ 114.
[12] Antonopoulos Report, ¶ 87.

Confidential

Bitcoin Gold (BTG).[13]  Mr. Antonopoulos also provides the prices for these forked coins on December 3, 2019,[14] but he does not clarify what, if any, role these prices play in Plaintiffs' damages estimate.

## IV.   Plaintiffs' Claim of Damages

10.    I understand access to and control of the bitcoins at issue requires private keys or other proof of ownership.  Without the corresponding private keys or some other method of gaining and exerting control over the bitcoins – for example, if the keys and ownership records have been lost, deleted, or are otherwise inaccessible – it is my understanding that the bitcoins associated with these keys cannot be used in transactions and cannot be transferred to other individuals.

11.    It is my understanding that the existence and accessibility of the private keys for the bitcoins at issue are a matter of dispute.  I also understand that the parties have not located or identified any private keys or even ownership records of any bitcoin related to a specific group of public addresses that were in the possession of or controlled by David Kleiman.  I have been informed that Ira Kleiman deleted, overwrote, or otherwise cannot recover or access certain data stored on computer devices or external drives left behind by David Kleiman.  If the only copies of David Kleiman's private keys or other records of ownership were among this lost data and cannot be recovered, my understanding is any associated bitcoins can no longer be accessed, and Dr. Wright's alleged actions described in the Complaint would not have

---

[13] Antonopoulos Report, ¶¶ 81-87
[14] Antonopoulos Report, ¶ 87.

Confidential

resulted in damages to Plaintiffs.  Plaintiffs do not address this issue in the Complaint or in the Antonopoulos Report.  If there were a mechanism to access the bitcoins through alternative means, such as through a court order, the damages calculation should take into account costs occasioned by Ira Kleiman's actions.  The discussion below assumes the bitcoins in dispute are accessible and can be controlled, and that they have been so throughout, including at the time of David Kleiman's death.

12.     Plaintiffs allege that, "on or about April 2013 through the present day, [Dr. Wright] converted to his own use, bitcoins, forked assets, and intellectual properties that was [sic] then the property of and owned by, the estate [of Dave Kleiman] and/or W&K."[15]  They further assert that "the property was worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over it"[16] and demand compensation for "damages in the amount of at least $11,427,755,048.02 and/or return of the wrongfully converted bitcoins with their forked assets."[17]

13.     Plaintiffs do not clarify how they arrived at this estimate of damages of approximately $11.4 billion other than stating that this is the value of the approximately 1.1 million bitcoins and their forked assets.  Nor do Plaintiffs consider the costs that were incurred in acquiring the Assets and how such costs should be apportioned.  Plaintiffs also have not considered how the bitcoins should be allocated between the alleged members of the partnership.

---

[15] Complaint ¶ 171.

[16] Complaint ¶ 172.

[17] Complaint ¶ 172.

Confidential

14.     Plaintiffs do not clarify how they arrived at their claim of approximately 1.1 million bitcoins.  I understand the company controlled by Dr. Wright had mined approximately 800,000 bitcoins from 2009 to mid-2010, which Plaintiffs allege have been misappropriated, and he has produced a list of the public addresses associated with these bitcoins.[18]  I also understand public records of the Bitcoin ledger indicate that the mined coins on this list were all mined in 2009 and 2010, which preceded the incorporation of W&K in 2011.[19]  Accordingly, it is my understanding that these bitcoins are exclusive of the approximately 1.1 million bitcoins claimed by Plaintiffs.

15.     The damages claim of $11.4 billion corresponds to approximately $10,387 for each asserted bitcoin.  The average price per BTC, measured in the USD/BTC exchange rate, did not reach this level until November 29, 2017.

---

[18] DEF_01586024.
[19] Complaint, ¶ 2.

Confidential



As the figure below illustrates, bitcoin prices in recent years have been significantly higher than the average price of $131.75 per BTC on April 26, 2013, the date of David Kleiman's death.[20]



---

[20] Bitcoinaverage.com.

Confidential

# V.    Economic Analysis of Plaintiffs' Claim of Damages

## A.    Damages are to be Calculated at the Time of Harm

16.    Plaintiffs have not set out their methodology for quantifying the alleged harm.  The Complaint contains no explanation or supporting documentation describing how Plaintiffs arrived at their estimate of approximately 1.1 million bitcoins, nor do they identify the forked assets over which they claim ownership.[21]  Moreover, Plaintiffs have not provided an explanation for how they determined the value of the still unclearly identified assets over which they claim ownership.  Accordingly, the available information does not allow the finder of fact to assess the reasonableness, accuracy, or reliability of Plaintiffs' damages calculation.   The only numbers relating to the quantum of damages contained in the Complaint refer to the number of bitcoins, the alleged value of the bitcoins and forked assets at different points in time, and the claimed harm.[22]

17.    The Complaint does not provide any detail on how the Assets were valued, including, for example, the value of individual bitcoins.  The Antonopoulos Report cites prices for Bitcoin Core (BTC), Bitcoin Cash (BCH), Bitcoin Satoshi Vision (BSV), and Bitcoin Gold (BTG).[23]  However, these prices correspond to December 3, 2019, which is considerably later than the date of the Complaint.  The Antonopoulos

---

[21] The wording of the Complaint suggests that at least some of the 1.1 million bitcoins were personally owned by the Defendant: "Dave and Craig owned and controlled approximately 1,100,111 bitcoins (either together personally or through their shared interest in W&K)." (Complaint, ¶ 79)

[22] Complaint, ¶ 114.

[23] Antonopoulos Report, ¶ 87.

Confidential

Report does not provide a damages estimate based on these prices that might shed light on the damages methodology employed by Plaintiffs.

18.     Plaintiffs' approach to quantifying the alleged harm appears to rely on the value of bitcoins at or near the date of the Complaint.[24]   Such an approach substantially overcompensates Plaintiffs as it "[awards the plaintiff] with all the benefits of a successful project without the plaintiff's need to assume the project risk."[25] Plaintiffs have put forward an opportunistic approach that allows them to realize the benefit of the increased prices in bitcoins without having borne any of the risk of holding bitcoins over a long period of time.[26]   That bitcoin prices would increase after April 2013 was not a foregone conclusion at the time.   The alleged violation "did not merely deprive the plaintiff of the stream of returns that would have accompanied the asset.   It also relieved the plaintiff of the uncertainty surrounding that stream.   To use hindsight is to ignore the latter effect."[27]

19.     Plaintiffs' damages claim ignores the risk of holding bitcoins over time. The table below shows summary statistics for bitcoin prices by calendar year.[28]

---

[24] Complaint, ¶¶ 114, 172.

[25] Evans, Elizabeth A. and Roman L. Weil. "Ex Ante versus Ex Post Damages Calculations," in *Litigation Service Handbook: The Role of the Financial Expert*, 6th ed. Roman L. Weil, Daniel G. Lentz and Elizabeth A. Evans (eds.) 2017. p. 5.6.

[26] Allen, Mark A., Robert E. Hall, and Victoria A. Lazear. "Reference Guide on Estimation of Economic Losses in Damages Awards," in *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, 2011, pp. 461-462.

[27] Fisher, Franklin and Craig Romaine (1990). "Janis Joplin's Yearbook and the Theory of Damages." *Journal of Accounting, Auditing, and Finance*, 5(1), 145–157 at 154.

[28] The data covers the period from July 17, 2010 to April 3, 2020.

Confidential

**BTC per USD**

|  | Average | Std. Deviation |
|---|---|---|
| 2010 | $    0.14 | $    0.09 |
| 2011 | 5.43 | 5.42 |
| 2012 | 8.25 | 3.19 |
| 2013 | 193.31 | 249.42 |
| 2014 | 527.01 | 146.27 |
| 2015 | 273.68 | 58.78 |
| 2016 | 569.40 | 138.29 |
| 2017 | 3,963.73 | 3,965.04 |
| 2018 | 7,547.86 | 2,396.80 |
| 2019 | 7,367.46 | 2,642.41 |
| 2020 | 8,225.93 | 1,430.48 |

*Source: bitcoinaverage.com*

The average bitcoin price in 2013 was $193, compared to annual averages between $3,964 and $7,548 for calendar years 2017 to 2019, the period on which Plaintiffs' valuations of the bitcoins appear to be based.  Moreover, prices have varied widely, as illustrated by the standard deviation.[29]  Bitcoin prices were most volatile relative to the average price level in 2013.

20.    To realize the value Plaintiffs appear to claim in their damages calculation would have required them to hold the contested bitcoins for several years. Financially, this would have been equivalent to holding a risky asset.  Bitcoin returns have historically been markedly more volatile than alternative stores of value and investments, such as gold and the S&P 500 index, as evidenced in the figure below.[30]

---

[29] The standard deviation is a common measure of the dispersion of a set of data and gives an indication of how closely or widely the data are spread out around their average.  The standard deviation can be interpreted as having the same unit of measurement as the average, so in 2013, the price of bitcoins had a standard deviation of $249.42.

[30] I use the S&P 500, a commonly used composite index for US equities, and gold, a commonly used hedge for macroeconomic volatility.  Both are assets widely held in long-term investors' portfolios.

**Confidential**



21.   The table below compares the volatility of daily returns on bitcoins to gold and the S&P 500 index by calendar year.

**Standard Deviation of Daily Return, BTC vs Other Assets**

|      | Bitcoin | Gold | S&P 500 |
|------|---------|------|---------|
| 2010 | 8.88% | 0.89% | 0.91% |
| 2011 | 7.96% | 1.26% | 1.48% |
| 2012 | 3.16% | 0.92% | 0.80% |
| 2013 | 7.56% | 1.33% | 0.70% |
| 2014 | 3.26% | 0.91% | 0.72% |
| 2015 | 2.99% | 0.86% | 0.98% |
| 2016 | 1.96% | 0.98% | 0.82% |
| 2017 | 3.97% | 0.63% | 0.42% |
| 2018 | 3.66% | 0.61% | 1.07% |
| 2019 | 2.92% | 0.71% | 0.79% |
| 2020 | 4.06% | 1.45% | 3.56% |

*Sources: bitcoinaverage.com, Bloomberg*

Bitcoin returns have been markedly more volatile than these other assets throughout the existence of Bitcoin.  The only period in which returns for either of the other assets approached the degree of volatility exhibited by bitcoin prices was Q1 2020, which

Confidential

includes the recent collapse of the equities market precipitated by the unprecedented economic consequences from the COVID-19 pandemic.

22.    The relationship between a security's expected return and the risk associated with it, or its risk-return tradeoff, is related to the observation that although investors desire higher returns, they are also risk averse, *i.e.*, they dislike uncertainty about future outcomes.[31]   As a consequence, in a market with freely traded securities, a security with a higher risk will, in equilibrium, have a higher expected return.[32]

23.    An article published by the Chicago Federal Reserve in 2013 noted the unconventional uses of bitcoin, including as a "speculative investment opportunity":

> So far, the uses of bitcoin as a medium of exchange appear limited, particularly if one excludes illegal activities.  *It has been used as a means to transfer funds outside of traditional and regulated channels and, presumably, as a speculative investment opportunity*.  People bet on bitcoin because it may develop into a full-fledged currency.  Some of bitcoin's features make it less convenient than existing currencies and payment systems, particularly for those who have no strong desire to avoid them in the first place. [Emphasis added][33]

24.    In December 2013, Bank of America considered "Bitcoin's role as a store of value [to be] seriously compromised by its elevated price volatility," and that "the quality of Bitcoin exchange security, where consumers exchange dollars for Bitcoins

---

[31] Berk, Jonathan and Peter DeMarzo. *Corporate Finance*, 3rd ed., Pearson, 2014, pp. 85-86.

[32] Otherwise, investors would switch away from that security in favor of other assets that offer a more favorable risk/reward ratio, until reduced demand for the security has driven its price down to a point where its expected return is in line with similarly risky securities.  See Berk, Jonathan and Peter DeMarzo, *Corporate Finance*, 3rd ed., Pearson, 2014, pp. 70-71, 86-87.

[33] Velde, François. "Bitcoin: A Primer." Chicago Fed Letter, No. 317, December 2013. https://www.chicagofed.org/publications/chicago-fed-letter/2013/december-317

Confidential

(and vice versa) is suspect."[34]  Around the same time, *The Wall Street Journal* noted that "if [Bitcoin is] an asset class, it's an incredibly volatile one. … investors shouldn't treat it as they would a normal asset class at all and instead think of it as … one that pays off only if an extremely unlikely event occurs."[35]

25.    The SEC issued an investor alert about Bitcoin and other cryptocurrencies in May 2014, noting that "Bitcoin does not have an established track record of credibility and trust."[36]  The SEC advised that "investments involving Bitcoin present unique risks" such as a history of volatility, lack of government regulation and protection, which "may limit [an investor's] recovery in the event of fraud or theft," and security concerns arising from the risk of "fraud, technical glitches, hackers or malware."[37]

26.    In light of the risks associated with holding bitcoins, it is not evident that Plaintiffs would have held the asserted bitcoins until 2018.  Holding bitcoins, especially the number of bitcoins claimed by Plaintiffs, would require a significant tolerance for risk.  Neither the Complaint nor the Antonopoulos report provides any evidence that Plaintiffs had a tolerance for such a degree of risk.

27.    Bitcoin prices in early April 2013 were already high by historical standards, as shown in the figure below.

---

[34] Bank of America Merrill Lynch. "Bitcoin: a first assessment." December 5, 2013.

[35] Light, Joe. "Should You Invest in Bitcoin?" *The Wall Street Journal*, November 23, 2013.

[36] U.S. Securities and Exchange Commission. "Investor Alert: Bitcoin and Other Virtual Currency-related Investments."  May 7, 2014.
https://www.sec.gov/oiea/investor-alerts-bulletins/investoralertsia_bitcoin.html

[37] U.S. Securities and Exchange Commission. "Investor Alert: Bitcoin and Other Virtual Currency-related Investments."  May 7, 2014.
https://www.sec.gov/oiea/investor-alerts-bulletins/investoralertsia_bitcoin.html

Confidential



It is a speculative proposition that Plaintiffs would have continued to hold onto the approximately 1.1 million bitcoins through date of the Complaint (*i.e.*, a duration of approximately five years).  Emails from Ira Kleiman to Dr. Wright are consistent with a desire to liquidate at least part of Bitcoin investment sooner rather than later:

- "Dave would prefer to lock in secured gains that have already been made."[38]

- "I am open to arranging distribution of 10 million a year for 3 years, but not through a new untested business that you just stated 'worst case scenarios [sic] 4 million'."[39]

- "Look where it got Dave by holding on for too long."[40]

- "Timing is Everything."[41]

- "I told you, I don't want to end up on the same sword as Dave. He had faith. It doesn't always pan out." [42]

---

[38] Complaint, Exhibit 20, pp. 13-14.

[39] Ibid, p. 13.

[40] Ibid, p. 11.

[41] Ibid.

[42] Ibid.

Confidential

- "But that doesn't mean something shouldn't be taken off the table. Just like trading stocks, you have to know when to take a profit and let the rest ride. No need for all eggs in one basket."[43]

28.    Accordingly, the disputed assets should be valued at the time of the alleged infringement, which I understand to be April 26, 2013.  This valuation should be based on the dollar amount that the holder of the disputed bitcoins would have been able to obtain from liquidating them at that point in time.

**B.    Bitcoin in April 2013**

29.    The first recorded transaction of dollars for bitcoins took place in 2009. The value of bitcoins for the initial transaction was determined on the basis of the electricity cost for generating a coin, resulting in the exchange of $5.02 for 5,050 bitcoins.[44]  Since then, a variety of exchanges have been created to provide more formal markets that allow users to buy and sell bitcoins for traditional currencies.  In April 2013, the largest such exchange was Mt. Gox, which accounted for roughly 70% of trade volume.[45]

30.    Consistent with the discussion above, bitcoin returns were highly volatile in April 2013 and an investor, at that time, could have potentially experienced large gains or large losses during this period.

---

[43] Ibid, p. 10.

[44] Popper, Nathaniel. *Digital Gold*. Harper, 2015, p. 38.

[45] Gandal, Neil, J.T. Hamrick, Tyler Moore, and Tali Oberman.  "Price manipulation in the Bitcoin ecosystem." *Journal of Monetary Economics* (95), May 2018, Appendix A.

Confidential

**Daily Return, BTC vs Other Assets (April 2013)**

|  | Average | Std. Deviation |
|---|---|---|
| Bitcoin | 2.59% | 15.50% |
| Gold | -0.33% | 2.51% |
| S&P 500 | 0.09% | 0.89% |

*Sources: bitcoinaverage.com, Bloomberg*

31.    The price per BTC on April 26, 2013, according to Bitcoinaverage.com, was $131.75.[46]



However, Plaintiffs have not shown that they would have been able to sell the approximately 1.1 million bitcoins that they claim at observed market prices.  That is, they have not shown that they would have been able to obtain, *e.g.*, $131.75 for each of the approximately 1.1 million bitcoins that they claim if they had sold them on or around April 26, 2013.

32.    First, prices may vary depending on which exchange coins are sold. Contrary to other assets, such as equities, "bitcoin prices behave differently across

---

[46] The methodology for calculating the average price is described at
https://bitcoinaverage.com/en/methodology.

Confidential

markets; not all exchanges adhere to the law of one price (LOOP) – the theory that identical goods should sell for identical prices after trade costs are taken into consideration."[47]

33.     In addition, past examples of Bitcoin price manipulation suggest that selling a large number of bitcoins such as those claimed by Plaintiffs will exert downward pressure on bitcoin prices and is highly likely to result in a sizable reduction in prices.  For instance, bots were found to have engaged in fraudulent transactions to purchase large quantities of Bitcoin on Mt. Gox in 2013.  A study of the transaction data from Mt. Gox concluded that this "was the likely cause of the massive spike in the USD/BTC exchange rate in which the rate rose from around 150 to over 1,000 in just two months in late 2013," and that "price manipulation remains quite feasible today."[48] A study of the more recent increase in bitcoin prices between March 2017 and March 2018 suggests that "about half of that increase was due to the influence of a manipulation scheme."[49]

34.     In light of the evidence that Bitcoin markets are susceptible to price manipulation, any valuation of the Assets would need to address the possibility that a liquidation of the Assets would have yielded prices below those observed in the market. As I discuss below, empirical evidence has repeatedly shown that the magnitude of an

---

[47] Pieters, Gina and Sofia Vivanco. "Financial Regulations and Price Inconsistencies across Bitcoin Markets." Federal Reserve Bank of Dallas Globalization and Monetary Policy Institute. Working Paper No. 293, December 2016.

[48] Gandal, Neil, J. T. Hamrick, Tyler Moore, and Tali Oberman. "Price manipulation in the Bitcoin ecosystem." *Journal of Monetary Economics* 95 (2018): 86-96.

[49] Vigna, Paul. "Large Bitcoin Player Manipulated Price Sharply Higher, Study Says." *The Wall Street Journal*, 4 November 2019.
https://www.wsj.com/articles/large-bitcoin-player-manipulated-price-sharply-higher-study-says-11572863400

Confidential

asset sale can significantly reduce the price that the seller is able to command for the asset.  Neither the Complaint nor the Antonopoulos Report consider this issue.

## VI.   Impact of Liquidating a Large Number of Coins

35.    Plaintiffs claim they are entitled to approximately  1.1 million bitcoins.[50] The total number of bitcoins in existence by April 26, 2013 was approximately 11.1 million.[51] Accordingly, Plaintiffs' claim of approximately 1.1 million bitcoins represents approximately 10% of the potentially available bitcoins at the time.[52]  Moreover, it represents 992% of the average daily trading volume of coins in the 90 days prior to the estimation date and 11% of the total trading volume over this period.[53]

36.    Mr. Antonopoulos testified that prices for cryptocurrencies listed on sites such as coincap.io give "some information about the *potential* market value of those currencies" (emphasis added).[54]  He further clarified that he did not know "whether the value that is seen on those listings can be realized immediately,"[55] and that the value obtained from liquidating a million BTC depended "on a number of factors," specifically "liquidity in the market."[56]   He also indicated that "someone has to have an understanding of how markets work and how market price lists on these sites work in

---

[50] Complaint, ¶¶ 114, 172.
[51] Blockchain.com. "Total Circulating Bitcoin."
https://www.blockchain.com/charts/total-bitcoins
[52] The actual share may have been higher, depending on whether any owners were unable to exert control over their bitcoins at the time, for example if they had lost required private keys.
[53] Daily worldwide volume data from www.bitcoinaverage.com.
[54] Deposition of Andreas Antonopoulos, January 7, 2020, p. 245:16-19.
[55] Antonopoulos deposition, p. 246:15-23.
[56] Antonopoulos deposition, p. 246:25-247:14.

Confidential

other words to draw conclusions about the potential realizable value of Bitcoin that they hold."[57]  Mr. Antonopoulos also testified that he had not carried out any analyses to determine the "realizable value" of the Assets.[58]  His opinion on realizable value – which Mr. Antonopoulos has not, to my knowledge, put forward yet – is based on his personal experience with market trading and advising exchanges,[59] but he has not indicated whether he has experience with transactions of the magnitude implied by the Assets.

37.    As I discuss below, historical prices reported by exchanges are unlikely to provide a reliable measure of the realizable value for the Assets.  Comparatively small transactions on the blockchain have had a sizable effect on Bitcoin prices, and the lack of liquidity in Bitcoin markets further undermines the credibility of prices on Bitcoin exchanges as a measure of the realizable value of the Assets.  Evidence from markets for other assets also indicate that liquidating approximately 1.1m bitcoins is going to require a discount on prices recorded on exchanges.

## A.    Comparatively Small Transactions Have Reduced Bitcoin Prices

38.    History suggests that the USD/BTC exchange rate can be appreciably affected by sell orders that are small compared to the claimed bitcoins.  Several sell-off events in bitcoin exchanges representing significantly smaller proportions of total coins outstanding have had notable effects on bitcoin prices.  Such events were forewarned in November 2013, when a transaction of 194,993 bitcoin was sufficiently large and

---

[57] Antonopoulos deposition, p. 246:6-10.
[58] Antonopoulos deposition, p. 249:10-15.
[59] Antonopoulos deposition, p. 249:10-15.

Confidential

unusual to draw attention.[60]   The transaction was not in exchange "for any fiat currency… that we know of. 'Dumping' such a large amount at once would probably have a negative impact on bitcoin's value."[61]

    a.   On August 14, 2014, one sale order of 500 bitcoins on the Bitstamp exchange was identified as the primary catalyst of an approximate 10% drop in price over the course of the day.[62]

    b.   In September 2016, when the sale of "a few hundred" bitcoins by a single trader triggered a sell-off and price decrease of more than 5% within less than one hour, as a result of "low trading volume and speculation, bitcoin prices have become vulnerable to the point where either a single buyer or one, large transaction can trigger sizable shifts."[63]

    c.   In May 2019, a large sell order of approximately 5,000 bitcoins "crashed the price of the cryptocurrency by over 10%."[64] Bitstamp, the exchange on which the order was placed, later confirmed that "a large sell order was executed on our BTC/USD pair today, strongly impacting the order book.  Our system behaved as designed, processing and fulfilling the client's order as it was received."[65]

---

[60] Southurst, Jon. "194,993 BTC transaction worth $147 Million sparks mystery and speculation." Coindesk.com. November 23, 2013, updated September 10, 2014.

https://www.coindesk.com/194993-btc-transaction-147m-mystery-and-speculation

[61] Southurst, Jon. "194,993 BTC transaction worth $147 Million sparks mystery and speculation." Coindesk.com. November 23, 2013, updated September 10, 2014.

[62] Rizzo, Pete. "Did Margin Trading Crash the Price of Bitcoin?" Coindesk.com. August 15, 2014, updated October 28, 2015.

https://www.coindesk.com/margin-trading-crash-price-bitcoin

[63] Bovaird, Charles. "On High Seas of Bitcoin Trading, Whales Still Make Waves." Coindesk.com.  September 14, 2016, updated September 15, 2016.

https://www.coindesk.com/high-seas-bitcoin-trading-whales-still-make-waves

[64] Williams-Grut, Oscar. "A 'whale' selling bitcoin crashed the price by $1,000." Yahoo Finance, May 17, 2019.

https://finance.yahoo.com/news/why-bitcoin-price-crashed-friday-may-17-bitstamp-whale-141622639.html

[65] @Bitstamp, "1/2: A large sell order was executed on our BTC/USD pair today, strongly impacting the order book. Our system behaved as designed, processing and fulfilling the client's order as it was received."  4.03AM, May 17, 2019.

https://twitter.com/Bitstamp/status/1129311518091300864, retrieved: 8 April 2020

Confidential

d.  Most recently, the liquidation of 13,000 bitcoins in March 2020 by traders controlling a suspected China-based Ponzi scheme caused a 10% single-day price decline.[66]

39.     Given that Plaintiffs' claimed 1.1 million bitcoin comprised a significant proportion of the total number of bitcoins in existence as of April 2013, a contemporaneous fair-value estimate of this position must take into consideration the but-for effect that a sale of such magnitude would have on the dollar price for bitcoins. There is a strong possibility that a liquidation of the approximately 1.1 million bitcoins would have been affected by price reductions analogous to those described above. Considering the much larger position that 1.1 million bitcoins represent, there is a strong possibility that liquidating them would have caused price reductions of at least as much as the examples described above.

**B.      Large Scale Sales of Financial Assets Lead to Price Reductions**

40.     As the examples above illustrate, even transactions that are small compared to the approximately 1.1 million bitcoins claimed by Plaintiffs can affect bitcoin prices.  I understand a sale of a magnitude comparable to the Assets has never been undertaken, and I have not been presented evidence that supports the position that a buyer existed for the entire 1.1 million bitcoins, or a sizable portion thereof, at prevailing prices.

---

[66] Omkar, Godbole. "Bitcoin's Sharp Price Drop May Have Been Prompted by $120M Scam Sell-off." March 9, 2020, updated March 9, 2020.
https://www.coindesk.com/bitcoins-sharp-price-drop-may-have-been-prompted-by-100m-scam-selloff

Confidential

41.     The evidence in markets for similar assets indicates that selling a large volume of bitcoins as a block would likely have commanded a "blockage discount." The effect of a large "block" sale of an asset "is a function of limited marketability; specifically, it applies when the block of property is so large that placing it on the market would cause a depression in the price of the property."[67]

42.     The negative effect on price of such blockage sales is well-documented in the finance literature, even in large, liquid markets with strong regulatory oversight and high degrees of transparency, such as the New York Stock Exchange ("NYSE").[68] For example, Keim and Madhavan (1996) studied 4,688 seller-initiated block trades on the NYSE, AMEX, and NASDAQ markets and found an average permanent price impact of -9.08% among the largest quintile of blocks (those representing 0.82% to 7.86% of shares outstanding) when measured as the cumulative market-adjusted price change between the 22nd day preceding the trade and the close of the following trading day.[69]

43.     In determining fair value, various methodologies exist for the determination of an appropriate "blockage discount" taken from the market price as of a specific valuation date. These include, for example, searching historical transaction

---

[67] Pratt, Shannon P. *Valuing a Business, 5th ed.*, McGraw-Hill (2008), p. 466.

[68] See, e.g., Kraus, Alan and Hans R. Stoll. "Price Impacts of Block Trading on the New York Stock Exchange." *Journal of Finance*, 27:3 (1972).
Holthausen, Robert W., Richard W. Leftwich and David Mayers. "The Effect of Large Block Transactions on Security Prices: A Cross-Sectional Analysis." *Journal of Financial Economics*, 19:2 (1987).
Easley, David and Maureen O'Hara. "Price, Trade Size, and Information in Securities Markets." *Journal of Financial Economics*, 19 (1987).

[69] Keim, Donald B. and Ananth Madhavan. "The Upstairs Market for Large-Block Transactions: Analysis and Measurement of Price Effects." *Review of Financial Studies*, 9:1 (1996).

Confidential

databases of secondary public offerings and/or private placements and determining the typical discount from prevailing market value that sellers faced when implementing such transactions resulting from, but not limited to, investment banking fees, other professional expenses, and the general compensation for various risks assumed by the buying party.[70]  Often, the approach taken assumes that the asset block would not be sold into the market at once but rather "dribbled-out" over an extended (often multi-year) period in order to avoid the negative price effects of block trades discussed above. A proxy commonly used to quantify this discount considers the average discount on sales of restricted stock in secondary markets, in which the restricted stockholders would otherwise be subject to dribble-out sales restrictions over multi-year periods. Multiple prior studies have documented discounts, with averages ranging from 13% to as much as 45%.[71]

44.    The market for gold also provides examples of how relatively large individual sales are accompanied by lower prices.  Since 1968, when the major central banks began the process of unpegging their currencies to gold, they and their associated treasury departments have occasionally sold off varying portions of their gold reserves through various mechanisms, including auctions.[72]  Public announcements of such sales are often followed by sharp, short-term decreases in the price of gold.

---

[70] Wilhoite, Charles A. and Aaron M. Rotkowski. "Fair Market Value and Blockage Discounts: When the Market Doesn't Give You the Answer." *Willamette Valuation Analysis Insights* (Autumn 2014).

[71] Pratt (2008), pp. 419-430.

[72] Salant, Stephen W. and Dale W. Henderson, "Market Anticipations of Government Policies and the Price of Gold," *The Journal of Political Economy*, 86:4 (1978).

Confidential

45.     One such event occurred on May 7, 1999, when the U.K. Treasury announced its intention to reduce the portion of its foreign exchange reserves held as gold from 715 tons to approximately 300 tons through a series of auctions.[73]  The announcement specified that it would sell 25 tons in each of five auctions held every other month during 1999 and 2000, with the initial auction two months later on July 6, 1999, and more auctions to follow.  In all, the U.K. Treasury sold approximately 395 tons of gold in 17 separate auctions between July 1999 and March 2002.[74]  The price of gold fell by more than 10% in dollar terms, from approximately $290 to $260 per ounce, during the month following the May 7, 1999, announcement.[75]  Of the approximate 140,000-ton stock of gold in existence globally as of January 2001, 33,500 tons (24%) were held by central banks and various international financial institutions as reserves, and the global stock added 2,600 tons annually through additional mining.[76]  Although the 395 tons sold in the auctions represented only 0.3% of the extant worldwide gold stock and 1.2% of institutional and government-held reserves, the announcement precipitated a 10% gold price decrease.

---

[73] HM Treasury. "Review of the sale of part of the UK gold reserves." Summary Document, October 2002, p. 8.
Wetherilt, Anne Vila and Graham Young, "An Analysis of the UK Gold Auctions: 1999-2002," *Bank of England Quarterly Bulletin*, Summer 2003, p.188.

[74] Wetherilt and Young (2003), p. 188.

[75] Brummer, Alex and Mark Atkinson. "Bank Governor in Clash Over Gold Sale." *The Guardian*, August 5, 1999
Ash, Adrian. "Gordon Brown's Big UK Gold Sales, 20 Years On." *BullionVault,* May 6, 2019.
Internal Monetary Fund. "The Gold Market." Internal Report, June 30, 1999.
Bloomberg.

[76] U.K. National Audit Office. "The Sale of Part of the UK Gold Reserves: Report by the Comptroller and Auditor General." January 12, 2001, p. 11.

Confidential

### C.   The Realizable Value of the Assets Would Have Been Further Diminished by a Lack of Liquidity

46.   Evidence suggests that the Bitcoin market was illiquid compared to markets for other assets during and around 2013.  Yermack (2013) characterized the bitcoin exchanges as often having "low liquidity, significant bid-ask-spreads, and a certain amount of execution and custody risk,"[77] and Athey, *et al.* (2017) stated that "as of mid-2015, active usage [of bitcoin] was not growing quickly, and… investors and infrequent users held the majority of Bitcoins."[78] Loi (2015) calculated several proxies for liquidity based on daily bitcoin pricing data between January 2014 and December 2015 and concluded that even the largest and most liquid bitcoin exchanges at the time were nonetheless illiquid relative to small-cap U.S. stocks.[79]  In a study highlighting the existence of persistent arbitrage between bitcoin exchanges, Markov and Schoar (2020) begin their analysis in January 2017 due to the fact that "[p]rior to these dates, the liquidity in crypto markets was significantly lower than in later periods."[80]  Other studies have suggested that a significant proportion of this already-low trading volume is likely attributable to fraudulent market-making activity.  Gandal, *et al.* (2018) propose that a material amount of trading volume on the Mt. Gox exchange in 2013 represented the activity of trading bots strategically placed by the exchange owners to

---

[77] Yermack, David, "Is Bitcoin a Real Currency? An Economic Appraisal," *NBER Working Paper* (2013).

[78] Athey, Susan, Ivo Parashkevov, Vishnu Srukkai and Jing Xia. "Bitcoin Pricing, Adoption, and Usage: Theory and Evidence." *Stanford Institute for Economic and Policy Research Working Paper* (2016).

[79] Loi, Hio. "The Liquidity of Bitcoin." *International Journal of Economics and Finance*, 10:1 (2018).

[80] Makarov, Igor and Antoinette Schoar. "Trading and Arbitrage in Cryptocurrency Markets." *Journal of Financial Economics*, 135:2 (2020).

Confidential

artificially inflate price and stimulate trading volume from actual investors.[81]   In a report for the SEC, Hougan, *et al.* (2019) claimed that although Bitcoin liquidity had recently improved, "roughly 95% of reported Bitcoin trading volume is fake or non-economic in nature."[82]   Smales (2019) found that Bitcoin exhibited lower levels of liquidity than gold, the S&P 500, and Apple and Twitter stock, measured by average daily volume and average bid-ask spreads.[83]

47.   Assets that exhibit a lack of marketability, for example due to illiquid markets, typically exhibit a discount relative to comparable assets that are freely traded.   For example, restricted stock typically sells at a discount compared to the comparable unrestricted stock.   Pratt (2008) reviews a series of studies based on observed trades beginning in the 1970s through to the 1990s that estimate the average discount on restricted stocks relative to unrestricted stocks.[84]   The studies find average discounts on asset prices ranging from 13% to 45%.   The review also indicated that the discount is higher for assets that have fewer potential buyers and that are relatively large.[85]   Moreover, assets with "no or low dividends suffer more from lack of marketability" than those with high dividends.[86]

---

[81] Gandal *et al* (2018).

[82] Hougan, Matthew, Hong Kim and Micah Lerner. "Economic and Non-Economic Trading in Bitcoin: Exploring the Real Spot Market for the World's First Digital Commodity." U.S. Securities and Exchange Commission. (2019).

[83] Smales, L.A. "Bitcoin as a safe haven: Is it even worth considering?" *Finance Research* Letters 30 (2019) 385–393, p. 389.

[84] Pratt (2008), p. 419

[85] Pratt (2008), p. 446.

[86] Pratt (2008), p. 446.

Confidential

48.     Accordingly, it is highly likely that liquidating approximately 1.1 million bitcoins would have depreciated the USD/BTC exchange rate due to low market liquidity.  Recent history indicates that significant declines in the USD/BTC exchange rates have been prompted by the sale of "a few hundred" bitcoins."[87]  Several factors make the USD/BTC exchange rate more sensitive to large trades than other commonly traded assets (*e.g.*, stocks). These include:

    (i)     the lack of a single exchange handling the majority of all USD/BTC transactions, causing liquidity issues;

    (ii)    dips are exacerbated by high amounts of leverage[88];

49.     Several recent examples illustrate this sensitivity.  In May 2019, a single large transaction caused a 20% decline in the price of bitcoins in 30 minutes on the BitMEX exchange.[89]  In August 2014, the sale of 500 bitcoins triggered a cascade of margin calls, causing the market price to plummet.[90]

50.     The valuation of the approximately 1.1 million bitcoins claimed by Plaintiffs would need to consider the market value of these assets.  The evidence indicates that disposing of even a fraction of these bitcoins would exert considerable

---

[87] Bovaird, Charles. "On High Seas of Bitcoin Trading, Whales Still Make Waves." Coindesk.com.  September 14, 2016, updated September 15, 2016.

https://www.coindesk.com/high-seas-bitcoin-trading-whales-still-make-waves

[88] Keoun, Brandley.  "Bitcoin's Price Slides $1,000 in 30 Minutes After Margin Calls at Bitmex." Coindesk.com. September 24, 2019, updated September 25, 2019.

https://www.coindesk.com/bitcoins-price-slides-1000-in-30-minutes-after-margin-calls-at-bitmex

[89] Partz, Helen. "Bitstamp Starts Investigation After Large BTC Sell Leads to $250 Mln Liquidated on BitMEX."  Cointelegraph.com.  May 17, 2019.

https://cointelegraph.com/news/bitstamp-starts-investigation-after-large-btc-sell-leads-to-250-mln-liquidated-on-bitmex

[90] Rizzo, Pete. "Did Margin Trading Crash the Price of Bitcoin?"  Coindesk.com. August 15, 2014, updated October 28, 2015.

https://www.coindesk.com/margin-trading-crash-price-bitcoin

**Confidential**

downward pressure on the USD/BTC exchange rate, and that selling them as a block would command a sizable discount.  The Complaint and Antonopoulos Report give no indication that the damages calculation takes this issue into account, which further undermines the reliability of Plaintiffs' damages claim.


William S. Choi, Ph.D.
April 17, 2020



Exhibit 1

## WILLIAM S CHOI
*Managing Director*

### Areas of Specialization
*Economic and statistical analyses used in securities, antitrust, intellectual property, class certification, and commercial disputes.*

### Education
*Ph.D. in Economics, Duke University*

*M.A. in Economics, Duke University*

*M.A. in Managerial Accounting, University of California, Santa Barbara*

*B.S. in Economics, University of California, Riverside*

### Certifications
*Certified Licensing Professional*

### Professional Affiliations
*American Economic Association*
*American Bar Association*
*Licensing Executives Society*

## Background

Dr. William Choi is an experienced economist and statistician who assists organizations and governments in solving complex and challenging issues in the marketplace and the courtroom.  He brings over 20 years of professional experience and has been identified in the *Who's Who Legal Consulting Experts.*  He has served as an expert witness on matters related to antitrust, class certification, securities litigation, statistics, econometrics, valuation of financial products, health care, and intellectual property.  He has testified at deposition, trial, and arbitration.  His testimony and consulting experience have covered a range of industries, including automotive, mobile devices, online commerce, artificial intelligence, opioids, virtual reality, e-cigarettes, apparel, food products, software, and consumer appliances.

William also assists companies with improving their competitive position in the marketplace.  In such matters, he provides companies with insights into their data using advanced economic and statistical analyses to design optimal pricing models, inventory management models, claims analysis, and intellectual property valuation.  In this capacity, he has assisted clients across numerous industries, including retail, pharmaceuticals, flash memory, restaurants, health insurance, and alcoholic beverages.  He previously was retained by the Department of Justice as an outside statistician related to its investigation of mortgage fraud that resulted in the largest settlements in US history.

William previously taught economics courses at Duke University and UCLA.  At UCLA, he designed the online curriculum for undergraduate microeconomics and macroeconomics for extension students. He also has taught at conferences, including programs on class certification and damages, economics, valuation, statistics, game theory, licensing, and finance at annual meetings of the American Bar Association, the Licensing Executives Society, and other associations.



Exhibit 1

# Professional Experience

## Finance

- Retained on multiple engagements in connection with class action securities fraud cases related to securities fraud against Australian companies working with the following law firm: Allens, Herbert Smith Freehills, Kennedys, King & Wood Mallesons, Sparke Helmore, and K&L Gates.
- Retained by the Department of Justice to assist in its investigations of mortgage fraud involving residential mortgage backed securities.
- Retained by a Japanese manufacturer of optics and reprography products to provide damages analysis related to the price inflation of ADRs and number of damaged shares from the revelation of alleged accounting issues.
- Retained by a U.S. investment and insurance company to advise on quantitative methods to be used to value structured credit portfolios.
- Retained by a mortgage broker to assess the value of residual interests in RMBS – analysis involved valuation, econometrics, and numerical simulation.
- Retained by an individual accused of insider trading by the SEC to testify on stock price inflation and number of damaged shares related to the revelation of alleged earnings manipulation.
- Retained by CHUBB in connection with multiple class action securities fraud cases advising on stock price impact and number of damaged shares.

## Competition and Antitrust

- Retained by a major automobile OEM to calculate damages related to alleged price fixing by wire harness manufacturers.
- Retained by a physicians board certification organization to respond to a class of physicians alleging antitrust violations.
- Retained by a manufacturer and seller of remanufactured ink and laser jet cartridges related to an attempt to monopolize claim.
- Testified on relevant market related to predictive chat.
- Lead author of an amicus brief on behalf of a supplier of surgical equipment related to whether tying arrangements were anti-competitive.
- Retained by a battery manufacturer to calculate economic damages arising from market manipulation in the lead commodities market.
- Retained to define the relevant market related to virtual reality on behalf of claimant alleging misappropriation of trade secrets.



Exhibit 1

- Retained to define the relevant market related to chatbots on behalf of claimant alleging misappropriation of trade secrets.

- Retained to define the relevant market related to re-bar procurement on behalf of claimant alleging misappropriation of trade secrets.

- Retained by a global company in the beverage industry to assess the economic impact of regional market conditions and presence of competitors on demand and pricing.

- Retained by an international automobile parts manufacturer to calculate damages related to price fixing by component manufacturers.

## Econometrics and Statistics

- Retained by a multinational technology company to advise on statistical sampling related to customer service data.

- Retained by a re-insurer in an arbitration related to ice dam claims in the New England area; analysis included econometric and statistics.

- Retained by the Securities and Exchange Commission related to RMBS including statistical sampling and examination of loan characteristics.

- Retained by a software developer to opine on proper sampling methods.

- Retained by a Guyanese telecommunications company to design a representative sample to determine whether international calls were being diverted to an IP network.

- Retained by a mortgage loan broker to advise on valuation and statistical sampling of loan portfolios intended for sale, including implementing a sampling procedure to comply with FDIC guidelines.

- Retained by a national shipping company to testify on econometric and forecasting involving time series related to a breach of contract claim.

- Retained by a sporting goods manufacturer to design sampling procedures that enabled a quantification of consumer preferences for new products and an assessment of competitor products based on time series and cross-sectional data.

- Retained by an HMO to assist in its modeling of IBNR claims.

- Retained by a restaurant and entertainment business to assist with data analytics to assess optimal pricing and consumer behavior.

- Retained by a luxury hotel in Las Vegas to address claims of market impact of excessive noise from neighboring areas on property values.

- Retained by a multinational computer technology company to testify on proper statistical sampling methods related to a class action alleging failure to comply with warranty guarantees.



Exhibit 1

- Retained by a property development company to advise on statistical tests used to identify potential erroneous quality control measurements related to a large commercial property development project.

## Intellectual Property

- Retained by a multinational conglomerate to opine on patent infringement damages related to mobile devices.
- Retained by a manufacturer of LEDs to opine on patent infringement damages against a competitor.
- Retained by a video game developer to opine on head start advantages and economic impact due to an alleged misappropriation of trade secrets.
- Retained by an online messaging company to opine on damages stemming from an alleged misappropriation of trade secrets.
- Retained by a technology company to opine on whether rates at issue were consistent with FRAND rates (settled prior to expert reports).
- Retained by a manufacturer of transmission line technology related to a patent infringement matter.
- Retained by a company specializing in flash memory to value a patent portfolio and licensing strategy.
- Retained by a manufacturer of electronic cigarettes to opine on damages related to trademark infringement.
- Retained by a multinational manufacturer of athletic apparel and a national sportswear retailer to opine on damages related to trademark infringement.
- Retained by a software developer to opine on damages related to misappropriation of trade secrets.
- Retained by a Mexican multinational bakery product manufacturing company to opine on damages related to trademark and patent infringement.
- Retained by a telematics software company to opine on damages related to a patent infringement claim.
- Retained by a life insurance company to testify on damages related to trademark infringement.
- Retained by a global consumer electronics company to advise on licensing policy and structure.
- Retained by a film actor to testify on damages related to trademark infringement and breach of contract.
- Retained by a manufacturer of automobile filters to testify on damages related to multiple claims of patent infringement and trade dress.



Exhibit 1

- Retained by a manufacturer of chainsaws to testify on damages related to an alleged false advertising claim.
- Retained to provide an evaluation on the proper apportionment of the proceeds from a multiple billion dollar sale of a patent portfolio.
- Retained by a manufacturer of fluid valves to opine on damages related to a patent infringement claim.
- Retained by a company specializing in food coloring to opine on price elasticity and damages related to a patent infringement claim.
- Retained by a company specializing in automobile designs to testify on damages related to a trademark infringement claim.

### Class Certification

- Retained by a national health insurer related to a class action by former and current subscribers claiming damages arising from a data breach.
- Retained by an international fast food company related to a class action by former and current employees alleging unpaid remuneration for maintenance of uniforms.
- Retained by a multinational conglomerate related to a consumer class action alleging false and misleading claims related to its microwave ovens.
- Retained by a national retailer related to a consumer class action alleging unfair business practices related to reference pricing.
- Retained by a beverage company related to a consumer class action alleging false and misleading advertising.
- Retained by an organic foods and drink company related to a consumer class action alleging false and misleading claims related to its packaging.
- Retained by retailer related to a consumer class action alleging false and misleading claims related a product containing resveratrol.

### Publications

- "Beware the Pitfalls of Applying AI to Big Data" (co-authored) *InformationWeek*, October 2019.
- "The Impact of Summary Disposition on International Arbitration: A Quantitative Analysis of the ICSID's Rule 41(5) on Its Tenth Anniversary" (co-authored) *Dispute Resolution International*, May 2019
- *"SETLcoin – Hype vs Reality" (co-authored) Bloomberg Law, July 2018.*
- "Smart Contracts are Having Their Moment: Named in the 1990s, They Took 15 Years to Arrive" *Metropolitan Corporate Counsel*, October 2017.



Exhibit 1

- "The Race to Patent the Blockchain" (co-authored) *AlixPartners Insight*, September 2016.
- "No Minimum Level for R-Squared in Regression Analysis" (co-authored) *Law360* (2016).
- "Don't Shoot the Methodology" (co-authored) *Law360* (2014).
- "Pay-For-Delay Practices in the Pharmaceutical Sector: Lundbeck, Actavis, and Others" (co-authored) *Journal of European Competition Law & Practice*, Volume 5, Issue 1 (2014).
- "Reverse Moral Hazard of Liability Insurers: Evidence from Medical Malpractice Claims" (co-authored) *Applied Economics* (2007).
- "An Analytical Solution to Reasonable Royalty Rate Calculations" (co-authored), *IDEA: The Journal of Law and Technology* (2001).
- "Technology Transfer in the Academic Sector" (co-authored), Midwest Economic Association Working Paper (2000).
- "Medical Malpractice Litigation" Ph.D. Dissertation, Duke University (1999).

## Presentations

- *Economics of Artificial Intelligence,* presentation to White & Case, *June 27, 2018*.
- *Damages and More …*, CLE International's Food Law Seminar, March 18, 2016.
- *Getting to Class: An Expert's Eye View of Damages Calculation*, INREACH webinar, October 29, 2015.
- *Antitrust Damages Litigation: Global Opportunities & Risk*, (with Quinn Emanuel) October 15, 2015.
- *Modern Approaches to Calculating Reasonable Royalty Damages: Avoiding Bare Bones Georgia-Pacific Analysis and Unsupportable Theories*, March 26, 2015, American Bar Association, 30th Annual Intellectual Property Law Conference.
- *Ascertainability and Damages Issues in Food and Cosmetic Mislabeling Class Actions*, September 17, 2014, Perrin's Legal Webinar Series
- *Calculating Market Share and Other Issues in Lost Profits Calculations*, May 30, 2014, Law Seminars International.
- *Developing a Quantitative Approach to Licensing Negotiations*, January 8, 2014, LES Mobile and Consumer Electronics Committee.
- *Bargaining Power in Licensing Negotiations*, July 24, 2013, LES Aerospace and Transportation Committee.
- *Bargaining Power in Licensing Negotiations*, March 12, 2013, LES San Diego Chapter Presentation.
- *Bargaining Theory in Reasonable Royalty Calculations*, December 14, 2012, ABA Webinar.
- *Entire Market Value Rule*, November 16, 2012, ABA Webinar.



Exhibit 1

- *Impact of Recent Decisions*, September 12, 2012, New York City Bar, New York, New York.
- *The Bar Gets Higher: Royalty Damages After Uniloc and Other Federal Circuit Decisions*, March 30, 2012, 27th Annual Intellectual Property Law Conference, Arlington, Virginia.
- *Issues in Calculating Lost Profits and Reasonable Royalties: Gross Margin, Operating Margin, Comparables and Rules of Thumb?*, April 20, 2009, Law Seminars International, San Francisco, California.
- *Real World Licensing Agreements at Work*, October 15, 2007, Licensing and Executive Society Annual Meeting, Vancouver, Canada.
- *Patent Infringement Damages Calculation*, April 28, 2006, IP Focus Series, Loyola Law School, Los Angeles, California.
- *A Comparison of Legal Defense Among Liability Insurers*, July 8, 2001, Western Economics Association Annual Meeting, San Francisco, California.

## Employment History

- AlixPartners, LLC (2005-present)
  - Managing Director (2014-present)
  - Director (2006-2013)
  - Vice President (2005)
- UCLA (2008-2013)
  - Instructor – Micro and Macroeconomics through Extension Program
- Econ One Research, Inc. (2000-2005)
  - Economist
- InteCap, Inc. (previously known as Micronomics) (1999-2000)
  - Director
- Duke University (1998-1999)
  - Department of Economics, Instructor
- NERA Consulting (1997)

  Summer Associate (concurrent with Ph.D. program enrollment)



**Exhibit 1**

## Testimony and Expert Reports (last five years)

- *In re: Opioid Litigation – County of Suffolk v. Purdue Pharma L.P., et al.; County of Nassau v. Purdue Pharma L.P., et al.,* Index No: 400000/2017 in the Supreme Court of the State of New York, County of Suffolk (on behalf of <u>CVS</u>) (Expert Report)

- *Zest Labs, Inc. f/k/a Intelliflex Corporation and Ecoark Holdings, Inc. v. <u>Walmart Inc. f/k/a Wal-Mart Stores, Inc.</u>,* Civil Action No. 4:18-cv-500-JM in the United States District Court for the Eastern District of Arkansas, Western Division. (Expert Report, Deposition Testimony)

- *<u>FCA US LLC</u> v. Yazaki Corp., Yazaki North America, Inc., and EWD, LLC,* Civil Action No. 2:17-cv-14138-MOB-MKM in Eastern District of Michigan – Southern Division. (Expert Report, Deposition Testimony)

- *<u>HSBC Bank USA, NA, in its capacity as Trustee of Nomura Home Equity Loan, Inc., Asset Backed Certificates, Series 2007-2</u> v. Nomura Credit & Capital, Inc.,* Index No. 650337/2013 in Supreme Court of the State of New York - County of New York. (Expert Report, Deposition Testimony)

- *<u>Nomura Asset Acceptance Corp., Mortgage Pass-Through Certificates, Series 2006-AF2 Trust, by HSBC Bank USA NA, as Trustee</u> v. Nomura Credit & Capital, Inc.,* Index No. 652614/2012 in Supreme Court of the State of New York - County of New York. (Expert Report, Deposition Testimony)

- *<u>Guyana Telephone and Telegraph Limited</u> v. U-Mobile (Cellular) Inc.,*2012-HC-DEM-CIV-W-283 in the High Court of the Supreme Court of Judicature of Guyana Civil Jurisdiction. (Expert Report)

- *In re National Prescription Opiate Litigation,* MDL 2804, Case No. 17-md-2804 in the United States District Court for the Northern District of Ohio – Eastern Division. (on behalf of <u>CVS</u>) (Expert Report, Deposition Testimony)

- *Fundamental Innovation Systems International LLC v. <u>Samsung Electronics Co. Ltd. and Samsung Electronics America, Inc.</u>,* Civil Action No. 2:17-CV-00145-JRG in the United States District Court for the Eastern District of Texas – Marshall Division. (Expert Report, Deposition Testimony)

- *<u>FABco, LLC</u> v. Commercial Metals Company,* Cause No. DC -16-09402 in the District Court – 101st Judicial District – Dallas County, Texas. (Expert Report, Deposition Testimony)

- *<u>LivePerson, Inc.</u> v. 24/7 Customer, Inc.,* Case No.  3:17-CV-01268 in the United States District Court – Northern District of California – San Francisco Division. (Expert Report, Deposition Testimony)

- *A. Schulman, Inc., HGGC Citadel Plastics Holdings, Inc. and Lucent Polymers, Inc. v. <u>Citadel Plastics Holdings, LLC, et al.</u>,* C.A. No. 12459-VCL in the Court of Chancery of the State of Delaware. (Expert Report)

- *Safety Insurance Company, Safety Indemnity Insurance Company, and Safety Property and Casualty Insurance Company v. <u>Endurance Specialty Insurance Ltd. and Endurance Specialty Holdings Ltd.</u>,* Matter of Arbitration, Boston, Massachusetts. (Expert Report, Deposition Testimony, Arbitration Testimony)

- *<u>CTC Global Corporation</u> v. Mercury Cable & Energy, Inc. d/b/a Mercury Cable & Energy, LLC; Energy Technology International Company, Inc., a Cook Islands corporation; Ronald Morris;*



Exhibit 1

*Todd Harris; Edward Skonezny; and DOES 1-10*, Case No. 09-CV-00261 in the United States District Court - Central District of California - Southern Division. (Expert Report)

■ *Marilyn Sperling; Jerred Schuh; and on behalf of all others similarly situated v. <u>Stein Mart, Inc.</u>*, Case No. 5:15-cv-01411-BRO-KKx in United States District Court - Central District of California - Eastern Division. (Expert Report)

■ *Vincent D. Mullins, individually and on behalf of all others similarly situated, v. <u>Premier Nutrition Corporation f/k/a Joint Juice, Inc.</u>*, Case No. C-13-01271 RS in the United States District Court for the Northern District of California – San Francisco Division. (Expert Report, Deposition Testimony)

■ *<u>ACE Securities Corp. Home Equity Loan Trust, Series 2006-HE4 by HSBC Bank USA National Association, as Trustee</u> v. DB Structured Products, Inc.*, Index No. 653394/2012 (Justice Bransten) in the Supreme Court of the State of New York – County of New York. (Expert Report)

■ *Guadalupe Salazar, et al. v. <u>McDonald's Corp., et al.</u>*, Case No. 3:14-CV-02096-RS in the United States District Court – Northern District of California – San Francisco. (Expert Report)

■ *Stephanie Ochoa, et al. v. <u>McDonald's Corp., et al.</u>*, Case No. 3:14-cv-02098-JD in the United States District Court – Northern District of California – San Francisco. (Expert Report)

■ *In Re Anthem, Inc. Data Breach Litigation*, Case No. 15-md-02617-LHK in the United States District Court for the Northern District of California – San Jose Division (on behalf of <u>Anthem Inc.</u>) (Expert Report, Deposition Testimony)

■ *<u>ZeniMax Media Inc. and id Software LLS</u> v Oculus VR, LLC, Palmer Luckey, and Facebook, Inc.*, Civil Case No. 3:14-cv-01849-P in the United States District Court for the Northern District of Texas – Dallas Division. (Expert Report, Deposition Testimony)

■ *Glen Grayson, and Doreen Mazzanti, individually and on behalf of themselves and all others similarly situated, v. <u>General Electric Company</u>*, Case No. 3:13-cv-01799 in the United States District Court for the District of Connecticut. (Expert Report, Deposition Testimony)

■ *<u>National Credit Union Administration Board, as Liquidating Agent of Southwest Corporate Federal Credit Union and Members United Corporate Federal Credit Union</u> v. Morgan Stanley & Co., Inc. and Morgan Stanley Capital I Inc.*, Case No. 13-cv-6705 (DLC) in the United States District Court for the Southern District of New York. (Expert Report)

■ *<u>National Credit Union Administration Board, as Liquidating Agent of U.S. Central Federal Credit Union and Western Corporate Federal Credit Union</u> v. Morgan Stanley & Co., Inc., Morgan Stanley ABS Capital I Inc., Morgan Stanley Capital I Inc., and Saxon Asset Securities Company*, Case No. 13-cv-2418 JWL-JPO in the United States District Court for the District of Kansas. (Expert Report)

■ *Rebecca Scheuerman, Individually and on Behalf of All Others Similarly Situated, v. <u>Vitamin Shoppe Industries, Inc. d/b/a Vitamin Shoppe, Inc.</u>*, Case No. 15cv0025 AJB NLS in the United States District Court for the Southern District of California. (Expert Report)

■ *<u>MSC Software Corporation</u> v Altair Engineering, Inc., et al.*, Case No. 2.07-cv-12807 in the United States District Court for the Eastern District of Michigan – Southern Division. (Expert Report, Deposition Testimony)