# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal
representative of the Estate of David
Kleiman, and W&K Info Defense
Research, LLC,

                         *Plaintiffs,*

v.

CRAIG WRIGHT,

                        *Defendant.*

CASE NO.: 9:18-cv-80176-BB

**PLAINTIFFS' OMNIBUS DAUBERT MOTION TO STRIKE DEFENSE EXPERTS**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   LEGAL STANDARD.............................................................................................. 2

III.  ARGUMENT ........................................................................................................... 3

   A.   Dr. Ami Klin's Report Should Be Stricken ......................................................... 3

      1.   Dr. Klin's destruction of the materials he relied upon was improper ............................ 4

      2.   Dr. Klin's destruction of materials he relied upon has prejudiced Plaintiffs and his opinion should be stricken............................................................................................... 7

      3.   Defendant cannot evade the requirements of Rule 26 by hiring an expert whose practice is to discard records. ......................................................................................... 9

      4.   Dr. Klin's Opinion #2 is improper expert witness testimony because it invades the province of the jury by opining on Defendant's credibility ................................................. 10

   B.   Kevin Madura's Opinion Should Be Stricken .................................................... 14

      1.   Madura failed to disclose information relevant to his opinion. .................................... 14

      2.   Madura's opinion is speculative and unreliable............................................................. 17

   C.   Harley Norwitch's Opinion Should Be Stricken ................................................ 20

      1.   Norwitch's Three Reports.......................................................................................... 22

      2.   Mr. Norwitch should be struck under Rule 26 because he has failed to adequately disclose the bases and reasons for his opinions..................................................................... 25

      3.   Defendant's noncompliance with Rule 26 was not substantially justified or harmless............................................................................................................................. 29

      4.   Separately, this Court should bar Norwitch from testifying because his non-disclosure means that Wright cannot carry his burden to prove a reliable methodology under Daubert ............................................................................................. 31

   D.   Dr. Stewart MacIntryre's Opinion Should Be Stricken. .................................... 35

      1.   Dr. MacIntyre's opinions related to Dave's physical health and capacity to work beginning in 2010 are irrelevant and contradicted by the record ........................................... 36

      2.   Dr. MacIntyre's testimony about Dave's lack of support by friends and family is irrelevant and contradicted by the record. ............................................................................. 38

      3.   Testimony related to Dave's "disruptive" behavior in the hospital, "irregular discharge," and cocaine found in his autopsy report is irrelevant, and any probative value of such evidence is substantially outweighed by its prejudicial effect...................................... 38

CONCLUSION................................................................................................................. 40

Plaintiffs move under Federal Rule of Civil Procedure 37(c)(1) and Federal Rule of Evidence 702 to strike defense experts Dr. Ami Klin, Kevin Madura, Harley Norwitch, and Dr. Stewart MacIntyre.

## I.  **INTRODUCTION**

Plaintiffs allege Dave Kleiman and Defendant partnered to create the bitcoin protocol, mine billions of dollars in bitcoin, and create intellectual property. To support these claims, Plaintiffs rely on the Defendant's own statements that Dave helped him write the Bitcoin Whitepaper and code the original Bitcoin protocol. Plaintiffs also rely on numerous documents produced by the Defendant evidencing their joint business relationship.

In an effort to un-ring the bell of his own admissions, the Defendant has proffered four experts that put forth opinions that are either engineered to cure his long record of lies, or directly contradict his Defendant's previous statements. Specifically:

1.  Dr. Amin Klin, who diagnoses the Defendant with autism, and opines that this condition impacts his presentation in legal proceedings, including depositions and court appearances;

2.  Kevin Madura, who opines that Dave Klemain didn't have the technical skills to program the Bitcoin protocol, despite Defendant's previous statements that Dave was an excellent coder;

3.  Harley Norwitch, who opines on the authenticity of certain signatures, including that one Wright admitted was his, isn't genuine; and

4.  Dr. Stewart MacIntyre, who opines on Dave's physical and mental health in what Plaintiffs assume to be an attempt to malign Dave's character and his family relationship.

To be clear, Plaintiffs do not bring this Motion to Strike on the basis that the opinions offered contradict the evidence the Defendant has produced in this litigation. Instead, as explained below, these experts either (1) failed to comply with the bare minimum requirements imposed by Fed. R. Civ. P. 26, and therefore must be excluded on fairness or reliability grounds under Rule 37 or

*Daubert*; or (2) issued opinions that are irrelevant to the issues in this litigation. Accordingly, Plaintiffs respectfully request the Court strike their opinions and preclude them testifying at trial.

## II.  LEGAL STANDARD

"A witness who is qualified as an expert" may "testify in the form of an opinion" if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Testimony that is not relevant and that would not "assist" the jury in reaching an informed decision should be excluded. *Id.*; *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); *Doctors Co. v. State, Dep't of Ins.*, 940 So. 2d 466, 470 (Fla. Dist. Ct. App. 2006) (testimony that would confuse the jury "by inserting additional issues into an already complicated case should be excluded").

"The party offering the expert testimony has the burden of demonstrating that the testimony is relevant to the task at hand and logically advances a material aspect of its case." *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) (citation and internal quotation marks omitted). Further, an expert's opinion "should be supported by 'good grounds,' based on what is known." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800–01 (6th Cir. 2000). "An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record." *Id.* at 801. Even if the proponent meets this burden, expert testimony may still be excluded if its probative value is substantially outweighed by danger of unfair prejudice, confusing the issues, or misleading the jury. *See* Fed. R. Evid. 403; *Williams v. Consol. City of Jacksonville*, No. 3:00-cv-469, 2006 WL 305916, at *8 (M.D. Fla. Feb. 8, 2006) ("[T]he Court's obligation under Fed. R. Evid. 403 to exclude evidence that is prejudicial, or that will confuse or mislead the jury, cuts across all categories of evidence, including expert evidence.").

To assist the Court's "gatekeeping" function under the *Daubert* standard, and prevent trial by ambush, Fed. R. Civ. P. 26 compels certain disclosures. Specifically, Rule 26(a)(2)(B)(ii) requires the production of all "facts or data considered by the witness in forming [their opinions]." Fed. R. Civ. P. 26. The Advisory Committee Notes make clear the intention is for "facts and data [to] be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients." Fed. R. Civ. P. 26, Advisory Committee Notes.

The consequences for a party's failure to comply with Rule 26(a)(2)(B) are governed by Rule 37(c)(1). *United States v. Batchelor-Robjohns*, 2005 WL 1761429, at *2 (S.D. Fla. June 3, 2005). If a party fails to provide information or identify a witness as required by Rule 26, the party is not allowed to use that information or witness at a trial, unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37; *United States v. Twenty-Nine Pre-Columbian & Colonial Artifacts from Peru*, 2015 WL 457860, at *2 (S.D. Fla. Feb. 3, 2015) ("[c]ourts in this Circuit routinely strike expert affidavits or preclude expert testimony for a failure to meet the requirements of Federal Rule 26"); *Reese v. Herbert*, 527 F.3d 1253, 1266 (11th Cir. 2008) (affirming the striking of an expert's testimony for non-compliance with Rule 26 and stating, "[b]ecause the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is not merely aspirational"). The burden rests upon the non-producing party to demonstrate that its actions were substantially justified or harmless. *Batchelor-Robjohns*, 2005 WL 1761429, at *2.

### III. ARGUMENT

#### A. Dr. Ami Klin's Report Should Be Stricken

On April 10, 2020 Defendant disclosed Dr. Ami Klin as an expert. (Ex. 1.) Dr. Klin was asked to opine whether Dr. Wright meets the criteria for "Autism Spectrum Disorder" ("ASD") and, if so, how this diagnosis would "impact [Dr. Wright's] presentation in legal proceedings."

Klin Rep., at 1. This opinion should be stricken for two reasons. *First*, his report, in contravention of the clear dictates of Fed. R. Civ. P. 26(a)(2)(B) failed to include essentially all the factual materials or data Dr. Klin relied upon in forming his opinions.[1] *Second*, putting aside the disclosure deficiencies, Dr. Klin's proposed testimony is improper because invades the province of the jury by opining extensively on Defendant's credibility. Accordingly, and for the reasons set forth in detail below, Dr. Klin's report should be stricken.

### 1. *Dr. Klin's destruction of the materials he relied upon was improper*

After Dr. Klin's opinion was initially disclosed, Defendant claimed Dr. Klin had not retained any of these materials he'd relied on when forming his opinions. This seemed unlikely given the fact that the report itself made clear that Dr. Klin, along with his colleague Dr. Saulnier, had conducted extensive interviews of Dr. Wright and four members of his family. Indeed, the report itself referenced notes taken by Dr. Saulnier and identified four separate psychological assessments conducted in conjunction with those interviews. As a secondary basis to not produce the allegedly destroyed materials, Defendant claimed the materials were privileged "draft reports."

Plaintiffs were forced to go to court to compel the production of these materials. Judge Reinhart heard that dispute on April 17. Relying on clear case law requiring similarly situated experts to produce their notes, Judge Reinhart overruled Defendant's objections and required production of all materials Dr. Klin relied upon:

> As for documents relied upon by Dr. Klin in preparing his expert report, I reject Defendant's argument that they are essentially draft reports and are, thus, protected from disclosure by Rule 26(b)(4)(B). Courts have held that the testing, analysis, and notes, as well as communications with other experts that a testifying expert relies upon in preparing his report do not constitute protected draft reports and are discoverable. *See Frazier v. Bd. of Cty. Comm'rs of Cty. of Arapahoe*, 2010 WL 447785, at *4 (D. Colo. Feb. 3, 2010) (ordering production of all psychological tests considered and

---

[1] Dr. Klin did review one of Dr. Wright's video depositions and read his deposition and court testimony from June 28, 2019. However, his opinions were primarily based on the materials discussed herein.

relied upon in forming opinions regarding plaintiff's emotional condition); *Pennenvironment & Sierra Club v. PPG Indus., Inc*., 2014 WL 12589147, at *2 (W.D. Pa. Oct. 7, 2014) (requiring the production of expert-to-expert communications and finding that "[t]here is widespread consensus that notes of experts or communications between experts…will not be protected from discovery 'as draft reports'"). Accordingly, Defendant is ordered to produce such documents, to the extent they exist, by **2:00 p.m. on April 18, 2020. ECF No. [457].**

The next day, Defendant produced a group of documents (referred to herein and at his deposition as the "Klin Binder"). Troublingly, the Klin Binder included some of the materials Defendant had represented did not exist. However, the Klin Binder did not include any of the following:

1. Dr. Klin's contemporaneous notes of his interview with Dr. Wright;

2. Dr. Saulnier's contemporaneous notes of her interview with Ramona Watts (Dr. Wright's wife);

3. Dr. Saulnier's contemporaneous notes of her interview with ████████ (Dr. Wright's mother);

4. Dr. Saulnier's contemporaneous notes of her interview with ███████ (Dr. Wright's sister);

5. Dr. Saulnier's contemporaneous notes of her interview with Don Lynam (Dr. Wright's uncle);

6. The ADR-1 psychological assessment performed by Dr. Saulnier based on his interview of Dr. Wright; or

7. The ADOS-2 psychological assessment performed by Dr. Klin based on his interview of Dr. Wright.

In fact, the last two items were produced in blank form (i.e., they contained no responses or notations), and make up over half of the materials produced.

Plaintiffs took Dr. Klin's deposition a few days later. At that deposition, Dr. Klin testified that he and Dr. Saulnier had taken copious and contemporaneous notes of their respective interviews of Dr. Wright, his wife, mother, sister, and uncle. (Klin Depo Trn. at 123:19-20, 124:7-15, attached hereto as Exhibit 2.) Since they did not attend each other's interviews, Dr. Saulnier's

notes and recollections generated from the interviews were Dr. Klin's sole source of data from everyone except Dr. Wright. (Ex. 1 at 2.) These interviews were the primary basis for the psychological assessments run, and the opinions offered by Dr. Klin.

At his deposition, Dr. Klin testified that he destroyed the notes of all of the interviews he and Dr. Saulnier conducted. (Ex. 2 at 124:1-6, 125:2-8 ("it's my practice that I destroy all of those – all of those written notes and stickies and notebooks, anything that has to do with that").) He went so far as to confirm that Dr. Saulnier had preserved her notes, given them to him, and he promptly destroyed those too.[2] (*Id.* at 312:14-22 – 313:1.)

Dr. Klin also confirmed that he and Dr. Saulnier had filled in the ADI-R (Saulnier) and ADOS-2 (Klin) psychological assessments either during, or right after, their interviews with Dr. Wright and his family. (*Id.* at 312:1-10; 368:15-20.) The attached assessments and Dr. Klin's testimony regarding them, evidences that they are run by taking notes on the assessment templates during the subject interviews, before later "scoring" them. (*Id.* at 377:11-19; 144:6-13.) For example, the ADI-R itself has 80 pages of questions, many of which are open-ended and leave the examiner ample room to take notes as the interview progresses (as Dr. Klin confirms Dr. Saulnier did).[3] (Klin Binder at 96-186, attached hereto as Ex. 3.) The last question requires the examiner to detail their "overall assessment," including their "impressions" and noting any discrepancies between the interviewee's responses and the examiner's observations. (*Id.* at 181.) Using these notes and impressions, the examiner must fill out a detailed four page "Comprehensive Algorithm Form" to reach an assessment score. (*Id.* at 183-186.) Dr. Saulnier took notes on the questionnaire,

---

[2] It is worth noting that this is not a case where Dr. Klin lost materials or failed to take steps to preserve them. He was retained on April 3rd, and he and Dr. Saulnier conducted their interviews and ran their assessments between April 6th and April 8th. By April 10th, Dr. Klin intentionally destroyed all of his reliance materials.

[3] The test is not designed for the questions to be asked verbatim or *in seriatim*, nor is every questionable applicable to each case.

filled out the algorithm score sheet, and provided this to Dr. Klin. (Ex. 2 at 312-313.) Dr. Klin then proceeded to destroy this too. (*Id.*) It goes without saying that these clinical observations, which are essential to rendering test results, are integral to testing Dr. Klin's opinion.

Dr. Klin fared no better with regard to the psychological assessment he ran based on his interviews with Dr. Wright. The ADOS-2 assessment is 20 pages of questions that the examiner answers based on his interview with the subject. (Ex. 3 at 188-207.) Like the ADI-R, it also includes an algorithm that uses answers to the assessment questions to arrive at a score. (*Id.* at 207.) Dr. Klin confirmed at his deposition that he took "a million notes" and filled out this assessment as he interviewed Dr. Wright. (Ex. 2 at 368:19-21.) Again, he destroyed those materials after he wrote his report. (*Id.* at 368:22-369:1.)

> ## 2. Dr. Klin's destruction of materials he relied upon has prejudiced Plaintiffs and his opinion should be stricken.

The issue of required disclosure, and Dr. Klin's failure to comply, has already been established. (ECF No. [457] at 2-3.) Accordingly, the only remaining issue is remedy.

Here, the only fair remedy is to strike Dr. Klin as a witness because the prejudice caused to Plaintiffs as a result of Defendant's disclosure violations is not curable because Plaintiffs are unable to test any of the bases for Dr. Klin's opinions.

Dr. Klin's failure to disclose the notes which formed the basis of his opinions is a sufficient basis to preclude his testimony. *See e.g., Batchelor-Robjohns*, 2005 WL 1761429, at *4 (precluding expert testimony for failure to disclose certain calculations which formed the basis of expert's opinions); *Capricorn*, 2019 WL 5694256, at *6 (precluding experts from offering testimony for failure to disclose the facts and data relied on in forming their opinions); *see generally Twenty-Nine Pre-Columbian*, 2015 WL 457860, at *2 (noting that courts in this Circuit routinely preclude expert testimony for failure to meet the requirements of Federal Rule 26).

Discarding documents that are subject to disclosure does not justify nor "side-step" the Rule's disclosure requirements; if expert disclosures are insufficiently detailed to satisfy the Rule, Courts may strike the witness. *Whalen v. CSX Transportation, Inc.*, 2016 WL 5660381, at *1 (S.D.N.Y. Sept. 29, 2016) (holding that an expert would be precluded from testifying if the experts "discarded" records were not produced within 21 days); *Capricorn*, 2019 WL 5694256, at *6 (granting motion to strike expert for failure to disclose the facts and data relied upon in the expert's report).

Specifically, Dr. Klin premises his opinions almost exclusively on the information he and Dr. Saulnier allegedly obtained in their respective interviews of Dr. Wright and his family. As with any mental health examination, the interview of the subject and those close to him is critical. (Ex. 2 at 225-228 (stating his evaluation and methodology requires reliable informants close to Dr. Wright who have concrete observations of his current and historical presentation).) The examiner must take note of what is said, how it is said, and otherwise the overall impression of the interviewee. (*Id.* at 240 (describing his impression of an instance where Dr. Wright became tearful during the interview and stated "we were having this conversation and, all of a sudden, he started to be tearful, and it came quite suddenly, and we explored that…. And this was absolutely not contrived.").) This data necessarily forms the bases for the resulting diagnosis, or, in the forensics context, the opinions offered at trial. Dr. Klin himself acknowledges that his diagnosis "emerg[ed] from the totality of th[e] information" and from "direct interviews and [an] expansive set of observations." (Ex. 1 at 13.)

Notwithstanding, Dr. Klin destroyed all of records of these observations. He now intends to come to trial and base sweeping opinions regarding Dr. Wright's mental health on information Plaintiffs have no access to. This is patently unfair and must not be allowed. *Batchelor-Robjohn*s,

8

2005 WL 1761429, at *3 (S.D. Fla. June 3, 2005) ("[W]ithout the disclosure… [d]efendants would be prejudiced in their ability to adequately cross-examine [the expert] and prepare their defense. Such results are exactly those that Rule 26(a)(2)(B) and 37(c)(1) are intended to prevent").

Ironically, if Dr. Klin had not taken any notes, Plaintiffs could cross-examine him on his lack of contemporaneous evidence of what was said. Here, however, the doctor is able to say he took notes concurrent with his assessments, and that those notes support his opinions. Yet, there is no way for Plaintiffs to test the veracity of that claim because Dr. Klin destroyed the evidence. This is precisely the harm that the Rule is intended to protect. Plaintiffs should not have to "take Dr. Klin's word for it" and hope they are not ambushed at trial. *Whalen*, 2016 WL 5660381, at *3 ("the purpose of the expert disclosure rules is to avoid surprise or trial by ambush"). These notes were inarguably the "facts and data" described in the Rule and without them, it is impossible for Plaintiffs to properly cross-examine Dr. Klin.

> 3. *Defendant cannot evade the requirements of Rule 26 by hiring an expert whose practice is to discard records.*

Dr. Klin's excuse for his affirmative and purposeful destruction of evidence is that it is his "standard practice" to do so. (Ex. 2 at 125:2-8; 368:22- 369:1-2.) However, this Court's disclosure obligations for expert witnesses are not subservient to how Dr. Klin decides to run his clinical practice. *Whalen*, 2016 WL 5660381, at *5 (one "should not be able to evade the Rule's requirements through the simple expedient of hiring an expert who discards [his] records"). This is especially so when Dr. Klin is not a "treating physician," but was specifically hired to provide a diagnosis and opinion in litigation. Indeed, the ethical guidelines of the American Psychological Association, the governing body for psychologists of which Dr. Klin is a member, instructs all psychologists acting in *forensic* activities to store and retain records and data related to their professional work in order to ensure compliance with law. APA Ethics Code 2017, §6.01; *See*

*also* APA SPECIALTY GUIDELINES FOR FORENSIC PSYCHOLOGY §10.06 ("[f]orensic practitioners are encouraged to recognize the importance of documenting all data they consider with enough detail and quality to allow for reasonable judicial scrutiny and adequate discovery by all parties").

Dr. Klin is not excused from abiding by the rules of the Court. Defendant "should not be able to evade the Rule's requirements through the simple expedient of hiring an expert who discards [his] records." *Whalen*, 2016 WL 5660381, at *5 ("[the Rule's] requirement would quickly become a dead letter if it could be side-stepped by this simple expedient").

**4. *Dr. Klin's Opinion #2 is improper expert witness testimony because it invades the province of the jury by opining on Defendant's credibility***

Plaintiffs also move to strike Dr. Klin's "Opinion #2" which purports to address how Dr. Wright's alleged Autism Spectrum Disorder ("ASD") diagnosis impacts his presentation in legal proceedings, including depositions and court appearances. Stated differently, Defendant intends to put forward an expert witness to "explain" to the jury how Dr. Wright's well-documented challenges with telling the truth are not evidence that he lacks credibility but are instead just an unfortunate symptom of a mental health disorder. The Opinion should be excluded because it is speculative, irrelevant to the issues of this case, and improperly invades the province of the jury by opining extensively on Defendant's credibility.

***First***, the court should exclude Opinion #2, and any related testimony, because it consists almost exclusively of Dr. Klin's opinion as to the sincerity and truthfulness of Dr. Wright. Generally, a witness' opinion as to the credibility of a party is inadmissible. *United States v. Falcon*, 245 F. Supp. 2d 1239, 1245 (S.D. Fla. 2003) ("[i]t is well-settled in this Circuit that, absent extreme or unusual circumstances, expert scientific testimony concerning the truthfulness or credibility of a witness is inadmissible"). Courts have expressly determined that witnesses (expert or lay) do not assist the trier of fact when they merely opine on the truthfulness of a statement.

*Dugas v. 3M Co.,* 2016 WL 7327666, at *7 (M.D. Fla. Mar. 30, 2016) ("[a] fundamental premise of our trial system is that the jury is the lie detector…. the jury does not need an expert to tell it whom to believe, and the expert's stamp of approval on a particular witness' testimony may unduly influence the jury"). Consequently, testimony constituting an opinion on credibility invades the province of the jury to make credibility determinations and fits squarely within the rule that opinion evidence on truthfulness is inadmissible. *Dugas,* 2016 WL 7327666, at *7 ("the truthfulness of a witness [is] a province explicitly reserved for the jury"); *Bodner v. Royal Caribbean Cruises, Ltd.*, 2018 WL 2471215, at *3 (S.D. Fla. Apr. 10, 2018) (precluding expert's opinion that a witness's version of events was credible because "the truthfulness or credibility of a witness is generally inadmissible because it invades the jury's province to make credibility determinations"); *Snowden v. Singletary*, 135 F.3d 732, 739 (11th Cir. 1998) ("[w]itness credibility is the sole province of the jury." )

Dr. Klin, under the guise of a mental health opinion, is trying to vouch for Dr. Wright's credibility (or excuse his lack thereof). For example, Dr. Klin evaluated Dr. Wright's deposition testimony and opined that Dr. Wright is "respectful, truthful, and made a real effort to answer questions and remember information."[4] Klin Rep., at 17. He goes on to state that Dr. Wright has a "deferential attitude towards the [J]udge, which is sincere" and has expectations of "fair and authoritative" court proceedings. *Id.*, at 14. Indeed, Dr. Klin has concluded what looks like "malicious intent [and] deceitful hiding of critical information" is actually just Dr. Wright reacting to the attorneys' lack of "technical super-accuracy" when asking him questions. *Id.* Dr. Klin further states that Dr. Wright's testimony is "not contrived to manipulate the opinions of others" and that his struggle to answer simple questions about past communications or decisions, which "fuels

---

[4] Dr. Klin's opinion on "truthfulness" are particularly speculative as he did not review any documents about the issues in the case.

other people's impressions that he is not telling the truth," is due to his alleged disorder. *Id.*, at 14, 17.

Dr. Klin's opinion is a thinly veiled attempt to minimize Dr. Wright's words, behavior, and actions in a manner that usurps the role of the jury. Dr. Klin purports to read Dr. Wright's mind and opine he is being "truthful", Klin Rpt. At 16, going as far as recommending how the Court and the attorneys in this action should interpret his testimony. *Id.* at 17. This is beyond the purview of an expert witness. Dr. Wright's subjective intentions and testimonial sincerity is for the jury alone to decide and as such, this testimony from Dr. Klin should be excluded.

It should be noted that Dr. Wright's track record of having difficulty with the truth goes far beyond how he answers questions. He has been shown to have forged documents, committed perjury, and submitted false Declarations to this Court. *See e.g.* DE [277] ("I have found that Dr. Wright intentionally submitted fraudulent documents to the Court, obstructed a judicial proceeding, and gave perjurious testimony"); DE [420] ("I have previously found that Dr. Wright gave perjured testimony in my presence"); DE [265] ("the Court notes that Defendant has made **several conflicting statements**"). Even Dr. Klin admitted that there is nothing about being on the Autism Spectrum that would cause Dr. Wright (or anyone else) to do these things. Depo Trn., at 343:14-22 - 344:1-7; 354:9-15; 356:16-20.

**Second**, the Opinion should be excluded because it is speculative and has no adequate basis in fact. Relevant testimony from a qualified expert is only admissible if the expert knows facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation. *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir.1988). The opinion must be supported by more than subjective belief and unsupported speculation. *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800–01 (6th Cir.2000). Nothing in the Federal Rules of Evidence requires a

court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert, and as such, the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 519 (1997).

In his expert report, Dr. Klin does not cite any literature in support of Opinion #2. Instead, he reviewed a deposition transcript and a video of Dr. Wright's deposition and concluded that Dr. Wright's evasive behavior is merely a symptom of a mental health disorder. Inexplicably, Dr. Klin limited his review of Dr. Wright's ability to answer questions to Court proceedings and his own interview of Dr. Wright, each a natural setting for Dr. Wright to advance his self-serving agenda. In doing so, Dr. Klin ignored voluminous amounts of publicly available videos which demonstrates clearly that, outside the context of this litigation, Dr. Wright has no problem answering questions asked of him. *See e.g.*, CoinGeek, *Dr. Wright on the accountability of Bitcoin, Metanet incentives*, YouTube (Jun. 17, 2019), https://www.youtube.com/watch?v=lARQAUjsv3U; Decentralized Thought, *Craig Wright crashed my live stream | Surprise Interview*, YouTube (Nov. 23, 2018), https://www.youtube.com/watch?v=BMKBd0x6TNA&t=293s

***Third***, Opinion #2 should be excluded because it is not relevant to the issues of this case. The basic standard of relevance is a liberal one, but if an expert opinion does not have a valid scientific connection to the pertinent inquiry, it should be excluded because there is no fit. Fed. R. Evid. 401; *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009).

As previously discussed, Dr. Klin devotes six pages of his report to vouch for Dr. Wright's sincerity, truthfulness, deference to law, and extensive frustration with attorneys' propensity to mischaracterize his testimony. These assertions have no bearing nor connection to the merits of

the case, but are instead designed to gloss over the credibility issues that undoubtedly accompany Dr. Wright's expected trial testimony. Yet, Dr. Klin is poised to tell the jury that Dr. Wright's dishonesty should be excused because he is allegedly suffering from a mental illness. This should not be permitted.

Opinions explaining how Dr. Wright's combative answers and pedantic testimony results from his intolerance for imprecise speech has nothing to do with whether Dr. Wright formed a partnership with Dave Kleiman or unlawfully took property belonging to Dave. *Id.*, 15-16. Thus, Dr. Klin's opinions in this regard are irrelevant and must be excluded.[5]

### B.  Kevin Madura's Opinion Should Be Stricken

On April 10, 2020, Dr. Wright disclosed proposed expert testimony from Kevin Madura where Madura opines that Dave's skills and experience are highly inconsistent with the skills and experience required to develop the bitcoin code. (Ex. 4.) However, such testimony is irrelevant and should be stricken for two reasons. *First*, Madura failed to comply with Rule 26 disclosure requirements by refusing to disclose documents and materials he reviewed in connection with work he performed in this litigation. *Second*, putting aside the documents he reviewed and failed to disclose, Madura's opinion is speculative at best, as it fails to consider evidence that undermines his ultimate opinion.

#### 1.  Madura failed to disclose information relevant to his opinion.

At his deposition, Madura revealed that he has served in the capacity as a consultant to Dr. Wright in this litigation since early 2019, and assisted his colleague who had previously been

---

[5] Although not necessary to decide this motion, it is worth pointing out that Dr. Wright is a well-known speaker, a father to three children, a husband (twice) and 52- years old. Nonetheless, before Dr. Klin was hired to opine on his mental condition at $1000 dollars an hour, last month, there is no evidence Dr. Wright has ever been diagnosed (or treated) for any mental illness.

disclosed as an expert in this case. (Madura Dep. Tr. at 135:10-19; 172:2-11, attached hereto as Exhibit 5.) However, when asked what materials he reviewed in this case he claimed privilege and refused to disclose the documents he reviewed when he was wearing his "consultant" hat. This distinction is generally not recognized under the Federal Rules of Civil Procedure and are even more problematic here when he was acting as a "consultant" and an "expert" *at the same time.* (*Id.* at 169:15-171:19.)

"When an expert serves as a testifying witness, Rule 26(a)(2)(B) . . . requires disclosure of material considered, reviewed or generated by the expert in forming the opinion, irrespective of whether the materials were actually relied on by the expert." *Vision 1 Homeowner Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 08-cv-81211, 2009 WL 10667552, at *2 (S.D. Fla. Dec. 30, 2009) (citations omitted). "When an expert witness serves the dual role of both a consultant and a testifying expert, the 'court shall only give force to this differentiation of roles if it is convinced that the information considered for consulting purposes was not also considered pursuant to the expert's testifying function.'" *Id.* (quoting In re Puig, 398 B.R. 69, 72 (Bankr. S.D. Fla. 2008)). "Disclosure is warranted 'when there **is at least an ambiguity** as to whether the materials informed the [testifying] expert's opinion.'" *Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc*., No. 18-cv-63130, 2019 WL 6896299, at *4 (S.D. Fla. Dec. 18, 2019) (emphasis added) (internal citations omitted).

Madura admitted that his work as a consultant and his work as a testifying expert "may share similarities" (Ex. 5 at 172:16-24), and that he himself was "not sure" whether certain questions related to his consultant or expert role (*Id.* at 217:12-18). Moreover, when Plaintiffs' counsel attempted to explore the potential relevance between his consulting work and the opinion he was offering, counsel for Dr. Wright repeatedly instructed him not to answer:

I was trying to be helpful to you and give you some information that could potentially be relevant to his testimony as a testifying expert. If you want to draw the line in the sand that it's all or nothing, that's fine, it will be nothing, and I'm going to instruct him that he is not to answer any questions regarding his testimony -- any work he did as a consulting expert because he is not offering any opinions regarding that work. He is offering opinions regarding what he is offering opinions about. Those are disclosed to you in two reports. You are not entitled to information about things that he may have provided on a consulting basis. That has no relevance to his testifying opinions.

(*Id.* at 163:11-164:21).[6] The instructions not to answer were inappropriate and suggest Madura

may have been instructed to rely only on evidence that was helpful to his opinion, and to ignore

any other documents or information he may have reviewed. Indeed, Defendant's counsel instructed

Madura not to answer deposition questions relating to:

- The overall substance of the consulting work he performed in the case. (*Id.* at 169:2-6.)

- The approximate amount of time he spent relating to his work as a consultant in the case. (*Id.* at 169:7-14).

- Whether he reviewed any documents relating to Dave Kleiman's involvement in the creation of Bitcoin. (*Id.* at 179:24-180:21.)

- Whether he reviewed any documents relating to Craig Wright's involvement in the creation of Bitcoin. (*Id.* at 185:7-13.)

- Whether he reviewed any evidence related to Dave Kleiman's ownership of Bitcoin. (*Id.* at 186:2-8.)

- Whether he reviewed any of Dave Kleiman's electronic devices. (*Id.* at 186:17-22; 202:22-203:4)

- Whether he reviewed any emails from Dave Kleiman. (*Id.* at 184:9-13.)

- Whether he reviewed any emails from Craig Wright. (*Id.* at 184:20-24.)

---

[6] Plaintiffs learned that, during the deposition breaks, Defendant's counsel had discussions with Mr. Madura on what was and wasn't to be considered part of his "consulting work." (*Id.* at 217:12-18. ("Q: Did you discuss with counsel anything related to your work as a consultant during the break today? Yes or no is all I'm looking for. A: I'm trying to determine whether it would be considered part of the consulting or expert work. I think for these purposes, it's the consulting work. I'm not sure.").)

- Whether he reviewed any documents relating to Craig Wright's programming skills. (*Id.* at 199:20:24.)

Plaintiffs were entitled to this information. For example, documents "relating to Dave's involvement in the creation of Bitcoin" go directly to his core opinion – that Dave's skills and experience are highly inconsistent with the skills and experience required to develop the bitcoin code. Indeed, if he was given full access to the record, he would have seen documents (many written by Dr. Wright himself) that directly contradict that opinion. But he has refused to say what he reviewed.[7]

The documents he reviewed should have been identified in Madura's expert disclosures.

Accordingly, Madura's testimony and opinions related to Dave's involvement in the creation of Bitcoin should be stricken. "Complying with Rule 26 is 'not merely an aspiration'": "[T]he expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise." *Calhoune*, 2018 WL 7287871, at *2 (citations and internal quotations omitted). "Failure to comply with Rule 26(a) has significant consequences, including Rule 37's 'self-executing sanction.'" *Rembrandt Vision*, 725 F.3d at 1381 (citations omitted). In particular, under Rule 37(c)(1), "when a party fails to comply with the dictates of Rule 26, the Court will prohibit the party's witness from testifying, 'unless the failure was substantially justified or is harmless.'" *Davis v. R.J. Reynolds Tobacco Co.*, No. 09-cv-11447, 2014 WL 12621597, at *3 (M.D. Fla. Oct. 31, 2014).

### 2. *Madura's opinion is speculative and unreliable.*

In rendering his opinion, Madura relied primarily on a resume that Dave Kleiman used for his forensic investigation business, an expert report issued as part of that business, and the

---

[7] Defendant's position that they needn't have disclosed this material is directly contrary to the position they insisted Plaintiff comply with throughout the discovery process – claiming that all material reviewed by an expert must be disclosed. (*See* Ex. 6.)

deposition testimony from Dave's friend Kimon Andreou. (Ex. 4 at 3.) This methodology fails to pass Daubert's gatekeeping requirement because (1) Madura inappropriately "cherry-picked" the evidence he relied on in forming his ultimate opinion and (2) such paltry materials are insufficient for reliably concluding anything about Dave's C++ programing skills. These deficiencies are even more glaring given his refusal to answer whether he reviewed evidence in this case that directly contradict his opinion. Accordingly, his opinion is speculative and unreliable and should be excluded.

The objective of *Daubert's* gatekeeping requirement is to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). When an expert's opinion is based on "cherry-picked" facts where he or she merely accepts certain testimony that suits his or her theory and ignores testimony and evidence that does not, such a selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to assist the trier of fact. *PODS Enterprises, Inc. v. U-Haul Int'l, Inc.*, 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014) (collecting authority); *see also* Barber *v. United Airlines*, Inc., 17 F. App'x 433, 437 (7th Cir. 2001) (rejecting expert who did not explain why he ignored certain data, accepted only testimony and data that suited his theory, and "cherry-picked" supporting facts); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert's testimony where expert "reache[d] his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion.")

In opining that Dave Kleiman could not have learned the technical skills necessary to write the Bitcoin protocol, Madura "cherry-picked" which evidence he relied on relating to Dave Kleiman's programming skills. For example, while Madura relied extensively on testimony from

Mr. Andreou about a collaboration he did with Dave two years before the bitcoin code was released (Ex. 4 at 7-10), he ignored statements from the Defendant that characterized Dave Kleiman as an excellent coder. (Ex. 5 at 93:18-94:10 ("I had math skills and some coding that, frankly, was crud . . . Dave could edit his way through hell and back.").)

In addition, Madura's testimony is unreliable because it is simply not possible for him to reliably opine on Dave's coding skill set with the extremely limited and irrelevant information he was provided. Indeed, at his deposition, Madura admitted that he "ha[dn't] conducted a scientific examination of [his] method" and that he had not "determined a minimum requirement for contribution to the code." (*Id.* at 42:18-19). He further admitted that he had not reviewed (i) the classes Dave took while enrolled in college to obtain a computer science degree (*Id.* at 44:13-17), or (ii) whether Dave took any programming classes in high school (*Id.* at 46:4-11), or (iii) whether Dave had ever attended a programming course (*Id.* at 46:17), or (iv) whether Dave had read any programming books (*Id.* at 49:21-24), or (v) whether Dave was otherwise self-taught or took classes that did not appear on his resume, (*Id.* at 46:4-11; 46:12-17; 57:3-7).[8] He also admitted that he had not determined what coding language Mr. Andreou was referencing when he said that in 2006 Dave "was familiar with [programming], he could dabble," (*Id.* at 82:23-24), and that he did not know whether Dave improved his coding ability since the time Mr. Andreou had made his assessment (*Id.* at 90:14-91:8). The failure to account for all these possibilities demonstrates the flawed methodology at play in Madura's opinion. Especially since, as admitted by Madura, there are renowned computer programmers that were self-taught – including Bill Gates. (*Id.* at 43:10-

---

[8] Madura's failure to consider the possibility that Dave was self-taught is striking considering the fact that Madura himself cites to his pre-collegiate experience reading and writing code related to programming languages, including C++. (*Compare* Report at 2 *with* Report at 38 (Madura cites his "12 years" of experience reading and writing code despite the fact he did not begin his collegiate studies until 2010.")

16)). In fact, according to a poll of 56,033 computer programmers performed in 2016,[9] 69% were partly self-taught, 13% were wholly self-taught, and like Dave Kleiman, 19.2% had done "some college coursework in computer science."

As to the resume and expert report he relied upon, Madura admitted that C++ coding wasn't relevant to Dave Kleiman's forensic investigations business or that report. (*Id.* at 67:17-68:2; 80:13-16.) Accordingly, it should be of no surprise that Dave did not identify his programming skills in advertising his forensic consulting work. In fact, Madura admitted that. (*Id.* at 80:20-81:3).

Dave is not around to testify to his technical skillset, and Madura should not be permitted to leverage Dave's absence to present unreliable testimony based on a flawed, admitted not scientific, method to the jury under the cloak of reliability implied to someone testifying as an expert in federal court. Accordingly, Madura's opinions relating to Dave's computers skills are based on an unreliable, non-scientific methodology, that applied cherry-picked evidence, and used insufficient data. It is therefore unreliable and should not be allowed in.

For the foregoing reasons, Plaintiffs respectfully request that the Court strike the April 10, 2020 Report of Madura.

### C.  Harley Norwitch's Opinion Should Be Stricken

Plaintiffs allege Defendant misappropriated billions of dollars in bitcoin and intellectual property from them. To support that allegation, Plaintiffs have pointed to a number of documents, including a purported "Deed of Loan" between Dr. Wright and other entities which includes a *handwritten* annotation stating that 650,000 bitcoin were to be held in a U.K trust until a "Group Company" was "formed with Dave K and CSW." Dr. Wright signed that page of the Deed of Loan (along with others). At his deposition he testified that **both** the handwritten annotation and that

---

[9] https://insights.stackoverflow.com/survey/2016#developer-profile-education

signature were his own. (Ex. 7 at 299:20-300:6 ("Q. There is a signature at the bottom; is that your signature? A. Yes . . . Q. The handwriting on the right-hand side of all the Bitcoin wallets listed there, whose handwriting is that? A. That looks like mine.").) Dr. Wright had also previously submitted this "Deed of Loan" to tax authorities in Australia in order to substantiate claims that his businesses were entitled to millions of dollars in tax refunds from the Australian government.[10]

Nevertheless, pursuant to Rule 26(a), Dr. Wright disclosed proposed expert testimony from F. Harley Norwitch that these signatures, one of which he has acknowledged is his, are not authentic. To be sure, this motion does not address the sheer implausibility of that scenario. It also does not address the extreme irony in Mr. Norwitch opining that someone forged Dr. Wright's signature, when it is Dr. Wright who has repeatedly perjured himself and submitted forged evidence to this Court. (*See, e.g.*, DE 277.)

Instead, Plaintiffs motion focuses on the fact that Mr. Norwitch's expert reports and proposed opinions should be struck because (i) his reports fail to comply with Rule 26(a)(2)(B)(i)'s requirement that they contain "the basis and reasons for" every opinion offered and (ii) his testimony fails to comply with the bare minimum requirements imposed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny.

Although the report includes Mr. Norwitch's final conclusions/opinions, it does not provide *any meaningful explanation* as to how or why he reached those opinions. Indeed, Mr.

---

[10] Dr. Wright provided this exact document to the Australian Tax Office ("ATO") in connection with the ATO's investigation of whether entities controlled by Dr. Wright were entitled to millions of dollars in tax returns. (*See* Ex. 8.) Indeed, in a "Notice of Objection" to the ATO's findings regarding Dr. Wright's entities' tax refunds that was *signed by Dr. Wright*, Dr. Wright referenced the Deed of Loan to support his claim that his entities were entitled to additional refunds. (*See* Ex. 9, at 3, 5.)

Norwitch's explanation, of whether *twenty signatures* are authentic is limited to a few conclusory sentences that shed no light on his reasoning or methodology.

### 1. Norwitch's Three Reports

Norwitch disclosed his first report in December 2019 (the "December Report," attached hereto as Exhibit 10). As discussed in greater detail below, he opined a former business associate of the Defendant, Jamie Wilson, signed a certain document.

On April 10, 2020, Norwitch disclosed his first supplemental report (the "April Report," attached hereto as Exhibit 11). The April Report is just over 6 pages, but only two contain Norwitch's opinions and purported analysis. The first two pages contain information solely related to his retention, what he was asked to do, and general background on forensic document examination. Specifically, in the "Examination Requested" section, Norwitch explains his assignment was "[t]o ascertain, if possible, the authenticity" of 18 signatures from Craig Wright and Uyen Nguyen on the Deed of Loan.[11] In the next subsection ("Forensic Document Examination Protocol") he provides a bare-bones description of the technique generally underlying handwriting analysis. Specifically, he writes that

> "[h]andwriting and signatures examination and comparison procedures consist of examination of standard (known) material for consistency and normal variation, and then a side by side comparison of individual writing movements and inherent characteristics found in the questioned material with comparable writing movements found in the standard material, such as, but not limited to: form, height ratios, slant, proportions, skill level, movement, speed, pressure, and line quality, where possible and/or necessary."

(*Id.*). Norwitch notes that "[e]xamination, comparisons, and archival procedures may employ, but are not limited to, stereo microscopy, video-spectral comparison and electro-static

---

[11] Mr. Norwitch divides the Deed of Loan into three documents, which he refers to as Items B, C, and D, respectively. (*See* Ex. 11, at 1, 10-18.)

instrumentation, transparency comparison, computer scanning, and photo microscopy (photomicrographs)." (*Id.*)

On the second (and final) page, Mr. Norwitch sets forth his opinions. (*Id.* at 4.) He states that "[a]n examination and comparison of the questioned and standard (known) signatures, as described previously, was accomplished." (*Id.*) Then, he states as follows:

1. A preliminary review of the submitted known signatures of Wright and Nguyen confirms that all of these signatures are consistent with one individual, respectively. Both writers' signatures are symbolic (individualized to the point of not containing readily recognized letters), are complex, and are written rapidly.

2. With respect to the questioned Craig Wright signatures, although bearing some pictorial resemblance to the standard Wright signatures, the questioned signatures do not compare favorably with the individual characteristics present in the standard signatures and, in fact, displays significant and fundamental departures form the genuine signatures. These dissimilarities are beyond the range of normal variation found within the standard signatures and are indicative and consistent with simulation.

    In view of the above findings, it is the opinion of this examiner that the questioned Craig Wright signatures on the documents in [the Deed of Loan] are simulations and, as such, are not genuine.

3. With respect to the questioned Uyen Nguyen signatures, these signatures fit comfortably within the parameters of individual variation displayed in the standard material and display the same significant individual characteristics present in those signatures. These individual characteristics, in combination, are sufficiently distinctive to conclude that the questioned signatures were written by the person who wrote the specimen Nguyen signatures.

    In view of the above findings, it is the opinion of this examiner that the questioned Uyen Nguyen signatures on the documents in [the Deed of Loan] were written by Uyen Nguyen.

(*Id.*) Beyond the cryptic generalities above, Norwitch's April Report provides no further explanation of his opinions, the details of his analysis, or the methodologies he employed. These deficiencies were not cured at his depositions.

As mentioned above, in the December Report Norwitch opined Jamie Wilson "very probably" signed the August 28, 2013 consent order submitted in the Australian proceedings against W&K.[12] (Ex. 10, at 3.) As with the April Report, the December Report fails to disclose the basis and reasons for Norwitch's opinion. Specifically, the first two paragraphs of his opinion section are *nearly identical* to the corresponding paragraphs in the April Report. And the final paragraph, with the exception of the final sentence, is nearly identical to the paragraph he used in the April Report to describe his opinion that the Nguyen signatures were genuine:

> The questioned signature fits comfortably within the parameters of individual variation displayed in the standard material and displays the same individual characteristics present in those signatures. These individual characteristics, in combination, are sufficiently distinctive to conclude to a good degree of probability that the question signature was written by the person who wrote the specimen signatures. Indications normally associated with simulation, such as hesitation, tremor, and a slow "drawn" appearance, are not present.

(*Id.*) Finally, on May 2, 2020 Norwitch issued another report where he opined Dr. Wright did not sign a certain IP deed (the "May Report," attached hereto as Exhibit 12). The May Report's opinion section is the sparsest of any previous report. The "analysis" Norwitch included is similarly non-descriptive and duplicative of previous reports. Specifically, that "the questioned signature does not compare favorably with the individual characteristics present in the standard signatures and, in fact, displays total departure and fundamental dissimilarity to the standard signatures in all areas." (Ex. 12, at 3.)

Norwitch failed to adequately disclose the reasons, basis, and methodology of his opinions. This means that his opinion should be struck for two independent reasons. First, the failure to adhere to FRCP 26 disclosure requirements activates FRCP 37's self-executing sanction to

---

[12] Norwitch's opinion ignores the fact that (i) Wilson testified he was never an officer or director of W&K and that (ii) Dr. Wright deposed Mr. Wilson, but inexplicably never asked him whether he signed the consent order. That is beyond the scope of this motion.

prohibit his testimony. Second, his non-disclosure has made it impossible for this Court to adequately test his opinion under FRE 702 and *Daubert*, thus resulting in Wright failing to carry his burden to demonstrate the testimony is admissible, and therefore necessitating an order disallowing his testimony.

> 2. *Mr. Norwitch should be struck under Rule 26 because he has failed to adequately disclose the bases and reasons for his opinions*

"Rule 26 requires an expert witness to disclose an expert report that contains 'a complete statement of all opinions the witness will express *and the basis and reasons for them*.'" *Rembrandt Vision Techs., LP v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (11th Cir. 2013) (quoting Fed. R. Civ. P. 26(a)(2)(B)(i)) (emphasis added). "An expert report is deemed adequate when it is 'sufficiently complete, detailed, and in compliance with the Rule so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced.'" *Brown v. NCL (Bahamas) Ltd.*, 190 F. Supp. 3d 1136, 1141 (S.D. Fla. 2016) (citations omitted). Indeed, "[a]n expert report must be so complete that 'opposing counsel is not forced to depose an expert in order to avoid ambush at trial.'" *Calhoune v. Ford Motor Co.*, No. 17-cv-61702, 2018 WL 7287871, at *1 (S.D. Fla. Dec. 26, 2018) (citations omitted). "Courts in this Circuit routinely strike expert affidavits or preclude expert testimony for a failure to meet the requirements of Federal Rule 26." *United States v. Twenty-Nine Pre-Columbian & Colonial Artifacts from Peru*, 2015 WL 457860, at *2 (S.D. Fla. Feb. 3, 2015).

Accordingly, to be sufficient, "expert reports must include 'how and why the expert reached a particular result, not merely the expert's conclusory opinions.'" *Id.* (internal quotations omitted); *see also Jones v. Novartis Pharm Corp.*, 235 F. Supp. 3d 1244, 1276 (N.D. Ala. 2017) (same). Expert reports that "furnish[] no real explanation" for the expert's opinion are therefore insufficient. *Looking Good Props. LLC v. Ascot Corp. Names Ltd.*, No. 4:12-cv-138, 2013 WL

12214331, at *2 (S.D. Ga. July 23, 2013). For example, in *Aponte v. Royal Caribbean Cruises, Ltd.*, the court held that a medical expert's report did not comply with Rule 26. The court described that report as follows:

> Dr. Razack's one-and-a-half page, double-spaced, report is cursory and superficial. Dr. Razack briefly summarized Aponte's presentation and treatment and then, without explanation, abruptly set forth his belief that Aponte's "need for [] surgery . . . were the result of the injury he sustained on the cruise ship . . ." He then perfunctorily pointed to the following as generally supporting his opinion: "the patient's history, symptoms, physical exam, EMG studies . . . MRI scans and the intraoperative findings at surgery." Dr. Razack provided no further detail or analysis. Contrary to the requirements of Rule 26, Dr. Razack's report does not contain "the basis and reasons for" his opinions . . . .

No. 15-cv-21854, 2019 WL 943267, at *3 (S.D. Fla. Feb. 26, 2019); *see also Rinker v. Carnival Corp.*, No. 09-cv-23154, 2011 WL 63770062, at *1 (S.D. Fla. Dec. 19, 2011) (striking expert report, where "the majority of the opinions contained in the [] report [were] conclusory without supporting reasons, facts, or data," and other opinions were not adequately explained).

Here, just like in *Aponte*, the Reports contains essentially no analysis, are cursory, and superficial. They fail to provide Plaintiffs with *any* notice regarding the methodology, examinations, or explanations for Norwitch's opinions.

Norwitch bases his opinion that Dr. Wright did not sign the Deed of Loan on four meaningless conclusions: that (i) the questioned signatures "do not compare favorably with the individual characteristics present in the" genuine signatures; that (ii) the questioned signatures display "significant and fundamental departures from the genuine signatures"; that (iii) "these dissimilarities are beyond the range of normal variation found within the" genuine signatures; and that (iv) they are therefore "indicative and consistent with simulation." (Ex. 11, at 4.)

But Norwitch provides (i) **no** details about what "individual characteristics" are, what about them he examined, how those alleged "individual characteristics" didn't "compare favorably," or

even provide an explanation for what "compare favorably" even means. Further, he disclosed (ii) **nothing** about what "significant and fundamental departures" he found, what those "significant and fundamental departures" even were, what a "departure" even means, or what the difference between a "significant" and insignificant departure even are. There is similarly **nothing** in the report that (iii) describes the alleged "dissimilarities," explains what the "range of normal variation" is, or how/what way the 'questioned' signatures exceed that "range." Finally, Norwitch provides **nothing that** (iv) explains what "indicates" that a signature is "simulated" or what would show "consistence" with a simulation.

The same deficiencies exist for Mr. Norwitch's opinion that Ms. Nguyen signed the document. Specifically, there is nothing beyond the general assertions that (i) the questioned signatures "fit comfortably within the parameters of individual variation displayed in the" genuine signatures, that they (ii) "display the same significant individual characteristics present in" the genuine signatures, and that (iii) these "individual characteristics, in combination, are sufficiently distinctive to conclude that the questioned signatures" are genuine. (*Id.*)

But again, Norwitch provides **no** details about (i) what the "parameters of individual variation" are or what the difference is between something fitting "comfortably" or uncomfortably in those "parameters." He provides **no** listing of what the (ii) "individual characteristics" purportedly "present" in the genuine signatures are, nor an explanation for what constitutes a "significant" as opposed to an insignificant "individual characteristic." Finally, there is also (iii) **nothing** to tell what "individual characteristics" Norwitch examined "in combination," how he did that "combined" examination, or what constitutes a "sufficiently distinctive" characteristic as opposed to an indistinct characteristic.

The same is true of the December Report which uses the exact same non-descriptive generalities to disclose his opinion. Specifically, he states again that the questioned signature "fits comfortably within the parameters of individual variation" of the standard signatures, and displays the same "individual characteristics" of those signatures – without any explanation for what any of that means. He adds slightly to the April Report by stating that "Indications normally associated with simulation, such as hesitation, tremor, and a slow "drawn" appearance, are not present." While this adds some additional information, it raises more questions as he fails to explain what a hesitation, tremor, or drawn appearance look like.

Finally, the same is true of his May Report which uses even less of the same non-descriptive generalities to "disclose" his opinion. Specifically, he states, again with no explanation, that the questioned signature "does not compare favorably with the individual characteristics" of the known signature, and concludes that the questioned signature displays "total departure and fundamental dissimilarity to the standard signatures in all areas" – again without any explanation for what these terms mean, how one determines the difference between a "total departure," from a slight departure, a "fundamental dissimilarity" from a non-fundamental one, or what constitutes "all areas."

Norwitch includes no additional bases or explanation for his opinions beyond these vacuous statements. Indeed, while the Reports describe some methodologies Mr. Norwitch *could* have used for determining whether signatures are authentic, it does not say which of these methodologies, if any, Mr. Norwitch *did* use. For example, the Reports all note that signatures may be compared along dimensions "such as, but not limited to: form, height ratios, slant, proportions, skill level, movement, speed, pressure, and line quality, where possible and/or necessary." (*Id.* at 3.) The Reports do not, however, indicate whether Mr. Norwitch compared the relevant signatures

on *any* of these dimensions, let alone which dimensions he considered for each of the *eighteen-plus* signatures that he analyzed, or what about those dimensions he found significant. Likewise, the Reports state that "[e]xamination, comparisons, and archival procedures may employ, but are not limited to, stereo microscopy, video-spectral comparison and electro-static instrumentation, transparency comparison, computer scanning, and photo microscopy (photomicrographs)." (*Id.* at 3.)

The fact that the analysis of such diverse signatures (Wilson, Wright, Nguyen) is described virtually identically across Norwitch's three reports underscores the sheer frivolity of his descriptions. In sum, Norwitch has failed to provide the required information regarding the "the basis and reasons for" his opinions and Wright has therefore violated Rule 26(a)(2)(B).

### 3. Defendant's noncompliance with Rule 26 was not substantially justified or harmless

"Complying with Rule 26 is 'not merely an aspiration'": "[T]he expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise." *Calhoune*, 2018 WL 7287871, at *2 (citations and internal quotations omitted). Accordingly, "[f]ailure to comply with Rule 26(a) has significant consequences, including Rule 37's 'self-executing sanction.'" *Rembrandt Vision*, 725 F.3d at 1381 (citations omitted). In particular, under Rule 37(c)(1), "when a party fails to comply with the dictates of Rule 26, the Court will prohibit the party's witness from testifying, 'unless the failure was substantially justified or is harmless.'" *Davis v. R.J. Reynolds Tobacco Co.*, No. 09-cv-11447, 2014 WL 12621597, at *3 (M.D. Fla. Oct. 31, 2014).

"The burden is on the party facing sanctions to prove that its failure to comply with Rule 26(a) was 'substantially justified or harmless.'" *Rembrandt Vision*, 725 F.3d at 1381 (citations omitted). "Failure to comply with Rule 26(a) is substantially justified when a reasonable person

would be satisfied that 'parties could differ as to whether the party was required'" to disclose additional information. *WM Aviation, LLC v. Cessna Aircraft Co.*, No. 6:11-cv-2005, 2013 WL 12392477, at *3 (M.D. Fla. Apr. 12, 2013). In other words, for noncompliance to be substantially justified, the party seeking to avoid sanctions "must have a reasonable basis in law and fact" for its position that disclosure was not required. *Id.*; *see also Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-cv-947, 2009 WL 1139575, at *3 (M.D. Fla. Apr. 27, 2009) (noncompliance not substantially justified, where noncomplying party did not claim it "was exempt from the requirement for a complete report" and there was "no reasonable room for disagreement about whether the report tendered was sufficient").

Here, there can be no dispute that the Reports are not exempt from Rule 26(a)(2)(B)'s requirements. Accordingly, noncompliance is not substantially justified.

"Failure to comply with Rule 26(a) is harmless when the party receiving the disclosure suffers no prejudice." *Id.* But a party that receives inadequate disclosures suffers prejudice whenever its "ability to prepare for effective cross-examination and rebuttal" is impaired. *Brown*, 190 F. Supp. 3d at 1143. To be sure, a "woefully inadequate report adversely impact[s the] ability to prepare for and conduct the deposition" and is therefore prejudicial. *Goodbys Creek*, 2009 WL 1139575, at *3. *Street v. Drury Inns, Inc.*, No. 08-cv-0700, 2009 WL 3784330, at *2 (S.D. Ala. Nov. 10, 2009) ("merely having to depose a party on information that should have been disclosed in a Rule 26 Report is a form of prejudice.").

Here, the noncompliance is clearly not harmless. The Reports fail to provide Plaintiffs with *any* notice regarding the methodology, examinations, or assumptions Mr. Norwitch employed, nor any notice with any articulable reason or basis for the opinions other than the meaningless conclusions and platitudes discussed above. These deficiencies fly in the face of the rule that "[a]n

expert report must be so complete that 'opposing counsel is not forced to depose an expert in order to avoid ambush at trial.'" *Calhoune v. Ford Motor Co.*, No. 17-cv-61702, 2018 WL 7287871, at *1 (S.D. Fla. Dec. 26, 2018) (citations omitted). As a result, Plaintiffs' ability to effectively rebut the Report has been completely foreclosed and their ability to cross-examine Mr. Norwitch has been substantially harmed. *See, e.g.*, *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1323 (11th Cir. 2008) (striking expert reports that failed to "state[] the expert's anticipated opinion with sufficient specificity to allow [the opposing party] to prepare for rebuttal or cross-examination"). The fact that Plaintiffs have deposed Mr. Norwitch does not alter the conclusion that Plaintiffs suffered prejudice because his inadequate reports rendered an effective deposition impossible. *See Goodbys Creek*, 2009 WL 1139575, at *3 (explaining that party's receipt of "woefully inadequate report adversely impact[ed] upon its ability to prepare for and conduct the deposition"). Accordingly, Mr. Norwitch should be stricken pursuant to Federal Rule of Civil Procedure 37(c)(1).

> 4. *Separately, this Court should bar Norwitch from testifying because his non-disclosure means that Wright cannot carry his burden to prove a reliable methodology under Daubert*

"The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "Under Rule 702 and *Daubert*, district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Id.* "To fulfil their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether," among other things, "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*." *Id.* at 1291-92. "The party offering the expert has the burden" to demonstrate "by a preponderance of the evidence" that the expert's opinions are reliable. *Id.*

This "rigorous" standard applies to testimony from handwriting experts. *See United States v. Paul*, 175 F.3d 906, 909-10 (11th Cir. 1999). Accordingly, to be admissible, expert testimony from a handwriting expert must be "reliable" and "based on sufficient facts or data and the application of accepted methodologies." *Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373, 1379 (M.D. Ga. 2006). Indeed, like any other expert testimony, a handwriting expert's opinions must be "the product of reliable principles and methods." *Am. Gen. Life & Accident Ins. Co. v. Ward*, 530 F. Supp. 2d 1306, 1313 (N.D. Ga. 2008).

If, the expert fails to provide a sufficient explanation of his or her methodology, then the court has no basis to conclude his/her methodology is reliable. As a result, courts routinely exclude testimony from handwriting experts who fail to sufficiently explain their methodology. *See, e.g.*, *Dracz*, 426 F. Supp. 2d at 1379-80 (excluding expert who failed to provide "any detailed explanation as to exactly *how* [he] evaluated the documents and drew his conclusions"); *Ward*, 530 F. Supp. 2d at 1314 (striking expert report based on "lack of any identifiable 'methodology'" to which "the *Daubert* factors" could be applied); *Agri-AFC, LLC v. Everidge*, No. 5:16-cv-00224, 2019 WL 385421, at *15 (M.D. Ga. Jan. 30, 2019) (excluding report that was "not based on any methodology that [was] readily apparent from the record"); Wheeler v. Olympia Sports Ctr., Inc., No. 03-265-P-H, 2004 WL 2287759, at *4 (D. Me. Oct. 12, 2004) (excluding testimony when the witness offered "no details about his methodology, beyond 'comparing' the handwriting on several documents.").

For example, in *Dracz*, the expert explained that he "evaluated the questioned document for consistency, variation style, and peculiar or identifying characteristics using a stereo star zoom American Optical 7X 1030X Twin Microscope and a Micronata Illuminated Microscope at 30X." 426 F. Supp. 2d at 1379-80. The court excluded the expert, explaining that his methodology was

not sufficiently explained: "Noticeably absent from this 'methodology' is any detailed explanation as to exactly *how* [the expert] evaluated the documents and drew his conclusion." *Id.* at 1380.

Likewise, in *Ward*, the expert explained that "the examiner must mentally compare [a handwriting sample] with all the writing he has ever seen and be able to determine whether each feature is common, rare, or somewhat in between in order to determine how much significance to attribute to the feature," and that "a number of variables can, and will be a factor in examining and evaluating a person['s handwriting." 530 F. Sup. 2d at 1314. The court characterized the former statement as "not so much a 'methodology' as a general observation about handwriting," and noted that, with respect to the latter statement, the expert's "lack of specificity ma[de] it difficult to evaluate [the expert's] methodology, but suggest[ed] that his report was not reliable." *Id.* Indeed, applying the *Daubert* factors, the court noted that the expert did "not state whether his observations have been empirically tested or whether his handwriting comparisons have an acceptable known or potential error rate," that it was "unclear whether his 'methodology' ha[d] been published or subjected to peer review," and that there was no "indication that [his] method [was] 'generally accepted' in the field, beyond his conclusory statement that his opinions 'are the product of reliable law enforcement principles.'" *Id.* Based on this analysis, the court held that the expert's "opinions [were] not sufficiently reliable to be admitted under Rule 702 and the standards of *Daubert*." *Id.* at 1313-14.

Similarly, in *Agri-AFC*, the expert explained that she "conducted [her] analysis . . . in accordance with the accepted methodology in the handwriting scientific community," and that "she examined and compared 81 documents 'using magnification' and evaluated the 'line quality, pressure patterns, rhythm, slant, size and proportions, utilization of space and spatial alignment, initial and terminal strokes, writing speed, legibility, skill level, letter forms, types of connectors,

method of construction, and pattern formation' of the signatures" on certain documents. 2019 WL 385421, at *15. The court found that this explanation was wholly inadequate, even though the expert supported her opinions with a number of exhibits demonstrating the manner in which she compared the relevant signatures:

> [N]one of these terms are defined or specifically applied in the report to show exactly what Ms. Peterson did while evaluating the signatures. Instead, the report merely offers several pages of signature samples with arrows and circles highlighting a particular part of each signature and noting the differences between them, but there is no explanation for why Ms. Peterson chose those parts of the signature to highlight as opposed to others. Thus, the report does not present a reliable method by which Ms. Peterson reached her conclusion that Jeanna did not sign the Daddy Rabbit and Jeanna Notes but Ron "may have." *Id.*

Finally, in *Wheeler* the expert offered "no details about his methodology, beyond 'comparing' the handwriting on several documents." *Wheeler*, 2004 WL 2287759, at *4. The court held this sparse opinion prevented it from determining "whether his methodology could be tested, has been subjected to peer review, or is in accordance with applicable standards." Id. In fact, the court pointed out that "[a]ny individual, with no training or experience whatsoever, could 'compare' the handwriting on different documents and reach a conclusion. That would not be a scientific examination." *Id*.

Here, the "explanation" Norwitch provided in the Reports regarding his methodology is plainly insufficient to enable the court to conclude that his methodology is reliable. Indeed, as explained above, Mr. Norwitch provided *no explanation* as to *how* he reached his conclusions. He did not identify the dimensions on which he compared the relevant signatures. He did not identify which, if any, differences between the signatures he found compelling. He did not identify what, if any, equipment he used to examine the signatures. He did not indicate whether his methodology had been empirically tested or had a known error rate, or whether that methodology had been

subjected to peer review or publication. His vacuous reports provide no useful information whatsoever.

In fact, Mr. Norwitch provided substantially less information regarding his methodology than the experts in *Dracz* and *Agri-AFC*, who were themselves excluded for failing to adequately describe their methodologies. Indeed, unlike Mr. Norwitch, those experts identified the dimensions on which they compared the signatures and the equipment that they used. Moreover, the expert in *Agri-AFC*, unlike Mr. Norwitch, annotated the signatures that she examined in order to highlight which differences she found relevant – and was still excluded.

In short, like the expert in *Wheeler*, Mr. Norwitch has failed to provide *any* information regarding the methodology that he employed to conclude that the signatures he analyzed were genuine or not. Accordingly, Wright has necessarily failed to carry his burden to demonstrate that his methodology is reliable. *Rink*, 400 F.3d at 1291-92. His proposed opinions are therefore inadmissible under Federal Rule of Evidence 702 and should be struck.

For these reasons, Plaintiffs request the Court prevent Norwitch from testifying.

### D.  Dr. Stewart MacIntryre's Opinion Should Be Stricken.

On December 13, 2019 Dr. Stewart MacIntyre, a medical doctor whose practice is limited to infectious disease, issued an expert report on behalf of the Defendant. (Ex. 13 at 1.) Dr. MacIntyre was asked to review Dave Kleiman's medical records, various litigation documents, a police report, and an autopsy report related to Dave's death, for the purpose of "forming opinions as to [Dave's] medical conditions (relating to infectious disease)." (*Id.*, at 1.) On April 8, 2020, Dr. MacIntyre submitted a second report. (Ex. 14.)

Dr. MacIntyre's two reports—which are five pages combined—set forth the following opinions: (i) Dave "had two basic types of chronic infection" (osteomyelitis relating to pressure

ulcers and urinary tract infections),[13] (ii) Dave received certain pain medications while in the hospital that "*could*" have affected his mental state, (iii) Dave's "irregular discharge" from the hospital "*could*" have adversely affected Dave's health, and (iv) a lack of support from family and friends may have contributed to Dave's death. As detailed below, each of these opinions is irrelevant, unsupported by the record, or both.

1. *Dr. MacIntyre's opinions related to Dave's physical health and capacity to work beginning in 2010 are irrelevant and contradicted by the record*

Dr. MacIntyre's opinion regarding Dave's physical health is irrelevant because nothing about Dave's physical health is at issue in this case. Further, his opinions about Dave's mental state and how it may have affected his capacity to work beginning in 2010 are irrelevant because the joint business relationship between Dave and Dr. Wright was formed before his hospitalization.

In putting forth Dr. MacIntyre's opinions, Defendant aims to paint a picture of Dave's health as so deteriorated that he was incapable of helping to create Bitcoin. Specifically, he opines that Dave's mental state may have been weakened by side-effects of prescription drugs taken during his hospitalization. (Ex. 14 at 2.) Yet, Dr. MacIntyre explicitly concedes he has no opinion as to Dave's mental state or acuity prior to 2010. (Apr. 20, 2020 MacIntyre Dep., at 52:1-53:24, attached hereto as Ex. 16.) Indeed, Dr. MacIntyre *admitted* that he is not qualified to determine such a matter, whether before or after 2010. (Jan. 10, 2020 MacIntyre Dep., at 59:1-18 at Ex. 15) Dr. MacIntyre offers only that after 2010, Dave's medications "*could*" have affected his mental state. (Ex. 14 at 2.) Even then, Dr. MacIntyre has little knowledge of how often Dave was using prescription drugs, nor is there any evidence that any physician noted that Dave had any of the

---

[13] Dave was in a serious motorcycle accident in 1995 resulting in permanent paralysis from just above the waist down. (Jan. 10, 2020 MacIntyre Dep. at 32:17-22, attached hereto as Exhibit 15.)

potential side effects of these drugs that Dr. MacIntyre speculates about. (Apr. 20, 2020 MacIntyre Dep., at 27:6-29:2, 31:20-32:18, attached hereto as Ex. 16.) Dr. MacIntyre's opinion therefore amounts to nothing more than "unscientific speculation offered by a genuine scientist." *Eberli v. Cirrus Deesign Corp.*, 615 F. Supp. 2d 1357, 1365 (S.D. Fla. 2009).

In any event, any conclusion that Dave's mental state affected his ability to work is contradicted by both Dr. MacIntyre's own testimony and the records. *See Jordan v. Celebrity Cruises, Inc.*, No. 1:17-cv-20773, 2018 WL 3584702, at *8 (S.D. Fla. July 25, 2018) (expert testimony inadmissible because it was "contradicted by the underlying record"). Dave's hospital records, the only records Dr. McIntyre reviewed, are replete with instances of clinicians noting how Dave was "busy with work," continually "participate[d] in work-related activities," and was "productive in doing work regarding his business." (Jan. 10, 2020 MacIntyre Dep. Exs. 4-6, attached hereto collectively as Exhibit 17.) Dr. MacIntyre's own report states Dave "was noted frequently to be using his laptop computer while in bed, and also less frequently using the telephone," and that on more than one occasion he had refused treatment because of "computer work and telephone conferences." (Ex. 14 at 2.) He even noted that Dave left to "give a lecture" during one of his furloughs. (*Id.*)

There is no basis to opine that Dave's mental condition in any way impacted his ability to form a joint business relationship with Dr. Wright. In fact, Dr. MacIntyre testified that "from an infectious disease point of view, I don't see anything getting from – that would get in the way – [of Dave] using a computer" or a telephone, and that a determination of his mental acuity while doing so should be "[left] to a psychologist or psychiatrist." (Jan. 10, 2020 MacIntyre Dep., at 62:3-63:24, Ex. 15.)

2. *Dr. MacIntyre's testimony about Dave's lack of support by friends and family is irrelevant and contradicted by the record.*

Any testimony related to visitation by friends and family while Dave was in the hospital is irrelevant. Dr. MacIntyre's report claims that the records demonstrate no in-person visitations by family members, friends, or co-workers, and that this "important element of support was lacking." (Ex. 14 at 2.) Most importantly, whether Dave had consistent visitors at the hospital has no bearing on whether Dave and Craig co-created Bitcoin or formed a joint business relationship with Craig Wright.

Regardless, Dr. MacIntyre's opinion is contradicted by the evidentiary record. *See Jordan*, 2018 WL 3584702, at *8. For example, Dave's friend, Kimon Andreou, testified that he visited Dave almost every day during parts of Dave's hospitalization. (*See* K. Andreou Dep., at 22:5-16, attached hereto as Ex. 18). Moreover, Dave's medical records also note the presence of visitors. (Jan. 10, 2020 MacIntyre Dep. Ex. 5, attached hereto as Ex. 19) (medical record noting Dave's recent activity which included visitors). Indeed, this "opinion" from Dr. McIntyre is not a medical opinion but instead is a back-door attempt to impermissibly inject the alleged lack of a close relationship between Ira and Dave Kleiman into the case.

3. *Testimony related to Dave's "disruptive" behavior in the hospital, "irregular discharge," and cocaine found in his autopsy report is irrelevant, and any probative value of such evidence is substantially outweighed by its prejudicial effect.*

Certain portions of Dr. MacIntyre's report discuss Dave's behavior while in the hospital, including the circumstances surrounding his final discharge. This includes a "letter of warning" from the hospital's Disruptive Behavior Committee in 2011 which noted that Dave was uncooperative with nurses and therapists. (Ex. 14 at 1.) His report also notes Dave's "irregular discharge" whereby Dave left on a furlough and did not return to the hospital (and soon after died in his home), and his autopsy report, which indicated the presence of cocaine metabolites. (*Id.*, at

2-3.) Defendant, through Dr. MacIntyre's report, attempts to depict Dave as unruly and reckless, and otherwise attack Dave's character. This testimony is irrelevant and markedly prejudicial to Plaintiffs. *See Travis v. State Farm Fire & Cas. Co.*, No. 04-cv-281, 2005 WL 8155520, at *4 (M.D. La. Dec. 23, 2005) (excluding expert testimony under FRCP 702 that attacks the general character of a witness and stating "[t]he drafters of the Rules were obviously concerned that a litigant would be unduly prejudiced if juries were invited to consider extrinsic evidence that someone is a 'bad person' and to make findings on that basis"); *United States v. Phaknikone*, 605 F.3d 1099, 1107 (11th Cir. 2010) (evidence inadmissible because "it was evidence of [] bad character that was offered for no purpose other than 'to show action in conformity therewith'").

Dave's temper during a hospital stay in 2011 and the circumstances surrounding his final discharge two years after that, are of no consequence to whether Dave formed a joint business relationship with Dr. Wright years prior to that hospitalization. Further, the indication of cocaine metabolites in Dave's autopsy report has no bearing on Dave's mental acuity during the previous time periods of relevance in this case and is considerably prejudicial to Plaintiffs.[14] *Nobles v. Sushi Sake NMB, Inc.*, No. 17-cv-21828, 2018 WL 3235534, at *1-2 (S.D. Fla. July 2, 2018) (excluding evidence of defendant's drug use because it was "unduly prejudicial and its probative value [was] de minimis").

Portraying Dave as a self-destructive or disorderly patient does nothing to make a fact in this case more or less true. It simply attacks his character, and thwarts the jury's perception of him. This testimony should therefore be stricken.

---

[14] There is no evidence cocaine contributed to Dave's death. (*See* D. Kleiman, Fl. Cert. of Death, issued June 10, 2013, attached hereto as Ex. 20.)

## CONCLUSION

WHEREFORE, for the reasons stated above, Plaintiffs respectfully request Dr. Klin, Mr. Madura, Mr. Norwitch, and Dr. MacIntyre be precluded from testifying at trial.

Respectfully submitted,

Dated: May 8, 2020

*/s/ Velvel Freedman*

Velvel (Devin) Freedman, Esq.
Florida Bar No. 99762
**ROCHE CYRULNIK FREEDMAN LLP**
200 S. Biscayne Blvd, Suite 5500
Miami, Florida 33131
Telephone: (305) 357-3861
vel@rcfllp.com
nbermond@rcfllp.com

Kyle W. Roche, Esq.
Joseph M. Delich, Esq.
*Admitted Pro Hac Vice*
**ROCHE CYRULNIK FREEDMAN LLP**
99 Park Avenue, Suite 1910
New York, NY 10016
kyle@rcfllp.com
jdelich@rcfllp.com

Andrew S. Brenner, Esq.
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

*Counsel to Plaintiff Ira Kleiman as Personal*
*Representative of the Estate of David Kleiman*
*and W&K Info Defense Research, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 8, 2020, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.

*/s/ Velvel Freedman*
VELVEL (DEVIN) FREEDMAN
