# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

----------------------------------X
IRA KLEIMAN, as the personal      )
representative of the Estate of   )
David Kleiman, and W&K Info       )
Defense Research, LLC,            )
                                  )
            Plaintiffs,           )   CASE NO.:
                                  )
v.                                )   9:18-cv-80176-BB/BR
                                  )
CRAIG WRIGHT,                     )
                                  )
            Defendant.            )
----------------------------------X

CONFIDENTIAL
REMOTE DEPOSITION OF AMI KLIN, PH.D.
Tuesday, April 21, 2020; 10:04 a.m. EST

Job No.:   572756
Pgs.   1 - 246, 263 - 400
Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR, CLR, RSA, Remote Counsel Reporter, LiveDeposition Authorized Reporter

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 123

1  talk to Ms. McGovern before Friday the 17th?
2       A.   Yes, I did.
3       Q.   Okay.  And what did you tell her about
4  the existence or nonexistence of what ultimately was
5  produced on Saturday?
6       A.   I told her that in my work as a
7  clinical expert witness in legal cases, that
8  everything that I do towards writing a -- my opinion
9  in my report -- these are materials that contribute
10 to my thinking, but I take them in the totality in
11 order to write the final report.  And that -- it's
12 been my practice for now since six to eight years
13 that I don't keep handwritten notes, I don't keep --
14 I don't keep any of those things once I have an
15 opportunity to complete my assignment, which is my
16 final report.
17      Q.   Did you, in fact, take handwritten
18 notes when you spoke with Dr. Wright?
19      A.   Oh, I took copious notes, and I assume
20 that -- yes, absolutely.
21      Q.   And you -- you -- after you were
22 completing your report, you destroyed those notes?



Page 124

1      A.   Yes, I destroy all of my stickies, all
2  my copious notes.  Once I have had an opportunity to
3  create an integration of all of the information, my
4  goal is to use the totality of that information to
5  generate my opinions, which are, again, written as
6  the report.  So I see that as my final work product.
7      Q.   And Dr. Saulnier -- do you know if she
8  took notes during her conversations with the mom,
9  the sister, the uncle and the wife?
10     A.   Oh, she -- she did.  And she provided
11 me with all of those notes.
12     Q.   Were those notes handwritten?
13     A.   Yes, they were handwritten on the forms
14 that were completed.  That's usually how you perform
15 those procedures.
16          As you -- as you probably checked,
17 the -- the -- the binder that I sent you, in which
18 there are copies of all of the instruments that we
19 use, there is plenty of room there to -- to write.
20 And so we write quite a bit.  So --
21     Q.   But do you know -- go ahead.
22     A.   -- and she handed in all those



Page 125

1  materials to me.
2           And -- and so once I integrated all of
3  the information and I was able to write, I guess, a
4  draft report, because -- but it is my final
5  product -- work product, I -- I -- it's my practice
6  that I destroy all of those -- all of those written
7  notes and stickies and notebooks, anything that has
8  to do with that.
9       Q.   Okay.  So let me change topics on you.
10      A.   Okay.
11      Q.   We've covered the -- in some detail,
12 although we'll go back -- we've covered a lot -- we
13 covered the materials you did review in connection
14 with your work in this case.  I want to talk to you
15 about some things you didn't review, okay, and
16 confirm you did not.
17      A.   Please.
18      Q.   Okay.  You -- first of all, was there
19 any materials -- whether it be depositions, court
20 proceedings, interview subjects -- anything -- any
21 materials that you asked to review that you were
22 told you could not review?



Page 144

1  possible, very concrete observations of every day
2  situations that they can tell me so that I can use
3  those things in order to subsequently complete a set
4  of, again, standard items with very detailed and
5  specific criteria so that I can rate.
6             So I'll never ask a person a direct
7  question, and I use that information to complete a
8  semistructured interview.  I elicit general
9  information as much as possible, as rich as
10 possible.  And on the basis of that information, I
11 then translate myself, because I know what I'm
12 looking for, into specific scores in a particular
13 form.
14     Q.   What do you do in the situation -- in
15 the situation where you -- and let's use Dr. Wright
16 as our example --
17     A.   Please.
18     Q.   -- what do you do in a situation -- if
19 you ask Dr. Wright, in the context of a
20 semistructured interview, a question and he gives
21 you an answer, but then that answer is not
22 consistent with the overall perception you're



Page 225

1  assessment is based on information either provided
2  to you or facilitated solely by the lawyers in the
3  case, correct?
4             MS. MCGOVERN:  Object to form.
5             THE WITNESS:  My opinion is based on
6       the information or the materials provided to
7       me plus the observations and results of
8       everything that was conducted as part of the
9       evaluations; so my own observations -- the
10      various different procedures that I followed
11      and that my colleague followed.
12            BY MR. BRENNER:
13      Q.    Fair enough.
14            The interviewees were all set up by
15  Rivero Mestre to talk to you, correct?
16            MS. MCGOVERN:  Object to the form of
17      the question.
18            THE WITNESS:  Not quite.
19            The attorneys never told me how I
20      would do my evaluation or who I should be
21      speaking to.  So I was the one who provided
22      them with the structure and methodology of



Page 226

1       my evaluation and that I would require
2       reliable informants on his current
3       presentation and on his historical
4       presentation.
5               And as part of the exchange, I
6       found out that there was a mother and that
7       the mother was lucid, and she could provide
8       information.  We -- I told them that -- is
9       there someone else in the family that can
10      join her.  And I was told that there was an
11      uncle, and so I requested the uncle.
12              And then for current presentation
13      and for the Vineland, which is realized
14      skills, the person in the best position
15      would be his wife.  So I asked for his wife.
16              And after the procedures were
17      conducted with his mother and his maternal
18      uncle, Dr. Saulnier and I talked about this,
19      and we needed to fill in some vantage
20      points.  And we thought then that the
21      younger sister, younger only by two years,
22      would be the person the closest to the kinds



Page 227

1      of concrete observations that we needed

2      about him when he was in school, for

3      example.

4           So the people I talked to were

5      people that -- in essence, I decided who

6      they're going to be on the basis of the

7      information provided to me.

8           BY MR. BRENNER:

9      Q.   And when you got done with that full

10 assessment that you just went through and you set

11 out -- you set forth in your report, you did not

12 then go back and try to find -- look at publicly

13 available information to see if it's consistent with

14 what you learned during your assessment, correct?

15      A.   That is correct.  And most clinicians

16 like myself don't like the idea of conducting

17 clinical work by looking at media materials or

18 things of that nature, because part of the

19 methodology used in gold standard clinical

20 evaluations is a setting that you have some control

21 over.

22           That's why when people say that



Page 228

1  Mr. Trump has a particular mental illness, this and
2  that, they're often discredited by others because
3  you don't conduct those kinds of -- you shouldn't
4  even state those kinds of impressions on the basis
5  of that kind of information.
6       Q.   Okay.  I'm going to play the video now
7  to the end.
8            (Video is played.)
9            BY MR. BRENNER:
10      Q.   I'll represent to you -- which I think
11 to be correct -- that the video is from -- let me
12 use -- it's off the screen, right?
13      A.   Yes, it is.
14      Q.   Okay.  I'll represent to you that my
15 understanding is that video is from May or June of
16 2019.  I think it's actually from May and uploaded
17 in June, which, just for the record, is between the
18 time of the deposition you -- you reviewed of
19 him and -- well, let me rephrase that.
20           May or June 2019 is the period of
21 time in between when the deposition you reviewed
22 was taken and the court testimony you reviewed was



Page 240

1  mentor sort of put me on -- it's just this very
2  basic notion, do you have daydreams, do you
3  daydream, because all of us do.  And what fills our
4  minds are typically things that have to do with
5  important others or people that we wanted to relate
6  with, some kind of a social situation or some --
7  those are the kinds of things that fill our minds.
8            What fills his mind is geometry, it's
9  algebra -- these are the things that -- when he's
10 idle, these are things he's thinking about.
11           And we were having this conversation
12 and, all of a sudden, he started to be tearful, and
13 it came quite suddenly, and we explored that.  Why?
14 And this was absolutely not contrived.
15           The reason being that in some
16 situations when he feels that people don't
17 understand him, he's hostile against them.  He
18 doesn't understand.  He just repeats himself all the
19 time and gets very hostile, even if -- it can be his
20 wife; it can be anybody.
21           But in that situation, the reason he
22 was tearful is because he can sense a -- a -- a true



Page 312

1  Dr. Saulnier would have had in front of her when
2  she was interviewing the people that were
3  interviewed for the ADI-R, correct?
4       A.   Correct.
5       Q.   And you talked -- you told me about
6  this earlier, but she would have been taking
7  handwritten notes on -- on this form.
8            And there's lots of spaces for it if
9  you keep scrolling through it, correct?
10      A.   That is correct.
11      Q.   Okay. And those are the notes -- we
12 don't have those notes now because she gave them to
13 you -- well, let me ask you.
14           Did she give them to you and you
15 destroyed them, or she destroyed them after she
16 gave them to you?
17      A.   No; she gave me everything.
18      Q.   Okay. So she handed over everything
19 she had -- all her background, all her data and all
20 her notes -- and then you made the decision to
21 destroy those notes, correct?
22      A.   As per my practice in this kind of



Page 313

1  work.

2      Q.   Okay.  Now, we don't know, on the
3  ADI-R, how any individual questions were scored, do
4  we?

5      A.   No.

6      Q.   Okay.  And all we know is what -- we
7  actually know two things:  We know what Dr. Saulnier
8  reported to you was her scoring, and we know what
9  you put in your report.

10          So let's look at both of those.

11          Okay?

12     A.   Please.

13     Q.   Okay.  So Dr. Saulnier -- I'm still in
14 the binder, and I think we're going to Page 5.  But
15 for your reference, it is -- I don't have to
16 describe it to you.  It's part of her -- it's part
17 of her draft narrative.  I don't really know what to
18 call it, but -- do you see what's on the screen?

19     A.   Yes, I see it.

20     Q.   Okay.  I don't want to -- I don't want
21 to characterize it as something it's not.

22          Just so we're clear -- and by the



Page 368

```
 1   an actual score for all of these things?
 2        A.   I have -- the way that the ADOS is used
 3   is the clinically -- the gold standard clinical
 4   judgment using the ADOS makes use of its algorithm
 5   scores -- his total scores, not item by item.  The
 6   validity of an instrument is maximized by using the
 7   totality of information and not any of the items in
 8   isolation.
 9        Q.   Okay.  We'll look at that -- we'll look
10   at what the actual algorithm is in a second.
11             What's Number 6?
12        A.   That would be a 1.
13        Q.   Okay.  Seven?
14        A.   It would be a 1.
15        Q.   Okay.  There was a time in this case
16   where you filled these out, right?  There's actually
17   a sheet of paper that existed with your numbers in
18   these boxes, right?
19        A.   There will be a form just like this
20   with not only the scores but a million notes.
21        Q.   And a million notes.
22             And you threw them all away?
```



Page 369

```
 1        A.    As I mentioned to you, that is my
 2   standard practice once I submit the report.
 3        Q.    Number 8?
 4        A.    It would be a 2.
 5        Q.    Yes, Doctor.
 6              Number 9?
 7        A.    It would be a 1.
 8        Q.    Ten?
 9        A.    It would be a 2.
10        Q.    Eleven?
11        A.    A 0.
12        Q.    Twelve?
13        A.    A 0.
14        Q.    All right.  New section -- there's only
15   one section -- Imagination section.
16              What did you give him on the one
17   question?
18        A.    A 0.
19        Q.    Okay --
20        A.    I --
21        Q.    -- I'm sorry.
22        A.    -- I just noted something.
```



Page 377

```
 1   just a little bit?
 2        Q.   Doctor, I feel like a golf caddy at
 3   this point.
 4        A.   I'm just trying to make sure.
 5             So the cutoff is 6 and 4, yes, and the
 6   cutoff is 10 and 7.
 7             Yes, it is identical.
 8        Q.   Okay.  The last page is identical?
 9        A.   Yeah -- well -- yeah, it is -- it
10   is the same items, yes.
11        Q.   And you did actually write in the
12   scores on this, correct?
13        A.   Correct.  You need to make a
14   transformation, but that is true.
15        Q.   And then you transferred the -- the
16   results to your report on Page 9, correct?
17        A.   Once I complete the algorithm page of
18   the ADOS-2 Module 4, I then have the scores, and
19   then I list them in my report.
20        Q.   And you discard this -- what we're
21   looking at on the screen, Page 207 of the binder?
22        A.   Yes, I discarded everything that I had
```

