# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
- - - - - - - - - - - - - - - - - - - - x
IRA KLEIMAN, as the personal
representative of the Estate of
David Kleiman and W&K Info Defense
Research, LLC,

       Plaintiffs,

                   CASE NO.:
   -against-       9:18-CV-80176-BB/BR

CRAIG WRIGHT,

       Defendant.

- - - - - - - - - - - - - - - - - - - - x


       Zoom video conference deposition of
KEVIN MADURA, taken pursuant to notice,
was held remotely, commencing April 30,
2020, 9:00 a.m., before Leslie Fagin, a
Stenographic Court Reporter and Notary
Public in the State of New York.

                - - -



       MAGNA LEGAL SERVICES
  320 West 37th Street, 12th Floor
    New York, New York 10018
      (866) 624-6221



Page 42

1                    K. Madura

2    have contributed to the Bitcoin code base?

3              MS. MARKOE:  Objection.

4         A.   I don't think that's impossible.

5         Q.   So it could be that someone who had

6    less than a bachelor's degree in computer

7    science would have sufficient ability to

8    contribute meaningfully to the Bitcoin code

9    bit?

10             MS. MARKOE:  Objection.

11        A.   It would be inconsistent with my

12   assessment of the complexity of the Bitcoin

13   code as it stood.

14        Q.   So I'm confused now.  Is it minimum

15   requirement to contribute meaningfully to the

16   Bitcoin code base, a bachelor's in computer

17   science or not?

18        A.   I haven't determined a minimum

19   requirement for contribution to the code,

20   only that it's -- the background required

21   would be consistent with someone or --

22   someone with extensive experience in computer

23   programming.

24        Q.   Mr. Madura, you are aware that Bill

25   Gates dropped out of college, right?



Page 43

```
 1                  K. Madura
 2             MS. MARKOE:  Objection.
 3       Q.   Was he a talented programmer?
 4             MS. MARKOE:  Objection.
 5       A.   He has programmed in the past, yes.
 6       Q.   Was he a talented programmer?
 7             MS. MARKOE:  Objection, outside the
 8       scope.
 9       Q.   You can answer.
10       A.   Bill Gates developed Microsoft
11  operating system, which is a complex piece of
12  code, so, yes, he is a talented programmer.
13       Q.   He did that without a bachelor's
14  degree, didn't he?
15             MS. MARKOE:  Objection.
16       A.   He did.
17       Q.   Mr. Madura, do you know who John
18  Carmack is?
19             MS. MARKOE:  Objection.
20       A.   No.
21       Q.   So, Mr. Madura, I want to bring you
22  back.
23             Why is it that your report, when
24  reviewing Dave Kleiman's qualifications, did
25  not list the fact or take into account or
```



Page 44

```
 1                    K. Madura
 2   even mention the fact that he had been
 3   educated at Palm Beach Community College and
 4   Embry-Riddle University where he was majoring
 5   in computer science?
 6            MS. MARKOE:  Objection.
 7       A.   I took that into account when
 8   studying his background as a whole, to
 9   determine whether or not his background and
10   experience would have been consistent with
11   the skills required to contribute to the
12   Bitcoin code.
13       Q.   Did you review which classes he
14   took while enrolled in Palm Beach Community
15   College and Embry-Riddle University?
16            MS. MARKOE:  Objection.
17       A.   I did not.
18       Q.   How did you make a determination
19   about what he was taught there?
20       A.   Again, I looked at his background
21   in its entirety to determine whether or not
22   it would be consistent with the skills
23   required to meaningfully contribute or code
24   the original Bitcoin version.
25       Q.   Do you know how long he was at Palm
```



1                    K. Madura

2          A.    I did not.

3                MS. MARKOE:  Objection.

4          Q.    And I know we established you

5     didn't review the courses he took when

6     majoring in computer science at Palm Beach

7     Community College and Embry-Riddle

8     University, but did you review any courses he

9     took while in high school?

10               MS. MARKOE:  Objection.

11         A.    I did not.

12         Q.    How did you -- let me ask you this

13    question.  Do you know whether or not Dave

14    Kleiman ever attended a course on programming

15    at some point before 2008?

16               MS. MARKOE:  Objection.

17         A.    I don't know that for certain.

18         Q.    What did you do to rule out the

19    possibility that he did attend such a

20    programming course?

21               MS. MARKOE:  Objection.

22         A.    I did not rule out that

23    possibility.  I looked at his professional

24    background and his experience as a whole to

25    determine whether or not his background would



Page 49

```
 1                    K. Madura
 2         A.   I am.
 3         Q.   Are you how did you rule out the
 4    possibility that he didn't attend a class on
 5    programming or watched YouTube videos or
 6    otherwise used the internet to teach himself
 7    how to code after that?
 8              MS. MARKOE:  Objection.
 9         A.   In reviewing his skills and
10    experience and background, I made a
11    determination and an opinion whether or not
12    his background would have been consistent
13    with developing complex code that
14    incorporates concepts across the field of
15    computer science, as well as other fields and
16    developed the original Bitcoin code.
17         Q.   Have you reviewed every book in
18    Dave Kleiman's house?
19              MS. MARKOE:  Objection.
20         A.   I have not.
21         Q.   Have you reviewed every book Dave
22    Kleiman has ever read?
23              MS. MARKOE:  Objection.
24         A.   I have not.
25         Q.   How do you rule out the possibility
```



```
 1                    K. Madura

 2       We've been going about an hour.

 3       Q.   Isn't it possible, Mr. Madura that

 4  Dave Kleiman taught himself C++, to some

 5  extent?

 6            MS. MARKOE:  Objection.

 7       A.   To some extent, perhaps, yes.

 8       Q.   Isn't it possible he taught himself

 9  C++, to an extent that he was able to

10  contribute to the Bitcoin code base?

11            MS. MARKOE:  Objection.

12       A.   It would be inconsistent with the

13  materials I reviewed regarding his

14  background.

15       Q.   But it would be possible, right,

16  Mr. Madura?

17            MS. MARKOE:  Objection.

18       A.   It's inconsistent, but possible.

19       Q.   Is it possible -- Mr. Madura, we

20  have gone over a bunch of different areas of

21  Dave Kleiman's history that you weren't able

22  to review, his college coursework, his high

23  school coursework, whether he attended any

24  online courses, is that accurate?

25            MS. MARKOE:  Objection.
```



```
 1                    K. Madura
 2        A.    I don't recall.
 3        Q.    Do you ever recall having an
 4   opportunity to review your call and see if
 5   you got it right or wrong, so, for example,
 6   you said, don't hire this guy, they did, and
 7   he turned out to be an excellent coder or you
 8   said, do hire this guy, and they did, and he
 9   turned out to be a terrible coder, so my
10   question is, has that ever happened that you
11   had an opportunity to look back at your
12   recommendation and determine whether you were
13   right or wrong?
14            MS. MARKOE:  Objection.
15        A.    I don't recall.
16        Q.    Sitting here today, can you tell
17   me, like, a known error rate of how often you
18   were right or wrong?
19            MS. MARKOE:  Objection.
20        A.    Again, I'm offering my opinion as
21   to the qualifications of Dave Kleiman as it
22   pertains to the ability to construct this
23   code.
24        Q.    That wasn't my question, Mr.
25   Madura.
```



Page 68

```
 1                    K. Madura
 2              Sitting here today, can you tell me
 3    a known error rate of your methodology for
 4    opining on people's ability or the
 5    consistency of their education with ability
 6    to program?
 7              MS. MARKOE:  Objection.
 8         A.   I haven't conducted a scientific
 9    examination of my method, no.
10         Q.   Mr. Madura, you understand that
11    Dave Kleiman held himself out as a forensic
12    investigator from 1997 until 2013, correct?
13         A.   Yes.
14         Q.   Do you need to know C++ code to be
15    a good forensic investigator?
16         A.   No.
17         Q.   Isn't it true that C++ coding was
18    not relevant to Dave Kleiman's public facing
19    experience as a forensic investigator?
20              MS. MARKOE:  Objection.
21         A.   Could you repeat the question?
22         Q.   Isn't it true that C++ coding
23    wasn't relevant to Dave Kleiman's public
24    facing forensic investigative business?
25              MS. MARKOE:  Objection.
```



```
 1                    K. Madura
 2        A.    I don't know much about Satoshi
 3   Nakamoto, so that's possible.
 4        Q.    Mr. Madura, you reviewed a report
 5   that Dave Kleiman issued in the Lighthouse
 6   Investment Partners versus Stacey Tenant
 7   (phonetic) case.
 8              Do you remember that?
 9        A.    I do.
10        Q.    You said it didn't reference C++
11   coding, correct?
12        A.    Correct.
13        Q.    Was C++ coding relevant to that
14   report?
15              MS. MARKOE:  Objection.
16        A.    I don't believe so.
17        Q.    Could that be why he didn't mention
18   any C++ coding expertise?
19              MS. MARKOE:  Objection.
20        A.    In describing his background, David
21   Kleiman didn't mention anything about
22   computer programming or C++ experience.
23        Q.    Because it wasn't relevant to the
24   report, right?
25              MS. MARKOE:  Objection.
```



Page 81

```
 1                    K. Madura
 2        A.    I'm not sure of the specifics of
 3   the intention, but that's correct, yes.
 4        Q.    Mr. Madura, you reviewed the
 5   deposition of Kimon Andreou, right?
 6        A.    I did.
 7        Q.    In that deposition, Mr. Andreou
 8   says that Dave was familiar with computer
 9   programming or he could dabble, but was not a
10   programmer.
11              Do you recall that testimony?
12              MS. MARKOE:  Objection.
13        A.    I don't recall that specific line.
14        Q.    Let's see if we can get it for you.
15   I will try to share with you the deposition
16   of Mr. Andreou.
17              MR. FREEDMAN:  Are we on No. 4?
18              (Exhibit 4, marked for
19              identification.)
20        Q.    This is the deposition of Kimon
21   Andreou.
22              Is this the deposition you
23   reviewed?
24        A.    I believe so.  I can't be exactly
25   certain without comparing the documents.
```



Page 82

                        K. Madura

1

2       Q.    I will represent to you it's the

3   only deposition transcript of Kimon Andreou

4   in this case, so it has to be the same one.

5             Do you see here, there is a

6   question on line 17 of page 9?  The question

7   is, Was Dave like a computer programmer?

8             Do you see that?

9       A.    I do.

10      Q.    And then the answer, No, he was

11  familiar with it, he could dabble, but was

12  not a programmer.

13      A.    I see that line, yes.

14      Q.    Is it possible that this level of

15  understanding may have enabled Dave Kleiman

16  to edit code, but perhaps not write it from

17  scratch?

18            MS. MARKOE:  Objection.

19      A.    It depends entirely on the language

20  that was being used at the time.

21      Q.    You don't know which language was

22  being used?

23      A.    I don't know what language Mr.

24  Andreou was referring to, no.

25      Q.    But if it was C++, then it would be



Page 90

```
 1                 K. Madura
 2             MR. FREEDMAN:  He has yet to answer
 3     it.
 4       Q.   Mr. Madura, is it possible that
 5   Dave Kleiman laid out the logic behind
 6   certain components of the Bitcoin code and
 7   used someone else to formally program it?
 8             MS. MARKOE:  Objection, asked and
 9     answered.
10       A.   It would be highly inconsistent,
11   but in the realm of all possibilities, it
12   would be possible.
13       Q.   Thank you.
14             Mr. Madura, do you know when these
15   interactions between Mr. Andreou and Dave
16   Kleiman occurred?
17       A.   Not specifically, no.
18       Q.   So you don't know whether or not
19   Dave Kleiman improved his coding ability
20   since that interaction, do you?
21             MS. MARKOE:  Objection.
22       A.   Nothing in the material I reviewed
23   regarding his background would indicate that.
24       Q.   But you are not aware of whether --
25   it's possible he could have improved his
```



Page 91

```
 1                    K. Madura
 2   coding capability, isn't it?
 3            MS. MARKOE:  Objection.
 4       A.   I'm not aware whether he did or did
 5   not.
 6       Q.   It's possible he did, correct?
 7            MS. MARKOE:  Objection.
 8       A.   I suppose it's possible, yes.
 9       Q.   Mr. Madura, I'm going to share with
10   you, I think now we are on Exhibit 5.  It's a
11   document produced in this litigation, Bates
12   labeled Defense Australia 11 -- actually, for
13   the record, it's Defaus, underscore,
14   00115950.
15            (Exhibit 5, marked for
16            identification.)
17       Q.   Did you review this document in
18   preparing your report?
19       A.   Not that I recall.
20       Q.   I will bring you down to the middle
21   of this document.
22            Do you see an email on March 7,
23   2014 from Craig Wright, craig@         ?
24       A.   I see that on the screen, yes.
25       Q.   Can you read this email for me for
```



Page 93

1                    K. Madura

2         record, this document seems to be a

3         piece of an email chain.

4              MR. FREEDMAN:  This is the way it

5         was produced to us.

6              MS. MARKOE:  I understand.

7         A.   Okay.

8         Q.   Do you want to read this email for

9    the record or do you want to keep going up?

10        A.    This is the next email in the

11   chain.  I can read it if you like.

12        Q.   I want you to be able to talk about

13   it, so if you want to take a moment to review

14   the whole document and then we can go back to

15   it.

16        A.    I think it would be useful to have

17   context.

18        Q.   So, now, can you please read for

19   the record the email on March 7, 2014 at 3:22

20   from Craig Wright at craig@███████?

21        A.    The text on the screen reads, Ira,

22   What is true?  I had math skills and some

23   coding that, frankly, was crud (better than

24   some but really), Dave could edit his way

25   through hell and back.  I am not a team



Page 94

1                    K. Madura

2    player, I am a terrible boss and slave

3    driver, but with Dave, I was far more.

4    Satoshi was a team.  Without the other part

5    of that team, he died.  Regards, and then a

6    signature.

7         Q.   You previously testified that you

8    did not review this email when reviewing Dave

9    Kleiman's skill set, correct?

10        A.   That's correct.

11        Q.   You understand that Craig Wright

12   testified that Dave Kleiman was his best

13   friend?

14             MS. MARKOE:  Objection.

15        A.   I don't recall that specifically,

16   but if you say so.

17        Q.   Do you think it would have been

18   appropriate, given the review you have done,

19   to take into account comments made by his

20   best friend?

21             MS. MARKOE:  Objection.

22        A.   Again, the materials I reviewed

23   were in connection with his skills and

24   capabilities, not necessarily his friendship.

25        Q.   So this is an email chain between



Page 135

1                    K. Madura

2    rebuttal report, will you know what I am

3    referring to?

4         A.   I will.

5         Q.   Did anyone assist you in the

6    preparation of this report?

7         A.   I worked on this report with

8    colleagues at AlixPartners, but the opinions

9    and conclusions are my own.

10        Q.   Which colleagues did you work with?

11        A.   I worked with Mr. David White.

12        Q.   Anyone else?

13        A.   Not that I can recall.

14        Q.   When did you start to work on this

15   report with Mr. White?

16        A.   I have to go back to my timesheets

17   to be certain.  I had assisted him in the

18   drafting of his report and led to drafting my

19   own, as well.

20        Q.   When you are saying you assisted

21   him in drafting his own report, are you

22   referring to the report Mr. White submitted

23   in January of this year?

24        A.   I believe so, yes.

25        Q.   Are you familiar with that report?



Page 163

1                    K. Madura

2          you put on the record that the witness

3          probably can't recall or can recall

4          stuff -- I'm sure it will be interesting

5          later on.

6          Q.    Mr. Madura, what can you recall

7     about the work that you have done outside in

8     your capacities as a consultant for this

9     case?

10               MS. MARKOE:  Objection.

11         Q.    You can answer.

12               MS. MARKOE:  I instruct him not to

13         answer that, unless it relates

14         specifically to his affirmative report,

15         rebuttal report or Mr. Antonopoulos'

16         report as a consulting, to the extent

17         that it was done on a consulting basis.

18               MR. ROCHE:  I will note my

19         objection that you can't use this as the

20         consulting privilege as a sword and

21         shield, so you can't offer a witness up

22         as both an expert and consultant, so we

23         preserve all rights with respect to the

24         testimony and we will move to strike.

25               MS. MARKOE:  Here is what we are



Page 164

```
 1                    K. Madura

 2         going to do.  I was trying to be helpful

 3         to you and give you some information

 4         that could potentially be relevant to

 5         his testimony as a testifying expert.

 6         If you want to draw the line in the sand

 7         that it's all or nothing, that's fine,

 8         it will be nothing, and I'm going to

 9         instruct him that he is not to answer

10         any questions regarding his testimony --

11         any work he did as a consulting expert

12         because he is not offering any opinions

13         regarding that work.  He is offering

14         opinions regarding what he is offering

15         opinions about.  Those are disclosed to

16         you in two reports.

17              You are not entitled to information

18         about things that he may have provided

19         on a consulting basis.  That has no

20         relevance to his testifying opinions.

21              MR. ROCHE:  Understood.

22         Q.   Mr. Madura, as I understand it, you

23    performed work, both in your role as a

24    consultant in this litigation and in your

25    capacity as a testifying expert?
```



Page 169

```
 1                    K. Madura

 2       Q.   Mr. Madura, sitting here today, do

 3  you recall the substance of the consulting

 4  work you have performed in this case?

 5            MS. MARKOE:  Objection, and I

 6       instruct him not to answer.

 7       Q.   Mr. Madura, do you recall

 8  approximately how much time you have spent in

 9  relation to the consulting work you have

10  performed in this case?

11            MS. MARKOE:  Objection.

12            I'm going to instruct him not to

13       answer.

14            I'm instructing you not to answer.

15       Q.   Mr. Madura, did you perform any

16  work in your context -- in your role as a

17  consultant in the month of April related to

18  this case?

19            MS. MARKOE:  Objection.  Give me a

20       second.  Just give me one second.  I'm

21       trying to make a decision.

22            Can you repeat the question?

23            (Record read.)

24            MS. MARKOE:  He can answer that

25       question.  Sorry, it's going to be
```



 1                    K. Madura

 2        question by question, Kyle.  I'm not

 3        trying to be difficult.

 4              MR. ROCHE:  Understood.

 5        A.   I believe I have.

 6        Q.   Approximately how much time?

 7        A.   I don't know for certain.  Not

 8   much, considering most of my time was spent

 9   on these reports.

10        Q.   In connection with the work you

11   performed this month in your role as a

12   consultant, what was the nature of that work?

13              MS. MARKOE:  Objection.

14              I'm going to instruct him not to

15        answer.

16        Q.   Did you do any work in your role as

17   a consultant in March?

18        A.   Role as a consultant?

19              MS. MARKOE:  Objection.

20              You can answer.

21        A.   I don't recall.  I would have to

22   look at my timesheet history.

23        Q.   Did you perform any work in your

24   role as a consultant in February?

25              MS. MARKOE:  Objection.



Page 171

```
 1                    K. Madura
 2               You can answer.
 3        A.   I don't recall.  I would have to
 4   look at my timesheets again.
 5        Q.   Did you perform any work in your
 6   role as a consultant in January?
 7               MS. MARKOE:  Objection.
 8               You can answer.
 9        A.   I don't believe so.  I was away and
10   out of the country for most of January.
11        Q.   Did you perform -- last one of
12   these questions.
13               Did you perform any work in your
14   role as a consultant in December of 2019?
15               MS. MARKOE:  Objection.
16               You can answer.
17        A.   Likely, yes, although I'm not
18   particularly sure how much or if I have it
19   all.
20        Q.   What is the basis for you thinking
21   it's likely?
22        A.   Because most of my --
23               MS. MARKOE:  Objection.
24        A.   Because most of my time recently
25   has been spent on the written reports.
```



Page 172

1                     K. Madura

2         Q.    When was the first time you did

3    work in your role as a consultant on this

4    litigation?

5              MS. MARKOE:  Can you repeat the

6         question?

7              (Record read.)

8              MS. MARKOE:  I'm going to object,

9         but you can answer as to the when.

10        A.    I don't know for certain.  Sometime

11   in 2019, early 2019.

12        Q.    Could it have been 2018?

13             MS. MARKOE:  Objection, but you can

14        answer.

15        A.    It could have been, I don't recall.

16        Q.    Did any of the work you performed

17   as a consultant in any way relate to your

18   testimony as an expert?

19             MS. MARKOE:  Objection.

20             You can answer.

21        A.    Not as it pertains to the drafting

22   of the report.  They may share similarities

23   in the technical understanding of certain

24   topics.

25        Q.    Have you reviewed the complaint in



Page 179

```
 1                    K. Madura

 2         testifying to and it's not about any

 3         consulting work that he did or did not

 4         do.

 5              MR. ROCHE:  Okay, that's

 6         interesting.

 7         Q.   Have you reviewed any evidence

 8    suggesting Craig Wright is the owner of

 9    Bitcoin?

10              MS. MARKOE:  Objection, outside the

11         scope.

12         A.   As it pertains to the reports and

13    the materials reviewed in drafting the

14    reports, again, there are lists of Bitcoin

15    that are proposed to be owned by Craig

16    Wright.

17         Q.   In your role as a consulting

18    expert, did you review any evidence

19    suggesting Craig Wright as an owner of

20    Bitcoin?

21              MS. MARKOE:  Objection.

22              I instruct him not to answer as to

23         consulting expert information.

24         Q.   Have you reviewed any evidence

25    suggesting Dave Kleiman was involved in the
```



Page 180

 1                    K. Madura

 2   creation of Bitcoin, in your role as a

 3   consulting expert?

 4             MS. MARKOE:  Objection.

 5             I'm going to instruct him not to

 6        answer, as it relates to a consulting

 7        expert.

 8             Can you repeat the question?

 9             MR. ROCHE:  Mr. Madura's report

10        opines on the likelihood of Mr.

11        Kleiman's involvement in the creation of

12        Bitcoin, so I think --

13             MS. MARKOE:  But you threw in

14        consulting expert and that's where I got

15        confused, which is why I wanted the

16        question repeated.

17             So go ahead.

18        Q.   Have you reviewed evidence related

19   to Dave Kleiman's involvement in the creation

20   of Bitcoin in connection with your role as a

21   consulting expert?

22             MS. MARKOE:  Can we stop for a

23        second, Kyle.  Here is where -- I want

24        to let you ask questions I think are

25        legitimate.  I don't have all the case



Page 184

```
 1                    K. Madura
 2  Kleiman in the context of this litigation?
 3            MS. MARKOE:  Objection.
 4            You can answer, to the extent it
 5       relates to your reports.
 6       A.   I don't recall reviewing specific
 7  emails from Dave Kleiman in connection with
 8  the drafting of my reports.
 9       Q.   Did you -- and in the context of
10  your consulting work, did you review emails
11  from Dave Kleiman?
12            MS. MARKOE:  Objection.
13            I instruct you not to answer.
14       Q.   Did you review emails from Craig
15  Wright in the context of this litigation?
16            MS. MARKOE:  Objection.
17       A.   I don't recall reviewing specific
18  emails from Craig Wright in connection with
19  drafting my reports.
20       Q.   Did you review communications from
21  Craig Wright in your capacity as a consulting
22  expert in this litigation?
23            MS. MARKOE:  I'm going to instruct
24       him not to answer.
25       Q.   Based on the evidence you reviewed,
```



Page 185

```
 1                    K. Madura
 2  is Craig Wright the creator of Bitcoin?
 3             MS. MARKOE:  Objection, outside the
 4        scope of the reports.
 5        A.   I don't have an opinion as to
 6  whether or not he is or is not.
 7        Q.   Have you reviewed evidence in the
 8  capacity as a consulting expert related to
 9  Craig Wright's involvement in the creation of
10  Bitcoin?
11             MS. MARKOE:  I'm going to instruct
12        him not to answer it as it relates to
13        consulting.
14        Q.   Have you reviewed any evidence
15  identifying any Bitcoin owned by Dave
16  Kleiman?
17             MS. MARKOE:  Objection.
18             You can answer, as it relates to
19        the reports.
20        A.   Again, I reviewed the lists as
21  identified by Mr. Antonopoulos, including the
22  DK list, which is implied to represent Dave
23  Kleiman, but haven't made a determination as
24  to whether or not Dave Kleiman owns or owned
25  that Bitcoin.
```



Page 186

                          K. Madura

1

2        Q.   Did you review any evidence related

3   to Dave Kleiman's ownership of Bitcoin in

4   your role as a consulting expert?

5             MS. MARKOE:  Objection.

6             I'm going to instruct him not to

7        answer, to the extent it relates to

8        consulting issues.

9        Q.   Have you examined any data related

10  to Dave Kleiman's electronic devices?

11            MS. MARKOE:  Objection, outside the

12       scope of his report.

13       Q.   You can answer.

14       A.   In preparation for the reports

15  here, I haven't reviewed any electronic

16  devices of Dave Kleiman's.

17       Q.   In your role as a consulting

18  expert, did you review any of Dave Kleiman's

19  electronic devices?

20            MS. MARKOE:  I'm instructing him

21       not to answer as it relates to any

22       consulting work that he did.

23       Q.   I will tweak that question.

24            In your role as a consulting

25  expert, did you review any of the electronic



Page 199

 1                    K. Madura

 2       want to take this to 8:00 tonight.

 3             And, of course, if you make an

 4       objection without an instruction to

 5       answer, I will allow you to reserve all

 6       rights, including the clawback.

 7             MS. MARKOE:  Can you repeat the

 8       question?

 9       Q.   Have you reviewed any evidence

10  relating to Craig Wright's programming

11  skills?

12             MS. MARKOE:  Objection, outside the

13       scope.

14       Q.   You can answer.

15       A.   I haven't reviewed any materials in

16  connection with the drafting of either report

17  regarding Craig Wright's programming skills

18  specifically or made a determination as to

19  what that evidence might be.

20       Q.   Have you reviewed any evidence in

21  your capacity as a consultant relating to

22  Craig Wright's coding skills?

23             MS. MARKOE:  Objection.

24             Instruct you not to answer.

25             MR. ROCHE:  Ms. Markoe, do you



Page 202

1                    K. Madura

2          Mr. Madura may or may not have reviewed

3          on Relativity does not have any

4          relationship to this -- to whether or

5          not -- let me restart.  I apologize.

6          I'm going to object to that because

7          every single document that Mr. Madura

8          may or may not have reviewed on

9          Relativity does not pertain to his

10         testimony as a testifying expert or his

11         opinions as a testifying expert.

12              If there is anything that he

13         reviewed that could have informed or

14         did, in fact, inform his opinions, then

15         we can discuss that issue more

16         specifically, but your request for all

17         documents that Mr. Madura has reviewed

18         on Relativity for any purpose whatsoever

19         is something that we will be objecting

20         to and we will not produce to you and we

21         will not provide that information.

22         Q.   Have you reviewed any evidence

23   relating to Dave -- strike that.

24              Have you reviewed any evidence

25   related to Dave Kleiman's electronic devices?



Page 203

```
 1                  K. Madura
 2            MS. MARKOE:  Objection.
 3            I'm going to instruct him not to
 4       answer.
 5            MR. ROCHE:  How does that not
 6       relate to what Mr. Kleiman may or may
 7       not have had on his electronic devices?
 8            MS. MARKOE:  Tell me what that
 9       might have to do with his opinion as to
10       Dave Kleiman's capacity to or his
11       opinion as to Dave Kleiman's educational
12       and experience background as it pertains
13       to the drafting of the Bitcoin code or
14       his rebuttal report to Mr. Antonopoulos
15       and a review of -- sorry, I'm not being
16       particularly articulate.
17            MR. ROCHE:  Mr. Madura opined on
18       Mr. Kleiman's coding skills, and to the
19       extent there are documents on Dave
20       Kleiman's electronic devices that relate
21       to his coding, that evidence would
22       certainly be relevant to his opinion.
23            MS. MARKOE:  That question, fine,
24       but whether or not he did any review of
25       Dave Kleiman's electronic devices or any
```



Page 217

 1                    K. Madura

 2            MR. ROCHE:  I'm asking whether or

 3       not he discussed with counsel the nature

 4       of his consulting work during the breaks

 5       -- strike that.  Whether or not he

 6       discussed anything related to his

 7       consulting work during the breaks.

 8            MS. MARKOE:  Objection, but

 9       reserving.

10       Q.   You can answer.

11       A.   Can you repeat the question?

12       Q.   Did you discuss with counsel

13   anything related to your work as a consultant

14   during the breaks today?  Yes or no is all

15   I'm looking for.

16       A.   I'm trying to determine whether it

17   would be considered part of the consulting

18   work or the expert work.

19            I think for these purposes, it's

20   the consulting work.  I'm not sure.

21       Q.   What was -- before the break, we

22   were discussing Ethereum.

23            Do you know whether or not Ethereum

24   has a hard cap on its supply?

25            MS. MARKOE:  Objection.

