# EXHIBIT 14

*D. Stewart MacIntyre, Jr., M.D.*

*Practice Limited to Infectious Disease*
*Mercy Professional Building*
*Suite 604*
*3661 South Miami Avenue*
*Miami Florida 33133*

Tel.  (305) 854 4857
Fax  (305) 854 3652

April 8, 2020

Rivero Mestre LLP
2525 Ponce de Leon Blvd., Suite 1000
Coral Gables FL 33134
ATTN: Zaharah Markoe, Esq.

RE: Kleiman v. Wright

Dear Ms. Markoe:

As requested, I have re-reviewed records and reviewed additional records regarding David Kleiman with the purpose of supplementing opinions in my previous report on this case, dated December 22, 2019. Opinions are felated to infectious disease. In addition to the records reviewed for the previous report, the following new records were reviewed:

- Deposition, David Kleiman, dated 4/8/2019
- Second deposition, David Kleiman, dated 1/10/20
- Second Amended Complaint, Kleiman v. Wright, dated 1/14/19
- Riviera Beach Police Department report on incident dated 4/26/13
- Palm Beach County Medical Examiner autopsy report, David Kleiman, deceased, dated 4/27/13

Attention was directed at Mr. Kleiman's final and extended hospitalization at the Miami Veterans 'Administration Medical Center (MVAH), admitted 9/28/10, discharged 3/25/13, and findings associated with his subsequent death, body discovered 4/26/13, relating to the following subjects:

1) Mr. Kleiman's paraplegia and infectious disease complications: As noted in the previous report ,Mr. Kleiman was involved in a motorcycle crash on April 30, 1995, resulting in multiple fractures, most importantly a spinal fracture resulting in functional transection of the spinal cord at a level around T4,5, or 6. This causes loss of motor function and sensation in the lower part of the body, with complications noted below. He could move about only by use of upper body (arms) muscles, using a wheelchair. In addition, paraplegia leads to greater risk of other injuries relating to difficulty of mobilization and also loss of bone strength and muscle protection. Mr. Kleiman sustained a fracture of the upper femoral shaft (upper thigh) during physical therapy in Sept. 2011.   (He needed intensive physical and occupational therapy to provide mobility and avoid complications.

2) Pressure ulcers (also known as decubitus ulcers or more colloquially as bed sores): These occur at sites of Sites of continued pressure to skin and subcutaneous tissue which is due to immobility. This pressure comes from body weight pressing against a surface, such as bed or (in Mr. Kleiman's case importantly) a wheelchair, typically over bony prominences. The pressure squeezes small blood vessels resulting of low of blood supply to the tissues, leading to cell death if prolonged. This leads to loss of skin integrity and to damage to tissues below the skin ("deep tissue injury"). Loss of sensation in an area (such as the lower body in Mr. Kleiman's case) aggravates this since the protective effect of sensation (touch, pain) leading to movement to relieve pressure is lost. These open sores typically become colonized and infected with bacteria, aggravating the ulcers and possibly leading to abscess formation, infection of underlying bone (osteomyelitis), and systemic infection. Mr. Kleiman had large and deep pressure ulcers over the buttocks and the ischial bones (the part of the pelvis one sits on) These required constant wound care which he could not do himself, including debriding (removal of devitalized tissue) and dressings. He underwent multiple surgical procedures in an attempt to close these ulcers (see "surgery" below).

3. Urinary bladder malfunction: Due to loss of central nervous system control, urinary incontinence and possibly retention occur, leading to urinary tract infection and possible contamination of pressure ulcers with infected urine. Prolonged contact with moist surfaces including diapers can also lead to skin irritation and breakdown. This problem ("neurogenic bladder") is treated with catheterization, either intermittently (possibly by the patient himself) or with a chronic Foley catheter. Catheterization further increases risk of infection, with the chronic Foley catheter being worse (sometimes called "the I-95 for bacteria to the bladder"). Urinary tract infection (UTI) can have as a complication

*CONFIDENTIAL*

Kleiman v. Wright                                                                                                        -2-

entry of bacteria into the blood stream (bacteremia).Mr. Kleiman had managed bladder dysfunction with intermittent catheterization previous to his final MVAH hospitalization, during which he had an indwelling Foley catheter. He had near continuous urinary tract infection during that hospitalization, with multiple organisms including Eschericia coli (E. coli), Pseudomonas, highly antibiotic resistant (extended spectrum betalactamase, ESBL, producing) Klebsiella, and yeas (Candida). He also had bacteremia at least twice, with E. coli; another episode of E. coli bacteremia was ascribed to his percutaneous intravenous central catheter (PICC, used for intravenous fluid and medication administration), but may well have also related to UTI.

4. Bowel dysfunction:  Because of the spinal injury and paraplegia, Mr. Kleiman did not have normal voluntary control of the anal sphincter. Thus, for defecation, stimulation of the anal sphincter with fingers (or an instrument) was necessary for defecation; this stimulation causes a reflex contraction of the rectum leading to defecation. This must be done periodically, and is difficult for a person to do it himself. Obviously, cleanup after defecation is necessary, and contamination of the pressure ulcers can occur.

5. Surgical procedures:  During his final prolonged hospitalization at MVAH Mr. Kleiman underwent multiple surgical procedures, mainly directed at diagnosing and treating osteomyelitis and attempting to repair and close pressure ulcers. And other traumatic incidents.  Included are:
- 10/27/10 debridement left hip
- 12/23/10 right knee washout for septic arthritis
- 4/14/11 attempted left hip Girdlestone procedure (removal of entire joint leaving a "flail hip"}, aborted due to bleeding, but with drainage of abscess of the femoral head
- 5/20/11 right lateral knee incision dehisced (reopened) with his moving around in physical therapy (unclear how)
- 7/28/11 right proximal femur resection and flap closure, followed by radiation therapy for reduction of ectopic (out of place) bone formation
- 9/15/11 acute spiral fracture proximal femoral shaft in physical therapy
- 12/30/11 removal of intermedullary nail (previously placed)
- 3/29/12 debridement right ischium and buttock
- 5/28/12 debridement ischioperineal wound
- 1/17/13 right ischial wound reopened while practicing transfers from wheelchair to shower seat

This does not include bedside debridements.

6. Computer and telephone work, family support:  During his MVAH hospitalization, Mr .Kleiman was noted frequently to be using  his laptop computer while in bed, and also less frequently using the telephone. He also on occasion refused treatments because of computer work and telephone conferences. Content of this work is obviously not known, although he did note on occasion watching movies on the laptop. At no time did I find mention of in person visits by family members, friends, or co-workers. This important element of support was lacking.

7. Medications affecting mental status:  During his last MVAH admission, Mr. Kleiman received medications which could affect mental status and ability to do complex work. He was receiving diazepam (Valium) throughout the admission, for control of muscle spasms. This is a benzodiazepine which has pharmacologic additive properties similar to alcohol and can dull mental acuity. He also received opiate pain relievers (Percocet, and on several occasions, fentanyl) early in the admission and on one occasion (4/19/11) an opiate antagonist (Naloxone) was ordered "for use in an emergency: After 4/19/11 there were no further orders for opiates; diazepam was continued. He also received multiple antibiotics throughout his long admission. Although antibiotics are not normally thought as having an effect on mental status, with a few exceptions (e.g. ertapenem, which he received), there is an effect of antibiotics giving a general feeling of malaise, often noted by its reversal after the antibiotic is stopped. This could affect ability to do complex tasks and computations.

8. Disruptive behavior:  On several occasions, he was uncooperative with nurses and therapists, and as noted in my previous report he received a letter of warning from the hospital Disruptive Behavior Committee (5/12/11).

9. Furloughs:  MVAH has a policy that patients can received passes for leaving the facility; these function much like military leaves of absence, requiring preauthorization and having a specific time period. Mr. Kleinman received several passes (I counted 12), all clustered at the end of his hospitalization (from 1/16/13 on). On various occasions a reason is stated, such as to buy food, "going to give a lecture", his birthday.  On 2/9/13 he was given a pass "to continue practicing home skills" and while out of hospital, called in to request an extension (which was granted),"very tired and did not want to take the road". Finally, as noted in my previous report, he requested a pass to assist in arrangements for a home lift. He did not return or call in, and attempts to contact him were unsuccessful. He was given an "irregular discharge".

Kleiman v. Wright                                                                                    -3-

10:  Effect of "irregular discharge":  With this discharge, he had no outpatient medicine prescriptions and no arrangements for nursing care (including anal stimulation for defecation and cleaning),  wound care, Foley catheter care, or physical and occupational therapy.  He would be expected to have uncontrolled infection, from urinary tract and from pressure ulcers and osteomyelitis,  He also would be expected to have benzodiazepine withdrawal symptoms (fever, mental status changes, possible seizures), although he may have had illicit drug sources (note presence of cocaine metabolites in postmortem urine).

11.  Circumstances surrounding his death:  After "irregular discharge" there is no medical record.  Per depositions, the last contact with Mr. Kleiman was several days before the body was discovered.  Per the police report, he was found slumped over in his wheelchair, with extensive fecal soilage of the lower body.  In addition, fecal material was found over extensive floor areas, with wheelchair tracks through it.  Although a loaded but unfired gun was found in the bed in front of him, there was no evidence of trauma.  The autopsy report noted extensive decomposition, and only a gross examination (no microscopic examinations, probably because of the decomposition}.  Cause of death was listed as myocardial infarction, based on findings of an occlusive plaque in the anterior descending coronary artery.  Bloody stool was noted in the colon (however, testing of fecal material on the floor in his house was negative).   Urine toxicology revealed cocaine metabolites, no opiates.  "Decomposition fluid" had a small amount alcohol (possibly produced postmortem).   No postmortem cultures were taken (again probably due to the degree of decomposition).  He had severe diarrhea prior to death, which was not considered by the medical examiner.  This could have been due to infection (including bacteremia, which can cause diarrhea) or to drug withdrawal, or both.  The lack of care after his discharge would clearly been contributory to this.

As will be noted from the above, Mr. Kleiman had a long and complex hospitalization, with many circumstances which would be expected to alter his ability to perform complex tasks, and no evidence of support by family or friends.  In addition, the circumstances of his death are strange, with aspects suggesting uncontrolled infection, related to his lack of care by family, friends, or medical personnel after his discharge.

I appreciate the opportunity to again review this fascinating case.

Sincerely yours,

D. Stewart MacIntyre, Jr., M.D.

DSM:dsm