# EXHIBIT 16

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:18-cv-80176-BB/BR

IRA KLEIMAN, as the Personal
Representative of the Estate of David
Kleiman, and W&K Info Defense
Research, LLC,

       Plaintiffs,

vs.

CRAIG WRIGHT,

       Defendant.

_____/

(Remote)

Monday, April 20, 2020

3:52 p.m. - 5:09 p.m.

VIDEOCONFERENCE DEPOSITION

OF DUGALD STEWART MACINTYRE, M.D.

Taken before Darline M. West,

Registered Professional Reporter, Notary Public

in and for the State of Florida At Large,

pursuant to Notice of Taking Deposition filed

by the Plaintiffs in the above cause.

- - -



Page 27

 1              Now, I might have missed some given at the

 2     time of surgery after that time.

 3         Q.   Okay.

 4         A.   But I didn't find any other prescriptions

 5     following that.

 6         Q.   Fair to say that you cannot quantify how

 7     often Mr. Kleiman took Percocet or fentanyl, correct?

 8         A.   I did not add it up, no.

 9         Q.   Well, do you -- can you estimate for me?

10         A.   Well, I'd have to go back and go through

11     and -- all I know is there were prescriptions for

12     Percocet and fentanyl multiple times up until that

13     April 19th date that I did note.

14         Q.   Okay.  Dr. MacIntyre, just to sort of put

15     this into context, Mr. Kleiman goes into the hospital

16     in September of 2010, right?

17         A.   That is correct.

18         Q.   There is a seven-month period between that

19     and April of 2011; is that fair?

20         A.   Yes.  Uh-huh.

21         Q.   During that period -- during that

22     seven-month period, Mr. Kleiman was prescribed by the

23     healthcare professionals at the V. A. Percocet and

24     fentanyl?

25         A.   Yes, he was.



Page 28

```
 1        Q.   As far as you know, after 2011, he was not
 2   prescribed those medications?
 3        A.   That is correct.  Other than that
 4   possibility that he might have gotten it relating to
 5   his anesthesias.
 6        Q.   But you don't know one way or the other?
 7        A.   Yes.
 8        Q.   You told me -- let me see if I can pull it
 9   up.
10             So, let me ask you this:  You note in your
11   report that these medications could -- and I'm
12   quoting you in the report in paragraph 7 -- "These
13   medications could affect mental status and ability to
14   do complex work."
15             Do you see that?
16        A.   That is correct.
17        Q.   Okay.  You are not offering and opinion,
18   within a reasonable degree of medical certainty, that
19   any of these medications did, in fact, cause -- did,
20   in fact, affect the mental status of Dave Kleiman,
21   correct?
22             MS. MARKOE:  Objection.
23             THE WITNESS:  That is correct, and
24        it's -- one can expect that type of effect
25        with these medications.  However, I did not
```



```
 1        see any actual psychological testing to

 2        measure that and quantify that.

 3  BY MR. BRENNER:

 4        Q.   You were also offering -- you're not

 5  offering an opinion, to a reasonable degree of

 6  medical certainty, any of the medications in

 7  paragraph 7 of your report did affect Dave Kleiman's

 8  ability to do complex work?

 9             MS. MARKOE:  Objection.

10             THE WITNESS:  I think it would be -- I

11        would have to use the well-known phrase more

12        likely than not they did have an effect of

13        dulling his ability to do complex work

14        during the time they were being given.

15  BY MR. BRENNER:

16        Q.   You don't know how often that was, correct?

17        A.   As far as the opiates are concerned, after

18  April 9th -- April 2011, there were no prescriptions

19  for them.

20        Q.   There was no --

21        A.   Now --

22        Q.   I'm sorry.

23        A.   -- the Valium was continued, and there were

24  prescriptions throughout the hospitalization.

25        Q.   You told me at your prior deposition
```



Page 31

```
 1   part that I have up.
 2        Q.   Let's do that.  Let's just be literally on
 3   the same page, page 32.
 4        A.   I got it, 32.
 5        Q.   Okay.  I asked if you're offering any
 6   opinions regarding Mr. Kleiman's mental state.
 7             Do you see that, line 7?
 8        A.   Got it.  Yes.  Uh-huh.
 9        Q.   You tell me that although you point out the
10   medications could do that, you were not stating that
11   as an opinion, correct?
12        A.   That is correct.  And you got me on that.
13   Gotcha.
14             However, as I pointed out before, that my
15   opinions have been amplified.  Just looking at the
16   fact he was on these medications for that period of
17   time -- and, again, using the more likely than not
18   phrase, that more likely than not, there was an
19   affect on his mental status.
20        Q.   Okay.  Was there any notation in the
21   medical records from any of the doctors that treated
22   him over a two-and-a-half-year period that he had a
23   decreased mental state?
24             MS. MARKOE:  Objection.
25             THE WITNESS:  I don't remember -- okay.
```



Page 32

 1         I don't remember seeing anything like that.

 2    BY MR. BRENNER:

 3         Q.   Well, surely you would have looked for it,

 4    because you were asked to offer an opinion whether

 5    the medications had, in fact, decreased his mental

 6    state.

 7              So you certainly looked for it, didn't you,

 8    Doctor?

 9              MS. MARKOE:   Objection.

10              THE WITNESS:   As I was going through, I

11         would have recorded if I saw something.

12    BY MR. BRENNER:

13         Q.   Right.

14         A.   Doesn't mean I didn't miss something, but I

15    didn't find anything.

16         Q.   Right.   You looked for it, and you didn't

17    find it?

18         A.   That's correct.

19         Q.   All right.   So, now, the medical records

20    and your report do talk about whether Dave Kleiman

21    was, in fact, working while he was in the hospital,

22    correct?

23         A.   That is correct.

24         Q.   And that's noted in paragraph 6 of your

25    report, correct?



Page 52

1        Q.   First of all, are you now going beyond the
2   word "could" and say it did affect his ability to do
3   tasks and complex computations?
4            MS. MARKOE:  Objection.
5            THE WITNESS:  I will say just the
6        could.  All those factors would be expected
7        to alter his ability to do those things,
8        similar to the other paragraphs.
9   BY MR. BRENNER:
10       Q.   And in what way would it affect his ability
11  to do complex tasks?
12       A.   The fact that he was on medications that
13  can dull mental acuity, that he was receiving
14  antibiotics that might make him not feel so well.
15  That's also in that paragraph.  That he had multiple
16  surgical procedures, that he was having to undergo
17  multiple treatments and therapies all contributed.
18       Q.   Right.  My question must have been a bad
19  one, because I didn't get the information I'm trying
20  to get.  I'm not asking you what was the cause.  I'm
21  asking how it manifested.
22            What was the affect on his ability to do
23  complex tasks?
24       A.   Well, as I said before, I did not measure
25  or quantify that.  I can't quantify the affect.



Page 53

```
 1        Q.    Same question:  What was his affect on his
 2   ability to do computations?
 3        A.    I can't say exactly how much it was.  All I
 4   can say is one would have expected an alteration in
 5   his ability to do those things.
 6        Q.    And you have no opinion on Mr. Kleiman's
 7   ability to do complex tasks or computations prior to
 8   2010, correct?
 9        A.    I have no information on that.
10        Q.    You have no opinion on his mental ability
11   prior to 2010, correct?
12        A.    That's correct, no information.
13        Q.    Right.  You have no opinion on his ability
14   to work before 2010, correct?
15        A.    Again, no information.
16        Q.    You have no ability -- you have no opinion
17   on his ability to write computer code before 2010?
18             MS. MARKOE:  Objection.  Beyond the
19        scope.
20   BY MR. BRENNER:
21        Q.    You can answer.
22        A.    Well, I have no idea what it takes to write
23   computer code.  I don't do that myself.  That's
24   outside of the field of my expertise.
25        Q.    You don't know anything about his abilities
```

