**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, | CASE NO.:  9:18-cv-80176-BB/BR |
| *Plaintiffs,* | |
| v. | |
| CRAIG WRIGHT, | |
| *Defendant.* | |

**<u>PLAINTIFFS' OMNIBUS MOTION IN LIMINE</u>**

1

## <u>TABLE OF CONTENTS</u>

**I.**   **INTRODUCTION** ................................................................................................ 3

**II.**   **LEGAL STANDARD** ......................................................................................... 3

**III.**   **ARGUMENT** ....................................................................................................... 4

**MIL #1:**   **To exclude testimony about Ira Kleiman's sibling-relationship with his   brother Dave** 4

**MIL #2:**   **To preclude Dr. Wright from contradicting judicially admitted documents** ................... 7

**MIL #3:**   **Preclude Defendant from selectively claiming his computers were hacked or   his documents were forged** ........................................................................................................ 12

**MIL #4:**   **Preclude Defendant's use of late disclosed documents** ...................................... 17

**MIL #5:**   **Preclude Dr. Wright from stating that Dave Kleiman committed suicide** ...................... 20

**MIL #6:**   **Preclude Dr. Wright from presenting evidence or testimony regarding Dave's drug use and social habits** ........................................................................................................ 21

**MIL #7:**   **Exclude testimony or references to Dr. Wright's childhood trauma** ............................ 21

**CONCLUSION** ........................................................................................................ 22

## I.        __INTRODUCTION__

Pursuant to the Federal Rules of Civil Procedure, Plaintiffs move *in limine* to exclude reference

or introduction of the following 7 issues:

1. Evidence or testimony related to Ira and Dave Kleiman's sibling relationship;

2. Evidence or testimony that would contradict Defendant's prior judicial admissions;

3. Selective and *ad hoc* claims by Defendant that his computers were "hacked" or that his documents were forged;

4. Defendant's use of untimely produced documents;

5. Claims by Defendant that Dave Kleiman committed suicide;

6. Evidence or testimony related to Dave Kleiman's social habits and alleged drug use;

7. Evidence or testimony related to Dr. Wright's alleged childhood trauma.

## II.   __LEGAL STANDARD__

A motion *in limine* functions to "give the trial judge notice of a movant's position so as to

avoid the introduction of damaging evidence, which may irretrievably affect the fairness of a trial."

E.g., *Fagundez v. Louisville Ladder*, Inc., 2012 WL 253214, at *1 (S.D. Fla. Jan. 26, 2012).

Accordingly, the utility of a motion *in limine* is to "present[] a pretrial issue of admissibility of

evidence that is likely to arise at trial, and as such, the order, like any other interlocutory order,

remains subject to reconsideration by the court throughout the trial." *Id*. (citing Schuler *v. Mid-*

*Central Cardiology*, 313 Ill. App. 3d 326, 729 N.E. 2d 536, 246 Ill. Dec. 163 (Ill. App. Ct. 2000));

*Smith v. Royal Caribbean Cruises*, Ltd., 302 F.R.D. 688, 688-89 (S.D. Fla. Oct. 10, 2014). A trial

court derives authority to rule *in limine* from its inherent power to manage trial and should exercise

that power where evidence is clearly inadmissible for any purpose. *Soto v. Geico Indem. Co.*, 2014 WL 3644247 *1 (M.D. Fla. 2014).

## III.   ARGUMENT

**MIL #1:      To exclude testimony about Ira Kleiman's sibling-relationship with his brother Dave**

Plaintiff anticipates Defendant will attempt to introduce evidence or arguments regarding Ira Kleiman's ("Ira") relationship with his brother, Dave Kleiman ("Dave").[1]  Specifically, Plaintiffs anticipate Defendant will seek to portray the brothers as estranged or otherwise not close. Defendant may also seek to introduce evidence Dave was adopted.  But Ira's relationship with Dave (and the entire Kleiman family relationship) is essentially irrelevant to these proceedings.

Ira is a party to this suit as the Personal Representative of Dave Kleiman's Estate, not personally. In that capacity, Ira has a duty to marshal the Estate's assets.  Finally, given Ira's admitted lack of first-hand, contemporaneous knowledge of almost all of the relevant facts that occurred during Dave's lifetime, any effort to portray their relationship in a negative light has minimal probative value and it substantially outweighed by the prejudice it would cause to Plaintiffs.

*Background*: Subsequent to Dave's death, and in accordance with Dave's will, Ira was appointed the personal representative of Dave's estate.  In that capacity, Ira is "under a duty to settle and distribute the estate of the decedent" and do so for "the best interests of the estate."  FL. Probate Code 733.602.  Ira is doing exactly that – marshaling the Estate's assets – by bringing this action.

---

[1] Because they share the same last name, Plaintiffs are using Ira and Dave to differentiate between the two men.

With almost no exceptions, Ira does not have personal knowledge of the underlying facts in the case that occurred while his brother was alive.[2] Indeed, the facts about this case about which Ira has the most personal knowledge, namely his communications with Dr. Wright, all occurred after Dave died.  His ability to recollect and/or testify about those facts is wholly unrelated to his personal relationship with his late brother.

Notwithstanding these facts, Defendant has questioned Ira's personal relationship with his brother Dave on numerous occasions.  For example, at both of Ira's depositions,[3] Defendant's counsel asked Ira a number of questions such as:[4]

- If "it was fair to say that you weren't really close with Dave?"  [Apr., 107:16-17]

- "Were you close to Dave" [Jan. 9:3]

- Whether Ira visited Dave in the hospital [Apr., 28:8-16 & Jan., 12:2-6, 140:18-20] or at his house [Jan., 10:10, 23:6-17]

- The number of times Ira spoke to Dave while he was in the hospital [Apr., 28:8-16]

- How close Ira lived to Dave  [Apr., 51:2-17; Jan., 9:18-10:10]

- The last time Ira saw Dave  [Apr., 24:12-16; Jan. 141:2-6]

- Whether Ira discussed with Dave prior to his death that he would be appointed as personal representative of Dave's estate [Apr., 27:16-23]

- The amount of times Ira had seen Dave's alleged fiancé and her son and the amount of times Dave mentioned Ira to them [Jan. 10:14-11:4]

---

[2] The extent of Ira's personal knowledge of facts germane to this lawsuit while Dave was alive is largely limited to Ira and Dave's November 26, 2009 (Thanksgiving Day) dinner conversation where Dave said he was making "digital money" and was partnering with a "wealthy individual." See Compl. ¶58-61, Ira related this story to Dr. Wright in an email at the outset of their relationship and prior to their being any adversity between them.

[3] Ira was deposed in April 2019 and in January 2020.

[4] The following examples from Ira's April 2019 deposition are attached collectively hereto as Ex. 1 and examples from his January 2020 deposition are attached collectively hereto as Ex. 2.

Counsel also engaged in similar questioning regarding Ira's relationship with Dave in depositions with Dave's former business partners, Patrick Paige and Carter Conrad. *See* Paige Dep. Trn. 10:15-25, attached hereto as Ex. 3 ("Do you know if Ira Kleiman ever visited Dave in the hospital?"), 11:1-7 ("Do you think Dave was close to Ira Kleiman?"); Conrad Dep. Trn. 13:21-25, attached hereto as Ex. 4 ("Did you ever see Ira visit Dave at the hospital?"), 14:1-8 ("So [Dave and Ira] didn't have a good relationship?").  Defendant has also retained an expert to opine or, more accurately, speculate that the lack of visitation and support from friends and family may have contributed to the "uncontrolled infection" found at the time of Dave's death.  Apr. 8 McIntyre Rep., at 3, attached hereto as Ex. 5.[5]

These lines of inquiry are clearly an attempt to paint Ira as an underserving Plaintiff because he was not close to his brother, didn't see him "enough," and therefore doesn't "deserve" the massive wealth his brother accumulated with Dr. Wright.  However, this is not a wrongful death suit, and Ira is not seeking damages for the loss of his brother.  Instead, Ira is fulfilling his legal obligation as Personal Representative to marshal the assets of Dave's estate.  The fact that those monies will ultimately flow to Ira as a beneficiary of the estate does not put his relationship with his brother at issue. *See Erony v. Alza Corp.*, No. 94 CIV. 5413 (DC), 1996 WL 554612, at *2 (S.D.N.Y. Sept. 30, 1996) (excluding testimony about family relationship unless it was put at issue by plaintiffs).

Finally, even if there were some probative value to this evidence – there is none – it is substantially outweighed by the danger of unfair prejudice, confusion of issues, and misleading the jury.  Fed. R. Evid. 403.  Any reference or discussion of Ira's quality as a brother has the potential to influence the jury through an emotional, rather than legal, basis.  *See* Fed. R. Evid.

---

[5] Dr. McIntryre's opinions are the subject of a separate Motion to Strike being filed concurrently with this Motion.

403, Advisory Comm. Note (1972) (in excluding evidence for unfair prejudice, the evidence must have "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one"); *Johnson v. Jennings*, 772 F. App'x 822, 826 (11th Cir. 2019) (stating that Rule 403 guards against making decisions on an emotional basis and finding that details of plaintiff's son's medical issues were unfairly prejudicial); *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) (finding that sexist comments were properly excluded as unfairly prejudicial because under Rule 403, "unfair prejudice means an undue tendency to suggest decision on….an emotional [basis]").

The only reason for Defendants to introduce such evidence would be to suggest to the jury that Ira was an absent sibling who abandoned his brother during Dave's time of need, and has only reappeared to claim Dave's fortune.[6]  Such evidence would severely prejudice Plaintiffs in front of a jury that may make a decision in the case premised on how "good" of a brother Ira was or whether Ira "deserves" Dave's fortune – instead of basing their decision on the facts and merits of the case.

Because the harm done by allowing the foregoing testimony or evidence will not be erased from the minds of the jury by an objection or curative instruction, this testimony should be precluded in advance of trial.

**MIL #2:        To preclude Dr. Wright from contradicting judicially admitted documents**

Fed. R. Civ. P. Rule 8(b) requires defendants responding to a complaint to "admit or deny the allegation asserted against it by an opposing party." Fed. R. Civ. P. 8(b)(1)(B). Once an allegation is admitted, "the general rule is that a party is bound by the admissions in his pleadings."

---

[6] As a factual matter, these insinuations are hurtful, wrong, and do not take into the account the complex and diverse way family relationship are shown and/or exhibited.

*Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177 (11th Cir. 2009). "Judicial admissions are proof possessing the highest possible probative value. Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them." *Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983); see *Cooper,* 575 F.3d at 1177. Accordingly, courts routinely exclude evidence introduced to controvert a judicially-admitted fact. *See, e.g.*, *Cooper,* 575 F.3d at 1177 ("[t]hese judicial admissions are binding, and the four appellants cannot now claim the exact opposite to be true"); *Johnson v. Publix Super Mkts., Inc.*, No. 10-cv-61100, 2012 WL 13001421, at *6 (S.D. Fla. Mar. 29, 2012) ("Further, the Court notes that it will not consider the facts that controvert Defendant's Admission in its Answer . . ."). This is consistent with "the theory of Rule 8(b) . . . that a defendant's pleading should apprise the opponent of those allegations in the complaint that stand admitted and will not be in issue at trial and those that are contested and will require proof to be established" *Wright & Miller*, 5 Fed. Prac. & Proc. Civ. § 1261 (3d ed.); *Mitchell v. Wright*, 154 F.2d 924, 926–27 (5th Cir. 1946).

In response to numerous allegations in Plaintiffs' Second Amended Complaint that reference or quote documents purportedly authored by or signed by Dr. Wright, his Amended Answer to Second Amended Complaint asserts[7]:

> The allegations in paragraph [X] of the Second Amended Complaint are based on an email that speaks for itself, and Dr. Wright denies any erroneous, incomplete, or out-of-context characterization of it, and any inaccurate inferences or conclusions derived from it.

---

[7] ECF No. [87], ¶¶ 55, 63, 70, 74, 76, 77, 78, 81, 86, 87, 88, 91, 103, 104, 105, 106, 108, 109, 117, 118, 120, 123, 125, 126, 127, 133, 137, 143, 145, 146, 147, 151, 152, 153, 163, 164, 165, 169. The majority are as quoted, some replace the word "email" with "email chain" or "documents" and others make other modifications (*e.g.,* limited to sentence that references the document) that do not change the sum or substance of "the document speaks for itself."

Through these admissions, Dr. Wright has judicially admitted that each of the following documents "speaks for itself": **ECF Nos. [83-2]** (¶63); **[83-4]** (¶¶70, 76, 77, 121, 163-164); **[83-5]** (¶¶70, 74, 103, 105, 106, 109); **[83-6]** (¶¶70); **[83-7]** (¶¶74, 147); **[83-8]** (¶¶74, 81, 151-153); **[83-10]** (¶¶78, 104, 105, 108); **[83-11]** (¶¶78, 117-118, 125-127); **[83-13]** (¶¶87); **[83-14]** (¶¶88); **[83-15]** (¶¶91, 105); **[83-19]** (¶121); **[83-20]** (¶¶123, 145-146); **[83-23]** (¶133); **[83-24]** (¶137); **[83-26]** (¶143); **[83-27]** (¶143); **[83-28]** (¶143); **[83-30]** (¶77, 120, 169); **83-31** (¶86); **83-32** (¶55).

The Court should hold Craig to his admission that each document "speaks for itself." Common sense says that if a document says it is from Craig Wright, and that document speaks for itself, then that document is, indeed, from Craig Wright. *See Charleston v. Salon Secrets Day Spa, Inc.*, No. CIV.A. 08-5889, 2009 WL 1795529, at *1 (E.D. Pa. June 24, 2009) (party conceded that "speaks for itself" responses were "equivalent to an admission"). This is especially true since it's quite clear from the Second Amended Answer that Wright knows exactly how to question the authenticity of a document referenced or quoted in the Second Amended Complaint, or otherwise challenge the content of those documents.  In fact, he did just that in his Amended Answer in several instances.

For example, in his response to ¶¶ 110, 131, 139, Wright states that "[t]he allegations . . . are based on uncertified, incomplete, unverified, and unreliable documents that were not legally obtained." Further, in ¶¶148, 154, and 155 Wright sated that the referenced articles "speak for themselves" but that he "does not adopt any statements" therein.  Finally, in ¶¶ 75, 79, 82, 83, 84, Wright does not state that the document "speaks for itself" and instead claims they were based on "admittedly leaked and unauthenticated documents" that for some he claims "were not legally obtained."

Just as the Court "need not 'suspend reality or shelve common sense' in determining whether" a complaint meets jurisdictional requirements, it should not do so when construing the import of an answer.  *Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1061–62 (11th Cir. 2010).  No one would say a document "speaks for itself" if they truly believed a document had been fabricated from whole cloth by a malicious third party in an effort to frame them. Any other reading of Defendant's "speaks for itself" responses would allow him to do precisely what Rule 8 prohibits by enabling him to neither admit nor deny allegations about which he necessarily has personal knowledge sufficient to answer.  *See Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1030 (C.C.P.A. 1982) ("An answer which attempts to evade the pleading requirements of Rule 8 by the tactic of an equivocal admission or denial is an admission").  As courts have explained, "[n]o reasonable party would deny an allegation describing an event on the basis that 'the events described in paragraph [x] speak for themselves.'" *FDIC v. Stovall*, No. 2:14-cv-00029, 2014 WL 8251465, at *12 (N.D. Ga. Oct. 2, 2014).

If Defendant had more to say about these documents, he should have denied the allegations. Instead, he opted to let those documents speak for themselves, and Plaintiffs ask the Court to hold him to that. *See In re Cotter*, No. 08-bk-12504, 2011 WL 5900811, at *8 (Bankr. D.N.J. Oct. 24, 2011) ("Thus, the Defendants' responses that the 'document speaks for itself' is deemed an admission as to the information in the document").

Despite these clear judicial admissions, Wright has impermissibly tried to walk them back throughout this proceeding.  For example, for several of these documents, he has gone on to offer sworn testimony that the documents do not speak for themselves, and what purport to be emails from Wright, documents signed by him, or documents authored by him – are in fact not from him.

For example, 83-23, when "speaking for itself", says that it is an email from "Craig S. Wright" and reads indisputably as an email from Dr. Wright:

> Your son Dave **and I** are two of the three key people behind Bitcoin . . . **I** will explain . . . **I** do not seek anything other then to give you information . . . **I** will talk to you again soon . . . **I** will let you know much more of Dave. **I** will also help you recover what Dave owned. **I** will let you know when **I** am in the USA [signature block:] Dr. Craig S. Wright GSE LLM Chief Executive Officer Hotwire Preemptive Intelligence

Indeed, at Wright's first deposition, when asked "it says . . . your son Dave and I are two of the three key people behind Bitcoin. Did you write that," he responded "I typed that." Craig Wright Apr. 4, 2019 Dep. Trn., at 126:16-19, attached hereto as Ex. 6. But at his March 2020 deposition 1-year later, in response to "it says . . . your son Dave and I are two of the three key people behind Bitcoin . . . did you type that" he responded "no I did not".  Craig Wright Mar. 16, 2020, Dep. Trn. 139:18-24[8], attached hereto as Ex. 7. Wright's March 2020 testimony is forbidden and must be excluded as it contradicts his judicial admission that the document "speaks for itself." *Best Canvas Prod. & Supplies, Inc.,* 713 F.2d at 621.

Similarly, 83-14, when speaking for itself says that it was an email that came from "Craig S Wright" to "Ira K." *Id*. Indeed, at Wright's April 2019 deposition he testified that he recognized this document as an "exchange of emails between you and Ira Kleiman."  Craig Wright Apr. 4, 2020 Dep. Trn., at 315:2-6, attached hereto as Ex. 8.  And in response to the question "can you read above that **your** response at March 1st, 2014 at 3p.m." he stated "**Mine**. 'Around that. Minus what was needed for the company's use." *Id.* at 318:3-6 (emphasis added).  But in March 2020, in response to "is this an exchange of emails between you and Ira Kleiman" he responded "No . . . I

---

[8] When asked about the changed position, Dr. Wright claimed that what he meant in April 2019 was that "[i]n discussions with my lawyers, I typed that exact sentence" but not that email. Craig Wright Mar. 16, 2020 Dep. Trn. 141:3-145:15, attached hereto as Ex.7.

did not send that e-mail." Craig Wright Mar. 18, 2020 Dep. Trn., at 95:13-25, attached hereto as Ex. 9. Wright's March 2020 testimony is forbidden and must be excluded as it contradicts his judicial admission that the document "speaks for itself." *Best Canvas Prod. & Supplies, Inc.,* 713 F.2d at 621.

There are other examples, but they are all along the same vein. Once Wright admitted that the document speaks for itself, he cannot later elect to speak for it and say, for example, that while it says that it came from me – it actually didn't, or while it bears my signature – it actually doesn't.

For these reasons Plaintiffs request an order precluding Wright from contradicting the plain meaning of the documents that come from him, were drafted by him, or were signed by him and which he judicially admitted, "speak for themselves" in his Answer. Specifically: **ECF Nos. [83-2]**; **[83-4]**; **[83-5]**; **[83-6]**; **[83-7]**; **[83-8]**; **[83-10]**; **[83-11]**; **[83-13]**; **[83-14]**; **[83-15]**; **[83-19]**; **[83-20]**; **[83-23]**; **[83-24]**; **[83-26]**; **[83-27]**; **[83-28]**; **[83-30]**; **[83-31]**; **[83-32]**.

### MIL #3:    Preclude Defendant from selectively claiming his computers were hacked or his documents were forged

Our civil justice system is built around an expansive discovery process, designed to avoid "trial by ambush." *Waite v. AII Acquisition Corp.*, No. 15-62359, 2016 WL 4433713, *3 (S.D. Fla. 2016) (recognizing that the Federal Rules were designed "specifically [to] guard against 'trial by ambush'"). Here, however, as he has done in many other parts of this case,[9] and despite his self-proclaimed reverence for the rule of law, Dr. Wright has turned that concept on its head. June 28 Evid. Hrg., at 27:19 -28:2, attached hereto as Ex. 10. ("Law is incredibly important to me…. I'm very focused on ensuring things fall within the rules, and if I'm ordered to do something by a valid court, and I can do it, I will do whatever I have to to do it").

---

[9] *See generally* Plf's Response to Def's Objection to Magistrate Judge [277] Order, ECF No. [333].

Although he's produced a large *volume* of documents, Dr, Wright has granted himself a "get of a jail free card."  To be more specific, Dr. Wright seeks to retain the right, at any time and for any reason, to claim that inconvenient documents (*i.e.* ones that contradict his defenses) are "hacked," "forged," or otherwise inauthentic. Dr. Wright's attempt to make a mockery of the justice system in this manner should not be permitted.[10]

The computer era has provided politicians, celebrities, and ne'er-do-wellers a convenient and easy to use excuse when confronted with digital evidence of their wrongdoing: "I was hacked." Consistent with the times, Dr. Wright intends to testify, on a self-serving and *ad hoc* basis, and without any meaningful evidentiary foundation beyond his word, that various documents— generally those that do not support his current version of events or contradict one of his various earlier versions of events—are the result of an alleged hacking scheme.  Dr. Wright has presented no specific or independent evidence of the individuals involved in the alleged hacking (beyond that he has "reasons to think" it was his "staff" and "other people"), and no forensic evidence showing that any hacking in fact occurred.  Mar. 16, 2020 Craig Wright Depo Trn., at 167:19-25, attached hereto as Ex. 11.

Plaintiffs have observed this tactic deployed in Wright's deposition multiple times. And Dr. Wright engaged in exactly this conduct at the evidentiary hearing in August 2019:

> When confronted with evidence indicating that certain documents had been fabricated or altered, he became extremely defensive, tried to sidestep questioning, and ultimately made vague comments about his systems being hacked and others having access to his computers. None of these excuses were corroborated by other evidence . . . While it is true that there was no direct evidence that Dr. Wright was responsible for alterations or falsification of documents, there is no evidence before the Court that anyone else had a motive to falsify them. As such, there is a strong, and unrebutted, circumstantial inference that Dr. Wright willfully created the fraudulent documents.

---

[10]  For many of these documents. Dr. Wright has already admitted that they "speak for themselves" which necessarily includes the admission that they were authored by him.  *See MIL #2, supra.*

ECF No. [277], at 20-21. Importantly, as noted by Judge Reinhart, "Dr. Wright does not write on

a clean slate" here either. *Id.* at 20.

Similarly, Counsel for Dr. Wright's Australian companies terminated their representation

due to forgeries he had submitted to the Australian Taxation Office ("ATO"). Specifically, in a

June 2015 email from counsel to Ms. Watts (Wright's wife) he stated:

> Set out below is a sample of the information the ATO has. They have significantly
> more material than this . . . you can see the differences between the ATO's records
> and the records in your submission. The differences are intended to support the
> position Craig wanted to advance. In each case the "supportive" wording does not
> appear on the ATO version of the emails but only the version of the emails contained
> in [your] submission . . . this is extremely serious. I understand [people] ha[ve] been
> in touch regarding obtaining future representation for Craig to assist him with these
> matters. You will understand why I and Clayton Utz can no longer act. I urge the
> company to seek appropriate advice and Craig to seek separate advice in relation to
> these allegations by the ATO . . .

DEF_01894962 (attached hereto as Ex. 12). Two days letter Clayton Utz sent a formal
termination letter stating:

> "information has been provided to our firm which raises serious questions about the
> integrity of documents provide by Dr. Craig Wright, both to our office and to the
> Australian Taxation Office. We believe this information to be credible. In these
> circumstances, we can no longer represent DeMorgan . . .

DEFAUS_01868823 (attached hereto as Ex. 13).

As this Court has observed, Wright does not hesitate to commit perjury in open Court.  ECF

No. [420], at 6 ("I have previously found that Dr. Wright gave perjured testimony in my

presence."); *See* ECF No. [265] ("Unfortunately, the record is replete with instances in which the

Defendant has proffered conflicting sworn testimony before this Court."). Given this lack of

integrity, Plaintiffs go into trial not knowing which of the hundreds of thousands of documents Dr.

Wright has produced, he will suddenly and without warning, disavow as the result of hacking,

forgery, or whatever else he comes up with.

The potential for trial by ambush is perhaps best illustrated by Dr. Wright's latest gambit regarding his signature on key documents.  Specifically, he has retained a handwriting expert to opine that his signature, on documents he produced from his own files, that he submitted to the ATO in support of his positions there, and that he swore bore his signature and handwriting at deposition, are forgeries.  *See also* Plf's *Daubert* Motion to Strike Expert F. Harley Norwitch.

In fact, the only theme that seems to tie together the hacking and forging claims by Dr. Wright is that it only seems to apply to documents that contradict his most recent story about this case.  And even that is difficult to predict because Dr. Wright's theories of the case have not been a paragon of consistency.  For example, Defendant has tried to get this case dismissed based on any alleged lack of jurisdiction based on the membership in Plaintiff W&K.  However, Dr. Wright has taken every different possible position on the "facts" of this issue.  As this Court observed:

> This is not the first time that the Defendant has made certain representations regarding the membership of W&K. Indeed, the Court notes that the Defendant has made *several conflicting statements* regarding even his own ownership of W&K. ECF No. [256], at 29:24-25 ("Judge, I get that there are a number of different statements by Dr. Wright.")

> These statements include:

> On *April 2, 2013*, the Defendant signed a contract, representing that Dave Kleiman is **100% owner** of W&K, which was filed before the Supreme Court of New South Wales. ECF No. [83-5], at 1.

> On or about *July and August of 2013*, the Defendant filed a sworn affidavit in the Supreme Court of New South Wales declaring that he and Dave Kleiman each **owned 50%** of W&K. ECF No. [83-4], at 4.

> On *April 16, 2018*, in a sworn affidavit the Defendant stated that he has "**never** been a member of W&K." ECF No. [12-2], at ¶ 12 (emphasis added).

> On *June 28, 2019*, during his deposition the Defendant testified under oath that he has "**no idea**" who the owners of W&K were, and unequivocally stated that he was not an owner of W&K. *See* ECF No. [242-1], at (233:12-14) ("Q: Who owned W&K in reality? A. Not me.") and (233:22-23) ("Q. You have no idea who owns W&K? A. I do not know that.").

15

> Now, in his Motion and contrary to the statements above, the Defendant
> argues that three additional parties may be members of W&K. Defendant
> claims that the record evidence supports the presence of the additional
> members.

ECF No. [265]. What Defendant appears poised to do with his "hacking" and "forgery"

defenses will turn the trial of this case into a sham.

Defendant claims to be a world-renowned expert in computers.  If his "hacking" claims

were anything other than a sham to avoid responsibility for documentary evidence that contradicts

his defenses in this case, he would have come forward with forensic evidence that his computers

were "hacked."  Indeed, he has retained computer experts, but none were asked to examine *his*

devices to substantiate his hacking claims.  *See* Chambers Rep., at 5, attached hereto as Ex.14

(asked to inspect all of Dave Kleiman's devices and identify any evidence of formatting, new file

creations or modifications, and the impact of any such activity); *see also* Madura Rep., at 3,

attached hereto as Ex. 15 (opining on whether Dave Kleiman had the "requisite skills and

experience to have written the original Bitcoin core software").  Instead, on an *ad hoc* basis,

without warning, and with no support other than his word, Dr. Wright wants to be allowed to inject

the idea of "hacking" into this trial to discount the damning evidence against him that he himself

produced. This should not be allowed.  *See United States v. Finley*, 1:11-CR-04, 2017 WL

3495345, at *7 (W.D. Pa. Aug. 15, 2017) (defendant's "theory of various possible complex unseen

computer hacking scenarios resulting in an intrusion into his computer . . . is a completely

unsupported speculative allegation."); *see also Cohen v. Porsche Cars N. Am., Inc*., 2:19-CV-

05530 AFM, 2019 WL 6700941, at *2 (C.D. Cal. Dec. 6, 2019) (holding that unsupported

allegations of "hacking" were insufficient to state a claim for relief where plaintiffs failed to

"specify how the 'hacking' took place, in what way [the hacked] device was defective, . . . when

and where the hacking took place and do not refer to any technical analysis that supports their assertion of hacking.").

A party that is willing to do anything, and say anything, to win is a threat to the civil justice system itself.  *See Leor Exploration and Production, LLC. v. Aguiar*, 2010 WL 3782195 at *4 (S.D. Fla. 2010) (upholding terminating sanctions where a party had crossed the line between "wanting to win" and "doing anything, whether legal or not, to win").  To allow Dr. Wright's "hacking" and forgery gambits to proceed is a threat to the integrity of the system.  *See Perna v. Electronic Data Systems, Corp.*, 916 F. Supp. 388, 397 (D. N.J. 1995) ("courts cannot lack the power to defend their integrity against unscrupulous marauders; if that were so, it would place at risk the very fundament of the judicial system").

Accordingly, Plaintiffs request that Dr. Wright be precluded from claiming his computers were "hacked" or that his signatures were forged.  In the alternative, to avoid a trial by ambush, Plaintiffs request that Dr. Wright be compelled to disclose, at least 30 days before trial, all documents he has produced that he claims are the result of hacking, are forged, or are otherwise inauthentic, with a detailed and sworn explanation for who, how, when, and why this hacking occurred.

**MIL #4:        Preclude Defendant's use of late disclosed documents**

Defendant produced almost 2000 pages of documents *after* both his deposition and expert discovery cutoff. Defendant should either be (i) precluded from using them at trial or (ii) be required to sit for an additional deposition so Plaintiffs may explore the newly disclosed information, after which Plaintiffs should be entitled to update their expert disclosures if necessary.

Defendant's deposition took place on March 16 and 18.  Parties were required to disclose all expert reports by April 10 and rebuttal reports by April 17, with all fact and expert discovery

closed by May 1.  ECF No. [441].  In between the completion of Defendant's deposition and the close of discovery, Defendant produced three additional productions:  (i) 6 pages of documents on March 25; (ii) 749 pages on April 6; and (iii) 1099 pages on April 24.

The documents produced appear relevant to major issues in this case. The productions include lists and data associated with of thousands of mined bitcoin blocks and accounting records for Wright International Investments Ltd., invoices for Information Defense Pty Ltd., intellectual property invoices for Bitcoin Database rights, and sales records for a company called Malaysian Global.  Many of the documents purportedly date back to 2009, a highly relevant time period in this case given its proximity to the original creation of the Bitcoin protocol. Notably, the production appears to include purchase and transfer records for nearly 1.25 million bitcoin from sources that have not been previously disclosed, including records related to bitcoin that was mined shortly after the inception of the Bitcoin protocol.

Despite the limited amount of time since the documents were produced, Plaintiffs have already identified significant red flags. As just one example, Defendant's counsel represented that these materials were "directly from the MYOB cloud/internet environment and not from any device that was collected," and provided by Defendant "after he regained access to the online account to counsel in zip files who sent those files to AlixPartners." April 29, 2020 Email from Z. Markoe *re Prod. Delivery Notice*, attached hereto as Ex. 16.  Yet the production included file types, such as "docx" that appear to be unsupported by MYOB's export function, and metadata for many of the documents shows a different law firm, SCA Ontier—which represents Defendant and his wife—as the creator of the documents.



Because of the late production,[11] Plaintiffs are unable to use written and oral discovery to probe the documents' content and reliability. Given the Defendant's conduct to date, including a propensity to manipulate documents and mysteriously obtain new documents (which conveniently contain no metadata) that support his story, these late-disclosed documents certainly need to be explained by the Defendant and tested by Plaintiff's experts. Plaintiffs, unfortunately, cannot rule out the possibility that these documents were withheld by Dr. Wright (or just fabricated) in an attempt to prejudice Plaintiffs' trial preparation.

With the Defendant's deposition over, Plaintiffs have no opportunity to question the person most knowledgeable about the documents and the circumstances surrounding their production. Additionally, given the passing of expert deadlines, Plaintiffs cannot ask their experts to opine or supplement their reports in response.

Without remedy, Defendant's tardy disclosure will accomplish its intended effect and prejudice Plaintiff's ability to adequately prepare for trial.  Courts can remedy such prejudice by excluding these documents from use by Defendant at trial or by ordering Defendant to sit for an additional deposition to fully explore the newly disclosed information.  *Debose v. Broward Health*, 2009 WL 1410348, at *2 (S.D. Fla. May 20, 2009) (precluding defendants from using documents at trial that were disclosed after discovery deadlines and depositions); *In re Delta/AirTran Baggage*

---

[11] Plaintiffs recognize that Judge Reinhart ruled that the parties could produce documents up until the discovery cutoff.  Jan. 2, 2020 Hrg. Trn., at 43:14-22, attached hereto as Ex. 17.  However, there is no reason to believe that Judge Reinhart was giving Defendant blanket permission to hold relevant documents until after depositions and expert disclosures so as to sandbag plaintiffs before trial.

*Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1347 (N.D. Ga. 2012), modified sub nom. *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 2012 WL 12952328 (N.D. Ga. July 18, 2012) (reopening discovery to allow plaintiffs to explore newly raised information where defendants produced relevant documents after discovery deadlines). Given that trial is less than two months away, and there is significant pre-trial work to be done, Plaintiffs respectfully request that this Court preclude Defendant from using documents he disclosed after his deposition.  However, if the Court determines that the Defendant should be able to rely on these documents, Plaintiffs request the Court to compel Dr. Wright to sit for an additional 4-hour deposition.[12]

**MIL #5:**          **Preclude Dr. Wright from stating that Dave Kleiman committed suicide**

During Wright's March 2020 deposition he made the unsolicited, unsubstantiated, and provably wrong statement that Dave committed suicide. *See e.g.,* Mar. 18, 2020 Craig Wright Dep. Trn., at 16:11-15, attached hereto as Ex. 18 ("David Kleiman that is -- committed suicide a number of days before he was due and required under the contract to return the software and other payments").[13] This purposeful attempt to malign Dave's memory is irrelevant to the issues before the jury, is completely unsupported by the record, and is in fact directly contrary to the medical evidence. Specifically, after Dave's death, the Office of the District Medical Examiner for Palm Beach County issued an autopsy report for David Kleiman stating that the "CAUSE OF DEATH" was "CORONARY ARTERY DISEASE" and that the "MANNER OF DEATH" was

---

[12] To be sure, Plaintiff would need much less time with any other witness, but at each deposition, the Defendant is evasive, gives irrelevant answers, and needlessly wastes time.

[13] *See also*, attached collectively as Ex. 18, 104:23-25 ("Unfortunately, Mr. Kleiman committed suicide . . ."); 123:25-124:1 ("I know Dave committed suicide at that time, yes."); 200:12-13 ("It would not be a random occurrence when someone commits suicide it is still fate.").

"NATURAL." See D. Kleiman autopsy report, attached hereto as Ex. 19. Any evidence or testimony that Dave committed suicide should be excluded.

**MIL #6:**     **Preclude Dr. Wright from presenting evidence or testimony regarding Dave's drug use and social habits**

At Ira's April 2019 deposition, Dr. Wright's attorneys asked a number of questions relating to Dave's alleged drug use. Defendant should be precluded from introducing evidence relating to Dave's alleged drug use, as well as evidence regarding Dave's social habits, including Dave's dating life and any alleged tendency to visit strip clubs, as such evidence is irrelevant and, therefore, inadmissible.  *See* Fed. R. Evid. 402.  Moreover, even if such evidence were relevant, and it's not, it should be excluded on the basis that that it presents a danger of unfair prejudice that substantially outweighs its probative value.  *See United States v. Sellers*, 906 F.2d 597, 602 (11th Cir. 1990) (noting "the extreme potential for unfair prejudice flowing from evidence of drug use"); *Nobles v. Sushi Sake NMB, Inc.*, No. 17-cv-21828, 2018 WL 3235534, at *1-2 (S.D. Fla. July 2, 2018) (excluding evidence of defendant's drug use because it was "unduly prejudicial and its probative value [was] de minimis"); *Hall v. Mayor Aldermen of City of Savannah*, No. 4:03-cv-248, 2005 WL 8156263, at *1-2 (S.D. Ga. Oct. 5, 2005) (excluding evidence that defendant worked at a strip club as "too irrelevant and prejudicial under Rule 403").

**MIL #7:**     **Exclude testimony or references to Dr. Wright's childhood trauma**

Defendant may seek to introduce evidence about matters related to traumatic events that allegedly occurred during his childhood.  Such matters are irrelevant to the issues of this case (which only involve Dr. Wright's actions during adulthood) and are highly prejudicial to Plaintiffs.  Defendant's expert, Dr. Klin, who opined as to Dr. Wright's purported Autism

Spectrum Disorder and how it impacts his presentation in these proceedings, noted that Dr. Wright and his siblings were "exposed to, and experienced, traumatizing events attributed to his biological father, and subsequently, to one of his stepfathers." Klin Rep., at 4, attached hereto as Ex. 20.  In his deposition, Dr. Klin also described how Dr. Wright was "relentlessly bullied by others" and how he "could be observed [at the] playground alone, dressed as a ninja and playing as if he was the weirdest person in the world."  Klin Dep. Trn., at 238:5-15, attached hereto as Ex. 21.  Yet, Dr. Klin firmly stated that he is "absolutely not" opining that Dr. Wright's alleged trauma suffered during childhood "was the cause or a contributing cause to his autism."  Klin Dep. Trn., at 245:21-246:5, attached hereto as Ex. 22.

Matters related to Dr. Wright's suffering as a child have potential to influence the jury to make decisions based on sympathy rather than on the pertinent facts germane to the issues of this case.  Fed. R. Civ. P. 403; *Johnson v. Jennings*, 772 F. App'x 822, 826 (11th Cir. 2019) (stating that Rule 403 guards against making decisions on an emotion basis and finding that details of plaintiff's son's medical issues were unfairly prejudicial"); *See also* Plf's Motion *in limine* to exclude Ira and Dave's familial relationship *supra*. Such matters are irrelevant and highly prejudicial to Plaintiffs and should be excluded.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated above, Plaintiffs respectfully request the Court grant the motions *in limine* described herein.

## S.D. FLA. L.R. 7.1 CERTIFICATION

In accordance with S.D. Fla. L.R. 7.1(a)(3), counsel for Plaintiffs conferred with Defendant's counsel regarding each of these Motions in Limine, and is informed that Defendant opposes the relief sought herein.

Dated: May 8, 2020

Respectfully submitted,

/s/ Andrew S. Brenner
Andrew S. Brenner, Esq.
Florida Bar No. 978663
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

Velvel (Devin) Freedman, Esq.
Florida Bar No. 99762
**ROCHE CYRULNIK FREEDMAN LLP**
200 S. Biscayne Blvd, Suite 5500
Miami, Florida  33131
Telephone: (305) 357-3861
vel@rcfllp.com
nbermond@rcfllp.com

Kyle W. Roche, Esq.
Joseph M. Delich, Esq.
*Admitted Pro Hac Vice*
**ROCHE CYRULNIK FREEDMAN LLP**
99 Park Avenue, Suite 1910
New York City, NY 10016
kyle@rcfllp.com
jdelich@rcfllp.com

*Counsel to Plaintiff Ira Kleiman as Personal*
*Representative of the Estate of David Kleiman*
*and W&K Info Defense Research, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 8, 2020 a true and correct copy of the foregoing was filed under Seal with CM/ECF, and served by E-mail to all counsel of record.

*s/ Andrew S. Brenner*
ANDREW S. BRENNER