### POWER OF ATTORNEY

This power of attorney is made on 22nd August 2016 by Craig Steven Wright of 7 Oak Rd, Cobham, KT11 3AZ (**Principal**).

1. **APPOINTMENT AND POWERS**

   The Principal appoints nCrypt Limited, a company incorporated in England and Wales with company number 09823112 whose registered office is at Coddan Cpm, 3rd Floor, 120 Baker Street, London, England, W1U 6TU, and its substitutes as his attorney (**Attorney**) and in the Principal's name or otherwise and on his behalf in relation to any intellectual property devised by Principal but owned by or assigned to Attorney in accordance with Principal's contract of employment with Attorney (the "**Employee IP**"):

   a) to execute any such instrument, or do any such thing, and generally to use his name for the purpose of giving the Attorney the full benefit of the Employee IP.

   b) to represent the Principal in and with respect to all matters relating to the Employee IP to the extent permitted by applicable law, including but not limited to:

      i. representing the Principal vis-à-vis governmental authorities, patent offices and other intellectual property offices;

      ii. signing patent and other intellectual property applications, extensions and other related filings;

      iii. prosecuting and/or abandoning patents and other intellectual property rights on behalf of the Principal;

      iv. representing the Principal in matters of conflicts or disputes relating to intellectual property matters; and

      v. negotiating and entering into license and/or other agreements with respect to intellectual property matters; and

   c) to take any steps or do any thing which the Attorney in its absolute discretion considers desirable in connection with the Employee IP or any of the foregoing.

2. **DELEGATION**

   The Attorney may delegate one or more of the powers conferred on the Attorney by this power of attorney and may revoke such delegation.

1

DEF_01074241

3.  **RATIFICATION**

The Principal undertakes to ratify and confirm whatever the Attorney does or purports to do in good faith in the exercise of any power conferred by this power of attorney as and when requested to do so by the Attorney.

4.  **VALIDITY**

The Principal declares that a person who deals with the Attorney in good faith may accept a written statement signed by that Attorney to the effect that this power of attorney shall supersede, void and replace all prior and existing powers with respect to the same subject matter as conclusive evidence of that fact.

5.  **PREVIOUS POWERS**

This power of attorney shall supersede, void and replace all prior and existing powers with respect to the same subject matter.

6.  **GOVERNING LAW AND JURISDICTION**

This power of attorney and any dispute or claim arising out of or in connection with it, its subject matter or its formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the law of England and Wales. Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this power of attorney or its subject matter or formation (including non-contractual disputes or claims).

This document has been executed as a deed and is delivered and takes effect on the date stated at the beginning of it.

CONFIDENTIAL

DEF_01074242

Signed as a deed by Craig Steven Wright

in the presence of:

SIGNATURE OF PRINCIPAL

SIGNATURE OF WITNESS

ALLAN PEDERSEN
NAME

UNIT 59 1
RIVERLIGHT
QUAY, VAUXHALL
ADDRESS

DIRECTOR OF PROGRAMS.
OCCUPATION

Signed on behalf of nCrypt Limited

M. FARNWORTH
NAME



3

DEF_01074243

**AUSCRIPT AUSTRALASIA PTY LIMITED**
ABN 72 110 028 825



Level 22, 179 Turbot Street, Brisbane QLD 4000
PO Box 13038 George St Post Shop, Brisbane QLD 4003
**T:** 1800 AUSCRIPT (1800 287 274)      **F:** 1300 739 037
**E:** clientservices@auscript.com.au      **W:** www.auscript.com.au

## TRANSCRIPT OF PROCEEDINGS

TRANSCRIPT IN CONFIDENCE

O/N H-356057

### AUSTRALIAN TAXATION OFFICE

### RECORD OF INTERVIEW

| | |
|---|---|
| **INTERVIEWER:** | **DES McMASTER** |
| | **MARINA DOLEVSKI** |
| | **HOA DOA** |
| | |
| **INTERVIEWEE:** | **CRAIG WRIGHT** |
| | **JOHN CHESTER** |
| | **ANDREW SOMMER** |
| | |
| **CONDUCTED AT:** | **SYDNEY** |
| | |
| **DATE:** | **TUESDAY, 18 FEBRUARY 2014** |

### TRANSCRIBED BUT NOT RECORDED BY
### AUSCRIPT AUSTRALASIA PTY LIMITED

.WRIGHT 18.02.14

CONFIDENTIAL

# Interview conducted with Craig WRIGHT

On the 18th February 2014

Sydney

Interviewers: Des McMaster, Marina Dolevski, Hoa Doa

5

| | | |
|---|---|---|
| Sommer | Okay, well, if everyone's happy, I really wanted to sort of – I know you've had a number of different discussions and I really wanted to sort of make this as productive as possible for everybody's time so I thought I would put as much as I can up on the slides and at least that way we've got a process for discussing things.  The agenda that John sent through to Marina yesterday afternoon, basically, I thought it would be useful just to highlight some of our current issues, go through quickly the history of development, our current state, vis a vis audits, the relevance of bitcoin treatment which I think is critical to where we are and what's going on;  looking at current transactions, both – at a high level.  So what I would like to do is agree, the in-principle treatment of various types of transactions and then – you know, it is undoubted that there is going to have to be revisions for the BASs that are lodged so a lot of the process and a lot of the grinding of wheels that's going on at the moment is information requests and stuff about BASs that have been lodged and simply they've got to be changed anyway.  So we're spending a lot of energy worrying about BASs that, on the Tax Office's view of the law, are wrong and so therefore we need to change those BASs anyway.  So if we can agree a process for actually the way in which those BASs should be filed what I would like to do is then have someone from a fresh team sit down with John and rebuild the BAS, so somebody from within the Tax Office who understands the way we've agreed the way that these transactions should be done sit down with John - it's only a hundred lines of transactions, rebuild the relevant BASs and resubmit them on the basis of – on an agreed basis so we can actually do something else without going - - - |

10

15

20

25

| | | |
|---|---|---|
| Dolevski | So if I just understand that correctly, Andrew - - - |
| Sommer | Yep. |
| Dolevski | So just basically on the tax view, which is outlined in the private binding rulings you're saying - - - |
| Sommer | Being singular, but we will get to that, yep. |
| Dolevski | Yep.  So you're saying that the BASs – you're accepting that the current BASs lodged are obviously not in line with the rulings and the ATO view so you're proposing - - - |
| Sommer | I don't think that's controversial, is it? |
| Dolevski | No. |
| Sommer | No. |
| Dolevski | No. |
| Sommer | Okay.  Yep. |
| Dolevski | No, just wanting to clarify. |
| Sommer | Yep |
| Dolevski | And therefore, based on that, you would be – you're proposing to revise the BAS, the BASs that have already been lodged? |

30

35

40

45

---

Page 1 of 40

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | If we can reach an agreed treatment about the way in which things need to be done, yeah, sure, let's just move on.  Do we think bitcoin is money?  Yes. Can I stand here for four hours and argue with the three of you that I think bitcoin is money and, you know, it passes the test established by Emmett at Travelex, the landmark case referred to in the ruling of facility and all that sort of – the landfill case facility.  Yeah, I can do all that but that's not going to progress the issue and I want to get these guys back to doing business and we can have the esoteric discussion about the nature of bitcoin and whether or not it's money later but let's free up this process because it's drowning them in unproductive wheel-grinding, constantly frustrating on both sides and I would like today to break that cycle. |
| | Dolevski | So rather than having the changes made from a compliance perspective it would just be a revision of BAS that you would want some assistance? |
| | Sommer | Yes. |
| | Dolevski | Is that right?  Yep. |
| | Sommer | I think that - - - |
| | Chester | And rather than us ..... something and resubmitting it, let's just sit down and let's go, "Okay, tick, tick, tick, tick, done" and we can go, "That looks good. That's good.  Fine.  We're done".  I think, as Andrew said, there's not many – it's not like there's thousands of transactions out there.  There's none. |
| | Dolevski | No, no. They're the first quarter BASs that were lodged. |
| | Sommer | Yeah.  That's right. |
| | Dolevski | And there's a couple – I think there's one that's a post issue. |
| | Sommer | Yep. |
| | McMaster | There are a couple of post issues. |
| | Dolevski | That have gone through. |
| | Sommer | Yep.  And we will get to that. |
| | McMaster | Yeah. |
| | Dolevski | Yeah. |
| | Sommer | Okay.  So a simple without prejudice meeting intended to resolve the issues that can be resolved, narrow the scope of issues that are under review and focus on the areas in which we can agree rather than issues of general grievance I think, you know.  I get the impression from having looked at some of the stuff that there's a bit of frustration in the Tax Office.  I don't know from talking to my clients if there's a bit of frustration on our side.  You know, let's just put all that to one side and try and work on those things that we can agree on and move this along.  The current issues:  we've got formal notices regarding retention of refunds.  We've got a multiplicity of audits.  We've got the issue for these guys being cash flow as a new business.  We're really struggling from a cash flow perspective and also from a resources perspective.  We need to sort of  ..... for the guys to do it.  Now, the retention of refunds is troubling because the current – we don't have any revised assessments yet and just from a process perspective a number of the documents that have been issued I think are wrong as a matter of law and we need to sort of tighten that process up.  So these are notices issued to Hotwire, Coin Exchange, Cloudcroft whereby – and I will show you an extract in a minute – whereby the decision to retain the refund is based on an |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| 5 | | interpretation of the law rather than the pending verification of information. Now, section 8AALZGA entitles you to retain a refund in certain circumstances pending verification of information. It doesn't entitle you to retain a refund without issuing an amended assessment in instances where you just happen to ..... the law. Now, you can go away and have a look at that. The notices that were issued purports to give the taxpayer an objection right. |
| | Dolevski | An objection right? |
| | Sommer | Against the - - - |
| 10 | Dolevski | It's retaining. |
| | Sommer | Yeah. |
| | Dolevski | Yeah. |
| 15 | Sommer | Now, the only – my only understanding is that you get – we hadn't looked into AALZGA ..... objection ..... process in relation to that decision doesn't apply generally but so even the decision to withhold it under that section ..... because there's no information verification referred to or it's not something else so it's just one of those process issues that I think needs to be cleaned up and it's a relatively new section. And certainly some of the ..... and some of the other notices refer to specific bits of information but the ones to Coin Exchange, Hotwire and Cloudcroft don't. |
| 20 | | |
| | Dolevski | The actual retention and the notice - - - |
| 25 | Sommer | Yeah. So we've got a bit of a problem there because we haven't got anything we can object to. Now, I don't want to go down the objection and appeals path because it's too slow and, as I say, if we can agree a basis, excellent, we don't have to worry about it. |
| | Dolevski | Well, the objection to hold isn't going to give you any technical clarity on the issue itself. |
| | Sommer | No. Look, it's a bit - - - |
| | Dolevski | There's just – yeah. But, I mean - - - |
| 30 | Sommer | It's a bit of a silly provision and I don't know why we put it in there in the first place. But we haven't got - - - |
| | Dolevski | But in terms of us speeding the assessments, I mean, we're ready to go with the imposition papers that were issued. |
| | Sommer | Yeah. No, no, but that's an interim ..... What I'm saying is - - - |
| 35 | Dolevski | We can get to final quite quickly. |
| 40 | Sommer | Yeah. Well, you probably shouldn't, on the basis of what they say, but the problem is the guys have got nothing to object against. They've got notices and they keep saying to me, "I've got this letter from the Tax Office that says I have an objection right" and I'm saying actually you don't have an objection right. There is nothing you can object to at the moment". There isn't. The assessment that was made when the return was lodged, the deemed self-assessment, is in accordance with their duty and there's nothing ..... to which they can object. |
| 45 | Dolevski | Well, we would say that under 8AAZLGA that that gives us the right to hold, under - - - |
| | Sommer | For what purpose? |

Page 3 of 40

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | For us to substantiate that the refund is in fact valid. |
| | Sommer | I don't think it really says that. |
| | Dolevski | Well, I don't have the Act – we don't actually have it there - - - |
| | Doa | No, I've got the GST - - - |
| 5 | McMaster | What Marina is saying is the commonly-held view within the office, okay, and has been since the legislation came into being - you do have rights of objection on the private binding rulings which would go to the heart of issue. |
| 10 | Sommer | Yes, but not – true, but not for where there's an assessment that has been issued and our assessment doesn't line up with the private ruling and the private ruling was only issued on 23 September – December, I think. |
| | McMaster | Yeah. |
| | Sommer | So – anyway.  Have a look at 8AALZGA. |
| 15 | Wright | And the private ruling didn't actually align.  It was a totally separate thing to the companies, anyway, because it was unrelated and never was related, which was informed right back to the beginning, before Selso even came on. |
| | McMaster | Okay. |
| | Dolevski | So - - - |
| | Wright | So that private ruling had nothing to do with any of the other transactions. |
| 20 | Dolevski | So under those provisions the Commissioner may retain an amount and we go through and address all of the 10 factors under - - - |
| | Sommer | Yep.  And which one of them says because you formed a different view of the law? |
| 25 | Dolevski | So we say – so the first one, "The Commissioner may retain an amount that he or she otherwise would have to refund to an entity if the entity has given the Commissioner notification that affects or may affect the amount".  Sorry, I haven't gone into this - - - |
| | Sommer | Yep.  Anyway, I don't want to get tied up on that today.  You guys have a look at it. |
| | Dolevski | Yep. |
| 30 | Sommer | But I don't think those notices as they are issued to Cloudcroft Coin Exchange - - - |
| | Dolevski | I will check them. |
| | Sommer | - - - and Hotwire - - - |
| | Dolevski | So you're saying only three of them are defective as far as you're concerned? |
| 35 | Sommer | Yep.  Yep, those three. |
| | Dolevski | And the others, we've actually got it right? |
| | Sommer | Yep.  Well, the others - - - |
| | Dolevski | We need to check what letters - - - |
| | McMaster | I think they would have been identical letters. |
| 40 | Dolevski | That's right. |
| | Sommer | ..... I can check. |

Page 4 of 40

CONFIDENTIAL

DEF_00051784

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Okay.  I will double check.  That's okay. |
| | Sommer | Yep. That's okay. |
| | Dolevski | Unless we've used incorrect letters.  I don't know - - - |
| | McMaster | I would be surprised but I will double check. |
| 5 | Dolevski | Yep.  All right. |
| | Sommer | Okay.  So - - - |
| | Wright | There were three different people issued the three different initial letters and then Selso issued subsequent different ones. |
| | Sommer | Yeah. |
| 10 | McMaster | The initial ones would have been the retention of refund letter which would have come from, highly likely, the Refund Integrity Team.  The subsequent ones that Selso would have issued would be providing you with the objection rights to the decision to withhold because it met the various requirements of timeframes. |
| 15 | Sommer | Yep. |
| | Dolevski | But we will look into that. |
| | McMaster | Yep. |
| | Sommer | Good.  Okay.  So the objective is to try and free up the cash flow and try and free up the resources so we can get all these issues ..... rather than continually dealing with various ongoing issues.  So just to sort of – for those players who are new to it, I thought it was useful just to quickly walk through the chronology of where we got to, or how we got to here.  In 2009 the mining of bitcoin commences.  There's audit and ensuing disputes with the Tax Office regarding information defence ..... and Dr Wright personally back in 2009 and that dragged on for a couple of years.  2011, bitcoin was transferred overseas.  R and D then conducted in the US under – by a joint venture company formed as ..... effectively info defence research LOC.  Bitcoin mining continues throughout 2011.  The bitcoins are derived by companies in Singapore and the Seychelles or entities in Singapore and the Seychelles, and they're actually trusts.  Trustee companies and trusts established - or trustee companies in the United Kingdom and other trusts established in the Seychelles.  Further work was planned.  In early April 2013 unfortunately David ..... dies in the US towards the end of April 2013.  In July we have the MJF transactions which are germane to the returns that are being looked at currently.  They involve software services and ..... and in July discussions commenced between – with the Tax Office about the nature of bitcoin.  September, following the death of David ..... in the US, there was a transfer of intellectual property out of a US entity to Dr Wright pursuant to orders granted in the New South Wales Supreme Court.  Those orders in the New South Wales Supreme Court substantiated value of the claims being made for that intellectual property in the amounts shown there, roughly 28 million a piece.  2013, September, intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange ..... and so on.  2013, December, 23 December, while I was having Christmas with my family, private ruling issued on the nature of bitcoin and January 2014 we got the retention refund notices and so on.  And that's how we got to – all right.  So these are the entities that I think are the key players in these transactions.  So we've got the UK companies;  we've got Singaporean |
| 20 | | |
| 25 | | |
| 30 | | |
| 35 | | |
| 40 | | |
| 45 | | |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

companies; we've got Seychelles, so they're all on the outside of the dotted line. We've got Craig which we've referred to with the ..... as CSW ..... is the trustee of the Wright Family Trust. We've got Hotwire PE, Coin Exchange, Cloudcroft, Strasan, Denariuz and if you look at it ..... audit, audit, audit, 5 refund to ..... and audit. So we're busy, and this is my point, that we're stretched in terms of our resources to answer these questions at the moment and it would be nice if we could wrap this up and get these audits sorted. So we've got copies of all those notices. I don't think anyone's worried about it but those are effectively the current drain on our compliance resources to deal 10 with all these questions. Okay. This is the refund retention letter that I was referring to in relation to – this one's the Cloudcroft one and letters in the same form were issued to Hotwire and Coin Exchange. A couple of issues. One is, "We've decided retaining a refund for the following reasons: we are maintaining our interim position with treating the transfer of bitcoin to pay for 15 your acquisitions in accordance with ....." etcetera. So it doesn't refer to any clarification of information.

| | | |
|---|---|---|
| | Dolevski | So that's our objection letter. |
| | Sommer | That's the objection letter, yeah. |
| | Dolevski | Yeah, but that's not the retention letter. |
| 20 | Sommer | Yeah, but this is saying – it also says, "How to object, and your objection", right? |
| | Dolevski | Yep. |
| | Sommer | Absent the mechanism provided by 8AALZGA how can I object to that notice? |
| | Dolevski | Why would you say "absent to 8AAALZGA"? |
| 25 | Sommer | Well, if the only – if you're – the reason you've decided to retain my refund - - - |
| | Dolevski | Is to verify - - - |
| | Sommer | No, no, it doesn't say verify, and we're just maintaining our view about the treatment of bitcoin. |
| | Dolevski | So - - - |
| 30 | McMaster | No, no. The reason that that objection letter has gone out is simply that we have exceeded the 75 days with the information held in the office and at that point in time there is a right to review the decision to retain the refund. |
| | Dolevski | Retain. That's right. |
| | McMaster | Within the office. |
| 35 | Sommer | I agree. I agree with that. |
| | Dolevski | So the objection - - - |
| | McMaster | The other part is actually irrelevant for the purpose of what we're looking at. |
| | Sommer | Well, the indication of a decision – well, that says to me that, "We have decided to retain your refund for the following reasons. We have a view of the law" and that bullet point is a view of the law, okay? I don't know how to object to that. |
| 40 | | |
| | Mr .......... | And the other problem is the private ruling was never issued - - - |
| | Sommer | Well, I will get to that. So I've got two problems with it. One is that that decision to maintain – to retain the refund because of a view of the law is not a decision ..... 8AALZGA, okay? The problem was that 30 – the other |
| 45 | | |

CONFIDENTIAL

DEF_00051786

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| | | problem is that 30 September 2013 ruling was never received.  It was never issued by the Tax Office and it was never received by the taxpayer.  Even if it had been, we've got a letter from Mr Walmsley dated 15 October 2013 specifically saying that he – oops, sorry – that we weren't going to be getting that ruling.  So it says in that highlighted paragraph, "However, any" – you know, "You may have got this ruling" in the first para.  "I understand that you have been told that a private ruling has issued or is about to issue on the questions you have asked but that is not correct".  The final sentence there, "However, any private ruling made on the basis of the existing application would be either invalid or worthless so the obtaining of additional information is unavoidable".  So both the – the notice refers to a ruling that was never issued and even if it had been issued it was – we got subsequent correspondence saying it was invalid or worthless in the Tax Office's view.  That - - - |
| 15 | Wright | And the actual ruling was actually created in November and backdated. |
| | Sommer | So that being – even as recently as last Friday we've got the interim report still making reference to this private ruling that was never issued to us and even if it had been issued to us it was declared by Mr Walmsley that it would be invalid or worthless.  So I'm – it's just – there seems to be a bit of a - - - |
| 20 | Wright | I had the particular authorisation number investigated.  I have – I know people in the ATO because I've been training for years and that was actually issued on 29 November as a backdated ..... internally. |
| | McMaster | Who provided that to you? |
| | Dolevski | To who, worry? |
| 25 | McMaster | To you, Craig. |
| | Wright | No one I will be saying until we go to court. |
| | McMaster | So you've approached a personal contact in the office and obtained information? |
| | Wright | No.  I went to Internal Fraud and Investigations. |
| 30 | McMaster | Okay. |
| | Sommer | In any event – let's leave - - - |
| | McMaster | Well, no, that's very important because you shouldn't be doing that and whoever gave you information should not be doing that either, okay? |
| 35 | Dolevski | Anyway, let's deal with this issue.  So we've made reference to a ruling dated 30 September. |
| | Wright | That was never issued. |
| | Dolevski | It was never issued, and then was there something issued in December? |
| 40 | Sommer | Yes, so there – about 23 December 2013 the private ruling was.  But the important thing about that is, that was long after the first batch of BASs were submitted so it's a bit different getting one on 30 September and then lodging BASs on 28 October that are different to the one in which a private ruling was issued, which is the imputation that that carries, versus getting one two months after you've lodged the first quarter's BASs which is the way in which it seems to have happened.  So I'm – it's a bit – I think there's something strange going on where that private ruling keeps popping up in references there - - - |

CONFIDENTIAL

DEF_00051787

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | Well, it's still sitting on our records. |
| | McMaster | That's why. It's on the single case management system. |
| | Dolevski | On the – that's right. |
| 5 | McMaster | And it's sitting there as not withdrawn. It's sitting there as a valid PBR. Unfortunately, I don't recall seeing from Peter Walmsley - - - |
| | Dolevski | So, Andrew – sorry – that letter - - - |
| | Sommer | So that's the - - - |
| | Dolevski | That letter that you made reference to from Peter Walmsley, are you saying that it said disregard the previous, it's not accurate? |
| 10 | Sommer | Well, it says, "I understand that you have been told that a private ruling has issued or is about to issue on the questions you have asked, but that is not correct". That's the first paragraph. And then even if we had got one he's saying that, "Any private ruling we made would be invalid or worthless". |
| | Dolevski | Okay. |
| 15 | Wright | And the particular ruling there, if you read it, doesn't say "bitcoins"; it says "commodities". |
| | Dolevski | Okay. |
| | Sommer | So we've got some strange things going on there but that continued reference to 30 September is frustrating to the client because it was never received. However it's represented in your system, it wasn't sent to us and even if it had been sent to us we would have been instructed by Mr Walmsley's letter to ignore it. |
| 20 | | |
| | Dolevski | So, sorry, just that date from Peter Walmsley saying - - - |
| | Sommer | 15 October. |
| 25 | Dolevski | 15 October. |
| | Chester | We even met with him ..... Was it about that time, or shortly after that? Discussing bitcoin in general ..... |
| | Wright | The two rulings, if you actually read the public thing or whatever else – what has happened is the one on the 23rd has been copied and backdated. |
| 30 | Mr .......... | I think – I – I - - - |
| | Dolevski | Sorry, the one on 23 December you're saying has been - - - |
| | Wright | Has been copied. |
| | Dolevski | - - - copied. |
| | Wright | And ..... to look like it was issued before. |
| 35 | Dolevski | Well, it was authored by Peter Walmsley so I'm not sure that I can - - - |
| | McMaster | Sorry, could you re-state that please, Craig? I didn't quite understand - - - |
| | Dolevski | Craig is saying that the 23 December ruling is a copy of the September ruling yet he has got a letter from Peter Walmsley saying that the 30 September ruling is inaccurate. That's the statement you're making. |
| 40 | McMaster | Well, at that point in – okay. So at that point in - - - |
| | Wright | No, we've got nothing issued. |

CONFIDENTIAL

DEF_00051788

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | Is it?  Sorry? |
| | Sommer | Nothing was issued so - - - |
| | McMaster | So not even the letter of 23 December? |
| | Sommer | No, no.  No, no, 23 December was certainly issued.  I remember this - - - |
| 5 | McMaster | Okay.  And it basically was verbatim of this other particular - - - |
| | Sommer | Well, we don't – we - - - |
| | Dolevski | They never received the 30 September. |
| | Sommer | We never received the 30 September ruling is my instruction. |
| | Ms .......... | Actually, yeah. |
| 10 | McMaster | I'm just trying to understand how, if you've never received it – how you know it's a copy. |
| | Sommer | I think Craig's saying that he publicly – the version that's on the public PBR - - - |
| | McMaster | Okay. |
| 15 | Sommer | - - - the register on the internet is verbatim to the version of 23 December ruling that – so it seems to be the same ruling. |
| | McMaster | Okay. |
| | Sommer | We never got it – based on the edited version on the website. |
| | McMaster | But you would accept that that ruling is a valid private binding ruling? |
| 20 | Sommer | Which one?  23 December? |
| | McMaster | Yes. |
| | Sommer | I'm not contesting that at all, no. |
| | McMaster | Okay. |
| | Sommer | I'm not accepting it but I'm not contesting it either. |
| 25 | McMaster | And that's fair enough.  And that's fair enough. |
| 30<br><br>35<br><br>40 | Sommer | I don't accept anything that I don't have to but I'm not presently objecting to the form, content or otherwise of the 23 December ruling other than the fact that it's wrong as a matter of fact but we will get to that ..... Okay.  So treatment of bitcoin.  Wherever we go with that first quarter of transactions there is nothing more fundamental to it than the way in which we're going to end up treating bitcoin in one sense because it creates all these interdependencies between the various entities and the way in which things were moved around.  We've made submissions to the Tax Office regarding the fact that it's broad - the definition of money for GST purposes is broad enough.  For my part I think it's simpler, I think it's more certain, and I think it's more predictable to treat bitcoin like money.  I think it's almost inevitable that it's going to – if it hasn't crossed the threshold ..... we're going to have to do it ..... and treat it like money for the purposes of it, but this isn't the forum to do that.  You know, as I say, that's where I would rather devote my resources as to esoteric questions of law because that's far more interesting to me.  But, really, I mean, we've got three options and, you know, I've been working with friends of mine who are on the OECD and representing various countries and talking to them about bitcoin because we had nothing else to do over Christmas and, really, the world is looking at it in three different ways.  One, |

CONFIDENTIAL

DEF_00051789

Interview Conducted with Craig WRIGHT

|   |   |   |
|---|---|---|
| 5 |  | you're treating it like a taxable barter, which is the way in which the UK initially tried to treat it and then they've recanted, bless them.  I think in Europe there's an option to treat it as money but not input taxed and I think that's probably where this concept of private money which exists under European law, which is probably where the Germans are going, probably where the English will follow the Germans, and it will be effectively in our purposes not fiat currency but treated as an input tax for exempt supplier to avoid the problems that arose in the UK. |
|  | Wright | The same as barter dollars. |
| 10 | Sommer | Yeah, with the HCMEU of it being a taxable barter that caused everybody to get upset and they seem to be moving inexorably and you don't know what it is, but it's exempt.  Under our system that's probably a little bit more complicated because of our exemption rules and I'm not entirely sure how we would make it exempt input tax if it's not money.  I don't know how we're going to do that but that's ..... and maybe one we will throw at the feet of Mr ..... in due course.  The other option is money.  Now, we have – and I think with all due respect to Mr Walmsley, Mr Walmsley is coming ..... from an income tax perspective and the income tax ..... he sees things like income tax and he sees things in delineation between Australian currency and foreign currency which is, you know, an all-encompassing – it has either got to be issued by the Australian Government or it has got to be the currency of another country, which I think is the way in which he sees the income tax world and I think that colours the way in which the definition of "money" is being approached.  But the definition of "money" for the GST purposes is very different and I think we owe to the issue to look at the GST definition of "money" rather than this notion of currency that we find in the income tax law.  I say that because of the references in the private ruling and in the – what I will call interim activity audit report that make reference to the New South Wales landfill case which is a stamp duty case which is – and the payment instrument in that case was found not to be money for stamp duty purposes but it would still be within the definition of money for GST purposes because it's a promissory note which is specifically picked up.  So I'm not quite sure why we're fixating on that case and saying, "Oh, see, it's not money" but it is money because that thing would have been ..... under our law but no bitcoin.  Anyway.  That's a question.  More relevant for present purposes is where are they?  How are they supplied?  What are consequences of ..... supplied?  The ATO view is expressed in the private ruling that it's not property.  Personally, I have the greatest difficulty accepting a proposition that bitcoin isn't property.  How the Tax Office can form the view that it's not property in any form I struggle with.  They say it's akin to confidential information because you need the private key.  Well, a private key attaches to the wallet not the bitcoin itself.  The bitcoins themselves, you know, aren't confident information.  The bitcoins are different to the wallets.  The bitcoins carry with them their own history of the wallets to which they've been allocated.  So I just think there's real problems in the private ruling about what bitcoin are and how they work and so on.  There's - - - |
| 15 |  |  |
| 20 |  |  |
| 25 |  |  |
| 30 |  |  |
| 35 |  |  |
| 40 |  |  |
| 45 |  |  |
|  | Wright | And one of the other difficulties is at the moment we're looking at doing it in a trust.  We will hold that in Singapore and we will issue trust rights in Australia.  A trust is – you know, unit trusts are input taxed and I will automate them.  I will build the software the same as bitcoin, as a wrap-around bitcoin, and we will have a GST-free bitcoin because it's attached to a trust. |
| 50 |  |  |

CONFIDENTIAL

DEF_00051790

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Yeah.  So I think – as far as I'm concerned the bitcoins display the characteristics of property in the sense that they can be owned, they can be transferred, and you can work out who owns them.  They're functionable like money because if they're stolen, you know, they're – you know, like – much like currency.  If, you know, John was to pinch the $10 from my wallet the presumption would be that he owns that money because that's the way in which the property law acts on money and money is slightly different and bitcoins follow that path but they do ..... the characteristics of money and we can talk elements of property but for the sake of time we will skip on.  Even if we were to perceive that bitcoin isn't money, which I think is – I can – you know, we're never going to agree a treatment for the BASs on the – if I – if we for the present purposes hold the line that we think bitcoin is money.  We do think bitcoin is money but we might have to go with the Tax Office view for the sake of resolving these outstanding BASs.  For the purposes of a without prejudice discussion, to move things along, we could adopt a view that a bitcoin is a form of intangible property which I think probably is a better view than trying to argue that bitcoin isn't property in any form.  That – again, my reason for going over all of that is that we need to work where it is, how it's applied and those sorts of things. Even if we're going to adopt your view as to it not being money, we still need to work out the operation of the nexus test in 9-25, the operation ..... and so on in relation to bitcoin in order to get any traction or any progress at all.  Mostly the bitcoin haven't been brought to Australia by Dr Wright so mostly bitcoin is subsisting in entities that exist outside of Australia.  So you will recall that on those opening slides we talked about bitcoin mining commenced and then they were transferred out of Australia to other overseas entities.  Mostly they have remained outside there.  They are held in wallets owned by non-resident entities outside of Australia.  An exception is the bitcoin brought to Australia for the purpose of the Denariuz transaction, which we will get to at the end.  Now, I think, Marina, you were talking about – that there is one BAS for the second quarter.  That is the one that I think has been – that is the one you're referring to, the Denariuz transaction, the Denariuz BAS that was lodged for the period ending 31.12.2013 and that contains a specific-purpose transaction which was done to demonstrate the way in which the Tax Office view of bitcoin ..... But as far as I know that's the one that you've got ..... in dispute with you guys. |
| | McMaster | There was a BAS lodged prior to 30 June for a previous quarter in which a refund claim was made and released for one of the entities. |
| | Sommer | Okay. |
| | Dolevski | Yeah. |
| | McMaster | And I just can't remember exactly which one it is. |
| | Sommer | Okay. |
| | Chester | That was the R and D claim that was released. |
| | Wright | That wasn't GST. |
| | Dolevski | No, that was - - - |
| | McMaster | There was a GST. |
| | Dolevski | Panopticrypt. |
| | Chester | Panopticrypt. |
| | Dolevski | Yep.  So 157,368 refund was issued. |

CONFIDENTIAL

DEF_00051791

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | Okay. |
| | McMaster | Okay.  And - - - |
| | Doa | So you say they're held in wallets outside.  You're saying that where the wallets are held is basically where the bitcoins are located? |
| 5 | Sommer | Well, yeah, I suppose.  I mean, it's like an intangible asset sitting in a trust in the sense that if the trust is a non-resident, it has got no relevant connection with Australia and it's holding an intangible asset the assumption is that the intangible asset is sitting outside of Australia.  Yeah - - - |
| | Doa | So all the private keys are being held - - - |
| 10 | Sommer | By the non - - - |
| | Doa | By the non-resident trust account. |
| | Sommer | True. |
| | McMaster | So how are you trading the bitcoins between the entities? |
| 15 20 25 30 35 | Sommer | This is the point to which we will soon come.  Current transactions.  Right.  In my view they seem to break down into three types of transactions.  There is – what I want to do, as I said, agree a basis for transaction in principle and then ..... All right  How do we do it?  Capitalisation of the ..... seems to happen in the following way.  Craig holds an interest in – sorry, Dr Wright holds an interest in the offshore trust which holds the bitcoins so Craig is there holding a bitcoin and sitting overseas.  Craig has an equitable interest in that trust and what seems to be happening, because there is no physical transfer of the bitcoin, is that the equitable interest in the offshore trust is transferred to the subsidiary in consideration for the issuance of shares.  So they are capitalised, not with actual bitcoin because as I understand it there is no transfer of the bitcoin into the vehicles and there is no movement of the bitcoin, except for the Denariuz transaction to which we will return, and Hotwire in this case – and I have to choose that as indicative of the others – receives that equitable interest in the offshore bitcoin which still sits out there and issues shares to Dr Wright in return.  So the supply of shares is clearly going to be taxed.  Dr Wright didn't supply actual bitcoin to the company, as I understand it.  Rather, Dr Wright transferred some of the equitable interest that he holds in the offshore trust to the company in consideration for the shares.   The company could then call for a transfer of bitcoin to it absolutely or it could direct the offshore trust to transfer the bitcoin to a third party purchaser at the company's direction.  Now - - - |
| | McMaster | Excuse me ..... |
| | Sommer | Sure. |
| | McMaster | Do you have copies of this – Marina is busy drawing ..... |
| | Sommer | Yeah, I will give you copies afterwards if that's okay. |
| 40 | Dolevski | Okay.  Terrific, yep. |
| | McMaster | Excellent.  Thank you. |
| 45 | Sommer | Yeah.  Des, you would be entitled to say that, "Andrew, you guys have always told us that we transferred bitcoin" and I think that's right and I think that's largely because we saw bitcoin as money and transferring balances around and ledger amounts of money from one entity to another entity if it's done on paper is done on paper and is still there, kind of – it's still money moving around.  It doesn't change the character of it.  But once you start saying, |

CONFIDENTIAL

DEF_00051792

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| 5 | | "Okay, bitcoin is some form of non-money, it's some form of intangible rights that subsist out there" you have to then start saying, "Well, did you actually get legal title to it or did you get something less than legal title to it?"  And we got – the problem is Dr Wright does not hold the legal title to those bitcoin.  They sit in the trust sitting in the UK or the Seychelles or in Singapore or wherever and so he couldn't transfer the actual bitcoin into the entities.  The rights that were transferred were the right to call for that bitcoin in accordance with the existing trust arrangements that are there. |
| 10 | McMaster | So Dr Wright would have the appropriate agreements etcetera with these entities that are overseas? |
| | Sommer | I think they're – with the entities that overseas, absolutely. |
| | McMaster | Because this is the first time - - - |
| | Sommer | Yeah.  No, I - - - |
| | McMaster | - - - I've heard of the overseas trusts. |
| 15 | Wright | Okay.  Well - - - |
| | McMaster | I suspect it's probably the first time Michael Hardy would have heard of these. |
| | Sommer | I don't think so, no.  I - - - |
| | Wright | Yeah, it was emailed to Michael and it was emailed to the people before Michael on 17 July. |
| 20 | Sommer | Okay. |
| | Wright | We have those emails where I communicated ..... |
| | McMaster | Well, that would be nice to get hold of because I've not seen those emails. |
| 25  30  35  40  45 | Sommer | I understand all of that and I understand that unfortunately – because – I think the problem is because everybody has been around the bitcoin issue rather than tackling the bitcoin issue everything has become fragmented and so what I'm desperately trying to do with all this is to try and put it all together because I can't understand it until it's in a cohesive framework, which means I can't communicate it to you guys until it's in a cohesive framework, and I'm trying to put this in a way that I – I have come to terms with what seems to be happening.  I am totally conscious of the fact that some of this information and some of the way in which we're looking at this is different and it's because changing that – pulling out that peg of bitcoin as money and saying, "All right, well, it's not money"  fundamentally changes the way in which a lot of this is seen from a legal perspective.  And, as I said, I'm – you know, if we, you know, had a million years to resolve this, which Craig tells me I don't, I could happily with, you know, as many people from the Tax Office as possible and we could debate and go and get declaratory relief and all that sort of stuff, and that's stuff we will have to do if we can't reach some sort of agreement.  But I would – I owe it to my client to say, "Look, there is a way through this where we can agree a treatment with the Tax Office while we work on the treatment of bitcoin".  Now, the treatment of bitcoin is really, really important because without it our business model doesn't work, but that's a business problem, that's not a tax-compliance problem.  I'm here to try and solve the tax-compliance problem in the short term and then we can, you know, have agents dancing on pinheads for the purposes of working out the definition of "money" later.  Right.  Again, purchased by the Australian companies of third party suppliers in Australia.  So if we have a supply of goods and services in Australia from an Australian supplier, the box in the bottom right, to the |

CONFIDENTIAL

DEF_00051793

Interview Conducted with Craig WRIGHT

---

companies – Hotwire again used as indicative – what seems to be happening – and, you know, we can go through the documentation with this – is that there is the supply that takes place here;  there is no transfer of bitcoin out of Hotwire because Hotwire aint got none.  What it does is it says to the Australian supplier, "I will grant you a right which you can exercise against the offshore trust to have them transfer bitcoin to you in satisfaction of my interest in the trust".  It's something different to the intragroup transactions so as you go here, see what there is from Craig to Hotwire, is a supply of the interest in the overseas trust.  I don't think there's any intention to have the Australian supplier a beneficiary of that but what it's doing is saying, "I will nominate you as the person to receive bitcoin in satisfaction of my interest in the trust" and the offshore trust then, you know, does what needs to be done in order to transfer the bitcoin out of the trust and at the direction of the Australian supplier.  Whether it goes to the Australian supplier there's ..... whatever, you know, is a whole other question.

| | | |
|---|---|---|
| McMaster | | By "Aus supply" do you mean a related entity or a totally unrelated - - - |
| Sommer | | No, no, no.  So these are third-party suppliers. |
| McMaster | | Okay.  So the only one that I'm reasonably certain of is MJF at the moment. |
| Sommer | | MJF is the one - - - |
| McMaster | | The prime one, obviously. |
| Sommer | | The prime one, yeah.  So - - - |
| Wright | | Some of the others  - - - |
| Sommer | | Again, I'm trying to set up a framework for understanding when we do this - - - |
| McMaster | | Sure.  Sure.  I understand. |
| Sommer | | If we ever do this again.   But, yeah, MJF is the principal one that we're worried about for the purposes of the outstanding BASs. |
| McMaster | | Okay. |
| Sommer | | Supplied by the Australian supplier will be a taxable supply ..... payable.  A supply by the undertaking of ..... is not a supply of bitcoin because they aint got any but there's a supply of right and supply is a right for use outside of Australia, the enforcement of transfer of bitcoin in accordance with agreement.  Supply of that right is probably GST free on the basis of section 38-190 item 4, you know, supply in relation to rights for use outside of Australia, much like Travelex and so on.  So that's where we would see that going.  Again, purchased by an Australian company and the third-party supply is from an offshore supplier.  Again, very similar other than we have, you know, possibly – whether or not the supplier is connected with Australia is another approach under section 9-555 and all those sort of things – again, there is supply of a right as against the offshore trust by the Australian company to the offshore supplier so again, you know, 38-190 item 4 or even 38-190 item 2(b) as well in relation to the GST-free treatment of a supply of that right. |
| Wright | | And the IP ID which is ..... location information assigned to an IP address, for the date of the supply is matching all the emails to do with the transfers etcetera is – matches Doncaster, UK where the entity that manages the trust happens to be sitting. |
| Sommer | | So - - - |
| Wright | | As are the dates and it's public information that can't be changed ..... |

---

CONFIDENTIAL

DEF_00051794

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | So they're the different ways.  So the outstanding – a number of BASs that have been lodged by the various entities, they're held up and all that ..... numerous ..... variables which start to go crazy.  But if you look at Hotwire when it was lodged, right – so the basis underpinning the lodgement of the Hotwire was that there was an issue of shares;  there was a transfer of bitcoin but there was software coming from the Wright Family Trust in the far left of the screen;  there were transactions with Coin Exchange and Panopticrypt. There are also some other little transactions that are immaterial and admitted for the purposes of the diagram.  I think – and, you know, I wasn't involved in the original lodgement and I'm coming to it with reasonably fresh eyes and going through the legal arrangements and so on.  This is the way I see it, that there's – at the top of the screen you see the capitalisation transaction that we have looked at and then you have a range of intragroup supplies across the bottom, Panopticrypt , Coin Exchange and the Wright Family Trust where there is a transfer of the equitable interest in the offshore trusts made in consideration for various supplies being made in and out of Hotwire.  Within the group, as Des is saying, there is a transfer of the equitable interests. That's not intended to be the case for MJF Mining Services.  I think we've all had enough to do with Mark Ferrier that we don't want to provide him with any equitable interests in anything and so he got the right to have bitcoin transferred out of the offshore trust, which is what in fact happened but it was transferred to him in satisfaction of the invoices that were issued.  So that's the way I would see it working, that there are a whole lot of supplies being made between the related entities in consideration for basically rebalancing the ledger of the equitable interests held in those Seychelles' trusts, for example, so that, you know, there's very little that actually moves.  It just depends at which point who is entitled to how much of the interest in the bitcoin sitting in the Seychelles.  As regards third parties there is in fact a physical transfer of bitcoin out of those trusts to those third-party suppliers where there is, you know, something real happening.  Now, that something real that happens does not seem to have a relevant connection with Australia in the sense that things are moving out of the Seychelles' trusts to, you know, the wallets designated by the relevant contractual counter party.  There's nothing that touches Australia.  The only thing that happens in Australia is the grant of that right to have the bitcoin transferred out of the trust.  Bitcoin didn't move, except in relation to the Al Baraka transactions and the MJF transactions.  The capitalisation ..... were covered.  Intragroup payments are affected by the transfer of equitable interests in the offshore trust and Dr Wright acted as agent of Hotwire in negotiating the Al Baraka transaction which is, "Andrew, that's all very well but show me the proof" which we will come to in a minute.  As such, no acquisition ..... supply by Dr Wright or the Wright Family Trust in relation to the Al Baraka ..... software and that is different to the way in which the BAS was lodged. There was an assumption I think that there was an acquisition and a ..... supply.  Having looked at the agreement there and the parties, I don't think that's right.  So I think that, really, Dr Wright personally was in there as the negotiating party on behalf of the end recipients and that seems to be the clear agreement between the parties, that Hotwire PE is acting through its agent, Craig Wright, R and D. Craig Wright ..... is authorised to represent Hotwire, etcetera, etcetera.  So the contractual – the interpretation of that as a matter of law, when I come to have a look at that agreement, says there's an agreement between the contracting parties and there are agents in there acting on their behalf. |
| | Wright | If I can just show you something.  This is Mr Ferrier ..... you can take it down and copy it later.  You will notice the dates.  It's a Telstra thing.  I don't have |

CONFIDENTIAL

DEF_00051795

Interview Conducted with Craig WRIGHT

|  |  | any access to the Telstra systems.  1 June 2013 we talked about the contract which is ..... |
|---|---|---|
|  | Dolevski | I think we've got that anyway. |
|  | Wright | This is an email.  This is - - - |
| 5 | Dolevski | Have you been – have you sent ..... |
|  | Wright | You probably have it. |
|  | McMaster | There was an image of - - - |
|  | Doa | Yeah.  I thought - - - |
|  | McMaster | I think you've sent that image to Michael Harding. |
| 10 | Wright | I have, yes. |
|  | Doa | Yeah.  Yep. |
|  | McMaster | And Michael has provided that to us. |
|  | Doa | Yep. |
|  | Wright | Okay.  I didn't know if you had or not. |
| 15 | McMaster | No, that's okay, because we've asked Michael to give us everything - - - |
|  | Wright | Because - - - |
|  | McMaster | So that we can form an appropriate opinion. |
| 20 | Wright | What happened was the day before sort of everything else we did the contract exchange but I formed the company the day after, so we had an agreement that I would form this company, which I then did, but – so I was acting for a company I was going to form, which was sort of out there but not out there, if that makes sense. |
|  | McMaster | A slight timing difference. |
|  | Doa | Yep. |
| 25 | Wright | Yes.  But the idea was to bring it into the company, so to speak. |
|  | McMaster | I remember reading this and I formed the same view as you, Andrew, that the thing that sort of still sticks with me is the ..... contracting so obviously there must have been some contact between them and Al Baraka. |
|  | Sommer | One would imagine. |
| 30 | McMaster | But - - - |
|  | Sommer | I don't know.  My Saudi Islamic law is not so good so - - - |
|  | McMaster | No.  Better than mine. |
| 35 | Sommer | So I think that's the way I see that, and then I see no acquisition, no taxable supply by the Wright Family Trust into Hotwire or other stuff, so there are other transactions.  Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire in consideration of the transfer of the interest in the offshore bitcoin trust so I think that filtered through.  There's lots of reasons I understand that took place and that is that there – you know, the combined 56 million worth of IP that came out of WK Info Defence was then broken up by Craig and put into different entities that were going to need the |

CONFIDENTIAL                                                                                                    DEF_00051796

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | | different bits.  That's the way I'm instructed that that happened and that seems - - - |
| | Wright | I wasn't intending to make it messy.  It was just trying – I had a big pool of stuff and I wanted to split it into each of the things that we're doing, each of the bits, so that - - - |
| 5 | | |
| | Sommer | Messy was a by-product rather than an objective.  That's good. |
| | Chester | ..... |
| | Wright | But you will be happy to know I agreed that I don't touch any of these things ever again and Andrew and John and ..... |
| 10 | Chester | But one thing they were broken up for is – it wasn't just convenience;  it's that there was differential IP for – one was for security and it was all security-based stuff.  That went into the security entity and the stuff that was learning, that went into the learning environment.  There was – so each of those different things was – it was – it was – they were sectioned out based on content rather than, "Oh, let's throw some of that over here and some of that over there".  That was the idea, put them where they were going to be used. |
| 15 | | |
| | Sommer | So at this point we're really saying, "I can understand how this all got a little bit out of – confused between ..... auditors" and Craig, you know ..... quick responses and so it's very easy to misunderstand what's going on. |
| 20 | McMaster | Got a habit of ..... too much. |
| | Sommer | It's very confusing.   It has got to be done and try and put it in some sort of cohesive framework so if you've got any questions about that framework as we go, please let me know. |
| 25 | Dolevski | I think the fundamental difference in our understanding is that we actually thought bitcoins were being ..... |
| | Sommer | Me too, until recently. |
| | Dolevski | Whereas an interest now in bitcoins via a trust. |
| | Sommer | It was when I had a conversation with Dr Wright where he said that nothing has even moved because – and I've got - - - |
| 30 | Wright | Apart from the external stuff. |
| 35 40 | Sommer | Apart from the external stuff and then it's just, like, "Okay, look" – I then literally at that point – I went back – had to go back to the drawing board and reconstruct all the diagrams because until then I had, like you, assumed – and Des has assumed and we've probably, you know, caused you to believe that bitcoin had been moving around.  But it seems that part from the Denariuz transaction, which is different, we will get to that, nothing seems to have moved and so therefore we are dealing in subsidiary interests in these things that remain and that in one sense is consistent with the way in which it has been done, that it's effectively ledger entries in the equitable – moving around an equitable interest rather than actually conducting the transfers.  Okay. Which then brings us to the - - - |
| | Wright | Just as an aside now I was going to say from all of that my assumption is that it's money. |
| | Sommer | Yeah. |
| 45 | Wright | So therefore if I treat it as money then it's how I move it so - - - |
| | Sommer | Yeah. |

CONFIDENTIAL

DEF_00051797

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| Wright | I just assumed that - - - | |
| Dolevski | I have to say it took me a while to get my head around bitcoins and them moving so you can imagine where I'm at at the moment. | |
| Sommer | Yeah.  See – no, you – this ..... | |
| 5 | Dolevski | Which from an audit perspective is – we were kind of having discussions about what's your starting point, your stops and blows, which is why we thought in your particular entity as a sole trader we would have to actually – or start from a point of how many do you own.  We thought yes, you've picked up some bitcoin ownership from the deceased director so you know, get the picture and connect all the dots. |
| 10 | | |
| | Wright | ..... and buckets. |
| | Dolevski | That's right, you know, but now I - - - |
| | Wright | Yeah.  After the first instance I moved everything offshore just because – well - - - |
| 15 | Dolevski | Well, I'm kind of now starting – if the trust actually is even offshore and it's all paper transaction what's the fundamental reason that you're moving around interests, really? |
| | Sommer | Oh, well, to pay for stuff.  It's not an unusual – I mean, if you think about a large corporate group that has got a single bank account you have a ledger of the transactions when those – you know, for intragroup transactions.  You know, one may rent property to another and the payment is on a ledger but no money actually leaves the account. |
| 20 | | |
| | Dolevski | I know.  There's actually no movement. |
| | Sommer | That's exactly right, and that happens all the time.  It's just – and that's why I think there was – these things were documented in the way they were documented because, really, it was just a ledger interest between effectively related parties. |
| 25 | | |
| | Wright | And - - - |
| | Sommer | And moving around those subsidiary interests of the offshore trusts so it's – I think of it much like that corporate group with a single bank account.  No money is moving but payment of consideration is clearly made;  just at any one point which company – the extent of each company's interest in that agglomerated bank account is then – can only be ..... by going through their individual accounting records so - - - |
| 30 | | |
| 35 | Wright | It was never the intention to make it more complex but when I spoke to you guys in July last year I said this is what I want to do and I was told I had to account for all these separately.  I said, "Why can't I just record ..... there" and I got sort of a blank look and – like I was the anti-Christ. |
| | Sommer | Yeah - - - |
| 40 | Dolevski | Well, we have to consider it separately because when you're moving it in different entities - - - |
| | Wright | Because they're – of course.  They're separate, yes. |
| | Dolevski | Every entity is a taxpayer so we have to separate it that way. |
| | Sommer | Yeah. |
| 45 | Wright | And they have different shareholders.  Not every company has - - - |

CONFIDENTIAL

DEF_00051798

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | But, I mean, even the private binding ruling is based on bitcoins. |
| | Wright | Yeah. |
| | Dolevski | Certainly not on interest. |
| 5 | Wright | And the other issue is each of the companies has different shareholdings. Hotwire has other shareholders; Coin Ex has other shareholders.  It's not just me in any of these so – I mean, that was the other thing when I was talking to people because what I've moved into Hotwire has nothing to do with any of the other companies so if for instance someone who has shares in Denariuz can't then claim against Hotwire or vice versa because I'm not the only shareholder.  I might be the major shareholder in everything but I'm not the only one. |
| 10 | | |
| | Sommer | Yeah.  So that seems to be how all that has happened so – in terms of the transfer of those subsidiary interests because nothing seems to have moved.  I mean, if nothing has moved I need to be able to tell you guys what it was that has moved.  It seems to me that there's trusts, that there's an equitable interest in the trust, that the idea was that each of those persons could call directly for the transfer to them absolutely.  As you see – you will see that they've effected payment by instructing that trust to make payment to third-party contractual counter parties and so there was a transfer of a beneficial interest in – or part of a beneficial interest held by Dr Wright or held by one of the other contractual counter parties to the other group companies.  You know, these group companies ..... related companies, I suppose, is probably the ..... I should adopt. |
| 15 | | |
| 20 | | |
| 25 | Wright | I will interrupt and say the reason for the PR was on a wallet that I do hold in Australia and I've dealt with – that's the only one I hold in Australia but I haven't transferred it yet. |
| | Dolevski | So that has got nothing to - - - |
| | Wright | No. |
| | Dolevski | The private binding ruling on the 55,000 wallet - - - |
| 30 | Wright | I still have that one. |
| | Dolevski | - - - of bitcoins has nothing to do with these transactions. |
| | Wright | No.  And that didn't go through because I – the private ruling.  I want to use it and that's part of where we're trying to figure out for selling the damn things in Australia versus overseas versus all the rest. |
| 35 | Sommer | Yeah.  So the relevance, the – our real need for clarification on the treatment of bitcoin isn't so much for some of these transactions, which are some of these transactions because they were conducted with actual bitcoins but most of those bitcoins were offshore.  The Australian legal treatment of bitcoin is critical to the business model because you can't have - - - |
| 40 | Dolevski | But not in respect of these group entities. |
| | Sommer | No, not in relation to – yeah, not in relation to the intragroup transactions. |
| | Dolevski | But isn't this – aren't we now talking about a trust and group of entities that's actually paying the things out of an interest in a trust - - - |
| | Sommer | Sure. |
| 45 | Dolevski | - - - that owns property? |
| | Sommer | Yep. |

CONFIDENTIAL                                                                                                          DEF_00051799

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | And fundamentally, if we're just talking theoretically - - - |
| | Sommer | It could be ..... |
| | Dolevski | It could be anything. |
| | Sommer | Exactly. |
| 5 | Dolevski | And so bitcoins is really a side issue which has perhaps confused us all but not relevant to - - - |
| | Sommer | Not relevant to the audits. |
| | Dolevski | No. |
| 10 | Sommer | But absolutely critical to what Dr Wright wants to do with his business because if you want to try and create a bitcoin exchange the whole liquidity and the convertibility of the currency is only going to be achieved if it's treated like money. |
| | Wright | If - - - |
| 15 | Sommer | The liquidity – if every time you transact, if every time I buy a bitcoin from you I have to pay you 110 per cent of its value because you've got a taxable supply then we've got a problem with the transactability of it. |
| | Wright | Which means you will go to Singapore or the US. |
| 20 | Dolevski | But, Andrew, if we raise these assessments or not release the refunds and revise the BASs, say – you know, whether the interim position paper read – I mean, if we take out that paragraph about the reference to the September ruling or whatever, it will clean up our system, but – so we take that out and our bottom line is not going to change with the revised – okay? |
| | Sommer | No. |
| 25 | Dolevski | That's still – even if you dispute that, that's still not going to get you your technical clarity on bitcoins because we literally have to walk away from here. |
| | Sommer | We're not dealing with bitcoin. |
| | Dolevski | We're not dealing with bitcoins here. |
| | Sommer | Except for Denariuz, and we will get to Denariuz because Denariuz is the answer. |
| 30 | Wright | Denariuz is – like, I did - - - |
| | Sommer | They actually did a physical transfer of bitcoin. |
| | Dolevski | So there has been lots of – and dare I say a lot of heated conversations amongst different people - - - |
| | Sommer | A lot of colour ..... movement but not a lot of progress and that's - - - |
| 35 | Dolevski | No. |
| | McMaster | But there was no clarity. |
| | Dolevski | No. |
| | Sommer | Hence why I wanted to – and that's why .... |
| | Wright | I apologise for that but - - - |
| 40 | Sommer | It's just that that's why – and I think there has been so much grinding of the wheels and that's why I really wanted to have this circuit-breaker meeting to |

CONFIDENTIAL

DEF_00051800

Interview Conducted with Craig WRIGHT

_____

|   | | |
|---|---|---|
| | | actually say, "Let's just really try and put it in some sort of cohesive framework and actually understand at law what really happened" because that's why I ..... |
| | Dolevski | Well, we're getting back to you and your facts of what has happened. |
| | Sommer | Well, that kind of helps so - - - |
| 5 | Dolevski | It does. |
| | Sommer | So this is where things start to get to where we really – so all of those intragroup transactions, intra-related party transactions, whether or not they produce – you know, if they're bitcoins that are taxable then they're taxable on both sides.  They're probably not taxable on both sides in the present circumstances because we're dealing with subsidiary interests in offshore bitcoin rather than actual bitcoin.  All of that nets out to a whole bunch of not very much.  So there's rats and mice stuff where we've paid for parking and rent and photocopiers and those sorts of things.  There's intragroup stuff.  The real refund that the guys need is in relation to the MJF transactions.  The rest of it is more a spinning of the wheels.  So these things are the things where we have paid GST-inclusive amounts to our supplier and they're considerable and we need those, you know, refunds ..... to us is to try and get those refunds back so they continue funding activities in Australia.   So that – that's – but this is the real pain of the retained refunds.  A lot of those – you know, there's 60 million here and you can flick through the BASs.  They're huge numbers but most of that is a lot of, you know, intragroup circling around of stuff and - - - |
| 10 | | |
| 15 | | |
| 20 | | |
| | Dolevski | Plus ..... |
| | Sommer | Exactly.  Moving stuff around between - - - |
| 25 | Dolevski | Yep. |
| | Sommer | Moving those large lumps of IP around whereas these MJF ones are the ones that, you know, I'm particularly focused on making sure - - - |
| | Dolevski | And so MJF – because obviously we can't discuss - - - |
| | Sommer | No. |
| 30 | Wright | That's right. |
| | Dolevski | It's a separate taxpayer but - - - |
| | Sommer | Yep. |
| | Dolevski | So where does this connect in terms of which of Craig Wright's entities? |
| 35 | Sommer | Okay.  So this was – and that's exactly where these lines are going.  So MJF contracting so the tax invoice that they issued and so there's two highlighted ones there, are acquisitions by Dr Wright personally.  So those acquisitions are valuation services by Ferrier for fifty five thousand or fifty thousand dollars in the top line there which – I'm sorry, you can't quite read. |
| | Wright | Can we focus that any better, do you think? |
| 40 | Sommer | I will be gentle - - - |
| | McMaster | We've seen that invoice today. |
| | Wright | You should have it. |
| | Dolevski | Yeah, the one that you showed me.  Yeah. |
| | McMaster | Yep. |

_____

CONFIDENTIAL                                                                                          DEF_00051801

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | I will be gentle.  I will be gentle.  That's about the best we're going to do there. |
| | Dolevski | Yep. Yep. |
| | McMaster | Yeah. |
| | Sommer | Okay.  So - - - |
| 5 | Chester | And one of those is – the top one is Ferrier promising his Ian Ferrier services to ..... as a consultant ..... |
| | Dolevski | And we've got a copy of that. |
| | Sommer | Yeah. |
| | McMaster | Yeah, we've got - - - |
| 10 | Chester | You've got all the stuff. |
| | Dolevski | Yep, yep. |
| | McMaster | Yes, we do. |
| | Chester | You've got all the stuff. |
| 15 | Sommer | So this is why I say that I think some of Dr Wright's confusion related to just how these were transacted and so some of these are Dr Wright transacting on his own account;  some of these are Dr Wright transacting as agent of the other entities.  So these two are, as I understand it, personal transactions for Dr Wright.  They relate to the valuation services because I think they couldn't – they weren't going to be allocated to any particular entity at that point, where this was something to have up your sleeve, you know, if you need valuation services which, you know, in a world of intellectual property are always useful. |
| 20 | | |
| | McMaster | So was there any valuation done? |
| | Sommer | It was - - - |
| | Wright | No. |
| 25 | Sommer | It's due for March 2014 so it's prepayment against future delivered services so, as I understand it, they haven't been delivered as yet.  And the last one, the last line there, is gold ore. |
| | McMaster | That would have been the Payne - - - |
| 30 | Sommer | The Payne ..... gold transaction and that's clear from the last line of that tax invoice and, again, I think – sorry, when I say "I think", I'm instructed that that was a transaction that Dr Wright was doing for his own - - - |
| | Wright | And that was my trust. |
| | Sommer | That was to go into the Wright Family Trust, was it? |
| | Wright | Yes. |
| 35 | Sommer | Okay.  I apologise.  So that the right to that gold ..... so I will revise that – were to go into the Wright Family Trust.  Okay.  Then supply in 1B, so just working through that tax invoice – supply of the automation software was a supply made to Hotwire again for five – this one for $5.5 million including GST and that's from Siemens – is that right? |
| 40 | Wright | Yes. |
| | Sommer | And then it was supplied through MJF. |
| | McMaster | Sorry. |

CONFIDENTIAL

DEF_00051802

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Sorry? |
| | McMaster | What did you say?  Siemens? |
| | Sommer | Siemens. |
| | Wright | Siemens. |
| 5 | Sommer | S-i-e-m-e-n-s, the - - - |
| | Wright | They're a German software – or Germany everything group. |
| | Sommer | That's - - - |
| | Wright | I have that software sitting in the office at the moment. |
| | McMaster | So how did you acquire that software? |
| 10 | Wright | We were given a licence key which was emailed – I believe John has got it – and a download link. |
| | McMaster | Okay.  And that came from Siemens or from MJF? |
| | Wright | That came through MJF. |
| | McMaster | And it worked?  Okay. |
| 15 | Wright | It does ..... |
| | McMaster | I accept what you're saying.  It's just given Mark's prior history I'm a little bit surprised. |
| | Wright | We were very careful with the software.  When I did the software stuff I made sure I – the payments happened as I got the software. |
| 20 | McMaster | Okay. |
| | Wright | And then what happened was - - - |
| | McMaster | Wise. |
| | Wright | Yeah.  And then I trusted them and the gold is a different issue. |
| | McMaster | The gold futures.  Okay. |
| 25 | Chester | It was the classic works, works, works, doesn't work routine, yeah. |
| | McMaster | Okay. |
| | Wright | So I kept going through and, "Wow, this is good.  This is good.  This is – he's disappeared". |
| | McMaster | Unfortunately. |
| 30 | Sommer | Okay.  And then my 1C, that's - - - |
| | Wright | Which I just made the assumption if you keep paying someone and they keep coming through they must be trustworthy. |
| | Sommer | That seems to be an acquisition by Coin Exchange through Dr Wright acting as its agent and eleven and a half million dollars plus GST.  That's - - - |
| 35 | McMaster | Is that the Al Baraka? |
| | Sommer | That is from Al Baraka and that's clear on the tax invoice there.  In the last line of the highlighted section there it says "Dallah Al Baraka Group" so – and that's the Microfinance software so the accounting packages. |
| | Chester | ..... my glasses ..... |
| 40 | Sommer | Okay.  And then - - - |

CONFIDENTIAL

Interview Conducted with Craig WRIGHT

|  | Wright | We will also admit that since everything we've spent an inordinate amount of time rather than building on our damn software at the moment going through it with a fine-tooth comb trying to make sure there's no back doors or such other such things after finding out what Mark Ferrier is actually like. |
| 5 | Sommer | Yeah. |
|  | McMaster | That would be a priority, I would suspect. |
|  | Sommer | It's – yes. |
|  | Wright | Yes.  We can't go live with it until we can trust it. |
|  | Sommer | It has been a disappointing contractual experience - - - |
| 10 | Wright | Yes.  I don't want to run something that we have 100,000 bitcoin one day and the next day, oops, it's gone. |
|  | McMaster | I know there has been some issues overseas with Mount  Cox. |
|  | Sommer | Mount Cox. |
|  | Wright | Mount Cox, yeah. |
| 15 | Sommer | Yeah, Mount Cox is causing us trouble for all other sorts of reasons at the moment. |
|  | Wright | Yes.  The little buggers won't release my fucking money. |
| 20 25 30 35 | Sommer | Acquisition by Coin Ex so this is – I think this is the second of the MJF contracting invoices and I've put this one as an acquisition by – well, I've got Coin Exchange but actually there is – some of that was broken up and apportioned to the other entities as well because there's a commitment fee in there and so from an audit perspective – and this is why I think it's really important to agree the principles and then go – have someone sit down with John and rebuild everything from scratch because it seems perfectly reasonable to apportion commitment fees from this one across some of the other acquisitions but it means none of the numbers line up neatly and, you know, I'm a ..... so I like things to match up really nicely and of course they don't.  So the idea is yes, some of that gets broken up and apportioned to the other acquisitions included on there which is why I think one of them is 5.3 in the accounts instead of five even but I – you know, if we can agree the big issues, minor issues about the apportionment of the commitment fees services and the basis on which that gets spread out, I don't think is going to be too controversial and there's certainly nothing too intellectually difficult about any of that;  it's just a matter of explaining why nothing particularly lines up.  Now - - - |
| 40 | Wright | And that sort of thing, Alan .....  program manager, has been dealing with people in Turkey at Al Baraka.  It's definitely the Turkish Al Baraka website but whether they have any other dealings with Mr Ferrier I have no idea.  All I know is I've got this offer and I believe it's right and if they haven't – what they've done internally, I have no idea, but we have the people there and we have been dealing with the people there and I can pass all that info. |
| 45 | Sommer | So we've got the software.  We've got that line 2 there, line 3 there we've got.  Line 1 is not due for performance yet.  Line 4 technically isn't due for performance yet but it would be fair to say that reasonable minds have suspicion as to whether or not that's going to be performed in accordance with the terms of that contract such that we've engaged litigators to secure what performance we can. |

CONFIDENTIAL

DEF_00051804

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | What it looks like and what we have information from at the moment that we would be happy to hand over is there are three directors at Payne who have a history of pump and dump schemes as well.  Just on the first, when I signed my contract, they bought up massively.  When it was depressed they issued a "everything's terrible" release.  Then, when I signed my contract, on the day of, they started buying even though there was a stop order, so I don't know how they bought.  So they weren't meant to be doing anything until releasing the fourth but they – whatever.  And then when the final contract came through with Mark and everything like that, everyone did the – waited and then sold at really high prices and that was, like, a 300 per cent increase and they made about another 20 million that way. |
| | Sommer | Yeah.  And that's the subject of ..... being taken. |
| | Chester | Which we're happy to help you with if you would like to explore. |
| | Wright | And from my point of view those action – you know, if we can get someone tied into Payne then we can try and recover something there because - - - |
| | Sommer | That's about making sure that we get the .....  We paid for it.  It hasn't failed yet.  We're a bit squeamish about it, given some of the changes in character and the disappearance with Ferrier at different banks. |
| | Wright | Again |
| | Sommer | And just to be clear, because Mr Ferrier – people by the name of Ferrier are, you know, scattered throughout the tax world.  We're talking about a completely different Mark Ferrier to the one in charge of tax ..... or special projects and - - - |
| | Wright | The one whose dad's a rather high-profiled - - - |
| | Sommer | Yep. |
| | McMaster | Yeah. |
| | Sommer | So – right.  So we have got those details of the payments that were made in satisfaction of those tax invoices so 245,000 bitcoin on 30 August and 135,000 bitcoin on 15 September.  Again, no bitcoin transferred directly by Dr Wright to Hotwire and Coin Exchange.  Bitcoin was transferred for a trust ..... the trustee of which I believe is the entity by the name of ..... Limited. |
| | Wright | Not any more. |
| | Sommer | Not any more.  Right. |
| | Wright | We changed the names of the two companies. |
| | Sommer | Okay.  So it's the - - - |
| | Wright | To ..... and Coin. |
| | Sommer | Right.  So it's the same company, it has just got a less weird name.  Yes? |
| | Wright | Now you've - - - |
| | Sommer | I'm not doubting it was designed by .....  It's just one of those names that - - - |
| | McMaster | So there was a separate transfer of bitcoin to Al Baraka? |
| | Sommer | There was a transfer of bitcoin to the wallets nominated by Ferrier so he nominated wallets into which the money should be transferred.  We asked for confirmation and we received confirmation from Ferrier that all the transfers had gone through and all was tickety boo. |

CONFIDENTIAL

DEF_00051805

Interview Conducted with Craig WRIGHT

|  | | |
|---|---|---|
| | McMaster | Okay.  So that amount up there includes the Al Baraka? |
| | Sommer | All of it. |
| | McMaster | Okay. |
| | Wright | Yeah.  That was - - - |
| 5 | Sommer | So - - - |
| | McMaster | And that all went to Ferrier? |
| | Sommer | Yep. |
| | Wright | My - - - |
| | Sommer | As I understand it those - - - |
| 10 | McMaster | Okay. |
| | Sommer | Those amounts should line up to the totals invoiced on each one. |
| | Wright | My understanding was Mr Ferrier didn't actually want any bitcoin.  He wanted the monetary value that he was going to get from these other guys for doing all the stuff, these things, so he was going - - - |
| 15 | Sommer | We weren't involved in paying Ferrier. |
| | McMaster | Sure. |
| | Sommer | Whatever Ferrier got he got from Al Baraka. |
| | McMaster | Okay. |
| | Wright | All he had to do was ..... |
| 20 | Sommer | From the other people that we had paid into the wallets that were nominated by him, got confirmation we've got the software keys, got the downloads and the, you know, source code that we needed. |
| | McMaster | Exactly.  So we would be able to get those wallet address, I would presume? |
| | Sommer | I've got them with but - - - |
| 25 | McMaster | Later on - - - |
| | Sommer | - - - subject to – in fact, I think they've been provided but again let's try and do it in a cohesive way and - - - |
| | McMaster | Yes. That's okay. |
| 30 | Wright | They go right back to July where I did the – these are my things and whatever and I did actually tell someone but it's like everything you tell random people at the Tax Office what you're doing and - - - |
| | Sommer | Unsurprisingly - - - |
| | Wright | - - - it goes randomly into buckets of - - - |
| 35 | McMaster | Well, there are 26-odd – well, 20,000-odd of us floating around so that could easily happen. |
| | Sommer | Because of the enforcement proceedings that we are preparing in case it's not – the gold one is not performed in accordance with ..... my litigation colleagues have all those records being dug out and - - - |
| | McMaster | Excellent. |

CONFIDENTIAL

DEF_00051806

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I'm happy to share all the litigation stuff that we have, that we are chasing ..... with, if we can actually find him again because he seems to have vanished again. |
| | Sommer | Okay.  So any questions about any of that?  Do you need to change - - - |
| 5 | McMaster | No, it's good for another 15 minutes. |
| | Sommer | Okay.  Good.  This is going to make riveting listening. |
| | McMaster | Well, the Aus transcript person is going to love it. |
| | Sommer | Excellent.  I always – you know, my students sometimes hate my lectures and just cannot understand why it is unless they're suffering from, you know - - - |
| 10 | McMaster | Insomnia? |
| | Sommer | Sleep deprivation. |
| | Wright | I did my best to try and hide the fact that I've been running bitcoin since 2009 but I think it's getting – most – most – by the end of this I think half the world is going to bloody know. |
| 15 | Sommer | Yeah, well. |
| | McMaster | So your mining would have started at Lisarow, at the server farm? |
| | Wright | Lisarow was part of it where you have the garage full of computers and the other was at Bagnu. |
| | McMaster | Okay. |
| 20 | Wright | That's why we had that big fibre cabling put in and - - - |
| | McMaster | Yes, you want to speed. |
| | Wright | Yeah.  And we changed the – the whole area.  Like, Telstra is not going to do anything for the area.  No wireless or whatever else it was – a community of 20 people so "stuff you" basically. |
| 25 | McMaster | Yeah. |
| | Wright | Until we put the fibre in and suddenly ADSL and everything ..... |
| | Sommer | Okay. So a similar situation.  So we've been through Hotwire in detail. |
| | McMaster | Yep. |
| 30

35 | Sommer | So a similar situation now of understanding at lodgement – a revised understanding – oops, sorry.  There's twitching in my fingers.  I need more caffeine.  Right to have bitcoin transferred, issue of shares, essentially the same.  Exactly the same pattern in relation to it.  It just seems that for – as you see there, which we did and those wallet addresses, I'm instructed, were overseas and were in Africa and seemed to have been effectively at the direction of Al Baraka and our informal – our contractual arrangements were with Al Baraka and it seems that the money that went to Ferrier went to Ferrier from Al Baraka.  So they collected all the money and then, "Here's your cut" and - - - |
| 40 | Wright | I got told, "This is how, you know, we do it.  This is how we check.  This is where they go.  This is what we're doing". |
| | Sommer | Yep. |
| | Wright | And my understanding - - - |
| | McMaster | So would that have – sorry to interrupt.  Go on. |

CONFIDENTIAL

DEF_00051807

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | I was going to say my understanding was - somehow he got paid.  He got – I don't know what his cut was or anything like this but – or even if he got paid in Australia.  All I know is he supposedly got paid into a trust somewhere. |
| 5 | McMaster | Okay.  So the Siemens and the Al Baraka one would have went to different wallets and the personal services - - - |
| | Wright | ..... |
| | McMaster | - - - and the gold - - - |
| | Sommer | There's a series of recipients but they don't – as I understand it they don't line up with each of those line items there. |
| 10 | McMaster | Okay. |
| | Sommer | They line up – those two transfers there line up with the invoiced amounts. |
| | McMaster | Okay. |
| | Sommer | The total invoiced amounts rather than the line items. |
| | McMaster | Okay. |
| 15 | Sommer | So we were – because we were told, dealing with MJF, put the money here in satisfaction of the invoice that MJF had issued to us, and we did. |
| | McMaster | Okay. |
| | Wright | I could explain it slightly differently but I think I will confuse the buggery out of everyone. |
| 20 | Sommer | Is what I said right? |
| | Wright | Right at what level?  Right at my level or right at - - - |
| | McMaster | Let's try our level. |
| | Wright | It's sort of right.  It covers things and yes, but is it actual – exactly how the things occur? |
| 25 | Sommer | Does it correctly describe the legal relationships? |
| | Wright | From a lawyer's point of view, yes. |
| | Sommer | Thank you.  I will take that as endorsement.  Right.  So again that's just the text describing what's on the previous slide so – all that.  I haven't finished this one yet.  Like I said, this is all a work in progress as I'm still trying to isolate the similar issues in relation to the Wright Family Trust.  I think there are clearly some software transactions between it and Hotwire Coin Exchange which is effectively the proceeds of the Supreme Court, New South Wales Supreme Court action which seems to have been broken up and transferred out of the Wright Family Trust.  My understanding, and we are being totally frank here – it is my understanding of those proceedings that they seem to be by Dr Wright personally and may have involved Dr Wright personally getting them and then on-supplying them to the Wright Family Trust.  I'm not entirely certain that's the case.  I would need to get clarification from my client as to that but I think that's one of the things – but that seems to be one of the inter-related party transactions that's going to go around in loops and circles and whichever way we look at it it's probably not going to produce any net tax across the different entities.  Yes, one entity might end up owing something and the other one will have an offsetting credit but I'm trying to aggregate stuff as much as possible for the purposes of resolving concepts and then we can try and line up ..... |

CONFIDENTIAL
DEF_00051808

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | And part of the whole finalising ..... and whatever else was my wife – now – made the comment that if I don't clean these up and get them out of the way then she doesn't marry me so – so we settled for – without going after any directors.  We settled without a whole lot of other things and with the understanding that if I wanted to get married I get the bullshit out of the way. |
| Sommer | Fair enough.  Okay.  Denariuz.  Now, this is the only one where we've actually got an actual transfer of actual bitcoin, just to show that we actually do have them, and this is the one that was done as I understand it after the 23 December 2013 private ruling was issued to us.  And the intention of the parties was to demonstrate the way in which this would operate, and I think just by aside this does demonstrate why treating it as money is a much better idea.  So if you've got a sale of $38 million worth of bitcoin from the Wright Family Trust into an Australian registered entity it then takes that and then, you know, if you've got an output tax liability in relation – from the trust, input tax credit entitlement for the Australian company who then sells the bitcoin to a non ..... not carrying on an enterprise in Australia you've got an input tax credit entitlement in Denariuz that's not offset by any output tax liability because you've got a GST-free supplier on the way out and you've got a massive – like $19 million is a $1.9 million refund because you've sold half of the - - - |
| Wright | ..... |
| Sommer | - - - bitcoin rather than all of it.  If we had sold all of it we would have, you know, effectively a $4 million refund due to Denariuz and no output tax liability.  I just think that's inexorably the consequences of the 23 December ruling, that if you're going to treat it as a taxable supply, you know, you're going to have these very lumpy transactions that are going to give rise to a whole lot – you know, I could preach for hours on the fact that it's a consumption tax - - - |
| Dolevski | So, Andrew - - - |
| Sommer | - - - and there has been no consumption so - - - |
| Dolevski | So, so far in the Wright Family Trust only interest to the trust that actually owned or - - - |
| Sommer | I can only assume - - - |
| Dolevski | How did the bitcoins then get into the Wright Family Trust - - - |
| Sommer | This is the - - - |
| Dolevski | - - - for them to be able to sell them - - - |
| Sommer | This is a question I haven't asked, that I – I can only assume that they called for a transfer to them absolutely of part of the interest that they hold in those trusts. |
| Dolevski | Well, that's the part we would need substantiated for obvious reasons. |
| Sommer | Understood but they haven't lodged their BAS for that tax period yet and so we will no doubt get to that in due course. |
| Dolevski | So that will be in the January quarter? |
| Sommer | No, no.  That will be in the December that - - - |
| McMaster | No. |
| Sommer | It will be a 28 February BAS. |

CONFIDENTIAL

DEF_00051809

Interview Conducted with Craig WRIGHT

| | Dolevski | Their quarter - - - |
|---|---|---|
| | Sommer | 28 February. |
| | Dolevski | Their quarterly lodges so, yeah, February. |
| | Sommer | Yeah, yep.  28 February.  28 February BAS. |
| 5 | McMaster | Yep. |
| | Sommer | So, yeah, that's something that will have to be addressed shortly, included in the return that's lodged for the 31 December - - - |
| | Wright | And the idea there was not to – just as a demonstration, yeah, and one that I think ..... the tourist refund scheme ..... |
| 10 | Dolevski | Well, I mean, with those export – I mean, we – you know, that's clear legislation in terms of - - - |
| | Sommer | I know, but - - - |
| | Dolevski | - - - products that are exported are entitled to the ITC scheme but - - - |
| 15 | Sommer | It's just - my point is this:  creating these lumpy supplies where there's no actual consumption where, you know, it's basically – you know, moneys are ..... value and what we've done is move a ..... value from one entity to another entity or a third entity where it retains its value without any consumption and you've got – the whole idea of the consumption tax is not to drag that sort of transaction into the system and by treating as something other than money, that's what we're doing.  And I take ..... entirely that, you know, that – refunds, sure.  And if it was $38 million worth of goods I wouldn't have a problem but it's $38 million of stuff that can't be consumed - - - |
| 20 | | |
| | Wright | But that's why I've made it a paper wallet so that it is a thing. |
| 25 | McMaster | But a paper wallet, if I understand it correctly, is the private key, okay, and you can - - - |
| | Wright | That stores within it, yes. |
| | McMaster | Okay.  And so you would have stored it on a USB stick or something like that or - - - |
| | Wright | No, no, actual paper wallet. |
| 30 | McMaster | - - - you physically wrote it down? |
| | Wright | I physically made a paper wallet containing the keys. |
| | McMaster | Okay. |
| 35 | Wright | And actually took that to the guys at the tourist fund scheme thing and sort of handed it over and said, "This is what it is.  This is how we can validate it and here's the QR code" and they went, "What's a QR code?"  And then I said, "Well, okay.   If we do our phone here, and what you do is you take a photo of it so that you can check later if you can't figure it now and here's what we do" and I stepped them all through it and they called their manager and said, "What the hell is this?" |
| 40 | McMaster | They would have been flustered. |
| | Wright | Yeah, and then we - - - |
| | McMaster | Okay. |

CONFIDENTIAL

DEF_00051810

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Wright | Then we did the 10 million plus bit and then we – "There's no enough digits, sir" and called over someone else and then the whole team got over there and then I held up the line for half an hour and everyone must have hated me - - - |
| | Chester | Anything just to prove a point. |
| 5 | Sommer | I don't think it's – I don't - - - |
| | McMaster | Was that - - - |
| | Sommer | - - - think it's goods anyway. |
| | McMaster | Was that wallet registered anywhere, by the way?  With Blockchain, for instance? |
| 10 | Wright | Is it - - - |
| | McMaster | A registered wallet with Blockchain. |
| | Wright | Yes, yeah. |
| | McMaster | Because I had a look at the invoice you provided to the Customs people and unless I've mis-keyed it I can't locate it. |
| 15 | Wright | You should be able to. |
| | McMaster | Yeah.  It may be that I've mis-keyed it but I will have another go. |
| | Sommer | I don't think it matters in the sense that it's not goods.  I don't care what you – I don't care how much paper Craig creates, it's not goods.  It doesn't qualify but it was transferred between legal people. |
| 20 | McMaster | Yeah |
| | Wright | That's the number down the bottom if you want to take it. |
| | McMaster | That's okay.  I will go back to the invoice that you had on you at the time and if I still can't get it – and it could simply be that I'm keying it in - - - |
| | Wright | I could have typed it wrong in the invoice too because - - - |
| 25 | McMaster | You could have done. |
| | Wright | A capital in the wrong place or - - - |
| | McMaster | Yeah.  It's easy enough. |
| | Wright | But, yeah, the one we handed over had the correct thing. |
| | Chester | They're not like ..... PIN numbers ..... |
| 30 | McMaster | Yeah, they are. |
| | Dolevski | No, unfortunately. |
| | McMaster | Now, we're coming to the end of recording here. |
| | Sommer | Yeah. Do you want to change it and then I will wrap up? |
| | McMaster | Yeah.  I will wait till it stops first. |
| 35 | Sommer | Okay. |
| | McMaster | It has got to go through its process and then we can wrap.  I know, I know. |
| | Sommer | Even the CDs are bureaucratic here.  Sorry. |
| | McMaster | Well, you've got to write them.  What can I say? |
| | Sommer | Oh, that was recorded too. |

CONFIDENTIAL

DEF_00051811

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | That's okay, Andrew.  It won't be held against you. |
| 5 | Sommer | Don't tell James I said that.  Okay.  So Denariuz is the first BAS to be lodged after receiving a private ruling on the bitcoin transaction ..... blah, blah, blah, we've done all of that.  Transfer the supply from Denariuz Australia to Denariuz Singapore is going to be GST-free ..... liability ..... and all of that.  Okay.  So where are we?  Clearly, revisions are going to be necessary to all the BASs that we've lodged.  Some transactions are uncontroversial and should give rise to immediately available ..... day-to-day transactions ..... stuff and we intend to buy a lot of computers and we intend t buy, you know, a lot of those sorts of things in order to ..... but, you know.  Day-to-day transactions we paid cash out of the entities and it's all fairly simple. |
| 10 | | |
| | Wright | We just like ..... |
| 15 | Sommer | Some transactions are more complicated but still give rise to the import tax credits and net input tax credits such as the MJF transactions, they need to be documented properly into the BASs.  Some transactions need to be removed ..... So where some of the ways in which I think the BASs have reflected some of the transactions needs to change.  So what would we want?  I would like to reach an agreed position in relation to these transactions that we can then sit down and it really should only be a matter of a couple of hours to sit down with someone to work through how these BASs should be re-lodged and have the Tax Office happy with them so we can say, "All right.  Here's the principles.  Let's apply them to these transactions".  As John said, I think there's about a hundred transactions and so get them into the right BASs.  Let's get them in and get them lodged and correct the issues and then we can then have the agreed principles for the lodging of future BASs so we don't have to do this again.  And then the third point there is to continue dialogue about the treatment of bitcoin, whether it should be treated as money, because that's not critical necessarily to the resolution of the BASs and I think subject to the discussion before we're probably happy to re-lodge the BASs on that basis, on the basis that bitcoin is money but because we've been dealing with subsidiary interests, apart from Denariuz, they're minimising a number of taxable supplies that actually occurred of bitcoin but, as I say, it's critical to the business that the guys want to do that we try and convince you guys that it's money, but that's more from a broad policy perspective rather than an immediate audit perspective.  And that's really it.  So - - - |
| 20 | | |
| 25 | | |
| 30 | | |
| 35 | | |
| | Wright | The other bit I've offered a few times is if you have anything that you want to do with Mr Ferrier – I know I can't get any information on other taxpayers but there's nothing stopping me from giving you information.  I'm happy for - - - |
| | Dolevski | True, there's nothing stopping you from giving us information. |
| 40 | Wright | No.  So I'm happy for Nick - - - |
| | Dolevski | Everyone's entitled to make a dob – you know, dob in or whatever - - - |
| | McMaster | Well, they call them Turks. |
| | Dolevski | Dob in a Turk. |
| | Sommer | So - - - |
| 45 | Wright | I'm not friendly with the guy at the moment so I'm happy to give over anything.  Trust me. |
| | McMaster | Understandable. |

CONFIDENTIAL

DEF_00051812

Interview Conducted with Craig WRIGHT

|    |          |                                                                                                                                                                                                              |
|----|----------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|    | Sommer   | And simply as a by-product if you like of some of the heat and light and frustration that seems to have gone on, I think we would like to have an independent person come in and assist with the preparation of those revised BASs. |
| 5  | Dolevski | So, Andrew, would you be proposing that your firm put the revised BASs together?                                                                                                                              |
|    | Sommer   | No, I'm not a BAS agent.  I don't do that sort of stuff.                                                                                                                                                      |
|    | Wright   | Have someone who does it.                                                                                                                                                                                     |
|    | Sommer   | No.  John will sit - - -                                                                                                                                                                                      |
| 10 | Dolevski | Well, it would actually need someone to provide the information and we've got – I mean, who I'm thinking of is Andrew.                                                                                         |
|    | McMaster | Yeah.  He would be a good person and he's independent of Selso so it's not a problem.                                                                                                                         |
|    | Sommer   | Andrew?                                                                                                                                                                                                       |
| 15 | McMaster | Miller.                                                                                                                                                                                                       |
|    | Sommer   | Okay.                                                                                                                                                                                                         |
|    | Dolevski | He's from Parramatta and he's from our audit area.                                                                                                                                                            |
|    | Wright   | What I would like to say is - - -                                                                                                                                                                             |
| 20 | Dolevski | Because, I mean, I don't think it's – there's no bias here in terms of – let me put that on the table.                                                                                                        |
|    | Sommer   | Yep.                                                                                                                                                                                                          |
| 25 | Dolevski | There's certainly not bias in terms of the way these audits are being conducted.  I think there has been a lack of clarity and understanding and even what we thought we actually had understood and we had put our own structure together from what we could put together - - - |
|    | Sommer   | Yep.                                                                                                                                                                                                          |
|    | Dolevski | But - - -                                                                                                                                                                                                     |
|    | McMaster | This is what we thought it was.                                                                                                                                                                               |
|    | Dolevski | But it was all pretty much around bitcoins.                                                                                                                                                                   |
| 30 | Sommer   | Yep.                                                                                                                                                                                                          |
|    | Dolevski | I have to say that I think we haven't been too off the mark in terms of - - -                                                                                                                                 |
|    | Wright   | One for John.                                                                                                                                                                                                 |
|    | Dolevski | - - - how things have flowed.                                                                                                                                                                                 |
|    | Sommer   | Yep.                                                                                                                                                                                                          |
| 35 | Wright   | Yeah.                                                                                                                                                                                                         |
|    | McMaster | But obviously that's no longer the - - -                                                                                                                                                                      |
|    | Dolevski | But I think - - -                                                                                                                                                                                             |
|    | Sommer   | No, no, no.                                                                                                                                                                                                   |
|    | Dolevski | No.                                                                                                                                                                                                           |
| 40 | Sommer   | And we're not .....                                                                                                                                                                                           |

CONFIDENTIAL

DEF_00051813

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | But I think from my perspective – and Andrew is the one that, you know, independently took all the information and, with another officer - - - |
| | McMaster | And prepared this flowchart. |
| 5 | Dolevski | - - - you know, assisted him and prepared this so I think with now at least having that background - - - |
| 10 | Sommer | Yep.  I think my – I'm instructed to request as humbly as possible that we move away from Parramatta and that may simply be a matter of perception rather than anything else but given some of the complicated history and particularly given some of the difficulties with some of the previous interactions with the Tax Office prior to these issues we would ask if it's at all possible to have it transferred to an audit team in a different ..... |
| | Dolevski | Well, all of the audit teams reported to me so - - - |
| | Sommer | I don't - - - |
| | Dolevski | Yeah. |
| 15 | Sommer | That would be something we would appreciate. |
| | Dolevski | Okay. |
| | Sommer | With the greatest of respect to the team that has been doing it it would give an additional degree of comfort to the taxpayer to have it relocated to a different team. |
| 20 | Dolevski | Even though we're now talking about a pure revision of BASs? |
| | Sommer | Yep. |
| | Dolevski | Accepting the ATO view and purely - - - |
| | Sommer | Yep. |
| 25 | Dolevski | - - - advising the BAS is based on that, you would still feel uncomfortable with - - - |
| | Sommer | I wouldn't put it like that - - - |
| | Dolevski | We would remove Selsa as the - - - |
| | Sommer | - - - but I would say I would feel more comfortable - - - |
| | Dolevski | Well, your request – yep. |
| 30 | Sommer | - - - if it was in one of the other offices, is what we're requesting. |
| | Chester | But ..... what we can do, though, because we're using zero ..... base, we can do it anyway ..... we just sit there and do it, just – I don't know .....  It doesn't have to be one of these .....  We could do it in this room ..... |
| 35 | Wright | And, see, you've got here, "Have not even acquired it yet".  I mean, I've already - - - |
| | Sommer | ..... |
| | Dolevski | Yeah.  It has been – we acknowledge that it's – yeah. |
| | McMaster | Well, it's based on what information we had. |
| | Wright | Yeah. |
| 40 | Dolevski | We've had misunderstandings and - - - |

CONFIDENTIAL

DEF_00051814

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Look, I would like not to have to do a, you know, line-by-line response to the interim audit report and all those sorts of things - - - |
| | Dolevski | No.  We were just - - - |
| | Sommer | If we can withdraw that and then, you know ..... |
| 5 | Wright | And the other bit is - - - |
| | Dolevski | So, Andrew, just on the interim report, though - - - |
| | Sommer | Yep. |
| | Dolevski | Well, I suppose it's riddled with reference to ..... isn't it? |
| 10 | McMaster | Well, it is. What has been presented today - - - |
| | Doa | Yeah. |
| | Dolevski | It's factually incorrect. |
| | McMaster | What has been presented today is factually incorrect, yeah. |
| | Dolevski | Instructions that have been put forward today ..... in light of those. |
| 15 | Sommer | Yeah. |
| | Dolevski | Agreed that the facts are wrong. |
| | McMaster | Totally. |
| | Dolevski | Okay.  I hear what you're saying and I still think it's a little bit unfair to judge the auditors based on the information they weren't given. |
| 20 | Sommer | No, no, no, it's not so much that.  It's just that the point – and we're not saying that they're – we're not making any allegation of impropriety.  It's merely – I think it would be seen as a nice fresh start if we could start in a different office ..... |
| 25 | Dolevski | It's just the timing aspect.  We would lose so much time with people that, you know - - - |
| | Sommer | I understand that but it would be - - - |
| | Dolevski | - - - have to come to grips of - - - |
| | Sommer | In many ways it would be nice to start with people who start afresh with what we now understand to be the way in which it happened ..... |
| 30 | Chester | But they're not going to review any of ..... confusion.  We're just going through an audit revision based on an agreed process ..... |
| | Dolevski | Well, leave that one with me. |
| | McMaster | Can I suggest we take it on advisement? |
| 35 | Dolevski | Yeah, absolutely.  We will have to look at it because, I mean, I have to look at what capacity auditors have and - - - |
| | Sommer | Sure.  Understood.  Resources. |
| | Dolevski | There is a – yeah.  There is an element of urgency in withholding refunds. |
| | Sommer | Yep. |
| | Chester | ..... so we would like to get that as quickly as possible. |
| 40 | Wright | And especially ..... of their money so - - - |

Page 35 of 40

CONFIDENTIAL

DEF_00051815

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Chester | ..... |
| | Dolevski | We will consider it.  I mean, that's why I thought Andrew.  You know, he's fresh.  He hasn't done any of this. |
| 5 | Sommer | I mean, but if he prepared those on the basis of the previous submissions then he has already - - - |
| | Dolevski | Well, I mean, but - - - |
| | McMaster | Only the documents received. |
| | Dolevski | Yeah, absolutely. |
| 10 | Sommer | Yeah, and I'm not – and, as I say, I'm not - - - |
| | Dolevski | Yeah.  And this is purely – I mean, we all in this room – we all thought it was bitcoins we're talking about so – I mean, this presentation has certainly shed quite a, you know, different light on things so - - - |
| | McMaster | Dramatically. |
| 15 | Dolevski | Yeah. |
| | Wright | See, but part of this is – I still see it as bitcoins. |
| | Dolevski | Shh.  Yeah. |
| | Wright | You have the lawyer hassling.  I mean, it's rights and - - - |
| | Dolevski | Yeah, but - - - |
| 20 | Wright | I have the technology - - - |
| 25 | Sommer | You see it as ..... until the point you say to me, "Andrew, nothing has ever moved and nothing has ever come to Australia" at which point I have to say, "Is there a taxable supply in Australia", and if nothing is here then I can't apply the nexus tests to that so what has actually transpired as the supply between those two entities?  It can only be, you know, the – you know, what is it, the nemo dat principle, you can only supply what you've got.  They don't have actual bitcoin.  They've only got rights to call for bitcoin.  Those rights came from you.  Those rights subsist against the trusts and that's – again, that's how, you know, I've – I've – Craig's entirely right.  This is my legal analysis of the facts as I understand them, based on what seems to have happened. |
| 30 | | |
| | Wright | See, I have the car in the UK and I had a piece of paper and whatever else and I sold – I – rather than say that I'm selling you a car, it may stay in the UK and everything like that and – but anyway. |
| | Dolevski | It has got nothing to do with tax in Australia then if you sold that car in the UK. |
| 35 | Sommer | ..... |
| 40 | Chester | What happened is that there's a whole treatment and the – I suppose the response that we got from Craig in terms of information generally has been a paranoia process based on prior experience and ..... taking things out or leave them, in 2010 or whatever it was, off to America and other places was a response to the experience that he had the last time ..... and the way he set things up was ..... |
| | McMaster | Well, the auditors that were involved in that prior one are nowhere near involved in this one. |
| | Chester | Well, you were involved in it. |

CONFIDENTIAL

DEF_00051816

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | McMaster | Well, only as a director, but I wasn't an auditor. |
| | Wright | I guess I gained a little bit of paranoia on that one - - - |
| 5 | McMaster | Look, I can understand where you're coming from, okay, and I can also understand the communication confusion because you clearly see these things as bitcoins. |
| | Wright | I see them as money. |
| 10 | McMaster | You see them as currency and you treat them in the same way and when you talk to us about them, that's how you talk about them and, unfortunately, that has created a confusion around what actually occurred, and that's all that me as a director and Marina as my Assistant Commissioner are trying to clarify. What are the true facts here and if at the end of the day you've got a refund, you've got a refund.  End of story.  You're entitled. |
| 15 20 25 | Sommer | And all we're trying to do, all I'm trying to do is, you know – you know, if I was a nefarious litigator – and I know lots of them – there's nothing I would rather do than run a declaratory proceeding against you guys about ..... money.  However, with Craig and John in their current situation that's going to tie more of their money up and, you know, I don't work for free, and that's not going to progress things.  I would rather come to you guys and say, "Look, listen, the whole treatment of bitcoin is not what we anticipated but if we actually look at what you've said and try and make it work" – and I'm a big fan of trying to make things work as far as we can.  We can always ..... you know, when you guys lose in the Federal Court and, you know, you decide not to appeal and bitcoin is money, we can always go back and revise the BASs again but at least we can make some progress and actually stop this business being strangled, and that's really what I want to achieve.  I just want to actually let these guys escape from under six different audits and try and get back to the business.  That's my objective. |
| | Chester | And whatever ..... so if Andrew's the guy and you vouch for Andrew.  He's the guy? |
| 30 | McMaster | He is a very good top-notch person. |
| | Chester | And make no mistake, there's nothing wrong with Selsa. |
| | McMaster | Yep. |
| 35 | Chester | We've had some good work with Selsa.  The problem is the way that he received things at the outset was ..... and we tried to explain on many different occasions and there was no – the difficulty is that it's – for all of us, that we're dealing in cyberspace and the problem with cyberspace is that it's out there some place but – and it doesn't exist, but it does exist;  and it doesn't exist, but it does.  It's like Europe.  The Euro isn't fiat money either.  It's just that people agree that it's money. |
| 40 | Dolevski | But, John, I don't think we actually even need to get confused by that. |
| | Chester | Yeah.  We can ignore it. |
| | Dolevski | You know, I think if we just look at the documents and what they're telling us, that's what we need to form a view on.  Just what Andrew has done, he has looked at, and that's what we need to do as tax administrators. |
| 45 | Wright | Yep.  And unfortunately there was bad timing as well. |

CONFIDENTIAL

DEF_00051817

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Dolevski | What  - you guys get on with your business, we don't need to be involved in; we just need to understand the transactions and then we can see how they apply and what is the relevant tax, if any. |
| 5 | Wright | And unfortunately there was also a bad situation in that just as all this happened the guy who was the CFO of the company, Jamie, had a family breakdown and death and all sorts of fun things and disappeared on me and I'm the first to acknowledge I'm not good at getting things to you guys.  I just dump everything.  I don't structure anything properly and that's ..... job. |
| 10 | Dolevski | Look, I mean – you know.  Anyway, look, I will discuss it with Des but my preference still, and I would strongly recommend that you agree about Andrew.  He's an excellent auditor which is why we actually had him review this and, you know, a very different way of working so - - - |
| | McMaster | Why don't my clients confer and they can - - - |
| | Dolevski | Yep. |
| 15 | McMaster | They can confirm or disavow .....  But, yeah. |
| | Dolevski | But I would love your presentation, please. |
| | Sommer | Yeah, yeah.  I will just – I will clean it up and - - - |
| | Dolevski | I think that's certainly – yeah. |
| | Sommer | - - - get Craig's authority to provide it to you and then I will send it to you. |
| 20 | McMaster | That would be good because we will need that sort of information in what we're doing because we still need to run that past yourself. |
| | Sommer | Yep.  And we've built this up – I mean, John and I built this up yesterday afternoon from the documents so we can provide you with the documents and I've tried to, as much as possible, put them up on the screen for you. |
| 25 | McMaster | Sure. |
| 30 | Sommer | So you can actually – because, you know, there's a difference between ..... and making assertions and actually giving you documents so where I've got easy extraction documents to show you I've tried to do that.  There are other documents behind all of that but I was pretty confident that once – if we could actually do this – and thank you for accommodating me with the projector because it – and I just thought if we could do it this way – I'm quite sure everything ..... |
| | McMaster | Visual is so much better. |
| | Sommer | Yeah, well, you know - - - |
| 35 | Dolevski | Which is why we tried to draw - - - |
| | Sommer | Yeah, exactly, and I've got – like, I could – I won't, but I could show you my notes going back from the start of January where I've completely scratched everything out and started again now that I understand what's going on, so - - - |
| 40 | McMaster | Which is what we've got to do. |
| | Sommer | Exactly.  All right.  Well - - - |
| | Wright | And I admit my problem is – I mean, I will point you to Economics 101 which says money is a stored value of blah blah blah and whether the – whatever you say, I will get stuck on that bit and ..... we will get nowhere. |

CONFIDENTIAL

DEF_00051818

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | But we will do is we will drive Michael Harding mad with that and we will try and keep you sane and get the audits process - - - |
| | Dolevski | That would be good. |
| | Sommer | I always enjoy - - - |
| 5 | McMaster | Sounds reasonable to me. |
| | Dolevski | Yeah. |
| | Sommer | I thought you would like that.  All right. |
| | McMaster | Okay. So any other discussion, because I will stop this and start recording it. |
| | Dolevski | Well, Hoa, have you got any questions considering you've come from Perth? |
| 10 | McMaster | Yeah, exactly. |
| | Doa | So did you want us to have another look at the objection right issues? |
| | Sommer | I think you should.  I think you should have a look at those notices. |
| | Doa | Yeah. |
| | Dolevski | Yep. |
| 15 | Doa | Yeah - - - |
| | Sommer | Call for a copy of those notices and actually have a look at whether or not you're happy with them. |
| | Doa | Yeah. |
| 20 | Sommer | Because John sent an email saying, "I can't see where the objection rights are in this because you don't seem to be telling me you need any information. You're telling me you formed a view as to the operation of the law". |
| | Doa | Yep. |
| 25 | Sommer | Tell me where my objection right is and then we will – so don't ..... refer to 8AALZGA and then if you're happy with them, send me an email saying, you know, you've looked at them and you're happy with them and if you're not happy with them then, you know, at least give us something that we can choose to object to if we want to. |
| | Doa | Sure.  Yep. |
| 30<br>35 | Sommer | But all of that, hopefully, if we can – my preference is just to raise that as a systems issue for you guys because I know it's a new provision.  I've never seen these notices before but when I got them I said, "I don't think these work".  But when – and I was involved in the drafting of it.  When we drafted the part ..... you into that section I thought it was a waste of time anyway because, you know, with a good conscious how do I tell the client that they should spend their money on a procedural review rather than answering the damn questions.  So it's always easier just to answer the questions. |
| | Doa | Yeah. |
| | Sommer | So, yeah. |
| | McMaster | Not a problem then. |
| 40 | Doa | Yeah.  And if we could that, that would be really good to review the transactions based on the new understanding.  And with the interim audit reports we will just leave them sitting to the side for a minute? |

CONFIDENTIAL

DEF_00051819

Interview Conducted with Craig WRIGHT

| | | |
|---|---|---|
| | Sommer | Well, probably best to send the letter saying – if you don't mind just sending a letter saying - - - |
| | Doa | ..... withdrawn. |
| 5 | Sommer | "We will withdraw these to reconsider the additional information we've provided". |
| | Wright | And just on a different note, but you want a formal – I'm happy for Nick, who is the litigator, to give you all the evidence that we have ..... to tie that together too. |
| 10 | Sommer | I think that will just bury you guys but if – once we've prepared the brief, because we are – you know, the full brief.  If you guys want a copy of the proof we have against ..... of MJF and so on because it may be of assistance to you in any action you may or may not choose to take in relation to a taxpayer who's not in the room - - - |
| | Wright | And you don't need to give me information about - - - |
| 15 | Sommer | - - - then I suppose we can do that but I think we're still working on putting all that together at the moment.  And if you think that would be useful from a – can I say interest perspective – we can probably do that in due course. |
| | McMaster | Okay. |
| 20 | Wright | Because the current one is – we might have it against the company but we're trying to build a unconscionable conduct-type thing against the individual so that – because if you're just a director you ..... and - - - |
| | Sommer | Okay.  Thank you so much.  I really appreciate - - - |
| | McMaster | Not a problem. |

CONFIDENTIAL

DEF_00051820



 **Dr Craig S Wright** ✔
@ProfFaustus



Replying to @VeryVeriViral

Neither of us mined after 2011 (only just starting again in 2018)

Neither of us mined together. You see, in 2009 there was no mining farms!

The closed there was comes from my computers that ran at my farm.

10:30 AM - 15 Jan 2019

 **CSW** Today at 4:25 PM
**Foundation**

Andrew Carnegie said *"earn as much as possible, give as much as possible"*.

This is the Wesleyan way.

The trust is not mine, I disassociated myself many years ago. The plan is to make a foundation.

My life goal is to increase the value of the bitcoin I mined as Satoshi in 2009/2010 to be as great as possible, this will take decades. I am bot a beneficiary, and I set it up so that the 825k will be used for a purpose. Not one bitcoin in that is to be spent on me. (edited)

  4    3    3    3    3    3    1   ❤️ 1

**From**: Craig S Wright [A]
**Sent**: 4/23/2014 6:14:45 PM
**To**: 'Ira K' [clocktime2020@gmail.com]
**CC**: 'Andrew' [asommer@claytonutz.com]
**Subject**: RE: Questions

Ira,

I have sold all the BTC that I plan to sell for now. In doing what we wanted to do, Dave and I arranged for the sale or around 500,000 BTC so that we could have access to Core Banking software. The rest that I hold are in trust. The terms of that trust are not met as yet and make if I was to break it, I would also cause the tax liability to fall and that would result in over 50% of the total being owed in taxes – a result that would drop the price to about nothing and leave nothing. I will not do that. I will not collapse years of work for anyone or anything.

Dave  and I decided to start Coin-Exch so that we could lock in some of the value. When we started planning this, it was late 2012. We locked in the value of the software based on the price of BTC then, which was less than now and if it was a year later we would have been smarter, but we took the option to cash out. That was Dave. If we had waited even 3 months the value would have been 5 times more.

No, I am not doing this as I think it is going to make me a trillionaire. I am working to make a system that is fraud resistant. One that does not allow printing money and fractional reserve banking. No inflation and no federal reserve BS.

If you read the terms of the Judgement from the court, I did not receive Dave's Bitcoin. I accepted the software Dave was developing for me. We had already exchanged this before he died. It is software that I started working on in 2003. Dave completed it for me after we split things up. He did this contracting other people.

I locked in the R&D amounts based on Dave's convincing me that was best. I am willing to take risks far more than him, but to me, this will work or I will die trying.

I thought Dave just wanted to have some time to work less. That he was planning on taking some time off and doing some relaxing and travel. He told me repeatedly that he was fine. He said the VA Hospital was covered as he was a vet. He said that he was all good. He wanted some cash to be able to do some other things he planned and we did talk about the exoframe idea. I convinced him that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us time.

I told him again and again that the wait is worth it. I gave him the figures and stated that he could have sold the amount I would leave him with. I wanted the software. That is what this is and always was about for me. With it, I can complete what I have worked on for 11 years now.

My eggs are not all in one basket. They are now tied to the Research funding as well.

I did the court action to ensure that the value was accepted. Not to force you, the estate etc into giving me anything, but to ensure I had a value against the software that I had received already.

I assume you know nothing of how Dave funded W&K?

I sell myself to gaming companies. I am a security professional, cryptographer and programmer. I wrote software and designed systems that created and became Lasseter's OnLine Casino. I worked with Playboy Casino. I did coding for Centrebet, Sporting Bet, BetLife etc.

In 2010 I gave the source code for a good number of online casinos to Dave. Hence Panama. I put him in contact with the people at Playboy. He used this code to fund the work, research etc.

DEFAUS_00119167

I have files of Dave's that I cannot access now. These are TrueCrypt partitions. We held backups for the other, but no passwords. I cannot access these. If I cannot finds a key or a password on these, I do not believe that I can on yours. Dave was smarter than I was in some ways. He broke his wallets into many 50BTC sized addresses. I left several large addresses that are not easy to move without making the world notice.

Dave estate is only worth 12 million IF you want to cash out right now.
IF you stay, you get the value AND the shares.
I will list these in coming years and THEN they are worth more.

"Craig's worth valued at $500 million"
There is a trust as I noted. Less than 200,000 Bitcoin remain. We need 100,000 to make the bank idea work. I cannot touch these yet even if I want to. And right now, I do. That stated, I will not move more now in any event. Dave held more and MtGox held some. I see both those sources as lost. Dave's drives are a one day possible. Each year, it is possible to crack more than double the key length that was previously possible. What I know of Dave's passwords places them at around 80 bits. We can expect them to be worth trying to crack in 10-12 years. Spending the next 5 years on this is going to cover 5-10% of the possibilities at a large cost. This is how crypto works.

What company owns right now is:
- Software – incl source code and perpetual licenses valued at over $50 million.
- Intellectual Property, design, codes etc
- Research claims

If we reinvest the Research rebates, we get 45% back in the following year. The program has been approved for three years and locked in using an advance finding. This means, if we take the existing spend, we will get the following each October:
- 2014     $12 million base
- 2015     $12 million base plus the 45% from 2014 reinvested = 17.4 million
- 2016     $12 million base plus 45 % of the 17.4 Million (prior year reinvested) = $20 Million

That comes to around $50 million cash over three years. Of this, I will drive 30 million back into the company and leave the last return as a wait and see if this all fails.

In 2016, Dave's estate gets 8 Million PLUS still has a share of the company.

IF you want, I will arrange that you can pull out. In this case, the following occurs:
- 2014     $12 million base – 4 million to Dave's Estate  after costs plus 4 million from share sale (well I will try).
- 2015     $12 million base plus the 45% from 2014 remaining million reinvested = 17.4 million and 4 million to Dave's Estate  after costs.
- 2016     $12 million base plus 45 % of the 17.4 Million (prior year reinvested) = $20 Million with 4 million to Dave's Estate  after costs.

Here, in 2014, 2015 and 2016 the estate gets $4 million a year, but that is it.

If you do the latter option – I will raise funds to cover the shortfall using your shares, so I end in the same position expenditure wise.

You can be a part of it and get paid. I offered this already.

You are talking of greed to me. Right now, I have told you that you can cash out at 4 million a year for three years or see where this goes and have a payment of over 8 million plus a large share of what will be a listed company. That is with risk. 12 Million without.

W&K used my software to fund everything.

DEFAUS_00119168

If you think I will give up the software I have received from this and pull what Dave and I have worked years to put together you are mad. I will make this open source before I end it. If that happens, nobody makes anything. Not me, not you , no one.

I am working on this no matter what. The amounts are locked in ONLY because of Dave. He wanted certainty. He wanted to make sure we had something now. I did this and have structured it so that we have this money now. We did this early and the increase in BTC has been a loss really.

The software (including banking software) has cost over 50 million alone. When I contracted for it, it was when BTC was worth $116.

IF Dave and I did not start this when we did and waited 6 months (not that Dave could have) we could have used 10% of the Bitcoin we held to do this. So, NO I will not move more now. If you get access to Dave's drives, then you can move those. I am not in a rush. In the next few months, the company will get money in AUD$ and I will STILL not be taking it other than to repay bills used in this process.

When Dave and I planned this, the ENTIRE holding, his, mine and that in trust was worth 20 million.

What Craig is worth in 10 years is up in the air, but I WILL drive 99% of this (my share) back into the project. What you do is your choice. I will negotiate this, I will allow you to work with it as Dave's heir, but I WILL NOT give it up.

So Ira, the simple thing is do you want to be a part of it or to be paid out. I have spent the money. If you want, fight me and have a copy of software that will be of little use without the parts we have completed since.

ALL I have is in this. EVERYTHING. If you want to not be a part, then I will provide Dave's estate with its due. If you want to be a small part, then be a small part, if you want to be all in, then work as if you are.

There are no other options. Unless you can access Dave's drive, then the BTC Dave held remain locked away. The ones I spent in doing this are spent and there is NO way to unspend them. The ones in trust are there for a purpose and I selected a jurisdiction that cannot be forced to give them over. Not even if the US government tries to make me.

So, as I have been saying, do you want to be a part of this? This is either as a silent shareholder or as a director. I have offered both. Or do you want to argue the point? There is no more to get and if you know my history, I will make sure that everything ends up completely worthless before I lose what I am doing.

Ave did not want to ta $4million a year from this. He wanted something to live on. He never asked for more. I am not taking that much, but that is YOUR choice. There are options, but one thing I will not do is give over the software or end this.

Dave bullshitted me about how he was doing and worked himself ragged. He lied to me about what he needed. There is NO WAY that I am stopping this now. I owe this to Dave and I will NOT give it up even to make Ramona's life simpler and I love her.

So, do you wan to know more and be involved or do you want to argue it and I will end up making it completely open source if I lose and then in place of the share I agreed with Dave you can have 100% of $0.


Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 3:38 PM
**To:** Craig Wright
**Subject:** Re: Questions

DEFAUS_00119169

Please explain to me what is stopping you from selling some?
Just because you think it will be worth trillions?


On Wed, Apr 23, 2014 at 1:37 AM, Ira K <clocktime2020@gmail.com> wrote:
It's not a matter of not believing in your abilities. I absolutely do.

But that doesn't mean something shouldn't be taken off the table.
Just like trading stocks, you have to know when to take a profit
and let the rest ride. No need for all eggs in one basket.


On Wed, Apr 23, 2014 at 1:33 AM, Craig Wright <craig@          > wrote:

And yes. Worst case

On 23/04/2014 3:31 pm, "Ira K" <clocktime2020@gmail.com> wrote:
I am trying. But from what I understand so far, you are placing his value
in a gambled situation and worst case scenario, 12 million?


On Wed, Apr 23, 2014 at 1:28 AM, Craig Wright <craig@          > wrote:

Before you go off on rash paths.... Try ans understand what. Is therre

On 23/04/2014 3:24 pm, "Ira K" <clocktime2020@gmail.com> wrote:
54k of coins could be mined in a few months with your operation if you still have it running.
Or your new venture's success will recoup this payment.


On Wed, Apr 23, 2014 at 1:20 AM, Ira K <clocktime2020@gmail.com> wrote:
I don't understand your hesitancy. You know he was worth the amount I am asking.


On Wed, Apr 23, 2014 at 1:19 AM, Ira K <clocktime2020@gmail.com> wrote:
I told you, I don't want to end up on the same sword as Dave.
He had faith. It doesn't always pan out.


On Wed, Apr 23, 2014 at 1:18 AM, Craig Wright <craig@          > wrote:

Then have faith

On 23/04/2014 3:17 pm, "Ira K" <clocktime2020@gmail.com> wrote:
He is worth more than that.


On Wed, Apr 23, 2014 at 1:16 AM, Craig Wright <craig@          > wrote:

Then take the 12 million and go

On 23/04/2014 3:12 pm, "Ira K" <clocktime2020@gmail.com> wrote:

DEFAUS_00119170

Look where it got Dave by holding on for too long.
Timing is Everything.

On Wed, Apr 23, 2014 at 1:11 AM, Craig Wright <craig@ ██████ wrote:

We locked them into cash payment s

On 23/04/2014 3:09 pm, "Ira K" <clocktime2020@gmail.com> wrote:
I simply want the fair share that Dave earned.
You told me you guys had 1 million bitcoins between you.

I was only asking for 54,910. and you could keep all
his drives which may contain more.

On Wed, Apr 23, 2014 at 1:04 AM, Craig S Wright <craig@ ██████ > wrote:

Would you prefer to know what you own or to argue it

You want assets list, balance sheets etc, then ask. You ARE a major shareholder.

You want to be a director and know it intimately – ask I have offered

You want to pull out – then do so and I will pay you out based on what Dave and I had been arranging.

If you want to stay, then do so and come to know more of what Dave and I did.

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:56 PM

**To:** Craig S Wright
**Subject:** Re: Questions

"You have the 40% of the refunds – I get any upside."

DEFAUS_00119171

Can you explain that to me?

On Wed, Apr 23, 2014 at 12:54 AM, Craig S Wright <craig@ ▮▮▮▮ > wrote:

In 10 years I believe this will be 100 times bigger.

But I am serious, if you want to cash out, I will arrange something on the cash

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:54 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Why not take some off the table?

On Wed, Apr 23, 2014 at 12:53 AM, Craig S Wright <craig@ ▮▮▮▮ wrote:

You agree to that – I will have the lawyers draft something for you to have reviewed

I have NOT cashed out

I will not

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:51 PM

**To:** Craig S Wright
**Subject:** Re: Questions

DEFAUS_00119172

I am open to arranging distribution of 10 million a year for 3 years,

but not through a new untested business that you just stated "worst

case scenarios 4 million".


On Wed, Apr 23, 2014 at 12:48 AM, Craig S Wright <craig@⬛⬛⬛> wrote:

This is WHY wed the software transfer!


It locked in payments starting in Oct this year of 10 million a year for 3 years – get it now!


That was Dave – his idea


We turn the BTC into R&D grants as cash!


YOU ARE his estate – I have added you!


**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:47 PM

**To:** Craig S Wright
**Subject:** Re: Questions


Dave would prefer to lock in secured gains that have already been made.


On Wed, Apr 23, 2014 at 12:46 AM, Ira K <clocktime2020@gmail.com> wrote:

There could be a new alternate crypto-currency that comes out and steals the thunder from Bitcoin

and the new business goes bankrupt.


On Wed, Apr 23, 2014 at 12:44 AM, Ira K <clocktime2020@gmail.com> wrote:

DEFAUS_00119173

It wouldn't matter if I had 100%. What if the business doesn't fly?

On Wed, Apr 23, 2014 at 12:43 AM, Craig S Wright <craig@ ▮ > wrote:

Ira – look at the balance sheet – you have 40% of the total worth in it

Do you get that?

NOT 10%

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:41 PM

**To:** Craig S Wright
**Subject:** Re: Questions

I understand, but that is water under the bridge. We can't do anything about that now.

But we can provide his estate with fair compensation for his assistance. If he was

50% partner, or even 33% partner.. he would deserve more than 10% in a unproven

business and undisclosed coins.

On Wed, Apr 23, 2014 at 12:38 AM, Craig S Wright <craig@ ▮ > wrote:

One issue that you have been fed half-truths on.

And yes, there is a lot that is messy from the time. I had no idea Dave was as sick as he was. He told me he was on top of it all. I believed him.

He said it was just a small operation and he would be up again soon, that we would present a paper in June that year. So, yes, lots that was missed.

DEFAUS_00119174

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:35 PM


**To:** Craig S Wright
**Subject:** Re: Questions


Like I said, that is just one issue.. there are so many more.


On Wed, Apr 23, 2014 at 12:33 AM, Craig S Wright <craig@▮▮▮▮▮ wrote:

Check:

- Otto

- Otto Maurer


It is the font


Mine is an image


All that makes it a signature is PGP


**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:30 PM


**To:** Craig S Wright
**Subject:** Re: Questions


It doesn't matter if you create a new font from scratch that looks exactly like the one on the contract.


Each contract has signatures with variations.  It is crystal clear to see.

DEFAUS_00119175

On Wed, Apr 23, 2014 at 12:23 AM, Craig S Wright <craig@ ███████ wrote:

I will need to dig through old emails and documents, but I can show it is a PDF type font.

http://www.adobe.com/content/dam/Adobe/en/products/acrobat/pdfs/adobe-acrobat-xi-esign-pdf-file-tutorial-ue.pdf

That will take time and I will need to look up what font was in there when Dave did this. I will also dig up the PGP signature for you. Dave's public key is out there on the web if you want to validate it.

I assume you know that Dave would not give ANYONE his private key – that includes me.

Andrew is a partner at Clayton Utz. I do not believe he will lie- for all people say about lawyers (sorry Andrew). Ask him – he has received the PGP singed versions.

http://www.claytonutz.com/

I will put all this together for you by the weekend. I will show the font (as noted I need to check what it was as I do not know what Dave's system defaulted to. I am really sorry you have been lead to believe this is something more than it was, but will this help?

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:15 PM

**To:** Craig S Wright
**Subject:** Re: Questions

It doesn't look like a type font.

There are 2 seperate contracts with the same style handwriting, but with slight variations.

On Wed, Apr 23, 2014 at 12:13 AM, Craig S Wright <craig@ ▮▮▮▮ wrote:

Yes.

The PGP key is the signature.

The PDF just adds it.

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 2:10 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Are you saying that the signature was just computer generated, a type font?

Ira

On Wed, Apr 23, 2014 at 12:05 AM, Craig S Wright <craig@ ▮▮▮▮ > wrote:

The document was signed using PGP. That is the digital signature. The other was a PDF thing that gets applied. It was and never was handwritten. The signature is the PGP signing.

Dave's interest is in founder shares in Coin-Exch.

The sale of the software and its use leads to an Research & Development refund into the company. Coin-Exch receives the moved the software and uses it for an R&D claim. That is why it was done. This is 45% of the expense.

That is what is obtained from this. That is what the ATO do not like.

Craig

DEFAUS_00119177

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 1:59 PM


**To:** Craig S Wright
**Subject:** Re: Questions


Craig,


It's not about information that they fed me. It's about contracts that you signed and agreements that don't seem logical.


I don't understand why Dave would make that agreement with you for a business divorce. Why would a successful

partnership suddenly seperate and leave one partner with everything of accountable value and the other(Dave) with

only 10% in a future venture and a undisclosed amount of Bitcoins? And the contract (CEWK01 and CEWK03) is

signed the same month of his death and without his real signature. Nor do I believe it to be a digital signature.

It doesn't even come close to his handwriting That is obviously a females signature. Things just don't make sense.


Ira


On Tue, Apr 22, 2014 at 11:48 PM, Craig S Wright <craig@     wrote:

Ira,

Dave died. I did the actions to make sure that the court signed off on what Dave and I planned.


The reason for the transfer is to use the R&D tax credit on the value of the software Dave and I developed.

DEFAUS_00119178

"I thought you appreciated Dave's contribution. "

More than I could express. This was not about screwing Dave or his estate, it was ensuring that we had something solid as Dave died. I did that action as accountants etc advised it was necessary.

I think they have mislead you as to what this is about. There is no GST (tax) on the software Dave transferred, but it is being used by the ATO as an excuse to try and not pay other amounts that are owed.

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 1:37 PM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

The information I have to work with is what you have told me and the documents from the ATO office.

From those documents it appears clear to see a systematic transfer of assets out of W&K back to you.

Up until April 15 I was a complete believer in what you were telling me.  But you never mentioned

any of the actions you were taking against W&K prior to contacting us.

We could start by going step by step through the questionaire the ATO sent me.  But I really didn't think

you would want to get into those details.  I thought you appreciated Dave's contribution.  Helping you

get the government funding to start it all, etc.

If you have more information that I'm missing you are more than welcome to email it to me.

DEFAUS_00119179

Regards,

Ira

On Tue, Apr 22, 2014 at 11:02 PM, Craig S Wright <craig@ ▊▊▊▊ > wrote:

Ira,

I do not know what you have been told, but I think there is a need to go into detail.

Andrew (CC'd) is a tax partner with Clayton Utz. I am happy for you to ask him anything. This is permission for that. I am sure he will give better truth than the tax office. At least more of it and without filtering things.

Dave signed electronically. I have not ever stated that these are his. If I had wanted to do that I would have dug up copies from the old company filings. The ATO and the court had the digitally signed documents. There is a wrapper as the signature.

Dave held his BTC, not me for him.

I do not know what Dave's resignation is. You mention a resignation, I do not know of one. I know what we planned – I not know all of what was occurring in WK.

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 23 April 2014 11:49 AM

**To:** Craig S Wright
**Subject:** Re: Questions

Craig,

Just as Dave believed in your vision and abilities, I share that

same belief.   There is no doubt in my mind that you are capable of

achieving the goals you have set.  And I am still in awe of your brilliance.

However, since receiving the documents from the ATO and spending more time

reviewing them, I feel like there are questionable discrepancies in the

contracts between you and W&K such as Dave's signatures, his resignation,

transfer of all accountable value, Uyen's role of Director, BAA projects, etc.

No need to go into details.

I can understand how you may have felt pressured to take actions to secure

the business you and Dave started.  And the last thing I want to do is

stifle the growth of it.  But I do believe we need to remedy the lopsided

contractual exchange.

As the Executor for the Estate of the Director at W&K I propose we

reach an agreement that Dave himself would approve.

DEFAUS_00119181

Good sir, my request equates to peace and prosperity for all:

1. Return 17% of the 323k bitcoins to Dave's estate.

2. Retain only half our current holdings in Coin-Exch.

3. Remain friends that avoid all taxing troubles henceforth.


And I would still welcome you to attempt gaining access to Dave's drives.

If you are able to find his bitcoin files I would gladly give you half

and invest Dave's other half into your new business.


Sincerely,

Ira


On Tue, Apr 15, 2014 at 9:41 PM, Ira K <clocktime2020@gmail.com> wrote:

Sure, that sounds good to me.


Thanks.


On Tue, Apr 15, 2014 at 9:28 PM, Craig S Wright <craig@          wrote:

I would love you to be involved.


How about we add you once we get the tax audit out of the way and also get directors insurance for you?


**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 16 April 2014 11:17 AM


**To:** Craig S Wright
**Subject:** Re: Questions

DEFAUS_00119182

Honestly I don't know. I'm not sure what obligations must be met as a director?

If it jallows me to follow what's going on in the business, that would be interesting.

But if you feel it's in my best interest not to be involved with it because it might expose

me to legal liablilities, then I will certainly understand.


Thanks,

Ira




On Tue, Apr 15, 2014 at 8:48 PM, Craig S Wright <craig@ ██████ wrote:

Hi Andrew,

Can you help Ira with this please.


It is hostile everywhere right now. That stated, Dave and I have put far too much blood sweat and tears into this to allow it to fail.


It will be successful, it is just going to take time. So, are you still sure you do not want to be a director of the companies as was offered? You can put up with all this fun day to day ;)


Thanks

Craig


**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Wednesday, 16 April 2014 10:42 AM
**To:** Craig S Wright
**Subject:** Re: Questions


Sure,

DEFAUS_00119183

Andrew can formulate whatever response you are comfortable with and I will send it to them.

Yeah, I have read how Australia and China aren't too bitcoin friendly. With the various

governments putting restrictions on BTC do you feel Coin-Exch can still be successful?

Thanks,

Ira

On Tue, Apr 15, 2014 at 8:13 PM, Craig S Wright <craig@          > wrote:

Ira,

Andrew can help if you want to answer the questions.

He can either formulate a response for you, check yours or at the same time, you can decide not to answer.
You are not an Australian Tax resident, so they cannot force you to answer.

I would appreciate if you do, but do remember, they cannot make you pay anything. It does not stop everyone
being against what Dave and I did.

Even the banks are starting to attack BTC now:

http://www.smh.com.au/it-pro/business-it/nab-severs-ties-with-bitcoin-vendors-20140410-zqt3b.html

Thanks Craig

DEFAUS_00119185

| | |
|---|---|
| **From:** | Craig S Wright <craig.wright@hotwirepe.com> |
| **Sent:** | Saturday, March 1, 2014 8:01 PM |
| **To:** | Ira K |
| **Subject:** | Re: Bond villains |

Around that. Minus what was needed for the company's use

Sent from my HTC

----- Reply message -----
From: "Ira K" <clocktime2020@gmail.com>
To: "Craig S Wright" <craig.wright@hotwirepe.com>
Subject: Bond villains
Date: Sun, Mar 2, 2014 06:42

Just to clarify on thoughts from previous email... In one of the email exchanges between Dave and you, he mentioned that you had 1 million Bitcoins in the trust and since you said he has 300,000 as his part. I was figuring the other 700,000 is yours.  Is that correct?

Ira


On Sat, Mar 1, 2014 at 9:23 AM, Ira K <clocktime2020@gmail.com> wrote:
 Can you allocate 20% to my dad and 80% to myself?

 So if I understand correctly, you have the rights to the remaining portion of Bitcoins stored on one of Dave's drives here?  If that's true we just need to figure out how to decrypt the drives.

 Ira



On Friday, February 28, 2014, Craig S Wright <craig.wright@hotwirepe.com> wrote:

 The trust Dave setup should have around 300,000



 We moved everything offshore as a result of my early fight with the Tax office. This was back in 2011. The BTC would be on a server or hard drive, just the rights are overseas.



 The price is displayed in the diagram below.

1

CONFIDENTIAL

KLEIMAN_00561744



I do not know what was going on with Dave before he died, or if he was taking notice – he seemed distant and we did not talk much in April other than a couple company matters. In the couple months before the end, it finally started to be worth something. Then it crashed just before he died, then it recovered.

I need to allocate shares to Dave's estate. You need to tell me how.

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Saturday, 1 March 2014 12:53 PM
**To:** Craig S Wright
**Subject:** Re: FW: Bond villains

Hi Craig,

I was just noticing the sentence where Dave mentioned Bitcoins were not worth much at the time.

That must be why he never cashed any in.

Do you still have a million bitcoins in the trust he setup?  And do you think there is a chance of finding

CONFIDENTIAL

KLEIMAN_00561745

the bank holding them?  If I can be of help just let me know what you need.  Since Dave setup the trust, perhaps my identification is needed in order to gain access?

Do you know how the bitcoins are stored in the trust?  Are they on a hard drive?

I don't quite understand why it was necessary to keep them in these offshore places.

And are there two seperate trusts?

1.) GICSR Trust in Belize.

2.) Design by Human in Seychelles.

Sorry if I sound a bit confused... it's because I am.  :-)

Ira

On Fri, Feb 28, 2014 at 12:54 AM, Craig S Wright <craig.wright@hotwirepe.com> wrote:

Just some emails from Dave.

**From:** Craig S Wright
**Sent:** Monday, 25 January 2010 2:15 PM
**To:** 'Craig Wright'
**Subject:** Bond Villains

-----BEGIN PGP SIGNED MESSAGE-----

Hash: SHA1

3

KLEIMAN_00561746

Craig,

How does the following sound?

*I very much wanted to find some way to include a short message, but the problem is, the whole world would be able to see the message. As much as you may keep reminding people that the message is completely non-private, it would be an accident waiting to happen.*

Look up Wotty - it is not a mistake.

Are  you really sure you want to know nothing of the Panama fund? I know you are having tax problems, but Bitcoins are not worth enough to be a bother. They are a wonderful idea, but you need to get some others involved and actually accept help from somebody other than me one day. I am not going to be here for you forever you know.

Worse, if you send yourself bankrupt it will not help anyone. I know you are a stubborn bastard mate (I can be an Ozzie too), I have helped you in many of the fights you get into online and more, but you need to know when to stop. Leave the government for now. Stop or they will really do some damage to you.

Dave

PS, thanks for making me a part of this.

4

CONFIDENTIAL

KLEIMAN_00561747

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


------------------------------)
                              )
                              )
                              )
IRA KLEIMAN, as the personal  )CASE NO:
representative of the Estate  )9:18-cv-80176-BB/BR
of David Kleiman, and W&K Info)
Defense Research, LLC         )
                              )
          Plaintiffs,         )
                              )
v.                            )
                              )
                              )
CRAIG WRIGHT                  )
                              )
          Defendant.          )
                              )
                              )
------------------------------)




Videotape Deposition of
CRAIG STEVEN WRIGHT

On Thursday, 4th April 2019


Taken at the offices of:

Boies Schiller Flexner LLP
5 New Street Square,
London EC4A 3BF

Reported by:  Paula Foley



## Page 2

```
 1           A P P E A R A N C E S
 2   On behalf of the Plaintiffs:
 3      VELVEL (DEVIN) FREEDMAN, ESQ
        Boies Schiller Flexner LLP
 4      100 SE Second Street, Suite 2800,
        Miami, Florida 33131
 5
        KYLE W ROCHE, ESQ
 6      Admitted Pro Hac Vice
        Boies Schiller Flexner LLP
 7      333 Main Street
        Armonk, NY 10504
 8
 9   On behalf of the Defendant:
10      ANDRÉS RIVERO
        ZAHARAH R. MARKOE
11      Rivero Mestre LLP
        2525 Ponce de Leon Blvd
12      Ste  1000 Miami,
        FL 331134
13
14
     Court Reporter:
15
        PAULA FOLEY
16      Magna Legal Services
        1635 Market Street,
17      Philadelphia,
        PA 19103
18      United States
19
     Also Present:
20
        PHILIP HILL (Videographer, Magna Legal
21      Services)
22      ANDREW S  BRENNER, ESQ (Boies Schiller
        Flexner LLP) for the Plaintiff By Telephone
23
        JOHN MCADAMS, ESQ (Boies Schiller Flexner
24      LLP) By Telephone
25      IRA KLEIMAN (Plaintiff) By Telephone
```

## Page 3

```
 1                I N D E X
 2
     Deponent                    Page
 3
     DR. CRAIG STEVEN WRIGHT
 4
     Questions by MR. FREEDMAN      5 - 385
 5
 6
 7           - - - - - - - - - -
 8
 9   Exhibits marked during this deposition
10   Exhibit              Page
11      1                  78
        2                  126
12      3                  189
        4                  227
13      5                  239
        6                  259
14      7                  296
        8                  314
15      9                  333
        10                 347
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1           THE VIDEOGRAPHER:  We are now on the
 2   record.  This begins the video card number 1, volume 1,
 3   in the video deposition of Dr. Craig Wright.  This is
 4   taken in the matter of Ira Kleiman et al versus Craig
 5   Wright.  This case is being heard in the United States
 6   District Court Southern District of Florida.  Case
 7   number 9:18-cv-80176-BB/BR.  Today's date is April 4,
 8   2019.  The time on the video screen is 10.37 a.m.  Local
 9   time is London.  This video deposition is taking place
10   at the London offices of Boies Schiller Flexner at the
11   request of Boies Schiller Flexner. The videographer is
12   Philip Hill representing Magna Legal Services and the
13   court reporter is Paula Foley, also representing Magna
14   Legal Services.  Please will counsel introduce
15   themselves and state whom they represent at the Boies
16   Schiller offices in London and those present via the
17   telephone conference link.  Thank you.
18           MR. FREEDMAN:  Vel Freedman for the
19   plaintiffs.
20           MR. ROCHE:  Kyle Roche for the
21   plaintiffs.
22           MR. RIVERO:  Andrés Rivero for Craig
23   Wright.
24           MS. MARKOE:  Zaharah Markoe for
25   Dr. Wright.
```

## Page 5

```
 1           MR. BRENNER:  (By Telephone) Andrew
 2   Brenner for the plaintiff.
 3           MR. FREEDMAN:  Did we loose Mr. McAdams?
 4           MR. BRENNER:  John McAdams is here.
 5           THE VIDEOGRAPHER:  Please will the court
 6   reporter swear in the witness.
 7       DR. CRAIG STEVEN WRIGHT, SWORN
 8       QUESTIONS BY MR. FREEDMAN
 9           MR. FREEDMAN:  Thank you very much.
10           MS. MARKOE:  Point of order before we get
11   started.  We are going to mark the entire deposition
12   confidential and then once we have the transcript we
13   will de-designate.
14           MR. FREEDMAN:  That is fine.
15       Q.  Good morning, Dr. Wright.
16       A.  Good morning.
17       Q.  We met earlier.  My name is Vel Freedman.
18   I represent the plaintiffs in this action.
19       A.  Hello Vel.
20       Q.  Can you please state your name and date
21   of birth for the record?
22       A.  My name is Craig Steven Wright.  I was
23   born in Brisbane, Australia, on 23rd October 1970.
24       Q.  Can you tell us your ██████████?
25       A.  ████████████████████████
```



Page 6

```
1    ██████████████.
2         Q.    And your work address?
3         A.    I mainly work from home.  To tell you the
4    truth I do not know the office address, I just walk
5    there, it is in Oxford Circus at nChain.  There is
6    another one at Golden Square.  I do not actually know,
7    I am sorry.
8         Q.    That is fine.  Doctor, you understand
9    today that you are under oath and that you have taken an
10   oath to tell the truth?
11        A.    I understand perfectly well the meaning
12   of an oath.
13        Q.    You understand that your examination
14   today is being recorded both via stenographer and
15   videographer and that at some point this testimony may
16   be shown to a jury?
17        A.    I understand that perfectly, thank you.
18        Q.    Are you taking any medication today?
19        A.    No.  I do not take medication.
20        Q.    Is there anything today that I do not
21   know about that would -- let me strike that.  Is there
22   anything today that would in fact affect your ability to
23   tell the truth at this deposition?
24        A.    No, nothing will affect my ability to
25   tell the truth.
```

Page 7

```
1         Q.    If I ask you a question and you do not
2    understand it, please let me know, and I will repeat it
3    or rephrase it?
4         A.    I shall.
5         Q.    If you do not ask me to do that, I will
6    assume you understand the question and I will rely on
7    your response?
8         A.    (The witness nodded)
9         Q.    In deposition-taking, it is not
10   intuitive, but we need you to verbally say your
11   responses on the record, so that the court reporter can
12   take them, so I will try to remind you to do it, and if
13   you could just try to answer with an affirmative yes or
14   no?
15        A.    Yes.
16        Q.    Thank you.  If at any time today you need
17   to take a break or you feel like you need to get a drink
18   or stretch your legs, just let me know and we will stop;
19   okay?
20        A.    Shall do.  Thank you.
21        Q.    You said you were born in Australia.  Did
22   there come a time when you stopped living in Australia?
23        A.    I am not living in Australia at the
24   moment.
25        Q.    When did you stop living in Australia?
```

Page 8

```
1         A.    We moved from Australia in October 2015.
2         Q.    Let me go back to about 2006.  In 2006
3    where were you living in Australia?
4         A.    In Wimbledon.
5         Q.    In Wimbledon.  Did there come a time when
6    you moved from Wimbledon?
7              MS. MARKOE:  Objection.  This is not part
8    of the deposition topics that we agreed to.  This is a
9    limited deposition.  I am not really sure how this line
10   of questioning fits in with any of the topics that you
11   proposed.
12             MR. FREEDMAN:  So, we are trying to
13   establish where Dr. Wright was so we can identify the
14   location of computers, locations of servers and
15   locations of all kinds of other things he may have used
16   to create Bitcoin to collaborate with David Kleiman.
17             THE WITNESS:  Anything that I have moved
18   with has moved with me in full.  I have only had one
19   residence at any location, so anywhere I have been is
20   irrelevant.  Everything has moved, full stop.
21   BY MR. FREEDMAN:
22        Q.    Dr. Wright, I am going to ask, if it is
23   possible, if you could wait until I ask a question to
24   respond.  I know you know where I may be going and you
25   know what I may be getting at, you want to try to
```

Page 9

```
1    short-circuit it, but unfortunately I have to ask the
2    question and you have to respond.  You were living in
3    Wimbledon in 2006.  Did there come a time when you moved
4    from Wimbledon?
5         A.    Yes.
6         Q.    When did you move from Wimbledon?
7              MS. MARKOE:  I am continuing to object to
8    this line of question.
9              MR. FREEDMAN:  Are you instructing him
10   not to answer or are you noting an objection?
11             MS. MARKOE:  I am noting an objection and
12   I am giving you a little bit of leeway.  If we get to a
13   point where I feel you are abusing that leeway then
14   I will instruct him not to answer.
15             MR. FREEDMAN:  Okay.
16        Q.    When did you move after 2006?
17        A.    I do not remember the exact date.
18        Q.    Where did you move to?
19        A.    ██████████.
20        Q.    ████████████████████████████████████
21   ██████?
22        A.    ████████████████████████████████████.
23        Q.    ██████████████████████████████████
24   ██████████████████?
25             MS. MARKOE:  ████████████████
```





Page 10

1    THE WITNESS: ███████
2    ███.
3  BY MR. FREEDMAN:
4    Q.   And then the ██████████████?
5    A.   Is the one I said I am at now.
6    Q.   So ████████ in the UK?
7    A.   That is correct.  I have been living in
8  █████████████████████████.  All of
9  those are in the UK.  That is correct.
10    Q.   I am confused.  This may be my fault.  In
11  2006 you were living in the UK?
12    A.   I am sorry, that is my fault I was
13  thinking 2016.  2006 I was living in Australia.
14    Q.   Okay, where in Australia?
15    A.   A number of different locations.
16    Q.   Can you let me know where those were?
17    A.   I do not remember.  I know approximate
18  locations.  I have had several houses.
19    Q.   Can you give me the approximate
20  locations?
21    A.   New South Wales.
22    Q.   From 2006 -- did there come a time when
23  you left New South Wales for another part of Australia,
24  or were you in New South Wales until you moved to the UK
25  in 2015?

Page 11

1    A.   I was in New South Wales until then.
2    Q.   But you do not recall the exact
3  addresses?
4    A.   Not off the top of my head, no.
5    Q.   Do you have those records available that
6  you could look up and then tell your counsel later?
7    MS. MARKOE:  Objection.
8    THE WITNESS:  I have no computers in any
9  other residence.  Everything I have had moved with me.
10  There is nothing to be found, there are no computers
11  there, and, no, I do not try and remember addresses.
12  BY MR. FREEDMAN:
13    Q.   So you took every computer storage
14  device, every system you had, has moved with you and you
15  currently have it with you in London?
16    MS. MARKOE:  Objection:  mischaracterises
17  the testimony.
18    THE WITNESS:  No, that is not what
19  I said.  I do not keep machines.  The average age of my
20  computers is one year.  After a year, quite often
21  I trash them.  I have a new phone every single year.
22  I have a new computer, at maximum, 18 months.
23  BY MR. FREEDMAN:
24    Q.   What do you do with the old equipment?
25    A.   In the past I used to donate those to

Page 12

1  charity.  Now, sometimes they go to charity, sometimes
2  they just get trashed.
3    Q.   What do you do with the data on those old
4  computers or hardware?
5    A.   It is wiped.
6    Q.   Do you save a copy of it?
7    A.   Not always, no.  If I do not need it, I
8  do not save it.
9    Q.   But whatever you need, you save?
10    A.   Yes.
11    Q.   Were you employed between 2006-2015, when
12  you left Australia?
13    A.   Yes.
14    MS. MARKOE:  Objection.
15  BY MR. FREEDMAN:
16    Q.   Where were you employed?
17    A.   At what point?
18    MS. MARKOE:  Objection.
19  BY MR. FREEDMAN:
20    Q.   From 2006, I guess in 2006, where were
21  you employed?
22    A.   I worked for a company or a partnership
23  called BDO, which was an accounting firm.
24    Q.   How long were you with BDO?
25    A.   From some time in 2005 until December

Page 13

1  2008, when I left.
2    Q.   When you left BDO in 2008, were you
3  employed by another organisation or employer?
4    A.   No.
5    Q.   Did there come a time when you were,
6  again, employed by an employer?
7    MS. MARKOE:  Objection.
8    THE WITNESS:  I am nominally employed by
9  nChain.
10  BY MR. FREEDMAN:
11    Q.   That was the next time after BDO?
12    A.   I was a director of my own company, so if
13  you want to call that employment, then ----
14    Q.   That is a good critique and a bad
15  question.  Besides working for your own companies and
16  yourself, have you worked for anyone else besides BDO
17  and nChain ----
18    A.   No.
19    Q.   ---- from 2006 on.  Where did you
20  maintain -- so you said that between 2008 you left BDO,
21  and then in 2000 -- when did you begin working for
22  nChain?
23    A.   Well, I did not really begin working for
24  nChain, I founded nChain.
25    Q.   When did you found nChain?

MAGNA ◗
LEGAL SERVICES

| | Page 14 |
|---|---|

1     A.    nChain was founded effectively in a
2  number of different forms in around May 2015.
3     Q.    So between December of 2008 and May of
4  2015, you worked for yourself in companies that you
5  created?
6     A.    I worked for the companies I created,
7  yes.  I did not work for myself per se, I was not
8  working for my own business, if that is what you are
9  asking.
10     Q.    Did these companies have offices in
11  Australia?
12     A.    Yes, some of them did.
13     Q.    Do you recall the addresses of those
14  offices?
15     A.    In North Ryde I do not remember the exact
16  address.
17     Q.    Were there more than one address?
18     A.    In some of them, yes.
19     Q.    Were they all in North Ryde?
20     A.    No.
21     Q.    Where else were they?
22     A.    I honestly do not remember.  I do not try
23  and remember addresses.  I do not remember, as I said,
24  the address at Oxford Circus where I drive into work
25  every week.  I just go there.

| | Page 15 |
|---|---|

1     Q.    Do you have records that you could look
2  this up and let your counsel know later?
3     MS. MARKOE:  Objection.
4     THE WITNESS:  No, but I am sure it is on
5  the internet.
6  BY MR. FREEDMAN:
7     Q.    How many times have you been married?
8     A.    Twice.
9     MS. MARKOE:  Objection.
10  BY MR. FREEDMAN:
11     Q.    What is the name of your first wife?
12     A.    Carol Lynne Wright.
13     Q.    What was her maiden name?
14     A.    Black.
15     Q.    When did you first meet her?
16     MS. MARKOE:  Objection.  What is the
17  relevance of when he met an ex-wife?  And how does that
18  relate to any of the topics that you have purported that
19  you are planning on covering today?
20     MR. RIVERO:  Instruct not to answer.
21  Next question, please.
22     MR. FREEDMAN:  Andrés?
23     BY MR. RIVERO:  Please ask the next
24  question.  That we will take up with the court if you
25  wish to.

| | Page 16 |
|---|---|

1     MR. FREEDMAN:  Okay.  Are you going to
2  instruct him not to answer any question about his first
3  wife?
4     MR. RIVERO:  Mr. Freedman, you have the
5  right to ask questions.  Ask the questions.  You are
6  wasting your own time.  If you want to take up that
7  question with the court I am ready to call now if you
8  want to find the judge.  When did he meet his first
9  wife?  Please, move on.
10     MR. FREEDMAN:  We will deal with it in
11  the court.
12     MR. RIVERO:  Please move on.  Next
13  question.
14  BY MR. FREEDMAN:
15     Q.    When did you get married to
16  Ms. Lynne Black?
17     A.    In the '90s.  I have an oath, as part of
18  my divorce settlement, that I will not discuss anything
19  about my wife or my former marriage.  I will not break
20  that.  Thank you.
21     Q.    When did you get divorced?
22     A.    I have an oath with my wife that I am
23  divorced from that I will not discuss anything about her
24  or my former marriage that is part of our settlement.
25  Thank you.

| | Page 17 |
|---|---|

1     Q.    Including the date of the divorce?
2     A.    I have an oath with my former wife that
3  I will not discuss anything about her or my former
4  marriage.  I will not break that.
5     Q.    Have you stayed in touch with your
6  ex-wife after the date of the divorce?
7     MS. MARKOE:  Objection.
8     THE WITNESS:  I have an oath with my
9  former wife that I will not discuss anything about her
10  in any way or my marriage, and I will not break an oath.
11  BY MR. FREEDMAN:
12     Q.    So we do not have to go through every
13  single question.  Are you refusing to answer any
14  questions about Ms. Lynne Black?
15     A.    I am not refusing to answer questions.
16  I have an oath that has been filed within a court in
17  Australia.  I will not breach oath and perjure myself or
18  break oath.  You are asking me to break oath, and unless
19  instructed by a judge, etcetera, etcetera, I will not do
20  that.
21     Q.    What is the name of your second wife?
22     A.    My second wife is called Ramona.
23     Q.    When did you meet Ramona Wright?
24     MS. MARKOE:  Objection.
25  BY MR. FREEDMAN:



Page 18

```
1        Q.    What is her last name?
2        A.    Watts.
3        Q.    Was it always Watts?
4        A.    No.
5        Q.    What was it before it was Watts?
6        A.    It was Ang.
7        Q.    Can you spell that, please?
8        A.    A-N-G.
9        Q.    When did it change to Watts?
10           MS. MARKOE:  Objection.
11           THE WITNESS:  I am not answering
12  questions about my wife.  My wife is privileged in the
13  UK.  My marriage is privileged.  You should know that,
14  as a lawyer.  Are you seeking to have me breach marital
15  privilege?
16  BY MR. FREEDMAN:
17       Q.    Dr. Wright, it will not be productive for
18  us to have a conversation about whether or not the time
19  of when your wife's name changed from Ang to Watts is
20  covered by spells of privilege, but ----
21       A.    I do not discuss my family, full stop.
22       Q.    Dr. Wright, you understand that you are
23  being sued in this case?
24       A.    I understand perfectly well that a con
25  man in America has made up a fraudulent claim, yes.
```

Page 19

```
1        Q.    And you understand that you tried to
2   dismiss this case?
3            MS. MARKOE:  Objection.  Sir, Vel, we
4   have a lit of topics.  These were approved by the court.
5   This is not part of your list of topics.
6            MR. FREEDMAN:  It certainly is,
7   Ms. Markoe.
8            MS. MARKOE:  Explain to me in what way.
9            MR. FREEDMAN:  Because the list of topics
10  approved by the court approved the inquiry into
11  witnesses and Ms. Ramona Watts is heavily and was
12  heavily involved with Dr. Wright's businesses.
13           MS. MARKOE:  That topic says:
14  "Identification of witnesses, including information
15  about their whereabouts and roles in the subject matter
16  of the pleadings".  Your questions do not go ----
17           MR. FREEDMAN:  Sure they do.
18           MS. MARKOE:  ---- to those issues.  Your
19  questions do not go to those issues.  Ask questions that
20  go to those issues and he will answer the questions that
21  go to those issues to the extent that they are not part
22  of a privilege.  Continue.
23           MR. FREEDMAN:  We are trying to determine
24  at what point she entered into this circle of companies
25  and this helps us determine that.
```

Page 20

```
1            MS. MARKOE:  When her name changed from
2   Ang to Watts helps you determine ----
3            MR. FREEDMAN:  Helps us identify her and
4   her history and learn about her, so that we can
5   eventually, if possible, take her deposition, yes.
6            MS. MARKOE:  And that has nothing to do
7   with these topics.  That has absolutely nothing to do
8   with these topics.  You can ask the questions that go to
9   these topics and go to the specific issues, period.
10           MR. FREEDMAN:  We will take it up with
11  court.
12           MS. MARKOE:  Take it up with the court.
13  BY MR. FREEDMAN:
14       Q.    Dr. Wright, do you have any computers
15  that existed as of 2006 that are still in your
16  possession today?
17           MS. MARKOE:  Objection: asked and
18  answered.
19           MR. FREEDMAN:  Ms. Markoe, I would if you
20  would just limit your objection to form as per the
21  rules.
22           THE WITNESS:  No.
23  BY MR. FREEDMAN:
24       Q.    Do you have any computers in your
25  possession from 2007?
```

Page 21

```
1        A.    No.
2        Q.    2008?
3            MS. MARKOE:  Objection.
4            THE WITNESS:  Any computer that I have
5   had has been imaged and taken.  I do not know if there
6   is any old hard drives or whatever else from any
7   particular date.  Every single computer has been taken,
8   imaged, etcetera.
9        Q.    I understand, but that is not my
10  question.  My question is if you have any -- let me
11  rephrase it, maybe it is easier.  What is the oldest
12  computer that you have in your possession?
13       A.    I do not know.
14       Q.    What is the oldest hard drive that you
15  have in your possession?
16       A.    I do not know.
17       Q.    What is the oldest media device that you
18  have in your possession?
19       A.    I do not know.
20       Q.    Did you use any cloud storage services in
21  the 2006 -- in 2006?
22       A.    Yes.
23       Q.    What were those services?
24       A.    I do not remember.
25       Q.    Did you use any cloud storages in 2007?
```

**MAGNA** ▶
LEGAL SERVICES

Page 22

1      A.     Yes.
2      Q.     What were the names of those storage
3  services?
4      A.     I do not remember.
5      Q.     Did you use cloud storages in 2008?
6      A.     Yes.
7      Q.     What were the names of those storages?
8      A.     I do not remember.
9      Q.     Did you use cloud storages in 2009?
10     A.     Yes.
11     Q.     What were the names of those cloud
12  storages?
13     A.     I do not remember.
14     Q.     Did you use cloud storages in 2010?
15     A.     Yes.
16     Q.     What were the names of those cloud
17  storages?
18     A.     I do not remember.
19     Q.     Did you use cloud storages in 2011?
20     A.     Yes.
21     Q.     What were the names of those cloud
22  storages?
23     A.     I do not remember.
24     Q.     Did you use cloud storage services in
25  2012?

Page 23

1      A.     Yes.
2      Q.     What were the names of those cloud
3  storages?
4      A.     I do not remember.
5      Q.     Did you use cloud storages in 2013?
6      A.     Yes.
7      Q.     What were the names of those cloud
8  storages?
9      A.     I do not remember.
10     Q.     From 2006 until 2013, did you ever use
11  cloud computing services?
12         MS. MARKOE:  Objection.
13         THE WITNESS:  Yes.
14  BY MR. FREEDMAN:
15     Q.     What were the names of those cloud
16  computing services?
17     A.     I do not remember.
18     Q.     What did you use cloud computing services
19  for?
20         MS. MARKOE:  Objection.
21         THE WITNESS:  To store data, to analyse
22  data.
23  BY MR. FREEDMAN:
24     Q.     What data did you store?
25     A.     A wide variety of all different things

Page 24

1  I was analysing.
2      Q.     Can you list for me the types of data you
3  stored?
4         MS. MARKOE:  Objection.
5         THE WITNESS:  0s and 1s.
6  BY MR. FREEDMAN:
7      Q.     And at a higher level?
8         MS. MARKOE:  Objection.
9         THE WITNESS:  I do not remember the exact
10  composition of data that I had at any period.  I do not
11  try and remember these things.
12  BY MR. FREEDMAN:
13     Q.     Do you remember any of the data that you
14  stored during that period?
15     A.     I, at most of these periods that you are
16  talking about, have staff.  I ask for things to happen,
17  things happen.
18     Q.     So, is it your testimony today that from
19  2006 until 2013, you do not recall any of the data that
20  you stored on cloud storage devices?
21         MS. MARKOE:  Objection: mischaracterises
22  the testimony.
23         MR. FREEDMAN:  I asked him if that was
24  his testimony.  I would ask again, Ms. Markoe, that you
25  limit your objection to form.

Page 25

1         MS. MARKOE:  And I would ask that you ask
2  proper questions.  Continue.
3         THE WITNESS:  Very simply, you have tried
4  to twist my words, that is not what I said.
5         MR. FREEDMAN:  Ms. Markoe, this is the
6  issue with objecting beyond form, because you are
7  coaching the witness and it is inappropriate under the
8  local rules.
9         MS. MARKOE:  I am not coaching the
10  witness at all.
11         THE WITNESS:  I would have said that
12  either way.
13         MS. MARKOE:  I am telling you what my
14  objection is and I am allowed to record my objection for
15  the record.
16         MR. FREEDMAN:  Just to form.  It is part
17  of the local rules.  It is quite clear.  You are only
18  allowed to object to form.
19         MS. MARKOE:  Take it up with the judge,
20  then.
21         MR. FREEDMAN:  I will, but I am hoping I
22  do not have to.
23     Q.     Dr. Wright, is it your testimony today
24  that from 2006-2013 that you do not recall any of the
25  data you stored on cloud storage devices?

MAGNA
LEGAL SERVICES

Page 26

1          MS. MARKOE:  Objection.
2          THE WITNESS:  I do not recall the data,
3    no.
4    BY MR. FREEDMAN:
5       Q.   Is it your testimony today that from
6    2006-2013 you do not recall any of the functions that
7    you used cloud computing services for?
8          MS. MARKOE:  Objection.
9          THE WITNESS:  That is not what I actually
10   said.  I said I do compute and storage.  They are
11   functions.
12   BY MR. FREEDMAN:
13      Q.   Do you recall what data you computed
14   during the 2006-2013 time period?
15         MS. MARKOE:  Objection.
16         THE WITNESS:  The purpose of storing data
17   and doing compute is so that I do not need to recall it.
18   BY MR. FREEDMAN:
19      Q.   So do you recall what you stored from
20   2006-2013?
21         MS. MARKOE:  Objection.
22         THE WITNESS:  Again, I do not recall,
23   because I do not need to.  The whole purpose of storing
24   information is so that you do not need to think about
25   it.

Page 27

1    BY MR. FREEDMAN:
2       Q.   So you do not recall?
3          MS. MARKOE:  Objection.
4          THE WITNESS:  I just said that.
5    BY MR. FREEDMAN:
6       Q.   Did any of the data stored, or any of the
7    cloud computing services used, relate to Bitcoin?
8       A.   Yes.
9          MS. MARKOE:  Objection.
10   BY MR. FREEDMAN:
11      Q.   Do you recall how it related to Bitcoin?
12         MS. MARKOE:  Objection.
13         THE WITNESS:  Define that.  Define what
14   you mean by how it related to Bitcoin.
15   BY MR. FREEDMAN:
16      Q.   Did it relate to the mining of Bitcoin?
17         MS. MARKOE:  Objection.
18         THE WITNESS:  No.
19   BY MR. FREEDMAN:
20      Q.   Did it relate to blockchain-based
21   intellectual property?
22         MS. MARKOE:  Objection.
23         THE WITNESS:  Define what
24   blockchain-based intellectual property means, please.
25   BY MR. FREEDMAN:

Page 28

1       Q.   What does the term blockchain mean to
2    you?
3       A.   Blockchain is a misrepresentation of the
4    use of timechain that is defined within the word
5    Bitcoin.  It is effectively, people not understanding
6    what the technology is, and calling it something that it
7    is not.
8       Q.   So would timechain be a more accurate
9    term to use?
10         MS. MARKOE:  Objection.
11         THE WITNESS:  For the general
12   representation, yes.
13   BY MR. FREEDMAN:
14      Q.   Did any of the cloud computing and cloud
15   storage services that you used between 2006 until 2013
16   relate to timechain intellectual property?
17         MS. MARKOE:  Objection.
18         THE WITNESS:  Again, what you are trying
19   to do is multiple things, and are you talking about the
20   development of what became Bitcoin, or are you talking
21   about something else, such as documenting or writing
22   papers on the topic?
23   BY MR. FREEDMAN:
24      Q.   Let us start with the development of
25   Bitcoin.  Did any of those cloud storages and cloud

Page 29

1    computing services relate to the development of what
2    became Bitcoin?
3          MS. MARKOE:  Objection.
4          THE WITNESS:  The cloud storages did not
5    relate to the development of Bitcoin.  The development
6    of Bitcoin was not done by cloud storages.
7    BY MR. FREEDMAN:
8       Q.   What was the development of it being done
9    by?
10         MS. MARKOE:  Objection.
11         THE WITNESS:  Humans.
12   BY MR. FREEDMAN:
13      Q.   Was any of the information relating to
14   the development of Bitcoin stored on cloud computing
15   services?
16      A.   Yes.
17      Q.   Do you recall what those cloud computing
18   services were called?
19         MS. MARKOE:  Objection.
20         THE WITNESS:  No.
21   BY MR. FREEDMAN:
22      Q.   Do you still have access to those cloud
23   computing services?
24      A.   No.
25      Q.   Do you have copies of the data that were



Page 30

1    on those cloud computing services?
2         A.   The data that I have at my house has been
3    analysed.  I do not recall what every bit of that data
4    is.  The analysis of that data has either been taken or
5    not.  I have not gone through what the lawyers have
6    copied, so I cannot answer that question.
7         Q.   So, sitting here today, you do not know
8    whether the data that was on the cloud computing storage
9    -- strike that.  Sitting here today, you do not know
10   whether the data that was on the cloud storage services
11   resides on the data that was imaged by your lawyers?
12        MS. MARKOE:  Objection.
13        THE WITNESS:  I do not know what my
14   lawyers imaged, so I cannot answer that question.
15   May I have a glass of water, please?
16        MS. MARKOE:  Yes.
17        MR. RIVERO:  Sparkling or still?
18        THE WITNESS:  Sparkling, thank you.
19   BY MR. FREEDMAN:
20        Q.   Dr. Wright, how did you identify for your
21   lawyers what devices to image?
22        MS. MARKOE:  Can you repeat the question,
23   I am sorry?
24   BY MR. FREEDMAN:
25        Q.   How did you identify for your lawyers

Page 31

1    what devices they should image for this litigation?
2         MR. RIVERO:  Dr. Wright, you cannot go
3    into conversations with your lawyers, because that would
4    be privileged.  So I am instructing you on that, but
5    answer to the extent that you can without going into any
6    communications with counsel.
7         THE WITNESS:  I was given a set of
8    instructions.  I told the people what matched the
9    instructions.
10   BY MR. FREEDMAN:
11        Q.   Are there devices at your home or office
12   here in the United Kingdom that have not been imaged?
13        MS. MARKOE:  Objection.
14        THE WITNESS:  Yes.
15   BY MR. FREEDMAN:
16        Q.   Can you list those devices for me?
17        MS. MARKOE:  Objection.
18        THE WITNESS:  No.
19   BY MR. FREEDMAN:
20        Q.   Why not?
21        A.   I do not know them.
22        Q.   Would you be able to provide a list of
23   those devices to your lawyers?
24        MS. MARKOE:  Objection.
25        THE WITNESS:  No.

Page 32

1    BY MR. FREEDMAN:
2         Q.   Why not?
3         A.   My wife has machines, they are not mine,
4    they have nothing to do with Bitcoin or this case.
5    I will not list her machines.  I will not ask her to
6    list her machines.
7         Q.   Do you have access to your wife's
8    machines?
9         A.   No.
10        MS. MARKOE:  Objection.
11   BY MR. FREEDMAN:
12        Q.   Did your wife use those machines for the
13   ----
14        A.   No.
15        Q.   Sorry?
16        A.   There are no machines at my house that
17   are that old.  There are no machines that have been
18   older than 2015, as you are trying to imply.  So, the
19   data that I had was copied to companies.  Those
20   companies in Australia have been imaged by the
21   Australian Tax Office for whatever they have done.  I do
22   not have them.
23        Q.   From 2006 until 2014, did you make any
24   trips to the United States?
25        A.   Yes.

Page 33

1         MS. MARKOE:  Objection.
2    BY MR. FREEDMAN:
3         Q.   How many trips did you make to the United
4    States?
5         A.   I do not know.
6         Q.   Did you travel to the United States in
7    2006?
8         MS. MARKOE:  Objection.  Again, we are
9    talking about ----
10        THE WITNESS:  I do not know.
11        MS. MARKOE:  ---- a list of topics.  This
12   is not related to your list of topics.  Stick to the
13   topics that you agreed to.  There were ten of them.
14   This is not one of them.
15        MR. FREEDMAN:  This relates to the
16   formation of the partnership with Dave Kleiman, so ----
17        MS. MARKOE:  How does it relate to the
18   formation of the partnership with Dave Kleiman when you
19   are asking about his trips to the United States from
20   2006-2014?
21        MR. FREEDMAN:  Because that is when we
22   allege the formation of the partnership eventually took
23   place.
24        MS. MARKOE:  Why do not you ask about the
25   formation of the partnership rather than random trips



Page 34

1  that he might have taken to the United States.
2       MR. FREEDMAN:  Ms. Markoe, I do not have
3  to ask the questions the way you would like me to ask
4  the questions.  If you instruct the witness not to
5  answer we will take it up with the court.  Otherwise
6  please either object or instruct.
7       Q.   In 2006, did you travel to the United
8  States?
9       MS. MARKOE:  Objection.
10      THE WITNESS:  I do not know.
11 BY MR. FREEDMAN:
12      Q.   In 2007, did you travel to the United
13 States?
14      A.   I do not know.
15      MS. MARKOE:  Objection.
16 BY MR. FREEDMAN:
17      Q.   In 2008, did you travel to the United
18 States?
19      MS. MARKOE:  Objection.
20      THE WITNESS:  Yes.
21      THE COURT REPORTER:  Slow down, please.
22 I cannot keep up.
23      MR. FREEDMAN:  Sorry.
24      Q.   In 2008, you travelled to the United
25 States?

Page 35

1       MS. MARKOE:  Objection.
2       THE WITNESS:  Yes.
3  BY MR. FREEDMAN:
4       Q.   Where in the United States did you
5  travel?
6       MS. MARKOE:  Objection.
7       THE WITNESS:  I do not remember.
8       MR. RIVERO:  Dr. Wright, the most
9  important person is actually the court reporter, who
10 makes the official record.  So you have to allow a beat
11 for objections, because our court reporter cannot take
12 you and the objection simultaneously, so I think it is
13 helpful if we all take a breath.  I speak very quickly,
14 so I have to take a breath.  It is very natural.
15 BY MR. FREEDMAN:
16      Q.   Do you recall the purpose of travel in
17 2008?
18      MS. MARKOE:  Objection.
19      THE WITNESS:  I went to various different
20 trips around the world.  I have been to over 100
21 countries.  I travel, even now, probably 30-50 countries
22 every year.  I do six countries a month, some months.  I
23 do not remember my trips.  I know I do presentations,
24 I met with government officials, I met with the FBI at
25 one point, I met with people in a number of three-letter

Page 36

1  agencies.  If you are asking did I meet with Dave
2  Kleiman then, no.
3  BY MR. FREEDMAN:
4       Q.   You remember very specifically to have
5  taken a trip to the United States in 2008?
6       MS. MARKOE:  Objection.
7  BY MR. FREEDMAN:
8       Q.   How do you recall that you were
9  travelling to the United States in 2008?
10      A.   One of my trips was to meet people at
11 Microsoft.
12      Q.   Where did you meet people at Microsoft?
13      MS. MARKOE:  Objection.
14      THE WITNESS:  At Microsoft.
15 BY MR. FREEDMAN:
16      Q.   Where at Microsoft?  At Microsoft
17 headquarters?
18      MS. MARKOE:  Objection.
19      THE WITNESS:  At Microsoft headquarters.
20      MS. MARKOE:  I am going to instruct the
21 witness not to answer this.  It has absolutely nothing
22 to do with this case and it has nothing to do with topic
23 number 3 which you are purporting this line of
24 questioning is related to.  He has already answered your
25 question that he did not meet with Mr. Kleiman during

Page 37

1  any of his trips to the United States in 2008,
2  I believe, but the record will state what he said.
3       MR. FREEDMAN:  Ms. Markoe, I am not going
4  to argue with you about it but we were given some leeway
5  to press Dr. Wright's initial representation of what he
6  did and did not do.
7       MS. MARKOE:  And he answered your
8  question by telling you that he met with people at
9  Microsoft.  That is enough pressing.
10 BY MR. FREEDMAN:
11      Q.   In 2009, did you travel to the United
12 States?
13      A.   Yes.
14      Q.   For what purpose?
15      A.   I do not remember all the conferences,
16 etcetera, that I went to in 2009.
17      Q.   Where in the United States did you travel
18 to?
19      MS. MARKOE:  Objection.
20      THE WITNESS:  I do not have my travel
21 records in front of me.  I cannot answer that.
22 BY MR. FREEDMAN:
23      Q.   Did you travel to Florida in 2009?
24      A.   Either then or 2010, I cannot remember
25 the exact dates.



Page 38

1    Q.    Did you travel to Florida in 2008?
2            MS. MARKOE:  Objection.
3            THE WITNESS:  No.  I do not believe
4    I did.
5    BY MR. FREEDMAN:
6        Q.    When you travelled to Florida in 2009 or
7    2010, did you meet with Dave Kleiman?
8        A.    Yes.
9        Q.    What did you discuss with Dave Kleiman?
10       A.    We drank.
11       Q.    Where did you drink?
12       A.    A pub.
13       Q.    Where was the pub located?
14       A.    I do not know.
15       Q.    In what city was the pub located?
16       A.    It was somewhere that Dave drove to, with
17   another person called Paul Henry.
18       Q.    Did you discuss anything related to
19   Bitcoin?
20       A.    No.
21       Q.    Did you discuss anything related to
22   blockchain or timechain?
23       A.    No.
24           MS. MARKOE:  Objection.
25   BY MR. FREEDMAN:

Page 39

1        Q.    How long did you meet with Dave Kleiman
2    for?
3            MS. MARKOE:  Objection.
4            THE WITNESS:  I do not remember.  We
5    drank a lot.
6    BY MR. FREEDMAN:
7        Q.    Was that the only time you saw
8    Dave Kleiman?
9        A.    No.
10       Q.    That was a bad question.  Strike that.
11   Was that the only time you saw Dave Kleiman on that
12   trip?
13       A.    Yes.
14       Q.    Did you travel to the United States in
15   2010?
16           MS. MARKOE:  Objection.
17           THE WITNESS:  As I said, 2009/10.
18   BY MR. FREEDMAN:
19       Q.    Sorry, yes, you are right.  Beyond the
20   2009/2010 trip to the United States where you met with
21   Dave Kleiman, was there another time that you travelled
22   to the United States and met with Dave Kleiman?
23       A.    No.
24       Q.    In 2011, did you travel to the United
25   States?

Page 40

1            MS. MARKOE:  Objection.  You can answer.
2            THE WITNESS:  Yes.
3    BY MR. FREEDMAN:
4        Q.    Did you meet with Dave Kleiman in 2011?
5            MS. MARKOE:  Objection.
6            THE WITNESS:  Briefly.
7    BY MR. FREEDMAN:
8        Q.    Where did you meet with Dave Kleiman?
9        A.    I need to obstruct -- this is one of
10   those matters.
11           MS. MARKOE:  Okay.  This is a matter that
12   I am going to instruct him not to answer.  He will
13   discuss the basis for his refusing not to answer in
14   camera with the court.  It involves issues of national
15   security and he is not permitted to answer these
16   questions.  He can give a more fulsome explanation to
17   the court in camera and the court can make a ruling
18   based on that in camera discussion.
19           Can I just consult with my client for one
20   second to see if I can get you some sort of an answer
21   that might be of assistance to you?
22           MR. FREEDMAN:  Sure.
23           MS. MARKOE:  Let us go off the record.
24           MR. FREEDMAN:  You want to take a break?
25           THE VIDEOGRAPHER:  Going off the record.

Page 41

1    The time is 11.12.
2            (A Short Break)
3            THE VIDEOGRAPHER:  Going back on the
4    record.  The time is 11.23.  Thank you.
5    BY MR. FREEDMAN:
6        Q.    Dr. Wright ----
7            THE VIDEOGRAPHER:  Sorry, sir ----
8            MR. FREEDMAN:  Oh, my mic!
9            MS. MARKOE:  Why do we not read back that
10   last question before the objection and we can take it
11   from there.
12           MR. FREEDMAN:  Actually, before we go
13   there, I just want to double back on something I left
14   out initially, which is earlier you told me that you
15   instructed employees how to store things on cloud
16   storage devices; do you recall that?
17           MS. MARKOE:  Objection.
18           THE WITNESS:  No, that is not what
19   I said.
20   BY MR. FREEDMAN:
21       Q.    What did you say?
22       A.    I said I instruct employees to do things
23   and things happened.
24       Q.    Who were those employees?
25       A.    I do not remember the names of all my

MAGNA ▶
LEGAL SERVICES

Page 42

1 employees.
2 Q. Do you remember the names of the
3 employees that dealt with cloud storage devices?
4 A. No.
5 Q. Cloud storage services?
6 A. No.
7 Q. Cloud computing services?
8 A. No.
9 Q. In 2011 you met with Dave Kleiman?
10 MR. RIVERO: Objection.
11 Paula, would you please go back. As we
12 requested, there was a pending question at which point
13 there was a request to take a break. We asked that the
14 last question be read back. I will read back but
15 I would ask the court reporter to confirm. The next to
16 last question: "Did you meet with Dave Kleiman in
17 2011?" The witness: "Briefly". Next question: "Where
18 did you meet with Dave Kleiman?" That is where that
19 took up. We would like to go back so it is clear on the
20 record what he is and is not answering. So if you can
21 read it. We want to do this formally. That is where we
22 were.
23 MR. FREEDMAN: Mr. Rivero, this is my
24 deposition. I strike the question. We will go back
25 now.

Page 43

1 MR. RIVERO: No, Mr. Freedman ----
2 MR. FREEDMAN: Mr. Rivero, this is my
3 deposition. I ask the questions I would like to ask.
4 MR. RIVERO: Mr. Freedman, you need to
5 hear me on this. There was a pending question. We
6 asked for and took time to address it. We want to
7 respond so it is clear to the court what our position is
8 on your pending question. Please, let us go back and do
9 it right.
10 MR. FREEDMAN: I do strike the question
11 and you can take up my striking the question with the
12 court, Mr. Rivero.
13 MR. RIVERO: We are not going to ----
14 MR. FREEDMAN: Mr. Rivero, I am not going
15 to continue arguing.
16 MR. RIVERO: Mr. Freedman, there was a
17 pending question. We asked for permission to break to
18 address the pending question. If you are withdrawing
19 the line of questioning, I am perfectly happy to go on,
20 but I am not going to have an unclear record. He is
21 prepared to answer the last question.
22 MR. FREEDMAN: In the interests of time,
23 let us go back. Can you please read back the question.
24 (The court reporter read back as requested)
25 THE WITNESS: I had a video conference

Page 44

1 while in New York that involved Mr. Kleiman.
2 BY MR. FREEDMAN:
3 Q. Where was Mr. Kleiman when you video
4 conferenced him?
5 A. Exactly where I do not know.
6 Q. How long did the video conference last?
7 A. Probably 30-45 minutes.
8 Q. Did the video conference have anything to
9 do with Bitcoin?
10 MS. MARKOE: Objection.
11 THE WITNESS: The video conference was
12 not about Bitcoin.
13 BY MR. FREEDMAN:
14 Q. Did the video conference have anything to
15 do with blockchain or timechain technology?
16 MS. MARKOE: Objection.
17 THE WITNESS: The video conference was
18 not about those topics.
19 BY MR. FREEDMAN:
20 Q. Was there anyone else on the conference?
21 A. Yes.
22 Q. Who else was on the conference?
23 A. I cannot answer that. That is part of
24 what we need to ----
25 Q. Okay.

Page 45

1 A. That individual has nothing to do with
2 Bitcoin in any way.
3 Q. Can you tell me the subject matter of the
4 discussion?
5 A. No.
6 MS. MARKOE: That is the in camera part.
7 BY MR. FREEDMAN:
8 Q. Was there any other time in 2011 that you
9 met with Dave Kleiman?
10 A. No.
11 Q. In 2012, did you meet with Dave
12 Kleiman -- strike that. In 2011, was there any other
13 time when you travelled to the United States?
14 MS. MARKOE: Objection.
15 THE WITNESS: I do not know. I travel a
16 lot. I cannot remember exactly where I travel when.
17 I have been to the US many times. I do not know when
18 I have and have not been at particular times.
19 BY MR. FREEDMAN:
20 Q. In 2012, did you travel to the United
21 States?
22 MS. MARKOE: Objection.
23 THE WITNESS: Again, I travelled a lot.
24 I do not remember.
25 BY MR. FREEDMAN:

Page 46

```
1        Q.    Did you travel to Florida in 2012?
2        A.    No.
3        Q.    Did you travel a lot between ----
4        A.    I travelled a lot.
5        Q.    ---- 2006 and 2013?
6              MS. MARKOE:  Objection.
7              THE WITNESS:  I have travelled a lot all
8    my life.
9    BY MR. FREEDMAN:
10       Q.    In 2013, did you travel to the United
11   States?
12             MS. MARKOE:  Objection.
13             THE WITNESS:  I believe so.  I did not
14   travel to Florida, however.
15   BY MR. FREEDMAN:
16       Q.    Why did you travel to the United States
17   in 2013?
18             MS. MARKOE:  Objection.
19             THE WITNESS:  I travel a lot.
20   I presented conferences.  I meet government officials.
21   I do all sorts of things.
22   BY MR. FREEDMAN:
23       Q.    Did you meet with Dave Kleiman in 2013?
24       A.    Physically, no.
25       Q.    Did you meet with Dave Kleiman via video
```

Page 47

```
1    conference in 2013?
2        A.    Yes.
3        Q.    How many times in 2013 did you meet with
4    Dave Kleiman via video conference?
5        A.    More than I can remember.
6        Q.    Approximately how frequently would you
7    meet with Dave Kleiman via video conference in 2013?
8        A.    There was only a small amount of time
9    before he died.
10       Q.    How many times a week approximately would
11   you meet with Dave Kleiman via video conference in 2013?
12             MS. MARKOE:  Objection.
13             THE WITNESS:  Not many.  Dave died.  He
14   was sick.
15   BY MR. FREEDMAN:
16       Q.    Dave died in April of 2013?
17       A.    Yes.
18       Q.    So, between January of 2013 and April of
19   2013, approximately how many times did you meet with
20   Dave Kleiman via video conference?
21       A.    Not many.
22             MS. MARKOE:  Objection.
23   BY MR. FREEDMAN:
24       Q.    Ten times?
25             MS. MARKOE:  Objection.
```

Page 48

```
1              THE WITNESS:  Less.
2    BY MR. FREEDMAN:
3        Q.    Five times?
4        A.    I do not remember.
5        Q.    Some amount of times between five and ten
6    to the best of your recollection?
7              MS. MARKOE:  Objection.
8              THE WITNESS:  Somewhere around less than
9    ten.
10   BY MR. FREEDMAN:
11       Q.    Okay.  In 2012, did you meet via video
12   conference with Dave Kleiman?
13       A.    Yes.
14       Q.    Approximately how often would you meet
15   via video conference with Dave Kleiman in 2012?
16             MS. MARKOE:  Objection.
17             THE WITNESS: Dave was my best friend.  We
18   talked a lot.
19   BY MR. FREEDMAN:
20       Q.    So, once a week?
21             MS. MARKOE:  Objection.
22             THE WITNESS:  I do not recollect.  I do
23   not try to think about these things.  I work.  I work
24   100 hour weeks.  At the moment my work is 108 hours.
25   I work less now than I used to.  I call people, I do
```

Page 49

```
1    things, I produce.  I do not sit there recording and
2    remembering what I did.  I do not remember how many
3    times I have called my mother.  I do not remember how
4    many times I have talked to my wife.  I do not remember
5    any of these things.
6    BY MR. FREEDMAN:
7        Q.    In 2011, besides from the video
8    conference we have just discussed that you want to talk
9    to the court about in camera, how many times did you
10   meet via video with Dave Kleiman?
11       A.    I do not know.
12             MS. MARKOE:  Objection.
13   BY MR. FREEDMAN:
14       Q.    Is it safe to say a lot?
15             MS. MARKOE:  Objection.
16             THE WITNESS:  Define "a lot".
17   BY MR. FREEDMAN:
18       Q.    You said you met with him a lot in 2013.
19   Was the frequency of meeting with Dave Kleiman via video
20   conference in 2012 the same as it was in 2013?
21             MS. MARKOE:  Objection.  The record will
22   speak for itself.
23             MR. FREEDMAN:  Let me strike that and
24   start again.
25       Q.    Approximately how many times did you meet
```

Page 50

1  with Dave Kleiman via video conference in 2011?
2        MS. MARKOE:  Objection.
3        THE WITNESS:  I do not know.
4  BY MR. FREEDMAN:
5        Q.   More than ten times?
6        MS. MARKOE:  Objection.
7        THE WITNESS:  I believe so.
8  BY MR. FREEDMAN:
9        Q.   More than 20 times?
10       A.   I do not know.
11       Q.   Is it safe to say it was somewhere
12  between ten to 20 times?
13       MS. MARKOE:  Objection.
14       THE WITNESS:  I do not know.
15  BY MR. FREEDMAN:
16       Q.   Could it have been more than 20 times?
17       BY MS. MARKOE:  Objection: calls for
18  speculation.
19       MR. FREEDMAN:  Please, Ms. Markoe, limit
20  your objections to form.
21       MR. RIVERO:  Proceed.
22       THE WITNESS:  Could this be the Cartesian
23  abstraction, a projection, yes, that is a possibility.
24  The possibility of my putting my hand through the wall
25  exists.  Is that a probability: no.  Please ask me

Page 51

1  something that is not fluffy.
2  BY MR. FREEDMAN:
3        Q.   Was it probable that you spoke with Dave
4  Kleiman more than 20 times in 2011?
5        MS. MARKOE:  Objection.
6        THE WITNESS:  I do not know.  It was
7  definitely more than 10 times.
8  BY MR. FREEDMAN:
9        Q.   In 2010, how many times did you meet with
10  Dave Kleiman via video conference?
11       MS. MARKOE:  Objection.
12       THE WITNESS:  Again, even less
13  recollection.  I do not know.
14  BY MR. FREEDMAN:
15       Q.   More than 10 times?
16       MS. MARKOE:  Objection.
17       THE WITNESS:  I do not know.
18  BY MR. FREEDMAN:
19       Q.   Do you have any recollection at all of
20  the frequency in which you talked to Dave Kleiman via
21  video conference in 2010?
22       A.   I could not even answer the recollection
23  of what I have talked to my wife in the last six months,
24  so, no.  What I do recollect is I wrote 64 papers that
25  will go to patent last month.

Page 52

1        Q.   Doctor ----
2        A.   I wrote 18 papers that have been
3  published last month.  That I recollect.  I recollect my
4  work.
5        Q.   If you could try to answer the question
6  that is posed, that would help us move quicker.  Did you
7  speak with Dave Kleiman via video conference in 2010
8  routinely?
9        MS. MARKOE:  Objection.
10       THE WITNESS:  Define the word "routine".
11  BY MR. FREEDMAN:
12       Q.   As you understand the word "routine"?
13       MS. MARKOE:  Objection.
14       THE WITNESS:  I have a full 21 volume
15  copy of the Oxford greater dictionary.  "Routine" is
16  actually about 1.5 pages worth of definitions going back
17  to the 16th century.  Which particular use of "routine"
18  would you like me to have?  As in per route, as in as a
19  directed, something that is not a common used word, or
20  what?
21  BY MR. FREEDMAN:
22       Q.   Let us just jump to 2009.  Do you recall
23  how many times you spoke with Dave Kleiman via video
24  conference in 2009?
25       MS. MARKOE:  Objection.

Page 53

1        THE WITNESS:  As with everyone else, I do
2  not recall exact details.  I do not even remember how
3  many times I have spoken to my mother in the last six
4  months.
5  BY MR. FREEDMAN:
6        Q.   You did not create Bitcoin with your with
7  mother, did you?
8        MS. MARKOE:  Objection.  Move to strike.
9  BY MR. FREEDMAN:
10       Q.   In 2008, do you recall how many times you
11  met with Dave Kleiman via video conference?
12       MS. MARKOE:  Objection.
13       THE WITNESS:  The same answer applies
14  with even less recollection.  I think about my work.
15  People do not always like it, but I do not think about
16  people.
17  BY MR. FREEDMAN:
18       Q.   In 2008, do you recall how many times you
19  had video conferences with Dave Kleiman?
20       MS. MARKOE:  Objection.
21       THE WITNESS:  Again, I do not recollect
22  exactly how many times.
23  BY MR. FREEDMAN:
24       Q.   When did you first meet Dave Kleiman?
25       A.   Exactly when, I do not remember.  Define

MAGNA ▶
LEGAL SERVICES

Page 54

1    "meet".
2        Q.    What year?
3        A.    Physically meet, meet online, meet by
4    e-mail, meet by video conference, meet by phone.
5        Q.    When were you first introduced to Dave
6    Kleiman in any capacity, in what year?
7        A.    I was never introduced to Dave Kleiman.
8        Q.    How did you come to meet Dave Kleiman in
9    any capacity?
10       A.    We started talking on mailing lists, IRC
11   chats and other such things.
12       Q.    When did you begin that conversation?
13           MS. MARKOE:  Objection.
14           THE WITNESS:  I do not remember exactly.
15   It has been 15 years.
16   BY MR. FREEDMAN:
17       Q.    Do you remember the year?
18       A.    No.
19       Q.    How did you communicate during that time?
20           MS. MARKOE:  Objection: vague.
21           THE WITNESS:  In English.
22   BY MR. FREEDMAN:
23       Q.    From 2006, were you in regular contact
24   with Dave Kleiman?
25           MS. MARKOE:  Objection.

Page 55

1            THE WITNESS:  Define "regular".
2    BY MR. FREEDMAN:
3        Q.    Once a week?
4        A.    No.
5        Q.    Twice a week -- once a month?
6        A.    Most likely, yes.
7        Q.    How were you in contact with him
8    approximately once a month in 2006?
9        A.    We spoke over IRC, we spoke over video
10   chats, we spoke over chats.
11       Q.    You said "chats".  Can you drill down on
12   that for me; what do you mean by chats?
13       A.    Digital chat media.  IRC is an example of
14   an early chat format.  It has rooms, some of those are
15   public, some of those are private.  Would you like me to
16   detail the format of the protocol any more?
17       Q.    No, but would I like you to drill down a
18   little more on the type of chats besides IRC that you
19   used to discuss with Dave Kleiman?
20           MS. MARKOE:  Objection.
21           THE WITNESS:  I do not remember.  These
22   things have changed.
23   BY MR. FREEDMAN:
24       Q.    Do you have access to any of these IRC
25   chats?

Page 56

1        A.    No, that is the nature of IRC.
2        Q.    Do you have access to any of these video
3    chats?
4        A.    No, that is nature of video chats.
5        Q.    Do you have access to any of the other
6    chat forms that you used to discuss with Dave Kleiman in
7    2006?
8        A.    No, we made sure we talked on things that
9    were chats.
10       Q.    Meaning there was no record?
11       A.    Meaning that there was no record.
12       Q.    In 2007, did the frequency with which you
13   spoke to Dave Kleiman increase?
14       A.    No.
15           MS. MARKOE:  Objection.
16   BY MR. FREEDMAN:
17       Q.    Did it stay the same?
18       A.    I do not have a record of how many times
19   I spoke to him.  As a statistician, I would have to
20   analyse that as a hypothesis taking one versus the
21   other, but I do not have the data.
22       Q.    Did you speak to Dave Kleiman
23   approximately once a month in 2007?
24       A.    I have no idea how many times I spoke to
25   anyone at any of those times.  Very simply, I am not

Page 57

1    able to answer that.
2        Q.    You have no recollection of the frequency
3    with which you spoke to Dave Kleiman in 2007; is that
4    correct?
5            MS. MARKOE:  Objection.
6            THE WITNESS:  I remember talking to
7    people.  I do not remember each of the talks.
8    BY MR. FREEDMAN:
9        Q.    But I am asking you to give me your best
10   recollection of the frequency with which you spoke to
11   Dave Kleiman in 2007?
12           MS. MARKOE:  Objection.
13           THE WITNESS:  I do not have a best
14   recollection.  I do not think about people that way.
15   I think about numbers.  I think about algorithms.
16   I remember those.
17   BY MR. FREEDMAN:
18       Q.    How often did you speak to Dave Kleiman
19   in 2008?
20           MS. MARKOE:  Objection.
21           THE WITNESS:  I do not remember.  The
22   same thing applies.  The same thing will apply to 2009.
23   BY MR. FREEDMAN:
24       Q.    How often did you speak to Dave Kleiman
25   in 2010?

Page 58

1      MS. MARKOE: Objection.
2      THE WITNESS: I do not know.
3  BY MR. FREEDMAN:
4      Q.   How often did you speak to Dave Kleiman
5  in 2011?
6      A.   I do not know.
7      Q.   How often did you speak to Dave Kleiman
8  in 2012?
9      A.   I do not know.
10     Q.   How often did you speak to Dave Kleiman
11  in 2013?
12     A.   Not terribly much.
13     Q.   When I say "speak to Dave Kleiman",
14  I also mean telephonically.  Does that change any of
15  your answers?
16     A.   No, I do not use telephone much at all.
17     Q.   Did there come a time when you began
18  e-mailing Dave Kleiman?
19     MS. MARKOE: Objection.
20     THE WITNESS: Yes.
21  BY MR. FREEDMAN:
22     Q.   When did you begin e-mailing Dave
23  Kleiman?
24     A.   I do not remember.
25     Q.   Did you e-mail Dave Kleiman in 2006?

Page 59

1      A.   I would have to say most likely, yes.
2      Q.   Did you e-mail Dave Kleiman in 2007?
3      A.   Definitely yes.
4      Q.   What about?
5      A.   I do not remember all the topics that
6  I spoke to Dave in 2007.  I did discuss a cookie recipe.
7      Q.   Why did you say "definitely yes" in 2007?
8      A.   Because there was a cookie recipe
9  discussed in 2007 that was published.
10     Q.   Whose cookie recipe was it?
11     A.   Mine.
12     Q.   Why did you discuss a cookie recipe with
13  Dave Kleiman?
14     MS. MARKOE: Objection.
15     THE WITNESS: He was asking about
16  cookies.
17  BY MR. FREEDMAN:
18     Q.   Did you e-mail Dave Kleiman in 2008?
19     A.   Yes.
20     Q.   Do you know how frequently you e-mailed
21  him in 2008?
22     A.   No.
23     Q.   Do you know what you spoke about with
24  Dave Kleiman in 2008?
25     MS. MARKOE: Objection.

Page 60

1      THE WITNESS: I do not know the range of
2  topics I spoke to Dave in 2008, no.
3  BY MR. FREEDMAN:
4      Q.   Did you speak to Dave Kleiman -- did you
5  e-mail Dave Kleiman in 2009?
6      A.   Yes.
7      Q.   From 2006 until 2009, what e-mails did
8  you use to communicate with Dave Kleiman?
9      A.   I do not remember.
10     Q.   Do you remember the e-mails you used to
11  communicate with Dave Kleiman?
12     A.   No.
13     Q.   Do you remember the e-mails Dave Kleiman
14  used?
15     A.   No, I have used multiple e-mail
16  addresses, I do not try and remember them.
17     Q.   In 2010, did you e-mail Dave Kleiman?
18     A.   Yes.
19     Q.   In 2011, did you e-mail Dave Kleiman?
20     A.   Yes.
21     Q.   Do you remember the frequency of e-mails
22  that you -- strike that.  Do you remember how frequently
23  you e-mailed Dave Kleiman in 2010?
24     A.   No.
25     Q.   Do you remember the frequency with which

Page 61

1  you e-mailed Dave Kleiman in 2011?
2      A.   No.
3      Q.   Do you remember what you spoke to Dave
4  Kleiman in 2010 and 2011 about?
5      A.   Again, I spoke with a number of topics.
6  I do not try and recollect all the things that are
7  spoken about.
8      Q.   What can you recollect?
9      MS. MARKOE: Objection.
10     THE WITNESS: We spoke about his problems
11  and going into hospital quite a number of times.
12  BY MR. FREEDMAN:
13     Q.   In 2012 -- did you e-mail Dave Kleiman in
14  2012?
15     A.   Yes.
16     Q.   Did you e-mail Dave Kleiman in 2013?
17     A.   I do not remember.
18     Q.   Do you remember the frequency with which
19  you e-mailed Dave Kleiman in 2012?
20     A.   No.
21     Q.   Do you remember the topics you e-mailed
22  Dave Kleiman about in 2012?
23     A.   No.
24     Q.   None of them?
25     A.   I know there were a couple of things

MAGNA
LEGAL SERVICES

Page 62

1  about companies that I wanted to set up but none of them
2  is not do I remember them all, no.
3       Q.   Which companies do you recall speaking
4  about in 2012 with Dave Kleiman?
5       A.   I spoke to him about a company called
6  Design by Human that he was supposed to set up for me,
7  which he did not end up paying for.
8       Q.   What do you mean "paying for"?
9       A.   To set up a company you need to pay for
10  it.  The exchange of goods and services generally
11  requires the exchange of money.  The exchange of money
12  is generally considered paying for something.
13       Q.   Do you mean a registration?
14       A.   Yes.
15       Q.   Did you e-mail Dave Kleiman about
16  timechain, blockchain or Bitcoin in 2006?
17       A.   Yes.
18       Q.   How did you communicate with Dave --
19  strike that.  What method did you use to communicate
20  with Dave Kleiman in 2006 about blockchain ----
21       A.   Sorry, 2006, no, I did not.  I was
22  thinking about the last year, sorry, about that,
23  I thought it was 2012.  In 2006, no, I did not talk
24  about blockchain or timechain or anything like that with
25  Dave.

Page 63

1       Q.   In 2007, did you speak with Dave Kleiman?
2  And when I say "speak", I want you to include any form
3  of communication; do we understand each other?
4       A.   Yes.
5       Q.   In 2007, did you speak with Dave Kleiman
6  about blockchain, timechain or Bitcoin?
7       A.   I do not remember the first time that
8  I actually mentioned it to Dave.
9       Q.   It could have been in 2007?
10       A.   It was either 2007 or 2008.  There's an
11  e-mail that I believe people have a copy of.  I do not
12  remember the date of the e-mail.
13       Q.   What does the e-mail say?
14            MS. MARKOE:  Objection.
15            THE WITNESS:  I do not remember what the
16  e-mail says.  I think it speaks for itself.
17  BY MR. FREEDMAN:
18       Q.   What was the purpose of e-mailing Dave
19  Kleiman?
20            MS. MARKOE:  Objection.
21            THE WITNESS:  I wanted Dave to give me
22  some help with editing a paper.
23  BY MR. FREEDMAN:
24       Q.   Which paper?
25       A.   In this particular e-mail that I believe

Page 64

1  you are saying, the Bitcoin white paper.
2       Q.   The date of that e-mail -- does it help
3  you recollect if I tell you that that e-mail is in March
4  of 2008?
5       A.   Yes, I will believe that that is the
6  date, then, and the date about that was March 2008 if
7  that is what it says.
8       Q.   Was that e-mail the very first time you
9  spoke to Dave Kleiman about Bitcoin, blockchain or
10  timechain technology?
11            MS. MARKOE:  Objection.
12            THE WITNESS:  I had not been talking to
13  Dave before that point, so those topics were not
14  something I discussed with Dave before that e-mail.
15  BY MR. FREEDMAN:
16       Q.   So that was the very first time you spoke
17  to Dave Kleiman about Bitcoin, blockchain or timechain
18  technology?
19       A.   I do not recollect whether I talked about
20  BlackNet at any point before that, I do not know.
21       Q.   What is BlackNet?
22       A.   BlackNet is a research project I started
23  in 1998.
24       Q.   What about?
25       A.   Digital electronic cash.

Page 65

1       Q.   I am looking at an e-mail from you to
2  Dave Kleiman dated 12th March 2008.  The subject is
3  "Forward deformation and the difficulties of law on the
4  internet".  It states:  "I need your help editing a
5  paper I am going to release later this year.  I have
6  been working on a new form of electronic money, BitCash,
7  Bitcoin ..."  And the e-mail goes on.  Is that the
8  e-mail you are referring to?
9            MS. MARKOE:  Objection.  If you want to
10  show him a document, you can show him a document.
11            MR. FREEDMAN:  Zaharah, please limit your
12  objection to form.
13            MS. MARKOE:  If you want to show him a
14  document, show him a document.
15  BY MR. FREEDMAN:  Zaharah, this is my
16  deposition.
17            MS. MARKOE:  If you want to have him
18  presume ----
19            THE WITNESS:  Can I see the document.
20            MS. MARKOE:  ---- that what you are
21  reading on a screen is accurate and correct, then he can
22  make that presumption if you ask him to, but if you are
23  going to be referencing a document you have to show the
24  witness the document.
25            MR. FREEDMAN:  Thank you, Zaharah.

17  (Pages 62 to 65)

Page 66

1      Q.    Is that the e-mail that we are referring
2  to?
3      A.    Can I see the e-mail?
4      Q.    Not at this time.
5           MS. MARKOE:  Objection.  I am going to
6  instruct him not to answer the question.
7           MR. FREEDMAN:  Then instruct him and just
8  instruct him.  Zaharah, either object to form or
9  instruct him not to answer.  There is no need for
10 dialogue between us.  We can take it up with the court
11 once you instruct him not to answer.
12          MS. MARKOE:  He can answer if you give
13 him the document.  He has asked for the document and you
14 are refusing to give it to him.
15          MR. FREEDMAN:  Zaharah, just instruct him
16 not to answer or object.
17     Q.    Does the e-mail I quoted to you refresh
18 your recollection of the date of the e-mail?
19     A.    Will you show me the e-mail?
20     Q.    Not at this time.
21     A.    Then I cannot answer that question.
22     Q.    So it does not refresh your recollection?
23          MS. MARKOE:  Objection.  You cannot have
24 a recollection refreshed without showing a document.
25 That is basic evidence.

Page 67

1           MR. FREEDMAN:  Zaharah, limit your
2  objection to form.
3           THE WITNESS:  If you wish to show me the
4  document, I will comment on the document.
5  BY MR. FREEDMAN:
6      Q.    In 2009, did you communicate with Dave
7  Kleiman about Bitcoin, blockchain or timechain
8  technology?
9      A.    Yes.
10     Q.    Do you recall the method of
11 communication?
12     A.    Are we talking e-mail or chats?
13     Q.    However you communicated with him about
14 Bitcoin, blockchain or timechain, please tell me all
15 methods.
16     A.    I do not remember all methods.  We used
17 IRC.  We used e-mail.  We used other -- I cannot even
18 remember the chats at the time.  It could have been
19 Facebook.  I do not have that Facebook account any more.
20     Q.    What was the account with Facebook?
21          MS. MARKOE:  Objection.
22          THE WITNESS:  I do not remember.  It is
23 been gone four or five years now.
24 BY MR. FREEDMAN:
25     Q.    Do you remember the name?

Page 68

1      A.    Yes, Dr. Craig Wright.
2      Q.    What e-mails did you use to communicate
3  with Dave Kleiman?
4           MS. MARKOE:  Objection.
5           THE WITNESS:  I do not remember.
6  BY MR. FREEDMAN:
7      Q.    Not even one.
8      A.    No, I had many e-mails.  I do not
9  remember which ones I actually used to communicate with
10 Dave.
11     Q.    Do you remember what e-mails Dave used to
12 receive these communications?
13          MS. MARKOE:  Objection.
14          THE WITNESS:  No, I do not.
15 BY MR. FREEDMAN:
16     Q.    Not even one?
17          MS. MARKOE:  Objection.
18          THE WITNESS:  I do not type in things in
19 my e-mail and bring up the whole name, I have contacts.
20 BY MR. FREEDMAN:
21     Q.    So you do not remember any e-mails?
22          MS. MARKOE:  Objection.
23          THE WITNESS:  I do not remember phone
24 numbers.  I do not remember e-mails.  I save those in
25 context.

Page 69

1  BY MR. FREEDMAN:
2      Q.    You do not remember any of Dave Kleiman's
3  e-mails that you communicated with to him about Bitcoin,
4  blockchain or timechain technology ----
5      A.    I even cannot tell you ----
6      Q.    Dr. Wright, if you could let me finish so
7  we have a clean record, I am sorry.  Do you recall any
8  of the e-mails Dave Kleiman used to receive
9  communications about Bitcoin, blockchain or timechain
10 technology from you in 2009?
11          MS. MARKOE:  Objection: asked and
12 answered.
13          MR. FREEDMAN:  Please limit your
14 objection to form.
15          MS. MARKOE:  I am allowed to preserve my
16 objection for the record.
17          MR. FREEDMAN:  By form, Zaharah.
18          MS. MARKOE:  And I am describing what the
19 form of the objection is.
20          MR. FREEDMAN:  No, that is not permitted
21 by the local rules.
22          MS. MARKOE:  Show me the local rule you
23 are referring to, then.
24          MR. RIVERO:  Please show us the local
25 rule.

MAGNA
LEGAL SERVICES

Page 70

1    MR. FREEDMAN:  Okay.  We will show it to
2  you at the break.
3    MR. RIVERO:  There is no such local rule.
4    MR. FREEDMAN:  There certainly is.  Even
5  the Federal Civil Procedure require you to limit your
6  objection.
7    MR. RIVERO:  Show us ----
8    MR. FREEDMAN:  No, we will do this off
9  the record because I am not going to waste my time with
10  it.
11    MR. RIVERO:  I am not wasting my time
12  with foolishness.  Please show us the rule.  If you say
13  this again show us the rule.
14  BY MR. FREEDMAN:
15    Q.    Did we get an answer to that question?
16  (Pause)  Do you recall any of the e-mails Dave Kleiman
17  used to receive communications about Bitcoin, blockchain
18  or timechain technology from you in 2009?
19    MS. MARKOE:  Objection: asked and
20  answered.
21    MR. FREEDMAN:  You can answer.
22    THE WITNESS:  I do not remember my
23  mother's e-mail address.  I do not remember my son's
24  e-mail address.  I do not remember either of their phone
25  numbers.  I do not remember friends over here's e-mail

Page 71

1  addresses today.  If I was asked to swear or lose
2  everything I have, I could not even give you my sister's
3  e-mail address right now.
4    Q.    Dr. Wright, if you could answer the
5  question posed it would help us move forward.
6    A.    I believe I did.
7    Q.    No, actually, I do not have an answer.
8    A.    That is my total recollection ever on
9  e-mails.
10    Q.    You do not recall any of the e-mails Dave
11  Kleiman used to receive communications from you about
12  Bitcoin, blockchain or timechain technology in 2009?
13    MS. MARKOE:  Objection: asked and
14  answered.
15    THE WITNESS:  I have answered that.
16  BY MR. FREEDMAN:
17    Q.    Do you recall any of the e-mails Dave
18  Kleiman used to receive communications about Bitcoin,
19  blockchain or timechain technology from 2010 through
20  2013?
21    MS. MARKOE:  Objection.
22    THE WITNESS:  I cannot answer what Dave
23  received anything on.  Dave is an independent person.
24  He was never my partner.  I have never had any
25  relationship that way with him.  He was just a friend.

Page 72

1  I have never formed a partnership.  I will never form a
2  partnership.  I hate the whole concept of partnership.
3  I will never be a partner.  I will never have a partner.
4  The only partner I have is my wife.  That is the form of
5  partnership I am in.  I have never been in a
6  partnership.  I do not want to know what other people
7  do.  I do not care what other people do.  I do not ask
8  what other people do.  I do not ever go into any details
9  of what other people do.
10  BY MR. FREEDMAN:
11    Q.    Did you communicate with Dave Kleiman on
12  Bitmessage?
13    A.    Yes.
14    Q.    What was your Bitmessage user name?
15    A.    There is not a Bitmessage user name.
16    Q.    What is there?
17    A.    Addresses.
18    Q.    What is your Bitmessage address?
19    A.    I cannot, from the top of my head, tell
20  you a many, many character long address.  That is not
21  how the thing works.
22    Q.    Do you recall Dave Kleiman's address on
23  Bitmessage?
24    A.    Again, no.  If I cannot recall an e-mail,
25  I definitely cannot recall a 30-something character

Page 73

1  address.
2    Q.    Could you look the addresses up and
3  inform your counsel of them after this deposition?
4    MS. MARKOE:  Objection.
5    THE WITNESS:  No, I could not.
6  BY MR. FREEDMAN:
7    Q.    Why not?
8    A.    I do not have Bitmessage any more.
9    Q.    When did you lose Bitmessage?
10    MS. MARKOE:  Objection.
11    THE WITNESS:  I did not lose Bitmessage.
12  BY MR. FREEDMAN:
13    Q.    Why do not you have Bitmessage any more?
14    MS. MARKOE:  Objection.
15    THE WITNESS:  I stopped using it in 2015.
16  BY MR. FREEDMAN:
17    Q.    Why did you stop using it in 2015?
18    MS. MARKOE:  Objection.
19    THE WITNESS:  Because I decided to stop
20  using it.
21  BY MR. FREEDMAN:
22    Q.    What did you do with all of the
23  Bitmessage communications that were in Bitmessage?
24    MS. MARKOE:  Objection.
25    THE WITNESS:  I do not keep all those



---

Page 74

1    communications.
2    BY MR. FREEDMAN:
3        Q.    What do you do with them?
4        A.    I do not do anything with them.
5        Q.    So?
6        A.    So they do not exist.
7        Q.    In 2015, did any Bitmessages exist?
8        A.    Yes.
9            MS. MARKOE:  Objection.
10   BY MR. FREEDMAN:
11       Q.    What happened to them?
12       A.    I do not know.
13       Q.    Did you delete them?
14           MS. MARKOE:  Objection.
15           THE WITNESS:  I wiped hard drives.
16   BY MR. FREEDMAN:
17       Q.    When, in 2015, did you wipe hard drives?
18       A.    I wiped hard drives all the time.
19   I worked as a digital forensic expert for a part of my
20   time.  I donated my time to working on child
21   exploitation cases, etcetera.  I did many of those.
22   Every time I did something like that, I wiped my hard
23   drive.
24       Q.    Have you wiped any hard drives since the
25   beginning of this litigation?

---

Page 75

1            MS. MARKOE:  Objection.
2            THE WITNESS:  No.
3    BY MR. FREEDMAN:
4        Q.    So, in 2015, you wiped a hard drive and
5    destroyed all electronic records of Bitmessage?
6            MS. MARKOE:  Objection.
7            THE WITNESS:  I do not know whether all
8    electronic messages have been destroyed.
9    BY MR. FREEDMAN:
10       Q.    Where would they be if they still resided
11   on a computer?
12       A.    I do not know.  Dave could have a copy.
13   That would be given on his drive.
14       Q.    Let us limit your responses to your
15   drives for now.  In 2015, you wiped all electronic
16   Bitmessages from all of your electronic media?
17           MS. MARKOE:  Objection:  mischaracterises
18   testimony.
19           MR. FREEDMAN:  Go ahead.  You can answer.
20           THE WITNESS:  My media, yes.  My media
21   has been wiped.  I wipe my media.
22   BY MR. FREEDMAN:
23       Q.    When did you begin discussing Bitcoin --
24   strike that.  Did you discuss Bitcoin, blockchain or
25   timechain technology with Dave Kleiman on Bitmessage?

---

Page 76

1        A.    Yes.
2        Q.    When did those discussions begin on
3    Bitmessage?
4        A.    I do not know.
5        Q.    In 2009?
6        A.    Bitmessage did not exist in 2009.
7        Q.    When did Bitmessage begin to exist?
8            MS. MARKOE:  Objection.
9            THE WITNESS:  I cannot remember.
10   BY MR. FREEDMAN:
11       Q.    In 2010?
12       A.    I do not remember when Bitmessage
13   started.
14       Q.    It started some time after 2009.
15           MS. MARKOE:  Objection.
16           THE WITNESS:  Bitmessage was based on
17   Bitcoin.  Bitcoin was launched in 2009.  Nobody knew
18   about Bitcoin prior to its public launch.  Developers
19   were unable to take the technology in Bitcoin and create
20   something that they did not know existed.  So, I would
21   say it would be rather difficult for someone to invent
22   something using technology that they have never heard
23   of.  That is what you call magic.  I do not believe in
24   magic.
25   BY MR. FREEDMAN:

---

Page 77

1        Q.    Just so you know where I am going, I am
2    going to switch gears now to start talking about the
3    various entities that have been touched on in the
4    litigation.
5            MS. MARKOE:  Why do we not take a
6    restroom break now ----
7            MR. FREEDMAN:  Sure.
8            MS. MARKOE:  ---- if this is a good time
9    to stop.
10           MR. FREEDMAN:  That is fine.  Let us go
11   off the record.
12           THE VIDEOGRAPHER:  Going off the record.
13   The time is 11.57.  End of video card number 1, volume 1
14   of the video deposition of Dr. Craig Wright.
15           (A Short Break)
16           THE VIDEOGRAPHER:  This is the beginning
17   of video card number 2, volume 1, in the video
18   deposition of Dr. Craig Wright.  Going on the record.
19   The time is 12.11.  Thank you.
20           MR. FREEDMAN:  Just a small housekeeping
21   matter before we get back to the line of questioning.
22   I figured out an easy way to resolve our objection
23   issue.  I am giving you on the record a standing
24   objection to form to every single one of my questions at
25   this deposition, so you no longer need to object to

---

Page 78

1   anything.  You can instruct the witness not to answer
2   obviously by the court's directive, but you have an
3   objection preserved as to every single question.
4           MS. MARKOE:  I do not think that that is
5   how it works, and I appreciate the effort, but I will
6   still make objections as I feel and deem necessary.
7           MR. FREEDMAN:  And we will raise with the
8   court that the only reason you are doing so is to coach
9   the witness.
10          MS. MARKOE:  It is not, it is because not
11  every single one of your questions is objectionable.  I
12  have not objected to every single one of your questions.
13          MR. FREEDMAN:  We will let the judge
14  decide.
15      Q.   Dr. Wright, before we took a break -- can
16  you mark this as Plaintiff's Exhibit 1.
17  (Plaintiff's Exhibit 1 marked for identification)
18      Q.   -- we were discussing ----
19          MR. RIVERO:  Sorry, I have a housekeeping
20  question myself.  I want the citation on the rule.
21          MR. FREEDMAN:  Sure.  Do you know what, I
22  will give it to you in the break.  I have it but I am
23  not going to waste my time on the record for it.  I will
24  give it to you.
25          MR. RIVERO:  Please.  I want it on the

Page 79

1   record ----
2           MR. FREEDMAN:  Do problem, we will give
3   it to you on the next break.
4           MR. RIVERO:  Please.
5   BY MR. FREEDMAN:
6       Q.   I am handing you what is marked as
7   Plaintiff's Exhibit 1.  This purports to be an e-mail
8   from to Dave Kleiman dated 12th March 2008.  Do you
9   recognise this e-mail?
10      A.   I recognise what you have there.
11      Q.   Is this the e-mail that you sent?
12          MS. MARKOE:  Objection.
13          THE WITNESS:  No.
14  BY MR. FREEDMAN:
15      Q.   Why is it not the e-mail you sent?
16      A.   Because this is an import into a
17  different mail server that existed at a later time.
18      Q.   Is this an identical copy of the e-mail
19  you sent to Dave Kleiman?
20          MS. MARKOE:  Objection.
21          THE WITNESS:  No, because when you import
22  something from one exchange server to another it is not
23  identical.
24  BY MR. FREEDMAN:
25      Q.   Is the text of the e-mail identical?

Page 80

1           MS. MARKOE:  Objection.
2           THE WITNESS:  I am unable to say whether
3   it is identical.  It looks the same.
4   BY MR. FREEDMAN:
5       Q.   Did you send this original e-mail on 12th
6   March 2008?
7           MS. MARKOE:  Objection.
8           THE WITNESS:  This is not an e-mail.
9   BY MR. FREEDMAN:
10      Q.   Did you send an e-mail that looks the
11  same as this on 12th March 2008?
12          MS. MARKOE:  Objection.
13          THE WITNESS:  I sent an e-mail that
14  contains the body that was approximately like that, if
15  not like that.  I cannot say exactly because this is a
16  copy and whatever else, but that is very familiar, and
17  that would appear to be the e-mail I sent, yes.
18  BY MR. FREEDMAN:
19      Q.   On 12th March 2008?
20          MS. MARKOE:  Objection.
21          THE WITNESS:  Yes.
22  BY MR. FREEDMAN:
23      Q.   Do you have the original copy of this
24  e-mail?
25      A.   No, the original was moved from a former

Page 81

1   exchange mailbox by one of my staff, Nicholas, I do not
2   remember his last name; hence the change in e-mail
3   address.
4       Q.   What do you mean change in e-mail
5   address?
6       A.   The "from" address changes when you move
7   OST files within Microsoft Exchange.  When you preserve
8   exchange of information but change the domains, because
9   you move companies, it alters the sort of domain record
10  within exchange.
11      Q.   So, if I am understanding you correctly,
12  and correct me if I am wrong, the original e-mail was
13  not sent from craig.wright@information-defense.com?
14      A.   That would be correct.
15      Q.   What was the original e-mail it was sent
16  from?
17      A.   I cannot remember which domains I had
18  back then.
19      Q.   Do you have the OST file that was moved
20  by Nicholas?
21      A.   No.
22      Q.   What happened to it?
23      A.   I have no idea.
24      Q.   Did you not think this was an important
25  e-mail to preserve?

MAGNA
LEGAL SERVICES

Page 82

1    MS. MARKOE:  Objection.
2    THE WITNESS:  No, I did not.
3  BY MR. FREEDMAN:
4    Q.    Why not?
5    MS. MARKOE:  Objection.
6    THE WITNESS:  Why would I?  It does not
7  add any value to anything I am doing.
8  BY MR. FREEDMAN:
9    Q.    Do you recall Nicholas's last name?
10   A.    It might be Desmond.  I do not remember.
11   Q.    D-E-S-M-O-N-D?
12   A.    You are asking me to spell someone's name
13 that I can barely remember.
14   Q.    How would we find Nicholas's last name,
15 if we needed to?
16   A.    Look up old records on the internet.
17   Q.    What company did he work for?
18   A.    The question you are, I believe, asking
19 is, which of my companies did he work for, which
20 I believe he worked for Hotwire, Integers and maybe
21 Pholus, P-H-O-L-U-S.  It is one of the Greek gods.  He
22 was a centaur.  He was a wise centaur.
23   Q.    Please, Dr. Wright, if we could have this
24 discussion on the break.  It is interesting but I want
25 to get us through.

Page 83

1    A.    Certainly.
2    Q.    Do you have records from Hotwire,
3  Integers and Pholus that would enable us to look up
4  Nicholas's last name?
5    A.    Unless there is something that the
6  lawyers have captured.  I have never looked at the
7  records in those boxes.  They were delivered to me and
8  they remained sealed until the lawyers opened them.
9    Q.    What boxes are you referring to?
10   A.    The boxes that they took copies of
11 documents from.
12   Q.    You said you received sealed boxes?
13   A.    Yes.
14   Q.    Where did you receive sealed boxes from?
15   A.    When the companies in Australia were shut
16 down, boxes of information were sent to me.
17   Q.    By whom?
18   A.    Someone in Australia, to do with the old
19 company.  I do not know.
20   Q.    I do not recall, I may have asked this:
21 the date of this e-mail, 12th March 2008, was this the
22 first time you reached out to Dave Kleiman about
23 Bitcoin, blockchain or timechain technology?
24   A.    I may have talked to him about BlackNet;
25 I do not recall.

Page 84

1    Q.    This is the first written communication?
2    A.    Again, I do not recall.
3    Q.    There is a company called Craig Wright
4  R&D?
5    A.    There were multiple companies.  There are
6  no longer those companies.
7    Q.    There were multiple companies called
8  Craig Wright R&D?
9    A.    There are multiple companies called Craig
10 Wright R&D.
11   Q.    When was the first Craig Wright R&D
12 founded?
13   A.    In the '90s.
14   Q.    When did it cease to exist?
15   A.    A variety of these companies have ceased
16 at different times.
17   Q.    How many of Craig Wright R&Ds have there
18 been?
19   A.    Seychelles, Panama, Belize, Kenya,
20 Australia, Singapore, a couple of Eastern European ones,
21 Hungary, Hong Kong.  More than that, I do not remember.
22   Q.    Okay.  Craig Wright R&D in the
23 Seychelles, when was it formed?
24   A.    A long time ago.  We are talking
25 20 years.

Page 85

1    Q.    When was the one in Panama formed?
2    A.    About 1998.  My exact recollection of
3  time is ----
4    Q.    When did the one in the Seychelles cease
5  to exist?
6    A.    Somewhere between 2011 and 2013.
7    Q.    When did the one in Belize -- when was
8  the Craig Wright R&D in Belize formed?
9    A.    I do not remember.
10   Q.    When did it cease to exist?
11   A.    I do not exactly remember.
12   Q.    When did Craig Wright R&D in Kenya --
13 strike that.  When was Craig Wright R&D in Kenya formed?
14   A.    Again, I do not remember the exact times
15 on that one.
16   Q.    Approximate year do you recall?
17   A.    Not off the top of my head, no.
18   Q.    Do you have any way to look that up?
19   MS. MARKOE:  Objection.
20   THE WITNESS:  No.
21 BY MR. FREEDMAN:
22   Q.    When did it cease to exist?
23   A.    I do not remember.
24   Q.    What was the purpose of Craig Wright R&D
25 in the Seychelles?



Page 86

```
1          A.   The purpose of all of these was to hold
2    intellectual property.
3          Q.   What type of intellectual property were
4    they holding?
5              MS. MARKOE:  Objection.
6              THE WITNESS:  Any type of intellectual
7    property I held.
8    BY MR. FREEDMAN:
9          Q.   Were they patents?
10         A.   No.
11             MS. MARKOE:  Objection.
12   BY MR. FREEDMAN:
13         Q.   Were they trade secrets?
14             MS. MARKOE:  Objection.
15             THE WITNESS:  Define what you mean by
16   "trade secrets".  That is a very wide area.  I have a
17   masters in intellectual property law, I could spend a
18   long time detailing that if you wish, but please define
19   what you actually mean by "trade secrets" or I will just
20   have to say yes and leave it at that.
21   BY MR. FREEDMAN:
22         Q.   Were they all computer related?
23         A.   No.
24             MS. MARKOE:  Objection.
25   BY MR. FREEDMAN:
```

Page 87

```
1          Q.   Did they relate to Bitcoin?
2          A.   Which one?
3          Q.   You said the purpose of all of these
4    entities -- strike that.  Did any of them hold Bitcoin
5    related intellectual property?
6              MS. MARKOE:  Objection.
7              THE WITNESS:  That, again, is a very wide
8    question.  Did they hold any assets relating to Bitcoin
9    in any way: yes.
10   BY MR. FREEDMAN:
11         Q.   Which ones?
12         A.   Panama, Costa Rica, Australia.  The
13   others I could not say off the top of my head.
14         Q.   Did any of these Craig Wright R&D
15   entities hold blockchain or timechain-related
16   intellectual property?
17             MS. MARKOE:  Objection.
18             THE WITNESS:  It is the same question.
19   Just ask me Bitcoin, because the only thing I do is
20   Bitcoin.
21   BY MR. FREEDMAN:
22         Q.   So, when I say "Bitcoin", you will take
23   it to mean Bitcoin, blockchain and timechain?
24             MS. MARKOE:  Objection.
25             THE WITNESS:  Yes.  I will answer per
```

Page 88

```
1    Bitcoin.  I only work on Bitcoin.  Some of the things
2    I do apply to any blockchain, but I do not develop for
3    Ethereum, I do not develop for other things.  I never
4    have, I never will.  I solely do one single system which
5    is Bitcoin.
6    BY MR. FREEDMAN:
7          Q.   Why did you create multiple entities to
8    hold Bitcoin-related intellectual property in different
9    countries?
10             MS. MARKOE:  Objection.
11             THE WITNESS:  I create multiple entities
12   all the time so that I can protect my assets.  I have
13   what people have called a web of companies because that
14   is the best way to ensure that when someone is doing
15   something that governments may not like, to protect
16   those assets and ensure that they remain protected.
17   BY MR. FREEDMAN:
18         Q.   In what way were you seeking to protect
19   these intellectual property assets?
20             MS. MARKOE:  Objection.  You are going
21   beyond the scope of the topics in this deposition.
22             MR. FREEDMAN:  Zaharah, just instruct him
23   not to answer.
24             MS. MARKOE:  The judge said you can get
25   some leeway with regard to entities that do not relate
```

Page 89

```
1    to Dave Kleiman.
2              MR. FREEDMAN:  Zaharah, either instruct
3    him not to answer or object.  That is it.  Well,
4    actually, do not object because ----
5              MS. MARKOE:  I can explain the basis of
6    my objection.
7              MR. FREEDMAN:  I do not need to hear it.
8    I give you a standing objection.
9              MS. MARKOE:  But the court does.  But the
10   court needs to hear it and I need to make my record.
11             MR. FREEDMAN:  So write it down.
12             MS. MARKOE:  So I am entitled to make my
13   record on the record.
14             MR. FREEDMAN:  Okay, we are going to move
15   on.
16             MS. MARKOE:  You are not permitted to
17   stop me.  I will not allow you to stop me.  I am
18   instructing the witness not to answer that question.
19   You have gone beyond the scope.
20             MR. FREEDMAN:  Which question are you
21   instructing him not to answer?
22             MS. MARKOE:  The last question, I
23   believe, which was -- if the court reporter could kindly
24   read it back to me I would appreciate it.
25        (The court reporter read back as requested)
```

**MAGNA** ▶
LEGAL SERVICES

Page 90

```
 1  BY MR. FREEDMAN:
 2      Q.   Did any of these Craig Wright R&Ds
 3  involve Dave Kleiman?
 4          MS. MARKOE:  Objection.
 5          THE WITNESS:  No.
 6  BY MR. FREEDMAN:
 7      Q.   Did they involve W&K?
 8          MS. MARKOE:  Objection.
 9          THE WITNESS:  No.
10  BY MR. FREEDMAN:
11      Q.   Did they ever enter into transactions
12  with Dave Kleiman or W&K?
13          MS. MARKOE:  Objection.
14          THE WITNESS:  They enacted transactions
15  with W&K, of which Dave was a member.
16  BY MR. FREEDMAN:
17      Q.   What were the transactions they entered
18  into W&K with?
19      A.   They had contracts with W&K.
20      Q.   Which entities specifically had contracts
21  with W&K?
22      A.   I do not remember each of the contracts.
23      Q.   Which entity had the contract?
24          MS. MARKOE:  Objection.
25          THE WITNESS:  I do not remember each of
```

Page 91

```
 1  the contracts.
 2  BY MR. FREEDMAN:
 3      Q.   Was the ownership of all these Craig
 4  Wright R&D entities identical?
 5          MS. MARKOE:  Objection.
 6          THE WITNESS:  No.
 7  BY MR. FREEDMAN:
 8      Q.   Who owned the Craig Wright R&D in the
 9  Seychelles?
10          MS. MARKOE:  Objection.
11          THE WITNESS:  I am unable to answer the
12  "who owned" because each of the companies, or whatever
13  else I have, has a complex ownership structure.  At the
14  end of the day, I own nothing.  I do not own a single
15  share in any company that I know of.  I do not own a
16  single disposition of a trust that I know of.  I have no
17  ownership of anything, which is what you are trying to
18  get at.  I have very carefully constructed something
19  where I get to direct my research and own nothing.
20  BY MR. FREEDMAN:
21      Q.   So I appreciate, again, that you are
22  anticipating where I am going, but please just answer
23  the question.
24      A.   I believe that was answering the
25  question.
```

Page 92

```
 1      Q.   Actually, I just want to know who owns
 2  them, not if you own them.  Who owns them?
 3          MS. MARKOE:  Objection.
 4          THE WITNESS:  I believe I was ----
 5          MS. MARKOE:  You may answer.
 6          THE WITNESS:  I believe I was answering.
 7  My answer is I have set up something so that I do not
 8  need to know who owns them.  I do not know who owns
 9  nChain now.
10  BY MR. FREEDMAN:
11      Q.   Who knows who owns Craig Wright R&D?
12          MS. MARKOE:  Objection.
13          THE WITNESS:  I have ensured that I know
14  nothing about the ownership of the companies I am with.
15  BY MR. FREEDMAN:
16      Q.   Who did you make that arrangement with?
17          MS. MARKOE:  Objection.
18          THE WITNESS:  Other individuals.
19  BY MR. FREEDMAN:
20      Q.   What are the names of those individuals?
21          MS. MARKOE:  Objection.
22          THE WITNESS:  I do not remember all of
23  their names.  Those people are no longer part of my
24  life.
25  BY MR. FREEDMAN:
```

Page 93

```
 1      Q.   Do you remember any of their names?
 2          MS. MARKOE:  Objection.
 3          THE WITNESS:  Yes.
 4  BY MR. FREEDMAN:
 5      Q.   Can you tell me the names that you do
 6  recall?
 7          MS. MARKOE:  Objection.
 8          THE WITNESS:  There was a Mark in High
 9  Secured in Panama.
10  BY MR. FREEDMAN:
11      Q.   Anyone else?
12      A.   I am thinking.  (Pause) No, I do not
13  remember the names.
14      Q.   Do you remember Mark's last name?
15      A.   No, I do not.
16      Q.   Mark was part of the people that took
17  care of the ownership of Craig Wright R&D for you?
18          MS. MARKOE:  Objection.
19          THE WITNESS:  I do not know exactly what
20  they did.  People set up structures.
21  BY MR. FREEDMAN:
22      Q.   You trusted these people to set up
23  structures for your companies?
24          MS. MARKOE:  Objection.
25          THE WITNESS:  High Secured was a law
```

MAGNA
LEGAL SERVICES

Page 94

```
 1  firm.
 2  BY MR. FREEDMAN:
 3      Q.   So you trusted a law firm to set up
 4  ownership structures for your companies?
 5      A.   Yes.
 6      Q.   And you have no way to get those records
 7  today?
 8      A.   Not that I know of.
 9      Q.   Did Craig Wright R&D ever mine Bitcoin?
10          MS. MARKOE:  Objection.
11          THE WITNESS:  No.
12  BY MR. FREEDMAN:
13      Q.   Was Craig Wright R&D ever audited by the
14  Australian Tax Office?
15          MS. MARKOE:  Also, I just want to make
16  sure for the court reporter, it is High Secured.
17  BY MR. FREEDMAN:
18      Q.   Were any of the Craig Wright R&D entities
19  ever audited by the Australian Tax Office?
20      A.   No.
21      Q.   Were they ever the subject of an
22  Australian Tax Office investigation?
23      A.   I do not know what the tax office
24  investigates.
25      Q.   I just want to know what you know.  Are
```

Page 95

```
 1  you aware of ----
 2      A.   I do not know what the tax office
 3  investigates.
 4      Q.   Are you aware of any Australian Tax
 5  Office investigation over any of the Craig Wright R&D
 6  entities?
 7      A.   I do not know what the tax office
 8  investigates.
 9      Q.   So you are not aware of any such
10  investigation?
11          MS. MARKOE:  Objection.
12          THE WITNESS:  I do not know what the tax
13  office investigates.  I will not speak for the tax
14  office.
15  BY MR. FREEDMAN:
16      Q.   I am not asking you to speak for the tax
17  office, I am just ask you to tell me if you are aware of
18  an investigation?
19          MS. MARKOE:  Objection.
20          THE WITNESS:  You are asking me to
21  express awareness of a federal body's investigations.
22  I have no interest in those unless it involves me
23  personally, in which case they will audit me first or do
24  something else.  I will not speculate as to the nature
25  of what a government body will do.
```

Page 96

```
 1      Q.   Did any of these Craig Wright R&D
 2  entities ever go by another name?
 3      A.   No.
 4      Q.   I am going to the next entity.  It is
 5  called Chaos and Non-Linear FNE & Finance.
 6      A.   That is not the correct company name.
 7      Q.   What is the correct company name?
 8      A.   The exact reference I cannot remember,
 9  but that is not it.
10      Q.   When was it founded?
11      A.   I do not remember.  The records will be
12  on ASIC, A-S-I-C.
13      Q.   What was the purpose of this entity?
14      A.   To use non-linear forecasting, which is
15  probably the word, in the creation of models for
16  determining different linear risk effects.
17      Q.   Does this have to do with Bitcoin?
18      A.   No.
19      Q.   Does it have to do with blockchain or
20  timechain?
21          MS. MARKOE:  Objection.
22          THE WITNESS:  Again, the same question.
23  BY MR. FREEDMAN:
24      Q.   Who owns Chaos and Non-Linear FNE &
25  Finance?
```

Page 97

```
 1      A.   Nobody as far as I know.  I believe it is
 2  already liquidated.  If not, it is in the process of
 3  being liquidated.
 4      Q.   Who owned it at the time it was
 5  established?
 6      A.   You would need to look at the
 7  shareholding.
 8      Q.   How do I obtain the shareholding?
 9      A.   I do not know.
10      Q.   Do you have access to the shareholding?
11      A.   If those records that the lawyers have
12  copied has any copy, then that would have it, otherwise
13  I do not know.  I have not looked at those records.
14  I do not intend to.
15      Q.   Did you use lawyers to form that entity?
16          MS. MARKOE:  Objection: relevance.
17          THE WITNESS:  You are asking whether I --
18  that would be a privileged thing, whether I used lawyers
19  or not and what I use them for, so are you asking me to
20  breach privilege?
21  BY MR. FREEDMAN:
22      Q.   Dr. Wright, you have to allow your own
23  counsel to object.  You cannot object as a witness.
24      A.   I did not object.  I just said, are you
25  asking me to ----
```

Page 98

1    Q.   I am asking ----
2         MR. RIVERO:  Let me step in a second.
3    Dr. Wright, the question as posed is, did you use
4    lawyers?  You may answer that, but please avoid going
5    into any communications with the lawyers.
6         THE WITNESS:  Mmm-hmm, okay.  I do not
7    remember.
8    BY MR. FREEDMAN:
9    Q.   Did W&K or Dave Kleiman ever own a
10   percent of this entity?
11   A.   No.
12   Q.   Did this entity ever enter into a
13   relationship with Dave Kleiman or W&K?
14        MS. MARKOE:  Objection.
15        THE WITNESS:  It was formed after
16   Mr. Kleiman died.
17   BY MR. FREEDMAN:
18   Q.   Do you remember when it was formed?
19   A.   No.
20   Q.   Did this entity ever go by another name?
21   A.   No.
22   Q.   Did this entity ever mine Bitcoin?
23        MS. MARKOE:  Objection.
24        THE WITNESS:  No.
25        MS. MARKOE:  He has already said that

Page 99

1    this entity was established after Mr. Kleiman's death.
2    Therefore, I am going to instruct him not to answer
3    any further questions about this entity.  I believe you have
4    asked all the questions that are sort of permitted under
5    sub-(2) as envisioned by the court, as I understood it.
6         MR. FREEDMAN:  Your recollection is
7    wrong, but we will take it up with the court.
8    Q.   I am going to move on to the next entity,
9    Cloudcroft.  When was Cloudcroft founded?
10   A.   I do not remember the date on any of
11   these companies.  All of them would be listed on ASIC.
12   It is a public record.  You can pay for it.  I am not
13   going to pay for it to hand it to you.
14   Q.   What was the purpose of this entity?
15   A.   Cloudcroft was designed -- well, created
16   for the development of large storage in high compute
17   devices.  It was so that you would have machines that
18   could hold multiple petabytes of data and process those
19   using an optical backend at high speed.
20   Q.   Did this entity ever mine Bitcoin?
21        MS. MARKOE:  Objection.
22        THE WITNESS:  No.
23   BY MR. FREEDMAN:
24   Q.   Did this entity ever create intellectual
25   property related to Bitcoin?

Page 100

1         MS. MARKOE:  Objection.  You may answer.
2         THE WITNESS:  The nature of Bitcoin goes
3    to what we have dubbed Metanet.  That requires storage.
4    To do that, to have large blocks and to scale Bitcoin
5    requires the creation of machines that can handle very
6    large transaction volumes and eventually be able to send
7    terabyte and larger block sizes in milliseconds.
8    BY MR. FREEDMAN:
9    Q.   So, did the entity ever create
10   intellectual property that relates to Bitcoin?
11        MS. MARKOE:  Objection.
12        THE WITNESS:  I believe I just said yes,
13   even if you did not understand it.
14   BY MR. FREEDMAN:
15   Q.   Was this entity ever audited by the
16   Australian Tax Office?
17   A.   Yes.
18   Q.   When?
19   A.   I do not remember the dates of the
20   audits.
21   Q.   Were there multiple audits?
22        MS. MARKOE:  Objection: vague.
23        THE WITNESS:  I have accountants in the
24   past, and I have them now.  They do these things.  I do
25   not necessarily, apart from when I am pulled up to

Page 101

1    things, go in and I definitely do not try to remember
2    the dates of when all this happened.
3    BY MR. FREEDMAN:
4    Q.   So your accountants would be aware of
5    this information?
6         MS. MARKOE:  Objection.
7         THE WITNESS:  I do not know.
8    BY MR. FREEDMAN:
9    Q.   Which accountants did you use to handle
10   the Australian Tax Office investigations?
11        MS. MARKOE:  Objection.  Are you
12   referring to this entity or are you referring to
13   generally?  It is just very unclear what you are talking
14   about and we need to have a clear record so that there
15   are no misunderstandings.
16   BY MR. FREEDMAN:
17   Q.   What accountants did you use to handle
18   Australian Tax Office investigations and audits of
19   Cloudcroft?
20   A.   If you are going to ask it that way,
21   I will say I do not remember.
22   Q.   What accountants do you recall using to
23   handle any Australian Tax Office investigation or audit?
24   A.   I did not use accountants to handle tax
25   office audits; I used accountants to be accountants and

MAGNA
LEGAL SERVICES

Page 102

1    auditors.  Would you like me to answer that?
2        Q.   Yes, please.
3        A.   During the time that we were there, we
4    used KPMG, we used Ernst & Young, we used Harry
5    something, I do not remember the name exactly, which is
6    in the records, and we had internal audit and accounts.
7        Q.   What are the names of the internal
8    auditing accounts?
9            MS. MARKOE:  Objection.
10            THE WITNESS:  I do not know what the
11    auditing accounts are, but if you are asking what is the
12    name of the person who was the CFO or accountant, at one
13    point that was John Cheshire, and we had a bookkeeper
14    Ann, and I do not remember her last name.  I am sure it
15    is on record somewhere.
16    BY MR. FREEDMAN:
17        Q.   Is that Ann Wrightson?
18        A.   That would be it, yes.
19            MR. RIVERO:  Can I just say to keep the
20    record clear, I believe he said "internal audit and
21    accounts", as opposed to "internal auditing accounts",
22    although I have old ears.
23            THE WITNESS:  That is correct.
24    BY MR. FREEDMAN:
25        Q.   Was there anyone else that worked

Page 103

1    internally as an accountant or CFO for your companies?
2        A.   Yes.
3        Q.   What were their names?
4        A.   I do not remember.
5        Q.   Did Jamie Wilson ever work as an
6    accountant for you?
7        A.   Very briefly.
8        Q.   What time period was that?
9        A.   I dealt with Jamie Wilson some time
10    between -- some time in 2012 into 2013.
11        Q.   Why did he stop working for you?
12            MS. MARKOE:  Objection.
13            THE WITNESS:  He was fired.
14    BY MR. FREEDMAN:
15        Q.   Why was he fired?
16            MS. MARKOE:  Objection.  This is really
17    going beyond the scope now.
18    BY MR. FREEDMAN:
19        Q.   Why was he fired?
20            MS. MARKOE:  I am going to instruct the
21    witness not to answer.  It goes beyond the scope.
22    BY MR. FREEDMAN:
23        Q.   Did KPMG interact with the Australian Tax
24    Office -- strike that.  When your companies were under
25    audit by the Australian Tax Office, did KPMG handle

Page 104

1    interactions with the tax office?
2        A.   No.
3        Q.   Same question for Ernst & Young?
4        A.   No.
5            MS. MARKOE:  Objection.
6    BY MR. FREEDMAN:
7        Q.   Did Harry, and we do not recall his last
8    name, interact with the ATO in regard to their audits?
9        A.   He interacted, but that is different than
10    your former question.
11        Q.   I know.  Did he interact -- he did?
12        A.   Interact means he communicated in some
13    way.  He e-mailed, he phoned, he had lunch, he passed
14    them in the street and said "Hi".  So, being an auditor,
15    I would say he interacted with the ATO many times.
16        Q.   Did Harry handle the Australian Tax
17    Office investigation on your behalf or your companies'
18    behalf?
19        A.   No.
20            MS. MARKOE:  Objection.
21    BY MR. FREEDMAN:
22        Q.   Did John Cheshire handle the Australian
23    Tax Office investigation for you or your companies'
24    behalf?
25        A.   He did some of that.

Page 105

1        Q.   Did Ann Wrightson?
2        A.   No.
3        Q.   Did Jamie Wilson?
4        A.   No.
5        Q.   What time period did John Cheshire work
6    for your companies or yourself?
7            MS. MARKOE:  Objection: compound.
8    BY MR. FREEDMAN:
9        Q.   What time period did John Cheshire work
10    for you?
11            MS. MARKOE:  Objection.
12            THE WITNESS:  John, I believe, would have
13    first been about 2008 until 2015, in different roles.
14            MS. MARKOE:  Can you please just spell
15    for the record how you spell Cheshire, because I think
16    it is being misspelt right now, if you remember.
17            THE WITNESS:  I am sorry, I cannot tell
18    you how I would spell John Cheshire.  I could make a
19    guess, but then I am just guessing.
20            MR. RIVERO:  Do not guess.
21    BY MR. FREEDMAN:
22        Q.   Did Ray Hong work for you at Cloudcroft?
23        A.   He worked in one of my companies.
24        Q.   Do you recall which company?
25        A.   No.

MAGNA
LEGAL SERVICES

Page 106

1      Q.    Do you recall what he did for your
2   companies?
3      A.    Yes.
4      Q.    What did he do for your companies?
5      A.    He was a programer and graphic designer.
6      Q.    What did he program for you?
7      A.    Code.
8      MS. MARKOE:  Objection.
9   BY MR. FREEDMAN:
10     Q.    Did it relate to Bitcoin?
11     MS. MARKOE:  Objection.
12     THE WITNESS:  Yes.
13     MR. RIVERO:  One moment.  Dr. Wright,
14  I can only instruct you.  I would be happy to instruct
15  everyone else.  The court reporter can only take one of
16  us at a time.  You have to pause a beat to allow the
17  objection.
18     THE WITNESS:  Certainly.
19     MR. RIVERO:  I do not mean to single you
20  out because everyone is doing it.
21     THE WITNESS:  Yes.  My apologies.
22  BY MR. FREEDMAN:
23     Q.    Who owned Cloudcroft on its founding?
24     A.    You would have to look at the records.  I
25  do not remember.

Page 107

1      Q.    Did the ownership ever change?
2      A.    I would believe so, but again you would
3   have to look at the records.  I do not remember.
4      Q.    Was Cloudcroft ever owned by
5   Tulip Trading?
6      A.    You would have to look at the records.  I
7   do not remember.  I do not do the company secretarial.
8      Q.    Do you have any recollection of the
9   ownership of Cloudcroft at any point in time?
10     A.    I do not speculate on these things.
11  I instruct people to do stuff.  I hire company
12  secretarial when I need to.  I do not remember.
13     Q.    Did Lynne Wright ever own any portion of
14  Cloudcroft?
15     A.    I do not remember.
16     Q.    Was this entity related to Dave or W&K in
17  any way?
18     A.    Not at any point.
19     Q.    Did this entity ever go by another name?
20     A.    I do not remember.
21     Q.    Is this entity still in existence?
22     A.    I have not checked.
23     Q.    I am going to move to the next entity.
24  This is ----
25     MS. MARKOE:  Before we move to the next

Page 108

1   entity, it is getting on to be about 1 o'clock.  Do you
2   want to go till 1 o'clock and then I do not know if we
3   are breaking for lunch, if they are bringing lunch in,
4   what the story is, but ----
5      MR. FREEDMAN:  Let us go off the record.
6      THE VIDEOGRAPHER:  Going off the record.
7   The time is 12.45.
8      (A Short Break)
9      THE VIDEOGRAPHER:  Going back on the
10  record.  The time is 12.46.  Thank you.
11  BY MR. FREEDMAN:
12     Q.    Did a woman with the first name of Ellen
13  ever work at any of your companies?
14     MS. MARKOE:  Objection.
15     THE WITNESS:  I do not know all the staff
16  at my companies now, so I cannot answer that.
17  BY MR. FREEDMAN:
18     Q.    You have no recollection of a woman named
19  Ellen working at your companies?
20     MS. MARKOE:  Objection.
21     THE WITNESS:  Do you have a last name?
22  BY MR. FREEDMAN:
23     Q.    I do not.
24     A.    I have no idea.
25     Q.    No recollection?

Page 109

1      A.    You realise that I have companies across
2   the world, and I meet people all the time in my
3   companies, and have no idea about all the people.
4   I shake hands, I speak in front of staff, I do all this
5   sort of stuff and people go, "Hey, I am such and such",
6   and a year later I do not remember.
7      Q.    Doctor, I am a bit confused because
8   earlier I thought you told me you do not own any
9   companies and now you have referring to your companies
10  so can you explain how that works?
11     MS. MARKOE:  Objection.
12     THE WITNESS:  I founded them.  You are
13  trying to confuse or confound people with the notion
14  that a company that I own shares of, or the company that
15  I have set up to do my research, are separate.  The fact
16  that I do not own, that I have set up trusts and
17  whatever else out of my control, does not remove the
18  fact that I will call them "my companies".
19  BY MR. FREEDMAN:
20     Q.    Okay.  I am going to move to the next
21  entity.  This is called C01N.
22     A.    C01N.
23     Q.    When was C01N founded?
24     MS. MARKOE:  Objection.
25     THE WITNESS:  I do not remember the date

MAGNA
LEGAL SERVICES

Page 110

1  and which C01N in particular you are talking about.
2  BY MR. FREEDMAN:
3      Q.   Is there more than one C01N?
4      A.   Yes.
5      Q.   Please list them for me?
6      A.   I do not remember them all.  I would need
7  to look at records.
8      Q.   Please list the ones you recall?
9      A.   UK, Australia.
10     Q.   When was the UK C01N formed?
11     A.   Under a different name, that is either
12 Permanent Success or Design by Human or whatever else, I
13 do not remember which exactly it was, which would have
14 been 2012.
15     Q.   So, why did you change the name in 2012?
16         MS. MARKOE:  Objection: mischaracterises
17 the record.
18         THE WITNESS:  I did not change the name
19 in 2012.
20 BY MR. FREEDMAN:
21     Q.   Why was the name changed in 2012?
22         MS. MARKOE:  Objection: mischaracterises
23 the testimony.
24         THE WITNESS:  As I just said, I did not
25 change the name in 2012, the name was not changed in

Page 111

1  2012.  Nor did I say ----
2  BY MR. FREEDMAN:
3      Q.   How did Permanent Success Limited or
4  Design by Human become C01N?
5      A.   The name was changed.
6      Q.   Who changed the name?
7      A.   I instructed a person in the UK to change
8  the name.
9      Q.   When did you make that instruction?
10     A.   After Dave's death.
11     Q.   Do you have ----
12     A.   I do not have the records in front of me.
13 I do not remember.
14     Q.   Who did you instruct to change the name?
15     A.   I have no idea.
16     Q.   You said a person in the UK?
17     A.   Yes.
18     Q.   But you do not recall who it was?
19     A.   I do not have the records in front of me.
20 If it is company secretarial, then all those records
21 would have been there at the time.  I have no idea.
22     Q.   What was the purpose of Permanent Success
23 Limited or Design by Human when it was formed?  You know
24 what, strike that.  What was the purpose of Permanent
25 Success Limited when it was formed?

Page 112

1      A.   Is that C01N?  I cannot remember if that
2  is the exact one.  I do not remember which one is which.
3      Q.   Let us forget about C01N for a moment.
4  I am talking about Permanent Success Limited.
5      A.   Is that separate to C01N?  I am asking
6  that question.  I do not remember otherwise.
7      Q.   I do not know.  It is your companies.
8          MS. MARKOE:  Objection: mischaracterises
9  the testimony.
10 BY MR. FREEDMAN:
11     Q.   When Permanent Success Limited was
12 formed, what was its purposes?
13     A.   What was the rename of that company?  I
14 do not know otherwise.  I did not name it.
15     Q.   Permanent Success Limited and Design by
16 Human were both renamed?
17     A.   Yes.
18     Q.   What were the two renames?
19     A.   You would need to tell me.  I do not
20 remember off the top of my head.  One of them became
21 C01N.  If you can give me the name that you are talking
22 about that it later became, I could give you
23 information.
24     Q.   The one that later became C01N?
25     A.   Yes.

Page 113

1      Q.   What was the purpose at formation?
2      A.   The purpose was to hold assets because
3  I wanted to eventually form something as a wallet for
4  Bitcoin.  So a custodial wallet service.
5      Q.   What assets did it hold?
6      A.   None.
7      Q.   Did it ever hold assets?
8      A.   It never held assets.
9      Q.   So what purpose did C01N serve?
10     A.   I believe I have said exactly what it
11 served.
12     Q.   You said why you formed it.  Did it end
13 up serving the purpose you formed it for?
14     A.   No.
15     Q.   So what purpose did it serve?
16     A.   It was there while I was creating.  We
17 did not end up launching C01N as a wallet.
18     Q.   So did C01N ever hold assets -- any type
19 of asset?
20     A.   Hold?  No.
21     Q.   Did it ever own assets?
22     A.   Yes.
23     Q.   What assets did it own?
24         MS. MARKOE:  Objection.
25         THE WITNESS:  It owned rights.

MAGNA ▶
LEGAL SERVICES

Page 114

```
 1    BY MR. FREEDMAN:
 2        Q.   It owned rights to what?
 3        A.   It owned rights to other assets.
 4        Q.   What assets did it own rights to?
 5        A.   I would need to look up the list.
 6        Q.   Was it Bitcoin?
 7        A.   Was what Bitcoin?
 8        Q.   Did it own rights to Bitcoin?
 9        A.   In part.
10             MS. MARKOE:  Objection.
11    BY MR. FREEDMAN:
12        Q.   Did it own rights to intellectual
13    property?
14             MS. MARKOE:  Objection.
15             THE WITNESS:  I would need to look at the
16    list of what was actually deposited into that company to
17    answer that question.
18    BY MR. FREEDMAN:
19        Q.   Who has the list of what was deposited
20    into that company?
21        A.   Unless it is in any of the records that
22    have been given to the lawyers, I cannot answer.
23        Q.   So are those assets lost to you now?
24             MS. MARKOE:  Objection.
25             THE WITNESS:  What assets?
```

Page 115

```
 1    BY MR. FREEDMAN:
 2        Q.   The Bitcoin assets?
 3             MS. MARKOE:  Objection.
 4             THE WITNESS:  What Bitcoin are you
 5    referring to?
 6    BY MR. FREEDMAN:
 7        Q.   C01N holds rights to Bitcoin; is that
 8    correct?
 9             MS. MARKOE:  Objection.
10             THE WITNESS:  No, C01N does not hold
11    rights to Bitcoin.
12    BY MR. FREEDMAN:
13        Q.   What does C01N hold rights to?
14        A.   C01N is a liquidated company.  It holds
15    rights to nothing.
16        Q.   When C01N was operational?
17        A.   I have already stated C01N was never
18    operational.
19        Q.   At some point in time C01N owned rights;
20    is that a correct statement?
21             MS. MARKOE:  Objection.
22             THE WITNESS:  That is a correct
23    statement.
24    BY MR. FREEDMAN:
25        Q.   When did it own those rights -- during
```

Page 116

```
 1    what period of time?
 2             MS. MARKOE:  Objection.
 3             THE WITNESS:  I would need to look at the
 4    records.  I do not know the date of the transfers off
 5    the top of my head.
 6    BY MR. FREEDMAN:
 7        Q.   Before Dave died or after Dave died?
 8             MS. MARKOE:  Objection.
 9             THE WITNESS:  After Dave died.
10    BY MR. FREEDMAN:
11        Q.   When was it liquidated?
12        A.   I do not know that.
13        Q.   Was it operational in 2008?
14             MS. MARKOE:  Objection.
15             MR. FREEDMAN:  Sorry, 2018.
16             THE WITNESS:  The company has never been
17    operational.
18    BY MR. FREEDMAN:
19        Q.   Was it in existence in 2018?
20        A.   I do not believe so, but you would need
21    to look at the records.  Companies House in the UK holds
22    records.  You can obtain them.
23             MR. RIVERO:  I think the last question
24    was in existence in 2018, but I do not want to misstate
25    it.  The record is showing 2008.
```

Page 117

```
 1             MS. MARKOE:  He corrected it.
 2             MR. RIVERO:  I apologise, sorry about
 3    that.
 4    BY MR. FREEDMAN:
 5        Q.   In 2013, C01N was in existence?
 6             MS. MARKOE:  Objection.
 7             THE WITNESS:  It was not called C01N at
 8    that time, I believe.  I do not know when the change was
 9    made to the name, but the company had been formed.
10    BY MR. FREEDMAN:
11        Q.   Once it had been formed, it held rights?
12        A.   No.
13             MS. MARKOE:  Objection.
14    BY MR. FREEDMAN:
15        Q.   When did it obtain rights?
16        A.   Again, I would need to look at the
17    accounts and records to say when rights were issued.
18        Q.   But at some point it held rights?
19        A.   Yes.
20        Q.   It held rights to Bitcoin?
21        A.   At some point it held rights to Bitcoin.
22        Q.   What does that mean?
23        A.   The term "rights" is defined in property
24    law rather succinctly.  Would you like me to start
25    quoting maybe Black's Law Dictionary on the nature of
```

Page 118

1 rights?
2    Q.   I would like you to tell me what was the
3 nature of the rights C01N held?
4       MS. MARKOE:  Objection.
5       THE WITNESS:  It had rights.  I do not
6 have the records.  I cannot read the exact stipulations.
7 BY MR. FREEDMAN:
8    Q.   So, in your own terms, describe to me
9 what C01N was able to do with its rights?
10       MS. MARKOE:  Objection.
11       THE WITNESS:  C01N cannot do anything.
12 It is a legal entity, which means by itself it cannot
13 actually do anything.  An individual, a person, needs to
14 direct and make things happen.
15 BY MR. FREEDMAN:
16    Q.   Yes, but they did so under the auspices
17 of C01N?
18       MS. MARKOE:  Objection.
19       THE WITNESS:  Did what under the auspices
20 of C01N exactly, please?  Be specific.
21 BY MR. FREEDMAN:
22    Q.   Should C01N have exercised its rights --
23 strike that.  If an individual of the appropriate
24 authority directed C01N to exercise its rights to
25 Bitcoin, what could they have done with it?

Page 119

1       MS. MARKOE:  Objection: calls for
2 speculation.
3       MR. FREEDMAN:  You can answer.
4       THE WITNESS:  If someone has rights to an
5 asset, they can do all sorts of things.  As a
6 speculative dive, someone with assets can destroy
7 assets, move assets, give them away.  So on a pure
8 speculative form in the way that you are asking this,
9 what could be done?  They could be made into a
10 charitable trust.  They could be shot into space as a
11 certain Tesla is believed to be up there.  They could be
12 given away to children's charities in Africa.
13 BY MR. FREEDMAN:
14    Q.   So, how much Bitcoin did C01N hold rights
15 over?
16       MS. MARKOE:  Objection.
17       THE WITNESS:  I would need to look at the
18 accounts.  I do not know off the top of my head.
19 BY MR. FREEDMAN:
20    Q.   Who has the accounts?
21    A.   I do not know.  It is a liquidated
22 company.  It has been closed.
23    Q.   So, where did the rights that C01N had
24 go?
25    A.   They have been moved.  I would need to

Page 120

1 look at the individual records to say what transfers
2 have occurred.  What you are trying to ask is about
3 Mr. Kleiman.  Mr. Kleiman had no ownership in that
4 company at any point.  He no assets in that company.
5 Nothing of his ever transferred to that company, or out
6 of that company.  He had no shareholding.  He had no
7 employee nature.  There was no contracts with
8 Mr. Kleiman.  There was no depositing of assets, removal
9 of assets, there was nothing that he owned ever went
10 into it.  A cent of his money or more never was involved
11 with anything to do with it.  He did not pay for the
12 formation.  He was asked to, he did not, because he got
13 sick, and that never occurred.
14    Q.   Did W&K have any relationship with C01N?
15       MS. MARKOE:  Objection.
16       THE WITNESS:  No.
17 BY MR. FREEDMAN:
18    Q.   Did C01N ever mine Bitcoin?
19       MS. MARKOE:  Objection.
20       THE WITNESS:  No.
21 BY MR. FREEDMAN:
22    Q.   Was C01N ever audited by the ATO?
23    A.   I do not know how that would be possible.
24 If you are talking about C01N UK, then C01N UK is a
25 British entity.

Page 121

1    Q.   Was it ever audited?  A simple yes or no
2 suffices.
3    A.   I would not be able to answer that.
4 I have no idea how the Australian government could ever
5 audit a British company, and if they did it would not
6 involve me.
7    Q.   You told me there is a UK entity C01N and
8 an Australian entity C01N?
9    A.   And I was very specific because we were
10 talking about the UK entity, you had not switched back
11 to the Australian entity, and I answered saying the UK
12 C01N.
13    Q.   So the Australian C01N, did it ever mine
14 Bitcoin?
15       MS. MARKOE:  Objection.
16       THE WITNESS:  No.
17 BY MR. FREEDMAN:
18    Q.   Was the Australian C01N ever audited by
19 the ATO?
20    A.   Yes.
21    Q.   When did that audit begin?
22    A.   I do not have the records in front of me.
23 I cannot answer any of those details.
24    Q.   Where do those records exist?
25       MS. MARKOE:  Objection.

MAGNA
LEGAL SERVICES

Page 122

1    THE WITNESS: I have no idea, other than
2  the documents that have been handed to my lawyers.  That
3  is all I have.
4  BY MR. FREEDMAN:
5    Q.    Who were the directors of C01N?
6    MS. MARKOE:  Objection.
7    THE WITNESS:  Again, I do not remember
8  which directors were directors at any particular time.
9  I do not do company secretarial.  I pay other people to
10  do company secretarial.  As such, other people,
11  including professional companies that were there doing
12  that, would know these things, not me.
13  BY MR. FREEDMAN:
14    Q.    Who are those companies, so we can reach
15  out to them?
16    MS. MARKOE:  Objection.
17    THE WITNESS:  If you look up the records
18  on ASIC you will see a record that notes a company.
19  I am not going to pay for the record for you to download
20  one that anyone can go and pay for.
21  BY MR. FREEDMAN:
22    Q.    Who owned C01N Australia when it was
23  founded?
24    A.    Again, I do not have the shareholding
25  structure in front of me.  I will not speculate on which

Page 123

1  particular company out of which one I set up was owned
2  in what way.
3    Q.    Who owned C01N UK when it was initially
4  set up?
5    A.    Again, I do not have the records in front
6  of me.  If you are asking about either of those having
7  anything to do with W&K or Dave, zero.  Dave owned zero
8  in either C01N, nothing, nada, null, blank.
9    Q.    Did either C01N UK or C01N Australia have
10  ownership over Bitcoin IP?
11    MS. MARKOE:  Objection.  He has already
12  responded this had nothing to do with Dave Kleiman.  You
13  have gotten some leeway into your questions about this
14  topic, and I am going to instruct him not to answer any
15  further questions about the assets of companies that had
16  nothing to do with Dave Kleiman or W&K.
17    MR. RIVERO:  It is just after one, and
18  I think we are wearing our court reporter out.  At a
19  good stopping point, let us take a break.
20    MR. FREEDMAN:  That is fine, we can stop
21  now.
22    THE VIDEOGRAPHER:  Going off the record.
23  The time is 13.02.  End of video card number 2, volume
24  1, in the video deposition of Dr. Craig Wright.
25    (Luncheon adjournment)

Page 124

1    THE VIDEOGRAPHER:  This is the beginning
2  of video card number 3, volume 1, in the video
3  deposition of Dr. Craig Wright.  Going on the record.
4  The time is 14.07.  Thank you.
5  BY MR. FREEDMAN:
6    Q.    Good afternoon, Dr. Wright.  Welcome
7  back.  I had one last question about C01N.  You were
8  referring me to ASIC.  Who has the non-public records of
9  C01N?
10    MS. MARKOE:  Objection.  You may answer.
11    THE WITNESS:  Anything that I do not have
12  in that pile, I do not know.
13  BY MR. FREEDMAN:
14    Q.    So if you did not give it to your
15  lawyers, you do not know where it is?
16    A.    I have no idea.
17    Q.    Whose idea was it to create Bitcoin?
18    MS. MARKOE:  Objection.
19    THE WITNESS:  I have been working on this
20  since 1998.
21  BY MR. FREEDMAN:
22    Q.    So it was your idea?
23    A.    Other people have wanted to create
24  digital money beforehand.  Bitcoin differs in that
25  everyone wanted an anonymous cash system.  I made sure

Page 125

1  that it was a legal system.  I have had other ideas that
2  were different to create what is Bitcoin meant
3  blockchain and that required being different than things
4  like e-cash, in a completely different way.
5    Q.    When did you decide to go from working on
6  it to bringing it public?
7    MS. MARKOE:  Objection.
8    MR. FREEDMAN:  You can answer.
9    THE WITNESS:  2008.
10  BY MR. FREEDMAN:
11    Q.    In 2008, did you believe what you were
12  doing would be successful?
13    A.    I had no idea.
14    Q.    Did you hope it would be successful?
15    A.    Of course you hope, or you would not work
16  on it otherwise.
17    Q.    Did you believe it would become a real
18  alternate currency?
19    MS. MARKOE:  Objection.
20    THE WITNESS:  I do not know; it is still
21  not a currency.  I hope.
22  BY MR. FREEDMAN:
23    Q.    Did you believe it would become a real
24  alternate method of exchange?
25    MS. MARKOE:  Objection.

MAGNA ►
LEGAL SERVICES

Page 126

1    THE WITNESS:  I always hoped.
2  BY MR. FREEDMAN:
3    Q.   Do you recall reaching out to
4  Louis Kleiman in February 2014?
5    A.   I do not remember the exact date, but
6  some time around then, yes.
7    Q.   I am handing you what we can mark as
8  Plaintiff's Exhibit 2.
9  (Plaintiff's Exhibit 2 marked for identification)
10  This is docket entry 83-23.  Do you recognise the
11  e-mail on the second half of page 2?
12    MS. MARKOE:  Objection.  You may answer.
13    THE WITNESS:  I recognise the printout of
14  the e-mail.
15  BY MR. FREEDMAN:
16    Q.   And it says: "Hello Louis, your son Dave
17  and I are two of the three key people behind Bitcoin."
18  Did you write that?
19    A.   I typed that.
20    Q.   Who is the third person?
21    THE WITNESS:  Is it one of those things?
22    MS. MARKOE:  Okay. Dr. Wright is not in
23  a position to answer that question.  He will provide a
24  fulsome explanation to the court in camera.
25    MR. FREEDMAN:  Do we know the basis for

Page 127

1  refusing to answer?
2    MS. MARKOE:  My understanding -- and he
3  will correct me if I am wrong -- is security.
4    MR. FREEDMAN:  National security?
5    MS. MARKOE:  Yes.
6    MR. FREEDMAN:  Of which country?
7    THE WITNESS:  In this particular case,
8  the USA.
9  BY MR. FREEDMAN:
10    Q.   Do you have a formal security clearance
11  from the USA?
12    A.   I am not going to be discussing any of
13  this stuff.
14    MS. MARKOE:  Okay, so he will discuss
15  details regarding that in camera with the court, and the
16  court will make a determination as to what parts of that
17  he can answer, if any.
18  BY MR. FREEDMAN:
19    Q.   Is the third person still alive?
20    A.   I do not know.
21    Q.   Is the third person a member of the US
22  government?
23    A.   If I do not know if they are alive I do
24  not know if they are a member of the US government.
25    Q.   Were they ever a member of the US

Page 128

1  government?
2    MS. MARKOE:  If you can answer, answer.
3  If you cannot answer, then you will answer ----
4    THE WITNESS:  Yes.
5  BY MR. FREEDMAN:
6    Q.   What body of the government?
7    MS. MARKOE:  Answer until you feel that
8  you need to answer in front of the court ----
9    THE WITNESS:  I will leave that one for
10  the court.
11    MS. MARKOE:  ---- in camera.
12  BY MR. FREEDMAN:
13    Q.   Was Dave aware of this third person's
14  involvement?
15    MS. MARKOE:  Objection.
16    THE WITNESS:  Again, I will leave that to
17  the court.
18  BY MR. FREEDMAN:
19    Q.   Was this third person aware of Dave's
20  involvement?
21    A.   Again, I am going to leave any of this to
22  the court.
23    Q.   Between 1998 and 2008, when you decided
24  to take Bitcoin public, who did you speak to about the
25  idea?

Page 129

1    A.   The idea is a very wide topic.  Who did
2  I speak to between 1998 and 2008?  Apart from e-mails to
3  Wei Dai and others who were seemingly public, such as
4  Hal Finney and John MacDonald and Bear ----
5    Q.   I am sorry?
6    A.   Bear.
7    Q.   Bear?  Is that a first name or a last
8  name?
9    A.   That is his nickname.  Also Cryptonaut.
10  If you search up you will find who it is.  That is Ray.
11    Q.   Ray who, I am sorry?
12    A.   Do a search on big time talk and say the
13  name, but "Bear Cryptonaut", you will find it.
14    Q.   This is a user name?
15    A.   Yes.
16    Q.   And Cryptonaut and Bear are the same
17  people?
18    A.   Yes.
19    Q.   I apologise, because I did not catch
20  Bear, but I interrupted you.
21    A.   B-E-A-R.
22    Q.   Thank you.  Wei Dai, Hal Finney, John
23  MacDonald, Bear Cryptonaut; was there anyone else you
24  spoke to during that time?
25    A.   In a 20-year period there were lots of

MAGNA ◆
LEGAL SERVICES

Page 130

1   other people.
2       Q.   I am talking just about 10 years from
3   1998-2008?
4       A.   Yes.
5       Q.   Were there any others that you recalled,
6   besides these four?
7       A.   I discussed things with Allan Granger.
8       Q.   Who is Allan Granger?
9       A.   He is a former partner of BDO.
10      Q.   Is Mr. Granger still alive?
11      A.   Yes.
12      Q.   When did you contact Mr. Granger about
13  Bitcoin?
14      A.   I worked for Mr. Granger.
15      Q.   What time did those communications with
16  Mr. Granger take place?
17      A.   Between times when we were working
18  together.
19      Q.   So 2008?
20          MS. MARKOE:  Objection.
21  BY MR. FREEDMAN:
22      Q.   When was the timeframe you worked at BDO?
23  Remind me, I forget.
24      A.   2005.
25      Q.   2005-2008.  Do you have contact

Page 131

1   information for Mr. Granger?
2       A.   I do not know.  I am not sure.  He is not
3   at BDO any more.  I do not know if he is still where he
4   was.
5       Q.   Does he still live in Australia?
6       A.   I have not talked to him in a couple of
7   years.
8       Q.   When was the last time you spoke to
9   Mr. Granger?
10      A.   2016, I believe.
11      Q.   At that time, was he living in Australia?
12      A.   Yes.
13      Q.   Do you have contact information for
14  Wei Dai?
15      A.   Just the e-mail.
16      Q.   Do you know that e-mail by heart?
17      A.   No.
18      Q.   Can you provide it to your lawyers?
19      A.   I will just do an internet search.
20      Q.   Do you have contact information for John
21  MacDonald?
22      A.   Again, I would do an internet search.
23      Q.   Do you have contact information for Bear?
24      A.   Again, I would do an internet search, and
25  he has not changed his address.

Page 132

1       Q.   When you contacted Bear, did you contact
2   him as Dr. Craig Wright or in some alias?
3           MS. MARKOE:  Objection.
4           MR. FREEDMAN:  You can answer.
5           THE WITNESS:  Both.
6   BY MR. FREEDMAN:
7       Q.   What method do you use to communicate
8   with Bear?
9       A.   Bitcointalk, IRC, e-mail.
10      Q.   Do you have any of those records still?
11      A.   Bitcointalk is public, IRC does not have
12  records, unless someone has captured them, and, no, I do
13  not have those e-mails, although some of them are still
14  available.
15      Q.   What was the user name on Bitcointalk
16  that you used?
17      A.   Satoshi.
18      Q.   Do you still have access to the Satoshi
19  account on Bitcointalk?
20          MS. MARKOE:  Objection.  You can answer.
21          THE WITNESS:  I have not tried logging in
22  in a long time.
23  BY MR. FREEDMAN:
24      Q.   Do you have the old credentials?
25      A.   I have not even looked whether I would.

Page 133

1       Q.   Where would they be, if you had them?
2       A.   Most likely in my head.
3       Q.   Can you look now and tell me if they are
4   there?
5       A.   I would need to try and see if I do not
6   log myself out.  I have used a lot of passwords in the
7   past and I can remember some of  the mnemonics from some
8   of them.  Have I tried: no; would I want to: no.
9       Q.   Did anyone else have access to the
10  Satoshi account on Bitcoin.com?
11          MS. MARKOE:  Objection.
12          MR. FREEDMAN:  Sorry, Bitcointalk, is it?
13          THE WITNESS:  Bitcointalk.  Yes.
14  BY MR. FREEDMAN:
15      Q.   Who else had access?
16      A.   Dave.
17      Q.   When did Dave have access to the Satoshi
18  account?
19      A.   The exact set-up time, I do not remember,
20  but we stopped using it in December 2010.
21      Q.   Why did you stop using it in December
22  2010?
23      A.   I was disillusioned with Bitcoin and
24  I needed to test whether I had completely fucked up.
25      Q.   So did you have a conversation with Dave?

Page 134

1  How did you mutually come to the agreement not to use it
2  any more?
3          MS. MARKOE:  Objection:  mischaracterises
4  the testimony.
5          MR. FREEDMAN:  You can answer.
6          THE WITNESS:  It was my account, so there
7  is no -- should not be used any more.  Did I go off and
8  stop interacting:  yes.  A number of things had occurred.
9  WikiLeaks, Silk Road and a number of other dark websites
10  were starting to be created.  The reason I created
11  Bitcoin was to ensure a form of money that had an
12  evidence trail stopped all that.  And what I saw was my
13  creation being used for everything I hated and nothing
14  valid at the time, and I thought I had failed.
15  BY MR. FREEDMAN:
16      Q.    Did Dave share this  disappointment?
17          MS. MARKOE:  Objection.
18          MR. FREEDMAN:  You can answer.
19      A.    No.  Dave was the reason I kept going.
20  BY MR. FREEDMAN
21      Q.    Did you ask Dave to stop -- strike that.
22  Did Dave ever communicate with the Satoshi account on
23  Bitcointalk?
24          MS. MARKOE:  Objection.
25          MR. FREEDMAN:  You can answer.

Page 135

1          THE WITNESS:  You are asking, did he
2  communicate with the account?
3  BY MR. FREEDMAN:
4      Q.    Did he ever write a post?  Did he ever
5  send a message as Satoshi?
6          MS. MARKOE:  Objection.
7          THE WITNESS:  That is a different
8  question again.  Did he send a message as Satoshi is not
9  did he answer on the Bitcoin account.
10  BY MR. FREEDMAN:
11      Q.    You are right.  Bad question. Strike it.
12  Did Dave ever post as Satoshi on the Bitcointalk forum?
13      A.    No.
14      Q.    Did Dave ever send a message as Satoshi
15  on the Bitcointalk forum?
16      A.    No.
17      Q.    What did Dave do with his access?
18          MS. MARKOE:  Objection.
19          THE WITNESS:  He checked what I was
20  doing.
21  BY MR. FREEDMAN:
22      Q.    Why did you give Dave access to the
23  Bitcointalk Satoshi account?
24      A.    Because I can be hot-headed.
25      Q.    And?

Page 136

1      A.    Dave is -- Dave was a rambunctious bugger
2  at times too, but Dave did the e-mail rule of reread
3  before you send.
4      Q.    So how did his access facilitate that?
5      A.    He cut out a whole lot of stupid things
6  that I would have sent to people.
7      Q.    So he edited the communications before
8  you sent them?
9          MS. MARKOE:  Objection.
10          THE WITNESS:  Not all, some.
11  BY MR. FREEDMAN:
12      Q.    Did you have a process in place where you
13  would draft responses, he would review  it and then you
14  would send it?
15          MS. MARKOE:  Objection.
16          THE WITNESS:  No, there was no formal
17  anything like that.
18  BY MR. FREEDMAN:
19      Q.    How did he see what you were going to
20  send to edit it?
21          MS. MARKOE:  Objection.
22          THE WITNESS:  If you have an account you
23  can see things.
24  BY MR. FREEDMAN:
25      Q.    You would save drafts?

Page 137

1      A.    If I was annoyed, I was able to contact
2  him and say I was annoyed before I sent something.
3      Q.    Did there come a time in December 2010
4  you asked Dave to stop using the account?
5          MS. MARKOE:  Objection.
6          THE WITNESS:  No.
7  BY MR. FREEDMAN:
8      Q.    You just never called him to log into the
9  account again?
10          MS. MARKOE:  Objection.
11          THE WITNESS:  No.
12  BY MR. FREEDMAN:
13      Q.    So, do you know if he stopped logging in?
14      A.    No one was logging in.
15      Q.    How do you know that he was not logging
16  in?
17      A.    The account has account details.  You can
18  log in and have a look at those if you want.
19      Q.    Do those account details exist today?
20      A.    Yes.
21      Q.    Are those public?
22      A.    Yes.
23      Q.    Did anyone else have access to the
24  Satoshi account at Bitcointalk?
25      A.    Yes.

MAGNA ▶
LEGAL SERVICES

Page 138

1    Q.    Who else?
2    A.    It's run on a common forum, so
3  administrators, whatever else, could have gained access.
4    Q.    Administrators could view the private
5  account of Satoshi?
6         MS. MARKOE:  Objection.
7         THE WITNESS:  A Google administrator
8  could view Google e-mail from anyone.  Whether they get
9  fired for doing it is another question.  You said
10 "could".
11 BY MR. FREEDMAN:
12   Q.    Who were the administrators of Bitcoin --
13 strike that.  Whose idea was it to write the Bitcoin
14 white paper?
15   A.    Mine.
16   Q.    When did you begin drafting the Bitcoin
17 white paper?
18   A.    2002.
19   Q.    Did you speak with anybody about the
20 Bitcoin white paper?
21        MS. MARKOE:  Objection.
22        THE WITNESS:  Yes, I have spoken to
23 people about the Bitcoin white paper.  I was on a call
24 last night doing just that.
25 BY MR. FREEDMAN:

Page 139

1    Q.    Did you send a draft of the Bitcoin white
2  paper to anyone from 2002 until 2007?
3         MS. MARKOE:  Objection.
4         THE WITNESS:  It was not complete at that
5  stage.
6  BY MR. FREEDMAN:
7    Q.    But did you share any form of any draft
8  of the white paper from 2002 until 2007?
9    A.    Yes.
10   Q.    With who?
11   A.    The Australian government.
12   Q.    How did you share it with the Australian
13 government?
14   A.    I sought funding from ITOL.
15   Q.    From, I am sorry?
16   A.    I-T-O-L.
17   Q.    What does that stand for?
18   A.    Off the top of my head, I have no idea.
19 It has been a long time.
20   Q.    Do you have the records of that
21 submission?
22   A.    Some exist, yes.
23   Q.    Do you have them?
24   A.    I know they are on ITOL.
25   Q.    Is ITOL publicly available?

Page 140

1    A.    No.
2    Q.    Can you request them from ITOL?
3    A.    I do not know.  I have not done that.
4    Q.    Did you get the funding?
5    A.    No.
6    Q.    Why not?
7         MS. MARKOE:  Objection:  foundation.
8         THE WITNESS:  The government decided not
9  to fund it.
10 BY MR. FREEDMAN:
11   Q.    Did you share the white paper with anyone
12 else from 2002-2007?
13   A.    Other people had helped me.
14   Q.    Who?
15   A.    In parts, I do not know.  I have talked
16 to many people in the past.  There are bits of things
17 that I have given over.  I cannot remember all the
18 details of that.
19   Q.    Do you remember anyone?
20   A.    In whole, no.
21   Q.    What do you mean "in whole"?
22   A.    You asked me if I have sent paragraphs to
23 people and things like this.
24   Q.    Who did you send paragraphs to?
25        MS. MARKOE:  Objection.  Vel, I would ask

Page 141

1  that you limit your questions to the timeframe of this
2  litigation, which begins, I think per your request, in
3  2006 or 2007.  So, anything prior to those years are
4  irrelevant, and beyond the scope.  I will instruct the
5  witness not to answer.
6  BY MR. FREEDMAN:
7    Q.    In 2006, did you share drafts of the
8  white paper with anyone?
9    A.    I do not know.  I discussed it.
10   Q.    Who did you discuss it with?
11   A.    I discussed some of the concepts that
12 became Bitcoin with Allan Granger, with Stefan Matthews,
13 with a person called Joseph Vaughn Perling.
14   Q.    How did you make those ----
15        MR. RIVERO:  He has not finished.
16        THE WITNESS:  Michael Shehadie.
17        MR. FREEDMAN:  Can you spell that for me.
18        THE WITNESS:  No.  S-H-E-H-A-D-I-E,
19 I believe, but quote me, it could have more Hs!
20 BY MR. FREEDMAN:
21   Q.    Anyone else?
22   A.    Yes, I am thinking, sorry.  (Pause)
23 Sorry, I just need to -- it has been a long time.  A
24 person from the Australian Federal Police, I cannot
25 remember his name, he is in the financial crime

Page 142

```
1    division.
2            MR. RIVERO:  Can I ask for the court
3    reporter, is Mr. Granger's first name Allan or Allen, if
4    you know?
5            THE WITNESS:  It is an AN, not an EN, but
6    I cannot remember off the top of my head whether it is a
7    LL or a single L.
8    BY MR. FREEDMAN:
9        Q.    Is there anyone else?
10       A.    Yes, but I cannot remember.  I know there
11   were a couple of people that I spoke to when I was doing
12   some financial crime work with BDO, and it was loosely
13   about not Bitcoin but the topics in there and I cannot
14   remember their name off the top of my head.
15       Q.    You showed these individuals drafts of
16   the white paper?
17       A.    I had shown them aspects.
18       Q.    Aspects.  How did you share aspects of
19   the white paper with Joseph Vaughn Perling?
20       A.    Exactly how I do not remember.  I met him
21   in person, exactly where back then I cannot remember.
22   It has been a long time.  I have been to a lot of
23   conferences, I do not remember each one.  I think other
24   people remember more than I do, because, as I said, I go
25   to so many conferences each month that when you are
```

Page 143

```
1    asking me more than 10 years ago, I do not remember
2    which particular conference or which particular paper.
3        Q.    How did you ----
4        A.    Likely on a tablet.
5        Q.    How did you share portions of the white
6    paper with Michael Shehadie?
7        A.    He is my lawyer.
8        Q.    Okay.  Where does he work?
9        A.    Australia.
10       Q.    What law firm?
11       A.    Michie Shehadie and Co.
12       Q.    Without revealing anything about your
13   discussions between yourself and Mr. Shehadie, why did
14   you discuss it with him?
15           MS. MARKOE:  Objection.  If you can
16   answer that question without revealing the contents and
17   legal purpose of your communication with him, then do
18   so.  If you cannot then I would instruct you not to
19   answer.
20           THE WITNESS:  It was all to do with legal
21   stuff.
22   BY MR. FREEDMAN:
23       Q.    Did you ever consider patenting the white
24   paper?
25       A.    Yes.
```

Page 144

```
1        Q.    When did you consider patenting the white
2    paper?
3            MS. MARKOE:  Objection.  I think we are
4    sort of getting beyond, again, the topics.  This is a
5    limited deposition.  Can you please explain to me how
6    that question relates to any one of these topics.
7            MR. FREEDMAN:  It has to do with -- well,
8    my next question was going to be, if it was Dave's idea
9    to patent it ----
10           MS. MARKOE:  I am asking about this
11   question, I am not asking about the next question.
12           MR. FREEDMAN:  Zaharah, I do not have
13   time, so either instruct him not to answer or object.
14   Choose.
15           MR. RIVERO:  We are asking you to connect
16   it up to the topics, and that is a fair question.
17   Connect it up if you have another question.
18           MR. FREEDMAN:  It has to do with quickly
19   details surrounding Craig and Dave's partnership to
20   create Satoshi Nakamoto.
21           MR. RIVERO:  Ask the question that makes
22   the connection of a predicate to why this is relevant.
23   We are not trying to stop you.  Go ahead.
24           MR. FREEDMAN:  I am not going to do it.
25       Q.    When did you contemplate patenting the
```

Page 145

```
1    white paper?
2            MS. MARKOE:  Objection.  You can answer.
3            THE WITNESS:  I considered patenting
4    Bitcoin in 2002.
5    BY MR. FREEDMAN:
6        Q.    Did you consider patenting it in 2008?
7            MS. MARKOE:  Objection.
8            THE WITNESS:  I considered patenting it
9    in 2007, but not in 2008.
10   BY MR. FREEDMAN:
11       Q.    When did Dave first become involved with
12   the white paper?
13       A.    2008.
14       Q.    Why did you decide not to patent Bitcoin?
15           MS. MARKOE:  Objection.
16           THE WITNESS:  Because ----
17           MS. MARKOE:  How does this relate in any
18   way to any purported partnership between Dave and
19   Dr. Wright?
20           MR. FREEDMAN:  I do not yet know the
21   answer.  Once I know I will let you know.
22           MS. MARKOE:  You have to actually
23   establish any sort of connection between the limited
24   topics.  I am giving you leeway here but this is not a
25   merits deposition on every topic that you want to ask
```



Page 146

1    about.  It is a limited deposition on ten specific
2    topics.  I have given you plenty of leeway but if you
3    cannot connect how a particular question, after that
4    leeway, relates to one of these topics then I will
5    instruct the witness not to answer.
6    BY MR. FREEDMAN:
7        Q.    Did you speak to anyone about patenting
8    Bitcoin?
9            MS. MARKOE:  Objection.  Do not answer
10   that.
11           THE WITNESS:  Lawyers.
12   BY MR. FREEDMAN:
13       Q.    Did you speak to anyone besides lawyers?
14           MS. MARKOE:  Objection.  Do not answer
15   that, except as it relates to Dave Kleiman.
16           MR. RIVERO:  Can you answer that, as
17   instructed by Ms. Markoe.
18           THE WITNESS:  No relation to Mr. Kleiman,
19   only to do with lawyers.
20   BY MR. FREEDMAN:
21       Q.    When did Dave become involved in the
22   white paper?
23           MS. MARKOE:  Objection: asked and
24   answered.
25           THE WITNESS:  2008.

Page 147

1    BY MR. FREEDMAN:
2        Q.    How did he become involved with the white
3    paper?
4        A.    That is a rather wide question.  How do
5    you -- sorry, how do you become involved with the white
6    paper?  Can you clarify that a bit please?
7        Q.    How did Dave find out about the white
8    paper?
9        A.    You have already given me an e-mail that
10   I have sent.  The white paper was not public before
11   that, so ----
12       Q.    Did you attach the white paper to that
13   e-mail?
14       A.    No.
15       Q.    So how did he obtain the white paper?
16       A.    It was put online.
17       Q.    When was it put online?
18       A.    2008.
19       Q.    Where was it put online?
20       A.    A server in Melbourne upload.ae.
21       Q.    How did he find the location of the white
22   paper?
23           MS. MARKOE:  Objection.  You can answer
24   if you understand the question.
25           THE WITNESS:  How did he find it?  Well,

Page 148

1    he typed in a link into a browser and it magically came
2    from the ether of the internet.
3    BY MR. FREEDMAN:
4        Q.    And he magically found out about the
5    hyperlink?
6            MS. MARKOE:  Objection: argumentative.
7            MR. FREEDMAN:  Withdrawn.
8        Q.    How did he find the specific URL he was
9    supposed to type in?
10       A.    As I have been saying, we discussed
11   things over IRC.
12       Q.    Did you give him the address over IRC?
13       A.    Yes.
14       Q.    When did that take place?
15       A.    Shortly after that e-mail.
16       Q.    Why did you e-mail him the initial
17   communication and follow up with IRC?
18           MS. MARKOE:  Objection: compound.
19           MR. FREEDMAN:  You can answer.
20           THE WITNESS:  I sent him that original
21   e-mail because I wanted his help.  I then followed up
22   because I would chat with him live over IRC.
23   BY MR. FREEDMAN:
24       Q.    How long was the Bitcoin white paper when
25   you contacted Dave in 2008?

Page 149

1            MS. MARKOE:  Objection.  You can answer
2    if you can.
3            THE WITNESS:  The same length as it is
4    now, approximately.
5    BY MR. FREEDMAN:
6        Q.    Why did you reach for Dave's help
7    about the white paper?
8            MS. MARKOE:  Objection.  You can answer.
9            THE WITNESS:  I was not so much asking
10   for his help about the white paper.
11   BY MR. FREEDMAN:
12       Q.    What were you reaching out for?
13       A.    His help in other ways.
14       Q.    What were the ways you were seeking Dave
15   Kleiman's help?
16       A.    I am not a likeable person.  Dave was.
17   I put people off.  I care about my business, my work, my
18   maths, my papers, my patents, and not much more, so
19   unfortunately dealing with people and dealing with
20   people in open source communities is something I am
21   very, very bad at.
22       Q.    This was something Dave was good at?
23       A.    That is something Dave could help me
24   with.
25       Q.    Did he help you with that?

MAGNA ◆
LEGAL SERVICES

Page 150

1      MS. MARKOE:  Objection.  You can answer.
2      THE WITNESS:  Dave has helped me with
3  that many times in the past.  The e-mail that you are
4  referencing, I believe I saw the defamation and whatever
5  is the title.
6      MS. MARKOE:  Exhibit 1.  I believe it is
7  right in front of you.
8      THE WITNESS:  "Defamation and the
9  difficulties of law on the Internet".  Around the same
10  time I was having other troll fights as I have had many
11  times, and Dave helped there as well.
12  BY MR. FREEDMAN:
13      Q.    Why did Dave need to review the white
14  paper to help you interact with open source communities?
15      MS. MARKOE:  Objection.  You may answer.
16      THE WITNESS:  Dave was not the only
17  person who reviewed the white paper.
18  BY MR. FREEDMAN:
19      Q.    Who else reviewed the entire white paper,
20  as uploaded to upload.ae?
21      THE WITNESS:  I do not know.
22      BY MS. MARKOE:  Objection.
23  BY MR. FREEDMAN:
24      Q.    Who else did you give the upload.ae
25  address to?

Page 151

1      A.    It was put on a public mailing list.
2      Q.    Which public mailing list?
3      A.    The cryptography mailing list, it was put
4  on the Usenet sites.  It was in an IRC chat group.  It
5  was sent to Wei Dai.  It was sent to Adam Back.
6      Q.    Did Dave put it on the cryptography
7  mailing list?
8      A.    No.
9      Q.    Who did?
10      A.    Me.
11      Q.    Did Dave put it on IRC?
12      A.    Yes.
13      Q.    Was there a chat on IRC?
14      A.    There were multiple chats on IRC.
15      Q.    Do you remember the chats he put them on?
16      A.    You have not used IRC, have you?
17      Q.    I have not.
18      A.    I suggest you look at how IRC works and
19  then you will see why I am sighing when you ask that.
20      Q.    Did Dave send it to Adam Back?
21      MS. MARKOE:  Objection.
22      THE WITNESS:  No.
23  BY MR. FREEDMAN:
24      Q.    Who did?
25      A.    I already said.

Page 152

1      Q.    I missed it.  Can you repeat it?
2      A.    Me.
3      Q.    When did you send it to Adam Back?
4      MS. MARKOE:  Objection.  You may answer.
5      THE WITNESS:  2008.
6  BY MR. FREEDMAN:
7      Q.    Did Adam Back comment on the white paper?
8      MS. MARKOE:  Objection.  You are getting
9  beyond the scope again.
10      MR. FREEDMAN:  Okay.
11      MS. MARKOE:  So, I would instruct the
12  witness not to answer.  You are going beyond the scope.
13  BY MR. FREEDMAN:
14      Q.    Did Dave interact with Adam Back?
15      MS. MARKOE:  Objection:  foundation.  You
16  can answer.
17      THE WITNESS:  Yes.
18  BY MR. FREEDMAN:
19      Q.    Did Dave interact with Adam Back about
20  the white paper?
21      MS. MARKOE:  Objection.  If you know.
22      THE WITNESS:  I do not know exactly what
23  Dave wrote.  I am not Dave.
24  BY MR. FREEDMAN:
25      Q.    How do you know that Adam Back

Page 153

1  communicated with Dave?
2      MS. MARKOE:  Objection:  mischaracterises
3  the testimony.
4      MR. FREEDMAN:  You can answer.
5      THE WITNESS:  I spoke with Dave.
6  BY MR. FREEDMAN:
7      Q.    And what did Dave say about Adam Back?
8      MS. MARKOE:  Objection.
9      THE WITNESS:  Do I have to say it?
10      MR. RIVERO:  Yes, go ahead.
11      MS. MARKOE:  Just answer.
12      THE WITNESS:  He said something along the
13  lines of, to characterise what you bloody Aussies say,
14  he is a wanker and we got the wrong person.
15  BY MR. FREEDMAN:
16      Q.    What did he mean by saying you have the
17  wrong person?
18      MS. MARKOE:  Objection.
19      THE WITNESS:  Hal Finney wrote the R
20  proof of work code that I used as a basis, not Adam.
21  BY MR. FREEDMAN:
22      Q.    Did you confuse the R proof of work code
23  as having been authored by Adam Back?
24      MS. MARKOE:  Objection.  You can answer.
25      THE WITNESS:  I did not check.  I chucked

Page 154

1  in a reference after doing a quick search.  The work by
2  Aurora et al had been implemented by a site I saw
3  referenced as Adam Back.  I put that down.  I did not
4  check that that did not actually work, and that it was
5  Hal Finney who actually fixed it and had it working.
6  BY MR. FREEDMAN:
7      Q.   Did Dave have any further interactions
8  with Adam Back about the white paper that you are aware
9  of?
10         MS. MARKOE:  Objection.  You can only
11  state stuff that you know.
12         THE WITNESS:  I do not know.
13  BY MR. FREEDMAN:
14     Q.   Did Dave reach out to Hal Finney about
15  the R proof of work?
16         MS. MARKOE:  Objection:  foundation.
17  BY MR. FREEDMAN:
18     Q.   Withdrawn.  Do you know whether Dave he
19  reached out to Hal Finney about the R proof of work
20  code?
21     A.   No, he would not need to reach out to
22  Hal Finney.
23     Q.   Why not?
24     A.   Because Hal Finney reached out to us.
25     Q.   How did Hal Finney reach out to you and

Page 155

1  Dave?
2          MS. MARKOE:  Objection.
3          MR. FREEDMAN:  You can answer.
4      A.   He talked over public forums, IRC and
5  e-mail.
6  BY MR. FREEDMAN:
7      Q.   What did he say, in his initial
8  communication?
9          MS. MARKOE:  Objection.
10         THE WITNESS:  He thought Bitcoin could
11  work but there would be a few problems.
12  BY MR. FREEDMAN:
13     Q.   Did you and Dave work on those problems?
14         MS. MARKOE:  Objection: assumes facts not
15  in evidence.
16         MR. FREEDMAN:  You can answer it.
17         THE WITNESS:  There were no problems.
18  Actually ----
19  BY MR. FREEDMAN:
20     Q.   Hal Finney was wrong?
21     A.   There were problems but not the problems
22  he was stating.  So, yes, Hal Finney was wrong.
23     Q.   What were the problems Hal Finney thought
24  were with the protocol?
25         MS. MARKOE:  Objection: relevance.  This

Page 156

1  is now again, you are getting beyond the scope.  I am
2  going to ask him not to answer that question.
3  BY MR. FREEDMAN:
4      Q.   Do you maintain any of the correspondence
5  with Hal Finney back in 2008?
6      A.   No.
7      Q.   Did Dave edit the white paper?
8      A.   A few people edited the white paper,
9  including Dave.
10     Q.   What were Dave's edits to the white
11  paper?
12     A.   I do not exactly remember.  There were
13  six different versions.
14     Q.   Sorry?
15     A.   There were six different versions.
16     Q.   When did version 1 come out?
17         MS. MARKOE:  Objection.
18         THE WITNESS:  2002.
19  BY MR. FREEDMAN:
20     Q.   When did version 2 come out?
21         MS. MARKOE:  Objection.
22         THE WITNESS:  I do not remember the exact
23  dates of all of these.
24  BY MR. FREEDMAN:
25     Q.   Do you recall when version 3 came out?

Page 157

1          MS. MARKOE:  Objection.
2          THE WITNESS:  Again, I do not remember
3  all of it.  I had multiple versions, all simultaneously
4  running.  If you ask any of my staff, my document
5  management is shit.  I save and then update the old
6  version sometimes and then go back to the first one.
7  I then re-edit a later one.  I have people bitch at me
8  and I have been banned from document management
9  altogether by my staff, who have basically just about
10 threatened to walk out if I am allowed to touch a
11 document ever again.
12 BY MR. FREEDMAN:
13     Q.   Did Dave help you keep track of the six
14 different versions of the white paper?
15         MS. MARKOE:  Objection.
16         THE WITNESS:  No; hence why it was a
17 fucking mess.
18 BY MR. FREEDMAN:
19     Q.   How did you compile all versions into
20 one?
21         MS. MARKOE:  Objection.
22         THE WITNESS:  I did not.
23 BY MR. FREEDMAN:
24     Q.   Who did?
25     A.   Nobody.

MAGNA◆
LEGAL SERVICES

Page 158

1    Q.   So how did you get the final version?
2    A.   The same way I do every single time,
3  I finish up a version.
4    Q.   Which is the version that is public?
5         MS. MARKOE:  Objection.
6         THE WITNESS:  It is the one that is still
7  public as the Bitcoin white paper.
8  BY MR. FREEDMAN:
9    Q.   Of the six, which one was that?
10        MS. MARKOE:  Objection.
11        THE WITNESS:  Exactly where each bit
12  came, I could not answer.
13  BY MR. FREEDMAN:
14   Q.   If you had a copy of the white paper in
15  front of you, would it help identify Dave's
16  contributions?
17   A.   No.  More than anything else, what Dave
18  helped me with was, it is like legal things.  I have
19  been an expert witness many, many times, and that is way
20  easier than being your own witness.  There is no emotion
21  in talking about someone else's things.  It is easy to
22  make mistakes when you are doing your own thing.  And it
23  is critical to get rid of the metadata.  If you want to
24  not be found, not have something point back, then it is
25  absolutely critical to strip anything that can identify

Page 159

1  a document.  Dave was also very good at that.  Dave
2  helped double-check that all the PDFs, etcetera, had
3  nothing to tie anything back.
4    Q.   Was there anyone else besides Dave that
5  you could have used to do those two functions?
6         MS. MARKOE:  Objection.
7         THE WITNESS:  I believe there is a world
8  full of editing services, so if you are saying anyone
9  could do that, then of course there are.  There are
10  commercial companies, but then if I am going to someone
11  and going, "Hey, I have this supersecret document that
12  I want you to sort of sit on", it does not work too
13  well.
14  BY MR. FREEDMAN:
15   Q.   Was there anyone you could trust to keep
16  it secret and who had these abilities besides Dave?
17        MS. MARKOE:  Objection.
18        MR. FREEDMAN:  You can answer.
19        THE WITNESS:  Yes.
20  BY MR. FREEDMAN:
21   Q.   Who?
22   A.   I have a lot of friends in the computer
23  forensics industry.
24   Q.   Why did you not use them?
25        MS. MARKOE:  Objection.

Page 160

1         THE WITNESS:  Because I asked Dave.
2  BY MR. FREEDMAN:
3    Q.   Was it because Dave was your best friend?
4    A.   In part, yes.
5    Q.   I want to direct your attention back to
6  Plaintiff's Exhibit 1, which is the 2008 e-mail.  When
7  did you settle on the name Bitcoin?
8         MS. MARKOE:  Objection.  You can answer.
9         THE WITNESS:  I thought about the name
10  Bitcoin for a while.  It was actually B-i-t-C-o-i-n,
11  which I got a lot shit for.  I believed we discussed
12  that sort of thing when naming.  Other people over here
13  in Britain seemed to like to capitalising in the middle
14  of things.  Americans think I am stupid for doing it.
15  BY MR. FREEDMAN:
16   Q.   So Dave eventually talked you into not
17  capitalising the C?
18        MS. MARKOE:  Objection: mischaracterises
19  the testimony.
20        THE WITNESS:  No, it was capitalised in
21  many places.
22  BY MR. FREEDMAN:
23   Q.   Did Dave prefer BitCash or Bitcoin?
24        MS. MARKOE:  Objection.  You can answer.
25        THE WITNESS:  Bitcoin.

Page 161

1  BY MR. FREEDMAN:
2    Q.   Did Dave prefer capital C or lower case
3  C?
4         MS. MARKOE:  Objection.
5         THE WITNESS:  Dave was American.
6  BY MR. FREEDMAN:
7    Q.   He liked lower case C?
8    A.   Yes.
9    Q.   Did you ultimately decide on a version?
10   A.   No, I used both.
11   Q.   When you sent this file to Ira, where did
12  you get the actual file from?
13        MS. MARKOE:  Objection.
14        THE WITNESS:  Which file?
15        MS. MARKOE:  Are you referring to a
16  different e-mail or Exhibit 1?
17        MR. FREEDMAN:  We are still on Exhibit 1.
18   Q.   When you sent Exhibit 1 to Ira, where did
19  you get the e-mail from to send to Ira?
20   A.   That would have been on our server.
21   Q.   Which server is "our" server?
22   A.   The company at the time.  That was
23  Hotwire, I believe.  We are talking about Hotwire time,
24  so it would have been on a Hotwire server.
25   Q.   Do you still have access to Hotwire

MAGNA
LEGAL SERVICES

Page 162

```
 1   servers?
 2        A.    It does not exist.
 3        Q.    Does anyone still have access to Hotwire
 4   servers?
 5        A.    I do not know.
 6        Q.    Are you aware of anyone who has access to
 7   a Hotwire server?
 8        A.    No, I am not.  Actually, strike that, it
 9   is possible that there are copies, because we had a
10   member of staff who stole information, but I do not know
11   whether they have it still or not.
12        Q.    What are the names of the staff that
13   stole information?
14              MS. MARKOE:  Objection.
15              MR. FREEDMAN:  Potential witnesses,
16   Zaharah.
17              MS. MARKOE:  I did not instruct him not
18   to answer.  Are you objecting to my objections now?
19              MR. FREEDMAN:  I am anticipating.
20              THE WITNESS:  I would need to double-check
21   that.  I do not want to go on record defaming someone
22   who has not been formally charged or anything like this.
23   BY MR. FREEDMAN:
24        Q.    I understand that it is not confirmed,
25   but who do you recall at the moment as being those
```

Page 163

```
 1   witnesses?
 2              MS. MARKOE:  Objection.  You can answer,
 3   if you can.
 4              THE WITNESS:  I am trying to remember his
 5   name.  There were two people in particular.  Both of
 6   them were systems engineers.  I really do not remember
 7   their names.
 8   BY MR. FREEDMAN:
 9        Q.    How would you look them up to confirm
10   them?
11              MS. MARKOE:  Objection.
12              THE WITNESS:  I would not.
13   BY MR. FREEDMAN:
14        Q.    Is there any way to find out their names?
15        A.    I am sure there is.
16        Q.    Are you aware of any way to find out
17   their names?
18        A.    One can do lots of searches for a start.
19   I mean, there is lots of stuff about me, my company,
20   people complaining, liquidation documents, etcetera, all
21   on the internet, that would list all the staff.
22        Q.    Are the names of these two staff members
23   and their potential taking of information publicly
24   available?
25              MS. MARKOE:  Objection.  You can answer.
```

Page 164

```
 1              THE WITNESS:  If you consider public
 2   includes liquidation files that would be publicly
 3   available, then yes.
 4   BY MR. FREEDMAN:
 5        Q.    What liquidation files would have these
 6   two ----
 7        A.    Hotwire.
 8        Q.    Would Ms. Watts know the name of these
 9   two individuals?
10              MS. MARKOE:  Objection.
11              THE WITNESS:  I am not going to bring
12   anything about my wife into this.  I am not going to
13   answer anything about my wife's state of mind, my wife's
14   anything.  I have already noted that my family is
15   something I will not touch.
16   BY MR. FREEDMAN:
17        Q.    Was Ms. Watts involved with Hotwire?
18              MS. MARKOE:  Objection.
19              THE WITNESS:  You can check those
20   records.
21   BY MR. FREEDMAN:
22        Q.    How?
23        A.    They are public.
24        Q.    Are all of Hotwire's records are public?
25              MS. MARKOE:  Objection: mischaracterises
```

Page 165

```
 1   the testimony.
 2   BY MR. FREEDMAN:
 3        Q.    Are all of Hotwire's records public?
 4        A.    No.
 5        Q.    When did you decide to start programing
 6   the Bitcoin protocol?
 7        A.    Can you be a bit more specific about what
 8   you are saying there.  That is actually a wider question
 9   and more nebulous than you seem to think.
10        Q.    When did you start writing the code that
11   became the Bitcoin protocol?
12        A.    Again, do you mean the node software?
13        Q.    When I say "Bitcoin protocol", what does
14   that mean to you?
15        A.    Bitcoin protocol is a set of rules that
16   nodes will interact by.  It will be not things like
17   block size, but rather the real sets that allow a
18   transaction signed, and not settled, to chain now to be
19   valid in 20-year time.  So, it is like the internet
20   protocol itself has a set of rules as well as
21   structures.  So things can happen within protocols but
22   also be dictated differently in rules.  For instance,
23   the limitation of HTML for Apple and Microsoft, although
24   on the same protocol, have different rule sets.  That
25   could be constructed such that the rules for one miner
```

MAGNA ◗
LEGAL SERVICES

Page 166

1  would allow something to be offered or rejected, but a
2  protocol would be the same for all systems and nodes.
3        Q.   If going forward I use the word "Bitcoin"
4  protocol to refer to all of those things, will you
5  understand what I mean?
6        MS. MARKOE:  Objection.
7        THE WITNESS:  No.
8  BY MR. FREEDMAN:
9        Q.   What is the way I should refer to the
10  code and programing that became the Bitcoin client?
11       A.   If you were talking about the original
12  one then I would say the node software.
13       Q.   When did that turn into something besides
14  the node software?
15       MS. MARKOE:  Objection.
16       THE WITNESS:  When did what turn into
17  something?
18  BY MR. FREEDMAN:
19       Q.   Going forward, if I use the word "node"
20  software, would you understand that to mean the computer
21  protocols and codes that people downloaded and used to
22  mine and use Bitcoin?
23       MS. MARKOE:  Objection.
24       THE WITNESS:  In the original version?
25  BY MR. FREEDMAN:

Page 167

1        Q.   In the original version.
2        A.   So we are talking the Satoshi client,
3  yes.
4        Q.   The Satoshi client.  That was made public
5  in 2009?
6        A.   In some parts it was actually made public
7  in, as early -- the first distribution was August 2008.
8        Q.   So before we get there, when did you
9  decide to start writing that node software, the Satoshi
10  client?
11       A.   In 2002.
12       Q.   How did you make it public in August of
13  2008?
14       A.   It was given to a few people.
15       Q.   Who was it given to?
16       A.   Parts were given to Wei Dai.
17       Q.   Wei Dai, is that his legal name or is
18  that a screen name?
19       A.   I have never really asked.  He publishes
20  papers under that.  So he could be a pseudonym like me,
21  but the thing is he has worked for companies under that.
22  I believe that is his real name.  I have never
23  physically -- actually, I have met him once, but that
24  was in the '90s, and I did not ask whether he used a
25  pseudonym or not.

Page 168

1        Q.   Who else besides Wei Dai?
2        A.   In August, there were other people, I do
3  not remember the names.
4        Q.   Did you give it to Dave in August?
5        A.   No.
6        Q.   When did Dave first receive it?
7        A.   May, end of, beginning of June.
8        Q.   May/June of 2008?
9        A.   Yes.
10       Q.   What did Dave do to develop the Satoshi
11  client?
12       MS. MARKOE:  Objection:  foundation.
13       THE WITNESS:  Dave did not develop the
14  Satoshi client.
15  BY MR. FREEDMAN:
16       Q.   Did Dave edit the Satoshi client code at
17  all?
18       A.   It is an open source project.
19       Q.   Prior to it becoming public -- strike
20  that.  When did the Satoshi client become publicly
21  available to everyone?
22       MS. MARKOE:  Objection:  vague.
23       THE WITNESS:  I am sorry, "everyone" is
24  too vague.
25  BY MR. FREEDMAN:

Page 169

1        Q.   When was the first time you publicly
2  posted the Satoshi client?
3        MS. MARKOE:  Objection:  asked and
4  answered.  You can answer.
5        THE WITNESS:  In full, was not until
6  January 2009.
7  BY MR. FREEDMAN:
8        Q.   What should we call that event so we know
9  we are talking about the same thing?
10       A.   You could say the public publishing of
11  the Bitcoin node software.
12       Q.   Can I call it Satoshi client so we are
13  consistent?
14       A.   Yes.
15       Q.   Did Dave edit the Satoshi client at any
16  point before the public posting of the Satoshi client?
17       MS. MARKOE:  Objection.
18       THE WITNESS:  Him and others could have,
19  yes.  Did I review whose changes:  no.
20  BY MR. FREEDMAN:
21       Q.   Where did you publicly post it so that
22  others could contribute to it?
23       A.   It was given privately after a post that
24  was public.
25       Q.   Where was the public post made?

MAGNA ▶
LEGAL SERVICES

Page 170

1      A.    The public post was made on the mailing
2   list.
3      Q.    What was the mailing list?
4      A.    It is the cryptography mailing list.
5   There are other ones as well, but that was the main one.
6      Q.    Where were the other ones?
7      A.    I do not remember.
8      Q.    Did Dave post it on other ones or did you
9   post it on other ones?
10        MS. MARKOE:  Objection.
11        THE WITNESS:  I do not know what Dave
12  did.
13  BY MR. FREEDMAN:
14     Q.    Are you aware of Dave posting it on other
15  mailing lists?
16     A.    No.
17     Q.    After you posted it on a mailing list,
18  you then hosted the Satoshi client somewhere for others
19  to collaborate on?
20        MS. MARKOE:  Objection.
21        THE WITNESS:  I am not sure what you are
22  asking, sorry.
23  BY MR. FREEDMAN:
24     Q.    You told me that people collaborated on
25  this open source software?

Page 171

1        MS. MARKOE:  Objection.
2        THE WITNESS:  The full software was not
3   given.  I said that.
4   BY MR. FREEDMAN:
5      Q.    So where did you post parts of the
6   software?
7        MS. MARKOE:  Objection: mischaracterises
8   the testimony.
9   BY MR. FREEDMAN:
10     Q.    I am just trying to figure out ----
11     A.    I said they were e-mailed or given, I did
12  not say they were posted.  There is a big difference.
13     Q.    Okay, so then you e-mailed Dave portions
14  of the Satoshi client; is that correct?
15     A.    Yes.
16     Q.    And he e-mailed you back edits?
17     A.    No, he communicated with other people.
18     Q.    Who did he communicate with?
19     A.    I do not know.  That would be Dave.
20     Q.    How did Dave get you back his edits to
21  the Satoshi client?
22        MS. MARKOE:  Objection.
23        THE WITNESS:  We discussed things over
24  IRC.
25  BY MR. FREEDMAN:

Page 172

1      Q.    So his feedback was through IRC?
2      A.    Yes.
3      Q.    So there is no record of his feedback?
4      A.    No, not that I know of.  There could be.
5   It is not impossible for IRC to be recorded and kept.
6      Q.    You kept no record of his ----
7      A.    I do not keep my IRC chats, no.
8      Q.    Do you know if Dave kept them?
9      A.    I do not know what Dave did with his IRC
10  chats.  If you are asking for every line of code Dave
11  changed, there would be at least 100 changes by
12  Hal Finney, there would be at least 80 changes by Bear,
13  etcetera.  There would be at least 1,000 changes by
14  other people for every one that Dave did.  So 0.1%.
15     Q.    0.1% of the edits are attributable to
16  Dave?
17     A.    Yes.  That was not the primary task that
18  Dave did.
19     Q.    Is it possible that it is more than 1%?
20        MS. MARKOE:  Objection: calls for
21  speculation.
22  BY MR. FREEDMAN:
23     Q.    You have a clear recollection of it being
24  exactly 1% of the code that Dave edited?
25        MS. MARKOE:  Objection.  You can answer.

Page 173

1        THE WITNESS:  I did not say exactly 1%.
2   And Dave was not a C++ coder.
3   BY MR. FREEDMAN:
4      Q.    Could it have been 5%?
5        MS. MARKOE:  Objection.
6        THE WITNESS:  No.
7   BY MR. FREEDMAN:
8      Q.    Could it have been 2%?
9        MS. MARKOE:  Objection.
10        THE WITNESS:  You are calling for
11  speculation on probabilities of that where other people
12  did far more code.  Basically you want to characterise
13  Dave as having written a lot more of the software.  That
14  is not what Dave did.
15        MS. MARKOE:  Can we take a bathroom
16  break?
17        MR. FREEDMAN:  Sure.
18        THE VIDEOGRAPHER:  Going off the record.
19  The time is 15.04.  End of video card number 3, volume 1
20  of the video deposition of Dr. Craig Wright.
21        (A Short Break)
22        THE VIDEOGRAPHER:  This is the beginning
23  of video card number 4, volume 1, in the video
24  deposition of Dr. Craig Wright.  Going on the record.
25  The time is 15.20.  Thank you.

Page 174

1    MR. RIVERO:  Yes, please, identification
2  of persons on the line.
3          MR. BRENNER:  (By Telephone) Sure.  This
4  is Andrew Brenner of Boies Schiller and to my knowledge
5  I have been on the line for all of the time that the
6  deposition has been in session.
7          MR. RIVERO:  Thank you, Mr. Brenner.
8          MR. BRENNER:  You are welcome.
9          MR. MCADAMS:  (By Telephone) This is John
10  McAdams, also from Boies Schiller, and also have been on
11  the line for all sessions.
12          MR. KLEIMAN:  (By Telephone) This is Ira
13  Kleiman.  I have been on the line since the beginning.
14          MR. RIVERO:  Anyone else?
15          MS. MARKOE:  Is there a reason why,
16  Mr. Kleiman, you failed to identify yourself previously?
17          MR. FREEDMAN:  Ira, do not answer that.
18  I think they asked for lawyers to make their
19  appearances.  I am not sure he knew.
20          THE WITNESS:  That is not correct.
21          MR. FREEDMAN:  Either way, we can deal
22  with this later, obviously.  He has been on the line, we
23  have disclosed it and you can do what you like with it.
24          MR. RIVERO:  Note our objection.
25          MS. MARKOE:  I would like to note our

Page 175

1  objection and I would also like to note that Mr. Kleiman
2  I am instructing you that this deposition is
3  confidential and you are bound by the confidentiality
4  order in this case.  We presume that you are aware of it
5  and will abide by it.
6          MR. FREEDMAN:  Okay.
7          MR. KLEIMAN:  Yes.
8  BY MR. FREEDMAN:
9      Q.   Dr. Wright, the A Back cited in the
10  Bitcoin white paper, is that a reference to the same
11  Adam Back we were previously discussing?
12          MS. MARKOE:  Objection.
13          THE WITNESS:  Yes.
14  BY MR. FREEDMAN:
15      Q.   Is it your testimony here today that that
16  is a mis-cite and it should instead be to Mr. Finney?
17          MS. MARKOE:  Objection.  You can answer.
18          THE WITNESS:  It should have Aurora in
19  the R PoW, that is R as in R, PoW should be cited to
20  Mr. Finney.
21  BY MR. FREEDMAN:
22      Q.   In response to interrogatory requests,
23  Dr. Wright, you said that "there was an individual who
24  helped me in the very early stages of my research well
25  before the release of the Bitcoin protocol.  As far as

Page 176

1  I know, that individual never met or interacted with
2  Dave Kleiman."  Who was that individual?
3          MS. MARKOE:  Objection.
4          MR. FREEDMAN:  You can answer.
5          THE WITNESS:  No, I cannot.
6          MS. MARKOE:  This is part of what you
7  need to discuss with the court in camera?
8          THE WITNESS:  Yes.
9          MS. MARKOE:  Okay.
10  BY MR. FREEDMAN:
11      Q.   Dr. Wright, whose idea was it to register
12  the Bitcoin.com domain name?
13      A.   Mine.
14      Q.   When did you first register that domain?
15      A.   I would have to look up the date.  I do
16  not remember.
17      Q.   Do you still have the records associated
18  with that original registration?
19          MS. MARKOE:  Objection.  You may answer.
20          THE WITNESS:  They are online.
21  BY MR. FREEDMAN:
22      Q.   Where are they online?
23          MS. MARKOE:  Objection.  You may answer.
24          THE WITNESS:  Again, I assume you do not
25  know technical name records or how these are

Page 177

1  constructed.  They are public records.
2  BY MR. FREEDMAN:
3      Q.   That is all right but you can still
4  explain it to me.  Where are they publicly available?
5      A.   Whois.
6      Q.   And what information did you give -- did
7  you do it under a private Whois registration or did you
8  do it publicly, and I give identification to Whois?
9          MS. MARKOE:  Objection: compound.
10          THE WITNESS:  There is no such thing as a
11  private versus a public Whois.
12  BY MR. FREEDMAN:
13      Q.   There is no way to privately register
14  domain names?
15          MS. MARKOE:  Objection.  You may answer.
16          THE WITNESS:  Define what you mean by
17  "private".
18  BY MR. FREEDMAN:
19      Q.   Is there a way to not give identifying
20  information for the owner of the domain name or the
21  registrant of the domain name?
22          MS. MARKOE:  Objection.
23          THE WITNESS:  Define what you mean by
24  that.  You are doing a whole lot of waffly fluffy crap,
25  excuse the language, that says private when you probably

MAGNA
LEGAL SERVICES

Page 178

1  mean anonymous.  And can you do something about that
2  phone, please, or I am going to have to throw it out of
3  a window because it keeps flashing and it is really,
4  really annoying.
5       MR. FREEDMAN:  My apologies.
6       Q.   What information did you give Whois when
7  you registered the Bitcoin.com domain name?
8       MS. MARKOE:  Objection.
9       THE WITNESS:  If you have a look at it,
10  you will see the information from the Vistomail or
11  anonymousspeech.com server.  That is provided from that
12  server and the Whois that they allow goes across into
13  the Whois that is, or was there.  I do not know about
14  the updates that have occurred since.
15  BY MR. FREEDMAN:
16       Q.   Did you communicate with Dave Kleiman
17  about the domain name?
18       MS. MARKOE:  Objection.
19       THE WITNESS:  Define what you mean by
20  "communicate about the domain name".
21  BY MR. FREEDMAN:
22       Q.   Did you communicate with him about the
23  registration of the domain name?
24       A.   I am not sure what you would be asking?
25       Q.   Did you send any communications to Dave

Page 179

1  Kleiman about the registration of Bitcoin.com?
2       A.   I did not register Bitcoin.com.
3       Q.   Who registered Bitcoin.com?
4       A.   It was not me.
5       Q.   Who was it?
6       A.   You are now asking me who registered
7  random e-mail -- sorry, domain name dot com, and expect
8  me to know.
9       Q.   Do you know who registered Bitcoin.com?
10       A.   No.
11       Q.   Do you know who registered
12  Bitcointalk.com?
13       A.   No.  I mean, I am dot org.  I think you
14  have those wrong.
15       Q.   It could be.  Did you register
16  Bitcoin.org?
17       A.   Yes.
18       Q.   Let me ask all the questions over because
19  I may have misspoken.  When did you first register
20  Bitcoin.org?
21       A.   Again, that is public record on Whois and
22  I do not remember the exact date.
23       Q.   Any answers you gave before about the
24  Vistomail account apply to Bitcoin.org?
25       MS. MARKOE:  Objection.

Page 180

1       THE WITNESS:  Yes.
2  BY MR. FREEDMAN:
3       Q.   Did you ever communicate with
4  Dave Kleiman about Bitcoin.org registration?
5       A.   No.  I registered my first domain name in
6  the '80s.  I do not need help registering domains.
7       Q.   Did there come a time when you
8  transferred ownership of the Bitcoin.org domain name?
9       MS. MARKOE:  Objection.
10       THE WITNESS:  There is not really
11  ownership of that domain.
12  BY MR. FREEDMAN:
13       Q.   Control of the domain?
14       MS. MARKOE:  Objection.
15       THE WITNESS:  Yes.
16  BY MR. FREEDMAN:
17       Q.   When did you transfer control of the
18  Bitcoin.org domain name?
19       A.   When I stopped being involved with the
20  community.
21       Q.   Which was?
22       A.   2011.  It was actually a little bit
23  before that that information had been handed over.
24       Q.   Information had been handed over, what do
25  you mean by that?

Page 181

1       A.   Domain keys, etcetera.
2       Q.   Who did you hand them over to?
3       A.   That was to Theymos, originally.
4       Q.   Did Dave Kleiman ever have the control
5  over the Bitcoin.org domain name?
6       MS. MARKOE:  Objection.  You can answer.
7       THE WITNESS:  No.
8  BY MR. FREEDMAN:
9       Q.   Who is Theymos?
10       MS. MARKOE:  Objection.  This is again
11  now you are going beyond the scope.  We have already
12  established that Dave Kleiman did not have control over
13  the Bitcoin.org domain name and you can move on now.
14  BY MR. FREEDMAN:
15       Q.   Who is Theymos?
16       MS. MARKOE:  Objection.  I will instruct
17  you not to answer.  Beyond the scope.
18  BY MR. FREEDMAN:
19       Q.   Why did you transfer the Bitcoin.org
20  domain name?
21       MS. MARKOE:  Objection: beyond the scope.
22  Do not answer.
23  BY MR. FREEDMAN:
24       Q.   Who mined the genesis block of the
25  Bitcoin timechain?

MAGNA
LEGAL SERVICES

| Page 182 |
|---|

1       MS. MARKOE:  Objection.
2       MR. FREEDMAN:  You can answer.
3       MS. MARKOE:  Can you connect that to one
4   these topics, please.
5       MR. FREEDMAN:  Formation of the Satoshi
6   Nakamoto partnership.  It is literally the first block
7   of Bitcoin.
8       THE WITNESS:  It is not mine.
9       MS. MARKOE:  The question you asked does
10  not make that connection, so why do you not try to make
11  that connection and then we can have a conversation.
12      MR. FREEDMAN:  Do not tell me how to ask
13  my questions.  Instruct him not to answer or object.
14      Q.   Who mined the genesis block of the
15  Bitcoin timechain?
16      THE WITNESS:  Nobody.
17      MS. MARKOE:  Objection.
18  BY MR. FREEDMAN:
19      Q.   I am sorry?
20      A.   Nobody.
21      Q.   Who programed the genesis block of the
22  Bitcoin timechain?
23      MS. MARKOE:  Objection.
24      THE WITNESS:  Nobody, because that is
25  again wrong.

| Page 183 |
|---|

1   BY MR. FREEDMAN:
2       Q.   How did the Bitcoin genesis block come
3   into existence?
4       MS. MARKOE:  Objection.
5       THE WITNESS:  Answer or not?  Instruction?
6   Do I answer this or not?
7       MS. MARKOE:  My suggestion would be that
8   someone relate this ----
9       MR. FREEDMAN:  Please do not suggest ----
10      MS. MARKOE:  ---- to Dave Kleiman or
11  I will strict him not to answer.
12      MR. FREEDMAN:  Then do what you will.  We
13  will raise it with the court.
14      MS. MARKOE:  Relate your question to Dave
15  Kleiman and whether or not there was a partnership or
16  I will strict him not to answer.
17      MR. FREEDMAN:  Do what you will.
18      MS. MARKOE:  Okay.  Then ask your
19  questions properly related to the scope as you prepared
20  this.
21  BY MR. FREEDMAN:
22      Q.   How did the genesis block come into
23  existence?
24      MS. MARKOE:  Objection.  Do not answer
25  that.

| Page 184 |
|---|

1   BY MR. FREEDMAN:
2       Q.   What was the first Bitcoin block Satoshi
3   mined?
4       MS. MARKOE:  You can answer that.
5       THE WITNESS:  Block one.
6   BY MR. FREEDMAN:
7       Q.   Is that also referred to as the genesis
8   block?
9       A.   No.
10      Q.   Is it the second block?
11      MS. MARKOE:  Objection.
12      THE WITNESS:  It is the first block -- it
13  is block one.
14  BY MR. FREEDMAN:
15      Q.   Block one.  Do you know what computer
16  mined block one?
17      A.   I know what, out of a group of computers,
18  mined block one.
19      Q.   Where was that group of computers
20  located?
21      A.   Port Macquarie just outside a small town
22  called Bagnoo.
23      MS. MARKOE:  Can you spell those names
24  for the court reporter, please.
25      THE WITNESS:  B-A-G-N-O-O.

| Page 185 |
|---|

1   BY MR. FREEDMAN:
2       Q.   How many computers were in Bagnoo?
3       MS. MARKOE:  Objection.
4       THE WITNESS:  I do not know how many
5   computers I had in Bagnoo.  I do not know how many
6   computers I have now.
7   BY MR. FREEDMAN:
8       Q.   Did anyone else know about the computer
9   set-up in Bagnoo?
10      MS. MARKOE:  Objection.
11      MR. FREEDMAN:  You can answer.
12      THE WITNESS:  Yes.
13  BY MR. FREEDMAN:
14      Q.   Who else?
15      A.   Many people knew that I had a computer
16  set-up in Bagnoo.  I had spent a lot of money getting
17  fibre laid into a completely rural area, that basically
18  was never going to have fibre, that opened up maybe
19  50,000 people in the community to low cost, high-speed
20  internet, because I had the whole road ripped up and
21  paid for to lay fibre to my home, the power run into it,
22  etcetera, so many would have known.
23      Q.   You had a home in Bagnoo?
24      A.   Yes.
25      Q.   Is it Bagnoo in New South Wales?

MAGNA ▸
LEGAL SERVICES

Page 186

```
1        A.   Yes.
2        Q.   Satoshi mined block one.  Were you the
3   one acting as Satoshi to mine block one?
4            MS. MARKOE:  Objection.
5            THE WITNESS:  There is no Satoshi that
6   way.  I was.
7   BY MR. FREEDMAN:
8        Q.   I am sorry?
9        A.   I was.  I used the pseudonym.  It did not
10  flip round like Dread Pirate Roberts or something like
11  this.  It was just me.  And it was not Satoshi mining
12  per se.  There was not any, other than me, apart from
13  block nine, which was then referenced by a transfer
14  I did.
15       Q.   So you mined block one?
16       A.   Yes.
17       Q.   Did you also mine block two?
18       A.   Relevance, please, give me ----
19           MS. MARKOE:  Look, connect it up with a
20  relationship with Dave Kleiman or do not.
21           THE WITNESS:  There were mining pools,
22  there were no shared mining.  Dave Kleiman and I could
23  not physically mine in any way.  Mining pools were not
24  developed until years after I disappeared, so there is
25  no joint mining.
```

Page 187

```
1   BY MR. FREEDMAN:
2        Q.   That was not my question.  It was just
3   whether ----
4        A.   Yes, it is, basically you are trying to
5   find out what I do and do not have, which is none of
6   your God damn business.  There is nothing to do with
7   Dave Kleiman.  Dave Kleiman never had a machine access
8   code.  He never went on those machines.  He never
9   accessed those machines.  He never touched those
10  machines.  Nothing.
11       Q.   Are you aware of anyone else who mined
12  Bitcoin in January of 2009?
13           MS. MARKOE:  Objection.  That is again
14  well beyond the scope of what this deposition is about.
15           MR. FREEDMAN:  To witnesses.
16           MS. MARKOE:  Of anyone who mined Bitcoin?
17           MR. FREEDMAN:  It literally came out days
18  ago, Zaharah; it came out in January 2009, so anybody
19  who was mining then was ----
20           MS. MARKOE:  Okay.  How would he know who
21  is doing what?
22           MR. FREEDMAN:  If he does not know he
23  does not know.
24           THE WITNESS:  The whole nature of the
25  system is that you do not register.
```

Page 188

```
1   BY MR. FREEDMAN:
2        Q.   Do you know anyone who was mining in
3   January 2009?
4            MS. MARKOE:  Objection.
5            THE WITNESS:  Yes.  Hal Finney.
6   BY MR. FREEDMAN:
7        Q.   Besides Hal Finney, was there anyone
8   else?
9            MS. MARKOE:  Objection.
10           THE WITNESS:  No, I do not know.  I did
11  not even ask Dave if he was doing it.
12  BY MR. FREEDMAN:
13       Q.   You do not know if Dave was mining in
14  January 2009?
15       A.   No, I do not.
16       Q.   Did he ever tell you if he was mining in
17  January 2009?
18           MS. MARKOE:  Objection: asked and
19  answered.
20           MR. FREEDMAN:  You can answer.
21           THE WITNESS:  No idea.
22  BY MR. FREEDMAN:
23       Q.   Dr. Wright, did there come a time when
24  you discussed Satoshi Nakamoto and the origin of Bitcoin
25  with a gentleman named Andrew O'Hagan?
```

Page 189

```
1            MS. MARKOE:  Objection.  What exactly
2   does this have to do with the topic?  I presume you are
3   talking about topic 3.  So can you please explain to me
4   what this has to do with any of the subtopics under
5   topic 3.
6            MR. FREEDMAN:  Yes.  I am handing you
7   what has been marked as Plaintiff's Exhibit 4.
8            MS. MARKOE:  Please explain it.
9            MR. FREEDMAN:  I will.  One second.
10  I think this is 4; right?  Is it 3 or 4?  3.  This goes
11  to relevant witnesses.
12           MS. MARKOE:  What goes to relevant
13  witnesses?
14           MR. FREEDMAN:  You will see when the
15  question comes.  Mr. O'Hagan himself is a relevant
16  witness if the answer is yes.
17  (Plaintiff's Exhibit 3 marked for identification)
18       Q.   Can you take a look at page 32, please.
19  The page numbering is in the upper right-hand corner of
20  the document.
21           MR. RIVERO:  You are referring to 32 of
22  96?
23           MR. FREEDMAN:  Correct.  This is docket
24  entry 83-1.
25       Q.   About halfway down that first paragraph
```

MAGNA ◆
LEGAL SERVICES

Page 190

1  it starts off with: "Satoshi also sent four other
2  transactions on the same day. I asked Wright who the
3  recipients were -- who the four addresses belonged to.
4  'Hal, Dave, myself', he replied. 'And another I cannot
5  name as I have no right to do so'." Do you recognise
6  this conversation?
7       MS. MARKOE: Objection.
8       THE WITNESS: I remember a half-truth
9  version of this conversation.
10 BY MR. FREEDMAN:
11      Q.  What was the truth of the conversation?
12      MS. MARKOE: Objection. You are going
13 beyond the scope. I am going to instruct him not to
14 answer.
15      MR. FREEDMAN: You are not going to let
16 me find out who the name of the other person is?
17      MS. MARKOE: I am going to instruct him
18 not to answer your question which, if I can see it,
19 says, "What was the truth of the conversation?" You are
20 limited to the details surrounding Craig and Dave's
21 partnership to create Satoshi Nakamoto, in your words,
22 the general process of their collaboration, in your
23 words, the accounts that they held to collaborate
24 technological and money, in your words, methods of
25 communication they used during that period, in your

Page 191

1  words ----
2       MR. FREEDMAN: Zaharah, you do not need
3  you to read the entire -- I am familiar with it.
4       MS. MARKOE: ---- and to identify the
5  computers and servers Satoshi Nakamoto used to draft the
6  white paper ----
7       MR. FREEDMAN: I am going to ask you to
8  stop wasting my time.
9       MS. MARKOE: ---- program Bitcoin and mine
10 the first few Bitcoin. Your question does not go to any
11 of those topics.
12      MR. FREEDMAN: It goes to the first one.
13      MS. MARKOE: I am instructing the witness
14 not to answer.
15      MR. FREEDMAN: Then just instruct him not
16 to answer, Zaharah. That is all you need to do and I
17 will move on.
18      MS. MARKOE: I will also put on the
19 record my objection which I am entitled to do and you
20 are not entitled to stop me from doing. As to the first
21 question, you have already identified, and he has
22 already said, he had a conversation with Mr. O'Hagan,
23 this is not an accurate representation of that
24 conversation. That is your identity of your witness.
25 You are done now.

Page 192

1       MR. FREEDMAN: Zaharah, if you continue
2  speaking we are going to ask the court for more time.
3       MS. MARKOE: Ask the court for more time.
4  I am allowed to state my objection for the record and
5  the basis for it so that I have an accurate record to
6  share with the court.
7       MR. FREEDMAN: We will.
8       Q.  On January 12th, 2009, did you send
9  Bitcoin to anyone?
10      A.  Yes.
11      Q.  Who did you send it to?
12      A.  Hal Finney.
13      Q.  Who else?
14      MS. MARKOE: Answer if you can.
15      THE WITNESS: I do not actually remember.
16 BY MR. FREEDMAN:
17      Q.  Did you send Bitcoin to Dave Kleiman on
18 January 12th, 2009?
19      MS. MARKOE: Objection, but you may
20 answer if you remember.
21      THE WITNESS: I cannot remember.
22 BY MR. FREEDMAN:
23      Q.  Did you send Bitcoin to yourself on
24 January 12th, 2009?
25      MS. MARKOE: Objection. You can answer

Page 193

1  if you remember.
2       THE WITNESS: I cannot remember.
3  BY MR. FREEDMAN:
4       Q.  Do you know who is being referred to in
5  Plaintiff's Exhibit 3: "... and another I cannot name
6  as I have no right to do so"?
7       MS. MARKOE: I just want to read the
8  question back. (Pause) You can answer the question. If
9  you need a read back, ask for a read back.
10      THE WITNESS: What I will say is this
11 work of fiction -- (Witness indicates Exhibit 3) -- was
12 created because Mr. O'Hagan refused to sign the
13 non-disclosure agreement, and basically took what he
14 thought would be a great story and created one. It is
15 fiction.
16 BY MR. FREEDMAN:
17      Q.  Your position is the entire article is
18 fiction?
19      MS. MARKOE: Objection: mischaracterises
20 his testimony.
21 BY MR. FREEDMAN:
22      Q.  Is it your position that the entire
23 article is fiction?
24      A.  No.
25      Q.  Did Mr. O'Hagan record sessions --

MAGNA
LEGAL SERVICES

Page 194

1  interview sessions with you?
2       A.   No, and if he did so that would be a
3  criminal act.
4       Q.   There are no recordings that you are
5  aware of?
6       A.   If he did so, that would be a criminal
7  act.
8       Q.   In January of 2009, until 2011, was there
9  anywhere you mined Bitcoin besides Bungaloo -- help me
10 please?
11      A.   Bagnoo.
12      Q.   Bagnoo?
13      A.   Yes.
14      Q.   Where else?
15      A.   At one stage, I had mining software I was
16 playing with on my phone.  It did not actually mine any
17 Bitcoin.
18      Q.   Was there any other locations of
19 computers that you mine Bitcoin in?
20      A.   No.
21      Q.   Only Bungaloo?
22      A.   Bagnoo.
23      Q.   Bagnoo.  Only Bagnoo?
24      A.   Yes.
25      Q.   That started in January 2009.  When did

Page 195

1  you stop, if ever, mining Bitcoin in Bagnoo?
2       A.   I stopped everything to do with Bagnoo in
3  December.
4       Q.   Of?
5       A.   2010.  Or probably not everything to do
6  with because I still owned part of the property and
7  whatever else, but I was not doing any IT stuff there at
8  all.
9            MR. RIVERO:  I want to note that we are
10 giving a lot of leeway, even though there is already
11 testimony disconnecting the subject of these questions
12 from Dave Kleiman.  But go ahead with your next
13 question.
14 BY MR. FREEDMAN:
15      Q.   In December of 2010 -- strike that.  Did
16 you stop mining entirely in December of 2010?
17      A.   No.
18      Q.   Where did the mining continue?
19      A.   The mining restarted later, by me, with
20 pools that I now run.
21      Q.   When did that start up?
22      A.   2016 on.
23      Q.   So is it your testimony here today that
24 from December of 2010 until the mining pools in 2016,
25 you never mined Bitcoin?

Page 196

1            MS. MARKOE:  Objection.
2            THE WITNESS:  That is not correct.  I did
3  not earn any Bitcoin because running a node in certain
4  configurations means that you are also mining.
5  BY MR. FREEDMAN:
6       Q.   Okay.  So ----
7       A.   Running testnet is also mining.  This is
8  not public Bitcoin.
9       Q.   So as I understand it, from December of
10 2010, until 2016, you never earned the mining reward for
11 mining a block of Bitcoin; is that correct?
12           MS. MARKOE:  Objection.  You can answer.
13           THE WITNESS:  That is correct.
14 BY MR. FREEDMAN:
15      Q.   At any point in time, was Dave involved
16 in the mining that took place in Bagnoo from 2009 until
17 to 2010?
18      A.   Nobody was ever involved in that.
19      Q.   Approximately how much Bitcoin were mined
20 from 2009 ----
21           MS. MARKOE:  Objection.  I am going to
22 instruct you not to answer.
23           MR. RIVERO:  I instruct you not to
24 answer.
25 BY MR. FREEDMAN:

Page 197

1       Q.   I am going to ask you another question.
2  Your attorneys may instruct you not to answer so take a
3  second ----
4            MS. MARKOE:  Do not ask it.
5            MR. FREEDMAN:  I do not think you are
6  right to instruct him not to answer but I am going to
7  ask it.
8       Q.   Do you know the amount of Bitcoin that
9  was mined from 2009 until 2010 in Bagnoo?
10           MS. MARKOE:  Objection.
11           MR. RIVERO:  Same instruction.
12 BY MR. FREEDMAN:
13      Q.   Have you ever mined Bitcoin out of
14 Australia?
15      A.   No.
16           MS. MARKOE:  Objection.  You can answer.
17           THE WITNESS:  Well, back then, no.  Now,
18 the pools are outside of Australia, but that is 2016 on.
19 So, when I say no to mining or anything like this,
20 I will just make it clear now I am talking about before
21 2016.
22 BY MR. FREEDMAN:
23      Q.   I understand.  Thanks for the
24 clarification.  I know we understood each other, but it
25 is important that the record is clear.

MAGNA
LEGAL SERVICES

Page 198

```
 1        A.   I got told to make sure I am clear,
 2   so ----
 3        Q.   From 2009 until 2010, when you were
 4   mining in Bagnoo, was that a full-time job for you?
 5            MS. MARKOE:  Objection.
 6            THE WITNESS:  It was not a job at all.
 7   BY MR. FREEDMAN:
 8        Q.   Did it take any time?
 9            MS. MARKOE:  Objection.
10            THE WITNESS:  Sneezing takes time.
11   BY MR. FREEDMAN:
12        Q.   Touché.  Did it take a significant amount
13   of your time?
14            MS. MARKOE:  Objection.
15            THE WITNESS:  No.
16   BY MR. FREEDMAN:
17        Q.   Did you discuss the details of your
18   mining activity with Dave Kleiman?
19        A.   Define what you mean by "discuss the
20   details of my mining activity".
21        Q.   Did you discuss the Bagnoo computers and
22   servers with Dave Kleiman?
23        A.   No.
24        Q.   To the best of your recollection, did
25   Dave Kleiman have any knowledge of the mining you were
```

Page 199

```
 1   doing in Bagnoo?
 2            MS. MARKOE:  Objection.
 3            THE WITNESS:  Yes, he did.
 4   BY MR. FREEDMAN:
 5        Q.   How did he come to find out about that?
 6        A.   He knew I had a property in Bagnoo and
 7   that I was running Bitcoin nodes.
 8        Q.   Did you discuss the amount of Bitcoin you
 9   had amassed with Dave Kleiman?
10            MS. MARKOE:  Objection.  Again, I am
11   going to instruct the witness not to answer these
12   questions.  You are now going well beyond the scope of
13   what is permitted in this deposition.
14            MR. FREEDMAN:  Communication between him
15   and Dave Kleiman.
16            MS. MARKOE:  You are not asking about
17   every communication that he had between himself and Dave
18   Kleiman.  That is not one of your topics.  Look at your
19   topics again.  This is not a merits deposition.  That
20   has been made very clear by the court.
21   BY MR. FREEDMAN:
22        Q.   Did Dave Kleiman mine any of the first 50
23   Bitcoin ----
24            MS. MARKOE:  Objection.  You can answer
25   if you know.
```

Page 200

```
 1   BY MR. FREEDMAN:
 2        Q.   ---- blocks.
 3        A.   Thank you for the clarification,
 4   otherwise I would have to say no, because no one mined
 5   the first 50 Bitcoin.
 6        Q.   I saw that look.
 7        A.   I cannot help rolling my eyes,
 8   I apologise.  I do not know.
 9        Q.   Did there come a time when Dave Kleiman
10   began mining Bitcoin?
11        A.   Yes.
12        Q.   When did he begin mining Bitcoin?
13        A.   I do not know.
14        Q.   Do you know approximately when he began
15   mining Bitcoin?
16        A.   I did not ask him.
17        Q.   Do you know what computer he used to mine
18   Bitcoin?
19        A.   No.
20        Q.   Do you know what hardware he used to mine
21   Bitcoin?
22        A.   Not really, no.
23        Q.   How do you know that he eventually began
24   mining Bitcoin?
25        A.   Because eventually we spoke about it and
```

Page 201

```
 1   he had told me he had mined Bitcoin.
 2        Q.   Where did that communication take place?
 3        A.   Most of my communications, including this
 4   one, were on IRC.
 5        Q.   There is no record of it?
 6            MS. MARKOE:  Objection.
 7            THE WITNESS:  I cannot answer that one, I
 8   do not know.
 9   BY MR. FREEDMAN:
10        Q.   You have no record of it?
11        A.   I do not have any records of many of
12   these things, as I have already stated.  That is why
13   I used IRC.
14        Q.   Do you know if Dave Kleiman ever used
15   cloud computing to mine Bitcoin?
16        A.   I do not know -- actually, we are talking
17   about a period where nobody used cloud computing to mine
18   Bitcoin.  There was no cloud computing to mine Bitcoin
19   at that stage.  Pool software did not exist.  The person
20   who created some of the first pool software was after
21   I disappeared the first time, and ----
22            MR. RIVERO:  Please finish.
23            THE WITNESS:  ---- that person had
24   nothing to do with Dave or anything like that, and
25   created pool mining and I am sorry to tell you that
```

Page 202

```
 1   there was no cloud mining at that stage.
 2           MR. RIVERO:  Just to make sure the record
 3   is clear, I heard at line 23 of the prior page, I heard
 4   "many".  I think it is transcribed as "any".  I just
 5   would like clarification.
 6           MR. FREEDMAN:  It is the hour.
 7           MR. RIVERO:  I am looking at the record
 8   to make sure.
 9           MR. FREEDMAN:  It is rough.
10       Q.    Do you know how Dave stored any of the
11   Bitcoins he mined?
12       A.    No.
13       Q.    And remind me, I do not recall if I asked
14   this, do you have any idea when Dave began mining
15   Bitcoin?
16       A.    No, I do not.
17       Q.    Was it before 2011?
18       A.    I do not know.
19       Q.    Do you recall when he told you he had
20   began mining Bitcoin?
21       A.    Not exactly, no.
22       Q.    Was it early on, after ----
23       A.    It would have been early on, yes.
24       Q.    Did Dave ever share the private keys of
25   Bitcoin with you?
```

Page 203

```
 1           MS. MARKOE:  Objection.
 2           THE WITNESS:  You do not share private
 3   keys, ever.
 4   BY MR. FREEDMAN:
 5       Q.    So is the answer no?
 6       A.    The answer is no.
 7       Q.    Did you ever share private keys with
 8   Dave?
 9           MS. MARKOE:  Objection: asked and
10   answered.
11           THE WITNESS:  I do not share private keys
12   with my wife.
13   BY MR. FREEDMAN:
14       Q.    What is a paper wallet?
15           MS. MARKOE:  Objection.  I am going to
16   give you a little bit of leeway here, but again we are
17   going beyond the scope of this deposition.  You get
18   another shot at him.  I will certainly instruct him, if
19   you continue along these lines, to not answer those
20   questions at the later deposition, if you get answers to
21   them now.
22           THE WITNESS:  A paper wallet is a key
23   that is printed on a piece of paper.
24   BY MR. FREEDMAN:
25       Q.    Have you ever used a paper wallet?
```

Page 204

```
 1       A.    Yes.
 2       Q.    Did you ever use a paper wallet with Dave
 3   Kleiman?
 4           MS. MARKOE:  Objection.
 5           THE WITNESS:  Please explain what you
 6   actually mean in that fluffy nebulous sentence.
 7   BY MR. FREEDMAN:
 8       Q.    Did you ever exchange a printed -- strike
 9   that.  Did you ever exchange a key that is printed on a
10   piece of paper with Dave Kleiman?
11           MS. MARKOE:  Objection.
12           THE WITNESS:  Mr. Kleiman and I had been
13   in the country together once since the creation of
14   Bitcoin, where neither of us handed over any Bitcoin on
15   paper wallets, neither of us handed pieces of paper
16   together as we were drinking and getting drunk, to each
17   other on that day, and the value of the entire Bitcoin
18   market at that stage, when we got together, was,
19   I think, about $100, which was millions of Bitcoin, for
20   the entire value $100 was it.  So, did I hand him a
21   piece of paper when we were in foreign countries:  I do
22   not know how I could possibly do that.
23   BY MR. FREEDMAN:
24       Q.    I am going to ask you just concisely, did
25   you ever exchange a key that is printed on a piece of
```

Page 205

```
 1   paper with Dave Kleiman in any way?
 2           MS. MARKOE:  Objection.  I am going to
 3   instruct the witness not to answer at this point.  We
 4   have given you a lot of leeway.  These questions are not
 5   going to subjects 3 or 4 which are the only ones I could
 6   possibly see any relevance to.  If you would like to
 7   explain how they relate to those topics or any other
 8   topics, I would reconsider my objection, but at this
 9   point in time I just do not see it.
10           MR. FREEDMAN:  It goes to the methods --
11   it goes to 4.
12           MS. MARKOE:  Explain how whether he ever
13   exchanged a paper wallet goes to 4.  4 relates to mining
14   of Bitcoins, not paper wallets.  There is a distinction.
15           MR. FREEDMAN:  It goes to the general
16   process of their collaboration.
17           MS. MARKOE:  We have already established
18   that there was no mining together.
19           MR. FREEDMAN:  I am just trying to figure
20   out whether or not they collaborated in another way.
21           MS. MARKOE:  How does one collaborate in
22   terms of holding a paper wallet or sharing information
23   about a paper wallet?  I am instructing the witness not
24   to answer.  You can move on.
25   BY MR. FREEDMAN:
```

Page 206

1    Q.   Did you ever use any other methods for
2   the offline exchange of Bitcoins with Dave?
3         MS. MARKOE:  Objection.
4         THE WITNESS:  Again, I did not exchange
5   Bitcoins with Dave the way you are suggesting.  The way
6   that you exchange Bitcoin is you a send transaction from
7   one address to another.  I would never exchange private
8   keys with Dave.
9   BY MR. FREEDMAN:
10        Q.   Did you ever send Bitcoin to public
11  addresses that you knew controlled?
12        MS. MARKOE:  Objection.
13        THE WITNESS:  I do not know what
14  addresses Dave controlled, so how could I do that?
15  BY MR. FREEDMAN:
16        Q.   Did Dave ever provide you with public
17  addresses that he controlled?
18        MS. MARKOE:  Objection.  You can answer.
19        THE WITNESS:  One.
20  BY MR. FREEDMAN:
21        Q.   Which one?
22        A.   I do not remember.
23        Q.   Why did he provide it to you?
24        MS. MARKOE:  Objection.
25        THE WITNESS:  It was for testing.

Page 207

1   BY MR. FREEDMAN:
2         Q.   When did he provide it to you?
3         A.   2009.
4         Q.   What were you testing?
5         A.   Testnet.
6         Q.   What is testnet?
7         A.   Testnet is the development version of
8   Bitcoin, that runs alongside, that we had our own
9   version of in the world to create a test of Bitcoin.
10  So, when I am saying "we" there, I mean the Bitcoin
11  community.  I started with my own multiple versions,
12  which I firewalled off, and eventually they became a
13  public testnet which was a second version of Bitcoin,
14  you could say, but a valueless version of Bitcoin that
15  was easier to mine, so you could test the software and
16  the code.
17        Q.   Who had access to testnet?
18        A.   Everyone.
19        MS. MARKOE:  Objection.
20        THE WITNESS:  It is possible.
21  BY MR. FREEDMAN:
22        Q.   And Dave's public address was a testnet
23  address.
24        MS. MARKOE:  Objection: mischaracterises
25  the testimony.

Page 208

1         THE WITNESS:  Testnet addresses are real
2   addresses and vice-versa, blah, blah, blah.  There is no
3   distinction.
4   BY MR. FREEDMAN:
5         Q.   What were the primary ways Satoshi
6   Nakamoto communicated with people?
7         A.   Which people?
8         Q.   What is the primary way Satoshi Nakamoto
9   communicated?
10        A.   Again, which people?  So, how did
11  I communicate?  Which people?  I mean, if you are
12  getting the "I am Satoshi", then that could be anything.
13  I primarily communicate with people without saying I am
14  Satoshi and I walk up like I am now and I open my mouth
15  and words come out.
16        Q.   I understand that.  When I say Satoshi
17  Nakamoto now, I am referring to the internet presence of
18  Satoshi Nakamoto.
19        A.   So you mean the pseudonym?
20        Q.   The pseudonym.
21        A.   Can you please be explicit in saying
22  that.
23        Q.   What was the primary way in which you
24  communicated through the pseudonym?
25        MS. MARKOE:  Objection.  You can answer.

Page 209

1         THE WITNESS:  Well, by definition, the
2   pseudonym was primarily done depending on which one it
3   was, by e-mail, or the Bitcoin forums, or the P2P
4   forums, or those other things.  So, it depends on which
5   one you are talking about, but online things that are
6   there, so ----
7   BY MR. FREEDMAN:
8         Q.   What are the e-mail addresses that you
9   used as the pseudonym Satoshi Nakamoto?
10        A.   They are all public.  The GMX account and
11  the Vistomail accounts are all public.
12        Q.   Please state them for the record.
13        MS. MARKOE:  If you recall.
14        THE WITNESS:  I do not remember which one
15  is Satoshi or Satoshi N off the top of my head.  I have
16  not used them in years.  I do not look at them any more.
17  And I am not going to even try and think about it.  They
18  are there.  Everyone knows them.  Look it up.
19  BY MR. FREEDMAN:
20        Q.   Was there a third account?
21        A.   Used for public communications?
22        Q.   What was that third account?
23        A.   There was not a third -- sorry.  What
24  third account?  I did not say there was a third account.
25        Q.   I asked if there was a third -- strike

MAGNA
LEGAL SERVICES

Page 210

```
 1    that.  It may be I misunderstood your answer.  Did
 2    Satoshi Nakamoto, the pseudonym, have a third e-mail
 3    account, besides GMX and Vistomail?
 4              MS. MARKOE:  Objection.  Answer if you
 5    can recall.
 6              THE WITNESS:  I used multiple e-mail
 7    accounts.
 8    BY MR. FREEDMAN:
 9         Q.   Can you list what they were?
10              MS. MARKOE:  Objection.
11              THE WITNESS:  No.
12    BY MR. FREEDMAN:
13         Q.   Did you use an e-mail account
14    satoshi@anonymousspeech.com?
15         A.   Yes, that one sounds about right.
16         Q.   Do you still have access to these
17    accounts?
18              MS. MARKOE:  Objection: vague.
19              THE WITNESS:  As I stated earlier, no.
20    I stopped accessing them a long time.
21    BY MR. FREEDMAN:
22         Q.   Do you have the ability to access these
23    accounts?
24         A.   I very much doubt it.
25         Q.   Why do you doubt it?
```

Page 211

```
 1         A.   Because GMX has been compromised and the
 2    other one has been compromised.  They have been reset
 3    over time.  So, I do not actually want to access them.
 4         Q.   Have you tried to access them?
 5         A.   No.
 6         Q.   Does that go for the GMX account, the
 7    Vistomail account and the Anonymous Speech accounts?
 8         A.   Yes.
 9         Q.   Do you know who has control over these
10    accounts now?
11         A.   No.  If anyone.
12         Q.   Did there come a time when you provided
13    Dave Kleiman with access to any of these accounts?
14         A.   Yes.
15         Q.   Which accounts?
16         A.   Dave was given the GMX account access for
17    a little while.
18         Q.   When was he given access to the account?
19         A.   I do not remember exactly.
20         Q.   Who gave him access to the account?
21         A.   If I am the person with it, then it has
22    to be me.
23         Q.   You gave him access to the GMX account?
24         A.   Yes.
25         Q.   Why?
```

Page 212

```
 1         A.   Because I asked him to check it for me.
 2         Q.   For what?
 3         A.   To read an e-mail.
 4         Q.   Which e-mail?
 5              MS. MARKOE:  Objection.  You can answer
 6    if you recall.
 7              THE WITNESS:  I do not recall which
 8    e-mail.
 9    BY MR. FREEDMAN:
10         Q.   How many times did Dave access the GMX
11    account?
12              MS. MARKOE:  Objection: foundation.
13              THE WITNESS:  How many hairs do you have
14    in your beard?
15    BY MR. FREEDMAN:
16         Q.   Did you provide access to anyone else --
17    strike that.  Did anyone else -- strike that.  Did you
18    ever give anyone else access to the GMX account?
19         A.   No.
20         Q.   Did you ever give anyone else access to
21    the Vistomail account?
22         A.   Yes.
23         Q.   Who?
24         A.   I think the only other person who had
25    access at that stage for a little bit was Uyen.
```

Page 213

```
 1         Q.   Can you spell that?
 2         A.   No.
 3         Q.   Is that Uyen Nguyen?
 4         A.   Yes.
 5         Q.   Who gave Uyen access to the Vistomail
 6    account?
 7              MS. MARKOE:  Objection: asked and
 8    answered.
 9              THE WITNESS:  I am not sure of the exact
10    details.  It was Uyen -- what is his name -- I cannot
11    remember his name -- the old Japanese guy, the one that
12    they pulled up as Satoshi?
13    BY MR. FREEDMAN:
14         Q.   Dorian.
15         A.   Dorian, that is it.  Sorry, I had
16    forgotten his name.  I instructed people to send a
17    message saying "I am not Dorian" because he was getting
18    a lot of shit.
19         Q.   You instructed Uyen Nguyen to do that?
20         A.   Yes.
21         Q.   And provided her with the log in
22    credentials?
23         A.   I gave her some, yes.
24         Q.   Did you ever provide anyone else with
25    access to the Anonymous Speech account?
```

Page 214

1     A.  No.
2     Q.  Did you ever use these accounts to
3  communicate with Dave Kleiman?
4     A.  I do not remember.
5     Q.  Did you ever ask Dave Kleiman to stop
6  accessing the GMX account?
7     A.  No.
8     Q.  Even when you stepped back from the
9  community you still did not ask him to stop accessing
10  the account?
11         MS. MARKOE:  Objection.
12         THE WITNESS:  It was not used at that
13  stage -- by anybody.
14  BY MR. FREEDMAN:
15     Q.  You trusted Dave Kleiman?
16     A.  Dave was my friend.
17     Q.  Best friend?
18     A.  Fairly much, yes.
19     Q.  Did you trust Uyen Nguyen?
20         MS. MARKOE:  Objection: you are going
21  beyond the scope.  I am going to instruct him not to
22  answer.
23         MR. FREEDMAN:  We agree for once!
24         MS. MARKOE:  I am sorry.  What?
25         MR. FREEDMAN:  We agree for once!

Page 215

1         BY MS. MARKOE:  That is a miracle in and
2  of itself.
3  BY MR. FREEDMAN:
4     Q.  After the creation of Bitcoin, what was
5  the first Bitcoin-related intellectual property you
6  worked on with Dave?
7         MS. MARKOE:  Objection: assumes facts not
8  in evidence.
9         THE WITNESS:  I did not ever work on
10  Bitcoin IP with Dave.
11  BY MR. FREEDMAN:
12     Q.  Did you ever work on any intellectual
13  property with Dave?
14     A.  Yes.
15     Q.  What were those projects, in short?  What
16  were the names?  Strike that.  What were the names of
17  those projects?
18     A.  SWAMP, software assurance marketplace.
19  Basically, there are a number of projects that are all
20  public and all have had their papers published.
21     Q.  Is one of them a metered payment system?
22     A.  No.
23     Q.  Do you know what I am referring to when
24  I say a metered payment system?
25     A.  I know what a metered payment system is.

Page 216

1     Q.  Is there value to intellectual property
2  about a metered payment system?
3         MS. MARKOE:  Objection.  I am going to
4  instruct the witness not to answer.  He has already
5  stated he did not create any intellectual property with
6  Dave Kleiman on metered payment systems and therefore
7  any discussion of that would go beyond the scope of this
8  deposition.
9  BY MR. FREEDMAN:
10     Q.  Did you collaborate with Dave Kleiman on
11  intellectual property entitled "Software Derivative
12  Markets and Information Security Risk Systems"?
13     A.  I did not collaborate with Dave on
14  anything.  I created software and Dave, who was a vet,
15  was able to try and file, so that he would have had some
16  money to help him out.  Dave was not a mathematician.
17  Dave had no knowledge of that area, so there was no
18  collaboration at all in that way for research.
19     Q.  Did there come a time when Dave Kleiman
20  took two millions lines of code and turned it into six
21  million lines of code?
22         MS. MARKOE:  Objection.  But you can
23  answer if you recall.
24         THE WITNESS:  No one could actually do
25  that.  Four million lines of code would be approximately

Page 217

1  4,000 years worth of work.
2  BY MR. FREEDMAN:
3     Q.  So, Dave Kleiman never turned two
4  millions lines of code into six million lines of code;
5  is that your testimony?
6     A.  No person can change four million
7  themselves into six million.
8     Q.  Did Dave Kleiman cause two million lines
9  of code to turn into six million lines of code?
10         MS. MARKOE:  Objection.
11         THE WITNESS:  Is Dave, in your
12  assumption, a wizard?
13  BY MR. FREEDMAN:
14     Q.  If you could just answer the question,
15  Dr. Wright.
16     A.  I believe I just did.
17     Q.  The answer is no?
18     A.  The answer is unless he is already 4,000
19  years old and he started coding at the time of the sort
20  of exodus or whatever else, then probably not.
21     Q.  Was it possible he supervised the
22  creation of four million lines of code?
23         MS. MARKOE:  Objection.  You can answer.
24         THE WITNESS:  Yes.
25  BY MR. FREEDMAN:



Page 218

1      Q.   Did he supervise the creation of four
2  million lines of code?
3      MS. MARKOE: Objection. You can answer
4  if you know.
5      THE WITNESS: I do not know.
6  BY MR. FREEDMAN:
7      Q.   Whose idea was it to create W&K US?
8      A.   Dave's.
9      Q.   How did that idea get initially
10  communicated to you by Dave?
11      MS. MARKOE: Objection. You can answer.
12      THE WITNESS: I do not really remember.
13  BY MR. FREEDMAN:
14      Q.   Was anyone else involved in the initial
15  communications about W&K?
16      A.   Yes.
17      Q.   Who?
18      A.   My ex-wife.
19      Q.   What was the purpose of starting W&K?
20      A.   Dave was a vet. As a vet, he was able to
21  theoretically access funding from the US government.
22  I was working on a number of different projects that
23  aligned with what the Department of Homeland Security
24  was seeking to be developed. I said I would aid Dave
25  because he was in a bit of trouble, and that we could do

Page 219

1  a few different projects together, including that, that
2  would enable him to hopefully get some money to be able
3  to work less, as he was in the hospital.
4      Q.   What was your involvement in W&K?
5      A.   Very little.
6      Q.   How much was your involvement? What was
7  your involvement in W&K?
8      A.   Talking about it and then going off and
9  writing some papers, full stop.
10      Q.   Did you have any ownership in W&K?
11      A.   No.
12      Q.   Who owned W&K?
13      A.   The records for W&K exist. I do not know
14  if the records are accurate.
15      Q.   Who owned W&K in reality?
16      A.   Not me.
17      MS. MARKOE: Objection.
18  BY MR. FREEDMAN:
19      Q.   Who?
20      A.   Who owns BHP Billiton in reality? It is
21  not my company. I do not care.
22      Q.   You have no idea who owns W&K?
23      A.   I do not know that.
24      MS. MARKOE: Objection.
25      THE WITNESS: If I do not own it, I do

Page 220

1  not care about it.
2  BY MR. FREEDMAN:
3      Q.   Did W&K ever mine Bitcoin?
4      A.   I do not know what other companies that
5  are not mine do.
6      Q.   Did you ever tell anyone that W&K mined
7  Bitcoin?
8      MS. MARKOE: Objection. You can answer
9  if you remember.
10      THE WITNESS: I have no idea.
11  BY MR. FREEDMAN:
12      Q.   Is there a reason you would have told
13  somebody why W&K mined Bitcoin?
14      MS. MARKOE: Objection. If he does not
15  know if he has told anyone then the question lacks a
16  predicate.
17      MR. FREEDMAN: He does not recall. I am
18  asking if there is a reason why he might have said it.
19      MS. MARKOE: Answer if you can, but I am
20  objecting.
21      THE WITNESS: The nature of Bitcoin is a
22  predicate-based system. It either fails true or false.
23  If it is true, a transaction is valid. If it is false,
24  it is rejected and never talked of again. This will be
25  never talked of again.

Page 221

1  Can we have a break in a moment?
2      MR. FREEDMAN: Absolutely. Let us take
3  one now.
4      THE VIDEOGRAPHER: Going off the record.
5  The time is 16.14. End of video card number 4, volume
6  1, in the video deposition of Dr. Craig Wright.
7      (A Short Break)
8      THE VIDEOGRAPHER: This is the beginning
9  of video card number 5, volume 1, in the video
10  deposition of Dr. Craig Wright. Going back on the
11  record. The time is 16.29. Thank you.
12  BY MR. FREEDMAN:
13      Q.   Do you feel better, Dr. Wright, for the
14  break?
15      MS. MARKOE: Objection.
16      THE WITNESS: Mmm-hmm, definitely.
17  BY MR. FREEDMAN:
18      Q.   Did W&K ever work on Bitcoin IP?
19      A.   What do you mean by did W&K ever work on
20  Bitcoin IP?
21      Q.   Did the company W&K ever work with you in
22  any way on Bitcoin IP?
23      A.   No.
24      MS. MARKOE: Objection. You can answer.
25  BY MR. FREEDMAN:

MAGNA
LEGAL SERVICES

Page 222

1    Q.    Did you work with W&K on any IP?
2    A.    No.  I did not work with W&K at all.
3    Q.    Did you create intellectual property
4  called a metered payment system?
5    A.    No.
6    Q.    Did you create intellectual property
7  called Software Derivative Markets and Information
8  Security Risk Systems?
9    A.    Yes.
10       MS. MARKOE:  Objection.
11  BY MR. FREEDMAN:
12    Q.    Do you know who created a metered payment
13  system's intellectual property?
14       MS. MARKOE:  Objection.  I am going to
15  instruct the witness not to answer.  It has no relevance
16  to either Dave Kleiman, W&K or even the witness.  He
17  said he had not create that intellectual property called
18  a metered payment system.
19  BY MR. FREEDMAN:
20    Q.    Did Dave Kleiman create a metered payment
21  system?
22       MS. MARKOE:  Objection.  Answer if you
23  know.
24       THE WITNESS:  I do not know what Dave
25  Kleiman created.

Page 223

1  BY MR. FREEDMAN:
2    Q.    The intellectual property Software
3  Derivative Markets and Information Security Risk
4  Systems, is it valuable?
5       MS. MARKOE:  Objection.
6       THE WITNESS:  It is put out open source
7  and the paper was published in an academic conference.
8  BY MR. FREEDMAN:
9    Q.    Does that mean it has no private value?
10       MS. MARKOE:  Objection.  You can answer
11  if you can.
12       THE WITNESS:  I am not an IP valuer.
13  BY MR. FREEDMAN:
14    Q.    Do you have a claim to it, a title, a
15  patent?
16    A.    No.  It is public.
17    Q.    Did you create intellectual property
18  called Software Assurance Marketplace?
19    A.    Yes.
20    Q.    Who has title to this intellectual
21  property now?
22       MS. MARKOE:  Objection.
23       THE WITNESS:  Public domain.
24  BY MR. FREEDMAN:
25    Q.    Did you create intellectual property

Page 224

1  called Software Assurance Through Economic Measures and
2  Anti-Fraud System?
3       THE WITNESS:  Yes.
4       MS. MARKOE:  Objection.
5  BY MR. FREEDMAN:
6    Q.    Who has title to it now?
7    A.    Public domain.
8    Q.    Did you create intellectual property
9  called Risk Quantification System for Financial
10  Modelling in Bitcoin?
11       MS. MARKOE:  Objection.  Look, can you
12  tell me what topics this relates to?
13       MR. FREEDMAN:  The collaboration in W&K.
14       MS. MARKOE:  But you have not connected.
15  You are asking has he created things.  Connect it to W&K
16  or I will instruct him not to answer.
17       MR. RIVERO:  Let me stop one second.
18  What topic about the collaboration on W&K?  I see W&K
19  referred to in a couple of spots.  Which topic?
20       MR. FREEDMAN:  You know what, we will
21  look it up and we will get back to you after the break
22  because I do not want to just waste time on the record
23  for now.  We will skip it.
24       THE WITNESS:  Can I just say there have
25  been no collaborations.

Page 225

1       BY MR. RIVERO:  I just want to say very
2  inefficient to do a series of questions and when you ask
3  you specifically what topics so we can figure it out, it
4  is not there.  That is the problem.  Just as the rule
5  that you referred to is not there.  You are wasting
6  time.  Let us get going.
7       MR. FREEDMAN:  No, we are not going to
8  keep going because I am going to respond to that on the
9  record.
10       MR. RIVERO:  State the rule.
11       MR. FREEDMAN:  I told you it is  rule 30
12  of the Rule of Civil Procedure and the local rule 30.1
13  which was amended and specifically stated that this was
14  not meant to take away the fact that you cannot lead the
15  witness.  There are many court opinions on point which
16  say you cannot make speaking objections because it leads
17  the witness.  Second of all ----
18       MR. RIVERO:  Let me respond to that.
19       MR. FREEDMAN:  No, no, I am  responding
20  to everything.
21       MR. RIVERO:  Let me respond to number 1.
22  Despite repeated statements on the record that a local
23  rule prohibited ----
24       MR. FREEDMAN:  It does.
25       MR. RIVERO:  ---- any statement beyond

MAGNA
LEGAL SERVICES

Page 226

1  form, you are entirely wrong. I have asked repeatedly.
2  There is no rule, it is not in the discovery handbook
3  and the case authority is definitely not the way you
4  describe it. So let us keep going. Number two.
5       MR. FREEDMAN: I am not going to waste my
6  time but I will tell you the case authority you can look
7  up.
8       MR. RIVERO: That already answers that
9  when you stated there was a rule prohibiting it you were
10 absolutely wrong.
11      MR. FREEDMAN: No, that is not true. It
12 is cites ----
13      MR. RIVERO: It is not in 30.1, it is not
14 in 30, it is not in the discovery handbook.
15      MR. FREEDMAN: It certainly is.
16      MR. RIVERO: No, it is not.
17      MR. FREEDMAN: Let us just put it on the
18 record. It is Flexiteek Americas Inc v Plastique Inc.
19      MR. RIVERO: We are now way off in case
20 law which is in dispute.
21      MR. FREEDMAN: The citation would be 2009
22 WL 10667524.
23      THE WITNESS: I am the only person with a
24 British legal degree in ----
25      THE COURT REPORTER: You are both

Page 227

1  speaking at the same time. I cannot do that.
2       MR. FREEDMAN: That is all right. The
3  videographer got it. That is all I needed. You will
4  get it later.
5       MR. RIVERO: I object to the process that
6  has been conducted. Next question.
7  (Plaintiff's Exhibit 4 marked for identification)
8  BY MR. FREEDMAN:
9       Q.   I have handed you what we have marked as
10 Plaintiff's Exhibit 4. Can you go to the bottom,
11 please, of page 4. Do you recognise what this document
12 is?
13      A.   Yes. This was a document put together by
14 staff at one of my companies.
15      Q.   Did you send this document to
16 Ira Kleiman?
17      A.   I presume so, seeing as it is chronology
18 of Craig Wright to Ira K.
19      Q.   Can you look at the bottom of page 4,
20 where it says: "There is a lot of IP and 'stuff' in the
21 mix. All up, it's about a hundred million dollars'
22 worth. This IP originates in work CSW has been doing
23 for more than 10 years; it originates in things that
24 came from W&K; it has to do with the software acquired."
25 Do you see that?

Page 228

1       MS. MARKOE: Objection. Can you re-point
2  us to where you are.
3       MR. FREEDMAN: Bottom of page 4.
4       MS. MARKOE: Bottom of page 4.
5       MR. FREEDMAN: Last paragraph, page 4.
6       MS. MARKOE: Okay. I will just state
7  that the document speaks for itself. I was unable to
8  track what you were saying, so the document will speak
9  for itself.
10 BY MR. FREEDMAN:
11      Q.   Can you break down that $100 million
12 worth for me into the three buckets that you have put
13 forward in that chronology: the work you have been doing
14 for 10 years, the work that originates from W&K and the
15 software acquired?
16      MS. MARKOE: Objection.
17      THE WITNESS: I did not put forth the
18 chronology.
19 BY MR. FREEDMAN:
20      Q.   So is it inaccurate?
21      A.   Yes. You will note that work for more
22 than 10 years and originates in W&K, which was not 10
23 years old, so therefore there is a discrepancy in that
24 very sentence you are pointing out. I did not create
25 the document.

Page 229

1       Q.   So was there not $100 million worth of IP
2  in the mix?
3       MS. MARKOE: Objection.
4       THE WITNESS: Which mix?
5  BY MR. FREEDMAN:
6       Q.   It says "'stuff' in the mix". You tell
7  me.
8       A.   What is the mix?
9       Q.   I am asking you, it is your staff that
10 did it. What did they mean by "IP and 'stuff' in the
11 mix"?
12      MS. MARKOE: Objection.
13      THE WITNESS: I do not know the state of
14 mind of my staff at all times.
15 BY MR. FREEDMAN:
16      Q.   You sent this to Ira without knowing what
17 it meant?
18      MS. MARKOE: Objection.
19      THE WITNESS: I sent quite a few things
20 to Ira. I did not check all of them for all the details
21 at any point.
22 BY MR. FREEDMAN:
23      Q.   So W&K had no IP of value?
24      MS. MARKOE: Objection.
25      THE WITNESS: I am not W&K.

Page 230

```
 1   BY MR. FREEDMAN:
 2        Q.   To the best of your knowledge did W&K
 3   ever have valuable intellectual property?
 4            MS. MARKOE:  Objection.  You can answer.
 5            THE WITNESS:  I have stated before,
 6   I care about my own companies.  I really do not care
 7   about any other in existence anywhere on the planet that
 8   has nothing to do with my companies, or cannot hand me
 9   something.
10   BY MR. FREEDMAN:
11        Q.   Did you ever obtain valuable intellectual
12   property from W&K?
13            MS. MARKOE:  Objection.  You can answer.
14            THE WITNESS:  Yes.
15   BY MR. FREEDMAN:
16        Q.   How?
17        A.   I paid for work to be done through my
18   companies.
19        Q.   Was W&K your company?
20            MS. MARKOE:  Objection.
21            THE WITNESS:  No.
22   BY MR. FREEDMAN:
23        Q.   So how did you get W&K's valuable
24   intellectual property?
25            MS. MARKOE:  Objection: asked and
```

Page 231

```
 1   answered.
 2            THE WITNESS:  As I have just stated,
 3   companies I own dealt with W&K.  W&K provided
 4   intellectual property.
 5   BY MR. FREEDMAN:
 6        Q.   What was the intellectual property W&K
 7   provided?
 8        A.   Source code.
 9        Q.   For?
10        A.   Primarily it enhanced some of the gaming
11   operations I was doing.  It improved upon a lot of the
12   poker operations.  We built a back door so that we could
13   get through the Chinese firewall.  That enabled a number
14   of Costa Rica gaming operations to basically deal with
15   online casinos in a number of places, not just sort of
16   in Costa Rica, but America and China.  It enabled
17   Sportsbooks to access things without putting their IP
18   better than Tor.  It enabled us to have monitoring and
19   software that was put onto WebMoney, and Liberty
20   Reserve.  It enabled the capture of information from
21   many of these networks.
22        Q.   What was the value of this intellectual
23   property?
24        A.   I am not an intellectual property valuer.
25        Q.   Who created this intellectual property?
```

Page 232

```
 1        A.   Which part?
 2        Q.   Who created the intellectual property
 3   that enhanced some of the gaming operations you were
 4   doing?
 5        A.   I do not know.
 6        Q.   Who created the intellectual property
 7   that improved upon a lot of the poker operations?
 8        A.   I do not know.
 9        Q.   Who created the intellectual property
10   that built the back door so that you could get through
11   the Chinese firewall?
12        A.   Who built it or who enhanced it or who
13   distributed it?  They are different things.
14        Q.   Tell me who built it?
15        A.   Me.
16        Q.   Who enhanced it?
17        A.   People Dave was dealing with out of
18   Russia.
19        Q.   Who distributed it?
20        A.   Quite a number of sites, including some
21   associated with the US government.
22        Q.   Can you list those sites for me?
23            MS. MARKOE:  Objection.
24            THE WITNESS:  No.
25   BY MR. FREEDMAN:
```

Page 233

```
 1        Q.   Because you do not know them?
 2        A.   Some I do.  Those ones we will have to
 3   deal with in camera.  Other ones, no.
 4        Q.   The distribution of these technologies
 5   relates to national security?
 6        A.   The poker stuff, no.  The back doors,
 7   some could.
 8        Q.   Can you tell me about Dave's interaction
 9   with the folks in Russia?
10            MS. MARKOE:  Objection.  Answer if you
11   can.
12            THE WITNESS:  I do not know about what
13   other people do.  I do not follow my own staff at the
14   moment, so you are asking me -- I mean, do you actually
15   know the size of my operations?
16   BY MR. FREEDMAN:
17        Q.   No.
18        A.   Then that is why you have no idea what
19   you are asking.  Do you know how many countries I have
20   operations in now?
21        Q.   I want you to focus on what you had in
22   2013 and before.
23        A.   In Australia, do you know how many people
24   I had at the end of 2013?
25        Q.   How many?
```

MAGNA◆
LEGAL SERVICES

Page 234

1   A.   Over 50.  Do you know how many countries
2   I had operations in in 2013?
3   Q.   No.
4   A.   Around 60.
5        MS. MARKOE:  Guys, seriously, Vel is
6   taking this deposition.  You are not taking the
7   deposition.  Let him ask his questions.
8   BY MR. FREEDMAN:
9        Q.   Who created the intellectual property
10  that enabled Sportsbooks to access things without
11  putting their IP better than Tor?
12       A.   Again, I did not follow up who was
13  individually creating anything.
14       Q.   Was Dave responsible for the creation of
15  this intellectual property?
16       MS. MARKOE:  Objection.
17       THE WITNESS:  Can you specify that in a
18  better, more clear manner.
19  BY MR. FREEDMAN:
20       Q.   W&K created all this intellectual
21  property; is that correct?
22       A.   A lot of that, yes.
23       Q.   Who was responsible for W&K's operations?
24       MS. MARKOE:  Objection.
25       THE WITNESS:  Again, you are asking me

Page 235

1   something -- who was responsible for the operations in
2   this office.
3   BY MR. FREEDMAN:
4        Q.   So you do not know who was responsible
5   for the operations at W&K to create this intellectual
6   property?
7        MS. MARKOE:  Objection.
8        THE WITNESS:  I have already said I do
9   not know who is responsible for half the things that
10  happen in my own office right at the moment, nor do
11  I intend to be.
12  BY MR. FREEDMAN:
13       Q.   Who was your contact at W&K to create all
14  this intellectual property?
15       MS. MARKOE:  Objection:  mischaracterises
16  the testimony.
17       MR. FREEDMAN:  You can answer.
18       THE WITNESS:  Dave.  By Dave, I mean Dave
19  Kleiman.
20  BY MR. FREEDMAN:
21       Q.   Did the Sportsbooks program intellectual
22  property enable betting with -- strike that.  Did any of
23  the poker-related technology involve the use of Bitcoin?
24       MS. MARKOE:  Objection.  You can answer
25  if you can.

Page 236

1        THE WITNESS:  Yes.
2   BY MR. FREEDMAN:
3        Q.   How did it involve Bitcoin?
4        A.   You could take Bitcoin and bet.
5        Q.   What was this called, this intellectual
6   property?
7        MS. MARKOE:  Objection:  vague.
8        THE WITNESS:  Texas hold'em.
9   BY MR. FREEDMAN:
10       Q.   Did you file a patent?  Was it a code?
11  How did you -- strike that.
12       A.   Do you understand that this is ----
13       MS. MARKOE:  There is no question
14  pending.  He struck his question.  Let him ask a
15  question and you can answer it.
16  BY MR. FREEDMAN:
17       Q.   How did you obtain the intellectual
18  property that relates to poker?
19       MS. MARKOE:  Objection:  mischaracterises
20  the testimony.
21       THE WITNESS:  Can you ask something a bit
22  less vague.
23  BY MR. FREEDMAN:
24       Q.   How did you obtain -- strike that.  You
25  obtained intellectual property from W&K that involved

Page 237

1   poker and Bitcoin; is that correct?
2        MS. MARKOE:  Objection.
3        THE WITNESS:  Are you talking about me or
4   a company that I owned?
5   BY MR. FREEDMAN:
6        Q.   Or a company that you -- I thought you
7   did not own any companies.
8        A.   I said owned.  And that is not own.
9        Q.   Which company did you own previously but
10  no longer do?
11       MS. MARKOE:  Objection.
12       A.   There are over 100 of those.
13  BY MR. FREEDMAN:
14       Q.   Over 100 companies that you owned but no
15  longer do?
16       A.   Yes.
17       Q.   Who owns them now?
18       A.   I do not know.
19       MS. MARKOE:  Objection.
20  BY MR. FREEDMAN:
21       Q.   This is because you put in place a
22  structure so you do not know who owns them?
23       MS. MARKOE:  Objection.  This question is
24  overbroad and is going to result in a very unclear
25  answer when you are talking about over 100 companies.

MAGNA
LEGAL SERVICES

Page 238

```
1   They cannot possibly all have the same answer.
2        MR. FREEDMAN:  Maybe it does.
3        THE WITNESS:  It does not.
4        MR. RIVERO:  What topic does it relate
5   to?
6        MR. FREEDMAN:  The court has specifically
7   directed us to be able to ask all about Dr. Wright's
8   entities at hearings and even beyond here.
9        MR. RIVERO:  No.
10       MR. FREEDMAN:  But at subsequent hearings
11  and you can ask Ms. Markoe about this.  He specifically
12  authorised inquiry into the companies.
13       MS. MARKOE:  He authorised limited
14  inquiry into those companies and it needs to be clear
15  inquiry, so if you would like to ask a question that
16  will result in a clear answer I am sure he can answer on
17  a limited basis.  You are limited, if my recollection is
18  correct, in asking questions about those once we have
19  established that those companies do not relate to Dave
20  Kleiman or W&K.
21       MR. FREEDMAN:  I am not sure that is
22  correct, but let us not waste time on that.
23       Q.   When was the first time you contracted
24  with W&K?
25       A.   I do not know.  You would have to look at
```

Page 239

```
1   the date of the contract.  (Pause.)
2   (Plaintiff's Exhibit 5 marked for identification)
3        Q.   I have just handed you Plaintiff's
4   Exhibit 5.  Do you recognise this contract?
5        A.   I recognise this contract.
6        Q.   What is the date of this contract?
7        A.   22nd April 2011.
8        Q.   Can you tell me in your own words what
9   the bargain in this contract was?
10       MS. MARKOE:  Objection.  You can answer.
11       THE WITNESS:  This is an agreement between
12  Craig Wright R&D, a company, and W&K Info Defense, an
13  LLC in the US, for provision of services.
14  BY MR. FREEDMAN:
15       Q.   On page 15 of this document is that your
16  signature?
17       MS. MARKOE:  Do you mean 15 at the top?
18       MR. FREEDMAN:  15 at the top.
19       THE WITNESS:  That is signed by me, yes.
20  BY MR. FREEDMAN:
21       Q.   Can you go back to page 3, please.
22  Sorry, take that back, can you go to page 4.  I am
23  looking at L.
24       MS. MARKOE:  You are referring to page 4
25  at the top.  There is just different paginations.
```

Page 240

```
1        MR. FREEDMAN:  Always at the top.
2        MS. MARKOE:  Okay.  I just want to make
3   sure we have a clear record.
4   BY MR. FREEDMAN:
5        Q.   This is docket entry 83-10.  Do you need
6   a second to familiarise yourself with paragraph L?
7        A.   I have read it.
8        Q.   What is going on here?
9        A.   Sorry, what do you mean what is going on?
10  It is a piece of paper.  Nothing is going on.
11       Q.   Can you tell me, as I read this paragraph
12  of the contract, you are providing, you are the
13  financier; is that correct?
14       MS. MARKOE:  Objection.
15       THE WITNESS:  No.
16  BY MR. FREEDMAN:
17       Q.   Craig Wright R&D is the financier?
18       A.   That is what it states, yes.
19       Q.   Craig Wright R&D is providing 1,024 core
20  Xeon and GPU based hardware solution.  (a) It is
21  acknowledged that two SGI ICE XE310-512 core hosts have
22  been provided and are in a data centre specified by the
23  provider."  What is SGI ICE XE310?
24       A.   A computer.
25       Q.   Is it a special computer or just a
```

Page 241

```
1   regular computer?
2        A.   It is an HPC, high memory, high core
3   computer.
4        Q.   (b) states the purpose of the provision
5   of these hardware systems; is that correct?
6        A.   It is a possible use that by the time
7   that this was implemented was not available.
8        Q.   So (b) says -- can you read (b) for me?
9        A.   "The provider will use these systems to
10  mine Bitcoin."
11       Q.   And then (c) says the expected amount of
12  the Bitcoin; is that correct?
13       A.   No.
14       Q.   Well, can you read (c) for me?
15       A.   "The provider expects to earn" -- that is
16  not correct because by the time this was implemented,
17  ASICs, FPGAs and other things had been developed which
18  would make this about one Bitcoin a year.
19       Q.   (c) says that you expect it to earn
20  12,000 Bitcoin per month; is that correct?
21       MS. MARKOE:  Objection: misstates what
22  the document says.
23       THE WITNESS:  I did not expect to earn
24  anything.
25  BY MR. FREEDMAN:
```

**MAGNA** ►
LEGAL SERVICES

Page 242

1      Q.   M states that W&K are supposed to pay for
2  these systems with 300,000 Bitcoin; is that correct?
3      A.   That is what it states.
4      Q.   Did W&K ever pay 300,000 Bitcoin?
5      A.   No.
6      Q.   Why not?
7      A.   David died.
8      Q.   How did W&K get 300,000 Bitcoin if
9  this -- strike that.  Did W&K put these computers listed
10  in L to work to mine Bitcoin?
11        MS. MARKOE:  Objection: foundation and
12  you are going beyond the scope again.  Would you like to
13  connect it to one of the topics, please.
14        MR. FREEDMAN:  This is 4, the location
15  and duration of Dave, W&K and Craig's mining of Bitcoin
16  from 2009 till April 2013.
17        MS. MARKOE:  You can answer the question
18  if you know the answer.
19        THE WITNESS:  There was no mining of
20  Bitcoin between myself and Dave ever.  There was no
21  mining at all in any way that I know of on those
22  machines, ever.
23  BY MR. FREEDMAN:
24      Q.   So, as far as you are aware, Dave never
25  used those machines to mine Bitcoin?

Page 243

1      A.   It would be totally stupidly foolish to
2  mine anything once ASICs came out on those machines.  It
3  would probably set me back around $4 million a month for
4  something, at the time, worth less than $12,000.
5      Q.   What was the purpose of this clause at
6  the time the contract was entered into?
7      A.   Which clause?
8      Q.   L?
9        MS. MARKOE:  Objection.
10        MR. RIVERO:  You may answer.
11        THE WITNESS:  The clause was there to
12  have machines that would be run and managed.  The
13  primary purpose would be I was using scaling tests and
14  other such things.  Those machines were running enhanced
15  versions of Bitcoin that I was creating, the node
16  software, so that I could see how far I could scale
17  Bitcoin as a blockchain.  Any other side use, while not
18  being used, was originally envisioned that others could
19  mine Bitcoin with.
20  BY MR. FREEDMAN:
21      Q.   In clause B, on page 3, the contract
22  states that "The provider desires the intellectual
23  property for the permitted use ..."  What was the
24  intellectual property referred to here?
25        MS. MARKOE:  Objection.  You can answer.

Page 244

1        THE WITNESS:  Some of that is the things
2  we have already talked about, including gaming software.
3  Dave was running operations that I helped set him up in
4  Costa Rica.
5  BY MR. FREEDMAN:
6      Q.   Craig Wright R&D paid for this
7  development in paragraphs F and G; is that correct?
8        MS. MARKOE:  Objection.  You can answer.
9        THE WITNESS:  I instructed people who
10  were with the company to pay for machines to be
11  purchased.
12  BY MR. FREEDMAN:
13      Q.   Where did this Bitcoin come from?
14        MS. MARKOE:  Objection.  I am going to
15  instruct the witness not to answer.  It goes beyond the
16  scope.
17        MR. FREEDMAN:  Of 10 as well?
18        MS. MARKOE:  Where in 10 does it
19  reference ----
20        MR. FREEDMAN:  Inquiry into the entities
21  and projects referenced in Exhibits 5, 10 and 15 in a
22  second I am going to complain.
23        MS. MARKOE:  Right, and your question, if
24  I recall correctly -- let me just see -- actually, would
25  you mind reading it back; I cannot locate it at the

Page 245

1  moment.
2      (The court reporter read back as requested)
3        MR. RIVERO:  Just give us a moment.
4        MR. FREEDMAN:  Let me take a break
5  because I have to use the restroom.
6        THE VIDEOGRAPHER:  Going off the record.
7  The time is 16.58.
8      (A Short Break)
9        THE VIDEOGRAPHER:  Going back on the
10  record.  The time is 17.09.  Thank you.
11  BY MR. FREEDMAN:
12      Q.   Before the break, Dr. Wright, I asked you
13  where the Bitcoin mentioned in paragraphs F and G --
14  sorry, take that back.
15        MS. MARKOE:  It might be easier just to
16  have her read back the last question.
17        MR. FREEDMAN:  I looked at it, though.  I
18  just said: "Where did this Bitcoin come from?"  Let us
19  start again with a clear record.
20        MS. MARKOE:  Okay.
21  BY MR. FREEDMAN:
22      Q.   Let us look at paragraph A.  Paragraph A,
23  Dr. Wright, says: "The Financier controls the following
24  Bitcoin (BTC) addresses."  How did Craig Wright R&D come
25  to possess these Bitcoin addresses?

MAGNA
LEGAL SERVICES

Page 246

```
 1        A.   I do not know.
 2        Q.   Paragraph F says that the financier will
 3   send 165,140 Bitcoin to the 1MSU address by 30th April
 4   2011.  Did Craig Wright R&D send 165,140 Bitcoin to the
 5   1MSU address?
 6        A.   I do not know.
 7        Q.   Did you cause or request that Craig
 8   Wright R&D make this transfer?
 9        A.   I requested that people pay the amounts
10   that they are meant to pay, yes.
11        Q.   Where did this request go to?
12        A.   It went to Craig Wright R&D.
13        Q.   Who at Craig Wright R&D?
14             MS. MARKOE:  Objection.  You can answer.
15             THE WITNESS:  I do not know.  This is
16   years ago.  I do not remember the people in that
17   company.
18   BY MR. FREEDMAN:
19        Q.   Which company was it?
20        A.   Craig Wright R&D.
21        Q.   But there were many of them.
22        A.   Which Craig Wright R&D is I believe what
23   you are asking.
24        Q.   Mmm-hmm.
25        A.   That was in Panama.
```

Page 247

```
 1        Q.   And Craig Wright R&D Panama had control
 2   over these Bitcoin addresses?
 3             MS. MARKOE:  Objection.  You can answer
 4   if you know.
 5             THE WITNESS:  I told people what to do.
 6   They told me they had done it.  That is as far as I go.
 7   BY MR. FREEDMAN:
 8        Q.   And then did Craig Wright R&D deliver the
 9   50,000 Bitcoin referenced in paragraph G?
10        A.   Again, I do not have much to do with
11   finance in the companies other than people giving me
12   reports saying it has all been done or not, and if I do
13   not get complaints about finance by creditors or debtors
14   or whatever else going, "Why the hell it has not
15   happened", etcetera, then I am a happy guy and I stay
16   out of people's way.
17        Q.   Can you go to page 13 for me, please,
18   Dr. Wright.
19             MS. MARKOE:  Again, just for clarity's
20   sake, that is 13 at the top.
21   BY MR. FREEDMAN:
22        Q.   Top of the page.  I am looking at
23   paragraph 18(a).
24        A.   Mmm-hmm.
25        Q.   It says:  "The paper Bitcoin Wallet with
```

Page 248

```
 1   address 1933ph", and so on ----
 2        A.   Yes.
 3        Q.   ---- "will be held by the financier as
 4   assurance or the contract and will convert to the
 5   ownership of the financier on default of the provider."
 6   So, Craig Wright R&D held the 1933 wallet as collateral?
 7             MS. MARKOE:  Objection.  You can answer.
 8             THE WITNESS:  That would be the finance
 9   people over in Panama, not me.
10   BY MR. FREEDMAN:
11        Q.   Who were the finance people at Panama?
12        A.   Some of those were associated with a
13   company called High Secured, and there were other people
14   who used to work for Liberty Reserve.
15        Q.   So the folks at High Secured and Liberty
16   Reserve controlled this Bitcoin wallet address?
17             MS. MARKOE:  Objection: mischaracterises
18   the testimony.
19   BY MR. FREEDMAN:
20        Q.   Did the folks at High Secured and Liberty
21   Reserve control this wallet address?
22        A.   I have stated my involvement with finance
23   which is exactly as it is now, is, I say do things;
24   things either happen or do not happen.  If they do not
25   happen Craig gets all yelly and screamy and everyone
```

Page 249

```
 1   gets upset, and when they do happen, things are good.
 2        Q.   So the folks at finance controlled the
 3   wallets listed at A on page 3; is that correct?
 4             MS. MARKOE:  Objection: mischaracterises
 5   the testimony.  You can answer.
 6             THE WITNESS:  I basically go to
 7   finance people, they tell me things, I trust what my
 8   people tell me, and if no one complains, no one says it
 9   is not real, then I have to believe what I am told by
10   people I contract or paid.
11   BY MR. FREEDMAN:
12        Q.   How did this amount of Bitcoin end up in
13   these wallets?
14             MS. MARKOE:  Objection.  You can answer
15   if you know.
16             THE WITNESS:  There are two problems with
17   what you have just said.  This amount of Bitcoin in
18   18(a) is not -- that is an address, not an amount of
19   Bitcoin, and, secondly, they are an address, not a
20   wallet.
21   BY MR. FREEDMAN:
22        Q.   How did Bitcoin end up in the wallets
23   listed at A(a) and A(b)?
24             MS. MARKOE:  Objection.
25             THE WITNESS:  My assumption is that a
```

MAGNA ▶
LEGAL SERVICES

Page 250

```
1    transaction would be sent to the Bitcoin ledger.  Miners
2    would take that transaction and send into a block which
3    would be mined, updating the ledger.
4    BY MR. FREEDMAN:
5         Q.    Did you cause the Bitcoin to end up in
6    those wallets?
7              MS. MARKOE:  Objection.
8              THE WITNESS:  These are not wallets.
9    BY MR. FREEDMAN:
10        Q.    Addresses.  Did you cause the Bitcoin to
11   end up in these addresses?
12             MS. MARKOE:  Objection.  Answer if you
13   can.
14             THE WITNESS:  If you are saying did
15   I tell someone to do something and things happened, to
16   the best of my knowledge, no one complained.  I told
17   people in a group of companies in Panama to do things to
18   make sure Dave was happy.  Things happened.  No one
19   complained.  Dave did not complain to me.  I am happy.
20   Everyone is happy.
21   BY MR. FREEDMAN:
22        Q.    I am trying to figure out how the folks
23   in Panama ended up with that much Bitcoin at their
24   disposal?
25             MS. MARKOE:  Objection.
```

Page 251

```
1              THE WITNESS:  Sorry, what is that much
2    Bitcoin?
3    BY MR. FREEDMAN:
4         Q.    It is 165,140 and then 50,000, so a total
5    of 215,140.
6         A.    You are asking how an organisation that
7    was turning over probably $20 million a month managed to
8    obtain $80,000 worth of Bitcoin?
9         Q.    Yes.
10        A.    Well, if you had offered someone 100,000,
11   they would have given you no questions asked.  You could
12   have gone to LocalBitcoins.  You could have gone to
13   Mt. Gox.  You could have gone to a number of criminal
14   organisations that were selling it.  Libya Reserves had
15   quite a number of Bitcoin.  How would you do that?
16   Well, people exchange goods and services.  You take US
17   dollars and you make a trade.
18             MR. RIVERO:  There is a question from the
19   court reporter.
20             THE WITNESS:  Mt. Gox.
21   BY MR. FREEDMAN:
22        Q.    In April of 2011, was it possible to
23   acquire 165,000 Bitcoin on the open market?
24        A.    Yes.  In fact, around that sort of time,
25   50,000 Bitcoin was swapped for two pizzas.
```

Page 252

```
1         Q.    Do you have any information on how the
2    165,140 and 50,000 ended up in the two addresses at A(a)
3    and A(b)?
4              MR. RIVERO:  Objection.  Did you say A(a)
5    and A(b)?
6              MR. FREEDMAN:  Yes, on page 3.
7              MR. RIVERO:  I am sorry, I do not
8    understand the question.  I do not understand your
9    question.  I cannot form an objection.  Do you mean F(b)
10   and G(b)?  Oh, I see.  Withdraw.  Go ahead.  Yes?
11             THE WITNESS:  My statement is very
12   simple: they are addresses; no amount is claimed at
13   those addresses.
14   BY MR. FREEDMAN:
15        Q.    These addresses transferred these
16   amounts -- sorry, let us make that clear.  The 12h
17   address transferred 165,140 Bitcoin to the 1MSU address?
18             MR. RIVERO:  Objection: mischaracterises
19   the testimony.  You may answer.
20             MR. FREEDMAN:  Do you mind, I did not
21   quite finish yet.
22             MR RIVERO:  Oh!
23   BY MR. FREEDMAN:
24        Q.    Do you know how the Bitcoin ended up in
25   the 12h address?
```

Page 253

```
1         A.    Well, a transaction would be sent to the
2    blockchain.  Miners will take their transaction for
3    transaction fees.
4         Q.    Let me be clear, doctor, because you
5    explained this before.  I am not asking for the
6    technical explanation of how the Bitcoin ends up, I am
7    asking for the practical explanation.  Everyday people
8    like me would say, how did the Bitcoin end up in that
9    wallet address, or that public address; who sent it
10   there?
11             MR. RIVERO:  Objection.
12             THE WITNESS:  I am saying, where is a
13   block explorer to tell me it actually went on any
14   particular date?
15   BY MR. FREEDMAN:
16        Q.    Sitting here today -- strike that.  Did
17   any of the Bitcoin you mined in Australia end up at
18   these public addresses?
19        A.    No.
20             MR. RIVERO:  Object to the form.  Just
21   give me one moment to state the objection.  (Pause)
22   BY MR. FREEDMAN:
23        Q.    Can you go with me to page 14 at the top.
24   Can you look at the definition of "Product", or the
25   listing of what product is.  Can you read that for me,
```



Page 254

1  please.
2      A.     "Bitcoin and Exchange Software in
3  C/C++/C#/R code."
4      Q.     How did Bitcoin and Exchange Software fit
5  into this contract?
6              MR. RIVERO:  Misstates the document.
7  Objection.
8              MR. FREEDMAN:  You can answer.
9              THE WITNESS:  Sorry, how did Bitcoin and
10  Exchange Software fit into this document?
11  BY MR. FREEDMAN:
12     Q.     Yes.  It just says "Product".  What does
13  that mean?
14     A.     It means exactly what it says there.
15     Q.     Is this the product that Dave Kleiman was
16  producing for you at W&K?
17             MR. RIVERO:  Objection.
18             THE WITNESS:  I need more of an
19  explanation than that.  Exchange Software, I mean that
20  is a very wide -- that is like saying ----
21  BY MR. FREEDMAN:
22     Q.     You do not know what the contract means?
23     A.     I do not know what you are trying to
24  classify it as.
25     Q.     You tell me what the contract you signed

Page 255

1  means.  It says: "Product: Bitcoin and Exchange
2  Software in C/C++/C#/R code."  What does that mean?
3      A.     If you want to cherry pick, that is a
4  different thing than saying this line means something
5  out of sort of the rest.  What the contract was about
6  was the production of code at the end.
7      Q.     For Bitcoin?
8      A.     Define "for Bitcoin".
9      Q.     I do not know, it says "Bitcoin",
10  "Product: Bitcoin"?
11     A.     Mmm-hmm.
12     Q.     Is that because the contract was creating
13  Bitcoin?
14     A.     No, Bitcoin was already created.
15     Q.     Is that because the contract was for the
16  purpose of creating mining Bitcoin?
17     A.     No, you cannot mine Bitcoin that way.
18  I have already stated this.
19     Q.     Was it for a Bitcoin exchange?
20     A.     No.  There were certain things that were
21  to do with a Bitcoin exchange, and some other aspects of
22  poker software, other aspects of the software I have
23  mentioned before, and the other stuff, intellectual
24  property, under the unawarded DHS projects.
25     Q.     Can you go with me to page 15.

Page 256

1      A.     Yes.
2      Q.     Do you see Dave Kleiman's name about a
3  quarter of the way down from the top of the page?
4      A.     Yes.
5      Q.     Do you see the signature there?
6      A.     What I see is his name written there,
7  yes.
8      Q.     Is that Dave Kleiman's signature?
9      A.     The definition of signature, if we take,
10  for instance, Salinger v Golden Mining, what you will
11  see is if I type "Regards, Craig", that is deemed a
12  signature under the law.  That was upheld in 2011 in the
13  British courts to be a signature.  A signature is an
14  attestation.  If I tell my EA, as I do every now and
15  again, "Please send in this document, I cannot get into
16  the office, I have noted in this e-mail I am authorising
17  you to sign", and she puts my name at the bottom, that
18  is legally a signature.  When I go "Regards, Dr. Craig
19  Wright" on an e-mail and it is typed, that is legally a
20  signature.  If I have a video attestation and I say, "I,
21  Craig Wright, agree to this contract", that is legally a
22  signature.  A signature in writing, basically,
23  incorporates, in this country at least, and as well
24  Australia, the incorporation of anything in any media,
25  including video attestation, that will allow one to

Page 257

1  prove that they agreed to be bound.  The definition of
2  signature is actually an agreement to be bound.  So,
3  what you are saying is, did Dave agree to be bound?  And
4  if he was part of this contract that would be that he
5  agreed to be bound.  If he was not, then he had no part
6  in the contract, and then has no rights under that
7  contract.  Which would you prefer to choose?
8      Q.     Actually, I would just prefer you to
9  answer the question.  Is that Dave Kleiman's signature?
10     A.     I have answered the question in detail.
11     Q.     I do not think so.  Can you give me a yes
12  or no; is that Dave Kleiman's signature?
13             MS. MARKOE:  Objection.  You can answer.
14             THE WITNESS:  I have answered the
15  question.
16  BY MR. FREEDMAN:
17     Q.     How did that mark get to be made on the
18  page?
19     A.     I do not really care.  If someone sends
20  me a contract and I haven't witnessed it personally or
21  noted that I witnessed it, then I have not witnessed it.
22  I am not going to give a rat's rectum about the origin
23  of something that someone does not dispute.  Dave had
24  many years to say, "Hey, I did not sign".  At some point
25  he could have put his hand up and said, "I do not agree

MAGNA
LEGAL SERVICES

Page 258

1   with this".  At no point did he.  Of course, the
2   argument here when we were talking about the creation of
3   software that is legal in Australia, but illegal in the
4   USA, brings into a difficult position with contracts.
5   Although it is a legal contract in New South Wales, one
6   could argue that the creation of a prohibitive product,
7   that is actually a crime for an American citizen to
8   create, or be involved with, or distribute, or actually
9   fairly much anything to do with, would actually
10  invalidate Dave's contract but that is a different
11  issue.
12        Q.    Did you witness Dave Kleiman sign this
13  contract?
14        A.    It does not say witnessed at any point.
15        Q.    So you did not witness him sign the
16  contract?
17        A.    I believe I have noted that I was never
18  in Australia -- sorry, Dave was not in Australia, and
19  that I was not on the signing date of this contract in
20  the US.  At the time, witnessing over video was not
21  legal, and although the law has been updated and now in
22  the UK and Australia that is possible, it was not
23  possible at the time.  So, without being in the same
24  room as Dave, I would not be able to witness.
25        Q.    Dr. Wright, it would help us get through

Page 259

1   this deposition if you gave shorter answers that address
2   the exact question targeted.
3         A.    I do not believe I can without being
4   vague.
5         Q.    If I asked you to, how could you prove to
6   me that Dave Kleiman signed this contract?
7               MS. MARKOE:  Objection.
8               THE WITNESS:  I do not need to.
9   BY MR. FREEDMAN:
10        Q.    List to me all the ways in which you
11  could demonstrate Dave Kleiman signed this contract?
12              MS. MARKOE:  Objection.
13              MR. RIVERO:  Objection.
14              MS. MARKOE:  I am going to instruct the
15  witness not to answer unless you can show me where in
16  the topics this relates.
17  (Plaintiff's Exhibit 6 marked for identification)
18              MR. FREEDMAN:  We believe this question
19  relates to section 10 that authorises us to ask about
20  the projects referenced in 5, 10 and 15, but if you are
21  instructing the witness not to answer, in the interests
22  of time, we will move on.
23              MS. MARKOE:  Can we go back and look at
24  the question again, based on what he said.  (Pause) The
25  last question by Mr. Freedman was:  "List me all the

Page 260

1   ways in which you could demonstrate Dave Kleiman signed
2   this contract."  I objected and instructed you not to
3   answer.  I will remove my instruction not to answer and
4   you can answer if you can.
5               MR. RIVERO:  We maintain the objection.
6               MS. MARKOE:  We maintain the objection,
7   correct.
8               MR. RIVERO:  The form is completely
9   defective, but answer if you can.
10              THE WITNESS:  I have just published to
11  two papers on electronic signatures that were presented
12  in Oxford last month.  That involves an analysis of many
13  ways of signing digitally.  So, basically, any way that
14  you can say that someone signed.  Now, a signature is
15  very simple.  It does not need to be a handwritten
16  thing, and in fact a handwritten thing is the antithesis
17  of the idea of what it was.  The history of signatures
18  goes back to allowing Jews to sign with their name and
19  Christians would put an X.  In fact, only those who were
20  literate signing with Xs in medieval England.  So, the
21  reason for that is that you were taking an attestation
22  or an oath.  So, the history of signatures is such that
23  you are saying that you agree to be bound.  Can you say
24  that you agree to be bound?  Was there any evidence to
25  the contrary where someone could bring up saying there

Page 261

1   was no evidence of agreement to be bound?  In the case
2   of someone like Mr. Kleiman, did Mr. Kleiman ever stand
3   up and say, "I do not agree to be bound"?  In years of
4   dealing, contracting, etcetera, did he say, "No, this
5   was not my contract"?  You would want to show the
6   absence of anything like that.  You would want to show
7   the absence of e-mails saying, "I disagree with this
8   thing.  I did not agree to be bound by the contract.
9   That is not my signature".
10              Of course, that is a signature not being
11  this handwritten thing that people try and say, but
12  rather the agreement to be bound.  I would look for the
13  absence, and hope that if you were trying to contest a
14  signature, and say that someone did not agree to be
15  bound, there would be something, some evidence, in the
16  wide swathe of communications that can occur over years,
17  of anyone at any point going, "I do not agree with
18  this", that there were some communications with other
19  people saying, "I do not agree", where Dave would say,
20  "I did not agree to this contract", where maybe Ira or
21  whatever else had been communicating and going, "Dave,
22  what do you mean he says you are under contract?"  And
23  then Dave would go, "No, I did not actually sign that".
24  BY MR. FREEDMAN:
25        Q.    Okay, I am going to cut you up.

MAGNA ◗
LEGAL SERVICES

Page 262

1    MR. RIVERO:  Wait, do not cut the
2  witness -- hold on.  You ask about tell me all the ways
3  you can prove it and he is answering your question.  He
4  is going to finish his answer.  Whenever you feel like
5  it, Dr. Wright.  You asked the question.  We objected to
6  it because it is a completely defective question.  You
7  answer it until you feel satisfied.
8    THE WITNESS:  So, I would start by
9  analysing every bit of media Dave has ever had.  Was
10  there any social media where Dave had online -- and he
11  was very prolific online -- stated, "I do not agree to
12  this contract.  Someone is saying I am bound but I am
13  not".  So, you would go through all of his Facebook
14  posts, all of his Twitter, all of his communications
15  with other partners that he had in Australia, because
16  Dave did have partners.  I was not one of them, but Page
17  and Connor and things like that, maybe he would go to
18  them and say, "I was not bound by this", or mutual
19  friends we had, like Paul Henry, would Dave talk to
20  these guys, who were really good friends with us, who
21  had been in the industry a long time, "I did not agree
22  to this", he would say.  He would go up there and go,
23  "I did not agree to this contract and yet people are
24  claiming that I did".  You would find some evidence.
25  You would analyse all his hard drives, all his e-mails.

Page 263

1  You would look to what other people might say.  You
2  would find somewhere where someone had said, "I do not
3  agree to be bound", or Dave had gone to them, "I do not
4  agree to be bound"; why?  You would find something in
5  communications where that has occurred.  Thank you.
6    MR. FREEDMAN:  Thank you.  If you do that
7  again, Dr. Wright, Andrés, we will bring it up with the
8  court.  It is purposely wasting time.
9    MR. RIVERO:  The question asked for
10  proof.  The witness has answered exactly.  But you
11  allowed him to finish, so we are going to continue.
12  BY MR. FREEDMAN:
13    Q.   I believe we handed you Plaintiff's
14  Exhibit 6.  Do you recognise this exhibit?
15    A.   I do.
16    Q.   What is this exhibit?
17    A.   It is a contract.
18    Q.   Made between who and who?
19    A.   Between W&K Info Defense in Florida and
20  Craig Wright R&D, which would be an Australian entity.
21    Q.   Is there another party to the contract?
22    A.   And W&K Info Defense LLC company.
23    Q.   I think you have misstated the first
24  party to the contract.  Perhaps take a look again at the
25  first party to the contract.

Page 264

1    MS. MARKOE:  Objection.
2    THE WITNESS:  W&K Info Defense LLC.
3  BY MR. FREEDMAN:
4    Q.    I believe it says Dave Kleiman of W&K
5  Info Defense LLC.
6    MS. MARKOE:  Objection.
7    THE WITNESS:  That is still the company,
8  which, under Commonwealth law means the legal entity
9  being represented by Dave Kleiman, not Dave Kleiman, is
10  being bound.  Dave Kleiman is not being bound by this
11  contract in any way.  Sorry, I do have a masters degree
12  and I am a legal scholar, and I am doing my doctor of
13  law at the moment.  If you want to discuss British or
14  Australian law I am quite happy to.
15    MS. MARKOE:  I would also like to note
16  for the record that it actually says that the entirety
17  of that first party, which is defined as the vendor, is
18  "Dave Kleiman of W&K Info Defense LLC (Florida)".
19  BY MR. FREEDMAN:
20    Q.   Can you take a look at paragraph B for
21  me, please, Dr. Wright.
22    A.   Yes.
23    Q.   Can you read that out loud for the
24  record?
25    A.   "The company is the owner of and conducts

Page 265

1  business known as Bitcoin mining and Software
2  Research/development (sic)."
3    Q.   I think it says "Software
4  development/Research"?
5    A.   Correct, I am sorry about that error.
6    Q.   Dr. Wright, this contract was signed two
7  years after, approximately, the last contract we just
8  looked at?
9    A.   Where is the date?  Yes.
10    Q.   You told me the April 2011 contract,
11  although it provides for Bitcoin mining hardware, could
12  not be used for Bitcoin mining hardware because ASIC
13  miners came along and rendered that technology obsolete;
14  is that correct?
15    MS. MARKOE:  Objection: the record will
16  speak for itself.
17    MR. FREEDMAN:  You can answer.
18    THE WITNESS:  I told you exactly as
19  I told you, yes.
20  BY MR. FREEDMAN:
21    Q.   Now two years later you are signing a
22  contract that says that the company does conduct the
23  business as Bitcoin mining.  Can you explain that to me?
24    MS. MARKOE:  Objection.
25  BY MR. FREEDMAN:



Page 266

1    Q.   Did something change?
2    A.   I do not have any care about what Dave
3 said his business was.
4    Q.   Can you go with me to page 11 of the
5 contract up on the top page.
6    A.   Yes.
7    Q.   Down the bottom, it says "Craig S
8 Wright"; is that your signature?
9    A.   Yes.
10    Q.   How do you know that Dave Kleiman has
11 entered into this contract?
12         MS. MARKOE:  Objection.  Answer if you
13 can.
14         THE WITNESS:  We communicated.
15 BY MR. FREEDMAN:
16    Q.   How did you communicate about it?
17    A.   As I have noted before, we would talk
18 over IRC and Skype.
19    Q.   So you have no record of those
20 communications?
21    A.   I do not have many records of anything
22 from that period.
23    Q.   Or a record of those communications?
24    A.   I do not have a record of practically
25 anything from that period.

Page 267

1    Q.   Do you have a record of the communication
2 between yourself and ----
3    A.   I do not know.  Unless my lawyers ----
4    Q.   Dr. Wright, please let me finish the
5 question.  Do you have a record of the communication
6 between yourself and Dave Kleiman where he assented to
7 the terms of this contract?
8         MS. MARKOE:  Objection.
9         THE WITNESS:  If my lawyers have any
10 record of what they have imaged, etcetera, then yes,
11 otherwise no.  I do not know.
12 BY MR. FREEDMAN:
13    Q.   Can you go with me to page 5, please.
14         MS. MARKOE:  Again, for the record, that
15 is page 5 at the top.
16         THE WITNESS:  Yes.
17 BY MR. FREEDMAN:
18    Q.   Can you look at (b) of paragraph 2.  Let
19 me know when you have familiarised yourself with it.
20    A.   Yes.
21    Q.   This is the 1933 wallet that we saw in
22 the 2011 contract?
23    A.   Yes.
24    Q.   In the 2011 contract it was being held by
25 Craig Wright R&D as a collateral?

Page 268

1    A.   In Panama, yes.
2    Q.   Can you explain to me why it is being
3 released to Craig Wright R&D if there is no default on
4 the contract?
5         MS. MARKOE:  Objection.
6         THE WITNESS:  The contract speaks for
7 itself.
8 BY MR. FREEDMAN:
9    Q.   I am trying to understand the negotiation
10 that went on.  The wallet was a collateral in 2011 and
11 now it is being given to the holder of the collateral.
12 I do not understand why.  Why?
13         MS. MARKOE:  Objection.
14         THE WITNESS:  It is a negotiation, it is
15 a contract.  You are saying, why did we negotiate
16 something?
17 BY MR. FREEDMAN:
18    Q.   Yes.  It was held as collateral.  Usually
19 collateral is returned at the fulfillment of the
20 contract.  Why are you keeping the collateral?
21         MS. MARKOE:  Objection.
22         THE WITNESS:  I did not keep the
23 collateral.
24 BY MR. FREEDMAN:
25    Q.   Who kept the collateral?

Page 269

1    A.   Again you will note that I am not the
2 person here, sorry.
3    Q.   You signed the contract?
4    A.   I signed for a legal entity.  Please be
5 specific.
6    Q.   Who owned Craig Wright R&D at the time
7 you signed this contract -- Craig Wright R&D Panama at
8 the time you signed this contract?
9    A.   I do not remember.
10    Q.   Have you any way to look that up?
11    A.   Not now, no.
12    Q.   Was it a trust?
13    A.   No.
14    Q.   It was people or corporations?
15         MS. MARKOE:  Objection.  You can answer.
16         THE WITNESS:  Companies are always
17 people.
18 BY MR. FREEDMAN:
19    Q.   Natural persons?
20    A.   Companies always have natural persons.  I
21 do not know any unnatural persons that can actually act.
22    Q.   Dr. Wright, my question was, did natural
23 persons own Craig Wright R&D Panama?
24         MS. MARKOE:  Objection.  You can answer.
25         THE WITNESS:  I do not remember.  I have

MAGNA

LEGAL SERVICES

Page 270

1  already stated I do not have any involvement with the
2  company structures or whatever else after I have set
3  them up and handed them off to be mixed up and created
4  so that we have companies.
5  BY MR. FREEDMAN:
6      Q.   Can you look at paragraph 3(a).
7      A.   Yes.
8      Q.   Was the 250,5000 -- well, tell me if you
9  are familiar with 3(a) and I can ask you questions on
10  it.
11      A.   It is right in front of me.
12      Q.   Can you tell me, did this 250,500
13  Bitcoin, was it ever transferred?
14      A.   No.
15      Q.   Can you tell me 3(b), did Craig Wright
16  R&D accept the 1933 paper Bitcoin wallet?
17      A.   I am not Craig Wright R&D.  I cannot
18  speak for other people.
19      Q.   Do you know if Craig Wright R&D accepted
20  the paper Bitcoin wallet?
21      MS. MARKOE:  Objection.
22      THE WITNESS:  I am not Craig Wright R&D.
23  I cannot speak for other people.
24  BY MR. FREEDMAN:
25      Q.   I am just asking what your knowledge is,

Page 271

1  Dr. Wright.  Please tell me only what your knowledge is.
2  If you know, you do not know.  If you know, let me know.
3      A.   I do not know.
4      Q.   Can you look at 3(c)?
5      A.   Yes.
6      Q.   Can you read that for me?
7      A.   "Transfer the ASC hardware to the
8  purchaser".
9      Q.   What is "ASC hardware"?
10      A.   It should be ASIC.
11      Q.   It is ASIC mining hardware?
12      MS. MARKOE:  Objection.
13      THE WITNESS:  Yes.
14  BY MR. FREEDMAN:
15      Q.   What ASIC mining hardware is it referring
16  to?
17      A.   I do not know.
18      Q.   It says in 3(d):  "Release the source
19  code to the purchaser."  What source code is it talking
20  to?
21      A.   That was a variety of source code that
22  I already had in my possession as well as other source
23  code that I did not.
24      Q.   What was the source code you had in your
25  possession?

Page 272

1      A.   That includes all the things we have
2  already detailed, I would need to look through the list
3  to go through without missing anything, but it included
4  the covert channel software, the recording software, the
5  poker software, etcetera.
6      Q.   Were you authorised to enter contracts
7  for Craig Wright R&D Panama?
8      A.   Yes.
9      Q.   How did you come to be authorised to
10  enter into contracts for Craig Wright R&D Panama?
11      MS. MARKOE:  Objection.  But you can
12  answer.
13      THE WITNESS:  I set up the system so that
14  I would be.
15  BY MR. FREEDMAN:
16      Q.   You set up Craig Wright R&D Panama?
17      MS. MARKOE:  Objection.
18      THE WITNESS:  That is not what I said.
19  BY MR. FREEDMAN:
20      Q.   You said:  "I set up the system so that
21  I would be".
22      A.   Correct.
23      Q.   Can you look at 3(e)?
24      A.   Yes.
25      Q.   Can you read it for the record, please.

Page 273

1      A.   "Transfer the Vistomail e-mail account."
2      Q.   Which Vistomail e-mail account is it
3  referring to?
4      A.   I think it was Sakura.
5      BY MS. MARKOE:  Can you spell that, if
6  you can.
7      THE WITNESS:  It is the name of the
8  Japanese flowers, the ones with the cherry blossoms in
9  spring.
10  BY MR. FREEDMAN:
11      Q.   Sakura; is that correct?
12      A.   Yes, I am not going try and spell it.
13      Q.   I think it is S-A-K-U-R-A.  What was
14  Sakura used for?
15      A.   Discussing some of the work that was
16  being done.
17      Q.   By whom?
18      A.   By people in Panama.
19      Q.   Did you get access to the Vistomail
20  e-mail account?
21      A.   I did.
22      Q.   Do you still have access to the Sakura
23  Vistomail e-mail account?
24      A.   No, I do not.
25      Q.   What happened to the access?

Page 274

1       A.   No one paid for the account so it lapsed.
2       Q.   And Vistomail delete it if you do not
3 pay?
4       A.   I have no idea.
5       MS. MARKOE: Objection.
6 BY MR. FREEDMAN:
7       Q.   When did it lapse?
8       A.   I don't know.
9       Q.   Have you tried to get the account back
10 from Vistomail?
11       MS. MARKOE: Objection.
12       THE WITNESS: Why would I do that?
13 BY MR. FREEDMAN:
14       Q.   Because you have been sued in this
15 lawsuit.
16       MS. MARKOE: Objection.
17       THE WITNESS: You are saying you want me
18 to pay to get evidence that you want.
19 BY MR. FREEDMAN:
20       Q.   All right, going back to 3(c), did you
21 obtain the ASIC hardware back from the purchaser?
22       A.   No, I specifically, when I went to the
23 court, etcetera, said I do not really care about
24 anything other than the IP, and said that anyone there
25 could keep it because I do not want it.

Page 275

1       Q.   What was the ASIC hardware worth?
2       A.   I do not know.
3       Q.   Did you get the source code back?
4       MS. MARKOE: Objection.
5       THE WITNESS: I had the source code that
6 I had. I did not get any extra.
7 BY MR. FREEDMAN:
8       Q.   3(f), can you read that for me, please.
9       A.   "Transfer all research materials from the
10 four (4) DHS BAA research projects to the purchaser with
11 all notes, data and results."
12       Q.   Did this transfer occur?
13       A.   No.
14       Q.   What are the four DHS BAA projects that
15 are being referred to?
16       A.   They are the ones that have been noted
17 before, SWAMP, the other software risk ones, etcetera.
18       Q.   Did Dave build those out for you?
19       MS. MARKOE: Objection: asked and
20 answered. You can answer.
21       THE WITNESS: I do not know, because
22 I did not get it.
23 BY MR. FREEDMAN:
24       Q.   Can you look at 4(b) for me?
25       A.   Yes.

Page 276

1       Q.   Tell me when you are familiar with it?
2       A.   It is right in front of me.
3       Q.   Craig Wright R&D is to accept the
4 vendor's 323,000 remaining mined Bitcoin as a 49.5%
5 stake in a new venture, and that venture was called
6 Coin-Exchange; is that correct?
7       A.   Yes.
8       Q.   Did you get the 323,000 Bitcoin?
9       A.   No.
10       Q.   So you were now aware that there were
11 323,000 Bitcoin mined by Dave Kleiman?
12       MS. MARKOE: Objection.
13       THE WITNESS: He had stated that.
14 BY MR. FREEDMAN:
15       Q.   Did he use the ASIC mining hardware --
16 strike that. The ASIC mining hardware referred to at
17 3(c), did you provide that to Dave Kleiman?
18       A.   No.
19       Q.   Do you know how he obtained that
20 hardware?
21       A.   I knew people who developed chips and
22 I put them in contact with Dave.
23       Q.   Who are those people?
24       MS. MARKOE: Objection. You can answer
25 if you know.

Page 277

1       THE WITNESS: I do not remember their
2 name.
3 BY MR. FREEDMAN:
4       Q.   Do you remember anything about them?
5       A.   Yes.
6       Q.   Can you tell me any contact details you
7 have about them?
8       A.   No.
9       Q.   Do you remember any identifying features
10 about them?
11       MS. MARKOE: Objection. Like a tattoo?!
12       MR. FREEDMAN: Judging by Dr. Wright's
13 previous answers, if I asked him what he remembered he
14 would launch into an irrelevant tirade about all kinds
15 of other things.
16       MR. RIVERO: Please ask your questions.
17 BY MR. FREEDMAN:
18       Q.   Can you go to page 6 for me.
19       A.   Yes.
20       Q.   Top of page 6, 4(d). Can you read that
21 for me.
22       A.   "Provide $30,000,000 in capital into
23 Coin-Exch Pty Ltd (to be formed) and the software
24 developed in the prior venture."
25       Q.   This is an obligation by Craig Wright R&D

MAGNA
LEGAL SERVICES

Page 278

1  to provide $30 million to Coin-Exchange?
2      A.   In capital.
3      Q.   Did Craig Wright R&D provide $30 million
4  in capital to Coin-Exchange?
5      A.   Yes.
6      Q.   How?
7          MS. MARKOE:  Objection.  Can you tie this
8  to one of your topics in the scope?
9          MR. FREEDMAN:  We are allowed to ask
10  about the projects in Exhibits 5, 10 and 15.  This is
11  Exhibit 10 -- 5.
12          MS. MARKOE:  Right, but this is not a
13  project.  This is a capital infusion into a company that
14  did not ----
15          MR. FREEDMAN:  It is part of the project,
16  it is part of the contractual agreement of the project.
17          THE WITNESS:  It was not part of a
18  project.
19          MS. MARKOE:  What project?  This is not
20  referring to a project, so can you tie it.
21          MR. FREEDMAN:  This is the Coin-Exchange
22  project.  This is an agreement with Coin-Exchange ----
23          THE WITNESS:  There is no such thing as a
24  Coin-Exchange project.
25          MS. MARKOE:  It does not say the

Page 279

1  Coin-Exchange project.
2          MR. FREEDMAN:  Okay, we will take it with
3  the court if you instruct him not to answer.  So, just
4  choose if you will or not.
5          MS. MARKOE:  I am not instructing him not
6  to answer.  I am asking you ----
7          MR. FREEDMAN:  I am not going to alter my
8  questions any more.  The question is what it is.
9          MR. RIVERO:  You have to give the court
10  reporter a break.  Again I am as guilty as everyone
11  else.
12          THE WITNESS:  I am starting to see smoke.
13  BY MR. FREEDMAN:
14      Q.   How did Craig Wright R&D provide the $30
15  million in capital to Coin-Exchange?
16          MS. MARKOE:  Objection.
17          THE WITNESS:  You would need to go to the
18  financial records and accounts of the companies.
19  BY MR. FREEDMAN:
20      Q.   Which companies?
21          MS. MARKOE:  Objection.
22          THE WITNESS:  Coin-Exch for a start.
23  BY MR. FREEDMAN:
24      Q.   Who has access to Coin-Exchange records?
25      A.   I do not know.

Page 280

1      Q.   Sitting here today you have no idea
2  whether or not Craig Wright R&D -- how Craig & Wright
3  R&D provided the $30 million in capital to
4  Coin-Exchange?
5          MS. MARKOE:  Objection.
6          THE WITNESS:  If you go through the
7  records you will be able to track all that.
8  BY MR. FREEDMAN:
9      Q.   I do not have the records.  I am not
10  asking you for what is in the records.  I am asking you
11  for what you recollect.  Do you ----
12          MS. MARKOE:  Objection.  Vel do not
13  testify.
14  BY MR. FREEDMAN:
15      Q.   Are you sitting here today able to
16  recollect anything about how Craig Wright R&D
17  transferred $30 million in capital to Coin-Exchange?
18          MS. MARKOE:  Objection.
19          THE WITNESS:  I instruct people to do
20  things.  Things happened.
21  BY MR. FREEDMAN:
22      Q.   Did you instruct someone to transfer?
23          MS. MARKOE:  Objection.  You can answer.
24          THE WITNESS:  I would need to look at the
25  records.

Page 281

1  BY MR. FREEDMAN:
2      Q.   Sitting here today, you do not know
3  whether that 30 million was provided?
4          MS. MARKOE:  Objection.
5          THE WITNESS:  That is not what I said.
6  You are again misstating what I said.  I said all of
7  this had been completed, the company had been set up.  I
8  do not know the exact process off the top of my head.  I
9  do not try and remember my finances.  I instruct people
10  to do things.  They get paid.  I instruct my lawyers to
11  get paid.  Magic happens, they get paid.
12  BY MR. FREEDMAN:
13      Q.   Was the $30 million provided in cash or
14  in Bitcoin?
15          MS. MARKOE:  Objection.
16          THE WITNESS:  Again, I would need to look
17  at the accounts.  I do not know the breakdown of what
18  the capital per company was.
19  BY MR. FREEDMAN:
20      Q.   Can you take a look at 8(e) for me.
21      A.   Yes.
22      Q.   Let me know when you are familiar with
23  it.
24      A.   I am fine with it.
25      Q.   This indicates that the ASIC mining

MAGNA ◆
LEGAL SERVICES

Page 282

1    hardware will be returned with this transfer. You told
2    me Craig Wright R&D did not provide it?
3            MS. MARKOE: Objection.
4            THE WITNESS: I do not know what happened
5    with companies. You are asking whether I did. Return
6    can be taken in many ways. It could be returned to
7    other people or myself. I do not really care. I did
8    not get, it was never given back, and if you notice "at
9    a site known to Mr. Kleiman," who died before anything
10   occurred. Unfortunately, post his death Mr. Kleiman was
11   not forthcoming in giving up that information.
12   BY MR. FREEDMAN:
13       Q.   So, sitting here today, do you know
14   whether or not Craig Wright R&D provided Mr. Kleiman
15   with ASIC mining hardware?
16           MS. MARKOE: Objection: asked and
17   answered. You may answer.
18           THE WITNESS: I do not know. I do not
19   look at the records of companies. I do not believe so.
20   And I do not believe that "returned" means what you are
21   saying it does. And I think you are miscategorising the
22   contract.
23   BY MR. FREEDMAN:
24       Q.   Can you explain to me what 8(f) means?
25       A.   "Solutions to the Agent and Merkle tree

Page 283

1    problems development by Professor David Reese." It is
2    saying the vendors shall deliver up and it means that
3    certain problems to do with agent-based software and
4    Merkle tree problems, which are mathematical constructs
5    that can be put into code, that had originally been
6    worked on by David Reese and were to be formulated into
7    code, David Reese having written these, not so much the
8    -- it was -- I think the language was CoCo if I remember
9    it right. Dr. Reese or Professor Reese had created
10   software in mathematics in a language earlier called
11   CoCo. CoCo was a horrendous, awful, awful piece of --
12   I will not even go there -- that needed to be changed
13   into something usable and constructed into something
14   that could actually be deployed. There are a number of
15   interesting things that can be done with Merkle trees.
16   So, the solutions would be taking something that
17   Dr. Reese had developed around 2004, back when he was a
18   lot, sharper, I am not trying to sound mean or anything
19   like that, but he was old at the end, and then taken by
20   others and constructed into software.
21           MS. MARKOE: I think the court reporter
22   needs a break.
23           MR. FREEDMAN: Let us take a break.
24           THE VIDEOGRAPHER: Going off the record.
25   The time is 17.55. End of video card number 5, volume

Page 284

1    1, in the video deposition of Dr. Craig Wright.
2            (A Short Break)
3            THE VIDEOGRAPHER: This is the beginning
4    of video card number 6, volume 1, in the video
5    deposition of Dr. Craig Wright. Going on the record.
6    The time is 18.08. Thank you.
7    BY MR. FREEDMAN:
8        Q.   Dr. Wright, before the break we were
9    looking at Plaintiff's Exhibit 6. Can you look at page
10   6. I am looking at 8(g) at the very bottom.
11           MS. MARKOE: That is 6 at the top, for
12   the record.
13   BY MR. FREEDMAN:
14       Q.   Can you read that sentence for me.
15       A.   "Bitcoin agent software and suit of
16   C/C++/C# and Python Blockchain software source codes."
17       Q.   Did you receive these?
18       A.   I already had those.
19       Q.   Why were they included in the contract,
20   then?
21           MS. MARKOE: Objection. You may answer,
22   if you know.
23           THE WITNESS: Because, quite simply, the
24   fact that you own -- so you have a copy of source code
25   does not mean that you own copy of source code.

Page 285

1    BY MR. FREEDMAN:
2        Q.   Doctor, I would like to talk you a little
3    bit about Ms. Uyen Nguyen. Do you know who I am
4    referring to when I say that?
5        A.   I do.
6        Q.   How did you first meet or come to know
7    Ms. Nguyen?
8            MS. MARKOE: Objection. You can answer.
9            THE WITNESS: I do not remember when
10   I first met her. I came to know her because she tracked
11   me down way back. I cannot remember exactly when. Like
12   2011, 2012. Because of my background and history in
13   information security, she wanted to learn from myself
14   and Dave. She knew about all of the courses I have done
15   with SANS, all of the publications I had been doing, and
16   came to the belief that I was Satoshi.
17   BY MR. FREEDMAN:
18       Q.   Ms. Nguyen deduced on her own that you
19   were Satoshi?
20           MS. MARKOE: Objection. Again you are
21   going beyond the scope. Please tell me what topic it is
22   that you are referring to.
23           MR. FREEDMAN: I am trying to determine a
24   relevant witness and what her knowledge is.
25           MS. MARKOE: That is not within the

Page 286

```
1    scope.  The scope of number 1, which is the one that you
2    are referring to:  "The location and existence of
3    documents along with the identification of witnesses,
4    including information about their whereabouts, and roles
5    in the subject matter of the pleadings."
6           MR. FREEDMAN:  Roles in the subject
7    matter of the pleadings.
8           MS. MARKOE:  So, let me see the question.
9    (Pause) Fine, you can answer that one.  I am going to
10   give you some limited scope here, but let us keep it
11   tight everyone.
12          THE WITNESS:  Can you ask that again,
13   please.
14   BY MR. FREEDMAN:
15      Q.   Sure.  Did Ms. Nguyen determine on her
16   own that you were Satoshi?
17          MS. MARKOE:  Objection.  You can answer.
18          THE WITNESS:  I do not know.
19   BY MR. FREEDMAN:
20      Q.   When did she first meet -- sorry, when
21   did she first come to know Dave Kleiman?
22          MS. MARKOE:  Objection.  You can answer
23   if you know.
24          THE WITNESS:  I do not know.
25   BY MR. FREEDMAN:
```

Page 287

```
1       Q.   You said she reached out to you and Dave
2    Kleiman in 2011 or 2012?
3           MS. MARKOE:  Objection.
4           THE WITNESS:  Yes.
5    BY MR. FREEDMAN:
6       Q.   How did she reach out to you both?
7           MS. MARKOE:  Objection.
8           THE WITNESS:  I am not trying to sound
9    rude, but the only way to put it she cyberstalked me.
10   BY MR. FREEDMAN:
11      Q.   Can you drill down on that a little bit?
12      A.   Cyberstalking is well developed as a sort
13   of discipline.  She followed me on every bit of social
14   media, e-mailed me a lot, kept asking and talking about
15   what I was doing.  Asked lots of questions.
16      Q.   Did Ms. Nguyen have a role in W&K?
17      A.   W&K is not my company.  I cannot talk
18   about W&K.
19      Q.   So you are not aware of any role she
20   played with W&K?
21          MS. MARKOE:  Objection: mischaracterises
22   his testimony.
23   BY MR. FREEDMAN:
24      Q.   Are you aware of any role she played with
25   W&K?
```

Page 288

```
1       A.   I believe she was a director.
2       Q.   Was Ms. Nguyen ever appointed as a
3    director of any of your companies?
4       A.   I believe so.
5           MS. MARKOE:  Objection.
6    BY MR. FREEDMAN:
7       Q.   Which companies?
8       A.   I would need to look at the records.
9       Q.   Sitting here today, you are not aware
10   which companies she was a director of?
11          MS. MARKOE:  Objection.
12          THE WITNESS:  I have no idea what the
13   directorships of each of my companies were multiple
14   years ago.  I do not know what the directorship of
15   nChain is today.
16   BY MR. FREEDMAN:
17      Q.   Did Ms. Nguyen ever become a trustee for
18   you?
19          MS. MARKOE:  Objection.
20          THE WITNESS:  In what sense?
21   BY MR. FREEDMAN:
22      Q.   Was she ever a trustee that you were --
23   strike that.  Was she ever the trustee over a trust that
24   you were the beneficiary of?
25      A.   What sort of trust are we talking about?
```

Page 289

```
1       Q.   Any.
2       A.   Then yes.
3       Q.   Can you tell me what that trust was
4    about?
5           MS. MARKOE:  Objection.  You can answer.
6           THE WITNESS:  That trust was holding a
7    number of slices of early Bitcoin keys.
8    BY MR. FREEDMAN:
9       Q.   Does that mean that it controlled
10   Bitcoin?
11          MS. MARKOE:  Objection.
12          THE WITNESS:  Nobody controls Bitcoin.
13   BY MR. FREEDMAN:
14      Q.   Does that mean it owned Bitcoin?
15          MS. MARKOE:  Objection.
16          THE WITNESS:  No, that does not mean it
17   owned Bitcoin.
18   BY MR. FREEDMAN:
19      Q.   What was the name of the trust?
20      A.   Which trust?
21      Q.   How many was Uyen a trust on?
22      A.   I do not know.
23      Q.   How many are you aware of her being a
24   trustee on?
25      A.   At least one.
```

**MAGNA**
LEGAL SERVICES

Page 290

1    Q.    What is the name of that trust?
2    A.    There was a trust called the Tulip Trust.
3    Q.    Is that trust no longer in existence?
4    A.    The trust was formalised early on and is
5  not the informal thing from 2011.
6    Q.    I am not following.  When was the
7  Tulip Trust created?
8    A.    2011.
9    Q.    Who created it?
10   A.    Me.
11   Q.    Who were the trustees when you created
12 it?
13   A.    I do not remember.  I would need to look
14 at the document.
15   Q.    Where are the documents?
16   A.    I do not have the documents.
17   Q.    Who has the documents?
18   A.    I do not know.
19   Q.    Who were the beneficiaries of the
20 Tulip Trust in 2011?
21   A.    I do not have the document.  I cannot
22 answer that.
23   Q.    What assets were controlled by the
24 Tulip Trust in 2011?
25   A.    Companies that I hold overseas, such as

Page 291

1  Wright International Investments that I founded in 2009,
2  and Tulip Trading.
3    Q.    What is Tulip Trading?
4    A.    It is a company.
5    Q.    So, when it was founded in 2011, it never
6  controlled the rights to any Bitcoin?
7         MS. MARKOE:  Objection: vague.
8         THE WITNESS:  That is not what I said.
9  The rights ----
10 BY MR. FREEDMAN:
11   Q.    How did -- sorry, go ahead.
12   A.    The rights to Bitcoin and controlled are
13 different.  You are mixing all your bits and pieces,
14 yes.
15   Q.    Did the Tulip Trust own any Bitcoin at
16 any point from 2011 until 2013?
17   A.    The trust does not own generally.  A
18 trust holds in trust.
19   Q.    I do not want to get into an argument
20 with you about the structure of trusts, I am just trying
21 to get to the bottom of, did the trust have control over
22 Bitcoin?
23   A.    Which Bitcoin?
24   Q.    Any Bitcoin.
25   A.    Yes.

Page 292

1    Q.    How much Bitcoin did the trust control
2  between 2011 and 2013?
3         MS. MARKOE:  Objection.  Where is this
4  related to the scope of this deposition?
5         MR. FREEDMAN:  Ms. Nguyen is a trustee of
6  the trust and we are authorised under number 6:
7  "Inquiry into the scope of knowledge and information
8  possessed by the individuals."  So, I am trying to
9  determine what her scope of knowledge was.
10        MS. MARKOE:  Her scope of knowledge is
11 not related to how much Bitcoin the trust controlled.
12 If you would like to ask, do you know if Ms. Nguyen
13 knows how much Bitcoin the trust controlled, you can ask
14 that question and he can answer that question.  However,
15 I will instruct him not to answer the question as asked.
16        MR. FREEDMAN:  You instruct how you need
17 to instruct.
18   Q.    Was Dave Kleiman ever involved with the
19 Tulip Trust?
20        MS. MARKOE:  Objection.  You may answer.
21        THE WITNESS:  Dave Kleiman was not
22 involved in the Tulip Trust as it is.  What you are
23 trying to get at was because I asked him to hold
24 documents for a while does that make him part of the
25 trust.  Dave was never a beneficiary of the trust.  Dave

Page 293

1  never put money into the trust.  Dave never had any
2  Bitcoin in the trust.  Dave never mined any Bitcoin that
3  had anything to do with the trust.  None of the Bitcoin
4  was ever involved with any mining in the US.  No Bitcoin
5  was post 2010 from that trust.  No company Dave owned
6  was involved with the trust.  No shares Dave owned was
7  involved with the trust.  Nothing Dave owned was
8  involved with the trust.  Dave had no rights to the
9  trust, no ownership of the trust, no knowledge of the
10 set-up of the trust.  He did not know about the
11 companies in the trust.  He did not know about Wright
12 International Investments that I set up in 2009.  Dave
13 did not know about any of those details.  Dave was asked
14 simply to hold a part of some documents and keys that
15 were split using Shamir's Secret Sharing scheme so that
16 he did not even know what he was actually holding.
17        MS. MARKOE:  Can you spell Shamir's for
18 the court reporter, please.
19        THE WITNESS:  S-H-A-M-I-R-S.
20 BY MR. FREEDMAN:
21   Q.    Did you put Bitcoin into the trust in
22 2011?
23        MS. MARKOE:  Objection.  You may answer.
24        THE WITNESS:  I founded the trust.
25 BY MR. FREEDMAN:

MAGNA◆
LEGAL SERVICES

Page 294

1    Q.    Did you put Bitcoin into the trust in
2    2011?
3           MS. MARKOE:  Objection.
4           THE WITNESS:  No.
5    BY MR. FREEDMAN:
6    Q.    Did you put Bitcoin into the trust in
7    2012?
8           MS. MARKOE:  Objection.
9           THE WITNESS:  No.
10   BY MR. FREEDMAN:
11   Q.    Did you ever put Bitcoin into the trust?
12          MS. MARKOE:  Objection.
13          THE WITNESS:  No.
14   BY MR. FREEDMAN:
15   Q.    Did anyone ever put Bitcoin into the
16   trust?
17          MS. MARKOE:  Objection.
18          THE WITNESS:  No.
19   BY MR. FREEDMAN:
20   Q.    Did the Tulip Trust ever come to hold
21   private keys to Bitcoin wallets?
22   A.    No.
23   Q.    Did it ever come to own or possess
24   private keys to Bitcoin addresses?
25   A.    No.

Page 295

1    Q.    What is the relationship between the
2    Tulip Trust and Bitcoin?
3           MS. MARKOE:  Objection.  Again, where are
4    we on the topics?
5           THE WITNESS:  What the hell does that
6    question even mean?
7           MR. FREEDMAN:  We are permitted to
8    enquire into Dr. Wright's companies.
9           THE WITNESS:  That is not a company.
10          MR. RIVERO:  Hold on, Dr. Wright.  Tell
11   us what topic or tell us where in the transcripts
12   because we can review the transcript.
13          MR. FREEDMAN:  Number 10.
14          MS. MARKOE:  Number 10?  Can you point
15   out where the Tulip Trust is referenced in the exhibits
16   that are referenced in topic 10?  It could be there.
17   I just do not recall.
18          MR. FREEDMAN:  We just do not have time,
19   so I guess you are going to instruct him not to answer?
20          MR. RIVERO:  If we do not get some
21   connection ----
22          MR. FREEDMAN:  The court has authorised
23   us.  I do not know which number it is because I do not
24   have it in front of us.  I believe Ms. Markoe has been
25   at many hearings where the court has authorised us to

Page 296

1    enquire into -- let me finish -- Dr. Wright's various
2    entities and trusts.  Specifically at the last hearing
3    he authorised us to do because Ms. Markoe refused to
4    turn over a compilation of those entities on
5    work-product grounds and he specifically authorised me
6    to enquire into the trust and companies.
7           MR. RIVERO:  With respect ----
8           MS. MARKOE:  Right, but ----
9           MR. RIVERO:  Let me please address.
10   Counsel today has referred to a rule that does not
11   exist.  He has referred to it without a number.  Now he
12   refers to transcripts without a certain page number.
13   I have been reviewing transcripts.  I do not find the
14   reference.  Unless there is a basis, the instruction is
15   do not answer.  Let us move on to the next question.
16          MR. FREEDMAN:  We will just move on.  We
17   will raise it with the court.
18   (Plaintiff's Exhibit 7 marked for identification)
19          MR. FREEDMAN:  For the record,
20   Mr. Rivero, you can look this over later, but just so
21   the record reflects, it is at the last hearing,
22   transcript pages 55 and 56, and I will give you the ----
23          MR. RIVERO:  I have the transcript.
24          MR. FREEDMAN:  It is for your own
25   knowledge and for the record, we can look at it and

Page 297

1    discuss it later.
2           MR. RIVERO:  Now you have identified a
3    page I will review it and we will come back to it.
4           MR. FREEDMAN:  We will return to it.
5           MR. RIVERO:  Yes.
6    BY MR. FREEDMAN:
7    Q.    Dr. Wright, do you recognise Plaintiff's
8    Exhibit 7 which has been just marked and placed before
9    you?
10   A.    I recognise two documents joined
11   together, yes.
12   Q.    What are the two documents that are
13   joined together?
14   A.    You have deed of loan as a front page.
15   Page 1 of 7, 2 of 7, 3 of 7, 4 of 7, 5 of 7, 6 of 7 of a
16   document, and then page 7 of 7 of a separate document.
17   So, potentially two, if not three, documents, put
18   together as one.
19   Q.    Page 7 of 7 belongs to what document?
20   A.    Not this one.
21   Q.    Do you know what document it does belong
22   to?
23   A.    I would need to look at records.  I do
24   not know.
25   Q.    Looking at the first six pages, which you

MAGNA ▶
LEGAL SERVICES

Page 298

1    say are one document; is that correct?
2        A.    The first six pages, you mean not the
3    first six, but the cover page does not have a thing, and
4    then that starts at page 1.  So, page 2, which is on
5    here as page 3 of 10, page 4 of 10, page 5 of 10, page 6
6    of 10, page 7 of 10, and page 8 of 10 are parts of the
7    same document that is not complete.
8        Q.    Sitting here today you have no idea what
9    page 9 of 10 document is -- strike that.  Sitting here
10   today you have no idea what page 9 of 10 -- strike that
11   again.  Sitting here today you have no idea what
12   document page 9 of 10 belongs to; is that correct?
13       A.    That is not what I said.
14       Q.    What document does page 9 of 10 belong
15   to?
16       A.    A different document that is not this
17   one.
18       Q.    Which document?
19       A.    I do not have documents in front of me.
20   I cannot match them.
21       Q.    So, sitting here today you do not know
22   what that document -- what that page -- what document
23   that page belongs to?
24       A.    I cannot match them, no, and page 10 of
25   10 is a separate document as well.  You will notice no

Page 299

1    page numbers or anything like that, so that is also out
2    of -- so there are possibly four documents constructed
3    into one.
4        Q.    Who has all the originals of these
5    documents?
6        MS. MARKOE:  Objection.
7        THE WITNESS:  I do not know.
8    BY MR. FREEDMAN:
9        Q.    Do you have the originals of these
10   documents?
11       A.    Unless my lawyers have gone through and
12   found things in boxes, then I do not know.
13       Q.    Does Ms. Nguyen have the originals of
14   this document?
15       MS. MARKOE:  Objection.
16       THE WITNESS:  I do not know what
17   Ms. Nguyen has.  I have not spoken to Ms. Nguyen in
18   three plus years.
19   BY MR. FREEDMAN:
20       Q.    Can you look at page 9 of 10.
21       A.    Yes.
22       Q.    There is a signature at the bottom; is
23   that your signature?
24       A.    Yes.
25       Q.    And there is a signature above that; is

Page 300

1    that Ms. Nguyen's signature?
2        A.    I believe so.
3        Q.    The handwriting on the right-hand side of
4    all the Bitcoin wallets listed there, whose handwriting
5    is that?
6        A.    That looks like mine.
7        Q.    Do you recognise what this appendix list
8    of Bitcoin is?
9        MS. MARKOE:  Objection.  Answer if you
10   can.
11       THE WITNESS:  I think you are confounding
12   two different things.  There is a random line talking
13   about wallets and a set of addresses.  Where I talk
14   about wallets, wallets are files, computer files,
15   etcetera, so you have done a typical error that most
16   people do in calling Bitcoin addresses wallets.  So, you
17   have taken two completely separate things, because
18   I have this habit of writing wherever the hell I feel
19   like it, usually over documents people complain that
20   I write on, because I write notes whenever I feel like
21   writing notes, and saying that they are related.
22   BY MR. FREEDMAN:
23       Q.    So, is it your testimony here today that
24   the note in your handwriting on the right-hand side of
25   this document is completely unrelated to the list of

Page 301

1    Bitcoin block addresses on the left-hand side of the
2    document?
3        MS. MARKOE:  Objection.
4        THE WITNESS:  I cannot say what it is.
5    It is all wallets, and then there is a list of
6    addresses.  They are two different things.  I have made
7    a note.  I would need to look at records to be able to
8    match up what that was.  I have left myself a note at
9    some point.  I cannot necessarily say what my note was.
10   BY MR. FREEDMAN:
11       Q.    Do you have those records that you could
12   look that up?
13       MS. MARKOE:  Objection.  You can answer.
14       THE WITNESS:  My lawyers have all the
15   records I have.  If anything is in there that goes to
16   further, then that would be there.
17   BY MR. FREEDMAN:
18       Q.    Did you have counsel help you draft this
19   document?
20       MS. MARKOE:  Objection.  He has already
21   testified that this appears to be a compilation of
22   multiple documents that were put together in error.
23   BY MR. FREEDMAN:
24       Q.    Did counsel help you draft page 9 of the
25   document?



Page 302

1      MS. MARKOE: Objection. Answer if you
2   can.
3          THE WITNESS: There is no page 9 of the
4   document. This is a compilation of multiple documents.
5   BY MR. FREEDMAN:
6      Q.   Exhibit. Did counsel help you draft page
7   9 of the exhibit?
8          MS. MARKOE: He is referring to page 9 at
9   the top.
10         THE WITNESS: By "counsel", do you mean
11  my lawyers?
12  BY MR. FREEDMAN:
13     Q.   Yes.
14     A.   Possibly. I had lists of different
15  addresses done by lawyers at different times.
16     Q.   Which lawyers created lists of different
17  addresses?
18         MS. MARKOE: Objection. You can answer.
19         THE WITNESS: I do not know which lawyers
20  produced different lists at different times. I have had
21  more lawyers than birthdays!
22  BY MR. FREEDMAN:
23     Q.   Can you list all the lawyers that you
24  have had that helped you draft lists of Bitcoin
25  addresses?

Page 303

1          MS. MARKOE: Objection. You can answer,
2   to the extent you remember.
3          THE WITNESS: That would be Clayton Utz.
4   There would be M & K. There would be the split off from
5   M & K that I cannot remember the name of -- one of the M
6   & K partners split off and formed his own firm -- and
7   I used both those firms. There would be High Secured.
8   There would be -- I should remember the name. The most
9   famous law firm in Panama that got into the Panama
10  papers, I used them too.
11  BY MR. FREEDMAN:
12     Q.   Do you recall the name?
13     A.   No, I do not. I should do, because it
14  was a big thing of discussion including everyone, and
15  I think I blocked it out of my mind because of that.
16  There were more law firms than I care to remember.
17     Q.   Can you tell me what you meant by your
18  handwritten note: "As agreed. All wallets ..." What
19  do you mean "All wallets"?
20         MS. MARKOE: Objection. You can answer.
21         THE WITNESS: "All wallets" means all
22  wallets, as in files, computer files, or other such
23  things, that hold Bitcoin.
24  BY MR. FREEDMAN:
25     Q.   And you say "As agreed". Agreed with

Page 304

1   who?
2      A.   I would need to look at the rest of the
3   document. I am not going to speculate what a page out
4   of a mysterious document, where this is page 7 of 7 that
5   has been attached incorrectly to a different document,
6   means.
7      Q.   So, sitting here today you do not recall
8   what "As agreed" means; is that correct?
9          MS. MARKOE: Objection: mischaracterises
10  his testimony.
11         THE WITNESS: I understand what
12  "As agreed" means.
13  BY MR. FREEDMAN:
14     Q.   You do not recall who the agreement was
15  made with?
16     A.   This is a note written on a thing that
17  may or may not have any relationship to the original
18  document, that I have one page of addresses, that I do
19  not memorise all the addresses from, that has been
20  constructed between four other documents and handed to
21  me.
22     Q.   And: "... held in UK in trust ..." Are
23  you aware, sitting here today, of moving wallets to be
24  held in a UK trust?
25         MS. MARKOE: Objection. Answer if you

Page 305

1   can.
2          THE WITNESS: No UK trust was ever set
3   up.
4   BY MR. FREEDMAN:
5      Q.   Can you go to page 2 of 10 for me at the
6   top.
7      A.   Yes.
8      Q.   Do you see where it says the last party,
9   Denariuz Seychelles Trust?
10     A.   Yes.
11     Q.   Who are the trustees of this trust?
12     A.   I do not know.
13     Q.   Who are the beneficiaries of this trust?
14     A.   Another trust.
15     Q.   What is the trust's name that is a
16  beneficiary?
17     A.   I would need to look at records.
18     Q.   Do you have those records?
19     A.   Not on me.
20     Q.   Have you given those records to your
21  lawyers?
22     A.   I have a box of -- well, actually, I had,
23  I do not know how many boxes. There were many, many
24  boxes that they spent many days going through, and if it
25  is in there, it would be there.

**MAGNA**
LEGAL SERVICES

Page 306

1    Q.    And if it is not there?
2    A.    When things get closed down, the
3  requirement is for Australian records to be kept for a
4  number of years afterwards and British records to be
5  kept for a number of years afterwards. The Seychelles
6  records requirement is under a year, and once anything
7  hits a period of one year, and the Seychelles trust is
8  no more, it goes the way of anything that is no longer
9  needed to be held, which generally means the shredder.
10   Q.    The Denariuz Seychelles Trust, does it no
11 longer exist?
12   A.    It no longer exists.
13   Q.    When did it cease to exist?
14   A.    Probably around December 2013.
15   Q.    And the wallet existed, what assets did
16 it hold?
17   A.    Again, I could not answer that.
18        MS. MARKOE:  Objection.
19 BY MR. FREEDMAN:
20   Q.    So, sitting here today, you have no idea
21 what assets the Denariuz Seychelles Trust held?
22   A.    Sitting here today, I could not answer
23 what assets the companies I founded hold.
24   Q.    Okay.  At the top, "Design by Human Ltd"?
25   A.    Yes.

Page 307

1    Q.    What is this?
2        MS. MARKOE:  Objection.  You can answer.
3        THE WITNESS:  It is a company name.
4  BY MR. FREEDMAN:
5    Q.    Was it a trust?
6    A.    It is a company.
7    Q.    Did it ever change its name?
8    A.    You have already covered that one.  Yes,
9  Design by Human had changed its name.
10   Q.    To?  What did it change its name to?
11   A.    Again, I do not remember which one is
12 which.  We covered that as well.  I do not remember
13 which particular one changed its name to C01N or
14 Denariuz, so I would need the records to check those
15 facts, otherwise I will be saying it changed to C01N
16 when in fact it changed to Denariuz and I will get it
17 wrong, and I do not want to do that.
18   Q.    Dr. Wright, you keep saying you checked
19 the records but then tell me that you do know where the
20 records are.  What would you do if you needed to figure
21 this information out?
22   A.    I do not need to figure this information
23 out.
24   Q.    Why not?
25        MS. MARKOE:  Objection.  You can answer.

Page 308

1        THE WITNESS:  Because we are talking
2  about companies that have been liquidated and no longer
3  need to hold records.
4  BY MR. FREEDMAN:
5    Q.    The assets held by the Denariuz
6  Seychelles Trust where are they currently held?
7        MS. MARKOE:  Objection.
8        THE WITNESS:  Again, I do not even know
9  where the current assets of my current things that
10 I have founded happen to be right now.  So you are
11 asking me when I do not know my current company, and
12 what it holds in four continents, where did this other
13 trust that has now gone years ago, where does it have
14 assets that you cannot even tell me what they are.
15 BY MR. FREEDMAN:
16   Q.    Under this trust document, Dr. Wright,
17 you are entitled to borrow 650,000 Bitcoin; is that
18 right?
19        MS. MARKOE:  Objection.
20        THE WITNESS:  Which trust document?
21 There is no full document here.
22 BY MR. FREEDMAN:
23   Q.    Sorry, I misspoke.  I strike that.  Under
24 this deed of loan you are entitled to borrow up to
25 650,000 Bitcoin; is that correct?

Page 309

1    A.    The partial deed of loan, yes.
2    Q.    Did you in fact borrow 650,000 Bitcoin?
3        MS. MARKOE:  Objection.
4        THE WITNESS:  How does this relate to
5  anything, sorry?
6  BY MR. FREEDMAN:
7    Q.    Dr. Wright, please answer the question
8  unless you are instructed otherwise by your counsel.
9    A.    I did not borrow 650,000 Bitcoin.
10   Q.    How much did you borrow?
11        MS. MARKOE:  Objection.
12        THE WITNESS:  I do not know how much
13 I actually borrowed.
14 BY MR. FREEDMAN:
15   Q.    To take these loans, did you have to
16 communicate with Ms. Nguyen?
17   A.    No.
18   Q.    Who was the one who you spoke to in order
19 to take the loans?
20   A.    I do not remember his last name.  He
21 worked for a company called High Secured.  His first was
22 Mark.
23   Q.    Was it Mark Ferrier?
24   A.    No.  He had nothing to do with anything
25 in Panama, nor did he have anything to do with High



Page 310

1  Secured.
2      Q.   Can you go to page 7 of 10 for me.
3          MS. MARKOE:  At the top again for the
4  record.
5          MR. FREEDMAN:  Yes, at the top, thank
6  you.
7          THE WITNESS:  Yes.
8  BY MR. FREEDMAN:
9      Q.   Do you see the reference at the bottom to
10 Permanent Success Limited?
11     A.   Yes.
12     Q.   What was Permanent Success Limited?
13     A.   A company.
14     Q.   Was it related to a trust in any way?
15     A.   I do not know.
16     Q.   Can you let me know what it says at the
17 bottom there, "and all related trusts"; what does that
18 mean?
19         MS. MARKOE:  Objection.
20         THE WITNESS:  It means any related
21 trusts.
22 BY MR. FREEDMAN:
23     Q.   Were there trusts related to Permanent
24 Success Limited?
25         MS. MARKOE:  Objection: rule of

Page 311

1  completeness.
2          MR. FREEDMAN:  You can answer.
3          THE WITNESS:  I do not know.  I cannot
4  take part of a document, and part of other things, and
5  incomplete records and then construct everything you
6  expect me to know.  As I have stated before, I do not
7  know the structure of BITC or nChain or nChain Holdings
8  or any other company that exists right now, so I cannot
9  actually even tell you what I have now, and yet you are
10 saying, "What happened years ago?"
11 BY MR. FREEDMAN:
12     Q.   Do you have any way of contacting Mark
13 from High Secured?
14     A.   He is in a federal penitentiary in the
15 USA.
16     Q.   Which federal penitentiary?
17     A.   I do not know.  I did not follow his
18 case.
19     Q.   Is there a way you can determine his last
20 name and let us know what it is later?
21         MS. MARKOE:  Objection.
22         THE WITNESS:  You can do searches on High
23 Secured.  There is this thing called Google.  You go
24 into this task bar, you type in "High Secured", and
25 search.

Page 312

1  BY MR. FREEDMAN:
2      Q.   Did you pay back the loans that you took
3  under this deed of loan?
4          MS. MARKOE:  Objection.  You may answer.
5          THE WITNESS:  None of your God damn
6  business.  This has nothing to do with anything there.
7  Does it say that it has to be paid back?  Does it say
8  what it is?  You are asking about the management of a
9  trust that has no relationship to Mr. Kleiman, no
10 relationship to a company Dave Kleiman has worked for,
11 no relationship to anyone who has ever been in the USA
12 as a resident or a citizen at any point in human
13 history, no relationship to anyone who has been in North
14 America from Mexico up in human history, that entire
15 continent.  No person who has ever been anything to do
16 with residing or citizenship in that part of the world
17 has had anything at all to do with this trust, assets in
18 this trust, management of this trust, control of this
19 trust, etcetera.  And then you want me to talk about
20 incomplete records that have been constructed in bits
21 and chucked together from four different documents as if
22 this is real evidence.
23 BY MR. FREEDMAN:
24     Q.   Did you pay back the loans that you took
25 from under this deed of loan, Dr. Wright?

Page 313

1          MS. MARKOE:  Objection.  You can answer
2  if you can.
3          THE WITNESS:  I do not have any records
4  in front of me.  I do not have the rest of the records
5  for this, so ----
6  BY MR. FREEDMAN:
7      Q.   So?  Could you finish your response,
8  please.
9      A.   So when you can give me all the financial
10 records of things, I will answer against them.
11         MS. MARKOE:  Objection.  Okay, withdrawn.
12 I strike my own.
13 BY MR. FREEDMAN:
14     Q.   Do you go where Ms. Nguyen is now,
15 Dr. Wright?
16     A.   Earth.
17     Q.   Do you know where on earth she is?
18     A.   I am assuming land.
19     Q.   Dr. Wright, I would appreciate if you
20 would co-operate with me so we could get this done.  Do
21 you know the whereabouts of Ms. Nguyen?
22     A.   I stated earlier I have not had any
23 contact with Ms. Nguyen for over three years.  That
24 would generally mean I do not have any knowledge.  I can
25 restate in other forms if you want or I can be narky

Page 314

1  about it.
2      Q.   Does Ms. Nguyen still maintain a trust
3  role in relation to companies that are related to you?
4          MS. MARKOE:  Objection.  You can answer.
5          THE WITNESS:  No.
6  BY MR. FREEDMAN:
7      Q.   She is no longer a trustee of any trusts
8  related to you?
9          MS. MARKOE:  Objection.  You may answer.
10         THE WITNESS:  That is what I just said.
11 BY MR. FREEDMAN:
12     Q.   When did she stop becoming a trustee of
13 trusts related to you?
14     A.   2015.
15     Q.   Did you help Ms. Nguyen disappear?
16         MS. MARKOE:  Objection.
17         THE WITNESS:  You are presuming that she
18 has disappeared.  I do not know.  You are asking me
19 about someone I have not had contact with.  My sister --
20 I have not had contact with my older sister in four
21 years.  She has not disappeared.  She is a hypercapitalist.  We get on like oil, water,
22 I am a hypercapitalist.  We get on like oil, water,
23 petrol and a match.  But my mother would know so she has
24 not actually disappeared.
25 (Plaintiff's Exhibit 8 marked for identification)

Page 315

1  BY MR. FREEDMAN:
2      Q.   Dr. Wright, I am handing you what has
3  been marked now as Plaintiff's Exhibit 8.  This is some
4  exchange of e-mails between you and Ira Kleiman; do you
5  recognise that?
6      A.   Yes.
7      Q.   Can you go to 3 of 5 of the document?
8      A.   Yes.
9      Q.   Do you see there at the bottom it says:
10 "1.) GICSR Trust in Belize"?
11     A.   Yes.
12     Q.   Can you explain to me what the GICSR
13 trust in Belize is?
14     A.   It was a trust set up in Belize.
15     Q.   By whom?
16     A.   I do not know.
17     Q.   Why did you give this information to Ira?
18         MS. MARKOE:  Objection.
19 BY MR. FREEDMAN:
20     Q.   Why was this information relevant to Ira?
21         MS. MARKOE:  Objection.
22         MR. FREEDMAN:  You can answer.
23         THE WITNESS:  There was a person
24 I thought would be interested in Dave's past, which was
25 his father, who then put me onto Ira, who was a greedy

Page 316

1  person who wished not to have shares that would vest
2  over a long time but instructed me to hide assets
3  because he would have to pay tax.  So, I stopped talking
4  to Ira because basically I had this fraud, con man,
5  trying to take money that he was not owed and trying to
6  hide things from the tax office in America and lying and
7  cheating and whatever else to make up things to try and
8  get more.
9  BY MR. FREEDMAN:
10     Q.   Dr. Wright, I do not understand how that
11 is related to my question, so let us try ----
12     A.   It is related perfectly well.
13     Q.   Let us try one more time.  Did Dave
14 Kleiman have anything to do with the GICSR trust in
15 Belize?
16     A.   Yes.
17     Q.   What was his relationship to the GICSR
18 trust in Belize?
19     A.   We organised putting information onto
20 computers because of it.
21     Q.   I am sorry, what type of information?
22     A.   This is, again, something we will need to
23 talk about with the judge.
24         MS. MARKOE:  Okay.  That is going to be
25 one of the in camera conversations.

Page 317

1  BY MR. FREEDMAN:
2      Q.   Okay, Dr. Wright, are there  reasons ----
3      A.   What I will say is there a reason if you
4  look at the GICSR website that used to be up in the
5  past, it had Department of Homeland Security, NSA and
6  other things on the website.
7      Q.   Do you know Deborah Kobza from GICSR?
8          MS. MARKOE:  Can you spell that for the
9  court reporter.
10         MR. FREEDMAN:  D-E-B-O-R-A-H -- I could
11 not tell you.  K-O-B-Z-A, I think.
12         THE WITNESS:  Not personally.
13 BY MR. FREEDMAN:
14     Q.   Can you look at page 2 of 5, please.
15     A.   Yes.
16     Q.   Can you look at the message that comes
17 from Ira to you at March 2nd, 2014.  Can you read that
18 for the record?
19     A.   "From: '----'".
20     Q.   Dr. Wright, please just read the body of
21 the e-mail.
22     A.   "Just to clarify on thoughts from
23 previous e-mail... In one of the email exchanges between
24 Dave and you, he mentioned that you had 1 million
25 Bitcoins in the trust and since you said he has 300,000



Page 318

1  as his part I was figuring the other 700,000 is yours.
2  Is that correct?  Ira."
3       Q.   Can you read above that your response at
4  March 1st, 2014 at 3 p.m.?
5       A.   Mine.  "Around that.  Minus what was
6  needed for the company's use."
7       Q.   So, where is the 300,000 that belonged to
8  Dave?
9            MS. MARKOE:  Objection.  Can you tie that
10 to one your topics, please?
11           MR. FREEDMAN:  4: "The location and
12 duration of Dave, W&K and Craig's mining of Bitcoin from
13 2009 until 2013."
14           MS. MARKOE:  You are not talking about
15 mining now, you are talking about actual Bitcoin.  Those
16 are two separate topics.  This does not relate to number
17 4.
18           MR. FREEDMAN:  Okay, so either instruct
19 him not to answer or allow the question.
20           MS. MARKOE:  I am going to instruct him
21 not to answer.
22 BY MR. FREEDMAN:
23      Q.   Can you go down to the February 28th,
24 2014 e-mail.
25      A.   Mmm-hmm.

Page 319

1       Q.   You say: "The trust Dave setup should
2  have around 300,000."  Do you see that?
3       A.   Yes.
4       Q.   Is that 300,000 Bitcoin?
5       A.   Yes.
6       Q.   Where is the trust Dave set up?
7       A.   Dave set up a series of trusts as well.
8  One was in Belize, which was not GICSR, he also had one
9  in Panama and companies in Costa Rica.
10      Q.   Do you have any information on who helped
11 him set those up?
12      A.   No.
13      Q.   Can you read the next sentence for me?
14      A.   "We moved everything offshore as a result
15 of my early fight with the Tax office.  This was back in
16 2011.  The BTC would be on a server on hard drive, just
17 the rights are overseas."
18      Q.   Here you say: "We moved everything
19 offshore"?
20      A.   I use a royal "we" all the time, so if
21 you are taking "we", "we" rarely means, for me, multiple
22 people. I talk.  As my lawyers keep instructing me,
23 stop saying "we".
24           MS. MARKOE:  Objection.
25           THE WITNESS:  I say "we" all the time.

Page 320

1            MS. MARKOE:  Do go into what we talked
2  about.
3            THE WITNESS:  Sorry.
4            MS. MARKOE:  Our conversations are
5  privileged.  And there is just a correction.
6            THE WITNESS:  I was not talking just
7  about you!
8            MS. MARKOE:  Nonetheless, any
9  conversations you have with lawyers are privileged, the
10 contents thereof.
11           MR. RIVERO:  Move to strike your client's
12 testimony.
13           MR. FREEDMAN:  Any move to just strike is
14 objected to.
15           MS. MARKOE:  Also, I would just like to
16 point out that there is an error in the transcript.  It
17 says "really means", and he said "rarely means".
18 BY MR. FREEDMAN:
19      Q.   So is it your testimony here today,
20 Dr. Wright, that when you used "we" here, you were
21 referring only to yourself?
22      A.   Independently Dave set up his own trust.
23      Q.   I am talking about your use of the word
24 "we".
25      A.   I am talking, and explaining this.

Page 321

1  I moved my things, Dave moved his things, independently.
2  We did not do it together.  It was a quick, flippant
3  e-mail to a con man who will take things out of context.
4  Basically, as this says, BTC would be on a server or
5  hard drive.  My suspicion is that it is the one Dave had
6  with him at nearly all time.
7       Q.   Can you go to page 4 for me.  Can you
8  look at, toward the bottom of the page, it says: "Look
9  up Wotty - it is not a mistake"; do you see that?
10      A.   Yes.
11      Q.   What is Wotty?
12      A.   It is a word.
13      Q.   Why is it not a mistake?
14           MS. MARKOE:  Objection.
15           THE WITNESS:  What do you mean, why is it
16 not a mistake?
17 BY MR. FREEDMAN:
18      Q.   This is an e-mail that Dave Kleiman sent
19 to you; is that correct?
20      A.   That is what it appears to be.
21      Q.   Did you know what Dave Kleiman meant when
22 he wrote to you: "Look up Wotty - it is not a mistake"?
23           MS. MARKOE:  Objection.  Answer if you
24 can.
25           THE WITNESS:  I am being told to look up

MAGNA
LEGAL SERVICES

Page 322

1 the word "Wotty".
2 BY MR. FREEDMAN:
3     Q.   Did you know what Dave Kleiman meant when
4 he told you this?
5     A.   Yes, he asked me to look up the word
6 "Wotty."
7     Q.   Did you understand the implication of
8 what that meant?
9     A.   Yes, it meant I would go to probably
10 volume 20 of the Oxford greater dictionary.
11     Q.   Dr. Wright, I mean what Dave Kleiman
12 meant when he -- let me phrase it another way.  Why did
13 Dave Kleiman want you to look up the word "Wotty"?
14         MS. MARKOE:  Objection.  Answer if you
15 can.
16         THE WITNESS:  You are asking me why
17 someone else asked me to look up something.
18 BY MR. FREEDMAN:
19     Q.   Do you know?  If the answer is no, then
20 just say no.
21     A.   Because he did silly things like that and
22 so did I.  So, my suspicion is without looking it up and
23 trying to figure out, because I cannot remember what
24 Wotty actually is, I would need to look up the word
25 again and try and guess what he was saying.

Page 323

1         MR. FREEDMAN:  Can we take a five-minute
2 break.  I need a drink of water.
3         MS. MARKOE:  Sure.
4         THE VIDEOGRAPHER:  Going off the record.
5 The time is 18.50.
6         (A Short Break)
7         THE VIDEOGRAPHER:  This is the beginning
8 of video card number 7, volume 1, in the video
9 deposition of Dr. Craig Wright.  Going on the record.
10 The time is 19.05.  Thank you.
11 BY MR. FREEDMAN:
12     Q.   Dr. Wright, who is Ian Grigg?
13     A.   Ian Grigg is a person currently involved
14 with the cryptocurrency called EOS.
15     Q.   Have you ever met Ian Grigg?
16     A.   Yes.
17     Q.   Did Ian have any involvement in the
18 development of the Bitcoin protocol or the Satoshi
19 client?
20     A.   Involvement, as I said, is a big word.
21 Ian Grigg wrote a whole lot of things, like Ricardian
22 contracts.  I have used some of Ian Grigg's writings.
23 I have used contacts I got from Ian.  I have used other
24 such things.  Bitcoin was not developed because of Ian
25 but I used some of the things that Ian had published.

Page 324

1     Q.   Did you converse directly with Ian before
2 the public posting on the Satoshi client?
3         MS. MARKOE:  Objection, but you can
4 answer.
5         THE WITNESS:  I talked to Ian in the
6 '90s, which had nothing to do with Bitcoin.
7 BY MR. FREEDMAN:
8     Q.   Did you talk to Ian about -- strike that.
9 Was Ian aware that you were Satoshi Nakamoto?
10         MS. MARKOE:  Objection: foundation.
11         THE WITNESS:  I cannot state his state of
12 mind.
13 BY MR. FREEDMAN:
14     Q.   Did you reveal yourself as Satoshi
15 Nakamoto to Ian Grigg?
16         MS. MARKOE:  Objection.
17         THE WITNESS:  I did not reveal myself to
18 anyone.  It was revealed.
19 BY MR. FREEDMAN:
20     Q.   Did you tell Ian Grigg that you were the
21 creator of Bitcoin?
22         MS. MARKOE:  Objection.
23         THE WITNESS:  I did not tell anyone until
24 this year that I was the creator of Bitcoin.
25 BY MR. FREEDMAN:

Page 325

1     Q.   Do you know when Ian Grigg came to learn
2 that you were Satoshi Nakamoto?
3         MS. MARKOE:  Objection.
4         THE WITNESS:  Strike the last one.
5 I have talked to my wife, but that is a different
6 matter, and I have talked to Dave, so they are anyones,
7 but, I mean, outside of the people that we are not
8 talking about, generally, in public, I did not talk to
9 anyone.  Ian Grigg came to believe that some time on his
10 own.  I do not remember the exact timing of that.
11 I know I had been talking to him about Bitcoin before
12 all the outing, etcetera.  I do not know when he decided
13 that I was.
14 BY MR. FREEDMAN:
15     Q.   Do you know whether Ian Grigg knew Dave
16 Kleiman?
17     A.   I believe he did.  I do not know.
18     Q.   Do you know whether Ian Grigg and Dave
19 Kleiman had any direct correspondence?
20     A.   I do not know.  Dave was known by
21 practically everyone in the industry.
22     Q.   To your best knowledge, does Ian Grigg
23 have any personal knowledge concerning the use of the
24 Satoshi e-mail addresses?
25     A.   I do not know what Ian knows.  I have not

MAGNA
LEGAL SERVICES

1    talked to Ian since he started bloody EOS.

2        Q.    When you first met Joseph Vaughn Perling,

3    did you introduce yourself as Satoshi Nakamoto?

4        A.    I do not remember what I said I was.

5    I used a number of silly pseudonyms in the past, Satoshi

6    being one of them, Toshi being another one, Toshi Gati

7    being another one.  Yes, I used a lot of Japanese

8    pseudonyms.

9        Q.    Did Mr. Vaughn Perling have any

10   involvement in the development of the Satoshi client?

11           MS. MARKOE:  Objection.

12           THE WITNESS:  I do not know what he did

13   online.  I believe he probably did.  He was very

14   interested in this.  He was one of the reasons that

15   I stayed secret as long as I did.

16   BY MR. FREEDMAN:

17       Q.    Mr. Vaughn Perling knew you were Satoshi

18   before the world did?

19           MS. MARKOE:  Objection.

20           THE WITNESS:  That is not what I said.

21   BY MR. FREEDMAN:

22       Q.    Did Mr. Vaughn Perling know you were

23   Satoshi Nakamoto before the world did?

24           MS. MARKOE:  Objection.

25           THE WITNESS:  I do not know.

1    BY MR. FREEDMAN:

2        Q.    Do you know whether Mr. Vaughn Perling

3    knows Uyen Nguyen?

4            MS. MARKOE:  Objection.

5            THE WITNESS:  I believe he does.

6    BY MR. FREEDMAN:

7        Q.    Do you know when they came to meet?

8        A.    I do not know that.

9        Q.    Do you know whether Mr. Vaughn Perling

10   knows about the Tulip Trust?

11       A.    I believe he does.

12       Q.    Is Mr. Vaughn Perling a trustee of the

13   Tulip Trust?

14       A.    No, he is not.

15       Q.    Is he a trustee of any trust related to

16   you?

17       A.    No.

18       Q.    Do you know a gentleman named G Mark

19   Hardy?

20       A.    G Mark Hardy?  The name is familiar.

21       Q.    Do you ever e-mail with him?

22       A.    If I have in the past, I do not any more.

23       Q.    Do you know whether G Mark Hardy is a

24   trustee of any trust related to you?

25       A.    He is not.  Oh, Mark Hardy he is from the

1    tax office.

2        Q.    No, this is a different Mark Hardy.  G

3    Mark Hardy I am talking about.

4        A.    G Mark Hardy?

5        Q.    Did Nick Szabo have any involvement in

6    the development of the Bitcoin protocol?

7            MS. MARKOE:  Objection.

8            THE WITNESS:  Nick Szabo ----

9    BY MR. FREEDMAN:

10       Q.    Let me clarify that though before, and I

11   do not mean that you used his prior work.  I mean, did

12   Nick Szabo have any direct involvement in the programing

13   of the Satoshi client?

14           MS. MARKOE:  Objection.  You can answer

15   if you can.

16           THE WITNESS:  Nick Szabo could not

17   program himself out of a wet paper bag if he was given

18   his children about to be hung and he had to save himself

19   by getting out of the wet paper bag, and having to type

20   a simple one-line C code.  He did not have anything to

21   do with Bitcoin.  He does not understand Bitcoin.  He

22   has no clue about what Bitcoin is, how it works or

23   anything more.  He is probably the most clueless guy who

24   has latched on to Bitcoin ever.

25   BY MR. FREEDMAN:

1        Q.    Am I understanding you correctly, that

2    Satoshi Nakamoto would have to have a deep understanding

3    of C computer language?

4            MS. MARKOE:  Objection.

5            THE WITNESS:  C++.

6    BY MR. FREEDMAN:

7        Q.    C++; is that correct?

8        A.    Yes.

9            MS. MARKOE:  Objection.

10   BY MR. FREEDMAN:

11       Q.    Did you ever e-mail with Jeff Garzik

12   about the Satoshi client?

13       A.    Yes.

14       Q.    Before it was released or after it was

15   released?

16       A.    I do not believe Jeff was e-mailed before

17   it was released.  I do not think he was on that list.

18       Q.    Did there come a time -- strike that.

19   Did Mr. Garzik learn you were Satoshi before the world

20   learned you were Satoshi?

21           MS. MARKOE:  Objection.

22           THE WITNESS:  I do not know.  I did not

23   ever tell him.

24   BY MR. FREEDMAN:

25       Q.    Did you ever discuss the amount of

MAGNA ▸
LEGAL SERVICES

| Page 330 | Page 331 |
|---|---|

**Page 330**

1  Bitcoin you had with Mr. Garzik?
2      MS. MARKOE: Objection.
3      THE WITNESS: No.
4  BY MR. FREEDMAN:
5      Q.   Did you ever discuss the Tulip Trust with
6  Mr. Garzik?
7      A.   No.
8      MS. MARKOE: Objection.
9  BY MR. FREEDMAN:
10     Q.   Did you discuss any trust with
11 Mr. Garzik?
12     A.   No.
13     Q.   Do you know whether Mr. Garzik and Dave
14 Kleiman had any direct communication between 2009 and
15 2013?
16     A.   Dave was on IRC groups that Jeff was on.
17 More than that, I could not say.
18     Q.   Have you ever met with Gavin Andresen?
19     A.   I have.
20     Q.   Did you ever speak with Gavin Andresen
21 about you being Satoshi Nakamoto?
22     MS. MARKOE: Objection. You can answer.
23     THE WITNESS: I did.
24     MS. MARKOE: Craig, just give me a minute
25 to object before you answer so we are not driving the

**Page 331**

1  court reporter crazy, please.
2      THE WITNESS: Sorry, yes.
3  BY MR. FREEDMAN:
4      Q.   Did you ever discuss the amount of
5  Bitcoin that you have with Mr. Andresen?
6      MS. MARKOE: Objection. You may answer.
7      THE WITNESS: No.
8  BY MR. FREEDMAN:
9      Q.   Did you ever discuss the Tulip Trust with
10 Mr. Andresen?
11     A.   I do not believe so.
12     Q.   Did you ever discuss any other trusts
13 with Mr. Andresen?
14     MS. MARKOE: Objection. You may answer.
15     THE WITNESS: No, and I do not discuss my
16 trusts with anyone outside my family, unless I am
17 required to by law.
18 BY MR. FREEDMAN:
19     Q.   Do you know if Uyen Nguyen ever reached
20 out to Mr. Andresen?
21     MS. MARKOE: Objection: foundation.
22     THE WITNESS: No.
23 BY MR. FREEDMAN:
24     Q.   Do you know if she would have a reason to
25 reach out to Mr. Andresen?

| Page 332 | Page 333 |
|---|---|

**Page 332**

1      MS. MARKOE: Objection: foundation.
2      THE WITNESS: I do not know.
3  BY MR. FREEDMAN:
4      Q.   Doctor, I want to direct your attention
5  the Australian Tax Office investigations. How many
6  investigations were undertaken by the tax office of
7  yourself personally?
8      A.   I do not know.
9      Q.   How many investigations were undertaken
10 by the tax office of your companies?
11     A.   I do not know.
12     Q.   Are you -- let me rephrase that question.
13 How many investigations are you aware that the tax
14 office has conducted against yourself?
15     A.   I do not know. I do not know.
16     Q.   And are you aware of how many
17 investigations the tax office has conducted against your
18 companies?
19     A.   No. What I do know is, for instance, on
20 myself, they have taken me to court multiple times, and
21 multiple times they have been forced basically to
22 apologise. Multiple times they have doctored records.
23 They have constructed records. They have done anything
24 possible, since the time I told them about Bitcoin,
25 before it was called Bitcoin, to basically find

**Page 333**

1  something to get me on. Because little things like
2  where I said Bitcoin means we do not need as many
3  auditors because it gets rid of fraud, means that they
4  do not like what it is.
5      Q.   Dr. Wright, you swore to the court in the
6  Southern District of Florida that you do not have any
7  Australian Tax Office documents; do you recall that?
8      A.   No, I do not. Can you show me the
9  document.
10     MR. FREEDMAN: Sure. Let us take a
11 break. I will go get it for you.
12     THE VIDEOGRAPHER: Going off the record.
13 The time is 19.15.
14     (A Short Break)
15 (Plaintiff's Exhibit 9 marked for identification)
16     THE VIDEOGRAPHER: Going back on the
17 record. The time is 19.31. Thank you.
18 BY MR. FREEDMAN:
19     Q.   Dr. Wright, before the break we were
20 discussing a sworn statement you submitted to the court,
21 and now you have what has been marked as Plaintiff's
22 Exhibit 9.
23     A.   I do.
24     Q.   If you would turn, please, to page 4.
25     A.   Page 4 of 7.

Page 334

```
1        Q.    Okay.  If you read for me ----
2             MS. MARKOE:  And that is at the top;
3    correct?
4    BY MR. FREEDMAN:
5        Q.    Do you recognise this as your sworn
6    statement?
7        A.    I do.
8        Q.    Do you recognise that at the very
9    beginning of this statement you swore: "I, Craig
10   Wright, declare under penalty of perjury under the laws
11   of United States of America that the following is true
12   and correct"?
13       A.    I do.
14       Q.    And if you see on page 4 of this
15   document, paragraph 18, can you read that for me?
16       A.    Sorry, number 19?
17       Q.    Number 18.
18       A.    18.  "I have no documents in my
19   possession from any ATO investigation.  To the extent
20   that my attorneys have any documents from any ATO
21   investigation related to me, those documents would be
22   located in Australia."
23       Q.    So, Dr. Wright, here you have sworn that
24   you have no documents in your possession from any ATO
25   investigation; is that correct?
```

Page 335

```
1        A.    That is correct.
2        Q.    But that is not entirely true; is that
3    not right?
4             MS. MARKOE:  Objection.
5             THE WITNESS:  I am sorry, I object to the
6    fact personally that you are implying that I have
7    perjured myself or lied.  I do not have documents from
8    any ATO investigation at all.  I do not have them now;
9    I did not have them in the past.
10   BY MR. FREEDMAN:
11       Q.    Dr. Wright, are you aware that your
12   lawyers have produced documents from the Australian Tax
13   Office investigation that they collected from your
14   house?
15            MS. MARKOE:  Objection.
16            THE WITNESS:  No, they have corporate
17   documents and e-mails back and forwards from the ATO.
18   You are saying that I have investigation files.  I do
19   not.
20   BY MR. FREEDMAN:
21       Q.    Okay, so I am trying to understand
22   exactly what you have and what you do not have.  Can you
23   tell me what it is you do have in regards to the
24   Australian Tax Office investigation?
25       A.    I have what my lawyers have, which is not
```

Page 336

```
1    ATO documents, or documents from an investigation.
2        Q.    In this you say that to the extent that
3    your attorneys have documents from the ATO, those
4    documents would be located in Australia.  Which
5    attorneys are those?
6             MS. MARKOE:  You can identify the names
7    of the attorneys.  You cannot identify the contents of
8    the conversations.
9             THE WITNESS:  I do not know which
10   documents would be with which attorneys.
11   BY MR. FREEDMAN:
12       Q.    You swore that you have no documents in
13   your possession from any ATO investigation.  What
14   documents did you mean that you do not have and what
15   documents do you have?
16            MS. MARKOE:  Objection: compound.
17   BY MR. FREEDMAN:
18       Q.    What documents do you not have in your
19   possession from the ATO?
20            MS. MARKOE:  Objection.
21       A.    I am a scientist, I cannot answer a
22   negative.  I do not know what documents I do not have.
23   BY MR. FREEDMAN:
24       Q.    You said: "I have no documents in my
25   possession from any ATO investigation."  What did you
```

Page 337

```
1    mean?
2        A.    An ATO investigation is where a group of
3    federal investigators decide to investigate.  That would
4    be material from what the ATO has.  That would be things
5    such as records of the ATO.  They can be given to you
6    after an investigation has happened.  You can ask for
7    them.  For instance, I could have, when I won the case
8    in 2012, asked for records.  I did not.
9        Q.    So you have the ability to ask the
10   Australian Tax Office for records?
11            MS. MARKOE:  Objection: mischaracterises
12   the testimony.
13   BY MR. FREEDMAN:
14       Q.    Do you have the ability to ask the
15   Australian Tax Office for records?
16       A.    I am an Australian citizen and I have my
17   rights under Australian law which includes asking
18   government officials, including freedom of information
19   and personal records, to be delivered to me, yes.
20       Q.    Did you ask for those records to be
21   collected from the Australian Tax Office when responding
22   to discovery requests in this lawsuit?
23            MS. MARKOE:  Objection.
24            THE WITNESS:  No.
25   BY MR. FREEDMAN:
```

MAGNA
LEGAL SERVICES

Page 338

1    Q.   I believe the witness answered the
2  question.  Can you answer again?
3    A.   No.
4    Q.   Dr. Wright, have you asked your attorneys
5  to collect documents from -- have you asked your
6  attorneys whether they hold any Australian Tax Office
7  documents?
8    MR. RIVERO:  Objection.
9    MS. MARKOE:  Objection.  I am instructing
10  the witness not to answer.  Communications between
11  counsel are privileged and are not to be disclosed.
12    MR. FREEDMAN:  Requesting whether or not
13  his lawyers have documents in the investigation?
14    MS. MARKOE:  Your question was:
15  "Dr. Wright, have you asked your attorneys to collect
16  documents ..."  That is ----
17    MR. FREEDMAN:  I disagree, but let me see
18  if I can make it so you do not object.
19    Q.   Dr. Wright, have you contacted your
20  Australian counsel to determine whether they have
21  documents in their possession from an Australian Tax
22  Office investigation?
23    A.   No.
24    MS. MARKOE:  Objection.
25    THE WITNESS:  And nor would I be sort of

Page 339

1  able to at the moment, because I resigned as a director
2  of all those companies before the end of those
3  companies.
4  BY MR. FREEDMAN:
5    Q.   Who took over the directorship after you
6  resigned?
7    MS. MARKOE:  Objection.  You can respond
8  if you recall.
9    THE WITNESS:  That would be in public
10  records.
11  BY MR. FREEDMAN:
12    Q.   So you do not know sitting here today?
13    A.   I do not follow-up these things.  I did
14  not look at the shareholding after I left.  Again, as
15  I said, I really do not care what it is after I have
16  done whatever else, as long as things get run and things
17  happened.  I do not care.  It is magic.
18    Q.   Dr. Wright, have you ever met
19  Ross Ulbricht in person?
20    MS. MARKOE:  Objection.
21    MR. RIVERO:  Can we ask what ----
22    MR. FREEDMAN:  Identification of the
23  witnesses and their knowledge base.
24    MS. MARKOE:  It has already been pretty
25  well established that Ross Ulbricht has no relevance.  I

Page 340

1  will allow him to answer this question.  Tread lightly,
2  please.
3    THE WITNESS:  Yes, once.
4  BY MR. FREEDMAN:
5    Q.   What was that meeting about?
6    MS. MARKOE:  Objection.  You do not need
7  to answer that question.
8  BY MR. FREEDMAN:
9    Q.   Did that meeting involve Bitcoin?
10    MS. MARKOE:  Objection.  You may answer.
11    THE WITNESS:  I mentioned Bitcoin.
12  BY MR. FREEDMAN:
13    Q.   In what way did you mention Bitcoin?
14    MS. MARKOE:  Objection.  I am going to
15  instruct the witness not to answer.  It goes beyond the
16  scope, unless you can point me to something.
17    MR. FREEDMAN:  To determine
18  Ross Ulbricht's knowledge.  It is clearly within the
19  scope.
20    MS. MARKOE:  It talks about his role in
21  the subject matter, not about his ----
22    MR. FREEDMAN:  No, no.  Where is the
23  list?  6.  Sorry, that is the wrong one, my apologies.
24  It is 1.  So, the question was:  "In what way did you
25  mention Bitcoin?"

Page 341

1    MS. MARKOE:  Right, and I am instructing
2  him ----
3    MR. FREEDMAN:  You are instructing him
4  not to answer.
5    MS. MARKOE:  I am instructing him not to
6  answer.
7  BY MR. FREEDMAN:
8    Q.   When did this meeting take place?
9    MS. MARKOE:  If you can recall, you can
10  answer.
11    THE WITNESS:  I do not recall exactly.
12  It was at the Bondi Icebergs, so therefore I pretty much
13  say not in the middle of winter.
14  BY MR. FREEDMAN:
15    Q.   Do you know what year it was?
16    A.   It would be 2010 off the top of my head.
17    Q.   Did Dave know you discussed Bitcoin with
18  Ross Ulbricht?
19    MS. MARKOE:  Objection.
20    THE WITNESS:  Dave's not my wife.  I do
21  not sit there and go, "Hey, Dave, I discussed something
22  with this guy who one day will be famous for doing shit
23  because he is a criminal."
24  BY MR. FREEDMAN:
25    Q.   I just asked the question, Dr. Wright,

MAGNA ▶
LEGAL SERVICES

Page 342

```
 1   whether or not Dave knew you had spoken with Ross
 2   Ulbricht about Bitcoin.  If the answer is no, it is no.
 3   If it is yes, it is yes.  Please answer the question?
 4              MS. MARKOE:  Objection ----
 5              THE WITNESS:  I do not know.
 6              MS. MARKOE:  ---- you are asking him to
 7   get into someone else's head.  He can answer if he
 8   knows.
 9              THE WITNESS:  I do not know.
10   BY MR. FREEDMAN:
11        Q.    You do not know; okay.  Did you ever tell
12   him you spoke to Ross Ulbricht about Bitcoin?
13        A.    No.  I did not like Ross Ulbricht.
14        Q.    Why did you not like Ross Ulbricht?
15              MS. MARKOE:  Objection.
16              MR. FREEDMAN:  He said he did not like
17   him.
18              MS. MARKOE:  I am going to instruct the
19   witness not to answer.
20   BY MR. FREEDMAN:
21        Q.    Have you ever communicated with Ross
22   Ulbricht by e-mail or other communications protocol?
23              MS. MARKOE:  Objection.  You may answer.
24              THE WITNESS:  No, I did not like him.
25   I did not really try and communicate with people I do
```

Page 343

```
 1   not like.
 2   BY MR. FREEDMAN:
 3        Q.    Did you use Liberty Reserve with Dave
 4   Kleiman?
 5        A.    No.
 6        Q.    Did you ever send money to Dave Kleiman
 7   through Liberty Reserve?
 8        A.    I sent money to a -- well, I instructed a
 9   group to send money to a group that Dave Kleiman was
10   involved.
11        Q.    Which group did you instruct?
12        A.    Craig Wright R&D.
13        Q.    Which one?
14        A.    Panama.
15        Q.    And you instructed Craig Wright R&D
16   Panama to send money to who?
17        A.    Dave's company in Panama.
18        Q.    Which was?
19        A.    I cannot remember off the top of my head.
20   I would need to see the record.
21        Q.    Where do those records exist?
22              MS. MARKOE:  Objection.  You may answer
23   if you know.
24              THE WITNESS:  I believe the lawyers have
25   taken a copy.
```

Page 344

```
 1   BY MR. FREEDMAN:
 2        Q.    How many times did you instruct Craig
 3   Wright R&D to send money to Dave's company in Panama?
 4              MS. MARKOE:  Objection.  You can answer
 5   if you know.
 6              THE WITNESS:  I do not know.
 7   BY MR. FREEDMAN:
 8        Q.    How much money did you instruct Craig
 9   Wright R&D to send to Dave's company in Panama?
10              MS. MARKOE:  Objection.  Is this at a
11   particular time or is this overall or over the course of
12   a period time?  Your question is unclear.
13   BY MR. FREEDMAN:
14        Q.    You said that you instructed Craig Wright
15   R&D, so at all times, how many times -- well, you know
16   what, strike that.  How much money in total did you
17   instruct Craig Wright R&D to transfer to Dave's company
18   in Panama in the transaction you referenced earlier?
19              MS. MARKOE:  Objection.  You can answer
20   if you understand.
21              THE WITNESS:  I do not remember the exact
22   amount.  It was like, I think it was about US$5 million.
23   BY MR. FREEDMAN:
24        Q.    Why did you have Craig Wright R&D make
25   this transfer?
```

Page 345

```
 1        A.    To have machines built.
 2        Q.    What type of machines?
 3        A.    HPCs.
 4        Q.    What purpose were you building HPCs for?
 5        A.    To test scaling.
 6        Q.    Scaling for what?
 7        A.    Bitcoin.
 8        Q.    And when you say scaling, does that mean
 9   bigger blocks?
10        A.    That is the only way Bitcoin scales.
11        Q.    Did Dave make the machines?
12        A.    No.
13              MS. MARKOE:  Objection.
14   BY MR. FREEDMAN:
15        Q.    Why not?
16              MS. MARKOE:  Objection.
17   BY MR. FREEDMAN:
18        Q.    Do you know why Dave did not make the
19   machines?
20        A.    Because to make the machines would
21   basically mean that you have a company that goes out
22   there and smelts iron and forms that into shapes and
23   then has silicon fabs and ----
24        Q.    Dr. Wright, did he cause them to be made?
25   I think you understood what I meant.
```

MAGNA
LEGAL SERVICES

Page 346

1    MS. MARKOE:  Objection.  You cannot
2  testify as to what our client understood.
3    MR. RIVERO:  And you cannot cut-off the
4  answer.
5  BY MR. FREEDMAN:
6    Q.    Did Dave cause the machines to be built?
7    A.    You want to know if Dave or Dave's
8  company bought them and I am going to have to interrupt
9  this way because I cannot stand this any more.  He did
10  not cause them to be built.  That would be an incorrect
11  characterisation, because companies make machines and
12  then they sell them.  He caused a number of machines to
13  be sent through grey markets from SGI, and then people
14  put them together.
15    Q.    And what happened to those machines?
16    A.    The last I know of, the American
17  government has them.
18    Q.    How did the American government come to
19  possess the machines?
20    A.    The American government started a number
21  of investigations.  One was into High Secured where they
22  have arrested the founders, another was into Arthur
23  Budovsky in Liberty Reserve, and due to money laundering
24  charges, a lot of people were arrested.
25    Q.    So, of the 5 million that you caused to

Page 347

1  be transferred, do you know approximately how much of it
2  Dave Kleiman spent on purchasing those machines?
3    A.    All of my machines ended up costing
4  around 60 million.
5    Q.    So the full 5 million was spent?
6    MS. MARKOE:  Objection:  mischaracterises
7  the testimony.
8  BY MR. FREEDMAN:
9    Q.    Was the full 5 million spent?
10    MS. MARKOE:  Objection.  You may answer
11  if you understand.
12    THE WITNESS:  I would assume so, but
13  I did not actually do that, and Dave obviously managed
14  to get something somewhere and other people got money
15  together to put, well, all those machines together.  So,
16  therefore, someone spent money.  Either that or there is
17  a debt, and which I do not care because it is not my
18  company.
19  (Plaintiff's Exhibit 10 marked for identification)
20  BY MR. FREEDMAN:
21    Q.    Mr. Wright, I have handed you what has
22  been marked now as Plaintiff's Exhibit 10.
23    A.    Yes.
24    Q.    Do you recognise what these are?
25    A.    Yes, they are a statement of claim.

Page 348

1    Q.    Who is the plaintiff in this action?
2    A.    The plaintiff is Craig Steven Wright.
3    Q.    Is that yourself?
4    A.    Yes, via ---
5    MS. MARKOE:  Objection.  You can answer.
6    THE WITNESS:  Yes, via a business trust.
7  BY MR. FREEDMAN:
8    Q.    What business trust?
9    A.    The one associated with ABN 97 481 146
10  384.
11    Q.    Can you go with me to page 3?
12    MS. MARKOE:  Are we talking about on the
13  top?
14    MR. FREEDMAN:  On the top.
15    MS. MARKOE:  On the top.
16  BY MR. FREEDMAN:
17    Q.    Paragraph 1 says that "the plaintiff",
18  Craig Steven Wright, "provided contract labour services
19  to the defendant."  Do you see that?
20    A.    I see that.
21    Q.    What were the labour services you
22  provided?
23    A.    The document is badly drafted.
24    Q.    Who drafted this document?
25    A.    Myself.

Page 349

1    Q.    What does it mean to say, or why is it
2  badly drafted?
3    A.    Because some of the things were in error,
4  it was rushed, I was trying to get through a document so
5  that I could simply just state the intellectual property
6  that I had and start moving forward.
7    Q.    So, is the sentence, "Between 2011 and
8  2013 the plaintiff provided contract labour services to
9  the defendant" incorrect?
10    MS. MARKOE:  Objection.  What topic are
11  we talking about now?
12    MR. FREEDMAN:  These are the Australian
13  tax proceedings -- sorry, the Australian court
14  proceedings.
15    MS. MARKOE:  The Australian court
16  proceedings, so that would be number 7, allows inquiry
17  into individuals and entities identified in the
18  proceedings, along with what documents exist relevant to
19  the lawsuit and where those documents are held.  These
20  questions do not address those topics.
21    MR. FREEDMAN:  He is saying the contract
22  was badly drafted, so I am trying to understand what it
23  was about so I can ask ----
24    THE WITNESS:  I did not say contract.
25    MR. FREEDMAN:  Sorry, statement of claim.

MAGNA ▶
LEGAL SERVICES



Page 350

```
1          MS. MARKOE:  Objection.  I am going to
2    instruct him not to answer.  Your inquiry can be limited
3    to those specific topics.
4          MR. FREEDMAN:  Okay.
5      Q.   Can you go down to paragraph 5, please.
6      A.   Yes.
7      Q.   "By contract dated" -- can you read
8    paragraph 5 for me, please?
9      A.   "By contract dated 8 January 2009, the
10   Defendant agreed to pay the Plaintiff for property and
11   consulting services to complete research.  The contract
12   was bonded against the intellectual property of the
13   defendant."
14     Q.   Where is that contract between Craig
15   Steven Wright and W&K Info Defense Research?
16         MS. MARKOE:  Objection.  You may answer.
17         THE WITNESS:  As stated, there was an
18   error in drafting.
19   BY MR. FREEDMAN:
20     Q.    So there is no contract?
21         MS. MARKOE:  Objection: mischaracterises
22   the testimony.  You may answer.
23         THE WITNESS:  No, I have the wrong date.
24   BY MR. FREEDMAN:
25     Q.    What date was it supposed to be?
```

Page 351

```
1      A.   I do not remember the date of the
2    contract.
3      Q.   Is it one of the contracts we looked at
4    today?
5      A.   Yes.
6      Q.   Is there anything else wrong with the
7    document?
8          MS. MARKOE:  Objection.
9          THE WITNESS:  I do not know.  I would
10   need to read through everything line-by-line and match
11   it all up.
12   BY MR. FREEDMAN:
13     Q.   Can you look at paragraph 7, please.
14     A.   Yes.
15     Q.   Can you read it for me?
16     A.   "The plaintiff conducted a project for
17   the development of a Bitcoin SDK in exchange".
18     Q.   What is SDK?
19     A.   Software development kit.
20     Q.   Do any documents exist as to this
21   development, software development kit?
22     A.   Again, this is an error.  The plaintiff
23   is mixed up with the defendant.
24     Q.   So, W&K conducted a project for the
25   development of the Bitcoin SDK?
```

Page 352

```
1      A.   Again what you are doing is the initial
2    horrible, horrible statement of claim that I had to go
3    into court and have multiple other documents done to
4    correct because we were not expecting anything fought,
5    it was just to basically end a contract saying anything
6    that W&K has they can keep; the things I have got,
7    I keep.  We all move on, happy, the end.
8      Q.   So is it fair to say that you were trying
9    to get this done and it is not accurate?
10         MS. MARKOE:  Objection.
11         THE WITNESS:  This is part of a
12   proceedings.
13   BY MR. FREEDMAN:
14     Q.   Why did you file a statement of claim
15   that was inaccurate?
16         MS. MARKOE:  Objection.  I am going to
17   instruct the witness not to answer.  You are limited in
18   this deposition.  You are going to get another bite at
19   this apple in terms of a full merits deposition of
20   Dr. Wright.  Move on.  Limit your questions to the
21   topics you identified to the court and the court
22   approved.
23   BY MR. FREEDMAN:
24     Q.   Can you go to page 9, please, for me and
25   paragraph 1.
```

Page 353

```
1      A.   And again, the same errors were made when
2    these were filed.
3      Q.   I need to know if any documents exist, so
4    I am trying to understand what it is really supposed to
5    say.  So you say it is an error.  What should it say?
6      A.   I do not know what the court may or may
7    not have document-wise.  A lot of documents were
8    produced for the court.  A lot of changes were made.
9    The register required that I went back several times and
10   corrected things.  I handed all those documents to the
11   register.  I do not know what the court has or has not
12   kept.
13     Q.   I want to know what you have kept?
14     A.   If my lawyers have it, I have it.
15     Q.   Which lawyers would this be?
16     A.   These ones right here.
17     Q.   Can you go down to paragraph 3, please.
18   You said -- can you read paragraph ----
19         MR. RIVERO:  This I think ----
20         MR. FREEDMAN:  Let us go off the record.
21         THE VIDEOGRAPHER:  Going off the record.
22   The time is 19.53.
23         (A Short Break)
24         THE VIDEOGRAPHER:  Going back on the
25   record.  The time is 19.55.
```

MAGNA
LEGAL SERVICES

Page 354

```
1    BY MR. FREEDMAN:
2        Q.    Can I direct your attention to paragraph
3    3.
4        A.    Yes.
5        Q.    And can you read that for me?
6        A.    Again, this is the same error as before.
7    The wrong date is in this version of the statement of
8    claim.
9        Q.    Did you take the 27th October 2008 date
10   from a document?
11       A.    There is no 27th October 2008 document
12   that I know of.  It could have been taken from a
13   different document and put in in error.  This does not
14   refer to that document.
15       Q.    Can you go to 6, please, on page 10 at
16   the top.
17       A.    Yes.
18       Q.    Can you read 6 for me?
19       A.    "In May 2013 the primary director of the
20   defendant died leaving the project not transferred to
21   the plaintiff and not returning funds.  These funds were
22   rated as: a. TTA 01 ----"
23       Q.    That is fine.  Just 6, not the a, b, c,
24   d.  There is then a list of funds below that in a, b, c
25   and d; is that not correct?
```

Page 355

```
1        A.    Yes.
2        Q.    Do any documents exist that validate that
3    these funds were provided?
4             MS. MARKOE:  Objection: mischaracterises
5    the document and what it states.  You can answer.
6             MR. FREEDMAN:  You can answer.
7             THE WITNESS:  Basically, this says funds
8    were meant to be given from Department of Homeland
9    Security if Dave had gone through with things.
10   Unfortunately Dave did not continue with the filing
11   after he went into hospital, so the payment lapsed.
12   This was not funds from me, this was funds that would
13   have been completed.  I completed those things, the
14   papers are published, and the other material was
15   produced.
16   BY MR. FREEDMAN:
17       Q.    You said the payment lapsed.  What
18   payment are you referring to?
19             MS. MARKOE:  Objection.  You can answer.
20             THE WITNESS:  The Department of Homeland
21   Security fund that Dave was there, which was because he
22   was a veteran.  None of that can be filed on a veteran
23   who is dead, and I believe part of the problem was he
24   did not file any taxes at all in any of the companies,
25   which invalidated any of the things he was going for.
```

Page 356

```
1    BY MR. FREEDMAN:
2        Q.    Could you look at 8 for me?
3        A.    Yes.
4        Q.    Can you read it for the record?
5        A.    "The contract set the interest rate at 8%
6    calculated annually."
7        Q.    Can you tell me what contract sets the
8    interest rate at 8% annually?
9             MS. MARKOE:  Objection.  You may answer.
10            THE WITNESS:  When you are talking about
11   New South Wales, the New South Wales contract rate was
12   about 8%.  It fluctuates between 7 and 9%.  This is a
13   court proceeding-type thing and if you are talking about
14   setting government mandated things we have high interest
15   rates in Australia because we have a crappy banana
16   republic-type economic.
17   BY MR. FREEDMAN:
18       Q.    So, "the contract" is not a reference to
19   the actual contract that is between you and W&K?
20            MS. MARKOE:  Objection.  You may answer.
21            THE WITNESS:  When you are stating that
22   certain things apply as in jurisdiction in Australia and
23   this sort of X, Y, Z, then it also implies interest,
24   which, when you are putting interest -- when you are
25   doing this sort of stuff, has to be put into court for
```

Page 357

```
1    statement of claim.
2    BY MR. FREEDMAN:
3        Q.    Can you look at 13 for me, please?
4        A.    Yes.
5        Q.    Can you read it for the record?
6        A.    "The IP is software and code used by the
7    US Military, [Department of Homeland Security] and other
8    associated parties."
9        Q.    Do any documents exist that substantiate
10   that this ----
11       A.    I will have to take this offline.
12       Q.    Does this relate to the matters you want
13   to speak to the court about in camera?
14       A.    Yes.
15       Q.    Can you go to page 13 for me.  The
16   signature in the middle of the page, is that your
17   signature?
18       A.    Yes.
19       Q.    Can you go to page 6 for me.  Is that
20   signature in the middle of the page your signature?
21       A.    Yes.
22            MR. FREEDMAN:  I need a drink and a
23   bathroom break.  If we could ----
24            THE VIDEOGRAPHER:  Going off the record.
25   The time is 19.59.
```



Page 358

1	(A Short Break)
2	THE VIDEOGRAPHER:  Going back on the
3	record.  The time is 20.09.  Thank you.
4	THE JUDGE: (By Telephone) Okay, counsel,
5	what can I do for you today?
6	MR. FREEDMAN:  Your Honour, this is
7	Mr. Freedman.  We had a couple of questions that the
8	witness has either just refused to answer or has been
9	instructed not to answer, and there is one particular
10	issue that I will let defence counsel talk to you about,
11	but ----
12	THE JUDGE:  Okay.
13	MR. FREEDMAN:  ---- if I could raise the
14	questions that the witness has refused to answer or has
15	been instructed not to answer.  There are only a couple
16	of them.
17	THE JUDGE:  Sure.
18	MR. FREEDMAN:  We asked Dr. Wright --
19	and, your Honour, just so you are aware Dr. Wright is
20	here in the room.
21	THE JUDGE:  Okay.  Hello, Dr. Wright.
22	THE WITNESS:  Hello.  How are you?
23	MR. FREEDMAN:  We asked Dr. Wright how
24	much Bitcoin he mined from January of 2009 until
25	December of 2010, which was his testimony on the time he

Page 359

1	mined Bitcoin.  He was instructed not to answer the
2	question.  We believe this goes to the tracing forward
3	issue and we were told this morning that we were not
4	receiving the list of Bitcoin wallets we were supposed
5	to receive before the deposition.  We never got the
6	list.
7	THE JUDGE:  Okay, so I am clear, the
8	question is, how much Bitcoin did he mine in 2009 and
9	2010?
10	MR. FREEDMAN:  Correct.  That is the
11	first question.
12	THE JUDGE:  Why do you not give me all
13	the questions.  That way I can have Mr. Rivero or
14	Ms. Markoe respond to all of them, then I will have you
15	address all of them and then I will come to a conclusion
16	about all of them.
17	MR. FREEDMAN:  Sure.
18	MR. RIVERO:  Judge, just before the
19	listing -- this is Andrés Rivero -- I believe by
20	telephone as well we have Mr. Brenner and Mr. McAdams
21	who are lawyers at Boies Schiller and, at least as of
22	some point during the deposition, the plaintiff Ira
23	Kleiman also by telephone.
24	MR. BRENNER:  That is right.  This is
25	Andrew Brenner for Boies Schiller by telephone.

Page 360

1	MR. MCADAMS:  John McAdams by telephone.
2	MR. KLEIMAN:  (By Telephone) Ira Kleiman.
3	THE JUDGE:  Thank you very much.
4	MR. FREEDMAN:  The second question, your
5	Honour, was, did you ever tell Dave Kleiman how much
6	Bitcoin you had mined, and the witness was instructed
7	not to answer.  The witness informed us ----
8	THE JUDGE:  I am sorry, was there a
9	timeframe attached to that question?  During what time
10	period did he mine it or just general?
11	MR. FREEDMAN:  I would have to check the
12	record, your Honour, but the question is just from 2009
13	until 2010, because Dr. Wright's testimony was that he
14	stopped mining and then did not begin again until 2016
15	when Dave Kleiman was already dead.
16	THE JUDGE:  Okay.
17	MR. FREEDMAN:  The third question was
18	that Dr. Wright had testified that his ex-wife, Lynne
19	Wright, had been on e-mail communications with Dave
20	Kleiman about the founding of W&K, but then refused to
21	answer any questions about Lynne Wright due to -- and if
22	I am misstating this please correct me defence
23	counsel -- an oath that he filed with the courts in
24	Australia not to talk about his ex-wife.
25	THE JUDGE:  Okay.

Page 361

1	MR. FREEDMAN:  And then Dr. Wright also
2	refused to answer any questions about his current wife,
3	Ms. Ramona Watts, who is listed as a director of many
4	different companies.  He was not instructed not to
5	answer, he just refused to answer the questions.
6	THE JUDGE:  Okay.
7	MR. FREEDMAN:  Those are the four
8	questions that do not touch on this other issue.
9	Briefly, there are other questions that Dr. Wright has
10	refused to answer, on national security grounds, and
11	defence counsel has requested an in camera discussion
12	with you about them.  I will let them talk to that, but
13	those first four are the questions the plaintiff is
14	raising now.
15	THE JUDGE:  Again, so our record is
16	clear, the plaintiff is asking me to compel Dr. Wright
17	to provide truthful answers to those four areas of
18	questioning?
19	MR. FREEDMAN:  Correct.
20	THE JUDGE:  Okay.  Let me hear from
21	counsel for Dr. Wright.
22	MS. MARKOE:  Your Honour, this is Zaharah
23	Markoe.  How are you this afternoon?  For us very late
24	in the evening.
25	THE JUDGE:  I am fine, Ms. Markoe.  Thank



Page 362

1  you.  Good afternoon.
2       MS. MARKOE:  Good afternoon.  Your
3  Honour, it is our position that this is a
4  limited-in-scope deposition, primarily targeted at
5  discovery issues, opening doors, closing doors, the
6  location of documents, and the location and
7  identification of witnesses, with some leeway, which we
8  believe we have been more than fair in providing.
9       With regard to the first question, which
10 is how much Bitcoin did Dr. Wright mine between 2009 and
11 2010, that goes beyond the scope.  We allowed him to
12 answer questions about the location of the computers
13 that were used to mine, and we also allowed him to
14 answer questions about whether or not he mined in any
15 way in conjunction with either Dave Kleiman or W&K.  And
16 the answer was there was no mining with Dave Kleiman or
17 with W&K.  Therefore, it is our position that how much
18 he mined on his own between 2009 and 2010 is both beyond
19 the scope and further irrelevant.
20      THE JUDGE:  Okay.  His testimony was that
21 he never mined anything with Mr. Kleiman?
22      MS. MARKOE:  Correct.
23      THE JUDGE:  Okay.
24      MS. MARKOE:  With regard to the second
25 question, did you ever tell Dave Kleiman how much

Page 363

1  Bitcoin you mined between 2009 and 2010, again this is a
2  limited-in-scope deposition, as I understood it.  It is
3  not going to the merits and we believe that that
4  question went too far into the merits, and is not
5  appropriate for this deposition.
6       THE JUDGE:  Okay.
7       MS. MARKOE:  With regard to the questions
8  about Lynne Wright, I believe specifically one of those
9  questions was how did they meet; (a) that is irrelevant
10 and then, (b), Dr. Wright has testified in this
11 deposition that he has in his divorce settlement
12 agreement agreed not to discuss Lynne Wright, so he
13 believes he is bound by that agreement, and that divorce
14 settlement.  With regard to his current wife, his
15 position is that he made an oath to his wife not to
16 discuss her, so he would like to honour that oath.
17 Again, one of the specific questions that was objected
18 to further goes beyond the scope in terms of how did he
19 meet.  These witnesses have already been identified.
20 There is no further information that is required as it
21 relates to this deposition, which again limited in
22 scope.  So, that is my response to those four questions.
23      THE JUDGE:  Let me start off with one or
24 two follow-up questions I have for you.  As to his
25 current wife, Ramona Wright, are you invoking any sort

Page 364

1  of marital privilege under US law or are you simply
2  relying upon some other basis upon which he is legally
3  bound?
4       MS. MARKOE:  I believe it depends on the
5  question.  I think that there were a couple of questions
6  that went into spousal communications, certainly, and
7  again as I said, I think that the question regarding how
8  they met certainly is, (a), irrelevant, and (b) goes
9  beyond the scope of this deposition.
10      THE JUDGE:  Okay, put aside the spousal
11 communications, are you also invoking the spousal
12 testimonial privilege?
13      MS. MARKOE:  Yes.
14      THE JUDGE:  In terms of his ex-wife,
15 Lynne Wright -- and I understand there may be some sort
16 of court proceeding in Australia that he feels bound
17 by -- what is your position as to whether I can order
18 him to do something even if the Australian court has
19 said or his agreement in Australia said that he cannot,
20 even if I have that authority?
21      MS. MARKOE:  It would be our position
22 that you do not have that authority, your Honour,
23 respectfully, of course.
24      THE JUDGE:  That is why I am asking.
25 What about the issue -- we have had so many hearings in

Page 365

1  this case that I do not remember everything, but I do
2  recall that I had ordered the production of a list of
3  Bitcoin.  Was that not done?
4       MS. MARKOE:  Your Honour, you had ordered
5  production of a list of his Bitcoin at a particular
6  point in time or allow us the opportunity to make an
7  objection probably by formal motion as to
8  burdensomeness.  We will probably be filing that motion
9  soon.  There is no such document that exists regarding
10 his list of public addresses at, I believe it was
11 December 31st, 2013, and to compile that list would be
12 incredibly burdensome.  We will be filing a motion to
13 that effect.
14      However, more importantly, with regard to
15 the questions that were at issue in this deposition,
16 they did not relate to addresses.  The questions were
17 about how much Bitcoin Dr. Wright mined and whether he
18 ever told Dave Kleiman how much Bitcoin he mined, and it
19 was our position, and remains our position, that those
20 go beyond the scope of this deposition.
21      THE JUDGE:  Okay.  I have heard you on
22 that.  Let me turn back to Mr. Freedman before I make my
23 rulings.  Mr. Freedman?
24      MR. FREEDMAN:  Your Honour, this is
25 Mr. Freedman.  First of all, I do not know if the court



Page 366

1   recalls, but the court set a deadline on when that
2   motion for burdensomeness would have had to have been
3   filed and it was purposely set in advance so that this
4   issue could be dealt with in advance of this deposition.
5   The motion was never filed.  We thought it would be
6   coming.  The list never came.
7          MS. MARKOE:  I would like a point of
8   clarification.  We had actually asked  Mr. Freedman for
9   an extension of time to file that motion, because that
10  motion was contemplated to be filed after our last
11  hearing.  Mr. Freedman needed to move that last hearing
12  for religious purposes and we accommodated that request.
13  We asked for a similar extension of time with regard to
14  filing our motion.  To be frank, Mr. Freedman never got
15  back with us and I think this is just something that
16  slipped through the cracks.
17         THE JUDGE:  No problem.  I know counsel
18  in this case have a lot going on and are working very
19  hard.  I hear you as to that, but the fact is it was not
20  yet produced and you are asking for leave to file a
21  motion.  I understand the structure of where we are.
22  Mr. Freedman, is there anything else you want to address
23  on the merits of these four things -- areas?
24         MR. FREEDMAN:  Yes, your Honour,
25  absolutely.  As the court is aware, it is our contention

Page 367

1   that the Bitcoin mined by Dr. Wright from 2009, and he
2   testifies until the end of 2010, was done in partnership
3   with Dave Kleiman, and so the amount of Bitcoin that was
4   mined during that period is relevant to plaintiff's
5   claims.  Whether or not he informed Dave Kleiman about
6   this amount is relevant, again, to the partnership and
7   in particular for this deposition, whether those
8   communications still exist anywhere.
9          As to questions about Ms. Wright, there
10  were initial questions about how they had met to
11  determine the timeframe of when she came in.  Obviously
12  I am happy not to ask those questions.  The purpose
13  would be to understand what she knows about and what she
14  does not know about to see whether or not she is a
15  witness for the case.
16         As to questions about Ms. Watts,
17  obviously if counsel invokes spousal privilege that is
18  one thing, but questions were not about communications,
19  they were questions about what companies she was a
20  director on, I believe, and certainly we would explore
21  that topic, but after asking a few questions and being
22  given the same mantra, "I will not discuss anything
23  about my wife", we moved on, so we never got a chance to
24  fully explore those topics.
25         THE JUDGE:  Okay, thank you.  Anything

Page 368

1   further, Mr. Freedman?
2          MR. FREEDMAN:  No, your Honour.
3          THE JUDGE:  Thank you.  Let me rule.  As
4   to the first area, which is enquiring of Dr. Wright
5   under oath how much Bitcoin he mined in 2009/2010,
6   I will defer that.  I will not require him to answer
7   that question today because I believe if I determine
8   that as a proper subject matter area, that can be
9   responded to through a targeted interrogatory and if
10  I determine that it is relevant, I would require him to
11  respond to that interrogatory under oath as if he were
12  asked the question live.  Since that is simply a fairly
13  straightforward question of how much Bitcoin that should
14  not be too burdensome to respond to, but I will deal
15  with that in the context of any motion and I will grant
16  leave for the defence to file a motion relating to
17  providing a list of the Bitcoin, because again obviously
18  if I order him to provide the list you are going to get
19  a lot more detail than just the final number.  So, as to
20  that issue, I will not require him to answer those
21  questions today.
22         As to the area of questioning about
23  whether he told Dave Kleiman how much he mined, I will
24  direct him to answer those questions.  I believe that
25  is not unduly burdensome.  I believe it is relevant to

Page 369

1   the plaintiff's theory that there was a partnership
2   here, and his answers are what they are.  If he told
3   Mr. Kleiman what he was doing he should answer that and
4   if he did not he can answer that.
5          As to the issues relating to the ex-wife,
6   Lynne Wright, I will allow the defence to file a
7   briefing as to whether, as a matter of law, I am
8   precluded from compelling this testimony.  I will not
9   opine as to whether -- I would probably be inclined to
10  compel the testimony if the law allows me to do so, but
11  I cannot claim to be an expert on Australian law or the
12  interactions between US law and Australian law on this
13  issue.  Given that I have already said that Dr. Wright
14  can be deposed a second time, I will defer that issue
15  and allow the defence time to file any motion they want
16  to file on that.
17         My ruling will be the same as to the
18  questions relating to any communications or testimony
19  relating to his current wife.  Again I will allow the
20  defence to flush out any privilege arguments they want
21  to make.  I will allow the plaintiffs to respond only to
22  any privilege arguments as to either the current or past
23  wife and I will rule on that at a later time.
24         I think I have now dealt with the four
25  areas that were raised.

**MAGNA**
LEGAL SERVICES

Page 370

1          In terms of the national security
2    issues -- sorry, Mr. Freedman, not waiving any
3    objections to my ruling, were there any other issues
4    that you require me to rule on or you request that I
5    rule on this afternoon?
6          MR. FREEDMAN:  Just the national security
7    stuff, your Honour.
8          MS. MARKOE:  And your Honour for that --
9    sorry, go ahead.
10          THE JUDGE:  Can you ask me the context --
11    the kinds of questions for which the national security
12    issues are going to relate.  Let us start with that.
13          MS. MARKOE:  I believe it came up in four
14    contexts.  One related to the -- well, two questions
15    related to the identity of particular people.  I believe
16    one related to a trust called GICSR, and the third
17    related to Exhibit 11 (sic) to the complaint, and it is,
18    I believe, page 10 of 15, on paragraph 13:  "The IP is
19    software and code used by the US Military, DHS and other
20    associated parties."  Certainly Mr. Freedman should
21    correct me if I either misstated or missed a general
22    topic area.
23          THE JUDGE:  Okay, you said there were
24    four, but there are only two.  Maybe you are merging
25    them together.

Page 371

1          MS. MARKOE:  So one was the identity of
2    particular people who may have involvement in
3    particular projects.  Two was related to a trust called
4    GICSR.  The third was related to Exhibit 11 (sic), and
5    then maybe I misspoke when I said four, I could have
6    misspoken.
7          THE JUDGE:  Okay.
8          MS. MARKOE:  I have three.
9          THE JUDGE:  I have not committed a
10    complaint on all of its attachments to memory.  Can you
11    help me out with what is on page 10 of 15 at paragraph
12    13?
13          MS. MARKOE:  Yes.  It says:  "The IP" --
14    and this is regarding the New South Wales statement of
15    claim -- "is software and code used by the US Military,
16    DHS and other associated parties."
17          THE JUDGE:  Okay.  Mr. Freedman?
18          MR. FREEDMAN:  Yes, your Honour, I think
19    Mr. Markoe laid it out, but just to give a little bit of
20    gloss on it, the identity of the first person was when
21    Dr. Wright first reached out to Louis Kleiman, which is
22    Dave and Ira's father.  He said to him:  "Your son Dave
23    and I are two of the three key people behind Bitcoin."
24    We asked the identity of the third person and were told
25    we were not able to know that information for national

Page 372

1    security reasons.
2          The second is that in response to an
3    interrogatory request that the court ordered Dr. Wright
4    to respond to at the last hearing, Dr. Wright wrote:
5    "There was an individual who helped me in the very early
6    stages of my research, well before the release of the
7    Bitcoin protocol.  As far as I know, that individual
8    never met or interacted with Dave Kleiman."  And the
9    defendant refused to identify that individual on
10    national security grounds.
11          THE JUDGE:  Okay.
12          MR. FREEDMAN:  The statement of claim
13    that Ms. Markoe was talking about is the Australian
14    statement -- a lawsuit where Dr. Wright sued W&K and
15    collected its consent judgment on its intellectual
16    property valued at tens of millions of dollars, and as
17    part of that statement of claim said that part of the IP
18    at issue was IP of software and code used by the US
19    Military, DHS and other associated parties.  It was
20    intellectual property that title was taken, as
21    I understand it, from W&K pursuant to these consent
22    judgments, and so it is directly relevant to the
23    intellectual property claims that plaintiff have brought
24    in this case.
25          Then finally, I do not have the e-mail in

Page 373

1    front of me, your Honour, but when Ira Kleiman was
2    conversing with Dr. Wright before the lawsuit was
3    initiated, Dr. Wright told him that there was a GICSR
4    trust that would be related to Dave's Bitcoin holdings
5    or intellectual property -- I do not have it in front of
6    me -- and when Dr. Wright was questioned about the trust
7    and who set it up, he refused to answer questions on
8    national security grounds.
9          MS. MARKOE:  Just one point of clarity.
10    We believe that Mr. Freedman incorrectly stated that
11    title was taken.  It is not quite that simple, and it is
12    certainly not entirely accurate, but that is the only
13    clarification I have for the moment.
14          THE JUDGE:  Okay.  Any further argument,
15    Ms. Markoe?
16          MS. MARKOE:  No, we just request that
17    Dr. Wright be permitted to speak with you in camera in a
18    separate room, without counsel for plaintiffs present,
19    without plaintiff on the phone, and without the court
20    reporter and you can get more information about this and
21    then render your decision.
22          THE JUDGE:  Okay.  I will respectfully
23    decline to have an off-the-record conversation with
24    Dr. Wright.  These are all topics that if I determine
25    that the information needs to be turned over, it can



Page 374

```
 1   either be turned over in the nature of an interrogatory
 2   response, or a continuation of this deposition by video
 3   teleconference, or in the subsequent deposition of
 4   Dr. Wright.  What I am going to do is I am going to not
 5   rule on any of these national security arguments,
 6   because I think there is one and only one person I need
 7   to hear from as to whether there is a national security
 8   interest here, and it is not Dr. Wright, it is the
 9   United States Government.
10           So, I will defer ruling, I will give the
11   defence leave to file a motion with any sort of
12   supporting affidavits or whatever else you want to
13   supply me with that comes from a responsible party of
14   the US government who tells me that US national security
15   interests require that these questions not be answered.
16   That obviously is not going to happen today.
17           I think I have now ruled on all the
18   issues that were presented this afternoon.  I know you
19   all worked very hard to get this accomplished and get it
20   done and I appreciate everyone's efforts.  Counsel, when
21   you are back in the country or while you are there and
22   you have some time, talk about how much time you think
23   is appropriate for the filing of the motions that we
24   discussed today, and when you get back we can do a quick
25   phone call and I can enter an order with an operational
```

Page 375

```
 1   schedule.
 2           Is there anything further I need to rule
 3   on this afternoon?  Mr. Freedman?
 4           MR. FREEDMAN:  No, your Honour.
 5           THE JUDGE:  Ms. Markoe?  Mr. Rivero?
 6           MR. RIVERO:  No, your Honour, and thank
 7   you so much for helping us with these issues.
 8           THE JUDGE:  No, like I said, thanks to
 9   the parties.  I know this is a really heavy effort to
10   get this done but I really think it is going to help
11   move this case forward.  I will get off the phone.  You
12   can continue with whatever is left of the deposition.
13   Everyone have a safe trip home and we will be in touch
14   when you get back.  Thank you.
15           MS. MARKOE:  Thank you, your Honour.
16           MR. RIVERO:  Thank you.
17           MR. FREEDMAN:  I think the only thing we
18   are entitled to ask about now is whether Dr. Wright
19   communicated -- okay.
20           MS. MARKOE:  How much Bitcoin he mined,
21   yes.
22           MR. RIVERO:  One subject.
23           MR. FREEDMAN:  One subject, yes.
24           MR. RIVERO:  Dave Kleiman did.  So let us
25   do this.  Because they have been running -- I think it
```

Page 376

```
 1   was 30 left at that time.  Why do we not just run -- it
 2   is going to be -- as a matter of fact just ask your
 3   question and it is 30 minutes.
 4           MR. FREEDMAN:  I have 30 minutes?  I am
 5   going to use 30 minutes.
 6           MR. RIVERO:  No, no, I am not going to
 7   count ----
 8           MS. MARKOE:  Let us just move on so that
 9   we can get everyone out of here.
10           MR. RIVERO:  Just do it and we will say
11   it is 30 minutes.
12           MS. MARKOE:  Let us just get it done.
13   BY MR. FREEDMAN:
14       Q.   Dr. Wright, did you ever tell Dave
15   Kleiman how much Bitcoin you mined?
16       A.   No.
17           MR. RIVERO:  30 minutes left.
18           MR. FREEDMAN:  30 minutes, okay.
19           MS. MARKOE:  29:46.
20   BY MR. FREEDMAN:
21       Q.   Dr. Wright, do you have a trust that is
22   based in Singapore?
23       A.   No.
24       Q.   Have you ever had a trust that is based
25   in Singapore?
```

Page 377

```
 1       A.   No, I have never had a Singapore trust.
 2       Q.   Do you have a trust based in the
 3   Seychelles?
 4       A.   Yes.
 5       Q.   How many?
 6       A.   I do not know.
 7       Q.   Dr. Wright, do you remember telling Ira
 8   Kleiman that you have back-up files of Dave's drives?
 9       A.   No, I told Ira Kleiman that he needed to
10   keep back-up files of Dave's drives.
11           MR. RIVERO:  Just a point of order,
12   I have got 29 minutes, but are you going to reserve some
13   time against a ruling by the court?
14           MR. FREEDMAN:  I do not think that would
15   -- no.
16           MR. RIVERO:  So your position is you get
17   this time plus more time?
18           MR. FREEDMAN:  I think if the court rules
19   we get more time, yes.
20           MR. RIVERO:  I do not agree.
21           MR. FREEDMAN:  Okay.  Understood.  Noted.
22           MR. RIVERO:  We object and we think you
23   should reserve time in case you win something.
24   BY MR. FREEDMAN:
25       Q.   Dr. Wright, do you have a Twitter
```

MAGNA
LEGAL SERVICES

Page 378

```
 1   account?
 2       A.   Not any more, no.
 3       Q.   Did you have a Twitter account?
 4       A.   Yes.
 5       Q.   What was it called?
 6           MS. MARKOE:  Objection.  You may answer.
 7           THE WITNESS:  I have had multiple Twitter
 8   accounts.
 9   BY MR. FREEDMAN:
10       Q.   What was the last Twitter account you
11   had?
12       A.   Dr. Craig S Wright.
13       Q.   What happened to Dr. Craig S Wright
14   Twitter account?
15       A.   I got suspended after I threatened Jack
16   with DMCA violations.
17       Q.   Who is Jack?
18       A.   One of the founders of Twitter.
19       Q.   What was the name of that handle?  Was it
20   at ----
21       A.   At probably Dr. Craig S Wright.  I do not
22   remember exactly.  I do not type the things in.
23       Q.   Does that "@ProfFaustus" mean anything?
24       A.   It was before that, yes.
25       Q.   Before Dr. Craig S Wright you had
```

Page 379

```
 1   @ProfFaustus?
 2       A.   Professor Faustus, yes.
 3       Q.   And what happened to Professor Faustus?
 4       A.   I started complaining about the fact that
 5   I had bots on the account.
 6       Q.   Okay.  And?
 7       A.   And Twitter will not take them down and
 8   I started complaining and now I have suspended accounts.
 9       Q.   So Twitter suspended your @ProfFaustus
10   account?
11       A.   The account went up, down, and all over
12   the place, so I do not know what is happening with it,
13   and I do not particularly want an account full of bots
14   back.
15       Q.   Did you take down the account?
16           MS. MARKOE:  Objection.  You may answer.
17           THE WITNESS:  I threatened Twitter with a
18   lawsuit.
19   BY MR. FREEDMAN:
20       Q.   And Twitter suspended your account?
21       A.   I do not know what has happened with that
22   account.  I cannot access it.
23       Q.   Did you save copies of your direct
24   messages in that account?
25       A.   No.
```

Page 380

```
 1           MS. MARKOE:  Objection.
 2   BY MR. FREEDMAN:
 3       Q.   Did you give your lawyers copies of the
 4   direct messages in that account?
 5       A.   No.
 6           MS. MARKOE:  Objection.
 7   BY MR. FREEDMAN:
 8       Q.   Did you save messages in the Dr. Craig S
 9   Wright account?
10       A.   It was up for a day.  There was no direct
11   messages that I know of.
12       Q.   When did the @ProfFaustus account start?
13       A.   It was originally started, I think, in
14   2011, but no posts were done until 2016.
15       Q.   Did you have a Twitter account when Dave
16   Kleiman was alive before 2013?
17       A.   Yes.
18       Q.   What was it called?
19       A.   Dr. Craig S Wright, I believe.
20       Q.   Do you still have access to that account?
21       A.   No.  That account was cancelled in
22   December 2015 when I was exposed to the media.
23       Q.   Dr. Wright, do you an individual called
24   Marco Bianchi?
25       A.   Marco is a familiar name.
```

Page 381

```
 1           MS. MARKOE:  That is my name!
 2   BY MR. FREEDMAN:
 3       Q.   Was there a Marco Bianchi who helped you
 4   set up trusts?
 5       A.   What trusts, sorry?
 6       Q.   Are you familiar with a Marco Bianchi
 7   helping you set up any trusts?
 8       A.   No.
 9       Q.   Dr. Wright, do you have a supercomputer
10   called C01N?
11       A.   No.
12       Q.   Do you have any supercomputer?
13       A.   No.
14       Q.   Have you ever had a supercomputer?
15           MS. MARKOE:  Objection.
16           THE WITNESS:  Yes.
17   BY MR. FREEDMAN:
18       Q.   When did you have a supercomputer?
19       A.   Back in 2013.  Sorry, end of 2012, but it
20   was not working.  2013, 2014, 2015.
21       Q.   What was it called?
22       A.   Tulip and C01N.  There were two.
23       Q.   So, you did have a supercomputer called
24   C01N?
25       A.   That is what I just said.
```

MAGNA
LEGAL SERVICES

Page 382

1    MS. MARKOE: Objection.
2    THE WITNESS: You before that said "do
3  I have". "Did I have" and "do I have" are different.
4  BY MR. FREEDMAN:
5    Q.    When did you get rid of these
6  supercomputers?
7    MS. MARKOE: Objection.
8    THE WITNESS: I did not.
9  BY MR. FREEDMAN:
10    Q.    You still have them?
11    A.    I do not have them.
12    Q.    Who has them?
13    A.    I do not know.
14    Q.    What happened to them at the end of 2015?
15    MS. MARKOE: Objection.
16    THE WITNESS: I do not know.
17  BY MR. FREEDMAN:
18    Q.    Did you ever discuss your supercomputers
19  with Dave?
20    A.    Dave basically died before I had
21  everything built and operating, so I discussed creating
22  them, but it is hard to discuss something, I do not
23  believe in seances, with dead people.
24    Q.    Dr. Wright, in 2016 you came forward and
25  claimed to be Satoshi Nakamoto; is that correct?

Page 383

1    MS. MARKOE: Objection.
2    THE WITNESS: I did not come forward.
3  BY MR. FREEDMAN:
4    Q.    You gave an interview to the BBC where
5  you said you were Satoshi Nakamoto; is that correct?
6    MS. MARKOE: Objection. Can you tie this
7  to one our topics, please.
8    MR. FREEDMAN: Yes, request for
9  production 88 goes into the relationship with
10  Robert MacGregor and the court said we should ask about
11  the deferred ruling in advance of the deposition.
12    MR. RIVERO: Hearing transcript
13  citements?
14    MR. FREEDMAN: I do not have time. Look
15  for it if you can find it. 86, 16-19.
16    MR. RIVERO: Which date?
17    MS. MARKOE: It is this one.
18    MR. FREEDMAN: Last one. In the meantime
19  we will keep moving.
20    Q.    As a consequence of coming out, you
21  provided cryptographic proof that you were in fact
22  Satoshi Nakamoto?
23    MS. MARKOE: Objection: goes beyond the
24  scope.
25    THE WITNESS: I did not come out.

Page 384

1  BY MR. FREEDMAN:
2    Q.    And people have tried to debunk your
3  claim of being Satoshi Nakamoto?
4    MS. MARKOE: Objection: goes beyond the
5  scope.
6    MR. FREEDMAN: Are you instructing him
7  not to answer?
8    MS. MARKOE: Can we just get out of here.
9  Will it make it move faster if he can answer?
10    MR. FREEDMAN: Yes, it is going to go
11  pretty quick.
12    MS. MARKOE: This is beyond the scope.
13  It is public information. This is a colossal waste of
14  our time.
15    MR. FREEDMAN: I do not agree.
16    MS. MARKOE: But if you would like you
17  may answer.
18    THE WITNESS: There is public information
19  to say that.
20  BY MR. FREEDMAN:
21    Q.    And they have called you Faketoshi
22  because of that?
23    MS. MARKOE: Objection. First of all,
24  I am going to instruct him not to answer. You are
25  harassing him now. It is offensive. It is very late.

Page 385

1  You have limited topics. This does not go to any of
2  these topics.
3    MR. RIVERO: Can I say another thing, Ms.
4  Markoe. Especially giving that you are not reserving
5  time against disputes, this kind of harassment is not
6  appropriate. We are going to argue very forcefully that
7  you wasted time you could have reserved for things the
8  court may rule on.
9    MR. FREEDMAN: We will reserve the rest
10  of our time, then. Thank you.
11    MS. MARKOE: Okay. Great. Thank you.
12    MR. FREEDMAN: How much time is left?
13  Let us note it on the record.
14    MS. MARKOE: 22 minutes, 19 seconds.
15    MR. ROCHE: That is what I have.
16    MR. FREEDMAN: Great.
17    THE VIDEOGRAPHER: Are we off the record?
18    MR. RIVERO: We are off the record.
19    MS. MARKOE: Off the record.
20    THE VIDEOGRAPHER: Going off the record.
21  The time is 20.42. End of the hearing card number 7,
22  volume 1. This is the end of volume 1 video deposition
23  of Dr. Craig Wright.
24    ----------
25

MAGNA
LEGAL SERVICES

Page 386

CERTIFICATE OF WITNESS

1
2
3      I, Craig Steven Wright, am the deponent in
4  the foregoing deposition.  I have read the
5  foregoing deposition and, having made such changes
6  and corrections as I desired, I certify that the
7  transcript is a true and accurate record of my
8  responses to the questions put to me on 4th April,
9  2019.
10
11
12
13
14
15
16
17
18
19  Signed ..........................
20      Craig S. Wright
21
22
23
24  Dated this ....... day of ............. 2019
25

Page 387

CERTIFICATE OF COURT REPORTER

1
2
3      I, Paula Foley, Accredited Court Reporter,
4  do hereby certify that I took the Stenograph Notes
5  of the foregoing, and that the transcript thereof
6  is a true and accurate record transcribed to the
7  best of my skill and ability.
8
9      I further certify that I am neither
10  counsel for, related to, nor employed by any of
11  the parties to the action in which the deposition
12  was taken and that I am not a relative or employee
13  of any attorney or counsel employed by the parties
14  hereto, nor financially or otherwise interested in
15  the outcome of the action.
16
17
22
23  Signed ..........................
24      Paula Foley
25

Page 388

1      E R R A T A
2
3      (Please make any corrections here,
4          not in the transcript)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MAGNA
LEGAL SERVICES

**A**

abide 175:5
abilities 159:16
ability 6:22,24
  210:22 337:9,14
  387:7
able 31:22 57:1
  100:6 118:9 121:3
  137:1 216:15
  218:20 219:2
  238:7 258:24
  280:7,15 301:7
  339:1 371:25
ABN 348:9
absence 261:6,7,13
absolutely 20:7
  36:21 158:25
  221:2 226:10
  366:25
abstraction 50:23
abusing 9:13
academic 223:7
accept 270:16
  276:3
accepted 270:19
access 29:22 32:7
  55:24 56:2,5
  97:10 132:18
  133:9,15,17
  135:17,22 136:4
  137:23 138:3
  161:25 162:3,6
  187:7 207:17
  210:16,22 211:3,4
  211:13,16,18,20
  211:23 212:10,16
  212:18,20,25
  213:5,25 218:21
  231:17 234:10
  273:19,22,25
  279:24 379:22
  380:20
accessed 187:9
accessing 210:20
  214:6,9

accommodated
  366:12
accomplished
  374:19
account 67:19,20
  132:19 133:10,18
  134:6,22 135:2,9
  135:23 136:22
  137:4,9,17,17,19
  137:24 138:5
  179:24 209:10,20
  209:22,24,24
  210:3,13 211:6,7
  211:16,18,20,23
  212:11,18,21
  213:6,25 214:6,10
  273:1,2,20,23
  274:1,9 378:1,3
  378:10,14 379:5
  379:10,11,13,15
  379:20,22,24
  380:4,9,12,15,20
  380:21
accountant 102:12
  103:1,6
accountants 100:23
  101:4,9,17,22,24
  101:25,25
accounting 12:23
accounts 102:6,8
  102:11,21,21
  117:17 119:18,20
  190:23 209:11
  210:7,17,23 211:7
  211:10,13,15
  214:2 279:18
  281:17 378:8
  379:8
Accredited 387:3
accurate 28:8
  65:21 191:23
  192:5 219:14
  352:9 373:12
  386:7 387:6
acknowledged
  240:21

acquire 251:23
acquired 227:24
  228:15
act 194:3,7 269:21
acting 186:3
action 5:18 348:1
  387:11,15
activity 198:18,20
actual 161:12
  318:15 356:19
Adam 151:5,20
  152:3,7,14,19,25
  153:7,20,23 154:3
  154:8 175:11
add 82:7
address 5:24 6:2,4
  9:22,23 14:16,17
  14:24 43:6,18
  70:23,24 71:3
  72:18,20,22 73:1
  81:3,5,6 131:25
  148:12 150:25
  206:7 207:22,23
  246:3,5 248:1,16
  248:21 249:18,19
  252:17,17,25
  253:9,9 259:1
  296:9 349:20
  359:15 366:22
addresses 11:3,11
  14:13,23 60:16
  71:1 72:17 73:2
  190:3 206:11,14
  206:17 208:1,2
  209:8 245:24,25
  247:2 250:10,11
  252:2,12,13,15
  253:18 294:24
  300:13,16 301:1,6
  302:15,17,25
  304:18,19 325:24
  365:10,16
adjournment
  123:25
administrator
  138:7

administrators
  138:3,4,12
Admitted 2:6
advance 366:3,4
  383:11
affect 6:22,24
affidavits 374:12
affirmative 7:13
Africa 119:12
afternoon 124:6
  361:23 362:1,2
  370:5 374:18
  375:3
age 11:19
agencies 36:1
agent 282:25
  284:15
agent-based 283:3
ago 84:24 143:1
  187:18 246:16
  288:14 308:13
  311:10
agree 214:23,25
  256:21 257:3,25
  260:23,24 261:3,8
  261:14,17,19,20
  262:11,21,23
  263:3,4 377:20
  384:15
agreed 8:8 33:13
  257:1,5 303:18,25
  303:25 304:8,12
  350:10 363:12
agreement 134:1
  193:13 239:11
  257:2 261:1,12
  278:16,22 304:14
  363:12,13 364:19
ahead 75:19 144:23
  153:10 195:12
  252:10 291:11
  370:9
aid 218:24
al 4:4 154:2
algorithms 57:15
alias 132:2

administrators
aligned 218:23
alive 127:19,23
  130:10 380:16
Allan 130:7,8
  141:12 142:3
allege 33:22
Allen 142:3
allow 35:10 89:17
  97:22 106:16
  165:17 166:1
  178:12 256:25
  318:19 340:1
  365:6 369:6,15,19
  369:21
allowed 25:14,18
  69:15 157:10
  192:4 263:11
  278:9 362:11,13
allowing 260:18
allows 349:16
  369:10
alongside 207:8
alter 279:7
alternate 125:18,24
alters 81:9
altogether 157:9
amassed 199:9
amended 225:13
America 18:25
  231:16 312:14
  316:6 334:11
American 161:5
  258:7 346:16,18
  346:20
Americans 160:14
Americas 226:18
amount 47:8 48:5
  197:8 198:12
  199:8 241:11
  249:12,17,18
  252:12 329:25
  331:4 344:22
  367:3,6
amounts 246:9
  252:16
analyse 23:21



56:20 262:25
**analysed** 30:3
**analysing** 24:1
262:9
**analysis** 30:4
260:12
**Andresen** 330:18
330:20 331:5,10
331:13,20,25
**Andrew** 2:22 5:1
174:4 188:25
359:25
**Andrés** 4:22 15:22
263:7 359:19
**ANDRÉS** 2:10
**Ang** 18:6,19 20:2
**Ann** 102:14,17
105:1
**annoyed** 137:1,2
**annoying** 178:4
**annually** 356:6,8
**anonymous** 124:25
178:1 211:7
213:25
**anonymousspeec...**
178:11
**answer** 7:13 9:10
9:14 15:20 16:2
17:13,15 19:20
30:6,14 31:5 34:5
36:21 37:21 40:1
40:12,13,15,20
43:21 44:23 51:22
52:5 53:13 57:1
66:6,9,11,12,16
66:21 70:15,21
71:4,7,22 75:19
78:1 87:25 88:23
89:3,18,21 91:11
91:22 92:5,7 98:4
99:2 100:1 102:1
103:21 108:16
114:17,22 119:3
121:3,23 123:14
124:10 125:8
126:12,23 127:1

127:17 128:2,2,3
128:3,7,8 132:4
132:20 134:5,18
134:25 135:9
141:5 143:16,19
144:13 145:2,21
146:5,9,14,16
147:23 148:19
149:1,8 150:1,15
152:4,12,16 153:4
153:11,24 155:3
155:16 156:2
158:12 159:18
160:8,24 162:18
163:2,25 164:13
169:4 172:25
174:17 175:17
176:4,19,23
177:15 181:6,17
181:22 182:2,13
183:5,6,11,16,24
184:4 185:11
188:20 189:16
190:14,18 191:14
191:16 192:14,20
192:25 193:8
196:12,22,24
197:2,6,16 199:11
199:24 201:7
203:5,6,19 205:3
205:24 206:18
208:25 210:1,4
212:5 214:22
216:4,23 217:14
217:17,18,23
218:3,11 220:8,19
221:24 222:15,22
223:10 224:16
230:4,13 233:10
235:17,24 236:15
237:25 238:1,16
238:16 239:10
242:17,18 243:10
243:25 244:8,15
246:14 247:3
248:7 249:5,14

250:12 252:19
254:8 257:9,13
259:15,21 260:3,3
260:4,9 262:4,7
265:17 266:12
269:15,24 272:12
275:20 276:24
279:3,6 280:23
282:17 284:21
285:8 286:9,17,22
289:5 290:22
292:14,15,20
293:23 295:19
296:15 300:9
301:13 302:1,18
303:1,20 304:25
306:17,22 307:2
307:25 309:7
311:2 312:4 313:1
313:10 314:4,9
315:22 318:19,21
321:23 322:14,19
324:4 328:14
330:22,25 331:6
331:14 336:21
338:2,10 340:1,7
340:10,15 341:4,6
341:10 342:2,3,7
342:19,23 343:22
344:4,19 346:4
347:10 348:5
350:2,16,22
352:17 355:5,6,19
356:9,20 358:8,9
358:14,15 359:1
360:7,21 361:2,5
361:5,10 362:12
362:14,16 368:6
368:20,24 369:3,4
373:7 378:6
379:16 384:7,9,17
384:24
**answered** 20:18
36:24 37:7 69:12
70:20 71:14,15
121:11 146:24

169:4 188:19
203:10 213:8
231:1 257:10,14
263:10 275:20
282:17 338:1
374:15
**answering** 18:11
42:20 91:24 92:6
262:3
**answers** 58:15
179:23 203:20
226:8 259:1
277:13 361:17
369:2
**anticipating** 91:22
162:19
**antithesis** 260:16
**Anti-Fraud** 224:2
**anybody** 138:19
187:18 214:13
**anyones** 325:6
**apart** 100:25 129:2
186:12
**apologies** 106:21
178:5 340:23
**apologise** 117:2
129:19 200:8
332:22
**appear** 80:17
**appearances**
174:19
**appears** 301:21
321:20
**appendix** 300:7
**apple** 165:23
352:19
**applies** 53:13 57:22
**apply** 57:22 88:2
179:24 356:22
**appointed** 288:2
**appreciate** 78:5
89:24 91:21
313:19 374:20
**appropriate** 118:23
363:5 374:23
385:6

**approved** 19:4,10
19:10 352:22
**approximate** 10:17
10:19 85:16
**approximately**
47:6,10,19 48:14
49:25 55:8 56:23
80:14 149:4
196:19 200:14
216:25 265:7
347:1
**April** 1:18 4:7
47:16,18 239:7
242:16 246:3
251:22 265:10
386:8
**area** 86:16 185:17
216:17 368:4,8,22
370:22
**areas** 361:17
366:23 369:25
**argue** 37:4 258:6
385:6
**arguing** 43:15
**argument** 258:2
291:19 373:14
**argumentative**
148:6
**arguments** 369:20
369:22 374:5
**Armonk** 2:7
**arrangement** 92:16
**arrested** 346:22,24
**Arthur** 346:22
**article** 193:17,23
**ASC** 271:7,9
**ASIC** 96:12 99:11
122:18 124:8
265:12 271:10,11
271:15 274:21
275:1 276:15,16
281:25 282:15
**ASICs** 241:17
243:2
**aside** 364:10
**asked** 20:17 24:23



42:13 43:6,17
66:13 69:11 70:19
71:1,13 83:20
99:4 120:12 137:4
140:22 146:23
160:1 167:19
169:3 174:18
182:9 188:18
190:2 202:13
203:9 209:25
212:1 213:7 226:1
230:25 245:12
251:11 259:5
262:5 263:9
275:19 277:13
282:16 287:15
292:15,23 293:13
322:5,17 337:8
338:4,5,15 341:25
358:18,23 366:8
366:13 368:12
371:24
**asking** 14:9 17:18
33:19 36:1 57:9
59:15 82:12,18
95:16,20 97:17,19
97:25 98:1 102:11
112:5 119:8 123:6
135:1 143:1
144:10,11,15
149:9 170:22
172:10 178:24
179:6 199:16
220:18 224:15
229:9 233:14,19
234:25 238:18
246:23 251:6
253:5,7 270:25
279:6 280:10,10
282:5 287:14
308:11 312:8
314:18 322:16
337:17 342:6
361:16 364:24
366:20 367:21
**aspects** 142:17,18

142:18 255:21,22
**assented** 267:6
**asset** 113:19 119:5
**assets** 87:8 88:12
88:16,19 113:2,5
113:7,8,18,21,23
114:3,4,23,25
115:2 119:6,7,7
120:4,8,9 123:15
290:23 306:15,21
306:23 308:5,9,14
312:17 316:2
**assistance** 40:21
**associated** 176:17
232:21 248:12
348:9 357:8
370:20 371:16
372:19
**assume** 7:6 176:24
347:12
**assumes** 155:14
215:7
**assuming** 313:18
**assumption** 217:12
249:25
**assurance** 215:18
223:18 224:1
248:4
**ATO** 104:8,15
120:22 121:19
334:19,20,24
335:8,17 336:1,3
336:13,19,25
337:2,4,5
**attach** 147:12
**attached** 304:5
360:9
**attachments**
371:10
**attention** 160:5
332:4 354:2
**attestation** 256:14
256:20,25 260:21
**attorney** 387:13
**attorneys** 197:2
334:20 336:3,5,7

336:10 338:4,6,15
**attributable** 172:15
**audit** 95:23 101:23
102:6,20 103:25
121:5,21
**audited** 94:13,19
100:15 120:22
121:1,18
**auditing** 102:8,11
102:21
**auditor** 104:14
**auditors** 102:1
333:3
**audits** 100:20,21
101:18,25 104:8
**August** 167:7,12
168:2,4
**Aurora** 154:2
175:18
**auspices** 118:16,19
**Aussies** 153:13
**Australia** 5:23 7:21
7:22,23,25 8:1,3
10:13,14,23 12:12
14:11 17:17 32:20
83:15,18 84:20
87:12 110:9
122:22 123:9
131:5,11 143:9
197:14,18 233:23
253:17 256:24
258:3,18,18,22
262:15 334:22
336:4 356:15,22
360:24 364:16,19
**Australian** 32:21
94:14,19,22 95:4
100:16 101:10,18
101:23 103:23,25
104:16,22 121:4,8
121:11,13,18
139:11,12 141:24
263:20 264:14
306:3 332:5 333:7
335:12,24 337:10
337:15,16,17,21

338:6,20,21
349:12,13,15
364:18 369:11,12
372:13
**authored** 153:23
**authorised** 238:12
238:13 272:6,9
292:6 295:22,25
296:3,5
**authorises** 259:19
**authorising** 256:16
**authority** 118:24
226:3,6 364:20,22
**available** 11:5
132:14 139:25
163:24 164:3
168:21 177:4
241:7
**average** 11:19
**avoid** 98:4
**aware** 95:1,4,9,17
101:4 128:13,19
154:8 162:6
163:16 170:14
175:4 187:11
194:5 242:24
276:10 287:19,24
288:9 289:23
304:23 324:9
332:13,16 335:11
358:19 366:25
**awareness** 95:21
**awful** 283:11,11
**A(a)** 249:23 252:2,4
**A(b)** 249:23 252:3
252:5
**A-N-G** 18:8
**A-S-I-C** 96:12
**a.m** 4:8

_____
**B**
_____
**b** 241:4,8,8 243:21
264:20 267:18
354:23,24 363:10
364:8
**BAA** 275:10,14

**back** 8:2 41:3,9,13
42:11,14,14,19,24
43:8,23,23,24
52:16 77:21 81:18
89:24,25 108:9
121:10 124:7
142:21 151:5,20
152:3,7,14,19,25
153:7,23 154:3,8
156:5 157:6
158:24 159:3
160:5 171:16,20
175:9,11 193:8,9
193:9 197:17
214:8 221:10
224:21 231:12
232:10 233:6
239:21,22 243:3
244:25 245:2,9,14
245:16 259:23
260:18 274:9,20
274:21 275:3
282:8 283:17
285:11 297:3
312:2,7,24 319:15
333:16 335:17
353:9,24 358:2
365:22 366:15
374:21,24 375:14
379:14 381:19
**backend** 99:19
**background** 285:12
**back-up** 377:8,10
**bad** 13:14 39:10
135:11 149:21
**badly** 348:23 349:2
349:22
**bag** 328:17,19
**Bagnoo** 184:22
185:2,5,9,16,23
185:25 194:11,12
194:22,23,23
195:1,2 196:16
197:9 198:4,21
199:1,6
**banana** 356:15



**banned** 157:8
**bar** 311:24
**barely** 82:13
**bargain** 239:9
**base** 339:23
**based** 40:18 76:16
240:20 259:24
376:22,24 377:2
**basic** 66:25
**basically** 157:9
173:12 185:17
187:4 193:13
215:19 231:14
249:6 256:22
260:13 316:4
321:4 332:21,25
345:21 352:5
355:7 382:20
**basis** 40:13 89:5
126:25 153:20
192:5 238:17
296:14 364:2
**bathroom** 173:15
357:23
**BBC** 383:4
**BDO** 12:23,24 13:2
13:11,16,20 130:9
130:22 131:3
142:12
**Bear** 129:4,6,7,13
129:16,20,23
131:23 132:1,8
172:12
**beard** 212:14
**beat** 35:10 106:16
**becoming** 168:19
314:12
**began** 58:17 200:10
200:14,23 202:14
202:20
**beginning** 74:25
77:16 124:1 168:7
173:22 174:13
221:8 284:3 323:7
334:9
**begins** 4:2 141:2

**behalf** 2:2,9 104:17
104:18,24
**belief** 285:16
**believe** 37:2 38:3
46:13 50:7 63:11
63:25 64:5 71:6
76:23 82:18,20
89:23 91:24 92:4
92:6 97:1 99:3
100:12 102:20
105:12 107:2
113:10 116:20
117:8 125:11,17
125:23 131:10
141:19 150:4,6
159:7 161:23
167:22 217:16
246:22 249:9
258:17 259:3,18
263:13 264:4
282:19,20 288:1,4
295:24 300:2
325:9,17 326:13
327:5,11 329:16
331:11 338:1
343:24 355:23
359:2,19 362:8
363:3,8 364:4
365:10 367:20
368:7,24,25
370:13,15,18
373:10 380:19
382:23
**believed** 119:11
160:11
**believes** 363:13
**Belize** 84:19 85:7,8
315:10,13,14
316:15,18 319:8
**belong** 297:21
298:14
**belonged** 190:3
318:7
**belongs** 297:19
298:12,23
**beneficiaries**

290:19 305:13
**beneficiary** 288:24
292:25 305:16
**best** 48:6,17 57:9
57:13 88:14 160:3
198:24 214:17
230:2 250:16
325:22 387:7
**bet** 236:4
**better** 221:13
231:18 234:11,18
**betting** 235:22
**beyond** 25:6 39:19
88:21 89:19
103:17,21 141:4
144:4 152:9,12
156:1 181:11,17
181:21 187:14
190:13 199:12
203:17 214:21
216:7 225:25
238:8 242:12
244:15 285:21
340:15 362:11,18
363:18 364:9
365:20 383:23
384:4,12
**BHP** 219:20
**Bianchi** 380:24
381:3,6
**big** 129:12 171:12
303:14 323:20
**bigger** 345:9
**Billiton** 219:20
**birth** 5:21
**birthdays** 302:21
**bit** 9:12 30:3 109:7
147:6 158:11
165:7 180:22
203:16 212:25
218:25 236:21
262:9 285:3
287:11,13 371:19
**BITC** 311:7
**BitCash** 65:6
160:23

**bitch** 157:7
**Bitcoin** 8:16 27:7
27:11,14,16 28:5
28:20,25 29:2,5,6
29:14 32:4 38:19
44:9,12 45:2 53:6
62:16 63:6 64:1,9
64:17 65:7 67:7
67:14 69:3,9
70:17 71:12,18
75:23,24 76:17,17
76:18,19 83:23
87:1,4,8,19,20,22
87:23 88:1,1,5
94:9 96:17 98:22
99:20,25 100:2,4
100:10 106:10
113:4 114:6,7,8
115:2,4,7,11
117:20,21 118:25
119:14 120:18
121:14 123:10
124:17,24 125:2
126:17 128:24
130:13 133:23
134:11 135:9
138:12,13,16,20
138:23 139:1
141:12 142:13
145:4,14 146:8
148:24 155:10
158:7 160:7,10,23
160:25 165:6,11
165:13,15 166:3
166:10,22 169:11
175:10,25 181:25
182:7,15,22 183:2
184:2 187:12,16
188:24 191:9,10
192:9,17,23 194:9
194:17,19 195:1
195:25 196:3,8,11
196:19 197:8,13
199:7,8,23 200:5
200:10,12,15,18
200:21,24 201:1

201:15,18,18
202:15,20,25
204:14,14,17,19
206:6,10 207:8,9
207:10,13,14
209:3 215:4,10
220:3,7,13,21
221:18,20,22
224:10 235:23
236:3,4 237:1
241:10,12,18,20
242:2,4,8,10,15
242:20,25 243:15
243:17,19 244:13
245:13,18,24,25
246:3,4 247:2,9
247:25 248:16
249:12,17,19,22
250:1,5,10,23
251:2,8,15,23,25
252:17,24 253:6,8
253:17 254:2,4,9
255:1,7,8,9,10,13
255:14,16,17,19
255:21 265:1,11
265:12,23 270:13
270:16,20 276:4,8
276:11 281:14
284:15 289:7,10
289:12,14,17
291:6,12,15,22,23
291:24 292:1,11
292:13 293:2,2,3
293:4,21 294:1,6
294:11,15,21,24
295:2 300:4,8,16
301:1 302:24
303:23 308:17,25
309:2,9 318:12,15
319:4 323:18,24
324:6,21,24
325:11 328:6,21
328:21,22,24
330:1 331:5
332:24,25 333:2
340:9,11,13,25



341:17 342:2,12
345:7,10 351:17
351:25 358:24
359:1,4,8 360:6
362:10 363:1
365:3,5,17,18
367:1,3 368:5,13
368:17 371:23
372:7 373:4
375:20 376:15
**Bitcoins** 202:11
205:14 206:2,5
317:25
**Bitcointalk** 132:9
132:11,15,19
133:12,13 134:23
135:12,15,23
137:24
**Bitcointalk.com**
179:12
**Bitcoin-related**
88:8 215:5
**Bitcoin.com** 133:10
176:12 178:7
179:1,2,3,9
**Bitcoin.org** 179:16
179:20,24 180:4,8
180:18 181:5,13
181:19
**bite** 352:18
**Bitmessage** 72:12
72:14,15,18,23
73:8,9,11,13,23
73:23 75:5,25
76:3,6,7,12,16
**Bitmessages** 74:7
75:16
**bits** 140:16 291:13
312:20
**Black** 15:14 16:16
17:14
**BlackNet** 64:20,21
64:22 83:24
**Black's** 117:25
**blah** 208:2,2,2
**blank** 123:8

**block** 100:7 165:17
181:24 182:6,14
182:21 183:2,22
184:2,5,8,10,12
184:13,15,16,18
186:2,3,13,15,17
196:11 250:2
253:13 301:1
**blockchain** 28:1,3
38:22 44:15 62:16
62:20,24 63:6
64:9,17 67:7,14
69:4,9 70:17
71:12,19 75:24
83:23 87:15,23
88:2 96:19 125:3
243:17 253:2
284:16
**blockchain-based**
27:20,24
**blocked** 303:15
**blocks** 100:4 200:2
345:9
**bloody** 153:13
326:1
**blossoms** 273:8
**Blvd** 2:11
**body** 80:14 95:25
128:6 317:20
**body's** 95:21
**Boies** 1:21 2:3,6,22
2:23 4:10,11,15
174:4,10 359:21
359:25
**bonded** 350:12
**Bondi** 341:12
**bookkeeper** 102:13
**born** 5:23 7:21
**borrow** 308:17,24
309:2,9,10
**borrowed** 309:13
**bots** 379:5,13
**bottom** 227:10,19
228:3,4 256:17
266:7 284:10
291:21 299:22

310:9,17 315:9
321:8
**bought** 346:8
**bound** 175:3 257:1
257:2,3,5 260:23
260:24 261:1,3,8
261:12,15 262:12
262:18 263:3,4
264:10,10 363:13
364:3,16
**box** 305:22
**boxes** 83:7,9,10,12
83:14,16 299:12
305:23,24
**breach** 17:17 18:14
97:20
**break** 7:17 16:19
17:4,10,18,18
40:24 41:2 42:13
43:17 70:2 77:6
77:15 78:15,22
79:3 82:24 108:8
123:19 173:16,21
221:1,7,14 224:21
228:11 245:4,8,12
279:10 283:22,23
284:2,8 323:2,6
333:11,14,19
353:23 357:23
358:1
**breakdown** 281:17
**breaking** 108:3
**breath** 35:13,14
**Brenner** 2:22 5:1,2
5:4 174:3,4,7,8
359:20,24,25
**briefing** 369:7
**briefly** 40:6 42:17
103:7 361:9
**bring** 68:19 164:11
260:25 263:7
**bringing** 108:3
125:6
**brings** 258:4
**Brisbane** 5:23
**Britain** 160:13

**British** 120:25
121:5 226:24
256:13 264:13
306:4
**brought** 372:23
**browser** 148:1
**BTC** 245:24 319:16
321:4
**buckets** 228:12
**Budovsky** 346:23
**bugger** 136:1
**build** 275:18
**building** 345:4
**built** 231:12 232:10
232:12,14 345:1
346:6,10 382:21
**Bungaloo** 194:9,21
**burdensome**
365:12 368:14,25
**burdensomeness**
365:8 366:2
**business** 14:8
149:17 187:6
265:1,23 266:3
312:6 348:6,8
**businesses** 19:12
**B-A-G-N-O-O**
184:25
**B-E-A-R** 129:21
**B-i-t-C-o-i-n**
160:10

———————————
**C**
———————————
**c** 2:1 160:17 161:2
161:3,7 173:2
241:11,14,19
254:3 255:2
284:16 328:20
329:3,5,7 354:23
354:24
**calculated** 356:6
**call** 13:13 16:7
48:25 76:23
109:18 138:23
169:8,12 374:25
**called** 12:23 17:22

29:18 38:17 49:3
62:5 84:3,7,9
88:13 96:5 109:21
117:7 137:8
141:13 184:22
222:4,7,17 223:18
224:1,9 236:5
248:13 276:5
283:10 290:2
309:21 311:23
323:14 332:25
370:16 371:3
378:5 380:18,23
381:10,21,23
384:21
**calling** 28:6 173:10
300:16
**calls** 50:17 119:1
172:20
**camera** 40:14,17,18
45:6 49:9 126:24
127:15 128:11
176:7 233:3
316:25 357:13
361:11 373:17
**cancelled** 380:21
**capacity** 54:6,9
**capital** 161:2
277:22 278:2,4,13
279:15 280:3,17
281:18
**capitalised** 160:20
**capitalising** 160:13
160:17
**capture** 231:20
**captured** 83:6
132:12
**card** 4:2 77:13,17
123:23 124:2
173:19,23 221:5,9
283:25 284:4
323:8 385:21
**care** 72:7 93:17
149:17 219:21
220:1 230:6,6
257:19 266:2



274:23 282:7
303:16 339:15,17
347:17
**carefully** 91:18
**Carol** 15:12
**Cartesian** 50:22
**case** 1:6 4:5,6 18:23
19:2 32:4 36:22
95:23 127:7 161:2
161:7 175:4 226:3
226:6,19 261:1
311:18 337:7
365:1 366:18
367:15 372:24
375:11 377:23
**cases** 74:21
**cash** 64:25 124:25
281:13
**casinos** 231:15
**catch** 129:19
**cause** 217:8 246:7
250:5,10 345:24
346:6,10
**caused** 346:12,25
**cease** 84:14 85:4,10
85:22 306:13
**ceased** 84:15
**cent** 120:10
**centaur** 82:22,22
**centre** 240:22
**century** 52:17
**certain** 119:11
196:3 255:20
283:3 296:12
356:22
**certainly** 19:6 70:4
83:1 106:18
203:18 226:15
364:6,8 367:20
370:20 373:12
**CERTIFICATE**
386:1 387:1
**certify** 386:6 387:4
387:9
**CFO** 102:12 103:1
**chain** 165:18

**chance** 367:23
**change** 18:9 58:14
81:2,4,8 107:1
110:15,18,25
111:7,14 117:8
217:6 266:1 307:7
307:10
**changed** 18:19 20:1
55:22 110:21,25
111:5,6 131:25
172:11 283:12
307:9,13,15,16
**changes** 81:6
169:19 172:11,12
172:13 353:8
386:5
**channel** 272:4
**Chaos** 96:5,24
**character** 72:20,25
**characterisation**
346:11
**characterise**
153:13 173:12
**charged** 162:22
**charges** 346:24
**charitable** 119:10
**charities** 119:12
**charity** 12:1,1
**chat** 55:13,14 56:6
148:22 151:4,13
**chats** 54:11 55:10
55:10,11,12,18,25
56:3,4,9 67:12,18
151:14,15 172:7
172:10
**cheating** 316:7
**check** 153:25 154:4
164:19 212:1
229:20 307:14
360:11
**checked** 107:22
135:19 307:18
**cherry** 255:3 273:8
**Cheshire** 102:13
104:22 105:5,9,15
105:18

**child** 74:20
**children** 328:18
**children's** 119:12
**China** 231:16
**Chinese** 231:13
232:11
**chips** 276:21
**choose** 144:14
257:7 279:4
**Christians** 260:19
**chronology** 227:17
228:13,18
**chucked** 153:25
312:21
**circle** 19:24
**Circus** 6:5 14:24
**citation** 78:20
226:21
**cited** 175:9,19
**citements** 383:13
**cites** 226:12
**citizen** 258:7
312:12 337:16
**citizenship** 312:16
**city** 38:15
**Civil** 70:5 225:12
**claim** 18:25 223:14
347:25 349:25
352:2,14 354:8
357:1 369:11
371:15 372:12,17
384:3
**claimed** 252:12
382:25
**claiming** 262:24
**claims** 367:5
372:23
**clarification** 197:24
200:3 202:5 366:8
373:13
**clarify** 147:6
317:22 328:10
**clarity** 373:9
**clarity's** 247:19
**classify** 254:24
**clause** 243:5,7,11

243:21
**Clayton** 303:3
**clean** 69:7
**clear** 25:17 42:19
43:7 101:14
102:20 172:23
197:20,25 198:1
199:20 202:3
234:18 238:14,16
240:3 245:19
252:16 253:4
359:7 361:16
**clearance** 127:10
**clearly** 340:18
**client** 40:19 166:10
167:2,4,10 168:11
168:14,16,20
169:2,12,15,16
170:18 171:14,21
323:19 324:2
326:10 328:13
329:12 346:2
**client's** 320:11
**closed** 119:22 306:2
**closing** 362:5
**cloud** 21:20,25 22:5
22:9,11,14,16,19
22:21,24 23:2,5,7
23:11,15,18 24:20
25:25 26:7 27:7
28:14,14,25,25
29:4,6,14,17,22
30:1,8,10 41:15
42:3,5,7 201:15
201:17,18 202:1
**Cloudcroft** 99:9,9
99:15 101:19
105:22 106:23
107:4,9,14
**clue** 328:22
**clueless** 328:23
**coach** 78:8
**coaching** 25:7,9
**Cobham** 6:1 9:19
9:21,22,23 10:4,6
10:8,8

**CoCo** 283:8,11,11
**code** 106:7 153:20
153:22 154:20
165:10 166:10
168:16 172:10,24
173:12 187:8
207:16 216:20,21
216:25 217:4,4,9
217:9,22 218:2
231:8 236:10
254:3 255:2,6
271:19,19,21,23
271:24 275:3,5
283:5,7 284:24,25
328:20 357:6
370:19 371:15
372:18
**coder** 173:2
**codes** 166:21
284:16
**coding** 217:19
**Coin-Exch** 277:23
279:22
**Coin-Exchange**
276:6 278:1,4,21
278:22,24 279:1
279:15,24 280:4
280:17
**collaborate** 8:16
170:19 190:23
205:21 216:10,13
**collaborated**
170:24 205:20
**collaboration**
190:22 205:16
216:18 224:13,18
**collaborations**
224:25
**collateral** 248:6
267:25 268:10,11
268:18,19,20,23
268:25
**collect** 338:5,15
**collected** 335:13
337:21 372:15
**colossal** 384:13



com 179:7
come 7:22 8:5 9:3
  9:20 10:22 13:5
  54:8 58:17 134:1
  137:3 156:16,20
  180:7 183:2,22
  188:23 199:5
  200:9 208:15
  211:12 216:19
  244:13 245:18,24
  272:9 285:6
  286:21 294:20,23
  297:3 329:18
  346:18 359:15
  383:2,25
comes 189:15
  317:16 374:13
coming 366:6
  383:20
comment 67:4
  152:7
commercial 159:10
committed 371:9
common 52:19
  138:2
Commonwealth
  264:8
communicate
  54:19 60:8,11
  62:18,19 67:6
  68:2,9 72:11
  132:7 134:22
  135:2 171:18
  178:16,20,22
  180:3 208:11,13
  214:3 266:16
  309:16 342:25
communicated
  67:13 69:3 104:12
  153:1 171:17
  208:6,9,24 218:10
  266:14 342:21
  375:19
communicating
  261:21
communication

63:3 67:11 84:1
  143:17 148:17
  155:8 190:25
  199:14,17 201:2
  267:1,5 330:14
communications
  31:6 68:12 69:9
  70:17 71:11,18
  73:23 74:1 98:5
  130:15 136:7
  178:25 201:3
  209:21 218:15
  261:16,18 262:14
  263:5 266:20,23
  338:10 342:22
  360:19 364:6,11
  367:8,18 369:18
communities
  149:20 150:14
community 180:20
  185:19 207:11
  214:9
companies 13:15
  14:4,6,10 19:24
  32:19,20 62:1,3
  81:9 82:19 83:15
  84:5,6,7,9,15
  88:13 91:12 92:14
  93:23 94:4 99:11
  103:1,24 104:17
  104:23 105:6,23
  106:2,4 108:13,16
  108:19 109:1,3,9
  109:9,18 112:7
  116:21 122:11,14
  123:15 159:10
  167:21 220:4
  227:14 230:6,8,18
  231:3 237:7,14,25
  238:12,14,19
  247:11 250:17
  269:16,20 270:4
  279:18,20 282:5
  282:19 288:3,7,10
  288:13 290:25
  293:11 295:8

296:6 306:23
  308:2 314:3 319:9
  332:10,18 339:2,3
  346:11 355:24
  361:4 367:19
company 12:22
  13:12 62:5,9
  82:17 83:19 84:3
  91:15 96:6,7
  105:24 107:7,11
  109:14,14 111:20
  112:13 114:16,20
  115:14 116:16
  117:9 119:22
  120:4,4,5,6 121:5
  122:9,10,18 123:1
  161:22 163:19
  219:21 221:21
  230:19 237:4,6,9
  239:12 244:10
  246:17,19 248:13
  263:22 264:7,25
  265:22 270:2
  278:13 281:7,18
  287:17 291:4
  293:5 295:9 307:3
  307:6 308:11
  309:21 310:13
  311:8 312:10
  343:17 344:3,9,17
  345:21 346:8
  347:18
company's 318:6
compel 361:16
  369:10
compelling 369:8
compilation 296:4
  301:21 302:4
compile 157:19
  365:11
complain 244:22
  250:19 300:19
complained 250:16
  250:19
complaining
  163:20 379:4,8

complains 249:8
complaint 370:17
  371:10
complaints 247:13
complete 139:4
  298:7 350:11
completed 281:7
  355:13,13
completely 125:4
  133:24 185:17
  260:8 262:6
  300:17,25
completeness 311:1
complex 91:13
composition 24:10
compound 105:7
  148:18 177:9
  336:16
compromised
  211:1,2
compute 26:10,17
  99:16
computed 26:13
computer 11:13,22
  21:4,7,12 75:11
  86:22 159:22
  166:20 184:15
  185:8,15 200:17
  240:24,25 241:1,3
  300:14 303:22
  329:3
computers 8:14
  11:8,10,20 12:4
  20:14,24 184:17
  184:19 185:2,5,6
  191:5 194:19
  198:21 242:9
  316:20 362:12
computing 23:11
  23:16,18 26:7
  27:7 28:14 29:1
  29:14,17,23 30:1
  30:8 42:7 201:15
  201:17,18
con 18:24 316:4
  321:3

complains 249:8
concept 72:2
concepts 141:11
concerning 325:23
concisely 204:24
conclusion 359:15
conduct 265:22
conducted 227:6
  332:14,17 351:16
  351:24
conducts 264:25
conference 4:17
  43:25 44:6,8,11
  44:14,17,20,22
  47:1,4,7,11,20
  48:12,15 49:8,20
  50:1 51:10,21
  52:7,24 53:11
  54:4 143:2 223:7
conferenced 44:4
conferences 37:15
  46:20 53:19
  142:23,25
confidential 5:12
  175:3
confidentiality
  175:3
configurations
  196:4
confirm 42:15
  163:9
confirmed 162:24
confound 109:13
confounding
  300:11
confuse 109:13
  153:22
confused 10:10
  109:7
conjunction 362:15
connect 144:15,17
  146:3 182:3
  186:19 224:15
  242:13
connected 224:14
connection 144:22
  145:23 182:10,11



295:21
**Connor** 262:17
**consent** 372:15,21
**consequence**
  383:20
**consider** 143:23
  144:1 145:6 164:1
**considered** 62:12
  145:3,8
**consistent** 169:13
**construct** 311:5
**constructed** 91:18
  165:25 177:1
  283:13,20 299:2
  304:20 312:20
  332:23
**constructs** 283:4
**consult** 40:19
**consulting** 350:11
**contact** 54:23 55:7
  130:12,25 131:13
  131:20,23 132:1
  137:1 235:13
  276:22 277:6
  313:23 314:19,20
**contacted** 132:1
  148:25 338:19
**contacting** 311:12
**contacts** 68:19
  323:23
**contains** 80:14
**contemplate**
  144:25
**contemplated**
  366:10
**contention** 366:25
**contents** 143:16
  320:10 336:7
**contest** 261:13
**context** 68:25 321:3
  368:15 370:10
**contexts** 370:14
**continent** 312:15
**continents** 308:12
**continuation** 374:2
**continue** 19:22

25:2 43:15 192:1
  195:18 203:19
  263:11 355:10
  375:12
**continuing** 9:7
**contract** 90:23
  239:1,4,5,6,9
  240:12 243:6,21
  248:4 249:10
  254:5,22,25 255:5
  255:12,15 256:21
  257:4,6,7,20
  258:5,10,13,16,19
  259:6,11 260:2
  261:5,8,20,22
  262:12,23 263:17
  263:21,24,25
  264:11 265:6,7,10
  265:22 266:5,11
  267:7,22,24 268:4
  268:6,15,20 269:3
  269:7,8 282:22
  284:19 348:18
  349:8,21,24 350:7
  350:9,11,14,20
  351:2 352:5 356:5
  356:7,11,18,19
**contracted** 238:23
**contracting** 261:4
**contracts** 90:19,20
  90:22 91:1 120:7
  258:4 272:6,10
  323:22 351:3
**contractual** 278:16
**contrary** 260:25
**contribute** 169:22
**contributions**
  158:16
**control** 109:17
  180:13,17 181:4
  181:12 211:9
  247:1 248:21
  291:21 292:1
  312:18
**controlled** 206:11
  206:14,17 248:16

249:2 289:9
  290:23 291:6,12
  292:11,13
**controls** 245:23
  289:12
**conversation** 18:18
  54:12 133:25
  182:11 190:6,9,11
  190:19 191:22,24
  373:23
**conversations** 31:3
  316:25 320:4,9
  336:8
**converse** 324:1
**conversing** 373:2
**convert** 248:4
**cookie** 59:6,8,10,12
**cookies** 59:16
**copied** 30:6 32:19
  97:12
**copies** 29:25 83:10
  162:9 379:23
  380:3
**copy** 12:6 52:15
  63:11 75:12 79:18
  80:16,23 97:12
  158:14 284:24,25
  343:25
**core** 240:19,21
  241:2
**corner** 189:19
**corporate** 335:16
**corporations**
  269:14
**correct** 10:7,9 57:4
  65:21 81:12,14
  96:6,7 102:23
  115:8,20,22 127:3
  171:14 174:20
  189:23 196:2,11
  196:13 234:21
  237:1 238:18,22
  240:13 241:5,12
  241:16,20 242:2
  244:7 249:3 260:7
  265:5,14 272:22

273:11 276:6
  298:1,12 304:8
  308:25 318:2
  321:19 329:7
  334:3,12,25 335:1
  352:4 354:25
  359:10 360:22
  361:19 362:22
  370:21 382:25
  383:5
**corrected** 117:1
  353:10
**correction** 320:5
**corrections** 386:6
  388:3
**correctly** 81:11
  244:24 329:1
**correspondence**
  156:4 325:19
**cost** 185:19
**Costa** 87:12 231:14
  231:16 244:4
  319:9
**costing** 347:3
**counsel** 4:14 11:6
  15:2 31:6 73:3
  97:23 296:10
  301:18,24 302:6
  302:10 309:8
  338:11,20 358:4
  358:10 360:23
  361:11,21 366:17
  367:17 373:18
  374:20 387:10,13
**count** 376:7
**countries** 35:21,21
  35:22 88:9 204:21
  233:19 234:1
**country** 127:6
  204:13 256:23
  374:21
**couple** 61:25 84:20
  131:6 142:11
  224:19 358:7,15
  364:5
**course** 125:15

159:9 258:1
  261:10 344:11
  364:23
**courses** 285:14
**court** 1:1 2:14 4:6
  4:13 5:5 7:11
  15:24 16:7,11
  17:16 19:4,10
  20:11,12 34:5,21
  35:9,11 40:14,17
  40:17 42:15 43:7
  43:12,24 49:9
  66:10 78:8 89:9
  89:10,23,25 94:16
  99:5,7 106:15
  123:18 126:24
  127:15,16 128:8
  128:10,17,22
  142:2 176:7
  183:13 184:24
  192:2,3,6 199:20
  225:15 226:25
  238:6 245:2
  251:19 263:8
  274:23 279:3,9
  283:21 293:18
  295:22,25 296:17
  317:9 331:1
  332:20 333:5,20
  349:13,15 352:3
  352:21,21 353:6,8
  353:11 356:13,25
  357:13 364:16,18
  365:25 366:1,25
  372:3 373:19
  377:13,18 383:10
  385:8 387:1,3
**courts** 256:13
  360:23
**court's** 78:2
**cover** 298:3
**covered** 18:20
  307:8,12
**covering** 15:19
**covert** 272:4
**co-operate** 313:20



**cracks** 366:16
**Craig** 1:11,17 3:3
4:3,4,22 5:7,22
68:1 77:14,18
84:3,8,9,11,17,22
85:8,12,13,24
87:14 90:2 91:3,8
92:11 93:17 94:9
94:13,18 95:5
96:1 123:24 124:3
132:2 144:19
173:20,24 190:20
221:6,10 227:18
239:12 240:17,19
244:6 245:24
246:4,7,12,13,20
246:22 247:1,8
248:6,25 256:11
256:18,21 263:20
266:7 267:25
268:3 269:6,7,23
270:15,17,19,22
272:7,10,16 276:3
277:25 278:3
279:14 280:2,2,16
282:2,14 284:1,5
323:9 330:24
334:9 343:12,15
344:2,8,14,17,24
348:2,18 350:14
378:12,13,21,25
380:8,19 385:23
386:3,20
**Craig's** 242:15
318:12
**craig.wright@inf...**
81:13
**crap** 177:24
**crappy** 356:15
**crazy** 331:1
**create** 8:16 53:6
76:19 88:7,11
99:24 100:9
124:17,23 125:2
144:20 190:21
207:9 216:5 218:7

222:3,6,17,20
223:17,25 224:8
228:24 235:5,13
258:8
**created** 14:5,6
99:15 134:10,10
193:12,14 201:20
201:25 216:14
222:12,25 224:15
231:25 232:2,6,9
234:9,20 255:14
270:3 283:9 290:7
290:9,11 302:16
**creating** 113:16
234:13 243:15
255:12,16 382:21
**creation** 96:15
100:5 134:13
204:13 215:4
217:22 218:1
234:14 258:2,6
**creator** 324:21,24
**credentials** 132:24
213:22
**creditors** 247:13
**crime** 141:25
142:12 258:7
**criminal** 194:3,6
251:13 341:23
**critical** 158:23,25
**critique** 13:14
**cryptocurrency**
323:14
**cryptographic**
383:21
**cryptography**
151:3,6 170:4
**Cryptonaut** 129:9
129:13,16,23
**CSW** 227:22
**currency** 125:18,21
**current** 308:9,9,11
361:2 363:14,25
369:19,22
**currently** 5:25
11:15 308:6

323:13
**custodial** 113:4
**cut** 136:5 261:25
262:1
**cut-off** 346:3
**cyberstalked** 287:9
**Cyberstalking**
287:12
**C/C** 254:3 255:2
284:16
**C01N** 109:21,22,23
110:1,3,10 111:4
112:1,3,5,21,24
113:9,17,18 115:7
115:10,13,14,16
115:17,19 117:5,7
118:3,9,11,17,20
118:22,24 119:14
119:23 120:14,18
120:22,24,24
121:7,8,12,13,18
122:5,22 123:3,8
123:9,9 124:7,9
307:13,15 381:10
381:22,24

_____

**D**

**d** 3:1 354:24,25
**Dai** 129:3,22
131:14 151:5
167:16,17 168:1
**damn** 187:6 312:5
**dark** 134:9
**data** 12:3 23:21,22
23:24 24:2,10,13
24:19 25:25 26:2
26:13,16 27:6
29:25 30:2,3,4,8
30:10,11 32:19
56:21 99:18
240:22 275:11
**date** 4:7 5:20 9:17
17:1,6 21:7 63:12
64:2,6,6 66:18
83:21 99:10
109:25 116:4

126:5 176:15
179:22 239:1,6
253:14 258:19
265:9 350:23,25
351:1 354:7,9
383:16
**dated** 65:2 79:8
350:7,9 386:24
**dates** 37:25 100:19
101:2 156:23
**Dave** 33:16,18 36:1
38:7,9,16 39:1,8
39:11,21,22 40:4
40:8 42:9,16,18
45:9,11 46:23,25
47:4,7,11,13,16
47:20 48:12,15,17
49:10,19 50:1
51:3,10,20 52:7
52:23 53:11,19,24
54:5,7,8,24 55:19
56:6,13,22 57:3
57:11,18,24 58:4
58:7,10,13,18,22
58:25 59:2,6,13
59:18,24 60:2,4,5
60:8,11,13,17,19
60:23 61:1,3,13
61:16,19,22 62:4
62:15,18,20,25
63:1,5,8,18,21
64:9,13,14,17
65:2 67:6 68:3,10
68:11 69:2,8
70:16 71:10,17,22
71:23 72:11,22
75:12,25 79:8,19
83:22 89:1 90:3
90:12,15 98:9,13
107:16 116:7,7,9
123:7,7,12,16
126:16 128:13
133:16,17,25
134:16,19,21,22
135:12,14,17,22
136:1,1,2 137:4

145:11,18 146:15
146:21 147:7
148:25 149:14,16
149:22,23 150:2
150:11,13,16
151:6,11,20
152:14,19,23,23
153:1,5,7 154:7
154:14,18 155:1
155:13 156:7,9
157:13 158:17
159:1,1,4,16
160:1,3,16,23
161:2,5 168:4,6
168:10,13,16
169:15 170:8,11
170:14 171:13,19
171:20 172:8,9,10
172:14,16,18,24
173:2,13,14 176:2
178:16,25 180:4
181:4,12 183:10
183:14 186:20,22
187:7,7 188:11,13
190:4 192:17
195:12 196:15
198:18,22,25
199:9,15,17,22
200:9 201:14,24
202:10,14,24
203:8 204:2,10
205:1 206:2,5,8
206:14,16 211:13
211:16 212:10
214:3,5,15,16
215:6,10,13 216:6
216:10,13,14,16
216:17,19 217:3,8
217:11 218:10,20
218:24 222:16,20
222:24 232:17
234:14 235:18,18
235:18 238:19
242:15,20,24
244:3 250:18,19
254:15 256:2,8



257:3,9,12,23
258:12,18,24
259:6,11 260:1
261:19,21,23
262:9,10,16,19
263:3 264:4,9,9
264:10,18 266:2
266:10 267:6
275:18 276:11,17
276:22 285:14
286:21 287:1
292:18,21,25,25
293:1,2,5,6,7,8,12
293:13 312:10
316:13 317:24
318:8,12 319:1,6
319:7 320:22
321:1,5,18,21
322:3,11,13 325:6
325:15,18,20
330:13,16 341:17
341:21 342:1
343:3,6,9 345:11
345:18 346:6,7
347:2,13 355:9,10
355:21 360:5,15
360:19 362:15,16
362:25 365:18
367:3,5 368:23
371:22,22 372:8
375:24 376:14
380:15 382:19,20
**Dave's** 111:10
128:19 144:8,19
149:6 156:10
158:15 190:20
207:22 218:8
233:8 258:10
315:24 341:20
343:17 344:3,9,17
346:7 373:4 377:8
377:10
**David** 1:7 8:16
242:7 283:1,6,7
**day** 91:14 190:2
204:17 341:22

**defence** 358:10
360:22 361:11
368:16 369:6,15
369:20 374:11
**defendant** 1:12 2:9
348:19 349:9
350:10,13 351:23
354:20 372:9
**Defense** 1:7 239:12
263:19,22 264:2,5
264:18 350:15
**defer** 368:6 369:14
374:10
**deferred** 383:11
**define** 27:13,13,23
49:16 52:10 53:25
55:1 86:15,18
177:16,23 178:19
198:19 255:8
**defined** 28:4
117:23 264:17
**definitely** 51:7 59:3
59:7 72:25 101:1
221:16 226:3
**definition** 209:1
253:24 256:9
257:1
**definitions** 52:16
**deformation** 65:3
**degree** 226:24
264:11
**delete** 74:13 274:2
**deliver** 247:8 283:2
**delivered** 83:7
337:19
**demonstrate**
259:11 260:1
**Denariuz** 305:9
306:10,21 307:14
307:16 308:5
**Department** 218:23
317:5 355:8,20
357:7
**depending** 209:2
**depends** 209:4
364:4

**deployed** 283:14
**deponent** 3:2 386:3
**deposed** 369:14
**deposited** 114:16
114:19
**depositing** 120:8
**deposition** 1:16 3:9
4:3,9 5:11 6:23
8:8,9 20:5 42:24
43:3 65:16 73:3
77:14,18,25 88:21
123:24 124:3
144:5 145:25
146:1 173:20,24
174:6 175:2
187:14 199:13,19
203:17,20 216:8
221:6,10 234:6,7
259:1 284:1,5
292:4 323:9
352:18,19 359:5
359:22 362:4
363:2,5,11,21
364:9 365:15,20
366:4 367:7 374:2
374:3 375:12
383:11 385:22
386:4,5 387:11
**deposition-taking**
7:9
**Derivative** 216:11
222:7 223:3
**describe** 118:8
226:4
**describing** 69:18
**Design** 62:6 110:12
111:4,23 112:15
306:24 307:9
**designed** 99:15
**designer** 106:5
**desired** 386:6
**desires** 243:22
**Desmond** 82:10
**Despite** 225:22
**destroy** 119:6
**destroyed** 75:5,8

**detail** 55:16 257:10
368:19
**detailed** 272:2
**detailing** 86:18
**details** 53:2 72:8
121:23 127:15
137:17,19 140:18
144:19 190:20
198:17,20 213:10
229:20 277:6
293:13
**determination**
127:16
**determine** 19:23,25
20:2 285:23
286:15 292:9
311:19 338:20
340:17 367:11
368:7,10 373:24
**determining** 96:16
**develop** 88:2,3
168:10,13
**developed** 186:24
218:24 241:17
276:21 277:24
283:17 287:12
323:24
**Developers** 76:18
**development** 28:20
28:24 29:1,5,5,8
29:14 99:16 207:7
244:7 283:1
323:18 326:10
328:6 351:17,19
351:21,21,25
**development/Res...**
265:4
**device** 11:14 21:17
**devices** 24:20 25:25
30:21 31:1,11,16
31:23 41:16 42:3
99:17
**DEVIN** 2:3
**de-designate** 5:13
**DHS** 255:24 275:10
275:14 370:19

380:10 386:24
**days** 187:17 305:24
**de** 2:11
**dead** 355:23 360:15
382:23
**deadline** 366:1
**deal** 16:10 174:21
231:14 233:3
368:14
**dealing** 149:19,19
232:17 261:4
**dealt** 42:3 103:9
231:3 366:4
369:24
**death** 99:1 111:10
282:10
**Deborah** 317:7
**debt** 347:17
**debtors** 247:13
**debunk** 384:2
**December** 12:25
14:3 133:20,21
137:3 195:3,15,16
195:24 196:9
306:14 358:25
365:11 380:22
**decide** 78:14 125:5
145:14 161:9
165:5 167:9 337:3
**decided** 73:19
128:23 140:8
325:12
**decision** 373:21
**declare** 334:10
**decline** 373:23
**deduced** 285:18
**deed** 297:14 308:24
309:1 312:3,25
**deem** 78:6
**deemed** 256:11
**deep** 329:2
**defamation** 150:4,8
**defaming** 162:21
**default** 248:5 268:3
**defective** 260:9
262:6



371:16 372:19
**dialogue** 66:10
**dictated** 165:22
**dictionary** 52:15
117:25 322:10
**died** 47:9,13,16
98:16 116:7,7,9
242:7 282:9
354:20 382:20
**difference** 171:12
**different** 10:15
14:2 23:25 35:19
79:17 84:16 88:8
96:16 104:9
105:13 110:11
125:2,3,4 135:7
156:13,15 157:14
161:16 165:24
218:22 219:1
232:13 239:25
255:4 258:10
291:13 298:16
300:12 301:6
302:14,15,16,20
302:20 304:5
312:21 325:5
328:2 354:13
361:4 382:3
**differently** 165:22
**differs** 124:24
**difficult** 76:21
258:4
**difficulties** 65:3
150:9
**digital** 55:13 64:25
74:19 124:24
**digitally** 260:13
**direct** 91:19 118:14
160:5 325:19
328:12 330:14
332:4 354:2
368:24 379:23
380:4,10
**directed** 52:19
118:24 238:7
**directive** 78:2

**directly** 324:1
372:22
**director** 13:12
288:1,3,10 339:1
354:19 361:3
367:20
**directors** 122:5,8,8
**directorship**
288:14 339:5
**directorships**
288:13
**disagree** 261:7
338:17
**disappear** 314:15
**disappeared**
186:24 201:21
314:18,21,24
**disappointment**
134:16
**discipline** 287:13
**disclosed** 174:23
338:11
**disconnecting**
195:11
**discovery** 226:2,14
337:22 362:5
**discrepancy** 228:23
**discuss** 16:18,23
17:3,9 18:21 38:9
38:18,21 40:13
55:19 56:6 59:6
59:12 75:24
127:14 141:10
143:14 176:7
198:17,19,21
199:8 264:13
297:1 329:25
330:5,10 331:4,9
331:12,15 363:12
363:16 367:22
382:18,22
**discussed** 49:8 59:9
64:14 130:7 141:9
141:11 148:10
160:11 171:23
188:24 341:17,21

**374:24 382:21
**discussing** 75:23
78:18 127:12
175:11 273:15
333:20
**discussion** 40:18
45:4 82:24 216:7
303:14 361:11
**discussions** 76:2
143:13
**disillusioned**
133:23
**dismiss** 19:2
**disposal** 250:24
**disposition** 91:16
**dispute** 226:20
257:23
**disputes** 385:5
**distinction** 205:14
208:3
**distribute** 258:8
**distributed** 232:13
232:19
**distribution** 167:7
233:4
**District** 1:1,1 4:6,6
333:6
**dive** 119:6
**division** 142:1
**divorce** 16:18 17:1
17:6 363:11,13
**divorced** 16:21,23
**DMCA** 378:16
**docket** 126:10
189:23 240:5
**doctor** 6:8 52:1
109:7 253:4
264:12 285:2
332:4
**doctored** 332:22
**document** 65:10,10
65:14,14,19,23,24
66:13,13,24 67:4
67:4 157:4,8,11
159:1,11 189:20
227:11,13,15

228:7,8,25 239:15
241:22 254:6,10
256:15 290:14,21
297:16,16,19,21
298:1,7,9,12,14
298:16,18,22,22
298:25 299:14
300:25 301:2,19
301:25 302:4
304:3,4,5,18
308:16,20,21
311:4 315:7 333:9
334:15 348:23,24
349:4 351:7
354:10,11,13,14
355:5 365:9
**documenting** 28:21
**documents** 83:11
122:2 163:20
286:3 290:15,16
290:17 292:24
293:14 297:10,12
297:17 298:19
299:2,5,10 300:19
301:22 302:4
304:20 312:21
333:7 334:18,20
334:21,24 335:7
335:12,17 336:1,1
336:3,4,10,12,14
336:15,18,22,24
338:5,7,13,16,21
349:18,19 351:20
352:3 353:3,7,10
355:2 357:9 362:6
**document-wise**
353:7
**doing** 26:17 78:8
82:7 88:14 106:20
122:11 125:12
135:20 138:9,24
142:11 154:1
158:22 160:14
177:24 187:21
188:11 191:20
195:7 199:1

227:22 228:13
231:11 232:4
264:12 285:15
287:15 341:22
352:1 356:25
369:3
**dollars** 227:21
251:17 372:16
**domain** 81:9
176:12,14 177:14
177:20,21 178:7
178:17,20,23
179:7 180:5,8,11
180:13,18 181:1,5
181:13,20 223:23
224:7
**domains** 81:8,17
180:6
**donate** 11:25
**donated** 74:20
**door** 231:12 232:10
**doors** 233:6 362:5,5
**Dorian** 213:14,15
213:17
**dot** 179:7,13
**double** 41:13
**double-check** 159:2
162:20
**doubt** 210:24,25
**download** 122:19
**downloaded** 166:21
**Dr** 3:3 4:3,25 5:7
5:15 8:13,22
18:17,22 19:12
20:14 25:23 30:20
31:2 35:8 37:5
41:6 68:1 69:6
71:4 77:14,18
78:15 82:23 97:22
98:3 106:13
123:24 124:3,6
126:22 132:2
145:19 173:20,24
175:9,23 176:11
188:23 217:15
221:6,10,13 238:7



245:12,23 247:18
256:18 258:25
262:5 263:7
264:21 265:6
267:4 269:22
271:1 277:12
283:9,17 284:1,5
284:8 295:8,10
296:1 297:7
307:18 308:16
309:7 312:25
313:15,19 315:2
316:10 317:2,20
320:20 322:11
323:9,12 333:5,19
334:23 335:11
338:4,15,19
339:18 341:25
345:24 352:20
358:18,19,21,23
360:13,18 361:1,9
361:16,21 362:10
363:10 365:17
367:1 368:4
369:13 371:21
372:3,4,14 373:2
373:3,6,17,24
374:4,8 375:18
376:14,21 377:7
377:25 378:12,13
378:21,25 380:8
380:19,23 381:9
382:24 385:23
**draft** 136:13 139:1
139:7 191:5
301:18,24 302:6
302:24
**drafted** 348:23,24
349:2,22
**drafting** 138:16
350:18
**drafts** 136:25 141:7
142:15
**drank** 38:10 39:5
**Dread** 186:10
**drill** 55:11,17

287:11
**drink** 7:17 38:11
323:2 357:22
**drinking** 204:16
**drive** 14:24 21:14
74:23 75:4,13
319:16 321:5
**drives** 21:6 74:15
74:17,18,24 75:15
262:25 377:8,10
**driving** 330:25
**drove** 38:16
**drunk** 204:16
**dubbed** 100:3
**due** 346:23 360:21
**duration** 242:15
318:12
**D-E-B-O-R-A-H**
317:10
**D-E-S-M-O-N-D**
82:11
_____

**E**
**E** 2:1,1 3:1 388:1
**EA** 256:14
**earlier** 5:17 41:14
109:8 210:19
283:10 313:22
344:18
**early** 55:14 167:7
175:24 202:22,23
289:7 290:4
319:15 372:5
**earn** 196:3 241:15
241:19,23
**earned** 196:10
**ears** 102:22
**earth** 313:16,17
**easier** 21:11 158:20
207:15 245:15
**Eastern** 84:20
**easy** 77:22 158:21
**economic** 224:1
356:16
**EC4A** 1:22
**edit** 136:20 156:7

168:16 169:15
**edited** 136:7 156:8
172:24
**editing** 63:22 65:4
159:8
**edits** 156:10 171:16
171:20 172:15
**effect** 365:13
**effectively** 14:1
28:5
**effects** 96:16
**effort** 78:5 375:9
**efforts** 374:20
**either** 25:12 30:4
34:6 37:24 63:10
66:8 70:24 89:2
110:11 123:6,8,9
144:13 174:21
220:22 222:16
248:24 318:18
347:16 358:8
362:15 369:22
370:21 374:1
**electronic** 64:25
65:6 75:5,8,15,16
260:11
**Ellen** 108:12,19
**else's** 158:21 342:7
**email** 317:23
**emotion** 158:20
**employed** 12:11,16
12:21 13:3,6,8
387:10,13
**employee** 120:7
387:12
**employees** 41:15,22
41:24 42:1,3
**employer** 13:3,6
**employment** 13:13
**EN** 142:5
**enable** 83:3 219:2
235:22
**enabled** 231:13,16
231:18,20 234:10
**enacted** 90:14
**ended** 250:23 252:2

252:24 347:3
**ends** 253:6
**engineers** 163:6
**England** 260:20
**English** 54:21
**enhanced** 231:10
232:3,12,16
243:14
**enquire** 295:8
296:1,6
**enquiring** 368:4
**ensure** 88:14,16
134:11
**ensured** 92:13
**enter** 90:11 98:12
272:6,10 374:25
**entered** 19:24
90:17 243:6
266:11
**entire** 5:11 150:19
191:3 193:17,22
204:17,20 312:14
**entirely** 195:16
226:1 335:2
373:12
**entirety** 264:16
**entities** 77:3 87:4
87:15 88:7,11,25
90:20 91:4 94:18
95:6 96:2 238:8
244:20 296:2,4
349:17
**entitled** 89:12
191:19,20 216:11
308:17,24 375:18
**entity** 90:23 96:4
96:13 97:15 98:10
98:12,20,22 99:1
99:3,8,14,20,24
100:9,15 101:12
107:16,19,21,23
108:1 109:21
118:12 120:25
121:7,8,10,11
263:20 264:8
269:4

**entry** 126:10
189:24 240:5
**envisioned** 99:5
243:18
**EOS** 323:14 326:1
**equipment** 11:24
**Ernst** 102:4 104:3
**error** 265:5 300:15
301:22 320:16
349:3 350:18
351:22 353:5
354:6,13
**errors** 353:1
**Especially** 385:4
**ESQ** 2:3,5,22,23
**establish** 8:13
145:23
**established** 97:5
99:1 181:12
205:17 238:19
339:25
**Estate** 1:6
**et** 4:4 154:2
**etcetera** 17:19,19
21:8 37:16 74:21
159:2 163:20
172:13 181:1
185:22 247:15
261:4 267:10
272:5 274:23
275:17 300:15
312:19 325:12
**ether** 148:2
**Ethereum** 88:3
**European** 84:20
**evening** 361:24
**event** 169:8
**eventually** 20:5
33:22 100:6 113:3
160:16 200:23,25
207:12
**Everyday** 253:7
**everyone's** 374:20
**evidence** 66:25
134:12 155:15
215:8 260:24



261:1,15 262:24
274:18 312:22
**exact** 9:17 11:2
14:15 24:9 37:25
53:2 85:2,14 96:8
112:2 118:6 126:5
133:19 156:22
179:22 213:9
259:2 281:8
325:10 344:21
**exactly** 44:5 45:16
53:22,25 54:14
80:15 85:11 93:19
102:5 110:13
113:10 118:20
142:20,21 152:22
156:12 158:11
172:24 173:1
189:1 202:21
211:19 248:23
254:14 263:10
265:18 285:11
335:22 341:11
378:22
**examination** 6:13
**example** 55:13
**exchange** 62:10,11
62:11 79:22 81:1
81:7,8,10 125:24
204:8,9,25 206:2
206:4,6,7 251:16
254:2,4,10,19
255:1,19,21 315:4
351:17
**exchanged** 205:13
**exchanges** 317:23
**excuse** 177:25
**exercise** 118:24
**exercised** 118:22
**exhibit** 3:10 78:16
78:17 79:7 126:8
126:9 150:6 160:6
161:16,17,18
189:7,17 193:5,11
227:7,10 239:2,4
259:17 263:14,14

263:16 278:11
284:9 296:18
297:8 302:6,7
314:25 315:3
333:15,22 347:19
347:22 370:17
371:4
**exhibits** 3:9 244:21
278:10 295:15
**exist** 74:6,7 76:6,7
84:14 85:5,10,22
121:24 137:19
139:22 162:2
201:19 219:13
296:11 306:11,13
343:21 349:18
351:20 353:3
355:2 357:9 367:8
**existed** 20:15 76:20
79:17 306:15
**existence** 107:21
116:19,24 117:5
183:3,23 230:7
286:2 290:3
**exists** 50:25 306:12
311:8 365:9
**exodus** 217:20
**expect** 179:7
241:19,23 311:6
**expected** 241:11
**expecting** 352:4
**expects** 241:15
**expert** 74:19
158:19 369:11
**explain** 19:8 89:5
109:10 144:5
177:4 189:3,8
204:5 205:7,12
265:23 268:2
282:24 315:12
**explained** 253:5
**explaining** 320:25
**explanation** 40:16
126:24 253:6,7
254:19
**explicit** 208:21

**exploitation** 74:21
**explore** 367:20,24
**explorer** 253:13
**exposed** 380:22
**express** 95:21
**extension** 366:9,13
**extent** 19:21 31:5
303:2 334:19
336:2
**extra** 275:6
**ex-wife** 15:17 17:6
218:18 360:18,24
364:14 369:5
**eyes** 200:7
**e-cash** 125:4
**e-mail** 54:4 58:25
59:2,18 60:5,15
60:17,19 61:13,16
62:15 63:11,12,13
63:16,25 64:2,3,8
64:14 65:1,7,8
66:1,3,17,18,19
67:12,17 68:19
70:23,24,25 71:3
72:24 79:7,9,11
79:15,18,25 80:5
80:8,10,13,17,24
81:2,4,12,15,25
83:21 126:11,14
131:15,16 132:9
136:2 138:8 147:9
147:13 148:15,16
148:21 150:3
155:5 160:6
161:16,19 179:7
209:3,8 210:2,6
210:13 212:3,4,8
256:16,19 273:1,2
273:20,23 317:21
317:23 318:24
321:3,18 325:24
327:21 329:11
342:22 360:19
372:25
**e-mailed** 59:20
60:23 61:1,19,21

104:13 171:11,13
171:16 287:14
329:16
**e-mailing** 58:18,22
63:18
**e-mails** 60:7,10,13
60:21 68:2,8,11
68:21,24 69:3,8
70:16 71:9,10,17
129:2 132:13
261:7 262:25
315:4 335:17

**F**

**F** 244:7 245:13
246:2
**fabs** 345:23
**Facebook** 67:19,19
67:20 262:13
**facilitate** 136:4
**fact** 6:22 109:15,18
225:14 251:24
260:16,19 284:24
307:16 309:2
335:6 366:19
376:2 379:4
383:21
**facts** 155:14 215:7
307:15
**failed** 134:14
174:16
**fails** 220:22
**fair** 144:16 352:8
362:8
**fairly** 214:18 258:9
368:12
**Faketoshi** 384:21
**false** 220:22,23
**familiar** 80:16
191:3 270:9 276:1
281:22 327:20
380:25 381:6
**familiarise** 240:6
**familiarised** 267:19
**family** 18:21
164:14 331:16

**famous** 303:9
341:22
**far** 97:1 173:12
175:25 242:24
243:16 247:6
363:4 372:7
**faster** 384:9
**father** 315:25
371:22
**fault** 10:10,12
**Faustus** 379:2,3
**FBI** 35:24
**features** 277:9
**February** 126:4
318:23
**federal** 70:5 95:21
141:24 311:14,16
337:3
**feedback** 172:1,3
**feel** 7:17 9:13 78:6
128:7 221:13
262:4,7 300:18,20
**feels** 364:16
**fees** 253:3
**Ferrier** 309:23
**fibre** 185:17,18,21
**fiction** 193:11,15
193:18,23
**fight** 319:15
**fights** 150:10
**figure** 171:10
205:19 225:3
250:22 307:20,22
322:23
**figured** 77:22
**figuring** 318:1
**file** 81:19 161:11,12
161:14 216:15
236:10 352:14
355:24 366:9,20
368:16 369:6,15
369:16 374:11
**filed** 17:16 353:2
355:22 360:23
366:3,5,10
**files** 81:7 164:2,5



300:14,14 303:22
303:22 335:18
377:8,10
**filing** 355:10 365:8
365:12 366:14
374:23
**final** 158:1 368:19
**finally** 372:25
**finance** 96:5,25
247:11,13 248:8
248:11,22 249:2,7
**finances** 281:9
**financial** 141:25
142:12 224:9
279:18 313:9
**financially** 387:14
**financier** 240:13,17
245:23 246:2
248:3,5
**find** 16:8 82:14
129:10,13 147:7
147:21,25 148:8
163:14,16 187:5
190:16 199:5
262:24 263:2,4
296:13 332:25
383:15
**fine** 5:14 6:8 77:10
123:20 281:24
286:9 354:23
361:25
**finish** 69:6 158:3
201:22 252:21
262:4 263:11
267:4 296:1 313:7
**finished** 141:15
**Finney** 129:4,22
153:19 154:5,14
154:19,22,24,25
155:20,22,23
156:5 172:12
175:16,20 188:5,7
192:12
**fired** 103:13,15,19
138:9
**firewall** 231:13

232:11
**firewalled** 207:12
**firm** 12:23 94:1,3
143:10 303:6,9
**firms** 303:7,16
**first** 9:24 15:11,15
16:2,8 53:24 54:5
63:7 64:8,16
83:22 84:1,11
95:23 105:13
108:12 129:7
142:3 145:11
157:6 167:7 168:6
169:1 176:14
179:19 180:5
182:6 184:2,12
189:25 191:10,12
191:20 199:22
200:5 201:20,21
215:5 238:23
263:23,25 264:17
285:6,10 286:20
286:21 297:25
298:2,3 309:21
326:2 359:11
361:13 362:9
365:25 368:4
371:20,21 384:23
**fit** 254:4,10
**fits** 8:10
**five** 48:3,5 67:23
**five-minute** 323:1
**fixed** 154:5
**FL** 2:12
**flashing** 178:3
**Flexiteek** 226:18
**Flexner** 1:21 2:3,6
2:22,23 4:10,11
**flip** 186:10
**flippant** 321:2
**Florida** 1:1 2:4 4:6
37:23 38:1,6 46:1
46:14 263:19
264:18 333:6
**flowers** 273:8
**fluctuates** 356:12

**fluffy** 51:1 177:24
204:6
**flush** 369:20
**FNE** 96:5,24
**focus** 233:21
**Foley** 1:24 2:15
4:13 387:3,24
**folks** 233:9 248:15
248:20 249:2
250:22
**follow** 148:17
233:13 234:12
311:17
**followed** 148:21
287:13
**following** 245:23
290:6 334:11
**follow-up** 339:13
363:24
**foolish** 243:1
**foolishness** 70:12
**forced** 332:21
**forcefully** 385:6
**forecasting** 96:14
**foregoing** 386:4,5
387:5
**foreign** 204:21
**forensic** 74:19
**forensics** 159:23
**forget** 112:3 130:23
**forgotten** 213:16
**form** 20:20 24:25
25:6,16,18 50:20
63:2 65:6,12 66:8
67:2 69:14,17,19
72:1,4 77:24
97:15 113:3 119:8
134:11 139:7
226:1 252:9
253:20 260:8
**formal** 127:10
136:16 365:7
**formalised** 290:4
**formally** 42:21
162:22
**format** 55:14,16

**formation** 33:16,18
33:22,25 113:1
120:12 182:5
**formed** 72:1 84:23
85:1,8,13 98:15
98:18 110:10
111:23,25 112:12
113:12,13 117:9
117:11 277:23
303:6
**former** 16:19,24
17:2,3,9 80:25
104:10 130:9
**forms** 14:2 56:6
313:25 345:22
**formulated** 283:6
**forth** 228:17
**forthcoming**
282:11
**forum** 135:12,15
138:2
**forums** 155:4 209:3
209:4
**forward** 65:3 71:5
166:3,19 228:13
349:6 359:2
375:11 382:24
383:2
**forwards** 335:17
**fought** 352:4
**found** 11:10 13:25
148:4 158:24
299:12
**foundation** 140:7
152:15 154:16
168:12 212:12
242:11 324:10
331:21 332:1
**founded** 13:24 14:1
84:12 96:10 99:9
109:12,23 122:23
291:1,5 293:24
306:23 308:10
**founders** 346:22
378:18
**founding** 106:23

360:20
**four** 67:23 130:6
190:1,3 216:25
217:6,22 218:1
275:10,14 299:2
304:20 308:12
312:21 314:20
361:7,13,17
363:22 366:23
369:24 370:13,24
371:5
**FPGAs** 241:17
**frank** 366:14
**fraud** 316:4 333:3
**fraudulent** 18:25
**Freedman** 2:3 3:4
4:18,18 5:3,8,9,14
5:17 8:12,21 9:9
9:15 10:3 11:12
11:23 12:15,19
13:10 15:6,10,22
16:1,4,10,14
17:11,25 18:16
19:6,9,17,23 20:3
20:10,13,19,23
23:14,23 24:6,12
24:23 25:5,16,21
26:4,12,18 27:1,5
27:10,15,19,25
28:13,23 29:7,12
29:21 30:19,24
31:10,15,19 32:1
32:11 33:2,15,21
34:2,11,16,23
35:3,15 36:3,7,15
37:3,10,22 38:5
38:25 39:6,18
40:3,7,22,24 41:5
41:8,12,20 42:23
43:1,2,4,10,14,16
43:22 44:2,13,19
45:7,19,25 46:9
46:15,22 47:15,23
48:2,10,19 49:6
49:13,17,23 50:4
50:8,15,19 51:2,8



51:14,18 52:11,21
53:5,9,17,23
54:16,22 55:2,23
56:16 57:8,17,23
58:3,21 59:17
60:3 61:12 63:17
63:23 64:15 65:11
65:15,25 66:7,15
67:1,5,24 68:6,15
68:20 69:1,13,17
69:20 70:1,4,8,14
70:21 71:16 72:10
73:6,12,16,21
74:2,10,16 75:3,9
75:19,22 76:10,25
77:7,10,20 78:7
78:13,21 79:2,5
79:14,24 80:4,9
80:18,22 82:3,8
85:21 86:8,12,21
86:25 87:10,21
88:6,17,22 89:2,7
89:11,14,20 90:1
90:6,10,16 91:2,7
91:20 92:10,15,19
92:25 93:4,10,21
94:2,12,17 95:15
96:23 97:21 98:8
98:17 99:6,23
100:8,14 101:3,8
101:16 102:16,24
103:14,18,22
104:6,21 105:8,21
106:9,22 108:5,11
108:17,22 109:19
110:2,20 111:2
112:10 114:1,11
114:18 115:1,6,12
115:24 116:6,10
116:15,18 117:4
117:10,14 118:7
118:15,21 119:3
119:13,19 120:17
120:21 121:17
122:4,13,21
123:20 124:5,13

124:21 125:8,10
125:22 126:2,15
126:25 127:4,6,9
127:18 128:5,12
128:18 130:21
132:4,6,23 133:12
133:14 134:5,15
134:18,20,25
135:3,10,21
136:11,18,24
137:7,12 138:11
138:25 139:6
140:10 141:6,17
141:20 142:8
143:22 144:7,12
144:18,24 145:5
145:10,20 146:6
146:12,20 147:1
148:3,7,19,23
149:5,11 150:12
150:18,23 151:23
152:6,10,13,18,24
153:4,6,15,21
154:6,13,17 155:3
155:6,12,16,19
156:3,19,24
157:12,18,23
158:8,13 159:14
159:18,20 160:2
160:15,22 161:1,6
161:17 162:15,19
162:23 163:8,13
164:4,16,21 165:2
166:8,18,25
168:15,25 169:7
169:20 170:13,23
171:4,9,25 172:22
173:3,7,17 174:17
174:21 175:6,8,14
175:21 176:4,10
176:21 177:2,12
177:18 178:5,15
178:21 180:2,12
180:16 181:8,14
181:18,23 182:2,5
182:12,18 183:1,9

183:12,17,21
184:1,6,14 185:1
185:7,11,13 186:7
187:1,15,17,22
188:1,6,12,20,22
189:6,9,14,23
190:10,15 191:2,7
191:12,15 192:1,7
192:16,22 193:3
193:16,21 195:14
196:5,14,25 197:5
197:12,22 198:7
198:11,16 199:4
199:14,21 200:1
201:9 202:6,9
203:4,13,24 204:7
204:23 205:10,15
205:19,25 206:9
206:15,20 207:1
207:21 208:4
209:7,19 210:8,12
210:21 212:9,15
213:13 214:14,23
214:25 215:3,11
216:9 217:2,13,25
218:6,13 219:18
220:2,11,17 221:2
221:12,17,25
222:11,19 223:1,8
223:13,24 224:5
224:13,20 225:7
225:11,19,24
226:5,11,15,17,21
227:2,8 228:3,5
228:10,19 229:5
229:15,22 230:1
230:10,15,22
231:5 232:25
233:16 234:8,19
235:3,12,17,20
236:2,9,16,23
237:5,13,20 238:2
238:6,10,21
239:14,18,20
240:1,4,16 241:25
242:14,23 243:20

244:5,12,17,20
245:4,11,17,21
246:18 247:7,21
248:10,19 249:11
249:21 250:4,9,21
251:3,21 252:6,14
252:20,23 253:15
253:22 254:8,11
254:21 257:16
259:9,18,25
261:24 263:6,12
264:3,19 265:17
265:20,25 266:15
267:12,17 268:8
268:17,24 269:18
270:5,24 271:14
272:15,19 273:10
274:6,13,19 275:7
275:23 276:14
277:3,12,17 278:9
278:15,21 279:2,7
279:13,19,23
280:8,14,21 281:1
281:12,19 282:12
282:23 283:23
284:7,13 285:1,17
285:23 286:6,14
286:19,25 287:5
287:10,23 288:6
288:16,21 289:8
289:13,18 291:10
292:5,16 293:20
293:25 294:5,10
294:14,19 295:7
295:13,18,22
296:16,19,24
297:4,6 299:8,19
300:22 301:10,17
301:23 302:5,12
302:22 303:11,24
304:13 305:4
306:19 307:4
308:4,15,22 309:6
309:14 310:5,8,22
311:2,11 312:1,23
313:6,13 314:6,11

315:1,19,22 316:9
317:1,10,13
318:11,18,22
320:13,18 321:17
322:2,18 323:1,11
324:7,13,19,25
325:14 326:16,21
327:1,6 328:9,25
329:6,10,24 330:4
330:9 331:3,8,18
331:23 332:3
333:10,18 334:4
335:10,20 336:11
336:17,23 337:13
337:25 338:12,17
339:4,11,22 340:4
340:8,12,17,22
341:3,7,14,24
342:10,16,20
343:2 344:1,7,13
344:23 345:14,17
346:5 347:8,20
348:7,14,16
349:12,21,25
350:4,19,24
351:12 352:13,23
353:20 354:1
355:6,16 356:1,17
357:2,22 358:6,7
358:13,18,23
359:10,17 360:4
360:11,17 361:1,7
361:19 365:22,23
365:24,25 366:8
366:11,14,22,24
368:1,2 370:2,6
370:20 371:17,18
372:12 373:10
375:3,4,17,23
376:4,13,18,20
377:14,18,21,24
378:9 379:19
380:2,7 381:2,17
382:4,9,17 383:3
383:8,14,18 384:1
384:6,10,15,20



385:9,12,16
**freedom** 337:18
**frequency** 49:19
51:20 56:12 57:2
57:10 60:21,25
61:18
**frequently** 47:6
59:20 60:22
**friend** 48:17 71:25
160:3 214:16,17
**friends** 70:25
159:22 262:19,20
**front** 37:21 109:4
111:12,19 121:22
122:25 123:5
128:8 150:7
158:15 270:11
276:2 295:24
297:14 298:19
313:4 373:1,5
**fucked** 133:24
**fucking** 157:17
**fulfillment** 268:15
**full** 8:18,20 18:21
52:14 159:8 169:5
171:2 219:9
308:21 347:5,9
352:19 379:13
**fully** 367:24
**full-time** 198:4
**fulsome** 40:16
126:24
**functions** 26:6,11
159:5
**fund** 140:9 355:21
**funding** 139:14
140:4 218:21
**funds** 354:21,21,24
355:3,7,12,12
**further** 99:3 123:15
154:7 301:16
362:19 363:18,20
368:1 373:14
375:2 387:9
**F(b)** 252:9

**G**

**G** 244:7 245:13
247:9 327:18,20
327:23 328:2,4
**gained** 138:3
**gaming** 231:10,14
232:3 244:2
**Garzik** 329:11,19
330:1,6,11,13
**Gati** 326:6
**Gavin** 330:18,20
**gears** 77:2
**general** 28:11
190:22 205:15
360:10 370:21
**generally** 62:10,12
101:13 291:17
306:9 313:24
325:8
**genesis** 181:24
182:14,21 183:2
183:22 184:7
**gentleman** 188:25
327:18
**getting** 8:25 108:1
144:4 152:8 156:1
185:16 204:16
208:12 213:17
328:19
**GICSR** 315:10,12
316:14,17 317:4,7
319:8 370:16
371:4 373:3
**give** 10:19 40:16
57:9 63:21 66:12
66:14 71:2 78:22
78:24 79:2 89:8
112:21,22 119:7
124:14 135:22
148:12 150:24
168:4 177:6,8,19
178:6 186:18
203:16 212:18,20
245:3 253:21
257:11,22 279:9

286:10 296:22
313:9 315:17
330:24 359:12
371:19 374:10
380:3
**given** 31:7 37:4
75:13 114:22
119:12 140:17
146:2 147:9
167:14,15,16
169:23 171:3,11
205:4 211:16,18
251:11 268:11
282:8 305:20
328:17 337:5
355:8 367:22
369:13
**giving** 9:12 77:23
145:24 195:10
247:11 282:11
385:4
**glass** 30:15
**gloss** 371:20
**GMX** 209:10 210:3
211:1,6,16,23
212:10,18 214:6
**go** 8:2 12:1 14:25
17:12 19:16,19,20
19:21 20:8,9 31:2
40:23 41:12 42:11
42:19,24 43:8,19
43:23 51:25 72:8
75:19 77:10 96:2
98:20 101:1
107:19 108:2,5
109:5 119:24
122:20 125:5
134:7 142:24
144:23 153:10
157:6 162:21
191:10 195:12
211:6 216:7
227:10 239:21,22
246:11 247:6,17
249:6 252:10
253:23 255:25

256:18 259:23
261:23 262:13,17
262:22,22 266:4
267:13 272:3
277:18 279:17
280:6 283:12
291:11 305:5
310:2 311:23
313:14 315:7
318:23 320:1
321:7 322:9
333:11 341:21
348:11 350:5
352:2,24 353:17
353:20 354:15
357:15,19 365:20
370:9 384:10
385:1
**God** 187:6 312:5
**gods** 82:21
**goes** 65:7 100:2
103:21 178:12
189:10,12 191:12
205:10,11,13,15
244:15 260:18
301:15 306:8
340:15 345:21
359:2 362:11
363:18 364:8
383:9,23 384:4
**going** 5:11 8:22,24
16:1 31:5 36:20
37:3 40:12,25
41:3 43:13,14,20
52:16 61:11 65:5
65:23 66:5 70:9
77:1,2,12,18
78:23 88:20 89:14
91:22 96:4 98:4
99:2,8,13 101:20
103:17,20 107:23
108:6,9 109:20
122:19 123:14,22
124:3 127:12
128:21 134:19
136:19 144:8,24

152:12 156:2
159:10,11 164:11
164:12 166:3,19
173:18,24 178:2
181:11 185:18
190:12,13,15,17
191:7 192:2
196:21 197:1,6
199:11,12 203:15
203:17 204:24
205:2,5 209:17
214:20,21 216:3
219:8 221:4,10
222:14 225:6,7,8
225:8 226:4,5
237:24 240:8,9,10
242:12 244:14,22
245:6,9 247:14
257:22 259:14
261:17,21,25
262:4 263:11
273:12 274:20
279:7 283:24
284:5 285:21
286:9 295:19
304:3 305:24
316:24 318:20
323:4,9 333:12,16
340:14 342:18
346:8 350:1
352:16,18 353:21
353:24 355:25
357:24 358:2
363:3 366:18
368:18 370:12
374:4,4,16 375:10
376:2,5,6 377:12
384:10,24 385:6
385:20
**Golden** 6:6 256:10
**good** 5:15,16 13:14
77:8 123:19 124:6
149:22 159:1
249:1 262:20
362:1,2
**goods** 62:10 251:16



**Google** 138:7,8
  311:23
**gotten** 123:13
**government** 35:24
  46:20 95:25 121:4
  127:22,24 128:1,6
  139:11,13 140:8
  218:21 232:21
  337:18 346:17,18
  346:20 356:14
  374:9,14
**governments** 88:15
**Gox** 251:13,20
**GPU** 240:20
**Granger** 130:7,8,10
  130:12,14,16
  131:1,9 141:12
**Granger's** 142:3
**grant** 368:15
**graphic** 106:5
**great** 193:14
  385:11,16
**greater** 52:15
  322:10
**greedy** 315:25
**Greek** 82:21
**grey** 346:13
**Grigg** 323:12,13,15
  323:21 324:15,20
  325:1,9,15,18,22
**Grigg's** 323:22
**grounds** 296:5
  361:10 372:10
  373:8
**group** 151:4 184:17
  184:19 250:17
  337:2 343:9,9,11
**groups** 330:16
**guess** 12:20 105:19
  105:20 295:19
  322:25
**guessing** 105:19
**guilty** 279:10
**guy** 213:11 247:15
  328:23 341:22
**guys** 234:5 262:20

**G(b)** 252:10

---

## H

**habit** 300:18
**Hac** 2:6
**hairs** 212:13
**Hal** 129:4,22
  153:19 154:5,14
  154:19,22,24,25
  155:20,22,23
  156:5 172:12
  188:5,7 190:4
  192:12
**half** 126:11 235:9
**halfway** 189:25
**half-truth** 190:8
**hand** 50:24 99:13
  181:2 204:20
  230:8 257:25
**handbook** 226:2,14
**handed** 122:2
  180:23,24 204:14
  204:15 227:9
  239:3 263:13
  270:3 304:20
  347:21 353:10
**handing** 79:6 126:7
  189:6 315:2
**handle** 100:5 101:9
  101:17,23,24
  103:25 104:16,22
  378:19
**hands** 109:4
**handwriting** 300:3
  300:4,24
**handwritten**
  260:15,16 261:11
  303:18
**happen** 24:16,17
  118:14 165:21
  235:10 248:24,24
  248:25 249:1
  308:10 374:16
**happened** 41:23
  74:11 81:22 101:2
  247:15 250:15,18

273:25 280:20
282:4 311:10
337:6 339:17
346:15 378:13
379:3,21 382:14
**happening** 379:12
**happens** 281:11
**happy** 43:19
  106:14 247:15
  250:18,19,20
  264:14 352:7
  367:12
**harassing** 384:25
**harassment** 385:5
**hard** 21:6,14 74:15
  74:17,18,22,24
  75:4 262:25
  319:16 321:5
  366:19 374:19
  382:22
**hardware** 12:4
  200:20 240:20
  241:5 265:11,12
  271:7,9,11,15
  274:21 275:1
  276:15,16,20
  282:1,15
**Hardy** 327:19,20
  327:23,25 328:2,3
  328:4
**Harebell** 5:25
**Harry** 102:4 104:7
  104:16
**hate** 72:2
**hated** 134:13
**head** 11:4 72:19
  85:17 87:13
  112:20 116:5
  119:18 133:2
  139:18 142:6,14
  209:15 281:8
  341:16 342:7
  343:19
**headquarters**
  36:17,19
**hear** 43:5 89:7,10

**361**:20 366:19
  374:7
**heard** 4:5 76:22
  202:3,3 365:21
**hearing** 296:2,21
  366:11,11 372:4
  383:12 385:21
**hearings** 238:8,10
  295:25 364:25
**heart** 131:16
**heavily** 19:11,12
**heavy** 375:9
**held** 86:7 113:8
  117:11,18,20,21
  118:3 190:23
  248:3,6 267:24
  268:18 304:22,24
  306:9,21 308:5,6
  349:19
**hell** 247:14 295:5
  300:18
**Hello** 5:19 126:16
  358:21,22
**help** 52:6 63:22
  64:2 65:4 71:5
  148:21 149:6,10
  149:13,15,23,25
  150:14 157:13
  158:15 180:6
  194:9 200:7
  216:16 258:25
  301:18,24 302:6
  314:15 371:11
  375:10
**helped** 140:13
  150:2,11 158:18
  159:2 175:24
  244:3 302:24
  319:10 372:5
  381:3
**helpful** 35:13
**helping** 375:7
  381:7
**helps** 19:25 20:2,3
**Henry** 38:17
  262:19

**hereto** 387:14
**Hey** 109:5 159:11
  257:24 341:21
**Hi** 104:14
**hide** 316:2,6
**high** 93:8,25 94:16
  99:16,19 241:2,2
  248:13,15,20
  303:7 309:21,25
  311:13,22,24
  346:21 356:14
**higher** 24:7
**high-speed** 185:19
**Hill** 2:20 4:12 5:25
**hippy** 314:21
**hire** 107:11
**history** 20:4 260:17
  260:22 285:12
  312:13,14
**hits** 306:7
**hold** 86:1 87:4,8,15
  88:8 99:18 113:2
  113:5,7,18,20
  115:10,13 119:14
  262:2 290:25
  292:23 293:14
  294:20 295:10
  303:23 306:16,23
  308:3 338:6
**holder** 268:11
**holding** 86:4
  205:22 289:6
  293:16
**holdings** 311:7
  373:4
**holds** 115:7,14
  116:21 291:18
  308:12
**hold'em** 236:8
**home** 5:24 6:3
  31:11 185:21,23
  375:13
**Homeland** 218:23
  317:5 355:8,20
  357:7
**honestly** 14:22



**Hong** 84:21 105:22
**honour** 358:6,19
  360:5,12 361:22
  362:3 363:16
  364:22 365:4,24
  366:24 368:2
  370:7,8 371:18
  373:1 375:4,6,15
**hope** 125:14,15,21
  261:13
**hoped** 126:1
**hopefully** 219:2
**hoping** 25:21
**horrendous** 283:11
**horrible** 352:2,2
**hospital** 61:11
  219:3 355:11
**hosted** 170:18
**hosts** 240:21
**Hotwire** 82:20 83:2
  161:23,23,24,25
  162:3,7 164:7,17
**Hotwire's** 164:24
  165:3
**hot-headed** 135:24
**hour** 48:24 202:6
**hours** 48:24
**house** 10:4 30:2
  32:16 116:21
  335:14
**housekeeping**
  77:20 78:19
**houses** 10:18
**HPC** 241:2
**HPCs** 345:3,4
**Hs** 141:19
**HTML** 165:23
**human** 62:6 110:12
  111:4,23 112:16
  306:24 307:9
  312:12,14
**Humans** 29:11
**hundred** 227:21
**hung** 328:18
**Hungary** 84:21
**hypercapitalist**

314:22
**hyperlink** 148:5
**hypothesis** 56:20

## I

**Ian** 323:12,13,15
  323:17,21,22,23
  323:24,25 324:1,5
  324:8,9,15,20
  325:1,9,15,18,22
  325:25 326:1
**ICE** 240:21,23
**Icebergs** 341:12
**idea** 56:24 81:23
  108:24 109:3
  111:15,21 121:4
  122:1 124:16,17
  124:22 125:13
  128:25 129:1
  138:13 139:18
  144:8 176:11
  188:21 202:14
  218:7,9 219:22
  220:10 233:18
  260:17 274:4
  280:1 288:12
  298:8,10,11
  306:20
**ideas** 125:1
**identical** 79:18,23
  79:25 80:3 91:4
**identification** 19:14
  78:17 126:9 174:1
  177:8 189:17
  227:7 239:2
  259:17 286:3
  296:18 314:25
  333:15 339:22
  347:19 362:7
**identified** 191:21
  297:2 349:17
  352:21 363:19
**identify** 8:13 20:3
  30:20,25 158:15
  158:25 174:16
  191:4 336:6,7

372:9
**identifying** 177:19
  277:9
**identity** 191:24
  370:15 371:1,20
  371:24
**illegal** 258:3
**image** 30:21 31:1
**imaged** 21:5,8
  30:11,14 31:12
  32:20 267:10
**implemented** 154:2
  241:7,16
**implication** 322:7
**implies** 356:23
**imply** 32:18
**implying** 335:6
**import** 79:16,21
**important** 35:9
  81:24 197:25
**importantly** 365:14
**impossible** 172:5
**improved** 231:11
  232:7
**inaccurate** 228:20
  352:15
**inappropriate** 25:7
**inclined** 369:9
**include** 63:2
**included** 272:3
  284:19
**includes** 164:2
  272:1 337:17
**including** 17:1
  19:14 122:11
  156:9 201:3 219:1
  232:20 244:2
  256:25 286:4
  303:14 337:18
**incomplete** 311:5
  312:20
**incorporates**
  256:23
**incorporation**
  256:24
**incorrect** 346:10

349:9
**incorrectly** 304:5
  373:10
**increase** 56:13
**incredibly** 365:12
**independent** 71:23
**independently**
  320:22 321:1
**indicates** 193:11
  281:25
**individual** 45:1
  118:13,23 120:1
  175:23 176:1,2
  372:5,7,9 380:23
**individually** 234:13
**individuals** 92:18
  92:20 142:15
  164:9 292:8
  349:17
**industry** 159:23
  262:21 325:21
**inefficient** 225:2
**Info** 1:7 239:12
  263:19,22 264:2,5
  264:18 350:15
**inform** 73:3
**informal** 290:5
**information** 19:14
  26:24 29:13 81:8
  83:16 101:5
  112:23 131:1,13
  131:20,23 162:10
  162:13 163:23
  177:6,20 178:6,10
  180:23,24 205:22
  216:12 222:7
  223:3 231:20
  252:1 282:11
  285:13 286:4
  292:7 307:21,22
  315:17,20 316:19
  316:21 319:10
  337:18 363:20
  371:25 373:20,25
  384:13,18
**informed** 360:7

367:5
**infusion** 278:13
**initial** 37:5 148:16
  155:7 218:14
  352:1 367:10
**initially** 41:14
  123:3 218:9
**initiated** 373:3
**inquiry** 19:10
  238:12,14,15
  244:20 292:7
  349:16 350:2
**instance** 165:22
  256:10 332:19
  337:7
**instruct** 9:14 15:20
  16:2 34:4,6 36:20
  40:12 41:22 66:6
  66:7,8,9,11,15
  78:1 88:22 89:2
  99:2 103:20
  106:14,14 107:11
  111:14 123:14
  141:4 143:18
  144:13 146:5
  152:11 162:17
  181:16 182:13
  190:13,17 191:15
  196:22,23 197:2,6
  199:11 203:18
  205:3 214:21
  216:4 222:15
  224:16 244:15
  259:14 279:3
  280:19,22 281:9
  281:10 292:15,16
  292:17 295:19
  318:18,20 340:15
  342:18 343:11
  344:2,8,17 350:2
  352:17 384:24
**instructed** 17:19
  41:15 111:7
  146:17 213:16,19
  244:9 260:2 309:8
  316:2 343:8,15



MAGNA
LEGAL SERVICES

344:14 358:9,15
359:1 360:6 361:4
**instructing** 9:9
31:4 89:18,21
175:2 191:13
205:23 259:21
279:5 319:22
338:9 341:1,3,5
384:6
**instruction** 111:9
183:5 197:11
260:3 296:14
**instructions** 31:8,9
**Integers** 82:20 83:3
**intellectual** 27:21
27:24 28:16 86:2
86:3,6,17 87:5,16
88:8,19 99:24
100:10 114:12
215:5,12 216:1,5
216:11 222:3,6,13
222:17 223:2,17
223:20,25 224:8
230:3,11,24 231:4
231:6,22,24,25
232:2,6,9 234:9
234:15,20 235:5
235:14,21 236:5
236:17,25 243:22
243:24 255:23
349:5 350:12
372:15,20,23
373:5
**intend** 97:14
235:11
**interact** 103:23
104:8,11,12
150:14 152:14,19
165:16
**interacted** 104:9,15
176:1 372:8
**interacting** 134:8
**interaction** 233:8
**interactions** 104:1
154:7 369:12
**interest** 95:22

356:5,8,14,23,24
374:8
**interested** 315:24
326:14 387:14
**interesting** 82:24
283:15
**interests** 43:22
259:21 374:15
**internal** 102:6,7,20
102:21
**internally** 103:1
**International** 291:1
293:12
**internet** 15:5 65:4
82:16 131:19,22
131:24 148:2
150:9 163:21
165:19 185:20
208:17
**interrogatory**
175:22 368:9,11
372:3 374:1
**interrupt** 346:8
**interrupted** 129:20
**interview** 194:1
383:4
**introduce** 4:14
326:3
**introduced** 54:5,7
**intuitive** 7:10
**invalidate** 258:10
**invalidated** 355:25
**invent** 76:21
**investigate** 337:3
**investigates** 94:24
95:3,8,13
**investigation** 94:22
95:5,10,18 101:23
104:17,23 334:19
334:21,25 335:8
335:13,18,24
336:1,13,25 337:2
337:6 338:13,22
**investigations**
95:21 101:10,18
332:5,6,9,13,17

346:21
**investigators** 337:3
**Investments** 291:1
293:12
**invokes** 367:17
**invoking** 363:25
364:11
**involve** 90:3,7
121:6 235:23
236:3 340:9
**involved** 19:12 44:1
120:10 145:11
146:21 147:2,5
164:17 180:19
196:15,18 218:14
236:25 258:8
292:18,22 293:4,6
293:7,8 323:13
343:10
**involvement**
128:14,20 219:4,6
219:7 248:22
270:1 323:17,20
326:10 328:5,12
371:2
**involves** 40:14
95:22 260:12
**IP** 123:10 215:10
221:18,20,22
222:1 223:12
227:20,22 229:1
229:10,23 231:17
234:11 274:24
357:6 370:18
371:13 372:17,18
**Ira** 1:6 2:25 4:4
161:11,18,19
174:12,17 227:16
227:18 229:16,20
261:20 315:4,17
315:20,25 316:4
317:17 318:2
359:22 360:2
373:1 377:7,9
**Ira's** 371:22
**IRC** 54:10 55:9,13

55:18,24 56:1
67:17 132:9,11
148:11,12,17,22
151:4,11,13,14,16
151:18 155:4
171:24 172:1,5,7
172:9 201:4,13
266:18 330:16
**iron** 345:22
**irrelevant** 8:20
141:4 277:14
362:19 363:9
364:8
**issue** 25:6 77:23
258:11 358:10
359:3 361:8
364:25 365:15
366:4 368:20
369:13,14 372:18
**issued** 117:17
**issues** 19:18,19,20
19:21 20:9 40:14
362:5 369:5 370:2
370:3,12 374:18
375:7
**ITOL** 139:14,24,25
140:2
**I-T-O-L** 139:16

**J**

**Jack** 378:15,17
**Jamie** 103:5,9
105:3
**January** 47:18
169:6 187:12,18
188:3,14,17 192:8
192:18,24 194:8
194:25 350:9
358:24
**Japanese** 213:11
273:8 326:7
**Jeff** 329:11,16
330:16
**Jews** 260:18
**job** 198:4,6
**John** 2:23 5:4

102:13 104:22
105:5,9,12,18
129:4,22 131:20
174:9 360:1
**joined** 297:10,13
**joint** 186:25
**Joseph** 141:13
142:19 326:2
**judge** 16:8 17:19
25:19 78:13 88:24
316:23 358:4,12
358:17,21 359:7
359:12,18 360:3,8
360:16,25 361:6
361:15,20,25
362:20,23 363:6
363:23 364:10,14
364:24 365:21
366:17 367:25
368:3 370:10,23
371:7,9,17 372:11
373:14,22 375:5,8
**Judging** 277:12
**judgment** 372:15
**judgments** 372:22
**jump** 52:22
**June** 168:7
**jurisdiction** 356:22
**jury** 6:16

**K**

**K** 227:18 303:4,5,6
**keep** 11:19 34:22
73:25 102:19
157:13 159:15
172:7 225:8 226:4
268:22 274:25
286:10 307:18
319:22 352:6,7
377:10 383:19
**keeping** 268:20
**keeps** 178:3
**Kenya** 84:19 85:12
85:13
**kept** 134:19 172:5,6
172:8 268:25



287:14 306:3,5
353:12,13
**key** 126:17 203:22
204:9,25 371:23
**keys** 181:1 202:24
203:3,7,11 206:8
289:7 293:14
294:21,24
**kind** 385:5
**kindly** 89:23
**kinds** 8:15 277:14
370:11
**Kingdom** 31:12
**kit** 351:19,21
**Kleiman** 1:6,7 2:25
4:4 8:16 33:16,18
36:2,25 38:7,9
39:1,8,11,21,22
40:4,8 42:9,16,18
44:1,3 45:9,12
46:23,25 47:4,7
47:11,20 48:12,15
49:10,19 50:1
51:4,10,20 52:7
52:23 53:11,19,24
54:6,7,8,24 55:19
56:6,13,22 57:3
57:11,18,24 58:4
58:7,10,13,18,23
58:25 59:2,13,18
59:24 60:4,5,8,11
60:13,17,19,23
61:1,4,13,16,19
61:22 62:4,15,20
63:1,5,19 64:9,17
65:2 67:7 68:3
69:8 70:16 71:11
71:18 72:11 75:25
79:8,19 83:22
89:1 90:3,12 98:9
98:13,16 120:3,3
120:8 123:12,16
126:4 146:15,18
174:12,13,16
175:1,7 176:2
178:16 179:1

180:4 181:4,12
183:10,15 186:20
186:22 187:7,7
192:17 195:12
198:18,22,25
199:9,15,18,22
200:9 201:14
204:3,10,12 205:1
211:13 214:3,5,15
216:6,10,19 217:3
217:8 222:16,20
222:25 227:16
235:19 238:20
254:15 258:12
259:6,11 260:1
261:2,2 264:4,9,9
264:10,18 266:10
267:6 276:11,17
282:9,10,14
286:21 287:2
292:18,21 312:9
312:10 315:4
316:14 321:18,21
322:3,11,13
325:16,19 330:14
343:4,6,9 347:2
359:23 360:2,2,5
360:15,20 362:15
362:16,21,25
365:18 367:3,5
368:23 369:3
371:21 372:8
373:1 375:24
376:15 377:8,9
380:16
**Kleiman's** 69:2
72:22 99:1 149:15
256:2,8 257:9,12
**knew** 76:17 174:19
185:15 199:6
206:11 276:21
285:14 325:15
326:17 342:1
**know** 6:4,6,21 7:2
7:18 8:24,24,25
10:16,17 15:2

18:13 21:5,13,16
21:19 30:7,9,13
31:21 33:5,10
34:10,14 35:23
38:14 44:5 45:15
45:17 49:11 50:3
50:10,14 51:6,13
51:17 58:2,6,9
59:20,23 60:1
61:25 64:20 72:6
74:12 75:7,12
76:4,20 77:1
78:21 83:19 91:15
91:16 92:1,8,8,13
93:19 94:8,23,25
94:25 95:2,7,12
97:1,9,13 101:7
102:10 104:11
108:2,15 111:23
112:7,14 116:4,12
117:8 119:18,21
120:23 122:12
124:12,15 125:20
126:25 127:20,23
127:24 131:2,3,16
137:13,15 139:24
140:3,15 141:9
142:4,10 145:20
145:21,21 150:21
152:21,22,25
154:11,12,18
162:5,10 164:8
169:8 170:11
171:19 172:4,8,9
176:1,25 178:13
179:8,9,11 184:15
184:17 185:4,5,8
187:20,22,23
188:2,10,13 193:4
197:8,24 199:25
200:8,13,14,17,20
200:23 201:8,14
201:16 202:10,18
204:22 206:13
211:9 215:23,25
218:4,5 219:13,23

220:4,15 222:12
222:23,24 224:20
229:13 232:5,8
233:1,12,15,19,23
234:1 235:4,9
237:18,22 238:25
242:18,21 246:1,6
246:15 247:4
249:15 252:24
254:22,23 255:9
266:10 267:3,11
267:19 269:21
270:19 271:2,2,2
271:2,3,17 274:8
275:2,21 276:19
276:25 279:25
281:2,8,17,22
282:4,13,18
284:22 285:3,6,10
286:18,21,23,24
288:14 289:22
290:18 292:12
293:10,11,13,16
295:23 297:21,24
298:21 299:7,12
299:16 302:19
305:12,23 307:19
308:8,11 309:12
310:15,16 311:3,6
311:7,17,20
313:17,21 314:18
314:23 315:16
317:7 321:21
322:3,19 325:1,11
325:12,15,17,18
325:20,25 326:12
326:22,25 327:2,7
327:8,9,18,23
329:22 330:13
331:19,24 332:2,8
332:11,15,15,19
336:9,22 339:12
341:15,17 342:5,9
342:11 343:23
344:5,6,15 345:18
346:7,16 347:1

351:9 353:3,6,11
353:13 354:12
365:25 366:17
367:14 371:25
372:7 374:18
375:9 377:6
379:12,21 380:11
382:13,16
**knowing** 229:16
**knowledge** 174:4
198:25 216:17
230:2 250:16
270:25 271:1
285:24 292:7,9,10
293:9 296:25
313:24 325:22,23
339:23 340:18
**known** 185:22
265:1 282:9
325:20
**knows** 92:11
209:18 292:13
325:25 327:3,10
342:8 367:13
**Kobza** 317:7
**Kong** 84:21
**KPMG** 102:4
103:23,25
**KT11** 10:1
**Kyle** 2:5 4:20
**K-O-B-Z-A** 317:11

———————

**L**

**L** 142:7 239:23
240:6 242:10
243:8
**labour** 348:18,21
349:8
**lacks** 220:15
**laid** 185:17 371:19
**land** 313:18
**language** 177:25
283:8,10 329:3
**lapse** 274:7
**lapsed** 274:11
355:11,17



large 99:16 100:4,6
larger 100:7
latched 328:24
late 361:23 384:25
launch 76:18
  277:14
launched 76:17
launching 113:17
laundering 346:23
law 65:3 86:17
  93:25 94:3 117:24
  117:25 143:10
  150:9 226:20
  256:12 258:21
  264:8,13,14 303:9
  303:16 331:17
  337:17 364:1
  369:7,10,11,12,12
laws 334:10
lawsuit 274:15
  337:22 349:19
  372:14 373:2
  379:18
lawyer 18:14 143:7
lawyers 30:5,11,14
  30:21,25 31:3,23
  83:6,8 97:11,15
  97:18 98:4,5
  114:22 122:2
  124:15 131:18
  146:11,13,19
  174:18 267:3,9
  281:10 299:11
  301:14 302:11,15
  302:16,19,21,23
  305:21 319:22
  320:9 335:12,25
  338:13 343:24
  353:14,15 359:21
  380:3
lay 185:21
lead 225:14
leads 225:16
learn 20:4 285:13
  325:1 329:19
learned 329:20

leave 86:20 128:9
  128:16,21 366:20
  368:16 374:11
leaving 354:20
ledger 250:1,3
leeway 9:12,13 37:4
  88:25 123:13
  145:24 146:2,4
  195:10 203:16
  205:4 362:7
left 10:23 12:12
  13:1,2,20 41:13
  301:8 339:14
  375:12 376:1,17
  385:12
left-hand 301:1
legal 2:16,20 4:12
  4:14 118:12 125:1
  143:17,20 158:18
  167:17 226:24
  258:3,5,21 264:8
  264:12 269:4
legally 256:18,19
  256:21 364:2
legs 7:18
length 149:3
Leon 2:11
level 24:7
Liberty 231:19
  248:14,15,20
  343:3,7 346:23
Libya 251:14
lied 335:7
life 46:8 92:24
lightly 340:1
likeable 149:16
liked 161:7
limit 20:20 24:25
  50:19 65:11 67:1
  69:13 70:5 75:14
  141:1 352:20
limitation 165:23
limited 8:9 111:3
  111:23,25 112:4
  112:11,15 144:5
  145:23 146:1

190:20 238:13,17
  238:17 286:10
  310:10,12,24
  350:2 352:17
  363:21 385:1
limited-in-scope
  362:4 363:2
line 8:9 9:8 36:23
  43:19 77:21
  172:10 174:2,5,11
  174:13,22 202:3
  255:4
linear 96:16
lines 153:13 203:19
  216:20,21,25
  217:4,4,8,9,22
  218:2
line-by-line 351:10
link 4:17 148:1
liquidated 97:2,3
  115:14 116:11
  119:21 308:2
liquidation 163:20
  164:2,5
list 19:5,9 24:2
  31:16,22 32:5,6
  33:11,12 110:5,8
  114:5,16,19 151:1
  151:2,3,7 163:21
  170:2,3,4,17
  210:9 232:22
  259:10,25 272:2
  300:7,25 301:5
  302:23 329:17
  340:23 354:24
  359:4,6 365:2,5
  365:10,11 366:6
  368:17,18
listed 99:11 242:9
  249:3,23 300:4
  361:3
listing 253:25
  359:19
lists 54:10 170:15
  302:14,16,20,24
lit 19:4

literally 182:6
  187:17
literate 260:20
litigation 31:1
  74:25 77:4 141:2
little 9:12 55:18
  180:22 203:16
  211:17 212:25
  219:5 285:2
  287:11 333:1
  371:19
live 5:25 131:5
  148:22 368:12
living 7:22,23,25
  8:3 9:2 10:7,11,13
  131:11
LLC 1:7 239:13
  263:22 264:2,5,18
LLP 1:21 2:3,6,11
  2:22,24
loan 297:14 308:24
  309:1 312:3,25
loans 309:15,19
  312:2,24
local 4:8 25:8,17
  69:21,22,24 70:3
  225:12,22
LocalBitcoins
  251:12
locate 244:25
located 38:13,15
  184:20 334:22
  336:4
location 8:14,19
  147:21 242:14
  286:2 318:11
  362:6,6,12
locations 8:14,15
  10:15,18,20
  194:18
log 133:6 137:8,18
  213:21
logging 132:21
  137:13,14,15
London 1:22 4:9,10
  4:16 11:15

long 12:24 39:1
  44:6 72:20 84:24
  86:18 132:22
  139:19 141:23
  142:22 148:24
  210:20 262:21
  316:2 326:15
  339:16
longer 77:25 84:6
  92:23 237:10,15
  290:3 306:8,11,12
  308:2 314:7
look 11:6 15:1 73:2
  82:16 83:3 85:18
  97:6 106:24 107:3
  107:6 110:7 114:5
  114:15 116:3,21
  117:16 119:17
  120:1 122:17
  133:3 137:18
  151:18 163:9
  176:15 178:9
  186:19 189:18
  199:18 200:6
  209:16,18 224:11
  224:21 226:6
  227:19 238:25
  245:22 253:24
  259:23 261:12
  263:1,24 264:20
  267:18 269:10
  270:6 271:4 272:2
  272:23 275:24
  280:24 281:16,20
  282:19 284:9
  288:8 290:13
  296:20,25 297:23
  299:20 301:7,12
  304:2 305:17
  317:4,14,16 321:8
  321:8,22,25 322:5
  322:13,17,24
  339:14 351:13
  356:2 357:3
  383:14
looked 83:6 97:13



MAGNA
LEGAL SERVICES

132:25 245:17
265:8 351:3
**looking** 65:1 202:7
239:23 247:22
284:9,10 297:25
322:22
**looks** 80:3,10 300:6
**loose** 5:3
**loosely** 142:12
**lose** 71:1 73:9,11
**lost** 114:23
**lot** 39:5 45:16,23
46:3,4,7,19 48:18
49:14,16,18 133:6
136:5 142:22
159:22 160:11
173:13 177:24
185:16 195:10
205:4 213:18
227:20 231:11
232:7 234:22
283:18 287:14
323:21 326:7
346:24 353:7,8
366:18 368:19
**lots** 129:25 163:18
163:19 287:15
**loud** 264:23
**Louis** 126:4,16
371:21
**low** 185:19
**lower** 161:2,7
**lunch** 104:13 108:3
108:3
**Luncheon** 123:25
**lying** 316:6
**Lynne** 15:12 16:16
17:14 107:13
360:18,21 363:8
363:12 364:15
369:6

**M**

**M** 242:1 303:4,5,5
**MacDonald** 129:4
129:23 131:21

**MacGregor** 383:10
**machine** 187:7
**machines** 11:19
32:3,5,6,8,12,16
32:17 99:17 100:5
187:8,9,10 242:22
242:25 243:2,12
243:14 244:10
345:1,2,11,19,20
346:6,11,12,15,19
347:2,3,15
**Macquarie** 184:21
**magic** 76:23,24
281:11 339:17
**magically** 148:1,4
**Magna** 2:16,20
4:12,13
**maiden** 15:13
**mail** 79:17
**mailbox** 81:1
**mailing** 54:10
151:1,2,3,7 170:1
170:3,4,15,17
**main** 2:7 170:5
**maintain** 13:20
156:4 260:5,6
314:2
**man** 18:25 316:4
321:3
**managed** 243:12
251:7 347:13
**management** 157:5
157:8 312:8,18
**mandated** 356:14
**manner** 234:18
**mantra** 367:22
**March** 64:3,6 65:2
79:8 80:6,11,19
83:21 317:17
318:4
**Marco** 380:24,25
381:3,6
**marital** 18:14
364:1
**mark** 5:11 78:16
93:8,16 126:7

257:17 309:22,23
311:12 327:18,20
327:23,25 328:2,3
328:4
**marked** 3:9 78:17
79:6 126:9 189:7
189:17 227:7,9
239:2 259:17
296:18 297:8
314:25 315:3
333:15,21 347:19
347:22
**market** 2:16 204:18
251:23
**marketplace**
215:18 223:18
**markets** 216:12
222:7 223:3
346:13
**Markoe** 2:10 4:24
4:24 5:10 8:7 9:7
9:11,25 11:7,16
12:14,18 13:7
15:3,9,16 17:7,24
18:10 19:3,7,8,13
19:18 20:1,6,12
20:17,19 21:3
23:12,20 24:4,8
24:21,24 25:1,5,9
25:13,19 26:1,8
26:15,21 27:3,9
27:12,17,22 28:10
28:17 29:3,10,19
30:12,16,22 31:13
31:17,24 32:10
33:1,8,11,17,24
34:2,9,15,19 35:1
35:6,18 36:6,13
36:18,20 37:3,7
37:19 38:2,24
39:3,16 40:1,5,11
40:23 41:9,17
44:10,16 45:6,14
45:22 46:6,12,18
47:12,22,25 48:7
48:16,21 49:12,15

49:21 50:2,6,13
50:17,19 51:5,11
51:16 52:9,13,25
53:8,12,20 54:13
54:20,25 55:20
56:15 57:5,12,20
58:1,19 59:14,25
61:9 63:14,20
64:11 65:9,13,17
65:20 66:5,12,23
67:21 68:4,13,17
68:22 69:11,15,18
69:22 70:19 71:13
71:21 73:4,10,14
73:18,24 74:9,14
75:1,6,17 76:8,15
77:5,8 78:4,10
79:12,20 80:1,7
80:12,20 82:1,5
85:19 86:5,11,14
86:24 87:6,17,24
88:10,20,24 89:5
89:9,12,16,22
90:4,8,13,24 91:5
91:10 92:3,5,12
92:17,21 93:2,7
93:18,24 94:10,15
95:11,19 96:21
97:16 98:14,23,25
99:21 100:1,11,22
101:6,11 102:9
103:12,16,20
104:5,20 105:7,11
105:14 106:8,11
107:25 108:14,20
109:11,24 110:16
110:22 112:8
113:24 114:10,14
114:24 115:3,9,21
116:2,8,14 117:1
117:6,13 118:4,10
118:18 119:1,16
120:15,19 121:15
121:25 122:6,16
123:11 124:10,18
125:7,19,25

126:12,22 127:2,5
127:14 128:2,7,11
128:15 130:20
132:3,20 133:11
134:3,17,24 135:6
135:18 136:9,15
136:21 137:5,10
138:6,21 139:3
140:7,25 143:15
144:3,10 145:2,7
145:15,17,22
146:9,14,17,23
147:23 148:6,18
149:1,8 150:1,6
150:15,23 151:21
152:4,8,11,15,21
153:2,8,11,18,24
154:10,16 155:2,9
155:14,25 156:17
156:21 157:1,15
157:21 158:5,10
159:6,17,25 160:8
160:18,24 161:4
161:13,15 162:14
162:17 163:2,11
163:25 164:10,18
164:25 166:6,15
166:23 168:12,22
169:3,17 170:10
170:20 171:1,7,22
172:20,25 173:5,9
173:15 174:15,25
175:12,17 176:3,6
176:9,19,23 177:9
177:15,22 178:8
178:18 179:25
180:9,14 181:6,10
181:16,21 182:1,3
182:9,17,23 183:4
183:7,10,14,18,24
184:4,11,23 185:3
185:10 186:4,19
187:13,16,20
188:4,9,18 189:1
189:8,12 190:7,12
190:17 191:4,9,13



191:18 192:3,14
192:19,25 193:7
193:19 196:1,12
196:21 197:4,10
197:16 198:5,9,14
199:2,10,16,24
201:6 203:1,9,15
204:4,11 205:2,12
205:17,21 206:3
206:12,18,24
207:19,24 208:25
209:13 210:4,10
210:18 212:5,12
213:7 214:11,20
214:24 215:1,7
216:3,22 217:10
217:23 218:3,11
219:17,24 220:8
220:14,19 221:15
221:24 222:10,14
222:22 223:5,10
223:22 224:4,11
224:14 228:1,4,6
228:16 229:3,12
229:18,24 230:4
230:13,20,25
232:23 233:10
234:5,16,24 235:7
235:15,24 236:7
236:13,19 237:2
237:11,19,23
238:11,13 239:10
239:17,24 240:2
240:14 241:21
242:11,17 243:9
243:25 244:8,14
244:18,23 245:15
245:20 246:14
247:3,19 248:7,17
249:4,14,24 250:7
250:12,25 257:13
259:7,12,14,23
260:6 264:1,6,15
265:15,24 266:12
267:8,14 268:5,13
268:21 269:15,24

270:21 271:12
272:11,17 273:5
274:5,11,16 275:4
275:19 276:12,24
277:11 278:7,12
278:19,25 279:5
279:16,21 280:5
280:12,18,23
281:4,15 282:3,16
283:21 284:11,21
285:8,20,25 286:8
286:17,22 287:3,7
287:21 288:5,11
288:19 289:5,11
289:15 291:7
292:3,10,20
293:17,23 294:3,8
294:12,17 295:3
295:14,24 296:3,8
299:6,15 300:9
301:3,13,20 302:1
302:8,18 303:1,20
304:9,25 306:18
307:2,25 308:7,19
309:3,11 310:3,19
310:25 311:21
312:4 313:1,11
314:4,9,16 315:18
315:21 316:24
317:8 318:9,14,20
319:24 320:1,4,8
320:15 321:14,23
322:14 323:3
324:3,10,16,22
325:3 326:11,19
326:24 327:4
328:7,14 329:4,9
329:21 330:2,8,22
330:24 331:6,14
331:21 332:1
334:2 335:4,15
336:6,16,20
337:11,23 338:9
338:14,24 339:7
339:20,24 340:6
340:10,14,20

341:1,5,9,19
342:4,6,15,18,23
343:22 344:4,10
344:19 345:13,16
346:1 347:6,10
348:5,12,15
349:10,15 350:1
350:16,21 351:8
352:10,16 355:4
355:19 356:9,20
359:14 361:22,23
361:25 362:2,22
362:24 363:7
364:4,13,21 365:4
366:7 370:8,13
371:1,8,13,19
372:13 373:9,15
373:16 375:5,15
375:20 376:8,12
376:19 378:6
379:16 380:1,6
381:1,15 382:1,7
382:15 383:1,6,17
383:23 384:4,8,12
384:16,23 385:4
385:11,14,19
**Mark's** 93:14
**marriage** 16:19,24
  17:4,10 18:13
**married** 15:7 16:15
**masters** 86:17
  264:11
**match** 298:20,24
  301:8 314:23
  351:10
**matched** 31:8
**material** 337:4
  355:14
**materials** 275:9
**mathematical**
  283:4
**mathematician**
  216:16
**mathematics**
  283:10
**maths** 149:18

**matter** 4:4 19:15
  40:11 45:3 77:21
  286:5,7 325:6
  340:21 368:8
  369:7 376:2
**matters** 40:10
  357:12
**Matthews** 141:12
**maximum** 11:22
**May/June** 168:8
**McAdams** 2:23 5:3
  5:4 174:9,10
  359:20 360:1,1
**mean** 27:14 28:1
  55:12 58:14 62:8
  62:13 81:4 86:15
  86:19 87:23
  106:19 117:22
  140:21 153:16
  163:19 165:12,14
  166:5,20 177:16
  177:23 178:1,19
  179:13 180:25
  198:19 204:6
  207:10 208:11,19
  221:19 223:9
  229:10 233:14
  235:18 239:17
  240:9 252:9
  254:13,19 255:2
  261:22 283:18
  284:25 289:9,14
  289:16 295:6
  298:2 302:10
  303:19 310:18
  313:24 321:15
  322:11 325:7
  328:11,11 336:14
  337:1 345:8,21
  349:1 378:23
**meaning** 6:11
  56:10,11
**means** 27:24
  104:12 118:12
  196:4 254:14,22
  255:1,4 264:8

**matter** 282:20,24 283:2
  303:21 304:6,8,12
  306:9 310:20
  319:21 320:17,17
  333:2,3
**meant** 125:2
  225:14 229:17
  246:10 303:17
  321:21 322:3,8,9
  322:12 345:25
  355:8
**Measures** 224:1
**media** 21:17 55:13
  75:16,20,20,21
  256:24 262:9,10
  287:14 380:22
**medication** 6:18,19
**medieval** 260:20
**meet** 15:15 16:8
  17:23 36:1,10,12
  36:25 38:7 39:1
  40:4,8 42:16,18
  45:11 46:20,23,25
  47:3,7,11,19
  48:11,14 49:10,25
  51:9 53:24 54:1,3
  54:3,3,4,4,8 109:2
  285:6 286:20
  327:7 363:9,19
**meeting** 49:19
  340:5,9 341:8
**Melbourne** 147:20
**member** 90:15
  127:21,24,25
  162:10
**members** 163:22
**memorise** 304:19
**memory** 241:2
  371:10
**mention** 340:13,25
**mentioned** 63:8
  245:13 255:23
  317:24 340:11
**merging** 370:24
**merits** 145:25
  199:19 352:19



363:3,4 366:23
**Merkle** 282:25
283:4,15
**mess** 157:17
**message** 135:5,8,14
213:17 317:16
**messages** 75:8
379:24 380:4,8,11
**Mestre** 2:11
**met** 5:17 15:17
35:24,24,25 37:8
39:20,22 42:9
45:9 49:18 53:11
142:20 167:23
176:1 285:10
323:15 326:2
330:18 339:18
364:8 367:10
372:8
**metadata** 158:23
**Metanet** 100:3
**metered** 215:21,24
215:25 216:2,6
222:4,12,18,20
**method** 62:19
67:10 125:24
132:7
**methods** 67:15,16
190:24 205:10
206:1
**Mexico** 312:14
**Miami** 2:4,12
**mic** 41:8
**Michael** 141:16
143:6
**Michie** 143:11
**Microsoft** 36:11,12
36:14,16,16,19
37:9 81:7 165:23
**middle** 160:13
341:13 357:16,20
**Military** 357:7
370:19 371:15
372:19
**million** 216:21,25
217:4,6,7,8,9,22

218:2 227:21
228:11 229:1
243:3 251:7 278:1
278:3 279:15
280:3,17 281:3,13
317:24 344:22
346:25 347:4,5,9
**millions** 204:19
216:20 217:4
372:16
**milliseconds** 100:7
**mind** 164:13
229:14 244:25
252:20 303:15
324:12
**mine** 32:3 59:11
94:9 98:22 99:20
120:18 121:13
138:15 166:22
176:13 182:8
186:3,17,23 191:9
194:16,19 199:22
200:17,20 201:15
201:17,18 207:15
220:3,5 241:10
242:10,25 243:2
243:19 255:17
300:6 318:5 359:8
360:10 362:10,13
**mined** 181:24
182:14 184:3,16
184:18 186:2,15
187:11,16 194:9
195:25 196:19
197:9,13 200:4
201:1 202:11
220:6,13 250:3
253:17 276:4,11
293:2 358:24
359:1 360:6
362:14,18,21
363:1 365:17,18
367:1,4 368:5,23
375:20 376:15
**miner** 165:25
**miners** 250:1 253:2

265:13
**mining** 27:16
186:11,21,22,23
186:25 187:19
188:2,13,16
194:15 195:1,16
195:18,19,24
196:4,7,10,11,16
197:19 198:4,18
198:20,25 200:10
200:12,15,24
201:25 202:1,14
202:20 205:13,18
242:15,19,21
255:16 256:10
265:1,11,12,23
271:11,15 276:15
276:16 281:25
282:15 293:4
318:12,15 360:14
362:16
**Minus** 318:5
**minute** 330:24
**minutes** 44:7 376:3
376:4,5,11,17,18
377:12 385:14
**miracle** 215:1
**miscategorising**
282:21
**mischaracterises**
11:16 24:21 75:17
110:16,22 112:8
134:3 153:2
160:18 164:25
171:7 193:19
207:24 235:15
236:19 248:17
249:4 252:18
287:21 304:9
337:11 347:6
350:21 355:4
**misrepresentation**
28:3
**missed** 152:1
370:21
**missing** 272:3

**misspelt** 105:16
**misspoke** 308:23
371:5
**misspoken** 179:19
371:6
**misstate** 116:24
**misstated** 263:23
370:21
**misstates** 241:21
254:6
**misstating** 281:6
360:22
**mistake** 321:9,13
321:16,22
**mistakes** 158:22
**misunderstandings**
101:15
**misunderstood**
210:1
**mis-cite** 175:16
**mix** 227:21 229:2,4
229:6,8,11
**mixed** 270:3 351:23
**mixing** 291:13
**Mmm-hmm** 98:6
221:16 246:24
247:24 255:11
318:25
**mnemonics** 133:7
**Modelling** 224:10
**models** 96:15
**moment** 7:24 48:24
106:13 112:3
162:25 221:1
233:14 235:10
245:1,3 253:21
264:13 339:1
373:13
**money** 62:11,11
65:6 120:10
124:24 134:11
185:16 190:24
216:16 219:2
293:1 316:5 343:6
343:8,9,16 344:3
344:8,16 346:23

347:14,16
**monitoring** 231:18
**month** 35:22 51:25
52:3 55:5,8 56:23
142:25 241:20
243:3 251:7
260:12
**months** 11:22
35:22 51:23 53:4
**morning** 5:15,16
359:3
**mother** 49:3 53:3,7
314:23
**mother's** 70:23
**motion** 365:7,8,12
366:2,5,9,10,14
366:21 368:15,16
369:15 374:11
**motions** 374:23
**mouth** 208:14
**move** 9:6,16,18
16:9,12 52:6 53:8
71:5 81:6,9 89:14
99:8 107:23,25
109:20 119:7
181:13 191:17
205:24 259:22
296:15,16 320:11
320:13 352:7,20
366:11 375:11
376:8 384:9
**moved** 8:1,6,17,18
8:20 9:3,20,22,24
10:24 11:9,14
80:25 81:19
119:25 319:14,18
321:1,1 367:23
**moving** 304:23
349:6 383:19
**Mt** 251:13,20
**multiple** 28:19
60:15 84:5,7,9
88:7,11 99:18
100:21 151:14
157:3 207:11
210:6 288:13



301:22 302:4
319:21 332:20,21
332:22 352:3
378:7
**mutual** 262:18
**mutually** 134:1
**mysterious** 304:4

_____

**N**

**N** 2:1 3:1 209:15
**nada** 123:8
**Nakamoto** 144:20
182:6 188:24
190:21 191:5
208:6,8,17,18
209:9 210:2 324:9
324:15 325:2
326:3,23 329:2
330:21 382:25
383:5,22 384:3
**name** 5:17,20,22
15:11,13 17:21
18:1,19 20:1
67:25 68:19 72:14
72:15 81:2 82:9
82:12,14 83:4
93:14 96:2,6,7
98:20 102:5,12,14
104:8 107:19
108:12,21 110:11
110:15,18,21,25
110:25 111:5,6,8
111:14 112:14,21
117:9 129:7,8,13
129:14 132:15
141:25 142:3,14
160:7,9 163:5
164:8 167:17,18
167:22 176:12,25
177:20,21 178:7
178:17,20,23
179:7 180:5,8,18
181:5,13,20 190:5
190:16 193:5
213:10,11,16
256:2,6,17 260:18

273:7 277:2
289:19 290:1
303:5,8,12 305:15
307:3,7,9,10,13
309:20 311:20
327:20 378:19
380:25 381:1
**named** 108:18
188:25 327:18
**names** 22:2,7,11,16
22:21 23:2,7,15
41:25 42:2 92:20
92:23 93:1,5,13
102:7 103:3
162:12 163:7,14
163:17,22 168:3
177:14 184:23
215:16,16 336:6
**naming** 160:12
**narky** 313:25
**national** 40:14
127:4 233:5
361:10 370:1,6,11
371:25 372:10
373:8 374:5,7,14
**natural** 35:14
269:19,20,22
**nature** 56:1,4 95:24
100:2 117:25
118:3 120:7
187:24 220:21
374:1
**nChain** 6:5 13:9,17
13:22,24,24,25
14:1 92:9 288:15
311:7,7
**nearly** 321:6
**nebulous** 165:9
204:6
**necessarily** 100:25
301:9
**necessary** 78:6
**need** 7:10,16,17
12:7,9 26:17,23
26:24 40:9 43:4
44:24 62:9 65:4

66:9 77:25 89:7
89:10 92:8 97:6
101:14 107:12
110:6 112:19
114:5,15 116:3,20
117:16 119:17,25
128:8 133:5
141:23 150:13
154:21 162:20
176:7 180:6 191:2
191:16 193:9
240:5 254:18
259:8 260:15
272:2 279:17
280:24 281:16
288:8 290:13
292:16 297:23
301:7 304:2
305:17 307:14,22
308:3 316:22
322:24 323:2
333:2 340:6
343:20 351:10
353:3 357:22
374:6 375:2
**needed** 82:15
133:24 227:3
283:12 306:9
307:20 318:6
366:11 377:9
**needs** 89:10 118:13
238:14 283:22
373:25
**negative** 336:22
**negotiate** 268:15
**negotiation** 268:9
268:14
**neither** 204:14,15
387:9
**networks** 231:21
**never** 54:7 71:24,24
72:1,1,3,3,5 76:22
83:6 88:3,4 113:8
115:17 116:16
120:10,13 137:8
167:19,22 176:1

185:18 187:7,8,8
187:9 195:25
196:10 206:7
217:3 220:24,25
242:24 258:17
282:8 291:5
292:25 293:1,1,2
359:5 362:21
366:5,6,14 367:23
372:8 377:1
**new** 1:22 10:21,23
10:24 11:1,21,22
44:1 65:6 185:25
258:5 276:5
356:11,11 371:14
**Nguyen** 213:3,19
214:19 285:3,7,18
286:15 287:16
288:2,17 292:5,12
299:13,17,17
309:16 313:14,21
313:23 314:2,15
327:3 331:19
**Nguyen's** 300:1
**Nicholas** 81:1,20
**Nicholas's** 82:9,14
83:4
**Nick** 328:5,8,12,16
**nickname** 129:9
**night** 138:24
**nine** 186:13
**nodded** 7:8
**node** 165:12 166:12
166:14,19 167:9
169:11 196:3
243:15
**nodes** 165:16 166:2
199:7
**nominally** 13:8
**non-disclosure**
193:13
**non-linear** 96:5,14
96:24
**non-public** 124:8
**North** 14:15,19
312:13

**note** 174:24,25
175:1 195:9
228:21 264:15
269:1 300:12,24
301:7,8,9 303:18
304:16 385:13
**noted** 164:14
256:16 257:21
258:17 266:17
275:16 377:21
**notes** 122:18
275:11 300:20,21
387:4
**notice** 282:8 298:25
**noting** 9:10,11
**notion** 109:13
**NSA** 317:5
**null** 123:8
**number** 4:2,7 10:1
10:15 14:2 35:25
36:23 61:5,11
77:13,17 123:23
124:2 134:8,9
173:19,23 215:19
218:22 221:5,9
225:21 226:4
231:13,15 232:20
251:13,15 283:14
283:25 284:4
286:1 289:7 292:6
295:13,14,23
296:11,12 306:4,5
318:16 323:8
326:5 334:16,17
346:12,20 349:16
368:19 385:21
**numbering** 189:19
**numbers** 57:15
68:24 70:25 299:1
**NY** 2:7

_____

**O**

**oath** 6:9,10,12
16:17,22 17:2,8
17:10,16,17,18,18
260:22 360:23



363:15,16 368:5
368:11
**object** 9:7 25:18
34:6 66:8,16
77:25 89:3,4
97:23,23,24
144:13 182:13
227:5 253:20
330:25 335:5
338:18 377:22
**objected** 78:12
260:2 262:5
320:14 363:17
**objecting** 25:6
162:18 220:20
**objection** 8:7 9:10
9:11,25 11:7,16
12:14,18 13:7
15:3,9,16 17:7,24
18:10 19:3 20:17
20:20 21:3 23:12
23:20 24:4,8,21
24:25 25:14,14
26:1,8,15,21 27:3
27:9,12,17,22
28:10,17 29:3,10
29:19 30:12 31:13
31:17,24 32:10
33:1,8 34:9,15,19
35:1,6,12,18 36:6
36:13,18 37:19
38:2,24 39:3,16
40:1,5 41:10,17
42:10 44:10,16
45:14,22 46:6,12
46:18 47:12,22,25
48:7,16,21 49:12
49:15,21 50:2,6
50:13,17 51:5,11
51:16 52:9,13,25
53:8,12,20 54:13
54:20,25 55:20
56:15 57:5,12,20
58:1,19 59:14,25
61:9 63:14,20
64:11 65:9,12

66:5,23 67:2,21
68:4,13,17,22
69:11,14,16,19
70:6,19 71:13,21
73:4,10,14,18,24
74:9,14 75:1,6,17
76:8,15 77:22,24
78:3 79:12,20
80:1,7,12,20 82:1
82:5 85:19 86:5
86:11,14,24 87:6
87:17,24 88:10,20
89:6,8 90:4,8,13
90:24 91:5,10
92:3,12,17,21
93:2,7,18,24
94:10 95:11,19
96:21 97:16 98:14
98:23 99:21 100:1
100:11,22 101:6
101:11 102:9
103:12,16 104:5
104:20 105:7,11
106:8,11,17
108:14,20 109:11
109:24 110:16,22
112:8 113:24
114:10,14,24
115:3,9,21 116:2
116:8,14 117:6,13
118:4,10,18 119:1
119:16 120:15,19
121:15,25 122:6
122:16 123:11
124:10,18 125:7
125:19,25 126:12
128:15 130:20
132:3,20 133:11
134:3,17,24 135:6
135:18 136:9,15
136:21 137:5,10
138:6,21 139:3
140:7,25 143:15
144:3 145:2,7,15
146:9,14,23
147:23 148:6,18

149:1,8 150:1,15
150:22 151:21
152:4,8,15,21
153:2,8,18,24
154:10,16 155:2,9
155:14,25 156:17
156:21 157:1,15
157:21 158:5,10
159:6,17,25 160:8
160:18,24 161:4
161:13 162:14
163:2,11,25
164:10,18,25
166:6,15,23
168:12,22 169:3
169:17 170:10,20
171:1,7,22 172:20
172:25 173:5,9
174:24 175:1,12
175:17 176:3,19
176:23 177:9,15
177:22 178:8,18
179:25 180:9,14
181:6,10,16,21
182:1,17,23 183:4
183:24 184:11
185:3,10 186:4
187:13 188:4,9,18
189:1 190:7,12
191:19 192:4,19
192:25 193:19
196:1,12,21
197:10,16 198:5,9
198:14 199:2,10
199:24 201:6
203:1,9,15 204:4
204:11 205:2,8
206:3,12,18,24
207:19,24 208:25
210:4,10,18 212:5
212:12 213:7
214:11,20 215:7
216:3,22 217:10
217:23 218:3,11
219:17,24 220:8
220:14 221:15,24

222:10,14,22
223:5,10,22 224:4
224:11 228:1,16
229:3,12,18,24
230:4,13,20,25
232:23 233:10
234:16,24 235:7
235:15,24 236:7
236:19 237:2,11
237:19,23 239:10
240:14 241:21
242:11 243:9,25
244:8,14 246:14
247:3 248:7,17
249:4,14,24 250:7
250:12,25 252:4,9
252:18 253:11,21
254:7,17 257:13
259:7,12,13 260:5
260:6 264:1,6
265:15,24 266:12
267:8 268:5,13,21
269:15,24 270:21
271:12 272:11,17
274:5,11,16 275:4
275:19 276:12,24
277:11 278:7
279:16,21 280:5
280:12,18,23
281:4,15 282:3,16
284:21 285:8,20
286:17,22 287:3,7
287:21 288:5,11
288:19 289:5,11
289:15 291:7
292:3,20 293:23
294:3,8,12,17
295:3 299:6,15
300:9 301:3,13,20
302:1,18 303:1,20
304:9,25 306:18
307:2,25 308:7,19
309:3,11 310:19
310:25 311:21
312:4 313:1,11
314:4,9,16 315:18

315:21 318:9
319:24 321:14,23
322:14 324:3,10
324:16,22 325:3
326:11,19,24
327:4 328:7,14
329:4,9,21 330:2
330:8,22 331:6,14
331:21 332:1
335:4,15 336:16
336:20 337:11,23
338:8,9,24 339:7
339:20 340:6,10
340:14 341:19
342:4,15,23
343:22 344:4,10
344:19 345:13,16
346:1 347:6,10
348:5 349:10
350:1,16,21 351:8
352:10,16 355:4
355:19 356:9,20
365:7 378:6
379:16 380:1,6
381:15 382:1,7,15
383:1,6,23 384:4
384:23
**objectionable**
78:11
**objections** 35:11
50:20 78:6 162:18
225:16 370:3
**obligation** 277:25
**obsolete** 265:13
**obstruct** 40:9
**obtain** 97:8 116:22
117:15 147:15
230:11 236:17,24
251:8 274:21
**obtained** 236:25
276:19
**obviously** 78:2
174:22 347:13
367:11,17 368:17
374:16
**occur** 261:16



275:12
occurred 120:2,13
  134:8 178:14
  263:5 282:10
October 5:23 8:1
  354:9,11
offensive 384:25
offered 166:1
  251:10
office 6:4 31:11
  32:21 94:14,19,22
  94:23 95:2,5,7,13
  95:14,17 100:16
  101:10,18,23,25
  103:24,25 104:1
  104:17,23 235:2
  235:10 256:16
  316:6 319:15
  328:1 332:5,6,10
  332:14,17 333:7
  335:13,24 337:10
  337:15,21 338:6
  338:22
offices 1:20 4:10,16
  14:10,14
official 35:10
officials 35:24
  46:20 337:18
offline 206:2
  357:11
offshore 319:14,19
off-the-record
  373:23
Oh 41:8 252:10,22
  327:25
oil 314:22
okay 7:19 9:15
  10:14 16:1 40:11
  44:25 48:11 70:1
  84:22 89:14 98:6
  109:20 126:22
  127:14 143:8
  152:10 171:13
  175:6 176:9
  183:18 187:20
  196:6 228:6 240:2

245:20 261:25
279:2 306:24
313:11 316:24
317:2 318:18
334:1 335:21
342:11 350:4
358:4,12,21 359:7
360:16,25 361:6
361:20 362:20,23
363:6 364:10
365:21 367:25
370:23 371:7,17
372:11 373:14,22
375:19 376:18
377:21 379:6
385:11
old 11:24 12:3 21:6
  32:17 82:16 83:18
  102:22 132:24
  157:5 213:11
  217:19 228:23
  283:19
older 32:18 314:20
oldest 21:11,14,17
once 5:12 48:20
  55:3,5,8 56:23
  66:11 117:11
  145:21 167:23
  204:13 214:23,25
  238:18 243:2
  306:6 340:3
ones 68:9 84:20
  87:11 110:8 170:5
  170:6,8,9 205:5
  233:2,3 273:8
  275:16,17 353:16
one-line 328:20
online 54:3 147:16
  147:17,19 176:20
  176:22 209:5
  231:15 262:10,11
  326:13
open 149:20 150:14
  168:18 170:25
  208:14 223:6
  251:23

opened 83:8 185:18
opening 362:5
operating 382:21
operational 115:16
  115:18 116:13,17
  374:25
operations 231:11
  231:12,14 232:3,7
  233:15,20 234:2
  234:23 235:1,5
  244:3
opine 369:9
opinions 225:15
opportunity 365:6
opposed 102:21
optical 99:19
order 5:10 175:4
  309:18 364:17
  368:18 374:25
  377:11
ordered 365:2,4
  372:3
org 179:13
organisation 13:3
  251:6
organisations
  251:14
organised 316:19
origin 188:24
  257:22
original 80:5,23,25
  81:12,15 148:20
  166:11,24 167:1
  176:18 304:17
originally 181:3
  243:18 283:5
  380:13
originals 299:4,9
  299:13
originates 227:22
  227:23 228:14,22
OST 81:7,19
outcome 387:15
outing 325:12
outside 184:21
  197:18 325:7

331:16
overall 344:11
overbroad 237:24
overseas 290:25
  319:17
owed 316:5
owned 91:8,12 97:4
  106:23 107:4
  113:25 114:2,3
  115:19 120:9
  122:22 123:1,3,7
  195:6 219:12,15
  237:4,8,14 269:6
  289:14,17 293:5,6
  293:7
owner 177:20
  264:25
ownership 91:3,13
  91:17 92:14 93:17
  94:4 107:1,9
  120:3 123:10
  180:8,11 219:10
  248:5 293:9
owns 92:1,2,8,8,11
  96:24 219:20,22
  237:17,22
Oxford 6:5 14:24
  52:15 260:12
  322:10
o'clock 108:1,2
O'Hagan 188:25
  189:15 191:22
  193:12,25

─────────
        P
─────────
P 2:1,1
PA 2:17
page 3:2,10 126:11
  189:18,19 202:3
  227:11,19 228:3,4
  228:5 239:15,21
  239:22,24 243:21
  247:17,22 249:3
  252:6 253:23
  255:25 256:3
  257:18 262:16

266:4,5 267:13,15
277:18,20 284:9
296:12 297:3,14
297:15,16,19
298:3,4,4,5,5,5,5
298:6,6,9,10,12
298:14,22,23,24
299:1,20 301:24
302:3,6,8 304:3,4
304:18 305:5
310:2 317:14
321:7,8 333:24,25
334:14 348:11
352:24 354:15
357:15,16,19,20
370:18 371:11
pages 52:16 296:22
  297:25 298:2
paginations 239:25
paid 185:21 230:17
  244:6 249:10
  274:1 281:10,11
  281:11 312:7
Panama 84:19 85:1
  87:12 93:9 246:25
  247:1 248:9,11
  250:17,23 268:1
  269:7,23 272:7,10
  272:16 273:18
  303:9,9 309:25
  319:9 343:14,16
  343:17 344:3,9,18
paper 63:22,24
  64:1 65:5 138:14
  138:17,20,23
  139:2,8 140:11
  141:8 142:16,19
  143:2,6,24 144:2
  145:1,12 146:22
  147:3,6,8,10,12
  147:15,22 148:24
  149:7,10 150:14
  150:17,19 152:7
  152:20 154:8
  156:7,8,11 157:14
  158:7,14 175:10



191:6 203:14,22
203:23,25 204:2
204:10,15,15,21
205:1,13,14,22,23
223:7 240:10
247:25 270:16,20
328:17,19
**papers** 28:22 51:24
52:2 149:18
167:20 215:20
219:9 260:11
303:10 355:14
**paragraph** 189:25
228:5 240:6,11
245:22,22 246:2
247:9,23 264:20
267:18 270:6
334:15 348:17
350:5,8 351:13
352:25 353:17,18
354:2 370:18
371:11
**paragraphs** 140:22
140:24 244:7
245:13
**part** 8:7 10:23
16:17,24 19:5,21
25:16 44:23 45:6
74:19 92:23 93:16
114:9 160:4 176:6
195:6 232:1 257:4
257:5 278:15,16
278:17 292:24
293:14 311:4,4
312:16 318:1
352:11 355:23
372:17,17
**partial** 309:1
**particular** 21:7
45:18 52:17 63:25
110:1 122:8 123:1
127:7 143:2,2
146:3 163:5
253:14 307:13
344:11 358:9
365:5 367:7

370:15 371:2,3
**particularly** 379:13
**parties** 357:8
370:20 371:16
372:19 375:9
387:11,13
**partner** 71:24 72:3
72:3,4 130:9
**partners** 262:15,16
303:6
**partnership** 12:22
33:16,18,22,25
72:1,2,2,5,6
144:19 145:18
182:6 183:15
190:21 367:2,6
369:1
**parts** 127:16
140:15 167:6,16
171:5 298:6
**party** 263:21,24,25
264:17 305:8
374:13
**passed** 104:13
**passwords** 133:6
**patent** 51:25 144:9
145:14 223:15
236:10
**patenting** 143:23
144:1,25 145:3,6
145:8 146:7
**patents** 86:9 149:18
**Paul** 38:17 262:19
**Paula** 1:24 2:15
4:13 42:11 387:3
387:24
**pause** 70:16 93:12
106:16 141:22
193:8 239:1
253:21 259:24
286:9
**pay** 62:9 99:12,13
120:11 122:9,19
122:20 242:1,4
244:10 246:9,10
274:3,18 312:2,24

316:3 350:10
**paying** 62:7,8,12
**payment** 215:21,24
215:25 216:2,6
222:4,12,18,20
355:11,17,18
**PDFs** 159:2
**penalty** 334:10
**pending** 42:12 43:5
43:8,17,18 236:14
**penitentiary**
311:14,16
**people** 28:5 31:8
35:25 36:10,12
37:8 48:25 53:15
53:16 57:7,14
63:11 72:6,7,8,9
88:13 92:23 93:16
93:20,22 107:11
109:2,3,5,13
122:9,10 124:23
126:17 129:17
130:1 136:6
138:23 140:13,16
140:23 142:11,24
149:17,19,20
156:8 157:7
160:12 163:5,20
166:21 167:14
168:2 170:24
171:17 172:14
173:11 185:15,19
208:6,7,10,11,13
213:16 232:17
233:13,23 244:9
246:9,16 247:5,11
248:9,11,13 249:7
249:8,10 250:17
251:16 253:7
261:11,19 262:23
263:1 269:14,17
270:18,23 273:18
276:21,23 280:19
281:9 282:7
300:16,19 319:22
325:7 342:25

346:13,24 347:14
370:15 371:2,23
382:23 384:2
**people's** 247:16
**percent** 98:10
**perfectly** 6:11,17
18:24 43:19
316:12
**period** 20:9 24:10
24:14 26:14 103:8
105:5,9 116:1
129:25 190:25
201:17 266:22,25
306:7 344:12
360:10 367:4
**periods** 24:15
**perjure** 17:17
**perjured** 335:7
**perjury** 334:10
**Perling** 141:13
142:19 326:2,9,17
326:22 327:2,9,12
**Permanent** 110:12
111:3,22,24 112:4
112:11,15 310:10
310:12,23
**permission** 43:17
**permitted** 40:15
69:20 89:16 99:4
199:13 243:23
295:7 373:17
**person** 35:9 38:17
71:23 102:12
111:7,16 118:13
126:20 127:19,21
128:19 141:13,24
142:21 149:16
150:17 153:14,17
190:16 201:19,23
211:21 212:24
217:6 226:23
269:2 312:15
315:23 316:1
323:13 339:19
371:20,24 374:6
**personal** 1:6

325:23 337:19
**personally** 95:23
257:20 317:12
332:7 335:6
**persons** 174:2
269:19,20,21,23
**person's** 128:13
**petabytes** 99:18
**petrol** 314:23
**Philadelphia** 2:17
**Philip** 2:20 4:12
**Pholus** 82:21 83:3
**phone** 11:21 54:4
68:23 70:24 178:2
194:16 373:19
374:25 375:11
**phoned** 104:13
**phrase** 322:12
**physically** 46:24
54:3 167:23
186:23
**pick** 255:3
**piece** 203:23
204:10,21,25
240:10 283:11
**pieces** 204:15
291:13
**pile** 124:12
**Pirate** 186:10
**pizzas** 251:25
**place** 4:9 33:23
130:16 136:12
148:14 196:16
201:2 237:21
341:8 379:12
**placed** 297:8
**places** 160:21
231:15
**plaintiff** 2:22,25
5:2 348:1,2,17
349:8 350:10
351:16,22 354:21
359:22 361:13,16
372:23 373:19
**plaintiffs** 1:8 2:2
4:19,21 5:18



369:21 373:18
**plaintiff's** 78:16,17
79:7 126:8,9
160:6 189:7,17
193:5 227:7,10
239:2,3 259:17
263:13 284:9
296:18 297:7
314:25 315:3
333:15,21 347:19
347:22 367:4
369:1
**planet** 230:7
**planning** 15:19
**Plastique** 226:18
**played** 287:20,24
**playing** 194:16
**pleadings** 19:16
286:5,7
**please** 4:14 5:5,20
7:2 15:21,23 16:9
16:12 18:7 27:24
30:15 34:6,21
42:11 43:8,23
50:19,25 65:11
67:14 69:13,24
70:12 78:25 79:4
82:23 86:18 91:22
98:4 102:2 105:14
110:5,8 118:20
144:5 147:6 174:1
178:2 182:4 183:9
184:24 186:18
189:3,8,18 194:10
201:22 204:5
208:21 209:12
227:11 239:21
242:13 247:17
254:1 256:15
264:21 267:4,13
269:4 271:1
272:25 275:8
277:16 285:21
286:13 293:18
296:9 309:7 313:8
317:14,20 318:10

331:1 333:24
340:2 342:3 350:5
350:8 351:13
352:24 353:17
354:15 357:3
360:22 383:7
388:3
**plenty** 146:2
**plus** 299:18 377:17
**point** 5:10 6:15
9:13 12:17 19:24
35:25 42:12 64:13
64:20 102:13
107:9,18 115:19
117:18,21 120:4
123:19 158:24
169:16 196:15
205:3,9 225:15
229:21 257:24
258:1,14 261:17
291:16 295:14
301:9 312:12
320:16 340:16
359:22 365:6
366:7 373:9
377:11
**pointing** 228:24
**poker** 231:12 232:7
233:6 236:18
237:1 255:22
272:5
**poker-related**
235:23
**Police** 141:24
**Ponce** 2:11
**pool** 201:19,20,25
**pools** 186:21,23
195:20,24 197:18
**Port** 184:21
**portion** 107:13
**portions** 143:5
171:13
**posed** 52:6 71:5
98:3
**position** 43:7
126:23 193:17,22

258:4 362:3,17
363:15 364:17,21
365:19,19 377:16
**possess** 245:25
294:23 346:19
**possessed** 292:8
**possession** 20:16,25
21:12,15,18
271:22,25 334:19
334:24 336:13,19
336:25 338:21
**possibility** 50:23,24
**possible** 8:23 20:5
120:23 162:9
172:19 207:20
217:21 241:6
251:22 258:22,23
332:24
**possibly** 204:22
205:6 238:1 299:2
302:14
**post** 135:4,12
169:21,23,25
170:1,8,9 171:5
282:10 293:5
**posted** 169:2
170:17 171:12
**posting** 169:16
170:14 324:2
**posts** 262:14
380:14
**potential** 162:15
163:23
**potentially** 297:17
**PoW** 175:19,19
**power** 185:21
**practical** 253:7
**practically** 266:24
325:21
**precluded** 369:8
**predicate** 144:22
220:16
**predicate-based**
220:22
**prefer** 160:23
161:2 257:7,8

**prepared** 43:21
183:19
**presence** 208:17
**present** 2:19 4:16
373:18
**presentations**
35:23
**presented** 46:20
260:11 374:18
**preserve** 69:15
81:7,25
**preserved** 78:3
**press** 37:5
**pressing** 37:9
**presume** 65:18
175:4 189:2
227:17
**presuming** 314:17
**presumption** 65:22
**pretty** 339:24
341:12 384:11
**previous** 277:13
317:23
**previously** 174:16
175:11 237:9
**primarily** 208:13
209:2 231:10
362:4
**primary** 172:17
208:5,8,23 243:13
354:19
**printed** 203:23
204:8,9,25
**printout** 126:13
**prior** 76:18 141:3
168:19 202:3
277:24 328:11
**private** 55:15 138:4
177:7,11,17,25
202:24 203:2,7,11
206:7 223:9
294:21,24
**privately** 169:23
177:13
**privilege** 18:15,20
19:22 97:20 364:1

364:12 367:17
369:20,22
**privileged** 18:12,13
31:4 97:18 320:5
320:9 338:11
**Pro** 2:6
**probabilities**
173:11
**probability** 50:25
**probable** 51:3
**probably** 35:21
44:7 96:15 177:25
195:5 217:20
243:3 251:7
306:14 322:9
326:13 328:23
365:7,8 369:9
378:21
**problem** 79:2 225:4
355:23 366:17
**problems** 61:10
155:11,13,17,21
155:21,23 249:16
283:1,3,4
**Procedure** 70:5
225:12
**Proceed** 50:21
**proceeding** 364:16
**proceedings** 349:13
349:14,16,18
352:12
**proceeding-type**
356:13
**process** 97:2 99:18
136:12 190:22
205:16 227:5
281:8
**produce** 49:1
**produced** 302:20
335:12 353:8
355:15 366:20
**producing** 254:16
**product** 253:24,25
254:12,15 255:1
255:10 258:6
**production** 255:6



365:2,5 383:9
productive 18:17
professional 122:11
Professor 283:1,9
  379:2,3
ProfFaustus
  378:23 379:1,9
  380:12
program 106:6
  191:9 235:21
  328:17
programed 182:21
programer 106:5
programing 165:5
  166:10 328:12
prohibited 225:23
prohibiting 226:9
prohibitive 258:6
project 64:22
  168:18 278:13,15
  278:16,18,19,20
  278:22,24 279:1
  351:16,24 354:20
projection 50:23
projects 215:15,17
  215:19 218:22
  219:1 244:21
  255:24 259:20
  275:10,14 278:10
  371:3
prolific 262:11
proof 153:20,22
  154:15,19 263:10
  383:21
proper 25:2 368:8
properly 183:19
property 27:21,24
  28:16 86:2,3,7,17
  87:5,16 88:8,19
  99:25 100:10
  114:13 117:23
  195:6 199:6 215:5
  215:13 216:1,5,11
  222:3,6,13,17
  223:2,17,21,25
  224:8 230:3,12,24

231:4,6,23,24,25
232:2,6,9 234:9
234:15,21 235:6
235:14,22 236:6
236:18,25 243:23
243:24 255:24
349:5 350:10,12
372:16,20,23
373:5
proposed 8:11
protect 88:12,15,18
protected 88:16
protocol 55:16
  155:24 165:6,11
  165:13,15,20,24
  166:2,4 175:25
  323:18 328:6
  342:22 372:7
protocols 165:21
  166:21
prove 257:1 259:5
  262:3
provide 31:22
  126:23 131:18
  206:16,23 207:2
  212:16 213:24
  276:17 277:22
  278:1,3 279:14
  282:2 361:17
  368:18
provided 178:11
  211:12 213:21
  231:3,7 240:22
  280:3 281:3,13
  282:14 348:18,22
  349:8 355:3
  383:21
provider 240:23
  241:9,15 243:22
  248:5
provides 265:11
providing 240:12
  240:19 362:8
  368:17
provision 239:13
  241:4

pseudonym 167:20
  167:25 186:9
  208:19,20,24
  209:2,9 210:2
pseudonyms 326:5
  326:8
Pty 277:23
pub 38:12,13,15
public 55:15 76:18
  99:12 125:6
  128:24 129:3
  132:11 137:21
  147:10 151:1,2
  155:4 158:4,7
  164:1,23,24 165:3
  167:4,6,12 168:19
  169:10,16,24,25
  170:1 177:1,11
  179:21 196:8
  206:10,16 207:13
  207:22 209:10,11
  209:21 215:20
  223:16,23 224:7
  253:9,18 324:2
  325:8 339:9
  365:10 384:13,18
publications
  285:15
publicly 139:25
  163:23 164:2
  168:20 169:1,21
  177:4,8
published 52:3
  59:9 215:20 223:7
  260:10 323:25
  355:14
publishes 167:19
publishing 169:10
pulled 100:25
  213:12
purchased 244:11
purchaser 271:8,19
  274:21 275:10
purchasing 347:2
pure 119:7
purported 15:18

145:18
purporting 36:23
purports 79:7
purpose 26:16,23
  35:16 37:14 63:18
  85:24 86:1 87:3
  96:13 99:14
  111:22,24 113:1,2
  113:9,13,15
  143:17 218:19
  241:4 243:5,13
  255:16 345:4
  367:12
purposely 263:8
  366:3
purposes 112:12
  366:12
pursuant 372:21
put 147:16,17,19
  149:17 151:1,3,6
  151:11,15 154:3
  191:18 223:6
  226:17 227:13
  228:12,17 231:19
  237:21 242:9
  257:25 260:19
  276:22 283:5
  287:9 293:1,21
  294:1,6,11,15
  297:17 301:22
  315:25 346:14
  347:15 354:13
  356:25 364:10
  386:8
puts 256:17
putting 50:24
  231:17 234:11
  316:19 356:24
Python 284:16
P-H-O-L-U-S
  82:21
p.m 318:4
P2P 209:3
_____
        Q
_____
Quantification

224:9
quarter 256:3
question 7:1,6 8:23
  9:2,8 13:15 15:21
  15:24 16:2,7,13
  17:13 21:10,10
  30:6,14,22 36:25
  37:8 39:10 41:10
  42:12,14,16,17,24
  43:5,8,10,11,17
  43:18,21,23 52:5
  66:6,21 70:15
  71:5 78:3,20
  82:18 87:8,18
  89:18,20,22 91:23
  91:25 96:22 98:3
  104:3,10 112:6
  114:17 116:23
  124:7 126:23
  135:8,11 138:9
  143:16 144:6,8,11
  144:11,16,17,21
  146:3 147:4,24
  156:2 165:8 182:9
  183:14 187:2
  189:15 190:18
  191:10,21 193:8,8
  195:13 197:1
  217:14 220:15
  227:6 236:13,14
  236:15 237:23
  238:15 242:17
  244:23 245:16
  251:18 252:8,9
  257:9,10,15 259:2
  259:18,24,25
  262:3,5,6 263:9
  267:5 269:22
  279:8 286:8
  292:14,14,15
  295:6 296:15
  309:7 316:11
  318:19 332:12
  338:2,14 340:1,7
  340:24 341:25
  342:3 344:12



359:2,8,11 360:4
360:9,12,17 362:9
362:25 363:4
364:5,7 368:7,12
368:13 376:3
**questioned** 373:6
**questioning** 8:10
36:24 43:19 77:21
361:18 368:22
**questions** 3:4 5:8
16:5,5 17:14,15
18:12 19:16,19,19
19:20 20:8 25:2
34:3,4 40:16 43:3
77:24 78:11,12
99:3,4 123:13,15
141:1 179:18
182:13 183:19
195:11 199:12
203:20 205:4
225:2 234:7
238:18 251:11
270:9 277:16
279:8 287:15
349:20 352:20
358:7,14 359:13
360:21 361:2,5,8
361:9,13 362:12
362:14 363:7,9,17
363:22,24 364:5
365:15,16 367:9
367:10,12,16,18
367:19,21 368:21
368:24 369:18
370:11,14 373:7
374:15 386:8
**quick** 154:1 321:2
374:24 384:11
**quicker** 52:6
**quickly** 35:13
144:18
**quite** 11:20 25:17
61:11 229:19
232:20 251:15
252:21 264:14
284:23 373:11

**quote** 141:19
**quoted** 66:17
**quoting** 117:25

**R**
**R** 2:1,10 153:19,22
154:15,19 175:19
175:19,19 254:3
255:2 388:1,1
**raise** 78:7 183:13
296:17 358:13
**raised** 369:25
**raising** 361:14
**rambunctious** 136:1
**Ramona** 17:22,23
19:11 361:3
363:25
**random** 33:25
179:7 300:12
**range** 60:1
**rarely** 319:21
320:17
**rate** 356:5,8,11
**rated** 354:22
**rates** 356:15
**rat's** 257:22
**Ray** 105:22 129:10
129:11
**reach** 122:14 149:6
154:14,21,25
287:6 331:25
**reached** 83:22
154:19,24 287:1
331:19 371:21
**reaching** 126:3
149:12
**read** 41:9 42:14,14
42:21 43:23,24
89:24,25 118:6
191:3 193:7,9,9
212:3 240:7,11
241:8,14 245:2,16
253:25 264:23
271:6 272:25
275:8 277:20

284:14 317:17,20
318:3 319:13
334:1,15 350:7
351:10,15 353:18
354:5,18 356:4
357:5 386:4
**reading** 65:21
244:25
**ready** 16:7
**real** 125:17,23
165:17 167:22
208:1 249:9
312:22
**realise** 109:1
**reality** 219:15,20
**really** 8:9 13:23
103:16 163:6
167:19 178:3,4
180:10 200:22
218:12 230:6
257:19 262:20
274:23 282:7
320:17 339:15
342:25 353:4
375:9,10
**reason** 78:8 134:10
134:19 174:15
220:12,18 260:21
317:3 331:24
**reasons** 317:2
326:14 372:1
**recall** 11:2 14:13
24:19 25:24 26:2
26:6,13,17,19,22
27:2,11 29:17
30:3 35:16 36:8
41:16 52:22 53:2
53:10,18 62:3
67:10 69:7 70:16
71:10,17 72:22,24
72:25 82:9 83:20
83:25 84:2 85:16
93:6 101:22 104:7
105:24 106:1
110:8 111:18
126:3 156:25

162:25 202:13,19
209:13 210:5
212:6,7 216:23
220:17 244:24
295:17 303:12
304:7,14 333:7
339:8 341:9,11
365:2
**recalled** 130:5
**recalls** 366:1
**receive** 68:12 69:8
70:17 71:11,18
83:14 168:6
284:17 359:5
**received** 71:23
83:12
**receiving** 359:4
**recipe** 59:6,8,10,12
**recipients** 190:3
**recognise** 79:9,10
126:10,13 190:5
227:11 239:4,5
263:14 297:7,10
300:7 315:5 334:5
334:8 347:24
**recollect** 48:22
51:24 52:3,3
53:21 61:6,8 64:3
64:19 280:11,16
**recollection** 48:6
51:13,19,22 53:14
57:2,10,14 66:18
66:22,24 71:8
85:2 99:6 107:8
108:18,25 172:23
198:24 238:17
**reconsider** 205:8
**record** 4:2 5:21
7:11 25:14,15
35:10 37:2 40:23
40:25 41:4 42:20
43:20 49:21 56:10
56:11,18 69:7,16
70:9 77:11,12,18
77:23 78:23 79:1
81:9 89:10,13,13

99:12 101:14
102:15,20 105:15
108:5,6,10 110:17
116:25 122:18,19
123:22 124:3
162:21 172:3,6
173:18,24 179:21
191:19 192:4,5
193:25 197:25
201:5,10 202:2,7
209:12 221:4,11
224:22 225:9,22
226:18 240:3
245:6,10,19
264:16,24 265:15
266:19,23,24
267:1,5,10,14
272:25 283:24
284:5,12 296:19
296:21,25 310:4
317:18 323:4,9
333:12,17 343:20
353:20,21,25
356:4 357:5,24
358:3 360:12
361:15 385:13,17
385:18,19,20
386:7 387:6
**recorded** 6:14
172:5
**recording** 49:1
272:4
**recordings** 194:4
**records** 11:5 15:1
37:21 75:5 82:16
83:2,7 94:6 96:11
97:11,13 102:6
106:24 107:3,6
110:7 111:12,19
111:20 114:21
116:4,21,22
117:17 118:6
120:1 121:22,24
122:17 123:5
124:8 132:10,12
139:20 164:20,24



165:3 176:17,25
177:1 201:11
219:13,14 266:21
279:18,24 280:7,9
280:10,25 282:19
288:8 297:23
301:7,11,15
305:17,18,20
306:3,4,6 307:14
307:19,20 308:3
311:5 312:20
313:3,4,10 332:22
332:23 337:5,8,10
337:15,19,20
339:10 343:21
**rectum** 257:22
**Reese** 283:1,6,7,9,9
283:17
**refer** 166:4,9
354:14
**reference** 96:8
154:1 175:10
244:19 296:14
310:9 356:18
**referenced** 154:3
186:13 244:21
247:9 259:20
295:15,16 344:18
**referencing** 65:23
150:4
**referred** 184:7
193:4 224:19
225:5 243:24
275:15 276:16
296:10,11
**referring** 65:8 66:1
69:23 83:9 101:12
101:12 109:9
115:5 124:8
161:15 189:21
208:17 215:23
239:24 271:15
273:3 278:20
285:4,22 286:2
302:8 320:21
355:18

**refers** 296:12
**reflects** 296:21
**refresh** 66:17,22
**refreshed** 66:24
**refused** 193:12
296:3 358:8,14
360:20 361:2,5,10
372:9 373:7
**refusing** 17:13,15
40:13 66:14 127:1
**regard** 88:25 104:8
362:9,24 363:7,14
365:14 366:13
**regarding** 127:15
364:7 365:9
371:14
**regards** 256:11,18
335:23
**register** 176:11,14
177:13 179:2,15
179:19 187:25
353:9,11
**registered** 178:7
179:3,6,9,11
180:5
**registering** 180:6
**registrant** 177:21
**registration** 62:13
176:18 177:7
178:23 179:1
180:4
**regular** 54:23 55:1
241:1
**rejected** 166:1
220:24
**relate** 15:18 27:7
27:16,20 28:16
29:1,5 33:17 87:1
88:25 106:10
145:17 183:8,14
205:7 238:4,19
309:4 318:16
357:12 365:16
370:12
**related** 27:11,14
33:12 36:24 38:18

38:21 86:22 87:5
99:25 107:16
183:19 292:4,11
300:21 310:14,17
310:20,23 314:3,8
314:13 316:11,12
327:15,24 334:21
370:14,15,16,17
371:3,4 373:4
387:10
**relates** 33:15
100:10 144:6
146:4,15 205:13
224:12 233:5
236:18 259:16,19
363:21
**relating** 29:13 87:8
368:16 369:5,18
369:19
**relation** 146:18
314:3
**relationship** 71:25
98:13 120:14
186:20 295:1
304:17 312:9,10
312:11,13 316:17
383:9
**relative** 387:12
**release** 65:5 175:25
271:18 372:6
**released** 268:3
329:14,15,17
**relevance** 15:17
97:16 155:25
186:18 205:6
222:15 339:25
**relevant** 144:22
189:11,12,15
285:24 315:20
349:18 367:4,6
368:10,25 372:22
**religious** 366:12
**rely** 7:6
**relying** 364:2
**remain** 88:16
**remained** 83:8

**remaining** 276:4
**remains** 365:19
**remember** 9:17,23
10:17 11:11 14:15
14:22,23,23 21:24
22:4,8,13,18,23
23:4,9,17 24:9,11
24:13 35:7,23
36:4 37:15,24
39:4 41:25 42:2
45:16,24 47:5
48:4 49:2,3,4 53:2
53:25 54:14,17
55:21 57:6,7,16
57:21 58:24 59:5
60:9,10,13,16,21
60:22,25 61:3,17
61:18,21 62:2
63:7,12,15 67:16
67:18,22,25 68:5
68:9,11,21,23,24
69:2 70:22,23,24
70:25 76:9,12
81:2,17 82:10,13
84:21 85:9,11,14
85:23 90:22,25
92:22 93:1,13,14
96:8,11 98:7,18
99:10 100:19
101:1,21 102:5,14
103:4 105:16
106:25 107:3,7,12
107:15,20 109:6
109:25 110:6,13
111:13 112:1,2,6
112:20 122:7
126:5 133:7,19
140:17,19 141:25
142:6,10,14,20,21
142:23,24 143:1
151:15 156:12,22
157:2 163:4,6
168:3 170:7
176:16 179:22
190:8 192:15,20
192:21 193:1,2

206:22 209:14
211:19 213:11
214:4 218:12
220:9 246:16
269:9,25 277:1,4
277:9 281:9 283:8
285:9,11 290:13
303:2,5,8,16
307:11,12 309:20
322:23 325:10
326:4 343:19
344:21 351:1
365:1 377:7
378:22
**remembered**
277:13
**remembering** 49:2
**remind** 7:12 130:23
202:13
**removal** 120:8
**remove** 109:17
260:3
**rename** 112:13
**renamed** 112:16
**renames** 112:18
**render** 373:21
**rendered** 265:13
**repeat** 7:2 30:22
152:1
**repeated** 225:22
**repeatedly** 226:1
**rephrase** 7:3 21:11
332:12
**replied** 190:4
**Reported** 1:24
**reporter** 2:14 4:13
5:6 7:11 34:21
35:9,11 42:15
43:24 89:23,25
94:16 106:15
123:18 142:3
184:24 226:25
245:2 251:19
279:10 283:21
293:18 317:9
331:1 373:20



387:1,3
reports 247:12
represent 4:15 5:18
representation
28:12 37:5 191:23
representative 1:6
represented 264:9
representing 4:12
4:13
republic-type
356:16
request 4:11 42:13
140:2 141:2 246:7
246:11 366:12
370:4 372:3
373:16 383:8
requested 42:12
43:24 89:25 245:2
246:9 361:11
Requesting 338:12
requests 175:22
337:22
require 70:5 368:6
368:10,20 370:4
374:15
required 125:3
331:17 353:9
363:20
requirement 306:3
306:6
requires 62:11
100:3,5
reread 136:2
research 1:7 64:22
91:19 109:15
175:24 216:18
275:9,10 350:11
350:15 372:6
Research/develo...
265:2
reserve 231:20
248:14,16,21
343:3,7 346:23
377:12,23 385:9
reserved 385:7
Reserves 251:14

reserving 385:4
reset 211:2
resided 75:10
residence 8:19 11:9
resident 312:12
resides 30:11
residing 312:16
resigned 339:1,6
resolve 77:22
respect 296:7
respectfully 364:23
373:22
respond 8:24 9:2
43:7 225:8,18,21
339:7 359:14
368:11,14 369:21
372:4
responded 123:12
368:9
responding 225:19
337:21
response 7:7
175:22 313:7
318:3 363:22
372:2 374:2
responses 7:11
75:14 136:13
386:8
responsible 234:14
234:23 235:1,4,9
374:13
rest 255:5 304:2
313:4 385:9
restarted 195:19
restate 313:25
restroom 77:6
245:5
result 237:24
238:16 319:14
results 275:11
return 282:5 297:4
returned 268:19
282:1,6,20
returning 354:21
reveal 324:14,17
revealed 324:18

revealing 143:12
143:16
review 136:13
150:13 169:19
295:12 297:3
reviewed 150:17,19
reviewing 296:13
reward 196:10
re-edit 157:7
re-point 228:1
Rica 87:12 231:14
231:16 244:4
319:9
Ricardian 323:21
rid 158:23 333:3
382:5
right 16:5 39:19
43:9 71:3 105:16
135:11 150:7
177:3 189:10
190:5 193:6 197:6
210:15 227:2
235:10 244:23
270:11 274:20
276:2 278:12
283:9 296:8
308:10,18 311:8
335:3 341:1
353:16 359:24
rights 113:25 114:2
114:3,4,8,12
115:7,11,13,15,19
115:25 117:11,15
117:17,18,20,21
117:23 118:1,3,5
118:9,22,24 119:4
119:14,23 257:6
291:6,9,12 293:8
319:17 337:17
right-hand 189:19
300:3,24
ripped 185:20
risk 96:16 216:12
222:8 223:3 224:9
275:17
Rivero 2:10,11 4:22

4:22 15:20,23
16:4,12 30:17
31:2 35:8 42:10
42:23 43:1,2,4,12
43:13,14,16 50:21
69:24 70:3,7,11
78:19,25 79:4
98:2 102:19
105:20 106:13,19
116:23 117:2
123:17 141:15
142:2 144:15,21
146:16 153:10
174:1,7,14,24
189:21 195:9
196:23 197:11
201:22 202:2,7
224:17 225:1,10
225:18,21,25
226:8,13,16,19
227:5 238:4,9
243:10 245:3
251:18 252:4,7,18
252:22 253:11,20
254:6,17 259:13
260:5,8 262:1
263:9 277:16
279:9 295:10,20
296:7,9,20,23
297:2,5 320:11
338:8 339:21
346:3 353:19
359:13,18,19
375:5,6,16,22,24
376:6,10,17
377:11,16,20,22
383:12,16 385:3
385:18
road 134:9 185:20
Robert 383:10
Roberts 186:10
Roche 2:5 4:20,20
385:15
role 287:16,19,24
314:3 340:20
roles 19:15 105:13

286:4,6
rolling 200:7
room 258:24
358:20 373:18
rooms 55:14
Ross 339:19,25
340:18 341:18
342:1,12,13,14,21
rough 202:9
round 186:10
route 52:18
routine 52:10,12,15
52:17
routinely 52:8
royal 319:20
rude 287:9
rule 69:22,25 70:3
70:12,13 78:20
136:2 165:24
225:4,10,11,12,12
225:23 226:2,9
296:10 310:25
368:3 369:23
370:4,5 374:5
375:2 385:8
ruled 374:17
rules 20:21 25:8,17
69:21 165:15,20
165:22,25 377:18
ruling 40:17 369:17
370:3 374:10
377:13 383:11
rulings 365:23
run 138:2 185:21
195:20 243:12
339:16 376:1
running 157:4
196:3,7 199:7
243:14 244:3
375:25
runs 207:8
rural 185:17
rushed 349:4
Russia 232:18
233:9
Ryde 14:15,19



**R&D** 84:4,8,10,11
84:22 85:8,12,13
85:24 87:14 91:4
91:8 92:11 93:17
94:9,13,18 95:5
96:1 239:12
240:17,19 244:6
245:24 246:4,8,12
246:13,20,22
247:1,8 248:6
263:20 267:25
268:3 269:6,7,23
270:16,17,19,22
272:7,10,16 276:3
277:25 278:3
279:14 280:2,3,16
282:2,14 343:12
343:15 344:3,9,15
344:17,24
**R&Ds** 84:17 90:2

**S**

**S** 2:1,22 266:7
378:12,13,21,25
380:8,19 386:20
**safe** 49:14 50:11
375:13
**sake** 247:20
**Sakura** 273:4,11,14
273:22
**Salinger** 256:10
**SANS** 285:15
**satisfied** 262:7
**Satoshi** 132:17,18
133:10,17 134:22
135:5,8,12,14,23
137:24 138:5
144:20 167:2,4,9
168:10,14,16,20
169:2,12,15,16
170:18 171:14,21
182:5 184:2 186:2
186:3,5,11 188:24
190:1,21 191:5
208:5,8,12,14,16
208:18 209:9,15

209:15 210:2
213:12 285:16,19
286:16 323:18
324:2,9,14 325:2
325:24 326:3,5,10
326:17,23 328:13
329:2,12,19,20
330:21 382:25
383:5,22 384:3
**satoshi@anonym...**
210:14
**save** 12:6,8,9 68:24
136:25 157:5
328:18 379:23
380:8
**saw** 39:7,11 134:12
150:4 154:2 200:6
267:21
**saying** 64:1 121:11
148:10 153:16
159:8 165:8
207:10 208:13,21
213:17 228:8
247:12 250:14
253:12 254:20
255:4 257:3
260:23,25 261:7
261:19 262:12
268:15 274:17
282:21 283:2
300:21 307:15,18
311:10 319:23
322:25 335:18
349:21 352:5
**says** 19:13 63:16
64:7 126:16
177:25 190:19
227:20 229:6
241:8,11,19,22
245:23 246:2
247:25 249:8
254:12,14 255:1,9
261:22 264:4,16
265:3,22 266:7
271:18 305:8
310:16 315:9

320:17 321:4,8
348:17 355:7
371:13
**scale** 100:4 243:16
**scales** 345:10
**scaling** 243:13
345:5,6,8
**schedule** 375:1
**scheme** 293:15
**Schiller** 1:21 2:3,6
2:22,23 4:10,11
4:16 174:4,10
359:21,25
**scholar** 264:12
**scientist** 336:21
**scope** 88:21 89:19
103:17,21 141:4
152:9,12 156:1
181:11,17,21
183:19 187:14
190:13 199:12
203:17 214:21
216:7 242:12
244:16 278:8
285:21 286:1,1,10
292:4,7,9,10
340:16,19 362:11
362:19 363:18,22
364:9 365:20
383:24 384:5,12
**screamy** 248:25
**screen** 4:8 65:21
167:18
**SDK** 351:17,18,25
**se** 2:4 14:7 186:12
**sealed** 83:8,12,14
**seances** 382:23
**search** 129:10,12
131:19,22,24
154:1 311:25
**searches** 163:18
311:22
**second** 2:4 10:4
17:21,22 40:20
98:2 126:11
184:10 189:9

197:3 207:13
224:17 225:17
240:6 244:22
360:4 362:24
369:14 372:2
**secondly** 249:19
**seconds** 385:14
**secret** 159:16
293:15 326:15
**secretarial** 107:7
107:12 111:20
122:9,10
**secrets** 86:13,16,19
**section** 259:19
**Secured** 93:9,25
94:16 248:13,15
248:20 303:7
309:21 310:1
311:13,23,24
346:21
**security** 40:15
127:3,4,10 216:12
218:23 222:8
223:3 233:5
285:13 317:5
355:9,21 357:7
361:10 370:1,6,11
372:1,10 373:8
374:5,7,14
**see** 40:20 65:19
66:3 122:18 133:5
136:19,23 151:19
178:10 189:14
190:18 205:6,9
224:18 227:25
243:16 244:24
252:10 256:2,5,6
256:11 279:12
286:8 305:8 310:9
315:9 319:2 321:9
334:14 338:17
343:20 348:19,20
367:14
**seeing** 227:17
**seeking** 18:14
88:18 149:14

218:24
**seemingly** 129:3
**sell** 346:12
**selling** 251:14
**send** 80:5,10 100:6
135:5,8,14 136:3
136:14,20 139:1
140:24 151:20
152:3 161:19
178:25 192:8,11
192:17,23 206:6
206:10 213:16
227:15 246:3,4
250:2 256:15
343:6,9,16 344:3
344:9
**sends** 257:19
**sense** 288:20
**sent** 79:11,15,19
80:13,17 81:13,15
83:16 136:6,8
137:2 140:22
147:10 148:20
151:5,5 161:11,18
190:1 229:16,19
250:1 253:1,9
321:18 343:8
346:13
**sentence** 204:6
228:24 284:14
319:13 349:7
**separate** 109:15
112:5 297:16
298:25 300:17
318:16 373:18
**series** 225:2 319:7
**seriously** 234:5
**serve** 113:9,15
**served** 113:11
**server** 79:17,22
147:20 161:20,21
161:21,24 162:7
178:11,12 319:16
321:4
**servers** 8:14 162:1
162:4 191:5



198:22
service 113:4
services 2:16,21
  4:12,14 21:20,23
  22:3,24 23:11,16
  23:18 26:7 27:7
  28:15 29:1,15,18
  29:23 30:1,10
  42:5,7 62:10
  159:8 239:13
  251:16 348:18,21
  349:8 350:11
serving 113:13
session 174:6
sessions 174:11
  193:25 194:1
set 31:7 62:1,6,9
  92:7 93:20,22
  94:3 109:15,16
  123:1,4 165:15,20
  243:3 244:3 270:2
  272:13,16,20
  281:7 293:12
  300:13 305:2
  315:14 319:6,7,11
  320:22 356:5
  366:1,3 373:7
  381:4,7
sets 165:17,24
  356:7
setting 356:14
settle 160:7
settled 165:18
settlement 16:18,24
  363:11,14
setup 319:1
set-up 133:19 185:9
  185:16 293:10
Seychelles 84:19,23
  85:4,25 91:9
  305:9 306:5,7,10
  306:21 308:6
  377:3
SGI 240:21,23
  346:13
shake 109:4

Shamir's 293:15,17
shapes 345:22
share 91:15 134:16
  139:7,12 140:11
  141:7 142:18
  143:5 192:6
  202:24 203:2,7,11
shared 186:22
shareholding 97:7
  97:8,10 120:6
  122:24 339:14
shares 109:14
  293:6 316:1
sharing 205:22
  293:15
sharper 283:18
Shehadie 141:16
  143:6,11,13
shit 157:5 160:11
  213:18 341:22
short 41:2 77:15
  108:8 173:21
  215:15 221:7
  245:8 284:2 323:6
  333:14 353:23
  358:1
shorter 259:1
Shortly 148:15
short-circuit 9:1
shot 119:10 203:18
show 65:10,10,13
  65:14,23 66:19
  67:3 69:22,24
  70:1,7,12,13
  259:15 261:5,6
  333:8
showed 142:15
showing 66:24
  116:25
shown 6:16 142:17
shredder 306:9
shut 83:15
sic 265:2 370:17
  371:4
sick 47:14 120:13
side 243:17 300:3

300:24 301:1
sighing 151:19
sign 193:12 256:17
  257:24 258:12,15
  260:18 261:23
signature 239:16
  256:5,8,9,12,13
  256:13,18,20,22
  256:22 257:2,9,12
  260:14 261:9,10
  261:14 266:8
  299:22,23,25
  300:1 357:16,17
  357:20,20
signatures 260:11
  260:17,22
signed 165:18
  239:19 254:25
  259:6,11 260:1,14
  265:6 269:3,4,7,8
  386:19 387:23
significant 198:12
signing 258:19
  260:13,20 265:21
silicon 345:23
Silk 134:9
silly 322:21 326:5
similar 366:13
simple 121:1
  252:12 260:15
  328:20 373:11
simply 25:3 56:25
  284:23 293:14
  349:5 364:1
  368:12
simultaneously
  35:12 157:3
Singapore 84:20
  376:22,25 377:1
single 11:21 17:13
  21:7 77:24 78:3
  78:11,12 88:4
  91:14,16 106:19
  142:7 158:2
sir 19:3 41:7
sister 314:19,20

sister's 71:2
sit 49:1 159:12
  341:21
site 154:2 282:9
sites 151:4 232:20
  232:22
sitting 30:7,9
  253:16 280:1,15
  281:2 282:13
  288:9 298:8,9,11
  298:21 304:7,23
  306:20,22 339:12
six 35:22 51:23
  53:3 156:13,15
  157:13 158:9
  216:20 217:4,7,9
  297:25 298:2,3
size 165:17 233:15
sizes 100:7
skill 387:7
skip 224:23
Skype 266:18
slices 289:7
slipped 366:16
Slow 34:21
small 47:8 77:20
  184:21
smelts 345:22
smoke 279:12
Sneezing 198:10
social 262:10
  287:13
software 165:12
  166:12,14,20
  167:9 169:11
  170:25 171:2,6
  173:13 194:15
  201:19,20 207:15
  215:18 216:11,14
  222:7 223:2,18
  224:1 227:24
  228:15 231:19
  243:16 244:2
  254:2,4,10,19
  255:2,22,22 258:3
  265:1,3 272:4,4,5

275:17 277:23
  283:3,10,20
  284:15,16 351:19
  351:21 357:6
  370:19 371:15
  372:18
solely 88:4
solution 240:20
solutions 282:25
  283:16
somebody 220:13
someone's 82:12
son 126:16 371:22
son's 70:23
soon 365:9
sorry 6:7 10:12
  30:23 32:15 34:23
  39:19 41:7 62:21
  62:22 69:7 78:19
  105:17 116:15
  117:2 129:5,11
  133:12 139:15
  141:22,23 147:5
  156:14 168:23
  170:22 179:7
  182:19 186:8
  201:25 209:23
  213:15 214:24
  239:22 240:9
  245:14 251:1
  252:7,16 254:9
  258:18 264:11
  265:5 269:2
  286:20 291:11
  308:23 309:5
  316:21 320:3
  331:2 334:16
  335:5 340:23
  349:13,25 360:8
  370:2,9 381:5,19
sort 40:20 81:9
  99:4 109:5 144:4
  145:23 159:12
  160:12 217:19
  231:15 251:24
  255:5 287:12



288:25 338:25
356:23,25 363:25
364:15 374:11
**sorts** 46:21 119:5
**sought** 139:14
**sound** 283:18 287:8
**sounds** 210:15
**source** 149:20
150:14 168:18
170:25 223:6
231:8 271:18,19
271:21,22,24
275:3,5 284:16,24
284:25
**South** 10:21,23,24
11:1 185:25 258:5
356:11,11 371:14
**Southern** 1:1 4:6
333:6
**space** 119:10
**Sparkling** 30:17,18
**speak** 35:13 49:22
52:7 56:22 57:18
57:24 58:4,7,10
58:13 60:4 63:1,2
63:5 95:13,16
109:4 128:24
129:2 138:19
146:7,13 228:8
265:16 270:18,23
330:20 357:13
373:17
**speaking** 62:3
192:2 225:16
227:1
**speaks** 63:16 228:7
268:6
**special** 240:25
**specific** 20:9
118:20 121:9
146:1 148:8 165:7
269:5 350:3
363:17
**specifically** 36:4
90:20 225:3,13
238:6,11 274:22

296:2,5 363:8
**specified** 240:22
**specify** 234:17
**speculate** 95:24
107:10 122:25
304:3
**speculation** 50:18
119:2 172:21
173:11
**speculative** 119:6,8
**Speech** 211:7
213:25
**speed** 99:19
**spell** 18:7 82:12
105:14,15,18
141:17 184:23
213:1 273:5,12
293:17 317:8
**spells** 18:20
**spend** 86:17
**spent** 185:16
305:24 347:2,5,9
347:16
**split** 293:15 303:4,6
**spoke** 51:3 52:23
55:9,9,10 56:13
56:19,24 57:3,10
59:6,23 60:2 61:3
61:5,10 62:5 64:9
64:16 129:24
131:8 142:11
153:5 200:25
309:18 342:12
**spoken** 53:3 61:7
138:22 299:17
342:1
**Sportsbooks**
231:17 234:10
235:21
**spots** 224:19
**spousal** 364:6,10,11
367:17
**spring** 273:9
**Square** 1:22 6:6
**staff** 24:16 81:1
108:15 109:4

157:4,9 162:10,12
163:21,22 227:14
229:9,14 233:13
**stage** 139:5 194:15
201:19 202:1
204:18 212:25
214:13
**stages** 175:24 372:6
**stake** 276:5
**stand** 139:17 261:2
346:9
**standing** 77:23
89:8
**start** 28:24 49:24
77:2 117:24
163:18 165:5,10
167:9 195:21
245:19 262:8
279:22 349:6
363:23 370:12
380:12
**started** 5:11 54:10
64:22 76:13,14
194:25 207:11
217:19 326:1
346:20 379:4,8
380:13
**starting** 134:10
218:19 279:12
**starts** 190:1 298:4
**state** 4:15 5:20 37:2
154:11 164:13
192:4 209:12
225:10 228:6
229:13 253:21
324:11,11 349:5
**stated** 115:17
201:12 210:19
216:5 225:13
226:9 230:5 231:2
248:22 255:18
262:11 270:1
276:13 311:6
313:22 350:17
373:10
**statement** 115:20

115:23 225:25
252:11 333:20
334:6,9 347:25
349:25 352:2,14
354:7 357:1
371:14 372:12,14
372:17
**statements** 225:22
**states** 1:1 2:18 4:5
32:24 33:4,6,19
34:1,8,13,18,25
35:4 36:5,9 37:1
37:12,17 39:14,20
39:22,25 45:13,21
46:11,16 65:4
240:18 241:4
242:1,3 243:22
334:11 355:5
374:9
**stating** 155:22
356:21
**statistician** 56:19
**stay** 56:17 247:15
**stayed** 17:5 326:15
**Ste** 2:12
**Stefan** 141:12
**Stenograph** 387:4
**stenographer** 6:14
**step** 98:2
**stepped** 214:8
**Steven** 1:17 3:3 5:7
5:22 348:2,18
350:15 386:3
**Stick** 33:12
**stipulations** 118:6
**stole** 162:10,13
**stop** 7:18,25 8:20
18:21 73:17,19
77:9 89:17,17
103:11 123:20
133:21 134:8,21
137:4 144:23
191:8,20 195:1,16
214:5,9 219:9
224:17 314:12
319:23

**stopped** 7:22 73:15
133:20 134:12
137:13 180:19
195:2 210:20
316:3 360:14
**stopping** 123:19
**storage** 11:13 21:20
22:2,24 24:20
25:25 26:10 28:15
30:8,10 41:16
42:3,5 99:16
100:3
**storages** 21:25 22:5
22:7,9,12,14,17
22:19,22 23:3,5,8
28:25 29:4,6
**store** 23:21,24
41:15
**stored** 24:3,14,20
25:25 26:19 27:6
29:14 202:10
**storing** 26:16,23
**story** 108:4 193:14
**straightforward**
368:13
**street** 1:22 2:4,7,16
10:2 104:14
**stretch** 7:18
**strict** 183:11,16
**strike** 6:21 30:9
39:10 42:24 43:10
45:12 49:23 53:8
60:22 62:19 75:24
85:13 87:4 103:24
111:24 118:23
134:21 135:11
138:13 162:8
168:19 195:15
204:8 209:25
212:17,17 215:16
235:22 236:11,24
242:9 253:16
276:16 288:23
298:9,10 308:23
313:12 320:11,13
324:8 325:4



329:18 344:16
**striking** 43:11
**strip** 158:25
**struck** 236:14
**structure** 91:13
122:25 237:22
291:20 311:7
366:21
**structures** 93:20,23
94:4 165:21 270:2
**stuff** 107:11 109:5
127:13 143:21
154:11 163:19
195:7 227:20
229:6,10 233:6
255:23 356:25
370:7
**stupid** 136:5
160:14
**stupidly** 243:1
**sub** 99:5
**subject** 19:15 45:3
65:2 94:21 195:11
286:5,6 340:21
368:8 375:22,23
**subjects** 205:5
**submission** 139:21
**submitted** 333:20
**subsequent** 238:10
374:3
**substantiate** 357:9
**subtopics** 189:4
**Success** 110:12
111:3,22,25 112:4
112:11,15 310:10
310:12,24
**successful** 125:12
125:14
**succinctly** 117:24
**sued** 18:23 274:14
372:14
**suffices** 121:2
**suggest** 151:18
183:9
**suggesting** 206:5
**suggestion** 183:7

**suit** 284:15
**Suite** 2:4
**supercomputer**
381:9,12,14,18,23
**supercomputers**
382:6,18
**supersecret** 159:11
**supervise** 218:1
**supervised** 217:21
**supply** 374:13
**supporting** 374:12
**supposed** 62:6
148:9 242:1
350:25 353:4
359:4
**sure** 8:9 15:4 19:17
40:22 56:8 77:7
78:21 94:16
102:14 124:25
131:2 163:15
170:21 173:17
174:3,19 178:24
198:1 202:2,8
213:9 238:16,21
240:3 250:18
286:15 323:3
333:10 358:17
359:17
**surrounding**
144:19 190:20
**suspended** 378:15
379:8,9,20
**suspicion** 321:5
322:22
**SWAMP** 215:18
275:17
**swapped** 251:25
**swathe** 261:16
**swear** 5:6 71:1
**switch** 77:2
**switched** 121:10
**swore** 333:5 334:9
336:12
**sworn** 5:7 333:20
334:5,23
**system** 11:14 88:4

124:25 125:1
187:25 215:21,24
215:25 216:2
220:22 222:4,18
222:21 224:2,9
272:13,20
**systems** 163:6
166:2 216:6,12
222:8 223:4 241:5
241:9 242:2
**system's** 222:13
**Szabo** 328:5,8,12
328:16
**S-A-K-U-R-A**
273:13
**S-H-A-M-I-R-S**
293:19
**S-H-E-H-A-D-I-E**
141:18

---

**T**

**T** 388:1
**tablet** 143:4
**take** 6:19 7:12,17
15:24 16:6 20:5
20:10,12 25:19
34:5 35:11,13,14
40:24 41:10 42:13
43:11 66:10 76:19
77:5 87:22 99:7
106:15 123:19
128:24 130:16
148:14 173:15
189:18 197:2
198:8,12 201:2
221:2 225:14
236:4 239:22
245:4,14 250:2
251:16 253:2
256:9 263:24
264:20 279:2
281:20 283:23
309:15,19 311:4
316:5 321:3 323:1
333:10 341:8
354:9 357:11

379:7,15
**taken** 1:20 4:4 6:9
21:5,7 30:4 34:1
36:5 282:6 283:19
300:17 332:20
343:25 354:12
372:20 373:11
387:12
**takes** 198:10
**talk** 49:8 62:23
129:12 262:19
266:17 285:2
287:17 300:13
312:19 316:23
319:22 324:8
325:8 358:10
360:24 361:12
374:22
**talked** 48:18 49:4
51:20,23 56:8
64:19 83:24 131:6
140:15 155:4
160:16 220:24,25
244:2 320:1 324:5
325:5,6 326:1
**talking** 24:16 28:19
28:20 33:9 54:10
57:6 64:12 67:12
77:2 84:24 101:13
110:1 112:4,21
120:24 121:10
130:2 158:21
161:23 166:11
167:2 169:9 189:3
197:20 201:16
209:5 219:8 237:3
237:25 258:2
271:19 287:14
288:25 300:12
308:1 316:3
318:14,15 320:6
320:23,25 325:8
325:11 328:3
348:12 349:11
356:10,13 372:13
**talks** 57:7 340:20

**targeted** 259:2
362:4 368:9
**task** 172:17 311:24
**tattoo** 277:11
**tax** 32:21 94:14,19
94:22,23 95:2,4,7
95:12,13,16
100:16 101:10,18
101:23,24 103:23
103:25 104:1,16
104:23 316:3,6
319:15 328:1
332:5,6,10,13,17
333:7 335:12,24
337:10,15,21
338:6,21 349:13
**taxes** 355:24
**technical** 176:25
253:6
**technological**
190:24
**technologies** 233:4
**technology** 28:6
44:15 64:10,18
67:8 69:4,10
70:18 71:12,19
75:25 76:19,22
83:23 235:23
265:13
**teleconference**
374:3
**telephone** 2:22,24
2:25 4:17 5:1
58:16 174:3,9,12
358:4 359:20,23
359:25 360:1,2
**telephonically**
58:14
**tell** 5:24 6:3,10,23
6:25 11:6 45:3
64:3 67:14 69:5
72:19 93:5 95:17
105:17 112:19
118:2 133:3
182:12 188:16
201:25 220:6



224:12 226:6
229:6 232:14
233:8 239:8
240:11 249:7,8
250:15 253:13
254:25 256:14
262:2 270:8,12,15
271:1 276:1 277:6
285:21 289:3
295:10,11 303:17
307:19 308:14
311:9 317:11
324:20,23 329:23
335:23 342:11
356:7 360:5
362:25 376:14
**telling** 25:13 37:8
377:7
**tells** 374:14
**ten** 33:13 47:24
48:5,9 50:5,12
146:1
**tens** 372:16
**terabyte** 100:7
**term** 28:1,9 117:23
**terms** 118:8 205:22
267:7 352:19
363:18 364:14
370:1
**terribly** 58:12
**Tesla** 119:11
**test** 133:24 207:9
207:15 345:5
**testified** 301:21
360:18 363:10
**testifies** 367:2
**testify** 280:13 346:2
**testimonial** 364:12
**testimony** 6:15
11:17 24:18,22,24
25:23 26:5 75:18
110:23 112:9
134:4 153:3
160:19 165:1
171:8 175:15
193:20 195:11,23

207:25 217:5
235:16 236:20
248:18 249:5
252:19 287:22
300:23 304:10
320:12,19 337:12
347:7 350:22
358:25 360:13
362:20 369:8,10
369:18
**testing** 206:25
207:4
**testnet** 196:7 207:5
207:6,7,13,17,22
208:1
**tests** 243:13
**Texas** 236:8
**text** 79:25
**thank** 4:17 5:9 6:17
7:16,20 16:20,25
30:18 41:4 65:25
77:19 108:10
124:4 129:22
173:25 174:7
200:3 221:11
245:10 263:5,6
284:6 310:5
323:10 333:17
358:3 360:3
361:25 367:25
368:3 375:6,14,15
375:16 385:10,11
**thanks** 197:23
375:8
**theoretically**
218:21
**theory** 369:1
**thereof** 320:10
387:5
**Theymos** 181:3,9
181:15
**thing** 57:22,22
72:21 87:19 97:18
158:22 160:12
167:21 169:9
177:10 255:4

260:16,16 261:8
261:11 278:23
290:5 298:3
303:14 304:16
311:23 356:13
367:18 375:17
385:3
**things** 8:15 23:25
24:11,16,17 28:19
41:15,22,23 46:21
48:23 49:1,5
54:11 55:22 56:8
61:6,25 68:18
88:1,3 100:24
101:1 107:10
118:14 119:5
122:12 125:3
126:21 130:7
134:8 136:5,23
140:16,23 148:11
158:18,21 160:14
165:16,21 166:4
171:23 201:12
209:4,5 224:15
227:23 229:19
231:17 232:13
234:10 235:9
241:17 243:14
244:1 248:23,24
249:1,7 250:15,17
250:18 255:20
262:17 272:1
277:15 280:20,20
281:10 283:15
299:12 300:12,17
301:6 303:23
306:2 308:9 311:4
313:10 316:6,7
317:6 321:1,1,3
322:21 323:21,24
323:25 333:1
337:4 339:13,16
339:16 349:3
352:6 353:10
355:9,13,25
356:14,22 366:23

378:22 385:7
**think** 26:24 35:12
48:23 53:14,15
57:14,15,15 63:16
78:4 81:24 105:15
116:23 123:18
141:2 142:23
144:3 160:14
165:9 174:18
179:13 189:10
197:5 202:4
204:19 209:17
212:24 257:11
263:23 265:3
273:4,13 282:21
283:8,21 300:11
303:15 317:11
329:17 344:22
345:25 353:19
364:5,7 366:15
369:24 371:18
374:6,17,22
375:10,17,25
377:14,18,22
380:13
**thinking** 10:13
62:22 93:12
141:22
**third** 126:20
127:19,21 128:13
128:19 209:20,22
209:23,24,24,25
210:2 360:17
370:16 371:4,24
**thought** 62:23
109:8 134:14
155:10,23 160:9
193:14 237:6
315:24 366:5
**thoughts** 317:22
**threatened** 157:10
378:15 379:17
**three** 126:17
228:12 297:17
299:18 313:23
371:8,23

**three-letter** 35:25
**throw** 178:2
**Thursday** 1:18
**tie** 159:3 278:7,20
318:9 383:6
**tight** 286:11
**till** 108:2 242:16
**time** 4:8,9 7:16,22
8:5 9:3,20 10:22
12:25 13:5,11
16:6 18:18 26:14
39:7,11,21 41:1,4
43:6,22 45:8,13
47:8 54:19 58:17
63:7 64:8,16 66:4
66:20 67:18 70:9
70:11 74:18,20,20
74:22 76:14 77:8
77:13,19 78:23
79:17 83:22 84:24
85:3 86:18 88:12
97:4 102:3 103:8
103:9,10 105:5,9
106:16 107:9
108:7,10 109:2
111:21 115:19
116:1 117:8 122:8
123:23 124:4
126:6 129:12,24
130:15 131:8,11
132:22 133:19
134:14 137:3
139:19 141:23
142:22 144:13
150:10 158:2
161:22,23 165:19
169:1 173:19,25
174:5 180:7
188:23 191:8
192:2,3 196:15
198:8,10,13 200:9
201:21 205:9
210:20 211:3,12
216:19 217:19
221:5,11 224:22
225:6 226:6 227:1



238:22,23 241:6
241:16 243:4,6
245:7,10 251:24
258:20,23 259:22
262:21 263:8
269:6,8 283:25
284:6 295:18
316:2,13 319:20
319:25 321:6
323:5,10 325:9
329:18 332:24
333:13,17 344:11
344:12 353:22,25
357:25 358:3,25
360:9 365:6 366:9
366:13 369:14,15
369:23 374:22,22
376:1 377:13,17
377:17,19,23
383:14 384:14
385:5,7,10,12,21
**timechain** 28:4,8
28:16 38:22 44:15
62:16,24 63:6
64:10,17 67:7,14
69:4,9 70:18
71:12,19 75:25
83:23 87:23 96:20
181:25 182:15,22
**timechain-related**
87:15
**timeframe** 130:22
141:1 360:9
367:11
**times** 15:7 45:17,18
47:3,10,19,24
48:3,5 49:3,4,9,25
50:5,9,12,16 51:4
51:7,9,15 52:23
53:3,10,18,22
56:18,24,25 61:11
84:16 85:14
104:15 130:17
136:2 150:3,11
158:19 212:10
229:14 302:15,20

332:20,21,22
344:2,15,15 353:9
**timing** 325:10
**tirade** 277:14
**title** 150:5 223:14
223:20 224:6
372:20 373:11
**today** 6:9,14,18,20
6:22 7:16 15:19
20:16 24:18 25:23
26:5 30:7,9 71:1
94:7 137:19
175:15 195:23
253:16 280:1,15
281:2 282:13
288:9,15 296:10
298:8,10,11,21
300:23 304:7,23
306:20,22 320:19
339:12 351:4
358:5 368:7,21
374:16,24
**Today's** 4:7
**told** 31:8 41:14
109:8 121:7
170:24 198:1
201:1 202:19
220:12,15 225:11
247:5,6 249:9
250:16 265:10,18
265:19 282:1
321:25 322:4
332:24 359:3
365:18 368:23
369:2 371:24
373:3 377:9
**top** 11:4 72:19
85:17 87:13
112:20 116:5
119:18 139:18
142:6,14 209:15
239:17,18,25
240:1 247:20,22
253:23 256:3
266:5 267:15
277:20 281:8

284:11 302:9
305:6 306:24
310:3,5 334:2
341:16 343:19
348:13,14,15
354:16
**topic** 19:13 28:22
36:22 123:14
129:1 145:25
189:2,3,5 224:18
224:19 238:4
285:21 295:11,16
349:10 367:21
370:22
**topics** 8:8,10 15:18
19:4,5,9 20:7,8,9
33:11,12,13 44:18
59:5 60:2 61:5,21
64:13 88:21
142:13 144:4,6,16
145:24 146:2,4
182:4 191:11
199:18,19 205:7,8
224:12 225:3
242:13 259:16
278:8 295:4
318:10,16 349:20
350:3 352:21
367:24 373:24
383:7 385:1,2
**Tor** 231:18 234:11
**Toshi** 326:6,6
**total** 71:8 251:4
344:16
**totally** 243:1
**touch** 17:5 157:10
164:15 361:8
375:13
**touched** 77:3 187:9
**Touché** 198:12
**town** 184:21
**tracing** 359:2
**track** 157:13 228:8
280:7
**tracked** 285:10
**trade** 86:13,16,19

251:17
**Trading** 107:5
291:2,3
**trail** 134:12
**transaction** 100:6
165:18 206:6
220:23 250:1,2
253:1,2,3 344:18
**transactions** 90:11
90:14,17 190:2
**transcribed** 202:4
387:6
**transcript** 5:12
295:12 296:22,23
320:16 383:12
386:7 387:5 388:4
**transcripts** 295:11
296:12,13
**transfer** 180:17
181:19 186:13
246:8 271:7 273:1
275:9,12 280:22
282:1 344:17,25
**transferred** 120:5
180:8 252:15,17
270:13 280:17
347:1 354:20
**transfers** 116:4
120:1
**trash** 11:21
**trashed** 12:2
**travel** 33:6 34:7,12
34:17 35:5,16,21
37:11,17,20,23
38:1 39:14,24
45:15,16,20 46:1
46:3,10,14,16,19
**travelled** 34:24
38:6 39:21 45:13
45:23 46:4,7
**travelling** 36:9
**Tread** 340:1
**tree** 282:25 283:4
**trees** 283:15
**tried** 19:1 25:3
132:21 133:8

211:4 274:9 384:2
**trip** 36:5 39:12,20
375:13
**trips** 32:24 33:3,19
33:25 35:20,23
36:10 37:1
**troll** 150:10
**trouble** 218:25
**true** 220:22,23
226:11 334:11
335:2 386:7 387:6
**trust** 91:16 119:10
159:15 214:19
249:7 269:12
288:23,25 289:3,6
289:19,20,21
290:1,2,2,3,4,7,20
290:24 291:15,17
291:18,18,21
292:1,6,11,13,19
292:22,25,25
293:1,2,3,5,6,7,8
293:9,9,10,11,21
293:24 294:1,6,11
294:16,20 295:2
295:15 296:6
304:22,24 305:2,9
305:11,13,14
306:7,10,21 307:5
308:6,13,16,20
310:14 312:9,17
312:18,18,19
314:2 315:10,13
315:14 316:14,18
317:25 319:1,6
320:22 327:10,13
327:15,24 330:5
330:10 331:9
348:6,8 370:16
371:3 373:4,6
376:21,24 377:1,2
**trusted** 93:22 94:3
214:15
**trustee** 288:17,22
288:23 289:24
292:5 314:7,12



327:12,15,24
**trustees** 290:11
305:11
**trusts** 109:16
291:20 296:2
310:17,21,23
314:7,13 319:7
331:12,16 381:4,5
381:7
**trust's** 305:15
**truth** 6:4,10,23,25
190:11,19
**truthful** 361:17
**try** 7:12,13 8:25
11:11 14:22 24:11
48:23 52:5 60:16
61:6 101:1 133:5
182:10 209:17
216:15 261:11
273:12 281:9
316:7,11,13
322:25 342:25
**trying** 8:12 19:23
28:18 32:18 91:17
109:13 120:2
144:23 163:4
171:10 187:4
205:19 250:22
254:23 261:13
268:9 283:18
285:23 287:8
291:20 292:8,23
316:5,5 322:23
335:21 349:4,22
352:8 353:4
**TTA** 354:22
**Tulip** 107:5 290:2,7
290:20,24 291:2,3
291:15 292:19,22
294:20 295:2,15
327:10,13 330:5
331:9 381:22
**turn** 166:13,16
217:9 296:4
333:24 365:22
**turned** 216:20

217:3 373:25
374:1
**turning** 251:7
**Twice** 15:8 55:5
**twist** 25:4
**Twitter** 262:14
377:25 378:3,7,10
378:14,18 379:7,9
379:17,20 380:15
**two** 112:18 126:17
159:5 163:5,22
164:6,9 186:17
216:20 217:3,8
226:4 240:21
249:16 251:25
252:2 260:11
265:6,21 297:10
297:12,17 300:12
300:17 301:6
318:16 363:24
370:14,24 371:3
371:23 381:22
**type** 55:18 68:18
86:3,6 113:18
148:9 256:11
311:24 316:21
328:19 345:2
378:22
**typed** 126:19 148:1
256:19
**types** 24:2
**typical** 300:15

———————
**U**
**UK** 6:1 10:6,9,11
10:24 18:13 110:9
110:10 111:7,16
116:21 120:24,24
121:7,10,11 123:3
123:9 258:22
304:22,24 305:2
**Ulbricht** 339:19,25
341:18 342:2,12
342:13,14,22
**Ulbricht's** 340:18
**ultimately** 161:9

**unable** 76:19 80:2
91:11 228:7
**unawarded** 255:24
**unclear** 43:20
101:13 237:24
344:12
**understand** 6:8,11
6:13,17 7:2,6
18:22,24 19:1
21:9 52:12 63:3
100:13 147:24
162:24 166:5,20
196:9 197:23
208:16 236:12
252:8,8 268:9,12
304:11 316:10
322:7 328:21
335:21 344:20
347:11 349:22
353:4 364:15
366:21 367:13
372:21
**understanding**
28:5 81:11 127:2
329:1,2
**understood** 99:5
197:24 345:25
346:2 363:2
377:21
**undertaken** 332:6
332:9
**unduly** 368:25
**unfortunately** 9:1
149:19 282:10
355:10
**United** 1:1 2:18 4:5
31:12 32:24 33:3
33:6,19 34:1,7,12
34:17,24 35:4
36:5,9 37:1,11,17
39:14,20,22,24
45:13,20 46:10,16
334:11 374:9
**unnatural** 269:21
**unrelated** 300:25
**update** 157:5

**updated** 258:21
**updates** 178:14
**updating** 250:3
**upheld** 256:12
**uploaded** 150:20
**upload.ae** 147:20
150:20,24
**upper** 189:19
**upset** 249:1
**URL** 148:8
**USA** 127:8,11
258:4 311:15
312:11
**usable** 283:13
**use** 21:20,25 22:5,9
22:14,19,24 23:5
23:10,18 28:4,9
32:12 52:17 58:16
60:8 62:19 68:2
96:14 97:15,19
98:3 101:9,17,24
132:7 134:1
159:24 166:3,19
166:22 204:2
206:1 210:13
214:2 235:23
241:6,9 243:17,23
245:5 276:15
318:6 319:20
320:23 325:23
343:3 376:5
**Usenet** 151:4
**user** 72:14,15
129:14 132:15
**usually** 268:18
300:19
**US$5** 344:22
**Utz** 303:3
**Uyen** 212:25 213:3
213:5,10,19
214:19 285:3
289:21 327:3
331:19

———————
**V**
**v** 1:9 226:18 256:10

**vague** 54:20 100:22
168:22,24 210:18
236:7,22 259:4
291:7
**valid** 134:14 165:19
220:23
**validate** 355:2
**valuable** 223:4
230:3,11,23
**value** 82:7 204:17
204:20 216:1
223:9 229:23
231:22
**valued** 372:16
**valueless** 207:14
**valuer** 223:12
231:24
**variety** 23:25 84:15
271:21
**various** 35:19 77:3
296:1
**Vaughn** 141:13
142:19 326:2,9,17
326:22 327:2,9,12
**Vel** 4:18 5:17,19
19:3 140:25 234:5
280:12
**VELVEL** 2:3
**vendor** 264:17
**vendors** 283:2
**vendor's** 276:4
**venture** 276:5,5
277:24
**verbally** 7:10
**version** 156:16,20
156:25 157:6
158:1,3,4 161:9
166:24 167:1
190:9 207:7,9,13
207:14 354:7
**versions** 156:13,15
157:3,14,19
207:11 243:15
**versus** 4:4 56:20
177:11
**vest** 316:1


MAGNA ▶
LEGAL SERVICES

vet 216:14 218:20
218:20
veteran 355:22,22
Vice 2:6
vice-versa 208:2
video 4:2,3,8,9
43:25 44:3,6,8,11
44:14,17 46:25
47:4,7,11,20
48:11,15 49:7,10
49:19 50:1 51:10
51:21 52:7,23
53:11,19 54:4
55:9 56:2,4 77:13
77:14,17,17
123:23,24 124:2,2
173:19,20,23,23
221:5,6,9,9
256:20,25 258:20
283:25 284:1,4,4
323:8,8 374:2
385:22
videographer 2:20
4:1,11 5:5 6:15
40:25 41:3,7
77:12,16 108:6,9
123:22 124:1
173:18,22 221:4,8
227:3 245:6,9
283:24 284:3
323:4,7 333:12,16
353:21,24 357:24
358:2 385:17,20
Videotape 1:16
view 138:4,8
violations 378:16
Vistomail 178:10
179:24 209:11
210:3 211:7
212:21 213:5
273:1,2,19,23
274:2,10
volume 4:2 52:14
77:13,17 123:23
124:2 173:19,23
221:5,9 283:25

284:4 322:10
323:8 385:22,22
volumes 100:6

## W

W 2:5
waffly 177:24
wait 8:23 262:1
waiving 370:2
Wales 10:21,23,24
11:1 185:25 258:5
356:11,11 371:14
walk 6:4 157:10
208:14
wall 50:24
wallet 113:3,4,17
203:14,22,25
204:2 205:13,22
205:23 247:25
248:6,16,21
249:20 253:9
267:21 268:10
270:16,20 306:15
wallets 204:15
205:14 249:3,13
249:22 250:6,8
294:21 300:4,13
300:14,14,16
301:5 303:18,19
303:21,22 304:23
359:4
wanker 153:14
want 8:25 13:13
16:6,8 40:24
41:13 42:21 43:6
49:8 63:2 65:9,13
65:17 72:6 78:20
78:25 82:24 92:1
94:15,25 108:2
116:24 133:8
137:18 145:25
158:23 159:12
160:5 162:21
173:12 193:7
195:9 211:3
224:22 225:1

233:21 240:2
255:3 261:5,6
264:13 274:17,18
274:25 291:19
307:17 312:19
313:25 322:13
332:4 346:7
353:13 357:12
366:22 369:15,20
374:12 379:13
wanted 62:1 63:21
113:3 124:23,25
148:21 285:13
waste 70:9 78:23
224:22 226:5
238:22 384:13
wasted 385:7
wasting 16:6 70:11
191:8 225:5 263:8
water 30:15 314:22
323:2
Watts 18:2,3,5,9,19
19:11 20:2 164:8
164:17 361:3
367:16
way 17:10 19:8
25:12 34:3 45:2
57:14 71:25 77:22
85:18 87:9 88:14
88:18 94:6 101:20
104:13 107:17
119:8 123:2 125:4
145:18 158:2,19
163:14,16 166:9
174:21 177:13,19
186:6,23 205:1,20
206:5,5 208:8,23
216:18 221:22
226:3,19 242:21
247:16 255:17
256:3 260:13
264:11 269:10
285:11 287:9
306:8 310:14
311:12,19 322:12
340:13,24 345:10

346:9 359:13
362:15
ways 149:13,14
208:5 259:10
260:1,13 262:2
282:6
wearing 123:18
web 88:13
WebMoney 231:19
website 317:4,6
websites 134:9
week 14:25 47:10
48:20 55:3,5
weeks 48:24
Wei 129:3,22
131:14 151:5
167:16,17 168:1
welcome 124:6
174:8
went 35:19 37:16
120:9 187:8
246:12 253:13
268:10 274:22
353:9 355:11
363:4 364:6
379:11
wet 328:17,19
whereabouts 19:15
286:4 313:21
white 64:1 138:14
138:17,20,23
139:1,8 140:11
141:8 142:16,19
143:5,23 144:1
145:1,12 146:22
147:2,5,7,10,12
147:15,21 148:24
149:7,10 150:13
150:17,19 152:7
152:20 154:8
156:7,8,10 157:14
158:7,14 175:10
191:6
Whois 177:5,7,8,11
178:6,12,13
179:21

wide 23:25 86:16
87:7 129:1 147:4
254:20 261:16
wider 165:8
wife 15:11 16:3,9
16:19,22 17:2,9
17:21,22 18:12,12
32:3,12 49:4
51:23 72:4 164:12
203:12 325:5
341:20 361:2
363:14,15,25
367:23 369:19,23
wife's 18:19 32:7
164:13,13
WikiLeaks 134:9
Wilson 103:5,9
105:3
Wimbledon 8:4,5,6
9:3,4,6 10:8
win 377:23
window 178:3
winter 341:13
wipe 74:17 75:21
wiped 12:5 74:15
74:18,22,24 75:4
75:15,21
wise 82:22
wish 15:25 67:3
86:18
wished 316:1
Withdraw 252:10
withdrawing 43:18
withdrawn 148:7
154:18 313:11
witness 5:6 7:8 8:17
10:1 11:8,18 13:8
15:4 17:8 18:11
20:22 21:4 23:13
23:21 24:5,9 25:3
25:7,10,11 26:2,9
26:16,22 27:4,13
27:18,23 28:11,18
29:4,11,20 30:13
30:18 31:7,14,18
31:25 33:10 34:4



34:10,20 35:2,7
35:19 36:14,19,21
37:20 38:3 39:4
39:17 40:2,6
41:18 42:17 43:25
44:11,17 45:15,23
46:7,13,19 47:13
48:1,8,17,22
49:16 50:3,7,14
50:22 51:6,12,17
52:10,14 53:1,13
53:21 54:14,21
55:1,21 57:6,13
57:21 58:2,20
59:15 60:1 61:10
63:15,21 64:12
65:19,24 67:3,22
68:5,14,18,23
70:22 71:15,22
73:5,11,15,19,25
74:15 75:2,7,20
76:9,16 78:1,9
79:13,21 80:2,8
80:13,21 82:2,6
85:20 86:6,15
87:7,18,25 88:11
89:18 90:5,9,14
90:25 91:6,11
92:4,6,13,18,22
93:3,8,19,25
94:11 95:12,20
96:22 97:17,23
98:6,15,24 99:22
100:2,12,23 101:7
102:10,23 103:13
103:21 105:12,17
106:12,18,21
108:15,21 109:12
109:25 110:18,24
113:25 114:15,25
115:4,10,22 116:3
116:9,16 117:7
118:5,11,19 119:4
119:17 120:16,20
121:16 122:1,7,17
124:11,19 125:9

125:20 126:1,13
126:21 127:7
128:4,9,16 132:5
132:21 133:13
134:6 135:1,7,19
136:10,16,22
137:6,11 138:7,22
139:4 140:8 141:5
141:16,18 142:5
143:20 145:3,8,16
146:5,11,18,25
147:25 148:20
149:3,9 150:2,8
150:16,21 151:22
152:5,12,17,22
153:5,9,12,19,25
154:12 155:10,17
156:18,22 157:2
157:16,22 158:6
158:11,19,20
159:7,19 160:1,9
160:20,25 161:5
161:14 162:20
163:4,12 164:1,11
164:19 166:7,16
166:24 168:13,23
169:5,18 170:11
170:21 171:2,23
173:1,6,10 174:20
175:13,18 176:5,8
176:20,24 177:10
177:16,23 178:9
178:19 180:1,10
180:15 181:7
182:8,16,24 183:5
184:5,12,25 185:4
185:12 186:5,21
187:24 188:5,10
188:21 189:16
190:8 191:13,24
192:15,21 193:2
193:10,11 196:2
196:13 197:17
198:6,10,15 199:3
199:11 201:7,23
203:2,11,22 204:5

204:12 205:3,23
206:4,13,19,25
207:20 208:1
209:1,14 210:6,11
210:19 212:7,13
213:9 214:12
215:9 216:4,24
217:11,24 218:5
218:12 219:25
220:10,21 221:16
222:15,16,24
223:6,12,23 224:3
224:24 225:15,17
226:23 228:17
229:4,13,19,25
230:5,14,21 231:2
232:24 233:12
234:17,25 235:8
235:18 236:1,8,21
237:3 238:3
239:11,19 240:15
241:23 242:19
243:11 244:1,9,15
246:15 247:5
248:8 249:6,16,25
250:8,14 251:1,20
252:11 253:12
254:9,18 257:14
258:12,15,24
259:8,15,21
260:10 262:2,8
263:10 264:2,7
265:18 266:14
267:9,16 268:6,14
268:22 269:16,25
270:22 271:13
272:13,18 273:7
274:12,17 275:5
275:21 276:13
277:1 278:17,23
279:12,17,22
280:6,19,24 281:5
281:16 282:4,18
284:23 285:9,24
286:12,18,24
287:4,8 288:12,20

289:6,12,16 291:8
292:21 293:19,24
294:4,9,13,18
295:5,9 299:7,16
300:11 301:4,14
302:3,10,19 303:3
303:21 304:11
305:2 307:3 308:1
308:8,20 309:4,12
310:7,20 311:3,22
312:5 313:3 314:5
314:10,17 315:23
317:12 319:25
320:3,6 321:15,25
322:16 324:5,11
324:17,23 325:4
326:12,20,25
327:5 328:8,16
329:5,22 330:3,23
331:2,7,15,22
332:2 335:5,16
336:9 337:24
338:1,10,25 339:9
340:3,11,15
341:11,20 342:5,9
342:19,24 343:24
344:6,21 347:12
348:6 349:24
350:17,23 351:9
352:11,17 355:7
355:20 356:10,21
358:8,14,22 360:6
360:7 367:15
378:7 379:17
381:16 382:2,8,16
383:2,25 384:18
386:1
**witnessed** 257:20
257:21,21 258:14
**witnesses** 19:11,14
162:15 163:1
187:15 189:11,13
286:3 339:23
362:7 363:19
**witnessing** 258:20
**wizard** 217:12

**WL** 226:22
**woman** 108:12,18
**won** 337:7
**word** 28:4 52:10,12
52:19 96:15 166:3
166:19 320:23
321:12 322:1,5,13
322:24 323:20
**words** 25:4 190:21
190:23,24 191:1
208:15 239:8
**work** 6:2,3 14:7,24
48:23,23,24,25
52:4 53:14 82:17
82:19 88:1 103:5
105:5,9,22 108:13
125:15 142:12
143:8 149:17
153:20,22 154:1,4
154:15,19 155:11
155:13 159:12
193:11 215:9,12
217:1 219:3
221:18,19,21
222:1,2 227:22
228:13,14,21
230:17 242:10
248:14 273:15
328:11
**worked** 12:22
13:16 14:4,6
74:19 82:20
102:25 105:23
130:14,22 167:21
215:6 283:6
309:21 312:10
374:19
**working** 13:15,21
13:23 14:8 65:6
74:20 103:11
108:19 124:19
125:5 130:17
154:5 218:22
366:18 381:20
**works** 72:21 78:5
109:10 151:18



328:22
**work-product**
296:5
**world** 35:20 109:2
159:7 207:9
312:16 326:18,23
329:19
**worth** 52:16 217:1
227:22 228:12
229:1 243:4 251:8
275:1
**Wotty** 321:9,11,22
322:1,6,13,24
**Wright** 1:11,17 3:3
4:3,5,23,25 5:7,15
5:22 8:13,22
15:12 17:23 18:17
18:22 20:14 25:23
30:20 31:2 35:8
41:6 68:1 69:6
71:4 77:14,18
78:15 82:23 84:3
84:8,10,11,17,22
85:8,12,13,24
87:14 90:2 91:4,8
92:11 93:17 94:9
94:13,18 95:5
96:1 97:22 98:3
106:13 107:13
123:24 124:3,6
126:22 132:2
145:19 173:20,24
175:9,23 176:11
188:23 190:2
217:15 221:6,10
221:13 227:18
239:12 240:17,19
244:6 245:12,23
245:24 246:4,8,12
246:13,20,22
247:1,8,18 248:6
256:19,21 258:25
262:5 263:7,20
264:21 265:6
266:8 267:4,25
268:3 269:6,7,22

269:23 270:15,17
270:19,22 271:1
272:7,10,16 276:3
277:25 278:3
279:14 280:2,2,16
282:2,14 284:1,5
284:8 291:1
293:11 295:10
297:7 307:18
308:16 309:7
312:25 313:15,19
315:2 316:10
317:2,20 320:20
322:11 323:9,12
333:5,19 334:10
334:23 335:11
338:4,15,19
339:18 341:25
343:12,15 344:3,9
344:14,17,24
345:24 347:21
348:2,18 350:15
352:20 358:18,19
358:21,23 360:18
360:19,21 361:1,9
361:16,21 362:10
363:8,10,12,25
364:15 365:17
367:1,9 368:4
369:6,13 371:21
372:3,4,14 373:2
373:3,6,17,24
374:4,8 375:18
376:14,21 377:7
377:25 378:12,13
378:21,25 380:9
380:19,23 381:9
382:24 385:23
386:3,20
**Wrightson** 102:17
105:1
**Wright's** 19:12
37:5 238:7 277:12
295:8 296:1
360:13
**write** 89:11 126:18

135:4 138:13
300:20,20
**writing** 28:21
165:10 167:9
219:9 256:22
300:18,21
**writings** 323:22
**written** 84:1 173:13
256:6 283:7
304:16
**wrong** 81:12 99:7
127:3 153:14,17
155:20,22 179:14
182:25 226:1,10
307:17 340:23
350:23 351:6
354:7
**wrote** 51:24 52:2
152:23 153:19
321:22 323:21
372:4
**W&K** 1:7 90:7,12
90:15,18,19,21
98:9,13 107:16
120:14 123:7,16
218:7,15,19 219:4
219:7,10,12,13,15
219:22 220:3,6,13
221:18,19,21
222:1,2,16 224:13
224:15,18,18
227:24 228:14,22
229:23,25 230:2
230:12,19 231:3,3
231:6 234:20
235:5,13 236:25
238:20,24 239:12
242:1,4,8,9,15
254:16 263:19,22
264:2,4,18 287:16
287:17,18,20,25
318:12 350:15
351:24 352:6
356:19 360:20
362:15,17 372:14
372:21

**W&K's** 230:23
234:23

---

### X

**X** 3:1 260:19
356:23
**Xeon** 240:20
**XE310** 240:23
**XE310-512** 240:21
**Xs** 260:20

---

### Y

**Y** 356:23
**year** 11:20,20,21
35:22 54:2,6,17
62:22 65:5 85:16
109:6 241:18
306:6,7 324:24
341:15
**years** 54:15 67:23
84:25 130:2 131:7
141:3 143:1
186:24 209:16
217:1,19 227:23
228:14,22,23
246:16 257:24
261:3,16 265:7,21
288:14 299:18
306:4,5 308:13
311:10 313:23
314:21
**yelly** 248:25
**York** 44:1
**Young** 102:4 104:3

---

### Z

**Z** 356:23
**Zaharah** 2:10 4:24
65:11,15,25 66:8
66:15 67:1 69:17
88:22 89:2 144:12
162:16 187:18
191:2,16 192:1
361:22
**zero** 123:7,7

---

### $

**$100** 204:19,20
228:11 229:1
**$12,000** 243:4
**$20** 251:7
**$30** 278:1,3 279:14
280:3,17 281:13
**$30,000,000** 277:22
**$4** 243:3
**$80,000** 251:8

---

### 0

**0s** 24:5
**0.1** 172:14,15
**01** 354:22

---

### 1

**1** 3:11 4:2,2 77:13
77:13,17 78:16,17
79:7 108:1,2
123:24 124:2
150:6 156:16
160:6 161:16,17
161:18 173:19,23
221:6,9 225:21
284:1,4 286:1
297:15 298:4
315:10 317:24
323:8 340:24
348:17 352:25
385:22,22
**1MSU** 246:3,5
252:17
**1s** 24:5
**1st** 318:4
**1%** 172:19,24
173:1
**1,000** 172:13
**1,024** 240:19
**1.5** 52:16
**10** 3:15 51:7,15
130:2 143:1
227:23 228:14,22
228:22 244:17,18
244:21 259:19,20
278:10,11 295:13



295:14,16 298:5,5
298:5,6,6,6,9,10
298:12,14,24,25
299:20 305:5
310:2 347:19,22
354:15 370:18
371:11
**10.37** 4:8
**100** 2:4 35:20 48:24
172:11 237:12,14
237:25
**100,000** 251:10
**1000** 2:12
**10504** 2:7
**10667524** 226:22
**108** 48:24
**11** 266:4 370:17
371:4
**11.12** 41:1
**11.23** 41:4
**11.57** 77:13
**12h** 252:16,25
**12th** 65:2 79:8 80:5
80:11,19 83:21
192:8,18,24
**12,000** 241:20
**12.11** 77:19
**12.45** 108:7
**12.46** 108:10
**126** 3:11
**13** 247:17,20 357:3
357:15 370:18
371:12
**13.02** 123:23
**14** 253:23
**14.07** 124:4
**146** 348:9
**15** 54:15 239:15,17
239:18 244:21
255:25 259:20
278:10 370:18
371:11
**15.04** 173:19
**15.20** 173:25
**16th** 52:17
**16-19** 383:15

**16.14** 221:5
**16.29** 221:11
**16.58** 245:7
**1635** 2:16
**165,000** 251:23
**165,140** 246:3,4
251:4 252:2,17
**17.09** 245:10
**17.55** 283:25
**18** 11:22 52:2
334:15,17,18
**18(a)** 247:23
249:18
**18.08** 284:6
**18.50** 323:5
**189** 3:12
**19** 334:16 385:14
**19.05** 323:10
**19.15** 333:13
**19.31** 333:17
**19.53** 353:22
**19.55** 353:25
**19.59** 357:25
**19103** 2:17
**1933** 248:6 267:21
270:16
**1933ph** 248:1
**1970** 5:23
**1998** 64:23 85:2
124:20 128:23
129:2
**1998-2008** 130:3

_____
**2**

**2** 3:11 77:17 99:5
123:23 126:8,9,11
156:20 267:18
297:15 298:4
305:5 317:14
**2nd** 317:17
**2%** 173:8
**20** 50:9,12,16 51:4
84:25 322:10
**20-year** 129:25
165:19
**20.09** 358:3

**20.42** 385:21
**2000** 13:21
**2002** 138:18 139:2
139:8 145:4
156:18 167:11
**2002-2007** 140:12
**2004** 283:17
**2005** 12:25 130:24
**2005-2008** 130:25
**2006** 8:2,2 9:3,16
10:11,13,22 12:20
12:20 13:19 20:15
21:21,21 23:10
24:19 28:15 32:23
33:7 34:7 46:5
54:23 55:8 56:7
58:25 60:7 62:16
62:20,21,23 141:3
141:7
**2006-2013** 25:24
26:6,14,20
**2006-2014** 33:20
**2006-2015** 12:11
**2007** 20:25 21:25
34:12 56:12,23
57:3,11 59:2,6,7,9
63:1,5,9,10 139:2
139:8 141:3 145:9
**2008** 13:1,2,20 14:3
21:2 22:5 34:17
34:24 35:17 36:5
36:9 37:1 38:1
53:10,18 57:19
59:18,21,24 60:2
63:10 64:4,6 65:2
79:8 80:6,11,19
83:21 105:13
116:13,25 125:9
125:11 128:23
129:2 130:19
145:6,9,13 146:25
147:18 148:25
152:5 156:5 160:6
167:7,13 168:8
354:9,11
**2009** 22:9 37:11,16

37:23 38:6 52:22
52:24 57:22 60:5
60:7 67:6 69:10
70:18 71:12 76:5
76:6,14,17 167:5
169:6 187:12,18
188:3,14,17 192:8
192:18,24 194:8
194:25 196:16,20
197:9 198:3 207:3
226:21 242:16
291:1 293:12
318:13 330:14
350:9 358:24
359:8 360:12
362:10,18 363:1
367:1
**2009/10** 39:17
**2009/2010** 39:20
368:5
**2010** 22:14 37:24
38:7 39:15 51:9
51:21 52:7 57:25
60:17,23 61:4
71:19 76:11
133:20,22 137:3
195:5,15,16,24
196:10,17 197:9
198:3 293:5
341:16 358:25
359:9 360:13
362:11,18 363:1
367:2
**2011** 22:19 39:24
40:4 42:9,17 45:8
45:12 49:7 50:1
51:4 58:5 60:19
61:1,4 85:6
180:22 194:8
202:17 239:7
246:4 251:22
256:12 265:10
267:22,24 268:10
285:12 287:2
290:5,8,20,24
291:5,16 292:2

293:22 294:2
319:16 349:7
380:14
**2012** 22:25 45:11
45:20 46:1 48:11
48:15 49:20 58:8
61:13,14,19,22
62:4,23 103:10
110:14,15,19,21
110:25 111:1
285:12 287:2
294:7 337:8
381:19
**2013** 23:5,10 24:19
28:15 46:5,10,17
46:23 47:1,3,7,11
47:16,18,19 49:18
49:20 58:11 61:16
71:20 85:6 103:10
117:5 233:22,24
234:2 242:16
291:16 292:2
306:14 318:13
330:15 349:8
354:19 365:11
380:16 381:19,20
**2014** 32:23 126:4
317:17 318:4,24
381:20
**2015** 8:1 10:25 14:2
14:4 32:18 73:15
73:17 74:7,17
75:4,15 105:13
314:14 380:22
381:20 382:14
**2016** 10:13 131:10
195:22,24 196:10
197:18,21 360:14
380:14 382:24
**2018** 116:15,19,24
**2019** 1:18 4:8 386:9
386:24
**21** 5:25 52:14
**215,140** 251:5
**22** 385:14
**22nd** 239:7



**227** 3:12
**23** 202:3
**23rd** 5:23
**239** 3:13
**250,500** 270:12
**250,5000** 270:8
**2525** 2:11
**259** 3:13
**27th** 354:9,11
**28th** 318:23
**2800** 2:4
**29** 377:12
**29:46** 376:19
**296** 3:14

**3**

**3** 3:12 36:23 124:2
  156:25 173:19
  189:3,5,10,10,17
  193:5,11 205:5
  239:21 243:21
  249:3 252:6
  297:15 298:5
  315:7 318:4
  348:11 353:17
  354:3
**3AZ** 10:1
**3BF** 1:22
**3(a)** 270:6,9
**3(b)** 270:15
**3(c)** 271:4 274:20
  276:17
**3(d)** 271:18
**3(e)** 272:23
**3(f)** 275:8
**30** 225:11 226:14
  281:3 376:1,3,4,5
  376:11,17,18
**30th** 246:3
**30-something**
  72:25
**30-45** 44:7
**30-50** 35:21
**30.1** 225:12 226:13
**300,000** 242:2,4,8
  317:25 318:7

  319:2,4
**31st** 365:11
**314** 3:14
**32** 189:18,21
**323,000** 276:4,8,11
**331134** 2:12
**33131** 2:4
**333** 2:7 3:15
**347** 3:15
**384** 348:10
**385** 3:4

**4**

**4** 3:12 4:7 173:23
  189:7,10,10 205:5
  205:11,13,13
  221:5 227:7,10,11
  227:19 228:3,4,5
  239:22,24 242:14
  275:10 297:15
  298:5 318:11,17
  321:7 333:24,25
  334:14
**4th** 1:18 386:8
**4(b)** 275:24
**4(d)** 277:20
**4,000** 217:1,18
**481** 348:9
**49.5** 276:4

**5**

**5** 1:22 3:4,13 221:9
  239:2,4 244:21
  259:20 267:13,15
  278:10,11 283:25
  297:15 298:5
  315:7 317:14
  346:25 347:5,9
  350:5,8
**5%** 173:4
**50** 199:22 200:5
  234:1
**50,000** 185:19
  247:9 251:4,25
  252:2
**55** 296:22

**56** 296:22

**6**

**6** 3:13 259:17
  263:14 277:18,20
  284:4,9,10,11
  292:6 297:15
  298:5 340:23
  354:15,18,23
  357:19
**60** 234:4 347:4
**64** 51:24
**650,000** 308:17,25
  309:2,9

**7**

**7** 3:14 10:1 296:18
  297:8,15,15,15,15
  297:15,15,16,16
  297:19,19 298:6
  304:4,4 310:2
  323:8 333:25
  349:16 351:13
  356:12 385:21
**700,000** 318:1
**78** 3:11

**8**

**8** 3:14 298:6 314:25
  315:3 350:9 356:2
**8%** 356:5,8,12
**8(e)** 281:20
**8(f)** 282:24
**8(g)** 284:10
**80** 172:12
**80s** 180:6
**83-1** 189:24
**83-10** 240:5
**83-23** 126:10
**86** 383:15
**88** 383:9

**9**

**9** 3:15 298:9,10,12
  298:14 299:20
  301:24 302:3,7,8

  333:15,22 352:24
**9%** 356:12
**9:18-cv-80176-B...**
  1:6 4:7
**90s** 16:17 84:13
  167:24 324:6
**96** 189:22
**97** 348:9



**From:**      Craig S Wright [craig@
**Sent:**      2/17/2014 12:33:11 PM
**To:**        'Patrick Paige' [patrick@computerforensicsllc.com]
**Subject:**   RE: Difficult

He had vistomail accounts.
I have no idea of what the details in Belize were.

The number would be related to the account.

**From:** Patrick Paige [mailto:patrick@computerforensicsllc.com]
**Sent:** Monday, 17 February 2014 11:53 AM
**To:** Craig Wright
**Subject:** RE: Difficult

Any users names, email addresses etc. that we may be unaware of in association with the activities DK used?  In regards to the account you listed, have you made any inquiries or try to contact them?  Any information on the name of the bank? Is the number listed an account number?

*Patrick Paige* *SCERS EnCE*
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
*561.818.9208 Cell*
*www.ComputerForensicsLLC.com*

**From:** Craig Wright [mailto:craig@
**Sent:** Sunday, February 16, 2014 3:41 PM
**To:** Patrick Paige
**Subject:** RE: Difficult

I do not have a lot to give you. These may help:

- W&K Info Defense Research LLC
- GICSR Trust
- 274997114
- TTA-1-14

Locations

- Belize

It is not much, but then Dave always did things his way.

Regards,

...
**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: + 61 417 683 914
http://www.rcjbr.org



**From:** Patrick Paige [mailto:patrick@computerforensicsllc.com]
**Sent:** Monday, 17 February 2014 1:01 AM
**To:** Craig Wright
**Subject:** RE: Difficult

What about accounts and location DK had etc.? I thought you were going to put a list together.

*Patrick Paige* SCERS EnCE
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
*561.818.9208 Cell*
*www.ComputerForensicsLLC.com*

**From:** Craig Wright [mailto:craig@
**Sent:** Saturday, February 15, 2014 8:04 PM
**To:** Patrick Paige; Ira K
**Subject:** RE: Difficult

Well, preservation is first. The thing with a BTC address is that it will never disappear and if I am right will appreciate over time

...
**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553 | Mobile: + 61 417 683 914
http://www.rcjbr.org

  

**From:** Patrick Paige [mailto:patrick@computerforensicsllc.com]
**Sent:** Sunday, 16 February 2014 10:59 AM
**To:** Craig Wright
**Subject:** RE: Difficult

Hey Craig, what's the plan... any progress?

*Patrick Paige* EnCE SCERS
*1880 North Congress Ave. Ste 333*
*Boynton Beach FL 33426*
*Office: 561.404.3074*
*Cell: 561.818.9208*
***www.computerforensicsllc.com***

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Craig Wright [mailto:craig@
**Sent:** Friday, February 14, 2014 12:20 AM
**To:** Patrick Paige
**Subject:** RE: Difficult

You will have it tomorrow

On 14/02/2014 4:06 pm, "Patrick Paige" <patrick@computerforensicsllc.com> wrote:

Hi Craig... I spoke to Dave's brother who is going to let me examine DK's laptop and thumb drives. Were you able to put together a list of what we should look for? Also I and Carter would like to see what information you have that confirms the news you shared with me. As close friends of DK we would love to hear the story of how this all played out. Talk soon

*Patrick Paige* SCERS EnCE
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
*561.818.9208 Cell*
*www.ComputerForensicsLLC.com*

**From:** Craig Wright [mailto:craig@▇▇▇▇▇
**Sent:** Wednesday, February 12, 2014 2:28 PM
**To:** Patrick Paige; Carter Conrad
**Subject:** RE: Difficult

I will try calling again later. My number is **+61 417 683 914**

Dave could have some paper wallets, but he was careful. He would have had some way to recover. It would also have been cryptic.

...
**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org
Tel: + 612 8003 7553 | Mobile: + 61 417 683 914
http://www.rcjbr.org

**From:** Patrick Paige [mailto:patrick@computerforensicsllc.com]
**Sent:** Thursday, 13 February 2014 1:06 AM
**To:** Craig Wright; Carter Conrad
**Subject:** RE: Difficult

Hi Craig,

Dave was also my best friend and like a brother to me. He wasn't in the right mindset when he decided to give up on life weeks before his death. He mentioned Bitcoins to me a while ago, but we never discussed it in depth. The issue would be that all his hard drives were encrypted including his cell phone. Do the wallets only exist on Dave's computers or are there backups somewhere else? Also "The amount DK mined is far too large to email." Please clarify.

*Patrick Paige* EnCE SCERS
*1880 North Congress Ave. Ste 333*
*Boynton Beach FL 33426*
*Office: 561.404.3074*
*Cell: 561.818.9208*
***www.computerforensicsllc.com***

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any*

DEFAUS_00112979

dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.

**From:** Craig Wright [mailto:craig@
**Sent:** Wednesday, February 12, 2014 5:21 AM
**To:** Carter Conrad; Patrick Paige
**Subject:** Difficult

Hello,

I know both of you knew Dave and trusted him.

Dave and I had a project in the US. He ran it there. We kept what we did secret.

The company he ran there mined Bitcoin. I do not believe there has been anything of this in the estate, but I also know his father is not IT literate. I would ask that if you know of any of his computers, that you help ensure that any wallet.dat files he has are saved. I know that is a long time, but I had thought Dave would have planned more for the end, but he did not always do that.

The amount DK mined is far too large to email. I know this is cryptic and I know I gave Dave the shits with this and some of the things we did in WK, but he was my best friend and I am not sure where else to contact.

I am not looking for anything, just that Dave's estate gets what was in it. I do not want any of it at all. Please note, I am not seeking anything in this, but I want his family taken care of.

Talk soon,

...

**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# **RCJBR.org**

Tel: + 612 8003 7553 | Mobile: + 61 417 683 914

http://www.rcjbr.org

<<...>>   <<...>>   <<...>>

DEFAUS_00112980

**From:** Craig S Wright
**Sent:** Sunday, October 6, 2013 12:57 AM
**To:** Italia, Mark <Mark.Italia@ato.gov.au>
**CC:** Ramona Watts; Jamie Wilson; Hardy, Michael <Michael.Hardy@ato.gov.au>
**Subject:** Email 6: RE: Notification of audit ABN 48 164 068 348
**Attachments:** BITCOIN_18.07.2013.png; Hotwire Transaction INV 0001 (1).png; BITCOIN_GICSR.png; Existing value.png

**SysUserProp:** 88334F2CCA0D8E51C8530404366F9B82

Hello Mark,
I have CC'd Michael.
Please understand that the funding and other areas is something I have been discussing with the ATO and it is an area that is to remain of utmost secrecy. The funding is in cash and Bitcoin. We have already been in discussions and have filed private rulings to have XBT (Bitcoin) recognised. We are and have offered wallet details to people within the ATO such that they can track the transactions we have in XBT.
Our funding comes as we are the group that controls 5% of the global Bitcoin market.
We are dealing with listed Australian and International companies. I will send details of some of these dealings next. We intend to have a licensed Australian Bank and other aspects by the end of the year.
This information is beyond secret. We are sharing it to the ATO, but it is NOT released to market as yet.
There will be a 7th email.

Regards,
Craig

---

**From:** Italia, Mark [mailto:Mark.Italia@ato.gov.au]
**Sent:** Friday, 4 October 2013 1:18 PM
**To:** Craig S Wright
**Subject:** Notification of audit ABN 48 164 068 348

Hi Craig,

Further to our discussion, attached is a letter outlining the information we require as part of the audit.

<<Confirm - audit - post issue SR.pdf>>
<<Acrobat Document.pdf>>

Regards

*Mark Italia*
Indirect Tax | Refund Integrity
Australian Taxation Office
Phone 03 9275 4243

ATO Centenary | *Working for all Australians*

********************************************************************
IMPORTANT
The information transmitted is for the use of the intended
recipient only and may contain confidential and/or legally
privileged material. Any review, re transmission, disclosure,
dissemination or other use of, or taking of any action in
reliance upon, this information by persons or entities other
than the intended recipient is prohibited and may result in
severe penalties. If you have received this e mail in error
please notify the Privacy Hotline of the Australian Taxation
Office, telephone 13 2869 and delete all copies of this
transmission together with any attachments.
********************************************************************

DEF_00046093