Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal)
representative of the Estate)
of David Kleiman, and W&K   ) Case No:
Info Defense Research, LLC, ) 9:18-cv-80176-BB/BR
      Plaintiffs,      )
      v.          )
CRAIG WRIGHT,        )
      Defendant.     )
      - - - - - - - - - - -

CONFIDENTIAL

VIDEOTAPED DEPOSITION

JAMIE R. WILSON

Friday, November 8, 2019

Reported by:  Lori J. Goodin, RPR, CLR, CRR, RSA

California CSR #13959

Assignment No. 528739



Page 2

1
2
3        The deposition of JAMIE WILSON was
4   convened on Friday, November 8, 2019, commencing
5   at 8:36 a.m., at the offices of
6
7        BOIES SCHILLER FLEXNER LLP
8        1410 New York Avenue, Northwest
9        Washington, D.C.  20005
10
11  before Lori J. Goodin, Registered Professional
12  Reporter, Certified LiveNote Reporter, Certified
13  Realtime Reporter, Realtime Systems Administrator,
14  California CSR #13959, and Notary Public in and
15  for the District of Columbia.
16
17
18
19
20
21
22

Page 3

1           APPEARANCES
2   For Plaintiffs:
      VELVEL FREEDMAN, Esquire
3     ROCHE FREEDMAN
      200 South Biscayne Boulevard
4     Suite 5500
      Miami, Florida  33131
5     305-357-3861
      vel@rochefreedman.com
6
    And Co-counsel:
7     KYLE ROCHE, Esquire (via telephone)
      ROCHE FREEDMAN
8     185 Wythe Avenue, F2
      Brooklyn, New York  11249
9     929-457-0050
      kyle@rochefreedman.com
10
    And Co-counsel:
11    ANDREW S. BRENNER, Esquire
      BOIES SCHILLER FLEXNER LLP
12    11401 New York Avenue, Northwest
      Washington, D.C  20005
13    202-237-2727
      abrenner@bsfllp.com
14
15  For Defendant:
      ZALMAN KASS, Esquire
16    BRYAN L. PASCHAL, Esquire
      JULIO PEREZ, Esquire (via video link)
17    RIVERO MESTRE
      565 Fifth Avenue
18    7th Floor
      New York, New York  10017
19    zkass@riveromestre.com
      bpaschal@riveromestre.com
20    jperez@riveromestre.com
21  ALSO PRESENT:
22    David Campbell, videographer

Page 4

1              CONTENTS
2   EXAMINATION BY              PAGE
    Mr. Freedman          8, 168
    Mr. Paschal               84
3
4              EXHIBITS
    WILSON
5   EXHIBIT NO. DESCRIPTION          PAGE
6   Exhibit 1  Mr. Wilson's resignation letters  18
7      10/23/2013
8      Defense Australia 108905-108908
9   Exhibit 2  E-mail from Wilson to Wright    24
10     9/20/2013, Defense 45496
11  Exhibit 3  Exhibit to Plaintiffs' complaint  32
12     Document 83-5
13  Exhibit 4  E-mail, Wright to Wilson        41
14     6/26/2013, Defense 28015
15  Exhibit 5  E-mail, Wright, cc Wilson       42
16     7/2/2013, Defense 266797
17  Exhibit 6  E-mail, Wright to Hardy,        44
18     cc Wilson, 10/9/2013
19     Defense 25094
20  Exhibit 7  E-mail, Wright, cc: Wilson      52
21     10/2/2013
22     Defense Australia 553926

Page 5

1           EXHIBITS CONTINUED
2   WILSON
3   EXHIBIT NO. DESCRIPTION          PAGE
4   Exhibit 8  E-mail, Wright, cc: Wilson      54
5      10/12/2013, Defense 45457
6   Exhibit 9  E-mail, Wright to Italia        57
7      cc: Wilson, 10/6/2013
8      Defense 46093
9   Exhibit 10 E-mail, Wright to Manu, Wilson  59
10     9/23/2013
11     Defense Australia 113043
12  Exhibit 11 E-mail, Wright to Dempster,     62
13     cc: Wilson, 7/18/2013
14     Defense 30127
15  Exhibit 12 E-mail, Wright to Italia        64
16     cc: Wilson, 10/6/2013
17     Defense 46098
18  Exhibit 13 E-mail, Lipke to Wright, Wilson 65
19     9/27/2013, Defense 467687
20  Exhibit 14 Affidavit submitted by Wright to  68
21     Supreme Court of New South Wales
22     Document 83-4



Page 6

1          EXHIBITS CONTINUED
2    WILSON
3    EXHIBIT NO. DESCRIPTION          PAGE
4    Exhibit 15  E-mail, Wilson to Wright and    74
5          Watts, 8/11/2013, Defense 43726
6    Exhibit 16  E-mail, Wright to Wilson, Watts   75
7          7/2/2013, Defense 31588
8    Exhibit 17  E-mail, Wright to Alastair      80
9          cc: Wilson, 8/8/2013
10          Defense 267325
11   Exhibit 18  MYOB Program               82
12          Defense 262775
13   Exhibit 19  Jamie Wilson's business card    92
14   Exhibit 20  Employee Remuneration Schedule  100
15          10/29/2013
16   Exhibit 21  Jamie Wilson's LinkedIn profile  111
17   Exhibit 22  U.S. Patent 14354359 by Wilson  156
18
19          (Original Exhibits attached to the
20   original transcript.)
21
22

Page 7

1          PROCEEDINGS
2              * * *
3
4          THE VIDEOGRAPHER:  We are now on the
5    record.  This begins Media Unit Number 1 in
6    the deposition of Jamie Wilson.
7          This is in the matter of Ira Kleiman
8    as the personal representative of the estate
9    of David Kleiman and W&K Info Defense
10   Research LLC, versus Craig Wright.
11          This is in the United States
12   District Court, Southern District of Florida.
13   Case Number 918 CV 80176 B/BR.
14          Today is November 8, 2019, and the
15   time is 8:36 a.m.
16          This deposition is being taken at
17   the Washington, D.C. offices of Boies
18   Schiller.
19          The videographer today is David
20   Campbell of Magna Legal Services and the
21   court reporter is Lori Goodin of Magna Legal
22   Services.

Page 8

1          Counsel will you please identify
2    yourselves for the record and then the
3    witness will be sworn in and we can proceed.
4          MR. FREEDMAN:  Vel Freedman of Roche
5    Freedman for the plaintiff.
6          MR. BRENNER:  Andrew Brenner from
7    Boies Schiller for the plaintiff.
8          MR. PASCHAL:  Bryan Paschal for
9    Dr. Craig Wright.
10          MR. KASS:  Zalman Kass for Dr. Craig
11   Wright.  And from our team we also have Julio
12   Perez who is on video link.
13              * * *
14          JAMIE R. WILSON,
15   a witness called for examination, having been
16   first duly sworn, testified as follows:
17              * * *
18          EXAMINATION
19   BY MR. FREEDMAN:
20   Q.   Good morning, Mr. Wilson.
21   A.   Good morning.
22   Q.   My name is Vel Freedman, we have met

Page 9

1    and spoken a few times before.
2          This is your deposition.  You have
3    just told us earlier that you have never taken a
4    deposition before.  Is that correct?
5    A.   That's correct.
6    Q.   I will go through a little bit of
7    the ground rules here for you and then we can get
8    started.  But before that, lets just take care of
9    a little housekeeping.
10          Can you please state your full name
11   and date of birth for the record?
12   A.   Jamie Robert Wilson, 15th of June,
13   1980.
14   Q.   And your home address?
15   A.   361 Westlake Drive, Queensland,
16   Australia.
17   Q.   And your work address?
18   A.   11420 George Street, Queensland,
19   Brisbane.
20   Q.   All in Australia?
21   A.   All in Australia.
22   Q.   So you understand that you are under



Page 10

1  oath today and you are sworn to tell the truth?
2      A.   Yes.
3      Q.   And your examination is now being
4  recorded and may be shown to a jury at some
5  point.
6          Along those lines of the ground
7  rules, the court reporter is taking down
8  everything you say.  And so it might be
9  counterintuitive, but you need to try to audibly
10 respond.  So yes or no.  If you shake your head
11 yes or if you shake your head no, she won't get
12 it.
13     A.   Okay.
14     Q.   I will try to remind you to speak
15 audibly, but try to do your best also.
16     A.   I understand.
17     Q.   Are you taking any medication today
18 that might affect your ability to tell the truth?
19     A.   No, I'm not.
20     Q.   Or to recollect anything?
21     A.   No.
22     Q.   Is there anything that would impair

Page 11

1  your ability to tell the truth at this deposition
2  today?
3      A.   No.
4      Q.   Okay.  If I ask you a question and
5  you don't understand it, please ask me to explain
6  or repeat it.
7      A.   Will do.
8      Q.   If you don't, I will assume that you
9  understood the question, and I will rely on your
10 answer, okay?
11     A.   Okay.
12         MR. PASCHAL:  Just one second, but
13 mine is working, but --
14         MR. FREEDMAN:  Go off the record.
15         THE VIDEOGRAPHER:  Off the record at
16 8:38.
17         (Whereupon, a discussion off the
18 record took place.)
19         THE VIDEOGRAPHER:  We are back on
20 the record at 8:39.
21 BY MR. FREEDMAN:
22     Q.   And finally, if you need a bathroom

Page 12

1  break or you just need a break, stretch your
2  legs, take a second.  Let me know.  This is not a
3  marathon.
4      A.   Will do, okay.
5      Q.   Okay.  So, Mr. Wilson, you were born
6  in Australia?
7      A.   Yes.
8      Q.   Did you go to college or university?
9      A.   Yes.
10     Q.   Where did you go?
11     A.   Queensland University of Technology.
12     Q.   Did you attain any degrees there?
13     A.   Bachelor of Commerce.
14     Q.   And what year did you get the
15 Bachelor of Commerce?
16     A.   2006.
17     Q.   Did you ever become a CPA or go to
18 graduate school?
19     A.   No.
20     Q.   Okay.  Have you been an accountant?
21     A.   Yes, but not a tax accountant.
22     Q.   And did you take any training to

Page 13

1  become an accountant?
2      A.   Yes.
3      Q.   Where?
4      A.   At JW Schubert & Co, located in
5  Springwood in Logan, in Queensland.
6      Q.   When did that program start?
7      A.   It would have -- 2004 to 2008.
8      Q.   Okay.  Was that your undergraduate
9  in commerce also?
10     A.   It was.
11     Q.   And then after, and you graduated in
12 2008?
13     A.   Yes.
14     Q.   And then did you begin working as an
15 accountant?
16     A.   Yes, I did.
17     Q.   In 2008?
18     A.   I started from 2004.
19     Q.   2004 you were working as an
20 accountant?
21     A.   That's right.
22     Q.   And how long did you continue



Page 14

1   working as an accountant?
2      A.   Up to 2010.
3      Q.   Okay.  Did you ever work as an
4   accountant after 2010?
5      A.   I, well only on the projects that I
6   was looking after full-time.
7      Q.   Got it.  So you weren't --
8      A.   So, not outside, where my interests
9   weren't involved.
10     Q.   Got it.  When did you first learn
11  about Bitcoin?
12     A.   Bitcoin, 2011.
13     Q.   Okay.  And how did you learn about
14  Bitcoin?
15     A.   It was part of my travels around the
16  world where I was cross-examining a whole lot of
17  cybersecurity experts looking for a solution that
18  I have built today in the market.
19     Q.   Okay.  So, can you tell me when you
20  first met -- well, do you know Craig Wright?
21     A.   Yes, I do.
22     Q.   Can you tell me when you first met

Page 15

1   Craig Wright?
2      A.   Craig Wright I would have met in
3   2012.
4      Q.   And how did you come to meet him?
5      A.   Through working and cross examining
6   a whole lot of cybersecurity experts to build a
7   stronger solution.
8      Q.   And tell me about the solution that
9   you have now built.
10          Is that your digital file?
11     A.   That's correct.  So, our technology
12  is called Cryptoloc which is a cryptographic
13  solution and we've got global patents which have
14  an escrow in a point of difference on a global
15  stage.
16     Q.   And you first spoke with Dr. Wright
17  to help you build this technology?
18     A.   That's correct, yes.
19     Q.   Along with a bunch of other --
20     A.   So, I already had started in 2012.
21     Q.   Okay.
22     A.   So, it would have been like '12,

Page 16

1   early '13 that I actually physically met Craig.
2      Q.   Okay.
3      A.   And from there we did bring Craig in
4   as a, the expert cybersecurity to be able to
5   oversee the development of the product.
6      Q.   Got it.  And did, similarly did
7   Craig involve you in his companies at that point?
8      A.   No, no.  It was after that period of
9   time.
10     Q.   Approximately when did Craig involve
11  you in his companies?
12     A.   It would be 2014.  Around about June
13  or July of 2014.
14     Q.   Okay.  Do you recall what capacity
15  he, Dr. Wright involved you in his companies?
16     A.   Because we were working on the
17  Cryptoloc Solution for Your Digital File, he
18  liked the way I was building the culture of the
19  team.  And, he said to me Jamie, I want to start
20  a new project would you come on as a director.
21          And also with my background you
22  would become the CFO.

Page 17

1      Q.   Got it.  So, he, Dr. Wright listed
2   you as a director of various companies.
3      A.   That's correct.
4      Q.   Were you a director of Coin
5   Exchange?
6      A.   Yes.
7      Q.   Were you a director of Integers?
8      A.   Yes.
9          MR. PASCHAL:  Objection, form.
10  BY MR. FREEDMAN:
11     Q.   Were you a director of -- do you
12  remember all of the companies you were director
13  of?
14     A.   No, I don't.
15     Q.   Were you a director of
16  Interconnected Research Pty?
17     A.   I would have to have a look at the
18  ASX Register.
19     Q.   Were you a director of Hotwire
20  Preemptive Intelligence Pty?
21     A.   Yes.
22     Q.   Were you also a shareholder in some



5 (Pages 14 to 17)

Page 18

1  of these companies?
2      A.   Craig did gift me shares.
3      Q.   Okay.
4      A.   But when I resigned, it was removed.
5      Q.   Okay.  Were you, do you recall if
6  you became a shareholder of Coin Exchange Pty?
7      A.   I'm positive I did, yes.
8      Q.   Okay.  And were you also the CFO for
9  Coin Exchange?
10      A.   I was.  So, for all companies I
11  would have been the CFO.
12      Q.   Okay.  And bear with me here.
13  Since, we had some printing trouble earlier so
14  I'm trying to pull these up electronically.
15          Let me e-mail these to you guys.
16          I'm going to hand you what has been
17  produced in this litigation as Defense Australia
18  108905 through 108908.
19          And we will mark it as Plaintiffs
20  Exhibit 1.
21          (Wilson Exhibit Number 1
22          marked for identification.)

Page 19

1  BY MR. FREEDMAN:
2      Q.   If you could start at the top and go
3  forward.  You guys should have it in your e-mail.
4      A.   The resignation letters.
5      Q.   Correct.  So, if you take a look at
6  the date at the top for me, Mr. Wilson.
7      A.   23rd of October, 2013.
8      Q.   So, does that help you potentially
9  remember when you started working and when you
10  ended working for Dr. Wright?
11      A.   It would have been, so, Craig would
12  have come in, I would have to have a look at my
13  records.  It would have been the end of 2011 and
14  2012.
15      Q.   Okay.  And then you would have
16  resigned in October of 2013?
17      A.   Yes, I did, yes.  After I returned
18  from New York.
19      Q.   Okay.  And if you take a look for me
20  at the page that is marked at the bottom 108907,
21  it is the third down.
22      A.   Yep.

Page 20

1      Q.   Do you see where it says--
2      A.   907, Interconnected Research Pty.
3      Q.   Does that help you remember if you
4  were the director of Interconnected Research Pty?
5      A.   Yes, this one here was a company
6  that I was set up when I was in New York which
7  would have been September or October, which Craig
8  signed me up as a director without my consent.
9      Q.   Okay.  Did you -- thank you,
10  Mr. Wilson.
11          Did you ever help -- well, you know
12  what, before I take these back from you, do you
13  recall writing these resignation letters?
14      A.   Absolutely.  And I physically handed
15  it to Craig as well.
16      Q.   And these are the resignation
17  letters that you handed to Craig?
18      A.   That's right.  And e-mailed.
19      Q.   Okay.  Did you ever help Craig set
20  up a trust?
21      A.   No.  One of our lawyers, who was
22  also on the board of Your Digital File, called

Page 21

1  Diane Pinder, was the one who looked after the
2  trust.
3      Q.   Okay.  And then as we have just seen
4  you have resigned in October of 2013.
5      A.   Yes.
6      Q.   Can you tell me why you resigned?
7      A.   The reason for it is that I wasn't
8  feeling comfortable with the position of what was
9  happening and not understanding everything behind
10  the documentation and the accounts.  That was the
11  purpose of it.
12          And also at the same time my ex-wife
13  had medical issues as well.
14      Q.   Okay.  Can you explain to me a
15  little bit more what you meant, what you mean by
16  you weren't comfortable with what was going on in
17  the documentation.
18      A.   Well, in, the lead up to my
19  resignation, and it would have been over a
20  12-month period, Craig did set up these
21  companies.  And I was working with Craig, prior
22  being on the board of White Ear and as an advisor



Page 22

1    to us in regards to development.
2           But, my trouble was, and it was
3    exciting moving in with him to start working on
4    the new projects.
5           But, where I didn't feel comfortable
6    is Craig's change of attitude from a developer
7    that would be in hoodies and, you know, very low
8    key and working with, to one that, that is it,
9    I've got to be the man, I've got to be the CEO,
10   new flash suits, ties, and it was just a massive
11   change from where he was conservative to right
12   out there.
13          Also I didn't agree on the
14   employment of the staff and the buildup of these
15   companies without understanding, the full
16   understanding, of where the funding was coming
17   from.
18          So, I know there was a lot of
19   Bitcoin there.  However, when I started to have a
20   look at the R&D and the claiming of the R&D,
21   research and development, for the Australia
22   federal government I didn't feel comfortable when

Page 23

1    I noticed that these amounts were from a U.S.,
2    and at that time and I am still not aware if the
3    money actually was funded by the U.S. government.
4           And I thought, well hang on, the
5    Supreme Court of Australia has turned around and
6    brought this IP into Australia, and now Craig is
7    turning around and claiming the R&D on this
8    money, that was paid by the U.S. government.
9           And I thought, this to me looks
10   fraud.  And, I want nothing to do with it.
11       Q.   So, you resigned?
12       A.   I resigned.  And since then I have
13   had many times with the Australia taxation
14   office, coming and investigate where I had to
15   give evidence and the breakdown of it, purely
16   because of, they put me under a microscope, the
17   ATO.
18       Q.   And has the ATO found that you did
19   anything wrong?
20       A.   No, no.
21       Q.   Okay.  I am, and ATO is the
22   Australia Tax Office?

Page 24

1        A.   Taxation Office.
2        Q.   Okay.
3            (Wilson Exhibit Number 2
4            marked for identification.)
5            MR. FREEDMAN:  I have just sent
6    e-mails to you, counsel.
7    BY MR. FREEDMAN:
8        Q.   But Mr. Wilson, I'm going to hand
9    you what has been produced in this litigation as
10   Defense 45496.  And if you can take a look at it
11   for a second, specifically under the line is, it
12   appears to be an e-mail from you to Craig.  Do
13   you see that?
14       A.   Yep.
15       Q.   Do you remember sending this e-mail?
16   You can take a second to familiarize yourself
17   with the document.
18           MR. PASCHAL:  You going to be
19   e-mailing us documents or do you have
20   physicals.
21           MR. FREEDMAN:  We are waiting for
22   them to print.  But I will e-mail them to you

Page 25

1    in the meantime.
2            MR. PASCHAL:  If you are e-mailing,
3    it takes a second to get to us, so let us
4    look at it before you show it to him.
5            THE WITNESS:  That's correct.
6    BY MR. FREEDMAN:
7        Q.   So, you recognize this document?
8        A.   Yes.  And I did send it.
9        Q.   Okay.  And, can you tell me a little
10   bit about what happened in this e-mail?
11       A.   Okay.  So, the reason for it was
12   that Craig wanted to increase his holdings within
13   YDF, with --
14       Q.   This is your company?
15       A.   That's correct.  It was called the
16   Digital Filing Company Pty Ltd which no longer
17   holds, in operation.
18           The reason, I wasn't aware that the
19   transfer in these amounts had been done and, nor
20   the capitalization of these accounts with the
21   listed on ASIC, hence why I did do the e-mail
22   just so that it was down on paper.



Page 26

1    Q.   Let me break this down for you.  The
2  capitalization of the accounts.  Can you explain
3  that a little bit to the jury?
4    A.   This is what the issue was.  I
5  didn't see the physical cash in the bank; it was
6  done by Bitcoin.
7    Q.   There was a capitalization of, I'm
8  looking at your e-mail, looking at a
9  capitalization of eight and a half million
10  dollars?
11    A.   Correct.
12    Q.   $40 million?
13    A.   That's right.
14    Q.   $30 million.
15    A.   That's right.
16    Q.   Suffice to say 10s and 10s of
17  millions of Bitcoin?
18    A.   Oh, absolutely.  And "Craig I see
19  you have issued shares to me personally and I'm
20  not aware this was done already.  This needs to
21  be fully accounted for as we are dealing with a
22  publically listed company."  And that was Rubik

Page 27

1  over in Australia.
2        They also were investigated by the
3  Australia Taxation Office in regards to the
4  matter with Craig.
5    Q.   Got it.  And did you ever sit down
6  with Craig and discuss this e-mail with him?
7    A.   I can't recall.
8    Q.   Okay.
9    A.   But the response is there from
10  Craig, too, it doesn't allow this right now, but
11  we have the following, oh, capitalization, that,
12  why didn't Xero do it?  Because it didn't have
13  Bitcoin at that stage of the currency.
14    Q.   Got it.  What happened to all of
15  your shares in these businesses after you
16  resigned, Jamie?
17    A.   Oh, they were just removed.
18    Q.   Okay.  During the time that you
19  worked for, or with Dr. Wright, so that would be
20  from about 2011 to 2000 -- October of 2013.
21    A.   '13.
22    Q.   Did you ever --

Page 28

1    MR. PASCHAL:  Objection, form.
2  BY MR. FREEDMAN:
3    Q.   Did you ever talk or e-mail with
4  Dave Kleiman?
5    A.   No.  Not me personally, no.
6    Q.   Had you heard of Dave Kleiman?
7    A.   Yes, I had.
8    Q.   Okay.  How did you hear of Dave
9  Kleiman?
10    A.   Through Craig, saying it was his
11  best mate and that they had been working on
12  projects together.
13    Q.   Okay.  Did he describe him as his
14  partner?
15    A.   He, no, a good mate.
16    Q.   I don't mean a romantic partner, I
17  mean like a business partner?
18    A.   No, no, no.  A business partner.
19    Q.   Did he describe him as a business
20  partner?
21    A.   Yes.
22    Q.   And somebody he was working with on

Page 29

1  projects with?
2    A.   That's right.
3    Q.   Did you understand that to be
4  intellectual property projects?
5    A.   No.
6    Q.   What type of projects did you
7  understand it to be?
8    A.   I only understood later on, when I
9  was going through the paperwork to do the R&D,
10  that all of the material of the break up of the
11  money that Dave Kleiman was actually on all of
12  these applications, all of the grants for the
13  federal, the U.S. government.
14        So, that is how I started to become
15  aware of it.
16        Craig is not forthcoming with
17  information.  It is a very slow feed.  But, the
18  longer I was there, the more I started to realize
19  that this is not correct way of doing business.
20    Q.   I see.  So you don't have much
21  details about what they worked on.
22        You just know that they worked on it



Page 30

1 together.  Is that fair?
2    A.   That's correct.
3       MR. PASCHAL:  Objection, form.
4 BY MR. FREEDMAN:
5    Q.   Okay.  Do you have a lot of details
6 about what they worked on together?
7    A.   No.
8    Q.   There may be times when opposing
9 counsel lodges an objection to the way I'm asking
10 you a question.
11       So you may hear me ask a question
12 more than once.
13       If you could just answer it again.
14    A.   Okay.
15    Q.   Did Craig ever talk to you about
16 Dave Kleiman's intent about anything?
17    A.   No.
18    Q.   Okay.  Bear with me one second.
19       So, Mr. Wilson, I think you told me
20 before that you were Director of Coin Exchange;
21 is that correct?
22    A.   Correct.

Page 31

1       MR. PASCHAL:  Objection, form.
2 BY MR. FREEDMAN:
3    Q.   You also were a shareholder of Coin
4 Exchange or were you, were you or were you not a
5 shareholder of Coin Exchange?
6       MR. PASCHAL:  Objection, form.
7       THE WITNESS:  I was given shares.
8 BY MR. FREEDMAN:
9    Q.   Sorry, go ahead.
10    A.   I was given shares by, gifted shares
11 by Craig.
12    Q.   Did you serve as its CFO?
13    A.   Yes.
14       MR. PASCHAL:  Objection, form.
15 BY MR. FREEDMAN:
16    Q.   Were you, did you handle the
17 accounts for Coin Exchange?
18    A.   No.  And what is strange is I didn't
19 actually handle the accounts for any of it.
20 There was a bookkeeper that was involved.
21       So, although I had the title of the
22 CFO, Chief Financial Officer, my capacity as an

Page 32

1 accountant, I was not given full control, nor did
2 I even have access to zero.
3    Q.   Okay.  So, during the time you were
4 director and shareholder and the CFO of Coin
5 Exchange, did Craig ever tell you that Dave
6 Kleiman was also a shareholder of Coin Exchange?
7    A.   No.
8       (Wilson Exhibit Number 3
9        marked for identification.)
10 BY MR. FREEDMAN:
11    Q.   Mr. Wilson, I'm handing you what we
12 are going to mark as Plaintiffs Exhibit 3?  And
13 it is a Document 83-5.  It is an exhibit to the
14 plaintiff's complaint.
15       Can you take a look at this document
16 and let me know if you have ever seen it before?
17    A.   No, I haven't.
18    Q.   Okay.  Do you see -- if you go to
19 Page 1 of 9 for me.  Or 3 of 11 at the top.
20    A.   3 of 11.
21    Q.   Do you see that?
22    A.   Yes.

Page 33

1    Q.   It says The agreement is between
2 Dave Kleiman of W&K Info Defense Florida.  Are
3 you familiar with this Florida company W&K Info
4 Defense LLC?
5    A.   I became aware of it when I was done
6 the R&D and realized that the W&K Info Defense
7 LLC was a part of it.  That is why I started
8 questioning a lot.
9    Q.   Were you ever a director of W&K Info
10 Defense LLC?
11    A.   No.
12    Q.   Were you ever a shareholder of W&K
13 Info Defense LLC?
14    A.   No.
15    Q.   Were you ever an officer of W&K LLC?
16    A.   No. I wasn't even aware of it.
17    Q.   Did you ever have anything to do
18 with -- strike that.
19       If you turn to Page 5 of 11 at the
20 top.  You will see Paragraph 4B.
21    A.   Yes.
22    Q.   And it says, "Except the vendor's"



Page 34

1    and the vendor is on Page 3, the vendor is Dave
2    Kleiman of W&K Defense Info Research, "So accept
3    Dave Kleiman's 323,000 remaining mined Bitcoin as
4    a 49.5 percent stake in a new venture to be
5    formed in Australia to be called Coin Exchange
6    Pty Ltd."
7        Do you see that?
8        A.   I do.  But if you have a look at the
9    ASX registers it will turn around and advise you
10   of the history of the directors of the company.
11       Q.   So you were never aware of this
12   agreement or --
13       A.   No, this is the first time I have
14   seen it.
15            MR. PASCHAL:  Objection to form.
16   BY MR. FREEDMAN:
17       Q.   Were you ever aware of this
18   agreement?
19       A.   No.
20            MR. PASCHAL:  Objection to form.
21   BY MR. FREEDMAN:
22       Q.   Were you ever aware that Dave had

Page 35

1    reportedly bought an interest in Coin Exchange?
2            MR. PASCHAL:  Objection to form.
3            THE WITNESS:  No.  This is
4    April 2013.
5    BY MR. FREEDMAN:
6        Q.   So, you were the CFO, in April of
7    2013 -- strike that.
8        What positions did you hold in Coin
9    Exchange in April of 2013?
10       A.   I'm not too sure when I, when it was
11   kicked off and when I was added as a director.  I
12   would have to go through the ASX Register.
13       Q.   Okay.  Thank you.
14       A.   That previous -- oh, not to worry.
15       Q.   Okay.  Mr. Wilson, were you aware
16   that Dave Kleiman died in April of 2013?
17       A.   Yes.
18       Q.   How did you know that Dave died?
19       A.   Craig said to me a good mate of his
20   just passed away, and I believe he came over to
21   Florida.
22       Q.   Okay.

Page 36

1        A.   Or he did fly to the States.
2        Q.   Did you notice a change in Craig
3    from before and after Dave died?
4            MR. PASCHAL:  Objection, form.
5            THE WITNESS:  Yes.
6    BY MR. FREEDMAN:
7        Q.   Okay.  Can you expand on what that
8    change was?
9        A.   The change was from Craig, as I
10   stated before, being a developer, security,
11   hoodie, you know, very much --
12            MR. FREEDMAN:  Sorry.
13            THE WITNESS:  You know, wearing
14   hoodies and things like that, when I would
15   have meetings down in Sydney, he would turn
16   up and we'd go to a little cafe shop and
17   things like that where the train station was.
18       Once Dave had passed away and things
19   started to get kicked off with these new
20   companies, there was a matter of all of a
21   sudden he had to dress in flash suits, you
22   know, wear the best watches, shoes,

Page 37

1    fascination with socks.
2       Even down to vehicles.  He moved
3    from his normal Subaru which was beaten up
4    and went and got a brand new car.  It was
5    just a massive change in lifestyle.  It
6    wasn't the Craig I originally met.
7    BY MR. FREEDMAN:
8        Q.   So, I want to drill down on that a
9    little bit more.
10       Before Dave died you said Craig
11   dressed in hoodies?
12       A.   Yes.
13       Q.   Can you expand a little bit more?
14       A.   Yes, tee shirts, normal sort of
15   developer sort of clothes.  You could tell -- I
16   mean Craig is a very bright, very smart man.
17       Q.   Right.
18       A.   As I have said before, one of the
19   greater futurists I have actually come across.
20       But it was just disappointing to see
21   the way the business was handled moving forward.
22   And his arrogance, believing that he has got to

Page 38

1 change himself, I think just caused him a lot of
2 problems.
3     Q.   Beyond the physical change of going
4 from hoodies to suits and expensive watches, did
5 you see a change in his attitude at all?
6         MR. PASCHAL:  Objection, form.
7         THE WITNESS:  Yes.
8 BY MR. FREEDMAN:
9     Q.   Did he suddenly have confidence?
10 What was the change?
11     A.   Oh, the confidence went through the
12 roof.  It was a matter of I'm the man, I'm going
13 to do this, this is the way I'm going to go about
14 it.
15         Whereas a lot more humble prior to
16 Dave's passing.
17     Q.   And, how quickly after Dave's
18 passing did this happen?
19     A.   I would have said June/July.
20     Q.   Did you understand, did you ever
21 come to have an understanding of why there was
22 this sudden shift in his personality?

Page 39

1         Did it have to do with money or any,
2 I mean, tell me, did you see any -- strike that.
3         Did you ever come to have an
4 understanding of why there was a sudden, a
5 massive shift in Craig's outward appearance?
6         MR. PASCHAL:  Objection, form.
7         THE WITNESS:  No.
8 BY MR. FREEDMAN:
9     Q.   Okay.
10     A.   It was only when time has gone by.
11     Q.   Beyond flashy watches, suits, new
12 cars, did you see any other sudden displays of
13 wealth?
14         MR. PASCHAL:  Objection, form.
15         THE WITNESS:  Yes.
16 BY MR. FREEDMAN:
17     Q.   Can you expand on that?
18     A.   I did have a Christmas party and
19 Craig and Ramona joined us at the event that
20 night.
21         I mean, Craig was very much, you
22 know, the best of the Champagne, top shelf, and

Page 40

1 out of a team of around about ten, there was
2 about $15,000 spent on the evening, all paid by
3 Craig.
4     Q.   Was that something Craig would have
5 done prior?  Is that something you had seen Craig
6 do prior to Dave's death?
7     A.   No, absolutely not.  I mean, prior
8 to Dave's passing, I was the one buying the
9 coffees and spending the money travelling back
10 and forward.
11     Q.   And then thereafter?
12     A.   It was a matter of he would even fly
13 his team up to Brisbane.  We would all go out
14 together.  Craig would actually pay for everyone
15 who came along.
16     Q.   Did it appear to you that after Dave
17 died, Craig had access to massive amounts of
18 assets that he did not previously have before?
19         MR. PASCHAL:  Objection to form.
20         THE WITNESS:  The money came from
21 somewhere.
22 BY MR. FREEDMAN:

Page 41

1     Q.   Sorry, go ahead?
2     A.   I believe that there was a change,
3 and overnight he had a lot of wealth.
4     Q.   Okay.
5     A.   But, at the same time I know that he
6 was in the very early stages of Bitcoin as well.
7         MR. FREEDMAN:  Can we take a, let's
8 go off the record for a minute.
9         THE VIDEOGRAPHER:  Off the record at
10 9:07.
11         (Recess taken -- 9:07 a.m.)
12         (After recess -- 9:12 a.m.)
13         THE VIDEOGRAPHER:  We are back on
14 the record at 9:12.
15 BY MR. FREEDMAN:
16     Q.   Mr. Wilson, I'm handing you what has
17 been marked as Wilson 4, and it is, it was
18 produced in this litigation as Defense 28015.
19         (Wilson Exhibit Number 4
20         marked for identification.)
21 BY MR. FREEDMAN:
22     Q.   Mr. Wilson, do you recognize this



Page 42

1  e-mail as an e-mail from Craig to you?
2      A.   Yes.
3      Q.   Do you recall this e-mail?
4      A.   Yes, I do.
5      Q.   And in it it says, "This is where
6  this started.  All of this started to move much
7  faster now.  Dave passed a couple of months ago
8  so I'm no longer waiting for him to get better."
9      A.   Correct.
10     Q.   Did you ever talk to Craig about
11  what he meant by this e-mail?
12     A.   No.
13     Q.   Do you know why he sent it to you?
14         MR. PASCHAL:  Objection, form.
15         THE WITNESS:  I think it was all
16  mainly to deal with the attachments and all
17  of the files.
18  BY MR. FREEDMAN:
19     Q.   Okay.
20     A.   And it was more about let's get
21  going.
22         (Wilson Exhibit Number 5

Page 43

1         marked for identification.)
2  BY MR. FREEDMAN:
3      Q.   Okay.  Mr. Wilson, I'm handing you
4  an exhibit marked as Wilson 5.  It was marked in
5  this litigation, it has been produced in this
6  litigation as Defense 266797.
7         If you can take a look at this
8  e-mail.  Do you recognize it as an e-mail from
9  Craig with a cc: to you?
10     A.   Yes.
11     Q.   And in it, Craig says, "Hello Love."
12  I'm assuming that is addressed to Ramona.
13     A.   Correct.
14     Q.   "Well I said I would be doing
15  something with that money.  And there is a link,
16  Jamie is on board."
17         Do you know what money he is
18  referring to?
19         MR. PASCHAL:  Objection, form.
20         THE WITNESS:  Well, yes.
21  BY MR. FREEDMAN:
22     Q.   Which money?

Page 44

1      A.   It would be the money that he had
2  from Bitcoin.
3      Q.   Okay.
4          MR. PASCHAL:  What was that marked
5  as?
6          THE REPORTER:  Five.
7          MR. ROCHE:  This is Kyle Roche, is
8  there any way we can move the mic closer to
9  Mr. Wilson?
10         MR. FREEDMAN:  Kyle, we are not sure
11  how to work the system here, so ...
12         MR. ROCHE:  Okay.
13         (Wilson Exhibit Number 6
14         marked for identification.)
15  BY MR. FREEDMAN:
16     Q.   Mr. Wilson, I am handing you what
17  has been marked as Wilson 6.  It has been
18  produced in this litigation as Defense 25094.
19         Can you take a moment to review this
20  e-mail, Mr. Wilson, and let me know if you
21  recognize it as an e-mail from Craig Wright to
22  you?

Page 45

1      A.   Yes, I do.
2      Q.   Okay.  This e-mail is also addressed
3  to Michael Hardy at the Australia Tax Office; is
4  that correct?
5          MR. PASCHAL:  Objection, form.
6  BY MR. FREEDMAN:
7      Q.   Mr. Wilson?
8      A.   I'm not sure if Michael was the one
9  from the ATO.
10     Q.   Okay.  Do you remember getting this
11  e-mail from Craig?
12     A.   Yes, I do.
13     Q.   In this e-mail, Mr. Wilson, Craig
14  says that "The main addresses we control as a
15  group include the following ones listed below."
16  Do you see that?
17     A.   It is in the middle.
18     Q.   Yes, right at the top the first
19  sentence, the main address that we control as a
20  group?
21         MR. PASCHAL:  Where are you reading
22  from?

MAGNA
LEGAL SERVICES

Page 46

1  BY MR. FREEDMAN:
2      Q.   It says, "Hello Michael, as we noted
3  there are a couple of recent transactions."
4          At the end of that sentence, it
5  says, "The main addresses we control as a group
6  include the following ones listed below."
7          Do you see that?
8      A.   Yes.
9      Q.   And then do you see, if you go to
10 the paragraph that starts, "The addresses are in
11 my control."
12     A.   Yes.
13     Q.   It says, "The addresses are in my
14 control now."
15         Did, and then, sorry, "The addresses
16 are in my control now as a matter of fate and
17 other circumstances."
18         Do you see that?
19     A.   Yes.
20     Q.   "David Reese and David Kleiman have
21 both been a central part of this project."
22     A.   Yes.

Page 47

1      Q.   And then, right above the little
2  graphic he says, "The addresses are," and there
3  is a list of addresses.  Do you see that?
4      A.   Yes, correct.
5      Q.   Do you see where it says balance
6  XBT?
7      A.   Yes.
8      Q.   That is the Bitcoin balance?
9          MR. PASCHAL:  Objection, form.
10 BY MR. FREEDMAN:
11     Q.   Do you recognize that as a Bitcoin
12 balance?
13     A.   Yes.
14     Q.   And it says Australia dollars and
15 there is figures underneath that?
16     A.   Correct.
17     Q.   And then there is some additional
18 wallets, addresses listed below that under the
19 title Coin and Other?
20     A.   That's right.
21     Q.   Did Craig lead you to believe that
22 he had the ability to access this Bitcoin?

Page 48

1          MR. PASCHAL:  Objection, form.
2          THE WITNESS:  Yes.  100 percent.
3  BY MR. FREEDMAN:
4      Q.   Did Craig ever tell you that these
5  Bitcoin were locked in a file that he could not
6  access?
7      A.   No, he could access them.
8      Q.   Okay.  This was in -- so, let's go
9  back here where it says, "These addresses are in
10 my control through fate and other circumstances.
11         "David Reese and David Kleiman have
12 both been central parts of this project.
13         "Both of these gentlemen, who I had
14 the good fortune to call friends, passed away
15 this year.  David Reese was a friend of my
16 grandfather before he died of Parkinson's.  Dave
17 Kleiman was my best friend."
18         Do you know what he means by fate
19 and other circumstances?
20         MR. PASCHAL:  Objection, form.
21         THE WITNESS:  No.
22 BY MR. FREEDMAN:

Page 49

1      Q.   Let me rephrase that.  Did you ever
2  come to understand what he meant by fate and
3  other circumstances?
4      A.   No.
5          MR. PASCHAL:  Objection, form.
6  BY MR. FREEDMAN:
7      Q.   Did he ever tell you what fate and
8  other circumstances meant?
9      A.   No.  And I didn't ask the question
10 either.
11     Q.   Did he ever give you any more -- did
12 Craig -- strike that.
13         Did Craig ever give you any more
14 color or explanation on what he meant by Dave was
15 a "an essential part of this project"?
16         MR. PASCHAL:  Objection, form.
17         THE WITNESS:  Yes.  In that they
18 worked together.
19         Now, I believed that Dave was the
20 original start.  He started looking on the
21 Blockchain.  And then later on Craig joined
22 it; it was a joint thing together, though.

MAGNA
LEGAL SERVICES

Page 50

1    BY MR. FREEDMAN:
2        Q.   And did you form that belief through
3    statements Craig made to you?
4        A.   Yes.
5        Q.   Okay.  When he refers to "this
6    project," did you take that to mean the mining of
7    all of this Bitcoin?
8        A.   Yes.
9            MR. PASCHAL:  Objection, form.
10   BY MR. FREEDMAN:
11       Q.   How did you take the project to mean
12   when he said Dave was an essential part of this,
13   of the, of this project?  How did you take "this
14   project" to mean?
15           MR. PASCHAL:  Objection, form.
16           THE WITNESS:  It was the mining.
17   BY MR. FREEDMAN:
18       Q.   The mining of?
19       A.   Bitcoin.
20       Q.   Okay.  Thank you.
21           Do you see if you turn the page over
22   to Defense 25095, do you see there is a graphic

Page 51

1    down there?
2        A.   Yes.
3        Q.   And if you look 1, 2, 3, 4, 5, about
4    six up from the top, from the bottom, do you see
5    where it says CSW-Dave K-DV?
6        A.   That's correct.
7        Q.   Do you know what this wallet was?
8        A.   No.
9            MR. PASCHAL:  Objection, form.
10   BY MR. FREEDMAN:
11       Q.   Do you know why there is a redaction
12   of the address?
13       A.   No.
14       Q.   Do you see at the top of the graphic
15   it says Bitcoin Wallet?
16       A.   Yes.
17       Q.   Did you take, when you received this
18   e-mail, did you understand it to be a snapshot of
19   wallets that Craig, Bitcoin wallets that --
20           MR. FREEDMAN:  It is tough.  I know
21       you know where I'm going, but for purposes of
22       the court reporter --

Page 52

1            THE WITNESS:  Right.
2            MR. FREEDMAN:  -- try to let me
3        finish.
4            MR. PASCHAL:  And I object, form, to
5        all of that.
6    BY MR. FREEDMAN:
7        Q.   So, when you received this e-mail,
8    were you under the impression that this was a
9    snapshot of Bitcoin wallets that Craig had access
10   to?
11           MR. PASCHAL:  Objection, form.
12           THE WITNESS:  Yes.
13   BY MR. FREEDMAN:
14       Q.   Thank you.
15           (Wilson Exhibit Number 7
16           marked for identification.)
17   BY MR. FREEDMAN:
18       Q.   Okay.  Mr. Wilson, I'm handing you
19   what has been marked as Wilson 7.  It has been
20   produced in this litigation as Defense Australia
21   553926.
22           Mr. Wilson, do you recognize this

Page 53

1    e-mail as an e-mail Craig sent to you, with a cc:
2    to you, rather?
3        A.   Yes.
4        Q.   And it was sent on October 2nd,
5    2013?
6        A.   Yes.
7        Q.   And it is also sent to Jenna Spears
8    at the Australia Tax Office and Michael Hardy at
9    the Australia Tax Office?
10       A.   Yes.
11       Q.   Do you recall receiving this e-mail?
12       A.   Yes.
13       Q.   In this e-mail do you see where
14   Craig says in the second paragraph, "The group I
15   head has a holding of over 100 million Australian
16   dollars in XBT Bitcoin"?
17       A.   Yes.
18       Q.   Did you ever talk to Craig about
19   this e-mail?
20       A.   No.  This was in regards to -- so,
21   Michael Hardy, now it does -- I do remember.
22   This was in regards to the tax returns and also

14  (Pages 50 to 53)

MAGNA ▶
LEGAL SERVICES

Page 54

1  the R&D, research and development.
2      Q.   Did Craig lead you to believe
3  through this e-mail that he had the control over
4  $100 million in Bitcoin?
5      A.   Yes.
6          MR. PASCHAL:  Objection, form.
7  BY MR. FREEDMAN:
8      Q.   Did he ever tell you that this
9  $100 million in Bitcoin was locked in a file that
10 he could not access?
11         MR. PASCHAL:  Objection, form.
12         THE WITNESS:  No.
13 BY MR. FREEDMAN:
14     Q.   Did he ever tell you it was locked
15 in a -- strike that.
16         (Wilson Exhibit Number 8
17          marked for identification.)
18 BY MR. FREEDMAN:
19     Q.   Mr. Wilson, I am handing you what
20 has been marked as Wilson 8.  It has been
21 produced in this litigation as Defense 45457.
22     A.   Thank you.

Page 55

1      Q.   Take a look at this e-mail for me,
2  Mr. Wilson, and tell me do you recognize this as
3  an e-mail that Craig sent with a cc: to you?
4      A.   Yes.
5      Q.   This e-mail was also sent to Michael
6  Hardy of the ATO; is that correct?
7      A.   Correct.
8      Q.   And Mark Italia of the ATO?
9      A.   Yes.
10     Q.   Do you see where he says, "I have
11 also attached a stat dec."  Is that a statutory
12 declaration?  "From our solicitors validating the
13 control of a number of Bitcoin-based addresses."
14     A.   Yes.
15     Q.   "You can validate the amount held in
16 these publicly.  For instance," and there is a
17 link with the block Explorer with the Bitcoin
18 address that begins 1933?
19     A.   Yes.
20     Q.   Do you see that?
21     A.   Yes.
22     Q.   And then the next paragraph.  "With

Page 56

1  a holding in excess of 111,114 Bitcoin.  The
2  above address we have confirmed control of is
3  valued at market, on market at Australian
4  $16.4 million."
5      A.   Yes.
6      Q.   Did you take this e-mail, did you
7  understand from this e-mail that Craig had
8  control over a Bitcoin address with over 111,000
9  Bitcoin in it?
10     A.   Yes.
11         MR. PASCHAL:  Objection, form.
12 BY MR. FREEDMAN:
13     Q.   Did you ask Craig what he meant by
14 we have confirmed control over it?
15     A.   No.  I was aware that he did have
16 control of it.
17     Q.   Okay.  Did he ever tell you that
18 this Bitcoin was locked in a file that he could
19 not access?
20         MR. PASCHAL:  Objection, form.
21         THE WITNESS:  When we talk about is
22     it locked, all of them are locked and Craig,

Page 57

1      my understanding, did have access to them.
2  BY MR. FREEDMAN:
3      Q.   So, let me rephrase that.
4          Did he ever tell you that it was
5  locked in a file that Craig could not access
6  himself?
7      A.   No.
8          (Wilson Exhibit Number 9
9           marked for identification.)
10 BY MR. FREEDMAN:
11     Q.   Okay.  Mr. Wilson, I am handing you
12 what has been marked as Wilson 9, it was produced
13 in this litigation as Defense Force 46093.
14         Mr. Wilson, do you recognize this
15 e-mail as an e-mail that Craig sent with a cc: to
16 you?
17     A.   Yes.
18     Q.   It was also sent to Mark Italia of
19 the ATO?
20     A.   Yes.
21     Q.   And Michael Hardy of the ATO?
22     A.   Yes.

Page 58

1    Q.   With a cc: to Ramona Watts?
2    A.   Yes.
3    Q.   Do you see where it says about
4  midway through that e-mail, "Our funding comes as
5  we are the group that controls 5 percent of the
6  global Bitcoin market"?
7    A.   Yes.
8    Q.   Do you remember receiving this
9  e-mail?
10   A.   Yes.
11   Q.   Did you ever ask Craig about how he
12 came to control 5 percent of the global Bitcoin
13 market?
14   A.   My understanding is that he was the
15 founder.
16   Q.   Okay.  Did he ever tell you, did he
17 lead you to believe that he had control over the
18 5 percent of the Bitcoin?
19   A.   Yes.
20       MR. PASCHAL:  Objection, form.
21   Mischaracterizes the document.
22 BY MR. FREEDMAN:

Page 59

1    Q.   Did he ever tell you that this
2  5 percent of Bitcoin that he had control of was
3  locked in a file that he could not access?
4    A.   No.
5        MR. PASCHAL:  Objection,
6    mischaracterizes the document and his
7    testimony.
8        MR. FREEDMAN:  Mr. Paschal, I have
9    an e-mail from Mr. Kass specifically asking
10   me to limit my objections to form in depos.
11       I would request that you do the
12   same.
13       MR. KASS:  I would like to see that
14   e-mail if you've got it.  We've had
15   discussions.
16       MR. FREEDMAN:  Please keep your
17   objection to form.
18       (Wilson Exhibit Number 10
19       marked for identification.)
20 BY MR. FREEDMAN:
21   Q.   Mr. Wilson, I am handing you what
22 has been marked as defense, sorry, as Wilson

Page 60

1  Exhibit 10.  It was produced in this litigation
2  as Defense Australia 113043.
3        If you take a look, do you see the
4  e-mail at the top of the page, this is a -- do
5  you recognize this as an e-mail that Craig sent
6  to you?
7    A.   Yes.
8    Q.   It also went to Roger Manu of Rubik?
9    A.   Correct.
10   Q.   In it Craig says, "XBT Bitcoin has a
11 currency.  There are 11 million Bitcoin.  Look at
12 the exchange rate in XE.com."  And then, "We
13 control what is all, up, a little over 1 million
14 Bitcoin."
15       Do you see that?
16   A.   Correct.
17   Q.   Do you recall receiving this e-mail?
18   A.   Yes.
19   Q.   Did you believe by receiving this
20 e-mail that Craig controlled over 1 million
21 Bitcoin?
22   A.   Yes.

Page 61

1        MR. PASCHAL:  Objection to form.
2  BY MR. FREEDMAN:
3    Q.   Was this statement that he
4  controlled, all up, a little over 1 million
5  Bitcoin consistent with other statements that
6  Craig had told you?
7        MR. PASCHAL:  Objection, form.
8        THE WITNESS:  Yes.
9  BY MR. FREEDMAN:
10   Q.   Did Craig ever tell you that this
11 over 1 million Bitcoin was locked in a file that
12 he could not access?
13       MR. PASCHAL:  Objection, form.
14       THE WITNESS:  No.
15       MR. FREEDMAN:  As a mechanics issue,
16   if I ask the question, take a beat before you
17   answer and give Mr. Paschal a chance to
18   object.
19       THE WITNESS:  Okay.
20       MR. PASCHAL:  Otherwise we are
21   talking over each other.
22       THE WITNESS:  Done.

MAGNA
LEGAL SERVICES

Page 62

```
1    BY MR. FREEDMAN:
2        Q.   Mr. Wilson, I'm handing you what has
3    been marked as Wilson 11.
4            (Wilson Exhibit Number 11
5            marked for identification.)
6    BY MR. FREEDMAN:
7        Q.   It was produced in this litigation
8    as Defense 30127.
9            Do you recognize this e-mail as an
10   e-mail Craig sent to -- with a cc: to you?
11       A.   Yes.
12       Q.   It is also sent to Mr. Dempster at
13   the ATO?
14       A.   Yes.
15       Q.   And the subject is Evidence?
16       A.   Yes.
17       Q.   And in it there is a listing of
18   companies, a Coin Exchange and CSW Personal?
19       A.   Yes.
20       Q.   With the Bitcoin holdings of 438,000
21   and 57,000?
22       A.   Yes.
```

Page 63

```
1        Q.   The value of those Bitcoin on
2    Mt. Gox which totals to 53.8 million.
3        A.   Correct.
4            MR. PASCHAL:  Objection, form.
5    BY MR. FREEDMAN:
6        Q.   Okay.  And then, "My wallet is
7    listed below."
8            Do you see that?
9        A.   Yes.
10       Q.   Did you take this e-mail to -- did
11   you take this e-mail to tell you that -- sorry,
12   strike that.
13           Did you understand from this e-mail
14   that Craig owned, controlled and owned and
15   controlled over $53 million worth of Bitcoin?
16           MR. PASCHAL:  Objection, form.
17           THE WITNESS:  Yes.
18   BY MR. FREEDMAN:
19       Q.   In fact, close to 500,000 Bitcoin?
20       A.   Yes.
21       Q.   Do you remember receiving this
22   e-mail?
```

Page 64

```
1        A.   Yes.
2        Q.   Did you ever talk to Craig about
3    this e-mail?
4        A.   It was ongoing conversations.
5        Q.   Okay.  All consistent with the story
6    that, what?
7        A.   All of these Bitcoin holdings.
8        Q.   Okay.  Did he ever tell you that
9    this Bitcoin was locked in an inaccessible file
10   to him?
11       A.   No.
12       Q.   Thank you, Mr. Wilson.
13           So I can stop asking the question a
14   million times, Mr. Wilson, did Craig ever tell
15   you that Bitcoin he owned or controlled was
16   locked in a file that he could not access?
17           MR. PASCHAL:  Objection, form.
18           THE WITNESS:  No.
19           (Wilson Exhibit Number 12
20           marked for identification.)
21   BY MR. FREEDMAN:
22       Q.   Mr. Wilson, I'm handing you what has
```

Page 65

```
1    been marked as Wilson 12.  It was produced in
2    this litigation as Defense 46098.
3            Do you recognize this as an e-mail
4    Craig sent with a cc: to you?
5        A.   Yes.
6        Q.   Do you remember receiving it?
7        A.   Yes.
8        Q.   Do you see about halfway down the
9    sentence says, "We control 165 million in XBT
10   Bitcoin"?
11       A.   Yes.
12       Q.   Did you understand this e-mail to
13   tell you that Craig controlled over 165 -- sorry,
14   strike that.
15           Did you take this e-mail -- strike
16   that.
17           Did you understand this e-mail to
18   say that Craig controlled $165 million worth of
19   Bitcoin?
20           MR. PASCHAL:  Objection, form.
21           THE WITNESS:  Yes.
22           (Wilson Exhibit Number 13
```

**MAGNA** ▶
LEGAL SERVICES

**17 (Pages 62 to 65)**

Page 66

1    marked for identification.)
2    BY MR. FREEDMAN:
3        Q.   Mr. Wilson, I'm handing you what has
4    been marked as Wilson 13.
5        It was produced in this litigation
6    as Defense 467687.
7        Do you recognize, and if you look at
8    the second e-mail on the page, do you recognize
9    this as an e-mail from Craig addressed to you and
10   other individuals at Hotwire?
11       A.   Yes.
12       Q.   Do you remember receiving it?
13       A.   Yes.
14       Q.   If you look at the last sentence of
15   the first paragraph it says, "A $5 million
16   Bitcoin fund was world news and TV globally.  We
17   make this look like a mom and pop operation from
18   the Winkly Bros."
19       Do you see that?
20       A.   Yes.
21       Q.   What did you understand that
22   sentence to say?

Page 67

1        MR. PASCHAL:  Objection, form.
2        THE WITNESS:  That Craig's holding
3    is a lot greater than the small amount that
4    the Winkler Brothers was trying to set up the
5    fund.
6    BY MR. FREEDMAN:
7        Q.   Mr. Wilson, when you finally did
8    have access to some of the books in the company,
9    did you see specific and identifiable wallet
10   addresses?
11       A.   Yes.  Craig showed me, like on
12   screen.
13       Q.   Okay.  Outside of the e-mails we
14   have just looked at, did Craig lead you to
15   believe that he had a massive amount of Bitcoin?
16       A.   Yes.
17       MR. PASCHAL:  Objection, form.
18   BY MR. FREEDMAN:
19       Q.   Did Craig lead you to believe that
20   he was incredibly wealthy?
21       MR. PASCHAL:  Objection, form.
22       THE WITNESS:  Yes.  And that I was

Page 68

1    extremely wealthy myself from the holdings
2    and the gifting of the Bitcoin to myself.
3        (Wilson Exhibit Number 14
4        marked for identification.)
5    BY MR. FREEDMAN:
6        Q.   Mr. Wilson, I'm handing you what has
7    been marked as Wilson 14.  It is Document 83-4.
8        If you open that up Mr. Wilson and
9    take a look, do you recognize this as an
10   affidavit Craig Wright submitted to the Supreme
11   Court of New South Wales?
12       A.   Yes.
13       Q.   Can you turn to Paragraph 23?
14       A.   Yes.
15       Q.   In it Craig writes, "On first of
16   August 2013 a shareholder's meeting was called
17   for W&K Info Defense LLC to be held on the 16th
18   of August 2013.
19       "The meeting was e-mailed to the
20   company address as well as sent to the address of
21   the shareholders and company.
22       "The shareholding of W&K Info

Page 69

1    Defense LLC was Craig S. Wright 50 percent; David
2    A. Kleiman 50 percent."
3        And in Paragraph 24, "The meeting
4    from Point 23, the meeting was held on the 16th
5    of August 2013.
6        "The following people were present.
7    Jamie Wilson, Craig S. Wright."  Do you see that?
8        A.   Yes.
9        Q.   Did this meeting ever occur?
10       A.   Yes.
11       Q.   What happened at that meeting?
12       A.   Craig said to me that with David's
13   passing that we needed to do the paperwork for
14   him to turn around and take full control and
15   resolve the issue of David being on the, as a
16   shareholder.
17       To be honest, at that stage I had
18   no, I didn't have the knowledge or understanding
19   of what it all meant, because the motions were
20   already happening with the Supreme Court of New
21   South Wales.
22       Q.   So, if you look at the next page,



Page 70

1    "The following points were moved at the meeting:
2         "One, Jamie Wilson will act as a
3    director for purposes of consenting to orders and
4    the company to be wound down.  The vote was Craig
5    Wright yes; no other parties.  It was agreed that
6    filing the motion to accept the debt owned by
7    company W&K Info Defense LLC would be closed."
8         Do you recall this happening?
9         A.   This is my first knowledge that I
10   was acting as a director of the U.S. company.
11        Q.   So, this is the first time -- so,
12   let me break that down a little bit.
13        You do recall the meeting happening;
14   is that correct?
15        A.   It was part of our meeting that day
16   and it was around Hotwire PE.
17        Q.   Okay.
18        A.   Not so much WK.
19        Q.   So, you remember the meeting
20   happening.
21        Is it accurate to say that you
22   remember the meeting happening, but you don't

Page 71

1    remember being made a director of W&K?
2         A.   Absolutely.
3         Q.   Okay.  So then you would agree with
4    the characterization in 24, Paragraph 24 that
5    there was a meeting.  Present, Jamie Wilson and
6    Craig S. Wright were there?
7         A.   Yes.
8         Q.   But is it accurate to say you would
9    disagree with what happened in Paragraph 26?
10        A.   Yes.  This is my first that I am
11   being made aware that I was a director of the LLC
12   company.
13        Q.   LLC is a Limited Liability Company.
14   The LLC meaning W&K Info Defense Research?
15        A.   Yes.
16        Q.   Mr. Wilson, can you talk to me about
17   the type of intellectual property that Craig was
18   developing in 2013?
19        MR. PASCHAL:  Objection, form.
20        MR. FREEDMAN:  What is the basis?
21        MR. PASCHAL:  Well, you can't do it
22   both ways.  I'm going to give you every

Page 72

1    single basis or do you want it just form.
2         MR. FREEDMAN:  I can ask you the
3    basis when I want.
4         MR. PASCHAL:  You said keep it to
5    form.
6         MR. FREEDMAN:  Yes, keep it to form
7    unless I ask you.  How am I supposed to know
8    what your objection is?  Normally I
9    understand what your objection is.  If I
10   don't understand what it is, I will ask you.
11        So what is the basis of your
12   objection?
13        MR. PASCHAL:  So, you have limited
14   time in this deposition.  Get through what
15   you need to.  Because I have questions.
16        MR. FREEDMAN:  I have seven hours,
17   I'm good.
18        MR. PASCHAL:  No you have three and
19   a half.
20        MR. FREEDMAN:  Are you not going to
21   state the basis of your objection?
22        MR. PASCHAL:  I said form.

Page 73

1         MR. BRENNER:  Mr. Paschal, you know
2    better.  Counsel is allowed to ask you --
3         MR. PASCHAL:  I'm not doing this.
4         MR. BRENNER:  You are not going to
5    answer the form, okay.  Good, then it is
6    waived.
7         MR. PASCHAL:  It is not waived.
8         MR. BRENNER:  Okay, go ahead.
9    BY MR. FREEDMAN:
10        Q.   Can you talk to me about the type of
11   intellectual property Craig was developing in
12   2013?
13        MR. PASCHAL:  Objection, form.
14   BY MR. FREEDMAN:
15        Q.   Please go ahead.
16        A.   So, we set up Hotwire PE and it was
17   all about setting up a banking platform, working
18   with Rubik out of Sydney.
19        The challenges were that it went to
20   a decimal six spaces instead of what we have
21   today being four.  So unfortunately it couldn't
22   go ahead.

MAGNA
LEGAL SERVICES

Page 74

1    At the time of October, so we
2  started that around about June/July of 2013.  And
3  by October I actually had finished and resigned.
4    All projects were related to Bitcoin
5  also setting up exchanges.
6  Q.   Okay.  So, was Craig involved in
7  Bitcoin related intellectual property development
8  in 2013?
9  A.   Yes.
10    (Wilson Exhibit Number 15
11    marked for identification.)
12  BY MR. FREEDMAN:
13  Q.   Mr. Wilson, I'm handing you what has
14  been marked as Wilson 15.
15    It was produced in this litigation
16  as Defense 43726.
17    Take a moment.  Do you recognize
18  this as an e-mail you sent to Craig and Ramona
19  Watts?
20  A.   Yes.
21  Q.   Can you explain to me what this
22  e-mail is?

Page 75

1  A.   These were all of the projects that
2  Craig wanted to work on.  5/5, Hotwire and the
3  increase in staff in a short period of time.
4  Q.   So, these were all intellectual
5  property projects?
6  A.   Yes.
7  Q.   And they all related to Bitcoin?
8    MR. PASCHAL:  Objection, form.
9  BY MR. FREEDMAN:
10  Q.   What did they relate to?  What did
11  all of the projects relate to -- strike that.
12    Was there a common theme between all
13  of these projects?
14  A.   Yes.
15  Q.   What was the common theme between
16  all of the intellectual property projects that
17  Hotwire was working on?
18  A.   It was Bitcoin.
19    (Wilson Exhibit Number 16
20    marked for identification.)
21  BY MR. FREEDMAN:
22  Q.   Mr. Wilson, I'm handing you what has

Page 76

1  been marked as Wilson 16.
2    It was produced in this litigation
3  as Defense 31588.
4    Do you recognize this as an e-mail
5  Craig sent to you and Ramona Watts?
6  A.   Yes.
7  Q.   Can you take a moment to familiarize
8  yourself with it.
9  A.   Yes.
10  Q.   Can you tell me what was happening
11  in this e-mail?  What is Craig telling you?
12  A.   It was a purchase, a license
13  agreement between the two companies.
14  Q.   Which two companies?
15  A.   And -- there was an agreement
16  between, well it would have been the W&K Defense,
17  the U.S. company, and the sale for the license to
18  the Australian company.  And this here was a cost
19  that they were picking up to be able to claim for
20  the R&D.
21  Q.   And do you see the last sentence in
22  the e-mail, "We just need to ensure that the

Page 77

1  court judgment is completed by August 30th."
2  A.   And it was.
3  Q.   Do you know why it needed to be
4  completed by August 30th?
5    MR. PASCHAL:  Objection, form.
6    THE WITNESS:  To be age to launch
7    the R&D and have the tax returns completed.
8  BY MR. FREEDMAN:
9  Q.   If the court judgment wasn't
10  completed by August 30th, what would have
11  happened?
12    MR. PASCHAL:  Objection, form.
13    THE WITNESS:  It would have had to
14    fall through to the following financial year.
15  BY MR. FREEDMAN:
16  Q.   So, is it accurate to say Craig was
17  under a lot of time pressure to make sure the
18  judgment finished by August 30th?
19    MR. PASCHAL:  Objection, form.
20    THE WITNESS:  Yes.
21  BY MR. FREEDMAN:
22  Q.   Okay.  When Craig told you that he



Page 78

1    worked with Dave Kleiman, did you understand that
2    to mean that he worked -- in projects that were
3    based in Florida?
4        A.   Yes.
5        Q.   Did you understand that he worked --
6    strike that.
7            Why don't we take ten minutes.  Can
8    we go off the record?
9            THE VIDEOGRAPHER:  Off the record at
10   9:49.
11           (Recess taken --  9:49 a.m.)
12           (After recess -- 10:01 a m.)
13           THE VIDEOGRAPHER:  We are back on
14   the record at 10:01.
15   BY MR. FREEDMAN:
16       Q.   Mr. Wilson, earlier I asked you if
17   the you were a shareholder of W&K and you said
18   no.
19           But, I recall that W&K is an LLC, a
20   limited liability company.  It doesn't have
21   shareholders, it has members.
22           So, I'm going to rephrase --

Page 79

1            MR. PASCHAL:  Objection, form.
2            MR. FREEDMAN:  I'm going to rephrase
3    my question.  Would you like to object?
4            MR. PASCHAL:  Yes, objection, form.
5    There was no question.
6    BY MR. FREEDMAN:
7        Q.   Mr. Wilson, did you have any
8    membership interest in W&K?
9        A.   No.
10       Q.   Mr. Wilson, earlier you told me that
11   the common theme of the intellectual property
12   that Dr. Wright was working on in Hotwire was
13   Bitcoin.  Do you recall that?
14       A.   Yes.
15       Q.   Dr. Wright had other companies that
16   you were also the director and shareholder of.
17           Was there a common theme to those
18   company's intellectual property development as
19   well?
20       A.   Yes.
21       Q.   What was that common theme?
22       A.   All related to Bitcoin.

Page 80

1        Q.   Okay.  Mr. Wilson, did Craig ever
2    tell you that his e-mails were hacked?
3        A.   No.
4        Q.   Did he ever tell you his company
5    documents were hacked?
6        A.   No.
7            (Wilson Exhibit Number 17
8             marked for identification.)
9    BY MR. FREEDMAN:
10       Q.   Mr. Wilson, I am handing you what
11   has been marked as Wilson 17.  It was produced in
12   this litigation as Defense 267325.
13           Do you recognize the top e-mail as
14   an e-mail Craig sent with a cc: to you?
15       A.   Yes.
16       Q.   In it Craig says, "I own both
17   companies."
18           Do you see that?
19       A.   Yes.
20       Q.   And did you take that as a reference
21   to PanOptiCrypt and Hotwire in the e-mail below
22   that?

Page 81

1        A.   Yes.
2            MR. FREEDMAN:  Counsel, up until
3    this point every document Mr. Wilson has been
4    handed he was a recipient of.
5            MR. PASCHAL:  Actually, no.  Your
6    computer screen is still on that TV.
7            MR. FREEDMAN:  This document he is
8    not technically a recipient of it.
9            If you can get him to execute the
10   confidentiality order, but I really don't
11   think this is a confidential e-mail.
12           So, if you are willing to waive the
13   confidentiality designation on it we can
14   avoid that process.
15           MR. PASCHAL:  We can discuss it
16   after the depo.
17           MR. FREEDMAN:  Okay.  So, can you --
18           MR. PASCHAL:  Send me an e-mail with
19   the document.
20           MR. FREEDMAN:  I've got to hand it
21   to the witness now.
22           MR. PASCHAL:  That is fine.  If we

21  (Pages 78 to 81)

Page 82

1    keep it, we will mark this part confidential.
2        MR. FREEDMAN: If you hand it to
3    him. I'll give you the unmarked copy.
4        MR. PASCHAL: Okay.
5            (Wilson Exhibit Number 18
6                marked for identification.)
7    BY MR. FREEDMAN:
8        Q.   I have just handed you what has been
9    marked as Wilson 18, it has been produced as
10   Defense 262775.
11       I'm not sure if you have ever seen
12   this before Mr. Wilson, but if you could take a
13   minute to familiarize yourself with it.
14       Are you familiar with what this is,
15   Mr. Wilson?
16       A.   It is a MYOB program. M-Y-O-B. It
17   is an accounting package. I am positive it was
18   only Xero we were using as an accounting package.
19       Q.   So you don't ever recall using MYOB?
20       A.   No, not for Craig's work, no. Not
21   at all.
22       Q.   Okay. It references a company

Page 83

1    Information Defense. Do you see that?
2        A.   Yes.
3        Q.   Do you recall, do you recall what
4    that company was?
5        A.   It was part of the group of
6    companies that Craig had set up for R&D.
7        Q.   And did you, were you involved with
8    that company at all?
9        MR. PASCHAL: Objection, form.
10   BY MR. FREEDMAN:
11       Q.   Were you involved with that company?
12       A.   I can't remember it.
13       Q.   Okay.
14       MR. FREEDMAN: We have no further
15   questions.
16       MR. PASCHAL: Let's take a break and
17   we will have some questions.
18       THE VIDEOGRAPHER: Off the record
19   at 10:07.
20       (Recess taken -- 10:07 a.m.)
21       (After recess -- 10:14 a.m.)
22       THE VIDEOGRAPHER: We are back on

Page 84

1    the record at 10:14.
2            EXAMINATION
3    BY MR. PASCHAL:
4        Q.   Good morning, Mr. Wilson. I am
5    Bryan Paschal. I represent Dr. Craig Wright in
6    the matter that you have just testified with
7    Mr. Freedman.
8        A.   Good morning.
9        Q.   Do you recall when you came in this
10   room today?
11       A.   Yes.
12       Q.   Did you speak with that lawyer?
13       A.   No. Well, when I came into this
14   room and you were here and present as well, at
15   the same time.
16       Q.   And that is Vel Freedman, right?
17       A.   That's correct.
18       Q.   And what did you say to
19   Mr. Freedman?
20       A.   Good morning. Good morning to all.
21       Q.   Did you say anything else to
22   Mr. Freedman?

Page 85

1        A.   No. That was it. You were present
2    when I walked in.
3        Q.   Did you say, "Mr. Freedman, it is
4    finally good to meet you in person"?
5        A.   Yes.
6        Q.   How many times have you spoken to
7    Mr. Freedman?
8        A.   Three, four times.
9        Q.   When was the first time you spoke to
10   Mr. Freedman?
11       A.   Oh, maybe July.
12       Q.   July of this year?
13       A.   Or August of this year, maybe.
14       Q.   How -- this year, right?
15       A.   That's correct. It might have been
16   August.
17       Q.   Okay. And how did you speak with
18   Mr. Freedman?
19       A.   By phone. By phone call.
20       Q.   You have never e-mailed
21   Mr. Freedman?
22       A.   Originally I did an e-mail. And he



Page 86

1   said Jamie, we have been looking for you, can you
2   give me a call.
3       Q.   You said you sent an e-mail?
4       A.   I physically sent an e-mail.
5       Q.   To say?
6       A.   To say congratulations or something
7   like that on the case of Craig Wright.
8       Q.   So, in July or August of this year,
9   you sent an e-mail to Mr. Freedman congratulating
10  him on this case?
11      A.   That's correct.
12      Q.   And when did Mr. Freedman respond to
13  you?
14      A.   Within a 24-hour period.
15      Q.   Okay.  Let me go back to your first
16  e-mail.
17           Was there anything else other than
18  you congratulating him for this case, was there
19  anything else that you said to Mr. Freedman in
20  that e-mail?
21      A.   No.  I mean I could give you a copy
22  of the e-mail.

Page 87

1       Q.   Yes, I would like a copy of the
2   e-mail.
3       A.   Sure.
4       Q.   And what did Mr. Freedman respond to
5   you and say?
6       A.   Can we talk?  It was a phone call
7   after that.
8       Q.   Was that all that Mr. Freedman said
9   to you in that e-mail?
10      A.   Yes there wasn't much in it at all.
11      Q.   So, I just want to be clear.  You
12  congratulate him and he says I want to talk to
13  you.  That is it?
14      A.   Yes, it was very simple with a
15  reply.
16      Q.   Okay.  Are those the only e-mails
17  that you had with Mr. Freedman?
18      A.   Yes, I'm more than happy to supply
19  the e-mails to you.
20      Q.   Do you have any text messages with
21  Mr. Freedman?
22      A.   No, only that can you write or can

Page 88

1   you give me a call.  I want to book my flights.
2   I want to make sure that I don't stand him up and
3   to make sure that I'm here present.
4       Q.   Okay.  Let me get into that.  So you
5   booked your flight to come here for what purpose?
6       A.   No.  So, I do have an office in New
7   York, a physical office on Madison Avenue.
8       Q.   Yes.
9       A.   I travel back and forward out of the
10  U.S. on a regular basis.
11           This, while I am here in Washington,
12  was for the CINet Conference, which is a whole
13  lot of leading CISOs nationally in the U.S. that
14  we all get together.
15      Q.   So, if I were to say that you don't
16  travel to the US that frequently, would that be a
17  false statement?
18      A.   That's correct.  And you can tell by
19  my passport and the amount of time that I enter
20  America.
21      Q.   When did Mr. Freedman arrange for
22  you to meet or have this deposition?

Page 89

1       A.   When he found out that I was coming
2   to the States.
3       Q.   When did he find out that you were
4   coming to the States?
5       A.   About two weeks ago.  Or a week ago.
6       Q.   Okay.  And how did you, how did you
7   communicate that?
8       A.   E-mail.
9       Q.   By e-mail?
10      A.   Yep.
11      Q.   Okay.  So there is a third e-mail
12  then?
13      A.   Yes, there would be a couple of
14  e-mails back and forth.
15      Q.   There is a chain of e-mails.
16      A.   That's right.
17      Q.   Okay.  Did Mr. Freedman ask you to
18  come or did you tell him that you were coming?
19      A.   No, no.  I was coming.  I mean I
20  have had my conference here for the last couple
21  of days.  Physically here.
22      Q.   And when -- I'm sorry, when did you

**MAGNA** ›
LEGAL SERVICES

Page 90

1  tell him that you were coming?
2      A.   About two weeks ago.
3      Q.   About two weeks ago.  Okay.  Did
4  Mr. Freedman, when you reached out to him in July
5  or August of this year, did he ever ask you to
6  come here for any other reason?
7      A.   No, not at all.
8      Q.   Okay.  Did you ever get any filings
9  in this case?  Did Mr. Freedman ever send you any
10  filings in this case?
11      A.   No, not at all.
12      Q.   Did he ever send you any documents
13  in this case?
14      A.   Absolutely zero.
15      Q.   Did he ever ask you for any
16  documents?
17      A.   Yes.
18      Q.   You sent him documents.
19      A.   Yes.
20      Q.   How many documents did you send him?
21      A.   Oh, my resignation letters.
22          Oh, there was an e-mail or a social

Page 91

1  media from Craig Wright making out that I was a
2  liar and deceitful and things like that, which
3  was posted.
4          And I thought well, you know what,
5  if that is the case, then I will give the
6  evidence that I actually did physically resign.
7  And these were the sequence of events.
8          I am more than happy to share what I
9  did share.
10      Q.   Okay.  And, are you represented by
11  counsel?
12      A.   No.
13      Q.   Okay.  And if I needed to get in
14  contact with you, how would I get in contact with
15  you?
16      A.   I'm more than happy to give you my
17  details.
18      Q.   What is your e-mail address?
19      A.   Jamie.wilson@cryptoloc,
20  C-R-Y-P-T-O-L-O-C.com.
21      Q.   And what is your phone number?
22      A.   Plus 61-416-176-816.

Page 92

1      Q.   Is that a cell phone or a land line?
2      A.   No, my mobile number.  And I will
3  give you my card as well.
4          MR. PASCHAL:  I guess we have to
5  mark this, can you mark this?
6          (Wilson Exhibit Number 19
7          marked for identification.)
8  BY MR. PASCHAL:
9      Q.   And just, my colleague reminded me,
10  what is your addresses for the offices in U.S.?
11      A.   So the one in New York is 261
12  Madison Avenue, Level 9.
13      Q.   Okay.  And then you said, do you
14  have another one?  I can't remember?
15      A.   No, just the one.
16      Q.   Okay.  So I just, I don't want to
17  mischaracterize anything you have said.
18          So, you reached out to Mr. Freedman
19  to congratulate him, correct?
20      A.   Yes.
21      Q.   And then you also reached out to him
22  two weeks ago to let him know you were coming

Page 93

1  here, right?
2      A.   Yes.
3      Q.   He did not reach out to you,
4  correct?
5      A.   No.  He did.
6      Q.   He being Mr. Freedman?
7      A.   Mr. Freedman asked me when was the
8  next time I coming to the U.S.
9      Q.   I'm sorry, did you ever receive a
10  subpoena to show up at this deposition today?
11      A.   No.
12      Q.   Did you ever ask for a subpoena to
13  be at this deposition today?
14      A.   No.
15      Q.   Are you here voluntarily?
16      A.   Yes.
17      Q.   Okay.  Now you also testified a
18  moment ago with Mr. Freedman that -- you said
19  things changed with Dr. Wright some time between,
20  or after Dave's death, right?
21      A.   Correct.
22      Q.   Okay.  And Dave died in April

MAGNA
LEGAL SERVICES

Page 94

1   of 2013, correct?
2       A.   Yes.
3       Q.   And you also testified that after
4   Dave's death Craig showed some wealth, right?
5       A.   Yes.
6       Q.   In fact you were able to tell me the
7   exact amount that Craig spent for champagne with
8   his wife, correct?
9       A.   Yes, for a Christmas party.
10      Q.   For a Christmas party.  And that
11  Christmas party was in 2013?
12      A.   Yes.
13      Q.   I'm going to break that down.
14          So --
15      A.   I don't even know if it was a
16  Christmas party.  But it was a get together,
17  anyway, a celebration.
18      Q.   Was it around Christmastime?
19      A.   I would have to go back and have a
20  look.  But it --
21      Q.   So you remember the amount he spent
22  for champagne, but you don't know --

Page 95

1       A.   No, it wasn't champagne; it was
2   dinner.  It was a 15,000; it was top end, not
3   champagne, had a big top range wine as well.
4       Q.   Were you responsible for the check
5   for dinner?
6          MR. FREEDMAN:  Let the witness
7       finish his answer, Mr. Paschal, before you
8       continue.
9          THE WITNESS:  No.
10  BY MR. PASCHAL:
11      Q.   But you remember the exact amount
12  for the bill?
13      A.   Yes.
14      Q.   Now I'm just going to address this
15  in parts, so ...
16      A.   Sure.
17      Q.   You knew of Dave, right?
18      A.   Yes.  Of him.
19      Q.   Dave Kleiman, I should clarify?
20      A.   Yes.
21      Q.   And you have heard people talk about
22  Dave Kleiman, right?

Page 96

1       A.   Yes.
2       Q.   Did you know that Dave Kleiman lived
3   in the VA Hospital for the last two years of his
4   life?
5       A.   No.
6       Q.   Did you know that Mr. Dave Kleiman
7   could not afford to pay his cell phone bill
8   during that time, so his phone was disconnected?
9       A.   No.
10      Q.   Did you ever that his friends had to
11  lend him money to pay his cell phone bill so that
12  he could use his cell phone?
13      A.   No.
14      Q.   Did you know that Mr. Kleiman could
15  not afford his internet or cable and XFINITY
16  actually had to disconnect his account?
17      A.   No.
18      Q.   Did you know that the day that
19  Mr. Kleiman passed, or about the day that he
20  passed or the day before he passed, his credit
21  report showed that he had applied for a Payday
22  loan and was denied?

Page 97

1       A.   No.
2       Q.   Did you ever know Dave Kleiman to
3   have a considerable amount of wealth?
4       A.   No.
5       Q.   Did you ever see Dave Kleiman
6   develop any intellectual property?
7       A.   I never met Dave Kleiman.
8       Q.   But just answer my question:  You
9   never knew of him developing any intellectual
10  property?
11      A.   Only with Craig being Blockchain or
12  Bitcoin.
13      Q.   I'm going to get into that in a
14  second.  So that is the only way that you know
15  that?
16      A.   Absolutely yes.
17      Q.   And did Craig tell you that?
18      A.   Yes.
19      Q.   And on how many occasions did Craig
20  tell you that?
21      A.   Well that is how he started
22  Blockchain or Bitcoin.  And it was a matter of I

Page 98

1   did it with Dave Kleiman.
2        So, that is how I knew of Dave
3   Kleiman was purely because of the relationship
4   between the two.
5        Q.   Just to clarify, you said I did it
6   with Dave Kleiman?  You did it with --
7        A.   No.  No.  Craig.
8        Q.   So Craig told you that.
9        A.   Yes.
10       Q.   And that is how you formed your
11  belief that Dave created intellectual property?
12       A.   Together with Craig.
13       Q.   Together with Craig?
14       A.   That's right.  But I had no
15  understanding that --
16       Q.   So, based on that statement -- --
17  I'm sorry, go ahead.
18       A.   That he was in financial ruin.
19       Q.   Who was in financial ruin?
20       A.   David Kleiman.
21       Q.   Okay.  Now, you said that there was
22  a change in Craig.  He started wearing suits,

Page 99

1   right?
2        A.   Yes.
3        Q.   You just have to answer for the
4   record.
5        A.   Yes.
6        Q.   You mentioned fancy watches.
7        A.   Yes.
8        Q.   You said that he was showing that he
9   had money.
10       A.   Yes.
11       Q.   That he had bought a new car?
12       A.   Yes.
13       Q.   And to you that made you
14  uncomfortable?
15       A.   No.  What made me uncomfortable was
16  the change in habits and also the way that he was
17  going about his business.
18       So, that was only a small effect
19  versus how he would actually run the business and
20  on-board staff and new projects.
21       Q.   Okay.
22       A.   So there is a bigger picture here.

Page 100

1   They are the smaller elements of the bigger
2   picture.
3        Q.   But this started in Dave's, after
4   Dave died?
5        A.   Yes.
6        Q.   So, he didn't exhibit this before
7   Dave died?
8        A.   No.
9        Q.   Okay.  And Dave died in April of
10  2013?
11       A.   Yes.
12       Q.   I'm going to show you --
13            MR. KASS:  It will be Exhibit 20.
14            (Wilson Exhibit Number 20
15             marked for identification.)
16  BY MR. PASCHAL:
17       Q.   So, I'm showing you an employee
18  remuneration.
19       A.   Yes.
20       Q.   But you are familiar with this
21  document, correct?
22       A.   Yes, I am.

Page 101

1        Q.   Have you done this -- how are you
2   familiar with this document?
3        A.   The reason for it is that I never
4   got paid, never received a cent.  And as I have
5   stated to the Australia Taxation Office, I never
6   received any money whatsoever from Craig Wright
7   and why should I have to pay tax.
8        Q.   Okay.
9        A.   So, I got a tax bill for money I
10  never received.
11       Q.   So, going to my question, that is
12  how you remember a document like this?
13       A.   Yes.
14       Q.   Okay.  So, I want to just go through
15  this with you.
16       Your name is on here under Employee,
17  right?
18       A.   Yes.
19       Q.   And it does say Start Date:
20  August 1, 2013, correct?
21       A.   Yes.
22       Q.   Then it says October 11, 2013,

MAGNA
LEGAL SERVICES

1    Termination, right?
2        A.   Correct.
3        Q.   That is when you resigned?
4        A.   Yes.
5        Q.   You could take a second.  But can
6    you look at Annual Salary?
7        A.   Yes.
8        Q.   And you could look at them all.
9            Are you the second highest paid
10   person for this company?
11           MR. FREEDMAN:  Objection, form.
12           THE WITNESS:  Yes.
13   BY MR. PASCHAL:
14       Q.   And how many employees are there on
15   that list?  More than 12?
16       A.   Yes.
17       Q.   More than 14?
18       A.   Yes.
19       Q.   So it is a significant amount of
20   employees for this company?  Correct.
21       A.   Yes.
22       Q.   And you are the second highest paid

1    person?
2        A.   Yes.
3            MR. FREEDMAN:  Objection to form.
4    BY MR. PASCHAL:
5        Q.   And you started in August of 2013,
6    right?
7        A.   No, no.  I didn't.  If you have a
8    look it was January, 8 of January, 2013.
9    So that Christmas party that we
10   asked before --
11       Q.   Hold on, go ahead.
12       A.   That would have been in December.
13   So that does work out.
14       Q.   So, the date on this, this goes, the
15   date then the month then the year?
16       A.   Yes.
17       Q.   So, why is your resignation say here
18   then November 10, 2013, if you resigned in
19   October?
20       A.   That would have been Craig or who,
21   or his bookkeeper who looked after the accounts.
22   I would not have processed my own termination pay

1    because I never received the payment.
2        Q.   Okay.  But you were scheduled to be
3    one of the highest employees, paid employees of
4    this company, correct?
5        A.   Yes.
6        Q.   So, it is January, you are saying
7    that you were employed January 8th of 2013.
8        A.   Yes.
9        Q.   And how many people started the
10   company, well I guess with you?
11       A.   Well Ramona Watts.  His wife.
12   Myself and Craig.
13       Q.   Okay.
14       A.   And then I would live in Brisbane;
15   Craig lives in Sydney.  All of the business was
16   done out of Sydney.  I was flying back and
17   forward.  Craig was then on-boarding other people
18   around him to start up Hotwire PE.
19       Q.   Okay.  So, for nine months -- strike
20   that.
21           So in April Dave dies?
22       A.   Yes.

1        Q.   You stay on with Hotwire in May,
2    right?
3        A.   Yes.
4        Q.   You stay on in June, right?  You
5    stay on in July.  You stay on all of the way
6    until October or November?
7        A.   23rd of October my resignation.
8        Q.   Okay.  And at no time -- well are
9    there any documents where you express concern to
10   Craig that his demeanor has suddenly changed?
11       A.   No.
12       Q.   Are there any documents that any of
13   their employees where you say Craig suddenly
14   changed, something is wrong?
15       A.   But you -- the difference is I
16   actually knew Craig prior to him on-boarding
17   staff.
18           I worked with Craig for quite some
19   period of time with the technology of YDF.
20           So, the advisory board that I had
21   around me, and to one of them being our lawyer,
22   Diane Pinder, would be one that would be able to

**MAGNA** ▶
LEGAL SERVICES

1    say, who is an attorney herself, that his
2    demeanor did change over that period of time as
3    well as Dr. Allen, I can't remember his surname.
4        Q.   I just want to go back to my
5    question.
6             Are there any e-mails or
7    communications where you expressed to anyone
8    during this 9 month or 10 month or 11 month
9    period that Craig's demeanor suddenly changed
10   when Dave died?
11       A.   No.
12       Q.   Did you ever express any concern
13   when you served as CFO of Hotwire?
14       A.   No.
15       Q.   As a CFO, and I guess there is a
16   difference between CFO -- well does CFO involve
17   tax duties?
18       A.   It does.  It can be, but we had a
19   external party, BDO, who would look after the
20   taxation part of it.
21       Q.   What is BDO?
22       A.   It is one of the larger, well middle

1    tier accounting firms in Australia, equivalent to
2    like an Ernst & Young here.
3        Q.   So it is a prestigious company?
4        A.   Yes.
5        Q.   And as CFO -- and your being an
6    accounting CFO role for the company of Hotwire,
7    right?
8        A.   That's right.
9        Q.   Not Craig Wright?
10       A.   No.
11       Q.   So, you owed some duties to the
12   company, correct?
13       A.   Absolutely.
14       Q.   And in this entire period there is
15   not a single e-mail or communication where you
16   said I am concerned because Craig Wright's
17   demeanor has suddenly changed.
18       A.   No, because he had the money to turn
19   around and back it, as per his Bitcoin wallets.
20            So I knew, it was all a very new
21   thing for me and to understand Bitcoin as well.
22            And so I thought well, I can see why

1    he has got the money to be on board and he has
2    got the confidence to be able to bring these
3    people on.
4             This was very new for me.  I had
5    never had a background in technology.  So, this
6    is the first start.  It was, I was leading Craig
7    and following to understand how do you turn
8    around and make something.  For what he was
9    doing, wanting to achieve.
10            I mean some of the plans with the
11   company were out of my depth with what he was
12   wanting to achieve.
13            So, it was interesting for me.  I
14   mean, he's a great futurist, so I could
15   understand where he was going and what he wanted
16   to do.
17            But doing it the right way, and
18   trying to put the right people around is where
19   the challenge was for Craig.
20       Q.   Okay.  You mentioned that you were
21   CFO but there was a bookkeeper?
22       A.   Yes.

1        Q.   Who was the bookkeeper?
2        A.   I can't remember her name.
3        Q.   Okay.  You can't remember her name.
4    But what were her duties?
5        A.   She looked after the accounts on a
6    daily basis and reported directly to Craig.
7        Q.   You testified earlier that that was
8    unusual for you?
9        A.   To not do --
10       Q.   To not do that as the CFO?
11       A.   Normally I would have full access to
12   the accounts and have a Xero access.  Xero being
13   the accounting package, that is.
14       Q.   Okay.
15       A.   In this case, no.  But then we are
16   at the early days before we were on-boarding a
17   whole lot of staff.
18            So I knew that over a period of
19   time, that the duties would increase.  But, I
20   didn't need to work in a full-time capacity.  It
21   was the early stages.  It was a startup.
22       Q.   So, for the nine months that you

MAGNA ▶
LEGAL SERVICES

Page 110

1    were CFO, 9, 10, 11 months you were CFO, did you
2    ever express any concerns that there was a
3    bookkeeper?
4        A.   No, I wouldn't express concerns of a
5    bookkeeper.  That makes total sense for the
6    everyday expenditure to be taken up by someone to
7    look after it.
8        Q.   So, that is completely okay then for
9    you?
10       A.   I have no problems with that.  It
11   makes total sense.
12       Q.   Okay.  And what were your duties as
13   CFO?
14       A.   Ours was working through the cash
15   flow.  For me, it was, and why Craig brought me
16   on, was the way that I had the discipline to be
17   able to build YDF, and the culture around it.
18            What Craig wanted was exactly
19   similar to what we had.  But the difference is on
20   a greater scale, and he had a huge amount of
21   money behind him to be able to back it, to be
22   able to do it.

Page 111

1        Q.   Okay.  I'm showing you -- what am I
2    on?
3            MR. KASS:  You are on 21.
4            (Wilson Exhibit Number 21
5             marked for identification.)
6    BY MR. PASCHAL:
7        Q.   I am showing you what we are going
8    to mark as 21?
9            What am I showing you?
10       A.   My LinkedIn profile.
11       Q.   Okay.  When was the last time you
12   updated this profile?
13       A.   Recently.
14       Q.   Did you draft this profile?
15       A.   No, my marketing, but I approved it.
16   My marketing staff would have drafted it and then
17   I signed off on it.
18       Q.   Who is your marketing staff?
19       A.   Nadine.
20       Q.   Could you spell her name, please?
21       A.   N-A-D-I-N-E.
22       Q.   What is her last name?

Page 112

1        A.   Scott.
2        Q.   And can you spell that, too?
3        A.   S-C-O-T-T.
4        Q.   Is she here in your office in New
5    York or Australia?
6        A.   Australia.
7        Q.   Okay.  And if I wanted to get in
8    contact with her, how would I do that?
9        A.   I could pass you her contact
10   details.
11       Q.   What is her e-mail address?
12       A.   If you let me know by e-mail, send
13   me an e-mail, and then I would be able to put the
14   two of you connected together.
15       Q.   Okay.  Now, if you turn to Page 3,
16   can you look at the bottom where it says
17   Education?
18       A.   Education.
19       Q.   Well let me ask you first --
20       A.   Here, Queensland University of
21   Technology.
22       Q.   So, let me ask you.  You have a

Page 113

1    marketing person looking at your LinkedIn, you
2    take this seriously, right?
3        A.   Yes, the LinkedIn.
4        Q.   And you hold this out because people
5    might use your company and want to look over
6    information about you.  Correct?
7        A.   That's correct.
8        Q.   So you would want to make sure this
9    is accurate.  Right?
10       A.   Yes.
11       Q.   You wouldn't put anything false in
12   here, right?
13       A.   No.
14       Q.   And you wouldn't leave out any
15   important information, would you?
16       A.   No.
17       Q.   Okay.  Education, where it says
18   Queensland University of Technology.
19       A.   Yes, QUT.
20       Q.   Accounting and finance was your
21   degree?
22       A.   Correct.

MAGNA
LEGAL SERVICES

1     Q.   Did you take any classes in
2   cybersecurity?
3     A.   No.
4     Q.   Did you take any classes related to
5   the Blockchain?
6     A.   No.
7     Q.   Did you take any classes related to
8   Bitcoin?
9     A.   No.
10    Q.   Did you take any classes related to
11  cryptocurrency?
12    A.   No.
13    Q.   Did you take any classes related to
14  cryptography?
15    A.   No.  And I never make out that I
16  have an IT background.
17    Q.   Okay.  And then you go in from, I
18  guess right after education you go into
19  laboratory assisted patient accounts, correct?
20    A.   Correct.
21    Q.   You didn't have any background
22  with --

1     A.   I have had no background whatsoever.
2   It was only after my dad passing that I started
3   to take an increase and understanding in cyber
4   security.
5          But even today, I do not read code.
6   I have experts there in my office, and I do have
7   a CISO, with a great background in cyber
8   security.
9          (Reporter requests clarification.)
10         THE WITNESS:  Ah.  CISO, chief
11     information security officer.
12    Q.   What is the name of your chief
13  information security officer?
14    A.   Mark McPherson.
15    Q.   Is that the only person that you
16  have in that capacity?
17    A.   Yes.
18    Q.   Do you have any computer scientists
19  working for you?
20    A.   Yes, I have a data scientist as
21  well.
22    Q.   What is that person's name?

1     A.   Melissa Crossman.
2     Q.   And do you know their e-mail
3   addresses?
4     A.   Yes, I do.
5     Q.   What is their e-mail address?
6     A.   Melissa.crossman@cryptoloc.com and
7   mark.mcpherson@cryptoloc.com.
8     Q.   Okay.  Can you go to the first page.
9   So you say, "I took a fierce interest in cyber
10  security solutions after two devastating events
11  in my life."  Right?
12    A.   Correct.
13    Q.   Would that be when you first had a
14  passion for cyber security?
15    A.   After the loss of my father, yes.
16    Q.   And your father passed in 2011?
17    A.   Ten, so in October 2010, my father
18  passed away.  And it was through this process
19  when I was trying to find a solution in the event
20  that one dies, that you can find the will, the
21  life insurance superannuation.
22    Q.   I'm sorry, I need to ask you

1   questions.  So that was an important -- strike
2   that.
3          When your father passed, it was
4   important that you were able to find documents
5   about him?
6     A.   Well it was.  We were fortunate to
7   have dad for a 12-month period when he was
8   terminal with cancer.
9          And through that stage it was a
10  challenge to find all of those important
11  documents.  And it was through that, that I had
12  seen, I even said to dad it was lucky that he was
13  alive, otherwise we never would have been able to
14  find the information.
15    Q.   Okay.  And I just want to ask you
16  then, so, when he, and I know it is difficult to
17  talk about some of this stuff, but I just want to
18  know.
19    A.   Uh-huh.
20    Q.   You were able to get documents from
21  him before he died because you had a window,
22  right?

Page 118

```
1      A.   Yes, he was alive and we could use
2   him to find the information.
3      Q.   But you, were you able to find
4   documents?
5      A.   Yes, because he was alive.
6      Q.   Would it strike you as odd if
7   somebody were to destroy documents after a family
8   member passed away?
9      A.   Well, I suppose if they don't know
10  the importance of it or a filing cabinet.
11          I mean, hence why I created YDF was
12  purely in event that I drop dead that my family
13  and my two children would know where the
14  information was.
15          Being an accountant at that stage, I
16  had a filing cabinet with a whole lot of
17  strategies of clientele.
18     Q.   Yes.
19     A.   And I thought what a mess it would
20  be that they would never receive their paperwork.
21          So I wanted to make sure that in the
22  event that I passed away, that everyone receives
```

Page 120

```
1          It depends on the capability of the
2   individual as well and the circumstances that
3   they grew up in.
4      Q.   So, if they erased hard drives and
5   threw out papers, that would be --
6      A.   That would be strange.
7      Q.   Okay.  Just to clarify, I'm going to
8   show you a place on your -- actually, you said
9   you became engaged in cyber security after your
10  father passed in 2011, right?
11     A.   Yes.
12     Q.   Okay.
13     A.   '10.
14     Q.   On your LinkedIn, I don't know if it
15  was just -- but it says 2010 is when you got
16  involved with cyber security.
17     A.   Correct.  So dad passed away in
18  October of 2010.
19     Q.   Okay.
20     A.   And I even spoke to dad prior to him
21  passing about it.
22     Q.   Okay.  I got it.  I'm sorry, if you
```

Page 119

```
1   the information, and that it would stand up in
2   court.
3          So hence why I created the
4   technology and went on this road and journey to
5   build it.
6      Q.   That is a noble process.  I mean,
7   that is important for people that you are doing
8   that for, right?
9      A.   It is.
10     Q.   Because it is important that if
11  somebody passes they could get access to
12  important documents.  Right?
13     A.   Yes.
14     Q.   So, would it be odd to you if
15  somebody were to throw away in the trash every
16  piece of paper that their family member had?
17  Without looking at them?
18     A.   Probably not.  It depends on who the
19  individual is.
20     Q.   Let's say it was your, I mean --
21     A.   For me it is different.  Like I
22  would actually go through it.
```

Page 121

```
1   wanted to keep --
2      A.   No, go ahead.  I understand.
3      Q.   Can you take a look at what was
4   Plaintiffs 15?
5      A.   Yes, with the projects.
6      Q.   Mr. Freedman asked you if there was
7   a common theme between all of these things in
8   this e-mail, right?
9      A.   Yes.
10     Q.   The live feed here says you took
11  about 20 seconds to read this e-mail, right?
12     A.   Yes.
13     Q.   Was that, and this is a two-page
14  single space e-mail, right?  Or one page?  It is
15  two pages, right?
16     A.   Yes.
17     Q.   -- let me go through here.
18          Do you see the -- let's go to the
19  fourth category.
20          MR. FREEDMAN:  Excuse me, counsel.
21  Could you tell me the Bates label on the
22  bottom of the page?
```

**MAGNA**
LEGAL SERVICES

Page 122

1    MR. PASCHAL: Yes. It is 0043726.
2    MR. FREEDMAN: Thank you.
3    MR. PASCHAL: Let me know when you
4  have.
5    MR. FREEDMAN: Go ahead.
6  BY MR. PASCHAL:
7    Q.   So, if you go down to the fourth
8  where it says Video System.
9    A.   Yes.
10   Q.   Replacement for Adobe and
11 GoToMeeting.
12   A.   Yes.
13   Q.   What does that have to do with
14 Bitcoin?
15   A.   What he was trying to set up, Craig
16 Wright, is the ability for, where you could go
17 into an environment, be able to negotiate and
18 then you would be able to use Blockchain, pay in
19 Bitcoin for the end of an agreement. So, of a
20 party.
21   Mainly if there was a legal problem.
22 And that as long as everyone was happy with the

Page 123

1  outcome of it, then the money would be
2  transferred.
3    If not it would stay as an escrow
4  and then other legal professions would be able to
5  come in and voice their opinion and the money
6  would be dispersed at a certain percentage.
7    Q.   Okay. But going back to my
8  question, though.
9    How is that related to Adobe or
10 GoToMeeting?
11   A.   It was an improvement of what Adobe
12 and GoToMeeting is.
13   It is the ability to be able to use
14 Blockchain to be able to escrow or escrow the
15 money with the Bitcoin and to be able to have a
16 background so you could actually track it all
17 back from those meetings.
18   Q.   So, the process of Adobe and
19 GoToMeeting could be similar or, or Bitcoin, let
20 me say.
21   A.   Yes.
22   Q.   Could be similar or the same as

Page 124

1  GoToMeeting or Adobe?
2    A.   It would be new technology. But,
3  you would be able to put it on the Blockchain.
4    Q.   Was that technology ever developed?
5    A.   I left in October 2013. This is
6  August 2013. These were projects where he was
7  scaling his staff to be able to deliver.
8    Q.   Okay. So -- hold on. So, the
9  Reputation Systems, think LinkedIn, do you see
10 that?
11   A.   Yes.
12   Q.   But with the tracking against
13 training?
14   A.   Yes.
15   Q.   That is related to Bitcoin?
16   A.   Blockchain.
17   Q.   Let's say Bitcoin first.
18   A.   All of these projects here are
19 Blockchain-related, which then could turn around
20 and have Bitcoin as well.
21   So when you are looking at the
22 LinkedIn, turning around and putting to

Page 125

1  qualifications, et cetera, you run it off the
2  Blockchain.
3    However you are able to send
4  information and be able to be paid in
5  remuneration with the Bitcoin.
6    Q.   So, I want to clarify this
7  Mr. Wilson, because earlier you said the common
8  point is Bitcoin?
9    A.   Secondary is Bitcoin.
10   Q.   So, the common theme is Blockchain?
11   A.   Blockchain is all of this. All of
12 it is Blockchain as we understand. Blockchain is
13 the underlying technology of Bitcoin.
14   So, all of this does come back into
15 receiving money and funds.
16   Q.   Okay. But there is a lot of
17 different technologies that stemmed from
18 Blockchain, correct?
19   A.   Absolutely.
20   Q.   Is the technology used at YDF, is
21 that Blockchain?
22   A.   Absolutely not.

MAGNA
LEGAL SERVICES

Page 126

1      Q.   Do you think it is better than
2  Blockchain?
3      A.   Yes, I do.
4      Q.   Is that based on your cyber security
5  experts, data scientists, and developers?
6      A.   Yes.
7      Q.   And that --
8      A.   When we, the reason for it is in
9  regards to privacy.
10          Blockchain doesn't give you the
11  privacy, and that is, it is a public ledger, and
12  that you can track all of the transactions,
13  understand what an individual is doing, be able
14  to do a 51 percent of tech.
15          There is plenty of information now
16  from the MIT which has come out and said we
17  realize that there is problems with scaling and
18  also the privacy around Blockchain.
19      Q.   Okay.
20      A.   I have done a closed ledger, you
21  know, with cryptography with an escrow being our
22  point of difference which we have patents on a

Page 127

1  global stage as well.
2          We actually could run a digital
3  currency off our Cryptoloc technology if we
4  wished and it would be a lot quicker and give the
5  privacy.  But we would work with law enforcement
6  as well.
7      Q.   Would that put you in competition
8  with Bitcoin?
9      A.   Would it put us in competition?  It
10  would if I did want to run out a digital
11  currency, but it is not on my agenda.
12      Q.   Oh, and do you have any
13  communications with Diane Pinder?
14      A.   Not recently.
15      Q.   Can you tell me the substance of
16  your communication was Diane Pinder?
17      A.   Diane Pinder was an advisory board
18  member with YDF in the early days.
19          And since then, so, many years now.
20      Q.   Uh-huh.
21      A.   Probably 2014, 2016 -- it would have
22  been 2014.

Page 128

1          It is the same year after I resigned
2  Diane finished up at Lloyd solicitors in a
3  capacity as one of the principal lawyers.
4          And then I haven't remained
5  connected to Diane.
6      Q.   Can you go back to your LinkedIn
7  page?
8      A.   Yes.
9      Q.   Earlier you testified you would make
10  sure that this information was accurate.
11  Correct?
12      A.   Yes.
13      Q.   And you would make sure that
14  everything is in here that is necessary.
15  Correct?
16      A.   Yes.
17      Q.   And you wouldn't leave out anything
18  that was important?
19      A.   I could leave out something.
20      Q.   Earlier you testified that you would
21  not leave out anything important.  I am
22  clarifying your testimony.

Page 129

1      A.   Well, only sensitive information
2  such as the clientele that I was looking after.
3  It is not relevant to a LinkedIn profile.
4      Q.   So it wasn't relevant that you were
5  involved with Hotwire?
6      A.   No, and I didn't turn around and add
7  Hotwire PE or any of the group of companies at
8  all to my LinkedIn profile.
9          Mind you, back in those days I
10  really didn't use LinkedIn.
11      Q.   You said you were CFO and
12  shareholder of several companies with Craig
13  Wright, right?
14      A.   Yes.  The group of his companies he
15  appointed me as CFO and director.
16      Q.   And none of these are on your
17  LinkedIn.  Are they?
18      A.   No.
19      Q.   And those companies had issues with
20  the ATO, correct?
21      A.   Yes.
22      Q.   And you were copied on e-mails with

Page 130

1   the ATO?
2       A.   Yes.
3       Q.   And you left all of them off of your
4   experience, correct?
5       A.   Yes, because I wasn't -- Craig ran
6   the matters himself.
7           It would be different if I ran the
8   matters.
9           I'm not going to turn around and put
10  myself out as the CFO when he is looking after
11  all of the matters.
12      Q.   And again you were CFO for nine
13  months, right?
14      A.   Yes.  Well --
15      Q.   And during those nine months did you
16  ever e-mail the ATO and say something is wrong?
17      A.   No, why would I?
18          Information was only supplied as we
19  were doing the R&D and the Australia Taxation
20  Office trying to come up with the numbers.
21      Q.   And earlier you said -- I just want
22  to make sure I get it right.  You said that after

Page 131

1   Dave died, you were uncomfortable with the
2   documentations for the companies?
3       A.   That's correct.  And when did I
4   receive the documentation, and the accounts, it
5   all started coming through from beginning of July
6   when our end of financial period was ended on the
7   30th of June.
8           And then when I had to start putting
9   the tax returns and the R&D forms all together
10  and Craig actually even did the numbers himself
11  and then would hand them to me.
12          So, even down to legal work.  Craig
13  looked after a lot of his legal work, he would
14  look after his accounts and then it would be
15  handed over to me and then I would have to go
16  through them.  And then I would ask questions and
17  then we would try to work it out.
18          And then that is when I turned
19  around and said I don't feel comfortable.
20      Q.   Okay.
21      A.   And that is why I never lodged them.
22  And Craig actually lodged them himself.

Page 132

1       Q.   So, from January to July I guess
2   there weren't any documents that you were looking
3   at, because you didn't get them until July?
4       A.   That's right.
5       Q.   So, what were you doing from January
6   to July with Hotwire?
7       A.   Trying to have a look at okay, what
8   is the best way moving forward.  How do we turn
9   around and increase the staffing, because things
10  don't happen that quickly anyway.
11          And the staff, if you have a look,
12  they were really only started in May, June, June.
13  It was late.  It wasn't --
14      Q.   So, what were you doing to complete
15  those tasks that you have just mentioned?
16      A.   Well that was my issue.  I didn't
17  have enough information, nor a whole lot of task.
18          It was all about the projects that
19  Craig was involved in and his background with
20  Bitcoin and understanding the knowledge of
21  Blockchain.
22      Q.   Okay.  So from January to July you

Page 133

1   had an issue, because you didn't have -- could
2   you clarify what was it that you didn't have?
3       A.   There was no accounts that were
4   required to be done or completed.
5       Q.   Okay.
6       A.   All of it was to do with the
7   transfer of information and license agreements
8   and things like that.
9           So, it was more of a legal over an
10  accounting.
11      Q.   Okay.  And so, did you, are there
12  any e-mails or documents or, did you have any
13  communications where you expressed concerns that
14  you weren't doing anything for the seven-month
15  period?
16      A.   There was no work to be done.  As in
17  there was nothing from the accounting point
18  because the bookkeeper was there.  So a lot of
19  mine was strategy with Craig and sitting and
20  understanding, okay, how do we actually structure
21  this to be able to move forward.
22      Q.   So, Hotwire agreed to make you the

1  second highest paid employee and you did nothing
2  for seven months?
3      A.   I never got a cent anyway.
4      Q.   Okay.
5      A.   But I still had to pay tax on the
6  money.  And if you go and have a look at the
7  records, I also put the down deposit down for the
8  rental property that Craig never paid me back as
9  well.  And all of the travel back and forward out
10  of Sydney and accommodation expense and
11  expenditure was never reimbursed as well.
12      Q.   Are you upset about that?
13      A.   I think it is unethical.
14      Q.   Okay.
15      A.   You would do the right thing.  If
16  you are delivering and you are working and doing
17  your duties, and your jobs and you want to be
18  part of a project, well then you should pay.
19      Q.   Were you monitoring this case?
20  Monitoring?
21      A.   No.  It actually was Steve Lipke who
22  made me aware of it.

1      Q.   And then you reached out and
2  congratulated Mr. Freedman?
3      A.   Yes, I did.  And the same reason I
4  never got paid, that team down in Sydney did not
5  get paid.  They were loaning money off family and
6  loved ones to be able to afford to pay their rent
7  and keep afloat.
8          They were in quite a state.  And
9  still have not recovered.
10      Q.   And you said that when you were, you
11  resigned your shares were just taken from you,
12  right?
13      A.   That's correct.
14      Q.   How did you feel about that?
15      A.   No, acceptable.  I never argued.  I
16  didn't dispute.  I, I was only wanting what I was
17  entitled to and that was the money, the physical
18  cash that I was out of pocket with.
19          But then the lawyers got involved
20  down in Sydney as part of the administration, and
21  said no, that is an individual matter for Craig.
22  We are not paying you anything.

1      Q.   And, were any other the lawyers that
2  you spoke with other than Mr. Freedman?
3      A.   No.
4      Q.   You said the ATO is asking you to
5  pay taxes on income that you would have made at
6  Hotwire, right?
7      A.   That's correct.
8      Q.   But you are saying you did not make
9  income --
10      A.   I did not receive one cent.  And you
11  can go through all the bank accounts and you will
12  notice that I never received one.  It was only me
13  sending money to Craig and never being
14  reimbursed.
15      Q.   And in January did you complain that
16  you hadn't been paid your salary?
17      A.   In January?
18      Q.   Of 2013.
19      A.   No.
20      Q.   And in February of 2013, did you
21  complain that you hadn't received your salary?
22      A.   To be honest I didn't expect to

1  receive a salary.  And I didn't even, wasn't
2  aware of the Document 20, this here, that I
3  believe is what you received from the
4  administrators, of when they were looking after
5  and winding up the company.
6          That's the only way, reason I've got
7  knowledge of it as well.
8          Prior to that it was with the
9  payment summary that came in, and the ATO said I
10  received money and I said no, I didn't.
11          But, that is how this documentation
12  also was supplied to me.
13      Q.   Okay.
14      A.   So, no, I didn't expect to receive
15  any money.  Otherwise it would be strange if I
16  turned around and said no I didn't take any
17  money.
18      Q.   Okay.  So, your payment, what was
19  your payment for being CFO?  What was your
20  expected payment?  What, were you getting out of
21  being CFO?
22      A.   It was supposed to be an annual

MAGNA
LEGAL SERVICES

Page 138

1   salary of what is here, 150.  But it never
2   commenced.
3        But, I wasn't worried anyway.
4        The issue is, I wasn't concerned,
5   because we were in the stages of doing a setup, a
6   startup.
7        Q.   Okay.
8        A.   During that period of time, I didn't
9   understand the whole, you know, the Bitcoin, the
10  wallets, and how much money.
11       So, I had to get all of that
12  training.  So, I was happy to turn around and
13  spend the time and learning, purely because of my
14  history with Craig, and being an advisory board
15  member of YDF and the relationship there.
16       So that's why I was more than happy
17  to turn around and wear it.  Once the companies
18  got money, then I would get paid but then my
19  duties would increase.  But we never got there.
20       Q.   So, earlier, earlier Mr. Freedman
21  asked you about whether or not you knew that
22  Dr. Wright's Bitcoin was locked up in an

Page 139

1   encrypted file.  Do you recall that line of
2   questioning?
3        A.   Yes.
4        Q.   And he asked you several times?
5        A.   And was he able to get, and was he
6   not able to get access to it.
7        Q.   Let me break that down.
8        Do you know how Craig Wright
9   obtained Bitcoin?
10       A.   Through mining.  With Dave Kleiman,
11  that was my understanding.
12       Q.   What is your understanding based on?
13       A.   From Craig saying that it was
14  working with a great mate who was in the U.S.,
15  Dave.  And they set up Bitcoin and that it was
16  Hitoshi --
17       Q.   Were those the statements to you,
18  were there any other statements that you recall
19  right now?
20       A.   No.  No.
21       Q.   So, from those statements, you --
22  well, let me back up.

Page 140

1        Craig Wright never told you that he
2   mined with Dave?
3        A.   Yes, he did.
4        MR. FREEDMAN:  Object to form.
5   BY MR. PASCHAL:
6        Q.   Well, when did he tell you that?
7        A.   Well that is how I knew all about
8   the Bitcoin and his wallets.
9        Q.   Mr. Wilson, I asked you a second ago
10  what were all of the statements that Mr. Craig
11  Wright made to you to make you think that.
12       You did not say that Craig Wright
13  said I mined Bitcoin with Dave.
14       MR. FREEDMAN:  Object to form.  You
15  are mischaracterizing.
16       MR. PASCHAL:  He did not say that.
17  That is why the live feed is helpful.
18       THE WITNESS:  You know, Dave, not
19  Dave, Craig, had been mining it for quite
20  some time.
21  BY MR. PASCHAL:
22       Q.   Well, let me ask you -- I'm sorry,

Page 141

1   are you finished?
2        A.   Yes.
3        Q.   Okay.  If Craig purchased Bitcoin,
4   would you have known that he purchased it?
5        A.   Well you could track it back,
6   absolutely, through the ledger.  I mean there is
7   a history, there is an audit trail.
8        Q.   Do you know if -- well, do you know
9   if Craig Wright purchased Bitcoin?
10       A.   No, I don't.
11       Q.   So, if he purchases Bitcoin, you
12  wouldn't know if it came, that could be his
13  Bitcoin holding, correct?
14       A.   Correct.
15       Q.   So, you are not sure if he mined
16  that Bitcoin then, am I --
17       A.   Oh, no, he definitely mined it.  He
18  even got new servers, et cetera, that ran in his
19  garage.
20       Q.   Okay.  But let's say his garage was
21  closed down and he removed all of his equipment.
22       A.   Right.

MAGNA
LEGAL SERVICES

Page 142

1          MR. FREEDMAN:  Object to form.
2    BY MR. PASCHAL:
3       Q.    Would he have been mining anywhere
4    else.
5       A.    Absolutely you can.
6       Q.    Well not anyone can, he can?
7       A.    He has the ability to be able to do
8    it on a mobile device.
9             I mean, it might blow the phone up
10   but you still have many other options of being
11   able to mine the Bitcoin.
12      Q.    Do you think he was mining on a
13   mobile device?
14      A.    No.
15      Q.    Okay.
16      A.    But if your question was do you
17   think that he had been doing -- mining Bitcoin,
18   absolutely.
19      Q.    But I'm going to go back to my
20   question.  Do you know, other than his garage,
21   was he mining Bitcoin?
22      A.    Yes.

Page 143

1       Q.    And how do you know that?
2       A.    Because he told me so.
3       Q.    Okay.  And when he told you, was he
4    saying that this is the Bitcoin that I mined in
5    my garage, do you know?
6       A.    No.  But that is not relevant, is
7    it?
8       Q.    Well, I'm asking you --
9       A.    Well, I don't think --
10      Q.    Did he say he was mining in his
11   garage and you don't know?
12      A.    No.
13      Q.    So, if he purchased Bitcoin
14   afterwards, you wouldn't know?
15      A.    No.
16      Q.    Okay.  And do you know how much he
17   mined, exactly?
18      A.    No.  Because he already had a huge
19   amount of Bitcoin as per the wallets.
20            And when Craig said to me this is
21   where my wallets are and this is the amount of
22   Bitcoin that I have mined it, well then, I mean

Page 144

1    it was all new to me.  So I would have to break
2    it down.
3             But, the wallets are there.  Craig
4    has e-mailed them through.
5       Q.    Okay.
6       A.    And I can't see Craig having that
7    sort of wealth to buy the Bitcoin when he was
8    driving around in hoodies and also, you know, in
9    a, in a very cheap car.  And a rental property.
10      Q.    Did you have access to any of
11   Dr. Craig Wright's financial records when he had
12   a hoodie?
13      A.    No.
14      Q.    Did you see his bank account
15   statements?
16      A.    No.
17      Q.    Did you see what he was spending to
18   buy computers?
19      A.    No.
20      Q.    Okay.  And let me ask you, when did
21   you stop speaking to Craig Wright?  Or did you
22   stop speaking to Craig Wright?

Page 145

1       A.    It is years ago.
2       Q.    Huh?
3       A.    Years ago.
4       Q.    Can you give me a date?  A year?
5       A.    Two, three.
6       Q.    Two, three years ago?
7       A.    Yes.
8       Q.    And what made you stop speaking with
9    Craig Wright?
10      A.    I didn't like the way he went about
11   business.  The ethics and morals.
12      Q.    Okay.
13      A.    The way he treats people.
14      Q.    Did he treat you bad?
15      A.    No.  No.  He was pretty good with
16   me.
17      Q.    Okay.  And when Craig Wright, you
18   saw these Bitcoin wallets, did you ever see Craig
19   Wright transfer Bitcoin to anyone?
20      A.    No.  See, I, I have never seen any
21   Bitcoin transfer at all.  All I have ever seen is
22   the wallets on a screen, or the ones that he has

**MAGNA**
LEGAL SERVICES

Page 146

1  e-mailed through.  That is it.
2      Q.   So, if Craig Wright had his Bitcoin
3  encrypted, and you never saw any transfers, how
4  would you be able to say that they weren't
5  encrypted?  Is it just that he said he never told
6  you that?
7      A.   Craig would log into them.  So, I
8  know that he could access them.
9      Q.   Okay.  And when did you see Craig
10  log into Bitcoin?
11      A.   Oh, several times at his home
12  address.
13      Q.   Okay.  And what would you see?
14      A.   Oh, the accounts, his wallets, and
15  then he showed me how it works.
16      Q.   And what computer, was it a computer
17  that he was showing you it on?
18      A.   Yes.
19      Q.   Was it like a laptop?
20      A.   Oh, I can't remember.
21      Q.   Okay.
22      A.   It was at his home.

Page 147

1      Q.   And how many years ago was that?
2      A.   Oh, that would have been 2013.
3      Q.   And in what home was that?
4      A.   At Howard Street at North Rye, I
5  think it was.
6      Q.   But you did not see him transfer
7  Bitcoin or move Bitcoin?
8      A.   No, but there was no reason for him
9  to do that in front of me.
10      Q.   Okay.  So, if you could log into the
11  screen, right, you could see Bitcoin.
12      A.   Yes.
13      Q.   But, if it was encrypted, then he
14  couldn't move them.  You wouldn't know that,
15  right?
16      A.   Well, once you log-in and you've got
17  access to it, you would be able to send money,
18  receive money.
19      Q.   Did you see the private keys that
20  Craig Wright had?
21      A.   Only what was on the screen.  But,
22  they are not -- no, the wallets only.

Page 148

1      Q.   So you never saw a private key?
2      A.   No.
3          MR. PASCHAL:  We are going to take a
4  break for a second.
5          THE VIDEOGRAPHER:  Off the record at
6  11:04.
7          (Recess taken -- 11:04 a.m.)
8          (After recess -- 11:20 a.m.)
9          THE VIDEOGRAPHER:  We are back on
10  the record at 11:20.
11  BY MR. PASCHAL:
12      Q.   Mr. Wilson, what did you discuss on
13  the phone with Mr. Freedman?
14      A.   When I was travelling back into the
15  U.S., would I be available to catch up.
16      Q.   Well, how many phone conversations
17  did you have with Mr. Freedman?
18      A.   Around about three.
19      Q.   Okay.  And they were three separate
20  e-mails, also?
21      A.   Well, yes, there were e-mails going
22  back and forward.  But some of them are very

Page 149

1  short.  I am happy to supply them.
2      Q.   Just focusing on the phone
3  conversations.
4      A.   Uh-huh.
5      Q.   What did you discuss with
6  Mr. Freedman?
7      A.   In regards to the social media posts
8  that Craig put up about myself, talking ill of
9  me, did I have any supporting documents?  And I
10  said yes I would share them with you.
11      Q.   What did you say about the posts
12  that Dr. Wright said about you?
13      A.   I wasn't aware of it.  I actually
14  had to go and search it myself.
15      Q.   Okay.
16      A.   I wasn't aware at all.
17          I actually wasn't even aware of the
18  case until Steven Lipke made me aware.
19      Q.   Who was Steven Lipke?
20      A.   He was one of the operations
21  managers for Craig Wright out of Sydney.
22      Q.   Okay.  For --

MAGNA
LEGAL SERVICES

Page 150

1      A.   I mean, even now, for today's
2  meeting, somehow it has been also on, there is an
3  article about it, that I was coming in and he
4  made me aware of it, too.
5      Q.   Steven Lipke did?
6      A.   Steven Lipke did, yes.
7      Q.   And where does Steven Lipke work
8  now?
9      A.   I'm not sure.
10      Q.   How does he communicate with you?
11      A.   He will send me a phone call, he
12  will send me an e-mail.
13      Q.   What is his e-mail address?
14      A.   I couldn't tell you.  I would have
15  to look it up.  It is not someone I go back and
16  forward.
17          Now and then he would just sort of
18  pop up and, I mean, I haven't even caught up with
19  Steve in, well, for quite some time.
20      Q.   And where does he live?
21      A.   In Sydney.
22      Q.   Do you know his phone number?

Page 151

1      A.   I would have to look it up for you,
2  I don't.
3      Q.   Where would you look up his phone
4  number?
5      A.   Out of my cell.
6      Q.   Do you have your cell on you now?
7      A.   Yes.
8      Q.   Can you please look at his number?
9      A.   Yes.
10          MR. BRENNER:  For the record,
11      Mr. Freedman is dealing with a personal issue
12      so I just stepped in.
13          THE WITNESS:  Okay he was the
14      project manager.
15  BY MR. PASCHAL:
16      Q.   And what is his phone number?
17      A.   Plus 61-761-261-542.
18      Q.   Does your contact info also show his
19  e-mail address?
20      A.   Yes, it does.
21      Q.   Can you please provide that tome?
22      A.   Lipke_s@hotmail.com.

Page 152

1      Q.   And have you ever spoken to Ira
2  Kleiman?
3      A.   No.
4      Q.   Have you ever looked up any
5  information about Ira Kleiman?
6      A.   No.  Oh, yes.  And I had an e-mail
7  that she was originally involved right at the
8  early days of it.
9      Q.   What e-mail?
10      A.   I would have to have a look.
11      Q.   Who was the e-mail between?
12      A.   Craig Wright.
13      Q.   And who else?
14      A.   Myself.  And probably Ramona Watts.
15      Q.   And it discussed Ira Kleiman?
16      A.   Ira was involved in the e-mail.
17      Q.   He was a recipient or was he
18  discussed in the e-mail?
19      A.   No, no, no, no.  A recipient of the
20  e-mail.
21      Q.   And what did the e-mail discuss?
22      A.   It was just general information.

Page 153

1          The only reason I'm aware of it,
2  because it came up and said we have never met
3  Ira.  I actually thought it was a -- wait, is
4  that Kleiman?
5      Q.   Ira Kleiman.
6      A.   No, no, I had no correspondence
7  whatsoever.
8      Q.   Okay.
9      A.   There was another person that Craig
10  was involved with, and it was a lady.  I can't
11  remember her name, though.
12      Q.   But her name was Ira?
13      A.   No, no.  It was a Chinese name.  Or
14  an Asian name.
15      Q.   Okay.
16      A.   I have had no correspondence
17  whatsoever from the Kleiman family.
18      Q.   Could you just spell Lipke, the
19  e-mail address that you had in your phone?
20      A.   L-I-P-K-E_S@hotmail.com.
21      Q.   And when did you start working with
22  Craig Wright?

**MAGNA**
LEGAL SERVICES

Page 154

1    A.   It would have been the end of 2011,
2    2012.
3    Q.   Okay.  And did you develop a patent
4    with Craig Wright?
5    A.   I already started the process
6    because I came up with the concept in 2010.  So,
7    the patents was already underway.
8         And, then Craig, I got Craig
9    involved and said --
10   Q.   Let me just ask you -- so, how did
11   you start the process?
12   A.   Because I --
13        MR. BRENNER:  Object to the form.
14        THE WITNESS:  Because when I was
15   looking for the solution, and I couldn't find
16   it.  So I went to a patent attorney, from my
17   commercial lawyers.  He said go to a patent
18   attorney and see if you can find it.
19        And they said Jamie, there is
20   nothing out there on a global stage.  And I
21   said you've got to be kidding, I mean it
22   makes sense to me.

Page 155

1    BY MR. PASCHAL:
2    Q.   Just to clarify, what was the stage,
3    for what?
4    A.   In the event of losing a loved one
5    that between an escrow and a cloud provider that
6    the information would be released.
7         So I already started the process.
8    Q.   So when you say the process, do you
9    refer to the idea?
10   A.   The concept, yes.
11   Q.   But you didn't actually start the
12   whole programming and putting together and coding
13   or anything?
14   A.   Yeah, I did before Craig come along.
15   Q.   But you didn't?
16   A.   Physically, no.  As I said, I don't
17   write code.  I don't have an IT background.  I
18   make it very clear, I do not have an IT
19   background.  I do not develop.
20   Q.   Who did that for you?
21   A.   Drew Nicholas.
22   Q.   Can you spell that for me, please?

Page 156

1    A.   D-R-E-W, and Nicholas,
2    N-I-C-H-O-L-A-S.
3    Q.   Okay.  And how did you know Mr. Drew
4    Nicholas?
5    A.   I was looking for an IT company with
6    developers to be able to develop it.
7    Q.   And do you still talk to
8    Mr. Nicholas today?
9    A.   Yes, I do.
10   Q.   Did Mr. Nicholas meet Craig Wright?
11   A.   Yes.
12   Q.   Did they work together?
13   A.   Craig was only advisor.  Craig never
14   got involved in code.
15   Q.   Okay.
16   A.   Craig wasn't involved in any of the
17   coding or development of it.
18        (Wilson Exhibit Number 22
19         marked for identification.)
20   BY MR. PASCHAL:
21   Q.   I'm showing you what we are marking
22   as 22.

Page 157

1         So is this one of the patents that
2    you and Craig Wright put together?
3    A.   Correct.
4    Q.   Okay.  And it was registered in
5    2011?
6    A.   That's correct.
7    Q.   October 28, 2011?
8    A.   Yes.
9    Q.   Okay.  So, when did Craig come on
10   board with this patent?
11   A.   Craig was only added as a name.  I
12   had to change all of the documentation.
13        So Craig came on around about 2012.
14   Q.   So, you were just using his name for
15   the patent?
16   A.   No, no, no.  Because Craig said to
17   me, well, I needed a local and I wanted to make
18   sure that I had all of the I's dotted and the T's
19   crossed.
20   Q.   Uh-huh.
21   A.   So, Craig was even paid handsomely
22   for his time as well to oversee it, which was

MAGNA
LEGAL SERVICES

Page 158

1  wrong, and I still had to get my patents
2  attorneys to go through it.
3       So, Davies Collison & Cave were the
4  ones who actually looked after the patents as
5  well.
6       And Craig, and naturally because he
7  was paid, it was my concept, the process already
8  started, he had to sign, make sure that we got a
9  signoff that he had no rights to it?
10  Q.   So, when you list Craig Wright and
11  you as the inventor, is that incorrect?
12  A.   No.  Because Craig was also an
13  advisor.  Same with my lawyers and people like
14  that.
15  Q.   Well, would your lawyers be listed
16  as an inventor?
17  A.   Well that was from the legal point.
18  Craig being IT and that this documentation was in
19  regards to the IT side, that is why it was
20  listed.
21  Q.   Why isn't Mr. Drew, why isn't Drew
22  listed on here as an inventor?

Page 159

1  A.   Drew was a developer.  It was, well
2  my concept.  Originally, it was just my name on
3  all of the documentation.
4       Then Craig wanted to get more
5  involved in it and I said well you should be
6  probably listed as an inventor as well.  And that
7  is how he got his name on it.
8  Q.   But you said he did some advising to
9  get this, right?
10  A.   He was involved, we had already done
11  all of the paperwork and all of the knowledge and
12  how it worked system-wise.
13       And then Craig came on later on down
14  the track.
15       And then I wanted Craig as a
16  director and an advisor to ensure that we were
17  moving in the right direction.
18       So, his expertise is what I was
19  using to ensure that the I's were dotted and the
20  T's were crossed.
21  Q.   Good memory.
22       Was Dave involved, Dave Kleiman

Page 160

1  involved in any way in this patent?
2  A.   No. Not at all.
3  Q.   Do you use any of this patent today?
4  A.   This is my technology.  Cryptoloc.
5  Q.   This is your technology?
6  A.   Yes.  Cryptoloc, absolutely.
7  Q.   And it involves cryptography?
8  A.   That's correct.
9  Q.   And would it be wrong to say that
10  Dave is entitled to half of this?
11  A.   How could he be entitled to half of
12  it?  How could Craig be entitled to half of it.
13  Q.   I'm just asking.  Would it be wrong
14  to say that Dave Kleiman is entitled to half of
15  this, your property right now, your intellectual
16  property.
17  A.   Absolutely not.
18       MR. FREEDMAN:  Objection to form.
19       MR. PASCHAL:  It would be correct?
20       THE WITNESS:  No, he is not entitled
21  to it at all.
22       MR. FREEDMAN:  Objection to form.

Page 161

1       THE WITNESS:  Nor is Craig Wright
2  entitled to it.
3  BY MR. PASCHAL:
4  Q.   Okay.  So, if you were to -- I just
5  want to -- have you ever amended the information
6  on this patent?
7  A.   Why would I?
8  Q.   To remove Craig Wright as inventor.
9  A.   No, Craig Wright signed off all of
10  his rights to be able to take any claim against
11  it.
12  Q.   Okay.  And --
13  A.   And that is all done under Davies
14  Collison & Cave; they are patent attorneys.
15  Q.   Okay.  And when did Craig Wright
16  sign that document?
17  A.   Oh, I'm not sure.  Davies Collison &
18  Cave would have the date.  It was at the
19  beginning stages, because Craig was paid,
20  physically paid money to it.
21  Q.   It couldn't have been early 2011,
22  right?

MAGNA
LEGAL SERVICES

Page 162

```
 1        A.   No, it wasn't.  It was '12.  I
 2  already started the process with the patents
 3  before Craig came along.
 4        Q.   Okay.
 5        A.   So, if you go and have a look at the
 6  history of it, you would notice that I was the
 7  only inventor.
 8        Q.   But, so you are saying that Craig
 9  wouldn't have interest in it because he signed
10  over any of his rights?
11        A.   That's correct.  Well he didn't have
12  the concept.  It was me who came up with the
13  concept.
14        Q.   Okay.  So I just want to clarify,
15  though --
16        A.   Craig --
17        Q.   -- would you think that it would
18  have been an accurate statement to say that Dave
19  Kleiman, the estate of Dave Kleiman is entitled
20  to half of this?
21             MR. FREEDMAN:  Objection to form.
22             THE WITNESS:  Why would you think
```

Page 163

```
 1    that, though?
 2  BY MR. PASCHAL:
 3        Q.   I'm just asking the question.
 4        A.   Well if you think about it, I
 5  started the process.  I had the concept.  The
 6  patent was lodged prior to them coming on board.
 7  Well, prior to Craig even being involved in the
 8  business.
 9             So, how could Dave, who I didn't
10  even know, and Craig Wright, who I didn't even
11  know at that stage, be involved or entitled to
12  the patent.
13  BY MR. PASCHAL:
14        Q.   Could Dave have been working on this
15  with -- could Craig have been working on this
16  with Dave without your knowledge?  The task that
17  you told them?
18        A.   They had no access to them.  They
19  never had access to the source code.
20        Q.   So, how was Craig making sure that
21  all of your T's were crossed and your I's were
22  dotted?
```

Page 164

```
 1        A.   It was through the lawyers and it
 2  was just paperwork.  It wasn't technology.
 3             It was documentation.
 4        Q.   So, you hired Craig Wright to be, to
 5  look at this?
 6        A.   Yes.
 7        Q.   As -- well, let me -- so, Craig
 8  Wright at this time he is wearing his hoodies?
 9        A.   Yes.
10        Q.   He is into his IT?
11        A.   Yes.
12        Q.   He is into his developer?
13        A.   Yes.
14        Q.   So, you wouldn't hire him as a
15  lawyer?
16        A.   No, Craig Wright as an expert in, a
17  cyber security expert.
18        Q.   And that is why his name was on here
19  as an inventor?
20        A.   That's right.
21        Q.   As inventor --
22        A.   Okay then, as an inventor.
```

Page 165

```
 1        Q.   Okay.  And, there is a document, I
 2  haven't seen it, but he has signed, you said he
 3  waived his rights to this?
 4        A.   Absolutely.
 5        Q.   In 2012?
 6        A.   Before we even started, or I got
 7  Craig involved.
 8             I mean naturally I'm not going to
 9  turn around and hand a concept over and have
10  people like you look at me and try to take half
11  of the technology.
12        Q.   It wouldn't be me.
13        A.   I know where you are trying to go,
14  though.
15        Q.   I don't think you do.
16             And so, just to be clear, if you
17  look on, if you look at the document on the
18  right-hand side of application U.S. 14/354359
19  events, nowhere in here does it say that Craig
20  Wright, or did you amend this patent to remove
21  Craig Wright, correct?
22        A.   Did I -- there was movement back and
```

MAGNA
LEGAL SERVICES

Page 166

1  forward with Davies Collison & Cave. So, Davies
2  Collison & Cave would have the history and the
3  documentation, et cetera, that was needed to be
4  done in the process.
5      Q.   And let's say in his advisory role
6  Craig Wright, as the inventor, as an IT guy
7  wearing his hoodie had conversations with Dave
8  Kleiman to develop this intellectual property or
9  to do anything with it. I mean let's say Craig
10  didn't tell you. Well first did Craig ever tell
11  you that?
12      A.   No. It was all done in-house. I
13  mean, Craig may have had conversations with many
14  people about it.
15          But, it was all done in-house; it
16  wasn't --
17      Q.   Did you ever get a document from
18  Dave Kleiman saying he would waive any of his
19  interests to this patent?
20      A.   I don't see how Dave could be
21  involved in it.
22      Q.   Let's assume that a court ordered

Page 167

1  that that intellectual property belonged --
2      A.   It wouldn't be involved.
3          MR. FREEDMAN: Objection to form.
4  BY MR. PASCHAL:
5      Q.   You didn't get a waiver from Dave
6  Kleiman, did you?
7      A.   No. I don't need to.
8      Q.   Okay. So, Mr. Freedman asked you
9  about hacking earlier?
10      A.   With Craig Wright, the e-mails being
11  hacked.
12      Q.   So, hacking can happen, do people
13  know exactly when a hack happens?
14      A.   Not -- no. Not thoroughly.
15      Q.   I mean part of that, I mean the
16  hacking could be something that, in fact, I don't
17  know if I need to pull it, but on your website
18  you expressed that hacking could be something you
19  learn of much later. Right?
20      A.   That's correct and it is public
21  knowledge.
22      Q.   And it is something even savvy

Page 168

1  people need protection, because hacking can
2  happen?
3      A.   And your e-mails are one of the
4  weakest links.
5      Q.   And so if Craig Wright were hacked,
6  and he just, is there some foolproof way that he
7  would know right away?
8      A.   No.
9      Q.   Okay. And if he learned many years
10  later, is that something that you see as uncommon
11  in your line of work?
12      A.   No.
13      Q.   Okay. And, I think I am pretty
14  much -- just one second.
15          MR. PASCHAL: I think we are good.
16  That is it.
17          FURTHER EXAMINATION
18  BY MR. FREEDMAN:
19      Q.   I have five questions for you, well
20  maybe a little more, but we will get you out of
21  here.
22          Did you ever respond to an e-mail

Page 169

1  from Craig and receive back an e-mail, I don't
2  know what you are talking about, I didn't send
3  this e-mail?
4      A.   I don't know what you mean.
5          MR. PASCHAL: Objection to form.
6  BY MR. FREEDMAN:
7      Q.   Well we were talking about whether
8  or not the e-mails were hacked.
9          My question is, did you ever respond
10  to an e-mail from Craig, either orally or via
11  e-mail and receive a response from Craig saying I
12  didn't send that e-mail. It is a hacked e-mail?
13      A.   No, I didn't even know he was
14  hacked.
15      Q.   Mr. Wilson, can you take a look at
16  Plaintiffs Exhibit 1 for me, or Wilson 1 for me.
17          And, those are the resignation
18  letters?
19      A.   Yes.
20      Q.   Can you read the companies you
21  resigned from?
22      A.   Coin Exchange, Hotwire Preemptive

MAGNA
LEGAL SERVICES

Page 170

1  Intelligence, Interconnect Research and Integers.

2     Q.   I noticed that, and actually you

3  noticed, Mr. Wilson, during a break you mentioned

4  this to us, that there was missing W&K was

5  missing from the resignation.

6     A.   That's correct.

7     Q.   Why is that?

8     A.   Because I didn't even know I was a

9  director.

10         MR. FREEDMAN:  No further questions.

11         MR. PASCHAL:  No further questions.

12         All right, I think we are done.

13         MR. FREEDMAN:  You have a right to

14  read your deposition and you can correct

15  inaccuracies that you believe are there, or

16  you can trust the court reporter did her job.

17         Do you elect to read it or do you

18  waive your right to read it.

19         THE WITNESS:  I will waive my right.

20         THE VIDEOGRAPHER:  All right, if

21  this is everything, we are off the record at

22  November 8, 2019, at 11:39.

Page 171

1         (Whereupon, signature having been waived,

2  the deposition concluded at 11:39 a m.)

3                   *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 172

1         CERTIFICATE OF COURT REPORTER

2  UNITED STATES OF AMERICA  )

3  DISTRICT OF COLUMBIA      )

4         I, LORI J. GOODIN, RPR, CLR, CRR, the

5  reporter before whom the foregoing deposition was

6  taken, do hereby certify that the witness whose

7  testimony appears in the foregoing deposition was

8  sworn by me; that the testimony of said witness

9  was taken by me in machine shorthand and

10  thereafter transcribed by computer-aided

11  transcription; that said deposition is a true

12  record of the testimony given by said witness;

13  that I am neither counsel for, related to, nor

14  employed by any of the parties to the action in

15  which this deposition was taken; and, further,

16  that I am not a relative or employee of any

17  attorney or counsel employed by the parties

18  hereto, or financially or otherwise interested

19  in the outcome of this action.

20  _____

       LORI J. GOODIN, RPR, CLR, CRR, RSA

21     Notary Public in and for the

       District of Columbia

22  My Commission expires:  May 14, 2021



**A**

**ability** 10:18 11:1
47:22 122:16
123:13 142:7
**able** 16:4 76:19
94:6 105:22 108:2
110:17,21,22
112:13 117:4,13
117:20 118:3
122:17,18 123:4
123:13,14,15
124:3,7 125:3,4
126:13 133:21
135:6 139:5,6
142:7,11 146:4
147:17 156:6
161:10
**abrenner@bsfllp...**
3:13
**absolutely** 20:14
26:18 40:7 71:2
90:14 97:16
107:13 125:19,22
141:6 142:5,18
160:6,17 165:4
**accept** 34:2 70:6
**acceptable** 135:15
**access** 32:2 40:17
47:22 48:6,7 52:9
54:10 56:19 57:1
57:5 59:3 61:12
64:16 67:8 109:11
109:12 119:11
139:6 144:10
146:8 147:17
163:18,19
**accommodation**
134:10
**account** 96:16
144:14
**accountant** 12:20
12:21 13:1,15,20
14:1,4 32:1
118:15
**accounted** 26:21

**accounting** 82:17
82:18 107:1,6
109:13 113:20
133:10,17
**accounts** 21:10
25:20 26:2 31:17
31:19 103:21
109:5,12 114:19
131:4,14 133:3
136:11 146:14
**accurate** 70:21
71:8 77:16 113:9
128:10 162:18
**achieve** 108:9,12
**act** 70:2
**acting** 70:10
**action** 172:14,19
**add** 129:6
**added** 35:11 157:11
**additional** 47:17
**address** 9:14,17
45:19 51:12 55:18
56:2,8 68:20,20
91:18 95:14
112:11 116:5
146:12 150:13
151:19 153:19
**addressed** 43:12
45:2 66:9
**addresses** 45:14
46:5,10,13,15
47:2,3,18 48:9
55:13 67:10 92:10
116:3
**administration**
135:20
**Administrator** 2:13
**administrators**
137:4
**Adobe** 122:10
123:9,11,18 124:1
**advise** 34:9
**advising** 159:8
**advisor** 21:22
156:13 158:13
159:16

**advisory** 105:20
127:17 138:14
166:5
**affect** 10:18
**affidavit** 5:20 68:10
**afford** 96:7,15
135:6
**afloat** 135:7
**age** 77:6
**agenda** 127:11
**ago** 42:7 89:5,5
90:2,3 92:22
93:18 140:9 145:1
145:3,6 147:1
**agree** 22:13 71:3
**agreed** 70:5 133:22
**agreement** 33:1
34:12,18 76:13,15
122:19
**agreements** 133:7
**Ah** 115:10
**ahead** 31:9 41:1
73:8,15,22 98:17
103:11 121:2
122:5
**Alastair** 6:8
**alive** 117:13 118:1
118:5
**Allen** 106:3
**allow** 27:10
**allowed** 73:2
**amend** 165:20
**amended** 161:5
**America** 88:20
172:2
**amount** 55:15 67:3
67:15 88:19 94:7
94:21 95:11 97:3
102:19 110:20
143:19,21
**amounts** 23:1
25:19 40:17
**Andrew** 3:11 8:6
**annual** 102:6
137:22
**answer** 11:10 30:13

61:17 73:5 95:7
97:8 99:3
**anyway** 94:17
132:10 134:3
138:3
**appear** 40:16
**appearance** 39:5
**APPEARANCES**
3:1
**appears** 24:12
172:7
**application** 165:18
**applications** 29:12
**applied** 96:21
**appointed** 129:15
**approved** 111:15
**Approximately**
16:10
**April** 35:4,6,9,16
93:22 100:9
104:21
**argued** 135:15
**arrange** 88:21
**arrogance** 37:22
**article** 150:3
**Asian** 153:14
**ASIC** 25:21
**asked** 78:16 93:7
103:10 121:6
138:21 139:4
140:9 167:8
**asking** 30:9 59:9
64:13 136:4 143:8
160:13 163:3
**assets** 40:18
**Assignment** 1:22
**assisted** 114:19
**assume** 11:8 166:22
**assuming** 43:12
**ASX** 17:18 34:9
35:12
**ATO** 23:17,18,21
45:9 55:6,8 57:19
57:21 62:13
129:20 130:1,16
136:4 137:9

**attached** 6:19
55:11
**attachments** 42:16
**attain** 12:12
**attitude** 22:6 38:5
**attorney** 106:1
154:16,18 172:17
**attorneys** 158:2
161:14
**audibly** 10:9,15
**audit** 141:7
**August** 68:16,18
69:5 77:1,4,10,18
85:13,16 86:8
90:5 101:20 103:5
124:6
**Australia** 4:8,22
5:11 9:16,20,21
12:6 18:17 22:21
23:5,6,13,22 27:1
27:3 34:5 45:3
47:14 52:20 53:8
53:9 60:2 101:5
107:1 112:5,6
130:19
**Australian** 53:15
56:3 76:18
**available** 148:15
**Avenue** 2:8 3:8,12
3:17 88:7 92:12
**avoid** 81:14
**aware** 23:2 25:18
26:20 29:15 33:5
33:16 34:11,17,22
35:15 56:15 71:11
134:22 137:2
149:13,16,17,18
150:4 153:1
**a.m** 2:5 7:15 41:11
41:12 78:11,12
83:20,21 148:7,8
171:2

**B**

**Bachelor** 12:13,15
**back** 11:19 20:12



40:9 41:13 48:9
78:13 83:22 86:15
88:9 89:14 94:19
104:16 106:4
107:19 110:21
123:7,17 125:14
128:6 129:9 134:8
134:9 139:22
141:5 142:19
148:9,14,22
150:15 165:22
169:1
**background** 16:21
108:5 114:16,21
115:1,7 123:16
132:19 155:17,19
**bad** 145:14
**balance** 47:5,8,12
**bank** 26:5 136:11
144:14
**banking** 73:17
**based** 78:3 98:16
126:4 139:12
**basis** 71:20 72:1,3
72:11,21 88:10
109:6
**Bates** 121:21
**bathroom** 11:22
**BDO** 106:19,21
**bear** 18:12 30:18
**beat** 61:16
**beaten** 37:3
**beginning** 131:5
161:19
**begins** 7:5 55:18
**belief** 50:2 98:11
**believe** 35:20 41:2
47:21 54:2 58:17
60:19 67:15,19
137:3 170:15
**believed** 49:19
**believing** 37:22
**belonged** 167:1
**best** 10:15 28:11
36:22 39:22 48:17
132:8

**better** 42:8 73:2
126:1
**Beyond** 38:3 39:11
**big** 95:3
**bigger** 99:22 100:1
**bill** 95:12 96:7,11
101:9
**birth** 9:11
**Biscayne** 3:3
**bit** 9:6 21:15 25:10
26:3 37:9,13
70:12
**Bitcoin** 14:11,12,14
22:19 26:6,17
27:13 34:3 41:6
44:2 47:8,11,22
48:5 50:7,19
51:15,19 52:9
53:16 54:4,9
55:17 56:1,8,9,18
58:6,12,18 59:2
60:10,11,14,21
61:5,11 62:20
63:1,15,19 64:7,9
64:15 65:10,19
66:16 67:15 68:2
74:4,7 75:7,18
79:13,22 97:12,22
107:19,21 114:8
122:14,19 123:15
123:19 124:15,17
124:20 125:5,8,9
125:13 127:8
132:20 138:9,22
139:9,15 140:8,13
141:3,9,11,13,16
142:11,17,21
143:4,13,19,22
144:7 145:18,19
145:21 146:2,10
147:7,7,11
**Bitcoin-based**
55:13
**block** 55:17
**Blockchain** 49:21
97:11,22 114:5

122:18 123:14
124:3,16 125:2,10
125:11,12,12,18
125:21 126:2,10
126:18 132:21
**Blockchain-related**
124:19
**blow** 142:9
**board** 20:22 21:22
43:16 105:20
108:1 127:17
138:14 157:10
163:6
**Boies** 2:7 3:11 7:17
8:7
**book** 88:1
**booked** 88:5
**bookkeeper** 31:20
103:21 108:21
109:1 110:3,5
133:18
**books** 67:8
**born** 12:5
**bottom** 19:20 51:4
112:16 121:22
**bought** 35:1 99:11
**Boulevard** 3:3
**bpaschal@rivero...**
3:19
**brand** 37:4
**break** 12:1,1 26:1
29:10 70:12 83:16
94:13 139:7 144:1
148:4 170:3
**breakdown** 23:15
**Brenner** 3:11 8:6,6
73:1,4,8 151:10
154:13
**bright** 37:16
**bring** 16:3 108:2
**Brisbane** 9:19
40:13 104:14
**Brooklyn** 3:8
**Bros** 66:18
**Brothers** 67:4
**brought** 23:6

110:15
**Bryan** 3:16 8:8
84:5
**build** 15:6,17
110:17 119:5
**building** 16:18
**buildup** 22:14
**built** 14:18 15:9
**bunch** 15:19
**business** 6:13 28:17
28:18,19 29:19
37:21 99:17,19
104:15 145:11
163:8
**businesses** 27:15
**buy** 144:7,18
**buying** 40:8
**B/BR** 7:13

**C**

**cabinet** 118:10,16
**cable** 96:15
**cafe** 36:16
**California** 1:21
2:14
**call** 48:14 85:19
86:2 87:6 88:1
150:11
**called** 8:15 15:12
20:22 25:15 34:5
68:16
**Campbell** 3:22
7:20
**cancer** 117:8
**capability** 120:1
**capacity** 16:14
31:22 109:20
115:16 128:3
**capitalization**
25:20 26:2,7,9
27:11
**car** 37:4 99:11
144:9
**card** 6:13 92:3
**care** 9:8
**cars** 39:12

**case** 1:4 7:13 86:7
86:10,18 90:9,10
90:13 91:5 109:15
134:19 149:18
**cash** 26:5 110:14
135:18
**catch** 148:15
**category** 121:19
**caught** 150:18
**caused** 38:1
**Cave** 158:3 161:14
161:18 166:1,2
**cc** 4:15,18,20 5:4,7
5:13,16 6:9 43:9
53:1 55:3 57:15
58:1 62:10 65:4
80:14
**celebration** 94:17
**cell** 92:1 96:7,11,12
151:5,6
**cent** 101:4 134:3
136:10
**central** 46:21 48:12
**CEO** 22:9
**certain** 123:6
**CERTIFICATE**
172:1
**Certified** 2:12,12
**certify** 172:6
**cetera** 125:1 141:18
166:3
**CFO** 16:22 18:8,11
31:12,22 32:4
35:6 106:13,15,16
106:16 107:5,6
108:21 109:10
110:1,1,13 129:11
129:15 130:10,12
137:19,21
**chain** 89:15
**challenge** 108:19
117:10
**challenges** 73:19
**champagne** 39:22
94:7,22 95:1,3
**chance** 61:17



change 22:6,11
36:2,8,9 37:5 38:1
38:3,5,10 41:2
98:22 99:16 106:2
157:12
changed 93:19
105:10,14 106:9
107:17
characterization
71:4
cheap 144:9
check 95:4
chief 31:22 115:10
115:12
children 118:13
Chinese 153:13
Christmas 39:18
94:9,10,11,16
103:9
Christmastime
94:18
CINet 88:12
circumstances
46:17 48:10,19
49:3,8 120:2
CISO 115:7,10
CISOs 88:13
claim 76:19 161:10
claiming 22:20
23:7
clarification 115:9
clarify 95:19 98:5
120:7 125:6 133:2
155:2 162:14
clarifying 128:22
classes 114:1,4,7,10
114:13
clear 87:11 155:18
165:16
clientele 118:17
129:2
close 63:19
closed 70:7 126:20
141:21
closer 44:8
clothes 37:15

cloud 155:5
CLR 1:20 172:4,20
code 115:5 155:17
156:14 163:19
coding 155:12
156:17
coffees 40:9
Coin 17:4 18:6,9
30:20 31:3,5,17
32:4,6 34:5 35:1,8
47:19 62:18
169:22
colleague 92:9
college 12:8
Collison 158:3
161:14,17 166:1,2
color 49:14
Columbia 2:15
172:3,21
come 15:4 16:20
19:12 37:19 38:21
39:3 49:2 88:5
89:18 90:6 123:5
125:14 126:16
130:20 155:14
157:9
comes 58:4
comfortable 21:8
21:16 22:5,22
131:19
coming 22:16 23:14
89:1,4,18,19 90:1
92:22 93:8 131:5
150:3 163:6
commenced 138:2
commencing 2:4
commerce 12:13,15
13:9
commercial 154:17
Commission
172:22
common 75:12,15
79:11,17,21 121:7
125:7,10
communicate 89:7
150:10

communication
107:15 127:16
communications
106:7 127:13
133:13
companies 16:7,11
16:15 17:2,12
18:1,10 21:21
22:15 36:20 62:18
76:13,14 79:15
80:17 83:6 129:7
129:12,14,19
131:2 138:17
169:20
company 20:5
25:14,16 26:22
33:3 34:10 67:8
68:20,21 70:4,7
70:10 71:12,13
76:17,18 78:20
80:4 82:22 83:4,8
83:11 102:10,20
104:4,10 107:3,6
107:12 108:11
113:5 137:5 156:5
company's 79:18
competition 127:7
127:9
complain 136:15
136:21
complaint 4:11
32:14
complete 132:14
completed 77:1,4,7
77:10 133:4
completely 110:8
computer 81:6
115:18 146:16,16
computers 144:18
computer-aided
172:10
concept 154:6
155:10 158:7
159:2 162:12,13
163:5 165:9
concern 105:9

106:12
concerned 107:16
138:4
concerns 110:2,4
133:13
concluded 171:2
conference 88:12
89:20
confidence 38:9,11
108:2
confidential 1:9
81:11 82:1
confidentiality
81:10,13
confirmed 56:2,14
congratulate 87:12
92:19
congratulated
135:2
congratulating
86:9,18
congratulations
86:6
connected 112:14
128:5
consent 20:8
consenting 70:3
conservative 22:11
considerable 97:3
consistent 61:5
64:5
contact 91:14,14
112:8,9 151:18
CONTENTS 4:1
continue 13:22
95:8
CONTINUED 5:1
6:1
control 32:1 45:14
45:19 46:5,11,14
46:16 48:10 54:3
55:13 56:2,8,14
56:16 58:12,17
59:2 60:13 65:9
69:14
controlled 60:20

61:4 63:14,15
64:15 65:13,18
controls 58:5
convened 2:4
conversations 64:4
148:16 149:3
166:7,13
copied 129:22
copy 82:3 86:21
87:1
correct 9:4,5 15:11
15:18 17:3 19:5
25:5,15 26:11
29:19 30:2,21,22
42:9 43:13 45:4
47:4,16 51:6 55:6
55:7 60:9,16 63:3
70:14 84:17 85:15
86:11 88:18 92:19
93:4,21 94:1,8
100:21 101:20
102:2,20 104:4
107:12 113:6,7,22
114:19,20 116:12
120:17 125:18
128:11,15 129:20
130:4 131:3
135:13 136:7
141:13,14 157:3,6
160:8,19 162:11
165:21 167:20
170:6,14
correspondence
153:6,16
cost 76:18
counsel 8:1 24:6
30:9 73:2 81:2
91:11 121:20
172:13,17
counterintuitive
10:9
couple 42:7 46:3
89:13,20
court 1:1 5:21 7:12
7:21 10:7 23:5
51:22 68:11 69:20



77:1,9 119:2 166:22 170:16 172:1
**Co-counsel** 3:6,10
**CPA** 12:17
**Craig** 1:6 7:10 8:9 8:10 14:20 15:1,2 16:1,3,7,10 18:2 19:11 20:7,15,17 20:19 21:20,21 23:6 24:12 25:12 26:18 27:4,6,10 28:10 29:16 30:15 31:11 32:5 35:19 36:2,9 37:6,10,16 39:19,21 40:3,4,5 40:14,17 42:1,10 43:9,11 44:21 45:11,13 47:21 48:4 49:12,13,21 50:3 51:19 52:9 53:1,14,18 54:2 55:3 56:7,13,22 57:5,15 58:11 60:5,10,20 61:6 61:10 62:10 63:14 64:2,14 65:4,13 65:18 66:9 67:11 67:14,19 68:10,15 69:1,7,12 70:4 71:6,17 73:11 74:6,18 75:2 76:5 76:11 77:16,22 80:1,14,16 83:6 84:5 86:7 91:1 94:4,7 97:11,17 97:19 98:7,8,12 98:13,22 101:6 103:20 104:12,15 104:17 105:10,13 105:16,18 107:9 107:16 108:6,19 109:6 110:15,18 122:15 129:12 130:5 131:10,12 131:22 132:19

133:19 134:8 135:21 136:13 138:14 139:8,13 140:1,10,12,19 141:3,9 143:20 144:3,6,11,21,22 145:9,17,18 146:2 146:7,9 147:20 149:8,21 152:12 153:9,22 154:4,8 154:8 155:14 156:10,13,13,16 157:2,9,11,13,16 157:21 158:6,10 158:12,18 159:4 159:13,15 160:12 161:1,8,9,15,19 162:3,8,16 163:7 163:10,15,20 164:4,7,16 165:7 165:19,21 166:6,9 166:10,13 167:10 168:5 169:1,10,11
**Craig's** 22:6 39:5 67:2 82:20 106:9
**created** 98:11 118:11 119:3
**credit** 96:20
**cross** 15:5
**crossed** 157:19 159:20 163:21
**Crossman** 116:1
**cross-examining** 14:16
**CRR** 1:20 172:4,20
**cryptocurrency** 114:11
**cryptographic** 15:12
**cryptography** 114:14 126:21 160:7
**Cryptoloc** 15:12 16:17 127:3 160:4 160:6
**CSR** 1:21 2:14

**CSW** 62:18
**CSW-Dave** 51:5
**culture** 16:18 110:17
**currency** 27:13 60:11 127:3,11
**CV** 7:13
**cyber** 115:3,7 116:9 116:14 120:9,16 126:4 164:17
**cybersecurity** 14:17 15:6 16:4 114:2
**C-R-Y-P-T-O-L-...** 91:20

---

**D**

**dad** 115:2 117:7,12 120:17,20
**daily** 109:6
**data** 115:20 126:5
**date** 9:11 19:6 101:19 103:14,15 145:4 161:18
**Dave** 28:4,6,8 29:11 30:16 32:5 33:2 34:1,3,22 35:16,18 36:3,18 37:10 40:16 42:7 48:16 49:14,19 50:12 78:1 93:22 95:17,19,22 96:2 96:6 97:2,5,7 98:1 98:2,6,11 100:4,7 100:9 104:21 106:10 131:1 139:10,15 140:2 140:13,18,19 159:22,22 160:10 160:14 162:18,19 163:9,14,16 166:7 166:18,20 167:5
**Dave's** 38:16,17 40:6,8 93:20 94:4 100:3
**David** 1:4 3:22 7:9

7:19 46:20,20 48:11,11,15 69:1 69:15 98:20
**David's** 69:12
**Davies** 158:3 161:13,17 166:1,1
**day** 70:15 96:18,19 96:20
**days** 89:21 109:16 127:18 129:9 152:8
**dead** 118:12
**deal** 42:16
**dealing** 26:21 151:11
**death** 40:6 93:20 94:4
**debt** 70:6
**dec** 55:11
**deceitful** 91:2
**December** 103:12
**decimal** 73:20
**declaration** 55:12
**Defendant** 1:6 3:15
**defense** 1:4 4:8,10 4:14,16,19,22 5:5 5:8,11,14,17,19 6:5,7,10,12 7:9 18:17 24:10 33:2 33:4,6,10,13 34:2 41:18 43:6 44:18 50:22 52:20 54:21 57:13 59:22 60:2 62:8 65:2 66:6 68:17 69:1 70:7 71:14 74:16 76:3 76:16 80:12 82:10 83:1
**definitely** 141:17
**degree** 113:21
**degrees** 12:12
**deliver** 124:7
**delivering** 134:16
**demeanor** 105:10 106:2,9 107:17
**Dempster** 5:12

62:12
**denied** 96:22
**depends** 119:18 120:1
**depo** 81:16
**depos** 59:10
**deposit** 134:7
**deposition** 1:11 2:3 7:6,16 9:2,4 11:1 72:14 88:22 93:10 93:13 170:14 171:2 172:5,7,11 172:15
**depth** 108:11
**describe** 28:13,19
**DESCRIPTION** 4:5 5:3 6:3
**designation** 81:13
**destroy** 118:7
**details** 29:21 30:5 91:17 112:10
**devastating** 116:10
**develop** 97:6 154:3 155:19 156:6 166:8
**developed** 124:4
**developer** 22:6 36:10 37:15 159:1 164:12
**developers** 126:5 156:6
**developing** 71:18 73:11 97:9
**development** 16:5 22:1,21 54:1 74:7 79:18 156:17
**device** 142:8,13
**Diane** 21:1 105:22 127:13,16,17 128:2,5
**died** 35:16,18 36:3 37:10 40:17 48:16 93:22 100:4,7,9 106:10 117:21 131:1
**dies** 104:21 116:20



**difference** 15:14 105:15 106:16 110:19 126:22
**different** 119:21 125:17 130:7
**difficult** 117:16
**digital** 15:10 16:17 20:22 25:16 127:2 127:10
**dinner** 95:2,5
**direction** 159:17
**directly** 109:6
**director** 16:20 17:2 17:4,7,11,12,15 17:19 20:4,8 30:20 32:4 33:9 35:11 70:3,10 71:1,11 79:16 129:15 159:16 170:9
**directors** 34:10
**disagree** 71:9
**disappointing** 37:20
**discipline** 110:16
**disconnect** 96:16
**disconnected** 96:8
**discuss** 27:6 81:15 148:12 149:5 152:21
**discussed** 152:15 152:18
**discussion** 11:17
**discussions** 59:15
**dispersed** 123:6
**displays** 39:12
**dispute** 135:16
**District** 1:1,2 2:15 7:12,12 172:3,21
**document** 4:12 5:22 24:17 25:7 32:13,15 58:21 59:6 68:7 81:3,7 81:19 100:21 101:2,12 137:2 161:16 165:1,17

166:17
**documentation** 21:10,17 131:4 137:11 157:12 158:18 159:3 164:3 166:3
**documentations** 131:2
**documents** 24:19 80:5 90:12,16,18 90:20 105:9,12 117:4,11,20 118:4 118:7 119:12 132:2 133:12 149:9
**doing** 29:19 43:14 73:3 108:9,17 119:7 126:13 130:19 132:5,14 133:14 134:16 138:5 142:17
**dollars** 26:10 47:14 53:16
**dotted** 157:18 159:19 163:22
**Dr** 8:9,10 15:16 16:15 17:1 19:10 27:19 79:12,15 84:5 93:19 106:3 138:22 144:11 149:12
**draft** 111:14
**drafted** 111:16
**dress** 36:21
**dressed** 37:11
**Drew** 155:21 156:3 158:21,21 159:1
**drill** 37:8
**Drive** 9:15
**drives** 120:4
**driving** 144:8
**drop** 118:12
**duly** 8:16
**duties** 106:17 107:11 109:4,19 110:12 134:17

138:19
**D-R-E-W** 156:1
**D.C** 2:9 3:12 7:17

---

**E**

**Ear** 21:22
**earlier** 9:3 18:13 78:16 79:10 109:7 125:7 128:9,20 130:21 138:20,20 167:9
**early** 16:1 41:6 109:16,21 127:18 152:8 161:21
**education** 112:17 112:18 113:17 114:18
**effect** 99:18
**eight** 26:9
**either** 49:10 169:10
**elect** 170:17
**electronically** 18:14
**elements** 100:1
**employed** 104:7 172:14,17
**employee** 6:14 100:17 101:16 134:1 172:16
**employees** 102:14 102:20 104:3,3 105:13
**employment** 22:14
**encrypted** 139:1 146:3,5 147:13
**ended** 19:10 131:6
**enforcement** 127:5
**engaged** 120:9
**ensure** 76:22 159:16,19
**enter** 88:19
**entire** 107:14
**entitled** 135:17 160:10,11,12,14 160:20 161:2 162:19 163:11

**environment** 122:17
**equipment** 141:21
**equivalent** 107:1
**erased** 120:4
**Ernst** 107:2
**escrow** 15:14 123:3 123:14,14 126:21 155:5
**Esquire** 3:2,7,11,15 3:16,16
**essential** 49:15 50:12
**estate** 1:3 7:8 162:19
**et** 125:1 141:18 166:3
**ethics** 145:11
**evening** 40:2
**event** 39:19 116:19 118:12,22 155:4
**events** 91:7 116:10 165:19
**everyday** 110:6
**evidence** 23:15 62:15 91:6
**exact** 94:7 95:11
**exactly** 110:18 143:17 167:13
**examination** 4:1 8:15,18 10:3 84:2 168:17
**examining** 15:5
**excess** 56:1
**exchange** 17:5 18:6 18:9 30:20 31:4,5 31:17 32:5,6 34:5 35:1,9 60:12 62:18 169:22
**exchanges** 74:5
**exciting** 22:3
**Excuse** 121:20
**execute** 81:9
**exhibit** 4:5,6,9,11 4:11,13,15,17,20 5:3,4,6,9,12,15,18

5:20 6:3,4,6,8,11 6:13,14,16,17 18:20,21 24:3 32:8,12,13 41:19 42:22 43:4 44:13 52:15 54:16 57:8 59:18 60:1 62:4 64:19 65:22 68:3 74:10 75:19 80:7 82:5 92:6 100:6 100:13,14 111:4 156:18 169:16
**Exhibits** 4:4 5:1 6:1 6:19
**expand** 36:7 37:13 39:17
**expect** 136:22 137:14
**expected** 137:20
**expenditure** 110:6 134:11
**expense** 134:10
**expensive** 38:4
**experience** 130:4
**expert** 16:4 164:16 164:17
**expertise** 159:18
**experts** 14:17 15:6 115:6 126:5
**expires** 172:22
**explain** 11:5 21:14 26:2 74:21
**explanation** 49:14
**Explorer** 55:17
**express** 105:9 106:12 110:2,4
**expressed** 106:7 133:13 167:18
**external** 106:19
**extremely** 68:1
**ex-wife** 21:12
**e-mail** 4:9,13,15,17 4:20 5:4,6,9,12,15 5:18 6:4,6,8 18:15 19:3 24:12,15,22 25:10,21 26:8



27:6 28:3 42:1,1,3
42:11 43:8,8
44:20,21 45:2,11
45:13 51:18 52:7
53:1,1,11,13,19
54:3 55:1,3,5 56:6
56:7 57:15,15
58:4,9 59:9,14
60:4,5,17,20 62:9
62:10 63:10,11,13
63:22 64:3 65:3
65:12,15,17 66:8
66:9 74:18,22
76:4,11,22 80:13
80:14,21 81:11,18
85:22 86:3,4,9,16
86:20,22 87:2,9
89:8,9,11 90:22
91:18 107:15
112:11,12,13
116:2,5 121:8,11
121:14 130:16
150:12,13 151:19
152:6,9,11,16,18
152:20,21 153:19
168:22 169:1,3,10
169:11,12,12
**e-mailed** 20:18
68:19 85:20 144:4
146:1
**e-mailing** 24:19
25:2
**e-mails** 24:6 67:13
80:2 87:16,19
89:14,15 106:6
129:22 133:12
148:20,21 167:10
168:3 169:8

---
**F**
---

**fact** 63:19 94:6
167:16
**fair** 30:1
**fall** 77:14
**false** 88:17 113:11
**familiar** 33:3 82:14

100:20 101:2
**familiarize** 24:16
76:7 82:13
**family** 118:7,12
119:16 135:5
153:17
**fancy** 99:6
**fascination** 37:1
**faster** 42:7
**fate** 46:16 48:10,18
49:2,7
**father** 116:15,16,17
117:3 120:10
**February** 136:20
**federal** 22:22 29:13
**feed** 29:17 121:10
140:17
**feel** 22:5,22 131:19
135:14
**feeling** 21:8
**fierce** 116:9
**Fifth** 3:17
**figures** 47:15
**file** 15:10 16:17
20:22 48:5 54:9
56:18 57:5 59:3
61:11 64:9,16
139:1
**files** 42:17
**filing** 25:16 70:6
118:10,16
**filings** 90:8,10
**finally** 11:22 67:7
85:4
**finance** 113:20
**financial** 31:22
77:14 98:18,19
131:6 144:11
**financially** 172:18
**find** 89:3 116:19,20
117:4,10,14 118:2
118:3 154:15,18
**fine** 81:22
**finish** 52:3 95:7
**finished** 74:3 77:18
128:2 141:1

**firms** 107:1
**first** 8:16 14:10,20
14:22 15:16 34:13
45:18 66:15 68:15
70:9,11 71:10
85:9 86:15 108:6
112:19 116:8,13
124:17 166:10
**five** 44:6 168:19
**flash** 22:10 36:21
**flashy** 39:11
**FLEXNER** 2:7
3:11
**flight** 88:5
**flights** 88:1
**Floor** 3:18
**Florida** 1:2 3:4
7:12 33:2,3 35:21
78:3
**flow** 110:15
**fly** 36:1 40:12
**flying** 104:16
**focusing** 149:2
**following** 27:11
45:15 46:6 69:6
70:1 77:14 108:7
**follows** 8:16
**foolproof** 168:6
**Force** 57:13
**foregoing** 172:5,7
**form** 17:9 28:1 30:3
31:1,6,14 34:15
34:20 35:2 36:4
38:6 39:6,14
40:19 42:14 43:19
45:5 47:9 48:1,20
49:5,16 50:2,9,15
51:9 52:4,11 54:6
54:11 56:11,20
58:20 59:10,17
61:1,7,13 63:4,16
64:17 65:20 67:1
67:17,21 71:19
72:1,5,6,22 73:5
73:13 75:8 77:5
77:12,19 79:1,4

83:9 102:11 103:3
140:4,14 142:1
154:13 160:18,22
162:21 167:3
169:5
**formed** 34:5 98:10
**forms** 131:9
**forth** 89:14
**forthcoming** 29:16
**fortunate** 117:6
**fortune** 48:14
**forward** 19:3 37:21
40:10 88:9 104:17
132:8 133:21
134:9 148:22
150:16 166:1
**found** 23:18 89:1
**founder** 58:15
**four** 73:21 85:8
**fourth** 121:19
122:7
**fraud** 23:10
**Freedman** 3:2,3,7
4:2 8:4,4,5,19,22
11:14,21 17:10
19:1 24:5,7,21
25:6 28:2 30:4
31:2,8,15 32:10
34:16,21 35:5
36:6,12 37:7 38:8
39:8,16 40:22
41:7,15,21 42:18
43:2,21 44:10,15
45:6 46:1 47:10
48:3,22 49:6 50:1
50:10,17 51:10,20
52:2,6,13,17 54:7
54:13,18 56:12
57:2,10 58:22
59:8,16,20 61:2,9
61:15 62:1,6 63:5
63:18 64:21 66:2
67:6,18 68:5
71:20 72:2,6,16
72:20 73:9,14
74:12 75:9,21

77:8,15,21 78:15
79:2,6 80:9 81:2,7
81:17,20 82:2,7
83:10,14 84:7,16
84:19,22 85:3,7
85:10,18,21 86:9
86:12,19 87:4,8
87:17,21 88:21
89:17 90:4,9
92:18 93:6,7,18
95:6 102:11 103:3
121:6,20 122:2,5
135:2 136:2
138:20 140:4,14
142:1 148:13,17
149:6 151:11
160:18,22 162:21
167:3,8 168:18
169:6 170:10,13
**frequently** 88:16
**Friday** 1:15 2:4
**friend** 48:15,17
**friends** 48:14 96:10
**front** 147:9
**full** 9:10 22:15 32:1
69:14 109:11
**fully** 26:21
**full-time** 14:6
109:20
**fund** 66:16 67:5
**funded** 23:3
**funding** 22:16 58:4
**funds** 125:15
**further** 83:14
168:17 170:10,11
172:15
**futurist** 108:14
**futurists** 37:19
**F2** 3:8

---
**G**
---

**garage** 141:19,20
142:20 143:5,11
**general** 152:22
**gentlemen** 48:13
**George** 9:18



getting 45:10
137:20
gift 18:2
gifted 31:10
gifting 68:2
give 23:15 49:11,13
61:17 71:22 82:3
86:2,21 88:1 91:5
91:16 92:3 126:10
127:4 145:4
given 31:7,10 32:1
172:12
global 15:13,14
58:6,12 127:1
154:20
globally 66:16
go 9:6 11:14 12:8
12:10,17 19:2
31:9 32:18 35:12
36:16 38:13 40:13
41:1,8 46:9 48:8
73:8,15,22 78:8
86:15 94:19 98:17
101:14 103:11
106:4 114:17,18
116:8 119:22
121:2,17,18 122:5
122:7,16 128:6
131:15 134:6
136:11 142:19
149:14 150:15
154:17 158:2
162:5 165:13
goes 103:14
going 18:16 21:16
24:8,18 29:9
32:12 38:3,12,13
42:21 51:21 71:22
72:20 73:4 78:22
79:2 94:13 95:14
97:13 99:17
100:12 101:11
108:15 111:7
120:7 123:7 130:9
142:19 148:3,21
165:8

good 8:20,21 28:15
35:19 48:14 72:17
73:5 84:4,8,20,20
85:4 145:15
159:21 168:15
Goodin 1:20 2:11
7:21 172:4,20
GoToMeeting
122:11 123:10,12
123:19 124:1
government 22:22
23:3,8 29:13
Gox 63:2
graduate 12:18
graduated 13:11
grandfather 48:16
grants 29:12
graphic 47:2 50:22
51:14
great 108:14 115:7
139:14
greater 37:19 67:3
110:20
grew 120:3
ground 9:7 10:6
group 45:15,20
46:5 53:14 58:5
83:5 129:7,14
guess 92:4 104:10
106:15 114:18
132:1
guy 166:6
guys 18:15 19:3

___

**H**
habits 99:16
hack 167:13
hacked 80:2,5
167:11 168:5
169:8,12,14
hacking 167:9,12
167:16,18 168:1
half 26:9 72:19
160:10,11,12,14
162:20 165:10
halfway 65:8

hand 18:16 24:8
81:20 82:2 131:11
165:9
handed 20:14,17
81:4 82:8 131:15
handing 32:11
41:16 43:3 44:16
52:18 54:19 57:11
59:21 62:2 64:22
66:3 68:6 74:13
75:22 80:10
handle 31:16,19
handled 37:21
handsomely 157:21
hang 23:4
happen 38:18
132:10 167:12
168:2
happened 25:10
27:14 69:11 71:9
77:11
happening 21:9
69:20 70:8,13,20
70:22 76:10
happens 167:13
happy 87:18 91:8
91:16 122:22
138:12,16 149:1
hard 120:4
Hardy 4:17 45:3
53:8,21 55:6
57:21
head 10:10,11
53:15
hear 28:8 30:11
heard 28:6 95:21
held 55:15 68:17
69:4
Hello 43:11 46:2
help 15:17 19:8
20:3,11,19
helpful 140:17
hereto 172:18
highest 102:9,22
104:3 134:1
hire 164:14

hired 164:4
history 34:10
138:14 141:7
162:6 166:2
Hitoshi 139:16
hold 35:8 103:11
113:4 124:8
holding 53:15 56:1
67:2 141:13
holdings 25:12
62:20 64:7 68:1
holds 25:17
home 9:14 146:11
146:22 147:3
honest 69:17
136:22
hoodie 36:11
144:12 166:7
hoodies 22:7 36:14
37:11 38:4 144:8
164:8
Hospital 96:3
Hotwire 17:19
66:10 70:16 73:16
75:2,17 79:12
80:21 104:18
105:1 106:13
107:6 129:5,7
132:6 133:22
136:6 169:22
hours 72:16
housekeeping 9:9
Howard 147:4
huge 110:20 143:18
Huh 145:2
humble 38:15

___

**I**
idea 155:9
identifiable 67:9
identification 18:22
24:4 32:9 41:20
43:1 44:14 52:16
54:17 57:9 59:19
62:5 64:20 66:1
68:4 74:11 75:20

80:8 82:6 92:7
100:15 111:5
156:19
identify 8:1
ill 149:8
impair 10:22
importance 118:10
important 113:15
117:1,4,10 119:7
119:10,12 128:18
128:21
impression 52:8
improvement
123:11
inaccessible 64:9
inaccuracies
170:15
include 45:15 46:6
income 136:5,9
incorrect 158:11
increase 25:12 75:3
109:19 115:3
132:9 138:19
incredibly 67:20
individual 119:19
120:2 126:13
135:21
individuals 66:10
info 1:4 7:9 33:2,3
33:6,9,13 34:2
68:17,22 70:7
71:14 151:18
information 29:17
83:1 113:6,15
115:11,13 117:14
118:2,14 119:1
125:4 126:15
128:10 129:1
130:18 132:17
133:7 152:5,22
155:6 161:5
instance 55:16
insurance 116:21
Integers 17:7 170:1
intellectual 29:4
71:17 73:11 74:7



75:4,16 79:11,18
   97:6,9 98:11
   160:15 166:8
   167:1
**Intelligence** 17:20
   170:1
**intent** 30:16
**Interconnect** 170:1
**Interconnected**
   17:16 20:2,4
**interest** 35:1 79:8
   116:9 162:9
**interested** 172:18
**interesting** 108:13
**interests** 14:8
   166:19
**internet** 96:15
**inventor** 158:11,16
   158:22 159:6
   161:8 162:7
   164:19,21,22
   166:6
**investigate** 23:14
**investigated** 27:2
**involve** 16:7,10
   106:16
**involved** 14:9 16:15
   31:20 74:6 83:7
   83:11 120:16
   129:5 132:19
   135:19 152:7,16
   153:10 154:9
   156:14,16 159:5
   159:10,22 160:1
   163:7,11 165:7
   166:21 167:2
**involves** 160:7
**in-house** 166:12,15
**IP** 23:6
**Ira** 1:3 7:7 152:1,5
   152:15,16 153:3,5
   153:12
**issue** 26:4 61:15
   69:15 132:16
   133:1 138:4
   151:11

**issued** 26:19
**issues** 21:13 129:19
**Italia** 5:6,15 55:8
   57:18
**I's** 157:18 159:19
   163:21

— J —

**J** 1:20 2:11 172:4
   172:20
**Jamie** 1:12 2:3 6:13
   6:16 7:6 8:14 9:12
   16:19 27:16 43:16
   69:7 70:2 71:5
   86:1 154:19
**Jamie.wilson@cr...**
   91:19
**January** 103:8,8
   104:6,7 132:1,5
   132:22 136:15,17
**Jenna** 53:7
**job** 170:16
**jobs** 134:17
**joined** 39:19 49:21
**joint** 49:22
**journey** 119:4
**jperez@riverom...**
   3:20
**judgment** 77:1,9,18
**Julio** 3:16 8:11
**July** 16:13 85:11,12
   86:8 90:4 105:5
   131:5 132:1,3,6
   132:22
**June** 9:12 16:12
   105:4 131:7
   132:12,12
**June/July** 38:19
   74:2
**jury** 10:4 26:3
**JW** 13:4

— K —

**Kass** 3:15 8:10,10
   59:9,13 100:13
   111:3

**keep** 59:16 72:4,6
   82:1 121:1 135:7
**key** 22:8 148:1
**keys** 147:19
**kicked** 35:11 36:19
**kidding** 154:21
**Kleiman** 1:3,4 7:7
   7:9 28:4,6,9 29:11
   32:6 33:2 34:2
   35:16 46:20 48:11
   48:17 69:2 78:1
   95:19,22 96:2,6
   96:14,19 97:2,5,7
   98:1,3,6,20
   139:10 152:2,5,15
   153:4,5,17 159:22
   160:14 162:19,19
   166:8,18 167:6
**Kleiman's** 30:16
   34:3
**knew** 95:17 97:9
   98:2 105:16
   107:20 109:18
   138:21 140:7
**know** 12:2 14:20
   20:11 22:7,18
   29:22 32:16 35:18
   36:11,13,22 39:22
   41:5 42:13 43:17
   44:20 48:18 51:7
   51:11,20,21 72:7
   73:1 77:3 91:4
   92:22 94:15,22
   96:2,6,14,18 97:2
   97:14 112:12
   116:2 117:16,18
   118:9,13 120:14
   122:3 126:21
   138:9 139:8
   140:18 141:8,8,12
   142:20 143:1,5,11
   143:14,16 144:8
   146:8 147:14
   150:22 156:3
   163:10,11 165:13
   167:13,17 168:7

169:2,4,13 170:8
**knowledge** 69:18
   70:9 132:20 137:7
   159:11 163:16
   167:21
**known** 141:4
**Kyle** 3:7 44:7,10
**kyle@rochefreed...**
   3:9
**K-DV** 51:5

— L —

**L** 3:16
**label** 121:21
**laboratory** 114:19
**lady** 153:10
**land** 92:1
**laptop** 146:19
**larger** 106:22
**late** 132:13
**launch** 77:6
**law** 127:5
**lawyer** 84:12
   105:21 164:15
**lawyers** 20:21
   128:3 135:19
   136:1 154:17
   158:13,15 164:1
**lead** 21:18 47:21
   54:2 58:17 67:14
   67:19
**leading** 88:13 108:6
**learn** 14:10,13
   167:19
**learned** 168:9
**learning** 138:13
**leave** 113:14
   128:17,19,21
**ledger** 126:11,20
   141:6
**left** 124:5 130:3
**legal** 7:20,21
   122:21 123:4
   131:12,13 133:9
   158:17
**legs** 12:2

**lend** 96:11
**letters** 4:6 19:4
   20:13,17 90:21
   169:18
**let's** 41:7 42:20
   48:8 83:16 119:20
   121:18 124:17
   141:20 166:5,9,22
**Level** 92:12
**liability** 71:13
   78:20
**liar** 91:2
**license** 76:12,17
   133:7
**life** 96:4 116:11,21
**lifestyle** 37:5
**liked** 16:18
**limit** 59:10
**limited** 71:13 72:13
   78:20
**line** 24:11 92:1
   139:1 168:11
**lines** 10:6
**link** 3:16 8:12
   43:15 55:17
**LinkedIn** 6:16
   111:10 113:1,3
   120:14 124:9,22
   128:6 129:3,8,10
   129:17
**links** 168:4
**Lipke** 5:18 134:21
   149:18,19 150:5,6
   150:7 153:18
**Lipke_s@hotmai...**
   151:22
**list** 47:3 102:15
   158:10
**listed** 17:1 25:21
   26:22 45:15 46:6
   47:18 63:7 158:15
   158:20,22 159:6
**listing** 62:17
**litigation** 18:17
   24:9 41:18 43:5,6
   44:18 52:20 54:21



57:13 60:1 62:7
65:2 66:5 74:15
76:2 80:12
**little** 9:6,9 21:15
25:9 26:3 36:16
37:9,13 47:1
60:13 61:4 70:12
168:20
**live** 104:14 121:10
140:17 150:20
**lived** 96:2
**LiveNote** 2:12
**lives** 104:15
**LLC** 1:4 7:10 33:4
33:7,10,13,15
68:17 69:1 70:7
71:11,13,14 78:19
**Lloyd** 128:2
**LLP** 2:7 3:11
**loan** 96:22
**loaning** 135:5
**local** 157:17
**located** 13:4
**locked** 48:5 54:9,14
56:18,22,22 57:5
59:3 61:11 64:9
64:16 138:22
**lodged** 131:21,22
163:6
**lodges** 30:9
**log** 146:7,10 147:10
**Logan** 13:5
**log-in** 147:16
**long** 13:22 122:22
**longer** 25:16 29:18
42:8
**look** 17:17 19:5,12
19:19 22:20 24:10
25:4 32:15 34:8
43:7 51:3 55:1
60:3,11 66:7,14
66:17 68:9 69:22
94:20 102:6,8
103:8 106:19
110:7 112:16
113:5 121:3

131:14 132:7,11
134:6 150:15
151:1,3,8 152:10
162:5 164:5
165:10,17,17
169:15
**looked** 21:1 67:14
103:21 109:5
131:13 152:4
158:4
**looking** 14:6,17
26:8,8 49:20 86:1
113:1 119:17
124:21 129:2
130:10 132:2
137:4 154:15
156:5
**looks** 23:9
**Lori** 1:20 2:11 7:21
172:4,20
**losing** 155:4
**loss** 116:15
**lot** 14:16 15:6 22:18
30:5 33:8 38:1,15
41:3 67:3 77:17
88:13 109:17
118:16 125:16
127:4 131:13
132:17 133:18
**Love** 43:11
**loved** 135:6 155:4
**low** 22:7
**lucky** 117:12
**L-I-P-K-E_S@h...**
153:20

**M**
**machine** 172:9
**Madison** 88:7
92:12
**Magna** 7:20,21
**main** 45:14,19 46:5
**making** 91:1
163:20
**man** 22:9 37:16
38:12

**manager** 151:14
**managers** 149:21
**Manu** 5:9 60:8
**marathon** 12:3
**mark** 18:19 32:12
55:8 57:18 82:1
92:5,5 111:8
115:14
**marked** 18:22
19:20 24:4 32:9
41:17,20 43:1,4,4
44:4,14,17 52:16
52:19 54:17,20
57:9,12 59:19,22
62:3,5 64:20 65:1
66:1,4 68:4,7
74:11,14 75:20
76:1 80:8,11 82:6
82:9 92:7 100:15
111:5 156:19
**market** 14:18 56:3
56:3 58:6,13
**marketing** 111:15
111:16,18 113:1
**marking** 156:21
**mark.mcpherson...**
116:7
**massive** 22:10 37:5
39:5 40:17 67:15
**mate** 28:11,15
35:19 139:14
**material** 29:10
**matter** 7:7 27:4
36:20 38:12 40:12
46:16 84:6 97:22
135:21
**matters** 130:6,8,11
**McPherson** 115:14
**mean** 21:15 28:16
28:17 37:16 39:2
39:21 40:7 50:6
50:11,14 78:2
86:21 89:19
108:10,14 118:11
119:6,20 141:6
142:9 143:22

150:1,18 154:21
165:8 166:9,13
167:15,15 169:4
**meaning** 71:14
**means** 48:18
**meant** 21:15 42:11
49:2,8,14 56:13
69:19
**mechanics** 61:15
**media** 7:5 91:1
149:7
**medical** 21:13
**medication** 10:17
**meet** 15:4 85:4
88:22 156:10
**meeting** 68:16,19
69:3,4,9,11 70:1
70:13,15,19,22
71:5 150:2
**meetings** 36:15
123:17
**Melissa** 116:1
**Melissa.crossma...**
116:6
**member** 118:8
119:16 127:18
138:15
**members** 78:21
**membership** 79:8
**memory** 159:21
**mentioned** 99:6
108:20 132:15
170:3
**mess** 118:19
**messages** 87:20
**MESTRE** 3:17
**met** 8:22 14:20,22
15:2 16:1 37:6
97:7 153:2
**Miami** 3:4
**mic** 44:8
**Michael** 45:3,8
46:2 53:8,21 55:5
57:21
**microscope** 23:16
**middle** 45:17

106:22
**midway** 58:4
**million** 26:9,12,14
53:15 54:4,9 56:4
60:11,13,20 61:4
61:11 63:2,15
64:14 65:9,18
66:15
**millions** 26:17
**Mind** 129:9
**mine** 11:13 133:19
142:11
**mined** 34:3 140:2
140:13 141:15,17
143:4,17,22
**mining** 50:6,16,18
139:10 140:19
142:3,12,17,21
143:10
**minute** 41:8 82:13
**minutes** 78:7
**mischaracterize**
92:17
**mischaracterizes**
58:21 59:6
**mischaracterizing**
140:15
**missing** 170:4,5
**MIT** 126:16
**mobile** 92:2 142:8
142:13
**mom** 66:17
**moment** 44:19
74:17 76:7 93:18
**money** 23:3,8 29:11
39:1 40:9,20
43:15,17,22 44:1
96:11 99:9 101:6
101:9 107:18
108:1 110:21
123:1,5,15 125:15
134:6 135:5,17
136:13 137:10,15
137:17 138:10,18
147:17,18 161:20
**monitoring** 134:19



134:20
**month** 103:15
106:8,8,8
**months** 42:7
104:19 109:22
110:1 130:13,15
134:2
**morals** 145:11
**morning** 8:20,21
84:4,8,20,20
**motion** 70:6
**motions** 69:19
**move** 42:6 44:8
133:21 147:7,14
**moved** 37:2 70:1
**movement** 165:22
**moving** 22:3 37:21
132:8 159:17
**Mt** 63:2
**MYOB** 6:11 82:16
82:19
**M-Y-O-B** 82:16

**N**

**Nadine** 111:19
**name** 8:22 9:10
101:16 109:2,3
111:20,22 115:12
115:22 153:11,12
153:13,14 157:11
157:14 159:2,7
164:18
**nationally** 88:13
**naturally** 158:6
165:8
**necessary** 128:14
**need** 10:9 11:22
12:1 72:15 76:22
109:20 116:22
167:7,17 168:1
**needed** 69:13 77:3
91:13 157:17
166:3
**needs** 26:20
**negotiate** 122:17
**neither** 172:13

**never** 9:3 34:11
85:20 97:7,9
101:3,4,5,10
104:1 108:5
114:15 117:13
118:20 131:21
134:3,8,11 135:4
135:15 136:12,13
138:1,19 140:1
145:20 146:3,5
148:1 153:2
156:13 163:19
**new** 2:8 3:8,12,18
3:18 5:21 16:20
19:18 20:6 22:4
22:10 34:4 36:19
37:4 39:11 68:11
69:20 88:6 92:11
99:11,20 107:20
108:4 112:4 124:2
141:18 144:1
**news** 66:16
**Nicholas** 155:21
156:1,4,8,10
**night** 39:20
**nine** 104:19 109:22
130:12,15
**noble** 119:6
**normal** 37:3,14
**Normally** 72:8
109:11
**North** 147:4
**Northwest** 2:8 3:12
**Notary** 2:14 172:21
**noted** 46:2
**notice** 36:2 136:12
162:6
**noticed** 23:1 170:2
170:3
**November** 1:15 2:4
7:14 103:18 105:6
170:22
**number** 7:5,13
18:21 24:3 32:8
41:19 42:22 44:13
52:15 54:16 55:13

57:8 59:18 62:4
64:19 65:22 68:3
74:10 75:19 80:7
82:5 91:21 92:2,6
100:14 111:4
150:22 151:4,8,16
156:18
**numbers** 130:20
131:10
**N-A-D-I-N-E**
111:21
**N-I-C-H-O-L-A-S**
156:2

**O**

**oath** 10:1
**object** 52:4 61:18
79:3 140:4,14
142:1 154:13
**objection** 17:9 28:1
30:3,9 31:1,6,14
34:15,20 35:2
36:4 38:6 39:6,14
40:19 42:14 43:19
45:5 47:9 48:1,20
49:5,16 50:9,15
51:9 52:11 54:6
54:11 56:11,20
58:20 59:5,17
61:1,7,13 63:4,16
64:17 65:20 67:1
67:17,21 71:19
72:8,9,12,21
73:13 75:8 77:5
77:12,19 79:1,4
83:9 102:11 103:3
160:18,22 162:21
167:3 169:5
**objections** 59:10
**obtained** 139:9
**occasions** 97:19
**occur** 69:9
**October** 19:7,16
20:7 21:4 27:20
53:4 74:1,3
101:22 103:19

105:6,7 116:17
120:18 124:5
157:7
**odd** 118:6 119:14
**office** 23:14,22 24:1
27:3 45:3 53:8,9
88:6,7 101:5
112:4 115:6
130:20
**officer** 31:22 33:15
115:11,13
**offices** 2:5 7:17
92:10
**oh** 26:18 27:11,17
35:14 38:11 85:11
90:21,22 127:12
141:17 146:11,14
146:20 147:2
152:6 161:17
**okay** 10:13 11:4,10
11:11 12:4,5,20
13:8 14:3,13,19
15:21 16:2,14
18:3,5,8,12 19:15
19:19 20:9,19
21:3,14 23:21
24:2 25:9,11 27:8
27:18 28:8,13
30:5,14,18 32:3
32:18 35:13,15,22
36:7 39:9 41:4
42:19 43:3 44:3
44:12 45:2,10
48:8 50:5,20
52:18 56:17 57:11
58:16 61:19 63:6
64:5,8 67:13
70:17 71:3 73:5,8
74:6 77:22 80:1
81:17 82:4,22
83:13 85:17 86:15
87:16 88:4 89:6
89:11,17 90:3,8
91:10,13 92:13,16
93:17,22 98:21
99:21 100:9 101:8

101:14 104:2,13
104:19 105:8
108:20 109:3,14
110:8,12 111:1,11
112:7,15 113:17
114:17 116:8
117:15 120:7,12
120:19,22 123:7
124:8 125:16
126:19 131:20
132:7,22 133:5,11
133:20 134:4,14
137:13,18 138:7
141:3,20 142:15
143:3,16 144:5,20
145:12,17 146:9
146:13,21 147:10
148:19 149:15,22
151:13 153:8,15
154:3 156:3,15
157:4,9 161:4,12
161:15 162:4,14
164:22 165:1
167:8 168:9,13
**once** 30:12 36:18
138:17 147:16
**ones** 45:15 46:6
135:6 145:22
158:4
**ongoing** 64:4
**on-board** 99:20
**on-boarding**
104:17 105:16
109:16
**open** 68:8
**operation** 25:17
66:17
**operations** 149:20
**opinion** 123:5
**opposing** 30:8
**options** 142:10
**orally** 169:10
**order** 81:10
**ordered** 166:22
**orders** 70:3
**original** 6:19,20



49:20
originally 37:6
  85:22 152:7 159:2
outcome 123:1
  172:19
outside 14:8 67:13
outward 39:5
overnight 41:3
oversee 16:5
  157:22
owed 107:11
owned 63:14,14
  64:15 70:6

**P**

package 82:17,18
  109:13
page 4:1,5 5:3 6:3
  19:20 32:19 33:19
  34:1 50:21 60:4
  66:8 69:22 112:15
  116:8 121:14,22
  128:7
pages 121:15
paid 23:8 40:2
  101:4 102:9,22
  104:3 125:4 134:1
  134:8 135:4,5
  136:16 138:18
  157:21 158:7
  161:19,20
PanOptiCrypt
  80:21
paper 25:22 119:16
papers 120:5
paperwork 29:9
  69:13 118:20
  159:11 164:2
paragraph 33:20
  46:10 53:14 55:22
  66:15 68:13 69:3
  71:4,9
Parkinson's 48:16
part 14:15 33:7
  46:21 49:15 50:12
  70:15 82:1 83:5

106:20 134:18
  135:20 167:15
parties 70:5 172:14
  172:17
partner 28:14,16
  28:17,18,20
parts 48:12 95:15
party 39:18 94:9,10
  94:11,16 103:9
  106:19 122:20
Paschal 3:16 4:2
  8:8,8 11:12 17:9
  24:18 25:2 28:1
  30:3 31:1,6,14
  34:15,20 35:2
  36:4 38:6 39:6,14
  40:19 42:14 43:19
  44:4 45:5,21 47:9
  48:1,20 49:5,16
  50:9,15 51:9 52:4
  52:11 54:6,11
  56:11,20 58:20
  59:5,8 61:1,7,13
  61:17,20 63:4,16
  64:17 65:20 67:1
  67:17,21 71:19,21
  72:4,13,18,22
  73:1,3,7,13 75:8
  77:5,12,19 79:1,4
  81:5,15,18,22
  82:4 83:9,16 84:3
  84:5 92:4,8 95:7
  95:10 100:16
  102:13 103:4
  111:6 122:1,3,6
  140:5,16,21 142:2
  148:3,11 151:15
  155:1 156:20
  160:19 161:3
  163:2,13 167:4
  168:15 169:5
  170:11
pass 112:9
passed 35:20 36:18
  42:7 48:14 96:19
  96:20,20 116:16

116:18 117:3
  118:8,22 120:10
  120:17
passes 119:11
passing 38:16,18
  40:8 69:13 115:2
  120:21
passion 116:14
passport 88:19
patent 6:17 154:3
  154:16,17 157:10
  157:15 160:1,3
  161:6,14 163:6,12
  165:20 166:19
patents 15:13
  126:22 154:7
  157:1 158:1,4
  162:2
patient 114:19
pay 40:14 96:7,11
  101:7 103:22
  122:18 134:5,18
  135:6 136:5
Payday 96:21
paying 135:22
payment 104:1
  137:9,18,19,20
PE 70:16 73:16
  104:18 129:7
people 69:6 95:21
  104:9,17 108:3,18
  113:4 119:7
  145:13 158:13
  165:10 166:14
  167:12 168:1
percent 34:4 48:2
  58:5,12,18 59:2
  69:1,2 126:14
percentage 123:6
Perez 3:16 8:12
period 16:8 21:20
  75:3 86:14 105:19
  106:2,9 107:14
  109:18 117:7
  131:6 133:15
  138:8

person 85:4 102:10
  103:1 113:1
  115:15 153:9
personal 1:3 7:8
  62:18 151:11
personality 38:22
personally 26:19
  28:5
person's 115:22
phone 85:19,19
  87:6 91:21 92:1
  96:7,8,11,12
  142:9 148:13,16
  149:2 150:11,22
  151:3,16 153:19
physical 26:5 38:3
  88:7 135:17
physically 16:1
  20:14 86:4 89:21
  91:6 155:16
  161:20
physicals 24:20
picking 76:19
picture 99:22 100:2
piece 119:16
Pinder 21:1 105:22
  127:13,16,17
place 11:18 120:8
plaintiff 8:5,7
Plaintiffs 1:5 3:2
  4:11 18:19 32:12
  121:4 169:16
plaintiff's 32:14
plans 108:10
platform 73:17
please 8:1 9:10 11:5
  59:16 73:15
  111:20 151:8,21
  155:22
plenty 126:15
Plus 91:22 151:17
pocket 135:18
point 10:5 15:14
  16:7 69:4 81:3
  125:8 126:22
  133:17 158:17

points 70:1
pop 66:17 150:18
position 21:8
positions 35:8
positive 18:7 82:17
posted 91:3
posts 149:7,11
potentially 19:8
Preemptive 17:20
  169:22
present 3:21 69:6
  71:5 84:14 85:1
  88:3
pressure 77:17
prestigious 107:3
pretty 145:15
  168:13
previous 35:14
previously 40:18
principal 128:3
print 24:22
printing 18:13
prior 21:21 38:15
  40:5,6,7 105:16
  120:20 137:8
  163:6,7
privacy 126:9,11
  126:18 127:5
private 147:19
  148:1
probably 119:18
  127:21 152:14
  159:6
problem 122:21
problems 38:2
  110:10 126:17
proceed 8:3
PROCEEDINGS
  7:1
process 81:14
  116:18 119:6
  123:18 154:5,11
  155:7,8 158:7
  162:2 163:5 166:4
processed 103:22
produced 18:17



24:9 41:18 43:5
44:18 52:20 54:21
57:12 60:1 62:7
65:1 66:5 74:15
76:2 80:11 82:9
**product** 16:5
**Professional** 2:11
**professions** 123:4
**profile** 6:16 111:10
111:12,14 129:3,8
**program** 6:11 13:6
82:16
**programming**
155:12
**project** 16:20 46:21
48:12 49:15 50:6
50:11,13,14
134:18 151:14
**projects** 14:5 22:4
28:12 29:1,4,6
74:4 75:1,5,11,13
75:16 78:2 99:20
121:5 124:6,18
132:18
**property** 29:4
71:17 73:11 74:7
75:5,16 79:11,18
97:6,10 98:11
134:8 144:9
160:15,16 166:8
167:1
**protection** 168:1
**provide** 151:21
**provider** 155:5
**Pty** 17:16,20 18:6
20:2,4 25:16 34:6
**public** 2:14 126:11
167:20 172:21
**publically** 26:22
**publicly** 55:16
**pull** 18:14 167:17
**purchase** 76:12
**purchased** 141:3,4
141:9 143:13
**purchases** 141:11
**purely** 23:15 98:3

118:12 138:13
**purpose** 21:11 88:5
**purposes** 51:21
70:3
**put** 23:16 108:18
112:13 113:11
124:3 127:7,9
130:9 134:7 149:8
157:2
**putting** 124:22
131:8 155:12

--- 

**Q**

**qualifications**
125:1
**Queensland** 9:15
9:18 12:11 13:5
112:20 113:18
**question** 11:4,9
30:10,11 49:9
61:16 64:13 79:3
79:5 97:8 101:11
106:5 123:8
142:16,20 163:3
169:9
**questioning** 33:8
139:2
**questions** 72:15
83:15,17 117:1
131:16 168:19
170:10,11
**quicker** 127:4
**quickly** 38:17
132:10
**quite** 105:18 135:8
140:19 150:19
**QUT** 113:19

--- 

**R**

**R** 1:12 8:14
**Ramona** 39:19
43:12 58:1 74:18
76:5 104:11
152:14
**ran** 130:5,7 141:18
**range** 95:3

**rate** 60:12
**reach** 93:3
**reached** 90:4 92:18
92:21 135:1
**read** 115:5 121:11
169:20 170:14,17
170:18
**reading** 45:21
**realize** 29:18
126:17
**realized** 33:6
**really** 81:10 129:10
132:12
**Realtime** 2:13,13
**reason** 21:7 25:11
25:18 90:6 101:3
126:8 135:3 137:6
147:8 153:1
**recall** 16:14 18:5
20:13 27:7 42:3
53:11 60:17 70:8
70:13 78:19 79:13
82:19 83:3,3 84:9
139:1,18
**receive** 93:9 118:20
131:4 136:10
137:1,14 147:18
169:1,11
**received** 51:17 52:7
101:4,6,10 104:1
136:12,21 137:3
137:10
**receives** 118:22
**receiving** 53:11
58:8 60:17,19
63:21 65:6 66:12
125:15
**recess** 41:11,12
78:11,12 83:20,21
148:7,8
**recipient** 81:4,8
152:17,19
**recognize** 25:7
41:22 43:8 44:21
47:11 52:22 55:2
57:14 60:5 62:9

65:3 66:7,8 68:9
74:17 76:4 80:13
**recollect** 10:20
**record** 7:5 8:2 9:11
11:14,15,18,20
41:8,9,14 78:8,9
78:14 83:18 84:1
99:4 148:5,10
151:10 170:21
172:12
**recorded** 10:4
**records** 19:13
134:7 144:11
**recovered** 135:9
**redaction** 51:11
**Reese** 46:20 48:11
48:15
**refer** 155:9
**reference** 80:20
**references** 82:22
**referring** 43:18
**refers** 50:5
**regards** 22:1 27:3
53:20,22 126:9
149:7 158:19
**Register** 17:18
35:12
**registered** 2:11
157:4
**registers** 34:9
**regular** 88:10
**reimbursed** 134:11
136:14
**relate** 75:10,11
**related** 74:4,7 75:7
79:22 114:4,7,10
114:13 123:9
124:15 172:13
**relationship** 98:3
138:15
**relative** 172:16
**released** 155:6
**relevant** 129:3,4
143:6
**rely** 11:9
**remained** 128:4

**remaining** 34:3
**remember** 17:12
19:9 20:3 24:15
45:10 53:21 58:8
63:21 65:6 66:12
70:19,22 71:1
83:12 92:14 94:21
95:11 101:12
106:3 109:2,3
146:20 153:11
**remind** 10:14
**reminded** 92:9
**remove** 161:8
165:20
**removed** 18:4
27:17 141:21
**remuneration** 6:14
100:18 125:5
**rent** 135:6
**rental** 134:8 144:9
**repeat** 11:6
**rephrase** 49:1 57:3
78:22 79:2
**Replacement**
122:10
**reply** 87:15
**report** 96:21
**reported** 1:20
109:6
**reportedly** 35:1
**reporter** 2:12,12,13
7:21 10:7 44:6
51:22 115:9
170:16 172:1,5
**represent** 84:5
**representative** 1:3
7:8
**represented** 91:10
**Reputation** 124:9
**request** 59:11
**requests** 115:9
**required** 133:4
**research** 1:4 7:10
17:16 20:2,4
22:21 34:2 54:1
71:14 170:1



resign 91:6
resignation 4:6
  19:4 20:13,16
  21:19 90:21
  103:17 105:7
  169:17 170:5
resigned 18:4 19:16
  21:4,6 23:11,12
  27:16 74:3 102:3
  103:18 128:1
  135:11 169:21
resolve 69:15
respond 10:10
  86:12 87:4 168:22
  169:9
response 27:9
  169:11
responsible 95:4
returned 19:17
returns 53:22 77:7
  131:9
review 44:19
right 13:21 20:18
  22:11 26:13,15
  27:10 29:2 37:17
  45:18 47:1,20
  52:1 84:16 85:14
  89:16 93:1,20
  94:4 95:17,22
  98:14 99:1 101:17
  102:1 103:6 105:2
  105:4 107:7,8
  108:17,18 113:2,9
  113:12 114:18
  116:11 117:22
  119:8,12 120:10
  121:8,11,14,15
  129:13 130:13,22
  132:4 134:15
  135:12 136:6
  139:19 141:22
  147:11,15 152:7
  159:9,17 160:15
  161:22 164:20
  167:19 168:7
  170:12,13,18,19

  170:20
rights 158:9 161:10
  162:10 165:3
right-hand 165:18
RIVERO 3:17
road 119:4
Robert 9:12
Roche 3:3,7,7 8:4
  44:7,7,12
Roger 60:8
role 107:6 166:5
romantic 28:16
roof 38:12
room 84:10,14
RPR 1:20 172:4,20
RSA 1:20 172:20
Rubik 26:22 60:8
  73:18
ruin 98:18,19
rules 9:7 10:7
run 99:19 125:1
  127:2,10
Rye 147:4
R&D 22:20,20 23:7
  29:9 33:6 54:1
  76:20 77:7 83:6
  130:19 131:9

_____
S
S 3:11 69:1,7 71:6
salary 102:6 136:16
  136:21 137:1
  138:1
sale 76:17
savvy 167:22
saw 145:18 146:3
  148:1
saying 28:10 104:6
  136:8 139:13
  143:4 162:8
  166:18 169:11
says 20:1 33:1,22
  42:5 43:11 45:14
  46:2,5,13 47:2,5
  47:14 48:9 51:5
  51:15 53:14 55:10

  58:3 60:10 65:9
  66:15 80:16 87:12
  101:22 112:16
  113:17 120:15
  121:10 122:8
scale 110:20
scaling 124:7
  126:17
Schedule 6:14
scheduled 104:2
Schiller 2:7 3:11
  7:18 8:7
school 12:18
Schubert 13:4
scientist 115:20
scientists 115:18
  126:5
Scott 112:1
screen 67:12 81:6
  145:22 147:11,21
search 149:14
second 11:12 12:2
  24:11,16 25:3
  30:18 53:14 66:8
  97:14 102:5,9,22
  134:1 140:9 148:4
  168:14
Secondary 125:9
seconds 121:11
security 36:10
  115:4,8,11,13
  116:10,14 120:9
  120:16 126:4
  164:17
see 20:1 24:13 26:5
  26:18 29:20 32:18
  32:21 33:20 34:7
  37:20 38:5 39:2
  39:12 45:16 46:7
  46:9,18 47:3,5
  50:21,22 51:4,14
  53:13 55:10,20
  58:3 59:13 60:3
  60:15 63:8 65:8
  66:19 67:9 69:7
  76:21 80:18 83:1

  97:5 107:22
  121:18 124:9
  144:6,14,17
  145:18,20 146:9
  146:13 147:6,11
  147:19 154:18
  166:20 168:10
seen 21:3 32:16
  34:14 40:5 82:11
  117:12 145:20,21
  165:2
send 25:8 81:18
  90:9,12,20 112:12
  125:3 147:17
  150:11,12 169:2
  169:12
sending 24:15
  136:13
sense 110:5,11
  154:22
sensitive 129:1
sent 24:5 42:13
  53:1,4,7 55:3,5
  57:15,18 60:5
  62:10,12 65:4
  68:20 74:18 76:5
  80:14 86:3,4,9
  90:18
sentence 45:19 46:4
  65:9 66:14,22
  76:21
separate 148:19
September 20:7
sequence 91:7
seriously 113:2
serve 31:12
served 106:13
servers 141:18
Services 7:20,22
set 20:6,19 21:20
  67:4 73:16 83:6
  122:15 139:15
setting 73:17 74:5
setup 138:5
seven 72:16 134:2
seven-month

  133:14
shake 10:10,11
share 91:8,9 149:10
shareholder 17:22
  18:6 31:3,5 32:4,6
  33:12 69:16 78:17
  79:16 129:12
shareholders 68:21
  78:21
shareholder's
  68:16
shareholding 68:22
shares 18:2 26:19
  27:15 31:7,10,10
  135:11
shelf 39:22
shift 38:22 39:5
shirts 37:14
shoes 36:22
shop 36:16
short 75:3 149:1
shorthand 172:9
show 25:4 93:10
  100:12 120:8
  151:18
showed 67:11 94:4
  96:21 146:15
showing 99:8
  100:17 111:1,7,9
  146:17 156:21
shown 10:4
side 158:19 165:18
sign 158:8 161:16
signature 171:1
signed 20:8 111:17
  161:9 162:9 165:2
significant 102:19
signoff 158:9
similar 110:19
  123:19,22
similarly 16:6
simple 87:14
single 72:1 107:15
  121:14
sit 27:5
sitting 133:19



six 51:4 73:20
slow 29:17
small 67:3 99:18
smaller 100:1
smart 37:16
snapshot 51:18
    52:9
social 90:22 149:7
socks 37:1
solicitors 55:12
    128:2
solution 14:17 15:7
    15:8,13 16:17
    116:19 154:15
solutions 116:10
somebody 28:22
    118:7 119:11,15
sorry 31:9 36:12
    41:1 46:15 59:22
    63:11 65:13 89:22
    93:9 98:17 116:22
    120:22 140:22
sort 37:14,15 144:7
    150:17
source 163:19
South 3:3 5:21
    68:11 69:21
Southern 1:2 7:12
space 121:14
spaces 73:20
speak 10:14 84:12
    85:17
speaking 144:21,22
    145:8
Spears 53:7
specific 67:9
specifically 24:11
    59:9
spell 111:20 112:2
    153:18 155:22
spend 138:13
spending 40:9
    144:17
spent 40:2 94:7,21
spoke 15:16 85:9
    120:20 136:2

spoken 9:1 85:6
    152:1
Springwood 13:5
staff 22:14 75:3
    99:20 105:17
    109:17 111:16,18
    124:7 132:11
staffing 132:9
stage 15:15 27:13
    69:17 117:9
    118:15 127:1
    154:20 155:2
    163:11
stages 41:6 109:21
    138:5 161:19
stake 34:4
stand 88:2 119:1
start 13:6 16:19
    19:2 22:3 49:20
    101:19 104:18
    108:6 131:8
    153:21 154:11
    155:11
started 9:8 13:18
    15:20 19:9 22:19
    29:14,18 33:7
    36:19 42:6,6
    49:20 74:2 97:21
    98:22 100:3 103:5
    104:9 115:2 131:5
    132:12 154:5
    155:7 158:8 162:2
    163:5 165:6
starts 46:10
startup 109:21
    138:6
stat 55:11
state 9:10 72:21
    135:8
stated 36:10 101:5
statement 61:3
    88:17 98:16
    162:18
statements 50:3
    61:5 139:17,18,21
    140:10 144:15

States 1:1 7:11 36:1
    89:2,4 172:2
station 36:17
statutory 55:11
stay 105:1,4,5,5
    123:3
stemmed 125:17
stepped 151:12
Steve 134:21
    150:19
Steven 149:18,19
    150:5,6,7
stop 64:13 144:21
    144:22 145:8
story 64:5
strange 31:18
    120:6 137:15
strategies 118:17
strategy 133:19
Street 9:18 147:4
stretch 12:1
strike 33:18 35:7
    39:2 49:12 54:15
    63:12 65:14,15
    75:11 78:6 104:19
    117:1 118:6
stronger 15:7
structure 133:20
stuff 117:17
Subaru 37:3
subject 62:15
submitted 5:20
    68:10
subpoena 93:10,12
substance 127:15
sudden 36:21 38:22
    39:4,12
suddenly 38:9
    105:10,13 106:9
    107:17
Suffice 26:16
Suite 3:4
suits 22:10 36:21
    38:4 39:11 98:22
summary 137:9
superannuation

116:21
supplied 130:18
    137:12
supply 87:18 149:1
supporting 149:9
suppose 118:9
supposed 72:7
    137:22
Supreme 5:21 23:5
    68:10 69:20
sure 35:10 44:10
    45:8 77:17 82:11
    87:3 88:2,3 95:16
    113:8 118:21
    128:10,13 130:22
    141:15 150:9
    157:18 158:8
    161:17 163:20
surname 106:3
sworn 8:3,16 10:1
    172:8
Sydney 36:15 73:18
    104:15,16 134:10
    135:4,20 149:21
    150:21
system 44:11 122:8
Systems 2:13 124:9
system-wise 159:12
S-C-O-T-T 112:3

────────────

T

take 9:8 12:2,22
    19:5,19 20:12
    24:10,16 32:15
    41:7 43:7 44:19
    50:6,11,13 51:17
    55:1 56:6 60:3
    61:16 63:10,11
    65:15 68:9 69:14
    74:17 76:7 78:7
    80:20 82:12 83:16
    102:5 113:2 114:1
    114:4,7,10,13
    115:3 121:3
    137:16 148:3
    161:10 165:10

169:15
taken 7:16 9:3
    41:11 78:11 83:20
    110:6 135:11
    148:7 172:6,9,15
takes 25:3
talk 28:3 30:15
    42:10 53:18 56:21
    64:2 71:16 73:10
    87:6,12 95:21
    117:17 156:7
talking 61:21 149:8
    169:2,7
task 132:17 163:16
tasks 132:15
tax 12:21 23:22
    45:3 53:8,9,22
    77:7 101:7,9
    106:17 131:9
    134:5
taxation 23:13 24:1
    27:3 101:5 106:20
    130:19
taxes 136:5
team 8:11 16:19
    40:1,13 135:4
tech 126:14
technically 81:8
technologies
    125:17
technology 12:11
    15:11,17 105:19
    108:5 112:21
    113:18 119:4
    124:2,4 125:13,20
    127:3 160:4,5
    164:2 165:11
tee 37:14
telephone 3:7
tell 10:1,18 11:1
    14:19,22 15:8
    21:6 25:9 32:5
    37:15 39:2 48:4
    49:7 54:8,14 55:2
    56:17 57:4 58:16
    59:1 61:10 63:11



64:8,14 65:13
76:10 80:2,4
88:18 89:18 90:1
94:6 97:17,20
121:21 127:15
140:6 150:14
166:10,10
**telling** 76:11
**ten** 40:1 78:7
116:17
**terminal** 117:8
**termination** 102:1
103:22
**testified** 8:16 84:6
93:17 94:3 109:7
128:9,20
**testimony** 59:7
128:22 172:7,8,12
**text** 87:20
**thank** 20:9 35:13
50:20 52:14 54:22
64:12 122:2
**theme** 75:12,15
79:11,17,21 121:7
125:10
**thing** 49:22 107:21
134:15
**things** 36:14,17,18
91:2 93:19 121:7
132:9 133:8
**think** 30:19 38:1
42:15 81:11 124:9
126:1 134:13
140:11 142:12,17
143:9 147:5
162:17,22 163:4
165:15 168:13,15
170:12
**third** 19:21 89:11
**thoroughly** 167:14
**thought** 23:4,9 91:4
107:22 118:19
153:3
**three** 72:18 85:8
145:5,6 148:18,19
**threw** 120:5

**throw** 119:15
**tier** 107:1
**ties** 22:10
**time** 7:15 16:9
21:12 23:2 27:18
32:3 34:13 39:10
41:5 70:11 72:14
74:1 75:3 77:17
84:15 85:9 88:19
93:8,19 96:8
105:8,19 106:2
109:19 111:11
138:8,13 140:20
150:19 157:22
164:8
**times** 9:1 23:13
30:8 64:14 85:6,8
139:4 146:11
**title** 31:21 47:19
**today** 7:14,19 10:1
10:17 11:2 14:18
73:21 84:10 93:10
93:13 115:5 156:8
160:3
**today's** 150:1
**told** 9:3 30:19 61:6
77:22 79:10 98:8
140:1 143:2,3
146:5 163:17
**tome** 151:21
**top** 19:2,6 32:19
33:20 39:22 45:18
51:4,14 60:4
80:13 95:2,3
**total** 110:5,11
**totals** 63:2
**tough** 51:20
**track** 123:16
126:12 141:5
159:14
**tracking** 124:12
**trail** 141:7
**train** 36:17
**training** 12:22
124:13 138:12
**transactions** 46:3

126:12
**transcribed** 172:10
**transcript** 6:20
**transcription**
172:11
**transfer** 25:19
133:7 145:19,21
147:6
**transferred** 123:2
**transfers** 146:3
**trash** 119:15
**travel** 88:9,16
134:9
**travelling** 40:9
148:14
**travels** 14:15
**treat** 145:14
**treats** 145:13
**trouble** 18:13 22:2
**true** 172:11
**trust** 20:20 21:2
170:16
**truth** 10:1,18 11:1
**try** 10:9,14,15 52:2
131:17 165:10
**trying** 18:14 67:4
108:18 116:19
122:15 130:20
132:7 165:13
**turn** 33:19 34:9
36:15 50:21 68:13
69:14 107:18
108:7 112:15
124:19 129:6
130:9 132:8
138:12,17 165:9
**turned** 23:5 131:18
137:16
**turning** 23:7
124:22
**TV** 66:16 81:6
**two** 76:13,14 89:5
90:2,3 92:22 96:3
98:4 112:14
116:10 118:13
121:15 145:5,6

**two-page** 121:13
**type** 29:6 71:17
73:10
**T's** 157:18 159:20
163:21

___

**U**

**Uh-huh** 117:19
127:20 149:4
157:20
**uncomfortable**
99:14,15 131:1
**uncommon** 168:10
**undergraduate**
13:8
**underlying** 125:13
**underneath** 47:15
**understand** 9:22
10:16 11:5 29:3,7
38:20 49:2 51:18
56:7 63:13 65:12
65:17 66:21 72:9
72:10 78:1,5
107:21 108:7,15
121:2 125:12
126:13 138:9
**understanding**
21:9 22:15,16
38:21 39:4 57:1
58:14 69:18 98:15
115:3 132:20
133:20 139:11,12
**understood** 11:9
29:8
**underway** 154:7
**unethical** 134:13
**unfortunately**
73:21
**Unit** 7:5
**United** 1:1 7:11
172:2
**university** 12:8,11
112:20 113:18
**unmarked** 82:3
**unusual** 109:8
**updated** 111:12

**upset** 134:12
**use** 96:12 113:5
118:1 122:18
123:13 129:10
160:3
**U.S** 6:17 23:1,3,8
29:13 70:10 76:17
88:10,13 92:10
93:8 139:14
148:15 165:18

___

**V**

**v** 1:5
**VA** 96:3
**validate** 55:15
**validating** 55:12
**value** 63:1
**valued** 56:3
**various** 17:2
**vehicles** 37:2
**Vel** 8:4,22 84:16
**VELVEL** 3:2
**vel@rochefreed...**
3:5
**vendor** 34:1,1
**vendor's** 33:22
**venture** 34:4
**versus** 7:10 99:19
**video** 3:16 8:12
122:8
**videographer** 3:22
7:4,19 11:15,19
41:9,13 78:9,13
83:18,22 148:5,9
170:20
**VIDEOTAPED**
1:11
**voice** 123:5
**voluntarily** 93:15
**vote** 70:4

___

**W**

**wait** 153:3
**waiting** 24:21 42:8
**waive** 81:12 166:18
170:18,19



**waived** 73:6,7 165:3 171:1
**waiver** 167:5
**Wales** 5:21 68:11 69:21
**walked** 85:2
**wallet** 51:7,15 63:6 67:9
**wallets** 47:18 51:19 51:19 52:9 107:19 138:10 140:8 143:19,21 144:3 145:18,22 146:14 147:22
**want** 16:19 23:10 37:8 72:1,3 87:11 87:12 88:1,2 92:16 101:14 106:4 113:5,8 117:15,17 125:6 127:10 130:21 134:17 161:5 162:14
**wanted** 25:12 75:2 108:15 110:18 112:7 118:21 121:1 157:17 159:4,15
**wanting** 108:9,12 135:16
**Washington** 2:9 3:12 7:17 88:11
**wasn't** 21:7 25:18 33:16 37:6 77:9 87:10 95:1 129:4 130:5 132:13 137:1 138:3,4 149:13,16,17 156:16 162:1 164:2 166:16
**watches** 36:22 38:4 39:11 99:6
**Watts** 6:5,6 58:1 74:19 76:5 104:11 152:14
**way** 16:18 29:19 30:9 37:21 38:13 44:8 97:14 99:16 105:5 108:17 110:16 132:8 137:6 145:10,13 160:1 168:6
**ways** 71:22
**weakest** 168:4
**wealth** 39:13 41:3 94:4 97:3 144:7
**wealthy** 67:20 68:1
**wear** 36:22 138:17
**wearing** 36:13 98:22 164:8 166:7
**website** 167:17
**week** 89:5
**weeks** 89:5 90:2,3 92:22
**went** 37:4 38:11 60:8 73:19 119:4 145:10 154:16
**weren't** 14:7,9 21:16 132:2 133:14 146:4
**Westlake** 9:15
**we've** 15:13 59:14
**whatsoever** 101:6 115:1 153:7,17
**White** 21:22
**wife** 94:8 104:11
**willing** 81:12
**Wilson** 1:12 2:3 4:4 4:9,13,15,18,20 5:2,4,7,9,13,16,18 6:2,4,6,9,17 7:6 8:14,20 9:12 12:5 18:21 19:6 20:10 24:3,8 30:19 32:8 32:11 35:15 41:16 41:17,19,22 42:22 43:3,4 44:9,13,16 44:17,20 45:7,13 52:15,18,19,22 54:16,19,20 55:2 57:8,11,12,14 59:18,21,22 62:2 62:3,4 64:12,14 64:19,22 65:1,22 66:3,4 67:7 68:3,6 68:7,8 69:7 70:2 71:5,16 74:10,13 74:14 75:19,22 76:1 78:16 79:7 79:10 80:1,7,10 80:11 81:3 82:5,9 82:12,15 84:4 92:6 100:14 111:4 125:7 140:9 148:12 156:18 169:15,16 170:3
**Wilson's** 4:6 6:13 6:16
**winding** 137:5
**window** 117:21
**wine** 95:3
**Winkler** 67:4
**Winkly** 66:18
**wished** 127:4
**witness** 8:3,15 25:5 31:7 35:3 36:5,13 38:7 39:7,15 40:20 42:15 43:20 48:2,21 49:17 50:16 52:1,12 54:12 56:21 61:8 61:14,19,22 63:17 64:18 65:21 67:2 67:22 77:6,13,20 81:21 95:6,9 102:12 115:10 140:18 151:13 154:14 160:20 161:1 162:22 170:19 172:6,8,12
**WK** 70:18
**work** 9:17 14:3 44:11 75:2 82:20 103:13 109:20 127:5 131:12,13 131:17 133:16 150:7 156:12 168:11
**worked** 27:19 29:21,22 30:6 49:18 78:1,2,5 105:18 159:12
**working** 11:13 13:14,19 14:1 15:5 16:16 19:9 19:10 21:21 22:3 22:8 28:11,22 73:17 75:17 79:12 110:14 115:19 134:16 139:14 153:21 163:14,15
**works** 146:15
**world** 14:16 66:16
**worried** 138:3
**worry** 35:14
**worth** 63:15 65:18
**wouldn't** 110:4 113:11,14 128:17 141:12 143:14 147:14 162:9 164:14 165:12 167:2
**wound** 70:4
**Wright** 1:6 4:9,13 4:15,17,20 5:4,6,9 5:12,15,18,20 6:4 6:6,8 7:10 8:9,11 14:20 15:1,2,16 16:15 17:1 19:10 27:19 44:21 68:10 69:1,7 70:5 71:6 79:12,15 84:5 86:7 91:1 93:19 101:6 107:9 122:16 129:13 139:8 140:1,11,12 141:9 144:21,22 145:9,17,19 146:2 147:20 149:12,21 152:12 153:22 154:4 156:10 157:2 158:10 161:1,8,9,15 163:10 164:4,8,16 165:20,21 166:6 167:10 168:5
**Wright's** 107:16 138:22 144:11
**write** 87:22 155:17
**writes** 68:15
**writing** 20:13
**wrong** 23:19 105:14 130:16 158:1 160:9,13
**Wythe** 3:8
**W&K** 1:4 7:9 33:2 33:3,6,9,12,15 34:2 68:17,22 70:7 71:1,14 76:16 78:17,19 79:8 170:4

**X**

**XBT** 47:6 53:16 60:10 65:9
**Xero** 27:12 82:18 109:12,12
**XE.com** 60:12
**XFINITY** 96:15

**Y**

**YDF** 25:13 105:19 110:17 118:11 125:20 127:18 138:15
**Yeah** 155:14
**year** 12:14 48:15 77:14 85:12,13,14 86:8 90:5 103:15 128:1 145:4
**years** 96:3 127:19 145:1,3,6 147:1 168:9
**Yep** 19:22 24:14 89:10
**York** 2:8 3:8,12,18 3:18 19:18 20:6 88:7 92:11 112:5
**Young** 107:2

**Z**

**Zalman** 3:15 8:10
**zero** 32:2 90:14
**zkass@riverome...**
  3:19

**$**

**$100** 54:4,9
**$15,000** 40:2
**$16.4** 56:4
**$165** 65:18
**$30** 26:14
**$40** 26:12
**$5** 66:15
**$53** 63:15

**#**

**#13959** 1:21 2:14

**0**

**0043726** 122:1

**1**

**1** 4:6 7:5 18:20,21
  32:19 51:3 60:13
  60:20 61:4,11
  101:20 169:16,16
**10** 5:9 59:18 60:1
  103:18 106:8
  110:1 120:13
**10s** 26:16,16
**10/12/2013** 5:5
**10/2/2013** 4:21
**10/23/2013** 4:7
**10/29/2013** 6:15
**10/6/2013** 5:7,16
**10/9/2013** 4:18
**10:01** 78:12,14
**10:07** 83:19,20
**10:14** 83:21 84:1
**100** 6:14 48:2 53:15
**10017** 3:18
**108905** 18:18
**108905-108908** 4:8
**108907** 19:20
**108908** 18:18

**11** 5:12 32:19,20
  33:19 60:11 62:3
  62:4 101:22 106:8
  110:1
**11:04** 148:6,7
**11:20** 148:8,10
**11:39** 170:22 171:2
**111** 6:16
**111,000** 56:8
**111,114** 56:1
**11249** 3:8
**113043** 5:11 60:2
**11401** 3:12
**11420** 9:18
**12** 5:15 15:22 64:19
  65:1 102:15 162:1
**12-month** 21:20
  117:7
**13** 5:18 16:1 27:21
  65:22 66:4
**14** 5:20 68:3,7
  102:17 172:22
**14/354359** 165:18
**1410** 2:8
**14354359** 6:17
**15** 6:4 74:10,14
  121:4
**15th** 9:12
**15,000** 95:2
**150** 138:1
**156** 6:17
**16** 6:6 75:19 76:1
**16th** 68:17 69:4
**165** 65:9,13
**168** 4:2
**17** 6:8 80:7,11
**18** 4:6 6:11 82:5,9
**185** 3:8
**19** 6:13 92:6
**1933** 55:18
**1980** 9:13

**2**

**2** 4:9 24:3 51:3
**2nd** 53:4
**20** 6:14 100:13,14

**121:11** 137:2
**200** 3:3
**2000** 27:20
**20005** 2:9 3:12
**2004** 13:7,18,19
**2006** 12:16
**2008** 13:7,12,17
**2010** 14:2,4 116:17
  120:15,18 154:6
**2011** 14:12 19:13
  27:20 116:16
  120:10 154:1
  157:5,7 161:21
**2012** 15:3,20 19:14
  154:2 157:13
  165:5
**2013** 19:7,16 21:4
  27:20 35:4,7,9,16
  53:5 68:16,18
  69:5 71:18 73:12
  74:2,8 94:1,11
  100:10 101:20,22
  103:5,8,18 104:7
  124:5,6 136:18,20
  147:2
**2014** 16:12,13
  127:21,22
**2016** 127:21
**2019** 1:15 2:4 7:14
  170:22
**202-237-2727** 3:13
**2021** 172:22
**21** 6:16 111:3,4,8
**22** 6:17 156:18,22
**23** 68:13 69:4
**23rd** 19:7 105:7
**24** 4:9 69:3 71:4,4
**24-hour** 86:14
**25094** 4:19 44:18
**25095** 50:22
**26** 71:9
**261** 92:11
**262775** 6:12 82:10
**266797** 4:16 43:6
**267325** 6:10 80:12
**28** 157:7

**28015** 4:14 41:18

**3**

**3** 4:11 32:8,12,19
  32:20 34:1 51:3
  112:15
**30th** 77:1,4,10,18
  131:7
**30127** 5:14 62:8
**305-357-3861** 3:5
**31588** 6:7 76:3
**32** 4:11
**323,000** 34:3
**33131** 3:4
**361** 9:15

**4**

**4** 4:13 41:17,19
  51:3
**4B** 33:20
**41** 4:13
**42** 4:15
**43726** 6:5 74:16
**438,000** 62:20
**44** 4:17
**45457** 5:5 54:21
**45496** 4:10 24:10
**46093** 5:8 57:13
**46098** 5:17 65:2
**467687** 5:19 66:6
**49.5** 34:4

**5**

**5** 4:15 33:19 42:22
  43:4 51:3 58:5,12
  58:18 59:2
**5/5** 75:2
**50** 69:1,2
**500,000** 63:19
**51** 126:14
**52** 4:20
**528739** 1:22
**53.8** 63:2
**54** 5:4
**5500** 3:4
**553926** 4:22 52:21

**565** 3:17
**57** 5:6
**57,000** 62:21
**59** 5:9

**6**

**6** 4:17 44:13,17
**6/26/2013** 4:14
**61-416-176-816**
  91:22
**61-417-261-542**
  151:17
**62** 5:12
**64** 5:15
**65** 5:18
**68** 5:20

**7**

**7** 4:20 52:15,19
**7th** 3:18
**7/18/2013** 5:13
**7/2/2013** 4:16 6:7
**74** 6:4
**75** 6:6

**8**

**8** 1:15 2:4 4:2 5:4
  7:14 54:16,20
  103:8 170:22
**8th** 104:7
**8/11/2013** 6:5
**8/8/2013** 6:9
**8:36** 2:5 7:15
**8:38** 11:16
**8:39** 11:20
**80** 6:8
**80176** 7:13
**82** 6:11
**83-4** 5:22 68:7
**83-5** 4:12 32:13
**84** 4:2

**9**

**9** 5:6 32:19 57:8,12
  92:12 106:8 110:1
**9/20/2013** 4:10



**9/23/2013** 5:10
**9/27/2013** 5:19
**9:07** 41:10,11
**9:12** 41:12,14
**9:18-cv-80176-B...**
  1:4
**9:49** 78:10,11
**907** 20:2
**918** 7:13
**92** 6:13
**929-457-0050** 3:9





23 October 2013

The Directors
Coin-Exch Pty Ltd
43 St Johns Avenue
Gordon NSW 2072

Dear Craig

I am no longer able to continue as a director of the company and hereby submit my resignation to take effect immediately.

Yours sincerely

Jamie R Wilson

23 October 2013

The Directors
Hotwire Preemptive Intelligence Pty Ltd
43 St Johns Avenue
Gordon  NSW  2072

Dear Craig and Ramona

I am no longer able to continue as a director of the company and hereby submit my resignation to take effect immediately.

Yours sincerely

Jamie R Wilson

DEFAUS_00108906

23 October 2013

The Directors
Interconnected Research Pty Ltd
43 St Johns Avenue
Gordon  NSW  2072

Dear Craig

I am no longer able to continue as a director of the company and hereby submit my resignation to take effect immediately.

Yours sincerely

Jamie R Wilson

DEFAUS_00108907

23 October 2013

The Directors
Integyrz Pty Ltd
43 St Johns Avenue
Gordon NSW 2072

Dear Craig and Ramona

I am no longer able to continue as a director of the company and hereby submit my resignation to take effect immediately.

Yours sincerely

Jamie R Wilson

CONFIDENTIAL

**From:** Craig S Wright
**Sent:** Friday, September 20, 2013 6:12 AM
**To:** Jamie Wilson
**Subject:** RE: Urgent ASIC



Xero does not allow this right now, but we have the following as the capitalisation.

- Bitcoin
- Intangables
- R&D

Details are following and I am adding BTC as inventory for now.

Craig

**From:** Jamie Wilson
**Sent:** Friday, 20 September 2013 3:39 PM
**To:** Craig S Wright
**Subject:** Urgent ASIC

Hi Craig,

After discussion with Roger Menu yesterday he was excited with the result of the ASIC search of capitalisation of $29,999,800.00 within HotwirePE. My last search on ASIC was 100 shares issued to you and unaware of any additional shares being issued. This has prompted me today to do company search on the following companies with the following shares issued and paid:

- Denariuz Pty Ltd - 8,500,000 with amount paid $8,500,000;
- Coin-Exch Pty Ltd – 40,000,000 with amount paid $40,000,000; and
- Hotwire Preemptive Intelligence Pty Ltd - 10,000,000 with amount paid $29,999,800.

Craig I see you have issued shares to me personally and not unaware this was done already. This needs to be fully accounted for as we are dealing with a publicly listed company. Would you please send through urgently evidence that backs up the dollars to the issued capital for the above companies. Rubik intends to make announcement early next week therefor this must be sorted out over the weekend.

Regards,

Jamie Wilson
Chief Financial Officer
Hotwire Preemptive Intelligence (Group)
Mobile: +61 416 176 816
jamie.wilson@hotwirepe.com



DEF_00045496



# EXHIBIT 5

# CONTRACT FOR THE SALE OF SHARES OF
## A COMPANY OWNING BUSINESS

**PARTIES**

**Dave Kleiman for W & K Info Defense LLC**
(Vendor)

**AND**

**Craig Wright R&D**
**ABN 97 481 146 384**
(Purchaser)

**AND**

**W&K Info Defense LLC**
(Company)

Ref: CEWK03

Case 9:18-cv-80176-BB   Document 511-9   Entered on FLSD Docket 05/18/2020   Page 70 of
214
Case 9:18-cv-80176-BB   Document 83-5   Entered on FLSD Docket 01/14/2019   Page 3 of 11

**THIS AGREEMENT** dated 02 day of April 2013

**BETWEEN**

    Dave Kleiman of W&K Info Defense LLC (Florida)

                                                         (Vendor)

And

    Craig Wright of Craig Wright R&D
    ABN 97 481 146 384

                                                   (Purchaser)

And

    W&K Info Defense LLC

                                                  (Company)

**RECITALS**

A.    The vendor is the owner of all issued shares in the company being ordinary class shares. Ownership is 50% in the vendor's name and 50% in trust held for the purchaser.

B.    The company is the owner of and conducts the business known as Bitcoin mining and Software development / Research.

C.    The vendor has agreed to sell and the purchaser has agreed to purchase the vendor's shares for the price and upon the terms set out hereunder.

D.    As the purchaser will succeed to the business of the company on completion of the acquisition of these shares, the parties agree that they will incorporate into this agreement those agreements contained in the attached contract for the sale of a business to the intent that they shall in relation to the sale of the shares have the rights and obligations contained in such contract as part of this agreement.

E.    The company has consented to and agreed to be bound by the terms of this agreement.

F.    The company includes all software, research material and other aspects of the business.

G.    The parties wish to commit the terms of their agreement to writing in the manner hereinafter set out.

**OPERATIVE PART**

1.  **Interpretation**

    This agreement is governed by the laws of the state of NSW, and the parties,
    submit to the non-exclusive jurisdiction of the courts of that state/country.

    In the interpretation of this agreement:

    (a)  References to legislation or provisions of legislation include changes or re-
         enactments of the legislation and statutory instruments and regulations
         issued under, the legislation;

    (b)  Words denoting the singular include the plural and vice versa; words
         denoting individuals or persons include bodies corporate and vice versa;
         references to documents or agreements also mean those documents or
         agreement as changed, novated or replaced, and words denoting one
         gender include all genders;

    (c)  Grammatical forms of defined words or phrases have corresponding
         meanings;

    (d)  Parties must perform their obligations on the dates and times fixed by
         reference to the capital city of the state of Sydney;

    (e)  Reference to an amount of money is a reference to the amount in the
         lawful currency of the Commonwealth of Australia;

    (f)  If the day on or by which anything is to be done is a Saturday, a Sunday or
         a public holiday in the place in which it is to be done, then it must be done
         on the next business day;

    (g)  References to a party are intended to bind their executors, administrators
         and permitted transferees; and

    (h)  Obligations under this agreement affecting more than one party bind them
         jointly and each of them severally.

2.  The vendor hereby agrees to sell and the purchaser hereby agrees to purchase
    ordinary class shares in the company for the purchase price as noted below:

    (a)  Two (2) loans issued under deed "CEWK01" are agreed to be repaid in
         full for the consideration of 300,000 Bitcoin agreed in the contract. The
         repayments as a one off of both loans for $20,000,000 with a total value of

$40,000,000 are deemed paid in full for the above value. This is noted as consideration from the purchaser and is issued in forbearance of the requirements of the contract signed 22 April 2011 between the Vendor/Company and the purchaser (designated CEWK01).

(b) The vendor agrees that the paper wallet with address "1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a" held in escrow will be released to the purchaser.

(c) Due to the unexpected rise in the value of Bitcoin, it is agreed that two transfers (in Bitcoin) of BTC 125,000 and BTC 125,500 when taken in conjunction with the supply of the software, will suffice to fulfil the contract.

3. Hence, the vendor will:

(a) Pay (transfer to) the purchaser 250,500 BTC on 30 April 2013,

(b) Accept transfer of the escrowed Bitcoin paper wallet to the purchaser,

(c) Transfer the ASC hardware to the purchaser,

(d) Release the source code to the purchaser.

(e) Transfer the Vistomail email account.

(f) Transfer all research materials from the four (4) DHS BAA research projects to the purchaser with all notes, data and results, and

(g) Transfer any shares in the company to the purchaser by 30 April 2013.

4. The Purchaser will:

(a) Accept the new terms in full satisfaction of the contract with Reference CEWK01 made between the vendor/company and the purchaser on 22 April 2013.

(b) Accept the vendor's 323,000 remaining "mined" Bitcoin as a 49.5% stake in a new venture to be formed in Australia (to be called Coin-Exch Pty Ltd) between the vendor and the purchaser for the exploitation of the joint and to be pooled Bitcoin

(c) Accept the transfer of the 323,000 Bitcoin (to be made on the 30th April 2013) as capital and note that shares in the new enterprise will be issued at this point.

Case 9:18-cv-80176-BB   Document 511-9   Entered on FLSD Docket 05/18/2020   Page 73 of
214
Case 9:18-cv-80176-BB   Document 83-5   Entered on FLSD Docket 01/14/2019   Page 6 of 11

(d)   Provide $30,000,000 in capital into Coin-Exch Pty Ltd (to be formed) and
the software developed in the prior venture.

5.   Settlement shall be effected on 30 April 2013.

6.   So far as they are relevant the agreements contained in the incorporated
contract for the sale of a business shall be agreements between the parties
herein.

7.   In the event of either party failing to complete this agreement on the settlement
date then the other shall be entitled at any time thereafter to serve a notice to
complete requiring the other to complete within 14 days from the date of service
of the notice, which time period is considered reasonable by both parties. For
the purpose of this contract, such notice to complete shall be deemed both at
law and in equity sufficient to make time of the essence of this contract.

8.   On the settlement date the vendors shall:
(a)   Deliver up to the purchaser possession of the business conducted by the
company and in all respects shall have complied with the terms of the
business sale contract incorporated herein;
(b)   Deliver up to the purchaser duly executed instruments of transfer of their
shares;
(c)   Cause a meeting of the directors of the company to be held at which the
directors shall approve and consent to the sale and transfer by the
vendors to the purchaser of the vendors' shares.
(d)   Send all software developed under the various DHS BAA filings to the
purchaser (incl. source code and documentation).
(e)   Provide the location and access rights to the ASC mining hardware hosted
at a site known to Mr Kleiman will be returned with this transfer. This has a
nominal value of $8,828,571.29 before depreciation. This is a
(f)   Solutions to the Agent and Merkle Tree problems developed by Professor
David Reese.
(g)   Bitcoin agent software and suit of C/C++/C# and Python Blockchain
software source codes.

(h)   Exchange Bitcoin holdings as noted in the contract.

9.   The company hereby agrees to take all steps and carry out all acts to procure the registration on the settlement date of the purchaser as the registered holder of tile to the vendors' shares.

10.   The purchaser will make all reasonable endeavours to have the new venture (Coin-Exch Pty Ltd) registered for GST and under the Australian Corporations act provisions before settlement on the 30th April 2013.

11.   The parties hereto agree to execute and perform all such acts, deeds, documents and things whatsoever as may be necessary and desirable to better carry into effect the provisions of this agreement.

12.   **Vendor's warranties**
   (a)   **Vendor's authority to sell**
      (i)   The vendors are the registered and beneficial owners of their shares in the company.
      (ii)   The vendors have full power and authority to sell and transfer to the purchaser good legal and equitable title to the shares without the consent or authorisation of any person except only consents required by the company.
   (b)   **The company's financial statements**
      Other than matters disclosed to the purchaser in writing the books and accounts of the company truly and fairly reflect the company's affairs.
   (c)   **Books and records**
      The company's books, records and registers are in the possession of the company, and accurately record the details of all of the company's transactions, finances, assets and liabilities.
   (d)   **Taxation**
      (i)   Other than disclosed to the purchaser in writing the company has lodged or filed all tax and duty returns for all taxes including GST, income tax, sales tax, fringe benefits tax, payroll tax, group tax and WorkCare levies.

(ii)   No claim has or will be made against the company for payment by the company pursuant to the provisions of the Income Tax Assessment Act 1936 of any tax which is not shown or included as a liability or provision in the balance sheet contained in the accounts.

(iii)   Neither the commissioner nor any federal, state or municipal body has any dispute with the company concerning the company's affair.

(e)   **Compliance with applicable laws**

(i)   Neither the vendor nor the company has breached, or caused a breach of the company's memorandum or articles of association; any contract, agreement or instrument which binds the company; or any judgment, order, injunction or decree of any court, commission or administrative body relating to the company or to the shares.

(ii)   Neither the company nor any of its officers, agents or employees (while performing their duties for the company) has breached the law. The company has not been notified that it has, or may have, breached the law regulating its affairs or the conduct of its business.

(f)   **Litigation and indebtedness**

Other than as disclosed to the purchaser in writing:

(i)   The company is not a party to, or threatened with, any claim, litigation, prosecution or arbitration in any court, tribunal or otherwise;

(ii)   There are no unsatisfied judgments or arbitral awards against the company;

(iii)   The company is not being investigated for any breach of the law. Neither the company nor any of its directors is aware of any breach of the law or of any circumstances, which would give rise to a breach of the law other than as disclosed to the purchaser in writing;

(iv)   The company has met all deadlines for repayment of its debts;

(v)   No petitions, notices or proceedings have come to the company's notice, which could result in it being wound up. No orders or resolutions have been made or passed to place the company in liquidation or provisional liquidation.

(g) **Accuracy of disclosed information**

    (i)   The vendor has disclosed to the purchaser all information, which would be material for a purchaser in forming a decision whether or not to purchase the shares.

    (ii)   If either the vendor or the company becomes aware of anything which may constitute a breach of, or be inconsistent with any representation, warranty or undertaking in this agreement, they will notify the purchaser of its particulars promptly in writing.

(h) **Warranties and indemnities**

    (i)   It is a condition of this agreement that each warranty is true and correct in every respect and shall be construed separately.

    (ii)   The vendor acknowledges that the warranties have been given with the intention and for the purpose of inducing the purchaser to enter into this agreement.

    (iii)   The purchaser has entered into this agreement and agreed to the purchase price payable for the shares on the basis of and in full reliance upon the warranties.

    (iv)   Prior to the settlement date the vendor will take all such steps and provide all such information and documents with regard to the company as the purchaser may reasonably require and will give the purchaser and its professional advisers full and free access to the records and accounts of the company (whether financial or otherwise) to enable them to fully investigate the accuracy of the warranties.

**13.  Notices**

A communication required by this agreement, by a party to another, must be in writing and may be given to them by being:

(a)  Delivered personally; or

(b)  Posted to their address specified in this agreement, or as later notified by them, in which case it will be treated as having been received on the second business day after posting; or

(c)   Faxed to the facsimile number of the party with acknowledgment of receipt received electronically by the sender, when it will be treated as received on the day of sending; or

(d)   Sent by email to their email address, when it will be treated as received on that day.

## 14.   Waiver or variation

(a)   A party's failure or delay to exercise a power or right does not operate as a waiver of that power or right.

(b)   The exercise of a power or right does not preclude:

(i)   Its future exercise; or

(ii)   The exercise of any other power or right.

(c)   The variation or waiver of a provision of this agreement or a party's consent to a departure from a provision by another party will be ineffective unless in writing executed by the parties.

## 15.   Counterparts

This agreement may be executed in any number of counterparts each of which will be an original but such counterparts together will constitute one and the same instrument and the date of the agreement will be the date on which it is executed by the last party.

## 16.   Further assurance

Each party will from time to time do all things (including executing all documents) necessary or desirable to give full effect to this agreement.

## 17.   Costs

Each party will pay their own costs in relation to this agreement.

Case 9:18-cv-80176-BB   Document 511-9   Entered on FLSD Docket 05/18/2020   Page 78 of
214
Case 9:18-cv-80176-BB   Document 83-5   Entered on FLSD Docket 01/14/2019   Page 11 of 11

**SIGNED AS AN AGREEMENT**

Executed by
W & K Info Defense LLC                )

Dave Kleiman
 DIRECTOR

Executed by
Craig Wright R&D (A.B.N. 97 481 146 384)

Craig S Wright

**From:** Craig S Wright
**Sent:** Wednesday, June 26, 2013 6:06 AM
**To:** Jamie Wilson; Ramona Watts
**Subject:** Some history
**Attachments:** BAA 11-02-TTA 14-0025-WP Software Derivative Markets Cover Sheet A Page.pdf; Proposal White Paper1.pdf; Proposal White Paper2.pdf; BAA 11-02-TTA 01-0127-WP Software Assurance Cover Sheet A Page.pdf; BAA 11-02-TTA 05-0155-WP Scada Cover Sheet A Page.pdf; BAA 11-02-TTA 09-0049-WP Risk Quantification Cover Sheet A Page.pdf; Proposal White Paper3.pdf; Proposal White Paper4.pdf

This is where this started.

All has started to move much faster now. Dave passed a couple months ago, so I am no longer waiting for him to get better.

CONFIDENTIAL

DEF_00028015

**From:** Craig S Wright
**Sent:** Tuesday, July 2, 2013 12:35 AM
**To:** 'Ramona Watts'
**CC:** jamie.wilson@hotwirepe.com
**Subject:** Next

Hello Love,

Well, I said I would be doing something with that money...

https://venture-lab.org/venture/pitch_decks/102

Jamie is on board. I will likely seek 20 or so projects such as this one. That will give us a spread against risk.

My time input is limited to governance and review. I will be supplying money and people. The lead is a professor in Stanford Uni I know.

Have a read, I am sure you will be interested in what it is. Jamie and I are.

Yours,

Craig

CONFIDENTIAL

EXHIBIT
6
Wilson
11/8/19 66
ALL-STATE LEGAL®

**From:** Craig S Wright
**Sent:** Wednesday, October 9, 2013 1:42 PM
**To:** Hardy, Michael
**CC:** 'Jamie Wilson'; Ramona Watts
**Subject:** Discussion

Hello Michael,
As we have noted, all discussions are to remain confidential.

There are a couple recent transactions. For the most part, we will be trading these as sparingly as possible. The main addresses we control as a group include the following ones listed below.
We can mapping and plan to in to our system. For Australian XBT holders and merchants, we will be recording and reporting TFN transactions and recording these. We will have these audited.
For privacy, we are developing a means to hide transactions whilst still reporting tax obligations. We would like to involve the ATO technical teams in this process.
The addresses are in my control now as a matter of fate and other circumstances. David Reese and David Kleiman have both been essential parts of this project. Both of these gentlemen who I had the good fortune to call friends passed away this year. David Reese was a friend of my grandfather before he died of Parkinson's. David Kleiman was my best friend.
The following addresses are not planned to be used. The idea is to have a future reserve function and to be able to backup and bond transactions.
I do have doubts about trusting the ATO with this information. I hope that you understand this. I am not admitting anything to do with the creation of this currency, just that we (and there are remaining others to the we outside of Australia) strongly desire to make a robust online international economy using XBT. At present, we are in the process of finalizing an agreement with a listed Australian company for the development of a core banking solution based on XBT that we plan to deliver globally from Australia. We are seeking to become an ADI and obtain an AFSL.
I hope that you understand the trust we are placing in the ATO and that we do want to roll out a global solution from Australia that
I hope this trust is not misplaced and that this information remains confidential.
The addresses are:

| Wallet (Address) | Balance XBT | $AU | Market |
|---|---|---|---|
| 1FJuzzQFVMbiMGw6JtcXefdD64amy7mSCF | 6,999.00 | $1,012,755.30 | $144.70 |
| 18JPragfuDVHWWG8ABQ15cghJFetnXUjBD | 24,404.51 | $3,531,331.96 | $144.70 |
| 1MyGwFAJjVtB5rGJa32M6Yh46cGirUta1K | 30,000.04 | $4,341,005.95 | $144.70 |
| 12ib7dApVFvg82TXKycWBNpN8kFyiAN1dr | 31,000.04 | $4,485,706.09 | $144.70 |
| 16Ls6azc76ixc9Ny7AB5ZPPq6oiEL9XwXy | 40,000.04 | $5,788,005.95 | $144.70 |
| 1cXNTyXj4xPGopfYZNY5xfSM1EPJJvBZV | 40,000.04 | $5,788,006.10 | $144.70 |
| 16cou7Ht6WjTzuFyDBnht9hmvXytg6XdVT | 53,000.04 | $7,669,106.24 | $144.70 |
| 1FeexV6bAHb8ybZjqQMjJrcCrHGW9sb6uF | 79,957.04 | $11,569,784.36 | $144.70 |
| 1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a | 111,114.60 | $16,078,282.66 | $144.70 |
|  | 416,475.36 | $60,263,984.60 |  |

| | | | |
|---|---|---|---|
| Misc | 3,518.63 | | |
| C01N | | | |
| 1LXc28hWx1t8np5sCAb2EaNFqPwqJCuERD | 34,512.83 | $4,994,006.36 | $144.70 |
| | | | |
| Other | | | |
| 12HddUDLhRP2F8JjpKYeKaDxxt5wUvx5nq | 40,000.04 | $5,788,005.95 | $144.70 |

Other wallet addresses are:
1ALXLVNj7yKRU2Yki3K3yQGB5TBPof7jyo

DEF_00025094



Regards,

Dr. Craig S Wright GSE LLM
Chief Executive Officer
Hotwire Preemptive Intelligence (Group)
Mobile: + 61.417.683.914
craig.wright@hotwirepe.com



CONFIDENTIAL

DEF_00025095

**EXHIBIT 7**
Wilson
11/8/19

| | |
|---|---|
| **From:** | Craig S Wright [craig███████████] |
| **Sent:** | 10/2/2013 3:12:39 PM |
| **To:** | jenna.spears@ato.gov.au |
| **CC:** | 'Jamie Wilson' [jamie.wilson@hotwirepe.com]; 'Hardy, Michael' [Michael.Hardy@ato.gov.au] |
| **Subject:** | Discussion |

Hello Jenna,

As discussed just now on the phone, I would like to have a meeting with Mr Jordan. I have had discussions with Michael Hardy and others, and now we need to move this discussion upstairs.

The group I head has a holding of over $Au 100,000,000 in XBT (Bitcoin).

We are in the process of becoming a fully regulated exchange and bank under APRA provisions.

What most people do not realise is what can be done in the Bitcoin scripting language. Basically, we can have a compliant series of transactions that are managed and mapped to company details such as a TFN for a business.

I would like to discuss this with Mr Jordan and also ensure that we have a regime that suits the needs of the ATO when we go live later in the financial year. We are also offering to teach your people how BTC works and to help you regulated this as a tool in an electronic economy.

Regards,

Dr. Craig S Wright GSE LLM
**Chief Executive Officer**
**Hotwire Preemptive Intelligence (Group)**
Mobile: + 61.417.683.914
craig.wright@hotwirepe.com


Hotwiring the World

CONFIDENTIAL

**From:** Craig S Wright
**Sent:** Saturday, October 12, 2013 4:47 AM
**To:** 'Italia, Mark'
**CC:** Jamie Wilson; 'Hardy, Michael'; Ramona Watts
**Subject:** RE: Notification of audit ABN 48 164 068 348
**Attachments:** Letter to ATO 11-10-13.pdf; 20131011145721820.pdf; abg_13_05_12_financial_31_mar_2013.pdf; abg_13_05_12_financial_31_mar_2013.pdf



Hello Mark,

More information will follow as promised later next week.

Attached you will see a letter in support from one of our suppliers, Rubik. The agreement to use this is from the MD of Rubik under the condition **"As agreed you may use this as a confidential letter to the ATO on the basis it remains a non-public document."** We are not ready to go to market nor to issue a press release on the products as yet, but will be in the next couple months.

I have also attached a Stat Dec from our solicitors validating the control of a number of Bitcoin based addresses. You can validate the amounts held in these publically. For instance at:

http://blockexplorer.com/address/1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a

With a holding in excess of 111,114 BTC the above address we have confirmed control of is valued on market at $AU 16,444,960.83 (See

http://www.xe.com/currencyconverter/convert/?Amount=1&From=XBT&To=AUD). I have signed an agreement to escrow this Bitcoin deposit in support of ongoing contracts the company has with Modulus Financial Software, Rubik Technology Limited and Dallah.

The Stat Dec can be confirmed. The details of our solicitor are:

Stephen D'Emilio

Director

Commercial Litigation

FD Commercial Lawyers

Level 3, 2 Bligh Street, Sydney NSW 2000 Direct dial: +61 2 9221 7289| Fax: +61 2 9221 8601

Mobile: 0412 548 791

I will follow this with transaction details early next week showing transfers of Bitcoin in August. Again, this information is pseudo-anonymous. That is, the information is actually public but is hidden as it is tied to a hash value that is the address. This both acts as proof of a transaction as well as a general ledger in effect. Knowing the addresses, the ATO can track and monitor all transactions. These are for amounts in excess of $5million Au for software and hardware purchases. These are large and unusual amounts, but as you can see for the supporting letter from Rubik, we are doing something new in the industry in building a Core Banking platform.

I will for the contracts from Dallah Group, who are providing platforms for Core Islamic Banking (so we can enter the Indian and Middle Eastern Markets) early next week. To this, I will attach a letter of support from H.E Sheikh Saleh Abdullah Kamel, Chairman And Founder Dallah Group of Companies. I have attached the interim financials for this group who are supporting us and helping supply microfinance software.

Modulus are developing software for us to enable FOR-EX [foreign exchange] and other forms of trading (such as a stock exchange).

As you can see from the link below, core banking is not a cheap exercise:

http://www.zdnet.com/commbank-promises-more-tech-innovation-7000019537/

"The CommBank group's IT costs for the 2013 year include: AU$439 million for applications, AU$236 million for data processing, AU$100 million for desktops, AU$202 million for communications, AU$245 million for software amortisation, and AU$77 million for IT equipment depreciation."

Jamie or myself will send you details of what this is providing during the week as week.

Once we have this to you, please feel free to ask us for anything more. We are more than happy to supply this information to you. We go "live" next year. Right now we are remaining somewhat secret, but as I hope you can see from the supporting letters and other information that we are sending you, this is a serious business concern.

The contract with Rubik and others is for a system that will support 1,000,000 clients in June 30 next year.

Regards,

**Dr. Craig S Wright GSE LLM**
**Chief Executive Officer**
**Hotwire Preemptive Intelligence (Group)**
Mobile: + 61.417.683.914
craig.wright@hotwirepe.com



---

**From:** Italia, Mark [mailto:Mark.Italia@ato.gov.au]
**Sent:** Wednesday, 9 October 2013 2:14 PM
**To:** Craig S Wright
**Subject:** Notification of audit ABN 48 164 068 348

Hi Craig,

Please refer to our notification to retain refund letter.

<<Notify - refund retained.pdf>>

Regards

**Mark Italia**
Indirect Tax | Refund Integrity
Australian Taxation Office
Phone 03 9275 4243

---

DEF_00045457

ATO Centenary | *Working for all Australians*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IMPORTANT
  The information transmitted is for the use of the intended
recipient only and may contain confidential and/or legally
privileged material. Any review, re-transmission, disclosure,
dissemination or other use of, or taking of any action in
reliance upon, this information by persons or entities other
than the intended recipient is prohibited and may result in
severe penalties. If you have received this e-mail in error
please notify the Privacy Hotline of the Australian Taxation
Office, telephone 13 2869 and delete all copies of this
transmission together with any attachments.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**From:** Craig S Wright
**Sent:** Sunday, October 6, 2013 12:57 AM
**To:** Italia, Mark <Mark.Italia@ato.gov.au>
**CC:** Ramona Watts; Jamie Wilson; Hardy, Michael <Michael.Hardy@ato.gov.au>
**Subject:** Email 6: RE: Notification of audit ABN 48 164 068 348
**Attachments:** BITCOIN_18.07.2013.png; Hotwire Transaction INV-0001 (1).png; BITCOIN_GICSR.png; Existing value.png

EXHIBIT 9
Wilson
11/7/19

SysUserProp: 88334F2CCA0D8E51C8530404366F9B82

Hello Mark,
I have CC'd Michael.
Please understand that the funding and other areas is something I have been discussing with the ATO and it is an area that is to remain of utmost secrecy. The funding is in cash and Bitcoin. We have already been in discussions and have filed private rulings to have XBT (Bitcoin) recognised. We are and have offered wallet details to people within the ATO such that they can track the transactions we have in XBT.
Our funding comes as we are the group that controls 5% of the global Bitcoin market.
We are dealing with listed Australian and International companies. I will send details of some of these dealings next. We intend to have a licensed Australian Bank and other aspects by the end of the year.
This information is beyond secret. We are sharing it to the ATO, but it is NOT released to market as yet.
There will be a 7th email.

Regards,
Craig

**From:** Italia, Mark [mailto:Mark.Italia@ato.gov.au]
**Sent:** Friday, 4 October 2013 1:18 PM
**To:** Craig S Wright
**Subject:** Notification of audit ABN 48 164 068 348

Hi Craig,

Further to our discussion, attached is a letter outlining the information we require as part of the audit.

<<Confirm - audit - post issue SR.pdf>>
<<Acrobat Document.pdf>>

Regards

*Mark Italia*
Indirect Tax | Refund Integrity
Australian Taxation Office
Phone 03 9275 4243

ATO Centenary | *Working for all Australians*

*************************************************************************
IMPORTANT
The information transmitted is for the use of the intended
recipient only and may contain confidential and/or legally
privileged material. Any review, re-transmission, disclosure,
dissemination or other use of, or taking of any action in
reliance upon, this information by persons or entities other
than the intended recipient is prohibited and may result in
severe penalties. If you have received this e-mail in error
please notify the Privacy Hotline of the Australian Taxation
Office, telephone 13 2869 and delete all copies of this
transmission together with any attachments.
*************************************************************************

DEF_00046093

**EXHIBIT**
10
Wilson
1/18/19
W

**From:**     Craig S Wright [craig.wright@hotwirepe.com]
**Sent:**     9/23/2013 12:56:01 PM
**To:**       Roger Manu [roger.manu@rubik.com.au]; Jamie Wilson [jamie.wilson@hotwirepe.com]
**Subject:**  RE: Advice

XBT.
Bitcoin is a currency.

There are 11 million Bitcoin.

Look at the exchange rate in Xe.com

We control what is all up a little over 1 million Bitcoin.

I will leave you with the math

Craig

**From:** Roger Manu [mailto:roger.manu@rubik.com.au]
**Sent:** Monday, 23 September 2013 12:48 PM
**To:** Craig S Wright; Jamie Wilson
**Subject:** Advice

Hi Craig/Jamie
Trust all is well. NZ went well and I will discuss more with you later in the week.

In doing our due diligence we discovered technical articles suggesting there are only 12m bit coins out there,
and it maxes out at 21m. So Rubik were wondering how the paid up share capital is 30m, all very confusing.
Can you please assist

Thanks and Regards
Roger


> **From:** Roger Manu <roger.manu@rubik.com.au>
> **Date:** Monday, 23 September 2013 12:30 PM
> **To:** ken <ken.carr@rubik.com.au>
> **Subject:** Re: Advice
>
> But see to have an oversight role
>
> Roger Manu
> RUBIK Financial
> +61414918714
> Roger.manu@rubik.com.au
>
> On 23/09/2013, at 2:18 PM, "Ken Carr" <ken.carr@rubik.com.au> wrote:
>
> > Nothing exciting then

CONFIDENTIAL

**From:** Diane Pearce - UR <dianep@nsw.uca.org.au>
**Date:** Monday, 23 September 2013 12:10 PM
**To:** ken <ken.carr@rubik.com.au>
**Subject:** RE: Advice

The Members of the Trust Association must be members of the Uniting Church. At the AGM they receive the accounts, appoint directors and auditors, etc. They are not normally involved in day to day operations.


Regards,
Diane



**Diane Pearce | Board Secretary | Uniting Resources**
**The Uniting Church in Australia, Synod of NSW and the ACT**
Level 9, 222 Pitt Street, Sydney NSW 2000
**t** 02 8267 4310 | 02 9264 4487
e dianep@nsw.uca.org.au
www.unitingresources.org.au

This email (and attachments) is confidential, and/or privileged and is intended for the use of the addressee only. If you are not the intended recipient of this email you must not copy, distribute, take any action in reliance on it or disclose it to anyone. Any confidentiality or privilege is not waived or lost by reason of mistaken delivery to you. If you have received this email in error please destroy the original and notify the sender.

**From:** Ken Carr [mailto:ken.carr@rubik.com.au]
**Sent:** Friday, 20 September 2013 5:09 PM
**To:** Diane Pearce - UR
**Subject:** Re: Advice

Thanks very much Diane, just not sure what the members do, are they like some governance group

**From:** Diane Pearce - UR <dianep@nsw.uca.org.au>
**Date:** Friday, 20 September 2013 4:58 PM
**To:** Karin Hawkins <karin@karinhawkins.com>, ken <ken.carr@rubik.com.au>
**Subject:** RE: Advice

Dear Mr Carr,

Craig Wright is a Member of The Uniting Church (NSW) Trust Association Limited ('UCTAL'), which can have a maximum of 25 Members. UFS is the trading name for the company UCTAL.

Craig was appointed a Member under the watch of our previous Chairperson who liked to use the word 'Trustee' when referring to Members, and so some of our newer Members (like Craig) refer to themselves as a 'Trustee'. They are, in fact, Members.

I hope this helps.

Regards,

DEFAUS_00113044

Diane

**Diane Pearce | Board Secretary | Uniting Resources**
**The Uniting Church in Australia, Synod of NSW and the ACT**
Level 9, 222 Pitt Street, Sydney NSW 2000
**t** 02 8267 4310 | 02 9264 4487
edianep@nsw.uca.org.au
www.unitingresources.org.au

This email (and attachments) is confidential, and/or privileged and is intended for the use of the addressee only. If you are not the intended recipient of this email you must not copy, distribute, take any action in reliance on it or disclose it to anyone. Any confidentiality or privilege is not waived or lost by reason of mistaken delivery to you. If you have received this email in error please destroy the original and notify the sender.

**From:** Karin Hawkins [mailto:karin@karinhawkins.com]
**Sent:** Friday, 20 September 2013 4:29 PM
**To:** Ken Carr
**Cc:** Diane Pearce - UR
**Subject:** Re: Advice

Hi Ken,

I am not familiar with all of the Trustees but Diane Pearce who is the Board Secretary will know. Diane, are you able to confirm whether Craig Steven Wright is a Trustee?

Cheers
Karin

Karin Hawkins
NED & Chair, Strategic Operations Committee
Uniting Financial Services
+61 412 217 447

On 20/09/2013, at 4:13 PM, Ken Carr <ken.carr@rubik.com.au> wrote:

Hello Karin,

This is a request on a completely different issue. We may be doing business with someone who presents as a current Trustee of The Uniting Church (NSW) Trust Association limited. Although I cannot find him on any site. His name is Craig Steven Wright. Do you know him by any chance

Regards

Ken Carr

DEFAUS_00113045

**EXHIBIT 11**

Wilson
4/8/19

**From:** Craig Wright
**Sent:** Thursday, July 18, 2013 5:06 AM
**To:** fhalyce.dempster@ato.gov.au
**CC:** jamie.wilson@hotwirepe.com
**Subject:** Evidence.

Hello,

|  | Bitcoin Value (Holding) | Mt Gox Value | Mt Gox Value |
|---|---|---|---|
|  |  | 18-Jul-13 | 1/07/2013 |
| Coin-Exch | 438,857 | $47,649,574.61 | $50,907,412 |
| Exchange Value |  | $108.58 116 | $116.00 |
| CSW (Personal) | 57,000 | $6,188,862.78 | $6,612,000 |
| Total |  | $53,838,437.39 |  |

The transfers are to be based on the values in the private ruling.

My wallet is listed below.

<<...>>

Regards,

...

**Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA**

# RCJBR.org

Tel: + 612 8003 7553  |  Mobile: + 61 417 683 914

http://www.rcjbr.org

<<...>>   <<...>>   <<...>>

CONFIDENTIAL

**From:** Craig S Wright
**Sent:** Sunday, October 6, 2013 1:07 AM
**To:** Italia, Mark <Mark.Italia@ato.gov.au>
**CC:** Jamie Wilson; Ramona Watts; Hardy, Michael <Michael.Hardy@ato.gov.au>
**Subject:** Email 7: RE: Notification of audit ABN 48 164 068 348
**Attachments:** SaaS Master Agreement Hotwire Final.pdf

SysUserProp: 88334F2CCA0D8E51C8530404366F9B82

Hello Mark,

This is the 7th email.

Jamie can get you the original signed copy of the Rubik agreement if you require it. It applied to the following:

http://www.rubik.com.au/Products/Temenos-T24.aspx

This should provide you with an idea of what we are and what we are doing. We have a capitalisation in the group of $230 million and will be filing as a Large Entity and ADI in June 2014. We control $165million in XBT (Bitcoin). We are becoming a regulated and licensed bank.

As you will have noted, all other XBT companies globally are not seeking regulation. The business will be live soon and we have a job and a half ensuring we are ready for the media circus that will ensure. I hope you understand the need for secrecy.

I will call tomorrow (Monday) to ensure that you have all you require.

We can get you more project charters, Ausindustry Advance findings, etc. Just let me know, we have voluminous quantities of documents here.

You should have received 7 emails in total.

Regards,

Craig

**From:** Italia, Mark [mailto:Mark.Italia@ato.gov.au]
**Sent:** Friday, 4 October 2013 1:18 PM
**To:** Craig S Wright
**Subject:** Notification of audit ABN 48 164 068 348

Hi Craig,

Further to our discussion, attached is a letter outlining the information we require as part of the audit.

<<Confirm - audit - post issue SR.pdf>>
<<Acrobat Document.pdf>>

Regards

**Mark Italia**
Indirect Tax | Refund Integrity
Australian Taxation Office
Phone 03 9275 4243

ATO Centenary | *Working for all Australians*


EXHIBIT 12
Wilson
11/8/19 vb

**********************************************************************
IMPORTANT
The information transmitted is for the use of the intended recipient only and may contain confidential and/or legally privileged material. Any review, re-transmission, disclosure, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited and may result in severe penalties. If you have received this e-mail in error please notify the Privacy Hotline of the Australian Taxation Office, telephone 13 2869 and delete all copies of this transmission together with any attachments.
**********************************************************************

CONFIDENTIAL

**From:** Steven Lipke
**Sent:** Friday, September 27, 2013 1:52 AM
**To:** Craig S Wright; Robert Urquhart; Jamie Wilson; Ramona Watts; Allan Pedersen
**CC:** Dez Blanchfield <dez@blanchfield.com.au>
**Subject:** Re: ATO Ruling

**SysUserProp:** 88334F2CCA0D8E51C8530404366F9B82

But I thought we were a multi currency bitcoin foreign exchange.

Sent from my HTC

----- Reply message -----
From: "Craig S Wright" <craig.wright@hotwirepe.com>
To: "Robert Urquhart" <robert.urquhart@hotwirepe.com>, "Jamie Wilson" <jamie.wilson@hotwirepe.com>, "Ramona Watts"
<ramona.watts@hotwirepe.com>, "Allan Pedersen" <allan.pedersen@hotwirepe.com>
Cc: "Steven Lipke" <steven.lipke@hotwirepe.com>, "Dez Blanchfield" <dez@blanchfield.com.au>
Subject: ATO Ruling
Date: Fri, Sep 27, 2013 11:16 AM

Hello,
I have been informed that the primary three ATO private rulings I have been seeking will be issued next week.
A private ruling is anonymised and then it is published on the ATO website. The ATO will be swarmed with press after this and we expect the quanta of the
ruling to be global news. A five million dollar Bitcoin fund was world news and TV globally, we make this look like a mum and pop operation from the Winkly
bros.
That stated, we want this to be global news without our name being noted as yet. I do not know how many and how deep the journalists will be coming, but I
know I have had Forbes and the WSJ already digging. Right now, we are sitting on one of the biggest stories globally and we are not going to talk.
Next year we do go live, but this has to be a planned and coordinated process.
Regards,

Dr. Craig S Wright GSE LLM
Chief Executive Officer
**Hotwire Preemptive Intelligence (Group)**
Mobile: + 61.417.683.914
craig.wright@hotwirepe.com





DEF_00467687



# EXHIBIT 4



FILED

4  NOV 2013

N.A.



Form 40 (version 2)
UCPR 35.1

# AFFIDAVIT OF Craig S Wright – 31st Oct 2013

## COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General Division Common Law |
| List | General |
| Registry | Sydney |
| Case number | 2013 / 225983 & |
| | 2013 / 245661 |

## TITLE OF PROCEEDINGS

Plaintiff                     **Craig Steven Wright (ABN 97 481 146 384)**

Defendant                  **W&K INFO DEFENSE RESEARCH LLC**

## FILING DETAILS

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright (craigswright@acm.org) |

## AFFIDAVIT DETAILS

Name            Craig S Wright

Address         43 St Johns Ave Gordon

Occupation      Director / Lecturer

Date            ~~31 Oct 2013~~  4th November 2013

I affirm:

1.    I am the plaintiff.

2.    I believe that the information contained in this affidavit is true.

3.    The defendant is indebted to the plaintiff in respect of the balance of the cause of action 2013 / 225983 for which this action was commenced in the amount of $28,254,666.00 together with interest on the principal sum from the date of the cause of action to today's date of **$156,755.34** calculated as follows:

| Period | Days & Rate p.a. | Debt Amount | Interest |
|--------|------------------|-------------|----------|
| 25 Jul 2013 – 23 Aug 2013 | 93 days @ 6.750% | $28,254,666.00 | $488,637.81 |
| $5,254.17 per day until entry of judgment | | | |
| | | Total: | $28,743,303.81 |

4.    The defendant is indebted to the plaintiff in respect of the balance of the cause of action 2013 / 245661 for which this action was commenced in the amount of $28,254,666.00 together with interest on the principal sum from the date of the cause of action to today's date of **$156,755.34** calculated as follows:

| Period | Days & Rate p.a. | Debt Amount | Interest |
|--------|------------------|-------------|----------|
| 25 Jul 2013 – 23 Aug 2013 | 93 days @ 6.750% | $28,534,049.79 | $490,746.57 |
| $5,254.17 per day until entry of judgment | | | |
| | | Total: | $29,024,796.36 |

5.    Since the commencement of this action no payments have been made or credits accrued.

6.    The amount for filing, issuing and serving of the statement of claim herein, which has not been paid is **$0**.

Case 9:18-cv-80176-BB   Document 511-9   Entered on FLSD Docket 05/18/2020   Page 96 of
Case 9:18-cv-80176-BB   Document 83-4   Entered on FLSD Docket 01/14/2019   Page 4 of 105

3

7.  The amount of solicitor's costs calculated in accordance with the Local Courts (Civil Claims) Rules, which has not been paid is $0.

8.  The Statement of Claim was served on the defendant on 26 Jul 2013 by leaving it with the Defendant at the registered address for service of:

    David A Kleiman
    3119 Contego Lane
    Palm Beach Gardens
    Fl 33410 USA

9.  The Statement of Claim was served on the defendant on 26 Jul 2013 by mailing it with the Defendant at the registered mailing address for service of:

    David A Kleiman
    4371 Northlake Blvd #314
    Palm Beach Gardens
    Fl 33410 USA

10. The defendant is a US LLC based in Florida USA. The US resident director was David A Kleiman.   (Appendix A).

11. The market rate (at this date) for the contract quantity of Bitcoin (Currency Code XBT) on Xe.com is $AUD 67,863,954.23 at a market rate of 1 XBT = 226.213 AUD 1 AUD = 0.00442061 XBT.

12. A contract was formed in April 2011 (Appendix B).

13. 300,000 Bitcoin and a series of software projects was to be paid in 2013 as consideration for this agreement.

14. On 02 Feb 2013 the agreement to pay the 300,000 Bitcoin was noted in an email of Dave Kleiman to Craig Wright noting the verbal agreement to start a Bitcoin exchange based on the mined Bitcoin of Mr Kleiman and the returned amounts paid as consideration.

15. The company, COIN-EXCH PTY. LTD. ACN 163 338 467 was started on 17th Apr 2013 with an agreement for Mr Kleiman to transfer the remaining capital from the contract (B) in repayment as well as to inject a further amount of capital into the company on or before 30th April 2013 Appendix D).

16. The contract was associated with an invoice to be paid for $34,862,323.00 USD from 22Apr 2011. This was paid in full.

4

17.   Mr David A Kleiman died on 26th April 2013 (US time) (Appendix F).

18.   The transfers made into "W&K Info Defence LLC" (Appendix G) were completed in April 2013. These are pseudo anonymous but public. The details have been supplied in Appendix G. Details of these transactions have been given to the Australian Tax Office for tax purposes.

19.   The Bitcoin addresses used have been independently validated by NSW Solicitors under oath (Appendix H).

20.   Work and research was conducted under the US Dept. of Homeland Security DHS BAA

      (a)   Appendix I

      (b)   Appendix J

      (c)   Appendix K

21.   Mr Kleiman noted that screening software was developing in unwarranted manners and I noted that our software was looking at being better in an email (Appendix L).

22.   The coversheets for the S&T Directorate projects are included in Appendix M

23.   On 01st August 2013 a shareholders meeting was called for "W&K Info Defense LLC" to be held on the 16th August 2013. The meeting was emailed to the company address as well as send to the address of the shareholders and company. The shareholding of "W&K Info Defense LLC" was:

      1.   Craig S Wright          50.0 %
      2.   David A Kleiman        50.0 %

24.   The meeting from point 23 meeting was held on the 16th of August 2013. The following people were present:

      1.   Jamie Wilson
      2.   Craig S Wright

25.   "W&K Info Defense LLC" was an incorporated partnership. All shares are held jointly. The constitution states there is to be a resident US director. Shares were held jointly as per the US Companies Act, 1956.

26.   The following points were moved at the meeting:

5

1.   Jamie Wilson will act as director for the purposes of consenting to orders and
the company to be wound down.

2.   The vote was Craig Wright – "Yes". No other parties.

3.   It was agreed that following the motion to accept the debt owed by the
company (W&K Info Defense LLC), it would be closed.

27.   Projects for the development of software started in 2009 under a company named
"Integyrs Pty Ltd" (Appendix N).

28.   The development of the software was extended considerably in the period between
2011 – 2013.

29.   I discovered that Mr Kleiman died before transferring the required funds on the 29th
April 2013. The payment was planned for 30th April 2013.

30.   Mr Kleiman was not added as a shareholder and director of Coin-Exch Pty Ltd as
was planned to occur on the 30th Apr 2013 as a consequence.

6

AFFIRMED at                    Sydney

                               Gordon, NSW

Signature of deponent

Name of witness        NICHOLAS CHARLES MCDONALD

Address of witness     21/103 MAJORS BAY ROAD CONCORD NSW 2137

Capacity of witness    JUSTICE OF THE PEACE

And as a witness, I certify the following matters concerning the person who made this affidavit (the deponent):

1        I saw the face of the deponent. I saw the face at the deponent [OR, delete whichever option is inapplicable]

2        I have confirmed the deponent's identity using the following identification document:

                               NSW DRIVERS LICENCE

                Identification document relied on (may be original or certified copy)[1]

Signature of witness

Note: The deponent and witness must sign each page of the affidavit. See UCPR 35.7B.

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174
in and for the State of New South Wales, Australia
21/103 Majors Bay Rd
Concord NSW 2137
Telephone 02 96034779 / 0412 473 695

[1 "Identification documents" include current driver licence, proof of age card, Medicare card, credit card, Centrelink pension card, Veterans Affairs entitlement card, student identity card, citizenship certificate, birth certificate, passport or see Oaths Regulation 2011 or JP Ruling 003 - Confirming identity for NSW statutory declarations and affidavits, footnote 3.]

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L11000019904
FILED 8:00 AM
February 16, 2011
Sec. Of State
tcline

## Article I

The name of the Limited Liability Company is:

W&K INFO DEFENSE RESEARCH LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

3119 CONTEGO LANE
PALM BEACH GARDENS, FL. US  33418

The mailing address of the Limited Liability Company is:

4371 NORTHLAKE BLVD #314
PALM BEACH GARDENS, FL. US  33410

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

DAVID A KLEIMAN
3119 CONTEGO LANE
PALM BEACH GARDENS, FL.   33410

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:  DAVE KLEIMAN

This is the annexure marked with the letter "A" referred to in the Affidavit /
Affirmation / Statutory Declaration of   Craig S WRIGHT
sworn/affirmed/declared before me at   Sydney
on the   4th   day of   Ntober   2013

One page only
Page 1 of 2 pages

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

## Article V

The name and address of managing members/managers are:

Title:  MGRM
DAVID A KLEIMAN
4371 NORTHLAKE BLVD #314
PALM BEACH GARDENS, FL.  33410  US

**L11000019904**
**FILED 8:00 AM**
**February 16, 2011**
**Sec. Of State**
tcline

## Article VI

The effective date for this Limited Liability Company shall be:

02/14/2011

Signature of member or an authorized representative of a member

Electronic Signature: DAVE KLEIMAN

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.



Case 9:18-cv-80176-BB   Document 511-9   Entered on FLSD Docket 05/18/2020   Page 102 of
Case 9:18-cv-80176-BB   Document 83-4   Entered on FLSD Docket 01/14/2019   Page 10 of 105
214

# INTELLECTUAL PROPERTY LICENCE
## FUNDING AGREEMENT

**PARTIES**

**Craig Wright R&D**
**ABN 97 481 146 384**
(Financer)

**AND**

**W&K Info Defense LLC**
(Provider)

This is the annexure marked with the letter "B" referred to In the Affidavit /
Affirmation / Statutory Declaration of        SWRIGHT
sworn/affirmed/declared before me at  Sydney
on the    4th        day of  November  2013

One page only
Page 1 of 14 pages

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

Ref: CEWK01

**THIS DEED** dated 22nd day of April 2011

**BETWEEN**

Craig Wright of Craig Wright R&D

(Financer)

And

Dave Kleiman for W & K Info Defense LLC

(Provider)

**RECITALS**

A.   The Financer controls the following Bitcoin (BTC) addresses:

(a)   12hRmmSda9qSSEH656zBaKEbeisH6ZhdTm.

(b)   12C9c9VQLMrLi4Ffzq2wDvwrKnUPaAaNFp.

B.   The Provider desires the intellectual property for the permitted use and to extend this for other purposes desirable to both parties.

C.   The Provider will use the funding for the development of several software products.

D.   The provider will return the loaned finances (in Bitcoin) on or before 01 July 2013 and 30 Dec 2013.

E.   The Provider will remain completely confidential on all matters in this deed (including even that family members do not have knowledge of the transaction).

F.   The financer will send the following amounts (in Bitcoin) to to following address by 30 April 2011:

(a)   165,140 BTC

(b)   1MSUvGS9BEjpL35CKu7feF4HaPCXv2cht7

G.   The financer will send the following amounts (in Bitcoin) to toe following address by 30 August 2011:

(a)   50,000 BTC

(b)   1JjtxXmbC95sgn5kE2Hm92axA7hcbDkRhK

H.   The Financer and the Provider wish to record the licence, which has been granted to the Provider to use the intellectual property in accordance with this deed.

I.   The Financer is the absolute owner of the entire unencumbered copyright in the works described in the schedule when complete.

J.   The Financer has agreed to license the works to the Provider and the Provider has agreed to accept such licence on the following terms and conditions.

K.   The provider will fund the software development using Bitcoin.

2

**L.**   The Financer will provide 1,024 core Xeon and GPU based hardware solution.

    (a)   It is acknowledged that two SGI ICE XE310 – 512 core hosts have been provided and are in a data centre specified by the provider

    (b)   The provider will use these systems to mine Bitcoin

    (c)   The provider expects to earn 12,000 BTC per month using these systems for the period to 30 June 2013

    (d)   The systems will be hosted in the US at a facility managed by the provider.

**M.**   The provider will pay for the use of the systems and the loan as follows:

    (a)   250,000 BTC to be repaid on 30 June 2013

    (b)   50,000 BTC to be repaid on 30 Dec 2013

    (c)   The developed software will be exclusively licensed perpetually to the financer (as of 30 June 2013).

    (d)   The software may be used but not distributed by the provider.

**N.**   The contract is complete when 300,000 BTC have been repaid.

**O.**   It is agreed that the value of the loan to be repaid is $ AUD 20,000,000 in two parts (for a total of $40,000,000).

**P.**   The server systems will return to the Financer at the completion of the contract.

**Q.**   On default, the contract is to be repaid in full to the financer.



3

OPERATIVE PART

1.   Definitions

In this deed:

(a)   **Business** means the business operated by the Provider described as such in the schedule;

(b)   **Business day** means a day, not being a Saturday, Sunday or gazetted public holiday, on which banks are open for commercial business where performance of an obligation under this deed is to take place;

(c)   **Claim** means, in relation to a person, a claim, demand, remedy, suit, injury, damage, loss, cost liability, action, proceeding, right of action, chose in action, claim for compensation or reimbursement or liability incurred by or to be made or recovered by or against the person, however arising and whether ascertained or unascertained, or immediate, future or contingent;

(d)   **Commencement date** means the date so specified in the schedule;

(e)   **Confidential information** means all technical and other information and know how, including all information and know how in any eye or machine readable form or other format, disclosed or given to the Provider from any source in respect of or incidental to:

(i)   The product;

(ii)   The technology;

(iii)   The Financer; and

(iv)   Any other information disclosed or given to the Provider by the Financer which is declared by the Financer to be confidential information;

(f)   **Improvements** means any improvement, modification, enhancement or derivative of the intellectual property arising during the term;

(g)   **Intellectual property** means:

(i)   The confidential information;

(ii)   The improvements;

(iii)   The patent; and

(iv)   The trade mark;



(h)   **Licence fee** means the amount calculated and paid by the Provider to the Financer specified in the schedule;

4

(i)    Notice means a written notice, consent approval, direction, order or other communication;

(j)    Obligation means any legal, equitable, contractual, statutory or other obligation, deed, covenant, commitment, duty, undertaking or liability;

(k)    Patent means the registered patent or patent application including the provisional and complete specifications described in the schedule;

(l)    Permitted use means to conduct the business to exploit market, promote, develop, integrate, research, sell and conduct and any other activity undertaken with respect to the product for profit or reward;

(m)   Product means the product described as such in the schedule;

(n)    Right includes a legal, equitable, contractual, statutory or other right, power, authority, benefit, privilege, remedy, discretion or cause of action;

(o)    Technology means all that technical information which relates to or forms part of the product, including, without limitation, methodology, techniques, drawings, outlines, notes, algorithms, detailed designs, flow charts, results, software: partial or intermediate versions and prototypes, data, formulae and other proprietary information and know how in the Provider's possession or control or which is revealed to the Provider which relates to the product;

(p)    Term means the term set out in the schedule; and

(q)    Trade mark means the registered trade mark, trade mark registration application and common law trademarks described in the schedule.

## 2.   Interpretation

This deed is governed by the law of NSW and the parties submit to the non-exclusive jurisdiction of the courts of that state.

In the interpretation of this deed:

(a)    References to legislation or provisions of legislation include changes or re-enactments of the legislation and statutory instruments and regulations issued under the legislation;

(b)    Words denoting the singular include the plural and vice versa; words denoting individuals or persons include bodies corporate and vice versa; references to documents or deeds also mean those documents or deeds

as changed, novated or replaced, and words denoting one gender include all genders;

(c) Grammatical forms of defined words or phrases have corresponding meanings;

(d) Parties must perform their obligations on the dates and times fixed by reference to the schedule;

(e) Reference to an amount of money is a reference to the amount in the lawful currency of the Commonwealth of Australia;

(f) If the day on or by which anything is to be done is a Saturday, a Sunday or a public holiday in the place in which it is to be done, then it must be done on the next business day;

(g) References to a party are intended to bind their executors, administrators and permitted transferees; and

(h) Obligations under this deed affecting more than one party bind them jointly and each of them severally.

## 3. Licence

The Financer hereby grants to the Provider an exclusive licence to use the intellectual property for the permitted use on the terms of this deed.

In consideration of the licence fee payable hereunder the Financer grants to the Provider an exclusive transferrable licence to copy publish sell or otherwise use the works in the course of its business in Australia and/or Overseas in respect of the whole or any part of the works commencing on 01st July 2013.

In consideration of the licence hereby granted to the Provider the Provider must pay a one off licence fee of $20,000,000 (GST exclusive) to the Financer on or before the 30th June 2013. The provider will also transfer the designated account of the provider:

(a) 250,000 BTC to be repaid on 30 June 2013

(b) 50,000 BTC to be repaid on 30 Dec 2013

The payment is to be issued in Bitcoin as per the schedule.

4.   **Provider's promises**

(a)   **Undertakings**

The Provider undertakes to:

(i)   Use its reasonable commercial endeavours to:

(1)   Preserve the value and validity of the intellectual property; and

(2)   Create, promote, retain, and enhance the goodwill in the intellectual property;

(ii)   During the term and thereafter the termination of this deed not to allow or facilitate the use, nor exploit the intellectual property in a manner in any way detrimental to the Financer and not contravene, deny or contest the rights subsisting in the intellectual property, and take such steps as may be appropriate and available to the Provider to prevent the infringement of any and all the rights subsisting in the intellectual property;

(iii)   In connection with the permitted use not give any warranty:

(1)   Beyond that which the Provider is obliged in law to give; or

(2)   Which has not been approved in writing by the Financer;

(iv)   To use the intellectual property only for the permitted use and not for any other use;

(v)   Treat as confidential the confidential information except that which at the time of its disclosure to the Provider was generally available, or subsequently became known to the public provided always that this covenant shall continue in full force and effect notwithstanding that this deed has terminated; and

(vi)   Devote all reasonable commercial endeavours in the conduct and operation of the business.

(b)   **Indemnity**

(i)   The Provider hereby agrees to fully, effectually, and promptly indemnify the Financer against any loss, either direct or indirect, damage or expense whatsoever which the Financer may suffer or incur in respect of:

(1)   Any breach by the Provider of the provisions of this deed; or

7

     (2)    Any claim by any person against the Financer arising out of or in respect of the exploitation of the intellectual property by the Provider; and

  (ii)    The Provider hereby irrevocably releases the Financer and waives all claims which the Provider may have in the future against the Financer, in respect of any action claim or remedy whatsoever in any way attributable to the exploitation of the intellectual property by the Provider.

## 5.  Improvements

If the Provider develops any improvements, the Financer hereby irrevocably:

(a)    Grants to the Provider the right to apply for any incidental intellectual property rights available in respect of that improvement and in connection with such application, the Financer shall:

  (i)    Make, supply and assist in the preparation of all models, plans, drawings or specifications necessary or convenient for the proper understanding or development of the improvements; and

  (ii)    Grant and do all things necessary to give effect to an assignment of the intellectual property rights in respect of the improvements to the Provider;

(b)    Assigns, transfers and sets over absolutely to the Provider all right title and interest to the improvements including all claims as they relate to the improvements.

## 6.  GST

(a)    GST means a goods and services tax as defined in A New Tax System (Goods and Services Tax) Act 1999.

(b)    In respect of any taxable supply, the Provider must pay to the Financer an additional amount equal to the prevailing GST rate on the supply. The additional amount referred to in this clause is payable at the same time and in the same manner as the licence fee subject to the receipt by the Provider of a valid tax invoice, as defined in A New Tax System (Goods and Services Tax) Act 1999.

8

7.  **Term and termination**

   (a)  **Term**

   This deed begins on 01st July 2010, the commencement date and will continue for the term unless it is earlier terminated.

   (b)  **Termination on notice**

   Either party may terminate this deed by notice in writing to the other if the other party commits any breach of any provision of this deed, and has failed to remedy such breach within fourteen days of receipt of notice specifying:

   (i)  The exact nature of the breach committed by the defaulting party; and

   (ii)  What is required by the defaulting party to remedy the breach;

8.  **Licence fee**

   (a)  **Payment of licence fee**

   The Provider must pay the licence fee specified in the schedule to the Financer during the term.

   (b)  **Late payment**

   If the licence fee or any other monies payable by the Provider to the Financer remain unpaid for seven days after the due date for payment, whether or not formal demand has been made, then the Provider shall pay, in addition to any monies actually owing to the Financer, interest at the rate of 2% over the bank indicator lending rate nominated by the Financer on such monies from the date the payment actually fell due until such monies are recovered and paid to the Financer.

9.  **Warranties by Financer**

   The Financer warrants to the Provider that:

   (a)  The Financer has the power and authority to enter into this deed; and

   (b)  The intellectual property rights granted under this deed will not when used in accordance with this deed infringe the intellectual property rights of any person.

10. **Third party claim**

   (a) Provided that the Provider is not in breach of its obligations under this deed, if a third party makes a claim against the Provider alleging that use of the intellectual property infringes its intellectual property rights, the Financer will defend, indemnify and hold harmless the Provider from such a claim provided that the:

   (i) The Provider notifies the Financer in writing promptly of the claim;

   (ii) The Provider provides such information, assistance and co-operation as the Financer may reasonably request and at its expense, from time to time; and

   (iii) The Financer has full discretion to defend, compromise or settle any such claim on such terms as the Financer deems fit.

   (b) If the Financer cannot satisfactorily settle the claim so as to retain ownership of the intellectual property, its liability will be limited to terminating this deed, and refunding the Provider an amount equal to the portion of any licence fee paid for the period following termination.

   (c) Nothing in this clause authorises the Provider to defend, compromise or settle any claim on the Financer's behalf.

11. **Limitation of liability**

   (a) Other than in respect of a party's:

   (i) Breach of the confidentiality provisions of this deed; or

   (ii) Infringement of another party's intellectual property rights; or

   (iii) Indemnification obligations under this deed; or

   (iv) Wilful misconduct.

   (b) Neither party will be liable to the other for any consequential, special or punitive damages arising out of this deed. Each party's cumulative direct damages will be limited to the licence fee payable under this deed in the prior twelve month period. This clause survives the termination or expiration of this deed.



12. **Assignment**

No party may assign its rights or obligations under this deed without the prior written consent of the other parties, which consent may be given or withheld, or given on conditions, in the absolute discretion of those other parties.

13. **Time**

The parties hereto agree that time shall in all respects be of the essence in regards this deed.

14. **Notices**

A communication required by this deed, by a party to another, must be in writing and may be given to them by being:

(a)   Delivered personally; or

(b)   Posted to their address specified in this deed, or as later notified by them, in which case it will be treated as having been received on the second business day after posting; or

(c)   Faxed to the facsimile number of the party with acknowledgment of receipt received electronically by the sender, when it will be treated as received on the day of sending, or

(d)   Sent by email to their email address, when it will be treated as received on that day.

15. **Waiver or variation**

(a)   A party's failure or delay to exercise a power or right does not operate as a waiver of that power or right.

(b)   The exercise of a power or right does not preclude:

(i)    Its future exercise; or

(ii)   The exercise of any other power or right; or

(iii)  The variation or waiver of a provision of this deed or a party's consent to a departure from a provision by another party will be ineffective unless in writing executed by the parties.



16. **Counterpart**

This deed may be executed in any number of counterparts each of which will be an original, but counterparts together will constitute one and the same instrument, and the date of the deed will be the date on which it is executed by the last party.

17. **Costs**

(a)   Each party will pay its own costs of and incidental to this deed.

(b)   The Provider will bear all duty payable on this deed and keep indemnified the Financer in respect of that liability.

(c)   The Provider will bear all GST payable in respect of any supply under this deed upon receipt of tax invoice issued by the Financer.

18. **Escrow**

(a)   The paper Bitcoin Wallet with address 1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a will be held by the financer as assurance or the contract and will convert to the ownership of the financer on default of the provider.

(b)   All source code and agreements are to be held in a manner that the financer can access on default.



## REFERENCE SCHEDULE

**Deed date:**            01st April 2011

**Licence fee:**          (a)     250,000 BTC to be repaid on 30 June 2013

                          (b)     50,000 BTC to be repaid on 30 Dec 2013

                          (ex GST) for exclusive perpetual assignment

**Product:**              Bitcoin and Exchange Software in C/C++/C#/R code

**Commencement date:**    01st July 2011

**Term:**                 Two (2) years

**Trademark:**            All Marks Associated with C01N and associated marks

                          To be filed

**Patent:**               All IP under BAA-001 / 002 / 003 / 004

13

**SIGNED AS A DEED**

Executed by
W & K Info Defense LLC                )
in accordance with s.127              )
Corporations Act 2001 (CTH) and its constitution        )


Dave Kleiman
DIRECTOR


Executed by
Craig Wright R&D (A.B.N. 97 481 146 384)


Craig S Wright

14





This is the annexure marked with the letter C referred to in the Affidavit /
Affirmation / Statutory Declaration of Craig S. WRIGHT
sworn/affirmed/declared before me at Gold Coast
on the 4th day of November 2013

One page only
Page 1 of 1 pages

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174



RE: Long time - Message (HTML)

**From:** Dave Kleiman <dave@davekleiman.com>
**To:** craig@panopticrypt.com
**Cc:**
**Subject:** RE: Long time

**Sent:** Sat 2/02/2013 12:36 AM

Hi Craig,

Good to hear from you. New I see what has been keeping you so busy.

We are ahead of where we need to be. Once Coin-Exch is setup on your end, I will transfer the 300k BTC and the software as agreed. I have mined under a "Fictitious name registration" with Sunbiz.

Sorry I cannot help more, but you need to move quick. BTC is on the rise and I see $200 by 30 Apr. Once you have the company setup in Au, I will transfer the extra with your amount. The mining has doubled what you started it with and the software solves the issues with the Merkle tree. Prof Reese does better math than you...

I hope to talk to and see you soon,

-Dave

Respectfully,

Dave Kleiman - http://www.ComputerForensicsLLC.com

2465 Mercer Ave, Suite 203
West Palm Beach, FL 33401
Main: 561.404.3074
Direct: 561.310.8801

'Dave Kleiman'



## ASIC
**Australian Securities & Investments Commission**

**Forms Manager**

Company Officeholders

**Company:**      COIN-EXCH PTY. LTD. ACN 163 338 467

# Company details

| | |
|---|---|
| Date company registered | 17-04-2013 |
| Company next review date | 17-04-2014 |
| Company type | Australian Proprietary Company |
| Company status | Registered |
| Home unit company | No |
| Superannuation trustee company | No |
| Non profit company | No |

## Registered office

LEVEL 5 , 32-38 DELHI ROAD , MACQUARIE PARK NSW 2113

## Principal place of business

LEVEL 5 , 32-38 DELHI ROAD , MACQUARIE PARK NSW 2113

## Officeholders

WRIGHT, CRAIG STEVEN

Born 23-10-1970 at BRISBANE QLD

43 ST JOHNS AVENUE , GORDON NSW 2072

Office(s) held:   Director, appointed 17-04-2013
                  Secretary, appointed 17-04-2013

This is the annexure marked with the letter D referred to in the Affidavit / Affirmation / Statutory Declaration of  Craig  S WRIGHT
sworn/affirmed/declared before me at  Sydney
on the  4th  day of  November  2017

One page only
Page 1 of  [ ]  pages

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

## Company share structure

| Share class | Share description | Number issued | Total amount paid | Total amount unpaid |
|---|---|---|---|---|
| FOU | FOUNDERS | 21500000 | 21500000.00 | 0.00 |
| ORD | ORDINARY | 20000000 | 20000000.00 | 0.00 |

## Members

PANOPTICRYPT PTY LTD                    43 ST JOHNS AVENUE , GORDON NSW 2072

| Share class | Total number held | Fully paid | Beneficially held |
|---|---|---|---|
| ORD | 17000000 | Yes | No |

DENARIUZ SG                    108 NAMLY AVE , SINGAPORE , SINGAPORE

| Share class | Total number held | Fully paid | Beneficially held |
|---|---|---|---|
| ORD | 3000000 | Yes | Yes |

WRIGHT , CRAIG STEVEN                    43 ST JOHNS AVENUE , GORDON NSW 2072

| Share class | Total number held | Fully paid | Beneficially held |
|---|---|---|---|
| FOU | 21500000 | Yes | No |

# INVOICE

Date: 4/22/2011
Invoice # 1253

**W&K INFO DEFENSE RESEARCH LLC**
4371 NORTHLAKE BLVD #314
PALM BEACH GARDENS
FL 33410
561.310.8801
dave@davekleiman.com

Craig Wright R&D
ABN 97 481 146 384
51 Cowangarra Rd
Bagnoo NSW 2446
+61 417 683 914
Customer ID CWR001

Craig Wright R&D
ABN 97 481 146 384
51 Cowangarra Rd
Bagnoo NSW 2446
+61 417 683 914
Customer ID CWRD01

| Salesperson | Job | Shipping Method | Shipping Terms | Delivery Date | Payment Terms | Due Date |
|---|---|---|---|---|---|---|
| Dave A Kleiman | BAA 001 | Software | NA | By Contract | Due on receipt | 30 Apr 2011 |

| Qty | Item # | Description | Unit Price | Discount | Line Total |
|---|---|---|---|---|---|
| 165,140 | Bitcoin | BTC loan @ USD 0.88 | 0.88 | | 145,323 |
| 50,000 | Bitcoin | BTC loan @ USD 0.88 | 0.88 | | 44,000 |
| 2 | SGI System | SGI ICE XE310 lease | 4,411,500 | | 8,823,000 |
| 1 | Software | Per agreement | 20,000,000 | | 20,000,000 |
| | BAA-001 | BAA 11-02-TTA 01-0127-WP | 650,000 | | 650,000 |
| | BAA-002 | BAA 11-02-TTA 09-0049-WP | 2,200,000 | | 2,200,000 |
| | BAA-003 | BAA 14-02-TTA 01-0025-WP | 1,200,000 | | 1,200,000 |
| | BAA-004 | BAA 11-02-TTA 01-0127-WP | 1,800,000 | | 1,800,000 |

**Total Discount**

| | |
|---|---|
| Subtotal | 34,862,323 |
| Sales Tax | |
| Total | 34,862,323 |

Terms in CEWK01

*Advanced security and research*

*Thank you for your business!*

This is the annexure marked with the letter E referred to in the Affidavit / Affirmation / Statutory Declaration of Craig S WRIGHT sworn/affirmed/declared before me at _____ on the 4 of _____ day of November 2013

One page only
Page 1 of 1 pages

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

# Dave Kleiman

From Wikipedia, the free encyclopedia

Dave Kleiman (1967 - 2013)[1] was a noted Forensic Computer Investigator, an author/coauthor of multiple books and a noted speaker at security related events.[2][3][4]



| Dave Kleiman | |
|---|---|
| Born | 1967 |
| | U.S. |
| Died | April 26, 2013 |
| | Palm Beach Gardens, Florida |
| Occupation | Forensic Computer Investigator |
| Website | |
| | http://www.davekleiman.com/ |

## Contents

- 1 Computer security & forensics
- 2 Publications
- 3 References
- 4 External links

This is the annexure marked with the letter "F" referred to in the Affidavit /
Affirmation / Statutory Declaration of *Craig Stratch*
sworn/affirmed/declared before me at *Sydney*
on the *4th* day of *November* 28 *18*

One page only.
Page 1 of *4* pages.

*(signature)*

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

## Computer security & forensics

For a number of years in the 1990s, Kleiman was a sworn law enforcement officer for the Palm Beach County Sheriff's Office (PBSO).[3][4] While there, he attained the rank of detective. Also, while at the PBSO, he worked as a System Security Analyst in the Computer Crimes Division and also helped set up the Computer Forensics Lab.[3][4]

Dave Kleiman is a regular contributor to a wide array of online forums and mailing lists where he assists network engineers and other IT professionals of varying levels in solving their issues, regardless of the level of difficulty involved. Kleiman is also well known as an advisor to engineering professionals in numerous industries.[2][3][4]

Dave also regularly volunteers his time and expertise assisting local and federal law enforcement agencies in cases both domestic and international in scope.

He is the creator of the "one-shot server lockdown utility" S-lok for Microsoft Windows servers.[3][4]

On January 1, 2007 he was named Microsoft MVP for Windows - Security

## Publications

- Co-author: Microsoft Log Parser Toolkit; Syngress Publishing; ISBN 1-932266-52-6
- Co-author: Security Log Management: Identifying Patterns in the Chaos; Syngress Publishing; ISBN 1-59749-042-3
- Technical editor: Perfect Passwords: Selection, Protection and Authentication; Syngress Publishing; ISBN 1-59749-041-5
- Technical editor: Winternals Defragmentation, Recovery, and Administration Field Guide; Syngress Publishing; ISBN 1-59749-079-2
- CD and DVD Forensics: Technical Editor, ISBN 1-59749-128-4
- How to Cheat at Windows System Administration: Contributing Author, ISBN 1-59749-105-5
- Enemy at the Water Cooler: Real Life Stories of Insider Threats, Technical Reviewer, ISBN 1-59749-129-2
- Rootkits for Dummies: Technical editor, ISBN 978-0-471-91710-6
- Windows Forensic Analysis Including DVD Toolkit: Technical Editor, ISBN 1-59749-156-X
- The Official CHFI Study Guide (Exam 312-49): Co-Author, ISBN 1-59749-197-7

## References

1. ^ "Obituary: Former PBSO deputy dies in his home" (http://www.mypalmbeachpost.com/news/news/local/obituary-former-pbso-deputy-dies-in-his-home/nXcqR/). Palm Beach Post. Retrieved May 1, 2013.
2. ^ a b "SANS WhatWorks Summit in Forensics and Incident Response" (http://www.sans.org/forensics09_summit/speakers.php#kleiman). SANS.
3. ^ a b c d e "Dave Kleiman" (http://credencecorp.com/bios/DaveKleiman.html). CredenceCorp.

4. ^ *a b c d e* "Dave Kleiman" (http://www.oreillynet.com/pub/au/2560?x-t=book.view). O'Reilly.

## External links

- Dave Kleiman's personal web site (http://www.davekleiman.com)
- Palm Beach County Sheriff's Office (http://www.pbso.org)
- CastleCops (http://www.castlecops.com)
- Microsoft MVP Program (https://mvp.support.microsoft.com/mvpexecsum)
- Microsoft MVP profile (https://mvp.support.microsoft.com/profile=C4ED32CD-9982-45F2-8636-BDE271C0DAC2)

Retrieved from "http://en.wikipedia.org/w/index.php?title=Dave_Kleiman&oldid=553157307"

Categories:  1967 births │ 2013 deaths │ People associated with computer security

This page was last modified on 2 May 2013 at 06:28.

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy.
Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.



## Craig S Wright

| | |
|---|---|
| **From:** | Carter Conrad <carter@computerforensicsllc.com> |
| **Sent:** | Tuesday, 30 April 2013 1:23 AM |
| **To:** | Patrick Paige |
| **Cc:** | Bill Long; Greg Kelley; Craig Ball; Matthew Shannon; Jerry Hatchett; Eric Robi; Greg Freemyer; Paul Henry; Craig S. Wright; Scott Moulton'; Wayne Marney; Bob Bell; Bill Dean; Kimon Andreou; Greg Kelley |
| **Subject:** | Dave Kleiman |

As close friends of Dave, Patrick and I wanted to let you know in advance of any general posting that we have lost a dear friend and colleague...

As most of you are aware Dave was battling an infection from 2010, and had never fully recovered in the 2 ½+ years that followed.

Dave died in his home in Palm Beach Gardens of, what is being told to us, natural causes.

At this time no further details are available, although there are plans for a memorial, and these will be pasted on as they become available.

Carter V Conrad, Jr
Computer Forensics, LLC
1880 N. Congress Avenue, Suite 333
Boynton Beach, Florida 33426
Phone: (561) 404-3074
Cell: (561) 502-3935

www.ComputerForensicsLLC.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.



Home    Charts    Stats    Wallet

# Bitcoin Address

### Summary

Address          12hRmmSda9qSSEH656zBaKEbeisH6ZhdTm

Short Link       http://blockchain.info/fb/12hrmm

Tools            Taint Analysis - Related Tags - Unspent Outputs

This is the annexure marked with the letter *referred to in the Affidavit /
Affirmation / Statutory Declaration of* CRAIG S WRIGHT
*sworn/affirmed/declared before me at*
*on the* 4th *day of* November *2013*

One page only
Page 1 of 8 pages

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

### Transactions

No. Transactions        2

Total Received          $ 74,055,693.41

Final Balance           $ 0.00

[ Request Payment ]    [ Donation Button ]



## Transactions

[ Filter ▾ ]

ddb352955903db83f76edb85f2121c51859b2f41a3...                2011-08-27 02:29:26

1PWr5e1JjL8wy6uzKzb5d3pCxkNLYm5vt1
1JjtxXmbC95sgn5kE2Hm92axA7hcbDkRhK

796187f76168cd0ca2fff6c3f967fe28242429cec320e...

$ 74,055,693.41

12hRmmSda9qSSEH656zBaKEbeisH6ZhdTm             2011-08-27 02:29:26



blockchain.info/address/12hRmmSda9qSSEH656zBaKEbeisH6ZhdTm                              2/2

Case 9:18-cv-80176-BB  Document 511-9  Entered on FLSD Docket 05/18/2020  Page 124 of
214
Case 9:18-cv-80176-BB  Document 83-4  Entered on FLSD Docket 01/14/2019  Page 32 of 105

Home    Charts    Stats    Wallet

# Bitcoin Address

## Summary

| | |
|---|---|
| Address | 1MSUvGS9BEjpL35CKu7feF4HaPCXv2cht7 |
| Short Link | http://blockchain.info/fb/1msuv |
| Tools | Taint Analysis - Related Tags - Unspent Outputs |

## Transactions

| | |
|---|---|
| No. Transactions | 2 |
| Total Received | $ 36,551,156.21 |
| Final Balance | $ 0.00 |

[ Request Payment ]   [ Donation Button ]



## Transactions

Filter ▾

0121f30f11152b3df11904401e13b1b972a5408682...                     **2011-04-29 03:20:56**

1B4JfdD4jGUWBehtGF2Phb4BxeN2ytkTxh
1GEeroqocswEazxzeNAJh3KPPD7C61XY2H

62fec42dd4370e0aeae88b3fe2a9970bb56a8d4bf0c...                     $ 36,551,156.21

1MSUvGS9BEjpL35CKu7feF4HaPCXv2cht7                                **2011-04-29 03:20:56**



Home    Charts    Stats    Wallet

# Bitcoin Address

### Summary

| | |
|---|---|
| Address | 1MSUvGS9BEjpL35CKu7feF4HaPCXv2cht7 |
| Short Link | http://blockchain.info/fb/1msuv |
| Tools | Taint Analysis - Related Tags - Unspent Outputs |

### Transactions

| | |
|---|---|
| No. Transactions | 2 |
| Total Received | 165,140 BTC |
| Final Balance | 0.00 BTC |

[ Request Payment ]   [ Donation Button ]



## Transactions

[ Filter ▾ ]

0121f30f11152b3df11904401e13b1b972a5408682...                    **2011-04-29 03:20:56**

1B4JfdD4jGUWBehtGF2Phb4BxeN2ytkTxh
1GEeroqocswEazxzeNAJh3KPPD7C61XY2H

-165,140 BTC

62fec42dd4370e0aeae88b3fe2a9970bb56a8d4bf0c...                    **2011-04-29 03:20:56**

1MSUvGS9BEjpL35CKu7feF4HaPCXv2cht7

blockchain.info/address/1MSUvGS9BEjpL35CKu7feF4HaPCXv2cht7                    1/2

Case 9:18-cv-80176-BB   Document 83-4   Entered on FLSD Docket 01/14/2019   Page 35 of 105

65.140 BTC



Home   Charts   Stats   Wallet

# Bitcoin Address

## Summary

| | |
|---|---|
| Address | 12hRmmSda9qSSEH656zBaKEbeisH6ZhdTm |
| Short Link | http://blockchain.info/fb/12hrmm |
| Tools | Taint Analysis - Related Tags - Unspent Outputs |

### Transactions

| | |
|---|---|
| No. Transactions | 2 |
| Total Received | 334,587.42424242 BTC |
| Final Balance | 0.00 BTC |

[ Request Payment ]   [ Donation Button ]



## Transactions

[ Filter ▾ ]

ddb352955903db83f76edb85f2121c51859b2f41a3...          **2011-08-27 02:29:26**

1PWr5e1JjL8wy6uzKzb5d3pCxkNLYm5vt1
1JjtxXmbC95sgn5kE2Hm92axA7hcbDkRhK

334,587.42424242 BTC

796187f76168cd0ca2fff6c3f967fe28242429cec320e...          **2011-08-27 02:29:26**

12hRmmSda9qSSEH656zBaKEbeisH6ZhdTm

This is the annexure marked will will be
sworn/affirmed/declared before me in
on the                        day of November      2013

One page only
Page 1 of 2 pages                    NICHOLAS CHARLES McDONALD
                                     Justice of the Peace Registration 105174

*H.*

**Statutory Declaration**
OATHS ACT 1900, NSW, EIGHTH SCHEDULE

I, Stephen D'Emilio, of Level 3, 2 Bligh Street, Sydney, in the State of New South Wales,
Solicitor, do solemnly and sincerely declare that:

1.  I am the solicitor acting for Mr Craig Wright and Hotwire Pre-emptive Intelligence Pty
    Ltd.

2.  On 11 October 2013, Mr Wright came into my office and showed me his HTC mobile
    phone (**Wright mobile**).

3.  On the screen of the Wright mobile, I viewed and verified the following Bitcoin wallet
    addresses:

    (i)    1JzzLXxuwn45S9HvBqAhkhWa3GhyG3zm64;

    (ii)   168Rc6wJdL4chWhEUQwyywi4sHub6erf2s;

    (iii)  1FeexV6bAHb8ybZjqQMjrcCrHGW9sb6uF;

    (iv)   1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a; and

    (v)    16cou7Ht6WjTzuFyDBnht9hmvXytg6XdVT (**Bitcoin wallet addresses**).

4.  I viewed the Bitcoin wallet addresses by scrolling down the screen on the Wright
    mobile.

5.  It appeared to me that if Mr Wright wanted to, he could control all of, and make
    transactions in, the Bitcoin wallet addresses.

6.  I make this solemn declaration conscientiously believing the same to be true and by
    virtue of the provisions of the *Oaths Act 1900*.

Declared at Sydney on 11 October 2013

..................................................
                                            Stephen D'Emilio

in the presence of an authorised witness, who states:

I, Adrian Fong, a solicitor certify the following matters concerning the making of this statutory
declaration by the person who made it:

1

(i)     I saw the face of the person;

(ii)    I have known the person for at least 12 months.

Adrian Fong

11 October 2013

2

## Craig S Wright

**From:** BAA Program Support Office <dhsbaa@reisys.com>
**Sent:** Wednesday, 2 March 2011 8:56 AM
**To:** Craig S. Wright; Craig S. Wright; Craig S. Wright
**Subject:** BAA BAA 11-02-TTA 09-0049-WP Upload Received

Your upload has been received electronically at the DHS BAA Support Office.

BAA 11-02 Proposal #: BAA 11-02-TTA 09-0049-WP
  Proposal Title: Risk Quantification
  Company Name: W&K INFO DEFENSE RESEARCH LLC

White Paper Uploaded on: 03/01/11 04:55 PM EST
  File Name: BAA 11-02-TTA 09-0049-WP Risk Quantification.pdf
  File Type: Portable Document Format
  File Size: 357845 bytes

Uploaded by: Craig S. Wright

This is your official confirmation of receipt. Please save this email for your records, as no other receipt will be provided.

Thank you for your participation in the DHS BAA Program.

Please login to the portal at https://baa2.st.dhs.gov/portal/BAA/

If you have any questions, please contact DHS Technical Support at dhsbaa@reisys.com or call (703) 480-7676

Sincerely,
DHS BAA Program Support

This is the annexure marked with the letter "I" referred to in the Affidavit / Affirmation / Statutory Declaration of Craig S Wright sworn/affirmed/declared before me at _____ day of November 13
on the 4 th
One page only
Page 1 of 4 pages

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174



1

## Craig S Wright

| | |
|---|---|
| **From:** | BAA Program Support Office <dhsbaa@reisys.com> |
| **Sent:** | Wednesday, 2 March 2011 9:00 AM |
| **To:** | Craig S. Wright; Craig S. Wright; Craig S. Wright |
| **Subject:** | BAA BAA 11-02-TTA 01-0127-WP Upload Received |

Your upload has been received electronically at the DHS BAA Support Office.

BAA 11-02 Proposal #: BAA 11-02-TTA 01-0127-WP
 Proposal Title: Software Assurance through Economic Measures
 Company Name: W&K INFO DEFENSE RESEARCH LLC

White Paper Uploaded on: 03/01/11 04:59 PM EST
 File Name: BAA 11-02-TTA 01-0127-WP Software Assurance through Economic Measures.pdf
 File Type: Portable Document Format
 File Size: 290708 bytes

Uploaded by: Craig S. Wright

This is your official confirmation of receipt. Please save this email for your records, as no other receipt will be provided.

Thank you for your participation in the DHS BAA Program.

Please login to the portal at https://baa2.st.dhs.gov/portal/BAA/

If you have any questions, please contact DHS Technical Support at dhsbaa@reisys.com or call (703) 480-7676

Sincerely,
DHS BAA Program Support

1



## Craig S Wright

| From: | BAA Program Support Office <dhsbaa@reisys.com> |
|---|---|
| Sent: | Wednesday, 2 March 2011 10:46 AM |
| To: | Wright, Craig S. ; Wright, Craig S. ; Wright, Craig S. |
| Subject: | Submission confirmation of your DHS BAA Program Proposal # BAA 11-02-TTA 01-0127-WP |

Your proposal has been received electronically at the DHS Program Support Office.

BAA 11-02 White Paper Proposal #: BAA 11-02-TTA 01-0127-WP
    Proposal Title: Software Assurance through Economic Measures
    Company Name: W&K INFO DEFENSE RESEARCH LLC

Proposal Details:
    Cover Sheet A completed on: 02/16/11 02:33 AM EST
    Cover Sheet B completed on: 02/16/11 12:50 AM EST
    White Paper Upload completed on: 03/01/11 04:59 PM EST
        File Name: BAA 11-02-TTA 01-0127-WP Software Assurance through Economic Measures.pdf
        File Type: Portable Document Format
        File Size: 283 KB bytes

Submitted electronically by: Wright, Craig S.

This is your official confirmation of receipt. Please save this email for your records, as no other receipt will be provided.

Thank you for your participation in the DHS BAA Program.

Please login to the portal at https://baa2.st.dhs.gov/portal/BAA/

If you have any questions, please contact DHS Technical Support at dhsbaa@reisys.com or call (703) 480-7676

Sincerely,
DHS BAA Program Support



**Craig S Wright**

| | |
|---|---|
| **From:** | BAA Program Support Office <dhsbaa@reisys.com> |
| **Sent:** | Wednesday, 2 March 2011 10:53 AM |
| **To:** | Wright, Craig S. ; Wright, Craig S. ; Wright, Craig S. |
| **Subject:** | Submission confirmation of your DHS BAA Program Proposal # BAA 11-02-TTA 09-0049-WP |

Your proposal has been received electronically at the DHS Program Support Office.

BAA 11-02 White Paper Proposal #: BAA 11-02-TTA 09-0049-WP
      Proposal Title: Risk Quantification
      Company Name: W&K INFO DEFENSE RESEARCH LLC

Proposal Details:
      Cover Sheet A completed on: 02/16/11 02:30 AM EST
      Cover Sheet B completed on: 02/16/11 01:22 AM EST
      White Paper Upload completed on: 03/01/11 04:55 PM EST
            File Name: BAA 11-02-TTA 09-0049-WP Risk Quantification.pdf
            File Type: Portable Document Format
            File Size: 349 KB bytes

Submitted electronically by: Wright, Craig S.

This is your official confirmation of receipt. Please save this email for your records, as no other receipt will be provided.

Thank you for your participation in the DHS BAA Program.

Please login to the portal at https://baa2.st.dhs.gov/portal/BAA/

If you have any questions, please contact DHS Technical Support at dhsbaa@reisys.com or call (703) 480-7676

Sincerely,
DHS BAA Program Support



Skip Navigation
Contact Us


**Homeland Security**

DHS Broad Agency Announcements (BAA) Program Portal

**BAA Program**

**BAA Home**

- Basic Research Focus Areas
- High Priority Technology Areas
- Solicitations
  - Current Solicitations
    - Past Solicitations
  - Solicitation Awards
  - **Proposal Submission**
  - Awardee Portal
  - News And Events
  - S&T Directorate Events
  - ST Directorate SBIR Website
  - Privacy Policy
  - FAQs
  - Program Portal

# Registration Form

**Please do not register yourself MORE THAN ONCE!**

Fill in your registration information below. If there are errors on the registration form, you will be asked to re-enter the Company PIN and user password. (**Note: For security reason, this page will expire after 20 minutes of inactivity.**)

Re(g)ister      Back

**\* Required Information**

This is the annexure marked with the letter "J" referred to in the Affidavit /
Affirmation / Statutory Declaration of   Craig   S   WRIGHT
sworn/affirmed/declared before me at   Sydney
on the   4 th   day of   December   2013

One page only
Page 1 of 6 pages      NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

**COMPANY INFORMATION**

| | |
|---|---|
| *Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| TIN: | 274997114 |
| *Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Address (Line 2): | *E-mail us* if you need to modify the TIN. |
| *City: | Palm Beach |
| State: | FL |
| *ZIP+4: | 33410 - 6253    Need help for ZIP+4? |
| *Phone: | 561-310-8801 |
| Fax: | Company's Phone and Fax. Enter only numbers |
| *CEO/President's E-mail: | dave@davekleiman.com |
| DUNS + 4: | - What is DUNS?    9-digit Data Universal Number System plus a 4-digit suffix given by parent concern |
| CAGE Code: | How do I get a CAGE? |
| SIC: | What is a SIC? |
| FICE: | What is a FICE? |
| Company URL: | http://www.information-defense.com/    Provide Full URL (http://www.example.com) |
| *Year of Company Founded: | 2011 |
| *Company PIN: | ••••••    Why do you need a PIN?    Should be all numeric; no blank spaces allowed. Length must be between 4-6 numbers. |
| *Confirm Company PIN: | •••••• |

**COMPANY POINT OF CONTACT INFORMATION**

| | |
|---|---|
| *Salutation: | Mr. |
| *First Name: | Craig |
| Middle Initial: | S |
| *Last Name: | Wright |
| *Title: | Lead Researcher |
| *Phone: | 61 (417) 683 914    Ext:    Enter only numbers |
| Fax: | |
| *E-mail Address: | craig.wright@information-defense.c    Important! Fill out carefully |
| *Confirm E-mail Address: | craig.wright@information-defense.c    Re-enter E-mail Address |

**USER INFORMATION**

☑ Check here if you are also the Company Point Of Contact. *(This will pre-populate your information.)*

| | |
|---|---|
| *Salutation: | Mr. |



| | | |
|---|---|---|
| **\*First Name:** | Craig | |
| **Middle Initial:** | S | |
| **\*Last Name:** | Wright | |
| **\*Title:** | Lead Researcher | |
| **\*Phone:** | 61 (417) 683 914 | **Ext:** |
| **Fax:** | | Enter only numbers |
| **\*E-mail Address:** | craig.wright@information-defense.c | **Important!** Fill out carefully |
| **\*Confirm E-mail Address:** | craig.wright@information-defense.c | Re-enter E-mail Address |
| **\*Username:** | CraigWright | Only alphanumeric characters and underscores are allowed. Username must be at least 8 characters. |
| **\*Password:** | •••••••••••••••• | Your password must be at least 8 characters long and must have an upper case, a lower case, a number, and a special character. Your new password cannot repeat any of your 8 previous passwords. |
| **\*Confirm Password:** | •••••••••••••••• | |

**PIN Contact:** ☑ **Check here if you want to list yourself as a contact for Company's PIN.**

**Additional Authentication (used if you forget your password)**

| | | |
|---|---|---|
| **\*Select your question:** | Who is your favorite person? | You will be prompted with this question and a new password will be issued automatically if your answer matches the one you give here |
| **\*Answer to above question:** | Myself | |

\* Required Information

Re(g)ister     Back

DHS Form 10025 (7/07)

- U.S. Department of Homeland Security
- Science & Technology
- S&T Directorate SBIR Website
- OSDBU
- SAFETY Act
- SECURE Program
- Contact Us

## Craig S Wright

| | |
|---|---|
| **From:** | Dave Kleiman <dave@davekleiman.com> |
| **Sent:** | Wednesday, 16 February 2011 2:22 PM |
| **To:** | craig.wright@Information-defense.com |
| **Cc:** | lynn.wright@information-defense.com |
| **Subject:** | RE: Registration - TTA1 |
| **Attachments:** | W&K Info Defense Research LLC - 08.pdf |

**Importance:**      High

Look over the attached real quickly.

Let me know if it is ok.

Or should the PoC be in the US??   I see a non US vendor on the list.

Pay special attention to "Additional Authentication"

Dave

-----Original Message-----
From: Craig S Wright [mailto:craig.wright@information-defense.com]
Sent: Tuesday, February 15, 2011 22:04
To: Dave Kleiman
Subject: RE: Registration - TTA1

51 Cowangarra Rd
Bagnoo, New South Wales, 2446
AU

The other is not any longer

-----Original Message-----
From: Dave Kleiman [mailto:dave@davekleiman.com]
Sent: Wednesday, 16 February 2011 1:08 PM
To: craig.wright@Information-defense.com; lynn.wright@information-defense.com
Subject: RE: Registration - TTA1

Are either of these your current address?

51 Cowangarra Rd
Bagnoo, New South Wales, 2446
AU

Level 19, 2 Market Street
Sydney, NSW  2000

1



AU

-----Original Message-----
From: Dave Kleiman
Sent: Tuesday, February 15, 2011 14:13
To: 'craig.wright@Information-defense.com'; 'lynn.wright@information-defense.com'
Subject: RE: Registration - TTA1

It is under vendor registration that it requested DUNS see:
https://www.fbo.gov/?s=main&mode=list&tab=register&subtab=step1

Dave

-----Original Message-----
From: Dave Kleiman
Sent: Tuesday, February 15, 2011 07:29
To: 'craig.wright@Information-defense.com'; 'lynn.wright@information-defense.com'
Subject: RE: Registration - TTA1
Importance: High

Last page of attached.  Do you think I can list you as mgr or mgrm with a foreign address, or you think they would kick it
back?

Dave

-----Original Message-----
From: Dave Kleiman
Sent: Tuesday, February 15, 2011 06:35
To: 'craig.wright@Information-defense.com'; lynn.wright@information-defense.com
Subject: RE: Registration - TTA1

Did you already create a username and password?

-----Original Message-----
From: Craig S Wright [mailto:craig.wright@information-defense.com]
Sent: Tuesday, February 15, 2011 04:48
To: Dave Kleiman; lynn.wright@information-defense.com
Subject: Registration - TTA1

The first is to do with the attached papers...

   TTA 01
   <https://baa2.st.dhs.gov/portal/action/processRequest.action?eurl=AAAAAAEytBoAAAEuKK8xRgAUQUVTL0NCQy9QS0
   NTNVBhZGRpbmcAgAAQABAAAQIDBAUGBwgJCgsMDQ4PAAAAYMUP8ssYOu8SxeEfopmq%2F3IzhM%2F3rhjRC7iE1fh3q
   m1MXOKybn1NrHVavYBx1eeYUN3%2F6NSLR8PelSRUj0y6vIcWkXCDFPvq9gwzP%2BL6NcP3DCcUZ%2FjCxvXo415tuR%2B
   t1gAU7aqi30%2B%2FBa8MygMsXUmvQKEcJuQ%3D#0>  - Software Assurance


       White paper title        Software assurance through economic measures

                                        2



This also leads to the following one with:

TTA 14
<https://baa2.st.dhs.gov/portal/action/processRequest.action?eurl=AAAAAAEytBoAAAEuKK8xRgAUQUVTL0NCQy9QS0
NTNVBhZGRpbmcAgAAQABAAAQIDBAUGBwgJCgsMDQ4PAAAAYMUP8ssYOu8SxeEfopmq%2F3IzhM%2F3rhjRC7iE1fh3q
m1MXOKybn1NrHVavYBx1eeYUN3%2F6NSLR8PelSRUj0y6vIcWkXCDFPvq9gwzP%2BL6NcP3DCcUZ%2FjCxvXo415tuR%2B
t1gAU7aqi30%2B%2FBa8MygMsXUmvQKEcJuQ%3D#13> - Software Assurance MarketPlace (SWAMP)


White paper title        Software derivative markets

            And

                    Information Security risk markets


Greyfog (last email) should also come under TTA 05
<https://baa2.st.dhs.gov/portal/action/processRequest.action?eurl=AAAAAAEytBoAAAEuKK8xRgAUQUVTL0NCQy9QS0
NTNVBhZGRpbmcAgAAQABAAAQIDBAUGBwgJCgsMDQ4PAAAAYMUP8ssYOu8SxeEfopmq%2F3IzhM%2F3rhjRC7iE1fh3q
m1MXOKybn1NrHVavYBx1eeYUN3%2F6NSLR8PelSRUj0y6vIcWkXCDFPvq9gwzP%2BL6NcP3DCcUZ%2FjCxvXo415tuR%2B
t1gAU7aqi30%2B%2FBa8MygMsXUmvQKEcJuQ%3D#4> - Secure, Resilient Systems and Networks


...

Dr. Craig S Wright <http://gse-compliance.blogspot.com/> GSE-Malware, GSE-Compliance, LLM, & ...

Information Defense <http://www.information-defense.com/> Pty Ltd

Mobile: 0417 683 914

Description: Logo4

This is the annexure marked with the letter 'A' referred to in the Affidavit /
Affirmation / Statutory Declaration of *Craig Steven Wright*
sworn/affirmed/declared before me at *Sydney*
on the *4 Fe* day of *November 20 ~~13~~*
One page only
Page 1 of *4* pages
NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

**Proposal White Paper**      (Type I)

**BAA number, •**            BAA 11-02-TTA 01-0127-WP

**Title of proposal;**        Software Assurance through Economic Measures

**Name of offeror**           W&K INFO DEFENSE RESEARCH LLC

Administrative Contact:     Dave Kleiman

Company Name:                W&K INFO DEFENSE RESEARCH LLC
Mailing Address (Line 1):   4371 Norhtlake Blvd #314
Mailing Address (Line 2):
City:                        Palm Beach
State & Zip Code:            FL 33410 - 6253
Phone:                       5613108801
Fax:                         NA
TIN:                         274997114

Technical Contact:          Craig Wright

Company Name:                W&K INFO DEFENSE RESEARCH LLC
Mailing Address (Line 1):   4371 Norhtlake Blvd #314
Mailing Address (Line 2):
City:                        Palm Beach
State & Zip Code:            FL 33410 - 6253
Phone:                       +61 2 4362 1512
Fax:                         NA
TIN:                         274997114


W&K INFO DEFENSE RESEARCH LLC is a Joint Venture Company between a US Vet.
Owned Enterprise and an Australian Research Company.


Amount Requested (in dollars):    $650000.00

Duration:                         36 months

Requested Starting Date:          07/04/2011

Business Type:                    Small Business


**1 | P a g e**

Case 9:18-cv-80176-BB   Document 511-9   Entered on FLSD Docket 05/18/2020   Page 143 of
214
Case 9:18-cv-80176-BB   Document 83-4   Entered on FLSD Docket 01/14/2019   Page 51 of 105

**Executive Summary**

The deficiency of published quantitative data on software development and systems design has been a major ground for software engineering's failure to ascertain a proper scientific foundation. Past studies into coding practice have focused on software vendors. These developers have many distinctions from in-house projects that are not incorporated into the practices and do not align well with in-house corporate code development. In the past, building software was the only option but as the industry developed, the build vs. buy argument has swung back towards in-house development with the uptake of Internet connected systems. In general, this has been targeted towards specialized web databases and online systems with office systems and mainstream commercial applications becoming a 'buy' decision.

As companies move more and more to using the web and as 'cloud applications' become accepted, in-house development is becoming more common. This paper uses an empirical study of in-house software coding practices in Australian companies to both demonstrate that there is an economic limit to how far testing should proceed as well as noting the deficiencies in the existing approaches.

1.1  Related Work

Other studies of coding processes and reliability have been conducted over the last few decades. The majority of these have been based either on studies of large systems and mainframe based operations or have analyzed software vendors. In the few cases where coding practices within individual organization have been quantitatively analyzed, the organizations have been nearly always large telecommunications firms or have focused on SCADA and other critical system providers.

Whilst these results are extremely valuable, they fail to reflect the state of affairs within the vast majority of organizations. With far more small to medium businesses coupled with comparatively few large organizations with highly focused and dedicated large scale development teams (as can be found in any software vendor), an analysis of in-house practice is critical to both security and the economics of in-house coding.

As the Internet becomes all persuasive, internal coding functions are only likely to become more prevalent and hence more crucial to the security of the organization.

1.2  Our contribution

We intend to present an analysis using empirical studies to determine and model the cost of finding, testing and fixing software bugs. We model the discovery of bugs or vulnerabilities in using quantitative functions and calculate the defect rate per SLOC (source line of codes) using Bayesian calculations.

The end solution to the limited and sub-optimal markets that currently exist would be the creation of Hedge funds for software security. Sales in software security based derivatives could be created on forward contracts. One such solution is the issuing of paired contracts (such as

exist in short sales of stocks ). The first contract would be taken by a user and would pay a fixed amount if the software has suffered from any unmitigated vulnerabilities on the (forward) date specified in the contract. The paired contract would cover the vendor. If the vendor creates software without flaws (or at least mitigates all easily determinable flaws prior to the inception of the contract) the contract pays them the same amount as the first contract.

This is in effect a 'bet' that the software will perform effectively. If a bug is discovered, the user is paid a predetermined amount. This amount can be determined by the user to cover the expected costs of patching and any consequential damages (if so desired). This allows the user to select their own risk position by purchasing more or less risk as suits both the risk tolerance and the nature of the user's systems.

Such a derivative (if an open market is allowed to exist) would indicate the consensus opinion as to the security of the software and the reputation of the vendor. Such an instrument would allow software vendors and users to hedge the risks faced by undiscovered software vulnerabilities. These instruments would also be in the interest of the software vendor's investors as the ability to manage risk in advance would allow for forward financial planning and limit the negative impact that vulnerability discovery has on the quoted prices of a vendors capital.

This project will model the security of software coding practices in a manner that will lead to fewer economic externalities

**Utility to Department of Homeland Security**

The game theoretic approach to this can be modeled looking at the incentives of the business and programming functions in the organization. Programmers are optimists. As Brooks noted, "the first assumption that underlies the scheduling of systems programming is that all will go well". Testing is rarely considered by the normal programmer as this would imply failure. However, the human inability to create perfection leads to the introductions of flaws at each stage of development.

### Technical Approach

Just as car dealers buff the exterior and detail the upholstery of a used car, neglecting the work that should be done on the engine, software vendors add features. Most users are unlikely to use even a small fraction of these features, yet they buy the product that offers more features over the more secure product with fewer features. The issue here is that users buy the features over security. This is a less expensive option for the vendor to implement and provide.

The creation of a security and risk derivative should change this. The user would have an upfront estimate of the costs and this could be forced back to the software vendor. Where the derivative costs more than testing, the vendor would conduct more in-depth testing and reduce the levels of bugs. This would most likely lead to product differentiation (as occurred in the past with Windows 95/Windows NT). Those businesses who wish to pay for security could receive it. Those wanting features would get what they asked for.

It is argued that software developers characteristically do not correct all the security vulnerabilities and that known ones remain in the product after release. Whether this is due to a lack of resources or other reasons, this is unlikely to be the norm and would be rectified by the market. The cost of vendors in share price and reputational losses exceed the perceived gains from technical reasons where the fix might break existing applications. The application is already broken in the instance of a security vulnerability.

Users could still run older versions of software and have few, if any, bugs. The issue is that they would also gain no new features. It is clear that users want features. They could also choose to use only secure software, but the costs of doing so far outweigh the benefits and do not provide a guarantee against the security of a system being compromised. As such, the enforced legislation of security standards against software vendors is detrimental. A better approach would be to allow an open market based system where vendors can operate in reputational and derivative markets.

At the end of any analysis, security is a risk function and what is most important is not the creation of perfectly security systems, but the correct allocation of scarce resources. Systems need to be created that allow the end user to determine their own acceptable level of risk based on good information.

The goal of this research project is to create a series of quantitative models for information security that can be used to create a software security derivative and insurance market. Mathematical modeling techniques that can be used to model and predict information security risk will be developed using a combination of techniques including:

- Economic theory, and Econometrics
- Quantitative financial modeling,
- Behavioral Economics,
- Algorithmic game theory and
- Statistical hazard/survival models.

The models will account for heteroscedastic confounding variables and include appropriate transforms such that variance heterogeneity is assured in non-normal distributions. Process modeling for integrated Poisson continuous-time process for risk through hazard will be developed using a combination of:

- Business financial data (company accountancy and other records),
- Anti-Virus Industry data
- Legal databases for tortuous and regulatory costs and
- Insurance datasets.

**This work and research follows and continues that published as:**

Wright, Craig S. and Zia, Tanveer A. (2010) T*he Economics of Developing Security Embedded Software*, Proceedings of the 8th Australian Information Security Management Conference, Edith Cowan University, Perth Western Australia, 30th November 2010

Charles Sturt University

http://ro.ecu.edu.au/cgi/viewcontent.cgi?article=1101&context=ism

and

Wright, Craig S. (2010) *Software, Vendors and Reputation: an analysis of the dilemma in creating secure software*, Proceedings of InTrust 2010 The Second International Conference on Trusted Systems 13th – 15th December 2010 Beijing, P. R. China

Charles Sturt University

and (forthcoming)

Wright, Craig S. and Zia, Tanveer A (2011) *A Quantitative Analysis into the Economics of Testing Software Bugs*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011

Wright, Craig S. and Zia, Tanveer A (2011) *A Rationally Opting for the Insecure Alternative: Negative Externalities and the Selection of Security Controls*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011

**Personnel and Performer Qualifications and Experience**
**Craig S Wright (Full CV too long and is available in request)**

Over the years Craig has personally conducted and managed in excess of 1,600 IT security related engagements for more than 180 Australian and international organizations in both the private and government sectors. As a strong believer in life-long learning, Craig has qualifications in Law, IT, Mathematics and Business. However, his driving focus is research and development in the security and risk arena. He is the first person to have obtained multiple GSE certifications (Malware and Compliance) Craig designed the architecture for the world's first online casino (Lasseter's Online) in the Northern Territory; as well he has, in the past, designed and managed the implementation of many of the systems that protect the Australian Stock Exchange. To add to these accomplishments he has authored IT security related books and articles as well as designed a new university program for Charles Sturt University in New South Wales, Australia which will offer a Master in Digital Forensics. This program commenced in 2010 and be offered as an on campus and distance education program.

**Dave Kleiman** (http://en.wikipedia.org/wiki/Dave_Kleiman)

Dave Kleiman is a noted Forensic Computer Investigator, an author/coauthor of multiple books and a noted speaker at security related events

**Bob Radvanovsky**, CIFI, CISM, REM, CIPS, Infracritical, Inc.
Principle, SCADA expert and Author
(chapter author) of "Corporate Hacking and Technology-driven Crime: Social Dynamics and Implication", ISBN 1616928050 and 9781616928056, Information Science Publishing, July 2010.



Case 9:18-cv-80176-BB  Document 511-9  Entered on FLSD Docket 05/18/2020  Page 147 of
214
Case 9:18-cv-80176-BB  Document 83-4  Entered on FLSD Docket 01/14/2019  Page 55 of 105

URL: http://www.amazon.com/Corporate-Hacking-Technology-driven-Crime-
Implications/dp/1616928050

"Challenges Faced by the SCADASEC Mailing List", Protecting Canada's Critical Infrastructure 2010
Control Systems Security Workshop, sponsored by Royal Canadian Mounted Police (Ontario
Technological Crime), Public Safety Canada and Emergency Management Ontario (Critical Infrastructure
Assurance Program), Wednesday April 14, 2010 and Thursday, April 15, 2010.
URL: http://www.infracritical.com/papers/scadasec-2010-review.zip
Author of "Critical Infrastructure: Homeland Security and Emergency Preparedness", Second Edition,
ISBN 1420095277 and 9781420095272, Taylor & Francis CRC Press, December 2009.
URL: http://www.amazon.co.uk/Critical-Infrastructure-Homeland-Emergency-
Preparedness/dp/1420095277
Contributor (introduction speaker) of "The Year in Homeland Security", 2008/2009 Edition (Charles
Oldham, editor director), Faircount Media Group.
URL: http://viewer.zmags.com/publication/d1408139#/d1408139/12
Author (co-author) of "Transportation Systems Security", ISBN 1420063782 and 9781420063783, Taylor
and Francis CRC Press, May 2008.
URL: http://www.amazon.com/Transportation-Systems-Security-Allan-McDougall/dp/1420063782

### Commercialization Capabilities and Plan

The principles are experienced researchers and businessmen in the realm of Information
Security. The research will be conducted in conjunction with Charles Sturt University and will
follow the standard commercialization processes of the University (these processes are available
online). Further, this project will create a large body of public and academic knowledge and
scientific research that could also be used by other companies and Universities in the creation of
further models and structures that will lead to the securing of more systems again.

### Costs, Work, and Schedule

Amount Requested (in dollars):        $650,000.00

Duration:                             36 months

The funding request will provide full scholarships and positions for three (3) PhD candidates to
aide in the research and investigation of software security issues and solution, the creation of
economic models and the publication of an expected 20-30 papers in this field.

The period is set to three years which includes the completion of the PhD projects and the
creation of the market, insurance and derivative models.

- PhD Funding              $240,000
- Supervision              $180,000
- Survey and data Analysis $230,000



| BAA Number: | BAA 11-02-TTA 01-0127-WP | |
|---|---|---|
| Offeror Name: | W&K INFO DEFENSE RESEARCH LLC | |
| Title | Software Assurance through Economic Measures | |
| Date: | 07/04/2010 | |

| N/A | **Operational Capability:** The project will analyze a sample of at least 1,000 coding projects using existing static analysis tools, manual code review and related techniques. Where these methods are lacking, proposals and methods to integrate existing methods and to fill the gaps left will be created. |
|---|---|
| **Proposed Technical Approach:**<br>This project will address and provide measures and The analysis will measure the following coding errors:<br>• Format string errors<br>• Integer Overflows<br>• Buffer overruns<br>• SQL Injection<br>• Cross-Site scripting<br>• Race Conditions<br>• Command Injection.<br>Several published papers have been released (forthcoming include)<br><br>Wright, Craig S. and Zia, Tanveer A (2011) *A Quantitative Analysis into the Economics of Testing Software Bugs*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011<br><br>Wright, Craig S. and Zia, Tanveer A (2011) *A Rationally Opting for the Insecure Alternative: Negative Externalities and the Selection of Security Controls*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011 | **Schedule, Cost, Deliverables, & Contact Info:**<br>Provide any milestone decision points that will be required. Describe period of performance and total costs. Include the base performance period cost and length, and estimates of cost and lengths of possible option.<br>**Deliverables:**<br>20-30 published papers<br>3 PhD Thesis' in the field<br>A commercial model for software derivatives and insurance markets<br><br>A means to measure and predict the following coding errors is being developed<br>    Format string errors<br>    Integer Overflows<br>    Buffer overruns<br>    SQL Injection<br>    Cross-Site scripting<br>    Race Conditions<br>    Command Injection.<br><br>**Corporate Information:**<br>Dave Kleiman<br>W&K INFO DEFENSE RESEARCH LLC<br>4371 Norhtlake Blvd #314<br>Palm Beach<br>FL 33410 - 6253<br><br>Phone:  5613108801<br>Email:   dave@davekleiman.com |

Authorized Representative:    Craig Wright

Signature:

**7 |** P a g e

**Proposal White Paper**     **(Type I)**

| | |
|---|---|
| **BAA number**, · | BAA 11-02-TTA 09-0049-WP |
| **Title of proposal;** | Risk Quantification |
| **Name of offeror** | W&K INFO DEFENSE RESEARCH LLC |
| Administrative Contact: | Dave Kleiman |
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL 33410 - 6253 |
| Phone: | 5613108801 |
| Fax: | NA |
| TIN: | 274997114 |
| Technical Contact: | Craig Wright |
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL 33410 - 6253 |
| Phone: | +61 2 4362 1512 |
| Fax: | NA |
| TIN: | 274997114 |

W&K INFO DEFENSE RESEARCH LLC is a Joint Venture Company between a US Vet. Owned Enterprise and a Australian Research Company.

| | |
|---|---|
| Amount Requested (in dollars): | $2,200,000.00 |
| Duration: | 36 months |
| Requested Starting Date: | 07/04/2011 |
| Business Type: | Small Business |

## Executive Summary

Using empirical evidence, this research aims to investigate and quantify the root cause of security flaws that act as a source of system compromise. Research into the effects of poor system design, market based risk solutions based on derivative instruments and the impact of common system misconfigurations will be incorporated into multivariate survival models. This research incorporates the economic impact of various decisions as a means of determining the optimal distribution of costs and liability when applied to information security and in particular when assigning costs in computer system security and reliability engineering.

The objective of this research is to produce an innovative modelling architecture designed around information systems security and risk based reliability and survivability analysis. The objectives of the research are:

(1) To address the critical limitations (Jeanblanc & Valchev, 2005) that are associated with reliability engineering in regards to computer systems. This will be completed with competing risks analysis and multivariate survival analysis coupled with a game theoretic approach. Data collected from an analysis of systems in the field will be used to test assumptions. These assumptions (Marti, 2008) include:

    a. constant and homogenous failure rates,
    b. binary failure and univariate reliability,
    c. censoring of failure data, and
    d. independent failures.

(2) To produce a methodology for the creation and testing of hazard and survival models for information systems. This will become a risk based quantitative approach to reliability and survivability engineering.

(3) To incorporate methods that represent the effects of misaligned incentives and their consequence to security controls.

To do this, it is necessary to recognise that information security is a risk function (Anderson, Longley & Kwok, 1994). Paying for too much security can be more damaging in economic terms than not buying enough. This leads to decisions about where the optimal expenditure on damage prevention should lie. This research will investigate who should be responsible for the security failures that are affecting the economy and society and how can this be maximized in order to minimize negative externalities (Cohen, 1976). The conclusions will be presented using an empirical study of software hazard rates and audit failures along with the question of how to enforce liability in a global economy.

The research is intended to address some of the economic issues that are arising due to an inability of assign risk correctly, a failure to measure risk as well as looking at the misalignment of information systems audit and the compliance regime. The externalities that restrict the development of secure software and how the failure of the end user to apply controls makes it less probable that a software vendor will enforce stricter programming controls with failures in the audit and measurement processes are addressed. This includes a look at the misalignment of audit to security. This misalignment is demonstrated to result from the drawing of funds from security in order to provide compliance with little true economic gain (Wright, 2010).

The introduction of Game Theory and Behavioural Economics (Anderson, 2001; Anderson, & Moore, 2006; Varian, 2004) have created a foundation for the rationalisation of information security processes which lead to improved allocation of economic resources. The optimal distribution of economic resources across risk allocations in information system can only lead to

Case 9:18-cv-80176-BB   Document 511-9   Entered on FLSD Docket 05/18/2020   Page 151 of
214
Case 9:18-cv-80176-BB   Document 83-4   Entered on FLSD Docket 01/14/2019   Page 59 of 105

a combination of more secure systems for a lower overall cost. This research will incorporate the game theoretic multi-player decision problem. Agents in the model will be deemed to be rational with well-defined preferences, include the ability to reason strategically using their knowledge and belief of other players and to act according to a combination of both economic "*first thought*" and deep strategic thinking (Nissan, et. al., 2007). Solutions to these models will be sought through a combination of the following game devices:

- Equilibrium: evolutive (steady state) games
- Heterogeneous sequential games
- Rationalisability: deductive reasoning

The models will detail the existence of strictly dominating games where these exist in information security practices and propose methods to improve these models. Existing information security practices in existing organisations will be classified into the following game types:

- Non-cooperative vs. cooperative game
- Strategic vs. extensive game
- Perfect vs. imperfect information

Bounded rationality, behavioural game aspects and other feedback effects will be investigated (Nissan, et. al., 2007). Social capital based on fairness and reciprocity will be defined as it applies to the economically efficient application of risk processes associated with Information systems. Contract Theory will be used to explain the creation of agreements and "*contracts*" in the presence of information asymmetry.  This is approached through the combination of adverse selection, moral hazards and the "*signalling game*". In this, adverse selection is defined as the "*Principal not having been informed of the other agent's private information ex-ante*" such as in George Akerlof's "*Market for lemons*" (1970). This application of game theory has been asserted to explain many aspects of the software industries predisposition to create insecure software (Anderson, 2001). Arora, Telang and Xu (2004) asserted that a market-based mechanism for software vulnerabilities would necessarily underperform a CERT-type mechanism. The market that they used was a game theoretic *pricing game*. In the model reported, the players in the market do not report their prices[1]. These players use a model where information is distributed simultaneously to the client of the player and the vendor. The CERT model was touted as being the most favourable solution. The research will demonstrate that the examined "*market*" model is in itself sub-optimal. It both creates incentives to leak information without proper safeguards and creates vulnerability black-markets that rely on waiting until a patch was publically released and only then releasing the patch to the public. This ignores many externalities and assumes the only control is a patch in place of other alternative compensating controls. It is to be demonstrated that there are flaws with this approach that can be solved through the creation of a security and risk derivative market for software. The user would have an upfront estimate of the costs and this could be forced back to the software vendor. Where the derivative costs more than testing, the vendor would conduct more in-depth testing and reduce the levels of bugs (Bacon et. al. 2009).

## 1.2  Our contribution and Technical Approach

We intend to present an analysis using empirical studies to determine and model the cost of finding, testing and fixing security vulnerabilities. The goal of this research project is to create a series of quantitative models for information security. Mathematical modelling techniques that

---

[1] E.g., iDefense Ltd. and other similar providers have a semi-closed market with limited information exchange.

can be used to model and predict information security risk will be developed using a combination of techniques including:

- Economic theory, and Econometrics
- Quantitative financial modelling,
- Behavioural Economics,
- Algorithmic game theory and
- Statistical hazard/survival models.

The models will account for heteroscedastic confounding variables and include appropriate transforms such that variance heterogeneity is assured in non-normal distributions. Process modelling for integrated Poisson continuous-time process for risk through hazard will be developed using a combination of:

- Business financial data (company accountancy and other records),
- Anti-Virus Industry data
- Legal databases for tortuous and regulatory costs and
- Insurance datasets.

This data will be coupled with hazard models created and validated using Honeynets (e.g. Project Honeynet), reporting sites such as the Internet Storm Centre and iDefence. The combination of this information will provide the framework for a truly quantitative security risk framework[2]. At present, the DShield storm centre receives logging from over 600,000 organisations. This represents a larger quantity of data than is used for actuarial data in the home insurance industry. The problem being that this information is not collated or analysed in any quantitatively sound manner. This research will model survival times for types of applications using the body of research into quantitative code analysis for risk. The research will create a series of models (such as those used within mechanical engineering, material science etc) for Information Risk.

Some of the methods that are planned testing in the creation of the risk framework will include:

- Random forest clustering,
- K-means analysis,
- Other classification algorithms, and
- Network associative maps in text analysis forensic work.

The correlation of reference data (such as IP and functional analysis data) between C&C (Command and Control) systems used in "*botnets*" is one aspect of this research. Starting from the outside (the cloud and perimeter) and working inwards to the network, the risk model would start by assessing external threats and move into internal threat sources, becoming gradually become more and more granular as one moves from network to individual hosts and finally to people (user behaviour (Varian, 2004)) and application modelling (Guo, Jarrow, & Zeng, 2005). The eventual result will be the creation of a model that can incorporate the type of organisation, size, location, application, systems used, and the user awareness levels to create a truly quantitative risk model. This would be reported with SE (standard error) and confidence level rather than a point estimate. Code to import data from hosts and networks, using raw "*pcap traces*"[3] will be developed such that system statistics and other data can be collated into a standardised format. This code will be developed in "R" and "C++". This will enable the

---

[2] Support has been sought and received from SANS (including DShield), CIS (Centre for Internet Security) and the Honeynet project.
[3] Pcap is a packet capture standard supported by both open source and commercial network capture equipment.



creation and release of actuarial threat risk models that incorporate heterogeneous tendencies in variance across multidimensional determinants while maintaining parsimony. I foresee a combination of Heteroscedastic predictors (GARCH/ARIMA etc) coupled with non-parametric survival models. I expect that this will result in a model where the underlying hazard rate (rather than survival time) is a function of the independent variables (covariates). Cox's Proportional Hazard Model with Time-Dependent Covariates would be a starting point, going to non-parametric methods if necessary. The end goal will be to create a framework and possibly a program that can assess data stream based on a number of dependant variables (Threat models, system survival etc) and covariates and return a quantified risk forecast and standard error.

**Utility to Department of Homeland Security**

When a system fails, it often can fail in numerous ways with several causes for the failure (Crowder 2001). Censored observation management can be considered the principal factor influencing survival analysis. Survival analysis and has developed rigorous procedures and methods effective for the treatment of censored data based on probability theory, asymptotic counting and stochastic process as well as the Martingale central limit theorem. References to the univariate analysis of survival is found in Cox (1972), Cox and Oakes (1984), Fleming and Harrington (1991), Andersen et al (1993), Kalbfleisch and Prentice (1980, 2002), Klein and Moeschberger (2003), Ibrahim et al. (2005), Lawless (1982, 2003), Ma and Krings (2008).

Modeling risk allows it to be measured and controlled.

**This work and research follows and continues:**

Wright, Craig S. and Zia, Tanveer A. (2010) T*he Economics of Developing Security Embedded Software*, Proceedings of the 8th Australian Information Security Management Conference, Edith Cowan University, Perth Western Australia, 30th November 2010

Charles Sturt University

http://ro.ecu.edu.au/cgi/viewcontent.cgi?article=1101&context=ism

and (forthcoming)

Wright, Craig S. and Zia, Tanveer A (2011) *A Quantitative Analysis into the Economics of Testing Software Bugs*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011

Wright, Craig S. and Zia, Tanveer A (2011) *A Rationally Opting for the Insecure Alternative: Negative Externalities and the Selection of Security Controls*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011

**Personnel and Performer Qualifications and Experience**

**Craig S Wright (Full CV too long and is available in request)**

Over the years Craig has personally conducted and managed in excess of 1,600 IT security related engagements for more than 180 Australian and international organizations in both the private and government sectors. As a strong believer in life-long learning, Craig has qualifications in Law, IT, Mathematics and Business. However, his driving focus is research and development in the security and risk arena. He is the first person to have obtained multiple GSE certifications (Malware and Compliance) Craig designed the architecture for the world's first online casino (Lasseter's Online) in the Northern Territory; as well he has, in the past, designed and managed the implementation of many of the systems that protect the Australian Stock Exchange. To add to these accomplishments he has authored IT security related books and articles as well as designed a new university program for Charles Sturt University in



New South Wales, Australia which will offer a Master in Digital Forensics. This program commenced in 2010 and be offered as an on campus and distance education program.

**Dave Kleiman** (http://en.wikipedia.org/wiki/Dave_Kleiman)

Dave Kleiman is a noted Forensic Computer Investigator, an author/coauthor of multiple books and a noted speaker at security related events

**Bob Radvanovsky**, CIFI, CISM, REM, CIPS, Infracritical, Inc.

Principle, SCADA expert and Author

URL: http://www.amazon.com/Corporate-Hacking-Technology-driven-Crime-Implications/dp/1616928050

URL: http://www.infracritical.com/papers/scadasec-2010-review.zip

URL: http://www.amazon.co.uk/Critical-Infrastructure-Homeland-Emergency-Preparedness/dp/1420095277

URL: http://viewer.zmags.com/publication/d1408139#/d1408139/12

URL: http://www.amazon.com/Transportation-Systems-Security-Alian-McDougall/dp/1420063782

### Commercialization Capabilities and Plan

The principles are experienced researchers and businessmen in the realm of Information Security. The research will be conducted in conjunction with Charles Sturt University and will follow the standard commercialization processes of the University (these processes are available online). Further, this project will create a large body of public and academic knowledge and scientific research that could also be used by other companies and Universities in the creation of further models and structures that will lead to the securing of more systems again.

### Costs, Work, and Schedule

Amount Requested (in dollars):          $2,200,000.00

Duration:                                              36 months

The funding request will provide full scholarships and positions for three (3) PhD candidates to aide in the research and investigation of software security issues and solution, the creation of economic models and the publication of an expected 20-30 papers in this field.

The period is set to three years which includes the completion of the PhD projects and the creation of the market, insurance and derivative models.

| | | |
|---|---|---|
| • | PhD Funding | $480,000 |
| • | Supervision | $350,000 |
| • | Survey and data Analysis | $230,000 |
| • | Research Fellowships (2) | $260,000 |
| • | Administration | $120,000 |
| • | Costs (Computational Systems) | $660,000 |
| • | Support Costs (Coding) | $300,000 |



| BAA Number: | BAA 11-02-TTA 01-0127-WP |
| --- | --- |
| **Offeror Name:** | W&K INFO DEFENSE RESEARCH LLC |
| **Title** | Risk Quantification |
| **Date:** | 07/04/2010 |

| N/A | **Operational Capability:** |
| --- | --- |
| | The research is intended to address some of the economic issues that are arising due to an inability of assign risk correctly, a failure to measure risk as well as looking at the misalignment of information systems audit and the compliance regime. The externalities that restrict the development of secure software and how the failure of the end user to apply controls makes it less probable that a software vendor will enforce stricter programming controls with failures in the audit and measurement processes are addressed. This includes a look at the misalignment of audit to security. This misalignment is demonstrated to result from the drawing of funds from security in order to provide compliance with little true economic gain (Wright, 2010). |

| **Proposed Technical Approach:** | **Schedule, Cost, Deliverables, & Contact Info:** |
| --- | --- |
| The objective of this research is to produce an innovative modeling architecture designed around information systems security and risk based reliability and survivability analysis. The objectives of the research are: | **Deliverables:**<br>30-40 published papers<br>3 PhD Thesis' in the field<br>A commercial model for modeling information risk |
| (1)     To address the critical limitations (Jeanblanc & Valchev, 2005) that are associated with reliability engineering in regards to computer systems. This will be completed with competing risks analysis and multivariate survival analysis coupled with a game theoretic approach. Data collected from an analysis of systems in the field will be used to test assumptions. These assumptions (Marti, 2008) include: | Several published papers have been released (forthcoming include)<br>Wright, Craig S. and Zia, Tanveer A (2011) A Quantitative Analysis into the Economics of Testing Software Bugs, Proceedings of CISIS 2011 June 8-10th, 2011<br>Wright, Craig S. and Zia, Tanveer A (2011) A Rationally Opting for the Insecure Alternative: Negative Externalities and the Selection of Security Controls, Proceedings of CISIS 2011, 2011 |
| a.     constant and homogenous failure rates,<br>b.     binary failure and univariate reliability,<br>c.     censoring of failure data, and<br>d.     independent failures. | **Corporate Information:** |
| (2)     To produce a methodology for the creation and testing of hazard and survival models for information systems. This will become a risk based quantitative approach to reliability and survivability engineering. | Dave Kleiman<br>W&K INFO DEFENSE RESEARCH LLC<br>4371 Norhtlake Blvd #314<br>Palm Beach<br>FL 33410 - 6253<br>Phone:  5613108801<br>Email:   dave@davekleiman.com |
| (3)     To incorporate methods that represent the effects of misaligned incentives and their consequence to security controls. | |

Authorized Representative:      Craig Wright

Signature:

**Proposal White Paper**          **(Type I)**

**BAA number,** ·          BAA 11-02-TTA 14-0025-WP

**Title of proposal;**          Software Derivative Markets & Information Security Risk

**Name of offeror**          W&K INFO DEFENSE RESEARCH LLC

Administrative Contact:          Dave Kleiman

| | |
|---|---|
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL 33410 - 6253 |
| Phone: | 5613108801 |
| Fax: | NA |
| TIN: | 274997114 |

Technical Contact:          Craig Wright

| | |
|---|---|
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL 33410 - 6253 |
| Phone: | +61 2 4362 1512 |
| Fax: | NA |
| TIN: | 274997114 |

W&K INFO DEFENSE RESEARCH LLC is a Joint Venture Company between a US Vet.
Owned Enterprise and a Australian Research Company.

| | |
|---|---|
| Amount Requested (in dollars): | $1,200,000.00 |
| Duration: | 36 months |
| Requested Starting Date: | 07/04/2011 |
| Business Type: | Small Business |

**Executive Summary**

This project will develop the optimal derivative and risk strategy for software markets. A game theoretic approach to this will be modeled looking at the incentives of the business and programming functions in the organization. Programmers, as optimists (Brooks) hold, "the first assumption that underlies the scheduling of systems programming is that all will go well". Testing is rarely considered by the normal programmer as this would imply failure. However, the human inability to create perfection leads to the introductions of flaws at each stage of development. This project will deliver frameworks designed to optimize the software development process and to sell the risk using a derivative market place that reflects this risk. The end goal is to remove externalities from the costs of software and incorporate the cost of bad software design into the final cost to the consumer.

The deficiency of published quantitative data on software development and systems design has been a major ground for software engineering's failure to ascertain a proper scientific foundation. Past studies into coding practice have focused on software vendors. These developers have many distinctions from in-house projects that are not incorporated into the practices and do not align well with in-house corporate code development. In the past, building software was the only option but as the industry developed, the build vs. buy argument has swung back towards in-house development with the uptake of Internet connected systems. In general, this has been targeted towards specialized web databases and online systems with office systems and mainstream commercial applications becoming a 'buy' decision.

As companies move more and more to using the web and as 'cloud applications' become accepted, in-house software development is becoming more common. This paper uses an empirical study of in-house software coding practices in Australian companies to both demonstrate that there is an economic limit to how far testing should proceed as well as noting the deficiencies in the existing approaches.

**1.1  Related Work and our contributions**

This research will seek to demonstrate that a well-defined software risk derivative market would improve the information exchange for both the software user and vendor removing the oft touted imperfect information state that is said to belie the software industry. In this way, users could have a rational means of accurately judging software risks and costs and as such the vendor could optimally apply their time between delivering features and averting risk in a manner demanded by the end user. After all, it is of little value to increase the cost per unit of software by more than an equal compensating control.

Arora, Telang and Xu asserted that a market based mechanism for software vulnerabilities will necessarily underperform a CERT-type mechanism. The market that they used was a game theoretic pricing game. In the model reported, the players in the market do not report their prices. These players use a model where information is simultaneously distributed to the client of the player and the vendor. The CERT model was touted as being optimal. It relies on waiting until a patch was publically released and only then releasing the patch to the public. This ignores many externalities and assumes the only control is a patch in place of other alternative compensating controls.

Consequently, the examined "market" model is in itself sub-optimal. It both creates incentives to leak information without proper safeguards and creates vulnerability black-markets. As criminal groups and selected security vendors (such as Penetration testers and IDS vendors) have an incentive to gain information secretly , they have an incentive to pay more for unknown vulnerabilities in a closed market. This means that a seller to one of these parties has a

reputational incentive to earn more through not releasing information as the individual's reputation will be based on their ability to maintain secrecy.

"Vulnerability disclosure adversely and significantly affects the stock performance of a software vendor. We show that, on average, a software vendor loses around 0.63% of market value on the day of the vulnerability announcement. This translates to a dollar amount of $0.86 billion loss in market value. We also show that markets do not penalize a vendor any more if the vulnerability is discovered by a third party than by the vendor itself."

These results demonstrate that a vendor has an incentive to minimize the vulnerabilities found in their products. If an excessive number of vulnerabilities continue to impact a vendor, their market capitalization suffers as a consequence. This justification offers strong evidence that a vendor does not have an incentive to hide information (as third party vulnerability researchers cause an equal loss in capitalization). It has to be expected that any vulnerability known by the vendor will be uncovered. If the vendor fixes this flaw before release, the cost is minimized and at the limit approaches the cost of testing, (that is a zero incremental cost to that which would be expressed later).

If the vendor discovers a vulnerability in the software they produce, the result is a 'strongly dominated' motive to fix the bug. Hence, any remaining bugs are those that have not been uncovered by the vendor and which are less economical to find (through an increase in testing). It can thus be demonstrated that the vendor knows no more than the user at the point of software release as to the state of bugs in a product.

Testing is far less expensive earlier in the development cycle. Early in the process, the software developer has the greatest returns in testing and bug finding. As the development progresses, the returns are reduced as the process required and the costs associated with finding and correcting software vulnerabilities increases.

The utility is lowest when the software has been shipped to the user. At this point, fixing flaws is an expensive process for both the user and the vendor. This leaves the optimal solution to find as many bugs as possible as early in the development process as is feasible. This contrasts with the increasing costs of finding bugs. This leaves the optimal solution for the vendor based on the discovery of as many bugs as possible as early in the development process as is feasible (as a bug discovered early in the process can cost as much as 10x less than one discovered later) . It does not mean that all bugs or vulnerabilities will be found as the cost of finding additional vulnerabilities quickly exceeds the returns.

The market for lemons requires that the vendor knows the level of flaws better than the user. To many this may seem a common sense outcome, the vendor has access to source code, wrote the program and ran the development process. This is a flawed view as we have demonstrated as it is in the vendor's interest to mitigate vulnerabilities as early as possible. More importantly, the vendor is punished for bugs.

1.2  Our contribution

We intend to present an analysis using empirical studies to determine and model the cost of finding, testing and fixing software bugs. We model the discovery of bugs or vulnerabilities in using quantitative functions and calculate the defect rate per SLOC (source line of codes) using Bayesian calculations.

The end solution to the limited and sub-optimal markets that currently exist would be the creation of Hedge funds for software security. Sales in software security based derivatives could be created on forward contracts. One such solution is the issuing of paired contracts (such as exist in short sales of stocks ). The first contract would be taken by a user and would pay a fixed

amount if the software has suffered from any unmitigated vulnerabilities on the (forward) date specified in the contract. The paired contract would cover the vendor. If the vendor creates software without flaws (or at least mitigates all easily determinable flaws prior to the inception of the contract) the contract pays them the same amount as the first contract.

This is in effect a 'bet' that the software will perform effectively. If a bug is discovered, the user is paid a predetermined amount. This amount can be determined by the user to cover the expected costs of patching and any consequential damages (if so desired). This allows the user to select their own risk position by purchasing more or less risk as suits both the risk tolerance and the nature of the user's systems.

Such a derivative (if an open market is allowed to exist) would indicate the consensus opinion as to the security of the software and the reputation of the vendor. Such an instrument would allow software vendors and users to hedge the risks faced by undiscovered software vulnerabilities.

These instruments would also be in the interest of the software vendor's investors as the ability to manage risk in advance would allow for forward financial planning and limit the negative impact that vulnerability discovery has on the quoted prices of a vendors capital.

This project will model the security of software coding practices in a manner that will lead to fewer economic externalities

**Utility to Department of Homeland Security**

In economic terms, we want to assign liability such that the optimal damage mitigation strategy occurs. The victim will mitigate their damages where no damages for breach apply in respect of the optimal strategy and payoffs. The rule that creates the best incentives for both parties is the doctrine of avoidable consequences (marginal costs liability).

Mitigation of damages is concerned with both the post-breach behaviors of the victim and the actions of the party to minimize the impact of a breach. In a software parlays', this would incur costs to the user of the software in order to adequately secure their systems. This again is a trade-off. Before the breach (through software failures and vulnerabilities that can lead to a violation of a system's security), the user has an obligation to install and maintain the system in a secure state. The user is likely to have the software products of several vendors installed on a single system. Because of this, the interactions of the software selected and installed by the user span the range of multiple sources and no single software vendor can account for all possible combinations and interactions.

Any pre-breach behavior of the vendor and user of software needs to incorporate the capability of the vendors to both minimize the liability attached to their own products, as well as the interactions of other products installed on a system. It is feasible to deploy one of several options that can aid in the minimization of the effects of a breach due to a software problem prior to the discovery of software vulnerabilities, these include:

1.    The software vendor can implement protective controls (such as firewalls)
2.    The user can install protective controls
3.    the vendor can provide accounting and tracking functions

The following steps further facilitate in minimizing the effects of software vulnerabilities:

1.    The vendor can employ more people to test software for vulnerabilities
2.    The software vendor can add additional controls

Where more time is expended on the provision of software security by the vendor (hiring more testers, more time writing code etc), the cost of the software needs to reflect this additional effort, hence the cost to the consumer increases. This cost is divisible in the case of a widely deployed Operating System (such as Microsoft Windows) where it is easy to distribute the



incremental costs across additional users. Smaller vendors (such as small tailored vendors for the
Hotel accounting market) do not have this distributional margin and the additional controls could
result in a substantial increase in the cost of the program.

**Technical Approach**

The goal of this research project is to create a series of quantitative models for information
security that can be used to create a software security derivative and insurance market.
Mathematical modeling techniques that can be used to model and predict information security
risk will be developed using a combination of techniques including:

- Economic theory, and Econometrics
- Quantitative financial modeling,
- Behavioral Economics,
- Algorithmic game theory and
- Statistical hazard/survival models.

The models will account for heteroscedastic confounding variables and include appropriate
transforms such that variance heterogeneity is assured in non-normal distributions. Process
modeling for integrated Poisson continuous-time process for risk through hazard will be
developed using a combination of:

- Business financial data (company accountancy and other records),
- Anti-Virus Industry data
- Legal databases for tortuous and regulatory costs and
- Insurance datasets.

**This work and research follows and continues that published as:**

> Wright, Craig S. and Zia, Tanveer A. (2010) T*he Economics of Developing Security
> Embedded Software*, Proceedings of the 8th Australian Information Security Management
> Conference, Edith Cowan University, Perth Western Australia, 30th November 2010
> Charles Sturt University
> http://ro.ecu.edu.au/cgi/viewcontent.cgi?article=1101&context=ism

and

> Wright, Craig S. (2010) *Software, Vendors and Reputation: an analysis of the dilemma in
> creating secure software*, Proceedings of InTrust 2010 The Second International
> Conference on Trusted Systems 13th – 15th December 2010 Beijing, P. R. China
> Charles Sturt University

and (forthcoming)

> Wright, Craig S. and Zia, Tanveer A (2011) *A Quantitative Analysis into the Economics
> of Testing Software Bugs*, Proceedings of 4th International Conference on Computational
> Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011
> Wright, Craig S. and Zia, Tanveer A (2011) *A Rationally Opting for the Insecure
> Alternative: Negative Externalities and the Selection of Security Controls*, CISIS 2011
> June 8-10th, 2011

**Personnel and Performer Qualifications and Experience**

**Craig S Wright (Full CV too long and is available in request)**

Over the years Craig has personally conducted and managed in excess of 1,600 IT security related
engagements for more than 180 Australian and international organizations in both the private and
government sectors. As a strong believer in life-long learning, Craig has qualifications in Law, IT,
Mathematics and Business. However, his driving focus is research and development in the security and



risk arena. He is the first person to have obtained multiple GSE certifications (Malware and Compliance) Craig designed the architecture for the world's first online casino (Lasseter's Online) in the Northern Territory; as well he has, in the past, designed and managed the implementation of many of the systems that protect the Australian Stock Exchange. To add to these accomplishments he has authored IT security related books and articles as well as designed a new university program for Charles Sturt University in New South Wales, Australia which will offer a Master in Digital Forensics. This program commenced in 2010 and be offered as an on campus and distance education program.

**Dave Kleiman** (http://en.wikipedia.org/wiki/Dave_Kleiman)

Dave Kleiman is a noted Forensic Computer Investigator, an author/coauthor of multiple books and a noted speaker at security related events

**Bob Radvanovsky**, CIFI, CISM, REM, CIPS, Infracritical, Inc.
Principle, SCADA expert and Author
(chapter author) of "Corporate Hacking and Technology-driven Crime: Social Dynamics and URL: http://www.amazon.com/Corporate-Hacking-Technology-driven-Crime-Implications/dp/1616928050

URL: http://www.infracritical.com/papers/scadasec-2010-review.zip
URL: http://www.amazon.co.uk/Critical-Infrastructure-Homeland-Emergency-Preparedness/dp/1420095277
URL: http://viewer.zmags.com/publication/d1408139#/d1408139/12
URL: http://www.amazon.com/Transportation-Systems-Security-Allan-McDougall/dp/1420063782

### Commercialization Capabilities and Plan

The principles are experienced researchers and businessmen in the realm of Information Security. The research will be conducted in conjunction with Charles Sturt University and will follow the standard commercialization processes of the University (these processes are available online). Further, this project will create a large body of public and academic knowledge and scientific research that could also be used by other companies and Universities in the creation of further models and structures that will lead to the securing of more systems again.

### Costs, Work, and Schedule

Amount Requested (in dollars):        $1,200,000.00
Duration:                             36 months
The funding request will provide full scholarships and positions for three (3) PhD candidates to aide in the research and investigation of software security issues and solution, the creation of economic models and the publication of an expected 20-30 papers in this field. The period is set to three years which includes the completion of the PhD projects and the creation of the market, insurance and derivative models.

| | | |
|---|---|---|
| • | PhD Funding | $360,000 |
| • | Supervision | $180,000 |
| • | Survey and data Analysis | $220,000 |
| • | Administration | $120,000 |
| • | Core Systems | $220,000 |
| • | Marketing of system and test use | $100,000 |



| BAA Number: | BAA 11-02-TTA 01-0127-WP | |
|---|---|---|
| Offeror Name: | W&K INFO DEFENSE RESEARCH LLC | |
| Title | Software Derivative Markets & Information Security Risk | |
| | BAA 11-02-TTA 14-0025-WP | |
| Date: | 07/04/2010 | |
| NA | | **Operational Capability:** The project test, develop and test a combination of insurance and derivative based risk markets for both software security and information risk minimization. |

| **Proposed Technical Approach:** | **Schedule, Cost, Deliverables, & Contact Info:** |
|---|---|
| This project will address and provide measures and The analysis will measure the following coding errors: <br>• Format string errors<br>• Integer Overflows<br>• Buffer overruns<br>• SQL Injection<br>• Cross-Site scripting<br>• Race Conditions<br>• Command Injection.<br>In addition, market models for selling vulnerabilities will be developed and tested. A first stage vulnerability and risk marketplace will be developed.<br><br>Several published papers have been released (forthcoming include)<br><br>Wright, Craig S. and Zia, Tanveer A (2011) *A Quantitative Analysis into the Economics of Testing Software Bugs*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011<br><br>Wright, Craig S. and Zia, Tanveer A (2011) *A Rationally Opting for the Insecure Alternative: Negative Externalities and the Selection of Security Controls*, Proceedings CISIS 2011 June 8-10th, 2011 | This project will develop the optimal derivative and risk strategy for software markets. A game theoretic approach to this will be modelled looking at the incentives of the business and programming functions in the organization. Programmers, as optimists (Brooks, ) hold, "the first assumption that underlies the scheduling of systems programming is that all will go well". Testing is rarely considered by the normal programmer as this would imply failure. However, the human inability to create perfection leads to the introductions of flaws at each stage of development. This project will deliver frameworks designed to optimize the software development process and to sell the risk using a derivative market place that reflects this risk. The end goal is to remove externalities from the costs of software and incorporate the cost of bad software design into the final cost to the consumer.<br>**Deliverables:**<br>20-30 published papers<br>3 PhD Thesis' in the field<br>A commercial model for software derivatives and insurance markets<br>**Corporate Information:**<br>Dave Kleiman<br>W&K INFO DEFENSE RESEARCH LLC<br>4371 Norhtlake Blvd #314<br>Palm Beach<br>FL 33410 - 6253<br>Phone:  5613108801<br>Email:   dave@davekleiman.com |

Authorized Representative:      Craig Wright

Signature:

**7 |** P a g e



| **Proposal White Paper** | **(Type II)** |
|---|---|

| **BAA number**, • | BAA 11-02-TTA 05-0155-WP |
|---|---|
| **Title of proposal;** | SCADA Isolation |
| **Name of offeror** | W&K INFO DEFENSE RESEARCH LLC |

Administrative Contact:   Dave Kleiman

| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
|---|---|
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL 33410 - 6253 |
| Phone: | 5613108801 |
| Fax: | NA |
| TIN: | 274997114 |

Technical Contact:   Craig Wright

| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
|---|---|
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL 33410 - 6253 |
| Phone: | +61 2 4362 1512 |
| Fax: | NA |
| TIN: | 274997114 |

W&K INFO DEFENSE RESEARCH LLC is a Joint Venture Company between a US Vet. Owned Enterprise and a Australian Research Company.

| Amount Requested (in dollars): | $1,800,000.00 |
|---|---|
| Duration: | 36 months |
| Requested Starting Date: | 07/04/2011 |
| Business Type: | Small Business |

**Executive Summary**

This project involves the creation of a SCADA targeted filter. This filter will act as a security gateway allowing users to access legacy systems that do not support modern encrypted protocols to do so whist not having to interfere with the existing system. At the same time, advanced threats and Malware (such as STUXNET) will be isolated from the systems using a bridged firewall layer. This system will in itself be isolated and resilient and be capable of reliable action when power and other failures occur. It will collate and report attacks seamlessly allowing Internet connected management and monitoring systems to co-exist on treacherous networks in a cloud environment.

The Revenant device is an embedded Linux-based appliance with an RFC compliant IPSec and Stateful firewall implementation built into the kernel.  It is built using embedded Linux and is completely solid state with no moving parts to fail and no hard drive. It also utilises kernel-based IPSec. Designed as an appliance, this system is modular and highly configurable, requiring a small physical, CPU and memory footprint.

The Revenant appliance platform provides a base set of services and functions as an operating environment for many security conscious network based applications. The Appliance provides built-in IPSec encryption, SSHv2 Secure Remote Management, text based management and power-off safe operation.

Basic Management and upkeep of Revenant

System Life-Cycle comprises:
- Security Patch updates
- System and Application updates
- System health-check and maintenance
- System Security Integrity maintenance

Revenant embodies an imbedded, appliance architecture with a strong bias towards encryption, out-of-band authentication and other network applications.

Two primary products have been designed at this point, with expansion into additional modules planned for the future.
- Revenant Encrypted Private Network Gateway
- The Revenant EPN Gateway provides a platform for performing IPSec encryption in several configurations:
  1) Network-to-Network
  2) Host-to-Network
  3) Host-to-Host
  4) Revenant IDS
- The Revenant application is also capable of providing a platform for an IDS sensor.

The Revenant appliance platform provides a base set of services and functions as an operating environment for many security conscious network based applications. The Appliance provides built-in IPSec encryption, SSHv2 Secure Remote Management, Text based management and power-off safe  operation



The Revenant appliance has been built with size, performance and security as primary goals, and as a result of this, the system does not run any network accessible processes except those required by specifically installed modules.

The Revenant platform offers no intrinsic network access paths, and is not accessible on the network unless one of the network modules has been installed. The Revenant system does not load any network accessible functionality except as required by the appliance modules loaded in any specific configuration.

The Revenant Measurement appliance is an "Out-of-Band" strong authentication and connection gateway system. Measurement is an access concentrator, which performs strong authentication of user requests. In a security conscious environment, the Measurement allows an organization to effectively provide wide-ranging access to systems or services through a single, secure access path.

The Revenant appliance is a perfect platform for Measurement services due to the security functions and services built into the base system.

## 1.1 Related Work and our contributions

This project involves the creation of a SCADA targeted filter. This filter will act as a security gateway allowing users to access legacy systems that do not support modern encrypted protocols to do so whist not having to interfere with the existing system. At the same time, advanced threats and Malware (such as STUXNET) will be isolated from the systems using a bridged firewall layer. This system will in itself be isolated and resilient and be capable of reliable action when power and other failures occur. It will collate and report attacks seamlessly allowing Internet connected management and monitoring systems to co-exist on treacherous networks in a cloud environment.

### Technical Approach

A PCap module written in R and C that can take direct network feeds (TCP/IP) and report on anomalous traffic (with a learning feature and feedback cycle to minimize error with use) will be developed with the appliance.

## This work and research follows and continues that published as:

Wright, Craig S. and Zia, Tanveer A. (2010) T*he Economics of Developing Security Embedded Software*, Proceedings of the 8th Australian Information Security Management Conference, Edith Cowan University, Perth Western Australia, 30th November 2010 Charles Sturt University
http://ro.ecu.edu.au/cgi/viewcontent.cgi?article=1101&context=ism

and

Wright, Craig S. (2010) *Software, Vendors and Reputation: an analysis of the dilemma in creating secure software*, Proceedings of InTrust 2010 The Second International Conference on Trusted Systems 13th – 15th December 2010 Beijing, P. R. China Charles Sturt University



and (forthcoming)

> Wright, Craig S. and Zia, Tanveer A (2011) *A Quantitative Analysis into the Economics
> of Testing Software Bugs*, Proceedings of 4th International Conference on Computational
> Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011
> Wright, Craig S. and Zia, Tanveer A (2011) *A Rationally Opting for the Insecure
> Alternative: Negative Externalities and the Selection of Security Controls*, CISIS 2011
> June 8-10th, 2011

### Personnel and Performer Qualifications and Experience
**Craig S Wright (Full CV too long and is available in request)**

Over the years Craig has personally conducted and managed in excess of 1,600 IT security related
engagements for more than 180 Australian and international organizations in both the private and
government sectors. As a strong believer in life-long learning, Craig has qualifications in Law, IT,
Mathematics and Business. However, his driving focus is research and development in the security and
risk arena. He is the first person to have obtained multiple GSE certifications (Malware and Compliance)
Craig designed the architecture for the world's first online casino (Lasseter's Online) in the Northern
Territory; as well he has, in the past, designed and managed the implementation of many of the systems
that protect the Australian Stock Exchange. To add to these accomplishments he has authored IT security
related books and articles as well as designed a new university program for Charles Sturt University in
New South Wales, Australia which will offer a Master in Digital Forensics. This program commenced in
2010 and be offered as an on campus and distance education program.

**Dave Kleiman** (http://en.wikipedia.org/wiki/Dave_Kleiman)

Dave Kleiman is a noted Forensic Computer Investigator, an author/coauthor of multiple books and a
noted speaker at security related events

**Bob Radvanovsky**, CIFI, CISM, REM, CIPS, Infracritical, Inc.
Principle, SCADA expert and Author
(chapter author) of "Corporate Hacking and Technology-driven Crime: Social Dynamics and URL:
http://www.amazon.com/Corporate-Hacking-Technology-driven-Crime-Implications/dp/1616928050

URL: http://www.infracritical.com/papers/scadasec-2010-review.zip
URL: http://www.amazon.co.uk/Critical-Infrastructure-Homeland-Emergency-
Preparedness/dp/1420095277
URL: http://viewer.zmags.com/publication/d1408139#/d1408139/12
URL: http://www.amazon.com/Transportation-Systems-Security-Allan-McDougall/dp/1420063782

### Commercialization Capabilities and Plan

The principles are experienced researchers and businessmen in the realm of Information
Security. The research will be conducted in conjunction with Charles Sturt University and will
follow the standard commercialization processes of the University (these processes are available
online). Further, this project will create a large body of public and academic knowledge and
scientific research that could also be used by other companies and Universities in the creation of
further models and structures that will lead to the securing of more systems again.

**4 |** P a g e



### Costs, Work, and Schedule

Amount Requested (in dollars):  $1,800,000.00
Duration:  36 months

The funding request will provide full scholarships and positions for two (2) PhD candidates to aide in the research and investigation of security issues and solution, the creation of software and IDS tools in this field. The period is set to three years which includes the completion of the PhD projects and the creation of the appliance and related open source software.

| | | |
|---|---|---|
| • | PhD Funding | $240,000 |
| • | Supervision | $180,000 |
| • | Survey and data Analysis | $120,000 |
| • | Administration | $120,000 |
| • | Core Systems | $220,000 |
| • | Marketing of system and test use | $100,000 |
| • | Software coding | $340,000 |
| • | Electronics and System | $480,000 |

**BAA Number:**  BAA 11-02-TTA 05-0155-WP
**Offeror Name:**  W&K INFO DEFENSE RESEARCH LLC
**Title**       SCADA Isolation
**Date:**       07/04/2010



**Operational Capability:**
The project test, develop and test a set of software and hardware solutions developed to minimize attacks again SCADA systems.

**Proposed Technical Approach:**
This project will provide a low cost, high availability and security SCADA security solution through:

- System inventory management
- Firewall
- Anti-virus / anti-malware
- Forensic network capture
- IP property protection and extrusion reporting
- Risk quantification
- Advanced traffic filtering and data capture
- The idea to be patented – advanced IDS / honeypot

**Schedule, Cost, Deliverables, & Contact Info:**
This project involves the creation of a SCADA targeted filter. This filter will act as a security gateway allowing users to access legacy systems that do not support modern encrypted protocols to do so whist not having to interfere with the existing system. At the same time, advanced threats and Malware (such as STUXNET) will be isolated from the systems using a bridged firewall layer. This system will in itself be isolated and resilient and be capable of reliable action when power and other failures occur. It will collate and report attacks seamlessly allowing Internet connected management and monitoring systems to co-exist on treacherous networks in a cloud environment.

**Deliverables:**
5-10 published papers
2 PhD Thesis' in the field
A commercial appliance
A TCPDump filter program
**Corporate Information:**
Dave Kleiman
W&K INFO DEFENSE RESEARCH LLC
4371 Norhtlake Blvd #314
Palm Beach
FL 33410 - 6253
Phone:   5613108801
Email:   dave@davekleiman.com

Authorized Representative:       Craig Wright

Signature:

**Proposal White Paper**          **(Type I)**

| | |
|---|---|
| **BAA number.** • | BAA 11-02-TTA 09-0049-WP |
| **Title of proposal;** | Risk Quantification |
| **Name of offeror** | W&K INFO DEFENSE RESEARCH LLC |
| Administrative Contact: | Dave Kleiman |
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL 33410 - 6253 |
| Phone: | 5613108801 |
| Fax: | NA |
| TIN: | 274997114 |
| Technical Contact: | Craig Wright |
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL 33410 - 6253 |
| Phone: | +61 2 4362 1512 |
| Fax: | NA |
| TIN: | 274997114 |

W&K INFO DEFENSE RESEARCH LLC is a Joint Venture Company between a US Vet.
Owned Enterprise and a Australian Research Company.

| | |
|---|---|
| Amount Requested (in dollars): | $2,200,000.00 |
| Duration: | 36 months |
| Requested Starting Date: | 07/04/2011 |
| Business Type: | Small Business |



**Executive Summary**

Using empirical evidence, this research aims to investigate and quantify the root cause of security flaws that act as a source of system compromise. Research into the effects of poor system design, market based risk solutions based on derivative instruments and the impact of common system misconfigurations will be incorporated into multivariate survival models. This research incorporates the economic impact of various decisions as a means of determining the optimal distribution of costs and liability when applied to information security and in particular when assigning costs in computer system security and reliability engineering.

The objective of this research is to produce an innovative modelling architecture designed around information systems security and risk based reliability and survivability analysis. The objectives of the research are:

(1) To address the critical limitations (Jeanblanc & Valchev, 2005) that are associated with reliability engineering in regards to computer systems. This will be completed with competing risks analysis and multivariate survival analysis coupled with a game theoretic approach. Data collected from an analysis of systems in the field will be used to test assumptions. These assumptions (Marti, 2008) include:

   a. constant and homogenous failure rates,
   b. binary failure and univariate reliability,
   c. censoring of failure data, and
   d. independent failures.

(2) To produce a methodology for the creation and testing of hazard and survival models for information systems. This will become a risk based quantitative approach to reliability and survivability engineering.

(3) To incorporate methods that represent the effects of misaligned incentives and their consequence to security controls.

To do this, it is necessary to recognise that information security is a risk function (Anderson, Longley & Kwok, 1994). Paying for too much security can be more damaging in economic terms than not buying enough. This leads to decisions about where the optimal expenditure on damage prevention should lie. This research will investigate who should be responsible for the security failures that are affecting the economy and society and how can this be maximized in order to minimize negative externalities (Cohen, 1976). The conclusions will be presented using an empirical study of software hazard rates and audit failures along with the question of how to enforce liability in a global economy.

The research is intended to address some of the economic issues that are arising due to an inability of assign risk correctly, a failure to measure risk as well as looking at the misalignment of information systems audit and the compliance regime. The externalities that restrict the development of secure software and how the failure of the end user to apply controls makes it less probable that a software vendor will enforce stricter programming controls with failures in the audit and measurement processes are addressed. This includes a look at the misalignment of audit to security. This misalignment is demonstrated to result from the drawing of funds from security in order to provide compliance with little true economic gain (Wright, 2010).

The introduction of Game Theory and Behavioural Economics (Anderson, 2001; Anderson, & Moore, 2006; Varian, 2004) have created a foundation for the rationalisation of information security processes which lead to improved allocation of economic resources. The optimal distribution of economic resources across risk allocations in information system can only lead to



a combination of more secure systems for a lower overall cost. This research will incorporate the game theoretic multi-player decision problem. Agents in the model will be deemed to be rational with well-defined preferences, include the ability to reason strategically using their knowledge and belief of other players and to act according to a combination of both economic "*first thought*" and deep strategic thinking (Nissan, et. al., 2007). Solutions to these models will be sought through a combination of the following game devices:

- Equilibrium: evolutive (steady state) games
- Heterogeneous sequential games
- Rationalisability: deductive reasoning

The models will detail the existence of strictly dominating games where these exist in information security practices and propose methods to improve these models. Existing information security practices in existing organisations will be classified into the following game types:

- Non-cooperative vs. cooperative game
- Strategic vs. extensive game
- Perfect vs. imperfect information

Bounded rationality, behavioural game aspects and other feedback effects will be investigated (Nissan, et. al., 2007). Social capital based on fairness and reciprocity will be defined as it applies to the economically efficient application of risk processes associated with Information systems. Contract Theory will be used to explain the creation of agreements and "*contracts*" in the presence of information asymmetry.  This is approached through the combination of adverse selection, moral hazards and the "*signalling game*". In this, adverse selection is defined as the "*Principal not having been informed of the other agent's private information ex-ante*" such as in George Akerlof's "*Market for lemons*" (1970). This application of game theory has been asserted to explain many aspects of the software industries predisposition to create insecure software (Anderson, 2001). Arora, Telang and Xu (2004) asserted that a market-based mechanism for software vulnerabilities would necessarily underperform a CERT-type mechanism. The market that they used was a game theoretic *pricing game*. In the model reported, the players in the market do not report their prices[1]. These players use a model where information is distributed simultaneously to the client of the player and the vendor. The CERT model was touted as being the most favourable solution. The research will demonstrate that the examined "*market*" model is in itself sub-optimal. It both creates incentives to leak information without proper safeguards and creates vulnerability black-markets that rely on waiting until a patch was publically released and only then releasing the patch to the public. This ignores many externalities and assumes the only control is a patch in place of other alternative compensating controls. It is to be demonstrated that there are flaws with this approach that can be solved through the creation of a security and risk derivative market for software. The user would have an upfront estimate of the costs and this could be forced back to the software vendor. Where the derivative costs more than testing, the vendor would conduct more in-depth testing and reduce the levels of bugs (Bacon et. al. 2009).

### 1.2  Our contribution and Technical Approach

We intend to present an analysis using empirical studies to determine and model the cost of finding, testing and fixing security vulnerabilities. The goal of this research project is to create a series of quantitative models for information security. Mathematical modelling techniques that

---

[1] E.g., iDefense Ltd. and other similar providers have a semi-closed market with limited information exchange.

can be used to model and predict information security risk will be developed using a combination of techniques including:

- Economic theory, and Econometrics
- Quantitative financial modelling,
- Behavioural Economics,
- Algorithmic game theory and
- Statistical hazard/survival models.

The models will account for heteroscedastic confounding variables and include appropriate transforms such that variance heterogeneity is assured in non-normal distributions. Process modelling for integrated Poisson continuous-time process for risk through hazard will be developed using a combination of:

- Business financial data (company accountancy and other records),
- Anti-Virus Industry data
- Legal databases for tortuous and regulatory costs and
- Insurance datasets.

This data will be coupled with hazard models created and validated using Honeynets (e.g. Project Honeynet), reporting sites such as the Internet Storm Centre and iDefence. The combination of this information will provide the framework for a truly quantitative security risk framework[2]. At present, the DShield storm centre receives logging from over 600,000 organisations. This represents a larger quantity of data than is used for actuarial data in the home insurance industry. The problem being that this information is not collated or analysed in any quantitatively sound manner. This research will model survival times for types of applications using the body of research into quantitative code analysis for risk. The research will create a series of models (such as those used within mechanical engineering, material science etc) for Information Risk.

Some of the methods that are planned testing in the creation of the risk framework will include:

- Random forest clustering,
- K-means analysis,
- Other classification algorithms, and
- Network associative maps in text analysis forensic work.

The correlation of reference data (such as IP and functional analysis data) between C&C (Command and Control) systems used in "*botnets*" is one aspect of this research. Starting from the outside (the cloud and perimeter) and working inwards to the network, the risk model would start by assessing external threats and move into internal threat sources, becoming gradually become more and more granular as one moves from network to individual hosts and finally to people (user behaviour (Varian, 2004)) and application modelling (Guo, Jarrow, & Zeng, 2005). The eventual result will be the creation of a model that can incorporate the type of organisation, size, location, application, systems used, and the user awareness levels to create a truly quantitative risk model. This would be reported with SE (standard error) and confidence level rather than a point estimate. Code to import data from hosts and networks, using raw "*pcap traces*"[3] will be developed such that system statistics and other data can be collated into a standardised format. This code will be developed in "R" and "C++". This will enable the

---

[2] Support has been sought and received from SANS (including DShield), CIS (Centre for Internet Security) and the Honeynet project.
[3] Pcap is a packet capture standard supported by both open source and commercial network capture equipment.

**4 |** P a g e



creation and release of actuarial threat risk models that incorporate heterogeneous tendencies in variance across multidimensional determinants while maintaining parsimony. I foresee a combination of Heteroscedastic predictors (GARCH/ARIMA etc) coupled with non-parametric survival models. I expect that this will result in a model where the underlying hazard rate (rather than survival time) is a function of the independent variables (covariates). Cox's Proportional Hazard Model with Time-Dependent Covariates would be a starting point, going to non-parametric methods if necessary. The end goal will be to create a framework and possibly a program that can assess data stream based on a number of dependant variables (Threat models, system survival etc) and covariates and return a quantified risk forecast and standard error.

**Utility to Department of Homeland Security**

When a system fails, it often can fail in numerous ways with several causes for the failure (Crowder 2001). Censored observation management can be considered the principal factor influencing survival analysis. Survival analysis and has developed rigorous procedures and methods effective for the treatment of censored data based on probability theory, asymptotic counting and stochastic process as well as the Martingale central limit theorem. References to the univariate analysis of survival is found in Cox (1972), Cox and Oakes (1984), Fleming and Harrington (1991), Andersen et al (1993), Kalbfleisch and Prentice (1980, 2002), Klein and Moeschberger (2003), Ibrahim et al. (2005), Lawless (1982, 2003), Ma and Krings (2008).

Modeling risk allows it to be measured and controlled.

**This work and research follows and continues:**

> Wright, Craig S. and Zia, Tanveer A. (2010) *The Economics of Developing Security Embedded Software*, Proceedings of the 8th Australian Information Security Management Conference, Edith Cowan University, Perth Western Australia, 30th November 2010
>
> Charles Sturt University
>
> http://ro.ecu.edu.au/cgi/viewcontent.cgi?article=1101&context=ism

and (forthcoming)

> Wright, Craig S. and Zia, Tanveer A (2011) *A Quantitative Analysis into the Economics of Testing Software Bugs*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011
>
> Wright, Craig S. and Zia, Tanveer A (2011) *A Rationally Opting for the Insecure Alternative: Negative Externalities and the Selection of Security Controls*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011

**Personnel and Performer Qualifications and Experience**

**Craig S Wright (Full CV too long and is available in request)**

Over the years Craig has personally conducted and managed in excess of 1,600 IT security related engagements for more than 180 Australian and international organizations in both the private and government sectors. As a strong believer in life-long learning, Craig has qualifications in Law, IT, Mathematics and Business. However, his driving focus is research and development in the security and risk arena. He is the first person to have obtained multiple GSE certifications (Malware and Compliance) Craig designed the architecture for the world's first online casino (Lasseter's Online) in the Northern Territory; as well he has, in the past, designed and managed the implementation of many of the systems that protect the Australian Stock Exchange. To add to these accomplishments he has authored IT security related books and articles as well as designed a new university program for Charles Sturt University in



New South Wales, Australia which will offer a Master in Digital Forensics. This program commenced in 2010 and be offered as an on campus and distance education program.

**Dave Kleiman** (http://en.wikipedia.org/wiki/Dave_Kleiman)

Dave Kleiman is a noted Forensic Computer Investigator, an author/coauthor of multiple books and a noted speaker at security related events

**Bob Radvanovsky**, CIFI, CISM, REM, CIPS, Infracritical, Inc.

Principle, SCADA expert and Author

URL: http://www.amazon.com/Corporate-Hacking-Technology-driven-Crime-Implications/dp/1616928050

URL: http://www.infracritical.com/papers/scadasec-2010-review.zip

URL: http://www.amazon.co.uk/Critical-Infrastructure-Homeland-Emergency-Preparedness/dp/1420095277

URL: http://viewer.zmags.com/publication/d1408139#/d1408139/12

URL: http://www.amazon.com/Transportation-Systems-Security-Allan-McDougall/dp/1420063782

### Commercialization Capabilities and Plan

The principles are experienced researchers and businessmen in the realm of Information Security. The research will be conducted in conjunction with Charles Sturt University and will follow the standard commercialization processes of the University (these processes are available online). Further, this project will create a large body of public and academic knowledge and scientific research that could also be used by other companies and Universities in the creation of further models and structures that will lead to the securing of more systems again.

### Costs, Work, and Schedule

Amount Requested (in dollars):          $2,200,000.00

Duration:                                           36 months

The funding request will provide full scholarships and positions for three (3) PhD candidates to aide in the research and investigation of software security issues and solution, the creation of economic models and the publication of an expected 20-30 papers in this field.

The period is set to three years which includes the completion of the PhD projects and the creation of the market, insurance and derivative models.

| | | |
|---|---|---|
| • | PhD Funding | $480,000 |
| • | Supervision | $350,000 |
| • | Survey and data Analysis | $230,000 |
| • | Research Fellowships (2) | $260,000 |
| • | Administration | $120,000 |
| • | Costs (Computational Systems) | $660,000 |
| • | Support Costs (Coding) | $300,000 |



| BAA Number: | BAA 11-02-TTA 01-0127-WP |
|---|---|
| **Offeror Name:** | W&K INFO DEFENSE RESEARCH LLC |
| **Title** | Risk Quantification |
| **Date:** | 07/04/2010 |

| N/A | **Operational Capability:** |
|---|---|
| | The research is intended to address some of the economic issues that are arising due to an inability of assign risk correctly, a failure to measure risk as well as looking at the misalignment of information systems audit and the compliance regime. The externalities that restrict the development of secure software and how the failure of the end user to apply controls makes it less probable that a software vendor will enforce stricter programming controls with failures in the audit and measurement processes are addressed. This includes a look at the misalignment of audit to security. This misalignment is demonstrated to result from the drawing of funds from security in order to provide compliance with little true economic gain (Wright, 2010). |

| **Proposed Technical Approach:** | **Schedule, Cost, Deliverables, & Contact Info:** |
|---|---|
| The objective of this research is to produce an innovative modeling architecture designed around information systems security and risk based reliability and survivability analysis. The objectives of the research are:<br><br>(1)      To address the critical limitations (Jeanblanc & Valchev, 2005) that are associated with reliability engineering in regards to computer systems. This will be completed with competing risks analysis and multivariate survival analysis coupled with a game theoretic approach. Data collected from an analysis of systems in the field will be used to test assumptions. These assumptions (Marti, 2008) include:<br><br>a.      constant and homogenous failure rates,<br>b.      binary failure and univariate reliability,<br>c.      censoring of failure data, and<br>d.      independent failures.<br><br>(2)      To produce a methodology for the creation and testing of hazard and survival models for information systems. This will become a risk based quantitative approach to reliability and survivability engineering.<br><br>(3)      To incorporate methods that represent the effects of misaligned incentives and their consequence to security controls. | **Deliverables:**<br>30-40 published papers<br>3 PhD Thesis' in the field<br>A commercial model for modeling information risk<br><br>Several published papers have been released (forthcoming include)<br>Wright, Craig S. and Zia, Tanveer A (2011) A Quantitative Analysis into the Economics of Testing Software Bugs, Proceedings of CISIS 2011 June 8-10th, 2011<br>Wright, Craig S. and Zia, Tanveer A (2011) A Rationally Opting for the Insecure Alternative: Negative Externalities and the Selection of Security Controls, Proceedings of CISIS 2011, 2011<br><br>**Corporate Information:**<br>Dave Kleiman<br>W&K INFO DEFENSE RESEARCH LLC<br>4371 Norhtlake Blvd #314<br>Palm Beach<br>FL 33410 - 6253<br>Phone:  5613108801<br>Email:  dave@davekleiman.com |

Authorized Representative:      Craig Wright
Signature:

**Proposal White Paper**        **(Type I)**

**BAA number**, ·            BAA 11-02-TTA 01-0127-WP

**Title of proposal;**        Software Assurance through Economic Measures

**Name of offeror**          W&K INFO DEFENSE RESEARCH LLC

Administrative Contact:      Dave Kleiman

| | |
|---|---|
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL 33410 - 6253 |
| Phone: | 5613108801 |
| Fax: | NA |
| TIN: | 274997114 |

Technical Contact:          Craig Wright

| | |
|---|---|
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL 33410 - 6253 |
| Phone: | +61 2 4362 1512 |
| Fax: | NA |
| TIN: | 274997114 |

W&K INFO DEFENSE RESEARCH LLC is a Joint Venture Company between a US Vet.
Owned Enterprise and an Australian Research Company.

| | |
|---|---|
| Amount Requested (in dollars): | $650000.00 |
| Duration: | 36 months |
| Requested Starting Date: | 07/04/2011 |
| Business Type: | Small Business |

**1** | P a g e



Case 9:18-cv-80176-BB   Document 511-9   Entered on FLSD Docket 05/18/2020   Page 177 of
214
Case 9:18-cv-80176-BB   Document 83-4   Entered on FLSD Docket 01/14/2019   Page 85 of 105

**Executive Summary**

The deficiency of published quantitative data on software development and systems design has been a major ground for software engineering's failure to ascertain a proper scientific foundation. Past studies into coding practice have focused on software vendors. These developers have many distinctions from in-house projects that are not incorporated into the practices and do not align well with in-house corporate code development. In the past, building software was the only option but as the industry developed, the build vs. buy argument has swung back towards in-house development with the uptake of Internet connected systems. In general, this has been targeted towards specialized web databases and online systems with office systems and mainstream commercial applications becoming a 'buy' decision.

As companies move more and more to using the web and as 'cloud applications' become accepted, in-house development is becoming more common. This paper uses an empirical study of in-house software coding practices in Australian companies to both demonstrate that there is an economic limit to how far testing should proceed as well as noting the deficiencies in the existing approaches.

1.1  Related Work

Other studies of coding processes and reliability have been conducted over the last few decades. The majority of these have been based either on studies of large systems and mainframe based operations or have analyzed software vendors. In the few cases where coding practices within individual organization have been quantitatively analyzed, the organizations have been nearly always large telecommunications firms or have focused on SCADA and other critical system providers.

Whilst these results are extremely valuable, they fail to reflect the state of affairs within the vast majority of organizations. With far more small to medium businesses coupled with comparatively few large organizations with highly focused and dedicated large scale development teams (as can be found in any software vendor), an analysis of in-house practice is critical to both security and the economics of in-house coding.

As the Internet becomes all persuasive, internal coding functions are only likely to become more prevalent and hence more crucial to the security of the organization.

1.2  Our contribution

We intend to present an analysis using empirical studies to determine and model the cost of finding, testing and fixing software bugs. We model the discovery of bugs or vulnerabilities in using quantitative functions and calculate the defect rate per SLOC (source line of codes) using Bayesian calculations.

The end solution to the limited and sub-optimal markets that currently exist would be the creation of Hedge funds for software security. Sales in software security based derivatives could be created on forward contracts. One such solution is the issuing of paired contracts (such as



exist in short sales of stocks ). The first contract would be taken by a user and would pay a fixed amount if the software has suffered from any unmitigated vulnerabilities on the (forward) date specified in the contract. The paired contract would cover the vendor. If the vendor creates software without flaws (or at least mitigates all easily determinable flaws prior to the inception of the contract) the contract pays them the same amount as the first contract.

This is in effect a 'bet' that the software will perform effectively. If a bug is discovered, the user is paid a predetermined amount. This amount can be determined by the user to cover the expected costs of patching and any consequential damages (if so desired). This allows the user to select their own risk position by purchasing more or less risk as suits both the risk tolerance and the nature of the user's systems.

Such a derivative (if an open market is allowed to exist) would indicate the consensus opinion as to the security of the software and the reputation of the vendor. Such an instrument would allow software vendors and users to hedge the risks faced by undiscovered software vulnerabilities. These instruments would also be in the interest of the software vendor's investors as the ability to manage risk in advance would allow for forward financial planning and limit the negative impact that vulnerability discovery has on the quoted prices of a vendors capital.

This project will model the security of software coding practices in a manner that will lead to fewer economic externalities

**Utility to Department of Homeland Security**

The game theoretic approach to this can be modeled looking at the incentives of the business and programming functions in the organization. Programmers are optimists. As Brooks noted, "the first assumption that underlies the scheduling of systems programming is that all will go well". Testing is rarely considered by the normal programmer as this would imply failure. However, the human inability to create perfection leads to the introductions of flaws at each stage of development.

**Technical Approach**

Just as car dealers buff the exterior and detail the upholstery of a used car, neglecting the work that should be done on the engine, software vendors add features. Most users are unlikely to use even a small fraction of these features, yet they buy the product that offers more features over the more secure product with fewer features. The issue here is that users buy the features over security. This is a less expensive option for the vendor to implement and provide.

The creation of a security and risk derivative should change this. The user would have an upfront estimate of the costs and this could be forced back to the software vendor. Where the derivative costs more than testing, the vendor would conduct more in-depth testing and reduce the levels of bugs. This would most likely lead to product differentiation (as occurred in the past with Windows 95/Windows NT). Those businesses who wish to pay for security could receive it. Those wanting features would get what they asked for.



It is argued that software developers characteristically do not correct all the security vulnerabilities and that known ones remain in the product after release. Whether this is due to a lack of resources or other reasons, this is unlikely to be the norm and would be rectified by the market. The cost of vendors in share price and reputational losses exceed the perceived gains from technical reasons where the fix might break existing applications. The application is already broken in the instance of a security vulnerability.

Users could still run older versions of software and have few, if any, bugs. The issue is that they would also gain no new features. It is clear that users want features. They could also choose to use only secure software, but the costs of doing so far outweigh the benefits and do not provide a guarantee against the security of a system being compromised. As such, the enforced legislation of security standards against software vendors is detrimental. A better approach would be to allow an open market based system where vendors can operate in reputational and derivative markets.

At the end of any analysis, security is a risk function and what is most important is not the creation of perfectly security systems, but the correct allocation of scarce resources. Systems need to be created that allow the end user to determine their own acceptable level of risk based on good information.

The goal of this research project is to create a series of quantitative models for information security that can be used to create a software security derivative and insurance market. Mathematical modeling techniques that can be used to model and predict information security risk will be developed using a combination of techniques including:

- Economic theory, and Econometrics
- Quantitative financial modeling,
- Behavioral Economics,
- Algorithmic game theory and
- Statistical hazard/survival models.

The models will account for heteroscedastic confounding variables and include appropriate transforms such that variance heterogeneity is assured in non-normal distributions. Process modeling for integrated Poisson continuous-time process for risk through hazard will be developed using a combination of:

- Business financial data (company accountancy and other records),
- Anti-Virus Industry data
- Legal databases for tortuous and regulatory costs and
- Insurance datasets.

**This work and research follows and continues that published as:**

Wright, Craig S. and Zia, Tanveer A. (2010) T*he Economics of Developing Security Embedded Software*, Proceedings of the 8th Australian Information Security Management Conference, Edith Cowan University, Perth Western Australia, 30th November 2010



Charles Sturt University

http://ro.ecu.edu.au/cgi/viewcontent.cgi?article=1101&context=ism

and

Wright, Craig S. (2010) *Software, Vendors and Reputation: an analysis of the dilemma in creating secure software*, Proceedings of InTrust 2010 The Second International Conference on Trusted Systems 13th – 15th December 2010 Beijing, P. R. China

Charles Sturt University

and (forthcoming)

Wright, Craig S. and Zia, Tanveer A (2011) *A Quantitative Analysis into the Economics of Testing Software Bugs*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011

Wright, Craig S. and Zia, Tanveer A (2011) *A Rationally Opting for the Insecure Alternative: Negative Externalities and the Selection of Security Controls*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011

**Personnel and Performer Qualifications and Experience**
**Craig S Wright (Full CV too long and is available in request)**

Over the years Craig has personally conducted and managed in excess of 1,600 IT security related engagements for more than 180 Australian and international organizations in both the private and government sectors. As a strong believer in life-long learning, Craig has qualifications in Law, IT, Mathematics and Business. However, his driving focus is research and development in the security and risk arena. He is the first person to have obtained multiple GSE certifications (Malware and Compliance) Craig designed the architecture for the world's first online casino (Lasseter's Online) in the Northern Territory; as well he has, in the past, designed and managed the implementation of many of the systems that protect the Australian Stock Exchange. To add to these accomplishments he has authored IT security related books and articles as well as designed a new university program for Charles Sturt University in New South Wales, Australia which will offer a Master in Digital Forensics. This program commenced in 2010 and be offered as an on campus and distance education program.

**Dave Kleiman** (http://en.wikipedia.org/wiki/Dave_Kleiman)

Dave Kleiman is a noted Forensic Computer Investigator, an author/coauthor of multiple books and a noted speaker at security related events

**Bob Radvanovsky**, CIFI, CISM, REM, CIPS, Infractitical, Inc.
Principle, SCADA expert and Author
(chapter author) of "Corporate Hacking and Technology-driven Crime: Social Dynamics and Implication", ISBN 1616928050 and 9781616928056, Information Science Publishing, July 2010.



URL: http://www.amazon.com/Corporate-Hacking-Technology-driven-Crime-Implications/dp/1616928050

"Challenges Faced by the SCADASEC Mailing List", Protecting Canada's Critical Infrastructure 2010 Control Systems Security Workshop, sponsored by Royal Canadian Mounted Police (Ontario Technological Crime), Public Safety Canada and Emergency Management Ontario (Critical Infrastructure Assurance Program), Wednesday April 14, 2010 and Thursday, April 15, 2010.
URL: http://www.infracritical.com/papers/scadasec-2010-review.zip
Author of "Critical Infrastructure: Homeland Security and Emergency Preparedness", Second Edition, ISBN 1420095277 and 9781420095272, Taylor & Francis CRC Press, December 2009.
URL: http://www.amazon.co.uk/Critical-Infrastructure-Homeland-Emergency-Preparedness/dp/1420095277
Contributor (introduction speaker) of "The Year in Homeland Security", 2008/2009 Edition (Charles Oldham, editor director), Faircount Media Group.
URL: http://viewer.zmags.com/publication/d1408139#/d1408139/12
Author (co-author) of "Transportation Systems Security", ISBN 1420063782 and 9781420063783, Taylor and Francis CRC Press, May 2008.
URL: http://www.amazon.com/Transportation-Systems-Security-Allan-McDougall/dp/1420063782

### Commercialization Capabilities and Plan

The principles are experienced researchers and businessmen in the realm of Information Security. The research will be conducted in conjunction with Charles Sturt University and will follow the standard commercialization processes of the University (these processes are available online). Further, this project will create a large body of public and academic knowledge and scientific research that could also be used by other companies and Universities in the creation of further models and structures that will lead to the securing of more systems again.

### Costs, Work, and Schedule

Amount Requested (in dollars):      $650,000.00

Duration:                          36 months

The funding request will provide full scholarships and positions for three (3) PhD candidates to aide in the research and investigation of software security issues and solution, the creation of economic models and the publication of an expected 20-30 papers in this field.

The period is set to three years which includes the completion of the PhD projects and the creation of the market, insurance and derivative models.

| | | |
|---|---|---|
| • | PhD Funding | $240,000 |
| • | Supervision | $180,000 |
| • | Survey and data Analysis | $230,000 |



| BAA Number: BAA 11-02-TTA 01-0127-WP | |
|---|---|
| Offeror Name: W&K INFO DEFENSE RESEARCH LLC | |
| **Title** Software Assurance through Economic Measures | |
| **Date:** 07/04/2010 | |
| N/A | **Operational Capability:** The project will analyze a sample of at least 1,000 coding projects using existing static analysis tools, manual code review and related techniques. Where these methods are lacking, proposals and methods to integrate existing methods and to fill the gaps left will be created. |
| **Proposed Technical Approach:** This project will address and provide measures and The analysis will measure the following coding errors: <br>• Format string errors <br>• Integer Overflows <br>• Buffer overruns <br>• SQL Injection <br>• Cross-Site scripting <br>• Race Conditions <br>• Command Injection. <br>Several published papers have been released (forthcoming include) <br><br>Wright, Craig S. and Zia, Tanveer A (2011) *A Quantitative Analysis into the Economics of Testing Software Bugs*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011 <br><br>Wright, Craig S. and Zia, Tanveer A (2011) *A Rationally Opting for the Insecure Alternative: Negative Externalities and the Selection of Security Controls*, Proceedings of 4th International Conference on Computational Intelligence in Security for Information Systems CISIS 2011 June 8-10th, 2011 | **Schedule, Cost, Deliverables, & Contact Info:** Provide any milestone decision points that will be required. Describe period of performance and total costs. Include the base performance period cost and length, and estimates of cost and lengths of possible option. <br>**Deliverables:** <br>20-30 published papers <br>3 PhD Thesis' in the field <br>A commercial model for software derivatives and insurance markets <br><br>A means to measure and predict the following coding errors is being developed <br>Format string errors <br>Integer Overflows <br>Buffer overruns <br>SQL Injection <br>Cross-Site scripting <br>Race Conditions <br>Command Injection. <br><br>**Corporate Information:** <br>Dave Kleiman <br>W&K INFO DEFENSE RESEARCH LLC <br>4371 Norhtlake Blvd #314 <br>Palm Beach <br>FL 33410 - 6253 <br><br>Phone: 5613108801 <br>Email: dave@davekleiman.com |

Authorized Representative:    Craig Wright

Signature:

**7 |** P a g e

U.S. Department of Homeland Security - Science & Technology

# S&T Directorate BAA Cover Sheet A

## Proposal Does Not Contain Proprietary Information

| | |
|---|---|
| Proposal Number: | BAA 11-02-TTA 14-0025-WP |
| Topic: | TTA 14 – Software Assurance MarketPlace (SWAMP) |
| Proposal Title: | Software Derivative Markets & Information Security Risk |
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL  33410 - 6253 |
| Phone: | 5613108801 |
| Fax: | |
| TIN: | 274997114 |
| DUNS + 4: | null - |
| CAGE Code: | |
| SIC: | |
| FICE: | |
| Proposal Contains Proprietary Information: | No |
| Amount Requested (*in dollars*): | $1200000.00 |
| Duration: | 36 months |
| Requested Starting Date: | 07/04/2011 |
| Business Type: | Small Business - 50 or Fewer Employees - Annual Gross Revenue - 1 Million or Less
Small Business |

This is the annexure marked with the letter M referred to in the Affidavit / Affirmation / Statutory Declaration of Craig S WRIGHT sworn/affirmed/declared before me at Sydney on the 4 6 day of November 2013

One page only
Page 1 of 4 pages

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

U.S. Department of Homeland Security - Science & Technology

# S&T Directorate BAA Cover Sheet A

### Proposal Does Not Contain Proprietary Information

| | |
|---|---|
| Proposal Number: | BAA 11-02-TTA 09-0049-WP |
| Topic: | TTA 09 – Cyber Economics |
| Proposal Title: | **Risk Quantification** |
| Company Name: | **W&K INFO DEFENSE RESEARCH LLC** |
| Mailing Address (Line 1): | **4371 Norhtlake Blvd #314** |
| Mailing Address (Line 2): | |
| City: | **Palm Beach** |
| State & Zip Code: | **FL  33410 - 6253** |
| Phone: | **5613108801** |
| Fax: | |
| TIN: | **274997114** |
| DUNS + 4: | **null -** |
| CAGE Code: | |
| SIC: | |
| FICE: | |
| Proposal Contains Proprietary Information: | **No** |
| Amount Requested (*in dollars*): | **$2200000.00** |
| Duration: | **36 months** |
| Requested Starting Date: | **07/04/2011** |
| Business Type: | **Small Business**<br>**Small Business - 50 or Fewer Employees - Annual Gross Revenue - 1 Million or Less** |

U.S. Department of Homeland Security - Science & Technology

# S&T Directorate BAA Cover Sheet A

## Proposal Does Not Contain Proprietary Information

| | |
|---|---|
| Proposal Number: | BAA 11-02-TTA 05-0155-WP |
| Topic: | TTA 05 - Secure, Resilient Systems and Networks |
| Proposal Title: | SCADA Isolation |
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL  33410 - 6253 |
| Phone: | 5613108801 |
| Fax: | |
| TIN: | 274997114 |
| DUNS + 4: | null - |
| CAGE Code: | |
| SIC: | |
| FICE: | |
| Proposal Contains Proprietary Information: | No |
| Amount Requested (*in dollars*): | $1800000.00 |
| Duration: | 36 months |
| Requested Starting Date: | 07/04/2011 |
| Business Type: | Small Business - 50 or Fewer Employees - Annual Gross Revenue - 1 Million or Less
Small Business |

Case 9:18-cv-80176-BB   Document 511-9   Entered on FLSD Docket 05/18/2020   Page 186 of
Case 9:18-cv-80176-BB   Document 83-4   Entered on FLSD Docket 01/14/2019   Page 94 of 105
214

U.S. Department of Homeland Security - Science & Technology

# S&T Directorate BAA Cover Sheet A

## Proposal Does Not Contain Proprietary Information

| | |
|---|---|
| Proposal Number: | BAA 11-02-TTA 01-0127-WP |
| Topic: | TTA 01 - Software Assurance |
| Proposal Title: | Software Assurance through Economic Measures |
| Company Name: | W&K INFO DEFENSE RESEARCH LLC |
| Mailing Address (Line 1): | 4371 Norhtlake Blvd #314 |
| Mailing Address (Line 2): | |
| City: | Palm Beach |
| State & Zip Code: | FL  33410 - 6253 |
| Phone: | 5613108801 |
| Fax: | |
| TIN: | 274997114 |
| DUNS + 4: | null - |
| CAGE Code: | |
| SIC: | |
| FICE: | |
| Proposal Contains Proprietary Information: | No |
| Amount Requested (*in dollars*): | $650000.00 |
| Duration: | 36 months |
| Requested Starting Date: | 07/04/2011 |
| Business Type: | Small Business<br>Small Business - 50 or Fewer Employees - Annual Gross Revenue - 1 Million or Less |





This is the annexure marked with the letter ___ referred to in the Affidavit / Affirmation / Statutory Declaration of Craig SWRIGHT sworn/affirmed/declared before me at Sydney on the 4th day of November 2013

One page only
Page 1 of 1 pages

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

---

RE:FAST Project - Minority Report - Message (Plain Text)

From: Craig S Wright <craig.wright@information-defense.com>
To: Dave Kleiman
Cc:
Subject: RE: FAST Project - Minority Report?

Sent: Mon 17/10/2011 5:58 AM

As a statistician... And knowing just how quickly the error rate diverges....

" might commit a future criminal act "

The SAME signals will also go off for (as a small subset):
- Whistle blowers
- Investigators
- Journalists

Our software will be better. Damn large project, but SWAMP is better than FAST. We need to catch up and discuss how the BAA project is going...

Craig

-----Original Message-----
From: Dave Kleiman [mailto:dave@davekleiman.com]
Sent: Monday, 17 October 2011 3:45 AM
To: Dave Kleiman
Subject: FAST Project - Minority Report?

You know it started out as a good Philip K Dick short story, then the Minority Report movie, precrime turned out to be a bad idea in the book and the movie, now it is coming live to the good ole USA...

According to documents published by the Department of Homeland Security, FAST is a Minority Report style initiative that seeks to determining the probability that an individual, who is not suspected of any crime, might commit a future criminal act. Under the FAST program, the DHS will collect and retain of a mix of "physiological and behavioral signals" (video images, audio recordings, cardiovascular signals, pheromones, electrodermal activity, and respiratory measurements) from individuals as they engage in daily activities.

http://news.cnet.com/8301-31921_3-20117058-281/homeland-security-moves-forward-with-pre-crime-detection/

Future Attribute Screening Technology - http://epic.org/privacy/fastproject/

Respectfully,

Dave Kleiman - http://www.ComputerForensicExaminer.com

4371 Northlake Blvd #314
Palm Beach Gardens, FL 33410
561.310.8801

## Integyrs

The following is a response to the request by the ATO, ref. 1011685995901.

## Enterprise

1. Income is on hold at present. The ATO has been auditing and reviewing the company following an initial question as to the allocation of GST that lead to a zero amount in payment overall.
   a. Income was based on an arrangement with a large multi-national form for the export of software and mathematical algorithms.
   b. The company plans to raise money and sell its IP and software.
   c. To do this, it needs to get past the audit phase.
   d. No income is expected to when the ATO allows us to actually carry on a business.
   e. Basically, we are conducting research and developing capital in the hope that one day the auditing process will actually provide some feedback and we can go to market. This was in progress before the ATO started calling clients and placed this on hold.
2. Australia
3. 24x7
4. International
   a. We have published malware papers and processes (peer reviewed)
   b. We have published statistical libraries
   c. These can be sold as .Net framework libraries. Large companies such as Microsoft, MacAfee and CA have interest in the IP, but we need to have cleared the audit before we can sell this.
5. All contract – see 2010 tax return.
   a. Income is on hold to when we can sell
   b. Sales will not start until the audit is complete
   c. Sales had started before the ATO started contacting clients who then placed holds on the sales.
6. All work is currently completed by directors and contractors.

This is the annexure marked with the letter J referred to in the Affidavit /
Affirmation / Statutory Declaration of   Craig   S   WRIGHT
sworn/affirmed/declared before me at   Sydney
on the   4Th   day of   November   20 13

One page only
Page 1 of 1 pages

NICHOLAS CHARLES McDONALD
Justice of the Peace Registration 105174

Supplies

1. Data warehousing
   a. Contracting
   b. Rental of office space
   c. Computer systems
   d. Software
   e. Previously Existing IP
2. See folders.
   a. Q4 2010 has not been completed and hence is not included in this.

## Capital Acquisitions

Plant leasing and core tech.

1. Transfer of developed code into the company.

    a. COCOMO used to cost technology.

2. Leasing of systems for the following 12 months.



The IP has been deducted at a rate of 3 years as this is the perceived life of the IP before patient. This is at $666,666 as 1/3rd of the total costs to date.



**Evidence**
See contract – copy on disk

**Capital Value**
Direct costs plus IP

**Valuation**
CoCOMO II based methodology plus direct costs.

**Use in the Enterprise**
The systems and equipment are used directly in the research and the development of solutions that will be offered for international sale.

This Research is directly linked to a PhD candidacy at Charles Sturt University and is related to a CRiCS research study.

The PhD proposal and associated research papers are available on request.



Case 9:18-cv-80176-BB Document 511-9 Entered on FLSD Docket 05/18/2020 Page 192 of
Case 9:18-cv-80176-BB Document 83-4 Entered on FLSD Docket 01/14/2019 Page 100 of
105

## Other Acquisitions

Non-capital acquisitions for the period 01/01/2010 to 31/21/2010 as per purchase schedule. This includes Carbon credits (to offset computers using electricity) and sundry expenses.



## 2010 Income Tax Return

Invoices – see disk

Payments – see disk

### Loans

– see disk

The following loan contracts have been attached (as prepared by Michie Shehadie and Co and registered).

Loan from Lynn Wright

Loan from Craig Wright

Other Loans (Visa and sundry expenses)

### Current Assets and Liabilities

See MYOB File on disk.

This includes depreciating assets.

These assets are used in the research projects and are key to the development of product.



Case 9:18-cv-80176-BB   Document 511-9   Entered on FLSD Docket 05/18/2020   Page 194 of
Case 9:18-cv-80176-BB   Document 83-4   Entered on FLSD Docket 01/14/2019   Page 102 of
214
105

Intellectual Property

Acquisition – how

**R& D intellectual property sold by Craig Wright to Integyrs Pty Ltd**

- You have valued the market value of your intellectual property as
  $2,246,000 (data from your BAS (Craig Wright) for the tax periods July –
  Dec 2009) which you sold to two of your companies where you are the
  Director.

- You have to provide documents to substantiate that you have incurred
  these costs during the course of your research and development of your
  intellectual property.

- Please provide substantiation of the above costs by providing the tax
  invoices with full details of the supplier, date, description and the amounts
  stated for the purchases.


Sale of Capital Assets to Integyrs Pty Ltd 95 137 033 535

Transfer of code, designs and assets from CSW to Integyrs as of June 30, 2009.

Contracts created by Mitchie Shehadie and Co.

I have attached these documents on the disk and with each sale contract. This includes a schedule as
what IP was transferred.

I have attached a spreadsheet with the breakdowns of loans by Lynn Wright for total for a 7%
interest rate. The total comes to $815,803.61 as of 01 Jul 2009.

The amounts are covered as follows in the spreadsheet under the following headers:

    Conferences and Travel

        Lynn paid monies for my attendance at conferences

        These where for my business and education (e.g. SANS)

    Monthly Contributions

        Lynn helped me pay the loans used for the legal costs.

        As per the attached information in the attached email, as per 'Farrugia v The
Official Receiver (1982) 43 ALR 700' The Doctrine of Exoneration is used in the allocation of these
when applied to real property. The loans where for the direct purpose of Integyrs and Research at
Lynn's detriment. These amounts are monies she paid towards the loan each month and are hence
loaned to the company.

    Debt - Purchased contract

        DeMorgan Pty Ltd had a contract for $105,000 pa in payments to Lynn on sale.

I purchased this in order to by the business of DeMorgan and start DeMorgan Information Security Systems P/L and this contract and the IP associated with it was transferred into Integyrs.

### Valuation
CoCOMO II for software

Cost basis and transfer for prior assets.

Assets and shares moved from prior companies set as per court order issued by NSW Supreme court.

### Supplier Agreements

Sale of Capital Assets to Integyrs Pty Ltd

> Transfer of code, designs and assets from CSW to Integyrs as of June 30, 2009.

> $1,100,000

> Transfer of code, designs and assets from CSW to Integyrs as of June 30, 2009.

> $1,100,000

Associated IP as maintined following -- Liquidation of DeMorgan Information Security Systems Pty Ltd and kept due to unpaid debt.

> Shares and debt                    $ 2,178,000

> As determined by NSW Supreme Court.

Losses -- Depreciation of capital Assets (Write-off)

> Old Computer Equipment              $22287

| | |
|---|---|
| Total Gains | $2,235,000 |
| Total Losses | $34,713 |



**From:** jamie.wilson@hotwirepe.com
**Sent:** Sunday, August 11, 2013 9:47 PM
**To:** jamie.wilson@hotwirepe.com; ramona.watts@hotwirepe.com; craig.wright@hotwirepe.com
**Subject:** Projects - To plan

**Importance:** High

I will call today to discuss

...........

These are things for us to start:

Research and Development Agency

http://www.ausindustry.gov.au/programs/innovation-rd/RD-TaxIncentive/Forms/Pages/ApplicationForRegistrationAsAResearchServiceProvider.aspx

We need to decide on Coin-Exch or HotwirePE and register.

This is for other work.

Bitcoin

- ForEx (Foreign Exchange Project)
- YDF based Bitcoin wallet
- Bitcoin Hedge and Arbitrage system
- Bitcoin Trading Platform (Such as Bloomberg was)
- Mobile wallet (Wallet in YDF but we have a secure web interface)
- Currency escrow (for sales and trade – also contracted services)
- Bitcoin PayWave card

Training Engine

- Patent
- Adaptive Learning System
- Network Cohorts
- Mind Mapping and Search System
- Course publishing system
- Course rating system (See Spotify and/or Netflix)
- Agreements for content underway with publishers (Subscriptions)
- Video system (See project below)
- Misc. – recording studio

Reputation System

- Think Linked in – but with tracking against training
- Employment and job trading
- Micro payments
- Job validation and completion system

Video System

- A replacement for Adobe and Goto Meeting
- Record lectures – all web based
- Mobile as well as desktop

Business Systems

- Like Harvest / Tax software – Merged (Expense and time tracking)
- Sales
- Driving logs (and tax recording – simplified)
- Reporting and financials tracking
- Risk System (See Below)
- In time – this can become a suite of managed systems (even the desktop as a service)

Risk Engine

- Simple drop and drag risk platform
- Project calculations
- Monte Carlo Sim and Heteroscadestic

DEF_00043726

      o  Set of algorithms – linked to training – no need to do maths

Security Project

      o  Next Gen Diversion system (Firewall/IDS)
      o  Big Data Intelligence tracking system
      o  IP and system mapping (To application engine)

Internal Systems

      o  Email/Collaboration etc. (MS Exchange)
      o  SVN system
      o  File system, Windows Domains
      o  NAP
      o  Etc.

Let me know if there are any early projects we need to add to the list.

CONFIDENTIAL

EXHIBIT

Wilson 16
4/8/19 W
ALL-STATE LEGAL

**From:** Craig S Wright
**Sent:** Tuesday, July 2, 2013 11:07 PM
**To:** Jamie Wilson; Ramona Watts
**Subject:** Initial Accounts
**Attachments:** Accounts_all.pdf; Balance Sheet 2013.pdf; Balance Sheet 2014.pdf; General Ledger.pdf; General Ledger2013.pdf; P and L 2013.pdf; Trial Balance.pdf; Trial Balance2014.pdf; Accounts.pdf

Hi Jamie
I have done the initial transfers etc.

As the assets to come in from the US are not Au, there is not GST on supply. These are dated from 01July 2013 and have been entered contingent of the NSW Supreme court action as of that date.

I have done the initial transfer to the company for licensing as of the 30th June 2013.

I have attached the existing accounts. I need to get these setup online so we can both access live as well as the book keeper.

Have a look at the accounts list and tell me what you want added / changed.

have done the initial GST and all that so we can have the year closed. The following have been processed and accepted by the ATO:

| | | |
|---|---|---|
| **G10** Capital purchases | $ | 8253633 |
| **G11** Non-capital purchases | $ | 3206412 |

GST is only $14 and is in credit - party huh :)

We may have to make an adjustment - but that will be based on the ATO and the private ruling.If it is adjusted, it is still set at 2013 tax year.

This initial amount is lodged and validated and processed by the ATO. We just need to ensure that the Court judgement is completed by August 30.

Accounts Attached

Regards,
Craig

CONFIDENTIAL

DEF_00031588

**From:** Craig S Wright
**Sent:** Thursday, August 8, 2013 9:52 AM
**To:** 'Alastair James', 'Ian Brightwell'
**CC:** 'jamie.wilson@hotwirepe.com'
**Subject:** RE: iVote Strategy for the NSW State General Election 2015



I own both companies.

Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA
Director, Technical Services and Research

# PanOptiCrypt
Security + Research
Tel: + 612 8003 7553 | Mobile: + 61 417 683 914
http://www.panopticrypt.com



---

**From:** Alastair James [mailto:alastair.james@efa.nsw.gov.au]
**Sent:** Thursday, 8 August 2013 6:19 PM
**To:** craig@panopticrypt.com; Ian Brightwell
**Cc:** jamie.wilson@hotwirepe.com
**Subject:** RE: iVote Strategy for the NSW State General Election 2015

Hi Craig

We have spotted a couple of things that need attention in the document, so will send a new version for you tomorrow.  We also need to put some words in regarding scope of the services.

Can you clarify the relationship between PanOptiCrypt and Hotwire?

Regards
Alastair

Alastair James
NSW Electoral Commission
Level 25, 201 Kent Street
Sydney NSW 2000
Direct: (02) 9290 5443 Mobile: 0408 165 953 Switch: (02) 9290 5999
---------------------------------------------------------------------------------

CONFIDENTIALITY NOTICE
---------------------------------------------------------------------------------

This message is intended for the addressee named and may contain confidential information. If you are not the intended recipient, please delete it and notify the sender. Views expressed in this message are those of the individual sender and are not necessarily the views of the NSW Electoral Commission, Election Funding Authority or the Electoral Commissioner.

**From:** Craig S Wright [mailto:craig@panopticrypt.com]
**Sent:** Thursday, 8 August 2013 16:50
**To:** Ian Brightwell
**Cc:** Alastair James; jamie.wilson@hotwirepe.com
**Subject:** RE: iVote Strategy for the NSW State General Election 2015

Hello,

I will have the signed and witnessed document to you soon for those sections we have completed – attached.

The rate is 275 incl. GST per hour.

Regards,

Dr. Craig Wright LLM GSE GSM GSC MMiT MNSA MInfoSec CISSP/ISSMP CISM CISA
Director, Technical Services and Research

# PanOptiCrypt
Security + Research
Tel: + 612 8003 7553 | Mobile: + 61 417 683 914
http://www.panopticrypt.com



---

**From:** Ian Brightwell [mailto:Ian.Brightwell@elections.nsw.gov.au]
**Sent:** Saturday, 3 August 2013 4:30 PM
**To:** Craig S Wright
**Cc:** Alastair James
**Subject:** FW: iVote Strategy for the NSW State General Election 2015

Craig,

I have attached a copy of the draft contract for your consideration. Note the clause;

"However the Principal will grant the Recipient the ability to use knowledge gained from exposure to confidential information for research and other related academic purposes as long as any written or verbal statements made by the Recipient are not directly attributable to the Confidential Information."

Could you review and get back with your comments and the commercial terms (your hourly rate)

I would like to get this underway so we can start consulting on a range of issues related to the project.

Ian Brightwell
Director IT and CIO
NSW Electoral Commission
Level 25, 201 Kent Street
Sydney NSW 2000
Switch: (02) 9290 5999, Direct: (02) 9290 5948, Fax: (02) 9290 5991, Mobile: 0412 252 151
---------------------------------------

CONFIDENTIALITY NOTICE
---------------------------------------

This message is intended for the addressee named and may contain confidential information. If you are not the intended recipient, please delete it and notify the sender. Views expressed in this message are those of the individual sender and are not necessarily the views of the NSW Electoral Commission, Election Funding Authority or the Electoral Commissioner.

**From:** MYOB AU Customer Service
**Sent:** Thursday, August 8, 2013 2:50 AM
**To:** craig@panopticrypt.com
**Subject:** MYOB AccountRight Live Administrator - invitation accepted



Can't see the images in this email? Make sure your email browser is setup to view/download images

Dear Craig S,

Jamie Wilson has accepted your invitation to become an AccountRight Live administrator for the account 'Information Defense' under the software serial number 612052072014.

They can now work with this file online, manage and invite other users to work with the file, and check out the file for exclusive use.

For more information about AccountRight Live administrators, see http://myob.com.au/support/accountrightlive.

Best regards
MYOB Australia Pty Ltd
myob.com.au

Making business life easier

This email and any attachment are confidential. If you are not the intended recipient, please notify MYOB by reply email and delete this email. Please note that you must not access or use this email or any information in it. MYOB accepts no liability for viruses in this email or in any attachment to it.

CONFIDENTIAL

DEF_00262775

### Employee Remuneration
As at Tuesday, 29 October 2013
Hotwire Preemptive Intelligence Pty Ltd

| Employee | Start Date | Termination Date | Employment Basis | Classification | Pay Run | Unit Rate | Annual Salary | Pay for October | Hrs Worked |
|---|---|---|---|---|---|---|---|---|---|
| Alex Cheung | 10/21/2013 | | Full-time employment | Development | Monthly Pays | 30.72 | $64,073.20 | No | |
| Allan Pedersen | 10/21/2013 | | Full-time employment | Research & Development | Monthly Pays | 76.8001 | $160,183.00 | No | |
| Ann Wrightson | 7/15/2013 | | Part-time employment | Accounts | Monthly Pays | 30 | $23,580.00 | Yes | |
| Balakrishnan Kannan | 10/1/2013 | | Full-time employment | Research & Development | Monthly Pays | 65.8287 | $137,299.80 | Yes | |
| Craig Wright | 7/1/2013 | | Full-time employment | Chief Executive Officer | Monthly Pays | 57.5342 | $120,000.00 | Yes | |
| Dmitry Bykovskiy | 10/1/2013 | | Full-time employment | Research & Development | Monthly Pays | 64.726 | $135,000.00 | Yes | |
| Guangxiong Chen | 9/2/2013 | | Full-time employment | Research & Development | Monthly Pays | 48.2743 | $100,686.50 | Yes | |
| Guido Villanueva | 10/1/2013 | | Full-time employment | Research & development | Monthly Pays | 61.4401 | $128,146.45 | Yes | |
| Ian Cosgrave | 9/23/2013 | | Full-time employment | Systems Engineering | Monthly Pays | 43.8857 | $91,533.00 | Yes | |
| Ignatius Pang | 9/1/2013 | | Casual employment | Time and Materials | Monthly Pays | 60 | $3,125.00 | Yes | |
| Jamie Wilson | 8/1/2013 | 10/11/2013 | Full-time employment | Chief Financial Officer | Monthly Pays | 71.9178 | $150,000.00 | Pro-rata | |
| John Panelo | 9/2/2013 | | Full-time employment | Research & Development | Monthly Pays | 47.9452 | $100,000.00 | Yes | |
| Jowena Chua | 9/9/2013 | | Full-time employment | Research & Development | Monthly Pays | 40.7534 | $85,000.00 | Yes | |
| Kelly Bounassif | 10/21/2013 | | Full-time employment | Junior Web Designer - Graphic Artist | Monthly Pays | 24.1371 | $50,343.00 | No | 72 hrs |
| Mehran Dowlatshahi | 9/2/2013 | | Full-time employment | Research & Development | Monthly Pays | 45.5479 | $95,000.00 | Yes | |
| Michelle Youssef | 10/1/2013 | | Full-time employment | Research & Development | Monthly Pays | 24.1371 | $50,343.00 | minus 8 hrs | 176 hrs |
| Nicholas Desmond | 10/17/2013 | | Full-time employment | Junior System Administrator | Monthly Pays | 30.7199 | $64,073.00 | No | 88 hrs |
| Pamfilo Montecillo | 9/2/2013 | | Full-time employment | Research & Development | Monthly Pays | 40.7534 | $85,000.00 | Yes | |
| Ramona Watts | 9/1/2013 | | Full-time employment | Chief People Officer | Monthly Pays | 39.3151 | $82,000.00 | Yes | |
| Robert Urquart | 9/2/2013 | | Full-time employment | Management | Monthly Pays | 57.5342 | $120,000.00 | Yes | |
| Steven Lipke | 9/9/2013 | | Full-time employment | Reserach & Development | Monthly Pays | 54.8572 | $114,416.50 | Yes | |
| Trupti Birje | 9/2/2013 | | Full-time employment | Research & Development | Monthly Pays | 35.1086 | $73,226.54 | Yes | |
| Uyen Nguyen | 8/1/2013 | | Full-time employment | Product Manager | Monthly Pays | 0 | $24,000.00 | Yes | |
| Zhong Bi | 9/2/2013 | 10/29/2013 | Full-time employment | Research & Development | Monthly Pays | 62.3288 | $130,000.00 | Pro-rata | 168 hrs |
| | | | | | | | $2,187,028.99 | | |



EXHIBIT 90
Wilson
11/8/19 w
ALL-STATE LEGAL®

11/6/2019                         Jamie Wilson - Founder - Cryptoloc Technology | LinkedIn

**Linked** in                                              Join now    | Sign in |

| Jamie Wilson                                                              |



# Jamie Wilson

Founder at Cryptoloc Technology

Brisbane, Australia · 500+ connections

Join to Connect

**C**  **Cryptoloc Technology**

**QUT**  **Queensland University of Technology**

**⚙**  **Company Website** ↗

---

## About

I took a fierce interest in cybersecurity solutions after two devastating life events. In 2010 my father died, and our family struggled to locate his crucial documents such as a will, superannuation and life insurance policies.

A year later, I witnessed a once in a 100-year flood in my home city of Brisbane with many businesses and residents losing vital and sensitive information.

At the time, I had a highly successful accounting practice, specialising in clients with portfolios higher than $100m. However, I realised the importance of a secure central location to store critical documents and so shifted from accounting to cybersecurity.

I travelled the world to learn from leading cybersecurity and cryptography experts. Back in Brisbane, I assembled a team of world-class developers and cybersecurity experts.

Together, we worked to develop a highly secure platform where the authenticity and integrity of documents would stand up in a court of law, with no chance of tampering.



**Linked**🖂                                                    Join now    | Sign in |

> Jamie Wilson

Developing Cryptoloc Technology has been hard work. However, knowing we have become trusted globally for providing cybersecurity solutions which are second to none have made the long days and sleepless nights worthwhile.

I regularly speak on panels and at conferences worldwide about maintaining the privacy and authenticity of data, educating individuals and industries about cybersecurity.

## Articles by Jamie



### Regulators must keep pace with technology

By **Jamie Wilson**

February 27, 2015

## Activity



**Do you have a product that is second to none in quality? Are others in your market actively committing fraud by creating 'fake' products and selling...**

Shared by **Jamie Wilson**



**Do you have a product that is second to none in quality? Are others in your market actively committing fraud by creating 'fake' products and selling...**

Liked by **Jamie Wilson**



**This is an exciting announcement!! Today we announce the expansion of our CrowdStrike Store partner eco-system. These new applications will help...**

Liked by **Jamie Wilson**

**Linked**in

Join now | Sign in

Jamie Wilson

## Experience



**Founder**
Cryptoloc Technology
Sep 2010 – Present · 9 years 3 months
Brisbane, Australia

### Managing Director
Your Digital File
Sep 2010 – Present · 9 years 3 months
Level 12, 420 George Street, Brisbane, Queensland, Australia

### Managing Director
JR Wilson Accounting
2004 – 2010 · 6 years
Brisbane, Australia
Successful accounting practice, specialising in clients with portfolios greater than $100m.

### Laboratory Assistant, Patient Accounts
QML Pathology
1998 – 2004 · 6 years
Brisbane, Australia

## Education

### Queensland University of Technology
Bachelor of Commerce (B.Com.) · Accounting and Finance

## Groups

**Linked**in                                    Join now    Sign in

Jamie Wilson

Entrepreneurs,Startups (Business Jobs- Careers)

**Chief Marketing Officer (CMO) Network - #1 Executive Group for CMOs | Jobs & Career**

## Recommendations

A preview of what LinkedIn members have to say about Jamie:

" I have known Mr Jamie Wilson, my employer, professionally for approximately 18 months. From my first meeting with Mr Wilson I detected in him an understanding of the importance of computer security issues rare in a non-IT professional. Jamie originally contracted me on a short-term basis to respond to some request for tenders, and to make recommendations on the use of an international standard of information security management (ISO 27001) to his company; to further improve the security posture and credibility of his organisation as a vendor of data security services. I was impressed that Mr Wilson was so passionate about computer security to the point where I realised that there would be no requirement for me to 'sell' the value of security to him as a business owner – a rare situation to be sure even in our tech-savvy society. Jamie already possessed a unique vision for, and had hired a team to develop a working software solution for the protection of personal legacy data online by the time he brought me on-board. As an IT security professional with 20 years' experience I do not believe I have come across such an innovative and worthwhile project as Mr Wilson described to me. By the time I learned the details of the concept behind the technology I was already sold on it as not only a superior offering in the market, but as something that fulfilled a unique community need. Over the past 18 months, I have advised Mr Wilson on matters of cyber security both in regard to the internal operations of Your Digital File, and in relation to current trends in cyber security threats and countermeasures. Jamie and I not only share a common understanding on the most appropriate way to deal with threats and how to advise our clients and partners, but Jamie relies heavily on my expertise as a sounding board whenever any issues are discussed or arise in our day-to-day dealings. I am essentially Mr Wilson's 24-hours-a-day security information feed, and through Jamie, Your Digital File represents a voice of

11/6/2019      Jamie Wilson - Founder - Cryptoloc Technology | LinkedIn

 **Linked** Join now | Sign in

| Jamie Wilson |
| --- |

security and the application of industry best practice cyber security approaches to solving the problems faced by all users of information technology, specifically in the area of confidential data security. Yours Sincerely, Mark McPherson

"

2 people have recommended Jamie

Join now to view

## View Jamie Wilson's full profile to

     See who you know in common

     Get introduced

     Contact Jamie Wilson directly

Join to view full profile

## People also viewed

 **Daniel Filmer**
Founder

**Dina Horne** ⚑
Making Cyber Security Easy - I help small businesses stay safe from the hackers - sme.cyberaware.com

**Jay Pandya**
Founder & CEO

 **Iain F.**

**Linked** in                                                          Join now    Sign in

Jamie Wilson

### Tracie Thompson
CEO and Co-founder, HackHunter

### Matt D'Astoli
★Director★Head of Security★Cyber-Security Software Expert★Vulnerability Management★Application &
Infrastructure Security



### Adam Bennett
Inspired, Driven, Innovator. Infosec strategist, founder and CEO at Red Piranha

### Paul Watters PhD



### Stuart Peace
Founder at Hula Strategic

## Others named **Jamie Wilson**

### Jamie Wilson
Vice President of Revenue at AskCody®
Greater Boston Area



### Jamie Wilson
UK and International HVAC-R Recruiters
United Kingdom

### Jamie Wilson
Account Director at Salesforce
Toronto, Canada Area

### Jamie Wilson
Head Of Finance at Tails.com
Twickenham, United Kingdom

6321 others named Jamie Wilson are on LinkedIn

**Linked** in                                                      Join now    | Sign in |

| Jamie Wilson |

 **Communicating about Culturally Sensitive Issues**

 **Interpersonal Communication**

 **Business Analysis Foundations: Business Process Modeling**

| See all courses |

## Jamie's public profile badge

Include this LinkedIn profile on other websites

---

 **Jamie Wilson**
Founder at Cryptoloc Technology

 Founder at Cryptoloc Technology

 Queensland University of Technology

| View profile |

---

| View profile badges |

## View similar profiles

### Jack Brown

Student at QUT (Queensland University of Technology)

### William Storck

Laboratory Assistant - High Volume Chemistry at QML Pathology

**Linked**in                                                          Join now      | Sign in |

| Jamie Wilson |

Laboratory Assistant at QML Pathology

**Madeleine M.**

Medical Laboratory Science Student

**Cindy Nguyen**

Aspiring Forensic Scientist

**Toni Tronson**

Laboratory Assistant at QML Pathology

---

© 2019                                        About

User Agreement                                  Privacy Policy

Cookie Policy                                   Copyright Policy

Brand Policy                                    Guest Controls

Community Guidelines                            Language ⌄

Patents  💡 

### egistry

#### Abstract

A system, method, server processing system, and computer program product for operating a registry. In one aspect, the server processing system is configured to: receive, from a user processing system in data communication with the server processing system, document data relating to an entity; receive, from the user processing system, access data indicative of an accessing party to be provided access to the document data if a defined trigger event occurs; store, in a data store associated with the server processing system, a registry for the entity indicative of the document data and the access data; determine that a defined trigger event has occurred; and in response to determining that that a defined trigger event has occurred, provide the accessing party read-only access to the document data via an access processing system in data communication with the server processing system.

#### Images (16)



◄ ▬▬▬▬▬▬▬▬▬▬▬ ►

#### Classifications

🖿 **G06Q50/186** Estate planning

*View 4 more classifications*

---

## US20140359291A1

United States

Download PDF      Find Prior Art      Similar

**Inventor:** Jamie Robert Wilson, Craig Steven Wright

**Current Assignee :** YDF GLOBAL Pty Ltd

**Worldwide applications**

2012 **US** EP AU WO  2017  US

**Application US14/354,359 events** ⓘ

| | |
|---|---|
| 2011-10-28 | Priority to AU2011904507A |
| 2012-10-25 | Application filed by DIGITAL FILING Co Pty Ltd |
| 2014-12-04 | Publication of US20140359291A1 |
| 2017-11-07 | Application granted |
| 2017-11-07 | Publication of US9811869B2 |
| 2019-11-06 | Application status is Active |
| 2032-10-25 | Anticipated expiration |

Show all events ⌄

**Info:** Patent citations (42), Cited by (6), Legal events, Similar documents, Priority and Related Applications

**External links:** USPTO, USPTO Assignment, Espacenet, Global Dossier, Discuss

---

**Claims (27)**                                                                 Hide Dependent ⌃

**1-12.** (canceled)

**13.** A method for operating a registry, wherein the method includes, in a server processing system:

   receiving, from a user processing system in data communication with the server processing system, document data relating to the entity;

   receiving, from the user processing system, access data indicative of an accessing party to be provided access to the document data if a defined trigger event occurs;

   storing, in a data store associated with the server processing system, a registry for the entity indicative of the document data and the access data;

   determining that a defined trigger event has occurred; and

   in response to determining that a defined trigger event has occurred, providing the accessing party read-only access to the document data via an access processing system in data communication with the server processing system.

   **14.** The method according to claim 13, wherein the registry is an estate registry, and wherein:

      the entity is an individual;

      the document data is estate data indicative of estate information relating to the estate of an individual;

      the access data is executor data indicative of an executor for the estate; and,

      a defined trigger event includes the individual dying.

   **15.** The method according to claim 13, wherein the registry is a corporate registry, and wherein:

      the entity is a corporate entity;

      the document data is entity data indicative of entity information relating to the entity;

      the access data is liquidator data indicative of a liquidator for the entity; and,



EXHIBIT
22
ALL-STATE LEGAL®
Wilson
11/7/19

a defined trigger event includes the entity being placed into liquidation.

16. The method according to any of claim 13, wherein the method includes, in the server processing system:

receiving, from the user processing system, authorisation data indicative of a third party authorised by the entity to access at least a portion of the registry;

receiving, from the third party via a third party processing system, an access request;

determining, based upon the authorisation data, if the third party is authorised to read-only access at least a portion of the registry; and

in response to identifying the third party as being authorised, providing the third party with access to at least a portion of the registry.

17. The method according to claim 16, wherein the method includes, in the server processing system:

receiving permission data indicative of the entity authorising the third party being able to access a portion of the registry;

storing the permission data in the data store; and

in response to receiving the access request and upon identifying the third party as being authorised, providing the third party with read-only access to the portion of the registry corresponding to the permission data for the third party.

18. The method according to claim 16, wherein the access request includes one or more identity fields and the data store has stored therein identity data for the entity associated with the registry, wherein the method includes the server processing system comparing the one or more identity fields to the identity data to uniquely identify the registry associated with the entity.

19. The method according to claim 13, wherein the method includes the server processing system monitoring electronic announcements to determine if a defined trigger event has occurred.

20. The method according to claim 13, wherein the method includes, in the server processing system:

receiving, from a notifying party, a notification indicative that a defined trigger event has occurred; and

in response to the party receiving the notification, providing the accessing party read-only access to the document data.

21. The method according to claim 13, wherein the method includes the server processing system:

receiving, from the entity via the user processing system, an indication of an authorised notifying party;

storing, in the data store, the indication of the authorised notifying party;

receiving, from a notifying party, an indication that a defined trigger event has occurred;

determining if the notifying party is the authorised notifying party; and

in response to the notifying party corresponding to the authorised notifying party, providing the accessing party read-only access to the document data.

22. (canceled)

23. The method according to claim 13, wherein the method includes the server processing system encrypting the document data when stored in the registry.

24.-65. (canceled)

66. A method of holding a document in escrow on behalf of an individual, the method including, in a processing system:

obtaining an electronic version of the document and a digital signature of the individual, the digital signature being at least partially indicative of document content and an identity of the individual;

encrypting the document so that the document can be decrypted using a decryption key; and,

storing the encrypted document in a data store, wherein the decryption key is defined by at least three key fragments, each key fragment being associated with a respective entity and the key fragments being arranged so that the decryption key can be constructed from any two key fragments thereby allowing the document to be decrypted and released from escrow using the key fragments of any two of the entities.

67. A method according to claim 66, wherein the key fragments are stored in a store together with an indication of an identity of the respective entity and wherein the method includes:

determining the document is to be released from escrow;

constructing the decryption key from the key fragments associated with at least two entities; and,

using the constructed decryption key to decrypt the document.

68.-73. (canceled)

74. A method according to claim 66, wherein the digital signature is generated by encrypting information using a private key of a public/private key pair, and wherein the method includes:

receiving the digital signature, the digital signature being generated by encrypting information using a private key of a public/private key pair; and,

decrypting the digital signature using the public key to thereby validate the identity of at least one of the individual and one of the entities.

75.-77. (canceled)

78. A method according to claim 66, wherein the method involves encrypting the document using a symmetrical encryption algorithm, the encryption key being the same as the decryption key.

79.-85. (canceled)

86. A method according to claim 66, wherein the method includes receiving the document from an end station via a communications network, the document being transferred via a secure connection between the end station and the processing system.

87.-91. (canceled)

92. The method according to claim 13, wherein the method includes, in the server processing system:

obtaining a digital signature of an individual, the digital signature being at least partially indicative of document content of the document data and an identity of the individual;

encrypting the document data so that the document data can be decrypted using a decryption key; and,

storing the encrypted document data in the registry, wherein the decryption key is defined by at least three key fragments, each key fragment being associated with a respective entity and the key fragments being arranged so that the decryption key can be constructed from any two key fragments thereby allowing the document data to be decrypted and accessed using the key fragments of any two of the entities.

93. The method according to claim 13, wherein the document data is encrypted so that the document data can be decrypted using a decryption key, the decryption key being defined by at least three key fragments, each key fragment being associated with a respective entity and the key fragments being arranged so that the decryption key can be constructed from any two key fragments, and wherein the method includes, in the processing system:

determining the document data is to be accessed;

constructing the decryption key from the key fragments associated with at least two of the entities; and,

using the constructed decryption key to decrypt and thereby provide access to the document data.

94. A method according to claim 93, wherein the key fragments are stored in a store together with an indication of an identity of the respective entity, and wherein the method includes, in the processing system:

determining at least two entities authorised to access the document data;

retrieving key fragments associated with the at least two entities from the store; and,

providing access to the document data using the key fragments associated with the at least two entities.

95. A server processing system for operating a registry, wherein the server processing system is configured to:

receive, from a user processing system in data communication with the server processing system, document data relating to an entity;

receive, from the user processing system, access data indicative of an accessing party to be provided access to the document data if a defined trigger event occurs;

store, in a data store associated with the server processing system, a registry for the entity indicative of the document data and the access data;

determine that a defined trigger event has occurred; and

in response to determining that a defined trigger event has occurred, provide the accessing party read-only access to the document data via an access processing system in data communication with the server processing system.

96. The server processing system according to claim 95, wherein the server processing system is configured to:

maintain read-only access to document data stored in the registry;

maintain a secure timestamp of all document data stored in the registry; and,

allow document data stored in the registry to be digitally signed.

## Description

### TECHNICAL FIELD

[0001] The present invention relates to a registry, and particularly a registry suitable for use as an estate registry, a corporate registry or a document registry.

### BACKGROUND

[0002] The reference in this specification to any prior publication (or information derived from it), or to any matter which is known, is not, and should not be taken as an acknowledgment or admission or any form of suggestion that the prior publication (or information derived from it) or known matter forms part of the common general knowledge in the field of endeavour to which this specification relates.

[0003] When a person dies or has a life event that precludes them from managing their own affairs (e.g. head trauma), an executor has the unfortunate task of gathering documentation and information to handle the affairs of the deceased. Most people store documentation in a number of disparate locations which can make the task of handling affairs for the deceased extremely frustrating for the executor at an emotionally difficult time. In some instances, it may not even be possible to locate particular information which causes further frustration.

[0004] One potential solution is the use of a traditional steel safe which safely stores therein the documentation needed to handle the person's affairs in the event of death. However, safes also suffer drawbacks. Firstly, another person must be able to access the contents of the safe after the person dies, otherwise the documentation cannot be accessed. Due to this necessity, there is a serious security issue, in particular that another person has access to a central source of information which can be used for identity fraud. Additionally, there is a heavy burden for the contents of the safe to be current and accurate. However, the task of ensuring that the contents of the safe is current can be tedious. Whilst it is possible that another person can be given the task of keeping the documentation up to date, this again raises the same security issue above. Furthermore, it may be the wishes of the person to whom the documentation relates that a trusted