010920Eisner.txt

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF FLORIDA

3                CASE NO. 9:18-cv-80176-BB/BR

4
    IRA KLEIMAN, as the personal representative
5   of the Estate of David Kleiman, and
    W&K Info Defense Research, LLC,
6
            Plaintiffs,
7
    -vs-
8
    CRAIG WRIGHT,
9
            Defendant.
10

11   * * * * * * * * * * * * * * * * * *

12   VIDEOTAPED DEPOSITION OF ZACHARY EISNER

13   DATE TAKEN: January 9, 2020

14   TIME: 10:05 a.m. - 3:27 p.m.

15   PLACE: 2525 Ponce de Leon Boulevard

16   Miami, Florida 33134

17
    TAKEN BEFORE: RICK E. LEVY, RPR, FPR
18              AND NOTARY PUBLIC

19

20   * * * * * * * * * * * * * * * * * *

21

22

010920Eisner.txt

```
23

24

25
```

2

```
1    APPEARANCES:

2    On behalf of the Plaintiff:

3        KYLE ROCHE, ESQUIRE
         ROCHE FREEDMAN, P.A.
4        200 S. Biscayne Boulevard
         Suite 5500
5        Miami, Florida 33131

6

7    On behalf of the Defendant:

8        BRYAN PASCHAL, ESQUIRE
         AMANDA MCGOVERN, ESQUIRE
9        RIVERO MESTRE, P.A.
         2525 Ponce de Leon Boulevard
10       Suite 1000
         Coral Gables, Florida 33134
11
     Also Present: Raul Torres, The Videographer
12                 Maria Sosa

13

14

15

16

17

18

19
```

010920Eisner.txt

```
20

21

22

23

24

25
```
⌃
                                                                          3

```
 1                              -  -  -
                             I N D E X
 2                              -  -  -

 3   WITNESS:         DIRECT    CROSS   REDIRECT    RECROSS
     ZACHARY EISNER
 4   BY MR. PASCHAL:       4
     BY MR. ROCHE:              135
 5                              -  -  -
                           E X H I B I T S
 6                              -  -  -

 7
     NUMBER                              PAGE
 8   DEFENDANT'S EX. 1                    8
     DEFENDANT'S EX. 2                   18
 9   DEFENDANT'S EX. 3                   19
     DEFENDANT'S EX. 4                   43
10   DEFENDANT'S EX. 5                   44
     DEFENDANT'S EX. 6                   48
11   DEFENDANT'S EX. 7                   72
     DEFENDANT'S EX. 8                   74
12   DEFENDANT'S EX. 9                   76
     DEFENDANT'S EX. 10                  80
13   DEFENDANT'S EX. 11                  82
     DEFENDANT'S EX. 12                  83
14   DEFENDANT'S EX. 13                 103
     DEFENDANT'S EX. 14                 111
15

16
```

010920Eisner.txt

17

18

19

20

21

22

23

24

25

⌃                                                                    4

1                   P R O C E E D I N G S

2                          - - -

3        Deposition taken before Rick E. Levy,

4   Registered Professional Reporter and Notary Public

5   in and for the State of Florida at Large, in the

6   above cause.

7                          - - -

8          THE WITNESS:  Good morning.  Today is Thursday

9          the 9th of January 2020.  The time is 10:04.  We

10         are here at 2525 Ponce De Leon Boulevard, Suite

11         1000 for the video deposition of Zach Eisner in

12         case number 9:18-cv-80176.  Would all counsel

13         please state appearances for the record.

010920Eisner.txt

14          MR. PASCHAL:  Bryan Paschal for Dr. Craig

15     Wright.

16          MR. KASS:  Zalman Kass for Dr. Craig Wright.

17          MS. SOSA:  Maria Sosa for Dr. Craig Wright.

18          MR. ROCHE:  Kyle Roche for plaintiffs.

19          THE WITNESS:  I do.

20                       - - -

21     Thereupon,

22                    (ZACHARY EISNER)

23                    having been first duly sworn or

24     affirmed, was examined and testified as follows:

25                    DIRECT EXAMINATION

                                                  5

1     BY MR. PASCHAL:

2          Q.   Sir, could you please state your name for the

3     record?

4          A.   Zach Eisner.

5          Q.   Mr. Eisner, do you understand what this

6     deposition is about?

7          A.   Yes.

8          Q.   You understand who you're representing?

9          A.   Yes.

10          Q.   How are you connected to W&K Info Defense

010920Eisner.txt

11  Research?

12      A.   I'm their corporate representative.

13      Q.   Have you ever heard of W&K before this date?

14      A.   No.

15      Q.   When did you first learn about W&K?

16      A.   Two months ago.

17      Q.   How did you hear about W&K?

18      A.   Plaintiff contacted me to be the corporate

19  representative.

20          MR. ROCHE:  Bryan, I hate to -- do you mind,

21      my thing is not connected.

22          THE VIDEOGRAPHER:  Off the record 10:06.

23          (Discussion held off the record.)

24          THE VIDEOGRAPHER:  On record 10:06.

25

6

1  BY MR. PASCHAL:

2      Q.   I left off with you said plaintiffs contacted

3  you?

4      A.   Yes.

5      Q.   Who from plaintiffs contacted you?

6      A.   Mr. Freedman.

7      Q.   Did anyone else contact you?

Page 6

010920Eisner.txt

```
 8        A.   No.

 9        Q.   How did he contact you?

10        A.   Phone.

11        Q.   Did he ever e-mail you?

12        A.   Possibly.

13        Q.   How long was the conversation on the phone?

14        A.   I know him from before so two minutes.  We

15   went out to lunch and he told me what he needed me for.

16        Q.   How did you you know Mr. Freedman from before?

17        A.   We're both on like a group chat, Jewish

18   lawyers chat.  Pretty much that.

19        Q.   How long did you know Mr. Freedman for?

20        A.   Close to a year.

21        Q.   What's your profession?

22        A.   I'm a lawyer.

23        Q.   Have you been deposed before?

24        A.   No.

25        Q.   Have you taken a deposition before?
```

❦

7

```
 1        A.   Yes.

 2        Q.   So you know how a deposition works?

 3        A.   Yes.

 4        Q.   How long have you been a lawyer?
```

010920Eisner.txt

5       A.   Nine years.

6       Q.   Where did you go to law school?

7       A.   St. Johns New York.

8       Q.   Did you know Mr. Freedman when you were in law

9    school?

10      A.   No.

11      Q.   What is your practice?

12      A.   My practice currently?  Real estate and wills

13   and trust and probate litigation and civil litigation.

14      Q.   Say the last part.

15      A.   Civil litigation.

16      Q.   How much do you practice civil litigation?

17      A.   Right now probably 60/70 percent litigation

18   and real estate, wills and trust.

19      Q.   Is litigation of wills and trust?

20      A.   Yes.

21      Q.   So is your litigation practice related to

22   wills and trusts?

23      A.   Both civil litigation and probate litigation.

24      Q.   What is your litigation connected to, what

25   practice area?

                                                          8

1       A.   Contract disputes, corporate disputes,

010920Eisner.txt

2    partnership disputes and also -- probably more probate

3    litigation, guardianships.

4         Q.   Have you ever had a case involving Bitcoin?

5         A.   No.

6         Q.   Crypto currency?

7         A.   No.

8         Q.   Where is your practice?

9         A.   4770 Biscayne Boulevard.

10        Q.   Have you always practiced in Florida?

11        A.   No, I practiced in New York for three years.

12        Q.   When did you come to Florida?

13        A.   2014, 2015.

14        Q.   What's your home address?

15        A.   My home address?

16        Q.   Yes.

17        A.   4044 North Meridian Avenue, Miami, Florida

18   33140.

19             (Defendant's Exhibit No. 1 was

20             marked for identification.)

21   BY MR. PASCHAL:

22        Q.   Handing you what we're marking as Exhibit 1.

23   Have you seen this document before?

24        A.   Yes.

25        Q.   When did you see this document?

010920Eisner.txt

⬆

9

```
 1        A.    About two months ago when Mr. Freedman
 2   contacted me to be the corporate representative.
 3        Q.    Can you turn to page five?
 4        A.    Yes.
 5        Q.    You see where it says designated topics?
 6        A.    Yes.
 7        Q.    On topic one the facts alleged in the
 8   complaint.  You see that?
 9        A.    Yes.
10        Q.    What did you do prepare for that topic?
11        A.    I read the complaint and all the exhibits.  I
12   read through the docket.  There was very large but I
13   went through some of the pleadings.  I went through
14   whatever corporate books that there were and all
15   available documentation regarding W&K.  I spoke with the
16   member manager currently.  There was a lot of
17   documentation.
18        Q.    About how long did that take you?
19        A.    About two months.
20        Q.    How many hours do you think you spent doing
21   that?
22        A.    15, 20.
```

010920Eisner.txt

23      Q.   Are you being paid for your time?

24      A.   Yes.

25      Q.   Who is paying you?

                                          10

1      A.   The plaintiff.

2      Q.   How much are you being paid?

3      A.   $325 an hour, I believe.

4      Q.   When you say plaintiff who are you referring

5  to?

6      A.   The plaintiff's law firms, law firm.

7      Q.   Which law firm is that?

8      A.   Roche, Freedman and Boies, Schiller.

9      Q.   Did you sign any agreements with Ira Kleiman?

10      A.   No.

11      Q.   Did you sign an engagement letter with Boies,

12  Schiller and Roche, Freedman?

13      A.   Yes.

14      Q.   Do you have a copy of that engagement letter?

15      A.   I do not but I can provide it if need be.

16      Q.   Could you look at topic number two?  It says

17  W&K membership including identification of its current

18  formal members and communication with those members

19  relating to the facts alleged in the complaint.  What

Page 11

010920Eisner.txt

20    did you do to prepare for that topic?

21         A.   I spoke with the manager and member currently.

22    I went through all the corporate records that we had.

23         Q.   What were those corporate records?

24         A.   Any documentation relating to W&K that was

25    available.

11

1         Q.   What does that include?

2         A.   If there were financial statements, if there

3    were, you know, anything related to the complaint.  All

4    the exhibits.

5         Q.   You said financial statements, what financial

6    statements did you review?

7         A.   There were none it turned out.

8         Q.   So how did you review them?

9         A.   No, I'm saying if there were.

10         Q.   How long did you speak with Mr. -- when you

11    say managing member currently who were you referring to?

12         A.   Ira Kleiman.

13         Q.   How long did you speak with Mr. Kleiman?

14         A.   It was brief.  Just some questions I needed

15    clarification on.

16         Q.   What were those questions?

010920Eisner.txt

17          MR. ROCHE:  Objection.  To the extent

18     obviously you can ask him how long, where, when.

19     To the extent a question seeks privileged

20     communication, you know, as far as what he did to

21     prepare I would object on the basis of privilege.

22   BY MR. PASCHAL:

23     Q.   Are you Ira Kleiman's attorney?

24     A.   I am not.

25     Q.   So what questions did you ask Mr. Kleiman?

                                                        12


 1     A.   I --

 2          MR. ROCHE:  Objection, privilege.  Calls for

 3     privileged communication.

 4          MR. PASCHAL:  Kyle, how is that privileged?

 5          MR. ROCHE:  He has been designated W&K's

 6     30(b)6 rep.  Just like any other company what

 7     communications we -- he has had with the company to

 8     prepare for this litigation are privileged and

 9     again this is, you know, not different than any

10     other expert -- an expert deposition you can ask

11     him the who, what, where, when but the substance of

12     the communication I am going to object on the basis

13     of privilege.

                         Page 13

010920Eisner.txt

14          MR. PASCHAL:  What's the privilege?

15          MR. ROCHE:  The privilege is work product.

16          MR. PASCHAL:  Can we -- what's the time on

17     this?

18          MR. ROCHE:  One thing we can do is we have a

19     call with Judge Reinhart at 1:30.  We can bring

20     this issue up then.

21          MR. PASCHAL:  Yes.

22          MR. ROCHE:  Okay, cool.

23          MR. PASCHAL:  I'm going to go through the

24     questions and you can instruct him not to answer.

25          MR. ROCHE:  Understood.

↑                                                    13


1          MR. PASCHAL:  What were the questions you

2     spoke to Mr. Kleiman on?

3          MR. ROCHE:  Objection, privilege.

4          THE WITNESS:  Answer?

5          MR. PASCHAL:  No.

6          MR. ROCHE:  No.

7     BY MR. PASCHAL:

8     Q.   How many occasions did you speak with

9     Mr. Kleiman?

10    A.   Once.

010920Eisner.txt

11      Q.   How did you speak with Mr. Kleiman?

12      A.   On the phone.

13      Q.   Did you ever meet him in person?

14      A.   No.

15      Q.   Did you ever exchange e-mails with

16   Mr. Kleiman?

17      A.   No.

18      Q.   Again how long did the conversation last with

19   Mr. Kleiman?

20      A.   It was brief.

21      Q.   Less than five minutes?

22      A.   Under 15 minutes.

23      Q.   When you said you reviewed documents related

24   to W&K how did you get those documents?

25      A.   They were provided to me by counsel.

❦

                                                            14


1       Q.   Did you do anything else to search for

2   documents?

3       A.   I did go on SunBiz myself.  I don't think so,

4   no.

5       Q.   So the only information you have is coming

6   from counsel?

7       A.   I believe so, yes.

010920Eisner.txt

8          Q.   On topic number three W&K's business purpose.

9     What did you do to understand that topic, prepare for

10    that topic I should say?

11         A.   Go through the complaint and all the exhibits.

12         Q.   Did you go through anything else?

13         A.   No.

14         Q.   Do you understand that there's a database of

15    documents in this case, do you know that?

16         A.   Yes.

17         Q.   Were you given access to that database?

18         A.   No.

19         Q.   Do you know what W&K's business purpose is?

20         A.   Yes.

21         Q.   What is it?

22         A.   To mine Bitcoin and hold intellectual

23    property.

24         Q.   Topic number four, W&K's proprietary and

25    financial documents?

♠
                                                                15


1          A.   Yes.

2          Q.   What did you do to prepare for that topic?

3          A.   Go through all the documents provided.

4          Q.   What are those documents?

010920Eisner.txt

5          A.    All the complaints, all the exhibits, any

6     corporate records, any W&K records they possibly had.

7          Q.    What are those records when you refer to --

8     what are the documents that you reviewed that you said

9     you possibly had?

10         A.    There were no financial documents.  There were

11    no tax returns that were filed.  So in this regard they

12    would have no knowledge.

13         Q.    Did you do anything to look for any other

14    documents?

15         A.    No.

16         Q.    Topic number five W&K's tax files.  What did

17    you do to prepare for that topic?

18         A.    I believe that request was sent to the IRS for

19    W&K and Dave Kleiman individually's tax filings and

20    there was no information whatsoever from the IRS

21    regarding anything on W&K tax filings.

22         Q.    Was there any documents from the IRS related

23    to W&K?

24         A.    No.

25         Q.    So you're not aware of any communications with

16

1     the IRS for W&K?

010920Eisner.txt

2          A.   I'm aware of communications with the IRS and

3     W&K but there were no documents send back from the IRS

4     regarding from W&K.

5          Q.   I want to clarify what were those

6     communications with the IRS?

7          A.   Please provide any tax filings and

8     documentation you have regarding W&K.

9          Q.   That's it?

10         A.   I believe so, yes.

11         Q.   So you're not aware of any IRS investigation,

12    nothing?

13         A.   No.

14         Q.   So if I showed you those documents today would

15    be the first time that you've seen them?

16         A.   Yes.

17         Q.   Did you ask counsel if they did anything else

18    for tax documents?

19         A.   Probably, yes.

20         Q.   What was the answer?

21              MR. ROCHE:  Hold on one second.  You can

22         answer the question to the extent it calls for what

23         W&K did to request tax documents, not on any

24         response counsel for W&K or Ira Kleiman told you

25         about what they did for tax documents.

010920Eisner.txt

⌃

17

```
 1          THE WITNESS:  To the extent to prepare me to
 2     be most knowledgeable corporate representative I
 3     went through all the designated topics and
 4     requested all the documents that I would need from
 5     counsel and when they said that -- they requested
 6     from the IRS when they showed me the letter and
 7     nothing came back.  He showed me that.
 8  BY MR. PASCHAL:
 9     Q.   Did the letter say -- did the letter say Dave
10  Kleiman or did it say W&K?
11     A.   It said both if I remember correctly.
12          MR. PASCHAL:  Could we take a quick break?
13          MR. ROCHE:  Yes.
14          THE VIDEOGRAPHER:  Off record 10:20.
15          (Discussion held off the record.)
16          THE VIDEOGRAPHER:  On record 10:32.
17  BY MR. PASCHAL:
18     Q.   So we just spoke about IRS documents that you
19  said the only document you saw was an IRS request form?
20     A.   And a letter back.
21     Q.   And a letter back.  What did the letter back
22  say?
```

010920Eisner.txt

23     A.   To my recollection, you know, I guess here are

24  the documents requested and it was not W&K documents.

25

                                                              18

1              (Defendant's Exhibit No. 2 was

2              marked for identification.)

3  BY MR. PASCHAL:

4     Q.   So I'm showing you a document from the IRS and

5  you haven't seen this document, have you?

6              MR. ROCHE:  Objection, form.

7              THE WITNESS:  I don't think I saw this

8     document, no.

9  BY MR. PASCHAL:

10    Q.   Can you look at the bottom of the document and

11  do you see the date?

12    A.   Yes.

13    Q.   You recognize this document as being from the

14  IRS?

15    A.   Not necessarily.  I mean it looks like it but

16  I don't know for sure.

17    Q.   Well, at the top of the document --

18    A.   Right.

19    Q.   -- what does it say?

                        Page 20

010920Eisner.txt

20      A.   Department of Treasury, Internal Revenue

21  Service information document request.

22      Q.   You don't think this is from the IRS?

23      A.   It looks like it.

24      Q.   Do you see if you go in the body of the

25  document you see there's numbers one, two, three, four,

˄

                                                      19


 1  five, six, seven and eight?

 2      A.   Yes.

 3      Q.   You see in question number one they're asking

 4  for W&K Info Defense?

 5      A.   Yes.

 6      Q.   Do you see in question four they are again

 7  asking about W&K, LLC?

 8      A.   Yes.

 9      Q.   Do you see in question number seven they're

10  again asking about W&K, LLC?

11      A.   Yes.

12      Q.   In question eight they're asking again about

13  W&K, LLC?

14      A.   Yes.

15      Q.   You're not prepared to talk about this

16  document because you never saw it; right?

010920Eisner.txt

17      A.   This document, no.

18           (Defendant's Exhibit No. 3 was

19           marked for identification.)

20   BY MR. PASCHAL:

21      Q.   Now I'm handing you what we're marking as

22   Exhibit 3.  Are you familiar with the Karp Law Firm?

23      A.   No.

24      Q.   Do you know who Joseph Karp is?

25      A.   No.

♠
                                                        20


1      Q.   But you see here that he is -- the regarding

2    line it says case number 362215?

3      A.   Yes.

4      Q.   Does that number match the IRS document that

5    you just saw?

6      A.   Yes.

7      Q.   And this letter is dated June 18th 2015?

8      A.   Yes.

9      Q.   Just about a month after the IRS sent a letter

10   to Ira Kleiman?

11           MR. ROCHE:  Going to instruct the witness to

12           the extent he needs to read the document please

13           feel free to take your time to do so.

010920Eisner.txt

14          THE WITNESS:  Yes, about a month later.

15   BY MR. PASCHAL:

16      Q.   Do you see that this Karp letter it's

17   addressed to Mr. Tosi?

18      A.   Yes.

19      Q.   Is that the person who sent the IRS letter on

20   May 20th 2015?

21      A.   Yes.

22      Q.   If you turn to page two and you go to the

23   first paragraph do you see that Mr. Karp is discussing

24   W&K, LLC?

25      A.   Yes.

                                                    21


 1      Q.   And he is saying Ira has no personal knowledge

 2   of W&K's business activities?

 3          MR. ROCHE:  Objection, document speaks for

 4          itself.

 5          THE WITNESS:  It says with regard to W&K, LLC

 6          or Bitcoin Ira has no personal knowledge of any of

 7          this.

 8   BY MR. PASCHAL:

 9      Q.   You can keep reading.

10      A.   And has no proof or evidence of what Bitcoins

010920Eisner.txt

11    David may own or any information.

12         Q.    Okay, you haven't seen this document this

13    letter to the IRS, have you?

14         A.    Nothing.

15         Q.    You're not prepared to talk about this

16    document?

17         A.    No.

18         Q.    Earlier when I asked you about Bitcoin or

19    W&K's business purpose you said that its business

20    purpose was to mine Bitcoin?

21         A.    And hold intellectual property related to

22    Bitcoin and block chain.

23         Q.    How did you get that information again?

24         A.    From Craig Wright.

25         Q.    You spoke with Craig Wright?

❦

                                                          22


1          A.    Through affidavits of Craig Wright and through

2     the complaint and through exhibits that exist.

3          Q.    Just stuff that was attached to the complaint?

4          A.    Yes.

5          Q.    Just the complaint?

6          A.    And the exhibits.

7          Q.    But you haven't looked at this document?

010920Eisner.txt

8       A.   No.

9       Q.   Could we go back to the Notice of Deposition

10   which was marked as Exhibit 1.  Can we look at topic

11   number six?

12      A.   Yes.

13      Q.   It says W&K's alleged ownership or development

14   of intellectual property?

15      A.   Yes.

16      Q.   What did you do to find out or prepare

17   yourself to talk about that topic today?

18      A.   The complaint and all the exhibits.

19      Q.   And that's it?

20      A.   Yes.

21      Q.   Did you review any patent applications or any

22   documents related to intellectual property?

23      A.   That were not attached to the complaint as

24   exhibits?

25      Q.   Yes.

23

1       A.   No, I did not.

2       Q.   Did you do any online searches?

3       A.   No.

4       Q.   Did you look at any documents that have been

010920Eisner.txt

5    produced in discovery?

6         A.   Some.

7         Q.   What documents were those?

8              MR. ROCHE:  Objection.  Withdrawn.

9              THE WITNESS:  I guess communications with

10        Craig Wright.  I mean most of what I was focused on

11        was the complaint and the exhibits and any

12        corporate documents that were available.  That was

13        how I got my knowledge of the corporation to be

14        able to testify.

15   BY MR. PASCHAL:

16        Q.   What corporate documents?

17        A.   Well, there were no financial documents.

18   There was no operating agreements.  Went through the

19   SunBiz records and the reinstatement.

20        Q.   All you did you also spoke to --

21        A.   Spoke to the manager member, yes.

22        Q.   For 15 minutes?

23        A.   Yes.

24        Q.   Can I just say for purposes of this deposition

25   are those basically everything that -- that's everything

                                                        24


1    you've done?

010920Eisner.txt

```
2        A.   A lot of paper to be honest.  Quite a docket

3   but did I run through every piece of the docket no, I

4   didn't have to.  I focused only on W&K.

5        Q.   What else in the docket did you look at?

6        A.   The complaints in each form and the exhibits.

7   That's probably about it.  There is a couple complaints.

8   A lot of exhibits.

9        Q.   Did you look at W&K's interrogatory responses?

10       A.   No.

11       Q.   Did you look at Ira Kleiman's interrogatory

12  responses?

13       A.   No.

14       Q.   Did you look at Craig Wright's interrogatory

15  responses?

16       A.   To the extent they were in the exhibits, the

17  affidavits that he put in I did.

18       Q.   You're referring to affidavits that were --

19       A.   That were in the second amended complaint.

20       Q.   But back to my question you haven't looked at

21  any of his interrogatory responses; right?

22       A.   No.

23       Q.   For topic number seven W&K's alleged mining of

24  Bitcoin or any crypto currency.  What did you do to

25  prepare for that?
```

Page 27

010920Eisner.txt

25

```
 1        A.   All the documents that I said.  All the

 2   complaints, all the exhibits.

 3        Q.   Just the complaint?

 4        A.   Yes.

 5        Q.   Nothing else?

 6        A.   There was a lot of documents.

 7        Q.   Just the complaint and its exhibits?

 8        A.   Yes.

 9        Q.   Nothing else.  For number eight W&K's

10   ownership of Bitcoin or any other crypto currency.  Did

11   you just review the complaint for that?

12        A.   Yes, all the complaints, all the exhibits,

13   yes.

14        Q.   For number nine W&K's reinstatement in 2018.

15   Did you just review the complaint?

16        A.   No, on SunBiz for that personally.  But again

17   all the complaints, all the exhibits, all the SunBiz

18   articles.

19        Q.   What did you view on SunBiz?

20        A.   The articles of organization, dissolution,

21   reinstatement, dissolution, reinstatement.

22        Q.   When did you go on
```

010920Eisner.txt
https://protect-us.mimecast.com/s/17yWCG6QRlc0ORx3HKRr6k

23        A.    Multiple times over the last month or so for

24    this purpose.

25        Q.    For topic number ten W&K's administrative

♠

26

1    dissolutions.  All you reviewed was the complaint?

2        A.    And SunBiz.

3        Q.    And SunBiz?  Did you talk to Ira Kleiman about

4    the reinstatement?

5        A.    The reinstatement?

6        Q.    Reinstatement and dissolution.

7             MR. ROCHE:  Objection.  I'm going to object to

8        the extent you're going to ask specific things he

9        discussed with Ira Kleiman.  You can ask him about

10       the facts, what he knows but to the extent this is

11       going to get into the specific discussion with

12       either counsel or Ira Kleiman we object it's

13       privileged.

14            MR. PASCHAL:  Are you instructing him not to

15       answer?

16            MR. ROCHE:  Instruct him not to answer,

17       correct.

18    BY MR. PASCHAL:

010920Eisner.txt

19      Q.   Just so the record is clear did you talk to

20   Ira Kleiman about W&K's administration dissolutions?

21           MR. ROCHE:  Objection, privileged.

22           MR. PASCHAL:  Are you instructing him?

23           MR. ROCHE:  Yes.  With any privilege

24      instruction it will be -- objection it will be an

25      instruction not to answer.

                                                    27

 1   BY MR. PASCHAL:

 2      Q.   Topic number 11 it says W&K Panama.  What did

 3   you do to prepare yourself to discuss that?

 4      A.   Spoke with counsel and Ira Kleiman.

 5      Q.   What did you speak with Ira Kleiman about?

 6           MR. ROCHE:  Objection, privileged.

 7   BY MR. PASCHAL:

 8      Q.   What did you speak to counsel about?

 9           MR. ROCHE:  Objection, privileged.

10   BY MR. PASCHAL:

11      Q.   Number 12, any legal actions against W&K that

12   is related to its alleged intellectual property,

13   Bitcoin, or crypto currency.  What did you do to prepare

14   for that?

15      A.   Spoke to counsel and Ira Kleiman.

010920Eisner.txt

16      Q.   That's it?

17      A.   Again all the complaints, all the exhibits.

18      Q.   What did you speak to Ira Kleiman and counsel?

19           MR. ROCHE:  Objection, privilege.

20  BY MR. PASCHAL:

21      Q.   Did you review any other complaints of any

22  other lawsuits?

23      A.   No.

24      Q.   Did you take any steps to educate yourself

25  about any of the legal actions against W&K?

                                                    28

1       A.   To the extent it would help me in my knowledge

2   of the company I took steps to educate myself, yes.

3       Q.   What steps did you take?

4       A.   I learned a little bit about Bitcoin and --

5   most of it was about Bitcoin because the ten or so

6   counts that was more or less personally familiar with.

7       Q.   So you familiarized yourself with Bitcoin to

8   learn about legal actions against W&K?

9           MR. ROCHE:  Objection, mischaracterizes the

10          witness' testimony.

11          THE WITNESS:  I familiarized myself about

12          Bitcoin in order to be the best corporate

                        Page 31

010920Eisner.txt

13    representative with knowledge of the company.

14    BY MR. PASCHAL:

15        Q.    But going back to my question.  Legal actions

16    against W&K what steps did you take to learn about legal

17    actions against W&K?

18        A.    Speaking with counsel and Ira Kleiman.

19        Q.    And you learned about Bitcoin?

20        A.    Maybe I'm confused.  I thought that was a

21    separate question.  Did you learn about anything to

22    educate yourself about the legal actions?

23        Q.    Yes.

24        A.    Any specific legal actions, no, other than

25    counsel and Ira Kleiman.  I don't think I understood

                                                            29

1    your question.

2        Q.    What did counsel and Ira Kleiman tell you

3    about legal actions against W&K?

4            MR. ROCHE:  Objection, privilege.  You can ask

5        him are there other legal actions against W&K you

6        other aware of but what we said privilege.

7            MR. PASCHAL:  Just making the record.

8            MR. ROCHE:  Okay.

9    BY MR. PASCHAL:

                        Page 32

010920Eisner.txt

10      Q.   Do you know about any legal actions brought by

11   W&K?

12       A.   To my knowledge this is the only one.

13       Q.   What steps did you take to learn about any

14   other legal actions taken by W&K?

15       A.   Speaking with counsel and Ira Kleiman.

16       Q.   Is that it?

17       A.   Yes.

18       Q.   And topic 14 any accounts that W&K had at

19   Liberty Reserve.  What steps did you take to educate

20   yourself on that topic?

21       A.   Speaking with counsel and Ira Kleiman that

22   there is no affiliation or no knowledge of anything

23   regarding Liberty Reserve.

24       Q.   Is that what they told you?

25           MR. ROCHE:  Objection, privilege.

                                                        30

1           MR. PASCHAL:  He's already answered.

2           MR. ROCHE:  I am going to instruct the witness

3       to the extent I think some of these questions are

4       dipping into your knowledge and conversations with

5       Kleiman to try to keep clear on the facts rather

6       than what counsel has shared with you.

010920Eisner.txt

7   BY MR. PASCHAL:

8       Q.   So you just said they told you that there was

9   no knowledge of accounts at Liberty Reserve; right?

10      A.   The corporate -- the corporation has no

11  knowledge of any accounts at Liberty Reserve.

12      Q.   Did you do any online searches for accounts at

13  Liberty Reserve?

14      A.   Did I -- I don't know how I would look at

15  Liberty Reserve to see what W&K had.

16      Q.   Did you Google Liberty Reserve?

17      A.   I did.

18      Q.   What did you see?

19      A.   It's a bank.  It's a financial institution.

20      Q.   Can you tell us anything else about Liberty

21  Reserve?

22      A.   I don't remember much about it.  I just wanted

23  to see where it was located.

24      Q.   You did that by accessing its Web site?

25      A.   By Googling.  I really don't remember the Web

                                                          31

1   site.

2       Q.   Do you remember what you saw on the Web site?

3       A.   No.

010920Eisner.txt

4      Q.   Did you see like a picture of a bank?

5      A.   If I saw it I would refresh my recollection.

6  I sort of wanted to see where it was.  That was really

7  my focus.

8      Q.   Did you see where it was?

9      A.   Yes.  Yes.

10     Q.   Where was it located?

11     A.   My purpose for it was just seeing if it had

12 branches or not.  And I really don't remember but from

13 my personal investigation there was no relevance.  So

14 that was pretty much it.

15     Q.   You're talking about locations.  Where were

16 the locations?

17         MR. ROCHE:  Just going to instruct the witness

18         to the extent you don't know just say you don't

19         know.

20         MR. PASCHAL:  Vel -- you mean sorry, Kyle,

21         that's coaching.  Let's not do that.  Not going to

22         do that.

23         THE WITNESS:  If I saw a Web site again I can

24         tell you exactly what I was looking for.  I really

25         don't remember exactly what I was looking for.  I

                                                        32

010920Eisner.txt

```
1         think just went on to see what it was.  I have

2         never heard it before.

3  BY MR. PASCHAL:

4         Q.   There was nothing important about the Web site

5  when you saw it?

6         A.   Not that I can recall.

7         Q.   Sir, do you realize if you put in Liberty

8  Reserve Web site the Department of Justice notice comes

9  up and it's very noticeable?

10        A.   When you Google it, no.

11        Q.   When you actually -- if you Google --

12        A.   Not the Web site.  Not the Web site.  I didn't

13 check the Web site.  I just Googled Liberty Reserve.

14        Q.   If you Google it you'll see a lot of

15 Department of Justice articles and notices about it?

16        A.   I don't recall that.

17        Q.   You don't recall any of that?

18        A.   No.

19        Q.   Do you realize that the Department of Justice

20 has an account look up and let me be clear an account

21 look up.  Did you use the account look up to see if

22 there were any accounts with W&K?

23        A.   No.

24        Q.   Did you contact the Department of Justice
```

010920Eisner.txt
25    about W&K?

33

1         A.    No.

2         Q.    I just want to be clear if you go to the

3    Liberty Reserve Web site it says this domain has been

4    seized?

5         A.    Right.  I didn't go to the Liberty Reserve

6    domain Web site.  I just Googled it.

7         Q.    This is the first time you're realizing it was

8    seized?

9         A.    I think so, yes.  I just never heard of the

10   bank before.  So I just Googled the name.

11        Q.    When did you Google the name Liberty Reserve?

12        A.    A month ago.  I don't remember.  I knew it

13   wasn't in business.  That I remember but I don't

14   remember like it was shut down or anything.

15        Q.    Topic 15 W&K's membership meetings discussing

16   this action, Dr. Craig Wright, Bitcoin or

17   cryptocurrency.  What did you do prepare yourself for

18   that topic?

19        A.    Complaint, exhibits, speaking with counsel and

20   Mr. Kleiman.

21        Q.    Were there any exhibits that had board minutes

010920Eisner.txt

22    for W&K?

23         A.   No.

24         Q.   W&K had board minutes and they just weren't

25    attached to the complaint you would not have reviewed

                                                          34

1    them; is that correct?

2              MR. ROCHE:  Objection, form.

3    BY MR. PASCHAL:

4         Q.   You would?

5         A.   I would have reviewed them in my review of

6    other corporate documents that W&K had if they were

7    available.

8         Q.   So you reviewed more than the complaint?

9         A.   To the extent that there were other corporate

10   documents relating to W&K for example the IRS request.

11   I reviewed those as well.

12        Q.   But that doesn't answer my question.  I'm

13   talking about board minutes.  If it wasn't attached to

14   board minutes -- if it wasn't attached the complaint you

15   would have not reviewed them; is that correct.

16             MR. ROCHE:  Objection, form.

17             THE WITNESS:  I would say that they would be

18        part of the other corporate documents that I would

                              Page 38

010920Eisner.txt

19    have reviewed if they were there.

20  BY MR. PASCHAL:

21       Q.   What are the other corporate documents?

22       A.   To the extent that there were corporate

23  documents such as financials or IRS requests or board

24  minutes if they existed I reviewed all those.

25       Q.   Did you review board minutes?

                                                        35


 1       A.   No.  Because they -- to our knowledge there

 2  are -- to the corporation's knowledge there are no board

 3  minutes.

 4       Q.   Again you don't have access to the database of

 5  documents that are available in this case; right?

 6       A.   No.

 7       Q.   Are you aware of how many documents have been

 8  produced in this case?

 9       A.   I was told there was very voluminous.

10       Q.   But you haven't seen any of them?

11       A.   I've seen a good portion of them.  I haven't

12  seen --

13       Q.   What documents have you seen in the database?

14       A.   In the database?

15       Q.   Yes.

Page 39

010920Eisner.txt

16      A.   I have not accessed the database.

17      Q.   When you say -- well, so all the documents

18   that are produced in our database you have not seen any

19   of them in discovery?

20           MR. ROCHE:  Objection, form.

21           THE WITNESS:  I don't believe so.

22   BY MR. PASCHAL:

23      Q.   So if Dr. Craig Wright and third parties

24   produced 800,000 documents you are not prepared to

25   testify on any of them?

                                                        36


 1      A.   That's -- as corporate representative I will

 2   give my opinions as best as I can.

 3      Q.   But you haven't educated yourself based on any

 4   of those documents, have you?

 5      A.   Educated myself about the company.

 6      Q.   By reading the complaint?

 7      A.   And exhibits and the manager and the member

 8   the sole manager and sole member and counsel.

 9      Q.   I want to get that clear, let's break that

10   down.  You read the complaint that plaintiffs filed?

11      A.   Multiple iterations of the complaint.

12      Q.   All the amendments of the complaint?

010920Eisner.txt

13      A.   Yes.

14      Q.   The exhibits to the complaint?

15      A.   Yes.

16      Q.   You spoke with the manager member for 15

17   minutes?

18      A.   (Indicating).

19      Q.   Is that yes?

20      A.   Yes.

21      Q.   You spoke with counsel?

22      A.   Yes.

23      Q.   And other than that you have done nothing else

24   to prepare yourself to testify today?

25           MR. ROCHE:  Objection, form, mischaracterizes

37

1      his testimony.

2           THE WITNESS:  It's quite a lot of documents

3      and I believe that I am well prepared to answer on

4      behalf of the company as corporate representative.

5   BY MR. PASCHAL:

6      Q.   Did you review any corporate resolutions for

7   W&K?

8      A.   No.

9      Q.   You are aware that a corporate resolution is

010920Eisner.txt

10    attached as a exhibit to the complaint?

11          A.   Can you show me that, please?

12          Q.   In a second.  You didn't review any deposition

13    testimony to testify today?

14          A.   No.

15          Q.   We'll pull up the exhibit list in the

16    complaint.  The next topic is the assignment of any

17    rights asserted in the complaint.  What did you do to

18    prepare for that?

19          A.   Complaint, exhibits, counsel, Ira Kleiman.

20          Q.   You reviewed the complaint to determine that

21    there was any rights assigned in the complaint?

22          A.   In the corporate documents and speaking with

23    counsel.

24          Q.   What corporate documents did you review?

25          A.   There was nothing of any assignment of rights

                                                              38

1    because there were none.

2          Q.   Is your testimony today that W&K has assigned

3    no rights to anyone?

4          A.   Regarding Bitcoin or intellectual property,

5    yes, that is the --

6          Q.   About this case, the complaint.

                            Page 42

010920Eisner.txt

 7     A.    About -- I don't understand the question.

 8     Q.    Has any right to recovery been assigned from

 9   W&K to any other entity in this case?

10     A.    Are you asking if there was like a litigation

11   funding or something?  I don't understand.

12     Q.    That would be one potential assignment of

13   recovery.

14     A.    Yes, the company has litigation funding.

15     Q.    Is that an assignment of recovery?

16         MR. ROCHE:  So our position on this will be he

17       can identify a litigation funder, that litigation

18       funding exists and the name of the litigation

19       funder.

20         MR. PASCHAL:  Kyle, can't tell him what to

21       say.  If I ask a question --

22         MR. ROCHE:  This is privileged.

23         MR. PASCHAL:  Then assert the privilege.

24         MR. ROCHE:  Okay.

25

                                                             39


 1   BY MR. PASCHAL:

 2     Q.    Who are the litigation funders?

 3     A.    Parabellum is the name of the company.

010920Eisner.txt

4      Q.   Do you have any involvement in Parabellum?

5      A.   No.

6      Q.   When did you first learn about Parabellum?

7      A.   In my getting familiar with the company.

8      Q.   Does W&K have an agreement with Parabellum?

9      A.   I believe so, yes.

10     Q.   What's the agreement?

11          MR. ROCHE:  Objection, privileged.

12  BY MR. PASCHAL:

13     Q.   Who signed the agreement with W&K and

14  Parabellum?

15          MR. ROCHE:  Hold on one second.  If you know

16     the answer to that question you can answer.

17          THE WITNESS:  I don't know the answer to that

18     question.

19  BY MR. PASCHAL:

20     Q.   The next topic is "all persons who are

21  believed or known by W&K to have any knowledge

22  concerning any of the issues in the complaint."  What

23  did you do to prepare for that topic?

24     A.   Complaint, exhibits, speaking with counsel and

25  Ira Kleiman.

                                                        40

010920Eisner.txt

```
1       Q.   Who are the people are or all persons who are

2  believed to have known by W&K to have knowledge

3  concerning the issues of the complaint?

4       A.   Dave Kleiman, Ira, Craig Wright, Gwen, the

5  woman who reinstated in 2014.  I may be mispronouncing

6  her name.  I guess, you know, Jay Wilson and -- Jamie

7  Wilson.  I guess that will be it right now to my

8  knowledge.

9       Q.   So topic 18 it says the location of documents

10 related to the complaint.  What did you do to prepare

11 for that topic?

12      A.   Speak to counsel.

13      Q.   What did counsel say?

14      A.   Online depository of documents.

15      Q.   So the documents produced in discovery?

16      A.   I would assume so.

17      Q.   You didn't review any of those documents?

18      A.   To the extent that they weren't relevant to my

19 knowledge of W&K I did not.

20      Q.   Did you access the database?

21      A.   No.

22      Q.   Did you look at documents in the database?

23      A.   While in the database?

24      Q.   Yes.
```

Page 45

010920Eisner.txt

25      A.   No.  Were documents printed off from the

                                                        41

1   database and given to me I am sure, yes.

2       Q.   What documents were printed off the database

3   and given to you?

4       A.   Documents that I would need to familiarize

5   myself with.

6       Q.   What were those documents?

7       A.   Of -- for W&K's corporate information,

8   knowledge.

9       Q.   What were those documents?

10      A.   The IRS request form for example.

11      Q.   Was there any other documents?

12      A.   I don't know what's on the depository to be

13  able to answer that question.

14      Q.   Sorry, what was your answer?

15      A.   I don't know what's on the depository to be

16  able to answer what they gave to me what's on the

17  depository.

18      Q.   Counsel gave you an IRS form to prepare for

19  this deposition?

20      A.   Counsel gave me multitude of documents to

21  prepare for the deposition.

010920Eisner.txt

22      Q.   What are those documents?

23      A.   The complaints, the exhibits, any relevant

24 corporate documents, SunBiz records.

25      Q.   You said relevant corporate documents.  What

                                                        42

1 are those?

2       A.   IRS requests.  There were no organizational

3 documents.  The articles of organization, the

4 reinstatement.

5       Q.   That's it?

6       A.   The company didn't have tax records from the

7 IRS.  The company didn't have financials.  The company

8 didn't do minutes.

9       Q.   As far as you know?

10      A.   As far as -- I'm speaking on behalf of the

11 company.

12      Q.   Last topic W&K's administration and its

13 mailing address, physical address and mail received

14 relating to this action.

15      A.   Yes, that is -- I prepared myself by

16 complaint, documents, speaking with Ira, counsel and

17 going on SunBiz.

18           MR. PASCHAL:  Let's just take a break.

010920Eisner.txt

19          THE VIDEOGRAPHER:  Off the record.

20          (Thereupon, a brief recess was taken.)

21          THE VIDEOGRAPHER:  On record 11:15.

22          MR. PASCHAL:  Are we back on the record?

23          MR. ROCHE:  Yes.

24          MR. PASCHAL:  I'm handing you what is marked

25      as Exhibit 4.  Have you seen this document?

                                                        43


1          THE WITNESS:  Yes.

2          (Defendant's Exhibit No. 4 was

3          marked for identification.)

4    BY MR. PASCHAL:

5      Q.   Under Article II where it says the mailing

6    address of the Limited Liability Company is 4371

7    Northlake Boulevard, #314, Palm Beach Gardens, Florida

8    US 33410.  Is that the correct mailing address for W&K?

9      A.   Yes.  You read that correctly.

10     Q.   So there is no dispute on that?

11     A.   You read the mailing address correctly.

12     Q.   So what do you understand this case to be

13   about?

14     A.   In broad terms the misappropriation of

15   conversion among other counts of Bitcoin, intellectual

                        Page 48

010920Eisner.txt

16   property owned in some -- either by Dave Kleiman, W&K,

17   LLC jointly, separately somehow by Craig Wright.

18        Q.   Do you know when this case was filed?

19        A.   Yes.

20        Q.   Do you know how long we've been in discovery?

21        A.   Not exactly.  I assume from around then.

22        Q.   Do you know how many depositions have been

23   taken?

24        A.   No.

25        Q.   Do you know whether or not Craig Wright has

                                                      44

1   testified in this case?

2        A.   I know that he filed an affidavit.  I don't

3   know if he's been deposed or testified in the case.

4             MR. PASCHAL:  I want to break this down.

5        Maria, can you pass me a copy of the complaint?

6             (Defendant's Exhibit No. 5 was

7             marked for identification.)

8   BY MR. PASCHAL:

9        Q.   If you turn to page three of paragraph five.

10  It's marked as Exhibit 5.  If you look at the top of

11  page three.  I guess you can read the whole sentence

12  before that starting on page two.  Starting at "these

010920Eisner.txt

13   events" do you see on page two, paragraph five?

14            MR. ROCHE:  On page two?

15            MR. PASCHAL:  Yes, paragraph five.

16            THE WITNESS:  I see it.

17   BY MR. PASCHAL:

18        Q.    Second sentence "these events include but are

19   not limed to the wrongful taking of property belonging

20   to a Florida estate or LLC within this district."  When

21   you refer to a Florida estate or LLC what company are

22   you referring to?

23        A.    W&K.

24        Q.    "The partnership of Dave and Craig within this

25   district."  What is the partnership of Dave and Craig?

                                                        45

 1        A.    Within W&K.

 2        Q.    "The operation of W&K by Dave and Craig within

 3   this district."  Was it just David and Craig who

 4   operated W&K in this district?

 5        A.    Can you repeat the question?

 6        Q.    Was it just Dave and Craig who operated W&K in

 7   this district?

 8        A.    The operations of W&K were in this district.

 9        Q.    By just Dave and Craig?

010920Eisner.txt

10      A.   To my knowledge, yes.

11      Q.   "The mining of a substantial amount of Bitcoin

12  through the use of computer equipment located within

13  this district and/or by equipment owned and operated by

14  Florida resident (Dave) or Florida LLC (W&K.)"  What

15  computer equipment is located in this district to mine

16  Bitcoin?

17      A.   I believe there are multiple affidavits

18  attached to this complaint that Craig states that he is

19  giving computer to W&K, excuse me, for the purposes of

20  mining Bitcoin and that he says that W&K's purpose is to

21  mine Bitcoin.

22      Q.   I'm not talking about Craig's affidavit.  I'm

23  asking for W&K's testimony.  As the 30(b)6 witness for

24  W&K can you identify the computer equipment located in

25  this district to mine Bitcoin?

                                                    46


1       A.   Only from the testimony of Craig.

2       Q.   But you have no testimony or you cannot

3   testify about computer equipment located in this

4   district absent Craig's testimony?

5       A.   Which Craig testified about, yes, I cannot.

6       Q.   To your knowledge two years into this case,

                        Page 51

010920Eisner.txt

7    we've done discovery for a very long time now can you

8    identify the computer equipment that's in this district?

9        A.   W&K's knowledge is based upon Craig's

10   admission of all the computers and I believe he lists

11   them in a couple of the exhibits that he gave to W&K.

12       Q.   What steps did you take to learn about the

13   computer equipment within this district that was owned

14   by W&K?

15       A.   Speaking to counsel.

16       Q.   And you did nothing else?

17       A.   No, nothing else.

18       Q.   Did you ask the managing member of W&K?

19           MR. ROCHE:  Objection.  Objection, that calls

20       for privileged information.

21   BY MR. PASCHAL:

22       Q.   You also state "there was mining of a

23   substantial amount of Bitcoin through the use of

24   computer equipment."  The substantial amount of Bitcoin

25   how much Bitcoin do you believe that -- what is the

                                                        47


1    substantial amount of Bitcoin?  What is the amount?

2        A.   Craig has stated approximately 300,000 to a

3    1,100,000.

                          Page 52

010920Eisner.txt

4      Q.   Again I'm asking for your testimony not what

5    Craig said.  What is W&K's testimony, sworn testimony

6    today, as to the amount of Bitcoin it believes was

7    mined?

8           A.   W&K's knowledge of the amount of Bitcoin is

9    based upon Craig's admissions, multiple admissions, and

10   further discovery will show exactly the amounts.

11          Q.   When you say further discovery you do realize

12   discovery is over?

13               MR. ROCHE:  Objection, mischaracterizes this

14          litigation.

15   BY MR. PASCHAL:

16          Q.   As the W&K corporate representative and you're

17   going to be testifying in front of a jury your only

18   testimony would be what Craig said?

19          A.   Yes, the admission of the defendant that he --

20   at least 300 to a million.

21          Q.   You have no other evidence of W&K mining

22   Bitcoin?

23          A.   I believe multiple admissions are good enough

24   for us.

25          Q.   So if you take out Craig then the only

                                                    48

010920Eisner.txt

1    evidence you have is Craig?

2            MR. ROCHE:  Objection, form, calls for a legal

3        conclusion.

4            THE WITNESS:  I don't know the answer to that

5        question.

6            MR. PASCHAL:  Let me show you.  Kyle, I'm

7        using plaintiff's second amended.  Can I show it to

8        the witness?

9            MR. ROCHE:  Can you show it to me first?

10           MR. PASCHAL:  Yes.

11           MR. ROCHE:  Can you give me a second to pull

12       it up?  Can you tell me what the date is on that?

13       Is it March 20?

14           MR. PASCHAL:  March 21.

15           MR. ROCHE:  Hold on.

16           (Defendant's Exhibit No. 6 was

17           marked for identification.)

18   BY MR. PASCHAL:

19       Q.   Showing you what we're marking as Exhibit 6.

20   This is plaintiff's Second Amended Responses to

21   Interrogatories.  Can you please turn to page number

22   five.  You see on page five the request is to identify

23   public addresses W&K or estate believes that Bitcoin

24   holds?

Page 54

010920Eisner.txt

25          MR. ROCHE:  What request are you on?

                                                    49

1          MR. PASCHAL:  Let me see.  Request number

2     five.

3          MR. ROCHE:  Can you give me one second?  I

4     have the wrong one.  I it have identified by --

5          MR. PASCHAL:  Can we take a two second break,

6     just going to get photocopies?

7          THE VIDEOGRAPHER:  Off the record 11:28.

8          (Thereupon, a brief recess was taken.)

9          THE VIDEOGRAPHER:  On record 11:33.

10   BY MR. PASCHAL:

11       Q.   I'm handing you Exhibit 6 which is Plaintiff's

12   Second Amended Responses and Objections to Wright's

13   First Set of Interrogatories to Plaintiff Ira Kleiman.

14          Request number five we ask identify by public

15   address all cryptocurrency that you claim rightfully

16   belongs to Dave Kleiman or his estate.

17          Now, in response to number five you say

18   discovery is still ongoing some other stuff.  But then

19   you list 26 addresses.

20          MR. ROCHE:  26?  Didn't print the second page.

21          THE WITNESS:  Yes.

010920Eisner.txt

22   BY MR. PASCHAL:

23       Q.   So does W&K believe that any of these

24   addresses belong to the estate or W&K?

25       A.   Yes, in some part to the estate and W&K.

                                                          50


1        Q.   What's the make up between the estate and W&K?

2        A.   Unknown as of this time.

3        Q.   Have you seen any of these addresses before?

4        A.   I don't believe so but it's just sort of

5    numbers and letters.

6        Q.   Are there any additional addresses to this

7    list that W&K believes it's entitled to?

8        A.   Discovery is still ongoing in that regard.

9        Q.   But as of right now are there any additional

10   addresses that W&K believes it's entitled to?

11       A.   I don't know the answer to that question yet.

12       Q.   If I were to tell you that some of these

13   addresses were actually mined which means they first

14   came into existence after the death of Dave Kleiman

15   would the estate still believe or W&K still believe that

16   it has an ownership interest in any of those addresses?

17           MR. ROCHE:  Objection, calls for a legal

18       conclusion.

                          Page 56

010920Eisner.txt

19        THE WITNESS:  Could I answer?

20        MR. PASCHAL:  Yes.

21        THE WITNESS:  To the extent that Dave and W&K

22     were mining Bitcoin from the inception all forked

23     derivative assets of Bitcoin would also belong to

24     them.  So if they were forked assets.

25

51

1   BY MR. PASCHAL:

2        Q.   Not forked assets.  I'll go back to my

3   question.  The very first time that some of these

4   addresses came into existence was after Dave Kleiman

5   died.  Does W&K or the estate believe that those

6   addresses belong to the estate or W&K?

7        MR. ROCHE:  Objection, calls for a legal

8        conclusion.

9        THE WITNESS:  If they were forked derivatives

10       then absolutely.  If not I don't know the answer to

11       that question.

12   BY MR. PASCHAL:

13        Q.   They're not forked derivatives.  These are

14   first time mined, first mined.  If they're mined after

15   the death of Dave Kleiman a year after he died does W&K

010920Eisner.txt

16    or the estate believe that they have an ownership

17    interest in those addresses?

18        A.   Were they mined using intellectual property

19    owned by W&K?

20        Q.   No.

21            MR. ROCHE:  Objection.  Again this calls for a

22        legal conclusion.

23            THE WITNESS:  I don't know the answer to that

24        question, of the company's position regarding that.

25

52

1    BY MR. PASCHAL:

2        Q.   So today W&K cannot tell me whether or not

3    some of these addresses is that whether or not it has

4    ownership interest in some of these addresses?

5        A.   Company's position is here in the

6    interrogatory.  The position of the assets that it

7    believed they own ownership interest in.

8        Q.   For deposition you do realize you're

9    testifying on behalf of the company.  I'm asking your

10    position, okay?  If these addresses were mined a year

11    after Dave Kleiman's death does W&K believe it has an

12    ownership interest in that address?

Page 58

010920Eisner.txt

13        MR. ROCHE:  Objection, calls for a legal

14        conclusion.

15            THE WITNESS:  I would answer that discovery is

16        still ongoing exactly on how they are owned but I

17        do believe and W&K believes that if they are forked

18        assets or derived intellectual property or derived

19        from original Bitcoins that W&K or Dave Kleiman

20        owns that it would be assets of W&K and Dave

21        Kleiman.

22   BY MR. PASCHAL:

23        Q.   I need an answer to this question.  They're

24   not forked assets as I said these are first mined.

25   They're not mined with any intellectual property from

                                                        53


1   W&K.  They mined a year after Dave dies does W&K believe

2   that it has an ownership interest in any of these

3   addresses?

4            MR. ROCHE:  Objection, calls for a legal

5        conclusion.

6            THE WITNESS:  I could only answer in a

7        hypothetical.  I don't know the answer to that

8        question.

9   BY MR. PASCHAL:

010920Eisner.txt

10      Q.   Here, give you an example.  A number or all of

11   these addresses have been proven to have been mined

12   after Dave Kleiman died, that's first.  Secondly, the

13   identity of the people who mined these addresses have

14   nothing to do with Dave Kleiman or Craig Wright.  So

15   assume that's a hypothetical for you W&K still believe

16   that it has an ownership interest in addresses that it

17   never mined and that were mined by other people after

18   Dave Kleiman died?

19           MR. ROCHE:  Objection, form.

20           THE WITNESS:  Without knowing more information

21       about the intellectual property that W&K owned or

22       if they're forked assets or derivatives I cannot

23       answer the question.

24   BY MR. PASCHAL:

25      Q.   But as of today these addresses are the

                                                        54

1   addresses that W&K believes it's entitled to?

2           MR. ROCHE:  Objection, calls for a legal

3       conclusion.

4           THE WITNESS:  Yes, and discovery is still

5       ongoing.

6   BY MR. PASCHAL:

010920Eisner.txt

7      Q.   I gave you a copy of the complaint.  Can you

8   take a look at it?  Can you go to paragraph 11?  You say

9   on April 26, 2013 mere months prior to Bitcoin's entry

10   into the mainstream Dave died after a battle with MRSA?

11      A.   Yes.

12      Q.   What is your basis to believe that it was mere

13   months prior to Bitcoin's entry into the mainstream?

14   What do you mean by Bitcoin's entry into the mainstream?

15          MR. ROCHE:  Objection, form.

16          THE WITNESS:  I don't know if that's knowledge

17       that W&K as a corporation would be able to

18       identify.

19   BY MR. PASCHAL:

20      Q.   You do understand W&K is a plaintiff in this

21   case?

22      A.   Yes.

23      Q.   W&K drafted this complaint?

24      A.   Yes.

25      Q.   W&K is claiming ownership over Bitcoin?

                                                         55


1      A.   Yes.

2      Q.   And you're prepared to testify today about

3   W&K's interest in Bitcoin?

Page 61

010920Eisner.txt

4       A.   Yes.

5       Q.   And cryptocurrency.  So when W&K says mere

6    months prior to Bitcoin's entry into the mainstream what

7    does W&K mean?

8       A.   I would have to speculate.

9       Q.   What do you mean by entry into the mainstream?

10       A.   Public consciousness.

11       Q.   What basis do you have -- what basis does W&K

12    have to say that that's when Bitcoin entered the

13    mainstream?

14       A.   I would have to speculate public

15    consciousness, users, I don't know the answer to the

16    question.

17       Q.   So when W&K alleges it didn't really know that

18    it was mere months or when Bitcoin entered into the

19    mainstream; right?

20          MR. ROCHE:  Objection to form, he is answering

21       the question.

22          THE WITNESS:  I don't know if you can pinpoint

23       an exact date in time.  I think it's a general

24       statement to mainstream thought and usage.

25

56

Page 62

010920Eisner.txt

1  BY MR. PASCHAL:

2      Q.   Back to my question.  When W&K alleged when

3  Bitcoin became -- entered into the mainstream what basis

4  did W&K have to make that allegation?

5           MR. ROCHE:  Objection, form.

6           THE WITNESS:  Again I don't know the answer.

7      I would have to speculate that mainstream means

8      public consciousness and use, users.

9  BY MR. PASCHAL:

10     Q.   You do realize you're testifying for W&K?

11     A.   To this answer I would have to speculate.

12     Q.   So you don't know the answer?

13     A.   What it means by mainstream?

14     Q.   No.  I'm asking not about mainstream, I'm

15 asking about your allegation.  You say an April 26, 2013

16 mere months prior to Bitcoin's entry into the mainstream

17 W&K you allege that; right?

18     A.   To what fact are you asking?

19     Q.   I'm asking -- just asking you did you allege

20 that in the complaint?

21     A.   Is the complaint written like that, yes.  I

22 don't understand the question.

23     Q.   You're the plaintiff W&K?

24     A.   Yes.

Page 63

010920Eisner.txt

25      Q.   When W&K alleges on April 26th 2013 mere

57

1    months prior to Bitcoin's entry into the mainstream what

2    was W&K's basis to allege that?

3        A.   What specifically are you asking?  Are you

4    asking -- the complete sentence is "on April 26th 2013

5    mere months prior to Bitcoin's entry into the mainstream

6    Dave died after a battle of MRSA."  Are you asking what

7    date Dave died?  Are you asking when does Bitcoin go

8    mainstream?

9        Q.   Not asking about when Dave died in any of the

10   series of my questions.  My question is you allege on

11   April 26th 2013 mere months prior to Bitcoin's entry

12   into the mainstream, you see that?

13       A.   Yes.

14       Q.   What is W&K's basis to make that allegation?

15       A.   To the extent that Bitcoin went mainstream in

16   terms of public conscious and let's say as a

17   hypothetical August that would be mere months before

18   Bitcoin went mainstream.

19       Q.   I'm not asking for hypotheticals.  You made an

20   allegation.  I want to know why are you saying that

21   Bitcoin went mainstream during that time?

010920Eisner.txt

22          MR. ROCHE:  Objection, the witness has given

23     you his understanding.

24          MR. PASCHAL:  Witness has not given me an

25     answer.

58

1          MR. ROCHE:  Told you what he knows and what he

2     doesn't know.

3          MR. PASCHAL:  He hasn't told me what he knows.

4          MR. ROCHE:  He quite literally said to the

5     extent I understand what this means.

6          MR. PASCHAL:  Kyle, that's fine.  You can make

7     your objection.  I want an answer to this question.

8          MR. ROCHE:  You're badgering the witness at

9     this point.

10          MR. PASCHAL:  I am not.  Make your objection.

11  BY MR. PASCHAL:

12     Q.   What is the basis -- just going to repeat the

13  question.  Allegation number 11 "on April, 26, 2013 mere

14  months prior to Bitcoin's entry into the mainstream."

15  What is W&K's basis to allege that Bitcoin went

16  mainstream mere months before Dave's death?

17     A.   I could only speculate that mainstream means

18  public consciousness and users.

Page 65

010920Eisner.txt

19     Q.   What was the public consciousness?  What

20   triggered the public consciousness?

21     A.   I don't know how to measure that.  Perhaps

22   Google searches.  Perhaps user rates.  Perhaps use --

23     Q.   Did W&K use Google searches to figure that

24   out?

25     A.   I don't know.  It could have been one of many

59

1    things to determine what mainstream is.

2      Q.   So you do not know how --

3      A.   I don't know --

4          MR. ROCHE:  Objection.  This calls for

5      privileged information.  You're asking how we chose

6      to use -- in drafting of the complaint why we chose

7      to use the particular word choice.  Anything that

8      gets into how W&K and Ira drafted the complaint

9      that's privileged information.  To the extent the

10     witness knows --

11         MR. PASCHAL:  Kyle, what is the privilege on

12     that?

13         MR. ROCHE:  You're asking word choices related

14     to drafting of the complaint.  So the objection is

15     privileged.  You're asking why did W&K use that

Page 66

010920Eisner.txt

16      word.

17          MR. PASCHAL:  I'm asking why W&K made an

18      allegation.  So I don't know how -- this is W&K's

19      allegation.  I can't imagine how that's privileged.

20      We have a hearing.

21          MR. ROCHE:  Right now there's not a question

22      pending.

23          MR. PASCHAL:  Do you want me to say it again?

24          MR. ROCHE:  It says so you don't know how

25      question.  So --

                                                          60

1           MR. PASCHAL:  Want me to state the full

2       question and you can make your objection?

3           MR. ROCHE:  I think that makes sense, yes.

4    BY MR. PASCHAL:

5       Q.   W&K is a plaintiff in this case; correct?

6       A.   Correct.

7       Q.   At paragraph 11 W&K alleges on April 26th 2013

8    mere months prior to Bitcoin's entry into the mainstream

9    Dave died of a battle with MRSA.  My question is what is

10   W&K's basis to allege that mere months before Dave's

11   death Bitcoin went mainstream?

12          MR. ROCHE:  You can answer that question.

010920Eisner.txt

13          THE WITNESS:  I don't know what -- I don't

14      know the answer.

15  BY MR. PASCHAL:

16      Q.   Can you turn to paragraph 23.  The first

17  sentence says there are two methods of acquiring

18  Bitcoin.  Then it says the first involves simply

19  receiving Bitcoin from someone.

20          Is it W&K's position that if Craig Wright

21  purchased Bitcoin long after Dave died it has ownership

22  rights over those Bitcoin?

23          MR. ROCHE:  Objection, calls for a legal

24      conclusion.

25          THE WITNESS:  I don't know the answer to that

                                                          61


1      question.

2  BY MR. PASCHAL:

3      Q.   So if you go to the next paragraph you guys

4  allege -- W&K alleged that there is a second way Bitcoin

5  can be acquired and that's through mining.  You would

6  understand that you are alleging you can either purchase

7  Bitcoin or you can mine it, right?

8      A.   Yes.

9      Q.   Is it W&K's position that Bitcoin that Craig

010920Eisner.txt

10    Wright purchased, not mined just purchased, does W&K

11    have any ownership rights or does it believe it has any

12    ownership rights to the purchased Bitcoin?

13         MR. ROCHE:  Objection, calls for a legal

14         conclusion.

15         THE WITNESS:  I don't know -- to the extent

16         that there's, you know, intellectual property also

17         and forked derivatives also all of which would be

18         assets of W&K and Dave I don't know how to answer

19         the question.

20    BY MR. PASCHAL:

21    Q.   Not asking about forks or not asking about

22    intellectual property.  I'm asking if Craig Wright went

23    online and bought $100,000 worth of Bitcoin yesterday

24    does W&K believe that it has some entitlement to that

25    Bitcoin?

                                                      62

1     A.   In that hypothetical I would say no.

2     Q.   So is it W&K's position that it's just mined

3     Bitcoin that it is at issue in this case?

4          MR. ROCHE:  Objection, calls for a legal

5          conclusion.

6          THE WITNESS:  My understanding is that forked

010920Eisner.txt

```
 7        derivatives are also extremely important and

 8        valuable and while the mined Bitcoin is anywhere

 9        from 300 to a million as Craig Wright said

10        intellectual property and the forked are themselves

11        very valuable streams.

12   BY MR. PASCHAL:

13        Q.   Can you go to paragraph 32.  32 mentions

14   Mr. Hal Finney.  Has W&K had any interaction with Hal

15   Finney?

16        A.   Not to my knowledge.

17        Q.   Can you go to paragraph 48?  Actually never

18   mind.  Skip that.  I'll withdraw that question.  Does

19   W&K believe that Dave Kleiman kept it secret that he was

20   mining Bitcoin?

21        A.   Does W&K believe that Dave Kleiman the sole

22   member and sole manager kept it secret that he was

23   mining the Bitcoin?  I mean Dave did tell Ira that he

24   was mining Bitcoin.

25        Q.   So it wasn't a secret; right?
```

63

```
 1             MR. ROCHE:  Objection, form.

 2             THE WITNESS:  The corporation's knowledge

 3        doesn't -- I don't know the corporation's ability
```

Page 70

010920Eisner.txt

4         to answer the individual told.

5    BY MR. PASCHAL:

6         Q.   Was any officers of W&K keeping it secret that

7    they were working on Bitcoin, on mining Bitcoin?

8         A.   I don't believe so.

9         Q.   As you said that's because Ira claims that

10   Dave told him at a 2009 Thanksgiving dinner that he was

11   working on Bitcoin?

12        A.   (Indicating).

13        Q.   You have to answer.

14        A.   Yes, that conversation happened.

15        Q.   So it was not a secret?

16             MR. ROCHE:  Objection, form.

17             THE WITNESS:  That W&K was mining Bitcoin?

18        Well, Dave told Ira that he was mining Bitcoin.  I

19        don't know if that transfers to W&K.  I can't make

20        that legal --

21   BY MR. PASCHAL:

22        Q.   Is W&K aware that Dave was keeping it a

23   secret?  Was there any -- does the company have

24   knowledge its manager member is keeping a secret that

25   it's mining Bitcoin?

                                                      64

                        Page 71

010920Eisner.txt

1    A.    The company has no knowledge they were keeping

2    a secret or not.

3    Q.    Can you go to paragraph 65.  W&K alleges from

4    their collaboration in 2008 until the Dave's death in

5    2013 Craig and Dave mined over a million of the initial

6    Bitcoins together personally and through W&K.  Do you

7    know the division of how much Bitcoin were mined

8    personally and through W&K?

9    A.    No.

10   Q.    Again would a million Bitcoin be reflected in

11   the interrogatories that I showed you earlier, the

12   addresses in the interrogatories I showed you earlier?

13   A.    It might be.  I don't know.

14   Q.    When you allege at the end of this paragraph

15   Craig has now asserted ownership over the Bitcoin can

16   W&K explain how has Craig asserted ownership over the

17   Bitcoin?

18   A.    By fraudulently obtaining judgments in

19   Australia and taking the intellectual property of W&K as

20   well as the ability to ever recover anything from W&K

21   that is Craig asserting ownership of W&K as well as

22   acting as manager or director or authorized agent none

23   of which Craig was ever allowed to do.

24   Q.    Going back to my question.  You're saying

010920Eisner.txt

25    here -- you allege identifiable Bitcoin wallets that

65

1     Craig has now asserted ownership over.  Talking about

2     Bitcoin wallets not intellectual property, not

3     Australian judgments.  How has Craig Wright asserted

4     ownership over the Bitcoin wallets?

5              MR. ROCHE:  Objection, form.

6              THE WITNESS:  Not sure I understand the

7         question.  Can you repeat the question?

8     BY MR. PASCHAL:

9         Q.   You allege that they're identifiable Bitcoin

10    wallets that Craig has now asserted ownership over.  How

11    has Craig asserted ownership over those identifiable

12    Bitcoin wallets?

13             MR. ROCHE:  Objection, form.

14             THE WITNESS:  By not being able to access or

15        identify the specific Bitcoin that W&K owns because

16        Craig moved them or transferred them or usurped

17        them that is Craig asserting ownership over those

18        specific assets.

19    BY MR. PASCHAL:

20        Q.   To move Bitcoin you would need the Bitcoin's

21    private key; correct?

010920Eisner.txt

22          MR. ROCHE:  Objection, calls for expert

23      testimony.

24          THE WITNESS:  To my knowledge personally you

25      could -- you could sequester Bitcoin by hiding

⬆

                                                        66

1       information.  If the person doesn't have the

2       private key they can't access the Bitcoin it's the

3       same thing.

4   BY MR. PASCHAL:

5       Q.   That's not my question.  My question is for me

6   to send Bitcoin -- you allege it in your complaint we

7   can go through it I'm just trying to get an answer.  To

8   get Bitcoin to go from point A to point B you need a

9   private key; right?

10      A.   Yes.

11      Q.   So when you allege that Craig has now asserted

12  ownership over identifiable Bitcoin wallets are you also

13  alleging that Craig Wright somehow has taken Dave

14  Kleiman's private keys?

15          MR. ROCHE:  Objection, form.

16          THE WITNESS:  Or -- that could be an avenue or

17      he could have taken the Bitcoin assets owned by W&K

18      and moved those Bitcoin assets to some other

010920Eisner.txt

19      location.

20  BY MR. PASCHAL:

21      Q.   How did he -- I'm asking what is W&K's theory

22  that Craig Wright moved W&K's assets or Bitcoin wallets?

23          MR. ROCHE:  Objection, asked and answered.

24          THE WITNESS:  I would say that there is

25      multiple ways that Craig Wright has asserted

67

1       ownership over Bitcoin and -- Bitcoin owned by W&K

2       and they can be whether moving the money -- moving

3       the Bitcoin wallets or just transferring them to

4       different companies so they're not accessible or

5       putting them in his trusts or just hiding them away

6       where they're not identifiable.  All of those even

7       if he can't access them would be ways of asserting

8       ownership.

9   BY MR. PASCHAL:

10      Q.   Does W&K believe that Dave Kleiman had any

11  keys to W&K's Bitcoin, private keys?

12      A.   Yes.

13      Q.   Where are those private keys?

14      A.   It's unknown now.

15      Q.   Where -- where would Dave Kleiman have stored

010920Eisner.txt

16    W&K's private keys?

17         MR. ROCHE:  Objection, calls for speculation.

18         THE WITNESS:  I don't know how to answer the

19    question.

20    BY MR. PASCHAL:

21    Q.   Let me ask you.  Where would Dave Kleiman have

22    stored W&K's private keys?

23    A.   I don't know the answer to that question.  I

24    could direct that Craig thought that Dave had -- had

25    private keys and he asked to save a wallet.dat file,

                                                    68

1    D-A-T file, so he thought that Dave had Bitcoin and

2    ownership.

3    Q.   I'm talking about W&K's hardware and what did

4    its managing member do, okay?

5         MR. ROCHE:  Objection, calls for speculation.

6         MR. PASCHAL:  I haven't asked a question.

7    BY MR. PASCHAL:

8    Q.   As W&K where did Dave Kleiman keep W&K's

9    private keys?

10    A.   W&K doesn't know the answer to that question.

11    Q.   Do you know about Dave Kleiman?

12    A.   What I've learned and become -- understand in

Page 76

010920Eisner.txt

13    order to be able to testify today, yes.

14        Q.   How did you learn -- what did you review to

15    learn about David Kleiman?

16        A.   The complaint, the documents, speaking with

17    counsel, with Ira.

18        Q.   Did you do any internet search?

19        A.   I believe he has a Wikipedia page.

20        Q.   Do you know if that page is edited by counsel?

21        A.   I don't know.

22        Q.   Did you speak to any of Dave Kleiman's close

23    friends?

24        A.   No.

25        Q.   Did you speak to his fiancee?

                                                          69

1        A.   No.

2        Q.   Did you speak to the son who lived with him --

3    or his figuratively son that lived with him during the

4    entire relevant period?

5        A.   No.

6        Q.   Did you look at any of Dave Kleiman's computer

7    hard drives?

8        A.   No.

9        Q.   Did you look at any of his USB drives?

010920Eisner.txt

10          A.   No.

11          Q.   Did you ask to look at any of that stuff?

12          A.   I don't believe so.

13          Q.   So would it be correct to say that you took no

14     steps to locate whether Dave Kleiman's private keys?

15               MR. ROCHE:  Objection, form.

16               THE WITNESS:  I asked counsel --

17               MR. PASCHAL:  Other than asking counsel,

18          sorry.

19               THE WITNESS:  They may be aware of all facts

20          relevant for me to be able to testify.

21     BY MR. PASCHAL:

22          Q.   I'm just trying to figure out because -- so --

23     can you go back to Exhibit 6?  You have a page two?

24          A.   Yes.

25          Q.   So you see there's a chart that lists -- I'm

                                                            70


1     just focusing on the chart.  The chart that lists

2     electronic equipment that Ira was able to recover.  On

3     this list what electronic equipment belongs to W&K or

4     would be W&K's property?

5          A.   I don't know the exact breakdown.  I don't

6     know.

010920Eisner.txt

7     Q.   Have you seen this list before?

8     A.   No.

9     Q.   On page three when you see e-mail accounts?

10    A.   Yes.

11    Q.   What e-mail accounts would be associated with

12 W&K?

13    A.   I don't know.

14    Q.   What steps did you take to find out?

15    A.   Speaking with counsel.

16    Q.   So counsel doesn't know?

17         MR. ROCHE:  Objection, calls for privileged

18    information.

19 BY MR. PASCHAL:

20    Q.   What steps did W&K take to preserve its

21 electronic devices in advance of this litigation?

22    A.   I do not know.  I don't know.

23    Q.   Was W&K aware that Ira Kleiman re-formatted

24 Dave's hard drives?

25    A.   I am aware that Ira Kleiman attempted to

                                                    71


1  access Dave's hard drives.

2     Q.   My question is W&K aware that Ira Kleiman

3  re-formatted Dave's hard drives?

010920Eisner.txt

4      A.   No.

5      Q.   Is W&K aware that after reformatting Dave

6  Kleiman's hard drives Ira Kleiman continued to use those

7  hard drives until 2019?

8      A.   I don't know.

9      Q.   Is W&K aware that on a number of these USB

10  drives that are listed on this chart there are encrypted

11  files?

12      A.   No.  We are not aware.

13      Q.   Has W&K taken any steps to learn about the

14  encrypted files?

15      A.   I don't know the answer to that question.

16      Q.   So if Dave's private keys were in those

17  encrypted files W&K -- what would your answer be as to

18  whether or not those private keys may be in the

19  encrypted files?

20          MR. ROCHE:  Objection, that's -- to the extent

21      you understand the question you can answer.

22          THE WITNESS:  I'll answer that if relevant

23      information concerning W&K was in any way on any of

24      the hard drives or encrypted files I would have

25      been made aware of it by counsel in my preparation

72

010920Eisner.txt

1        to be corporate representative of W&K.

2    BY MR. PASCHAL:

3        Q.   W&K has access to the encrypted files?

4        A.   I don't know the answer to that question.

5        Q.   When W&K was created who were its members?

6        A.   Dave Kleiman was the sole member.

7        Q.   In 2012 who were the members?

8        A.   Dave Kleiman was the sole member up until

9    dissolution.

10       Q.   What documents have you reviewed to prepare

11   yourself or educated yourself to make that answer?

12       A.   There is no operating agreement to W&K's

13   knowledge.  So the only information we have that he was

14   a sole member is the sole manager and the disclaiming by

15   Craig of any interest in W&K leads us to believe there

16   is no other member other than Dave.

17       Q.   You have produced this -- actually plaintiff

18   produced this -- no, we produced this and plaintiff

19   produced this.  Can you --

20            MR. ROCHE:  Exhibit 7?

21            MR. PASCHAL:  Yes.

22            (Defendant's Exhibit No. 7 was

23            marked for identification.)

24   BY MR. PASCHAL:

010920Eisner.txt

25  Q. Handing you what I'm marking as Exhibit 7.  At

73

1 the bottom of this e-mail chain who is the e-mail being

2 sent from?

3  A. From Dave Kleiman.

4  Q. Who is it being sent to?

5  A. Craig Wright and CC Lynn Wright.

6  Q. What is the domain name for Lynn Wright?

7  A. Lynn.Wright@Information-defense.com.

8  Q. Dave writes, "Hmmm, I am all ears on

9 suggestions but I see no way of filing for LLC or non

10 profit in time.  Do you have any ideas?  I have three

11 fictitious names I can easily apply for if needed" and

12 he links to SunBiz.  Did you see this e-mail?

13  A. I don't believe so.

14  Q. Since you pulled out the articles of

15 incorporation what's the date on the Articles of

16 Incorporation for W&K?

17  A. February 16.

18  Q. What year?

19  A. 2011.

20  Q. What's the date on this e-mail?

21  A. February 14, 2011.

010920Eisner.txt

22      Q.   The next e-mail Dave Kleiman writes to Craig

23   Wright and LynnWright@InformationDefense.com and he says

24   "I sent an e-mail to see if there is an expedited or

25   online way to accomplish in any case how about a name?"

74

1            MR. ROCHE:  Objection, mischaracterizes the

2         document.

3   BY MR. PASCHAL:

4      Q.   Do you see that?

5      A.   Yes.

6      Q.   Then Craig writes to Dave Kleiman and Lynn

7   Wright and he says Lynn, question mark.

8      A.   Yes, I see that.

9      Q.   What does Dave Kleiman say after that?

10      A.   Wright Kleiman Information Security dot, dot,

11   dot W&K Info Defense dot, dot, dot.

12      Q.   That is what one day before the Articles of

13   Incorporation are filed?

14      A.   Yes.

15      Q.   Then Lynn Wright says "either or, you choose."

16      A.   Yes.

17      Q.   Do you take that as they're letting Lynn

18   Wright choose the name of the company?

Page 83

010920Eisner.txt

19      A.    Yes.

20      Q.    Then Craig responds and he says W&K Info

21  Defense Research.

22      A.    Yes.

23            (Defendant's Exhibit No. 8 was

24            marked for identification.)

25

75

1   BY MR. PASCHAL:

2       Q.    Showing you Exhibit 8.  Again this is

3   February 15, 2011, the day before Articles of

4   Incorporation are filed.  You see the subject says

5   registration TTA1?

6       A.    Yes.

7       Q.    Then Dave Kleiman says to Craig Wright and

8   Lynn Wright@InformationDefense.com last page of

9   attached.  "Do you think I could list you as an MGR or

10  MGRM with a foreign address or do you think they would

11  kick it back?"

12            MR. ROCHE:  Objection, mischaracterizes the

13            document.

14  BY MR. PASCHAL:

15      Q.    How long have you been practicing for nine

010920Eisner.txt

16   years; right?

17        A.   Yes.

18        Q.   What does MGR mean to you?

19        A.   Manager.

20        Q.   What does MGRM mean to you?

21        A.   Managing member.

22        Q.   Why would Dave Kleiman be asking Lynn Wright

23   that question?

24             MR. ROCHE:  Objection, calls for speculation.

25             THE WITNESS:  Can I answer?  He was asking --

⬆

76

1        reading it do you think I could list you as a

2        manager or not.  In fact, he ended up not listing

3        him as a manager.  He was the sole manager.

4   BY MR. PASCHAL:

5        Q.   You know as a matter of law you don't have to

6   actually list all of your members or managing members on

7   https://protect-us.mimecast.com/s/mTtGCJ678oc1AvG9fGjLTo document,
right?

8             MR. ROCHE:  Objection, calls for a legal

9        conclusion.

10            MR. PASCHAL:  Coming from a lawyer.

11            THE WITNESS:  Me personally.

12   BY MR. PASCHAL:

Page 85

010920Eisner.txt

13      Q.   You aware --

14      A.   I'm aware you don't have to list all the

15  members, not the managers.  You have to list the

16  managers.

17           (Defendant's Exhibit No. 9 was

18           marked for identification.)

19  BY MR. PASCHAL:

20      Q.   Handing you Exhibit 9.  I guess just start at

21  the top it's easier.  Dave Kleiman on the date that the

22  Articles of Incorporation are filed Dave sends an e-mail

23  to Craig Wright and Lynn Wright@informationdefense.com

24  and the subject is re: registration TTA1 and then he has

25  an attachment W&K Info Defense Research, LLC.

77

1  Representing to you because we don't have a computer in

2  front of us but the metadata for that attachment is that

3  Articles of Incorporation draft.  He says "look it over

4  real quick.  Let me know if it's okay or should the PoC

5  be in the US.  I see a non US vendor on the list.  Pay

6  special attention to additional authentication."

7           If Dave Kleiman was the only member of W&K why

8  is he sending the Articles of Incorporation to Lynn

9  Wright and Craig Wright and asking them if it's okay --

Page 86

010920Eisner.txt

10      let me know if it's okay?

11              MR. ROCHE:  Objection, calls for speculation.

12              THE WITNESS:  May I ask where it says anything

13          about additional authentication in this Exhibit 4

14          document?

15      BY MR. PASCHAL:

16          Q.   I'll get to that in a second.

17          A.   You're telling me that the attachments is

18      Exhibit 4?

19          Q.   Yes.

20          A.   So it seems like he already filed it.  I don't

21      know what PoC means.  Sorry, what was the question?

22          Q.   Let me show you the TTA1.

23              MR. ROCHE:  In a few minutes can we take a

24          break?

25

                                                            78


1       BY MR. PASCHAL:

2           Q.   Yes.  When we get back I'll show you the

3       department of Homeland registration.  Why is he asking

4       for permission if he is the managing member why is he

5       asking Lynn Wright and Craig Wright to submit something

6       on behalf of W&K?

010920Eisner.txt

```
 7              MR. ROCHE:  Objection, calls for speculation.

 8              THE WITNESS:  Again I don't understand.  What

 9         is the attachment?

10    BY MR. PASCHAL:

11         Q.   That is the attachment.

12         A.   Exhibit 4?

13              MR. ROCHE:  Counsel, you can represent that is

14         the exact attachment --

15              THE WITNESS:  Exhibit 4 is attached to Exhibit

16         9 you're saying?

17              MR. PASCHAL:  Yes, attachment W&K Info Defense

18         Research, LLC the Articles of Incorporation.

19              THE WITNESS:  Again I don't see -- I trust

20         you.  I don't know what PoC means.  I don't see

21         additional authentication.

22    BY MR. PASCHAL:

23         Q.   Even though it's a document that's being

24    submitted for W&K?

25         A.   Purpose of your question?
```

                                                            79

```
 1         Q.   Something being submitted on behalf of W&K;

 2    right?

 3         A.   He's sending them something about W&K, right?
```

Page 88

010920Eisner.txt

4        Q.   If he is the managing sole member of the

5   company why is he asking for permission from Lynn Wright

6   and Craig Wright about submitting any document?

7            MR. ROCHE:  Objection, mischaracterizes the

8        document, calls for speculation.

9            THE WITNESS:  The sole manager who has all

10       legal authority was Dave Kleiman.  He can ask for

11       understanding or acceptance or does this look good

12       or do you approve this to anybody.  Doesn't

13       necessarily mean a legal right, rights to

14       ownership.

15           MR. PASCHAL:  Let's get into the development.

16       What time is it?

17           MR. ROCHE:  12:18.  We can either take the

18       break probably if this is going to be to four

19       minutes.

20           MR. PASCHAL:  Let's take a break.

21           THE VIDEOGRAPHER:  Off record at 12:16.

22           (Thereupon, a brief lunch recess was taken.)

23           THE VIDEOGRAPHER:  On record 1:34.

24   BY MR. PASCHAL:

25       Q.   So just I need to correct the record on

80

010920Eisner.txt

1    Exhibit 9 the e-mail chain?

2         A.   Yes.

3              MR. PASCHAL:  It says W&K Info Defense, LLC.

4         The actual attachment was application to Homeland

5         Security so I'm going to hand that to you as 10.

6              (Defendant's Exhibit No. 10 was

7              marked for identification.)

8    BY MR. PASCHAL:

9         Q.   Have you seen this document before today?

10        A.   No.

11        Q.   On page two what's identified as the company

12   name applying for this program?

13        A.   W&K Info Defense Research, LLC.

14        Q.   And the address 4371 Northlake Boulevard, #314

15   is that the same address that was listed on the Articles

16   of Organization?

17        A.   As the mailing address, yes.

18        Q.   As the mailing address.

19        A.   It's misspelled but yes.

20        Q.   This is the attachment that Dave Kleiman is

21   sending to Lynn Wright and Craig Wright?

22             MR. ROCHE:  You've made the representation

23        that this is --

24             MR. PASCHAL:  Clarified on the record this is

Page 90

010920Eisner.txt

25          the actual attachment.  I was wrong.

                                                           81


1               THE WITNESS:  Not Exhibit 4?

2               MR. PASCHAL:  Not Exhibit 4.  This is the

3           attachment.

4       BY MR. PASCHAL:

5           Q.   You notice in the e-mail they reference point

6       of contact information?

7           A.   Yes.

8               MR. ROCHE:  Just so the record is clear I'm

9           going to object now that we know the previous

10          questions were based on the wrong attachment I am

11          going to preserve an objection all those answers

12          are objectionable based on wrong attachment.

13      BY MR. PASCHAL:

14          Q.   The point of contact who is listed as the

15      point of contact?

16          A.   Mr. Craig Wright.

17          Q.   What is his title?

18          A.   Lead researcher.

19          Q.   Again this is the document that Dave is

20      sending to Craig Wright and Ms. Lynn Wright?

21          A.   Yes.

010920Eisner.txt

22          Q.    And the e-mail this is the same e-mail where

23    Dave is asking for permission from Dave -- from Craig

24    and Lynn of whether or not he can submit this document?

25              MR. ROCHE:  Objection, form, calls for

♠

                                                                82


1          speculation.

2              THE WITNESS:  Let me know if this is okay but

3          I would suppose more if this is accurate.

4    BY MR. PASCHAL:

5          Q.    Before today have you heard of Information

6    Defense, PTY?

7          A.    Before I was brought in for this, no.

8          Q.    At any point have you heard of Information

9    Defense?

10              MR. ROCHE:  Objection, form, vague.

11              THE WITNESS:  Have I heard of Information

12          Defense?  You mean in my review of company

13          materials?  I don't recall if it was part of Dave

14          Kleiman materials but I don't believe so.

15    BY MR. PASCHAL:

16          Q.    Were you aware that Craig Wright and Mrs. Lynn

17    Wright were going through a divorce at about the time

18    that W&K was being created?

010920Eisner.txt

19          A.   I know that they were divorced.  I don't know

20    the exact timeline.

21              MR. PASCHAL:  Going to show you what I'm

22    marking as Exhibit 11.

23              (Defendant's Exhibit No. 11 was

24              marked for identification.)

25

                                                          83


1    BY MR. PASCHAL:

2          Q.   At the top of this e-mail it says it's from

3    Craig Wright; correct?

4          A.   Yes.

5          Q.   It's going to Dave Kleiman that is

6    Dave@DaveKleiman.com address?

7          A.   Yes.

8          Q.   The date is 2011; correct?

9          A.   Yes.

10          Q.   At the bottom you see Craig Wright's

11    signature; correct?

12          A.   Yes.

13          Q.   The company name is Information Defense PTY

14    LTD?

15          A.   Yes.

010920Eisner.txt

16      Q.   I'm just going to read this because it's going

17   to be significant in a second but do you see in the

18   second paragraph that in this e-mail to Dave Craig says

19   Lynn will be taking over the company?

20      A.   Yes, I do.

21           MR. PASCHAL:  This is a document that was

22       filed -- this is Exhibit 12.

23           (Defendant's Exhibit No. 12 was

24           marked for identification.)

25

84


1   BY MR. PASCHAL:

2       Q.   This is a document that was filed as a part of

3   Craig Wright and Lynn Wright's divorce.  This is an

4   appendix and it's a Court document.  On this appendix

5   it's summarizing the split of who would get what.

6           MR. ROCHE:  Object, using this document to the

7       extent it's unauthentic.

8           MR. PASCHAL:  Kyle, according to Vel there was

9       an agreement that it would be objections to form

10      only on all depositions.

11          MR. ROCHE:  I mean -- if you have an issue

12      with my objection you can raise it with the court.

010920Eisner.txt

13      I think we've all -- everybody in this case has

14      been stepping outside of the lines of just form

15      objections.

16           MR. PASCHAL:  All right.

17  BY MR. PASCHAL:

18      Q.   So this document that was filed in court do

19  you see where it says W&K?

20      A.   Yes.

21      Q.   What does it say about the shares of W&K?

22      A.   50 percent of shares from Craig Wright

23  existing shares to be split and divided 50 percent to go

24  to Lynn Wright.

25      Q.   Now, this document this divorce settlement --

                                                        85


1   would divest Craig Wright of any interest in W&K;

2   correct?

3            MR. ROCHE:  Objection, calls for a legal

4        conclusion.

5            THE WITNESS:  Again to the extent that it's

6        authentic I can't -- I don't know for sure as W&K I

7        don't know exactly and also it seem -- it would

8        seem to conflict with an affidavit that Craig did

9        file saying it never had anything to do with W&K.

010920Eisner.txt

10    BY MR. PASCHAL:

11        Q.   Again his e-mail before was that he's stepping

12    away from Information Defense altogether; correct, that

13    Lynn was taking over Information Defense?

14             MR. ROCHE:  Objection, form.

15             THE WITNESS:  It says Lynn will be taking over

16        the company.  I don't know what company they're

17        referring to.  It's my understanding they had

18        multiple companies.

19    BY MR. ROCHE:

20        Q.   Do you understand that Information Defense

21    started in Australia between Craig and Lynn Wright?

22             MR. ROCHE:  Objection to form.

23             THE WITNESS:  I did not know that.

24    BY MR. PASCHAL:

25        Q.   And that -- what was the purpose of W&K

                                                        86

1    forming?

2        A.   To mine Bitcoin and hold intellectual

3    property.

4        Q.   That e-mail that we just went through with

5    Dave talking with Lynn Wright and Craig Wright can you

6    show me in in any point -- they're talking about forming

                        Page 96

010920Eisner.txt

7    W&K can you show me any point in that e-mail where they

8    say the company is to mine Bitcoin?

9              MR. ROCHE:  Objection, form.

10   BY MR. PASCHAL:

11        Q.   If you go to Exhibit 9, Exhibit 8, Exhibit 7.

12        A.   Nowhere in the e-mail does it say to mine

13   Bitcoin.  On the business record it says any and all

14   lawful business.  I believe Craig Wright is to supposed

15   to mine Bitcoin.

16        Q.   Not talking about business record of Bitcoin.

17   Talking about this e-mail between Dave Kleiman and Lynn

18   Wright and Craig Wright and Info Defense?

19        A.   I thought we said this was recording

20   application for DHS.

21        Q.   That's this one e-mail.  These e-mails so if

22   you go to Exhibit 8?

23        A.   What attachment is that?  That's a different

24   attachment than before.

25        Q.   Talking about the e-mail.

87

1         A.   Exhibit 8.

2         Q.   Exhibit 7 for example.  If you go to Exhibit 7

3    at the bottom it says I sent -- Dave Kleiman says to

010920Eisner.txt

4   Craig Wright and Lynn "I sent an e-mail to see if

5   there's an expedited online way to accomplish.  In any

6   case how about a name" and eventually Lynn Wright

7   selects W&K Info Defense?

8       A.   Yes.

9       Q.   You recall this e-mail?

10      A.   Yes.

11      Q.   So at this point Craig Wright had no

12  involvement with W&K Info Defense?

13           MR. ROCHE:  Objection, form.

14           THE WITNESS:  What do you mean by involvement?

15  BY MR. PASCHAL:

16      Q.   It hasn't been created yet?

17      A.   Right.  Seems as of this date it wasn't

18  created.

19      Q.   In this e-mail do they mention anything about

20  Bitcoin?

21      A.   No.  Could have been bankrupt.

22      Q.   The very next day and you go back to Exhibit 9

23  as you pointed out what -- the first thing they do for a

24  business is apply to Department of Homeland Security an

25  application?

88

010920Eisner.txt

1      A.   Yes.  That was another one of their business

2   purposes to apply for the -- to the four DHS

3   applications.

4      Q.   Nowhere on that application does it mention

5   anything about Bitcoin.

6           MR. ROCHE:  Objection, form.

7           THE WITNESS:  I would need to see the

8           applications.  I did see them.  I don't recall them

9           perfectly.  I would argue that, you know,

10          businesses could have multiple purposes.

11   BY MR. PASCHAL:

12      Q.   When I asked you about the business purpose

13   you never told me this one, this specific business

14   purpose.

15      A.   Yes, I would like to amend my answer also to

16   apply to four DHS applications, yes.  Forgot about that

17   one.

18      Q.   Does the estate -- or does W&K have any

19   e-mails that Dave Kleiman the purpose of W&K was to mine

20   Bitcoin?

21      A.   Not to my knowledge.

22      Q.   Does W&K have any documents saying that the

23   purpose of W&K is to mine Bitcoin?

24      A.   Does W&K have any documents -- if Craig's

010920Eisner.txt

25    multiple admissions that W&K was supposed to mine

∧

89

1     Bitcoin.

2          Q.   I'm asking if W&K has any documents not Craig

3     Wright, to say --

4               MR. ROCHE:  Objection to form.

5               THE WITNESS:  Not to my knowledge.

6     BY MR. PASCHAL:

7          Q.   You mentioned IRS tax requests.  Did W&K ever

8     pay taxes for the Bitcoin that it purportedly mined?

9               MR. ROCHE:  Objection, form.

10              THE WITNESS:  There were no tax records to

11         review.

12    BY MR. PASCHAL:

13         Q.   So back to my question.  Did W&K pay for any

14    of the -- pay taxes on any of the Bitcoin that it

15    purportedly mined?

16         A.   I don't know the answer to that question.

17         Q.   Do you know if Dave Kleiman filed for his tax

18    returns?

19         A.   I don't know the answer to that question.

20         Q.   Do you know if Dave Kleiman ever listed

21    Bitcoin as an asset on his taxes?

010920Eisner.txt

22          A.   I don't know the answer to that question.

23          Q.   When W&K was reinstated what efforts did W&K

24    take to locate the members of W&K?

25          A.   When W&K was reinstated in 2018?

90

1           Q.   Yes.

2           A.   Absent other evidence W&K believes that Dave

3     was the sole member and Ira was taking it over and who

4     is now the sole member.

5           Q.   But did you contact anyone about the

6     membership of W&K?

7           A.   I don't know the answer to that question.

8           Q.   So you wouldn't know if anyone contacted Lynn

9     Wright about reinstating W&K, would you?

10               MR. ROCHE:  Objection, form.

11               THE WITNESS:  I would not know.

12    BY MR. PASCHAL:

13          Q.   Can you turn to paragraph 72 in the complaint?

14    Sorry, it's paragraph 70.  That first sentence W&K

15    alleges that it has no operating agreement and its exact

16    ownership structure is unclear due to Craig's

17    contradictory statements.  So from the time you filed

18    this complaint to now what evidence does W&K have to

010920Eisner.txt

19   clear -- to make clear its ownership structure?

20        A.   Currently?

21        Q.   So you filed this complaint --

22        A.   Yes.

23        Q.   -- with Craig's affidavits and everything.

24   You're saying it's unclear the ownership structure;

25   correct?

91

1         A.   In 2011.

2         Q.   2011?  No.  W&K -- read the paragraph.  W&K

3    has no operating agreement and its exact ownership

4    structure is unclear due to Craig's contradictory

5    statements.  W&K made this allegation on January 14th

6    2019.  Okay?

7         A.   Correct.

8         Q.   So from January 14th 2019 to today what

9    evidence does W&K have to support that Ira Kleiman is

10   the only member of W&K?

11        A.   Other than Craig's statements disclaiming any

12   interest I do not know.

13        Q.   So -- but those statements disclaiming

14   interest you put that in the complaint but you did

15   recognize it's still unclear the ownership structure of

010920Eisner.txt

16    W&K?

17          MR. ROCHE:  Objection, form.

18          MR. PASCHAL:  Correct.

19          THE WITNESS:  It's our position that Dave

20     Kleiman was 100 percent the sole member and now IRA

21     is 100 percent the sole member.

22    BY MR. PASCHAL:

23     Q.   I'm trying to get to the basis of that

24    position.  You say on January 14, 2019 it's unclear you

25    do not know your ownership structure?

92

1     A.   Absence any other evidence Dave is 100 percent

2    the member and Ira is 100 percent the member.

3     Q.   You're saying it's unclear on January 14,

4    2019; correct?

5     A.   Yes, that's what it says.

6     Q.   Going forward what evidence do you have to

7    suggest that Ira Kleiman is the only managing member of

8    W&K?

9          MR. ROCHE:  Objection, form.

10          THE WITNESS:  Again the reason it's unclear is

11     because of the contradictory statements of Craig

12     Wright to our knowledge and our position is that

Page 103

010920Eisner.txt

13      Dave is the 100 percent sole member and Ira is

14      100 percent the sole member.

15  BY MR. PASCHAL:

16      Q.   Has Ira opened up a probate to accept the

17  shares of W&K?

18           MR. ROCHE:  Objection, outside the scope of

19      the 30(b)6 topics.

20           MR. PASCHAL:  That's outside the scope.  Goes

21      to W&K whether it's even active.

22           MR. ROCHE:  Goes to what?

23           MR. PASCHAL:  W&K's proprietary information,

24      its membership.

25           MR. ROCHE:  How does Ira's opening up --

                                                           93


1            MR. PASCHAL:  I'm trying to figure out whether

2       it's the estate or Ira Kleiman.  He said Ira is the

3       managing member so I'm trying to figure that out if

4       you're going to instruct him not to answer.

5            MR. ROCHE:  I'm going to instruct him not to

6       answer because this is outside the scope of the

7       30(b)6.

8            MS. MCGOVERN:  Can you please mark this

9       question because there is a hearing?

010920Eisner.txt

10    BY MR. PASCHAL:

11         Q.   To be clear the only evidence you have of the

12    ownership of W&K as you sit here today is preparing the

13    complaint and talking to counsel; correct?

14         A.   And Ira.

15         Q.   The 15 minute conversation you had with Ira?

16         A.   I believe so, yes.

17         Q.   Again they never -- counsel never provided you

18    with any -- Ira never provided you with any of the

19    documents that we produced in discovery including the

20    e-mails that I showed you previously, 7, 8 and 9?

21         A.   No.

22         Q.   Is that a no?

23         A.   Yes, no.

24         Q.   Can you go to 79?  You're saying the exact

25    number of Bitcoin belonging to Dave's estate and or W&K

                                                            94


1     will be determined at trial.  How is that going to be

2     determined at trial?

3              MR. ROCHE:  Objection, calls for a legal

4         conclusion.  Withdraw that objection.

5              THE WITNESS:  That's for the judge to

6         determine.

010920Eisner.txt

7   BY MR. PASCHAL:

8       Q.   What evidence does W&K have to determine the

9   exact number of Bitcoins belonging to Dave's estate and

10  or W&K and how it will be determined at trial?

11      A.   Again that's for the judge to determine but

12  various documents, e-mails, contracts, admissions and

13  transcripts.

14      Q.   What e-mails are going to reflect the amount

15  of Bitcoin that belongs to Dave's estate and or W&K?

16      A.   I believe Craig said through Ira at least

17  300,000.  There is an e-mail saying I have a million.

18  Similar amounts multiple e-mails going through.  Whether

19  it in part owned by Dave.  Whether in part owned by W&K.

20  We're not sure yet.

21      Q.   How many e-mails -- how many e-mails exactly

22  state that?

23      A.   I could not tell exactly how many e-mails.  I

24  know multiple e-mails are attached to the complaint.

25      Q.   All those e-mails are from Craig Wright to Ira

95

1   Kleiman?

2       A.   If I saw the exhibits I would be able to

3   better show but to my remembering there's also an

Page 106

010920Eisner.txt

4   Australian tax transcript of which he also says how much

5   Bitcoin he has or something of the sort.  I would have

6   to look at the exhibits again to --

7        Q.   If we were at trial right now what will W&K

8   tell the jury as to the amount of Bitcoin that it

9   purportedly owns?

10       A.   Anywhere between 300 --

11            MR. ROCHE:  Objection, form.  You can go ahead

12       and answer.

13            THE WITNESS:  Anywhere between 300 and

14       1,100,000.

15   BY MR. PASCHAL:

16       Q.   Is the jury supposed to guess?

17            MR. ROCHE:  Objection, form.

18            THE WITNESS:  I don't know the answer to that

19       question.

20   BY MR. PASCHAL:

21       Q.   You're telling a jury they have to pick a

22   number between 300 and a million.  How are they supposed

23   to pick that number?

24            MR. ROCHE:  Objection, form.

25            THE WITNESS:  I don't know the answer to that

96

010920Eisner.txt

1       question.

2   BY MR. PASCHAL:

3       Q.   As W&K's corporate representative what are you

4   suing Craig Wright for?

5       A.   Anywhere between 300 and 1,100,000 Bitcoin.

6       Q.   How much of that belongs to Dave and how much

7   of that belongs to W&K?

8       A.   It's unknown exactly the split.

9       Q.   How are you going to clear that up?  How are

10  you going to figure that out?

11          MR. ROCHE:  Objection to form.

12          THE WITNESS:  I don't know the answer to that

13          question.

14  BY MR. PASCHAL:

15      Q.   So of that range that 700,000 range 300

16  between a million sitting here as the corporate

17  representative of W&K you can't tell the jury how much

18  of that belongs to you -- to W&K?

19          MR. ROCHE:  Objection, form.

20          THE WITNESS:  I don't think that's really

21          relevant.  If you took 300 to a million then it was

22          owed to W&K and/or Dave in some, you know, manner

23          that's for the jury to decide.

24  BY MR. PASCHAL:

010920Eisner.txt

25          Q.   How is the jury going to decide that?

1               MR. ROCHE:  Objection, form.

2               THE WITNESS:  Based on numerous, numerous

3          affidavits and admissions on how much Bitcoin --

4          that's for them to decide.

5     BY MR. PASCHAL:

6          Q.   When you say numerous like what are you

7     referring to numerous what?  I know you mentioned the

8     ATO transcript and some e-mails?

9          A.   I point out paragraph 83 of the complaint that

10    says that Craig has 1.1 Bitcoin and Mr. Kleiman would

11    have a similar amount.  Point at multiple e-mails I

12    don't recall the exact exhibits but I know they're

13    attached to the complaint.  I don't have it in front of

14    me that he said to Ira that at least 300 -- there's

15    multiple, multiple -- there is the e-mail actually on

16    paragraph 88 Craig admitted 300,000 are held for Dave.

17         Q.   These are all e-mails that were --

18         A.   Sorry?

19         Q.   These are all e-mails that are with Ira?

20    E-mails between Craig and Ira?

21         A.   One of them was with the Australian tax

Page 109

010920Eisner.txt

22    people.

23         Q.   He had an e-mail with the Australian tax

24    people?

25         A.   Craig and the Australian tax people the

                                                    98

1     transcript.

2          Q.   Australian -- were you aware that Craig Wright

3     had issues with the Australian Tax Office?

4          A.   Yes.

5          Q.   Are you aware that counsel for plaintiffs have

6     alleged that numerous of those documents in the ATO

7     proceedings were forged or faked or fraud; correct?

8              MR. ROCHE:   Objection, form.

9              THE WITNESS:   I'm aware that -- they did

10             inform me that some of the documents were

11             manipulated.

12    BY MR. PASCHAL:

13         Q.   Can you go to paragraph 93?  You allege that

14    the mined Bitcoin was stored in wallets in the

15    possession of Dave, Craig, W&K and/or certain trusts.

16    What are the trusts that you're referring to?

17         A.   It's unknown at this time.

18         Q.   What steps have you taken to learn what the

010920Eisner.txt

19   trusts are?

20        A.   What steps has W&K the corporation taken?

21        Q.   Yes.  Or you as the corporate representative

22   to educate yourself on that topic?

23        A.   Asking counsel.

24        Q.   Does W&K believe that Dave had access to this

25   trust?

99

1             MR. ROCHE:  Objection, form.  Just testified

2        he doesn't know trusts.

3             MR. PASCHAL:  Not asking about them.

4             MR. ROCHE:  You said this trust.  Objection,

5        form.

6             THE WITNESS:  Can you repeat the question?

7   BY MR. PASCHAL:

8        Q.   Yes.  Does W&K believe that Dave Kleiman had

9   access to the trust?

10        A.   I don't know the answer to that question.

11        Q.   I don't know if I asked this before but has

12   W&K taken any steps to decrypt or recover any data from

13   Dave's electronic devices?

14        A.   I don't know the answer to that question.

15        Q.   Has W&K taken any steps to recover e-mails

Page 111

010920Eisner.txt

16    from all of Dave's e-mail addresses?

17         A.   I don't know the answer to that question.

18         Q.   Throughout your complaint you allege that Dave

19    and Craig were mining at least from 2013; correct?

20         A.   Yes.

21         Q.   And developing intellectual property until

22    2013?

23         A.   Yes.

24         Q.   Are you aware that Dave Kleiman was in the

25    hospital from 2011 to 2013 consistently?

                                                      100


1          A.   I am aware that he was in and out of the

2     hospital over periods of this time.

3          Q.   Do you realize -- do you know he was admitted

4     from 2011 to 2013?

5          A.   Do I know that he was admitted in the hospital

6     for two straight years?

7          Q.   Yes.

8          A.   No.

9          Q.   Did you know -- do you know anything about his

10    health condition during those years?

11         A.   I know that he was I believe a quadriplegic.

12    I know that he declined seriously in 2013.  I don't know

010920Eisner.txt

13      much more than that.

14          Q.   Do you know that he had serious financial

15      issues for the last couple years of his life?

16          A.   No.

17          Q.   Did you know that his home was going into

18      foreclosure?

19          A.   No.

20          Q.   Did you know that he was trying to refinance

21      his house during that time and he couldn't?

22              MR. ROCHE:  Objection, this is -- you can

23          answer but this is outside the scope of 30(b)6.

24              MR. PASCHAL:  Just asking whether he knows.

25              THE WITNESS:  I was going to say the

                                                        101


1           corporation's knowledge of that I don't know.  I

2           don't know all that.

3       BY MR. PASCHAL:

4           Q.   Is it W&K's position that during this time

5       that Dave Kleiman had financial trouble and serious

6       health conditions that he was mining Bitcoin out of the

7       Miami V.A. Hospital?

8               MR. ROCHE:  Objection, form.

9               THE WITNESS:  The mining could have been set

010920Eisner.txt

10        up and let to run.

11   BY MR. PASCHAL:

12        Q.   Like at his house?

13        A.   Among other places, sure.

14        Q.   Did you know that he couldn't pay his power

15   bills so his power was shut off?

16             MR. ROCHE:  Objection, outside the scope of

17        30(b)6.

18             THE WITNESS:  As corporate representative I

19        don't know.

20   BY MR. PASCHAL:

21        Q.   What other places could he have been set up to

22   mine?

23        A.   I don't know the answer to that question.

24        Q.   Going back to my question is it W&K's position

25   that with Dave's financial situation and his declining

                                                   102

1    health and his admittance in the Miami V.A. that he was

2    mining Bitcoin out of the Miami V.A.?

3             MR. ROCHE:  Objection, form.

4             THE WITNESS:  I don't think mining out of the

5        V.A. would be the correct usage but the corporation

6        was set up and mining was set up to continuously

                        Page 114

010920Eisner.txt

```
 7      mine.  That is the company's position from 2011

 8      throughout.

 9   BY MR. PASCHAL:

10      Q.   Where was the company storing these mined

11   Bitcoin?

12           MR. ROCHE:  Objection, form.

13           THE WITNESS:  We don't know the answer to that

14      question.  We don't know.

15   BY MR. PASCHAL:

16      Q.   Can you turn to paragraph 119?  Paragraph 117

17   you allege that in July August 2013 Craig filed two

18   claims in New South Wales Supreme Court against W&K for

19   $28 million each.  Are you aware of that lawsuit?

20      A.   I am aware of the lawsuit.

21      Q.   If you go down to 119 W&K alleges that W&K was

22   never served validly or otherwise with these

23   proceedings.  What steps did you take to determine

24   whether or not you were actually were served?

25      A.   By speaking with counsel and Ira regarding
```

                                                    103


```
 1   service that should have been processed.  There is no

 2   record of receiving any service whatsoever.

 3           (Defendant's Exhibit No. 13 was
```

010920Eisner.txt

```
 4              marked for identification.)

 5   BY MR. PASCHAL:

 6       Q.   Handing you Exhibit 13.  I want to just start

 7   on the second page of this.  So at top of the page you

 8   see Supreme Court of New South Wales; correct?

 9       A.   Second page, yes.

10       Q.   It says postage paid Australia at the top

11   right; correct?

12       A.   Yes.

13       Q.   The address that's on this envelope the 4371

14   Northlake Boulevard, Suite 314, is that the same address

15   that's the mailing address for W&K?

16       A.   It is but it's not the registered agent

17   address.  You would not be sending service of process to

18   the mailing address.

19       Q.   Just asking if it was the mailing address?

20       A.   It is.

21       Q.   It says it's addressed to W&K Info Defense

22   Research, LLC; right?

23       A.   Yes.

24       Q.   And there's handwriting that says received

25   10/10/13?
```

104

010920Eisner.txt

1        A.   Yes.

2        Q.   Do you know who wrote that?

3        A.   I could only assume that it is the UPS store

4   of which 4371 Northlake Boulevard is.

5        Q.   Do you know what 4371 Northlake Boulevard is?

6        A.   It's a UPS store.

7        Q.   Do you know if anyone was checking that

8   mailbox after Dave's death?

9        A.   I believe that Dave's business partner was

10  checking that mailbox.

11       Q.   Do you know that Dave's business partner is

12  the one who wrote received 10/10/2013?

13       A.   No.

14       Q.   Are you aware that Dave's business partner is

15  also alerted Ira that -- about this mailbox, this UPS

16  mailbox?

17            MR. ROCHE:  Objection, form.

18  BY MR. PASCHAL:

19       Q.   Ira declined to pay for the mailbox for W&K's

20  mailing address?

21       A.   I'm not aware.  However again it's not service

22  of process because it could only be done to the

23  registered agent.

24       Q.   You're familiar with the Haigh Convention;

                    Page 117

010920Eisner.txt

25    correct?

105

1              MR. ROCHE:  Objection.  You can answer.

2              THE WITNESS:  Vaguely.

3    BY MR. PASCHAL:

4         Q.   There's laws in the state of Florida; correct,

5    right?

6         A.   Yes, there are laws in the state of Florida.

7         Q.   The Haigh Convention does trump those laws?

8              MR. ROCHE:  Objection to the extent it calls

9         for a legal conclusion.

10             THE WITNESS:  The little bit I know of the

11        Haigh Convention.

12   BY MR. PASCHAL:

13        Q.   Are you also aware that Carter Conrad and

14   Patrick Paige sent this to Ira, this actual -- sent this

15   envelope to Ira Kleiman?

16        A.   No, I'm not aware.

17        Q.   Ira never told you that?

18             MR. ROCHE:  Objection, calls -- instruction

19        not to answer.  Well, okay withdraw the objection.

20        To the extent that Ira ever told you that just

21        directed to the extent counsel was present don't

010920Eisner.txt

22      answer.

23          MR. PASCHAL:  I can withdrew the question.  He

24      kind of answered already.

25          MR. ROCHE:  He did?  I didn't see it in the

                                                            106

1       transcript.

2           MR. PASCHAL:  When he said no.

3           MR. ROCHE:  Okay.

4    BY MR. PASCHAL:

5       Q.   If you look at the first page of the document

6    now at the top left corner what court is that coming

7    from?

8       A.   Supreme Court of New South Wales.

9       Q.   Who is it addressed to?

10      A.   W&K Info Defense Research, LLC 4371 Northlake

11   Boulevard -- again North is spelled incorrectly.  Yes,

12   Palm Beach, yes.

13      Q.   It was received at 4371 Northlake Boulevard?

14      A.   Second time.  Drawing my attention to it

15   that's all.  I apologize.

16      Q.   Top right corner it has the contact

17   information for court.  You see that?

18      A.   Yes.

010920Eisner.txt

19      Q.   What is the date of this document?

20      A.   September 3rd 2013.

21      Q.   It says Notice of Listing is the title; right?

22      A.   Yes.

23      Q.   What is the case title?

24      A.   Craig Steven Wright vs. W&K Info Defense

25   Research, LLC.

107

1       Q.   This is instructing you that the matters

2   listed for directions common law registrar on

3   October 30th 2013 at 9:00 a.m. Supreme Court civil,

4   Supreme Court Sydney Court, 9C Queens Square City.  Then

5   it says if you do not appear in court this matter may be

6   dealt with in your absence.

7       A.   To the extent that this entire lawsuit both

8   lawsuits are based on fraudulent forged contracts by

9   Craig Wright so all are totally void.  I see you're

10   reading correctly, yes.

11      Q.   Thank you for that.  Didn't have a question

12   pending.  But so W&K can't say that this document was

13   received at its mailing address listed on its Articles

14   of Incorporation?

15           MR. ROCHE:  Objection, form.

010920Eisner.txt

16          THE WITNESS:  Which isn't service of process

17      but it seems it was received at the mailing

18      address.

19          MR. PASCHAL:  Do you want to go ten more

20      minutes and then dial?

21          MR. ROCHE:  Let's go to 2:20.

22          MR. PASCHAL:  Kyle, I asked about the probate.

23      Was that the one you instructed him not to answer?

24          MR. ROCHE:  Correct.

25

108

1  BY MR. PASCHAL:

2      Q.   Can you turn to Count I, it's on page 37?

3      A.   Count number what?

4      Q.   Count I on page 37.  Paragraph 171 you say "on

5  or about April 2013 through the present date defendant

6  converted to his own use Bitcoin, forked assets and

7  intellectual properties that was then the property of

8  and owned by the estate and/or W&K."  As the corporate

9  representative what is your basis to say that Craig

10 Wright converted any of these things?

11     A.   By filing this fraudulent lawsuit and enabling

12 him to get the I.P. as well as access and perhaps other

010920Eisner.txt

13    Bitcoin as well from the W&K all of W&K's assets that I

14    would say is conversion of the assets of W&K.

15        Q.   So let's break that down.  There's a lawsuit

16    that transfers intellectual property.  What is the

17    intellectual property that was transferred?

18        A.   At least four patents associated with W&K were

19    transferred to CoinX and Hot Wire and some other company

20    I don't recall the exact name.

21        Q.   What are those --

22        A.   Among others.

23        Q.   What are those patents?

24        A.   I don't know specifically.  I would say at

25    least four.

                                                          109


1         Q.   How did you find out there were four patents?

2         A.   They're listed as an exhibit to the complaints

3    in the contracts of I.P. for sale or deed of sale.

4         Q.    You realize those companies went defunct so

5    what would you value the intellectual property at?

6             MR. ROCHE:  Objection to form, calls for

7         expert testimony.

8             THE WITNESS:  I don't know the answer but

9         Craig values it at 50 to $100 million in his

010920Eisner.txt

10          e-mails to Ira.

11   BY MR. PASCHAL:

12          Q.   Let me get this straight.  So you believe that

13   W&K had 50 to $100 million in intellectual property?

14          A.   I believe that the intellectual property that

15   Craig admits was put in -- was the purpose of W&K.

16          Q.   That's not my question.  My question is W&K --

17   as W&K is it your position that you have between 50 and

18   $100 million in intellectual property?

19          A.   I do not know the value if you're asking me a

20   specific number I don't know the answer to that

21   question.  It could be way more.  We don't know the

22   value.

23          Q.   Could be 500 million?

24          A.   I don't know the value of intellectual

25   property.  It's worth whatever the buyer pays; right?

                                                          110

1          Q.   You also think that W&K was mining between 300

2   and a million Bitcoin?

3          A.   I believe --

4               MR. ROCHE:  Objection to form.

5               THE WITNESS:  I believe Dave and/or W&K owned

6          300 to a million Bitcoin.  W&K was mining I believe

                            Page 123

010920Eisner.txt

```
 7        12,000 a month.  I believe it says somewhere in the

 8        complaint.  I don't recall Craig stated that it was

 9        12,000 a month.

10   BY MR. PASCHAL:

11        Q.   Given those activities why didn't W&K file any

12   of its annual reports and let itself go defunct?

13        A.   W&K went defunct in 2013 in September because

14   Dave died.

15        Q.   Went defunct in 2012.

16        A.   May I see the --

17        Q.   He didn't file his annual report for 2012?

18        A.   Can I see that, please?  I don't recall.  I do

19   not recall.

20        Q.   Could be that he didn't file in 2012 and

21   finally went defunct.

22        A.   I don't recall.

23        Q.   Well, 2012 he didn't file an annual report.

24   For 2013 he didn't file an annual report.  Is that

25   correct?
```

                                                        111

```
 1        A.   I don't know.  I need to see the document.  I

 2   also -- if I could refresh my recollection I also

 3   believe that I have a document.
```

                          Page 124

010920Eisner.txt

4              (Defendant's Exhibit No. 14 was

5              marked for identification.)

6    BY MR. PASCHAL:

7        Q.   With Exhibit 14.  Document images after the

8    company was formed in February 16, 2011 is there an

9    annual report for February of 2012?

10       A.   No.

11       Q.   Is there an annual report for February of 2013

12   while Dave was still alive?

13       A.   Not that it appears here.  It doesn't

14   necessarily mean they filed an annual report or not.

15   Just mean -- doesn't say there was a dissolution but yet

16   there was a reinstatement in 2014.

17       Q.   You don't believe that W&K was -- there was --

18   W&K was dissolved or dissolution -- administrative

19   dissolution?

20       A.   I'm saying this document is incomplete because

21   we know it was dissolved but yet it doesn't list that

22   here.

23       Q.   These are documents that were filed on behalf

24   of Dave.  So -- or whoever.  You don't file your own

25   administrative dissolution.

                                                        112

010920Eisner.txt

1        A.    I don't know the answer to that question.  I

2    would have to see the complete documents.

3        Q.    But back to my point there's no annual report

4    for 2012 or 2013; correct?

5        A.    That is on this incomplete list, yes.  I do

6    believe that it was dissolved in September of 2013.

7        Q.    Again you can't identify any -- can you

8    identify -- when you say Bitcoin are the only Bitcoin

9    addresses you believe W&K at this moment owns are those

10   the ones we discussed in the interrogatory response that

11   W&K provided?

12       A.    I believe the interrogatory response was

13   discovery is still ongoing and not limited to these 26

14   addresses.

15       Q.    As of today because discovery is about to end

16   are those the public addresses?

17       A.    I don't know the answer to that question.

18       Q.    On the Bitcoin, what is W&K's theory that

19   Craig converted Dave or W&K's Bitcoins?

20       A.    I believe we spoke about this in terms of

21   ownership.  If you're sequestering it, you're hiding it,

22   if you're moving it you are depriving the right of

23   ownership to W&K or Dave or Ira.  That's a conversion.

24       Q.    I'm asking you to be more specific what

010920Eisner.txt

25    actually happened not theory.  How did Dave convert the

113

1    Bitcoin?  Did he go take the private keys?  Did he hide

2    the private keys?

3         A.   How did Craig convert?

4         Q.   How did he convert it?

5         A.   I --

6              MR. ROCHE:  Objection, asked and answered.

7              THE WITNESS:  To the extent -- I can only

8         speculate personally that we know there was Bitcoin

9         mined.  That was the purpose of the company.  We

10        know that there was between 300 to a million.  We

11        have no access to it.  He took the company from

12        them through fraudulent forged lawsuits therefore

13        he has taken their ownership of this Bitcoin away.

14   BY MR. PASCHAL:

15        Q.   Bitcoin is not a piece of paper; right?

16        A.   Right.  It was not a piece of paper.

17        Q.   It's a block chain?

18        A.   Right.

19        Q.   You need a private key to access it?

20        A.   Right.

21        Q.   So how did Craig Wright take the private key?

Page 127

010920Eisner.txt

22          MR. ROCHE:  Objection, asked and answered.

23          THE WITNESS:  You're asking how he took the

24     private key is not the only way to take ownership.

25     You can also sequester the ability to access the

❦

114

1     funds.

2  BY MR. PASCHAL:

3     Q.   How is he doing that?

4     A.   By -- I understand a little bit about block

5  chain and Bitcoin, right.  To the extent that someone

6  has usurped ownership or moved or sequestered assets I

7  would say that is conversion.  W&K doesn't have access

8  any more to Bitcoin that we know they owned at some

9  point, that Craig admitted and that is conversion.

10     Q.   When Ira deleted stuff on Dave's hard drives

11  and destroyed working papers could that be the reason

12  why you cannot access W&K's Bitcoin?

13          MR. ROCHE:  Objection, calls for speculation.

14          THE WITNESS:  I don't know that fact.

15  BY MR. PASCHAL:

16     Q.   So you're saying that -- so your theory of W&K

17  is not that Craig stole private keys from W&K?  I'm

18  trying to pinpoint what is your theory?  Did he steal

Page 128

010920Eisner.txt

19    private keys from W&K?

20            MR. ROCHE:  Objection, asked and answered.

21            THE WITNESS:  I don't know.

22    BY MR. PASCHAL:

23        Q.   Now you're talking about sequestering or

24    keeping access; right but could the reason that you can

25    not access W&K's purported Bitcoin be because you can't

                                                            115


 1    access Dave's hard drives?

 2        A.   I don't know.

 3        Q.   If Dave had private keys on his hard drive

 4    that would unlock the whatever Bitcoin that W&K might

 5    have had did Craig Wright sue W&K or Ira?

 6            MR. ROCHE:  Objection, calls for legal

 7        conclusion.

 8    BY MR. PASCHAL:

 9        Q.   Let me he strike that.  Is isn't the same

10    scenario if you can't access W&K's Bitcoin couldn't it

11    be you couldn't access it because you couldn't access

12    Dave's hard drives?

13        A.   I don't know.

14            MR. ROCHE:  Objection.

15            THE WITNESS:  The answer to that question.  I

010920Eisner.txt

16      would also say I don't know what wallets

17      theoretically might be found in the hard drives or

18      what access they have or whose ownership it is.

19          MR. ROCHE:  Just real quick.

20          MR. PASCHAL:  Step off.  We have a hearing.

21          THE VIDEOGRAPHER:  Off record 2:22.

22          (Discussion held off the record.)

23          THE VIDEOGRAPHER:  On record 2:43.

24  BY MR. PASCHAL:

25      Q.  I want to ask you about your 15 minute

116

1   conversation with Ira Kleiman.  What was discussed

2   during that conversation?

3          MR. ROCHE:  I'm going to instruct the witness

4      to the extent Ira Kleiman gave you facts related to

5      W&K you can answer that.  To the extent any legal

6      strategy was discussed I'm going to ask you to

7      refrain from answering that.

8          THE WITNESS:  I asked him about membership and

9      management of the company from reinstatement in

10      2018 and on.  I asked him if he ever received any

11      notice.  He said no.

12  BY MR. PASCHAL:

Page 130

010920Eisner.txt

13      Q.   Just pause for a second.  When you said notice

14  are you referring to the Australian --

15      A.   Yes, Australian lawsuits.  Those are the two

16  things I remember discussing.  Little questions that I

17  had regarding the complaint.  I don't necessarily recall

18  every detail.  I know those two.

19      Q.   What did he tell you?

20      A.   That he never received notice and not

21  personally or on behalf of the company.  That membership

22  is 100 percent him.  I believe that's it.

23      Q.   Did you ask him if he did anything to verify

24  that the company is 100 percent his?

25      A.   I didn't ask him to verify that.

                                                      117


1       Q.   Did he tell you that the company was always

2   100 percent his?

3       A.   He told me since the reinstatement.  I asked

4   specifically any membership minutes, you know, meetings

5   or operating agreement from 2018 reinstatement on.  He

6   said no.  I said how is it held.  He said he is the sole

7   manager, sole member.

8       Q.   That was a phone call; right?

9       A.   Yes, phone call.

010920Eisner.txt

10      Q.   It was just you and him on the phone call?

11      A.   No, counsel was present.

12      Q.   Who was present?

13      A.   Vel Freedman, Kyle Roche, another attorney

14  Steven I forget his last name.

15           MR. ROCHE:  Lagos.

16  BY MR. PASCHAL:

17      Q.   Let's get back to the complaint.  So if you

18  can go to Count II unjust enrichment.

19      A.   Yes.

20      Q.   You allege that plaintiffs have conferred a

21  benefit on the defendant who has knowledge thereof.

22  What benefit did plaintiffs -- what benefit did

23  plaintiffs confer on defendant?

24      A.   Bitcoin intellectual property and however

25  amount of value they value it at.

♠

118


1      Q.   So this is essentially the same as Count I?

2           MR. ROCHE:  Objection, calls for a legal

3           conclusion.

4           THE WITNESS:  Right.  I was going to say to

5           the extent I can, you know, I don't know how to

6           answer that question.

Page 132

010920Eisner.txt

 7  BY MR. PASCHAL:

 8      Q.   Well, is the relief you're seeking in this

 9  count the same as the relief you're seeking in Count I

10  for conversion?

11          MR. ROCHE:  Objection, calls for a legal

12      conclusion.  You can answer.

13          THE WITNESS:  I don't know the answer.  It

14      sames that there are two conclusory paragraphs

15      labled wherefore under Count I and Count II that

16      are different although extremely similar calling

17      for monies or converted Bitcoin and asset IP, fair

18      market value and second one calls for monetary

19      damages.

20  BY MR. PASCHAL:

21      Q.   What I'm asking the assets, what subject of

22  Count I, the Bitcoin, intellectual property, forked

23  assets is that all the same as the stuff you're seeking

24  in Count II unjust enrichment or is there something

25  more?

                                                      119

 1      A.   I don't know how to answer that question.

 2      Q.   Are you seeking anything more in Count II than

 3  Count I?

010920Eisner.txt

4          A.    I don't know how to answer that question.

5          Q.    Count III misappropriation, can you turn to

6    that.  In paragraph 178 you say "after Dave's death

7    Craig unlawfully maliciously misappropriated trade

8    secrets belonging to Dave and/or W&K relating to block

9    chain based technologies, smart contracts by using them

10   for himself and using a series of fraudulent contracts

11   and fraudulently obtained court judgments to transfer

12   and acquire the property rights in these trade secrets

13   to himself."

14          Earlier you testified that it was your theory

15   that Craig Wright used the Australian proceedings to

16   acquire intellectual property from W&K?

17         A.    Among other assets, yes.

18         Q.    Did the intellectual property you're

19   discussing in Count III is that considered a trade

20   secret?

21         MR. ROCHE:  Objection, calls for legal

22         conclusion.

23         THE WITNESS:  I don't know how to answer that

24         question.

25

010920Eisner.txt

1   BY MR. PASCHAL:

2       Q.   The intellectual property that you're alleging

3   in Count III -- if you look at 179 is 179 a description

4   of the intellectual property that you believe W&K had?

5       A.   It may be.  Intellectual property can be trade

6   secrets, it could also be patents or something of the

7   sort.

8       Q.   Back to my point.  179 the intellectual

9   property that you believe was misappropriated is some of

10  that a trade secret?

11      A.   It could possibly be.

12      Q.   There's a count here for misappropriation that

13  you allege against my client for billions of dollars.  I

14  need you to tell me what the trade secret is.

15          MR. ROCHE:  Objection, calls for a legal

16      conclusion.

17          THE WITNESS:  I don't know how to answer that

18      question.

19  BY MR. PASCHAL:

20      Q.   Count IV, Federal Defense of Trade Secrets

21  Act.  Is this seeking the same relief as your

22  misappropriation claim?

23          MR. ROCHE:  Objection to the extent it calls

24      for a legal conclusion.  You can answer.

010920Eisner.txt

25          THE WITNESS:  The conclusory paragraphs the

121

1     wherefores are different but similar calling for

2     all available damages in the first one.  Second one

3     calling for value of the wrongfully taking of

4     intellectual property.

5     BY MR. PASCHAL:

6          Q.   So here you're alleging misappropriation of

7     trade secrets but you only identify intellectual

8     property?

9          A.   What do you mean by here?

10          Q.   Just point to the wherefore clause.  This is

11     the Federal Defense Trade Secrets Act.  It says

12     "wherefore, plaintiffs demand judgment against defendant

13     for the value of the wrongfully taken intellectual

14     property together with costs, interest, attorney fees

15     and other relief."  The only thing you identify is the

16     intellectual property.  You see that?

17          A.   I see that word.  However, the paragraphs

18     before from 185 on describe trade secrets.

19          Q.   So can you say now reading that some of the

20     intellectual property is trade secret?

21          MR. ROCHE:  Objection to the extent it calls

010920Eisner.txt

22        for legal conclusion.

23              THE WITNESS:  Whether some of the property is

24        trade secret it could possibly be.

25

                                                          122

1   BY MR. PASCHAL:

2        Q.    So in this Federal Defense Trade Secret Act

3   claim what is it you're suing Dr. Wright for?

4        A.    I think the complaint speaks for itself.

5        Q.    Not asking what the complaint says.  I need to

6   know from you your testimony.  In this claim what are

7   you suing Dr. Wright for?

8        A.    Trade secrets that W&K owns or Dave Kleiman

9   had between him and Craig solely that were

10   misappropriated and taken by Craig.

11        Q.    What are those trade secrets?

12        A.    I don't know at this time.  I don't know how

13   to answer the question.

14        Q.    Count V breach of fiduciary duty.

15        A.    If I may reform -- complaint 186 paragraph 186

16   it does say trade secrets can be identified as software

17   that Dave personally developed through W&K.  Then Craig

18   transferred.

010920Eisner.txt

19          Q.   Is that considered intellectual property?

20          A.   It could possibly be.

21          Q.   Turn to Count V.  Ira told you that he was

22     100 percent the owner of W&K.  Did he ever tell you that

23     Craig was a member of W&K?

24          A.   To my recollection he said that Craig was

25     never -- I don't recall if he said that Craig was ever a

                                                         123


1     member of W&K.  I believe the company's position that

2     Dave was a sole member and Ira was a sole member.  If

3     Craig was ever a member which doesn't appear that he

4     ever was he disclaimed all of that.

5          Q.   So in paragraph 194 you allege in the

6     alternative Craig was an actual member of W&K.  Why are

7     you alleging that if Craig was never a member?

8          A.   If the fact comes out that requires the

9     company to change its knowledge it will change its

10     knowledge.  As simple as that.

11          Q.   What fact will make the company change its

12     knowledge?

13          MR. ROCHE:  Objection, calls for speculation.

14          THE WITNESS:  Any multitude of facts.  An

15     operating agreement.  Discovery is ongoing.  I

010920Eisner.txt

16      don't know.

17   BY MR. PASCHAL:

18      Q.   Count VII, what is your basis for fraud?

19      A.   As set forth in paragraph 202 Dave and W&K's

20   Bitcoins, intellectual property rights are transferred

21   and sold to Craig and returned to Craig pursuant to

22   valid contracts that Dave signed those contracts it's

23   W&K's position those contracts with absolutely

24   fraudulent, forgeries.

25           Continuing to read, the estate will be able to

                                                        124


 1   sell shares in CoinX.  He would -- he Craig would help

 2   the estate recover what Dave owned.  That the estate

 3   could participate in CoinX.  All of these were

 4   fraudulent statements that Craig made.

 5      Q.   You're a lawyer you know fraud requires

 6   reliance?

 7           MR. ROCHE:  Objection.

 8           MR. PASCHAL:  Right?

 9           MR. ROCHE:  Objection, he is not here to

10           testify in his capacity as a lawyer.

11   BY MR. PASCHAL:

12      Q.   So in 2004 -- what were the damages -- what

                        Page 139

010920Eisner.txt

13    was the reliance on fraudulent statements?  What was the

14    damages?

15         A.   Are you asking me personally?

16         Q.   As W&K.

17         A.   I don't know the answer to that question.  I

18    could answer personally that if plaintiff didn't

19    challenge an Australian lawsuit because Craig was

20    telling him don't worry, everything is going to be okay

21    during a period of e-mails that would be reliance and

22    damage.

23         Q.   Okay.  So he get as summons from a court

24    saying if you don't show up a judgment is going to be

25    entered against you.  But he relied on Craig to not show

125

1    up to the hearing?

2         A.   If he ever received such a summons if that

3    ever happened yes, that would perhaps be a reliance and

4    damage.

5         Q.   So you're saying he didn't --

6              MR. ROCHE:  Objection, legal conclusion.  Go

7         ahead.

8              THE WITNESS:  Speaking personally because --

9    BY MR. PASCHAL:

010920Eisner.txt

10        Q.   I understand.  So if he didn't receive a

11   summons then how is he acting in reliance --

12        A.   Let's go back then because I was answering

13   questions -- W&K's answer -- sorry, what was the

14   question?

15        Q.   So for reliance on the -- you just mentioned

16   Australian judgment not challenging it.  If either Ira

17   or the estate or W&K more importantly that's the party

18   in Australian never received the summons in its mailbox

19   then how would anyone have acted on reliance to not

20   challenge the legal claims in Australia how would they

21   know about it?

22            MR. ROCHE:  Objection, calls for a legal

23        conclusion.  You can answer.

24            THE WITNESS:  That was a hypothetical that I

25        personally was saying would be possible reliance.

126

1        If you want me to answer as W&K's corporate

2        representative what was the original question?

3    BY MR. PASCHAL:

4        Q.   Well, okay.  Your personal knowledge was what

5    the allegation says in 204 it says the reliance included

6    was not limited to not challenging Craig's legal claim

Page 141

010920Eisner.txt

7   in Australia.  If you didn't know about it how could you

8   have relied on -- about the proceeding in Australia then

9   how could he have relied on Craig's statements to not

10   participate in the Australian proceeding?

11       A.   Among those -- among those statements that

12   Craig made there's a variety of statements I'll pay you

13   $12 million in six months time and other statements that

14   all of which were also fraudulent.  Fraudulent also

15   being the forgeries on those Australian judgments.  We

16   hold all those contracts were fraud and fraudulent.

17       Q.   If someone says I'll give you a million

18   dollars and they just don't give it to you you would

19   consider that fraud?

20           MR. ROCHE:  Objection, calls for a legal

21       conclusion.

22           THE WITNESS:  I don't know the answer to that

23       question.

24   BY MR. PASCHAL:

25       Q.   You say expended time and resources reviewing

                                                        127


1   fraudulent documents.  What time and resources did W&K

2   spend reviewing fraudulent documents?

3           MR. ROCHE:  Objection, form.  You can answer.

010920Eisner.txt

4              THE WITNESS:  I don't understand the question.

5    BY MR. PASCHAL:

6         Q.   You allege that part of the reliance included

7    expending time and resources reviewing fraudulent

8    documents.  What was the time and resources and what was

9    the fraudulent documents?

10        A.   The Australian judgments were fraudulent.

11   Most of what Craig says was fraudulent.  I would -- the

12   time and the resources I guess would be the time you

13   know that he was stringing Ira along but if not me --

14   not corporate -- of W&K that's Ira.  I don't know how

15   W&K would specifically answer that question.

16        Q.   I'm asking -- W&K is suing Craig Wright and

17   alleging so I need an answer from W&K.

18        A.   Perhaps that is a question that is more Ira's

19   claim.

20        Q.   So Ira -- W&K is withdrawing its claim against

21   Craig as to Count VII?

22             MR. ROCHE:  Objection, calls for a legal

23        conclusion.

24             THE WITNESS:  Again W&K absolutely alleges

25        fraud.  Fraud in the Australian contracts.

                                                        128

010920Eisner.txt

1      Fraudulent statement that did intend reliance but

2      to ask for a legal conclusion from W&K I don't know

3      the answer to that question.

4  BY MR. PASCHAL:

5      Q.   Not asking for a legal conclusion.  I want to

6  know the basis for W&K alleging that the reliance due to

7  expending time how much time W&K spent?

8      A.   I could only tell you my personal corporate

9  representative time.  I don't know the answer how much

10  time W&as entity spent.

11      Q.   What resources did W&K spend reviewing

12  fraudulent documents?

13      A.   I don't know the answer to that question.

14      Q.   You said -- a second ago you said most of what

15  Craig says was fraudulent.  Do you recall saying that?

16      A.   Yes.

17      Q.   Isn't the only basis --

18      A.   I want to be clear, you know, I don't mean

19  most as in -- I meant it as a general term that a lot of

20  what he was saying to Ira was clearly fraudulent in

21  terms of I will pay you $12 million in six months.

22      Q.   So if most of what he says is fraudulent and

23  he is the only person -- the only evidence you have that

24  have W&K ever had any Bitcoin what should the jury

Page 144

010920Eisner.txt

25    believe that he is fraudulent or that he doesn't own a

                                                                129


1    ton of Bitcoin out there?

2            MR. ROCHE:  Objection to form.

3            THE WITNESS:  None of what he said about W&K

4        that W&K owns zero Bitcoin.  That in fact from my

5        understanding all of what he said was W&K owns and

6        Dave in some way, shape or form owns anywhere from

7        300 to a million Bitcoin.

8    BY MR. PASCHAL:

9        Q.   You've testified gone through today he is the

10   only witness that you have or only evidence that that

11   there may have been some Bitcoin?

12       A.   Sorry, please?

13       Q.   Correct me if I'm wrong is there another piece

14   of evidence out there?

15       A.   No, his admissions.

16       Q.   His admissions.  Only what Craig Wright said

17   is your evidence, right, I'm asking as W&K?

18           MR. ROCHE:  Objection.  You can answer.

19           THE WITNESS:  I would say that discovery is

20       still ongoing but it seems that that is the bulk of

21       the claim.

010920Eisner.txt

22   BY MR. PASCHAL:

23        Q.   To be clear to the jury discovery is ongoing

24   for like a week, one week it will be over?

25        A.   I do not know that.

↑
                                                           130


 1        Q.   Been going on for about a year.  What I want

 2   to ask you is if most of what he says is fraudulent what

 3   should the jury believe from him, is it only there's

 4   Bitcoin but nothing else?

 5             MR. ROCHE:  Objection, form.

 6             THE WITNESS:  So when he says there is Bitcoin

 7        and then he gives a range of numbers the jury

 8        believes that W&K has Bitcoin in that range of

 9        numbers, 300 to a million because he changes his

10        story.

11             He never says W&K has zero Bitcoin and never

12        mined intellectual property at all.  In fact he

13        says repeatedly that he and Dave definitely had

14        Bitcoin.  They both had intellectual property in

15        W&K.

16   BY MR. PASCHAL:

17        Q.   I'm going back to my point.  You testified

18   that most of what Craig says is fraudulent.  Should the

                         Page 146

010920Eisner.txt

19    jury believe -- tell me what the jury should believe

20    when you say that most of what Craig says is fraudulent?

21         MR. ROCHE:  Objection to form.

22         THE WITNESS:  If a person makes a repeated

23         amount of contradictory statements but all the

24         statements have the same fact which is W&K and Dave

25         mined and owned Bitcoin in some range of amounts

131

1          and owned intellectual property then that is the

2          fact and the range of amounts and the quantity

3          thereof is for facts to be determined.

4     BY MR. PASCHAL:

5          Q.   Even if every witness in this case testified

6     that's not true you would still believe that's a fact?

7          A.   I don't know --

8          MR. ROCHE:  Objection to form.

9          THE WITNESS:  I don't know that if every

10         witness is saying that but I could say that.

11    BY MR. PASCHAL:

12         Q.   Hypothetical.

13         A.   Admission of Craig Wright himself the quote

14    unquote partner from the beginning would be -- would

15    bear more weight.

Page 147

010920Eisner.txt

16          Q.   Dave Kleiman's fiance who lived with him

17    during the relevant period will testify that this is not

18    true, there's no Bitcoin he never mentioned Bitcoin?

19          MR. ROCHE:  Object.

20    BY MR. PASCHAL:

21          Q.   That's one.  The proverbial son who Dave took

22    in as a son who lived with him during the relevant

23    period who played video games with him, talked to him

24    every day will say he never mentioned a word about

25    Bitcoin or anything bad about Craig Wright or any

                                                            132


1    partnership.  All of Dave's closest friends who visited

2    him consistently in the hospital will testify that there

3    are no Bitcoin, there was never any Bitcoin and they

4    find it impossible there's Bitcoin because Dave was

5    broke and couldn't even pay his cell phone.

6               Now, you just said most of what Craig said was

7    fraudulent.  My question to you is should the jury

8    believe the only fact that the jury believe is that

9    there's 300 to a million Bitcoin out there?

10          MR. ROCHE:  Objection to form.

11    BY MR. PASCHAL:

12          Q.   Even in light of all the other witnesses

                            Page 148

010920Eisner.txt

13    testifying against that statement?

14            MR. ROCHE:  Objection to form.

15            THE WITNESS:  The admission of the person who

16        supposed ownership of the Bitcoin who is determined

17        through a bunch of contradictory facts but one sole

18        truth to all those facts is that yes, there was an

19        amount of 300 to a million Bitcoin and yes, there

20        was ownership of intellectual property in W&K I

21        think would trump these type of witnesses again

22        which I have no knowledge.

23    BY MR. PASCHAL:

24        Q.   Because you didn't read their deposition

25    transcripts before today?

                                                        133


1        A.   No.  They were not relevant to my corporate

2    representative role.

3        Q.   And W&K's interrogatory responses was that

4    relevant to your corporate representative?

5        A.   I believe they were discussed with me with

6    counsel.

7        Q.   You never reviewed them?

8        A.   I don't believe so.  There's a lot of

9    documents.

                        Page 149

010920Eisner.txt

10          Q.   You testified you doesn't review them.  Can

11   you turn to paragraph 217 under civil theft?

12               MR. ROCHE:  What paragraph?

13               MR. PASCHAL:  Actually start with 215.

14               MR. ROCHE:  215.

15   BY MR. PASCHAL:

16          Q.   On 215 you say "on or about April 2013 through

17   the present day defendant knowingly and wrongfully took

18   with felonious criminal intent Bitcoins, forked assets,

19   intellectual property and property owned by the estate

20   and/or W&K."  Now you're saying that he actually took

21   with felonious criminal intent.  How did he take these

22   things with felonious criminal intent?

23          A.   I believe that's a legal conclusion.

24               MR. ROCHE:  Objection, calls for a legal

25          conclusion.

                                                    134

 1   BY MR. PASCHAL:

 2          Q.   How did he take them?  What is your basis for

 3   saying that?

 4          A.   I don't know the exact legal determination of

 5   civil theft.

 6          Q.   Not asking for legal.  I'm asking for --

010920Eisner.txt

```
 7    you're alleging here he took it and you say felonious

 8    criminal intent.  No legal conclusion that's how did he

 9    take it?  Did he go in Dave Kleiman's house and take it?

10         A.    Same way it was misappropriated and -- Count I

11    and II.

12         Q.    Same way he misappropriated what?

13         A.    Same way he misappropriated and converted the

14    assets.

15         Q.    You said earlier that Craig didn't provide

16    access to Ira towards whatever Bitcoin might be out

17    there.  Here you're saying he took Bitcoins.

18         A.    I said previously that could be one of the

19    ways that he could have converted or misappropriated

20    those assets.  I don't know enough about Bitcoin to

21    speculate on what taking Bitcoin can mean.  It could

22    mean taking private keys.  It could mean taking access

23    away.

24         Q.    Let me just ask you.  As W&K's representative

25    you don't have a theory as to how Dr. Craig Wright took
```

                                                        135


```
 1    Bitcoin from W&K?

 2         A.    I don't have the legal argument.  I leave that

 3    to counsel.
```

010920Eisner.txt

```
  4            MR. PASCHAL:  Can we take a break?

  5            MR. ROCHE:  Yes.

  6            THE VIDEOGRAPHER:  Off record 3:09.

  7            (Thereupon, a brief recess was taken.)

  8            THE VIDEOGRAPHER:  On record 3:26.

  9            MR. PASCHAL:  I have no further questions at

 10       this time.

 11                    CROSS (ZACHARY EISNER)

 12  BY MR. ROCHE:

 13       Q.    Mr. Eisner, good afternoon.

 14       A.    Good afternoon.

 15       Q.    I just got a few quick questions to ask you.

 16  If you could go back to Exhibit 6 if you have it handy.

 17  It's the interrogatories.  If you could turn to page two

 18  and three of those where there's I believe counsel for

 19  Dr. Wright was asking questions concerning the list of

 20  devices.  You see the list of devices?

 21       A.    Yes.

 22       Q.    As W&K's corporate representative do you have

 23  any reason to believe that these devices were property

 24  of W&K as opposed to Dave Kleiman's personal property?

 25       A.    No.
```

136

010920Eisner.txt

1       Q.   Mr. Eisner, what did you do to educate

2   yourself about Bitcoin in preparation for your

3   deposition today?

4            MR. PASCHAL:  Objection, form.

5            THE WITNESS:  I knew a little bit already.

6       You know, you Google around and you learn what you

7       can online.

8   BY MR. ROCHE:

9       Q.   So did you read -- did you read anything, any

10  instructional stuff about Bitcoin online or any blogs or

11  posts about Bitcoin online?

12      A.   Yes.  Yes, both.

13      Q.   Are you here today to hold yourself out as an

14  expert on Bitcoin?

15      A.   Absolutely not.

16           MR. ROCHE:  No further questions.

17           MR. PASCHAL:  I have nothing.

18           THE VIDEOGRAPHER:  Off record 3:27.

19           MR. PASCHAL:  I'll take the transcript

20      expedited as soon as possible.

21           MR. ROCHE:  I will take a copy as well.

22               (Witness excused.)

23             (Deposition was concluded.)

24

Page 153

010920Eisner.txt

25

↑

137

1

2                    CERTIFICATE OF REPORTER

3             THE STATE OF FLORIDA

4             COUNTY OF DADE

5

6        I, Rick Levy, Registered Professional Reporter
and Notary Public in and for the State of Florida at
7   large, do hereby certify that I was authorized to
and did report said deposition in stenotype of
8   ZACHARY EISNER; and that the foregoing pages,
numbered from 1 to 136, inclusive, are a true and
9   correct transcription of my shorthand notes of said
deposition.
10
         I further certify that said deposition was
11   taken at the time and place hereinabove set forth
and that the taking of said deposition was commenced
12   and completed as hereinabove set out.

13        I further certify that I am not attorney or
counsel of any of the parties, nor am I a relative
14   or employee of any attorney or counsel of party
connected with the action, nor am I financially
15   interested in the action.

16        The foregoing certification of this transcript
does not apply to any reproduction of the same by
17   any means unless under the direct control and/or
direction of the certifying reporter.
18
         IN WITNESS WHEREOF, I have hereunto set my hand
19   this 13TH day of January, 2020.

20
             _____
21

```
                      010920Eisner.txt
                  Rick Levy, RPR, FPR, Notary Public
       22         in and for the State of Florida
                  My Commission Expires:  12/8/2023
       23         My Commission No.:  GG937684

       24

       25
```

138

```
        1                      CERTIFICATE OF OATH

        2    THE STATE OF FLORIDA

        3          COUNTY OF DADE

        4

        5       I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,

        6    Notary Public, State of Florida, certify that

        7    ZACHARY EISNER personally appeared before me on the

        8    9TH day of JANUARY, 2020 and was duly sworn.

        9

       10            Signed this 13th day of January, 2020.

       11

       12

       13

       14            _____

       15
                          Rick Levy, RPR, FPR
       16                 Notary Public - State of Florida
                          My Commission Expires:  12/8/2023
       17                 My Commission No.:  GG937684

       18
```

010920Eisner.txt

19

20

21

22

23

24

25

♠

139

1            E R R A T A   S H E E T

2    IN RE:  IRA KLEIMAN VS CRAIG WRIGHT

3    DEPOSITION OF:  ZACHARY EISNER

4    TAKEN: 1/9/2020

5       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

6    PAGE #  LINE #   CHANGE              REASON

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

010920Eisner.txt

16  _____

17  Please forward the original signed errata sheet to
    this office so that copies may be distributed to all
18  parties.

19  Under penalty of perjury, I declare that I have read
    my deposition and that it is true and correct
20  subject to   any changes in form or substance
    entered here.

21

22  DATE: _____

23

24  SIGNATURE OF
    DEPONENT:_____
25

                                                    140


1   DATE:      January 14, 2020

2   TO:  KYLE ROCHE, ESQUIRE
         ROCHE FREEDMAN, P.A.
3        200 S. Biscayne Boulevard
         Suite 5500
4        Miami, Florida 33131

5   IN RE:     Ira Kleiman vs Craig Wright

6   Dear Mr. Roche:

7   Enclosed please find the original errata page with
    your copy of the transcript so ZACHARY EISNER may
8   read and sign their transcript.  Please have him/her
    make whatever changes are necessary on the errata
9   page and sign it.  Then place the original errata
    page back into the original transcript.  Please then
10  forward the original errata page back to our office
    @1080 Woodcock Road, Suite 100, Orlando, Florida
11  32803.

12  If the errata page is not signed by the witness

010920Eisner.txt

```
         within 30 days after this letter has been furnished,
13       we will then process the transcript without a signed
         errata page.  If your client wishes to waive their
14       right to read and sign, please have him/her sign
         their name at the bottom of this letter and send it
15       back to the office.

16           Your prompt attention to this matter is

17       appreciated.

18       Sincerely,

19       _____
         RICK E. LEVY, RPR
20
         I do hereby waive my signature:
21
         _____
22       ZACHARY EISNER

23       cc via transcript:  Bryan Paschal, Esq.
                             Kyle Roche, Esq.
24       file copy

25
```