IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF FLORIDA

3             CASE NO. 9:18-cv-80176-BB/BR

4

5    IRA KLEIMAN, as the personal
     representative of the Estate of
     David Kleiman, and W&K Info Defense
6    Research, LLC

7
              Plaintiffs,
8
     -vs-
9
     CRAIG WRIGHT
10
              Defendant.
11

12   * * * * * * * * * * * * * * * * * *

13   VIDEOTAPED DEPOSITION OF IRA KLEIMAN

14   DATE TAKEN: April 8, 2019

15   TIME: 10:10 - 2:55 p.m.

16   PLACE:100 S.E. 2nd Street

17   Miami, Florida 33131

18

19   TAKEN BEFORE: RICK E. LEVY, RPR, FPR
                   AND NOTARY PUBLIC

20

21   * * * * * * * * * * * * * * * * * *

22

23

24

25

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                    Pages 2..5

Page 2

```
1   APPEARANCES:
2   On behalf of the Plaintiff:
3        KYLE ROCHE, ESQUIRE
         BOIES, SCHILLER & FLEXNER LLP
4        333 Main Street
         Armonk, NY 10504
5
         VEL FREEDMAN, ESQUIRE
6        ANDREW BRENNER, ESQUIRE
         BOIES, SCHILLER & FLEXNER LLP
7        100 S.E. 2nd Street
         Suite 2800
8        Miami, Florida 33131
9
10  On behalf of the Defendant:
11
         BRYAN PASCHAL, ESQUIRE
12       AMANDA MCGOVERN, ESQUIRE
         ANDRES RIVERO, ESQUIRE (VIA PHONE)
13       RIVERO MESTRE, LLP
         2525 Ponce de Leon Boulevard
14       Suite 1000
         Coral Gables, Florida 33134
15
16
17  Also Present: Rene Lavandera, The Videographer
18
19
20
21
22
23
24
25
```

Page 3

```
1                  - - -
                 I N D E X
2                  - - -
3   WITNESS:     DIRECT   CROSS   REDIRECT   RECROSS
    IRA KLEIMAN
4   BY MR. PASCHAL   5
5                  - - -
               E X H I B I T S
6                  - - -
7
    NUMBER                       PAGE
8   DEFENDANT'S EX. 1             6
    DEFENDANT'S EX. 2             29
9   DEFENDANT'S EX. 3             34
    DEFENDANT'S EX. 4             37
10  DEFENDANT'S EX. 5             39
    DEFENDANT'S EX. 6             45
11  DEFENDANT'S EX. 7             56
    DEFENDANT'S EX. 8             58
12  DEFENDANT'S EX. 9             59
    DEFENDANT'S EX. 10            63
13  DEFENDANT'S EX. 11            82
    DEFENDANT'S EX. 12            84
14  DEFENDANT'S EX. 13            90
    DEFENDANT'S EX. 14            108
15  DEFENDANT'S EX. 15            115
    DEFENDANT'S EX. 16            123
16  DEFENDANT'S EX. 17            122
    DEFENDANT'S EX. 18            138
17  DEFENDANT'S EX. 19            139
18
19
20
21
22
23
24
25
```

Page 4

```
1              P R O C E E D I N G S
2                  - - -
3       Deposition taken before Rick E. Levy,
4   Registered Professional Reporter and Notary Public
5   in and for the State of Florida at Large, in the
6   above cause.
7                  - - -
8       THE VIDEOGRAPHER:  Good morning.  We are now
9   on the record in the matter of Kleiman, Ira and the
10  estate of David Kleiman vs. Wright, Craig.  Today
11  is April 8th 2019.  The time is now 10:10 a.m.
12      This is the video recorded deposition of
13  Mr. Ira Kleiman being taken here at 100 Southeast
14  2nd Street, Suite 2800, Miami, Florida 33131.  My
15  name is Rene Mestre representing First Choice
16  Reporting located in Orlando, Florida.
17      The court reporter this morning is Mr. Rick
18  Levy.  Will all counsel present please introduce
19  yourselves for the record?
20      MR. PASCHAL:  Bryan Paschal for Dr. Craig
21  Wright and Amanda McGovern for Dr. Craig Wright as
22  well.
23      MR. RIVERO:  Andres Rivero on the telephone
24  also representing Dr. Craig Wright.
25      MR. ROCHE:  Kyle Roche of Boies, Schiller &
```

Page 5

```
1   Flexner representing plaintiffs.
2       MR. FREEDMAN:  Vel Freedman, Boies, Schiller
3   representing plaintiff.
4       THE VIDEOGRAPHER:  Mr. Court reporter, you may
5   swear in the witness.
6   Thereupon,
7              (Ira Kleiman)
8       having been first duly sworn or affirmed,
9   was examined and testified as follows:
10           DIRECT EXAMINATION
11      THE WITNESS:  Yes.
12  BY MR. PASCHAL:
13      Q.  Could you please state your full name?
14      A.  Ira Kleiman.
15      Q.  Ira, have you ever been deposed before?
16      A.  No.
17      Q.  I'll go over a few basics how a deposition is
18  going to work today.  We need you to provide clear, oral
19  responses so the court reporter, this is the court
20  reporter, can hear you.  Please keep in mind the court
21  reporter can only take down one person at a time so only
22  one person can talk at a time.  Do you understand?
23      A.  Yes.
24      Q.  If at any time I ask you a question that you
25  do not understand please let me know right away
```

Page 6

1  otherwise I'll assume that you understood the question;
2  okay?
3      A.  Yes.
4      Q.  If at any point you remember something or want
5  to clarify an answer you previously gave please do so.
6  You understand?
7      A.  Yes.
8      Q.  If you need to take a break at any point just
9  let me know, okay?
10      A.  (Indicating).
11      Q.  Is there any reason preventing you from giving
12  your best deposition testimony today?
13      A.  No.
14      Q.  Are you currently on any prescribed
15  medication?
16      A.  No.
17      Q.  Is there any medical condition or other reason
18  why it might be difficult for you understand my
19  questions today?
20      A.  No.
21      MR. PASCHAL:  This is going to be Exhibit 1.
22      (Defendant's Exhibit No. 1 was
23      marked for identification.)
24  BY MR. PASCHAL:
25      Q.  If you turn to page two of that exhibit this

Page 7

1  is the topics that you're to -- you're here for today in
2  this deposition.
3      A.  Okay.
4      Q.  When did you first see this list?
5      A.  When did I first receive this list?
6      Q.  When did you review this list?
7      A.  I believe my attorneys sent it to me maybe --
8      MR. FREEDMAN:  One second.  Don't discuss
9      anything that we spoke with you.  If you can answer
10      the question by just giving a date, good.  If not
11      you can't recall you can't recall.
12      THE WITNESS:  I don't remember exactly.
13  BY MR. PASCHAL:
14      Q.  Did you see this list before today?
15      A.  Yes.
16      Q.  Are you prepared to discuss these topics
17  today?
18      A.  Yes.
19      Q.  What did you do to prepare?
20      MR. FREEDMAN:  Again don't discuss anything
21      you spoke about with your attorneys but to the
22      extent you've done preparation you should answer
23      the question.
24      THE WITNESS:  I haven't done anything to
25      prepare.

Page 8

1      MS. MCGOVERN:  Can you speak up a little bit?
2      THE WITNESS:  Yes, I haven't done anything.
3  BY MR. PASCHAL:
4      Q.  Did you look at any documents?
5      A.  I reviewed some of my old e-mails, yes.
6      Q.  About how many e-mails did you review?
7      A.  I don't know.
8      Q.  You met with your attorneys, right?
9      A.  Yes.
10      Q.  What's your date of birth?
11      A.  October 16, 1970.
12      Q.  Where were you born?
13      A.  New Jersey.
14      Q.  When did you move to Florida?
15      A.  1975.
16      Q.  Have you always lived in Palm Beach Gardens?
17      A.  No.
18      Q.  Where else did you live?
19      A.  Hollywood, Florida.
20      Q.  How long did you live in Hollywood, Florida?
21      A.  Maybe two or three years.
22      Q.  Is that right after you moved from Jersey?
23      A.  Yes -- no.  We went from New Jersey to
24  California for I think just about one year and then
25  Hollywood.

Page 9

1      Q.  So when did you move to Palm Beach Gardens?
2      A.  Probably around 1978.
3      Q.  From 1998 -- I show that you purchased the
4  home in 1998.  Was that your first home that you
5  purchased?
6      A.  Yes.
7      Q.  Then you have that home until 2014 and it was
8  located at Geminata Oak Court in Palm Beach Gardens; is
9  that right?
10      A.  Yes.
11      Q.  2014 through today you have a home that's
12  located at Bent Tree Drive in Palm Beach Gardens; is
13  that correct?
14      A.  Yes.
15      Q.  How long have you been married?
16      A.  Since 2009.
17      Q.  What is your wife's name?
18      A.  Ju.
19      Q.  Ju Kleiman?
20      A.  Yes.
21      Q.  Did she go by the name of Sasithorn?
22      A.  Yes.
23      Q.  When did she change her name?
24      A.  I guess Sasithorn would be her official Thai
25  name.  Ju is what she goes by in the States.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Pages 10..13

Page 10

1    Q.   That's her legal name?
2    A.   I suppose so.  Sasithorn.
3    Q.   Sasithorn is her legal name?
4    A.   Yes.
5    Q.   What is your wife's occupation?
6    A.   She doesn't work.
7    Q.   You have two other siblings; right?
8    A.   Yes, I had two siblings, yes.
9    Q.   Was that Dave and Leonard Kleiman?
10   A.   Yes.
11   Q.   How did Leonard pass away?
12   A.   I believe a drug overdose.
13   Q.   Did you speak with him often?
14   A.   Not too often, no.
15   Q.   Do you know why Dave excluded Leonard from his
16   will?
17   A.   They were --
18      MR. FREEDMAN:  Hold on, you're outside the
19   scope of your deposition unless you can tell me
20   what topic you're tied to then I'm happy to let you
21   proceed.  Otherwise I think you're outside the
22   scope.
23      MR. PASCHAL:  You're going to instruct him not
24   to answer?
25      MR. FREEDMAN:  Unless you tell me what topic,

Page 11

1    yes.
2       MR. PASCHAL:  I think this ties into location
3    of evidence of the case.  I think that was a
4    general order from the Court.
5       MR. FREEDMAN:  How does the reason Dave
6    Kleiman did or did not exclude one of his brothers
7    tie into the --
8       MR. PASCHAL:  This is my deposition.  I'm
9    asking him.
10      MR. FREEDMAN:  Don't answer the question.
11   BY MR. PASCHAL:
12   Q.   Have you ever been sued?
13   A.   No.
14   Q.   Have you ever sued someone or an entity
15   excluding this lawsuit?
16   A.   Yes.
17   Q.   What lawsuit was that?
18   A.   A case against Computer Forensics, LLC.
19   Q.   What is currently happening in that case?
20   A.   It's still ongoing.
21   Q.   There's another lawsuit here it might not be
22   you it says Steve Kleiman vs. Metropolitan Health
23   Networks?
24   A.   Not me.
25   Q.   Sometimes you go by your middle name Steven?

Page 12

1    A.   Yes.
2    Q.   Is there a reason you --
3    A.   Certain amount of years I went by Steve and
4    earlier people that know me from a younger age always
5    call me Ira.
6    Q.   So it's interchangeable?
7    A.   Yes.
8    Q.   Have you ever been charged or accused of a
9    crime?
10   A.   No.
11   Q.   What schools have you attended?
12   A.   Palm Beach Gardens High School and Palm Beach
13   Community College.
14   Q.   Was the community college, that was the last
15   school attended?
16   A.   Yes.
17   Q.   What degrees and certifications do you have?
18   A.   I just have a high school diploma.
19   Q.   So you didn't graduate from the community
20   college?
21   A.   No.
22   Q.   Did you get any certifications from the
23   community college?
24   A.   No.
25   Q.   Do you have any professional licenses?

Page 13

1    A.   No.
2    Q.   What is your current profession?
3    A.   Self employed, web site designer, affiliate
4    marketing.
5    Q.   What type of web sites do you design?
6    A.   Basically I just design my own type of web
7    sites that are related to affiliate marketing.
8    Q.   What's affiliate marketing?
9    A.   Like take Amazon as an example.  Put up a web
10   site and you advertise other people's products and if
11   someone clicks through you would -- you receive a
12   commission when someone purchases.
13   Q.   So do you typically do work for companies or
14   individuals?
15   A.   Just myself.
16   Q.   I guess the way that you get -- how do you
17   charge people, it's by the clicking?
18   A.   I receive commission.  That's it.
19   Q.   Do you work from home or an office?
20   A.   From home.
21   Q.   Is that your primary source of income?
22   A.   And trading stocks.
23   Q.   How much money more or less do you make from
24   trading stocks?
25      MR. FREEDMAN:  Wait, stop.  You're outside the

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                Pages 14..17

Page 14

1    scope of your deposition.  Instruct him not to
2    answer unless you tie it to a topic.
3        MR. PASCHAL:  These are background questions
4    trying to find out.
5        MR. FREEDMAN:  Don't answer the question.
6        MR. PASCHAL:  I can't find out about his
7    professional --
8        MR. FREEDMAN:  Not unless you tie it to topic
9    you disclosed.  Tie it to a topic and I'll give it
10   to you.
11       MR. PASCHAL:  Are you instructing him not to
12   answer?
13       MR. FREEDMAN:  Yes, unless you tie it to a
14   topic.
15   BY MR. PASCHAL:
16       Q.  How much -- what was your income for your
17   affiliate marketing?
18       MR. FREEDMAN:  Same instruction.
19       MR. PASCHAL:  Not to answer?
20       MR. FREEDMAN:  Don't answer unless you tie it
21   to a topic.
22   BY MR. PASCHAL:
23       Q.  From 2012 to today relatively what was your
24   income?
25       MR. FREEDMAN:  Again don't answer unless he

Page 15

1    ties it to a topic.
2    BY MR. PASCHAL:
3        Q.  What was your previous occupations?
4        A.  The last time I worked for somebody I think it
5    was for a company called Active Frame.  I was also doing
6    web design for them.  Prior to that just like part-time
7    jobs, florist delivery, stock person at pharmacy.  For
8    the most part I've pretty much always worked for myself.
9        MR. FREEDMAN:  Just one housekeeping matter.
10   I forgot to do this before we started we're going
11   the mark the whole deposition transcript
12   confidential and then we'll go through it obviously
13   with the timeframe.  For now everything is
14   confidential.
15       MS. MCGOVERN:  We disagree with that position.
16       MR. FREEDMAN:  The same for Dr. Wright just so
17   you know.
18       MS. MCGOVERN:  I think it was a different
19   situation.
20       MR. FREEDMAN:  Is it your position that you'll
21   disclose things from the deposition immediately?
22       MS. MCGOVERN:  Not taking any position with
23   respect to Dr. Wright's deposition.
24       MR. FREEDMAN:  I need to know if you intend to
25   disclose things from the deposition immediately or

Page 16

1    if you're going to give me time to dictate a
2    report?
3        MS. MCGOVERN:  Absolutely, no.  Would never do
4    that.  Not going to disclose anything.  I don't
5    think a blanket confidential stamp over the
6    plaintiff's deposition is appropriate in this case.
7    Just stating that for the record.
8        MR. FREEDMAN:  Okay.  Just so it's clear --
9    the record is clear I'm saying it's temporary.
10   We're just saying don't disclose anything, we'll go
11   through it and then we'll --
12       MR. PASCHAL:  That's fine.  I want to go back
13   to the questions you told him not to answer.  We
14   did ask for his technical experience and how much
15   money he was making off this technical experience.
16       MR. FREEDMAN:  Disagree with that.  Take that
17   up with the judge.
18       MR. PASCHAL:  So you did not object in your
19   e-mail but you're going to tell him not to --
20   instruct him?
21       MR. FREEDMAN:  Don't agree this goes to the
22   technical experience.  The amount of money they
23   make doesn't go to technical experience.
24   BY MR. PASCHAL:
25       Q.  Have you ever been fired from a job?

Page 17

1        A.  No.
2        Q.  Have you ever been asked to resign from a job?
3        A.  No.
4        Q.  I want to ask you about a few companies you've
5    been involved with.  What was the business purpose of
6    The Gigabyte Connection?
7        A.  I set that company up a long time ago.  I
8    don't even remember what I was doing with that.  I'm not
9    even sure I actually used it or not.
10       Q.  How long ago did you set it up?
11       A.  I think it was in the '90s.
12       Q.  Do you know how long it lasted?
13       A.  No, I don't remember.
14       Q.  Did you set it up with any business partners?
15       A.  No, it was my own company.  Probably going to
16   do some kind of computer related type of business with
17   it.
18       Q.  So Future World Shopper, Inc.  What was the
19   business purpose of that company?
20       A.  I intended on setting up like an online
21   portal.  I guess at the time I think they only had like
22   BBSs.  I don't think the internet existed and I was
23   thinking of creating a portal where people could log
24   into it and purchase products.  I guess similar to what
25   people do with Amazon today.  It never got off the

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Pages 18..21

Page 18

1  ground.
2      **Q.   What about Hackers, Inc.?**
3      A.   That wasn't my company.  That was my
4  brother's.
5      **Q.   Which brother?**
6      A.  David.
7      **Q.   Did you work with Dave in that company?**
8      A.  No.
9      **Q.   Do you know what was the purpose of that**
10  **company?**
11      A.   I think he was doing some kind of computer
12  consulting with a partner.
13      **Q.   Do you know who that partner was?**
14      A.   I think his name was Scott Howell.
15      **Q.   What's the status of that company?**
16      A.   That was closed many years -- that was like
17  early '90s.
18      **Q.   It was closed?**
19      A.   Yes.
20      **Q.   What about Steve's Web Design?**
21      A.   I don't think I ever did anything with it.
22      **Q.   You just created it?**
23      A.   Yes.
24      **Q.   Did you have any partners in that?**
25      A.   No.

Page 19

1      **Q.   Ira, how many computers do you own?**
2      A.   Primarily one laptop.
3      **Q.   Do you own any computers from Dave?**
4      A.   Oh, yes, if you're including Dave's.
5      **Q.   In all how many computers do you own?**
6      A.   I think Dave had three laptops.
7      **Q.   What was his three laptops?**
8      A.   Two of them were Alienware.  One was a Dell
9  laptop.
10      **Q.   What's the one computer that you own?**
11      A.   I believe it's an ASIS.
12      **Q.   ASIS.  What year did you purchase that**
13  **computer?**
14      A.   I don't remember.
15      **Q.   Was it after 2013?**
16      A.   I don't know.
17      **Q.   Did you purchase it with a credit card?**
18      A.   I'm not sure.  I may have got it like from one
19  of my affiliate marketing web sites where it's possible
20  I didn't need a credit card to purchase it.
21      **Q.   Do you own any Bitcoin or crypto currency?**
22      A.   Yes.
23      **Q.   How much?**
24      MR. FREEDMAN:  Don't answer the question.
25  You're outside the scope of your deposition.

Page 20

1      MR. PASCHAL:  How much Bitcoin he has is
2  outside the scope?
3      MR. FREEDMAN:  You tell me where the topics
4  that list the amount of crypto assets that are
5  being held.
6      MR. PASCHAL:  I don't know.  Let me ask this
7  then.  That was your topic we put it on here and
8  you guys asked that question so is it your position
9  that's not -- that asking how much Bitcoin somebody
10  has is outside the scope?  I'm fine if that's your
11  response.
12      MR. FREEDMAN:  Is it in yours?
13      MR. PASCHAL:  I copied yours.  I put that in
14  and you had no objection.
15      MR. FREEDMAN:  Where is the topic that says
16  the amount of Bitcoin mined or owned I think is the
17  question.
18      MR. PASCHAL:  One of them and you asked that
19  question.
20      MR. FREEDMAN:  If you show it to me I can read
21  it.  If you don't show it to me --
22      MR. PASCHAL:  Let me ask this question.  If
23  you asked that at your depo are you saying it was
24  outside the scope of your deposition topics?
25      MR. FREEDMAN:  My questions were different --

Page 21

1  my list of topics are different than your list of
2  topics.  I had just off the top of my head I
3  remember I had the words Satoshi Yakamoto in mine
4  and I don't see it in yours.  This isn't an
5  identical copy of my list.
6      MR. PASCHAL:  So you're instructing him not to
7  answer the question?
8      MR. FREEDMAN:  Correct.
9  BY MR. PASCHAL:
10      **Q.   Are you familiar with how Bitcoin is stored on**
11  **a device?**
12      A.   Not really.
13      **Q.   Have you read any literature on Bitcoin and**
14  **crypto currency?**
15      A.   I've read articles about it.
16      **Q.   If you own Bitcoin how are you not familiar in**
17  **the manner in which it's owned?**
18      MR. FREEDMAN:  Hold on a second.  Can you
19  repeat the question?
20      MR. PASCHAL:  Want me to repeat it or want the
21  reporter?
22      MR. FREEDMAN:  You can repeat it or the
23  reporter, whatever your preference.
24  BY MR. PASCHAL:
25      **Q.   If you own Bitcoin how are you not familiar**

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Pages 22..25

Page 22

1  with how it's stored?
2      MR. FREEDMAN:  Objection.  You can answer the
3  question.
4      THE WITNESS:  I don't know the technical
5  workings of how it works.  I just know you can
6  purchase it.
7  BY MR. PASCHAL:
8      Q.  Is it stored on your computer?
9      MR. FREEDMAN:  Objection, hold on.  If you
10  know what the question means you can answer.
11     THE WITNESS:  Is it --
12     MR. PASCHAL:  You can have a standing
13  objection to form but we're not going to have
14  speaking objections so let's not do that today,
15  okay?
16     MR. FREEDMAN:  Isn't that ironic?
17     MR. PASCHAL:  You can answer the question.
18     THE WITNESS:  I've heard that it can be stored
19  on a computer.
20  BY MR. PASCHAL:
21     Q.  So as you own Bitcoin do you know how it's
22  held?
23     MR. FREEDMAN:  Objection.  Go ahead and
24  answer.
25     THE WITNESS:  Not really.

Page 23

1  BY MR. PASCHAL:
2      Q.  I want to ask you a few questions about your
3  relationship with Dave.  Before Dave passed away when
4  was the last time you spoke with him?
5      MR. FREEDMAN:  Hold on, Ira.  What topic does
6  this relate to?
7      MR. PASCHAL:  His communications with Dave.
8      MR. FREEDMAN:  I think you're a little bit
9  outside.  I'll give you some leeway.  Go ahead Ira,
10  answer the question.
11     THE WITNESS:  2009 November.
12  BY MR. PASCHAL:
13     Q.  That was the last time you spoke with him?
14     A.  No, that's the last time I saw him.  The last
15  time I spoke with him would probably be sometime late
16  2012.
17     Q.  Was that by phone or e-mail?
18     A.  I think I have an e-mail around that date and
19  I also think I spoke with him on the phone around then
20  too.
21     Q.  What did you talk about?
22     A.  I would have to go back and look at the
23  e-mail.  On the phone I don't remember.
24     Q.  Do you remember what his mood was like when
25  you spoke to him?

Page 24

1      A.  I --
2      MR. FREEDMAN:  Objection.
3      THE WITNESS:  Not really.
4  BY MR. PASCHAL:
5      Q.  So in 2009 you met Dave in person -- or you
6  saw him in person.  From then though just relatively how
7  many times would you speak with him per year, was it
8  monthly, weekly?
9      MR. FREEDMAN:  Objection.
10     THE WITNESS:  It would vary.
11  BY MR. PASCHAL:
12     Q.  I just want to be clear the last time that you
13  saw your brother was 2009; right?
14     A.  I believe so.
15     Q.  Under what circumstances was that?
16     A.  We were having Thanksgiving dinner.
17     Q.  Did you have any other business ventures with
18  Dave?
19     A.  No.
20     Q.  Did you ever work together with Dave in any
21  business?
22     A.  No.
23     Q.  Dave's autopsy report showed that he had
24  cocaine in his system.  Did you know anything about
25  that?

Page 25

1      MR. FREEDMAN:  Objection.  What topic is this
2  relating to?
3      MR. PASCHAL:  If he is not going to answer
4  tell him.
5      MR. FREEDMAN:  You can't tell me which topics
6  this relates to?
7      MR. PASCHAL:  This goes to background
8  information.  Trying to find documents that was the
9  general mandate from the Court.
10     MR. FREEDMAN:  I just don't see how Ira's
11  knowledge of cocaine in Dave's system has anything
12  to do with the --
13  BY MR. PASCHAL:
14     Q.  Do you have any documents showing that Dave
15  had cocaine in his system?
16     A.  I would have to look at the autopsy report
17  again.
18     Q.  That's the only document that you have?
19     A.  Yes, that's the only one I have.
20     Q.  Are there any communications between you and
21  Dave when you spoke about cocaine?
22     A.  No.
23     Q.  Do you know any of Dave's girlfriends?
24     A.  Not personally -- I mean I've heard of them.
25  I don't personally know them.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Pages 26..29

Page 26

1   Q.  Which ones have you heard of?
2      A.  One named Kirsten and another named Lynada and
3   a very old girlfriend named Angela.
4      Q.  How did you learn about these girlfriends?
5      A.  Angela we knew -- he was like dating her in
6   high school.  Kirsten I believe I met once at my
7   parent's wedding anniversary and Lynada I only found out
8   after he passed away.
9      Q.  Have you been in contact with any of these
10  three girlfriends?
11     A.  I think I spoke with Angela a little bit.
12     Q.  You didn't speak to Lynada?
13     A.  No.
14     Q.  Who was the last girlfriend that you know that
15  Dave had?
16     A.  That would be Lynada.
17     Q.  You haven't spoken to her?
18     A.  No.
19     Q.  When did you speak with Angela?
20     A.  Maybe like a year ago.
21     Q.  What circumstances did you speak with her,
22  what were the circumstances?
23     A.  I think I saw her -- she left like a Facebook
24  posting on my dad's web site -- I mean my dad's Facebook
25  page and then I responded to her Facebook posting.

Page 27

1      Q.  So there's a Facebook message where you
2   responded to her?
3      A.  Yes, I think so.  No, I just e-mailed her.
4   She left a Facebook posting and then I e-mailed her.
5      Q.  When did you e-mail her?
6      A.  I think it could have been like a year, year
7   and a half ago.
8      Q.  What did the Facebook posting say, do you
9   remember?
10     A.  No.
11     Q.  What did you discuss with Angela?
12     A.  We talked about David a little bit.
13     Q.  What did you talk to her about, talking about
14  David?
15     A.  At first just general things I think.
16     Q.  We'll get into that a little later.  When did
17  you learn that Dave was appointed as the representative
18  of -- or that Dave appointed you as the representative
19  of his estate, sorry?
20     A.  After he passed away.
21     Q.  So Dave never discussed that with you before
22  he passed away?
23     A.  No.
24     Q.  Were you surprised to learn --
25     MR. FREEDMAN:  Objection, don't answer the

Page 28

1   question.
2      MR. PASCHAL:  What's the reason for
3   instructing him?
4      MR. FREEDMAN:  Don't see how it has anything
5   to do with your topics.
6      MR. PASCHAL:  Just asking --
7      MR. FREEDMAN:  His state of mind when he found
8   out whether or not Dave Kleiman appointed him as
9   the personal representative.  Where is that any of
10  your topics?
11     MR. PASCHAL:  I am going to say for the record
12  that these topics are helpful but the judge mandate
13  was really that hey, I want to have a depo so you
14  can figure out what discovery is and a number of
15  times you shut down inquiries because you just
16  don't think that these match the topic which isn't
17  helpful for us to.  It will force us to have to go
18  to the Court unnecessarily and bring Ira back here
19  for another deposition to do that.  Purpose to find
20  out where documents are and find out where evidence
21  is.  I just don't think it's helpful for the record
22  for you to instruct him not to answer background
23  questions, very basic questions.
24     MR. FREEDMAN:  Just so the record is complete
25  the parties set the tone that we had to stay

Page 29

1   strictly by the disclosed topics at Dr. Wright's
2   deposition where we were held strictly to the
3   topics --
4      MR. PASCHAL:  And I don't believe you did
5   so --
6      MR. FREEDMAN:  If it's the defendant's
7   position that refusing to answer background
8   questions should necessitate a second deposition we
9   might just able to agree to reach a second
10  deposition.  Do you want to agree to a second
11  deposition?
12     MR. PASCHAL:  I'm just moving on with you.
13  Just --
14     MR. FREEDMAN:  Okay.
15     MR. PASCHAL:  I want to ask you about what
16  you're alleging in the complaint so we know what
17  documents we're looking for.  I'm going to give you
18  a copy of the complaint.
19     (Defendant's Exhibit No. 2 was
20     marked for identification.)
21  BY MR. PASCHAL:
22     Q.  Can you turn to page 37.  Under Count I you
23  have a claim for conversion.  Do you see that?
24     A.  Yes.
25     Q.  If you go down to paragraph 171 you allege

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Pages 30..33

Page 30

1  that Dr. Wright converted to his own use, Bitcoins,
2  forked assets and intellectual properties that were the
3  property of, and owned by, the estate and/or W&K. Do
4  you see that?
5      A.  Yes.
6      Q.  If you can turn to 46 and 47.
7          MR. FREEDMAN:  Bryan, I think you just asked
8      the witness to turn to two pages.  Which one?
9          MR. PASCHAL:  I said page 46 and 47.
10         MR. FREEDMAN:  Which one do you want him to
11     start at?
12  BY MR. PASCHAL:
13     Q.  Start at 46.  It's Count X, 46 and 47.  You
14  have a claim for civil theft, you see that?
15     A.  Yes.
16     Q.  In that claim you allege that Dr. Wright took
17  with felonious criminal intent Bitcoins, forked assets
18  and intellectual properties that were the property of
19  and owned by the estate and/or W&K.  You see that?
20     A.  Yes.
21     Q.  Ira, is it your position that Dr. Wright stole
22  from Dave?
23         MR. FREEDMAN:  Hold on a second.  Go ahead
24     answer the question.
25         THE WITNESS:  I believe so.

Page 31

1  BY MR. PASCHAL:
2      Q.  You believe so?
3      A.  Yes.
4      Q.  I want you to turn to page 16 of your
5  complaint.  There you have a bold heading saying -- are
6  you there?
7      A.  Yes.
8      Q.  You have a bold heading saying Dave and/or W&K
9  owned a substantial amount of Bitcoin.  You see that?
10     A.  Yes.
11     Q.  Ira, do you have any e-mails from Dave where
12  he told you he had a substantial amount of Bitcoin?
13     A.  No.
14     Q.  Do you have any text messages from Dave where
15  he said that he had a substantial amount of Bitcoin?
16     A.  No.
17     Q.  Do you have any handwritten letters where Dave
18  says to you I have a substantial amount of Bitcoin?
19     A.  No.
20     Q.  Did he put that in his personal will -- let me
21  say it differently.  Did Dave put in his will that he
22  has a substantial amount of Bitcoin?
23     A.  No.
24     Q.  Are there any documents from Dave to you
25  stating that he has a substantial amount of Bitcoin?

Page 32

1      A.  No.
2      Q.  After Dave died did you go through his
3  possessions?
4      A.  Yes.
5          MR. FREEDMAN:  Objection.
6  BY MR. PASCHAL:
7      Q.  Did you find any mention of a substantial
8  amount of -- any evidence to suggest there was a
9  substantial amount of Bitcoin?
10     A.  No.
11     Q.  Do you have any documents where Dave tells you
12  about W&K and Info Defense Fund Research, LLC?
13     A.  No.
14     Q.  After Dave died did you find any documents at
15  his house regarding W&K?
16     A.  No.
17     Q.  When you became the personal representative
18  for Dave's estate did you look on SunBiz.org?  Are you
19  familiar with that web site?
20     A.  Yes.
21     Q.  Did you look on SunBiz.org to see if he owned
22  any companies?
23     A.  I was only aware of Computer Forensics
24  Company.
25     Q.  But just my question was did you go on

Page 33

1  SunBiz.org to search to see if he owned any companies?
2      A.  I don't think so.
3      Q.  Did you first learn of W&K from Dr. Wright?
4      A.  Yes.
5      Q.  Ira, you're aware that Dave was receiving debt
6  collection calls in mid 2012?
7      A.  2012, I was not aware of it.
8      Q.  Do you have documents reflecting Dave's debt?
9      A.  The autopsy report.
10     Q.  Sorry.  Do you have documents reflecting
11  Dave's debt?
12     A.  Oh, debt.  Sorry.
13     Q.  My mistake, sorry.
14     A.  I don't think so.
15     Q.  Do you know how much debt Dave had when he
16  died?
17     A.  I remember getting some kind of paperwork.  I
18  may have handed it over to my estate attorney so he
19  might have the actual number but I don't remember.
20     Q.  Is that attorney Joseph Karp?
21     A.  Yes.
22     Q.  Do you remember what that document was?
23     A.  No.  I didn't really look at it.
24     Q.  Do you have any bank account statements for
25  Dave?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                               Pages 34..37

Page 34

1    A. Bank account statement, I don't think so.
2    Q. What efforts did you take to locate any bank
3  accounts?  Did you take any efforts?
4    A. I believe so.
5    Q. What did you do?
6    A. I think I contacted Joe Karp about that.
7    Q. Sorry, what did you say?
8    A. I think I contacted Joe Karp about that.  I
9  think he looked into it it to see if Dave had any -- what
10 bank accounts.
11   Q. Was Joe Karp was he your attorney at that
12 time?
13   A. Yes.
14   Q. So we went over documents regarding the
15 substantial Bitcoin.  Have you spoken to any witnesses
16 that told you that Dave had a substantial amount of
17 Bitcoin?
18       MR. FREEDMAN:  Objection to form.
19       THE WITNESS:  No.
20 BY MR. PASCHAL:
21   Q. So just to clarify then.  There are no
22 witnesses -- no testimony that says that Dave has a
23 substantial amount of Bitcoin that you have?
24       MR. FREEDMAN:  Objection.
25       THE WITNESS:  Not that I'm aware of.

Page 35

1        MR. PASCHAL: Ira, I'm showing you a complaint
2    that was filed against Dave by Wells Fargo Bank.
3        (Defendant's Exhibit No. 3 was
4        marked for identification.)
5        MR. FREEDMAN:  Do you have a copy for us?
6        MR. PASCHAL:  (Indicating).
7  BY MR. PASCHAL:
8    Q. Can you go to page two of that complaint.  If
9  you look at paragraph five Wells Fargo alleges that
10 there's been a default under the note and mortgage held
11 by plaintiff and that payment due October 1, 2012 and
12 all subsequent payments have not been made?
13       MR. FREEDMAN:  Bryan, where are you?
14       MR. PASCHAL:  Page two, paragraph five.
15       MR. FREEDMAN:  Page two, paragraph five I
16   don't see that.
17       MR. PASCHAL:  Not page numbered.  Just turn to
18   the next page.
19       MR. FREEDMAN:  There is a number on the bottom
20   page.
21       THE WITNESS:  Five up top.
22       MR. PASCHAL:  Yes, paragraph five.
23 BY MR. PASCHAL:
24   Q. Do you see that?
25   A. Where it says there's been a default?

Page 36

1    Q. Yes.  Are you aware that Dave stopped making
2  payments on his house October 1st 2012?
3    A. I wasn't aware.
4    Q. So Dave never told you that?
5    A. No.
6    Q. When was the first time that you learned this?
7    A. I think after he passed away.
8    Q. Ira, did you speak to Dave while he was in the
9  V.A. Hospital?
10   A. I think couple times, yes.
11   Q. About how many?
12   A. Don't remember.
13   Q. You say less than ten?
14   A. Maybe.
15   Q. Did you visit him while he was in the V.A.?
16   A. No.
17   Q. Did you exchange e-mails with him while he was
18 in the V.A.?
19   A. Yes.
20   Q. How many e-mails did you exchange roughly?
21   A. I would have to go look.  Couldn't tell you
22 off the top of my head.
23   Q. What e-mail account did you use to e-mail him,
24 do you remember?
25   A. Mostly Dex561@Yahoo.com.

Page 37

1    Q. What e-mail did you send to Dave -- I mean not
2  e-mail but what e-mail address was -- for Dave would you
3  send it to?
4    A. Are you talking about that period of time when
5  he was in the V.A.?
6    Q. When you sent those e-mails in the V.A.
7    A. I think at that time he was probably using
8  Dave@DavidKleiman.com.
9    Q. Do you remember what you talked about with
10 Dave?
11   A. No.  I would have to go back and look.
12       MR. FREEDMAN:  Are you done with this?
13       MR. PASCHAL:  Yes.
14       MR. FREEDMAN:  Don't want to lose them.
15       MR. PASCHAL:  May want to keep them close
16   because I may go back.
17       MR. FREEDMAN:  Just keep them right here.
18 BY MR. PASCHAL:
19   Q. Did Dave ever ask you for money in 2012?
20   A. I don't think so.
21   Q. Do you know if anyone made any personal loans
22 to Dave?
23   A. I remember his friend Patrick mentioning that
24 he may have loaned Dave money like once in a while but
25 as far as like an amount I don't know.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                          Pages 38..41

Page 38

1    Q.  Do you have any documents related to those
2  loans or no?
3    A.  No.
4    Q.  Did Dave ever tell you he needed help paying
5  V.A. bills?
6    A.  Paying V.A. bills, no.
7    Q.  So you -- did you ever help him pay any V.A.
8  bills?
9    A.  No.
10     MR. PASCHAL:  Mark this as Exhibit 4.
11     (Defendant's Exhibit No. 4 was
12     marked for identification.)
13  BY MR. PASCHAL:
14    Q.  Showing you an e-mail from Dave to Dr. Wright
15  dated October 11, 2012.  In that e-mail Dave says to
16  Dr. Wright, "Craig, if you don't mind please do transfer
17  in USD from Liberty.  If you can handle it that way I
18  would be grateful.  I have been in the V.A. again.
19  Nothing to worry about more of a routine as we have to
20  live with.  But I am not sure when I'll be able to get
21  back home for enough time to manage all the exchanges.
22  The cost of the hospital also comes as the reason for
23  this request.  Nothing I need help on but the funds in
24  USD will make my life easier right now."  Have you seen
25  this e-mail before?

Page 39

1     MR. FREEDMAN:  Objection.  Go ahead.
2     THE WITNESS:  I recently saw it in one of the
3     produced documents that Craig turned over, yes.
4     But I have never seen it before.
5  BY MR. PASCHAL:
6    Q.  In this case?
7    A.  Yes, in this case.
8    Q.  Do you know if Dr. Wright helped Dave with his
9  V.A. bills?
10    A.  No.
11    Q.  Ira, do you have any communications or
12  documents or anything from Dave to Dr. Wright accusing
13  him of theft?
14    A.  No.
15    Q.  Do you still have the October -- going back to
16  the October 11th e-mail do you have any documents -- do
17  you have any documents showing that Dave had a foreign
18  account with the bank called Liberty Reserve?
19    A.  No.
20    Q.  Did you know that Liberty Reserve was seized
21  by the United States Government?
22    A.  I remember hearing that from Craig.
23    Q.  When did you hear that from Craig?
24    A.  In one of the e-mails that he sent me.  I
25  don't remember when it was.

Page 40

1    Q.  Have you done any research on Liberty Reserve?
2    A.  I looked it up to see what it was.
3    Q.  What did you learn?
4    A.  It was some kind of like money exchange
5  business.
6     MR. PASCHAL:  Can you mark that as the next
7  exhibit?
8     (Defendant's Exhibit No. 5 was
9     marked for identification.)
10  BY MR. PASCHAL:
11    Q.  Showing you the unsealed indictment for the
12  United States Government versus Liberty Reserve.  Can
13  you turn to page -- paragraph 20 and that's going to be
14  on page nine?  If you look at the second sentence there
15  it starts "with the merchants who accepted."  Do you see
16  that?
17    A.  Did you say the second sentence?
18    Q.  Yes, on paragraph 20 "the merchants who
19  accepted."  You can read the whole paragraph but I'm
20  starting with "the merchants who accepted."
21    A.  "To further enable to use of Liberty Reserve"
22  on 20.
23    Q.  I'll just read the whole thing.  "To further
24  enable the use of Liberty Reserve for criminal activity,
25  its website offered shopping cart interface that

Page 41

1  merchant web sites could use to access LR, which means
2  Liberty Reserve, currency as a form of payment.  The
3  merchants who accepted LR, being Liberty Reserve,
4  currency was overwhelmingly criminal in nature.  They
5  included, for example traffickers of stolen credit card
6  data and personal identity information, peddlers of
7  various types of online Ponzi and get-rich-quick
8  schemes, computer hackers for hire, unregulated gambling
9  enterprises and underground drug dealing web sites."
10     MR. FREEDMAN:  Objection.
11  BY MR. PASCHAL:
12    Q.  Aside from any documents we produced to you do
13  you have any documents showing that Dave was involved in
14  developing software for gambling activities?
15    A.  No.
16    Q.  Do you have any knowledge of that?
17    A.  No.  Knowledge of him creating gambling type
18  software, no.
19    Q.  Have you heard that he was doing that before
20  today?
21    A.  I heard of Craig mentioned that he was
22  involved in that type of stuff but -- and I think he
23  mentioned that Dave may have assisted him in some
24  capacity but I don't have any evidence of Dave ever
25  doing that type of stuff.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                Pages 42..45

Page 42

1    Q.  Did you learn from any third parties that --
2  aside from Craig that Dave may have been involved in
3  online gambling activities?
4    A.  I don't believe so, no.
5    Q.  Is that your testimony today?
6    A.  Yes.
7    Q.  One second --
8    A.  I think the ATO may have mentioned something
9  about Liberty Reserve but I don't know if they were
10  specifically saying that Dave was involved or not but
11  yes, I think I did get a document from ATO.
12    Q.  Let me ask you this.  Did you ever exchange an
13  e-mail with Patrick Paige where you mentioned you were
14  surprised to find out that Dave was --
15    A.  Yes.
16    Q.  Let me finish that question.  E-mail with
17  Patrick Paige where you said you were surprised to learn
18  that Dave was involved with gambling activities?
19    A.  Yes.
20    MR. FREEDMAN:  You have to wait until he
21    finishes the question and then answer so that he
22    has a clean record.
23  BY MR. PASCHAL:
24    Q.  Have you made any efforts to find the Liberty
25  Reserve account that Dave had?

Page 43

1    A.  No.
2    Q.  Have you spoken to the Southern District of
3  New York about Liberty Reserve?
4    A.  No.
5    Q.  Have you spoken to the FBI agents that were
6  investigating Liberty Reserve?
7    A.  No.
8    Q.  So you mentioned the Thanksgiving dinner
9  earlier and you allege in your complaint so let's talk
10  about that.  The 2009 Thanksgiving dinner.  Who was at
11  that dinner?
12    A.  Myself, my wife, my six month old daughter,
13  Dave and my father.
14    Q.  Now, in your complaint I don't know if you
15  want a copy but you say at paragraph 61 that Dave told
16  you that he was working on something bigger than
17  Facebook by creating his own digital money.  Do you
18  remember that?
19    A.  Yes.
20    Q.  Do you have any pictures from that day?
21    A.  Yes.
22    Q.  Do you know if they were produced in
23  discovery?
24    A.  I'm not sure.
25    Q.  After the Thanksgiving dinner did you have any

Page 44

1  communications with Dave in 2009 regarding the digital
2  money that he said would be bigger than Facebook?
3    A.  No.
4    Q.  Do you have any communications with Dave in
5  2010 regarding the digital money that Dave said would be
6  bigger than Facebook?
7    A.  No.
8    Q.  Do you have any communications with Dave in
9  2011 regarding the digital money that Dave said would be
10  bigger than Facebook?
11    A.  No.
12    Q.  Do you have any communications with Dave in
13  2012 regarding the digital money that Dave said would be
14  bigger than Facebook?
15    A.  No.
16    Q.  Do you have any communications with Dave up
17  until April 2013 regarding the digital money that Dave
18  said would be bigger than Facebook?
19    A.  No.
20    Q.  After Dave died I understand that you formated
21  some of Dave's hard drives and threw out a bunch of his
22  work papers; is that correct?
23    MR. FREEDMAN:  Objection.
24    THE WITNESS:  I did discard some papers and
25    hard drives I first examined to see if there was

Page 45

1  anything on them and once I found out that there
2  wasn't I believe there were two hard drives that I
3  formated.
4  BY MR. PASCHAL:
5    Q.  Before you formated and before you threw those
6  papers away did you find any evidence of the digital
7  currency that Dave said would be bigger than Facebook?
8    A.  No.
9    MR. PASCHAL:  I want to show you an e-mail
10    exchange that you had with Dr. Wright.
11    (Defendant's Exhibit No. 6 was
12    marked for identification.)
13  BY MR. PASCHAL:
14    Q.  So if you look at the bottom of page one and
15  you sent this e-mail -- do you remember this e-mail?  Go
16  ahead and read it.
17    MR. FREEDMAN:  What exhibit number is this?
18    MR. PASCHAL:  I think it's 6.
19    THE WITNESS:  Yes, I remember.
20  BY MR. PASCHAL:
21    Q.  You remember this e-mail?
22    A.  Yes.
23    Q.  At the bottom you'll say "hi Craig, I would
24  like to ask for your advice if I may.  After everything
25  you have shared with me I feel like I can completely

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Pages 46..49

Page 46

1  trust you.  As mysterious and exciting as all this news
2  is I also feel nervous about making mistakes.  I very
3  well could have already made some mistakes months ago by
4  throwing away of bunch of Dave's papers and formating
5  drives that I could not access."  Do you remember that
6  statement?
7        MR. FREEDMAN:  Objection.
8        THE WITNESS:  Yes.
9        MR. FREEDMAN:  Wait one second let me object
10     and then go ahead and answer the question.
11  BY MR. PASCHAL:
12     Q.  Do you remember that statement?
13     A.  Yes.
14     Q.  I just want to go over this e-mail.  First you
15  say that you may have made some mistakes some months
16  ago.  When you say "some months ago" what timeframe are
17  you talking about, how many months ago?
18     A.  Sometime in 2013.
19     Q.  Was it before Thanksgiving, after
20  Thanksgiving?
21        MR. FREEDMAN:  Objection.
22        THE WITNESS:  You're talking about 2013?
23  BY MR. PASCHAL:
24     Q.  Yes, November 2013 Thanksgiving.
25     A.  It could have been before that.

Page 47

1     Q.  Our analysis shows that two drives were
2  formated and installed with Windows on November 10, 2013
3  would that date be about right?
4     A.  Possibly, yes.
5     Q.  Did you purchase the Windows software
6  installed on those drives?
7     A.  I don't remember.
8     Q.  You don't remember?
9     A.  (Indicating).
10     Q.  Would any -- do you have any documents like
11  credit card receipts showing you purchased the Windows
12  software?
13     A.  I don't know.
14     Q.  You don't know?
15     A.  Could have been a version of Windows that my
16  brother had.
17     Q.  You also say that you threw out a bunch of
18  Dave's work papers.  How much is a bunch?
19     A.  Just when I was cleaning out his house.  I
20  don't remember exactly how many.
21     Q.  When you threw these papers out was it the
22  same day November 10th 2013 or November of 2013?
23     A.  No.  This was like shortly after he passed
24  away when I was going through his house, going through
25  his stuff.

Page 48

1     Q.  Did you keep any of the documents that he had,
2  any of his work papers?
3     A.  I couldn't really find any like work papers.
4  I only found things like related to the certificates
5  that he earned like security related certificates.
6     Q.  You threw away his certificates?
7     A.  No, I'm saying I kept --
8     Q.  You kept those?
9     A.  Right.
10     Q.  When you say the working papers you threw away
11  what are you referring to?
12     A.  Actually I'm not even sure they were work
13  papers.  I guess they looked like things that didn't
14  look relevant to keeping.
15     Q.  Did you read all the papers before you threw
16  them away?
17     A.  Briefly.
18     Q.  So I guess none of it seemed important?
19     A.  Exactly.
20     Q.  Let me ask you.  If any of those documents had
21  a random set of numbers and letters and just random
22  gibberish you would haven't considered that important,
23  would you?
24        MR. FREEDMAN:  Objection.
25        THE WITNESS:  I don't know.  I don't know.

Page 49

1  BY MR. PASCHAL:
2     Q.  So what did you do to determine whether or not
3  something was important?
4     A.  Just whatever I looked at -- I don't know
5  specifically.  I mean like I was just going through
6  papers quickly and if something looked like it was
7  connected to him I would keep it.
8     Q.  Say the last part again, I couldn't hear you.
9     A.  If something looked like it was connected to
10  him I would keep it.  Like certificates, things he
11  earned, anything personal.
12     Q.  So --
13     A.  Like a lot of stuff I threw out could have
14  just been like junk mail.  That was unimportant I didn't
15  need to keep it.
16     Q.  How would you consider something junk mail?
17     A.  Like advertisement type stuff.
18     Q.  Let me just -- when you were formating or when
19  you threw out the papers were you already the personal
20  representative of the estate?  Let me rephrase that.  Do
21  you know -- do you know that you were the personal
22  representative of the estate when you --
23     A.  I'm not sure if I knew at that time.
24     Q.  Okay.
25        MR. FREEDMAN:  We've been going an hour.  Can

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                        Pages 50..53

Page 50

1  we take a break?
2      MR. PASCHAL:  Can we --
3      MR. FREEDMAN:  If you have more questions go
4  ahead.
5      MR. PASCHAL:  Few more questions and then we
6  can take a break.
7  BY MR. PASCHAL:
8      Q.  So you said if it was connected to Dave you
9  would keep it.  So if something I'm just trying to
10 figure out what the measurement that was.  If there was
11 scribbling on papers would you just throw that away?
12     MR. FREEDMAN:  Objection.
13     THE WITNESS:  I don't know.  Possibly.
14 BY MR. PASCHAL:
15     Q.  When did you become familiar with Bitcoin?
16     MR. FREEDMAN:  Do you think maybe we can take
17 a break here?  Sounds like you're going to a
18 different topic.
19     MR. PASCHAL:  Let's take a break.
20     THE VIDEOGRAPHER:  The time is 11:03 a.m. and
21 we're off the record.
22     (Thereupon, a brief recess was taken.)
23     THE VIDEOGRAPHER:  The time is now 11:17 a.m.
24 and we're back on the record.
25

Page 51

1  BY MR. PASCHAL:
2      Q.  Sorry.  Just briefly before we left off and
3  earlier today.  I have some follow-up questions.  Did
4  Dave live in Palm Beach Gardens?
5      A.  It might be officially called like Riviera
6  Beach.
7      Q.  It's in the area, right?
8      A.  Yes.
9      Q.  Palm Beach County?
10     A.  Yes.
11     Q.  Last time you saw Dave was in 2009?
12     A.  Yes.
13     Q.  And you guys lived in the same county?
14     A.  Yes.
15     Q.  About how far apart did you guys live from
16 each other?
17     A.  Five to ten minutes.
18     Q.  When we left off we were talking about on the
19 e-mail where you formated and you said you formated
20 threw out some of Dave's work papers so I think we were
21 talking about the work papers.  Why were you throwing
22 the papers away?
23     A.  Like I said it just looked like it was
24 unimportant stuff.  Everyday stuff you get in the mail
25 just advertisements, news clipping type and things.

Page 52

1      Q.  So if you go back to that e-mail in front of
2  you you say that you were concerned that you made a
3  mistake?
4      A.  Yes.
5      Q.  How were you concerned?
6      MR. FREEDMAN:  You said how or what?
7  BY MR. PASCHAL:
8      Q.  Why?  Why were you concerned?
9      A.  What's that?
10     Q.  Why were you concerned?
11     A.  Because I had just discarded some of his
12 stuff.
13     Q.  But you said the stuff you discarded was junk
14 mail?
15     A.  Right.  And I was using his drives.
16     Q.  So you were concerned because you were using
17 his drives, not because you threw out his work papers?
18     A.  No.  I was concerned about a little of
19 everything.
20     Q.  But sitting here today you can't tell us the
21 content of the papers that you threw out?
22     MR. FREEDMAN:  Objection.
23     THE WITNESS:  No.
24 BY MR. PASCHAL:
25     Q.  But you were concerned that you were throwing

Page 53

1  them out and formated certain drives?
2      MR. FREEDMAN:  Objection.
3      THE WITNESS:  Well, the drives that I formated
4  there was nothing on them.
5  BY MR. PASCHAL:
6      Q.  We're going to talk about that more but you
7  said you were concerned because you were using the
8  drives; right?
9      A.  Yes.  After -- after he passed away yes, I
10 started using them.
11     Q.  And you were concerned you were using them.
12 Did you continue to use them in 2014?
13     A.  Yes.
14     Q.  Did you continue to use them in 2015?
15     A.  Yes.
16     Q.  Did you continue to use them in 2016?
17     A.  Yes.
18     Q.  Did you continue to use them in 2017?
19     A.  Yes.
20     Q.  Did you continue to use them in 2018?
21     A.  I believe so.
22     Q.  After you filed the lawsuit you continued to
23 use Dave's devices; right?
24     A.  Yes.
25     Q.  When did you stop using Dave's devices?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                          Pages 54..57

Page 54

1    A. I don't remember exactly.
2    Q. Was it maybe like a few months ago, few weeks
3  ago?
4       MR. FREEDMAN: Objection.
5       THE WITNESS: In the range of like around this
6    lawsuit but --
7  BY MR. PASCHAL:
8    Q. Sorry, go ahead.
9    A. I was just putting my personal files on them.
10 I never touched Dave's stuff.
11   Q. Let me break that statement down. So what
12 caused you to stop using the devices?
13      MR. FREEDMAN: If you can answer this question
14   without going into conversation you had with your
15   lawyers then answer it.
16      THE WITNESS: Well, I just didn't want to
17   tamper with anything.
18 BY MR. PASCHAL:
19   Q. So you were using them in 2018 you were
20 tampering with it?
21      MR. FREEDMAN: Objection.
22      THE WITNESS: No. I mean I -- I was just
23   using it for my own personal use --
24 BY MR. PASCHAL:
25   Q. I want to go back two questions ago and you

Page 55

1  just said that you stopped using the devices because you
2  didn't want to tamper with anything. So were you
3  concerned that you were tampering with anything in 2018?
4    A. I was never concerned about tampering with
5  anything of Dave's. I was concerned about tampering
6  with my own personal things like -- like deleting my
7  lawsuit you might view that I was somehow like deleting
8  my own stuff or something that might be a bad thing but
9  I wasn't --
10   Q. Let me say it this way. Because of the
11 lawsuit you were concerned that it would appear that you
12 were trying to delete things by using the devices; is
13 that fair to say?
14      MR. FREEDMAN: Objection.
15      THE WITNESS: Can you repeat that?
16 BY MR. PASCHAL:
17   Q. Yes, was it because of the lawsuit that you
18 stopped using the devices because you were concerned
19 that it would appear that you were trying to delete
20 things?
21      MR. FREEDMAN: Objection.
22      THE WITNESS: I guess that's part of it.
23 BY MR. PASCHAL:
24   Q. When do you remember that you first considered
25 suing or bringing this action against Dr. Wright?

Page 56

1       MR. FREEDMAN: Hold on. What topic are you
2  in?
3       MR. PASCHAL: That goes to the facts alleged
4  in the amended complaint.
5       MR. FREEDMAN: Which number?
6       MR. PASCHAL: That goes to the facts alleged
7  in the alleged complaint. Goes to preservation of
8  device, chain of custody. I think it goes to
9  several topics. You want to go through them all?
10      MR. FREEDMAN: Where -- can you show me the
11   number?
12      MR. PASCHAL: Preservation of devices I think
13   that's like the first five. That's the very
14   purpose of this deposition.
15      MR. FREEDMAN: I don't think so. He can
16   answer. I'll allow the question but keeping an eye
17   on you.
18      MR. PASCHAL: Can you read my question back?
19      (Thereupon, a portion of the record
20      was read back by the reporter.)
21      THE WITNESS: I don't remember the exact date.
22 BY MR. PASCHAL:
23   Q. Was it 2016?
24   A. I don't know.
25   Q. Could it have been after that?

Page 57

1    A. It could have been after that.
2    Q. So I'm going to show you an e-mail that you
3  had with Patrick Paige, March 31st 2016.
4       (Defendant's Exhibit No. 7 was
5       marked for identification.)
6  BY MR. PASCHAL:
7    Q. If you turn to the second page and you can
8  look at what you said before but you say there are a lot
9  of details left out -- you're discussing Craig and
10 things you think about Dr. Wright. "There a lot are of
11 details left out that I may have to reserve until
12 litigation." You see that?
13   A. Yes.
14   Q. So this was March 31st 2016. So as early at
15 least March 31st 2016 you were considering litigation?
16      MR. FREEDMAN: Objection.
17      THE WITNESS: I'm not sure about that.
18 BY MR. PASCHAL:
19   Q. So what were you considering to reserve until
20 litigation when you were talking to Patrick Paige? Who
21 were you planning on litigating against?
22      MR. FREEDMAN: Ira, if you need to read the
23   whole e-mail read the whole e-mail and answer the
24   question.
25      MR. PASCHAL: Take your time.

Page 58

1     THE WITNESS: Yes, I guess --
2     MR. FREEDMAN: Don't guess Ira. Answer the
3  question if you know it. Not going to help them if
4  you guess.
5     THE WITNESS: I may have been considering
6  litigation against him at that time.
7  BY MR. PASCHAL:
8     Q.  March 31st 2016?
9     A.  I don't believe I filed anything -- it was
10  just --
11     Q.  Just asking --
12     A.  I was thinking about it, yes.
13     Q.  Are there any documents to reflect an earlier
14  date than that?
15     A.  I don't know.
16     Q.  You don't know? Sorry, I didn't hear you.
17     A.  I don't know.
18     MR. PASCHAL: Showing you an article that
19  Dr. Wright and your brother wrote.
20     (Defendant's Exhibit No. 8 was
21     marked for identification.)
22  BY MR. PASCHAL:
23     Q.  It's called Overwriting Hard Drive Data: The
24  Great Wiping Controversy. You produced this document to
25  us, do you recall that?

Page 59

1     A.  I guess if we produced it we --
2     Q.  Have you read this?
3     A.  No.
4     Q.  You have what, 20 plus years of experience
5  with computers; right?
6     A.  Just general use, yes.
7     Q.  You're generally familiar with how to
8  preserve, overwrite or delete data on a hard drive?
9     A.  I don't have any special training in that. I
10  just have general computer use.
11     Q.  To my question you have general experience
12  with how to overwrite, preserve or delete data from a
13  hard drive?
14     A.  Not preserve. If you're talking about like
15  how a forensic specialist might know how to secure data
16  I don't have any training in that type of thing. I just
17  know how to general --
18     Q.  Generally do you know how to preserve,
19  overwrite and delete data from a hard drive?
20     MR. FREEDMAN: Objection.
21     THE WITNESS: I just know how to generally
22  store data on a hard drive.
23  BY MR. PASCHAL:
24     Q.  You understand you're under oath today;
25  correct?

Page 60

1     A.  Yes.
2     Q.  You understand the importance when you're
3  under oath you have to give complete and truthful
4  answers to the best of your ability; correct?
5     A.  Yes.
6     MR. PASCHAL: I'm showing you your responses
7  to our interrogatories. This is going to be number
8  eight?
9     MR. FREEDMAN: 9.
10     (Defendant's Exhibit No. 9 was
11     marked for identification.)
12     MR. FREEDMAN: Do you have a copy for us?
13     MR. PASCHAL: Yes.
14  BY MR. PASCHAL:
15     Q.  If you turn to page six a response to request
16  it should be interrogatory number 20 at the second
17  sentence you say "additionally Ira has been employed in
18  web site design and affiliate marketing for the past 22
19  years and uses computers extensively as a part of his
20  work. During this time Ira became generally familiar
21  with how to preserve, overwrite or erase data on
22  electronic devices." Is that your statement?
23     A.  Yes.
24     Q.  And you swore this under penalty of perjury
25  just like you did here today; correct?

Page 61

1     A.  Yes.
2     Q.  So do you know or do you have general
3  experience with how to preserve, overwrite or delete
4  data from a hard drive?
5     A.  That's just general every day use. Just like
6  an average computer --
7     Q.  With that general knowledge you were in
8  possession of overwriting paper that Dave and Dr. Wright
9  wrote from March of 2016 you continued to use Dave's
10  electronic devices for your personal use until well
11  after -- almost a year after this litigation was filed;
12  is that correct?
13     MR. FREEDMAN: Objection.
14     THE WITNESS: Yes.
15  BY MR. PASCHAL:
16     Q.  So could we go back to the February 2014
17  e-mail that you had with Craig?
18     MR. FREEDMAN: What exhibit number?
19     MR. PASCHAL: I wasn't writing them down. I
20  think that might be three.
21     MR. FREEDMAN: No, three is the verified
22  complaint.
23     MR. PASCHAL: Four? Maybe it's five.
24     MR. FREEDMAN: Four is the 11th October 2012
25  e-mail.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                        Pages 62..65

Page 62

1    MR. PASCHAL: Yes, that's it, four.
2  BY MR. PASCHAL:
3    Q.  So we talked about the work papers.  Let's
4  talk about the formating of the drives.  You said in
5  that e-mail that you couldn't --
6    MR. FREEDMAN: Give me one second to grab it
7    myself.  Okay.  Go ahead.
8  BY MR. PASCHAL:
9    Q.  So you said in that e-mail that you formated
10  drives you could not access.  You see that?
11    A.  Yes.
12    Q.  What did --
13    MR. FREEDMAN: Wait, this is the wrong e-mail.
14    This is not that e-mail.  This is from Dave Kleiman
15    to Craig Wright.  What's the date on it?
16    MR. PASCHAL: You know what, you can borrow
17    mine and give it back to me after this question.
18    MR. FREEDMAN: He doesn't have it in front of
19    him either.  This is Exhibit 4.
20    THE WITNESS: I know what you're talking
21    about.
22    MR. FREEDMAN: Hold on a second.
23    February 14th.  It's Exhibit 6.
24  BY MR. PASCHAL:
25    Q.  Ira, you said you know what I'm talking about.

Page 63

1  So you said that you couldn't -- you formated drives you
2  couldn't access?
3    A.  I formated drives that prompted me that they
4  could only be formated.
5    Q.  Sorry, say that again.
6    A.  When I tried to access the drive the pop up
7  screen appears and it says that the drive needs to be
8  formated.  So I take that as the drive's empty and I
9  could format it.
10    Q.  Let's break that down then.  So before you
11  formatted the drive did you ask for any professional
12  help in recovering any data from the drive?
13    A.  No.
14    Q.  When you say I take that as the drive is empty
15  what are you basing that -- your -- that statement on?
16    A.  Just my general computer use.
17    Q.  Your general -- what I discussed before your
18  general knowledge of preserving, deleting and
19  overwriting data?
20    MR. FREEDMAN: Objection.
21    THE WITNESS: My general use of hard drives,
22    computers.
23  BY MR. PASCHAL:
24    Q.  So Ira, I mean in 2009 Dave tells you that he
25  is working on something that's bigger than Facebook,

Page 64

1  this digital currency, you have two hard drives and you
2  format them; right?
3    A.  Yes.
4    Q.  And then you continue to use them for several
5  years; right?
6    A.  Yes.
7    MR. PASCHAL: I'm showing you your second
8    amended responses and objections to our first set
9    of interrogatories.  This is going to be number
10    ten.
11    (Defendant's Exhibit No. 10 was
12    marked for identification.)
13  BY MR. PASCHAL:
14    Q.  Can you look at response number two and that
15  interrogatory two is identify all electronic devices
16  that Dave Kleiman owned or possessed at the time of his
17  death.  You see that?
18    A.  Yes.
19    Q.  Is this a complete list or is there anything
20  else that needs to be added to this list?
21    A.  I believe that's a complete list.
22    Q.  So these were all electronic devices that Dave
23  had?
24    A.  Yes.
25    Q.  Which of these drives did you format?

Page 65

1    A.  I believe it was two of the Seagate Momentus.
2    Q.  So there's the first one, right the Seagate
3  Momentus 500GB, that one?
4    A.  I think so.
5    Q.  Then it said the amount of data currently
6  stored is 17.6 GBs.  You see that?
7    A.  Yes.
8    Q.  Now, you said that you took the prompt as to
9  format the drive there was no information on the drives.
10  Is this entire 17.6 GBs your personal information?
11    A.  I think that's probably mostly the operating
12  system that I installed on it.
13    Q.  And then the next Seagate would be the -- I
14  think three down it's a Seagate Momentus 500 GB.  Are
15  those the same types of drive, just two of them?
16    A.  I believe so.
17    Q.  The third one that's the other one that you
18  formated?
19    A.  I think so.
20    Q.  Did you format the drives so that you could
21  use them personally?
22    A.  Yes.
23    Q.  Well, now if you've been using them for so
24  long why is it saying on the third one the amount of
25  data currently stored is zero?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Pages 66..69

Page 66

1    A.  I'm not sure the amount of data on that one is
2    accurate.  I'm not sure if that one was reported
3    accurately.
4    **Q.  Would that be for the same one -- scratch**
5    **that.  Strike that.  Would that be the same for the**
6    **first one where you said 17.6 GB was for the operating**
7    **system alone; is that accurate?**
8    A.  I believe so.
9    **Q.  You've been using that device for years you**
10   **haven't stored anything on it?**
11   A.  I don't think I really used it that much.  I
12   remember installing operating systems on those two
13   drives but I never really used it much.
14   **Q.  So you formated them so you could use them;**
15   **right?**
16   A.  Yes.  I may have not used it for a very
17   limited amount of time.
18   **Q.  When was that limited amount of time?**
19   A.  I don't remember.
20   **Q.  What are you storing on those devices?**
21   A.  I think just the operating systems.  I may
22   have also put like maybe some web site design program on
23   there.
24   **Q.  That's it?**
25   A.  As far as I can recall.

Page 67

1    **Q.  Ira, are you storing any commercial videos on**
2    **those devices?**
3    A.  Commercial videos?  I don't know.
4    **Q.  Are you storing any commercial music files on**
5    **those devices?**
6        MR. FREEDMAN:  Objection.
7        THE WITNESS:  I would have to look at that, I
8    don't know.
9    BY MR. PASCHAL:
10   **Q.  Are you storing any personal photos of your**
11   **family on those devices?**
12       MR. FREEDMAN:  Objection.
13       THE WITNESS:  Are you talking about just the
14   Seagate?
15   BY MR. PASCHAL:
16   **Q.  On these two you formated.**
17   A.  I don't know.  I don't think so.  I don't
18   think I put any photos on there.
19   **Q.  Were you able to access the remainder of all**
20   **of Dave's drives?**
21   A.  No.
22       MR. FREEDMAN:  Objection.
23   BY MR. PASCHAL:
24   **Q.  That's in this list.**
25   A.  Yes, right.

Page 68

1    **Q.  You weren't able to access them?**
2    A.  I think there might be one or two that we
3    weren't able to access.
4    **Q.  What were those?**
5    A.  I think the Hitachi Travelstar.
6    **Q.  What was the other one?**
7    A.  I don't remember.
8    **Q.  What did you do to access the Hitachi**
9    **Travelstar 100 GB?**
10   A.  I think I just plugged it in.
11   **Q.  You haven't done anything else to it?**
12   A.  No.
13   **Q.  There's no forensic image of it?**
14   A.  There was like you mean after litigation
15   started?  Not prior to litigation.
16   **Q.  There was none.  There was one done after the**
17   **litigation?**
18   A.  Yes.
19   **Q.  When was that done?**
20   A.  I don't remember the date.
21   **Q.  Was it this year?**
22   A.  Yes.
23   **Q.  Are you storing any commercial videos on any**
24   **of these devices?**
25   A.  I don't remember.

Page 69

1    **Q.  Are you storing any commercial music files on**
2    **any of these devices?**
3    A.  I would have to look at them.  I don't know.
4    **Q.  You didn't look at them before today?**
5    A.  Yes, I've looked at them before today but I
6    don't remember it exactly what was on them.
7    **Q.  Do you remember storing any pictures of your**
8    **family on any of those devices?**
9    A.  I think -- yes, I think I put some photos.  I
10   mean I would imagine that some of these drives have
11   photos.
12   **Q.  Which drives have photos?**
13   A.  I don't know specifically.
14   **Q.  Can you look at I think it's seven down where**
15   **you say four to five hard drives that are no longer in**
16   **the estate's possession.  You see that?**
17   A.  Yes.
18   **Q.  Then a footnote you say "Ira gave three or**
19   **four drives that were possessed by Dave Kleiman at the**
20   time of his death to Patrick Paige (Dave's business
21   partner in Computer Forensics LLC) as Patrick informed
22   him they were Computer Forensic LLC drives with business
23   data stored on them.  There was one other drive that was
24   on Dave's bedroom counter.  This drive was broken and
25   would not power on.  Ira disposed of this drive in

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Pages 70..73

Page 70

1  2013." Do you recall that?
2      A.  Yes.
3      Q.  I'm going to just break that down.  Can you
4  tell me today whether it's three or four drives that you
5  gave to Patrick Paige and Carter Conrad?
6      A.  I don't remember.
7      MR. FREEDMAN:  Objection.
8  BY MR. PASCHAL:
9      Q.  Can you say your answer again?
10     A.  I don't remember the exact number.
11     Q.  Do you recall when you gave him those drives?
12     MR. FREEDMAN:  Objection.
13     THE WITNESS:  I believe it was maybe within
14  like a month after Dave passed away.
15  BY MR. PASCHAL:
16     Q.  Did they ever give those drives back to you?
17     A.  No.
18     Q.  I want to go into that but let me ask you
19  this.  You said you found this drive on the bedroom
20  counter.  Did Dave have an office at his house?
21     A.  Yes, he had a room in the back, yes.
22     Q.  Was this -- were the three or four drives you
23  you gave to Patrick Paige, were those in his bedroom or
24  were they in his office?
25     A.  They were in his office.

Page 71

1      Q.  Before you gave those drives to Patrick Paige
2  did you get any professional analysis to see what was on
3  the drives?
4      A.  No.
5      Q.  Did you look in the drives yourself?
6      A.  No.
7      Q.  Did you access the drives?
8      A.  No.
9      Q.  How was Patrick able to access the drives?
10     A.  Repeat that.
11     Q.  How was Patrick able to access the drives?
12     A.  I don't know.
13     Q.  So how did Patrick know that -- well, did
14  Patrick tell you how did you know that those drives
15  belonged to Computer Forensics?
16     A.  He told me that they belonged to Computer
17  Forensics.
18     Q.  Did you --
19     A.  I don't remember if they were labeled or not.
20     Q.  But so other than Patrick's word they belonged
21  to Computer Forensics did you have anything else to show
22  that they may have not been belonged to Computer
23  Forensics?
24     MR. FREEDMAN:  Objection.
25     THE WITNESS:  No.

Page 72

1  BY MR. PASCHAL:
2      Q.  You don't know what was stored on those
3  drives, do you?
4      A.  Correct.
5      Q.  So if a Bitcoin wallet was on that drive you
6  wouldn't know?
7      A.  Yes, I don't know -- I never looked at the
8  drives.
9      Q.  Have you asked for those drives back from
10  Patrick?
11     A.  No.
12     Q.  Now, you say that there was a drive on the
13  bedroom counter that you couldn't power on and you
14  disposed of it.  Do you recall that?
15     A.  Yes.
16     Q.  Dave had an office so was this the only drive
17  that was in his bedroom?
18     A.  No.  I believe there were -- he kept his
19  backpack.
20     Q.  So let me do this then.  I'm not going to show
21  you the photo but on his counter he had a backpack, a
22  blue backpack?
23     A.  Not on the counter.  In his bedroom.  You
24  asked if there were other hard drives in his bedroom.
25     Q.  Okay.  Were there any hard drives in his

Page 73

1  bedroom?
2      A.  Yes.
3      Q.  What other drives were in his bedroom?
4      A.  I believe most of the drives that you have
5  listed here.
6      Q.  So he kept all of his drives in his bedroom?
7      A.  In a backpack, yes.
8      Q.  But the three or four drives that he didn't
9  have in the backpack they were in his office?
10     A.  Yes.
11     Q.  Now, this one drive was on the bedroom
12  counter; right?
13     A.  Yes.
14     Q.  It was the only drive that was on the bedroom
15  counter?
16     A.  Yes.
17     Q.  What was on his bedroom counter?
18     MR. FREEDMAN:  Objection.
19     THE WITNESS:  I don't remember exactly.
20  BY MR. PASCHAL:
21     Q.  What did this drive look like?
22     A.  I just remember it was an external drive.
23     Q.  Do you remember what color it was?
24     A.  No.
25     Q.  You don't know what type it was either?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                            Pages 74..77

Page 74

1    A.  Not offhand.
2    Q.  Do you remember how big it was?
3    A.  Maybe like six or seven inches high by a
4  couple inches wide.
5    Q.  So like --
6    A.  Yes.
7    Q.  It was a big hard drive?
8    A.  I don't --
9    Q.  It wasn't like a laptop hard drive, let me ask
10  that?
11    A.  No, it wasn't a laptop drive.  It was an
12  external drive.
13    Q.  For like a tower computer?
14    A.  For a tower computer?
15    Q.  For like a regular computer?  For like a
16  desktop computer?
17    A.  It could be used with anything.
18    Q.  You just plug it in?
19    A.  You can connect it to any type of computer.
20    Q.  I'm not going to show the picture but on
21  Dave's countertop he had a blue backpack, he had a
22  yellow shirt, he had another bag, he had a bottle of
23  beer.  There was a wine glass that was empty and then he
24  had his glass mirror here.  There was a cell phone on
25  the top of a white box and then right below it there was

Page 75

1  a very, very small black box, that doesn't fit the
2  description of the hard drive you're talking about but
3  could that have been the hard drive?
4    MR. FREEDMAN:  Objection.
5    THE WITNESS:  Where are you getting this
6    picture?  I don't even -- I don't understand the
7    picture that you're just painting.
8  BY MR. PASCHAL:
9    Q.  The pictures that the police took after when
10  they --
11    A.  You have actual photos?
12    Q.  Yes.  I can show them.
13    A.  Yes, it would help if I could see the photo
14  then I might -- I don't know.
15    MR. PASCHAL:  Can we print here?
16    MR. FREEDMAN:  Yes.
17    MR. PASCHAL:  So on our next break I'll print
18    it and show you.  I don't know -- the reason why I
19    did not show you is because it's -- it is graphic.
20    So I don't know if -- at the next break you guys
21    decide if you want to see it and I can point it out
22    to you, okay?
23    THE WITNESS:  Okay.
24  BY MR. PASCHAL:
25    Q.  So the pictures that the police took from the

Page 76

1  day that they went to Dave's house you haven't seen any
2  of those pictures?
3    A.  No.
4    Q.  On the drive that you -- you threw away you
5  wouldn't be able to tell us today one way or another
6  whether or not there was Bitcoin wallets or Bitcoin
7  information on that drive?
8    A.  I was never able to access it.
9    Q.  So you wouldn't be able to tell us today
10  whether or not Bitcoin wallets or Bitcoin were on that
11  drive?
12    MR. FREEDMAN:  Objection.
13    THE WITNESS:  Again I wasn't able to access
14    it.
15  BY MR. PASCHAL:
16    Q.  Is it a yes or no?
17    A.  Anything could have been on it.
18    Q.  But you wouldn't know?
19    A.  I wouldn't know because I couldn't access it.
20    Q.  And you threw it away?
21    A.  Yes.  It was -- it didn't work.
22    Q.  Just going back.  So when you came in
23  possession of Dave's computers did you have your own
24  personal computer?
25    A.  Yes.

Page 77

1    Q.  So why did you format Dave's devices so that
2  you could use those computers?
3    A.  I guess I needed more storage space.  Maybe my
4  computer was full with stuff, other stuff.
5    Q.  So sitting here today you can't tell us why
6  you decided to use Dave's computers, you're speculating,
7  are you?
8    A.  Why I couldn't use --
9    Q.  Why did you use Dave's computers rather than
10  your own?
11    A.  I put the operating systems on there because
12  my computer might have had a different operating system.
13  For one reason or another I needed to use like Windows 7
14  or Windows 8 so that's why I formatted those two and put
15  those operating systems on there.
16    Q.  Why didn't you just get another hard drive or
17  computer?
18    MR. FREEDMAN:  Objection.
19    THE WITNESS:  His were laying around and
20    they -- they said they could be formatted.
21  BY MR. PASCHAL:
22    Q.  Who said they could be formatted?
23    A.  When I plugged them in the pop up screen said
24  that the drives need to be formated.  So that to me that
25  appears that the drives were empty.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                   Pages 78..81

Page 78

1    Q.  When you had the drive that was broken what
2  made you think it was broken?
3    A.  It wouldn't turn on.  You didn't hear like the
4  platter spinning or anything.
5    Q.  Did you ask for any professional help trying
6  to get it to start, to turn on?
7    A.  No.
8    Q.  So just -- you tried turning it on it didn't
9  turn on so you threw it away?
10    A.  Yes.
11    MR. FREEDMAN:  Objection.
12  BY MR. PASCHAL:
13    Q.  So when you became the personal representative
14  of the estate of Dave Kleiman what steps did you take to
15  preserve the assets of the estate?
16    A.  Well, I reached out to my attorney --
17    MR. FREEDMAN:  Ira, if you can answer the
18    question without revealing what you discussed with
19    your attorney then answer it.  But don't discuss
20    anything that you discussed with your attorney.
21    MR. PASCHAL:  Your objection is don't talk
22    about Karp?
23    MR. FREEDMAN:  Just discussions with your
24    lawyer.
25    MR. PASCHAL:  Don't tell me about your

Page 79

1    conversations with Karp.
2  BY MR. PASCHAL:
3    Q.  When you became the personal representative
4  what did you do to preserve the assets of the estate?
5    A.  My attorney assisted me with doing that.
6    Q.  But what did you do like did you -- what did
7  you do personally to preserve whatever was in Dave's
8  house?
9    MR. FREEDMAN:  Objection.
10    THE WITNESS:  I collected his personal things.
11  BY MR. PASCHAL:
12    Q.  And what did you collect?
13    A.  Well, his computer equipment, some guns in his
14  gun safe.  Some of his clothing.  Just personal items.
15  Like I said, his computer certificates, things like
16  that.
17    Q.  Can you go back to the February 2014 e-mail
18  that you had with Dr. Wright where you discussed
19  formating the drives?
20    MR. FREEDMAN:  Which exhibit number?
21    MR. PASCHAL:  I didn't write it down.  Do you
22    have it?
23    MR. FREEDMAN:  I think it's Exhibit 6.
24  BY MR. PASCHAL:
25    Q.  So if you go to the second page that's the

Page 80

1  second paragraph where you start with Patrick.  You say
2  "Patrick and his partner e-mailed me the other day and
3  would like me to bring over his, I guess that means
4  Dave's, drives.  I haven't spoken with them about what
5  happened if they did manage to access his account.  I
6  assume that anything in it cannot be traced when there
7  is a withdrawal.  Being that I've only met Patrick a
8  couple times in my life I was wondering if there are any
9  safety measures you can recommend to me so I don't make
10  another mistake."  So let's break this down.  What did
11  you mean by another mistake?
12    A.  I guess I was thinking that if I discarded
13  anything that could have been important or related to
14  Bitcoin.
15    Q.  Then the section before you say "being that
16  I've only met Patrick a couple times in my life I was
17  wondering if there were any safety measures to
18  recommended to me again so I don't make another
19  mistake."  This is in February 2014 and you're saying
20  that you have only met Patrick a couple times in my
21  life?
22    MR. FREEDMAN:  Objection.
23  BY MR. PASCHAL:
24    Q.  Is that correct?
25    MR. FREEDMAN:  Objection.

Page 81

1    THE WITNESS:  Yes.
2  BY MR. PASCHAL:
3    Q.  But one month after Dave died you gave him
4  three or four of Dave's hard drives; right?
5    A.  Correct.
6    Q.  That was only based on him telling you these
7  belong to Computer Forensics?
8    A.  Yes.
9    Q.  I want to be clear you take any images of the
10  drives that you gave to Patrick; right?
11    A.  No.
12    Q.  So you have no copies?
13    A.  No.
14    Q.  So if you go back to the e-mail you say you're
15  going to give certain drives to Patrick and Conrad for
16  them to analyze.  Do you see that?
17    A.  Yes.
18    Q.  Did you give them drives?
19    A.  No.
20    Q.  Why didn't you give them any drives excluding
21  the three or four that you had already given him why
22  didn't you give him drives at this point?
23    A.  I didn't -- what date are we talking about
24  again?
25    Q.  So in February of 2014 you told Craig that you

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019
Pages 82..85

Page 82

1  were going to give Patrick and Conrad some of Dave's
2  electronic devices to analyze.  Did you give Patrick and
3  Conrad Dave's --
4     A.  No.
5     Q.  The answer is no?
6     A.  No, I didn't.
7        MS. MCGOVERN:  Just finish the question.
8  BY MR. PASCHAL:
9     Q.  And why didn't you give Patrick and Conrad the
10  drives?
11     A.  I thought that the best idea would be to allow
12  Craig to examine them.
13     Q.  So you didn't give any drives to Patrick
14  Paige?
15     A.  No.
16     Q.  Except for the three or four; right?
17     A.  Right.
18        MR. PASCHAL:  I'm showing you the first
19     amended complaint you filed against Patrick Paige
20     and Carter Conrad.  This is going to be what
21     exhibit?
22        THE COURT REPORTER:  11.
23        (Defendant's Exhibit No. 11 was
24        marked for identification.)
25

Page 83

1  BY MR. PASCHAL:
2     Q.  Can you turn to paragraph 18?  Let me know
3  when you're there.
4     A.  Okay.
5     Q.  So at paragraph 18 you say "shortly after
6  David Kleiman's passing plaintiff, and that's you, also
7  entrusted Computer Forensics and Patrick Paige with a
8  smart phone owned by decedent, being Dave, which was
9  provided the defendants for the purpose of unlocking the
10  phone as it was password protected in aid of plaintiff's
11  efforts to develop information as to assets of the
12  estate.
13        The phone has never been returned to plaintiff
14  and defendant Paige has since claimed that he, a
15  computer forensic consultant, had thrown away the phone
16  after he had dropped the phone and cracked the screen."
17  Do you recall making this allegation?
18     A.  Yes.
19     Q.  So you attempted to access the device being
20  the phone by giving it to Patrick Paige; correct?
21     A.  Yes.
22     Q.  But he never gave you any information from
23  that device?
24     A.  Correct.
25     Q.  Did he ever give it back to you?

Page 84

1     A.  No.
2     Q.  When did you give that phone to -- that device
3  to Patrick?
4     A.  It was the same time that I handed him -- when
5  he took the three drives from Dave's home.
6     Q.  Why did you give him something?
7     A.  Because I couldn't access it and he is a
8  computer forensics expert I thought he would have a
9  better chance at it than I would.
10        MR. PASCHAL:  Showing you your response and
11     objections to our first set of interrogatories.
12        (Defendant's Exhibit No. 12 was
13        marked for identification.)
14  BY MR. PASCHAL:
15     Q.  Can you turn to the last page of this
16  document?  Can you read that statement that you made?
17     A.  "I, Ira Kleiman declare under penalty of
18  perjury under the laws in the United States and the
19  State of Florida that the foregoing is true and
20  correct."
21     Q.  Can you turn to interrogatory response number
22  three?
23     A.  Okay.
24     Q.  We ask you "describe with specificity all
25  attempts you have made to access Dave Kleiman's

Page 85

1  electronic devices."  Your response was "Ira did not
2  keep a record of every attempt he made to access Dave
3  Kleiman's electronic devices.  That said, Ira states
4  that he personally reviewed all drives that were
5  accessible.  During this review Ira looked through each
6  individual folder and each individual file contained on
7  these drives to find anything of importance."
8        You didn't mention in here that you gave a
9  device the cell phone to Patrick Paige for them to
10  access; is that correct?
11     A.  Well, those drives from what I believe --
12     Q.  Not the drives I'm asking you -- go ahead.
13     A.  What are you referring to?
14     Q.  The phone, the device, the one that you allege
15  in the Computer Forensic lawsuit.
16     A.  Yes, I didn't give him the cell phone.  I just
17  asked him to access it.
18     Q.  So in your amended complaint for Computer
19  Forensics you didn't allege that you gave the phone to
20  Patrick to access the phone and that he told you that he
21  cracked the screen and threw it away?
22     A.  I handed the phone to him with an expectation
23  that it would be returned to me.
24     Q.  But you gave it to him so he could access the
25  phone; right?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                              Pages 86..89

Page 86

1    A.  Yes.
2    Q.  Your testimony earlier was you gave it to him
3  because he is a computer forensic expert so you can
4  access the device?
5    A.  Yes.
6    Q.  I'm asking you you gave this answer under the
7  penalty of perjury.  When we asked you describe with
8  specificity all attempts you made to access Dave
9  Kleiman's devices.  You did not say in this answer that
10  you gave an electronic device, being the phone, to
11  Patrick to access?
12    A.  I thought we listed that phone on here.
13    Q.  I'm looking just this one interrogatory right
14  here.  You can go through them but nowhere in there do
15  you say you gave the phone to Patrick Paige.
16    A.  Okay.
17    Q.  So is this an untruthful response?
18    A.  It's possible we just missed including the
19  cell phone.
20    Q.  Can you go to your amendment to this
21  interrogatory which is second amended response and
22  objection to Dr. Wright's first set of interrogatories.
23  That's Exhibit 10.
24    MR. FREEDMAN:  Are you done with 12?
25    MR. PASCHAL:  We're going to use it again.

Page 87

1  BY MR. PASCHAL:
2    Q.  Can you turn to page 11, that's the last page.
3  You took an oath to the court reporter today and you
4  also signed this verification.  Can you read it out to
5  me?
6    A.  "I, Ira Kleiman, declare under penalty of
7  perjury under the law of the United States and State of
8  Florida that the foregoing is true and correct."
9    Q.  Can you go back to that same interrogatory
10  request number three.  In the first paragraph you say
11  the same thing that you said -- just so I'm clear on
12  these you revised them you served us on March 21, 2019,
13  okay?  Your first interrogatory responses the first
14  version of this you served on March 7th 2019.  So two
15  weeks later we get this revised response.  If you look
16  in the second paragraph you add one paragraph to this
17  response.  You want to go ahead and read that?
18    A.  Where are you?
19    Q.  Interrogatory three, the same one we're
20  talking about.  It says request number three but it
21  should be -- you say describe with specificity?
22    A.  "Describe with specificity all the attempts
23  you have made to access Dave Kleiman's electronic
24  devices."
25    Q.  Now, that first paragraph it's the same

Page 88

1  paragraph you had in your previous version to this
2  interrogatory; right?
3    A.  Yes.
4    Q.  Now, if you turn the page you added the
5  paragraph.  In this paragraph you mention that you gave
6  an electronic device to Patrick Paige to access?
7    A.  Apparently not.
8    Q.  So in the two week span that you revised you
9  did not include that additional information in this
10  interrogatory response; correct?
11    A.  I guess we missed it.
12    Q.  In the two weeks that you served the first
13  response and the second response what information did
14  you get to remember that you installed Windows operating
15  systems on two drives in an effort to gain access to the
16  drives in 2013?  What caused you to remember that that
17  information was missing?
18    MR. FREEDMAN:  Objection.
19    THE WITNESS:  Can you repeat that again?
20  BY MR. PASCHAL:
21    Q.  Yes, you give us a response on March 7th 2019;
22  right?
23    A.  Yes.
24    Q.  You supplement that response two weeks later
25  to add a new paragraph in that second paragraph here

Page 89

1  where you're saying you installed windows on the drives
2  which you didn't include in your first version to these
3  interrogatories.
4    A.  I don't know.
5    MR. FREEDMAN:  Objection.
6  BY MR. PASCHAL:
7    Q.  Are there any documents that shows why you
8  remembered that your first answer was incomplete?
9    MR. FREEDMAN:  Objection.
10    THE WITNESS:  I don't know.
11  BY MR. PASCHAL:
12    Q.  Is this a truthful answer?
13    A.  At the time I believe it was.
14    Q.  Is it truthful today?
15    A.  It's possible some information was missed.
16    Q.  Is it truthful?
17    MR. FREEDMAN:  Objection.
18    THE WITNESS:  If it's missing some information
19  I guess it's not completely.
20  BY MR. PASCHAL:
21    Q.  While we're on the interrogatories I'm showing
22  you an e-mail that you had with Patrick Paige and this
23  is June 27, 2015.  I think that's Exhibit 12.
24    MR. ROCHE:  13.
25

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Pages 90..93

Page 90

1        (Defendant's Exhibit No. 13 was
2        marked for identification.)
3 BY MR. PASCHAL:
4    Q.  In this e-mail you start by saying "hi
5 Patrick, I don't think I'm going to be able to meet up
6 this week.  Need to finish a client's web site.  But for
7 now I stored the drives in a safe deposit box so they'll
8 remain safe and as Craig mentioned there's no time limit
9 with this stuff so we have time to figure it all out."
10 Do you remember this e-mail?
11   A.  Yes.
12   Q.  Just as an initial matter is there any
13 reason -- what computer did you send this e-mail from?
14   A.  I guess my personal computer.
15   Q.  Is there a reason why the date is set for the
16 day to go first then the month and then the year?
17   A.  Can you repeat that?
18   Q.  If you look at the sent the time where it says
19 Saturday and then it says the date 27 and then it says
20 the month 6 and then the year 2015?
21   A.  Right.
22   Q.  Is there -- was is it unusual to you that it's
23 set like that?
24   A.  I never really paid attention to it.
25   Q.  Your e-mail is -- your e-mail sends out using

Page 91

1 that date format; right?
2    MR. FREEDMAN:  Objection.
3    THE WITNESS:  I don't know.  I never paid
4 attention to it.
5 BY MR. PASCHAL:
6    Q.  There's no cause for concern let me ask you
7 that that your e-mails are sending out --
8    MR. FREEDMAN:  Objection.
9 BY MR. PASCHAL:
10   Q.  No, right?
11   A.  No.
12   Q.  Would it be surprising to you if Dave had
13 e-mails that also had -- used that same date
14 configuration?
15    MR. FREEDMAN:  Objection.
16 BY MR. PASCHAL:
17   Q.  Date, month, year?
18   A.  I suppose not.
19   Q.  In the February 2000 -- February 15, 2014
20 e-mail you told Patrick that you put the drives in a
21 safe deposit box; correct?
22    MR. FREEDMAN:  Objection.
23    THE WITNESS:  Yes.
24 BY MR. PASCHAL:
25   Q.  Now, can you turn to your responses and

Page 92

1 objections to the second set of interrogatories.  I
2 don't have an exhibit number on that but you guys have
3 it.
4    MR. FREEDMAN:  Second amended?
5    MR. PASCHAL:  Not the second amended, the
6 second set of interrogatories.
7    MR. FREEDMAN:  I have responses objections to
8 Wright's first set of interrogatories to plaintiff.
9 I have plaintiff's second amended responses and
10 objection to Wright's first set of interrogatories.
11    MR. PASCHAL:  Is it in that stack?
12    MR. FREEDMAN:  It should be identical.  One is
13 marked and one is not.
14    MR. ROCHE:  Plaintiff's responses and
15 objections to plaintiff's second set?
16    MR. FREEDMAN:  What number?
17    MR. ROCHE:  Nine.
18 BY MR. PASCHAL:
19   Q.  So at 14 we ask you to describe with
20 specificity all efforts you made to preserve Dave
21 Kleiman's electronic devices and data contained on them.
22 Do you see that interrogatory?
23   A.  Yes.
24   Q.  Under the penalty of perjury again you said "I
25 restored all of Dave Kleiman's electronic devices in the

Page 93

1 exact same place that he found them in Dave's computer
2 backpack?"
3   A.  Yes.
4   Q.  Are they in a backpack or safety deposit box?
5   A.  In a back pack.
6   Q.  So you never put them in a safe deposit box?
7   A.  I was thinking about them putting them in a
8 save deposit.  Then I decided to keep them where I found
9 them.
10   Q.  You said when Ira reviewed these devices he
11 found nothing of importance or out of ordinary but you
12 did find the true crypt file on the drive which you
13 could not access.  You made copies of these files?
14    MR. FREEDMAN:  Objection.
15 BY MR. PASCHAL:
16   Q.  You see that?
17   A.  Yes.
18   Q.  How did you determine what was of importance
19 or whether something was out of the ordinary?
20   A.  I basically kept everything of Dave's, all of
21 his files.  But are you -- are you asking me about the
22 true crypt file specifically?
23   Q.  I'm asking in that sentence.  "When I reviewed
24 Dave's devices he found nothing of importance or out of
25 the ordinary."  These are Dave's work laptops; correct,

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Pages 94..97

Page 94

1 some of them were his personal laptops, work laptops;
2 right?
3        MR. FREEDMAN:  Objection.
4        THE WITNESS:  I don't know what drives were in
5 his laptops.
6 BY MR. PASCHAL:
7    Q.  But these drives had Dave's work on them;
8 right?
9    A.  It had forensic related software on them.  I
10 don't know.
11    Q.  How did you determine that there was nothing
12 of importance or out of the ordinary on Dave's drives?
13    A.  I kept all of his stuff.
14    Q.  That's not my question.  My question is how
15 did you determine whether something was of importance or
16 out of the ordinary?
17    A.  Being that I didn't delete any of his
18 things -- I just kept everything.
19    Q.  You made a statement here that he found or you
20 found nothing of importance out of the ordinary.  What
21 were you looking for in those drives to determine
22 whether anything was of importance or was out of the
23 ordinary?
24    A.  I don't know.
25    Q.  I'm sorry, could you say that again?

Page 95

1    A.  I don't know.
2    Q.  The true crypt file, what have you done to
3 access that file?
4    A.  I just stored it -- I just made copies of it.
5 There's been no attempt to access it.
6        THE VIDEOGRAPHER:  The time is 12:18 p.m. and
7 we're off the record.
8        (Thereupon, a brief recess was taken.)
9        THE VIDEOGRAPHER:  The time is now 1:11 p.m.
10 and we are now back on the record.
11 BY MR. PASCHAL:
12    Q.  So Ira, when we left off we were talking about
13 where Dave's devices were located, whether they were in
14 a safety deposit box or computer bag.  You said they're
15 in the computer bag?
16    A.  Yes.
17    Q.  Where is that computer bag located?
18    A.  In my home.
19    Q.  So you have the hard drives and the bag?
20    A.  Yes.
21    Q.  What type of bag is it?
22    A.  Just a large backpack.
23    Q.  Do you know the brand?
24    A.  Not offhand.
25    Q.  Where in your house are you keeping it?

Page 96

1    A.  I think it's in my bedroom.
2    Q.  You think or -- are you guessing, do you know
3 for sure?
4    A.  Well, I sometimes move around.  Sometimes if I
5 was like using the drives it would be in my bedroom.
6 Other times I would store it in an extra room.
7    Q.  You said when you use the drives, what are you
8 using the drives for?
9    A.  Just my personal files.
10    Q.  What personal files?
11    A.  I don't recall exactly.
12    Q.  Because earlier we spoke and on the drives
13 you -- strike that.  So I'm going back to Computer
14 Forensics, the complaint you filed against Computer
15 Forensics and Patrick Paige.  Do you have that in front
16 of you?
17        MR. FREEDMAN:  11, right?
18        MR. PASCHAL:  Yes.  Do you have it?
19        MR. FREEDMAN:  Yes.
20 BY MR. PASCHAL:
21    Q.  So if you go to paragraph 32 on page eight.
22 That's a Count III and you're seeking a permanent
23 injunction.  Do you see that?
24    A.  32?
25    Q.  The heading Count III seeking a permanent

Page 97

1 injunction?
2    A.  Yes.
3    Q.  If you go to paragraph 32 and you look at the
4 last sentence you say "further upon information and
5 belief David Kleiman created and maintained Bitcoin
6 wallets which were his personal property during the time
7 he was a member of Computer Forensics."  Do you recall
8 making that allegation?
9    A.  I don't remember saying those exact words
10 but --
11    Q.  But this is your complaint; right?
12    A.  Yes.
13    Q.  Now, if you go to paragraph 35 at the last
14 sentence as a part of your permanent injunction you say
15 to the extent that Computer Forensics, Paige or Conrad
16 have retained any Bitcoin wallets that were the personal
17 property of David Kleiman Computer Forensics should be
18 enjoined from monetizing, transferring or otherwise
19 converting such Bitcoin to its use and that's a typo it
20 should be or it says of or the use of its principals or
21 third parties.  Do you see that allegation that you
22 made?
23    A.  Yes.
24    Q.  So can you turn to your second amended
25 responses to our first interrogatories I think that's

Page 98

1 ten.
2       MR. FREEDMAN: Second amended responses?
3       MR. PASCHAL: Yes.
4       MR. FREEDMAN: It is ten.
5       MR. PASCHAL: 10.
6 BY MR. PASCHAL:
7    Q. Can you turn to page four? You ready? You
8 say "describe with specificity all attempts you made to
9 determine the identity and location of any crypto
10 currency that David Kleiman owned or possessed at the
11 time of his death."
12      In your answer under the penalty of perjury
13 you did not make any mention that you're seeking a
14 permanent injunction against Computer Forensics, Patrick
15 Paige, Carter Conrad for the return of David Kleiman's
16 personal Bitcoin wallets, do you?
17   A. Could you repeat that?
18   Q. Yes. Can you read it back?
19      (Thereupon, a portion of the record
20      was read back by the reporter.)
21      THE WITNESS: I don't know -- I suppose we
22 missed that.
23 BY MR. PASCHAL:
24   Q. Ira, so can you go to the last page of this
25 interrogatory. This is your signature, right?

Page 99

1    A. Yes.
2    Q. And you are swearing the under penalty of
3 perjury that the foregoing answers are true and correct;
4 correct?
5    A. Yes.
6    Q. And the question we're asking is whether all
7 attempts that you've made to find or locate or access
8 David Kleiman's Bitcoin, right?
9    A. Yes.
10   Q. Isn't it important to mention that you're
11 seeking a permanent injunction against three or two
12 people in a company to get those very Bitcoin?
13      MR. FREEDMAN: Objection.
14      THE WITNESS: We didn't know if they possessed
15 any Bitcoin.
16 BY MR. PASCHAL:
17   Q. You made the allegation without knowing?
18   A. I don't know.
19   Q. You don't know if you made the allegation in
20 this complaint without knowing whether it was true or
21 not?
22      MR. FREEDMAN: Objection.
23      THE WITNESS: I don't remember.
24 BY MR. PASCHAL:
25   Q. But aside from whether it's true or not you

Page 100

1 did not mention that you were seeking an injunction in
2 the sworn interrogatory?
3      MR. FREEDMAN: Objection.
4 BY MR. PASCHAL:
5    Q. Did you?
6      MR. FREEDMAN: Objection.
7      THE WITNESS: I don't know.
8 BY MR. PASCHAL:
9    Q. Is that a yes or no?
10   A. I don't know.
11   Q. You don't know in this interrogatory response
12 whether you make any mention of the injunction that
13 you're seeking against Patrick Paige, Carter Conrad and
14 Computer Forensics?
15      MR. FREEDMAN: Objection.
16      THE WITNESS: I don't know.
17 BY MR. PASCHAL:
18   Q. Ira, you can turn to the interrogatory and
19 read it if you would like.
20   A. What page?
21   Q. It's on page four.
22   A. What is your question?
23   Q. Nowhere in here do you mention that you're
24 seeking a permanent injunction for David Kleiman's
25 Bitcoin for Patrick Paige, Carter Conrad and Computer

Page 101

1 Forensics?
2      MR. FREEDMAN: Objection.
3      THE WITNESS: I don't know.
4 BY MR. PASCHAL:
5    Q. Ira, it's really a yes or no. In this answer
6 do you mention that you're seeking an injunction against
7 Patrick Paige, Carter Conrad and Computer Forensics?
8 You're under oath today just like you were under oath
9 under these interrogatories.
10      MR. FREEDMAN: Objection.
11      THE WITNESS: My attorneys drafted this and I
12 don't -- I don't completely understand what an
13 injunction is.
14 BY MR. PASCHAL:
15   Q. Well, without understanding what an injunction
16 is you do allege here in Computer Forensics' complaint
17 that to the extent that Computer Forensics, Paige,
18 Conrad have retained any Bitcoin wallets that were the
19 personal property of David Kleiman, Computer Forensics
20 should be enjoined from monetizing, transferring or
21 otherwise converting Bitcoin to its use or its use to
22 third parties. Do you understand the allegation you
23 made?
24      MR. FREEDMAN: Objection.
25      THE WITNESS: No.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                              Pages 102..105

Page 102

1  BY MR. PASCHAL:
2      Q.  So if there is a similar allegation in the
3  Second Amended Complaint which you filed against
4  Dr. Wright you wouldn't understand that allegation
5  either, would you?
6          MR. FREEDMAN:  Objection.
7          THE WITNESS:  I didn't draft the complaints.
8  BY MR. PASCHAL:
9      Q.  Did you look at them?
10     A.  Yes.
11     Q.  Did you review them?
12     A.  Yes.
13     Q.  Did you say it's okay to file this?
14     A.  Yes.
15     Q.  Are did you look at these interrogatories?
16     A.  Yes.
17     Q.  Did you review them?
18     A.  Yes.
19     Q.  Did you swear under the penalty of perjury
20  that these answers are correct?
21     A.  Yes.
22         MR. FREEDMAN:  Objection.
23  BY MR. PASCHAL:
24     Q.  Are they correct?
25         MR. FREEDMAN:  Objection.

Page 103

1          THE WITNESS:  I don't know entirely.
2  BY MR. PASCHAL:
3      Q.  So do you have any basis to support the
4  allegation you're making here in the Computer Forensics
5  complaint?
6          MR. FREEDMAN:  Objection.
7          THE WITNESS:  I believe so at the time.
8  BY MR. PASCHAL:
9      Q.  And what was that?  What evidence?  What
10  documents?
11     A.  I thought it was possible that they retain --
12  being that they were partners with Dave they may have
13  shared equipment, they may have had access to Dave's
14  property.
15     Q.  So Ira, just -- your testimony today is that
16  you made that allegation because they were partners with
17  Dave and they had access to Dave's information?
18         MR. FREEDMAN:  Objection.  There's no question
19  pending.
20         MR. PASCHAL:  There is a question.
21         MR. FREEDMAN:  What's the question?  Do you
22  want to read it back?
23         MR. PASCHAL:  Read the question back.
24         (Thereupon, a portion of the record
25         was read back by the reporter.)

Page 104

1          MR. FREEDMAN:  It's not a question.
2  BY MR. PASCHAL:
3      Q.  Add a question mark.  That's a question.  Is
4  that your testimony today?
5      A.  We're talking about Computer Forensics?
6      Q.  Computer Forensics, this allegation.
7      A.  Yes, because I believe that they had access to
8  Dave's --
9      Q.  Sorry, go ahead.
10     A.  To Dave's -- well, property that they shared
11  with Dave.
12     Q.  That was enough for you to file a complaint
13  against Computer Forensics?
14         MR. FREEDMAN:  Objection.
15         THE WITNESS:  That's not what solely the
16  complaint was about.
17  BY MR. PASCHAL:
18     Q.  I'm talking about this very sentence, these
19  two sentences I mentioned.
20         MR. FREEDMAN:  Objection.
21         THE WITNESS:  I suppose so.
22  BY MR. PASCHAL:
23     Q.  Getting back to this though are there any
24  communication aside from with your lawyers or any
25  documents showing why you decided to leave out this

Page 105

1  injunction or mention of the injunction in your
2  interrogatories?
3          MR. FREEDMAN:  Objection.
4          THE WITNESS:  I don't know.
5  BY MR. PASCHAL:
6      Q.  We talked about three or four hard drives
7  earlier that you gave to Dr. Wright after Dave died.
8  Let me repeat the question.  That there were three to
9  four hard drives you gave to Patrick one month after
10  Dave died?
11     A.  (Indicating).
12     Q.  Could Bitcoin address, Bitcoin wallets have
13  been on those hard drives?
14         MR. FREEDMAN:  Objection.
15         THE WITNESS:  I was told that they were just
16  work related drives.
17  BY MR. PASCHAL:
18     Q.  And who told you that?
19     A.  Patrick.
20     Q.  The person you're suing?
21     A.  Yes.
22     Q.  And that lawsuit is still active today?
23     A.  Yes.
24     Q.  Ira, did you ever notify this court in this
25  action that you have a separate action where you're

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Pages 106..109

Page 106

1  seeking the same stuff against three other people?
2        MR. FREEDMAN: Hold on. Where are you in your
3  topics?
4        MR. PASCHAL: I'm just asking him.
5        MR. FREEDMAN: Don't answer the question.
6  BY MR. PASCHAL:
7     Q. Ira, let's talk about as a personal
8  representative when you came in possession of Dave's
9  stuff. When did you learn that Dave passed away?
10    A. Around April -- I think it was 27, 28 of 2013.
11    Q. So if Dave passed on the 26th you learned the
12  day after, two days after?
13    A. I think so.
14    Q. Where were you?
15    A. I don't exactly recall. Probably home.
16    Q. Do you remember what you were doing when you
17  found out that Dave died?
18    A. No.
19    Q. Do you remember what time of the day it was?
20    A. No.
21    Q. Do you remember who told you?
22    A. Yes, my dad.
23    Q. Did you go to his house right away?
24    A. Go to whose house?
25    Q. Your brother, Dave.

Page 107

1     A. No.
2     Q. When did you go to Dave's house after you
3  learned that he died?
4     A. Probably maybe two or three weeks afterwards.
5     Q. Did you go to your dad's house right after you
6  learned that Dave died?
7     A. I don't remember.
8     Q. Do you remember what you did after you learned
9  that Dave died?
10       MR. FREEDMAN: Objection.
11       THE WITNESS: I just remember talking to my
12    dad about it.
13  BY MR. PASCHAL:
14    Q. But you don't remember anything else?
15    A. No.
16    Q. Ira, would it be fair to say that you weren't
17  really close with Dave?
18       MR. FREEDMAN: Objection, stop. What does
19    this go to?
20  BY MR. PASCHAL:
21    Q. Let me rephrase. You don't have personal
22  knowledge relating to Dave's business activities, do
23  you?
24    A. No.
25    Q. I'm showing you an e-mail exchange you had

Page 108

1  with Angie Ojea, is that how you say her last name?
2     A. Angie Ojea.
3        (Defendant's Exhibit No. 14 was
4        marked for identification.)
5  BY MR. PASCHAL:
6     Q. Can you turn to -- do you remember this
7  e-mail? Take a look at it.
8     A. The one at the very top?
9     Q. Do you remember this e-mail in general? Do
10  you remember having this e-mail conversation with
11  Angela?
12    A. I remember having a few e-mail exchanges.
13    Q. If you go to page six.
14    A. Okay.
15       MR. FREEDMAN: These aren't Bates stamped.
16       MR. PASCHAL: No, these are the ones you
17    produced to us. I guess when I printed them out
18    they didn't have the Bates stamp.
19  BY MR. PASCHAL:
20    Q. Not important. Somewhere in this e-mail you
21  mentioned you hired a cleaning crew?
22    A. Yes.
23    Q. The cleaning crew found bullet casing?
24    A. Yes.
25    Q. Did you take out Dave's work papers and

Page 109

1  electronic devices before the cleaning crew cleaned the
2  house?
3     A. No. I definitely did not.
4     Q. Can you tell me the name of the cleaning crew?
5     A. I don't have it off --
6     Q. Do you have any documents showing who the
7  cleaning crew is?
8     A. I think I can get the name.
9        MR. PASCHAL: Can you give us that?
10       MR. FREEDMAN: (Indicating).
11  BY MR. PASCHAL:
12    Q. Did the cleaning crew find anything else other
13  than the bullet casing that they mentioned you?
14    A. That was the only thing they mentioned.
15    Q. So how -- when did the cleaning crew clean
16  Dave's house?
17    A. Maybe -- I don't remember exactly. I'm
18  thinking maybe one or two weeks after.
19    Q. Do you know when Dave's house was foreclosed?
20    A. No.
21    Q. Did you go by his house and check on his
22  things or did you already remove everything from the
23  house?
24       MR. FREEDMAN: Objection.
25       THE WITNESS: What time are you talking about?

Page 110

1  BY MR. PASCHAL:
2      Q.  After he died -- before the house was
3  foreclosed on did you already remove Dave's belongings
4  from the house?
5      A.  I don't know exactly.  Are you talking like
6  after the cleaning crew?
7      Q.  No.  So before Wells Fargo finished the
8  foreclosure sale --
9      A.  I don't know when that was.
10     Q.  I know but let's say it's this date.  Any time
11 before that date did you remove Dave's electronic
12 devices, his papers, his possessions?
13         MR. FREEDMAN:  Objection.
14 BY MR. PASCHAL:
15     Q.  Or were they foreclosed with his stuff still
16 in the house?
17         MR. FREEDMAN:  Objection.
18         THE WITNESS:  I don't know when they
19     foreclosed.
20 BY MR. PASCHAL:
21     Q.  Did you ever take all of Dave's stuff out of
22 the house?
23     A.  I don't think I took everything.
24     Q.  Stuff was left in the house though?
25     A.  Yes.

Page 111

1      Q.  Who else had access to Dave's house?
2      A.  I think his girlfriend at the time, Lyneda.
3      Q.  What about after his death who had access to
4  the house?
5      A.  I'm not sure if -- I'm not sure if anyone
6  else -- I had his key.
7      Q.  Did you change his locks?
8      A.  No.
9      Q.  Did you have a security system on the house?
10     A.  I think he did.
11     Q.  Was it active after he died?
12     A.  I don't remember using a security system to
13 get in.  I just used the key.
14     Q.  Were you paying the electrical bill for the
15 house?
16     A.  I didn't.  I don't believe.
17     Q.  Was anybody paying the electric bill for the
18 house?
19     A.  Not that I'm aware of.
20     Q.  So there was no electricity in the house as
21 far as you're aware after he died?
22     A.  I'm trying to -- I don't remember.
23     Q.  So if there was no electricity in the house
24 the house was going into foreclosure -- strike that.
25 Can you definitively say whether or not there was any

Page 112

1  other electronic devices in the house you may have not
2  known about?
3          MR. FREEDMAN:  Objection.
4          THE WITNESS:  I believe I collected all of the
5      equipment that I visibly saw.
6  BY MR. PASCHAL:
7      Q.  But there was still stuff in the house; right?
8      A.  Like furniture.
9      Q.  Did you check all the furniture to see what
10 was in them?
11     A.  I don't remember.
12     Q.  So if something was important in some of his
13 furniture you wouldn't be able to tell us that; right?
14         MR. FREEDMAN:  Objection.
15         THE WITNESS:  I don't remember searching
16     through his furniture.
17 BY MR. PASCHAL:
18     Q.  Sorry, what did you say?
19     A.  I don't remember searching through his
20 furniture.
21     Q.  When you saw -- so Dave had two Alienware
22 computers and a laptop?
23     A.  Yes.
24     Q.  Was the Alienware -- was it -- was the
25 Alienware computer was it the color black?

Page 113

1      A.  Yes.
2      Q.  One of them was, right?
3      A.  I believe both.
4      Q.  Were the hard drives in the computer or were
5  they out of them when you got the Alienware computer?
6      A.  They were out of them.
7      Q.  Was there any evidence in the house showing
8  why the hard drives were removed from the computers?
9          MR. FREEDMAN:  Objection.
10         THE WITNESS:  No.  I don't think so.
11 BY MR. PASCHAL:
12     Q.  Did Dave typically keep his hard drives out of
13 his computer?
14     A.  I don't know what he did.
15     Q.  On the ESI disclosure you listed one phone but
16 you said that Patrick had destroyed Dave's phone so what
17 phone -- did Dave have two phones?
18     A.  Yes.
19     Q.  What phone -- do you remember the make and
20 model of the phone you gave to Patrick Paige?
21     A.  I believe it was a Samsung Galaxy.  I don't
22 remember the model.  It's probably listed in --
23     Q.  It's in the disclosures.  No, it's not
24 actually.  It's a Samsung Galaxy?
25     A.  That's all it says?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                  Pages 114..117

Page 114

1     Q.  I'm asking you.
2     A.  Yes, it was a Samsung Galaxy.
3     Q.  Did you see any devices used for Bitcoin
4  mining, Bitcoin servers, anything?
5     A.  Not that I'm aware of.  I wouldn't know what a
6  Bitcoin mining server would look like.
7     Q.  Would you have known what a Bitcoin wallet
8  looks like?
9     A.  No.
10    Q.  So if you saw one you wouldn't have thought it
11  was important, would you?
12       MR. FREEDMAN:  Objection.
13       THE WITNESS:  If I saw one?  I suppose not.  I
14    wouldn't know how to detect what a Bitcoin wallet
15    was.
16  BY MR. PASCHAL:
17    Q.  If he had a wallet for example on paper and it
18  just had random letters and numbers on it you wouldn't
19  have known that was a Bitcoin wallet; right?
20       MR. FREEDMAN:  Objection.
21       THE WITNESS:  I suppose not.
22  BY MR. PASCHAL:
23    Q.  So when you threw papers away that you thought
24  weren't important you could have thrown away one of
25  those papers that had a Bitcoin wallet on it; right?

Page 115

1        MR. FREEDMAN:  Objection.
2        THE WITNESS:  It's possible, yes.
3        MR. PASCHAL:  Let's go to the ESI disclosure.
4     I haven't given that to you, I'm sorry.
5        (Defendant's Exhibit No. 15 was
6        marked for identification.)
7  BY MR. PASCHAL:
8     Q.  On this ESI disclosure under number one you
9  list David Kleiman's e-mail accounts.  You list five.
10  You see that?
11    A.  Yes.
12    Q.  Do you have access to all five e-mail
13  accounts?
14    A.  I don't believe so.
15    Q.  Which ones do you not have access to?
16    A.  I would have to check.  I don't remember
17  offhand.
18    Q.  Do you know which e-mail account you do have
19  access to?
20    A.  I have access to Dave@DaveKleiman.com.
21    Q.  But you're not sure about the rest?
22    A.  I don't believe I have access to the two on
23  the bottom.  The two at the top I'm not sure about.
24    Q.  Have you tried to log into those?
25    A.  I may have.

Page 116

1     Q.  When did --
2     A.  I just don't remember at the present time.
3     Q.  So you don't remember any efforts you took to
4  access those e-mail accounts, do you?
5        MR. FREEDMAN:  Objection.
6        THE WITNESS:  Like I said I do recall
7     accessing Dave@DaveKleiman.com.
8  BY MR. PASCHAL:
9     Q.  The first two and last two?
10    A.  The first two I don't remember.
11    Q.  The last two what did you do to access those
12  accounts?
13    A.  I think I recovered the domain names to those
14  but I don't think I ever like set up an active account
15  for them.  So I don't think those e-mail addresses work.
16    Q.  So when you say you have the domain name you
17  should be able to get access then to the e-mail address,
18  right?
19    A.  No, not unless you set up an account for it.
20    Q.  You haven't set up an account for these?
21    A.  I don't believe so.
22    Q.  Could you set up an account?
23    A.  Yes.
24    Q.  Why haven't you?
25    A.  Just there's no purpose.  If I set up an

Page 117

1  account it's not going to suddenly give me access to
2  e-mails that were sent to those addresses a long time
3  ago.
4     Q.  Why not?
5     A.  It's just because his e-mails were hosted
6  elsewhere.
7     Q.  Where were they hosted?
8     A.  I think they were hosted with Patrick's
9  company, Computer Forensics LLC.
10    Q.  All five of his e-mail addresses were hosted
11  by Patrick?
12    A.  I believe so.
13    Q.  Did Patrick give you access to these e-mail
14  accounts?
15    A.  It's possible after the litigation with
16  Patrick that he gave me those.  I would to check the
17  records.
18    Q.  You said through the litigation, through the
19  lawsuit?
20    A.  Yes.
21    Q.  When do you think you got access -- when do
22  you think that Patrick may have given you access to
23  those e-mail accounts?
24    A.  I would have to go back and look at the
25  records.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                          Pages 118..121

Page 118

1    Q.  I just want to know the process.  For
2  Patrick -- it would just be Patrick he can access the
3  e-mail accounts and give you the documents in them?
4    A.  I'm not exactly sure what access he had to
5  those accounts after Dave passed.
6    Q.  Did you request from Patrick access to those
7  e-mails before you filed this lawsuit?
8    A.  Before this lawsuit?
9    Q.  Before this lawsuit.
10   A.  I believe so.
11   Q.  And he never gave them to you?
12   A.  I think eventually yes, he did.
13   Q.  So we haven't received any production from
14  these e-mail addresses.  Why haven't we?
15       MR. FREEDMAN:  Objection.
16       THE WITNESS:  I don't know if we've -- if
17    they're currently active.  Like I said the only one
18    that I know for certain is Dave@DaveKleiman.com.
19    The others I have to check.
20  BY MR. PASCHAL:
21   Q.  So Patrick obviously can help get access to
22  these two e-mail address; right?
23       MR. FREEDMAN:  Objection.
24       THE WITNESS:  I don't know.  I don't know what
25    access he had to them.  For Dave@DaveKleiman, yes.

Page 119

1  BY MR. PASCHAL:
2    Q.  Did you access Dave Kleiman -- the one you can
3  access before you filed this lawsuit?
4    A.  Well, it only allowed me to set up a new
5  account.  Like once I received the domain name from that
6  point forward I start getting new e-mail to it.
7  BY MR. PASCHAL:
8    Q.  Not old e-mails?
9    A.  Not old e-mail.
10   Q.  What about the Dave@DaveKleiman.com?
11   A.  That's what I'm talking about.  Once I
12  received the domain at that point --
13   Q.  Do you have any old e-mails?  I'm sorry.  Do
14  you want me to repeat the question because I wasn't
15  finished?
16   A.  I may have some old that Patrick produced.  I
17  have to check.
18   Q.  So the only -- I want to break this down.  So
19  the only e-mails that you have from Dave are coming from
20  Patrick; right?
21       MR. FREEDMAN:  Objection.
22       THE WITNESS:  Yes.
23  BY MR. PASCHAL:
24   Q.  So none of them are coming from these five
25  e-mail addresses directly?

Page 120

1       MR. FREEDMAN:  Objection.
2       THE WITNESS:  Like I said I would have to go
3    back and look at those accounts to see if I have
4    access to them.  Like I said the two at the bottom
5    I'm certain I never accessed.  The two at the top I
6    have to check.
7  BY MR. PASCHAL:
8    Q.  Just back on my question.  Did you review any
9  documents from these e-mail accounts before you filed
10  this lawsuit?
11       MR. FREEDMAN:  Obviously don't answer anything
12    to the extent it involves conversations with your
13    attorneys.
14       THE WITNESS:  I have to go back and look at
15    what records were produced.
16  BY MR. PASCHAL:
17   Q.  What e-mail account is verifymail@G-mail.com?
18   A.  Which one?
19   Q.  Verifymail@G-mail.com.
20   A.  I think it was just like a temporary account
21  that I set up for my attorneys.
22   Q.  Them being them?
23   A.  Yes.
24   Q.  Do you have separate attorneys in the Computer
25  Forensics lawsuit?

Page 121

1    A.  I had separate, yes.
2    Q.  Do you have attorneys in the lawsuit now?
3    A.  Currently, no.
4    Q.  So I think you have about 35 e-mail addresses
5  give or take, I don't know.  Why so many?
6    A.  I don't know.
7    Q.  I want to ask you about one e-mail address in
8  particular.  It's on the second page and I don't know
9  what number it is but it's WrightKleiman@G-mail.com.
10  What's the purpose of that e-mail account?
11   A.  It probably had something to do with the
12  litigation but I would have to look at it to see.  I
13  don't remember offhand.
14   Q.  Have you produced documents from that e-mail
15  account?
16   A.  I don't know.
17   Q.  I think we have one document which you
18  produced to us where you communicated with the ATO which
19  is this e-mail address?
20   A.  Maybe that's what it was.
21   Q.  Do you recall in this e-mail asking ATO if
22  they're continuing to investigate your brother and
23  Craig?
24   A.  Can you repeat that?
25   Q.  Do you remember if in that e-mail if you asked

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                Pages 122..125

Page 122

1  the ATO whether they're investigating your brother as in
2  Dave Kleiman and Craig Wright?
3      A.  I don't specifically remember what I discussed
4  with them.
5      Q.  Did the ATO ever tell you we're not
6  investigating David Kleiman?
7      A.  They never mentioned that to me.
8          MR. PASCHAL:  I'm showing you your e-mail to
9  Michael Hardy on June 30th 2015.
10         (Defendant's Exhibit No. 16 was
11         marked for identification.)
12  BY MR. PASCHAL:
13     Q.  At the bottom you say "dear Mr. Hardy, I
14  understand that you are investigating a case involving
15  my brother David Kleiman and his partner Craig Wright.
16  Could you tell me if you are still seeking new
17  information regarding this case or if it was closed can
18  you tell me when.  Thank you, Ira Kleiman."  Do you
19  remember that?
20     A.  Yes.
21     Q.  And at the top -- I guess he doesn't give you
22  an answer but at the top you say "what you can confirm
23  there is presently no investigation of Dr. Craig Wright
24  and my brother."  You see that?
25     A.  Yes.

Page 123

1      Q.  Did Mr. Hardy ever tell you one way or the
2  other or give you an answer to that question one way or
3  another?
4      A.  I guess if there's no e-mail to it probably
5  not.
6      Q.  So was WrightKleiman@G-mail.com was it used
7  for any other reason?
8      A.  Not that I remember.
9      Q.  Let's talk about Coin Exchange briefly.  You
10  had 10.5 million shares in Coin Exchange; right?
11     A.  Yes.
12     Q.  Now, you understand that Coin Exchange is
13  under the control of an Australian liquidator; right?
14     A.  I didn't know who took control of it.
15     Q.  Is it your testimony today that you don't know
16  who took control of it?
17     A.  Yes, I wasn't sure what happened with Coin
18  Exchange.  I knew a liquidator was trying to find out
19  information about Coin Exchange but I'm not exactly sure
20  what activity they did.
21         MR. PASCHAL:  I'm showing you an e-mail with
22  Mr. Jeremy Mudford.  And these are August 31st
23  2017.
24         (Defendant's Exhibit No. 17 was
25         marked for identification.)

Page 124

1  BY MR. PASCHAL:
2      Q.  Is Jeremy Mudford, is he the liquidator for
3  Coin Exchange?
4      A.  That's what he told me, yes.
5      Q.  I want you to look at his e-mail to you
6  August 29, 2017.  Do you recall discussing W&K that you
7  believe that Dr. Wright transferred assets from W&K to
8  Coin Exchange and then to other various entities?
9      A.  Are you referring to an e-mail?
10     Q.  I'm just asking.  Do you remember telling
11  Jeremy Mudford that, yes or no?
12     A.  Can you repeat that?
13     Q.  Do you remember telling Jeremy Mudford that
14  Dr. Wright transferred from W&K assets to Coin Exchange
15  and then to other entities that he was involved in?
16     A.  I don't remember specifically saying that but
17  if you show me the e-mail --
18     Q.  I'll show it to you in a second.  Let's go to
19  the bottom here.  On Jeremy Mudford's e-mail to you
20  August 29, 2017?
21     A.  First page?
22     Q.  Yes.
23     A.  Of course.
24     Q.  It says "dear Ira, I referred to your e-mail
25  below in your prior e-mail correspondence regarding the

Page 125

1  company.  Besides the information provided which
2  predominately has consisted of various blog site
3  articles it would be appreciated if you could provide
4  any tangible evidence that the company, being Coin
5  Exchange, and/or its related entities" and you were
6  talking about W&K "that we have been appointed over any
7  IP which may include related to Bitcoin.  In the interim
8  our preliminary investigations do not reveal any
9  trademark registration to the company name" and then he
10  refers you to two links supporting his conclusion.  Do
11  you recall that e-mail?
12     A.  Yes.
13     Q.  This is in 2017.  In 2018 do you have any
14  communications with Jeremy Mudford?
15     A.  Do you have any e-mails that --
16     Q.  I don't.  That's why I'm asking.
17     A.  I don't know.
18     Q.  Do you have any e-mails for 2019?
19     A.  Pretty sure, no.
20     Q.  Let's talk about W&K.  You said you first
21  learned of W&K through Dr. Wright; is that correct?
22     A.  Yes.
23     Q.  At the time -- well, you reinstated W&K as a
24  company in I think it was March of 2018; correct?
25     A.  I don't remember the date.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Pages 126..129

Page 126

1    Q.  But you reinstated it; correct?
2    A.  Yes.
3    Q.  When you reinstated W&K what was its business
4  purpose?
5         MR. FREEDMAN:  Hold on.  Where are you in your
6  topics?
7         MR. PASCHAL:  W&K, information regarding W&K.
8         MR. FREEDMAN:  I don't see a general
9  information regarding W&K.  Maybe I'm missing it.
10        MR. PASCHAL:  I guess this is going to go to
11  the location of W&K's proprietary documents and
12  information slips identified W&K purchases, bit
13  message account, Panama and also W&K's membership.
14        MR. FREEDMAN:  What was the question?  Can you
15  read it back?
16        (Thereupon, a portion of the record
17        was read back by the reporter.)
18        MR. FREEDMAN:  Don't answer the question.
19  BY MR. PASCHAL:
20    Q.  Can you tell me what W&K's business purpose
21  ever was?
22        THE WITNESS:  According to Craig it was for
23  research purposes and mining of Bitcoin.
24  BY MR. PASCHAL:
25    Q.  Based on your personal knowledge what was the

Page 127

1  business purpose of W&K?
2    A.  Like I said according to Craig --
3    Q.  Not according to Craig.  Based on your own
4  personal knowledge?
5    A.  My own personal knowledge about W&K came from
6  Craig Wright.
7    Q.  So you have no testimony, documents or
8  evidence other than Craig Wright?
9    A.  Correct.
10    Q.  About W&K?
11    A.  What's that?
12    Q.  About W&K?
13    A.  Yes.
14    Q.  When you reinstated W&K you removed Coin
15  Exchange and Ms. Uyen as its publicly identified
16  members, do you recall that?
17        MR. FREEDMAN:  Can you repeat the question?
18  Sorry, I didn't hear.
19        (Thereupon, a portion of the record
20        was read back by the reporter.)
21        MR. FREEDMAN:  Don't answer the question.  I
22  don't see where it connects to your topics about
23  W&K's e-mail addresses, bit message accounts or W&K
24  Panama.
25        MR. PASCHAL:  I'm asking about proprietary

Page 128

1  documents about W&K.  That includes W&K's
2  membership and its filings with Sunbiz.org.  That
3  is the definition of proprietary documents.
4         MR. FREEDMAN:  And the location.
5         MR. PASCHAL:  Also very basic allegation in
6  the second amended complaint.
7         MR. FREEDMAN:  You'll have another chance to
8  depose Ira when you can go to the merits.  Right
9  now you're supposed to be asking location
10  proprietary documents.
11  BY MR. PASCHAL:
12    Q.  Do you have documents establishing W&K's
13  membership?
14    A.  From like SunBiz.
15    Q.  Do you have any documents establishing W&K's
16  membership?
17    A.  The only documents would be whatever I found
18  on the SunBiz web site.
19    Q.  Does SunBiz.org list every member of a
20  company?
21    A.  I don't know.
22        (Thereupon, a portion of the record
23        was read back by the reporter.)
24        THE WITNESS:  No, I don't know.
25

Page 129

1  BY MR. PASCHAL:
2    Q.  Do you have any documents from the Department
3  of Finance telling you that SunBiz.org you cannot rely
4  on it to determine the membership of a company?
5         MR. FREEDMAN:  Objection.
6         THE WITNESS:  No.
7  BY MR. PASCHAL:
8    Q.  You do not -- is it your testimony you do not
9  have a document stating that?
10    A.  The Department of Finance -- say that again?
11    Q.  From the Department of Finance stating that
12  you cannot rely on SunBiz.org to determine membership of
13  the company?
14    A.  I'm not aware of it.
15    Q.  Before you filed this lawsuit or before you
16  filed your amended complaint in this lawsuit are there
17  any documents with Jeremy Mudford where you discussed
18  removing Coin Exchange as a member of W&K?
19    A.  Discussing with Jeremy Mudford?
20    Q.  The liquidator for Coin Exchange.
21    A.  I don't believe so.
22    Q.  Do you have any documents that are resignation
23  letters from any members of W&K before you reinstated
24  and listed yourself as the member of W&K?
25    A.  No.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                     Pages 130..133

Page 130

1    Q.  Did you take out any loans on W&K's behalf?
2    A.  Not that I'm aware of.
3    Q.  Are you paying -- are there any tax returns
4  right now for W&K or any tax information for W&K?
5    A.  No.
6    Q.  Are you paying W&K's taxes?
7    A.  No.
8    Q.  Do you know who last paid W&K's taxes?
9    A.  No.
10    Q.  Does W&K have any revenue for this year?
11    A.  Not that I'm aware of.
12    Q.  Does W&K have any revenue from last year?
13    A.  Not that I'm aware of.
14    Q.  Are you conducting any business on behalf of
15  W&K?
16    A.  Me personally?
17    Q.  Yes.
18    A.  No.
19    Q.  Is anyone conducting business on behalf of
20  W&K?
21    A.  No.
22    Q.  Has W&K assigned any of its rights in this
23  lawsuit to anyone else?
24    MR. FREEDMAN:  Hold on.  What topic are you
25  on?

Page 131

1  BY MR. PASCHAL:
2    Q.  Are there any documents showing whether or not
3  W&K assigned any of its interest in its lawsuit to
4  anyone else?
5    MR. FREEDMAN:  Don't answer the question.
6    MR. FREEDMAN:  Under what basis?
7    MR. FREEDMAN:  If such documents exist they
8  would be work product.
9    MR. PASCHAL:  An assignment of a claim?  That
10  would be work product?
11    MR. FREEDMAN:  You don't like the instruction
12  bring it to the judge.
13    MR. PASCHAL:  I'm just trying to get it.  I
14  just want the record to be complete on the
15  objection.  So you're saying that an assignment of
16  claim is going to be protected by work product?
17    MR. FREEDMAN:  Either work product or
18  attorney-client privilege or the common interest
19  privilege, yes.
20  BY MR. PASCHAL:
21    Q.  We'll skip this.  Have the allegations that
22  you made in this lawsuit or this second amended
23  complaint or the amended complaint or its original
24  complaint been given to any third party other than your
25  attorneys?

Page 132

1    MR. FREEDMAN:  Objection.
2    THE WITNESS:  I believe so.
3  BY MR. PASCHAL:
4    Q.  Who are those third parties?
5    A.  A company that assists in funding litigation
6  cases.
7    Q.  What's the name of that company?
8    A.  Parabelum.
9    Q.  Can you say that again?
10    A.  Parabelum.
11    Q.  When did you give that complaint to Parabelum?
12    A.  I don't remember the date.
13    Q.  When did you first meet Parabelum?
14    A.  I don't remember the date.
15    Q.  Was it 2016?
16    A.  I would have to go look at the records.
17    Q.  Did Parabelum give you any money?
18    MR. FREEDMAN:  Hold on.  What topic are you
19  on?
20    MR. PASCHAL:  This goes to -- this really goes
21  to 31 but he just answered something different so
22  I'm --
23    MR. FREEDMAN:  How does it go into 31?  I
24  don't see how it ties into 31.  If you want to ask
25  it with a tie in to 31 I'm happy to listen to it,

Page 133

1  otherwise don't answer the question.
2    MR. PASCHAL:  Let me break that down in two
3  things.  One, we asked questions about this
4  regarding interrogatories, you objected.  We spoke
5  on the phone yesterday we told you we would lay the
6  record here so the judge could make a ruling based
7  on the record and we wrote these topics what we
8  knew.  I can't give exact topics on events because
9  I just didn't know your witness would say that.  I
10  can't -- I mean --
11    MR. FREEDMAN:  I had the same problem deposing
12  Dr. Wright.
13    MR. PASCHAL:  That's the problem.  That's not
14  here right now.  I wasn't there.
15    MR. FREEDMAN:  Just saying the parties kept
16  each other to their topics.  Your team members kept
17  me to my topics so keeping you to your topics.
18  Goose gander provision.
19    MR. PASCHAL:  Did Parabelum give you any
20  money?
21    MR. FREEDMAN:  Don't answer the question.
22    MR. PASCHAL:  What's the basis?
23    MR. FREEDMAN:  First of all, I think you're
24  outside the topic.  Second of all -- I think you're
25  outside the topic.  I'm just going to rely on you

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Pages 134..137

Page 134

1    being outside the topic.
2    BY MR. PASCHAL:
3        Q.  Who is BTCN1610491, LLC?
4        A.  I think that's a company related to the entity
5    that assists in litigation funding.
6        Q.  Is that Parabelum?
7        A.  Yes.
8        Q.  So when did you first speak with Parabelum?
9        A.  Like I said I would have to check the records.
10       Q.  Did BTCN or Parabelum give you any money?
11           MR. FREEDMAN:  Hold on.  We're going to
12       instruct Ira not to answer the question.
13           MR. PASCHAL:  On what basis?
14           MR. FREEDMAN:  A, on relevance and -- stay
15       with relevance for now.
16   BY MR. PASCHAL:
17       Q.  Under what circumstances did BTCN give you
18   money?
19           MR. FREEDMAN:  Stop.  Hold on a second.
20       Trying to figure out the position to take on your
21       question.  If you want to just stop or you want
22       take a break?
23           MS. MCGOVERN:  Let's take five minutes.
24           THE VIDEOGRAPHER:  The time is 2:08 p.m. and
25       we're off the record.

Page 135

1        (Thereupon, a brief recess was taken.)
2            THE VIDEOGRAPHER:  The time is now 2:23 p.m.
3        and we are now back on the record.
4            MR. FREEDMAN:  So we just spoke with our
5        client.  I'm going to state for the record that
6        BTCN is owned by Parabelum Capital which is an
7        entity that provides litigation financing
8        assistance.  Parabelum has provided litigation
9        financing assistance in this case.
10           I am not going to allow Ira to answer any
11       other questions about that topic because I believe
12       it will invade either work product privilege,
13       attorney-client privilege or common interest
14       privilege.  If you want more you have to go to the
15       court but I think your record is clear now what's
16       going on and what more you would want.
17           MR. PASCHAL:  There are a few things I want.
18           MR. FREEDMAN:  You can ask but I most likely
19       will instruct him not to answer.
20   BY MR. PASCHAL:
21       Q.  When did you first speak to Parabelum?
22           MR. FREEDMAN:  That you can answer.
23           THE WITNESS:  I would have to go back and
24       check the records.
25

Page 136

1    BY MS. MCGOVERN:
2        Q.  What records would you have to check?
3        A.  I guess e-mail exchanges with them.
4        Q.  Did you give Parabelum documents relating to
5    this case?  You don't have to say what documents?
6            MR. FREEDMAN:  Go ahead.
7            THE WITNESS:  I would have to check my
8        records.
9    BY MR. PASCHAL:
10       Q.  What records would you have to check?
11       A.  E-mail.
12       Q.  E-mail?  Did you sign any documents with
13   Parabelum?
14           MR. FREEDMAN:  That's fine.  Go ahead and
15       answer that question.
16           THE WITNESS:  I don't remember.  I have to
17       check that too.
18   BY MR. PASCHAL:
19       Q.  Did W&K or the estate of Dave Kleiman --
20   strike that.  Are there any documents showing that Dave
21   Kleiman or the estate of Dave Kleiman or W&K assigned
22   any portion or any right in this lawsuit to Parabelum or
23   any third party?
24           MR. FREEDMAN:  Don't answer the question.
25           MR. PASCHAL:  What's the basis?

Page 137

1            MR. FREEDMAN:  I told you the basis.
2    BY MR. PASCHAL:
3        Q.  Are there any documents that give your right
4    to recovery of any money to Parabelum or BTCN?
5            MR. FREEDMAN:  Don't answer the question.
6    BY MR. PASCHAL:
7        Q.  In connection with getting funding from
8    Parabelum did you provide any documents to support any
9    of the allegations of the complaint?
10           MR. FREEDMAN:  Don't answer that.  Well, the
11       answer yes or no you can answer.  Just don't
12       identify what, if any, documents you provided.
13           THE WITNESS:  Yes.
14   BY MR. PASCHAL:
15       Q.  What documents did you provide?
16           MR. FREEDMAN:  Don't answer that.
17   BY MR. PASCHAL:
18       Q.  Are there any documents that you provided to
19   them that you haven't produced in this case?
20           MR. FREEDMAN:  Don't answer that.
21           MR. PASCHAL:  I'm showing you an e-mail you
22       had with Patrick Paige on March 24th 2016.
23           (Defendant's Exhibit No. 18 was
24           marked for identification.)
25

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Pages 138..141

Page 138

1  BY MR. PASCHAL:
2      Q.  In the e-mail you say "hey Patrick, I haven't
3  heard back from you about the hosting file stuff.
4  Anyway, there is another issue I was wondering if you
5  can help me with. I'm trying to locate any documents
6  related to the W&K business Dave operated. I remember
7  we had a conversation at Dave's house shortly after he
8  passed away. You were mentioning to me how my dad was
9  asking for the return of a file cabinet he bought for
10  Dave and you said something like what does your dad need
11  another file cabinet. I was like I don't know I guess
12  he just wants it because he bought it. Of course I
13  didn't think anything of it at the time but it just
14  donned on me maybe inside that cabinet is where Dave
15  stored his W&K related stuff. You didn't possibly come
16  across any papers mentioning W&K." Do you remember this
17  e-mail?
18      A.  Yes.
19      Q.  Did you ever recover that file cabinet?
20      A.  No.
21      Q.  Did you ever see what was in that file
22  cabinet?
23      A.  No.
24      Q.  Why did you believe that Dave may have kept
25  his W&K stuff in that file cabinet?

Page 139

1      MR. FREEDMAN: Objection.
2      THE WITNESS: I didn't know what was kept in
3  the file cabinet.
4  BY MR. PASCHAL:
5      Q.  Well, I'm asking -- so --
6      A.  I wanted to determine what was --
7      MR. FREEDMAN: There's no question pending,
8  Ira.
9  BY MR. PASCHAL:
10      Q.  Are there any documents showing or any
11  documents evidencing or supporting your belief that W&K
12  documents may have been inside that cabinet?
13      A.  No.
14      MR. PASCHAL: I'm showing you an e-mail with
15  Patrick Paige on March 17, 2017.
16      (Defendant's Exhibit No. 19 was
17      marked for identification.)
18  BY MR. PASCHAL:
19      Q.  If you go on the second page on March 28th
20  2016 Patrick Paige says "what would Appriver support do
21  for us," question mark. "Also I found the original
22  court mailing about W&K. Has a case number, see
23  attached."
24      You respond -- you respond by saying I don't
25  know -- only relevant part is when did you find that W&K

Page 140

1  filing question mark. Were you ever contacted by the
2  girl Uyen that took over David's position as director
3  for W&K? Patrick responds "I just found the filing
4  today and I was looking for something else. I was never
5  contacted by anyone about W&K and never heard the girl."
6      Then you respond on the first sentence in the
7  next e-mail responding to Patrick "can you keep the
8  letter and envelope in a safe place for me? I would
9  like to check it out some time."
10      Then Patrick responds "yes, I will keep it.
11  It seems weird that the address of the envelope is
12  handwritten considering it came from the Supreme Court."
13  How did Patrick get the original envelope from the
14  Australian case?
15      MR. FREEDMAN: Objection.
16  BY MR. PASCHAL:
17      Q.  Strike that. Do you know where Patrick found
18  the original court mailing about W&K?
19      A.  I assume it would be to the mailing address --
20  the Computer Forensics mailing address that they shared.
21      Q.  Was that the address that was listed for W&K
22  on SunBiz.org as the registered agent?
23      A.  I would have to check. I don't remember what
24  that address is.
25      Q.  Could this envelope had been -- you sent this

Page 141

1  e-mail four days after you asked about the file cabinet.
2  Could this envelope have been in the file cabinet?
3      A.  I never asked Patrick where he found it.
4      Q.  Did you ever recover the envelope from
5  Patrick?
6      A.  No, I think he just e-mailed me like a scan of
7  it.
8      Q.  What was the document? What was the contents
9  of the document?
10      A.  I would have to look at it. I don't remember.
11      Q.  Was it the statement of claim in Australia?
12      A.  I would have to look at it. I remember seeing
13  like an envelope but I don't remember what the contents
14  inside of it was.
15      Q.  So is it fair to say that something was mailed
16  from Australia with the W&K court case to a mailing
17  address in Palm Beach from either Computer Forensics or
18  Dave's house?
19      MR. FREEDMAN: Objection.
20      THE WITNESS: Again I would have to go look at
21  it to make sure what it was.
22  BY MR. PASCHAL:
23      Q.  Well, in your Second Amended Complaint you
24  allege that W&K was never served with the filings in the
25  Australian court. Do you recall that?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Pages 142..145

Page 142

1     A.  I believe --
2         MR. FREEDMAN:  Objection.
3         THE WITNESS:  I believe so.
4  BY MR. PASCHAL:
5     Q.  Did you make the allegation -- well,
6  obviously -- you sent this e-mail before you made that
7  allegation; correct?
8     A.  I think so.
9     Q.  And you never bothered -- sorry, you never
10  read that document before you filed the complaint?
11        MR. FREEDMAN:  Objection.
12        THE WITNESS:  I'm pretty sure I did.
13  BY MR. PASCHAL:
14    Q.  But you just don't remember what it says?
15    A.  I don't remember now.  I have to look at it.
16    Q.  Just earlier I asked you about two homes you
17  had.  I think one was on Bent Tree that's the one you
18  you live in now?
19    A.  Yes.
20    Q.  Then you had one on Geminata?
21    A.  Geminata Court.
22    Q.  You didn't sell your first home when you
23  purchased your second home; right?
24    A.  Correct.
25    Q.  You kept it until about 2018?

Page 143

1     A.  I would have to check.  Possibly.
2     Q.  On your second home there's no mortgage
3  recorded for that house?
4         MR. FREEDMAN:  Don't answer the question.
5         MR. PASCHAL:  On what basis?
6         MR. FREEDMAN:  What basis are you asking?
7  Where does this tie into your topics?
8         MR. PASCHAL:  Several of my topics.
9         MR. FREEDMAN:  Which one of them, name one?
10        MR. PASCHAL:  Goes to the administration of
11  the estate and goes into --
12        MR. FREEDMAN:  Whether or not Ira Kleiman has
13  a mortgage on his house goes to the administration?
14        MR. PASCHAL:  That's my question.
15        MR. FREEDMAN:  I instruct him not to answer
16  unless you can convince me it comes into a topic.
17        MS. MCGOVERN:  We're just going to make the
18  record.
19  BY MR. PASCHAL:
20    Q.  Are there any documents showing where the
21  source of funds came to purchase the second home?
22        MR. FREEDMAN:  Don't answer.
23  BY MR. PASCHAL:
24    Q.  Did you purchase that home two or three weeks
25  after Craig first reached out to you?

Page 144

1     A.  I would have to check.  I don't remember.
2     Q.  Would it sound about right if you purchased
3  that home -- the finalized closing was in March of 2014?
4         MR. FREEDMAN:  Objection.
5         THE WITNESS:  I would have to check.  I know
6  it was 2014.
7  BY MR. PASCHAL:
8     Q.  Then Craig first reached out to you in about
9  February 2014?
10    A.  Right.
11    Q.  Telling you about Bitcoin?
12    A.  Yes.
13    Q.  You paid $450,000 cash for that house?
14        MR. FREEDMAN:  Objection, don't answer.
15  BY MR. PASCHAL:
16    Q.  Did the purchase of that house have anything
17  to do with the administration of the estate or Bitcoin?
18    A.  No.
19    Q.  Do you have documents reflecting that?
20        MR. FREEDMAN:  Objection.  You can answer.
21        THE WITNESS:  Showing that it didn't have
22  anything to do with --
23  BY MR. PASCHAL:
24    Q.  Yes.  That the source of funds for that house
25  did not come from Dave's possession, Bitcoin?

Page 145

1     A.  I probably do.
2     Q.  What documents would that be?
3     A.  I guess a check written by myself for the
4  house.
5     Q.  What about the underlying funds for that
6  check?
7         MR. FREEDMAN:  Objection.  I don't understand
8  your question and it's touching on this area I've
9  been instructing him not to answer so could you try
10  to clarify what you mean?
11  BY MR. PASCHAL:
12    Q.  Were there any documents to show that the
13  underlying funds to write a $450,000 check for that
14  house are there any documents showing it didn't come
15  from Dave's estate, from Bitcoin, from Dave's
16  possession?
17        MR. FREEDMAN:  So I don't want to instruct him
18  not to answer if I can avoid it.  The problem is
19  you're asking him about proving a negative.  Are
20  you asking whether -- obviously you don't have to
21  adopt my formulation just to see if I can get you
22  the information you want.  Are you asking whether
23  there's documents that identify where the funds
24  actually came from?
25        MR. PASCHAL:  I've asked that you've told him

Page 146

1    not to answer so I'm asking a different one.
2        MR. FREEDMAN:  If you ask if there are
3    documents that exist to show where the funds came
4    from I'll allow him to answer.
5        MR. PASCHAL:  Can you repeat my question,
6    Mr. Court reporter, and then you can answer?
7        (Thereupon, a portion of the record
8        was read back by the reporter.)
9        MR. FREEDMAN:  Don't answer.
10   BY MR. PASCHAL:
11       Q.  Are there any documents showing the source of
12   the funds to purchase the house came from?
13       A.  I imagine yes, there should be.
14       Q.  What documents would those be?
15       MR. FREEDMAN:  You can describe the types of
16   documents.  Don't go beyond that.
17       THE WITNESS:  Checks.
18   BY MR. PASCHAL:
19       Q.  That's it?
20       A.  Yes.  Personal checks.
21       Q.  Did the purchase of the house have anything to
22   do with the financing of this lawsuit?
23       A.  No.
24       MR. PASCHAL:  I think we're almost done so can
25   we take a break?

Page 147

1        MR. FREEDMAN:  Sure.
2        THE VIDEOGRAPHER:  The time is now 2:38 p.m.
3    and we're off the record.
4        (Thereupon, a brief recess was taken.)
5        THE VIDEOGRAPHER:  The time is 2:49 p.m. and
6    we're back on the record.
7    BY MR. PASCHAL:
8        Q.  Ira, could you go back to your second amended
9    complaint and that's probably Exhibit 2 or 3?
10       MR. FREEDMAN:  2.
11   BY MR. PASCHAL:
12       Q.  Can you go to page 46.  From 46 to 47 you
13   allege that Dr. Wright stole or committed theft of
14   Dave's Bitcoin, forked assets and intellectual
15   properties.  Do you see that?
16       A.  Yes.
17       Q.  Ira, you don't have any documents showing that
18   Dr. Wright stole Dave's Bitcoin, do you?
19       MR. FREEDMAN:  Objection.
20       THE WITNESS:  Documents?  Well, I have
21   documents that lead me to believe that he stole
22   Dave's Bitcoin.
23   BY MR. PASCHAL:
24       Q.  Well, let me break that down in two parts.  Do
25   you have documents that actually show that Dr. Wright

Page 148

1    stole Dave's Bitcoin?
2        MR. FREEDMAN:  Objection.
3        THE WITNESS:  I don't have like a document
4    with the kind of evidence like showing that he
5    withdrew funds like from a bank account, no.
6    Nothing like that, no.
7    BY MR. PASCHAL:
8        Q.  What documents led you to believe that
9    Dr. Wright stole from Dave?
10       A.  Lots of e-mails from Craig Wright.
11       Q.  Are the e-mails that you produced to us?
12       A.  Should be.
13       Q.  In none of those e-mails does Dr. Wright say I
14   took Dave's Bitcoin; right?
15       A.  He may not have said that, no.  I would
16   imagine he wouldn't say that.
17       Q.  Other than communications with Craig do you
18   have any other documents evidencing that Dr. Wright
19   stole Bitcoin from Dave?
20       A.  I would have to check.  I don't know off the
21   top of my head.
22       Q.  Sitting here today do you have any knowledge
23   of any documents that evidence that Dr. Wright stole
24   Bitcoin from Dave?
25       A.  Again I would have to go back and look at all

Page 149

1    my documents.
2        Q.  Right now today can you recall any of them?
3        A.  At this moment, no.
4        Q.  Do you have testimony from anyone or
5    statements saying that -- or evidencing that Dr. Wright
6    stole Bitcoin or intellectual property from Dave?
7        A.  Testimony from other people?
8        Q.  Or statements.
9        A.  Not that I remember.
10       Q.  So today in this deposition you can't recall
11   any testimony or documents?
12       A.  No.
13       Q.  That last question to be clear is about
14   Bitcoin and intellectual property?
15       MR. FREEDMAN:  Objection.
16       THE WITNESS:  Okay.
17   BY MR. PASCHAL:
18       Q.  The answer is still the same; right?
19       A.  Yes.
20       Q.  The answer is no?
21       A.  No.
22       MR. PASCHAL:  I think that's about it.
23       MR. FREEDMAN:  Okay.
24       THE VIDEOGRAPHER:  Read or waive?
25       MR. FREEDMAN:  We'll read.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Pages 150..153

Page 150

1    THE VIDEOGRAPHER:  The time is now 2:54 p.m
2    and this concludes the video deposition.  We're off
3    the record.
4    THE COURT REPORTER:  Do you want to order?
5    MR. PASCHAL:  Yes.
6    MR. FREEDMAN:  Take a copy as well.
7    MR. PASCHAL:  As soon as possible.
8    MR. ROCHE:  Can we get a rough of that?
9    THE COURT REPORTER:  Yes.
10   MR. ROCHE:  You guys as well?
11   MR. PASCHAL:  Yes.
12        (Witness excused.)
13      (Deposition was concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1              CERTIFICATE OF OATH
2    THE STATE OF FLORIDA
3            COUNTY OF DADE
4
5    I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,
6    Notary Public, State of Florida, certify that IRA
7    KLEIMAN personally appeared before me on the 8th day
8    of April, 2019 and was duly sworn.
9
10       Signed this 11th day of April, 2019.
11
12
13
14
15
16            Rick Levy, RPR, FPR
              Notary Public - State of Florida
              My Commission Expires:  12/7/19
17            My Commission No.:  FF 939483
18
19
20
21
22
23
24
25

Page 151

1
2              CERTIFICATE OF REPORTER
3              THE STATE OF FLORIDA
4              COUNTY OF DADE
5
6    I, Rick Levy, Registered Professional Reporter
     and Notary Public in and for the State of Florida at
7    large, do hereby certify that I was authorized to
     and did report said deposition in stenotype of IRA
8    KLEIMAN; and that the foregoing pages, numbered from
     1 to 148, inclusive, are a true and correct
9    transcription of my shorthand notes of said
     deposition.
10
     I further certify that said deposition was
11   taken at the time and place hereinabove set forth
     and that the taking of said deposition was commenced
12   and completed as hereinabove set out.
13   I further certify that I am not attorney or
     counsel of any of the parties, nor am I a relative
14   or employee of any attorney or counsel of party
     connected with the action, nor am I financially
15   interested in the action.
16   The foregoing certification of this transcript
     does not apply to any reproduction of the same by
17   any means unless under the direct control and/or
     direction of the certifying reporter.
18
     IN WITNESS WHEREOF, I have hereunto set my hand
19   this 10TH day of April, 2019.
20
21
     Rick Levy, RPR, FPR, Notary Public
22   in and for the State of Florida
     My Commission Expires:  12/7/19
23   My Commission No.:  FF 939483.
24
25

Page 153

1              E R R A T A   S H E E T
2    IN RE:  IRA KLEIMAN VS CRAIG WRIGHT
3    DEPOSITION OF:  IRA KLEIMAN
4    TAKEN: 4/8/2019
5      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
6    PAGE #  LINE #  CHANGE          REASON
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   Please forward the original signed errata sheet to
     this office so that copies may be distributed to all
18   parties.
19   Under penalty of perjury, I declare that I have read
     my deposition and that it is true and correct
20   subject to   any changes in form or substance
     entered here.
21
22   DATE: _____
23
24   SIGNATURE OF
     DEPONENT:_____
25

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 154

```
                                                        Page 154
1   DATE:      April 11, 2019
2   TO:  VEL FREEDMAN, ESQUIRE
         BOIES, SCHILLER & FLEXNER LLP
3        100 S.E. 2nd Street
         Suite 2800
4        Miami, Florida 33131
5   IN RE: IRA KLEIMAN VS CRAIG WRIGHT
6   Dear Mr. Freedman:
7   Enclosed please find the original errata page with
    your copy of the transcript so IRA KLEIMAN may read
8   and sign their transcript.  Please have him/her make
    whatever changes are necessary on the errata page
9   and sign it.  Then place the original errata page
    back into the original transcript.  Please then
10  forward the original errata page back to our office
    @1080 Woodcock Road, Suite 100, Orlando, Florida
11  32803.
12  If the errata page is not signed by the witness
    within 30 days after this letter has been furnished,
13  we will then process the transcript without a signed
    errata page.  If your client wishes to waive their
14  right to read and sign, please have him/her sign
    their name at the bottom of this letter and send it
15  back to the office.
16      Your prompt attention to this matter is
17  appreciated.
18  Sincerely,
19  _____
    RICK E. LEVY, RPR
20
    I do hereby waive my signature:
21
    _____
22  IRA KLEIMAN
23  cc via transcript:  Bryan Paschal, Esq.
                        Vel Freedman, Esq.
24  file copy
25
```

## Paula Alvarez

| | |
|---|---|
| **From:** | Velvel (Devin) Freedman <vfreedman@bsfllp.com> |
| **Sent:** | Wednesday, March 27, 2019 8:57 PM |
| **To:** | Bryan Paschal; Kyle Roche |
| **Cc:** | Andres Rivero; Zaharah Markoe; Zalman Kass; Nathalie Bermond; Maxwell Pritt; William T Dzurilla |
| **Subject:** | RE: Kleiman v. Wright |

Bryan,

We do not object to the topics below. But this isn't intended to be a waiver of our right to instruct the witness not to answer questions that would call for protected information or as permitted by the Court. For example, depending on the questions asked under #28, the answer might call for protected information.

-Vel

**Velvel (Devin) Freedman**
<u>Counsel</u>

## BOIES SCHILLER FLEXNER LLP

100 SE 2ND Street Suite 2800
Miami, FL 33131
(t) +1 305 357 8438
(m) +1 305 753 3675
<u>vfreedman@bsfllp.com</u>
<u>www.bsfllp.com</u>

**From:** Bryan Paschal [mailto:bpaschal@riveromestre.com]
**Sent:** Wednesday, March 27, 2019 9:42 AM
**To:** Velvel (Devin) Freedman; Kyle Roche
**Cc:** Andres Rivero; Zaharah Markoe; Zalman Kass; Nathalie Bermond; Maxwell Pritt; William T Dzurilla
**Subject:** RE: Kleiman v. Wright

Vel,

On the March 18, you said that review our list and let us know if you have any objections. We have not heard back from you. Given the short time frame that the Court gave us to resolve these issues can you confirm that you do not have any objections to the list of topics?

**From:** Velvel (Devin) Freedman <vfreedman@bsfllp.com>
**Sent:** Monday, March 18, 2019 12:36 PM
**To:** Bryan Paschal <bpaschal@riveromestre.com>; Kyle Roche <kroche@bsfllp.com>
**Cc:** Andres Rivero <arivero@riveromestre.com>; Zaharah Markoe <zmarkoe@riveromestre.com>; Zalman Kass <zkass@riveromestre.com>; Nathalie Bermond <nbermond@bsfllp.com>; Maxwell Pritt <mpritt@bsfllp.com>; William T Dzurilla <wdzurilla@bsfllp.com>
**Subject:** RE: Kleiman v. Wright

Thanks Bryan.



EXHIBIT
1

On Friday's meet and confer we agreed that you'd set Ira's deposition for our office. Please re-notice it with the address below my signature. Further, please include Nathalie Bermond (cc'd) on case correspondence to make sure everything is received and properly calendared.

We will review your list and revert if we have any objections.
-Vel

**Velvel (Devin) Freedman**
Counsel

## BOIES SCHILLER FLEXNER LLP

100 SE 2ND Street Suite 2800
Miami, FL 33131
(t) +1 305 357 8438
(m) +1 305 753 3675
vfreedman@bsfllp.com
www.bsfllp.com

**From:** Bryan Paschal [mailto:bpaschal@riveromestre.com]
**Sent:** Monday, March 18, 2019 12:28 PM
**To:** Kyle Roche; Velvel (Devin) Freedman
**Cc:** Andres Rivero; Zaharah Markoe; Zalman Kass
**Subject:** Kleiman v. Wright

Dear Kyle and Vel,

Here is the notice of deposition for you client. I am the responsible attorney for this deposition, so if there are any issues, please direct them to me.

Also, below is a revised list of topics for Ira's initial deposition. We don't agree that the scope of the topics for the initial deposition should be as broad as the list you prepared for Dr. Wright. However, given the Court's ruling at the March 14th hearing, we have revised our list for Ira's initial deposition to be consistent with that ruling.

1.  The identification of Dave Kleiman's electronic devices.
2.  The chain of custody for Dave's electronic devices.
3.  The preservation of Dave's electronic devices and steps taken to preserve Dave's electronic devices.
4.  Attempts to access Dave's electronic devices.
5.  The storage and preservation of Dave's working papers.
6.  Forensic imaging of Dave's electronic devices.
7.  Steps taken to identify Dave's email addresses.
8.  Steps taken to identify Dave's Bitmessage accounts.
9.  The location of W&K Info Defense Research LLC's ("W&K") proprietary documents and information.
10. Steps taken to identify W&K's email addresses.
11. Steps taken to identify W&K's Bitmessage accounts.
12. Steps taken to identify email accounts for W&K Panama.
13. Steps taken to identify any Bitmessage accounts for W&K Panama.
14. The identification of Dave's public Bitcoin wallet address and private keys.
15. The identification of any companies in which Dave may have held a proprietary interest.
16. The identification of Dave's Liberty Reserve account.
17. Identification of Dave's and W&K's intellectual property.

2

18.     The original formation of the alleged partnership for the alleged development of the Bitcoin, including the general process for the alleged development, how that alleged partnership continued, and any witnesses to that partnership.

19.     Any alleged Bitcoin mining that occurred between Dr. Wright, Dave, or W&K, including the general process for the alleged mining and where the mined Bitcoins are located.

20.     Communications with the Coin-Exch liquidator, including any attempt to identify any of W&K and Coin-Exch's assets.

21.     The identification of any alleged trusts or companies that involved Dave or W&K, including information on the purposes of these entities, their organizational and ownership structure, their assets or holdings, and their document management systems.

22.     Dave's relationship with Dr. Wright, including any witnesses to their relationship.

23.     The Australian Court proceedings 2013 / 225983 & 2013 / 245661 (Craig Steven Wright v. W&K Info Defense Research LLC, NSW Supreme Court).

24.     Dave's involvement with the Australian Tax Office investigation, including the tax issues that he assisted Dr. Wright with.

25.     The location and existence of documents and the identification of witnesses, including information about their whereabouts and role(s) in the subject matter of the pleadings.

26.     Dave's technical experience with information technology.

27.     Ira's technical experience with information technology.

28.     Any efforts by Ira to determine Dave's assets, including reviewing Dave's electronic devices, working papers, emails, and interviewing witnesses.

29.     Ira's acceptance of shares in Coin-Exch, including his activities as a shareholder, information he received as a shareholder, and the identity of any third parties that he attempt to sell his shares to.

30.     Any attempts to sell or give away electronic devices or working papers from Dave's estate, including the sale of computers, hard drives, usb drives, computer hardware, and technical papers.

31.     Information regarding BTCN 1610-491 LLC ("BTCN"), including the identification of its members and loan agreements between BTCN and Ira, Dave's estate, and W&K.

Sincerely,

**Bryan L. Paschal**
**RIVERO MESTRE LLP**
2525 Ponce de Leon Blvd., Suite 1000
Miami, Florida 33134
(T) 305.445.2500 | (F) 305.445.2505
Bpaschal@riveromestre.com | www.riveromestre.com

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1 08201831BSF]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC

      Plaintiffs,

v.

CRAIG WRIGHT

      Defendant.

**CASE NO.:  9:18-cv-80176-BB**

**SECOND AMENDED COMPLAINT AND JURY DEMAND**

Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.   (305)539-8400
Fax.   (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche (*admitted pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.   (914)749-8200
Fax.   (914)749-8300
Email: kroche@bsfllp.com

**ATTORNEYS FOR PLAINTIFFS**



EXHIBIT

2

AL  4/8/19

## SECOND AMENDED COMPLAINT

Plaintiff Ira Kleiman, as personal representative of David Kleiman's estate ("Ira"), and

Plaintiff W&K Info Defense Research, LLC ("W&K") hereby sue Defendant Craig Steven Wright

("Craig") and state as follows:

### PARTIES

1.      Plaintiff Ira Kleiman, as personal representative, is a resident of Palm Beach

County, Florida.  He is David Kleiman's ("Dave") brother and the personal representative of his

estate ("the estate").

2.      Plaintiff W&K Info Defense Research, LLC is a Florida limited liability company

incorporated in 2011.  During the times relevant to this Second Amended Complaint, W&K

operated in Florida. This entity is one vehicle through which Defendant and Dave mined hundreds

of thousands of bitcoins and created valuable blockchain intellectual property.

3.      Defendant Craig Steven Wright is a resident of London, United Kingdom.  He is

Dave's former business partner in W&K and otherwise.

### JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332 as the parties are completely diverse in citizenship and the amount in controversy exceeds

$75,000; this Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 and 18 U.S.C. § 1836(c) because Plaintiffs' Defense of Trade Secrets Act claim arises under

the laws of the United States.

5.      Venue lies within this District under 28 U.S.C. § 1391(b) because a substantial part

of the events giving rise to these claims occurred in this District.  These events include, but are not

limited to: the wrongful taking of property belonging to a Florida estate and/or LLC within this

District; the partnership of Dave and Craig within this District; the operation of W&K by Dave

and Craig within this District; the mining of a substantial amount of bitcoins through the use of computer equipment located within this District and/or by equipment owned and/or operated by a Florida resident (Dave) or Florida LLC (W&K); the development of certain blockchain related intellectual property within this District; and the commission of a fraud against an estate in this District.

6.      This Court has personal jurisdiction over Craig pursuant to Fla. Stat. § 48.193 as he operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within this state; and caused injury to persons and property within this state at or about the time he was engaged in solicitation and service activities within this state.

## INTRODUCTION

7.      This matter concerns the rightful ownership of hundreds of thousands of bitcoins[1] and the valuable intellectual property rights of various blockchain technologies. As of the date of the Amended Complaint filing, the value of these assets far exceed $11,427,755,048.02 USD (before punitive or treble damages); at their highest value they were worth over $27,332,125,781.93. Plaintiffs allege Defendant has stolen these bitcoins and intellectual property assets from them.

8.      After Ira filed this claim, Craig committed a fraud on this Court in an attempt to circumvent its jurisdiction. As detailed in paragraphs 160 to 170 Craig filed a sworn declaration that is incontrovertibly false based on an affidavit (and supporting evidence) he previously submitted to an Australian court. The boldfaced misrepresentations Craig has told this Court demonstrate his desperation to avoid this suit.

---

[1] The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol, software, and community, and the term "bitcoin" to label the units of exchange.

9.     Bitcoin is the world's first decentralized cryptocurrency. The concept and technology behind Bitcoin was first published in October 2008 when its pseudonymous creator, Satoshi Nakamoto, sent the now famous protocol to a mailing list of cryptography enthusiasts. That protocol has since spawned a system of value and exchange with a current market cap of ~$150 billion.

10.    Based on information Ira Kleiman received directly from Dave, it is undeniable that Craig and Dave were involved in Bitcoin from its inception and, together, had accumulated a vast wealth of bitcoins from 2009 through 2013.

11.    On April 26, 2013, mere months prior to Bitcoin's entry into the mainstream, Dave died after a battle with MRSA.

12.    Recognizing Dave's family and friends weren't aware of the extent of Dave's Bitcoin and blockchain related activities, Craig perpetrated a scheme against Plaintiffs to seize their bitcoins and their rights to certain blockchain related intellectual property.

13.    As part of this plan, Craig took control of Plaintiffs' bitcoins and forged a series of contracts that purported to transfer Plaintiffs' bitcoins and intellectual property assets to Craig and/or companies controlled by him. Craig backdated these contracts and forged Dave's signature on them.

14.    About a year after Dave's death, and under pressure from an Australian Tax Office investigation, Craig reached out to Ira, Dave's brother. Craig disclosed he had partnered with Dave to create Bitcoin, mine bitcoin, and create valuable intellectual property. But, he claimed Dave signed all these property rights away in exchange for a non-controlling share of a non-operational Australian company worth "millions."

4

15.     Craig told Ira he'd be able to sell Dave's stake in the company in a few months. This was a lie in several respects. First, Dave had not in fact traded his bitcoin and intellectual property rights for an interest in the Australian company. Second, the company went bankrupt shortly after Craig misled the Australian Tax Office ("ATO").

16.     The ATO raided Craig's home in late 2015 and Craig fled Australia for London. Since fleeing to London, Craig has lived a life of fame and fortune. In May 2016, he publicly revealed himself and Dave as the alleged creators of Bitcoin.

17.     Craig currently serves as Chief Scientist of nChain, a UK company purporting to be the global leader in research and development of blockchain technologies. He also regularly posts pictures to his social media accounts of his lavish lifestyle.

18.     To date, Craig has not returned any of the mined bitcoins or intellectual property rights belonging to Plaintiffs. This action is brought to rectify that injustice.

19.     As described in detail below, Craig's pattern of lies, deception, and fraudulent conduct continues even against this Court. His fraud on this Court is simply the latest step taken in Florida to defraud the estate and W&K.

### FACTUAL ALLEGATIONS

#### Bitcoin

20.     Bitcoin is a decentralized digital currency with a current market cap of ~$150 billion as of March 14, 2018.[2] At its core, Bitcoin is simply a giant ledger that tracks the ownership and transfer of every bitcoin in existence. This ledger is called the bitcoin blockchain.

21.     In order to transact with bitcoins, you must have a bitcoin wallet. Like a bank account number, each bitcoin wallet has a "public key" that is the "address" provided if one would

---

[2] https://coinmarketcap.com/.

like to receive bitcoin from others. Every wallet can be identified on the blockchain (by referring to its "public key") along with the number of bitcoins inside that particular wallet. Wallets are separate computer files dedicated to storing information about specific bitcoins.

22.     Each wallet is also assigned a "private key." Unlike public keys, private keys are only known by the individual who creates the bitcoin wallet. The private key is like the "password" to the wallet. To send bitcoin out of a wallet, an individual must have the private key associated with the bitcoin wallet. This is similar to the manner in which one must have a PIN to withdraw cash from an ATM.

23.     There are two methods of acquiring bitcoins. The first involves simply receiving bitcoins from someone. In fact, there are many businesses that operate "bitcoin exchanges," such as coinbase.com, which is a bitcoin marketplace where individuals can purchase bitcoins with their native currency from individuals looking to sell.

24.     The second way one can acquire bitcoins is by "mining" them.

25.     There is no centralized authority that curates the Bitcoin blockchain. Consequently, the protocol has to incentivize individuals to curate the blockchain, i.e., to update the "ledger" with new transactions as they take place. This process is called "bitcoin mining."

26.     Anyone with internet access can "mine bitcoins" by employing computer power to solve a complex mathematical problem. The first "miner" who solves the problem gets the right to add a block of recent transactions to the blockchain, i.e., the right to update the ledger. In return for this work, the protocol pays the successful miner in newly minted bitcoins (the number of which is fixed by a pre-existing algorithm). This process is repeated every 10 minutes or so, ensuring an accurate and up to date record of all bitcoin transactions.

27.     When the Bitcoin protocol was first launched in January 2009, the protocol paid the successful miner 50 bitcoins for each block of transactions added to the blockchain ledger. The protocol cuts this mining reward in half every four years so that the maximum amount of bitcoin in existence will never exceed 21 million. At the current mining rate and reward algorithm, this maximum circulation will be reached in circa 2140.

28.     Today, the mining reward is 12.5 bitcoins for each block added to the blockchain. That, together with rising competition in mining bitcoins means it was easier to amass significant amounts of bitcoins in 2009, than now.

29.     To date, just over 17 million of the total 21 million bitcoins have been mined.

### History of Bitcoin

30.     On October 31, 2008, a white paper authored under the pseudonymous name Satoshi Nakamoto ("Satoshi") titled *Bitcoin: A Peer-to-Peer Electronic Cash System* was posted to a mailing list of cryptography enthusiasts. This paper detailed novel methods of using a peer-to-peer network to generate what it described as "a system for electronic transactions without relying on trust."

31.     Less than three months later, the system outlined became a reality. On January 3, 2009, Satoshi mined the first 50 bitcoins. To place a timestamp on the occasion, Satoshi left a text message digitally encoded on these first 50 bitcoins that read, "The Times 3 January 2009 Chancellor on brink of second bailout for banks," referring to that day's headline in the British newspaper, *The Times*.

32.     Hal Finney, one of the first supporters and adopters of Bitcoin, downloaded the bitcoin software that same day, and received 10 bitcoins from Satoshi in the world's first bitcoin transaction.

33.     Satoshi also created a website under the domain name bitcoin.org and continued to collaborate with other developers on the Bitcoin protocol until mid-2010. Around this time, he handed control of the Bitcoin source code repository to Gavin Andresen, another active member of the bitcoin development community, and disappeared. The last confirmed email from Satoshi was sent on April 23, 2011. It read, "I've moved on to other things. It's in good hands with Gavin and everyone."

34.     For most of its early history, bitcoins were of relatively little value. Famously, the first documented commercial bitcoin transaction occurred when developer Laszlo Hanyecz used 10,000 bitcoins to purchase two Domino's pizzas on May 22, 2010. At today's prices, those two pizzas would be worth approximately 1% of Domino's total market cap.

35.     During Bitcoin's early history, cryptocurrencies were a niche technology with a small development community. Consequently, there was little competition for maintaining the ledger or "mining bitcoins." Thus, individuals mining bitcoins through 2013 could expend relatively minor resources to accumulate large sums of bitcoins.

36.     It has been widely reported that Satoshi Nakamoto mined approximately 1 million bitcoins during this time.[3]

### Bitcoin "forks"

37.     Since its inception in 2009, Bitcoin has inspired the creation of over one thousand other digital currencies. Many of these new cryptocurrencies use characteristics of the initial Bitcoin program, but have made significant changes to the original model in an attempt to create

---

[3]     *See      e.g.*     http://time.com/money/5002378/bitcoin-creator-nakamoto-billionaire/;
http://www.businessinsider.com/satoshi-nakamoto-owns-one-million-bitcoin-700-price-2016-6;
https://eklitzke.org/how-many-bitcoins-did-satoshi-nakamoto-mine.

an entirely new cryptocurrency with distinct functions or ones better suited to a specific market niche.

38.     In other cases, individuals have taken the actual Bitcoin protocol and modified it in a way they believed would improve Bitcoin itself, *e.g.*, by allowing more transactions into a single "block" of the blockchain.

39.     If the "improved" Bitcoin protocol garners significant support, but less than a majority of support, a new version of "Bitcoin" is created. In these situations, the supporters of the new Bitcoin, have created a "fork" through which the original Bitcoin blockchain/ledger is divided into two distinct, but identical, copies, (i) the original Bitcoin, and (ii) the new Bitcoin. The result is that any individual who owned the original Bitcoin, now owns an identical amount of the new Bitcoin. After the point of the "fork," the ledgers will diverge as owners "spend" the two assets differently.

40.     This has happened numerous times to Bitoin. To date, however, the original Bitcoin protocol remains the most valuable in terms of its correlation to the US dollar, with a market capitalization of ~$150 billion at the time of filing. However, other noteworthy Bitcoin forks include Bitcoin Cash (market cap. of ~$25 billion), Bitcoin Gold (market cap. of ~$1.0 billion), Bitcoin Private (market cap of ~$510 million), and Bitcoin Diamond (market cap. of ~$650 million).

41.     As explained below, the bitcoins at the heart of this dispute were all mined prior to the creation of any of the aforementioned Bitcoin forks. Consequentially, Plaintiffs' claims of

ownership over these original bitcoins necessarily implicates ownership over their "forked" counterparts ("forked assets").[4]

### Background on parties and key individuals

42.     Dave Kleiman was born in 1967. Obsessed with computers and technology at an early age, he joined the U.S. Army in 1986 as a helicopter technician.

43.     A few years after being honorably discharged, Dave got into a serious motorcycle accident which left him physically handicapped and wheelchair-bound. After this accident, Dave's interest in computers intensified, and he began to build a reputation in computer forensics and secure network infrastructures.

44.     Dave began working in the information technology security sector in 1990. He was a frequent speaker at national security conferences and was a regular contributor for many security related newsletters, websites, and online forums.

45.     Dave was a member of several computer security organizations, including the International Association of Counter Terrorism and Security Professionals (IACSP), International Society of Forensic Computer Examiners (ISFCE), Information Systems Audit and Control Association (ISACA), High Technology Crime Investigation Association (HTCIA), Network and Systems Professionals Association (NaSPA), Association of Certified Fraud Examiners (ACFE), Anti-Terrorism Accreditation Board (ATAB), and ASIS International.

46.     Dave was also a Secure Member and Sector Chief for Information Technology at the FBI's InfraGard and a Member and Director of Education at the International Information Systems Forensics Association (IISFA). When he attended conferences, he was known as "Dave

---

[4] Consequently, where appropriate, the word "bitcoins" should be construed to include claims over the "forked assets" as well.

Mississippi," a nickname referring to the long string of three letter certificates that followed his name; which could literally be used to spell Mississippi.

47.     Dave co-authored and was the technical editor of numerous publications, including *Perfect Passwords: Selection, Protection and Authentication,*[5] and Security Log Management: Identifying Patterns in the Chaos.[6]

48.     In 2010, Dave was hospitalized.  He was in and out of medical facilities due to MRSA infected sores.  On March 22, 2013, Dave signed out of the hospital against medical advice. He was unstable and nearing death.[7]  On April 26, 2013, Dave passed away.

49.     Ira is Dave's brother and the personal representative of his estate.

50.     Craig is a 46-year-old Australian computer scientist and businessman.  Craig began his career in information technology working for various entities in Australia, including the Australian Securities Exchange.   Craig claims to have many degrees, including doctorates, masters, and technical certifications; these claims are disputed.[8]

51.     In May 2016, Craig claimed that he and Dave were Satoshi Nakamoto—the venerated creator of Bitcoin.

---

[5]https://www.amazon.com/Perfect-Passwords-Selection-Protection-Authentication/dp/1597490415.

[6] https://www.amazon.com/Security-Log-Management-Identifying-Patterns/dp/1597490423.

[7] https://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460.

[8]  https://www.forbes.com/sites/thomasbrewster/2015/12/11/bitcoin-creator-satoshi-craig-wright-lies-hoax/#12e524116794.

### Dave and Craig's early relationship

52.    Dave and Craig met in or around 2003. Both men had a longtime interest in cyber security and digital forensics, and the future of money. (Ex. 1 at 26).[9]

53.    For years, they communicated on various topics related to the internet and file sharing. For example, in 2008 they co-authored a paper on the mechanics of overwriting hard drive data.[10]

54.    Around that time, they began to speak about ways to use peer-to-peer file sharing, infamously used by the Napster music sharing service, to solve some of the most difficult issues in cryptography. (Ex. 1 at 27).

55.    In March 2008, just a few months before Satoshi's paper on the Bitcoin protocol was published, Craig emailed Dave saying: "I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin . . . [y]ou are always there for me Dave. I want you to be part of it all." (Ex. 32).[11]

56.    After leaving his job in late 2008, Craig wrote to Dave: "I need your help. You edited my paper and now I need to have you aid me build this idea." (Ex. 1 at 31). For the next few months, Craig and Dave worked to get Bitcoin operational.

57.    On January 12, 2009, Craig, Dave, and two others sent each other bitcoin transactions recorded on the blockchain. (Ex. 1 at 32).

58.    On November 26, 2009 (Thanksgiving Day), Ira Kleiman and Dave met at their father's home for an early dinner. He and Dave discussed Facebook's recent success and Ira asked

---

[9] All Exhibit citations refer to the as filed ECF pagination.

[10] https://www.vidarholen.net/~vidar/overwriting_hard_drive_data.pdf.

[11] Craig sent a "copy" of this communication to Ira on March 6, 2014.

Dave if he was working on anything interesting.  Dave responded by telling Ira he was working on "something bigger" than Facebook, that he was "creating his own money."

59.     Ira asked Dave to clarify and jokingly asked if Dave was making counterfeit money.

60.     Dave responded by saying he was making "digital money."  He then opened his wallet, took out a business card, flipped it over, drew a "B" with a line or two through it, and commented on how "we" were working on a logo.

61.     Dave told Ira he was working with a relatively wealthy foreign man who owned some properties. Ira asked Dave why he didn't partner with this wealthy individual.  Dave was silent, which Ira understood to be Dave's concession they were already partners.

62.     On May 20, 2014, Ira shared this story with Craig via email.  (Ex. 2).

63.     Craig responded that same day stating "we did partner ;)".  (*Id.*).  Craig then commented on the "properties" stating, *inter alia*, that he owned 550 acres.  (*Id.*).  He then said, "I will have to see what I can dig up.  The old Bitcoin logo we did is no longer used. I have a copy." (*Id.*).  Craig later provided Ira with a copy of this Bitcoin logo. (*Id.*).

64.     This independent verification that Dave was creating "digital money" with Craig in 2009, Craig's admissions that he and Dave were "partners" in this venture, part of the Satoshi team, and that they were mining bitcoin through W&K, all lead to the inescapable conclusion that their collaboration in "creating" or "mining" bitcoin and intellectual property was continuous from 2009 until Dave's passing in 2013.

65.     From their collaboration in 2008 until Dave's death in 2013, Craig and Dave mined over a million of the initial bitcoins together (personally and through W&K).  These bitcoins were, as all bitcoin are, stored in specifically identifiable bitcoin wallets that Craig has now asserted ownership over.

66.     Further, Dave, in partnership with Craig, created intellectual property both in his individual capacity and through W&K. As Craig email to Ira on March 7, 2014, "I had an idea, but it would never have executed without Dave." The estate and/or W&K owns all this intellectual property.[12]

### Dave and Craig created W&K to mine bitcoin and develop blockchain related intellectual property

67.     The exact structure of their joint mining activities, intellectual property development, and "partnership" from c. 2008 until February 2011 requires discovery to fully reveal.

68.     From February 2011, Craig and Dave conducted their bitcoin mining activities and intellectual property research and development through W&K.

69.     On February 14, 2011, Dave formed W&K Info Defense Research LLC ("W&K") in Florida. The Articles of Incorporation for W&K list Dave as the managing member and registered agent. (Ex. 3).

70.     W&K has no operating agreement and its exact ownership structure is unclear due to Craig's contradictory statements.  In an affidavit Craig filed in Australian court proceedings, Craig stated he and Dave each owned 50% of W&K.  (Ex. 4 at 5).  But in a fake "contract" produced by Craig, he states Dave owned legal title to 100% of W&K, while holding 50% in trust for Craig. (Ex. 5 at 3).  He doubled down on some form of this equal split in a 2014 email to Ira,

---

[12] The exact division of intellectual property ownership between Dave's estate and/or W&K will be determined at trial. Accordingly, some counts contain a request for relief from both Plaintiffs, and it will be for the final finder of fact to determine what each Plaintiff is entitled to recover.

where he represented that "Dave owned 50% of" W&K. (Ex. 6 at 2),[13] and when both he and his counsel referred to it as a "joint venture." (Ex. 4 at 50, 57, 64, 71, 77, 84; Ex. 9 at 6). In contrast, Craig has testified to this Court that he does not have, and never has had, any interest in W&K.[14] (Ex. 29 ¶ 10). But it makes sense Craig would have some form of indirect interest as the entity appeared to be named after them both: **W**right & **K**leiman.

71.     As best as can presently be discerned, Dave was the sole "member" of W&K, but Craig maintained some kind of beneficial ownership interest in W&K, which he subsequently disclaimed.

72.     Regardless of its exact ownership structure, the purpose of W&K was clear:  Craig and Dave created it to mine bitcoin and develop intellectual property.

73.     *First*, on telephone conversations with Ira, Craig admitted this was W&K's purpose.

74.     *Second*, Craig has admitted this in writing multiple times.  For example, in a "chronology" Craig sent to Ira, he wrote that that W&K "was set up to further statistical and risk mitigating algorithms, to develop some ideas around CBT learning methodologies, and to mine Bitcoin." (Ex. 7).  Craig also put this admission into legal documents he claims are valid stating that W&K "is the owner of and conducts the business known as Bitcoin mining and Software development / Research." (Ex. 5 at 3).  Finally, Craig has admitted this to third parties where, e.g.,

---

[13] This Second Amended Complaint attaches certain emails with timestamps from Australian time zones.  For consistency, the Second Amended Complaint has converted various timestamps to Eastern Standard Time.

[14] When confronted with the claims in this lawsuit, Craig didn't hesitate to continue his fraud against W&K and Dave's estate by perjuring himself in a sworn declaration filed with this Court, wherein he now swears, in absolute conflict with his Australian affidavit, that he never had any interest in W&K. See *Infra*, 160-170.  It seems that whatever interest he once held in W&K, he has disclaimed it.

on February 12, 2014, he emailed Dave's former business partners stating "Dave and I had a project in the US. He ran it there . . . The company he ran there mined Bitcoin." (Ex. 8 at 5).

75.     *Third*, in leaked ATO transcripts, Craig's bookkeeper states that "W&K was an entity created for the purpose of mining Bitcoins." (Ex. 9 at 3).

76.     Dave and Craig collaborated within W&K to create intellectual property. Craig then used W&K and this intellectual property to personally solicit business from the United States Department of Homeland Security ("DHS"). (Ex. 4 at 40-43).

77.     Craig acted as W&K's "authorized representative," its "lead researcher," and its "technical contact." (*Id.* at 45-46, 50, 56-57, 63-64, 70-71, 76-77, 83-84, 90). Further, Craig repeatedly used W&K's Florida address as his own, *e.g.*, identifying it as his "mailing address." (*Id.* at 50, 57, 64, 71, 77, 84). Craig has also held himself out as W&K's "legal agent and representative" and its "Director/Australian Agent." (Ex. 30).

78.     Craig also claimed to have (i) delivered servers and other computer hardware to Florida for W&K's use (Ex. 10 at 3 (Recital L)); (ii) provided "contract labour services" to W&K (Ex. 11 at 2); (iii) licensed software for W&K's use (Ex. 10 at 3 (Recital M)); and (iv) loaned money to W&K for use in its Florida mining operation (Ex. 10 at 3 (Recital L); Ex. 11 at 3).

### Dave and/or W&K owned a substantial amount of bitcoin

79.     The exact number of bitcoins belonging to Dave's estate and/or W&K will be determined at trial.[15]     That said, various documents including emails, "contracts," spoken admissions, and transcripts from 2014 ATO meetings with Craig, his counsel, and his accountant

---

[15] Accordingly, some counts contain a request for relief for both Plaintiffs, and it will be for the final finder of fact to determine how much each Plaintiff is entitled to recover.

evidence Dave and Craig owned and controlled approximately 1,100,111 bitcoins (either together personally or through their shared interest in W&K).

80.     As discussed above, Craig admitted that he "did partner" with Dave in 2009 to create/mine "digital money," i.e., bitcoins.  And Craig has also admitted in multiple documents that W&K (beneficially owned, at the time, and in some form, by Dave and Craig) mined bitcoin. Due to the historically larger mining reward and low competition existing during that time, Craig and Dave's continuous joint bitcoin mining activity since 2009 would have resulted in an unparalleled fortune of bitcoins.

81.     Furthermore, in February 2014, Craig emailed two of Dave's other business partners stating Dave had mined an enormous amount of bitcoins, an amount *"far too large to email."* (Ex. 8 at 5).

82.     In addition, a transcript of a February 18, 2014 meeting between the ATO and Craig demonstrates that Craig has led others to believe he took ownership of Dave's bitcoin.  The ATO investigator states:

> We thought yes, ***you've picked up some bitcoin ownership from the deceased director*** so we were trying to, you know, get the picture and connect all the dots.  (Ex. 12 at 20) (emphasis added).

83.     Minutes from a February 26, 2014 meeting between the ATO and Craig's bookkeeper (John Chester), document Craig's bookkeeper stating that Dave had an incredible amount of bitcoin, and implying that Craig assumed ownership of them when he died:

> Craig Wright had mined a lot of [b]itcoins . . . Craig had gotten approximately 1.1 million [b]itcoins. There was a point in time, when he had . . . around 10% of all the [b]itcoins out there.  Mr Kleiman ***would have had*** a similar amount. ***However***, Mr Kleiman ***passed away*** during that time.  (Ex. 9 at 3) (emphasis added).

84.     At the February 18, 2014 meeting, Craig's counsel states that W&K's bitcoins were transferred to Seychelles, Singapore, and UK trusts.  As Dave owned between 50% to 100% of

W&K, *at least* half of the bitcoins allegedly transferred to the trusts belong to Dave (and/or they all belong to W&K):

> In 2009 the mining of bitcoin commences *** 2011, bitcoin was transferred overseas. R and D then conducted in the US under – by a joint venture company formed as . . . effectively info defence research LOC. Bitcoin mining continues throughout 2011. The bitcoins are derived by companies in Singapore and the Seychelles or entities in Singapore and the Seychelles, and they're actually trusts. Trustee companies and trusts established - or trustee companies in the United Kingdom and other trusts established in the Seychelles. Further work was planned. In early April 2013 unfortunately Dave . . . dies in the US towards the end of April 2013. (*Id.* at 6).

85.    Years later, Craig admitted to Andrew O'Hagan that "his and Kleiman's mining activity ha[d] led to a complicated trust." (Ex. 1 at 36).

86.    In a 2012 email Craig forwarded to Ira, Craig wrote to Dave reaffirming the joint nature of the bitcoin allegedly held in trust (emphasis added):

> From: Craig Wright [mailto:craig@rcjbr.org]
> Sent: Wednesday, 10 October 2012 4:55 PM
> To: Dave Kleiman [mailto:dave@davekleiman.com]
> Subject: FW: IFIP-WG11.9 CFP
>
> We need to discuss the trsut [sic] and work out what the [expletive] *we* are doing with it all. So, a good tax deductible way to have a visit and also write a paper. (Ex. 31)

87.    In fact, Craig consistently referred to the "trust" as both Craig and Dave's, for example in another email Craig forwarded to Ira (emphasis added):

> From: Craig S Wright
> To: dave@davekleiman.com
> Subject: This week
> Date: Tue, 22 May 2012 09:45:31 +1000
>
> Dave,
> A recycled rant . . . the ATO are simply BS'ing again. It costs me money and in a way I guess they want to get a result through attrition rather than honesty. They will drain all I have if they can. **We do not touch the trusts**. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions and let them try

18

[expletive] **on us** then. . . (Ex. 13) (bold emphasis added; profanity redacted).

88.    In  a 2014 email exchange with Ira, Craig ***admitted*** that at least 300,000 of the

1,000,000+ bitcoins allegedly held in trust belong to Dave:

> From: Ira K <REDACTED@REDACTED>
> To: Craig S Wright <craig.wright@hotwirepe.com>
> Subject: Bond villains
> Date: Sat, Mar 1, 2014 at 2:42 PM
>
> Just to clarify on thoughts from previous email... In one of the email
> exchanges between Dave and you, he mentioned that you had 1 million
> Bitcoins in the trust and since you said he has 300,000 as his part. I was
> figuring the other 700,000 is yours.  Is that correct?
> Ira
> ---
> From: Craig S Wright <craig.wright@hotwirepe.com>
> To: Ira K <REDACTED@REDACTED>
> Subject: Re: Bond villains
> Date: Sat, Mar 1, 2014 at 3:00 PM
>
> Around that. Minus what was needed for the company's use
> Sent from my HTC.  (Ex. 14).

89.    As discussed below in more detail, Craig provided fraudulent contracts to the ATO

in an attempt to substantiate his ownership of bitcoins and intellectual property assets that belonged

to Dave and/or W&K.  Their authenticity aside, however, these "contracts" produced by Craig

constitute his admission that Dave, Craig, and W&K collectively owned hundreds of thousands of

bitcoins.

90.    For example, a 2011 contract produced by Craig includes a provision stating W&K

expected to mine new bitcoin at a rate of 12,000 bitcoins per month for a period of over two years

(312,000 bitcoin).  (Ex.10).

91.     Further, a 2012 contract provided to Ira by the ATO lists Bitcoin wallets containing over 650,000 bitcoins (the "2012 Deed of Loan"). Next to the list of wallets and total bitcoin held, there is a handwritten annotation stating: "*as agreed, all wallets to be held in UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW.*" (Ex. 15 at 9). This annotation is in Craig's handwriting.

92.     As can be seen, Dave, in partnership with Craig, lawfully mined and possessed hundreds of thousands of bitcoins both in his individual capacity and through W&K.

93.     The mined bitcoins were stored in wallets in the possession of Dave, Craig, W&K, and/or certain trusts. These wallets were not used for any purpose but to store the bitcoins for sale at some future date.

94.     As "partners" from c. 2008-2011, and then in some form of "co-owners/members" of W&K from 2011-2013, Dave and Craig shared the private keys to the bitcoins they mined. As demonstrated from emails produced by Craig, his ability to control the bitcoins continued once they were, allegedly, placed in trust.

**After Dave's death, Craig fraudulently converted the bitcoin and intellectual property that belonged to, and was possessed by, Dave and/or W&K**

95.     After Dave's death, Craig took sole ownership/control of all bitcoins and intellectual property owned by Dave and/or W&K and those that were held in trust for Dave and/or W&K and refuses to return any bitcoins or intellectual property to the estate or W&K.

96.     It appears that Craig needed to use W&K and Dave's assets to try and justify certain tax positions he claimed in Australia. To that end, he instituted an elaborate scheme to assert dominion over Dave's and W&K's bitcoin and intellectual property.

97.     To accomplish this scheme, Craig drafted and backdated at least three contracts, and forged Dave's signature on at least two, to create a fraudulent "paper trail" purporting to show

that Dave transferred bitcoins and intellectual property rights that belonged to Dave and W&K, to Craig. These fraudulent contracts include:

      a.    2011 contract titled "Intellectual Property License Funding Agreement" (the "2011 IP Agreement") (Ex. 10);

      b.    2012 contract titled "Deed of Loan" (the "2012 Deed of Loan") (Ex. 15); and

      c.    2013 contract titled "Contract for the Sale of Shares of a Company Owning Business" (the "2013 W&K Sale Agreement") (Ex. 5).

98.    On their face, these contracts are demonstrably fraudulent in a number of manners.

99.    *First*, the electronic signatures on these documents are not Dave's. They are substantially different than known examples of Dave's electronic and written signatures:

| Authentic Signatures<br>2/1/2013[16] & 7/30/2003[17] & 2/22/2012 | Signature on Fraudulent Contracts<br>4/22/2011 & 04/2/2013 |
|---|---|
|  |  |

---

[16] See Ex. 16 (signature on Computer Forensics LLC Operating Agreement).

[17] See Ex. 17 (signature on Dave's last will and testament).

21

100.     In fact, this signature is a near identical copy of a computer-generated font called Otto, available here: https://www.wfonts.com/font/otto. When computer generated, this Otto font produces the signature:

Otto.ttf

*Dave Kleiman*

101.     When confronted with this information by Ira, Craig admitted the signatures were computer generated, but claimed there were other ways to prove their veracity.

102.     Craig has never provided additional evidence of their legitimacy.

103.     *Second*, the "Purchaser" listed in the 2013 W&K Sale Agreement is "Craig Wright R&D" and is further identified by its Australian Business Number (ABN) 97 481 146 384. However, the entity associated with this ABN was not identified as "Craig Wright R&D" until September 2, 2013 – over three months after Dave died.[18]

104.     *Third,* the terms of the 2011 IP Agreement are nonsensical. While it purports to "finance" W&K through the transfer of around 215,000 bitcoin, and requires W&K to "fund the software development using bitcoin," there was essentially nothing that could be purchased with bitcoins at that time. Thus, no one could "finance" or "fund" anything with bitcoins then. This calls the 2013 W&K Sale Agreement's purported "release" of this nonsensical "financing arrangement" into question.

105.     *Fourth,* the 2011 IP Agreement, the 2012 Deed of Loan, and the 2013 W&K Sale Agreement conflict with each other. The 2011 IP Agreement provides that Bitcoin wallet 1933***XY8a would be held by Craig in escrow and revert to Craig only if W&K defaulted, but

---

[18] https://abr.business.gov.au/SearchByAbnHistory.aspx?abn=97481146384

the 2013 W&K Sale Agreement provides that it will be "released to" Craig *despite* satisfaction of the liability, and the 2012 Deed of Loan shows that same wallet being placed into a trust by Craig with a notation that it be held there until Dave and Craig can set up a joint-company later.

106.    *Fifth*, the 2013 W&K Sale Agreement references 250,000 bitcoin and then 250,500 bitcoin as the amount of bitcoin Dave was to transfer to Craig.

107.    *Sixth*, the fraudulent signatures aren't witnessed or notarized.  Even the most unsophisticated parties would understand that a contract purporting to release and transfer property valued at eight figures should be substantiated in some way with witnesses and/or notaries.

108.    *Lastly*, many of the contractual terms are extremely convenient for Craig.  For example, the 2011 IP Agreement provides for confidentiality even from family members, stipulates the value of 215,000 bitcoin at 40,000,000 AUD (when it was really worth around ~$250,000), and includes a "typo" showing the date as 2013, and amending it by hand to 2011 (likely because it was written in 2013).

109.    These red flags are rendered even more suspicious by the fact that the 2013 W&K Sale Agreement was purportedly signed a mere 10 days after Dave left the VA hospital, and no more than three weeks before he died.

110.    Craig has a documented history and habit of backdating contracts and documents to suit his needs.  During the February 18, 2014 interview with Craig by the ATO, Craig admitted that he backdated certain tax invoices.  (Ex. 12).  Further, Wired has written that Craig likely backdated numerous blog posts to further his claim of being Satoshi.[19]  Finally, in its 2015 audit

---

[19]    https://www.wired.com/2015/12/new-clues-suggest-satoshi-suspect-craig-wright-may-be-a-hoaxer/.

of Coin-Exch, the ATO assessed tax liability and penalties against Craig for providing recklessly misleading tax information by, *inter alia*, backdating numerous documents. (Ex. 18).

111.     As described herein, after Dave died, Craig unlawfully and without permission took control of the bitcoins from Dave's estate and from W&K by exercising exclusive possession over the private keys necessary to own, move, or sell the bitcoins belonging to Dave and/or W&K; actually using those private keys to move these bitcoins out of their wallets; claiming to own bitcoins really owned by W&K and/or Dave by virtue of fraudulent contracts Craig created; refusing to return bitcoins that belonged to the estate and W&K; moving them to, or holding these bitcoins in, "trusts" known only to him and controlled by him and preventing these assets from being returned to the estate and/or W&K; and using those bitcoins (or the "rights" to them) to make large trades for his Australian businesses.

112.     While the exact number of bitcoins stolen remains to be determined, by Craig's admission, Dave's estate is entitled to the possession of *at least* 300,000 bitcoins that Craig controls in a trust (along with their forked assets).  But the estate may be entitled to even more bitcoins based on Dave and Craig's partnership from 2009 until 2011.

113.     Further, as Craig's admitted that the mining continued within W&K from 2011, W&K is entitled to the possession of all bitcoins mined through its operations since 2011 (along with their forked assets).

114.     To Plaintiffs' best knowledge, information, and belief, these bitcoins could number around ~1,100,111.[20]  Together, these bitcoins and their forked assets are worth approximately

---

[20] Should discovery reveal additional bitcoin were mined, either by Dave individually, or by W&K after Dave died, Plaintiffs may amend their Complaint to assert a claim over those bitcoins and their forked assets as well.

$11,427,755,048.02, though at their peak in December 2017 they were worth ~$27,332,125,781.68.

115.    Ira has requested Craig return these bitcoins, but Craig has not done so. In light of this refusal, demanding the return of the forked assets would be futile.

116.    Thus, Craig has wrongfully asserted dominion over Dave and W&K's bitcoins forked assets, and intellectual property in a way that is inconsistent with Dave and W&K's ownership of those bitcoins, forked assets, and intellectual property which has damaged them both.

**Craig attempts to launder the stolen title to W&K's intellectual property, by securing "consent judgments" against W&K, without serving W&K, falsely representing W&K's consent, and using fraudulent contracts**

117.    In July and August 2013, Craig filed two claims in New South Wales Supreme Court against W&K for ~$28 million each. (Ex. 11).

118.    In both claims, Craig alleged that W&K agreed to pay Craig for property and consulting services necessary to "complete research" and that this contract was "bonded against the intellectual property of [W&K]." (Ex. 11 at 3, 9). The pleadings alleged that "the contract stated that a breach would lead to liquidated damages [and if] the liquidated amount is not paid all IP systems returns to the sole ownership of [Craig]." (*Id.* at 4, 10). The statements of claim allege that the intellectual property at issue was the "software and code used in the creation of a Bitcoin system" and "used by the US Military, DHS and other associated parties." (*Id.*).

119.    W&K was never served, validly or otherwise, with these proceedings; Dave's estate was not even aware of them until long after the judgments had been entered.

120.    Craig prevented W&K from participating in these proceedings as, *inter alia*, he filed, in both lawsuits, a false "Acknowledgment of Liquidated Claim" on behalf of W&K where he represented that W&K accepted and agreed to his claims. (Ex. 30). In these filings, Craig falsely identified himself as the "legal agent and representative for the defendant" and its

25

"Director/Australian Agent" and falsely stated that "I acknowledge the whole of the amount being claimed by the plaintiff." (*Id.*). Further, he falsely identified his Australian address and email as the "Address for service" for W&K. (*Id.*).

121.    Craig further prevented W&K from participating in the proceedings, by filing, on August 28, 2013, Consent Orders in both cases. (Ex. 19). These filings represent to the Australian courts that W&K consented to judgment being entered against it through the signature of its "authorised officer," a "J Wilson." (*Id.* at 2). But J Wilson – Craig's employee – was not authorized. Instead, Craig "elected" him a director at a "shareholder meeting" where only Craig was present and only Craig voted. (Ex. 4 at 5-6).

122.    Craig did this even though (i) Craig did not have any direct or voting interest in this Florida LLC (only an indirect or beneficial interest), (ii) Dave's estate (which held at least 50% of the interest in the LLC) was not notified of the meeting, and (iii) even if Craig had a 50% voting interest in W&K, the election of Wilson was void because the "meeting" lacked a quorum.

123.    In April 2014, Ira first learned of these court proceedings, when the ATO sent him some of the court documents. Ira confronted Craig for taking Dave and W&K's assets and concealing the court proceedings from Dave's estate. Craig admitted his subterfuge, but defended himself by claiming the ends justified the means:

> Ira: ". . . From [the] documents [I have] it appears clear to see a systematic transfer of assets out of W&K back to you . . . But you never mentioned any of the actions you were taking against W&K prior to contacting us."

> Craig: "Dave died. I did the actions to make sure that the court signed off on what Dave and I planned." (Ex. 20 at 18).

124.    Importantly, these Australian claims, like the sworn testimony he submitted to this Court, are based on demonstrably false factual allegations. Specifically:

125.     The July 2013 claim alleges the existence of an October 27, 2008 contract between Craig and W&K, claiming that "[W&K] agreed to pay [Craig] for property and consulting services." (*Id.* at 2).  However, W&K did not exist in 2008.

126.     Also, the July 2013 claim alleges:

"[Craig] conducted four projects associated with the DHS (Dept. of Homeland Security USA) with [W&K] under contract:

    a.   BAA 11-02-TTA 01-0127-WP  TTA 01 - Software Assurance:  Software Assurance through Economic Measures

    b.   BAS 11-02-TTA 05-0155-WP TTA 05 - Secure Resilient Systems and Networks

    c.   BAA 11-02-TTA 09-0049-WP TTA 09 - Cyber Economics

    d.   BAA 11-02-TTA 14-0025-WP TTA 14 - Software Assurance MarketPlace (SWAMP)." (*Id.* at 9-10).

127.     The July 2013 claim goes on to state that "these funds were rated as:

    a.   TTA 01         US$ 650,000

    b.   TTA 05         US$ 1,8000,000 (*sic*)

    c.   TTA 09         US$ 2,200,000

    d.   TTA 14         US$ 1,200,000." (*Id.* at 10).

128.     However, these statements were false.  The results of Freedom of Information Act requests by Ira to the DHS reveals that W&K's applications for TTA 01, TTA 05, TTA 09, and TTA 14 were all denied by the DHS. (Ex. 21).

129.     The August 2013 claim also contains a demonstrably false allegation, alleging the existence of a January 8, 2009 contract between Craig and W&K, claiming that "[W&K] agreed

to pay [Craig] for property and consulting services." (Ex. 11 at 2). But again, W&K did not exist until 2011.

130.     On November 6, 2013, judgments appear to have been entered for both Australian claims. (Ex. 22). Craig's fraud to keep W&K and Dave's estate out of the litigation was successful as, in the judgment, the Court "**note[d] the agreement of the parties** that [Craig] will accept the transfer of the intellectual property held by the plaintiff in full and final satisfaction of the judgment." (*Id.*) (emphasis added).

131.     To this day, Craig has used these fraudulently obtained judgments to assert ownership over the intellectual property assets developed by W&K and Dave. For example, in the February 18, 2014 meeting with the ATO, Craig's attorney represented to the ATO that "intellectual property that had been acquired by Dr Wright from WK Info Defence is on-supplied to the Wright Family Trust and then broken up and transferred to other group entities, Hotwire, Coin Exchange . . . and so on." (Ex. 12 at 7). And later again stating: "Remember there's the IP coming out of WK Info Defence in the US came to Craig through Craig to the Wright Family Trust and then from the Wright Family Trust into Hotwire . . ." (*Id.* at 18). Further, as discussed in para 142-143, the ATO has provided Ira with "deeds" drafted and executed by Craig which show that his companies have taken ownership over the intellectual property created by W&K and "transferred" by virtue of these fraudulently obtained "judgments."

**Craig reaches out to Ira to cover up his fraud, deceive Ira into believing him, and secure an ally in his fight against the ATO**

132.     With the ATO closely auditing Craig's activities, Craig knew he had to reveal some of his and Dave's bitcoin mining and blockchain work to justify various tax positions he took in Australia. Realizing this would lead the ATO to contact the Kleimans, Craig reached out first.

133.     Nearly ten months after Dave's death, on February 11, 2014, Craig reached out to

Dave and Ira's 94 year old father Louis, and wrote:

> Date: Feb. 11, 2014
> From: Craig Wright <Craig.Wright@hotwirepc.com>
> To: Louis <REDACTED@REDACTED>
>
> Hello Louis,
>
> Your son Dave and I are two of the three key people behind Bitcoin . . .
>
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I will explain what this is later. Please understand, I do not seek anything other than to give you information about your son.
>
> Know also that Dave was a key part of an invention that will revolutionise the world . . .
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.
>
> I will let you know when I am in the USA.  (Ex. 23).

134.     As Louis Kleiman was elderly, Ira took over the correspondence with Craig.

135.     Craig told Ira he was partners with Dave and that no one knew about their

collaboration or W&K. He explained to Ira that W&K was involved in Bitcoin mining and that it

was quite successful.

136.     Shortly after informing Ira about W&K, Craig told Ira that Craig and Dave were

planning on starting a new company together called "Coin-Exch."  He explained to Ira that Dave's

estate would receive shares in it worth millions.

137.     On April 23, 2014, Craig wrote to Ira:

> Date: April 23, 2014 8:56pm
> From: Craig <craig@rcjbr.org>
> To: Ira <REDACTED@REDACTED.com>

29

The software Dave updated, and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level. This is all good under the law. Basically the GST (like a Vat) cancels as it is an international transfer

What company owns right now is:

- Software – incl source code and perpetual licenses valued at over $50 million.
- Intellectual Property, design, codes etc
- Research claims. (Ex. 24).

138.    At the same time Craig was defrauding the Kleimans, Craig also reached into Florida though an agent, Uyen Nguyen, to revive W&K after it had been administratively dissolved – to ensure he had control over it if necessary.

139.    Consequently, on March 28, 2014, nearly a year after Dave died, W&K was reinstated by Craig's agent, Uyen Nguyen ("Uyen"). (Ex. 25). Uyen removed Dave as the registered agent for W&K and listed herself. (*Id.*). She then added herself as manager and secretary and an entity named Coin-Exch Pty Ltd as director. (*Id.*; ECF 12 at 11 n3). But Coin-Exch Pty Ltd was merely Craig seizing control of W&K from the shadows, as it's well established "Craig Wright" was the "director and controlling mind" of Coin-Exch Pty Ltd. (Ex. 18 at 5).[21]

140.    Of course, despite Ira and Craig being in regular email contact at the time, Craig concealed this action from Ira.

**The ATO reached out to Ira to verify Craig's allegations over W&K, and provided Ira with documents that demonstrate Craig assumed control over intellectual property that belonged to W&K and/or Dave**

141.    As Craig expected, on April 15, 2014, an auditor from the ATO, reached out to Ira to inquire about his knowledge concerning the legal action Craig took against W&K. The auditor provided Ira copies of the 2011 IP Agreement and the 2013 W&K Sale Agreement.

---

[21] https://www.arnnet.com.au/article/621503/australian-bitcoin-figure-supercomputing-company-enters-liquidation/.

142.     The ATO also provided Ira with three deeds, each titled "IP Deed of Assignment" and each executed on September 15, 2013 – nearly four months after Dave's death.  (Ex. 26; Ex. 27; & Ex. 28).  Each of these IP Deeds of Assignments assigned various intellectual property rights from DeMorgan Ltd to three entities: Coin-Exch Pty Ltd (Ex. 26), Hotwire Preemptive Intelligence Pty Ltd (Ex. 27), and Cloudcroft Pty Ltd (Ex. 28).

143.     The deeds also described the source and nature of this IP: "The IP held in total by DeMorgan consists of source code, algorithms and patentable materials that have been obtained by Craig Wright R&D (ABD 97 481 146 384) through the following unrelated entities . . . W&K Information Defense Research LLC [as two batches)." (Ex. 26 at 4; Ex. 27 at 4; & Ex. 28 at 4).

**Craig continues to assure Ira and reveals the nature of the intellectual property owned by, and misappropriated from, W&K and Dave**

144.     On April 22, 2014, Ira wrote to Craig that after he had time to review the documents sent by the ATO, he "felt like there [were] questionable discrepancies in the contracts between you and W&K such as Dave's signatures, his resignation, transfer of all accountable value . . . ." (Ex. 24 at 20).

145.     To keep Ira from going public, Craig promised Ira that he could be paid out of what was owed to Dave's estate "based on what Dave and I had been arranging." (*Id.* at 12).  On April 23, 2014, Craig told Ira that he would receive the first $12 million payment in October 2014. (*Id.* at 8).

146.     On the same day, trying to further placate Ira, and further evidencing Dave and the estate's claim to W&K's transferred intellectual property, Craig wrote Ira stating:

> The software Dave updated and which I have transferred back in OUR company, and it is OURs as you are Dave's heir, was done at a zero tax level . . . Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code. (*Id.* at 2).

147.     On April 25, 2014, still trying to reassure Ira, Craig sent Ira a chronology of his activities related to W&K and the development of its intellectual property.  In this document, Craig wrote:

> There is a lot of IP and 'stuff' in the mix.  All up, it's around a hundred million dollars' worth.  This IP originates in work CSW has been doing for more than 10 years; it originates in things that came from W&K; it has to do with the software acquired.  The values and distribution . . . amounts to a third each for Cloudcroft, Hotwire, and Coin exch. Cloudcroft gets the security related IP, Coin-Exch gets the banking and Hotwire gets all of the automation R&D based stuff.  (Ex. 7).

148.     The nature of this intellectual property transferred from W&K to DeMorgan, Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft was further explained by Craig in a letter he published on DeMorgan's website in 2015.  This letter demonstrates that Coin-Exch, Hotwire Preemptive Intelligence, and Cloudcroft were involved in building out W&K's intellectual property with R&D efforts targeted at "the development of smart contract and Blockchain based technologies" and "commercialisation of our Blockchain and smart contract systems research."[22]

149.     Craig's promise of a multi-million dollar payment by October 2014, never came true. Craig blamed the delay on the ATO investigation and kept promising Ira he would see value when the investigation closed.

150.     On October 9, 2015, Craig essentially stopped responding to Ira.

151.     In November 2015, Dave's friend and business partner, Patrick Paige reached out to Craig when a reporter called him inquiring about Craig and Dave's involvement in Bitcoin. Craig responded:

---

[22]http://www.businessinsider.com/craig-steven-wright-rumoured-bitcoin-creator-was-commercialising-blockchain-research-and-reviving-company-hotwire-2015-12; https://prwire.com.au/pr/51565/the-demorgan-ltd-group-of-companies-to-receive-up-to-54-million-from-ausindustry-r-amp-d-tax-rebate-scheme-1.

> Thanks for the heads up.  Reporters are always troubling.  They ignored the stuff Dave and I did when he was alive.  I don't know what has started to interest them now . . . as you know[, **Dave] did a fair amount of research with me.  Most yet to be completed and published.** (Ex. 8 at 13 (emphasis added)).

152.      After Craig yet again confirmed Dave's involvement in Bitcoin and the intellectual property they developed, Patrick wrote back:

> . . . I think we both know Dave was a genius when it came to computers and I sure would like Dave to get recognition for his part if any in the development of bitcoins.  I realize there is a lot of things to consider releasing this information but my question is when? (*Id.* at 12).

153.      Craig responded:  "When it all comes out, there is no way Dave will be left out. **We need at least a year more.**" (*Id.* (emphasis added)).

### Craig claims that he and Dave are Satoshi Nakamoto

154.      On December 8, 2015, two popular tech publications, *Wired* and *Gizmodo*, outed Craig as Satoshi.[23]  Both articles also articulated Dave's integral role in the development of Bitcoin.  They described numerous details and leaked communications implicating Dave and Craig's roles in creating and developing Bitcoin; they also discussed Dave and Craig's accumulation of a vast hoard of bitcoin.

155.      On May 2, 2016, nearly five months after the *Wired* and *Gizmodo* publications, Craig published a blog post in which he claimed to be Satoshi.[24]

156.      Craig has readily admitted Dave was intimately involved in the creation of Bitcoin. In numerous interviews with Andrew O'Hagan, documented in *The Satoshi Affair*, Craig told

---

[23] https://www.wired.com/2015/12/bitcoins-creator-satoshi-nakamoto-is-probably-this-unknown-australian-genius/;  https://gizmodo.com/this-australian-says-he-and-his-dead-friend-invented-bi-1746958692.

[24] https://qz.com/674129/an-australian-nobody-claims-to-be-the-inventor-of-bitcoin-but-no-one-knows-for-sure/.

O'Hagan that "[Craig] did the coding and that Kleiman helped him to write the white paper." (Ex. 1 at 31).

157.     Further, in numerous emails to Ira, Craig admitted the same.

158.     Craig currently serves as Chief Scientist of a UK company called nChain in London, where, in 2016, he filed dozens of patents related to Bitcoin and blockchain technology through this entity.[25] The public filing of these patents disclosed to the public intellectual property belonging to Dave and W&K without the permission of Dave's estate and/or W&K.

159.     To date, neither Dave's estate nor W&K have received the assets belonging to them as a result of their early involvement in Bitcoin and bitcoin mining.

## Fraud on this Court[26]

160.     In Ira's initial Complaint, as in this one, he alleged that (i) Craig and Dave held some form of interests in a Florida LLC called W&K, that (ii) through this LLC, and otherwise, they mined over 1.1 million bitcoins and developed extremely valuable intellectual property, that (iii) after Dave died, Craig took unlawful possession of all the bitcoins the Florida LLC mined and intellectual property it created (along with the bitcoin and intellectual property they mined/developed together personally), that (iv) Craig then tried to "launder" this stolen intellectual property by defrauding the Australian courts into entering consent orders transferring clean title over W&K's intellectual property to Craig; and that (v) Craig needs to return the stolen property.

161.     In response to this Complaint, Craig filed a motion to dismiss alleging he has essentially **no** connection to Florida or W&K.  His motion stated Plaintiff's jurisdictional

---

[25]   https://www.reuters.com/article/us-bitcoin-wright-fund-exclusive/exclusive-company-behind-bitcoin-creator-sold-to-private-investors-idUSKBN17F26V.

[26] The emphases appearing in this section have been added.

34

allegations were "frivolous" and "sanctionable." (ECF D.E. 12 at 36). Craig supported these assertions with a sworn declaration stating he was never a shareholder, member, agent, employee, or representative of W&K. (Ex. 29 ¶¶ 11-12). He swore, under penalty of perjury under the laws of the United States, that he's never exercised authority or control over W&K. (*Id.* ¶ 13).

162.    He perjured himself.

163.    To procure his fraudulent Australian judgments, Craig submitted an affidavit to the Supreme Court of New South Wales where Craig affirmed that:

> "The **shareholding** of 'W&K Info Defense LLC' was:
>
> 1. **Craig S Wright**               **50.0%**
> 2. David A Kleiman          50.0%"

(Ex. 4 at 5).

164.    Craig then doubled down on this ownership structure affirming further that "W&K Info Defense LLC was an incorporated partnership. **All shares are held jointly.**" (*Id.*). He then affirmed that **he called a "shareholders meeting"** on August 16, 2013 at which only he and Jamie Wilson were present. (*Id.*). Craig affirmed **he was the sole vote** that nominated Jamie Wilson to act as a director "for purposes of consenting to orders and the company to be wound down." (*Id.* at 5).[27]

165.    These affidavit statements directly contradict his sworn statements to this Court that (i) "I have never been a . . . **shareholder** . . . of W&K," (ii) "I have never been a **member** of W&K," and (iii) "I have never **exercised authority or control** over W&K . . ." (Ex. 29 ¶¶ 11-13).

166.    But the perjury doesn't end there.

---

[27] Under Florida law, there is no such thing as an "incorporated partnership" and an LLC does not have "shares" or "directors" or hold shareholders' meetings. The "owners" of an LLC are called "members."

167.    Craig attached voluminous records to his Australian affidavit. These attachments evidence Craig signed as the **"authorized representative"** of W&K six (6) times (Ex. 4 at 56, 63, 70, 76, 83, 90), identified himself as W&K's **"lead researcher"** twice (*id.* at 45-46), its **"technical contact"** six (6) times (*id.* 50, 57, 64, 71, 77, 84), affiliates himself with **W&K's Florida address** as, *e.g.*, his **"mailing address"** twelve (12) times (*id.* at 49, 56-57, 63-64, 70-71, 76-77, 83-84, 90), includes detailed descriptions of the computer programs and research Craig was **attempting to get DHS to fund** (*id.* at 50-94), and includes four (4) emails from DHS confirming Craig had **uploaded various proposals on behalf of W&K attempting to secure funding** (*Id.* at 40-43). Collectively, these documents clearly evidence Craig's participation in operating W&K from Florida to solicit business from the United States DHS.

168.    Obviously, these affidavit attachments are in direct conflict with Craig's sworn statements to this Court that (i) "I have never been a . . . **employee**, or **representative** of W&K," (ii) "I have never been an **agent** of W&K," (iii) "I have never . . . **developed software for** any purpose relating to a Florida business, including **W&K**," (iv) "I have never **advertised services in Florida**," (v)  "I have never had an **office in Florida**," and (vi) "I have never **exercised authority or control over W&K . . .**"  (Ex. 29 ¶¶ 6, 8, 11-13, 15).

169.    As mentioned in ¶ 120, Craig also submitted two "Acknowledgment of Liquidated Claim" filings in Australia where he signed as the **"legal agent and representative"** of W&K and as its **"Director/ Australian Agent."** (Ex. 30). As set forth in ¶¶ 138-139 he also acted as the **"director"** of W&K when he had his agent put Coin-Exch, his company, as its director.  These also directly conflict with his sworn testimony above.

170.    Craig's boldfaced misrepresentations and perjury before this Court constitute a continuation of his grand fraud to unlawfully take Plaintiffs' assets.  Said differently, Craig's latest

fraud on this Florida Court is simply one more action he's taken in Florida to defraud Dave's estate and W&K.

## CLAIMS FOR RELIEF

### COUNT I
### Conversion
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

171.    On or about April 2013 through the present day, Defendant converted to his own use, bitcoins, forked assets, and intellectual properties that was then the property of, and owned by, the estate and/or W&K.

172.    The property was worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over it.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages in the amount of at least $11,427,755,048.02 and/or return of the wrongfully converted bitcoins with their forked assets. Plaintiffs demands the return of the IP, or its fair market value. Plaintiffs also demand punitive damages, together with court costs, interest, and any other relief this Court deems just and proper.

### COUNT II
### Unjust Enrichment
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

173.    Plaintiffs have conferred a benefit on the Defendant, who has knowledge thereof.

174.    Defendant voluntarily accepted and retained the benefit conferred.

175.    The circumstances render Defendant's retention of the benefit inequitable unless the Defendant pays to Plaintiffs the value of the benefit.

176.    Defendant has been unjustly enriched at Plaintiffs' expense.

37

177.　　Plaintiffs are entitled to damages as a result of Defendant's unjust enrichment, including disgorgement of all monies and or properties unlawfully accepted and retained by Defendant from Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant for the return of the wrongfully retained property or monetary damages equaling to the value thereof, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT III
### Misappropriation
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

178.　　After Dave's death, Craig unlawfully, willfully, and maliciously misappropriated trade secrets belonging to Dave and/or W&K relating to blockchain based technologies and smart contracts by using them for himself and using a series of fraudulent contracts, misrepresentations, and fraudulently obtained court judgments to transfer/acquire the property rights in these trade secrets to/for himself.

179.　　These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts. These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

180.　　These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use. As evidence of the substantial economic value relating to these trade

secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

181.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets.  Dave made no disclosures of these trade secrets to anyone but Craig.

182.    As a proximate result of Craig's unlawful misappropriation, Dave's estate and/or W&K have suffered actual losses consisting of the loss in economic value associated with the trade secrets.

183.    As a proximate result of Craig's unlawful misappropriation, Dave's estate and W&K are informed and believe that Craig has been unjustly enriched.

184.    As a proximate result of Craig's unlawful and willful misappropriation, Dave's estate is entitled to a recovery of damages pursuant to Fla. Stat. § 688.004.

WHEREFORE, Plaintiffs demand judgment against Defendant for all available damages caused by Craig's misappropriation, including exemplary damages, together with court costs, interest, attorney's fees pursuant to Fla. Stat. 688.005, and any other relief this Court deems just and proper.

## COUNT IV
### Federal Defense of Trade Secrets Act
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

185.    Craig's conduct described in this Second Amended Complaint constitutes misappropriation of trade secrets under the Defend Trade Secrets Act.  18 U.S.C. §§ 1832.

186.    These trade secrets are generally described as programs, methods, techniques, and processes relating to blockchain based technologies and smart contracts which is a product used

and intended to be used in interstate and foreign commerce. These trade secrets can be identified specifically as the software Dave developed personally and through W&K, i.e., those Craig attempted to have transferred through the fraudulent Australian judgments, which he then on-supplied to himself, the Wright Family Trust, DeMorgan and its subsidiaries.

187.    These trade secrets derived actual and potential independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use. As evidence of the substantial economic value relating to these trade secrets, Craig has used these trade secrets to develop new intellectual property and assets, some of which have resulted in the filing of new patents, through his work at nChain.

188.    Craig caused many of these patents to be filed *after* May 11, 2016.

189.    Dave and W&K possessed secret information and made reasonable efforts to maintain the secrecy of these trade secrets. Dave made no disclosures of these trade secrets to anyone but Craig.

190.    As a proximate result of Craig's unlawful misappropriation, Dave's estate has suffered actual losses consisting of the loss in economic value associated with the trade secrets.

191.    As a proximate result of Craig's unlawful misappropriation, Dave's estate is informed and believes that Craig has been unjustly enriched.

WHEREFORE, Plaintiffs demand judgment against Defendant for the value of the wrongfully taken intellectual property, together with court costs, interest, attorney's fees, and any other relief this Court deems just and proper.

## COUNT V
### Breach of Fiduciary Duty
*(Asserted by the Estate and W&K)*

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

192.     Although Craig did not have a direct ownership interest in W&K, he owed fiduciary duties to the LLC, as, *inter alia*, its agent, its purported "authorized representative," "lead researcher," "technical contact," "legal agent and representative" and "Director/Australian Agent." Although lacking any authority to do so, upon Dave's death Craig assumed *de facto* control and management of W&K and thereby incurred fiduciary duties to act in the LLC's, and its member's, best interests.

193.     In the alternative, just as the shareholders of a closely held corporation have partnership-like fiduciary duties to each other, Craig and Dave acted as partners in the management and operation of W&K, and thus Craig owed fiduciary duties of care, loyalty, and good faith to Dave, his estate, and W&K, by virtue of their joint venture.

194.     In the alternative, if Craig *was* an actual member in W&K Info Defense LLC, Craig owed fiduciary duties of care, loyalty, and good faith to W&K, Dave, and his estate pursuant to Fla. Stat. § 605.04091.

195.     Craig breached his fiduciary duty of loyalty and good faith, by, among other things, intentionally and wrongly transferring assets that belonged to Dave's estate and/or W&K to himself and/or companies controlled by him.

196.     Dave's estate and or W&K have been damaged by Craig's breach of his fiduciary duties.

WHEREFORE, Plaintiffs demand judgment against Defendant for damages and/or return of the wrongfully taken bitcoins, forked assets, and intellectual property, together with court costs, interest, and any other relief this Court deems just and proper.

41

**COUNT VI**
**Breach of Partnership Duties of Loyalty and Care**
(*Asserted by the Estate*)

Plaintiff incorporates paragraphs 1 to 170, and 178-191.

197. From c. 2008 until at least the creation of W&K in 2011, Craig and Dave associated to carry on as co-owners of a business for profit to create Bitcoin, mine bitcoins, and create other block chain intellectual property. Pursuant to Fla. Stat. § 620.8202, and Craig's admission of same, this formed a partnership.

198. Pursuant to Fla. Stat. § 620.8404(2), Craig owed Dave a duty of loyalty to, *inter alia*, "account to the partnership and hold as trustee for the partnership any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity.

199. Pursuant to Fla. Stat. § 620.8404(3), Craig owed Dave a duty of care to refrain from engaging in intentional misconduct, or a knowing violation of law.

200. Craig breached these duties of loyalty and care by, *inter alia*, stealing Dave's bitcoins and any intellectual property Dave owned and or designed during the c. 2008-2011 timeframe (or any other time they partnered).

201. Pursuant to Fla. Stat. §§ 620.8405, Dave's estate brings this action for breach of the duties of loyalty and care owed under Fla. Stat. § 620.8404, including but not limited to its rights pursuant to Fla. Stat. §§ 620.8401, 620.8403, 620.8807, its right to have its partnership interest purchased pursuant to § 620.8701, and to otherwise enforce the rights and protect the interests of Dave's estate.

42

WHEREFORE, Plaintiff demands judgment against Defendant for damages, and purchase of his partnership interest together with court costs, interest, and any other relief this Court deems just and proper.

**COUNT VII**
**Fraud**
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

202.    As detailed above, Defendant made knowing false statements of fact, intentional omissions of material facts, and falsely promised future action with no intention of performing and/or specifically intending not to perform. These included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred, sold, and/or returned to Craig pursuant to valid contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

203.    Defendant took these actions/omissions with the purpose of inducing Plaintiffs to rely on these fraudulent acts and omissions.

204.    Plaintiffs acted in reliance on Defendant's fraudulent representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

205.    As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT VIII
### Constructive Fraud
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170, and 192-205.

206.    As detailed above, a fiduciary relationship existed between Craig and W&K and Craig and Ira.

207.    Craig invited W&K and Ira's utmost trust and loyalty as their fiduciary.

208.    Plaintiffs reposed the utmost trust and loyalty in Craig.

209.    Craig intentionally violated Plaintiffs trust and confidence, took unconscionable advantage of Plaintiffs, abused and took improper advantage of their confidential and fiduciary relationship, and materially breached his fiduciary duties to them both by knowingly making false statements of fact, intentional omissions of material facts, remaining silent in light of a duty to speak, falsely promising future action with no intention of performing and/or specifically intending not to perform, and by engaging in unfair methods against them. These fraudulent representations/omissions included, but are not limited to: that Dave and W&K's bitcoins and intellectual property rights were transferred, sold, and/or returned to Craig pursuant to valid

44

contracts; that Dave signed those contracts; that the estate would be able to sell its shares in Coin-Exch, that he would help the estate recover what Dave owned; that the estate could participate in Coin-Exch, that Craig did not have any of Dave's or W&K's bitcoins, and the fraudulent declaration submitted to this Court; and Craig's omissions that he was pursuing judgments and lawsuits against W&K in Australia and that he had assumed control over W&K, its assets, and the estate's assets as well.

210.    As detailed above, at the time Craig made those false statements and material omissions, and concealed his misconduct, a fiduciary relationship existed between Craig and Ira, and Craig and W&K, as Craig owed fiduciary duties and duties of care and loyalty to the estate and W&K.  Craig induced Ira's reliance and Craig took an improper/unconscionable/unfair advantage of, and abused, the fiduciary and confidential relationship at Ira and W&K's expense. Craig's misrepresentations and omissions were intentional, for the specific purpose of defrauding the estate and W&K of their property, but in any event, regardless of intent, Craig is liable for constructive fraud.

211.    Plaintiffs acted in reliance on Defendants fraudulent and unfair representations and omissions. This reliance included, but was not limited to, not challenging Craig's legal claims in Australia, expending time and resources reviewing fraudulent documents, delaying uncovering Craig's fraud and bringing this lawsuit, and not securing the bitcoins and intellectual property they owned and/or controlled.

212.    As a direct and proximate result of their reliance, Plaintiffs were damaged and injured. This includes, but is not limited to, the continued conversion and misappropriation of their bitcoins, forked assets, trade secrets, and intellectual property; by the expenditure of resources interacting with the ATO and investigating Craig's fraud; by the entry of the Australian court

judgements entered against W&K; by the inability to pursue business opportunities due to the lack of access to the aforementioned assets.

WHEREFORE, Plaintiffs demand judgment against Defendant for actual, nominal, consequential, special, and punitive damages in an amount to be determined at trial, together with court costs, interest, and any other relief this Court deems just and proper.

## COUNT IX
### Permanent Injunction
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

213.    Craig's unlawful taking of the bitcoins and intellectual property belonging to Plaintiffs has resulted in great and irreparable injury to them both as they have been deprived of unique, limited, and valuable digital assets.

214.    Neither Plaintiff can be fully compensated in damages and is without adequate remedy at law.

WHEREFORE, Plaintiffs request this Court enter an injunction ordering Defendant to return all bitcoins, forked assets, and intellectual property unlawfully taken from Plaintiffs.

## COUNT X
### Civil Theft - § 772.11 Fla. Stat.,
*(Asserted by the Estate and W&K)*

Plaintiffs incorporate paragraphs 1 to 170.

215.    On or about April 2013 through the present day, Defendant knowingly and wrongfully took, with felonious criminal intent, bitcoins, forked assets, and intellectual properties that were then the property of, and owned by, the estate and/or W&K.

46

216.      Defendant took these with the intent to deprive Plaintiffs of the right to these properties and to appropriate the properties to his own use and the use of others not entitled to use the properties.

217.      Defendant also trafficked in, and endeavored to traffic in, properties that he knew were stolen and properties that he initiated, organized, planned, financed, directed, managed, and supervised, the theft of.

218.      The properties were worth between ~$201,728,340.04 and $27,332,125,781.68 during the time Defendant has had possession over them.

219.      The actions taken by Defendant were done intentionally and maliciously as part of a scheme designed to defraud Plaintiffs of their assets.

220.      On June 19, 2018, pursuant to § 772.11 Fla. Stat., counsel for Plaintiffs sent the demand required by Florida Law required to initiate a claim for civil theft.  (Ex. 33.)

221.      Defendant has not complied with that demand.

222.      Plaintiffs have been damaged as a result of Defendants actions.

223.      Plaintiffs have retained the undersigned to represent them in this action and in so doing have incurred an obligation for the payment of attorney's fees and costs.

WHEREFORE, Plaintiffs demand judgment against Defendant awarding damages, including treble damages and attorney's fees pursuant to § 772.11 Fla. Stat. as well as ordering Defendant to divest himself of relevant enterprise(s), as well as granting such other relief as the Court deems just, equitable and proper.

**Plaintiffs demand a trial by jury for all issues triable by right.**

Dated:  January 14, 2019

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: */s/Velvel Devin Freedman*
Velvel (Devin) Freedman
**BOIES SCHILLER FLEXNER LLP**
100 SE Second Street
Miami, FL 33131
Tel.    (305)539-8400
Fax.    (305)539-1307
Email: vfreedman@bsfllp.com

Kyle Roche
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel.    (914)749-8200
Fax.    (914)749-8300
Email: kroche@bsfllp.com
*Admitted pro hac vice*

Attorneys for Plaintiffs
IRA KLEIMAN in his capacity as Personal
Representative of the Estate of David Kleiman and
W&K Info Defense Research, LLC.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 14, 2019, a true and correct copy of the foregoing

was filed with CM/ECF, which caused a copy to be served on all counsel of record.

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman

Electronically Filed 08/16/2013 05:17:59 PM ET

*** FILED: PALM BEACH COUNTY, FL  SHARON BOCK, CLERK. ***

IN THE CIRCUIT COURT OF THE 15TH
JUDICIAL CIRCUIT, IN AND FOR
PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION
CASE NO.

WELLS FARGO BANK, NATIONAL ASSOCIATION, AS
TRUSTEE FOR OPTION ONE MORTGAGE LOAN TRUST
2007-4, ASSET-BACKED CERTIFICATES, SERIES
2007-4

      Plaintiff,

vs.

DAVID A. KLEIMAN; UNKNOWN SPOUSE OF DAVID
A. KLEIMAN; UNKNOWN PERSON(S) IN POSSESSION
OF THE SUBJECT PROPERTY; WOODBINE MASTER
ASSOCIATION, INC.; CASA RIO HOMEOWNERS' SUB-
ASSOCIATION, INC.;

      Defendants.
_____/

## VERIFIED COMPLAINT

    The Plaintiff, WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR OPTION ONE

MORTGAGE LOAN TRUST 2007-4, ASSET-BACKED CERTIFICATES, SERIES

2007-4

, sues the Defendants named in the caption hereof and alleges:

1.    This is an action to foreclose a mortgage on real property in PALM BEACH County, Florida.

2.    On January 11, 2007, DAVID A. KLEIMAN executed and delivered a promissory note and DAVID A.

    KLEIMAN executed and delivered a mortgage securing payment of the same. Said mortgage was recorded

    in Official Records Book 21332, Page 1890, of the Public Records of PALM BEACH County, Florida, and

    which mortgaged the property described therein, then owned by and in possession of said mortgagor. The

    Note was negotiated and/or transferred to the Plaintiff. A copy of the note and mortgage are attached hereto

    and made a part hereof.

3.    Plaintiff, the holder of the note and first mortgage, is a person entitled to enforce said note and mortgage as

    provided within the meaning of Chapter 673, Florida Statutes.

4.    Defendant(s), DAVID A. KLEIMAN, own(s) the property.



File No.: 13-00208 OCN



EXHIBIT
3
RL    4/8/9

5. There has been a default under the note and mortgage held by Plaintiff in that the payment due October 1, 2012, and all subsequent payments have not been made. Plaintiff declares the full amount due under the note and mortgage to be now due.

6. All conditions precedent to the filing of this action have been performed or have occurred.

7. There is now due, owing and unpaid to Plaintiff herein $257,426.18 on principal of said note and mortgage, plus interest from September 1, 2012, and title search expenses for ascertaining necessary parties to this suit, escrow shortage, advances, late fees, costs and attorneys fees.

8. Plaintiff has obligated itself to pay the undersigned attorneys a reasonable fee for their services herein.

9. UNKNOWN SPOUSE OF DAVID A. KLEIMAN, may claim some interest or lien upon the subject property. Said interest, if any, is subject and inferior to the lien of Plaintiff's mortgage.

10. WOODBINE MASTER ASSOCIATION, INC. may claim some interest in or lien upon the subject property by virtue of UNPAID ASSESSMENTS AND MAINTENANCE FEES . Said interest, if any, is subject and inferior to the lien of Plaintiff's mortgage.

11. CASA RIO HOMEOWNERS' SUB-ASSOCIATION, INC. may claim some interest in or lien upon the subject property by virtue of UNPAID ASSESSMENTS AND MAINTENANCE FEES . Said interest, if any, is subject and inferior to the lien of Plaintiff's mortgage.

12. Defendant, Unknown Person(s) in Possession of the Subject Property, may claim an interest in the subject property by virtue of being in actual possession of same or by virtue of a tenancy at will, but the interest, if any, is subject and inferior to the lien of Plaintiff's mortgage, or is otherwise terminable as provided by law.

WHEREFORE, Plaintiff prays as follows:

(a.) That this Court will take jurisdiction of this cause, of the subject matter and the parties hereto.

(b.) That this Court ascertain and determine the sums of money due and payable to the Plaintiff from the Defendants.

(c.) That the sum of money found to be due as aforesaid be decreed by this Court to be a lien upon the lands described in Plaintiff's mortgage.

(d.) That such lien be foreclosed in accordance with the rules and established practice of this Court, and upon failure of the Defendants to pay the amount of money found to be due by them to the Plaintiff, the said land be sold to satisfy said lien.

(e.) That this Court decree that the lien of the Plaintiff is superior to any and all right, title or interest of the Defendants herein or any person or parties claiming by, through or under them since the institution of this suit.

File No.: 13-00208 OCN

(f.) That all right, title or intere st of the Defendants or any person claiming by, through or under them be forever barred and foreclosed.

(g.) That the Court retain jurisdiction of this cause to grant further relief as the Court deems just and proper including, but not limited to, deficiency judgment(s) if the proceeds of the sale are insufficient to pay Plaintiff's claim. Reservation of jurisdiction pertaining to deficiency judgments shall not apply to matters wherein the debt has been properly scheduled and discharged in bankruptcy.

## VERIFICATION OF COMPLAINT

Under penalty of perjury, I declare that I have read the foregoing Complaint, and the facts alleged therein are true and correct to the best of my knowledge and belief.

Dated: 9th of August 2013.

Ocwen Loan Servicing, LLC as servicer for WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE FOR OPTION ONE MORTGAGE LOAN TRUST 2007-4, ASSET-BACKED CERTIFICATES, SERIES 2007-4

By: _____

Kaye Weichel               Contract Management Coordinator

**Print Name and Title**

Kahane & Associates, P.A.
8201 Peters Road, Ste. 3000
Plantation, Florida 33324
Telephone: (954) 382-3486
Telefacsimile: (954) 382-5380
Designated service email: notice@kahaneandassociates.com

By: _____
Robert S. Kahane, Esq.
Fla. Bar No.: 946850
Clive M. Ryan, Esq., Fla. Bar No.: 388955
☐ Cindy Wolper Borzillo, Esq., Fla. Bar No.: 145912
☐ Charlene K. Eligon, Esq., Fla. Bar No.: 294070
☑ Eric M. Knopp, Esq., Fla. Bar No.: 709921
☐ Juan Diaz, Esq., Fla. Bar No.: 91011
☐ Stacey D. Rosenthal, Esq., Fla. Bar No.: 598291
☐ Craig P. Rogers, Esq., Fla. Bar No.: 352128

File No.: 13-00208 OCN

NOT A CERTIFIED COPY

Loan Number:   871007168          Servicing Number:   002276060-7          Date:   01/11/07

## ADJUSTABLE RATE NOTE
(LIBOR Index – Rate Caps)

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY, IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

          3119   CONTEGO LANE,   PALM BEACH GARDENS, FL 33418-
                              [Property Address]

1.   BORROWER'S PROMISE TO PAY
     In return for a loan that I have received, I promise to pay U.S.          $270,600.00                    (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is          Option One Mortgage Corporation, a California Corporation
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.   INTEREST
     Interest will be charged on unpaid principal until the full amount of principal has been paid.  Interest will be calculated on the basis of a 12-month year and a 30-day month. I will pay interest at a yearly rate of          7.000%          . The interest rate I will pay may change in accordance with Section 4 of this Note.
     The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

3.   PAYMENTS  **BALLOON NOTE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF**
     (A) Time and Place of Payments
     I will pay principal and interest by making payments every month.
     I will make my monthly payments on the first day of each month beginning on   March 01          , 2007          . I will make these payments every month, in addition to a final Balloon Payment payable at Maturity as referenced in the attached Balloon Note Addendum, until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on,
     February 01          , 2037          I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
     I will make my monthly payments at          Option One Mortgage Corporation
          P.O. BOX 92103 LOS ANGELES, CA 90009-2103
or at a different place if required by the Note Holder.
     (B) Amount of My Initial Monthly Payments
     Each of my initial monthly payments will be in the amount of U.S.   $1,681.59          . This amount may change.
     (C) Monthly Payment Changes
     Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.
     (D) Application of Payments
     Payments received by the Note Holder will be applied in the following order: (i) prepayment charges due under this Note; (ii) amounts payable under paragraph 2 of the Security Instrument (defined below); (iii) interest due under this Note; (iv) principal due under this Note; and (v) late charges due under this Note.

4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
     (A) Change Dates
     The interest rate I will pay may change on the first day of   February 01          , 2010          and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
     (B) The Index
     Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
     If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

FLORIDA ADJUSTABLE RATE BALLOON NOTE-LIBOR INDEX - Single Family
Page 1 of 3                                                                    FLNT051.wp (09-28-06)


ORIGINAL

Loan Number: 871007168    Servicing Number: 002276060-7    Date: 01/11/07

(C) Calculation of Changes **BALLOON NOTE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE AND 60/100 percentage point(s) ( 5.600% ) to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.000% or less than 5.600% ; Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than 13.000% or less than 5.600%

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due, together with accrued interest. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

*** PREPAYMENT CHARGE NOTE ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF ***

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all interest that I owe on that amount, together with any other charges that I owe under this Note or the Security Instrument, except as otherwise required by applicable law.

(C) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(D) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law, whether or not a lawsuit is filed. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

Page 2 of 3           FLNT051.up (09-28-06)

Loan Number:   871007168        Servicing Number:   002276060-7        Date:   01/11/07

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12.   DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the Mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
DAVID A. KLEIMAN          -Borrower          -Borrower

_____ (Seal)        _____ (Seal)
-Borrower          -Borrower

_____ (Seal)        _____ (Seal)
-Borrower          -Borrower

[Sign Original Only]

NOT A CERTIFIED COPY

FLNT051.wp (09-28-06)

Loan Number: 891007168     Servicing Number: 002276060-7     Date: 01/11/07

# BALLOON NOTE ADDENDUM

This is a BALLOON LOAN. The term of the loan is 40/30 years. This means that while your monthly payment amount is amortized in accordance with a 40 year loan term, the loan is payable in full in THIRTY (30) years from the date the loan is made. As a result, you will be required to repay the entire remaining principal balance, together with accrued interest, late charges, if any, and all advancements made by the lender under the terms of this loan in THIRTY (30) years from the date on which the loan is made.

The lender has no obligation to refinance this loan at the end of its term. Therefore, you may be required to repay the loan out of other assets you may own, or you may have to find another lender willing to refinance the loan.

Assuming this lender or another lender refinances this loan at maturity, you will probably be charged interest at market rates prevailing at that time which may be considerably higher or lower than the interest rate paid on this loan. You may also have to pay some or all of the closing costs normally associated with the new mortgage loan even if you obtain refinancing from the same lender.

_____     _____
Borrower  DAVID A. KLEIMAN     Borrower

_____     _____
Borrower     Borrower

_____     _____
Borrower     Borrower

MULTISTATE BALLOON NOTE ADDENDUM
Page 1 of 1                    USD5641.wp (05-19-05)

NOT A CERTIFIED COPY

ORIGINAL

Loan Number: 871009168          Servicing Number: 002276060~7          Date: 01/11/07

## PREPAYMENT CHARGE NOTE ADDENDUM

For value received, the undersigned (the "Borrower") agree(s) that the following provisions shall be incorporated into and shall be deemed to amend and supplement the Note made by the Borrower in favor of    Option One Mortgage Corporation, a California Corporation (the "Lender"), and dated as of even date herewith (the "Note"). To the extent that the provisions of this Prepayment Charge Note Addendum (the "Addendum") are inconsistent with the provisions of the Note, the provisions of this Addendum shall prevail over and shall supersede any such inconsistent provision on the Note

Section 5 of the Note is amended to read in its entirety as follows:

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal at any time before they are due. A prepayment of all of the unpaid principal is known as a "Full Prepayment." A prepayment of only part of the unpaid principal is known as a "Partial Prepayment." When I make a Full Prepayment or Partial Prepayment, I will tell the Note Holder in writing that I am doing so.

If I make a Partial Prepayment, there will be changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

If within   24 months    from the date of execution of the Security Instrument I make a Full Prepayment or, in certain cases a Partial Prepayment, I will at the same time pay to the Note Holder a prepayment charge. The prepayment charge will be equal to six (6) months' ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ed to all other amounts prepaid during the twelve (12) month period immediately preceding the date of the prepayment, exceeds twenty percent (20%) of the original principal amount of this Note. In no event will such a charge be made unless it is authorized by state or federal law.


_____   _____        _____   _____
Borrower DAVID A. KLEIMAN          Date           Borrower                          Date


_____   _____        _____   _____
Borrower                          Date           Borrower                          Date


_____   _____        _____   _____
Borrower                          Date           Borrower                          Date

MULTISTATE PREPAYMENT CHARGE NOTE ADDENDUM – ADJUSTABLE RATE
Page 1 of 1                                                       USP1021.wp (11-17-06)

NOT A CREDIT COPY

ORIGINAL

Loan Number: 871007168  Servicing Number: 002276060-7  Date: 01/11/07

## ALLONGE TO NOTE
### (INVESTOR)

This allonge makes reference to the following Note:

Borrowers: DAVID A. KLEIMAN
Loan #: 871007168
Property Address: 3119 CONTEGO LANE, PALM BEACH GARDENS, FL 33418-
Loan Amount: $270,600.00

Note Date: 01/11/07

Therefore, in reference to the captioned note, the following applies:

Pay to the order of:                                    Without Recourse

Pay to the order of Wells Fargo Bank, N.A.,
without recourse

Option One Mortgage Corporation
A California Corporation

By: _____
John Amico
Assistant Secretary

Page 1 of 1                                             USD3050.wp (03-14-03)

RETURN TO:
HEAVYWEIGHT TITLE CO.
10811 RED RUN BLVD. STE. 100
OWINGS MILLS, MD 21117
410-356-8430
TO6-8432

~~WHEN RECORDED MAIL TO:~~

Prepared by:
OPTION ONE MORTGAGE CORPORATION
P.O. BOX 57096
IRVINE, CA 92619-7096
ATTN: RECORDS MANAGEMENT
OON GROVE

Loan Number: 871007168
Servicing Number: 002276060-7

CFN 20070034987
OR BK 21332 PG 1890
RECORDED 01/23/2007 08:18:08
Palm Beach County, Florida
AMT 270,600.00
Deed Doc 947.10
Intang 541.20
Sharon R. Bock, CLERK & COMPTROLLER
Pgs 1890 - 1905; (16pgs)

[Space Above This Line For Recording Data]

## MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on January 11, 2007 . The mortgagor is
DAVID A. KLEIMAN

whose address is 3119   CONTEGO LANE , PALM BEACH GARDENS, FL  33418~   ("Borrower").
This Security Instrument is given to
Option One Mortgage Corporation, a California Corporation
which is organized and existing under the laws of CALIFORNIA          , and whose address is
3 Ada, Irvine, CA 92618                                           ("Lender").
Borrower owes Lender the principal sum of TWO HUNDRED SEVENTY THOUSAND SIX HUNDRED
AND No/100THS       Dollars (U.S.$270,600.00        ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides
for monthly payments, with the full debt, if not paid earlier, due and payable on February 01, 2037    .
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and
all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced
under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's
covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby
mortgage, grant and convey to Lender the following described property located in Palm Beach
County, Florida:
56-42-42-25-14-000-0540
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART THEREOF.

which has the address of 3119   CONTEGO LANE, PALM BEACH GARDENS
                                                                          [Street, City],
Florida        33418~      ("Property Address");
          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements,
appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be
covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the
right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances
of record. Borrower warrants and will defend generally the title to the Property against all claims and demands,
subject to any encumbrances of record.

FLORIDA-Single Family
Page 1 of 8                                                      FLD10011 (05/10/00)





Loan Number: 011007168          Servicing Number: 002276060-7          Date: 01/11/07

COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

Page 2 of 8                                                               FLD10012 (05/10/00)





Loan Number: 471007168          Servicing Number 002276060-7          Date: 01/11/07

5. Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, or applicable Law otherwise requires, insurance proceeds shall be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Lender's option, in such order and proportion as Lender may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by this Security Instrument, whether or not then due, and to such components thereof as Lender may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Lender. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, Lender may collect the insurance proceeds. Lender may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

If Borrower obtains earthquake insurance, any other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Lender, then such insurance shall (i) name Lender as loss payee thereunder, and (ii) be subject to the provisions of this paragraph 5.

6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower acknowledges that the Lender does not desire to make a loan to Borrower secured by this property on the terms contained in the Note unless the property is to be occupied by Borrower as Borrower's primary/secondary residence. Lender makes non-owner residence loans of different terms. Borrower promises and assures Lender that Borrower intends to occupy this property as Borrower's primary/secondary residence and that Borrower will so occupy this property as its sole primary/secondary residence within sixty (60) days after the date of the Security Instrument. If Borrower breaches this promise to occupy the property as Borrower's primary/secondary residence, then Lender may invoke any of the following remedies, in addition to the remedies provided in the Security Instrument; (1) Declare all sums secured by the Security Instrument due and payable and foreclose the Security Instrument, (2) Decrease the term of the loan and adjust the monthly payments under the Note accordingly, increase the interest rate and adjust the monthly payments under the Note accordingly, or (3) require that the principal balance be reduced to a percentage of either the original purchase price or the appraised value then being offered on non-owner occupied loans.

Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

Page 3 of 8                                                                                      FLD10013 (05/10/00)



Loan Number: 0171007168          Servicing Number: 002276060-7          Date: 01/11/07

Borrower shall, at Borrower's own expense, appear in and defend any action or proceeding purporting to affect the Property or any portion thereof or Borrower's title thereto, the validity or priority of the lien created by this Security Instrument, or the rights or powers of Lender with respect to this Security Instrument or the Property. All causes of action of Borrower, whether accrued before or after the date of this Security Instrument, for damage or injury to the Property or any part thereof, or in connection with any transaction financed in whole or in part by the proceeds of the Note or any other note secured by this Security Instrument, by Lender, or in connection with or affecting the Property or any part thereof, including causes of action arising in tort or contract and causes of action for fraud or concealment of a material fact, are, at Lender's option, assigned to Lender, and the proceeds thereof shall be paid directly to Lender who, after deducting therefrom all its expenses, including reasonable attorneys' fees, may apply such proceeds to the sums secured by this Security Instrument or to any deficiency under this Security Instrument or may release any monies so received by it or any part thereof, as Lender may elect. Lender may, at its option, appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement thereof. Borrower agrees to execute such further assignments and any other instruments as from time to time may be necessary to effectuate the foregoing provisions and as Lender shall request.

7. Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate in effect from time to time and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8. Mortgage Insurance. If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided
by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Lender may apply, use or release the condemnation proceeds in the same manner as provided in paragraph 5 hereof with respect to insurance proceeds.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to

Page 4 of 8                                                                                          FLD10014 (05/10/00)





Loan Number: 471007168          Servicing Number: 002276060-7          Date: 01/11/07

extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. Successors and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Loan Charges. If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. Borrower's Right to Reinstate. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

Page 5 of 8                                                                 FLD10015 (03/10/00)







Loan Number: 521007216B          Servicing Number: 002276060-7          Date: 01/11/07

19. Sale of Note; Change of Loan Servicer. The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law. The holder of the Note and this Security Instrument shall be deemed to be the Lender hereunder.

20. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

Borrower shall be solely responsible for, shall indemnify, defend and hold harmless Lender, its directors, officers, employees, attorneys, agents, and their respective successors and assigns, from and against any and all claims, demands, causes of action, loss, damage, cost (including actual attorneys' fees and court costs and costs of any required or necessary repair, cleanup or detoxification of the Property and the preparation and implementation of any closure, abatement, containment, remedial or other required plan), expenses and liability directly or indirectly arising out of or attributable to (a) the use, generation, storage, release, threatened release, discharge, disposal, abatement or presence of Hazardous Substances on, under or about the Property, (b) the transport to or from the Property of any Hazardous Substances, (c) the violation of any Hazardous Substances law, and (d) any Hazardous Substances claims.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

ADDITIONAL COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. If any installment under the Note or notes secured hereby is not paid when due, or if Borrower should be in default under any provision of this Security Instrument, or if Borrower is in default under any other mortgage or other instrument secured by the Property, all sums secured by this Security Instrument and accrued interest thereon shall at once become due and payable at the option of Lender without prior notice, except as otherwise required by applicable law, and regardless of any prior forbearance. In such event, Lender, at its option, and subject to applicable law, may then or thereafter invoke the power of sale and/or any other remedies or take any other actions permitted by applicable law. Lender will collect all expenses incurred in pursuing the remedies described in this Paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for releasing the Property for services rendered if the charging of the fee is permitted under applicable law.

23. Attorneys' Fees. As used in this Security Instrument and the Note, "attorneys' fees" shall include any attorneys' fees awarded by an appellate court.

24. Misrepresentation and Nondisclosure. Borrower has made certain written representations and disclosures in order to induce Lender to make the loan evidenced by the Note or notes which this Security Instrument secures, and in the event that Borrower has made any material misrepresentation or failed to disclose any material fact, Lender, at its option and without prior notice or demand, shall have the right to declare the indebtedness secured by this Security Instrument, irrespective of the maturity date specified in the Note or notes secured by this Security Instrument, immediately due and payable.

25. Time is of the Essence. Time is of the essence in the performance of each provision of this Security Instrument.

Page 6 of 8                                                                 PLD10016 (03/18/00)

Book21332/Page1895



Loan Number: 221007168          Servicing Number: 002276060-7          Date: 01/11/07

26. **Waiver of Statute of Limitations.** The pleading of the statute of limitations as a defense to enforcement of this Security Instrument, or any and all obligations referred to herein or secured hereby, is hereby waived to the fullest extent permitted by applicable law.

27. **Modification.** This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

28. **Reimbursement.** To the extent permitted by applicable law, Borrower shall reimburse Trustee and Lender for any and all costs, fees and expenses which either may incur, expend or sustain in the execution of the trust created hereunder or in the performance of any act required or permitted hereunder or by law or in equity or otherwise arising out of or in connection with

this Security Instrument, the Note, any other note secured by this Security Instrument or any other instrument executed by Borrower in connection with the Note or Security Instrument. To the extent permitted by applicable law, Borrower shall pay to Trustee and Lender their fees in connection with Trustee and Lender including, but not limited to assumption application fees; fees for payoff demands and, statements of loan balance; fees for making, transmitting and transporting copies of loan documents, verifications, full or partial lien release and other documents requested by borrower or necessary for performance of Lender's rights or duties under this Security Instrument; fees arising from a returned or dishonored check; fees to determine whether the Property is occupied, protected, maintained or insured or related purposes; appraisal fees, inspection fees, legal fees, broker fees, insurance mid-term substitutions, repair expenses, foreclosure fees and costs arising from foreclosure of the Property and protection of the security for this Security Instrument; and all other fees and costs of a similar nature not otherwise prohibited by law.

Security Instrument or any other instrument executed by Borrower in connection with the Note or Security Instrument. To the extent permitted by applicable law, Borrower shall pay to Lender their fees in connection with Lender providing documents or services arising out of or in connection with this Security Instrument, the Note, any other note secured by this Security Instrument or any other instrument executed by Borrower in connection with the Note or Security Instrument.

29. **Clerical Error.** In the event Lender at any time discovers that the Note, any other note secured by this Security Instrument, Note or document or instrument executed in connection with the Security Instrument, Note or Note contains an error that was caused by a clerical mistake, calculation error, computer malfunction, printing error or similar error, Borrower agrees, upon notice from Lender, to reexecute any documents that are necessary to correct any such error(s). Borrower further agrees that Lender will not be liable to Borrower for any damages incurred by Borrower that are directly or indirectly caused by any such error.

30. **Lost, Stolen, Destroyed or Mutilated Security Instrument and Other Documents.** In the event of the loss, theft or destruction of the Note, any other note secured by this Security Instrument, the Security Instrument or any other documents or instruments executed in connection with the Security Instrument, Note or notes (collectively, the "Loan Documents"), upon Borrower's receipt of an indemnification executed in favor of Borrower by Lender, or, in the event of the mutilation of any of the Loan Documents, upon Lender's surrender to Borrower of the mutilated Loan Document, Borrower shall execute and deliver to Lender a Loan Document in form and content identical to, and to serve as a replacement of, the lost, stolen, destroyed, or mutilated Loan document, and such replacement shall have the same force and effect as the lost, stolen, destroyed, or mutilated Loan Documents, and may be treated for all purposes as the original copy of such Loan Document.

31. **Assignment of Rents.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property. Borrower shall have the right to collect and retain the rents of the Property as they become due and payable provided Lender has not exercised its rights to require immediate payment in full of the sums secured by this Security Instrument and Borrower has not abandoned the Property.

32. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)]

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Manufactured Home Rider | ☒ Planned Unit Development Rider | ☐ Occupancy Rider |
| ☒ Other(s) (specify) Balloon Rider | | |

*Page 7 of 8*                                                                 FLD10017 (05/10/00)

Loan Number: 021007268          Servicing Number: 002276060-7          Date: 01/11/07

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____          _____(Seal)
MICHAEL A. WI...          Witness          -Borrower

_____          _____(Seal)
Judy Ann Wilcox-Wilson          Witness          -Borrower

_____          _____(Seal)
DAVID A. KLEIMAN                    -Borrower
3119 CONTEGO LANE
PALM BEACH GARDENS, FL 33418

_____(Seal)          _____(Seal)
-Borrower          -Borrower

STATE OF FLORIDA, County ss: Palm Beach
The foregoing instrument was acknowledged before me this   1/11/07   by
DAVID A. KLEIMAN
who is personally known to me or who has produced   FLA. Dr. License   as identification.

[Notary Seal]
MICHAEL RANDOLPH WILSON
MY COMMISSION # DD 470702
EXPIRES September 12, 2009
Bonded Thru Notary Public Underwriters

Notary Public MICHAEL RANDOLPH WILSON



Loan Number:  871007168    Servicing Number:  002276060-7    Date:  01/11/07

## ADJUSTABLE RATE RIDER
### (LIBOR Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made  January 11, 2007
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
        Option One Mortgage Corporation, a California Corporation
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

        3119   CONCORD LANE,   PALM BEACH GARDENS, FL 33418
                             [Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

The Note provides for an initial interest rate of        7.000%        . The Note provides for changes in the interest rate and the monthly payments, as follows:

**4.**     *INTEREST RATE AND MONTHLY PAYMENT CHANGES*
        (A) Change Dates
        The interest rate I will pay may change on the first day of    February 01    2010
and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."
        (B) The Index
        Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
        If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
        (C) Calculation of Changes
        Before each Change Date, the Note Holder will calculate my new interest rate by adding
        FIVE AND 60/100                    percentage point(s) ( 5.600%    )
to the Current Index. The Note Holder will then round the result of this addition to the next higher one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will

MULTISTATE ADJUSTABLE RATE RIDER-LIBOR INDEX - Single Family
Page 1 of 3                                                    USRI0011 (01-23-99)

This is not a CERTIFIED COPY NOT A CERTIFIED COPY





Loan Number: 871007168     Servicing Number: 002276060-7     Date: 01/11/07

be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.600% or less than 5.600%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.0%) from the rate of interest I have been paying for the preceding six months. In no event will my interest rate be greater than 13.000% or less than 5.600%.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
Covenant 17 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

MULTISTATE ADJUSTABLE RATE RIDER-LIBOR INDEX-Single Family
Page 2 of 3                                                                                   USRI0021 (02-23-99)



Loan Number: 871007166    Servicing Number: 002276060-7    Date: 01/11/07

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)    _____ (Seal)
DAVID A. KLEIMAN

_____ (Seal)    _____ (Seal)

_____ (Seal)    _____ (Seal)

MULTISTATE ADJUSTABLE RATE RIDER-LIBOR INDEX-Single Family
Page 3 of 3                                              USRE0013 (02-23-99)

Loan Number: 871007168     Servicing Number: 002276060-7     Date: 01/11/07

# BALLOON RIDER

This is a BALLOON LOAN. The term of the loan is 40/30 years. This means that while your monthly payment amount is amortized in accordance with a 40 year loan term, the loan is payable in full in THIRTY (30) years from the date the loan is made. As a result, you will be required to repay the entire remaining principal balance, together with accrued interest, late charges, if any, and all advancements made by the lender under the terms of this loan in THIRTY (30) years from the date on which the loan is made.

The lender has no obligation to refinance this loan at the end of its term. Therefore, you may be required to repay the loan out of other assets you may own, or you may have to find another lender willing to refinance the loan.

Assuming this lender or another lender refinances this loan at maturity, you will probably be charged interest at market rates prevailing at that time, which may be considerably higher or lower than the interest rate paid on this loan. You may also have to pay some or all of the closing costs normally associated with the new mortgage loan even if you obtain refinancing from the same lender.

_____     _____
DAVID A. KLEIMAN          -Borrower                              -Borrower

_____     _____
                          -Borrower                              -Borrower

_____     _____
                          -Borrower                              -Borrower

MULTISTATE BALLOON RIDER
Page 1 of 1                                                      USRI091.vsp (08-19-05)



Loan Number: 872007168     Servicing Number: 002276060-7   Date:   01/11/07

## PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made   January 11, 2007   , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to

Option One Mortgage Corporation, a California Corporation

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

3115   CONTEGO LANE,   PALM BEACH GARDENS, FL 33418-

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in
COVENANTS, CONDITIONS AND RESTRICTIONS
(the "Declaration"). The Property is a part of a planned unit development known as
WOODBINE
[Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Hazard Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," then:
(i) Lender waives the provision in Covenant 2 for the monthly payment to Lender of the yearly premium installments for hazard insurance on the Property; and
(ii) Borrower's obligation under Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy. Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.
In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, with any excess paid to Borrower.

C. Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

MULTISTATE PUD RIDER—Single Family–FNMA/FHLMC UNIFORM INSTRUMENT—Form 3150 09/90
Page 1 of 2                                                                 USRI0111.wp (11-19-04)



Loan Number: 871007168     Servicing Number: 002276060-7     Date: 01/11/07

D. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 10.

E. **Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:

    (i)  the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;

    (ii)  any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender;

    (iii) termination of professional management and assumption of self-management of the Owners Association; or

    (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender, if allowed by applicable law, may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)     _____ (Seal)
DAVID A. KLEIMAN            -Borrower                                 -Borrower

_____ (Seal)     _____ (Seal)
                           -Borrower                                 -Borrower

_____ (Seal)     _____ (Seal)
                           -Borrower                                 -Borrower

MULTISTATE PUD RIDER – Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Page 2 of 2                                                              USR00112.wp (11-19-04)

This is... [watermark]
NOT A CERTIFIED COPY [watermark]



### Exhibit A

The following described land, situate, lying and being in Palm Beach County, Florida, to-wit:

Lot 54, Woodbine Parcel "C", according to the Plat thereof recorded in Plat Book 72, Pages 106 through 110, inclusive, Palm Beach County, Florida, Public Records.

Together with a non-exclusive easement of ingress and egress over both Tract "A" limited access public right of ways of said Woodbine Parcel "C" and the Tract "A" limited access public right of way "Woodbine Trail" of Woodbine according to the Plat thereof recorded in Plat Book 72, pages 46 through 49, inclusive, Palm Beach County, Florida. public records, which non-exclusive easement of ingress and egress is a appurtenant grant to the fee ownership of the aforesaid lot and may not be further assigned except with the simultaneous conveyance, transfer or inheritance of the aforesaid lot.

THE CONVEYANCE IS GIVEN EXPRESSLY SUBJECT TO THE FOLLOWING MATTERS:

1. Subject to Northern Palm Beach County Water Control District Notice and Disclosure for Unit of Development No. 3A recorded in Official Records Book 7943, Page 241, Palm Beach County, Florida, public Records. Taxes or Non-Ad Valorem special assessments of Northern Palm Beach County Water Control District which are not shown as existing liens by the public records. Non-Ad Valorem Assessment against the lot of Northern Palm Beach County Water Control District for Unit of Development No. 3A, which provides for annual installation repayments of bond monies for roads, water lines, waste water lines, drainage and other improvements together with annual interest charges and district maintenance assessment.

2. Memorandum of Exclusive Cable Television Agreement with FAIRBANKS COMMUNICATIONS, INC, d/b/a Leadership Cablevision Recorded in Official Records Book 8487, Page 1990, Palm Beach County, Florida, public records.

3. Agreement dated August 10, 1993, between Steeplechase Safe Neighborhood Improvements District and Schickedanz Enterprises, Inc., recorded in Official Records Book 8138, Page 204, Palm Beach County, Florida, public records.

4. Subject to Water Management Easements (W.M.E.) granted to Northern Palm Beach County Improvement District, (formerly Northern Palm Beach County Water Control District), a political subdivision of the State of Florida.

5. Subject to the Declaration of Covenants, Conditions and Restrictions of WOODBINE recorded in Official Records Book 8271, Pages 9 through 89,




inclusive, Palm Beach County, Florida, public records, as amended from time to time, including the Articles of Incorporation of WOODBINE MASTER ASSOCIATION, INC. a Florida Non-profit Corporation and the Bylaws of WOODBINE MASTER ASSOCIATION, INC.

6. Subject to the Plat of Woodbine (Woodbine Residential Planned Unit Development) recorded in Plat Book 72, Pages 46 through 49, inclusive, Palm Beach County, Florida, Public records.

7. Subject to Subordinated Declaration of Covenants, Conditions and Restrictions of Woodbine Parcel "C" recorded at Official Records Book 8503, Pages 876 through 922, inclusive, public records of Palm Beach County, Florida including the Articles of Incorporation of Casa Rio Homeowners' Sub-Association, Inc., a Florida non-profit Corporation and the Bylaws of Casa Rio Homeowners' Sub-Association Inc.

8. Subject to the Plat of Woodbine Parcel "C" recorded in Plat Book 72, Pages 106 through 110, inclusive, Palm Beach County, Florida, public records.

9. City of Riviera Beach Resolution No. 248-91 granting Master Site Plan-Special Exception for the Woodbine PUD as amended by City of Riviera Beach Resolution No. 7-93, amending condition 10 of Section 3 of Resolution No. 248-91.

**FOR INFORMATIONAL PURPOSES ONLY**
THE improvements thereon being known as 3119 Contego Lane, Palm Beach Gardens, Florida 33418.

PROPERTY CONTROL# 56-42-42-25-14-000-0540

THE ABOVE DESCRIBED PROPERTY WAS TAKEN IN FEE SIMPLE

BEING the same property which, by Warranty Deed dated December 29, 1995, and recorded on January 3, 1996 in the Public records the County of Palm Beach, State of Florida, in Liber No. 9067, folio 1918, was granted and conveyed by Schickedanz Bros - Riviera Ltd., a Florida Limited Partnership, by Schickedanz Enterprises, Inc., a Florida Corporation, its General Partner unto David A. Kleiman, a single man, as sole owner.

**From:**    Dave Kleiman
**To:**       Craig Wright <Craig@Integyrs.com>
**Subject:**  RE: Payment terms
**Date:**     Thursday, 11 October 2012 5:37:49 PM

Craig,

If you do not mind, please do the transfer in USD from Liberty. If you can handle it that way I would be grateful. I have been in the VA again. Nothing to worry about, more of the routine as we have to live with, but I am not sure when I will be able to get back home for enough time to manage all the exchanges.

The cost of the hospital also comes as a reason for the request. Nothing I need help on, but the funds in USD will make my life easier right now.

I will transfer the trust holdings from the Seychelles into a shell I have obtained for you. It is UK company 08248988. I have the filing code for you below so you can get this updated when you are ready with everything.

a6b8eeeJxjZRd2YnXi4ohPyU9OSS1OBnHYQJzMFCdxfj8DCyMTC0sLPYtIE0tz1ycuzvi0/KLcksqCVCdxNj/XcE8/Zycu1viU5MQSJ3FGM5hBiSVAeQ4jA0MjQwNDwyY15/zcgsS8zNRij/zS4lQrqwhfH/dwKyvP3MT0VCjlnVpJpDJuBgYGRiBmAmJmIGYBYlYgZgNidiDmAGJOIOYCYm4AcWg1Wg⹀

The other information will be sent via Skype as a one off later.

Did you look at that conference and are you coming over to speak/visit as we discussed?

Respectfully,
Dave Kleiman - http://www.ComputerForensicsLLC.com -
http://www.ComputerForensicsExpertWitnesses.com
4371 Northlake Blvd #314
Palm Beach Gardens, FL 33410
561.310.8801



ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                   :
UNITED STATES OF AMERICA           :
                                   :
         - v. -                    :      SEALED INDICTMENT
                                   :
LIBERTY RESERVE S.A.,              :      13 CRIM 368
ARTHUR BUDOVSKY,                   :
     a/k/a "Arthur Belanchuk,"     :
     a/k/a "Eric Paltz,"           :
VLADIMIR KATS,                     :
     a/k/a "Ragnar,"               :
AHMED YASSINE ABDELGHANI,          :
     a/k/a "Alex,"                 :
ALLAN ESTEBAN HIDALGO JIMENEZ,     :
     a/k/a "Allan Garcia,"         :
AZZEDDINE EL AMINE,                :
MARK MARMILEV,                     :
     a/k/a "Marko,"                :
     a/k/a "Mark Halls," and       :
MAXIM CHUKHAREV,                   :
                                   :
         Defendants.               :
                                   :
- - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___MAY 2 0 2013

## COUNT ONE

(Conspiracy to Commit Money Laundering)

The Grand Jury charges:

### THE DEFENDANTS

1.    Incorporated in Costa Rica in 2006, LIBERTY RESERVE

S.A. ("LIBERTY RESERVE"), the defendant, has for years operated

one of the world's most widely used digital currencies.  Through

its website, www.libertyreserve.com, LIBERTY RESERVE has

provided its users with what it described as "instant, real-time

currency for international commerce," which can be used to "send


EXHIBIT
5

and receive payments from anyone, anywhere on the globe."
LIBERTY RESERVE also touted itself as the Internet's "largest
payment processor and money transfer system," serving "millions"
of people around the world, including the United States.  At no
time, however, did LIBERTY RESERVE register with the United
States Department of the Treasury as a money transmitting
business.

          2.   ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric
Paltz," the defendant, was the principal founder of LIBERTY
RESERVE.  At all relevant times, BUDOVSKY directed and
supervised LIBERTY RESERVE's operations, finances, and corporate
strategy.

          3.   VLADIMIR KATS, a/k/a "Ragnar," the defendant, was a
co-founder of LIBERTY RESERVE.  KATS helped direct LIBERTY
RESERVE until he left the company over a dispute with ARTHUR
BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the
defendant, in or about 2009.  KATS has also run multiple LIBERTY
RESERVE "exchanger" services.

          4.   AHMED YASSINE ABDELGHANI, a/k/a "Alex," the defendant,
managed the day-to-day operations of LIBERTY RESERVE from in or
about 2006 through in or about 2009, when he too left the
company over a dispute with ARTHUR BUDOVSKY, a/k/a "Arthur
Belanchuk," a/k/a "Eric Paltz," the defendant.

5.   ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia,"
the defendant, replaced AHMED YASSINE ABDELGHANI, a/k/a "Alex,"
the defendant, as the manager of LIBERTY RESERVE's day-to-day
operations.   HIDALGO has also been a part-owner of LIBERTY
RESERVE since in or about 2010.

6.   AZZEDDINE EL AMINE, the defendant, has, since in or
about 2010, served as a principal deputy to ARTHUR BUDOVSKY,
a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant.   He
has managed various financial accounts controlled by LIBERTY
RESERVE and operated a prominent LIBERTY RESERVE "exchanger"
service, from which he has shared the profits with BUDOVSKY.

7.   MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," the
defendant, and MAXIM CHUKHAREV, the defendant, were associates
of ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric
Paltz," and were principally responsible for designing and
maintaining LIBERTY RESERVE's technological infrastructure.

                              OVERVIEW

8.   ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric
Paltz," the defendant, and his co-conspirators, intentionally
created, structured, and operated LIBERTY RESERVE as a criminal
business venture, one designed to help criminals conduct illegal
transactions and launder the proceeds of their crimes.   The
defendants deliberately attracted and maintained a customer base
of criminals by making financial activity on LIBERTY RESERVE

anonymous and untraceable.  The defendants also protected the criminal infrastructure they created by, among other things, lying to anti-money laundering authorities in Costa Rica, pretending to shut down LIBERTY RESERVE after learning the company was being investigated by U.S. law enforcement (only to continue operating the business through a set of shell companies), and moving tens of millions of dollars through shell-company accounts maintained in Cyprus, Russia, Hong Kong, China, Morocco, Spain, and Australia, among other places.

9.    Through the defendants' efforts, LIBERTY RESERVE has emerged as one of the principal means by which cyber-criminals around the world distribute, store, and launder the proceeds of their illegal activity.  Indeed, LIBERTY RESERVE has become a financial hub of the cyber-crime world, facilitating a broad range of online criminal activity, including credit card fraud, identity theft, investment fraud, computer hacking, child pornography, and narcotics trafficking.

10.    Because virtually all of LIBERTY RESERVE's business derived from suspected criminal activity, the scope of the defendants' unlawful conduct is staggering.  Estimated to have had more than one million users worldwide, with more than 200,000 users in the United States, LIBERTY RESERVE processed more than 12 million financial transactions annually, with a combined value of more than $1.4 billion.  Overall, from 2006 to

May 2013, LIBERTY RESERVE processed an estimated 55 million separate financial transactions and is believed to have laundered more than $6 billion in criminal proceeds.

<u>THE FOUNDING OF LIBERTY RESERVE</u>

11.   LIBERTY RESERVE, as currently constituted, was born out of the defendants' unsuccessful experience running a third-party exchange service for another digital currency. Specifically, in or about 2006, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," and VLADIMIR KATS, a/k/a "Ragnar," the defendants, operated a company called "Gold Age, Inc.," which functioned as an "exchanger" for "E-Gold," then the most popular digital currency in operation.   However, in December 2006, BUDOSVKY and KATS were convicted in New York State of operating "Gold Age, Inc." as an unlicensed money transmitting business.   At or about the same time, E-Gold and several of its principals were charged with various offenses including money laundering.

12.   In the wake of his criminal conviction, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant, set about building a digital currency that would succeed in eluding law enforcement where E-Gold had failed, by, among other ways, locating the business outside the United States.   Accordingly, BUDOVSKY emigrated to Costa Rica, where, in 2006, he and AHMED YASSINE ABDELGHANI, a/k/a "Alex," the

defendant, had incorporated LIBERTY RESERVE. Working at first

principally with YASSINE and VLADIMIR KATS, a/k/a "Ragnar," the

defendant, BUDOVSKY devoted himself to building and expanding

LIBERTY RESERVE so that the company could profit from attracting

more and more criminal customers, all while seeking to evade the

scrutiny and reach of U.S. law enforcement authorities.

13. LIBERTY RESERVE thereupon grew exponentially, filling

the void left by E-Gold and becoming the predominant digital

form of money laundering used by cyber-criminals worldwide. By

in or about 2011, BUDOVSKY was so committed to evading U.S. law

enforcement that he formally renounced his U.S. citizenship and

became a Costa Rican citizen, telling U.S. immigration

authorities that he was concerned that the "software" his

"company" was developing "might open him up to liability in the

U.S."

<u>THE CRIMINAL DESIGN OF LIBERTY RESERVE</u>

14. To use LIBERTY RESERVE's digital currency, commonly

referred to as "LR," a user first was required to open an

account through the LIBERTY RESERVE website. In registering,

the user was required to provide basic identifying information,

such as name, address, and date of birth. However, unlike

traditional banks or legitimate online payment processors,

LIBERTY RESERVE did not require users to validate their identity

information, such as by providing official identification

documents or a credit card.  Accounts could therefore be opened easily using fictitious or anonymous identities.

15.  Once a user established an account with LIBERTY RESERVE, the user could then conduct transactions with other LIBERTY RESERVE users.  That is, the user could receive transfers of LR from other users' accounts, and transfer LR from his own account to other users – including any "merchants" that accepted LR as payment.  LIBERTY RESERVE charged a one-percent fee every time a user transferred LR to another user through the LIBERTY RESERVE system.  In addition, for an additional "privacy fee" of 75 cents per transaction, a user could hide his own LIBERTY RESERVE account number when transferring funds, effectively making the transfer completely untraceable, even within LIBERTY RESERVE's already opaque system.

16.  To add an additional layer of anonymity, LIBERTY RESERVE did not permit users to fund their accounts by transferring money to LIBERTY RESERVE directly, such as by issuing a credit card payment or wire transfer to LIBERTY RESERVE.  Nor could LIBERTY RESERVE users withdraw funds from their accounts directly, such as through an ATM withdrawal. Instead, LIBERTY RESERVE users were required to make any deposits or withdrawals through the use of third-party "exchangers," thus enabling LIBERTY RESERVE to avoid collecting any information about its users through banking transactions or

other activity that would leave a centralized financial paper trail.

17.    LIBERTY RESERVE's "exchangers" were third-party entities that maintained direct financial relationships with LIBERTY RESERVE, buying and selling LR in bulk from LIBERTY RESERVE in exchange for mainstream currency.  The exchangers in turn bought and sold this LR in smaller transactions with end users in exchange for mainstream currency.  Thus, in order to fund a LIBERTY RESERVE account, a user was required to transmit mainstream currency in some fashion (through a money remitter, for example) to an exchanger.  Upon receiving the user's payment, the exchanger credited the user's LIBERTY RESERVE account with a corresponding amount of LR, by transferring LR from the exchanger's LIBERTY RESERVE account to the user's account.  Similarly, if a LIBERTY RESERVE user wished to withdraw funds from his account, the user was required to transfer LR from his LIBERTY RESERVE account to an exchanger's LIBERTY RESERVE account, and the exchanger then made arrangements to provide the user a corresponding amount of mainstream currency.

18.    The LIBERTY RESERVE website recommended a number of "pre-approved" exchangers.  These exchangers tended to be unlicensed money transmitting businesses operating without significant governmental oversight or regulation, concentrated

in Malaysia, Russia, Nigeria, and Vietnam.  The exchangers charged transaction fees for their services, typically amounting to five percent or more of the funds being exchanged.  Such fees were much higher than those charged by mainstream banks or payment processors for comparable money transfers.

THE CRIMINAL USE OF LIBERTY RESERVE

19.  As set forth above, LIBERTY RESERVE's system was designed so that criminals could effect financial transactions under multiple layers of anonymity and thereby avoid apprehension by law enforcement.  Not surprisingly, LIBERTY RESERVE was in fact used extensively for illegal purposes, functioning in effect as the bank of choice for the criminal underworld.  LIBERTY RESERVE users routinely established accounts under false names – including such blatantly criminal monikers as "Russia Hackers" and "Hacker Account."  Believing themselves to be protected by this anonymity, LIBERTY RESERVE users then engaged in criminal transactions with an impunity that would have been impossible in the legitimate financial system.

20.  To further enable the use of LIBERTY RESERVE for criminal activity, its website offered a "shopping cart interface" that "merchant" websites could use to accept LR currency as a form of payment.  The "merchants" who accepted LR currency were overwhelmingly criminal in nature.  They included,

for example: traffickers of stolen credit card data and personal identity information; peddlers of various types of online Ponzi and get-rich-quick schemes; computer hackers for hire; unregulated gambling enterprises; and underground drug-dealing websites.

21.   In addition to being used to process payments for illegal goods and services online, LIBERTY RESERVE was also used by cyber-criminals to launder criminal proceeds and transfer funds among criminal associates.   LIBERTY RESERVE was used by credit-card theft and computer-hacking rings operating in countries around the world, including Vietnam, Nigeria, Hong Kong, China, and the United States, to distribute proceeds of these conspiracies among the members involved.

22.   The defendants were well aware that LIBERTY RESERVE functioned as an unlawful money-laundering enterprise.   Indeed, in an online chat that was captured by law enforcement between VLADIMIR KATS, a/k/a "Ragnar," and AHMED YASSINE ABDELGHANI, a/k/a "Alex," KATS explicitly described LIBERTY RESERVE's activities as "illegal" and noted that "everyone in USA" such as "DOJ" knows "LR is [a] money laundering operation that hackers use."

EFFORTS TO CONCEAL LIBERTY RESERVE'S OPERATIONS AND ASSETS

23.   Throughout its operation, LIBERTY RESERVE and its principals sought to thwart effective regulation by anti-money

laundering authorities and to evade the reach of law enforcement.

24.   For example, in or about 2009, a Costa Rican agency responsible for regulating financial institutions, known as Superintendencia General de Entidades Financieras ("SUGEF"), determined that LIBERTY RESERVE fell within its jurisdiction and notified the company that it needed to apply for a license to operate as a money transmitting business in Costa Rica. Beginning in or about October 2009, LIBERTY RESERVE sought such a license from SUGEF, but SUGEF refused to grant the application based on concerns that LIBERTY RESERVE did not have even basic anti-money laundering controls in place such as "know your customer" procedures, and otherwise lacked any effective means of tracking suspicious activity within its system.

25.   Instead of remedying these deficiencies, LIBERTY RESERVE created a system designed to feign compliance with anti-money laundering procedures. Specifically, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, created a computer portal that appeared to give Costa Rican regulators the ability to access LIBERTY RESERVE transactional information and monitor it for suspicious activity.  However, the data that appeared in the portal was,

according to internal communications between the defendants, mostly "fake" and could be manipulated to hide data that LIBERTY RESERVE did not want regulators to see.

26.   By November 2011, LIBERTY RESERVE had still been unable to obtain a license from SUGEF to operate legally in Costa Rica.  Compounding the company's troubles, on or about November 18, 2011, the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a notice to financial institutions within its network of the risks associated with providing financial services to LIBERTY RESERVE. The notice stated, among other things, that: "[i]nformation obtained by the United States Department of the Treasury indicates LIBERTY RESERVE is . . . currently being used by criminals to conduct anonymous transactions to move money globally."

27.   LIBERTY RESERVE obtained a copy of the FinCEN notice. Approximately two weeks after the FinCEN notice was issued, LIBERTY RESERVE falsely informed SUGEF that its business had been sold to a foreign company and would no longer be operating in Costa Rica.  LIBERTY RESERVE thus withdrew its application for a money-transmitting license from SUGEF and purported to shut down its office in Costa Rica.  In reality, however, LIBERTY RESERVE went underground and continued to operate in Costa Rica using a stripped-down staff working out of office

space held in the name of shell companies controlled by ARTHUR

BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the

defendant.

28.   At or about the same time LIBERTY RESERVE falsely

informed SUGEF that it was shutting down its operations in Costa

Rica, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric

Paltz," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," and

AZZEDDINE EL AMINE, the defendants, began emptying LIBERTY

RESERVE's bank accounts in Costa Rica of millions of dollars and

transferring the money first to a bank account in Cyprus held in

the name of a shell company controlled by BUDOVSKY and EL AMINE,

and then to a bank account in Russia held in the name of another

shell company.

29.   Shortly after the defendants began emptying LIBERTY

RESERVE's bank accounts in Costa Rica, the Costa Rican

government was able to seize approximately $19.5 million in

Costa Rican bank accounts maintained by LIBERTY RESERVE pursuant

to a request by U.S. law enforcement authorities.   Following

that seizure, BUDOVSKY, HIDALGO, and EL AMINE sought to evade

further seizure action by moving LIBERTY RESERVE funds into more

than two dozen shell-company accounts held in locations around

the world, including Cyprus, Hong Kong, China, Morocco,

Australia, and Spain.

STATUTORY ALLEGATIONS

30.   From in or about 2006, up to and including in or about May 2013, in the Southern District of New York and elsewhere, LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i).

31.   It was a part and an object of the conspiracy that LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial

transactions, which in fact involved the proceeds of specified unlawful activity, to wit, identity theft, access device fraud, computer hacking, wire fraud, child pornography, and narcotics trafficking, in violation of Title 18, United States Code, Sections 1028, 1029, 1030, 1343, and 2252, and Title 21, United States Code, Section 841, respectively, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

32. It was further a part and an object of the conspiracy that LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, and others known and unknown, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from places in the United States to and through places outside the United States, and to places in the United States from and through places outside the United States, knowing that the monetary instruments and funds involved in the transportation,

transmissions, and transfers represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmissions, and transfers were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit, identity theft, access device fraud, computer hacking, wire fraud, child pornography, and narcotics trafficking, in violation of Title 18, United States Code, Sections 1028, 1029, 1030, 1343, and 2252, and Title 21, United States Code, Section 841, respectively, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO

### (Conspiracy to Operate Unlicensed Money Transmitting Business)

The Grand Jury further charges:

### BACKGROUND

33.  The allegations contained in paragraphs 1 through 29 of this Indictment are repeated and realleged as if fully set forth herein.

34.  Title 18, United States Code, Section 1960 makes it a crime to operate an unlicensed money transmitting business.  The statute was enacted in 1992 in order "to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises."

35.   The term "money transmitting" under Section 1960(b)(2) includes "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."

36.   Under Title 18, United States Code Section 1960, it is a felony to conduct a "money transmitting business" if, among other things, the business is not registered as a money transmitting business with the Secretary of the Treasury as required under Title 31, United States Code, Section 5330 or regulations prescribed thereunder, or if the business otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or intended to be used to promote unlawful activity. See 31 C.F.R. §§ 1010.100(ff)(5), 1022.380(a)(2).

37.   The implementing regulations for Title 31, United States Code, Section 5330 specifically apply to foreign-based money transmitting businesses doing substantial business in the United States.  See 31 C.F.R. §§ 1010.100(ff)(5), 1022.380(a)(2).  As noted above, LIBERTY RESERVE is estimated to have had approximately 200,000 users located in the United States, and at no time did LIBERTY RESERVE register with the United States Department of Treasury as a money transmitting business.

STATUTORY ALLEGATIONS

38.   From in or about 2006, up to and including in or about May 2013, in the Southern District of New York and elsewhere, LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to operate an unlicensed money transmitting business, in violation of Title 18, United States Code, Sections 1960(b)(1)(B) and 1960(b)(1)(C).

39.   It was a part and an object of the conspiracy that LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, and others known and unknown, would and did conduct, control, manage, supervise, direct, and own all and part of a money transmitting business affecting interstate and foreign commerce, to wit, LIBERTY RESERVE, which (i) failed to comply with the money transmitting business registration requirements

set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder, including Title 31, Code of Federal Regulations, Sections 1010.100(ff)(5) and 1022.380(a)(2); and (ii) otherwise involved the transportation and transmission of funds known to the defendants to have been derived from a criminal offense and intended to be used to promote and support unlawful activity.

<u>OVERT ACT</u>

40.   In furtherance of said conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

a.   From on or about November 29, 2011, up to and including on or about December 6, 2011, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," the defendant, caused a series of wire transfers, totaling approximately $13.5 million, to be made from Costa Rican bank accounts held by LIBERTY RESERVE, the defendant, through a correspondent bank account in the Southern District of New York, to a shell-company bank account in Cyprus controlled by AZZEDDINE EL AMINE, the defendant.

(Title 18, United States Code, Section 371.)

<u>COUNT THREE</u>

(Operation of an Unlicensed Money Transmitting Business)

The Grand Jury further charges:

41.   The allegations contained in paragraphs 1 through 29 and 34 through 37 of this Indictment are repeated and realleged as if fully set forth herein.

42.   From in or about 2006, up to and including in or about May 2013, in the Southern District of New York and elsewhere, LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, knowingly conducted, controlled, managed, supervised, directed, and owned all and part of a money transmitting business affecting interstate and foreign commerce, to wit, LIBERTY RESERVE, which (i) failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder, including Title 31, Code of Federal Regulations, Sections 1010.100(ff)(5) and 1022.380(a)(2); and (ii) otherwise involved the transportation and transmission of funds known to the defendants to have been

derived from a criminal offense and intended to be used to promote and support unlawful activity.

(Title 18, United States Code, Sections 1960 & 2.)

### FORFEITURE ALLEGATION

43.  As a result of committing one or more of the offenses alleged in Counts One and Three of this Indictment, LIBERTY RESERVE, ARTHUR BUDOVSKY, a/k/a "Arthur Belanchuk," a/k/a "Eric Paltz," VLADIMIR KATS, a/k/a "Ragnar," AHMED YASSINE ABDELGHANI, a/k/a "Alex," ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a "Allan Garcia," AZZEDDINE EL AMINE, MARK MARMILEV, a/k/a "Marko," a/k/a "Mark Halls," and MAXIM CHUKHAREV, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, involved in the offenses and all property traceable to such property, including but not limited to:

a.  A sum of money of at least $6 billion in United States currency;

b.  All funds on deposit in the following accounts:

   i.   Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 101527143, held in the name of LIBERTY RESERVE Sociedad Anonima;

   ii.  Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 101527141, held in the name of LIBERTY RESERVE Sociedad Anonima;

   iii. Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 101527144, held in the name of LIBERTY RESERVE Sociedad Anonima;

iv. Banco Crédito Agrícola de Cartago (Costa Rica) Account No. 302-301-302107678, held in the name of LIBERTY RESERVE Sociedad Anonima;

v. Grupo Mutual Alajuela (Costa Rica) Account No. 140-305-803301217563, held in the name of LIBERTY RESERVE Sociedad Anonima;

vi. Grupo Mutual Alajuela (Costa Rica) Account No. 140-305-803301218849, held in the name of LIBERTY RESERVE Sociedad Anonima;

vii. Grupo Mutual Alajuela (Costa Rica) Account No. 140-305-803301218988, held in the name of LIBERTY RESERVE Sociedad Anonima;

viii. Banco Lafise (Costa Rica) Account No. 110024084, held in the name of LIBERTY RESERVE Sociedad Anonima;

ix. Banco Nacional (Costa Rica) Account No. 100021546003625, held in the name of Worldwide E-Commerce Business S.A.;

x. Banco BAC San Jose (Costa Rica) Account No. 912049962, held in the name of Grupo Lulu;

xi. Hellenic Bank (Cyprus) Account No. 240-07-576000-01, held in the name of Ediago Holding Limited;

xii. Hellenic Bank (Cyprus) Account No. 240-07-510618-01, held in the name of Serpentino LTD.;

xiii. Hellenic Bank (Cyprus) Account No. 240-01-510618-01, held in the name of Serpentino LTD.;

xiv. Hellenic Bank (Cyprus) Account No. 240-07-510619-01, held in the name of Oriata Limited;

xv. Hellenic Bank (Cyprus) Account No. 240-01-510619-01, held in the name of Oriata Limited;

xvi.    Hellenic Bank (Cyprus) Account No. 240-01-510649-01, held in the name of Arthur Budovsky;

xvii.   Hellenic Bank (Cyprus) Account No. 240-07-510649-01, held in the name of Arthur Budovsky;

xviii.  Hellenic Bank (Cyprus) Account No. 240-01-521212-01, held in the name of Travertine LTD;

xix.    Hellenic Bank (Cyprus) Account No. 240-01-521214-01, held in the name of Marania Limited;

xx.     Hellenic Bank (Cyprus) Account No. 240-07-539613-01, held in the name of Makelina Limited;

xxi.    Hellenic Bank (Cyprus) Account No. 240-01-539613-01, held in the name of Makelina Limited;

xxii.   Hellenic Bank (Cyprus) Account No. 240-07-540249-01, held in the name of Allan Esteban Hidalgo Jimenez;

xxiii.  Hellenic Bank (Cyprus) Account No. 240-07-568225-01, held in the name of Azzeddine El Amine;

xxiv.   Hellenic Bank (Cyprus) Account No. 240-01-568225-01, held in the name of Azzeddine El Amine;

xxv.    Hellenic Bank (Cyprus) Account No. 240-01-438977-02, held in the name of Elano Consulting Limited;

xxvi.   Hellenic Bank (Cyprus) Account No. CY09005002400002400741184302, held in the name of Phaerman Management Limited;

xxvii.  Hellenic Bank (Cyprus) Account No. CY58005002400002400753771401, held in the name of Manueta Limited;

xxviii. National Bank of Greece (Cyprus) Account
No. CY5200600550000000505507935079, held in
the name of Sandstein Limited;

xxix.   National Bank of Greece (Cyprus) Account
No. CY9700600550000000505507935239, held in
the name of Ediago Holdings Ltd.;

xxx.    Cyprus Development Bank P.C. (Cyprus)
Account No. CY45014002010101010005029010,
held in the name of Unida Limited;

xxxi.   EuroBank EFG (Cyprus) Account No.
201100040131, held in the name of
Sandstein Limited;

xxxii.  EuroBank EFG (Cyprus) Account No.
201100040140, held in the name of Fleureen
Limited;

xxxiii. Sovetsky Bank Zao (Russia) Account No.
40702978700110001548, held in the name of
Olymp-47 LLC;

xxxiv.  Bank of Communications (Hong Kong) Account
No. 532-9-312438-5, held in the name of
Extension Asia Limited;

xxxv.   Shenzhen Bank (China) Account No.
11012870675701, held in the name of
Extension Asia Limited;

xxxvi.  Attijariwafa Bank (Morocco) Account No.
MA007810000446700041001887, held in the
name of Arthur B. Belanchuk;

xxxvii. Attijariwafa Bank (Morocco) Account No.
MA007810000446500046028825, held in the
name of Azzeddine El Amine;

xxxviii. Banque Marocaine de Commerce Exterieur
(Morocco) Account No.
MA011780000048205000892589, held in the
name of Ahmed Yassine;

xxxix.  Banque Marocaine de Commerce Exterieur
(Morocco) Account No.

MA01178000004849600000892395, held in the name of Kelsin Antonio Varela Figueroa;

xl.   Barclay's Bank (Spain) Account No. ES5300651157130021000973, held in the name of Arthur Budovsky;

xli.   Rietumu Bank (Latvia) Account No. LV69 RTMB 0000608806731, held in the name of Robix Services Inc.; and

xlii.   SunTrust Bank Account No. 1000049971780, held in the name of Webdata Inc.;

c.   Up to $36,919,884 on deposit in the following accounts:

i.   Westpac Bank (Australia) Account No. 034702289721, held in the name of Technocash Ltd.;

ii.   Westpac Bank (Australia) Account No.034705205706, held in the name of Technocash Ltd.;

iii.   Westpac Bank (Australia) Account No. 034702807875, held in the name of Technocash Ltd.; and

d.   The following domain names:

i.   LIBERTYRESERVE.COM;

ii.   EXCHANGEZONE.COM;

iii.   SWIFTEXCHANGER.COM;

iv.   MONEYCENTRALMARKET.COM;

v.   ASIANAGOLD.COM; and

vi.   EUROGOLDCASH.COM.

SUBSTITUTE ASSET PROVISION

44.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(1)   cannot be located upon the exercise of due diligence;

(2)   has been transferred or sold to, or deposited with, a third person;

(3)   has been placed beyond the jurisdiction of the Court;

(4)   has been substantially diminished in value; or

(5)   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above-described forfeitable property.

(Title 18, United States Code, Section 982 and
Title 21, United States Code, Section 853.)


FOREPERSON   5/20/2013


Preet Bharara
PREET BHARARA
United States Attorney


JAIKUMAR RAMASWAMY
Chief, Asset Forfeiture and
Money Laundering Section, Criminal
Division, United States
Department of Justice

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

LIBERTY RESERVE, S.A.,
ARTHUR BUDOVSKY, a/k/a "Arthur
Belanchuk," a/k/a "Eric Paltz,"
VLADIMIR KATS, a/k/a "Ragnar,"
AHMED YASSINE ABDELGHANI, a/k/a "Alex,"
ALLAN ESTEBAN HIDALGO JIMENEZ, a/k/a
"Allan Garcia,"
AZZEDDINE EL AMINE,
MARK MARMILEV, a/k/a "Marko," a/k/a
"Mark Halls," and
MAXIM CHUKHAREV

INDICTMENT

13 Cr.

(18 U.S.C. §§ 1956, 371, 1960 & 2)

Foreperson.          United States Attorney.
PREET BHARARA

**Craig S Wright**

| | |
|---|---|
| **From:** | Ira K |
| **Sent:** | Tuesday, 18 February 2014 1:06 PM |
| **To:** | Craig S Wright |
| **Subject:** | Re: FW: AGMO COE in IPv6.pptx |

No problem, hopefully Dave's friends are trustworthy with their findings.

In terms of Dave's part of the estate in the company. Could you possibly put it in both my name and my dad's,
but still leave me with primary authorization as to how it is managed?

My dad wasn't included in Dave's Will so he feels sad about that, especially since he gave him lots of money throughout the years. They had a very rocky relationship, but my dad was always there for him whenever he needed help. And I think Dave acknowledged it towards the end because he told my dad he loved him shortly before his passing. This is something that never happened before.
It would be nice if my dad believed that Dave had planned to include him in this business trust.

Thank you,
Ira

On Mon, Feb 17, 2014 at 7:18 PM, Craig S Wright <███████████wrote:

i do not know.

I have though on this, and it was Dave who kept/got me out of trouble. This is an aspect of life I am far from good at. Code, fine. People...

From: Ira K
Sent: Tuesday, 18 February 2014 3:16 AM
To: Craig Wright
Subject: Re: FW: AGMO COE in IPv6.pptx

Hi Craig,

I would like to ask for your advice if I may. After everything you have shared with me I feel like I can

completely trust you.

1



As mysterious and exciting as all this news is, I also feel nervous about making mistakes.

I very well could have already made some months ago by throwing away a bunch of Dave's papers

and formating drives that I couldn't access.

Patrick and his partner emailed me the other day and would like me to bring over his drives.

I haven't spoken with them about what would happen next if they did manage to access his

account.  And I assume that anything in it cannot be traced when there is a withdrawl?.

Being that I have only met Patrick a couple times in my life I was wondering if there any

safety measures you can recommend to me so I don't make another mistake?

Thanks,

Ira

On Mon, Feb 17, 2014 at 4:31 AM, Craig S Wright <██████████████████████> wrote:

**From:** Craig S Wright ██████████████████████████
**Sent:** Monday, 12 September 2011 3:28 PM
**To:** 'Craig S Wright'
**Subject:** AGMO COE in IPv6.pptx

| | |
|---|---|
| **To:** | verifymail20@gmail.com[verifymail20@gmail.com] |
| **From:** | Dex |
| **Sent:** | Sun 13/05/2018 4:05:38 AM |
| **Subject:** | Fw: Re: files |

----- Forwarded Message -----
**From:** Dex <dex561@yahoo.com>
**To:** "patrick@computerforensicsllc.com" <patrick@computerforensicsllc.com>
**Sent:** Thursday, March 31, 2016, 10:11:12 PM EDT
**Subject:** Re: files

Yep I read that pdf when it was leaked.  Parts of the document I was already aware of, and a few things were new.  I'm actually surprised reporters haven't dug their teeth into it.  If they would take the time to look into the section discussing Mark Ferrier and his associates, they would easily discover what a bunch of criminals Craig got involved with in order to hide the money he stole from W&K.  Craig says due diligence was conducted before engaging with Ferrier, but even I can see from a quick search online what a bunch of crooks they are.

On Thursday, March 31, 2016 6:41 PM, Patrick Paige <patrick@computerforensicsllc.com> wrote:

Let me digest all this... In the meantime have you seen this information?

*Patrick Paige* EnCE SCERS
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
**Office: 561.404.3074**
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Thursday, March 31, 2016 3:33 PM
**To:** Patrick Paige <patrick@computerforensicsllc.com>
**Subject:** Re: files

Thank you.

ok, there are two reasons why i know parts of the story are true.

1. First, Dave personally told me that he was involved in what he referred to as "digital money" back in 2009.  My daughter was born that year and it was Dave's first time
meeting her for Thanksgiving at my dad's house.  I have photos of us from that day and vividly remember Dave telling me that he was creating his own money.  At first I looked at him oddly and asked "what do you mean, you're making counterfeit money?"
And he said no, I'm making digital money.  There's more to that story, but we save that for another time.
2.  Second, there is enough evidence which both Craig and the ATO provided to me that document their business relationship.

The problem is determining what exactly happened during their relationship and right after.  If Craig is the only person left to reveal the full story, I'm afraid the truth will never be told.  I spoke with him quite a bit over the last two years.  And at first I really bought into the stuff he was telling me.  When I saw the video of Craig crying on that video he made after Dave died, he sounded so sincere.  It seemed like he really cared about Dave and now he was contacting us to look out for his family. But that first impression of him was short lived.  Over time he revealed his true intentions which were to turn W&K into just W.

EXHIBIT
7
4/8/19
DEMCO 800-631-6989

The timeline of events so far:

1. Craig and David definitely played a part in either creating bitcoin or atleast mining it from 2009, perhaps 2008.
2. The entity handling this was W&K which Dave managed.
3. Craig tells me via email that Dave was a 50% owner although I can't find any documents or emails revealing the Articles of Incorporation.
4. Craig then makes a bunch of promises to me which I consulted with Jody (Joe Karp) about.  Joe seemed to believe everything Craig says so I agree to go along with them.
5. None of Craig's promises are kept.   I let him know I'm upset about being lied to for two long years.
7. Craig outs himself to give others a reason for his leaving town (or country).
8. And here we are.

There are a lot of details left out that I may have to reserve until litigation.  But I figure since you guys were friends and partners of Dave and are experts at uncovering electronic evidence, now would be a good time to uncover it if it exists.

If you have any other ideas or advice as to what I should do, I'm all ears.  I have zero experience in all of this, so I am just going with my gut instinct as to what feels right.

Do you know to what extent emails be used as evidence in the court of law?
When he told me Dave owned 50% via email, how would a court view such things?

Thanks,
Ira

# Overwriting Hard Drive Data: The Great Wiping Controversy

Craig Wright[1], Dave Kleiman[2]  and Shyaam Sundhar R.S[3].

[1] BDO Kendalls, Sydney, Australia. Craig.Wright@bdo.com.au,
2 ComputerForensicExaminer.com, Florida, US. dave@davekleiman.com,
3 Symantec, USA, shyaam@gmail.com

**Abstract.** Often we hear controversial opinions in digital forensics on the required or desired number of passes to utilize for properly overwriting, sometimes referred to as wiping or erasing, a modern hard drive. The controversy has caused much misconception, with persons commonly quoting that data can be recovered if it has only been overwritten once or twice. Moreover, referencing  that it actually takes up to ten, and even as many as 35 (referred to as the Gutmann scheme because of the 1996 Secure Deletion of Data from Magnetic and Solid-State Memory published paper by Peter Gutmann) passes to securely overwrite the previous data. One of the chief controversies is that if a head positioning system is not exact enough, new data written to a drive may not be written back to the precise location of the original data. We demonstrate that the controversy surrounding this topic is unfounded.

**Keywords:** Digital Forensics, Data Wipe, Secure Wipe, Format

## 1  Introduction

Often we hear controversial opinions on the required or desired number of passes to utilize for properly overwriting, sometimes referred to as wiping or erasing, a modern hard drive. The controversy has caused much misconception, with persons commonly quoting that data can be recovered if it has only been overwritten once or twice. Moreover, referencing  that it actually takes up to ten, and even as many as 35 (referred to as the Gutmann scheme because of the 1996 Secure Deletion of Data from Magnetic and Solid-State Memory published paper by Peter Gutmann, [12]) passes to securely overwrite the previous data.

One of the chief controversies is that if a head positioning system is not exact enough, new data written to a drive may not be written back to the precise location of the original data. This track misalignment is argued to make possible the process of identifying traces of data from earlier magnetic patterns alongside the current track.

This was the case with high capacity floppy diskette drives, which have a rudimentary position mechanism. This was at the bit level and testing did not take into account accumulated error.

The basis of this belief is a presupposition is that when a one (1) is written to disk the actual effect is closer to obtaining a 0.95 when a zero (0) is overwritten with one

EXHIBIT

8

PENGAD 800-631-6989


2

(1), and a 1.05 when one (1) is overwritten with one (1). This we can show is false and that in fact, there is a distribution based on the density plots that supports the contention that the differential in write patterns is too great to allow for the recovery of overwritten data.

The argument arises from the statement that "each track contains an image of everything ever written to it, but that the contribution from each "layer" gets progressively smaller the further back it was made". This is a misunderstanding of the physics of drive functions and magneto-resonance. There is in fact no time component and the image is not layered. It is rather a density plot.

This is of prime importance to forensic analysts and security personal. The time needed to run a single wipe of a hard drive is economically expensive. The requirements to have up to 35 wipes [12] of a hard drive before disposal become all the more costly when considering large organisations with tens of thousands of hosts. With a single wipe process taking up to a day to run per host through software and around an hour with dedicated equipment, the use of multiple wipes has created a situation where many organisations ignore the issue all together – resulting in data leaks and loss.

The inability to forensically recover data following a single wipe makes the use of data wiping more feasible. As forensic and information security professionals face these issues on a daily basis, the knowledge that a single wipe is sufficient to remove trace data and stop forensic recovery will remove a great deal of uncertainty from the industry and allow practitioners to focus on the real issues.

## 1.1   What is Magnetic Force Microscopy[1]

Magnetic force microscopy (MFM) images the spatial variation of magnetic forces on a sample surface. The tip of the microscope is coated with a ferromagnetic thin film. The system operates in non-contact mode, detecting changes in the resonant frequency of the cantilever induced by the magnetic field's dependence on tip-to-sample separation. A MFM can be used to image naturally occurring and deliberately written domain structures in magnetic materials. This allows the device to create a field density map of the device.

## 1.2    MFM imagery of overwritten hard disk tracks

The magnetic field topography (Fig. 2A below) was imaged with an MFM to measure the magnetic force density. This image was captured using the MFM in Lift Mode (lift height 35 nm). This results in the mapping of the shift in the cantilever resonant frequency.

The acquisition time for 1 byte is about 4 minutes (this would improve with newer machines). The image displays the:
- track width and skew,

---

[1] The MFM senses the stray magnetic field above the surface of a sample. A magnetic tip is brought into close proximity with the surface and a small cantilever is used to detect the force between the tip and the sample. The tip is scanned over the surface to reveal the magnetic domain structure of the sample at up to 50 nm resolution.

3

- transition irregularities, and
- the difference between written and overwritten areas of the drive.



**Fig. 1.** The concepts of how Partial Response Maximum Likelihood (PRML) (a method for converting the weak analog signal from the head of a magnetic disk or tape drive into a digital signal) (and newer Extended Partial Response Maximum Likelihood (EPRML) drive) encoding is implemented on a hard drive. The MFM reads the unprocessed analog value. Complex statistical digital processing algorithms are used to determine the "maximum likelihood" value associated with the individual reads.

Because of the misconception, created by much older technologies (such as floppy drives) with far lower densities, many believe that the use of an electron microscope will allow for the recovery of forensically usable data. The fact is, with modern drives (even going as far back as 1990) that this entire process is mostly a guessing game that fails significantly when tested. Older technologies used a different method of reading and interpreting bits than modern hard called *peak detection*. This method is satisfactory while the peaks in magnetic flux sufficiently exceed the background signal noise. With the increase in the write density of hard drives (Fig. 3), encoding schemes based on peak detection (such as Modified Frequency Modulation or MFM) that are still used with floppy disks have been replaced in hard drive technologies. The encoding of hard disks is provided using PRML and EPRML encoding technologies that have allowed the write density on the hard disk to be increased by a full 30-40% over that granted by standard peak detection encoding.

Additionally, hard disk drives use zoned bit recording (Fig 2B) which differs from floppy drives and similar technologies. Older technologies (including floppy disks) used a single zone with a write density that is several orders of magnitude larger than that used with hard disks. We have not tested recovery from a floppy disk using these

4

methods, but it would be expected that the recovery rate would be significantly greater than with respect of that of a hard disk platter - although still stochastically distributed.




A.                                                                                                 B.

**Fig. 2. A.** This image was captured and reconstructed at a 25 µm scan from an Atomic Force Microscope [15]. The image displays the residual from overwrites and alignment.
**Fig. 2. B.** This image from PCGuide.com displays the configuration of a 20 track hard drive. These tracks are separated into five zones which are displayed in a separate color as follows: 5 x 16 sector tracks in the blue zone, 5 x 14 sector tracks in the cyan zone, 4 x 12 sector tracks in the green zone, 3 x 11 sectors tracks in the yellow zone, and 3 x 9 sector tracks in the red.

The fact is many people believe that this is a physical impression in the drive that can belie the age of the impression. This is a misconception that is commonly held as to the process used to measure the magnetic field strength. Using the MFM in Tapping Mode[2], we get a topography image that represents the physical surface of the drive platter.

The magnetic flux density follows a function known as the hysteresis loop. The magnetic flux levels written to the hard drive platter vary in a stochastic manner with variations in the magnetic flux related to head positioning, temperature and random error. The surfaces of the drive platters can have differing temperatures at different points and may vary from the read/write head. This results in differences in the expansion and contraction rates across the drive platters. This differential can result in misalignments. Thermal recalibration is used on modern drives to minimize this variance, but this is still results in an analogue pattern of magnetic flux density.

One of ways used to minimize the resultant error has come through the introduction of more advanced encoding schemes (such as PRML mentioned previously). Rather than relying on differentiating the individual peaks at digital maxima, magnetic flux reversals are measured by hard drive heads and processed using an encoding process (PRML or EPRML) that is based on determining maximum likelihood for the flux value using a digital signal sampling process. Complex statistically based detection algorithms are employed to process the analog

---

[2] Tapping mode can also be called Dynamic Force mode, intermittent contact mode, non-contact mode, wave mode, and acoustic AC mode by various microscope vendors. When operating in tapping mode the cantilever is driven to oscillate up and down at near its resonance frequency by a small piezoelectric element.

5

data stream as it is read the disk. This is the "partial response" component. This stochastic distribution of data not only varies on each read, but also over time and with temperature differentials. This issue has only grown as drive densities increase.



**Fig. 3.** This graph from IBM demonstrates how the bit size used with modern hard drives is shrinking. This has resulted in a dramatic increase in the density of hard disks which has resulted in the error rate from movement and temperature remaining an issue even with the improvements in compensating technologies.

A Track is a concentric set of magnetic bits on the disk. Each track is commonly divided into 512 bytes sectors. The drive sector is the part of each track defined with magnetic marking and an ID number. Sectors have a sector header and an error correction code (ECC).

A Cylinder is a group of tracks with the same radius.

Data addressing occurs within the two methods for data addressing:

- CHS (cylinder-head-sector) and
- LBA (logical block address).

The issue from Guttmann's paper [12] is that we can recover data with foreknowledge of the previous values, but not with any level of accuracy. The issues with this are twofold. First, to have any chance of recovery it is necessary to have perfect knowledge of what was previously written to the drive. This situation most often never occurs in a digital forensic investigation. In fact, if a perfect copy of the data existed, there would be no reason to recover data from the wiped drive. Next, the level of recovery when presented with a perfect image is too low to be of use even on a low density pristine drive (which does not exist in any actual environment). Carroll and Pecora (1993a, 1993b) demonstrated this effect and how stochastic noise results in a level of controlled chaos. The Guttmann preposition [12] is true based on a

6

Bayesian a-prior model assuming that we have the original data and the pattern from the overwrite, but of course this defeats the purpose of the recovery process and as noted is still not sufficiently accurate to be of any use. Stating that we can recover data with a high level of accuracy, given that we have the original data, is a tautology, and there would be no reason to do the recovery.



**Fig. 4.** The hysteresis loop[3] demonstrates the relationship between the induced magnetic flux density (B) and the magnetizing force (H). It is often referred to as the B-H loop. This function varies with a number of prevalent conditions including temperature.

The previously mentioned paper uses the determination that the magnetic field strength is larger or smaller than that which would be expected from a write suggests the prior overwritten value. This is that a factored magnetic field strength of 0.90 or 1.10 (where 1.0 is a "clean" write with no prior information) would represent the previous information written to the drive that has been overwritten. This is postulated to be a means through which the use of an electron microscope could be deployed to recover data from a drive that has been wiped. The problem with this theory is that there are both small write errors on an unwritten sector and remnant magnetic field densities from prior use of the drive sector.

Magnetic signatures are not time-stamped, accordingly there is no "unerase" capability [15]. Figure 4 displays the B-H loop for magnetic flux. Starting at a zero flux density for a drive platter that has not been previously magnetized, the induced flux density created when the drive head writes to the platter follows the dashed line (displayed in Fig. 4) as the magnetizing force is increased. Due to a combination of power constraints, timing issues and write density, modern hard drives do not saturate the magnetic flux on the drive to point "a". Rather, they use sophisticated statistical

---

[3] Image sourced from Iowa's State University Center for Nondestructive Evaluation NDT (Non Destructive Testing).

measures (PRML and EPRML) to determine the maximum likelihood of the value stored on the drive. In demagnetizing a drive (reducing H to zero) the curve moves from point "a" to point "b" on Figure 4. Some residue from the prior magnetic flux remains in the material even though the magnetizing force is zero. This phenomenon is known as remanence. The retentivity of disk platter will not reach the maxima (defined by points "b" and "d" in figure 4) as the drive heads do not reach saturation. Further, fluctuations in temperature, movement and prior writes influence the permeability[4] of the platter. Jiles [21] notes that in the event that the temperature of a drive platter is increased from, 20 to 80 centigrade then a typical ferrite can become subject to a 25% reduction in the in permeability of the platter.

 

Fig. 5. This example displays the experimentally derived magnetic field density functions for hard drive rewrites where "A" displays the measured distribution of binary "1" values on initial copy. "B" displays the distribution of values associated with a binary "1" value following an overwrite with another binary "1".

Consequently, the B-H curve does not go back to the originating point when the magnetic flux is rewritten and the B-H curve will vary with use due to temperature fluctuations. On subsequent writes the hysteresis curve follows a separate path from position "f" in Figure 4. As drive heads to not cause the hard drive platter to reach the saturation point, the resultant B-H loop will vary on each write.

A common misconception concerning the writing of data to a hard drive arises as many people believe that a digital write is a digital operation. As was demonstrated above, this is a fallacy, drive writes are analogue with a probabilistic output [6], [8], [10]. It is unlikely that an individual write will be a digital +1.00000 (1). Rather - there is a set range, a normative confidence interval that the bit will be in [15].

What this means is that there is generally a 95% likelihood that the +1 will exist in the range of (0.95, 1.05) there is then a 99% likelihood that it will exist in the range (0.90, 1.10) for instance. This leaves a negligible probability (1 bit in every 100,000

---

[4] Permeability is a material property that is used to measure how much effort is required to induce a magnetic flux within a material. Permeability is defined the ratio of the flux density to the magnetizing force. This may be displayed with the formula: $\mu = B/H$ (where $\mu$ is the permeability, B is the flux density and H is the magnetizing force).

8

billion or so) that the actual potential will be less than 60% of the full +1 value. This error is the non-recoverable error rating for a drive using a single pass wipe [19].



**Fig. 6 (A and B).** This example displays the magnetic field density functions that were experimentally obtained following a rewrite (wipe) of the prior binary unit on the hard drive. Plot "A" displays the density distribution associated with "1" values following an overwrite with a "0". Plot "B" displays the density function for an initial "0" value that has been overwritten with a "1".

As a result, there is no difference to the drive of a 0.90 or 1.10 factor of the magnetic potential. What this means is that due to temperature fluctuations, humidity, etc the value will most likely vary on *each* and *every* pass of a write. The distributions of these reads are displayed as histograms in Fig. 5. The distribution is marginally different to the original, but we cannot predict values. From Fig. 6 it is simple to see that even with the prior data from the initial write we gain little benefit. These images display the differences in the voltage readings of the drives (which are determined through the magnetic field strength). Clearly, some values that are more distantly distributed than would be expected in the differenced results (Fig. 6 B) with voltage values that are significantly greater then are expected. The problem is that the number of such readings is far lower than the numbers that result through shear probability alone.

Resultantly, there is no way to even determine if a "1.06" is due to a prior write or a temperature fluctuation. Over time, the issue of magnetic decay would also come into play. The magnetic flux on a drive decays slowly over time. This further skews the results and raises the level of uncertainty of data recovery.

Consequently, we can categorically state that there is a minimal (less than a 0.01% chance) of recovering any data on a NEW and unused drive that has a single raw wipe pass (not even a low-level format). In the cases where a drive has been used (even being formatted for use) it is not possible to recover the information – there is a small chance of bit recovery, but the odds of obtaining a whole word are small.

The improvement in technology with electron microscopes will do little to change these results. The error from microscope readings was minimal compared to the drive error and as such, the issue is based on drive head alignment and not the method used for testing.

9

### 1.3    Read Error Severities and Error Management Logic

A sequence of intricate procedures are performed by the hard drive controller in order to minimise the errors that occur when either writing data to or reading data for a drive. These processes vary with each hard drive producer implementing their own process. Some of the most common error management processes have been listed below.

**ECC Error Detection**: A drive sector is read by the head. An error detection algorithm is used to determine the likelihood of a read error. In the event that an error state is considered to be unlikely, the sector is processed and the read operation is considered as having been concluded successfully.

**ECC Error Correction**: The controller uses the ECC codes that it has interpreted for the sector in order to try and correct the error. A read error can be corrected very quickly at this level and is usually deemed to be an "automatic correction".

**Automatic Retry**: The next phase involves waiting until the drive platter has completed a full spin before attempting to read the data again. Stray magnetic field variances are a common occurrence leading to drive read error. These fluctuations may result due to sudden movement and temperature variations. If the error is corrected following a retry, most drives will judge the error condition to be "corrected after retry".

**Advanced Error Correction**: Many drives will, on subsequent retries after the first, invoke more advanced error correction algorithms that are slower and more complex than the regular correction protocols, but have an increased chance of success. These errors are "recovered after multiple reads" or "recovered after advanced correction".

**Failure**: In the event that the drive is incapable of reading the sector, a signal is sent to the drive controller noting a read error. This type of failure is an unrecoverable read error.

Modern encoding schemes (PRML and EPRML) have a wide tolerance range allowing the analogue values that the drive head reads from and writes to a hard disk to vary significantly without loss of data integrity. Consequently, the determination of a prior write value is also a stochastic process.

## 2    Data and method

In order to completely validate all possible scenarios, a total of 15 data types were used in 2 categories. Category A divided the experiment into testing the raw drive (this is a pristine drive that has never been used), formated drive (a single format was completed in Windows using NTFS with the standard sector sizes) and a simulated used drive (a new drive was overwritten 32 times with random data from /dev/random on a Linux host before being overwritten with all 0's to clear any residual data).

The experiment was also divided into a second category in order to test a number of write patterns. Category B consisted of the write pattern used both for the initial write and for the subsequent overwrites. This category consisted of 5 dimensions:

- all 0's,
- all 1's,

10

- a "01010101 pattern,
- a "00110011" pattern, and
- a "00001111" pattern.

The Linux utility "dd" was used to write these patterns with a default block size of 512 (bs=512). A selection of 17 models of hard drive where tested (from an older Quantum 1 GB drive to current drives dated to 2006). The data patterns where written to each drive in all possible combinations.

1. The data write was a 1 kb file (1024 bits).
2. Both drive skew and the bit was read.
3. The process was repeated 5 times for an analysis of 76,800 data points.

The likelihood calculations were completed for each of the 76,800 points with the distributions being analyzed for distribution density and distance. This calculation was based on the Bayesian likelihood where the prior distribution was known. As has been noted, in real forensic engagements, the prior distribution is unknown. This presents this method with an advantage to recovering the data that would not be found when conducting a forensic examination and recovery of a drive.

Even on a single write, the overlap at best gives a probability of just over 50% of choosing a prior bit (the best read being a little over 56%). This caused the issue to arise, that there is no way to determine if the bit was correctly chosen or not. Therefore, there is a chance of correctly choosing any bit in a selected byte (8-bits) – but this equates a probability around 0.9% (or less) with a small confidence interval either side for error.

Resultantly, if there is less than a 1% chance of determining each character to be recovered correctly, the chance of a complete 5-character word being recovered drops exponentially to 8.463E-11 (or less on a used drive and who uses a new raw drive format). This results in a probability of less than 1 chance in 10Exp50 of recovering any useful data. So close to zero for all intents and definitely not within the realm of use for forensic presentation to a court.

Table 1 below, shows the mapped out results of probable recovery with a pristine drive of a similar make and model[5] to that which would have been used in the paper by Dr. Gutmann. This drive had never been used and was had raw data written to it for the first time in this test. The other drive was a newer drive[6] that has been used (I used this for my daily operations for 6 months) prior to the wiping procedure. A total of 17 variety of drives dated from 1994 to 2006 of both the SCSI and IDE category where tested for this process. A total of 56 drives where tested. On average only one (1) drive in four[7] (4) was found to function when the platter had been returned after an initial reading with the MFM.

## 3    Data Relationships

The only discernable relationship of note is between an initial write of a "1" on a pristine drive that is overwritten with a "0". This is a function of the drive write head

---

[5] SEAGATE: ST51080N MEDAL.1080 1080MB 3.5"/SL SCSI2 FAST
[6] Western Digital WD1200JS
[7] 23.5% of drives where able to be used for an overwrite following an initial MFM scan.

and has no correlation to data recovery, so this is a just point of interest and noting to aid in data extraction from a forensic perspective. All other combinations of wipes displayed comparative distributions of data that where suggestive of random white noise.

## 3.1   Distributions of Data

The tables used in this section display the probabilities of recovery for each of the drives tested. Although the chances of recovering any single bit from a drive are relatively good, the aim in any forensic engagement is to recover usable data that can be presented in court.

Table 1. Table of Probability Distributions for the older model drives. Note that a "used" drive has only a marginally better chance of any recovery than tossing a coin. The Pristine drive is the optimal case based on an early Seagate 1Gb drive.

| Probability of recovery | Pristine drive | Used Drive (ideal) |
|---|---|---|
| 1 bit | 0.92 | 0.56 |
| 2 bit | 0.8464 | 0.3136 |
| 4 bit | 0.71639296 | 0.098345 |
| 8 bits[8] | 0.51321887 | 0.009672 |
| 16 bits | 0.26339361 | 9.35E-05 |
| **32 bits** | **0.06937619** | **8.75E-09** |
| 64 bits | 0.00481306 | 7.66E-17 |
| 128 bits | 2.3166E-05 | 5.86E-33 |
| 256 bits | 5.3664E-10 | 3.44E-65 |
| 512 bits | 2.8798E-19 | 1.2E-129 |
| 1024 bits | 8.2934E-38 | 1.4E-258 |

These tests where run as a series of 4 tests on each of 17 types of drives. The reported (Table 1) recovery rate of 92% this was the optimal rate (which was itself stochastically distributed). The results were in distributed over a wide range of values with the use of the drive impacting on the capacity to recover data.

This clearly shows that any data recovery is minimal and that no forensically sound recovery is possible. The recovery of a single 32 bit value (such as an IP address) is highly unlikely. It has been stated[9], that the smallest fragment of usable digital forensic evidence is a 32 bit field (the IP address). To be used in a Civil court case, the evidence needs to be subjected to the balance of probability (usually 51%). In a criminal matter, the preponderance is set at between 95% and 99% to account for all reasonable doubt. The rate at which evidence may be recovered using this technique is too low to be useful. In fact, with the optimal recovery under 7% for a single IP address on an older drive. This is an event that cannot occur outside the lab.

The bit-by-bit chance of recovery lies between 0.92 (+/- 0.15)[10] and 0.54 (+/- 0.16)[11]. We have used the higher probability in the calculations to add an additional

---

[8] This represents one (1) ASCII character.
[9] Rob Lee, SANS Forensics 508
[10] For the optimal recovery on an old drive.
[11] On a used "new" drive

12

level of confidence in our conclusions. This demonstrates that the chances of recovering a single 8-bit character on the pristine drive are 51.32%. The recovery rate of a 32-bit word is 0.06937619 (just under 7%). As such, the chances of finding a single 4 letter word correctly from a Microsoft Word document file is 2.3166E-05 (0.00002317%)

**Table 2.** Table of Probability Distributions for the "new" model drives.

| Probability of recovery | Pristine drive (plus 1 wipe) | Pristine drive (plus 3 wipe) |
|---|---|---|
| 1 bit | 0.87 | 0.64 |
| 2 bit | 0.7569 | 0.4096 |
| 4 bit | 0.57289761 | 0.16777216 |
| 8 bits | 0.328211672 | 0.028147498 |
| 16 bits | 0.107722901 | 0.000792282 |
| **32 bits** | **0.011604223** | **6.2771E-07** |
| 64 bits | 0.000134658 | 3.9402E-13 |
| 128 bits | 1.81328E-08 | 1.55252E-25 |
| 256 bits | 3.28798E-16 | 2.41031E-50 |
| 512 bits | 1.08108E-31 | 5.8096E-100 |
| 1024 bits | 1.16873E-62 | 3.3752E-199 |

Table 2 below is a table that further illustrates the wiping fallacy. We tested this by completing a single pass wipe, to simulate minimal use we repeated the process.

Once again, we can see the data recovery is minimal.

The standard daily use of the drive makes recovery even more difficult, without even considering a wipe, just *prior* use. In this case, the 3 former wipes are used to simulate use (though minimal and real use is far more intensive). The chances of recovering a single 8-bit word (a single character) are 0.0281475 (or 2.8%) – which is actually lower than randomly selecting the character.

The calculated probability of recovering data from any used drive that uses a newer encoding scheme (EPRML) and high density was indistinguishable from a random guess. When recovering data from the 2006 model drive, the best determination of the prior write value was 49.18% (+/- 0.11)[12] from the "all 0's" pattern when overwritten with the "all 1's" pattern. The other overwrite patterns actually produced results as low as 36.08% (+/- 0.24). Being that the distribution is based on a binomial choice, the chance of guessing the prior value is 50%. In many instances, using a MFM to determine the prior value written to the hard drive was less successful than a simple coin toss.

### 3.2 Distribution of recovered data
The following is a retrieval pattern from the drive. Where the 8-bit word is correctly read, a "1" is listed. Where the value did not match the correct pattern that was written to the drive, a "0" is displayed.



_____
[12] This is reported at a 99% confidence level.

```
[189] 1 0 1 1 0 1 0 1 0 0 0 1 0 1 0 1 0 1 1 1 0 1 1 1 0 1 0 1 0 0 1 0 0 0 0 1 1 0 0 0 0 1 0 1
[236] 0 0 1 0 1 1 1 0 1 1 0 0 1 1 1 1 1 1 0 0 1 1 1 0 0 1 0 1 0 1 0 0 1 0 0 0 0 0 0 0 1 0 1 0 1
[283] 0 1 0 1 0 1 1 0 0 0 1 1 0 0 0 1 0 0 1 0 0 1 0 0 1 1 1 1 1 0 1 0 1 1 0 1 1 0 0 0 1 0 0
[330] 0 0 0 0 0 0 1 1 0 1 0 1 1 0 1 0 1 1 0 0 0 1 1 0 0 1 0 1 0 1 0 0 0 0 1 0 0 1 1 1 0 1 0
[377] 1 1 1 0 1 0 1 0 0 1 0 0 0 0 1 0 0 1 0 0 1 0 1 1 1 1 0 1 0 1 0 1 0 1 1 1 0 1 0 0 0 1
[424] 1 1 0 0 1 1 1 0 0 0 0 1 1 0 0 0 0 0 1 0 0 0 0 1 0 0 1 1 0 0 1 0 0 1 1 1 0 0 1 0 1 0 1
[471] 1 1 1 1 1 1 0 1 0 0 0 0 1 0 0 0 0 0 0 1 0 0 0 0 1 0 1 1 0 1 1 1 1 1 1 0 1 0 1 0 0 0 0
[518] 1 0 0 1 0 1 1 1 1 0 0 1 1 0 1 1 0 1 0 1 1 0 1 0 0 0 1 0 0 0 0 1 1 0 0 0 0 1 1 0 0 0
[565] 1 1 1 0 0 0 0 0 1 0 0 1 0 0 1 0 0 1 0 1 1 1 0 0 0 1 1 1 0 0 0 0 1 0 0 1 0 0 0 1 0 1 0
[612] 1 1 0 1 0 0 0 0 0 1 1 1 1 1 0 0 0 1 0 0 0 1 1 0 0 1 1 0 1 0 1 1 0 1 0 0 0 0 0 1 0 1 0
[659] 1 1 0 1 0 1 0 1 0 0 0 0 1 1 0 1 0 0 1 1 1 0 0 1 1 0 1 0 0 0 0 0 1 1 1 1 0 0 1 1
[706] 1 0 0 1 1 1 0 1 1 0 1 0 1 0 0 0 0 0 1 0 1 1 0 1 0 0 0 1 0 1 0 1 0 0 1 1 1 0 0 0 0 0 1
[753] 1 0 0 1 1 1 0 0 1 0 1 1 6 0 0 0 1 1 1 1 0 0 0 1 0 0 1 1 1 0 0 0 0 1 0 1 0 0 0 1 0 1 0
[800] 0 0 1 0 0 0 1 0 0 0 0 0 0 1 0 1 1 0 1 0 1 0 1 0 0 0 0 0 1 0 1 0 0 1 0 0 0 0 0 0 0 0 0
[847] 0 0 0 0 1 0 1 0 0 0 0 0 1 0 1 1 0 1 1 1 0 0 1 1 0 0 0 1 1 1 0 0 0 0 1 1 1 0 1 0
[894] 1 1 1 0 1 1 0 0 1 0 0 0 0 1 1 0 1 1 1 1 1 0 1 0 0 1 0 0 1 1 1 1 0 1 1 0 0 1 0 1 1 0
[941] 1 0 0 0 1 0 0 1 0 1 1 1 1 1 1 0 1 0 0 1 0 0 1 0 1 0 0 0 0 0 0 1 1 1 1 0 0 1 1 1 0 1 0
[988] 0 0 1 0 1 1 1 0 1 1 0 0 1 1 0 0 1 1 0 1 0 0 0 0 0 0 1 0 0 0 0 0
```

As an example, the following is the start of the paper by Peter Gutmann [12], first displayed accurately, and next at an optimal retrieval level.

### 3.2.1   Correct display

*Secure deletion of data - Peter Gutmann - 1996*

*Abstract*

*With the use of increasingly sophisticated encryption systems, an attacker wishing to gain access to sensitive data is forced to look elsewhere for information. One avenue of attack is the recovery of supposedly erased data from magnetic media or random-access memory.*

### 3.2.2   Display from recovery (optimal)

‰
ŘcKræ}d8Œeti³nÿof0daÊI0Ptr0GþtWÆïi_¼Á1u960eb8tÈðutW00000D₫ Ã#Ì
0
Hƒ$00¦000%£z0\0ã0000á0áã«it\tþÚ0u³e* Ff"ïẠ%¦eÌsinqTyøîopÚṛË:iúaze0
®Mcryption0sîÜtems?DKtA""cDÌ0+¢sinŒ0toKŘ¢i2z÷c(ns~0îü0;e
½iti)e""daÆa>s0foôce‚ÑtÔÍÏ2oŘ
ie1ÎÀ˜$eôe›Ýr""inf÷rm‰ion.0OnŘïavem>egoN0-ĊtRÁ"1i
            lãβh± 0"eÜoie=y0C₂‚
su* Čs/'lÊ{eraȓJd0dataFČro³* magne³;&ÿôãÈËã%or*r‰ndo⁴-Qcc«ÆŸ0mÌ
@ṛyl00000000000000000

Although on the perfect drive some words could be recovered, there is little of forensic value.

### 3.2.3  Display from recovery (expected)

¡ÂuÜiÞdM@""ïFnFã:à* ÅÔÐ¾ŘĊLŘ¿óPÜ#Ḽ ¨ÜÆ!mC
2q³„ᶅ·ʲNŽÿôêZØˆ›lãþiÁ·äÈÆv¿ˆœⁿ0TÏ["HŶBŝ‚ð
7zó\ʷôêÉ/""ʲ[ÿÁú,kR¿xt‚Ś'Í2$Ìã""* ÈÚ%Î1ñÁȓΘoxÈ$i
Wï^ẠoÈŠ²Œ‚É%ð  ÕeS» eùBÄËk‹|Ÿṛ/ÈÃ÷ÍÐSÃ¡óþ¥D
óÈŻ"¦øÚA6‚œŠÚ* $µMü;Õœeÿ1ÍMÃ÷æ¿]#* Q
―――――――――――――――――――――――Á'Ù""ʳ  OXŘh
ÍÿïÇøÈ Ã""W$5Ã÷=rB+5ÿôŘGβÜã⁹ïõÑë-ã-Ya¦¶%×Ò¿Ô[Mãü
·úÍᶄ…[Ã‚KDnFJˆ×ÁŒ¿êãdˆ~sPÈi8'v0œ#!)YÐôÆã
k-ᵗHÃˆπ$ú* Øûḽm/Wîc□Ú»Ð"„zbiþ00000000000000000

14

On the drive that had been wiped 3 times (prior) to the data being written and then added, the results are worse. What needs to be noted is that small errors in the calculations lead to wide discrepancies in the data that is recovered. Further, it needs to be noted that any drive recovered is not likely to be in a pristine state. The daily use of a drive reduces the chances of recovery to a level that is truly insignificant.

## 4    Conclusion

The purpose of this paper was a categorical settlement to the controversy surrounding the misconceptions involving the belief that data can be recovered following a wipe procedure. This study has demonstrated that correctly wiped data cannot reasonably be retrieved even if it is of a small size or found only over small parts of the hard drive. Not even with the use of a MFM or other known methods. The belief that a tool can be developed to retrieve gigabytes or terabytes of information from a wiped drive is in error.

Although there is a good chance of recovery for any individual bit from a drive, the chances of recovery of any amount of data from a drive using an electron microscope are negligible. Even speculating on the possible recovery of an old drive, there is no likelihood that any data would be recoverable from the drive. The forensic recovery of data using electron microscopy is infeasible. This was true both on old drives and has become more difficult over time. Further, there is a need for the data to have been written and then wiped on a raw unused drive for there to be any hope of any level of recovery even at the bit level, which does not reflect real situations. It is unlikely that a recovered drive will have not been used for a period of time and the interaction of defragmentation, file copies and general use that overwrites data areas negates any chance of data recovery. The fallacy that data can be forensically recovered using an electron microscope or related means needs to be put to rest.

## References

1.  Abramowitz, M., & Stegun, I. A. (1965), "Handbook of Mathematical Functions" (Dover, New York).
2.  Amit, D. J., (1984), "Field Theory", The Renormalization Group and Critical Phenomena (World Scientific, Singapore).
3.  Braun, H. B. (1994) "Fluctuations and instabilities of ferromagnetic domain-wall pairs in an external magnetic field", Phys. Rev. B. 50 (1994), 16485–16500
4.  Brown, G., Novotny, M. A. & Rikvold, P. A. (2001) "Thermal magnetization reversal in arrays of nanoparticles", J. Appl. Phys. 89, 7588–7590.
5.  Bulsara, A., S. Chillemi, L. Kiss, P. V. E. McClintock, R. Mannella, F. Marchesoni, G. Nicolis, and K. Wiesenfeld, (1995), Eds., "International Workshop on Fluctuations in Physics and Biology: Stochastic Resonance, Signal Processing and Related Phenomena", published in Nuovo Cimento 17D, 653.
6.  Carroll, T. L., &Pecora, L. M. (1993a), Phys. Rev. Lett. 70, 576.
7.  Carroll, T. L., & Pecora, L. M. (1993b), Phys. Rev. E 47, 3941.
8.  Gomez, R., A. Adly, I. Mayergoyz, E. Burke. (1992). "Magnetic Force Scanning Tunnelling Microscope Imaging of Overwritten Data", IEEE Transactions on Magnetics, (28:5), 3141.

15

9. Gammaitoni L., Ha¨nggi P., Jung P., & Marchesoni F. (1998) "Stochastic resonance", Reviews of Modern Physics, Vol. 70, No. 1, January 1998, The American Physical Society

10. Gomez, R., E.Burke, A. Adly, I. Mayergoyz, J. Gorczyca. (1993). "Microscopic Investigations of Overwritten Data", Journal of Applied Physics, (73:10), 6001.

11. Grinstein G. & Koch, R. H. (2005) "Switching probabilities for single-domain magnetic particles, to appear" Phys. Rev. B 71, 184427, USA

12. Gutmann, P. (1996) "Secure Deletion of Data from Magnetic and Solid-State Memory", Proceedings of the Sixth USENIX Security Symposium. July 22-25, San Jose, CA., 77-90. (http://www.cs.auckland.ac.nz/~pgut001/pubs/secure_del.html)

13. Ha¨nggi, P., and R. Bartussek, (1996), in Nonlinear Physics of Complex Systems: "Current Status and Future Trends", edited by J. Parisi, S. C. Mu¨ler, and W. Zimmermann, Lecture Notes in Physics 476 (Springer, Berlin, New York), p. 294.

14. Liu, D. (2003) "Topics in the Analysis and Computation of Stochastic Differential Equations", Ph. D. thesis, Princeton University.

15. Mayergoyza, I.D., Tse, C., Krafft, & C., Gomez, R. D. (2001) "Spin-stand imaging of overwritten data and its comparison with magnetic force microscopy", JOURNAL OF APPLIED PHYSICS VOLUME 89, NUMBER 11.

16. Moss, F., (1994), in Contemporary Problems in Statistical Physics, edited by G. H. Weiss (SIAM, Philadelphia), pp. 205–253.

17. Ren, W. E, W. & Vanden-Eijnden, E. (2003) "Energy landscape and thermally activated switching of submicron-size ferromagnetic elements", J. Appl. Phys. 93, 2275–2282.

18. Reznikoff, M. G. (2004) "Rare Events in Finite and Infinite Dimensions", Ph. D. thesis, New York University.

19. Rugar, D. H. Mamin, P. Guenther, S. Lambert, J. Stern, I. McFadyen, and T. Yogi. (1990). "Magnetic Force Microscopy: General Principles and Application to Longitudinal Recording Media", Journal of Applied Physics, (68:3), 1169

20. Nikola Tesla *"The Great Radio Controversy"*. http://en.wikipedia.org/wiki/Invention_of_radio

21. Jiles, David, (1998) *"Introduction to magnetism and magnetic materials"*, 2nd. Ed., Chapman & Hall

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC

    *Plaintiffs,*

v.

CRAIG WRIGHT

    *Defendant.*

CASE NO.: 9:18-cv-80176-BB/BR

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO WRIGHT'S SECOND SET OF INTERROGATORIES TO PLAINTIFF, IRA KLEIMAN

PLEASE TAKE NOTICE that, pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs hereby responds to Wright's First Set of Interrogatories to Plaintiff, Ira Kleiman as follows:

### SPECIFIC OBJECTIONS TO TIME FRAME

Ira objects to the time period requested as it is inconsistent with what the Defendant himself has argued is appropriate at this stage of the litigation. Accordingly, Ira will treat the relevant time period for all Interrogatories as one month after the filing of the Initial Complaint. If the parties reach an agreement to expand the relevant time period, or if Defendant demonstrates a specific reason to exceed that timeframe for an individual interrogatory, Ira will supplement his responses to the extent necessary.

### SPECIFIC RESPONSES AND OBJECTIONS

**REQUEST NO. 10:**

Identify all attorneys with whom you consulted regarding any potential lawsuit against Dr. Craig Wright and the dates of those consultations.

**RESPONSE TO REQUEST NO. 10:**


EXHIBIT
9
4/8/19
PENGAD 800-631-6989

Ira objects to this request because it seeks information that has no relevance to any issue related to the claims and defenses of this case. This kind of discovery is expressly forbidden by the federal rules, which limit the scope of discovery to "nonprivileged matter[s] that [are] relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). The identity of any attorneys Ira consulted with prior to retaining Boies Schiller Flexner LLP to litigate the claims at issue in this litigation is irrelevant. Ira further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege and the work-product doctrine.

**REQUEST NO. 11:**

State whether you have assigned, in whole or in part, any portion of the potential recovery in the Lawsuit to any person(s), entity, or entities and, if so, identify them.

**RESPONSE TO REQUEST NO. 11:**

Ira objects to this request because it seeks information that has no relevance to any issue related to the claims and defenses of this case. This kind of discovery is expressly forbidden by the federal rules, which limit the scope of discovery to "nonprivileged matter[s] that [are] relevant to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). The assignment of any portion of any potential recovery in the Lawsuit is irrelevant to the claims and defenses at issue in this litigation. Ira further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege and the work-product doctrine.

**REQUEST NO. 12:**

Identify all person(s), entity, or entities with whom you consulted (including the date of those consultations) regarding Litigation Funding.

**RESPONSE TO REQUEST NO. 12:**

Ira objects to this request because it seeks information that has no relevance to any issue related to the claims and defenses of this case. This kind of discovery is expressly forbidden by the federal rules, which limit the scope of discovery to "nonprivileged matter[s] that [are] relevant

2

to any party's claim or defense . . . ." Fed. R. Civ. P. 26(b)(1). The identity of any litigation funders

Ira may have consulted with prior to retaining Boies Schiller Flexner LLP to litigate the claims at

issue in this litigation are irrelevant. Ira further objects to this definition to the extent it seeks

information protected by the attorney-client privilege and the work-product doctrine.

**REQUEST NO. 13:**

Describe with specificity all efforts you have made to restore the data on Dave Kleiman's
Electronic Devices.

**RESPONSE TO REQUEST NO. 13:**

Ira made attempts to restore data on two of Dave Kleiman's Electronic Devices that were

inaccessible. On November 10, 2013, Ira Kleiman installed Windows 7 on a Seagate Momentus

500GB drive (s/n 5VE1B6VT) in order to access the data contained on that drive. On November

17, 2013, Ira Kleiman installed Windows 7 on a Seagate Momentus 500GB drive (s/n

5VE1B6VT) in order to access the data contained on that drive.

In addition to these efforts, Ira also offered to mail Dave's drives to the Defendant for

assistance in locating the bitcoins the Defendant alleged were on the drive. The Defendant

declined.

**REQUEST NO. 14:**

Describe with specificity all efforts you made to preserve Dave Kleiman's Electronic Devices
and the data contained on them.

**RESPONSE TO REQUEST NO. 14:**

Ira stored all of Dave Kleiman's Electronic Devices in the exact same place that he found

them – in Dave's computer backpack. When Ira reviewed Dave's devices, he found nothing of

importance or out of the ordinary. Ira did find a Truecrypt file on the drive which he couldn't

access. He made copies of this file.

The Defendant also told Ira he held backups of Dave's files.  At the time he was informed of this, Ira viewed this as yet another safety measure to ensure the preservation of any potentially "important" files.

**REQUEST NO. 15:**

Describe with specificity all of Dave Kleiman's Electronic Devices that Ira Kleiman or anyone in his family used for their personal use, including in that description the time frame during which those Electronic Devices were used and who used them.

**RESPONSE TO REQUEST NO. 15:**

Ira was the only individual in his family that used or had access to Dave Kleiman's Electronic Devices.  Ira occasionally used the following electronic devices for personal use up until January 2019, but did not delete any of Dave's files off these drives:

- Seagate Momentus 500GB (Ext. HDD; s/n 5VE1B6VT)

- WD Scorpio Blue 750GB (Ext. HDD; s/n WX71A20K2955)

- Corsair Survivor Stealth TD Black (s/n 1100300000000135)

- Corsair Survivor Stealth TD Gray Orange (thumb drive; s/n A107000000000001)

- Corsair Survivor Stealth TD Gray Blue (thumb drive; s/n AA04012700008813)

- Corsair Survivor Stealth TD Gray Blue 2 (thumb drive; s/n 12291214800015413109)

**REQUEST NO. 16:**

Identify all of Dave Kleiman's property that was sold after his death. For the purposes of this interrogatory, "identify" includes a description of the property, the person(s), entity or entities to whom the property was sold, and the amount(s) for which it was sold.

**RESPONSE TO REQUEST NO. 16:**

Ira sold the following items belonging to Dave after his death:

- a washer;
- a dryer;
- an air handler;
- an empty gun safe; and
- a rifle.

Ira does not recall the purchasers of these items nor the amount received for each item.

## REQUEST NO. 17:

Identify all Persons who made offers to you, Ira Kleiman in his individual capacity, Louis Kleiman, or anyone else on behalf of the estate of David Kleiman, to purchase shares of Coin-Exch, Pty. Ltd. For each such offer, include the date the offer was made, the amount of money offered (either per share or in total), and any responses to those offers.

## RESPONSE TO REQUEST NO. 17

On June 27, 2015, the Defendant and Ramona Watts informed Ira that an unidentified individual wanted to purchase his shares of Coin-Exch. Ira was informed he was not allowed to speak with the unidentified individual and that he had to decide whether to accept the offer very quickly. The offer was that in exchange for these shares, Ira would receive 5% of any R&D rebates the ATO approved. Ira did not accept this offer and as far as Ira is aware, the ATO did not approve any rebates.

## REQUEST NO. 18:

State whether you have had any verbal communications with Uyen Nguyen and for each such verbal communication provide the date of that communication and the substance of that communication.

## RESPONSE TO REQUEST NO. 18:

Ira has never had any verbal communications with Uyen Nguyen.

## REQUEST NO. 19:

List all degrees and professional and technical certifications held at any point in time by Ira Kleiman. For the purposes of this interrogatory, include the date any certification was received, the date any certification expired, and describe the certification.

## RESPONSE TO REQUEST NO. 19:

Ira received his high school diploma from Palm Beach Gardens High School in 1988. Additionally, Ira took computer graphic design classes at Palm Beach Community College from approximately 1991-1994, although he did not receive a degree or certification.

## REQUEST NO. 20:

Describe with specificity Ira Kleiman's experience, skill, and knowledge relating to Electronic Devices and the methods of preserving, overwriting, or erasing data on Electronic Devices.

**RESPONSE TO REQUEST NO. 20:**

From approximately 1991 to 1994, Ira took computer graphic design classes at Palm Beach Community College. Additionally, Ira has been employed in website design and affiliate marketing for the past twenty-two years and uses computers extensively as part of his work. During this time, Ira became generally familiar with how to preserve, overwrite, or erase data on Electronic devices.

**REQUEST NO. 21:**

Describe with specificity Ira Kleiman's employment history (including self-employment and independent contracting) from 1991 to the present, including the nature of each business where he was employed.

**RESPONSE TO REQUEST NO. 21:**

Ira worked at Rite-aid Pharmacy in Palm Beach as a stock person but cannot recall the year he worked there. He worked in flower delivery at Prevatte Flowers in Palm Beach but cannot recall the year he worked there. In 1997, he worked in web design at Active Frame. From 1998 to the present, he has been self-employed in website design and affiliate marketing.

Dated: March 21, 2019

Respectfully submitted,

*s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman, Esq.
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida 33131
Telephone: (305) 539-8400
Facsimile: (305) 539-1307
vfreedman@bsfllp.com

Kyle W. Roche, Esq.

*Admitted Pro Hac Vice*
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300
kroche@bsfllp.com

*Counsel to Plaintiff Ira Kleiman as Personal*
*Representative of the Estate of David Kleiman*
*and W&K Info Defense Research, LLC.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 7, 2019, a true and correct copy of the foregoing was served on all counsel of record identified on the Service List below via e-mail:

Andres Rivero, Esq.
Jorge A. Mester, Esq.
Alan H. Rolnick, Esq.
Amanda McGovern, Esq.
Zaharah Markoe, Esq.
Zalman Kass, Esq.
RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard
Suite 1000
Coral Gables, FL 33134
305-445-2500
(305) 445-2505 (fax)
arivero@riveromestre.com
jmestre@riveromestre.com
arolnick@riveromestre.com
receptionist@riveromestre.com
zkass@riveromestre.com
zmarkoe@riveromestre.com
amcgovern@riveromestre.com

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman

7

I, Ira Kleiman, declare under penalty of perjury under the laws of the United States and the State of Florida, that the foregoing is true and correct.

Executed on March 21, 2019, at West Palm Beach, Florida.

_____

Ira Kleiman

8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC

     *Plaintiffs,*

v.

CRAIG WRIGHT

     *Defendant.*

CASE NO.: 9:18-cv-80176-BB/BR

## PLAINTIFFS' SECOND AMENDED RESPONSES AND OBJECTIONS TO WRIGHT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF, IRA KLEIMAN

PLEASE TAKE NOTICE that, pursuant to Rule 34 of the Federal Rules of Civil Procedure, Plaintiffs hereby responds to Wright's First Set of Interrogatories to Plaintiff, Ira Kleiman as follows:

### SPECIFIC OBJECTIONS TO TIME FRAME

Plaintiffs' object to the time period requested as it is inconsistent with what the Defendant himself has argued is appropriate at this stage of the litigation. Accordingly, unless indicated otherwise, Plaintiffs' will treat the relevant time period for all Interrogatories as one month after the filing of the Initial Complaint. If the parties reach an agreement to expand the relevant time period, or if Defendant demonstrates a specific reason to exceed that timeframe for an individual interrogatory, Ira will supplement his responses to the extent necessary.

### SPECIFIC RESPONSES AND OBJECTIONS

**REQUEST NO. 1:**

Identify of [sic] all persons that were present at the November 26, 2009, Thanksgiving dinner referenced in paragraphs 58 through 62 of the Second Amended Complaint.

**RESPONSE TO REQUEST NO. 1:**


EXHIBIT
10
4/8/19

The following individuals were present at the November 26, 2009 Thanksgiving dinner referenced in paragraphs 58 through 62 of the Second Amended Complaint:

- Louis Kleiman;
- Dave Kleiman;
- Ira Kleiman (155 Bent Tree Drive, Palm Beach Gardens, FL. 33418; phone: 561-624-6367; self-employed in website design / affiliate marketing);
- Ju Kleiman (155 Bent Tree Drive, Palm Beach Gardens, FL. 33418; phone: 561-624-6367; salesperson at LG Electronics, Thailand); and
- Ira's six-month year old child.

**REQUEST NO. 2:**

Identify all electronic devices that Dave Kleiman owned or possessed at the time of his death.

**RESPONSE TO REQUEST NO. 2:**

Ira objects to this Request to the extent it seeks knowledge he doesn't possess.

Notwithstanding that objection, the following is a list of the electronic devices that Ira believes to have been owned or possessed by Dave Kleiman at the time of his death:

| Device Description | Type | Amount of Data currently stored  (GB) |
| --- | --- | --- |
| Seagate Momentus 500GB | External HDD | 17.6 |
| WD Scorpio Blue 750GB | External HDD | 119.2 |
| Seagate Momentus 500GB | External HDD | 0 |
| Hitachi Travelstar 100GB | External HDD | 0 |
| WD Scorpio Black 320GB | External HDD | 0 |
| Four to five hard drives that are no longer in the estate's possession.[1] | External HDD | n/a |
| HTC T7373X Touch Pro2 | Mobile Phone | .01 |

---

[1] Ira gave three or four drives that were possessed by Dave Kleiman at the time of his death, to Patrick Page (Dave's business partner in Computer Forensics LLC) as Patrick informed him they were Computer Forensic LLC's drives with the business's data stored on them.  There was one other drive that was on Dave's bedroom counter. This drive was broken, and would not power on. Ira disposed of this drive in 2013.

| Samsung Galaxy Note SGH-I717 | Mobile Phone | N/A |
|---|---|---|
| Corsair Survivor Stealth TD Black | Thumb Drive | 25.7 |
| Corsair Survivor Stealth TD Gray Orange | Thumb Drive | 2.09 |
| Corsair Survivor Stealth TD Gray Blue | Thumb Drive | 58 |
| Corsair Survivor Stealth TD Gray Blue 2 | Thumb Drive | 48.7 |
| IACIS TD | Thumb Drive | 0.35 |
| Micro Vault Tiny 4GB | Thumb Drive | .1 |
| Sandisk Cruzer Micro 8GB | Thumb Drive | 2.81 |
| CEIC 2009 2GB | Thumb Drive | 2.79 |
| Key Thumbdrive 8GB | Thumb Drive | 1.03 |
| Two Alienware m9700i R1 series laptops | Laptop | n/a |
| 1 Dell Laptop (Precision M65) | Laptop | n/a |
| 1 Toshiba micro tower (Magnia Z310) | Desktop | n/a |
| Various CD-ROM containing various software programs | CD-ROM | n/a |

**Email Accounts**
1. kleimandave@yahoo.com
2. davesdigitalforensics@gmail.com
3. dave@davekleiman.com
4. dave@netmedic.net
5. dave@isecureu.com

**REQUEST NO. 3:**

Describe with specificity all attempts you have made to access Dave Kleiman's electronic devices.

**RESPONSE TO REQUEST NO. 3:**

Ira did not keep a record of every attempt he made to access Dave Kleiman's electronic devices. That said, Ira states that he personally reviewed all drives that were accessible. During this review, Ira looked through each individual folder and each individual file contained on these drives to find anything of importance.

Ira successfully installed Windows operating systems on two of the drives in an effort to gain access to those drives in November 2013. He successfully installed Windows 7 on the Seagate Momentus 500 GB drive (Serial No. 5VE1B6VT) on November 10, 2013. He installed Windows 8 on the WD Scorpio Blue 750 GB drive on November 17, 2013.

**REQUEST NO. 4:**

Describe with specificity all attempts you have made to determine the identity and location of any cryptocurrency that Dave Kleiman owned or possessed at the time of his death apart [sic].

**RESPONSE TO REQUEST NO. 4:**

Ira objects to this request to the extent it seeks privileged information protected by the attorney client privilege and work product privilege. Notwithstanding that objection, Ira states that he personally reviewed all accessible electronic devices that he believed Dave owned or possessed. During this review, Ira looked through each individual folder and each individual file contained on these drives to find anything of importance.

Furthermore, Ira spoke to the following individuals in an effort to identify the identity and location of the cryptocurrency that Dave Kleiman owned at the time of his death:

- Craig Wright;

- Patrick Paige;

- Carter Conrad;

- Angela Ojea (cell-phone: 561-707-3734; home phone: 561-748-9916); and

- Kimon Andreou (phone: 305-606-7423).

Finally, Ira has reviewed numerous documents provided by the Defendant, Ramona Watts, the Australian Tax Office, as well as documents obtained from the public domain, from the Australian Courts, and as a result of subpoenas served in this litigation to try and identify the cryptocurrency and location of the cryptocurrency the Defendant stole from Dave and W&K Info

4

Defense Research, LLC.

**REQUEST NO. 5:**

Identify by public address all cryptocurrency that you claim rightfully belongs to Dave Kleiman or his estate.

**RESPONSE TO REQUEST NO. 5:**

Discovery is still ongoing and Plaintiffs currently lack sufficient knowledge to identify the public addresses of *all* cryptocurrency belonging to Dave Kleiman or his estate. Plaintiffs will supplement the response to this Request as more information is made available during the discovery process.

Based on information available to Plaintiff today, however, Plaintiffs believe that any cryptocurrency held in the following addresses (or any bitcoin transferred out of these wallets), belongs at least in part, to Plaintiffs:

1. 12tls9c9RsALt4ockxa1hB41TCTSmxj2me
2. 1933phthK3ZgFQNLGSDXvqCn32k2buXY8a
3. 1FeexV6bAHb8ybZjqQMJJrcCrHGW9sb6uF
4. 1f1miYFQWTzdliCBxtHHniW7IVAWPUccr
5. 1MHdm5XZ111rfoZFoUid&GbYevmdiXoob4
6. 18JPragfuDVHWWG8ABQ15cghJFetnXUJBD
7. 1LXc28hWx1t8np5sCAb2EaNFqPwqJCuERD
8. 1FpqQnKQCgDkJFMC94JL8FpRyHTZ3uRVZ1
9. 1F34duy2ccMz5mSrvFepVzy7Y1rBsnAyWC
10. 1JtpgqCf3SSeCeYWEDJjkfYFH7Ruhy4Vp1
11. 18k9tin39LKegfzIIe8rxSgvJXDpuMriGJq
12. 1HtTw9zR9wWFfgV8Jy8MqsacVl7ZXrjdq6

13. 18pn4NQ7NgsJjeuFjazeTdVRnsmfw5ofTz

14. 12fZ2HxkljG9zn1u44XYsFFYKHM4A2zCea

15. 12tkqA9xSoowkzoERHMWNKsTey55YEBqkv

16. 16Ls6azc76ixc9Ny7AB5ZPPq6oiEL9XwXy

17. 12HddUDLhRP2F8JjpKYeKaDxxt5wUvx5nq

18. 1P3S1grZVmcqYDuaEOVOYobJ5Fx85E9fE9

19. 1MyGwFAJjVtB5rGJa32M6Yh46cGirUta1K

20. 145YHsQU7HMzkRnD5SBSuFAzQgCYnAnlkN

21. 16TPVCpvtJ6FkV5xNKBp35aMo4BWFGxiEY

22. 1KbrSKrT3GeEruTuuYYUSQ35JwKbrAWJYm

23. 1FLFnbN7m5psLfvLEwYtRUUjJ34YkmV3dM

24. 1A6SDef1TJAM8Saw2SqmqFGhkWR1y3qMx2

25. 16cou7Hl6WjTzuFyDBnht9hmvXytg6XdVT

26. 12ib7dApVFvg82TXKycWBNpN8kFyiAN1dr

## REQUEST NO. 6:

Identify with specificity all intellectual property that you claim rightfully belongs to Dave Kleiman or his estate.

## RESPONSE TO REQUEST NO. 6:

Discovery is still ongoing and Plaintiffs currently lack sufficient knowledge to identify *all* intellectual property belonging to them. Plaintiffs will supplement the response to this Request as more information is made available during the discovery process.

Based on information available to Plaintiffs today, however, Plaintiffs believe that the estate and/or W&K have an ownership interest in source code, compiler code, Machine Language

(MASM/NASM), algorithms, manuals, trademarks, pending patents, granted patents, and other external filings associated with the following IP items:

1. A metered payments system;

2. Software derivative markets & information security risk systems;

3. Software assurance marketplace;

4. Software assurance through economic measures and anti-fraud system;

5. Risk quantification system (for financial modeling in Bitcoin);

6. SCADA measurements suite of software; and

7. Scriptable money.

More generally, Plaintiffs believe that the Defendant has taken intellectual property belonging to the estate and W&K that was created by Dave and Craig's partnership through research Dave Kleiman conducted with Craig Wright that was not completed or published as of 2015. Further discovery is needed to uncover the exact nature of this intellectual property, including discovery to uncover the exact nature of the 6,000,000 lines of code the Defendant has admitted David Kleiman created.

Furthermore, Plaintiffs believe they hold an interest in the security, banking, and automation intellectual property distributed to Cloudcroft, Hotwire, and Coin-Exch. Finally, Plaintiffs believe they hold an interest in the intellectual property, source code, algorithms, and patentable materials claimed by DeMorgan which relates to the development of smart contract and Blockchain based technologies and the commercialization of Blockchain and smart contract system research.

## REQUEST NO. 7:

Describe with specificity how you first came to possess copies of the documents that are attached as exhibits 9, 12 15, and 18 to the Second Amended Complaint, and Exhibit A to Plaintiffs' First Request

for Production, including by identifying the first person who provided you with copies of those documents.

**RESPONSE TO REQUEST NO. 7:**

Ira first reviewed Exhibit 9 to the Second Amended Complaint when it was released online by John Cook of Gawker. *See* https://www.documentcloud.org/documents/2644013-20140226-Meeting-Minutes-Redacted.html. Ira first reviewed Exhibit 12 of the Second Amended Complaint when it was released online by Gizmodo. https://gizmodo.com/heres-all-the-evidence-that-craig-wright-invented-bitco-1747059371. Ira first reviewed Exhibit 15 of the Second Amended Complaint when Craig emailed it to him on May 11, 2014. Ira first reviewed Exhibit 18 of the Second Amended Complaint when Ramona Watts emailed it to him on July 2, 2015.

**REQUEST NO. 8:**

Identify all persons at news agencies with whom you have spoken about any of the facts that you have alleged in the Second Amended Complaint.

**RESPONSE TO REQUEST NO.**

Ira or his attorneys had discussions or correspondence with the following persons at news agencies about the facts alleged in the Second Amended Complaint:

1. Andy Cush (443-852-1025; andy.cush@gmail.com)

2. Sam Biddle (sam.biddle@theintercept.com)

3. Andy Greenberg (Wired); (agreenberg@wired.com)

4. Jordan Pearson (vice); (jordan.pearson@vice.com)

5. Ryan Browne (NBC Universal); (Ryan.Browne@nbcuni.com)

6. Ritika Shah (NBC Universal); (Ritika.Shah@nbcuni.com)

7. Michelle Caruso-Cabrera (NBC Universal) (Michelle.Caruso-Cabrera@nbcuni.com)

8. Cyrus Farivar (arstechnica); (cyrus.farivar@arstechnica.com)

9.  MP McQueen (ALM); (mmcqueen@alm.com)

10. Will Yakowicz (Inc.com); (wry201@gmail.com)

11. Olga Kharif (Bloomberg); (okharif@bloomberg.net)

12. Jef Feeley (Bloomberg); (jfeeley@bloomberg.net)

**REQUEST NO. 9:**

Identify the auditor from the ATO who allegedly reached out to you as referenced in paragraph 141 of the Second Amended Complaint.

**RESPONSE TO REQUEST NO. 9:**

Ira states that the auditor referenced in paragraph 141 of the Second Amended Complaint

is Andrew Miller (Phone: (02) 9354-6379).

Dated: March 21, 2019          Respectfully submitted,

         *s/ Velvel (Devin) Freedman*
         Velvel (Devin) Freedman, Esq.
         BOIES SCHILLER FLEXNER LLP
         100 SE Second Street, Suite 2800
         Miami, Florida 33131
         Telephone: (305) 539-8400
         Facsimile: (305) 539-1307
         vfreedman@bsfllp.com

         Kyle W. Roche, Esq.
         *Admitted Pro Hac Vice*
         BOIES SCHILLER FLEXNER LLP
         333 Main Street
         Armonk, NY 10504
         Telephone: (914) 749-8200
         Facsimile: (914) 749-8300
         kroche@bsfllp.com

         *Counsel to Plaintiff Ira Kleiman as Personal*
         *Representative of the Estate of David Kleiman*
         *and W&K Info Defense Research, LLC.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 21, 2019, a true and correct copy of the foregoing was served on all counsel of record identified on the Service List below via e-mail:

Andres Rivero, Esq.
Jorge A. Mester, Esq.
Alan H. Rolnick, Esq.
Amanda McGovern, Esq.
Zaharah Markoe, Esq.
Zalman Kass, Esq.
RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard
Suite 1000
Coral Gables, FL 33134
305-445-2500
(305) 445-2505 (fax)
arivero@riveromestre.com
jmestre@riveromestre.com
arolnick@riveromestre.com
receptionist@riveromestre.com
zkass@riveromestre.com
zmarkoe@riveromestre.com
amcgovern@riveromestre.com

/s/ Velvel (Devin) Freedman
Velvel (Devin) Freedman

I, Ira Kleiman, declare under penalty of perjury under the laws of the United States and the State of Florida, that the foregoing is true and correct.

Executed on March 21, 2019 at West Palm Beach, Florida.

_____

Ira Kleiman

Filing # 61672693 E-Filed 09/18/2017 05:58:20 PM

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVL DIVISON AN
CASE NO. 50-2016-CA-013045-XXXX-MB

IRA KLEIMAN, individually, and as
Personal Representative of the
Estate of David Kleiman,

     Plaintiff,

v.

COMPUTER FORENSICS LLC,
CARTER CONRAD, individually, &
PATRICK PAIGE, individually.

     Defendants.

_____/

## FIRST AMENDED COMPLAINT

Plaintiff Ira Kleiman, individually and as personal representative of the Estate of David Kleiman, hereby sues Computer Forensics LLC, a Florida limited liability company, and Carter Conrad, and Patrick Paige, and alleges as follows:

## PARTIES, JURISDICTION & VENUE

1.    Plaintiff Ira Kleiman is a resident of Palm Beach County, Florida. He is the sole heir to the Estate of David Kleiman (Ira's late brother, and referred to herein as "DAVID") and is the Personal Representative of the Estate of David Kleiman ("Plaintiff"). See Letters of Administration Appointing Ira Kleiman as Personal Representative of the Estate of David Kleiman, attached hereto as Exhibit 1. As sole heir, Ira Kleiman is also a beneficiary of any property of David Kleiman. David Kleiman was, at the time of his passing on April 26, 2013, a one-third owner of Defendant Computer Forensics, LLC. See Computer Forensics, LLC Operating Agreement, attached hereto as Exhibit 2. Upon the death of David Kleiman, his one-third ownership interest was assumed by

**EXHIBIT**
11

his Estate and its Personal Representative, and the Personal Representative has standing to pursue this action.   Alternatively, Ira Kleiman also became the sole beneficiary of the decedent, and any benefits or monies owed to David Kleiman by some or all of the Defendants in this action are due and owing to Ira Kleiman, subject to expenses/costs of the Estate.

2.    Defendant Computer Forensics LLC ("Computer Forensics") is a Florida limited liability company with its principal place of business in Boynton Beach, Florida.   At the time of its formation in 2012, the LLC's two Managing Members were David Kleiman and Defendant Carter Conrad ("Conrad").    Defendant Patrick Paige ("Paige") thereafter was added as a Managing Member and three Managing Members executed the Operating Agreement on or about February 13, 2013. See Exhibit 2, attached hereto.

3.    Defendant Conrad is, upon information and belief, a resident of Palm Beach County, Florida.   He owns one-third of Defendant Computer Forensics LLC and is a Managing Member, pursuant to the Operating Agreement, attached as Exhibit 2, hereto.

4.    Defendant Paige is, upon information and belief, a resident of Palm Beach County, Florida.  He owns one-third of Defendant Computer Forensics LLC and is a Managing Member.

5.    Jurisdiction is proper because this is an action in excess of $ 15,000.00, exclusive of interests, costs and fees.

6.    Venue is proper because the underlying facts occurred in Palm Beach County, Florida and because all parties are residents of Palm Beach County, Florida.

## FACTS COMMON TO ALL COUNTS

7.    On February 13, 2012, Computer Forensics LLC was created.   Its two founding managing members were David Kleiman and Carter Conrad.   Both had a one-half ownership

interest in the LLC.   Sometime thereafter, Paige became a Managing Member of Computer Forensics.

8.       On or about February 13, 2013, David Kleiman, Conrad, and Paige executed an Operating Agreement, attached hereto as Exhibit 2, which provided, among other things, that:

a.       Each Managing Member would possess and own a 33.33% interest of Computer Forensics;

b.       Gross revenue produced and received by Computer Forensics, LLC would be distributed pursuant to a specific formula: 20% of all gross proceeds would be paid to Computer Forensics for expenses and overhead, and the remaining 80% of proceeds would be distributed to each participating member based on a percentage of activity or work product, proportional to the production of the revenue or income;

c.       At the end of each fiscal year, and if proceeds in excess of operating expenses remained in Computer Forensic's accounts, each Managing Member would be awarded an additional 33.33% share of income not bookmarked for expenses.

9.       The Operating Agreement further provided that "[a]ll equipment, software, hardware, or other intellectual property, owned individually by each Member" would remain in the ownership of that Member.   See Exhibit 2, attached hereto.

10.       On April 26, 2013, David Kleiman passed away.

11.       Plaintiff was David Kleiman's sole heir and is the personal representative of David Kleiman's estate.

12.     David Kleiman's interest has never been transferred, sold or other disposed of and, upon information and belief, the Estate of David Kleiman still owns one-third of Computer Forensics.

13.     On May 10, 2013, two weeks after David Kleiman died, Defendant Conrad filed an amended annual report indicating that Computer Forensics had two managing members – Defendants Conrad and Paige.  Any record of David Kleiman's (or his Estate's) ownership of the Computer Forensics was removed from the LLC's publicly-filed corporate records.

14.     Prior to the execution of the Operating Agreement, David Kleiman had created, registered, and owned at least two personal websites, www.davidakleiman.com and www.davekleiman.com, among others (hereinafter referred to as the "Kleiman Websites").   These websites were created before the formation of Computer Forensics or the execution of the Operating Agreement, and, as per the terms of the Agreement, remained in the ownership of David Kleiman and are now the rightful property of David Kleiman's Estate.   Upon information and belief David Kleiman never transferred the Kleiman Websites to the ownership of Computer Forensics or any other party, individual, or entity.   Upon information and belief, the Kleiman Websites are now in the control of the Defendants and the websites redirect to and mirror www.computerforensicsllc.com.

15.     Upon information and belief, prior to his death, David Kleiman had carried out computer forensic expert services on behalf of multiple clients of Computer Forensics, including conducting such services as an expert in litigation matters.  Up to the date of his death (April 26, 2013), David Kleiman had been entitled to distributions based on his percentage of activity or work product, as per the terms of Operating Agreement, attached as Exhibit 2, hereto.  After his death,

David Kleiman's estate was entitled to any such distributions for activity conducted or for work product created by David Kleiman while he was alive.   Upon information and belief, subsequent to David Kleiman's death, Patrick Page assumed all client files that had been worked on by David Kleiman, including several litigation matters.

16.     Upon information and belief, in the course of his assumption of said files/matters, Patrick Paige presented some or all of the work that had been conducted by Decedent David Kleiman as his own.    Neither the Estate or the Personal Representative of the Estate of David Kleiman were advised of Paige's activities on David Kleiman's files, and similarly provided no accounting or distributions to Personal Representative Ira Kleiman for activity conducted by or work product created by David Kleiman, and, as such has been deprived of such payments, and have suffered damages as a result.

17.     Similarly, following the death of David Kleiman, Computer Forensics seized control of the Kleiman Websites, and/or converted them to its own use, depriving David Kleiman's estate and Ira Kleiman, as beneficiary, of the use of these websites, or any income derived by Computer Forensics and/or by Conrad and Paige.

18.     Shortly after David Kleiman's passing, Plaintiff also entrusted Computer Forensics and Patrick Paige with a smartphone owned by Decedent, which was provided to these Defendants for the purpose of unlocking the phone (as it was password protected),  in aid of Plaintiff's efforts to develop information as to assets of the Estate.   The phone has never been returned to Plaintiff and Defendant Paige has since claimed that he, a computer forensic consultant, had thrown away the phone after he had dropped the phone and cracked the screen.

19.     As a consequence of the above activities, Plaintiff has sustained damages and seeks relief under law and equity.

**COUNT I**
**CONVERSION OF PROPERTY**
**BELONGING TO PLAINTIFF**
**(AGAINST COMPUTER FORENSICS)**

20.     The allegations of paragraphs 1 through 19 are realleged and incorporated as if fully set forth herein.

21.     As a course of its dealings with David Kleiman, Defendant Computer Forensics has taken illegal possession of the property of David Kleiman, namely certain websites that were created and initially registered by David Kleiman, and which are identified as www.davidakleiman.com and www.davekleiman.com.   In addition, said sites direct traffic to Computer Forensics' own website, which allows Computer Forensics and its principals to benefit from the name and property and David Kleiman.   In addition, the smartphone belonging to David Kleiman has never been returned to Plaintiff and, per Defendant Paige, has been discarded due to a "cracked screen," with no further explanation.

22.     Such acts deprive and continue to deprive David Kleiman's Estate and survivor, the Plaintiff, of the benefit of such property.

23.     The deprivation by Computer Forensics is inconsistent with Plaintiff's ownership rights, in that Defendant has no right to this property, and has benefitted by such illegal conversion.

24.     As a result of such conversion by Computer Forensics, Plaintiff has suffered and continues to suffer damages in relation to being deprived of the use of his property.

WHEREFORE, Plaintiff demands judgment for damages against Defendant plus interest thereon at the legal rate from date such became due, and any such other relief as the Court deems just and proper.

## COUNT II
## CONSTRUCTIVE TRUST
### (As to all Defendants)

25.    The allegations of paragraphs 1 through 19 are realleged and incorporated as if fully set forth herein.

26.    Conrad, Paige, and David Kleiman executed the Computer Forensics Operating Agreement (attached hereto as Exhibit 2) on or before February 13, 2013, whereby the parties agreed, among other things, that gross revenue produced and received by Computer Forensics, LLC would be distributed pursuant to a specific formula: 20% of all gross proceeds would be paid to Computer Forensics for expenses and overhead, and the remaining 80% of proceeds would be distributed to each participating member based on a percentage of activity or work product, proportional to the production of the revenue or income.

27.    David Kleiman was and his estate (and therefore Plaintiff, by operation of the law) remains a one-third owner of Computer Forensics.

28.    Plaintiff has been denied his equal share of Computer Forensics' profits and revenue that has been generated by virtue of Defendants' use of and trading off the David Kleiman name and website without compensation, and which have been distributed to Paige and Conrad.

29.    Equity demands that the Court place a constructive trust over one-third of all past and future profits and assets of Computer Forensics, or portions of any such profits and assets that have been distributed by Computer Forensics to Paige and/or Conrad.

30.  Equity similarly demands that the websites www.davekleiman.com and www.davidakleiman.com be placed in trust for the Plaintiff.

WHEREFORE, Plaintiff demands that a constructive trust be imposed as to the Defendants, to ensure that any and all properties or monies due to Plaintiff are safeguarded, and any other remedy this Court may deem appropriate and just.

**COUNT III**
**PERMANENT INJUNCTION DUE TO BREACH OF OPERATING AGREEMENT**
**AS TO ALL DEFENDANTS**

31.  The allegations of paragraphs 1 through 19 are realleged and incorporated as if fully set forth herein.

32.  As a course of its dealings with David Kleiman, Defendant Computer Forensics has taken illegal possession of the property of David Kleiman, namely certain websites that were created and initially registered by David Kleiman, and which are identified as www.davidakleiman.com and www.davekleiman.com.  In addition, said sites direct traffic to Computer Forensics' own website, which allows Computer Forensics, Paige, and Conrad to benefit from the name and property of David Kleiman.  Further, upon information and belief, David Kleiman created and maintained bitcoin wallets which were his personal property during the time he was a member of Computer Forensics.

33.  Pursuant to the terms of the Operating Agreement at issue, all such property was personal property of David Kleiman and is not property of Computer Forensics or any of its principals.  See Exhibit 2, attached hereto.

34.  By operation of the law, Plaintiff is entitled to receive and control any property of the Decedent, as Decedent's Personal Representative, heir, and beneficiary.

35.     Defendants should be enjoined from further use of any websites that were created by David Kleiman and which are therefore the property of the Estate, heir and beneficiary (the Plaintiff).    To the extent that Computer Forensics, Paige, or Conrad have retained any bitcoin wallets that were the personal property of David Kleiman, Computer Forensics should be enjoined from monetizing, transferring or otherwise converting such bitcoin to its use of the use of its principals or third parties.

WHEREFORE Plaintiff demands judgment for temporary and permanent injunction against Defendant Computer Forensics, enjoining it from further use or operation of any websites of David Kleiman, and from monetizing, transferring or otherwise converting any bitcoin that belonged to David Kleiman to its use of the use of its principals or third parties, and any other remedy this Court may deem appropriate and just.

### COUNT IV
### ACCOUNTING & INSPECTION OF RECORDS
### PURSUANT TO SECTION 608.4101 OF THE FLORIDA STATUTES
### (AS TO COMPUTER FORENSICS)

36.     The allegations of paragraphs 1 through 19 are realleged and incorporated as if fully set forth herein.

37.     Computer Forensics is a limited liability company that was created on February 13, 2012, and is therefore subject to the Florida Limited Liability Act, which was in effect at the time. See Florida Stat. Section 608 et seq. (2012).

38.     Plaintiff, by operation of law and as personal representative of the Estate of David Kleiman, has now and has had a one-third interest in Computer Forensics, LLC since the passing of David Kleiman.

39.     Fla. Stat. § 608.4101(3) provides that a "limited liability shall furnish to a member, and to the legal representative of a deceased member or member under legal liability: (a) without demand, information concerning the limited liability company's business or affairs reasonably required for the proper exercise of the member's rights and performance of the member's duties under the operating agreement or this chapter."

40.     Plaintiff has learned of a sworn statement filed in federal court earlier this year (February 2017), stating that Patrick Paige presented some or all of the work that had been conducted by Decedent David Kleiman as his own.   Plaintiff had received no prior notification or information regarding this issue from Computer Forensics, and requires a full review of information concerning how David Kleiman's work was used and/or billed for following his death in April 2013, and said information is reasonably required for Plaintiff to exercise his rights as a one third member, as well as to enforce performance of the Operating Agreement executed in February 2013, based on this newly-discovered information.

41.     Fla. Stat. § 608.4101(6) provides that "any action to enforce any right arising under this section shall be brought in the appropriate court," and this action is properly brought in the Circuit Court of Palm Beach County.

42.     Plaintiff requests an accounting of Computer Forensics, to include the production of the following documents, which are reasonably required for Plaintiff to exercise his rights pursuant to Fla. Stat. § 608.4101(3) :

a.     File materials and work records for all client matters handled by David Kleiman before his death in 2013, including time sheets, or other means of recording his activity and work product;

b.   Emails issued by David Kleiman on all client matters to allow Plaintiff to assess the Decedent's activity and work product, and calculate distributions that should have been made to decedent and/or his estate.

c.   Records of any payments received by Computer Forensics for all matters that were assigned to or worked on at any time by David Kleiman;

d.   Records of distributions made to Paige or Conrad arising out of any matters that were assigned to or worked on at any time by David Kleiman;

e.   All registrations and/or ownership documents for the website domain www.davidakleiman.com.

f.   All registrations and/or ownership documents for the website domain www.davekleiman.com.

43.   Plaintiff requests any attorney fees and costs awardable to Plaintiff pursuant to Fla. Stat. § 608, in bringing this action.

WHEREFORE, Plaintiff demands that Computer Forensics provide a complete and transparent accounting and inspection of records of any income generated from any client files assigned to or worked on by David Kleiman, and all other information reasonably required for Plaintiff to exercise his rights as a one third member, as well as to enforce performance of the Operating Agreement, and entry of any other remedy this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

## RESERVATION OF RIGHT TO FURTHER AMEND

Plaintiff reserves the right to further amend the Complaint if new information arises via discovery that gives rise to new or enhanced claims against the Defendants.

## PRAYER FOR RELIEF

Plaintiff prays for the following relief: (a) Enter a final judgment in favor of the Plaintiff and against the Defendants on all claims; and (b) Grant any further relief the Court deems proper.

Dated this 18th day of September 2017.

LUBELL & ROSEN, LLC
*Attorney for Plaintiff*
*Ira Kleiman, individually and as*
*Personal Representative of the*
*Estate of David Kleiman*
1 Alhambra Plaza, Suite 1410
Coral Gables, Florida 33134
Phone: (305) 655-3425
Fax: (305) 442.9047
Primary:   aml@lubellrosen.com
Secondary:maria@lubellrosen.com

By: *Aldo M. Leiva*
     ALDO M. LEIVA, ESQUIRE
     Florida Bar #116424

NOT A CERTIFIED COPY

NOT A CERTIFIED COPY

**EXHIBIT 1**

CFN 20160043050
OR BK 28090 PG 1377
RECORDED 02/08/2016 11:13:05
Palm Beach County, Florida
AMT
Sharon R. Bock
CLERK & COMPTROLLER
Pg 1377; (1Pgs)

**IN THE CIRCUIT COURT FOR PALM BEACH COUNTY, FLORIDA        PROBATE DIVISION**

IN RE: ESTATE OF

DAVID ALAN KLEIMAN

Deceased.

File No.
502013CP005060XXXXNB

Division IH

**LETTERS OF ADMINISTRATION**
(single personal representative)

TO ALL WHOM IT MAY CONCERN

WHEREAS, David Alan Kleiman, a resident of Palm Beach County, Florida, died on April 26, 2013, owning assets in the State of Florida, and

WHEREAS, Ira Steven Kleiman has been appointed personal representative of the estate of the decedent and has performed all acts prerequisite to issuance of Letters of Administration in the estate,

NOW, THEREFORE, I, the undersigned circuit judge, declare Ira Steven Kleiman duly qualified under the laws of the State of Florida to act as personal representative of the estate of David Alan Kleiman, deceased, with full power to administer the estate according to law; to ask, demand, sue for, recover and receive the property of the decedent; to pay the debts of the decedent as far as the assets of the estate will permit and the law directs; and to make distribution of the estate according to law.

ORDERED on _____2-4-_____, 2016.

Circuit Judge

STATE OF FLORIDA • PALM BEACH COUNTY
I hereby certify that the foregoing is a true copy as recorded in my office and the ...

SHARON R. BOCK
CLERK & COMPTROLLER

EXHIBIT 2

## Computer Forensics, LLC Operating Agreement

This Agreement executed on February 1, 2013 shall strictly state the activity governing Computer Forensics, LLC business operations.

Computer Forensics, LLC shall be owned equally by Carter Conrad, Dave Kleiman, and Patrick Paige. Each individual shall be a Managing Member of Computer Forensics, LLC, with a fiscal year of each calendar year (January to December). Each Managing Member shall possess, and own, a 33.33% interest of Computer Forensics, LLC. Gross revenue produced, and received, by Computer Forensics, LLC shall be distributed as follows: 20% of all gross proceeds shall go to Computer Forensics, LLC for expenses and overhead, the remaining 80% shall be distributed to each participating member based on a percentage of activity or work product, proportional to the production of the revenue or income. Upon the end of the fiscal year, should there be proceeds in excess of operation expenses remaining with in the accounts of Computer Forensics, LLC, each member shall be awarded an equal 33.33% share of income determined not to be bookmarked for expenses, by a majority of the Managing Members. All equipment, software, hardware, or other intellectual property, owned individually by each member shall remain in the ownership of that member. Any equipment, software, hardware, or other intellectual property purchased with Computer Forensics, LLC assets shall be owned by Computer Forensics, LLC, with all provisions as stated above.

This operating agreement shall be enforced from the date noted above and supersedes any and all previous agreements.

So witnessed by our hand and signature below,


_____

Carter Conrad


Digitally signed by Dave Kleiman
DN: cn=Dave Kleiman, o=DaveKleiman.com, ou=Forensics,
email=dave@davekleiman.com, c=US
Reason: I agree to the terms defined by the placement of
my signature on this document
Location: Miami, Florida
Date: 2013.02.13 11:43:24 -05'00'

_____

Dave Kleiman


_____

Patrick Paige

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC

      *Plaintiffs,*

v.

CRAIG WRIGHT

      *Defendant.*

CASE NO.: 9:18-cv-80176-BB/BR

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO WRIGHT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF, IRA KLEIMAN

PLEASE TAKE NOTICE that, pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiffs hereby responds to Wright's First Set of Interrogatories to Plaintiff, Ira Kleiman as follows:

### SPECIFIC OBJECTIONS TO TIME FRAME

Plaintiffs' object to the time period requested as it is inconsistent with what the Defendant himself has argued is appropriate at this stage of the litigation. Accordingly, Plaintiffs' will treat the relevant time period for all Interrogatories as one month after the filing of the Initial Complaint. If the parties reach an agreement to expand the relevant time period, or if Defendant demonstrates a specific reason to exceed that timeframe for an individual interrogatory, Ira will supplement his responses to the extent necessary.

### SPECIFIC RESPONSES AND OBJECTIONS

#### REQUEST NO. 1:

Identify of [sic] all persons that were present at the November 26, 2009, Thanksgiving dinner referenced in paragraphs 58 through 62 of the Second Amended Complaint.

#### RESPONSE TO REQUEST NO. 1:



EXHIBIT

12

PENGAD 800-631-6989

The following individuals were present at the November 26, 2009 Thanksgiving dinner referenced in paragraphs 58 through 62 of the Second Amended Complaint:

- Louis Kleiman;
- Dave Kleiman;
- Ira Kleiman;
- Ju Kleiman; and
- Ira's six-month year old child.

**REQUEST NO. 2:**

Identify all electronic devices that Dave Kleiman owned or possessed at the time of his death.

**RESPONSE TO REQUEST NO. 2:**

Ira objects to this Request to the extent it seeks knowledge he doesn't possess.

Notwithstanding that objection, the following is a list of the electronic devices that Ira believes to have been owned/possessed by Dave Kleiman at the time of his death:

| Device Description | Type |
| --- | --- |
| Seagate Momentus 500GB | External HDD |
| WD Scorpio Blue 750GB | External HDD |
| Seagate Momentus 500GB | External HDD |
| Hitachi Travelstar 100GB | External HDD |
| WD Scorpio Black 320GB | External HDD |
| Four to five hard drives that are no longer in the estate's possession. | External HDD |
| HTC T7373X Touch Pro2 | Mobile Phone |
| Samsung Galaxy Note SGH-I717 | Mobile Phone |
| Corsair Survivor Stealth TD Black | Thumb Drive |
| Corsair Survivor Stealth TD Gray Orange | Thumb Drive |
| Corsair Survivor Stealth TD Gray Blue | Thumb Drive |
| Corsair Survivor Stealth TD Gray Blue 2 | Thumb Drive |
| Two Alienware m9700i R1 series laptops | Laptop |

| 1 Dell Laptop (Precision M65) | Laptop |
| 1 Toshiba micro tower (Magnia Z310) | Desktop |
| Various CD-ROM containing various software programs | CD-ROM |

**Email Accounts**
1. kleimandave@yahoo.com
2. davesdigitalforensics@gmail.com
3. dave@davekleiman.com
4. dave@netmedic.net
5. dave@isecureu.com

## REQUEST NO. 3:

Describe with specificity all attempts you have made to access Dave Kleiman's electronic devices.

## RESPONSE TO REQUEST NO. 3:

Ira did not keep a record of every attempt he made to access Dave Kleiman's electronic devices. That said, Ira states that he personally reviewed all drives that were accessible. During this review, Ira looked through each individual folder and each individual file contained on these drives to find anything of importance.

## REQUEST NO. 4:

Describe with specificity all attempts you have made to determine the identity and location of any cryptocurrency that Dave Kleiman owned or possessed at the time of his death apart [sic].

## RESPONSE TO REQUEST NO. 4:

Ira objects to this request to the extent it seeks privileged information protected by the attorney client privilege and work product privilege. Notwithstanding that objection, Ira states that he personally reviewed all accessible electronic devices that he believed Dave owned or possessed. During this review, Ira looked through each individual folder and each individual file contained on these drives to find anything of importance.

3

Furthermore, Ira spoke to the following individuals in an effort to identify the identity and location of the cryptocurrency that Dave Kleiman owned at the time of his death:

- Craig Wright;

- Patrick Paige;

- Carter Conrad;

- Angela Ojea; and

- Kimon Andreou.

Finally, Ira has reviewed numerous documents provided by the Defendant, Ramona Watts, the Australian Tax Office, as well as documents obtained from the public domain, from the Australian Courts, and as a result of subpoenas served in this litigation to try and identify the cryptocurrency and location of the cryptocurrency the Defendant stole from Dave and W&K Info Defense Research, LLC.

**REQUEST NO. 5:**

Identify by public address all cryptocurrency that you claim rightfully belongs to Dave Kleiman or his estate.

**RESPONSE TO REQUEST NO. 5:**

Discovery is still ongoing and Plaintiffs currently lack sufficient knowledge to identify the public addresses of *all* cryptocurrency belonging to Dave Kleiman or his estate. Plaintiffs will supplement the response to this Request as more information is made available during the discovery process.

Based on information available to Plaintiff today, however, Plaintiffs believe that any cryptocurrency held in the following addresses (or any bitcoin transferred out of these wallets), belongs at least in part, to Plaintiffs:

1. 12tls9c9RsALt4ockxa1hB41TCTSmxj2me

4

2. 1933phthK3ZgFQNLGSDXvqCn32k2buXY8a

3. 1FeexV6bAHb8ybZjqQMJJrcCrHGW9sb6uF

4. 1f1miYFQWTzdliCBxtHHniW7IVAWPUccr

5. 1MI1dm5XZ111rfoZFoUid&GbYevmdiXoob4

6. 18JPragfuDVHWWG8ABQ15cghJFetnXUJBD

7. 1LXc28hWx1t8np5sCAb2EaNFqPwqJCuERD

8. 1FpqQnKQCgDkJFMC94JL8FpRyHTZ3uRVZ1

9. 1F34duy2eeMz5mSrvFepVzy7Y1rBsnAyWC

10. 1JtpgqCf3SSeCeYWEDJjkfYFH7Ruhy4Vp1

11. 18k9tin39LKegfzHe8rxSgvJXDpuMriGJq

12. 1IItTw9zR9wWFfgV8Jy8MqsacVl7ZXrjdq6

13. 18pn4NQ7NgsJjeuFjazeTdVRnsmfw5ofTz

14. 12fZ2HxkljG9zn1u44XYsFFYKHM4A2zCea

15. 12tkqA9xSoowkzoERHMWNKsTey55YEBqkv

16. 16Ls6azc76ixc9Ny7AB5ZPPq6oiEL9XwXy

17. 12IIddUDLhRP2F8JjpKYeKaDxxt5wUvx5nq

18. 1P3S1grZVmcqYDuaEOVOYobJ5Fx85E9fE9

19. 1MyGwFAJjVtB5rGJa32M6Yh46cGirUta1K

20. 145YHsQU7HMzkRnD5SBSuFAzQgCYnAnlkN

21. 16TPVCpvtJ6FkV5xNKBp35aMo4BWFGxiEY

22. 1KbrSKrT3GeEruTuuYYUSQ35JwKbrAWJYm

23. 1FLFnbN7m5psLfvLEwYtRUUjJ34YkmV3dM

24. 1A6SDef1TJAM8Saw2SqmqFGhkWR1y3qMx2

25. 16cou7Hl6WjTzuFyDBnht9hmvXytg6XdVT

26. 12ib7dApVFvg82TXKycWBNpN8kFyiAN1dr

## REQUEST NO. 6:

Identify with specificity all intellectual property that you claim rightfully belongs to Dave Kleiman or his estate.

## RESPONSE TO REQUEST NO. 6:

Discovery is still ongoing and Plaintiffs currently lack sufficient knowledge to identify *all* intellectual property belonging to them. Plaintiffs will supplement the response to this Request as more information is made available during the discovery process.

Based on information available to Plaintiffs today, however, Plaintiffs believe that the estate and/or W&K have an ownership interest in source code, compiler code, Machine Language (MASM/NASM), algorithms, manuals, trademarks, pending patents, granted patents, and other external filings associated with the following IP items:

1. A metered payments system;

2. Software derivative markets & information security risk systems;

3. Software assurance marketplace;

4. Software assurance through economic measures and anti-fraud system;

5. Risk quantification system (for financial modeling in Bitcoin);

6. SCADA measurements suite of software; and

7. Scriptable money.

More generally, Plaintiffs believe that the Defendant has taken intellectual property belonging to the estate and W&K that was created by Dave and Craig's partnership through research Dave Kleiman conducted with Craig Wright that was not completed or published as of 2015. Further discovery is needed to uncover the exact nature of this intellectual property,

6

including discovery to uncover the exact nature of the 6,000,000 lines of code the Defendant has admitted David Kleiman created.

Furthermore, Plaintiffs believe they hold an interest in the security, banking, and automation intellectual property distributed to Cloudcroft, Hotwire, and Coin-Exch. Finally, Plaintiffs believe they hold an interest in the intellectual property, source code, algorithms, and patentable materials claimed by DeMorgan which relates to the development of smart contract and Blockchain based technologies and the commercialization of Blockchain and smart contract system research.

**REQUEST NO. 7:**

Describe with specificity how you first came to possess copies of the documents that are attached as exhibits 9, 12 15, and 18 to the Second Amended Complaint, and Exhibit A to Plaintiffs' First Request for Production, including by identifying the first person who provided you with copies of those documents.

**RESPONSE TO REQUEST NO. 7:**

Ira first reviewed Exhibit 9 to the Second Amended Complaint when it was released online by John Cook of Gawker.  *See* https://www.documentcloud.org/documents/2644013-20140226-Meeting-Minutes-Redacted.html. Ira first reviewed Exhibit 12 of the Second Amended Complaint when it was released online by Gizmodo.  https://gizmodo.com/heres-all-the-evidence-that-craig-wright-invented-bitco-1747059371.  Ira first reviewed Exhibit 15 of the Second Amended Complaint when Craig emailed it to him on May 11, 2014.  Ira first reviewed Exhibit 18 of the Second Amended Complaint when Ramona Watts emailed it to him on July 2, 2015.

**REQUEST NO. 8:**

Identify all persons at news agencies with whom you have spoken about any of the facts that you have alleged in the Second Amended Complaint.

**RESPONSE TO REQUEST NO.**

Ira or his attorneys had discussions or correspondence with the following persons at news agencies about the facts alleged in the Second Amended Complaint:

1. Andy Cush

2. Sam Biddle

3. Andy Greenberg

4. Jordan Pearson

5. Ryan Browne

6. Ritika Shah

7. Michelle Caruso-Cabrera

8. Cyrus Farivar

9. MP McQueen

10. Will Yakowicz

11. Olga Kharif

12. Jef Feeley

**REQUEST NO. 9:**

Identify the auditor from the ATO who allegedly reached out to you as referenced in paragraph 141 of the Second Amended Complaint.

**RESPONSE TO REQUEST NO. 9:**

Ira states that the auditor referenced in paragraph 141 of the Second Amended Complaint is Andrew Miller.

Dated: March 7, 2019                   Respectfully submitted,

                                       *s/ Velvel (Devin) Freedman*
                                       Velvel (Devin) Freedman, Esq.
                                       BOIES SCHILLER FLEXNER LLP
                                       100 SE Second Street, Suite 2800
                                       Miami, Florida 33131
                                       Telephone: (305) 539-8400

Facsimile:   (305) 539-1307
vfreedman@bsfllp.com

Kyle W. Roche, Esq.
*Admitted Pro Hac Vice*
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300
kroche@bsfllp.com

*Counsel to Plaintiff Ira Kleiman as Personal*
*Representative of the Estate of David Kleiman*
*and W&K Info Defense Research, LLC.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 7, 2019, a true and correct copy of the foregoing was served on all counsel of record identified on the Service List below via e-mail:

Andres Rivero, Esq.
Jorge A. Mester, Esq.
Alan H. Rolnick, Esq.
Amanda McGovern, Esq.
Zaharah Markoe, Esq.
Zalman Kass, Esq.
RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard
Suite 1000
Coral Gables, FL 33134
305-445-2500
(305) 445-2505 (fax)
arivero@riveromestre.com
jmestre@riveromestre.com
arolnick@riveromestre.com
receptionist@riveromestre.com
zkass@riveromestre.com
zmarkoe@riveromestre.com
amcgovern@riveromestre.com

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman

I, Ira Kleiman, declare under penalty of perjury under the laws of the United States and the State of Florida, that the foregoing is true and correct.

Executed on March 7, 2019, at West Palm Beach, Florida.

_____

Ira Kleiman

**To:**     clocktime2020@gmail.com[clocktime2020@gmail.com]
**From:**   Dex
**Sent:**   Sat 27/06/2015 8:32:50 PM
**Subject:** Fw: what's up

On Thursday, February 20, 2014 1:56 PM, Dex <dex561@yahoo.com> wrote:

Hi Patrick,

I don't think I'm going to be able to meet up this week.  Need to finish a clients website.
But for now I stored the drives in a safe deposit box so they'll remain safe.  And as Craig
mentioned, there's no time limit with this stuff so we have time to figure it all out.

Ira

On Thursday, February 20, 2014 11:01 AM, Patrick Paige <patrick@computerforensicsllc.com> wrote:
Ira, were you planning on stopping by this week?

*Patrick Paige* *EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
*Office: 561.404.3074*
*Cell: 561.818.9208*
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the
intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the
message and deleting it from your computer. Thank you.*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Tuesday, February 18, 2014 10:01 AM
**To:** Patrick Paige
**Subject:** Re: what's up

Did you already finish searching the drives and cellphone you have?

On Tuesday, February 18, 2014 9:45 AM, Patrick Paige <patrick@computerforensicsllc.com> wrote:
I have no idea what if anything is in the account, that's all Craig sent me... who knows what it means at this point.  I
doubt Dave had any money elsewhere, but Craig seems to think so.  I think the only thing we can do at this point is try
and gain access to the thumb drives.  Carter is checking with some people he knows in the banking area to see if the
numbers Craig gave us mean anything.

*Patrick Paige* *EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
*Office: 561.404.3074*
*Cell: 561.818.9208*
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the
intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination,
distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the
message and deleting it from your computer. Thank you.*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Tuesday, February 18, 2014 8:57 AM
**To:** Patrick Paige
**Subject:** Re: what's up



EXHIBIT

13

What exactly is supposed to be in the Belize account?  Money already mined from his Bitcoins?

I'm a little confused.

Are you searching for both a password to access the bank as well as a bitcoin key?

On Monday, February 17, 2014 10:12 AM, Patrick Paige <patrick@computerforensicsllc.com> wrote:
Not sure… We need to find someone in banking, one is probably the account number, not sure what the other is…
Anytime you want to stop by the office this week is fine, just give me a call to make sure I'm there… We are at the S.E.
corner of Gateway and Congress above Bonefish Grill.

*Patrick Paige* EnCE SCERS
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
*Office: 561.404.3074*
*Cell: 561.818.9208*
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Sunday, February 16, 2014 10:30 PM
**To:** Patrick Paige
**Subject:** Re: what's up

Yeah, I can stop by sometime this week.  I'm not sure about tomorrow though.

What's up with the Belize account?

On Sunday, February 16, 2014 7:40 PM, Patrick Paige <patrick@computerforensicsllc.com> wrote:
I know he's genuine, we are aware of his and Dave's friendship for years… I just don't know if we are getting the whole story…

Ira, when can you stop by the office so we can image the drives and put a plan together to crack the encryption?

*Patrick Paige* SCERS EnCE
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
*561.818.9208 Cell*
*www.ComputerForensicsLLC.com*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Sunday, February 16, 2014 10:55 AM
**To:** Patrick Paige
**Subject:** Re: what's up

He sent me the attached proposal white paper for a project they were working on.
And I have read several articles online that he wrote years ago and thanking Dave for his assistance.
I figure if we combine the PDF, the articles, the Youtube video about Dave, and his current business of creating the first Bitcoin Bank..  I conclude he's genuine.

Maybe he's waiting for you to see if you find a key before divulging the account info?
I'm not sure what his plan is, but I'm impressed with what I have read about them so far.

Ira

On Sunday, February 16, 2014 9:06 AM, Patrick Paige <patrick@computerforensicsllc.com> wrote:
I didn't get any more emails from him other than preserve the data... I just sent him one... I asked him where is the information he was going to send... account information and locations... so far he isn't being very helpful so I don't what to believe yet.

*Patrick Paige SCERS EnCE*
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
*561.818.9208 Cell*
*www.ComputerForensicsLLC.com*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Saturday, February 15, 2014 10:30 PM
**To:** Patrick Paige
**Subject:** Re: what's up

Did you get the emails from Craig?  What do you think?

I for one have to say I'm a believer.  The evidence is overwhelming that he is legit.
That or he's the most elaborate social engineering hacker ever.

Seriously, I think he and Dave are a couple of geniuses.

This stuff is just mind blowing.


On Saturday, February 15, 2014 10:59 AM, Dex <dex561@yahoo.com> wrote:
He didn't seem to be mad and even suggested sending someone here to help us decrypt the drives.
But he also hinted that if Dave encrypted the drives it would be very difficult to gain access.

I wanted to see if he would divulge additional information to what was already given to you.  And I mentioned to him that you needed to consult with me because as the person in charge of his estate I have some of his belongings and drives.  I let him know any information provided would not go beyond our circle.

Perhaps you should try to reach out to him again.  The other question I have is if they are the true creators of this system, shouldn't there be such a thing as a master key?  I never heard of a program without one.

Ira



On Saturday, February 15, 2014 10:14 AM, Patrick Paige <patrick@computerforensicsllc.com> wrote:
Be careful about what words you use in unencrypted emails.  He never sent me the information he said he was going to send, is he mad now... Plus He told me not to tell anyone else right now... and now he know I told you, not good... we need to be patient and get the information flowing from him and build a trust.

*Patrick Paige SCERS EnCE*
*Computer Forensics LLC*
*1880 North Congress Ave Suite 333*
*Boynton Beach FL 33426*
*561.818.9208 Cell*
*www.ComputerForensicsl.LLC.com*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Saturday, February 15, 2014 9:09 AM
**To:** Patrick Paige

**Subject:** Re: what's up

I exchanged a few emails with that guy last night.  Couldn't resist asking him for proof that Dave was involved in the original Bitcoin document.  He said it's too risky to release that information right now, but eventually he wants to.  I'm still not sure what to make of him.

I told him how Dave was in need of money and how I find it unlikely for him not to cash in some coins if they were of any value.  He said it's possible he could have cashed them in while they were still of lesser value, but believes he had a lot of them.

Still puzzled by all this.  He's not willing to give concrete evidence about anything, yet what he say's might be true.

Ira

**To:**       elmsap6@gmail.com[elmsap6@gmail.com]
**From:**     dex561@aol.com
**Sent:**     Sat 09/12/2017 12:56:34 AM
**Subject:**  Re: David

Hi Angie,
I often think of David as well.  Actually it's hard not to think about him since Bitcoin has become so popular.  The mainstream media talks about it every day now.  Every time I hear that word it's like Arrrrggh!  I'm confilcted by it.  On one hand it's really cool that he helped invent it, but brutally sad if it was all stolen from him.  And why the heck didn't he tell us to buy some when it was selling for pennies.  Anyway, aside from that stuff, everything is good here.  I hope you and your family have a Merry Christmas.

-Ira


-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Thu, Dec 7, 2017 9:42 pm
Subject: Re: David

Hey Ira! Was thinking of David today, as I always do especially at this time of year. It reminded me that I haven't talked to you in awhile and just wanted to check in on you and see how you and the family are doing.

Hope all is well.
Angie

On Tue, May 31, 2016 at 8:28 AM Angie Ojea <elmsap6@gmail.com> wrote:

   You're welcome! I'm always here for you just as I was for your brother and your dad. Your family was and always will be a huge part of my life.
   Angie


   On Saturday, May 28, 2016, <dex561@aol.com> wrote:

    I agree, it's very possible some of the leaked info came from him.
    Thanks for the kind words and support.  :-)

    Ira


    -----Original Message-----
    From: Angie Ojea <elmsap6@gmail.com>
    To: dex561 <dex561@aol.com>
    Sent: Sat, May 28, 2016 9:05 pm
    Subject: Re: David

    The timing seems very strange! I'm not liking this at all. Do you think it's possible that this "leaked" info they speak of in previous articles was possibly Craig himself? To cover his tracks for these so called contracts? It's too fishy.
    You know you don't only have to contact me about new developments. I'm here also as a friend. If you need anything, want to share a happy moment, please know I'm here.

    Hugs!
    Angie


    On Saturday, May 28, 2016, <dex561@aol.com> wrote:

     Hi Angie,
     All is good here.  There hasn't been much news since Craig disappeared again.
     I have been talking with a few attorneys about litigation, but so far no action has been taken.
     The frustrating part is not really knowing what David wants me to do.  I wish I knew if the contracts he agreed to with Craig were truly voluntary or if they were fabracated as they appear to be.  I have this one contract dated April 2, 2013 where David transfers the assets in their company back to Craig and in exchange David was supposed to receive 50% of a



new company to be created in Australia.  David died the same month as this contract.
The timing sounds strange doesn't it?

Have a good weekend.
Ira


-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Sat, May 28, 2016 1:30 pm
Subject: Re: David

Hey Ira. Just checking in on you and hoping you're doing well. Have a good weekend!

On Monday, May 9, 2016, Angie Ojea <elmsap6@gmail.com> wrote:

You have to know, that is certainly not what I was hoping for, expecting or ever even considered. I appreciate your thoughtfulness
and hope that you would of course take care of you and yours first. I know that David was a loving and generous man!
Sometimes to a fault. But he did always want to take care of those he loved.
I knew that Craig was trying to prove he was Satoshi, and that there were people proving him to be a fraud. I was unaware that
he came out apologizing for lack of "courage" to do it. This is crazy. Thank you for the updates.

I hope you are getting some rest and remembering to take of yourself for the others in your life that love you and need you.

Angie

On Saturday, May 7, 2016, <dex561@aol.com> wrote:

That's why I'm fighting for David's rights in this crazy situation.  I know he would want you and some of his
other close friends to be taken care of.  If it's true that part of the bitcoin fortune belongs to him and we
are able to recover them, I don't think you'll ever have to worry about money again.

The latest developments were about Craig attempting to publicly prove he is Satoshi and then failing.
The next day he leaves a message apologizing to everyone and saying he doesn't have the courage to do it.
I'll keep you updated when something new develops.

Ira


-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Sat, May 7, 2016 1:40 pm
Subject: Re: David

Thank you Ira.
It's mostly achieving a work life balance. I've been a single mom for the past 3 years or so. I manage a Starbucks and it's a lot of
work, and very early hours. My ex and I do not get along because he causes a lot of drama.
I have a full social schedule as well as a family and work schedule this past week and this one coming up. Birthdays,
Graduations, School performances, friends coming in to town, Friends having surgeries....

By Wednesday, I should start to see things settle down. It's just been a lot to balance. And sleep eludes me.

I'm anxious to hear about the new developments, just wanted you to know why if it takes a day or 2 to respond.

Thanks.
Angie

On Saturday, May 7, 2016, <dex561@aol.com> wrote:

Crazy days?  If there's anything you want to talk about I can be a good listener too.
There have been a few new twists and turns in the story, but it can wait until
whatever stuff your dealing with is cleared up.

Ira

-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Fri, May 6, 2016 4:23 pm
Subject: Re: David

I've had a few crazy days with a few more ahead of me. But thank you for your thoughts and insight. I know it was a crazy thought.
Please keep me updated with any new developments.

Thanks Ira.

Angie

On Tuesday, May 3, 2016, <dex561@aol.com> wrote:

I never saw David program any software or figure out insanely difficult math equations so I don't believe he completely invented bitcoin.  He may have helped in the encryption and security areas as well as operating functions of the business.  I think he was also the primary person in charge of the company assets - being bitcoin.  I can't really determine whether they co-invented bitcoin or were just very early bitcoin miners.

There may be a few reason why Craig is coming out as Satoshi.
1. Ego
2. Wants to legitimize his claim of a Trust he setup that holds the bitcoins he transfered out of the company that was jointly owned by him and David.
3. In the bitcoin community there are disputes about how bitcoin should evolve and perhaps he wants to take a leadership role to move things forward.


-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Tue, May 3, 2016 9:17 am
Subject: Re: David

Crazy thought....If Craig is lying about being Satoshi, why risk coming out and being found a fraud? Unless the person who IS can not discredit him because he has passed away.
IS THAT CRAZY TO THINK?


On Tuesday, May 3, 2016, Angie Ojea <elmsap6@gmail.com> wrote:

I read several stories, all of them pretty much the same with the exception that he IS, and that he is NOT. I don't know what to think.

On Monday, May 2, 2016, <dex561@aol.com> wrote:

Hi Angie,
Check out today's news about Craig.

Ira


-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Fri, Apr 29, 2016 4:56 am
Subject: Re: David

I'm glad to hear your wife is supportive. That's huge to have that behind you. There is nothing like having people you can trust and share with. I'm one of those people.
Thank you for sharing. Yesterday was kind of a rough day for me, knowing what I now know and it being the anniversary of that dreaded call from your dad. I couldn't stop thinking about David. As hard as I tried.

And thank you for clarifying the conditions in which his home was found. That was troublesome to me. I didn't want to think that the story was true or that he had reached some level of desperation. Then I thought, after talking to you, that it was staged.

Please keep me posted as much as you can of any new developments. Stay strong, go with your gut, listen to your support system and know that I'm always here.

Thank you Ira. Thank you so much.

On Thursday, April 28, 2016, <dex561@aol.com> wrote:

I really appreciate you taking the time to listen and share your thoughts.  It's difficult finding people I can trust to talk with about this stuff.  My wife is supportive, and actually if I had followed her advice from the start and not trusted Craig at all, I probably would be in a better place.

David's autopsy didn't show any bullets or wounds.  At the time I don't think I checked his gun for missing bullets.  I simply figured it had to be from his gun.  The article that mentioned liquor bottles spread about all over was a bit of an exaggeration.  There was a bottle of wine with a nearly empty glass next to it, and one small opened liquor bottle on his bedroom dresser.  I'm not sure why his friend Patrick described things the way he did to reporters.
I assume the writer knows where Craig is.  I guess for now I'll just wait and see if he reveals any new information.

Ira

-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Mon, Apr 25, 2016 6:13 pm
Subject: Re: David

Maybe Craig knows there's something on them, and knows you can't access the information. Maybe that's why he never took you up on the offer. Proof that he owes David SOMETHING. Your other theory of being impossible to decrypt would also make sense, seeing as David was a genius with security and encryption.
You said the autopsy revealed no bullet wounds? You saw the autopsy report? Was David's gun fully loaded? What are your thoughts on the foul play if there were no bullet wounds? Alcohol? The report said he was surrounded by empty liquor bottles. I know he drank, but that just seemed odd to me. Like how many bottles? Drugged?

I can understand there being some difficulty with finding an attorney to take this on. It is complicated, especially with like you said, recovering damages in Bitcoin.

From my understanding, Craig has disappeared, cashed out on businesses he was involved in and is maybe in England? Deleted Twitter, Facebook and other accounts. Something is certainly amiss. Any idea or news on whether he has been located? Obviously, someone knows where he is if he is planning on writing this story you spoke of. I think you were wise to decline to participate. Like you said, so many unanswered questions. Maybe, somehow, his "coming out" story might help your case somehow. Admissions and such. Thoughts on that?

Ira, I can't imagine the stress and grief you have endured during these last 3 years, and now with the passing of your dad. I'm sorry you are taking this on with no surrounding family. How is your wife with all of this? Is she supportive? I hope so. Honestly, it's none of my business, except concern for you being so bombarded with doing all of this alone.

Maybe one day soon we can have lunch or something. Sometimes just having a face across from you, to talk to, that you know loved your brother can be therapeutic. Let me know. In the mean time, I will continue to be here in whatever capacity you need. You're not alone.

Angie

On Sunday, April 24, 2016, <dex561@aol.com> wrote:

Yes I have some of David's usb drives and for now I put them in a safe deposit box.  They are encrypted with a password so I

don't have access to see what's on them.  But since Craig is the one who suggested there might be bitcoins on them, I don't put much weight in it.  When I first started talking with Craig, I actually did trust him and even offered to give him access to the drives so he could decrypt them.  He never took me up on the offer so I figure either he just wanted me to believe there was something on them( a device of distraction from other fraud), or he knows they are impossible to decrypt.
I didn't keep the bullet casing.  At that time it never crossed my mind that anybody would shoot David.  I was thinking like you, maybe he shot himself and his police buddies were possibly trying to shield us from it.

I have been talking to some attorneys about pursuing legal action against Craig for the stuff he
promised David's estate as well as the fruadulent contracts I believe he made up after David passed away.  But it's been difficult finding attorney's that will take the case because it's so complicated, and being the value is stored mostly in bitcoin, they aren't sure how they would recover damages.

About a month ago I was contacted by a writer that was handpicked by Craig to compose a story about all of this.  He wanted me to share insight about David..  I told him I like the idea of my brother getting the recognition he deserves, but I think it's too soon to be writing a story when there are still so many unanswered questions.  So I ended up declining to participate. There must be a reason why Craig wants to reveal the story now, and I'm afraid to be involved if it could end up helping him in some way.  The writer told me that Craig plans to reveal to the public that he has proof that he is "Satoshi Nakamoto", that's the alias both Craig and David used online.  This might take place toward the end of this month or maybe early May.  I'll be surprised if it actually happens, but if it does I'm interested to see what's revealed.

Ira


-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Sun, Apr 24, 2016 11:42 am
Subject: Re: David

Oh wow! That is a lot to absorb.
I had originally thought, too, that David was frustrated with his health, and I was somewhat aware of financial difficulties through conversations with your dad,  that maybe he took his own life. Your dad confided the same thing to me. When they wouldn't allow him to see the body, he questioned if it was because maybe it was suicide, and they were protecting him from knowing that.

After reading the article, and your last email, I began to think like you. Foul play.

The article stated there were no "wounds consistent with a bullet" or so I think it said.  I did read where the bullet hole was found in the mattress. You are in possession of the casing?

And it mentioned you may be in possession of a USB? Please be careful! If your theory is correct, this could wind up being a dangerous situation. No wonder you are not finding any comfort. I'm so sorry!

Are you pursuing anything? I would really love to talk to you more about it. If this Craig guy is involved in shady things, hit men and the like, what may you be risking? Consider your family in every decision.

Everything we discuss, it's between you and I only! I won't tell another living soul. For your protection as much as anything.


On Sunday, April 24, 2016, <dex561@aol.com> wrote:

thanks Angie.
I can give you more details on the phone sometime, but for now I'll try to provide
a summary of what's been going on.

About 10 months after David passed away I was contacted by this Australian guy
named Craig Wright.  He tells me that he was David's partner in a secret business that
nobody was aware of.  It was a bitcoin mining business.

Bitcoins are a form of digital money and according to Craig, he and David invented
this new form of currency.  They were the first people to mine it, meaning they used
computers to generate lots of them.  Anway, Craig tells me that he wants to make
sure David's estate receives something from the business.  Over the next two years he
makes a bunch of promises to me and my dad, but none of them are ever kept.  During
this time I do a lot of research about Craig, and discover he has done a lot of shady stuff.
He certainly isn't the good guy he originally presented himself to be.  Although I question

much of the story told by Craig, I know that some of it is true.  I know for a fact that David was somehow involved in this bitcoin business because of a conversation I had with him years ago.  In 2009 my daughter was born and it was David's first time meeting her for Thanksgiving at my dad's house.  I have photos of us from that day and vividly remember David telling me that he was creating his own money.  Facebook was in the news at the time and I remember asking him "why don't you create the next big internet business like that Mark Zuckerberg kid, your as smart as him".  And then he tells me he is working on something better, he says "I'm creating my own money."  And I was like "what, you're printing counterfeit money?"  And he  says "No, I'm making digital money".  I don't remember him calling it bitcoin back then, he just referred to it as "digital money".

Now the part that troubles me about David's death is when I question if foul play was involved. You may have read from the online articles that they found a bullet hole in David's bed, but the article doesn't mention that there was also an empty bullet casing.  The cleanup crew I hired to go in his house found it and gave it to me.  At the time I thought maybe he was so frustrated with his condition of health he fired a round into his bed.  But what if there's more to it than that?  He was somehow controlling millions of dollars in bitcoin.

From what I understand, Craig and David were also in some capacity involved with Silk Road. I don't know if you ever heard of it, but Silk Road was like a hidden website where people could buy and sell illegal services and products like drugs.  They would use untraceable bitcoins to make their purchases.  There are reports of the guy who headed Silk Road hiring hitmen to eliminate threats and such.  David's autopsy doesn't mention any wounds or bullets, but I can't help but think there still might be a connection.

I know that shortly before he died, David was having money problems and was asking my dad to help him with his house payments.  But if he had access to these millions in bitcoin, why wouldn't he just sell a few to pay some bills?  What if he had a falling out with Craig over a decision to sell some of them?  There are so many unanswered questions.

I hope that gives you a glimpse into what's been going on.
Please keep our conversations private.

Ira

-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Sat, Apr 23, 2016 1:46 pm
Subject: Re: David

I actually googled it right after I responded to your last email.
I found in one of the stories that I read, my theory on his condition was correct. Or at least according to the article.

Listen, I loved your family, especially David. Even though we had moved on in our lives, I never truly got completely over him. I always wondered what could have been had we stayed together. Circumstances of young love I suppose.

Please know that if you ever want to talk, anything you share with me would be kept confidential. I'm a little confused as to the Bitcoin matter, but if you need help, I'm willing to give you any help you need. Even just an ear.

I'm so glad you reached out to me.
Thank you Ira.

On Saturday, April 23, 2016, <dex561@aol.com> wrote:

If you google "Dave Kleiman bitcoin" there are many articles that will give you an idea
of what he was involved with.

Here is one:
http://gizmodo.com/the-strange-life-and-death-of-dave-kleiman-a-computer-1747092460

There is much more to the story than what has been published.  I can share some of it with you, but there is still a great deal that I am uncertain about.

-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Sat, Apr 23, 2016 11:16 am
Subject: Re: Louis K

I'm so sorry to hear that. I know that David was struggling a lot with his stays at the VA. Although he tried to avoid talking to me about exactly why he was there. He never did share that with me. I have my theories on both his "illness" and his passing as well. It's hard to imagine that a man as stubborn, as strong willed as he was, would go out any other way than by natural causes, but, I feel as you. It's heart breaking.
I have not heard anything about Bitcoin. I'm curious now.

If you need me, I've been told I have a good ear. You are welcome to call. My number is 561-707-3734.

At least you have several ways to reach me should you ever feel the need.

On Saturday, April 23, 2016, <dex561@aol.com> wrote:

Angie,
To be honest, I haven't found comfort yet mostly surrounding David's passing. There's a lot of strange stuff that kind of fell in my lap after he passed away and I'm still trying to figure out how to deal with it.  Sometimes I feel like his death was not by natural causes.

Did you ever read any articles about David's involvement with Bitcoin?

Ira


-----Original Message-----
From: Angie Ojea <elmsap6@gmail.com>
To: dex561 <dex561@aol.com>
Sent: Sat, Apr 23, 2016 7:27 am
Subject: Re: Louis K

Hi Ira.
I'm doing well.

My hope is that you are doing well and that you have found comfort in your family considering the recent loss of your dad.

I ran into your dad one December not long after your mom passed away. We exchanged phone numbers and addresses and thus began our keeping in touch.

I miss him.

And that picture of David and I? How funny is that? We were 14,15 at best. I miss him terribly. We kept in touch, my children knew him, as well as my husband. He would come to the house on occasion and fix a computer and have dinner with us.

If you like, I'm on Facebook all the time. (I'm a junkie)  Angela Whittle Ojea,  Send me a request.

Thank you for reaching out and I pray you are doing ok.


On Friday, April 22, 2016, <dex561@aol.com> wrote:

Hi Angie,
How are you?  This is Ira.

I rarely ever use Facebook, but I just happened to logon to my dads account today and noticed you left some messages.  I didn't realize that you stayed in touch with him.

Thanks for the touching words you left.

And I saw that photo of you and David.  Wow, you guys looked great.
Ah, the good ol 80's.

I hope all is well.
Ira

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense
Research, LLC,

        *Plaintiffs,*

v.

CRAIG WRIGHT,

        *Defendant.*

CASE NO.:  9:18-cv-80176-BB

## PLAINTIFFS' DISCLOSURE OF ALL REPOSITORIES OF POTENTIALLY RELEVANT ESI PURSUANT TO THE PARTIES STIPULATED DISCOVERY PLAN <u>FILED FEBRUARY 5, 2019</u>

Pursuant to the Parties Stipulated Discovery Plan, ECF No. [88], at 4, ¶3, Plaintiffs hereby

disclose the following repositories of potentially relevant ESI known to Ira and that is or was under

his or Dave Kleiman's possession, custody, or control:

**(1) email addresses including but not limited to email addresses registered under an alias or shared with another individual or entity;**

**Dave Kleiman's email accounts**:

- kleimandave@yahoo.com
- davesdigitalforensics@gmail.com
- dave@davekleiman.com
- dave@netmedic.net
- dave@isecureu.com

**Ira Kleiman's email accounts:**

- zaigon1@aol.com
- dex561@aol.com
- sam0812@aol.com
- dzign4@aol.com
- blazzei@aol.com
- ghb3762@aol.com


EXHIBIT
15

- helen868@aol.com
- dex561@yahoo.com
- goldkey@gmail.com
- voltar888@gmail.com
- zupzup101@gmail.com
- raysun909@gmail.com
- peekatee@gmail.com
- backclock1999@gmail.com
- zookloud@gmail.com
- davidcoinex@gmail.com
- rezurch88@gmail.com
- iradavid2009@gmail.com
- 33bots@gmail.com
- bluetap22@gmail.com
- bampogo77@gmail.com
- davek2140@gmail.com
- wrightkleiman@gmail.com
- casekleiman@gmail.com
- clocktime2020@gmail.com
- karmatoshi@gmail.com
- ira99usa@gmail.com
- axbot555@gmail.com
- florida9369@gmail.com
- pixcloud9@gmail.com
- olaypaulo34@gmail.com
- cereals@protonmail.com
- frank58@protonmail.com
- decrypt55@protonmail.com
- raysun@asia.com

**Louis Kleiman's email account:**
- lureg8@yahoo.com

**(2) laptops, desktops, hard drives, tablets, phones, or any other computing device;**

**Dave Kleiman's electronic devices:**
- Seagate Momentus 500GB
- WD Scorpio Blue 750GB
- Seagate Momentus 500GB
- Hitachi Travelstar 100GB
- WD Scorpio Black 320GB
- HTC T7373X Touch Pro2
- Corsair Survivor Stealth TD Black

- Corsair Survivor Stealth TD Gray Orange
- Corsair Survivor Stealth TD Gray Blue
- Corsair Survivor Stealth TD Gray Blue 2
- IACIS TD (thumb drive)
- Micro Vault Tiny 4GB (thumb drive)
- Sandisk Cruzer Micro 8GB (thumb drive)
- CEIC 2009 2GB (thumb drive)
- Key Thumbdrive 8GB (thumb drive)

**Ira Kleiman's electronic devices:**
- Black Apple 4GB (thumb drive)
- DataTraveler 100 G2 8GB (thumb drive)
- Kingston DT101 G2 16GB (thumb drive)
- PNY TD 128GB (thumb drive)
- Sandisk Cruzer 128GB(thumb drive)
- Kingston DT101 G2 16GB (thumb drive)
- MS FLASH (thumb drive)
- Samsung GT-18190L (cell phone)
- Kleiman-Laptop E Drive (laptop drive)
- Kleiman-laptop C Drive (laptop drive)
- Seagate 320GB Momentus (Internal HDD)
- WD Scorpio (Internal HD)
- Iomega Ext HDD Fat Partiti F-Drive (External HD)
- Iomega Ext HDD Fat Partiti G-Drive (External HD)
- Seagate FreeAgent Go 500GB (External HD)
- Store Jet 500GB (External HD)
- Store Jet HDD 1TB (External HD)

**(3) any device or software used to mine or store cryptocurrencies;**

- Ira is not aware of any at this time.

**(4) any device or software used to write or code the Bitcoin client;**

- Ira is not aware of any at this time.

**(5) cloud storage accounts;**

- Dave Kleiman's filesanywhere.com account
- Dave Kleiman's Appriver account
- Dave Kleiman's Godaddy.com account

**(6) USB, flash drives, CD/DVDs or any other physical ESI storage medium;**

- See #2

3

**(7) Social media accounts;**

- Ira has the following Twitter handles:
    - Rezurch
    - sneakers2many
    - billybob730
    - 33bots
    - raydoox
    - raynboot

**(8) any intranet or shared servers;**

- Ira is not aware of any at this time.

**(9) text messages and voicemails;**

- Ira's computers contain copies of some text messages.
- Ira's phone system may have voicemails.

**(10) any repositories used to develop or store intellectual property including but not limited to any computer code repositories; and**

- Ira is not aware of any at this time.

**(11) any unique or proprietary software on which relevant data is stored.**

- Ira is not aware of any at this time.

**(12) Dave's Agents**

- Attorney: The Karp Law Firm
- Accountant: David Scott Kuharcik

**(13) Ira's Agents**
- Attorneys:
    - The Karp Law Firm
    - Lubell Rosen, LLC
    - Boies Schiller Flexner LLP

Dated: March 7, 2019                         Respectfully submitted,

4

*s/Velvel (Devin) Freedman*
Velvel (Devin) Freedman, Esq.
Florida Bar No. 99762
BOIES SCHILLER FLEXNER LLP
100 SE Second Street, Suite 2800
Miami, Florida 33131
Telephone:  (305) 539-8400
Facsimile:  (305) 539-1307
vfreedman@bsfllp.com

Kyle W. Roche, Esq.
*Admitted Pro Hac Vice*
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile:  (914) 749-8300
kroche@bsfllp.com

*Counsel to Plaintiff Ira Kleiman as Personal*
*Representative of the Estate of David Kleiman*
*and W&K Info Defense Research, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 7, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*s/Velvel (Devin) Freedman*
VELVEL (DEVIN) FREEDMAN

5

**To:**       Hardy, Michael[michael.hardy@ato.gov.au]
**From:**     Ira Kleiman
**Sent:**     Mon 29/06/2015 11:40:30 PM
**Subject:**  Re: ATO Investigation [SEC=UNCLASSIFIED]

But you can confirm that there is presently no investigation of Dr. Craig Wright and my brother?

Regards,
Ira Kleiman

On Mon, Jun 29, 2015 at 7:23 PM, Hardy, Michael <<u>Michael.Hardy@ato.gov.au</u>> wrote:

Please note that if there is no present investigation and the information by itself does not warrant an investigation there may be no immediate action.

**Michael Hardy**
Senior Assistant Commissioner
Australian Taxation Office
Phone <u>+61 2 6216 1798</u> | Mobile <u>+61 401 144 796</u>

**ATO** | *Working for all Australians*

**From:** Ira Kleiman [mailto:<u>clocktime2020@gmail.com</u>]
**Sent:** Tuesday, 30 June 2015 8:49 AM
**To:** Hardy, Michael
**Subject:** ATO Investigation

Dear Mr. Hardy,

I understand that you were investigating a case involving my brother

David Kleiman and his partner Craig Wright.

Could you tell me if you are still seeking new information regarding

this case?  Or if it was closed can you tell me when?



Thank you,

Ira Kleiman

*********************************************************************
IMPORTANT
    The information transmitted is for the use of the intended
recipient only and may contain confidential and/or legally
privileged material. Any review, re-transmission, disclosure,
dissemination or other use of, or taking of any action in
reliance upon, this information by persons or entities other
than the intended recipient is prohibited and may result in
severe penalties. If you have received this e-mail in error
please notify the Privacy Hotline of the Australian Taxation
Office, telephone 1300 661 542 and delete all copies of this
transmission together with any attachments.
*********************************************************************

**To:**  jeremy.mudford@worrells.net.au[jeremy.mudford@worrells.net.au]
**From:**  dex561@aol.com
**Sent:**  Thur 31/08/2017 2:12:44 AM
**Subject:**  Re: COIN-EXCH PTY. LTD. A.C.N. 163 338 467

ATO-Meeting-Minutes-Redacted - notes.pdf

Hi Jeremy,

Yes I have tangible evidence that Coin-Exch had IP in it's possession.
Please find the attached document in which a representative from Coin-Exch discusses
the IP and assets with ATO officials.

Based upon what I have learned of Mr. Wright, it is possible that assets moving through
his entities were acquired by fraudulent means. But I suppose that is a separate issue that
may not concern your investigation.

May I ask why hasn't the ATO provided you with documentation about the companies
they appointed you to?  They clearly have evidence revealing the transfer of assets
in and out of Mr. Wright's entities.  I would imagine the ATO would also expect a detailed
investigation. They are already aware of Mr. Wright's prior infractions and his views
about avoiding taxes.

Since Coin-Exch officers have failed to:
1. Provide you with a Report as to Affairs for the company;
2. Provide the company's books and records;
3. Reasonably assist you in carrying out your role as Liquidator..

I believe you can apply to ASIC for funding to carry out a further investigation?.

Officers of the company breached their duty to provide shareholders (myself) with
financial reports or notify me of corporate actions.

Can you tell me what other claims I may have against officers of Coin-Exch?
And what offences by company management can you report to ASIC?

Kind regards,
Ira

-----Original Message-----
From: Jeremy Mudford <jeremy.mudford@worrells.net.au>
To: dex561 <dex561@aol.com>
Sent: Tue, Aug 29, 2017 8:28 pm
Subject: RE: COIN-EXCH PTY. LTD. A.C.N. 163 338 467

Dear Ira,

I refer to your email below and previous email correspondence regarding the company.

Besides the information provided (which predominately has consisted of various Blog site articles), it would be much

EXHIBIT
17
PENGAD 800-631-6989

appreciated if you could provide any tangible evidence that the company (and/or its related entities that we have been
appointed over) held any IP (which may include IP relating to Bitcoin). In the interim, our preliminary investigations do
not reveal any trademarks registered to the company's name. Please refer to the links here and here.

Upon your request, we wrote to nTrust regarding the purported sale, however, have not received a response to our
request. I note this company appears to be situated in Canada and as such, we are not in a position to pursue the matter
further without being indemnified for our costs.

We have also attempted to contact the company's directors, however, have not received any response from them.

I reiterate that the Liquidation is unfunded in this matter and as such, we do not have any obligation to continue to incur
cost without any realistic prospects of return.  Notwithstanding, should you have any further tangible evidence that the
company held IP, I would appreciate if you could please provide same to me as soon as practicable.

Should you be able to provide funding in order to progress further investigations into the company's IP (including
evidence that the company held IP relating to Bitcoin), please put your proposal in writing to us for the Liquidator to
consider. In the absence of such funding, it is our intention to complete our investigations into the company's affairs and
finalise the liquidation as soon practicable thereafter.

Should you have any other queries, please do not hesitate to contact me.

Kind Regards,


**JEREMY MUDFORD**
**Senior File Accountant**



WESTERN SYDNEY

Suite 601B, Level 6, 91 Phillip Street
Parramatta NSW 2150
PO Box 207
Parramatta NSW 2124

D

P   02 8844 1200

F   02 8844 1211

E

W  worrells.net.au

**Standard Worrells E-mail Disclaimer**
Liability limited by a scheme approved under Professional Standards Legislation.

This email (including all attachments) may be subject to either legal privilege or professional confidentiality and may contain personal information. If you received this email in error professional
confidentiality is not waived or lost. This email is protected by copyright.

**From:** dex561@aol.com [mailto:dex561@aol.com]
**Sent:** Wednesday, 30 August 2017 9:49 AM
**To:** Jeremy Mudford <jeremy.mudford@worrells.net.au>
**Subject:** Re: COIN-EXCH PTY. LTD. A.C.N. 163 338 467

Hi Jeremy,

Coin-Exch held a valuable amount of IP in it's possession.  Before finalizing the liquidation, shouldn't a determination first be made as
to where the IP was transferred?  It would appear that either a insolvent or fraudulent transaction has taken place.

Didn't Coin-Exch have a number of Directors that you could attempt to contact for more details?

Kind regards,

-----Original Message-----
From: Jeremy Mudford <jeremy.mudford@worrells.net.au>
To: dex561 <dex561@aol.com>
Sent: Tue, Aug 29, 2017 3:20 am
Subject: RE: COIN-EXCH PTY. LTD. A.C.N. 163 338 467

Hi Ira,

We have not received a response to our correspondence regarding the sale to nTrust, nor have we identified any monies paid to the entities by the ATO.

Accordingly, we are currently made an application to the ASIC Liquidator Assistance Program to assist in contacting the Director. However, in the absence of any realisations, it will be our intention to lodge our report to ASIC and finalise these matters thereafter (subject to ASIC clearance).

Kind Regards,


**JEREMY MUDFORD**
**Senior File Accountant**



| | **WESTERN SYDNEY** |
|---|---|
| | Suite 601B, Level 6, 91 Phillip Street |
| | Parramatta NSW 2150 |
| | PO Box 207 |
| | Parramatta NSW 2124 |
| | D |
| | P  02 8844 1200 |
| | F  02 8844 1211 |
| | E |
| | W worrells.net.au |

**Standard Worrells E-mail Disclaimer**
Liability limited by a scheme approved under Professional Standards Legislation.

This email (including all attachments) may be subject to either legal privilege or professional confidentiality and may contain personal information. If you received this email in error professional confidentiality is not waived or lost. This email is protected by copyright.


**From:** dex561@aol.com [mailto:dex561@aol.com]
**Sent:** Tuesday, 29 August 2017 2:41 AM
**To:** Jeremy Mudford <jeremy.mudford@worrells.net.au>
**Subject:** Re: COIN-EXCH PTY. LTD. A.C.N. 163 338 467

Dear Jeremy,

Can you provide any updates on the Coin-Exch matter?

Regards,
Ira

-----Original Message-----
From: Jeremy Mudford <jeremy.mudford@worrells.net.au>
To: dex561 <dex561@aol.com>
Sent: Thu, Jul 20, 2017 11:54 am
Subject: Automatic reply: COIN-EXCH PTY. LTD. A.C.N. 163 338 467

Dear Sir/Madam,

I am currently on leave from 28 June 2017, returning to work 7 August 2017.

If your enquiry is urgent please contact Youssef Sarakbi of this office on (02) 8844 1200 or youssef.sarakbi@worrells.net.au.

Kind Regards,

**To:**     Dex[dex561@yahoo.com]
**From:**   Dex
**Sent:**    Thur 24/03/2016 1:45:50 PM
**Subject:**  Re: Website Files

Hey Patrick,

I haven't heard back from you about the hosting files stuff.

Anyway, there's another issue I was wondering if you could help me with.
I'm trying to locate any documents related to the W&K biz Dave operated.

I remember we had a conversation at Dave's house shortly after he passed
away. You were mentioning to me how my dad was asking for the return
of a file cabinet he bought for Dave and you said something like "what
does your dad need with another file cabinet?" And I was like "I don't know,
I guess he just wants it because he bought it." Of course I didn't think
anything of it at the time. But it just dawned on me that maybe inside that
cabinet is where Dave stored his W&K related stuff? You didn't possibly
come across any papers mentioning W&K?

Thanks,
Ira


On Monday, February 15, 2016 3:16 PM, Dex <dex561@yahoo.com> wrote:


Hey Patrick,

I just noticed your email today.   Sure, I'll take a look around if you want to give me web acces to it.  It can't hurt
trying.

Thanks,
Ira


On Friday, February 5, 2016 2:31 PM, Patrick Paige <patrick@computerforensicsllc.com> wrote:


Hi Ira... I was looking at files stored on our web hosting company and find password cache files like the one below... are
these supposed to be there?  I think since you're familiar with this stuff maybe you should poke around in there and see if
Dave hide anything there.  Maybe there is hidden files of value there.  Whatcha think?



EXHIBIT

18

https://gator3196.hostgator.com:2083/cpsess5412086372/frontend/x3/filemanager/

Most Visited   EBay   Kitco   Amazon   Chase   EnCase   TCA   Bank of

dave
ASCII text

```
passwd:$1$fbpK34IB$qZbm/Jr6qCwGmtb9xP5c21
quota:838860800
homedir:/home4/netfixer/mail/davekleiman.com/dave
lastchanged:-1
```

**Patrick Paige** *EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
*Office: 561.404.3074*
### www.computerforensicsllc.com

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**To:**       Patrick Paige[patrick@computerforensicsllc.com]
**From:**    Dex
**Sent:**    Fri 17/03/2017 10:46:59 PM
**Subject:** Re: viewing emails

On Monday, March 28, 2016 2:22 PM, Patrick Paige <patrick@computerforensicsllc.com> wrote:

I was able to login with the info I gave you.

*Patrick Paige* *EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
*Office: 561.404.3074*
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Monday, March 28, 2016 2:18 PM
**To:** Patrick Paige <patrick@computerforensicsllc.com>
**Subject:** Re: viewing emails

I agree, that does seem weird.

I tried to login with the d@d address and the cf passwd, but doesn't seem to work.

Can you try logging into it?

On Monday, March 28, 2016 2:11 PM, Patrick Paige <patrick@computerforensicsllc.com> wrote:

Yes I will keep it... It seems weird that the address on the envelope is handwritten considering it came from the "Supreme Court".  Appriver support is mainly online, did you go to their site and login with Dave's info?

https://cp.appriver.com/Login.aspx

*Patrick Paige* *EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
*Office: 561.404.3074*
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Monday, March 28, 2016 2:03 PM
**To:** Patrick Paige <patrick@computerforensicsllc.com>
**Subject:** Re: viewing emails

Can you keep that letter and envelope in a safe place for me?
I'd like to check it out sometime.

So what do you think about the Appriver avenue?
Can I talk to their support guy?


EXHIBIT
19

Thanks.

On Monday, March 28, 2016 1:58 PM, Patrick Paige <patrick@computerforensicsllc.com> wrote:

I just found the filing today when I was looking for something else... I was never contacted by anyone about W&K and I've never heard of the girl.

*Patrick Paige* EnCE SCERS
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
*Office: 561.404.3074*
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Monday, March 28, 2016 1:52 PM
**To:** Patrick Paige <patrick@computerforensicsllc.com>
**Subject:** Re: viewing emails

I don't know, they might be able to access stuff we don't know about.  You mentioned this web hosting biz is not your forte.  And the backend of it is not really mine either.

When did you find that W&K filing?

Were you ever contacted by the girl (Uyen) that took over David's position as director for W&K?

Thanks.

On Monday, March 28, 2016 1:40 PM, Patrick Paige <patrick@computerforensicsllc.com> wrote:

What would appriver support do for us?  Also I found the original court mailing about WK, it has a case number... see attached.

*Patrick Paige* EnCE SCERS
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
*Office: 561.404.3074*
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Monday, March 28, 2016 1:31 PM
**To:** Patrick Paige <patrick@computerforensicsllc.com>
**Subject:** Re: viewing emails

Yep, I realized that shortly after emaiing you.

Could I possibly have the account login info that would let me talk to the appriver support people?

Thanks,
Ira

On Monday, March 28, 2016 10:18 AM, Patrick Paige <patrick@computerforensicsllc.com> wrote:

Looks like a log file created when the site is backed up.  You can open is as a text document to view it.

*Patrick Paige EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
Office: 561.404.3074
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Saturday, March 26, 2016 1:07 PM
**To:** Patrick Paige <patrick@computerforensicsllc.com>
**Subject:** Re: viewing emails

okay i think i figured out how to extract the file, but don't know how to read it.

i will attach one of them. maybe you know how to view it?

On Saturday, March 26, 2016 12:47 PM, Patrick Paige <patrick@computerforensicsllc.com> wrote:

No I don't… I've seen some text files with weird passwords but I don't know if they are related.

*Patrick Paige EnCE SCERS*
**1880 North Congress Ave. Ste 333**
**Boynton Beach FL 33426**
Office: 561.404.3074
**www.computerforensicsllc.com**

*Note: The information contained in this message may be privileged and confidential and thus protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer. Thank you.*

**From:** Dex [mailto:dex561@yahoo.com]
**Sent:** Friday, March 25, 2016 10:32 PM
**To:** Patrick Paige <patrick@computerforensicsllc.com>
**Subject:** viewing emails

Hey Patrick,

I been searching through the emails, but no mention of bitcoin related stuff yet.
There seems to be a bunch of archived email files in .gz format and they are
password protected.  Do you know what it might be?

If so, can you text it to me.

Thanks,
Ira