UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


```
------------------------------)
                              )
                              )
                              )
IRA KLEIMAN, as the personal  )CASE NO:
representative of the Estate  )9:18-cv-80176-BB/BR
of David Kleiman, and W&K Info)
Defense Research, LLC         )
                              )
          Plaintiffs,         )
                              )
v.                            )
                              )
                              )
CRAIG WRIGHT                  )
                              )
          Defendant.          )
                              )
                              )
------------------------------)
```


Videotape Deposition of
CRAIG STEVEN WRIGHT

On Thursday, 4th April 2019


Taken at the offices of:

Boies Schiller Flexner LLP
5 New Street Square,
London EC4A 3BF

Reported by:  Paula Foley





-----Original Message-----
From: Craig S Wright [mailto:craig.wright@information-defense.com]
Sent: Wednesday, 12 March 2008 6:37 PM
To: dave kleiman
Subject: FW: Defamation and the diffculties of law on the Internet.

I need your help editing a paper I am going to relase later this year. I have been working on a new form of electronic money. Bit cash, Bitcoin...

You are always there for me Dave. I want you to be a part of it all.

I cannot release it as me. GMX, vistomail and Tor. I need your help and I need a version of me to make this work that is better than me.

Craig



# EXHIBIT 23

# M Gmail

---

## Fw: Re: Dave

**Lou K** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

----- Forwarded Message -----
**From:** Lou K <▮▮▮▮▮▮▮ >
**To:** "craig.wright@hotwirepe.com" <craig.wright@hotwirepe.com>
**Sent:** Wednesday, February 12, 2014, 3:34:40 PM EST
**Subject:** Re: Dave

Craig:

After reviewing the information you sent , I want to thank you very much.

My home address is: ▮▮▮▮▮▮▮ , West Palm Beach, Florida 33417

I look forward to any information you can give me about my son DAVID. To me,

he was alway's someone special.      Lou Kleiman


On Tuesday, February 11, 2014 6:23 PM, Craig S Wright <craig.wright@hotwirepe.com> wrote:

> Hello Louis,
> Your son Dave and I are two of the three key people behind Bitcoin:
> https://bitcoin.org/
> http://www.motherjones.com/politics/2013/04/what-is-bitcoin-explained
>
> If you have any of Dave's computer systems, you need to save a file named "wallet.dat". I
> will explain what this is later. Please understand, I do not seek anything other than to give
> you information about your son.
>
> Know also that Dave was a key part of an invention that will revolutionise the world:
> http://techcrunch.com/2014/02/10/bitcoin-wins-best-technology-achievement-but-satoshi-
> doesnt-show/
>
> I will talk to you again soon.
>
> When I can, I will let you know much more of Dave. I will also help you recover what Dave
> owned.
>
> I will let you know when I am in the USA,
> ────────────────────
> **Dr. Craig S Wright GSE LLM**
> **Chief Executive Officer**
> **Hotwire Preemptive Intelligence (Group)**
> Mobile: + 61.417.683.914
> craig.wright@hotwirepe.com





# EXHIBIT 1

# The Satoshi Affair

## Andrew O'Hagan on the many lives of Satoshi Nakamoto

### The Raid

Ten men raided a house in Gordon, a north shore suburb of Sydney, at 1.30 p.m. on Wednesday, 9 December 2015. Some of the federal agents wore shirts that said 'Computer Forensics'; one carried a search warrant issued under the Australian Crimes Act 1914. They were looking for a man named Craig Steven Wright, who lived with his wife, Ramona, at 43 St Johns Avenue. The warrant was issued at the behest of the Australian Taxation Office. Wright, a computer scientist and businessman, headed a group of companies associated with cryptocurrency and online security. As one set of agents scoured his kitchen cupboards and emptied out his garage, another entered his main company headquarters at 32 Delhi Road in North Ryde. They were looking for 'originals or copies' of material held on hard drives and computers; they wanted bank statements, mobile phone records, research papers and photographs. The warrant listed dozens of companies whose papers were to be scrutinised, and 32 individuals, some with alternative names, or alternative spellings. The name 'Satoshi Nakamoto' appeared sixth from the bottom of the list.



*Craig Wright in the Oxford Circus office.*

Some of the neighbours say the Wrights were a little distant. She was friendly but he was weird – to one neighbour he was 'Cold-Shoulder Craig' – and their landlord wondered why they needed so much extra power: Wright had what appeared to be a whole room full of generators at the back of the property. This fed a rack of computers that he called his 'toys', but the real computer, on which he'd spent a lot of money, was nearly nine thousand miles away in Panama. He had already taken the computers away the day before the raid. A reporter had turned up at the house and Wright, alarmed, had phoned Stefan, the man advising them on what he and Ramona were calling 'the deal'. Stefan immediately moved Wright and his wife into

a luxury apartment at the Meriton World Tower in Sydney. They'd soon be moving to England anyway, and all parties agreed it was best to hide out for now.

At 32 Delhi Road, the palm trees were throwing summer shade onto the concrete walkways – 'Tailor Made Office Solutions', it said on a nearby billboard – and people were drinking coffee in Deli 32 on the ground floor. Wright's office on level five was painted red, and looked down on the Macquarie Park Cemetery, known as a place of calm for the living as much as the dead. No one was sure what to do when the police entered. The staff were gathered in the middle of the room and told by the officers not to go near their computers or use their phones. 'I tried to intervene,' one senior staff member, a Dane called Allan Pedersen, remarked later, 'and said we would have to call our lawyers.'

Ramona wasn't keen to tell her family what was happening. The reporters were sniffing at a strange story – a story too complicated for her to explain – so she just told everyone that damp in the Gordon house had forced them to move out. The place they moved into, a tall apartment building, was right in the city and Wright felt as if he was on holiday. On 9 December, after their first night in the new apartment, Wright woke up to the news that two articles, one on the technology site *Gizmodo*, the other in the tech magazine *Wired*, had come out overnight fingering him as the person behind the pseudonym Satoshi Nakamoto, who in 2008 published a white paper describing a 'peer-to-peer electronic cash system' – a technology Satoshi went on to develop as bitcoin. Reading the articles on his laptop, Wright knew his old life was over.

By this point, cameras and reporters were outside his former home and his office. They had long heard rumours, but the*Gizmodo* and *Wired* stories had sent the Australian media into a frenzy. It wasn't clear why the police and the articles had appeared on the same day. At about five that same afternoon, a receptionist called from the lobby of Wright's apartment building to say that the police had arrived. Ramona turned to Wright and told him to get the hell out. He looked at a desk in front of the window: there were two large laptop computers on it – they weighed a

few kilos each, with 64 gigabytes of RAM – and he grabbed the one that wasn't yet fully encrypted. He also took Ramona's phone, which wasn't encrypted either, and headed for the door. They were on the 63rd floor. It occurred to him that the police might be coming up in the elevator, so he went down to the 61st floor, where there were office suites and a swimming pool. He stood frozen for a minute before he realised he'd rushed out without his passport.

Ramona left the apartment shortly after Wright. She went straight down to the basement car park and was relieved to find the police weren't guarding the exits. She jumped into her car, a hire vehicle, and, in her panic, crashed into the exit barrier. But she didn't stop, and was soon on the motorway heading to north Sydney. She just wanted to be somewhere familiar where she would have time to think. She felt vulnerable without her phone, and decided to drive to a friend's and borrow his. She went to his workplace and took his phone, telling him she couldn't explain because she didn't want to get him involved.

Meanwhile, Wright was still standing beside the swimming pool in his suit, with a laptop in his arms. He heard people coming up the stairs, sped down the corridor and ducked into the gents. A bunch of teenagers were standing around but seemed not to notice him. He went to the furthest cubicle and deliberately kept the door unlocked. (He figured the police would just look for an engaged sign.) He was standing on top of the toilet when he heard the officers come in. They asked the youngsters what they were doing, but they said 'nothing' and the police left. Wright stayed in the cubicle for a few minutes, then went out and used his apartment keycard to hide in the service stairwell. Eventually, a call came from Ramona on her friend's phone. She was slightly horrified to discover he was still in the building and told him again to get out. He, too, had a rental car, and had the key in his pocket. He went down sixty flights of stairs to the car park in the basement, unlocked his car and opened the boot, where he lifted out the spare wheel and put his laptop in the wheel cavity. He drove towards the Harbour Bridge and got lost in the traffic.



*Craig Wright in 2016.*

As Ramona drove along she began texting the mysterious Stefan, who was at Sydney Airport, having already checked in for a flight to Manila, where he lived. Stefan had to make a fuss to get his bag removed from the plane and then he spoke to Ramona, telling her that Wright would have to get out of the country. She didn't argue. She called the Flight Centre and asked what flights were leaving. 'To where?' asked the saleswoman.

'Anywhere,' Ramona said. Within ten minutes she had booked her husband on a flight to Auckland.

In the early evening, Wright, scared and lost, made his way to Chatswood. He texted Ramona to come and meet him, and she immediately texted back saying he should go straight to the airport. She'd booked him a flight. 'But I don't have my passport,' he said. Ramona was afraid she'd be arrested if she returned to their apartment, but her friend said he'd go into the building and get the passport. They waited until the police left the building, then he went upstairs. A few minutes later he came back with the passport, along with the other computer and a power supply.

They met Wright in the airport car park. Ramona had never seen him so worried. 'I was shocked,' he later said. 'I hadn't expected to be outed like that in the media, and then to be chased down by the police. Normally, I'd be prepared. I'd have a bag packed.' As Ramona gave him the one-way ticket to Auckland, she was anxious about when she would see him again. Wright said New Zealand was a bit too close and wondered what to do about money. Ramona went to an ATM and gave him $600. He bought a yellow bag from the airport shop in which to store his computers. He had no clothes. 'It was awful saying goodbye to him,' Ramona said.

In the queue for security, he felt nervous about his computers. His flight was about to close when the security staff flagged him down. He was being taken to an interview room when an Indian man behind him started going berserk. It was just after the Paris bombings; the man's wife was wearing a sari and the security staff wanted to pat her down. The man objected. All the security staff ran over to deal with the situation and told Wright to go. He couldn't believe his luck. He put his head down and scurried through the lounge.

Back at Wright's office, Allan Pedersen was being interviewed by the police. He overheard one of them ask: 'Have we got Wright yet?'

'He's just hopped a flight to New Zealand,' his colleague said.

Wright was soon 30,000 feet above the Tasman Sea watching the programmer Thomas Anderson (Keanu Reeves) being chased by unknowable agents in *The*

*Matrix*. Wright found the storyline strangely comforting; it was good to know he wasn't alone.

At Auckland Airport, Wright kept his phone on flight mode, but turned it on to use the airport's wifi to Skype with Stefan, using a new account. They had a discussion about how to get him to Manila. There was a big rock concert that night in Auckland, and all the hotels were full, but he crossed town in a cab and managed to get a small room at the Hilton. He booked two nights, using cash. He knew how to get more cash out of ATMs than the daily limit, so he worked several machines near the hotel, withdrawing $5000. He ordered room service that night and the next morning went to the Billabong store in Queen Street to buy some clothes. He felt agitated, out of his element: normally he would wear a suit and tie – he enjoys the notion that he is too well dressed to be a geek – but he bought a T-shirt, a pair of jeans and some socks. On the way back to the hotel he got a bunch of SIM cards, so that his calls wouldn't be monitored. Back at the Hilton he was packing up his computers when the dependable Stefan came on Skype. He told Wright to go to the airport and pick up a ticket he'd left him for a flight to Manila. His picture was all over the papers, along with the story that he was trying to escape.

Within hours of Wright's name appearing in the press, anonymous messages threatened to reveal his 'actual history'. Some said he had been on Ashley Madison, the website that sets up extramarital affairs, others that he'd been seen on Grindr, the gay hook-up app. During a six-hour layover in Hong Kong, he killed his email accounts and tried to wipe his social media profile, which he knew would be heavy with information he wasn't keen to publicise: 'Mainly rants,' he said later. When he got to Manila airport, Stefan picked him up. They went to Stefan's apartment and the maid washed Wright's clothes while he set up his laptops on the dining-room table. They spent the rest of Saturday wiping his remaining social media profile. Stefan didn't want any contact to be possible: he wanted to cut Wright off from the world. The next day he put him on a plane to London.

**Mayfair**

Technology is constantly changing the lives of people who don't really understand it – we drive our cars, and care nothing for internal combustion – but now and then a story will break from that frontier. I was one of the people who had never heard of Satoshi Nakamoto or the blockchain – the invention underlying bitcoin, which verifies transactions without the need for any central authority – or that it is the biggest thing in computer science.  It was news to me that the banks were grabbing onto the blockchain as the foundation of a future 'internet of value'. The story of a mythical computer scientist was an odd one to come my way. I'm not much detained by thoughts of new computer paradigms. (I'm still getting the hang of the first one.) But to those who are much more invested in the world of tomorrow, the Satoshi story has the lineaments of a modern morality tale quite independent of stock realities. There are things, there are always things, that others assume are at the centre of the universe but don't make a scratch on your own sense of the everyday world. This story was like that for me, enclosing me in an enigma I couldn't have named. A documentary is a fashioned thing, of course, as fashioned as fiction in its own ways, but I had to overcome my own bafflement – as will you – to enter this world.

A few weeks before the raid on Craig Wright's house, when his name still hadn't ever been publicly associated with Satoshi Nakamoto, I got an email from a Los Angeles lawyer called Jimmy Nguyen, from the firm Davis Wright Tremaine (self-described as 'a one-stop shop for companies in entertainment, technology, advertising, sports and other industries'). Nguyen told me that they were looking to contract me to write the life of Satoshi Nakamoto. 'My client has acquired life story rights … from the true person behind the pseudonym Satoshi Nakamoto – the creator of the bitcoin protocol,' the lawyer wrote. 'The story will be [of] great interest to the public and we expect the book project will generate significant publicity and media coverage once Satoshi's true identity is revealed.'

Journalists, it turned out, had spent years looking for Nakamoto. His identity was one of the great mysteries of the internet, and a holy grail of investigative reporting, with writers who couldn't dig up evidence simply growing their own. For the *New*

*Yorker*'s Joshua Davis the need to find him seemed almost painful. 'Nakamoto himself was a cipher,' he wrote in October 2011:

> Before the debut of bitcoin, there was no record of any coder with that name. He used an email address and a website that were untraceable. In 2009 and 2010, he wrote hundreds of posts in flawless English, and though he invited other software developers to help him improve the code, and corresponded with them, he never revealed a personal detail. Then, in April 2011, he sent a note to a developer saying that he had 'moved on to other things'. He has not been heard from since.

Davis went on to examine Satoshi's writing quite closely and concluded that he used British spelling and was fond of the word 'bloody'. He then named a 23-year-old Trinity College Dublin graduate student, Michael Clear, who quickly denied it. The story went nowhere and Clear went back to his studies. Then Leah McGrath Goodman wrote a piece for *Newsweek* claiming Satoshi was a maths genius called Dorian Nakamoto, who lived in the Californian suburb of Temple City and didn't actually know, it turned out, how to pronounce bitcoin. When Goodman's article ran on the magazine's cover reporters from all over the world arrived on Dorian's doorstep. He said he would give an interview to the first person who would take him to lunch. It turned out that his hobby wasn't alternative currencies but model trains. Someone calling himself Satoshi Nakamoto, and using Satoshi's original email address, visited one of the forums Satoshi used to haunt and posted the message: 'I am not Dorian Nakamoto.'  Other commentators, including Nathaniel Popper of the *New York Times*, named Nick Szabo, a cool cryptocurrency nut and the inventor of Bit Gold, but he denied it profusely. *Forbes* believed it was Hal Finney, who, the blockchain irrefutably showed, was the first person in the world to be sent bitcoin by Satoshi. Finney, a native Californian, was an expert cryptographer whose involvement in the development of bitcoin was vital. He was diagnosed with motor neurone disease in 2009 and died in 2014. It came to seem that the holy grail would remain out of reach. 'Many in the bitcoin community … in deference to the bitcoin creator's clear desire for privacy … didn't want to see the wizard unmasked,' Popper wrote in the *New York Times*. 'But even among those who said this, few could resist debating the clues the founder left behind.'

The 'Stefan' who was hovering during the raid on Craig Wright's house and office is Stefan Matthews, an IT expert whom Wright had known for ten years, since they both worked for the online gambling site Centrebet. In those days, around 2007, Wright was often hired as a security analyst by such firms, deploying his skills as a

computer scientist (and his experience as a hacker) to make life difficult for fraudsters. Wright was an eccentric guy, Stefan Matthews remembered, but known to be a reliable freelancer. Matthews said that Wright had given him a document to look at in 2008 written by someone called Satoshi Nakamoto, but Matthews had been busy at the time and didn't read it for a while. He said that Wright was always trying to get him interested in this new venture called bitcoin. He tried to sell him 50,000 coin for next to nothing, but Matthews wasn't interested, he told me, because Wright was weird and the whole thing seemed a bit cranky. A few years later, however, Matthews realised that the document he had been shown was, in fact, an original draft of the by now famous white paper by Satoshi Nakamoto. (Like the governments they despise, bitcoiners deal – when it comes to ideas – in 'white papers', as if they were issuing laws.) Last year, when Wright was in financial trouble, he approached Matthews several times. By that time, Matthews had become friendly with Robert MacGregor, the founder and CEO of a Canada-based money-transfer firm called nTrust. Matthews encouraged MacGregor to come to Australia and assess Wright's value as an investment opportunity. Wright had founded a number of businesses that were in trouble and he was deeply embedded in a dispute with the ATO. Nevertheless, Matthews told MacGregor, Wright was almost certainly the man behind bitcoin.

Matthews argued that since Satoshi's disappearance in 2011, Wright had been working on new applications of the blockchain technology he had invented as Satoshi. He was, in other words, using the technology underlying bitcoin to create new versions of the formula that could, at a stroke, replace the systems of bookkeeping and registration and centralised authority that banks and governments depend on. Wright and his people were preparing dozens of patents, and each invention, in a specific way, looked to rework financial, social, legal or medical services, expanding on the basic idea of the 'distributed public ledger' that constitutes the blockchain. This is utopian thinking, even by normal geek standards,

but it's a hot topic in computer science and banking at the moment, and hundreds of millions of dollars are being invested in such ideas. Thus: Matthews's proposal.

After initial scepticism, and in spite of a slight aversion to Wright's manner, MacGregor was persuaded, and struck a deal with Wright, signed on 29 June 2015. MacGregor says he felt sure that Wright was bitcoin's legendary missing father, and he told me it was his idea, later in the drafting of the deal, to insist that Satoshi's 'life rights' be included as part of the agreement. Wright's companies were so deep in debt that the deal appeared to him like a rescue plan, so he agreed to everything, without, it seems, really examining what he would have to do. Within a few months, according to evidence later given to me by Matthews and MacGregor, the deal would cost MacGregor's company $15 million. 'That's right,' Matthews said in February this year. 'When we signed the deal, $1.5 million was given to Wright's lawyers. But my main job was to set up an engagement with the new lawyers … and transfer Wright's intellectual property to nCrypt' – a newly formed subsidiary of nTrust. 'The deal had the following components: clear the outstanding debts that were preventing Wright's business from getting back on its feet, and work with the new lawyers on getting the agreements in place for the transfer of any non-corporate intellectual property, and work with the lawyers to get Craig's story rights.' From that point on, the 'Satoshi revelation' would be part of the deal. 'It was the cornerstone of the commercialisation plan,' Matthews said, 'with about ten million sunk into the Australian debts and setting up in London.'

The plan was always clear to the men behind nCrypt. They would bring Wright to London and set up a research and development centre for him, with around thirty staff working under him. They would complete the work on his inventions and patent applications – he appeared to have hundreds of them – and the whole lot would be sold as the work of Satoshi Nakamoto, who would be unmasked as part of the project. Once packaged, Matthews and MacGregor planned to sell the intellectual property for upwards of a billion dollars. MacGregor later told me he was speaking

to Google and Uber, as well as to a number of Swiss banks. 'The plan was to package it all up and sell it,' Matthews told me. 'The plan was never to operate it.'



*Clockwise from top left: Hal Finney, Gavin Andresen, Robert MacGregor, Stefan Matthews*

*

Since the time I worked with Julian Assange, my computers have been hacked several times. It isn't unusual for me to find that material has been wiped, and I was careful to make sure the lawyer's approach wasn't part of a sting operation. But I was curious to see what these men had. I assumed MacGregor — or someone behind him — must be the 'client' referred to in the email I had received from California. On Thursday, 12 November, I turned up at MacGregor's office near Oxford Circus, where I signed in under a pseudonym and made my way to a boardroom wallpapered with mathematical formulae. MacGregor came into the room wearing a tailored jacket and jeans, with a blue-edged pocket square in his breast pocket, a scarf and brown brogue boots. He was 47 but looked about 29. There was something studied about him — the Alexander McQueen scarf, the lawyerly punctilio — and I'd never met anyone who spoke so easily about such large

sums of money. When I asked him the point of the whole exercise he said it was simple: 'Buy in, sell out, make some zeroes.'

MacGregor described Wright to me as 'the goose that lays the golden egg'. He said that if I agreed to take part I would have exclusive access to the whole story, and to everyone around Wright, and that it would all end with Wright proving he was Satoshi by using cryptographic keys that only Satoshi had access to, those associated with the very first blocks in the blockchain. MacGregor told me this might happen at a public TED talk. He said it would be 'game over'. Wright's patents would then be sold and Wright could get on with his life, out of the public eye. 'All he wants is peace to get on with his work,' MacGregor told me at that first meeting. 'And how this ends, for me, is with Craig working for, say, Google, with a research staff of four hundred.'

I told MacGregor that there would have to be a process of verification. We talked about money, and negotiated a little, but after several meetings I decided I wouldn't accept any. I would write the story as I had every other story under my name, by observing and interviewing, taking notes and making recordings, and sifting the evidence. 'It should be warts and all,' MacGregor said. He said it several times, but I was never sure he understood what it meant. This was a changing story, and I was the only one keeping account of the changes. MacGregor and his co-workers were already convinced Wright was Satoshi, and they behaved, to my mind, as if that claim was the end of the story, rather than the beginning.

I don't mean to imply anything sinister. The company was excited by the project and so was I. Very quickly we were working hand in hand: I reserved judgment (and independence) but I was very caught up in the thought of the story unfolding as planned. At this point, nobody knew who Craig Wright was, but he appeared, from the initial evidence, to have a better claim to being Satoshi Nakamoto than anyone else had. He seemed to have the technical ability. He also had the right social history, and the timeline worked. The big proof was up ahead, and how could it not be spectacular? I went slowly forward with the project, and said no to everything

that would hamper my independence. This would become an issue later on with MacGregor and Matthews, or the men in black, as I'd taken to calling them, but for those first few months, nobody asked me to sign anything and nobody refused me access. Mysteries would open up, and some would remain, but there seemed no mystery about the fact that these people were confident that a supremely important thing was happening and that the entire process should be witnessed and recorded. My emails to MacGregor took it for granted that what would be good for my story, in terms of securing proof, would also be good for his deal, and that seemed perfectly true. Yet I feel bad that I didn't warn him of the possibility that this might not be what happened, that my story wouldn't die if the deal died, that human interest doesn't stop at success.

It was at this point, four weeks after my first meeting with MacGregor, that *Wired* and *Gizmodo* reported that he might be Satoshi. The news unleashed a tsunami of responses from the cryptocurrency community, and most of it was bad for Wright's credibility. Had he left artificial footprints to suggest his involvement with bitcoin had been earlier than it was? Had he exaggerated the number and nature of the degrees he'd accumulated from various universities? Why did the company that supplied the supercomputer he claimed to have bought with amassed bitcoin say it had never heard of him?

'The smell,' as one commentator said, 'was a mile high.' The nCrypt people were unfazed by this mudslinging, believing that every one of the charges made against Wright could be easily disproved. Wright produced an impressive paper showing that his 'footprint' wasn't faked and that the 'cryptographic' evidence against him was bogus (people continue to argue on this point). He produced a letter from the supercomputer supplier acknowledging the order. Charles Sturt University provided a photocopy of his staff card, proving he had lectured there, and Wright sent me a copy of the thesis he'd submitted for a doctorate his critics claim he doesn't have.

*

I had arrived five minutes early at 28-50 Degrees, a wine bar and restaurant in Mayfair. It was just before 1 p.m. on 16 December and the lunchtime crowd, men in blue suits and white shirts, were eating oysters and baby back ribs and drinking high-end wine by the glass. A jeroboam of Graham's ten-year-old tawny port stood on the bar, and I was inspecting it when MacGregor arrived with Mr and Mrs Smith. That's what he'd been calling them in his emails to me. Craig Wright, 45 years old, wearing a white shirt under a black jacket, a pair of blue chinos, a belt with a large Armani buckle and very green socks, wasn't the kind of guy who seems comfortable in a swish restaurant. He sat across from me and lowered his head and at first he let MacGregor do the talking. Ramona was very friendly, chatting about their time in London as if they were a couple of holidaymakers who'd just blown into Mayfair. She wasn't drinking, but the rest of us ordered a glass of Malbec each. When Wright lifted his head to laugh at something, I noticed he had a nice smile but uneven teeth, and a scar that climbed from the top of his nose to the area just above his left eyebrow. He hadn't shaved since he'd left Sydney.

Wright told me he was rubbish at small talk. He too wanted what I wrote to be 'warts and all'; he felt he was being misunderstood by everybody, and normally that wouldn't bother him but he had to consider the respectability of his work, and his family's rights. He appeared to ponder this for a moment, then he told me his old neighbours at the house in Gordon hadn't been friendly.

'They barely even knew your name,' Ramona said.

'They do now,' he replied.

I found him easier to talk to than I'd expected. He said his father had worked for the NSA (he couldn't explain this), but that, to this day, his mother thinks he worked for Nasa. 'The few people I care about I care about a lot,' he said, 'and I care about the state of the world. But there's not much in between.' He said he was happy I was writing about him because he wanted 'to step into history', but mainly because he wanted to tell the story of the brilliant people he had collaborated with. He and

Ramona were both jet-lagged and anxious about things back home. 'We should have been having our company's Christmas party today,' Ramona said.

MacGregor asked Wright if being a libertarian had influenced his work, or if the work had turned him into a libertarian. 'I was always libertarian,' he replied, and then he told me his father had more or less kidnapped him after his parents got divorced. He hated being told what to do – that was one of his main motivations. He believed in freedom, and in what freedom would come to mean, and he said his work would guarantee a future in which privacy was protected. 'Where we are,' he said, 'is a place where people can be private and part of that privacy is to be someone other than who they were. Computing will allow you to start again, if you want to. And that is freedom.' In fact he never stopped imagining different lives for himself. That afternoon he seemed preoccupied by the case people were making against his being Satoshi. He shook his head a lot and said he wished he could just get on in silence with his work. 'If you want to stay sane through this, ignore Reddit,' his wife told him.

The next day, 17 December, we met again, in a private room in Claridge's. You could see outside, over the rooftops, cranes garlanded in fairy lights. Ramona came in looking tired and totally fed up. From time to time, especially when exhausted, she would resent the hold these people had over them. 'We have sold our souls,' she said to me in a quiet moment.

MacGregor said he would spend the evening preparing paperwork to be signed by Wright the following day. This would effectively be the final signing over to nCrypt of the intellectual property held by Wright's companies. This was the main plank in the deal. MacGregor was confident the work was 'world historical', that it would change the way we lived. He regularly described the blockchain as the greatest invention since the internet. He said that what the internet had done for communication, the blockchain would do for value.

MacGregor explained that Wright's Australian companies were being signed over to nCrypt and that he'd extended an 'olive branch' to the ATO, which had responded quickly and positively. A lot of trouble with the ATO had to do with whether bitcoin was a commodity or a currency and how it should be taxed. It also had doubts about whether Wright's companies had done as much research and development as they claimed, and whether they were therefore entitled to the tax rebates they had applied for. The ATO had said it couldn't see where the spending was going. Some critics in the media claimed Wright's companies had been set up only for the purpose of claiming rebates, though not even the ATO went that far.

Wright told me that thanks to the tax office they'd had to lay out all the research for their patents, which had been useful since the nCrypt team was in a hurry: the banks, now alert to cryptocurrencies and the effectiveness of the blockchain, are rushing to create their own versions. At that moment, Bank of America was patenting ten ideas for which Craig and his team told me they had a claim to 'prior art'. Governments spent a long time denying the value of bitcoin – seeing it as unstable, or the currency of criminals – but now they celebrate the potential of the technology behind it.

'They're behaving like children,' Wright said of the ATO.

MacGregor looked at his watch. He straightened his cuffs. 'I see this as a pivotal moment in history … It's like being able to go back in time and watch Bill Gates in the garage.' He turned to Wright. 'You released this thing into the wild. Some people got it right and some people got it wrong. But you've got a vision of where it's going next and next and next.'

'None of this would have worked without bitcoin,' Wright said, 'but it's a wheel and I want to build a car.'

Ramona looked depressed. She was worried that her husband, as the person claiming to have invented bitcoin, might be held liable for the actions of those who'd

used the currency for nefarious purposes. 'He didn't issue a currency,' MacGregor assured her. 'This is just technology – it is not money.' Ramona was still anxious. 'We're talking about legal risk … I'm giving you the legal answer,' MacGregor said. 'I would stake my career on the fact that the creation of bitcoin is not a prosecutable event.'

Right to the end, the Wrights would express worries about things Craig did as a young computer forensics worker. Much of his professional past looked questionable, but in the meeting room at Claridge's he simply batted the past away. 'It's what you're doing now that matters. I'm not perfect. I never will be … All these different people arguing about what Satoshi should be at the moment, it's crazy.'

### Ninjutsu

Wright's father, Frederick Page Wright, was a forward scout in Vietnam, serving with the 8th Battalion of the Australian army. 'He lost all his friends,' Wright told me, 'every single one of them' – and before long he was drinking and being violent towards Wright's mother, who eventually left him. Both Wright and his mother, when I went to meet her in Brisbane in March, told me about his father's anger at his own mother: he sent all his army pay cheques home to her and she spent them while he was away. He also dreamed of a football career that never happened. 'I have a chip on my shoulder,' Wright said, 'but his was bigger.'

'Did you admire him?'

'He never admired me. I was never fucking good enough. We played chess from when I was three or four and if I made a wrong move he'd wallop me. We clashed right from the beginning.'

The boy had two great influences. The first was his grandfather Ronald Lyman, who his family claims received the first degree awarded by the Marconi School of Wireless in Australia, and who served in the army as a signals officer. They also say he later became a spy with the Australian security services. Craig's favourite place

was his grandfather's basement, a paradise of early computing. 'We'd sit there and look at these books of log tables,' he told me. 'I loved doing it.' Captain Lyman had an old terminal and a Hayes 80-103A modem that they used to connect to the University of Melbourne's network. To keep Craig quiet while he worked, Pop, as the children called him, would let him write code. 'I found this community of hackers,' Wright says, 'and I worked out how to interact with them. I started building games and hacking other people's games. In time, I'd be pulling apart hacker code, and eventually I did this for companies, to help them create defences against hackers.'

His mother told me he was sometimes picked on at school. 'He struggled,' she said, 'but after a while I sent him to Padua College' – a private Catholic college in Brisbane – 'and he shone there. I mean, he was different. He used to dress up and he had an obsession with Japanese culture. He had big samurai swords.'

'As a teenager?'

'Dressed up in samurai clothes, with the odd wooden shoes and everything. Making all the noises. His sisters would complain about him embarrassing them: "We're down the park, we've got friends down there, and he's walking around with webbed feet." He used to have this group of nerdy friends in the 1980s: they'd come around in horn-rimmed glasses and play Dungeons & Dragons for hours.'

He had a karate teacher called Mas who moved him quickly from karate through judo to Ninjutsu. Craig broke his knuckles over and over again and 'became stronger', he told me, because 'the pain led to a "me" that could handle more.' The thing that attracted him most to martial arts was the discipline. Learning to become a ninja involves 18 disciplines, including *bōjutsu*(tactics), *hensōjutsu* (disguise and impersonation), *intonjutsu*(escape and concealment) and *shinobi-iri* (stealth and infiltration). He walked home from his lessons feeling stronger, like another self.

When he was 18, Wright joined the air force. 'They locked me in a bunker,' he told me, 'and I worked on a bombing system. Smart bombs. We needed fast code, and I did that.' When he was in his twenties a melanoma appeared on his back and he had several skin grafts. 'This was after he got out of the air force,' his mother told me, 'and when he recovered he was off to university, and it's been degrees, degrees, degrees since then.' He went to the University of Queensland to study computer systems engineering. And over the following 25 years he would finish, or not finish, or finish and not do the graduation paperwork for degrees in digital forensics, nuclear physics, theology, management, network security, international commercial law and statistics. After our first full interview, he went home to work on an assignment for a new course he was taking at the University of London, a masters in quantitative finance.

Over the months I spent with him, I noticed that he loved the idea of heroism and was strongly attracted to creation myths. One of the first things he emailed me was a copy of one of his dissertations, 'Gnarled Roots of a Creation Mythos'. I noticed it was dedicated to Mas, his martial arts instructor. The text wasn't merely an argument for self-invention, but a feminist exegesis that railed against patriarchal views of the Fall. Wright also speaks of the pilgrim-visitor in the 'world garden'. 'While in the garden, the pilgrim almost inevitably suffers deception. His or her senses, enchanted by illusory and transitory formal appearances, betray his or her soul and lead to sin.'

Wright said he had never expected the myth of Satoshi to gather such force. 'We were all used to using pseudonyms,' he told me. 'That's the cypherpunk way. Now people want Satoshi to come down from the mountain like a messiah. I am not *that*. And we didn't mean to set up a myth that way.' Satoshi was loved by bitcoin fans for making a beautiful thing and then disappearing. They don't want Satoshi to be wrong or contradictory, boastful or short-tempered, and they don't really want him to be a 45-year-old Australian called Craig.

While reading Wright's ideas on creation, I kept thinking of his karate teacher and the position he had in the young man's life. An offhand remark Wright made had stayed with me. It was about storytelling and how a possible meaning of freedom might reside not only in martial arts, in the ability to defend oneself, but in the ability to make oneself. Mas 'taught me a lot of Eastern philosophy and gave me the means to become myself', Wright said. One day Mas told him about Tominaga Nakamoto. 'He was a Japanese merchant philosopher,' Wright told me. 'I read translations of his stuff, material from the 1740s.'

Weeks later, I was in the kitchen of the house Wright was renting in London drinking tea with him when I noticed a book on the worktop called *Visions of Virtue in Tokugawa Japan.* I'd done some mugging up by then and was keen to nail the name thing.

'So that's where you say you got the Nakamoto part?' I asked. 'From the 18th-century iconoclast who criticised all the beliefs of his time?'

'Yes.'

'What about Satoshi?'

'It means "ash",' he said. 'The philosophy of Nakamoto is the neutral central path in trade. Our current system needs to be burned down and remade. That is what cryptocurrency does – it is the phoenix …'

'So *satoshi* is the ash from which the phoenix …'

'Yes. And Ash is also the name of a silly Pokémon character. The guy with Pikachu.' Wright smiled. 'In Japan the name of Ash is Satoshi,' he said.

'So, basically, you named the father of bitcoin after Pikachu's chum?'

'Yes,' he said. 'That'll annoy the buggery out of a few people.' This was something he often said, as if annoying people was an art.

Wright's generation, now in their mid to late forties, are seeing a world that enlarges on their teenage kicks. For Wright, as for Jeff Bezos, the rules of how to shop and how to think and how to live are extrapolations of dreams they had sitting in a box room somewhere. 'The person who experiences greatness must have a feeling for the myth he is in,' Frank Herbert wrote in *Dune*, Wright's favourite novel as a teenager. '*Dune* was really about people,' Wright told me. 'It was about the idea that we don't want to leave things to machines and [should instead] develop as humans. But I see things a little differently from Mr Herbert. I see that it's not one or the other – man or machines – it's a symbiosis and a way of becoming something different together.' This kind of cyberpunk energy – as opposed to cypherpunk, which came later – delivered Wright's generation of would-be computer scientists into the brightness of the future.

After getting his first degree, Wright settled into IT roles in a number of companies. He became a well-known 'go-to guy' among startups and security firms: he always solved the problem and they always came back for more. 'When I've characterised Craig to colleagues and friends,' Rob Jenkins, who worked with Wright in this period and now holds a senior position in Australia's Westpac Bank, told me, 'I've always described him as the most qualified person I've ever known. I've worked with other smart people but Craig has such a strong desire to pursue knowledge. He has passion. And bitcoin was just another one of those bright things he was talking about.'

'Sketch it out for me,' I said to Wright. 'Those years before bitcoin. What was happening that would later have an influence? I want to know about all the precursors, all the previous attempts to solve the problem.'

'Back in 1997 there was Tim May's BlackNet …' May was a crypto-anarchist, who had been operating and agitating in the cypherpunk community since the mid-1980s. 'Computer technology is on the verge of providing the ability for individuals and groups to communicate and interact with each other in a totally anonymous manner,' he wrote in the *Crypto-Anarchist Manifesto in 1988*. BlackNet

operated like a precursor to WikiLeaks, soliciting secret information with payments made by untraceable, digital money.

'We all have a narcissistic hubris,' Wright told me. He wanted to take May's BlackNet idea further. He was also enthusiastic, in those early days, about Hashcash and B-money. The idea behind Hashcash, a 'proof of work' algorithm where each of a group of computers performs a small task that can be instantly verified (thus making life impossible for spammers, who depend on multiple emails going out with little to no work involved), was 'totally necessary for the building of bitcoin'.  Wright said that he spoke to Adam Back, who proposed Hashcash in 1997, 'a few times in 2008, whilst setting up the first trials of the bitcoin protocol'.

B-Money was invented by a man called Wei Dai. At the time of its creation, Wei wrote a paper which assumed 'the existence of an untraceable network, where senders and receivers are identified only by digital pseudonyms (public keys) and every message is signed by its sender and encrypted to its receiver.' The public key, or address, is matched, as John Lanchester handily described it in the *LRB*, to 'a private key which provides access to that address'. A key is really just a string of numbers and digits: the public key demonstrates ownership of any given address; the private key can only be used by the owner of that address. Wei went on to suggest a system for the exchange and transfer of money. 'Anyone can create money by broadcasting the solution to a previously unsolved computational problem,' he wrote. The system had methods for rewarding work and keeping users honest. 'I admired B-Money,' Wright told me, 'and he definitely gave me some of the cryptographic code that ended up in the first version of bitcoin.' Wright was always careful to give credit to those early developers. 'Wei was very helpful,' he went on, but 'to people like that bitcoin seems a bit of a fudge. It works, but it's not mathematically elegant.'

'Wei said that?'

'Wei was very polite. But others said it: Adam Back, Nick Szabo. They would probably like to find a more elegant solution to the problem. Perhaps they see the mining system in bitcoin as wasteful: there's wasted computation in my system –

machines which are trying to solve problems and not winning. But that's like society.'

'Are these early cryptocurrency people in a state of rivalry?'

'Yes, but it doesn't matter.'

**Kleiman**

The flat in Marylebone where I interviewed Wright had wooden shutters and modern ornaments and pictures, mainly of crows. I set the flat up for work while Craig and Ramona were in the City signing over his intellectual property, and all his companies, to MacGregor. They arrived at the flat a couple of hours late. 'When did you realise the whole Satoshi thing wasn't going to be a secret for ever?' I asked.

'Very recently,' Wright said. 'I didn't really believe it would need to come out. What we believed is that we could leave it in doubt – we wouldn't have to sign using the Satoshi keys or anything else. We have hundreds of patents and papers in progress – research from the beginning – and in the next year we're going to start releasing them. We thought people could suspect and people could query and we could leave it like that.'

'And how did that change?'

Ramona said a single word: 'Rob.'

The days in St Christopher Place were almost languorous. We would bring coffee back to the flat and spread out, and I'd try to build a picture of how he did what he said he did. We put up whiteboards and he bamboozled me with maths. Sometimes he would write at the board for hours, then tear open books and point to theories and proofs. I talked to the scientists he worked with, many of whom were better explainers than he was. One of the things I noticed was that Wright hated claiming outright to be Satoshi and would spend hours giving credit to everyone who had

ever contributed. It was odd: we were in the room because he was coming out as Satoshi, yet the claim embarrassed him and I have many hours of tape in which he deflects it. I felt this unwillingness supported his claim because it showed a proper regard for the communal nature of the work. He was contradictory enough sometimes to enjoy the limelight and actively court it, and this would cause trouble for him, but the idea of speaking directly as Satoshi seemed to fill him with dread. 'I'm afraid that they're just going to look at my papers because I've got Satoshi after my name,' he told me. 'I've got my little Satoshi mask on, and people go "Aren't you wonderful?" because you were Satoshi. I wanted the doubt. When I released future papers, I wanted people to go: "Oh, fuck, he could be, and these papers are so good he might be."'

Dave Kleiman was to become the most important person in Wright's professional life, the man he says helped him do Satoshi's work. They met online: they visited the same cryptography forums and had interacted since 2003. Both men were interested in cyber security, digital forensics and the future of money, but Kleiman was a boy's boy, an army veteran who loved contact sports and fast living. Five foot ten and weighing 200 pounds, he lived in Riviera Beach, Florida, and from 1986 to 1990 he was an army helicopter technician. When I looked into Kleiman's life, I discovered he had also done computer forensics work for Homeland Security and the army. After active service he became a deputy in the Palm Beach County sheriff's office. A motorcycle crash in 1995, when he was 28, left him in a wheelchair. Kleiman was a drug user and one source told me he was heavily into online gambling and various illicit activities; there is evidence he was associated with Silk Road, the online marketplace for all things illegal. After the accident he devoted himself to computers, and set up a company called Computer Forensics LLC.

Until Napster (the brainchild of a teenager called Shawn Fanning) came along in 1999, enabling users to share music files across the internet without a central server, the phrase 'peer-to-peer sharing' was familiar only to the early internet's true believers.  Napster, with its user-friendly interface, brought file-sharing to the

masses. The old model of copyright and revenue generation became obsolete overnight: people stopped buying CDs; young people got music through the internet for free. The music industry had to reinvent itself or die. Wright told me that his earliest conversations with Kleiman were about file-sharing. In 2007 they wrote a study guide together on hacking. 'I used to fire ideas off him,' Wright said. 'I'm pretty good at maths but I'm not very good at people.' Kleiman, he said, could put up with his temper, which not everybody could. They began to speak of ways to use the Napster idea in other areas and solve some old problems in cryptography. Wright never, I have to say, made it fully clear how they had collaborated on building bitcoin. I kept returning to the subject, and my doubts would flare up when he failed to be explicit.

'Give me a sense of how the idea of Satoshi formed,' I said.

'I guess,' Wright replied, 'the initial idea was having a pseudonymous head that wouldn't be cut off.'

'More your idea than his?'

'Probably mine.'

'And was there a point you realised you needed a figurehead?' I asked.

'We needed people to respond to us,' he said. 'But I didn't really want people to respond to me. There are a couple of reasons for that. I don't think I would really have sold the idea to anyone. If I'd come out originally as Satoshi without Dave, I don't think it would have gone anywhere. I've had too many conversations with people who get annoyed because it's me.'

'The blockchain came about as an idea of a ledger,' he said. 'But there were a number of problems that needed to be solved. It needed to be distributed, but how do you make sure people don't collude – it may seem awful but you don't put trust in people, you incentivise people to act. And you incentivise people to act by giving them the opportunity to earn something. It's as Adam Smith says: it's not through the goodness of the heart, it's not the baker caring about you, it's not the butcher

caring about you, it's them caring about their own families. Together, as he put it, the invisible hand controls the way society works.'

I asked him to explain the distributed ledger in layman's terms and he went into an algorithmic paroxysm of verbal ingenuity. Ignoring all that, a distributed ledger is a database that is shared between multiple users, with every contributor to the network having their own identical copy of the database. Any and all additions or alterations to the ledger are mirrored in every copy as soon as they're made. No central authority is in charge of it, but no entry on it can be disputed. Adam Smith's point about 'incentive' is embedded in the way bitcoin works: people do not just buy coins or use them; they 'mine' them. Miners use their computers to solve increasingly difficult mathematical problems, the reward for the solving of which can be paid in bitcoin. This keeps the currency honest and, ideally, stops it from being dominated by any single entity.

I had brought rolls of disposable whiteboard and stuck it up around the flat, and, while we were speaking, he would jump up and cover the walls in formulae, along with arrows, arcs and curves. His wife told me she sometimes goes into the shower room and finds him standing there, stark naked, writing on the steamed glass. 'Was there a primary person doing the maths?' I asked.

'Me,' he said. 'Dave wasn't really a mathematician. What he did was make me simplify it.'

'How did he know how to make you simplify it?'

'We got to a point in the writing of the Satoshi white paper where it was … People say that it was hard.'

'He wanted you to bring the language down a little bit?'

'A lot. It's very simple. The elliptical curve stuff is not described in the paper at all, it's just there. The crypto stuff isn't described either.' I asked him to show me the

trail of ideas that led to their collaboration. 'So all these things are there,' he said, pointing to a 337-page thesis on his computer called 'The Quantification of Information Systems Risk', which he had recently submitted in partial fulfilment of a philosophy doctorate at Charles Sturt University. 'Application to audits, how you analyse failures, deriving the mathematics behind it, simplifying the mathematics and there you go … The core of the bitcoin paper is a Poisson model based on binomial distribution. That's how it got solved.'

In 2008 it was a 'hodgepodge', he said. I asked him if he felt the development of bitcoin was, at some level, a response to the financial crisis. 'It was already in process. I saw [the crisis] coming though. It was a kind of perfect storm. During that year, I spoke to Wei Dai. So between him and Hal Finney there were a lot of really good ideas about making money work … [Finney] was the one who actually took what I said seriously. He received the first bitcoin.'

Craig started turning up to our interviews in a three-piece suit. His suits were unfashionable and his ties even more so – 1970s-style yellow, sometimes paisley – and he would ramble on a range of subjects. On his own subject, he could be brilliant, but he was wayward: he would side-track, miss the point and never come back to it. He was nothing like people imagine the mythical Satoshi to be – in fact, he was Satoshi's comic opposite. He told stories against himself that weren't really against himself. He was obsessed with his opponents' views but had no skill at providing a straight answer to their questions. 'I'm an arsehole,' he said many times, as if saying so were a major concession. But he wasn't really, he was actually pretty nice. He was arrogant about maths and computing, which wasn't so surprising. He also had a habit of dissembling, of now and then lying about small things in a way that cast shade on larger things. At one point, I asked him to send me an email from the original Satoshi account.

'Can you do that?' I asked.

'Yes,' he said. 'But I'd need Rob's permission.' When I asked MacGregor he said that was absurd. He simply didn't want to – or couldn't – give too much away, and that was unfortunate in someone who'd agreed to sit down every day with a writer. He seemed to have full knowledge of that email account, in a way that made it seem unquestionably his. But somehow, it offended his sense of personal power to prove it. At first, I thought he was a man in existential crisis, like the hero of Bellow's *Dangling Man*, brilliant but antisocial, waiting to be drafted. But as the months passed I began to think of him more as a Russian 'superfluous' man of the 1850s, a romantic hero out of Turgenev, constantly held back from self-realisation by some blinding secret, showing himself not by action but in speech. Wright talked all day and he scribbled on the board and he called me his friend. He cried and he shouted and he unloaded his childhood and spoke about his father. He claimed to be Satoshi and he spoke Satoshi's thoughts and described what he did and gave an account of what people misunderstood about his invention and where bitcoin needed to go now. I moved to an office in Piccadilly – it was like something out of John le Carré, all those rooftops and fluttering Union Jacks – and we continued to do interviews. He talked without cease, without direction, and continued to find it difficult to land near the spot where my question was marked on the ground. When I asked to see the emails between him and Kleiman, he shrugged. He said he wasn't getting on well with his first wife when he wrote them and I assumed that meant they were full of talk about her. 'Just edit them down for me,' I said.

'I don't know if I can find them,' he said. But I wouldn't let it go and eventually he sent me a selection and they certainly seem to be authentic. A few of the emails were obviously the same as those quoted in the *Wired* and *Gizmodo* stories before Christmas. Wright always said these stories had been provoked by a 'leak', the work of a disgruntled employee of his who had stolen a hard drive. In any case, the emails he sent me show a pair of men with shadowy habits – socially undernourished men, I'd say, with a high degree of intellectual ability – operating in a world where the line between inventing and scamming is not always clear. The first email Wright sent me was from 27 November 2007, when he was working for

the Sydney accountancy firm BDO Kendalls and the two men were working on a paper on 'Cookies in Internet Banking'. 'Next year Dave, we come out with something big. I will tell you, but not now,' he wrote to Kleiman on 22 December 2007. Kleiman's reply told him what he was reading – 'Sagan, Feynman, Einstein' – and added: 'I hope we make an event together this year so we can "break some bread" and have a casual conversation, instead of the brain dump middle of the night email exchanges we normally have.' On 1 January 2008, Wright closed an email: 'Nothing now, but I want your help on something big soon.'

The subject of bitcoin came up – quite starkly – in an email from Wright dated 12 March 2008. 'I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, bitcoin … you are always there for me Dave. I want you to be part of it all. I cannot release it as me. GMX, vistomail and Tor. I need your help and I need a version of me to make this work that is better than me.' Wright told me that he did the coding and that Kleiman helped him to write the white paper and make the language 'serene'. With a protocol as clever as the one underlying bitcoin, you would imagine the work was complex and endlessly discussed. But Wright says they mainly talked about it by direct message and by phone. Wright had been fired from his job at BDO (the crash was taking effect) and had retired with his then wife, Lynn, and many computers to a farm in Port Macquarie. It was there, Wright says, that he did the majority of the work on bitcoin and where he spoke to Kleiman most regularly. The Satoshi white paper, 'Bitcoin: A Peer-to-Peer Electronic Cash System', was published on a cryptography mailing list on 31 October 2008.

On 27 December 2008, Wright wrote to Kleiman: 'My wife will not be happy, but I am not going back to work. I need time to get my idea going … The presentation was good and the paper is out. I am already getting shit from people and attacks on what we did. The bloody bastards are wrong and I friken showed it, they should stick to the science and piss off with their politicised crap. I need your help. You edited my paper and now I need to have you aid me build this idea.' Wright told me

that it took several attempts to get the protocol up and running. He began to test it early in January 2009. 'That was where the real money started rolling in,' he told me. The originating block in the blockchain – the file that provably records every transaction ever made – is called the Genesis block. 'There were actually a few versions of the Genesis block,' Wright told me. 'It fucked up a few times and we reviewed it a few times. The Genesis block is the one that didn't crash.' There from the beginning was Hal Finney, who would receive the first bitcoin transaction, on block 9. This was a key moment for the new cryptocurrency: block 9 for ever shows that Satoshi sent Finney ten bitcoin on 12 January 2009 – it is the first outgoing transaction we know to have come from Satoshi. Satoshi also sent four other transactions on the same day. I asked Wright who the recipients were – who the four addresses belonged to. 'Hal, Dave, myself,' he replied. 'And another I cannot name as I have no right to do so.' Wright told me that around this time he was in correspondence with Wei Dai, with Gavin Andresen, who would go on to lead the development of bitcoin, and Mike Hearn, a Google engineer who had ideas about the direction bitcoin should take. Yet when I asked for copies of the emails between Satoshi and these men he said they had been wiped when he was running from the ATO. It seemed odd, and still does, that some emails were lost while others were not. I think he believed it would be more interesting to play hide and seek than to be a man with a knowable past.

Wright's emails to Kleiman suggest that by this point he was starting to mine the million or so bitcoins that are said to be owned by Satoshi Nakamoto. 'I have a few potential clients in gaming and banking,' he wrote to Kleiman. 'I figure I can work ten to 15 hours a week and pretend to have a consultancy and use this to build and buy the machines I need. If I automate the code and monitoring, I can double the productivity and still offer more than others are doing … The racks are in place in Bagnoo and Lisarow. I figure we can have 100 cores a month setup and get to around 500.' Kleiman replied the same day to affirm their vows.

'Craig, you always know I am there for you. You changed the paradigm that was held for over a decade and destroyed the work of a couple [sic] academics. Do you really think they will just take this happily? I know you will not, but try not to take the comments to heart. Let the paper speak for itself. Next time you need to get me a copy of the conference proceedings as well. You know it is not easy for me to travel.' A picture emerges of an ailing Kleiman sitting at his computer day and night in his small ranch-style house in Riviera Beach, Florida. After writing this last email, he spent a frighteningly long period in hospital. The two men agreed to meet up at a conference in Florida on 11 March 2009 and Kleiman wrote expressing his excitement at the prospect of a few beers with Wright. Craig and Lynn stayed at Disney's Coronado Springs Resort Hotel and Kleiman drove there in his customised van, rolling into the bar with a big smile: Kleiman was the brother and drinking buddy and like-minded computer nerd Wright had never had. Not even Lynn had a clue what they were talking about.

During my visit to Australia I met Lynn in Chatswood, on Sydney's north shore, a busy commercial district that heaves with eager shoppers on a Saturday morning. She had met Wright on the internet while she was working as the nursing manager of the ICU in a military hospital in Ottawa. She told me Wright asked her to marry him about six weeks after they met online. When she eventually went to Sydney to visit him, he brought a ring to the airport. 'He was 26 and I was 44,' she said. Neither of them had been married before.

'He was very mature for 26,' Lynn told me. 'He always has to be the best. And the hard part about that is he left bodies by the wayside. He stepped on people.' She began working for him – 'he was the geek and I was the gofer' – and he got a lot of work in information security, working for the Australian Securities Exchange, and Centrebet, which is where he first got to know Stefan Matthews. Wright told me he was afraid some of the things he did for those online betting companies would come back to bite him, if and when he was outed as Satoshi. Other sources told me that he and Kleiman had had some involvement with illegal gambling. 'I knew Dave

Kleiman and he were working together,' Lynn told me, 'and I remember them saying that digital money was the way of the future. I've never said this to anybody, but I knew he was working on it and I didn't ask, because I knew he would bite my head off if I didn't understand it. He's got a very sociopathic personality.'

Lynn said her husband had admired Kleiman. And she admired him too: 'He loved life,' she said, 'and he had a brilliant mind, like Craig, but he had a gentler soul.' She remembered the Orlando conference. 'We stayed in a hotel that looked like a giant cartoon,' she told me. 'We met in one of the bars. He was a young guy, in his thirties or early forties, brown hair and moustache, average-looking. And boy, he loved to have a good time. It might have been his birthday. I went into the Disney store and bought some hats – Craig had Pluto, and Dave had one in the shape of a giant birthday cake.' Wright stepped out of himself for Kleiman: 'I'd never seen him like that with anybody. It was like, "I wanna grow up to be just like him." Dave softened Craig. A lot of what they wrote together was in his voice. I'd never seen Craig react like that to anybody. When he felt unsure of himself he went and talked to Dave. I think he wanted to be like Dave, but he knew he couldn't be.'

'In terms of having that kind of temperament?'

'Yeah. Dave was good for him. It made him realise that life doesn't go your way all of the time.'

I asked her if she thought he was a flawed person. 'Yes,' she said. 'He's starting to realise it. He knows he's done well in his work but he hasn't done well as a human being.' She stared into her cup. 'When we were at the farm,' she said, 'I was interested in finding four-leaf clovers. I would never find any, but Craig would just step out of the house and find three.'

In mid-2011 Satoshi suddenly disappeared from view. Apart from one or two emails denouncing fake Satoshis, he wasn't heard from again. Control of the network alert key is said to have been passed at this time to Andresen – possession of this key

makes its holder the closest thing bitcoin has to a chief. Wright sent Kleiman an email on 10 September 2011: 'It is recorded. I cannot do the Satoshi bit any more. They no longer listen. I am better as a myth. Back to my lectures and rants that everyone ignores as me. I hate this Dave, my pseudonym is more popular than I can ever hope to be.'

For some reason – possibly fear of the ATO – Wright set up a trust fund called the Tulip Trust in June 2011, and asked Kleiman to sign an agreement stating that he, Kleiman, would hold 1,100,111 bitcoin (then valued at £100,000, currently worth around $800 million). For clarity: there is no evidence that Kleiman ever took custody of that amount. However, there was a separate agreement that Kleiman would receive 350,000 bitcoin and this transaction was made. 'All bitcoin will be returned to Dr right on 1 January 2020,' it says in the trust document.

> No record of this arrangement will be made public at any time ... Dr Wright MAY request a loan of bitcoin for the following reasons (and no others): Furthering research into peer to peer systems ... commercial activities that enhance the value and position of bitcoin. In all events, all transactions in loaned funds will be concluded outside of Australia and the USA until and unless a clear and acceptable path to the recognition of bitcoin as currency has occurred ... I lastly acknowledge that I will not divulge the identity of the Key with ID C941FE6D nor of the origins of the satoshin@gmx.com email.

Kleiman signed it. 'I think you are mad and this is risky,' he wrote in an email to Wright on 24 June 2011, perhaps spying a possible illegality. 'But I believe in what we are trying to do.' Wright meanwhile seemed to get more and more frustrated. He both wanted fame and repudiated it, craving the recognition he felt was his due while claiming his only wish was to get back to his desk. 'I have people who love my secret identity and hate me,' he wrote to Kleiman on 23 October that year. 'I have hundreds of papers. Satoshi has one. Nothing, just one bloody paper and I cannot associate myself with ME! I am tired of all these dicks Dave. Tired of academic attacks. Tired of tax fuckwits. Tired of having to do shenanigans like moving stuff overseas IN CASE it works.'

I came to feel that there were secrets between Wright and Kleiman that might never be revealed. Wright usually clammed up when asked about Kleiman and money. One day, in a fit of high spirits, he showed me a piece of software he said that US Homeland Security had ripped off from him and Kleiman. He smiled when I asked if they'd done government security work. The first thing most people ask about when you mention Satoshi is his alleged hoard of bitcoin: he invented the thing, and created the Genesis block, and mined bitcoin from the start, so where was Wright's money and where was Kleiman's? The emails, when I got them, seemed to clear this up slightly, but, during many dozens of hours of conversation with Wright, he never properly told me how many bitcoin he mined. I was aware – and he knew I was aware, because I told him several times – that he wasn't giving me a full account of everything that had occurred between him and Kleiman. He said it was complicated.

Somewhat more helpful are minutes taken during a meeting between the ATO and representatives from Wright's Australian companies in Sydney on 26 February 2014. According to the minutes, Wright's representative John Cheshire went into detail about the financial collaboration between Wright and Kleiman. This was a story that Wright, for some reason, didn't want to tell me. Cheshire said that Wright and Kleiman had set up a company called W&K Info Defense LLC (W&K), 'an entity created for the purpose of mining bitcoins'. Some of these bitcoins were put into a Seychelles trust and some into one in Singapore. Wright, according to Cheshire, 'had gotten approximately 1.1 million bitcoins. There was a point in time when he had around 10 per cent of all the bitcoins out there. Mr Kleiman would have had a similar amount.'

I asked Wright about this and he told me it was true that his and Kleiman's mining activity had led to a complicated trust. The trust question was persistently vague: not only how many trusts but the names of the trustees, and the dates of their formation. The only consistent thing is the amount of bitcoin Wright is said to have had at one time, 1.1 million. He said that his bitcoin could not now be moved without

the agreement of the (several) trustees. He also said that Kleiman had been given 350,000 bitcoin but had not moved them. He kept them on a personal hard drive.

Wright also set up a shell company in the UK. 'I know what you want and I know how impatient you can be,' Kleiman wrote on 10 December 2012, 'but really, we need to do this right. If you fail you can start again. That is the real beauty of what you have.' It's possible Kleiman was referring to their ability to mine bitcoins and then squirrel them away. But he was evidently worried about Wright's ability to cope with all the flak, and about Wright's kamikaze attitude to the tax authorities. 'I love you like a brother Craig,' he added, 'but you are a really difficult person to be close to. You need people. Stop pushing them away. You have over one million bitcoin now in the trust. Start doing something for yourself and this family you have.'

Around this time, an 18-year-old IT enthusiast called Uyen Nguyen began working with them. Very quickly, Kleiman made her a co-director of their company and she later became a powerful figure in the trust. It's unclear how such a young and inexperienced person came to have so much influence. Wright told me she was 'volatile, capricious and beyond control' and added that Kleiman liked young women and that she was loyal and trusted – but that 'she wants to help and this always leads to trouble.' While I was preparing this story, Wright began to seem worried about ██████. I always felt he was in the middle of a very ███████████ when he talked about her. ███████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████.

Towards the end of 2012, Dave began to fail. 'Paraplegics get sick a lot,' Lynn Wright had told me, speaking as a nurse. 'The bedsores get bad and they can't fight infections. Dave was in and out of hospital a lot and I don't know what his life was really like.' Wright told me that Kleiman had girlfriends, but admitted he didn't really know much about his life. Like Wright and his first wife, they had met in a chatroom. They met in the flesh no more than half a dozen times. Kleiman seems to have lived in front of his computer day and night, and the sicker he got the more isolated he

seemed to be. Just after 6 p.m. on 27 April 2013 he was found dead by a friend who'd been trying to contact him for several days. He was sitting in his wheelchair and leaning to the left with his head resting on his hand. Lying next to him on the bed was a 0.45 calibre semi-automatic handgun, a bottle of whisky and a loaded magazine of bullets. In the mattress a few feet from where he sat, a bullet hole was found, but Kleiman had died from coronary heart disease. There were prescription medicines in his bloodstream and a modest amount of cocaine.

'We never really thought that "we made Satoshi,"' Wright told me once. 'It was good. It was done. It was cool. But I don't think we realised how big it would be.'

'There was no conversation between you about how it was going over? That Satoshi was becoming a guru?'

'We thought it was funny.'

Wright paused, shook his head, and broke down. 'I loved Dave,' he said. 'I would have seen him more. I would have talked to him more. I would've made sure he had some fucking money to go to a decent hospital. I don't think he had the right to choose not to tell me.'

'What was happening to him?'

'Neither of us had any money, physical money. We had money in Liberty, an exchange in Costa Rica, but the Americans closed it down as a money-laundering operation. Dave had a number of bitcoins on the hard drive he carried with him. Probably about 350,000.'

'Hoping it would …'

'As I said, it wasn't worth that much then. Dave died a week before the value went up by 25 times.' Wright kept wiping his eyes and shaking his head. He emphasised something he said the commentators never understood: for a long time, bitcoin

wasn't worth anything, and they constantly needed money to keep the whole operation going. They feared that dumping their bitcoin hoard would have flooded the market and devalued the currency. One of the things Wright and Kleiman had in common is that they had a problem turning their ideas into cash and were always being chased by creditors. Kleiman died feeling like a failure. No one in his family has the passwords to release the bitcoins on his computer. After he died, his family didn't open probate on his estate because they believed it had no value. Kleiman's supposed personal bitcoin holdings are worth $260 million at today's prices.

**The London Office**

In January this year, on a rainy London afternoon, Wright took me to see the large office that was being set up for him as part of the deal with nCrypt. It hadn't taken long for the world to forget that they'd once thought Wright was Satoshi. One or two of the media organisations that had 'outed' him in December had taken down the original articles from their websites, stung by the cries of fraud. After only a few days' interest in the notion, most people had made up their minds that Wright had nothing to do with Satoshi. Wright – under strict advisement – had said nothing in response to the media reports accusing him of perpetrating a hoax, but when we were alone, which was most of the time, he would launch into point-by-point rebuttals of what his critics had been saying. In the end he would shrug, as if the most obscure things were actually obvious.

The press coverage of Wright and Wright himself had something in common: they succeeded in making him seem less plausible than he actually was, and, to me, that is a general truth about computer geeks. They are content to know what they know and not to explain it. They will answer a straightforward slur with an algorithm, or fail to claim credit for something big then spend all night trying to claim credit for something small. Many of the accusations of lying that were thrown at Wright last December were thrown by other coders. And that's what they're like – see Reddit, or any of the bitcoin forums. Much of what these people do they do in the dark, beyond scrutiny, and, just as it's against their nature to incriminate themselves, it is

equally unnatural for them, even under pressure, to de-incriminate themselves. They just shrug.

Coders call one another liars, when all they really mean is that they disagree about how software should work. During the time I was working with Wright in secret, I would text my colleague John Lanchester, who I knew I could trust to keep the secret but also to understand what was at stake in the story. 'Imagine a situation,' I wrote to John, 'where novelists were strangely invested in denying the plausibility of each other's books. There's no "proof" as such that one is right and the other is wrong, but they could argue fiercely and accuse each other of all sorts of things while not really settling the problem.'

'Edmund Wilson says somewhere that the reason poets dislike each other's books is because they seem wrong, false – a kind of lie,' John replied. 'If you were telling the truth you would be writing the same poems as me.'

So the world that Wright knew best thought he was a liar. And the day we visited his new offices he seemed resigned to the fact. Much later, he told me that these months were the high-point of his career in computer science: he was working in secret on material that seemed to be coming together beautifully and profitably. It irked him that people called him a fraud and it irked him, just as much, that his deal with nCrypt would require him to prove that he was Satoshi. He hated being accused of being a fraud *and* he hated having to prove that he wasn't a fraud. Having it both ways is a life, a life that requires a certain courage as well as shamelessness, and Wright was living his double life to the hilt.

Wright introduced me to Allan Pedersen, who'd been his project manager in Sydney. We were in the Workshop – a floor above MacGregor's office near Oxford Circus – standing at a glass workbench beside a whiteboard covered in writing. The opposite wall was stencilled with a quote from Henry Ford: 'Whether you think you can or think you can't, you are right.' Pedersen told me he had been brought over to direct a group preparing an initial batch of 32 patent applications, to be completed

by April. (This was in January.) Beyond that there were 'upwards of four hundred patents', ideas to do with using the blockchain to set up contracts that would come into action on specified dates years ahead, or using the blockchain to allow cars to tell their owners when they needed petrol and to debit the cost when they refuelled. At this point, and for several minutes afterwards, Wright spoke of himself in the third person. 'Craig has been given a big kick up the bum,' he said, 'because Craig, instead of doing tons of research and sticking it on a shelf, has to complete it and turn it into something.'

'How do you organise him?' I asked Pedersen.

'I'm the organised type,' he said. 'When Craig comes into the office he's always in the middle of a sentence. And I'm trying to work out what this sentence is and manage things around what he's saying. I'm sort of grounding his latest thoughts, placing them in what we're trying to do. I'm the glue between Craig and the developers.'

It had become obvious, mainly from things Wright himself had said, that he often found it difficult to get on with people who worked for him. He got rattled when they said things couldn't be done, or were too conventional in their thinking, or too stupid, as he saw it. Ramona told me that 40 per cent of his staff in Sydney had been in a state of rebellion. 'I'm an arsehole,' Craig said to me once again, 'and I know that.' Pedersen had the job of keeping things cool with the developers, whose job it was to turn Wright's ideas into a form in which they could be patented and eventually licensed. 'I'm making sure the ideas get executed,' he said. 'Craig's not that interested in that part. He's always moving on.'

'Craig's great at research,' Wright said, 'but his development and commercialisation sucks. I build it, and then it works, and then I walk off.'

'You're losing interest?'

'I've lost interest. I've proved it, and off I go.'

'It's getting easier,' Pedersen said, with a smile. 'It was quite complex in the beginning.' Wright had strong views about how the technology should develop, and how it could 'scale' to meet greater demand. 'It can go to any size,' Wright said that day. I've tested up to 340 gigabyte blocks, which is hundreds of thousands of times greater than it is now. It's every stock exchange, it's every registry rolled into one … Ultimately bitcoin is a 1980s program, because that's what I was trained in … The idea is good, the code is robust, it runs and does the job, but it's slow and cumbersome. There were some things early on that needed to be fixed and were, but it wasn't as perfect as everyone thinks. At the end of the day, it needs to be turned into professional code. It needs to move away from the home user network and into a server network environment. And then it can do much more and be faster.' There are those who feel it should remain small, and that making it bigger is a betrayal of its first principles.

'This is the future of the blockchain,' Pedersen said.

'People are saying, "It's not really something we can run yet,"' Wright said, 'but it's time that we grew up and that bitcoin becomes professional.'

Pedersen shook his head. 'We're not working in a world where we know exactly what we're doing,' he said. 'It's coming from Craig. And then I start establishing the ground rules and we begin rolling it out. I'm putting people on a certain track and I keep going back to Craig, saying, "We need to sort this or that out," and I'm constantly keeping them and him in the loop. The good thing about Craig is that he wants me to task him, so it's a very strange relationship we've got. I'm reporting to him but I'm tasking him at the same time and it seems to work beautifully.' He was tired, and so was the whole team, but they felt confident the patent applications would be filed on time.

When Craig left the room to take a phone call, Pedersen took pains to close the door properly. 'He's a really nice person,' he said, 'but he's a fucking nightmare. Every single morning he comes in and I think, "What is he talking about?"' Pedersen told me how he handled him, how he made him focus, and how he worked hard to keep him on track. 'When I've got new people here,' he said, and there were many new people, 'I have to train them how to talk to Craig. That's what I have to do. Sometimes, he can't explain things and this is where the anger comes from. It's the interesting part. You can't be in the same room with him. He's constantly telling you something. He's like Steve Jobs, you know – only worse.'

● As we made our way to the new office – it was a building site that day, but would be up and running four weeks later – Wright presented himself as a man who was ready for anything. In a pinstripe suit and ruby tie, he looked like a hellbent 1980s bond dealer, except the cypherpunk glint in the eye suggested he was getting away with something. He wasn't the king of all he surveyed, he was the joker, and, crossing Oxford Street, he joked that he might be Moses. The traffic parted and he made his way to the promised land, a brand new suite of offices down a side street.

\*

● Pedersen had come along. 'This is how it works in this company,' he said. 'You're sitting in Vancouver in October' – Vancouver is where nTrust, the parent company, is based – 'and suddenly Rob MacGregor says: "We need these thirty-odd patents by April and when can you go to London?"' The hurry for the patents was to help with the giant sale to Google or whomever. The men behind the deal were very keen to beat other blockchain developers to the punch, especially the R3 consortium of banks and financial institutions which late last year started spending a fortune trying to deploy the technology. We were accompanied by a young Irish woman who had been put in charge of designing the new office. MacGregor's firm had invested millions in Wright. The new company, nCrypt, had pretty much been built around him, and its offices showed it. He was to have the enormous corner office with a view all the way along Oxford Street. MacGregor clearly believed in

Wright, however obnoxious he could be, but I never understood why he wasn't interrogating his uncertainties before spending his money. He was a lawyer, but he put trust in front of diligence, which is unusual in someone so intelligent. MacGregor never, incidentally, used the words 'off the record' with me – only once, later on, did he imply it, when he said something and then said he'd deny saying it if I quoted him – and he was a generous source of information. At no point, however, did he tell me where the money for this project was coming from.

The designer was waving a colour swatch. 'We've gone for a kind of Scandi look,' she said.

'This place will work,' Wright said, striding through the open space, 'mainly when it comes to protecting me from myself.' Amid the hammering and drilling, Wright stood in an office about 20 feet by 20 feet, with floor to ceiling windows and a view down into the heart of Soho.

'You remember J.R. Ewing in *Dallas*?' I asked.

Wright laughed. What he most enjoyed, he said, was that all this was going on in secret while the world outside had written him off as a mug and a fantasist. 'If Satoshi has to come out, he'll come out in style.' He turned back to the designer to tell her how the frosted glass should work in the meeting room. 'We do a lot of work on whiteboards,' he said. He pursed his lips, then smiled. 'Will the interactive whiteboards be set up so that I can contact the guys in Sydney?'

We spent an hour at the new office. 'And they say *nothing is going on*,' Wright said as we stepped back into the elevator. 'It's all a *figment of our imagination*. I'm not Satoshi, and none of this is real.' Out on the street again, he told me he had all the money he would ever need. 'And I'll have the monkeys off my back for ever and just get on with the one thing I'm good at, not business, not managing people, but doing research and honouring this thing we made.' Wright was enjoying himself, but nCrypt was already, as MacGregor told me repeatedly, negotiating the sale of the

whole package to the highest bidder: 'Buy in, sell out, make some zeroes,' as he had said, and he'd always been honest about that goal. Wright wasn't facing up to this. The next time I visited his corner office it was finished and decked out with claret-red leather armchairs and sofas flown in from Sydney. It looked, as I'd joked earlier, like the office of a Texan oil magnate. A host of management certificates were framed on the wall next to a signed photograph of Muhammad Ali.

I told Pedersen I thought Wright was struggling with the fine print of the deal – coming out. 'He's sold his soul,' Pedersen said. 'That's how simple this is. And the combination of Craig and Ramona is dangerous here. They can't just sign all these [legal] papers and think it's going to be all right, that they'll sort something out. It doesn't work that way. They now have to go to the end and live with it. But they're doing it on first class. When this Satoshi thing comes out I can see a lot of bad things happening, and they are not geared up for this, any of them.'

'I'm concerned for him,' I said.

'There's not really a happy ending here,' Pedersen said.

'Was it the same in Australia?'

'It was the exact same,' he said, 'except in Australia you could say he was in control. He's learned absolutely nothing. He's now in this box, he can't move, he can't do anything, and this box is getting smaller and smaller.'

'Do you think he wants to be outed as Satoshi?'

'Yes I do. It's in in his personality. He wants to be recognised. He says too much. After two weeks of working with him, I knew.'

'He and Ramona tell me they had a pact never to come out.'

'My feeling is that she doesn't want him to come out, but he does. He's been pushing for this to happen.'

I spoke to one of the scientists, a shy, unexcitable man in his late fifties, who has been working on this technology for several years. He and Pedersen are old-school IT people, quiet-spoken and completely uninterested in the limelight. Both of them thought Wright was working at a different level from everybody else. The scientist, who spoke to me from the beginning on condition that he wouldn't be named, worried about Wright's attention to detail and about his conspiratorial nature, but he had no doubts about Wright's command of the big picture. The scientist was helping to oversee all the white papers and patent applications and managing a large team of IT specialists and mathematicians. I asked him if he was worried about the R3 consortium's work on blockchain technology. 'They are going to fail,' he said. 'They don't have Satoshi. There is a panic out there, a misunderstanding about how the blockchain and bitcoin works. They hire people who know about bitcoin and are attempting to buy into it rather than being left behind. I've read some patent applications that are pending, applied for by the Bank of America. What I saw was ultimately unimpressive in comparison to what Craig is trying to do with the blockchain.'

The scientist described how the staff try to get the ideas out of Wright's head. 'You can't say: "Explain this to me." If you ask a question like that, he'll just go off on giant tangents. First, he'll have difficulty explaining what's in his head. Often he's just coming up with ideas on the spot that he'll throw into conversation. You want to try to get yes and no answers from him. We film him at the whiteboard and someone will type out the text.'

He described moments when everyone in the research team thought what Wright was saying was impossible. It couldn't be done, the software wasn't up to it, the blockchain couldn't scale to the task, and then suddenly everyone would understand what he was saying and appreciate its originality. 'I need to be able to go over what he's said,' the scientist told me, 'to find the pearls of wisdom and find out what the

hell he means. If I don't get it then I might have to make some guesses. I had to train my team to work in that mode. They have to be good researchers. They have to *understand* the technology as well as be able to work with it.'

Often, the scientist said, the staff were amazed by an unexpected turn in Wright's thinking. But he admitted to being amazed, too, by certain gaps in Wright's technical knowledge. It was bizarre. Wright had what the scientist and the team regarded as vast experience and command of the blockchain, which he spoke of as his invention and appeared to know inside out, but then he would file a piece of maths that didn't work. Or he would show a lack of detailed knowledge of something the team took for granted. Nobody I spoke to could explain this discrepancy. 'One of the problems with him is that he's a terrible communicator,' the scientist said. 'He's invented this beautiful thing – the internet of value. But sometimes he'll just talk in equations but can't or is unwilling to explain their content and application.' His mistakes could also, he implied, be a result of laziness and lack of attention to detail.

I knew this for myself, but I was, to some extent, vexed that the technologists had the same experience. At the same time, I was impressed that people like the scientist and Pedersen could live with such a high degree of ambivalence about their boss. When I asked Pedersen if he thought the work was truly revolutionary, a non-native weariness came into his blue eyes. 'I think so,' he said. 'But I don't think he'll get the Nobel Prize because he's too political. He's coming out as a street fighter and could end up in prison or whatever.'

*

The main players in this story were keen to help me, to talk about what they knew and to show me the documents, but, in every case, there were topics they would avoid, and that were never cleared up. One of the most helpful individuals was Stefan Matthews. He pointed me in the direction of people from Wright's personal life, and sent me a typed history of his association with the man who would be Satoshi. Matthews noted that, when he signed the deal with MacGregor, Wright didn't have a feasible business plan for any of his companies. The Wrights' financial situation was dire. They couldn't pay their staff and a number had already left.

Pedersen and some others had stayed on without pay; Wright owed his lawyers $1 million. Superannuation remittances were overdue and loan repayments unpaid; the companies needed £200,000 just to make it to next week. Craig and Ramona had sold their cars. One of the companies was already in administration and, with the ATO closing in, 'all related entities were on the brink of collapse.' Before signing the deal, MacGregor, sources say, tried to assess the value of Wright's research, commissioning a 'high-level overview' of the companies. MacGregor instructed Matthews to be in Sydney on 24 June 2015, when a final appraisal of the businesses was undertaken and a draft arrangement negotiated for nTrust 'to acquire the intellectual property and the companies themselves'.

One night I went to have dinner with Matthews on my own. We met in the restaurant at the back of Fortnum & Mason, 92 Jermyn Street, and he seemed incongruous among the red banquettes – a large, bald Australian with a rough laugh and wearing a plaid shirt, keen to tell me everything he thought useful. Matthews seemed a much more affable character than MacGregor, both upfront and very loyal, without perhaps seeing how the two might cancel each other out. One of the tasks of the eager businessman is to make himself more sure of his own position, and Matthews spent a lot of time, as did MacGregor, selling the idea of Wright as Satoshi rather than investigating it. They drafted me into telling the world who Wright was, but they didn't really know for sure themselves, and at one point their seeming haste threatened to drive a wedge between us. It seemed odd that they would ask a writer to celebrate a truth without first providing overwhelming evidence that the truth was true. I took it in my stride, most of the time, and enjoyed the doubts, while hoping for clarity.

Matthews drank a little wine but not much. He was talking about the night in Sydney when they signed the deal. 'We pulled up outside Rob's hotel. He said: "Do you realise what you have just done? You have just done the deal of a career. This is a billion dollar deal. Fucking more. Billion dollars plus."'

'Why is Rob so convinced?'

'Don't know, don't know.' (MacGregor later told me he was convinced because Wright had shown Matthews the draft Satoshi white paper. 'I always had that,' MacGregor said.) 'If it turns out that he's a fraud, I don't know how he's managed to do it because you couldn't make this up.'

Matthews told me about a meeting at the Bondi Iceberg Club in Sydney that Wright had with Ross Ulbricht, the founder of Silk Road, now serving two life sentences. Silk Road used bitcoin to trade all kinds of contraband items because the transactions could be made anonymously. Wright later confirmed that this meeting took place, but said only that Ulbricht was full of himself and they didn't discuss bitcoin. Matthews seemed to think this was unlikely. He wondered whether Kleiman had had more to do with Ulbricht; other sources suggested the same.

'Wright signed a deal to come out as Satoshi,' I said to Matthews. 'Does he realise everything that involves?'

'You're gonna have criminal groups that paid him lots of money and there are people who know about that,' Matthews alleged. 'If they quack? You've got Ross Ulbricht who's in prison and apparently going to appeal trial this year or next. What happens when Ross sees Satoshi's name splashed everywhere and Craig's name everywhere? Is he going to say "I had lunch with that guy. We made a deal"? I'm not worried about what Craig has done, I worry about people who have associated with him.' It was very strange to do an interview with someone who would come out with this stuff, given that he was also trying to market the guy. In fairness to Wright, Matthews might just have been running his mouth off, and I've left out the worst of what he said, now and later.

We talked about some of the difficulties that had arisen between Wright and MacGregor. 'Craig and Ramona are in a state about the keys leaving the room,' I said. 'He feels it is an act of self-annihilation to let them go. Rob has a Hollywood ending in mind and it's looking incredibly unlikely. You can't go into a marketplace claiming full legitimacy when the proof hasn't been produced.' I told Matthews that

there were emails still missing between Wright and Kleiman, emails that the public would want to see before accepting him as Satoshi, because the correspondence would presumably go into the kind of detail about the invention that only the inventors could know. Wright had told me he would produce the missing emails by the following Wednesday, but he never did.

'I know what's in there,' Matthews told me. 'It will be chatter to do with illegal stuff that he and Dave were doing in Costa Rica – particularly around Costa Rican casinos where they got $23 million of income. And you don't get paid that amount just for doing a security review … He mined all those bitcoins himself using equipment that he bought with money that he got from Costa Rica.' Again: why was Matthews saying this? It was obvious to me that Wright was going to have a problem telling the full story, whatever it was. I wasn't even sure he'd told the full story to his wife, but perhaps he had, because she referred, several times, to the fact that there were things that she just couldn't tell me. 'They'll come after us,' she said, in a state of high emotion. 'They'll destroy us.' Matthews said he didn't know what that was about. He did tell me something he said he had told MacGregor when MacGregor asked him what he was getting out of the deal. 'Absolutely nothing,' Matthews said. 'I get what I get paid by Calvin. Calvin is the only allegiance I have, then and now.'

Calvin Ayre is one of the topics the team routinely went dark on. When I first met Wright, he called him 'the man in Antigua'. MacGregor never mentioned him at all during our early meetings. When I later told him that Ramona had mentioned a big man in Antigua, he said he didn't mind talking about him, but didn't bring his name up again. When, in February this year, they took Wright to Antigua for a pep talk, I emailed Matthews to ask if I could come too, and he didn't reply. Wright, in a low moment, later asked me if I'd told MacGregor they were the ones who let the cat out of the bag about Ayre. I said it wasn't them: Ayre's name had first been mentioned to me by Matthews. The Antigua meeting was being arranged when I went out for dinner with Matthews, and he referred to Ayre freely without ever asking that it be

off the record. MacGregor never went into detail about Ayre's involvement but both men's regular visits to Antigua made me wonder about the extent of the connection. Matthews, explicit as usual, always spoke about Ayre as if he was the *capo di tutti capi* of the entire affair, though I have no other evidence that Ayre was anything but an interested observer. Interestingly, nCrypt's only shareholder (one share worth one pound) is nCrypt Holdings, registered in Antigua.

Like MacGregor, Calvin Ayre is Canadian. His father, a pig-farmer, was convicted in 1987 of smuggling large amounts of Jamaican marijuana to Canada. When Calvin left college he went to work for a heart-valve manufacturer called Bicer Medical Systems and was later charged with insider trading, agreeing a deal where he was fined $10,000 and barred from running a public company listed on the Vancouver Stock Exchange until 2016. 'I clearly made some mistakes,' Ayre told the Vancouver *Sun*, 'but it was not a criminal issue and nobody got hurt from anything I did.' Ayre later started a software development company intended to help offshore betting companies take online bets. He relocated to Costa Rica in 1996, where he worked with two online casinos, WinSports and GrandPrix. Unlike most bookmakers, Ayre would send cheques directly, without using Western Union or an equivalent. He then set up Bodog, which would become the biggest name in the online gambling industry. (It's the company Matthews worked for after Centrebet.) Bodog was a huge success. In 2005, it handled more than $7 billion. Ayre appeared on the *Forbes* billionaires' list in 2006. In the same year, Bodog moved its global headquarters to Antigua. The IRS had started following the company in 2003 and US Customs and Immigration were also on his tail. A joint inquiry was started in 2006 and, in 2012, Ayre, along with two of the website's operators, was indicted on money-laundering charges. He entered no plea, but he maintains his innocence, seeing the indictment as 'an abuse of the criminal justice system'. In one profile of Ayre, we find him drinking coffee and paraphrasing Sun Tzu's *The Art of War*. 'I've put a lot of energy into finding ways not to fight my enemies,' he says. My researcher Josh showed me this interview, then remembered a note from my first meeting with MacGregor, in which he, too, had quoted Sun Tzu. 'You build your enemy a golden bridge to

retreat over,' MacGregor had said, drinking coffee. When he said this, I wasn't sure who the enemy was. The only person MacGregor had built a golden bridge for, so far as I knew, was Wright.

At the Jermyn Street dinner, Matthews didn't tell me any of Ayre's history, referring to him simply as a great guy. 'Do you know how many bitcoins Craig's got left of the original 1.1 million?' he asked later on. There are conflicting stories about the 'Satoshi millions'. Many people refer to a Satoshi-mined hoard that has never been spent, and the figure – always around a million bitcoin – is the same one admitted to by Wright and Kleiman. The difference is that Wright says he spent a lot of his. This was what Matthews was getting at. 'He told me last week,' Matthews said, 'and I've been having some sledgehammer conversations with Craig. I said to him: "Time for straight answers on this one, my friend. How many coins are left under the control of the Seychelles trust? And don't tell me you don't know because you're a grown man, and don't lie to me." And his answer was 100,000. I know that 650,000 was taken out to fund all the research and development stuff. And 350,000 is on Dave's hard drive. "Why has Dave got 350,000 of your coins on his encrypted hard drive?" Because he gave them to him. They're Dave's. Those wallets are encrypted on his hard drive, with three or four keys to his trust. Now, why did Dave die in squalor?'

'Why?'

'Because bitcoins weren't worth that much when Dave died. They skyrocketed around that time and in the weeks thereafter. But he was a man of principle apparently and wouldn't spend those coins unless Craig told him to.'

'And you don't think Dave mined coins himself?'

'Of course he did. No doubt. But how many? Who knows … We know they ran a business together based in Florida. They did stuff for contractors. We know that they lost money jointly in Liberty Reserve. And they would both have lost money in Mt Gox.'

Wright had told me he'd lost quite a bit when the bitcoin exchange Mt Gox was hacked and then collapsed. He also referred, in a later email, to information that was seeping from the collapsed Mt Gox database, some of it linking him to Ulbricht. 'The amount to a large wallet was me,' Wright told me. I took him to mean that there was evidence of a bitcoin transaction between him and Ulbricht. He wouldn't explain further.

As I was paying the bill, Matthews reared up. 'You know Craig has gone out and bought himself some cars? One hundred and eighty thousand dollars' worth of cars.' (When I checked this with Wright he said the cars were leased.) 'One of them stands out like the dog's balls in the proverbial moonlight, and this is from the man we're trying to keep fucking secret. How many custom BMW i8s are going around London? He's spending every fucking penny that we've paid him … Does he think this is just a game? You know, these guys have gone from being backyard scrappers and they've suddenly found themselves in a high-stakes poker game.' Matthews said he wouldn't take any rubbish from the Wrights, and that they'd end up on a plane back to Australia and jail if they didn't fulfil their end of the bargain, to reveal Satoshi. 'The people that I work with are capable of deciding this was a $30 million bad decision and write it off,' he said. I thought this a curiously revealing line, and wondered again just how he expected me to use such information.

'You haven't asked me why I'm doing this,' Matthews said at the end of the evening. He worked his way round to an answer, but it wasn't an answer, just more questions. 'Part of me,' he said, 'has asked over the past three or four months, why did I ever get involved in this? Why did Craig keep coming back to me? Why did he never shake out of my life? Why did he show me the Satoshi white paper in 2008? Why was he delivered back to me in 2015? I didn't go looking for it.'

*

Satoshi Nakamoto is not really a man; he is a manifestation of public acclamation, an entity made by technology, and a myth. Old-fashioned journalism might bring you

to him – or cause you to miss him altogether – but he was born of relationships that depend on concealment. A reporter was once a person who could rely on visible evidence, recordings, notes, statements of fact, and I gathered these assiduously, but this was a story that challenged the foundations on which reporting depends. I fought to uphold familiar standards of truth, and fought to discover new ways to uncover it in this underworld of companies with a vested interest in disclosing some things but not others, but it felt like the walls of virtual reality were forever pressing in on my notepad. It is standard practice in Silicon Valley for everyone, from bagel boy to research chief, to sign a Non-Disclosure Agreement. This is because every company – Apple or Microsoft or Google or Facebook – has a mission not only to make money but to control the narrative of who they are. A writer requires determination if he is to write anything about that world that isn't paid for or manufactured by a company. There is nothing particularly underhand about this: they offer you big money up front and ask you to sign over your allegiance. But when you turn down this offer and they don't banish you from the court, your version of reality might end up clashing with theirs. This happened several times during the months I was working on the Craig Wright story. Wright himself never mentioned rights or agreements or privacy – until the very end, when he asked for two particular aspects of his private life not to be discussed – but when I went to Australia at the end of February to talk with Wright's family and friends, the nCrypt men began insisting I sign an NDA.

Why they hadn't asked me to sign one at the beginning I'll never know. I had roamed freely for three months, noting and recording, going to meetings and interviewing everyone, and only now did they want me to sign. Early on, MacGregor told me in an email that he had advised Craig and Ramona to tell me 'everything'. He went on to express, on Wright's behalf, worries about how the material would be used. This was especially sensitive, I gathered, because of the government security work Wright had done. I replied that we would be judicious about what was published. MacGregor still wanted to discuss contractual issues, and I replied, on 6 March, that I would have to see proof that Wright was Satoshi, and see it presented

before his peers and selected journalists. MacGregor replied that the proof package was in train and that he didn't understand why I wouldn't sign. I replied on 7 March that I couldn't write the story, no matter how good my access, if there wasn't proof that Wright was Satoshi, and I was still waiting for evidence. 'My commitment is clear,' I wrote, 'but the book turns to dust if we do not have unanswerable and generous proof.' I insisted that I wouldn't sign any document and eventually MacGregor accepted this. We fell out over it, but I saw their point and I still do. Despite my refusal they continued, without binding agreements or legal constraints, to provide me with access to every meeting and every aspect of the story, which was set to change faster and in ways none of us could ever have prepared for. My story and nCrypt's deal seemed to be on the same track, aligned and friendly, but none of us discussed what would happen if the deal came unstuck.

**Proof**

When I asked Wright what kind of martial arts he did as a kid he gave the following answer. 'I did a few actually. I have studied in the Chinese forms Wing Chun, *Tánglángquán*, Kuo Shu, Duan Da, Zui Quan and *lóng xíng mó qiáo*. I have also mastered Muay Thai, Kenpo and Taekwondo and Chito-ryu style karate. I started with karate and Ninjutsu.' As with most things about him, it's not that it's not true, it just smells of self-doubt and a need not to hide anything positive about himself. It's the kind of truth-telling that expresses fear and gives rise to doubt, but it's not the same as a lie.

Wright's mother had told me about her son's long-standing habit of adding bits on to the truth, just to make it bigger. 'When he was a teenager,' she said, 'he went into the back of a car on his bike. It threw him through the window of a parked car. That's where his scar comes from. His sister accompanied him to the hospital and he's telling the doctor that he's had his nose broken twenty or so times, and the doctor is saying "You couldn't possibly have had it broken." And Craig says: "I sew myself up when I get injured."' What his mother said connected with something I'd noticed. In what he said, he often went further than he needed to; further than he

ought to have done. He appeared to start with the truth, and then, slowly, he would inflate his part until the whole story suddenly looked weak.

In the time since I'd last seen Matthews, he and MacGregor had been to Antigua with Wright and had agreed a 'proof strategy'. I had been pushing hard for the proof, and Ramona had asked me several times what Wright could do to prove to me that he was Satoshi. MacGregor asked the same thing during a meeting I attended with him and the public relations firm they'd hired, the Outside Organisation. 'It's not about proving it to me,' I said. 'It's about proving it – full stop. You just prove it for the whole world to see and then everybody goes home.' The nCrypt guys, pointing out that they had always intended to set up a proof session, organised a series of events with the help of the PR company, intended to bring Satoshi into the open. Originally, the plan was for the London School of Economics to host a panel discussion about the evidence and the findings, but someone seems to have blabbed to the *Financial Times*, which ran an article on 31 March. 'After nearly four months of silence,' the *FT* blogger Izabella Kaminska wrote, 'and a bitcoin community mostly resigned to the notion that the story was an elaborate hoax – conditional approaches are being made to media and other institutions in connection to an upcoming "big reveal" of Wright as Satoshi Nakamoto.' Her source was clearly inside the project. 'Wright will publicly perform a cryptographic miracle which proves his identity once and for all,' she wrote. MacGregor was outraged, and the LSE was sacked from the project. But the first and biggest of these proofs was to involve Wright using Satoshi's private encryption keys in sessions with key members of the bitcoin community. Jon Matonis, former head of the Bitcoin Foundation, agreed to take part. So did Gavin Andresen, one of the most respected bitcoin core developers, someone who had been there since its inception. These proof sessions would begin the denouement of this search for Satoshi.

Just before these sessions took place, in April, I asked Wright what had happened in Antigua. 'We discussed the whole PR strategy,' he said. 'The truth thing is going to happen.' He talked about Matonis and Andresen. 'We're going to bring them in on

reveal sessions in the next few weeks. I guess that's the way it has to be. Do I like it? No. But I haven't really been given a choice. I'm between a rock and a hard place because of whoever outed me last year.' He said very clearly at a meeting with me that he would not sign with the key in public. We agreed that he would do it for me at home, signing with the private key from one of Satoshi's original blocks. He would do for me what he was going to do for Matonis and Andresen, and this would prove beyond doubt, he said, that he was Satoshi. We made a plan, then Wright asked me to come to his office so he could draw something for me on his whiteboard, a new timelock encryption scheme he'd come up with. He wanted to add it to the list of patent applications. I didn't always know what he was talking about, but his expertise in certain areas was startling, and so were his obfuscations.

*

It was exactly 9 a.m. when I turned up at his house in South London, on one of those clear mornings when the planes leave trails in the sky. I knew his house by the BMW in the driveway, and I pressed the bell. He opened the door and a cloud of cologne came to meet me. In his study, there were three computers and seven screens. *Options, Futures and Other Derivatives* by John C. Hull was sitting on a grey sofa. There were rows of computing books and seven dead laptops stacked on top of a bookshelf. Even after all these months, Wright couldn't really do small talk, finding it hard to summon anything easy in himself. I asked him about his sofa and told him about a pain in my shoulder and he just said: 'Very good.' He made me a cup of tea and then beckoned me over to his main computer: it was time for him to prove to me that he was Satoshi. His manner was still that of a man who mildly resented having to prove anything. He smiled and pointed to the screen. 'This is his wallet, which is open,' he said. I saw a list of transactions with addresses specified. 'The initial Genesis block was hardcoded,' he said. 'There are no conflicting Genesis blocks. If a piece of code crashed on this machine it would still start on another machine with the same Genesis block. Always.' As I was looking at the screen in front of me and watching his hand move the mouse, lines from the

Wikipedia entry on the blockchain came into my head. 'The blockchain consists of blocks that hold time-stamped batches of recent valid transactions. Each block includes the hash of the prior block, linking the blocks together. The linked blocks form a chain, with each additional block reinforcing those before it.'

'It can't be moved or changed?'

'No. It's hardcoded into the original program,' he said.

Everything on his screen was time-stamped. I was looking at transactions from early January 2009. 'I was officially canned from my job at BDO on 3 January,' he said. He told me he went to his house at Port Macquarie and settled down to do the final work to get the bitcoin software up and running. 'The original definition was published by Satoshi Nakamoto in 2008 and implemented in the original source code of bitcoin published in 2009,' the Wikipedia entry said. As he explained what was in front of me, he clicked through the sequential blocks, the transactions database that underlies bitcoin. He was looking at the very earliest ones and all included dates, amounts of bitcoin and addresses. A long list of transactions showed incoming small amounts to Satoshi's wallet. 'Lots of people send micro payments to me,' he said. 'They think so much of Satoshi that they want to burn their pennies.'

'So these fans are sending tiny payments to that known address? It is the first generated and the first known address?'

'Yes. They're hoping I'll do something – out myself.'

The address was 12c6DSiU4Rq3P4ZxziKxzrL5LmMBrzjrJX. I could see that people had left messages – 'public notes' – for Satoshi: 'Hey satoshi, change my life, send me some bitcoins!' 'God bless you, China.' 'If you are reading this, please take some time to remember those who died 12 years ago today in the WTC attacks.'

'The bitcoin blockchain can be used as a trusted timestamp for arbitrary messages,' Wikipedia said.

If you scroll back to the very first transaction associated with this address – 12c6DSiU4Rq3P4ZxziKxzrL5LmMBrzjrJX – you find that it is the first bitcoin transaction recorded. It was for 50 bitcoin and remains unspent. Anyone can enter that bitcoin address into a search engine and inspect the history of transactions associated with it. 'The Genesis block was hardcoded on 3 January 2009,' Wright said to me, 'and that was the first run. There was no previous block.' (Under the heading 'Previous Block', there is a line of 74 zeros.) 'Then the code was reworked,' he continued, 'and fired up and the first address that was ever created from the hardcoded Genesis block – the first mined address – is the one I'm sending you a message from.' He was about to use the original cryptographic key to sign a message to me and it was as if he was dropping a sugar lump into my tea. He typed the words, 'Here I am, Andrew,' and rested his fingers. 'This gives us that little block there,' he said, before verifying the signature. He looked sheepish and resigned in his blue checked shirt. 'Welcome to the bit I was hoping to bury,' he said. He leaned back and I noticed a samurai sword by the desk.

I shook his hand. Then I stared at the screen and considered how strange it would be to live with a secret for seven years and then feel no relief when it finally came out. Perhaps it never felt like a professional secret; it felt like a part of his being, and now he was giving it up. 'I want it in layman's terms,' I said. 'Explain what you just did.'

'I just digitally signed a message using the first ever mined address on bitcoin.'

If he had done what he appeared to have done, and what he said he'd done, then his claim to be Satoshi was strong. For a moment, the amassed unlikelihoods and dissemblings seemed circumstantial, and the case against him suddenly much more fanciful than the idea of him being the famously secret man who invented this protocol. An alternative Satoshi would have had to share his entire password hoard

with him, and synchronised his 'real world' timeline in order to be placed where Wright was placed and align with his email existence and his expertise. It wasn't merely that Wright had been in the right place at the right time: he had been in the only place at the only time, and that time was stamped not only into the blockchain but into his correspondence and the experiences of those around him. He sat back in his large black chair and asked me if I wanted more tea. 'I could have been working with Satoshi, I guess,' he said, 'who told me he was going to fire it up at this time and I had all my machines ready and just took over from him. But that would make me Satoshi anyway.' He stared into the bank of screens and seemed nostalgic for a more ghostly self, and I asked him if it felt overwhelming.

'I don't care – whatever,' he said. But of course he did care – care is what he did most. He was agitated through the whole process, mainly, I guessed, from an old cypherpunk embarrassment at having to bend to authority. He wasn't satisfied when he sat back in his chair, he was annoyed and already making his detractors' arguments for them. 'They'll say I killed Satoshi and stole the keys. Having them doesn't prove I created them. Maybe it was a collaboration between me, Dave, Hal and some random person. Maybe I compromised Hal's machine and stole everything and his family didn't know. Maybe, maybe, fucking maybe. All that bullshit. Those people don't believe in Occam's razor. I've seen Reddit. They want the most convoluted explanation. But they can say what they want; I've got nothing more to prove.'

There is a message embedded in the Genesis block, a headline from the *Times* of 3 January 2009, the day the block was mined: 'Chancellor on brink of second bailout for banks.' I later asked Wright why he'd chosen that particular headline. 'As you know, I am rather anti-central/reserve bank,' he wrote to me. 'I see them as the true cause of these issues and the bubbles and collapses. But the date was important as a timestamp. It means that I could not have been "pre-mining" and gaming the system. The first iteration of the code was *finalised* on 9 January 2009. The run was started when I was at the farm in Macquarie later that week. It means that I cannot have been mining for months ahead and had collected a pre-mined set of solved

hashes to game the system. I ran more than fifty machines, so the headline was a marker.'

The question of proof in a story about computer science is a question for the birds. If you can't check the maths, how can you be sure? I wrote to four Princeton and Stanford cryptocurrency experts during the preparation of this story and sent them some of Wright's white papers. These men, who are together about to publish a textbook on bitcoin and blockchain technology, are obsessed with who Satoshi is, and obsessed with who he isn't. But they behave like visitors to a funhouse: they see distorting mirrors everywhere and hear distant laughter and weird music. Some of them did want to see the evidence, but they didn't want to be seen responding to it and I never heard from them again. And that is the kind of attitude that pervades the not entirely adult world of new inventions in the highly contested world of computer science.

Another thing: when such people want to make a point, they often want to destroy those they disagree with. It's clear how paranoia-inducing it is to be constantly assaulted by people who hate you for thinking your thoughts. Geek culture in general is fantastically vitriolic: even an issue that seems pretty marginal to the rest of us – like the question of who might play Captain America's love interest – can easily spiral into death threats. In the world of cryptography, this has been a bar to invention and progress: developers are hung, drawn and quartered every day on the internet and they have to be unusually robust to take it. The question of how to take bitcoin forward has been riven with opposing views, and after Satoshi disappeared there was no central authority to lead the discussion or calm the waters. By increments, the task fell to Gavin Andresen, a Princeton graduate with experience in Silicon Valley. Andresen only gradually accepted the role of lead core bitcoin developer. This is not an official designation and he appears to have got none of the thanks and all the flak, but by general consensus he is the most level-headed thinker in the bitcoin world. One insider said there was an irony in Andresen's situation that few people realised. 'The word is that Satoshi passed the torch to

Gavin before he retired in 2011,' he said. 'In fact, it was more like Satoshi threw the torch at Gavin and ran away leaving him holding it.'

From time to time during those months, I wondered what if, in some brutally postmodern way, the true identity of Satoshi could never be fully ascertained? What if Wright had every single element necessary to prove himself, but somehow couldn't? Anonymity – or at least pseudonymity – is an essential part of the cryptographic world. I had a job on my hands – as did MacGregor and Matthews, as would the core developers, as would the press – to establish the truth. Any narrative that is dependent on 'outing' such secretive people is at the mercy of their basic hatred of being controlled or being known, and Wright was a spectacular example of this.

*

Andresen had been in touch with Satoshi in the early days and would have records of their conversations. He would presumably be able to ask Wright questions that only Satoshi could answer. In December, after *Wired* published the story about Wright possibly being Satoshi, Andresen told the magazine he'd never heard of Craig Wright. But he began to believe in Wright once he started corresponding with him by email in early April. At one point, Wright sent him two emails, one written in his own Craig Wright way, and another one, with essentially the same content, written as Satoshi would have written it. They discussed maths and the history of the invention and the problems it had faced. Within a week, Andresen was sufficiently convinced to get on a plane to London. He was ready to see Wright sign a message to him using the original Satoshi cryptographic keys.

At this point, I began talking to Andresen. He told me he had written an email to Wright before getting on the plane, asking for a little more of his backstory and for his thoughts on 'the state of bitcoin in 2016'. 'He replied with a longish email,' Andresen told me, 'on the state of bitcoin and why he decided to reveal his secret now, then followed up with a couple of in-progress research papers. The email

"sounded like" the Satoshi I worked with, and the papers matched his academic, math-heavy voice, too.'

Andresen crossed the Atlantic overnight, arriving at the Covent Garden Hotel at 11 a.m. on 7 April. He went to his room – which had been booked, as had his flight, by nCrypt – and had two hours' sleep, after which MacGregor and Matthews turned up. 'They gave me a lot of the background and explained their involvement,' Andresen told me. When Wright turned up at the hotel, Andresen found it easy to talk to him, 'although I was so jet-lagged at one point,' he wrote, 'I had to stop him from diving deep into a mathematical proof he'd worked out related to how blocks are validated in bitcoin.'

Matthews had booked a conference room in the basement, and MacGregor could see that Wright was very emotional when he entered the room. 'He knew this was it,' MacGregor said to me. 'It's one thing to prove his identity to you and me, but the bitcoin community is something else. He knew that they would believe Gavin. He knew this was it – that he would have no plausible deniability after he'd talked to Gavin and shown him the keys.' Before the meeting in the basement properly started, Andresen said to MacGregor – as he said to me – that some of the phrases Wright had used in their email exchange had been 'familiar' to him; he sounded like the Satoshi he had been in contact with before. Andresen asked MacGregor and Matthews a few questions about what nCrypt hoped to achieve with this in the future. They didn't go into detail about the company's business plans, but they spoke about the future of bitcoin and alternative projects. Wright and Andresen quickly started scribbling on pieces of paper. Wright was using his big laptop to show his access to certain addresses. It was a strange situation in all sorts of ways, and the main one, perhaps, was that Andresen, who had, once upon a time, left behind high-paying job opportunities to work on the bitcoin project for free, was possibly about to meet his hero. But he stuck to practical questions. He asked Wright about the trust and about his bitcoin holdings and what had happened to them. MacGregor later told me that his first question after Matthews told him that

Wright was Satoshi was: 'Well, why isn't he sitting on an island surrounded by piles of gold?'

Wright became quite relaxed. He explained what it had cost him to keep his companies alive and to pay for research and development, and the supercomputer. It was about 5.30 p.m. when he finally logged on to his laptop to do for Andresen what he had done for me in his office at home, sign a message with the key and have it verified. Andresen looked on. Wright had just used Satoshi's key. At that point, it seemed to some of those in the room that Andresen's body language had changed; he seemed slightly awed by the situation. He reached over to his bag and took out a brand-new USB stick and removed it from its wrapping. He took out his own laptop. 'I need to test it on my computer,' he said. He added that he was convinced, but that if people were going to ask him, he had to be able to say that he'd checked it independently. He pointed to Wright's laptop and said it could all have been pre-loaded on there, though he knew that was unlikely. But he had to check on his own computer and then they would be done. He said the key could be used on his laptop and saved to the memory stick and that Wright could keep it. But for his own peace of mind, and for due diligence, so that there wasn't a chance of fraud, he had to see it work on a computer that wasn't Wright's own.

Wright suddenly baulked. He had just signed a message to Andresen from Satoshi, he said, and had demonstrated his complete familiarity with their correspondence, but, in his mind, what Andresen was now asking for was of a different order. 'I had vowed,' Wright told me, 'never to show the key publicly and never to let it go. I trusted Andresen, but I couldn't do it.' Wright got up from the table and started pacing. He had clearly believed he would be able to get through the proof session without this. In fact, he had said in my presence several times over the preceding months that he would never hand the key over to anyone or allow it to be copied or used on someone else's machine. 'I do not want to categorically prove keys across machines,' he wrote to me in an email. To him, this would be to give Satoshi away and perhaps to dilute his own proclaimed connection to him. He went to a chair in

the corner of the room and looked up at Andresen. 'Maybe you and I could get to know each other better,' he said.

Andresen just nodded his assent. 'Like, trade more emails,' Wright said, 'and I can sign more messages to you.'

At this point, Matthews's blood ran cold. 'It was the only time during all the years that I thought: "Jesus Christ, has he been spinning us the whole time?"' MacGregor too felt this was a very risky moment. He glanced at Matthews. There was no way he was going to let Andresen get back on the plane with *that* as a punctuation mark. They all felt Wright's behaviour was ludicrous: he'd demonstrated that he was Satoshi and only had to let this be verified on Gavin's laptop. End of story. But Wright spoke to me later in a way that showed his old cypherpunk suspicion had reared its head: what if Gavin was a plant? What if the whole thing was a plot to rob him of Satoshi's keys and exploit him or deny him? Wright told me he felt strong-armed and that, for some reason, he couldn't let this thing go and remain himself.

Afterwards, Andresen was sanguine. 'The proof session took longer than expected,' he told me. 'I insisted that the verification happen on a computer that I was convinced hadn't been tampered with. And they' – Wright, Matthews and MacGregor – 'insisted that the signed message never touch a computer that could have been tampered with (the risk would be that the proof might leak out before the official announcement). So we waited a bit while an assistant went to a computer shop and got a brand-new laptop.' The idea had been MacGregor's. He said the tension in the room was unbelievably high. Wright was refusing to do the one thing that would guarantee the success of his mission. He hadn't seen it coming, but Andresen wouldn't blindly trust Wright's hardware, and Wright wouldn't blindly trust Andresen's. The solution had to be a fresh computer straight out of the box. MacGregor called his assistant and gave her the task. 'This is how you get your One,' he said to her. (In his company the best score you could get in a staff appraisal was a One.) It was just before 6 p.m. on a Friday night and they needed a

brand-new laptop in Covent Garden. The assistant got hold of one and rushed over from Oxford Circus to the hotel.

The new laptop was lifted out of the box. It took a while to connect it to the hotel's wifi and to load the basic software. 'During all that time,' Andresen told me, 'it was obvious Craig was still, even then, deeply hoping his secret identity could remain secret. It was emotionally difficult for him to perform that cryptographic proof.'

'It was tense and there was a bit of shouting. There were a few drops during the day about "the evil businessman in the room",' MacGregor said. 'He stopped short of accusing Gavin of having a key-logger, but he clearly wasn't going to do it. He said he had trust issues, and he'd been attacked, and it had been so long, and he just couldn't bring himself over the line today, but they should keep talking. And Gavin was willing to do that. But we were like: "No, no, no". I remember what I said. I said, "Look, Craig, you've just been alone for way too long. Gavin has dedicated a huge chunk of his life to what you invented. I think he has the right to see this. He is the friend you don't have: Stefan and I can't fill that role for you; Ramona can't. This is someone who really understands what you have been trying to do."'

There were long silences. 'He was on the edge,' MacGregor said. Matthews was practically holding his breath. He didn't want to say too much out loud, so he texted MacGregor. The text said: 'He should call Ramona.' While MacGregor was out of the room Wright phoned his wife, and she said: 'Do it.' Everyone waited with bated breath as Wright used the new laptop to open the Satoshi wallet and set about signing a new message to Andresen. It failed. It wouldn't verify. He tried it again and again, until Andresen remembered that Wright hadn't typed 'CSW' at the end of the message the way he had in the original, the one he was seeking to verify. When he put 'CSW' at the end of his message to Gavin it said: 'Verified'. Wright had demonstrated, on a brand-new laptop, that he held Satoshi's private key. They stood up and shook hands and Gavin thanked him for all he had done. There were tears in Wright's eyes. 'His voice was breaking,' MacGregor told me. 'Gavin could see he was going though something.' Both MacGregor and Matthews later said that

Wright was turned inside out by the session. 'I didn't want to just put him in a taxi,' MacGregor said. Andresen was wiped out, so he went to get some fish and chips, and then headed to bed. 'Craig broke down,' MacGregor told me. 'He said he thought he'd never have to do this. He said he never knew how to trust people in his life.' Wright and Matthews and MacGregor went off to find a bottle of wine. 'He was semi-apologising for being a pain in the ass,' MacGregor told me, 'but I understood more than ever, at that point, how hard the whole thing was for him.'

When I asked Andresen if he thought ending the Satoshi mystery might be good for the technology, he wasn't sure. 'On one hand,' he said, 'having a mysterious founder is a great creation myth. People love a creation myth. Knowing the real story might make bitcoin less interesting to people. On the other hand, money is supposed to be boring – something that "just works", used by most people without understanding how or why it works. I'm excited to see how Craig contributes to making bitcoin work even better than it does today.' I later met with Jon Matonis, who had been through his own proof session with Wright. He was equally impressed and relieved. He too believed the search for Satoshi had come to an end and he was looking forward to working with Wright, to seeing the patents and the new blockchain ideas. During our lunch in Notting Hill, Matonis suggested that this technology would change the world. One of the scientists said to me, 'This isn't Bitcoin 2.0. This is something magnificent that will change who we are. This is Life 2.0,' and Matonis agreed.

The idea was now to use the 'proofs' – the gathered papers, the testimonies of the two bitcoin experts, the use of the keys, plus solid, document-heavy answers to every criticism previously made of Wright – and roll them out to selected members of the press on a certain day. I told MacGregor and Matthews I didn't want to go first with the story. I wanted to sit in on the interviews and proof sessions with the media organisations, and fold their reports, and the response to their reports, into my story.

Wright began to fade as we entered the proof sessions. He went from being a man with a clear picture of himself, to being a fuzzy screen. He would email me at all

hours with a pressing sense of anxiety. He seemed to be losing it. Yet we all forged ahead to a conclusion that seemed much more conclusive to him than anything he had ever expected, or could ever bear. He had signed up for it and was now faced with a full-frontal assault of cameras and lights. I had once asked him if he felt happy hiding in the internet and he said yes, it was his home. On a good day it is the bright field that contains all souls but on a bad day it is the final darkness, where misery is gapingly exposed. I came to believe that Wright, this last year, was fighting for his soul on that plain, like Aeneas with his ships at his back and all hell in front of him, going down to an underworld where he might meet his own father. Wright told me, without demur, that his life had been an attempt to prove himself to his father. In the wee small hours, he seemed like a child whose fantasy had gone too far. And the fantasy was not that he is Satoshi. He may well be Satoshi. The fantasy was that he could live as Satoshi, and take his place among the great men, and forget the little boy who was slapped for losing at chess. Like Aeneas, he knew that his journey was as much ordeal as opportunity, and though, again like Aeneas, he had asked for it, the process was increasingly unendurable. 'It is easy to descend into Avernus,' the Sibyl in Seamus Heaney's translation of Book VI of the *Aeneid* tells Aeneas:

Death's dark door stands open day and night.

But to retrace your steps and get back to upper air,

That is the task, that is the undertaking.

Only a few have prevailed, sons of gods

Whom Jupiter favoured, or heroes exalted to glory

By their own worth.

**The Reveal**

By my last weeks with Craig Wright, I was in two minds about the money men, probably because I liked them. And while I wanted to assert my journalistic doubts – preserve my innocence, stand back from the parade – my wish for the reveal to turn out well was beginning to cajole my judgment. I was wise enough to say no to the world exclusive; I still wanted material I didn't have and I was convinced that the real proof of the pudding would be in the world's tasting of it. The internet is great at crowdsourcing facts and establishing the accuracy of stories, and I had always felt this could be important. But in the meantime, I had to fight to give my doubts the oxygen they needed. The nCrypt boys said they understood – but did they? They appeared to have no Plan B if Wright couldn't prove to the world that he was who he said he was. People can start off by saying, 'Write everything, warts and all,' and end by saying: 'I don't exist, maybe you shouldn't mention me.' In a conversation with MacGregor at this point, I allowed for the possibility that I might give him a made-up name in the story. I said it because he seemed anxious, and because, as I told him at the time, he had brought the story to me and I meant him no harm – but this possibility depended on its being proved that Wright was Satoshi. Our discussion about using real names was inconclusive – during a later meeting at Berners Tavern, Matthews expressed the view that I should put their names in and make a final decision later – but the decision was really made by what the story became. The men in black seemed not to have prepared for any of that. They believed that only one big thing was going to happen: Craig Wright was going to emerge as Satoshi Nakamoto, the great mystery figure of the digital age, and the evidence would be 'overwhelming'. In the final week, as the men prepared the reveal, I found my independence slipping. No doubt about it: I felt like part of the team. I wanted to please MacGregor – pleasing people is my chief vice as a man and my main virtue as a reporter – but I could have told him my work so far might only be fieldwork. I wouldn't know how the story would turn out until it had turned out. Only in public relations is the story straight in advance.

In private, Wright was still saying he wouldn't 'jump through hoops', but then I'd find him agreeing to do exactly what was asked of him. Only a few nights before the

media appointments, I was sitting with him in the Coach & Horses in Greek Street. The PR company, he told me, had asked if he wanted to go on TV, and he'd said there was no way in hell they'd get him in front of a TV camera. Yet it was all happening. I mentioned the fact that MacGregor, when I first met him, had spoken about all this ending with a TED talk in which Satoshi would be revealed.

'Rob always said "eventually",' Wright replied.

'But what does "eventually" mean?' I asked.

'It originally meant, "*if* you came out",' Craig said.

The PR team, at MacGregor's behest, had been in touch with a number of journalists; the ones who were interested were from the BBC, the *Economist* and *GQ*. The inclusion of *GQ* had irked Wright from the start (he sees himself as an academic), but the PR company, the Outside Organisation, had a connection there – their founder was a contributing editor – and said the magazine would love the story. But did the PR men explain to the editors there who was behind this project to out Satoshi, and who was paying their fee? I later asked them by email and one of them replied: 'It is not at all unusual to be instructed to represent an individual through an independent company. Our conversation with [*GQ*] and the other journalists was about the proposed story.'

I emailed him again. 'But did you tell them,' I wrote, 'that the outing of Satoshi was being done at the behest of a commercial company?' He didn't reply.

All the journalists had signed NDAs and embargos. They would each be allowed a brief interview with Wright after he had demonstrated to them his use of the Satoshi key. These meetings would take place at the offices of the PR company in Tottenham Court Road on Monday, 24 April and Tuesday, 25 April. I found all this a bit odd: Wright was being difficult, for sure, but the PR strategy was crazily old-fashioned. Everyone in the cryptography world knew that all Wright had to do was send an email from the famous Satoshi email address, alert people he was

going to sign a message using Satoshi's keys, do so online and move a single bitcoin from an early block, and the entire internet would light up like Coney Island for the World's Fair. The piecemeal feeding of 'proof' to these journalists was compelling but anachronistic. I supposed it was an attempt to get the story out of the world of crypto-gab and into the real media, but it was set up with an alarming sense of security paranoia. Wright could never have handled a celebration, but the journalists were being managed to an extent that might have raised more questions than it answered. I was just an observer, and was worried about Wright by then, and, though I believed in him, I felt distinctly that there was something missing and something wrong.

When I turned up at Starbucks in Tottenham Court Road, Wright, Ramona and Matthews were already there. Wright was sulking a little. It had been decided that, as well as the demonstration, the journalists would be given a memory stick to take away with them, showing the signed Satoshi message. (Wright later told me the stuff he put on it was fake. There wasn't anything on there they could understand, but it certainly bore no relation to any of Satoshi's keys.) Matthews was dressed smartly and wearing dark glasses and Wright was wearing a gold tie and a business suit. Ramona sat beside him stroking his ear. 'Let me know if you have trouble with the guys upstairs,' Matthews said. He meant the PR guys. 'Sometimes they forget their role.' As usual, I found Matthews likeable and easy to talk to, but he seemed not to appreciate the difference between his way of talking and the circus of manipulation surrounding us.

Rory Cellan-Jones, the BBC's technology correspondent, was led into a conference room with his producer, Priya Patel, and Mark Ward, a technology correspondent for the BBC News website. Wright sat at his laptop, hardly looking up, and a screen on the wall showed what he was looking at. Matonis was in the room, and so was Matthews. Ramona had gone upstairs. Cellan-Jones was decent and professional, ready to get to the bottom of the story. He appeared to feel the tension, with Wright already behaving as if being asked questions was grossly humiliating and the

questioner openly hostile. But Cellan-Jones was not hostile: if anything, he was mildly pre-convinced, and just going about capturing the story for the layman.

'When I started out I asked myself what I'd need to see to know if someone who claimed to be Satoshi was Satoshi,' Matonis said. 'And you can break down three distinct lines of evidence: the cryptographic line, the social line and the technical line. Obviously, the social and technical lines are going to be more subjective … On the cryptographic side, I'll explain what I witnessed personally and give you a lead up to what Craig's going to demonstrate this morning.'

He then went into more detail about the cryptographic proof. 'The Genesis block is block zero,' Matonis said. 'And you can't spend any of the blocks in that chain – which means that the ones that come after that (which are spendable) can be attributed to the creator of bitcoin.'

'And what would they be called?' Cellan-Jones asked.

'In succession they'd be called block 1, block 2 etc. Now this morning, Craig is going to demonstrate signing blocks 1 through 9. I personally witnessed the signing of blocks 1 and 9, so this is not going to be a transfer of bitcoins, it's going to involve a signing of a message, which he'll do with the private key and which will be verified by the public key. Are we clear on that?'

Eventually, Wright asked Cellan-Jones to give him a message. 'Um. "Hi, historic message to the BBC."' Wright typed the message and added a bit of commentary as he did so.

'This message will verify, but if I change a single digit, it won't,' Wright said as he signed the message using block 9.

'This is the only key that we know is definitely owned by Satoshi because it was used with Hal Finney,' Matonis added.

'So,' Cellan-Jones said, 'just getting this clear in my mind. We've seen Craig use a private key known to have been used with Hal Finney. And we've seen it verified with the public key.'

'Yes,' Craig said. Then he proceeded to sign a message with the key associated with the first ever mined bitcoin.

'Out of interest,' Cellan-Jones said. 'How many bitcoins do you have?'

'Well, that would be telling,' Wright said.

'Do you still mine bitcoins?'

'Only for fun.'

Wright then went into an aria about Sartre's speech when he turned down the Nobel Prize. He planned to use a hash function – which turns information into a unique set of letters and numbers – to attach Sartre's famous speech cryptographically to block 9, and then later verify it publicly on his blog. 'He gave up the prize,' Wright said, 'because "If I were to accept it, I'd become the institution." I never wanted to sign Craig Wright as Satoshi,' he continued. 'I haven't done this because it's what I wanted, I just can't refuse it. Because I've got staff, I've got family. It's what I am and I'm not going to deny it because that's not the truth. So I'm choosing to sign Sartre because it's not my choice, I'm not choosing to come out, I've been thrust into it.'

'In what way have you been forced into it?' Cellan-Jones asked, quite reasonably.

'I've got people mudslinging,' Wright said. But that wasn't true: he wasn't feeling forced because of what people said. He felt forced, or obliged, to come out because he'd signed the deal with nCrypt in June 2015. And he deepened the lie when Cellan-Jones asked him why he hadn't revealed himself before. 'I liked to go to

conferences, put out papers,' he said. 'I can't do that now. I can never just be Craig again.'

He was asked whether he wanted to be the public face of bitcoin.

'I don't want to be the public face of anything.' He paused and looked down. He then said that his blog would explain everything and help people to download the material and understand how the keys work.

'When does that go live?' Cellan-Jones asked.

'Monday or Tuesday.'

'There will be people out there who will try desperately to prove this isn't the case. Are you confident that there are no chinks in your armour?'

'They'll say I stole keys, that I buried Satoshi in a ditch, they'll say all sorts of things.'

The BBC planned to come back the next day with cameras. Then a man arrived from the *Economist*, Ludwig Siegele, a man in a grey suit. He was less immediately friendly but his questions were fine-grained. You could see he wasn't entirely comfortable with this very PR-managed way of outing Satoshi. Wright signed a message for Siegele using block 9, and had the private key verified by the computer. 'I'm sorry,' Siegele said, 'but I'm still a little unsure what that proves.'

'It proves I have the private keys,' Wright said. 'All the original private keys.'

'OK, so. The first question that my readers are going to ask is: "Why now?"'

Wright didn't hesitate. He was using his media training. 'I've tried to avoid media,' he said, 'but it's starting to affect other people. I'd prefer to stay quiet. Why now? I have staff, I have family … All the innuendo, the falsehoods.' He had never suggested to me, in all our months of interviews, that he was outing himself because of media misrepresentation. I accepted it, though, when he said it to these journalists,

imagining that perhaps he had realised that the tax office pressure was the real pressure in his life, the thing that forced the outing. I said this later to the nCrypt guys and they agreed.

'Why conceal your identity anyway?' Siegele asked.

'I don't want to be a public figure,' Wright said. 'I hope people don't listen to Craig Wright. They will look at the facts, not decide based on what Satoshi says.'

That afternoon, I went to another appointment while Wright went off to Parsons Green to have his photograph taken for *GQ*. The next morning, at Starbucks again, Matthews was ridiculing the whole business with the photographs, and making fun of the magazine's original idea that he wear a mask in one photograph and rip it off in another. Matthews described what happened at the interview with the magazine's senior commissioning editor, Stuart McGurk. 'It actually went quite well,' Wright told me. 'The journalist was nice, but he brought along this complete wanker of an "expert".'

The man they were talking about is a university lecturer in cryptology. McGurk brought him along to help verify the claims. 'It was hilarious,' Matthews said. 'Craig threw the guy out.' According to one witness, he'd questioned Wright quite forcefully about his understanding of public and private encryption keys. 'He was totally in the guy's face at one point.'

'He was telling me he was more qualified than I am,' Wright said. 'It became a nice interview but this guy was a complete idiot and I told him to get the fuck out.' Matonis – who was there – said the scene was intense. I wasn't sure it was wise to greet dissenters and opponents, even ones who might be wrong, that way, but Wright was roundly applauded for doing so. I confess I felt it was wrong to tell journalists only half of the story, allowing them to misunderstand the reason he was suddenly coming out as Satoshi.

*

That day, the BBC came back. Wright was more irate than he had been the day before and less co-operative now that the camera crew was here. He felt he had done much more than he had ever wanted to and he said so, mainly under his breath. The cameraman set up the camera and then Cellan-Jones got into position. 'So who are you? And what are you about to show me?' he asked.

'My name's Craig Wright, and I'm about to demonstrate the signing of the message with a key that is associated with the first transaction ever done on bitcoin – a transaction of ten bitcoin to Hal Finney.'

'And who did that first transaction?'

'I did.'

'And whose name is associated with that transaction?'

'The moniker is Satoshi Nakamoto.'

'So you're going to show me that Satoshi Nakamoto is you?' Craig looked bewildered for a second and hesitated.

'Yes,' he said.

'Are you confident that this will prove to the world that you are Satoshi?'

'It proves I have keys … other things we'll be releasing will help … Some people will believe and some people won't, and, to tell you the truth, I don't really care.'

'But you can say, hand on heart, I am Satoshi Nakamoto?'

'I was the main part of it. Other people helped. At the end of the day, none of this would have happened without Dave Kleiman, without Hal Finney, and without those who took over – like Gavin and Mike.'

'And this is going to have a huge effect on your life?'

'Unfortunately, yes.'

Something changed in Wright in those few minutes. With these direct questions about Satoshi, his sense of himself – I don't know how else to put it – had come unstuck and he became noticeably uncomfortable. He said that he wanted to make the point that people should stop looking to him for answers.

'Make that point upstairs,' Cellan-Jones said.

'Upstairs?'

'We're going to film a straightforward interview upstairs, without the computer.'

Wright muttered something and stared into the depths of his computer as if he wanted to escape into it and never come out. 'I just want the basis to be on the computer,' he said.

The female producer interjected. 'Because we haven't actually done that bit on camera yet,' she said.

The PR executive came over, a little red in the face. 'Can we do that bit upstairs?' he asked. 'Are we all right to do the "why now?" question upstairs? And we'll be done?'

'You know, I don't actually watch TV,' Wright said.

The BBC left the room to scout out the location for the proper 'sit-down' interview. Wright complained to me that he was being pushed. 'I just didn't want a big facial

shot of me,' he said to the PR man. 'I preferred to be behind the screen a little bit …
I'm not against it, as long as I can hide behind the screen.' The PR man said he
didn't have to do anything he didn't want.

'I'm just doing the one question,' Wright said. The PR man left the room leaving me
alone with him.

'Does it feel completely against the grain of your nature to be asked, "Are you
Satoshi?" like that?'

'Yes.'

'Is it a crude question to you?'

'Why does it matter, other than that you need someone to attack, someone to deify.
I mean, fuck's sake. I'll do this. That's it. Fuck off. I can dance around saying
"please believe me." But it's more than absurd, it's melting clocks on a landscape.'
At that point, the door opened and the PR consultant came in.

'Craig,' he said, 'we've explained to the BBC that you want to stay down here, and
they're all making the point that this is the last thing you'll ever do …'

Craig started shaking and pushed his chair back. 'No! No! No!' His face was pale.
'You see this door,' he said. 'I don't want to hear another word. It's here, it's my
way.' Then he walked out and slammed the door, leaving me alone in the room with
the PR boss.

'We're only doing our job,' the boss said, with a shrug. Wright came back a second
later and his microphone pack was trailing behind him.

'It's my way or I don't come back. OK? I'm not doing this for fucking PR stuff, I'm not
doing this for anyone else. I don't give a fucking shit about what people say, I'd
rather not do it. One word about it and I'll never come back. Not exaggeration. I will

never enter this office again. I'll never answer an email again, and I'll never talk to another PR person in my life again … Got it?'

'Yeah,' the boss said.

'Thank you.'

He went out and I was alone with Wright again. 'They've already pushed me,' he said. 'I'm already beyond where I want to be: I'm already doing a TV thing. And everything is always: "Let's take it a little bit further, a little bit further." Which bit of "Go away" don't they get?'

I asked him if Kleiman would have handled it better. 'Better than I do,' he said. 'He would still have told them to fuck off. But in a nicer way. Hal would have done it far better.'

'What do you think they're talking about up there?' I asked.

'The fact that I don't want to jump through their fucking bloody crap. "This man has a big credibility gap he's got to overcome, I'm open to being convinced he's Satoshi but …"'

The BBC came back downstairs to ask their 'one question' and, naturally, Cellan-Jones asked more than one. In the panicked and hostile mood Wright was in, he needed scapegoats, and the PR weren't meat enough and Matthews was too much the boss. So he scapegoated the BBC, saying, as soon as they left the room, that they had broken their 'contract' with him, that they were liars. 'I'll never do any television interviews again in my life,' he said. 'Never.' And as he said it, I was imagining him with Fox News or the rottweiler interviewers. 'The whole thing was just an attempt to expose me as being something I'm not,' he said.

'That was actually a pretty softball interview, Craig,' I said. 'You can't blame them for turning up and asking for proof.'

'Are you talking about proof or evidence? You're conflating the two. They're not the same and that's one of the things I'm saying. I gave them proof. They want more.'

Wright was happy to lecture you day and night about algorithms, but he wouldn't name names, and he struggled to provide real-world evidence of Satoshi's footprints. The more I thought about it, the more I realised something was wrong, for him, with the footprints analogy, because if Satoshi was only one man he would only have one set of prints. The Satoshi who existed online could be any number of people. But there was something revealing about his treatment of the BBC – something not very nice in his attitude to people who make it their business to ask straight questions – and the handling of the proof sessions made it clear how much of a danger he was to his own credibility. A month later, when I asked Cellan-Jones if the PR company had ever explained to him that there was a commercial company behind the outing of Satoshi, he said he had never been given that information, 'just that they were representing the man who was Satoshi'.

**Life Rights**

At 7.51 A.M. on 2 May 2016 all was quiet on the Twitter front. Well, not quiet, but the names Satoshi Nakamoto and Craig Wright were nowhere to be seen. This was the day of reckoning, the day the embargo would lift and the media outlets could run their pieces and name Satoshi. At 7.55, *Game of Thrones* was trending and so was Gerry Adams, for allegedly using the word 'nigger'. Also trending was a wildfire in Fort McMurray and a bombing in West Bengal. There's a strange feeling of supreme calm before a storm breaks. At 8 a.m., Wright posted a blog containing the supposed hash of the Sartre speech and various postings about himself as Satoshi. At the same moment, Gavin Andresen posted a message to his blog. Title: 'Satoshi'. 'I believe Craig Steven Wright is the person who invented bitcoin,' it began.

I was flown to London to meet Dr Wright a couple of weeks ago, after an initial email conversation convinced me that there was a very good chance he was the same person

I'd communicated with in 2010 and early 2011. After spending time with him I am convinced beyond a reasonable doubt: Craig Wright is Satoshi.

Part of that time was spent on a careful cryptographic verification of messages signed with keys that only Satoshi should possess. But even before I witnessed the keys signed and then verified on a clean computer that could not have been tampered with, I was reasonably certain I was sitting next to the father of bitcoin.

During our meeting, I saw the brilliant, opinionated, focused, generous – and privacy-seeking – person that matches the Satoshi I worked with six years ago. And he cleared up a lot of mysteries, including why he disappeared when he did and what he's been busy with since 2011. But I'm going to respect Dr Wright's privacy, and let him decide how much of that story he shares with the world.

We love to create heroes – but also seem to love hating them if they don't live up to some unattainable ideal. It would be better if Satoshi Nakamoto was the codename for an NSA project, or an artificial intelligence sent from the future to advance our primitive money. He is not, he is an imperfect human being just like the rest of us. I hope he manages to mostly ignore the storm that his announcement will create, and keep doing what he loves – learning and research and innovating.

I am very happy to be able to say I shook his hand and thanked him for giving bitcoin to the world.

Also at 8 a.m., with the embargo lifted, the first tweet appeared, from Rory Cellan-Jones: 'Craig Wright tells BBC I am bitcoin inventor Satoshi Nakamoto, publishes evidence backing his claim.' One minute later, a tweet appeared from @CalvinAyre, naming Craig Wright as the proven Satoshi. The *Economist* went one minute later, with a link to Ludwig Seigele's open-minded piece asking for more and better evidence. At 8.09 a.m. Radio 4's *Today* programme broadcast Cellan-Jones's report. 'I'm about to demonstrate the signing of a message with a key that is associated with the first transaction ever done on bitcoin.' The report was brief and quoted Wright once. It said Wright hoped to disappear and that that would be

difficult. They played the part of the interview where Wright said he was part of the group behind Satoshi.

'He sounds plausible,' Justin Webb, the presenter, said, laughing. Then they played part of the interview with Matonis, who said he was '100 per cent convinced'.

'Why should people be excited by this?'

'I put it on the level of the Gutenberg printing press,' Matonis said.

'Quite a lot of people are saying that this is as important as the internet,' Cellan-Jones reported, 'and that this man – if he is the man – should be celebrated like Tim Berners-Lee.'

'Craig Wright has just outed himself as the leader of the Satoshi Nakamoto team,' the bitcoin insider Ian Grigg wrote on his blog:

> Sometime in summer of 2015 the secret started to spread, and the writing was on the wall. An extortionist and a hacker started attacking, perhaps together, perhaps apart; to add to the woes, Dr Wright and his companies were engaged in a long harsh bitter battle with the Australian Tax Office. Since then, the team has been more or less in hiding, guarded, at great expense and at some fear ... Satoshi Nakamoto dies with this moment. Satoshi was more than a name, it was a concept, a secret, a team, a vision. Now Satoshi lives on in a new form – changed. Much of the secret is gone, but the vision is still there. Satoshi Nakamoto is dead, long live Satoshi. Yet, a warning to all. Satoshi was a vision, but Craig is a man. The two are not equal, not equivalent, not even close ... It is true that Craig is the larger part of the genius behind the team, but he could not have done it alone.

Over the following two hours the words 'Craig Wright' were typed into search engines tens of thousands of times, and the Reddit forums and the cryptocurrency community got to work. Meanwhile, I was being copied into the emails sent from the PR company to nCrypt and the Wrights. It issued a press release spreading the news to less favoured outlets. 'Wright's decision to go public follows a series of

misleading statements that are circulating and which he seeks to set straight,' the release said. 'Wright has also launched a blog, with a vision to create a forum about bitcoin, which dispels myths and helps to unleash its full potential. He will create a space to provide developers and producers with the real facts about the technology so as to encourage the widespread use of bitcoin and the blockchain.'

'Great start!' the top PR man wrote to the group at 9.31 a.m.

'Ta. All going well,' Wright wrote just before ten.

'All going to plan,' the second PR man echoed a few minutes later.

'Right on course so far,' the first PR man wrote at 10.13 a.m. And that was the last of the good news to come from the world of public relations.

By midday the blog was receiving the wrong sort of attention. A number of researchers had studied what Wright had written and noticed that the explanation was fudged – worse than fudged, it was faked. Something that he said was signed with the Satoshi key had, in fact, been cut and pasted from an old, publicly available signature associated with Nakamoto. It was astonishing and the buzz quickly grew fierce. All those hours in secret flats scrolled through my head. There had always been something missing, something he hadn't wanted to show. But was that because he wouldn't, or because he couldn't? The thought that he would fake proof so publicly and so coarsely was hard to comprehend. He sent me an email. 'They changed my blog post,' he wrote. 'It will be back as I wanted. But first I need to negotiate with Stefan.' And I replied: 'How did they change it?'

I thought he was lying. He had lied before, but to lie so transparently and so publicly made me think he had lost his mind. There was no way to square such actions with his wish to have no publicity. He had faked his own proof, and now he was being ripped apart on the internet. I briefly wondered if he might be enjoying the cries of execration, but how could he do that to Andresen and Matonis? Suddenly his opponents seemed wiser and greater in number. It took me a few days to see that

Wright's action might be consistent with something deeper in his character. He never wanted to come out and when it came to it he flunked his own paternity test. But I had a feeling that that he was too close to the invention to be a simple hoaxer.

'I will explain why I think he's probably not Satoshi,' said Vitalik Buterin, a big wheel in the cryptocurrency scene, speaking at Consensus, a bitcoin conference in New York that day. A friend of mine was there. He said that men had started the day high-fiving and shouting 'Satoshi, baby', but that as the long day closed, his name became the punchline of every joke. Core developers and others were calling for him to sign something new and in public right away, using the Genesis block, which is unquestionably Nakamoto's. One of them, Peter Todd, was quoted by *Forbes*: 'All Wright needs to do, says Todd, is to provide a signature on the message "Craig Wright is Satoshi Nakamoto" signed by a key known to be Satoshi's. "This is *really* easy to do … if you're actually Satoshi. Also, you'll know sufficient proof has been provided when it actually happens, because cryptographers will be convinced."'

That was the strangest element of all: Wright must have known, having been a cryptographer all his adult life, that his fraud would be spotted immediately. But when I asked him about it he said it wasn't a fraud, it was a mistake. 'I cut and pasted something just for the time being but knew I would change it later,' he said. 'But then it went up.' That rang hollow to me, the words of a falling man. He intentionally faked it. I believed at that point that he had misled his colleagues and tried to get out of being Satoshi, which isn't necessarily the same thing as not being him. 'I can't think of a more convoluted way to go about claiming one is Satoshi than what Craig Wright has done so far,' Jerry Brito, the executive director of Coin Center, told the *Daily Beast*. 'He's provided no cryptographic evidence verifiable by the public, and many of his answers sound plain fishy.' Emin Gün Sirer, a Cornell professor who had criticised Wright before, referred to Wright's 'meta-modernist play'.

The next day, I turned up at MacGregor's office and found him sitting with Matthews in a dark meeting room. They were hunched over the desk, exhausted and

shellshocked. When I asked them what happened MacGregor shook his head. It was the first time in six months I'd heard him sounding incoherent. 'Craig happened,' he said. 'He got cute with the math. He has been trying to get consent from the trustees to get the private keys … But he wasn't allowed access to coin or to do anything other than that. So what he was trying to do was re-sign a message …' Matthews butted in, saying Wright never had authorisation from the trust to use the key publicly or let anyone take it away.

'Why didn't he just say that?' I asked.

'You tell me,' Matthews said. MacGregor went on to explain how a signed message can be used nefariously by people with enough computing power. He said the trustees didn't want anyone analysing those blocks. I'm not sure if he was grasping at straws, but what he said didn't explain the suddenness or the fraudulence of what Wright had done. MacGregor said that he and Matthews had since been with Wright and indicated that the encounter had been shouty and ugly. But he said it was OK now. 'We have verbal consent from the trustees to move coin, and we're just waiting on the written consent.'

MacGregor and Matthews had been in the meeting room for hours trying to work everything out. They thought it could all still be kept on track. MacGregor was writing new blog posts for Wright. He asked for my help with one of them and I explained that I had now to distance myself from the whole thing. I had got too close. MacGregor said they were going to 'flood the blog with evidence' and get Wright to 'move' some of the Satoshi bitcoin, to transfer it to someone else in a way that only someone in possession of Satoshi's private keys could do. Andresen had agreed to be on the end of the coin transaction.

'Craig is being mauled out there,' I said.

Rob removed his glasses. 'The first meeting we had with him yesterday ended with: "You're fired. Buy a ticket to Sydney. You fucked us. Good luck with the ATO."'

'He didn't sleep last night,' Matthews said. 'He looks fucking terrible.'

'He risks destroying his entire reputation.'

'His and ours,' MacGregor said. 'I've been taking meetings with investment bankers for the last two months. I've pulled every string I know to get meetings with Google and Uber. If he goes down in flames, I'll go down with him. I mean, he's fucked me. Millions of dollars out of my pocket, nine months out of my life. But what we have now is a very pliant Craig Wright. We're going to drag this back from the brink.'

'It's a big task, Rob,' I said.

'We finally beat him to a pulp today. No more decisions. This is what we're going to do, because he knew the next move was pack your toothbrush and get on a plane and good luck in Australia.' MacGregor told me he'd started Monday morning on an unbelievable high. 'I can't believe we kept all the puppies in the box this whole time,' he'd thought to himself. 'Nobody broke embargo, holy shit this is going to work. And then ... '

We spoke about Wright's possible lies. I said that all through these proof sessions, he'd acted this like this was the last thing he ever wanted.

'That's not true,' MacGregor said. 'He freaking loves it. Why was I so certain he'd do that BBC interview the next day? It's adoration. He wants this more than we want this, but he wants to come out of this looking like he got dragged into it.' He told me if everything had gone to plan, the groundwork was laid for selling the patents. It was a really big deal. He said Ramona had said that if Wright doesn't come out you still have this really smart guy who has made all these patents, who knows all about bitcoin. 'Yeah,' MacGregor said. 'You and five hundred other guys who have called today.' I shook their hands and wished them luck, thinking I would probably never see the men in black again. And as I descended in the lift, I thought I would miss their brio and their belief, despite everything.

Craig was lost in some labyrinth of his own making, or mostly of his own making. He didn't want to be Satoshi. And he didn't want to be Craig. And he didn't want to be a letdown. And yet the message boards lit up and the walls closed in. Over the next 24 hours, he agreed to move Satoshi's coin and his blog advertised the fact. It said, 'Extraordinary claims require extraordinary proof,' and he was set to provide it.

The next day, Wednesday, 4 May, Matthews was at Wright's house organising the movement of coin. The new (and final) proof session was intended to blow away the doubts created by the first. Many commentators felt it was too late, that Wright was beyond the pale, but Matthews and MacGregor had agreed with Andresen that the movement of coin, to Andresen and also to Cellan-Jones at the BBC, would undo the damage. Wright spoke to Andresen on the phone from his house – Andresen was in New York – and told him he was worried about a security flaw in the early blockchain, a problem in the way those first blocks were constructed that would make it dangerous for him to move coin, exposing him to exploitation or theft. My sources say that Andresen understood the problem and confirmed that it was all right, it had been fixed. But Wright continued to worry and was showing great reluctance about offering the final proof. Then he left the room abruptly and didn't come back.

The next day, he sent me an email. It linked to an article headlined 'UK Law Enforcement Sources Hint at Impending Craig Wright Arrest'. The article suggested that the father of bitcoin might be liable, under the Terrorism Act, for the actions of people who used bitcoin to buy weapons. Under the link, Wright had written an explanation: 'I walk from 1 billion or I go to jail. I never wanted to be out, but if I prove it, they destroy me and my family. I am the source of terrorist funds as bitcoin creator or I am a fraud to the world. At least a fraud is able to see his family. There is nothing I can do.'

He was devastated. He was the runner who failed twenty yards short of the finishing tape, the man who froze at the moment of truth, and started walking backwards. He said he feared prosecution on the one hand and humiliation on the other. The

borstal boy in Alan Sillitoe's 'The Loneliness of the Long Distance Runner' comes from a family who make much of running, 'especially running away from the police'. He hates being understood, feels authority is only there to grind you down, and holds on to his essential privacy, knowing 'they can't make an X-ray of our guts to find out what we're telling ourselves.' The boy lives on his own terms, which means not faking it for power, even when the pressure is high and the rewards are obvious. So he refuses to win. Representing the borstal in a championship race he is well ahead of the other runners, but he stops, and lets them pass, and at the end jogs up to the tape: 'I got to the rope,' Sillitoe writes, 'and collapsed, with a murderous-sounding roar going up through my ears while I was still on the wrong side of it.' In another email that day Wright wrote: 'Andrew, I don't know what I can say. If I was to do the proof and save myself, I damn myself.' That afternoon, he closed down the blog – the one that was intended to lead cryptocurrency fans into a new era – but left a final posting:

I'm sorry. I believed that I could do this. I believed that I could put the years of anonymity and hiding behind me. But, as the events of this week unfolded and I prepared to publish the proof of access to the earliest keys, I broke. I do not have the courage. I cannot. When the rumours began, my qualifications and character were attacked. When those allegations were proven false, new allegations have already begun. I know now that I am not strong enough for this. I know that this weakness will cause great damage to those that have supported me, and particularly to Jon Matonis and Gavin Andresen. I can only hope that their honour and credibility is not irreparably tainted by my actions. They were not deceived, but I know that the world will never believe that now. I can only say I'm sorry.

And goodbye.

*

The next morning I drove through the traffic to a London suburb. It was early in the day and the high streets were empty, the happy boutiques, the delis and the wicker-and-candle dens where people come to improve their mood or do something

about their lifestyle. Craig and Ramona were sitting in the corner of a popular café. They were holding hands and staring at the table. He was wearing his Billabong T-shirt – I remembered it from his description of the clothes he'd bought in Auckland when he began his long-distance run last December. He looked as he'd looked the first night I met him in Mayfair: unshaven, unslept, the scar on his face more livid, his pupils like pinpricks and his breathing heavy. He wasn't just white, he was empty-looking, and his hands were trembling. Ramona was crying. The light of the café seemed too much for the darkness enclosing them. I went to shake his hand but we hugged instead, and it was like embracing a drowning man. He hadn't really slept since Monday and this was Friday. He wasn't drinking his latte, he made clouds on the spoon, and stared.

'Well, it was worth about a billion dollars to them,' he said. Ramona talked about jail and I asked if they were afraid of being prosecuted.

'They say it'll never happen,' she said. 'Of course it will … So how can he? How can he?' He spoke of men he knew who had sold bitcoin and had been prosecuted for money-laundering and said they might try to do that to him. 'It was always a present danger,' Ramona said. MacGregor, Wright alleged, had always had a plan to move him if necessary to Manila or Antigua if it looked like he might be arrested.

'It's always been incremental,' Craig said. 'One step, one step, and nobody realises that eventually that takes you over a precipice.'

'That's the thing,' Ramona said. 'Your happiness doesn't count at all. But now we're stuck. You come out – you go to jail. You don't come out – you're a fraud. It's got to the point where it's almost better if he's a fraud.'

'So what happened on Monday,' I asked, 'when it came to writing that blog?'

'I gave them the wrong thing,' he said. 'Then they changed it. Then I didn't correct it because I was so angry. Which was stupid. I put up the wrong one. No one wants

SN. I will never be SN. I'm not personable. You can lock me in a room and I'll write papers, I'll never be personable.'

Ramona was crying. 'They could take us down,' she said. 'They could really take you down if they want to.'

They spoke about moneymaking ventures Wright was involved in a long time ago. Wright alleged Matthews knew about these activities, which was true, because Matthews had mentioned them to me.

'I just couldn't do things anymore,' he said. 'That's all.'

They wanted to talk about the trust, but they didn't really explain it. He said it was to hide the bitcoin. 'It's not meant to be spent,' he said. 'Too many problems.'

'It's also a guarantee that you can't flood the market,' Ramona said. 'That we can't use it to pay the bills, no matter how desperate things get.' When I asked who the trustees were they went quiet.

Ramona began to worry about my story. She tried to strong-arm me. She began to tell me what I should say and what I shouldn't say and how I should hide from MacGregor and Matthews the comments she and Wright had made about them. 'I want to write the truth,' I said.

She said I knew too much. She said that Craig would go to jail or harm himself if I told everything I knew. I was stunned. There were many things that were said to me by every party in this story that I would choose not to print. Not only things they said about one another, but business arrangements and unsubstantiated allegations about the past, and things I knew in the present. But I had been recording this as a documentary from the start, as I'd said I would when we met at Claridge's in December. Now I was being told that my material was too hot and my story posed a threat.

Craig suddenly got very upset. His face crumpled and he put his head in his hands. 'And the Brits have their equivalent of Guantánamo Bay as well,' he said. 'I'll never write, I'll never see anyone. I'll be in a little room. I won't even have a pen and paper. I won't see my wife again. I'll never see …' He sobbed and was inconsolable. 'I'll never write again.'

'They won't do that,' Ramona said. I suggested they might get a lawyer to advise them on the possible threats they faced. Ramona said it was too expensive. She said the bills would run into the millions. Craig talked about Ian Grigg and others who'd 'outed' him last year by nominating him for various awards. Satoshi was nominated for a Nobel Prize and a Turing Prize. Wright told me that people in the bitcoin community wanted him to come out and receive recognition. He said it had never been in his interest to come out, but in other people's interest. 'I don't care if people like my work,' he said. 'I just have to *do* my work. That's the only thing that'll keep me sane.'

'I would like that his reputation gets redeemed but I don't know if that's possible,' Ramona told me. 'This is what I propose, if you can do it, you do it, if you can't, it's up to you. If [you say] he didn't choose to come out … then the company gets put in the spotlight. If you say you know he is Satoshi then we're in trouble. If you say you have your doubts then he looks like a fool.'

I'm sure I looked at her disbelievingly. 'You're basically saying that every version of the truth of this story is untellable.'

'But if you say it, Andrew …'

'If you were sure that this could never be said in the end, then you should never have allowed it to happen.'

'It was one step, then one step …' Craig said, again.

'And you let a writer into your life?' I said.

'Do you know how much this meant to me?' Craig said. 'The company. The people. To be doing that. To get all these papers out. To be in that position. It's my idea of heaven, but the cost is hell.'

'If we didn't co-operate with you,' Ramona said, 'they'd stop …'

I reminded them that every time I'd tried to walk away from this story – like when they tried to make me sign an NDA – she'd begged me to come back. I told them that full disclosure was much less damaging than any other option. Naturally enough, that was my view.

'No one wants to believe me,' Craig said.

'And I think that's great,' Ramona said. 'It's great that no one wants to believe you.'

Craig said he'd **filed all these patents** and they were all from him, 'not just Dave'.

'What do you mean,' I asked. '"Not just Dave?"'

'I mean I wrote those patents,' he said. 'It means I knew all this shit.'

'Have you been able to talk to Matonis or Andresen?' I asked.

'No,' Ramona said. 'I don't know if they'll even talk to us.'

'I think you should have some crisis management advice.'

'From who?'

'From a therapist.'

'We don't have time for that,' she said.

I walked home with them and he slumped on a sofa, looking wan, gone. 'His mental health is fucked,' she said to me when he was out of the room. 'If he goes to jail, he'll kill himself. I can't leave him alone.'

When he returned he seemed almost paler than before. 'This is all because I wrote code,' Craig said. 'Not because I blew up something, because I wrote code.'

'Just out of interest,' I said. 'If you are a fraud … How hard a fraud would it have been to perpetrate?'

'It would be the best one in human history,' Craig said. 'It'd be Ronnie Biggs on steroids times a million. I invented a new form of money. Who has ever had anything to do with money that wasn't to do with government? Who has ever really succeeded?'

'You mean it's a thankless task?'

'It's always Prometheus,' he said.

*

This was a story in which everybody wanted their story told, then untold, then hidden, back in the vaults. It seemed like a very new story, but, in fact, it was a very old one, a story of metamorphosis, and of Prometheus unbound. Craig Wright proved cryptographically that he had Satoshi's keys, his emails seemed to show his involvement, his science extrapolated on the technology of the blockchain, and he spent a full year engaged in a business plan to reveal it all. But, when it came to it, he behaved like a fraud, he shape-shifted and he dissolved.

I began to wonder whether Craig Wright might be a man who had never known who he was, a missing person, constantly in discussion with some inner lost boy, unable to bear the conditions which forced him to say definitively who he was. Some people, it could be said, *really* aren't anyone, in the sense that the complications of

being themselves have wiped them out. The internet eats its own ciphers, and Wright is one of them. He might have sabotaged his own proof or simply flunked the paternity test because he isn't the right man, but his own doubts about himself are the real drama. He was sick, he was brilliant, he was manipulative – but much of what he said was true. And as I drove away that morning, it was the sickness that seemed predominant. Wright was a clever man who had gone to the very end of himself to prove who he wasn't. 'We are all Satoshi now,' became a tagline for bitcoin's early fans. And in the end we all are Satoshi, and we'll begin to accept it as paper currency starts to look stale, and our minds merge with our computers. There are new networks up ahead that will have grown from the seed Satoshi planted, and it was odd, after all my travels, to believe that the only man who wanted to opt out of being Satoshi was Craig Wright. A week after his 'proof sessions' with the BBC and others, he was in complete disgrace, his corner office at nCrypt had been emptied and his leather sofas had disappeared, removed from the building with the signed Muhammad Ali picture and the rest of his stuff. Without ceremony, the best room in the office became a conference room and his name was spoken in whispers.

My last meeting with MacGregor and Matthews was a time of conjecture and anger, devastation and apology. They felt Wright had perjured himself, and for no good reason. He had never admitted to problems with the trust, problems that would, though he hadn't admitted it, make the Satoshi reveal very difficult for him. They still believe, as do Andresen and Matonis, that he is Satoshi. To them, there is just too much evidence to accept Wright's late attempt to cloak himself in deniability. But no matter. He was now fired, they said, and the deal with Google was off. 'He put a gun to our head and pulled the trigger,' MacGregor told me. 'The world is still going to think we got fooled, but I know the facts. He has the keys.' There was a moment in our meeting when I realised this had gone all the way to the bone with MacGregor. He said he never wanted to see Wright again. 'This was supposed to be so noble,' he said, 'and it became so dark.' Matthews told me that Wright's office, his house, his job, his work visa, everything, was set to go. They had spent as much as $15 million and maybe lost a billion. MacGregor said the PR company would never deal

with him again, and there were investment bankers who weren't picking up his calls. A way would be found, however, to continue developing the blockchain technology. The company would go on. MacGregor shook his head. The whole thing was unfathomable. It was baffling. For no obvious reason Wright had found a way to disappear back into the shadows.

### Coda

He seemed to miss me. Craig wanted to meet. It was a few weeks after the abortive 'reveal' and I saw when I got to Patisserie Valerie that he was happy again and ready to take on the world. 'It was unfair of me to request you not to publish certain things about our situation,' Ramona had written to me in an email. 'As you said, you have a debt to the truth, and that is as it should be.' And yet, as we all know, the truth has more faces than the town clock.

Wright told me in Patisserie Valerie that he felt free again. He had lost a third share in a billion dollars but he felt unburdened. He was sorry to have let good people down but now he could work in peace. Sherlock Holmes's central precept came into my mind. 'When you have eliminated the impossible, whatever remains, however improbable, must be the truth.'

'Do you want to know what I think?' I said to him after he told me again that all would be well from now on.

'Yes.'

'What if you were 30 per cent Satoshi. You were there at its formation and you were part of a brilliant group. You coded and you synthesised other people's work and you shared in the encryption keys. Then, some time in the last year, you upgraded yourself to 80 or 90 per cent. You were already a lot more Satoshi than anybody else has been hitherto, but the deal, in your eyes, required you to be more and in the end you couldn't carry that off.'

'No,' he said. And he flew off on a tangent about elliptical curves and the nature of the blockchain and how he never wanted to be a deity. I turned off my recording head at that point and stared through him.

Outside the café, he shook my hand. I knew I would never see him again. For six months we had allowed each other to think we were friends – subjects need storytellers, and storytellers need subjects. There had been a time when he'd imagined that I could free him from his fictions and build him a new story in reality. I was a willing stenographer, thinking Wright was something perhaps bigger than Satoshi. He was the internet's habit of self-dramatisation and self-concealment all at once; its new sort of persona. What he actually did may never be known. Either he's one of the greatest computer scientists of his generation, or he's a reckless opportunist, or he's both. We can't be sure. But there he was, standing in Old Compton Street in the pouring rain, saying sorry.



# EXHIBIT 7

---------- Forwarded message ----------
From: **Craig S Wright** <craig.wright@hotwirepe.com>
Date: Fri, Apr 25, 2014 at 11:22 PM
Subject: Chronology of Craig Wright.docx
To: Ira K

And more reading

## Chronology of Craig Wright (CSW) activities & transactions

**2009**   Craig Wright mines some bitcoins and attempts to incorporate IP into Integyrs

**2010**   ATO Rejects IP transaction and CSW retains IP

**2011**   CSW sends Bitcoin overseas. Value at that stage AUD $0.02   Founds a company in USA with David Kleiman, a business associate from forensic & security related IT areas.  Kleiman & Wright co-authored books on the subject and had fairly longstanding relationship.  The established was W&K Info Defense.  It was set up to further statistical and risk mitigating algorithms, to develop some ideas around CBT learning methodologies (CSW was by then lecturing regularly for Charles Sturt University and others) and to mine Bitcoin.  This was done on behalf of entities in Belize (related to Kleiman) and entities in Singapore and the Seychelles (related to Wright).   There is an agreement between CSW and W&K whereby CSW loans his Bitcoin and expertise to the company with payback and payment to be received in Bitcoin. In all, 1.1 million Bitcoin reverted to Sq and Seychelles accounts.  It is unkown how much reverted to Belize and Kleiman.

**2012**   CSW forms 2 UK trust companies  (non trading)  and owned through Seychelles.
       Permanent Success   &   Design by Human
Plans from W&K develop to the point where there is imminent product in the eLearning space.  Discussions progress.  At the same time CSW is contemplating Bitcoin and its regulation.

**2013**   Structural discussions progress to a plan and an agreement between W&K and CSW.  See share sale agreement. See also Strasan Agreement.   This is done by early April 2013.  David Kleiman dies shortly thereafter reportedly from infections related to injuries incurred in US military. He was wheelchair bound and had related circulatory issues.  Per terms of the Agreement, CSW forms Hotwire Pre-emptive Intelligence Pty Ltd in Australia and continues the planned program. ( June 2013) Acquires IP and software from Strasan and registers for R&D with AusIndustry. All prior to June 30.  AusIndustry accepts his application and both AI and ATO do an audit.  Hotwire passes AI audit but ATO audit drags on.

During the early 2013 period, CSW is pursuing Exchange and banking ideas with Bitcoin.  At the same time he is a lecturer and a speaker at functions on topics around IT security and SCADA.  At one of these in March 2013, he meets a fellow introduced as Mark Ferrier.  They chat about mining and security and CSW says he's is actively pursuing the Bitcoin banking possibility but is stumbling due to the need for core banking software. Nothing more said. Within days, weeks he starts receiving emails from Ferrier (MJF) who intimates he may have someone who can help with the banking stuff.  There are a series of emails that follow this and a further meeting at some point and it all culminates on the 2nd of June 2013, when CSW agrees to buy a variety of things through MJF's company as agent.  These include:

- Core banking software and source code from al Baraka
- Seimens automation software
- Exchange software - micropayments
- Some gold ore
- And even MJF's father providing some consulting. Ian Ferrier – noted accountant

There are invoices for all of this.  CSW did due diligence on MJF through ASIC D&B  Whois etc and both the individual and his company came up clean. The notion of Ian Ferrier lent some credibility.  Missed social media however, which would probably have given him a better idea as to who he was dealing with.  Payment was from one of the UK entities and a directed payment supported by a Loan agreement to CSW.  He has since traced destination as somewhere in Africa.

The software and source code have all been delivered.  It has been determined that MJF is unable to deliver the gold ore and his father denies any knowledge of any agreement and purports to be estranged from his son.  On that basis CSW took action in the Supreme court of NSW for recovery of his Bitcoin or value for the Ore Purchase and consulting fees.  Judgment has been given.

Emails, contracts and any correspondence has been provided both in court and to the ATO in support of the facts.  CSW has offered to assist the ATO in pursuit of MJF should they choose to do so.  We are prepared and have briefed counsel on a Federal court action for misleading and deceptive behavior as well as the judgment debt.

Return to early July 2013, CSW communicates with ATO and briefs them on his intention to do the MJF transaction including the offshore payment in Bitcoin.  He states at that time his relative holding or control of considerable quantities of Bitcoin and a hope/intention of developing a regulated Bitcoin bank in Australia. He has actively pursued Private Rulings with ATO on many of his transactions and processes;  forms a nucleus of companies for Research and Development of the eLearning opportunity and also eBanking.

Since that time, CSW has populated Hotwire with some top people to pursue both R&D projects.  He has paid for all this through cashing in Bitcoin when and where possible and after a long struggle with the ATO receiving 1.45Million in R&D rebate from the 2013 tax return for Hotwire.  He has spent about 450,000 BTC over that period, much of it at values less than $120.00 so there is no questioning his commitment to trying to do something positive in Australia.

He has also been under audit for most of 2014 financial year by one entity or another.  And that leads us to today.  What the hell is he up to?

There is a lot of IP and 'stuff' in the mix.  All up, it's around a hundred million dollars' worth.  This IP originates in work CSW has been doing for more than 10years; it originates in things that came from W&K; it has to do with the software acquired.   The values and distribution have all

been given to the ATO. It amounts to a third each for Cloudcroft Hotwire and Coin exch. Cloudcroft gets the security related IP, Coin-Exch gets the banking and exchange and Hotwire gets all of the automation and R&D based stuff. The transactions were all intended to go into the Trust to be distributed. That may or may have been the way it transacted. That is the cleanest solution.

Why not just run the purchase through the entities? Because each transaction had a mix of acquisitions that needed to parsed to different entities. MJF had banking, automation, exchange and Ore; W&K also had variety as did the other. The neatest solution was to bring them into one pot and then distribute accordingly. And that is the mess we are in.



# EXHIBIT 10

## INTELLECTUAL PROPERTY LICENCE
## FUNDING AGREEMENT

**PARTIES**

**Craig Wright R&D**
**ABN 97 481 146 384**
(Financer)

**AND**

**W&K Info Defense LLC**
(Provider)

Ref: CEWK01

Case 9:18-cv-80176-BB Document 511-21 Entered on FLSD Docket 05/18/2020 Page 109 of
311
Case 9:18-cv-80176-BB Document 83-10 Entered on FLSD Docket 01/14/2019 Page 3 of 15

**THIS DEED** dated 22nd day of April 2011

**BETWEEN**

    Craig Wright of Craig Wright R&D

                                         (Financer)

And

    Dave Kleiman for W & K Info Defense LLC

                                         (Provider)

## RECITALS

A.   The Financer controls the following Bitcoin (BTC) addresses:

      (a)    12hRmmSda9qSSEH656zBaKEbeisH6ZhdTm.

      (b)    12C9c9VQLMrLi4Ffzq2wDvwrKnUPaAaNFp.

B.   The Provider desires the intellectual property for the permitted use and to extend this for other purposes desirable to both parties.

C.   The Provider will use the funding for the development of several software products.

D.   The provider will return the loaned finances (in Bitcoin) on or before 01 July 2013 and 30 Dec 2013.

E.   The Provider will remain completely confidential on all matters in this deed (including even that family members do not have knowledge of the transaction).

F.   The financer will send the following amounts (in Bitcoin) to to following address by 30 April 2011:

      (a)    165,140 BTC

      (b)    1MSUvGS9BEjpL35CKu7feF4HaPCXv2cht7

G.   The financer will send the following amounts (in Bitcoin) to toe following address by 30 August 2011:

      (a)    50,000 BTC

      (b)    1JjtxXmbC95sgn5kE2Hm92axA7hcbDkRhK

H.   The Financer and the Provider wish to record the licence, which has been granted to the Provider to use the intellectual property in accordance with this deed.

I.   The Financer is the absolute owner of the entire unencumbered copyright in the works described in the schedule when complete.

J.   The Financer has agreed to license the works to the Provider and the Provider has agreed to accept such licence on the following terms and conditions.

K.   The provider will fund the software development using Bitcoin.

2

**L.** The Financer will provide 1,024 core Xeon and GPU based hardware solution.

    (a)    It is acknowledged that two SGI ICE XE310 – 512 core hosts have been provided and are in a data centre specified by the provider

    (b)    The provider will use these systems to mine Bitcoin

    (c)    The provider expects to earn 12,000 BTC per month using these systems for the period to 30 June 2013

    (d)    The systems will be hosted in the US at a facility managed by the provider.

**M.** The provider will pay for the use of the systems and the loan as follows:

    (a)    250,000 BTC to be repaid on 30 June 2013

    (b)    50,000 BTC to be repaid on 30 Dec 2013

    (c)    The developed software will be exclusively licensed perpetually to the financer (as of 30 June 2013).

    (d)    The software may be used but not distributed by the provider.

**N.** The contract is complete when 300,000 BTC have been repaid.

**O.** It is agreed that the value of the loan to be repaid is $ AUD 20,000,000 in two parts (for a total of $40,000,000).

**P.** The server systems will return to the Financer at the completion of the contract.

**Q.** On default, the contract is to be repaid in full to the financer.



Case 9:18-cv-80176-BB Document 511-21 Entered on FLSD Docket 05/18/2020 Page 111 of
Case 9:18-cv-80176-BB Document 83-10 Entered on FLSD Docket 01/14/2019 Page 5 of 15
311

## OPERATIVE PART

### 1. Definitions

In this deed:

(a) Business means the business operated by the Provider described as such in the schedule;

(b) Business day means a day, not being a Saturday, Sunday or gazetted public holiday, on which banks are open for commercial business where performance of an obligation under this deed is to take place;

(c) Claim means, in relation to a person, a claim, demand, remedy, suit, injury, damage, loss, cost liability, action, proceeding, right of action, chose in action, claim for compensation or reimbursement or liability incurred by or to be made or recovered by or against the person, however arising and whether ascertained or unascertained, or immediate, future or contingent;

(d) Commencement date means the date so specified in the schedule;

(e) Confidential information means all technical and other information and know how, including all information and know how in any eye or machine readable form or other format, disclosed or given to the Provider from any source in respect of or incidental to:

   (i) The product;

   (ii) The technology;

   (iii) The Financer; and

   (iv) Any other information disclosed or given to the Provider by the Financer which is declared by the Financer to be confidential information;

(f) Improvements means any improvement, modification, enhancement or derivative of the intellectual property arising during the term;

(g) Intellectual property means:

   (i) The confidential information;

   (ii) The improvements;

   (iii) The patent; and

   (iv) The trade mark;

(h) Licence fee means the amount calculated and paid by the Provider to the Financer specified in the schedule;

4

(i) Notice means a written notice, consent approval, direction, order or other communication;

(j) Obligation means any legal, equitable, contractual, statutory or other obligation, deed, covenant, commitment, duty, undertaking or liability;

(k) Patent means the registered patent or patent application including the provisional and complete specifications described in the schedule;

(l) Permitted use means to conduct the business to exploit market, promote, develop, integrate, research, sell and conduct and any other activity undertaken with respect to the product for profit or reward;

(m) Product means the product described as such in the schedule;

(n) Right includes a legal, equitable, contractual, statutory or other right, power, authority, benefit, privilege, remedy, discretion or cause of action;

(o) Technology means all that technical information which relates to or forms part of the product, including, without limitation, methodology, techniques, drawings, outlines, notes, algorithms, detailed designs, flow charts, results, software: partial or intermediate versions and prototypes, data, formulae and other proprietary information and know how in the Provider's possession or control or which is revealed to the Provider which relates to the product;

(p) Term means the term set out in the schedule; and

(q) Trade mark means the registered trade mark, trade mark registration application and common law trademarks described in the schedule.

## 2. Interpretation

This deed is governed by the law of NSW and the parties submit to the non-exclusive jurisdiction of the courts of that state.

In the interpretation of this deed:

(a) References to legislation or provisions of legislation include changes or re-enactments of the legislation and statutory instruments and regulations issued under the legislation;

(b) Words denoting the singular include the plural and vice versa; words denoting individuals or persons include bodies corporate and vice versa; references to documents or deeds also mean those documents or deeds

5

as changed, novated or replaced, and words denoting one gender include all genders;

(c) Grammatical forms of defined words or phrases have corresponding meanings;

(d) Parties must perform their obligations on the dates and times fixed by reference to the schedule;

(e) Reference to an amount of money is a reference to the amount in the lawful currency of the Commonwealth of Australia;

(f) If the day on or by which anything is to be done is a Saturday, a Sunday or a public holiday in the place in which it is to be done, then it must be done on the next business day;

(g) References to a party are intended to bind their executors, administrators and permitted transferees; and

(h) Obligations under this deed affecting more than one party bind them jointly and each of them severally.

## 3. Licence

The Financer hereby grants to the Provider an exclusive licence to use the intellectual property for the permitted use on the terms of this deed.

In consideration of the licence fee payable hereunder the Financer grants to the Provider an exclusive transferrable licence to copy publish sell or otherwise use the works in the course of its business in Australia and/or Overseas in respect of the whole or any part of the works commencing on 01st July 2013.

In consideration of the licence hereby granted to the Provider the Provider must pay a one off licence fee of $20,000,000 (GST exclusive) to the Financer on or before the 30th June 2013. The provider will also transfer the designated account of the provider:

(a)     250,000 BTC to be repaid on 30 June 2013

(b)     50,000 BTC to be repaid on 30 Dec 2013

6

The payment is to be issued in Bitcoin as per the schedule.

## 4. Provider's promises

### (a) Undertakings

The Provider undertakes to:

(i) Use its reasonable commercial endeavours to:

(1) Preserve the value and validity of the intellectual property; and

(2) Create, promote, retain, and enhance the goodwill in the intellectual property;

(ii) During the term and thereafter the termination of this deed not to allow or facilitate the use, nor exploit the intellectual property in a manner in any way detrimental to the Financer and not contravene, deny or contest the rights subsisting in the intellectual property, and take such steps as may be appropriate and available to the Provider to prevent the infringement of any and all the rights subsisting in the intellectual property;

(iii) In connection with the permitted use not give any warranty:

(1) Beyond that which the Provider is obliged in law to give; or

(2) Which has not been approved in writing by the Financer;

(iv) To use the intellectual property only for the permitted use and not for any other use;

(v) Treat as confidential the confidential information except that which at the time of its disclosure to the Provider was generally available, or subsequently became known to the public provided always that this covenant shall continue in full force and effect notwithstanding that this deed has terminated; and

(vi) Devote all reasonable commercial endeavours in the conduct and operation of the business.

### (b) Indemnity

(i) The Provider hereby agrees to fully, effectually, and promptly indemnify the Financer against any loss, either direct or indirect, damage or expense whatsoever which the Financer may suffer or incur in respect of:

(1) Any breach by the Provider of the provisions of this deed; or

7

Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 115 of
Case 9:18-cv-80176-BB   Document 83-10   Entered on FLSD Docket 01/14/2019   Page 9 of 15
311

(2) Any claim by any person against the Financer arising out of or in respect of the exploitation of the intellectual property by the Provider; and

(ii) The Provider hereby irrevocably releases the Financer and waives all claims which the Provider may have in the future against the Financer, in respect of any action claim or remedy whatsoever in any way attributable to the exploitation of the intellectual property by the Provider.

## 5. Improvements

If the Provider develops any improvements, the Financer hereby irrevocably:

(a) Grants to the Provider the right to apply for any incidental intellectual property rights available in respect of that improvement and in connection with such application, the Financer shall:

    (i) Make, supply and assist in the preparation of all models, plans, drawings or specifications necessary or convenient for the proper understanding or development of the improvements; and

    (ii) Grant and do all things necessary to give effect to an assignment of the intellectual property rights in respect of the improvements to the Provider;

(b) Assigns, transfers and sets over absolutely to the Provider all right title and interest to the improvements including all claims as they relate to the improvements.

## 6. GST

(a) GST means a goods and services tax as defined in A New Tax System (Goods and Services Tax) Act 1999.

(b) In respect of any taxable supply, the Provider must pay to the Financer an additional amount equal to the prevailing GST rate on the supply. The additional amount referred to in this clause is payable at the same time and in the same manner as the licence fee subject to the receipt by the Provider of a valid tax invoice, as defined in A New Tax System (Goods and Services Tax) Act 1999.

8

## 7.  Term and termination

(a)  **Term**

This deed begins on 01ˢᵗ July 2019 the commencement date and will continue for the term unless it is earlier terminated.

(b)  **Termination on notice**

Either party may terminate this deed by notice in writing to the other if the other party commits any breach of any provision of this deed, and has failed to remedy such breach within fourteen days of receipt of notice specifying:

   (i)  The exact nature of the breach committed by the defaulting party; and

   (ii)  What is required by the defaulting party to remedy the breach:

## 8.  Licence fee

(a)  **Payment of licence fee**

The Provider must pay the licence fee specified in the schedule to the Financer during the term.

(b)  **Late payment**

If the licence fee or any other monies payable by the Provider to the Financer remain unpaid for seven days after the due date for payment, whether or not formal demand has been made, then the Provider shall pay, in addition to any monies actually owing to the Financer, interest at the rate of 2% over the bank indicator lending rate nominated by the Financer on such monies from the date the payment actually fell due until such monies are recovered and paid to the Financer.

## 9.  Warranties by Financer

The Financer warrants to the Provider that:

(a)  The Financer has the power and authority to enter into this deed: and

(b)  The intellectual property rights granted under this deed will not when used in accordance with this deed infringe the intellectual property rights of any person.

Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 117 of
311
Case 9:18-cv-80176-BB   Document 83-10   Entered on FLSD Docket 01/14/2019   Page 11 of 15

10. **Third party claim**

    (a)    Provided that the Provider is not in breach of its obligations under this deed, if a third party makes a claim against the Provider alleging that use of the intellectual property infringes its intellectual property rights, the Financer will defend, indemnify and hold harmless the Provider from such a claim provided that the:

        (i)    The Provider notifies the Financer in writing promptly of the claim;

        (ii)    The Provider provides such information, assistance and co-operation as the Financer may reasonably request and at its expense, from time to time; and

        (iii)    The Financer has full discretion to defend, compromise or settle any such claim on such terms as the Financer deems fit.

    (b)    If the Financer cannot satisfactorily settle the claim so as to retain ownership of the intellectual property, its liability will be limited to terminating this deed, and refunding the Provider an amount equal to the portion of any licence fee paid for the period following termination.

    (c)    Nothing in this clause authorises the Provider to defend, compromise or settle any claim on the Financer's behalf.

11. **Limitation of liability**

    (a)    Other than in respect of a party's:

        (i)    Breach of the confidentiality provisions of this deed; or

        (ii)    Infringement of another party's intellectual property rights; or

        (iii)    Indemnification obligations under this deed; or

        (iv)    Wilful misconduct.

    (b)    Neither party will be liable to the other for any consequential, special or punitive damages arising out of this deed. Each party's cumulative direct damages will be limited to the licence fee payable under this deed in the prior twelve month period. This clause survives the termination or expiration of this deed.

10

Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 118 of
Case 9:18-cv-80176-BB   Document 83-10   Entered on FLSD Docket 01/14/2019   Page 12 of 15
311

## 12.  Assignment

No party may assign its rights or obligations under this deed without the prior written consent of the other parties, which consent may be given or withheld, or given on conditions, in the absolute discretion of those other parties.

## 13.  Time

The parties hereto agree that time shall in all respects be of the essence in regards this deed.

## 14.  Notices

A communication required by this deed, by a party to another, must be in writing and may be given to them by being:

(a)   Delivered personally; or

(b)   Posted to their address specified in this deed, or as later notified by them, in which case it will be treated as having been received on the second business day after posting; or

(c)   Faxed to the facsimile number of the party with acknowledgment of receipt received electronically by the sender, when it will be treated as received on the day of sending, or

(d)   Sent by email to their email address, when it will be treated as received on that day.

## 15.  Waiver or variation

(a)   A party's failure or delay to exercise a power or right does not operate as a waiver of that power or right.

(b)   The exercise of a power or right does not preclude:

(i)    Its future exercise; or

(ii)   The exercise of any other power or right; or

(iii)  The variation or waiver of a provision of this deed or a party's consent to a departure from a provision by another party will be ineffective unless in writing executed by the parties.

Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 119 of
Case 9:18-cv-80176-BB   Document 83-10   Entered on FLSD Docket 01/14/2019   Page 13 of 15
311

## 16.  Counterpart

This deed may be executed in any number of counterparts each of which will be an original, but counterparts together will constitute one and the same instrument, and the date of the deed will be the date on which it is executed by the last party.

## 17.  Costs

(a)   Each party will pay its own costs of and incidental to this deed.

(b)   The Provider will bear all duty payable on this deed and keep indemnified the Financer in respect of that liability.

(c)   The Provider will bear all GST payable in respect of any supply under this deed upon receipt of tax invoice issued by the Financer.

## 18.  Escrow

(a)   The paper Bitcoin Wallet with address 1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a will be held by the financer as assurance or the contract and will convert to the ownership of the financer on default of the provider.

(b)   All source code and agreements are to be held in a manner that the financer can access on default.

## REFERENCE SCHEDULE

**Deed date:** 01st April 2011

**Licence fee:**
    (a)    250,000 BTC to be repaid on 30 June 2013
    (b)    50,000 BTC to be repaid on 30 Dec 2013
    (ex GST) for exclusive perpetual assignment

**Product:** Bitcoin and Exchange Software in C/C++/C#/R code

**Commencement date:** 01st July 2011

**Term:** Two (2) years

**Trademark:** All Marks Associated with C01N and associated marks
To be filed

**Patent:** All IP under BAA-001 / 002 / 003 / 004

**SIGNED AS A DEED**

Executed by
W & K Info Defense LLC                    )
in accordance with s.127                  )
Corporations Act 2001 (CTH) and its constitution          )

Dave Kleiman
DIRECTOR

Executed by
Craig Wright R&D (A.B.N. 97 481 146 384)

Craig S Wright

14

# EXHIBIT 5



## CONTRACT FOR THE SALE OF SHARES OF
## A COMPANY OWNING BUSINESS

**PARTIES**

**Dave Kleiman for W & K Info Defense LLC**
(Vendor)

**AND**

**Craig Wright R&D**
**ABN 97 481 146 384**
(Purchaser)

**AND**

**W&K Info Defense LLC**
(Company)

Ref: CEWK03

Case 9:18-cv-80176-BB Document 511-21 Entered on FLSD Docket 05/18/2020 Page 124 of
311
Case 9:18-cv-80176-BB Document 83-5 Entered on FLSD Docket 01/14/2019 Page 3 of 11

**THIS AGREEMENT** dated 02 day of April 2013

**BETWEEN**

     Dave Kleiman of W&K Info Defense LLC (Florida)

                                                (Vendor)

And

     Craig Wright of Craig Wright R&D
     ABN 97 481 146 384

                                          (Purchaser)

And

     W&K Info Defense LLC

                                          (Company)

**RECITALS**

A.   The vendor is the owner of all issued shares in the company being ordinary class shares. Ownership is 50% in the vendor's name and 50% in trust held for the purchaser.

B.   The company is the owner of and conducts the business known as Bitcoin mining and Software development / Research.

C.   The vendor has agreed to sell and the purchaser has agreed to purchase the vendor's shares for the price and upon the terms set out hereunder.

D.   As the purchaser will succeed to the business of the company on completion of the acquisition of these shares, the parties agree that they will incorporate into this agreement those agreements contained in the attached contract for the sale of a business to the intent that they shall in relation to the sale of the shares have the rights and obligations contained in such contract as part of this agreement.

E.   The company has consented to and agreed to be bound by the terms of this agreement.

F.   The company includes all software, research material and other aspects of the business.

G.   The parties wish to commit the terms of their agreement to writing in the manner hereinafter set out.

Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 125 of
311
Case 9:18-cv-80176-BB   Document 83-5   Entered on FLSD Docket 01/14/2019   Page 4 of 11

## OPERATIVE PART

### 1.   Interpretation

This agreement is governed by the laws of the state of NSW, and the parties,
submit to the non-exclusive jurisdiction of the courts of that state/country.

In the interpretation of this agreement:

(a)   References to legislation or provisions of legislation include changes or re-
enactments of the legislation and statutory instruments and regulations
issued under, the legislation;

(b)   Words denoting the singular include the plural and vice versa; words
denoting individuals or persons include bodies corporate and vice versa;
references to documents or agreements also mean those documents or
agreement as changed, novated or replaced, and words denoting one
gender include all genders;

(c)   Grammatical forms of defined words or phrases have corresponding
meanings;

(d)   Parties must perform their obligations on the dates and times fixed by
reference to the capital city of the state of Sydney;

(e)   Reference to an amount of money is a reference to the amount in the
lawful currency of the Commonwealth of Australia;

(f)   If the day on or by which anything is to be done is a Saturday, a Sunday or
a public holiday in the place in which it is to be done, then it must be done
on the next business day;

(g)   References to a party are intended to bind their executors, administrators
and permitted transferees; and

(h)   Obligations under this agreement affecting more than one party bind them
jointly and each of them severally.

### 2.   The vendor hereby agrees to sell and the purchaser hereby agrees to purchase
ordinary class shares in the company for the purchase price as noted below:

(a)   Two (2) loans issued under deed "CEWK01" are agreed to be repaid in
full for the consideration of 300,000 Bitcoin agreed in the contract. The
repayments as a one off of both loans for $20,000,000 with a total value of

$40,000,000 are deemed paid in full for the above value. This is noted as consideration from the purchaser and is issued in forbearance of the requirements of the contract signed 22 April 2011 between the Vendor/Company and the purchaser (designated CEWK01).

(b)   The vendor agrees that the paper wallet with address "1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a" held in escrow will be released to the purchaser.

(c)   Due to the unexpected rise in the value of Bitcoin, it is agreed that two transfers (in Bitcoin) of BTC 125,000 and BTC 125,500 when taken in conjunction with the supply of the software, will suffice to fulfil the contract.

3.   Hence, the vendor will:

(a)   Pay (transfer to) the purchaser 250,500 BTC on 30 April 2013,

(b)   Accept transfer of the escrowed Bitcoin paper wallet to the purchaser,

(c)   Transfer the ASC hardware to the purchaser,

(d)   Release the source code to the purchaser,

(e)   Transfer the Vistomail email account.

(f)   Transfer all research materials from the four (4) DHS BAA research projects to the purchaser with all notes, data and results, and

(g)   Transfer any shares in the company to the purchaser by 30 April 2013.

4.   The Purchaser will:

(a)   Accept the new terms in full satisfaction of the contract with Reference CEWK01 made between the vendor/company and the purchaser on 22 April 2013.

(b)   Accept the vendor's 323,000 remaining "mined" Bitcoin as a 49.5% stake in a new venture to be formed in Australia (to be called Coin-Exch Pty Ltd) between the vendor and the purchaser for the exploitation of the joint and to be pooled Bitcoin

(c)   Accept the transfer of the 323,000 Bitcoin (to be made on the 30th April 2013) as capital and note that shares in the new enterprise will be issued at this point.

    (d)    Provide $30,000,000 in capital into Coin-Exch Pty Ltd (to be formed) and the software developed in the prior venture.

**5.**    Settlement shall be effected on 30 April 2013.

**6.**    So far as they are relevant the agreements contained in the incorporated contract for the sale of a business shall be agreements between the parties herein.

**7.**    In the event of either party failing to complete this agreement on the settlement date then the other shall be entitled at any time thereafter to serve a notice to complete requiring the other to complete within 14 days from the date of service of the notice, which time period is considered reasonable by both parties. For the purpose of this contract, such notice to complete shall be deemed both at law and in equity sufficient to make time of the essence of this contract.

**8.**    On the settlement date the vendors shall:

    (a)    Deliver up to the purchaser possession of the business conducted by the company and in all respects shall have complied with the terms of the business sale contract incorporated herein;

    (b)    Deliver up to the purchaser duly executed instruments of transfer of their shares;

    (c)    Cause a meeting of the directors of the company to be held at which the directors shall approve and consent to the sale and transfer by the vendors to the purchaser of the vendors' shares.

    (d)    Send all software developed under the various DHS BAA filings to the purchaser (incl. source code and documentation).

    (e)    Provide the location and access rights to the ASC mining hardware hosted at a site known to Mr Kleiman will be returned with this transfer. This has a nominal value of $8,828,571.29 before depreciation. This is a

    (f)    Solutions to the Agent and Merkle Tree problems developed by Professor David Reese.

    (g)    Bitcoin agent software and suit of C/C++/C# and Python Blockchain software source codes.

(h)    Exchange Bitcoin holdings as noted in the contract.

9.    The company hereby agrees to take all steps and carry out all acts to procure the registration on the settlement date of the purchaser as the registered holder of tile to the vendors' shares.

10.   The purchaser will make all reasonable endeavours to have the new venture (Coin-Exch Pty Ltd) registered for GST and under the Australian Corporations act provisions before settlement on the 30th April 2013.

11.   The parties hereto agree to execute and perform all such acts, deeds, documents and things whatsoever as may be necessary and desirable to better carry into effect the provisions of this agreement.

**12. Vendor's warranties**

(a)   **Vendor's authority to sell**

(i)    The vendors are the registered and beneficial owners of their shares in the company.

(ii)   The vendors have full power and authority to sell and transfer to the purchaser good legal and equitable title to the shares without the consent or authorisation of any person except only consents required by the company.

(b)   **The company's financial statements**

Other than matters disclosed to the purchaser in writing the books and accounts of the company truly and fairly reflect the company's affairs.

(c)   **Books and records**

The company's books, records and registers are in the possession of the company, and accurately record the details of all of the company's transactions, finances, assets and liabilities.

(d)   **Taxation**

(i)    Other than disclosed to the purchaser in writing the company has lodged or filed all tax and duty returns for all taxes including GST, income tax, sales tax, fringe benefits tax, payroll tax, group tax and WorkCare levies.

Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 129 of
311
Case 9:18-cv-80176-BB   Document 83-5   Entered on FLSD Docket 01/14/2019   Page 8 of 11

    (ii)   No claim has or will be made against the company for payment by the company pursuant to the provisions of the Income Tax Assessment Act 1936 of any tax which is not shown or included as a liability or provision in the balance sheet contained in the accounts.

    (iii)   Neither the commissioner nor any federal, state or municipal body has any dispute with the company concerning the company's affair.

(e)  **Compliance with applicable laws**

    (i)   Neither the vendor nor the company has breached, or caused a breach of the company's memorandum or articles of association; any contract, agreement or instrument which binds the company; or any judgment, order, injunction or decree of any court, commission or administrative body relating to the company or to the shares.

    (ii)   Neither the company nor any of its officers, agents or employees (while performing their duties for the company) has breached the law. The company has not been notified that it has, or may have, breached the law regulating its affairs or the conduct of its business.

(f)  **Litigation and indebtedness**

Other than as disclosed to the purchaser in writing:

    (i)   The company is not a party to, or threatened with, any claim, litigation, prosecution or arbitration in any court, tribunal or otherwise;

    (ii)   There are no unsatisfied judgments or arbitral awards against the company;

    (iii)   The company is not being investigated for any breach of the law. Neither the company nor any of its directors is aware of any breach of the law or of any circumstances, which would give rise to a breach of the law other than as disclosed to the purchaser in writing;

    (iv)   The company has met all deadlines for repayment of its debts;

    (v)   No petitions, notices or proceedings have come to the company's notice, which could result in it being wound up. No orders or resolutions have been made or passed to place the company in liquidation or provisional liquidation.

(g)  **Accuracy of disclosed information**

(i)  The vendor has disclosed to the purchaser all information, which would be material for a purchaser in forming a decision whether or not to purchase the shares.

(ii)  If either the vendor or the company becomes aware of anything which may constitute a breach of, or be inconsistent with any representation, warranty or undertaking in this agreement, they will notify the purchaser of its particulars promptly in writing.

(h)  **Warranties and indemnities**

(i)  It is a condition of this agreement that each warranty is true and correct in every respect and shall be construed separately.

(ii)  The vendor acknowledges that the warranties have been given with the intention and for the purpose of inducing the purchaser to enter into this agreement.

(iii)  The purchaser has entered into this agreement and agreed to the purchase price payable for the shares on the basis of and in full reliance upon the warranties.

(iv)  Prior to the settlement date the vendor will take all such steps and provide all such information and documents with regard to the company as the purchaser may reasonably require and will give the purchaser and its professional advisers full and free access to the records and accounts of the company (whether financial or otherwise) to enable them to fully investigate the accuracy of the warranties.

## 13. Notices

A communication required by this agreement, by a party to another, must be in writing and may be given to them by being:

(a)  Delivered personally; or

(b)  Posted to their address specified in this agreement, or as later notified by them, in which case it will be treated as having been received on the second business day after posting; or

(c)  Faxed to the facsimile number of the party with acknowledgment of receipt received electronically by the sender, when it will be treated as received on the day of sending; or

(d)  Sent by email to their email address, when it will be treated as received on that day.

## 14.  Waiver or variation

(a)  A party's failure or delay to exercise a power or right does not operate as a waiver of that power or right.

(b)  The exercise of a power or right does not preclude:

(i)  Its future exercise; or

(ii)  The exercise of any other power or right.

(c)  The variation or waiver of a provision of this agreement or a party's consent to a departure from a provision by another party will be ineffective unless in writing executed by the parties.

## 15.  Counterparts

This agreement may be executed in any number of counterparts each of which will be an original but such counterparts together will constitute one and the same instrument and the date of the agreement will be the date on which it is executed by the last party.

## 16.  Further assurance

Each party will from time to time do all things (including executing all documents) necessary or desirable to give full effect to this agreement.

## 17.  Costs

Each party will pay their own costs in relation to this agreement.

Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 132 of
Case 9:18-cv-80176-BB   Document 83-5   Entered on FLSD Docket 01/14/2019   Page 11 of 11
311

**SIGNED AS AN AGREEMENT**

Executed by
W & K Info Defense LLC              )


Dave Kleiman
 DIRECTOR



Executed by
Craig Wright R&D (A.B.N. 97 481 146 384)


Craig S Wright

# EXHIBIT 15



# DEED OF LOAN

**PARTIES**

**Design by Human Ltd (08248988) UK**
**(Mortgagee)**

**AND**

**Craig Wright R&D (ABN 97 481 146 384)**
**(Mortgagor)**

**AND**

**Denariuz Seychelles Trust**
(Guarantor)

CRAIG S WRIGHT

**Confidential**
Not to be disclosed.

Uyen T. Nguyen

Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 135 of
311
Case 9:18-cv-80176-BB   Document 83-15   Entered on FLSD Docket 01/14/2019   Page 3 of 10

**THIS DEED** dated 23 day of October 2012

**BETWEEN:**

Uyen Nguyen of Design by Human Ltd (08248988) UK

**(Mortgagee)**

And

Craig Steven Wright of Craig Wright R&D (ABN 97 481 146 384)

**(Mortgagor)**

And

Panopticrypt Pty Ltd for Denariuz Seychelles International Trust

**(Guarantor)**

**RECITALS**

A.   The mortgagee has, at the request of the guarantor, if applicable, agreed to lend money (in the form of Bitcoin) to the mortgagor in accordance with and subject to the terms of this deed.

B.   The guarantor, if any, and the mortgagor acknowledge that the money referred to in this deed has been received by the mortgagor.

C.   It is noted that the Mortgagee holds a sum of Bitcoin (in wallets noted in appendix A) for a trust that wishes to extend the uptake and value of Bitcoin globally.

**OPERATIVE PART**

1.   **Loan**

(a)   The mortgagee has at the request of the guarantor, agreed to lend to the mortgagor the principal sum shown in the first schedule on the drawdown date shown in the first schedule.

(b)   The mortgagee may at the request of the mortgagor lend further amounts of money to the mortgagor and all such amounts shall be deemed to be money lent by the mortgagee to the mortgagor pursuant to this clause provided always that the mortgagee shall not be obliged of required to lend such further money to the mortgagor hereunder.

2.   **Interest**

The mortgagor covenants with the mortgagee to pay to the mortgagee interest in respect of the principal sum calculated in accordance with the provisions of the second schedule at the time and in the manner therein set forth and to duly

_Uyen T. Nguyen_

Page 1 of 7

Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 136 of
Case 9:18-cv-80176-BB   Document 83-15   Entered on FLSD Docket 01/14/2019   Page 4 of 10
311

and punctually observe and perform every other obligation contained in the second schedule.

**3.   Repayment**

(a)   The mortgagor covenants with the mortgagee to repay the principal sum **or so much thereof as is then unpaid to the mortgagee on the due date** shown in the first schedule.

(b)   **The mortgagor further covenants with the mortgagee that the money** owing will be repaid upon written demand being made by the mortgagee **at any time after the happening of any of the following events:**

(i)   Default being made by the mortgagor in the due or punctual payment to the mortgagee of any money which comprises part of the money owing;

(ii)   The failure of the mortgagor to rectify a default in the due or punctual **observance or performance of any other obligations on the part of** the mortgagor under this deed within 7 days of being requested to do **so by the mortgagee;**

(iii)   Any collateral security or any mortgage, charge or encumbrance **ranking in priority to or pari passu with any collateral security** becoming enforceable;

(iv)   If any collateral security is or becomes wholly or partly void, voidable or unenforceable or is claimed to be so by the mortgagor; and

(v)   If any event occurs that renders a collateral security enforceable.

**4.   Early repayment**

The mortgagor shall be entitled to repay the whole of the principal sum or the amount then unpaid at any time with interest to the date of repayment.

**5.   Security**

(a)   In consideration of the mortgagee advancing money to the mortgagor under or pursuant to this deed each of the mortgagor and the guarantor, if any, agrees to execute or upon demand from the mortgagee procure the

Uyen T. Nguyen

Page 2 of 7

execution in favour of the mortgagee of the securities referred to in the third schedule.

(b) The mortgagor and the guarantor, if any, agree that each of the securities described in the third schedule is a collateral security to the intent that the money owing is secured thereby. Default under any of the collateral securities shall constitute default under this deed.

(c) Collateral security means any mortgage, charge or other encumbrance affecting any real or personal property now in existence or which may in the future be given to the mortgagee by the mortgagor or any other person as security for the payment of the whole or any part of the money owing whether or not any other money is also secured thereby.

6. **Governing laws and jurisdiction**
The laws in force in Seychelles govern this deed.

7. **Guarantors guarantee and indemnity**

(a) The guarantor agrees that the guarantee and indemnity is a continuing guarantee, and extends to the ultimate balance owing under this deed, and that the guarantor remains fully liable under the guarantee and indemnity despite the fact that the mortgagee might have done something which may otherwise have the effect at law or in equity of varying or discharging the guarantor's liability.

(b) The mortgagee need not first exercise its rights against any of the mortgagors or against the mortgagors' security before exercising its rights under this guarantee against the guarantors.

8. **Costs**
The mortgagor shall pay all costs fees and duties in relation to this deed and any collateral security.

**THE FIRST SCHEDULE**

| | |
|---|---|
| **Item 1** | **Principal sum 650,000 BTC** |
| **Item 2** | **Due date** 30 June 2020 |
| **Item 3** | **Drawdown date 01st July 2013** |

*Uyen T. Nguyen*

Page 3 of 7

## THE SECOND SCHEDULE

**Interest only loan**

The mortgagor will pay to the mortgagee the principal sum, or so much thereof as **shall remain unpaid on 30 June 2020 and in meantime may pay multiples of BTC** 50,000 in reduction of the principal sum on any due day for payment and interest **shall reduce accordingly from the date of such partial reduction in the principal sum.**

In the meantime the mortgagor will pay interest only to the mortgagee on any amount payable under this deed at the rate of 0.05% per annum calculated on monthly rests and payable on the first day of each and every month commencing on the 30th day of July 2016 and compounding monthly from the date upon which the amount becomes **due until payment.** Such interest may be capitalised by the mortgagee as it deems appropriate and the mortgagor shall pay interest on the capitalised interest at the **same rate and calculated in the same manner. Provided always, and it is hereby** agreed and declared, that if the mortgagor shall on every day on which interest is **hereinbefore made payable under this security, or within 14 days after each such** days respectively, pay to the mortgagee interest on the principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum, and shall also duly observe and perform each and every covenant on the mortgagor's part herein contained or implied then the mortgagee shall accept interest on the said principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum in lieu of 0.05% per annum for every month **for which such interest shall be paid to the mortgagee within such 14 days aforesaid.**

The mortgagor agrees, as an independent obligation which will not merge in any **judgment or order, to pay interest on any judgement or order for the payment of all or** any part of the money secured at the higher of the rate payable under the judgment or order or interest calculated at the rate and in the manner set out in the preceding sub-clause.

OR

**Reducible mortgage principal and interest repayments.**

Page 4 of 7

The mortgagor will pay to the mortgagee the principal sum, or so much thereof as shall remain unpaid on 30 June 2018.

**In the meantime the mortgagor will pay the principal and interest on the principal sum** or on so much thereof as for the time being shall remain unpaid, and upon any **judgment or order in which this or the preceding covenant may become merged at** the rate of 0.05% per annum as follows, namely, by equal monthly payments on the first day of each and every month in each and every year until the principal sum and interest shall be fully paid and satisfied, the first of such payments computed from 01st July 2017 to be made on 01st July 2018 next. Provided always, and it is hereby agreed and declared, that if the mortgagor shall on every day on which principal and interest is hereinbefore made payable under this security, or within 14 days after **each such days respectively, pay to the mortgagee interest on the principal sum or** on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per **annum, and shall also duly observe and perform each and every covenant on the** mortgagor's part herein contained or implied then the mortgagee shall accept interest **on the said principal sum or on so much thereof as shall for the time being remain** unpaid at the rate of 0.05% per annum in lieu of 0.05% per annum for every month for which such interest shall be paid to the mortgagee within such 14 days aforesaid.

The mortgagor agrees, as an independent obligation which will not merge in any judgment or order, to pay interest on any judgment or order for the payment of all or **any part of the money secured at the higher of the rate payable under the judgment** or order or interest calculated at the rate and in the manner set out in the preceding sub-clause.

## THE THIRD SCHEDULE

(COLLATERAL SECURITY) First/Second mortgage over PERMANENT SUCCESS **LIMITED UK** being the whole of the shares comprised in UK company reference 08260048 and all related trusts.

Uyen T. Nguyen

**EXECUTED AS A DEED**

**Design by Human Ltd (08248988) UK**
(Mortgagee)

By: Uyen Nguyen
016 Lô L, cư xá Thanh Đa, phường 27, quận Bình Thạnh, Thành phố Hồ Chí Minh

**Craig Wright R&D (ABN 97 481 146 384)**
(Mortgagor)

By: Craig Wright
7 Eastgate Ave Gordon NSW 2072

**Denariuz Seychelles Trust**
(Guarantor)

Page 6 of 7

**Appendix 1:**
Bitcoin block addresses transferred:

| Address | Amount |
|---|---|
| 12tLs9c9RsALt4ockxa1hB4iTCTSmxj2me | 10,000.00 |
| 1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a | 111,114.00 |
| 1FeexV6bAHb8ybZjqQMjJrcCrHGW9sb6uF | 79,957.05 |
| 1f1miYFQWTzdLiCBxtHHnNiW7WAWPUccr | 10,009.25 |
| 1MHdm5XZMrfoZFoUktEaGhYevmdiXoc4x4 | 12,950.00 |
| 18JPragfuDVHWWG8ABQ15cghJFetnXUJBD | 24,404.50 |
| 1LXc28hWx1t8np5sCAb2EaNFqPwqJCuERD | 34,512.80 |
| 1FpqQnKQCgDkJFMC94JL8FpRyHTZ3uRVZ1 | 10,689.03 |
| 1F34duy2eeMz5mSrvFepVzy7Y1rBsnAyWC | 10,770.52 |
| 1JtpgqCf3SSeCeYWEDJjkfYFH7Ruhy4Vp1 | 10,000.00 |
| 18k9tin39LKegFzHe8rxSgvJXDpuMriGJq | 10,000.00 |
| 1HtTw9zR9wWFfgV8Jy8MqsaeVl7ZXrjdq6 | 1,014.00 |
| 18pn4NQ7NgsJjeuFjazeTdVRnsmfw5ofTz | 750.00 |
| 12fZ2HxkLjG9zn1u44XYsFFYKHM4A2zCea | 23,249.04 |
| 12tkqA9xSoowkzoERHMWNKsTey55YEBqkv | 28,150.04 |
| 16Ls6azc76ixc9Ny7AB5ZPPq6oiEL9XwXy | 40,000.04 |
| 12HddUDLhRP2F8JjpKYeKaDxxt5wUvxt5nq | 40,000.04 |
| 1P3S1grZYmcqYDuaEDVDYobJ5Fx85E9fE9 | 50,000.04 |
| 1MyGwFAJjVtB5rGJa32M6Yh46cGirUta1K | 30,000.04 |
| 145YHsQU7HMzkRnD5SBSuFAzQgCYnAnLkN | 10,000.00 |
| 16TPVCpvtJ6FkV5xNKBp35aMo4BWFGxiEY | 10,000.00 |
| 1KbrSKrT3GeEruTuuYYUSQ35JwKbrAWJYm | 10,000.00 |
| 1FLFnbN7m5psLfvLEwYfRUUjJ34YkmV3dM | 3,700.00 |
| 1A6SDef1TJAM8Saw2SqmqFGhkWR1y3qMx2 | 4.65 |
| 16cou7Ht6WjTzuFyDBnht9hmvXytg6XdVT | 53,000.00 |
| 12ib7dApVFvg82TXKycWBNpN8kFyiAN1dr | 31,000.04 |



Page 7 of 7

Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 142 of
311
Case 9:18-cv-80176-BB   Document 83-15   Entered on FLSD Docket 01/14/2019   Page 10 of 10

## Consent to act

I Uyen Nguyen of:

**016 Lô L, cư xá Thanh Đa, phường 27, quận Bình Thạnh, Thành phố Hồ Chí Minh,**

Consent to act as director of the following companies from the later date of 30 June 2013:

- Design by Human Ltd (08248988) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)
- PERMANENT SUCCESS LIMITED (08260048) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)

I also accept the position of COO (Chief Operations Officer) of the following companies from 18 Oct 2012.

- Design by Human Ltd (08248988) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)
- PERMANENT SUCCESS LIMITED (08260048) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)

Signed:



# EXHIBIT 14

---------- Forwarded message ----------
From: **Craig S Wright** <craig.wright@hotwirepe.com>
Date: Sat, Mar 1, 2014 at 3:00 PM
Subject: Re: Bond villains
To: Ira K <clocktime2020@gmail.com>


Around that. Minus what was needed for the company's use

Sent from my HTC

----- Reply message -----
From: "Ira K" <clocktime2020@gmail.com>
To: "Craig S Wright" <craig.wright@hotwirepe.com>
Subject: Bond villains
Date: Sun, Mar 2, 2014 06:42

Just to clarify on thoughts from previous email... In one of the email exchanges between Dave and you, he mentioned that you had 1 million Bitcoins in the trust and since you said he has 300,000 as his part. I was figuring the other 700,000 is yours.  Is that correct?

Ira


On Sat, Mar 1, 2014 at 9:23 AM, Ira K <clocktime2020@gmail.com> wrote:
Can you allocate 20% to my dad and 80% to myself?

So if I understand correctly, you have the rights to the remaining portion of Bitcoins stored on one of Dave's drives here?  If that's true we just need to figure out how to decrypt the drives.

Ira


On Friday, February 28, 2014, Craig S Wright <craig.wright@hotwirepe.com> wrote:
The trust Dave setup should have around 300,000

We moved everything offshore as a result of my early fight with the Tax office. This was back in 2011. The BTC would be on a server or hard drive, just the rights are overseas.

The price is displayed in the diagram below.


I do not know what was going on with Dave before he died, or if he was taking notice – he seemed distant and we did not talk much in April other than a couple company matters. In the couple months before the end, it finally started to be worth something. Then it crashed just before he died, then it recovered.

I need to allocate shares to Dave's estate. You need to tell me how.

Craig

**From:** Ira K [mailto:clocktime2020@gmail.com]
**Sent:** Saturday, 1 March 2014 12:53 PM
**To:** Craig S Wright
**Subject:** Re: FW: Bond villains

Hi Craig,

I was just noticing the sentence where Dave mentioned Bitcoins were not worth much at the time.

That must be why he never cashed any in.

Do you still have a million bitcoins in the trust he setup?  And do you think there is a chance of finding

the bank holding them?  If I can be of help just let me know what you need.  Since Dave setup the trust,

perhaps my identification is needed in order to gain access?

Do you know how the bitcoins are stored in the trust?  Are they on a hard drive?

I don't quite understand why it was necessary to keep them in these offshore places.

And are there two seperate trusts?

1.) GICSR Trust in Belize.

2.) Design by Human in Seychelles.

Sorry if I sound a bit confused... it's because I am.  :-)

Ira

On Fri, Feb 28, 2014 at 12:54 AM, Craig S Wright <craig.wright@hotwirepe.com> wrote:

Just some emails from Dave.

**From:** Craig S Wright
**Sent:** Monday, 25 January 2010 2:15 PM
**To:** 'Craig Wright'
**Subject:** Bond Villains

-----BEGIN PGP SIGNED MESSAGE-----

Hash: SHA1

Craig,

How does the following sound?

*I very much wanted to find some way to include a short message, but the problem is, the whole world would be able to see the message. As much as you may keep reminding people that the message is completely non-private, it would be an accident waiting to happen.*

Look up Wotty - it is not a mistake.

Are  you really sure you want to know nothing of the Panama fund? I know you are having tax problems, but Bitcoins are not worth enough to be a bother. They are a wonderful idea, but you need to get some others involved and actually accept help from somebody other than me one day. I am not going to be here for you forever you know.

Worse, if you send yourself bankrupt it will not help anyone. I know you are a stubborn bastard mate (I can be an Ozzie too), I have helped you in many of the fights you get into online and more, but you need to know when to stop. Leave the government for now. Stop or they will really do some damage to you.

Dave

PS, thanks for making me a part of this.



# EXHIBIT C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-80176

IRA KLEIMAN,
as personal representative of
the estate of David Kleiman,

      Plaintiff,

v.

CRAIG WRIGHT.

_____/

## DECLARATION OF CRAIG WRIGHT

    I, Craig Wright, declare under penalty of perjury under the laws of the United States of

America that the following is true and correct:

1.     I am over the age of 18, and I am competent to testify.

2.     I give this declaration based on my personal knowledge.

3.     I am a citizen of Australia and Antigua.

4.     I reside in London, England.

5.     I have never been a citizen of the United States or a resident of Florida.

6.     I have been to Florida only once in my life. Specifically, in approximately March

2009, I attended a cyber-security conference in Orlando where I spoke about information

security. I was there for approximately seven days. My attendance at that conference was

unrelated to Bitcoin, W&K Info Defense Research LLC ("W&K"), or Dave Kleiman.

7.     Dave Kleiman was my friend. We first became acquainted in an online forum on

cryptography.



8.     I only met Dave in person twice. The first time we met in person was at a cyber

security conference in San Diego, California before 2009, which I attended as an invited

speaker. My attendance at that conference was unrelated to Bitcoin, W&K, or Dave

Kleiman. The second and last time I met Dave was when I was in Florida for the Orlando

conference in 2009, where I was an invited speaker.

9.     I have never been to Dave's home or to any W&K office in Florida or elsewhere.

10.    I do not have any assets, property, funds, business interests, or bank accounts in

the United States.

11.    I have never had an office in Florida.

12.    I have never had a license to do business in Florida.

13.    I have never advertised services in Florida or to Florida residents.

14.    I have never used or accessed hardware located in Florida or anywhere else in the

United States to mine or obtain Bitcoin.

15.    I have never configured hardware or developed software in Florida or anywhere

else in the United States.

16.    I have never transferred Bitcoin to or from a trust in Florida or anywhere else in

the United States.

17.    Documents and information about any Australian Tax Office ("ATO")

investigation relating to me are supposed to be located in Australia. I have never authorized

the ATO or anyone else to release, leak, or otherwise make public any of the confidential

or privileged information, documents, transcripts, or records from any ATO investigation

related to me.

2



18. I have no documents in my possession from any ATO investigation. To the extent that my attorneys have any documents from any ATO investigation related to me, those documents would be located in Australia.

19. The transcripts attached to the amended complaint as exhibits 8 and 12 are not accurate.

20. As far as I know, all potential witnesses relevant to this lawsuit are located outside of Florida, including:

    a. **Hoa Doa,** who is listed in the amended complaint as an ATO official present at an ATO interview held on February 26, 2014. To the best of my knowledge, she is located in Australia;

    b. **Marina Doleviski,** who is listed in the amended complaint as an ATO official present at an ATO interview held on February 18, 2014. As far as I know, she is located in Australia;

    c. **John Chesher,** who was an advisor to me and to a group of companies ultimately owned by Demorgan Ltd., a group of Australian businesses in which I was a founder and a shareholder. To the best of my knowledge, he is located in Sydney, New South Wales, Australia;

    d. **Des McMaster,** who is listed in the amended complaint as an ATO official present at an ATO interview held on February 26, 2014. To the best of my knowledge, he is located in Australia;

    e. **Andrew Miller,** who is listed the amended complaint as an ATO auditor present at an ATO interview held on February 25, 2014. To the best of my knowledge, he is located in Australia;



3

Case 9:18-cv-80176-BB Document 511-21 Entered on FLSD Docket 05/18/2020 Page 152 of
Case 9:18-cv-80176-BB Document 33-3 Entered on FLSD Docket 06/15/2018 Page 5 of 7
311

f. **Uyen Nguyen,** who is listed in the amended complaint as the person who reinstated W&K on March 28, 2018. To the best of my knowledge, she is located in ~~California~~ Vietnam;

g. **Andrew O'Hagan,** who plaintiff claims has information relating to this action. To the best of my knowledge, he is a Scottish novelist residing in the United Kingdom;

h. **Alan Pedersen,** who is a manager of Demorgan Ltd. living in Australia;

i. **Bob Radvanovky,** who plaintiff claims has information relating to this action. To the best of my knowledge, he is located in Illinois;

j. **Andrew Sommer,** who was my solicitor in Australia and is a partner at the law firm of Clayton Utz. By referring to him here, I do not mean to waive any privilege afforded me by law, including the attorney-client privilege;

k. **Janifer Trinh,** who is listed in the amended complaint as a bookkeeper present at an ATO interview held on February 25, 2014. To the best of my knowledge, she is located in Australia;

l. **Ramona Watts,** who is my wife, is located in London, England;

m. **Ann Wrightson,** who is listed in the amended complaint as a bookkeeper for Demorgan Ltd. To the best of my knowledge, she is located in Australia.

21. As far as I know, businesses (active and inactive) relevant to this lawsuit are located outside of the United States, including:

a. **C01n Pty. Ltd.,** Australian company number 152 222 421, an Australia company registered in New South Wales. To the best of my knowledge, its books and records are in Australia;



b. **Cloudcroft Pty. Ltd.,** Australian company number 149 732 365, an Australia company registered in New South Wales. To the best of my knowledge, its books and records are in Australia;

c. **Coin-Exch Pty. Ltd.,** Australian company number 163 338 467, an Australia company registered in New South Wales. It is under external administration. To the best of my knowledge, its books and records are in Australia;

d. **Demorgan Ltd.,** Australian company number 601 560 525, an Australia company registered in Queensland, Australia. To the best of my knowledge, its books and records are in Australia;

e. **Hotwire Preemptive Intelligence Pty. Ltd.,** Australian company number 164 068 348, an Australia company registered in New South Wales and deregistered in 2017. To the best of my knowledge, its books and records are in Australia;

f. **Panopticrypt Pty. Ltd.,** Australian company number 151 567 118, is an Australian company registered in New South Wales. To the best of my knowledge, its books and records are in Australian; and

g. **Pholus Pty. Ltd.,** Australian company number 165 472 079, is an Australia company registered in New South Wales. To the best of my knowledge, its books and records are in Australia.

22. I do not store any digital or paper records, files, or documents in the United States.

23. As a citizen of New South Wales, Australia, I am amenable to service of process for litigation there.



5

I declare that the foregoing is true and correct under penalty of perjury and in accordance

with the laws of the United States of America.

This sworn declaration was signed in ___/U___ on June _06_, 2018.

Craig Wright
Identification Number: _N 251/456._

6



# EXHIBIT 11

1 3 AUG 2013

VO

Form 3B (version 4)
UCPR 6.2

# STATEMENT OF CLAIM

## COURT DETAILS

| | |
|---|---|
| Court | NSW Supreme Court |
| Division | General division / Common Law |
| List | General |
| Registry | Sydney |
| Case number | 2013 | 245661 |

## TITLE OF PROCEEDINGS

Plaintiff                    **Craig Steven Wright (ABN 97 481 146 384)**


Defendant                **W&K INFO DEFENSE RESEARCH LLC**

## FILING DETAILS

| | |
|---|---|
| Filed for | **Craig S Wright** |
| | Plaintiff |
| Contact name and telephone | Craig S Wright |
| | 0417 683 914 |
| Contact email | Craig S Wright (craigswright@acm.org) |

## TYPE OF CLAIM

Mercantile Law - Sale of Goods and Services – Contractual Dispute

Mercantile Law – ~~Other~~ Money ~~Lent~~

## RELIEF CLAIMED

1       That the defendant pay the plaintiff the total amount claimed below.

| Amount of claim | $ $28,533,016.79 |
|---|---|
| Interest | $ 0 |
| Filing fees | $ 999.00 |
| Service fees | $ 34.00 |
| Solicitors fees | $ 0.00 |
| **TOTAL** | **$ $28,534,049.79** |

## PLEADINGS AND PARTICULARS

1       Between 2011 and 2013 the plaintiff provided contract labour services to the
        defendant. The plaintiff loaned money to the defendant to the defendant at a set
        interest rate with a commercial expectation that the said monies would be repaid in
        full when a project was completed.

2       This was issued in Bitcoin. The value at the current date is $13,917,775.

3       The Software and SDK developed under this project is guaranteed against the
        amounts of this claim.

4       The defendant is a company that operates from Palm Beach, FL, USA and does
        research in homeland security research.

5       By contract dated 8 January 2009, the Defendant agreed to pay the Plaintiff for
        property and consulting services to complete research. The contract was bonded
        against the intellectual property of the defendant.

6       The material terms of the purchase contract were:

        a.  The Plaintiff was the contractor and financier

        b.  The Defendant was the Vendor

        c.  Completion was to take place on 30 June 2013.

        d.  Time was of the essence of the contract.

        e.  That in the event that the Purchaser breached the contract, the Seller could
            either affirm or terminate the contract with a full return of value.

7       The plaintiff conducted a project for the development of a Bitcoin SDK and
        exchange.



8       The contract was executed with an agreement that all created Intellectual property reverts to the ownership of the plaintiff with interest if the project concludes without assignment of shares in the defendant.

9       The contract set the interest rate at 12% calculated annually.

10      The exchange rate was contracted with a formula to be $1.12 at the point of breach.

11      The funding was supplied using Bitcoin and Gold bonds.

12      A bond of Au $20,000,000.00 was provided to cover funding aspects of the research and for the provision of ASC hardware as a pooled amount with a depreciated capitals value of $8,828,571.29 with straight line depreciation which has 5 years remaining.

13      The contract stated that a breach would lead to liquidated damages to the amounts stated as the project limits. If the liquidated amount is not paid all IP and systems returns to the sole ownership of the plaintiff.

14      The IP is software and code used in the creation of a Bitcoin system.

15      The defendant is unable to complete its responsibilities due to the death of its director, Mr Kleiman.

16      The total debt after depreciation of the hardware comes to $22,746,346.29 in Australian dollars. The Interest on this amount is calculated at $AU 5,786,670.50.

17      The plaintiff claims:

Debt of $ $28,533,016.79.

Interest pursuant to section 100 Civil Procedure Act 2005 from 01 July 2013 to judgement.

**SIGNATURE**

I acknowledge that court fees may be payable during these proceedings.  These fees may include a hearing allocation fee.

Signature

Capacity                                    Plaintiff

Date of signature           / 2 Aug /3

**NOTICE TO DEFENDANT**

**If you do not file a defence within 28 days of being served with this statement of claim:**

- **You will be in default in these proceedings.**

- **The court may enter judgment against you without any further notice to you.**

The judgment may be for the relief claimed in the statement of claim and for the plaintiff's costs of bringing these proceedings. The court may provide third parties with details of any default judgment entered against you.

**HOW TO RESPOND**

**Please read this statement of claim very carefully. If you have any trouble understanding it or require assistance on how to respond to the claim you should get legal advice as soon as possible.**

You can get further information about what you need to do to respond to the claim from:

- A legal practitioner.

- LawAccess NSW on 1300 888 529 or at www.lawaccess.nsw.gov.au.

- The court registry for limited procedural information.

You can respond in one of the following ways:

**1**     **If you intend to dispute the claim or part of the claim,** by filing a defence and/or making a cross-claim.

**2**     **If money is claimed, and you believe you owe the money claimed,** by:

- Paying the plaintiff all of the money and interest claimed. If you file a notice of payment under UCPR 6.17 further proceedings against you will be stayed unless the court otherwise orders.

- Filing an acknowledgement of the claim.

- Applying to the court for further time to pay the claim.

**3**     **If money is claimed, and you believe you owe part of the money claimed,** by:

- Paying the plaintiff that part of the money that is claimed.

- Filing a defence in relation to the part that you do not believe is owed.

Court forms are available on the UCPR website at www.lawlink.nsw.gov.au/ucpr or at any NSW court registry.

**REGISTRY ADDRESS**

| | |
|---|---|
| Street address | 184 Phillip St, Sydney NSW 2000 |
| Postal address | Supreme Court of NSW, GPO Box 3, Sydney NSW 2001 Australia 2000 |
| Telephone | (02) 9377 5840 |

**#AFFIDAVIT VERIFYING**

| | |
|---|---|
| Name | Craig Steven Wright |
| Address | 43 St Johns Ave Gordon NSW 2072 |
| Occupation | Lecturer/Director |
| Date | 12 Aug2013 |

I say on oath:

1    I am the plaintiff.

2    I believe that the allegations of fact in the statement of claim are true.

SWORN at                          Gordon

Signature of deponent

Name of witness          ~~Craig Steven Wright~~

Address of witness 818 Pacific Hwy
Gordon NSW 2072

Capacity of witness          Justice of the peace

CHRISTIAN HOFMANN
Reg. No 195484
Justice of the Peace in and for
the State of New South Wales

And as a witness, I certify the following matters concerning the person who made this affidavit (the **deponent**):

1    #I saw the face of the deponent. [OR, delete whichever option is inapplicable]

~~#I did not see the face of the deponent because the deponent was wearing a face covering, but I am satisfied that the deponent had a special justification for not removing the covering.*~~

2    ~~#I have known the deponent for at least 12 months. [OR, delete whichever option is inapplicable]~~

#I have confirmed the deponent's identity using the following identification document:

NSW Driver Licence

Identification document relied on (may be original or certified copy) †

Signature of witness

Note:  The deponent and witness must sign each page of the affidavit.  See UCPR 35.7B.

---

[* The only "special justification" for not removing a face covering is a legitimate medical reason (at April 2012).]

[†"Identification documents" include current driver licence, proof of age card, Medicare card, credit card, Centrelink pension card, Veterans Affairs entitlement card, student identity card, citizenship certificate, birth certificate, passport or see Oaths Regulation 2011.]



Case 9:18-cv-80176-BB   Document 511-21   Entered on FLSD Docket 05/18/2020   Page 161 of
311
Case 9:18-cv-80176-BB   Document 83-11   Entered on FLSD Docket 01/14/2019   Page 7 of 15
6

#PARTY DETAILS

PARTIES TO THE PROCEEDINGS

**Plaintiff**                                          **Defendant**

Craig Steven Wright                          W&K INFO DEFENSE RESEARCH LLC

                                                            4371 Norhtlake Blvd #314

                                                            Palm Beach

                                                            FL 33410 - 6253 [Defendant]

FURTHER DETAILS ABOUT PLAINTIFF[S]

**Plaintiff**

Name                          Craig Steven Wright

Address                       43 St Johns Ave

                                    Gordon NSW 2072


**Contact details for plaintiff acting in person or by authorised officer**

Address for service          as above

Telephone                       0417 683 914

Email                              craigswright@acm.org

DETAILS ABOUT DEFENDANT

**Defendant**

Name                          W&K INFO DEFENSE RESEARCH LLC

Address                       4371 Norhtlake Blvd #314

                                    Palm Beach

                                    FL 33410 - 6253

Form 3B (version 4)
UCPR 6.2

# STATEMENT OF CLAIM

## COURT DETAILS

Court                          NSW Supreme Court

Division                       General division  Common Law

List                           General .

Registry                       Sydney

Case number                    2013 / 225985

## TITLE OF PROCEEDINGS

Plaintiff                      **Craig Steven Wright (ABN 97 481 146 384)**


Defendant                      **W&K INFO DEFENSE RESEARCH LLC**


## FILING DETAILS

Filed for                      **Craig S Wright**

                               Plaintiff

Contact name and telephone     Craig S Wright

                               0417 683 914

Contact email                  Craig S Wright (craigswright@acm.org)

## TYPE OF CLAIM

Mercantile Law - Sale of Goods and Services – Contract ~~ual~~ Dispute -

~~Mercantile Law - Other – Money Lent~~

30 October 2013

9 UUnn



2

## RELIEF CLAIMED

1    That the defendant pay the plaintiff the total amount claimed below.

| | |
|---|---|
| Amount of claim | $ 28,253,633.00 |
| Interest | $ 0 |
| Filing fees | $ 999.00 |
| Service fees | $ 34.00 |
| Solicitors fees | $ 0.00 |
| **TOTAL** | **$ 28,254,666.00** |

## PLEADINGS AND PARTICULARS

1    Between 2011 and 2013 the plaintiff provided contract labour services to the defendant. The plaintiff loaned money to the defendant to the defendant at a set interest rate with a commercial expectation that the said monies would be repaid in full when a project was completed.

2    The defendant is a company that operates from Palm Beach, FL, USA and does research in homeland security research.

3    By contract dated 27 October 2008, the Defendant agreed to pay the Plaintiff for property and consulting services to complete research. The contract was bonded against the intellectual property of the defendant.

4    The material terms of the purchase contract were:

   a.   The Plaintiff was the contractor and financier

   b.   The Defendant was the Vendor

   c.   Completion was to take place on 30 June 2013.

   d.   Time was of the essence of the contract.

   e.   That in the event that the Purchaser breached the contract, the Seller could either affirm or terminate the contract with a full return of value.

5    The plaintiff conducted four (4) projects associated with the DHS (Dept. of Homeland Security USA) with the defendant under contract:

   a.   BAA 11-02-TTA 01-0127-WP: TTA 01 - Software Assurance: Software Assurance through Economic Measures



3

      b.  BAA 11-02-TTA 05-0155-WP: TTA 05 - Secure. Resilient Systems and Networks

      c.  BAA 11-02-TTA 09-0049-WP: TTA 09 - Cyber Economics

      d.  BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace (SWAMP)

6    In May 2013 the primary director of the defendant died leaving the project not transferred to the plaintiff and not returning funds. These funds were rated as:

      a.  TTA 01     US$ 650,000

      b.  TTA 05     US$ 1,8000,000

      c.  TTA 09     US$ 2,200,000

      d.  TTA 14     US$ 1,200,000

7    The contract was executed with an agreement that all created Intellectual property reverts to the ownership of the plaintiff with interest if the project concludes without assignment of shares in the defendant.

8    The contract set the interest rate at 8% calculated annually.

9    The exchange rate was contracted with a formula to be $1.12 at the point of breach.

10    The funding was supplied using Bitcoin and Gold bonds.

11    A bond of Au $20,000,000.00 was provided to cover funding aspects of the research.

12    The contract stated that a breach would lead to liquidated damages to the amounts stated as the project limits. If the liquidated amount is not paid all IP returns to the sole ownership of the plaintiff.

13    The IP is software and code used by the US Military, DHS and other associated parties.

14    The defendant is unable to complete its responsibilities due to the death of its director, Mr Kleiman.

15    The debt of US$ 5,850,000 comes to $6,552,000 in Australian $. The Interest on this amount is calculated at $AU 1,701,633.00.

16    The plaintiff claims:

Debt of $ 28,253,633.00



4

Interest pursuant to section 100 Civil Procedure Act 2005 from 01 July 2013 to judgement.

## SIGNATURE

I acknowledge that court fees may be payable during these proceedings.  These fees may include a hearing allocation fee.

Signature

Capacity                              Plaintiff

Date of signature                     25 Jul 13

5

**NOTICE TO DEFENDANT**

**If you do not file a defence within 28 days of being served with this statement of claim:**

- **You will be in default in these proceedings.**

- **The court may enter judgment against you without any further notice to you.**

The judgment may be for the relief claimed in the statement of claim and for the plaintiff's costs of bringing these proceedings. The court may provide third parties with details of any default judgment entered against you.

**HOW TO RESPOND**

**Please read this statement of claim very carefully. If you have any trouble understanding it or require assistance on how to respond to the claim you should get legal advice as soon as possible.**

You can get further information about what you need to do to respond to the claim from:

- A legal practitioner.

- LawAccess NSW on 1300 888 529 or at www.lawaccess.nsw.gov.au.

- The court registry for limited procedural information.

You can respond in one of the following ways:

1    **If you intend to dispute the claim or part of the claim,** by filing a defence and/or making a cross-claim.

2    **If money is claimed, and you believe you owe the money claimed,** by:

- Paying the plaintiff all of the money and interest claimed. If you file a notice of payment under UCPR 6.17 further proceedings against you will be stayed unless the court otherwise orders.

- Filing an acknowledgement of the claim.

- Applying to the court for further time to pay the claim.

3    **If money is claimed, and you believe you owe part of the money claimed,** by:

- Paying the plaintiff that part of the money that is claimed.

- Filing a defence in relation to the part that you do not believe is owed.

Court forms are available on the UCPR website at www.lawlink.nsw.gov.au/ucpr or at any NSW court registry.

**REGISTRY ADDRESS**

| | |
|---|---|
| Street address | 184 Phillip St, Sydney NSW 2000 |
| Postal address | Supreme Court of NSW, GPO Box 3, Sydney NSW 2001 Australia  2000 |
| Telephone | (02) 9377 5840 |

6

# #AFFIDAVIT VERIFYING

| | |
|---|---|
| Name | Craig Steven Wright |
| Address | 43 St Johns Ave Gordon NSW 2072 |
| Occupation | Lecturer/Director |
| Date | 23 July 2012 |

I say on oath:

1    I am the plaintiff.

2    I believe that the allegations of fact in the statement of claim are true.

| | |
|---|---|
| SWORN at | Gordon |
| Signature of deponent | |
| Name of witness | Craig Steven Wright    Karle Wiggins. |
| Address of witness | KARLIE WIGGINS<br>Reg. No. 194194<br>A Justice of the Peace in and for the<br>State of New South Wales<br>Justice of the peace |
| Capacity of witness | **Ku·ring·gai Council**<br>818 Pacific Highway, Gordon<br>Locked Bag 1056, Pymble, NSW 2073<br>ABN: 86 408 856 611 |

And as a witness, I certify the following matters concerning the person who made this affidavit (the deponent):

1    #I saw the face of the deponent. [OR delete whichever is not applicable]

~~#I did not see the face of the deponent because the deponent was wearing a face covering, but I am satisfied that the deponent had a special justification for not removing the covering.*~~

2    ~~#I have known the deponent for at least 12 months.~~ [OR delete whichever is not applicable]

#I have confirmed the deponent's identity using the following identification document:

NSW D/L · 12510410 ·

Identification document relied on (may be original or certified copy) †

Signature of witness

Note: The deponent and witness must sign each page of the affidavit. See UCPR 35.7B.

[* The only "special justification" for not removing a face covering is a legitimate medical reason (at April 2012).]

[†"Identification documents" include current driver licence, proof of age card, Medicare card, credit card, Centrelink pension card, Veterans Affairs entitlement card, student identity card, citizenship certificate, birth certificate, passport or see Oaths Regulation 2011.]



7

# #PARTY DETAILS

## PARTIES TO THE PROCEEDINGS

**Plaintiff**                          **Defendant**

Craig Steven Wright                    W&K INFO DEFENSE RESEARCH LLC

                                       4371 Norhtlake Blvd #314

                                       Palm Beach

                                       FL 33410 - 6253 [Defendant]

## FURTHER DETAILS ABOUT PLAINTIFF[S]

**Plaintiff**

Name                    Craig Steven Wright

Address                 43 St Johns Ave

                        Gordon NSW 2072

### Contact details for plaintiff acting in person or by authorised officer

Address for service        as above

Telephone                  0417 683 914

Email                      craigswright@acm.org

## DETAILS ABOUT DEFENDANT

**Defendant**

Name                    W&K INFO DEFENSE RESEARCH LLC

Address                 4371 Norhtlake Blvd #314

                        Palm Beach

                        FL 33410 - 6253

## Page 2

```
 1         A P P E A R A N C E S
 2   On behalf of the Plaintiffs:
 3      VELVEL (DEVIN) FREEDMAN, ESQ
        Boies Schiller Flexner LLP
 4      100 SE Second Street, Suite 2800,
        Miami, Florida 33131
 5
        KYLE W ROCHE, ESQ
 6      Admitted Pro Hac Vice
        Boies Schiller Flexner LLP
 7      333 Main Street
        Armonk, NY 10504
 8
 9   On behalf of the Defendant:
10      ANDRÉS RIVERO
        ZAHARAH R. MARKOE
11      Rivero Mestre LLP
        2525 Ponce de Leon Blvd
12      Ste  1000 Miami,
        FL 331134
13
14
     Court Reporter:
15
        PAULA FOLEY
16      Magna Legal Services
        1635 Market Street,
17      Philadelphia,
        PA 19103
18      United States
19
20   Also Present:
21      PHILIP HILL (Videographer, Magna Legal
        Services)
22      ANDREW S  BRENNER, ESQ (Boies Schiller
        Flexner LLP) for the Plaintiff By Telephone
23
        JOHN MCADAMS, ESQ (Boies Schiller Flexner
24      LLP) By Telephone
25      IRA KLEIMAN (Plaintiff) By Telephone
```

## Page 3

```
 1               I N D E X
 2
     Deponent                    Page
 3
     DR. CRAIG STEVEN WRIGHT
 4
     Questions by MR. FREEDMAN       5 - 385
 5
 6
 7          - - - - - - - - - -
 8
 9   Exhibits marked during this deposition
10      Exhibit              Page
11         1                  78
           2                 126
12         3                 189
           4                 227
13         5                 239
           6                 259
14         7                 296
           8                 314
15         9                 333
          10                 347
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1           THE VIDEOGRAPHER:  We are now on the
 2   record.  This begins the video card number 1, volume 1,
 3   in the video deposition of Dr. Craig Wright.  This is
 4   taken in the matter of Ira Kleiman et al versus Craig
 5   Wright.  This case is being heard in the United States
 6   District Court Southern District of Florida.  Case
 7   number 9:18-cv-80176-BB/BR.  Today's date is April 4,
 8   2019.  The time on the video screen is 10.37 a.m.  Local
 9   time is London.  This video deposition is taking place
10   at the London offices of Boies Schiller Flexner at the
11   request of Boies Schiller Flexner. The videographer is
12   Philip Hill representing Magna Legal Services and the
13   court reporter is Paula Foley, also representing Magna
14   Legal Services.  Please will counsel introduce
15   themselves and state whom they represent at the Boies
16   Schiller offices in London and those present via the
17   telephone conference link.  Thank you.
18           MR. FREEDMAN:  Vel Freedman for the
19   plaintiffs.
20           MR. ROCHE:  Kyle Roche for the
21   plaintiffs.
22           MR. RIVERO:  Andrés Rivero for Craig
23   Wright.
24           MS. MARKOE:  Zaharah Markoe for
25   Dr. Wright.
```

## Page 5

```
 1           MR. BRENNER:  (By Telephone) Andrew
 2   Brenner for the plaintiff.
 3           MR. FREEDMAN:  Did we loose Mr. McAdams?
 4           MR. BRENNER:  John McAdams is here.
 5           THE VIDEOGRAPHER:  Please will the court
 6   reporter swear in the witness.
 7      DR. CRAIG STEVEN WRIGHT, SWORN
 8        QUESTIONS BY MR. FREEDMAN
 9           MR. FREEDMAN:  Thank you very much.
10           MS. MARKOE:  Point of order before we get
11   started.  We are going to mark the entire deposition
12   confidential and then once we have the transcript we
13   will de-designate.
14           MR. FREEDMAN:  That is fine.
15      Q.  Good morning, Dr. Wright.
16      A.  Good morning.
17      Q.  We met earlier.  My name is Vel Freedman.
18   I represent the plaintiffs in this action.
19      A.  Hello Vel.
20      Q.  Can you please state your name and date
21   of birth for the record?
22      A.  My name is Craig Steven Wright.  I was
23   born in Brisbane, Australia, on 23rd October 1970.
24      Q.  Can you tell us your ████████████
25      A.  ██████████████████,
```



2  (Pages 2 to 5)

Page 6

1    ▮▮▮▮▮
2        Q.    And your work address?
3        A.    I mainly work from home.  To tell you the
4    truth I do not know the office address, I just walk
5    there, it is in Oxford Circus at nChain.  There is
6    another one at Golden Square.  I do not actually know,
7    I am sorry.
8        Q.    That is fine.  Doctor, you understand
9    today that you are under oath and that you have taken an
10   oath to tell the truth?
11       A.    I understand perfectly well the meaning
12   of an oath.
13       Q.    You understand that your examination
14   today is being recorded both via stenographer and
15   videographer and that at some point this testimony may
16   be shown to a jury?
17       A.    I understand that perfectly, thank you.
18       Q.    Are you taking any medication today?
19       A.    No.  I do not take medication.
20       Q.    Is there anything today that I do not
21   know about that would -- let me strike that.  Is there
22   anything today that would in fact affect your ability to
23   tell the truth at this deposition?
24       A.    No, nothing will affect my ability to
25   tell the truth.

Page 7

1        Q.    If I ask you a question and you do not
2    understand it, please let me know, and I will repeat it
3    or rephrase it?
4        A.    I shall.
5        Q.    If you do not ask me to do that, I will
6    assume you understand the question and I will rely on
7    your response?
8        A.    (The witness nodded)
9        Q.    In deposition-taking, it is not
10   intuitive, but we need you to verbally say your
11   responses on the record, so that the court reporter can
12   take them, so I will try to remind you to do it, and if
13   you could just try to answer with an affirmative yes or
14   no?
15       A.    Yes.
16       Q.    Thank you.  If at any time today you need
17   to take a break or you feel like you need to get a drink
18   or stretch your legs, just let me know and we will stop;
19   okay?
20       A.    Shall do.  Thank you.
21       Q.    You said you were born in Australia.  Did
22   there come a time when you stopped living in Australia?
23       A.    I am not living in Australia at the
24   moment.
25       Q.    When did you stop living in Australia?

Page 8

1        A.    We moved from Australia in October 2015.
2        Q.    Let me go back to about 2006.  In 2006
3    where were you living in Australia?
4        A.    In Wimbledon.
5        Q.    In Wimbledon.  Did there come a time when
6    you moved from Wimbledon?
7              MS. MARKOE:  Objection.  This is not part
8    of the deposition topics that we agreed to.  This is a
9    limited deposition.  I am not really sure how this line
10   of questioning fits in with any of the topics that you
11   proposed.
12             MR. FREEDMAN:  So, we are trying to
13   establish where Dr. Wright was so we can identify the
14   location of computers, locations of servers and
15   locations of all kinds of other things he may have used
16   to create Bitcoin to collaborate with David Kleiman.
17             THE WITNESS:  Anything that I have moved
18   with has moved with me in full.  I have only had one
19   residence at any location, so anywhere I have been is
20   irrelevant.  Everything has moved, full stop.
21   BY MR. FREEDMAN:
22       Q.    Dr. Wright, I am going to ask, if it is
23   possible, if you could wait until I ask a question to
24   respond.  I know you know where I may be going and you
25   know what I may be getting at, you want to try to

Page 9

1    short-circuit it, but unfortunately I have to ask the
2    question and you have to respond.  You were living in
3    Wimbledon in 2006.  Did there come a time when you moved
4    from Wimbledon?
5        A.    Yes.
6        Q.    When did you move from Wimbledon?
7              MS. MARKOE:  I am continuing to object to
8    this line of question.
9              MR. FREEDMAN:  Are you instructing him
10   not to answer or are you noting an objection?
11             MS. MARKOE:  I am noting an objection and
12   I am giving you a little bit of leeway.  If we get to a
13   point where I feel that you are abusing that leeway then
14   I will instruct him not to answer.
15             MR. FREEDMAN:  Okay.
16       Q.    When did you move after 2006?
17       A.    I do not remember the exact date.
18       Q.    Where did you move to?
19       A.    ▮▮▮▮
20       Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮
21   ▮▮▮?
22       A.    ▮▮▮▮▮▮▮▮▮▮▮▮
23       Q.    ▮▮▮▮▮▮▮▮
24   ▮▮▮▮▮▮?
25





Page 10

```
1            THE WITNESS: ██████████████
2    s██
3    BY MR. FREEDMAN:
4        Q.   And then the ██████████████████
5        A.   Is the one I said I am at now.
6        Q.   ███████████ in the UK?
7        A.   That is correct.  I have been living in
8    ██████████████████████████████  All of
9    those are in the UK.  That is correct.
10       Q.   I am confused.  This may be my fault.  In
11   2006 you were living in the UK?
12       A.   I am sorry, that is my fault I was
13   thinking 2016.  2006 I was living in Australia.
14       Q.   Okay, where in Australia?
15       A.   A number of different locations.
16       Q.   Can you let me know where those were?
17       A.   I do not remember.  I know approximate
18   locations.  I have had several houses.
19       Q.   Can you give me the approximate
20   locations?
21       A.   New South Wales.
22       Q.   From 2006 -- did there come a time when
23   you left New South Wales for another part of Australia,
24   or were you in New South Wales until you moved to the UK
25   in 2015?
```

Page 11

```
1        A.   I was in New South Wales until then.
2        Q.   But you do not recall the exact
3    addresses?
4        A.   Not off the top of my head, no.
5        Q.   Do you have those records available that
6    you could look up and then tell your counsel later?
7            MS. MARKOE:  Objection.
8            THE WITNESS:  I have no computers in any
9    other residence.  Everything I have had moved with me.
10   There is nothing to be found, there are no computers
11   there, and, no, I do not try and remember addresses.
12   BY MR. FREEDMAN:
13       Q.   So you took every computer storage
14   device, every system you had, has moved with you and you
15   currently have it with you in London?
16           MS. MARKOE:  Objection: mischaracterises
17   the testimony.
18           THE WITNESS:  No, that is not what
19   I said.  I do not keep machines.  The average age of my
20   computers is one year.  After a year, quite often
21   I trash them.  I have a new phone every single year.
22   I have a new computer, at maximum, 18 months.
23   BY MR. FREEDMAN:
24       Q.   What do you do with the old equipment?
25       A.   In the past I used to donate those to
```

Page 12

```
1    charity.  Now, sometimes they go to charity, sometimes
2    they just get trashed.
3        Q.   What do you do with the data on those old
4    computers or hardware?
5        A.   It is wiped.
6        Q.   Do you save a copy of it?
7        A.   Not always, no.  If I do not need it, I
8    do not save it.
9        Q.   But whatever you need, you save?
10       A.   Yes.
11       Q.   Were you employed between 2006-2015, when
12   you left Australia?
13       A.   Yes.
14           MS. MARKOE:  Objection.
15   BY MR. FREEDMAN:
16       Q.   Where were you employed?
17       A.   At what point?
18           MS. MARKOE:  Objection.
19   BY MR. FREEDMAN:
20       Q.   From 2006, I guess in 2006, where were
21   you employed?
22       A.   I worked for a company or a partnership
23   called BDO, which was an accounting firm.
24       Q.   How long were you with BDO?
25       A.   From some time in 2005 until December
```

Page 13

```
1    2008, when I left.
2        Q.   When you left BDO in 2008, were you
3    employed by another organisation or employer?
4        A.   No.
5        Q.   Did there come a time when you were,
6    again, employed by an employer?
7            MS. MARKOE:  Objection.
8            THE WITNESS:  I am nominally employed by
9    nChain.
10   BY MR. FREEDMAN:
11       Q.   That was the next time after BDO?
12       A.   I was a director of my own company, so if
13   you want to call that employment, then ----
14       Q.   That is a good critique and a bad
15   question.  Besides working for your own companies and
16   yourself, have you worked for anyone else besides BDO
17   and nChain ----
18       A.   No.
19       Q.   ---- from 2006 on.  Where did you
20   maintain -- so you said that between 2008 you left BDO,
21   and then in 2000 -- when did you begin working for
22   nChain?
23       A.   Well, I did not really begin working for
24   nChain, I founded nChain.
25       Q.   When did you found nChain?
```

MAGNA
LEGAL SERVICES

Page 14

1      A.   nChain was founded effectively in a
2  number of different forms in around May 2015.
3      Q.   So between December of 2008 and May of
4  2015, you worked for yourself in companies that you
5  created?
6      A.   I worked for the companies I created,
7  yes.  I did not work for myself per se, I was not
8  working for my own business, if that is what you are
9  asking.
10     Q.   Did these companies have offices in
11 Australia?
12     A.   Yes, some of them did.
13     Q.   Do you recall the addresses of those
14 offices?
15     A.   In North Ryde I do not remember the exact
16 address.
17     Q.   Were there more than one address?
18     A.   In some of them, yes.
19     Q.   Were they all in North Ryde?
20     A.   No.
21     Q.   Where else were they?
22     A.   I honestly do not remember.  I do not try
23 and remember addresses.  I do not remember, as I said,
24 the address at Oxford Circus where I drive into work
25 every week.  I just go there.

Page 15

1      Q.   Do you have records that you could look
2  this up and let your counsel know later?
3           MS. MARKOE:  Objection.
4           THE WITNESS:  No, but I am sure it is on
5  the internet.
6  BY MR. FREEDMAN:
7      Q.   How many times have you been married?
8      A.   Twice.
9           MS. MARKOE:  Objection.
10 BY MR. FREEDMAN:
11     Q.   What is the name of your first wife?
12     A.   Carol Lynne Wright.
13     Q.   What was her maiden name?
14     A.   Black.
15     Q.   When did you first meet her?
16          MS. MARKOE:  Objection.  What is the
17 relevance of when he met an ex-wife?  And how does that
18 relate to any of the topics that you have purported that
19 you are planning on covering today?
20          MR. RIVERO:  Instruct not to answer.
21 Next question, please.
22          MR. FREEDMAN:  Andrés?
23          BY MR. RIVERO:  Please ask the next
24 question.  That we will take up with the court if you
25 wish to.

Page 16

1           MR. FREEDMAN:  Okay.  Are you going to
2  instruct him not to answer any question about his first
3  wife?
4           MR. RIVERO:  Mr. Freedman, you have the
5  right to ask questions.  Ask the questions.  You are
6  wasting your own time.  If you want to take up that
7  question with the court I am ready to call now if you
8  want to find the judge.  When did he meet his first
9  wife?  Please, move on.
10          MR. FREEDMAN:  We will deal with it in
11 the court.
12          MR. RIVERO:  Please move on.  Next
13 question.
14 BY MR. FREEDMAN:
15     Q.   When did you get married to
16 Ms. Lynne Black?
17     A.   In the '90s.  I have an oath, as part of
18 my divorce settlement, that I will not discuss anything
19 about my wife or my former marriage.  I will not break
20 that.  Thank you.
21     Q.   When did you get divorced?
22     A.   I have an oath with my wife that I am
23 divorced from that I will not discuss anything about her
24 or my former marriage that is part of our settlement.
25 Thank you.

Page 17

1      Q.   Including the date of the divorce?
2      A.   I have an oath with my former wife that
3  I will not discuss anything about her or my former
4  marriage.  I will not break that.
5      Q.   Have you stayed in touch with your
6  ex-wife after the date of the divorce?
7           MS. MARKOE:  Objection.
8           THE WITNESS:  I have an oath with my
9  former wife that I will not discuss anything about her
10 in any way or my marriage, and I will not break an oath.
11 BY MR. FREEDMAN:
12     Q.   So we do not have to go through every
13 single question.  Are you refusing to answer any
14 questions about Ms. Lynne Black?
15     A.   I am not refusing to answer questions.
16 I have an oath that has been filed within a court in
17 Australia.  I will not breach oath and perjure myself or
18 break oath.  You are asking me to break oath, and unless
19 instructed by a judge, etcetera, etcetera, I will not do
20 that.
21     Q.   What is the name of your second wife?
22     A.   My second wife is called Ramona.
23     Q.   When did you meet Ramona Wright?
24          MS. MARKOE:  Objection.
25 BY MR. FREEDMAN:



Page 18

```
1      Q.    What is her last name?
2      A.    Watts.
3      Q.    Was it always Watts?
4      A.    No.
5      Q.    What was it before it was Watts?
6      A.    It was Ang.
7      Q.    Can you spell that, please?
8      A.    A-N-G.
9      Q.    When did it change to Watts?
10          MS. MARKOE:  Objection.
11          THE WITNESS:  I am not answering
12   questions about my wife.  My wife is privileged in the
13   UK.  My marriage is privileged.  You should know that,
14   as a lawyer.  Are you seeking to have me breach marital
15   privilege?
16   BY MR. FREEDMAN:
17      Q.    Dr. Wright, it will not be productive for
18   us to have a conversation about whether or not the time
19   of when your wife's name changed from Ang to Watts is
20   covered by spells of privilege, but ----
21      A.    I do not discuss my family, full stop.
22      Q.    Dr. Wright, you understand that you are
23   being sued in this case?
24      A.    I understand perfectly well that a con
25   man in America has made up a fraudulent claim, yes.
```

Page 19

```
1      Q.    And you understand that you tried to
2    dismiss this case?
3          MS. MARKOE:  Objection.  Sir, Vel, we
4    have a lit of topics.  These were approved by the court.
5    This is not part of your list of topics.
6          MR. FREEDMAN:  It certainly is,
7    Ms. Markoe.
8          MS. MARKOE:  Explain to me in what way.
9          MR. FREEDMAN:  Because the list of topics
10   approved by the court approved the inquiry into
11   witnesses and Ms. Ramona Watts is heavily and was
12   heavily involved with Dr. Wright's businesses.
13          MS. MARKOE:  That topic says:
14   "Identification of witnesses, including information
15   about their whereabouts and roles in the subject matter
16   of the pleadings".  Your questions do not go ----
17          MR. FREEDMAN:  Sure they do.
18          MS. MARKOE:  ---- to those issues.  Your
19   questions do not go to those issues.  Ask questions that
20   go to those issues and he will answer the questions that
21   go to those issues to the extent that they are not part
22   of a privilege.  Continue.
23          MR. FREEDMAN:  We are trying to determine
24   at what point she entered into this circle of companies
25   and this helps us determine that.
```

Page 20

```
1          MS. MARKOE:  When her name changed from
2    Ang to Watts helps you determine ----
3          MR. FREEDMAN:  Helps us identify her and
4    her history and learn about her, so that we can
5    eventually, if possible, take her deposition, yes.
6          MS. MARKOE:  And that has nothing to do
7    with these topics.  That has absolutely nothing to do
8    with these topics.  You can ask the questions that go to
9    these topics and go to the specific issues, period.
10          MR. FREEDMAN:  We will take it up with
11   court.
12          MS. MARKOE:  Take it up with the court.
13   BY MR. FREEDMAN:
14      Q.    Dr. Wright, do you have any computers
15   that existed as of 2006 that are still in your
16   possession today?
17          MS. MARKOE:  Objection: asked and
18   answered.
19          MR. FREEDMAN:  Ms. Markoe, I would if you
20   would just limit your objection to form as per the
21   rules.
22          THE WITNESS:  No.
23   BY MR. FREEDMAN:
24      Q.    Do you have any computers in your
25   possession from 2007?
```

Page 21

```
1      A.    No.
2      Q.    2008?
3          MS. MARKOE:  Objection.
4          THE WITNESS:  Any computer that I have
5    had has been imaged and taken.  I do not know if there
6    is any old hard drives or whatever else from any
7    particular date.  Every single computer has been taken,
8    imaged, etcetera.
9      Q.    I understand, but that is not my
10   question.  My question is if you have any -- let me
11   rephrase it, maybe it is easier.  What is the oldest
12   computer that you have in your possession?
13      A.    I do not know.
14      Q.    What is the oldest hard drive that you
15   have in your possession?
16      A.    I do not know.
17      Q.    What is the oldest media device that you
18   have in your possession?
19      A.    I do not know.
20      Q.    Did you use any cloud storage services in
21   the 2006 -- in 2006?
22      A.    Yes.
23      Q.    What were those services?
24      A.    I do not remember.
25      Q.    Did you use any cloud storages in 2007?
```

Page 22

1    A.    Yes.
2    Q.    What were the names of those storage
3    services?
4    A.    I do not remember.
5    Q.    Did you use cloud storages in 2008?
6    A.    Yes.
7    Q.    What were the names of those storages?
8    A.    I do not remember.
9    Q.    Did you use cloud storages in 2009?
10   A.    Yes.
11   Q.    What were the names of those cloud
12   storages?
13   A.    I do not remember.
14   Q.    Did you use cloud storages in 2010?
15   A.    Yes.
16   Q.    What were the names of those cloud
17   storages?
18   A.    I do not remember.
19   Q.    Did you use cloud storages in 2011?
20   A.    Yes.
21   Q.    What were the names of those cloud
22   storages?
23   A.    I do not remember.
24   Q.    Did you use cloud storage services in
25   2012?

Page 23

1    A.    Yes.
2    Q.    What were the names of those cloud
3    storages?
4    A.    I do not remember.
5    Q.    Did you use cloud storages in 2013?
6    A.    Yes.
7    Q.    What were the names of those cloud
8    storages?
9    A.    I do not remember.
10   Q.    From 2006 until 2013, did you ever use
11   cloud computing services?
12        MS. MARKOE:  Objection.
13        THE WITNESS:  Yes.
14   BY MR. FREEDMAN:
15   Q.    What were the names of those cloud
16   computing services?
17   A.    I do not remember.
18   Q.    What did you use cloud computing services
19   for?
20        MS. MARKOE:  Objection.
21        THE WITNESS:  To store data, to analyse
22   data.
23   BY MR. FREEDMAN:
24   Q.    What data did you store?
25   A.    A wide variety of all different things

Page 24

1    I was analysing.
2    Q.    Can you list for me the types of data you
3    stored?
4         MS. MARKOE:  Objection.
5         THE WITNESS:  0s and 1s.
6    BY MR. FREEDMAN:
7    Q.    And at a higher level?
8         MS. MARKOE:  Objection.
9         THE WITNESS:  I do not remember the exact
10   composition of data that I had at any period.  I do not
11   try and remember these things.
12   BY MR. FREEDMAN:
13   Q.    Do you remember any of the data that you
14   stored during that period?
15   A.    I, at most of these periods that you are
16   talking about, have staff.  I ask for things to happen,
17   things happen.
18   Q.    So, is it your testimony today that from
19   2006 until 2013, you do not recall any of the data that
20   you stored on cloud storage devices?
21        MS. MARKOE:  Objection:  mischaracterises
22   the testimony.
23        MR. FREEDMAN:  I asked him if that was
24   his testimony.  I would ask again, Ms. Markoe, that you
25   limit your objection to form.

Page 25

1         MS. MARKOE:  And I would ask that you ask
2    proper questions.  Continue.
3         THE WITNESS:  Very simply, you have tried
4    to twist my words, that is not what I said.
5         MR. FREEDMAN:  Ms. Markoe, this is the
6    issue with objecting beyond form, because you are
7    coaching the witness and it is inappropriate under the
8    local rules.
9         MS. MARKOE:  I am not coaching the
10   witness at all.
11        THE WITNESS:  I would have said that
12   either way.
13        MS. MARKOE:  I am telling you what my
14   objection is and I am allowed to record my objection for
15   the record.
16        MR. FREEDMAN:  Just to form.  It is part
17   of the local rules.  It is quite clear.  You are only
18   allowed to object to form.
19        MS. MARKOE:  Take it up with the judge,
20   then.
21        MR. FREEDMAN:  I will, but I am hoping I
22   do not have to.
23   Q.    Dr. Wright, is it your testimony today
24   that from 2006-2013 that you do not recall any of the
25   data you stored on cloud storage devices?

MAGNA
LEGAL SERVICES

Page 26

1        MS. MARKOE:  Objection.
2        THE WITNESS:  I do not recall the data,
3   no.
4   BY MR. FREEDMAN:
5        Q.   Is it your testimony today that from
6   2006-2013 you do not recall any of the functions that
7   you used cloud computing services for?
8        MS. MARKOE:  Objection.
9        THE WITNESS:  That is not what I actually
10  said.  I said I do compute and storage.  They are
11  functions.
12  BY MR. FREEDMAN:
13       Q.   Do you recall what data you computed
14  during the 2006-2013 time period?
15       MS. MARKOE:  Objection.
16       THE WITNESS:  The purpose of storing data
17  and doing compute is so that I do not need to recall it.
18  BY MR. FREEDMAN:
19       Q.   So do you recall what you stored from
20  2006-2013?
21       MS. MARKOE:  Objection.
22       THE WITNESS:  Again, I do not recall,
23  because I do not need to.  The whole purpose of storing
24  information is so that you do not need to think about
25  it.

Page 27

1   BY MR. FREEDMAN:
2        Q.   So you do not recall?
3        MS. MARKOE:  Objection.
4        THE WITNESS:  I just said that.
5   BY MR. FREEDMAN:
6        Q.   Did any of the data stored, or any of the
7   cloud computing services used, relate to Bitcoin?
8        A.   Yes.
9        MS. MARKOE:  Objection.
10  BY MR. FREEDMAN:
11       Q.   Do you recall how it related to Bitcoin?
12       MS. MARKOE:  Objection.
13       THE WITNESS:  Define that.  Define what
14  you mean by how it related to Bitcoin.
15  BY MR. FREEDMAN:
16       Q.   Did it relate to the mining of Bitcoin?
17       MS. MARKOE:  Objection.
18       THE WITNESS:  No.
19  BY MR. FREEDMAN:
20       Q.   Did it relate to blockchain-based
21  intellectual property?
22       MS. MARKOE:  Objection.
23       THE WITNESS:  Define what
24  blockchain-based intellectual property means, please.
25  BY MR. FREEDMAN:

Page 28

1        Q.   What does the term blockchain mean to
2   you?
3        A.   Blockchain is a misrepresentation of the
4   use of timechain that is defined within the word
5   Bitcoin.  It is effectively, people not understanding
6   what the technology is, and calling it something that it
7   is not.
8        Q.   So would timechain be a more accurate
9   term to use?
10       MS. MARKOE:  Objection.
11       THE WITNESS:  For the general
12  representation, yes.
13  BY MR. FREEDMAN:
14       Q.   Did any of the cloud computing and cloud
15  storage services that you used between 2006 until 2013
16  relate to timechain intellectual property?
17       MS. MARKOE:  Objection.
18       THE WITNESS:  Again, what you are trying
19  to do is multiple things, and are you talking about the
20  development of what became Bitcoin, or are you talking
21  about something else, such as documenting or writing
22  papers on the topic?
23  BY MR. FREEDMAN:
24       Q.   Let us start with the development of
25  Bitcoin.  Did any of those cloud storages and cloud

Page 29

1   computing services relate to the development of what
2   became Bitcoin?
3        MS. MARKOE:  Objection.
4        THE WITNESS:  The cloud storages did not
5   relate to the development of Bitcoin.  The development
6   of Bitcoin was not done by cloud storages.
7   BY MR. FREEDMAN:
8        Q.   What was the development of it being done
9   by?
10       MS. MARKOE:  Objection.
11       THE WITNESS:  Humans.
12  BY MR. FREEDMAN:
13       Q.   Was any of the information relating to
14  the development of Bitcoin stored on cloud computing
15  services?
16       A.   Yes.
17       Q.   Do you recall what those cloud computing
18  services were called?
19       MS. MARKOE:  Objection.
20       THE WITNESS:  No.
21  BY MR. FREEDMAN:
22       Q.   Do you still have access to those cloud
23  computing services?
24       A.   No.
25       Q.   Do you have copies of the data that were



Page 30

1  on those cloud computing services?
2      A.   The data that I have at my house has been
3  analysed.  I do not recall what every bit of that data
4  is.  The analysis of that data has either been taken or
5  not.  I have not gone through what the lawyers have
6  copied, so I cannot answer that question.
7      Q.   So, sitting here today, you do not know
8  whether the data that was on the cloud computing storage
9  -- strike that.  Sitting here today, you do not know
10 whether the data that was on the cloud storage services
11 resides on the data that was imaged by your lawyers?
12      MS. MARKOE:  Objection.
13      THE WITNESS:  I do not know what my
14 lawyers imaged, so I cannot answer that question.
15 May I have a glass of water, please?
16      MS. MARKOE:  Yes.
17      MR. RIVERO:  Sparkling or still?
18      THE WITNESS:  Sparkling, thank you.
19 BY MR. FREEDMAN:
20      Q.   Dr. Wright, how did you identify for your
21 lawyers what devices to image?
22      MS. MARKOE:  Can you repeat the question,
23 I am sorry?
24 BY MR. FREEDMAN:
25      Q.   How did you identify for your lawyers

Page 31

1  what devices they should image for this litigation?
2      MR. RIVERO:  Dr. Wright, you cannot go
3  into conversations with your lawyers, because that would
4  be privileged.  So I am instructing you on that, but
5  answer to the extent that you can without going into any
6  communications with counsel.
7      THE WITNESS:  I was given a set of
8  instructions.  I told the people what matched the
9  instructions.
10 BY MR. FREEDMAN:
11      Q.   Are there devices at your home or office
12 here in the United Kingdom that have not been imaged?
13      MS. MARKOE:  Objection.
14      THE WITNESS:  Yes.
15 BY MR. FREEDMAN:
16      Q.   Can you list those devices for me?
17      MS. MARKOE:  Objection.
18      THE WITNESS:  No.
19 BY MR. FREEDMAN:
20      Q.   Why not?
21      A.   I do not know them.
22      Q.   Would you be able to provide a list of
23 those devices to your lawyers?
24      MS. MARKOE:  Objection.
25      THE WITNESS:  No.

Page 32

1  BY MR. FREEDMAN:
2      Q.   Why not?
3      A.   My wife has machines, they are not mine,
4  they have nothing to do with Bitcoin or this case.
5  I will not list her machines.  I will not ask her to
6  list her machines.
7      Q.   Do you have access to your wife's
8  machines?
9      A.   No.
10      MS. MARKOE:  Objection.
11 BY MR. FREEDMAN:
12      Q.   Did your wife use those machines for the
13 ----
14      A.   No.
15      Q.   Sorry?
16      A.   There are no machines at my house that
17 are that old.  There are no machines that have been
18 older than 2015, as you are trying to imply.  So, the
19 data that I had was copied to companies.  Those
20 companies in Australia have been imaged by the
21 Australian Tax Office for whatever they have done.  I do
22 not have them.
23      Q.   From 2006 until 2014, did you make any
24 trips to the United States?
25      A.   Yes.

Page 33

1      MS. MARKOE:  Objection.
2  BY MR. FREEDMAN:
3      Q.   How many trips did you make to the United
4  States?
5      A.   I do not know.
6      Q.   Did you travel to the United States in
7  2006?
8      MS. MARKOE:  Objection.  Again, we are
9  talking about ----
10      THE WITNESS:  I do not know.
11      MS. MARKOE:  ---- a list of topics.  This
12 is not related to your list of topics.  Stick to the
13 topics that you agreed to.  There were ten of them.
14 This is not one of them.
15      MR. FREEDMAN:  This relates to the
16 formation of the partnership with Dave Kleiman, so ----
17      MS. MARKOE:  How does it relate to the
18 formation of the partnership with Dave Kleiman when you
19 are asking about his trips to the United States from
20 2006-2014?
21      MR. FREEDMAN:  Because that is when we
22 allege the formation of the partnership eventually took
23 place.
24      MS. MARKOE:  Why do not you ask about the
25 formation of the partnership rather than random trips



Page 34

1   that he might have taken to the United States.
2            MR. FREEDMAN:  Ms. Markoe, I do not have
3   to ask the questions the way you would like me to ask
4   the questions.  If you instruct the witness not to
5   answer we will take it up with the court.  Otherwise
6   please either object or instruct.
7        Q.    In 2006, did you travel to the United
8   States?
9            MS. MARKOE:  Objection.
10            THE WITNESS:  I do not know.
11   BY MR. FREEDMAN:
12        Q.    In 2007, did you travel to the United
13   States?
14        A.    I do not know.
15            MS. MARKOE:  Objection.
16   BY MR. FREEDMAN:
17        Q.    In 2008, did you travel to the United
18   States?
19            MS. MARKOE:  Objection.
20            THE WITNESS:  Yes.
21            THE COURT REPORTER:  Slow down, please.
22   I cannot keep up.
23            MR. FREEDMAN:  Sorry.
24        Q.    In 2008, you travelled to the United
25   States?

Page 35

1            MS. MARKOE:  Objection.
2            THE WITNESS:  Yes.
3   BY MR. FREEDMAN:
4        Q.    Where in the United States did you
5   travel?
6            MS. MARKOE:  Objection.
7            THE WITNESS:  I do not remember.
8            MR. RIVERO:  Dr. Wright, the most
9   important person is actually the court reporter, who
10   makes the official record.  So you have to allow a beat
11   for objections, because our court reporter cannot take
12   you and the objection simultaneously, so I think it is
13   helpful if we all take a breath.  I speak very quickly,
14   so I have to take a breath.  It is very natural.
15   BY MR. FREEDMAN:
16        Q.    Do you recall the purpose of travel in
17   2008?
18            MS. MARKOE:  Objection.
19            THE WITNESS:  I went to various different
20   trips around the world.  I have been to over 100
21   countries.  I travel, even now, probably 30-50 countries
22   every year.  I do six countries a month, some months.  I
23   do not remember my trips.  I know I do presentations,
24   I met with government officials, I met with the FBI at
25   one point, I met with people in a number of three-letter

Page 36

1   agencies.  If you are asking did I meet with Dave
2   Kleiman then, no.
3   BY MR. FREEDMAN:
4        Q.    You remember very specifically to have
5   taken a trip to the United States in 2008?
6            MS. MARKOE:  Objection.
7   BY MR. FREEDMAN:
8        Q.    How do you recall that you were
9   travelling to the United States in 2008?
10        A.    One of my trips was to meet people at
11   Microsoft.
12        Q.    Where did you meet people at Microsoft?
13            MS. MARKOE:  Objection.
14            THE WITNESS:  At Microsoft.
15   BY MR. FREEDMAN:
16        Q.    Where at Microsoft?  At Microsoft
17   headquarters?
18            MS. MARKOE:  Objection.
19            THE WITNESS:  At Microsoft headquarters.
20            MS. MARKOE:  I am going to instruct the
21   witness not to answer this.  It has absolutely nothing
22   to do with this case and it has nothing to do with topic
23   number 3 which you are purporting this line of
24   questioning is related to.  He has already answered your
25   question that he did not meet with Mr. Kleiman during

Page 37

1   any of his trips to the United States in 2008,
2   I believe, but the record will state what he said.
3            MR. FREEDMAN:  Ms. Markoe, I am not going
4   to argue with you about it but we were given some leeway
5   to press Dr. Wright's initial representation of what he
6   did and did not do.
7            MS. MARKOE:  And he answered your
8   question by telling you that he met with people at
9   Microsoft.  That is enough pressing.
10   BY MR. FREEDMAN:
11        Q.    In 2009, did you travel to the United
12   States?
13        A.    Yes.
14        Q.    For what purpose?
15        A.    I do not remember all the conferences,
16   etcetera, that I went to in 2009.
17        Q.    Where in the United States did you travel
18   to?
19            MS. MARKOE:  Objection.
20            THE WITNESS:  I do not have my travel
21   records in front of me.  I cannot answer that.
22   BY MR. FREEDMAN:
23        Q.    Did you travel to Florida in 2009?
24        A.    Either then or 2010, I cannot remember
25   the exact dates.

Page 38

1    Q.   Did you travel to Florida in 2008?
2         MS. MARKOE:  Objection.
3         THE WITNESS:  No.  I do not believe
4    I did.
5    BY MR. FREEDMAN:
6         Q.   When you travelled to Florida in 2009 or
7    2010, did you meet with Dave Kleiman?
8         A.   Yes.
9         Q.   What did you discuss with Dave Kleiman?
10        A.   We drank.
11        Q.   Where did you drink?
12        A.   A pub.
13        Q.   Where was the pub located?
14        A.   I do not know.
15        Q.   In what city was the pub located?
16        A.   It was somewhere that Dave drove to, with
17   another person called Paul Henry.
18        Q.   Did you discuss anything related to
19   Bitcoin?
20        A.   No.
21        Q.   Did you discuss anything related to
22   blockchain or timechain?
23        A.   No.
24        MS. MARKOE:  Objection.
25   BY MR. FREEDMAN:

Page 39

1    Q.   How long did you meet with Dave Kleiman
2    for?
3         MS. MARKOE:  Objection.
4         THE WITNESS:  I do not remember.  We
5    drank a lot.
6    BY MR. FREEDMAN:
7         Q.   Was that the only time you saw
8    Dave Kleiman?
9         A.   No.
10        Q.   That was a bad question.  Strike that.
11   Was that the only time you saw Dave Kleiman on that
12   trip?
13        A.   Yes.
14        Q.   Did you travel to the United States in
15   2010?
16        MS. MARKOE:  Objection.
17        THE WITNESS:  As I said, 2009/10.
18   BY MR. FREEDMAN:
19        Q.   Sorry, yes, you are right.  Beyond the
20   2009/2010 trip to the United States where you met with
21   Dave Kleiman, was there another time that you travelled
22   to the United States and met with Dave Kleiman?
23        A.   No.
24        Q.   In 2011, did you travel to the United
25   States?

Page 40

1         MS. MARKOE:  Objection.  You can answer.
2         THE WITNESS:  Yes.
3    BY MR. FREEDMAN:
4         Q.   Did you meet with Dave Kleiman in 2011?
5         MS. MARKOE:  Objection.
6         THE WITNESS:  Briefly.
7    BY MR. FREEDMAN:
8         Q.   Where did you meet with Dave Kleiman?
9         A.   I need to obstruct -- this is one of
10   those matters.
11        MS. MARKOE:  Okay.  This is a matter that
12   I am going to instruct him not to answer.  He will
13   discuss the basis for his refusing not to answer in
14   camera with the court.  It involves issues of national
15   security and he is not permitted to answer these
16   questions.  He can give a more fulsome explanation to
17   the court in camera and the court can make a ruling
18   based on that in camera discussion.
19        Can I just consult with my client for one
20   second to see if I can get you some sort of an answer
21   that might be of assistance to you?
22        MR. FREEDMAN:  Sure.
23        MS. MARKOE:  Let us go off the record.
24        MR. FREEDMAN:  You want to take a break?
25        THE VIDEOGRAPHER:  Going off the record.

Page 41

1    The time is 11.12.
2         (A Short Break)
3         THE VIDEOGRAPHER:  Going back on the
4    record.  The time is 11.23.  Thank you.
5    BY MR. FREEDMAN:
6         Q.   Dr. Wright ----
7         THE VIDEOGRAPHER:  Sorry, sir ----
8         MR. FREEDMAN:  Oh, my mic!
9         MS. MARKOE:  Why do we not read back that
10   last question before the objection and we can take it
11   from there.
12        MR. FREEDMAN:  Actually, before we go
13   there, I just want to double back on something I left
14   out initially, which is earlier you told me that you
15   instructed employees how to store things on cloud
16   storage devices; do you recall that?
17        MS. MARKOE:  Objection.
18        THE WITNESS:  No, that is not what
19   I said.
20   BY MR. FREEDMAN:
21        Q.   What did you say?
22        A.   I said I instruct employees to do things
23   and things happened.
24        Q.   Who were those employees?
25        A.   I do not remember the names of all my

MAGNA >
LEGAL SERVICES

Page 42

1  employees.
2      Q.   Do you remember the names of the
3  employees that dealt with cloud storage devices?
4      A.   No.
5      Q.   Cloud storage services?
6      A.   No.
7      Q.   Cloud computing services?
8      A.   No.
9      Q.   In 2011 you met with Dave Kleiman?
10         MR. RIVERO:  Objection.
11     Paula, would you please go back.  As we
12  requested, there was a pending question at which point
13  there was a request to take a break.  We asked that the
14  last question be read back.  I will read back but
15  I would ask the court reporter to confirm.  The next to
16  last question:  "Did you meet with Dave Kleiman in
17  2011?" The witness: "Briefly". Next question: "Where
18  did you meet with Dave Kleiman?"  That is where that
19  took up.  We would like to go back so it is clear on the
20  record what he is and is not answering.  So if you can
21  read it.  We want to do this formally.  That is where we
22  were.
23         MR. FREEDMAN:  Mr. Rivero, this is my
24  deposition.  I strike the question.  We will go back
25  now.

Page 43

1          MR. RIVERO:  No, Mr. Freedman ----
2          MR. FREEDMAN:  Mr. Rivero, this is my
3  deposition.  I ask the questions I would like to ask.
4          MR. RIVERO:  Mr. Freedman, you need to
5  hear me on this.  There was a pending question.  We
6  asked for and took time to address it.  We want to
7  respond so it is clear to the court what our position is
8  on your pending question.  Please, let us go back and do
9  it right.
10         MR. FREEDMAN:  I do strike the question
11  and you can take up my striking the question with the
12  court, Mr. Rivero.
13         MR. RIVERO:  We are not going to ----
14         MR. FREEDMAN:  Mr. Rivero, I am not going
15  to continue arguing.
16         MR. RIVERO:  Mr. Freedman, there was a
17  pending question.  We asked for permission to break to
18  address the pending question.  If you are withdrawing
19  the line of questioning, I am perfectly happy to go on,
20  but I am not going to have an unclear record.  He is
21  prepared to answer the last question.
22         MR. FREEDMAN:  In the interests of time,
23  let us go back.  Can you please read back the question.
24     (The court reporter read back as requested)
25         THE WITNESS:  I had a video conference

Page 44

1  while in New York that involved Mr. Kleiman.
2  BY MR. FREEDMAN:
3      Q.   Where was Mr. Kleiman when you video
4  conferenced him?
5      A.   Exactly where I do not know.
6      Q.   How long did the video conference last?
7      A.   Probably 30-45 minutes.
8      Q.   Did the video conference have anything to
9  do with Bitcoin?
10         MS. MARKOE:  Objection.
11         THE WITNESS:  The video conference was
12  not about Bitcoin.
13  BY MR. FREEDMAN:
14     Q.   Did the video conference have anything to
15  do with blockchain or timechain technology?
16         MS. MARKOE:  Objection.
17         THE WITNESS:  The video conference was
18  not about those topics.
19  BY MR. FREEDMAN:
20     Q.   Was there anyone else on the conference?
21     A.   Yes.
22     Q.   Who else was on the conference?
23     A.   I cannot answer that.  That is part of
24  what we need to ----
25     Q.   Okay.

Page 45

1      A.   That individual has nothing to do with
2  Bitcoin in any way.
3      Q.   Can you tell me the subject matter of the
4  discussion?
5      A.   No.
6          MS. MARKOE:  That is the in camera part.
7  BY MR. FREEDMAN:
8      Q.   Was there any other time in 2011 that you
9  met with Dave Kleiman?
10     A.   No.
11     Q.   In 2012, did you meet with Dave
12  Kleiman -- strike that.  In 2011, was there any other
13  time when you travelled to the United States?
14         MS. MARKOE:  Objection.
15         THE WITNESS:  I do not know.  I travel a
16  lot.  I cannot remember exactly where I travel when.
17  I have been to the US many times.  I do not know when
18  I have and have not been at particular times.
19  BY MR. FREEDMAN:
20     Q.   In 2012, did you travel to the United
21  States?
22         MS. MARKOE:  Objection.
23         THE WITNESS:  Again, I travelled a lot.
24  I do not remember.
25  BY MR. FREEDMAN:

MAGNA
LEGAL SERVICES

| | Page 46 |
|---|---|

```
 1        Q.    Did you travel to Florida in 2012?
 2        A.    No.
 3        Q.    Did you travel a lot between ----
 4        A.    I travelled a lot.
 5        Q.    ---- 2006 and 2013?
 6              MS. MARKOE:  Objection.
 7              THE WITNESS:  I have travelled a lot all
 8   my life.
 9   BY MR. FREEDMAN:
10        Q.    In 2013, did you travel to the United
11   States?
12              MS. MARKOE:  Objection.
13              THE WITNESS:  I believe so.  I did not
14   travel to Florida, however.
15   BY MR. FREEDMAN:
16        Q.    Why did you travel to the United States
17   in 2013?
18              MS. MARKOE:  Objection.
19              THE WITNESS:  I travel a lot.
20   I presented conferences.  I meet government officials.
21   I do all sorts of things.
22   BY MR. FREEDMAN:
23        Q.    Did you meet with Dave Kleiman in 2013?
24        A.    Physically, no.
25        Q.    Did you meet with Dave Kleiman via video
```

| | Page 47 |
|---|---|

```
 1   conference in 2013?
 2        A.    Yes.
 3        Q.    How many times in 2013 did you meet with
 4   Dave Kleiman via video conference?
 5        A.    More than I can remember.
 6        Q.    Approximately how frequently would you
 7   meet with Dave Kleiman via video conference in 2013?
 8        A.    There was only a small amount of time
 9   before he died.
10        Q.    How many times a week approximately would
11   you meet with Dave Kleiman via video conference in 2013?
12              MS. MARKOE:  Objection.
13              THE WITNESS:  Not many.  Dave died.  He
14   was sick.
15   BY MR. FREEDMAN:
16        Q.    Dave died in April of 2013?
17        A.    Yes.
18        Q.    So, between January of 2013 and April of
19   2013, approximately how many times did you meet with
20   Dave Kleiman via video conference?
21        A.    Not many.
22              MS. MARKOE:  Objection.
23   BY MR. FREEDMAN:
24        Q.    Ten times?
25              MS. MARKOE:  Objection.
```

| | Page 48 |
|---|---|

```
 1              THE WITNESS:  Less.
 2   BY MR. FREEDMAN:
 3        Q.    Five times?
 4        A.    I do not remember.
 5        Q.    Some amount of times between five and ten
 6   to the best of your recollection?
 7              MS. MARKOE:  Objection.
 8              THE WITNESS:  Somewhere around less than
 9   ten.
10   BY MR. FREEDMAN:
11        Q.    Okay.  In 2012, did you meet via video
12   conference with Dave Kleiman?
13        A.    Yes.
14        Q.    Approximately how often would you meet
15   via video conference with Dave Kleiman in 2012?
16              MS. MARKOE:  Objection.
17              THE WITNESS: Dave was my best friend.  We
18   talked a lot.
19   BY MR. FREEDMAN:
20        Q.    So, once a week?
21              MS. MARKOE:  Objection.
22              THE WITNESS:  I do not recollect.  I do
23   not try to think about these things.  I work.  I work
24   100 hour weeks.  At the moment my work is 108 hours.
25   I work less now than I used to.  I call people, I do
```

| | Page 49 |
|---|---|

```
 1   things, I produce.  I do not sit there recording and
 2   remembering what I did.  I do not remember how many
 3   times I have called my mother.  I do not remember how
 4   many times I have talked to my wife.  I do not remember
 5   any of these things.
 6   BY MR. FREEDMAN:
 7        Q.    In 2011, besides from the video
 8   conference we have just discussed that you want to talk
 9   to the court about in camera, how many times did you
10   meet via video with Dave Kleiman?
11        A.    I do not know.
12              MS. MARKOE:  Objection.
13   BY MR. FREEDMAN:
14        Q.    Is it safe to say a lot?
15              MS. MARKOE:  Objection.
16              THE WITNESS:  Define "a lot".
17   BY MR. FREEDMAN:
18        Q.    You said you met with him a lot in 2013.
19   Was the frequency of meeting with Dave Kleiman via video
20   conference in 2012 the same as it was in 2013?
21              MS. MARKOE:  Objection.  The record will
22   speak for itself.
23              MR. FREEDMAN:  Let me strike that and
24   start again.
25        Q.    Approximately how many times did you meet
```

Page 50

1   with Dave Kleiman via video conference in 2011?
2           MS. MARKOE:  Objection.
3           THE WITNESS:  I do not know.
4   BY MR. FREEDMAN:
5       Q.   More than ten times?
6           MS. MARKOE:  Objection.
7           THE WITNESS:  I believe so.
8   BY MR. FREEDMAN:
9       Q.   More than 20 times?
10      A.   I do not know.
11      Q.   Is it safe to say it was somewhere
12  between ten to 20 times?
13          MS. MARKOE:  Objection.
14          THE WITNESS:  I do not know.
15  BY MR. FREEDMAN:
16      Q.   Could it have been more than 20 times?
17          BY MS. MARKOE:  Objection: calls for
18  speculation.
19          MR. FREEDMAN:  Please, Ms. Markoe, limit
20  your objections to form.
21          MR. RIVERO:  Proceed.
22          THE WITNESS:  Could this be the Cartesian
23  abstraction, a projection, yes, that is a possibility.
24  The possibility of my putting my hand through the wall
25  exists.  Is that a probability: no.  Please answer me

Page 51

1   something that is not fluffy.
2   BY MR. FREEDMAN:
3       Q.   Was it probable that you spoke with Dave
4   Kleiman more than 20 times in 2011?
5           MS. MARKOE:  Objection.
6           THE WITNESS:  I do not know.  It was
7   definitely more than 10 times.
8   BY MR. FREEDMAN:
9       Q.   In 2010, how many times did you meet with
10  Dave Kleiman via video conference?
11          MS. MARKOE:  Objection.
12          THE WITNESS:  Again, even less
13  recollection.  I do not know.
14  BY MR. FREEDMAN:
15      Q.   More than 10 times?
16          MS. MARKOE:  Objection.
17          THE WITNESS:  I do not know.
18  BY MR. FREEDMAN:
19      Q.   Do you have any recollection at all of
20  the frequency in which you talked to Dave Kleiman via
21  video conference in 2010?
22      A.   I could not even answer the recollection
23  of what I have talked to my wife in the last six months,
24  so, no.  What I do recollect is I wrote 64 papers that
25  will go to patent last month.

Page 52

1       Q.   Doctor ----
2       A.   I wrote 18 papers that have been
3   published last month.  That I recollect.  I recollect my
4   work.
5       Q.   If you could try to answer the question
6   that is posed, that would help us move quicker.  Did you
7   speak with Dave Kleiman via video conference in 2010
8   routinely?
9           MS. MARKOE:  Objection.
10          THE WITNESS:  Define the word "routine".
11  BY MR. FREEDMAN:
12      Q.   As you understand the word "routine"?
13          MS. MARKOE:  Objection.
14          THE WITNESS:  I have a full 21 volume
15  copy of the Oxford greater dictionary.  "Routine" is
16  actually about 1.5 pages worth of definitions going back
17  to the 16th century.  Which particular use of "routine"
18  would you like me to have?  As in per route, as in as a
19  directed, something that is not a common used word, or
20  what?
21  BY MR. FREEDMAN:
22      Q.   Let us just jump to 2009.  Do you recall
23  how many times you spoke with Dave Kleiman via video
24  conference in 2009?
25          MS. MARKOE:  Objection.

Page 53

1           THE WITNESS:  As with everyone else, I do
2   not recall exact details.  I do not even remember how
3   many times I have spoken to my mother in the last six
4   months.
5   BY MR. FREEDMAN:
6       Q.   You did not create Bitcoin with your with
7   mother, did you?
8           MS. MARKOE:  Objection.  Move to strike.
9   BY MR. FREEDMAN:
10      Q.   In 2008, do you recall how many times you
11  met with Dave Kleiman via video conference?
12          MS. MARKOE:  Objection.
13          THE WITNESS:  The same answer applies
14  with even less recollection.  I think about my work.
15  People do not always like it, but I do not think about
16  people.
17  BY MR. FREEDMAN:
18      Q.   In 2008, do you recall how many times you
19  had video conferences with Dave Kleiman?
20          MS. MARKOE:  Objection.
21          THE WITNESS:  Again, I do not recollect
22  exactly how many times.
23  BY MR. FREEDMAN:
24      Q.   When did you first meet Dave Kleiman?
25      A.   Exactly when, I do not remember.  Define

**MAGNA**
LEGAL SERVICES

Page 54

```
 1   "meet".
 2       Q.   What year?
 3       A.   Physically meet, meet online, meet by
 4   e-mail, meet by video conference, meet by phone.
 5       Q.   When were you first introduced to Dave
 6   Kleiman in any capacity, in what year?
 7       A.   I was never introduced to Dave Kleiman.
 8       Q.   How did you come to meet Dave Kleiman in
 9   any capacity?
10       A.   We started talking on mailing lists, IRC
11   chats and other such things.
12       Q.   When did you begin that conversation?
13       MS. MARKOE:  Objection.
14       THE WITNESS:  I do not remember exactly.
15   It has been 15 years.
16   BY MR. FREEDMAN:
17       Q.   Do you remember the year?
18       A.   No.
19       Q.   How did you communicate during that time?
20       MS. MARKOE:  Objection: vague.
21       THE WITNESS:  In English.
22   BY MR. FREEDMAN:
23       Q.   From 2006, were you in regular contact
24   with Dave Kleiman?
25       MS. MARKOE:  Objection.
```

Page 55

```
 1       THE WITNESS:  Define "regular".
 2   BY MR. FREEDMAN:
 3       Q.   Once a week?
 4       A.   No.
 5       Q.   Twice a week -- once a month?
 6       A.   Most likely, yes.
 7       Q.   How were you in contact with him
 8   approximately once a month in 2006?
 9       A.   We spoke over IRC, we spoke over video
10   chats, we spoke over chats.
11       Q.   You said "chats".  Can you drill down on
12   that for me; what do you mean by chats?
13       A.   Digital chat media.  IRC is an example of
14   an early chat format.  It has rooms, some of those are
15   public, some of those are private.  Would you like me to
16   detail the format of the protocol any more?
17       Q.   No, but would I like you to drill down a
18   little more on the type of chats besides IRC that you
19   used to discuss with Dave Kleiman?
20       MS. MARKOE:  Objection.
21       THE WITNESS:  I do not remember.  These
22   things have changed.
23   BY MR. FREEDMAN:
24       Q.   Do you have access to any of these IRC
25   chats?
```

Page 56

```
 1       A.   No, that is the nature of IRC.
 2       Q.   Do you have access to any of these video
 3   chats?
 4       A.   No, that is nature of video chats.
 5       Q.   Do you have access to any of the other
 6   chat forms that you used to discuss with Dave Kleiman in
 7   2006?
 8       A.   No, we made sure we talked on things that
 9   were chats.
10       Q.   Meaning there was no record?
11       A.   Meaning that there was no record.
12       Q.   In 2007, did the frequency with which you
13   spoke to Dave Kleiman increase?
14       A.   No.
15       MS. MARKOE:  Objection.
16   BY MR. FREEDMAN:
17       Q.   Did it stay the same?
18       A.   I do not have a record of how many times
19   I spoke to him.  As a statistician, I would have to
20   analyse that as a hypothesis taking one versus the
21   other, but I do not have the data.
22       Q.   Did you speak to Dave Kleiman
23   approximately once a month in 2007?
24       A.   I have no idea how many times I spoke to
25   anyone at any of those times.  Very simply, I am not
```

Page 57

```
 1   able to answer that.
 2       Q.   You have no recollection of the frequency
 3   with which you spoke to Dave Kleiman in 2007; is that
 4   correct?
 5       MS. MARKOE:  Objection.
 6       THE WITNESS:  I remember talking to
 7   people.  I do not remember each of the talks.
 8   BY MR. FREEDMAN:
 9       Q.   But I am asking you to give me your best
10   recollection of the frequency with which you spoke to
11   Dave Kleiman in 2007?
12       MS. MARKOE:  Objection.
13       THE WITNESS:  I do not have a best
14   recollection.  I do not think about people that way.
15   I think about numbers.  I think about algorithms.
16   I remember those.
17   BY MR. FREEDMAN:
18       Q.   How often did you speak to Dave Kleiman
19   in 2008?
20       MS. MARKOE:  Objection.
21       THE WITNESS:  I do not remember.  The
22   same thing applies.  The same thing will apply to 2009.
23   BY MR. FREEDMAN:
24       Q.   How often did you speak to Dave Kleiman
25   in 2010?
```

MAGNA ▶
LEGAL SERVICES

Page 58

1    MS. MARKOE:  Objection.
2    THE WITNESS:  I do not know.
3  BY MR. FREEDMAN:
4    Q.   How often did you speak to Dave Kleiman
5  in 2011?
6    A.   I do not know.
7    Q.   How often did you speak to Dave Kleiman
8  in 2012?
9    A.   I do not know.
10    Q.   How often did you speak to Dave Kleiman
11  in 2013?
12    A.   Not terribly much.
13    Q.   When I say "speak to Dave Kleiman",
14  I also mean telephonically.  Does that change any of
15  your answers?
16    A.   No, I do not use telephone much at all.
17    Q.   Did there come a time when you began
18  e-mailing Dave Kleiman?
19    MS. MARKOE:  Objection.
20    THE WITNESS:  Yes.
21  BY MR. FREEDMAN:
22    Q.   When did you begin e-mailing Dave
23  Kleiman?
24    A.   I do not remember.
25    Q.   Did you e-mail Dave Kleiman in 2006?

Page 59

1    A.   I would have to say most likely, yes.
2    Q.   Did you e-mail Dave Kleiman in 2007?
3    A.   Definitely yes.
4    Q.   What about?
5    A.   I do not remember all the topics that
6  I spoke to Dave in 2007.  I did discuss a cookie recipe.
7    Q.   Why did you say "definitely yes" in 2007?
8    A.   Because there was a cookie recipe
9  discussed in 2007 that was published.
10    Q.   Whose cookie recipe was it?
11    A.   Mine.
12    Q.   Why did you discuss a cookie recipe with
13  Dave Kleiman?
14    MS. MARKOE:  Objection.
15    THE WITNESS:  He was asking about
16  cookies.
17  BY MR. FREEDMAN:
18    Q.   Did you e-mail Dave Kleiman in 2008?
19    A.   Yes.
20    Q.   Do you know how frequently you e-mailed
21  him in 2008?
22    A.   No.
23    Q.   Do you know what you spoke about with
24  Dave Kleiman in 2008?
25    MS. MARKOE:  Objection.

Page 60

1    THE WITNESS:  I do not know the range of
2  topics I spoke to Dave in 2008, no.
3  BY MR. FREEDMAN:
4    Q.   Did you speak to Dave Kleiman -- did you
5  e-mail Dave Kleiman in 2009?
6    A.   Yes.
7    Q.   From 2006 until 2009, what e-mails did
8  you use to communicate with Dave Kleiman?
9    A.   I do not remember.
10    Q.   Do you remember the e-mails you used to
11  communicate with Dave Kleiman?
12    A.   No.
13    Q.   Do you remember the e-mails Dave Kleiman
14  used?
15    A.   No, I have used multiple e-mail
16  addresses, I do not try and remember them.
17    Q.   In 2010, did you e-mail Dave Kleiman?
18    A.   Yes.
19    Q.   In 2011, did you e-mail Dave Kleiman?
20    A.   Yes.
21    Q.   Do you remember the frequency of e-mails
22  that you -- strike that.  Do you remember how frequently
23  you e-mailed Dave Kleiman in 2010?
24    A.   No.
25    Q.   Do you remember the frequency with which

Page 61

1  you e-mailed Dave Kleiman in 2011?
2    A.   No.
3    Q.   Do you remember what you spoke to Dave
4  Kleiman in 2010 and 2011 about?
5    A.   Again, I spoke with a number of topics.
6  I do not try and recollect all the things that are
7  spoken about.
8    Q.   What can you recollect?
9    MS. MARKOE:  Objection.
10    THE WITNESS:  We spoke about his problems
11  and going into hospital quite a number of times.
12  BY MR. FREEDMAN:
13    Q.   In 2012 -- did you e-mail Dave Kleiman in
14  2012?
15    A.   Yes.
16    Q.   Did you e-mail Dave Kleiman in 2013?
17    A.   I do not remember.
18    Q.   Do you remember the frequency with which
19  you e-mailed Dave Kleiman in 2012?
20    A.   No.
21    Q.   Do you remember the topics you e-mailed
22  Dave Kleiman about in 2012?
23    A.   No.
24    Q.   None of them?
25    A.   I know there were a couple of things

MAGNA
LEGAL SERVICES

Page 62

1  about companies that I wanted to set up but none of them
2  is not do I remember them all, no.
3       Q.    Which companies do you recall speaking
4  about in 2012 with Dave Kleiman?
5       A.    I spoke to him about a company called
6  Design by Human that he was supposed to set up for me,
7  which he did not end up paying for.
8       Q.    What do you mean "paying for"?
9       A.    To set up a company you need to pay for
10  it.  The exchange of goods and services generally
11  requires the exchange of money.  The exchange of money
12  is generally considered paying for something.
13      Q.    Do you mean a registration?
14      A.    Yes.
15      Q.    Did you e-mail Dave Kleiman about
16  timechain, blockchain or Bitcoin in 2006?
17      A.    Yes.
18      Q.    How did you communicate with Dave --
19  strike that.  What method did you use to communicate
20  with Dave Kleiman in 2006 about blockchain ----
21      A.    Sorry, 2006, no, I did not.  I was
22  thinking about the last year, sorry, about that,
23  I thought it was 2012.  In 2006, no, I did not talk
24  about blockchain or timechain or anything like that with
25  Dave.

Page 63

1       Q.    In 2007, did you speak with Dave Kleiman?
2  And when I say "speak", I want you to include any form
3  of communication; do we understand each other?
4       A.    Yes.
5       Q.    In 2007, did you speak with Dave Kleiman
6  about blockchain, timechain or Bitcoin?
7       A.    I do not remember the first time that
8  I actually mentioned it to Dave.
9       Q.    It could have been in 2007?
10      A.    It was either 2007 or 2008.  There's an
11  e-mail that I believe people have a copy of.  I do not
12  remember the date of the e-mail.
13      Q.    What does the e-mail say?
14           MS. MARKOE:  Objection.
15           THE WITNESS:  I do not remember what the
16  e-mail says.  I think it speaks for itself.
17  BY MR. FREEDMAN:
18      Q.    What was the purpose of e-mailing Dave
19  Kleiman?
20           MS. MARKOE:  Objection.
21           THE WITNESS:  I wanted Dave to give me
22  some help with editing a paper.
23  BY MR. FREEDMAN:
24      Q.    Which paper?
25      A.    In this particular e-mail that I believe

Page 64

1  you are saying, the Bitcoin white paper.
2       Q.    The date of that e-mail -- does it help
3  you recollect if I tell you that that e-mail is in March
4  of 2008?
5       A.    Yes, I will believe that that is the
6  date, then, and the date about that was March 2008 if
7  that is what it says.
8       Q.    Was that e-mail the very first time you
9  spoke to Dave Kleiman about Bitcoin, blockchain or
10  timechain technology?
11           MS. MARKOE:  Objection.
12           THE WITNESS:  I had not been talking to
13  Dave before that point, so those topics were not
14  something I discussed with Dave before that e-mail.
15  BY MR. FREEDMAN:
16      Q.    So that was the very first time you spoke
17  to Dave Kleiman about Bitcoin, blockchain or timechain
18  technology?
19      A.    I do not recollect whether I talked about
20  BlackNet at any point before that, I do not know.
21      Q.    What is BlackNet?
22      A.    BlackNet is a research project I started
23  in 1998.
24      Q.    What about?
25      A.    Digital electronic cash.

Page 65

1       Q.    I am looking at an e-mail from you to
2  Dave Kleiman dated 12th March 2008.  The subject is
3  "Forward deformation and the difficulties of law on the
4  internet".  It states:  "I need your help editing a
5  paper I am going to release later this year.  I have
6  been working on a new form of electronic money, BitCash,
7  Bitcoin ..."  And the e-mail goes on.  Is that the
8  e-mail you are referring to?
9           MS. MARKOE:  Objection.  If you want to
10  show him a document, you can show him a document.
11           MR. FREEDMAN:  Zaharah, please limit your
12  objection to form.
13           MS. MARKOE:  If you want to show him a
14  document, show him a document.
15  BY MR. FREEDMAN:  Zaharah, this is my
16  deposition.
17           MS. MARKOE:  If you want to have him
18  presume ----
19           THE WITNESS:  Can I see the document.
20           MS. MARKOE:  ---- that what you are
21  reading on a screen is accurate and correct, then he can
22  make that presumption if you ask him to, but if you are
23  going to be referencing a document you have to show the
24  witness the document.
25           MR. FREEDMAN:  Thank you, Zaharah.

MAGNA
LEGAL SERVICES

Page 66

```
 1        Q.    Is that the e-mail that we are referring
 2   to?
 3        A.    Can I see the e-mail?
 4        Q.    Not at this time.
 5        MS. MARKOE:  Objection.  I am going to
 6   instruct him not to answer the question.
 7        MR. FREEDMAN:  Then instruct him and just
 8   instruct him.  Zaharah, either object to form or
 9   instruct him not to answer.  There is no need for
10   dialogue between us.  We can take it up with the court
11   once you instruct him not to answer.
12        MS. MARKOE:  He can answer if you give
13   him the document.  He has asked for the document and you
14   are refusing to give it to him.
15        MR. FREEDMAN:  Zaharah, just instruct him
16   not to answer or object.
17        Q.    Does the e-mail I quoted to you refresh
18   your recollection of the date of the e-mail?
19        A.    Will you show me the e-mail?
20        Q.    Not at this time.
21        A.    Then I cannot answer that question.
22        Q.    So it does not refresh your recollection?
23        MS. MARKOE:  Objection.  You cannot have
24   a recollection refreshed without showing a document.
25   That is basic evidence.
```

Page 67

```
 1        MR. FREEDMAN:  Zaharah, limit your
 2   objection to form.
 3        THE WITNESS:  If you wish to show me the
 4   document, I will comment on the document.
 5   BY MR. FREEDMAN:
 6        Q.    In 2009, did you communicate with Dave
 7   Kleiman about Bitcoin, blockchain or timechain
 8   technology?
 9        A.    Yes.
10        Q.    Do you recall the method of
11   communication?
12        A.    Are we talking e-mail or chats?
13        Q.    However you communicated with him about
14   Bitcoin, blockchain or timechain, please tell me all
15   methods.
16        A.    I do not remember all methods.  We used
17   IRC.  We used e-mail.  We used other -- I cannot even
18   remember the chats at the time.  It could have been
19   Facebook.  I do not have that Facebook account any more.
20        Q.    What was the account with Facebook?
21        MS. MARKOE:  Objection.
22        THE WITNESS:  I do not remember.  It is
23   been gone four or five years now.
24   BY MR. FREEDMAN:
25        Q.    Do you remember the name?
```

Page 68

```
 1        A.    Yes, Dr. Craig Wright.
 2        Q.    What e-mails did you use to communicate
 3   with Dave Kleiman?
 4        MS. MARKOE:  Objection.
 5        THE WITNESS:  I do not remember.
 6   BY MR. FREEDMAN:
 7        Q.    Not even one.
 8        A.    No, I had many e-mails.  I do not
 9   remember which ones I actually used to communicate with
10   Dave.
11        Q.    Do you remember what e-mails Dave used to
12   receive these communications?
13        MS. MARKOE:  Objection.
14        THE WITNESS:  No, I do not.
15   BY MR. FREEDMAN:
16        Q.    Not even one?
17        MS. MARKOE:  Objection.
18        THE WITNESS:  I do not type in things in
19   my e-mail and bring up the whole name, I have contacts.
20   BY MR. FREEDMAN:
21        Q.    So you do not remember any e-mails?
22        MS. MARKOE:  Objection.
23        THE WITNESS:  I do not remember phone
24   numbers.  I do not remember e-mails.  I save those in
25   context.
```

Page 69

```
 1   BY MR. FREEDMAN:
 2        Q.    You do not remember any of Dave Kleiman's
 3   e-mails that you communicated with to him about Bitcoin,
 4   blockchain or timechain technology ----
 5        A.    I even cannot tell you ----
 6        Q.    Dr. Wright, if you could let me finish so
 7   we have a clean record, I am sorry.  Do you recall any
 8   of the e-mails Dave Kleiman used to receive
 9   communications about Bitcoin, blockchain or timechain
10   technology from you in 2009?
11        MS. MARKOE:  Objection: asked and
12   answered.
13        MR. FREEDMAN:  Please limit your
14   objection to form.
15        MS. MARKOE:  I am allowed to preserve my
16   objection for the record.
17        MR. FREEDMAN:  By form, Zaharah.
18        MS. MARKOE:  And I am describing what the
19   form of the objection is.
20        MR. FREEDMAN:  No, that is not permitted
21   by the local rules.
22        MS. MARKOE:  Show me the local rule you
23   are referring to, then.
24        MR. RIVERO:  Please show us the local
25   rule.
```

MAGNA
LEGAL SERVICES

Page 70

```
1          MR. FREEDMAN:  Okay.  We will show it to
2    you at the break.
3          MR. RIVERO:  There is no such local rule.
4          MR. FREEDMAN:  There certainly is.  Even
5    the Federal Civil Procedure require you to limit your
6    objection.
7          MR. RIVERO:  Show us ----
8          MR. FREEDMAN:  No, we will do this off
9    the record because I am not going to waste my time with
10   it.
11         MR. RIVERO:  I am not wasting my time
12   with foolishness.  Please show us the rule.  If you say
13   this again show us the rule.
14   BY MR. FREEDMAN:
15       Q.    Did we get an answer to that question?
16   (Pause) Do you recall any of the e-mails Dave Kleiman
17   used to receive communications about Bitcoin, blockchain
18   or timechain technology from you in 2009?
19         MS. MARKOE:  Objection: asked and
20   answered.
21         MR. FREEDMAN:  You can answer.
22         THE WITNESS:  I do not remember my
23   mother's e-mail address.  I do not remember my son's
24   e-mail address.  I do not remember either of their phone
25   numbers.  I do not remember friends over here's e-mail
```

Page 71

```
1    addresses today.  If I was asked to swear or lose
2    everything I have, I could not even give you my sister's
3    e-mail address right now.
4        Q.    Dr. Wright, if you could answer the
5    question posed it would help us move forward.
6        A.    I believe I did.
7        Q.    No, actually, I do not have an answer.
8        A.    That is my total recollection ever on
9    e-mails.
10       Q.    You do not recall any of the e-mails Dave
11   Kleiman used to receive communications from you about
12   Bitcoin, blockchain or timechain technology in 2009?
13         MS. MARKOE:  Objection: asked and
14   answered.
15         THE WITNESS:  I have answered that.
16   BY MR. FREEDMAN:
17       Q.    Do you recall any of the e-mails Dave
18   Kleiman used to receive communications about Bitcoin,
19   blockchain or timechain technology from 2010 through
20   2013?
21         MS. MARKOE:  Objection.
22         THE WITNESS:  I cannot answer what Dave
23   received anything on.  Dave is an independent person.
24   He was never my partner.  I have never had any
25   relationship that way with him.  He was just a friend.
```

Page 72

```
1    I have never formed a partnership.  I will never form a
2    partnership.  I hate the whole concept of partnership.
3    I will never be a partner.  I will never have a partner.
4    The only partner I have is my wife.  That is the form of
5    partnership I am in.  I have never been in a
6    partnership.  I do not want to know what other people
7    do.  I do not care what other people do.  I do not ask
8    what other people do.  I do not ever go into any details
9    of what other people do.
10   BY MR. FREEDMAN:
11       Q.    Did you communicate with Dave Kleiman on
12   Bitmessage?
13       A.    Yes.
14       Q.    What was your Bitmessage user name?
15       A.    There is not a Bitmessage user name.
16       Q.    What is there?
17       A.    Addresses.
18       Q.    What is your Bitmessage address?
19       A.    I cannot, from the top of my head, tell
20   you a many, many character long address.  That is not
21   how the thing works.
22       Q.    Do you recall Dave Kleiman's address on
23   Bitmessage?
24       A.    Again, no.  If I cannot recall an e-mail,
25   I definitely cannot recall a 30-something character
```

Page 73

```
1    address.
2        Q.    Could you look the addresses up and
3    inform your counsel of them after this deposition?
4          MS. MARKOE:  Objection.
5          THE WITNESS:  No, I could not.
6    BY MR. FREEDMAN:
7        Q.    Why not?
8        A.    I do not have Bitmessage any more.
9        Q.    When did you lose Bitmessage?
10         MS. MARKOE:  Objection.
11         THE WITNESS:  I did not lose Bitmessage.
12   BY MR. FREEDMAN:
13       Q.    Why do not you have Bitmessage any more?
14         MS. MARKOE:  Objection.
15         THE WITNESS:  I stopped using it in 2015.
16   BY MR. FREEDMAN:
17       Q.    Why did you stop using it in 2015?
18         MS. MARKOE:  Objection.
19         THE WITNESS:  Because I decided to stop
20   using it.
21   BY MR. FREEDMAN:
22       Q.    What did you do with all of the
23   Bitmessage communications that were in Bitmessage?
24         MS. MARKOE:  Objection.
25         THE WITNESS:  I do not keep all those
```

Page 74

1    communications.
2    BY MR. FREEDMAN:
3        Q.    What do you do with them?
4        A.    I do not do anything with them.
5        Q.    So?
6        A.    So they do not exist.
7        Q.    In 2015, did any Bitmessages exist?
8        A.    Yes.
9            MS. MARKOE:  Objection.
10   BY MR. FREEDMAN:
11       Q.    What happened to them?
12       A.    I do not know.
13       Q.    Did you delete them?
14           MS. MARKOE:  Objection.
15           THE WITNESS:  I wiped hard drives.
16   BY MR. FREEDMAN:
17       Q.    When, in 2015, did you wipe hard drives?
18       A.    I wiped hard drives all the time.
19   I worked as a digital forensic expert for a part of my
20   time.  I donated my time to working on child
21   exploitation cases, etcetera.  I did many of those.
22   Every time I did something like that, I wiped my hard
23   drive.
24       Q.    Have you wiped any hard drives since the
25   beginning of this litigation?

Page 75

1            MS. MARKOE:  Objection.
2            THE WITNESS:  No.
3    BY MR. FREEDMAN:
4        Q.    So, in 2015, you wiped a hard drive and
5    destroyed all electronic records of Bitmessage?
6            MS. MARKOE:  Objection.
7            THE WITNESS:  I do not know whether all
8    electronic messages have been destroyed.
9    BY MR. FREEDMAN:
10       Q.    Where would they be if they still resided
11   on a computer?
12       A.    I do not know.  Dave could have a copy.
13   That would be given on his drive.
14       Q.    Let us limit your responses to your
15   drives for now.  In 2015, you wiped all electronic
16   Bitmessages from all of your electronic media?
17           MS. MARKOE:  Objection:  mischaracterises
18   testimony.
19           MR. FREEDMAN:  Go ahead.  You can answer.
20           THE WITNESS:  My media, yes.  My media
21   has been wiped.  I wipe my media.
22   BY MR. FREEDMAN:
23       Q.    When did you begin discussing Bitcoin --
24   strike that.  Did you discuss Bitcoin, blockchain or
25   timechain technology with Dave Kleiman on Bitmessage?

Page 76

1        A.    Yes.
2        Q.    When did those discussions begin on
3    Bitmessage?
4        A.    I do not know.
5        Q.    In 2009?
6        A.    Bitmessage did not exist in 2009.
7        Q.    When did Bitmessage begin to exist?
8            MS. MARKOE:  Objection.
9            THE WITNESS:  I cannot remember.
10   BY MR. FREEDMAN:
11       Q.    In 2010?
12       A.    I do not remember when Bitmessage
13   started.
14       Q.    It started some time after 2009.
15           MS. MARKOE:  Objection.
16           THE WITNESS:  Bitmessage was based on
17   Bitcoin.  Bitcoin was launched in 2009.  Nobody knew
18   about Bitcoin prior to its public launch.  Developers
19   were unable to take the technology in Bitcoin and create
20   something that they did not know existed.  So, I would
21   say it would be rather difficult for someone to invent
22   something using technology that they have never heard
23   of.  That is what you call magic.  I do not believe in
24   magic.
25   BY MR. FREEDMAN:

Page 77

1        Q.    Just so you know where I am going, I am
2    going to switch gears now to start talking about the
3    various entities that have been touched on in the
4    litigation.
5            MS. MARKOE:  Why do we not take a
6    restroom break now ----
7            MR. FREEDMAN:  Sure.
8            MS. MARKOE:  ---- if this is a good time
9    to stop.
10           MR. FREEDMAN:  That is fine.  Let us go
11   off the record.
12           THE VIDEOGRAPHER:  Going off the record.
13   The time is 11.57.  End of video card number 1, volume 1
14   of the video deposition of Dr. Craig Wright.
15           (A Short Break)
16           THE VIDEOGRAPHER:  This is the beginning
17   of video card number 2, volume 1, in the video
18   deposition of Dr. Craig Wright.  Going on the record.
19   The time is 12.11.  Thank you.
20           MR. FREEDMAN:  Just a small housekeeping
21   matter before we get back to the line of questioning.
22   I figured out an easy way to resolve our objection
23   issue.  I am giving you on the record a standing
24   objection to form to every single one of my questions at
25   this deposition, so you no longer need to object to

MAGNA ◆
LEGAL SERVICES

Page 78

1    anything.  You can instruct the witness not to answer
2    obviously by the court's directive, but you have an
3    objection preserved as to every single question.
4            MS. MARKOE:  I do not think that that is
5    how it works, and I appreciate the effort, but I will
6    still make objections as I feel and deem necessary.
7            MR. FREEDMAN:  And we will raise with the
8    court that the only reason you are doing so is to coach
9    the witness.
10           MS. MARKOE:  It is not, it is because not
11   every single one of your questions is objectionable.  I
12   have not objected to every single one of your questions.
13           MR. FREEDMAN:  We will let the judge
14   decide.
15       Q.    Dr. Wright, before we took a break -- can
16   you mark this as Plaintiff's Exhibit 1.
17   (Plaintiff's Exhibit 1 marked for identification)
18       Q.    -- we were discussing ----
19           MR. RIVERO:  Sorry, I have a housekeeping
20   question myself.  I want the citation on the rule.
21           MR. FREEDMAN:  Sure.  Do you know what, I
22   will give it to you in the break.  I have it but I am
23   not going to waste my time on the record for it.  I will
24   give it to you.
25           MR. RIVERO:  Please.  I want it on the

Page 79

1    record ----
2            MR. FREEDMAN:  Do problem, we will give
3    it to you on the next break.
4            MR. RIVERO:  Please.
5    BY MR. FREEDMAN:
6        Q.    I am handing you what is marked as
7    Plaintiff's Exhibit 1.  This purports to be an e-mail
8    from you to Dave Kleiman dated 12th March 2008.  Do you
9    recognise this e-mail?
10       A.    I recognise what you have there.
11       Q.    Is this the e-mail that you sent?
12           MS. MARKOE:  Objection.
13           THE WITNESS:  No.
14   BY MR. FREEDMAN:
15       Q.    Why is it not the e-mail you sent?
16       A.    Because this is an import into a
17   different mail server that existed at a later time.
18       Q.    Is this an identical copy of the e-mail
19   you sent to Dave Kleiman?
20           MS. MARKOE:  Objection.
21           THE WITNESS:  No, because when you import
22   something from one exchange server to another it is not
23   identical.
24   BY MR. FREEDMAN:
25       Q.    Is the text of the e-mail identical?

Page 80

1            MS. MARKOE:  Objection.
2            THE WITNESS:  I am unable to say whether
3    it is identical.  It looks the same.
4    BY MR. FREEDMAN:
5        Q.    Did you send this original e-mail on 12th
6    March 2008?
7            MS. MARKOE:  Objection.
8            THE WITNESS:  This is not an e-mail.
9    BY MR. FREEDMAN:
10       Q.    Did you send an e-mail that looks the
11   same as this on 12th March 2008?
12           MS. MARKOE:  Objection.
13           THE WITNESS:  I sent an e-mail that
14   contains the body that was approximately like that, if
15   not like that.  I cannot say exactly because this is a
16   copy and whatever else, but that is very familiar, and
17   that would appear to be the e-mail I sent, yes.
18   BY MR. FREEDMAN:
19       Q.    On 12th March 2008?
20           MS. MARKOE:  Objection.
21           THE WITNESS:  Yes.
22   BY MR. FREEDMAN:
23       Q.    Do you have the original copy of this
24   e-mail?
25       A.    No, the original was moved from a former

Page 81

1    exchange mailbox by one of my staff, Nicholas, I do not
2    remember his last name; hence the change in e-mail
3    address.
4        Q.    What do you mean change in e-mail
5    address?
6        A.    The "from" address changes when you move
7    OST files within Microsoft Exchange.  When you preserve
8    exchange of information but change the domains, because
9    you move companies, it alters the sort of domain record
10   within exchange.
11       Q.    So, if I am understanding you correctly,
12   and correct me if I am wrong, the original e-mail was
13   not sent from craig.wright@information-defense.com?
14       A.    That would be correct.
15       Q.    What was the original e-mail it was sent
16   from?
17       A.    I cannot remember which domains I had
18   back then.
19       Q.    Do you have the OST file that was moved
20   by Nicholas?
21       A.    No.
22       Q.    What happened to it?
23       A.    I have no idea.
24       Q.    Did you not think this was an important
25   e-mail to preserve?

MAGNA
LEGAL SERVICES

Page 82

```
1          MS. MARKOE:  Objection.
2          THE WITNESS:  No, I did not.
3   BY MR. FREEDMAN:
4      Q.    Why not?
5          MS. MARKOE:  Objection.
6          THE WITNESS:  Why would I?  It does not
7   add any value to anything I am doing.
8   BY MR. FREEDMAN:
9      Q.    Do you recall Nicholas's last name?
10     A.    It might be Desmond.  I do not remember.
11     Q.    D-E-S-M-O-N-D?
12     A.    You are asking me to spell someone's name
13  that I can barely remember.
14     Q.    How would we find Nicholas's last name,
15  if we needed to?
16     A.    Look up old records on the internet.
17     Q.    What company did he work for?
18     A.    The question you are, I believe, asking
19  is, which of my companies did he work for, which
20  I believe he worked for Hotwire, Integers and maybe
21  Pholus, P-H-O-L-U-S.  It is one of the Greek gods.  He
22  was a centaur.  He was a wise centaur.
23     Q.    Please, Dr. Wright, if we could have this
24  discussion on the break.  It is interesting but I want
25  to get us through.
```

Page 83

```
1      A.    Certainly.
2      Q.    Do you have records from Hotwire,
3   Integers and Pholus that would enable us to look up
4   Nicholas's last name?
5      A.    Unless there is something that the
6   lawyers have captured.  I have never looked at the
7   records in those boxes.  They were delivered to me and
8   they remained sealed until the lawyers opened them.
9      Q.    What boxes are you referring to?
10     A.    The boxes that they took copies of
11  documents from.
12     Q.    You said you received sealed boxes?
13     A.    Yes.
14     Q.    Where did you receive sealed boxes from?
15     A.    When the companies in Australia were shut
16  down, boxes of information were sent to me.
17     Q.    By whom?
18     A.    Someone in Australia, to do with the old
19  company.  I do not know.
20     Q.    I do not recall, I may have asked this:
21  the date of this e-mail, 12th March 2008, was this the
22  first time you reached out to Dave Kleiman about
23  Bitcoin, blockchain or timechain technology?
24     A.    I may have talked to him about BlackNet;
25  I do not recall.
```

Page 84

```
1      Q.    This is the first written communication?
2      A.    Again, I do not recall.
3      Q.    There is a company called Craig Wright
4   R&D?
5      A.    There were multiple companies.  There are
6   no longer those companies.
7      Q.    There were multiple companies called
8   Craig Wright R&D?
9      A.    There are multiple companies called Craig
10  Wright R&D.
11     Q.    When was the first Craig Wright R&D
12  founded?
13     A.    In the '90s.
14     Q.    When did it cease to exist?
15     A.    A variety of these companies have ceased
16  at different times.
17     Q.    How many of Craig Wright R&Ds have there
18  been?
19     A.    Seychelles, Panama, Belize, Kenya,
20  Australia, Singapore, a couple of Eastern European ones,
21  Hungary, Hong Kong.  More than that, I do not remember.
22     Q.    Okay.  Craig Wright R&D in the
23  Seychelles, when was it formed?
24     A.    A long time ago.  We are talking
25  20 years.
```

Page 85

```
1      Q.    When was the one in Panama formed?
2      A.    About 1998.  My exact recollection of
3   time is ----
4      Q.    When did the one in the Seychelles cease
5   to exist?
6      A.    Somewhere between 2011 and 2013.
7      Q.    When did the one in Belize -- when was
8   the Craig Wright R&D in Belize formed?
9      A.    I do not remember.
10     Q.    When did it cease to exist?
11     A.    I do not exactly remember.
12     Q.    When did Craig Wright R&D in Kenya --
13  strike that.  When was Craig Wright R&D in Kenya formed?
14     A.    Again, I do not remember the exact times
15  on that one.
16     Q.    Approximate year do you recall?
17     A.    Not off the top of my head, no.
18     Q.    Do you have any way to look that up?
19         MS. MARKOE:  Objection.
20         THE WITNESS:  No.
21  BY MR. FREEDMAN:
22     Q.    When did it cease to exist?
23     A.    I do not remember.
24     Q.    What was the purpose of Craig Wright R&D
25  in the Seychelles?
```

MAGNA
LEGAL SERVICES

Page 86

```
1          A.    The purpose of all of these was to hold
2    intellectual property.
3          Q.    What type of intellectual property were
4    they holding?
5               MS. MARKOE:  Objection.
6               THE WITNESS:  Any type of intellectual
7    property I held.
8    BY MR. FREEDMAN:
9          Q.    Were they patents?
10         A.    No.
11              MS. MARKOE:  Objection.
12   BY MR. FREEDMAN:
13         Q.    Were they trade secrets?
14              MS. MARKOE:  Objection.
15              THE WITNESS:  Define what you mean by
16   "trade secrets".  That is a very wide area.  I have a
17   masters in intellectual property law, I could spend a
18   long time detailing that if you wish, but please define
19   what you actually mean by "trade secrets" or I will just
20   have to say yes and leave it at that.
21   BY MR. FREEDMAN:
22         Q.    Were they all computer related?
23         A.    No.
24              MS. MARKOE:  Objection.
25   BY MR. FREEDMAN:
```

Page 87

```
1          Q.    Did they relate to Bitcoin?
2          A.    Which one?
3          Q.    You said the purpose of all of these
4    entities -- strike that.  Did any of them hold Bitcoin
5    related intellectual property?
6               MS. MARKOE:  Objection.
7               THE WITNESS:  That, again, is a very wide
8    question.  Did they hold any assets relating to Bitcoin
9    in any way: yes.
10   BY MR. FREEDMAN:
11         Q.    Which ones?
12         A.    Panama, Costa Rica, Australia.  The
13   others I could not say off the top of my head.
14         Q.    Did any of these Craig Wright R&D
15   entities hold blockchain or timechain-related
16   intellectual property?
17              MS. MARKOE:  Objection.
18              THE WITNESS:  It is the same question.
19   Just ask me Bitcoin, because the only thing I do is
20   Bitcoin.
21   BY MR. FREEDMAN:
22         Q.    So, when I say "Bitcoin", you will take
23   it to mean Bitcoin, blockchain and timechain?
24              MS. MARKOE:  Objection.
25              THE WITNESS:  Yes.  I will answer per
```

Page 88

```
1    Bitcoin.  I only work on Bitcoin.  Some of the things
2    I do apply to any blockchain, but I do not develop for
3    Ethereum, I do not develop for other things.  I never
4    have, I never will.  I solely do one single system which
5    is Bitcoin.
6    BY MR. FREEDMAN:
7          Q.    Why did you create multiple entities to
8    hold Bitcoin-related intellectual property in different
9    countries?
10              MS. MARKOE:  Objection.
11              THE WITNESS:  I create multiple entities
12   all the time so that I can protect my assets.  I have
13   what people have called a web of companies because that
14   is the best way to ensure that when someone is doing
15   something that governments may not like, to protect
16   those assets and ensure that they remain protected.
17   BY MR. FREEDMAN:
18         Q.    In what way were you seeking to protect
19   these intellectual property assets?
20              MS. MARKOE:  Objection.  You are going
21   beyond the scope of the topics in this deposition.
22              MR. FREEDMAN:  Zaharah, just instruct him
23   not to answer.
24              MS. MARKOE:  The judge said you can get
25   some leeway with regard to entities that do not relate
```

Page 89

```
1    to Dave Kleiman.
2               MR. FREEDMAN:  Zaharah, either instruct
3    him not to answer or object.  That is it.  Well,
4    actually, do not object because ----
5               MS. MARKOE:  I can explain the basis of
6    my objection.
7               MR. FREEDMAN:  I do not need to hear it.
8    I give you a standing objection.
9               MS. MARKOE:  But the court does.  But the
10   court needs to hear it and I need to make my record.
11              MR. FREEDMAN:  So write it down.
12              MS. MARKOE:  So I am entitled to make my
13   record on the record.
14              MR. FREEDMAN:  Okay, we are going to move
15   on.
16              MS. MARKOE:  You are not permitted to
17   stop me.  I will not allow you to stop me.  I am
18   instructing the witness not to answer that question.
19   You have gone beyond the scope.
20              MR. FREEDMAN:  Which question are you
21   instructing him not to answer?
22              MS. MARKOE:  The last question, I
23   believe, which was -- if the court reporter could kindly
24   read it back to me I would appreciate it.
25    (The court reporter read back as requested)
```

Page 90

```
 1    BY MR. FREEDMAN:
 2        Q.    Did any of these Craig Wright R&Ds
 3    involve Dave Kleiman?
 4            MS. MARKOE:  Objection.
 5            THE WITNESS:  No.
 6    BY MR. FREEDMAN:
 7        Q.    Did they involve W&K?
 8            MS. MARKOE:  Objection.
 9            THE WITNESS:  No.
10    BY MR. FREEDMAN:
11        Q.    Did they ever enter into transactions
12    with Dave Kleiman or W&K?
13            MS. MARKOE:  Objection.
14            THE WITNESS:  They enacted transactions
15    with W&K, of which Dave was a member.
16    BY MR. FREEDMAN:
17        Q.    What were the transactions they entered
18    into W&K with?
19        A.    They had contracts with W&K.
20        Q.    Which entities specifically had contracts
21    with W&K?
22        A.    I do not remember each of the contracts.
23        Q.    Which entity had the contract?
24            MS. MARKOE:  Objection.
25            THE WITNESS:  I do not remember each of
```

Page 91

```
 1    the contracts.
 2    BY MR. FREEDMAN:
 3        Q.    Was the ownership of all these Craig
 4    Wright R&D entities identical?
 5            MS. MARKOE:  Objection.
 6            THE WITNESS:  No.
 7    BY MR. FREEDMAN:
 8        Q.    Who owned the Craig Wright R&D in the
 9    Seychelles?
10            MS. MARKOE:  Objection.
11            THE WITNESS:  I am unable to answer the
12    "who owned" because each of the companies, or whatever
13    else I have, has a complex ownership structure.  At the
14    end of the day, I own nothing.  I do not own a single
15    share in any company that I know of.  I do not own a
16    single disposition of a trust that I know of.  I have no
17    ownership of anything, which is what you are trying to
18    get at.  I have very carefully constructed something
19    where I get to direct my research and own nothing.
20    BY MR. FREEDMAN:
21        Q.    So I appreciate, again, that you are
22    anticipating where I am going, but please just answer
23    the question.
24        A.    I believe that was answering the
25    question.
```

Page 92

```
 1        Q.    Actually, I just want to know who owns
 2    them, not if you own them.  Who owns them?
 3            MS. MARKOE:  Objection.
 4            THE WITNESS:  I believe I was ----
 5            MS. MARKOE:  You may answer.
 6            THE WITNESS:  I believe I was answering.
 7    My answer is I have set up something so that I do not
 8    need to know who owns them.  I do not know who owns
 9    nChain now.
10    BY MR. FREEDMAN:
11        Q.    Who knows who owns Craig Wright R&D?
12            MS. MARKOE:  Objection.
13            THE WITNESS:  I have ensured that I know
14    nothing about the ownership of the companies I am with.
15    BY MR. FREEDMAN:
16        Q.    Who did you make that arrangement with?
17            MS. MARKOE:  Objection.
18            THE WITNESS:  Other individuals.
19    BY MR. FREEDMAN:
20        Q.    What are the names of those individuals?
21            MS. MARKOE:  Objection.
22            THE WITNESS:  I do not remember all of
23    their names.  Those people are no longer part of my
24    life.
25    BY MR. FREEDMAN:
```

Page 93

```
 1        Q.    Do you remember any of their names?
 2            MS. MARKOE:  Objection.
 3            THE WITNESS:  Yes.
 4    BY MR. FREEDMAN:
 5        Q.    Can you tell me the names that you do
 6    recall?
 7            MS. MARKOE:  Objection.
 8            THE WITNESS:  There was a Mark in High
 9    Secured in Panama.
10    BY MR. FREEDMAN:
11        Q.    Anyone else?
12        A.    I am thinking.  (Pause)  No, I do not
13    remember the names.
14        Q.    Do you remember Mark's last name?
15        A.    No, I do not.
16        Q.    Mark was part of the people that took
17    care of the ownership of Craig Wright R&D for you?
18            MS. MARKOE:  Objection.
19            THE WITNESS:  I do not know exactly what
20    they did.  People set up structures.
21    BY MR. FREEDMAN:
22        Q.    You trusted these people to set up
23    structures for your companies?
24            MS. MARKOE:  Objection.
25            THE WITNESS:  High Secured was a law
```



Page 94

1  firm.
2  BY MR. FREEDMAN:
3      Q.   So you trusted a law firm to set up
4  ownership structures for your companies?
5      A.   Yes.
6      Q.   And you have no way to get those records
7  today?
8      A.   Not that I know of.
9      Q.   Did Craig Wright R&D ever mine Bitcoin?
10         MS. MARKOE:  Objection.
11         THE WITNESS:  No.
12  BY MR. FREEDMAN:
13     Q.   Was Craig Wright R&D ever audited by the
14  Australian Tax Office?
15         MS. MARKOE:  Also, I just want to make
16  sure for the court reporter, it is High Secured.
17  BY MR. FREEDMAN:
18     Q.   Were any of the Craig Wright R&D entities
19  ever audited by the Australian Tax Office?
20     A.   No.
21     Q.   Were they ever the subject of an
22  Australian Tax Office investigation?
23     A.   I do not know what the tax office
24  investigates.
25     Q.   I just want to know what you know.  Are

Page 95

1  you aware of ----
2      A.   I do not know what the tax office
3  investigates.
4      Q.   Are you aware of any Australian Tax
5  Office investigation over any of the Craig Wright R&D
6  entities?
7      A.   I do not know what the tax office
8  investigates.
9      Q.   So you are not aware of any such
10  investigation?
11         MS. MARKOE:  Objection.
12         THE WITNESS:  I do not know what the tax
13  office investigates.  I will not speak for the tax
14  office.
15  BY MR. FREEDMAN:
16     Q.   I am not asking you to speak for the tax
17  office, I am just ask you to tell me if you are aware of
18  an investigation?
19         MS. MARKOE:  Objection.
20         THE WITNESS:  You are asking me to
21  express awareness of a federal body's investigations.
22  I have no interest in those unless it involves me
23  personally, in which case they will audit me first or do
24  something else.  I will not speculate as to the nature
25  of what a government body will do.

Page 96

1      Q.   Did any of these Craig Wright R&D
2  entities ever go by another name?
3      A.   No.
4      Q.   I am going to the next entity.  It is
5  called Chaos and Non-Linear FNE & Finance.
6      A.   That is not the correct company name.
7      Q.   What is the correct company name?
8      A.   The exact reference I cannot remember,
9  but that is not it.
10     Q.   When was it founded?
11     A.   I do not remember.  The records will be
12  on ASIC, A-S-I-C.
13     Q.   What was the purpose of this entity?
14     A.   To use non-linear forecasting, which is
15  probably the word, in the creation of models for
16  determining different linear risk effects.
17     Q.   Does this have to do with Bitcoin?
18     A.   No.
19     Q.   Does it have to do with blockchain or
20  timechain?
21         MS. MARKOE:  Objection.
22         THE WITNESS:  Again, the same question.
23  BY MR. FREEDMAN:
24     Q.   Who owns Chaos and Non-Linear FNE &
25  Finance?

Page 97

1      A.   Nobody as far as I know.  I believe it is
2  already liquidated.  If not, it is in the process of
3  being liquidated.
4      Q.   Who owned it at the time it was
5  established?
6      A.   You would need to look at the
7  shareholding.
8      Q.   How do I obtain the shareholding?
9      A.   I do not know.
10     Q.   Do you have access to the shareholding?
11     A.   If those records that the lawyers have
12  copied has any copy, then that would have it, otherwise
13  I do not know.  I have not looked at those records.
14  I do not intend to.
15     Q.   Did you use lawyers to form that entity?
16         MS. MARKOE:  Objection: relevance.
17         THE WITNESS:  You are asking whether I --
18  that would be a privileged thing, whether I used lawyers
19  or not and what I use them for, so are you asking me to
20  breach privilege?
21  BY MR. FREEDMAN:
22     Q.   Dr. Wright, you have to allow your own
23  counsel to object.  You cannot object as a witness.
24     A.   I did not object.  I just said, are you
25  asking me to ----

MAGNA
LEGAL SERVICES

Page 98

1    Q.   I am asking ----
2        MR. RIVERO:  Let me step in a second.
3    Dr. Wright, the question as posed is, did you use
4    lawyers?  You may answer that, but please avoid going
5    into any communications with the lawyers.
6        THE WITNESS:  Mmm-hmm, okay.  I do not
7    remember.
8    BY MR. FREEDMAN:
9        Q.   Did W&K or Dave Kleiman ever own a
10   percent of this entity?
11       A.   No.
12       Q.   Did this entity ever enter into a
13   relationship with Dave Kleiman or W&K?
14       MS. MARKOE:  Objection.
15       THE WITNESS:  It was formed after
16   Mr. Kleiman died.
17   BY MR. FREEDMAN:
18       Q.   Do you remember when it was formed?
19       A.   No.
20       Q.   Did this entity ever go by another name?
21       A.   No.
22       Q.   Did this entity ever mine Bitcoin?
23       MS. MARKOE:  Objection.
24       THE WITNESS:  No.
25       MS. MARKOE:  He has already said that

Page 99

1    this entity was established after Mr. Kleiman's death.
2    Therefore, I am going to instruct him not to answer any
3    further questions about this entity.  I believe you have
4    asked all the questions that are sort of permitted under
5    sub-(2) as envisioned by the court, as I understood it.
6        MR. FREEDMAN:  Your recollection is
7    wrong, but we will take it up with the court.
8        Q.   I am going to move on to the next entity,
9    Cloudcroft.  When was Cloudcroft founded?
10       A.   I do not remember the date on any of
11   these companies.  All of them would be listed on ASIC.
12   It is a public record.  You can pay for it.  I am not
13   going to pay for it to hand it to you.
14       Q.   What was the purpose of this entity?
15       A.   Cloudcroft was designed -- well, created
16   for the development of large storage in high compute
17   devices.  It was so that you would have machines that
18   could hold multiple petabytes of data and process those
19   using an optical backend at high speed.
20       Q.   Did this entity ever mine Bitcoin?
21       MS. MARKOE:  Objection.
22       THE WITNESS:  No.
23   BY MR. FREEDMAN:
24       Q.   Did this entity ever create intellectual
25   property related to Bitcoin?

Page 100

1        MS. MARKOE:  Objection.  You may answer.
2        THE WITNESS:  The nature of Bitcoin goes
3    to what we have dubbed Metanet.  That requires storage.
4    To do that, to have large blocks and to scale Bitcoin
5    requires the creation of machines that can handle very
6    large transaction volumes and eventually be able to send
7    terabyte and larger block sizes in milliseconds.
8    BY MR. FREEDMAN:
9        Q.   So, did the entity ever create
10   intellectual property that relates to Bitcoin?
11       MS. MARKOE:  Objection.
12       THE WITNESS:  I believe I just said yes,
13   even if you did not understand it.
14   BY MR. FREEDMAN:
15       Q.   Was this entity ever audited by the
16   Australian Tax Office?
17       A.   Yes.
18       Q.   When?
19       A.   I do not remember the dates of the
20   audits.
21       Q.   Were there multiple audits?
22       MS. MARKOE:  Objection: vague.
23       THE WITNESS:  I have accountants in the
24   past, and I have them now.  They do these things.  I do
25   not necessarily, apart from when I am pulled up to

Page 101

1    things, go in and I definitely do not try to remember
2    the dates of when all this happened.
3    BY MR. FREEDMAN:
4        Q.   So your accountants would be aware of
5    this information?
6        MS. MARKOE:  Objection.
7        THE WITNESS:  I do not know.
8    BY MR. FREEDMAN:
9        Q.   Which accountants did you use to handle
10   the Australian Tax Office investigations?
11       MS. MARKOE:  Objection.  Are you
12   referring to this entity or are you referring to
13   generally?  It is just very unclear what you are talking
14   about and we need to have a clear record so that there
15   are no misunderstandings.
16   BY MR. FREEDMAN:
17       Q.   What accountants did you use to handle
18   Australian Tax Office investigations and audits of
19   Cloudcroft?
20       A.   If you are going to ask it that way,
21   I will say I do not remember.
22       Q.   What accountants do you recall using to
23   handle any Australian Tax Office investigation or audit?
24       A.   I did not use accountants to handle tax
25   office audits; I used accountants to be accountants and

MAGNA
LEGAL SERVICES

Page 102

1   auditors.  Would you like me to answer that?
2       Q.   Yes, please.
3       A.   During the time that we were there, we
4   used KPMG, we used Ernst & Young, we used Harry
5   something, I do not remember the name exactly, which is
6   in the records, and we had internal audit and accounts.
7       Q.   What are the names of the internal
8   auditing accounts?
9           MS. MARKOE:  Objection.
10          THE WITNESS:  I do not know what the
11  auditing accounts are, but if you are asking what is the
12  name of the person who was the CFO or accountant, at one
13  point that was John Cheshire, and we had a bookkeeper
14  Ann, and I do not remember her last name.  I am sure it
15  is on record somewhere.
16  BY MR. FREEDMAN:
17      Q.   Is that Ann Wrightson?
18      A.   That would be it, yes.
19          MR. RIVERO:  Can I just say to keep the
20  record clear, I believe he said "internal audit and
21  accounts", as opposed to "internal auditing accounts",
22  although I have old ears.
23          THE WITNESS:  That is correct.
24  BY MR. FREEDMAN:
25      Q.   Was there anyone else that worked

Page 103

1   internally as an accountant or CFO for your companies?
2       A.   Yes.
3       Q.   What were their names?
4       A.   I do not remember.
5       Q.   Did Jamie Wilson ever work as an
6   accountant for you?
7       A.   Very briefly.
8       Q.   What time period was that?
9       A.   I dealt with Jamie Wilson some time
10  between -- some time in 2012 into 2013.
11      Q.   Why did he stop working for you?
12          MS. MARKOE:  Objection.
13          THE WITNESS:  He was fired.
14  BY MR. FREEDMAN:
15      Q.   Why was he fired?
16          MS. MARKOE:  Objection.  This is really
17  going beyond the scope now.
18  BY MR. FREEDMAN:
19      Q.   Why was he fired?
20          MS. MARKOE:  I am going to instruct the
21  witness not to answer.  It goes beyond the scope.
22  BY MR. FREEDMAN:
23      Q.   Did KPMG interact with the Australian Tax
24  Office -- strike that.  When your companies were under
25  audit by the Australian Tax Office, did KPMG handle

Page 104

1   interactions with the tax office?
2       A.   No.
3       Q.   Same question for Ernst & Young?
4       A.   No.
5           MS. MARKOE:  Objection.
6   BY MR. FREEDMAN:
7       Q.   Did Harry, and we do not recall his last
8   name, interact with the ATO in regard to their audits?
9       A.   He interacted, but that is different than
10  your former question.
11      Q.   I know.  Did he interact -- he did?
12      A.   Interact means he communicated in some
13  way.  He e-mailed, he phoned, he had lunch, he passed
14  them in the street and said "Hi".  So, being an auditor,
15  I would say he interacted with the ATO many times.
16      Q.   Did Harry handle the Australian Tax
17  Office investigation on your behalf or your companies'
18  behalf?
19      A.   No.
20          MS. MARKOE:  Objection.
21  BY MR. FREEDMAN:
22      Q.   Did John Cheshire handle the Australian
23  Tax Office investigation for you or your companies'
24  behalf?
25      A.   He did some of that.

Page 105

1       Q.   Did Ann Wrightson?
2       A.   No.
3       Q.   Did Jamie Wilson?
4       A.   No.
5       Q.   What time period did John Cheshire work
6   for your companies or yourself?
7           MS. MARKOE:  Objection: compound.
8   BY MR. FREEDMAN:
9       Q.   What time period did John Cheshire work
10  for you?
11          MS. MARKOE:  Objection.
12          THE WITNESS:  John, I believe, would have
13  first been about 2008 until 2015, in different roles.
14          MS. MARKOE:  Can you please just spell
15  for the record how you spell Cheshire, because I think
16  it is being misspelt right now, if you remember.
17          THE WITNESS:  I am sorry, I cannot tell
18  you how I would spell John Cheshire.  I could make a
19  guess, but then I am just guessing.
20          MR. RIVERO:  Do not guess.
21  BY MR. FREEDMAN:
22      Q.   Did Ray Hong work for you at Cloudcroft?
23      A.   He worked in one of my companies.
24      Q.   Do you recall which company?
25      A.   No.

MAGNA ▶
LEGAL SERVICES

Page 106

1    Q.    Do you recall what he did for your
2  companies?
3    A.    Yes.
4    Q.    What did he do for your companies?
5    A.    He was a programer and graphic designer.
6    Q.    What did he program for you?
7    A.    Code.
8    MS. MARKOE:  Objection.
9  BY MR. FREEDMAN:
10   Q.    Did it relate to Bitcoin?
11   MS. MARKOE:  Objection.
12   THE WITNESS:  Yes.
13   MR. RIVERO:  One moment.  Dr. Wright,
14  I can only instruct you.  I would be happy to instruct
15  everyone else.  The court reporter can only take one of
16  us at a time.  You have to pause a beat to allow the
17  objection.
18   THE WITNESS:  Certainly.
19   MR. RIVERO:  I do not mean to single you
20  out because everyone is doing it.
21   THE WITNESS:  Yes.  My apologies.
22  BY MR. FREEDMAN:
23   Q.    Who owned Cloudcroft on its founding?
24   A.    You would have to look at the records.  I
25  do not remember.

Page 107

1    Q.    Did the ownership ever change?
2    A.    I would believe so, but again you would
3  have to look at the records.  I do not remember.
4    Q.    Was Cloudcroft ever owned by
5  Tulip Trading?
6    A.    You would have to look at the records.  I
7  do not remember.  I do not do the company secretarial.
8    Q.    Do you have any recollection of the
9  ownership of Cloudcroft at any point in time?
10   A.    I do not speculate on these things.
11  I instruct people to do stuff.  I hire company
12  secretarial when I need to.  I have company
13   Q.    Did Lynne Wright ever own any portion of
14  Cloudcroft?
15   A.    I do not remember.
16   Q.    Was this entity related to Dave or W&K in
17  any way?
18   A.    Not at any point.
19   Q.    Did this entity ever go by another name?
20   A.    I do not remember.
21   Q.    Is this entity still in existence?
22   A.    I have not checked.
23   Q.    I am going to move to the next entity.
24  This is ----
25   MS. MARKOE:  Before we move to the next

Page 108

1  entity, it is getting on to be about 1 o'clock.  Do you
2  want to go till 1 o'clock and then I do not know if we
3  are breaking for lunch, if they are bringing lunch in,
4  what the story is, but ----
5    MR. FREEDMAN:  Let us go off the record.
6    THE VIDEOGRAPHER:  Going off the record.
7  The time is 12.45.
8    (A Short Break)
9    THE VIDEOGRAPHER:  Going back on the
10  record.  The time is 12.46.  Thank you.
11  BY MR. FREEDMAN:
12   Q.    Did a woman with the first name of Ellen
13  ever work at any of your companies?
14   MS. MARKOE:  Objection.
15   THE WITNESS:  I do not know all the staff
16  at my companies now, so I cannot answer that.
17  BY MR. FREEDMAN:
18   Q.    You have no recollection of a woman named
19  Ellen working at your companies?
20   MS. MARKOE:  Objection.
21   THE WITNESS:  Do you have a last name?
22  BY MR. FREEDMAN:
23   Q.    I do not.
24   A.    I have no idea.
25   Q.    No recollection?

Page 109

1    A.    You realise that I have companies across
2  the world, and I meet people all the time in my
3  companies, and have no idea about all the people.
4  I shake hands, I speak in front of staff, I do all this
5  sort of stuff and people go, "Hey, I am such and such",
6  and a year later I do not remember.
7    Q.    Doctor, I am a bit confused because
8  earlier I thought you told me you do not own any
9  companies and now you have referring to your companies
10  so can you explain how that works?
11   MS. MARKOE:  Objection.
12   THE WITNESS:  I founded them.  You are
13  trying to confuse or confound people with the notion
14  that a company that I own shares of, or the company that
15  I have set up to do my research, are separate.  The fact
16  that I do not own, that I have set up trusts and
17  whatever else out of my control, does not remove the
18  fact that I will call them "my companies".
19  BY MR. FREEDMAN:
20   Q.    Okay.  I am going to move to the next
21  entity.  This is called C01N.
22   A.    C01N.
23   Q.    When was C01N founded?
24   MS. MARKOE:  Objection.
25   THE WITNESS:  I do not remember the date

MAGNA ⟩
LEGAL SERVICES

Page 110

1    and which C01N in particular you are talking about.
2    BY MR. FREEDMAN:
3        Q.    Is there more than one C01N?
4        A.    Yes.
5        Q.    Please list them for me?
6        A.    I do not remember them all.  I would need
7    to look at records.
8        Q.    Please list the ones you recall?
9        A.    UK, Australia.
10       Q.    When was the UK C01N formed?
11       A.    Under a different name, that is either
12   Permanent Success or Design by Human or whatever else, I
13   do not remember which exactly it was, which would have
14   been 2012.
15       Q.    So, why did you change the name in 2012?
16           MS. MARKOE:  Objection:  mischaracterises
17   the record.
18           THE WITNESS:  I did not change the name
19   in 2012.
20   BY MR. FREEDMAN:
21       Q.    Why was the name changed in 2012?
22           MS. MARKOE:  Objection:  mischaracterises
23   the testimony.
24           THE WITNESS:  As I just said, I did not
25   change the name in 2012, the name was not changed in

Page 111

1    2012.  Nor did I say ----
2    BY MR. FREEDMAN:
3        Q.    How did Permanent Success Limited or
4    Design by Human become C01N?
5        A.    The name was changed.
6        Q.    Who changed the name?
7        A.    I instructed a person in the UK to change
8    the name.
9        Q.    When did you make that instruction?
10       A.    After Dave's death.
11       Q.    Do you have ----
12       A.    I do not have the records in front of me.
13   I do not remember.
14       Q.    Who did you instruct to change the name?
15       A.    I have no idea.
16       Q.    You said a person in the UK?
17       A.    Yes.
18       Q.    But you do not recall who it was?
19       A.    I do not have the records in front of me.
20   If it is company secretarial, then all those records
21   would have been there at the time.  I have no idea.
22       Q.    What was the purpose of Permanent Success
23   Limited or Design by Human when it was formed?  You know
24   what, strike that.  What was the purpose of Permanent
25   Success Limited when it was formed?

Page 112

1        A.    Is that C01N?  I cannot remember if that
2    is the exact one.  I do not remember which one is which.
3        Q.    Let us forget about C01N for a moment.
4    I am talking about Permanent Success Limited.
5        A.    Is that separate to C01N?  I am asking
6    that question.  I do not remember otherwise.
7        Q.    I do not know.  It is your companies.
8           MS. MARKOE:  Objection:  mischaracterises
9    the testimony.
10   BY MR. FREEDMAN:
11       Q.    When Permanent Success Limited was
12   formed, what was its purposes?
13       A.    What was the rename of that company?  I
14   do not know otherwise.  I did not name it.
15       Q.    Permanent Success Limited and Design by
16   Human were both renamed?
17       A.    Yes.
18       Q.    What were the two renames?
19       A.    You would need to tell me.  I do not
20   remember off the top of my head.  One of them became
21   C01N.  If you can give me the name that you are talking
22   about that it later became, I could give you
23   information.
24       Q.    The one that later became C01N?
25       A.    Yes.

Page 113

1        Q.    What was the purpose at formation?
2        A.    The purpose was to hold assets because
3    I wanted to eventually form something as a wallet for
4    Bitcoin.  So a custodial wallet service.
5        Q.    What assets did it hold?
6        A.    None.
7        Q.    Did it ever hold assets?
8        A.    It never held assets.
9        Q.    So what purpose did C01N serve?
10       A.    I believe I have said exactly what it
11   served.
12       Q.    You said why you formed it.  Did it end
13   up serving the purpose you formed it for?
14       A.    No.
15       Q.    So what purpose did it serve?
16       A.    It was there while I was creating.  We
17   did not end up launching C01N as a wallet.
18       Q.    So did C01N ever hold assets -- any type
19   of asset?
20       A.    Hold?  No.
21       Q.    Did it ever own assets?
22       A.    Yes.
23       Q.    What assets did it own?
24           MS. MARKOE:  Objection.
25           THE WITNESS:  It owned rights.

**MAGNA**
LEGAL SERVICES

Page 114

```
1    BY MR. FREEDMAN:
2        Q.   It owned rights to what?
3        A.   It owned rights to other assets.
4        Q.   What assets did it own rights to?
5        A.   I would need to look up the list.
6        Q.   Was it Bitcoin?
7        A.   Was what Bitcoin?
8        Q.   Did it own rights to Bitcoin?
9        A.   In part.
10           MS. MARKOE:  Objection.
11   BY MR. FREEDMAN:
12       Q.   Did it own rights to intellectual
13   property?
14           MS. MARKOE:  Objection.
15           THE WITNESS:  I would need to look at the
16   list of what was actually deposited into that company to
17   answer that question.
18   BY MR. FREEDMAN:
19       Q.   Who has the list of what was deposited
20   into that company?
21       A.   Unless it is in any of the records that
22   have been given to the lawyers, I cannot answer.
23       Q.   So are those assets lost to you now?
24           MS. MARKOE:  Objection.
25           THE WITNESS:  What assets?
```

Page 115

```
1    BY MR. FREEDMAN:
2        Q.   The Bitcoin assets?
3            MS. MARKOE:  Objection.
4            THE WITNESS:  What Bitcoin are you
5    referring to?
6    BY MR. FREEDMAN:
7        Q.   C01N holds rights to Bitcoin; is that
8    correct?
9            MS. MARKOE:  Objection.
10           THE WITNESS:  No, C01N does not hold
11   rights to Bitcoin.
12   BY MR. FREEDMAN:
13       Q.   What does C01N hold rights to?
14       A.   C01N is a liquidated company.  It holds
15   rights to nothing.
16       Q.   When C01N was operational?
17       A.   I have already stated C01N was never
18   operational.
19       Q.   At some point in time C01N owned rights;
20   is that a correct statement?
21           MS. MARKOE:  Objection.
22           THE WITNESS:  That is a correct
23   statement.
24   BY MR. FREEDMAN:
25       Q.   When did it own those rights -- during
```

Page 116

```
1    what period of time?
2            MS. MARKOE:  Objection.
3            THE WITNESS:  I would need to look at the
4    records.  I do not know the date of the transfers off
5    the top of my head.
6    BY MR. FREEDMAN:
7        Q.   Before Dave died or after Dave died?
8            MS. MARKOE:  Objection.
9            THE WITNESS:  After Dave died.
10   BY MR. FREEDMAN:
11       Q.   When was it liquidated?
12       A.   I do not know that.
13       Q.   Was it operational in 2008?
14           MS. MARKOE:  Objection.
15           MR. FREEDMAN:  Sorry, 2018.
16           THE WITNESS:  The company has never been
17   operational.
18   BY MR. FREEDMAN:
19       Q.   Was it in existence in 2018?
20       A.   I do not believe so, but you would need
21   to look at the records.  Companies House in the UK holds
22   records.  You can obtain them.
23           MR. RIVERO:  I think the last question
24   was in existence in 2018, but I do not want to misstate
25   it.  The record is showing 2008.
```

Page 117

```
1            MS. MARKOE:  He corrected it.
2            MR. RIVERO:  I apologise, sorry about
3    that.
4    BY MR. FREEDMAN:
5        Q.   In 2013, C01N was in existence?
6            MS. MARKOE:  Objection.
7            THE WITNESS:  It was not called C01N at
8    that time, I believe.  I do not know when the change was
9    made to the name, but the company had been formed.
10   BY MR. FREEDMAN:
11       Q.   Once it had been formed, it held rights?
12       A.   No.
13           MS. MARKOE:  Objection.
14   BY MR. FREEDMAN:
15       Q.   When did it obtain rights?
16       A.   Again, I would need to look at the
17   accounts and records to say when rights were issued.
18       Q.   But at some point it held rights?
19       A.   Yes.
20       Q.   It held rights to Bitcoin?
21       A.   At some point it held rights to Bitcoin.
22       Q.   What does that mean?
23       A.   The term "rights" is defined in property
24   law rather succinctly.  Would you like me to start
25   quoting maybe Black's Law Dictionary on the nature of
```

Page 118

```
 1    rights?
 2         Q.    I would like you to tell me what was the
 3    nature of the rights C01N held?
 4              MS. MARKOE:  Objection.
 5              THE WITNESS:  It had rights.  I do not
 6    have the records.  I cannot read the exact stipulations.
 7    BY MR. FREEDMAN:
 8         Q.    So, in your own terms, describe to me
 9    what C01N was able to do with its rights?
10              MS. MARKOE:  Objection.
11              THE WITNESS:  C01N cannot do anything.
12    It is a legal entity, which means by itself it cannot
13    actually do anything.  An individual, a person, needs to
14    direct and make things happen.
15    BY MR. FREEDMAN:
16         Q.    Yes, but they did so under the auspices
17    of C01N?
18              MS. MARKOE:  Objection.
19              THE WITNESS:  Did what under the auspices
20    of C01N exactly, please?  Be specific.
21    BY MR. FREEDMAN:
22         Q.    Should C01N have exercised its rights --
23    strike that.  If an individual of the appropriate
24    authority directed C01N to exercise its rights to
25    Bitcoin, what could they have done with it?
```

Page 119

```
 1              MS. MARKOE:  Objection:  calls for
 2    speculation.
 3              MR. FREEDMAN:  You can answer.
 4              THE WITNESS:  If someone has rights to an
 5    asset, they can do all sorts of things.  As a
 6    speculative dive, someone with assets can destroy
 7    assets, move assets, give them away.  So on a pure
 8    speculative form in the way that you are asking this,
 9    what could be done?  They could be made into a
10    charitable trust.  They could be shot into space as a
11    certain Tesla is believed to be up there.  They could be
12    given away to children's charities in Africa.
13    BY MR. FREEDMAN:
14         Q.    So, how much Bitcoin did C01N hold rights
15    over?
16              MS. MARKOE:  Objection.
17              THE WITNESS:  I would need to look at the
18    accounts.  I do not know off the top of my head.
19    BY MR. FREEDMAN:
20         Q.    Who has the accounts?
21         A.    I do not know.  It is a liquidated
22    company.  It has been closed.
23         Q.    So, where did the rights that C01N had
24    go?
25         A.    They have been moved.  I would need to
```

Page 120

```
 1    look at the individual records to say what transfers
 2    have occurred.  What you are trying to ask is about
 3    Mr. Kleiman.  Mr. Kleiman had no ownership in that
 4    company at any point.  He no assets in that company.
 5    Nothing of his ever transferred to that company, or out
 6    of that company.  He had no shareholding.  He had no
 7    employee nature.  There was no contracts with
 8    Mr. Kleiman.  There was no depositing of assets, removal
 9    of assets, there was nothing that he owned ever went
10    into it.  A cent of his money or more never was involved
11    with anything to do with it.  He did not pay for the
12    formation.  He was asked to, he did not, because he got
13    sick, and that never occurred.
14         Q.    Did W&K have any relationship with C01N?
15              MS. MARKOE:  Objection.
16              THE WITNESS:  No.
17    BY MR. FREEDMAN:
18         Q.    Did C01N ever mine Bitcoin?
19              MS. MARKOE:  Objection.
20              THE WITNESS:  No.
21    BY MR. FREEDMAN:
22         Q.    Was C01N ever audited by the ATO?
23         A.    I do not know how that would be possible.
24    If you are talking about C01N UK, then C01N UK is a
25    British entity.
```

Page 121

```
 1         Q.    Was it ever audited?  A simple yes or no
 2    suffices.
 3         A.    I would not be able to answer that.
 4    I have no idea how the Australian government could ever
 5    audit a British company, and if they did it would not
 6    involve me.
 7         Q.    You told me there is a UK entity C01N and
 8    an Australian entity C01N?
 9         A.    And I was very specific because we were
10    talking about the UK entity, you had not switched back
11    to the Australian entity, and I answered saying the UK
12    C01N.
13         Q.    So the Australian C01N, did it ever mine
14    Bitcoin?
15              MS. MARKOE:  Objection.
16              THE WITNESS:  No.
17    BY MR. FREEDMAN:
18         Q.    Was the Australian C01N ever audited by
19    the ATO?
20         A.    Yes.
21         Q.    When did that audit begin?
22         A.    I do not have the records in front of me.
23    I cannot answer any of those details.
24         Q.    Where do those records exist?
25              MS. MARKOE:  Objection.
```

MAGNA ▶
LEGAL SERVICES

Page 122

1    THE WITNESS:  I have no idea, other than
2  the documents that have been handed to my lawyers.  That
3  is all I have.
4  BY MR. FREEDMAN:
5    Q.   Who were the directors of C01N?
6    MS. MARKOE:  Objection.
7    THE WITNESS:  Again, I do not remember
8  which directors were directors at any particular time.
9  I do not do company secretarial.  I pay other people to
10  do company secretarial.  As such, other people,
11  including professional companies that were there doing
12  that, would know these things, not me.
13  BY MR. FREEDMAN:
14    Q.   Who are those companies, so we can reach
15  out to them?
16    MS. MARKOE:  Objection.
17    THE WITNESS:  If you look up the records
18  on ASIC you will see a record that notes a company.
19  I am not going to pay for the record for you to download
20  one that anyone can go and pay for.
21  BY MR. FREEDMAN:
22    Q.   Who owned C01N Australia when it was
23  founded?
24    A.   Again, I do not have the shareholding
25  structure in front of me.  I will not speculate on which

Page 123

1  particular company out of which one I set up was owned
2  in what way.
3    Q.   Who owned C01N UK when it was initially
4  set up?
5    A.   Again, I do not have the records in front
6  of me.  If you are asking about either of those having
7  anything to do with W&K or Dave, zero.  Dave owned zero
8  in either C01N, nothing, nada, null, blank.
9    Q.   Did either C01N UK or C01N Australia have
10  ownership over Bitcoin IP?
11    MS. MARKOE:  Objection.  He has already
12  responded this had nothing to do with Dave Kleiman.  You
13  have gotten some leeway into your questions about this
14  topic, and I am going to instruct him not to answer any
15  further questions about the assets of companies that had
16  nothing to do with Dave Kleiman or W&K.
17    MR. RIVERO:  It is just after one, and
18  I think we are wearing our court reporter out.  At a
19  good stopping point, let us take a break.
20    MR. FREEDMAN:  That is fine, we can stop
21  now.
22    THE VIDEOGRAPHER:  Going off the record.
23  The time is 13.02.  End of video card number 2, volume
24  1, in the video deposition of Dr. Craig Wright.
25    (Luncheon adjournment)

Page 124

1    THE VIDEOGRAPHER:  This is the beginning
2  of video card number 3, volume 1, in the video
3  deposition of Dr. Craig Wright.  Going on the record.
4  The time is 14.07.  Thank you.
5  BY MR. FREEDMAN:
6    Q.   Good afternoon, Dr. Wright.  Welcome
7  back.  I had one last question about C01N.  You were
8  referring me to ASIC.  Who has the non-public records of
9  C01N?
10    MS. MARKOE:  Objection.  You may answer.
11    THE WITNESS:  Anything that I do not have
12  in that pile, I do not know.
13  BY MR. FREEDMAN:
14    Q.   So if you did not give it to your
15  lawyers, you do not know where it is?
16    A.   I have no idea.
17    Q.   Whose idea was it to create Bitcoin?
18    MS. MARKOE:  Objection.
19    THE WITNESS:  I have been working on this
20  since 1998.
21  BY MR. FREEDMAN:
22    Q.   So it was your idea?
23    A.   Other people have wanted to create
24  digital money beforehand.  Bitcoin differs in that
25  everyone wanted an anonymous cash system.  I made sure

Page 125

1  that it was a legal system.  I have had other ideas that
2  were different to create what is Bitcoin meant
3  blockchain and that required being different than things
4  like e-cash, in a completely different way.
5    Q.   When did you decide to go from working on
6  it to bringing it public?
7    MS. MARKOE:  Objection.
8    MR. FREEDMAN:  You can answer.
9    THE WITNESS:  2008.
10  BY MR. FREEDMAN:
11    Q.   In 2008, did you believe what you were
12  doing would be successful?
13    A.   I had no idea.
14    Q.   Did you hope it would be successful?
15    A.   Of course you hope, or you would not work
16  on it otherwise.
17    Q.   Did you believe it would become a real
18  alternate currency?
19    MS. MARKOE:  Objection.
20    THE WITNESS:  I do not know; it is still
21  not a currency.  I hope.
22  BY MR. FREEDMAN:
23    Q.   Did you believe it would become a real
24  alternate method of exchange?
25    MS. MARKOE:  Objection.

MAGNA ▶
LEGAL SERVICES

Page 126

1    THE WITNESS:  I always hoped.
2  BY MR. FREEDMAN:
3    Q.   Do you recall reaching out to
4  Louis Kleiman in February 2014?
5    A.   I do not remember the exact date, but
6  some time around then, yes.
7    Q.   I am handing you what we can mark as
8  Plaintiff's Exhibit 2.
9  (Plaintiff's Exhibit 2 marked for identification)
10  This is docket entry 83-23.  Do you recognise the
11  e-mail on the second half of page 2?
12    MS. MARKOE:  Objection.  You may answer.
13    THE WITNESS:  I recognise the printout of
14  the e-mail.
15  BY MR. FREEDMAN:
16    Q.   And it says: "Hello Louis, your son Dave
17  and I are two of the three key people behind Bitcoin."
18  Did you write that?
19    A.   I typed that.
20    Q.   Who is the third person?
21    THE WITNESS: Is it one of those things?
22    MS. MARKOE:  Okay. Dr. Wright is not in
23  a position to answer that question.  He will provide a
24  fulsome explanation to the court in camera.
25    MR. FREEDMAN:  Do we know the basis for

Page 127

1  refusing to answer?
2    MS. MARKOE:  My understanding -- and he
3  will correct me if I am wrong -- is security.
4    MR. FREEDMAN:  National security?
5    MS. MARKOE:  Yes.
6    MR. FREEDMAN:  Of which country?
7    THE WITNESS:  In this particular case,
8  the USA.
9  BY MR. FREEDMAN:
10    Q.   Do you have a formal security clearance
11  from the USA?
12    A.   I am not going to be discussing any of
13  this stuff.
14    MS. MARKOE:  Okay, so he will discuss
15  details regarding that in camera with the court, and the
16  court will make a determination as to what parts of that
17  he can answer, if any.
18  BY MR. FREEDMAN:
19    Q.   Is the third person still alive?
20    A.   I do not know.
21    Q.   Is the third person a member of the US
22  government?
23    A.   If I do not know if they are alive I do
24  not know if they are a member of the US government.
25    Q.   Were they ever a member of the US

Page 128

1  government?
2    MS. MARKOE:  If you can answer, answer.
3  If you cannot answer, then you will answer ----
4    THE WITNESS:  Yes.
5  BY MR. FREEDMAN:
6    Q.   What body of the government?
7    MS. MARKOE:  Answer until you feel that
8  you need to answer in front of the court ----
9    THE WITNESS:  I will leave that one for
10  the court.
11    MS. MARKOE: ---- in camera.
12  BY MR. FREEDMAN:
13    Q.   Was Dave aware of this third person's
14  involvement?
15    MS. MARKOE:  Objection.
16    THE WITNESS:  Again, I will leave that to
17  the court.
18  BY MR. FREEDMAN:
19    Q.   Was this third person aware of Dave's
20  involvement?
21    A.   Again, I am going to leave any of this to
22  the court.
23    Q.   Between 1998 and 2008, when you decided
24  to take Bitcoin public, who did you speak to about the
25  idea?

Page 129

1    A.   The idea is a very wide topic.  Who did
2  I speak to between 1998 and 2008?  Apart from e-mails to
3  Wei Dai and others who were seemingly public, such as
4  Hal Finney and John MacDonald and Bear ----
5    Q.   I am sorry?
6    A.   Bear.
7    Q.   Bear?  Is that a first name or a last
8  name?
9    A.   That is his nickname.  Also Cryptonaut.
10  If you search up you will find who it is.  That is Ray.
11    Q.   Ray who, I am sorry?
12    A.   Do a search on big time talk and say the
13  name, but "Bear Cryptonaut", you will find it.
14    Q.   This is a user name?
15    A.   Yes.
16    Q.   And Cryptonaut and Bear are the same
17  people?
18    A.   Yes.
19    Q.   I apologise, because I did not catch
20  Bear, but I interrupted you.
21    A.   B-E-A-R.
22    Q.   Thank you.  Wei Dai, Hal Finney, John
23  MacDonald, Bear Cryptonaut; was there anyone else you
24  spoke to during that time?
25    A.   In a 20-year period there were lots of

Page 130

1  other people.
2      Q.   I am talking just about 10 years from
3  1998-2008?
4      A.   Yes.
5      Q.   Were there any others that you recalled,
6  besides these four?
7      A.   I discussed things with Allan Granger.
8      Q.   Who is Allan Granger?
9      A.   He is a former partner of BDO.
10     Q.   Is Mr. Granger still alive?
11     A.   Yes.
12     Q.   When did you contact Mr. Granger about
13 Bitcoin?
14     A.   I worked for Mr. Granger.
15     Q.   What time did those communications with
16 Mr. Granger take place?
17     A.   Between times when we were working
18 together.
19     Q.   So 2008?
20          MS. MARKOE:  Objection.
21 BY MR. FREEDMAN:
22     Q.   When was the timeframe you worked at BDO?
23 Remind me, I forget.
24     A.   2005.
25     Q.   2005-2008.  Do you have contact

Page 131

1  information for Mr. Granger?
2      A.   I do not know.  I am not sure.  He is not
3  at BDO any more.  I do not know if he is still where he
4  was.
5      Q.   Does he still live in Australia?
6      A.   I have not talked to him in a couple of
7  years.
8      Q.   When was the last time you spoke to
9  Mr. Granger?
10     A.   2016, I believe.
11     Q.   At that time, was he living in Australia?
12     A.   Yes.
13     Q.   Do you have contact information for
14 Wei Dai?
15     A.   Just the e-mail.
16     Q.   Do you know that e-mail by heart?
17     A.   No.
18     Q.   Can you provide it to your lawyers?
19     A.   I will just do an internet search.
20     Q.   Do you have contact information for John
21 MacDonald?
22     A.   Again, I would do an internet search.
23     Q.   Do you have contact information for Bear?
24     A.   Again, I would do an internet search, and
25 he has not changed his address.

Page 132

1      Q.   When you contacted Bear, did you contact
2  him as Dr. Craig Wright or in some alias?
3          MS. MARKOE:  Objection.
4          MR. FREEDMAN:  You can answer.
5          THE WITNESS:  Both.
6  BY MR. FREEDMAN:
7      Q.   What method do you use to communicate
8  with Bear?
9      A.   Bitcointalk, IRC, e-mail.
10     Q.   Do you have any of those records still?
11     A.   Bitcointalk is public, IRC does not have
12 records, unless someone has captured them, and, no, I do
13 not have those e-mails, although some of them are still
14 available.
15     Q.   What was the user name on Bitcointalk
16 that you used?
17     A.   Satoshi.
18     Q.   Do you still have access to the Satoshi
19 account on Bitcointalk?
20          MS. MARKOE:  Objection.  You can answer.
21          THE WITNESS:  I have not tried logging in
22 in a long time.
23 BY MR. FREEDMAN:
24     Q.   Do you have the old credentials?
25     A.   I have not even looked whether I would.

Page 133

1      Q.   Where would they be, if you had them?
2      A.   Most likely in my head.
3      Q.   Can you look now and tell me if they are
4  there?
5      A.   I would need to try and see if I do not
6  log myself out.  I have used a lot of passwords in the
7  past and I can remember some of the mnemonics from some
8  of them.  Have I tried: no; would I want to: no.
9      Q.   Did anyone else have access to the
10 Satoshi account on Bitcoin.com?
11          MS. MARKOE:  Objection.
12          MR. FREEDMAN:  Sorry, Bitcointalk, is it?
13          THE WITNESS:  Bitcointalk.  Yes.
14 BY MR. FREEDMAN:
15     Q.   Who else had access?
16     A.   Dave.
17     Q.   When did Dave have access to the Satoshi
18 account?
19     A.   The exact set-up time, I do not remember,
20 but we stopped using it in December 2010.
21     Q.   Why did you stop using it in December
22 2010?
23     A.   I was disillusioned with Bitcoin and
24 I needed to test whether I had completely fucked up.
25     Q.   So did you have a conversation with Dave?

MAGNA
LEGAL SERVICES

Page 134

1   How did you mutually come to the agreement not to use it
2   any more?
3           MS. MARKOE:  Objection:  mischaracterises
4   the testimony.
5           MR. FREEDMAN:  You can answer.
6           THE WITNESS:  It was my account, so there
7   is no -- should not be used any more.  Did I go off and
8   stop interacting:  yes.  A number of things had occurred.
9   WikiLeaks, Silk Road and a number of other dark websites
10  were starting to be created.  The reason I created
11  Bitcoin was to ensure a form of money that had an
12  evidence trail stopped all that.  And what I saw was my
13  creation being used for everything I hated and nothing
14  valid at the time, and I thought I had failed.
15  BY MR. FREEDMAN:
16      Q.   Did Dave share this  disappointment?
17          MS. MARKOE:  Objection.
18          MR. FREEDMAN:  You can answer.
19      A.   No.  Dave was the reason I kept going.
20  BY MR. FREEDMAN
21      Q.   Did you ask Dave to stop -- strike that.
22  Did Dave ever communicate with the Satoshi account on
23  Bitcointalk?
24          MS. MARKOE:  Objection.
25          MR. FREEDMAN:  You can answer.

Page 135

1           THE WITNESS:  You are asking, did he
2   communicate with the account?
3   BY MR. FREEDMAN:
4       Q.   Did he ever write a post?  Did he ever
5   send a message as Satoshi?
6           MS. MARKOE:  Objection.
7           THE WITNESS:  That is a different
8   question again.  Did he send a message as Satoshi is not
9   did he answer on the Bitcoin account.
10  BY MR. FREEDMAN:
11      Q.   You are right.  Bad question. Strike it.
12  Did Dave ever post as Satoshi on the Bitcointalk forum?
13      A.   No.
14      Q.   Did Dave ever send a message as Satoshi
15  on the Bitcointalk forum?
16      A.   No.
17      Q.   What did Dave do with his access?
18          MS. MARKOE:  Objection.
19          THE WITNESS:  He checked what I was
20  doing.
21  BY MR. FREEDMAN:
22      Q.   Why did you give Dave access to the
23  Bitcointalk Satoshi account?
24      A.   Because I can be hot-headed.
25      Q.   And?

Page 136

1       A.   Dave is -- Dave was a rambuncious bugger
2   at times too, but Dave did the e-mail rule of reread
3   before you send.
4       Q.   So how did his access facilitate that?
5       A.   He cut out a whole lot of stupid things
6   that I would have sent to people.
7       Q.   So he edited the communications before
8   you sent them?
9           MS. MARKOE:  Objection.
10          THE WITNESS:  Not all, some.
11  BY MR. FREEDMAN:
12      Q.   Did you have a process in place where you
13  would draft responses, he would review  it and then you
14  would send it?
15          MS. MARKOE:  Objection.
16          THE WITNESS:  No, there was no formal
17  anything like that.
18  BY MR. FREEDMAN:
19      Q.   How did he see what you were going to
20  send to edit it?
21          MS. MARKOE:  Objection.
22          THE WITNESS:  If you have an account you
23  can see things.
24  BY MR. FREEDMAN:
25      Q.   You would save drafts?

Page 137

1       A.   If I was annoyed, I was able to contact
2   him and say I was annoyed before I sent something.
3       Q.   Did there come a time in December 2010
4   you asked Dave to stop using the account?
5           MS. MARKOE:  Objection.
6           THE WITNESS:  No.
7   BY MR. FREEDMAN:
8       Q.   You just never called him to log into the
9   account again?
10          MS. MARKOE:  Objection.
11          THE WITNESS:  No.
12  BY MR. FREEDMAN:
13      Q.   So, do you know if he stopped logging in?
14      A.   No one was logging in.
15      Q.   How do you know that he was not logging
16  in?
17      A.   The account has account details.  You can
18  log in and have a look at those if you want.
19      Q.   Do those account details exist today?
20      A.   Yes.
21      Q.   Are those public?
22      A.   Yes.
23      Q.   Did anyone else have access to the
24  Satoshi account at Bitcointalk?
25      A.   Yes.

MAGNA
LEGAL SERVICES

Page 138

```
1         Q.    Who else?
2         A.    It's run on a common forum, so
3    administrators, whatever else, could have gained access.
4         Q.    Administrators could view the private
5    account of Satoshi?
6              MS. MARKOE:  Objection.
7              THE WITNESS:  A Google administrator
8    could view Google e-mail from anyone.  Whether they get
9    fired for doing it is another question.  You said
10   "could".
11   BY MR. FREEDMAN:
12        Q.    Who were the administrators of Bitcoin --
13   strike that.  Whose idea was it to write the Bitcoin
14   white paper?
15        A.    Mine.
16        Q.    When did you begin drafting the Bitcoin
17   white paper?
18        A.    2002.
19        Q.    Did you speak with anybody about the
20   Bitcoin white paper?
21             MS. MARKOE:  Objection.
22             THE WITNESS:  Yes, I have spoken to
23   people about the Bitcoin white paper.  I was on a call
24   last night doing just that.
25   BY MR. FREEDMAN:
```

Page 139

```
1         Q.    Did you send a draft of the Bitcoin white
2    paper to anyone from 2002 until 2007?
3              MS. MARKOE:  Objection.
4              THE WITNESS:  It was not complete at that
5    stage.
6    BY MR. FREEDMAN:
7         Q.    But did you share any form of any draft
8    of the white paper from 2002 until 2007?
9         A.    Yes.
10        Q.    With who?
11        A.    The Australian government.
12        Q.    How did you share it with the Australian
13   government?
14        A.    I sought funding from ITOL.
15        Q.    From, I am sorry?
16        A.    I-T-O-L.
17        Q.    What does that stand for?
18        A.    Off the top of my head, I have no idea.
19   It has been a long time.
20        Q.    Do you have the records of that
21   submission?
22        A.    Some exist, yes.
23        Q.    Do you have them?
24        A.    I know they are on ITOL.
25        Q.    Is ITOL publicly available?
```

Page 140

```
1         A.    No.
2         Q.    Can you request them from ITOL?
3         A.    I do not know.  I have not done that.
4         Q.    Did you get the funding?
5         A.    No.
6         Q.    Why not?
7              MS. MARKOE:  Objection:  foundation.
8              THE WITNESS:  The government decided not
9    to fund it.
10   BY MR. FREEDMAN:
11        Q.    Did you share the white paper with anyone
12   else from 2002-2007?
13        A.    Other people had helped me.
14        Q.    Who?
15        A.    In parts, I do not know.  I have talked
16   to many people in the past.  There are bits of things
17   that I have given over.  I cannot remember all the
18   details of that.
19        Q.    Do you remember anyone?
20        A.    In whole, no.
21        Q.    What do you mean "in whole"?
22        A.    You asked me if I have sent paragraphs to
23   people and things like this.
24        Q.    Who did you send paragraphs to?
25             MS. MARKOE:  Objection.  Vel, I would ask
```

Page 141

```
1    that you limit your questions to the timeframe of this
2    litigation, which begins, I think per your request, in
3    2006 or 2007.  So, anything prior to those years are
4    irrelevant, and beyond the scope.  I will instruct the
5    witness not to answer.
6    BY MR. FREEDMAN:
7         Q.    In 2006, did you share drafts of the
8    white paper with anyone?
9         A.    I do not know.  I discussed it.
10        Q.    Who did you discuss it with?
11        A.    I discussed some of the concepts that
12   became Bitcoin with Allan Granger, with Stefan Matthews,
13   with a person called Joseph Vaughn Perling.
14        Q.    How did you make those ----
15             MR. RIVERO:  He has not finished.
16             THE WITNESS:  Michael Shehadie.
17             MR. FREEDMAN:  Can you spell that for me.
18             THE WITNESS:  No.  S-H-E-H-A-D-I-E,
19   I believe, but quote me, it could have more Hs!
20   BY MR. FREEDMAN:
21        Q.    Anyone else?
22        A.    Yes, I am thinking, sorry.  (Pause)
23   Sorry, I just need to -- it has been a long time.  A
24   person from the Australian Federal Police, I cannot
25   remember his name, he is in the financial crime
```

MAGNA

LEGAL SERVICES

Page 142

```
1    division.
2         MR. RIVERO:  Can I ask for the court
3    reporter, is Mr. Granger's first name Allan or Allen, if
4    you know?
5         THE WITNESS:  It is an AN, not an EN, but
6    I cannot remember off the top of my head whether it is a
7    LL or a single L.
8    BY MR. FREEDMAN:
9         Q.   Is there anyone else?
10        A.   Yes, but I cannot remember.  I know there
11   were a couple of people that I spoke to whom I was doing
12   some financial crime work with BDO, and it was loosely
13   about not Bitcoin but the topics in there and I cannot
14   remember their name off the top of my head.
15        Q.   You showed these individuals drafts of
16   the white paper?
17        A.   I had shown them aspects.
18        Q.   Aspects.  How did you share aspects of
19   the white paper with Joseph Vaughn Perling?
20        A.   Exactly how I do not remember.  I met him
21   in person, exactly where back than I cannot remember.
22   It has been a long time.  I have been to a lot of
23   conferences, I do not remember each one.  I think other
24   people remember more than I do, because, as I said, I go
25   to so many conferences each month that when you are
```

Page 143

```
1    asking me more than 10 years ago, I do not remember
2    which particular conference or which particular paper.
3         Q.   How did you ----
4         A.   Likely on a tablet.
5         Q.   How did you share portions of the white
6    paper with Michael Shehadie?
7         A.   He is my lawyer.
8         Q.   Okay.  Where does he work?
9         A.   Australia.
10        Q.   What law firm?
11        A.   Michie Shehadie and Co.
12        Q.   Without revealing anything about your
13   discussions between yourself and Mr. Shehadie, why did
14   you discuss it with him?
15        MS. MARKOE:  Objection.  If you can
16   answer that question without revealing the contents and
17   legal purpose of your communication with him, then do
18   so.  If you cannot then I would instruct you not to
19   answer.
20        THE WITNESS:  It was all to do with legal
21   stuff.
22   BY MR. FREEDMAN:
23        Q.   Did you ever consider patenting the white
24   paper?
25        A.   Yes.
```

Page 144

```
1         Q.   When did you consider patenting the white
2    paper?
3         MS. MARKOE:  Objection.  I think we are
4    sort of getting beyond, again, the topics.  This is a
5    limited deposition.  Can you please explain to me how
6    that question relates to any one of these topics.
7         MR. FREEDMAN:  It has to do with -- well,
8    my next question was going to be, if it was Dave's idea
9    to patent it ----
10        MS. MARKOE:  I am asking about this
11   question, I am not asking about the next question.
12        MR. FREEDMAN:  Zaharah, I do not have
13   time, so either instruct him not to answer or object.
14   Choose.
15        MR. RIVERO:  We are asking you to connect
16   it up to the topics, and that is a fair question.
17   Connect it up if you have another question.
18        MR. FREEDMAN:  It has to do with quickly
19   details surrounding Craig and Dave's partnership to
20   create Satoshi Nakamoto.
21        MR. RIVERO:  Ask the question that makes
22   the connection of a predicate to why this is relevant.
23   We are not trying to stop you.  Go ahead.
24        MR. FREEDMAN:  I am not going to do it.
25        Q.   When did you contemplate patenting the
```

Page 145

```
1    white paper?
2         MS. MARKOE:  Objection.  You can answer.
3         THE WITNESS:  I considered patenting
4    Bitcoin in 2002.
5    BY MR. FREEDMAN:
6         Q.   Did you consider patenting it in 2008?
7         MS. MARKOE:  Objection.
8         THE WITNESS:  I considered patenting it
9    in 2007, but not in 2008.
10   BY MR. FREEDMAN:
11        Q.   When did Dave first become involved with
12   the white paper?
13        A.   2008.
14        Q.   Why did you decide not to patent Bitcoin?
15        MS. MARKOE:  Objection.
16        THE WITNESS:  Because ----
17        MS. MARKOE:  How does this relate in any
18   way to any purported partnership between Dave and
19   Dr. Wright?
20        MR. FREEDMAN:  I do not yet know the
21   answer.  Once I know I will let you know.
22        MS. MARKOE:  You have to actually
23   establish any sort of connection between the limited
24   topics.  I am giving you leeway here but this is not a
25   merits deposition on every topic that you want to ask
```

**MAGNA** ▶
LEGAL SERVICES

Page 146

1    about.  It is a limited deposition on ten specific
2    topics.  I have given you plenty of leeway but if you
3    cannot connect how a particular question, after that
4    leeway, relates to one of these topics then I will
5    instruct the witness not to answer.
6    BY MR. FREEDMAN:
7        Q.   Did you speak to anyone about patenting
8    Bitcoin?
9            MS. MARKOE:  Objection.  Do not answer
10   that.
11           THE WITNESS:  Lawyers.
12   BY MR. FREEDMAN:
13       Q.   Did you speak to anyone besides lawyers?
14           MS. MARKOE:  Objection.  Do not answer
15   that, except as it relates to Dave Kleiman.
16           MR. RIVERO:  Can you answer that, as
17   instructed by Ms. Markoe.
18           THE WITNESS:  No relation to Mr. Kleiman,
19   only to do with lawyers.
20   BY MR. FREEDMAN:
21       Q.   When did Dave become involved in the
22   white paper?
23           MS. MARKOE:  Objection: asked and
24   answered.
25           THE WITNESS:  2008.

Page 147

1    BY MR. FREEDMAN:
2        Q.   How did he become involved with the white
3    paper?
4        A.   That is a rather wide question.  How do
5    you -- sorry, how do you become involved with the white
6    paper?  Can you clarify that a bit please?
7        Q.   How did Dave find out about the white
8    paper?
9        A.   You have already given me an e-mail that
10   I have sent.  The white paper was not public before
11   that, so ----
12       Q.   Did you attach the white paper to that
13   e-mail?
14       A.   No.
15       Q.   So how did he obtain the white paper?
16       A.   It was put online.
17       Q.   When was it put online?
18       A.   2008.
19       Q.   Where was it put online?
20       A.   A server in Melbourne upload.ae.
21       Q.   How did he find the location of the white
22   paper?
23           MS. MARKOE:  Objection.  You can answer
24   if you understand the question.
25           THE WITNESS:  How did he find it?  Well,

Page 148

1    he typed in a link into a browser and it magically came
2    from the ether of the internet.
3    BY MR. FREEDMAN:
4        Q.   And he magically found out about the
5    hyperlink?
6            MS. MARKOE:  Objection: argumentative.
7            MR. FREEDMAN:  Withdrawn.
8        Q.   How did he find the specific URL he was
9    supposed to type in?
10       A.   As I have been saying, we discussed
11   things over IRC.
12       Q.   Did you give him the address over IRC?
13       A.   Yes.
14       Q.   When did that take place?
15       A.   Shortly after that e-mail.
16       Q.   Why did you e-mail him the initial
17   communication and follow up with IRC?
18           MS. MARKOE:  Objection: compound.
19           MR. FREEDMAN:  You can answer.
20           THE WITNESS:  I sent him that original
21   e-mail because I wanted his help.  I then followed up
22   because I would chat with him live over IRC.
23   BY MR. FREEDMAN:
24       Q.   How long was the Bitcoin white paper when
25   you contacted Dave in 2008?

Page 149

1            MS. MARKOE:  Objection.  You can answer
2    if you can.
3            THE WITNESS:  The same length as it is
4    now, approximately.
5    BY MR. FREEDMAN:
6        Q.   Why did you reach for Dave's help
7    about the white paper?
8            MS. MARKOE:  Objection.  You can answer.
9            THE WITNESS:  I was not so much asking
10   for his help about the white paper.
11   BY MR. FREEDMAN:
12       Q.   What were you reaching out for?
13       A.   His help in other ways.
14       Q.   What were the ways you were seeking Dave
15   Kleiman's help?
16       A.   I am not a likeable person.  Dave was.
17   I put people off.  I care about my business, my work, my
18   maths, my papers, my patents, and not much more, so
19   unfortunately dealing with people and dealing with
20   people in open source communities is something I am
21   very, very bad at.
22       Q.   This was something Dave was good at?
23       A.   That is something Dave could help me
24   with.
25       Q.   Did he help you with that?

MAGNA
LEGAL SERVICES

1    MS. MARKOE:  Objection.  You can answer.
2    THE WITNESS:  Dave has helped me with
3  that many times in the past.  The e-mail that you are
4  referencing, I believe I saw the defamation and whatever
5  is the title.
6    MS. MARKOE:  Exhibit 1.  I believe it is
7  right in front of you.
8    THE WITNESS:  "Defamation and the
9  difficulties of law on the Internet".  Around the same
10  time I was having other troll fights as I have had many
11  times, and Dave helped there as well.
12  BY MR. FREEDMAN:
13    Q.    Why did Dave need to review the white
14  paper to help you interact with open source communities?
15    MS. MARKOE:  Objection.  You may answer.
16    THE WITNESS:  Dave was not the only
17  person who reviewed the white paper.
18  BY MR. FREEDMAN:
19    Q.    Who else reviewed the entire white paper,
20  as uploaded to upload.ae?
21    THE WITNESS:  I do not know.
22    BY MS. MARKOE:  Objection.
23  BY MR. FREEDMAN:
24    Q.    Who else did you give the upload.ae
25  address to?

1    A.    It was put on a public mailing list.
2    Q.    Which public mailing list?
3    A.    The cryptography mailing list, it was put
4  on the Usenet sites.  It was in an IRC chat group.  It
5  was sent to Wei Dai.  It was sent to Adam Back.
6    Q.    Did Dave put it on the cryptography
7  mailing list?
8    A.    No.
9    Q.    Who did?
10    A.    Me.
11    Q.    Did Dave put it on IRC?
12    A.    Yes.
13    Q.    Was there a chat on IRC?
14    A.    There were multiple chats on IRC.
15    Q.    Do you remember the chats he put them on?
16    A.    You have not used IRC, have you?
17    Q.    I have not.
18    A.    I suggest you look at how IRC works and
19  then you will see why I am sighing when you ask that.
20    Q.    Did Dave send it to Adam Back?
21    MS. MARKOE:  Objection.
22    THE WITNESS:  No.
23  BY MR. FREEDMAN:
24    Q.    Who did?
25    A.    I already said.

1    Q.    I missed it.  Can you repeat it?
2    A.    Me.
3    Q.    When did you send it to Adam Back?
4    MS. MARKOE:  Objection.  You may answer.
5    THE WITNESS:  2008.
6  BY MR. FREEDMAN:
7    Q.    Did Adam Back comment on the white paper?
8    MS. MARKOE:  Objection.  You are getting
9  beyond the scope again.
10    MR. FREEDMAN:  Okay.
11    MS. MARKOE:  So, I would instruct the
12  witness not to answer.  You are going beyond the scope.
13  BY MR. FREEDMAN:
14    Q.    Did Dave interact with Adam Back?
15    MS. MARKOE:  Objection: foundation.  You
16  can answer.
17    THE WITNESS:  Yes.
18  BY MR. FREEDMAN:
19    Q.    Did Dave interact with Adam Back about
20  the white paper?
21    MS. MARKOE:  Objection.  If you know.
22    THE WITNESS:  I do not know exactly what
23  Dave wrote.  I am not Dave.
24  BY MR. FREEDMAN:
25    Q.    How do you know that Adam Back

1  communicated with Dave?
2    MS. MARKOE:  Objection: mischaracterises
3  the testimony.
4    MR. FREEDMAN:  You can answer.
5    THE WITNESS:  I spoke with Dave.
6  BY MR. FREEDMAN:
7    Q.    And what did Dave say about Adam Back?
8    MS. MARKOE:  Objection.
9    THE WITNESS:  Do I have to say it?
10    MR. RIVERO:  Yes, go ahead.
11    MS. MARKOE:  Just answer.
12    THE WITNESS:  He said something along the
13  lines of, to characterise what you bloody Aussies say,
14  he is a wanker and we got the wrong person.
15  BY MR. FREEDMAN:
16    Q.    What did he mean by saying you have the
17  wrong person?
18    MS. MARKOE:  Objection.
19    THE WITNESS:  Hal Finney wrote the R
20  proof of work code that I used as a basis, not Adam.
21  BY MR. FREEDMAN:
22    Q.    Did you confuse the R proof of work code
23  as having been authored by Adam Back?
24    MS. MARKOE:  Objection.  You can answer.
25    THE WITNESS:  I did not check.  I chucked

MAGNA
LEGAL SERVICES

Page 154

```
1   in a reference after doing a quick search. The work by
2   Aurora et al had been implemented by a site I saw
3   referenced as Adam Back. I put that down. I did not
4   check that that did not actually work, and that it was
5   Hal Finney who actually fixed it and had it working.
6   BY MR. FREEDMAN:
7       Q.   Did Dave have any further interactions
8   with Adam Back about the white paper that you are aware
9   of?
10          MS. MARKOE: Objection. You can only
11  state stuff that you know.
12          THE WITNESS: I do not know.
13  BY MR. FREEDMAN:
14      Q.   Did Dave reach out to Hal Finney about
15  the R proof of work?
16          MS. MARKOE: Objection: foundation.
17  BY MR. FREEDMAN:
18      Q.   Withdrawn. Do you know whether Dave he
19  reached out to Hal Finney about the R proof of work
20  code?
21      A.   No, he would not need to reach out to
22  Hal Finney.
23      Q.   Why not?
24      A.   Because Hal Finney reached out to us.
25      Q.   How did Hal Finney reach out to you and
```

Page 155

```
1   Dave?
2           MS. MARKOE: Objection.
3           MR. FREEDMAN: You can answer.
4       A.   He talked over public forums, IRC and
5   e-mail.
6   BY MR. FREEDMAN:
7       Q.   What did he say, in his initial
8   communication?
9           MS. MARKOE: Objection.
10          THE WITNESS: He thought Bitcoin could
11  work but there would be a few problems.
12  BY MR. FREEDMAN:
13      Q.   Did you and Dave work on those problems?
14          MS. MARKOE: Objection: assumes facts not
15  in evidence.
16          MR. FREEDMAN: You can answer it.
17          THE WITNESS: There were no problems.
18  Actually ----
19  BY MR. FREEDMAN:
20      Q.   Hal Finney was wrong?
21      A.   There were problems but not the problems
22  he was stating. So, yes, Hal Finney was wrong.
23      Q.   What were the problems Hal Finney thought
24  were with the protocol?
25          MS. MARKOE: Objection: relevance. This
```

Page 156

```
1   is now again, you are getting beyond the scope. I am
2   going to ask him not to answer that question.
3   BY MR. FREEDMAN:
4       Q.   Do you maintain any of the correspondence
5   with Hal Finney back in 2008?
6       A.   No.
7       Q.   Did Dave edit the white paper?
8       A.   A few people edited the white paper,
9   including Dave.
10      Q.   What were Dave's edits to the white
11  paper?
12      A.   I do not exactly remember. There were
13  six different versions.
14      Q.   Sorry?
15      A.   There were six different versions.
16      Q.   When did version 1 come out?
17          MS. MARKOE: Objection.
18          THE WITNESS: 2002.
19  BY MR. FREEDMAN:
20      Q.   When did version 2 come out?
21          MS. MARKOE: Objection.
22          THE WITNESS: I do not remember the exact
23  dates of all of these.
24  BY MR. FREEDMAN:
25      Q.   Do you recall when version 3 came out?
```

Page 157

```
1           MS. MARKOE: Objection.
2           THE WITNESS: Again, I do not remember
3   all of it. I had multiple versions, all simultaneously
4   running. If you ask any of my staff, my document
5   management is shit. I save and then update the old
6   version sometimes and then go back to the first one.
7   I then re-edit a later one. I have people bitch at me
8   and I have been banned from document management
9   altogether by my staff, who have basically just about
10  threatened to walk out if I am allowed to touch a
11  document ever again.
12  BY MR. FREEDMAN:
13      Q.   Did Dave help you keep track of the six
14  different versions of the white paper?
15          MS. MARKOE: Objection.
16          THE WITNESS: No; hence why it was a
17  fucking mess.
18  BY MR. FREEDMAN:
19      Q.   How did you compile all versions into
20  one?
21          MS. MARKOE: Objection.
22          THE WITNESS: I did not.
23  BY MR. FREEDMAN:
24      Q.   Who did?
25      A.   Nobody.
```

Page 158

```
1       Q.   So how did you get the final version?
2       A.   The same way I do every single time,
3   I finish up a version.
4       Q.   Which is the version that is public?
5           MS. MARKOE:  Objection.
6           THE WITNESS:  It is the one that is still
7   public as the Bitcoin white paper.
8   BY MR. FREEDMAN:
9       Q.   Of the six, which one was that?
10          MS. MARKOE:  Objection.
11          THE WITNESS:  Exactly where each bit
12  came, I could not answer.
13  BY MR. FREEDMAN:
14      Q.   If you had a copy of the white paper in
15  front of you, would it help identify Dave's
16  contributions?
17      A.   No.  More than anything else, what Dave
18  helped me with was, it is like legal things.  I have
19  been an expert witness many, many times, and that is way
20  easier than being your own witness.  There is no emotion
21  in talking about someone else's things.  It is easy to
22  make mistakes when you are doing your own thing.  And it
23  is critical to get rid of the metadata.  If you want to
24  not be found, not have something point back, then it is
25  absolutely critical to strip anything that can identify
```

Page 159

```
1   a document.  Dave was also very good at that.  Dave
2   helped double-check that all the PDFs, etcetera, had
3   nothing to tie anything back.
4       Q.   Was there anyone else besides Dave that
5   you could have used to do those two functions?
6           MS. MARKOE:  Objection.
7           THE WITNESS:  I believe there is a world
8   full of editing services, so if you are saying anyone
9   could do that, then of course there are.  There are
10  commercial companies, but then if I am going to someone
11  and going, "Hey, I have this supersecret document that
12  I want you to sort of sit on", it does not work too
13  well.
14  BY MR. FREEDMAN:
15      Q.   Was there anyone you could trust to keep
16  it secret and who had these abilities besides Dave?
17          MS. MARKOE:  Objection.
18          MR. FREEDMAN:  You can answer.
19          THE WITNESS:  Yes.
20  BY MR. FREEDMAN:
21      Q.   Who?
22      A.   I have a lot of friends in the computer
23  forensics industry.
24      Q.   Why did you not use them?
25          MS. MARKOE:  Objection.
```

Page 160

```
1           THE WITNESS:  Because I asked Dave.
2   BY MR. FREEDMAN:
3       Q.   Was it because Dave was your best friend?
4       A.   In part, yes.
5       Q.   I want to direct your attention back to
6   Plaintiff's Exhibit 1, which is the 2008 e-mail.  When
7   did you settle on the name Bitcoin?
8           MS. MARKOE:  Objection.  You can answer.
9           THE WITNESS:  I thought about the name
10  Bitcoin for a while.  It was actually B-i-t-C-o-i-n,
11  which I got a lot shit for.  I believed we discussed
12  that sort of thing when naming.  Other people over here
13  in Britain seemed to like to capitalising in the middle
14  of things.  Americans think I am stupid for doing it.
15  BY MR. FREEDMAN:
16      Q.   So Dave eventually talked you into not
17  capitalising the C?
18          MS. MARKOE:  Objection: mischaracterises
19  the testimony.
20          THE WITNESS:  No, it was capitalised in
21  many places.
22  BY MR. FREEDMAN:
23      Q.   Did Dave prefer BitCash or Bitcoin?
24          MS. MARKOE:  Objection.  You can answer.
25          THE WITNESS:  Bitcoin.
```

Page 161

```
1   BY MR. FREEDMAN:
2       Q.   Did Dave prefer capital C or lower case
3   C?
4           MS. MARKOE:  Objection.
5           THE WITNESS:  Dave was American.
6   BY MR. FREEDMAN:
7       Q.   He liked lower case C?
8       A.   Yes.
9       Q.   Did you ultimately decide on a version?
10      A.   No, I used both.
11      Q.   When you sent this file to Ira, where did
12  you get the actual file from?
13          MS. MARKOE:  Objection.
14          THE WITNESS:  Which file?
15          MS. MARKOE:  Are you referring to a
16  different e-mail or Exhibit 1?
17          MR. FREEDMAN:  We are still on Exhibit 1.
18      Q.   When you sent Exhibit 1 to Ira, where did
19  you get the e-mail from to send to Ira?
20      A.   That would have been on our server.
21      Q.   Which server is "our" server?
22      A.   The company at the time.  That was
23  Hotwire, I believe.  We are talking about Hotwire time,
24  so it would have been on a Hotwire server.
25      Q.   Do you still have access to Hotwire
```

Page 162

```
1   servers?
2           A.    It does not exist.
3           Q.    Does anyone still have access to Hotwire
4   servers?
5           A.    I do not know.
6           Q.    Are you aware of anyone who has access to
7   a Hotwire server?
8           A.    No, I am not.  Actually, strike that, it
9   is possible that there are copies, because we had a
10  member of staff who stole information, but I do not know
11  whether they have it still or not.
12          Q.    What are the names of the staff that
13  stole information?
14          MS. MARKOE:  Objection.
15          MR. FREEDMAN:  Potential witnesses,
16  Zaharah.
17          MS. MARKOE:  I did not instruct him not
18  to answer.  Are you objecting to my objections now?
19          MR. FREEDMAN:  I am anticipating.
20          THE WITNESS:  I would need to double-check
21  that.  I do not want to go on record defaming someone
22  who has not been formally charged or anything like this.
23  BY MR. FREEDMAN:
24          Q.    I understand that it is not confirmed,
25  but who do you recall at the moment as being those
```

Page 163

```
1   witnesses?
2           MS. MARKOE:  Objection.  You can answer,
3   if you can.
4           THE WITNESS:  I am trying to remember his
5   name.  There were two people in particular.  Both of
6   them were systems engineers.  I really do not remember
7   their names.
8   BY MR. FREEDMAN:
9           Q.    How would you look them up to confirm
10  them?
11          MS. MARKOE:  Objection.
12          THE WITNESS:  I would not.
13  BY MR. FREEDMAN:
14          Q.    Is there any way to find out their names?
15          A.    I am sure there is.
16          Q.    Are you aware of any way to find out
17  their names?
18          A.    One can do lots of searches for a start.
19  I mean, there is lots of stuff about me, my company,
20  people complaining, liquidation documents, etcetera, all
21  on the internet, that would list all the staff.
22          Q.    Are the names of these two staff members
23  and their potential taking of information publicly
24  available?
25          MS. MARKOE:  Objection.  You can answer.
```

Page 164

```
1           THE WITNESS:  If you consider public
2   includes liquidation files that would be publicly
3   available, then yes.
4   BY MR. FREEDMAN:
5           Q.    What liquidation files would have these
6   two ----
7           A.    Hotwire.
8           Q.    Would Ms. Watts know the name of these
9   two individuals?
10          MS. MARKOE:  Objection.
11          THE WITNESS:  I am not going to bring
12  anything about my wife into this.  I am not going to
13  answer anything about my wife's state of mind, my wife's
14  anything.  I have already noted that my family is
15  something I will not touch.
16  BY MR. FREEDMAN:
17          Q.    Was Ms. Watts involved with Hotwire?
18          MS. MARKOE:  Objection.
19          THE WITNESS:  You can check those
20  records.
21  BY MR. FREEDMAN:
22          Q.    How?
23          A.    They are public.
24          Q.    Are all of Hotwire's records are public?
25          MS. MARKOE:  Objection: mischaracterises
```

Page 165

```
1   the testimony.
2   BY MR. FREEDMAN:
3           Q.    Are all of Hotwire's records public?
4           A.    No.
5           Q.    When did you decide to start programing
6   the Bitcoin protocol?
7           A.    Can you be a bit more specific about what
8   you are saying there.  That is actually a wider question
9   and more nebulous than you seem to think.
10          Q.    When did you start writing the code that
11  became the Bitcoin protocol?
12          A.    Again, do you mean the node software?
13          Q.    When I say "Bitcoin protocol", what does
14  that mean to you?
15          A.    Bitcoin protocol is a set of rules that
16  nodes will interact by.  It will be not things like
17  block size, but rather the real sets that allow a
18  transaction signed, and not settled, to chain now to be
19  valid in 20-year time.  So, it is like the internet
20  protocol itself has a set of rules as well as
21  structures.  So things can happen within protocols but
22  also be dictated differently in rules.  For instance,
23  the limitation of HTML for Apple and Microsoft, although
24  on the same protocol, have different rule sets.  That
25  could be constructed such that the rules for one miner
```

Page 166

1  would allow something to be offered or rejected, but a
2  protocol would be the same for all systems and nodes.
3      Q.  If going forward I use the word "Bitcoin"
4  protocol to refer to all of those things, will you
5  understand what I mean?
6          MS. MARKOE:  Objection.
7          THE WITNESS:  No.
8  BY MR. FREEDMAN:
9      Q.  What is the way I should refer to the
10 code and programing that became the Bitcoin client?
11     A.  If you were talking about the original
12 one then I would say the node software.
13     Q.  When did that turn into something besides
14 the node software?
15         MS. MARKOE:  Objection.
16         THE WITNESS:  When did what turn into
17 something?
18 BY MR. FREEDMAN:
19     Q.  Going forward, if I use the word "node"
20 software, would you understand that to mean the computer
21 protocols and codes that people downloaded and used to
22 mine and use Bitcoin?
23         MS. MARKOE:  Objection.
24         THE WITNESS:  In the original version?
25 BY MR. FREEDMAN:

Page 167

1      Q.  In the original version.
2      A.  So we are talking the Satoshi client,
3  yes.
4      Q.  The Satoshi client.  That was made public
5  in 2009?
6      A.  In some parts it was actually made public
7  in, as early -- the first distribution was August 2008.
8      Q.  So before we get there, when did you
9  decide to start writing that node software, the Satoshi
10 client?
11     A.  In 2002.
12     Q.  How did you make it public in August of
13 2008?
14     A.  It was given to a few people.
15     Q.  Who was it given to?
16     A.  Parts were given to Wei Dai.
17     Q.  Wei Dai, is that his legal name or is
18 that a screen name?
19     A.  I have never really asked.  He publishes
20 papers under that.  So he could be a pseudonym like me,
21 but the thing is he has worked for companies under that.
22 I believe that is his real name.  I have never
23 physically -- actually, I have met him once, but that
24 was in the '90s, and I did not ask whether he used a
25 pseudonym or not.

Page 168

1      Q.  Who else besides Wei Dai?
2      A.  In August, there were other people, I do
3  not remember the names.
4      Q.  Did you give it to Dave in August?
5      A.  No.
6      Q.  When did Dave first receive it?
7      A.  May, end of, beginning of June.
8      Q.  May/June of 2008?
9      A.  Yes.
10     Q.  What did Dave do to develop the Satoshi
11 client?
12         MS. MARKOE:  Objection:  foundation.
13         THE WITNESS:  Dave did not develop the
14 Satoshi client.
15 BY MR. FREEDMAN:
16     Q.  Did Dave edit the Satoshi client code at
17 all?
18     A.  It is an open source project.
19     Q.  Prior to it becoming public -- strike
20 that.  When did the Satoshi client become publicly
21 available to everyone?
22         MS. MARKOE:  Objection:  vague.
23         THE WITNESS:  I am sorry, "everyone" is
24 too vague.
25 BY MR. FREEDMAN:

Page 169

1      Q.  When was the first time you publicly
2  posted the Satoshi client?
3          MS. MARKOE:  Objection:  asked and
4  answered.  You can answer.
5          THE WITNESS:  In full, was not until
6  January 2009.
7  BY MR. FREEDMAN:
8      Q.  What should we call that event so we know
9  we are talking about the same thing?
10     A.  You could say the public publishing of
11 the Bitcoin node software.
12     Q.  Can I call it Satoshi client so we are
13 consistent?
14     A.  Yes.
15     Q.  Did Dave edit the Satoshi client at any
16 point before the public posting of the Satoshi client?
17         MS. MARKOE:  Objection.
18         THE WITNESS:  Him and others could have,
19 yes.  Did I review whose changes:  no.
20 BY MR. FREEDMAN:
21     Q.  Where did you publicly post it so that
22 others could contribute to it?
23     A.  It was given privately after a post that
24 was public.
25     Q.  Where was the public post made?

Page 170

1    A.    The public post was made on the mailing
2    list.
3    Q.    What was the mailing list?
4    A.    It is the cryptography mailing list.
5    There are other ones as well, but that was the main one.
6    Q.    Where were the other ones?
7    A.    I do not remember.
8    Q.    Did Dave post it on other ones or did you
9    post it on other ones?
10    MS. MARKOE: Objection.
11    THE WITNESS: I do not know what Dave
12    did.
13    BY MR. FREEDMAN:
14    Q.    Are you aware of Dave posting it on other
15    mailing lists?
16    A.    No.
17    Q.    After you posted it on a mailing list,
18    you then hosted the Satoshi client somewhere for others
19    to collaborate on?
20    MS. MARKOE: Objection.
21    THE WITNESS: I am not sure what you are
22    asking, sorry.
23    BY MR. FREEDMAN:
24    Q.    You told me that people collaborated on
25    this open source software?

Page 171

1    MS. MARKOE: Objection.
2    THE WITNESS: The full software was not
3    given. I said that.
4    BY MR. FREEDMAN:
5    Q.    So where did you post parts of the
6    software?
7    MS. MARKOE: Objection: mischaracterises
8    the testimony.
9    BY MR. FREEDMAN:
10    Q.    I am just trying to figure out ----
11    A.    I said they were e-mailed or given, I did
12    not say they were posted. There is a big difference.
13    Q.    Okay, so then you e-mailed Dave portions
14    of the Satoshi client; is that correct?
15    A.    Yes.
16    Q.    And he e-mailed you back edits?
17    A.    No, he communicated with other people.
18    Q.    Who did he communicate with?
19    A.    I do not know. That would be Dave.
20    Q.    How did Dave get you back his edits to
21    the Satoshi client?
22    MS. MARKOE: Objection.
23    THE WITNESS: We discussed things over
24    IRC.
25    BY MR. FREEDMAN:

Page 172

1    Q.    So his feedback was through IRC?
2    A.    Yes.
3    Q.    So there is no record of his feedback?
4    A.    No, not that I know of. There could be.
5    It is not impossible for IRC to be recorded and kept.
6    Q.    You kept no record of his ----
7    A.    I do not keep my IRC chats, no.
8    Q.    Do you know if Dave kept them?
9    A.    I do not know what Dave did with his IRC
10    chats. If you are asking for every line of code Dave
11    changed, there would be at least 100 changes by
12    Hal Finney, there would be at least 80 changes by Bear,
13    etcetera. There would be at least 1,000 changes by
14    other people for every one that Dave did. So 0.1%.
15    Q.    0.1% of the edits are attributable to
16    Dave?
17    A.    Yes. That was not the primary task that
18    Dave did.
19    Q.    Is it possible that it is more than 1%?
20    MS. MARKOE: Objection: calls for
21    speculation.
22    BY MR. FREEDMAN:
23    Q.    You have a clear recollection of it being
24    exactly 1% of the code that Dave edited?
25    MS. MARKOE: Objection. You can answer.

Page 173

1    THE WITNESS: I did not say exactly 1%.
2    And Dave was not a C++ coder.
3    BY MR. FREEDMAN:
4    Q.    Could it have been 5%?
5    MS. MARKOE: Objection.
6    THE WITNESS: No.
7    BY MR. FREEDMAN:
8    Q.    Could it have been 2%?
9    MS. MARKOE: Objection.
10    THE WITNESS: You are calling for
11    speculation on probabilities of that where other people
12    did far more code. Basically you want to characterise
13    Dave as having written a lot more of the software. That
14    is not what Dave did.
15    MS. MARKOE: Can we take a bathroom
16    break?
17    MR. FREEDMAN: Sure.
18    THE VIDEOGRAPHER: Going off the record.
19    The time is 15.04. End of video card number 3, volume 1
20    of the video deposition of Dr. Craig Wright.
21    (A Short Break)
22    THE VIDEOGRAPHER: This is the beginning
23    of video card number 4, volume 1, in the video
24    deposition of Dr. Craig Wright. Going on the record.
25    The time is 15.20. Thank you.

MAGNA
LEGAL SERVICES

Page 174

1    MR. RIVERO:  Yes, please, identification
2  of persons on the line.
3    MR. BRENNER:  (By Telephone) Sure.  This
4  is Andrew Brenner of Boies Schiller and to my knowledge
5  I have been on the line for all of the time that the
6  deposition has been in session.
7    MR. RIVERO:  Thank you, Mr. Brenner.
8    MR. BRENNER:  You are welcome.
9    MR. MCADAMS:  (By Telephone) This is John
10  McAdams, also from Boies Schiller, and also have been on
11  the line for all sessions.
12    MR. KLEIMAN:  (By Telephone) This is Ira
13  Kleiman.  I have been on the line since the beginning.
14    MR. RIVERO:  Anyone else?
15    MS. MARKOE:  Is there a reason why,
16  Mr. Kleiman, you failed to identify yourself previously?
17    MR. FREEDMAN:  Ira, do not answer that.
18  I think they asked for lawyers to make their
19  appearances.  I am not sure he knew.
20    THE WITNESS:  That is not correct.
21    MR. FREEDMAN:  Either way, we can deal
22  with this later, obviously.  He has been on the line, we
23  have disclosed it and you can do what you like with it.
24    MR. RIVERO:  Note our objection.
25    MS. MARKOE:  I would like to note our

Page 175

1  objection and I would also like to note that Mr. Kleiman
2  I am instructing you that this deposition is
3  confidential and you are bound by the confidentiality
4  order in this case.  We presume that you are aware of it
5  and will abide by it.
6    MR. FREEDMAN:  Okay.
7    MR. KLEIMAN:  Yes.
8  BY MR. FREEDMAN:
9    Q.   Dr. Wright, the A Back cited in the
10  Bitcoin white paper, is that a reference to the same
11  Adam Back we were previously discussing?
12    MS. MARKOE:  Objection.
13    THE WITNESS:  Yes.
14  BY MR. FREEDMAN:
15    Q.   Is it your testimony here today that that
16  is a mis-cite and it should instead be to Mr. Finney?
17    MS. MARKOE:  Objection.  You can answer.
18    THE WITNESS:  It should have Aurora in
19  the R PoW, that is R as in R, PoW should be cited to
20  Mr. Finney.
21  BY MR. FREEDMAN:
22    Q.   In response to interrogatory requests,
23  Dr. Wright, you said that "there was an individual who
24  helped me in the very early stages of my research well
25  before the release of the Bitcoin protocol.  As far as

Page 176

1  I know, that individual never met or interacted with
2  Dave Kleiman."  Who was that individual?
3    MS. MARKOE:  Objection.
4    MR. FREEDMAN:  You can answer.
5    THE WITNESS:  No, I cannot.
6    MS. MARKOE:  This is part of what you
7  need to discuss with the court in camera.
8    THE WITNESS:  Yes.
9    MS. MARKOE:  Okay.
10  BY MR. FREEDMAN:
11    Q.   Dr. Wright, whose idea was it to register
12  the Bitcoin.com domain name?
13    A.   Mine.
14    Q.   When did you first register that domain?
15    A.   I would have to look up the date.  I do
16  not remember.
17    Q.   Do you still have the records associated
18  with that original registration?
19    MS. MARKOE:  Objection.  You may answer.
20    THE WITNESS:  They are online.
21  BY MR. FREEDMAN:
22    Q.   Where are they online?
23    MS. MARKOE:  Objection.  You may answer.
24    THE WITNESS:  Again, I assume you do not
25  know technical name records or how these are

Page 177

1  constructed.  They are public records.
2  BY MR. FREEDMAN:
3    Q.   That is all right but you can still
4  explain it to me.  Where are they publicly available?
5    A.   Whois.
6    Q.   And what information did you give -- did
7  you do it under a private Whois registration or did you
8  do it publicly, and I give identification to Whois?
9    MS. MARKOE:  Objection: compound.
10    THE WITNESS:  There is no such thing as a
11  private versus a public Whois.
12  BY MR. FREEDMAN:
13    Q.   There is no way to privately register
14  domain names?
15    MS. MARKOE:  Objection.  You may answer.
16    THE WITNESS:  Define what you mean by
17  "private".
18  BY MR. FREEDMAN:
19    Q.   Is there a way to not give identifying
20  information for the owner of the domain name or the
21  registrant of the domain name?
22    MS. MARKOE:  Objection.
23    THE WITNESS:  Define what you mean by
24  that.  You are doing a whole lot of waffly fluffy crap,
25  excuse the language, that says private when you probably

45 (Pages 174 to 177)

MAGNA ▶
LEGAL SERVICES

Page 178

1  mean anonymous.  And can you do something about that
2  phone, please, or I am going to have to throw it out of
3  a window because it keeps flashing and it is really,
4  really annoying.
5      MR. FREEDMAN:  My apologies.
6      Q.   What information did you give Whois when
7  you registered the Bitcoin.com domain name?
8      MS. MARKOE:  Objection.
9      THE WITNESS:  If you have a look at it,
10 you will see the information from the Vistomail or
11 anonymousspeech.com server.  That is provided from that
12 server and the Whois that they allow goes across into
13 the Whois that is, or was there.  I do not know about
14 the updates that have occurred since.
15 BY MR. FREEDMAN:
16     Q.   Did you communicate with Dave Kleiman
17 about the domain name?
18     MS. MARKOE:  Objection.
19     THE WITNESS:  Define what you mean by
20 "communicate about the domain name".
21 BY MR. FREEDMAN:
22     Q.   Did you communicate with him about the
23 registration of the domain name?
24     A.   I am not sure what you would be asking?
25     Q.   Did you send any communications to Dave

Page 179

1  Kleiman about the registration of Bitcoin.com?
2      A.   I did not register Bitcoin.com.
3      Q.   Who registered Bitcoin.com?
4      A.   It was not me.
5      Q.   Who was it?
6      A.   You are now asking me who registered
7  random e-mail -- sorry, domain name dot com, and expect
8  me to know.
9      Q.   Do you know who registered Bitcoin.com?
10     A.   No.
11     Q.   Do you know who registered
12 Bitcointalk.com?
13     A.   No.  I mean, I am dot org.  I think you
14 have those wrong.
15     Q.   It could be.  Did you register
16 Bitcoin.org?
17     A.   Yes.
18     Q.   Let me ask all the questions over because
19 I may have misspoken.  When did you first register
20 Bitcoin.org?
21     A.   Again, that is public record on Whois and
22 I do not remember the exact date.
23     Q.   Any answers you gave before about the
24 Vistomail account apply to Bitcoin.org?
25     MS. MARKOE:  Objection.

Page 180

1      THE WITNESS:  Yes.
2  BY MR. FREEDMAN:
3      Q.   Did you ever communicate with
4  Dave Kleiman about Bitcoin.org registration?
5      A.   No.  I registered my first domain name in
6  the '80s.  I do not need help registering domains.
7      Q.   Did there come a time when you
8  transferred ownership of the Bitcoin.org domain name?
9      MS. MARKOE:  Objection.
10     THE WITNESS:  There is not really
11 ownership of that domain.
12 BY MR. FREEDMAN:
13     Q.   Control of the domain?
14     MS. MARKOE:  Objection.
15     THE WITNESS:  Yes.
16 BY MR. FREEDMAN:
17     Q.   When did you transfer control of the
18 Bitcoin.org domain name?
19     A.   When I stopped being involved with the
20 community.
21     Q.   Which was?
22     A.   2011.  It was actually a little bit
23 before that that information had been handed over.
24     Q.   Information had been handed over, what do
25 you mean by that?

Page 181

1      A.   Domain keys, etcetera.
2      Q.   Who did you hand them over to?
3      A.   That was to Theymos, originally.
4      Q.   Did Dave Kleiman ever have the control
5  over the Bitcoin.org domain name?
6      MS. MARKOE:  Objection.  You can answer.
7      THE WITNESS:  No.
8  BY MR. FREEDMAN:
9      Q.   Who is Theymos?
10     MS. MARKOE:  Objection.  This is again
11 now you are going beyond the scope.  We have already
12 established that Dave Kleiman did not have control over
13 the Bitcoin.org domain name and you can move on now.
14 BY MR. FREEDMAN:
15     Q.   Who is Theymos?
16     MS. MARKOE:  Objection.  I will instruct
17 you not to answer.  Beyond the scope.
18 BY MR. FREEDMAN:
19     Q.   Why did you transfer the Bitcoin.org
20 domain name?
21     MS. MARKOE:  Objection: beyond the scope.
22 Do not answer.
23 BY MR. FREEDMAN:
24     Q.   Who mined the genesis block of the
25 Bitcoin timechain?

MAGNA ▶
LEGAL SERVICES

Page 182

```
1            MS. MARKOE:  Objection.
2            MR. FREEDMAN:  You can answer.
3            MS. MARKOE:  Can you connect that to one
4     these topics, please.
5            MR. FREEDMAN:  Formation of the Satoshi
6     Nakamoto partnership.  It is literally the first block
7     of Bitcoin.
8            THE WITNESS:  It is not mine.
9            MS. MARKOE:  The question you asked does
10    not make that connection, so why do you not try to make
11    that connection and then we can have a conversation.
12           MR. FREEDMAN:  Do not tell me how to ask
13    my questions.  Instruct him not to answer or object.
14       Q.   Who mined the genesis block of the
15    Bitcoin timechain?
16           THE WITNESS:  Nobody.
17           MS. MARKOE:  Objection.
18    BY MR. FREEDMAN:
19       Q.   I am sorry?
20       A.   Nobody.
21       Q.   Who programed the genesis block of the
22    Bitcoin timechain?
23           MS. MARKOE:  Objection.
24           THE WITNESS:  Nobody, because that is
25    again wrong.
```

Page 183

```
1     BY MR. FREEDMAN:
2        Q.   How did the Bitcoin genesis block come
3     into existence?
4            MS. MARKOE:  Objection.
5            THE WITNESS:  Answer or not?  Instruction?
6     Do I answer this or not?
7            MS. MARKOE:  My suggestion would be that
8     someone relate this ----
9            MR. FREEDMAN:  Please do not suggest ----
10           MS. MARKOE:  ---- to Dave Kleiman or
11    I will strict him not to answer.
12           MR. FREEDMAN:  Then do what you will.  We
13    will raise it with the court.
14           MS. MARKOE:  Relate your question to Dave
15    Kleiman and whether or not there was a partnership or
16    I will strict him not to answer.
17           MR. FREEDMAN:  Do what you will.
18           MS. MARKOE:  Okay.  Then ask your
19    questions properly related to the scope as you prepared
20    this.
21    BY MR. FREEDMAN:
22       Q.   How did the genesis block come into
23    existence?
24           MS. MARKOE:  Objection.  Do not answer
25    that.
```

Page 184

```
1     BY MR. FREEDMAN:
2        Q.   What was the first Bitcoin block Satoshi
3     mined?
4            MS. MARKOE:  You can answer that.
5            THE WITNESS:  Block one.
6     BY MR. FREEDMAN:
7        Q.   Is that also referred to as the genesis
8     block?
9        A.   No.
10       Q.   Is it the second block?
11           MS. MARKOE:  Objection.
12           THE WITNESS:  It is the first block -- it
13    is block one.
14    BY MR. FREEDMAN:
15       Q.   Block one.  Do you know what computer
16    mined block one?
17       A.   I know what, out of a group of computers,
18    mined block one.
19       Q.   Where was that group of computers
20    located?
21       A.   Port Macquarie just outside a small town
22    called Bagnoo.
23           MS. MARKOE:  Can you spell those names
24    for the court reporter, please.
25           THE WITNESS:  B-A-G-N-O-O.
```

Page 185

```
1     BY MR. FREEDMAN:
2        Q.   How many computers were in Bagnoo?
3            MS. MARKOE:  Objection.
4            THE WITNESS:  I do not know how many
5     computers I had in Bagnoo.  I do not know how many
6     computers I have now.
7     BY MR. FREEDMAN:
8        Q.   Did anyone else know about the computer
9     set-up in Bagnoo?
10           MS. MARKOE:  Objection.
11           MR. FREEDMAN:  You can answer.
12           THE WITNESS:  Yes.
13    BY MR. FREEDMAN:
14       Q.   Who else?
15       A.   Many people knew that I had a computer
16    set-up in Bagnoo.  I had spent a lot of money getting
17    fibre laid into a completely rural area, that basically
18    was never going to have fibre, that opened up maybe
19    50,000 people in the community to low cost, high-speed
20    internet, because I had the whole road ripped up and
21    paid for to lay fibre to my home, the power run into it,
22    etcetera, so many would have known.
23       Q.   You had a home in Bagnoo?
24       A.   Yes.
25       Q.   Is it Bagnoo in New South Wales?
```

MAGNA ▶
LEGAL SERVICES

Page 186

```
 1        A.   Yes.
 2        Q.   Satoshi mined block one.  Were you the
 3   one acting as Satoshi to mine block one?
 4             MS. MARKOE:  Objection.
 5             THE WITNESS:  There is no Satoshi that
 6   way.  I was.
 7   BY MR. FREEDMAN:
 8        Q.   I am sorry?
 9        A.   I was.  I used the pseudonym.  It did not
10   flip round like Dread Pirate Roberts or something like
11   this.  It was just me.  And it was not Satoshi mining
12   per se.  There was not any, other than me, apart from
13   block nine, which was then referenced by a transfer
14   I did.
15        Q.   So you mined block one?
16        A.   Yes.
17        Q.   Did you also mine block two?
18        A.   Relevance, please, give me ----
19             MS. MARKOE:  Look, connect it up with a
20   relationship with Dave Kleiman or do not.
21             THE WITNESS:  There were mining pools,
22   there were no shared mining.  Dave Kleiman and I could
23   not physically mine in any way.  Mining pools were not
24   developed until years after I disappeared, so there is
25   no joint mining.
```

Page 187

```
 1   BY MR. FREEDMAN:
 2        Q.   That was not my question.  It was just
 3   whether ----
 4        A.   Yes, it is, basically you are trying to
 5   find out what I do and do not have, which is none of
 6   your God damn business.  There is nothing to do with
 7   Dave Kleiman.  Dave Kleiman never had a machine access
 8   code.  He never went on those machines.  He never
 9   accessed those machines.  He never touched those
10   machines.  Nothing.
11        Q.   Are you aware of anyone else who mined
12   Bitcoin in January of 2009?
13             MS. MARKOE:  Objection.  That is again
14   well beyond the scope of what this deposition is about.
15             MR. FREEDMAN:  To witnesses.
16             MS. MARKOE:  Of anyone who mined Bitcoin?
17             MR. FREEDMAN:  It literally came out days
18   ago, Zaharah; it came out in January 2009, so anybody
19   who was mining then was ----
20             MS. MARKOE:  Okay.  How would he know who
21   is doing what?
22             MR. FREEDMAN:  If he does not know he
23   does not know.
24             THE WITNESS:  The whole nature of the
25   system is that you do not register.
```

Page 188

```
 1   BY MR. FREEDMAN:
 2        Q.   Do you know anyone who was mining in
 3   January 2009?
 4             MS. MARKOE:  Objection.
 5             THE WITNESS:  Yes.  Hal Finney.
 6   BY MR. FREEDMAN:
 7        Q.   Besides Hal Finney, was there anyone
 8   else?
 9             MS. MARKOE:  Objection.
10             THE WITNESS:  No, I do not know.  I did
11   not even ask Dave if he was doing it.
12   BY MR. FREEDMAN:
13        Q.   You do not know if Dave was mining in
14   January 2009?
15        A.   No, I do not.
16        Q.   Did he ever tell you if he was mining in
17   January 2009?
18             MS. MARKOE:  Objection: asked and
19   answered.
20             MR. FREEDMAN:  You can answer.
21             THE WITNESS:  No idea.
22   BY MR. FREEDMAN:
23        Q.   Dr. Wright, did there come a time when
24   you discussed Satoshi Nakamoto and the origin of Bitcoin
25   with a gentleman named Andrew O'Hagan?
```

Page 189

```
 1             MS. MARKOE:  Objection.  What exactly
 2   does this have to do with the topic?  I presume you are
 3   talking about topic 3.  So can you please explain to me
 4   what this has to do with any of the subtopics under
 5   topic 3.
 6             MR. FREEDMAN:  Yes.  I am handing you
 7   what has been marked as Plaintiff's Exhibit 4.
 8             MS. MARKOE:  Please explain it.
 9             MR. FREEDMAN:  I will.  One second.
10   I think this is 4; right?  Is it 3 or 4?  3.  This goes
11   to relevant witnesses.
12             MS. MARKOE:  What goes to relevant
13   witnesses?
14             MR. FREEDMAN:  You will see when the
15   question comes.  Mr. O'Hagan himself is a relevant
16   witness if the answer is yes.
17   (Plaintiff's Exhibit 3 marked for identification)
18        Q.   Can you take a look at page 32, please.
19   The page numbering is in the upper right-hand corner of
20   the document.
21             MR. RIVERO:  You are referring to 32 of
22   96?
23             MR. FREEDMAN:  Correct.  This is docket
24   entry 83-1.
25        Q.   About halfway down that first paragraph
```

MAGNA
LEGAL SERVICES

Page 190

```
1   it starts off with:  "Satoshi also sent four other
2   transactions on the same day.  I asked Wright who the
3   recipients were -- who the four addresses belonged to.
4   'Hal, Dave, myself', he replied.  'And another I cannot
5   name as I have no right to do so'."  Do you recognise
6   this conversation?
7           MS. MARKOE:  Objection.
8           THE WITNESS:  I remember a half-truth
9   version of this conversation.
10  BY MR. FREEDMAN:
11      Q.   What was the truth of the conversation?
12          MS. MARKOE:  Objection.  You are going
13  beyond the scope.  I am going to instruct him not to
14  answer.
15          MR. FREEDMAN:  You are not going to let
16  me find out who the name of the other person is?
17          MS. MARKOE:  I am going to instruct him
18  not to answer your question which, if I can see it,
19  says, "What was the truth of the conversation?"  You are
20  limited to the details surrounding Craig and Dave's
21  partnership to create Satoshi Nakamoto, in your words,
22  the general process of their collaboration, in your
23  words, the accounts that they held to collaborate
24  technological and money, in your words, methods of
25  communication they used during that period, in your
```

Page 191

```
1   words ----
2           MR. FREEDMAN:  Zaharah, you do not need
3   you to read the entire -- I am familiar with it.
4           MS. MARKOE:  ---- and to identify the
5   computers and servers Satoshi Nakamoto used to draft the
6   white paper ----
7           MR. FREEDMAN:  I am going to ask you to
8   stop wasting my time.
9           MS. MARKOE:  ---- program Bitcoin and mine
10  the first few Bitcoin.  Your question does not go to any
11  of those topics.
12          MR. FREEDMAN:  It goes to the first one.
13          MS. MARKOE:  I am instructing the witness
14  not to answer.
15          MR. FREEDMAN:  Then just instruct him not
16  to answer, Zaharah.  That is all you need to do and I
17  will move on.
18          MS. MARKOE:  I will also put on the
19  record my objection which I am entitled to do and you
20  are not entitled to stop me from doing.  As to the first
21  question, you have already identified, and he has
22  already said, he had a conversation with Mr. O'Hagan,
23  this is not an accurate representation of that
24  conversation.  That is your identity of your witness.
25  You are done now.
```

Page 192

```
1           MR. FREEDMAN:  Zaharah, if you continue
2   speaking we are going to ask the court for more time.
3           MS. MARKOE:  Ask the court for more time.
4   I am allowed to state my objection for the record and
5   the basis for it so that I have an accurate record to
6   share with the court.
7           MR. FREEDMAN:  We will.
8       Q.   On January 12th, 2009, did you send
9   Bitcoin to anyone?
10      A.   Yes.
11      Q.   Who did you send it to?
12      A.   Hal Finney.
13      Q.   Who else?
14          MS. MARKOE:  Answer if you can.
15          THE WITNESS:  I do not actually remember.
16  BY MR. FREEDMAN:
17      Q.   Did you send Bitcoin to Dave Kleiman on
18  January 12th, 2009?
19          MS. MARKOE:  Objection, but you may
20  answer if you remember.
21          THE WITNESS:  I cannot remember.
22  BY MR. FREEDMAN:
23      Q.   Did you send Bitcoin to yourself on
24  January 12th, 2009?
25          MS. MARKOE:  Objection.  You can answer
```

Page 193

```
1   if you remember.
2           THE WITNESS:  I cannot remember.
3   BY MR. FREEDMAN:
4       Q.   Do you know who is being referred to in
5   Plaintiff's Exhibit 3:  "... and another I cannot name
6   as I have no right to do so"?
7           MS. MARKOE:  I just want to read the
8   question back.  (Pause) You can answer the question.  If
9   you need a read back, ask for a read back.
10          THE WITNESS:  What I will say is this
11  work of fiction -- (Witness indicates Exhibit 3) -- was
12  created because Mr. O'Hagan refused to sign the
13  non-disclosure agreement, and basically took what he
14  thought would be a great story and created one.  It is
15  fiction.
16  BY MR. FREEDMAN:
17      Q.   Your position is the entire article is
18  fiction?
19          MS. MARKOE:  Objection:  mischaracterises
20  his testimony.
21  BY MR. FREEDMAN:
22      Q.   Is it your position that the entire
23  article is fiction?
24      A.   No.
25      Q.   Did Mr. O'Hagan record sessions --
```

MAGNA
LEGAL SERVICES

Page 194

```
 1   interview sessions with you?
 2        A.    No, and if he did so that would be a
 3   criminal act.
 4        Q.    There are no recordings that you are
 5   aware of?
 6        A.    If he did so, that would be a criminal
 7   act.
 8        Q.    In January of 2009, until 2011, was there
 9   anywhere you mined Bitcoin besides Bungaloo -- help me
10   please?
11        A.    Bagnoo.
12        Q.    Bagnoo?
13        A.    Yes.
14        Q.    Where else?
15        A.    At one stage, I had mining software I was
16   playing with on my phone.  It did not actually mine any
17   Bitcoin.
18        Q.    Was there any other locations of
19   computers that you mine Bitcoin in?
20        A.    No.
21        Q.    Only Bungaloo?
22        A.    Bagnoo.
23        Q.    Bagnoo.  Only Bagnoo?
24        A.    Yes.
25        Q.    That started in January 2009.  When did
```

Page 195

```
 1   you stop, if ever, mining Bitcoin in Bagnoo?
 2        A.    I stopped everything to do with Bagnoo in
 3   December.
 4        Q.    Of?
 5        A.    2010.  Or probably not everything to do
 6   with because I still owned part of the property and
 7   whatever else, but I was not doing any IT stuff there at
 8   all.
 9        MR. RIVERO:  I want to note that we are
10   giving a lot of leeway, even though there is already
11   testimony disconnecting the subject of these questions
12   from Dave Kleiman.  But go ahead with your next
13   question.
14   BY MR. FREEDMAN:
15        Q.    In December of 2010 -- strike that.  Did
16   you stop mining entirely in December of 2010?
17        A.    No.
18        Q.    Where did the mining continue?
19        A.    The mining restarted later, by me, with
20   pools that I now run.
21        Q.    When did that start up?
22        A.    2016 on.
23        Q.    So is it your testimony here today that
24   from December of 2010 until the mining pools in 2016,
25   you never mined Bitcoin?
```

Page 196

```
 1        MS. MARKOE:  Objection.
 2        THE WITNESS:  That is not correct.  I did
 3   not earn any Bitcoin because running a node in certain
 4   configurations means that you are also mining.
 5   BY MR. FREEDMAN:
 6        Q.    Okay.  So ----
 7        A.    Running testnet is also mining.  This is
 8   not public Bitcoin.
 9        Q.    So as I understand it, from December of
10   2010, until 2016, you never earned the mining reward for
11   mining a block of Bitcoin; is that correct?
12        MS. MARKOE:  Objection.  You can answer.
13        THE WITNESS:  That is correct.
14   BY MR. FREEDMAN:
15        Q.    At any point in time, was Dave involved
16   in the mining that took place in Bagnoo from 2009 until
17   to 2010?
18        A.    Nobody was ever involved in that.
19        Q.    Approximately how much Bitcoin were mined
20   from 2009 ----
21        MS. MARKOE:  Objection.  I am going to
22   instruct you not to answer.
23        MR. RIVERO:  I instruct you not to
24   answer.
25   BY MR. FREEDMAN:
```

Page 197

```
 1        Q.    I am going to ask you another question.
 2   Your attorneys may instruct you not to answer so take a
 3   second ----
 4        MS. MARKOE:  Do not ask it.
 5        MR. FREEDMAN:  I do not think you are
 6   right to instruct him not to answer but I am going to
 7   ask it.
 8        Q.    Do you know the amount of Bitcoin that
 9   was mined from 2009 until 2010 in Bagnoo?
10        MS. MARKOE:  Objection.
11        MR. RIVERO:  Same instruction.
12   BY MR. FREEDMAN:
13        Q.    Have you ever mined Bitcoin out of
14   Australia?
15        A.    No.
16        MS. MARKOE:  Objection.  You can answer.
17        THE WITNESS:  Well, back then, no.  Now,
18   the pools are outside of Australia, but that is 2016 on.
19   So, when I say no to mining or anything like this,
20   I will just make it clear now I am talking about before
21   2016.
22   BY MR. FREEDMAN:
23        Q.    I understand.  Thanks for the
24   clarification.  I know we understood each other, but it
25   is important that the record is clear.
```

Page 198

1          A.    I got told to make sure I am clear,
2    so ----
3          Q.    From 2009 until 2010, when you were
4    mining in Bagnoo, was that a full-time job for you?
5          MS. MARKOE:  Objection.
6          THE WITNESS:  It was not a job at all.
7    BY MR. FREEDMAN:
8          Q.    Did it take any time?
9          MS. MARKOE:  Objection.
10         THE WITNESS:  Sneezing takes time.
11   BY MR. FREEDMAN:
12         Q.    Touché.  Did it take a significant amount
13   of your time?
14         MS. MARKOE:  Objection.
15         THE WITNESS:  No.
16   BY MR. FREEDMAN:
17         Q.    Did you discuss the details of your
18   mining activity with Dave Kleiman?
19         A.    Define what you mean by "discuss the
20   details of my mining activity".
21         Q.    Did you discuss the Bagnoo computers and
22   servers with Dave Kleiman?
23         A.    No.
24         Q.    To the best of your recollection, did
25   Dave Kleiman have any knowledge of the mining you were

Page 199

1    doing in Bagnoo?
2          MS. MARKOE:  Objection.
3          THE WITNESS:  Yes, he did.
4    BY MR. FREEDMAN:
5          Q.    How did he come to find out about that?
6          A.    He knew I had a property in Bagnoo and
7    that I was running Bitcoin nodes.
8          Q.    Did you discuss the amount of Bitcoin you
9    had amassed with Dave Kleiman?
10         MS. MARKOE:  Objection.  Again, I am
11   going to instruct the witness not to answer these
12   questions.  You are now going well beyond the scope of
13   what is permitted in this deposition.
14         MR. FREEDMAN:  Communication between him
15   and Dave Kleiman.
16         MS. MARKOE:  You are not asking about
17   every communication that he had between himself and Dave
18   Kleiman.  That is not one of your topics.  Look at your
19   topics again.  This is not a merits deposition.  That
20   has been made very clear by the court.
21   BY MR. FREEDMAN:
22         Q.    Did Dave Kleiman mine any of the first 50
23   Bitcoin ----
24         MS. MARKOE:  Objection.  You can answer
25   if you know.

Page 200

1    BY MR. FREEDMAN:
2          Q.    ---- blocks.
3          A.    Thank you for the clarification,
4    otherwise I would have to say no, because no one mined
5    the first 50 Bitcoin.
6          Q.    I saw that look.
7          A.    I cannot help rolling my eyes,
8    I apologise.  I do not know.
9          Q.    Did there come a time when Dave Kleiman
10   began mining Bitcoin?
11         A.    Yes.
12         Q.    When did he begin mining Bitcoin?
13         A.    I do not know.
14         Q.    Do you know approximately when he began
15   mining Bitcoin?
16         A.    I did not ask him.
17         Q.    Do you know what computer he used to mine
18   Bitcoin?
19         A.    No.
20         Q.    Do you know what hardware he used to mine
21   Bitcoin?
22         A.    Not really, no.
23         Q.    How do you know that he eventually began
24   mining Bitcoin?
25         A.    Because eventually we spoke about it and

Page 201

1    he had told me he had mined Bitcoin.
2          Q.    Where did that communication take place?
3          A.    Most of my communications, including this
4    one, were on IRC.
5          Q.    There is no record of it?
6          MS. MARKOE:  Objection.
7          THE WITNESS:  I cannot answer that one, I
8    do not know.
9    BY MR. FREEDMAN:
10         Q.    You have no record of it?
11         A.    I do not have any records of many of
12   these things, as I have already stated.  That is why
13   I used IRC.
14         Q.    Do you know if Dave Kleiman ever used
15   cloud computing to mine Bitcoin?
16         A.    I do not know -- actually, we are talking
17   about a period where nobody used cloud computing to mine
18   Bitcoin.  There was no cloud computing to mine Bitcoin
19   at that stage.  Pool software did not exist.  The person
20   who created some of the first pool software was after
21   I disappeared the first time, and ----
22         MR. RIVERO:  Please finish.
23         THE WITNESS:  ---- that person had
24   nothing to do with Dave or anything like that, and
25   created pool mining and I am sorry to tell you that

MAGNA
LEGAL SERVICES

Page 202

1  there was no cloud mining at that stage.
2         MR. RIVERO:  Just to make sure the record
3  is clear, I heard at line 23 of the prior page, I heard
4  "many".  I think it is transcribed as "any".  I just
5  would like clarification.
6         MR. FREEDMAN:  It is the hour.
7         MR. RIVERO:  I am looking at the record
8  to make sure.
9         MR. FREEDMAN:  It is rough.
10     Q.    Do you know how Dave stored any of the
11  Bitcoins he mined?
12     A.    No.
13     Q.    And remind me, I do not recall if I asked
14  this, do you have any idea when Dave began mining
15  Bitcoin?
16     A.    No, I do not.
17     Q.    Was it before 2011?
18     A.    I do not know.
19     Q.    Do you recall when he told you he had
20  began mining Bitcoin?
21     A.    Not exactly, no.
22     Q.    Was it early on, after ----
23     A.    It would have been early on, yes.
24     Q.    Did Dave ever share the private keys of
25  Bitcoin with you?

Page 203

1         MS. MARKOE:  Objection.
2         THE WITNESS:  You do not share private
3  keys, ever.
4  BY MR. FREEDMAN:
5     Q.    So is the answer no?
6     A.    The answer is no.
7     Q.    Did you ever share private keys with
8  Dave?
9         MS. MARKOE:  Objection: asked and
10  answered.
11        THE WITNESS:  I do not share private keys
12  with my wife.
13  BY MR. FREEDMAN:
14     Q.    What is a paper wallet?
15        MS. MARKOE:  Objection.  I am going to
16  give you a little bit of leeway here, but again we are
17  going beyond the scope of this deposition.  You get
18  another shot at him.  I will certainly instruct you, if
19  you continue along these lines, to not answer those
20  questions at the later deposition, if you get answers to
21  them now.
22        THE WITNESS:  A paper wallet is a key
23  that is printed on a piece of paper.
24  BY MR. FREEDMAN:
25     Q.    Have you ever used a paper wallet?

Page 204

1     A.    Yes.
2     Q.    Did you ever use a paper wallet with Dave
3  Kleiman?
4         MS. MARKOE:  Objection.
5         THE WITNESS:  Please explain what you
6  actually mean in that fluffy nebulous sentence.
7  BY MR. FREEDMAN:
8     Q.    Did you ever exchange a printed -- strike
9  that.  Did you ever exchange a key that is printed on a
10  piece of paper with Dave Kleiman?
11        MS. MARKOE:  Objection.
12        THE WITNESS:  Mr. Kleiman and I had been
13  in the country together once since the creation of
14  Bitcoin, where neither of us handed over any Bitcoin on
15  paper wallets, neither of us handed pieces of paper
16  together as we were drinking and getting drunk, to each
17  other on that day, and the value of the entire Bitcoin
18  market at that stage, when we got together, was,
19  I think, about $100, which was millions of Bitcoin, for
20  the entire value $100 was it.  So, did I hand him a
21  piece of paper when we were in foreign countries:  I do
22  not know how I could possibly do that.
23  BY MR. FREEDMAN:
24     Q.    I am going to ask you just concisely, did
25  you ever exchange a key that is printed on a piece of

Page 205

1  paper with Dave Kleiman in any way?
2         MS. MARKOE:  Objection.  I am going to
3  instruct the witness not to answer at this point.  We
4  have given you a lot of leeway.  These questions are not
5  going to subjects 3 or 4 which are the only ones I could
6  possibly see any relevance to.  If you would like to
7  explain how they relate to those topics or any other
8  topics, I would reconsider my objection, but at this
9  point in time I just do not see it.
10        MR. FREEDMAN:  It goes to the methods --
11  it goes to 4.
12        MS. MARKOE:  Explain how whether he ever
13  exchanged a paper wallet goes to 4.  4 relates to mining
14  of Bitcoins, not paper wallets.  There is a distinction.
15        MR. FREEDMAN:  It goes to the general
16  process of their collaboration.
17        MS. MARKOE:  We have already established
18  that there was no mining together.
19        MR. FREEDMAN:  I am just trying to figure
20  out whether or not they collaborated in another way.
21        MS. MARKOE:  How does one collaborate in
22  terms of holding a paper wallet or sharing information
23  about a paper wallet?  I am instructing the witness not
24  to answer.  You can move on.
25  BY MR. FREEDMAN:

MAGNA ►
LEGAL SERVICES

Page 206

1      Q.   Did you ever use any other methods for
2   the offline exchange of Bitcoins with Dave?
3           MS. MARKOE:  Objection.
4           THE WITNESS:  Again, I did not exchange
5   Bitcoins with Dave the way you are suggesting.  The way
6   that you exchange Bitcoin is you a send transaction from
7   one address to another.  I would never exchange private
8   keys with Dave.
9   BY MR. FREEDMAN:
10      Q.   Did you ever send Bitcoin to public
11  addresses that you knew controlled?
12          MS. MARKOE:  Objection.
13          THE WITNESS:  I do not know what
14  addresses Dave controlled, so how could I do that?
15  BY MR. FREEDMAN:
16      Q.   Did Dave ever provide you with public
17  addresses that he controlled?
18          MS. MARKOE:  Objection.  You can answer.
19          THE WITNESS:  One.
20  BY MR. FREEDMAN:
21      Q.   Which one?
22      A.   I do not remember.
23      Q.   Why did he provide it to you?
24          MS. MARKOE:  Objection.
25          THE WITNESS:  It was for testing.

Page 207

1   BY MR. FREEDMAN:
2       Q.   When did he provide it to you?
3       A.   2009.
4       Q.   What were you testing?
5       A.   Testnet.
6       Q.   What is testnet?
7       A.   Testnet is the development version of
8   Bitcoin, that runs alongside, that we had our own
9   version of in the world to create a test of Bitcoin.
10  So, when I am saying "we" there, I mean the Bitcoin
11  community.  I started with my own multiple versions,
12  which I firewalled off, and eventually they became a
13  public testnet which was a second version of Bitcoin,
14  you could say, but a valueless version of Bitcoin that
15  was easier to mine, so you could test the software and
16  the code.
17      Q.   Who had access to testnet?
18      A.   Everyone.
19          MS. MARKOE:  Objection.
20          THE WITNESS:  It is possible.
21  BY MR. FREEDMAN:
22      Q.   And Dave's public address was a testnet
23  address.
24          MS. MARKOE:  Objection: mischaracterises
25  the testimony.

Page 208

1           THE WITNESS:  Testnet addresses are real
2   addresses and vice-versa, blah, blah, blah.  There is no
3   distinction.
4   BY MR. FREEDMAN:
5       Q.   What were the primary ways Satoshi
6   Nakamoto communicated with people?
7       A.   Which people?
8       Q.   What is the primary way Satoshi Nakamoto
9   communicated?
10      A.   Again, which people?  So, how did
11  I communicate?  Which people?  I mean, if you are
12  getting the "I am Satoshi", then that could be anything.
13  I primarily communicate with people without saying I am
14  Satoshi and I walk up like I am now and I open my mouth
15  and words come out.
16      Q.   I understand that.  When I say Satoshi
17  Nakamoto now, I am referring to the internet presence of
18  Satoshi Nakamoto.
19      A.   So you mean the pseudonym?
20      Q.   The pseudonym.
21      A.   Can you please be explicit in saying
22  that.
23      Q.   What was the primary way in which you
24  communicated through the pseudonym?
25          MS. MARKOE:  Objection.  You can answer.

Page 209

1           THE WITNESS:  Well, by definition, the
2   pseudonym was primarily done depending on which one it
3   was, by e-mail, or the Bitcoin forums, or the P2P
4   forums, or those other things.  So, it depends on which
5   one you are talking about, but online things that are
6   there, so ----
7   BY MR. FREEDMAN:
8       Q.   What are the e-mail addresses that you
9   used as the pseudonym Satoshi Nakamoto?
10      A.   They are all public.  The GMX account and
11  the Vistomail accounts are all public.
12      Q.   Please state them for the record.
13          MS. MARKOE:  If you recall.
14          THE WITNESS:  I do not remember which one
15  is Satoshi or Satoshi N off the top of my head.  I have
16  not used them in years.  I do not look at them any more.
17  And I am not going to even try and think about it.  They
18  are there.  Everyone knows them.  Look it up.
19  BY MR. FREEDMAN:
20      Q.   Was there a third account?
21      A.   Used for public communications?
22      Q.   What was that third account?
23      A.   There was not a third -- sorry.  What
24  third account?  I did not say there was a third account.
25      Q.   I asked if there was a third -- strike

MAGNA
LEGAL SERVICES

Page 210

1 that. It may be I misunderstood your answer. Did
2 Satoshi Nakamoto, the pseudonym, have a third e-mail
3 account, besides GMX and Vistomail?
4        MS. MARKOE: Objection. Answer if you
5 can recall.
6        THE WITNESS: I used multiple e-mail
7 accounts.
8 BY MR. FREEDMAN:
9      Q.   Can you list what they were?
10       MS. MARKOE: Objection.
11       THE WITNESS: No.
12 BY MR. FREEDMAN:
13     Q.   Did you use an e-mail account
14 satoshi@anonymousspeech.com?
15     A.   Yes, that one sounds about right.
16     Q.   Do you still have access to these
17 accounts?
18       MS. MARKOE: Objection: vague.
19       THE WITNESS: As I stated earlier, no.
20 I stopped accessing them a long time.
21 BY MR. FREEDMAN:
22     Q.   Do you have the ability to access these
23 accounts?
24     A.   I very much doubt it.
25     Q.   Why do you doubt it?

Page 211

1      A.   Because GMX has been compromised and the
2 other one has been compromised. They have been reset
3 over time. So, I do not actually want to access them.
4      Q.   Have you tried to access them?
5      A.   No.
6      Q.   Does that go for the GMX account, the
7 Vistomail account and the Anonymous Speech accounts?
8      A.   Yes.
9      Q.   Do you know who has control over these
10 accounts now?
11     A.   No. If anyone.
12     Q.   Did there come a time when you provided
13 Dave Kleiman with access to any of these accounts?
14     A.   Yes.
15     Q.   Which accounts?
16     A.   Dave was given the GMX account access for
17 a little while.
18     Q.   When was he given access to the account?
19     A.   I do not remember exactly.
20     Q.   Who gave him access to the account?
21     A.   If I am the person with it, then it has
22 to be me.
23     Q.   You gave him access to the GMX account?
24     A.   Yes.
25     Q.   Why?

Page 212

1      A.   Because I asked him to check it for me.
2      Q.   For what?
3      A.   To read an e-mail.
4      Q.   Which e-mail?
5        MS. MARKOE: Objection. You can answer
6 if you recall.
7        THE WITNESS: I do not recall which
8 e-mail.
9 BY MR. FREEDMAN:
10     Q.   How many times did Dave access the GMX
11 account?
12       MS. MARKOE: Objection: foundation.
13       THE WITNESS: How many hairs do you have
14 in your beard?
15 BY MR. FREEDMAN:
16     Q.   Did you provide access to anyone else --
17 strike that. Did anyone else -- strike that. Did you
18 ever give anyone else access to the GMX account?
19     A.   No.
20     Q.   Did you ever give anyone else access to
21 the Vistomail account?
22     A.   Yes.
23     Q.   Who?
24     A.   I think the only other person who had
25 access at that stage for a little bit was Uyen.

Page 213

1      Q.   Can you spell that?
2      A.   No.
3      Q.   Is that Uyen Nguyen?
4      A.   Yes.
5      Q.   Who gave Uyen access to the Vistomail
6 account?
7        MS. MARKOE: Objection: asked and
8 answered.
9        THE WITNESS: I am not sure of the exact
10 details. It was Uyen -- what is his name -- I cannot
11 remember his name -- the old Japanese guy, the one that
12 they pulled up as Satoshi?
13 BY MR. FREEDMAN:
14     Q.   Dorian.
15     A.   Dorian, that is it. Sorry, I had
16 forgotten his name. I instructed people to send a
17 message saying "I am not Dorian" because he was getting
18 a lot of shit.
19     Q.   You instructed Uyen Nguyen to do that?
20     A.   Yes.
21     Q.   And provided her with the log in
22 credentials?
23     A.   I gave her some, yes.
24     Q.   Did you ever provide anyone else with
25 access to the Anonymous Speech account?

Page 214

1      A.   No.
2      Q.   Did you ever use these accounts to
3  communicate with Dave Kleiman?
4      A.   I do not remember.
5      Q.   Did you ever ask Dave Kleiman to stop
6  accessing the GMX account?
7      A.   No.
8      Q.   Even when you stepped back from the
9  community you still did not ask him to stop accessing
10  the account?
11         MS. MARKOE:  Objection.
12         THE WITNESS:  It was not used at that
13  stage -- by anybody.
14  BY MR. FREEDMAN:
15      Q.   You trusted Dave Kleiman?
16      A.   Dave was my friend.
17      Q.   Best friend?
18      A.   Fairly much, yes.
19      Q.   Did you trust Uyen Nguyen?
20         MS. MARKOE:  Objection: you are going
21  beyond the scope.  I am going to instruct him not to
22  answer.
23         MR. FREEDMAN:  We agree for once!
24         MS. MARKOE:  I am sorry.  What?
25         MR. FREEDMAN:  We agree for once!

Page 215

1         BY MS. MARKOE:  That is a miracle in and
2  of itself.
3  BY MR. FREEDMAN:
4      Q.   After the creation of Bitcoin, what was
5  the first Bitcoin-related intellectual property you
6  worked on with Dave?
7         MS. MARKOE:  Objection: assumes facts not
8  in evidence.
9         THE WITNESS:  I did not ever work on
10  Bitcoin IP with Dave.
11  BY MR. FREEDMAN:
12      Q.   Did you ever work on any intellectual
13  property with Dave?
14      A.   Yes.
15      Q.   What were those projects, in short?  What
16  were the names?  Strike that.  What were the names of
17  those projects?
18      A.   SWAMP, software assurance marketplace.
19  Basically, there are a number of projects that are all
20  public and all have had their papers published.
21      Q.   Is one of them a metered payment system?
22      A.   No.
23      Q.   Do you know what I am referring to when
24  I say a metered payment system?
25      A.   I know what a metered payment system is.

Page 216

1      Q.   Is there value to intellectual property
2  about a metered payment system?
3         MS. MARKOE:  Objection.  I am going to
4  instruct the witness not to answer.  He has already
5  stated he did not create any intellectual property with
6  Dave Kleiman on metered payment systems and therefore
7  any discussion of that would go beyond the scope of this
8  deposition.
9  BY MR. FREEDMAN:
10      Q.   Did you collaborate with Dave Kleiman on
11  intellectual property entitled "Software Derivative
12  Markets and Information Security Risk Systems"?
13      A.   I did not collaborate with Dave on
14  anything.  I created software and Dave, who was a vet,
15  was able to try and file, so that he would have had some
16  money to help him out.  Dave was not a mathematician.
17  Dave had no knowledge of that area, so there was no
18  collaboration at all in that way for research.
19      Q.   Did there come a time when Dave Kleiman
20  took two millions lines of code and turned it into six
21  million lines of code?
22         MS. MARKOE:  Objection.  But you can
23  answer if you recall.
24         THE WITNESS:  No one could actually do
25  that.  Four million lines of code would be approximately

Page 217

1  4,000 years worth of work.
2  BY MR. FREEDMAN:
3      Q.   So, Dave Kleiman never turned two
4  millions lines of code into six million lines of code;
5  is that your testimony?
6      A.   No person can change four million
7  themselves into six million.
8      Q.   Did Dave Kleiman cause two million lines
9  of code to turn into six million lines of code?
10         MS. MARKOE:  Objection.
11         THE WITNESS:  Is Dave, in your
12  assumption, a wizard?
13  BY MR. FREEDMAN:
14      Q.   If you could just answer the question,
15  Dr. Wright.
16      A.   I believe I just did.
17      Q.   The answer is no?
18      A.   The answer is unless he is already 4,000
19  years old and he started coding at the time of the sort
20  of exodus or whatever else, then probably not.
21      Q.   Was it possible he supervised the
22  creation of four million lines of code?
23         MS. MARKOE:  Objection.  You can answer.
24         THE WITNESS:  Yes.
25  BY MR. FREEDMAN:

MAGNA
LEGAL SERVICES

Page 218

1    Q.   Did he supervise the creation of four
2  million lines of code?
3        MS. MARKOE:  Objection.  You can answer
4  if you know.
5        THE WITNESS:  I do not know.
6  BY MR. FREEDMAN:
7    Q.   Whose idea was it to create W&K US?
8    A.   Dave's.
9    Q.   How did that idea get initially
10  communicated to you by Dave?
11       MS. MARKOE:  Objection.  You can answer.
12       THE WITNESS:  I do not really remember.
13  BY MR. FREEDMAN:
14   Q.   Was anyone else involved in the initial
15  communications about W&K?
16   A.   Yes.
17   Q.   Who?
18   A.   My ex-wife.
19   Q.   What was the purpose of starting W&K?
20   A.   Dave was a vet.  As a vet, he was able to
21  theoretically access funding from the US government.
22  I was working on a number of different projects that
23  aligned with what the Department of Homeland Security
24  was seeking to be developed.  I said I would aid Dave
25  because he was in a bit of trouble, and that we could do

Page 219

1  a few different projects together, including that, that
2  would enable him to hopefully get some money to be able
3  to work less, as he was in the hospital.
4    Q.   What was your involvement in W&K?
5    A.   Very little.
6    Q.   How much was your involvement?  What was
7  your involvement in W&K?
8    A.   Talking about it and then going off and
9  writing some papers, full stop.
10   Q.   Did you have any ownership in W&K?
11   A.   No.
12   Q.   Who owned W&K?
13   A.   The records for W&K exist.  I do not know
14  if the records are accurate.
15   Q.   Who owned W&K in reality?
16   A.   Not me.
17       MS. MARKOE:  Objection.
18  BY MR. FREEDMAN:
19   Q.   Who?
20   A.   Who owns BHP Billiton in reality?  It is
21  not my company.  I do not care.
22   Q.   You have no idea who owns W&K?
23   A.   I do not know that.
24       MS. MARKOE:  Objection.
25       THE WITNESS:  If I do not own it, I do

Page 220

1  not care about it.
2  BY MR. FREEDMAN:
3    Q.   Did W&K ever mine Bitcoin?
4    A.   I do not know what other companies that
5  are not mine do.
6    Q.   Did you ever tell anyone that W&K mined
7  Bitcoin?
8        MS. MARKOE:  Objection.  You can answer
9  if you remember.
10       THE WITNESS:  I have no idea.
11  BY MR. FREEDMAN:
12   Q.   Is there a reason you would have told
13  somebody why W&K mined Bitcoin?
14       MS. MARKOE:  Objection.  If he does not
15  know if he has told anyone then the question lacks a
16  predicate.
17       MR. FREEDMAN:  He does not recall.  I am
18  asking if there is a reason why he might have said it.
19       MS. MARKOE:  Answer if you can, but I am
20  objecting.
21       THE WITNESS:  The nature of Bitcoin is a
22  predicate-based system.  It either fails true or false.
23  If it is true, a transaction is valid.  If it is false,
24  it is rejected and never talked of again.  This will be
25  never talked of again.

Page 221

1  Can we have a break in a moment?
2        MR. FREEDMAN:  Absolutely.  Let us take
3  one now.
4        THE VIDEOGRAPHER:  Going off the record.
5  The time is 16.14.  End of video card number 4, volume
6  1, in the video deposition of Dr. Craig Wright.
7        (A Short Break)
8        THE VIDEOGRAPHER:  This is the beginning
9  of video card number 5, volume 1, in the video
10  deposition of Dr. Craig Wright.  Going back on the
11  record.  The time is 16.29.  Thank you.
12  BY MR. FREEDMAN:
13   Q.   Do you feel better, Dr. Wright, for the
14  break?
15       MS. MARKOE:  Objection.
16       THE WITNESS:  Mmm-hmm, definitely.
17  BY MR. FREEDMAN:
18   Q.   Did W&K ever work on Bitcoin IP?
19   A.   What do you mean by did W&K ever work on
20  Bitcoin IP?
21   Q.   Did the company W&K ever work with you in
22  any way on Bitcoin IP?
23   A.   No.
24       MS. MARKOE:  Objection.  You can answer.
25  BY MR. FREEDMAN:

MAGNA
LEGAL SERVICES

```
                                                    Page 222
1         Q.    Did you work with W&K on any IP?
2         A.    No.  I did not work with W&K at all.
3         Q.    Did you create intellectual property
4    called a metered payment system?
5         A.    No.
6         Q.    Did you create intellectual property
7    called Software Derivative Markets and Information
8    Security Risk Systems?
9         A.    Yes.
10             MS. MARKOE:  Objection.
11   BY MR. FREEDMAN:
12        Q.    Do you know who created a metered payment
13   system's intellectual property?
14             MS. MARKOE:  Objection.  I am going to
15   instruct the witness not to answer.  It has no relevance
16   to either Dave Kleiman, W&K or even the witness.  He
17   said he had not create that intellectual property called
18   a metered payment system.
19   BY MR. FREEDMAN:
20        Q.    Did Dave Kleiman create a metered payment
21   system?
22             MS. MARKOE:  Objection.  Answer if you
23   know.
24             THE WITNESS:  I do not know what Dave
25   Kleiman created.
```

```
                                                    Page 223
1    BY MR. FREEDMAN:
2         Q.    The intellectual property Software
3    Derivative Markets and Information Security Risk
4    Systems, is it valuable?
5              MS. MARKOE:  Objection.
6              THE WITNESS:  It is put out open source
7    and the paper was published in an academic conference.
8    BY MR. FREEDMAN:
9         Q.    Does that mean it has no private value?
10             MS. MARKOE:  Objection.  You can answer
11   if you can.
12             THE WITNESS:  I am not an IP valuer.
13   BY MR. FREEDMAN:
14        Q.    Do you have a claim to it, a title, a
15   patent?
16        A.    No.  It is public.
17        Q.    Did you create intellectual property
18   called Software Assurance Marketplace?
19        A.    Yes.
20        Q.    Who has title to this intellectual
21   property now?
22             MS. MARKOE:  Objection.
23             THE WITNESS:  Public domain.
24   BY MR. FREEDMAN:
25        Q.    Did you create intellectual property
```

```
                                                    Page 224
1    called Software Assurance Through Economic Measures and
2    Anti-Fraud System?
3              THE WITNESS:  Yes.
4              MS. MARKOE:  Objection.
5    BY MR. FREEDMAN:
6         Q.    Who has title to it now?
7         A.    Public domain.
8         Q.    Did you create intellectual property
9    called Risk Quantification System for Financial
10   Modelling in Bitcoin?
11             MS. MARKOE:  Objection.  Look, can you
12   tell me what topics this relates to?
13             MR. FREEDMAN:  The collaboration in W&K.
14             MS. MARKOE:  But you have not connected.
15   You are asking has he created things.  Connect it to W&K
16   or I will instruct him not to answer.
17             MR. RIVERO:  Let me stop one second.
18   What topic about the collaboration on W&K?  I see W&K
19   referred to in a couple of spots.  Which topic?
20             MR. FREEDMAN:  You know what, we will
21   look it up and we will get back to you after the break
22   because I do not want to just waste time on the record
23   for now.  We will skip it.
24             THE WITNESS:  Can I just say there have
25   been no collaborations.
```

```
                                                    Page 225
1              BY MR. RIVERO:  I just want to say very
2    inefficient to do a series of questions and when you ask
3    you specifically what topics so we can figure it out, it
4    is not there.  That is the problem.  Just as the rule
5    that you referred to is not there.  You are wasting
6    time.  Let us get going.
7              MR. FREEDMAN:  No, we are not going to
8    keep going because I am going to respond to that on the
9    record.
10             MR. RIVERO:  State the rule.
11             MR. FREEDMAN:  I told you it is  rule 30
12   of the Rule of Civil Procedure and the local rule 30.1
13   which was amended and specifically stated that this was
14   not meant to take away the fact that you cannot lead the
15   witness.  There are many court opinions on point which
16   say you cannot make speaking objections because it leads
17   the witness.  Second of all ----
18             MR. RIVERO:  Let me respond to that.
19             MR. FREEDMAN:  No, no, I am  responding
20   to everything.
21             MR. RIVERO:  Let me respond to number 1.
22   Despite repeated statements on the record that a local
23   rule prohibited ----
24             MR. FREEDMAN:  It does.
25             MR. RIVERO:  ---- any statement beyond
```

MAGNA ◆
LEGAL SERVICES

Page 226

```
1    form, you are entirely wrong. I have asked repeatedly.
2    There is no rule, it is not in the discovery handbook
3    and the case authority is definitely not the way you
4    describe it. So let us keep going. Number two.
5            MR. FREEDMAN: I am not going to waste my
6    time but I will tell you the case authority you can look
7    up.
8            MR. RIVERO: That already answers that
9    when you stated there was a rule prohibiting it you were
10   absolutely wrong.
11           MR. FREEDMAN: No, that is not true. It
12   is cites ----
13           MR. RIVERO: It is not in 30.1, it is not
14   in 30, it is not in the discovery handbook.
15           MR. FREEDMAN: It certainly is.
16           MR. RIVERO: No, it is not.
17           MR. FREEDMAN: Let us just put it on the
18   record. It is Flexiteek Americas Inc v Plastique Inc.
19           MR. RIVERO: We are now way off in case
20   law which is in dispute.
21           MR. FREEDMAN: The citation would be 2009
22   WL 10667524.
23           THE WITNESS: I am the only person with a
24   British legal degree in ----
25           THE COURT REPORTER: You are both
```

Page 227

```
1    speaking at the same time. I cannot do that.
2            MR. FREEDMAN: That is all right. The
3    videographer got it. That is all I needed. You will
4    get it later.
5            MR. RIVERO: I object to the process that
6    has been conducted. Next question.
7    (Plaintiff's Exhibit 4 marked for identification)
8    BY MR. FREEDMAN:
9        Q.   I have handed you what we have marked as
10   Plaintiff's Exhibit 4. Can you go to the bottom,
11   please, of page 4. Do you recognise what this document
12   is?
13       A.   Yes. This was a document put together by
14   staff at one of my companies.
15       Q.   Did you send this document to
16   Ira Kleiman?
17       A.   I presume so, seeing as it is chronology
18   of Craig Wright to Ira K.
19       Q.   Can you look at the bottom of page 4,
20   where it says: "There is a lot of IP and 'stuff' in the
21   mix. All up, it's about a hundred million dollars'
22   worth. This IP originates in work CSW has been doing
23   for more than 10 years; it originates in things that
24   came from W&K; it has to do with the software acquired."
25   Do you see that?
```

Page 228

```
1            MS. MARKOE: Objection. Can you re-point
2    us to where you are.
3            MR. FREEDMAN: Bottom of page 4.
4            MS. MARKOE: Bottom of page 4.
5            MR. FREEDMAN: Last paragraph, page 4.
6            MS. MARKOE: Okay. I will just state
7    that the document speaks for itself. I was unable to
8    track what you were saying, so the document will speak
9    for itself.
10   BY MR. FREEDMAN:
11       Q.   Can you break down that $100 million
12   worth for me into the three buckets that you have put
13   forward in that chronology: the work you have been doing
14   for 10 years, the work that originates from W&K and the
15   software acquired?
16           MS. MARKOE: Objection.
17           THE WITNESS: I did not put forth the
18   chronology.
19   BY MR. FREEDMAN:
20       Q.   So is it inaccurate?
21       A.   Yes. You will note that work for more
22   than 10 years and originates in W&K, which was not 10
23   years old, so therefore there is a discrepancy in that
24   very sentence you are pointing out. I did not create
25   the document.
```

Page 229

```
1        Q.   So was there not $100 million worth of IP
2    in the mix?
3            MS. MARKOE: Objection.
4            THE WITNESS: Which mix?
5    BY MR. FREEDMAN:
6        Q.   It says "'stuff' in the mix". You tell
7    me.
8        A.   What is the mix?
9        Q.   I am asking you, it is your staff that
10   did it. What did they mean by "IP and 'stuff' in the
11   mix"?
12           MS. MARKOE: Objection.
13           THE WITNESS: I do not know the state of
14   mind of my staff at all times.
15   BY MR. FREEDMAN:
16       Q.   You sent this to Ira without knowing what
17   it meant?
18           MS. MARKOE: Objection.
19           THE WITNESS: I sent quite a few things
20   to Ira. I did not check all of them for all the details
21   at any point.
22   BY MR. FREEDMAN:
23       Q.   So W&K had no IP of value?
24           MS. MARKOE: Objection.
25           THE WITNESS: I am not W&K.
```

MAGNA
LEGAL SERVICES

Page 230

```
 1   BY MR. FREEDMAN:
 2       Q.   To the best of your knowledge did W&K
 3   ever have valuable intellectual property?
 4           MS. MARKOE:  Objection.  You can answer.
 5           THE WITNESS:  I have stated before,
 6   I care about my own companies.  I really do not care
 7   about any other in existence anywhere on the planet that
 8   has nothing to do with my companies, or cannot hand me
 9   something.
10   BY MR. FREEDMAN:
11       Q.   Did you ever obtain valuable intellectual
12   property from W&K?
13           MS. MARKOE:  Objection.  You can answer.
14           THE WITNESS:  Yes.
15   BY MR. FREEDMAN:
16       Q.   How?
17       A.   I paid for work to be done through my
18   companies.
19       Q.   Was W&K your company?
20           MS. MARKOE:  Objection.
21           THE WITNESS:  No.
22   BY MR. FREEDMAN:
23       Q.   So how did you get W&K's valuable
24   intellectual property?
25           MS. MARKOE:  Objection: asked and
```

Page 231

```
 1   answered.
 2           THE WITNESS:  As I have just stated,
 3   companies I own dealt with W&K.  W&K provided
 4   intellectual property.
 5   BY MR. FREEDMAN:
 6       Q.   What was the intellectual property W&K
 7   provided?
 8       A.   Source code.
 9       Q.   For?
10       A.   Primarily it enhanced some of the gaming
11   operations I was doing.  It improved upon a lot of the
12   poker operations.  We built a back door so that we could
13   get through the Chinese firewall.  That enabled a number
14   of Costa Rica gaming operations to basically deal with
15   online casinos in a number of places, not just sort of
16   in Costa Rica, but America and China.  It enabled
17   Sportsbooks to access things without putting their IP
18   better than Tor.  It enabled us to have monitoring and
19   software that was put onto WebMoney, and Liberty
20   Reserve.  It enabled the capture of information from
21   many of these networks.
22       Q.   What was the value of this intellectual
23   property?
24       A.   I am not an intellectual property valuer.
25       Q.   Who created this intellectual property?
```

Page 232

```
 1       A.   Which part?
 2       Q.   Who created the intellectual property
 3   that enhanced some of the gaming operations you were
 4   doing?
 5       A.   I do not know.
 6       Q.   Who created the intellectual property
 7   that improved upon a lot of the poker operations?
 8       A.   I do not know.
 9       Q.   Who created the intellectual property
10   that built the back door so that you could get through
11   the Chinese firewall?
12       A.   Who built it or who enhanced it or who
13   distributed it?  They are different things.
14       Q.   Tell me who built it?
15       A.   Me.
16       Q.   Who enhanced it?
17       A.   People Dave was dealing with out of
18   Russia.
19       Q.   Who distributed it?
20       A.   Quite a number of sites, including some
21   associated with the US government.
22       Q.   Can you list those sites for me?
23           MS. MARKOE:  Objection.
24           THE WITNESS:  No.
25   BY MR. FREEDMAN:
```

Page 233

```
 1       Q.   Because you do not know them?
 2       A.   Some I do.  Those ones we will have to
 3   deal with the folks in camera.  Other ones, no.
 4       Q.   The distribution of these technologies
 5   relates to national security?
 6       A.   The poker stuff, no.  The back doors,
 7   some could.
 8       Q.   Can you tell me about Dave's interaction
 9   with the folks in Russia?
10           MS. MARKOE:  Objection.  Answer if you
11   can.
12           THE WITNESS:  I do not know about what
13   other people do.  I do not follow my own staff at the
14   moment, so you are asking me -- I mean, do you actually
15   know the size of my operations?
16   BY MR. FREEDMAN:
17       Q.   No.
18       A.   Then that is why you have no idea what
19   you are asking.  Do you know how many countries I have
20   operations in now?
21       Q.   I want you to focus on what you had in
22   2013 and before.
23       A.   In Australia, do you know how many people
24   I had at the end of 2013?
25       Q.   How many?
```

MAGNA
LEGAL SERVICES

Page 234

1         A.   Over 50.  Do you know how many countries
2    I had operations in in 2013?
3         Q.   No.
4         A.   Around 60.
5         MS. MARKOE:  Guys, seriously, Vel is
6    taking this deposition.  You are not taking the
7    deposition.  Let him ask his questions.
8    BY MR. FREEDMAN:
9         Q.   Who created the intellectual property
10   that enabled Sportsbooks to access things without
11   putting their IP better than Tor?
12        A.   Again, I did not follow up who was
13   individually creating anything.
14        Q.   Was Dave responsible for the creation of
15   this intellectual property?
16        MS. MARKOE:  Objection.
17        THE WITNESS:  Can you specify that in a
18   better, more clear manner.
19   BY MR. FREEDMAN:
20        Q.   W&K created all this intellectual
21   property; is that correct?
22        A.   A lot of that, yes.
23        Q.   Who was responsible for W&K's operations?
24        MS. MARKOE:  Objection.
25        THE WITNESS:  Again, you are asking me

Page 235

1    something -- who was responsible for the operations in
2    this office.
3    BY MR. FREEDMAN:
4         Q.   So you do not know who was responsible
5    for the operations at W&K to create this intellectual
6    property?
7         MS. MARKOE:  Objection.
8         THE WITNESS:  I have already said I do
9    not know who is responsible for half the things that
10   happen in my own office right at the moment, nor do
11   I intend to be.
12   BY MR. FREEDMAN:
13        Q.   Who was your contact at W&K to create all
14   this intellectual property?
15        MS. MARKOE:  Objection: mischaracterises
16   the testimony.
17        MR. FREEDMAN:  You can answer.
18        THE WITNESS:  Dave.  By Dave, I mean Dave
19   Kleiman.
20   BY MR. FREEDMAN:
21        Q.   Did the Sportsbooks program intellectual
22   property enable betting with -- strike that.  Did any of
23   the poker-related technology involve the use of Bitcoin?
24        MS. MARKOE:  Objection.  You can answer
25   if you can.

Page 236

1         THE WITNESS:  Yes.
2    BY MR. FREEDMAN:
3         Q.   How did it involve Bitcoin?
4         A.   You could take Bitcoin and bet.
5         Q.   What was this called, this intellectual
6    property?
7         MS. MARKOE:  Objection: vague.
8         THE WITNESS:  Texas hold'em.
9    BY MR. FREEDMAN:
10        Q.   Did you file a patent?  Was it a code?
11   How did you -- strike that.
12        A.   Do you understand that this is ----
13        MS. MARKOE:  There is no question
14   pending.  He struck his question.  Let him ask a
15   question and you can answer it.
16   BY MR. FREEDMAN:
17        Q.   How did you obtain the intellectual
18   property that relates to poker?
19        MS. MARKOE:  Objection: mischaracterises
20   the testimony.
21        THE WITNESS:  Can you ask something a bit
22   less vague.
23   BY MR. FREEDMAN:
24        Q.   How did you obtain -- strike that.  You
25   obtained intellectual property from W&K that involved

Page 237

1    poker and Bitcoin; is that correct?
2         MS. MARKOE:  Objection.
3         THE WITNESS:  Are you talking about me or
4    a company that I owned?
5    BY MR. FREEDMAN:
6         Q.   Or a company that you -- I thought you
7    did not own any companies.
8         A.   I said owned.  And that is not own.
9         Q.   Which company did you own previously but
10   no longer do?
11        MS. MARKOE:  Objection.
12        A.   There are over 100 of those.
13   BY MR. FREEDMAN:
14        Q.   Over 100 companies that you owned but no
15   longer do?
16        A.   Yes.
17        Q.   Who owns them now?
18        A.   I do not know.
19        MS. MARKOE:  Objection.
20   BY MR. FREEDMAN:
21        Q.   This is because you put in place a
22   structure so you do not know who owns them?
23        MS. MARKOE:  Objection.  This question is
24   overbroad and is going to result in a very unclear
25   answer when you are talking about over 100 companies.

1   They cannot possibly all have the same answer.
2         MR. FREEDMAN:  Maybe it does.
3         THE WITNESS:  It does not.
4         MR. RIVERO:  What topic does it relate
5   to?
6         MR. FREEDMAN:  The court has specifically
7   directed us to be able to ask all about Dr. Wright's
8   entities at hearings and even beyond here.
9         MR. RIVERO:  No.
10        MR. FREEDMAN:  But at subsequent hearings
11  and you can ask Ms. Markoe about this.  He specifically
12  authorised inquiry into the companies.
13        MS. MARKOE:  He authorised limited
14  inquiry into those companies and it needs to be clear
15  inquiry, so if you would like to ask a question that
16  will result in a clear answer I am sure he can answer on
17  a limited basis.  You are limited, if my recollection is
18  correct, in asking questions about those once we have
19  established that those companies do not relate to Dave
20  Kleiman or W&K.
21        MR. FREEDMAN:  I am not sure that is
22  correct, but let us not waste time on that.
23     Q.    When was the first time you contracted
24  with W&K?
25     A.    I do not know.  You would have to look at

1   the date of the contract.  (Pause)
2   (Plaintiff's Exhibit 5 marked for identification)
3      Q.    I have just handed you Plaintiff's
4   Exhibit 5.  Do you recognise this contract?
5      A.    I recognise this contract.
6      Q.    What is the date of this contract?
7      A.    22nd April 2011.
8      Q.    Can you tell me in your own words what
9   the bargain in this contract was?
10        MS. MARKOE:  Objection.  You can answer.
11        THE WITNESS:  This is an agreement between
12  Craig Wright R&D, a company, and W&K Info Defense, an
13  LLC in the US, for provision of services.
14  BY MR. FREEDMAN:
15     Q.    On page 15 of this document is that your
16  signature?
17        MS. MARKOE:  Do you mean 15 at the top?
18        MR. FREEDMAN:  15 at the top.
19        THE WITNESS:  That is signed by me, yes.
20  BY MR. FREEDMAN:
21     Q.    Can you go back to page 3, please.
22  Sorry, take that back, can you go to page 4.  I am
23  looking at L.
24        MS. MARKOE:  You are referring to page 4
25  at the top.  There is just different paginations.

1         MR. FREEDMAN:  Always at the top.
2         MS. MARKOE:  Okay.  I just want to make
3   sure we have a clear record.
4   BY MR. FREEDMAN:
5      Q.    This is docket entry 83-10.  Do you need
6   a second to familiarise yourself with paragraph L?
7      A.    I have read it.
8      Q.    What is going on here?
9      A.    Sorry, what do you mean what is going on?
10  It is a piece of paper.  Nothing is going on.
11     Q.    Can you tell me, as I read this paragraph
12  of the contract, you are providing, you are the
13  financier; is that correct?
14        MS. MARKOE:  Objection.
15        THE WITNESS:  No.
16  BY MR. FREEDMAN:
17     Q.    Craig Wright R&D is the financier?
18     A.    That is what it states, yes.
19     Q.    Craig Wright R&D is providing 1,024 core
20  Xeon and GPU based hardware solution.  (a) It is
21  acknowledged that two SGI ICE XE310-512 core hosts have
22  been provided and are in a data centre specified by the
23  provider."  What is SGI ICE XE310?
24     A.    A computer.
25     Q.    Is it a special computer or just a

1   regular computer?
2      A.    It is an HPC, high memory, high core
3   computer.
4      Q.    (b) states the purpose of the provision
5   of these hardware systems; is that correct?
6      A.    It is a possible use that by the time
7   that this was implemented was not available.
8      Q.    So (b) says -- can you read (b) for me?
9      A.    "The provider will use these systems to
10  mine Bitcoin."
11     Q.    And then (c) says the expected amount of
12  the Bitcoin; is that correct?
13     A.    No.
14     Q.    Well, can you read (c) for me?
15     A.    "The provider expects to earn" -- that is
16  not correct because by the time this was implemented,
17  ASICs, FPGAs and other things had been developed which
18  would make this about one Bitcoin a year.
19     Q.    (c) says that you expect it to earn
20  12,000 Bitcoin per month; is that correct?
21        MS. MARKOE:  Objection: misstates what
22  the document says.
23        THE WITNESS:  I did not expect to earn
24  anything.
25  BY MR. FREEDMAN:

Page 242

```
1         Q.   M states that W&K are supposed to pay for
2    these systems with 300,000 Bitcoin; is that correct?
3         A.   That is what it states.
4         Q.   Did W&K ever pay 300,000 Bitcoin?
5         A.   No.
6         Q.   Why not?
7         A.   David died.
8         Q.   How did W&K get 300,000 Bitcoin if
9    this -- strike that.  Did W&K put these computers listed
10   in L to work to mine Bitcoin?
11             MS. MARKOE:  Objection: foundation and
12   you are going beyond the scope again.  Would you like to
13   connect it to one of the topics, please.
14             MR. FREEDMAN:  This is 4, the location
15   and duration of Dave, W&K and Craig's mining of Bitcoin
16   from 2009 till April 2013.
17             MS. MARKOE:  You can answer the question
18   if you know the answer.
19             THE WITNESS:  There was no mining of
20   Bitcoin between myself and Dave ever.  There was no
21   mining at all in any way that I know of on those
22   machines, ever.
23   BY MR. FREEDMAN:
24        Q.   So, as far as you are aware, Dave never
25   used those machines to mine Bitcoin?
```

Page 243

```
1         A.   It would be totally stupidly foolish to
2    mine anything once ASICs came out on those machines.  It
3    would probably set me back around $4 million a month for
4    something, at the time, worth less than $12,000.
5         Q.   What was the purpose of this clause at
6    the time the contract was entered into?
7         A.   Which clause?
8         Q.   L?
9             MS. MARKOE:  Objection.
10            MR. RIVERO:  You may answer.
11            THE WITNESS:  The clause was there to
12   have machines that would be run and managed.  The
13   primary purpose would be I was using scaling tests and
14   other such things.  Those machines were running enhanced
15   versions of Bitcoin that I was creating, the node
16   software, so that I could see how far I could scale
17   Bitcoin as a blockchain.  Any other side use, while not
18   being used, was originally envisioned that others could
19   mine Bitcoin with.
20   BY MR. FREEDMAN:
21        Q.   In clause B, on page 3, the contract
22   states that "The provider desires the intellectual
23   property for the permitted use ..."  What was the
24   intellectual property referred to here?
25            MS. MARKOE:  Objection.  You can answer.
```

Page 244

```
1             THE WITNESS:  Some of that is the things
2    we have already talked about, including gaming software.
3    Dave was running operations that I helped set him up in
4    Costa Rica.
5    BY MR. FREEDMAN:
6         Q.   Craig Wright R&D paid for this
7    development in paragraphs F and G; is that correct?
8             MS. MARKOE:  Objection.  You can answer.
9             THE WITNESS:  I instructed people who
10   were with the company to pay for machines to be
11   purchased.
12   BY MR. FREEDMAN:
13        Q.   Where did this Bitcoin come from?
14            MS. MARKOE:  Objection.  I am going to
15   instruct the witness not to answer.  It goes beyond the
16   scope.
17            MR. FREEDMAN:  Of 10 as well?
18            MS. MARKOE:  Where in 10 does it
19   reference ----
20            MR. FREEDMAN:  Inquiry into the entities
21   and projects referenced in Exhibits 5, 10 and 15 in a
22   second I am going to complain.
23            MS. MARKOE:  Right, and your question, if
24   I recall correctly -- let me just see -- actually, would
25   you mind reading it back; I cannot locate it at the
```

Page 245

```
1    moment.
2        (The court reporter read back as requested)
3             MR. RIVERO:  Just give us a moment.
4             MR. FREEDMAN:  Let me take a break
5    because I have to use the restroom.
6             THE VIDEOGRAPHER:  Going off the record.
7    The time is 16.58.
8              (A Short Break)
9             THE VIDEOGRAPHER:  Going back on the
10   record.  The time is 17.09.  Thank you.
11   BY MR. FREEDMAN:
12        Q.   Before the break, Dr. Wright, I asked you
13   where the Bitcoin mentioned in paragraphs F and G --
14   sorry, take that back.
15            MS. MARKOE:  It might be easier just to
16   have her read back the last question.
17            MR. FREEDMAN:  I looked at it, though.  I
18   just said: "Where did this Bitcoin come from?"  Let us
19   start again with a clear record.
20            MS. MARKOE:  Okay.
21   BY MR. FREEDMAN:
22        Q.   Let us look at paragraph A.  Paragraph A,
23   Dr. Wright, says: "The Financier controls the following
24   Bitcoin (BTC) addresses."  How did Craig Wright R&D come
25   to possess these Bitcoin addresses?
```

MAGNA
LEGAL SERVICES

Page 246

1      A.   I do not know.
2      Q.   Paragraph F says that the financier will
3  send 165,140 Bitcoin to the 1MSU address by 30th April
4  2011.  Did Craig Wright R&D send 165,140 Bitcoin to the
5  1MSU address?
6      A.   I do not know.
7      Q.   Did you cause or request that Craig
8  Wright R&D make this transfer?
9      A.   I requested that people pay the amounts
10 that they are meant to pay, yes.
11     Q.   Where did this request go to?
12     A.   It went to Craig Wright R&D.
13     Q.   Who at Craig Wright R&D?
14         MS. MARKOE:  Objection.  You can answer.
15         THE WITNESS:  I do not know.  This is
16 years ago.  I do not remember the people in that
17 company.
18 BY MR. FREEDMAN:
19     Q.   Which company was it?
20     A.   Craig Wright R&D.
21     Q.   But there were many of them.
22     A.   Which Craig Wright R&D is I believe what
23 you are asking.
24     Q.   Mmm-hmm.
25     A.   That was in Panama.

Page 247

1      Q.   And Craig Wright R&D Panama had control
2  over these Bitcoin addresses?
3          MS. MARKOE:  Objection.  You can answer
4  if you know.
5          THE WITNESS:  I told people what to do.
6  They told me they had done it.  That is as far as I go.
7  BY MR. FREEDMAN:
8      Q.   And then did Craig Wright R&D deliver the
9  50,000 Bitcoin referenced in paragraph G?
10     A.   Again, I do not have much to do with
11 finance in the companies other than people giving me
12 reports saying it has all been done or not, and if I do
13 not get complaints about finance by creditors or debtors
14 or whatever else going, "Why the hell it has not
15 happened", etcetera, then I am a happy guy and I stay
16 out of people's way.
17     Q.   Can you go to page 13 for me, please,
18 Dr. Wright.
19         MS. MARKOE:  Again, just for clarity's
20 sake, that is 13 at the top.
21 BY MR. FREEDMAN:
22     Q.   Top of the page.  I am looking at
23 paragraph 18(a).
24     A.   Mmm-hmm.
25     Q.   It says:  "The paper Bitcoin Wallet with

Page 248

1  address 1933ph", and so on ----
2      A.   Yes.
3      Q.   ---- "will be held by the financier as
4  assurance or the contract and will convert to the
5  ownership of the financier on default of the provider."
6  So, Craig Wright R&D held the 1933 wallet as collateral?
7          MS. MARKOE:  Objection.  You can answer.
8          THE WITNESS:  That would be the finance
9  people over in Panama, not me.
10 BY MR. FREEDMAN:
11     Q.   Who were the finance people at Panama?
12     A.   Some of those were associated with a
13 company called High Secured, and there were other people
14 who used to work for Liberty Reserve.
15     Q.   So the folks at High Secured and Liberty
16 Reserve controlled this Bitcoin wallet address?
17         MS. MARKOE:  Objection: mischaracterises
18 the testimony.
19 BY MR. FREEDMAN:
20     Q.   Did the folks at High Secured and Liberty
21 Reserve control this wallet address?
22     A.   I have stated my involvement with finance
23 which is exactly as it is now, is, I say do things;
24 things either happen or do not happen.  If they do not
25 happen Craig gets all yelly and screamy and everyone

Page 249

1  gets upset, and when they do happen, things are good.
2      Q.   So the folks at finance controlled the
3  wallets listed at A on page 3; is that correct?
4          MS. MARKOE:  Objection: mischaracterises
5  the testimony.  You can answer.
6          THE WITNESS:  I basically go to
7  finance people, they tell me things, I trust what my
8  people tell me and, if no one complains, no one says it
9  is not real, then I have to believe what I am told by
10 people I contract or paid.
11 BY MR. FREEDMAN:
12     Q.   How did this amount of Bitcoin end up in
13 these wallets?
14         MS. MARKOE:  Objection.  You can answer
15 if you know.
16         THE WITNESS:  There are two problems with
17 what you have just said.  This amount of Bitcoin in
18 18(a) is not -- that is an address, not an amount of
19 Bitcoin, and, secondly, they are an address, not a
20 wallet.
21 BY MR. FREEDMAN:
22     Q.   How did Bitcoin end up in the wallets
23 listed at A(a) and A(b)?
24         MS. MARKOE:  Objection.
25         THE WITNESS:  My assumption is that a

MAGNA ▶
LEGAL SERVICES

Page 250

1  transaction would be sent to the Bitcoin ledger. Miners
2  would take that transaction and send into a block which
3  would be mined, updating the ledger.
4  BY MR. FREEDMAN:
5      Q.   Did you cause the Bitcoin to end up in
6  those wallets?
7          MS. MARKOE:  Objection.
8          THE WITNESS:  These are not wallets.
9  BY MR. FREEDMAN:
10     Q.   Addresses. Did you cause the Bitcoin to
11 end up in these addresses?
12         MS. MARKOE:  Objection. Answer if you
13 can.
14         THE WITNESS:  If you are saying did
15 I tell someone to do something and things happened, to
16 the best of my knowledge, no one complained. I told
17 people in a group of companies in Panama to do things to
18 make sure Dave was happy. Things happened. No one
19 complained. Dave did not complain to me. I am happy.
20 Everyone is happy.
21 BY MR. FREEDMAN:
22     Q.   I am trying to figure out how the folks
23 in Panama ended up with that much Bitcoin at their
24 disposal?
25         MS. MARKOE:  Objection.

Page 251

1          THE WITNESS:  Sorry, what is that much
2  Bitcoin?
3  BY MR. FREEDMAN:
4      Q.   It is 165,140 and then 50,000, so a total
5  of 215,140.
6      A.   You are asking how an organisation that
7  was turning over probably $20 million a month managed to
8  obtain $80,000 worth of Bitcoin?
9      Q.   Yes.
10     A.   Well, if you had offered someone 100,000,
11 they would have given you no questions asked. You could
12 have gone to LocalBitcoins. You could have gone to
13 Mt. Gox. You could have gone to a number of criminal
14 organisations that were selling it. Libya Reserves had
15 quite a number of Bitcoin. How would you do that?
16 Well, people exchange goods and services. You take US
17 dollars and you make a trade.
18         MR. RIVERO:  There is a question from the
19 court reporter.
20         THE WITNESS:  Mt. Gox.
21 BY MR. FREEDMAN:
22     Q.   In April of 2011, was it possible to
23 acquire 165,000 Bitcoin on the open market?
24     A.   Yes. In fact, around that sort of time,
25 50,000 Bitcoin was swapped for two pizzas.

Page 252

1      Q.   Do you have any information on how the
2  165,140 and 50,000 ended up in the two addresses at A(a)
3  and A(b)?
4          MR. RIVERO:  Objection. Did you say A(a)
5  and A(b)?
6          MR. FREEDMAN:  Yes, on page 3.
7          MR. RIVERO:  I am sorry, I do not
8  understand the question. I do not understand your
9  question. I cannot form an objection. Do you mean F(b)
10 and G(b)? Oh, I see. Withdraw. Go ahead. Yes?
11         THE WITNESS:  My statement is very
12 simple: they are addresses; no amount is claimed at
13 those addresses.
14 BY MR. FREEDMAN:
15     Q.   These addresses transferred these
16 amounts -- sorry, let us make that clear. The 12h
17 address transferred 165,140 Bitcoin to the 1MSU address?
18         MR. RIVERO:  Objection: mischaracterises
19 the testimony. You may answer.
20         MR. FREEDMAN:  Do you mind, I did not
21 quite finish yet.
22         MR. RIVERO:  Oh!
23 BY MR. FREEDMAN:
24     Q.   Do you know how the Bitcoin ended up in
25 the 12h address?

Page 253

1      A.   Well, a transaction would be sent to the
2  blockchain. Miners will take their transaction for
3  transaction fees.
4      Q.   Let me be clear, doctor, because you
5  explained this before. I am not asking for the
6  technical explanation of how the Bitcoin ends up, I am
7  asking for the practical explanation. Everyday people
8  like me would say, how did the Bitcoin end up in that
9  wallet address, or that public address; who sent it
10 there?
11         MR. RIVERO:  Objection.
12         THE WITNESS:  I am saying, where is a
13 block explorer to tell me it actually went on any
14 particular date?
15 BY MR. FREEDMAN:
16     Q.   Sitting here today -- strike that. Did
17 any of the Bitcoin you mined in Australia end up at
18 these public addresses?
19     A.   No.
20         MR. RIVERO:  Object to the form. Just
21 give me one moment to state the objection.  (Pause)
22 BY MR. FREEDMAN:
23     Q.   Can you go with me to page 14 at the top.
24 Can you look at the definition of "Product", or the
25 listing of what product is. Can you read that for me,

Page 254

```
1    please.
2         A.    "Bitcoin and Exchange Software in
3    C/C++/C#/R code."
4         Q.    How did Bitcoin and Exchange Software fit
5    into this contract?
6              MR. RIVERO:  Misstates the document.
7    Objection.
8              MR. FREEDMAN:  You can answer.
9              THE WITNESS:  Sorry, how did Bitcoin and
10   Exchange Software fit into this document?
11   BY MR. FREEDMAN:
12        Q.    Yes.  It just says "Product".  What does
13   that mean?
14        A.    It means exactly what it says there.
15        Q.    Is this the product that Dave Kleiman was
16   producing for you at W&K?
17             MR. RIVERO:  Objection.
18             THE WITNESS:  I need more of an
19   explanation than that.  Exchange Software, I mean that
20   is a very wide -- that is like saying ----
21   BY MR. FREEDMAN:
22        Q.    You do not know what the contract means?
23        A.    I do not know what you are trying to
24   classify it as.
25        Q.    You tell me what the contract you signed
```

Page 255

```
1    means.  It says: "Product:  Bitcoin and Exchange
2    Software in C/C++/C#/R code."  What does that mean?
3         A.    If you want to cherry pick, that is a
4    different thing than saying this line means something
5    out of sort of the rest.  What the contract was about
6    was the production of code at the end.
7         Q.    For Bitcoin?
8         A.    Define "for Bitcoin".
9         Q.    I do not know, it says "Bitcoin",
10   "Product: Bitcoin"?
11        A.    Mmm-hmm.
12        Q.    Is that because the contract was creating
13   Bitcoin?
14        A.    No, Bitcoin was already created.
15        Q.    Is that because the contract was for the
16   purpose of creating mining Bitcoin?
17        A.    No, you cannot mine Bitcoin that way.
18   I have already stated this.
19        Q.    Was it for a Bitcoin exchange?
20        A.    No.  There were certain things that were
21   to do with a Bitcoin exchange, and some other aspects of
22   poker software, other aspects of the software I have
23   mentioned before, and the other stuff, intellectual
24   property, under the unawarded DHS projects.
25        Q.    Can you go with me to page 15.
```

Page 256

```
1         A.    Yes.
2         Q.    Do you see Dave Kleiman's name about a
3    quarter of the way down from the top of the page?
4         A.    Yes.
5         Q.    Do you see the signature there?
6         A.    What I see is his name written there,
7    yes.
8         Q.    Is that Dave Kleiman's signature?
9         A.    The definition of signature, if we take,
10   for instance, Salinger v Golden Mining, what you will
11   see is if I type "Regards, Craig", that is deemed a
12   signature under the law.  That was upheld in 2011 in the
13   British courts to be a signature.  A signature is an
14   attestation.  If I tell my EA, as I do every now and
15   again, "Please send in this document, I cannot get into
16   the office, I have noted in this e-mail I am authorising
17   you to sign", and she puts my name at the bottom, that
18   is legally a signature.  When I go "Regards, Dr. Craig
19   Wright" on an e-mail and it is typed, that is legally a
20   signature.  If I have a video attestation and I say, "I,
21   Craig Wright, agree to this contract", that is legally a
22   signature.  A signature in writing, basically,
23   incorporates, in this country at least, and as well
24   Australia, the incorporation of anything in any media,
25   including video attestation, that will allow one to
```

Page 257

```
1    prove that they agreed to be bound.  The definition of
2    signature is actually an agreement to be bound.  So,
3    what you are saying is, did Dave agree to be bound?  And
4    if he was part of this contract that would be that he
5    agreed to be bound.  If he was not, then he had no part
6    in the contract, and then has no rights under that
7    contract.  Which would you prefer to choose?
8         Q.    Actually, I would just prefer you to
9    answer the question.  Is that Dave Kleiman's signature?
10        A.    I have answered the question in detail.
11        Q.    I do not think so.  Can you give me a yes
12   or no; is that Dave Kleiman's signature?
13             MS. MARKOE:  Objection.  You can answer.
14             THE WITNESS:  I have answered the
15   question.
16   BY MR. FREEDMAN:
17        Q.    How did that mark get to be made on the
18   page?
19        A.    I do not really care.  If someone sends
20   me a contract and I haven't witnessed it personally or
21   noted that I witnessed it, then I have not witnessed it.
22   I am not going to give a rat's rectum about the origin
23   of something that someone does not dispute.  Dave had
24   many years to say, "Hey, I did not sign".  At some point
25   he could have put his hand up and said, "I do not agree
```

Page 258

1  with this".  At no point did he.  Of course, the
2  argument here when we were talking about the creation of
3  software that is legal in Australia, but illegal in the
4  USA, brings into a difficult position with contracts.
5  Although it is a legal contract in New South Wales, one
6  could argue that the creation of a prohibitive product,
7  that is actually a crime for an American citizen to
8  create, or be involved with, or distribute, or actually
9  fairly much anything to do with, would actually
10 invalidate Dave's contract but that is a different
11 issue.
12      Q.    Did you witness Dave Kleiman sign this
13 contract?
14      A.    It does not say witnessed at any point.
15      Q.    So you did not witness him sign the
16 contract?
17      A.    I believe I have noted that I was never
18 in Australia -- sorry, Dave was not in Australia, and
19 that I was not on the signing date of this contract in
20 the US.  At the time, witnessing over video was not
21 legal, and although the law has been updated and now in
22 the UK and Australia that is possible, it was not
23 possible at the time.  So, without being in the same
24 room as Dave, I would not be able to witness.
25      Q.    Dr. Wright, it would help us get through

Page 259

1  this deposition if you gave shorter answers that address
2  the exact question targeted.
3      A.    I do not believe I can without being
4  vague.
5      Q.    If I asked you to, how could you prove to
6  me that Dave Kleiman signed this contract?
7           MS. MARKOE:  Objection.
8           THE WITNESS:  I do not need to.
9  BY MR. FREEDMAN:
10      Q.    List to me all the ways in which you
11 could demonstrate Dave Kleiman signed this contract?
12           MS. MARKOE:  Objection.
13           MR. RIVERO:  Objection.
14           MS. MARKOE:  I am going to instruct the
15 witness not to answer unless you can show me where in
16 the topics this relates.
17 (Plaintiff's Exhibit 6 marked for identification)
18           MR. FREEDMAN:  We believe this question
19 relates to section 10 that authorises us to ask about
20 the projects referenced in 5, 10 and 15, but if you are
21 instructing the witness not to answer, in the interests
22 of time, we will move on.
23           MS. MARKOE:  Can we go back and look at
24 the question again, based on what he said.  (Pause) The
25 last question by Mr. Freedman was:  "List me all the

Page 260

1  ways in which you could demonstrate Dave Kleiman signed
2  this contract."  I objected and instructed you not to
3  answer.  I will remove my instruction not to answer and
4  you can answer if you can.
5           MR. RIVERO:  We maintain the objection.
6           MS. MARKOE:  We maintain the objection,
7  correct.
8           MR. RIVERO:  The form is completely
9  defective, but answer if you can.
10          THE WITNESS:  I have just published to
11 two papers on electronic signatures that were presented
12 in Oxford last month.  That involves an analysis of many
13 ways of signing digitally.  So, basically, any way that
14 you can say that someone signed.  Now, a signature is
15 very simple.  It does not need to be a handwritten
16 thing, and in fact a handwritten thing is the antithesis
17 of the idea of what it was.  The history of signatures
18 goes back to allowing Jews to sign with their name and
19 Christians would put an X.  In fact, only those who were
20 literate signing with Xs in medieval England.  So, the
21 reason for that is that you were taking an attestation
22 or an oath.  So, the history of signatures is such that
23 you are saying that you agree to be bound.  Can you say
24 that you agree to be bound?  Was there any evidence to
25 the contrary where someone could bring up saying there

Page 261

1  was no evidence of agreement to be bound?  In the case
2  of someone like Mr. Kleiman, did Mr. Kleiman ever stand
3  up and say, "I do not agree to be bound"?  In years of
4  dealing, contracting, etcetera, did he say, "No, this
5  was not my contract"?  You would want to show the
6  absence of anything like that.  You would want to show
7  the absence of e-mails saying, "I disagree with this
8  thing.  I did not agree to be bound by the contract.
9  That is not my signature".
10          Of course, that is a signature not being
11 this handwritten thing that people try and say, but
12 rather the agreement to be bound.  I would look for the
13 absence, and hope that if you were trying to contest a
14 signature, and say that someone did not agree to be
15 bound, there would be something, some evidence, in the
16 wide swathe of communications that can occur over years,
17 of anyone at any point going, "I do not agree with
18 this", that there were some communications with other
19 people saying, "I do not agree", where Dave would say,
20 "I did not agree to this contract", where maybe Ira or
21 whatever else had been communicating and going, "Dave,
22 what do you mean he says you are under contract?"  And
23 then Dave would go, "No, I did not actually sign that".
24 BY MR. FREEDMAN:
25      Q.    Okay, I am going to cut you up.

MAGNA
LEGAL SERVICES

Page 262

1    MR. RIVERO:  Wait, do not cut the
2  witness -- hold on.  You ask about tell me all the ways
3  you can prove it and he is answering your question.  He
4  is going to finish his answer.  Whenever you feel like
5  it, Dr. Wright.  You asked the question.  We objected to
6  it because it is a completely defective question.  You
7  answer it until you feel satisfied.
8    THE WITNESS:  So, I would start by
9  analysing every bit of media Dave has ever had.  Was
10  there any social media where Dave had online -- and he
11  was very prolific online -- stated, "I do not agree to
12  this contract.  Someone is saying I am bound but I am
13  not".  So, you would go through all of his Facebook
14  posts, all of his Twitter, all of his communications
15  with other partners that he had in Australia, because
16  Dave did have partners.  I was not one of them, but Page
17  and Connor and things like that, maybe he would go to
18  them and say, "I was not bound by this", or mutual
19  friends we had, like Paul Henry, would Dave talk to
20  these guys, who were really good friends with us, who
21  had been in the industry a long time, "I did not agree
22  to this", he would say.  He would go up there and go,
23  "I did not agree to this contract and yet people are
24  claiming that I did".  You would find some evidence.
25  You would analyse all his hard drives, all his e-mails.

Page 263

1  You would look to what other people might say.  You
2  would find somewhere where someone had said, "I do not
3  agree to be bound", or Dave had gone to them, "I do not
4  agree to be bound"; why?  You would find something in
5  communications where that has occurred.  Thank you.
6    MR. FREEDMAN:  Thank you.  If you do that
7  again, Dr. Wright, Andrés, we will bring it up with the
8  court.  It is purposely wasting time.
9    MR. RIVERO:  The question asked for
10  proof.  The witness has answered exactly.  But you
11  allowed him to finish, so we are going to continue.
12  BY MR. FREEDMAN:
13    Q.  I believe we handed you Plaintiff's
14  Exhibit 6.  Do you recognise this exhibit?
15    A.  I do.
16    Q.  What is this exhibit?
17    A.  It is a contract.
18    Q.  Made between who and who?
19    A.  Between W&K Info Defense in Florida and
20  Craig Wright R&D, which would be an Australian entity.
21    Q.  Is there another party to the contract?
22    A.  And W&K Info Defense LLC company.
23    Q.  I think you have misstated the first
24  party to the contract.  Perhaps take a look again at the
25  first party to the contract.

Page 264

1    MS. MARKOE:  Objection.
2    THE WITNESS:  W&K Info Defense LLC.
3  BY MR. FREEDMAN:
4    Q.  I believe it says Dave Kleiman of W&K
5  Info Defense LLC.
6    MS. MARKOE:  Objection.
7    THE WITNESS:  That is still the company,
8  which, under Commonwealth law means the legal entity
9  being represented by Dave Kleiman, not Dave Kleiman, is
10  being bound.  Dave Kleiman is not being bound by this
11  contract in any way.  Sorry, I do have a masters degree
12  and I am a legal scholar, and I am doing my doctor of
13  law at the moment.  If you want to discuss British or
14  Australian law I am quite happy to.
15    MS. MARKOE:  I would also like to note
16  for the record that it actually says that the entirety
17  of that first party, which is defined as the vendor, is
18  "Dave Kleiman of W&K Info Defense LLC (Florida)".
19  BY MR. FREEDMAN:
20    Q.  Can you take a look at paragraph B for
21  me, please, Dr. Wright.
22    A.  Yes.
23    Q.  Can you read that out loud for the
24  record?
25    A.  "The company is the owner of and conducts

Page 265

1  business known as Bitcoin mining and Software
2  Research/development (sic)."
3    Q.  I think it says "Software
4  development/Research"?
5    A.  Correct, I am sorry about that error.
6    Q.  Dr. Wright, this contract was signed two
7  years after, approximately, the last contract we just
8  looked at?
9    A.  Where is the date?  Yes.
10    Q.  You told me the April 2011 contract,
11  although it provides for Bitcoin mining hardware, could
12  not be used for Bitcoin mining hardware because ASIC
13  miners came along and rendered that technology obsolete;
14  is that correct?
15    MS. MARKOE:  Objection: the record will
16  speak for itself.
17    MR. FREEDMAN:  You can answer.
18    THE WITNESS:  I told you exactly as
19  I told you, yes.
20  BY MR. FREEDMAN:
21    Q.  Now two years later you are signing a
22  contract that says that the company does conduct the
23  business as Bitcoin mining.  Can you explain that to me?
24    MS. MARKOE:  Objection.
25  BY MR. FREEDMAN:



Page 266

1      Q.    Did something change?
2      A.    I do not have any care about what Dave
3  said his business was.
4      Q.    Can you go with me to page 11 of the
5  contract up on the top page.
6      A.    Yes.
7      Q.    Down the bottom, it says "Craig S
8  Wright"; is that your signature?
9      A.    Yes.
10     Q.    How do you know that Dave Kleiman has
11 entered into this contract?
12         MS. MARKOE: Objection. Answer if you
13 can.
14         THE WITNESS: We communicated.
15 BY MR. FREEDMAN:
16     Q.    How did you communicate about it?
17     A.    As I have noted before, we would talk
18 over IRC and Skype.
19     Q.    So you have no record of those
20 communications?
21     A.    I do not have many records of anything
22 from that period.
23     Q.    Or a record of those communications?
24     A.    I do not have a record of practically
25 anything from that period.

Page 267

1      Q.    Do you have a record of the communication
2  between yourself and ----
3      A.    I do not know.  Unless my lawyers ----
4      Q.    Dr. Wright, please let me finish the
5  question.  Do you have a record of the communication
6  between yourself and Dave Kleiman where he assented to
7  the terms of this contract?
8          MS. MARKOE: Objection.
9          THE WITNESS: If my lawyers have any
10 record of what they have imaged, etcetera, then yes,
11 otherwise no.  I do not know.
12 BY MR. FREEDMAN:
13     Q.    Can you go with me to page 5, please.
14         MS. MARKOE: Again, for the record, that
15 is page 5 at the top.
16         THE WITNESS: Yes.
17 BY MR. FREEDMAN:
18     Q.    Can you look at (b) of paragraph 2.  Let
19 me know when you have familiarised yourself with it.
20     A.    Yes.
21     Q.    This is the 1933 wallet that we saw in
22 the 2011 contract?
23     A.    Yes.
24     Q.    In the 2011 contract it was being held by
25 Craig Wright R&D as a collateral?

Page 268

1      A.    In Panama, yes.
2      Q.    Can you explain to me why it is being
3  released to Craig Wright R&D if there is no default on
4  the contract?
5          MS. MARKOE: Objection.
6          THE WITNESS: The contract speaks for
7  itself.
8  BY MR. FREEDMAN:
9      Q.    I am trying to understand the negotiation
10 that went on.  The wallet was a collateral in 2011 and
11 now it is being given to the holder of the collateral.
12 I do not understand why.  Why?
13         MS. MARKOE: Objection.
14         THE WITNESS: It is a negotiation, it is
15 a contract.  You are saying, why did we negotiate
16 something?
17 BY MR. FREEDMAN:
18     Q.    Yes.  It was held as collateral.  Usually
19 collateral is returned at the fulfillment of the
20 contract.  Why are you keeping the collateral?
21         MS. MARKOE: Objection.
22         THE WITNESS: I did not keep the
23 collateral.
24 BY MR. FREEDMAN:
25     Q.    Who kept the collateral?

Page 269

1      A.    Again you will note that I am not the
2  person here, sorry.
3      Q.    You signed the contract?
4      A.    I signed for a legal entity.  Please be
5  specific.
6      Q.    Who owned Craig Wright R&D at the time
7  you signed this contract -- Craig Wright R&D Panama at
8  the time you signed this contract?
9      A.    I do not remember.
10     Q.    Have you any way to look that up?
11     A.    Not now, no.
12     Q.    Was it a trust?
13     A.    No.
14     Q.    It was people or corporations?
15         MS. MARKOE: Objection.  You can answer.
16         THE WITNESS: Companies are always
17 people.
18 BY MR. FREEDMAN:
19     Q.    Natural persons?
20     A.    Companies always have natural persons.  I
21 do not know any unnatural persons that can actually act.
22     Q.    Dr. Wright, my question was, did natural
23 persons own Craig Wright R&D Panama?
24         MS. MARKOE: Objection.  You can answer.
25         THE WITNESS: I do not remember.  I have

MAGNA
LEGAL SERVICES

Page 270

```
 1    already stated I do not have any involvement with the
 2    company structures or whatever else after I have set
 3    them up and handed them off to be mixed up and created
 4    so that we have companies.
 5    BY MR. FREEDMAN:
 6        Q.    Can you look at paragraph 3(a).
 7        A.    Yes.
 8        Q.    Was the 250,5000 -- well, tell me if you
 9    are familiar with 3(a) and I can ask you questions on
10    it.
11        A.    It is right in front of me.
12        Q.    Can you tell me, did this 250,500
13    Bitcoin, was it ever transferred?
14        A.    No.
15        Q.    Can you tell me 3(b), did Craig Wright
16    R&D accept the 1933 paper Bitcoin wallet?
17        A.    I am not Craig Wright R&D.  I cannot
18    speak for other people.
19        Q.    Do you know if Craig Wright R&D accepted
20    the paper Bitcoin wallet?
21            MS. MARKOE:  Objection.
22            THE WITNESS:  I am not Craig Wright R&D.
23    I cannot speak for other people.
24    BY MR. FREEDMAN:
25        Q.    I am just asking what your knowledge is,
```

Page 271

```
 1    Dr. Wright.  Please tell me only what your knowledge is.
 2    If you know, you do not know.  If you know, let me know.
 3        A.    I do not know.
 4        Q.    Can you look at 3(c)?
 5        A.    Yes.
 6        Q.    Can you read that for me?
 7        A.    "Transfer the ASC hardware to the
 8    purchaser".
 9        Q.    What is "ASC hardware"?
10        A.    It should be ASIC.
11        Q.    It is ASIC mining hardware?
12            MS. MARKOE:  Objection.
13            THE WITNESS:  Yes.
14    BY MR. FREEDMAN:
15        Q.    What ASIC mining hardware is it referring
16    to?
17        A.    I do not know.
18        Q.    It says in 3(d):  "Release the source
19    code to the purchaser."  What source code is it talking
20    to?
21        A.    That was a variety of source code that
22    I already had in my possession as well as other source
23    code that I did not.
24        Q.    What was the source code you had in your
25    possession?
```

Page 272

```
 1        A.    That includes all the things we have
 2    already detailed, I would need to look through the list
 3    to go through without missing anything, but it included
 4    the covert channel software, the recording software, the
 5    poker software, etcetera.
 6        Q.    Were you authorised to enter contracts
 7    for Craig Wright R&D Panama?
 8        A.    Yes.
 9        Q.    How did you come to be authorised to
10    enter into contracts for Craig Wright R&D Panama?
11            MS. MARKOE:  Objection.  But you can
12    answer.
13            THE WITNESS:  I set up the system so that
14    I would be.
15    BY MR. FREEDMAN:
16        Q.    You set up Craig Wright R&D Panama?
17            MS. MARKOE:  Objection.
18            THE WITNESS:  That is not what I said.
19    BY MR. FREEDMAN:
20        Q.    You said:  "I set up the system so that
21    I would be".
22        A.    Correct.
23        Q.    Can you look at 3(e)?
24        A.    Yes.
25        Q.    Can you read it for the record, please.
```

Page 273

```
 1        A.    "Transfer the Vistomail e-mail account."
 2        Q.    Which Vistomail e-mail account is it
 3    referring to?
 4        A.    I think it was Sakura.
 5            BY MS. MARKOE:  Can you spell that, if
 6    you can.
 7            THE WITNESS:  It is the name of the
 8    Japanese flowers, the ones with the cherry blossoms in
 9    spring.
10    BY MR. FREEDMAN:
11        Q.    Sakura; is that correct?
12        A.    Yes, I am not going try and spell it.
13        Q.    I think it is S-A-K-U-R-A.  What was
14    Sakura used for?
15        A.    Discussing some of the work that was
16    being done.
17        Q.    By whom?
18        A.    By people in Panama.
19        Q.    Did you get access to the Vistomail
20    e-mail account?
21        A.    I did.
22        Q.    Do you still have access to the Sakura
23    Vistomail e-mail account?
24        A.    No, I do not.
25        Q.    What happened to the access?
```

**MAGNA ▶**
**LEGAL SERVICES**

Page 274

```
 1        A.   No one paid for the account so it lapsed.
 2        Q.   And Vistomail delete it if you do not
 3   pay?
 4        A.   I have no idea.
 5             MS. MARKOE:  Objection.
 6   BY MR. FREEDMAN:
 7        Q.   When did it lapse?
 8        A.   I don't know.
 9        Q.   Have you tried to get the account back
10   from Vistomail?
11             MS. MARKOE:  Objection.
12             THE WITNESS:  Why would I do that?
13   BY MR. FREEDMAN:
14        Q.   Because you have been sued in this
15   lawsuit.
16             MS. MARKOE:  Objection.
17             THE WITNESS:  You are saying you want me
18   to pay to get evidence that you want.
19   BY MR. FREEDMAN:
20        Q.   All right, going back to 3(c), did you
21   obtain the ASIC hardware back from the purchaser?
22        A.   No, I specifically, when I went to the
23   court, etcetera, said I do not really care about
24   anything other than the IP, and said that anyone there
25   could keep it because I do not want it.
```

Page 275

```
 1        Q.   What was the ASIC hardware worth?
 2        A.   I do not know.
 3        Q.   Did you get the source code back?
 4             MS. MARKOE:  Objection.
 5             THE WITNESS:  I had the source code that
 6   I had.  I did not get any extra.
 7   BY MR. FREEDMAN:
 8        Q.   3(f), can you read that for me, please.
 9        A.   "Transfer all research materials from the
10   four (4) DHS BAA research projects to the purchaser with
11   all notes, data and results."
12        Q.   Did this transfer occur?
13        A.   No.
14        Q.   What are the four DHS BAA projects that
15   are being referred to?
16        A.   They are the ones that have been noted
17   before, SWAMP, the other software risk ones, etcetera.
18        Q.   Did Dave build those out for you?
19             MS. MARKOE:  Objection: asked and
20   answered.  You can answer.
21             THE WITNESS:  I do not know, because
22   I did not get it.
23   BY MR. FREEDMAN:
24        Q.   Can you look at 4(b) for me?
25        A.   Yes.
```

Page 276

```
 1        Q.   Tell me when you are familiar with it?
 2        A.   It is right in front of me.
 3        Q.   Craig Wright R&D is to accept the
 4   vendor's 323,000 remaining mined Bitcoin as a 49.5%
 5   stake in a new venture, and that venture was called
 6   Coin-Exchange; is that correct?
 7        A.   Yes.
 8        Q.   Did you get the 323,000 Bitcoin?
 9        A.   No.
10        Q.   So you were now aware that there were
11   323,000 Bitcoin mined by Dave Kleiman?
12             MS. MARKOE:  Objection.
13             THE WITNESS:  He had stated that.
14   BY MR. FREEDMAN:
15        Q.   Did he use the ASIC mining hardware --
16   strike that.  The ASIC mining hardware referred to at
17   3(c), did you provide that to Dave Kleiman?
18        A.   No.
19        Q.   Do you know how he obtained that
20   hardware?
21        A.   I knew people who developed chips and
22   I put them in contact with Dave.
23        Q.   Who are those people?
24             MS. MARKOE:  Objection.  You can answer
25   if you know.
```

Page 277

```
 1             THE WITNESS:  I do not remember their
 2   name.
 3   BY MR. FREEDMAN:
 4        Q.   Do you remember anything about them?
 5        A.   Yes.
 6        Q.   Can you tell me any contact details you
 7   have about them?
 8        A.   No.
 9        Q.   Do you remember any identifying features
10   about them?
11             MS. MARKOE:  Objection.  Like a tattoo?!
12             MR. FREEDMAN:  Judging by Dr. Wright's
13   previous answers, if I asked him what he remembered he
14   would launch into an irrelevant tirade about all kinds
15   of other things.
16             MR. RIVERO:  Please ask your questions.
17   BY MR. FREEDMAN:
18        Q.   Can you go to page 6 for me.
19        A.   Yes.
20        Q.   Top of page 6, 4(d).  Can you read that
21   for me.
22        A.   "Provide $30,000,000 in capital into
23   Coin-Exch Pty Ltd (to be formed) and the software
24   developed in the prior venture."
25        Q.   This is an obligation by Craig Wright R&D
```

MAGNA ►
LEGAL SERVICES

Page 278

```
 1   to provide $30 million to Coin-Exchange?
 2        A.   In capital.
 3        Q.   Did Craig Wright R&D provide $30 million
 4   in capital to Coin-Exchange?
 5        A.   Yes.
 6        Q.   How?
 7             MS. MARKOE:  Objection.  Can you tie this
 8   to one of your topics in the scope?
 9             MR. FREEDMAN:  We are allowed to ask
10   about the projects in Exhibits 5, 10 and 15.  This is
11   Exhibit 10 -- 5.
12             MS. MARKOE:  Right, but this is not a
13   project.  This is a capital infusion into a company that
14   did not ----
15             MR. FREEDMAN:  It is part of the project,
16   it is part of the contractual agreement of the project.
17             THE WITNESS:  It was not part of a
18   project.
19             MS. MARKOE:  What project?  This is not
20   referring to a project, so can you tie it.
21             MR. FREEDMAN:  This is the Coin-Exchange
22   project.  This is an agreement with Coin-Exchange ----
23             THE WITNESS:  There is no such thing as a
24   Coin-Exchange project.
25             MS. MARKOE:  It does not say the
```

Page 279

```
 1   Coin-Exchange project.
 2             MR. FREEDMAN:  Okay, we will take it with
 3   the court if you instruct him not to answer.  So, just
 4   choose if you will or not.
 5             MS. MARKOE:  I am not instructing him not
 6   to answer.  I am asking you ----
 7             MR. FREEDMAN:  I am not going to alter my
 8   questions any more.  The question is what it is.
 9             MR. RIVERO:  You have to give the court
10   reporter a break.  Again I am as guilty as everyone
11   else.
12             THE WITNESS:  I am starting to see smoke.
13   BY MR. FREEDMAN:
14        Q.   How did Craig Wright R&D provide the $30
15   million in capital to Coin-Exchange?
16             MS. MARKOE:  Objection.
17             THE WITNESS:  You would need to go to the
18   financial records and accounts of the companies.
19   BY MR. FREEDMAN:
20        Q.   Which companies?
21             MS. MARKOE:  Objection.
22             THE WITNESS:  Coin-Exch for a start.
23   BY MR. FREEDMAN:
24        Q.   Who has access to Coin-Exchange records?
25        A.   I do not know.
```

Page 280

```
 1        Q.   Sitting here today you have no idea
 2   whether or not Craig Wright R&D -- how Craig & Wright
 3   R&D provided the $30 million in capital to
 4   Coin-Exchange?
 5             MS. MARKOE:  Objection.
 6             THE WITNESS:  If you go through the
 7   records you will be able to track all that.
 8   BY MR. FREEDMAN:
 9        Q.   I do not have the records.  I am not
10   asking you for what is in the records.  I am asking you
11   for what you recollect.  Do you ----
12             MS. MARKOE:  Objection.  Vel do not
13   testify.
14   BY MR. FREEDMAN:
15        Q.   Are you sitting here today able to
16   recollect anything about how Craig Wright R&D
17   transferred $30 million in capital to Coin-Exchange?
18             MS. MARKOE:  Objection.
19             THE WITNESS:  I instruct people to do
20   things.  Things happened.
21   BY MR. FREEDMAN:
22        Q.   Did you instruct someone to transfer?
23             MS. MARKOE:  Objection.  You can answer.
24             THE WITNESS:  I would need to look at the
25   records.
```

Page 281

```
 1   BY MR. FREEDMAN:
 2        Q.   Sitting here today, you do not know
 3   whether that 30 million was provided?
 4             MS. MARKOE:  Objection.
 5             THE WITNESS:  That is not what I said.
 6   You are again misstating what I said.  I said all of
 7   this had been completed, the company had been set up.  I
 8   do not know the exact process off the top of my head.  I
 9   do not try and remember my finances.  I instruct people
10   to do things.  They get paid.  I instruct my lawyers to
11   get paid.  Magic happens, they get paid.
12   BY MR. FREEDMAN:
13        Q.   Was the $30 million provided in cash or
14   in Bitcoin?
15             MS. MARKOE:  Objection.
16             THE WITNESS:  Again, I would need to look
17   at the accounts.  I do not know the breakdown of what
18   the capital per company was.
19   BY MR. FREEDMAN:
20        Q.   Can you take a look at 8(e) for me.
21        A.   Yes.
22        Q.   Let me know when you are familiar with
23   it.
24        A.   I am fine with it.
25        Q.   This indicates that the ASIC mining
```

**MAGNA ►**
LEGAL SERVICES

Page 282

1  hardware will be returned with this transfer.  You told
2  me Craig Wright R&D did not provide it?
3          MS. MARKOE:  Objection.
4          THE WITNESS:  I do not know what happened
5  with companies.  You are asking whether I did.  Return
6  can be taken in many ways.  It could be returned to
7  other people or myself.  I do not really care.  I did
8  not get, it was never given back, and if you notice "at
9  a site known to Mr. Kleiman," who died before anything
10  occurred.  Unfortunately, post his death Mr. Kleiman was
11  not forthcoming in giving up that information.
12  BY MR. FREEDMAN:
13      Q.    So, sitting here today, do you know
14  whether or not Craig Wright R&D provided Mr. Kleiman
15  with ASIC mining hardware?
16          MS. MARKOE:  Objection: asked and
17  answered.  You may answer.
18          THE WITNESS:  I do not know.  I do not
19  look at the records of companies.  I do not believe so.
20  And I do not believe that "returned" means what you are
21  saying it does.  And I think you are miscategorising the
22  contract.
23  BY MR. FREEDMAN:
24      Q.    Can you explain to me what 8(f) means?
25      A.    "Solutions to the Agent and Merkle tree

Page 283

1  problems development by Professor David Reese."  It is
2  saying the vendors shall deliver up and it means that
3  certain problems to do with agent-based software and
4  Merkle tree problems, which are mathematical constructs
5  that can be put into code, that had originally been
6  worked on by David Reese and were to be formulated into
7  code, David Reese having written these, not so much the
8  -- it was -- I think the language was CoCo if I remember
9  it right.  Dr. Reese or Professor Reese had created
10  software in mathematics in a language earlier called
11  CoCo.  CoCo was a horrendous, awful, awful piece of --
12  I will not even go there -- that needed to be changed
13  into something usable and constructed into software
14  that could actually be deployed.  There are a number of
15  interesting things that can be done with Merkle trees.
16  So, the solutions would be taking something that
17  Dr. Reese had developed around 2004, back when he was a
18  lot, sharper, I am not trying to sound mean or anything
19  like that, but he was old at the end, and then taken by
20  others and constructed into software.
21          MS. MARKOE:  I think the court reporter
22  needs a break.
23          MR. FREEDMAN:  Let us take a break.
24          THE VIDEOGRAPHER:  Going off the record.
25  The time is 17.55.  End of video card number 5, volume

Page 284

1  1, in the video deposition of Dr. Craig Wright.
2          (A Short Break)
3          THE VIDEOGRAPHER:  This is the beginning
4  of video card number 6, volume 1, in the video
5  deposition of Dr. Craig Wright.  Going on the record.
6  The time is 18.08.  Thank you.
7  BY MR. FREEDMAN:
8      Q.    Dr. Wright, before the break we were
9  looking at Plaintiff's Exhibit 6.  Can you look at page
10  6.  I am looking at 8(g) at the very bottom.
11          MS. MARKOE:  That is 6 at the top, for
12  the record.
13  BY MR. FREEDMAN:
14      Q.    Can you read that sentence for me.
15      A.    "Bitcoin agent software and suit of
16  C/C++/C# and Python Blockchain software source codes."
17      Q.    Did you receive these?
18      A.    I already had those.
19      Q.    Why were they included in the contract,
20  then?
21          MS. MARKOE:  Objection.  You may answer,
22  if you know.
23          THE WITNESS:  Because, quite simply, the
24  fact that you own -- so you have a copy of source code
25  does not mean that you own copy of source code.

Page 285

1  BY MR. FREEDMAN:
2      Q.    Doctor, I would like to talk you a little
3  bit about Ms. Uyen Nguyen.  Do you know who I am
4  referring to when I say that?
5      A.    I do.
6      Q.    How did you first meet or come to know
7  Ms. Nguyen?
8          MS. MARKOE:  Objection.  You can answer.
9          THE WITNESS:  I do not remember when
10  I first met her.  I came to know her because she tracked
11  me down way back.  I cannot remember exactly when.  Like
12  2011, 2012.  Because of my background and history in
13  information security, she wanted to learn from myself
14  and Dave.  She knew about all of the courses I have done
15  with SANS, all of the publications I had been doing, and
16  came to the belief that I was Satoshi.
17  BY MR. FREEDMAN:
18      Q.    Ms. Nguyen deduced on her own that you
19  were Satoshi?
20          MS. MARKOE:  Objection.  Again you are
21  going beyond the scope.  Please tell me what topic it is
22  that you are referring to.
23          MR. FREEDMAN:  I am trying to determine a
24  relevant witness and what her knowledge is.
25          MS. MARKOE:  That is not within the

MAGNA ▶
LEGAL SERVICES

Page 286

1    scope.  The scope of number 1, which is the one that you
2    are referring to: "The location and existence of
3    documents along with the identification of witnesses,
4    including information about their whereabouts, and roles
5    in the subject matter of the pleadings."
6            MR. FREEDMAN:  Roles in the subject
7    matter of the pleadings.
8            MS. MARKOE:  So, let me see the question.
9    (Pause) Fine, you can answer that one.  I am going to
10   give you some limited scope here, but let us keep it
11   tight everyone.
12           THE WITNESS:  Can you ask that again,
13   please.
14   BY MR. FREEDMAN:
15       Q.   Sure.  Did Ms. Nguyen determine on her
16   own that you were Satoshi?
17           MS. MARKOE:  Objection.  You can answer.
18           THE WITNESS:  I do not know.
19   BY MR. FREEDMAN:
20       Q.   When did she first meet -- sorry, when
21   did she first come to know Dave Kleiman?
22           MS. MARKOE:  Objection.  You can answer
23   if you know.
24           THE WITNESS:  I do not know.
25   BY MR. FREEDMAN:

Page 287

1        Q.   You said she reached out to you and Dave
2    Kleiman in 2011 or 2012?
3            MS. MARKOE:  Objection.
4            THE WITNESS:  Yes.
5    BY MR. FREEDMAN:
6        Q.   How did she reach out to you both?
7            MS. MARKOE:  Objection.
8            THE WITNESS:  I am not trying to sound
9    rude, but the only way to put it she cyberstalked me.
10   BY MR. FREEDMAN:
11       Q.   Can you drill down on that a little bit?
12       A.   Cyberstalking is well developed as a sort
13   of discipline.  She followed me on every bit of social
14   media, e-mailed me a lot, kept asking and talking about
15   what I was doing.  Asked lots of questions.
16       Q.   Did Ms. Nguyen have a role in W&K?
17       A.   W&K is not my company.  I cannot talk
18   about W&K.
19       Q.   So you are not aware of any role she
20   played with W&K?
21           MS. MARKOE:  Objection: mischaracterises
22   his testimony.
23   BY MR. FREEDMAN:
24       Q.   Are you aware of any role she played with
25   W&K?

Page 288

1        A.   I believe she was a director.
2        Q.   Was Ms. Nguyen ever appointed as a
3    director of any of your companies?
4        A.   I believe so.
5            MS. MARKOE:  Objection.
6    BY MR. FREEDMAN:
7        Q.   Which companies?
8        A.   I would need to look at the records.
9        Q.   Sitting here today, you are not aware
10   which companies she was a director of?
11           MS. MARKOE:  Objection.
12           THE WITNESS:  I have no idea what the
13   directorships of each of my companies were multiple
14   years ago.  I do not know what the directorship of
15   nChain is today.
16   BY MR. FREEDMAN:
17       Q.   Did Ms. Nguyen ever become a trustee for
18   you?
19           MS. MARKOE:  Objection.
20           THE WITNESS:  In what sense?
21   BY MR. FREEDMAN:
22       Q.   Was she ever a trustee that you were --
23   strike that.  Was she ever the trustee over a trust that
24   you were the beneficiary of?
25       A.   What sort of trust are we talking about?

Page 289

1        Q.   Any.
2        A.   Then yes.
3        Q.   Can you tell me what that trust was
4    about?
5            MS. MARKOE:  Objection.  You can answer.
6            THE WITNESS:  That trust was holding a
7    number of slices of early Bitcoin keys.
8    BY MR. FREEDMAN:
9        Q.   Does that mean that it controlled
10   Bitcoin?
11           MS. MARKOE:  Objection.
12           THE WITNESS:  Nobody controls Bitcoin.
13   BY MR. FREEDMAN:
14       Q.   Does that mean it owned Bitcoin?
15           MS. MARKOE:  Objection.
16           THE WITNESS:  No, that does not mean it
17   owned Bitcoin.
18   BY MR. FREEDMAN:
19       Q.   What was the name of the trust?
20       A.   Which trust?
21       Q.   How many was Uyen a trust on?
22       A.   I do not know.
23       Q.   How many are you aware of her being a
24   trustee on?
25       A.   At least one.

**MAGNA**
LEGAL SERVICES

Page 290

```
1        Q.    What is the name of that trust?
2        A.    There was a trust called the Tulip Trust.
3        Q.    Is that trust no longer in existence?
4        A.    The trust was formalised early on and is
5   not the informal thing from 2011.
6        Q.    I am not following.  When was the
7   Tulip Trust created?
8        A.    2011.
9        Q.    Who created it?
10       A.    Me.
11       Q.    Who were the trustees when you created
12  it?
13       A.    I do not remember.  I would need to look
14  at the document.
15       Q.    Where are the documents?
16       A.    I do not have the documents.
17       Q.    Who has the documents?
18       A.    I do not know.
19       Q.    Who were the beneficiaries of the
20  Tulip Trust in 2011?
21       A.    I do not have the document.  I cannot
22  answer that.
23       Q.    What assets were controlled by the
24  Tulip Trust in 2011?
25       A.    Companies that I hold overseas, such as
```

Page 291

```
1   Wright International Investments that I founded in 2009,
2   and Tulip Trading.
3        Q.    What is Tulip Trading?
4        A.    It is a company.
5        Q.    So, when it was founded in 2011, it never
6   controlled the rights to any Bitcoin?
7             MS. MARKOE:  Objection: vague.
8             THE WITNESS:  That is not what I said.
9   The rights ----
10  BY MR. FREEDMAN:
11       Q.    How did -- sorry, go ahead.
12       A.    The rights to Bitcoin and controlled are
13  different.  You are mixing all your bits and pieces,
14  yes.
15       Q.    Did the Tulip Trust own any Bitcoin at
16  any point from 2011 until 2013?
17       A.    The trust does not own generally.  A
18  trust holds in trust.
19       Q.    I do not want to get into an argument
20  with you about the structure of trusts, I am just trying
21  to get to the bottom of, did the trust have control over
22  Bitcoin?
23       A.    Which Bitcoin?
24       Q.    Any Bitcoin.
25       A.    Yes.
```

Page 292

```
1        Q.    How much Bitcoin did the trust control
2   between 2011 and 2013?
3             MS. MARKOE:  Objection.  Where is this
4   related to the scope of this deposition?
5             MR. FREEDMAN:  Ms. Nguyen is a trustee of
6   the trust and we are authorised under number 6:
7   "Inquiry into the scope of knowledge and information
8   possessed by the individuals."  So, I am trying to
9   determine what her scope of knowledge was.
10            MS. MARKOE:  Her scope of knowledge is
11  not related to how much Bitcoin the trust controlled.
12  If you would like to ask, do you know if Ms. Nguyen
13  knows how much Bitcoin the trust controlled, you can ask
14  that question and he can answer that question.  However,
15  I will instruct him not to answer the question as asked.
16            MR. FREEDMAN:  You instruct how you need
17  to instruct.
18       Q.    Was Dave Kleiman ever involved with the
19  Tulip Trust?
20            MS. MARKOE:  Objection.  You may answer.
21            THE WITNESS:  Dave Kleiman was not
22  involved in the Tulip Trust as it is.  What you are
23  trying to get at was because I asked him to hold
24  documents for a while does that make him part of the
25  trust.  Dave was never a beneficiary of the trust.  Dave
```

Page 293

```
1   never put money into the trust.  Dave never had any
2   Bitcoin in the trust.  Dave never mined any Bitcoin that
3   had anything to do with the trust.  None of the Bitcoin
4   was ever involved with any mining in the US.  No Bitcoin
5   was post 2010 from that trust.  No company Dave owned
6   was involved with the trust.  No shares Dave owned was
7   involved with the trust.  Nothing Dave owned was
8   involved with the trust.  Dave had no rights to the
9   trust, no ownership of the trust, no knowledge of the
10  set-up of the trust.  He did not know about the
11  companies in the trust.  He did not know about Wright
12  International Investments that I set up in 2009.  Dave
13  did not know about any of those details.  Dave was asked
14  simply to hold a part of some documents and keys that
15  were split using Shamir's Secret Sharing scheme so that
16  he did not even know what he was actually holding.
17            MS. MARKOE:  Can you spell Shamir's for
18  the court reporter, please.
19            THE WITNESS:  S-H-A-M-I-R-S.
20  BY MR. FREEDMAN:
21       Q.    Did you put Bitcoin into the trust in
22  2011?
23            MS. MARKOE:  Objection.  You may answer.
24            THE WITNESS:  I founded the trust.
25  BY MR. FREEDMAN:
```

MAGNA
LEGAL SERVICES

Page 294

1    Q.    Did you put Bitcoin into the trust in
2  2011?
3        MS. MARKOE: Objection.
4        THE WITNESS: No.
5  BY MR. FREEDMAN:
6    Q.    Did you put Bitcoin into the trust in
7  2012?
8        MS. MARKOE: Objection.
9        THE WITNESS: No.
10  BY MR. FREEDMAN:
11    Q.    Did you ever put Bitcoin into the trust?
12        MS. MARKOE: Objection.
13        THE WITNESS: No.
14  BY MR. FREEDMAN:
15    Q.    Did anyone ever put Bitcoin into the
16  trust?
17        MS. MARKOE: Objection.
18        THE WITNESS: No.
19  BY MR. FREEDMAN:
20    Q.    Did the Tulip Trust ever come to hold
21  private keys to Bitcoin wallets?
22    A.    No.
23    Q.    Did it ever come to own or possess
24  private keys to Bitcoin addresses?
25    A.    No.

Page 295

1    Q.    What is the relationship between the
2  Tulip Trust and Bitcoin?
3        MS. MARKOE: Objection. Again, where are
4  we on the topics?
5        THE WITNESS: What the hell does that
6  question even mean?
7        MR. FREEDMAN: We are permitted to
8  enquire into Dr. Wright's companies.
9        THE WITNESS: That is not a company.
10        MR. RIVERO: Hold on, Dr. Wright. Tell
11  us what topic or tell us where in the transcripts
12  because we can review the transcript.
13        MR. FREEDMAN: Number 10.
14        MS. MARKOE: Number 10? Can you point
15  out where the Tulip Trust is referenced in the exhibits
16  that are referenced in topic 10? It could be there.
17  I just do not recall.
18        MR. FREEDMAN: We just do not have time,
19  so I guess you are going to instruct him not to answer?
20        MR. RIVERO: If we do not get some
21  connection ----
22        MR. FREEDMAN: The court has authorised
23  us. I do not know which number it is because I do not
24  have it in front of us. I believe Ms. Markoe has been
25  at many hearings where the court has authorised us to

Page 296

1  enquire into -- let me finish -- Dr. Wright's various
2  entities and trusts. Specifically at the last hearing
3  he authorised us to do because Ms. Markoe refused to
4  turn over a compilation of those entities on
5  work-product grounds and he specifically authorised me
6  to enquire into the trust and companies.
7        MR. RIVERO: With respect ----
8        MS. MARKOE: Right, but ----
9        MR. RIVERO: Let me please address.
10  Counsel today has referred to a rule that does not
11  exist. He has referred to it without a number. Now he
12  refers to transcripts without a certain page number.
13  I have been reviewing transcripts. I do not find the
14  reference. Unless there is a basis, the instruction is
15  do not answer. Let us move on to the next question.
16        MR. FREEDMAN: We will just move on. We
17  will raise it with the court.
18  (Plaintiff's Exhibit 7 marked for identification)
19        MR. FREEDMAN: For the record,
20  Mr. Rivero, you can look this over later, but just so
21  the record reflects, it is at the last hearing,
22  transcript pages 55 and 56, and I will give you the ----
23        MR. RIVERO: I have the transcript.
24        MR. FREEDMAN: It is for your own
25  knowledge and for the record, we can look at it and

Page 297

1  discuss it later.
2        MR. RIVERO: Now you have identified a
3  page I will review it and we will come back to it.
4        MR. FREEDMAN: We will return to it.
5        MR. RIVERO: Yes.
6  BY MR. FREEDMAN:
7    Q.    Dr. Wright, do you recognise Plaintiff's
8  Exhibit 7 which has been just marked and placed before
9  you?
10    A.    I recognise two documents joined
11  together, yes.
12    Q.    What are the two documents that are
13  joined together?
14    A.    You have deed of loan as a front page.
15  Page 1 of 7, 2 of 7, 3 of 7, 4 of 7, 5 of 7, 6 of 7 of a
16  document, and then page 7 of 7 of a separate document.
17  So, potentially two, if not three, documents, put
18  together as one.
19    Q.    Page 7 of 7 belongs to what document?
20    A.    Not this one.
21    Q.    Do you know what document it does belong
22  to?
23    A.    I would need to look at records. I do
24  not know.
25    Q.    Looking at the first six pages, which you

MAGNA
LEGAL SERVICES

Page 298

1    say are one document; is that correct?
2        A.    The first six pages, you mean not the
3    first six, but the cover page does not have a thing, and
4    then that starts at page 1. So, page 2, which is on
5    here as page 3 of 10, page 4 of 10, page 5 of 10, page 6
6    of 10, page 7 of 10, and page 8 of 10 are parts of the
7    same document that is not complete.
8        Q.    Sitting here today you have no idea what
9    page 9 of 10 document is -- strike that. Sitting here
10   today you have no idea what page 9 of 10 -- strike that
11   again. Sitting here today you have no idea what
12   document page 9 of 10 belongs to; is that correct?
13       A.    That is not what I said.
14       Q.    What document does page 9 of 10 belong
15   to?
16       A.    A different document that is not this
17   one.
18       Q.    Which document?
19       A.    I do not have documents in front of me.
20   I cannot match them.
21       Q.    So, sitting here today you do not know
22   what that document -- what that page -- what document
23   that page belongs to?
24       A.    I cannot match them, no, and page 10 of
25   10 is a separate document as well. You will notice no

Page 299

1    page numbers or anything like that, so that is also out
2    of -- so there are possibly four documents constructed
3    into one.
4        Q.    Who has all the originals of these
5    documents?
6        MS. MARKOE:  Objection.
7        THE WITNESS:  I do not know.
8    BY MR. FREEDMAN:
9        Q.    Do you have the originals of these
10   documents?
11       A.    Unless my lawyers have gone through and
12   found things in boxes, then I do not know.
13       Q.    Does Ms. Nguyen have the originals of
14   this document?
15       MS. MARKOE:  Objection.
16       THE WITNESS:  I do not know what
17   Ms. Nguyen has. I have not spoken to Ms. Nguyen in
18   three plus years.
19   BY MR. FREEDMAN:
20       Q.    Can you look at page 9 of 10.
21       A.    Yes.
22       Q.    There is a signature at the bottom; is
23   that your signature?
24       A.    Yes.
25       Q.    And there is a signature above that; is

Page 300

1    that Ms. Nguyen's signature?
2        A.    I believe so.
3        Q.    The handwriting on the right-hand side of
4    all the Bitcoin wallets listed there, whose handwriting
5    is that?
6        A.    That looks like mine.
7        Q.    Do you recognise what this appendix list
8    of Bitcoin is?
9        MS. MARKOE:  Objection. Answer if you
10   can.
11       THE WITNESS:  I think you are confounding
12   two different things. There is a random note talking
13   about wallets and a set of addresses. Where I talk
14   about wallets, wallets are files, computer files,
15   etcetera, so you have done a typical error that most
16   people do in calling Bitcoin addresses wallets. So, you
17   have taken two completely separate things, because
18   I have this habit of writing wherever the hell I feel
19   like it, usually over documents people complain that
20   I write on, because I write notes whenever I feel like
21   writing notes, and saying that they are related.
22   BY MR. FREEDMAN:
23       Q.    So, is it your testimony here today that
24   the note in your handwriting on the right-hand side of
25   this document is completely unrelated to the list of

Page 301

1    Bitcoin block addresses on the left-hand side of the
2    document?
3        MS. MARKOE:  Objection.
4        THE WITNESS:  I cannot say what it is.
5    It is all wallets, and then there is a list of
6    addresses. They are two different things. I have made
7    a note. I would need to look at records to be able to
8    match up what that was. I have left myself a note at
9    some point. I cannot necessarily say what my note was.
10   BY MR. FREEDMAN:
11       Q.    Do you have those records that you could
12   look that up?
13       MS. MARKOE:  Objection. You can answer.
14       THE WITNESS:  My lawyers have all the
15   records I have. If anything is in there that goes to
16   further, then that would be there.
17   BY MR. FREEDMAN:
18       Q.    Did you have counsel help you draft this
19   document?
20       MS. MARKOE:  Objection. He has already
21   testified that this appears to be a compilation of
22   multiple documents that were put together in error.
23   BY MR. FREEDMAN:
24       Q.    Did counsel help you draft page 9 of the
25   document?



Page 302

1        MS. MARKOE: Objection. Answer if you
2    can.
3        THE WITNESS: There is no page 9 of the
4    document. This is a compilation of multiple documents.
5    BY MR. FREEDMAN:
6        Q. Exhibit. Did counsel help you draft page
7    9 of the exhibit?
8        MS. MARKOE: He is referring to page 9 at
9    the top.
10       THE WITNESS: By "counsel", do you mean
11   my lawyers?
12   BY MR. FREEDMAN:
13       Q. Yes.
14       A. Possibly. I had lists of different
15   addresses done by lawyers at different times.
16       Q. Which lawyers created lists of different
17   addresses?
18       MS. MARKOE: Objection. You can answer.
19       THE WITNESS: I do not know which lawyers
20   produced different lists at different times. I have had
21   more lawyers than birthdays!
22   BY MR. FREEDMAN:
23       Q. Can you list all the lawyers that you
24   have had that helped you draft lists of Bitcoin
25   addresses?

Page 303

1        MS. MARKOE: Objection. You can answer,
2    to the extent you remember.
3        THE WITNESS: That would be Clayton Utz.
4    There would be M & K. There would be the split off from
5    M & K that I cannot remember the name of -- one of the M
6    & K partners split off and formed his own firm -- and
7    I used both those firms. There would be High Secured.
8    There would be -- I should remember the name. The most
9    famous law firm in Panama that got into the Panama
10   papers, I used them too.
11   BY MR. FREEDMAN:
12       Q. Do you recall the name?
13       A. No, I do not. I should do, because it
14   was a big thing of discussion including everyone, and
15   I think I blocked it out of my mind because of that.
16   There were more law firms than I care to remember.
17       Q. Can you tell me what you meant by your
18   handwritten note: "As agreed. All wallets ..." What
19   do you mean "All wallets"?
20       MS. MARKOE: Objection. You can answer.
21       THE WITNESS: "All wallets" means all
22   wallets, as in files, computer files, or other such
23   things, that hold Bitcoin.
24   BY MR. FREEDMAN:
25       Q. And you say "As agreed". Agreed with

Page 304

1    who?
2        A. I would need to look at the rest of the
3    document. I am not going to speculate what a page out
4    of a mysterious document, where this is page 7 of 7 that
5    has been attached incorrectly to a different document,
6    means.
7        Q. So, sitting here today you do not recall
8    what "As agreed" means; is that correct?
9        MS. MARKOE: Objection: mischaracterises
10   his testimony.
11       THE WITNESS: I understand what
12   "As agreed" means.
13   BY MR. FREEDMAN:
14       Q. You do not recall who the agreement was
15   made with?
16       A. This is a note written on a thing that
17   may or may not have any relationship to the original
18   document, that I have one page of addresses, that I do
19   not memorise all the addresses from, that has been
20   constructed between four other documents and handed to
21   me.
22       Q. And: "... held in UK in trust ..." Are
23   you aware, sitting here today, of moving wallets to be
24   held in a UK trust?
25       MS. MARKOE: Objection. Answer if you

Page 305

1    can.
2        THE WITNESS: No UK trust was ever set
3    up.
4    BY MR. FREEDMAN:
5        Q. Can you go to page 2 of 10 for me at the
6    top.
7        A. Yes.
8        Q. Do you see where it says the last party,
9    Denariuz Seychelles Trust?
10       A. Yes.
11       Q. Who are the trustees of this trust?
12       A. I do not know.
13       Q. Who are the beneficiaries of this trust?
14       A. Another trust.
15       Q. What is the trust's name that is a
16   beneficiary?
17       A. I would need to look at records.
18       Q. Do you have those records?
19       A. Not on me.
20       Q. Have you given those records to your
21   lawyers?
22       A. I have a box of -- well, actually, I had,
23   I do not know how many boxes. There were many, many
24   boxes that they spent many days going through, and if it
25   is in there, it would be there.

**MAGNA**
LEGAL SERVICES

Page 306

1      Q.    And if it is not there?
2      A.    When things get closed down, the
3   requirement is for Australian records to be kept for a
4   number of years afterwards and British records to be
5   kept for a number of years afterwards. The Seychelles
6   records requirement is under a year, and once anything
7   hits a period of one year, and the Seychelles trust is
8   no more, it goes the way of anything that is no longer
9   needed to be held, which generally means the shredder.
10     Q.    The Denariuz Seychelles Trust, does it no
11  longer exist?
12     A.    It no longer exists.
13     Q.    When did it cease to exist?
14     A.    Probably around December 2013.
15     Q.    And the wallet existed, what assets did
16  it hold?
17     A.    Again, I could not answer that.
18           MS. MARKOE:  Objection.
19  BY MR. FREEDMAN:
20     Q.    So, sitting here today, you have no idea
21  what assets the Denariuz Seychelles Trust held?
22     A.    Sitting here today, I could not answer
23  what assets the companies I founded hold.
24     Q.    Okay.  At the top, "Design by Human Ltd"?
25     A.    Yes.

Page 307

1      Q.    What is this?
2            MS. MARKOE:  Objection.  You can answer.
3            THE WITNESS:  It is a company name.
4   BY MR. FREEDMAN:
5      Q.    Was it a trust?
6      A.    It is a company.
7      Q.    Did it ever change its name?
8      A.    You have already covered that one.  Yes,
9   Design by Human had changed its name.
10     Q.    To?  What did it change its name to?
11     A.    Again, I do not remember which one is
12  which.  We covered that as well.  I do not remember
13  which particular one changed its name to C01N or
14  Denariuz, so I would need the records to check those
15  facts, otherwise I will be saying it changed to C01N
16  when in fact it changed to Denariuz and I will get it
17  wrong, and I do not want to do that.
18     Q.    Dr. Wright, you keep saying you checked
19  the records but then tell me that you do know where the
20  records are.  What would you do if you needed to figure
21  this information out?
22     A.    I do not need to figure this information
23  out.
24     Q.    Why not?
25           MS. MARKOE:  Objection.  You can answer.

Page 308

1            THE WITNESS:  Because we are talking
2   about companies that have been liquidated and no longer
3   need to hold records.
4   BY MR. FREEDMAN:
5      Q.    The assets held by the Denariuz
6   Seychelles Trust where are they currently held?
7            MS. MARKOE:  Objection.
8            THE WITNESS:  Again, I do not even know
9   where the current assets of my current things that
10  I have founded happen to be right now.  So you are
11  asking me when I do not know my current company, and
12  what it holds in four continents, where did this other
13  trust that has now gone years ago, where does it have
14  assets that you cannot even tell me what they are.
15  BY MR. FREEDMAN:
16     Q.    Under this trust document, Dr. Wright,
17  you are entitled to borrow 650,000 Bitcoin; is that
18  right?
19           MS. MARKOE:  Objection.
20           THE WITNESS:  Which trust document?
21  There is no full document here.
22  BY MR. FREEDMAN:
23     Q.    Sorry, I misspoke.  I strike that.  Under
24  this deed of loan you are entitled to borrow up to
25  650,000 Bitcoin; is that correct?

Page 309

1      A.    The partial deed of loan, yes.
2      Q.    Did you in fact borrow 650,000 Bitcoin?
3            MS. MARKOE:  Objection.
4            THE WITNESS:  How does this relate to
5   anything, sorry?
6   BY MR. FREEDMAN:
7      Q.    Dr. Wright, please answer the question
8   unless you are instructed otherwise by your counsel.
9      A.    I did not borrow 650,000 Bitcoin.
10     Q.    How much did you borrow?
11           MS. MARKOE:  Objection.
12           THE WITNESS:  I do not know how much
13  I actually borrowed.
14  BY MR. FREEDMAN:
15     Q.    To take these loans, did you have to
16  communicate with Ms. Nguyen?
17     A.    No.
18     Q.    Who was the one who you spoke to in order
19  to take the loans?
20     A.    I do not remember his last name.  He
21  worked for a company called High Secured.  His first was
22  Mark.
23     Q.    Was it Mark Ferrier?
24     A.    No.  He had nothing to do with anything
25  in Panama, nor did he have anything to do with High

Page 310

1   Secured.
2       Q.   Can you go to page 7 of 10 for me.
3            MS. MARKOE:  At the top again for the
4   record.
5            MR. FREEDMAN:  Yes, at the top, thank
6   you.
7            THE WITNESS:  Yes.
8   BY MR. FREEDMAN:
9       Q.   Do you see the reference at the bottom to
10  Permanent Success Limited?
11      A.   Yes.
12      Q.   What was Permanent Success Limited?
13      A.   A company.
14      Q.   Was it related to a trust in any way?
15      A.   I do not know.
16      Q.   Can you let me know what it says at the
17  bottom there, "and all related trusts"; what does that
18  mean?
19           MS. MARKOE:  Objection.
20           THE WITNESS:  It means any related
21  trusts.
22  BY MR. FREEDMAN:
23      Q.   Were there trusts related to Permanent
24  Success Limited?
25           MS. MARKOE:  Objection: rule of

Page 311

1   completeness.
2            MR. FREEDMAN:  You can answer.
3            THE WITNESS:  I do not know.  I cannot
4   take part of a document, and part of other things, and
5   incomplete records and then construct everything you
6   expect me to know.  As I have stated before, I do not
7   know the structure of BITC or nChain or nChain Holdings
8   or any other company that exists right now, so I cannot
9   actually even tell you what I have now, and yet you are
10  saying, "What happened years ago?"
11  BY MR. FREEDMAN:
12      Q.   Do you have any way of contacting Mark
13  from High Secured?
14      A.   He is in a federal penitentiary in the
15  USA.
16      Q.   Which federal penitentiary?
17      A.   I do not know.  I did not follow his
18  case.
19      Q.   Is there a way you can determine his last
20  name and let us know what it is later?
21           MS. MARKOE:  Objection.
22           THE WITNESS:  You can do searches on High
23  Secured.  There is this thing called Google.  You go
24  into this task bar, you type in "High Secured", and
25  search.

Page 312

1   BY MR. FREEDMAN:
2       Q.   Did you pay back the loans that you took
3   under this deed of loan?
4            MS. MARKOE:  Objection.  You may answer.
5            THE WITNESS:  None of your God damn
6   business.  This has nothing to do with anything there.
7   Does it say that it has to be paid back?  Does it say
8   what it is?  You are asking about the management of a
9   trust that has no relationship to Mr. Kleiman, no
10  relationship to a company Dave Kleiman has worked for,
11  no relationship to anyone who has ever been in the USA
12  as a resident or a citizen at any point in human
13  history, no relationship to anyone who has been in North
14  America from Mexico up in human history, that entire
15  continent.  No person who has ever been anything to do
16  with residing or citizenship in that part of the world
17  has had anything at all to do with this trust, assets in
18  this trust, management of this trust, control of this
19  trust, etcetera.  And then you want me to talk about
20  incomplete records that have been constructed in bits
21  and chucked together from four different documents as if
22  this is real evidence.
23  BY MR. FREEDMAN:
24      Q.   Did you pay back the loans that you took
25  from under this deed of loan, Dr. Wright?

Page 313

1            MS. MARKOE:  Objection.  You can answer
2   if you can.
3            THE WITNESS:  I do not have any records
4   in front of me.  I do not have the rest of the records
5   for this, so ----
6   BY MR. FREEDMAN:
7       Q.   So?  Could you finish your response,
8   please.
9       A.   So when you can give me all the financial
10  records of things, I will answer against them.
11           MS. MARKOE:  Objection.  Okay, withdrawn.
12  I strike my own.
13  BY MR. FREEDMAN:
14      Q.   Do you go where Ms. Nguyen is now,
15  Dr. Wright?
16      A.   Earth.
17      Q.   Do you know where on earth she is?
18      A.   I am assuming land.
19      Q.   Dr. Wright, I would appreciate if you
20  would co-operate with me so we could get this done.  Do
21  you know the whereabouts of Ms. Nguyen?
22      A.   I stated earlier I have not had any
23  contact with Ms. Nguyen for over three years.  That
24  would generally mean I do not have any knowledge.  I can
25  restate in other forms if you want or I can be narky

1   about it.
2       Q.   Does Ms. Nguyen still maintain a trust
3   role in relation to companies that are related to you?
4           MS. MARKOE:  Objection.  You can answer.
5           THE WITNESS:  No.
6   BY MR. FREEDMAN:
7       Q.   She is no longer a trustee of any trusts
8   related to you?
9           MS. MARKOE:  Objection.  You may answer.
10          THE WITNESS:  That is what I just said.
11  BY MR. FREEDMAN:
12      Q.   When did she stop becoming a trustee of
13  trusts related to you?
14      A.   2015.
15      Q.   Did you help Ms. Nguyen disappear?
16          MS. MARKOE:  Objection.
17          THE WITNESS:  You are presuming that she
18  has disappeared.  I do not know.  You are asking me
19  about someone I have not had contact with.  My sister --
20  I have not had contact with my older sister in four
21  years.  She has not disappeared.  She is a hippy, and
22  I am a hypercapitalist.  We get on like oil, water,
23  petrol and a match.  But my mother would know so she has
24  not actually disappeared.
25  (Plaintiff's Exhibit 8 marked for identification)

1   BY MR. FREEDMAN:
2       Q.   Dr. Wright, I am handing you what has
3   been marked now as Plaintiff's Exhibit 8.  This is some
4   exchange of e-mails between you and Ira Kleiman; do you
5   recognise that?
6       A.   Yes.
7       Q.   Can you go to 3 of 5 of the document?
8       A.   Yes.
9       Q.   Do you see there at the bottom it says:
10  "1.)  GICSR Trust in Belize"?
11      A.   Yes.
12      Q.   Can you explain to me what the GICSR
13  trust in Belize is?
14      A.   It was a trust set up in Belize.
15      Q.   By whom?
16      A.   I do not know.
17      Q.   Why did you give this information to Ira?
18          MS. MARKOE:  Objection.
19  BY MR. FREEDMAN:
20      Q.   Why was this information relevant to Ira?
21          MS. MARKOE:  Objection.
22          MR. FREEDMAN:  You can answer.
23          THE WITNESS:  There was a person
24  I thought would be interested in Dave's past, which was
25  his father, who then put me onto Ira, who was a greedy

1   person who wished not to have shares that would vest
2   over a long time but instructed me to hide assets
3   because he would have to pay tax.  So, I stopped talking
4   to Ira because basically I had this fraud, con man,
5   trying to take money that he was not owed and trying to
6   hide things from the tax office in America and lying and
7   cheating and whatever else to make up things to try and
8   get more.
9   BY MR. FREEDMAN:
10      Q.   Dr. Wright, I do not understand how that
11  is related to my question, so let us try ----
12      A.   It is related perfectly well.
13      Q.   Let us try one more time.  Did Dave
14  Kleiman have anything to do with the GICSR trust in
15  Belize?
16      A.   Yes.
17      Q.   What was his relationship to the GICSR
18  trust in Belize?
19      A.   We organised putting information onto
20  computers because of it.
21      Q.   I am sorry, what type of information?
22      A.   This is, again, something we will need to
23  talk about with the judge.
24          MS. MARKOE:  Okay.  That is going to be
25  one of the in camera conversations.

1   BY MR. FREEDMAN:
2       Q.   Okay, Dr. Wright, are there  reasons ----
3       A.   What I will say is there a reason if you
4   look at the GICSR website that used to be up in the
5   past, it had Department of Homeland Security, NSA and
6   other things on the website.
7       Q.   Do you know Deborah Kobza from GICSR?
8           MS. MARKOE:  Can you spell that for the
9   court reporter.
10          MR. FREEDMAN:  D-E-B-O-R-A-H -- I could
11  not tell you.  K-O-B-Z-A, I think.
12          THE WITNESS:  Not personally.
13  BY MR. FREEDMAN:
14      Q.   Can you look at page 2 of 5, please.
15      A.   Yes.
16      Q.   Can you look at the message that comes
17  from Ira to you at March 2nd, 2014.  Can you read that
18  for the record?
19      A.   "From: '----'".
20      Q.   Dr. Wright, please just read the body of
21  the e-mail.
22      A.   "Just to clarify on thoughts from
23  previous e-mail... In one of the email exchanges between
24  Dave and you, he mentioned that you had 1 million
25  Bitcoins in the trust and since you said he has 300,000

Page 318

1   as his part I was figuring the other 700,000 is yours.
2   Is that correct?  Ira."
3        Q.   Can you read above that your response at
4   March 1st, 2014 at 3 p.m.?
5        A.   Mine.  "Around that.  Minus what was
6   needed for the company's use."
7        Q.   So, where is the 300,000 that belonged to
8   Dave?
9            MS. MARKOE:  Objection.  Can you tie that
10  to one your topics, please?
11           MR. FREEDMAN:  4: "The location and
12  duration of Dave, W&K and Craig's mining of Bitcoin from
13  2009 until 2013."
14           MS. MARKOE:  You are not talking about
15  mining now, you are talking about actual Bitcoin.  Those
16  are two separate topics.  This does not relate to number
17  4.
18           MR. FREEDMAN:  Okay, so either instruct
19  him not to answer or allow the question.
20           MS. MARKOE:  I am going to instruct him
21  not to answer.
22  BY MR. FREEDMAN:
23       Q.   Can you go down to the February 28th,
24  2014 e-mail.
25       A.   Mmm-hmm.

Page 319

1        Q.   You say:  "The trust Dave setup should
2   have around 300,000."  Do you see that?
3        A.   Yes.
4        Q.   Is that 300,000 Bitcoin?
5        A.   Yes.
6        Q.   Where is the trust Dave set up?
7        A.   Dave set up a series of trusts as well.
8   One was in Belize, which was not GICSR, he also had one
9   in Panama and companies in Costa Rica.
10       Q.   Do you have any information on who helped
11  him set those up?
12       A.   No.
13       Q.   Can you read the next sentence for me?
14       A.   "We moved everything offshore as a result
15  of my early fight with the Tax office.  This was back in
16  2011.  The BTC would be on a server on hard drive, just
17  the rights are overseas."
18       Q.   Here you say:  "We moved everything
19  offshore"?
20       A.   I use a royal "we" all the time, so if
21  you are taking "we", "we" rarely means, for me, multiple
22  people.  I talk.  As my lawyers keep instructing me,
23  stop saying "we".
24           MS. MARKOE:  Objection.
25           THE WITNESS:  I say "we" all the time.

Page 320

1            MS. MARKOE:  Do go into what we talked
2   about.
3            THE WITNESS:  Sorry.
4            MS. MARKOE:  Our conversations are
5   privileged.  And there is just a correction.
6            THE WITNESS:  I was not talking just
7   about you!
8            MS. MARKOE:  Nonetheless, any
9   conversations you have with lawyers are privileged, the
10  contents thereof.
11           MR. RIVERO:  Move to strike your client's
12  testimony.
13           MR. FREEDMAN:  Any move to just strike is
14  objected to.
15           MS. MARKOE:  Also, I would just like to
16  point out that there is an error in the transcript.  It
17  says "really means", and he said "rarely means".
18  BY MR. FREEDMAN:
19       Q.   So is it your testimony here today,
20  Dr. Wright, that when you used "we" here, you were
21  referring only to yourself?
22       A.   Independently Dave set up his own trust.
23       Q.   I am talking about your use of the word
24  "we".
25       A.   I am talking, and explaining this.

Page 321

1   I moved my things, Dave moved his things, independently.
2   We did not do it together.  It was a quick, flippant
3   e-mail to a con man who will take things out of context.
4   Basically, as this says, BTC would be on a server or
5   hard drive.  My suspicion is that it is the one Dave had
6   with him at nearly all time.
7        Q.   Can you go to page 4 for me.  Can you
8   look at, toward the bottom of the page, it says:  "Look
9   up Wotty - it is not a mistake"; do you see that?
10       A.   Yes.
11       Q.   What is Wotty?
12       A.   It is a word.
13       Q.   Why is it not a mistake?
14           MS. MARKOE:  Objection.
15           THE WITNESS:  What do you mean, why is it
16  not a mistake?
17  BY MR. FREEDMAN:
18       Q.   This is an e-mail that Dave Kleiman sent
19  to you; is that correct?
20       A.   That is what it appears to be.
21       Q.   Did you know what Dave Kleiman meant when
22  he wrote to you:  "Look up Wotty - it is not a mistake"?
23           MS. MARKOE:  Objection.  Answer if you
24  can.
25           THE WITNESS:  I am being told to look up

Page 322

1    the word "Wotty".
2    BY MR. FREEDMAN:
3        Q.    Did you know what Dave Kleiman meant when
4    he told you this?
5        A.    Yes, he asked me to look up the word
6    "Wotty."
7        Q.    Did you understand the implication of
8    what that meant?
9        A.    Yes, it meant I would go to probably
10   volume 20 of the Oxford greater dictionary.
11       Q.    Dr. Wright, I mean what Dave Kleiman
12   meant when he -- let me phrase it another way.  Why did
13   Dave Kleiman want you to look up the word "Wotty"?
14           MS. MARKOE:  Objection.  Answer if you
15   can.
16           THE WITNESS:  You are asking me why
17   someone else asked me to look up something.
18   BY MR. FREEDMAN:
19       Q.    Do you know?  If the answer is no, then
20   just say no.
21       A.    Because he did silly things like that and
22   so did I.  So, my suspicion is without looking it up and
23   trying to figure out, because I cannot remember what
24   Wotty actually is, I would need to look up the word
25   again and try and guess what he was saying.

Page 323

1           MR. FREEDMAN:  Can we take a five-minute
2    break.  I need a drink of water.
3           MS. MARKOE:  Sure.
4           THE VIDEOGRAPHER:  Going off the record.
5    The time is 18.50.
6           (A Short Break)
7           THE VIDEOGRAPHER:  This is the beginning
8    of video card number 7, volume 1, in the video
9    deposition of Dr. Craig Wright.  Going on the record.
10   The time is 19.05.  Thank you.
11   BY MR. FREEDMAN:
12       Q.    Dr. Wright, who is Ian Grigg?
13       A.    Ian Grigg is a person currently involved
14   with the cryptocurrency called EOS.
15       Q.    Have you ever met Ian Grigg?
16       A.    Yes.
17       Q.    Did Ian have any involvement in the
18   development of the Bitcoin protocol or the Satoshi
19   client?
20       A.    Involvement, as I said, is a big word.
21   Ian Grigg wrote a whole lot of things, like Ricardian
22   contracts.  I have used some of Ian Grigg's writings.
23   I have used contacts I got from Ian.  I have used other
24   such things.  Bitcoin was not developed because of Ian
25   but I used some of the things that Ian had published.

Page 324

1        Q.    Did you converse directly with Ian before
2    the public posting on the Satoshi client?
3           MS. MARKOE:  Objection, but you can
4    answer.
5           THE WITNESS:  I talked to Ian in the
6    '90s, which had nothing to do with Bitcoin.
7    BY MR. FREEDMAN:
8        Q.    Did you talk to Ian about -- strike that.
9    Was Ian aware that you were Satoshi Nakamoto?
10          MS. MARKOE:  Objection, foundation.
11          THE WITNESS:  I cannot state his state of
12   mind.
13   BY MR. FREEDMAN:
14       Q.    Did you reveal yourself as Satoshi
15   Nakamoto to Ian Grigg?
16          MS. MARKOE:  Objection.
17          THE WITNESS:  I did not reveal myself to
18   anyone.  It was revealed.
19   BY MR. FREEDMAN:
20       Q.    Did you tell Ian Grigg that you were the
21   creator of Bitcoin?
22          MS. MARKOE:  Objection.
23          THE WITNESS:  I did not tell anyone until
24   this year that I was the creator of Bitcoin.
25   BY MR. FREEDMAN:

Page 325

1        Q.    Do you know when Ian Grigg came to learn
2    that you were Satoshi Nakamoto?
3           MS. MARKOE:  Objection.
4           THE WITNESS:  Strike the last one.
5    I have talked to my wife, but that is a different
6    matter, and I have talked to Dave, so they are anyones,
7    but, I mean, outside of the people that we are not
8    talking about, generally, in public, I did not talk to
9    anyone.  Ian Grigg came to believe that some time on his
10   own.  I do not remember the exact timing of that.
11   I know I had been talking to him about Bitcoin before
12   all the outing, etcetera.  I do not know when he decided
13   that I was.
14   BY MR. FREEDMAN:
15       Q.    Do you know whether Ian Grigg knew Dave
16   Kleiman?
17       A.    I believe he did.  I do not know.
18       Q.    Do you know whether Ian Grigg and Dave
19   Kleiman had any direct correspondence?
20       A.    I do not know.  Dave was known by
21   practically everyone in the industry.
22       Q.    To your best knowledge, does Ian Grigg
23   have any personal knowledge concerning the use of the
24   Satoshi e-mail addresses?
25       A.    I do not know what Ian knows.  I have not

MAGNA ▶
LEGAL SERVICES

1    talked to Ian since he started bloody EOS.
2        Q.   When you first met Joseph Vaughn Perling,
3    did you introduce yourself as Satoshi Nakamoto?
4        A.   I do not remember what I said I was.
5    I used a number of silly pseudonyms in the past, Satoshi
6    being one of them, Toshi being another one, Toshi Gati
7    being another one.  Yes, I used a lot of Japanese
8    pseudonyms.
9        Q.   Did Mr. Vaughn Perling have any
10   involvement in the development of the Satoshi client?
11       MS. MARKOE:  Objection.
12       THE WITNESS:  I do not know what he did
13   online.  I believe he probably did.  He was very
14   interested in this.  He was one of the reasons that
15   I stayed secret as long as I did.
16   BY MR. FREEDMAN:
17       Q.   Mr. Vaughn Perling knew you were Satoshi
18   before the world did?
19       MS. MARKOE:  Objection.
20       THE WITNESS:  That is not what I said.
21   BY MR. FREEDMAN:
22       Q.   Did Mr. Vaughn Perling know you were
23   Satoshi Nakamoto before the world did?
24       MS. MARKOE:  Objection.
25       THE WITNESS:  I do not know.

1    BY MR. FREEDMAN:
2        Q.   Do you know whether Mr. Vaughn Perling
3    knows Uyen Nguyen?
4        MS. MARKOE:  Objection.
5        THE WITNESS:  I believe he does.
6    BY MR. FREEDMAN:
7        Q.   Do you know when they came to meet?
8        A.   I do not know that.
9        Q.   Do you know whether Mr. Vaughn Perling
10   knows about the Tulip Trust?
11       A.   I believe he does.
12       Q.   Is Mr. Vaughn Perling a trustee of the
13   Tulip Trust?
14       A.   No, he is not.
15       Q.   Is he a trustee of any trust related to
16   you?
17       A.   No.
18       Q.   Do you know a gentleman named G Mark
19   Hardy?
20       A.   G Mark Hardy?  The name is familiar.
21       Q.   Do you ever e-mail with him?
22       A.   If I have in the past, I do not any more.
23       Q.   Do you know whether G Mark Hardy is a
24   trustee of any trust related to you?
25       A.   He is not.  Oh, Mark Hardy he is from the

1    tax office.
2        Q.   No, this is a different Mark Hardy.  G
3    Mark Hardy I am talking about.
4        A.   G Mark Hardy?
5        Q.   Did Nick Szabo have any involvement in
6    the development of the Bitcoin protocol?
7        MS. MARKOE:  Objection.
8        THE WITNESS:  Nick Szabo ----
9    BY MR. FREEDMAN:
10       Q.   Let me clarify that though before, and I
11   do not mean that you used his prior work.  I mean, did
12   Nick Szabo have any direct involvement in the programing
13   of the Satoshi client?
14       MS. MARKOE:  Objection.  You can answer
15   if you can.
16       THE WITNESS:  Nick Szabo could not
17   program himself out of a wet paper bag if he was given
18   his children about to be hung and he had to save himself
19   by getting out of the wet paper bag, and having to type
20   a simple one-line C code.  He did not have anything to
21   do with Bitcoin.  He does not understand Bitcoin.  He
22   has no clue about what Bitcoin is, how it works or
23   anything more.  He is probably the most clueless guy who
24   has latched on to Bitcoin ever.
25   BY MR. FREEDMAN:

1        Q.   Am I understanding you correctly, that
2    Satoshi Nakamoto would have to have a deep understanding
3    of C computer language?
4        MS. MARKOE:  Objection.
5        THE WITNESS:  C++.
6    BY MR. FREEDMAN:
7        Q.   C++; is that correct?
8        A.   Yes.
9        MS. MARKOE:  Objection.
10   BY MR. FREEDMAN:
11       Q.   Did you ever e-mail with Jeff Garzik
12   about the Satoshi client?
13       A.   Yes.
14       Q.   Before it was released or after it was
15   released?
16       A.   I do not believe Jeff was e-mailed before
17   it was released.  I do not think he was on that list.
18       Q.   Did there come a time -- strike that.
19   Did Mr. Garzik learn you were Satoshi before the world
20   learned you were Satoshi?
21       MS. MARKOE:  Objection.
22       THE WITNESS:  I do not know.  I did not
23   ever tell him.
24   BY MR. FREEDMAN:
25       Q.   Did you ever discuss the amount of

MAGNA
LEGAL SERVICES

Page 330

1   Bitcoin you had with Mr. Garzik?
2         MS. MARKOE:  Objection.
3         THE WITNESS:  No.
4   BY MR. FREEDMAN:
5         Q.    Did you ever discuss the Tulip Trust with
6   Mr. Garzik?
7         A.    No.
8         MS. MARKOE:  Objection.
9   BY MR. FREEDMAN:
10        Q.    Did you discuss any trust with
11  Mr. Garzik?
12        A.    No.
13        Q.    Do you know whether Mr. Garzik and Dave
14  Kleiman had any direct communication between 2009 and
15  2013?
16        A.    Dave was on IRC groups that Jeff was on.
17  More than that, I could not say.
18        Q.    Have you ever met with Gavin Andresen?
19        A.    I have.
20        Q.    Did you ever speak with Gavin Andresen
21  about you being Satoshi Nakamoto?
22        MS. MARKOE:  Objection.  You can answer.
23        THE WITNESS:  I did.
24        MS. MARKOE:  Craig, just give me a minute
25  to object before you answer so we are not driving the

Page 331

1   court reporter crazy, please.
2         THE WITNESS:  Sorry, yes.
3   BY MR. FREEDMAN:
4         Q.    Did you ever discuss the amount of
5   Bitcoin that you have with Mr. Andresen?
6         MS. MARKOE:  Objection.  You may answer.
7         THE WITNESS:  No.
8   BY MR. FREEDMAN:
9         Q.    Did you ever discuss the Tulip Trust with
10  Mr. Andresen?
11        A.    I do not believe so.
12        Q.    Did you ever discuss any other trusts
13  with Mr. Andresen?
14        MS. MARKOE:  Objection.  You may answer.
15        THE WITNESS:  No, and I do not discuss my
16  trusts with anyone outside my family, unless I am
17  required to by law.
18  BY MR. FREEDMAN:
19        Q.    Do you know if Uyen Nguyen ever reached
20  out to Mr. Andresen?
21        MS. MARKOE:  Objection: foundation.
22        THE WITNESS:  No.
23  BY MR. FREEDMAN:
24        Q.    Do you know if she would have a reason to
25  reach out to Mr. Andresen?

Page 332

1         MS. MARKOE:  Objection:  foundation.
2         THE WITNESS:  I do not know.
3   BY MR. FREEDMAN:
4         Q.    Doctor, I want to direct your attention
5   the Australian Tax Office investigations.  How many
6   investigations were undertaken by the tax office of
7   yourself personally?
8         A.    I do not know.
9         Q.    How many investigations were undertaken
10  by the tax office of your companies?
11        A.    I do not know.
12        Q.    Are you -- let me rephrase that question.
13  How many investigations are you aware that the tax
14  office has conducted against yourself?
15        A.    I do not know.  I do not know.
16        Q.    And are you aware of how many
17  investigations the tax office has conducted against your
18  companies?
19        A.    No.  What I do know is, for instance, on
20  myself, they have taken me to court multiple times, and
21  multiple times they have been forced basically to
22  apologise.  Multiple times they have doctored records.
23  They have constructed records.  They have done anything
24  possible, since the time I told them about Bitcoin,
25  before it was called Bitcoin, to basically find

Page 333

1   something to get me on.  Because little things like
2   where I said Bitcoin means we do not need as many
3   auditors because it gets rid of fraud, means that they
4   do not like what it is.
5         Q.    Dr. Wright, you swore to the court in the
6   Southern District of Florida that you do not have any
7   Australian Tax Office documents; do you recall that?
8         A.    No, I do not.  Can you show me the
9   document.
10        MR. FREEDMAN:  Sure.  Let us take a
11  break.  I will go get it for you.
12        THE VIDEOGRAPHER:  Going off the record.
13  The time is 19.15.
14        (A Short Break)
15  (Plaintiff's Exhibit 9 marked for identification)
16        THE VIDEOGRAPHER:  Going back on the
17  record.  The time is 19.31.  Thank you.
18  BY MR. FREEDMAN:
19        Q.    Dr. Wright, before the break we were
20  discussing a sworn statement you submitted to the court,
21  and now you have what has been marked as Plaintiff's
22  Exhibit 9.
23        A.    I do.
24        Q.    If you would turn, please, to page 4.
25        A.    Page 4 of 7.

Page 334

1    Q.   Okay.  If you read for me ----
2        MS. MARKOE:  And that is at the top;
3    correct?
4    BY MR. FREEDMAN:
5        Q.   Do you recognise this as your sworn
6    statement?
7        A.   I do.
8        Q.   Do you recognise that at the very
9    beginning of this statement you swore:  "I, Craig
10   Wright, declare under penalty of perjury under the laws
11   of United States of America that the following is true
12   and correct"?
13       A.   I do.
14       Q.   And if you see on page 4 of this
15   document, paragraph 18, can you read that for me?
16       A.   Sorry, number 19?
17       Q.   Number 18.
18       A.   18.  "I have no documents in my
19   possession from any ATO investigation.  To the extent
20   that my attorneys have any documents from any ATO
21   investigation related to me, those documents would be
22   located in Australia."
23       Q.   So, Dr. Wright, here you have sworn that
24   you have no documents in your possession from any ATO
25   investigation; is that correct?

Page 335

1        A.   That is correct.
2        Q.   But that is not entirely true; is that
3    not right?
4        MS. MARKOE:  Objection.
5        THE WITNESS:  I am sorry, I object to the
6    fact personally that you are implying that I have
7    perjured myself or lied.  I do not have documents from
8    any ATO investigation at all.  I do not have them now;
9    I did not have them in the past.
10   BY MR. FREEDMAN:
11       Q.   Dr. Wright, are you aware that your
12   lawyers have produced documents from the Australian Tax
13   Office investigation that they collected from your
14   house?
15       MS. MARKOE:  Objection.
16       THE WITNESS:  No, they have corporate
17   documents and e-mails back and forwards from the ATO.
18   You are saying that I have investigation files.  I do
19   not.
20   BY MR. FREEDMAN:
21       Q.   Okay, so I am trying to understand
22   exactly what you have and what you do not have.  Can you
23   tell me what it is you do have in regards to the
24   Australian Tax Office investigation?
25       A.   I have what my lawyers have, which is not

Page 336

1    ATO documents, or documents from an investigation.
2        Q.   In this you say that to the extent that
3    your attorneys have documents from the ATO, those
4    documents would be located in Australia.  Which
5    attorneys are those?
6        MS. MARKOE:  You can identify the names
7    of the attorneys.  You cannot identify the contents of
8    the conversations.
9        THE WITNESS:  I do not know which
10   documents would be with which attorneys.
11   BY MR. FREEDMAN:
12       Q.   You swore that you have no documents in
13   your possession from any ATO investigation.  What
14   documents did you mean that you do not have and what
15   documents do you have?
16       MS. MARKOE:  Objection: compound.
17   BY MR. FREEDMAN:
18       Q.   What documents do you not have in your
19   possession from the ATO?
20       MS. MARKOE:  Objection.
21       A.   I am a scientist, I cannot answer a
22   negative.  I do not know what documents I do not have.
23   BY MR. FREEDMAN:
24       Q.   You said: "I have no documents in my
25   possession from any ATO investigation."  What did you

Page 337

1    mean?
2        A.   An ATO investigation is where a group of
3    federal investigators decide to investigate.  That would
4    be material from what the ATO has.  That would be things
5    such as records of the ATO.  They can be given to you
6    after an investigation has happened.  You can ask for
7    them.  For instance, I could have, when I won the case
8    in 2012, asked for records.  I did not.
9        Q.   So you have the ability to ask the
10   Australian Tax Office for records?
11       MS. MARKOE:  Objection: mischaracterises
12   the testimony.
13   BY MR. FREEDMAN:
14       Q.   Do you have the ability to ask the
15   Australian Tax Office for records?
16       A.   I am an Australian citizen and I have my
17   rights under Australian law which includes asking
18   government officials, including freedom of information
19   and personal records, to be delivered to me, yes.
20       Q.   Did you ask for those records to be
21   collected from the Australian Tax Office when responding
22   to discovery requests in this lawsuit?
23       MS. MARKOE:  Objection.
24       THE WITNESS:  No.
25   BY MR. FREEDMAN:

MAGNA
LEGAL SERVICES

Page 338

1    Q.   I believe the witness answered the
2  question. Can you answer again?
3    A.   No.
4    Q.   Dr. Wright, have you asked your attorneys
5  to collect documents from -- have you asked your
6  attorneys whether they hold any Australian Tax Office
7  documents?
8    MR. RIVERO:  Objection.
9    MS. MARKOE:  Objection. I am instructing
10  the witness not to answer. Communications between
11  counsel are privileged and are not to be disclosed.
12    MR. FREEDMAN:  Requesting whether or not
13  his lawyers have documents in the investigation?
14    MS. MARKOE:  Your question was:
15  "Dr. Wright, have you asked your attorneys to collect
16  documents ..." That is ----
17    MR. FREEDMAN:  I disagree, but let me see
18  if I can make it so you do not object.
19    Q.   Dr. Wright, have you contacted your
20  Australian counsel to determine whether they have
21  documents in their possession from an Australian Tax
22  Office investigation?
23    A.   No.
24    MS. MARKOE:  Objection.
25    THE WITNESS:  And nor would I be sort of

Page 339

1  able to at the moment, because I resigned as a director
2  of all those companies before the end of those
3  companies.
4  BY MR. FREEDMAN:
5    Q.   Who took over the directorship after you
6  resigned?
7    MS. MARKOE:  Objection. You can respond
8  if you recall.
9    THE WITNESS:  That would be in public
10  records.
11  BY MR. FREEDMAN:
12    Q.   So you do not know sitting here today?
13    A.   I do not follow-up these things. I did
14  not look at the shareholding after I left. Again, as
15  I said, I really do not care what it is after I have
16  done whatever else, as long as things get run and things
17  happened. I do not care. It is magic.
18    Q.   Dr. Wright, have you ever met
19  Ross Ulbricht in person?
20    MS. MARKOE:  Objection.
21    MR. RIVERO:  Can we ask what ----
22    MR. FREEDMAN:  Identification of the
23  witnesses and their knowledge base.
24    MS. MARKOE:  It has already been pretty
25  well established that Ross Ulbricht has no relevance. I

Page 340

1  will allow him to answer this question. Tread lightly,
2  please.
3    THE WITNESS:  Yes, once.
4  BY MR. FREEDMAN:
5    Q.   What was that meeting about?
6    MS. MARKOE:  Objection. You do not need
7  to answer that question.
8  BY MR. FREEDMAN:
9    Q.   Did that meeting involve Bitcoin?
10    MS. MARKOE:  Objection. You may answer.
11    THE WITNESS:  I mentioned Bitcoin.
12  BY MR. FREEDMAN:
13    Q.   In what way did you mention Bitcoin?
14    MS. MARKOE:  Objection. I am going to
15  instruct the witness not to answer. It goes beyond the
16  scope, unless you can point me to something.
17    MR. FREEDMAN:  To determine
18  Ross Ulbricht's knowledge. It is clearly within the
19  scope.
20    MS. MARKOE:  It talks about his role in
21  the subject matter, not about his ----
22    MR. FREEDMAN:  No, no. Where is the
23  list? 6. Sorry, that is the wrong one, my apologies.
24  It is 1. So, the question was: "In what way did you
25  mention Bitcoin?"

Page 341

1    MS. MARKOE:  Right, and I am instructing
2  him ----
3    MR. FREEDMAN:  You are instructing him
4  not to answer.
5    MS. MARKOE:  I am instructing him not to
6  answer.
7  BY MR. FREEDMAN:
8    Q.   When did this meeting take place?
9    MS. MARKOE:  If you can recall, you can
10  answer.
11    THE WITNESS:  I do not recall exactly.
12  It was at the Bondi Icebergs, so therefore I pretty much
13  say not in the middle of winter.
14  BY MR. FREEDMAN:
15    Q.   Do you know what year it was?
16    A.   It would be 2010 off the top of my head.
17    Q.   Did Dave know you discussed Bitcoin with
18  Ross Ulbricht?
19    MS. MARKOE:  Objection.
20    THE WITNESS:  Dave's not my wife. I do
21  not sit there and go, "Hey, Dave, I discussed something
22  with this guy who one day will be famous for doing shit
23  because he is a criminal."
24  BY MR. FREEDMAN:
25    Q.   I just asked the question, Dr. Wright,

Page 342

```
1    whether or not Dave knew you had spoken with Ross
2    Ulbricht about Bitcoin.  If the answer is no, it is no.
3    If it is yes, it is yes.  Please answer the question?
4            MS. MARKOE:  Objection ----
5            THE WITNESS:  I do not know.
6            MS. MARKOE:  ---- you are asking him to
7    get into someone else's head.  He can answer if he
8    knows.
9            THE WITNESS:  I do not know.
10   BY MR. FREEDMAN:
11       Q.   You do not know; okay.  Did you ever tell
12   him you spoke to Ross Ulbricht about Bitcoin?
13       A.   No.  I did not like Ross Ulbricht.
14       Q.   Why did you not like Ross Ulbricht?
15           MS. MARKOE:  Objection.
16           MR. FREEDMAN:  He said he did not like
17   him.
18           MS. MARKOE:  I am going to instruct the
19   witness not to answer.
20   BY MR. FREEDMAN:
21       Q.   Have you ever communicated with Ross
22   Ulbricht by e-mail or other communications protocol?
23           MS. MARKOE:  Objection.  You may answer.
24           THE WITNESS:  No, I did not like him.
25   I did not really try and communicate with people I do
```

Page 343

```
1    not like.
2    BY MR. FREEDMAN:
3        Q.   Did you use Liberty Reserve with Dave
4    Kleiman?
5        A.   No.
6        Q.   Did you ever send money to Dave Kleiman
7    through Liberty Reserve?
8        A.   I sent money to a -- well, I instructed a
9    group to send money to a group that Dave Kleiman was
10   involved.
11       Q.   Which group did you instruct?
12       A.   Craig Wright R&D.
13       Q.   Which one?
14       A.   Panama.
15       Q.   And you instructed Craig Wright R&D
16   Panama to send money to who?
17       A.   Dave's company in Panama.
18       Q.   Which was?
19       A.   I cannot remember off the top of my head.
20   I would need to see the record.
21       Q.   Where do those records exist?
22           MS. MARKOE:  Objection.  You may answer
23   if you know.
24           THE WITNESS:  I believe the lawyers have
25   taken a copy.
```

Page 344

```
1    BY MR. FREEDMAN:
2        Q.   How many times did you instruct Craig
3    Wright R&D to send money to Dave's company in Panama?
4            MS. MARKOE:  Objection.  You can answer
5    if you know.
6            THE WITNESS:  I do not know.
7    BY MR. FREEDMAN:
8        Q.   How much money did you instruct Craig
9    Wright R&D to send to Dave's company in Panama?
10           MS. MARKOE:  Objection.  Is this at a
11   particular time or is this overall or over the course of
12   a period time?  Your question is unclear.
13   BY MR. FREEDMAN:
14       Q.   You said that you instructed Craig Wright
15   R&D, so at all times, how many times -- well, you know
16   what, strike that.  How much money in total did you
17   instruct Craig Wright R&D to transfer to Dave's company
18   in Panama in the transaction you referenced earlier?
19           MS. MARKOE:  Objection.  You can answer
20   if you understand.
21           THE WITNESS:  I do not remember the exact
22   amount.  It was like, I think it was about US$5 million.
23   BY MR. FREEDMAN:
24       Q.   Why did you have Craig Wright R&D make
25   this transfer?
```

Page 345

```
1        A.   To have machines built.
2        Q.   What type of machines?
3        A.   HPCs.
4        Q.   What purpose were you building HPCs for?
5        A.   To test scaling.
6        Q.   Scaling for what?
7        A.   Bitcoin.
8        Q.   And when you say scaling, does that mean
9    bigger blocks?
10       A.   That is the only way Bitcoin scales.
11       Q.   Did Dave make the machines?
12       A.   No.
13           MS. MARKOE:  Objection.
14   BY MR. FREEDMAN:
15       Q.   Why not?
16           MS. MARKOE:  Objection.
17   BY MR. FREEDMAN:
18       Q.   Do you know why Dave did not make the
19   machines?
20       A.   Because to make the machines would
21   basically mean that you have a company that goes out
22   there and smelts iron and forms that into shapes and
23   then has silicon fabs and ----
24       Q.   Dr. Wright, did he cause them to be made?
25   I think you understood what I meant.
```

Page 346

```
1           MS. MARKOE:  Objection.  You cannot
2    testify as to what our client understood.
3           MR. RIVERO:  And you cannot cut-off the
4    answer.
5    BY MR. FREEDMAN:
6       Q.   Did Dave cause the machines to be built?
7       A.   You want to know if Dave or Dave's
8    company bought them and I am going to have to interrupt
9    this way because I cannot stand this any more.  He did
10   not cause them to be built.  That would be an incorrect
11   characterisation, because companies make machines and
12   then they sell them.  He caused a number of machines to
13   be sent through grey markets from SGI, and then people
14   put them together.
15      Q.   And what happened to those machines?
16      A.   The last I know of, the American
17   government has them.
18      Q.   How did the American government come to
19   possess the machines?
20      A.   The American government started a number
21   of investigations.  One was into High Secured where they
22   have arrested the founders, another was into Arthur
23   Budovsky in Liberty Reserve, and due to money laundering
24   charges, a lot of people were arrested.
25      Q.   So, of the 5 million that you caused to
```

Page 347

```
1    be transferred, do you know approximately how much of it
2    Dave Kleiman spent on purchasing these machines?
3       A.   All of my machines ended up costing
4    around 60 million.
5       Q.   So the full 5 million was spent?
6           MS. MARKOE:  Objection: mischaracterises
7    the testimony.
8    BY MR. FREEDMAN:
9       Q.   Was the full 5 million spent?
10          MS. MARKOE:  Objection.  You may answer
11   if you understand.
12          THE WITNESS:  I would assume so, but
13   I did not actually do that, and Dave obviously managed
14   to get something somewhere and other people got money
15   together to put, well, all those machines together.  So,
16   therefore, someone spent money.  Either that or there is
17   a debt, and which I do not care because it is not my
18   company.
19   (Plaintiff's Exhibit 10 marked for identification)
20   BY MR. FREEDMAN:
21      Q.   Mr. Wright, I have handed you what has
22   been marked now as Plaintiff's Exhibit 10.
23      A.   Yes.
24      Q.   Do you recognise what these are?
25      A.   Yes, they are a statement of claim.
```

Page 348

```
1       Q.   Who is the plaintiff in this action?
2       A.   The plaintiff is Craig Steven Wright.
3       Q.   Is that yourself?
4       A.   Yes, via ---
5           MS. MARKOE:  Objection.  You can answer.
6           THE WITNESS:  Yes, via a business trust.
7    BY MR. FREEDMAN:
8       Q.   What business trust?
9       A.   The one associated with ABN 97 481 146
10   384.
11      Q.   Can you go with me to page 3?
12          MS. MARKOE:  Are we talking about on the
13   top?
14          MR. FREEDMAN:  On the top.
15          MS. MARKOE:  On the top.
16   BY MR. FREEDMAN:
17      Q.   Paragraph 1 says that "the plaintiff",
18   Craig Steven Wright, "provided contract labour services
19   to the defendant."  Do you see that?
20      A.   I see that.
21      Q.   What were the labour services you
22   provided?
23      A.   The document is badly drafted.
24      Q.   Who drafted this document?
25      A.   Myself.
```

Page 349

```
1       Q.   What does it mean to say, or why is it
2    badly drafted?
3       A.   Because some of the things were in error,
4    it was rushed, I was trying to get through a document so
5    that I could simply just state the intellectual property
6    that I had and start moving forward.
7       Q.   So, is the sentence, "Between 2011 and
8    2013 the plaintiff provided contract labour services to
9    the defendant" incorrect?
10          MS. MARKOE:  Objection.  What topic are
11   we talking about now?
12          MR. FREEDMAN:  These are the Australian
13   tax proceedings -- sorry, the Australian court
14   proceedings.
15          MS. MARKOE:  The Australian court
16   proceedings, so that would be number 7, allows inquiry
17   into individuals and entities identified in the
18   proceedings, along with what documents exist relevant to
19   the lawsuit and where those documents are held.  These
20   questions do not address those topics.
21          MR. FREEDMAN:  He is saying the contract
22   was badly drafted, so I am trying to understand what it
23   was about so I can ask ----
24          THE WITNESS:  I did not say contract.
25          MR. FREEDMAN:  Sorry, statement of claim.
```

MAGNA
LEGAL SERVICES

Page 350

```
 1            MS. MARKOE:  Objection.  I am going to
 2   instruct him not to answer.  Your inquiry can be limited
 3   to those specific topics.
 4            MR. FREEDMAN:  Okay.
 5       Q.   Can you go down to paragraph 5, please.
 6       A.   Yes.
 7       Q.   "By contract dated" -- can you read
 8   paragraph 5 for me, please?
 9       A.   "By contract dated 8 January 2009, the
10   Defendant agreed to pay the Plaintiff for property and
11   consulting services to complete research.  The contract
12   was bonded against the intellectual property of the
13   defendant."
14       Q.   Where is that contract between Craig
15   Steven Wright and W&K Info Defense Research?
16            MS. MARKOE:  Objection.  You may answer.
17            THE WITNESS:  As stated, there was an
18   error in drafting.
19   BY MR. FREEDMAN:
20       Q.    So there is no contract?
21            MS. MARKOE:  Objection: mischaracterises
22   the testimony.  You may answer.
23            THE WITNESS:  No, I have the wrong date.
24   BY MR. FREEDMAN:
25       Q.    What date was it supposed to be?
```

Page 351

```
 1       A.   I do not remember the date of the
 2   contract.
 3       Q.   Is it one of the contracts we looked at
 4   today?
 5       A.   Yes.
 6       Q.   Is there anything else wrong with the
 7   document?
 8            MS. MARKOE:  Objection.
 9            THE WITNESS:  I do not know.  I would
10   need to read through everything line-by-line and match
11   it all up.
12   BY MR. FREEDMAN:
13       Q.   Can you look at paragraph 7, please.
14       A.   Yes.
15       Q.   Can you read it for me?
16       A.   "The plaintiff conducted a project for
17   the development of a Bitcoin SDK in exchange".
18       Q.   What is SDK?
19       A.   Software development kit.
20       Q.   Do any documents exist as to this
21   development, software development kit?
22       A.   Again, this is an error.  The plaintiff
23   is mixed up with the defendant.
24       Q.   So, W&K conducted a project for the
25   development of the Bitcoin SDK?
```

Page 352

```
 1       A.    Again what you are doing is the initial
 2   horrible, horrible statement of claim that I had to go
 3   into court and have multiple other documents done to
 4   correct because we were not expecting anything fought,
 5   it was just to basically end a contract saying anything
 6   that W&K has they can keep; the things I have got,
 7   I keep.  We all move on, happy, the end.
 8       Q.    So is it fair to say that you were trying
 9   to get this done and it is not accurate?
10            MS. MARKOE:  Objection.
11            THE WITNESS:  This is part of a
12   proceedings.
13   BY MR. FREEDMAN:
14       Q.    Why did you file a statement of claim
15   that was inaccurate?
16            MS. MARKOE:  Objection.  I am going to
17   instruct the witness not to answer.  You are limited in
18   this deposition.  You are going to get another bite at
19   this apple in terms of a full merits deposition of
20   Dr. Wright. Move on.  Limit your questions to the
21   topics you identified to the court and the court
22   approved.
23   BY MR. FREEDMAN:
24       Q.    Can you go to page 9, please, for me and
25   paragraph 1.
```

Page 353

```
 1       A.    And again, the same errors were made when
 2   these were filed.
 3       Q.    I need to know if any documents exist, so
 4   I am trying to understand what it is really supposed to
 5   say.  So you say it is an error.  What should it say?
 6       A.    I do not know what the court may or may
 7   not have document-wise.  A lot of documents were
 8   produced for the court.  A lot of changes were made.
 9   The register required that I went back several times and
10   corrected things.  I handed all those documents to the
11   register.  I do not know what the court has or has not
12   kept.
13       Q.    I want to know what you have kept?
14       A.    If my lawyers have it, I have it.
15       Q.    Which lawyers would this be?
16       A.    These ones right here.
17       Q.    Can you go down to paragraph 3, please.
18   You said -- can you read paragraph ----
19            MR. RIVERO:  This I think ----
20            MR. FREEDMAN:  Let us go off the record.
21            THE VIDEOGRAPHER:  Going off the record.
22   The time is 19.53.
23            (A Short Break)
24            THE VIDEOGRAPHER:  Going back on the
25   record.  The time is 19.55.
```

MAGNA ▶
LEGAL SERVICES

Page 354

BY MR. FREEDMAN:

Q.   Can I direct your attention to paragraph 3.

A.   Yes.

Q.   And can you read that for me?

A.   Again, this is the same error as before. The wrong date is in this version of the statement of claim.

Q.   Did you take the 27th October 2008 date from a document?

A.   There is no 27th October 2008 document that I know of.  It could have been taken from a different document and put in in error.  This does not refer to that document.

Q.   Can you go to 6, please, on page 10 at the top.

A.   Yes.

Q.   Can you read 6 for me?

A.   "In May 2013 the primary director of the defendant died leaving the project not transferred to the plaintiff and not returning funds.  These funds were rated as: a. TTA 01 ----"

Q.   That is fine.  Just 6, not the a, b, c, d.  There is then a list of funds below that in a, b, c and d; is that not correct?

Page 355

A.   Yes.

Q.   Do any documents exist that validate that these funds were provided?

MS. MARKOE:  Objection: mischaracterises the document and what it states.  You can answer.

MR. FREEDMAN:  You can answer.

THE WITNESS:  Basically, this says funds were meant to be given from Department of Homeland Security if Dave had gone through with things.  Unfortunately Dave did not continue with the filing after he went into hospital, so the payment lapsed.  This was not funds from me, this was funds that would have been completed.  I completed those things, the papers are published, and the other material was produced.

BY MR. FREEDMAN:

Q.   You said the payment lapsed.  What payment are you referring to?

MS. MARKOE:  Objection.  You can answer.

THE WITNESS:  The Department of Homeland Security fund that Dave was there, which was because he was a veteran.  None of that can be filed on a veteran who is dead, and I believe part of the problem was he did not file any taxes at all in any of the companies, which invalidated any of the things he was going for.

Page 356

BY MR. FREEDMAN:

Q.   Could you look at 8 for me?

A.   Yes.

Q.   Can you read it for the record?

A.   "The contract set the interest rate at 8% calculated annually."

Q.   Can you tell me what contract sets the interest rate at 8% annually?

MS. MARKOE:  Objection.  You may answer.

THE WITNESS:  When you are talking about New South Wales, the New South Wales contract rate was about 8%.  It fluctuates between 7 and 9%.  This is a court proceeding-type thing and if you are talking about setting government mandated things we have high interest rates in Australia because we have a crappy banana republic-type economic.

BY MR. FREEDMAN:

Q.   So, "the contract" is not a reference to the actual contract that is between you and W&K?

MS. MARKOE:  Objection.  You may answer.

THE WITNESS:  When you are stating that certain things apply as in jurisdiction in Australia and this sort of X, Y, Z, then it also implies interest, which, when you are putting interest -- when you are doing this sort of stuff, has to be put into court for

Page 357

statement of claim.

BY MR. FREEDMAN:

Q.   Can you look at 13 for me, please?

A.   Yes.

Q.   Can you read it for the record?

A.   "The IP is software and code used by the US Military, [Department of Homeland Security] and other associated parties."

Q.   Do any documents exist that substantiate that this ----

A.   I will have to take this offline.

Q.   Does this relate to the matters you want to speak to the court about in camera?

A.   Yes.

Q.   Can you go to page 13 for me.  The signature in the middle of the page, is that your signature?

A.   Yes.

Q.   Can you go to page 6 for me.  Is that signature in the middle of the page your signature?

A.   Yes.

MR. FREEDMAN:  I need a drink and a bathroom break.  If we could ----

THE VIDEOGRAPHER:  Going off the record.  The time is 19.59.

Page 358

```
1              (A Short Break)
2         THE VIDEOGRAPHER:  Going back on the
3    record.  The time is 20.09.  Thank you.
4         THE JUDGE: (By Telephone) Okay, counsel,
5    what can I do for you today?
6         MR. FREEDMAN:  Your Honour, this is
7    Mr. Freedman.  We had a couple of questions that the
8    witness has either just refused to answer or has been
9    instructed not to answer, and there is one particular
10   issue that I will let defence counsel talk to you about,
11   but ----
12        THE JUDGE:  Okay.
13        MR. FREEDMAN:  ---- if I could raise the
14   questions that the witness has refused to answer or has
15   been instructed not to answer.  There are only a couple
16   of them.
17        THE JUDGE:  Sure.
18        MR. FREEDMAN:  We asked Dr. Wright --
19   and, your Honour, just so you are aware Dr. Wright is
20   here in the room.
21        THE JUDGE:  Okay.  Hello, Dr. Wright.
22        THE WITNESS:  Hello.  How are you?
23        MR. FREEDMAN:  We asked Dr. Wright how
24   much Bitcoin he mined from January of 2009 until
25   December of 2010, which was his testimony on the time he
```

Page 359

```
1    mined Bitcoin.  He was instructed not to answer the
2    question.  We believe this goes to the tracing forward
3    issue and we were told this morning that we were not
4    receiving the list of Bitcoin wallets we were supposed
5    to receive before the deposition.  We never got the
6    list.
7         THE JUDGE:  Okay, so I am clear, the
8    question is, how much Bitcoin did he mine in 2009 and
9    2010?
10        MR. FREEDMAN:  Correct.  That is the
11   first question.
12        THE JUDGE:  Why do you not give me all
13   the questions.  That way I can have Mr. Rivero or
14   Ms. Markoe respond to all of them, then I will have you
15   address all of them and then I will come to a conclusion
16   about all of them.
17        MR. FREEDMAN:  Sure.
18        MR. RIVERO:  Judge, just before the
19   listing -- this is Andrés Rivero -- I believe by
20   telephone as well we have Mr. Brenner and Mr. McAdams
21   who are lawyers at Boies Schiller and, at least as of
22   some point during the deposition, the plaintiff Ira
23   Kleiman also by telephone.
24        MR. BRENNER:  That is right.  This is
25   Andrew Brenner for Boies Schiller by telephone.
```

Page 360

```
1         MR. MCADAMS:  John McAdams by telephone.
2         MR. KLEIMAN:  (By Telephone) Ira Kleiman.
3         THE JUDGE:  Thank you very much.
4         MR. FREEDMAN:  The second question, your
5    Honour, was, did you ever tell Dave Kleiman how much
6    Bitcoin you had mined, and the witness was instructed
7    not to answer.  The witness informed us ----
8         THE JUDGE:  I am sorry, was there a
9    timeframe attached to that question?  During what time
10   period did he mine it or just general?
11        MR. FREEDMAN:  I would have to check the
12   record, your Honour, but the question is just from 2009
13   until 2010, because Dr. Wright's testimony was that he
14   stopped mining and then did not begin again until 2016
15   when Dave Kleiman was already dead.
16        THE JUDGE:  Okay.
17        MR. FREEDMAN:  The third question was
18   that Dr. Wright had testified that his ex-wife, Lynne
19   Wright, had been on e-mail communications with Dave
20   Kleiman about the founding of W&K, but then refused to
21   answer any questions about Lynne Wright due to -- and if
22   I am misstating this please correct me defence
23   counsel -- an oath that he filed with the courts in
24   Australia not to talk about his ex-wife.
25        THE JUDGE:  Okay.
```

Page 361

```
1         MR. FREEDMAN:  And then Dr. Wright also
2    refused to answer any questions about his current wife,
3    Ms. Ramona Watts, who is listed as a director of many
4    different companies.  He was not instructed not to
5    answer, he just refused to answer the questions.
6         THE JUDGE:  Okay.
7         MR. FREEDMAN:  Those are the four
8    questions that do not touch on this other issue.
9    Briefly, there are other questions that Dr. Wright has
10   refused to answer, on national security grounds, and
11   defence counsel has requested an in camera discussion
12   with you about them.  I will let them talk to that, but
13   those first four are the questions the plaintiff is
14   raising now.
15        THE JUDGE:  Again, so our record is
16   clear, the plaintiff is asking me to compel Dr. Wright
17   to provide truthful answers to those four areas of
18   questioning?
19        MR. FREEDMAN:  Correct.
20        THE JUDGE:  Okay.  Let me hear from
21   counsel for Dr. Wright.
22        MS. MARKOE:  Your Honour, this is Zaharah
23   Markoe.  How are you this afternoon?  For us very late
24   in the evening.
25        THE JUDGE:  I am fine, Ms. Markoe.  Thank
```

MAGNA
LEGAL SERVICES

Page 362

```
1    you.  Good afternoon.
2         MS. MARKOE:  Good afternoon.  Your
3    Honour, it is our position that this is a
4    limited-in-scope deposition, primarily targeted at
5    discovery issues, opening doors, closing doors, the
6    location of documents, and the location and
7    identification of witnesses, with some leeway, which we
8    believe we have been more than fair in providing.
9         With regard to the first question, which
10   is how much Bitcoin did Dr. Wright mine between 2009 and
11   2010, that goes beyond the scope.  We allowed him to
12   answer questions about the location of the computers
13   that were used to mine, and we also allowed him to
14   answer questions about whether or not he mined in any
15   way in conjunction with either Dave Kleiman or W&K.  And
16   the answer was there was no mining with Dave Kleiman or
17   with W&K.  Therefore, it is our position that how much
18   he mined on his own between 2009 and 2010 is both beyond
19   the scope and further irrelevant.
20        THE JUDGE:  Okay.  His testimony was that
21   he never mined anything with Mr. Kleiman?
22        MS. MARKOE:  Correct.
23        THE JUDGE:  Okay.
24        MS. MARKOE:  With regard to the second
25   question, did you ever tell Dave Kleiman how much
```

Page 363

```
1    Bitcoin you mined between 2009 and 2010, again this is a
2    limited-in-scope deposition, as I understood it.  It is
3    not going to the merits and we believe that that
4    question went too far into the merits, and is not
5    appropriate for this deposition.
6         THE JUDGE:  Okay.
7         MS. MARKOE:  With regard to the questions
8    about Lynne Wright, I believe specifically one of those
9    questions was how did they meet; (a) that is irrelevant
10   and then, (b), Dr. Wright has testified in this
11   deposition that he has in his divorce settlement
12   agreement agreed not to discuss Lynne Wright, so he
13   believes he is bound by that agreement, and that divorce
14   settlement.  With regard to his current wife, his
15   position is that he made an oath to his wife not to
16   discuss her, so he would like to honour that oath.
17   Again, one of the specific questions that was objected
18   to further goes beyond the scope in terms of how did he
19   meet.  These witnesses have already been identified.
20   There is no further information that is required as it
21   relates to this deposition, which again limited in
22   scope.  So, that is my response to those four questions.
23        THE JUDGE:  Let me start off with one or
24   two follow-up questions I have for you.  As to his
25   current wife, Ramona Wright, are you invoking any sort
```

Page 364

```
1    of marital privilege under US law or are you simply
2    relying upon some other basis upon which he is legally
3    bound?
4         MS. MARKOE:  I believe it depends on the
5    question.  I think that there were a couple of questions
6    that went into spousal communications, certainly, and
7    again as I said, I think that the question regarding how
8    they met certainly is, (a), irrelevant, and (b) goes
9    beyond the scope of this deposition.
10        THE JUDGE:  Okay, put aside the spousal
11   communications, are you also invoking the spousal
12   testimonial privilege?
13        MS. MARKOE:  Yes.
14        THE JUDGE:  In terms of his ex-wife,
15   Lynne Wright -- and I understand there may be some sort
16   of court proceeding in Australia that he feels bound
17   by -- what is your position as to whether I can order
18   him to do something even if the Australian court has
19   said or his agreement in Australia said that he cannot,
20   even if I have that authority?
21        MS. MARKOE:  It would be our position
22   that you do not have that authority, your Honour,
23   respectfully, of course.
24        THE JUDGE:  That is why I am asking.
25   What about the issue -- we have had so many hearings in
```

Page 365

```
1    this case that I do not remember everything, but I do
2    recall that I had ordered the production of a list of
3    Bitcoin.  Was that not done?
4         MS. MARKOE:  Your Honour, you had ordered
5    production of a list of his Bitcoin at a particular
6    point in time or allow us the opportunity to make an
7    objection probably by formal motion as to
8    burdensomeness.  We will probably be filing that motion
9    soon.  There is no such document that exists regarding
10   his list of public addresses at, I believe it was
11   December 31st, 2013, and to compile that list would be
12   incredibly burdensome.  We will be filing a motion to
13   that effect.
14        However, more importantly, with regard to
15   the questions that were at issue in this deposition,
16   they did not relate to addresses.  The questions were
17   about how much Bitcoin Dr. Wright mined and whether he
18   ever told Dave Kleiman how much Bitcoin he mined, and it
19   was our position, and remains our position, that those
20   go beyond the scope of this deposition.
21        THE JUDGE:  Okay.  I have heard you on
22   that.  Let me turn back to Mr. Freedman before I make my
23   rulings.  Mr. Freedman?
24        MR. FREEDMAN:  Your Honour, this is
25   Mr. Freedman.  First of all, I do not know if the court
```

MAGNA
LEGAL SERVICES

Page 366

1  recalls, but the court set a deadline on when that
2  motion for burdensomeness would have had to have been
3  filed and it was purposely set in advance so that this
4  issue could be dealt with in advance of this deposition.
5  The motion was never filed. We thought it would be
6  coming. The list never came.
7       MS. MARKOE: I would like a point of
8  clarification. We had actually asked Mr. Freedman for
9  an extension of time to file that motion, because that
10 motion was contemplated to be filed after our last
11 hearing. Mr. Freedman needed to move that last hearing
12 for religious purposes and we accommodated that request.
13 We asked for a similar extension of time with regard to
14 filing our motion. To be frank, Mr. Freedman never got
15 back with us and I think this is just something that
16 slipped through the cracks.
17      THE JUDGE: No problem. I know counsel
18 in this case have a lot going on and are working very
19 hard. I hear you as to that, but the fact is it was not
20 yet produced and you are asking for leave to file a
21 motion. I understand the structure of where we are.
22 Mr. Freedman, is there anything else you want to address
23 on the merits of these four things -- areas?
24      MR. FREEDMAN: Yes, your Honour,
25 absolutely. As the court is aware, it is our contention

Page 367

1  that the Bitcoin mined by Dr. Wright from 2009, and he
2  testifies until the end of 2010, was done in partnership
3  with Dave Kleiman, and so the amount of Bitcoin that was
4  mined during that period is relevant to plaintiff's
5  claims. Whether or not he informed Dave Kleiman about
6  this amount is relevant, again, to the partnership
7  and in particular for this deposition, whether those
8  communications still exist anywhere.
9       As to questions about Ms. Wright, there
10 were initial questions about how they had met to
11 determine the timeframe of when she came in. Obviously
12 I am happy not to ask those questions. The purpose
13 would be to understand what she knows about and what she
14 does not know about to see whether or not she is a
15 witness for the case.
16      As to questions about Ms. Watts,
17 obviously if counsel invokes spousal privilege that is
18 one thing, but questions were not about communications,
19 they were questions about what companies she was a
20 director on, I believe, and certainly we would explore
21 that topic, but after asking a few questions and being
22 given the same mantra, "I will not discuss anything
23 about my wife", we moved on, so we never got a chance to
24 fully explore those topics.
25      THE JUDGE: Okay, thank you. Anything

Page 368

1  further, Mr. Freedman?
2       MR. FREEDMAN: No, your Honour.
3       THE JUDGE: Thank you. Let me rule. As
4  to the first area, which is enquiring of Dr. Wright
5  under oath how much Bitcoin he mined in 2009/2010,
6  I will defer that. I will not require him to answer
7  that question today because I believe if I determine
8  that as a proper subject matter area, that can be
9  responded to through a targeted interrogatory and if
10 I determine that it is relevant, I would require him to
11 respond to that interrogatory under oath as if he were
12 asked the question live. Since that is simply a fairly
13 straightforward question of how much Bitcoin that should
14 not be too burdensome to respond to, but I will deal
15 with that in the context of any motion and I will grant
16 leave for the defence to file a motion relating to
17 providing a list of the Bitcoin, because again obviously
18 if I order him to provide the list you are going to get
19 a lot more detail than just the final number. So, as to
20 that issue, I will not require him to answer those
21 questions today.
22      As to the area of questioning about
23 whether he told Dave Kleiman how much he mined, I will
24 direct him to answer those questions. I believe that
25 is not unduly burdensome. I believe it is relevant to

Page 369

1  the plaintiff's theory that there was a partnership
2  here, and his answers are what they are. If he told
3  Mr. Kleiman what he was doing he should answer that and
4  if he did not he can answer that.
5       As to the issues relating to the ex-wife,
6  Lynne Wright, I will allow the defence to file a
7  briefing as to whether, as a matter of law, I am
8  precluded from compelling this testimony. I will not
9  opine as to whether -- I would probably be inclined to
10 compel the testimony if the law allows me to do so, but
11 I cannot claim to be an expert on Australian law or the
12 interactions between US law and Australian law on this
13 issue. Given that I have already said that Dr. Wright
14 can be deposed a second time, I will defer that issue
15 and allow the defence time to file any motion they want
16 to file on that.
17      My ruling will be the same as to the
18 questions relating to any communications or testimony
19 relating to his current wife. Again I will allow the
20 defence to flush out any privilege arguments they want
21 to make. I will allow the plaintiffs to respond only to
22 any privilege arguments as to either the current or past
23 wife and I will rule on that at a later time.
24      I think I have now dealt with the four
25 areas that were raised.

Page 370

1    In terms of the national security
2    issues -- sorry, Mr. Freedman, not waiving any
3    objections to my ruling, were there any other issues
4    that you require me to rule on or you request that I
5    rule on this afternoon?
6    MR. FREEDMAN:  Just the national security
7    stuff, your Honour.
8    MS. MARKOE:  And your Honour for that --
9    sorry, go ahead.
10   THE JUDGE:  Can you ask me the context --
11   the kinds of questions for which the national security
12   issues are going to relate.  Let us start with that.
13   MS. MARKOE:  I believe it came up in four
14   contexts.  One related to the -- well, two questions
15   related to the identity of particular people.  I believe
16   one related to a trust called GICSR, and the third
17   related to Exhibit 11 (sic) to the complaint, and it is,
18   I believe, page 10 of 15, on paragraph 13:  "The IP is
19   software and code used by the US Military, DHS and other
20   associated parties."  Certainly Mr. Freedman should
21   correct me if I either misstated or missed a general
22   topic area.
23   THE JUDGE:  Okay, you said there were
24   four, but there are only two.  Maybe you are merging
25   them together.

Page 371

1    MS. MARKOE:  So one was the identity of
2    particular people who may have involvement in
3    particular projects.  Two was related to a trust called
4    GICSR.  The third was related to Exhibit 11 (sic), and
5    then maybe I misspoke when I said four, I could have
6    misspoken.
7    THE JUDGE:  Okay.
8    MS. MARKOE:  I have three.
9    THE JUDGE:  I have not committed a
10   complaint on all of its attachments to memory.  Can you
11   help me out with what is on page 10 of 15 at paragraph
12   13?
13   MS. MARKOE:  Yes.  It says: "The IP" --
14   and this is regarding the New South Wales statement of
15   claim -- "is software and code used by the US Military,
16   DHS and other associated parties."
17   THE JUDGE:  Okay.  Mr. Freedman?
18   MR. FREEDMAN:  Yes, your Honour, I think
19   Mr. Markoe laid it out, but just to give a little bit of
20   gloss on it, the identity of the first person was when
21   Dr. Wright first reached out to Louis Kleiman, which is
22   Dave and Ira's father.  He said to him: "Your son Dave
23   and I are two of the three key people behind Bitcoin."
24   We asked the identity of the third person and were told
25   we were not able to know that information for national

Page 372

1    security reasons.
2    The second is that in response to an
3    interrogatory request that the court ordered Dr. Wright
4    to respond to at the last hearing, Dr. Wright wrote:
5    "There was an individual who helped me in the very early
6    stages of my research, well before the release of the
7    Bitcoin protocol.  As far as I know, that individual
8    never met or interacted with Dave Kleiman."  And the
9    defendant refused to identify that individual on
10   national security grounds.
11   THE JUDGE:  Okay.
12   MR. FREEDMAN:  The statement of claim
13   that Ms. Markoe was talking about is the Australian
14   statement -- a lawsuit where Dr. Wright sued W&K and
15   collected its consent judgment on its intellectual
16   property valued at tens of millions of dollars, and as
17   part of that statement of claim said that part of the IP
18   at issue was IP of software and code used by the US
19   Military, DHS and other associated parties.  It was
20   intellectual property that title was taken, as
21   I understand it, from W&K pursuant to these consent
22   judgments, and so it is directly relevant to the
23   intellectual property claims that plaintiff have brought
24   in this case.
25   Then finally, I do not have the e-mail in

Page 373

1    front of me, your Honour, but when Ira Kleiman was
2    conversing with Dr. Wright before the lawsuit was
3    initiated, Dr. Wright told him that there was a GICSR
4    trust that would be related to Dave's Bitcoin holdings
5    or intellectual property -- I do not have it in front of
6    me -- and when Dr. Wright was questioned about the trust
7    and who set it up, he refused to answer questions on
8    national security grounds.
9    MS. MARKOE:  Just one point of clarity.
10   We believe that Mr. Freedman incorrectly stated that
11   title was taken.  It is not quite that simple, and it is
12   certainly not entirely accurate, but that is the only
13   clarification I have for the moment.
14   THE JUDGE:  Okay.  Any further argument,
15   Ms. Markoe?
16   MS. MARKOE:  No, we just request that
17   Dr. Wright be permitted to speak with you in camera in a
18   separate room, without counsel for plaintiffs present,
19   without plaintiff on the phone, and without the court
20   reporter and you can get more information about this and
21   then render your decision.
22   THE JUDGE:  Okay.  I will respectfully
23   decline to have an off-the-record conversation with
24   Dr. Wright.  These are all topics that if I determine
25   that the information needs to be turned over, it can



Page 374

```
 1   either be turned over in the nature of an interrogatory
 2   response, or a continuation of this deposition by video
 3   teleconference, or in the subsequent deposition of
 4   Dr. Wright.  What I am going to do is I am going to not
 5   rule on any of these national security arguments,
 6   because I think there is one and only one person I need
 7   to hear from as to whether there is a national security
 8   interest here, and it is not Dr. Wright, it is the
 9   United States Government.
10        So, I will defer ruling, I will give the
11   defence leave to file a motion with any sort of
12   supporting affidavits or whatever else you want to
13   supply me with that comes from a responsible party of
14   the US government who tells me that US national security
15   interests require that these questions not be answered.
16   That obviously is not going to happen today.
17        I think I have now ruled on all the
18   issues that were presented this afternoon.  I know you
19   all worked very hard to get this accomplished and get it
20   done and I appreciate everyone's efforts.  Counsel, when
21   you are back in the country or while you are there and
22   you have some time, talk about how much time you think
23   is appropriate for the filing of the motions that we
24   discussed today, and when you get back we can do a quick
25   phone call and I can enter an order with an operational
```

Page 375

```
 1   schedule.
 2        Is there anything further I need to rule
 3   on this afternoon?  Mr. Freedman?
 4        MR. FREEDMAN:  No, your Honour.
 5        THE JUDGE:  Ms. Markoe?  Mr. Rivero?
 6        MR. RIVERO:  No, your Honour, and thank
 7   you so much for helping us with these issues.
 8        THE JUDGE:  No, like I said, thanks to
 9   the parties.  I know this is a really heavy effort to
10   get this done but I really think it is going to help
11   move this case forward.  I will get off the phone.  You
12   can continue with whatever is left of the deposition.
13   Everyone have a safe trip home and we will be in touch
14   when you get back.  Thank you.
15        MS. MARKOE:  Thank you, your Honour.
16        MR. RIVERO:  Thank you.
17        MR. FREEDMAN:  I think the only thing we
18   are entitled to ask about now is whether Dr. Wright
19   communicated -- okay.
20        MS. MARKOE:  How much Bitcoin he mined,
21   yes.
22        MR. RIVERO:  One subject.
23        MR. FREEDMAN:  One subject, yes.
24        MR. RIVERO:  Dave Kleiman did.  So let us
25   do this.  Because they have been running -- I think it
```

Page 376

```
 1   was 30 left at that time.  Why do we not just run -- it
 2   is going to be -- as a matter of fact just ask your
 3   question and it is 30 minutes.
 4        MR. FREEDMAN:  I have 30 minutes?  I am
 5   going to use 30 minutes.
 6        MR. RIVERO:  No, no, I am not going to
 7   count ----
 8        MS. MARKOE:  Let us just move on so that
 9   we can get everyone out of here.
10        MR. RIVERO:  Just do it and we will say
11   it is 30 minutes.
12        MS. MARKOE:  Let us just get it done.
13   BY MR. FREEDMAN:
14     Q.   Dr. Wright, did you ever tell Dave
15   Kleiman how much Bitcoin you mined?
16     A.   No.
17        MR. RIVERO:  30 minutes left.
18        MR. FREEDMAN:  30 minutes, okay.
19        MS. MARKOE:  29:46.
20   BY MR. FREEDMAN:
21     Q.   Dr. Wright, do you have a trust that is
22   based in Singapore?
23     A.   No.
24     Q.   Have you ever had a trust that is based
25   in Singapore?
```

Page 377

```
 1     A.   No, I have never had a Singapore trust.
 2     Q.   Do you have a trust based in the
 3   Seychelles?
 4     A.   Yes.
 5     Q.   How many?
 6     A.   I do not know.
 7     Q.   Dr. Wright, do you remember telling Ira
 8   Kleiman that you have back-up files of Dave's drives?
 9     A.   No, I told Ira Kleiman that he needed to
10   keep back-up files of Dave's drives.
11        MR. RIVERO:  Just a point of order,
12   I have got 29 minutes, but are you going to reserve some
13   time against a ruling by the court?
14        MR. FREEDMAN:  I do not think that would
15   -- no.
16        MR. RIVERO:  So your position is you get
17   this time plus more time?
18        MR. FREEDMAN:  I think if the court rules
19   we get more time, yes.
20        MR. RIVERO:  I do not agree.
21        MR. FREEDMAN:  Okay.  Understood.  Noted.
22        MR. RIVERO:  We object and we think you
23   should reserve time in case you win something.
24   BY MR. FREEDMAN:
25     Q.   Dr. Wright, do you have a Twitter
```

Page 378

1    account?
2        A.    Not any more, no.
3        Q.    Did you have a Twitter account?
4        A.    Yes.
5        Q.    What was it called?
6            MS. MARKOE:  Objection.  You may answer.
7            THE WITNESS:  I have had multiple Twitter
8    accounts.
9    BY MR. FREEDMAN:
10        Q.    What was the last Twitter account you
11    had?
12        A.    Dr. Craig S Wright.
13        Q.    What happened to Dr. Craig S Wright
14    Twitter account?
15        A.    I got suspended after I threatened Jack
16    with DMCA violations.
17        Q.    Who is Jack?
18        A.    One of the founders of Twitter.
19        Q.    What was the name of that handle?  Was it
20    at ----
21        A.    At probably Dr. Craig S Wright.  I do not
22    remember exactly.  I do not type the things in.
23        Q.    Does that "@ProfFaustus" mean anything?
24        A.    It was before that, yes.
25        Q.    Before Dr. Craig S Wright you had

Page 379

1    @ProfFaustus?
2        A.    Professor Faustus, yes.
3        Q.    And what happened to Professor Faustus?
4        A.    I started complaining about the fact that
5    I had bots on the account.
6        Q.    Okay.  And?
7        A.    And Twitter will not take them down and
8    I started complaining and now I have suspended accounts.
9        Q.    So Twitter suspended your @ProfFaustus
10    account?
11        A.    The account went up, down, and all over
12    the place, so I do not know what is happening with it,
13    and I do not particularly want an account full of bots
14    back.
15        Q.    Did you take down the account?
16            MS. MARKOE:  Objection.  You may answer.
17            THE WITNESS:  I threatened Twitter with a
18    lawsuit.
19    BY MR. FREEDMAN:
20        Q.    And Twitter suspended your account?
21        A.    I do not know what has happened with that
22    account.  I cannot access it.
23        Q.    Did you save copies of your direct
24    messages in that account?
25        A.    No.

Page 380

1            MS. MARKOE:  Objection.
2    BY MR. FREEDMAN:
3        Q.    Did you give your lawyers copies of the
4    direct messages in that account?
5        A.    No.
6            MS. MARKOE:  Objection.
7    BY MR. FREEDMAN:
8        Q.    Did you save messages in the Dr. Craig S
9    Wright account?
10        A.    It was up for a day.  There was no direct
11    messages that I know of.
12        Q.    When did the @ProfFaustus account start?
13        A.    It was originally started, I think, in
14    2011, but no posts were done until 2016.
15        Q.    Did you have a Twitter account when Dave
16    Kleiman was alive before 2013?
17        A.    Yes.
18        Q.    What was it called?
19        A.    Dr. Craig S Wright, I believe.
20        Q.    Do you still have access to that account?
21        A.    No.  That account was cancelled in
22    December 2015 when I was exposed to the media.
23        Q.    Dr. Wright, do you an individual called
24    Marco Bianchi?
25        A.    Marco is a familiar name.

Page 381

1            MS. MARKOE:  That is my name!
2    BY MR. FREEDMAN:
3        Q.    Was there a Marco Bianchi who helped you
4    set up trusts?
5        A.    What trusts, sorry?
6        Q.    Are you familiar with a Marco Bianchi
7    helping you set up any trusts?
8        A.    No.
9        Q.    Dr. Wright, do you have a supercomputer
10    called C01N?
11        A.    No.
12        Q.    Do you have any supercomputer?
13        A.    No.
14        Q.    Have you ever had a supercomputer?
15            MS. MARKOE:  Objection.
16            THE WITNESS:  Yes.
17    BY MR. FREEDMAN:
18        Q.    When did you have a supercomputer?
19        A.    Back in 2013.  Sorry, end of 2012, but it
20    was not working.  2013, 2014, 2015.
21        Q.    What was it called?
22        A.    Tulip and C01N.  There were two.
23        Q.    So, you did have a supercomputer called
24    C01N?
25        A.    That is what I just said.

Page 382

1   MS. MARKOE: Objection.
2   THE WITNESS: You before that said "do
3   I have". "Did I have" and "do I have" are different.
4   BY MR. FREEDMAN:
5   Q. When did you get rid of these
6   supercomputers?
7   MS. MARKOE: Objection.
8   THE WITNESS: I did not.
9   BY MR. FREEDMAN:
10  Q. You still have them?
11  A. I do not have them.
12  Q. Who has them?
13  A. I do not know.
14  Q. What happened to them at the end of 2015?
15  MS. MARKOE: Objection.
16  THE WITNESS: I do not know.
17  BY MR. FREEDMAN:
18  Q. Did you ever discuss your supercomputers
19  with Dave?
20  A. Dave basically died before I had
21  everything built and operating, so I discussed creating
22  them, but it is hard to discuss something, I do not
23  believe in seances, with dead people.
24  Q. Dr. Wright, in 2016 you came forward and
25  claimed to be Satoshi Nakamoto; is that correct?

Page 383

1   MS. MARKOE: Objection.
2   THE WITNESS: I did not come forward.
3   BY MR. FREEDMAN:
4   Q. You gave an interview to the BBC where
5   you said you were Satoshi Nakamoto; is that correct?
6   MS. MARKOE: Objection. Can you tie this
7   to one our topics, please.
8   MR. FREEDMAN: Yes, request for
9   production 88 goes into the relationship with
10  Robert MacGregor and the court said we should ask about
11  the deferred ruling in advance of the deposition.
12  MR. RIVERO: Hearing transcript
13  citements?
14  MR. FREEDMAN: I do not have time. Look
15  for it if you can find it. 86, 16-19.
16  MR. RIVERO: Which date?
17  MS. MARKOE: It is this one.
18  MR. FREEDMAN: Last one. In the meantime
19  we will keep moving.
20  Q. As a consequence of coming out, you
21  provided cryptographic proof that you were in fact
22  Satoshi Nakamoto?
23  MS. MARKOE: Objection: goes beyond the
24  scope.
25  THE WITNESS: I did not come out.

Page 384

1   BY MR. FREEDMAN:
2   Q. And people have tried to debunk your
3   claim of being Satoshi Nakamoto?
4   MS. MARKOE: Objection: goes beyond the
5   scope.
6   MR. FREEDMAN: Are you instructing him
7   not to answer?
8   MS. MARKOE: Can we just get out of here.
9   Will it make it move faster if he can answer?
10  MR. FREEDMAN: Yes, it is going to go
11  pretty quick.
12  MS. MARKOE: This is beyond the scope.
13  It is public information. This is a colossal waste of
14  our time.
15  MR. FREEDMAN: I do not agree.
16  MS. MARKOE: But if you would like you
17  may answer.
18  THE WITNESS: There is public information
19  to say that.
20  BY MR. FREEDMAN:
21  Q. And they have called you Faketoshi
22  because of that?
23  MS. MARKOE: Objection. First of all,
24  I am going to instruct him not to answer. You are
25  harassing him now. It is offensive. It is very late.

Page 385

1   You have limited topics. This does not go to any of
2   these topics.
3   MR. RIVERO: Can I say another thing, Ms.
4   Markoe. Especially giving that you are not reserving
5   time against disputes, this kind of harassment is not
6   appropriate. We are going to argue very forcefully that
7   you wasted time you could have reserved for things the
8   court may rule on.
9   MR. FREEDMAN: We will reserve the rest
10  of our time, then. Thank you.
11  MS. MARKOE: Okay. Great. Thank you.
12  MR. FREEDMAN: How much time is left?
13  Let us note it on the record.
14  MS. MARKOE: 22 minutes, 19 seconds.
15  MR. ROCHE: That is what I have.
16  MR. FREEDMAN: Great.
17  THE VIDEOGRAPHER: Are we off the record?
18  MR. RIVERO: We are off the record.
19  MS. MARKOE: Off the record.
20  THE VIDEOGRAPHER: Going off the record.
21  The time is 20.42. End of the hearing card number 7,
22  volume 1. This is the end of volume 1 video deposition
23  of Dr. Craig Wright.
24  ----------
25

MAGNA
LEGAL SERVICES

Page 386

CERTIFICATE OF WITNESS

1
2
3          I, Craig Steven Wright, am the deponent in
4    the foregoing deposition.  I have read the
5    foregoing deposition and, having made such changes
6    and corrections as I desired, I certify that the
7    transcript is a true and accurate record of my
8    responses to the questions put to me on 4th April,
9    2019.
10
11
12
13
14
15
16
17
18
19   Signed ..........................
20        Craig S. Wright
21
22
23
24   Dated this ....... day of ............. 2019
25

Page 387

CERTIFICATE OF COURT REPORTER

1
2
3          I, Paula Foley, Accredited Court Reporter,
4    do hereby certify that I took the Stenograph Notes
5    of the foregoing, and that the transcript thereof
6    is a true and accurate record transcribed to the
7    best of my skill and ability.
8
9          I further certify that I am neither
10   counsel for, related to, nor employed by any of
11   the parties to the action in which the deposition
12   was taken and that I am not a relative or employee
13   of any attorney or counsel employed by the parties
14   hereto, nor financially or otherwise interested in
15   the outcome of the action.
16
17
22
23   Signed ..........................
24        Paula Foley
25

Page 388

E R R A T A

1
2
3          (Please make any corrections here,
4               not in the transcript)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

MAGNA
LEGAL SERVICES

## A

**abide** 175:5
**abilities** 159:16
**ability** 6:22,24
  210:22 337:9,14
  387:7
**able** 31:22 57:1
  100:6 118:9 121:3
  137:1 216:15
  218:20 219:2
  238:7 258:24
  280:7,15 301:7
  339:1 371:25
**ABN** 348:9
**absence** 261:6,7,13
**absolutely** 20:7
  36:21 158:25
  221:2 226:10
  366:25
**abstraction** 50:23
**abusing** 9:13
**academic** 223:7
**accept** 270:16
  276:3
**accepted** 270:19
**access** 29:22 32:7
  55:24 56:2,5
  97:10 132:18
  133:9,15,17
  135:17,22 136:4
  137:23 138:3
  161:25 162:3,6
  187:7 207:17
  210:16,22 211:3,4
  211:13,16,18,20
  211:23 212:10,16
  212:18,20,25
  213:5,25 218:21
  231:17 234:10
  273:19,22,25
  279:24 379:22
  380:20
**accessed** 187:9
**accessing** 210:20
  214:6,9

**accommodated**
  366:12
**accomplished**
  374:19
**account** 67:19,20
  132:19 133:10,18
  134:6,22 135:2,9
  135:23 136:22
  137:4,9,17,17,19
  137:24 138:5
  179:24 209:10,20
  209:22,24,24
  210:3,13 211:6,7
  211:16,18,20,23
  212:11,18,21
  213:6,25 214:6,10
  273:1,2,20,23
  274:1,9 378:1,3
  378:10,14 379:5
  379:10,11,13,15
  379:20,22,24
  380:4,9,12,15,20
  380:21
**accountant** 102:12
  103:1,6
**accountants** 100:23
  101:4,9,17,22,24
  101:25,25
**accounting** 12:23
**accounts** 102:6,8
  102:11,21,21
  117:17 119:18,20
  190:23 209:11
  210:7,17,23 211:7
  211:10,13,15
  214:2 279:18
  281:17 378:8
  379:8
**Accredited** 387:3
**accurate** 28:8
  65:21 191:23
  192:5 219:14
  352:9 373:12
  386:7 387:6
**acknowledged**
  240:21

**acquire** 251:23
**acquired** 227:24
  228:15
**act** 194:3,7 269:21
**acting** 186:3
**action** 5:18 348:1
  387:11,15
**activity** 198:18,20
**actual** 161:12
  318:15 356:19
**Adam** 151:5,20
  152:3,7,14,19,25
  153:7,20,23 154:3
  154:8 175:11
**add** 82:7
**address** 5:24 6:2,4
  9:22,23 14:16,17
  14:24 43:6,18
  70:23,24 71:3
  72:18,20,22 73:1
  81:3,5,6 131:25
  148:12 150:25
  206:7 207:22,23
  246:3,5 248:1,16
  248:21 249:18,19
  252:17,17,25
  253:9,9 259:1
  296:9 349:20
  359:15 366:22
**addresses** 11:3,11
  14:13,23 60:16
  71:1 72:17 73:2
  190:3 206:11,14
  206:17 208:1,2
  209:8 245:24,25
  247:2 250:10,11
  252:2,12,13,15
  253:18 294:24
  300:13,16 301:1,6
  302:15,17,25
  304:18,19 325:24
  365:10,16
**adjournment**
  123:25
**administrator**
  138:7

**administrators**
  138:3,4,12
**Admitted** 2:6
**advance** 366:3,4
  383:11
**affect** 6:22,24
**affidavits** 374:12
**affirmative** 7:13
**Africa** 119:12
**afternoon** 124:6
  361:23 362:1,2
  370:5 374:18
  375:3
**age** 11:19
**agencies** 36:1
**agent** 282:25
  284:15
**agent-based** 283:3
**ago** 84:24 143:1
  187:18 246:16
  288:14 308:13
  311:10
**agree** 214:23,25
  256:21 257:3,25
  260:23,24 261:3,8
  261:14,17,19,20
  262:11,21,23
  263:3,4 377:20
  384:15
**agreed** 8:8 33:13
  257:1,5 303:18,25
  303:25 304:8,12
  350:10 363:12
**agreement** 134:1
  193:13 239:11
  257:2 261:1,12
  278:16,22 304:14
  363:12,13 364:19
**ahead** 75:19 144:23
  153:10 195:12
  252:10 291:11
  370:9
**aid** 218:24
**al** 4:4 154:2
**algorithms** 57:15
**alias** 132:2

**administrators**
**aligned** 218:23
**alive** 127:19,23
  130:10 380:16
**Allan** 130:7,8
  141:12 142:3
**allege** 33:22
**Allen** 142:3
**allow** 35:10 89:17
  97:22 106:16
  165:17 166:1
  178:12 256:25
  318:19 340:1
  365:6 369:6,15,19
  369:21
**allowed** 25:14,18
  69:15 157:10
  192:4 263:11
  278:9 362:11,13
**allowing** 260:18
**allows** 349:16
  369:10
**alongside** 207:8
**alter** 279:7
**alternate** 125:18,24
**alters** 81:9
**altogether** 157:9
**amassed** 199:9
**amended** 225:13
**America** 18:25
  231:16 312:14
  316:6 334:11
**American** 161:5
  258:7 346:16,18
  346:20
**Americans** 160:14
**Americas** 226:18
**amount** 47:8 48:5
  197:8 198:12
  199:8 241:11
  249:12,17,18
  252:12 329:25
  331:4 344:22
  367:3,6
**amounts** 246:9
  252:16
**analyse** 23:21



56:20 262:25
**analysed** 30:3
**analysing** 24:1
262:9
**analysis** 30:4
260:12
**Andresen** 330:18
330:20 331:5,10
331:13,20,25
**Andrew** 2:22 5:1
174:4 188:25
359:25
**Andrés** 4:22 15:22
263:7 359:19
**ANDRÉS** 2:10
**Ang** 18:6,19 20:2
**Ann** 102:14,17
105:1
**annoyed** 137:1,2
**annoying** 178:4
**annually** 356:6,8
**anonymous** 124:25
178:1 211:7
213:25
**anonymousspeec...**
178:11
**answer** 7:13 9:10
9:14 15:20 16:2
17:13,15 19:20
30:6,14 31:5 34:5
36:21 37:21 40:1
40:12,13,15,20
43:21 44:23 51:22
52:5 53:13 57:1
66:6,9,11,12,16
66:21 70:15,21
71:4,7,22 75:19
78:1 87:25 88:23
89:3,18,21 91:11
91:22 92:5,7 98:4
99:2 100:1 102:1
103:21 108:16
114:17,22 119:3
121:3,23 123:14
124:10 125:8
126:12,23 127:1

127:17 128:2,2,3
128:3,7,8 132:4
132:20 134:5,18
134:25 135:9
141:5 143:16,19
144:13 145:2,21
146:5,9,14,16
147:23 148:19
149:1,8 150:1,15
152:4,12,16 153:4
153:11,24 155:3
155:16 156:2
158:12 159:18
160:8,24 162:18
163:2,25 164:13
169:4 172:25
174:17 175:17
176:4,19,23
177:15 181:6,17
181:22 182:2,13
183:5,6,11,16,24
184:4 185:11
188:20 189:16
190:14,18 191:14
191:16 192:14,20
192:25 193:8
196:12,22,24
197:2,6,16 199:11
199:24 201:7
203:5,6,19 205:3
205:24 206:18
208:25 210:1,4
212:5 214:22
216:4,23 217:14
217:17,18,23
218:3,11 220:8,19
221:24 222:15,22
223:10 224:16
230:4,13 233:10
235:17,24 236:15
237:25 238:1,16
238:16 239:10
242:17,18 243:10
243:25 244:8,15
246:14 247:3
248:7 249:5,14

250:12 252:19
254:8 257:9,13
259:15,21 260:3,3
260:4,9 262:4,7
265:17 266:12
269:15,24 272:12
275:20 276:24
279:3,6 280:23
282:17 284:21
285:8 286:9,17,22
289:5 290:22
292:14,15,20
293:23 295:19
296:15 300:9
301:13 302:1,18
303:1,20 304:25
306:17,22 307:2
307:25 309:7
311:2 312:4 313:1
313:10 314:4,9
315:22 318:19,21
321:23 322:14,19
324:4 328:14
330:22,25 331:6
331:14 336:21
338:2,10 340:1,7
340:10,15 341:4,6
341:10 342:2,3,7
342:19,23 343:22
344:4,19 346:4
347:10 348:5
350:2,16,22
352:17 355:5,6,19
356:9,20 358:8,9
358:14,15 359:1
360:7,21 361:2,5
361:5,10 362:12
362:14,16 368:6
368:20,24 369:3,4
373:7 378:6
379:16 384:7,9,17
384:24
**answered** 20:18
36:24 37:7 69:12
70:20 71:14,15
121:11 146:24

169:4 188:19
203:10 213:8
231:1 257:10,14
263:10 275:20
282:17 338:1
374:15
**answering** 18:11
42:20 91:24 92:6
262:3
**answers** 58:15
179:23 203:20
226:8 259:1
277:13 361:17
369:2
**anticipating** 91:22
162:19
**antithesis** 260:16
**Anti-Fraud** 224:2
**anybody** 138:19
187:18 214:13
**anyones** 325:6
**apart** 100:25 129:2
186:12
**apologies** 106:21
178:5 340:23
**apologise** 117:2
129:19 200:8
332:22
**appear** 80:17
**appearances**
174:19
**appears** 301:21
321:20
**appendix** 300:7
**apple** 165:23
352:19
**applies** 53:13 57:22
**apply** 57:22 88:2
179:24 356:22
**appointed** 288:2
**appreciate** 78:5
89:24 91:21
313:19 374:20
**appropriate** 118:23
363:5 374:23
385:6

**approved** 19:4,10
19:10 352:22
**approximate** 10:17
10:19 85:16
**approximately**
47:6,10,19 48:14
49:25 55:8 56:23
80:14 149:4
196:19 200:14
216:25 265:7
347:1
**April** 1:18 4:7
47:16,18 239:7
242:16 246:3
251:22 265:10
386:8
**area** 86:16 185:17
216:17 368:4,8,22
370:22
**areas** 361:17
366:23 369:25
**argue** 37:4 258:6
385:6
**arguing** 43:15
**argument** 258:2
291:19 373:14
**argumentative**
148:6
**arguments** 369:20
369:22 374:5
**Armonk** 2:7
**arrangement** 92:16
**arrested** 346:22,24
**Arthur** 346:22
**article** 193:17,23
**ASC** 271:7,9
**ASIC** 96:12 99:11
122:18 124:8
265:12 271:10,11
271:15 274:21
275:1 276:15,16
281:25 282:15
**ASICs** 241:17
243:2
**aside** 364:10
**asked** 20:17 24:23



42:13 43:6,17
66:13 69:11 70:19
71:1,13 83:20
99:4 120:12 137:4
140:22 146:23
160:1 167:19
169:3 174:18
182:9 188:18
190:2 202:13
203:9 209:25
212:1 213:7 226:1
230:25 245:12
251:11 259:5
262:5 263:9
275:19 277:13
282:16 287:15
292:15,23 293:13
322:5,17 337:8
338:4,5,15 341:25
358:18,23 366:8
366:13 368:12
371:24
**asking** 14:9 17:18
33:19 36:1 57:9
59:15 82:12,18
95:16,20 97:17,19
97:25 98:1 102:11
112:5 119:8 123:6
135:1 143:1
144:10,11,15
149:9 170:22
172:10 178:24
179:6 199:16
220:18 224:15
229:9 233:14,19
234:25 238:18
246:23 251:6
253:5,7 270:25
279:6 280:10,10
282:5 287:14
308:11 312:8
314:18 322:16
337:17 342:6
361:16 364:24
366:20 367:21
**aspects** 142:17,18

142:18 255:21,22
**assented** 267:6
**asset** 113:19 119:5
**assets** 87:8 88:12
88:16,19 113:2,5
113:7,8,18,21,23
114:3,4,23,25
115:2 119:6,7,7
120:4,8,9 123:15
290:23 306:15,21
306:23 308:5,9,14
312:17 316:2
**assistance** 40:21
**associated** 176:17
232:21 248:12
348:9 357:8
370:20 371:16
372:19
**assume** 7:6 176:24
347:12
**assumes** 155:14
215:7
**assuming** 313:18
**assumption** 217:12
249:25
**assurance** 215:18
223:18 224:1
248:4
**ATO** 104:8,15
120:22 121:19
334:19,20,24
335:8,17 336:1,3
336:13,19,25
337:2,4,5
**attach** 147:12
**attached** 304:5
360:9
**attachments**
371:10
**attention** 160:5
332:4 354:2
**attestation** 256:14
256:20,25 260:21
**attorney** 387:13
**attorneys** 197:2
334:20 336:3,5,7

336:10 338:4,6,15
**attributable** 172:15
**audit** 95:23 101:23
102:6,20 103:25
121:5,21
**audited** 94:13,19
100:15 120:22
121:1,18
**auditing** 102:8,11
102:21
**auditor** 104:14
**auditors** 102:1
333:3
**audits** 100:20,21
101:18,25 104:8
**August** 167:7,12
168:2,4
**Aurora** 154:2
175:18
**auspices** 118:16,19
**Aussies** 153:13
**Australia** 5:23 7:21
7:22,23,25 8:1,3
10:13,14,23 12:12
14:11 17:17 32:20
83:15,18 84:20
87:12 110:9
122:22 123:9
131:5,11 143:9
197:14,18 233:23
253:17 256:24
258:3,18,18,22
262:15 334:22
336:4 356:15,22
360:24 364:16,19
**Australian** 32:21
94:14,19,22 95:4
100:16 101:10,18
101:23 103:23,25
104:16,22 121:4,8
121:11,13,18
139:11,12 141:24
263:20 264:14
306:3 332:5 333:7
335:12,24 337:10
337:15,16,17,21

338:6,20,21
349:12,13,15
364:18 369:11,12
372:13
**authored** 153:23
**authorised** 238:12
238:13 272:6,9
292:6 295:22,25
296:3,5
**authorises** 259:19
**authorising** 256:16
**authority** 118:24
226:3,6 364:20,22
**available** 11:5
132:14 139:25
163:24 164:3
168:21 177:4
241:7
**average** 11:19
**avoid** 98:4
**aware** 95:1,4,9,17
101:4 128:13,19
154:8 162:6
163:16 170:14
175:4 187:11
194:5 242:24
276:10 287:19,24
288:9 289:23
304:23 324:9
332:13,16 335:11
358:19 366:25
**awareness** 95:21
**awful** 283:11,11
**A(a)** 249:23 252:2,4
**A(b)** 249:23 252:3
252:5
**A-N-G** 18:8
**A-S-I-C** 96:12
**a.m** 4:8

**B**
**b** 241:4,8,8 243:21
264:20 267:18
354:23,24 363:10
364:8
**BAA** 275:10,14

**back** 8:2 41:3,9,13
42:11,14,14,19,24
43:8,23,23,24
52:16 77:21 81:18
89:24,25 108:9
121:10 124:7
142:21 151:5,20
152:3,7,14,19,25
153:7,23 154:3,8
156:5 157:6
158:24 159:3
160:5 171:16,20
175:9,11 193:8,9
193:9 197:17
214:8 221:10
224:21 231:12
232:10 233:6
239:21,22 243:3
244:25 245:2,9,14
245:16 259:23
260:18 274:9,20
274:21 275:3
282:8 283:17
285:11 297:3
312:2,7,24 319:15
333:16 335:17
353:9,24 358:2
365:22 366:15
374:21,24 375:14
379:14 381:19
**backend** 99:19
**background** 285:12
**back-up** 377:8,10
**bad** 13:14 39:10
135:11 149:21
**badly** 348:23 349:2
349:22
**bag** 328:17,19
**Bagnoo** 184:22
185:2,5,9,16,23
185:25 194:11,12
194:22,23,23
195:1,2 196:16
197:9 198:4,21
199:1,6
**banana** 356:15



banned 157:8
bar 311:24
barely 82:13
bargain 239:9
base 339:23
based 40:18 76:16
240:20 259:24
376:22,24 377:2
basic 66:25
basically 157:9
173:12 185:17
187:4 193:13
215:19 231:14
249:6 256:22
260:13 316:4
321:4 332:21,25
345:21 352:5
355:7 382:20
basis 40:13 89:5
126:25 153:20
192:5 238:17
296:14 364:2
bathroom 173:15
357:23
BBC 383:4
BDO 12:23,24 13:2
13:11,16,20 130:9
130:22 131:3
142:12
Bear 129:4,6,7,13
129:16,20,23
131:23 132:1,8
172:12
beard 212:14
beat 35:10 106:16
becoming 168:19
314:12
began 58:17 200:10
200:14,23 202:14
202:20
beginning 74:25
77:16 124:1 168:7
173:22 174:13
221:8 284:3 323:7
334:9
begins 4:2 141:2

behalf 2:2,9 104:17
104:18,24
belief 285:16
believe 37:2 38:3
46:13 50:7 63:11
63:25 64:5 71:6
76:23 82:18,20
89:23 91:24 92:4
92:6 97:1 99:3
100:12 102:20
105:12 107:2
113:10 116:20
117:8 125:11,17
125:23 131:10
141:19 150:4,6
159:7 161:23
167:22 217:16
246:22 249:9
258:17 259:3,18
263:13 264:4
282:19,20 288:1,4
295:24 300:2
325:9,17 326:13
327:5,11 329:16
331:11 338:1
343:24 355:23
359:2,19 362:8
363:3,8 364:4
365:10 367:20
368:7,24,25
370:13,15,18
373:10 380:19
382:23
believed 119:11
160:11
believes 363:13
Belize 84:19 85:7,8
315:10,13,14
316:15,18 319:8
belong 297:21
298:14
belonged 190:3
318:7
belongs 297:19
298:12,23
beneficiaries

290:19 305:13
beneficiary 288:24
292:25 305:16
best 48:6,17 57:9
57:13 88:14 160:3
198:24 214:17
230:2 250:16
325:22 387:7
bet 236:4
better 221:13
231:18 234:11,18
betting 235:22
beyond 25:6 39:19
88:21 89:19
103:17,21 141:4
144:4 152:9,12
156:1 181:11,17
181:21 187:14
190:13 199:12
203:17 214:21
216:7 225:25
238:8 242:12
244:15 285:21
340:15 362:11,18
363:18 364:9
365:20 383:23
384:4,12
BHP 219:20
Bianchi 380:24
381:3,6
big 129:12 171:12
303:14 323:20
bigger 345:9
Billiton 219:20
birth 5:21
birthdays 302:21
bit 9:12 30:3 109:7
147:6 158:11
165:7 180:22
203:16 212:25
218:25 236:21
262:9 285:3
287:11,13 371:19
BITC 311:7
BitCash 65:6
160:23

bitch 157:7
Bitcoin 8:16 27:7
27:11,14,16 28:5
28:20,25 29:2,5,6
29:14 32:4 38:19
44:9,12 45:2 53:6
62:16 63:6 64:1,9
64:17 65:7 67:7
67:14 69:3,9
70:17 71:12,18
75:23,24 76:17,17
76:18,19 83:23
87:1,4,8,19,20,22
87:23 88:1,1,5
94:9 96:17 98:22
99:20,25 100:2,4
100:10 106:10
113:4 114:6,7,8
115:2,4,7,11
117:20,21 118:25
119:14 120:18
121:14 123:10
124:17,24 125:2
126:17 128:24
130:13 133:23
134:11 135:9
138:12,13,16,20
138:23 139:1
141:12 142:13
145:4,14 146:8
148:24 155:10
158:7 160:7,10,23
160:25 165:6,11
165:13,15 166:3
166:10,22 169:11
175:10,25 181:25
182:7,15,22 183:2
184:2 187:12,16
188:24 191:9,10
192:9,17,23 194:9
194:17,19 195:1
195:25 196:3,8,11
196:19 197:8,13
199:7,8,23 200:5
200:10,12,15,18
200:21,24 201:1

201:15,18,18
202:15,20,25
204:14,14,17,19
206:6,10 207:8,9
207:10,13,14
209:3 215:4,10
220:3,7,13,21
221:18,20,22
224:10 235:23
236:3,4 237:1
241:10,12,18,20
242:2,4,8,10,15
242:20,25 243:15
243:17,19 244:13
245:13,18,24,25
246:3,4 247:2,9
247:25 248:16
249:12,17,19,22
250:1,5,10,23
251:2,8,15,23,25
252:17,24 253:6,8
253:17 254:2,4,9
255:1,7,8,9,10,13
255:14,16,17,19
255:21 265:1,11
265:12,23 270:13
270:16,20 276:4,8
276:11 281:14
284:15 289:7,10
289:12,14,17
291:6,12,15,22,23
291:24 292:1,11
292:13 293:2,2,3
293:4,21 294:1,6
294:11,15,21,24
295:2 300:4,8,16
301:1 302:24
303:23 308:17,25
309:2,9 318:12,15
319:4 323:18,24
324:6,21,24
325:11 328:6,21
328:21,22,24
330:1 331:5
332:24,25 333:2
340:9,11,13,25



341:17 342:2,12
345:7,10 351:17
351:25 358:24
359:1,4,8 360:6
362:10 363:1
365:3,5,17,18
367:1,3 368:5,13
368:17 371:23
372:7 373:4
375:20 376:15
**Bitcoins** 202:11
205:14 206:2,5
317:25
**Bitcointalk** 132:9
132:11,15,19
133:12,13 134:23
135:12,15,23
137:24
**Bitcointalk.com**
179:12
**Bitcoin-related**
88:8 215:5
**Bitcoin.com** 133:10
176:12 178:7
179:1,2,3,9
**Bitcoin.org** 179:16
179:20,24 180:4,8
180:18 181:5,13
181:19
**bite** 352:18
**Bitmessage** 72:12
72:14,15,18,23
73:8,9,11,13,23
73:23 75:5,25
76:3,6,7,12,16
**Bitmessages** 74:7
75:16
**bits** 140:16 291:13
312:20
**Black** 15:14 16:16
17:14
**BlackNet** 64:20,21
64:22 83:24
**Black's** 117:25
**blah** 208:2,2,2
**blank** 123:8

**block** 100:7 165:17
181:24 182:6,14
182:21 183:2,22
184:2,5,8,10,12
184:13,15,16,18
186:2,3,13,15,17
196:11 250:2
253:13 301:1
**blockchain** 28:1,3
38:22 44:15 62:16
62:20,24 63:6
64:9,17 67:7,14
69:4,9 70:17
71:12,19 75:24
83:23 87:15,23
88:2 96:19 125:3
243:17 253:2
284:16
**blockchain-based**
27:20,24
**blocked** 303:15
**blocks** 100:4 200:2
345:9
**bloody** 153:13
326:1
**blossoms** 273:8
**Blvd** 2:11
**body** 80:14 95:25
128:6 317:20
**body's** 95:21
**Boies** 1:21 2:3,6,22
2:23 4:10,11,15
174:4,10 359:21
359:25
**bonded** 350:12
**Bondi** 341:12
**bookkeeper** 102:13
**born** 5:23 7:21
**borrow** 308:17,24
309:2,9,10
**borrowed** 309:13
**bots** 379:5,13
**bottom** 227:10,19
228:3,4 256:17
266:7 284:10
291:21 299:22

310:9,17 315:9
321:8
**bought** 346:8
**bound** 175:3 257:1
257:2,3,5 260:23
260:24 261:1,3,8
261:12,15 262:12
262:18 263:3,4
264:10,10 363:13
364:3,16
**box** 305:22
**boxes** 83:7,9,10,12
83:14,16 299:12
305:23,24
**breach** 17:17 18:14
97:20
**break** 7:17 16:19
17:4,10,18,18
40:24 41:2 42:13
43:17 70:2 77:6
77:15 78:15,22
79:3 82:24 108:8
123:19 173:16,21
221:1,7,14 224:21
228:11 245:4,8,12
279:10 283:22,23
284:2,8 323:2,6
333:11,14,19
353:23 357:23
358:1
**breakdown** 281:17
**breaking** 108:3
**breath** 35:13,14
**Brenner** 2:22 5:1,2
5:4 174:3,4,7,8
359:20,24,25
**briefing** 369:7
**briefly** 40:6 42:17
103:7 361:9
**bring** 68:19 164:11
260:25 263:7
**bringing** 108:3
125:6
**brings** 258:4
**Brisbane** 5:23
**Britain** 160:13

**British** 120:25
121:5 226:24
256:13 264:13
306:4
**brought** 372:23
**browser** 148:1
**BTC** 245:24 319:16
321:4
**buckets** 228:12
**Budovsky** 346:23
**bugger** 136:1
**build** 275:18
**building** 345:4
**built** 231:12 232:10
232:12,14 345:1
346:6,10 382:21
**Bungaloo** 194:9,21
**burdensome**
365:12 368:14,25
**burdensomeness**
365:8 366:2
**business** 14:8
149:17 187:6
265:1,23 266:3
312:6 348:6,8
**businesses** 19:12
**B-A-G-N-O-O**
184:25
**B-E-A-R** 129:21
**B-i-t-C-o-i-n**
160:10

C
**c** 2:1 160:17 161:2
161:3,7 173:2
241:11,14,19
254:3 255:2
284:16 328:20
329:3,5,7 354:23
354:24
**calculated** 356:6
**call** 13:13 16:7
48:25 76:23
109:18 138:23
169:8,12 374:25
**called** 12:23 17:22

29:18 38:17 49:3
62:5 84:3,7,9
88:13 96:5 109:21
117:7 137:8
141:13 184:22
222:4,7,17 223:18
224:1,9 236:5
248:13 276:5
283:10 290:2
309:21 311:23
323:14 332:25
370:16 371:3
378:5 380:18,23
381:10,21,23
384:21
**calling** 28:6 173:10
300:16
**calls** 50:17 119:1
172:20
**camera** 40:14,17,18
45:6 49:9 126:24
127:15 128:11
176:7 233:3
316:25 357:13
361:11 373:17
**cancelled** 380:21
**capacity** 54:6,9
**capital** 161:2
277:22 278:2,4,13
279:15 280:3,17
281:18
**capitalised** 160:20
**capitalising** 160:13
160:17
**capture** 231:20
**captured** 83:6
132:12
**card** 4:2 77:13,17
123:23 124:2
173:19,23 221:5,9
283:25 284:4
323:8 385:21
**care** 72:7 93:17
149:17 219:21
220:1 230:6,6
257:19 266:2



274:23 282:7
303:16 339:15,17
347:17
**carefully** 91:18
**Carol** 15:12
**Cartesian** 50:22
**case** 1:6 4:5,6 18:23
19:2 32:4 36:22
95:23 127:7 161:2
161:7 175:4 226:3
226:6,19 261:1
311:18 337:7
365:1 366:18
367:15 372:24
375:11 377:23
**cases** 74:21
**cash** 64:25 124:25
281:13
**casinos** 231:15
**catch** 129:19
**cause** 217:8 246:7
250:5,10 345:24
346:6,10
**caused** 346:12,25
**cease** 84:14 85:4,10
85:22 306:13
**ceased** 84:15
**cent** 120:10
**centaur** 82:22,22
**centre** 240:22
**century** 52:17
**certain** 119:11
196:3 255:20
283:3 296:12
356:22
**certainly** 19:6 70:4
83:1 106:18
203:18 226:15
364:6,8 367:20
370:20 373:12
**CERTIFICATE**
386:1 387:1
**certify** 386:6 387:4
387:9
**CFO** 102:12 103:1
**chain** 165:18

**chance** 367:23
**change** 18:9 58:14
81:2,4,8 107:1
110:15,18,25
111:7,14 117:8
217:6 266:1 307:7
307:10
**changed** 18:19 20:1
55:22 110:21,25
111:5,6 131:25
172:11 283:12
307:9,13,15,16
**changes** 81:6
169:19 172:11,12
172:13 353:8
386:5
**channel** 272:4
**Chaos** 96:5,24
**character** 72:20,25
**characterisation**
346:11
**characterise**
153:13 173:12
**charged** 162:22
**charges** 346:24
**charitable** 119:10
**charities** 119:12
**charity** 12:1,1
**chat** 55:13,14 56:6
148:22 151:4,13
**chats** 54:11 55:10
55:10,11,12,18,25
56:3,4,9 67:12,18
151:14,15 172:7
172:10
**cheating** 316:7
**check** 153:25 154:4
164:19 212:1
229:20 307:14
360:11
**checked** 107:22
135:19 307:18
**cherry** 255:3 273:8
**Cheshire** 102:13
104:22 105:5,9,15
105:18

**child** 74:20
**children** 328:18
**children's** 119:12
**China** 231:16
**Chinese** 231:13
232:11
**chips** 276:21
**choose** 144:14
257:7 279:4
**Christians** 260:19
**chronology** 227:17
228:13,18
**chucked** 153:25
312:21
**circle** 19:24
**Circus** 6:5 14:24
**citation** 78:20
226:21
**cited** 175:9,19
**citements** 383:13
**cites** 226:12
**citizen** 258:7
312:12 337:16
**citizenship** 312:16
**city** 38:15
**Civil** 70:5 225:12
**claim** 18:25 223:14
347:25 349:25
352:2,14 354:8
357:1 369:11
371:15 372:12,17
384:3
**claimed** 252:12
382:25
**claiming** 262:24
**claims** 367:5
372:23
**clarification** 197:24
200:3 202:5 366:8
373:13
**clarify** 147:6
317:22 328:10
**clarity** 373:9
**clarity's** 247:19
**classify** 254:24
**clause** 243:5,7,11

243:21
**Clayton** 303:3
**clean** 69:7
**clear** 25:17 42:19
43:7 101:14
102:20 172:23
197:20,25 198:1
199:20 202:3
234:18 238:14,16
240:3 245:19
252:16 253:4
359:7 361:16
**clearance** 127:10
**clearly** 340:18
**client** 40:19 166:10
167:2,4,10 168:11
168:14,16,20
169:2,12,15,16
170:18 171:14,21
323:19 324:2
326:10 328:13
329:12 346:2
**client's** 320:11
**closed** 119:22 306:2
**closing** 362:5
**cloud** 21:20,25 22:5
22:9,11,14,16,19
22:21,24 23:2,5,7
23:11,15,18 24:20
25:25 26:7 27:7
28:14,14,25,25
29:4,6,14,17,22
30:1,8,10 41:15
42:3,5,7 201:15
201:17,18 202:1
**Cloudcroft** 99:9,9
99:15 101:19
105:22 106:23
107:4,9,14
**clue** 328:22
**clueless** 328:23
**coach** 78:8
**coaching** 25:7,9
**Cobham** 6:1 9:19
9:21,22,23 10:4,6
10:8,8

**CoCo** 283:8,11,11
**code** 106:7 153:20
153:22 154:20
165:10 166:10
168:16 172:10,24
173:12 187:8
207:16 216:20,21
216:25 217:4,4,9
217:9,22 218:2
231:8 236:10
254:3 255:2,6
271:19,19,21,23
271:24 275:3,5
283:5,7 284:24,25
328:20 357:6
370:19 371:15
372:18
**coder** 173:2
**codes** 166:21
284:16
**coding** 217:19
**Coin-Exch** 277:23
279:22
**Coin-Exchange**
276:6 278:1,4,21
278:22,24 279:1
279:15,24 280:4
280:17
**collaborate** 8:16
170:19 190:23
205:21 216:10,13
**collaborated**
170:24 205:20
**collaboration**
190:22 205:16
216:18 224:13,18
**collaborations**
224:25
**collateral** 248:6
267:25 268:10,11
268:18,19,20,23
268:25
**collect** 338:5,15
**collected** 335:13
337:21 372:15
**colossal** 384:13



**com** 179:7
**come** 7:22 8:5 9:3
  9:20 10:22 13:5
  54:8 58:17 134:1
  137:3 156:16,20
  180:7 183:2,22
  188:23 199:5
  200:9 208:15
  211:12 216:19
  244:13 245:18,24
  272:9 285:6
  286:21 294:20,23
  297:3 329:18
  346:18 359:15
  383:2,25
**comes** 189:15
  317:16 374:13
**coming** 366:6
  383:20
**comment** 67:4
  152:7
**commercial** 159:10
**committed** 371:9
**common** 52:19
  138:2
**Commonwealth**
  264:8
**communicate**
  54:19 60:8,11
  62:18,19 67:6
  68:2,9 72:11
  132:7 134:22
  135:2 171:18
  178:16,20,22
  180:3 208:11,13
  214:3 266:16
  309:16 342:25
**communicated**
  67:13 69:3 104:12
  153:1 171:17
  208:6,9,24 218:10
  266:14 342:21
  375:19
**communicating**
  261:21
**communication**

63:3 67:11 84:1
  143:17 148:17
  155:8 190:25
  199:14,17 201:2
  267:1,5 330:14
**communications**
  31:6 68:12 69:9
  70:17 71:11,18
  73:23 74:1 98:5
  130:15 136:7
  178:25 201:3
  209:21 218:15
  261:16,18 262:14
  263:5 266:20,23
  338:10 342:22
  360:19 364:6,11
  367:8,18 369:18
**communities**
  149:20 150:14
**community** 180:20
  185:19 207:11
  214:9
**companies** 13:15
  14:4,6,10 19:24
  32:19,20 62:1,3
  81:9 82:19 83:15
  84:5,6,7,9,15
  88:13 91:12 92:14
  93:23 94:4 99:11
  103:1,24 104:17
  104:23 105:6,23
  106:2,4 108:13,16
  108:19 109:1,3,9
  109:9,18 112:7
  116:21 122:11,14
  123:15 159:10
  167:21 220:4
  227:14 230:6,8,18
  231:3 237:7,14,25
  238:12,14,19
  247:11 250:17
  269:16,20 270:4
  279:18,20 282:5
  282:19 288:3,7,10
  288:13 290:25
  293:11 295:8

296:6 306:23
  308:2 314:3 319:9
  332:10,18 339:2,3
  346:11 355:24
  361:4 367:19
**company** 12:22
  13:12 62:5,9
  82:17 83:19 84:3
  91:15 96:6,7
  105:24 107:7,11
  109:14,14 111:20
  112:13 114:16,20
  115:14 116:16
  117:9 119:22
  120:4,4,5,6 121:5
  122:9,10,18 123:1
  161:22 163:19
  219:21 221:21
  230:19 237:4,6,9
  239:12 244:10
  246:17,19 248:13
  263:22 264:7,25
  265:22 270:2
  278:13 281:7,18
  287:17 291:4
  293:5 295:9 307:3
  307:6 308:11
  309:21 310:13
  311:8 312:10
  343:17 344:3,9,17
  345:21 346:8
  347:18
**company's** 318:6
**compel** 361:16
  369:10
**compelling** 369:8
**compilation** 296:4
  301:21 302:4
**compile** 157:19
  365:11
**complain** 244:22
  250:19 300:19
**complained** 250:16
  250:19
**complaining**
  163:20 379:4,8

**complains** 249:8
**complaint** 370:17
  371:10
**complaints** 247:13
**complete** 139:4
  298:7 350:11
**completed** 281:7
  355:13,13
**completely** 125:4
  133:24 185:17
  260:8 262:6
  300:17,25
**completeness** 311:1
**complex** 91:13
**composition** 24:10
**compound** 105:7
  148:18 177:9
  336:16
**compromised**
  211:1,2
**compute** 26:10,17
  99:16
**computed** 26:13
**computer** 11:13,22
  21:4,7,12 75:11
  86:22 159:22
  166:20 184:15
  185:8,15 200:17
  240:24,25 241:1,3
  300:14 303:22
  329:3
**computers** 8:14
  11:8,10,20 12:4
  20:14,24 184:17
  184:19 185:2,5,6
  191:5 194:19
  198:21 242:9
  316:20 362:12
**computing** 23:11
  23:16,18 26:7
  27:7 28:14 29:1
  29:14,17,23 30:1
  30:8 42:7 201:15
  201:17,18
**con** 18:24 316:4
  321:3

**complains** 249:8
**concept** 72:2
**concepts** 141:11
**concerning** 325:23
**concisely** 204:24
**conclusion** 359:15
**conduct** 265:22
**conducted** 227:6
  332:14,17 351:16
  351:24
**conducts** 264:25
**conference** 4:17
  43:25 44:6,8,11
  44:14,17,20,22
  47:1,4,7,11,20
  48:12,15 49:8,20
  50:1 51:10,21
  52:7,24 53:11
  54:4 143:2 223:7
**conferenced** 44:4
**conferences** 37:15
  46:20 53:19
  142:23,25
**confidential** 5:12
  175:3
**confidentiality**
  175:3
**configurations**
  196:4
**confirm** 42:15
  163:9
**confirmed** 162:24
**confound** 109:13
**confounding**
  300:11
**confuse** 109:13
  153:22
**confused** 10:10
  109:7
**conjunction** 362:15
**connect** 144:15,17
  146:3 182:3
  186:19 224:15
  242:13
**connected** 224:14
**connection** 144:22
  145:23 182:10,11



295:21
**Connor** 262:17
**consent** 372:15,21
**consequence**
383:20
**consider** 143:23
144:1 145:6 164:1
**considered** 62:12
145:3,8
**consistent** 169:13
**construct** 311:5
**constructed** 91:18
165:25 177:1
283:13,20 299:2
304:20 312:20
332:23
**constructs** 283:4
**consult** 40:19
**consulting** 350:11
**contact** 54:23 55:7
130:12,25 131:13
131:20,23 132:1
137:1 235:13
276:22 277:6
313:23 314:19,20
**contacted** 132:1
148:25 338:19
**contacting** 311:12
**contacts** 68:19
323:23
**contains** 80:14
**contemplate**
144:25
**contemplated**
366:10
**contention** 366:25
**contents** 143:16
320:10 336:7
**contest** 261:13
**context** 68:25 321:3
368:15 370:10
**contexts** 370:14
**continent** 312:15
**continents** 308:12
**continuation** 374:2
**continue** 19:22

25:2 43:15 192:1
195:18 203:19
263:11 355:10
375:12
**continuing** 9:7
**contract** 90:23
239:1,4,5,6,9
240:12 243:6,21
248:4 249:10
254:5,22,25 255:5
255:12,15 256:21
257:4,6,7,20
258:5,10,13,16,19
259:6,11 260:2
261:5,8,20,22
262:12,23 263:17
263:21,24,25
264:11 265:6,7,10
265:22 266:5,11
267:7,22,24 268:4
268:6,15,20 269:3
269:7,8 282:22
284:19 348:18
349:8,21,24 350:7
350:9,11,14,20
351:2 352:5 356:5
356:7,11,18,19
**contracted** 238:23
**contracting** 261:4
**contracts** 90:19,20
90:22 91:1 120:7
258:4 272:6,10
323:22 351:3
**contractual** 278:16
**contrary** 260:25
**contribute** 169:22
**contributions**
158:16
**control** 109:17
180:13,17 181:4
181:12 211:9
247:1 248:21
291:21 292:1
312:18
**controlled** 206:11
206:14,17 248:16

249:2 289:9
290:23 291:6,12
292:11,13
**controls** 245:23
289:12
**conversation** 18:18
54:12 133:25
182:11 190:6,9,11
190:19 191:22,24
373:23
**conversations** 31:3
316:25 320:4,9
336:8
**converse** 324:1
**conversing** 373:2
**convert** 248:4
**cookie** 59:6,8,10,12
**cookies** 59:16
**copied** 30:6 32:19
97:12
**copies** 29:25 83:10
162:9 379:23
380:3
**copy** 12:6 52:15
63:11 75:12 79:18
80:16,23 97:12
158:14 284:24,25
343:25
**core** 240:19,21
241:2
**corner** 189:19
**corporate** 335:16
**corporations**
269:14
**correct** 10:7,9 57:4
65:21 81:12,14
96:6,7 102:23
115:8,20,22 127:3
171:14 174:20
189:23 196:2,11
196:13 234:21
237:1 238:18,22
240:13 241:5,12
241:16,20 242:2
244:7 249:3 260:7
265:5,14 272:22

273:11 276:6
298:1,12 304:8
308:25 318:2
321:19 329:7
334:3,12,25 335:1
352:4 354:25
359:10 360:22
361:19 362:22
370:21 382:25
383:5
**corrected** 117:1
353:10
**correction** 320:5
**corrections** 386:6
388:3
**correctly** 81:11
244:24 329:1
**correspondence**
156:4 325:19
**cost** 185:19
**Costa** 87:12 231:14
231:16 244:4
319:9
**costing** 347:3
**counsel** 4:14 11:6
15:2 31:6 73:3
97:23 296:10
301:18,24 302:6
302:10 309:8
338:11,20 358:4
358:10 360:23
361:11,21 366:17
367:17 373:18
374:20 387:10,13
**count** 376:7
**countries** 35:21,21
35:22 88:9 204:21
233:19 234:1
**country** 127:6
204:13 256:23
374:21
**couple** 61:25 84:20
131:6 142:11
224:19 358:7,15
364:5
**course** 125:15

159:9 258:1
261:10 344:11
364:23
**courses** 285:14
**court** 1:1 2:14 4:6
4:13 5:5 7:11
15:24 16:7,11
17:16 19:4,10
20:11,12 34:5,21
35:9,11 40:14,17
40:17 42:15 43:7
43:12,24 49:9
66:10 78:8 89:9
89:10,23,25 94:16
99:5,7 106:15
123:18 126:24
127:15,16 128:8
128:10,17,22
142:2 176:7
183:13 184:24
192:2,3,6 199:20
225:15 226:25
238:6 245:2
251:19 263:8
274:23 279:3,9
283:21 293:18
295:22,25 296:17
317:9 331:1
332:20 333:5,20
349:13,15 352:3
352:21,21 353:6,8
353:11 356:13,25
357:13 364:16,18
365:25 366:1,25
372:3 373:19
377:13,18 383:10
385:8 387:1,3
**courts** 256:13
360:23
**court's** 78:2
**cover** 298:3
**covered** 18:20
307:8,12
**covering** 15:19
**covert** 272:4
**co-operate** 313:20



cracks 366:16
Craig 1:11,17 3:3
  4:3,4,22 5:7,22
  68:1 77:14,18
  84:3,8,9,11,17,22
  85:8,12,13,24
  87:14 90:2 91:3,8
  92:11 93:17 94:9
  94:13,18 95:5
  96:1 123:24 124:3
  132:2 144:19
  173:20,24 190:20
  221:6,10 227:18
  239:12 240:17,19
  244:6 245:24
  246:4,7,12,13,20
  246:22 247:1,8
  248:6,25 256:11
  256:18,21 263:20
  266:7 267:25
  268:3 269:6,7,23
  270:15,17,19,22
  272:7,10,16 276:3
  277:25 278:3
  279:14 280:2,2,16
  282:2,14 284:1,5
  323:9 330:24
  334:9 343:12,15
  344:2,8,14,17,24
  348:2,18 350:14
  378:12,13,21,25
  380:8,19 385:23
  386:3,20
Craig's 242:15
  318:12
craig.wright@inf...
  81:13
crap 177:24
crappy 356:15
crazy 331:1
create 8:16 53:6
  76:19 88:7,11
  99:24 100:9
  124:17,23 125:2
  144:20 190:21
  207:9 216:5 218:7

222:3,6,17,20
  223:17,25 224:8
  228:24 235:5,13
  258:8
created 14:5,6
  99:15 134:10,10
  193:12,14 201:20
  201:25 216:14
  222:12,25 224:15
  231:25 232:2,6,9
  234:9,20 255:14
  270:3 283:9 290:7
  290:9,11 302:16
creating 113:16
  234:13 243:15
  255:12,16 382:21
creation 96:15
  100:5 134:13
  204:13 215:4
  217:22 218:1
  234:14 258:2,6
creator 324:21,24
credentials 132:24
  213:22
creditors 247:13
crime 141:25
  142:12 258:7
criminal 194:3,6
  251:13 341:23
critical 158:23,25
critique 13:14
cryptocurrency
  323:14
cryptographic
  383:21
cryptography
  151:3,6 170:4
Cryptonaut 129:9
  129:13,16,23
CSW 227:22
currency 125:18,21
current 308:9,9,11
  361:2 363:14,25
  369:19,22
currently 5:25
  11:15 308:6

323:13
custodial 113:4
cut 136:5 261:25
  262:1
cut-off 346:3
cyberstalked 287:9
Cyberstalking
  287:12
C/C 254:3 255:2
  284:16
C01N 109:21,22,23
  110:1,3,10 111:4
  112:1,3,5,21,24
  113:9,17,18 115:7
  115:10,13,14,16
  115:17,19 117:5,7
  118:3,9,11,17,20
  118:22,24 119:14
  119:23 120:14,18
  120:22,24,24
  121:7,8,12,13,18
  122:5,22 123:3,8
  123:9,9 124:7,9
  307:13,15 381:10
  381:22,24

_____
        D
_____
d 3:1 354:24,25
Dai 129:3,22
  131:14 151:5
  167:16,17 168:1
damn 187:6 312:5
dark 134:9
data 12:3 23:21,22
  23:24 24:2,10,13
  24:19 25:25 26:2
  26:13,16 27:6
  29:25 30:2,3,4,8
  30:10,11 32:19
  56:21 99:18
  240:22 275:11
date 4:7 5:20 9:17
  17:1,6 21:7 63:12
  64:2,6,6 66:18
  83:21 99:10
  109:25 116:4

126:5 176:15
  179:22 239:1,6
  253:14 258:19
  265:9 350:23,25
  351:1 354:7,9
  383:16
dated 65:2 79:8
  350:7,9 386:24
dates 37:25 100:19
  101:2 156:23
Dave 33:16,18 36:1
  38:7,9,16 39:1,8
  39:11,21,22 40:4
  40:8 42:9,16,18
  45:9,11 46:23,25
  47:4,7,11,13,16
  47:20 48:12,15,17
  49:10,19 50:1
  51:3,10,20 52:7
  52:23 53:11,19,24
  54:5,7,8,24 55:19
  56:6,13,22 57:3
  57:11,18,24 58:4
  58:7,10,13,18,22
  58:25 59:2,6,13
  59:18,24 60:2,4,5
  60:8,11,13,17,19
  60:23 61:1,3,13
  61:16,19,22 62:4
  62:15,18,20,25
  63:1,5,8,18,21
  64:9,13,14,17
  65:2 67:6 68:3,10
  68:11 69:2,8
  70:16 71:10,17,22
  71:23 72:11,22
  75:12,25 79:8,19
  83:22 89:1 90:3
  90:12,15 98:9,13
  107:16 116:7,7,9
  123:7,7,12,16
  126:16 128:13
  133:16,17,25
  134:16,19,21,22
  135:12,14,17,22
  136:1,1,2 137:4

145:11,18 146:15
  146:21 147:7
  148:25 149:14,16
  149:22,23 150:2
  150:11,13,16
  151:6,11,20
  152:14,19,23,23
  153:1,5,7 154:7
  154:14,18 155:1
  155:13 156:7,9
  157:13 158:17
  159:1,1,4,16
  160:1,3,16,23
  161:2,5 168:4,6
  168:10,13,16
  169:15 170:8,11
  170:14 171:13,19
  171:20 172:8,9,10
  172:14,16,18,24
  173:2,13,14 176:2
  178:16,25 180:4
  181:4,12 183:10
  183:14 186:20,22
  187:7,7 188:11,13
  190:4 192:17
  195:12 196:15
  198:18,22,25
  199:9,15,17,22
  200:9 201:14,24
  202:10,14,24
  203:8 204:2,10
  205:1 206:2,5,8
  206:14,16 211:13
  211:16 212:10
  214:3,5,15,16
  215:6,10,13 216:6
  216:10,13,14,16
  216:17,19 217:3,8
  217:11 218:10,20
  218:24 222:16,20
  222:24 232:17
  234:14 235:18,18
  235:18 238:19
  242:15,20,24
  244:3 250:18,19
  254:15 256:2,8



257:3,9,12,23
258:12,18,24
259:6,11 260:1
261:19,21,23
262:9,10,16,19
263:3 264:4,9,9
264:10,18 266:2
266:10 267:6
275:18 276:11,17
276:22 285:14
286:21 287:1
292:18,21,25,25
293:1,2,5,6,7,8,12
293:13 312:10
316:13 317:24
318:8,12 319:1,6
319:7 320:22
321:1,5,18,21
322:3,11,13 325:6
325:15,18,20
330:13,16 341:17
341:21 342:1
343:3,6,9 345:11
345:18 346:6,7
347:2,13 355:9,10
355:21 360:5,15
360:19 362:15,16
362:25 365:18
367:3,5 368:23
371:22,22 372:8
375:24 376:14
380:15 382:19,20
**Dave's** 111:10
128:19 144:8,19
149:6 156:10
158:15 190:20
207:22 218:8
233:8 258:10
315:24 341:20
343:17 344:3,9,17
346:7 373:4 377:8
377:10
**David** 1:7 8:16
242:7 283:1,6,7
**day** 91:14 190:2
204:17 341:22

380:10 386:24
**days** 187:17 305:24
**de** 2:11
**dead** 355:23 360:15
382:23
**deadline** 366:1
**deal** 16:10 174:21
231:14 233:3
368:14
**dealing** 149:19,19
232:17 261:4
**dealt** 42:3 103:9
231:3 366:4
369:24
**death** 99:1 111:10
282:10
**Deborah** 317:7
**debt** 347:17
**debtors** 247:13
**debunk** 384:2
**December** 12:25
14:3 133:20,21
137:3 195:3,15,16
195:24 196:9
306:14 358:25
365:11 380:22
**decide** 78:14 125:5
145:14 161:9
165:5 167:9 337:3
**decided** 73:19
128:23 140:8
325:12
**decision** 373:21
**declare** 334:10
**decline** 373:23
**deduced** 285:18
**deed** 297:14 308:24
309:1 312:3,25
**deem** 78:6
**deemed** 256:11
**deep** 329:2
**defamation** 150:4,8
**defaming** 162:21
**default** 248:5 268:3
**defective** 260:9
262:6

**defence** 358:10
360:22 361:11
368:16 369:6,15
369:20 374:11
**defendant** 1:12 2:9
348:19 349:9
350:10,13 351:23
354:20 372:9
**Defense** 1:7 239:12
263:19,22 264:2,5
264:18 350:15
**defer** 368:6 369:14
374:10
**deferred** 383:11
**define** 27:13,13,23
49:16 52:10 53:25
55:1 86:15,18
177:16,23 178:19
198:19 255:8
**defined** 28:4
117:23 264:17
**definitely** 51:7 59:3
59:7 72:25 101:1
221:16 226:3
**definition** 209:1
253:24 256:9
257:1
**definitions** 52:16
**deformation** 65:3
**degree** 226:24
264:11
**delete** 74:13 274:2
**deliver** 247:8 283:2
**delivered** 83:7
337:19
**demonstrate**
259:11 260:1
**Denariuz** 305:9
306:10,21 307:14
307:16 308:5
**Department** 218:23
317:5 355:8,20
357:7
**depending** 209:2
**depends** 209:4
364:4

**deployed** 283:14
**deponent** 3:2 386:3
**deposed** 369:14
**deposited** 114:16
114:19
**depositing** 120:8
**deposition** 1:16 3:9
4:3,9 5:11 6:23
8:8,9 20:5 42:24
43:3 65:16 73:3
77:14,18,25 88:21
123:24 124:3
144:5 145:25
146:1 173:20,24
174:6 175:2
187:14 199:13,19
203:17,20 216:8
221:6,10 234:6,7
259:1 284:1,5
292:4 323:9
352:18,19 359:5
359:22 362:4
363:2,5,11,21
364:9 365:15,20
366:4 367:7 374:2
374:3 375:12
383:11 385:22
386:4,5 387:11
**deposition-taking**
7:9
**Derivative** 216:11
222:7 223:3
**describe** 118:8
226:4
**describing** 69:18
**Design** 62:6 110:12
111:4,23 112:15
306:24 307:9
**designed** 99:15
**designer** 106:5
**desired** 386:6
**desires** 243:22
**Desmond** 82:10
**Despite** 225:22
**destroy** 119:6
**destroyed** 75:5,8

**detail** 55:16 257:10
368:19
**detailed** 272:2
**detailing** 86:18
**details** 53:2 72:8
121:23 127:15
137:17,19 140:18
144:19 190:20
198:17,20 213:10
229:20 277:6
293:13
**determination**
127:16
**determine** 19:23,25
20:2 285:23
286:15 292:9
311:19 338:20
340:17 367:11
368:7,10 373:24
**determining** 96:16
**develop** 88:2,3
168:10,13
**developed** 186:24
218:24 241:17
276:21 277:24
283:17 287:12
323:24
**Developers** 76:18
**development** 28:20
28:24 29:1,5,5,8
29:14 99:16 207:7
244:7 283:1
323:18 326:10
328:6 351:17,19
351:21,21,25
**development/Res...**
265:4
**device** 11:14 21:17
**devices** 24:20 25:25
30:21 31:1,11,16
31:23 41:16 42:3
99:17
**DEVIN** 2:3
**de-designate** 5:13
**DHS** 255:24 275:10
275:14 370:19



371:16 372:19
**dialogue** 66:10
**dictated** 165:22
**dictionary** 52:15
117:25 322:10
**died** 47:9,13,16
98:16 116:7,7,9
242:7 282:9
354:20 382:20
**difference** 171:12
**different** 10:15
14:2 23:25 35:19
79:17 84:16 88:8
96:16 104:9
105:13 110:11
125:2,3,4 135:7
156:13,15 157:14
161:16 165:24
218:22 219:1
232:13 239:25
255:4 258:10
291:13 298:16
300:12 301:6
302:14,15,16,20
302:20 304:5
312:21 325:5
328:2 354:13
361:4 382:3
**differently** 165:22
**differs** 124:24
**difficult** 76:21
258:4
**difficulties** 65:3
150:9
**digital** 55:13 64:25
74:19 124:24
**digitally** 260:13
**direct** 91:19 118:14
160:5 325:19
328:12 330:14
332:4 354:2
368:24 379:23
380:4,10
**directed** 52:19
118:24 238:7
**directive** 78:2

**directly** 324:1
372:22
**director** 13:12
288:1,3,10 339:1
354:19 361:3
367:20
**directors** 122:5,8,8
**directorship**
288:14 339:5
**directorships**
288:13
**disagree** 261:7
338:17
**disappear** 314:15
**disappeared**
186:24 201:21
314:18,21,24
**disappointment**
134:16
**discipline** 287:13
**disclosed** 174:23
338:11
**disconnecting**
195:11
**discovery** 226:2,14
337:22 362:5
**discrepancy** 228:23
**discuss** 16:18,23
17:3,9 18:21 38:9
38:18,21 40:13
55:19 56:6 59:6
59:12 75:24
127:14 141:10
143:14 176:7
198:17,19,21
199:8 264:13
297:1 329:25
330:5,10 331:4,9
331:12,15 363:12
363:16 367:22
382:18,22
**discussed** 49:8 59:9
64:14 130:7 141:9
141:11 148:10
160:11 171:23
188:24 341:17,21

374:24 382:21
**discussing** 75:23
78:18 127:12
175:11 273:15
333:20
**discussion** 40:18
45:4 82:24 216:7
303:14 361:11
**discussions** 76:2
143:13
**disillusioned**
133:23
**dismiss** 19:2
**disposal** 250:24
**disposition** 91:16
**dispute** 226:20
257:23
**disputes** 385:5
**distinction** 205:14
208:3
**distribute** 258:8
**distributed** 232:13
232:19
**distribution** 167:7
233:4
**District** 1:1,1 4:6,6
333:6
**dive** 119:6
**division** 142:1
**divorce** 16:18 17:1
17:6 363:11,13
**divorced** 16:21,23
**DMCA** 378:16
**docket** 126:10
189:23 240:5
**doctor** 6:8 52:1
109:7 253:4
264:12 285:2
332:4
**doctored** 332:22
**document** 65:10,10
65:14,14,19,23,24
66:13,13,24 67:4
67:4 157:4,8,11
159:1,11 189:20
227:11,13,15

228:7,8,25 239:15
241:22 254:6,10
256:15 290:14,21
297:16,16,19,21
298:1,7,9,12,14
298:16,18,22,22
298:25 299:14
300:25 301:2,19
301:25 302:4
304:3,4,5,18
308:16,20,21
311:4 315:7 333:9
334:15 348:23,24
349:4 351:7
354:10,11,13,14
355:5 365:9
**documenting** 28:21
**documents** 83:11
122:2 163:20
286:3 290:15,16
290:17 292:24
293:14 297:10,12
297:17 298:19
299:2,5,10 300:19
301:22 302:4
304:20 312:21
333:7 334:18,20
334:21,24 335:7
335:12,17 336:1,1
336:3,4,10,12,14
336:15,18,22,24
338:5,7,13,16,21
349:18,19 351:20
352:3 353:3,7,10
355:2 357:9 362:6
**document-wise**
353:7
**doing** 26:17 78:8
82:7 88:14 106:20
122:11 125:12
135:20 138:9,24
142:11 154:1
158:22 160:14
177:24 187:21
188:11 191:20
195:7 199:1

227:22 228:13
231:11 232:4
264:12 285:15
287:15 341:22
352:1 356:25
369:3
**dollars** 227:21
251:17 372:16
**domain** 81:9
176:12,14 177:14
177:20,21 178:7
178:17,20,23
179:7 180:5,8,11
180:13,18 181:1,5
181:13,20 223:23
224:7
**domains** 81:8,17
180:6
**donate** 11:25
**donated** 74:20
**door** 231:12 232:10
**doors** 233:6 362:5,5
**Dorian** 213:14,15
213:17
**dot** 179:7,13
**double** 41:13
**double-check** 159:2
162:20
**doubt** 210:24,25
**download** 122:19
**downloaded** 166:21
**Dr** 3:3 4:3,25 5:7
5:15 8:13,22
18:17,22 19:12
20:14 25:23 30:20
31:2 35:8 37:5
41:6 68:1 69:6
71:4 77:14,18
78:15 82:23 97:22
98:3 106:13
123:24 124:3,6
126:22 132:2
145:19 173:20,24
175:9,23 176:11
188:23 217:15
221:6,10,13 238:7



245:12,23 247:18
256:18 258:25
262:5 263:7
264:21 265:6
267:4 269:22
271:1 277:12
283:9,17 284:1,5
284:8 295:8,10
296:1 297:7
307:18 308:16
309:7 312:25
313:15,19 315:2
316:10 317:2,20
320:20 322:11
323:9,12 333:5,19
334:23 335:11
338:4,15,19
339:18 341:25
345:24 352:20
358:18,19,21,23
360:13,18 361:1,9
361:16,21 362:10
363:10 365:17
367:1 368:4
369:13 371:21
372:3,4,14 373:2
373:3,6,17,24
374:4,8 375:18
376:14,21 377:7
377:25 378:12,13
378:21,25 380:8
380:19,23 381:9
382:24 385:23
**draft** 136:13 139:1
139:7 191:5
301:18,24 302:6
302:24
**drafted** 348:23,24
349:2,22
**drafting** 138:16
350:18
**drafts** 136:25 141:7
142:15
**drank** 38:10 39:5
**Dread** 186:10
**drill** 55:11,17

287:11
**drink** 7:17 38:11
323:2 357:22
**drinking** 204:16
**drive** 14:24 21:14
74:23 75:4,13
319:16 321:5
**drives** 21:6 74:15
74:17,18,24 75:15
262:25 377:8,10
**driving** 330:25
**drove** 38:16
**drunk** 204:16
**dubbed** 100:3
**due** 346:23 360:21
**duration** 242:15
318:12
**D-E-B-O-R-A-H**
317:10
**D-E-S-M-O-N-D**
82:11

**E**

**E** 2:1,1 3:1 388:1
**EA** 256:14
**earlier** 5:17 41:14
109:8 210:19
283:10 313:22
344:18
**early** 55:14 167:7
175:24 202:22,23
289:7 290:4
319:15 372:5
**earn** 196:3 241:15
241:19,23
**earned** 196:10
**ears** 102:22
**earth** 313:16,17
**easier** 21:11 158:20
207:15 245:15
**Eastern** 84:20
**easy** 77:22 158:21
**economic** 224:1
356:16
**EC4A** 1:22
**edit** 136:20 156:7

168:16 169:15
**edited** 136:7 156:8
172:24
**editing** 63:22 65:4
159:8
**edits** 156:10 171:16
171:20 172:15
**effect** 365:13
**effectively** 14:1
28:5
**effects** 96:16
**effort** 78:5 375:9
**efforts** 374:20
**either** 25:12 30:4
34:6 37:24 63:10
66:8 70:24 89:2
110:11 123:6,8,9
144:13 174:21
220:22 222:16
248:24 318:18
347:16 358:8
362:15 369:22
370:21 374:1
**electronic** 64:25
65:6 75:5,8,15,16
260:11
**Ellen** 108:12,19
**else's** 158:21 342:7
**email** 317:23
**emotion** 158:20
**employed** 12:11,16
12:21 13:3,6,8
387:10,13
**employee** 120:7
387:12
**employees** 41:15,22
41:24 42:1,3
**employer** 13:3,6
**employment** 13:13
**EN** 142:5
**enable** 83:3 219:2
235:22
**enabled** 231:13,16
231:18,20 234:10
**enacted** 90:14
**ended** 250:23 252:2

252:24 347:3
**ends** 253:6
**engineers** 163:6
**England** 260:20
**English** 54:21
**enhanced** 231:10
232:3,12,16
243:14
**enquire** 295:8
296:1,6
**enquiring** 368:4
**ensure** 88:14,16
134:11
**ensured** 92:13
**enter** 90:11 98:12
272:6,10 374:25
**entered** 19:24
90:17 243:6
266:11
**entire** 5:11 150:19
191:3 193:17,22
204:17,20 312:14
**entirely** 195:16
226:1 335:2
373:12
**entirety** 264:16
**entities** 77:3 87:4
87:15 88:7,11,25
90:20 91:4 94:18
95:6 96:2 238:8
244:20 296:2,4
349:17
**entitled** 89:12
191:19,20 216:11
308:17,24 375:18
**entity** 90:23 96:4
96:13 97:15 98:10
98:12,20,22 99:1
99:3,8,14,20,24
100:9,15 101:12
107:16,19,21,23
108:1 109:21
118:12 120:25
121:7,8,10,11
263:20 264:8
269:4

**entry** 126:10
189:24 240:5
**envisioned** 99:5
243:18
**EOS** 323:14 326:1
**equipment** 11:24
**Ernst** 102:4 104:3
**error** 265:5 300:15
301:22 320:16
349:3 350:18
351:22 353:5
354:6,13
**errors** 353:1
**Especially** 385:4
**ESQ** 2:3,5,22,23
**establish** 8:13
145:23
**established** 97:5
99:1 181:12
205:17 238:19
339:25
**Estate** 1:6
**et** 4:4 154:2
**etcetera** 17:19,19
21:8 37:16 74:21
159:2 163:20
172:13 181:1
185:22 247:15
261:4 267:10
272:5 274:23
275:17 300:15
312:19 325:12
**ether** 148:2
**Ethereum** 88:3
**European** 84:20
**evening** 361:24
**event** 169:8
**eventually** 20:5
33:22 100:6 113:3
160:16 200:23,25
207:12
**Everyday** 253:7
**everyone's** 374:20
**evidence** 66:25
134:12 155:15
215:8 260:24



261:1,15 262:24
274:18 312:22
**exact** 9:17 11:2
14:15 24:9 37:25
53:2 85:2,14 96:8
112:2 118:6 126:5
133:19 156:22
179:22 213:9
259:2 281:8
325:10 344:21
**exactly** 44:5 45:16
53:22,25 54:14
80:15 85:11 93:19
102:5 110:13
113:10 118:20
142:20,21 152:22
156:12 158:11
172:24 173:1
189:1 202:21
211:19 248:23
254:14 263:10
265:18 285:11
335:22 341:11
378:22
**examination** 6:13
**example** 55:13
**exchange** 62:10,11
62:11 79:22 81:1
81:7,8,10 125:24
204:8,9,25 206:2
206:4,6,7 251:16
254:2,4,10,19
255:1,19,21 315:4
351:17
**exchanged** 205:13
**exchanges** 317:23
**excuse** 177:25
**exercise** 118:24
**exercised** 118:22
**exhibit** 3:10 78:16
78:17 79:7 126:8
126:9 150:6 160:6
161:16,17,18
189:7,17 193:5,11
227:7,10 239:2,4
259:17 263:14,14

263:16 278:11
284:9 296:18
297:8 302:6,7
314:25 315:3
333:15,22 347:19
347:22 370:17
371:4
**exhibits** 3:9 244:21
278:10 295:15
**exist** 74:6,7 76:6,7
84:14 85:5,10,22
121:24 137:19
139:22 162:2
201:19 219:13
296:11 306:11,13
343:21 349:18
351:20 353:3
355:2 357:9 367:8
**existed** 20:15 76:20
79:17 306:15
**existence** 107:21
116:19,24 117:5
183:3,23 230:7
286:2 290:3
**exists** 50:25 306:12
311:8 365:9
**exodus** 217:20
**expect** 179:7
241:19,23 311:6
**expected** 241:11
**expecting** 352:4
**expects** 241:15
**expert** 74:19
158:19 369:11
**explain** 19:8 89:5
109:10 144:5
177:4 189:3,8
204:5 205:7,12
265:23 268:2
282:24 315:12
**explained** 253:5
**explaining** 320:25
**explanation** 40:16
126:24 253:6,7
254:19
**explicit** 208:21

**exploitation** 74:21
**explore** 367:20,24
**explorer** 253:13
**exposed** 380:22
**express** 95:21
**extension** 366:9,13
**extent** 19:21 31:5
303:2 334:19
336:2
**extra** 275:6
**ex-wife** 15:17 17:6
218:18 360:18,24
364:14 369:5
**eyes** 200:7
**e-cash** 125:4
**e-mail** 54:4 58:25
59:2,18 60:5,15
60:17,19 61:13,16
62:15 63:11,12,13
63:16,25 64:2,3,8
64:14 65:1,7,8
66:1,3,17,18,19
67:12,17 68:19
70:23,24,25 71:3
72:24 79:7,9,11
79:15,18,25 80:5
80:8,10,13,17,24
81:2,4,12,15,25
83:21 126:11,14
131:15,16 132:9
136:2 138:8 147:9
147:13 148:15,16
148:21 150:3
155:5 160:6
161:16,19 179:7
209:3,8 210:2,6
210:13 212:3,4,8
256:16,19 273:1,2
273:20,23 317:21
317:23 318:24
321:3,18 325:24
327:21 329:11
342:22 360:19
372:25
**e-mailed** 59:20
60:23 61:1,19,21

104:13 171:11,13
171:16 287:14
329:16
**e-mailing** 58:18,22
63:18
**e-mails** 60:7,10,13
60:21 68:2,8,11
68:21,24 69:3,8
70:16 71:9,10,17
129:2 132:13
261:7 262:25
315:4 335:17

**F**

**F** 244:7 245:13
246:2
**fabs** 345:23
**Facebook** 67:19,19
67:20 262:13
**facilitate** 136:4
**fact** 6:22 109:15,18
225:14 251:24
260:16,19 284:24
307:16 309:2
335:6 366:19
376:2 379:4
383:21
**facts** 155:14 215:7
307:15
**failed** 134:14
174:16
**fails** 220:22
**fair** 144:16 352:8
362:8
**fairly** 214:18 258:9
368:12
**Faketoshi** 384:21
**false** 220:22,23
**familiar** 80:16
191:3 270:9 276:1
281:22 327:20
380:25 381:6
**familiarise** 240:6
**familiarised** 267:19
**family** 18:21
164:14 331:16

**famous** 303:9
341:22
**far** 97:1 173:12
175:25 242:24
243:16 247:6
363:4 372:7
**faster** 384:9
**father** 315:25
371:22
**fault** 10:10,12
**Faustus** 379:2,3
**FBI** 35:24
**features** 277:9
**February** 126:4
318:23
**federal** 70:5 95:21
141:24 311:14,16
337:3
**feedback** 172:1,3
**feel** 7:17 9:13 78:6
128:7 221:13
262:4,7 300:18,20
**feels** 364:16
**fees** 253:3
**Ferrier** 309:23
**fibre** 185:17,18,21
**fiction** 193:11,15
193:18,23
**fight** 319:15
**fights** 150:10
**figure** 171:10
205:19 225:3
250:22 307:20,22
322:23
**figured** 77:22
**figuring** 318:1
**file** 81:19 161:11,12
161:14 216:15
236:10 352:14
355:24 366:9,20
368:16 369:6,15
369:16 374:11
**filed** 17:16 353:2
355:22 360:23
366:3,5,10
**files** 81:7 164:2,5



300:14,14 303:22
303:22 335:18
377:8,10
**filing** 355:10 365:8
365:12 366:14
374:23
**final** 158:1 368:19
**finally** 372:25
**finance** 96:5,25
247:11,13 248:8
248:11,22 249:2,7
**finances** 281:9
**financial** 141:25
142:12 224:9
279:18 313:9
**financially** 387:14
**financier** 240:13,17
245:23 246:2
248:3,5
**find** 16:8 82:14
129:10,13 147:7
147:21,25 148:8
163:14,16 187:5
190:16 199:5
262:24 263:2,4
296:13 332:25
383:15
**fine** 5:14 6:8 77:10
123:20 281:24
286:9 354:23
361:25
**finish** 69:6 158:3
201:22 252:21
262:4 263:11
267:4 296:1 313:7
**finished** 141:15
**Finney** 129:4,22
153:19 154:5,14
154:19,22,24,25
155:20,22,23
156:5 172:12
175:16,20 188:5,7
192:12
**fired** 103:13,15,19
138:9
**firewall** 231:13

232:11
**firewalled** 207:12
**firm** 12:23 94:1,3
143:10 303:6,9
**firms** 303:7,16
**first** 9:24 15:11,15
16:2,8 53:24 54:5
63:7 64:8,16
83:22 84:1,11
95:23 105:13
108:12 129:7
142:3 145:11
157:6 167:7 168:6
169:1 176:14
179:19 180:5
182:6 184:2,12
189:25 191:10,12
191:20 199:22
200:5 201:20,21
215:5 238:23
263:23,25 264:17
285:6,10 286:20
286:21 297:25
298:2,3 309:21
326:2 359:11
361:13 362:9
365:25 368:4
371:20,21 384:23
**fit** 254:4,10
**fits** 8:10
**five** 48:3,5 67:23
**five-minute** 323:1
**fixed** 154:5
**FL** 2:12
**flashing** 178:3
**Flexiteek** 226:18
**Flexner** 1:21 2:3,6
2:22,23 4:10,11
**flip** 186:10
**flippant** 321:2
**Florida** 1:1 2:4 4:6
37:23 38:1,6 46:1
46:14 263:19
264:18 333:6
**flowers** 273:8
**fluctuates** 356:12

**fluffy** 51:1 177:24
204:6
**flush** 369:20
**FNE** 96:5,24
**focus** 233:21
**Foley** 1:24 2:15
4:13 387:3,24
**folks** 233:9 248:15
248:20 249:2
250:22
**follow** 148:17
233:13 234:12
311:17
**followed** 148:21
287:13
**following** 245:23
290:6 334:11
**follow-up** 339:13
363:24
**foolish** 243:1
**foolishness** 70:12
**forced** 332:21
**forcefully** 385:6
**forecasting** 96:14
**foregoing** 386:4,5
387:5
**foreign** 204:21
**forensic** 74:19
**forensics** 159:23
**forget** 112:3 130:23
**forgotten** 213:16
**form** 20:20 24:25
25:6,16,18 50:20
63:2 65:6,12 66:8
67:2 69:14,17,19
72:1,4 77:24
97:15 113:3 119:8
134:11 139:7
226:1 252:9
253:20 260:8
**formal** 127:10
136:16 365:7
**formalised** 290:4
**formally** 42:21
162:22
**format** 55:14,16

**formation** 33:16,18
33:22,25 113:1
120:12 182:5
**formed** 72:1 84:23
85:1,8,13 98:15
98:18 110:10
111:23,25 112:12
113:12,13 117:9
117:11 277:23
303:6
**former** 16:19,24
17:2,3,9 80:25
104:10 130:9
**forms** 14:2 56:6
313:25 345:22
**formulated** 283:6
**forth** 228:17
**forthcoming**
282:11
**forum** 135:12,15
138:2
**forums** 155:4 209:3
209:4
**forward** 65:3 71:5
166:3,19 228:13
349:6 359:2
375:11 382:24
383:2
**forwards** 335:17
**fought** 352:4
**found** 11:10 13:25
148:4 158:24
299:12
**foundation** 140:7
152:15 154:16
168:12 212:12
242:11 324:10
331:21 332:1
**founded** 13:24 14:1
84:12 96:10 99:9
109:12,23 122:23
291:1,5 293:24
306:23 308:10
**founders** 346:22
378:18
**founding** 106:23

360:20
**four** 67:23 130:6
190:1,3 216:25
217:6,22 218:1
275:10,14 299:2
304:20 308:12
312:21 314:20
361:7,13,17
363:22 366:23
369:24 370:13,24
371:5
**FPGAs** 241:17
**frank** 366:14
**fraud** 316:4 333:3
**fraudulent** 18:25
**Freedman** 2:3 3:4
4:18,18 5:3,8,9,14
5:17 8:12,21 9:9
9:15 10:3 11:12
11:23 12:15,19
13:10 15:6,10,22
16:1,4,10,14
17:11,25 18:16
19:6,9,17,23 20:3
20:10,13,19,23
23:14,23 24:6,12
24:23 25:5,16,21
26:4,12,18 27:1,5
27:10,15,19,25
28:13,23 29:7,12
29:21 30:19,24
31:10,15,19 32:1
32:11 33:2,15,21
34:2,11,16,23
35:3,15 36:3,7,15
37:3,10,22 38:5
38:25 39:6,18
40:3,7,22,24 41:5
41:8,12,20 42:23
43:1,2,4,10,14,16
43:22 44:2,13,19
45:7,19,25 46:9
46:15,22 47:15,23
48:2,10,19 49:6
49:13,17,23 50:4
50:8,15,19 51:2,8



51:14,18 52:11,21
53:5,9,17,23
54:16,22 55:2,23
56:16 57:8,17,23
58:3,21 59:17
60:3 61:12 63:17
63:23 64:15 65:11
65:15,25 66:7,15
67:1,5,24 68:6,15
68:20 69:1,13,17
69:20 70:1,4,8,14
70:21 71:16 72:10
73:6,12,16,21
74:2,10,16 75:3,9
75:19,22 76:10,25
77:7,10,20 78:7
78:13,21 79:2,5
79:14,24 80:4,9
80:18,22 82:3,8
85:21 86:8,12,21
86:25 87:10,21
88:6,17,22 89:2,7
89:11,14,20 90:1
90:6,10,16 91:2,7
91:20 92:10,15,19
92:25 93:4,10,21
94:2,12,17 95:15
96:23 97:21 98:8
98:17 99:6,23
100:8,14 101:3,8
101:16 102:16,24
103:14,18,22
104:6,21 105:8,21
106:9,22 108:5,11
108:17,22 109:19
110:2,20 111:2
112:10 114:1,11
114:18 115:1,6,12
115:24 116:6,10
116:15,18 117:4
117:10,14 118:7
118:15,21 119:3
119:13,19 120:17
120:21 121:17
122:4,13,21
123:20 124:5,13

124:21 125:8,10
125:22 126:2,15
126:25 127:4,6,9
127:18 128:5,12
128:18 130:21
132:4,6,23 133:12
133:14 134:5,15
134:18,20,25
135:3,10,21
136:11,18,24
137:7,12 138:11
138:25 139:16
140:10 141:6,17
141:20 142:8
143:22 144:7,12
144:18,24 145:5
145:10,20 146:6
146:12,20 147:1
148:3,7,19,23
149:5,11 150:12
150:18,23 151:23
152:6,10,13,18,24
153:4,6,15,21
154:6,13,17 155:3
155:6,12,16,19
156:3,19,24
157:12,18,23
158:8,13 159:14
159:18,20 160:2
160:15,22 161:1,6
161:17 162:15,19
162:23 163:8,13
164:4,16,21 165:2
166:8,18,25
168:15,25 169:7
169:20 170:13,23
171:4,9,25 172:22
173:3,7,17 174:17
174:21 175:6,8,14
175:21 176:4,10
176:21 177:2,12
177:18 178:5,15
178:21 180:2,12
180:16 181:8,14
181:18,23 182:2,5
182:12,18 183:1,9

183:12,17,21
184:1,6,14 185:1
185:7,11,13 186:7
187:1,15,17,22
188:1,6,12,20,22
189:6,9,14,23
190:10,15 191:2,7
191:12,15 192:1,7
192:16,22 193:3
193:16,21 195:14
196:5,14,25 197:5
197:12,22 198:7
198:11,16 199:4
199:14,21 200:1
201:9 202:6,9
203:4,13,24 204:7
204:23 205:10,15
205:19,25 206:9
206:15,20 207:1
207:21 208:4
209:7,19 210:8,12
210:21 212:9,15
213:13 214:14,23
214:25 215:3,11
216:9 217:2,13,25
218:6,13 219:18
220:2,11,17 221:2
221:12,17,25
222:11,19 223:1,8
223:13,24 224:5
224:13,20 225:7
225:11,19,24
226:5,11,15,17,21
227:2,8 228:3,5
228:10,19 229:5
229:15,22 230:1
230:10,15,22
231:5 232:25
233:16 234:8,19
235:3,12,17,20
236:2,9,16,23
237:5,13,20 238:2
238:6,10,21
239:14,18,20
240:1,4,16 241:25
242:14,23 243:20

244:5,12,17,20
245:4,11,17,21
246:18 247:7,21
248:10,19 249:11
249:21 250:4,9,21
251:3,21 252:6,14
252:20,23 253:15
253:22 254:8,11
254:21 257:16
259:9,18,25
261:24 263:6,12
264:3,19 265:17
265:20,25 266:15
267:12,17 268:8
268:17,24 269:18
270:5,24 271:14
272:15,19 273:10
274:6,13,19 275:7
275:23 276:14
277:3,12,17 278:9
278:15,21 279:2,7
279:13,19,23
280:8,14,21 281:1
281:12,19 282:12
282:23 283:23
284:7,13 285:1,17
285:23 286:6,14
286:19,25 287:5
287:10,23 288:6
288:16,21 289:8
289:13,18 291:10
292:5,16 293:20
293:25 294:5,10
294:14,19 295:7
295:13,18,22
296:16,19,24
297:4,6 299:8,19
300:22 301:10,17
301:23 302:5,12
302:22 303:11,24
304:13 305:4
306:19 307:4
308:4,15,22 309:6
309:14 310:5,8,22
311:2,11 312:1,23
313:6,13 314:6,11

315:1,19,22 316:9
317:1,10,13
318:11,18,22
320:13,18 321:17
322:2,18 323:1,11
324:7,13,19,25
325:14 326:16,21
327:1,6 328:9,25
329:6,10,24 330:4
330:9 331:3,8,18
331:23 332:3
333:10,18 334:4
335:10,20 336:11
336:17,23 337:13
337:25 338:12,17
339:4,11,22 340:4
340:8,12,17,22
341:3,7,14,24
342:10,16,20
343:2 344:1,7,13
344:23 345:14,17
346:5 347:8,20
348:7,14,16
349:12,21,25
350:4,19,24
351:12 352:13,23
353:20 354:1
355:6,16 356:1,17
357:2,22 358:6,7
358:13,18,23
359:10,17 360:4
360:11,17 361:1,7
361:19 365:22,23
365:24,25 366:8
366:11,14,22,24
368:1,2 370:2,6
370:20 371:17,18
372:12 373:10
375:3,4,17,23
376:4,13,18,20
377:14,18,21,24
378:9 379:19
380:2,7 381:2,17
382:4,9,17 383:3
383:8,14,18 384:1
384:6,10,15,20



385:9,12,16
**freedom** 337:18
**frequency** 49:19
51:20 56:12 57:2
57:10 60:21,25
61:18
**frequently** 47:6
59:20 60:22
**friend** 48:17 71:25
160:3 214:16,17
**friends** 70:25
159:22 262:19,20
**front** 37:21 109:4
111:12,19 121:22
122:25 123:5
128:8 150:7
158:15 270:11
276:2 295:24
297:14 298:19
313:4 373:1,5
**fucked** 133:24
**fucking** 157:17
**fulfillment** 268:15
**full** 8:18,20 18:21
52:14 159:8 169:5
171:2 219:9
308:21 347:5,9
352:19 379:13
**fully** 367:24
**full-time** 198:4
**fulsome** 40:16
126:24
**functions** 26:6,11
159:5
**fund** 140:9 355:21
**funding** 139:14
140:4 218:21
**funds** 354:21,21,24
355:3,7,12,12
**further** 99:3 123:15
154:7 301:16
362:19 363:18,20
368:1 373:14
375:2 387:9
**F(b)** 252:9

## G

**G** 244:7 245:13
247:9 327:18,20
327:23 328:2,4
**gained** 138:3
**gaming** 231:10,14
232:3 244:2
**Garzik** 329:11,19
330:1,6,11,13
**Gati** 326:6
**Gavin** 330:18,20
**gears** 77:2
**general** 28:11
190:22 205:15
360:10 370:21
**generally** 62:10,12
101:13 291:17
306:9 313:24
325:8
**genesis** 181:24
182:14,21 183:2
183:22 184:7
**gentleman** 188:25
327:18
**getting** 8:25 108:1
144:4 152:8 156:1
185:16 204:16
208:12 213:17
328:19
**GICSR** 315:10,12
316:14,17 317:4,7
319:8 370:16
371:4 373:3
**give** 10:19 40:16
57:9 63:21 66:12
66:14 71:2 78:22
78:24 79:2 89:8
112:21,22 119:7
124:14 135:22
148:12 150:24
168:4 177:6,8,19
178:6 186:18
203:16 212:18,20
245:3 253:21
257:11,22 279:9

286:10 296:22
313:9 315:17
330:24 359:12
371:19 374:10
380:3
**given** 31:7 37:4
75:13 114:22
119:12 140:17
146:2 147:9
167:14,15,16
169:23 171:3,11
205:4 211:16,18
251:11 268:11
282:8 305:20
328:17 337:5
355:8 367:22
369:13
**giving** 9:12 77:23
145:24 195:10
247:11 282:11
385:4
**glass** 30:15
**gloss** 371:20
**GMX** 209:10 210:3
211:1,6,16,23
212:10,18 214:6
**go** 8:2 12:1 14:25
17:12 19:16,19,20
19:21 20:8,9 31:2
40:23 41:12 42:11
42:19,24 43:8,19
43:23 51:25 72:8
75:19 77:10 96:2
98:20 101:1
107:19 108:2,5
109:5 119:24
122:20 125:5
134:7 142:24
144:23 153:10
157:6 162:21
191:10 195:12
211:6 216:7
227:10 239:21,22
246:11 247:6,17
249:6 252:10
253:23 255:25

256:18 259:23
261:23 262:13,17
262:22,22 266:4
267:13 272:3
277:18 279:17
280:6 283:12
291:11 305:5
310:2 311:23
313:14 315:7
318:23 320:1
321:7 322:9
333:11 341:21
348:11 350:5
352:2,24 353:17
353:20 354:15
357:15,19 365:20
370:9 384:10
385:1
**God** 187:6 312:5
**gods** 82:21
**goes** 65:7 100:2
103:21 178:12
189:10,12 191:12
205:10,11,13,15
244:15 260:18
301:15 306:8
340:15 345:21
359:2 362:11
363:18 364:8
383:9,23 384:4
**going** 5:11 8:22,24
16:1 31:5 36:20
37:3 40:12,25
41:3 43:13,14,20
52:16 61:11 65:5
65:23 66:5 70:9
77:1,2,12,18
78:23 88:20 89:14
91:22 96:4 98:4
99:2,8,13 101:20
103:17,20 107:23
108:6,9 109:20
122:19 123:14,22
124:3 127:12
128:21 134:19
136:19 144:8,24

152:12 156:2
159:10,11 164:11
164:12 166:3,19
173:18,24 178:2
181:11 185:18
190:12,13,15,17
191:7 192:2
196:21 197:1,6
199:11,12 203:15
203:17 204:24
205:2,5 209:17
214:20,21 216:3
219:8 221:4,10
222:14 225:6,7,8
225:8 226:4,5
237:24 240:8,9,10
242:12 244:14,22
245:6,9 247:14
257:22 259:14
261:17,21,25
262:4 263:11
273:12 274:20
279:7 283:24
284:5 285:21
286:9 295:19
304:3 305:24
316:24 318:20
323:4,9 333:12,16
340:14 342:18
346:8 350:1
352:16,18 353:21
353:24 355:25
357:24 358:2
363:3 366:18
368:18 370:12
374:4,4,16 375:10
376:2,5,6 377:12
384:10,24 385:6
385:20
**Golden** 6:6 256:10
**good** 5:15,16 13:14
77:8 123:19 124:6
149:22 159:1
249:1 262:20
362:1,2
**goods** 62:10 251:16



**Google** 138:7,8
  311:23
**gotten** 123:13
**government** 35:24
  46:20 95:25 121:4
  127:22,24 128:1,6
  139:11,13 140:8
  218:21 232:21
  337:18 346:17,18
  346:20 356:14
  374:9,14
**governments** 88:15
**Gox** 251:13,20
**GPU** 240:20
**Granger** 130:7,8,10
  130:12,14,16
  131:1,9 141:12
**Granger's** 142:3
**grant** 368:15
**graphic** 106:5
**great** 193:14
  385:11,16
**greater** 52:15
  322:10
**greedy** 315:25
**Greek** 82:21
**grey** 346:13
**Grigg** 323:12,13,15
  323:21 324:15,20
  325:1,9,15,18,22
**Grigg's** 323:22
**grounds** 296:5
  361:10 372:10
  373:8
**group** 151:4 184:17
  184:19 250:17
  337:2 343:9,9,11
**groups** 330:16
**guess** 12:20 105:19
  105:20 295:19
  322:25
**guessing** 105:19
**guilty** 279:10
**guy** 213:11 247:15
  328:23 341:22
**guys** 234:5 262:20

**G(b)** 252:10

**H**

**habit** 300:18
**Hac** 2:6
**hairs** 212:13
**Hal** 129:4,22
  153:19 154:5,14
  154:19,22,24,25
  155:20,22,23
  156:5 172:12
  188:5,7 190:4
  192:12
**half** 126:11 235:9
**halfway** 189:25
**half-truth** 190:8
**hand** 50:24 99:13
  181:2 204:20
  230:8 257:25
**handbook** 226:2,14
**handed** 122:2
  180:23,24 204:14
  204:15 227:9
  239:3 263:13
  270:3 304:20
  347:21 353:10
**handing** 79:6 126:7
  189:6 315:2
**handle** 100:5 101:9
  101:17,23,24
  103:25 104:16,22
  378:19
**hands** 109:4
**handwriting** 300:3
  300:4,24
**handwritten**
  260:15,16 261:11
  303:18
**happen** 24:16,17
  118:14 165:21
  235:10 248:24,24
  248:25 249:1
  308:10 374:16
**happened** 41:23
  74:11 81:22 101:2
  247:15 250:15,18

273:25 280:20
282:4 311:10
337:6 339:17
346:15 378:13
379:3,21 382:14
**happening** 379:12
**happens** 281:11
**happy** 43:19
  106:14 247:15
  250:18,19,20
  264:14 352:7
  367:12
**harassing** 384:25
**harassment** 385:5
**hard** 21:6,14 74:15
  74:17,18,22,24
  75:4 262:25
  319:16 321:5
  366:19 374:19
  382:22
**hardware** 12:4
  200:20 240:20
  241:5 265:11,12
  271:7,9,11,15
  274:21 275:1
  276:15,16,20
  282:1,15
**Hardy** 327:19,20
  327:23,25 328:2,3
  328:4
**Harebell** 5:25
**Harry** 102:4 104:7
  104:16
**hate** 72:2
**hated** 134:13
**head** 11:4 72:19
  85:17 87:13
  112:20 116:5
  119:18 133:2
  139:18 142:6,14
  209:15 281:8
  341:16 342:7
  343:19
**headquarters**
  36:17,19
**hear** 43:5 89:7,10

361:20 366:19
374:7
**heard** 4:5 76:22
  202:3,3 365:21
**hearing** 296:2,21
  366:11,11 372:4
  383:12 385:21
**hearings** 238:8,10
  295:25 364:25
**heart** 131:16
**heavily** 19:11,12
**heavy** 375:9
**held** 86:7 113:8
  117:11,18,20,21
  118:3 190:23
  248:3,6 267:24
  268:18 304:22,24
  306:9,21 308:5,6
  349:19
**hell** 247:14 295:5
  300:18
**Hello** 5:19 126:16
  358:21,22
**help** 52:6 63:22
  64:2 65:4 71:5
  148:21 149:6,10
  149:13,15,23,25
  150:14 157:13
  158:15 180:6
  194:9 200:7
  216:16 258:25
  301:18,24 302:6
  314:15 371:11
  375:10
**helped** 140:13
  150:2,11 158:18
  159:2 175:24
  244:3 302:24
  319:10 372:5
  381:3
**helpful** 35:13
**helping** 375:7
  381:7
**helps** 19:25 20:2,3
**Henry** 38:17
  262:19

**hereto** 387:14
**Hey** 109:5 159:11
  257:24 341:21
**Hi** 104:14
**hide** 316:2,6
**high** 93:8,25 94:16
  99:16,19 241:2,2
  248:13,15,20
  303:7 309:21,25
  311:13,22,24
  346:21 356:14
**higher** 24:7
**high-speed** 185:19
**Hill** 2:20 4:12 5:25
**hippy** 314:21
**hire** 107:11
**history** 20:4 260:17
  260:22 285:12
  312:13,14
**hits** 306:7
**hold** 86:1 87:4,8,15
  88:8 99:18 113:2
  113:5,7,18,20
  115:10,13 119:14
  262:2 290:25
  292:23 293:14
  294:20 295:10
  303:23 306:16,23
  308:3 338:6
**holder** 268:11
**holding** 86:4
  205:22 289:6
  293:16
**holdings** 311:7
  373:4
**holds** 115:7,14
  116:21 291:18
  308:12
**hold'em** 236:8
**home** 5:24 6:3
  31:11 185:21,23
  375:13
**Homeland** 218:23
  317:5 355:8,20
  357:7
**honestly** 14:22



**Hong** 84:21 105:22
**honour** 358:6,19
  360:5,12 361:22
  362:3 363:16
  364:22 365:4,24
  366:24 368:2
  370:7,8 371:18
  373:1 375:4,6,15
**hope** 125:14,15,21
  261:13
**hoped** 126:1
**hopefully** 219:2
**hoping** 25:21
**horrendous** 283:11
**horrible** 352:2,2
**hospital** 61:11
  219:3 355:11
**hosted** 170:18
**hosts** 240:21
**Hotwire** 82:20 83:2
  161:23,23,24,25
  162:3,7 164:7,17
**Hotwire's** 164:24
  165:3
**hot-headed** 135:24
**hour** 48:24 202:6
**hours** 48:24
**house** 10:4 30:2
  32:16 116:21
  335:14
**housekeeping**
  77:20 78:19
**houses** 10:18
**HPC** 241:2
**HPCs** 345:3,4
**Hs** 141:19
**HTML** 165:23
**human** 62:6 110:12
  111:4,23 112:16
  306:24 307:9
  312:12,14
**Humans** 29:11
**hundred** 227:21
**hung** 328:18
**Hungary** 84:21
**hypercapitalist**

314:22
**hyperlink** 148:5
**hypothesis** 56:20

---

**I**
**Ian** 323:12,13,15
  323:17,21,22,23
  323:24,25 324:1,5
  324:8,9,15,20
  325:1,9,15,18,22
  325:25 326:1
**ICE** 240:21,23
**Icebergs** 341:12
**idea** 56:24 81:23
  108:24 109:3
  111:15,21 121:4
  122:1 124:16,17
  124:22 125:13
  128:25 129:1
  138:13 139:18
  144:8 176:11
  188:21 202:14
  218:7,9 219:22
  220:10 233:18
  260:17 274:4
  280:1 288:12
  298:8,10,11
  306:20
**ideas** 125:1
**identical** 79:18,23
  79:25 80:3 91:4
**identification** 19:14
  78:17 126:9 174:1
  177:8 189:17
  227:7 239:2
  259:17 286:3
  296:18 314:25
  333:15 339:22
  347:19 362:7
**identified** 191:21
  297:2 349:17
  352:21 363:19
**identify** 8:13 20:3
  30:20,25 158:15
  158:25 174:16
  191:4 336:6,7

372:9
**identifying** 177:19
  277:9
**identity** 191:24
  370:15 371:1,20
  371:24
**illegal** 258:3
**image** 30:21 31:1
**imaged** 21:5,8
  30:11,14 31:12
  32:20 267:10
**implemented** 154:2
  241:7,16
**implication** 322:7
**implies** 356:23
**imply** 32:18
**implying** 335:6
**import** 79:16,21
**important** 35:9
  81:24 197:25
**importantly** 365:14
**impossible** 172:5
**improved** 231:11
  232:7
**inaccurate** 228:20
  352:15
**inappropriate** 25:7
**inclined** 369:9
**include** 63:2
**included** 272:3
  284:19
**includes** 164:2
  272:1 337:17
**including** 17:1
  19:14 122:11
  156:9 201:3 219:1
  232:20 244:2
  256:25 286:4
  303:14 337:18
**incomplete** 311:5
  312:20
**incorporates**
  256:23
**incorporation**
  256:24
**incorrect** 346:10

349:9
**incorrectly** 304:5
  373:10
**increase** 56:13
**incredibly** 365:12
**independent** 71:23
**independently**
  320:22 321:1
**indicates** 193:11
  281:25
**individual** 45:1
  118:13,23 120:1
  175:23 176:1,2
  372:5,7,9 380:23
**individually** 234:13
**individuals** 92:18
  92:20 142:15
  164:9 292:8
  349:17
**industry** 159:23
  262:21 325:21
**inefficient** 225:2
**Info** 1:7 239:12
  263:19,22 264:2,5
  264:18 350:15
**inform** 73:3
**informal** 290:5
**information** 19:14
  26:24 29:13 81:8
  83:16 101:5
  112:23 131:1,13
  131:20,23 162:10
  162:13 163:23
  177:6,20 178:6,10
  180:23,24 205:22
  216:12 222:7
  223:3 231:20
  252:1 282:11
  285:13 286:4
  292:7 307:21,22
  315:17,20 316:19
  316:21 319:10
  337:18 363:20
  371:25 373:20,25
  384:13,18
**informed** 360:7

367:5
**infusion** 278:13
**initial** 37:5 148:16
  155:7 218:14
  352:1 367:10
**initially** 41:14
  123:3 218:9
**initiated** 373:3
**inquiry** 19:10
  238:12,14,15
  244:20 292:7
  349:16 350:2
**instance** 165:22
  256:10 332:19
  337:7
**instruct** 9:14 15:20
  16:2 34:4,6 36:20
  40:12 41:22 66:6
  66:7,8,9,11,15
  78:1 88:22 89:2
  99:2 103:20
  106:14,14 107:11
  111:14 123:14
  141:4 143:18
  144:13 146:5
  152:11 162:17
  181:16 182:13
  190:13,17 191:15
  196:22,23 197:2,6
  199:11 203:18
  205:3 214:21
  216:4 222:15
  224:16 244:15
  259:14 279:3
  280:19,22 281:9
  281:10 292:15,16
  292:17 295:19
  318:18,20 340:15
  342:18 343:11
  344:2,8,17 350:2
  352:17 384:24
**instructed** 17:19
  41:15 111:7
  146:17 213:16,19
  244:9 260:2 309:8
  316:2 343:8,15



344:14 358:9,15
359:1 360:6 361:4
**instructing** 9:9
31:4 89:18,21
175:2 191:13
205:23 259:21
279:5 319:22
338:9 341:1,3,5
384:6
**instruction** 111:9
183:5 197:11
260:3 296:14
**instructions** 31:8,9
**Integers** 82:20 83:3
**intellectual** 27:21
27:24 28:16 86:2
86:3,6,17 87:5,16
88:8,19 99:24
100:10 114:12
215:5,12 216:1,5
216:11 222:3,6,13
222:17 223:2,17
223:20,25 224:8
230:3,11,24 231:4
231:6,22,24,25
232:2,6,9 234:9
234:15,20 235:5
235:14,21 236:5
236:17,25 243:22
243:24 255:23
349:5 350:12
372:15,20,23
373:5
**intend** 97:14
235:11
**interact** 103:23
104:8,11,12
150:14 152:14,19
165:16
**interacted** 104:9,15
176:1 372:8
**interacting** 134:8
**interaction** 233:8
**interactions** 104:1
154:7 369:12
**interest** 95:22

356:5,8,14,23,24
374:8
**interested** 315:24
326:14 387:14
**interesting** 82:24
283:15
**interests** 43:22
259:21 374:15
**internal** 102:6,7,20
102:21
**internally** 103:1
**International** 291:1
293:12
**internet** 15:5 65:4
82:16 131:19,22
131:24 148:2
150:9 163:21
165:19 185:20
208:17
**interrogatory**
175:22 368:9,11
372:3 374:1
**interrupt** 346:8
**interrupted** 129:20
**interview** 194:1
383:4
**introduce** 4:14
326:3
**introduced** 54:5,7
**intuitive** 7:10
**invalidate** 258:10
**invalidated** 355:25
**invent** 76:21
**investigate** 337:3
**investigates** 94:24
95:3,8,13
**investigation** 94:22
95:5,10,18 101:23
104:17,23 334:19
334:21,25 335:8
335:13,18,24
336:1,13,25 337:2
337:6 338:13,22
**investigations**
95:21 101:10,18
332:5,6,9,13,17

346:21
**investigators** 337:3
**Investments** 291:1
293:12
**invokes** 367:17
**invoking** 363:25
364:11
**involve** 90:3,7
121:6 235:23
236:3 340:9
**involved** 19:12 44:1
120:10 145:11
146:21 147:2,5
164:17 180:19
196:15,18 218:14
236:25 258:8
292:18,22 293:4,6
293:7,8 323:13
343:10
**involvement**
128:14,20 219:4,6
219:7 248:22
270:1 323:17,20
326:10 328:5,12
371:2
**involves** 40:14
95:22 260:12
**IP** 123:10 215:10
221:18,20,22
222:1 223:12
227:20,22 229:1
229:10,23 231:17
234:11 274:24
357:6 370:18
371:13 372:17,18
**Ira** 1:6 2:25 4:4
161:11,18,19
174:12,17 227:16
227:18 229:16,20
261:20 315:4,17
315:20,25 316:4
317:17 318:2
359:22 360:2
373:1 377:7,9
**Ira's** 371:22
**IRC** 54:10 55:9,13

55:18,24 56:1
67:17 132:9,11
148:11,12,17,22
151:4,11,13,14,16
151:18 155:4
171:24 172:1,5,7
172:9 201:4,13
266:18 330:16
**iron** 345:22
**irrelevant** 8:20
141:4 277:14
362:19 363:9
364:8
**issue** 25:6 77:23
258:11 358:10
359:3 361:8
364:25 365:15
366:4 368:20
369:13,14 372:18
**issued** 117:17
**issues** 19:18,19,20
19:21 20:9 40:14
362:5 369:5 370:2
370:3,12 374:18
375:7
**ITOL** 139:14,24,25
140:2
**I-T-O-L** 139:16

___
### J
___
**Jack** 378:15,17
**Jamie** 103:5,9
105:3
**January** 47:18
169:6 187:12,18
188:3,14,17 192:8
192:18,24 194:8
194:25 350:9
358:24
**Japanese** 213:11
273:8 326:7
**Jeff** 329:11,16
330:16
**Jews** 260:18
**job** 198:4,6
**John** 2:23 5:4

102:13 104:22
105:5,9,12,18
129:4,22 131:20
174:9 360:1
**joined** 297:10,13
**joint** 186:25
**Joseph** 141:13
142:19 326:2
**judge** 16:8 17:19
25:19 78:13 88:24
316:23 358:4,12
358:17,21 359:7
359:12,18 360:3,8
360:16,25 361:6
361:15,20,25
362:20,23 363:6
363:23 364:10,14
364:24 365:21
366:17 367:25
368:3 370:10,23
371:7,9,17 372:11
373:14,22 375:5,8
**Judging** 277:12
**judgment** 372:15
**judgments** 372:22
**jump** 52:22
**June** 168:7
**jurisdiction** 356:22
**jury** 6:16

___
### K
___
**K** 227:18 303:4,5,6
**keep** 11:19 34:22
73:25 102:19
157:13 159:15
172:7 225:8 226:4
268:22 274:25
286:10 307:18
319:22 352:6,7
377:10 383:19
**keeping** 268:20
**keeps** 178:3
**Kenya** 84:19 85:12
85:13
**kept** 134:19 172:5,6
172:8 268:25



287:14 306:3,5
353:12,13
**key** 126:17 203:22
204:9,25 371:23
**keys** 181:1 202:24
203:3,7,11 206:8
289:7 293:14
294:21,24
**kind** 385:5
**kindly** 89:23
**kinds** 8:15 277:14
370:11
**Kingdom** 31:12
**kit** 351:19,21
**Kleiman** 1:6,7 2:25
4:4 8:16 33:16,18
36:2,25 38:7,9
39:1,8,11,21,22
40:4,8 42:9,16,18
44:1,3 45:9,12
46:23,25 47:4,7
47:11,20 48:12,15
49:10,19 50:1
51:4,10,20 52:7
52:23 53:11,19,24
54:6,7,8,24 55:19
56:6,13,22 57:3
57:11,18,24 58:4
58:7,10,13,18,23
58:25 59:2,13,18
59:24 60:4,5,8,11
60:13,17,19,23
61:1,4,13,16,19
61:22 62:4,15,20
63:1,5,19 64:9,17
65:2 67:7 68:3
69:8 70:16 71:11
71:18 72:11 75:25
79:8,19 83:22
89:1 90:3,12 98:9
98:13,16 120:3,3
120:8 123:12,16
126:4 146:15,18
174:12,13,16
175:1,7 176:2
178:16 179:1

180:4 181:4,12
183:10,15 186:20
186:22 187:7,7
192:17 195:12
198:18,22,25
199:9,15,18,22
200:9 201:14
204:3,10,12 205:1
211:13 214:3,5,15
216:6,10,19 217:3
217:8 222:16,20
222:25 227:16
235:19 238:20
254:15 258:12
259:6,11 260:1
261:2,2 264:4,9,9
264:10,18 266:10
267:6 276:11,17
282:9,10,14
286:21 287:2
292:18,21 312:9
312:10 315:4
316:14 321:18,21
322:3,11,13
325:16,19 330:14
343:4,6,9 347:2
359:23 360:2,2,5
360:15,20 362:15
362:16,21,25
365:18 367:3,5
368:23 369:3
371:21 372:8
373:1 375:24
376:15 377:8,9
380:16
**Kleiman's** 69:2
72:22 99:1 149:15
256:2,8 257:9,12
**knew** 76:17 174:19
185:15 199:6
206:11 276:21
285:14 325:15
326:17 342:1
**know** 6:4,6,21 7:2
7:18 8:24,24,25
10:16,17 15:2

18:13 21:5,13,16
21:19 30:7,9,13
31:21 33:5,10
34:10,14 35:23
38:14 44:5 45:15
45:17 49:11 50:3
50:10,14 51:6,13
51:17 58:2,6,9
59:20,23 60:1
61:25 64:20 72:6
74:12 75:7,12
76:4,20 77:1
78:21 83:19 91:15
91:16 92:1,8,8,13
93:19 94:8,23,25
94:25 95:2,7,12
97:1,9,13 101:7
102:10 104:11
108:2,15 111:23
112:7,14 116:4,12
117:8 119:18,21
120:23 122:12
124:12,15 125:20
126:25 127:20,23
127:24 131:2,3,16
137:13,15 139:24
140:3,15 141:9
142:4,10 145:20
145:21,21 150:21
152:21,22,25
154:11,12,18
162:5,10 164:8
169:8 170:11
171:19 172:4,8,9
176:1,25 178:13
179:8,9,11 184:15
184:17 185:4,5,8
187:20,22,23
188:2,10,13 193:4
197:8,24 199:25
200:8,13,14,17,20
200:23 201:8,14
201:16 202:10,18
204:22 206:13
211:9 215:23,25
218:4,5 219:13,23

220:4,15 222:12
222:23,24 224:20
229:13 232:5,8
233:1,12,15,19,23
234:1 235:4,9
237:18,22 238:25
242:18,21 246:1,6
246:15 247:4
249:15 252:24
254:22,23 255:9
266:10 267:3,11
267:19 269:21
270:19 271:2,2,2
271:2,3,17 274:8
275:2,21 276:19
276:25 279:25
281:2,8,17,22
282:4,13,18
284:22 285:3,6,10
286:18,21,23,24
288:14 289:22
290:18 292:12
293:10,11,13,16
295:23 297:21,24
298:21 299:7,12
299:16 302:19
305:12,23 307:19
308:8,11 309:12
310:15,16 311:3,6
311:7,17,20
313:17,21 314:18
314:23 315:16
317:7 321:21
322:3,19 325:1,11
325:12,15,17,18
325:20,25 326:12
326:22,25 327:2,7
327:8,9,18,23
329:22 330:13
331:19,24 332:2,8
332:11,15,15,19
336:9,22 339:12
341:15,17 342:5,9
342:11 343:23
344:5,6,15 345:18
346:7,16 347:1

351:9 353:3,6,11
353:13 354:12
365:25 366:17
367:14 371:25
372:7 374:18
375:9 377:6
379:12,21 380:11
382:13,16
**knowing** 229:16
**knowledge** 174:4
198:25 216:17
230:2 250:16
270:25 271:1
285:24 292:7,9,10
293:9 296:25
313:24 325:22,23
339:23 340:18
**known** 185:22
265:1 282:9
325:20
**knows** 92:11
209:18 292:13
325:25 327:3,10
342:8 367:13
**Kobza** 317:7
**Kong** 84:21
**KPMG** 102:4
103:23,25
**KT11** 10:1
**Kyle** 2:5 4:20
**K-O-B-Z-A** 317:11

**L**

**L** 142:7 239:23
240:6 242:10
243:8
**labour** 348:18,21
349:8
**lacks** 220:15
**laid** 185:17 371:19
**land** 313:18
**language** 177:25
283:8,10 329:3
**lapse** 274:7
**lapsed** 274:12
355:11,17



**large** 99:16 100:4,6
**larger** 100:7
**latched** 328:24
**late** 361:23 384:25
**launch** 76:18
    277:14
**launched** 76:17
**launching** 113:17
**laundering** 346:23
**law** 65:3 86:17
    93:25 94:3 117:24
    117:25 143:10
    150:9 226:20
    256:12 258:21
    264:8,13,14 303:9
    303:16 331:17
    337:17 364:1
    369:7,10,11,12,12
**laws** 334:10
**lawsuit** 274:15
    337:22 349:19
    372:14 373:2
    379:18
**lawyer** 18:14 143:7
**lawyers** 30:5,11,14
    30:21,25 31:3,23
    83:6,8 97:11,15
    97:18 98:4,5
    114:22 122:2
    124:15 131:18
    146:11,13,19
    174:18 267:3,9
    281:10 299:11
    301:14 302:11,15
    302:16,19,21,23
    305:21 319:22
    320:9 335:12,25
    338:13 343:24
    353:14,15 359:21
    380:3
**lay** 185:21
**lead** 225:14
**leads** 225:16
**learn** 20:4 285:13
    325:1 329:19
**learned** 329:20

**leave** 86:20 128:9
    128:16,21 366:20
    368:16 374:11
**leaving** 354:20
**ledger** 250:1,3
**leeway** 9:12,13 37:4
    88:25 123:13
    145:24 146:2,4
    195:10 203:16
    205:4 362:7
**left** 10:23 12:12
    13:1,2,20 41:13
    301:8 339:14
    375:12 376:1,17
    385:12
**left-hand** 301:1
**legal** 2:16,20 4:12
    4:14 118:12 125:1
    143:17,20 158:18
    167:17 226:24
    258:3,5,21 264:8
    264:12 269:4
**legally** 256:18,19
    256:21 364:2
**legs** 7:18
**length** 149:3
**Leon** 2:11
**level** 24:7
**Liberty** 231:19
    248:14,15,20
    343:3,7 346:23
**Libya** 251:14
**lied** 335:7
**life** 46:8 92:24
**lightly** 340:1
**likeable** 149:16
**liked** 161:7
**limit** 20:20 24:25
    50:19 65:11 67:1
    69:13 70:5 75:14
    141:1 352:20
**limitation** 165:23
**limited** 8:9 111:3
    111:23,25 112:4
    112:11,15 144:5
    145:23 146:1

190:20 238:13,17
    238:17 286:10
    310:10,12,24
    350:2 352:17
    363:21 385:1
**limited-in-scope**
    362:4 363:2
**line** 8:9 9:8 36:23
    43:19 77:21
    172:10 174:2,5,11
    174:13,22 202:3
    255:4
**linear** 96:16
**lines** 153:13 203:19
    216:20,21,25
    217:4,4,8,9,22
    218:2
**line-by-line** 351:10
**link** 4:17 148:1
**liquidated** 97:2,3
    115:14 116:11
    119:21 308:2
**liquidation** 163:20
    164:2,5
**list** 19:5,9 24:2
    31:16,22 32:5,6
    33:11,12 110:5,8
    114:5,16,19 151:1
    151:2,3,7 163:21
    170:2,3,4,17
    210:9 232:22
    259:10,25 272:2
    300:7,25 301:5
    302:23 329:17
    340:23 354:24
    359:4,6 365:2,5
    365:10,11 366:6
    368:17,18
**listed** 99:11 242:9
    249:3,23 300:4
    361:3
**listing** 253:25
    359:19
**lists** 54:10 170:15
    302:14,16,20,24
**lit** 19:4

**literally** 182:6
    187:17
**literate** 260:20
**litigation** 31:1
    74:25 77:4 141:2
**little** 9:12 55:18
    180:22 203:16
    211:17 212:25
    219:5 285:2
    287:11 333:1
    371:19
**live** 5:25 131:5
    148:22 368:12
**living** 7:22,23,25
    8:3 9:2 10:7,11,13
    131:11
**LLC** 1:7 239:13
    263:22 264:2,5,18
**LLP** 1:21 2:3,6,11
    2:22,24
**loan** 297:14 308:24
    309:1 312:3,25
**loans** 309:15,19
    312:2,24
**local** 4:8 25:8,17
    69:21,22,24 70:3
    225:12,22
**LocalBitcoins**
    251:12
**locate** 244:25
**located** 38:13,15
    184:20 334:22
    336:4
**location** 8:14,19
    147:21 242:14
    286:2 318:11
    362:6,6,12
**locations** 8:14,15
    10:15,18,20
    194:18
**log** 133:6 137:8,18
    213:21
**logging** 132:21
    137:13,14,15
**London** 1:22 4:9,10
    4:16 11:15

**long** 12:24 39:1
    44:6 72:20 84:24
    86:18 132:22
    139:19 141:23
    142:22 148:24
    210:20 262:21
    316:2 326:15
    339:16
**longer** 77:25 84:6
    92:23 237:10,15
    290:3 306:8,11,12
    308:2 314:7
**look** 11:6 15:1 73:2
    82:16 83:3 85:18
    97:6 106:24 107:3
    107:6 110:7 114:5
    114:15 116:3,21
    117:16 119:17
    120:1 122:17
    133:3 137:18
    151:18 163:9
    176:15 178:9
    186:19 189:18
    199:18 200:6
    209:16,18 224:11
    224:21 226:6
    227:19 238:25
    245:22 253:24
    259:23 261:12
    263:1,24 264:20
    267:18 269:10
    270:6 271:4 272:2
    272:23 275:24
    280:24 281:16,20
    282:19 284:9
    288:8 290:13
    296:20,25 297:23
    299:20 301:7,12
    304:2 305:17
    317:4,14,16 321:8
    321:8,22,25 322:5
    322:13,17,24
    339:14 351:13
    356:2 357:3
    383:14
**looked** 83:6 97:13



132:25 245:17
265:8 351:3
**looking** 65:1 202:7
239:23 247:22
284:9,10 297:25
322:22
**looks** 80:3,10 300:6
**loose** 5:3
**loosely** 142:12
**lose** 71:1 73:9,11
**lost** 114:23
**lot** 39:5 45:16,23
46:3,4,7,19 48:18
49:14,16,18 133:6
136:5 142:22
159:22 160:11
173:13 177:24
185:16 195:10
205:4 213:18
227:20 231:11
232:7 234:22
283:18 287:14
323:21 326:7
346:24 353:7,8
366:18 368:19
**lots** 129:25 163:18
163:19 287:15
**loud** 264:23
**Louis** 126:4,16
371:21
**low** 185:19
**lower** 161:2,7
**lunch** 104:13 108:3
108:3
**Luncheon** 123:25
**lying** 316:6
**Lynne** 15:12 16:16
17:14 107:13
360:18,21 363:8
363:12 364:15
369:6

**M**

**M** 242:1 303:4,5,5
**MacDonald** 129:4
129:23 131:21

**MacGregor** 383:10
**machine** 187:7
**machines** 11:19
32:3,5,6,8,12,16
32:17 99:17 100:5
187:8,9,10 242:22
242:25 243:2,12
243:14 244:10
345:1,2,11,19,20
346:6,11,12,15,19
347:2,3,15
**Macquarie** 184:21
**magic** 76:23,24
281:11 339:17
**magically** 148:1,4
**Magna** 2:16,20
4:12,13
**maiden** 15:13
**mail** 79:17
**mailbox** 81:1
**mailing** 54:10
151:1,2,3,7 170:1
170:3,4,15,17
**main** 2:7 170:5
**maintain** 13:20
156:4 260:5,6
314:2
**man** 18:25 316:4
321:3
**managed** 243:12
251:7 347:13
**management** 157:5
157:8 312:8,18
**mandated** 356:14
**manner** 234:18
**mantra** 367:22
**March** 64:3,6 65:2
79:8 80:6,11,19
83:21 317:17
318:4
**Marco** 380:24,25
381:3,6
**marital** 18:14
364:1
**mark** 5:11 78:16
93:8,16 126:7

257:17 309:22,23
311:12 327:18,20
327:23,25 328:2,3
328:4
**marked** 3:9 78:17
79:6 126:9 189:7
189:17 227:7,9
239:2 259:17
296:18 297:8
314:25 315:3
333:15,21 347:19
347:22
**market** 2:16 204:18
251:23
**marketplace**
215:18 223:18
**markets** 216:12
222:7 223:3
346:13
**Markoe** 2:10 4:24
4:24 5:10 8:7 9:7
9:11,25 11:7,16
12:14,18 13:7
15:3,9,16 17:7,24
18:10 19:3,7,8,13
19:18 20:1,6,12
20:17,19 21:3
23:12,20 24:4,8
24:21,24 25:1,5,9
25:13,19 26:1,8
26:15,21 27:3,9
27:12,17,22 28:10
28:17 29:3,10,19
30:12,16,22 31:13
31:17,24 32:10
33:1,8,11,17,24
34:2,9,15,19 35:1
35:6,18 36:6,13
36:18,20 37:3,7
37:19 38:2,24
39:3,16 40:1,5,11
40:23 41:9,17
44:10,16 45:6,14
45:22 46:6,12,18
47:12,22,25 48:7
48:16,21 49:12,15

49:21 50:2,6,13
50:17,19 51:5,11
51:16 52:9,13,25
53:8,12,20 54:13
54:20,25 55:20
56:15 57:5,12,20
58:1,19 59:14,25
61:9 63:14,20
64:11 65:9,13,17
65:20 66:5,12,23
67:21 68:4,13,17
68:22 69:11,15,18
69:22 70:19 71:13
71:21 73:4,10,14
73:18,24 74:9,14
75:1,6,17 76:8,15
77:5,8 78:4,10
79:12,20 80:1,7
80:12,20 82:1,5
85:19 86:5,11,14
86:24 87:6,17,24
88:10,20,24 89:5
89:9,12,16,22
90:4,8,13,24 91:5
91:10 92:3,5,12
92:17,21 93:2,7
93:18,24 94:10,15
95:11,19 96:21
97:16 98:14,23,25
99:21 100:1,11,22
101:6,11 102:9
103:12,16,20
104:5,20 105:7,11
105:14 106:8,11
107:25 108:14,20
109:11,24 110:16
110:22 112:8
113:24 114:10,14
114:24 115:3,9,21
116:2,8,14 117:1
117:6,13 118:4,10
118:18 119:1,16
120:15,19 121:15
121:25 122:6,16
123:11 124:10,18
125:7,19,25

126:12,22 127:2,5
127:14 128:2,7,11
128:15 130:20
132:3,20 133:11
134:3,17,24 135:6
135:18 136:9,15
136:21 137:5,10
138:6,21 139:3
140:7,25 143:15
144:3,10 145:2,7
145:15,17,22
146:9,14,17,23
147:23 148:6,18
149:1,8 150:1,6
150:15,22 151:21
152:4,8,11,15,21
153:2,8,11,18,24
154:10,16 155:2,9
155:14,25 156:17
156:21 157:1,15
157:21 158:5,10
159:6,17,25 160:8
160:18,24 161:4
161:13,15 162:14
162:17 163:2,11
163:25 164:10,18
164:25 166:6,15
166:23 168:12,22
169:3,17 170:10
170:20 171:1,7,22
172:20,25 173:5,9
173:15 174:15,25
175:12,17 176:3,6
176:9,19,23 177:9
177:15,22 178:8
178:18 179:25
180:9,14 181:6,10
181:16,21 182:1,3
182:9,17,23 183:4
183:7,10,14,18,24
184:4,11,23 185:3
185:10 186:4,19
187:13,16,20
188:4,9,18 189:1
189:8,12 190:7,12
190:17 191:4,9,13



191:18 192:3,14
192:19,25 193:7
193:19 196:1,12
196:21 197:4,10
197:16 198:5,9,14
199:2,10,16,24
201:6 203:1,9,15
204:4,11 205:2,12
205:17,21 206:3
206:12,18,24
207:19,24 208:25
209:13 210:4,10
210:18 212:5,12
213:7 214:11,20
214:24 215:1,7
216:3,22 217:10
217:23 218:3,11
219:17,24 220:8
220:14,19 221:15
221:24 222:10,14
222:22 223:5,10
223:22 224:4,11
224:14 228:1,4,6
228:16 229:3,12
229:18,24 230:4
230:13,20,25
232:23 233:10
234:5,16,24 235:7
235:15,24 236:7
236:13,19 237:2
237:11,19,23
238:11,13 239:10
239:17,24 240:2
240:14 241:21
242:11,17 243:9
243:25 244:8,14
244:18,23 245:15
245:20 246:14
247:3,19 248:7,17
249:4,14,24 250:7
250:12,25 257:13
259:7,12,14,23
260:6 264:1,6,15
265:15,24 266:12
267:8,14 268:5,13
268:21 269:15,24

270:21 271:12
272:11,17 273:5
274:5,11,16 275:4
275:19 276:12,24
277:11 278:7,12
278:19,25 279:5
279:16,21 280:5
280:12,18,23
281:4,15 282:3,16
283:21 284:11,21
285:8,20,25 286:8
286:17,22 287:3,7
287:21 288:5,11
288:19 289:5,11
289:15 291:7
292:3,10,20
293:17,23 294:3,8
294:12,17 295:3
295:14,24 296:3,8
299:6,15 300:9
301:3,13,20 302:1
302:8,18 303:1,20
304:9,25 306:18
307:2,25 308:7,19
309:3,11 310:3,19
310:25 311:21
312:4 313:1,11
314:4,9,16 315:18
315:21 316:24
317:8 318:9,14,20
319:24 320:1,4,8
320:15 321:14,23
322:14 323:3
324:3,10,16,22
325:3 326:11,19
326:24 327:4
328:7,14 329:4,9
329:21 330:2,8,22
330:24 331:6,14
331:21 332:1
334:2 335:4,15
336:6,16,20
337:11,23 338:9
338:14,24 339:7
339:20,24 340:6
340:10,14,20

341:1,5,9,19
342:4,6,15,18,23
343:22 344:4,10
344:19 345:13,16
346:1 347:6,10
348:5,12,15
349:10,15 350:1
350:16,21 351:8
352:10,16 355:4
355:19 356:9,20
359:14 361:22,23
361:25 362:2,22
362:24 363:7
364:4,13,21 365:4
366:7 370:8,13
371:1,8,13,19
372:13 373:9,15
373:16 375:5,15
375:20 376:8,12
376:19 378:6
379:16 380:1,6
381:1,15 382:1,7
382:15 383:1,6,17
383:23 384:4,8,12
384:16,23 385:4
385:11,14,19
**Mark's** 93:14
**marriage** 16:19,24
17:4,10 18:13
**married** 15:7 16:15
**masters** 86:17
264:11
**match** 298:20,24
301:8 314:23
351:10
**matched** 31:8
**material** 337:4
355:14
**materials** 275:9
**mathematical**
283:4
**mathematician**
216:16
**mathematics**
283:10
**maths** 149:18

**matter** 4:4 19:15
40:11 45:3 77:21
286:5,7 325:6
340:21 368:8
369:7 376:2
**matters** 40:10
357:12
**Matthews** 141:12
**maximum** 11:22
**May/June** 168:8
**McAdams** 2:23 5:3
5:4 174:9,10
359:20 360:1,1
**mean** 27:14 28:1
55:12 58:14 62:8
62:13 81:4 86:15
86:19 87:23
106:19 117:22
140:21 153:16
163:19 165:12,14
166:5,20 177:16
177:23 178:1,19
179:13 180:25
198:19 204:6
207:10 208:11,19
221:19 223:9
229:10 233:14
235:18 239:17
240:9 252:9
254:13,19 255:2
261:22 283:18
284:25 289:9,14
289:16 295:6
298:2 302:10
303:19 310:18
313:24 321:15
322:11 325:7
328:11,11 336:14
337:1 345:8,21
349:1 378:23
**meaning** 6:11
56:10,11
**means** 27:24
104:12 118:12
196:4 254:14,22
255:1,4 264:8

282:20,24 283:2
303:21 304:6,8,12
306:9 310:20
319:21 320:17,17
333:2,3
**meant** 125:2
225:14 229:17
246:10 303:17
321:21 322:3,8,9
322:12 345:25
355:8
**Measures** 224:1
**media** 21:17 55:13
75:16,20,20,21
256:24 262:9,10
287:14 380:22
**medication** 6:18,19
**medieval** 260:20
**meet** 15:15 16:8
17:23 36:1,10,12
36:25 38:7 39:1
40:4,8 42:16,18
45:11 46:20,23,25
47:3,7,11,19
48:11,14 49:10,25
51:9 53:24 54:1,3
54:3,3,4,4,8 109:2
285:6 286:20
327:7 363:9,19
**meeting** 49:19
340:5,9 341:8
**Melbourne** 147:20
**member** 90:15
127:21,24,25
162:10
**members** 163:22
**memorise** 304:19
**memory** 241:2
371:10
**mention** 340:13,25
**mentioned** 63:8
245:13 255:23
317:24 340:11
**merging** 370:24
**merits** 145:25
199:19 352:19



363:3,4 366:23
**Merkle** 282:25
283:4,15
**mess** 157:17
**message** 135:5,8,14
213:17 317:16
**messages** 75:8
379:24 380:4,8,11
**Mestre** 2:11
**met** 5:17 15:17
35:24,24,25 37:8
39:20,22 42:9
45:9 49:18 53:11
142:20 167:23
176:1 285:10
323:15 326:2
330:18 339:18
364:8 367:10
372:8
**metadata** 158:23
**Metanet** 100:3
**metered** 215:21,24
215:25 216:2,6
222:4,12,18,20
**method** 62:19
67:10 125:24
132:7
**methods** 67:15,16
190:24 205:10
206:1
**Mexico** 312:14
**Miami** 2:4,12
**mic** 41:8
**Michael** 141:16
143:6
**Michie** 143:11
**Microsoft** 36:11,12
36:14,16,16,19
37:9 81:7 165:23
**middle** 160:13
341:13 357:16,20
**Military** 357:7
370:19 371:15
372:19
**million** 216:21,25
217:4,6,7,8,9,22

218:2 227:21
228:11 229:1
243:3 251:7 278:1
278:3 279:15
280:3,17 281:3,13
317:24 344:22
346:25 347:4,5,9
**millions** 204:19
216:20 217:4
372:16
**milliseconds** 100:7
**mind** 164:13
229:14 244:25
252:20 303:15
324:12
**mine** 32:3 59:11
94:9 98:22 99:20
120:18 121:13
138:15 166:22
176:13 182:8
186:3,17,23 191:9
194:16,19 199:22
200:17,20 201:15
201:17,18 207:15
220:3,5 241:10
242:10,25 243:2
243:19 255:17
300:6 318:5 359:8
360:10 362:10,13
**mined** 181:24
182:14 184:3,16
184:18 186:2,15
187:11,16 194:9
195:25 196:19
197:9,13 200:4
201:1 202:11
220:6,13 250:3
253:17 276:4,11
293:2 358:24
359:1 360:6
362:14,18,21
363:1 365:17,18
367:1,4 368:5,23
375:20 376:15
**miner** 165:25
**miners** 250:1 253:2

265:13
**mining** 27:16
186:11,21,22,23
186:25 187:19
188:2,13,16
194:15 195:1,16
195:18,19,24
196:4,7,10,11,16
197:19 198:4,18
198:20,25 200:10
200:12,15,24
201:25 202:1,14
202:20 205:13,18
242:15,19,21
255:16 256:10
265:1,11,12,23
271:11,15 276:15
276:16 281:25
282:15 293:4
318:12,15 360:14
362:16
**Minus** 318:5
**minute** 330:24
**minutes** 44:7 376:3
376:4,5,11,17,18
377:12 385:14
**miracle** 215:1
**miscategorising**
282:21
**mischaracterises**
11:16 24:21 75:17
110:16,22 112:8
134:3 153:2
160:18 164:25
171:7 193:19
207:24 235:15
236:19 248:17
249:4 252:18
287:21 304:9
337:11 347:6
350:21 355:4
**misrepresentation**
28:3
**missed** 152:1
370:21
**missing** 272:3

**misspelt** 105:16
**misspoke** 308:23
371:5
**misspoken** 179:19
371:6
**misstate** 116:24
**misstated** 263:23
370:21
**misstates** 241:21
254:6
**misstating** 281:6
360:22
**mistake** 321:9,13
321:16,22
**mistakes** 158:22
**misunderstandings**
101:15
**misunderstood**
210:1
**mis-cite** 175:16
**mix** 227:21 229:2,4
229:6,8,11
**mixed** 270:3 351:23
**mixing** 291:13
**Mmm-hmm** 98:6
221:16 246:24
247:24 255:11
318:25
**mnemonics** 133:7
**Modelling** 224:10
**models** 96:15
**moment** 7:24 48:24
106:13 112:3
162:25 221:1
233:14 235:10
245:1,3 253:21
264:13 339:1
373:13
**money** 62:11,11
65:6 120:10
124:24 134:11
185:16 190:24
216:16 219:2
293:1 316:5 343:6
343:8,9,16 344:3
344:8,16 346:23

347:14,16
**monitoring** 231:18
**month** 35:22 51:25
52:3 55:5,8 56:23
142:25 241:20
243:3 251:7
260:12
**months** 11:22
35:22 51:23 53:4
**morning** 5:15,16
359:3
**mother** 49:3 53:3,7
314:23
**mother's** 70:23
**motion** 365:7,8,12
366:2,5,9,10,14
366:21 368:15,16
369:15 374:11
**motions** 374:23
**mouth** 208:14
**move** 9:6,16,18
16:9,12 52:6 53:8
71:5 81:6,9 89:14
99:8 107:23,25
109:20 119:7
181:13 191:17
205:24 259:22
296:15,16 320:11
320:13 352:7,20
366:11 375:11
376:8 384:9
**moved** 8:1,6,17,18
8:20 9:3,20,22,24
10:24 11:9,14
80:25 81:19
119:25 319:14,18
321:1,1 367:23
**moving** 304:23
349:6 383:19
**Mt** 251:13,20
**multiple** 28:19
60:15 84:5,7,9
88:7,11 99:18
100:21 151:14
157:3 207:11
210:6 288:13



301:22 302:4
319:21 332:20,21
332:22 352:3
378:7
**mutual** 262:18
**mutually** 134:1
**mysterious** 304:4

**N**

**N** 2:1 3:1 209:15
**nada** 123:8
**Nakamoto** 144:20
182:6 188:24
190:21 191:5
208:6,8,17,18
209:9 210:2 324:9
324:15 325:2
326:3,23 329:2
330:21 382:25
383:5,22 384:3
**name** 5:17,20,22
15:11,13 17:21
18:1,19 20:1
67:25 68:19 72:14
72:15 81:2 82:9
82:12,14 83:4
93:14 96:2,6,7
98:20 102:5,12,14
104:8 107:19
108:12,21 110:11
110:15,18,21,25
110:25 111:5,6,8
111:14 112:14,21
117:9 129:7,8,13
129:14 132:15
141:25 142:3,14
160:7,9 163:5
164:8 167:17,18
167:22 176:12,25
177:20,21 178:7
178:17,20,23
179:7 180:5,8,18
181:5,13,20 190:5
190:16 193:5
213:10,11,16
256:2,6,17 260:18

273:7 277:2
289:19 290:1
303:5,8,12 305:15
307:3,7,9,10,13
309:20 311:20
327:20 378:19
380:25 381:1
**named** 108:18
188:25 327:18
**names** 22:2,7,11,16
22:21 23:2,7,15
41:25 42:2 92:20
92:23 93:1,5,13
102:7 103:3
162:12 163:7,14
163:17,22 168:3
177:14 184:23
215:16,16 336:6
**naming** 160:12
**narky** 313:25
**national** 40:14
127:4 233:5
361:10 370:1,6,11
371:25 372:10
373:8 374:5,7,14
**natural** 35:14
269:19,20,22
**nature** 56:1,4 95:24
100:2 117:25
118:3 120:7
187:24 220:21
374:1
**nChain** 6:5 13:9,17
13:22,24,24,25
14:1 92:9 288:15
311:7,7
**nearly** 321:6
**nebulous** 165:9
204:6
**necessarily** 100:25
301:9
**necessary** 78:6
**need** 7:10,16,17
12:7,9 26:17,23
26:24 40:9 43:4
44:24 62:9 65:4

66:9 77:25 89:7
89:10 92:8 97:6
101:14 107:12
110:6 112:19
114:5,15 116:3,20
117:16 119:17,25
128:8 133:5
141:23 150:13
154:21 162:20
176:7 180:6 191:2
191:16 193:9
240:5 254:18
259:8 260:15
272:2 279:17
280:24 281:16
288:8 290:13
292:16 297:23
301:7 304:2
305:17 307:14,22
308:3 316:22
322:24 323:2
333:2 340:6
343:20 351:10
353:3 357:22
374:6 375:2
**needed** 82:15
133:24 227:3
283:12 306:9
307:20 318:6
366:11 377:9
**needs** 89:10 118:13
238:14 283:22
373:25
**negative** 336:22
**negotiate** 268:15
**negotiation** 268:9
268:14
**neither** 204:14,15
387:9
**networks** 231:21
**never** 54:7 71:24,24
72:1,1,3,3,5 76:22
83:6 88:3,4 113:8
115:17 116:16
120:10,13 137:8
167:19,22 176:1

185:18 187:7,8,8
187:9 195:25
196:10 206:7
217:3 220:24,25
242:24 258:17
282:8 291:5
292:25 293:1,1,2
359:5 362:21
366:5,6,14 367:23
372:8 377:1
**new** 1:22 10:21,23
10:24 11:1,21,22
44:1 65:6 185:25
258:5 276:5
356:11,11 371:14
**Nguyen** 213:3,19
214:19 285:3,7,18
286:15 287:16
288:2,17 292:5,12
299:13,17,17
309:16 313:14,21
313:23 314:2,15
327:3 331:19
**Nguyen's** 300:1
**Nicholas** 81:1,20
**Nicholas's** 82:9,14
83:4
**Nick** 328:5,8,12,16
**nickname** 129:9
**night** 138:24
**nine** 186:13
**nodded** 7:8
**node** 165:12 166:12
166:14,19 167:9
169:11 196:3
243:15
**nodes** 165:16 166:2
199:7
**nominally** 13:8
**non-disclosure**
193:13
**non-linear** 96:5,14
96:24
**non-public** 124:8
**North** 14:15,19
312:13

**note** 174:24,25
175:1 195:9
228:21 264:15
269:1 300:12,24
301:7,8,9 303:18
304:16 385:13
**noted** 164:14
256:16 257:21
258:17 266:17
275:16 377:21
**notes** 122:18
275:11 300:20,21
387:4
**notice** 282:8 298:25
**noting** 9:10,11
**notion** 109:13
**NSA** 317:5
**null** 123:8
**number** 4:2,7 10:1
10:15 14:2 35:25
36:23 61:5,11
77:13,17 123:23
124:2 134:8,9
173:19,23 215:19
218:22 221:5,9
225:21 226:4
231:13,15 232:20
251:13,15 283:14
283:25 284:4
286:1 289:7 292:6
295:13,14,23
296:11,12 306:4,5
318:16 323:8
326:5 334:16,17
346:12,20 349:16
368:19 385:21
**numbering** 189:19
**numbers** 57:15
68:24 70:25 299:1
**NY** 2:7

**O**

**oath** 6:9,10,12
16:17,22 17:2,8
17:10,16,17,18,18
260:22 360:23



363:15,16 368:5
368:11
**object** 9:7 25:18
34:6 66:8,16
77:25 89:3,4
97:23,23,24
144:13 182:13
227:5 253:20
330:25 335:5
338:18 377:22
**objected** 78:12
260:2 262:5
320:14 363:17
**objecting** 25:6
162:18 220:20
**objection** 8:7 9:10
9:11,25 11:7,16
12:14,18 13:7
15:3,9,16 17:7,24
18:10 19:3 20:17
20:20 21:3 23:12
23:20 24:4,8,21
24:25 25:14,14
26:1,8,15,21 27:3
27:9,12,17,22
28:10,17 29:3,10
29:19 30:12 31:13
31:17,24 32:10
33:1,8 34:9,15,19
35:1,6,12,18 36:6
36:13,18 37:19
38:2,24 39:3,16
40:1,5 41:10,17
42:10 44:10,16
45:14,22 46:6,12
46:18 47:12,22,25
48:7,16,21 49:12
49:15,21 50:2,6
50:13,17 51:5,11
51:16 52:9,13,25
53:8,12,20 54:13
54:20,25 55:20
56:15 57:5,12,20
58:1,19 59:14,25
61:9 63:14,20
64:11 65:9,12

66:5,23 67:2,21
68:4,13,17,22
69:11,14,16,19
70:6,19 71:13,21
73:4,10,14,18,24
74:9,14 75:1,6,17
76:8,15 77:22,24
78:3 79:12,20
80:1,7,12,20 82:1
82:5 85:19 86:5
86:11,14,24 87:6
87:17,24 88:10,20
89:6,8 90:4,8,13
90:24 91:5,10
92:3,12,17,21
93:2,7,18,24
94:10 95:11,19
96:21 97:16 98:14
98:23 99:21 100:1
100:11,22 101:6
101:11 102:9
103:12,16 104:5
104:20 105:7,11
106:8,11,17
108:14,20 109:11
109:24 110:16,22
112:8 113:24
114:10,14,24
115:3,9,21 116:2
116:8,14 117:6,13
118:4,10,18 119:1
119:16 120:15,19
121:15,25 122:6
122:16 123:11
124:10,18 125:7
125:19,25 126:12
128:15 130:20
132:3,20 133:11
134:3,17,24 135:6
135:18 136:9,15
136:21 137:5,10
138:6,21 139:3
140:7,25 143:15
144:3 145:2,7,15
146:9,14,23
147:23 148:6,18

149:1,8 150:1,15
150:22 151:21
152:4,8,15,21
153:2,8,18,24
154:10,16 155:2,9
155:14,25 156:17
156:21 157:1,15
157:21 158:5,10
159:6,17,25 160:8
160:18,24 161:4
161:13 162:14
163:2,11,25
164:10,18,25
166:6,15,23
168:12,22 169:3
169:17 170:10,20
171:1,7,22 172:20
172:25 173:5,9
174:24 175:1,12
175:17 176:3,19
176:23 177:9,15
177:22 178:8,18
179:25 180:9,14
181:6,10,16,21
182:1,17,23 183:4
183:24 184:11
185:3,10 186:4
187:13 188:4,9,18
189:1 190:7,12
191:19 192:4,19
192:25 193:19
196:1,12,21
197:10,16 198:5,9
198:14 199:2,10
199:24 201:6
203:1,9,15 204:4
204:11 205:2,8
206:3,12,18,24
207:19,24 208:25
210:4,10,18 212:5
212:12 213:7
214:11,20 215:7
216:3,22 217:10
217:23 218:3,11
219:17,24 220:8
220:14 221:15,24

222:10,14,22
223:5,10,22 224:4
224:11 228:1,16
229:3,12,18,24
230:4,13,20,25
232:23 233:10
234:16,24 235:7
235:15,24 236:7
236:19 237:2,11
237:19,23 239:10
240:14 241:21
242:11 243:9,25
244:8,14 246:14
247:3 248:7,17
249:4,14,24 250:7
250:12,25 252:4,9
252:18 253:11,21
254:7,17 257:13
259:7,12,13 260:5
260:6 264:1,6
265:15,24 266:12
267:8 268:5,13,21
269:15,24 270:21
271:12 272:11,17
274:5,11,16 275:4
275:19 276:12,24
277:11 278:7
279:16,21 280:5
280:12,18,23
281:4,15 282:3,16
284:21 285:8,20
286:17,22 287:3,7
287:21 288:5,11
288:19 289:5,11
289:15 291:7
292:3,20 293:23
294:3,8,12,17
295:3 299:6,15
300:9 301:3,13,20
302:1,18 303:1,20
304:9,25 306:18
307:2,25 308:7,19
309:3,11 310:19
310:25 311:21
312:4 313:1,11
314:4,9,16 315:18

315:21 318:9
319:24 321:14,23
322:14 324:3,10
324:16,22 325:3
326:11,19,24
327:4 328:7,14
329:4,9,21 330:2
330:8,22 331:6,14
331:21 332:1
335:4,15 336:16
336:20 337:11,23
338:8,9,24 339:7
339:20 340:6,10
340:14 341:19
342:4,15,23
343:22 344:4,10
344:19 345:13,16
346:1 347:6,10
348:5 349:10
350:1,16,21 351:8
352:10,16 355:4
355:19 356:9,20
365:7 378:6
379:16 380:1,6
381:15 382:1,7,15
383:1,6,23 384:4
384:23
**objectionable**
78:11
**objections** 35:11
50:20 78:6 162:18
225:16 370:3
**obligation** 277:25
**obsolete** 265:13
**obstruct** 40:9
**obtain** 97:8 116:22
117:15 147:15
230:11 236:17,24
251:8 274:21
**obtained** 236:25
276:19
**obviously** 78:2
174:22 347:13
367:11,17 368:17
374:16
**occur** 261:16



275:12
occurred 120:2,13
  134:8 178:14
  263:5 282:10
October 5:23 8:1
  354:9,11
offensive 384:25
offered 166:1
  251:10
office 6:4 31:11
  32:21 94:14,19,22
  94:23 95:2,5,7,13
  95:14,17 100:16
  101:10,18,23,25
  103:24,25 104:1
  104:17,23 235:2
  235:10 256:16
  316:6 319:15
  328:1 332:5,6,10
  332:14,17 333:7
  335:13,24 337:10
  337:15,21 338:6
  338:22
offices 1:20 4:10,16
  14:10,14
official 35:10
officials 35:24
  46:20 337:18
offline 206:2
  357:11
offshore 319:14,19
off-the-record
  373:23
Oh 41:8 252:10,22
  327:25
oil 314:22
okay 7:19 9:15
  10:14 16:1 40:11
  44:25 48:11 70:1
  84:22 89:14 98:6
  109:20 126:22
  127:14 143:8
  152:10 171:13
  175:6 176:9
  183:18 187:20
  196:6 228:6 240:2

245:20 261:25
  279:2 306:24
  313:11 316:24
  317:2 318:18
  334:1 335:21
  342:11 350:4
  358:4,12,21 359:7
  360:16,25 361:6
  361:20 362:20,23
  363:6 364:10
  365:21 367:25
  370:23 371:7,17
  372:11 373:14,22
  375:19 376:18
  377:21 379:6
  385:11
old 11:24 12:3 21:6
  32:17 82:16 83:18
  102:22 132:24
  157:5 213:11
  217:19 228:23
  283:19
older 32:18 314:20
oldest 21:11,14,17
once 5:12 48:20
  55:3,5,8 56:23
  66:11 117:11
  145:21 167:23
  204:13 214:23,25
  238:18 243:2
  306:6 340:3
ones 68:9 84:20
  87:11 110:8 170:5
  170:6,8,9 205:5
  233:2,3 273:8
  275:16,17 353:16
one-line 328:20
online 54:3 147:16
  147:17,19 176:20
  176:22 209:5
  231:15 262:10,11
  326:13
open 149:20 150:14
  168:18 170:25
  208:14 223:6
  251:23

opened 83:8 185:18
opening 362:5
operating 382:21
operational 115:16
  115:18 116:13,17
  374:25
operations 231:11
  231:12,14 232:3,7
  233:15,20 234:2
  234:23 235:1,5
  244:3
opine 369:9
opinions 225:15
opportunity 365:6
opposed 102:21
optical 99:19
order 5:10 175:4
  309:18 364:17
  368:18 374:25
  377:11
ordered 365:2,4
  372:3
org 179:13
organisation 13:3
  251:6
organisations
  251:14
organised 316:19
origin 188:24
  257:22
original 80:5,23,25
  81:12,15 148:20
  166:11,24 167:1
  176:18 304:17
originally 181:3
  243:18 283:5
  380:13
originals 299:4,9
  299:13
originates 227:22
  227:23 228:14,22
OST 81:7,19
outcome 387:15
outing 325:12
outside 184:21
  197:18 325:7

331:16
overall 344:11
overbroad 237:24
overseas 290:25
  319:17
owed 316:5
owned 91:8,12 97:4
  106:23 107:4
  113:25 114:2,3
  115:19 120:9
  122:22 123:1,3,7
  195:6 219:12,15
  237:4,8,14 269:6
  289:14,17 293:5,6
  293:7
owner 177:20
  264:25
ownership 91:3,13
  91:17 92:14 93:17
  94:4 107:1,9
  120:3 123:10
  180:8,11 219:10
  248:5 293:9
owns 92:1,2,8,8,11
  96:24 219:20,22
  237:17,22
Oxford 6:5 14:24
  52:15 260:12
  322:10
o'clock 108:1,2
O'Hagan 188:25
  189:15 191:22
  193:12,25

_____

**P**

P 2:1,1
PA 2:17
page 3:2,10 126:11
  189:18,19 202:3
  227:11,19 228:3,4
  228:5 239:15,21
  239:22,24 243:21
  247:17,22 249:3
  252:6 253:23
  255:25 256:3
  257:18 262:16

266:4,5 267:13,15
  277:18,20 284:9
  296:12 297:3,14
  297:15,16,19
  298:3,4,4,5,5,5,5
  298:6,6,9,10,12
  298:14,22,23,24
  299:1,20 301:24
  302:3,6,8 304:3,4
  304:18 305:5
  310:2 317:14
  321:7,8 333:24,25
  334:14 348:11
  352:24 354:15
  357:15,16,19,20
  370:18 371:11
pages 52:16 296:22
  297:25 298:2
paginations 239:25
paid 185:21 230:17
  244:6 249:10
  274:1 281:10,11
  281:11 312:7
Panama 84:19 85:1
  87:12 93:9 246:25
  247:1 248:9,11
  250:17,23 268:1
  269:7,23 272:7,10
  272:16 273:18
  303:9,9 309:25
  319:9 343:14,16
  343:17 344:3,9,18
paper 63:22,24
  64:1 65:5 138:14
  138:17,20,23
  139:2,8 140:11
  141:8 142:16,19
  143:2,6,24 144:2
  145:1,12 146:22
  147:3,6,8,10,12
  147:15,22 148:24
  149:7,10 150:14
  150:17,19 152:7
  152:20 154:8
  156:7,8,11 157:14
  158:7,14 175:10



191:6 203:14,22
203:23,25 204:2
204:10,15,15,21
205:1,13,14,22,23
223:7 240:10
247:25 270:16,20
328:17,19
**papers** 28:22 51:24
52:2 149:18
167:20 215:20
219:9 260:11
303:10 355:14
**paragraph** 189:25
228:5 240:6,11
245:22,22 246:2
247:9,23 264:20
267:18 270:6
334:15 348:17
350:5,8 351:13
352:25 353:17,18
354:2 370:18
371:11
**paragraphs** 140:22
140:24 244:7
245:13
**part** 8:7 10:23
16:17,24 19:5,21
25:16 44:23 45:6
74:19 92:23 93:16
114:9 160:4 176:6
195:6 232:1 257:4
257:5 278:15,16
278:17 292:24
293:14 311:4,4
312:16 318:1
352:11 355:23
372:17,17
**partial** 309:1
**particular** 21:7
45:18 52:17 63:25
110:1 122:8 123:1
127:7 143:2,2
146:3 163:5
253:14 307:13
344:11 358:9
365:5 367:7

370:15 371:2,3
**particularly** 379:13
**parties** 357:8
370:20 371:16
372:19 375:9
387:11,13
**partner** 71:24 72:3
72:3,4 130:9
**partners** 262:15,16
303:6
**partnership** 12:22
33:16,18,22,25
72:1,2,2,5,6
144:19 145:18
182:6 183:15
190:21 367:2,6
369:1
**parts** 127:16
140:15 167:6,16
171:5 298:6
**party** 263:21,24,25
264:17 305:8
374:13
**passed** 104:13
**passwords** 133:6
**patent** 51:25 144:9
145:14 223:15
236:10
**patenting** 143:23
144:1,25 145:3,6
145:8 146:7
**patents** 86:9 149:18
**Paul** 38:17 262:19
**Paula** 1:24 2:15
4:13 42:11 387:3
387:24
**pause** 70:16 93:12
106:16 141:22
193:8 239:1
253:21 259:24
286:9
**pay** 62:9 99:12,13
120:11 122:9,19
122:20 242:1,4
244:10 246:9,10
274:3,18 312:2,24

316:3 350:10
**paying** 62:7,8,12
**payment** 215:21,24
215:25 216:2,6
222:4,12,18,20
355:11,17,18
**PDFs** 159:2
**penalty** 334:10
**pending** 42:12 43:5
43:8,17,18 236:14
**penitentiary**
311:14,16
**people** 28:5 31:8
35:25 36:10,12
37:8 48:25 53:15
53:16 57:7,14
63:11 72:6,7,8,9
88:13 92:23 93:16
93:20,22 107:11
109:2,3,5,13
122:9,10 124:23
126:17 129:17
130:1 136:6
138:23 140:13,16
140:23 142:11,24
149:17,19,20
156:8 157:7
160:12 163:5,20
166:21 167:14
168:2 170:24
171:17 172:14
173:11 185:15,19
208:6,7,10,11,13
213:16 232:17
233:13,23 244:9
246:9,16 247:5,11
248:9,11,13 249:7
249:8,10 250:17
251:16 253:7
261:11,19 262:23
263:1 269:14,17
270:18,23 273:18
276:21,23 280:19
281:9 282:7
300:16,19 319:22
325:7 342:25

346:13,24 347:14
370:15 371:2,23
382:23 384:2
**people's** 247:16
**percent** 98:10
**perfectly** 6:11,17
18:24 43:19
36:12
**period** 20:9 24:10
24:14 26:14 103:8
105:5,9 116:1
129:25 190:25
201:17 266:22,25
306:7 344:12
360:10 367:4
**periods** 24:15
**perjure** 17:17
**perjured** 335:7
**perjury** 334:10
**Perling** 141:13
142:19 326:2,9,17
326:22 327:2,9,12
**Permanent** 110:12
111:3,22,24 112:4
112:11,15 310:10
310:12,23
**permission** 43:17
**permitted** 40:15
69:20 89:16 99:4
199:13 243:23
295:7 373:17
**person** 35:9 38:17
71:23 102:12
111:7,16 118:13
126:20 127:19,21
128:19 141:13,24
142:21 149:16
150:17 153:14,17
190:16 201:19,23
211:21 212:24
217:6 226:23
269:2 312:15
315:23 316:1
323:13 339:19
371:20,24 374:6
**personal** 1:6

325:23 337:19
**personally** 95:23
257:20 317:12
332:7 335:6
**persons** 174:2
269:19,20,21,23
**person's** 128:13
**petabytes** 99:18
**petrol** 314:23
**Philadelphia** 2:17
**Philip** 2:20 4:12
**Pholus** 82:21 83:3
**phone** 11:21 54:4
68:23 70:24 178:2
194:16 373:19
374:25 375:11
**phoned** 104:13
**phrase** 322:12
**physically** 46:24
54:3 167:23
186:23
**pick** 255:3
**piece** 203:23
204:10,21,25
240:10 283:11
**pieces** 204:15
291:13
**pile** 124:12
**Pirate** 186:10
**pizzas** 251:25
**place** 4:9 33:23
130:16 136:12
148:14 196:16
201:2 237:21
341:8 379:12
**placed** 297:8
**places** 160:21
231:15
**plaintiff** 2:22,25
5:2 348:1,2,17
349:8 350:10
351:16,22 354:21
359:22 361:13,16
372:23 373:19
**plaintiffs** 1:8 2:2
4:19,21 5:18



369:21 373:18
**plaintiff's** 78:16,17
79:7 126:8,9
160:6 189:7,17
193:5 227:7,10
239:2,3 259:17
263:13 284:9
296:18 297:7
314:25 315:3
333:15,21 347:19
347:22 367:4
369:1
**planet** 230:7
**planning** 15:19
**Plastique** 226:18
**played** 287:20,24
**playing** 194:16
**pleadings** 19:16
286:5,7
**please** 4:14 5:5,20
7:2 15:21,23 16:9
16:12 18:7 27:24
30:15 34:6,21
42:11 43:8,23
50:19,25 65:11
67:14 69:13,24
70:12 78:25 79:4
82:23 86:18 91:22
98:4 102:2 105:14
110:5,8 118:20
144:5 147:6 174:1
178:2 182:4 183:9
184:24 186:18
189:3,8,18 194:10
201:22 204:5
208:21 209:12
227:11 239:21
242:13 247:17
254:1 256:15
264:21 267:4,13
269:4 271:1
272:25 275:8
277:16 285:21
286:13 293:18
296:9 309:7 313:8
317:14,20 318:10

331:1 333:24
340:2 342:3 350:5
350:8 351:13
352:24 353:17
354:15 357:3
360:22 383:7
388:3
**plenty** 146:2
**plus** 299:18 377:17
**point** 5:10 6:15
9:13 12:17 19:24
35:25 42:12 64:13
64:20 102:13
107:9,18 115:19
117:18,21 120:4
123:19 158:24
169:16 196:15
205:3,9 225:15
229:21 257:24
258:1,14 261:17
291:16 295:14
301:9 312:12
320:16 340:16
359:22 365:6
366:7 373:9
377:11
**pointing** 228:24
**poker** 231:12 232:7
233:6 236:18
237:1 255:22
272:5
**poker-related**
235:23
**Police** 141:24
**Ponce** 2:11
**pool** 201:19,20,25
**pools** 186:21,23
195:20,24 197:18
**Port** 184:21
**portion** 107:13
**portions** 143:5
171:13
**posed** 52:6 71:5
98:3
**position** 43:7
126:23 193:17,22

258:4 362:3,17
363:15 364:17,21
365:19,19 377:16
**possess** 245:25
294:23 346:19
**possessed** 292:8
**possession** 20:16,25
21:12,15,18
271:22,25 334:19
334:24 336:13,19
336:25 338:21
**possibility** 50:23,24
**possible** 8:23 20:5
120:23 162:9
172:19 207:20
217:21 241:6
251:22 258:22,23
332:24
**possibly** 204:22
205:6 238:1 299:2
302:14
**post** 135:4,12
169:21,23,25
170:1,8,9 171:5
282:10 293:5
**posted** 169:2
170:17 171:12
**posting** 169:16
170:14 324:2
**posts** 262:14
380:14
**potential** 162:15
163:23
**potentially** 297:17
**PoW** 175:19,19
**power** 185:21
**practical** 253:7
**practically** 266:24
325:21
**precluded** 369:8
**predicate** 144:22
220:16
**predicate-based**
220:22
**prefer** 160:23
161:2 257:7,8

**prepared** 43:21
183:19
**presence** 208:17
**present** 2:19 4:16
373:18
**presentations**
35:23
**presented** 46:20
260:11 374:18
**preserve** 69:15
81:7,25
**preserved** 78:3
**press** 37:5
**pressing** 37:9
**presume** 65:18
175:4 189:2
227:17
**presuming** 314:17
**presumption** 65:22
**pretty** 339:24
341:12 384:11
**previous** 277:13
317:23
**previously** 174:16
175:11 237:9
**primarily** 208:13
209:2 231:10
362:4
**primary** 172:17
208:5,8,23 243:13
354:19
**printed** 203:23
204:8,9,25
**printout** 126:13
**prior** 76:18 141:3
168:19 202:3
277:24 328:11
**private** 55:15 138:4
177:7,11,17,25
202:24 203:2,7,11
206:7 223:9
294:21,24
**privately** 169:23
177:13
**privilege** 18:15,20
19:22 97:20 364:1

364:12 367:17
369:20,22
**privileged** 18:12,13
31:4 97:18 320:5
320:9 338:11
**Pro** 2:6
**probabilities**
173:11
**probability** 50:25
**probable** 51:3
**probably** 35:21
44:7 96:15 177:25
195:5 217:20
243:3 251:7
306:14 322:9
326:13 328:23
365:7,8 369:9
378:21
**problem** 79:2 225:4
355:23 366:17
**problems** 61:10
155:11,13,17,21
155:21,23 249:16
283:1,3,4
**Procedure** 70:5
225:12
**Proceed** 50:21
**proceeding** 364:16
**proceedings** 349:13
349:14,16,18
352:12
**proceeding-type**
356:13
**process** 97:2 99:18
136:12 190:22
205:16 227:5
281:8
**produce** 49:1
**produced** 302:20
335:12 353:8
355:15 366:20
**producing** 254:16
**product** 253:24,25
254:12,15 255:1
255:10 258:6
**production** 255:6



productive 18:17
professional 122:11
Professor 283:1,9
379:2,3
ProfFaustus
378:23 379:1,9
380:12
program 106:6
191:9 235:21
328:17
programed 182:21
programer 106:5
programing 165:5
166:10 328:12
prohibited 225:23
prohibiting 226:9
prohibitive 258:6
project 64:22
168:18 278:13,15
278:16,18,19,20
278:22,24 279:1
351:16,24 354:20
projection 50:23
projects 215:15,17
215:19 218:22
219:1 244:21
255:24 259:20
275:10,14 278:10
371:3
prolific 262:11
proof 153:20,22
154:15,19 263:10
383:21
proper 25:2 368:8
properly 183:19
property 27:21,24
28:16 86:2,3,7,17
87:5,16 88:8,19
99:25 100:10
114:13 117:23
195:6 199:6 215:5
215:13 216:1,5,11
222:3,6,13,17
223:2,17,21,25
224:8 230:3,12,24

231:4,6,23,24,25
232:2,6,9 234:9
234:15,21 235:6
235:14,22 236:6
236:18,25 243:23
243:24 255:24
349:5 350:10,12
372:16,20,23
373:5
proposed 8:11
protect 88:12,15,18
protected 88:16
protocol 55:16
155:24 165:6,11
165:13,15,20,24
166:2,4 175:25
323:18 328:6
342:22 372:7
protocols 165:21
166:21
prove 257:1 259:5
262:3
provide 31:22
126:23 131:18
206:16,23 207:2
212:16 213:24
276:17 277:22
278:1,3 279:14
282:2 361:17
368:18
provided 178:11
211:12 213:21
231:3,7 240:22
280:3 281:3,13
282:14 348:18,22
349:8 355:3
383:21
provider 240:23
241:9,15 243:22
248:5
provides 265:11
providing 240:12
240:19 362:8
368:17
provision 239:13
241:4

pseudonym 167:20
167:25 186:9
208:19,20,24
209:2,9 210:2
pseudonyms 326:5
326:8
Pty 277:23
pub 38:12,13,15
public 55:15 76:18
99:12 125:6
128:24 129:3
132:11 137:21
147:10 151:1,2
155:4 158:4,7
164:1,23,24 165:3
167:4,6,12 168:19
169:10,16,24,25
170:1 177:1,11
179:21 196:8
206:10,16 207:13
207:22 209:10,11
209:21 215:20
223:16,23 224:7
253:9,18 324:2
325:8 339:9
365:10 384:13,18
publications
285:15
publicly 139:25
163:23 164:2
168:20 169:1,21
177:4,8
published 52:3
59:9 215:20 223:7
260:10 323:25
355:14
publishes 167:19
publishing 169:10
pulled 100:25
213:12
purchased 244:11
purchaser 271:8,19
274:21 275:10
purchasing 347:2
pure 119:7
purported 15:18

145:18
purporting 36:23
purports 79:7
purpose 26:16,23
35:16 37:14 63:18
85:24 86:1 87:3
96:13 99:14
111:22,24 113:1,2
113:9,13,15
143:17 218:19
241:4 243:5,13
255:16 345:4
367:12
purposely 263:8
366:3
purposes 112:12
366:12
pursuant 372:21
put 147:16,17,19
149:17 151:1,3,6
151:11,15 154:3
191:18 223:6
226:17 227:13
228:12,17 231:19
237:21 242:9
257:25 260:19
276:22 283:5
287:9 293:1,21
294:1,6,11,15
297:17 301:22
315:25 346:14
347:15 354:13
356:25 364:10
386:8
puts 256:17
putting 50:24
231:17 234:11
316:19 356:24
Python 284:16
P-H-O-L-U-S
82:21
p.m 318:4
P2P 209:3

224:9
quarter 256:3
question 7:1,6 8:23
9:2,8 13:15 15:21
15:24 16:2,7,13
17:13 21:10,10
30:6,14,22 36:25
37:8 39:10 41:10
42:12,14,16,17,24
43:5,8,10,11,17
43:18,21,23 52:5
66:6,21 70:15
71:5 78:3,20
82:18 87:8,18
89:18,20,22 91:23
91:25 96:22 98:3
104:3,10 112:6
114:17 116:23
124:7 126:23
135:8,11 138:9
143:16 144:6,8,11
144:11,16,17,21
146:3 147:4,24
156:2 165:8 182:9
183:14 187:2
189:15 190:18
191:10,21 193:8,8
195:13 197:1
217:14 220:15
227:6 236:13,14
236:15 237:23
238:15 242:17
244:23 245:16
251:18 252:8,9
257:9,10,15 259:2
259:18,24,25
262:3,5,6 263:9
267:5 269:22
279:8 286:8
292:14,14,15
295:6 296:15
309:7 316:11
318:19 332:12
338:2,14 340:1,7
340:24 341:25
342:3 344:12

_____
Q
_____
Quantification



359:2,8,11 360:4
360:9,12,17 362:9
362:25 363:4
364:5,7 368:7,12
368:13 376:3
**questioned** 373:6
**questioning** 8:10
36:24 43:19 77:21
361:18 368:22
**questions** 3:4 5:8
16:5,5 17:14,15
18:12 19:16,19,19
19:20 20:8 25:2
34:3,4 40:16 43:3
77:24 78:11,12
99:3,4 123:13,15
141:1 179:18
182:13 183:19
195:11 199:12
203:20 205:4
225:2 234:7
238:18 251:11
270:9 277:16
279:8 287:15
349:20 352:20
358:7,14 359:13
360:21 361:2,5,8
361:9,13 362:12
362:14 363:7,9,17
363:22,24 364:5
365:15,16 367:9
367:10,12,16,18
367:19,21 368:21
368:24 369:18
370:11,14 373:7
374:15 386:8
**quick** 154:1 321:2
374:24 384:11
**quicker** 52:6
**quickly** 35:13
144:18
**quite** 11:20 25:17
61:11 229:19
232:20 251:15
252:21 264:14
284:23 373:11

**quote** 141:19
**quoted** 66:17
**quoting** 117:25

**R**

**R** 2:1,10 153:19,22
154:15,19 175:19
175:19,19 254:3
255:2 388:1,1
**raise** 78:7 183:13
296:17 358:13
**raised** 369:25
**raising** 361:14
**rambunctious**
136:1
**Ramona** 17:22,23
19:11 361:3
363:25
**random** 33:25
179:7 300:12
**range** 60:1
**rarely** 319:21
320:17
**rate** 356:5,8,11
**rated** 354:22
**rates** 356:15
**rat's** 257:22
**Ray** 105:22 129:10
129:11
**reach** 122:14 149:6
154:14,21,25
287:6 331:25
**reached** 83:22
154:19,24 287:1
331:19 371:21
**reaching** 126:3
149:12
**read** 41:9 42:14,14
42:21 43:23,24
89:24,25 118:6
191:3 193:7,9,9
212:3 240:7,11
241:8,14 245:2,16
253:25 264:23
271:6 272:25
275:8 277:20

284:14 317:17,20
318:3 319:13
334:1,15 350:7
351:10,15 353:18
354:5,18 356:4
357:5 386:4
**reading** 65:21
244:25
**ready** 16:7
**real** 125:17,23
165:17 167:22
208:1 249:9
312:22
**realise** 109:1
**reality** 219:15,20
**really** 8:9 13:23
103:16 163:6
167:19 178:3,4
180:10 200:22
218:12 230:6
257:19 262:20
274:23 282:7
320:17 339:15
342:25 353:4
375:9,10
**reason** 78:8 134:10
134:19 174:15
220:12,18 260:21
317:3 331:24
**reasons** 317:2
326:14 372:1
**recall** 11:2 14:13
24:19 25:24 26:2
26:6,13,17,19,22
27:2,11 29:17
30:3 35:16 36:8
41:16 52:22 53:2
53:10,18 62:3
67:10 69:7 70:16
71:10,17 72:22,24
72:25 82:9 83:20
83:25 84:2 85:16
93:6 101:22 104:7
105:24 106:1
110:8 111:18
126:3 156:25

162:25 202:13,19
209:13 210:5
212:6,7 216:23
220:17 244:24
295:17 303:12
304:7,14 333:7
339:8 341:9,11
365:2
**recalled** 130:5
**recalls** 366:1
**receive** 68:12 69:8
70:17 71:11,18
83:14 168:6
284:17 359:5
**received** 71:23
83:12
**receiving** 359:4
**recipe** 59:6,8,10,12
**recipients** 190:3
**recognise** 79:9,10
126:10,13 190:5
227:11 239:4,5
263:14 297:7,10
300:7 315:5 334:5
334:8 347:24
**recollect** 48:22
51:24 52:3,3
53:21 61:6,8 64:3
64:19 280:11,16
**recollection** 48:6
51:13,19,22 53:14
57:2,10,14 66:18
66:22,24 71:8
85:2 99:6 107:8
108:18,25 172:23
198:24 238:17
**reconsider** 205:8
**record** 4:2 5:21
7:11 25:14,15
35:10 37:2 40:23
40:25 41:4 42:20
43:20 49:21 56:10
56:11,18 69:7,16
70:9 77:11,12,18
77:23 78:23 79:1
81:9 89:10,13,13

99:12 101:14
102:15,20 105:15
108:5,6,10 110:17
116:25 122:18,19
123:22 124:3
162:21 172:3,6
173:18,24 179:21
191:19 192:4,5
193:25 197:25
201:5,10 202:2,7
209:12 221:4,11
224:22 225:9,22
226:18 240:3
245:6,10,19
264:16,24 265:15
266:19,23,24
267:1,5,10,14
272:25 283:24
284:5,12 296:19
296:21,25 310:4
317:18 323:4,9
333:12,17 343:20
353:20,21,25
356:4 357:5,24
358:3 360:12
361:15 385:13,17
385:18,19,20
386:7 387:6
**recorded** 6:14
172:5
**recording** 49:1
272:4
**recordings** 194:4
**records** 11:5 15:1
37:21 75:5 82:16
83:2,7 94:6 96:11
97:11,13 102:6
106:24 107:3,6
110:7 111:12,19
111:20 114:21
116:4,21,22
117:17 118:6
120:1 121:22,24
122:17 123:5
124:8 132:10,12
139:20 164:20,24



165:3 176:17,25
177:1 201:11
219:13,14 266:21
279:18,24 280:7,9
280:10,25 282:19
288:8 297:23
301:7,11,15
305:17,18,20
306:3,4,6 307:14
307:19,20 308:3
311:5 312:20
313:3,4,10 332:22
332:23 337:5,8,10
337:15,19,20
339:10 343:21
**rectum** 257:22
**Reese** 283:1,6,7,9,9
283:17
**refer** 166:4,9
354:14
**reference** 96:8
154:1 175:10
244:19 296:14
310:9 356:18
**referenced** 154:3
186:13 244:21
247:9 259:20
295:15,16 344:18
**referencing** 65:23
150:4
**referred** 184:7
193:4 224:19
225:5 243:24
275:15 276:16
296:10,11
**referring** 65:8 66:1
69:23 83:9 101:12
101:12 109:9
115:5 124:8
161:15 189:21
208:17 215:23
239:24 271:15
273:3 278:20
285:4,22 286:2
302:8 320:21
355:18

**refers** 296:12
**reflects** 296:21
**refresh** 66:17,22
**refreshed** 66:24
**refused** 193:12
296:3 358:8,14
360:20 361:2,5,10
372:9 373:7
**refusing** 17:13,15
40:13 66:14 127:1
**regard** 88:25 104:8
362:9,24 363:7,14
365:14 366:13
**regarding** 127:15
364:7 365:9
371:14
**regards** 256:11,18
335:23
**register** 176:11,14
177:13 179:2,15
179:19 187:25
353:9,11
**registered** 178:7
179:3,6,9,11
180:5
**registering** 180:6
**registrant** 177:21
**registration** 62:13
176:18 177:7
178:23 179:1
180:4
**regular** 54:23 55:1
241:1
**rejected** 166:1
220:24
**relate** 15:18 27:7
27:16,20 28:16
29:1,5 33:17 87:1
88:25 106:10
145:17 183:8,14
205:7 238:4,19
309:4 318:16
357:12 365:16
370:12
**related** 27:11,14
33:12 36:24 38:18

38:21 86:22 87:5
99:25 107:16
183:19 292:4,11
300:21 310:14,17
310:20,23 314:3,8
314:13 316:11,12
327:15,24 334:21
370:14,15,16,17
371:3,4 373:4
387:10
**relates** 33:15
100:10 144:6
146:4,15 205:13
224:12 233:5
236:18 259:16,19
363:21
**relating** 29:13 87:8
368:16 369:5,18
369:19
**relation** 146:18
314:3
**relationship** 71:25
98:13 120:14
186:20 295:1
304:17 312:9,10
312:11,13 316:17
383:9
**relative** 387:12
**release** 65:5 175:25
271:18 372:6
**released** 268:3
329:14,15,17
**relevance** 15:17
97:16 155:25
186:18 205:6
222:15 339:25
**relevant** 144:22
189:11,12,15
285:24 315:20
349:18 367:4,6
368:10,25 372:22
**religious** 366:12
**rely** 7:6
**relying** 364:2
**remain** 88:16
**remained** 83:8

**remaining** 276:4
**remains** 365:19
**remember** 9:17,23
10:17 11:11 14:15
14:22,23,23 21:24
22:4,8,13,18,23
23:4,9,17 24:9,11
24:13 35:7,23
36:4 37:15,24
39:4 41:25 42:2
45:16,24 47:5
48:4 49:2,3,4 53:2
53:25 54:14,17
55:21 57:6,7,16
57:21 58:24 59:5
60:9,10,13,16,21
60:22,25 61:3,17
61:18,21 62:2
63:7,12,15 67:16
67:18,22,25 68:5
68:9,11,21,23,24
69:2 70:22,23,24
70:25 76:9,12
81:2,17 82:10,13
84:21 85:9,11,14
85:23 90:22,25
92:22 93:1,13,14
96:8,11 98:7,18
99:10 100:19
101:1,21 102:5,14
103:4 105:16
106:25 107:3,7,12
107:15,20 109:6
109:25 110:6,13
111:13 112:1,2,6
112:20 122:7
126:5 133:7,19
140:17,19 141:25
142:6,10,14,20,21
142:23,24 143:1
151:15 156:12,22
157:2 163:4,6
168:3 170:7
176:16 179:22
190:8 192:15,20
192:21 193:1,2

206:22 209:14
211:19 213:11
214:4 218:12
220:9 246:16
269:9,25 277:1,4
277:9 281:9 283:8
285:9,11 290:13
303:2,5,8,16
307:11,12 309:20
322:23 325:10
326:4 343:19
344:21 351:1
365:1 377:7
378:22
**remembered**
277:13
**remembering** 49:2
**remind** 7:12 130:23
202:13
**removal** 120:8
**remove** 109:17
260:3
**rename** 112:13
**renamed** 112:16
**renames** 112:18
**render** 373:21
**rendered** 265:13
**repeat** 7:2 30:22
152:1
**repeated** 225:22
**repeatedly** 226:1
**rephrase** 7:3 21:11
332:12
**replied** 190:4
**Reported** 1:24
**reporter** 2:14 4:13
5:6 7:11 34:21
35:9,11 42:15
43:24 89:23,25
94:16 106:15
123:18 142:3
184:24 226:25
245:2 251:19
279:10 283:21
293:18 317:9
331:1 373:20



387:1,3
**reports** 247:12
**represent** 4:15 5:18
**representation**
28:12 37:5 191:23
**representative** 1:6
**represented** 264:9
**representing** 4:12
4:13
**republic-type**
356:16
**request** 4:11 42:13
140:2 141:2 246:7
246:11 366:12
370:4 372:3
373:16 383:8
**requested** 42:12
43:24 89:25 245:2
246:9 361:11
**Requesting** 338:12
**requests** 175:22
337:22
**require** 70:5 368:6
368:10,20 370:4
374:15
**required** 125:3
331:17 353:9
363:20
**requirement** 306:3
306:6
**requires** 62:11
100:3,5
**reread** 136:2
**research** 1:7 64:22
91:19 109:15
175:24 216:18
275:9,10 350:11
350:15 372:6
**Research/develo...**
265:2
**reserve** 231:20
248:14,16,21
343:3,7 346:23
377:12,23 385:9
**reserved** 385:7
**Reserves** 251:14

**reserving** 385:4
**reset** 211:2
**resided** 75:10
**residence** 8:19 11:9
**resident** 312:12
**resides** 30:11
**residing** 312:16
**resigned** 339:1,6
**resolve** 77:22
**respect** 296:7
**respectfully** 364:23
373:22
**respond** 8:24 9:2
43:7 225:8,18,21
339:7 359:14
368:11,14 369:21
372:4
**responded** 123:12
368:9
**responding** 225:19
337:21
**response** 7:7
175:22 313:7
318:3 363:22
372:2 374:2
**responses** 7:11
75:14 136:13
386:8
**responsible** 234:14
234:23 235:1,4,9
374:13
**rest** 255:5 304:2
313:4 385:9
**restarted** 195:19
**restate** 313:25
**restroom** 77:6
245:5
**result** 237:24
238:16 319:14
**results** 275:11
**return** 282:5 297:4
**returned** 268:19
282:1,6,20
**returning** 354:21
**reveal** 324:14,17
**revealed** 324:18

**revealing** 143:12
143:16
**review** 136:13
150:13 169:19
295:12 297:3
**reviewed** 150:17,19
**reviewing** 296:13
**reward** 196:10
**re-edit** 157:7
**re-point** 228:1
**Rica** 87:12 231:14
231:16 244:4
319:9
**Ricardian** 323:21
**rid** 158:23 333:3
382:5
**right** 16:5 39:19
43:9 71:3 105:16
135:11 150:7
177:3 189:10
190:5 193:6 197:6
210:15 227:2
235:10 244:23
270:11 274:20
276:2 278:12
283:9 296:8
308:10,18 311:8
335:3 341:1
353:16 359:24
**rights** 113:25 114:2
114:3,4,8,12
115:7,11,13,15,19
115:25 117:11,15
117:17,18,20,21
117:23 118:1,3,5
118:9,22,24 119:4
119:14,23 257:6
291:6,9,12 293:8
319:17 337:17
**right-hand** 189:19
300:3,24
**ripped** 185:20
**risk** 96:16 216:12
222:8 223:3 224:9
275:17
**Rivero** 2:10,11 4:22

4:22 15:20,23
16:4,12 30:17
31:2 35:8 42:10
42:23 43:1,2,4,12
43:13,14,16 50:21
69:24 70:3,7,11
78:19,25 79:4
98:2 102:19
105:20 106:13,19
116:23 117:2
123:17 141:15
142:2 144:15,21
146:16 153:10
174:1,7,14,24
189:21 195:9
196:23 197:11
201:22 202:2,7
224:17 225:1,10
225:18,21,25
226:8,13,16,19
227:5 238:4,9
243:10 245:3
251:18 252:4,7,18
252:22 253:11,20
254:6,17 259:13
260:5,8 262:1
263:9 277:16
279:9 295:10,20
296:7,9,20,23
297:2,5 320:11
338:8 339:21
346:3 353:19
359:13,18,19
375:5,6,16,22,24
376:6,10,17
377:11,16,20,22
383:12,16 385:3
385:18
**road** 134:9 185:20
**Robert** 383:10
**Roberts** 186:10
**Roche** 2:5 4:20,20
385:15
**role** 287:16,19,24
314:3 340:20
**roles** 19:15 105:13

286:4,6
**rolling** 200:7
**room** 258:24
358:20 373:18
**rooms** 55:14
**Ross** 339:19,25
340:18 341:18
342:1,12,13,14,21
**rough** 202:9
**round** 186:10
**route** 52:18
**routine** 52:10,12,15
52:17
**routinely** 52:8
**royal** 319:20
**rude** 287:9
**rule** 69:22,25 70:3
70:12,13 78:20
136:2 165:24
225:4,10,11,12,12
225:23 226:2,9
296:10 310:25
368:3 369:23
370:4,5 374:5
375:2 385:8
**ruled** 374:17
**rules** 20:21 25:8,17
69:21 165:15,20
165:22,25 377:18
**ruling** 40:17 369:17
370:3 374:10
377:13 383:11
**rulings** 365:23
**run** 138:2 185:21
195:20 243:12
339:16 376:1
**running** 157:4
196:3,7 199:7
243:14 244:3
375:25
**runs** 207:8
**rural** 185:17
**rushed** 349:4
**Russia** 232:18
233:9
**Ryde** 14:15,19



**R&D** 84:4,8,10,11
84:22 85:8,12,13
85:24 87:14 91:4
91:8 92:11 93:17
94:9,13,18 95:5
96:1 239:12
240:17,19 244:6
245:24 246:4,8,12
246:13,20,22
247:1,8 248:6
263:20 267:25
268:3 269:6,7,23
270:16,17,19,22
272:7,10,16 276:3
277:25 278:3
279:14 280:2,3,16
282:2,14 343:12
343:15 344:3,9,15
344:17,24
**R&Ds** 84:17 90:2

**S**

**S** 2:1,22 266:7
378:12,13,21,25
380:8,19 386:20
**safe** 49:14 50:11
375:13
**sake** 247:20
**Sakura** 273:4,11,14
273:22
**Salinger** 256:10
**SANS** 285:15
**satisfied** 262:7
**Satoshi** 132:17,18
133:10,17 134:22
135:5,8,12,14,23
137:24 138:5
144:20 167:2,4,9
168:10,14,16,20
169:2,12,15,16
170:18 171:14,21
182:5 184:2 186:2
186:3,5,11 188:24
190:1,21 191:5
208:5,8,12,14,16
208:18 209:9,15

209:15 210:2
213:12 285:16,19
286:16 323:18
324:2,9,14 325:2
325:24 326:3,5,10
326:17,23 328:13
329:2,12,19,20
330:21 382:25
383:5,22 384:3
**satoshi@anonym...**
210:14
**save** 12:6,8,9 68:24
136:25 157:5
328:18 379:23
380:8
**saw** 39:7,11 134:12
150:4 154:2 200:6
267:21
**saying** 64:1 121:11
148:10 153:16
159:8 165:8
207:10 208:13,21
213:17 228:8
247:12 250:14
253:12 254:20
255:4 257:3
260:23,25 261:7
261:19 262:12
268:15 274:17
282:21 283:2
300:21 307:15,18
311:10 319:23
322:25 335:18
349:21 352:5
**says** 19:13 63:16
64:7 126:16
177:25 190:19
227:20 229:6
241:8,11,19,22
245:23 246:2
247:25 249:8
254:12,14 255:1,9
261:22 264:4,16
265:3,22 266:7
271:18 305:8
310:16 315:9

320:17 321:4,8
348:17 355:7
371:13
**scale** 100:4 243:16
**scales** 345:10
**scaling** 243:13
345:5,6,8
**schedule** 375:1
**scheme** 293:15
**Schiller** 1:21 2:3,6
2:22,23 4:10,11
4:16 174:4,10
359:21,25
**scholar** 264:12
**scientist** 336:21
**scope** 88:21 89:19
103:17,21 141:4
152:9,12 156:1
181:11,17,21
183:19 187:14
190:13 199:12
203:17 214:21
216:7 242:12
244:16 278:8
285:21 286:1,1,10
292:4,7,9,10
340:16,19 362:11
362:19 363:18,22
364:9 365:20
383:24 384:5,12
**screamy** 248:25
**screen** 4:8 65:21
167:18
**SDK** 351:17,18,25
**se** 2:4 14:7 186:12
**sealed** 83:8,12,14
**seances** 382:23
**search** 129:10,12
131:19,22,24
154:1 311:25
**searches** 163:18
311:22
**second** 2:4 10:4
17:21,22 40:20
98:2 126:11
184:10 189:9

197:3 207:13
224:17 225:17
240:6 244:22
360:4 362:24
369:14 372:2
**secondly** 249:19
**seconds** 385:14
**secret** 159:16
293:15 326:15
**secretarial** 107:7
107:12 111:20
122:9,10
**secrets** 86:13,16,19
**section** 259:19
**Secured** 93:9,25
94:16 248:13,15
248:20 303:7
309:21 310:1
311:13,23,24
346:21
**security** 40:15
127:3,4,10 216:12
218:23 222:8
223:3 233:5
285:13 317:5
355:9,21 357:7
361:10 370:1,6,11
372:1,10 373:8
374:5,7,14
**see** 40:20 65:19
66:3 122:18 133:5
136:19,23 151:19
178:10 189:14
190:18 205:6,9
224:18 227:25
243:16 244:24
252:10 256:2,5,6
256:11 279:12
286:8 305:8 310:9
315:9 319:2 321:9
334:14 338:17
343:20 348:19,20
367:14
**seeing** 227:17
**seeking** 18:14
88:18 149:14

218:24
**seemingly** 129:3
**sell** 346:12
**selling** 251:14
**send** 80:5,10 100:6
135:5,8,14 136:3
136:14,20 139:1
140:24 151:20
152:3 161:19
178:25 192:8,11
192:17,23 206:6
206:10 213:16
227:15 246:3,4
250:2 256:15
343:6,9,16 344:3
344:9
**sends** 257:19
**sense** 288:20
**sent** 79:11,15,19
80:13,17 81:13,15
83:16 136:6,8
137:2 140:22
147:10 148:20
151:5,5 161:11,18
190:1 229:16,19
250:1 253:1,9
321:18 343:8
346:13
**sentence** 204:6
228:24 284:14
319:13 349:7
**separate** 109:15
112:5 297:16
298:25 300:17
318:16 373:18
**series** 225:2 319:7
**seriously** 234:5
**serve** 113:9,15
**served** 113:11
**server** 79:17,22
147:20 161:20,21
161:21,24 162:7
178:11,12 319:16
321:4
**servers** 8:14 162:1
162:4 191:5



198:22
service 113:4
services 2:16,21
  4:12,14 21:20,23
  22:3,24 23:11,16
  23:18 26:7 27:7
  28:15 29:1,15,18
  29:23 30:1,10
  42:5,7 62:10
  159:8 239:13
  251:16 348:18,21
  349:8 350:11
serving 113:13
session 174:6
sessions 174:11
  193:25 194:1
set 31:7 62:1,6,9
  92:7 93:20,22
  94:3 109:15,16
  123:1,4 165:15,20
  243:3 244:3 270:2
  272:13,16,20
  281:7 293:12
  300:13 305:2
  315:14 319:6,7,11
  320:22 356:5
  366:1,3 373:7
  381:4,7
sets 165:17,24
  356:7
setting 356:14
settle 160:7
settled 165:18
settlement 16:18,24
  363:11,14
setup 319:1
set-up 133:19 185:9
  185:16 293:10
Seychelles 84:19,23
  85:4,25 91:9
  305:9 306:5,7,10
  306:21 308:6
  377:3
SGI 240:21,23
  346:13
shake 109:4

Shamir's 293:15,17
shapes 345:22
share 91:15 134:16
  139:7,12 140:11
  141:7 142:18
  143:5 192:6
  202:24 203:2,7,11
shared 186:22
shareholding 97:7
  97:8,10 120:6
  122:24 339:14
shares 109:14
  293:6 316:1
sharing 205:22
  293:15
sharper 283:18
Shehadie 141:16
  143:6,11,13
shit 157:5 160:11
  213:18 341:22
short 41:2 77:15
  108:8 173:21
  215:15 221:7
  245:8 284:2 323:6
  333:14 353:23
  358:1
shorter 259:1
Shortly 148:15
short-circuit 9:1
shot 119:10 203:18
show 65:10,10,13
  65:14,23 66:19
  67:3 69:22,24
  70:1,7,12,13
  259:15 261:5,6
  333:8
showed 142:15
showing 66:24
  116:25
shown 6:16 142:17
shredder 306:9
shut 83:15
sic 265:2 370:17
  371:4
sick 47:14 120:13
side 243:17 300:3

300:24 301:1
sighing 151:19
sign 193:12 256:17
  257:24 258:12,15
  260:18 261:23
signature 239:16
  256:5,8,9,12,13
  256:13,18,20,22
  256:22 257:2,9,12
  260:14 261:9,10
  261:14 266:8
  299:22,23,25
  300:1 357:16,17
  357:20,20
signatures 260:11
  260:17,22
signed 165:18
  239:19 254:25
  259:6,11 260:1,14
  265:6 269:3,4,7,8
  386:19 387:23
significant 198:12
signing 258:19
  260:13,20 265:21
silicon 345:23
Silk 134:9
silly 322:21 326:5
similar 366:13
simple 121:1
  252:12 260:15
  328:20 373:11
simply 25:3 56:25
  284:23 293:14
  349:5 364:1
  368:12
simultaneously
  35:12 157:3
Singapore 84:20
  376:22,25 377:1
single 11:21 17:13
  21:7 77:24 78:3
  78:11,12 88:4
  91:14,16 106:19
  142:7 158:2
sir 19:3 41:7
sister 314:19,20

sister's 71:2
sit 49:1 159:12
  341:21
site 154:2 282:9
sites 151:4 232:20
  232:22
sitting 30:7,9
  253:16 280:1,15
  281:2 282:13
  288:9 298:8,9,11
  298:21 304:7,23
  306:20,22 339:12
six 35:22 51:23
  53:3 156:13,15
  157:13 158:9
  216:20 217:4,7,9
  297:25 298:2,3
size 165:17 233:15
sizes 100:7
skill 387:7
skip 224:23
Skype 266:18
slices 289:7
slipped 366:16
Slow 34:21
small 47:8 77:20
  184:21
smelts 345:22
smoke 279:12
Sneezing 198:10
social 262:10
  287:13
software 165:12
  166:12,14,20
  167:9 169:11
  170:25 171:2,6
  173:13 194:15
  201:19,20 207:15
  215:18 216:11,14
  222:7 223:2,18
  224:1 227:24
  228:15 231:19
  243:16 244:2
  254:2,4,10,19
  255:2,22,22 258:3
  265:1,3 272:4,4,5

275:17 277:23
  283:3,10,20
  284:15,16 351:19
  351:21 357:6
  370:19 371:15
  372:18
solely 88:4
solution 240:20
solutions 282:25
  283:16
somebody 220:13
someone's 82:12
son 126:16 371:22
son's 70:23
soon 365:9
sorry 6:7 10:12
  30:23 32:15 34:23
  39:19 41:7 62:21
  62:22 69:7 78:19
  105:17 116:15
  117:2 129:5,11
  133:12 139:15
  141:22,23 147:5
  156:14 168:23
  170:22 179:7
  182:19 186:8
  201:25 209:23
  213:15 214:24
  239:22 240:9
  245:14 251:1
  252:7,16 254:9
  258:18 264:11
  265:5 269:2
  286:20 291:11
  308:23 309:5
  316:21 320:3
  331:2 334:16
  335:5 340:23
  349:13,25 360:8
  370:2,9 381:5,19
sort 40:20 81:9
  99:4 109:5 144:4
  145:23 159:12
  160:12 217:19
  231:15 251:24
  255:5 287:12



288:25 338:25
356:23,25 363:25
364:15 374:11
**sorts** 46:21 119:5
**sought** 139:14
**sound** 283:18 287:8
**sounds** 210:15
**source** 149:20
150:14 168:18
170:25 223:6
231:8 271:18,19
271:21,22,24
275:3,5 284:16,24
284:25
**South** 10:21,23,24
11:1 185:25 258:5
356:11,11 371:14
**Southern** 1:1 4:6
333:6
**space** 119:10
**Sparkling** 30:17,18
**speak** 35:13 49:22
52:7 56:22 57:18
57:24 58:4,7,10
58:13 60:4 63:1,2
63:5 95:13,16
109:4 128:24
129:2 138:19
146:7,13 228:8
265:16 270:18,23
330:20 357:13
373:17
**speaking** 62:3
192:2 225:16
227:1
**speaks** 63:16 228:7
268:6
**special** 240:25
**specific** 20:9
118:20 121:9
146:1 148:8 165:7
269:5 350:3
363:17
**specifically** 36:4
90:20 225:3,13
238:6,11 274:22

296:2,5 363:8
**specified** 240:22
**specify** 234:17
**speculate** 95:24
107:10 122:25
304:3
**speculation** 50:18
119:2 172:21
173:11
**speculative** 119:6,8
**Speech** 211:7
213:25
**speed** 99:19
**spell** 18:7 82:12
105:14,15,18
141:17 184:23
213:1 273:5,12
293:17 317:8
**spells** 18:20
**spend** 86:17
**spent** 185:16
305:24 347:2,5,9
347:16
**split** 293:15 303:4,6
**spoke** 51:3 52:23
55:9,9,10 56:13
56:19,24 57:3,10
59:6,23 60:2 61:3
61:5,10 62:5 64:9
64:16 129:24
131:8 142:11
153:5 200:25
309:18 342:12
**spoken** 53:3 61:7
138:22 299:17
342:1
**Sportsbooks**
231:17 234:10
235:21
**spots** 224:19
**spousal** 364:6,10,11
367:17
**spring** 273:9
**Square** 1:22 6:6
**staff** 24:16 81:1
108:15 109:4

157:4,9 162:10,12
163:21,22 227:14
229:9,14 233:13
**stage** 139:5 194:15
201:19 202:1
204:18 212:25
214:13
**stages** 175:24 372:6
**stake** 276:5
**stand** 139:17 261:2
346:9
**standing** 77:23
89:8
**start** 28:24 49:24
77:2 117:24
163:18 165:5,10
167:9 195:21
245:19 262:8
279:22 349:6
363:23 370:12
380:12
**started** 5:11 54:10
64:22 76:13,14
194:25 207:11
217:19 326:1
346:20 379:4,8
380:13
**starting** 134:10
218:19 279:12
**starts** 190:1 298:4
**state** 4:15 5:20 37:2
154:11 164:13
192:4 209:12
225:10 228:6
229:13 253:21
324:11,11 349:5
**stated** 115:17
201:12 210:19
216:5 225:13
226:9 230:5 231:2
248:22 255:18
262:11 270:1
276:13 311:6
313:22 350:17
373:10
**statement** 115:20

115:23 225:25
252:11 333:20
334:6,9 347:25
349:25 352:2,14
354:7 357:1
371:14 372:12,14
372:17
**statements** 225:22
**states** 1:1 2:18 4:5
32:24 33:4,6,19
34:1,8,13,18,25
35:4 36:5,9 37:1
37:12,17 39:14,20
39:22,25 45:13,21
46:11,16 65:4
240:18 241:4
242:1,3 243:22
334:11 355:5
374:9
**stating** 155:22
356:21
**statistician** 56:19
**stay** 56:17 247:15
**stayed** 17:5 326:15
**Ste** 2:12
**Stefan** 141:12
**Stenograph** 387:4
**stenographer** 6:14
**step** 98:2
**stepped** 214:8
**Steven** 1:17 3:3 5:7
5:22 348:2,18
350:15 386:3
**Stick** 33:12
**stipulations** 118:6
**stole** 162:10,13
**stop** 7:18,25 8:20
18:21 73:17,19
77:9 89:17,17
103:11 123:20
133:21 134:8,21
137:4 144:23
191:8,20 195:1,16
214:5,9 219:9
224:17 314:12
319:23

stopped 7:22 73:15
133:20 134:12
137:13 180:19
195:2 210:20
316:3 360:14
**stopping** 123:19
**storage** 11:13 21:20
22:2,24 24:20
25:25 26:10 28:15
30:8,10 41:16
42:3,5 99:16
100:3
**storages** 21:25 22:5
22:7,9,12,14,17
22:19,22 23:3,5,8
28:25 29:4,6
**store** 23:21,24
41:15
**stored** 24:3,14,20
25:25 26:19 27:6
29:14 202:10
**storing** 26:16,23
**story** 108:4 193:14
**straightforward**
368:13
**street** 1:22 2:4,7,16
10:2 104:14
**stretch** 7:18
**strict** 183:11,16
**strike** 6:21 30:9
39:10 42:24 43:10
45:12 49:23 53:8
60:22 62:19 75:24
85:13 87:4 103:24
111:24 118:23
134:21 135:11
138:13 162:8
168:19 195:15
204:8 209:25
212:17,17 215:16
235:22 236:11,24
242:9 253:16
276:16 288:23
298:9,10 308:23
313:12 320:11,13
324:8 325:4



329:18 344:16
**striking** 43:11
**strip** 158:25
**struck** 236:14
**structure** 91:13
122:25 237:22
291:20 311:7
366:21
**structures** 93:20,23
94:4 165:21 270:2
**stuff** 107:11 109:5
127:13 143:21
154:11 163:19
195:7 227:20
229:6,10 233:6
255:23 356:25
370:7
**stupid** 136:5
160:14
**stupidly** 243:1
**sub** 99:5
**subject** 19:15 45:3
65:2 94:21 195:11
286:5,6 340:21
368:8 375:22,23
**subjects** 205:5
**submission** 139:21
**submitted** 333:20
**subsequent** 238:10
374:3
**substantiate** 357:9
**subtopics** 189:4
**Success** 110:12
111:3,22,25 112:4
112:11,15 310:10
310:12,24
**successful** 125:12
125:14
**succinctly** 117:24
**sued** 18:23 274:14
372:14
**suffices** 121:2
**suggest** 151:18
183:9
**suggesting** 206:5
**suggestion** 183:7

**suit** 284:15
**Suite** 2:4
**supercomputer**
381:9,12,14,18,23
**supercomputers**
382:6,18
**supersecret** 159:11
**supervise** 218:1
**supervised** 217:21
**supply** 374:13
**supporting** 374:12
**supposed** 62:6
148:9 242:1
350:25 353:4
359:4
**sure** 8:9 15:4 19:17
40:22 56:8 77:7
78:21 94:16
102:14 124:25
131:2 163:15
170:21 173:17
174:3,19 178:24
198:1 202:2,8
213:9 238:16,21
240:3 250:18
286:15 323:3
333:10 358:17
359:17
**surrounding**
144:19 190:20
**suspended** 378:15
379:8,9,20
**suspicion** 321:5
322:22
**SWAMP** 215:18
275:17
**swapped** 251:25
**swathe** 261:16
**swear** 5:6 71:1
**switch** 77:2
**switched** 121:10
**swore** 333:5 334:9
336:12
**sworn** 5:7 333:20
334:5,23
**system** 11:14 88:4

124:25 125:1
187:25 215:21,24
215:25 216:2
220:22 222:4,18
222:21 224:2,9
272:13,20
**systems** 163:6
166:2 216:6,12
222:8 223:4 241:5
241:9 242:2
**system's** 222:13
Szabo 328:5,8,12
328:16
**S-A-K-U-R-A**
273:13
**S-H-A-M-I-R-S**
293:19
**S-H-E-H-A-D-I-E**
141:18

### T

T 388:1
**tablet** 143:4
**take** 6:19 7:12,17
15:24 16:6 20:5
20:10,12 25:19
34:5 35:11,13,14
40:24 41:10 42:13
43:11 66:10 76:19
77:5 87:22 99:7
106:15 123:19
128:24 130:16
148:14 173:15
189:18 197:2
198:8,12 201:2
221:2 225:14
236:4 239:22
245:4,14 250:2
251:16 253:2
256:9 263:24
264:20 279:2
281:20 283:23
309:15,19 311:4
316:5 321:3 323:1
333:10 341:8
354:9 357:11

379:7,15
**taken** 1:20 4:4 6:9
21:5,7 30:4 34:1
36:5 282:6 283:19
300:17 332:20
343:25 354:12
372:20 373:11
387:12
**takes** 198:10
**talk** 49:8 62:23
129:12 262:19
266:17 285:2
287:17 300:13
312:19 316:23
319:22 324:8
325:8 358:10
360:24 361:12
374:22
**talked** 48:18 49:4
51:20,23 56:8
64:19 83:24 131:6
140:15 155:4
160:16 220:24,25
244:2 320:1 324:5
325:5,6 326:1
**talking** 24:16 28:19
28:20 33:9 54:10
57:6 64:12 67:12
77:2 84:24 101:13
110:1 112:4,21
120:24 121:10
130:2 158:21
161:23 166:11
167:2 169:9 189:3
197:20 201:16
209:5 219:8 237:3
237:25 258:2
271:19 287:14
288:25 300:12
308:1 316:3
318:14,15 320:6
320:23,25 325:8
325:11 328:3
348:12 349:11
356:10,13 372:13
**talks** 57:7 340:20

**targeted** 259:2
362:4 368:9
**task** 172:17 311:24
**tattoo** 277:11
**tax** 32:21 94:14,19
94:22,23 95:2,4,7
95:12,13,16
100:16 101:10,18
101:23,24 103:23
103:25 104:1,16
104:23 316:3,6
319:15 328:1
332:5,6,10,13,17
333:7 335:12,24
337:10,15,21
338:6,21 349:13
**taxes** 355:24
**technical** 176:25
253:6
**technological**
190:24
**technologies** 233:4
**technology** 28:6
44:15 64:10,18
67:8 69:4,10
70:18 71:12,19
75:25 76:19,22
83:23 235:23
265:13
**teleconference**
374:3
**telephone** 2:22,24
2:25 4:17 5:1
58:16 174:3,9,12
358:4 359:20,23
359:25 360:1,2
**telephonically**
58:14
**tell** 5:24 6:3,10,23
6:25 11:6 45:3
64:3 67:14 69:5
72:19 93:5 95:17
105:17 112:19
118:2 133:3
182:12 188:16
201:25 220:6



224:12 226:6
229:6 232:14
233:8 239:8
240:11 249:7,8
250:15 253:13
254:25 256:14
262:2 270:8,12,15
271:1 276:1 277:6
285:21 289:3
295:10,11 303:17
307:19 308:14
311:9 317:11
324:20,23 329:23
335:23 342:11
356:7 360:5
362:25 376:14
**telling** 25:13 37:8
377:7
**tells** 374:14
**ten** 33:13 47:24
48:5,9 50:5,12
146:1
**tens** 372:16
**terabyte** 100:7
**term** 28:1,9 117:23
**terms** 118:8 205:22
267:7 352:19
363:18 364:14
370:1
**terribly** 58:12
**Tesla** 119:11
**test** 133:24 207:9
207:15 345:5
**testified** 301:21
360:18 363:10
**testifies** 367:2
**testify** 280:13 346:2
**testimonial** 364:12
**testimony** 6:15
11:17 24:18,22,24
25:23 26:5 75:18
110:23 112:9
134:4 153:3
160:19 165:1
171:8 175:15
193:20 195:11,23

207:25 217:5
235:16 236:20
248:18 249:5
252:19 287:22
300:23 304:10
320:12,19 337:12
347:7 350:22
358:25 360:13
362:20 369:8,10
369:18
**testing** 206:25
207:4
**testnet** 196:7 207:5
207:6,7,13,17,22
208:1
**tests** 243:13
**Texas** 236:8
**text** 79:25
**thank** 4:17 5:9 6:17
7:16,20 16:20,25
30:18 41:4 65:25
77:19 108:10
124:4 129:22
173:25 174:7
200:3 221:11
245:10 263:5,6
284:6 310:5
323:10 333:17
358:3 360:3
361:25 367:25
368:3 375:6,14,15
375:16 385:10,11
**thanks** 197:23
375:8
**theoretically**
218:21
**theory** 369:1
**thereof** 320:10
387:5
**Theymos** 181:3,9
181:15
**thing** 57:22,22
72:21 87:19 97:18
158:22 160:12
167:21 169:9
177:10 255:4

260:16,16 261:8
261:11 278:23
290:5 298:3
303:14 304:16
311:23 356:13
367:18 375:17
385:3
**things** 8:15 23:25
24:11,16,17 28:19
41:15,22,23 46:21
48:23 49:1,5
54:11 55:22 56:8
61:6,25 68:18
88:1,3 100:24
101:1 107:10
118:14 119:5
122:12 125:3
126:21 130:7
134:8 136:5,23
140:16,23 148:11
158:18,21 160:14
165:16,21 166:4
171:23 201:12
209:4,5 224:15
227:23 229:19
231:17 232:13
234:10 235:9
241:17 243:14
244:1 248:23,24
249:1,7 250:15,17
250:18 255:20
262:17 272:1
277:15 280:20,20
281:10 283:15
299:12 300:12,17
301:6 303:23
306:2 308:9 311:4
313:10 316:6,7
317:6 321:1,1,3
322:21 323:21,24
323:25 333:1
337:4 339:13,16
339:16 349:3
352:6 353:10
355:9,13,25
356:14,22 366:23

378:22 385:7
**think** 26:24 35:12
48:23 53:14,15
57:14,15,15 63:16
78:4 81:24 105:15
116:23 123:18
141:2 142:23
144:3 160:14
165:9 174:18
179:13 189:10
197:5 202:4
204:19 209:17
212:24 257:11
263:23 265:3
273:4,13 282:21
283:8,21 300:11
303:15 317:11
329:17 344:22
345:25 353:19
364:5,7 366:15
369:24 371:18
374:6,17,22
375:10,17,25
377:14,18,22
380:13
**thinking** 10:13
62:22 93:12
141:22
**third** 126:20
127:19,21 128:13
128:19 209:20,22
209:23,24,24,25
210:2 360:17
370:16 371:4,24
**thought** 62:23
109:8 134:14
155:10,23 160:9
193:14 237:6
315:24 366:5
**thoughts** 317:22
**threatened** 157:10
378:15 379:17
**three** 126:17
228:12 297:17
299:18 313:23
371:8,23

**three-letter** 35:25
**throw** 178:2
**Thursday** 1:18
**tie** 159:3 278:7,20
318:9 383:6
**tight** 286:11
**till** 108:2 242:16
**time** 4:8,9 7:16,22
8:5 9:3,20 10:22
12:25 13:5,11
16:6 18:18 26:14
39:7,11,21 41:1,4
43:6,22 45:8,13
47:8 54:19 58:17
63:7 64:8,16 66:4
66:20 67:18 70:9
70:11 74:18,20,20
74:22 76:14 77:8
77:13,19 78:23
79:17 83:22 84:24
85:3 86:18 88:12
97:4 102:3 103:8
103:9,10 105:5,9
106:16 107:9
108:7,10 109:2
111:21 115:19
116:1 117:8 122:8
123:23 124:4
126:6 129:12,24
130:15 131:8,11
132:22 133:19
134:14 137:3
139:19 141:23
142:22 144:13
150:10 158:2
161:22,23 165:19
169:1 173:19,25
174:5 180:7
188:23 191:8
192:2,3 196:15
198:8,10,13 200:9
201:21 205:9
210:20 211:3,12
216:19 217:19
221:5,11 224:22
225:6 226:6 227:1



238:22,23 241:6
241:16 243:4,6
245:7,10 251:24
258:20,23 259:22
262:21 263:8
269:6,8 283:25
284:6 295:18
316:2,13 319:20
319:25 321:6
323:5,10 325:9
329:18 332:24
333:13,17 344:11
344:12 353:22,25
357:25 358:3,25
360:9 365:6 366:9
366:13 369:14,15
369:23 374:22,22
376:1 377:13,17
377:17,19,23
383:14 384:14
385:5,7,10,12,21
**timechain** 28:4,8
28:16 38:22 44:15
62:16,24 63:6
64:10,17 67:7,14
69:4,9 70:18
71:12,19 75:25
83:23 87:23 96:20
181:25 182:15,22
**timechain-related**
87:15
**timeframe** 130:22
141:1 360:9
367:11
**times** 15:7 45:17,18
47:3,10,19,24
48:3,5 49:3,4,9,25
50:5,9,12,16 51:4
51:7,9,15 52:23
53:3,10,18,22
56:18,24,25 61:11
84:16 85:14
104:15 130:17
136:2 150:3,11
158:19 212:10
229:14 302:15,20

332:20,21,22
344:2,15,15 353:9
**timing** 325:10
**tirade** 277:14
**title** 150:5 223:14
223:20 224:6
372:20 373:11
**today** 6:9,14,18,20
6:22 7:16 15:19
20:16 24:18 25:23
26:5 30:7,9 71:1
94:7 137:19
175:15 195:23
253:16 280:1,15
281:2 282:13
288:9,15 296:10
298:8,10,11,21
300:23 304:7,23
306:20,22 320:19
339:12 351:4
358:5 368:7,21
374:16,24
**Today's** 4:7
**told** 31:8 41:14
109:8 121:7
170:24 198:1
201:1 202:19
220:12,15 225:11
247:5,6 249:9
250:16 265:10,18
265:19 282:1
321:25 322:4
332:24 359:3
365:18 368:23
369:2 371:24
373:3 377:9
**top** 11:4 72:19
85:17 87:13
112:20 116:5
119:18 139:18
142:6,14 209:15
239:17,18,25
240:1 247:20,22
253:23 256:3
266:5 267:15
277:20 281:8

284:11 302:9
305:6 306:24
310:3,5 334:2
341:16 343:19
348:13,14,15
354:16
**topic** 19:13 28:22
36:22 123:14
129:1 145:25
189:2,3,5 224:18
224:19 238:4
285:21 295:11,16
349:10 367:21
370:22
**topics** 8:8,10 15:18
19:4,5,9 20:7,8,9
33:11,12,13 44:18
59:5 60:2 61:5,21
64:13 88:21
142:13 144:4,6,16
145:24 146:2,4
182:4 191:11
199:18,19 205:7,8
224:12 225:3
242:13 259:16
278:8 295:4
318:10,16 349:20
350:3 352:21
367:24 373:24
383:7 385:1,2
**Tor** 231:18 234:11
**Toshi** 326:6,6
**total** 71:8 251:4
344:16
**totally** 243:1
**touch** 17:5 157:10
164:15 361:8
375:13
**touched** 77:3 187:9
**Touché** 198:12
**town** 184:21
**tracing** 359:2
**track** 157:13 228:8
280:7
**tracked** 285:10
**trade** 86:13,16,19

251:17
**Trading** 107:5
291:2,3
**trail** 134:12
**transaction** 100:6
165:18 206:6
220:23 250:1,2
253:1,2,3 344:18
**transactions** 90:11
90:14,17 190:2
**transcribed** 202:4
387:6
**transcript** 5:12
295:12 296:22,23
320:16 383:12
386:7 387:5 388:4
**transcripts** 295:11
296:12,13
**transfer** 180:17
181:19 186:13
246:8 271:7 273:1
275:9,12 280:22
282:1 344:17,25
**transferred** 120:5
180:8 252:15,17
270:13 280:17
347:1 354:20
**transfers** 116:4
120:1
**trash** 11:21
**trashed** 12:2
**travel** 33:6 34:7,12
34:17 35:5,16,21
37:11,17,20,23
38:1 39:14,24
45:15,16,20 46:1
46:3,10,14,16,19
**travelled** 34:24
38:6 39:21 45:13
45:23 46:4,7
**travelling** 36:9
**Tread** 340:1
**tree** 282:25 283:4
**trees** 283:15
**tried** 19:1 25:3
132:21 133:8

211:4 274:9 384:2
**trip** 36:5 39:12,20
375:13
**trips** 32:24 33:3,19
33:25 35:20,23
36:10 37:1
**troll** 150:10
**trouble** 218:25
**true** 220:22,23
226:11 334:11
335:2 386:7 387:6
**trust** 91:16 119:10
159:15 214:19
249:7 269:12
288:23,25 289:3,6
289:19,20,21
290:1,2,2,3,4,7,20
290:24 291:15,17
291:18,18,21
292:1,6,11,13,19
292:22,25,25
293:1,2,3,5,6,7,8
293:9,9,10,11,21
293:24 294:1,6,11
294:16,20 295:2
295:15 296:6
304:22,24 305:2,9
305:11,13,14
306:7,10,21 307:5
308:6,13,16,20
310:14 312:9,17
312:18,18,19
314:2 315:10,13
315:14 316:14,18
317:25 319:1,6
320:22 327:10,13
327:15,24 330:5
330:10 331:9
348:6,8 370:16
371:3 373:4,6
376:21,24 377:1,2
**trusted** 93:22 94:3
214:15
**trustee** 288:17,22
288:23 289:24
292:5 314:7,12



327:12,15,24
**trustees** 290:11
305:11
**trusts** 109:16
291:20 296:2
310:17,21,23
314:7,13 319:7
331:12,16 381:4,5
381:7
**trust's** 305:15
**truth** 6:4,10,23,25
190:11,19
**truthful** 361:17
**try** 7:12,13 8:25
11:11 14:22 24:11
48:23 52:5 60:16
61:6 101:1 133:5
182:10 209:17
216:15 261:11
273:12 281:9
316:7,11,13
322:25 342:25
**trying** 8:12 19:23
28:18 32:18 91:17
109:13 120:2
144:23 163:4
171:10 187:4
205:19 250:22
254:23 261:13
268:9 283:18
285:23 287:8
291:20 292:8,23
316:5,5 322:23
335:21 349:4,22
352:8 353:4
**TTA** 354:22
**Tulip** 107:5 290:2,7
290:20,24 291:2,3
291:15 292:19,22
294:20 295:2,15
327:10,13 330:5
331:9 381:22
**turn** 166:13,16
217:9 296:4
333:24 365:22
**turned** 216:20

217:3 373:25
374:1
**turning** 251:7
**Twice** 15:8 55:5
**twist** 25:4
**Twitter** 262:14
377:25 378:3,7,10
378:14,18 379:7,9
379:17,20 380:15
**two** 112:18 126:17
159:5 163:5,22
164:6,9 186:17
216:20 217:3,8
226:4 240:21
249:16 251:25
252:2 260:11
265:6,21 297:10
297:12,17 300:12
300:17 301:6
318:16 363:24
370:14,24 371:3
371:23 381:22
**type** 55:18 68:18
86:3,6 113:18
148:9 256:11
311:24 316:21
328:19 345:2
378:22
**typed** 126:19 148:1
256:19
**types** 24:2
**typical** 300:15

─────── U ───────

**UK** 6:1 10:6,9,11
10:24 18:13 110:9
110:10 111:7,16
116:21 120:24,24
121:7,10,11 123:3
123:9 258:22
304:22,24 305:2
**Ulbricht** 339:19,25
341:18 342:2,12
342:13,14,22
**Ulbricht's** 340:18
**ultimately** 161:9

**unable** 76:19 80:2
91:11 228:7
**unawarded** 255:24
**unclear** 43:20
101:13 237:24
344:12
**understand** 6:8,11
6:13,17 7:2,6
18:22,24 19:1
21:9 52:12 63:3
100:13 147:24
162:24 166:5,20
196:9 197:23
208:16 236:12
252:8,8 268:9,12
304:11 316:10
322:7 328:21
335:21 344:20
347:11 349:22
353:4 364:15
366:21 367:13
372:21
**understanding**
28:5 81:11 127:2
329:1,2
**understood** 99:5
197:24 345:25
346:2 363:2
377:21
**undertaken** 332:6
332:9
**unduly** 368:25
**unfortunately** 9:1
149:19 282:10
355:10
**United** 1:1 2:18 4:5
31:12 32:24 33:3
33:6,19 34:1,7,12
34:17,24 35:4
36:5,9 37:1,11,17
39:14,20,22,24
45:13,20 46:10,16
334:11 374:9
**unnatural** 269:21
**unrelated** 300:25
**update** 157:5

**updated** 258:21
**updates** 178:14
**updating** 250:3
**upheld** 256:12
**uploaded** 150:20
**upload.ae** 147:20
150:20,24
**upper** 189:19
**upset** 249:1
**URL** 148:8
**USA** 127:8,11
258:4 311:15
312:11
**usable** 283:13
**use** 21:20,25 22:5,9
22:14,19,24 23:5
23:10,18 28:4,9
32:12 52:17 58:16
60:8 62:19 68:2
96:14 97:15,19
98:3 101:9,17,24
132:7 134:1
159:24 166:3,19
166:22 204:2
206:1 210:13
214:2 235:23
241:6,9 243:17,23
245:5 276:15
318:6 319:20
320:23 325:23
343:3 376:5
**Usenet** 151:4
**user** 72:14,15
129:14 132:15
**usually** 268:18
300:19
**US$5** 344:22
**Utz** 303:3
**Uyen** 212:25 213:3
213:5,10,19
214:19 285:3
289:21 327:3
331:19

─────── V ───────

**v** 1:9 226:18 256:10

**vague** 54:20 100:22
168:22,24 210:18
236:7,22 259:4
291:7
**valid** 134:14 165:19
220:23
**validate** 355:2
**valuable** 223:4
230:3,11,23
**value** 82:7 204:17
204:20 216:1
223:9 229:23
231:22
**valued** 372:16
**valueless** 207:14
**valuer** 223:12
231:24
**variety** 23:25 84:15
271:21
**various** 35:19 77:3
296:1
**Vaughn** 141:13
142:19 326:2,9,17
326:22 327:2,9,12
**Vel** 4:18 5:17,19
19:3 140:25 234:5
280:12
**VELVEL** 2:3
**vendor** 264:17
**vendors** 283:2
**vendor's** 276:4
**venture** 276:5,5
277:24
**verbally** 7:10
**version** 156:16,20
156:25 157:6
158:1,3,4 161:9
166:24 167:1
190:9 207:7,9,13
207:14 354:7
**versions** 156:13,15
157:3,14,19
207:11 243:15
**versus** 4:4 56:20
177:11
**vest** 316:1



**vet** 216:14 218:20 218:20
**veteran** 355:22,22
**Vice** 2:6
**vice-versa** 208:2
**video** 4:2,3,8,9 43:25 44:3,6,8,11 44:14,17 46:25 47:4,7,11,20 48:11,15 49:7,10 49:19 50:1 51:10 51:21 52:7,23 53:11,19 54:4 55:9 56:2,4 77:13 77:14,17,17 123:23,24 124:2,2 173:19,20,23,23 221:5,6,9,9 256:20,25 258:20 283:25 284:1,4,4 323:8,8 374:2 385:22
**videographer** 2:20 4:1,11 5:5 6:15 40:25 41:3,7 77:12,16 108:6,9 123:22 124:1 173:18,22 221:4,8 227:3 245:6,9 283:24 284:3 323:4,7 333:12,16 353:21,24 357:24 358:2 385:17,20
**Videotape** 1:16
**view** 138:4,8
**violations** 378:16
**Vistomail** 178:10 179:24 209:11 210:3 211:7 212:21 213:5 273:1,2,19,23 274:2,10
**volume** 4:2 52:14 77:13,17 123:23 124:2 173:19,23 221:5,9 283:25

284:4 322:10 323:8 385:22,22
**volumes** 100:6

**W**

**W** 2:5
**waffly** 177:24
**wait** 8:23 262:1
**waiving** 370:2
**Wales** 10:21,23,24 11:1 185:25 258:5 356:11,11 371:14
**walk** 6:4 157:10 208:14
**wall** 50:24
**wallet** 113:3,4,17 203:14,22,25 204:2 205:13,22 205:23 247:25 248:6,16,21 249:20 253:9 267:21 268:10 270:16,20 306:15
**wallets** 204:15 205:14 249:3,13 249:22 250:6,8 294:21 300:4,13 300:14,14,16 301:5 303:18,19 303:21,22 304:23 359:4
**wanker** 153:14
**want** 8:25 13:13 16:6,8 40:24 41:13 42:21 43:6 49:8 63:2 65:9,13 65:17 72:6 78:20 78:25 82:24 92:1 94:15,25 108:2 116:24 133:8 137:18 145:25 158:23 159:12 160:5 162:21 173:12 193:7 195:9 211:3 224:22 225:1

233:21 240:2 255:3 261:5,6 264:13 274:17,18 274:25 291:19 307:17 312:19 313:25 322:13 332:4 346:7 353:13 357:12 366:22 369:15,20 374:12 379:13
**wanted** 62:1 63:21 113:3 124:23,25 148:21 285:13
**waste** 70:9 78:23 224:22 226:5 238:22 384:13
**wasted** 385:7
**wasting** 16:6 70:11 191:8 225:5 263:8
**water** 30:15 314:22 323:2
**Watts** 18:2,3,5,9,19 19:11 20:2 164:8 164:17 361:3 367:16
**way** 17:10 19:8 25:12 34:3 45:2 57:14 71:25 77:22 85:18 87:9 88:14 88:18 94:6 101:20 104:13 107:17 119:8 123:2 125:4 145:18 158:2,19 163:14,16 166:9 174:21 177:13,19 186:6,23 205:1,20 206:5,5 208:8,23 216:18 221:22 226:3,19 242:21 247:16 255:17 256:3 260:13 264:11 269:10 285:11 287:9 306:8 310:14 311:12,19 322:12 340:13,24 345:10

346:9 359:13 362:15
**ways** 149:13,14 208:5 259:10 260:1,13 262:2 282:6
**wearing** 123:18
**web** 88:13
**WebMoney** 231:19
**website** 317:4,6
**websites** 134:9
**week** 14:25 47:10 48:20 55:3,5
**weeks** 48:24
**Wei** 129:3,22 131:14 151:5 167:16,17 168:1
**welcome** 124:6 174:8
**went** 35:19 37:16 120:9 187:8 246:12 253:13 268:10 274:22 353:9 355:11 363:4 364:6 379:11
**wet** 328:17,19
**whereabouts** 19:15 286:4 313:21
**white** 64:1 138:14 138:17,20,23 139:1,8 140:11 141:8 142:16,19 143:5,23 144:1 145:1,12 146:22 147:2,5,7,10,12 147:15,21 148:24 149:7,10 150:13 150:17,19 152:7 152:20 154:8 156:7,8,10 157:14 158:7,14 175:10 191:6
**Whois** 177:5,7,8,11 178:6,12,13 179:21

**wide** 23:25 86:16 87:7 129:1 147:4 254:20 261:16
**wider** 165:8
**wife** 15:11 16:3,9 16:19,22 17:2,9 17:21,22 18:12,12 32:3,12 49:4 51:23 72:4 164:12 203:12 325:5 341:20 361:2 363:14,15,25 367:23 369:19,23
**wife's** 18:19 32:7 164:13,13
**WikiLeaks** 134:9
**Wilson** 103:5,9 105:3
**Wimbledon** 8:4,5,6 9:3,4,6 10:8
**win** 377:23
**window** 178:3
**winter** 341:13
**wipe** 74:17 75:21
**wiped** 12:5 74:15 74:18,22,24 75:4 75:15,21
**wise** 82:22
**wish** 15:25 67:3 86:18
**wished** 316:1
**Withdraw** 252:10
**withdrawing** 43:18
**withdrawn** 148:7 154:18 313:11
**witness** 5:6 7:8 8:17 10:1 11:8,18 13:8 15:4 17:8 18:11 20:22 21:4 23:13 23:21 24:5,9 25:3 25:7,10,11 26:2,9 26:16,22 27:4,13 27:18,23 28:11,18 29:4,11,20 30:13 30:18 31:7,14,18 31:25 33:10 34:4



34:10,20 35:2,7
35:19 36:14,19,21
37:20 38:3 39:4
39:17 40:2,6
41:18 42:17 43:25
44:11,17 45:15,23
46:7,13,19 47:13
48:1,8,17,22
49:16 50:3,7,14
50:22 51:6,12,17
52:10,14 53:1,13
53:21 54:14,21
55:1,21 57:6,13
57:21 58:2,20
59:15 60:1 61:10
63:15,21 64:12
65:19,24 67:3,22
68:5,14,18,23
70:22 71:15,22
73:5,11,15,19,25
74:15 75:2,7,20
76:9,16 78:1,9
79:13,21 80:2,8
80:13,21 82:2,6
85:20 86:6,15
87:7,18,25 88:11
89:18 90:5,9,14
90:25 91:6,11
92:4,6,13,18,22
93:3,8,19,25
94:11 95:12,20
96:22 97:17,23
98:6,15,24 99:22
100:2,12,23 101:7
102:10,23 103:13
103:21 105:12,17
106:12,18,21
108:15,21 109:12
109:25 110:18,24
113:25 114:15,25
115:4,10,22 116:3
116:9,16 117:7
118:5,11,19 119:4
119:17 120:16,20
121:16 122:1,7,17
124:11,19 125:9

125:20 126:1,13
126:21 127:7
128:4,9,16 132:5
132:21 133:13
134:6 135:1,7,19
136:10,16,22
137:6,11 138:7,22
139:4 140:8 141:5
141:16,18 142:5
143:20 145:3,8,16
146:5,11,18,25
147:25 148:20
149:3,9 150:2,8
150:16,21 151:22
152:5,12,17,22
153:5,9,12,19,25
154:12 155:10,17
156:18,22 157:2
157:16,22 158:6
158:11,19,20
159:7,19 160:1,9
160:20,25 161:5
161:14 162:20
163:4,12 164:1,11
164:19 166:7,16
166:24 168:13,23
169:5,18 170:11
170:21 171:2,23
173:1,6,10 174:20
175:13,18 176:5,8
176:20,24 177:10
177:16,23 178:9
178:19 180:1,10
180:15 181:7
182:8,16,24 183:5
184:5,12,25 185:4
185:12 186:5,21
187:24 188:5,10
188:21 189:16
190:8 191:13,24
192:15,21 193:2
193:10,11 196:2
196:13 197:17
198:6,10,15 199:3
199:11 201:7,23
203:2,11,22 204:5

204:12 205:3,23
206:4,13,19,25
207:20 208:1
209:1,14 210:6,11
210:19 212:7,13
213:9 214:12
215:9 216:4,24
217:11,24 218:5
218:12 219:25
220:10,21 221:16
222:15,16,24
223:6,12,23 224:3
224:24 225:15,17
226:23 228:17
229:4,13,19,25
230:5,14,21 231:2
232:24 233:12
234:17,25 235:8
235:18 236:1,8,21
237:3 238:3
239:11,19 240:15
241:23 242:19
243:11 244:1,9,15
246:15 247:5
248:8 249:6,16,25
250:8,14 251:1,20
252:11 253:12
254:9,18 257:14
258:12,15,24
259:8,15,21
260:10 262:2,8
263:10 264:2,7
265:18 266:14
267:9,16 268:6,14
268:22 269:16,25
270:22 271:13
272:13,18 273:7
274:12,17 275:5
275:21 276:13
277:1 278:17,23
279:12,17,22
280:6,19,24 281:5
281:16 282:4,18
284:23 285:9,24
286:12,18,24
287:4,8 288:12,20

289:6,12,16 291:8
292:21 293:19,24
294:4,9,13,18
295:5,9 299:7,16
300:11 301:4,14
302:3,10,19 303:3
303:21 304:11
305:2 307:3 308:1
308:8,20 309:4,12
310:7,20 311:3,22
312:5 313:3 314:5
314:10,17 315:23
317:12 319:25
320:3,6 321:15,25
322:16 324:5,11
324:17,23 325:4
326:12,20,25
327:5 328:8,16
329:5,22 330:3,23
331:2,7,15,22
332:2 335:5,16
336:9 337:24
338:1,10,25 339:9
340:3,11,15
341:11,20 342:5,9
342:19,24 343:24
344:6,21 347:12
348:6 349:24
350:17,23 351:9
352:11,17 355:7
355:20 356:10,21
358:8,14,22 360:6
360:7 367:15
378:7 379:17
381:16 382:2,8,16
383:2,25 384:18
386:1
**witnessed** 257:20
257:21,21 258:14
**witnesses** 19:11,14
162:15 163:1
187:15 189:11,13
286:3 339:23
362:7 363:19
**witnessing** 258:20
**wizard** 217:12

**WL** 226:22
**woman** 108:12,18
**won** 337:7
**word** 28:4 52:10,12
52:19 96:15 166:3
166:19 320:23
321:12 322:1,5,13
322:24 323:20
**words** 25:4 190:21
190:23,24 191:1
208:15 239:8
**work** 6:2,3 14:7,24
48:23,23,24,25
52:4 53:14 82:17
82:19 88:1 103:5
105:5,9,22 108:13
125:15 142:12
143:8 149:17
153:20,22 154:1,4
154:15,19 155:11
155:13 159:12
193:11 215:9,12
217:1 219:3
221:18,19,21
222:1,2 227:22
228:13,14,21
230:17 242:10
248:14 273:15
328:11
**worked** 12:22
13:16 14:4,6
74:19 82:20
102:25 105:23
130:14,22 167:21
215:6 283:6
309:21 312:10
374:19
**working** 13:15,21
13:23 14:8 65:6
74:20 103:11
108:19 124:19
125:5 130:17
154:5 218:22
366:18 381:20
**works** 72:21 78:5
109:10 151:18



MAGNA
LEGAL SERVICES

328:22
**work-product**
296:5
**world** 35:20 109:2
159:7 207:9
312:16 326:18,23
329:19
**worth** 52:16 217:1
227:22 228:12
229:1 243:4 251:8
275:1
**Wotty** 321:9,11,22
322:1,6,13,24
**Wright** 1:11,17 3:3
4:3,5,23,25 5:7,15
5:22 8:13,22
15:12 17:23 18:17
18:22 20:14 25:23
30:20 31:2 35:8
41:6 68:1 69:6
71:4 77:14,18
78:15 82:23 84:3
84:8,10,11,17,22
85:8,12,13,24
87:14 90:2 91:4,8
92:11 93:17 94:9
94:13,18 95:5
96:1 97:22 98:3
106:13 107:13
123:24 124:3,6
126:22 132:2
145:19 173:20,24
175:9,23 176:11
188:23 190:2
217:15 221:6,10
221:13 227:18
239:12 240:17,19
244:6 245:12,23
245:24 246:4,8,12
246:13,20,22
247:1,8,18 248:6
256:19,21 258:25
262:5 263:7,20
264:21 265:6
266:8 267:4,25
268:3 269:6,7,22

269:23 270:15,17
270:19,22 271:1
272:7,10,16 276:3
277:25 278:3
279:14 280:2,2,16
282:2,14 284:1,5
284:8 291:1
293:11 295:10
297:7 307:18
308:16 309:7
312:25 313:15,19
315:2 316:10
317:2,20 320:20
322:11 323:9,12
333:5,19 334:10
334:23 335:11
338:4,15,19
339:18 341:25
343:12,15 344:3,9
344:14,17,24
345:24 347:21
348:2,18 350:15
352:20 358:18,19
358:21,23 360:18
360:19,21 361:1,9
361:16,21 362:10
363:8,10,12,25
364:15 365:17
367:1,9 368:4
369:6,13 371:21
372:3,4,14 373:2
373:3,6,17,24
374:4,8 375:18
376:14,21 377:7
377:25 378:12,13
378:21,25 380:9
380:19,23 381:9
382:24 385:23
386:3,20
**Wrightson** 102:17
105:1
**Wright's** 19:12
37:5 238:7 277:12
295:8 296:1
360:13
**write** 89:11 126:18

135:4 138:13
300:20,20
**writing** 28:21
165:10 167:9
219:9 256:22
300:18,21
**writings** 323:22
**written** 84:1 173:13
256:6 283:7
304:16
**wrong** 81:12 99:7
127:3 153:14,17
155:20,22 179:14
182:25 226:1,10
307:17 340:23
350:23 351:6
354:7
**wrote** 51:24 52:2
152:23 153:19
321:22 323:21
372:4

**W&K** 1:7 90:7,12
90:15,18,19,21
98:9,13 107:16
120:14 123:7,16
218:7,15,19 219:4
219:7,10,12,13,15
219:22 220:3,6,13
221:18,19,21
222:1,2,16 224:13
224:15,18,18
227:24 228:14,22
229:23,25 230:2
230:12,19 231:3,3
231:6 234:20
235:5,13 236:25
238:20,24 239:12
242:1,4,8,9,15
254:16 263:19,22
264:2,4,18 287:16
287:17,18,20,25
318:12 350:15
351:24 352:6
356:19 360:20
362:15,17 372:14
372:21

**W&K's** 230:23
234:23

**X**

**X** 3:1 260:19
356:23
**Xeon** 240:20
**XE310** 240:23
**XE310-512** 240:21
**Xs** 260:20

**Y**

**Y** 356:23
**year** 11:20,20,21
35:22 54:2,6,17
62:22 65:5 85:16
109:6 241:18
306:6,7 324:24
341:15
**years** 54:15 67:23
84:25 130:2 131:7
141:3 143:1
186:24 209:16
217:1,19 227:23
228:14,22,23
246:16 257:24
261:3,16 265:7,21
288:14 299:18
306:4,5 308:13
311:10 313:23
314:21
**yelly** 248:25
**York** 44:1
**Young** 102:4 104:3

**Z**

**Z** 356:23
**Zaharah** 2:10 4:24
65:11,15,25 66:8
66:15 67:1 69:17
88:22 89:2 144:12
162:16 187:18
191:2,16 192:1
361:22
**zero** 123:7,7

**$**

**$100** 204:19,20
228:11 229:1
**$12,000** 243:4
**$20** 251:7
**$30** 278:1,3 279:14
280:3,17 281:13
**$30,000,000** 277:22
**$4** 243:3
**$80,000** 251:8

**0**

**0s** 24:5
**0.1** 172:14,15
**01** 354:22

**1**

**1** 3:11 4:2,2 77:13
77:13,17 78:16,17
79:7 108:1,2
123:24 124:2
150:6 156:16
160:6 161:16,17
161:18 173:19,23
221:6,9 225:21
284:1,4 286:1
297:15 298:4
315:10 317:24
323:8 340:24
348:17 352:25
385:22,22
**1MSU** 246:3,5
252:17
**1s** 24:5
**1st** 318:4
**1%** 172:19,24
173:1
**1,000** 172:13
**1,024** 240:19
**1.5** 52:16
**10** 3:15 51:7,15
130:2 143:1
227:23 228:14,22
228:22 244:17,18
244:21 259:19,20
278:10,11 295:13



295:14,16 298:5,5
298:5,6,6,6,9,10
298:12,14,24,25
299:20 305:5
310:2 347:19,22
354:15 370:18
371:11
**10.37** 4:8
**100** 2:4 35:20 48:24
172:11 237:12,14
237:25
**100,000** 251:10
**1000** 2:12
**10504** 2:7
**10667524** 226:22
**108** 48:24
**11** 266:4 370:17
371:4
**11.12** 41:1
**11.23** 41:4
**11.57** 77:13
**12h** 252:16,25
**12th** 65:2 79:8 80:5
80:11,19 83:21
192:8,18,24
**12,000** 241:20
**12.11** 77:19
**12.45** 108:7
**12.46** 108:10
**126** 3:11
**13** 247:17,20 357:3
357:15 370:18
371:12
**13.02** 123:23
**14** 253:23
**14.07** 124:4
**146** 348:9
**15** 54:15 239:15,17
239:18 244:21
255:25 259:20
278:10 370:18
371:11
**15.04** 173:19
**15.20** 173:25
**16th** 52:17
**16-19** 383:15

**16.14** 221:5
**16.29** 221:11
**16.58** 245:7
**1635** 2:16
**165,000** 251:23
**165,140** 246:3,4
251:4 252:2,17
**17.09** 245:10
**17.55** 283:25
**18** 11:22 52:2
334:15,17,18
**18(a)** 247:23
249:18
**18.08** 284:6
**18.50** 323:5
**189** 3:12
**19** 334:16 385:14
**19.05** 323:10
**19.15** 333:13
**19.31** 333:17
**19.53** 353:22
**19.55** 353:25
**19.59** 357:25
**19103** 2:17
**1933** 248:6 267:21
270:16
**1933ph** 248:1
**1970** 5:23
**1998** 64:23 85:2
124:20 128:23
129:2
**1998-2008** 130:3

---
**2**
---

**2** 3:11 77:17 99:5
123:23 126:8,9,11
156:20 267:18
297:15 298:4
305:5 317:14
**2nd** 317:17
**2%** 173:8
**20** 50:9,12,16 51:4
84:25 322:10
**20-year** 129:25
165:19
**20.09** 358:3

**20.42** 385:21
**2000** 13:21
**2002** 138:18 139:2
139:8 145:4
156:18 167:11
**2002-2007** 140:12
**2004** 283:17
**2005** 12:25 130:24
**2005-2008** 130:25
**2006** 8:2,2 9:3,16
10:11,13,22 12:20
12:20 13:19 20:15
21:21,21 23:10
24:19 28:15 32:23
33:7 34:7 46:5
54:23 55:8 56:7
58:25 60:7 62:16
62:20,21,23 141:3
141:7
**2006-2013** 25:24
26:6,14,20
**2006-2014** 33:20
**2006-2015** 12:11
**2007** 20:25 21:25
34:12 56:12,23
57:3,11 59:2,6,7,9
63:1,5,9,10 139:2
139:8 141:3 145:9
**2008** 13:1,2,20 14:3
21:2 22:5 34:17
34:24 35:17 36:5
36:9 37:1 38:1
53:10,18 57:19
59:18,21,24 60:2
63:10 64:4,6 65:2
79:8 80:6,11,19
83:21 105:13
116:13,25 125:9
125:11 128:23
129:2 130:19
145:6,9,13 146:25
147:18 148:25
152:5 156:5 160:6
167:7,13 168:8
354:9,11
**2009** 22:9 37:11,16

37:23 38:6 52:22
52:24 57:22 60:5
60:7 67:6 69:10
70:18 71:12 76:5
76:6,14,17 167:5
169:6 187:12,18
188:3,14,17 192:8
192:18,24 194:8
194:25 196:16,20
197:9 198:3 207:3
226:21 242:16
291:1 293:12
318:13 330:14
350:9 358:24
359:8 360:12
362:10,18 363:1
367:1
**2009/10** 39:17
**2009/2010** 39:20
368:5
**2010** 22:14 37:24
38:7 39:15 51:9
51:21 52:7 57:25
60:17,23 61:4
71:19 76:11
133:20,22 137:3
195:5,15,16,24
196:10,17 197:9
198:3 293:5
341:16 358:25
359:9 360:13
362:11,18 363:1
367:2
**2011** 22:19 39:24
40:4 42:9,17 45:8
45:12 49:7 50:1
51:4 58:5 60:19
61:1,4 85:6
180:22 194:8
202:17 239:7
246:4 251:22
256:12 265:10
267:22,24 268:10
285:12 287:2
290:5,8,20,24
291:5,16 292:2

293:22 294:2
319:16 349:7
380:14
**2012** 22:25 45:11
45:20 46:1 48:11
48:15 49:20 58:8
61:13,14,19,22
62:4,23 103:10
110:14,15,19,21
110:25 111:1
285:12 287:2
294:7 337:8
381:19
**2013** 23:5,10 24:19
28:15 46:5,10,17
46:23 47:1,3,7,11
47:16,18,19 49:18
49:20 58:11 61:16
71:20 85:6 103:10
117:5 233:22,24
234:2 242:16
291:16 292:2
306:14 318:13
330:15 349:8
354:19 365:11
380:16 381:19,20
**2014** 32:23 126:4
317:17 318:4,24
381:20
**2015** 8:1 10:25 14:2
14:4 32:18 73:15
73:17 74:7,17
75:4,15 105:13
314:14 380:22
381:20 382:14
**2016** 10:13 131:10
195:22,24 196:10
197:18,21 360:14
380:14 382:24
**2018** 116:15,19,24
**2019** 1:18 4:8 386:9
386:24
**21** 5:25 52:14
**215,140** 251:5
**22** 385:14
**22nd** 239:7



**227** 3:12
**23** 202:3
**23rd** 5:23
**239** 3:13
**250,500** 270:12
**250,5000** 270:8
**2525** 2:11
**259** 3:13
**27th** 354:9,11
**28th** 318:23
**2800** 2:4
**29** 377:12
**29:46** 376:19
**296** 3:14

**3**
**3** 3:12 36:23 124:2
   156:25 173:19
   189:3,5,10,10,17
   193:5,11 205:5
   239:21 243:21
   249:3 252:6
   297:15 298:5
   315:7 318:4
   348:11 353:17
   354:3
**3AZ** 10:1
**3BF** 1:22
**3(a)** 270:6,9
**3(b)** 270:15
**3(c)** 271:4 274:20
   276:17
**3(d)** 271:18
**3(e)** 272:23
**3(f)** 275:8
**30** 225:11 226:14
   281:3 376:1,3,4,5
   376:11,17,18
**30th** 246:3
**30-something**
   72:25
**30-45** 44:7
**30-50** 35:21
**30.1** 225:12 226:13
**300,000** 242:2,4,8
   317:25 318:7

   319:2,4
**31st** 365:11
**314** 3:14
**32** 189:18,21
**323,000** 276:4,8,11
**331134** 2:12
**33131** 2:4
**333** 2:7 3:15
**347** 3:15
**384** 348:10
**385** 3:4

**4**
**4** 3:12 4:7 173:23
   189:7,10,10 205:5
   205:11,13,13
   221:5 227:7,10,11
   227:19 228:3,4,5
   239:22,24 242:14
   275:10 297:15
   298:5 318:11,17
   321:7 333:24,25
   334:14
**4th** 1:18 386:8
**4(b)** 275:24
**4(d)** 277:20
**4,000** 217:1,18
**481** 348:9
**49.5** 276:4

**5**
**5** 1:22 3:4,13 221:9
   239:2,4 244:21
   259:20 267:13,15
   278:10,11 283:25
   297:15 298:5
   315:7 317:14
   346:25 347:5,9
   350:5,8
**5%** 173:4
**50** 199:22 200:5
   234:1
**50,000** 185:19
   247:9 251:4,25
   252:2
**55** 296:22

**56** 296:22

**6**
**6** 3:13 259:17
   263:14 277:18,20
   284:4,9,10,11
   292:6 297:15
   298:5 340:23
   354:15,18,23
   357:19
**60** 234:4 347:4
**64** 51:24
**650,000** 308:17,25
   309:2,9

**7**
**7** 3:14 10:1 296:18
   297:8,15,15,15,15
   297:15,15,16,16
   297:19,19 298:6
   304:4,4 310:2
   323:8 333:25
   349:16 351:13
   356:12 385:21
**700,000** 318:1
**78** 3:11

**8**
**8** 3:14 298:6 314:25
   315:3 350:9 356:2
**8%** 356:5,8,12
**8(e)** 281:20
**8(f)** 282:24
**8(g)** 284:10
**80** 172:12
**80s** 180:6
**83-1** 189:24
**83-10** 240:5
**83-23** 126:10
**86** 383:15
**88** 383:9

**9**
**9** 3:15 298:9,10,12
   298:14 299:20
   301:24 302:3,7,8

   333:15,22 352:24
**9%** 356:12
**9:18-cv-80176-B...**
   1:6 4:7
**90s** 16:17 84:13
   167:24 324:6
**96** 189:22
**97** 348:9

