# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:9:18-cv-80176-BB/BR

---------------------------------------
IRA KLEIMAN, as the personal        )
representative of the Estate of David  )
Kleiman, and W&K Info Defense        )
Research, LLC                        )
                  Plaintiffs,.       )
                                     )
        v.                           )
                                     )
CRAIG WRIGHT                         )
                  Defendant.         )
---------------------------------------

VIDEO-TAPED DEPOSITION OF

DR. CRAIG WRIGHT

on

Wednesday, March 18, 2020

At the offices of:
SCA Ontier
Halton House
20-23 Holborn
London EC1N 3JD
United Kingdom

Taken by:
AMY COLEY, Court Reporter



Page 103

1          A.      Dave was not doing any research.

2    Dave was not an academic.  Dave didn't even finish

3    university.

4          Q.      Did you ever tell the Australian

5    Tax Office such a trust was set up?

6               MR. RIVERO:  Same objection as

7    previously about reliance on such transcripts.  Go

8    ahead and answer.

9    BY MR. FREEDMAN:

10         Q.      We gave you a standing objection to

11   that, so you don't have to do that.

12               MR. RIVERO:  I'm just establishing

13   my record.  Please go ahead.

14         A.      Again, those transcripts were not

15   even remotely accurate.

16   BY MR. FREEDMAN:

17         Q.      I did not mention the transcripts.

18   I just said did you tell the Australian Tax Office

19   such a trust was set up?

20         A.      No, I did not say that there was a

21   trust with Dave.  The tax office knew about all of

22   my trusts, going back until 1996.  Craig Wright

23   R&D was originally mentioned in an Australian

24   court case in 2003 and all of those things were

25   set up with their reciprocal Australian domiciled



Page 104

```
1    trust entity.  At no point was Dave Kleiman ever

2    mentioned, whereas I listed all the beneficiaries,

3    paid all the tax and recorded all the

4    documentation for each of these entities, so there

5    is not a Mr. Dave Kleiman as associated with any

6    of them.

7    BY MR. FREEDMAN:

8           Q.     Did you ever mine Bitcoin into a

9    Panama trust?

10          A.     No, I did not mine Bitcoin into a

11   Panama trust.

12          Q.     Dr. Wright is this the same trust

13   -- strike that question.  Dr. Wright, did you and

14   Dave ever put assets into the same trust?

15          A.     Dave has never had anything to do

16   with any assets that I have owned, other than

17   Coin-Exch.  The only company that Dave ever had

18   shares for was Coin-Exch and that only occurred

19   because I honoured a promise even though it turns

20   out that the person I thought Dave was was

21   different and that he never completed any task nor

22   had anything that he promised to do.

23   Unfortunately, Mr. Kleiman committed suicide four

24   days before he would be required to put his

25   Bitcoin that he promised he had into a company
```



1  I had founded, but he was never associated with

2  any trust I was involved with.

3           My trusts are family trusts, they

4  don't involve anyone outside of my family.  They

5  don't involve friends, they don't involve

6  co-workers and they don't involve anything else.

7  At no point have any of my trusts mined Bitcoin.

8  My trusts hold shares in companies that mined

9  Bitcoin.  I have simplified this for people

10  because it becomes difficult at times and they

11  roll their eyes at me when I explain it.

12           I have a trust and that trust owns

13  shares.  The shares are in a company.  The company

14  is owned not in the past by multiple people.

15  Those company records are all filed.  The taxes

16  are paid, the employees are paid.  Then those

17  companies act.  When I say I am mining Bitcoin and

18  I have a staff member, an employee who is under a

19  contract working for me, then I am mining Bitcoin.

20  When someone runs a machine under my direction,

21  I am mining Bitcoin.  When I say I am mining

22  Bitcoin I mean that the trust that I founded runs

23  a company that employs people that do an employed

24  role to mine Bitcoin into the company, making the

25  shares more valuable.  By the shares being more



Page 130

```
1          A.      Yes, I think it was his.
2          Q.      Why did you take a staff member's
3    phone number and not use your own?
4          A.      It wasn't a phone number.
5          Q.      Why did you take a staff member's
6    phone and not your own?
7          A.      Because we were developing an app
8    and it was basically a company phone that was
9    being used for the development of -- well, C01N
10   had a wallet.  The wallet was going to be similar
11   to something like HandCash or Sent B we have now,
12   where you have a simplified phone web-based
13   application allowing you to spend and receive
14   Bitcoin online.
15         Q.      You recognise, Dr. Wright, at the
16   time you signed this declaration there was a
17   significant amount of Bitcoin in these addresses?
18         A.      Yes, I do.
19         Q.      You put access to that significant
20   amount of capital on to an employee's cell phone?
21         A.      This was actually by employees.  It
22   was in the company so there was a company thing
23   doing -- where I said we are developing an
24   application we are testing an application, so yes.
25   What you seem to think though is owning the
```



Page 131

1    private key is the only part that makes you own

2    Bitcoin, which is not correct at all.  You own

3    Bitcoin because you have rights ----

4            Q.      I did not ask you ----

5            A.      Actually, you did.  You are asking

6    me why I did that, that I did it and whatever

7    else.

8            Q.      Dr. Wright, I want to go back to

9    the statement that these Bitcoin ended up in Tulip

10   Trading.

11           A.      Yes.

12           Q.      At your previous depositions you

13   have told us that you had a law firm in Panama

14   called HighSecured that managed this Bitcoin for

15   you; is that accurate?

16           A.      At a later date, yes.

17           Q.      You told us that HighSecured

18   managed between 600-750,000 Bitcoin; is that

19   accurate?

20                   MR. RIVERO:  Object to form.

21           A.      I would need to see the accounts,

22   but somewhere around that amount at one stage,

23   only at the beginning.

24   BY MR. FREEDMAN:

25           Q.      Then you said at your previous --



Page 132

1  you testified previously that you ended up

2  spending all but a little over 100,000 of that

3  Bitcoin in your various companies; is that

4  accurate?

5            A.      That is correct.

6                    MR. RIVERO:   Object to the form.

7  BY MR. FREEDMAN:

8            Q.      And that Ritzela De Gracia from

9  HighSecured was the woman who was managing those

10  Bitcoin for you at HighSecured; is that accurate?

11           A.      That was the final person.  There

12  were other people.  I don't have the other names

13  in front of me.

14           Q.      And that she has fled and with her

15  taken the balance of Bitcoin -- the little over

16  100,000 Bitcoin with her; is that accurate?

17                   MR. RIVERO:   Object to form.

18           A.      She has taken some Bitcoin with

19  her, yes.

20  BY MR. FREEDMAN:

21           Q.      Did she take the full 100,000 or so

22  or did you get some of that back?

23           A.      No, I didn't get that back.

24           Q.      So far as you know, she disappeared

25  with access to a little over 100,000 of your



Page 133

1    Bitcoin; is that accurate?

2              A.     I don't know the exact amount.

3              Q.     But somewhere in the ball park of

4    100,000?

5              A.     It's not my Bitcoin.

6              Q.     Tulip Trading's Bitcoin; is that

7    accurate?

8              A.     It belongs to different

9    assignments, different companies, whatever else,

10   so you would have to look through all the

11   assignments in the corporate records to which bit

12   owns where.  Different companies, different groups

13   owns different amounts and still hold different

14   amounts.  I believe the Singaporean company still

15   has rights to a certain amount, but I am not sure

16   without going through accounts what the exact

17   amounts that are owed, not owed etc.  This is the

18   purchased Bitcoin, not the mined Bitcoin, none of

19   which ----

20             Q.     I understand.

21             A.     I don't know -- without the

22   accounts I don't know the exact amounts.

23             Q.     I just want to understand; when you

24   say you spent the 700, all but -- strike that.

25   When you say you spent all but about 100,000 of



Page 134

```
1     the Bitcoin, do you actually mean transferred it
2     across the blockchain or do you mean it was
3     assigned out into various companies?
4               MR. RIVERO:  Object to form.
5          A.   No.  When external transfers were
6     done they were done by people moving Bitcoins, so
7     assignments could be done but on external
8     allocation all of the amounts would move.
9     BY MR. FREEDMAN:
10         Q.   If any of the Bitcoin that you
11    purchased in Tulip Trading are still in the
12    original wallets, is it fair to assume that
13    Ritzela De Gracia has control over them?
14              MR. RIVERO:  Object to form.
15         A.   No.
16    BY MR. FREEDMAN:
17         Q.   So, for example, I want to direct
18    your attention back to one of the wallets that
19    were in statutory declaration that we looked at.
20    To the extent that one of those wallets has
21    Bitcoin still inside of them, do you have control
22    over those Bitcoin or does Ritzela De Gracia have
23    control over that Bitcoin?
24         A.   I don't have control over any of
25    those Bitcoin.
```



Page 176

1        Q.      So two thirds?

2        A.      Yes.

3        Q.      Dr. Wright, I am going to share

4    with you now a document I believe you just

5    mentioned, which was produced in this litigation

6    as Defense 1854321.   Tell me when you have that.

7        (Exhibit Defense 1854321 referred to)

8        A.      That is not a document I have just

9    mentioned.

10       Q.      Do you recognise this document?

11       A.      Yes, I have seen this document.

12       Q.      This purports to be a limited

13   liability company agreement between the members of

14   W&K Info Defense Research; do you see that?

15       A.      Yes, I see that.

16       Q.      Is this an authentic document?

17       A.      Again, it is not my document so you

18   are asking me about someone else's document and

19   whether it is authentic.

20       Q.      How is this not your document?

21       A.      If I am not a shareholder, a member

22   or whatever else, then how is it my document?   I'm

23   sorry, I don't see how ----

24       Q.      How did you get this document?

25       A.      This document is an operating



Page 177

1    agreement that was saved by, what do you call it,

2    accounts of W&K and then other companies,

3    including Cloud Croft.

4            Q.    Dr. Wright, how did you get your

5    hands on this document?

6                    MR. RIVERO:  Object to the form.

7            A.    I don't have my hands on this

8    document.

9    BY MR. FREEDMAN:

10           Q.    How did you get this document in

11   your possession?

12           A.    At present this document is not in

13   my possession.

14           Q.    Dr. Wright you are aware that your

15   lawyers produced this document to us, are you not?

16           A.    No, I am not.

17           Q.    That is interesting because your

18   lawyers told me that you are the one that found

19   these documents on external media, like CDs or

20   junk drives and you provided it in January 2020;

21   is that not true?

22                   MR. RIVERO:  Object to the form.

23           A.    My lawyers were given external

24   devices and equipment from Lynn and other such

25   things.  I don't know what is on any of those



Page 178

1   devices, nor do I know what Lynn has given.

2   BY MR. FREEDMAN:

3          Q.    Did Lynn give you those devices?

4          A.    I have not checked anything, so

5   I don't know ----

6          Q.    That is not what I asked you.  I

7   asked you if Lynn gave you those devices, not if

8   you checked them.  I asked you did Lynn give you

9   those devices.

10         A.    I just made a statement.  I said

11  Lynn gave me some things, different equipment

12  etc., and Lynn gave me access to other files and

13  I also had other files from company records.

14  I did not check any of them so I cannot tell which

15  this is from.

16         Q.    When did you get these devices?

17         A.    The ones from Lynn I got -- I can't

18  remember exactly when.  Not that long ago.

19         Q.    Was it January of 2020?

20         A.    I don't remember.

21         Q.    Was it December of 2019?

22         A.    I don't remember.

23         Q.    How did you know that you should

24  provide these documents to your lawyers?

25         A.    I just provide everything to my



Page 190

1    Satoshi on Bitcointalk.org?

2            A.      As I just stated, Bitcointalk.org

3    was not the original forum.  The original forum

4    was Bitcoin.org/forums.

5            Q.      Dr. Wright, Satoshi opened an

6    account on what eventually became Bitcointalk.org

7    November 19, 2019 at 7.12.39 p.m.  Did you open

8    that account?

9            A.      No.  Bitcoin.org/forums was

10   originally that and that was migrated to a new

11   site, so you are confusing the two.  The old site

12   that had all my posts was migrated to a new site.

13           Q.      So the account that now resides on

14   Bitcointalk.org and reflects the name Satoshi that

15   was registered on November 19th 2009, you did not

16   open that account?

17           A.      Bitcointalk was not the original

18   forum site.  Bitcointalk was formed to migrate the

19   forum site.

20           Q.      So Dave opened that account?

21           A.      No, Dave did not open that account.

22   Dave was not able to.  Dave was actually in

23   hospital.  Dave was under operations and

24   unconscious during some of the times when Satoshi

25   was communicating, when I was communicating.  Dave


MAGNA
LEGAL SERVICES

Page 191

1    was literally out.  He was not available, not able

2    to talk because when you are under anaesthetic --

3    not local -- when he was knocked out, under full

4    complete surgery, it is not possible to sit there

5    on your laptop and type messages.

6              Q.     Have you tried to log into any of

7    the accounts you opened as Satoshi, on any forum,

8    to collect documents for this case?

9              A.     No.

10             Q.     Why not?

11             A.     Because Bitcoin.org/forums no

12   longer exists.  The original site, the original

13   SourceForge repository, were all disabled.  It was

14   migrated in I believe 2013 at the latest, where

15   Gavin Andreson and others stopped SourceForge,

16   which I prefer, and started using Github.  The

17   website was migrated earlier than that.  The

18   original forums were altered and changed so that

19   new administrators -- not me -- could be

20   appointed.

21             Q.     Dr. Wright, wouldn't your password

22   still open that account?

23             A.     No, they would not.

24             Q.     Have you tried?

25             A.     Nope.



Page 192

1          Q.      Have you tried to collect e-mails

2    from Satoshi's GMX account for this case?

3          A.      No.  The GMX account was

4    compromised years ago.

5          Q.      Did you try to log in and get the

6    documents from it?

7          A.      The GMX account was compromised

8    years ago.  The GMX account no longer exists.  The

9    compromise happened more than five years before

10   this case.

11         Q.      "Compromised" meaning the password

12   was changed?

13         A.      No, meaning totally taken over.

14   After it was closed down a new Satoshi e-mail

15   account was started.

16         Q.      So the Satoshi GMX account no

17   longer exists; is that accurate?

18         A.      No, there is a new Satoshi GMX

19   account.

20         Q.      The original e-mails no longer

21   reside in your Satoshi GMX account; is that

22   accurate?

23         A.      Yes.

24         Q.      Did you try to log into Satoshi's

25   Vistomail account to collect documents for this



Page 193

1   case?

2           A.      No, I did not.

3           Q.      Why not?

4           A.      Because I have not logged into

5   there for ages and Vistomail requires payment.

6   Without payment the account goes into lockdown and

7   basically you end up not being able to log in.

8           Q.      Can you pay and log back in?

9           A.      No.  Vistomail is not a standard

10  open thing where you can communicate with anyone

11  properly.  It is run by a bunch of anarchists who

12  -- yes, well, they are anarchists.  On top of that

13  the site was taken over in 2013.  A new company

14  bought the site and re-enabled a new version, so

15  the disabled accounts no longer exist.

16          Q.      Have you tried logging into

17  Satoshi's Anonymous Speech account to provide

18  documents for this case?

19          A.      Anonymous Speech and Vistomail are

20  the same server.  If you have Satoshi@vistomail.

21  anything and Satoshi@anonymousspeech. anything,

22  they are the same account.

23                  MR. FREEDMAN:  Can we take a two

24  minute break.

25                  (Recess at 4.55 p.m. to 5.04 p.m.)



Page 194

1                    MR. FREEDMAN:  I just got back.

2    How much time have we been on the record for?

3                    THE VIDEOGRAPHER:  Four hours and

4    eight minutes.

5    BY MR. FREEDMAN:

6         Q.      Dr. Wright, I am going to put up a

7    PDF of an e-mail for you.  Can you let me know if

8    you see it.  It has been produced as Defense

9    46098.  Dr. Wright, can you see that now?

10        (Exhibit Defense 46098 referred to)

11        A.      Yes, I see this now.

12        Q.      Okay.  Do you recognise this as an

13   e-mail from you to Mark Italia at the Australian

14   Tax Office, with a cc to your wife?

15        A.      As a director and Jamie Wilson as

16   the CFO at the time.  That was something that was

17   instructed to be sent.

18        Q.      Okay, but it is something that you

19   sent?

20        A.      It is something I instructed to be

21   sent.

22        Q.      Did you look it over before you

23   sent it?

24        A.      I -- what do you call it --

25   dictated it, so ----



Page 226

1   e-mails are, so I am not sure -- it is Craig

2   Wright to Craig Wright but that could be any

3   e-mail, so I can't comment on that.  Anyone can

4   send an e-mail address to be anything, so the

5   "from" name without the e-mail address means

6   nothing and the "to" name without the e-mail

7   address means nothing.

8          Q.     So you don't recognise this e-mail

9   then?

10          A.     I cannot say whether this is an

11   e-mail that was forwarded to myself or which

12   particular e-mail that it might have been

13   forwarded to.

14          Q.     Okay.  Dr. Wright I am going to

15   share with you another document; Defense 68503.

16   Do you see this document?

17          (Exhibit Defense 68503 referred to)

18          A.     I see a document, yes.

19          Q.     Do you recognise this document?

20          A.     It looks familiar, but I would have

21   to -- I cannot prove every line by looking at it.

22          Q.     It also has a history of e-mails

23   that appear to be between you and Dave, and they

24   appear to be signed by PGP key.  Do you see that?

25          A.     I do.



Page 227

1          Q.      Do these appear to be real e-mails

2     between you and Dave?  Sorry, did you answer that?

3          A.      Was that a question?

4          Q.      Do these appear to be real e-mails

5     before between you and Dave?

6          A.      You did not say "do these", you

7     said "these appear".  Yes, they appear reel.

8          Q.      Dr. Wright, is it your position

9     that everything with the DEFAUS Bates stamp is

10    fabricated?

11         A.      I cannot say whether everything is,

12    but you are talking about machines that are

13    captured from my wife's e-mail and my e-mail when

14    we were no longer even in the country, so you are

15    talking about even our personal e-mails and our

16    children's details on machines that, well, quite

17    simply should never have ever had access to that

18    material.  So if you have something there then you

19    have effectively had machines that have been

20    hacked, and I would not trust anything that has

21    been hacked other than to show that there has been

22    something hacked.

23         Q.      Dr. Wright, did you ever tell Ira

24    that he would be releasing you from claims if he

25    accepted shares in Coin-Exch?



Page 228

```
 1              A.      No, I never made any such thing.
 2              Q.      Did you ever tell Ira that he would
 3      be waiving any claims against you if he accepted
 4      shares in Coin-Exch?
 5              A.      No, I did not say anything like
 6      that.
 7              Q.      Did you ever sell your shares in
 8      Coin-Exch?
 9              A.      I did not sell my shares in
10      Coin-Exch, I still have them.  I have not said
11      anything about what Ira would or would not do
12      because Ira is very simply a shareholder, so when
13      I was no longer a director I would not say
14      anything.  Before, when I was a director, it is
15      very simple; you don't tell shareholders about
16      claims or anything like this.  You have a valuable
17      asset; what you choose to do with it is up to you.
18      It is not my place, as a director of a company, to
19      tell you what you should do with them, whether you
20      should hold them, sell them or do anything else.
21      My place as a director is to give you the books
22      and accounts as they are signed off by the audit
23      committee, as the independent and external
24      auditors have signed them off, and hand them to
25      the shareholders.
```



Page 241

1                    JUDGE REINHARDT:  Well, Mr. Rivero,

2    I have been listening to the whole deposition.

3    Mr. Rivero, if you want to be heard I will hear

4    you.

5                    MR. RIVERO:  The Bates labelling is

6    our Bates labelling, of course.  The DEFAUS Bates

7    label resulted specifically from a plaintiff

8    request that we make sure to identify documents

9    that we were asked, as part of these conferences

10   and decisions, to obtain from sources in Australia

11   like counsel etc.  That is how it came about.  So

12   to ask Dr. Wright anything about how we did that

13   is to evade the privilege right.

14                   JUDGE REINHARDT:  The ruling is

15   this; Dr. Wright, if you know the answers to these

16   questions of your own personal knowledge, not

17   based upon information that was conveyed to you by

18   your lawyers, you should answer the question.  If

19   you only know the answer to the question because

20   your lawyers told you something in confidence in

21   your attorney-client relationship, then you don't

22   have to answer the question.  If you don't know

23   the answer to the question simply say you don't

24   know the answer to the question.  With that

25   instruction I will allow -- Mr. Freedman, ask your



Page 242

1   question and Dr. Wright you can respond

2   accordingly.

3            THE WITNESS: Thank you, sir.

4   BY MR. FREEDMAN:

5        Q.      Dr. Wright, how do you know whether

6   a document came from an Australian device?

7        A.      Discussions with my lawyers.

8        Q.      How do you know that documents that

9   came from an Australian device are untrustworthy?

10       A.      Discussions with my lawyers.

11       Q.      How do you know that there is a

12  higher potential for documents that were in

13  Australia -- strike that.  How do you know that

14  documents that were in Australia were susceptible

15  to being manipulated?

16       A.      I was not in Australia, so

17  therefore any machines that are being altered,

18  accessing in my e-mail, my wife's e-mail, running

19  a thing -- Ramona copy -- that was sending all

20  e-mails to and from her into other addresses,

21  could not be valid.  If someone is accessing our

22  personal e-mails and doing that without

23  authorisation and it is going into machines that

24  we had no idea were receiving and altering our

25  e-mails, then I would that they cannot be trust.



Page 243

```
 1          Q.      If the documents that came from
 2   Australia came from your Australian counsel would
 3   they then be trustworthy?
 4          A.      No, because we were not in
 5   Australia at all at the end.  If a machine has
 6   been captured in 2016, purporting to be Craig
 7   Wright's machine, when Craig Wright had not been
 8   in Australia and had no computers with him in
 9   Australia, then there is a real problem.  Someone
10   running a computer and e-mail as me, in Australia,
11   ,was not authorised at any point.
12          Q.      But if you e-mailed an e-mail to
13   your lawyer while you were still in Australia and
14   then your lawyers collected that e-mail last year
15   from that lawyer, do you have any reason to
16   suspect that that document would be manipulated?
17          A.      Yes, I do.
18          Q.      Why?
19          A.      These came from discussions with my
20   lawyer.
21          Q.      So is it an accurate statement that
22   the only way you know that a document you sent to
23   your lawyers in Australia while you were in
24   Australia and was collected from those lawyers in
25   2019 would be susceptible to manipulation is
```



Page 244

1    through discussions with your lawyers?  You have

2    no other knowledge of that; is that an accurate

3    statement?

4           A.     Through discussions with my lawyers

5    and the forensic people that they are using,

6    I have come to determine information concerning

7    the machines in Australia.

8           Q.     Which machines in Australia are you

9    referring to?

10          A.     I don't have that information in

11   front of me.  My lawyers have it.

12          Q.     I need to know which machines you

13   claim have been manipulated, so I can identify

14   documents that you cannot say are manipulated.  We

15   need to have a common understanding of which

16   documents you think might be susceptible to

17   manipulation, so please tell me do you know any of

18   the Australian devices that have been manipulated?

19          A.     I know some of the identifiers

20   associated with Australian devices, yes.

21          Q.     Please give them to me.

22          A.     The HTC phone was actually a

23   company phone that was run by a number of people

24   in the system engineering department.  It was

25   designed to have apps that we were developing run



Page 245

1    on it.  I did not realise that after I had given

2    it back to the company, after doing some

3    demonstrations, that I had not wiped it, which

4    would allow people to keep using my e-mail and

5    have access to other such things.  On top of that,

6    there are IP addresses associated with Big Pond

7    and other accounts in Brisbane.  The Brisbane IP

8    addresses are not mine.  Some of those are

9    associated with Jamie Wilson and other people.

10   Jamie Wilson was working with a person that I

11   fired and also Jamie Wilson has fabricated a

12   number of documents, such as a power of attorney

13   over the patent that I created.  He has

14   fraudulently created assignment documents to file

15   the patent in America and has actually used my

16   signature, if we call it that, to file those

17   documents.

18             Investigation of the documentation

19   from the lawyers has turned up that some of the

20   signatures that are on some of my documents --

21   'my' -- turn out to be signed by someone else's

22   hand.  Some of that hand in some of the early ones

23   also happens -- which I have not gone over with my

24   lawyers in full detail yet and I will not here --

25   to match Mr. Wilson.  Mr. Wilson seeks to keep IP



Page 246

1    that is not his.

2                    Other people in my company sought

3    to sell some of the intellectual property that I

4    was working on.  We have documented exchanges

5    between some of the people who were let go and

6    companies, including a French bank, for the sale

7    of intellectual property.  Jamie Wilson had

8    potentially a deal for $100 million.  If that deal

9    had gone through and he had managed to get access

10   to the intellectual property, some of the staff

11   members, including some of the development and

12   coding staff, would have been cut in on the deal.

13   The IP addresses of each of those machines, of

14   course, is suspect.

15                   Anything where it is a Ramona copy

16   account for things rather than an exchange Ramona

17   account -- you see, if you are an exchange

18   administrator it is very simple to have a

19   completely copied e-mail account.  You can

20   actually copy the mailbox and have everything

21   sent.  Unfortunately, when you run a company you

22   have to trust people who work for you.  Ramona's

23   account, where it was Ramona copy, was running

24   simultaneously to an account, Ramona Watts.  All

25   of the e-mails in and out of Ramona copy were sent



Page 247

1   with the same e-mail address and everything would

2   be received.  All of those things I know are

3   indicators.

4          Q.     Dr. Wright, I am going to share

5   with you a document that has been produced in this

6   litigation, Defense 1674223.  Do you see that

7   document?

8       (Exhibit Defense 1674223 referred to)

9          A.     Can you zoom in a little bit,

10  please?

11         Q.     I can.  How is that?

12         A.     That is much better.

13         Q.     Do you recognise this as an e-mail

14  you sent to Calvin Ayre, Stefan Matthews, Andrew

15  Sommer and other individuals in mid-2015?

16         A.     It looks very familiar to it, yes.

17         Q.     Take a look at it and let me know

18  if it is an exact copy of the e-mail you sent.

19         A.     I cannot tell you whether it is an

20  exact copy but I can see whether it is familiar.

21  Yes, that looks familiar.

22         Q.     I am now going to show you DEFAUS

23  112094.  Do you see this is a draft of a

24  discretionary trust deed?

25          (Exhibit Defense 112094 referred to)



Page 248

```
 1          A.      I see that is what it says.

 2          Q.      Do you see here it lists W&K Info

 3   Defense Research as trustee?

 4          A.      I see that is what it says.

 5          Q.      Do you see this annotation

 6   "movement of Bitcoin following ATO asset reversal

 7   see CSW issues (2010)"?

 8          A.      Yes, I see that is what it says.

 9          Q.      That same annotation is on the

10   Tulip Trust 2 document you handed up to the court;

11   do you recall that?

12          A.      No.  I don't recall everything that

13   is in the trust documents, no.

14          Q.      Is this a draft, an earlier draft

15   of Tulip Trust 2?

16          A.      No, this is not a trust document at

17   all.

18          Q.      It is entitled Discretionary Trust

19   Deed.

20          A.      Can you go through the rest and

21   have a look?  (Document scrolled through)  Stop

22   for a moment.  Yes, can you go back up.

23          Q.      Yes.  Where would you like me to

24   go?

25          A.      The first page again.  Yes, this is
```



Page 249

1    a fabrication.

2              Q.      This is a forgery?

3              A.      There are multiple documents that

4    have been joined.  If you look at the end you will

5    see "page 1 of 2" at the end of the document.

6              Q.      They all say 1 of 2.

7              A.      Then that is not correct.  These

8    things are -- sorry.  No, this is not correct.

9              Q.      Dr. Wright, in this trust document,

10   which looks remarkably similar to Tulip Trust 2,

11   you have the first appointer being Dave Kleiman of

12   W&K Info Defense Research.

13             A.      No, this is not a trust document.

14   This is more likely something taking the trust

15   document and seeking to alter it.

16             Q.      Dr. Wright, I am showing you what

17   has been produced as Defense 28003.  It appears to

18   be an e-mail from you to yourself.  You put an

19   annotation to yourself, "your eyes only - to

20   discuss".  Below, you have forwarded on e-mails

21   between you and Dave Kleiman.  Do you recognise

22   this?

23             (Exhibit Defense 28003 referred to)

24             A.      I recognise discussions at that

25   time.  As I said, certain things get burnt into my



Page 250

1    mind.  IFIP-WG11.9 is the 2013 conference to do

2    with digital forensics that was to be held in

3    Orlando, Florida.  I was putting a paper in for

4    that conference.  The paper I didn't end up

5    finalising.  I had made a promise to David Kleiman

6    that I would put a paper in because I would be

7    attending and visiting in the January/February

8    period in Florida if I had presented that paper.

9    The tax deductible thing about that is why I had

10   done it, so I sent back communications with Dave.

11   The fact that I had digital forensic

12   qualifications meant that it would have been tax

13   deductible, so it is a good way of having a quick

14   holiday, meeting up with a friend and being able

15   to claim the tax on it, which is what academics

16   do.

17            Unfortunately though, the

18   Australian Tax Office had not settled their

19   information properly and what had occurred is that

20   all of that fell through, so the IFIP material

21   does not match what you are calling for.  We need

22   to discuss -- the "trust" misspelt and whatever

23   else is not the e-mail.  The e-mail I have burnt

24   in my mind because I still feel guilty about it,

25   is a communication between myself and Dave Kleiman

