**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

      plaintiffs,

v.                                                                              **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

      defendant.

_____/

**DR. CRAIG WRIGHT'S RESPONSE TO**
**PLAINTIFFS' OMNIBUS *DAUBERT* MOTION TO STRIKE DEFENSE EXPERTS**

## INTRODUCTION

Dr. Wright seeks to present opinion testimony of four expert witnesses who are the subject of plaintiffs' Omnibus *Daubert* Motion to Strike Defense Experts. The reports and testimony presented by these experts are products of reliable methods and are admissible under Federal Rules of Evidence 702, and *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993) and progeny.

First is Dr. Ami Klin, a licensed clinical psychologist who has studied Autism Spectrum Disorder for more than 35 years, who will testify that he has diagnosed Dr. Wright with Autism Spectrum Disorder with high intellectual skills. Dr. Klin's testimony will help the jury understand how this disability affects behavior. Plaintiffs attempt to slight Dr. Wright's disability, but the fact remains that Dr. Klin's testimony will be critical for the jury to fairly weigh the evidence. Plaintiffs' argument sets it focus on the fact that Dr. Klin discarded certain handwritten notes and raw scores as a matter of his routine practice. However, they fail to highlight that Dr. Klin integrated those notes into his final expert report before discarding them and that his report contains the "totality" of the information used to generate his opinions.

Second is Mr. Kevin Madura, a computer science specialist whose opinion focuses on the single issue of whether Dave Kleiman had the requisite skills and experience to have written or significantly have contributed to the original Bitcoin software application released in 2009. Here, in seeking to exclude the testimony of Mr. Madura, plaintiffs largely rely on the fact that he served as a consulting expert prior to being designated as a testifying expert. Using this fact, plaintiffs attempt to assert a Rule 26 disclosure violation even though the undisclosed information was identified as privileged as it was in the scope of Mr. Madura's role as a *consulting expert*, not a *testifying expert*. Plaintiffs further claim that his opinion is speculative and unreliable because there is no "scientific examination" of his method. Mr. Madura's testimony, although not science-based, constitutes admissible non-scientific, experience-based testimony.

Third is Mr. Frank Norwitch, a handwriting authentication expert with more than 40 years of experience. Mr. Norwitch examined certain documents and provided on opinion on the authenticity of the signatures in question. Plaintiffs challenge the sufficiency of Mr. Norwitch's expert reports, primarily arguing that the three expert reports do not provide the "basis or reasons" (or methodology) for his opinions. To the contrary, his reports explain that he used the industry standard of "side-by-side" visual comparison as the basis for his opinions. Moreover, Mr.

Norwitch's reports clearly identify his methodology and his findings, reflecting that they are based on a careful examination and analysis.

Last is Dr. D. Stewart MacIntyre, a licensed physician and infectious disease specialist. Dr. MacIntyre will provide a summary of Dave Kleiman's medical records focusing on the last two and half years of his life that he spent primarily in a Veterans Administration hospital, and explain and opine on his chronic and severe medical conditions that dominated his day-to-day life, independence, and physical mobility. Plaintiffs raise a relevancy issue with respect to Dr. MacIntyre's opinions. However, Dr. MacIntyre's opinions are not only relevant but important for a jury to hear because they go to a core fact of Dave Kleiman's life during the period in which plaintiffs assert that W&K Info Defense Research, LLC was actively mining and developing valuable intellectual property and without which the jury's understanding of this critical figure in the case will be incomplete.

For these reasons, and those demonstrated more fully below, the Court should deny plaintiffs' motion.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony, which the court determines by engaging in a three-part inquiry that includes whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

The Court of Appeals for the Eleventh Circuit refers to these requirements as the "qualification, reliability, and helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Although there is some overlap among these requirements, the court must analyze each one individually. *See id.* An expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, 2013 WL 752697, at *3 (S.D. Fla. 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007); FED. R. EVID. 702).

Under *Daubert*, a district court must take on the role of gatekeeper, but this is not intended to replace the adversary system or the role of the jury. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The district court is not to ultimately decide on the persuasiveness of the proffered evidence. *Quiet Tech.*, 326 F.3d at 1341).

## ARGUMENT

### I.   Dr. Ami Klin

The law requires expert testimony on "an issue [that] appears to be within the parameters of a layperson's common sense, but in actuality, is beyond their common knowledge." *United States v. Finley*, 301 F.3d 1000, 1013 (9th Cir. 2002). Jurors are "plainly unqualified to determine" how a disability like Autism Spectrum Disorder ("ASD") causes someone like Dr. Wright to present themselves or behave[1]. *United States v. Shay*, 57 F.3d 126, 133-34 (1st Cir. 1995) (reversing exclusion of expert testimony); *United States v. Hall*, 93 F.3d 1337, 1344 (7th Cir. 1996) (same). Here, expert testimony will fill in what is indisputably beyond the jury's common knowledge so that they can accurately weigh Dr. Wright's critical testimonial evidence and evaluate his credibility.

Dr. Ami Klin is a licensed clinical psychologist who has studied ASD for more than 35 years and completed over 2,000 ASD diagnostic evaluations. He, and his similarly qualified colleague, Dr. Celine Saulnier, assessed Dr. Wright using a rigorous "gold standard" methodology and diagnosed him with ASD with high intellectual skills. Klin Report, Ex. 1 to Plaintiffs' *Daubert* Motion, ECF No. [509-1] ("Klin Report" or "Dr. Klin Rep."). High intellect people with ASD behave differently than ones without ASD; those differences are "not immediately obvious to people who don't have expertise in that area."[2] That is why the jury needs Dr. Klin's testimony.

This should be uncontroversial. Jurors do not know that high intellect people with ASD are "profoundly deficient" in reciprocal social behavior. Expert testimony is necessary to provide that

---

[1] Plaintiffs improperly state that Dr. Klin diagnosed Dr. Wright with a mental health disorder. Mot. at 13. Autism is not a mental illness and it is improper for plaintiffs to say that it is. Dr. Klin diagnosed Dr. Wright as ASD with high intellect. ASD is a "neurodevelopmental disorder of early onset marked by profound social disability affecting a person's capacity for understanding other people, intuiting their feelings, and establishing reciprocal relationships." Ami Klin et al., *Defining and Quantifying the Social Phenotype in Autism*, 159 AM J PSYCHIATRY 895, 895 (2002).

[2] *See* **Exhibit A**, (April 21, 2020 Dep. of Dr. Ami Klin), 389:18-22.

4

specialized knowledge so that the jury can "judge [Dr. Wright] by the facts," not his disability.[3] For example, a juror might equate a lack of eye contact with hiding something, unaware that ASD causes that behavior. Or, a juror might conclude that insistence on precision, or a pedantic, methodical style to answering questions, equates to evasiveness, ignorant that ASD causes that behavior too.[4] Dr. Klin's testimony will provide knowledge about these issues that the jury lacks. The alternative will cause jurors to decide facts *because* of Dr. Wright's disability, which would be tantamount to punishing him for his disability; the Court should reject the invitation to do that.

### A.    Expert Testimony Regarding Autism Is Admissible Under FRE 702

Dr. Klin is qualified and the "gold standard" method he applied is reliable. Ex. A, Dr. Klin Dep. 75:20-76:8; 104:7-106:3; 142:5-144:13. There also is no dispute that Dr. Klin possesses and will testify about "specialized knowledge" concerning ASD. Plaintiffs' arguments that this testimony is irrelevant and would not "assist the trier of fact" are meritless.

#### 1.    *Expert testimony will assist the jury*

While the jury is expected to weigh evidence and decide credibility by drawing on their ordinary experiences of life and common knowledge as to the natural tendencies of human nature, courts "must be cautious not to overstate the scope of the average juror's common understanding and knowledge." *Finley*, 301 F.3d at 1013. The proper Rule 702 question is: "[w]hether the untrained layman would be qualified to determine intelligently and to the best degree, the particular issue without enlightenment from those having a specialized understanding of the subject matter involved." *Id*. (quoting *Shay*, 57 F.3d at 132). When "a layperson will not always be aware of [a] disorder, its symptoms, or its consequences," expert testimony is needed. *Hall*, 93 F.3d at 1343; *Finley*, 301 F.3d at 1013 (admitting expert testimony because "the average layperson was not qualified to assess [the defendant's] mental condition without the assistance of an expert's specialized understanding.").

Numerous courts have admitted expert testimony under FRE 702 to explain how a disability affects behavior. The First Circuit twice reversed the exclusion of expert testimony that

---

[3] Dr. Klin Dep. 390:21-391:3.

[4] *See, e.g., Id*. at 390:13-20 (When Dr. Wright "transgress[es] the rules of common sense, the laws and conventions of social interaction, when he's being pedantic, when he is reciting lectures and when he is giving you histories of words," he is "not doing that contemptuously," or "being evasive," or "deliberately contriving falsehoods . . . . This is the way he is.").

explained why the defendants falsely confessed. *Shay*, 57 F.3d at 132; *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 16 (1st Cir. 1997). The disabilities caused the defendants to "make grandiose" (*Shay,* 57 F.3d at 133) and "exaggerated" statements (*Gonzalez-Maldonado*, 115 F.3d at 16), which were used against them.[5] The First Circuit reversed because "an untrained layman would not be qualified to determine intelligently, and to the best degree the weight to place on Robles's recorded statements without enlightenment from" the expert. *Shay*, 57 F.3d at 132.

The Seventh Circuit in *Hall* also reversed exclusion of similar testimony that "would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried." 93 F.3d at 1345. "It would have been up to the jury, of course, to decide how much weight to attach to" the testimony "and to decide whether they believed his explanation of [defendant's] behavior or the more commonplace explanation that the confession was true." *Id*. By excluding such testimony, the Court found that "the jury here may have been deprived of critical information it should have had in evaluating [the defendant's] case." *Id*. Circuit courts, district courts, and state courts alike have admitted this kind of testimony.[6] While those courts considered a wide range of behavior, they all agreed that "*why*" a witness or party behaves in a particular way is a crucial evidence for the jury to hear and consider. That is precisely the nature of Dr. Klin's opinion. He will testify about how and why an ASD, high-intellect, individual like Dr. Wright behaves. His observations are critical for the jury to fairly weigh the evidence. And the jury could very well reject them all. But that is for the jury to decide.

---

[5] For example, in *Shay*, after the defendant allegedly blew up his father's car, he confessed that he was "sorry about it and wished he could turn back the hands of time." 57 F.3d at 132.

[6] **Circuit Courts**: *United States v. Peralta*, 941 F.2d 1003 (9th Cir. 1991) (admitting expert testimony on Stockholm Syndrome); *United States v. Winters,* 729 F.2d 602 (9th Cir.1984) (affirming admission of expert testimony concerning the psychological impact of post-traumatic stress disorder); *United States v. West*, 813 F.3d 619, 625 (7th Cir. 2015); **District Courts**: *United States v. Ganadonegro*, 805 F. Supp. 2d 1188 (D.N.M. 2011) (admitting expert testimony to explain false confession); *R.K. v. Kanaskie*, No. 02-61534-CIV, 2007 WL 9761337, at *7 (S.D. Fla. July 12, 2007) (admitting expert testimony describing party's "current psyche" because "these observations could prove useful to a jury"); **State Courts**: *Carter v. State*, 754 N.E.2d 877, 882 (Ind. 2001) (admitting expert testimony as to behavior caused by autism); *State v. Buechler*, 253 Neb. 727, 739, 572 N.W.2d 65 (1998) (reversing trial court's exclusion of expert testimony concerning mental disorder); *Burns v. State*, 122 S.W.3d 434, 437 (Tex. App. 2003) (reversing exclusion of expert testimony about "behaviors and traits that might be indicia of manipulation").

*Quiet Tech.*, 326 F.3d at 1341 ("It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence.").

> 2.   *Dr. Klin's testimony does not usurp the role of the jury*

By taking sound bites from Dr. Klin's report and stripping them of their context, plaintiffs argue that, "under the guise of a mental health opinion," Dr. Klin "is trying to vouch for Dr. Wright's credibility." Mot. at 11. Dr. Klin is doing no such thing.

Plaintiffs twist what Dr. Klin says in his penultimate paragraph: "[i]n many instances," Dr. Wright was "respectful, truthful and made a real effort to answer questions," Mot. at 11 (citing to Dr. Klin Rep. at 17), to mean that Dr. Klin is opining that Dr. Wright is always truthful or respectful. Dr. Klin is not opining as to whether Dr. Wright is truthful or respectful. He compared Dr. Wright's behavior when his "mind was not absorbed in reacting to . . . imprecisions of language and technical terms," with his behavior when those imprecisions are absent. The difference is the point. If Dr. Wright behaves normally in the absence of imprecisions (which trigger his "profoundly deficient" ability to engage in reciprocal social behavior), then the *reason* why he behaves differently when they are present is exactly what the jury should hear.

Plaintiffs latch onto Dr. Klin's description of Dr. Wright's behavior (or "style") in depositions and legal proceedings. Dr. Klin observes that the format of these proceedings magnifies Dr. Wright's ASD and that a layperson might perceive this behavior as "arrogant, entitled and even grandiose," as well as "evasive, and deceitful." *See* Dr. Klin Rep. at 14. Dr. Klin explained that, while one might expect Dr. Wright's deficits to be "mitigated" by the "highly structured format" of a deposition or court proceeding, where Dr. Klin observed Dr. Wright behaving in a "sincere" and "deferential" is way, his disability was nevertheless exposed. This is specialized knowledge as to behavior that is beyond the juror's common knowledge.

Plaintiffs take issue with Dr. Klin's observations that a layperson would assume that obsession with "technical super-accuracy" is associated with "malicious intent" when, in fact, it is a classic symptom of ASD. *See* Motion at 11. As described above, those with ASD struggle with "areas of social interaction and social communication, and is characterized by restrictive, repetitive patterns of behavior." *See* Dr. Klin Rep. at 3. Accordingly, ASD-diagnosed people have trouble inferring another "person's intention and social context" if that person is imprecise. *Id*. at 11. Dr. Klin explains that "[f]ormal language is extraordinarily important to [Dr. Wright], but it's a minefield, because just like his style in other areas, it creates too many details, and he never

graduates from those details into gist, into context, into meaningful communication . . . ." Dr. Klin Dep. 191:21-192:5.

In sum, Dr. Klin is not telling the jury to believe Dr. Wright. He also is not attempting to "read Dr. Wright's mind and opine that he is 'truthful.'" Motion at 12. Rather, Dr. Klin is providing the jury with specialized knowledge that falls squarely within what is admissible under FRE 702. And while plaintiffs can continue to argue that Dr. Wright has a "track record of having difficulty for the truth" (Mot. at 12), nothing is stopping plaintiffs from presenting that evidence to the jury (to the extent it is admissible) and letting the jury decide for themselves.

### B.    Dr. Klin's Expert Testimony Is Admissible Under FRE 608(a)

"[T]he Federal Rules of Evidence permit expert testimony to be offered in appropriate circumstances to establish a witness's truthful or untruthful character." *Shay*, 57 F.3d at 131. The rationale is similar to admissibility under FRE 702—experts possess special insights about behavior that bear on a general propensity for truthfulness or untruthfulness. Thus, like any other witness testifying pursuant to the invitation of Rule 608(a), an expert expressing an opinion that the witness or party is truthful, is doing so to persuade the jury to believe the witness. The difference, however, lies in that the persuasion comes in the form of specialized knowledge.

As noted above, the First Circuit recognized this aspect of 608(a) in *Gonzalez-Maldonado*, 115 F.3d at 16, where it found error with the trial court not allowing the defendant's expert to testify concerning the defendant's poor character for truthfulness. The expert would have testified that the defendant "had a medical condition that led him to exaggerate" and that evidence would have been admitted under Rule 608(a) to establish the defendant's poor character for truthfulness. *Id*. at 15.

While expert character evidence does not come in unless a party's character is attacked, it is no secret that plaintiffs' flagship theory is that Dr. Wright has a "track record of having difficulty with the truth." Motion at 12. These types of attacks trigger Rule 608(a)'s protections and allow Dr. Klin to offer his *observations* to rehabilitate Dr. Wright's character for truthfulness. Dr. Wright does not propose to admit Dr. Klin's report and testimony to support any fact at issue. Rather, Dr. Klin's conclusions discussed above, and more fully detailed in his report, should be admitted because they are conditions that bear on Dr. Wright's general character for truthfulness or untruthfulness.

### C.    Plaintiffs' Cases Are Not Behavioral Testimony Cases

None of plaintiffs' cases involve behavioral (or analogous) testimony.[7] In two of plaintiffs' cases, the expert directly opined as to the truth of certain evidence. *Dugas v. 3M Co.,* 2016 WL 7327666, at *7 (M.D. Fla. 2016) (opining that plaintiff's testimony was untrue); *Bodner v. Royal Caribbean Cruises, Ltd.*, 2018 WL 2471215, at *3 (S.D. Fla. 2018) (opining and resolving a "discrepancy in testimony"). That leaves *United States v. Falcon*, 245 F. Supp. 2d 1239 (S.D. Fla. 2003) and *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998). *Falcon* involved testimony as to a personality disorder, which the district court excluded because the proffered testimony purported to make the same observations that any juror could make, *i.e.*, no specialized knowledge was required. *Snowden* was a child abuse case where the prosecution's expert had testified that 99.5% of children tell the truth, a statement the prosecution repeatedly referred to throughout the trial and in closing arguments. The Eleventh Circuit concluded that the expert went too far because "permitting an expert to vouch forcefully for the children's credibility in this case was a 'crucial, critical, highly significant factor.'" *Snowden*, 135 F.3d at 739.

Dr. Klin's testimony is unlike any of these cases, because it is highly specialized and will assist the jury in assessing the evidence (including credibility) before them (FRE 702) and is admissible under FRE 608(a) if and when plaintiffs attack Dr. Wright's character for truthfulness.

### D.    Plaintiffs' Remaining Arguments Are Without Merit

Plaintiffs argue that Dr. Klin's opinion is "speculative," even though expert witness testimony is "admissible if the expert knows facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir.1988). "[A]bsolute certainty is not required." *Id.* There are "[s]everal subjective testing instruments . . . used to make the [ASD] diagnosis." *Dwyer ex rel. Dwyer v. Sec'y of Health & Human Servs.*, 2010 WL 892250, at *32 (Fed. Cl. 2010). Those are the Autism Diagnostic Observation Schedule ("ADOS") and the Autism Diagnostic Interview-Revised ("ADI-R"). Dr.

---

[7] While not cited in plaintiffs' brief, the closest the Eleventh Circuit has come to addressing the testimony at issue in this case is *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996), where the defendants sought to introduce expert testimony that the government's key witness was a psychopath "who had no conception of the truth." In a cursory one-paragraph analysis, the Eleventh Circuit rejected that the district erred in excluding this testimony because "expert medical testimony concerning the truthfulness or credibility is inadmissible." As described above, Dr. Klin does not purport to testify as to Dr. Wright's truthfulness. He will testify as to how ASD causes certain behavior that is outside the common knowledge of jurors.

Klin completed and relied on both. Other instruments include the Vineland Adaptive Behavioral Scales, which he also completed and relied on. A "gold standard" diagnosis is hardly conjecture or speculation.

Plaintiffs additionally argue that Dr. Klin authored Opinion #2 only by reviewing "a deposition transcript and a video of Dr. Wright's deposition . . . ." Mot. at 13. To the contrary, Opinion #2 is based on the extensive materials and data identified in Dr. Klin's report, which included the above "gold standard" interviews of Dr. Wright, his mother, uncle, and sister, and wife. "These procedures . . . generated a wide and expansive range of illustrations of representative behavior exhibit by Dr. Wright, both historically and presently." *See* Dr. Klin Rep. at 3. Dr. Klin then applied his specialized knowledge to this "expansive range" to offer his opinions on how ASD affects Dr. Wright's behavior.

Plaintiffs insinuate that Opinion #2 is novel, ignoring Dr. Klin's testimony that he has authored similar opinions for "between five and six of" the adults he has studied as part of his expert work. Dr. Klin Dep. 57:11-12. Plaintiffs argue that Dr. Klin "does not cite any literature in support of Opinion #2," neglecting the book he wrote about Asperger Syndrome[8], where he "address[ed] many issues regarding presentation, clinical presentations, treatments, challenges," Dr. Klin Dep. 62:3-6, including how ASD "high intellect" individuals present in "legal proceedings," which has been the "subject of great interest in the past 10 years or so." *Id*. at 63:4-5.

Plaintiffs falsely claim that Dr. Klin "limited his review," even though Dr. Klin relied on a robust set of interviews. Dr. Klin Dep. 69:14-70:2 ("[W]e evaluate the validity and the reliability, as well as the vantage point of who is providing you with information. And if there is a concern about that, then one seeks additional sources; one looks for consistencies; one will -- looks for vantage points. Some people know somebody better at certain stages of one's life, things of that nature -- so that we can create the most robust set of observations about an individual."); *Id.* at 105:15-19 ("I immediately requested the attorneys to make the contact with the younger sister, because we wanted to create as robust a body of observations as we could."); *Id.* at 106:15-107:4 ("I wanted to get as robust a body of information, of observations about his developmental history and subsequent life.").

---

[8] ASPERGER SYNDROME, (James C. McPartland, Ami Klin, and Fred R. Volkmar eds., Guilford Press 2d ed. 2013). Dr. Klin Rep. at 25.

Plaintiffs also suggest that Dr. Wright somehow engineered his own diagnosis, even though Dr. Klin debunked this suggestion in his deposition. Dr. Klin Dep. 192:11-22. Plaintiffs then argue that Dr. Klin should have watched YouTube videos of Dr. Wright, even though Dr. Klin did and explained why that was unhelpful. Dr. Klin Dep. 138-139 (explaining that there "was nobody requiring reciprocity from [Dr. Wright]" when he was giving lectures and people "with autism of high intellect . . . can present themselves relatively well . . . [b]ut the moment they veer away from that, their presentation is . . . starkly different").[9]

Plaintiffs' arguments are exactly the type of material that can be used to cross-examine Dr. Klin at trial. The Court need only assure that Dr. Klin's testimony is reliable and relevant. Expert testimony is "relevant if knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), as amended (Apr. 27, 2010) (internal citation omitted). It is reliable if "the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. Dr. Klin's opinion satisfies both: it is based on the gold standard methodology and rooted in Dr. Klin's decades of experience examining ASD of high intellect. It is relevant for the reasons noted above, and it is of no moment that plaintiffs believe it is wrong or impeachable, because "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his [or her] testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013). Challenges that go to the weight of the evidence are within the province of a fact finder.

### E.     The Requirements of Rule 26 Are Unequivocally Met

Dr. Klin's opinion is proper expert witness testimony that is both reliable and relevant. It also complies with the requirements of Rule 26(a)(2)(B) despite plaintiffs' complaint that Dr. Klin's report and disclosures did not contain handwritten notes and raw scores. Plaintiffs complain that the absence of this information from Dr. Klin's report renders it a "disclosure violation." Mot.

---

[9] Plaintiffs obsessed over these videos at the deposition and Dr. Klin repeatedly explained why they weren't relevant or helpful. Dr. Klin Dep. 216:2-11 ("no experienced clinician would base a diagnosis on this video clip"); 227:9-228:5 (Q: "[Y]ou did not then go back and try to find -- look at publicly available information to see if it's consistent with what you learned during your assessment, correct?" A: "That is correct. And most clinicians like myself don't like the idea of conducting clinical work by looking at media materials or things of that nature, because part of the methodology used in gold standard clinical evaluations is a setting that you have some control over.").

at 7. This position is simply not supported by Rule 26 or the cases interpreting the expert disclosure requirements.

Rule 26(a)(2)(B)'s requirements that the expert's report include his opinions and reasoning and "the data or other information considered by the witness in forming his opinions" do not, however, require that the expert report contain, or be accompanied by, all of the expert's working notes or recordings. *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1121 (D. Colo. 2006); *Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 34–35 (1st Cir. 2004) (rejecting the notion that the language of Rule 26(a)(2)(B) requires expert reports contain, or be accompanied by, all working notes or recordings).

The rule does not require an expert to disclose every "scrap of paper" or articulate every "nano-detail." *See McCoy v. Whirlpool Corp.*, 214 F.R.D. 646, 652 (D. Kan. 2003); *Etherton v. Owners Ins. Co.*, 2011 WL 684592, at *2 (D. Colo. 2011) ("Rule 26(a)(2)(B) does not require production of every scrap of paper with potential relevance to an expert's opinion."). Although Rule 26(a)(2)(B) "requires a complete statement of all opinions to be expressed and the basis and reasons therefor, along with the data or other information considered by the witness in forming the opinions, it does not require that a report cite each minute fact or piece of scientific information that might be elicited on direct examination to establish the admissibility of the expert opinion under *Daubert*." *McCoy*, 214 F.R.D. at 652.

Dr. Klin employs the Autism Diagnostic Observation Schedule-2 (ADOS-2) and Autism Diagnostic Interview-Revised (ADI-R) which are considered the "gold standard" in diagnosing ASD. The raw scores from those evaluations are incorporated into Dr. Klin's report. Dr. Klin's report is a complete statement of his opinions, contains the facts and data considered, and otherwise complies with the requirements of Rule 26(a)(2)(B)[10]. His report is, in fact, an in-depth methodological evaluation consisting of the following components:

---

[10] Rule 26(a)(2)(B) requires a written report from a testifying expert which contains: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case. FED. R. CIV. P. 26.

1.   Background for consultation identifying the scope of the assignment and materials reviewed (Dr. Klin Rep. at 1)

2.   Identification of the diagnostic consultants and their roles (*Id.* at 2)

3.   Identification of procedures and notes on methodology (*Id.* at 3-4)

4.   Summary of the Autism Diagnostic Interview (ADI-R), setting forth, in meticulous detail, Dr. Wright's family history and genetic liabilities, his developmental history, his communication skills, his reciprocal social interaction skills, and his patterns of behavior; information pertinent to this assessment was collected through interviews with Dr. Wright's wife, mother, sister and uncle and the report chronicles the information received through the interviews (*Id.* at 4-6)

5.   Dr. Wright's final *scores* on the ADI-R scale (*Id.* at 6)

6.   Dr. Wright's *scores* on the Social Responsiveness Scale (SRS-2) (*Id.* at 6)

7.   Assessment of adaptive behavior on the Vineland Adaptive Behavior Scales[11] identifying Dr. Wright's communication skills, daily living skills, socialization skills and maladaptive behaviors; this assessment included *an interview with Dr. Wright's wife and the report contains a detailed account of the information received through the interview* (*Id.* at 7-9)

8.   Direct interview and observation analysis of Dr. Wright utilizing ADOS-2 Module 4[12] and setting forth Dr. Wright's *ADOS-2 final scores with a detailed account his social interactions, communication, and cognitive observations* (*Id.* at 9-12)

9.   Diagnostic evaluation of Dr. Wright (*Id.* at 13)

10.  Opinion on the impact of ASD on Dr. Wright's presentation in legal proceedings (*Id.* at 13-17).

In compliance with Magistrate Reinhart's Order[13], additional expert materials consisting of *208 pages* were provided to plaintiffs, and were inclusive of: *(a)* draft component report sent to Dr. Klin by Dr. Saulnier (Plaintiffs' Ex. 3 [ECF No. 509-3] at 1-8); *(b)* correspondence between Dr. Saulnier and Dr. Wright (*Id.* at 10-12); *(c)* correspondence between Dr. Saulnier and Ramona

---

[11] The Vineland Adaptive Behaviour Scales, Third Edition, Interview Form (Vineland-3)

[12] ADOS-2 Module 4 refers to the Autism Diagnostic Observation Schedule, Second Edition, Module 4. Dr. Klin Dep. 36:20-22.

[13] Order Memorializing Discovery Rulings, ECF No. [457].

Watts (*Id.* at 13-17); *(d)* SRS-2, self-report, score report (*Id.* at 19-23); *(e)* SRS-2, other-report, score report (*Id.* at 24-27); (f) Vineland-3, comprehensive interview report (*Id.* at 28-58).

The purpose of Rule 26's expert witness disclosure requirements is to "eliminate surprise" and "provide the opposing party with enough information regarding the expert's opinion and methodology to prepare efficiently for deposition, any pretrial motions and trial." *Cook*, 580 F. Supp. 2d at 1122. Further, "[t]he content of an expert report is adequate when it is sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced." *Powers v. Target Corporation*, 2020 WL 1986968, at *9 (S.D. Fla. 2020). The purpose of Rule 26 has been served by the contents of Dr. Klin's report and related disclosures. The report identifies extensive details about Dr. Wright and his family that could only have been gathered from the interviews, and it provides the data and analysis related to the ADI-R, ADOS-2 and Vineland-3 assessments.

The absence of the handwritten notes and raw scores does not detract from the completeness of the report, especially since that data was incorporated into the report itself. Yet, plaintiffs argue that it constitutes a "disclosure violation." It does not. In *Walker v. DDR Corp.*, defendants challenged the reliability, under Rule 702, of an expert's retention policy because the notes underlying his report were, without dispute between the parties, destroyed. *Walker v. DDR Corp.*, 2019 WL 3409724, at *3 (D.S.C. 2019), *reconsideration denied*, 2019 WL 1349514 (D.S.C. 2019). The plaintiff in *Walker* took the position that defendants were already in possession of the expert's notes via his report and ignored the fact that the expert dictated his notes into his report. The defendants argued it was impossible to scrutinize the expert's opinion because his notes and underlying facts or data were destroyed. The court rejected defendants' argument. First, the court found that whether or not the expert was *required to disclose* his underlying notes to defendants was a discovery question separate and distinct from the question of *admissibility* for purposes of *Daubert*. *Id.* at *6 (emphasis added). Next, the court ruled that defendants' admissibility argument under *Daubert* was without merit because the expert's report included various sources he evaluated. *Walker.* The expert's methodology and opinion were also found to be relevant and reliable because they were thorough and provided the court with enough background to make such a determination.[14]

---

[14] The court in *Walker* noted the following insightful point in its analysis:

Plaintiffs have sketched an incomplete picture for the Court. Dr. Klin was transparent about the fact that he discarded his handwritten notes and raw scores, but he was equally transparent that *(a)* it is his standard practice to do so, and *(b)* his handwritten notes and raw scores are integrated into his final work product, *i.e.*, his report. Dr. Klin Dep. 124:2-6 ("Once I have had an opportunity to create an integration of all of the information, my goal is to use to the totality of that information to generate my opinions, which are, again, written as the report. So I see that as my final work product."). This is no different from the expert in *Walker* who destroyed his notes, pursuant to his retention policy after they were dictated into his report. Plaintiffs' argument ignores that the handwritten notes and raw scores are integrated into Dr. Klin's report. Dr. Klin's report is complete, thorough, and complies with the disclosure requirements of Rule 26.

### F.   There is No Discovery Violation -- Much Less One That Warrants Exclusion

#### 1.   *The Absence of Materials Incorporated into the Expert's Report Does Not Warrant Sanctions*

Even if the Court were to find that the absence of handwritten notes could be classified a disclosure violation, striking Dr. Klin as a witness would be an extreme sanction unsupported by the law. Numerous courts have refused to exclude expert testimony due to the absence of an expert's notes, even when they were destroyed or discarded by the expert. In *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 2019 WL 1369007, at *18 (S.D. Cal. 2019), the court addressed the issue of whether an expert witness' testimony must be excluded pursuant to Rule 37 for failure to abide by the disclosure requirements in Rule 26(a)(2). There the expert acknowledged in her deposition that the materials listed in her report did not encompass the entire universe of documents that she reviewed, and further stated that there were missing materials in the form of notes made by her and her staff during their recreation of a certain evaluative process. *Id.* at *18. A motion to exclude her testimony prompted a declaration where the expert advised that it was not

---

Were the court to adopt plaintiff's position—that the absence of an expert's notes is insufficient to survive *Daubert* scrutiny—the consequences would be profound. Experts who decline to keep their notes would always be disqualified under the *Daubert* standard, and the court's ability to properly perform its "gatekeeping" responsibilities would be undermined because there may be instances, such as here, in which an expert's report purportedly reflects handwritten notes . . . Federal courts have expressly rejected such a rigid application of *Daubert*.

*Walker v. DDR Corp.*, 2019 WL 3409724, at *7 n.9 (D.S.C. 2019), *reconsideration denied*, 2019 WL 1349514 (D.S.C. 2019).

her "practice to keep working papers, notes, or drafts." *Id.* The court, without determining whether disclosure of expert working notes was required,[15] held that even if there was a duty to disclose, the failure to preserve was harmless and the exclusion sanction was not warranted. *Id.* at *19. The party seeking to exclude argued that it suffered prejudice because it was deprived of a meaningful opportunity to cross-examine the expert on her conclusions and intervening findings she might have made in her working papers at variance with her ultimate report. The court found, "the destruction of [the expert's] working papers do not seem particularly prejudicial in light of the factual particulars of *this* case." *Id.* This finding was based on the expert's declaration that her working paper evaluations were "entirely incorporated" within her expert report, and that being the case, the expert could simply be cross-examined on the methods and analysis. *Id.*

Other courts have reached similar conclusions. In *Patel*, the district court declined to exclude expert testimony merely because the expert discarded his notes, *and in spite of the fact that the expert lacked personal knowledge of some of the analysis* where he relied on his staff. *Patel v. Verde Valley Med. Ctr.*, 2009 WL 5842048, at *1 (D. Ariz. 2009) (emphasis added). In *Tipp*, the court refused to exclude a witness who destroyed interview notes after they were included in her typewritten report and noted that other courts have dealt with this issue in a similar manner. *Tipp v. Adeptus Health Inc.*, 2018 WL 447256, at *4 (D. Ariz. 2018). Like the experts in these cases Dr. Klin discarded his handwritten notes and the raw scores only after they were incorporated into his report. This does not, in and of itself, justify a consideration of sanctions.

Sanctions are not warranted if the failure is "substantially justified" or "harmless." *Zanakis v. Scanreco, Inc.*, 2019 WL 2215908, at *4 (S.D. Fla. 2019). "Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request . . . [f]ailing to comply with Rule 26 is 'harmless' when 'there is no prejudice to the opposing party.'" *In re Denture Cream Prod. Liab. Litig.*, 2012 WL 5199597, at *5 (S.D. Fla. 2012) (internal citations omitted), *on reconsideration in part*, 2012 WL 13008163 (S.D. Fla. 2012). Here, the substantial justification is in the fact that the destruction of handwritten notes by Dr. Klin was in accordance with his routine practice, and as discussed above, the case law supports the conclusion that there

---

[15] The court noted the conflicting law on the disclosure issue but determined it was not necessary to reconcile it because even if the expert had a duty to disclose her notes, the failure to preserve was harmless. *Bona Fide Conglomerate*, 2019 WL 1369007 at *19.

is no Rule 26 violation under the circumstances. Further, any failure was harmless because there was "no prejudice to the opposing party" in that the substance of the notes is *not absent* from Dr. Klin's report. Dr. Klin Dep. 123:9-16, 124:1-6; 126:2-17; 368:2-8. In addition, plaintiffs had the benefit of deposing Dr. Klin for seven hours and can adequately cross-examine him at trial. *See Bona Fide Conglomerate*, 2019 WL 1369007, at *18 (stating that Bona Fide could simply cross-examine the expert on the content of her final expert report, and no sanctions were warranted).

### 2. *Plaintiffs' Cases Do Not Support Their Position*

Plaintiffs cite four cases in support of their argument, none of which address the issue of whether the absence or destruction of an expert's notes warrant the specific remedy requested, *i.e.* striking of the expert testimony. In *United States v. Batchelor-Robjohns*, 2005 WL 1761429, at *3 (S.D. Fla. 2005), the court excluded expert testimony under Rule 37(c)(1) due to a party's *undisputed* failure to provide various models and curves relied upon by the expert, which were necessary for the opposing party to test the reliability and accuracy of the expert's valuation opinion. That information that fell squarely within the Rule 26(a)(2)(B) disclosure requirements. *Id.* at *3–4. Unlike the situation addressed in *Batchelor-Robjohns*, here, the handwritten notes and raw scores are captured in Dr. Klin's methodology and analysis underlying the reported final scores, and there is no concession that the plaintiffs cannot test the reliability and accuracy of Dr. Klin's opinion with the information that defendant has produced.[16]

### 3. *Rule 37 Exclusion Sanctions Is Too Harsh a Remedy*

Excluding the testimony of Dr. Klin is too harsh a remedy that is disproportionate to the alleged disclosure violation. *See Fid. Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 751–52 (7th Cir. 2005) (finding that the district court's exclusion of expert testimony due to the nondisclosure of interview notes was too severe); *Finley*, 301 F.3d at 1018

---

[16] The other three cases cited by plaintiffs are similarly distinguishable. *United States v. Twenty-Nine Pre-Columbian & Colonial Artifacts from Peru*, 2015 WL 457860, at *2 (S.D. Fla. 2015) (party proposing the expert did not dispute the failure to timely disclose the expert witness and the failure to provide an expert report); *Capricorn Mgmt. Sys., Inc. v. Gov't Employees Ins. Co.*, 2019 WL 5694256, at *5 (E.D.N.Y. 2019) (finding that Rule 26(a)(2)(B) requirements were not met because the reports submitted with the expert disclosures were not "prepared and signed by the experts," but by plaintiff's counsel and failed to provide any substantive rationale for the opinion); *Whalen v. CSX Transportation, Inc.*, 2016 WL 5660381, at *7 (S.D.N.Y. 2016) (granting request to exclude expert testimony, with an opportunity to cure, for failure to comply with Rule 26(a)(2)(B) disclosure requirements, where two experts failed to provide a list of cases in which they had testified in the four years preceding their reports).

(total exclusion of expert testimony was disproportionate to the alleged harm, and noting that even assuming there was "an omission of some sort, it was not willfully done to gain a tactical advantage"). Such a remedy would also serve to prejudice a fundamental right to present witnesses in one's defense. *Id.* Further, without a finding of bad faith, "many courts are loathe to invoke the strong medicine of precluding expert testimony." *McClain v. Metabolife Int'l, Inc.*, 193 F. Supp. 2d 1252, 1259 (N.D. Ala. 2002) (holding that the deficiencies in the expert's reports were harmless and thus did not warrant preclusion of his testimony). Plaintiffs can show no bad faith here. Dr. Klin's discarding handwritten notes and raw scores was a product of his standard practice, and not of a deliberate intent to evade disclosure. Any suggestion by plaintiffs that Dr. Klin was selected due to his standard practice as opposed to his exemplary credentials is baseless. To strike Dr. Klin as an expert witness for the reasons cited by the plaintiffs would be an extreme sanction not supported by the law or the facts. Dr. Klin should be permitted to testify.

## II.    KEVIN MADURA

Dr. Craig Wright submitted an expert report from Kevin Madura, a cybersecurity specialist with a computer science background and more than 12 years of experience, including writing code for the Department of Defense and IBM. Mot. Ex. 4, ECF No. [509-4] ("Madura Rep."), ¶ 3. Mr. Madura's analysis relates to a single issue: whether Dave Kleiman had the requisite skills and experience to have written or significantly have contributed to the original Bitcoin software application released in 2009.[17] Madura Rep. sec. II. Mr. Madura opines that the development of the Bitcoin code "by Dave Kleiman would be highly inconsistent with his skills and experience." *Id.* ¶ 41.

Mr. Madura's specialized experience lies in computer security as it relates to identifying vulnerabilities in computer code and systems, cybersecurity, applied cryptography, cryptocurrencies, blockchain technology, and computer programming in numerous coding languages including C++, the programming language for the Bitcoin code. Madura Rep. ¶¶ 3-4, 6-8, 25. He previously served in the federal consulting practice at IBM, providing cybersecurity and cryptography services as a subject matter expert to military and civilian agencies alike, including

---

[17] Mr. Madura has also submitted a rebuttal report in this matter, however, his rebuttal opinion is not the subject of plaintiffs' motion and, as such, it, and Mr. Madura's experience related to that report is not addressed here.

the Department of Defense. *Id.* ¶ 6. Mr. Madura's opinion is based on his specialized knowledge, experience, and training. Moreover, his opinion is well-supported and based on a comprehensive review of numerous sources of information regarding Dave Kleiman's experience, knowledge, and skills, including but not limited to Dave Kleiman's resume, professional website, expert declaration, publications, and testimony from a former colleague. Madura Rep. sec. III; **Exhibit B**, (April 30, 2020 Dep. of Kevin Madura), 6:2-6, 7:20-24; 14:11-15, 47:18-22; 48:11-13; 58:3-13; 69:24-70:6; 80:4-9; 81:4-6.

Plaintiffs' argument with respect to Mr. Madura is twofold: (1) that he failed to comply with the disclosure requirements of Rule 26 because he did not disclose certain information (which information was identified as privileged, as it was in the scope of Mr. Madura serving as a *consulting expert*, not a *testifying expert*); and (2) that his opinion is speculative and unreliable. As discussed below, neither argument warrants the exclusion of Mr. Madura's expert opinion.

### A.   Mr. Madura's Affirmative Opinion is Reliable and Based on a Comprehensive Analysis of Available Information

Plaintiffs argue that Mr. Madura's testimony is unreliable because there is no "scientific examination" of his method and he had not "determined a minimum requirement for the contribution to the code." Mot. at 19. This is not the applicable standard. The applicable three-part inquiry is set forth in *Frazier* (*see supra* p. 3) and entails the "qualifications", "reliability" and "helpfulness" of an expert witness. *Frazier*, 387 F.3d at 1260. The qualification and reliability prongs are addressed below. Plaintiffs do not raise the helpfulness of Mr. Madura's testimony.

Mr. Madura is qualified to testify competently regarding the matters to be addressed, and accordingly, the first prong of *Frazier* is satisfied. When determining the admissibility of expert testimony based on experience as opposed to scientific process, as is the case with Mr. Madura's testimony, an expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G.*, 2013 WL 752697, at \*3. "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (*citing Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F.Supp.2d 1321, 1325 (S.D.Fla.2009)). Mr. Madura's extensive technical and specialized expertise, as documented in his report, demonstrates that he is more than minimally qualified. Madura Rep. ¶¶ 1-8. Indeed Mr. Madura testified as to his experience at IBM assessing the skill set and capabilities of other coders and determining and opining on their programming abilities. Madura Dep. 60:5-62:17. Mr. Madura's

knowledge, skill and experience qualify him to render an expert opinion about Dave Kleiman's skills and capabilities as it relates to the creation of Bitcoin and coding.

Mr. Madura's opinion further meets the reliability prong of *Frazier*. Where an expert proffers non-scientific, experience-based testimony, a court has flexibility in assessing the relevant factors relating to reliability. *Frazier*, 387 F.3d at 1262. This assessment "will depend . . . on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005). In rendering his opinion regarding Dave Kleiman's skills, experience and whether he could have authored the bitcoin code, Mr. Madura considered the following documents and analyzed that information based on his experience: (1) Dave Kleiman's available resume, professional certification, and supporting documents; (2) a memo prepared by a human resources director regarding Dave Kleiman; (3) an expert declaration submitted by Dave Kleiman; (4) the deposition transcript of one of his professional collaborators; (5) his professional biographies; (6) his publications; (7) information about Dave Kleiman's professional roles; and (8) the Bitcoin client application code and related materials. Madura Rep. ¶¶ 9-18; Madura Rep., Ex. 1–3. Plaintiffs argue that these materials are "paltry" and "insufficient" to determine Dave Kleiman's programming skills, because Mr. Madura did not review whether Dave Kleiman had ever attended a programming course, whether he had read programming books, or whether he was self-taught. Mot. at 18-19. Plaintiffs improperly suggest that Mr. Madura should have considered information that Ira Kleiman (a) admitted to destroying, (b) failed to produce, or (c) represented does not exist. *See* **Composite Exhibit C**, (Apr. 8, 2019 Dep. of Ira Kleiman), at 47-52 (destruction of papers), at 76-78 (destruction of drives); Ex. C, (Jan. 10, 2020 Dep. of Ira Kleiman), at 34 (failure to produce books and certificates); Ex. C, I. Kleiman RFA Resp. 4/1/20 (admission that degrees do not exist); Ex. C, I. Kleiman RFA Supp. Resp. 4/15/20 (same).

Plaintiffs' arguments are further refuted by record evidence or can otherwise be addressed during cross-examination or trial. Although plaintiffs contend that Mr. Madura did not review the coursework Dave Kleiman took in high school (Mot. at 19), Mr. Madura's report indicates he in fact did review the coursework listed on Mr. Kleiman's resume for institutions he attended from 1983 to 1992, but from which he never obtained a degree, and concluded that "none of the course work listed includes any[thing] relating to computer programming or C++ coding." Madura Rep. ¶ 38. Mr. Madura also considered the possibility that Dave Kleiman was self-taught in computer science and programming and testified that "it would be inconsistent with [his] assessment of the

20

complexity of the Bitcoin code as it stood." Madura Dep. 42:11-13. Plaintiffs' own statistics make it clear most programmers hold a bachelor's degree (which Dave Kleiman did not). Whether or not C++ programming language was available in high school (while Dave was in school) is something plaintiffs' counsel can address in cross-examination.[18]

Plaintiffs contend that Mr. Madura "cherry-picked" evidence because he considered the deposition testimony of Mr. Andreou, but "ignored statements" from Dr. Wright that they believe positively characterize Mr. Kleiman's coding ability. There is only *one* statement from Dr. Wright that plaintiffs contend contradicts Mr. Madura's opinion and that he ignored. Mot. at 19. In the statement quoted by plaintiffs, Dr. Wright is referring to *editing*, not coding. Dr. Wright's deposition testimony that "Dave was never a C-coder . . . and could not have coded Bitcoin" further undermines plaintiffs' characterization of Dr. Wright's statement about editing being about editing code. **Exhibit D**, (Mar. 16, 2020 Dep. of Dr. Craig Wright), 81:12; 121:7-16; 122:21-22. And, when shown the email, Mr. Madura did not read the statement as referring to coding either (even without being aware of Dr. Wright's testimony on it). Madura Dep. 95:12-97:4. Finally, it was appropriate for Mr. Madura to consider Mr. Andreou's testimony as he intimately knew Mr. Dave Kleiman's skills and work product after collaborating in the development of a software program together.[19]

Plaintiffs are free to cross examine Mr. Madura on all of these points but should not be permitted to exclude his testimony. *Quiet Tech.*, 326 F.3d at 1341 ("[a] district court's gatekeeper role ... is not intended to supplant the adversary system or the role of the jury. Vigorous cross-examination . . . [is] the traditional and appropriate means of attacking . . . admissible evidence."). Mr. Madura's expert opinion is based on his technical and specialized expertise, and the review of relevant documents sufficient to formulate his opinion "that the development of the Satoshi Code

---

[18] C++ programming language was not commercially available until 1985 making it very unlikely (if not impossible) that any high school courses on C++ existed in the early 1980s, when Dave Kleiman would have attended high school. It is also a far-fetched suggestion by plaintiffs that any programming skills learned by a high school student in the early 1980s would demonstrate or prove the type of skill set required to create the extremely complex code behind Bitcoin.

[19] As discussed in Mr. Madura's report, Mr. Andreou testified that he worked closely with Mr. Kleiman during their time at Securit-e-doc and noted that Mr. Kleiman "needed help many times [] creating a simple program." Madura Rep. ¶ 31; *see also* **Exhibit I**, (Dep. of Kimon Andreou), 9:19; 9:21-22; 16:21-22; 57:5-6, 10-11.

for the Bitcoin software by Dave Kleiman would be highly inconsistent with his skills and experience." Report ¶ 41.

**B.      Mr. Madura Disclosed All Information Considered in His *Testifying Expert Role*.**

AlixPartners, Mr. Madura's employer, was retained by Dr. Wright as its e-discovery vendor and for consulting expertise/litigation support as needed in January 2019. Mr. Madura began working on the case as a consultant/litigation support specialist in early 2019 (Madura Dep. 172:10-11), providing technical expertise and opinions "regarding various data." Madura Dep. 145:9-10. His first involvement as a potential *testifying* expert began in December 2019. Between December 2019 and April 2020, Mr. Madura allocated most of his time to writing the expert reports he has submitted in this matter. Madura Dep. 169:15-170:9; 171:13-25. Unequivocally, Mr. Madura testified that his work as a consultant did not in any way relate to "the drafting of [his] report." Madura Dep. *Id.* 172:16-22. Moreover, Mr. Madura has clearly indicated the materials listed in his report as those he considered and relate to his opinion. *Id.* 148:7-10 (Q. So let me -- the materials considered list, you only identified documents that related to your opinion? A. That's right.). Mr. Madura has met the disclosure requirements of Rule 26, as he is not required to disclose materials that uniquely relate to his role as a consultant, and exclusion of his testimony would be unwarranted.

### 1.      The Disclosure Requirements of Rule 26 Are Met

Rule 26(a)(2)(B) requires a complete statement of all opinions to be expressed and the basis and reasons therefor, along with the data or other information considered by the witness in forming the opinions. *Prieto v. Malgor*, 361 F.3d 1313, 1318 (11th Cir. 2004). In connection with Mr. Madura's role as a testifying expert, the disclosure requirements of Rule 26(a)(2)(B) were met because his report is sufficiently detailed and complete. He further identifies, as required, the materials which he considered and relied upon in forming his opinions. Madura Rep. secs. III, IV. In fact, during his deposition, counsel for plaintiffs questioned Mr. Madura at length regarding the specifics of the documents he relied on and considered. Madura Dep. 6:2-6, 7:20-24; 14:11-15; 47:18-22; 48:11-13; 58:3-13; 69:24-70:6; 80:4-9; 81:4-6. Accordingly, plaintiffs' argument that Mr. Madura failed to disclose information relevant to his opinion is without merit.

> 2. *The Dual-Hat Doctrine Does Not Dictate Disclosure of Information Uniquely Considered by Mr. Madura in His Role as a Consulting Expert*

Courts are tasked with determining Rule 26 disclosure standards for dual experts that serve as both non-testifying consultants and testifying experts. Courts have held that a single expert may serve in both roles and "materials generated or considered *uniquely* in the expert's role as a consultant" are not subject to disclosure. *Sara Lee Corp. v. Kraft Foods Inc.*, 273 F.R.D 416, 419-20 (N.D. Ill. 2011) (internal citations omitted). Ultimately, the court must determine whether "the information *considered* for consulting purposes was [] also *considered* pursuant to the expert's testifying function." *Vision I Homeowners Ass'n, Inc. v. Aspen Spec. Ins. Co.*, 2009 WL 10667552, at *2 (S.D. Fla 2009) (emphasis added) (citing *In re Puig*, 398 B.R. 69, 72 (Bankr. S.D. Fla. 2008)). "[A] court need not compel disclosure of materials an expert considered in his consultative capacity . . . that have no relation to the expert's role as [a testifying] expert." *Monsanto Co. v. Aventis Cropscience, N.V.*, 214 F.R.D. 545, 547 (E.D. Miss. 2002).

Where documents "reviewed or generated by [an expert are] uniquely in his role as consultant or [] the [d]ocuments have no relation to the subject matter of [his] report," disclosure is not warranted. *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, 2019 WL 6896299, at *4 (S.D. Fla. 2019). In *Ohio State Troopers Association, Inc.* at issue was non-disclosure of certain documents related to testing work where the party offering the expert did not raise any argument that those documents were unrelated to the subject matter of the report. By contrast, here, Mr. Madura disclosed all documents related to the subject matter of his report (Madura Dep. 148:7-10), and there is no ambiguity as to the delineation of Mr. Madura's role as a testifying expert (on the subject of Dave Kleiman's skill and experience) and the worked performed as a consultant. *See e.g.*, Madura Dep. 172:16-24 (In response to an inquiry as to whether his work performed as a consultant in any way related to his testimony as an expert, Mr. Madura unequivocally denied it stating "[n]ot as it pertains to the drafting of the report."); Madura Dep. 173:21-174:10 (When asked if any of the information he reviewed as a consultant informed his understanding of this lawsuit, Mr. Madura testified that he could not "pinpoint a specific instance" where his work as a consultant influenced his understanding as an expert witness.);.

During Mr. Madura's deposition, the parties had extensive good-faith exchanges on the record to determine the boundaries of privilege as to Mr. Madura's consulting work. *See, e.g.*,

23

Madura Dep. 188-94.[20] After the good faith exchanges during which Dr. Wright's counsel cited to some of the cases discussed above, the parties agreed the witness would testify as to information "to the extent it relates or would have intentionally informed his opinions as they relate to his expert testimony." Madura Dep. 187:23-188:8. In their Motion, plaintiffs cite to nine instances where the witness was instructed not to answer counsel's overly broad questions that invaded privilege and were outside the scope of Mr. Madura's expert work[21]; *eight* of those instances were *before* the parties came to this agreement. *See, e.g.,* Madura Dep. 189:2-190:6, 199:3-6. Plaintiffs had the opportunity to revisit any and all questions that were previously objected to, and in fact were encouraged to do so by Dr. Wright's counsel. They chose not to.

Moreover, several of plaintiffs' listed deposition questions (Mot. at 16-17) were either actually answered during deposition or unrelated to Mr. Madura's opinion regarding Dave Kleiman's coding abilities and experience. Mr. Madura testified as to the general topics of his consulting work (145:9-10), his review of evidence related to Dave Kleiman's involvement in the creation of Bitcoin (183:20-24), his review of evidence related to Dave Kleiman's ownership of Bitcoin (185:20-25), his review of Dave Kleiman's devices (186:14-16). Questions regarding Dr. Wright's involvement in the creation of Bitcoin, Dr. Wright's emails generally,[22] and Dr. Wright's programming skills do not relate to Mr. Madura's opinion, the scope of which is narrow and specific -- Dave Kleiman's abilities, Dr, Wright's. Privilege was rightfully asserted for information relating uniquely to Mr. Madura's role as a consulting expert, for which Rule 26 does not dictate disclosure and specifically protects.

---

[20] Plaintiffs' counsel is seeking to impugn the integrity of defense counsel. That effort is without merit. Defense counsel's attempt to provide an alternate means to arrive at the answer without disclosure of privileged information demonstrates the ethical manner in which this particular situation was handled. It is acceptable and appropriate for counsel to protect against unnecessary disclosure of potentially privileged information. Indeed, that practice was employed by counsel for both parties throughout the depositions in this case.

[21] *See* Madura Dep. 174:11-19; 178:8-17; 186:23-187:7; 199:20-200:12.

[22] Mr. Madura testified he did not review the sole email from Dr. Wright plaintiffs presented during deposition (Madura Dep. 91:17-19) and stated that he did not recall reviewing emails from Dr. Wright in the drafting of his reports (Madura Dep. 184:17-19).

       3.    *Exclusion of Mr. Madura's Expert Testimony is Not Warranted by the Facts and Circumstances Here*

The cases relied on by the plaintiffs in support of the proposition that Mr. Madura's testimony should be excluded are inapposite. Indeed, none of plaintiffs' cases in support of exclusion involve the dual-hat issue. *See Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1379 (11th Cir. 2013) (expert opinion *at trial* stricken because outside the scope of the expert's report). *Davis v. R.J. Reynolds Tobacco Co*., 2014 WL 12621597, at *2–3 (M.D. Fla. 2014) (Rule 37 applied to preclude expert's testimony regarding an issue that the expert inadvertently omitted from his report, did not disclose during his deposition, and did not provide a supplemental report). *Calhoune v. Ford Motor Co.*, 2018 WL 7287871, at *1 (S.D. Fla. 2018) (exclusion of expert whose opinions were conclusory and not linked to data or the case facts).*Id*.

Here, the requirements of Rule 37(c)(1) are not met. If this Court finds that there was, in fact a failure to disclose, sanctions are not warranted if the failure is "substantially justified" or "harmless." *Zanakis*, 2019 WL 2215908, at *4. "Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. . . . The proponent's position must have a reasonable basis in law and fact. Failing to comply with Rule 26 is 'harmless' when 'there is no prejudice to the opposing party.'" *In re Denture*, 2012 WL 5199597, at *5. There was a substantial justification for the non-disclosure given the information sought by the plaintiffs was: (1) not considered by Mr. Madura in rendering his expert opinion; (2) colorably privileged, at a minimum; and (3) not subject to Rule 26 disclosure. *See generally Adelman v. Boy Scouts of Am.*, 276 F.R.D. 681 (S.D. Fla. 2011) (discussing whether counsel was substantially justified in asserting privilege and relevance objections). The nondisclosure was further harmless because the assertion of privilege was not a deliberate or fraudulent attempt to gain an advantage and the assertion was known to opposing counsel, who could have addressed the issue after deposition with defense counsel, or with the Court in a motion to compel and re-open the deposition.

Moreover, without a finding of bad faith, "courts are loathe to invoke the strong medicine of precluding expert testimony." *McClain*, 193 F. Supp. 2d at 1259. Here, Dr. Wright's counsel acted in the utmost good faith during the deposition of Mr. Madura, and as demonstrated in counsel's extensive exchanges during Mr. Madura's deposition, every effort was made so that plaintiffs' counsel could get all the answers they were entitled to without crossing the boundaries

of privilege for consulting experts. Madura Dep. 188-194.[23] Indeed, it was Dr. Wright's counsel who suggested a way to move forward and suggested that counsel re-ask any questions based on the parties' ultimate agreement. Excluding Mr. Madura's testimony is a remedy that is disproportionate to the alleged disclosure violation, particularly since plaintiffs cannot make a showing of bad faith. *See Finley*, 301 F.3d at 1018. Accordingly, Mr. Madura should be permitted to testify.

## III.   FRANK NORWITCH

Dr. Wright submits three expert reports from the well-regarded forensic document expert, F. Harley Norwitch, who received specialized training on handwriting authentication by the Federal Bureau of Investigation, United States Secret Service, United States Postal Service Laboratory, and the Florida Department of Law Enforcement, among others. *See* Norwitch Dec. 2019 Rep. App. A-1 [Mot. Ex. 10]. Mr. Norwitch has over 40 years of experience in forensic document examination. In fact, Mr. Norwitch's expert reports and testimony have been admitted in several cases. *See, e.g.*, *Rubinstein v. Keshet Inter Vivos Tr.*, 2018 WL 6446575, at *5 (S.D. Fla. 2018); *Smith v. Bank of America, N.A.*, 2014 WL 12617777, at *1 (M.D. Fla. 2014). Despite Mr. Norwitch's exemplary qualifications and experience,[24] plaintiffs argue that his expert reports lack substance. Plaintiffs contend that a proposed handwriting expert's report must provide an elaborate, verbose "explanation as to how he reached his conclusions." Mot. at 34. For the reasons demonstrated below, Mr. Norwitch's expert reports do just that, perhaps just more succinctly than

---

[23] Counsel had an extensive discussion on the record regarding the caselaw on dual-hat experts, specifically *Monsanto Co. v. Aventis Cropscience, N.V.*, 214 F.R.D. at 545, the delineation of privileged information, and how objections would be made. *See* Madura Dep. 193:5-7. Plaintiffs' counsel agreed to go back and ask any questions regarding David Kleiman and Mr. Antonopoulous that he needed to address: "MR. ROCHE:  Questions I have asked about Dave Kleiman, I will go back and ask those. With respect to questions related to Mr. Antonopoulos, I will go back and ask him those questions." Madura Dep. 192:8-13. The parties agreed defense counsel would assert privilege over information solely involving his consultation work, but where there was an ambiguity as to the relationship between the information considered in both roles, defense counsel would allow the witness to answer.

[24] Plaintiffs *do not* challenge Mr. Norwitch's qualifications to provide an expert opinion on handwriting authentication.

plaintiffs would like.[25] Mot. Ex. 10, ECF No. [509-10] ("Norwitch Dec. 2019 Rep."); Mot. Ex. 11, ECF No. [509-11] at 35-72 ("Norwitch Mar. 2020 Rep."); Mot. Ex. 12, ECF No. [509-12] ("Norwitch May 2020 Rep.").

### A.    Mr. Norwitch's Report and Opinions Meet the Requirements of Rule 702

Mr. Norwitch's concise expert reports are properly admissible under Federal Rule of Evidence 702 for the following reasons. Each of Mr. Norwitch's reports lists the evidence that he considered in preparing the report.[26] The expert reports also explain the protocol (or methodology) that Mr. Norwitch used to analyze each of the questioned documents, which plaintiffs acknowledge. Mot. at 28. Further, Mr. Norwitch provided succinct, yet detailed, findings of each of the questioned signatures. The expert reports also include a signature comparison chart and attached as exhibits the documents from which the signatures were obtained.

### 1.    The Norwitch Reports Explain the Methodology Used to Analyze the Questioned Signatures

Plaintiffs challenge the sufficiency of Mr. Norwitch's expert reports under Federal Rule of Evidence 702. Interpreting this rule, the Supreme Court stated that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one," and that Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 594.

Plaintiffs challenge the methodology underlying Mr. Norwitch's opinions. They argue that Mr. Norwitch provided "no explanation as to how he reached his conclusions." Mot. at 34. This argument is meritless. Plaintiffs rely primarily on three district court rulings from Georgia to support their argument. The primary holding of these cases, however, is that the experts were not qualified to provide expert opinions on handwriting analysis. *Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373, 1379 (M.D. Ga. 2006) (finding that there was no evidence that the proposed expert "authored an authoritative text in the field, completed an extensive document examination training program with the United States Army, or taught forensic document examination in a

---

[25] Mr. Norwitch's expert reports merely compare and examine the authenticity of certain signatures within documents. Nothing more. Plaintiffs' attempt to suggest otherwise misconstrues the express scope of his opinions. Norwitch Dec. 2019 Rep. at 2 (identifying the scope of the opinion is to "ascertain, if possible, the authenticity of the questioned" signatures).

[26] *See* Norwitch Rep. Dec. 2019, ECF No. [509-10] at 1; Norwitch Rep. Mar. 2020, ECF No. [509-11, p. 35] at 1-2; Norwitch Rep. May 2020, ECF No. [509-12] at 1.

recognized program for that discipline"); *Am. Gen. Life & Accident Ins. Co. v. Ward*, 530 F. Supp. 2d 1306, 1313 (N.D. Ga. 2008) (There is "no evidence that [the expert] has ever taken a certification examination or a proficiency test. Neither is there any evidence that [the expert] received training through the 'guild-type' apprenticeship process, by which supervised trainees typically study and perfect methods of document examination among others."); *Agri-AFC, LLC v. Everidge*, 2019 WL 385421, at *15 (M.D. Ga. 2019) (excluding expert based on inadequate qualifications). That is not the case here. Mr. Norwitch has been an instructor and lecturer of document forensic courses in numerous organizations, including Fidelity National Law Group, FALI, CAPE Institute, the Federal Public Defender's Office, Broward Crime Laboratory, the South Miami Kendall Bar Association, and Palm Beach Community College, among others. Norwitch Dec. 2019 Rep. App. A-3–5. Mr. Norwitch has also published a chapter of a handwriting analysis textbook and several articles on questioned documents, and he is a member of two forensic document organizations. *Id.* at A-5.

Moreover, plaintiffs ignore binding precedent from the Eleventh Circuit, which has repeatedly held that handwriting expert reports and testimony were properly admissible under Rule 702. In *Paul*, it was noted that "[c]ourts have long received handwriting analysis testimony as admissible evidence." *Paul*, 175 F.3d at 910 n.2; *United States v. Velasquez*, 64 F.3d 844, 848–50 (handwriting expert witness admissible). Moreover, "[w]here, as here, the authenticity and authorship of a document is in question, the opinions of qualified forensic document examiners have frequently and consistently been permitted in state and federal courts, including courts in the Eleventh Circuit Court of Appeals and in Florida." *Salamaya v. MasTec Inc.*, 2012 WL 13137096, at *4 (M.D. Fla. 2012).

Apart from Mr. Norwitch's qualifications, his expert reports describe in detail the methodology that he used when analyzing the questioned signatures.[27] *E.g.* Norwitch Dec. 2019 Rep. at 2. Specifically, the reports state that "[h]andwriting and signatures examination and comparison procedures consist of examination of standard (known) material for consistency and normal variation, and then a side by side comparison of individual writing movements and inherent characteristics found in the questioned material with comparable writing movements found in the standard material, such as . . . form, height ratios, slant, proportions, skill level, movement, speed,

---

[27] Mr. Norwitch's methodology is described under a bold and underlined heading titled "**Forensic Document Examination Protocol.**"

pressure, and line quality . . . ." *Id.* In short, the "primary methodology employed by [Mr. Norwitch] was the . . . comparison method that is the hallmark of a document examiner's profession." *Salamaya*, 2012 WL 13137096, at *5.

Accordingly, plaintiffs' argument that Mr. Norwitch's expert reports fail to provide "any notice regarding the methodology" for Mr. Norwitch's opinions is disingenuous. Mot. at 26. In fact, plaintiffs' counsel deposed Mr. Norwitch *twice* and specifically questioned his methodologies, to which Mr. Norwitch testified that he employed a "side-by-side examination" of that questioned signature to the represented known samples of that person's signature and that the examination "consisted of examining each portion of the questioned signature with the corresponding portion of the signature." **Exhibit F**, (Jan. 3, 2020 Dep. of Frank Norwitch), 13:25-14:11. No special equipment, software, or tools were used. *Id.* at 15:11-12 ("Signature examination is almost always strictly a visual examination."). Mr. Norwitch further testified that "magnification would not have done an awful lot to help out the examination" because the matter involved "all machine copies" and not originals. *Id.* at 15:13-16.[28]

Accordingly, Mr. Norwitch used the reliable method of visual comparison as the basis of his opinions.

### 2.     *Mr. Norwitch's Expert Reports Provide Succinct, Detailed Findings*

Plaintiffs appear to take issue with the brevity of Mr. Norwitch's reports, while failing to appreciate the detail in Mr. Norwitch's findings and observations. In fact, plaintiffs quote directly from one of Mr. Norwitch's reports and complain that the observations and opinions are "cryptic generalities." Mot. at 23.  That is simply not the case. First, "submitted known signatures" of Dr. Wright and Nguyen are reviewed "to make sure there's consistency within them and there's not one that's been added that perhaps is not written by the same person." Ex. E, Norwitch May 2020 Dep., 6:2-6. The characteristics of each of the signatures are noted. Here, Dr. Wright's and Nguyen's signatures are categorized as "symbolic," which is "individualized to the point of not

---

[28] Plaintiffs' counsel also questioned Mr. Norwitch about the quality of the machine copies and whether there were any indications of manipulation or alteration of the signatures. Plaintiffs seemed well prepared for Mr. Norwitch's deposition based on his expert reports, negating their argument that the purported lack of notice of Mr. Norwitch's methodology has hindered their ability "to effectively rebut" the expert reports. Mot. at 31. Moreover, plaintiffs had a second bite at the apple and asked Mr. Norwitch additional questions about his methodology in his second deposition. **Exhibit E**, (May 1, 2020 Dep. of Frank Norwitch), 15:23-16:2.

containing readily recognized letters," and are "complex" and "written rapidly." Norwitch Mar. 2020 Rep. at 4 [Mot. Ex. 11, p. 35]. These details are not "cryptic generalities" as plaintiffs contend. Mot. at 23.

Continuing with the above example, Mr. Norwitch then visually examined the questioned signatures and compared it to the known signatures. As to the questioned Dr. Wright signatures, Mr. Norwitch notes that the questioned signatures do not "compare favorably" to the known signatures of Dr. Wright. Norwitch Mar. 2020 Rep. at 4 [Mot. Ex. 11, p. 35]. Mr. Norwitch specifically notes that the questioned signatures "bear[] some pictorial resemblance" to the known signatures of Dr. Wright, however, there are "significant and fundamental departures" from the known signatures. *Id.* To support his findings, Mr. Norwitch attaches a comparison chart which includes the questioned signatures and the known signatures. *Id.* at 6. Mr. Norwitch concludes the questioned signatures were "simulations and, as such, not genuine." *Id.* at 4. Thus, Mr. Norwitch's ultimate opinion is that the questioned signatures of Dr. Wright were not "genuine."[29]

Similar findings and opinions have been affirmed by the Eleventh, and other Circuits, to suffice under Rule 702 and *Daubert*. For example, in *Dale*, the government submitted a one-page expert report, wherein the expert opined that it was "the examiner's opinion that author of the known document probably wrote the questioned entries." *United States v. Dale*, Case No. 0:12-cr-60251-KMW at D.E. 30-1 (S.D. Fla. 2012), *aff'd* 618 F. App'x 494, 496 (11th Cir. 2015) (finding that handwriting analysis is a "scientifically reliable methodology"). The report in *Dale* provided fewer details than those submitted by Mr. Norwitch. Other circuits have similarly affirmed the admission of succinct handwriting expert reports.[30]

Accordingly, the Court should find that Mr. Norwitch's expert reports comply with the requirements of Rule 702 and *Daubert*, as numerous other courts have confirmed.

---

[29] Mr. Norwitch made clear in his deposition, that he was not opining on whether anyone was authorized to sign on Dr. Wright's behalf or whether Dr. Wright actually signed the questioned document. Depo. Trans. 14:19-22 (May 1, 2020).

[30] *United States v. Crisp*, 324 F.3d 261, 271 (4th Cir. 2003) (noting that handwriting experts have "a long history of admissibility in the courts of this country") (citing *Robinson v. Mandell*, 20 F. Cas. 1027 (D. Mass. 1868)); *United States v. Prime*, 431 F.3d 1147, 1154 (9th Cir. 2005); *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002); *United States v. Jolivet*, 224 F.3d 902, 906 (8th Cir. 2000). Moreover, the Federal Rules of Evidence provide that documents may be authenticated by expert comparison. *See* FED. R. EVID. 901(b)(3).

**B.      Mr. Norwitch's Expert Reports Satisfy Rule 26**

Having established that Mr. Norwitch's expert reports satisfy Federal Rule of Evidence 702, Plaintiffs' argument that the expert reports do not satisfy Rule 26, lacks credibility and should be rejected.

*1.      Mr. Norwitch Provides the "Basis and Reasons" for his Opinions*

Federal Rule of Civil Procedure 26(a)(2) requires that an expert's report include, among others, a "complete statement of all opinions the witness will express and the basis and reasons for them." FED. R. CIV. P. 26(a)(2)(B)(i). The Advisory Committee noted that the report should "disclose the data and other information considered by the expert and any exhibits or charts that summarize or support the expert's opinions." FED. R. CIV. P. 26, advisory committee's note to 1993 amendment. As demonstrated above, Mr. Norwitch provides ample basis and reasons for his opinions. Those reasons include, among others, that the questioned signature "displays total departure and fundamental dissimilarity" from the known signature, (Norwitch May 2020 Rep. at 3), and that the questioned signature "fits comfortably within the parameters of individual variation displayed in the standard material and displays the same individual characteristics present in those signatures. Norwitch Mar. 2020 Rep. at 3 [Mot. Ex. 11, p. 35]; Norwitch Dec. 2019 Rep. at 3. Accordingly, plaintiffs cannot contend that they would be "surprised" by Mr. Norwitch's testimony at trial.

Plaintiffs cite no case law for the proposition that they would be surprised by the testimony of a handwriting expert, who merely relies on his extensive training and visual comparison to make an assessment. This is not complex scientific analysis requiring complicated testing procedures. As Mr. Norwitch testified, his method consisted of visually "examining each portion of the questioned signature with the corresponding portion of the signature." Frank Norwitch Jan. 2020 Dep. 13:25-14:11.[31] Simply put, Mr. Norwitch's expert reports satisfy all the requirements of Rule

---

[31] Plaintiffs' reliance on *Aponte v. Royal Caribbean Cruises, Ltd.*, 2013 WL 12214331, at *2 (S.D. Ga. 2013) and *Rinker v. Carnival Corp.*, 2011 WL 6370062, at *1 (S.D. Fla. 2011) miss the mark. Mot. at 25-26. Those cases involved a medical expert report on medical treatment, which necessarily required in depth examination of a patient's medical history, physical examinations, testing and test results. Those kinds of issues are not present in handwriting analysis. In fact, the only cases that plaintiffs cite in support their Rule 26 arguments involve types of medical reports or economic damages reports, all of which are not germane here.

26. *Boomj.com v. Pursglove*, 2011 WL 2174966, at *2 (D. Nev. 2011) (finding that handwriting expert's concise explanation of his analysis "plainly satisfies" Rule 26(a)(2)(B)).

> 2.   *Plaintiffs' Request for Sanctions is Without Basis*

Even if the Court were to find that Dr. Wright did not comply with Rule 26, Rule 37 sanctions are unwarranted because there is no demonstrable harm to the plaintiffs. *Zanakis*, 2019 WL 2215908, at *4. Plaintiffs argue that they are unduly harmed because their "ability to effectively rebut the Report has been completely foreclosed . . . ." Mot. at 31. First, plaintiffs could have sought to engage a rebuttal expert on the handwriting analysis but have chosen not to. Second, as demonstrated above, plaintiffs have more than adequate notice of Mr. Norwitch's expert opinions, their bases and methodologies. Plaintiffs have had the opportunity to depose Mr. Norwitch more than once regarding his opinions and explore his methodology and conclusions. At bottom, Mr. Norwitch could only opine on whether a questioned signature was genuine after a visual comparison to known signatures. Nothing more. Thus, the "processes [Mr. Norwitch] chose to employ and how []he carried out the tests are a matter of [his] professional discretion, but may certainly be explored on cross-examination." *Salamaya*, 2012 WL 13137096, at *6. Plaintiffs' request for sanctions is unsupported by the record and applicable law, and Mr. Norwitch should be permitted to testify.

## IV.   DR. STEWART MACINTYRE

Dr. MacIntyre is a licensed medical doctor in Michigan (1968) and Florida (1974). Presently, he serves as the Chairman of the Infection Control Committee at Mercy Hospital. He has been certified by the American Board of Internal Medicine in Internal Medicine and in the subspecialty of Infectious Diseases. In addition to summarizing the voluminous medical records (totaling over 1,000 pages), Dr. MacIntyre will opine on Dave Kleiman's medical conditions (relating to infectious disease) and the resulting impediments to his physical mobility, independence, and ability to perform complex tasks. Mot. Ex. 13, ECF No. [509-13] ("Dr. MacIntyre Dec. 2019 Rep."); Mot. Ex. 14, ECF No. [509-14] ("Dr. MacIntyre Apr. 2020 Rep."). Dr. MacIntyre is *not* offering a stand-alone opinion as to Dave Kleiman's mental state. **Exhibit G** (Jan. 10, 2020 Dep. of Dr. MacIntyre), 32:14-16. He is also *not* opining on the issue the plaintiffs claim he is, *i.e.* whether Dave Kleiman was incapable of helping to create Bitcoin. Mot. at 36; *E.g.* **Exhibit H** (Apr. 20, 2020 Dep. of Dr. Steward MacIntyre), 53:16-24.

### A.    Dr. MacIntyre's Testimony Regarding Dave Kleiman's Medical History Is Relevant

The question of relevance has been recognized by the Supreme Court as one of "fit." *Daubert*, 509 U.S. at 591, citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985). Therefore, the Court must determine whether Dr. MacIntyre's proposed testimony "fits" in this case. To fit, the proposed expert testimony must be "relevant to the task at hand, ... [in] that it logically advances a material aspect of the proposing party's case." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (internal quotations omitted).  The standard for fit is "not that high," although it is "higher than bare relevance."  *Cotromano v. United Techs. Corp.*, 2018 WL 2047468, at \*14 (S.D. Fla. May 2, 2018) (internal citation omitted).

Dr. MacIntyre's reports and testimony regarding Dave Kleiman's medical history "fits" this case. Plaintiffs argue that "Dave Kleiman's physical health is irrelevant because nothing about Dave's physical health is at issue in this case" and "opinions about Dave's mental state and how it may have affected his capacity to work beginning in 2010 are irrelevant" because the purported partnership was formed before Dave Kleiman's hospitalization. Mot. at 36. These are blanket statements that contain inaccuracies. *First,* plaintiffs' claims are neither squarely limited to facts pre-dating 2010, nor are they limited to the formation of a purported joint business relationship prior to that year. The allegations on which plaintiffs premise their claims, including the claims asserted by W&K Info Defense Research LLC, implicate a timeframe that spans into 2013, and the death of Dave Kleiman. Second Amended Complaint [D.E. 83], ¶ 94.[32] *Second*, Dr. MacIntyre is not offering a stand-alone opinion on Dave Kleiman's mental health or intellectual capacity; he is not a psychologist. He *is*, however, offering an opinion on the *inescapable* consequences and burdens of the severe (physical) medical conditions[33] and related issues plaguing Dave Kleiman,[34]

---

[32] As "partners" from c. 2008-2011, and then in some form of "co-owners/members" of W&K from 2011-2013, Dave and Craig shared the private keys to the bitcoins they mined. Second Amended Complaint, ¶¶ 83, 94.

[33] Paraplegia; pressure ulcers; urinary bladder malfunction that required catheterization; bowel dysfunction that required manual stimulation; and multiple surgical procedures. Dr. MacIntyre Apr. 2020 Rep. ¶¶ 1-5.

[34] Dr. MacIntyre Jan. Dep. 32:10–12 (detailing some of Dave Kleiman's medications that might have affected his mental state); 44:23–25 (affirming that the Valium Dave took daily tended to cause sleepiness); 46:2–10 (stating that Dave received additional medications at varying times "that would also affect mental status"); 90:5–91:4 (noting that the bacteremia Dave suffered from

which includes impediment to a person's independence, mobility, and ability to function and work. An integral part of this analysis is opining on Dave Kleiman's prescribed medications. It is not a novel idea that certain prescription drugs affect "mental acuity."[35] Based on the records, his qualifications and experience, Dr. MacIntyre should be permitted to testify about these effects (*see* n.34). Further, this tangential aspect of Dr. MacIntyre's analysis does not, in and of itself, make it an impermissible opinion. *Third*, the genesis of Dave Kleiman's severe medical conditions was a 1995 motorcycle accident[36] that lead to paraplegia.[37] Given the time and scope of plaintiffs' intellectual property claims, the jury is entitled to understand the chronic physical conditions that dominated Dave Kleiman's day-to-day life, including the final prolonged hospitalization involving "multiple surgical procedures" and "other traumatic incidents." Dr. MacIntyre Apr. 2020 Rep. ¶ 5. Further, Dave Kleiman's medical condition was not a peripheral issue, it was an integral part of his life. To exclude Dr. MacIntyre's testimony will be to provide an incomplete account to the jury of substantial factors relevant to a fair determination of the issues in this case.

### B.     Dr. MacIntyre's Expert Testimony Meets the Requirements of *Daubert*

#### 1.     *Dr. MacIntyre's Reports*

Dr. MacIntyre submitted two reports, dated December 13, 2019 (Mot. Ex. 13) and April 8, 2020 (Mot. Ex. 14). The December 2019 report includes a summary and opinion of Dave Kleiman's medical records from the Miami Veterans' Administration Medical Center from 1995 to March 22, 2013. Dr. MacIntyre Dec. 2019 Rep. at 1. As indicated in this report, the records are in "typical Veterans' Administration format, with all entries in a given category listed in reverse chronological order for all admissions and outpatient services." *Id.* at 1. A list of the specific records reviewed is identified on page 1 of the first report. *Id.* at 1. The list is followed by Dr. MacIntyre's synopsis of Dave Kleiman's medical records which include a history of paraplegia

---

on several occasions "can cause various problems with mental status and varying from just difficulty concentrating, having fever with chills, to actual coma"); 91:24–93:2 (explaining how VA Hospital Disruptive Behavior Committees generally issue warnings, like the one Dave received, for behavior that is "abusive or destructive"); Dr. MacIntyre Apr. 2020 Rep. at 3 (explaining that Dave's lack of medicine prescriptions and outpatient care upon his "irregular discharge" would have led to uncontrolled infection as well as withdrawal symptoms such as fever, mental status changes, and possible seizures).

[35] Dr. MacIntyre Apr. 2020 Rep, ¶ 7.

[36] Second Amended Complaint, ¶ 43.

[37] Dr. MacIntyre Dec. 2019 Rep. at 1-2.

resulting from a 1995 motorcycle crash and two chronic infections, namely, osteomyelitis (caused in part by MRSA[38]) and urinary tract infections. *Id.* at 1-2.

The second report was provided to supplement the first report and includes additional analysis of Dave Kleiman's chronic medical conditions. Dr. MacIntyre Apr. 2020 Rep. at 2. In this report, Dr. MacIntyre discusses Dave Kleiman's "irregular discharge" from the Miami Veterans' Administration Medical Center in February 2013 and circumstances surrounding his death in April 2013. The second report also provides further medical insight into the effects of Dave Kleiman's physical conditions on day-to-day life, tasks, and activities. This is well within the scope of Dr. MacIntyre's experience and qualifications, and the records reviewed by him.

　　　2.　　*Dr. MacIntyre's Testimony Is Reliable Because It Is Based on His Background and Specialization as an Infectious Disease Specialist*

Dr. MacIntyre is an infectious disease specialist who is a veteran and served as the hospital epidemiologist for the Department of Veterans' Affairs Miami Medical Center from 1977 to 2003. He remains in practice to this day. Given his background and specialization, he is well qualified to offer an opinion on the specific medical conditions identified in Dave Kleiman's medical records.

Dr. MacIntyre's report and testimony are based upon his review of Dave Kleiman's medical records. This type of medical expert testimony has been accepted by courts as reliable and "grounded in the methods and procedures of science." *Geyer v. NCL (Bahamas) Ltd.*, 203 F. Supp. 3d 1212, 1217 (S.D. Fla. 2016) (internal citation omitted); *O'Brien v. NCL (Bahamas) Ltd.*, 2017 WL 10410455, at *4 (S.D. Fla. 2017) ("[t]he Court finds that Dr. Baker's opinion, applying his nearly forty years of experience in internal medicine and infectious diseases to plaintiff's medical records and plaintiff's deposition testimony, is reliable."). In *Geyer*, the court determined that the expert's testimony was admissible because it was based on his twenty-six years of experience as an orthopedic surgeon and his review of plaintiff's medical records. *Geyer*, 203 F. Supp. at 1217. Similarly, Dr. MacIntyre's testimony is admissible because it is based on his forty-eight years of experience in internal medicine and infectious diseases (Dr. MacIntyre Dep., 74:16-76:1), and his review of Dave Kleiman's medical records. Dr. MacIntyre Jan. Dep. 28:12-29:13.

---

[38] Methicillin-resistant Staphylococcus aureus (MRSA) infection

### 3.     *Dr. MacIntyre's Testimony Will Be Helpful to the Jury*

Expert testimony must assist the trier of fact to be admissible under Rule 702. FED. R. EVID. 702. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262 (citation omitted). "Expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." *Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999); *Gold v. Dalkon Shield Claimants Tr.,* 1998 WL 351456, at *3 (D. Conn. 1998) ("[e]xpert testimony is required when the factual content of the underlying issues is not found within the laypersons' common knowledge and experience.... Medical evidence relating to causes of injury to the human body is not normally considered to dwell within the common knowledge of a layperson."), *aff'd* 189 F.3d 460 (2d Cir. 1999). Dr. MacIntyre's testimony will help the jury understand the medical records as well as the significance and severity of Dave Kleiman's prolonged medical complications.

### C.     **Dr. MacIntyre's Report and Testimony Do Not Contradict the Record**

Plaintiffs argue that Dr. MacIntyre's testimony is contradicted by his own testimony and the records. This is not true. First, plaintiffs claim "any conclusion that Dave's mental state affected his ability to work is contradicted by both Dr. MacIntyre's testimony and the records." Mot. at 37. Plaintiffs point to three references in Dave Kleiman's medical records[39] where he self-reports doing non-descript work, and in fact Dr. MacIntyre acknowledges those references in his report. There is no contradiction here. It is plaintiffs who are confusing the issues by attempting to correlate a handful of references to "work" to Dave Kleiman's "ability to form a joint business relationship." Mot. at 37.  Specifically, plaintiffs state the following: "There is no basis to opine that Dave's mental condition in any way impacted his ability to form a joint business relationship

---

[39] Mot. Ex. 17 (Dr. MacIntyre Jan. Dep. at Ex. 4) ("Mr. Kleiman that he has been "busy" with work . . ."); Mot. Ex. 17 (Dr. MacIntyre Jan. Dep. at Ex. 5) ("[a]dditionally, patient has continued to participate in work related activities to stay occupied" and "he indicated that having a specific plan helps in his ability to cope with the boredom he experiences in the hospital"); Mot. Ex. 17 (Dr. MacIntyre Jan. Dep. at Ex. 6) ("Mr. Kleiman reported that he has been very productive in doing work regarding his business").

with Dr. Wright.[40] In fact, Dr. MacIntyre testified that 'from an infectious disease point of view, I don't see anything getting from – that would get in the way – [of Dave] using a computer' or a telephone, and that a determination of his mental acuity while doing so should be '[left] to a psychologist or psychiatrist.'" Further, the fact that Dave Kleiman used a computer or did some "work," as noted in three instances in the medical records, proves none of plaintiffs' points. As Dr. MacIntyre testifies in his deposition that there was no notation he saw in the medical records from medical staff regarding what Dave Kleiman was doing on his computer, and that "[h]e could have been playing games. I don't know." Dr. MacIntyre Jan. Dep. 93:19-95:5.

Second, plaintiffs assert that Dr. MacIntyre's statement that "the records demonstrate no in-person visitations by family members, friends, or co-workers, and that this 'important element of support was lacking'" is contradicted by the record. Mot. at 38. For this assertion, plaintiffs first cite to the testimony of Kimon Andreou, who stated that he visited almost every day during parts of Dave's hospitalization. Mot. at 38. However, Mr. Andreou also testified that when visiting the hospital, he would "just walk in" because "security was pretty lax there," and that he was not aware of a visitor log. Ex. I, Andreou Dep. 13:8-20. Certainly, the shortcomings in hospital security procedures and visitor logs cannot be attributed as a contradiction by Dr. MacIntyre. Plaintiffs additionally rely on a medical record dated May 25, 2011 which merely states, "[p]atient reports he has been receiving *support* from friends to deal with these stressors." Mot. Ex. 17 (MacIntyre Jan. Dep. Ex. 5). This also does not conflict with Dr. MacIntyre's assertion that he did not find mention of "*in person visits*" by family members, friends, or co-workers" in the medical records. Dr. MacIntyre Apr. 2020 Rep. at 2.[41] Accordingly, there is no basis for plaintiffs to assert a contradiction in Dr. MacIntyre's opinion or testimony and the evidentiary record. Further, even if such a contradiction existed, plaintiffs can certainly explore it on cross-examination at trial.

---

[40] Plaintiffs again seek to ignore that their own claims allege that Dave Kleiman actively developed intellectual property and mined bitcoin through W&K from 2011 through his death in April 2013. While Dr MacIntyre is not opining on Dave Kleiman's mental capacity, he will explain the medications that Dave Kleiman was on, and his medical procedures, during the relevant time period. Explanation of those medications is relevant with respect to Dr. Wright's argument that they affected Dave Kleiman's ability to actively develop intellectual property.

[41] There is one passing reference to "visitors" in plaintiffs' Motion, Exhibit 17. This does not in and of itself create a contradiction.

**D.      The Probative Value of the Testimony Outweighs Any Prejudice**

Plaintiffs argue that because certain portions of Dr. MacIntyre's report discuss Dave Kleiman's behavior while in the hospital, the circumstances surrounding his final discharge, and his death that his testimony should be stricken. Plaintiffs cite to three specific artifacts that they are motivated to keep out of the purview of the jury: (a) Dave Kleiman's "irregular discharge" from the MVAH where he left on a furlough and did not return to the hospital; (b) Dave Kleiman's autopsy report that marked the presence of cocaine metabolites in his system; and (c) a "letter of warning" from the hospital's Disruptive Behavior Committee. Mot. at 38-39.

Plaintiffs cite three cases which are not instructive on the specific issue raised by them. To support a claim that the above artifacts would be "irrelevant and markedly prejudicial," (Mot at. 39), plaintiffs first cite to *Travis v. State Farm Fire & Cas. Co.*, 2005 WL 8155520 (M.D. La. 2005), for the proposition that prejudice occurs if "juries were invited to consider extrinsic evidence that someone is a bad person." *Id.* at *4. The expert testimony in *Travis* was excluded due to a number of reasons, only *one of which* was related to the probative value of the evidence.[42] As such, *Travis* does not allow for any parallels to the medical record evidence in this case and does not support plaintiffs' position. Quite simply, there is no attempt here to portray Dave Kleiman in a bad light or as a bad person; his medical records present relevant and important evidence for this case, and the fact that they recite unfortunate events does not in and of itself create a prejudicial effect.

The other two cases cited by plaintiffs also do not support their position. In *United States v. Phaknikone*, 605 F.3d 1099 (11th Cir. 2010), the evidence in question was neither expert testimony nor did it relate in any way to the crime the defendant was convicted of. And, plaintiffs' citing to *Nobles v. Sushi Sake NMB, Inc.*, 2018 WL 3235534 (S.D. Fla. 2018) is not helpful, as the court's analysis for its decision to preclude all evidence of plaintiff's purported drug use from her workplace harassment and discrimination lawsuit is limited to one sentence: "The Court finds that

---

[42] In *Travis*, the expert used an auditing industry model called the "fraud triangle" to make broad assertions about the plaintiff having the "incentives or pressures to commit fraud" as well as the "attitudes, characteristics, or ethical values that would allow her to rationalize committing fraud." *Id.* at 1. Although the court found some limited merit to this testimony under *Daubert*, it concluded that some of the "fraud triangle" risk factors in this case were facts that seemed to have no purpose other than to show the plaintiff's propensity to commit fraud, and were thus inadmissible. *Travis*, 2005 WL 8155520, at *4.

any reference to the plaintiff's marijuana use is unduly prejudicial and its probative value is de minimis." *Nobles*, 2018 WL 3235534, at *2 (emphasis removed).

Here, the totality of Dr. MacIntyre's testimony goes to key considerations in this case. As discussed previously, the medical conditions plaguing Dave Kleiman were an integral part of his life; they were neither in passing, nor were they peripheral. Such conditions necessarily influenced his mobility, independence, and ability to perform complex tasks. To disallow this testimony would be to provide an incomplete account to the jury about Dave Kleiman, a central figure in this case.

Thus, the probative value of Dr. MacIntyre's testimony outweighs any prejudicial effect, and accordingly, he should be permitted to testify.

## **CONCLUSION**

For all of the foregoing good and sufficient reasons, Dr. Wright respectfully requests that the Court deny plaintiffs' Omnibus Motion to Strike Defense Experts.

Respectfully submitted,

RIVERO MESTRE LLP
*Attorneys for Dr. Craig Wright*
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: amcgovern@riveomestre.com
Email: zmarkoe@riveromestre.com
Secondary: receptionist@riveromestre.com

By: s/ Andres Rivero
ANDRES RIVERO
Florida Bar No. 613819
AMANDA MCGOVERN
Florida Bar No. 964263
ZAHARAH MARKOE
Florida Bar No. 504734

<u>**CERTIFICATE OF SERVICE**</u>

      I certify that on May 22, 2020, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record either by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

                                      /s/ Andres Rivero
                                      ANDRES RIVERO