# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


--------------------------------X

IRA KLEIMAN, as the personal        )

representative of the Estate of     )

David Kleiman, and W&K Info         )

Defense Research, LLC,              )

                                    )

              Plaintiffs,           )   CASE NO.:

                                    )

v.                                  )   9:18-cv-80176-BB/BR

                                    )

CRAIG WRIGHT,                       )

                                    )

              Defendant.            )

--------------------------------X


CONFIDENTIAL

REMOTE DEPOSITION OF AMI KLIN, PH.D.

Tuesday, April 21, 2020; 10:04 a.m. EST



Job No.:   572756

Pgs.   1 - 246, 263 - 400

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR,

CLR, RSA, Remote Counsel Reporter, LiveDeposition

Authorized Reporter

MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 24

1                Okay.  As of this invoice, the --

2    what we've marked as Exhibit 2, you had -- well,

3    let's go to the time sheet because I have some

4    questions about it.

5           A.    Please.

6           Q.    When I say "the time sheet," it's

7    Page 2 of the document.

8                And according to this, you didn't do

9    any work on April 3rd; is that correct?

10          A.    Nothing that I deemed to be billable.

11          Q.    Well, what did you do that you deemed

12   to not be billable?

13          A.    I recall that I were -- I was sent

14   materials by the law firm, and there was a -- a

15   transcript, and there also were a series of videos.

16   And those -- and those videos needed to be

17   downloaded and they needed to be stored in my

18   computer so that I could watch them subsequently.

19                But I did not think this would be a

20   billable hour.  This was basically just a technical

21   preparation for starting the work.

22          Q.    Right.  And I understand that, and I



1          A.    Okay.  So let's start with April 5th.

2          Q.    Yes, sir.

3          A.    Those three items -- they're all me.

4    Maybe I'll read each one and, in that way, it will

5    make it clear.

6               Review and analysis -- now I am on

7    April 6th.

8          Q.    Yes, Doctor.

9          A.    Review and analysis of deposition

10   transcript -- that is me.

11              Organization of analysis of deposition

12   transcript -- that is me.

13              ADI-R -- which stands for Autism

14   Diagnostic Interview-Revised -- interview and

15   clinical interview with mother and uncle -- and

16   uncle -- this is Celine Saulnier --

17         Q.    Okay.

18         A.    -- Review and analysis of video

19   deposition -- that's me.

20              ADOS-2 stands for Autism Diagnostic

21   Observation Schedule, Second Addition, Module 4.

22   That is me.



1    the pronouns.

2             Did I get that right?

3        A.    Yes.

4        Q.    How many times have you, in a forensic

5    setting, been asked to assess how an individual who

6    meets the criteria for autism spectrum disorder --

7    how that could impact their presentation in legal

8    proceedings, such as depositions and court

9    appearances?

10       A.    I would say that's a smaller number of

11   cases, probably between five and six of those adults

12   that I've mentioned to you.  But sometimes the

13   questions that I am asked are -- are similar.  I

14   need to evaluate a person's presentation in other

15   settings.  And to my mind, it is not very different.

16       Q.    Did you inquire of the Rivero Mestre

17   firm why they were asking you Question Number 2?

18       A.    They've indicated that to me.

19       Q.    And what did they tell you?

20       A.    That Dr. Wright's presentation is

21   unusual, and -- and they would like to better

22   understand why he presents himself in ways that are



Page 62

1    called Asperger Syndrome --

2         Q.    Okay.

3         A.    -- and in that particular book, I

4    address many issues regarding presentation, clinical

5    presentation, treatments, challenges, things of that

6    nature.

7         Q.    Which book is that, just so we have it

8    for the record?

9         A.    At the -- the very last item on

10   Page 25.

11        Q.    With McPartland?

12        A.    McPartland, Klin and Volkmar, Asperger

13   Syndrome, Second Edition.

14        Q.    Does that book have information which

15   discusses, specifically, court or legal proceedings?

16             MS. MCGOVERN:  Objection to the form

17        of the question.

18             THE WITNESS:  You know, I can't

19        recall if the discussions are specifically in

20        that domain, but I believe there are some

21        discussions that encompass that setting, too.

22             The presentation of individuals who



Page 63

1  have an autism spectrum disorder and intact

2  or high intellect in -- in legal -- not only

3  legal proceedings but legal challenges has

4  been of subject of great interest in the

5  past 10 years or so.  And I have not been

6  involved directly in writing some of that

7  information because my scientific career is

8  focused elsewhere, but I have been able to

9  support colleagues who wrote books on those

10  subjects.

11    And, therefore, this is a domain

12  that is -- that is emerging.  And if I may

13  say, it is unfortunate that most of that

14  knowledge is enshrined in legal proceedings.

15  I wish that some of that information

16  actually came through, in a distilled form,

17  of course, to inform the public more

18  generally.

19    BY MR. BRENNER:

20  Q.    Have you ever been qualified as an

21 expert by any Court to talk about how an individual

22 who meets the criteria for autism spectrum



Page 69

1          BY MR. BRENNER:

2          Q.     Right.

3          A.     -- in which you're making that

4     statement.

5                 From my statement, I do assess

6     reliability and validity of informants who provide

7     me information that I am processing and integrating

8     into my judgments.

9          Q.     You did the same thing here, right, in

10    this case -- or did you?

11         A.     We certainly assessed collectively,

12    Dr. Saulnier and I -- we certainly -- it is part of

13    what we do every day when we conduct an assessment,

14    that we evaluate the validity and the reliability,

15    as well as the vantage point of who is providing you

16    with information.

17                And if there is a concern about that,

18    then one seeks additional sources; one looks for

19    consistencies; one will -- looks for vantage points.

20    Some people know somebody better at certain stages

21    of one's life, things of that nature -- so that we

22    can create the most robust set of observations about



Page 70

1    an individual -- an individual's life history as

2    well as current presentation.

3         Q.   So let's see what you did here and see

4    how that worked in this case.

5              Okay?

6         A.   Yes.

7         Q.   You interviewed no one outside of

8    Dr. Wright's immediate family, correct?

9              MS. MCGOVERN:  Object to the form.

10             I'm sorry.  You haven't defined

11        "immediate family," so I'm going to object

12        to the form of the question.

13             BY MR. BRENNER:

14        Q.   Okay.  Doctor, let's do this:  Let's go

15   through every one -- every one and everything you

16   reviewed and see the context for each.

17             Okay?

18        A.   By all means.

19        Q.   Okay.

20             MS. MCGOVERN:  Andrew, can I -- can I

21        ask you a quick question before you go into

22        this line of questioning?



Page 75

1            Okay?

2       A.    Please.

3       Q.    The only interview you did -- or

4   interviews you did, because there may have been more

5   than one, was with Dr. Wright, correct?

6       A.    Correct.

7       Q.    Dr. Saulnier interviewed -- strike

8   that.

9            You would agree with -- you would

10   agree with the idea that if you were doing an

11   assessment, it would be a less-than-complete

12   picture if the only person you talked to was

13   Dr. Wright; is that fair?

14            MS. MCGOVERN:  Object to the form of

15       the question.

16            When you say "you," who are you

17       referring to?

18            BY MR. BRENNER:

19       Q.    You, Dr. Klin.

20       A.    We conducted this evaluation very much

21   like we would conduct a gold standard evaluation of

22   individuals with autism spectrum disorder.  We play



Page 76

1    different roles in that evaluation; we combine

2    information.

3              And in this case, I basically integrate

4    all of the information that is generated whereas

5    the -- the -- the different interviews and things of

6    that nature.  But the form of the evaluation was

7    very much the gold standard that we utilize for, in

8    fact, both clinical and research assessments.

9         Q.   When you first spoke with Dr. Wright,

10   did you introduce yourself?

11        A.   Yes, indeed.

12        Q.   And who did you tell him you were?

13        A.   I sent him an e-mail.

14        Q.   You did?

15        A.   Yes, I did.

16        Q.   Did you provide that e-mail to me?

17        A.   No.  I'm happy to provide it to you.

18        Q.   Okay.  What did it say?  I would like

19   you to provide it, but you can do that after.

20             Tell me what it said.

21        A.   Hmm.  I may be able to even read it for

22   you --



Page 104

1          Q.    Okay.  In any event, who told you or

2     Dr. Saulnier to reach out to Dr. Wright's mother,

3     Dr. Wright's uncle, Dr. Wright's sister and

4     Dr. Wright's wife?

5                MS. MCGOVERN:  Object to the form of

6          the question.

7                THE WITNESS:  When you conduct a

8          gold standard evaluation of individuals with

9          autism, there are some things that are really

10         critical.  And those elements needed to -- I

11         needed to have those elements in my

12         gold standard evaluation.

13               And those evaluations --

14         they -- they depend on the direct

15         observation and they -- and they depend on

16         information that is provided by other

17         individuals.

18               In a gold standard evaluation, you

19         will have, typically, the loved ones

20         providing the information because they're

21         supposed to know best those individuals.

22               In the most common situation, we



1       have a child, and we interview the mother or

2       the father or both.  Sometimes when you are

3       evaluating an adult, the problem that you

4       have is that different loved ones may

5       actually provide information that fill in

6       gaps that one, alone, cannot do by

7       themselves.

8              So after Dr. Saulnier had an

9       interview with Dr. Wright's mother, she told

10      me that she felt that we needed more

11      information from the standpoint of a peer,

12      somebody who could have observed Dr. Wright

13      in a school setting or in -- in a setting

14      with other children.

15             And -- and that's the reason why I

16      immediately requested the attorneys to make

17      the contact with the younger sister, because

18      we wanted to create as robust a body of

19      observations as we could.

20             And that was the -- that's -- that

21      is a chronology that I remember well

22      because, initially, we didn't think about



1     possibility of interviewing the younger

2     sister.  But on the basis of the first

3     interview, we felt that we needed more.

4              BY MR. BRENNER:

5          Q.    How did you get to the uncle?

6          A.    Oh.  The uncle -- we -- one of the very

7     first questions that I posed to the attorneys was as

8     follows:  When you conduct a gold standard

9     evaluation of a person with autism, you need

10    developmental history; you need history over a

11    period of time.  That is quite important.  And it is

12    not that we cannot conduct an evaluation without

13    that, but one feels much more comfortable having

14    that information.

15              And I told them straight off the bat

16    that I wanted to get as robust a body of

17    information, of observations about his developmental

18    history and subsequent life.  And, therefore, if

19    there were other adults who were privy to his life,

20    I would like to engage them.

21              And I was told that -- that mother was

22    very much alive and -- and we could contact her, and



Page 107

1    that there was also a paternal uncle.  And that

2    person may be able to contribute some because he

3    spent quite a bit of time over the course of years

4    with Dr. Wright.

5         Q.    Did the attorneys tell you that

6    Dr. Wright was previously married?

7         A.    I know that Dr. Wright was previously

8    married because I read transcripts of depositions.

9    But needless to say, the very first section of the

10   Autism Diagnostic Interview-Revised is a description

11   of the family.  It is very important, when you

12   conduct that procedure, that you get a sense of

13   the -- of the family setting, how many siblings, who

14   are important people in that individual's life.

15              And so Dr. Saulnier, for sure, reported

16   to me that Dr. Wright had been married before.

17        Q.    Did you or Dr. Saulnier try to contact

18   Dr. Wright's ex-wife?

19        A.    No.

20        Q.    Do you agree that she was someone that

21   spent some time with him as an adult?

22        A.    By all means.



Page 123

1    talk to Ms. McGovern before Friday the 17th?

2         A.    Yes, I did.

3         Q.    Okay.  And what did you tell her about

4    the existence or nonexistence of what ultimately was

5    produced on Saturday?

6         A.    I told her that in my work as a

7    clinical expert witness in legal cases, that

8    everything that I do towards writing a -- my opinion

9    in my report -- these are materials that contribute

10   to my thinking, but I take them in the totality in

11   order to write the final report.  And that -- it's

12   been my practice for now since six to eight years

13   that I don't keep handwritten notes, I don't keep --

14   I don't keep any of those things once I have an

15   opportunity to complete my assignment, which is my

16   final report.

17        Q.    Did you, in fact, take handwritten

18   notes when you spoke with Dr. Wright?

19        A.    Oh, I took copious notes, and I assume

20   that -- yes, absolutely.

21        Q.    And you -- you -- after you were

22   completing your report, you destroyed those notes?



1          A.    Yes, I destroy all of my stickies, all

2     my copious notes.  Once I have had an opportunity to

3     create an integration of all of the information, my

4     goal is to use the totality of that information to

5     generate my opinions, which are, again, written as

6     the report.  So I see that as my final work product.

7          Q.    And Dr. Saulnier -- do you know if she

8     took notes during her conversations with the mom,

9     the sister, the uncle and the wife?

10         A.    Oh, she -- she did.  And she provided

11    me with all of those notes.

12         Q.    Were those notes handwritten?

13         A.    Yes, they were handwritten on the forms

14    that were completed.  That's usually how you perform

15    those procedures.

16              As you -- as you probably checked,

17    the -- the -- the binder that I sent you, in which

18    there are copies of all of the instruments that we

19    use, there is plenty of room there to -- to write.

20    And so we write quite a bit.  So --

21         Q.    But do you know -- go ahead.

22         A.    -- and she handed in all those



Page 125

1    materials to me.

2              And -- and so once I integrated all of

3    the information and I was able to write, I guess, a

4    draft report, because -- but it is my final

5    product -- work product, I -- I -- it's my practice

6    that I destroy all of those -- all of those written

7    notes and stickies and notebooks, anything that has

8    to do with that.

9         Q.    Okay.  So let me change topics on you.

10        A.    Okay.

11        Q.    We've covered the -- in some detail,

12   although we'll go back -- we've covered a lot -- we

13   covered the materials you did review in connection

14   with your work in this case.  I want to talk to you

15   about some things you didn't review, okay, and

16   confirm you did not.

17        A.    Please.

18        Q.    Okay.  You -- first of all, was there

19   any materials -- whether it be depositions, court

20   proceedings, interview subjects -- anything -- any

21   materials that you asked to review that you were

22   told you could not review?



Page 126

```
 1          A.    No.

 2          Q.    Okay.  Were there any materials that

 3   you wanted to review -- again, as broadly as we can

 4   define "materials" -- that you were unable to

 5   review?

 6          A.    No.

 7          Q.    So as far as you're concerned, you were

 8   satisfied with the -- the compilation of the

 9   materials you reviewed?  And when I say "satisfied,"

10   I mean satisfied enough to render the opinions you

11   did.

12          A.    I was satisfied with -- with the

13   totality of information that I could rely on in

14   order to express my opinion.

15                I am stating it in this fashion because

16   we generated a great deal of information through our

17   evaluation.

18          Q.    Okay.  Did you -- did you review any

19   medical records for Dr. Wright?

20          A.    No.

21          Q.    Okay.  Did you review -- and I don't

22   mean to -- maybe there's not a distinction -- let me
```



Page 138

1    evaluations in some legal situations that I feel I'm

2    not interested in doing because it's some criminal

3    case and, during some kind of sentencing phase,

4    somebody believes that they need to talk with me.

5    Those kinds of things are not things necessarily

6    that I'm interested in doing.

7              I like to be of help.  And so I just

8    wanted to get a sense of what kind of a person he

9    was, his age, the extent that he was verbal, for

10   that matter.

11        Q.    Was he?

12        A.    Oh, he was very polished in that

13   lecture.

14        Q.    Was what you watched on the video, as

15   far as his persona and his polish, consistent with

16   how he was in his interview with you?

17        A.    No, absolutely not.

18        Q.    So in his interview with you, he was

19   different?

20        A.    Well, it was a different context.  So

21   he was giving what I believe was a public lecture.

22   And he was basically lecturing, so nobody was



Page 139

1    talking with him nor was -- nobody was requiring

2    reciprocity from him.  He was basically lecturing.

3    He looked very polished.

4              When I interviewed him -- it's part of

5    the procedure that I create a much more challenging

6    reciprocal social interaction.  That's part of the

7    procedure because there are many individuals with

8    autism of high intellect that can present themselves

9    relatively well if they are talking about the things

10   they are interested in talking about.  But the

11   moment that you veer away from that, their

12   presentation is quite -- is quite starkly different.

13             It is also the case that when you're

14   having a conversation like I'm having with you right

15   now, we're taking turns and we're following some

16   rules of conversation.  These are called the

17   "pragmatic rules of speech."  And I'm -- we're

18   making sure that we take turns.  We're making sure

19   that the information that I provide you is relevant

20   and that we're going to build on what the other one

21   said beforehand.

22             Those things tend to break down with



Page 142

1    were conducting their interviews in a way that was

2    -- that they -- that they perceived to be helpful

3    to Dr. Wright's defense of this case?  Have you

4    ruled that out?

5         A.    So as part of any gold standard

6    evaluation in my field, we need to assess two things

7    about any informant: reliability and validity.

8              Validity is the extent to which the

9    information that is being conveyed to you aims to

10   capture the reality of who they're talking about.

11             And reliability -- say that -- if I ask

12   him a similar question or if I had a conversation

13   that overlapped about a particular topic, that the

14   information that I got in two or three or four

15   different instances -- they came together.

16             And so this is part of what we do every

17   time that we talk with an informant.  And this would

18   apply to anyone that we interviewed in this case.

19   It is also the case that the term "semistructured,"

20   which I used to describe -- not I use -- the

21   literature use to describe those particular

22   instruments -- it has a very specific meaning and



Page 143

1    requires a great deal of training in order for you

2    to use it in a valid fashion.

3              So those instruments are not rating

4    scales.  I made sure that I told you what a rating

5    scale was, and those things are not rating scales in

6    which you receive a set of questions and you say

7    yes, no, or maybe you put yourself on a given scale.

8              A semistructured interview is a

9    situation -- is a clinical situation in which I have

10   what should be felt by you, as the person that I'm

11   having the conversation or a play session, or

12   something like that, as something more natural,

13   something that will be closer to the way that you

14   are in typical situations outside of my interview.

15             Now, while I am eliciting, sometimes

16   with open-ended questions, that kind of information,

17   you're telling me things; you're giving me

18   information.

19             Now, you are not telling me this person

20   has a particular technical term -- by "technical

21   term," I mean something -- what I want in those

22   interviews with informants is I want, as much as



Page 144

1    possible, very concrete observations of every day

2    situations that they can tell me so that I can use

3    those things in order to subsequently complete a set

4    of, again, standard items with very detailed and

5    specific criteria so that I can rate.

6              So I'll never ask a person a direct

7    question, and I use that information to complete a

8    semistructured interview.  I elicit general

9    information as much as possible, as rich as

10   possible.  And on the basis of that information, I

11   then translate myself, because I know what I'm

12   looking for, into specific scores in a particular

13   form.

14        Q.    What do you do in the situation -- in

15   the situation where you -- and let's use Dr. Wright

16   as our example --

17        A.    Please.

18        Q.    -- what do you do in a situation -- if

19   you ask Dr. Wright, in the context of a

20   semistructured interview, a question and he gives

21   you an answer, but then that answer is not

22   consistent with the overall perception you're



Page 191

1    is a man who uses his -- his 20 volumes of the

2    Oxford Dictionary in the way that we used to use

3    maybe the yellow pages.  He goes to that all the

4    time.

5            He seems to -- he seems to require to

6    understand every single possible meaning, including

7    the historical meanings, of a word so that he

8    scrolls and he finally gets to -- hopefully, to what

9    might be the colloquial meaning of a word.

10           Needless to say, he can do this kind of

11   research as much as he wants, but he's -- if he's

12   unable to -- to use the intention of the person

13   communicating with him, he's going to be wrong many,

14   many, many different times.

15           And the reason I say "interesting" is

16   because that e-mail -- it was an illustration of --

17   of a style that his wife told me about that I

18   observed reading the transcripts, that I -- I

19   observed when I looked at the video depositions and

20   that he used with me as well.

21           Formal language is extraordinarily

22   important to him, but it's a minefield, because just



Page 192

```
1   like his style in other areas, it creates too many

2   details, and he never graduates from those details

3   into gist, into context, into meaningful

4   communication, into something that other people are

5   expecting from him.

6             So, absolutely, this is -- I've had

7   quite a few adult patients who -- who sort of took

8   issue with words that should be apparent -- the

9   meaning of those words should be apparent to

10  children as young as 4 or 5.

11       Q.    Dr. Klin, what did you do to make sure

12  that Dr. Wright was not putting on an act for you?

13       A.    How -- how to address that question?

14       Q.    Yes.

15       A.    I started in the field maybe 35 years

16  ago.  I've seen thousands of people with that

17  condition.  I started in this field actually living

18  in a residential unit for individuals of autism for

19  three years.

20             To put on an act requires a level of

21  social sophistication and perspective-taking that

22  was just not there.
```



Page 216

1    believe that for someone that you're evaluating for

2    autism, I bet that no experienced clinician would

3    base a diagnosis on this video clip.  Because there

4    are so many things that can go into preparing an

5    individual for any stage appearance, and if you have

6    a decontextualized example of that behavior, it is

7    not necessarily going to tell you if those things

8    were historically present in the life of that

9    individual or they're even typical of that

10   individual when he has no interest to gain.  And

11   that's most of our lives.

12              Most of our lives, we're not in front

13   of the camera; most of our lives, we are -- we're

14   interacting -- we're interacting with our family

15   members, with our spouses, or with coworkers, or

16   with others.

17              So I would not use a clip from a

18   V -- may I just tell you one thing?  And this may

19   actually -- has to do with the way that I interacted

20   with the attorneys who engaged me in the first place

21   after I -- I watched that video clip of three to

22   five minutes.



Page 227

```
1       of concrete observations that we needed

2       about him when he was in school, for

3       example.

4              So the people I talked to were

5       people that -- in essence, I decided who

6       they're going to be on the basis of the

7       information provided to me.

8              BY MR. BRENNER:

9       Q.    And when you got done with that full

10  assessment that you just went through and you set

11  out -- you set forth in your report, you did not

12  then go back and try to find -- look at publicly

13  available information to see if it's consistent with

14  what you learned during your assessment, correct?

15      A.    That is correct.  And most clinicians

16  like myself don't like the idea of conducting

17  clinical work by looking at media materials or

18  things of that nature, because part of the

19  methodology used in gold standard clinical

20  evaluations is a setting that you have some control

21  over.

22              That's why when people say that
```



Page 228

1   Mr. Trump has a particular mental illness, this and

2   that, they're often discredited by others because

3   you don't conduct those kinds of -- you shouldn't

4   even state those kinds of impressions on the basis

5   of that kind of information.

6          Q.    Okay.  I'm going to play the video now

7   to the end.

8                (Video is played.)

9                BY MR. BRENNER:

10         Q.    I'll represent to you -- which I think

11  to be correct -- that the video is from -- let me

12  use -- it's off the screen, right?

13         A.    Yes, it is.

14         Q.    Okay.  I'll represent to you that my

15  understanding is that video is from May or June of

16  2019.  I think it's actually from May and uploaded

17  in June, which, just for the record, is between the

18  time of the deposition you -- you reviewed of

19  him and -- well, let me rephrase that.

20               May or June 2019 is the period of

21  time in between when the deposition you reviewed

22  was taken and the court testimony you reviewed was



Page 277

1    the structured interview, or does the interviewee

2    fill them in?

3         A.    Oh, no.  Oh, no.  This is not a rating

4    scale, very much like the ADI.  This is a

5    semistructured interview, and Sara Sparrow was very

6    particular about that.  And I know that Celine is

7    just as strict a person.

8              What you see here basically on this

9    form -- you only see the items, but that's -- you

10   don't read the items to anybody.  There is a manual

11   that goes with it.  And what you do is you ask a

12   particular open-ended question to elicit

13   information.  On the basis of the information that

14   people provide to you -- you, yourself, you score

15   each one of the items, and you probe further if the

16   person did not provide you information sufficient to

17   complete some items.

18        Q.    Right.  You have the right to answer

19   the questions any way you want.  I would ask -- and

20   if you can't do it, you can't do it -- I would like

21   you to try to focus on my question.  I'm not asking

22   you why it's done a certain way; I wanted you to let



MAGNA ►
LEGAL SERVICES

Page 278

1    me know who fills it in, the doctor or the patient.

2         A.    Oh.  It is -- my apologies.

3         Q.    That's okay.

4         A.    You just want to know who is the person

5    who conducts this.  It is the clinician.

6         Q.    Okay.  So I'm going -- you made a

7    reference in your answer -- I think you're referring

8    to the Vineland interview form which was part of the

9    exhibit we've marked as the binder.  So I'm going to

10   pull that up, if you give me a second.

11              Okay?

12        A.    Sure.

13              (Pause.)

14              BY MR. BRENNER:

15        Q.    Okay.  So this is part of the

16   exhibit -- the binder exhibit.  It starts on -- what

17   I have on the screen is Page 60.

18              And I think this is what you're

19   referring to as the "interview form," the first

20   page of it?

21        A.    Yes, it is the first page of the

22   comprehensive interview form.  There are several



Page 368

1    an actual score for all of these things?

2         A.    I have -- the way that the ADOS is used

3    is the clinically -- the gold standard clinical

4    judgment using the ADOS makes use of its algorithm

5    scores -- his total scores, not item by item.  The

6    validity of an instrument is maximized by using the

7    totality of information and not any of the items in

8    isolation.

9         Q.    Okay.  We'll look at that -- we'll look

10   at what the actual algorithm is in a second.

11               What's Number 6?

12        A.    That would be a 1.

13        Q.    Okay.  Seven?

14        A.    It would be a 1.

15        Q.    Okay.  There was a time in this case

16   where you filled these out, right?  There's actually

17   a sheet of paper that existed with your numbers in

18   these boxes, right?

19        A.    There will be a form just like this

20   with not only the scores but a million notes.

21        Q.    And a million notes.

22               And you threw them all away?



Page 389

1    that sense.

2                   This is the way this man is.  This is

3    the way he behaves not only in a court of law or in

4    a deposition room, but this is the way he seems to

5    be in his own home with his own beloved folk.

6         Q.    Are you -- I'm sorry.  Are you done?

7         A.    I'm done.

8         Q.    Okay.  Are you recommending that any --

9    any special procedures be put in place to -- to

10   govern Dr. Wright's testimony at trial?

11        A.    No.

12        Q.    Are you recommending that he be treated

13   differently than any other litigant is treated in

14   the courts of our country?

15        A.    The answer is yes.

16               May I explain?

17        Q.    Of course.

18        A.    The reason why people consider me an

19   expert is because the presentation of individuals

20   with autism, particularly those with high intellect,

21   is not immediately obvious to people who don't have

22   the expertise in that area.



Page 390

1              If Dr. Wright was blind and you asked

2     me that question, I would say that that individual

3     should be treated differently than everybody else

4     because that individual has what society calls "a

5     disability"; he doesn't see.

6              So in that way, I am asking for you to

7     treat that individual who is blind or deaf

8     differently than most others.

9              Dr. Wright is not deaf, is not blind,

10    and his very presentation is probably his worst

11    enemy because he conveys a sense of

12    supreme competence as he speaks.  I would like for

13    people to believe that when he is transgressing the

14    rules of common sense, the laws and conventions of

15    social interaction, when he's being pedantic, when

16    he is reciting lectures and when he is giving you

17    histories of words, that he's not doing that

18    contemptuously.  He's not doing that as a way of

19    being evasive.  He is not deliberately contriving

20    falsehoods in this regard.  This is the way he is.

21              Because if people understand that

22    despite his high intellect, there are areas in his



1    being -- in his being in the world that are

2    profoundly deficient.  People will judge him by the

3    facts, but they are not going to have impressions

4    that are going to be detrimental to his

5    presentation, things that were not deliberate --

6    they were not created for the purpose of deceit.

7                    That's all I need.  I need him to be

8    treated on the basis of whatever are the technical

9    facts of this case.  But sometimes people go beyond

10   the facts, and they judge the person.  And he is a

11   person that -- as he put it himself, he is not good

12   with people.  People don't like him.  He doesn't

13   think about people.  And that can be very

14   detrimental to his legal standing, particularly

15   within the context of a jury proceeding, which I

16   assume is what you're going to have, when people are

17   going to look at him and they are going to have

18   disdain for a man who comes across as -- as

19   arrogant, as self-centered, as inhumane, almost, as

20   if his pursuit is more important than the people

21   that he affected in his life.

22                    This is the way he is.  That is his

