# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
- - - - - - - - - - - - - - - - - - - - - x
IRA KLEIMAN, as the personal
representative of the Estate of
David Kleiman and W&K Info Defense
Research, LLC,

       Plaintiffs,

                CASE NO.:
   -against-      9:18-CV-80176-BB/BR

CRAIG WRIGHT,

       Defendant.

- - - - - - - - - - - - - - - - - - - - x


       Zoom video conference deposition of
KEVIN MADURA, taken pursuant to notice,
was held remotely, commencing April 30,
2020, 9:00 a.m., before Leslie Fagin, a
Stenographic Court Reporter and Notary
Public in the State of New York.

              - - -


      MAGNA LEGAL SERVICES
  320 West 37th Street, 12th Floor
    New York, New York 10018
      (866) 624-6221



```
 1                    K. Madura
 2   Nakamoto, and reviewing the communications
 3   between Satoshi Nakamoto and various members
 4   of the community at the time.  It's my belief
 5   that Satoshi was the author of the code that
 6   was pushed around this time.
 7        Q.   Why do you say, primary author of
 8   the code?
 9        A.   I am unable to determine whether or
10   not it was one or multiple individuals who
11   may have contributed to the code or not.
12        Q.   So it's possible -- strike that.
13             Do you know whether or not Satoshi
14   Nakamoto is an individual or could have been
15   a team of individuals?
16             MS. MARKOE:  Objection, outside the
17        scope of the report.
18        A.   I am unable to make that
19   determination.
20        Q.   So it's possible Satoshi Nakamoto
21   was a team of individuals?
22             MS. MARKOE:  Objection, outside the
23        scope of the report.
24        A.   Again, by reviewing the
25   communications, it was always under the
```



```
 1                    K. Madura
 2   single pseudonym, Satoshi Nakamoto, who was
 3   believed to be the primary author of the code
 4   at the time.
 5        Q.   I'm asking you whether it's
 6   possible that Satoshi Nakamoto was actually a
 7   team of individuals?
 8             MS. MARKOE:  Objection, outside the
 9        scope of the report.
10        A.   I'm unable to make that
11   determination.
12             MR. FREEDMAN:  I would ask you to
13        keep your objection to form.
14             MS. MARKOE:  I'm allowed to state
15        my basis for my objection.
16             MR. FREEDMAN:  You are only
17        supposed to say objection to form and I
18        would appreciate it if you keep it that
19        way.
20        Q.   Mr. Madura, you are aware that
21   Gavin Andresen gave deposition testimony in
22   this case and you have reviewed his
23   deposition, is that correct?
24        A.   Yes.
25        Q.   And do you recall that Mr. Andresen
```



```
 1                    K. Madura
 2        this line of questioning because you are
 3        showing him a single page of a website
 4        that clearly has more than one page.
 5        Q.   Mr. Madura, are you saying that you
 6   incorporated the entire Satoshi Nakamoto
 7   Institute -- strike that.
 8             Mr. Madura, as I read your footnote
 9   1, it says, Satoshi Nakamoto Institute at,
10   and you give a specific URL.
11             Are you now saying you relied on
12   the entire Satoshi Nakamoto website?
13             MS. MARKOE:  Objection.
14        A.   I reviewed multiple communications
15   from the Nakamoto Institute for my report.
16        Q.   Part of the rules in litigation is
17   that you need to tell me which documents you
18   relied on.
19             You told me you relied on footnote
20   1, so that is fair.  I don't see where you
21   are telling me you relied on other
22   communications and to the extent you have, I
23   need to know which communications those are.
24             So can you tell me which exact
25   communications you relied on to make that
```



Page 42

```
 1                    K. Madura
 2  have contributed to the Bitcoin code base?
 3            MS. MARKOE:  Objection.
 4       A.   I don't think that's impossible.
 5       Q.   So it could be that someone who had
 6  less than a bachelor's degree in computer
 7  science would have sufficient ability to
 8  contribute meaningfully to the Bitcoin code
 9  bit?
10            MS. MARKOE:  Objection.
11       A.   It would be inconsistent with my
12  assessment of the complexity of the Bitcoin
13  code as it stood.
14       Q.   So I'm confused now.  Is it minimum
15  requirement to contribute meaningfully to the
16  Bitcoin code base, a bachelor's in computer
17  science or not?
18       A.   I haven't determined a minimum
19  requirement for contribution to the code,
20  only that it's -- the background required
21  would be consistent with someone or --
22  someone with extensive experience in computer
23  programming.
24       Q.   Mr. Madura, you are aware that Bill
25  Gates dropped out of college, right?
```



```
 1                    K. Madura
 2   be consistent with the ability to develop
 3   complex codes such as Bitcoin.
 4       Q.   You just said you looked at his
 5   background as a whole, but you didn't look at
 6   his background as a whole because you didn't
 7   rule out the possibility that he attended
 8   course on programming?
 9            MS. MARKOE:  Objection.
10       Q.   Isn't that right?
11       A.   Can you repeat the question?
12       Q.   You said you reviewed his
13   background as a whole, but, in fact, you
14   didn't, because you just told me you rule out
15   the possibility that he attended a course on
16   programming at some point before 2008?
17            MS. MARKOE:  Objection.
18       A.   I reviewed the materials indicated
19   in my report to determine whether or not his
20   professional experience is consistent with
21   the skills required to develop a complex
22   piece of software such as Bitcoin.
23       Q.   How did you rule out the
24   possibility that he used the internet or
25   YouTube to teach himself how to code?
```



Page 48

```
 1                    K. Madura
 2              MS. MARKOE:  Objection.
 3         A.    That would be highly inconsistent
 4    with his professional experience.
 5         Q.    His professional experience --
 6    strike that.
 7              It would be highly inconsistent
 8    that he went and learned how to code on
 9    publicly available websites?
10              MS. MARKOE:  Objection.
11         A.    Again, in reviewing testimony from
12    colleagues, it was apparent that he didn't
13    know how to code very well.
14         Q.    What was the timeframe for those
15    statements?
16         A.    I don't recall specifically.
17         Q.    How do you know he didn't attend
18    the programming course off those statements
19    that were made by his colleagues or I believe
20    colleague?
21         A.    Could you repeat the question?
22         Q.    How did you rule out the -- let me
23    take a step back.
24              Are you referring to the testimony
25    of Kimon Andreou?
```



Page 58

```
 1                    K. Madura
 2        A.   Yes.
 3        Q.   So you can't really testify what
 4   Dave Kleiman's skills and experiences were,
 5   you really can only testify to what his
 6   published or advertised skills and experience
 7   were, correct?
 8             MS. MARKOE:  Objection.
 9        A.   I reviewed the materials referenced
10   in my report to determine whether or not his
11   skill set was consistent with the skills
12   required to create a complex piece of
13   software such as Bitcoin.
14        Q.   It's not really a skill set, you
15   reviewed his publicly available skill set or
16   his published skill set?
17             MS. MARKOE:  Objection.
18        A.   Which, from my understanding, would
19   be a fair representation of his skill set.
20        Q.   But, in fact, it was just his
21   published and advertised skills, correct?
22             MS. MARKOE:  Objection.
23        A.   From what I can tell, yes.
24        Q.   You don't have any personal
25   knowledge of what his actual skills were?
```



```
 1                    K. Madura
 2   in review of his background, as compared to
 3   the skills and background required to develop
 4   the Satoshi code that I reviewed.
 5        Q.   So have you ever taken any training
 6   in assessing ability of programmers?
 7             MS. MARKOE:  Objection.
 8        A.   My professional background has
 9   prepared me well to understand this type of
10   material and I regularly review code to
11   determine the skills of programmers in
12   regards to their ability to prevent the
13   inclusion of security vulnerabilities into
14   their code.
15        Q.   I asked if you took any formal
16   training on assessing the ability of
17   programmers?
18             MS. MARKOE:  Objection.
19        A.   I'm not aware of formal training
20   that's that specific.
21        Q.   Have you ever reviewed the
22   qualifications of a programmer and opined,
23   prior to this report, that they were not
24   capable of executing a certain task?
25             MS. MARKOE:  Can you repeat the
```



```
 1                  K. Madura
 2      question?
 3      Q.   Prior to this report, have you ever
 4 assessed the capabilities of a programmer and
 5 opined that they were not capable of
 6 performing a certain programming task?
 7           MS. MARKOE:  Objection.
 8      A.   Yes.
 9      Q.   When?
10      A.   During my time at IBM, I was the
11 cybersecurity expert that would opine on the
12 programming abilities of certain programmers
13 to determine whether or not they were --
14 whether they should be allowed to manipulate
15 certain parts of the code base.
16      Q.   So you offered recommendations to
17 your employer about who they should and
18 should not utilize, is that correct?
19      A.   For specific parts of the code
20 base, that's correct.
21      Q.   But you never opined, formally, an
22 opinion that they are not capable of doing
23 this task, did you?
24           MS. MARKOE:  Objection.
25      A.   I provided my opinion as to their
```



```
 1                    K. Madura
 2  ability to adequately protect the system and
 3  code in a way that was congruent with what my
 4  employer was intending to create.
 5      Q.   You made a judgment call about who
 6  should and should not manipulate your
 7  employer's code?
 8           MS. MARKOE:  Objection.
 9      A.   Certain parts of the code, that's
10  correct.
11      Q.   Have you ever issued a formal
12  opinion that someone is incapable of doing
13  certain programming work?
14           MS. MARKOE:  Objection.
15      A.   I have offered my opinion in
16  regards to the competency of specific
17  programmers, yes.
18           MS. MARKOE:  Can we take a break
19      now?
20           (Recess.)
21      Q.   Mr. Madura, can you explain to me
22  the methodology you used to determine whether
23  or not Dave Kleiman's skill set would be
24  highly consistent with the ability to program
25  the Bitcoin code base?
```



Page 69

```
 1                      K. Madura
 2        A.    That's my opinion, yes.
 3        Q.    Could that be one of the reasons
 4   why he didn't include C++ coding
 5   qualifications on his forensic investigator
 6   resume or reports?
 7              MS. MARKOE:  Objection.
 8        A.    I couldn't speak to the state of
 9   mind of Dave Kleiman at the time of why he
10   would or wouldn't include a specific skill as
11   part of his resume.
12        Q.    But it's possible, right?
13              MS. MARKOE:  Objection.
14        A.    Again, I can't speak to his state
15   of mind at the time.
16        Q.    Is it impossible?
17              MS. MARKOE:  Objection.
18        A.    It's not impossible.
19        Q.    It's, like, why list it if you are
20   not selling it, that's the point I'm trying
21   to get across.  Do you understand what I'm
22   saying?
23              MS. MARKOE:  Objection.
24        A.    In my review of his background, he
25   listed many different certifications.  I
```



```
 1                    K. Madura
 2    found it reasonable to expect if he had
 3    earned some type of certification or had the
 4    ability to demonstrate his capabilities in
 5    programming specifically within C++, he would
 6    have advertised that as such.
 7         Q.   Didn't all the certifications he
 8    have relate to his forensic investigative
 9    business?
10         A.   If I recall correctly, not all of
11    them did, no.
12         Q.   And when I say, forensic
13    investigative business, I mean all of the
14    services he offered through his forensic
15    investigative business, network security and
16    all of that stuff.
17         A.   Could you repeat the question?
18         Q.   Strike the question.
19              We will look at certifications.
20              Mr. Madura, isn't it possible that
21    Dave Kleiman was decent at coding, but
22    because he didn't have the degree and wasn't
23    a professional, he didn't want to list it on
24    his business facing resume?
25              MS. MARKOE:  Objection.
```



Page 80

                        K. Madura

1

2        A.    I don't know much about Satoshi

3    Nakamoto, so that's possible.

4        Q.    Mr. Madura, you reviewed a report

5    that Dave Kleiman issued in the Lighthouse

6    Investment Partners versus Stacey Tenant

7    (phonetic) case.

8              Do you remember that?

9        A.    I do.

10       Q.    You said it didn't reference C++

11   coding, correct?

12       A.    Correct.

13       Q.    Was C++ coding relevant to that

14   report?

15             MS. MARKOE:   Objection.

16       A.    I don't believe so.

17       Q.    Could that be why he didn't mention

18   any C++ coding expertise?

19             MS. MARKOE:   Objection.

20       A.    In describing his background, David

21   Kleiman didn't mention anything about

22   computer programming or C++ experience.

23       Q.    Because it wasn't relevant to the

24   report, right?

25             MS. MARKOE:   Objection.



Page 81

1                    K. Madura

2        A.    I'm not sure of the specifics of

3    the intention, but that's correct, yes.

4        Q.    Mr. Madura, you reviewed the

5    deposition of Kimon Andreou, right?

6        A.    I did.

7        Q.    In that deposition, Mr. Andreou

8    says that Dave was familiar with computer

9    programming or he could dabble, but was not a

10   programmer.

11              Do you recall that testimony?

12              MS. MARKOE:   Objection.

13       A.    I don't recall that specific line.

14       Q.    Let's see if we can get it for you.

15   I will try to share with you the deposition

16   of Mr. Andreou.

17              MR. FREEDMAN:   Are we on No. 4?

18              (Exhibit 4, marked for

19         identification.)

20       Q.    This is the deposition of Kimon

21   Andreou.

22              Is this the deposition you

23   reviewed?

24       A.    I believe so.  I can't be exactly

25   certain without comparing the documents.



Page 91

```
 1                    K. Madura
 2    coding capability, isn't it?
 3             MS. MARKOE:  Objection.
 4        A.   I'm not aware whether he did or did
 5    not.
 6        Q.   It's possible he did, correct?
 7             MS. MARKOE:  Objection.
 8        A.   I suppose it's possible, yes.
 9        Q.   Mr. Madura, I'm going to share with
10    you, I think now we are on Exhibit 5.  It's a
11    document produced in this litigation, Bates
12    labeled Defense Australia 11 -- actually, for
13    the record, it's Defaus, underscore,
14    00115950.
15             (Exhibit 5, marked for
16        identification.)
17        Q.   Did you review this document in
18    preparing your report?
19        A.   Not that I recall.
20        Q.   I will bring you down to the middle
21    of this document.
22             Do you see an email on March 7,
23    2014 from Craig Wright, craig@rcjbr.org?
24        A.   I see that on the screen, yes.
25        Q.   Can you read this email for me for
```



MAGNA
LEGAL SERVICES

Page 145

```
 1                    K. Madura
 2        Q.   Sitting here today, can you recall
 3   anything that you examined prior to the
 4   drafting of Mr. White's report?
 5             MS. MARKOE:  Objection.
 6        A.   Not specifically, no, it's been
 7   different things.
 8        Q.   What about generally?
 9        A.   Generally, I provided my technical
10   opinion regarding various data.
11        Q.   And so I'm trying to -- just so you
12   understand what I'm trying to get at, is you
13   submitted two expert reports here, you've
14   identified materials you reviewed.  So I'm
15   trying to understand just what other
16   materials, if any, in this litigation, you
17   reviewed.  So you provided services prior to
18   the issuing of the expert report.
19             I'm trying understand, sitting here
20   today, can you recall the details of any of
21   those services and the documents you may or
22   may not have examined?
23             MS. MARKOE:  Objection.
24        A.   I can't recall any specific
25   documents.  I would have to review a list of
```



Page 148

```
 1                      K. Madura
 2    determine whether Mr. Antonopoulos was
 3    completely accurate in describing the Bitcoin
 4    system and what he noted in his report and
 5    then the supporting evidence and anything
 6    supporting my observations.
 7         Q.   So let me -- the materials
 8    considered list, you only identified
 9    documents that related to your opinion?
10         A.   That's right.
11         Q.   And not other documents you
12    reviewed in this litigation?
13         A.   That's right.
14         Q.   What was the basis for you
15    believing that was the correct way to
16    identify the materials you considered for
17    purposes of identifying in your report?
18         A.   Could you repeat the question?
19              MS. MARKOE:  Objection.
20         Q.   Do you understand that in
21    submitting an expert report, there is a duty
22    to identify the materials you considered?
23         A.   I understand that.
24         Q.   What is your -- what's the basis
25    for your understanding what materials to
```



Page 169

```
 1                    K. Madura
 2       Q.   Mr. Madura, sitting here today, do
 3  you recall the substance of the consulting
 4  work you have performed in this case?
 5            MS. MARKOE:  Objection, and I
 6       instruct him not to answer.
 7       Q.   Mr. Madura, do you recall
 8  approximately how much time you have spent in
 9  relation to the consulting work you have
10  performed in this case?
11            MS. MARKOE:  Objection.
12            I'm going to instruct him not to
13       answer.
14            I'm instructing you not to answer.
15       Q.   Mr. Madura, did you perform any
16  work in your context -- in your role as a
17  consultant in the month of April related to
18  this case?
19            MS. MARKOE:  Objection.  Give me a
20       second.  Just give me one second.  I'm
21       trying to make a decision.
22            Can you repeat the question?
23            (Record read.)
24            MS. MARKOE:  He can answer that
25       question.  Sorry, it's going to be
```



Page 170

```
 1                    K. Madura
 2       question by question, Kyle.  I'm not
 3       trying to be difficult.
 4            MR. ROCHE:  Understood.
 5       A.   I believe I have.
 6       Q.   Approximately how much time?
 7       A.   I don't know for certain.  Not
 8  much, considering most of my time was spent
 9  on these reports.
10       Q.   In connection with the work you
11  performed this month in your role as a
12  consultant, what was the nature of that work?
13            MS. MARKOE:  Objection.
14            I'm going to instruct him not to
15       answer.
16       Q.   Did you do any work in your role as
17  a consultant in March?
18       A.   Role as a consultant?
19            MS. MARKOE:  Objection.
20            You can answer.
21       A.   I don't recall.  I would have to
22  look at my timesheet history.
23       Q.   Did you perform any work in your
24  role as a consultant in February?
25            MS. MARKOE:  Objection.
```



```
 1                    K. Madura
 2               You can answer.
 3        A.   I don't recall.  I would have to
 4   look at my timesheets again.
 5        Q.   Did you perform any work in your
 6   role as a consultant in January?
 7               MS. MARKOE:  Objection.
 8               You can answer.
 9        A.   I don't believe so.  I was away and
10   out of the country for most of January.
11        Q.   Did you perform -- last one of
12   these questions.
13               Did you perform any work in your
14   role as a consultant in December of 2019?
15               MS. MARKOE:  Objection.
16               You can answer.
17        A.   Likely, yes, although I'm not
18   particularly sure how much or if I have it
19   all.
20        Q.   What is the basis for you thinking
21   it's likely?
22        A.   Because most of my --
23               MS. MARKOE:  Objection.
24        A.   Because most of my time recently
25   has been spent on the written reports.
```



Page 172

1                    K. Madura

2        Q.   When was the first time you did

3    work in your role as a consultant on this

4    litigation?

5              MS. MARKOE:  Can you repeat the

6        question?

7              (Record read.)

8              MS. MARKOE:  I'm going to object,

9        but you can answer as to the when.

10       A.   I don't know for certain.  Sometime

11   in 2019, early 2019.

12       Q.   Could it have been 2018?

13             MS. MARKOE:  Objection, but you can

14       answer.

15       A.   It could have been, I don't recall.

16       Q.   Did any of the work you performed

17   as a consultant in any way relate to your

18   testimony as an expert?

19             MS. MARKOE:  Objection.

20             You can answer.

21       A.   Not as it pertains to the drafting

22   of the report.  They may share similarities

23   in the technical understanding of certain

24   topics.

25       Q.   Have you reviewed the complaint in



Page 173

1                    K. Madura

2     this case?

3          A.    I have.

4          Q.    In your own words, what is this

5     lawsuit about?

6               MS. MARKOE:  Objection, outside the

7          scope, relevance.

8          Q.    You can answer.

9          A.    It's been a while since I reviewed

10    it.

11         Q.    Not the complaint.  Let me strike

12    that.  I'm not asking about the complaint.

13              In your own words, what is the

14    nature of this lawsuit about?

15              MS. MARKOE:  Objection, again,

16         outside the scope and relevance.

17              You can answer.

18         A.    My understanding is plaintiffs are

19    alleging that a total sum of Bitcoin assets

20    should be split evenly between two parties.

21         Q.    Did any of the work you reviewed in

22    connection as a consultant inform your

23    understanding of what this lawsuit is about?

24              MS. MARKOE:  Objection.

25              You can answer, if you can.



Page 174

```
 1                    K. Madura
 2        A.   Can you repeat the question?
 3        Q.   Can you please repeat the question?
 4             (Record read.)
 5        A.   It likely increased my
 6   understanding of it vaguely, yes.
 7        Q.   What do you mean by -- why do you
 8   say, vaguely?
 9        A.   I can't pinpoint a specific
10   instance of a clarity in my understanding.
11        Q.   But you reviewed documents and
12   facts about this litigation?
13             MS. MARKOE:  Objection.  Can you --
14        I'm not trying to tell you how to ask
15        your questions.  I'm trying to get you
16        information you are entitled to.
17             Can you ask that question just a
18        little more specifically, because it was
19        really broad.
20        Q.   Did you review documents -- strike
21   that.
22             Did you perform -- strike that.
23             Did you review documents
24   relating -- in your role as a consultant,
25   relating to the facts of this litigation?
```



Page 178

```
 1                    K. Madura
 2   controlled by Craig Wright.
 3        Q.   Have you reviewed any evidence
 4   identifying any Bitcoin owned by Craig Wright
 5   in your role as a consultant?
 6             MS. MARKOE:  I'm going to instruct
 7        him not to answer that.
 8        Q.   Have you reviewed any evidence
 9   showing Craig Wright as the creator of
10   Bitcoin?
11             MS. MARKOE:  You are asking these
12        questions so broadly, I can't tell if
13        you are asking in connection with the
14        reports.
15             In which case, he can answer
16        because it's in connection with the
17        reports.
18             MR. ROCHE:  Are you instructing me
19        not to ask broad questions?
20             MS. MARKOE:  We are here to talk
21        about his expert reports.  His
22        deposition about his proposed trial
23        testimony as laid out in his expert
24        reports.  It is not about anything under
25        the sun that he is not going to be
```



Page 183

1                    K. Madura

2          this case, regardless of whether as

3          expert or consulting and I will continue

4          to ask my questions and to the extent

5          you are going to instruct him not to

6          answer because you think it's a

7          privilege, I will move on to my next

8          question.  If you want to let me ask the

9          question, I will then proceed with the

10         question.

11              MS. MARKOE:  You are not giving me

12         a position.  That's fine.  Ask your

13         question and I think I will have to

14         instruct you not to answer.

15         Q.   I, myself, don't recall what the

16   question was.  I will ask you again.  Have

17   you reviewed any evidence related to Dave

18   Kleiman's role in the creation of Bitcoin in

19   the context of this litigation?

20         A.   As it relates to the preparation of

21   my report, I reviewed, again, the lists that

22   are marked DK and CW, that would imply Craig

23   Wright and Dave Kleiman as part of lists of

24   the original My Bitcoin.

25         Q.   Have you reviewed emails from Dave



Page 184

1                    K. Madura

2   Kleiman in the context of this litigation?

3                MS. MARKOE:  Objection.

4                You can answer, to the extent it

5       relates to your reports.

6       A.   I don't recall reviewing specific

7   emails from Dave Kleiman in connection with

8   the drafting of my reports.

9       Q.   Did you -- and in the context of

10  your consulting work, did you review emails

11  from Dave Kleiman?

12               MS. MARKOE:  Objection.

13               I instruct you not to answer.

14      Q.   Did you review emails from Craig

15  Wright in the context of this litigation?

16               MS. MARKOE:  Objection.

17      A.   I don't recall reviewing specific

18  emails from Craig Wright in connection with

19  drafting my reports.

20      Q.   Did you review communications from

21  Craig Wright in your capacity as a consulting

22  expert in this litigation?

23               MS. MARKOE:  I'm going to instruct

24       him not to answer.

25      Q.   Based on the evidence you reviewed,



Page 185

```
 1                    K. Madura
 2    is Craig Wright the creator of Bitcoin?
 3            MS. MARKOE:  Objection, outside the
 4        scope of the reports.
 5        A.   I don't have an opinion as to
 6    whether or not he is or is not.
 7        Q.   Have you reviewed evidence in the
 8    capacity as a consulting expert related to
 9    Craig Wright's involvement in the creation of
10    Bitcoin?
11            MS. MARKOE:  I'm going to instruct
12        him not to answer it as it relates to
13        consulting.
14        Q.   Have you reviewed any evidence
15    identifying any Bitcoin owned by Dave
16    Kleiman?
17            MS. MARKOE:  Objection.
18            You can answer, as it relates to
19        the reports.
20        A.   Again, I reviewed the lists as
21    identified by Mr. Antonopoulos, including the
22    DK list, which is implied to represent Dave
23    Kleiman, but haven't made a determination as
24    to whether or not Dave Kleiman owns or owned
25    that Bitcoin.
```



Page 186

 1                    K. Madura

 2       Q.    Did you review any evidence related

 3  to Dave Kleiman's ownership of Bitcoin in

 4  your role as a consulting expert?

 5            MS. MARKOE:  Objection.

 6            I'm going to instruct him not to

 7       answer, to the extent it relates to

 8       consulting issues.

 9       Q.    Have you examined any data related

10  to Dave Kleiman's electronic devices?

11            MS. MARKOE:  Objection, outside the

12       scope of his report.

13       Q.    You can answer.

14       A.    In preparation for the reports

15  here, I haven't reviewed any electronic

16  devices of Dave Kleiman's.

17       Q.    In your role as a consulting

18  expert, did you review any of Dave Kleiman's

19  electronic devices?

20            MS. MARKOE:  I'm instructing him

21       not to answer as it relates to any

22       consulting work that he did.

23       Q.    I will tweak that question.

24            In your role as a consulting

25  expert, did you review any of the electronic



Page 187

```
 1                    K. Madura
 2   -- any of the data on Dave Kleiman's
 3   electronic devices?
 4            MS. MARKOE:  Objection, outside the
 5        scope, and also, I'm going to instruct
 6        you not to answer relating to any
 7        consulting work that you did.
 8   Q.   What is BSV?
 9   A.   BSV, as I understand it, within the
10   context of Bitcoin, is referred to as Bitcoin
11   Satoshi Vision.
12   Q.   What is -- does Bitcoin SV relate
13   to your expert report?
14   A.   My expert report was a rebuttal to
15   Mr. Antonopoulos' report.  I don't recall if
16   it mentioned Bitcoin SV by name or not.
17   Q.   Because Bitcoin SV -- strike that.
18            MS. MARKOE:  Can we actually take
19        like a five, 10-minute break, like
20        restroom and refreshments?
21            MR. ROCHE:  Sure.  2:15, come back.
22        (Recess.)
23            MS. MARKOE:  Kyle, we did some
24        quick and dirty research, but the
25        research that we have done supports my
```



Page 188

```
 1                    K. Madura
 2        position that in his consulting
 3        capacity, to the extent it relates or
 4        would have intentionally informed his
 5        opinions as they relate to his expert
 6        testimony, expert testifying testimony,
 7        you are entitled to that, but you are
 8        not entitled to everything.
 9            So the final offer I'm making is,
10        and I can send you those cases or give
11        you those case citations and you can
12        have your people check those out, but
13        what we can do, I don't want to -- I
14        don't expect you to take my word for it
15        and I won't take your word for it, but
16        if you let me do what I think the right
17        thing to do is, based on my experience
18        on the case law that I have seen thus
19        far, like I said, it's not exhaustive,
20        where I will allow him to disclose
21        information regarding his consulting
22        services, to the extent that they could
23        have any relationship to the reports,
24        then I will do that.
25            And, you know, with no prejudice to
```



```
 1                  K. Madura
 2       your position, but if your position is
 3       going to be that I'm completely wrong
 4       and it's going to be a waiver, then I
 5       will still let him do it, if you will
 6       allow me to use a clawback, to clawback
 7       that testimony, to the extent that my
 8       reading of this case law is wrong and
 9       you are right and it's a whole waiver
10       because I don't want to do a whole
11       waiver, but I also don't want to be in a
12       position where, you know, I think that
13       if there is some information that you
14       are entitled to, but under the threat of
15       a complete waiver, I can't share that
16       with you without some sort of a clawback
17       or assurance from you.
18            Does that make sense?
19            MR. ROCHE:  I am willing -- to the
20       extent you allow him to answer, I am
21       willing to let you agree that if you
22       later determine or the court later
23       determines that that is the information
24       he revealed was privileged, then I agree
25       with your right to reserve.
```



Page 190

```
 1                 K. Madura
 2          Information he discloses, when you
 3     make an objection with respect to
 4     privilege, if you just preserve the
 5     objection and let him answer, I'm
 6     willing to let you preserve that right.
 7          MS. MARKOE:  That's fine.  I will
 8     make the objection and say, essentially,
 9     based on my understanding of case law, I
10     am preserving my objection in case I am
11     wrong, but he can answer in case I'm
12     right because it does relate and I will
13     still instruct him not to answer because
14     I think it really goes way out beyond
15     the privilege.
16          MR. ROCHE:  Why don't we come up
17     with some better shorthand.  If you are
18     going to instruct him not to answer,
19     objection, not answer.  If you are going
20     to reserve a privilege, just objection,
21     privilege, you may answer.
22          MS. MARKOE:  So here is what I can
23     tell you, is that you asked two
24     questions.  I believe one was about
25     anything that he reviewed as a
```



Page 192

```
 1                    K. Madura
 2           MS. MARKOE:  No, it was to the
 3      extent that it related to his consulting
 4      work, I can't remember exactly how you
 5      framed the question, to be honest, but
 6      it was something, I think, related to
 7      the DK and CW lists.
 8           MR. ROCHE:  Questions I have asked
 9      about Dave Kleiman, I will go back and
10      ask those.
11           With respect to questions related
12      to Mr. Antonopoulos, I will go back and
13      ask him those questions.
14           Do you stand on your objection for
15      all the other questions I've asked him?
16           MS. MARKOE:  For the time being,
17      since I don't recall all of them, I
18      think my answer has to be yes.
19           I'm just trying to get to where I
20      think his consulting work could have had
21      some relationship or informed any of his
22      opinions or work or conclusions related
23      to his expert reports, that I think you
24      are entitled to, so those topics, you
25      can ask again with this understanding
```



Page 193

```
 1                    K. Madura
 2      and I can have someone shoot you some of
 3      the cases.
 4           I think one of them is called
 5      Monsanto and it's 214 FRD.  I just have
 6      a short cite for it right now, which is
 7      547, and I have not read the cases in
 8      their entirety.
 9           There are two quotes.  One is, A
10      court should order disclosure when there
11      is an ambiguity as to whether the
12      material informs the expert's opinion.
13           If the subject matter directly
14      relates to the opinion in the expert
15      report, there will be at least an
16      ambiguity as to whether the materials
17      inform the expert's opinion and
18      consulting materials should be
19      disclosed.
20           There is another case that says --
21      hold on -- so that's some of the quick
22      and dirty research we have done so far.
23           MR. ROCHE:  As I understand it --
24           MS. MARKOE:  I'm trying to see --
25           MR. ROCHE:  If there is an
```



Page 199

```
 1                    K. Madura
 2        want to take this to 8:00 tonight.
 3              And, of course, if you make an
 4        objection without an instruction to
 5        answer, I will allow you to reserve all
 6        rights, including the clawback.
 7              MS. MARKOE:  Can you repeat the
 8        question?
 9        Q.   Have you reviewed any evidence
10   relating to Craig Wright's programming
11   skills?
12              MS. MARKOE:  Objection, outside the
13        scope.
14        Q.   You can answer.
15        A.   I haven't reviewed any materials in
16   connection with the drafting of either report
17   regarding Craig Wright's programming skills
18   specifically or made a determination as to
19   what that evidence might be.
20        Q.   Have you reviewed any evidence in
21   your capacity as a consultant relating to
22   Craig Wright's coding skills?
23              MS. MARKOE:  Objection.
24              Instruct you not to answer.
25              MR. ROCHE:  Ms. Markoe, do you
```



MAGNA
LEGAL SERVICES

Page 194

```
 1                    K. Madura
 2        ambiguity, you will allow him to answer
 3        the question?
 4             MS. MARKOE:  If there is an
 5        ambiguity as to whether as a consulting
 6        expert could have informed his opinions
 7        as a testifying expert, then, yes, but I
 8        think that it has to have a relationship
 9        to his expert testimony.
10             MR. ROCHE:  But if there is any
11        ambiguity --
12             MS. MARKOE:  It can't be on a
13        general side issue.
14             MR. ROCHE:  What does the case --
15             MS. MARKOE:  I agree, but I'm
16        saying, I will tell you if I think there
17        is legitimately any ambiguity, you and I
18        can have a difference of opinion on
19        that, but I'm going to be as -- I'm
20        going to give it my best legitimate
21        effort as to whether or not I
22        legitimately think there is an ambiguity
23        and give you that information under the
24        conditions that we have discussed.
25             MR. ROCHE:  Ready?
```



Page 200

```
 1                    K. Madura
 2        think -- what's the basis for that?  I
 3        believe that would be ambiguous as to at
 4        least at --
 5             MS. MARKOE:  His opinion -- none of
 6        his opinions have anything to do with
 7        whether or not Craig Wright is Satoshi
 8        Nakamoto, whether Craig Wright drafted
 9        the White paper, whether or not Craig
10        Wright did the Bitcoin code, whether or
11        not Craig Wright did any coding, that's
12        not in the scope of his report.
13        Q.   Mr. Madura, have you reviewed any
14   evidence to suggest whether or not Mr.
15   Kleiman was a better coder than Mr. Wright?
16   You can answer.
17             MS. MARKOE:  I'm objecting.
18             You can answer.
19        A.   I haven't qualified or formed an
20   opinion as to what evidence that would be, so
21   I don't know if I have reviewed that or not.
22        Q.   Is there evidence you reviewed in
23   this litigation?  Are there documents you
24   reviewed in Relativity relevant to Dave
25   Kleiman's expertise as a coder?
```


MAGNA
LEGAL SERVICES

Page 201

```
1                    K. Madura
2              MS. MARKOE:  Objection.
3              You can answer.
4         A.   As it pertains to my affirmative
5    report --
6         Q.   I'm asking, period, have you
7    reviewed documents?  I'm asking, have you
8    reviewed documents in Relativity that relate
9    to Dave Kleiman's expertise as a coder?
10             MS. MARKOE:  Objection.
11             You can answer.
12        Q.   All documents?
13        A.   I don't recall specifically either
14   way if I have reviewed evidence that would be
15   that specific, I'm not sure.
16             MR. ROCHE:  Ms. Markoe, I'm going
17        to make a request on the record for all
18        documents Mr. Madura has reviewed in the
19        context of this litigation.  I
20        understand that Relativity allows you to
21        export that and so that we can, and I'm
22        reserving a right to take a further
23        deposition upon review of that evidence.
24             MS. MARKOE:  I'm objecting to that
25        request now because every document that
```



Page 202

1                    K. Madura

2          Mr. Madura may or may not have reviewed

3          on Relativity does not have any

4          relationship to this -- to whether or

5          not -- let me restart.  I apologize.

6          I'm going to object to that because

7          every single document that Mr. Madura

8          may or may not have reviewed on

9          Relativity does not pertain to his

10         testimony as a testifying expert or his

11         opinions as a testifying expert.

12              If there is anything that he

13         reviewed that could have informed or

14         did, in fact, inform his opinions, then

15         we can discuss that issue more

16         specifically, but your request for all

17         documents that Mr. Madura has reviewed

18         on Relativity for any purpose whatsoever

19         is something that we will be objecting

20         to and we will not produce to you and we

21         will not provide that information.

22         Q.   Have you reviewed any evidence

23    relating to Dave -- strike that.

24              Have you reviewed any evidence

25    related to Dave Kleiman's electronic devices?



Page 95

```
 1                    K. Madura
 2  Craig Wright and Ira Kleiman, correct?
 3      A.   It appears to be a document showing
 4  that.
 5      Q.   And in it, they're discussing
 6  Satoshi Nakamoto and Craig and Dave's
 7  potential collaboration within that creation
 8  of Bitcoin, correct?
 9           MS. MARKOE:  Objection.  The
10      document speaks for itself.
11      A.   It appears that way, I believe.
12      Q.   And then in this particular email,
13  Craig Wright says, He has math skills and
14  some coding, frankly, was crud, but then he
15  says, Dave could edit his way through hell
16  and back.
17           Do you see that?
18      A.   I do.
19      Q.   You relied on Kimon Andreou's
20  statements in assessing Dave Kleiman's
21  capabilities.  Why didn't you rely on Craig
22  Wright's statements?
23           MS. MARKOE:  Objection.
24      A.   I didn't review every single
25  communication between the two.
```



Page 96

```
 1                    K. Madura
 2        Q.   Now that you know Craig Wright has
 3   said Dave Kleiman can edit his way through
 4   hell and back, do you want to edit your
 5   opinion on Dave Kleiman's skill set?
 6             MS. MARKOE:  Objection.
 7        A.   The text here doesn't impact my
 8   conclusions or opinions, no.
 9        Q.   You don't now think Dave was able
10   to edit code?
11             MS. MARKOE:  Objection.
12        A.   It's not clear to me that it's
13   referring to editing words or code or what,
14   I'm not sure.
15        Q.   He said, I have math skills and
16   some coding, which was, frankly, crud, but
17   better than some, but, really, Dave could
18   edit his way through hell and back.
19             How do you read that as anything
20   other than editing code?
21             MS. MARKOE:  Objection.
22        A.   Again, I'm not necessarily sure
23   what it's referring to.
24        Q.   If it's referring to code, would
25   that undermine your opinion?
```



```
 1                    K. Madura
 2              MS. MARKOE:  Objection.
 3       A.    The text on the screen, again,
 4   doesn't undermine opinions.
 5       Q.    But if that statement that Dave
 6   could edit his way through hell and back was
 7   a reference to edit his way through hell and
 8   back to the Bitcoin code in C++, that would
 9   undermine your opinion, wouldn't it?
10              MS. MARKOE:  Objection.
11       A.    That's not what the document says.
12       Q.    I understand.  I'm asking you to
13   make an assumption.  I don't agree with you,
14   that's not what the document says, for the
15   record, but I understand your position is
16   that's not what the document says.
17              I'm asking you to assume if the
18   document was referring to the C++ code, that
19   would undermine your opinion, right?
20              MS. MARKOE:  Objection.
21       A.    It would undermine my opinion
22   because the materials I reviewed informed my
23   opinion.
24       Q.    So you would just -- how would you
25   explain the fact Dave was able to edit his
```

