# EXHIBIT G

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:18-cv-80176-BB/BR

IRA KLEIMAN, as the Personal
Representative of the Estate
of DAVID KLEIMAN, and W&K
Info Defense Research, LLC,

       Plaintiffs,
v.

CRAIG WRIGHT,

       Defendant.
_____/

                100 SE Second Street
                Suite 2800
                Miami, Florida 33131
                Friday, January 10, 2020
                11:02 a.m. - 12:33 p.m.

VIDEOTAPED DEPOSITION OF

DUGALD STEWART MACINTYRE, JR., M.D.

Taken before Darline M. West, Registered Professional Reporter, Notary Public in and for the State of Florida At Large, pursuant to Notice of Taking Deposition filed by the Plaintiffs in the above cause.

Magna Legal Services
www.MagnaLS.com
866.624.6221



Page 28

1  understanding what I'm asking you, just please give
2  me -- give me the hands up and say -- ask me to
3  repeat it or rephrase it. Okay?
4       A.   Understood.
5       Q.   I will not be offended, I promise. Okay?
6       A.   Okay.
7       Q.   Is there any reason, as you sit here today,
8  that you're unable to give full and truthful
9  testimony to the best of your ability?
10      A.   None that I know of.
11      Q.   Okay. Great.
12           Now, the -- I'm now looking at the
13  substance of the report, which is dated December 13,
14  2019.
15           Do you see that?
16      A.   Yes.
17      Q.   So it appears to me that -- well, let's --
18  let's do it this way: You start off the report,
19  which happens to be a letter to -- to Miss Markoe by
20  saying, "As requested, I have reviewed medical
21  records regarding Mr. David Kleiman with the purpose
22  of forming opinions as to his medical -- medical
23  conditions (related to infectious disease) for a
24  certain period of years."
25           Do you see that?



Page 29

```
 1       A.    Yes, I do.
 2       Q.    Is that what you were asked to do?
 3       A.    That is correct.
 4       Q.    Were you asked to do anything other than
 5   that?
 6       A.    No.
 7       Q.    What were the certain period of years you
 8   were asked to focus on?
 9       A.    Well, the entire period was from 1995 to
10   20- -- if I can get this right, 2013, when he was
11   finally discharged from the Miami VA Hospital.
12       Q.    I think have you that right.
13       A.    That is correct.
14             Now, I was given the VA records, which,
15   during the early years, were somewhat spotty.  So,
16   obviously, I don't have everything from the early
17   years.
18       Q.    Okay.
19       A.    But those later years are more complete.
20       Q.    Okay.  I guess my question's slightly
21   different.
22             I understand from your report, and you've
23   stated as such, that you reviewed records starting
24   from 1995 and ending in March of 2013, right?
25       A.    That's correct.
```



Page 32

1  report -- again, I don't want to know anything that's
2  not in your report.  I'm just gonna ask you if it's
3  in your report.  Since it's pretty short, I'd ask you
4  to -- to look at it to make sure you're comfortable
5  with -- with my question and your answer --
6       A.   All right.
7       Q.   Okay.  Anywhere in your report, do you
8  offer any opinions regarding Mr. Kleiman's mental
9  state?
10      A.   No, I did not.  I did, however, point out
11 some medications he's on that one might have assumed
12 or concluded might have affected mental state.  But I
13 did not state that as an opinion.
14      Q.   So you don't have an opinion as to his
15 mental state?
16      A.   No, I don't.
17      Q.   Okay.  Now, as you point out in your
18 report, Mr. -- Mr. Kleiman was involved in a
19 motorcycle accident, correct?
20      A.   That is correct.
21      Q.   And that was in 1995, correct?
22      A.   That is also correct.
23      Q.   And as a result of that accident -- I'm
24 looking at the bottom of the first page of your
25 report -- you say that he sustained multiple bone



Page 44

1  taking them, it was prescribed usually every four to
2  six hours.  He states in a number of places that he
3  wasn't taking them as often as that.  So it would
4  have varied between one and four per day.
5       Q.   Okay.
6       A.   During that time.
7       Q.   Is it your opinion that he was taking
8  Valium one to four times a day for 18 years?
9       A.   Yes.
10      Q.   Okay.  And what -- what is the effect --
11 first of all, is there a noted effect in the medical
12 records on Mr. Kleiman from his taking of Valium?
13      A.   You know, I don't remember any of the
14 nurses notes or anything like that saying, given
15 Valium, effect noted.
16      Q.   Okay.
17      A.   Now, usually with pain medications -- and,
18 in fact, they're now required to do that -- they have
19 to note whether it was effective or not.
20      Q.   Right.
21      A.   But with Valium, they don't note that.  So
22 I don't know how well it was working or not.
23      Q.   Okay.  Some folks, when they -- when they
24 take Valium become really sleepy, right?
25      A.   That is correct.



Page 46

1  Mr. Kleiman?
2       A.   Well, that's one.  And now, as I said, I
3  didn't list them in there, but he did receive pain
4  medications in addition, varying times, and I didn't
5  really go over how often he was getting those.
6  Obviously, when he had surgery, he had pain
7  medication.
8       Q.   Right.
9       A.   And there were other times listed also.  So
10 that would also affect mental status.
11      Q.   And would you refer to -- as opposed to the
12 Valium, which it's your opinion he was on fairly
13 consistently -- more consistently for 18 years, the
14 other pain medications were more episodic in nature,
15 meaning postsurgery or specific pain?
16      A.   That is my understanding, from looking at
17 the record.
18      Q.   Okay.  None of those other ones were
19 chronic -- chronically-used medications?
20      A.   That is correct.
21      Q.   Okay.  And you -- you -- you told me, but
22 I'll confirm on the record, you -- you did not see in
23 the medical records how Valium or Diazepam affected
24 Mr. Kleiman's mental state?
25      A.   They don't notice -- they don't notice



Page 74

```
 1        A.    Yes.  Uh-huh.
 2        Q.    And it says your fellowship started a month
 3   later, in August of '71.  Is that mistake?
 4        A.    That may be a mistake.  Because I was in
 5   the army for two years.
 6        Q.    Okay.  Is it your recollection that you
 7   were in the army between '71 and '73?
 8        A.    Yes.
 9        Q.    And did you serve overseas or...
10        A.    Well, it depends on your definition of
11   "overseas."  I had a tour in Panama.
12        Q.    Okay.  I heard that's beautiful.
13        A.    It is.
14        Q.    Yeah.  Did you serve in any war zones?
15        A.    I was not under hostile fire, no.
16        Q.    Okay.  And -- and what did you do in the --
17   in the military?
18        A.    I was a physician.
19        Q.    Okay.
20        A.    A medical officer.
21        Q.    Well, thank you for your service.
22              And you did that for two years?
23        A.    That is correct.
24        Q.    And then in '73 you -- you came down to
25   Miami?
```



```
 1     A.    That's correct.
 2     Q.    And were at Jackson.  And that's --
 3           What is a fellowship?
 4     A.    A fellowship is specialty training over and
 5  above the residency.  And it's actually to go into a
 6  subspecialty of some type.  Now, infectious disease
 7  is a subspecialty of internal medicine.
 8     Q.    Okay.  And at that point, had you decided
 9  you wanted to be infectious disease specialist?
10     A.    No.  Actually, I decided that back earlier
11  on, when I was a resident.
12     Q.    During your residency?
13     A.    Yes.  Uh-huh.
14     Q.    Okay.  Do you know a Dr. -- a local
15  infectious disease doctor named Dr. Freedman?
16     A.    Freedman?
17     Q.    Yeah.
18     A.    Not right off, no.
19     Q.    Okay.  And you did that, the infectious
20  disease fellowship, for two years?
21     A.    That is correct.
22     Q.    And then you sat for the boards?
23     A.    Yes.  Uh-huh.
24     Q.    Did you pass the boards?
25     A.    I passed both internal medicine and
```

Page 76

```
 1   infectious disease.
 2        Q.   Okay.  And -- and those are what's noted at
 3   the top of your CV as -- as diplomates?
 4        A.   That's correct.  Yes.
 5        Q.   Do you have any other board certifications?
 6        A.   No.  That's it.  I've maintain
 7   certification in infectious disease.
 8        Q.   And have you not in internal medicine?
 9        A.   I've not done the official maintenance of
10   certification, which has been started over the last
11   two or three years by the American Board of Internal
12   Medicine, in medicine, but I have maintained it in
13   infectious disease.
14        Q.   Got it.
15             And have you held the -- the board
16   certification in internal medicine -- in infectious
17   disease.  When -- when did you get that,
18   approximately?
19        A.   I think it was in '75.
20        Q.   Okay.  And have you held that consistently
21   until today?
22        A.   Yes.  Uh-huh.
23        Q.   What did you do, did you start practicing
24   in private medicine in 1975?
25        A.   No.  I stayed on the full-time faculty in
```



Page 90

1      Q.   For these various infections that he had
2   over -- particularly let's focus on this last time
3   period from, I believe, 2010 until March of 2013, he
4   was -- was he regularly treated with antibiotics?
5      A.   He was very frequently treated with
6   antibiotics.  Most of them directed at problems
7   relating to the pressure ulcers, but also on a number
8   of occasions for urinary tract infection, including
9   the bacteremia.
10     Q.   And did the -- do those -- did the taking
11  of those antibiotics affect mental status in any way?
12          MR. BRENNER:  Object to the form.
13      Calls for -- calls for opinions beyond
14      what's in his report and also essentially
15      asked and answered.
16          THE WITNESS:  I cannot say that the
17      antibiotic per se would have affected mental
18      status.  The infection being treated,
19      particularly bacteremias, can affect mental
20      status.
21  BY MS. MARKOE:
22     Q.   In what way?
23          MR. BRENNER:  Same objections.
24          THE WITNESS:  That the bacteremia can
25      cause various problems with mental status



Page 91

```
 1        and varying from just difficulty in
 2        concentrating, having fever with chills, to
 3        actual coma.  Now, that did not occur in his
 4        case, but that could happen.
 5   BY MS. MARKOE:
 6        Q.   Speaking of -- of mental status, I note in
 7   your report that there was one instance recorded of
 8   Mr. Kleiman being given a warnin' -- warning by the
 9   Hospital Disruptive Behavior Committee.
10             What is the Hospital Disruptive Behavior
11   Committee?
12             MR. BRENNER:  Just you answer, you --
13        you mentioned it's in his report.  Can you
14        let me know where that is.
15             MS. MARKOE:  Page 2, in the same -- in
16        the third paragraph that's discussing --
17             MR. BRENNER:  Got it.  Thank you.
18             MS. MARKOE:  No problem.
19             MR. BRENNER:  And if you want to re-ask
20        it to make it cleaner, I'm be happy to have
21        you do it.
22   BY MS. MARKOE:
23        Q.   Okay.  So let me re-ask the question.
24             Speaking of mental status, I note in your
25   report that there was one instance recorded of
```



Page 92

1  Mr. Kleiman being given a warning by the Hospital
2  Disruptive Behavior Committee.
3         What is the Hospital Disruptive Behavior
4  Committee?
5     A.  Well, this is a VA phenomenon, that if a
6  patient is causing problems with staff or with other
7  patients in the hospital, it can be referred to this
8  committee, and this committee decides whether some
9  sort of discipline should be carried out.
10        Now, what discipline can they do to a
11 patient in the hospital?  They can discharge him or
12 they can issue a warning.  And in this case, they
13 issued a warning.
14    Q.  In your experience -- 'cause you've worked
15 at VA Hospitals; is that correct?
16    A.  Yes.  Uh-huh.
17    Q.  In your experience in working in VA
18 Hospitals, what types of disruptive behavior or
19 referred to?  I mean, you -- you mentioned
20 "disruptive behavior."
21        Is that just sort of being argumentative,
22 or is that being verbally or physically abusive?
23        MR. BRENNER:  Object to the form.
24        THE WITNESS:  I don't know what the
25     episode -- this episode was specifically in



Page 93

```
 1           this case.  However, in general, it's being
 2           abusive or destructive.
 3   BY MS. MARKOE:
 4        Q.   Mr. Brenner, I believe, men- -- showed you
 5   a couple of examples of Mr. Kleiman self-reporting
 6   that he was doing work at a couple of points in 2011.
 7             Do you recall that?
 8        A.   Yes, I do.
 9        Q.   And you have no way of knowing whether that
10   was a truthful statement or a untruthful statement?
11             MR. BRENNER:  Object to the form.
12             THE WITNESS:  Well, there's no way
13           deriving from the record precisely or
14           exactly what he was doing.  It's just that
15           he was claiming to do some kind of work on a
16           computer.  And then one thing about a clock.
17           I really don't know what that is.
18   BY MS. MARKOE:
19        Q.   With regard to your discussions earlier and
20   the questions earlier about the -- the use of the
21   computer, do you recall in the medical records, aside
22   from Mr. Kleiman's own statements about doing work,
23   any reference noted that he was, in fact, doing work
24   when using his computer?
25        A.   I do remember that there were references to
```



Page 94

1  that, and I believe most of them did come from a
2  psychology service, which -- including these
3  (Indicating) --
4      Q.  Right.
5      A.  -- that there are multiple references from
6  a nursing service and from the physicians that he was
7  using the computer, but he was doing on it is not
8  documented.
9      Q.  And you would have no way of knowing
10 whether -- no one would have any way of knowing
11 whether he was using that computer to do work, to
12 play solitaire, to surf the Internet, whatever the
13 case may be?
14     A.  Well, there are a number of different
15 things --
16         MR. BRENNER:  Object to the form.
17     Beyond the scope -- excuse me.
18         THE COURT REPORTER:  Beyond the scope
19     of?
20         MR. BRENNER:  Beyond the scope of the
21     medical doctor's opinion.
22         But you can answer.
23         THE WITNESS:  Okay.  He could have been
24     doing any of those.  He could have been
25     playing games.  I don't know.



Page 95

BY MS. MARKOE:

Q. And there's no notation that you saw in the medical records from medical staff regarding what he was doing on the computer?

A. That is correct.

MS. MARKOE: I don't think I have anything else.

REDIRECT EXAMINATION

BY MR. BRENNER:

Q. The -- the only question I'd ask, just to clarify is, the one time -- he had bacteremia one time?

A. At least one time. One time that I remember specifically.

Q. And the -- the -- the parade of side effects one could get from the antibiotics for bacteremia that relate to mental state, you didn't see any evidence of that with Mr. Kleiman, correct?

A. Yeah, I would have to say that the mental state would have been affected by the bacteremia itself, not by the antibiotics.

Q. You saw no evidence of that with Mr. Kleiman, correct?

A. That is correct.

MR. BRENNER: Noting further.

