**Reasons for decision**

**Coin-Exch Pty Ltd – 31 163 338 467**

**Issues**

1. Are you, Craig Wright, entitled to the input tax credits claimed in your Business Activity Statement (BAS) as lodged for the tax period ended 30 September 2013 (the relevant tax period), for the purpose of the *A New Tax System (Goods and Services Tax) Act 1999* (GST Act)?

2. Are any of your related entities, Trustee for the Wright Family Trust (DeMorgan); Cloudcroft Pty Ltd (Cloudcroft) and Coin-Exch Pty Ltd (Coin-Ex) (collectively, the related entities) entitled to the input tax credits claimed in their BAS' as lodged for the relevant tax period, for the purposes of the GST Act?

3. Alternatively, does Division 165 of the GST Act apply to negate any GST benefits obtained by you or any of the related entities?

**Audit Findings**

4. No, you are not entitled to the input tax credits claimed in your BAS for the relevant tax period so far as those input tax credits relate to the purported acquisition of software from W&K Information Defence Research LLC (W&K) and MJF Mining Services WA Pty Ltd (MJF)[1].

5. No, the related entities are not entitled to the input tax credits claimed in their BAS' for the relevant tax period so far as those input tax credits relate to the purported acquisition of software or intellectual property (IP) in software from you or DeMorgan.

6. To the extent you and the related entities are properly entitled to the input tax credits described above, Division 165 of the GST Act applies to negate any associated GST benefits, as defined by subsection 165-10(1) of the GST Act, arising for you and the related entities.

**Background information**

7. On 14 February 2014, we emailed Hotwire[2] and Coin-Exch an interim audit report. The interim audit report explained that Hotwire and Coin-Exch initially contended to have paid bitcoin to DeMorgan for software licences, and asserted that an input tax credit entitlement arose for these acquisitions. The interim audit report advised that Coin-Exch did not properly account for its supply of bitcoin in consideration for the contended software licence acquisition as a taxable supply. If it did, Coin-Exch would not have a negative net amount for the relevant tax

---

[1] The contract provided to us between you and MJF refers to 'MJF Mining Services WA Pty Ltd' whereas the invoice purportedly issued to you was from 'MJF Contracting'. These entities are purportedly one and the same.
[2] Hotwire Pre-emptive Intelligence Pty Ltd, an entity formerly under your control but under administration as at the date of this correspondence.

CONFIDENTIAL                                                                                                  DEF_00051443

period.   Marina Dolevski of the ATO withdrew this report on 19 February 2014, based on subsequent information you provided to us, as set out below.

8. On 18 February 2014,  you and other representatives of yourself and the related entities, namely John Chesher and Andrew Sommer (of Clayton Utz), met Des McMaster, Marina Dolevski and Hoa Do of the ATO at our Sydney office.[3] During the meeting, you provided the following information:
   a. Hotwire and Coin-Exch did not supply bitcoin to pay DeMorgan for the software. Instead, they transferred an equitable interest that you held in an offshore trust. You further explained that the recipient of the interest could call for the transfer of bitcoin from the trust to it absolutely, or, could direct the trustee to transfer the bitcoin to a third-party;
   b. As such, there was a supply of rights, not the supply of bitcoin, and later your advisor suggested that these supplies were interests in or under a trust over bitcoin, which are input taxed under item 10 of the table following subregulation 40-5.09(3) of the GST Regulations;[4]
   c. The invoice MJF issued you dated 1 July 2013 (Ref: OB0188) included an item 'Agreement to supply Microfinance software and Accounting packages. Integration and support. Developed in conjunction with Dallah AlBaraka group (SA).'(Al Baraka). The 'unit price' was $11,500,000 and you advised you made this acquisition as an agent for Coin-Exch. (At the meeting you provided us a copy of a contract regarding the AlBaraka software that showed  Al Baraka Banking Group and Hotwire (with Craig Wright as agent) as the parties);
   d. For the MJF transactions, payment was made in bitcoin, and not by way of a transfer of rights. The bitcoin were transferred from trusts held in the UK, the trustee of which is 'Design by Human Ltd'. The remainder of bitcoin remains in offshore trusts; and
   e. Share capital in the relevant related entities Coin-Exch, Hotwire and Cloudcroft was funded through the transfer of an interest in an offshore trust which holds bitcoin.

9. On 19 February 2014, the case was transferred from auditor Celso Tomas to auditor Andrew Miller, following your request that your case be reassigned.

10. On 25 February 2014, John Chesher provided Andrew Miller with proposed amended BAS working papers for a number of entities under audit.

11. On 26 February 2014, John Chesher emailed Andrew Miller a paper that described certain relevant transactions. This paper provides the following information:
   a. Much of the bitcoin available to you is held in a trust, formed in the Seychelles (the Seychelles trust).
   b. The Trustee of the Seychelles Trust is a company incorporated in the United Kingdom, Design by Human Ltd.
   c. Pursuant to a 'Deed of Loan', entered in to by that Trustee and you in October 2012, the Seychelles trust made a facility of 650,000 bitcoin available to you.

---

[3] We note that the presentation slides used by Clayton Utz at this meeting and later provided to Marina Dolevski differ in material respects from the transactions described in the Clayton Utz letter dated 9 May 2014. The description of the information disclosed at the 18 February 2014 meeting, as outlined in paragraph 8, is taken from the transcripts of that meeting.
[4] Per email from Clayton Utz on 24 March 2014 to Andrew Miller.

CONFIDENTIAL

DEF_00051444

   d. An annotation on the Deed of Loan (which is believed to have been written contemporaneously with the execution of the Deed) states 'As agreed all wallets to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K [understood to be a reference to a certain Dave Kleiman] and CSW'.
   e. Share capitalisation of the related entities occurred through the transfer of the rights to draw down on the facility, and the relevant related entity (i.e.: either Coin-Exch or Cloudcroft) receiving the rights would be able to call for the transfer of bitcoin to itself or the transfer of the bitcoin to a third party. Until such time as the relevant related entity provided the Trustee with its instructions, the bitcoin would remain held by the Trustee for the benefit of that entity.

12. Also on 26 February 2014, John Chesher and Ann Wrightson met with Andrew Miller and Jenifer Trinh of the ATO. Your representatives gave explanations concerning the updated working papers provided the previous day.

13. On 17 March 2014, John Chesher sent a response to an ATO information request sent on 5 March 2014, in relation to you and DeMorgan. This included responses to questions, and documents in support of those responses. The following information was provided:
   a. You were not a director of W&K but on occasion served as alternate director.
   b. You transferred IP to W&K during the 2010 income year, with a value set at $5,000.
   c. You entered into an agreement with W&K on 2 April 2013 (REF: CEWK03). Under this deed, loans from you to W&K referred to in a previous agreement (CEWK01) were deemed to have been paid in full and the purchaser is stated to have accepted the new terms as full satisfaction of CEWK01.
   d. Uyen Nguyen accepted the position of US resident director of W&K on 1 July 2013. You advised that Dave Kleiman request she hold this position.
   e. On 9 July 2013, Uyen Nguyen transferred all software and related algorithms to you in exchange for the release of W&K from existing debts. The document that is contended to give effect to this transfer referenced NSW Supreme Court (NSWSC) cases 2013/225983 and 2013/245661. The relevant statements of claim were filed at the NSWSC on 25 July 2013.

14. Also provided was a 'Deed of Loan' in relation to the Seychelles trust (Loan Deed). This deed is contended to establish the loan to you of 650,000 bitcoin from Design by Human Ltd, explained at paragraph 11 above. It is contended that rights to the equity of this 'trust' were used as consideration for the acquisition of software in transactions involving you and the related entities. It is noted in this deed that:
   a. The trustee of the Trust is 'Design by Human Ltd' (08248988) UK;
   b. The deed is dated 23 October 2012;
   c. The deed is executed by Uyen Nguyen for Design by Human. The 'Consent to Act' document at the end of the deed states that Uyen Nguyen accepts the position of Chief Operating Officer of Design by Human from 18 October 2012 and consents to act as Director from the later date of 30 June 2013;
   d. The mortgagee (identified in the deed as Design by Human) agreed to lend money in the form of bitcoin to the mortgagor (identified in the deed as you).

CONFIDENTIAL                                                                                      DEF_00051445

    e.  The loan is for 650,000 bitcoin;

    f.  You are to repay the loan by 30 June 2020; and

    g.  Appendix 1 lists bitcoin blockchain addresses stated to have been transferred and contains a note that 'As agreed all wallets to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW'.

15. On 18 March 2014, John Chesher advised Andrew Miller by email that amended BAS' for the relevant period had been lodged for you and other entities related to you. Our systems show that you lodged an amended BAS on 17 March 2014.

16. On 28 March 2014, Andrew Miller, Jenifer Trinh and Des McMaster of the ATO met with John Chesher, Craig Wright and Andrew Sommer, at the premises of Clayton Utz in Sydney. At this meeting your representatives provided documents and information in further response to our information requests, some of which had not been previously provided.[5] In particular, you provided us the following documents and information for the first time during these audits:

    a.  A 'Deed of Assignment and Charge' between you and DeMorgan, signed and dated 15 July 2013. This deed among other things, refers to the ABN of DeMorgan. Under the deed, you agreed to transfer IP to DeMorgan. The IP was stated to consist of core software and training materials, source code developed under agreement with W&K (the deed listed categories of source code purportedly related to projects completed for the United States Department of Homeland Security (US DHS)) and software sourced from MJF (which although stated by the deed not to have been received as at the date of signing, was stated to be purportedly subject to an agreement for supply).

    b.  Three documents, all described as an 'IP Deed of Assignment' respectively between DeMorgan and each of the related entities, dated 15 September 2013.

    c.  Three documents, each described as a 'Deed of Assignment of Equitable interests' between you and each of the related entities, dated 1 July 2013. According to these documents you held equitable rights to a number of bitcoin managed in the UK, the bitcoin being legally owned under the terms of an overseas trust. The 'equitable interest' so described is contended to confer the right to call on bitcoin.

    d.  You also confirmed that you personally did not provide the bonds referred to in the NSWSC statements of claim, despite claiming relief for those amounts.  You were uncertain of the source of those bonds and thought the bonds may have been from an American gaming company called 'Playboy Gaming'. The settlement of the NSWSC proceedings is said to have resulted in you obtaining legal title to software purportedly held previously by W&K in exchange for the satisfaction of the debt you claimed in those proceedings (which included the $20,000,000 bonds).

17. W&K was administratively dissolved on 28 September 2012 due to failure to pay annual fees. On 29 March 2014, John Chesher advised us that Uyen Nguyen had paid the required fees to the Florida Department of State (FDS) to reinstate W&K

---

[5] We note that these documents are inconsistent with the structure of the arrangement as advised to us at the meeting of 18 March 2014. In describing the arrangement below, we have taken into account relevant source documents, including those provided to us on 28 March 2014 and statements made by you at interview on 11 and 18 August 2014.

CONFIDENTIAL

DEF_00051446

as a company, as at 28 March 2014. This had the effect of treating W&K has having never been administratively dissolved.

18. On 2 April 2014, John Chesher provided Andrew Miller with a list of all bitcoin wallets used for the MJF transactions. He advised that these were 'off blockchain' transactions, which is understood to mean that there was no transfer of bitcoin between the wallets of the purchaser and the vendor of the software recorded on the blockchain (a publicly available ledger of bitcoin transactions), but rather an entire bitcoin wallet and key were provided by the purchaser to the vendor. It is noted that the wallets and bitcoins purportedly transferred in the transaction under which the MJF software was acquired, comprise the majority of wallets and bitcoins referred to in the deed of loan entered between you and the trustee of the Seychelles trust.

19. On 8 April 2014, we issued a second interim report to Coin-Exch, explaining our view that there was no supply or acquisition of software or IP given the conflicting contractual documents and that even if there was, there was no consideration provided for any associated acquisition, as a result of the deed of loan not being signed by an authorised person and hence having no effect.

20. We received a response to the 8 April 2014 interim report on 9 May 2014. Broadly your advisor asserted Coin-Exch's entitlement to input tax credits arose because it made an acquisition for a creditable purpose, the acquisition by Coin-Exch was of a taxable supply, and that Coin-Exch provided or was liable to provide consideration for the supply of the thing acquired. You provided us with an opportunity to view the software held in your group in order to verify that there was a supply and that you do hold software.

21. On 3 June 2014, Stuart Coulson and Andrew Miller of the ATO, attended the Sydney offices of Clayton Utz. You provided a demonstration of various software, showing you had access to Siemens support and could download different software suites. You showed us source code which appeared to relate to Al Baraka and demonstrated what you purport to be a functioning online bitcoin banking system. You also showed us other software packages which you said were obtained from W&K, including online gaming software such as 'Texas hold 'em'.

22. On 30 June 2014, George Montanez of the ATO spoke with your representatives and advised that the refund claimed by Coin-Exch would be released because, on our understanding of the  evidence held at that time, it was considered appropriate to do so. However, we made it clear that there would be further compliance action encompassing a review of the transactions concerning the contended acquisition of software IP underlying you and your related entities input tax credit claims for the relevant tax period.

23. On 11 and 18 August 2013, you attended an interview with Counsel representing the ATO. Some relevant statements made at these interviews are set out below:

    a. You advised the funding for Coin-Exch was obtained via a Panamanian trust, in conflict with all previous statements that it was a trust in the Seychelles.[6]
    b. You admitted to back-dating invoices, despite advice that you shouldn't.[7]

---

[6] Auscript transcript of 11 August 2014 at pages 10-13.
[7] Auscript transcript of 11 August 2014 at pages 23-24 and 18 August 2014 at pages 25-26.

CONFIDENTIAL                                                                                                          DEF_00051447

c. When asked what changed [with the transactions] following input from the Commissioner [of Taxation], you said 'How we did GST'.[8]

d. You advised that there was no business plan for Coin-Exch and that it won't be making money in the foreseeable future, and that it will be spending money.[9]

e. You described the inter-company transactions as 'zero transactions', the effect of which is to net-off to a nil amount.[10]

24. On 15 September 2014 we sent you our final audit report (in draft form). On 23 September 2014 you provided us with further information in relation to whether DeMorgan, Coin-Exch and Cloudcroft were carrying on an enterprise for the purposes of subsection 25-5(1) of the GST Act.

**Description of the arrangement[11]**

25. You, Craig Wright, incorporated numerous companies which you have indicated each relate to the bitcoin industry. The company details (based on ASIC records) are set out below:

| Company Name | ABN | Established | Director(s) |
|---|---|---|---|
| Coin-Exch Pty Ltd (Coin-Exch) | 31 163 338 467 | 17/04/2013 | Craig Wright Jamie Wilson  (ceased) |
| Hotwire Preemptive Intelligence Pty Ltd (Hotwire)[12] | 48 164 068 348 | 02/06/2013 | Craig Wright Ramona Watts |
| Cloudcroft Pty Ltd (Cloudcroft) | 94 149 732 365 | 08/03/2011 | Craig Wright Lynn Wright (ceased) |

26. You and each of these companies report GST quarterly on an accrual basis.

27. You also contend to have established a trust 'the Wright Family Trust', which through its trustee purportedly trades as 'DeMorgan'. You assert that you formed the intention to set up a family trust to hold software in the first part of 2013 and engaged a lawyer to assist with this. The trust deed for DeMorgan was stated to have been executed on 9 August 2013 and it was issued with an ABN on 26 August 2013. The trustee is said to be Panopticrypt Pty Ltd.

28. You have stated that you acquired software, including source code, from two primary sources; W&K and MJF. Your stated intention in acquiring the software from W&K and MJF was to supply it to DeMorgan and then split the software into components which would then be supplied to Coin-Exch, Hotwire and Cloudcroft.[13]

The W&K transaction:

29. W&K is a limited liability company that was registered in Florida on 14 February 2011. W&K was administratively dissolved on 28 September 2012 due to owing outstanding company fees to its  corporate regulator, the FDS. After advising you

---

[8] Auscript transcript of 11 August 2014 at page 24 and 18 August 2014 at pages 25-26.
[9] Auscript transcript of 11 August 2014 at pages 9-10.
[10] Auscript transcript of 18 August 2014 at pages 25-26.
[11] All amounts in this position paper are in Australian dollars unless otherwise indicated.
[12] According to ASIC records, Hotwire was placed into administration on 28 April 2014.
[13] Submissions received in relation to the draft interim report for Coin-Exch dated 9 May 2014 (the Clayton Utz letter) at page 8.

CONFIDENTIAL

DEF_00051448

of this on 28 March 2014 the outstanding fees were paid to FDS on the same day, the effect of which was to reinstate the company as if it were never administratively dissolved.

30. You have stated that some of the software the subject of the W&K agreements was originally developed by you and later transferred to Dave Kleiman 'at cost' for $5,000.[14] Your representatives have also stated that irrespective of the contractual arrangements with W&K, you were in possession of the relevant software at the time you purportedly transferred it to DeMorgan.[15]

31. On 25 July 2013 you lodged a Statement of Claim with the NSWSC, which you claim was done to obtain title to software previously owned by W&K. In this case, 2013/225983, you made the following statements to the court:
    a.  You provided contract labour services to W&K.
    b.  You were party to a contract with W&K dated 27 October 2008.
    c.  You were a contractor and financier.
    d.  You conducted four projects associated with the US DHS (the statements you provided to the NSWSC listed the projects and the associated funding)
    e.  The Director of W&K died in May 2013.
    f.  A bond of $20,000,000 was provided (the inference to be drawn, given your claim as particularised at g below, is that you purportedly loaned or otherwise provided W&K a bond of $20,000,000). W&K held IP in the form of software and code used by the US Military, US DHS and other associated parties.
    g.  You claimed $28,253,633.00. This was comprised of the $20,000,000 bond, the funding provided for the four projects, and the interest accrued on the project funds.

32. The reference to the contract of 27 October 2008 was explained as being a reference to a purported contract between you and David Kleiman in his personal capacity which was then ratified by W&K once it was incorporated.[16]

33. The US DHS has confirmed that whilst W&K had placed a bid to complete the four projects listed in the documents you provided the NSWSC, it was not successful in obtaining any of those contracts. You were listed as the contact person for the project submissions. Documents obtained from the NSWSC in relation to these cases contained 2 emails sent to you from the US DHS BAA Program Support Office confirming that two proposals for W&K had been received electronically at that office and that those proposals were uploaded by you.

34. The US DHS also confirmed that it did not provide any funding to W&K.  You have stated that you were not involved in the applications for funding from the US DHS and that David Kleiman did not inform you of the outcome. An email between David Kleiman and Uyen Nguyen refers to using your source code to 'gain a large amount of funding' but it is not clear what funding is referred to and where that funding was obtained.[17]

---

[14] Email from David Kleiman dated 28 June 2011 confirming that 'all software' had been transferred for $5,000. This appears to be the subject of NSWSC case 2013/245661.
[15] Clayton Utz letter at page 3.
[16] In this respect, your provided us with a document titled 'statement of work'.
[17] Email between David Kleiman and Uyen Nguyen dated 20 December 2012 referring to her acceptance of the director position at W&K.

CONFIDENTIAL                                                                              DEF_00051449

35. The IP that is said to have been developed for these 4 projects purportedly forms part of the software that was later acquired by your related entities Coin-Exch and Cloudcroft.

36. On 13 August 2013, you filed a second statement of claim with the NSWSC. In this case, 2013/245661, you made the following statements to the court:
    a. You provided contract labour services to W&K.
    b. You loaned money to W&K at a set interest rate, with the expectation that W&K would repay that amount in full when a project was completed. This loan was issued in bitcoin.
    c. You entered into a contract with W&K on 8 January 2009, under which W&K agreed to pay you for property and consulting services.
    d. The contract was secured against the intellectual property of W&K.
    e. You were the contractor and financier.
    f. Funding was supplied using Bitcoin and gold bonds.
    g. A bond of $20,000,000 was provided to cover funding of the research.
    h. The IP is software and code used in the creation of a Bitcoin system.
    i. You claimed $28,533,016.79 which includes the $20,000,000 bond.

37. You have advised us that W&K did not have any representatives present for the court proceedings,[18] and that Uyen Nguyen acted for W&K in the two cases before the NSWSC. Both NSW Supreme Court matters were settled pursuant to an agreement dated 9 July 2013[19] (16 days before a Statement of Claim was filed for either action), between you and Uyen Nguyen in her stated capacity as director of W&K.

38. That agreement specifically listed the NSWSC case reference numbers and states "In consideration of the amounts due, W&K Info Defense hereby accepts the offer to transfer all agreed items to Craig Wright R&D for the agreed considerations." The consent document provided to the ATO was not found in the case files sourced directly from the NSWSC.

39. Information obtained from NSWSC court files for cases 2013/225983 and 2013/245661 show that you filed the Acknowledgment of Liquidated Claim on 19 August 2013 on behalf of W&K as the legal agent and representative. In the documents you stated that you were acting as Director/Australian Agent of W&K. However, you have stated that you were not a director of W&K at any time but served as an alternative director for David Kleiman from time to time.[20] There are no records which establish that you held any authorised position with W&K.

40. In the same information obtained from the NSWSC court files, Jamie Wilson signed the *Consent Orders* on behalf of W&K on 28 August 2013. There are no records that establish that Jamie Wilson was ever an officeholder or had authority to represent W&K in the NSWSC.

41. You asserted that the value of the software obtained from W&K is established by reference to the amount of the debts claimed in these NSWSC matters.[21] However, you have also stated that you did not provide the $20,000,000 bond,

---

[18] Response to questions received by us on 17 March 2014.
[19] We clarified with you whether the date on this document was 9 July 2013 or 7 September 2013 and you confirmed that the correct date was 9 July 2013.
[20] Response to further questions for Craig Wright received by us on 17 March 2014.
[21] Clayton Utz letter of 9 May 2014 at page 12.

CONFIDENTIAL                                                                DEF_00051450

claimed as a debt owing to you in the NSWSC actions, and that you do not know who did.[22] Further, the NSWSC was presented with a purported invoice from W&K to you, which states that W&K supplied you with 4 US DHS projects, $20,000,000 in software and loans of bitcoin.[23]

<u>The MJF transaction:</u>

42. On 3 June 2013, Mark Ferrier of MJF and you entered into a *Contract for the Sale of Personalty* (ref OB0188)[24] for you to acquire:

    i.   Siemens mining automation software for $5,000,000;
    ii.  Microfinance software and accounting packages, developed by Al Baraka for $11,500,000; and
    iii. Gold options from Paynes Gold Mining for $18,750,000.
       (All amounts excluding GST)

43. You hold two documents described as tax invoices purportedly issued by MJF. The first is dated 1 July 2013, marked 'OB0188' and refers to the items listed above, plus valuation services of $50,000.  This invoice is for $35,300,000 plus GST; that is, for a total of $38,830,000.

44. The second purported tax invoice is dated 15 August 2013 marked 'Dallah', and is stated to be for fees in relation to 'core software per the Al Baraka contract'. This invoice is for $18,454,974 plus GST, i.e. $20,311,471.

45. You provided us a list of the public addresses of the bitcoin wallets which were purportedly used as consideration for the MJF transaction. These wallets were purportedly transferred 'off blockchain' meaning that the relevant transactions cannot be traced in the blockchain ledger and the relevant private key is passed directly to the recipient rather than transferring bitcoin to the recipient's wallet.

46. You claimed input tax credits for these contended software acquisitions from MJF in your BAS for the relevant tax period. You did not include GST on any supply of Bitcoin in your BAS for the relevant tax period.  It is noted that you advised that the Gold Options and Valuation services were never provided to you and you are taking legal action against MJF in relation to this. Regardless of the supply not occurring, you claimed an input tax credit for these acquisitions in your BAS for the relevant tax period.

47. A Software Agreement was entered into on 1 July 2013, between Al Baraka and Hotwire, listing you acting as agent for Hotwire, and MJF acting as agent for Al Baraka (a wholly owned subsidiary of Al Baraka Banking Group). However, the purported invoice that is said to substantiate the supply and consideration provided is addressed from MJF to you directly.

48. Your advisors have stated that it was always your intention to acquire all the relevant software from MJF in your personal capacity and that the subsequent

---

[22] Statement made at interview with us on 28 March 2014.
[23] Invoice dated 22 April 2011, copy obtained from the NSWSC case file on 26 May 2014.
[24] You have stated that you met Mark Ferrier at a conference but cannot recall where that conference was held or what the conference was in relation to. You have confirmed that all negotiations for this contract were done over Skype and have provided us with a Skype record (in a form of an excel spread sheet) and email exchanges as evidence.

CONFIDENTIAL

agreements between you, DeMorgan and related entities such as Coin-Exch and Cloudcroft evidence this intention.[25]

49. ATO officers have viewed software which appears to be Siemens software and source code for a core banking package. However, based on the following third party checks we consider that you and your related entities did not at any material time hold authorised versions of the relevant software. Specifically:
   a. Siemens Australia have advised us that it has not sold or licensed software to either MJF or you; and
   b. Al Baraka have advised us that it has not had any relationship whatsoever with MJF, there was not any business conducted between it and Mark Ferrier (the director of MJF), and, that that the purported software supply agreement had nothing to do with them as they are not related to such business.

50. You have provided the ATO with copies of letters and emails purporting to be from employees of Al Baraka regarding training and technical support available in relation to the Al Baraka software you purportedly acquired. These emails were sent from a domain which has an address listed as a virtual office in Istanbul known as 'Servcorp'. The domain was established in January 2014. Your credit card records show that a payment was made to this virtual office around the time the domain was established. You indicated to us in interview on 18 August 2014 that you did not have any reason to make such a payment to 'Servcorp' and that you intended to make inquiries as to how that payment appeared on your statement.

51. We do not accept that the copies of the letters and emails you purportedly received from Al Baraka substantiate your input tax credit claim for software, for reasons including that they were sent from a domain name which was not active at the time the email was purportedly sent.[26]

<u>Your purported sale of the W&K and MJF software to DeMorgan:</u>

52. You state that you formed the intention of setting up a family trust in the first part of 2013. Due to delays caused by your lawyers the trust deed for the Wright Family Trust (DeMorgan) was not executed until 9 August 2013. Panopticrypt Pty Ltd was appointed as trustee, but a resolution was made on 19 August 2013 that it act as trustee through you as the sole manager of the trust for a term of up to 3 years.[27] Another memo dated 9 August 2013, stated that Lloyds Solicitors had settled the trust and that an ABN registration was to be filed with the ATO. This same document contains the ABN of DeMorgan in the footer of the page.

53. You have provided us with a 'Deed of Assignment and Charge' between you and DeMorgan dated 15 July 2013. This Deed also contains the ABN of DeMorgan, which was not issued until 26 August 2013. Your advisors have stated that it would seem likely that the deed was executed after 15 July 2013 and the date on the front page of the agreement was not updated.[28] However, even if the deed

---

[25] Clayton utz letter at page 8.
[26] Email sent from 'craig.wright@hotwirepe.com' to 'Ghamrawi@albaraka-bank.asia' at 3:12pm on 31 December 2013. Domain search for 'albaraka.bank.asia' shows it was created at 8:21pm on 1 January 2014. The registered address is Level 8, Tefken Tower Buyukdere St No2094 Istanbul. This is the result of an online 'WhoIS' search on 2 June 2014.
[27] Memo dated 19 August 2013 under the DeMorgan logo.
[28] Clayton Utz letter at page 5.

CONFIDENTIAL                                                          DEF_00051452

was executed on 15 July 2013, you have stated that you had signed this deed in the belief that you were acting in your capacity as trustee. However, the trust did not exist at this time. This deed purports to grant DeMorgan an exclusive licence to use and exploit certain IP which includes the software from W&K and MJF.[29] However, the deed specifically notes that the IP of W&K in 'SCADA and Firewall research will be transferred directly from Mr Wright to Cloudcroft Pty Ltd'.[30]

54. Documents described as 'invoices' dated 1 July 2013 were issued by you to DeMorgan. These 'invoices' include the ABN of DeMorgan, though no ABN was issued at this time. You advised that the invoices were issued at a later date, and that you back-dated them, despite advice from Jamie Wilson that you should not. You had previously advised that the incorrect dates appear on these invoices because of an error in your cloud based accounting software, Xero.

55. The details of these purported invoices are:

| Inv. No. | Description | Recipient | Unit Price $ | GST $ | Total Amount $ |
|---|---|---|---|---|---|
| INV-0096 | 2013/225983 and other supplies | DeMorgan | 31,388,908.50 | 3,138,890.85 | 34,527,799.35 |
| INV-0097A | Cloudcroft - NSWSC | Cloudcroft | 28,181,818.18 | 2,818,181.82 | 31,000,000.00 |
| INV-0098 | 2013 / Judgement 2 | DeMorgan | 31,000,000.00 | 3,100,000.00 | 34,100,000.00 |
| INV-0099 | Courseware for Uni Site | DeMorgan | 19,904,766.36 | 477.64 | 19,905,244.00 |
| INV-0100 | Uni Core Software | DeMorgan | 44,848,630.00 | 544,863.00 | 45,393493.00 |
| INV-0101 | Hardware Design | Coin-Exch | 174,559.83 | 17,455.98 | 192,015.81 |
| Total | | | 155,498,682.87 | 9,619,869.29 | 165,118,552.16 |

56. You have advised that INV-0097A was issued in mistake as it is intended to represent a supply of the relevant software to DeMorgan, not Cloudcroft, with DeMorgan then supplying a corresponding licence to Cloudcroft. This advice is inconsistent with the specific terms of clause 14.4 of the deed between you and DeMorgan, under which you retained the IP in the W&K SCADA to be transferred directly by you to Cloudcroft. As a consequence DeMorgan did not acquire the W&K SCADA software under this agreement.

57. You have explained that INV-099 and INV-0100 purportedly included GST-free sales for university courseware and testing.

58. On 22 August 2013, you in your personal capacity as 'Craig Wright R&D' entered into three purported 'Intellectual Property Licence' agreements with Hotwire, Coin-Exch and Cloudcroft. The terms of these contracts are similar and the key terms have been summarised below:
   a. That you as licensor own or have the right to use the IP as software.
   b. The licensor has clear title internationally based on the judgment from the NSWSC. (It is noted that this judgement was not handed down until 6 November 2013).

---

[29] Clause 14 of the Deed of Assignment and Charge between you and DeMorgan dated 15 July 2013.
[30] Subclause 14.4 of the Deed of Assignment and Charge between you and DeMorgan dated 15 July 2013.

CONFIDENTIAL                                                                                    DEF_00051453

     c. The licence fee is the amount of relief claimed under respective court cases.
     d. Commencement date: 01 July 2013
     e. Term: No end

59. You issued purported invoices on the same day to each company reflecting the amounts set out in the agreements.

60. On 27 August 2013, you applied for a private ruling relating to GST and the supply of IP (which subsequently issued as Authorisation Number: 1012513887115). In this private ruling application, you advised that the NSWSC action was taken to distribute property and transfer it into your name. The property was IP and valued in two tranches at $28,533,016.79 and $28,254,666.00. You advised you intended to exploit the value of the IP by using it within companies you control and would have an assignment contract completed at arm's length with the value based on that determined by the NSWC.

61. You then provided us three 'agreements' styled as deeds between DeMorgan and Hotwire, Coin-Exch and Cloudcroft respectively, all dated 15 September 2013. The deeds stated that DeMorgan owned IP in the form of software obtained through W&K and MJF. While these purported agreements conflict with the agreements of 22 August 2013, it is noted that they align with the purported invoices DeMorgan issued these companies. You advised that the invoices you issued on 22 August 2013 were in error and void and that the invoices you issued to DeMorgan correctly reflect the arrangement.

62. You lodged your BAS for the relevant tax period on 28 September 2013 (self-revised on 18 March 2014) with the following (revised) amounts:

| Sales | GST Debits | Acquisitions | GST Credits | Net BAS |
|---|---|---|---|---|
| $145,223,819 | $9,619,869 | $79,145,230 | $5,385,612 | $4,234,257 |

Transfers from DeMorgan to related entities

63. You have contended that DeMorgan supplied prepaid software licences to your related entities during the relevant tax period, and that the supply is evidenced by the deeds of assignment entered into on 15 September 2013 with each of Hotwire and Coin-Exch and the invoices dated 1 July 2013. The following information was provided on these purported tax invoices:

| Inv. No. | Description | Recipient | Unit Price $ | GST $ | Total Amount $ |
|---|---|---|---|---|---|
| INV-0001 | Software Sales-Prepaid Software License | Hotwire | 10,341,500 | 1,034,150 | 11,375,650 |
| INV-0002 | Software Sales-Prepaid Software License | Hotwire | 10,000,000 | 1,000,000 | 11,000,000 |
| INV-0003 | Software Sales-Prepaid Software License | Hotwire | 8,000,000 | 800,000 | 8,800,000 |
| INV-0004 | Software Sales-Prepaid Software License | Hotwire | 5,950,000 | 595,000 | 6,545,000 |
| INV-0005 | Software Sales-Prepaid Software License | Coin-Exch | 9,950,000 | 995,000 | 10,945,000 |

CONFIDENTIAL                                         DEF_00051454

| | | | | | |
|---|---|---|---|---|---|
| INV-0006 | Software Sales-Prepaid Software License | Coin-Exch | 4,950,000 | 495,000 | 5,445,000 |
| INV-0007 | Software Sales-Prepaid Software License | Coin-Exch | 4,950,000 | 495,000 | 5,445,000 |
| INV-0008 | Software Sales-Prepaid Software License | Coin-Exch | 4,950,000 | 495,000 | 5,445,000 |
| INV-0009 | Software Sales-Prepaid Software License | Coin-Exch | 4,950,000 | 495,000 | 5,445,000 |
| INV-0010 | Software Sales-Prepaid Software License | Coin-Exch | 4,950,000 | 495,000 | 5,445,000 |
| **Total** | | | **68,991,500** | **6,899,150** | **75,890,650** |

*Coin-Exch*

64. Coin-Exch was incorporated and registered with ASIC on 17 April 2013. At the time of registration you were recorded as the sole director and secretary.  At that time 100 shares were issued to you for $100.

65. Pursuant to a deed of assignment dated 1 July 2013 between you and Coin-Exch you purportedly assigned Coin-Exch your rights to call on 150,000 bitcoin held in a Seychelles trust (the 'rights to call on bitcoin').

66. On 22 August 2013 Coin-Exch issued 39,999,999 new shares of which 29,999,999 were allocated to you and 10,000,000 were allocated to Jamie Wilson.[31] The total value of these shares was stated to be $39,999,999 and all the shares were stated to have been paid in full. You advised us on 3 December 2013 that Coin-Exch received bitcoin in exchange for issuing these new shares. On 18 February 2014 you revised this explanation and stated that the share issue was paid for by the transfer of rights to call on bitcoin held by a trust in the Seychelles. On 11 August 2014, you advised that Coin-Exch was funded through a trust in Panama.

67. On 15 September 2013 Coin-Exch and DeMorgan entered into an 'IP deed of assignment' in relation to the licensing of Core Banking and Exchange Software, which was said to comprise of elements of both the Al Baraka and W&K software.

68. Purported invoices dated 1 July 2013 issued to Coin-Exch from DeMorgan for the supply of software licences and are said to relate to this deed of assignment and total $38,170,000. You have stated that Coin-Exch used the purported rights to call on bitcoin to pay these invoices. You advised at interview on 18 August 2014 the only funding source for each of your related entities, including Coin-Exch, were the purported rights to call on bitcoin. On 23 September 2014 your advisors noted that you have in fact redeemed that right and called on the bitcoin purportedly available to Coin-Exch and it has also used cash. Bank records for Coin-Exch show very little cash was available to Coin-Exch during the relevant period. The largest amount deposited into that account was attributable to an ATO refund which was then transferred to a related entity on the same day.

69. You advised in interview on 11 August 2014 that there was no business plan developed for Coin-Exch and you conceded that there was no possibility of a

---

[31] ASIC records filed on 25 August 2013.

CONFIDENTIAL

profit in the near future. During the relevant period, there is no evidence to demonstrate that Coin-Exch ever made any acquisitions or supplies to or from entities apart from you, DeMorgan and Hotwire. On 23 September 2014, your advisors provided further details in relation to the purported activities of Coin-Exch which included a paper titled 'Coin-Exch Pty Ltd Core Research' and a document provided to AusIndustry in relation to their request for further information (the 'AusIndustry document'). You have further advised that Coin-Exch has made acquisitions from third parties namely, Rubik, Modulus and Signia. These are understood to be acquisitions made after 30 September 2013.

*Hotwire*

70. Hotwire was incorporated and registered with ASIC on 2 June 2013. At the time of registration, you were sole director and secretary and 100 shares were issued to you for $100. On 1 July 2013 Ramona Watts (RW) was appointed as a director.

71. On 1 July 2013 you purportedly transferred an 'initial bitcoin wallet' contended to be worth $32,994,806.68 to Hotwire as a capital subscription. On 3 December 2013 you confirmed that this purported capital subscription was paid for in bitcoin. You later stated at an interview of 18 August 2014 that this capital subscription was in fact funded by rights to call on bitcoin held by a trust in the Seychelles.

72. Pursuant to a so called deed of assignment dated 1 July 2013 between you and Hotwire you purported to assign your rights to call on 284,438 bitcoin held in a Seychelles trust (the 'rights to call on bitcoin').

73. On 15 September 2013 DeMorgan and Hotwire entered into an 'IP deed of assignment' in relation to the purported licensing of automation software, including some software purportedly originating from Siemens and some software originating from W&K (which was the subject of a NSWSC action).

74. Hotwire was placed in external administration on 28 April 2014.

*Cloudcroft*

75. Cloudcroft registered for GST on 15 March 2011. Since 11 November 2011 you have been the sole director of Cloudcroft.  The majority shareholder since 1 July 2012 is Panopticrypt which acquired 500,000 shares for $50,000 on that date. On 15 November 2012 you acquired 120,000 shares for $120,000.  On 1 August 2013 Hotwire became a shareholder of Cloudcroft and according to documents lodged with ASIC acquired 1,000,000 shares for $1,000,000.

76. You have advised that there was a further capital subscription in exchange for 474,332 bitcoin. You also advised that this capital subscription was by way of transfer of rights to call on bitcoin.

77. Cloudcroft lodged a BAS for the relevant tax period disclosing purchases of a security software licence from you for $31,000,000. You have since advised that the invoice that related to this contended acquisition was issued in error.

78. In that same BAS, Cloudcroft declared total sales of $3,123,500, which included self-assessed export sales of $3,100,000 for the contended transfer of software to Denariuz SG, a Singapore based company, controlled by you.

CONFIDENTIAL                                                                     DEF_00051456

79. You lodged the BAS on behalf of Cloudcroft which included these disclosures, and resulted in a net refund payable of $2,834,648. This amount has been retained by the Commissioner under s 8AAZLGA of the TAA.

80. You have subsequently advised the ATO that the transfer of the licence from you was a mistake and should have been from you to DeMorgan, and then from DeMorgan to Cloudcroft.

81. To the extent it has undertaken any transactions, Cloudcroft has only done so with related entities.  Other than the purported transfer of rights to call on bitcoin, its only other source of funds appears to be from tax refunds.

*The Seychelles Trust*

82. In initial discussions earlier during the audit process you advised that transactions undertaken by you and the related entities were in bitcoin. After the PBR issued that explained our view that a supply of bitcoin in consideration for an acquisition would give rise to a taxable supply if the other requirements in section 9-5 of the GST Act were satisfied, you contended that consideration for all supplies of software and IP made under this arrangement was by an assignment of rights to the equitable interests in an offshore trust which holds bitcoin. In response to our information requests, you have advised that all of these assignments were for the interest in the Seychelles trust, which was purportedly created pursuant to the Loan Deed of 23 October 2012. The deed is executed by Uyen Nguyen of Design by Human Ltd. Attached to the deed is a consent to act, whereby she accepts the position of Chief Operating Officer (COO) from 18 October 2012, and Director from 30 June 2013.

83. The deed records a purported loan to you for the principal amount of 650,000 bitcoin, and the drawdown date was 1 July 2013.   The loan described in the deed is stated to be interest only loan at the rate of 0.05% per annum, with repayments commencing 30 July 2016 and repayment in full by 30 June 2020. The Loan Deed records a First/Second mortgage over all the shares in 'Permanent Success Limited UK' (Permanent Success UK company reference 08260048) and all related trusts as collateral security.

84. On 28 March 2014 we advised you that there is no record of Uyen Nguyen ever holding the position of Director of Design by Human. Companies House records were then updated on 10 April 2014 to enter Uyen Nguyen retrospectively as director, as of 12 October 2012.

85. An Appendix to the Loan Deed lists what were described as the 26 bitcoin blockchain addresses which were the subject of the Deed and contains a note that "As agreed all wallets to be held in the UK in trust until all regulatory issues solved and Group Company formed with Dave K and CSW (CW)". The Loan Deed states that the money referred to in this deed, which appears to be a reference to bitcoin, has been received by you.[32]

86. It is noted that 22 of the 26 listed bitcoin addresses the subject of the Loan Deed were the same public addresses for wallets purportedly transferred off blockchain

---

[32] Item 3 of the first schedule to the deed of loan notes that the draw down date was 1 July 2013, recital B states that the guarantor and the mortgagor acknowledge that the money referred to in this deed has been received by the mortgagor. The reference to 'money' is understood to be to bitcoin.

CONFIDENTIAL                                                                      DEF_00051457

to MJF on 15 August 2013 and 15 September 2013. As a result of that transfer, it appears that 4 wallets purportedly remained available in the Seychelles trust (to the extent such a trust actually existed) with a total of 275,071 bitcoin.[33] One of these remaining four wallets was allegedly sold by DeMorgan to Denariuz Pty Ltd (a company related to you) and purportedly exported by you as a paper wallet to a company in Singapore. You have given two separate addresses as evidencing the existence of this particular wallet.

87. On 7 January 2014 the company name for the purported corporate trustee of the Seychelles Trust changed from Design by Human to C01n Ltd and according to Companies House records you were appointed as its Director.[34]

88. However, despite holding this position, at the interview of 18 August 2014, you said that you were unable to identify any beneficiaries of the Seychelles trust. Further, despite repeated requests for a copy of the trust deed for the Seychelles trust, you have stated that you are unable to obtain that information as the terms of the trust do not allow you access to any information until 2015.

**Our findings explained**

**Issue 1 & 2 – entitlement to input tax credits**

89. You are entitled to an input tax credit if you make a creditable acquisition.[35] You make a creditable acquisition if:[36]
    a. You acquire anything solely or partly for a creditable purpose; and
    b. The supply of the thing to you is a taxable supply; and
    c. You provide, or are liable to provide, consideration for the supply; and
    d. You are registered, or required to be registered.

90. Having regard to the facts and evidence established to date and as explained above, we do not consider that you, Cloudcroft, DeMorgan or Coin-Exch made any creditable acquisitions of software or IP for which input tax credits were attributable to the relevant tax period. In particular we do not consider that:
    a. You acquired any software or IP from MJF or W&K;
    b. DeMorgan, Coin-Exch and Cloudcroft acquired software; and
    c. DeMorgan, Coin-Exch or Cloudcroft provided or were liable to provide consideration for the purported supplies of IP or software.

91. We also do not concede that, to the extent they acquired software, DeMorgan, Coin-Exch and Cloudcroft acquired it for a creditable purpose within the meaning of section 11-15 of the GST Act.. The reasons for this are explained at paragraphs 113 – 130 below.

92. We note that you provided further information to us on 23 September 2014 in relation to whether these entities were carrying on an enterprise at the relevant time. A request was also made to provide us with further information on whether the entities will likely be carrying on an enterprise in the next 12 months by 29 September 2014. We will take this information into consideration in determining

---

[33] Applying the exchange rate for bitcoin to Australian dollars at 15 September 2013, the purported bitcoins remaining available to be drawn down under the loan would have been worth $42,361,050.
[34] Companies House records accessed on 15 July 2014.
[35] Section 11-20 GST Act.
[36] Section 11-5 GST Act.

CONFIDENTIAL                                                                                    DEF_00051458

any application of subsection 25-55(2) of the GST Act to the GST registration for these entities.

*Purported acquisitions from MJF and W&K*

93. In this case we do not accept that you acquired software from MJF or W&K as Siemens and Al Baraka have confirmed that they did not transact with any of MJF or W&K, and it is from these entities that you purport to have acquired Siemens and Al Baraka software.

94. Additionally, according to our records MJF, has denied supplying you any software which in our view supports the conclusion that no such acquisition occurred, and or, that documents purporting otherwise did not reflect the common intention underlying any transaction between you and MJF, if indeed a transaction occurred. It follows that these documents (including any related purported invoices or tax invoices) can be considered a nullity based on sham.[37]

95. Moreover, we do not accept that the NSWSC court proceedings resulted in any acquisition by you of software and or IP from W&K, or any acquisition by you of software and or IP from W&K for the value asserted. The NSWC did not consider any evidence or make any findings of fact as to the existence or value of the software you purportedly acquired from W&K as a result of the proceedings.

96. On the evidence we have obtained, we do not consider such an acquisition in fact occurred. Part of the purported software or IP you contended to have acquired as a result of the settlement of these proceedings was purportedly developed in relation to projects undertaken for the US DHS. The US DHS has verified that neither you nor W&K were awarded any software development projects.

97. Additionally, the statements of claim underlying these proceedings were for repayment of loans or bonds you purportedly advanced according to the court documents. You have subsequently denied that you had provided the bonds referred to in the statement of claim, and could not otherwise verify the existence of these loans or bonds.

98. We also note the backdating of purported invoices said to substantiate these and related acquisitions. As put recently by the AAT '…*a tax invoice does not create a taxable supply; it records one. If a taxable supply did not take place, then a "tax invoice" is meaningless. In other words, documents that are so called "tax invoices" cannot substantiate a creditable acquisition, if in fact there was no supply or acquisition.*'[38]

99. Given this backdating and our view of the other facts surrounding this case, we do not agree that back dated invoices can substantiate supplies or acquisitions, or retrospectively impose or notify an entity of an obligation to pay, in the

---

[37] A sham arises where there is an intention common to transacting parties that the transaction is a concealment or disguise for some other and real transaction or for no transaction at all. *Snook v London & West Riding Investments Ltd* [1967] 2 QB , as referred to by Lockhart J when explaining sham under Australian law at [16] in *Sharrment Pty Ltd v Official Trustee in Bankruptcy* [1988] FCA 179. See also Edmonds J at [97] in *Professional Admin Service Centres Pty Ltd v Commissioner of Taxation* [2013] FCA 1123 at [97].

[38] *Bayconnection Pty Ltd v Commissioner of Taxation* [2013] AATA 40 at [86]; See also *R.V. Investments (Aust) Pty Ltd as Trustee for the RV Unit Trust* [2014] AATA 158 at [72].

CONFIDENTIAL                                                                              DEF_00051459

absence of any such supplies, acquisitions or obligations actually arising at the relevant times. In the facts of this case, we do not accept that simply accounting for GST on an accruals basis and receiving a document described as an invoice or tax invoices establishes that you or your related entities made creditable acquisitions in the manner contended.

100.    It is noted that you have claimed input tax credits for an acquisition of Siemens Software and Al Baraka Source Code from MJF. You also claimed an input tax credit for acquisition of Gold Options and Valuation Services, yet you submitted to the NSWSC that these things were never supplied to you and have taken legal action against MJF in this regard. We understand that you withdrew that action and commenced separate action in the Federal Court. Your claims for ITCs in relation to the items not supplied will be disallowed.

101.    In the alternative, if you are entitled to the input tax credit claims for your acquisition of Siemens software and Al Baraka source code from MJF, totalling $1,650,000 (which we don't concede), we note that you are contended to have provided bitcoin to MJF as consideration for this supply. The Draft GST Ruling GSTR 2014/D3 states that a transfer of bitcoin is a supply for GST purposes. The result of this ruling is that, where the supply is a taxable supply, we consider GST is levied on the supply with the value of the bitcoin you provided matching the value of the supply of software. Hence to the extent it occurred, we consider your supply of bitcoin would have been a taxable supply.

102.    As such $1,650,000 in GST is payable on the bitcoin.[39]

_Were there supplies between DeMorgan and Coin-Exch or Cloudcroft_

103.    Our concerns in relation to the fact that purported transfers of IP was made to DeMorgan at a time it did not exist were sought to be addressed by your representative in the response to our interim report for Coin-Exch. You stated that your intention at the time of the relevant deed of assignment, dated 15 July 2013, was to transfer the IP to DeMorgan and that the transfer was perfected at the time DeMorgan came into existence.

104.    Although the deeds of assignment between DeMorgan and Coin-Exch and Cloudcroft were purportedly entered into on 15 September 2013, documents described as tax invoices were issued with a date of 1 July 2013. You admitted in the interview of 18 August 2014 that documents such as these purported tax invoices were deliberately backdated and that it in your view this was not material from a tax perspective because all the transactions had occurred during the same tax period.

---

[39] We note this position provides the same outcome as the private binding ruling provided to you in December 2013 and the position taken in the first interim report issued to Coin-Exch and Hotwire in February 2014.

CONFIDENTIAL

DEF_00051460

105.    *McDonald v Commissioner of Taxation*[40] (*McDonald*) concerned the effectiveness of backdating a contract for the acquisition of land to 13 September 1985 in determining whether a gain from a post-CGT subdivision and disposal of the land was subject to CGT. Stone J with whom the other members of the Full Court agreed observed that upon making a binding contract:[41]

> parties may agree that one of the terms of the contract is that certain obligations under it are to be retrospective to a specified date. However, the date of the formation of the contract is a matter of law and the parties cannot, by backdating the written document, rewrite history with the effect that a binding contract existed from the specified date.

106.    It is noted that a supply for GST purposes need not occur only by way of contract. However, in the context of an arrangement where the thing supplied by its very nature takes it value and existence from an intangible set of rights, such as a licence to use intellectual property, it is difficult to see how a supply of such a thing can be made other than by way of a written agreement between the parties with valid legal effect.

107.    We consider that a backdated agreement cannot have the effect of 'rewriting history', such that DeMorgan is said to have supplied rights to intellectual property it could not have owned because it did not yet exist at that time.

108.    In the alternative, if each of these entities did acquire software from DeMorgan (which we don't concede), then your advisors have stated in the letter of 23 September 2014 that Coin-Exch had actually called on the bitcoin the subject of the deed of loan in order to fund its purported activities. In such a case, where bitcoin is purportedly supplied as consideration for a purported acquisition, there is GST payable on that supply.[42] In the case of Coin-Exch, the amount of GST payable on the taxable supply of the bitcoin would be equal to the amount of input tax credits claimed on the purported acquisition of the licence to the software.

*Was consideration provided or liable to be provided*

109.    We do not accept that the Seychelles Trust existed as a matter of law or fact during the relevant tax period. Further or alternatively, we do not accept that a pool of 650,000 bitcoin was in fact held according to the terms of the Seychelles Trust during the relevant tax period, or that any equitable interests in the Trust were effectively created or assigned. Notwithstanding that you asserted at interviews on 11 and 18 August 2014 that you created the trust, you could not advise us of the identity of any beneficiaries of this purported trust, or its terms. This in our view is consistent with the Trust not having any beneficiaries (and hence not existing), and or not being constituted and settled in the manner asserted. The Deed of Loan of itself does not in our view demonstrate the effective establishment of the Seychelles Trust or the holding of 650,000 bitcoin pursuant to its terms.

110.    Additionally, the Deed of Loan states that you received a loan from the trust. However you purportedly assigned your right to draw down on this loan to your related entities in exchange for shares they issued. The related entities are then

---

[40] [2001] FCA 305
[41] *McDonald* [2001] FCA 305 at [20]
[42] Consistently with the first interim report issued to Coin-Exch, the private ruling issued to you and the views expressed in draft GST ruling GSTR 2014/D3.

CONFIDENTIAL                                                                                                    DEF_00051461

said to have assigned this right in payment to DeMorgan for software and IP. This could not have occurred in our view because the Trust either did not exist, did not in fact have 650,000 bitcoin settled upon it, or, had already advanced you the loan funds under the Deed of Loan.

111.     It follows that we do not consider the related entities provided any consideration for their purported acquisitions by assigning 'equitable interests' for the purposes of paragraph 11-5(c) of the GST Act. Additionally, we do not consider there were any legally effective arrangements in place during the relevant tax period to have obliged them to provide consideration for their purported creditable acquisitions.

112.     Furthermore, we consider that the purported pool of 650,000 bitcoin which were the purported subject of the Deed of Loan between you and the trustee of the Seychelles trust would have been substantially depleted once and to the extent, the wallets were transferred to MJF off blockchain. At the interview conducted on 18 August 2014, you have confirmed that there are no other sources of funds available to these entities to pay the required consideration.[43] Taking into account the purported invoices issued to Coin-Exch, Hotwire and Cloudcroft, we consider that there were insufficient funds available under the Deed of Loan (assuming the trust existed) remaining for draw down under the loan agreement for the relevant entities. This, we consider supports our conclusion that paragraph 11-5(c) of the GST Act was not satisfied.

_Were DeMorgan, Coin-Exch or Cloudcroft carrying on an enterprise?_

113.     You acquire a thing for a creditable purpose to the extent that you acquire it in carrying on your enterprise.[44] 'Carrying on' an enterprise includes doing anything in the course of the commencement or termination of the enterprise.[45]

114.     Relevantly, an 'enterprise' is defined to include an activity, or a series of activities, done:
    (a)   in the form of a business; or
    (b)   in the form of an adventure or concern in the nature of trade; or
    (c)   on a regular or continuous basis, in the form of a lease, licence or other grant of an interest in property.[46]

115.     However, an enterprise does not include an activity, or series of activities, done as a private, recreational pursuit or hobby.[47]

116.     The existence of a business is a matter of fact and degree.[48] Some of the indicators that establish a business enterprise is being conducted are an intention of making a profit and a reasonable prospect of profitability,[49] existence of a business plan, keeping of detailed business records, commercial sales of product

---

[43] Your advisors have stated in the letter of 23 September 2014 that these related entities now do have access to further bitcoin and can also access funding from other related entities. However, those purported avenues of funding do not appear to have been available in the relevant period to fund the transactions the subject of these audits.
[44] Subsection 11-15(1) GST Act.
[45] Definition of 'carrying on' in section 195-1 GST Act.
[46] Subsection 9-20(1) GST Act.
[47] Paragraph 9-20(2)(b) GST Act.
[48] _Spriggs v FCT_ (2009) 239 CLR 1 at [59].
[49] _Hope v Bathurst City Council_ (1980) 144 CLR 1, at 8-9; _Case H11_ (1976) 76 ATC 59 at 61.

CONFIDENTIAL                                                                 DEF_00051462

&/or skills, exercise of knowledge of skill.[50] No single indicator is decisive and the indicators often overlap.[51] Further, not all of them will be relevant all of the time.[52]

117.   More specifically, an 'enterprise' includes an activity, or series of activities, done in the form of a business. The phrase 'in the form of a business' is broad and has as its foundation the longstanding concept of a business. The meaning of this phrase has not been considered in significant detail by Australian courts.[53]

118.   In *FCT v. Swansea Services Pty Ltd*[54] McKerracher J. observed in relation to the words 'in the form of' in paragraph 9-20(1)(a):[55] '

> Rather than these words supporting a suggestion that form alone may prevail over substance, they have the effect of extending the reach of "enterprise" to those activities which are in the form of a business but would not, in the ordinary meaning of "business" be considered such. But the activity must still be reasonably intended to be profit making in the case of an individual and cannot for any entity simply be a private recreational pursuit or hobby. That this is so is clear from the exclusions to s 9-20 of the GST Act which, relevantly, rules out private recreational pursuits or hobbies or, in the case of individuals, (other than a charitable trustee) an activity or activities done without a reasonable expectation of profit or gain.

119.   TR 97/11 discusses the main indicators of carrying on a business. Based on that discussion some indicators are:
   ∞ a significant commercial activity;
   ∞ a purpose and intention of the taxpayer to engage in commercial activity;
   ∞ an intention to make a profit from the activity;
   ∞ the activity is or will be profitable;
   ∞ the recurrent or regular nature of the activity;
   ∞ the activity is carried on in a similar manner to that of other businesses in the same or similar trade;
   ∞ activity is systematic, organised and carried on in a businesslike manner and records are kept;
   ∞ the activities are of a reasonable size and scale;
   ∞ a business plan exists;
   ∞ commercial sales of product; and
   ∞ the entity has relevant knowledge or skill.

120.   We have taken into account the information provided by your advisors on 23 September 2014 in our discussion below. We note that a decision on whether to cancel the GST registration for DeMorgan, Cloudcroft and Coin-Exch under subsection 25-55(2) of the GST Act will be made after we receive further information from you to be provided, as requested, on 29 September 2014.

121.   In examining the activities conducted by you, DeMorgan, and the related companies, it is noted that none of these entities have traded with any third parties during the relevant period.

---

[50] *Miscellaneous Tax Ruling MT 2006/1: The New Tax System: the meaning of entity carrying on an enterprise for the purposes of entitlement to an Australian Business Number.*
[51] *Evans v FC of T* (1989) 89 ATC 4540 at 4555.
[52] *Dotrac Pty Ltd v Commissioner of Taxation* [2014] AATA 336 at [52].
[53] Paragraph 170 of MT 2006/1.
[54] [2009] FCA 402.
[55] *Swansea* [2009] FCA 402 at [97]-[99].

CONFIDENTIAL                                                                                    DEF_00051463

122.    In relation to Coin-Exch and Cloudcroft, during the relevant period, neither of these companies retained the services of any employees or third parties contractors.

123.    You stated that there was no business plan for Coin-Exch and there appears in our view to be a lack of commercial purpose. On 23 September 2014 you provided us with documents titled 'Coin-Exch Pty Ltd Core Research' and 'Cloudcroft Pty Ltd Research'. Neither of these documents are dated. You also provided us with a copy of a response to AusIndustry's for further information from Coin-Exch. Whilst there is much detail in these documents outlining the intention of the research that Coin-Exch and Cloudcroft are to undertake, in this respect the statements of Brennan J in *Inglis v FCT* are relevant:[56]

> The carrying on of a business is not a matter merely of intention. It is a matter of activity, … At the end of the day, the extent of the activity determines whether the business is being carried on. That is a question of fact and degree.

124.    The documents do not show how such intended activities could be practically undertaken or turned to a profit. In examining these companies, even if each entity was engaged in an activity in the relevant period, that activity consisted entirely of transactions with related parties.

125.    More broadly, the significant amounts of shares issued in the companies purportedly paid for by bitcoin or by the assignment of rights thereto, do not on the facts appear to have made any real or lasting contribution to the capital of the companies. The inference to be drawn is that the bitcoin related capital contributions have not established or advanced any enterprise by your related entities.

126.    Additionally, an indicator of carrying on a business is commercial sales of product. As stated above, none of the entities related to you have made any commercial sales, other than sales to related entities, with payment amounting to contended interests in the Seychelles trust (the same trust stated to have been used to capitalise the entities).

127.    Although you have stated in relation to Coin-Exch that it could use its bitcoin holdings as payment or convert such bitcoin to cash to meet its expenditure, on the evidence we currently have, we do not think that any of these entities, had a reasonable view to a profit. Any business plans that did exist relied solely, if not heavily, upon generating ATO refunds to meet running costs. You explained during two interviews in August 2014, that all the inter-company transactions net off to zero from a GST perspective. The position in our first interim reports for Hotwire and Coin-Exch supported this approach, as the GST payable on the transfer of bitcoin as consideration for the purported transfer of the software would equate to any applicable input tax credit entitlement  for each transaction. You later advised of an updated footing for the inter-company transactions involving the purported transfer of trust interest as consideration. We consider this was done to enable the companies to receive refunds for what you described as a 'zero transaction'.

128.    Although you have explained that there is an intention that the entities will promote bitcoin and establish a platform for, among other things, trading and

---

[56] *Inglis v FCT* (1979) 10 ATR 493 at 496-7.

CONFIDENTIAL

DEF_00051464

loaning bitcoin, you have not demonstrated that the related entities are conducting an enterprise. It is our position that in the absence of ATO refunds, the companies would likely be insolvent – this relevantly indicates that the companies are not operated in a business-like manner, nor is there an intention to make a profit. You have previously indicated that there was no business plan and the documents you provided on 23 September 2014 provide no details as to how the proposed research could be turned to profit or commercially exploited. Your activities and those of your related entities during the relevant period consisted entirely of related party transactions and there no records of commercial sales of product that have or are reasonably likely to occur in future.

129.   In relation to DeMorgan's purported activities in granting a licence or other grant of an interest in property, as noted above at paragraph 106 above, DeMorgan was not able to supply rights to intellectual property it could not have owned because it did not yet exist at the relevant time.

130.   We consider that during the relevant period neither DeMorgan, Coin-Exch and Cloudcroft were carrying on an enterprise. On this basis, paragraph 11-5(a) is not satisfied.

**Issue 3 – Application of Division 165**

131.   To the extent you and your related entities were properly entitled to the software and IP related input tax credits claimed for the relevant tax periods in accordance with Divisions 11 and 29 of the GST Act, we consider the requirements of section 165-5 of the GST Act were met in the alternative, and that a declaration to negate any associated GST benefits should be made under section 165-40 of the GST Act.  The application of Division 165 of the GST Act turns on the satisfaction of the requirements in section 165-5 of the GST Act. Relevantly, section 165-5 of the GST Act is satisfied if:
   a.  an 'entity' (the avoider) gets a 'GST benefit' from a 'scheme';
   b.  taking into account the matters described in section 165-15 of the GST Act, it is reasonable to include that either:
      i.  an entity that (whether or alone or with others) entered into or carried out the scheme, or part of the scheme, did so with the sole or dominant purpose of that entity or another entity getting a GST benefit from the scheme; or
      ii.  the principal effect of the scheme, or of part of the scheme, is that the avoider gets a GST benefit from the scheme directly or indirectly.

132.   Subsection 165-10(2) of the GST Act defines a 'scheme' broadly to include any arrangement, agreement, course of action or course of conduct.  In your case we consider there was a scheme which involved you acquiring software from MJF and W&K in order for it to be on supplied to your related entities so as to generate GST refunds in Coin-Exch, Hotwire and Cloudcroft. You had initially planned to use bitcoin to fund these transactions in such a way that you would never lose control or access to those bitcoins.

133.   However, on receipt of the private binding ruling advising you that the supply of bitcoin in consideration for an acquisition would be a taxable supply, you

CONFIDENTIAL                                                DEF_00051465

altered the scheme to insert the Seychelles trust to which you transferred the bitcoin.

134.    Once possessed of the bitcoin, the trustee then entered into a loan agreement with you enabling you to draw down on the loan in bitcoin. You assigned your right to draw down on the loan to your related entities, who in turn assigned the rights to pay for software and IP, the assignments not being taxable supplies. Consequently, your related entities made creditable acquisitions of software and IP but had negative net amounts because there was no corresponding GST liability arising from their provision of consideration.

135.    On this scheme (which is particularised further below), the avoiders are Craig Wright, Coin-Exch, Cloudcroft and DeMorgan.

136.    The  scheme that generated the GST benefits for the avoiders specified below involved 8 steps.
   a.   Step 1: You caused a trust to be established in the Seychelles
   b.   Step 2: You acquired software from MJF at a purported cost of $38,461,471, in order to generate a GST credit with a corresponding GST liability by MJF which would never be paid
   c.   Step 3: You initiated a court action to confirm legal title to W&K software at an inflated value, being $58,786,649
   d.   Step 4: You entered into a Deed of Loan with trustee of the Seychelles trust in order to access 650,000 bitcoin
   e.   Step 5: You assigned the right to call for the bitcoin under the Deed of Loan to your related entities Coin-Exch
   f.   Step 6: You sold the intellectual property and software above to your family trust (DeMorgan) and Cloudcroft at a price reflecting the purported cost bases.
   g.   Step 7: DeMorgan licensed the software and IP to entities related to you. The licences were paid for by rights to call for bitcoin provided to those entities by you.
   h.   Step 8: The related entities lodged BAS and claimed input tax for the acquisition of the licenced software, resulting in significant refunds.

GST Benefits and the avoider

137.    The ITCs claimed by you and each related entity resulting from the scheme is outlined in the table below, by claiming these ITCs each of the entities has obtained a GST benefit from the scheme and are the avoiders.[57] The GST benefits were the amount by which the ITCs have reduced each entity's net amount, which in most cases has resulted in a negative net amount (i.e.: a GST refund).

| Entity | ITCs |
|---|---|
| Craig Wright | 5,385,612 |
| Cloudcroft Pty Ltd | 2,836,794 |
| Coin-Exch Pty Ltd | 3,787,429 |
| Trustee for the Wright Family Trust | 6,784,231 |

---

[57] Within the meaning of paragraph 165-5(1)(a) of the GST Act.

CONFIDENTIAL                                                                          DEF_00051466

The counterfactuals

138.    But for the scheme, it is reasonable to expect that you would have continued to develop the software you had acquired from W&K as part of the enterprise carried on by Hotwire.[58] The GST benefits would not have arisen on this counterfactual.

139.    A further counterfactual is that you and your related entities would have used bitcoin as consideration for the relevant acquisitions. If you had used bitcoin then for each acquisition there would have been an equal and offsetting GST liability on the supply of bitcoin as consideration and hence the GST benefits would not have arisen.

140.    These counterfactuals provide you with the same opportunities to develop your purported bitcoin bank venture, without attainment of the GST benefits.

The matters in section 165-15 of the GST Act

*The first matter – the manner in which the scheme was entered into or carried out*

141.    You have advised in the interview of 11 August 2014 that you did not expect Coin-Exch to generate any profits in the near future. The manner in which you negotiated the acquisition of the MJF software  lacks any apparent due diligence or commercial prudence. For example  all correspondence regarding the acquisition was said to have been undertaken by Skype between you and Mark Ferrier directly. This is highly unusual and added to the contrivance of the scheme taking into account the large values involved. It does not appear that you had sought any legal or commercial advice on the transaction, despite it being valued in the millions.

142.    You contend that you always had possession of the W&K software and that the NSWSC action was undertaken to ensure you obtained legal title to the software and to determine a value for that software. The claims made in the proceedings do not reflect the information we have received from third parties and your own admissions, namely, that you provided all of the financing under the agreements claimed as a debt owed to you. The fact that there may have been an agreement to settle the matter between you and W&K does not mean that the values attributed to that purported software were reflective of its true value.

143.    The proposition that you had intended to acquire completed software in order to break it up into component parts and distribute it amongst the related entities through your family trust appears to be unnecessarily complex in order to achieve your main aim of setting up a bitcoin bank. The price paid for software acquired, if the valuations are to be accepted, was approximately $77 million (that is, the combined price for the MJF and W&K software). You have noted that in order to do what you want to do, you would need to spend approximately $500 million developing the relevant banking platform. This appears to be an extraordinarily expensive way of developing bespoke software compared to, for example, hiring programmers to develop the software for you.

144.    The use of the Seychelles trust to facilitate the creation of assignable rights to bitcoin rather than using bitcoin itself as consideration for these acquisitions

---

[58] Hotwire appears to be the only entity which had employees and a business premises.

CONFIDENTIAL

DEF_00051467

enabled Coin-Exch and Cloudcroft to generate a net negative amount for the September 2013 quarter. If bitcoin was used as consideration, then the GST payable on the supply of that bitcoin by the relevant entity would have cancelled the benefit of the ITCs claimed and so result in a nil amount for the entity in that period.

145.    To the extent it might have been reasonable to expect that you have done something but for the scheme, the counterfactuals provide you with the opportunity to have profited from the sale or licensing of the software in a more straightforward manner.

Conclusion

146.    The first factor points towards the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the related entities entered into the scheme with this as their dominant purpose.

The second factor – the form and substance of the scheme

147.    In form the agreements sought to create an impression that each entity was acquiring the exclusive licence to a specific part of the software purportedly held by DeMorgan in order to develop the software for use in its business. It is not clear whether once the software was divided into components it could in fact be used by the entities at all, at least without some substantial amount of work and further development.

148.    The contracts between the entities suggest that what was intended, was to provide consideration for the acquisition of the relevant software components by assignment of rights to bitcoin loaned by a trust.  In reality it appears that there was insufficient amounts of bitcoin available under the loan to support all of the relevant transactions. Having regard to this aspect of the scheme, the entities would be unable to provide any consideration for the acquisitions despite having an obligation under the relevant contracts to do so.

149.    In substance, none of the entities did anything with the software other than Hotwire (who has since run out of funds), and by your own admission, you stated that Coin-Exch did not have a business plan and was not expected to generate a profit in the near future.

Conclusion

150.    The second factor points towards the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the entities listed above and that they entered into the scheme with this as their dominant purpose.

The third factor – the purpose or object of the GST Act (whether or not expressly stated)

151.    The following passages based on the AAT decisions in *VCE v Commissioner of Taxation* and *Bayconnection* are relevant:

> An input tax credit is dependent on there having been a taxable supply on which GST is payable. Some correlation between payment of GST and an input tax credit is assumed. The consideration paid, or payable for an acquisition will generally include an amount on account of GST.  The supplier will pay the GST to the Commissioner.  In practical terms, the input tax credit effectively lightens the acquirer's burden in a transaction, by allowing the acquirer to claim the GST, or part of it, from the Commissioner.  *An input tax credit does not represent some*

CONFIDENTIAL

DEF_00051468

*sort of bounty that the Commissioner bestows upon a person.* It is more appropriately regarded as an alleviation of the burden that a person has borne in paying the price for an acquisition.[59] (emphasis added)

The GST system contains a degree of symmetry whereby what is a taxable supply for a supplier may lead to a creditable acquisition for the recipient of that supply. In such a case the GST payable by the supplier is creditable (refunded) to the recipient. Section 11-25 of the GST Act provides that the amount of the ITC available is equal to the amount of the GST payable – not paid – by the supplier on the taxable supply. *But it is surely a bold position for a taxpayer to say that,* as a purported recipient of a taxable supply, *it can comfortably claim back from the Commissioner the GST amounts that the entity on the other side of the alleged transaction* – controlled by the same family, and whose BASs were prepared by the very person who was lodging the ITC claims – *did not pay to the Commissioner in the first place.*[60] (emphasis added)

152.   It has been stated by you that the 'intra-group' transactions between the DeMorgan and the related entities would 'net out' given DeMorgan is paying GST on the supply of the software which is then claimed as an ITC by the relevant related entity (eg: Coin-Exch, Hotwire etc). However, that GST liability is offset by DeMorgan claiming ITCs on its acquisition of the software from you. The ultimate liability for GST on the relevant acquisitions appears to rest with the third parties, principally MJF.

153.   This scheme results in an unintended 'bounty'. Entities controlled by you claim ITCs and receive refunds of GST never paid by MJF or W&K (which is a US resident entity, who does not appear to be registered for GST).

154.   Hence the scheme distorts the symmetry contemplated by the GST Act. Neither you nor your related entities bore the burden of any GST ultimately remitted to the Commissioner in the consideration it purportedly paid for the rights.

Conclusion
155.   The third factor points towards the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the entities listed above entered into the scheme with this as their dominant purpose.

The fourth and fifth factors - the timing of the scheme and period over which it was entered into or carried out

156.   All of the transactions were planned to take place in the same tax period – 1 July 2013 to 30 September 2013. You have admitted to backdating tax invoices to the beginning of that tax period because 'it made sense to [you]' because those were the dates on which you had wanted the transactions to occur.

157.   The NSW SC settlement agreement appears to be back-dated to 9 July 2013 in order to come within this period, despite the fact that the decision in these matters was handed down in November 2013. This appears to be a deliberate attempt to ensure that the acquisition of the legal title to the W&K software was

---

[59] *VCE v Commissioner of Taxation* [2006] AATA 821 at [136]. See also *Simon Harland as Trustee for the PCS Global Discretionary Trust v Commissioner of Taxation* [2013] AATA 930 at [160].
[60] *Bayconnection Property Developments Pty Ltd v Commissioner of Taxation* [2013] AATA 40 at [77] and [79].

CONFIDENTIAL                                                                                    DEF_00051469

recorded at a time which enabled you to transfer those rights to DeMorgan and for DeMorgan to supply that software before 30 September 2013.

Conclusion

158.    The fourth and fifth factors point towards the conclusion that the scheme's principal effect was attainment of the GST benefits by each of the entities listed above and they entered into the scheme with this as their dominant purpose.

<u>The sixth factor - the effect of the GST Act in relation to the scheme, but for Division 165</u>

159.    In our view, the provision of bitcoin in consideration for an acquisition is a supply that will be taxable if the other requirements of section 9-5 of the GST Act are met. A taxable supply does not include an input taxed supply, and section 40-5 of the GST Act makes a financial supply input taxed. A financial supply has the meaning given by the *A New Tax System (Goods and Services Tax) Regulations 1999* and you contend that the assignment of the rights to bitcoin held under the Seychelles trust were input taxed supplies under item 10 to the table under regulation 40-5.09(3).

160.    Accordingly, to the extent they were effective the assignment of rights to draw down on the bitcoin loan from the Trustee of the Seychelles trust would have given rise to an input taxed supply. Consequently, your related entities would have generated negative net amounts for the relevant tax period. The change from the provision of consideration by way of bitcoin, as was in serious contemplation given the PBR application, to the assignment of the rights in our view is only explicable by the favourable GST consequences that would follow .

Conclusion

161.    The sixth factor point towards the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the related entities and that they entered into the scheme with this as their dominant purpose.

<u>The seventh & eighth factors - any change in the financial position of the relevant entities that resulted or may reasonably be expected to result from the scheme</u>

162.    As noted above, to the extent effective the use of the Seychelles trust has removed a GST liability which would have otherwise arisen in relation to the acquisition of the licence to the software by the related entities when compared with using bitcoin (as was originally contemplated). Those liabilities would have eliminated the effect of the claimed input tax credits in generating the GST benefits.  Although no GST liability would have arisen if cash or a loan were used to finance the software and IP acquisitions under the scheme,  that does not appear to be a reasonable counterfactual given the amount of consideration involved (ie: some $77 million). Neither you nor your related entities had enough collateral to raise this type of financing through traditional means.

163.    None of the counterfactuals involve any adverse change to your net assets on account of dealing with the software rights. The counterfactuals that assume you would have done something but for the scheme provide you and your related entities with the potential to profit from the software, without incurring any significant liabilities.

CONFIDENTIAL                                                                                      DEF_00051470

Conclusion

164.    The seventh and eighth factors point toward the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the entities listed above and that they entered into the scheme with this as their dominant purpose.

The ninth factor - any other consequences of the scheme for the avoider

165.    There are no other material consequences identifiable, separately from those explained in the analysis of the other factors. This ninth factor is neutral.

The tenth and eleventh factors – the nature of the connection between you and your related entities, including whether dealings were at arm's length

166.    The connection between individuals and entities involved in and advantaged by the scheme is based on you creating the related entities in order to carry out the relevant transactions.   These were not arm's length commercial dealings.

167.    The facts surrounding the W&K agreements and subsequent NSW SC action suggests that the parties were not dealing at arm's length in determining the value of the software supplied. This conclusion is further supported by reference to the fact that the relevant software was transferred for $5,000 in 2010 and it does not appear from the evidence that it was developed to the stage that it would be worth in excess of $28 million in 2013.

168.    The manner in which the negotiations were undertaken for the MJF transactions suggests that at the very least the arrangement was not commercial.

Conclusion

169.    The tenth and eleventh factors point toward the conclusions that the scheme's principal effect was attainment of the GST benefits by each of the entities listed above and that they entered into the scheme with this as their dominant purpose.

The twelfth factor - the circumstances surrounding the scheme and any other relevant circumstances

170.    For the past 2 years, based on information available from your bank accounts and accounts of entities you control, 94% of your income or money to which you have access is comprised of GST or income tax refunds. It is clear, on your own estimations of cost for your bitcoin bank project, that it will be some time before any of these entities will generate a profit, despite the vast amounts of capital required for the scheme.

171.    It is noted that other entities operating in the same space have managed to set up payment systems to accept bitcoin; have opened bitcoin ATM's across Australia to provide a platform for investment and cashing in of a person's bitcoin investments and have developed other forms of financial investment business in respect of bitcoin. Competitors in the market appear to have been able to adapt current systems to enable the use of bitcoin without the extraordinary level of capital which you have sought to expend.

Conclusion

172.    The eleventh and twelfth factors point toward the conclusion that the scheme's principal effect was attainment of the GST benefits by each of the

CONFIDENTIAL

DEF_00051471

entities listed above and that they had entered into the scheme with this as their dominant purpose.

<u>Conclusion as to purpose and principal effect after considering the 12 factors</u>

173.    The majority of factors point toward the conclusions that you and your related entities entered into or carried out the scheme or part thereof, with the dominant purpose of getting the GST benefits, and that the getting of those benefits was each scheme's principal effect. Accordingly, the requirements for making a declaration under section 165-40 of the GST Act negating the GST benefits are met.

CONFIDENTIAL

DEF_00051472