SENSITIVE

| C01N PTY LTD | 11 MARCH 2016 | **SENSITIVE** |
|---|---|---|
| AUDIENCE | DATE | CLASSIFICATION |



Australian Government
Australian Taxation Office

FILE REF: 1-678K9NF

# Reasons for decision

This paper explains the ATO's reasons for decision for C01N Pty Ltd for the period 1 July 2012 to 30 June 2013

 SENSITIVE

For more information on this decision, phone Arna Synnot on (08) 7422 2364

SENSITIVE

CONFIDENTIAL

DEF_01617814

# TABLE OF CONTENTS

Table of contents..............................................................................................................2

Glossary...........................................................................................................................3

Introduction......................................................................................................................5

Summary of our decision..................................................................................................6

Relevant facts ................................................................................................................10

      Incorporation.............................................................................................................10
      Purported R&D activity .............................................................................................10
      Income tax return .....................................................................................................12
      Retention of refund..................................................................................................13
      IaaS transaction – purported contract......................................................................13
      IaaS transaction – purported invoice and payment..................................................16
      Substantiation of purported IaaS services ...............................................................23
      W&K..........................................................................................................................27
      Location of purported IaaS services .........................................................................28
      Dr Pang....................................................................................................................29
      Professor Rees .........................................................................................................30
      Electronic evidence submitted by the taxpayer.........................................................37

Your contentions ...........................................................................................................41

Our reasons for decision ...............................................................................................42

Issue 1: R&D tax offsets (W&K) ....................................................................................42

      No R&D activities registered....................................................................................42
      No expenditure incurred ..........................................................................................43
      R&D activities (if any) not conducted solely in Australia or an external Territory...............48

Issue 2: R&D tax offsets (Pang) ....................................................................................49

      No R&D activities registered....................................................................................49
      No expenditure incurred ..........................................................................................49
      Notional deductions less than $20,000....................................................................50

Issue 3: Foreign exchange loss......................................................................................50

      No obligation to pay foreign currency ......................................................................50
      Forex loss (if any) incorrectly calculated..................................................................51

Issue 4: Professor Rees deduction..................................................................................51

      No loss or outgoing .................................................................................................51
      No connection with assessable income....................................................................53

Issue 5: Assessable income ...........................................................................................53

      No assessable income derived.................................................................................53
      Assessable income (if any) calculated incorrectly....................................................54

CONFIDENTIAL

DEF_01617815

# GLOSSARY

Words defined in this glossary shall have the meanings ascribed to them:

| | |
|---|---|
| 146m | Bitcoin address 146mH689Kn1yPqvWzkZHa4EfhEyhYcTWML |
| 153R | Bitcoin address 153R6qYmjySgwaQpQjKv7pb2nEN5cg8RJq |
| 168R | Bitcoin address 168Rc6wJdL4chWhEUQwyywi4sHub6erf2s |
| 1933 | Bitcoin address 1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a |
| 19dQ | Bitcoin address 19dQ2xfrK5GEUahG6Cv87XDRK7W6YFnGFx |
| 1CXn | Bitcoin address 1CXnCzV78381AJQtxHYihF7kzoixtoncKE |
| 1Jzz | Bitcoin address 1JzzLXxuwn45S9HvBqAhkhWa3GhyG3zm64 |
| 1M7c | Bitcoin address 1M7ccmVnWpvKa41RGf7H8wS6thy5Tt3bad |
| 1MyG | Bitcoin address 1MyGwFAJjVtB5rGJa32M6Yh46cGirUta1K |
| 1PbX | Bitcoin address 1PbXw8aP5PymdQUM29UyimhgnFykut5p2W |
| 1P57 | Bitcoin address 1P5759ZaUX44MHEsiJgWckBMNAEJbGu7SY |
| 1LXc | Bitcoin address 1LXc28hWx1t8np5sCAb2EaNFqPwqJCuERD |
| 2012-13 income year | The year ended 30 June 2013 |
| 2013-14 income year | The year ended 30 June 2014 |
| ABN | Australian Business Number |
| APNIC | Asia-Pacific Network Information Centre |
| ASIC | Australian Securities & Investments Commission |
| ATO | Australian Taxation Office |
| A$ | Australian dollars |
| BTC | Bitcoin |
| Commissioner | the Commissioner of Taxation of the Commonwealth of Australia |
| C01N | C01N Pty Ltd |
| C01N UK | C01N Ltd |
| Deuba | Deuba Pty Ltd |
| EA Professionals | EA Professionals Pty Ltd |

CONFIDENTIAL

SENSITIVE

REASONS FOR DECISION

| Forex | foreign exchange |
|---|---|
| GST | Goods and Services Tax |
| Hotwire | Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) |
| IaaS | Infrastructure as a Service |
| IRDA | the *Industry Research and Development Act 1986* |
| ITAA | the *Income Tax Assessment Act 1997* |
| Panama | The Republic of Panama |
| Panopticrypt | Panopticrypt Pty Ltd |
| PSO | Particle swarm optimisation |
| R&D | Research and Development |
| Seychelles | Republic of Seychelles |
| SGI | Silicon Graphics International |
| Strasan | Strasan Pty Ltd |
| TAA | the *Taxation Administration Act 1953* |
| Taxpayer | C01N Pty Ltd / Strasan Pty Ltd |
| UK | The United Kingdom |
| US | The United States of America |
| US$ | US dollars |
| W&K | W&K Info Defense Research LLC |
| We | the ATO |
| Wright International | Wright International Investments Ltd |

SENSITIVE

CONFIDENTIAL

DEF_01617817

# INTRODUCTION

1.  An audit was undertaken to determine the taxable income of C01N Pty Ltd (**the taxpayer**)(**C01N**) and its eligibility for a refundable tax offset in the year ended 30 June 2013 (**2012-13 income year**).

2.  Set out below is our decision in relation to the tax issues which have been identified in the course of the audit. Also set out below is:

    2.1.  a statement of the facts which we have relied upon in reaching our decision

    2.2.  a summary of your contentions and

    2.3.  an explanation of the reasons for our decision.

3.  If you do not agree with our understanding of the facts or our interpretation of the law, then you will be given the opportunity to object. The attached cover letter explains what you need to do and what happens next.

CONFIDENTIAL

SENSITIVE

# SUMMARY OF OUR DECISION

## ISSUE 1: R&D TAX OFFSETS (W&K)

4.  *Issue:* Is the taxpayer entitled to an Research and Development (**R&D**) tax offset in the 2012-13 income year, under Division 355 of the *Income Tax Assessment Act 1997* (**ITAA 1997**)[1], in respect of expenditure it purportedly incurred pursuant to a contract with W&K Info Defense Research LLC (**W&K**)?

5.  *Decision:* No.

**No registered R&D activities**

6.  AusIndustry has made a finding that none of the activities registered by the taxpayer in its 2012-13 AusIndustry application were core or supporting R&D activities. The taxpayer is therefore not entitled to claim notional R&D deductions.[2]

**No expenditure incurred**

7.  Further, we do not consider the taxpayer to have incurred any expenditure pursuant to a contract with W&K. Accordingly, the taxpayer would not have been entitled to a notional deduction for the purpose of the R&D tax offset even if registered R&D activities had been conducted.[3]

**R&D activities (if any) not conducted solely in Australia or an external Territory**

8.  Further, we do not consider that any activities undertaken were conducted solely in Australia or an external Territory. Accordingly, the taxpayer would not have been entitled to a notional deduction for the purposes of the R&D tax offset even if it had incurred expenditure on registered R&D activities.[4]

## ISSUE 2: R&D TAX OFFSETS (PANG)

9.  *Issue:* Is the taxpayer entitled to an R&D tax offset in the 2012-13 income year, under Division 355, in respect of expenditure purportedly incurred to Dr Ignatius Pang?

10.  *Decision:* No.

**No registered R&D activities**

11.  AusIndustry has made a finding that none of the activities registered by the taxpayer in its 2012-13 AusIndustry application were core or supporting R&D activities. The taxpayer is therefore not entitled to claim notional R&D deductions.

**No expenditure incurred**

12.  Further, we do not consider the taxpayer to have incurred any expenditure to Dr Pang. Accordingly, the taxpayer would not have been entitled to a notional deduction for the purpose of the R&D tax offset even if registered R&D activities had been conducted.

**Notional deductions less than $20,000**

13.  Further, as no notional deduction is allowed relating to the purported W&K expenditure, the taxpayer's notional deductions for the 2012-13 income year would be considered to

---

[1] All legislative references in this paper are to the *Income Tax Assessment Act 1997* (ITAA) unless otherwise indicated.
[2] Subparagraph 355-205(1)(a)(i) and subsection 355-705(1)
[3] Paragraph 355-100(1)(a) and subsection 355-205(1)
[4] Paragraphs 355-100(1)(a), 355-205(1)(a) and 355-210(1)(a)

SENSITIVE

CONFIDENTIAL

DEF_01617819

REASONS FOR DECISION

be less than $20,000. As such, that expenditure would not give rise to an R&D tax offset, even if registered R&D activities had been conducted, as it was not incurred to a research service provider.[5]

## ISSUE 3: FOREIGN EXCHANGE LOSS

14. *Issue:* Is the taxpayer entitled to a deduction for a foreign exchange (**forex**) realisation loss of $404,204 in the 2012-13 income year in respect of a purported obligation to pay foreign currency to W&K?

15. *Decision:* No.

**No obligation to pay foreign currency**

16. We do not consider that the purported agreement with W&K gave rise to any obligation to pay foreign currency for the purposes of the forex provisions.[6] Accordingly, the purported agreement did not give rise to any forex realisation loss.

**Forex loss (if any) incorrectly calculated**

17. Further, or in the alternative, if the taxpayer did have an obligation to pay foreign currency to W&K, its deductible loss was $6,053.

## ISSUE 4: PROFESSOR REES DEDUCTION

18. *Issue:* Is the taxpayer entitled to a general deduction[7] of $2,066,392 in the 2012-13 income year in respect of a loss or outgoing purportedly incurred in respect of an acquisition from Professor Rees?

19. *Decision:* No.

**No loss or outgoing**

20. We do not consider the taxpayer to have incurred a loss or outgoing in respect of any such acquisition. Accordingly, the taxpayer is not entitled to any general deduction.

**No connection to assessable income**

21. Further, or in the alternative, if Professor Rees did provide the invoiced items and payment was made, any such payment was not incurred in gaining or producing assessable income, nor was it necessarily incurred in carrying on a business to gain or produce assessable income. Accordingly, the taxpayer is not entitled to any general deduction.

## ISSUE 5: ASSESSABLE INCOME

22. *Issue:* Did the taxpayer derive assessable income[8] of $2,962,399 in the 2012-13 income year in respect of a purported supply to Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) ('**Hotwire**') related to the purported acquisition from Professor Rees?

23. *Decision:* No.

---

[5] Item 1 of Subsection 355-105(2)
[6] Section 775-55
[7] Subsection 8-1(1)
[8] Section 6-5

CONFIDENTIAL

DEF_01617820

| SENSITIVE | REASONS FOR DECISION |
|---|---|

**No assessable income derived**

24.     We do not consider the subject matter of the purported sale to Hotwire, materials from Professor Rees, were acquired or existed. Accordingly, any amount received by the taxpayer did not have the character of ordinary income.

**Assessable income (if any) incorrectly calculated**

25.     Further, or in the alternative, if the taxpayer did provide a license or services unrelated to any purported acquisition from Professor Rees to Hotwire and Hotwire paid the taxpayer, we consider the taxpayer derived income of $3,205,820. This will be reduced by $1/11^{th}$ if the sale is found to be a taxable supply.

## OTHER CONSIDERATIONS

### Part IVA

26.     Part IVA of the *Income Tax Assessment Act 1936* contains a general anti-avoidance rule that applies to schemes undertaken for the sole or dominant purpose of obtaining a tax benefit. Where Part IVA applies to a scheme, the Commissioner may make a determination cancelling any tax benefits obtained in connection with that scheme.

27.     This decision does not consider whether Part IVA would apply in the event that the taxpayer was entitled to the tax offsets or deductions summarised above; or whether, if it did, the Commissioner would make a determination which had the effect of cancelling the applicable tax benefit.

28.     However, the Commissioner may give subsequent consideration to whether one or more of the schemes considered in this paper give rise to a tax benefit which should be cancelled under Part IVA.

### Purported R&D expenditure carried forward

29.     This decision does not consider the tax implications of the $850,000 of R&D expenditure the taxpayer claims to have incurred to associates and carried forward to later years. However, the Commissioner may give subsequent consideration to whether this purported expenditure gives rise to a notional deduction for the purposes of the R&D tax offset.

### Other transactions

30.     This decision does not consider the correctness of other purported income and deductions reported by the taxpayer. However, the Commissioner may give subsequent consideration to whether the taxpayer's other income and deductions have been reported correctly.

### Penalties and interest

31.     This decision does not consider the application of any penalties or shortfall interest. A position paper setting out our view of the application of penalties and interest will be provided separately.

## SUMMARY OF ADJUSTMENTS

32.     The following table displays the tax adjustment we will make in relation to the taxpayer for the 2012-13 income year:

| SENSITIVE | |
|---|---|

CONFIDENTIAL

DEF_01617821

Case 9:18-cv-80176-BB   Document 547-7   Entered on FLSD Docket 06/01/2020   Page 9 of 55

|  | Pre audit | Post audit |
|---|---|---|
| Taxable income | 476,077.00 | 0 |
| Tax on taxable income | 142,823.10 | 0 |
| Refundable tax offsets | 2,222,252.10 | 0 |
| Amount payable (+) / refundable (-) | (2,079,429.00) | 0 |
| Tax shortfall |  | 2,079,429.00 |

33.    In order to give effect to this adjustment, we propose to issue a notice of amended assessment reducing taxable income to nil, and a notice[9] specifying that the taxpayer is not entitled to any tax offset refunds for the 2012-13 income year. The taxpayer will be entitled to object to the amended assessment and notice in accordance with Part IVC of the *Taxation Administration Act 1953* (**TAA**).[10]

---

[9] *Income Tax (Transitional Provisions) Act 1997* (TPA) subdivision 67-L
[10] TPA Section 67-135

CONFIDENTIAL

DEF_01617822

REASONS FOR DECISION

# RELEVANT FACTS

### Incorporation

34. Strasan Pty Ltd (**Strasan**) (**the taxpayer**) was registered with the Australian Securities & Investments Commission (**ASIC**) on 21 July 2011. Dr Craig Wright and Mr Muhammad Shoaib Yousuf were appointed directors.[11] At incorporation, 2,000 shares were issued as follows:

    34.1.   500 to Panopticrypt Pty Ltd (**Panopticrypt**) beneficially

    34.2.   500 to an entity controlled by Mr Yousuf.

    34.3.   500 each to two other unrelated entities – EA Professionals Pty Ltd (**EA Professionals**) and Deuba Pty Ltd (**Deuba**).

35. The taxpayer's share register and ASIC show that shares held by EA Professionals and Deuba were cancelled on 6 March 2014 (effective 3 March 2014) as the result of a buyback and forfeiture respectively.[12] The taxpayer advises that EA Professionals was deregistered on 15 May 2013 and Deuba's shares were bought back in 2012.[13] The taxpayer advises that they did not update ASIC at the time as the then secretary was withholding records.[14]

36. At the relevant time, the shares in Panopticrypt were owned by Dr Wright and his current spouse, Ms Ramona Watts, in a 29:71 ratio.[15] Dr Wright and Ms Watts were its directors.[16]

37. The taxpayer advises that on 1 July 2013 Ms Uyen Nguyen was appointed as a director of, and issued 18,000 shares in, the taxpayer.[17] At 23 June 2015, Ms Nguyen advised she still held a financial interest in the taxpayer, albeit indirectly.[18]

38. On 25 February 2014, the taxpayer changed its name to C01N Pty Ltd (**C01N**) with effect from 15 February 2014.[19]

### Purported R&D activity

39. On 7 October 2013, the taxpayer applied to register a project named 'Sukuriputo okane' under section 27A of the *Industry Research and Development Act 1986* (**IRDA**) for 2012-13.[20] The project is described as a software library for financial cryptography including a prototype server and high-level client API able to process Bitcoin transactions and markets. The three core activities are described in the AusIndustry application as follows:[21]

---

[11] ASIC form 201 for Strasan Pty Ltd lodged 21 July 2011 (1E7590526) [C1]
[12] C01n Pty Ltd register of members [C6]; ASIC form 484 for C01n lodged 6 March 2014 (7E5887792) [C2]; ASIC form 484 lodged 6 March 2014 (7E5887818) [C3]
[13] C01N Pty Ltd Register of members [C6]; Response to ATO from Ramona Watts received on 16 March 2015 page 13 (undated) [C56]; ASIC form 484 for C01N Pty Ltd (7E5887818) [C3]
[14] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[15] Panopticrypt Pty Ltd Register of members [C11]
[16] ASIC organisation extract Panopticrypt Pty Ltd, viewed 10 June 2015 [C12]
[17] C01n Pty Ltd register of members [C6]; ASIC form 484 lodged 25 October 2013 (7E5601347) [C97]; ASIC form 484 lodged 25 October 2013 (7E5601224) [C98]
[18] Record of conversation with Uyen Nguyen on 23 June 2015 [H30]
[19] ASIC form 205A for Strasan Pty Ltd lodged 25 February 2015 (7E5861347) [C5]
[20] R&D Tax Incentive Application: Registration of R&D Activities for Strasan Pty Ltd submitted 7 October 2013 [C13]
[21] Strasan AusIndustry 2012-13, Additional information provided on 7 October 2014, AusIndustry registration dated 25 November 2013 [C14]

---

CONFIDENTIAL

DEF_01617823

REASONS FOR DECISION

39.1.   Scriptable money: exploring ways to program a distributed contract using Bitcoin to form agreements with people via the blockchain

39.2.   'BTC' agents: exploring currency agents

39.3.   Transaction signing: no information is provided about this activity.

40.   Much of the AusIndustry application is taken from internet sources, without acknowledgement. An annotated version of the application showing these sources is provided as **Appendix 1**.

41.   The taxpayer provided additional information to AusIndustry on 7 October 2013. Much of this information is taken from internet sources, without acknowledgement. An annotated version of the application showing these sources is provided as **Appendix 2**.

42.   On 20 October 2014, the taxpayer provided to the ATO 'examples of the R&D activities conducted in Australia using the overseas cloud servers to run particle swarm optimisation (**PSO**) techniques on the Bitcoin Blockchain'.[22] Much of this information is taken, unacknowledged, from an internet source.[23] A version of the information highlighting the information taken from this source is provided at **Appendix 3.**

43.   The taxpayer acknowledges the use of public sources and considers it appropriate as it never suggested they discovered the problems identified in the materials. It contends its research is not taken from internet sources.[24]

44.   On 25 November 2013, AusIndustry registered the activities for 2012-13.[25]

45.   The ATO visited the taxpayer's premises in March and April 2015 and requested written information from the taxpayer to obtain evidence that the activities as registered had been conducted in the relevant financial years and that the expenditure claimed as notional deductions had the requisite nexus to the registered activities. As a result of our investigations, the ATO requested that AusIndustry examine the taxpayer's registration for 2012-13 and that AusIndustry make a finding as to the eligibility of the activities.

46.   On 19 February 2016, AusIndustry made a finding under section 27J of the IRDA that none of the activities registered by the taxpayer in its 2012-13 AusIndustry application met the requirements of a core or supporting R&D activity.[26] AusIndustry found that:

46.1.   In relation to activity 1.1 (Core – Scriptable Money), the taxpayer had not provided any evidence that activities were conducted in 2012-13 to program contracts and had not demonstrated that any experimental activities were necessary to resolve a scientific or technical hypothesis.

46.2.   In relation to activity 1.2 (Core – BTC Agents), the taxpayer had stated that the focus of the activity had been on the assembly of a supercomputer platform. That is, the taxpayer admitted that Activity 1.2 registered in 2012-13 around currency agents was not conducted. The taxpayer had not demonstrated that any experimental activities were necessary to resolve a scientific or technical hypothesis.

---

[22] Appendix L5 to letter from KPMG to ATO dated 20 October 2014 [C16]
[23] James McCaffrey: Artificial Intelligence – Particle Swarm Optimisation, August 2011, https://msdn.microsoft.com/en-us/magazine/hh335067.aspx
[24] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[25] Strasan Pty Ltd AusIndustry registration for 2012-13 dated 25 November 2013 [C15]
[26] Certificate for finding under section 27J of the IRDA reference number RF00068 dated 19 February 2016 issued to C01N Pty Ltd [C131]

CONFIDENTIAL

DEF_01617824

46.3.    In relation to activity 1.3 (Core – Transaction Signing), the taxpayer had not provided any evidence that activities were conducted in 2012-13 to solve issues around the signing of bitcoin transactions and the taxpayer had not demonstrated that any experimental activities were necessary to resolve a scientific or technical hypothesis.

46.4.    In relation to activity 1.2.1 (Supporting – Coding test site), as the taxpayer had not demonstrated any core activities, this activity could not be a supporting activity and the taxpayer had stated that the focus of this activity had been on the assembly of a supercomputer platform, that is, the taxpayer admitted that Activity 1.2.1 registered in 2012-13 around APIs was not conducted. The taxpayer had also not provided any evidence that activities were conducted and had not demonstrated that the establishment of the supercomputing platform had any direct, close and relatively immediate relationship to any registered core R&D activities.

**Income tax return**

47.    On 20 June 2014, the taxpayer's 2012-13 income tax return claiming notional deductions of $4,938,338 and a refundable R&D tax offset of $2,222,252.10 was lodged by KPMG.[27] The notional deductions were made up of $4,933,338 of expenditure relating to an Infrastructure as a Service (**IaaS**) contract used to operate a Silicon Graphics International (**SGI**) based supercomputer referred to as 'C01N', and $5,000 of expenditure to a third-party contractor, Dr Ignatius Pang. IaaS is defined as:

> The capability provided to the consumer is to provision processing, storage, networks, and other fundamental computing resources where the consumer is able to deploy and run arbitrary software, which can include operating systems and applications. The consumer does not manage or control the underlying cloud infrastructure but has control over operating systems, storage, and deployed applications; and possibly limited control of select networking components (e.g., host firewalls).[28]

48.    The taxpayer also claimed a deduction of $2,066,392.17[29] for materials and assistance acquired from Professor David Rees, an academic based in the United Kingdom (**UK**).

49.    The taxpayer has returned assessable income of $2,962,399[30] pursuant to a sale to Hotwire based on a contract value of $3,205,820. The taxpayer contends that it provided the Professor Rees material, a statistical algorithmic library, a project plan and a budget to Hotwire.[31]

50.    A further $850,000 of notional deductions claimed to have been incurred to associates in the current and prior years have been carried forward on the basis they had not been paid.[32]

---

[27] C01N Pty Ltd 2013 Income Tax Return and R&D Schedule [C65]
[28] Department of Finance, Australian Government Cloud Computing Policy, October 2014, http://www.finance.gov.au/sites/default/files/australian-government-cloud-computing-policy-3.pdf [C120]
[29] Represented by the expense of $2,258,534 in the taxpayer's financial statements less an addition in the tax reconciliation of $192,142 for a purported error in the taxpayer's financial statements; Letter from KPMG to Craig Wright dated 16 February 2015 [C64]; C01N 2012-2013 Tax Reconciliation [C63]
[30] Represented by the income of $3,205,820 in the taxpayer's financial statements less a subtraction item in the tax reconciliation of $243,421 for a purported error in the taxpayer's financial statements; Letter from KPMG to Craig Wright dated 16 February 2015 [C64]; C01N 2012-2013 Tax Reconciliation [C63]
[31] Email from John Chesher to Brigid Kinloch dated 18 February 2014 [H14]
[32] C01N Pty Ltd 2013 Income Tax Return and R&D Schedule [C65]

CONFIDENTIAL

**Retention of refund**

51.   On 14 July 2014, we sent a letter notifying the taxpayer that we were retaining its refund in accordance with section 8AAZLGA of the TAA. The letter was sent to C01N Pty Ltd c/- KPMG PO Box 558, Gordon, New South Wales 2072.[33]

52.   On 4 February 2015, the taxpayer advised that they had not been notified that its refund had been held.[34]

53.   On 4 February 2015, a copy of the letter was provided to the taxpayer.[35] Note two copies were provided, one addressed to the taxpayer's Gordon address, and one addressed to 'C/ KPMG, Level 5, 32 Delhi Rd, North Ryde New South Wales 2113'. Notes on ATO systems show that two letters were created, but only the one addressed to the Gordon address was sent.

54.   On 19 February 2015, we confirmed to the taxpayer that the letter issued on 14 July 2014 had been sent to the Gordon address.[36]

**IaaS transaction – purported contract**

55.   The taxpayer advised that Dr Wright, for the taxpayer, and Mr Dave Kleiman, for W&K, began negotiating for W&K to provide IaaS services in March 2012. W&K is a company incorporated and based in the State of Florida in the United States of America (**US**). The taxpayer advised that W&K had contacts in the Republic of Panama (**Panama**) that could provide better and cheaper services than other providers.[37] The taxpayer's desire to acquire the services are ostensibly supported by board meeting notes from a meeting between Dr Wright, Ms Watts and Mr Yousuf (and Mr Sanjeev Bhola who is listed as both present and not present) dated 5 June 2012.[38]

56.   The taxpayer purported to enter into a contract with W&K titled 'statement of work' for the provision of IaaS services over a 12 month period. The statement of work is dated 30 June 2012, and appears to have been digitally signed by Dr Wright and Mr Kleiman on 2 July 2012.[39] Refer to comments at 174 to 194 regarding electronic communications below.

57.   The statement of work appears to have been adapted from a US government IaaS tender document obtained from the internet.[40] A highlighted version of the statement of work showing where the text matches the tender document is provided at **Appendix 4**. The taxpayer acknowledges that the tender document was used as a precedent and does not consider this inappropriate.[41]

58.   The taxpayer advised that the purported contract was signed electronically and has provided the electronic signature. However, the purported appendices and 'HPC Work

---

[33] Letter from ATO to C01N PL dated 14 July 2014 [C60]
[34] Email from Andrew Sommer to Arna Synnot dated 4 February 2015 with subject 'RE: Wright and related entities' [C61]
[35] Email from Arna Synnot to Andrew Sommer dated 4 February 2015 with subject 'RE: Wright and related entities' [C61]
[36] Letter from ATO to C01N PL, Intergyrz PL and Zuhl PL dated 19 February 2015 [C62]
[37] Letter from KPMG to ATO dated 20 October 2014 Response to question 11, page 21 [C52]
[38] Board meeting notes for Strasan Pty Ltd dated 5 June 2012 (unsigned) [C23]
[39] Statement of Work between Strasan Pty Ltd and W&K Info Defense Research LLC dated 30 June 2012, including certificate [C24]
[40] US Government IaaS solicitation http://webcache.googleusercontent.com/search?
q=cache:_c038yREBo4J:https://www.gsaadvantage.gov/images/products/elib/pdf_files/iaasrfq.pdf+&cd=8&hl=en&ct
=clnk&gl=au [C28]
[41] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]

CONFIDENTIAL

REASONS FOR DECISION

Schedule' are not included in the electronically signed document.[42] Further, the purported appendices do not have the same writing style,[43] lettering system,[44] font or footer as the statement of work. The taxpayer states that the appendices were created for the specific purpose of addressing issues that arose in correspondence following the initial drafting of the statement of work. The taxpayer has not advised when the appendices were drafted or agreed upon.[45]

59.   The statement of work states that W&K, via 'W&K Panama', will provide Strasan with cloud storage services, virtual machines and cloud web hosting as needed for 12 months. No identifiers or addresses for W&K Panama are provided and the taxpayer advises they have no knowledge of this entity.[46]

60.   The statement of work includes detailed descriptions of the technical specifications and different 'bundles' available, but no terms relating to pricing or quantity (in terms of the amount of storage, RAM or disk space of virtual machines or data bandwidth allowed). The taxpayer contends the contract involved an agreed price for the supply of a system, such that this part of the statement of work was not relevant.[47]

61.   The statement of work provides that the service is for a 'fixed fee for the provision of systems over a 12 month period'.[48] However, an appendix titled 'C01N Pricing', states that 'Cost base will be calculated as… RPeak 4.50 USD /GFlop'.[49] At the time the contract was purportedly executed, the taxpayer's name was Strasan Pty Ltd. The taxpayer contends that the name of the supercomputer was 'C01N' and that this is evidenced by its entry in the Top 500 list.[50] However, C01N's first entry in the Top 500 list was not until November 2014.[51]

62.   A separate document titled 'Server HPC Schedule' is not referenced in the statement of work.[52] The document provides a breakdown of the cost of the provision of 1024 virtual computers, 100,000 GB of SSD storage, 100,000,000 GB of storage and 50,000,000 GB of snapshot storage and a monthly cost of $431,250. The taxpayer contends that this document was used to determine the invoiced amount of US$5,175,000[53] and that it represents Appendix C to the statement of work.[54] However, Appendix C appears to be the document titled 'C01N Pricing'.

63.   With respect to payment, the statement of work provides that funds for the service 'are to be held at and paid' through Liberty Reserve SA of San Jose, Costa Rica.[55] Liberty Reserve was an unlicensed financial transaction company based in Costa Rica that did

---

[42] Statement of Work between Strasan Pty Ltd and W&K Info Defense Research LLC dated 30 June 2012, including certificate [C24]
[43] Unlike the Statement of Work, the purported Appendices contain numerous typographical, spelling and grammatical errors.
[44] The Statement of Work contains a 'List of Attachments' which includes 'Appendix A', 'Appendix B', 'Appendix C' etc; refer Statement of Work between Strasan Pty Ltd and W&K Info Defense Research LLC dated 30 June 2012 at 23 [C24]
[45] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[46] Letter from KPMG to ATO dated 20 October 2014, question 5 response (page 14) [C52]
[47] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[48] 'Statement of Work' between Strasan Pty Ltd and W&K Info Defense Research LLC, clause 6 [C24]
[49] Appendices to 'Statement of Work' between Strasan Pty Ltd and W&K Info Defense Research LLC [C26]
[50] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[51] C01N Top 500 record http://top500.org/site/50559 [C106]
[52] Server HPC Schedule [C27]
[53] Letter from KPMG to ATO dated 13 August 2014 at page 22, paragraph (g) [C52]
[54] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph 23 [C57]
[55] Statement of Work', clause 6 [C24]

CONFIDENTIAL

DEF_01617827

not observe 'know your client' procedures and was shut down by the US Government in May 2013.

64. The statement of work does not contain any provisions for, or reference to, security for payment. However, a purported appendix titled 'Contractor Team Arrangements (URL)' provides that 'all details will be conducted using a suitable timestamp system to be decided by the parties on or before the final payment and movement of funds form escrow'.[56] Further, a purported appendix titled 'Commercial Terms and Conditions' provides that '[f]ailure to pay by the due date will invoke the irrevocable retention of the Bitcoin wallet', and that 'transfer of this wallet will not count as full satisfaction of the contract unless the sale value of such exceeds the amount owed'.[57] There is no reference to any 'escrow', 'due date' or 'Bitcoin wallet' elsewhere in the documentation. The taxpayer has subsequently advised that Bitcoin address 1933 was to be held in escrow until payment.[58]

65. On 18 December 2014 the taxpayer advised that the escrow arrangement for the Bitcoin held for the security of the payment obligation was 'built into the blockchain', hence no escrow provider was used.[59]

66. On 26 May 2015, the taxpayer provided screenshots of purported Bitmessages indicating that Bitcoin address 1933 was transferred via Fedex, indicating that a paper wallet may have been used in the escrow arrangement and physically transferred between the parties.[60] Refer to comments at 174 to 194  regarding electronic communications below. The taxpayer contends this paper wallet was held by W&K as security until payment was made and could only be accessed once Dr Wright provided a passphrase and parts of the key were combined.[61]

67. The taxpayer advises that W&K obtained the services from Signia, trading as 'High Secured'. High Secured is a company located in the Panama, specialising in offshore data hosting, merchant accounts and legal services. It is not owned, controlled by, or otherwise associated with Dr Wright.

68. The taxpayer has provided screenshots of purported Bitmessages between Dr Wright and Mr Kleiman and Dr Wright and High Secured to support this[62], as well as a printout of an email purportedly from Devian Rockwell at High Secured confirming High Secured received US$5 million via Liberty Reserve from Mr Kleiman for the provision of the purported C01N supercomputer.[63] Refer to comments at 174 to 194 regarding electronic communications below.

69. A purported appendix titled 'Security Requirements' references a director of 'Signia Corp. Panama (783956)' as a potential manager of systems access.[64] However, there was no such Panamanian company in existence at the time the contract was purportedly

---

[56] Appendices to 'Statement of Work' between Strasan Pty Ltd and W&K Info Defense Research LLC, 'Contractor Team Arrangements (URL)', [C26]
[57] Appendices to 'Statement of Work' between Strasan Pty Ltd and W&K Info Defense Research LLC, 'Commercial Terms and Conditions', [C26]
[58] Letter from KPMG to ATO dated 20 October 2014, question 15 response (page 22) [C52]
[59] Annexure 1 to letter from Clayton Utz to ATO dated 18 December 2014, response to question 5 (page 2) [C53]
[60] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]
[61] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[62] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]
[63] Annexure C (High Secured correspondence) of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C107]
[64] Appendices to 'Statement of Work' between Strasan Pty Ltd and W&K Info Defense Research LLC, 'Security Requirements', [C26]

CONFIDENTIAL

DEF_01617828

executed. A company named 'Signia Enterprises Corp' was registered with that company number four months later, on 17 October 2012.[65]

70.    On 26 May 2015, the taxpayer advised that the contract was 'a mixture of written terms (the statement of work) and oral terms'.[66]

71.    'C Wright' is listed as W&K's representative under the contract, which further states that he 'shall act as a central point of contact with Strassan [sic] … (and) have full authority to act for W&K in all contractual matters'.[67] The taxpayer contends that W&K authorised Dr Wright to negotiate with High Secured in relation to the supercomputer in terms of the requirements and specifications, but excluding price.[68]

**IaaS transaction – purported invoice and payment**

72.    The taxpayer has provided a purported invoice issued by W&K dated 30 June 2012 for 12 months of IaaS services for a total of US$5,175,000 and states payment was to be made by assigning rights to Bitcoin on 15 January 2013.[69] The taxpayer advises that negotiating a fixed price per month provided better value and payment would be made in January as the taxpayer needed W&K to acquire the systems to conduct its R&D before it could make full use of the services.[70]

73.    The taxpayer advises that due to volatility in the price of Bitcoin, the parties renegotiated the payment terms such that payment would be made in US dollars.[71]

74.    The taxpayer contends that it paid the amount of the purported invoice in the 2012-13 income year.

***Purported Liberty Reserve transfer***

75.    To evidence the purported payment to W&K, the taxpayer has provided a purported screenshot of the Transaction History screen of a Liberty Reserve account called 'Craig Wright R&D Trust' showing a payment equal to US$5,175,000 was made to W&K on 6 January 2013.[72] The screenshot differs from other publicly available screenshots of Liberty Reserve Transaction History screens around the same time in terms of graphics, layout, text, font and colour.[73]

76.    On 21 November 2014, we requested documents evidencing the establishment of the Liberty Reserve account and the transfer of funds into the Liberty Reserve account from a currency exchange service. In its response on 16 December 2014, the taxpayer did not provide any documentation to evidence the establishment of the account or the transfer

---

[65] Registro Publico De Panama search results for Signia Enterprises Corp. (company number 783956) undertaken on 19 January 2015 [C30]
[66] Appendix 3 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015 [C45]
[67] Statement of Work between Strasan Pty Ltd and W&K Info Defense Research LLC including certificate page 20 [C24]
[68] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[69] Invoice issued by W&K Info Defence Research LLC to Strasan Pty Ltd dated 30 July 2012 [C25]
[70] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph 23 [C57]
[71] Letter from KPMG to ATO dated 20 October 2014, question 15 response (page 25) [C52]
[72] Liberty Reserve screenshot: 'Craig Wright R&D Trust' [C34]
[73] http://1.bp.blogspot.com/-DFmhWjCq1Gs/UYJfCCtDQlI/AAAAAAAAhA/cK_ffKXR7Wg/s1600/Liberty+Reserve +%E2%80%93+largest+payment+processor+and+money+transfer+system.+Liberty+Reserve+serves+millions+sinc e+2002+++Transaction+History.png [C108], http://4.bp.blogspot.com/-ga9cdzpd4xl/UVE3iCwH0cI/AAAAAAAAHvo/ ATaCFoblBZY/s1600/Liberty+Reserve.JPG [C109], https://www.points2shop.com/testimonials_images/ free_free_0_07_by_liberty_reserve_3830306_3520.jpg [C110], http://3.bp.blogspot.com/-zp7vev5xOv0/ UYzv0PFSR-I/AAAAAAAAAIQ/NRtEKI5iEzA/s1600/Liberty+Reserve+%E2%80%93+largest+payment+ processor+and+money+transfer+system.+Liberty+Reserve+serves+millions+since+2002+-+Transaction+ History.htm_20130510175305.png [C111], http://www.forexpeacearmy.com/community/attachments/liberty-reserve- scamming-its-client-4-jpg.8582/ [C112]

CONFIDENTIAL

DEF_01617829

REASONS FOR DECISION

of funds to the Liberty Reserve account.[74] The taxpayer contends that Liberty Reserve was a Bitcoin exchange.[75]

77. The taxpayer's accounting records record the payment as having been made on 14 January 2013. They also show a foreign exchange loss of $404,280.93 was generated from the difference between the A$/US$ exchange rate at the time of the invoice and the time of payment.[76]

78. The taxpayer contends the A$/US$ rates at 30 July 2012 and the date of payment were $1.04869 and $0.969281 respectively.[77]

79. The actual A$/US$ rates at 30 July 2012 and 6 January 2013 were $0.953301991 and $0.9544717.[78]

80. The taxpayer advises that the calculation was made and submitted by KPMG and they consider it to be reliable.[79]

81. The advice provided by KPMG to the taxpayer, provided to the ATO on 20 February 2015, states that the taxpayer's 2012-13 income tax return was prepared using information taken from the taxpayer's accounting system and that KPMG has relied on those accounts and not sought to audit or independently review the balances provided for the preparation of the return. KPMG do not state in their advice that they have undertaken the calculations to determine the foreign exchange loss amount, rather they appear to have accepted the amount recorded in the taxpayer's accounts of over $400,000 on face value.[80]

82. The taxpayer has provided purported screenshots of Bitmessages, blogs, emails and text messages that ostensibly confirm the payment was received by W&K in Liberty Reserves and that W&K paid High Secured $5 million in Liberty Reserves to provide the services.[81] Refer to the comments at 174 to 194 regarding electronic communications below.

### Purported arrangement with C01N UK

83. The taxpayer contends that it paid the amount of the purported IaaS invoice in accordance with an arrangement with UK company, C01N Ltd (**C01N UK**) (previously called Design by Human Ltd and Moving Forward in Business Ltd). The taxpayer has provided the following explanations regarding this purported payment and contends they are consistent.

   83.1.   On 13 August 2014, the taxpayer advised that C01N UK, acting in its capacity as trustee of the Craig Wright R&D Trust, funded the taxpayer with equity. C01N UK paid share subscription proceeds direct to W&K in settlement of the invoice.

---

[74] Annexure 1 to letter from Clayton Utz dated 18 December 2014, question 10 and response to question 10 (page 3) [C53]
[75] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[76] C01N Pty Ltd Xero 'Realised Gains and Losses' – Accounts Payable (United States Dollar) report from 1 July 2012 to 30 June 2013 [C70]
[77] C01N Pty Ltd Xero 'Realised Gains and Losses' – Accounts Payable (United States Dollar) report from 1 July 2012 to 30 June 2013 [C70]
[78] www.xe.com [C122]
[79] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[80] Letter from KPMG to C01N Pty Ltd dated 18 June 2014, Appendix B (pages 12 and 13) [C102]
[81] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]; Purported email correspondence with High Secured (Appendix C to email from Robyn Thomas to Arna Synnot in response to C01N position paper) [HS39]

CONFIDENTIAL

DEF_01617830

C01N UK transferred funds to W&K using a Liberty Reserve account in the name of Craig Wright R&D Trust.[82]

83.2. On 20 October 2014, the taxpayer indicated that shares in the taxpayer were issued to C01N UK in its personal capacity, rather than in its capacity as trustee, that C01N UK made the payment by transferring value from its share capitalisation and held that value as trustee of the Craig Wright R&D Trust as a payment mechanism.[83]

83.3. On 16 December 2014, the taxpayer indicated that C01N UK agreed to make an equity contribution to the taxpayer and C01N UK provided property (known as Liberty Dollars) to the value of US$5,175,000 to Dr Wright on behalf of the taxpayer and that the taxpayer directed Dr Wright to convert the property to US dollars and pay the US dollar amount to W&K.[84] The taxpayer declined to provide C01N UK's financial statements, despite an entity related to Dr Wright being a director of C01N UK.

83.4. In correspondence received on 20 February 2015, the taxpayer indicated that a further, unnamed 'trust' transferred $5,270,895.98 in Liberty Dollars to Dr Wright's trust account under loan. The taxpayer stated that Dr Wright used $5,175,000 of this amount to pay W&K. This was described as a 'capital injection', 75% from 'Uyen' (believed to be Ms Uyen Nguyen) and 25% from Ms Watts, 'as owners of the capital injected'.[85]

83.5. On 26 May 2015, the taxpayer indicated that C01N UK acquired the shares as trustee for the Tulip Trust and that it owned the Liberty Reserve account titled 'Craig Wright R&D Trust' as trustee for that trust.[86]

83.6. On 27 November 2015, the taxpayer indicated that the 'Craig Wright R&D Trust' Liberty Reserve account was set up 'for Wright International Investments'.[87] We understand this is a reference to Wright International Investments Ltd (**Wright International**).

84. The taxpayer has provided documents showing Wright International was incorporated as an international business company in the Republic of Seychelles (**Seychelles**) on 4 August 2009.[88] These include a copy of a certificate issued by the Seychelles registrar of international business companies, and documents stamped by the Seychelles International Business Authority or Abacus (Seychelles) Limited. Among the documents provided are declarations for Wright International signed by Craig Wright dated 4 August 2009.[89] The declaration begins:

'in accordance with Section 119 of the International Business Companies Act, 1994 (as amended)…'

85. Section 119 of the *International Business Companies Act, 1994* (Seychelles) was not enacted until December 2013.[90]

---

[82] Letter from KPMG to ATO dated 13 August 2014, appendix C (page 3) [C51]
[83] Letter from KPMG to ATO dated 20 October 2014, question 7(c) response (page 16) [C52]
[84] Annexure 1 to letter from Clayton Utz to ATO dated 18 December 2014, response to question 10 (page 3) [C53]
[85] Response from Ramona Watts to ATO received on 20 February 2015, page 27 (dated 16 February 2015) [C55]
[86] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph [31d] [C57]
[87] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[88] Documents relating to Wright International Investments Ltd [IC9]
[89] Documents relating to Wright International Investments Ltd [IC9]
[90] International Business Companies (Amendment) Act, 2013 (Act 15 of 2013) (Seychelles) [IC11]

CONFIDENTIAL

DEF_01617831

86. The taxpayer has provided a company memorandum for a UK company referred to as '08248988 UK', the company number of Design by Human Ltd, dated 7 January 2013 that states:[91]

    86.1. The taxpayer will issue 50,000 shares to the UK company in return for that company funding the data centre.

    86.2. Craig Wright R&D's Liberty Reserve account 'will be used in trust for this transaction. The UK company will be the trustee of this account'.

    86.3. W&K will manage the Panama data centre for not more than 10% over costs.

87. The memorandum describes the company as '08248988 (To be C01N)'. Design by Human Ltd changed its name to Moving Forward in Business Ltd on 15 October 2013.[92] Moving Forward in Business Ltd changed its name to C01N Ltd on 7 January 2014.[93] The taxpayer contends the name change to C01N Ltd was contemplated at the date of the memorandum.[94]

88. The memorandum states that it was issued by Panopticrypt as director. The references to the company number are in a different colour and font type to the rest of the memorandum.

89. A carbon copy of the memorandum was sent to Ms Nguyen. The taxpayer has provided an undated 'consent to act' whereby Ms Nguyen agrees to act as a director of C01N UK from the later date of 30 June 2013.[95]

90. The taxpayer advises that the shares in it were issued at $100 each as that was the value of the taxpayer at the time. No valuations were performed to determine this value. The taxpayer has advised the shares were finally issued at $106 due to exchange rate differences.[96]

91. Records from the UK Companies House show that until 3 January 2014:[97]

    91.1. C01N UK was owned and controlled by a UK shelf company operator, the CFS group of companies

    91.2. its directors were CFS Nominees Ltd and Bryan Thornton (connected with the CFS group)

    91.3. it had one ordinary £1 share on issue

    91.4. the company's name was changed from Design By Human Ltd to Moving Forward in Business Ltd on 15 October 2013.

92. CFS Secretaries Ltd confirmed these facts on 11 May 2015.[98] When asked about the formation and sale of C01N UK, CFS Secretaries Ltd stated C01N UK:

    … Was a Shelf Company which was purchased from CFS on 3rd January 2014

    … Sold as a Shelf Company

---

[91] Company memorandum – 08248988 UK dated 7 January 2013 [C33]
[92] File Copy - Certificate of Incorporation on Change of name Company Number 8248988 dated 15 October 2013 [C72]
[93] File Copy – Certificate of Incorporation on Change of name Company Number 8248988 dated 7 January 2014 [C73]
[94] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[95] Consent to Act, Uyen Nguyen, Design by Human Ltd (undated) [C71]
[96] Letter from KPMG to ATO dated 20 October 2014, question 17(b) response (page 26) [C52]
[97] Companies house extract: C01N Ltd [C35]; Annual return AR01 for Design By Human Ltd dated 11 October 2013 submitted 14 October 2013 [C74]
[98] Attachments to letter from HM Revenue & Customs to ATO dated 11 May 2015 ATO ref 7790 [C38]

CONFIDENTIAL

DEF_01617832

… Dormant when the company was incorporated and owned by CFS

… The name was changed from Design By Human to Moving Forward in Business by CFS to sell as a Shelf Company. The Client then changed the name to C01N LTD.

93. We have obtained a 'Combined Register' for C01N UK, from computer records obtained from an entity related to the taxpayer, where the details match the original contemporaneous CFS documents.[99]

94. These records do not show Panopticrypt as a director of C01N UK. However, on 22 February 2014 (ie after CFS sold the company), documents were lodged with Companies House indicating:[100]

94.1. Panopticrypt had been a director since 1 January 2013

94.2. At 30 June 2013:

(a) the directors were Panopticrypt and Bryan Thornton (associated with the CFS group) and the secretary was Craig Wright

(b) 200 ordinary shares were on issue and 38,707,000 preference shares were on issue

(c) The company had assets of £38,508,838 and no liabilities. It had a revaluation reserve of negative £127,017 and a loss account balance of £71,345.

94.3. At 1 February 2014:[101]

(a) the directors were Panopticrypt and Craig Wright and the secretary was Craig Wright

(b) 200 ordinary shares were on issue held equally between Craig Wright and Ramona Watts

(c) 18,707,000 redeemable preference shares were held by Denariuz Lte (believed to be Denariuz Ltd, a Singaporean company related to Dr Wright)

(d) 20,000,000 redeemable preference shares were held by Panopticrypt non-beneficially.

95. On 28 March 2014, the ATO advised the taxpayer that there was no record of Uyen Nguyen ever holding the position of Director of Design by Human.

96. On 10 April 2014, documents were lodged with Companies House indicating Mr Kleiman and Ms Nguyen were appointed directors on 12 October 2012.[102]

97. A response to a request for information from CFS Secretaries bears a handwritten annotation which indicates that both appointments had been 'backdated by the client'.[103]

98. CFS Secretaries stated 'not applicable' when we requested company minutes. However, several purported minutes (unsigned, or signed by Dr Wright) were found on computer records obtained from an entity related to the taxpayer that ostensibly corroborate the

---

[99] Combined Register for C01N Ltd (obtained from NUIX) [C36]
[100] Companies house extract: C01N Ltd [C35]; C01N Ltd Abbreviated (Unaudited) Accounts (11 October 2012 to 30 June 2013) submitted 22 February 2014 [C75]; Annual return AR01 for Design By Human Ltd dated 11 October 2013 submitted 14 October 2013 (Companies House document ID X2I Y8NUH) [C74]
[101] Annual return AR01 for C01N Ltd dated 1 February 2014 22 February 2014 (Companies House document ID X32AHLAB) [C76]
[102] Appointment of director for C01N Ltd (Mr David Kleiman) submitted 13 April 2014 (Companies House document ID X35OYHCI) [C78]; Appointment of director for C01N Ltd (Ms Uyen Nguyen) submitted 13 April 2014 (Companies House document ID X35JPOGG) [C79]
[103] Attachments to letter from HM Revenue & Customs to ATO dated 11 May 205 ATO ref 7790 [C38].

REASONS FOR DECISION

taxpayer's contention that Panopticrypt was a director of C01N UK. One minute (dated 3 January 2014) appears to have been executed by the same person that executed several share certificates included in the 'Combined Register', yet makes no reference to Panopticrypt having any role in the company at 3 January 2014.[104]

99.   The taxpayer contends that C01N UK was set up by Mr Kleiman and that Dr Wright was not involved in the administrative aspects of the company. The taxpayer further contends that either Mr Kleiman or CFS failed to keep the records up to date.[105]

**Purported issue of shares to C01N UK**

100.   On 16 March 2015, the taxpayer provided a copy of a document entitled 'C01N Pty Ltd – A.C.N. 152 222 421 – Application for shares', dated 8 January 2013.[106] The document appears to represent an application by 'C01N Ltd' for 50,000 shares in 'C01N Pty Ltd' at $1 each. However, on 8 January 2013 the taxpayer's name was Strasan Pty Ltd and C01N UK's name was 'Design By Human Ltd'.

101.   Both the application and share register show the shares as being beneficially held by C01N UK. However, the taxpayer's most recent contention is that the shares are held by C01N UK for the Tulip Trust; refer subparagraph 83.5 above.

102.   The issue of 50,000 shares is recorded on the share register as having occurred on 8 January 2013 at $106 each.[107] The accompanying share certificate is numbered five and has also been issued in the name of C01N Pty Ltd.[108]

103.   A share certificate originally numbered five issued in the name of Strasan and dated 1 July 2013 has been annotated to change the number to six and the sequence of shares to accommodate the 50,000 shares apparently issued to C01N UK in January 2013.[109]

104.   ASIC records show 50,000 shares were issued to C01N UK on 1 April 2013 and that these were held beneficially. However, the share register shows the shares were issued on 8 January 2013. The ASIC record was lodged on 22 April 2014, over a year after the purported issue took place.[110]

105.   On 11 November 2013, as part of an application for a private binding ruling, Hotwire advised the ATO that, as at 2 June 2013, the taxpayer's membership had not changed since incorporation; refer paragraph 34 above. Hotwire advised: [111]

>   The only company CS Wright controlled is Panopticrypt as one of two directors.
>
>   At the time, his ownership of Panopticrypt was 5%.

106.   The taxpayer contends that this statement was made by John Chesher, who was not familiar with C01N Pty Ltd and that his statement was incorrect.[112] However, John Chesher sent a carbon copy of the email containing the shareholding information to Dr

---

[104] Minutes of Design By Human Ltd dated 11 October 2012, 1 January 2013, 14 October 2013 and 15 October 2013; Minutes of Members' meeting of Moving Forward in Business Ltd dated 3 January 2014; Minutes of meeting of Moving Forward in Business Ltd dated 3 January 2014 (signed); Minutes of meeting of C01n Ltd dated 3 January 2014 (obtained from NUIX) [C37]
[105] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[106] Application by C01N Ltd for shares in C01N Pty Ltd dated 8 January 2013 [C7]
[107] C01N Pty Ltd Register of Members [C6]
[108] C01N Pty Ltd share certificate number 5 dated 8 January 2013 [C8]
[109] C01N Pty Ltd share certificate number 6 dated 1 July 2013 [C9]
[110] ASIC form 484 for C01N Pty Ltd dated 22 April 2014 (7E5996081) [C4]
[111] Email from John Chesher to Rosa Solomon and Craig Wright dated 11 November 2013 with subject 'RE: Research & Development Claim' [H13]
[112] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]

---

CONFIDENTIAL

DEF_01617834

REASONS FOR DECISION

Wright, and Dr Wright subsequently forwarded it with a new message to the ATO.[113] Dr Wright did not correct the information. We also note that on 21 October 2013 (several weeks prior to Mr Chesher's email about the taxpayer's shareholdings), Dr Wright emailed the ATO in relation to a Goods and Services Tax (**GST**) audit on the taxpayer stating 'This is a note to say that John Chesher is our tax adviser and has permission to communicate with you'.[114]

107. In a separate query about the taxpayer's Business Activity Statements, the taxpayer was asked when its share capital was paid and who the beneficial owners were. In its response, on 10 March 2014, the taxpayer made no reference to 50,000 shares having been issued to C01N UK or the Tulip Trust.[115]

108. The taxpayer contends that it appointed a secretarial service on 2 September 2014 who fixed errors in the share register and certificates that may have existed, and that the secretarial service issued documents under the name C01N instead of Strasan. The taxpayer states it is in the process of updating its share register. The taxpayer further states that the former secretary would not give out the company key, meaning that ASIC could not be updated, and that they have emails to ASIC to evidence this.[116] These emails were not provided.

***Tulip Trust***

109. A series of documents relating to the Tulip Trust have been provided by the taxpayer and related entities, including what appears to be a digitally signed document by Dave Kleiman indicating he held Bitcoin from Dr Wright and was going to establish a trust (the 'Tulip Trust document').[117] However, the taxpayer has provided two versions of the email from Mr Kleiman to which the Tulip Trust document was purportedly attached. The emails are identical except one is dated 24 June 2011 and the other 17 October 2014.[118] Mr Kleiman died in April 2013.

110. The Tulip Trust document lists four PGP fingerprints relating to the following PGP keys[119] E545EB7B, C941FE6D, 1F556274, 5EC948A1. These are listed on the MIT key server as being associated with Dave Kleiman, Satoshi Nakamoto,[120] Dr Wright and Satoshi Nakamoto respectively.

111. ATO Forensics advises that two of the keys, Dr Wright's and one tied to Satoshi Nakamoto, are showing as having been created using encryption software that was unavailable at the dates they were purportedly created.[121]

112. The taxpayer has provided a forensic report it commissioned from Mr Alan Batey that confirms that 'the Tulip Trust.pdf file was indeed signed by David A Kleiman or an

---

[113] Email from Craig Wright to Rosa Solomon dated 11 November 2013 with subject 'RE: Research & Development Claim [DLM=SENSITIVE] [H13]

[114] Email from Craig Wright to Celso Tomas dated 21 October 2013 with subject 'RE: Strahan P/L [DLM=SENSITIVE]' [C113]

[115] Response to GST queries regarding C01N Pty Ltd received on 10 March 2014 [C84]

[116] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]

[117] Attachment titled 'Tulip Trust.pdf' to email from Dave Kleiman to Craig Wright sent on 24 June 2011 at 12:04:57 PM with subject 'Requested attached.' [C80]

[118] Email from Dave Kleiman to Craig Wright sent on 17 October 2014 at 12:04:57 PM with subject 'Requested attached.' [C81]

[119] PGP is a data encryption and decryption program that provides cryptographic privacy and authentication for data communication. Each user has a public/private key pair. The private key is known only to the user. The public key is usually bound to a user name and/or an email address.

[120] Satoshi Nakamoto is the pseudonym used by the person or group who invented Bitcoin.

[121] Both were created using the preferred has algorithm 8,2,19, 11, which was non-existent in the PGP code base until 9 July 2009 [C123]

CONFIDENTIAL

DEF_01617835

individual who had access to his private PGP key and had made the public key available on the MIT PGP keyserver. If anyone else had access to the private PGP key then that person would also need to know the passphrase associated with that key'.[122] The document analysed by Mr Batey has not been provided however we understand it to be the Tulip Trust document referred to in paragraph 109 above.

113.    The taxpayer has provided a series of screenshots of purported Bitmessages, emails (some electronically signed) and text messages from Dave Kleiman that ostensibly indicate Mr Kleiman advised Dr Wright that he 'had obtained' Design By Human Pty Ltd, on 11 October 2012, then on 14 October 2012 that Dave Kleiman would 'put in the order for the UK company shortly', then on 25 October 2012 advises 'I have used CFS in the UK. I have 2 companies in the UK. Design by Human'. They further ostensibly indicate that Dave Kleiman established a trust known as the Tulip Trust.[123] Refer to the comments at 174 to 194 regarding electronic communications below.

114.    The taxpayer has advised that C01N UK was the trustee for the Tulip Trust[124], however the document by Mr Kleiman and advice from Ms Nguyen appear to state that a number of individuals act as trustees.[125] The taxpayer contends that at no stage was the ATO advised that C01N UK was the only trustee.[126]

**Substantiation of purported IaaS services**

115.    On 6 December 2013, the taxpayer's representative sent an email to the ATO referring to an invoice from the taxpayer to a related entity for '512 x dual core ASIC/GPU systems' and contends that this is evidence that the taxpayer had access to the purported  C01N supercomputer in the  2012-13 income year.[127]

116.    On 20 October 2014, the taxpayer provided a series of reports purportedly showing the supercomputer's CPU, disk and memory use and job data, as well as time sheets for Dr Wright. They appear to show that the supercomputer was in use in September 2012.[128] Dr Wright's timesheets also show that he was working on 'PSO tuning' from July 2012.[129]

117.    We visited the taxpayer's premises with two ATO computer scientists on several occasions to view records of the R&D activities undertaken using the IaaS services purportedly acquired by the taxpayer.

118.    During the visit on 2 and 3 March 2015, the taxpayer advised that all the research data and artefacts (including code) were developed and stored on the supercomputer.

119.    For the visit on 26 March 2015, we provided an agenda that described the following evidence we wished to see in relation to the purported  C01N supercomputer:

119.1.    Linpack benchmark

119.2.    nVidia suite

---

[122] Forensic Report by Alan Batey dated 20 November 2015 case name 'PGP Document Analysis' CF case reference 'CP15 1588' [C117]
[123] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]
[124] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph 27 [C57]
[125] Bitmessage from Dave Kleiman to Craig Wright with subject 'the trust process' dated 6 November 2012 at 12:19AM [C31]; Record of conversation with Uyen Nguyen on 23 June 2015 [H30]; Attachment titled 'Tulip Trust.pdf' to email from Dave Kleiman to Craig Wright sent on 24 June 2011 at 12:04:57 PM with subject 'Requested attached.' [C80]
[126] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[127] Email from John Chesher to Celso Tomas dated 6 December 2013 with subject 'Strasan Pholus transaction' [C105]
[128] Files titles CPU.Sep12.csv; Mem.Sep12.csv; CPUperJob.Sep12.csv; Disk.Sep12.csv
[129] Timesheets for Dr Wright for 2012-13 [C17]

CONFIDENTIAL
DEF_01617836

REASONS FOR DECISION

119.3.   GPUCheck.cu

119.4.   Hadoop

119.5.   Run the module command

119.6.   Other commands

120. The agenda also specified the following that we wanted to see on the purported C01N supercomputer for the taxpayer's activities for the 2012-13 income year:

120.1.   Run the R module

120.2.   Load the neural network, Bitcoin engine and PSO code

120.3.   Demonstration of the above

120.4.   View the data used in 2012-13

120.5.   View the source code used in 2012-13

120.6.   View the results generated in 2012-13.[130]

121. On 26 March 2015, Dr Wright showed ATO officers what he advised was the purported C01N supercomputer and ran a series of commands to substantiate its existence and the taxpayer's access to it. The taxpayer recorded videos of the ATO officers' visit to its premises and screen captures of the material shown to them on the purported C01N supercomputer.

122. In relation to the material demonstrated to the ATO officers on 26 March 2015, and recorded in these videos and screen captures, we note the following:

122.1.   The CPU details reported are inconsistent with those expected to be reported for a system with the specifications the taxpayer claims to have acquired, specifically:

(a)   Cores per CPU is reported as 8 where 12 is expected[131]

(b)   Model name is reported as 'E5-2695' where 'E5-2695 V2' is expected (we also note that there is no Intel CPU called 'E5-2695')[132]

(c)   L3 Cache is reported as 20MB where 30MB is expected, the Cache size is also inconsistently reported as 8MB when a subsequent command is executed to show additional CPU information[133]

122.2.   Further commands run to show the computer's technical and hardware information show a script being run to produce a file called 'configuration-output-2015-03-26.doc'. At the time this script is run the computer clock shows the time as 11:01 and the date 2015-03-26. Rather than showing the results generated by the script, a file called 'configuration-output-2015-03-25.doc' is then displayed. During the demonstration of the computer at the ATO visit both of the output files were displayed and we note the following:

(a)   Both output files show the same values for the 'Product Name', 'Serial Number', 'UUID', and 'SKU Number'.

---

[130] Agenda for site visit dated 25 March 2015 [C66]
[131] Intel Corporation, viewed 17 February 2016 http://ark.intel.com/products/75281/Intel-Xeon-Processor-E5-2695-v2-30M-Cache-2_40-GHz [C124]
[132] Intel Corporation, viewed 17 February 2016 http://ark.intel.com/products/75281/Intel-Xeon-Processor-E5-2695-v2-30M-Cache-2_40-GHz [C124]
[133] Intel Corporation, viewed 17 February 2016, http://ark.intel.com/products/75281/Intel-Xeon-Processor-E5-2695-v2-30M-Cache-2_40-GHz [C124]

CONFIDENTIAL

DEF_01617837

SENSITIVE

REASONS FOR DECISION

(b) The '2015-03-25' output shows 'Supermicro' as the 'Manufacturer' and 'Twin Blade' as the 'Family'.

(c) The '2015-03-26' output shows 'SGI' as the 'Manufacturer' and 'IceX' as the family. We further note that SGI documentation uses 'ICE X' when referring to this system and the capitalisation on the output appears inconsistent with this SGI documentation.

(d) The SKU shown on the '2015-03-25' output is inconsistent with the SKU of the Supermicro SuperBlade system.[134]

(e) The SKU shown on the '2015-03-26' output is inconsistent with the SKU of the SGI ICE X system.[135]

(f) Chassis information is displayed in both output files, again, the 'Serial Number' is the same on both, with the 'Manufacturer' shown as 'SuperMicro' and 'SGI' respectively. Both outputs also show the chassis height as "2U".[136] SGI and SuperMicro enclosures are 21U and 7U high respectively.[137]

(a) When further CPU information is displayed on the '2015-03-26' output the CPU name is displayed as 'E52695' rather than the earlier 'E5-2695', the 'V2' that would be expected to follow the CPU name is also still absent. The CPU information also displays 'Upgrade' as 'Socket LGA1366' where 'Socket LGA2011' is expected.[138]

(b) Details of the physical memory of the system displayed in the '2015-03-26' output display different maximum memory values for each CPU where we would expect them to be identical, the maximum memory displayed is also inconsistent with the maximum memory supported by the Intel E5-2695 V2.[139]

(c) The 'Number of Devices' displayed in the physical memory details is inconsistent with the maximum memory capacity displayed and also suggest that the computer is using triple channel memory, which is inconsistent with the Intel E5-2695 V2.[140]

(d) The 'SKU Number', 'Serial Number' and Socket values displayed in both output files are consistent with a Hewlett Packard DL380 Gen 6 server, rather than an SGI or SuperMicro product.[141] The Hewlett Packard server also supports triple channel memory.[142]

(e) The CPU used in the DL380 Gen 6 server is an Intel Xeon E5530. The technical details of this system are far more consistent with the details

---

[134] Super Micro Computer, Inc., viewed 17 February 2016, http://www.supermicro.com/products/superblade/module/SBI-7127RG-E.cfm [C124]
[135] Letter from Silicon Graphics Pty Ltd dated 3 March 2016 [C164]
[136] A 'U' is a unit of height for server racks.
[137] Super Micro Computer, Inc., viewed 17 February 2016, http://www.supermicro.com.tw/products/SuperBlade/enclosure/; Silicon Graphics International Corporation, viewed 17 February 2016, http://techpubs.sgi.com/library/manuals/5000/007-5806-001/pdf/007-5806-001.pdf [C124]
[138] Intel Corporation, viewed 17 February 2016, http://ark.intel.com/products/75281/Intel-Xeon-Processor-E5-2695-v2-30M-Cache-2_40-GHz [C124]
[139] Intel Corporation, viewed 17 February 2016, http://ark.intel.com/products/75281/Intel-Xeon-Processor-E5-2695-v2-30M-Cache-2_40-GHz [C124]
[140] Intel Corporation, viewed 17 February 2016, http://ark.intel.com/products/75281/Intel-Xeon-Processor-E5-2695-v2-30M-Cache-2_40-GHz [C124]
[141] Hewlett Packard Enterprise Development LP, viewed 17 February 2016, http://partsurfer.hpe.com/Search.aspx?searchText=SGH107X3HT [C124]
[142] Intel Corporation, viewed 17 February 2016, http://ark.intel.com/products/37103/Intel-Xeon-Processor-E5530-8M-Cache-2_40-GHz-5_86-GTs-Intel-QPI [C124]

---

SENSITIVE

CONFIDENTIAL

DEF_01617838

displayed in the screen captures provided by the taxpayer than the components of the supercomputer as contended by the taxpayer.[143]

122.3. The host file showing the 1160 compute nodes of the purported C01N supercomputer displays the network address of the local computer, which is called C01NAccess01, as being 203.57.21.155. The compute nodes then display addresses in the 10.0.x.x range. This range belongs to a private network, which is not accessible over the internet. This configuration, of an access node which can be accessed over a network, including the internet, with an independent private network, connected through a second port, which allows the access node to control the compute nodes, is consistent with the normal configuration of a High Performance Computer system. The access node should be in the same location as the cluster.

122.4. The Asia-Pacific Network Information Centre (**APNIC**) is the Regional Internet Registry and manages internet addresses in the Asia Pacific region. APNIC records indicate that the 203.57.21.x range of IP addresses is owned by 'Ridges R and D', with the contact person listed as 'Craig Steven Wright'.[144] We note that Dr Wright is a former director and shareholder of a now deregistered company called 'Ridges Estate Pty Ltd'[145], which claimed tax offsets under the R&D Tax Incentive in 2002, 2003 and 2004. This range of IP addresses is shown as being allocated by APNIC. APNIC do not allocate or manage IP addresses for Panama.[146]

122.5. The information extracted from several nVidia cards was shown with Serial Numbers and GPU UUIDs that are identical and have characters obscured with the character 'X'. ATO Computer Forensics have been unable to replicate these results on a nVidia Tesla M2090, the card the taxpayer claims is utilised in the purported C01N supercomputer. Rather their testing has returned unique Serial Numbers and UUIDs on all cards tested. We note that the results shown during the demonstration by Dr Wright match material available on various websites explaining the nVidia utility.[147]

123. The taxpayer has provided specifications for the purported C01N supercomputer to the ATO on two occasions, the first being the 'Server HPC Schedule' which the taxpayer contends forms part of the purported IaaS contract[148] and the second in a later response from a related entity received on 2 March 2015.[149] The specifications are inconsistent with each other and with the Top 500 entry for the purported C01N supercomputer[150] in terms of the number of nodes and cores for the system.

124. We also note that Dr Wright holds numerous computer science qualifications, has authored numerous research publications, is an Adjunct Lecturer at Charles Sturt University (CSU) and has delivered computer science courses in conjunction with IT

---

[143] Hewlett Packard Enterprise Development LP, viewed 17 February 2016, http://partsurfer.hpe.com/Search.aspx?searchText=SGH107X3HT [C124]
[144] APNIC, viewed 17 February 2016, https://wq.apnic.net/whois-search/static/search.html?query=203.57.21.0 [C129]
[145] MASCOT organisation extract for Ridges Estate Pty Ltd viewed 24 February 2016 [C128]
[146] APNIC, viewed 17 February 2016, https://www.apnic.net/about-APNIC/organization/apnics-region [C130]
[147] Microway, viewed 17 February 2016, https://www.microway.com/hpc-tech-tips/nvidia-smi_control-your-gpus/ [C124]
[148] Server HPC Schedule [C27]
[149] Response from Pholus, Interconnected and Denariuz received 2 March 2015, tab 27, Supercomputer specifications [C119]
[150] C01N Top 500 record http://top500.org/site/50559 [C106]

CONFIDENTIAL

DEF_01617839

Masters and CSU, including presenting the course 'Master Class: Programming on Supercomputers'.[151]

125. Third party information obtained by the Commissioner shows:

125.1. that the Hewlett Packard DL380 Gen 6 server with the serial number and SKU matching those that appear in the screen capture material provided by the taxpayer was sold and shipped to a purchaser (unrelated to the taxpayer) located in Australia.[152]

125.2. The SGI SKU for the SGI ICE X system utilising the Intel processor E5-2695V2 is LCF-CPU-2695V2.

125.3. The SGI product with this SKU was released on 5 March 2013.

125.4. No SGI ICE X systems utilising the Intel processor E5-2695V2 were shipped to any purchaser prior to 1 July 2013

125.5. SGI has not sold any systems with similar or matching configurations to those supplied by the taxpayer as the configurations of the purported C01N supercomputer.

125.6. Although the SMBIOS strings (shown in the screen captures provided by the taxpayer and containing information such as manufacturer, product name and SKU) are generally set by the manufacturer, SGI are aware that they are also editable to some degree by those with advanced knowledge.[153]

126. The taxpayer advised that the data it collected was stored on the Hadoop database on the supercomputer. However, Dr Wright refused to enter commands to allow us to view the dataset, or its metadata, to verify its existence, determine when it had been loaded onto the supercomputer and determine its size. The taxpayer contends this was because Dr Wright did not want to input 'random commands from a person who had never before used a supercomputer of this size'.[154]

**W&K**

127. W&K was registered with Florida's corporate registry on 14 February 2011 with Dave Kleiman, listed as agent and 'manager/member'.[155]

128. The taxpayer has advised that Dr Wright had no role with the company other than as a shareholder.[156] However, Dr Wright has signed an acknowledgement of liquidated claim for W&K acknowledging 'I am the legal agent and representative for the defendant' in his capacity as its 'director / Australian agent'.[157] The taxpayer contends that Dr Wright was acting as an agent under direction from Ms Nguyen, who it contends was a director of the

---

[151] The IT Masters Pty Ltd, viewed 24 February 2016, http://www.itmasters.edu.au/free-short-course-programming-super-computers/ [C125]; Charles Sturt University News, viewed 24 February 2016, http://news.csu.edu.au/latest-news/science/cyber-security-research-initiative [C126]

[152] Letter from Hewlett-Packard Australia Pty Ltd dated 19 February 2016 [C127]

[153] Letter from Silicon Graphics Pty Ltd dated 3 March 2016 [C164]

[154] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]

[155] Electronic articles of organisation for Florida Limited Liability Company: W&K Info Defense Research LLC [C18]; 2013 Limited liability company reinstatement: W&K Info Defense Research LLC [C19]

[156] Letter from KPMG to ATO dated 20 October 2014, Question 3(c) response, page 12 and question 17(a) response, page 26 [C52]

[157] Acknowledgement of liquidated claim case number 2013/225983 filed on 19 August 2013 (NSWSC) [C21]

CONFIDENTIAL

DEF_01617840

company.[158] Ms Nguyen has stated that Dr Wright had no authority to sign anything for W&K.[159]

129. W&K's shareholder register shows that at incorporation, Dr Wright and Mr Kleiman initially held 500 shares each. At the time of the transaction with the taxpayer it shows that Mr Kleiman held 500 shares, Dr Wright 250 shares, Ms Lynn Wright (Dr Wright's ex-wife) 250 shares and Ms Nguyen 500 shares.[160] However, an agreement between Dr Wright and Mr Kleiman dated 2 April 2013 that styles itself as a share sale agreement states 'the vendor [Dave Kleiman] is the owner of all issued shares in the company [W&K Info Defense LLC]. Ownership is 50% in the Vendor's name and 50% in trust held for the purchaser [Craig Wright]'.[161]

130. The taxpayer has advised that the contract figures are wrong and this was an oversight that was repeated in an affidavit to the New South Wales Supreme Court.[162]

**Location of purported IaaS services**

131. High Secured's website indicates that its data centre is located in Panama.[163]

132. On 24 April 2014, Dr Wright posed the following question to AusIndustry:[164]

> ...is research from Australia by Australian researchers that only operate out of a location and from a computer system in Australia using a cloud based system (somewhere undefined) considered valid Australian research? Is the expense on the IaaS system needed for the activity thus a valid expense?'

133. Dr Wright states:[165]

> All research activities are conducted in Australia. This means, that people who are doing the research reside full time in Australia. They systems being in the cloud they use can be anywhere in the world. The contract for leasing the hardware used to create and run simulations is not specifically located in any place, but can be located anywhere.

> I do not see that this is an overseas activity as per Section 28D of the Industry Research and Development Act 1986. The people are situated in Australia and log onto computers here. They use these local machines to connect to a cloud service where we run simulations. The simulations are created using a series of neural networks that are developed and run as an evolutionary programming automata. In effect, we have a genetic algorithm that is being tuned.

134. On 29 April 2014, AusIndustry responded stating:[166]

> ... it is our position that the work you have described as being done by people sitting at a computer is being conducted in Australia and is therefore an "Australian activity". You have obviously self-assessed that work as being an eligible R&D activity. However, whether the expenditure on the IaaS system is "expenditure incurred" on one or more R&D activities is really a matter for the ATO...

135. The taxpayer contends that this email indicates that AusIndustry confirmed that its R&D activities using the supercomputer were conducted solely within Australia.[167]

---

[158] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[159] Record of conversation with Uyen Nguyen on 23 June 2015 [H30]
[160] W&K US share register [C20]
[161] Contract for the sale of shares of a company owning business between Dave Kleiman for W&K Info Defence LLC (vendor) and Craig Wright R&D (purchaser) dated 2 April 2013 [C22]
[162] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraph 19 [C57]
[163] HighSecured.com 'Our Facility', https://www.highsecured.com/facility.php, viewed 24 February 2016 [C121]
[164] Email from Craig Wright to Lynn Bloomfield sent on 24 April 2014 [C82]
[165] Email from Craig Wright to Lynn Bloomfield sent on 24 April 2014 [C82]
[166] Email from Lynn Bloomfield to Craig Wright sent on 29 April 2014 [C82]

CONFIDENTIAL

DEF_01617841

### Dr Pang

136.　On 14 August 2014, the taxpayer advised that it incurred $5,000 of expenditure to Dr Pang for undertaking registered R&D activities on behalf of the taxpayer. The taxpayer referred to Dr Pang as a 'contractor'. The taxpayer advised that payment was made by:

136.1.　C01n Ltd as trustee for the Craig Wright R&D Trust, transferring licenses to the taxpayer in exchange for shares in the taxpayer

136.2.　The taxpayer assigning the licenses to Dr Pang as consideration for services performed in respect of the R&D activities.[168]

137.　As part of the same response, the taxpayer provided invoice number 1550 dated 1 June 2013, issued by Dr Wright to the taxpayer. It features both Dr Wright and the taxpayer's Australian Business Numbers (**ABN**s). It describes the supply of three items (SPSS Base, SPSS Support and SPSS Advanced Statistics) totalling $5,000 exclusive of GST. The invoice includes GST of $500. Under the 'ship to' field, it states 'C01N/Strasan, Ignatius Pang, By assignment' and the customer ID is given as 'Iggy P'. The invoice further states:

> Transfer of beneficial ownership of SPSS licence from Craig Wright R&D to Ignatius Pang in consideration for work conducted under Strasan in Statistical programming and network analysis. License code follows. This document is an irrevocable assignment of rights to the license to Mr Pang in consideration for his work for Strasan. The computer hardware is also assigned at cost.[169]

138.　On 19 December 2014, the taxpayer advised that there was no formal agreement for the provision of Dr Pang's services and that the negotiations were undertaken via Skype. The taxpayer also advised that Dr Wright invoiced the taxpayer as an agent of Dr Pang, and that these arrangements were recorded in correspondence.[170] The correspondence provided does not contain any statements to this effect.

139.　The taxpayer has provided two emails from Dr Pang. One provides some details of the work he conducted for the taxpayer.[171] In the other Dr Pang advises he received a laptop, printer, salary and super payments to the value of $5,000.[172] In neither does Dr Pang state that he authorised Dr Wright to invoice for him or say which company paid him. The taxpayer contends that it provided Dr Pang a computer and software to the value of $5,000, and that Hotwire provided Dr Pang with a printer, payment for hours worked and superannuation.[173]

140.　On 23 May 2014, Wright advised KPMG that $5,000 had been incurred in the 2012-13 income year to Dr Pang but that 'we have not paid [this amount] yet, but [it is] also not on the books as yet as [it] will not be formally issued until June 2014'.[174] In contrast with this, the taxpayer now contends the financial statements record the invoice issued by Dr Wright to C01N.[175] We are unable to locate the invoice (or indeed any amount for $5,000)

---

[167] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[168] Letter from KPMG to ATO dated 13 August 2014, appendix C (page 6) [C51]
[169] Invoice 1550 dated 1 June 2013 from Dr Craig Wright to Strasan PL [C93]
[170] Annexure 1 to letter from Clayton Utz to ATO dated 18 December 2014, response to question 29 (page 8) [C53]
[171] Email from Ignatius Pang to Viveca Magnusson dated 2 December 2014 at 2:28 PM with subject 'Re: Work you did for Craig' [C93]
[172] Email from Ignatius Pang to Craig S Wright dated 11 May 2015 at 8:55 AM with subject 'Payment confirmation' [C93]
[173] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[174] Email from Dr Wright to Jade Aitken dated 23 May 2014 with subject 'RE: Australian R&D Activities' [C115]
[175] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]

CONFIDENTIAL

DEF_01617842

REASONS FOR DECISION

in the taxpayer's financial records.[176]  Despite this, an amount of $5,000 has been added back by KPMG in the tax reconciliation.[177]

141.  ATO records indicate that Dr Pang was employed by Hotwire, a related entity of the taxpayer, from 1 September 2013 and that Hotwire paid him $5,353 in the year ended 30 June 2014 (**2013-14 income year**).[178]

142.  Dr Pang was not registered as a research service provider under the IRDA in the 2012-13 income year.[179]

**Professor Rees**

*Purported acquisition*

143.  Professor Rees was an English mathematician known for his work in commutative algebra and semigroup theory.[180] Professor Rees died aged 95 on 16 August 2013.

144.  On 10 March 2014 the taxpayer advised that Professor Rees was a contractor for the taxpayer.[181]

145.  In a written response on 28 March 2014 the taxpayer advised that 'Dr Rees had been paid for work completed in 13 and for future work. Dr Rees's wife died less than a week after Dr Rees meaning we could not recover any of his work completed after June 01st 2013'.[182] On 27 November 2015, the taxpayer contended that 'on 28 March 2014 the taxpayer advised that Professor Rees had been paid for work that Craig utilised and completed, based on Prof Rees' notes and answers to Craig in 2012-13 and for future work'.[183]

146.  On 5 February 2015 Dr Wright verbally advised that:[184]

146.1.  Professor Rees provided some source code, small algorithms and other notes and answered a number of questions particularly around algebra and the Otway-Rees protocol[185]

146.2.  the taxpayer paid Professor Rees by Dr Wright requesting that Mr Kleiman, representing the Tulip Trust, begin holding certain Bitcoin addresses that up until that point had been held in a bare trust for the taxpayer, for Professor Rees. Dr Wright believed the Bitcoin was still held in trust for Professor Rees. He did not believe the executor of Professor Rees' estate was aware of the Bitcoin.

146.3.  there was no written agreement and there was not much of a negotiation on the amount to be paid to Professor Rees; it was more Dr Wright saying to Professor Rees, 'I will give you this'.

147.  On 20 February 2015, the taxpayer advised that:[186]

---

[176] C01N Pty Ltd Detailed Account Transaction Report from 1 July 2012 to 30 June 2013 [C94]
[177] Letter from KPMG to Craig Wright dated 16 February 2015 [C64]; C01N 2012-2013 Tax Reconciliation [C63]
[178] Hotwire Preemptive Intelligence Pty Ltd employee wages data [C95]
[179] Innovation Australia Annual Report 2012-13, Appendix E, Table E1: List of Research Service Providers (page 137) [C92]
[180] The Telegraph obituary on Professor Rees dated 20 August 2013
http://www.telegraph.co.uk/news/obituaries/10255561/Professor-David-Rees.html, viewed 4 May 2015 [C42]
[181] Response from John Chesher to Andrew Miller received 10 March 2014, Page 2 [C49]
[182] Response to Andrew Miller received 28 March 2014, Page 5 [C50]
[183] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[184] Record of conversation between ATO and Dr Wright, Ramona Watts and Andrew Sommer, 5 February 2015 [C54]
[185] The Otway-Rees protocol was not developed by Professor David Rees.
[186] Response from Ramona Watts to ATO received on 20 February 2015 (dated 16 February 2015), page 14 [C55]

CONFIDENTIAL

147.1.   it paid Professor Rees on 28 June 2013 by giving him the private keys to seven Bitcoin addresses (146m, 153R, 1CXn, 1PbX, 1P57, 168R, 19dQ) containing 19,470.12 Bitcoin. However, the earlier response indicated the Bitcoin was held in trust for Professor Rees. The taxpayer contends these explanations are consistent as the Bitcoin was held on trust until the keys were released.[187]

147.2.   the payment to Professor Rees was for research notes relating to cryptography

147.3.   Professor Rees stopped publishing in 1952; however continued research in his field well into the current century

147.4.   the amount to be paid to Professor Rees was agreed earlier in the same tax year.

148.   On 3 March 2015 Dr Wright verbally stated that:[188]

148.1.   he acquired some bits of software and a library of unpublished papers from Professor Rees. He said some of what Professor Rees had supplied may have been from his daughters' work and that Professor Rees had been paid. He stated that Professor Rees provided help answering questions and solving things – ie 'consulting' services and that this was what the payment was for.

148.2.   he first communicated with Professor Rees in 1996. He then received assistance and advice from him between 2003 and 2011. Professor Rees didn't provide a lot of advice in 2013. On 27 November 2015, the taxpayer contended that Professor Rees didn't provide any advice in 2013.[189]

148.3.   in 2010 he and Professor Rees agreed that Professor Rees would be paid for his assistance, but this agreement was not documented.

148.4.   they corresponded by phone, letters and skype and through Mr Kleiman.

149.   During our visit to the taxpayer's premises on 2 April 2015, Dr Wright:

149.1.   showed software source code files that he said Professor Rees provided to the taxpayer. These appear to be taken from the CoCoA software library available on the internet.[190] The taxpayer contends that the fact that CoCoA libraries are on the internet is irrelevant as the variables and configuration provided by Professor Rees was what was valuable.[191]

149.2.   claimed he was the user of Professor Rees' material, but did not demonstrate its use during our visit claiming it was maths that has been solved and that there was nothing to demonstrate.

149.3.   although it was requested in advance and the taxpayer advised that 'selected copies of the material will be available for review when the ATO visits on site', the taxpayer did not produce evidence of the unpublished research papers and when asked to produce them Dr Wright advised they were at his home. On 27

---

[187] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[188] Record of conversation between the ATO and Dr Craig Wright at site visit [C87]
[189] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[190] http://cocoa.dima.unige.it/download/install5-unix.shtml [C116]
[191] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]

CONFIDENTIAL

DEF_01617844

November 2015, the taxpayer advised that 'we will not be providing unpublished papers. If necessary, an agreed expert can view the unpublished work'.[192]

150.  On 27 November 2015, the taxpayer advised that Professor Rees was paid for work carried out between 1999 and 2008 and other than the initial unpublished papers, the other material obtained from Professor Rees was intermittent advice, and that by 2005 communications with Professor Rees were rare.[193]

***Source of funding***

151.  The taxpayer contends that it obtained the Bitcoin to pay Professor Rees from Hotwire as payment pursuant to a 'software development agreement'.[194] The background to the agreement indicates that Dave Kleiman was the 'funder' of the project and that he would 'transfer a sufficient quantity of 'Bitcoin' into trust to fund the completion of the project' on or before 10 April 2013. On 27 November 2015, the taxpayer advised that the funding was to be provided by Mr Kleiman, but following his death funds were ultimately provided by Hotwire.[195]

152.  On 29 October 2013, Hotwire advised the ATO it paid Bitcoin to the taxpayer on 18 June 2013 using Bitcoin address 1MyG (per the notation on the invoice from the taxpayer to Hotwire dated 2 June 2013).[196] We note Dr Wright has also advised that this address was the property of the Tulip Trust until 1 July 2013.[197]

153.  On 18 February 2014, Hotwire provided us with a 'deed of assignment' between Craig Wright 'for' Hotwire and the taxpayer dated 30 June 2013.[198] It states that Hotwire is 'the registered proprietor in NSW and has the following Bitcoin addresses associated by private keys to be transferred' to the taxpayer. The deed lists 11 Bitcoin addresses (1PbX, 1P57, 1CXn, 19dQ, 19dQ, 146m, 168R, 19dQ, 1Jzz, 1M7c and 153R).

154.  On 22 February 2014, Hotwire changed its earlier advice, that it had paid the taxpayer on 18 June 2013 and instead advised that Hotwire paid the taxpayer by assigning equitable interests in Bitcoin on 30 June 2013.[199]

155.  We note the following with respect to the deed of assignment:

155.1.  There is no register of proprietors of Bitcoin addresses

155.2.  The address 19dQ is listed three times

155.3.  The address Hotwire previously advised was used as payment, 1MyG, is not listed

155.4.  The address 1Jzz contained no Bitcoin at 30 June 2013

---

[192] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[193] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[194] Software Development Agreement between Craig Wright (Craig Wright R&D) ABN 97481146384 and Dave Kleiman (W&K Info Def LLC) (client) and Strasan Pty Ltd (Developer) dated 4 April 2013 (12 pages - provided to the ATO) [H15]
[195] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[196] Email from John Chesher to Rosa Solomon dated 29 October 2013 with subject 'RE: Research & Development Claim'[H13]; Invoice 1040 issued by Strasan Pty Ltd to Hotwire Pre-emptive Intelligence dated 2 June 2013 [H16]
[197] Deed of loan between Design by Human Ltd (08248988) UK (Mortgagee) and Craig Wright R&D (ABN 97481146384) (Mortgagor) and Denariuz Seychelles Trust (Guarantor) dated 23 October 2012 [C83]
[198] Deed of assignment between Craig Wright R&D for Hotwire Pre-emptive Intelligence Pty Ltd and Strasan Pty Ltd dated 30 June 2013 [H24]
[199] Record of conversation between ATO (Brigid Kinloch, Mike Doran) and John Chesher, Dr Wright on 25 April 2014 [H25]

CONFIDENTIAL

DEF_01617845

REASONS FOR DECISION

155.5.   On 30 June 2013, the amount in these addresses totalled 34,512.52 Bitcoin and the exchange rate was A$106.1315 per Bitcoin, meaning the amount the taxpayer contends to have received was equal to A$3,622,869. This is $457,049 more than required under the agreement.

155.6.   The deed of assignment lists the taxpayer's ABN incorrectly

155.7.   The deed specifically refers to the taxpayer acquiring the 'entire right, title and interest in and to' the Bitcoin, not an equitable interest in the Bitcoin

155.8.   The agreement is not signed by Dr Wright (or Dr Wright 'for' Hotwire). The taxpayer contends that Dr Wright sent Ms Nguyen a signed copy.[200] This has not been provided.

155.9.   Ms Nguyen has signed for Strasan despite not becoming a director of Strasan until 1 July 2013.[201] On 27 November 2015, the taxpayer advised that Ms Nguyen signed in her capacity as Chief Operating Officer.[202] No evidence of Ms Nguyen holding this position was provided.

156.   On 27 November 2015, the taxpayer advised that approximately 30,000 Bitcoin were moved into address 1MyG, a 'trust address, on 16 November 2011. The taxpayer contends that in 2013, '(1) rights to wallet transferred to C01N (2) rights to wallet transferred [sic] to HWPE [Hotwire]' and that 'the actual amounts held in any particular address are irrelevant provided that, combined, they are sufficient to cover the overall amount transferred'.[203]

157.   On 25 May 2015, we requested that the taxpayer and related entities show control of the private keys of certain Bitcoin addresses (including 1PbX, 1P57, 1CXn, 146m, 168R, 19dQ, 1Jzz, 1M7c and 153R) by signing messages within the addresses using the private keys.[204] This can be performed by the holder of a private key even once the Bitcoin in the address has been spent. The taxpayer and related entities did not sign any messages and on 26 May 2015, made a new claim that address 1Jzz had 'transferred out of Dr Wright's control as part of the MJF transactions by transfer of private keys'.[205] However, previous advice provided to the ATO indicated this address was not transferred to MJF.[206]

158.   On 14 August 2015 Ms Nguyen was asked if it was possible for her to sign messages to verify control of the addresses used to pay Professor Rees. Ms Nguyen advised that the homomorphic encryption scheme used to divide the private keys does not involve key retention once the process is complete. As such, once the keys are transferred to a third party, the process cannot be recreated securely.[207]

159.   Ms Nguyen also advised that Dr Wright had offered to sign messages in 2013, however as this was refused by the ATO at the time, the offer was no longer 'on the table'.[208]

---

[200] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[201] C01N Pty Ltd register of members [C6]; C01N Pty Ltd register of directors [H26]
[202] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[203] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[204] Letter from ATO to C01N Pty Ltd and related entities dated 25 May 2015 [C84]
[205] Appendix 3 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015 [C45]
[206] Appendices 4 and 11 to a letter from Clayton Utz to Peter Walmsley dated 17 November 2014 (GAAR panel second submission) [C43]
[207] Email from Uyen Nguyen to Arna Synnot dated 14 August 2015 [C99]
[208] Email from Uyen Nguyen to Arna Synnot dated 14 August 2015 [C99]

CONFIDENTIAL

DEF_01617846

160. On 27 November 2015 the taxpayer also contended that it offered to sign transactions in 2013 to prove that Dr Wright had access to the Bitcoin addresses held by the trust. In its contention the taxpayer stated that:

> By May 2015, the trust ceased to have control of those keys because they had been distributed to MJF And Professor Rees. The last of the keys were distributed in Sep 2013 Once a third party has received the keys, the trust has no further access to the keys.

161. To evidence the offer by Dr Wright to sign transactions the taxpayer provided an email to Michael Hardy of the ATO,[209] sent on 28 October 2013, inviting him to:

> ..visit the vault we have as a site to hold our cold storage wallet. At this point the particular value holds the cold storage address of one of the addresses we have supplied you with a value just under $24 million. I can show this and show how it is verified and I can also let you have your own technical person validate this.

162. Michael Hardy was head of the ATO Bitcoin Taskforce, and not involved in any of the compliance activities involving the taxpayer and its related entities. The email also does not refer to signing messages and, at best, shows Dr Wright offered to verify ownership of one unspecified address.

163. On 27 November 2015, the taxpayer also provided a copy of an email purportedly sent from Dr Wright to Celso Tomas of the ATO on 17 October 2013 to further evidence the contention that Dr Wright offered to sign messages for the ATO.[210] The email states:

> If there is a simple means to offer ongoing proof, we will do this now. As we are moving forward in business, we cannot promise that the same information will always be available. If you allow us, we will prove how we can transfer keys on and off block. Once a transfer has occurred offblock, the scheme we use wipes information. I did a paper on data wiping in 2008, so I can assure you that I would like to ensure the information is exchanged in a format the ATO can use prior to losing this ability.'

164. This email was never received by ATO servers.

165. We also note that, in regard to the addresses the taxpayer contends were transferred to third parties, in previous statements to the ATO, the taxpayer, or entities related to the taxpayer, have contended that 21 of the 22 addresses transferred to MJF and Professor Rees had already been transferred  by 17 October 2013, with the last address transferred that day. The ATO's request to sign messages on 26 May 2015 also included a request to sign messages in three addresses[211] that were not transferred to MJF or Professor Rees. The taxpayer's response stated '30/06/2014 – Address transferred out of Dr Wright's control as part of a repayment of the amounts loaned by the Trust'.[212]

166. The transaction between the taxpayer and Hotwire was the subject of a Private Binding Ruling application, on which the Commissioner refused to rule given the lack of clarity about the facts. It was also the subject of queries posed as part of a High Risk Refund review of Hotwire following the lodgment of its 2012-13 income tax return. After discussions with the ATO about the transaction and decline in value calculations, Hotwire made some changes to its notional decline in value deductions. Contemporaneous notes on the ATO's systems show that Hotwire's refund was subsequently released as notification under section 8AAZLGA of the TAA had not been given within the required 30 days of lodgment. However, the offset claim was recommended for post-issue review.[213]

---

[209] Email from Craig Wright to Michael Hardy dated 28 October 2013 with subject 'RE: Submissions for Thursday' [C100]
[210] Purported email from Craig Wright to Celso Tomas dated 17 October 2013 with subject 'Email' [C100]
[211] 1Fee, 16co and 12ib
[212] Appendix 3 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015 [C45] [C45]
[213] Siebel note 1-55M4H97 (activity ID 1-4ZJN4XQ); Siebel note (activity ID 1-4QTWYJY) [H10]

CONFIDENTIAL

DEF_01617847

| SENSITIVE | REASONS FOR DECISION |
|---|---|

### *Purported payment to Professor Rees*

167. The taxpayer has recorded the Professor Rees transaction as an expense in its accounts of A$2,258,534 on 30 June 2013 and has recorded the amount as being paid on the same day by paying 19,470.12 Bitcoin.[214] The Blockchain shows the amount in the addresses at 28 June 2013, was 29,569.57 Bitcoin. The Blockchain shows that these amounts were transferred into a new address, 1LXc, on 13 August 2013, along with an additional 4,943 Bitcoin from address, 1M7c. This totals 34,512.57 Bitcoin held in address 1LXc for Professor Rees.[215] However, as recently as 19 November 2014, Dr Wright advised that address 1LXc was used to pay a third party, MJF, on 15 September 2013.[216] On 10 October 2013, Dr Wright also advised that he was still in control of address 1LXc.[217] The taxpayer's former solicitor, Mr Andrew Sommer, verbally advised the ATO on 25 May 2015 that the information in this email was not current at the time it was sent.

168. On 26 May 2015, the taxpayer stated that, sometime in 2011, Dr Wright advised Professor Rees he would give him a total of 34,512.919 Bitcoin in recognition of his contribution to Dr Wright's work, but this was not documented, and the first payment was for 19,470.12 Bitcoin in the 2012-13 income year.[218]

169. The taxpayer contends that Dr Wright provided instructions to Mr Kleiman and others, purportedly acting for Professor Rees, on how to pay Professor Rees and how to set up his accounts, and that a representative for Professor Rees prepared an invoice for Professor Rees (invoice number 4501) dated 30 June 2013 to Strasan for £1,342,246.72 with the description:[219]

> David Rees - license of software for research and development project.
>
> Automated design and BTC chain splitting.
>
> Algebra known as semi-group theory and commutative algebra – For use in developing an automated self-matching learning system. Solutions using the Otway-Rees protocol and Northcott-Rees theory of reductions and integral closures.
>
> Library collection of selected papers. For memory of Ron Lynam.
>
> Payment CC'd to account of Joan Rees.
>
> Export (no VAT).

170. We have obtained a document that appears to be a printout from Hotwire's Xero accounting system showing an invoice from Professor Rees to Hotwire, rather than to the taxpayer, dated 1 July 2013.[220] The taxpayer contends that it was struggling to adapt to the new Xero accounting system in September 2013 and that transactions were erroneously entered into the wrong taxpayer's general ledger.[221] We note that the taxpayer contends that this transaction occurred in June 2013.

171. The taxpayer has provided screenshots of purported Bitmessages and emails between Dr Wright and Mr Kleiman that ostensibly support the provision of the notes and code and the holding of Bitcoin on trust for Professor Rees. Refer to the comments at 174 to 194 regarding electronic communications below.

---

[214] C01N general ledger for 1 July 2012 to 30 June 2013 [C10]
[215] Appendix 3 to a letter form Clayton Utz to Michael Cranston dated 26 May 2015, address IXLc [C45]
[216] Appendices 4 and 11 to a letter from Clayton Utz to Peter Walmsley dated 17 November 2014 (GAAR panel second submission) [C43]
[217] Email from Dr Wright to Michael Hardy dated 10 October 2013 with subject 'Discussion' [C44]
[218] Appendix 1 to a letter from Clayton Utz to Michael Cranston dated 26 May 2015, paragraphs 46-47 [C57]
[219] Record of conversation between ATO and Dr Wright, Ramona Watts and Andrew Sommer, 5 February 2015 [C54]; Invoice from Professor Rees to Strasan Pty Ltd dated 30 June 2013 [C40]
[220] Invoice statement from David Rees to Hotwire (NUIX) [C41]
[221] Document titled 'Craig Wright group Items for Clarification' provided on 3 December 2013 [C85]

| SENSITIVE | |
|---|---|
| | PAGE 35 OF 55 |

DEF_01617848

SENSITIVE

### Third party enquiries

172. The following information has been obtained from Professor Rees's daughters (Professor Sarah Rees, Professor Mary Rees, Debbie Rees and Rebecca Rees) and the executor of his estate, Lloyds Bank:[222]

    172.1. Professor Rees did not write any software and had not been involved in computers since the late 1940s.

    172.2. He never did any consulting work and never issued any invoices.

    172.3. He undertook no work relating to cryptography after the 1940s and never undertook any work relating to automated design, Bitcoin chain splitting or automated self-matching learning systems.

    172.4. His daughter, Professor Sarah Rees, is aware of only one unpublished piece of work by her father, this work was later updated and published.

    172.5. In 2008 Professor Rees was 90, mentally confused and not developing any new mathematical ideas. His daughters do not believe it is possible he could have carried out any work relating specifically to Bitcoin. They considered it inconceivable that their father could have completed work of this nature without his family being aware.

    172.6. For the last few years of his life Professor Rees was very frail, a little confused and suffered some memory loss, his doctor regarded him as suffering from senile dementia. In early 2011 he moved into a nursing home.

    172.7. None of his daughters were aware of him having any dealings with Dr Wright or the taxpayer.

    172.8. He never spoke of Bitcoin and his estate included no Bitcoin or equitable interests in Bitcoin.

    172.9. His daughters confirmed that very few emails were sent in the last few years of his life and were sent with assistance from them, as he was unable to email on his own.

    172.10. At the time the invoice was issued Professor Rees was in the last weeks of his life, was very confused and not in a state to produce the invoice or do any mathematics. His wife, Joan Rees was also bed bound and only able to communicate intermittently.

    172.11. Professor Rees's daughter, Rebecca Rees, conducted his financial affairs from mid-2011. She has no knowledge of any dealings with Dr Wright, or his related entities, Professor Rees granting any rights, or him holding any intellectual property other than that which applied to his various academic publications, published in academic journals. She has no knowledge of Professor Rees holding any Bitcoin addresses or transacting in Bitcoin.

    172.12. His estate executors were not aware of any connection with Dr Wright's entities or Bitcoin.

173. The taxpayer contends that Professor Rees' daughters must have been unaware of his activities.[223]

---

[222] Attachments to letter from HM Revenue and Customs to ATO dated 27 May 2015 ref 7790 [C46]; Attachments to letter from HM Revenue and Customs to ATO dated 20 May 2015 ref 7790 [C47]; Email from Professor Sarah Rees to ATO dated 8 May 2015 [C48]

[223] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]

SENSITIVE

CONFIDENTIAL

SENSITIVE

**Electronic evidence submitted by the taxpayer**

*ATO Emails*

174. The taxpayer and related entities also controlled by Dr Wright have provided a series of emails they allege represent email correspondence between ATO officers and the taxpayer's directors/representatives. These variously purport:

174.1. On 14 July 2014, Celeste Salem of the ATO sent Dr Wright an email relating to the holding of the taxpayer's income tax refund for the 2012-13 income year, failed to attach the notification letter properly and sent the physical letter to the wrong address. As a result, the taxpayer contends it was not notified that the ATO was holding its refund, as required under section 8AAZLGA of the TAA.[224]

174.2. On 5 April 2013, Dr Wright sent an email to Hao Khuu of the ATO advising that the taxpayer was buying IP from Professor Rees and acquiring software from Dr Wright acquired following a dispute with a company and that Hao Khuu advised on the GST treatment of the latter transaction.[225]

175. Two other emails, pertaining to the affairs of entities related to the taxpayer, also contain purported correspondence with ATO officers.[226]

176. ATO records show that these emails were either never sent, or that the content of the emails has been altered from what was originally sent or received, to support the contentions of the taxpayer and related entities.[227]

177. On 27 November 2015, the taxpayer provided a series of forensic reports commissioned by Dr Wright.

178. Dr Nick Sharples was asked to examine four emails that are identified in the report as DM2, DM3, DM5 and DM6.[228] The report suggests that DM2 and DM3 are emails from Hao Khuu, DM5 is from Brigid Kinloch and DM6 is from Celeste Salem. However, copies of the emails are not attached so we are unable to identify which emails are being referenced. Notwithstanding this, we note that Dr Sharples:

178.1. was unable to confirm that the emails had the message headers and message bodies when they were originally composed[229]

178.2. noted that the ATO email system was configured to include the email header field 'content-transfer-encoding' and none of the emails have that field present[230]

178.3. noted anomalies with the header fields in all four emails[231]

---

[224] Alleged email from Celeste Salem to Craig S Wright received in an attachment titled 'Appendix 4 – 8AAZLGA Email (00000004).pdf' to an email from Ramona Watts to Andrew Miller dated 26 June 2015 with subject '20150625 – Response to Interim Position Paper – C01n' [C88]
[225] Alleged email correspondence between Hao Khuu and Craig Wright received as an attachment titled 'Appendix 7 – ATO Email CF Khou 00 (000000003).pdf' to an email from Ramona Watts to Andrew Miller dated 26 June 2015 with subject '20150625 – Response to Interim Position Paper – C01n' [C89]
[226] Alleged email from Brigid Kinloch to Craig S Wright and John Chesher received as an attachment titled 'Appendix 0 – Kinloch Brigit 0111131 (00000002).pdf' to an email from Ramona Watts to Andrew Miller dated 26 June 2015 with subject '20150625 – Response to Interim Position Paper – C01n' [C90]; Alleged email from Craig S Wright to Shalyce Dempster sent Thursday 18 July 2013 at 9:34 PM with subject 'Evidence.' provided to the ATO by email from John Chesher to Marina Dolevski on 13 February 2014 [C91]
[227] ATO email records provided by ATO Forensics
[228] Computer Forensics Report on Behalf of: DeMorgan Ltd by Dr Nick Sharples FR/352/2015 dated 17 November 2015 [C94]
[229] Sharples report, paragraph 12.2
[230] Sharples report, paragraph 12.3
[231] Sharples report, paragraph 12.4

---

SENSITIVE

CONFIDENTIAL

DEF_01617850

178.4. was unable to verify that the Domain Keys Identified Mail (**DKIM**)[232] test was passed for DM2 and DM3, indicating that he could not confirm whether the message was the same as when it was composed or that the ATO's public-private key-pair had been changed[233]

178.5. noted DM5 and DM6 did not contain a DKIM signature or Sender Policy Framework (**SPF**)[234] header verification, indicating that he could not confirm whether the message was the same as when it was composed, and that these inconsistencies raised questions in his mind concerning the provenance of those emails.[235]

179. The ATO's public-private key pair has not changed.[236]

180. Alan Batey was also asked by Dr Wright to examine four emails that are identified in the report as DM2, DM3, DM5 and DM6.[237] The report suggests that DM2 and DM3 are emails from Hao Khuu, DM5 is from Brigid Kinloch and DM6 is from Celeste Salem. However, copies of the emails are not attached so we are unable to identify which emails are being referenced. Notwithstanding this, we note that on the basis of the email headers, Mr Batey:

180.1. States that DM2 and DM3 were sent from addresses residing within the ato.gov.au domain space

180.2. Identifies that DM5 contains no SPF record or DKIM signature

180.3. Identifies that DM6 contains no SPF record

180.4. Conversely states that three emails have SPF and DKIM records that validate as correct

180.5. Identifies that there is a question over the origin of DM5 given it does not have SPF and DKIM records.

181. Mr Batey does not appear to have attempted to verify the DKIM signatures.

***Other electronic evidence***

182. The taxpayer has also provided purported screenshots of Bitmessages, text messages, blogspot posts and digitally signed emails between Dr Wright, Mr Kleiman, Ms Nguyen and High Secured (who the taxpayer advises provided the services to W&K) that ostensibly support the taxpayer's assertions that it obtained services from W&K, paid W&K in Liberty Reserves, and obtained services and paid Professor Rees.[238] The taxpayer advises that these serve as contemporaneous, unalterable evidence that the transactions took place.

---

[232] Dr Sharples states 'Domain Keys Identified Mail (DKIM) is a defined standard that enables the contents and the source of email message to be verified', Sharples report, paragraph 5.1
[233] Sharples report, paragraphs 5.7, 5.8, 7.9 and 8.9
[234] Dr Sharples states 'The Sender Policy Framework (SPF) is a further email-validation system that enables those computers processing the email on its journey from sender to recipient, and which are external to the originating domain, to confirm that the email was passed from one of a set of computers that are authorised to process outgoing email from a domain', Sharples report, paragraph 6.1
[235] Sharples report, paragraphs 9.7, 10,12, 10.13, 12.5.2 and 12.5.3
[236] ATO Forensics Advice [C96]
[237] Forensic Report by Alan Batey dated 11 November 2015 case name 'Email Analysis' CF case reference 'CP15 1588' [C114]
[238] Various Bitmessages, emails and texts between Dr Wright and Dave Kleiman, Uyen Nguyen and High Secured [C31]; Various blogs written by Dr Wright [C32]

CONFIDENTIAL

DEF_01617851

SENSITIVE                                                        REASONS FOR DECISION

### Bitmessage

183. ATO Forensics have independently verified that Bitmessages themselves are only encrypted ('cryptographically secure') and therefore tamper proof when they are transmitted over the internet. Once the Bitmessage is received, it can be altered. The taxpayer contends this is incorrect, however has provided no evidence supporting this assertion.[239]

### Mr Kleiman's PGP signature

184. The taxpayer contends a report by Mr Batey confirms that Mr Kleiman's digital signature has been verified. The taxpayer commissioned the report from Mr Batey 'to examine the PGH keys and establish if they were used to sign the Tulip Trust PDF document'.[240] The Tulip Trust PDF document has not been provided, however we understand it to be the Tulip Trust document (refer to paragraphs 109 to 114 above). The report concludes that 'the Tulip Trust.pdf file was indeed signed by David A Kleiman or an individual who had access to his private PGP key and had made the public key available on the MIT PGP key server. If anyone else had access to the private PGP key then that person would also need to know the passphrase associated with that key'.

185. ATO Forensics advise that:

    185.1.  the public key used in the email purportedly signed by Mr Kleiman can be created with a backdated creation date

    185.2.  there is no 'Know Your Customer' or 'Proof Of Identity' requirements when uploading a public key to the MIT key server

    185.3.  as the digital signature is not supported by an X.509 certificate issued by a trusted authority, there is no way to verify the owner of the digital signature, nor the date that any signing occurred

186. This is demonstrated by the fact that another key on the same key server is also tied to Mr Kleiman. However, its creation date is 26 February 2014, almost a year after his death.[241]

187. We further note that the key Mr Kleiman purportedly used to sign the IaaS contract was purportedly created in 2008 using the preferred encryption algorithm 8, 2, 19, 11. This encryption algorithm did not exist in the PGP code base until 9 July 2009.

### Blogspot

188. ATO Forensics have advised it is possible to backdate blogspot posts.

189. The taxpayer contends that Dr Wright has a hash of the blogspot saved to Twitter and that this hash has been forensically verified. The taxpayer refers us to a report written by Alan Batey as evidence.[242]

190. Mr Batey was asked to 'determine if the supplied hash value is the same as the generated has value from the PDF file named Deed of Trust'. Mr Batey was provided with a hash value and the PDF file, which he hashed using HashCalc. The report does not mention a tweet.

---

[239] Annexure A of email from Robyn Thomas to Arna Synnot dated 27 November 2015 with subject 'RE: C01N Pty Ltd – 2013 position paper [DLM=Sensitive] [C103]
[240] Forensic Report by Alan Batey dated 20 November 2015 case name 'PGP Document Analysis' CF case reference 'CP15 1588' [C117]
[241] MIT PGP keyserver search results of 0x2bd4b0e7 pgp.mit.edu, viewed 3 February 2016 [C144]
[242] Forensic Report by Alan Batey dated 18 November 2015 case name 'Hash Analysis' CF case reference 'CP15 1588' [C118]

SENSITIVE

CONFIDENTIAL                                                        DEF_01617852

191. The taxpayer has not provided the PDF file that was hashed or details of the tweet to the ATO to allow us to verify Mr Batey's work.

*Other*

192. The taxpayer and related entities have also provided emails purportedly with other parties that contain features that cast doubt on their genuineness. One email provided was apparently sent at '23:40 AM'.[243] Another references a domain that was not in existence at the time it was sent.[244]

193. On another occasion Dr Wright and his connected entities provided ATO officers with copies of emails purporting to demonstrate training and technical support provided by an entity, Al Baraka, from whom the entities had 'acquired' software. The emails were sent from a domain linked to a virtual office in Istanbul known as 'Servcorp'. The credit card records of Dr Wright show that a payment was made to this virtual office around the time the domain was established.[245] Dr Wright indicated in interview on 18 August 2014 that he did not have any reason to make such a payment to 'Servcorp' and that he intended to make inquiries as to how that payment appeared on his statement.[246] On 27 November 2015, a related entity contended that 'it is likely that [Al Baraka's purported agent] had a copy of Dr Wright's credit card. This credit card was cancelled in 2014 as it had been used for several fraudulent purchases'.[247]

194. Dr Wright sent an email to Michael Hardy on 10 October 2014 with details of addresses controlled by the taxpayer and related entities.[248] This included a screenshot of Bitcoin wallet software. One address, 1933, is written in a different font to the rest of the text within the software.

---

[243] Email from accounts@mjfminingservices.com to Craig Wright dated 16 August 2013 at 23:40 AM with subject 'Reciept' [HS32]

[244] Purported email from markferrier@hotmail.com to Craig S Wright dated 12 October 2013 with subject 'Thank You…' references the subdomain cp-in-2.e-delivery.albaraka-bank.asia/cpanel. The albaraka-bank.asia domain was first registered on 31 December 2013 [M26]

[245] Attachments to letter from HM Revenue and Customs to ATO dated 27 May 2015 ref 7790 [C46]; Attachments to letter from HM Revenue and Customs to ATO dated 20 May 2015 ref 7790 [C47]; Email to ATO dated 8 May 2015 [C48]

[246] Email from Craig Wright to Jonathon Slater of Clayton Utz dated 21 August 2014 with subject 'RE: Servcorp' [M37]

[247] Annexure A of email from Robyn Thomas to Nathan Firth dated 27 November 2015 with subject 'RE: Following up on GST objections [DLM=Sensitive:Legal] [T35]

[248] Email from Craig Wright to Michael Hardy dated 10 October 2013 with subject 'Discussion' [C44]

CONFIDENTIAL

DEF_01617853

| SENSITIVE | REASONS FOR DECISION |
|---|---|

# YOUR CONTENTIONS

195. Detailed information relating to the taxpayer's factual contentions is set out in various parts of the 'Relevant facts' section of this paper above.

## ISSUE 1: R&D TAX OFFSETS (W&K)

196. The taxpayer contends that it is entitled to an R&D tax offset in 2012-13 income year in respect of expenditure incurred pursuant to an agreement with W&K.

197. The taxpayer contends that it incurred the expenditure pursuant to an agreement with W&K.

198. The taxpayer contends that it conducted registered R&D activities during the 2012-13 income year.

199. The taxpayer contends that it conducted the registered R&D activities in 2012-13 solely in Australia.

## ISSUE 2: R&D TAX OFFSETS (PANG)

200. The taxpayer contends that it is entitled to an R&D tax offset in the 2012-13 income year in respect of expenditure incurred to Ignatius Pang.

201. The taxpayer contends that it incurred the expenditure to Dr Pang.

202. The taxpayer contends that it conducted registered R&D activities during the 2012-13 income year.

## ISSUE 3: FOREIGN EXCHANGE LOSS

203. The taxpayer contends that it is entitled to a deduction for a forex realisation loss of $404,204 in the 2012-13 income year, in respect of an obligation to pay foreign currency to W&K.

## ISSUE 4: PROFESSOR REES DEDUCTION

204. The taxpayer contends that it is entitled to a general deduction of $2,066,392 in the 2012-13 income year in respect of a loss or outgoing incurred in respect of an acquisition from Professor Rees.

## ISSUE 5: ASSESSABLE INCOME

205. The taxpayer contends that it derived assessable income of $2,962,399 in the 2012-13 income year in respect of a sale to Hotwire.

| SENSITIVE | |
|---|---|
| | |

CONFIDENTIAL

# OUR REASONS FOR DECISION

## ISSUE 1: R&D TAX OFFSETS (W&K)

206. ***Issue:*** Is the taxpayer entitled to an R&D tax offset in the 2012-13 income year in respect of expenditure incurred pursuant to a contract with W&K?

207. ***Decision:*** No.

208. Under Division 355 of the ITAA, an R&D entity may be entitled to a tax offset in respect of certain R&D activities. To be entitled to the tax offset, the R&D entity needs one or more notional deductions under the Division. One kind of notional deduction is for expenditure on R&D activities.

209. An R&D entity's entitlement to a notional deduction is determined under section 355-205, which provides:

> (1) An R&D entity can deduct for an income year (the present year) expenditure it incurs during that year to the extent that the expenditure:
>
> (a) is incurred on one or more R&D activities
>
> > (i) for which the R&D entity is registered under section 27A of the *Industry Research and Development Act 1986* for an income year and
> >
> > (ii) that the activities to which section 355-210 (conditions for R&D activities) applies and
>
> (b)      if the expenditure is incurred to the R&D entity's associate – is paid to that associate during the present year.
>
> Note 1: if the matters in sub-paragraphs (a)(i) and (ii) are not satisfied until a later income year, the R&D entity will need to wait until then before it can deduct the expenditure for the present year
>
> Note 2: The R&D activities will need to be conducted during the income year the R&D entity is registered for those activities (see sections 27A and 27J of the *Industry Research and Development Act 1986*)

210. An R&D entity whose notional deductions are at least $20,000 is entitled to a tax offset equal to a proportion of those deductions.[249] Where the R&D entity's aggregated turnover is less than $20m and the entity is not controlled by an exempt entity or entities, the tax offset is 45% of the deductible amount and is refundable.[250]

## No R&D activities registered

211. For the purposes of the R&D Tax Offset, an entity can deduct for an income year expenditure it incurs during that year to the extent that the expenditure is incurred on one or more core or supporting R&D activities for which the entity is registered under section 27A of the IRDA.[251]

212. On 19 February 2016 AusIndustry made a finding under section 27J of the IR&D Act that none of the activities registered by the taxpayer in its 2012-13 AusIndustry application were core or supporting R&D activities.

213. Where a finding is made under section 27J the R&D entity's registration is taken always to have existed in a form consistent with the finding, meaning the taxpayer is taken to have never been registered for core or supporting R&D activities in 2012-13.[252]

---

[249] Subsection 355-100(1)
[250] Items 1 and 2 of subsection 355-100(1) and section 67-30
[251] Section 355-205
[252] IRDA subsection 27L(1)

CONFIDENTIAL                                                          DEF_01617855

214. Findings made by AusIndustry under section 27J are binding on the Commissioner for the purposes of assessments of the R&D entity for the income year or years to which they apply.[253]

215. Given the taxpayer has no registered core or supporting R&D activities for 2012-13, it is not entitled to claim the expenditure purportedly incurred to W&K as a notional deduction for the purposes of the R&D tax offset.

**No expenditure incurred**

216. Further, we do not consider the taxpayer to have incurred any expenditure pursuant to a contract with W&K. Accordingly, the purported contract would not have given rise to a notional deduction for the purposes of the R&D tax offset even if registered R&D activities had been conducted for the taxpayer.[254]

217. To qualify for a notional deduction under section 355-205, an R&D entity must incur expenditure.

218. The term 'incurred' is not defined in the legislation. The following guidance on the term 'incurred' is provided in *TR 97/7: Income tax: section 8-1 - meaning of 'incurred' - timing of deductions*. At paragraph 6, it states:

> The courts have been reluctant to attempt an exhaustive definition of a term such as 'incurred'. The following propositions do not purport to do this, they help to outline the scope of the definition. The following general rules, settled by case law, assist in most cases in defining whether and when a loss or outgoing has been incurred:
>
> a) a taxpayer need not actually have paid any money to have incurred an outgoing provided the taxpayer is definitively committed in the year of income. Accordingly, a loss or outgoing may be incurred within section 8-1 even though it remains unpaid, provided the taxpayer is 'completely subjected' to the loss or outgoing. That is, subject to the principles set out below, it is not sufficient if the liability is merely contingent or no more than pending, threatened or expected, no matter how certain it is in the year of income that the loss or outgoing will be incurred in the future. It must be a presently existing liability to pay a pecuniary sum;
>
> b) a taxpayer may have a presently existing liability, even though the liability may be defeasible by others;
>
> c) a taxpayer may have a presently existing liability, even though the amount of the liability cannot be precisely ascertained, provided it is capable of reasonable estimation (based on probabilities);
>
> d) whether there is a presently existing liability is a legal question in each case, having regard to the circumstances under which the liability is claimed to arise;
>
> e) in the case of a payment made in the absence of a presently existing liability (where the money ceases to be the taxpayer's funds) the expense is incurred when the money is paid.

219. The meaning of the term 'incurred' in relation to R&D expenditure is the same as its meaning in relation to section 8-1.[255]

220. In the present case there are numerous anomalies and inconsistencies in the evidence provided that lead us to conclude that:

220.1. the taxpayer did not have access to the purported C01N supercomputer

220.2. no payment was made to W&K

---

[253] Subsection 355-705(1)
[254] Paragraph 355-100(1)(a) and subsection 355-205(1)
[255] *Desalination Technology Pty Ltd v. Federal Commissioner of Taxation* 2013 ATC 10-343 paragraph 16

CONFIDENTIAL

DEF_01617856

REASONS FOR DECISION

220.3.   no liability arose from the purported agreement between the taxpayer and W&K.

221.   Considered cumulatively,[256] we consider that these anomalies and inconsistencies lead to the conclusion that the purported agreement amounts to a sham. It is considered that the purported agreement was not intended to create the legal rights and obligations it gives the appearance of creating,[257] but was, rather, intended to be a disguise for some other transaction or for no transaction at all.[258]

222.   At the outset, we note that the taxpayer's contentions rely almost exclusively on electronic evidence that cannot be verified by independent third parties, and in some instance has been proven to have been fabricated. We note:

222.1.   ATO Forensic records show that the emails from Celeste Salem, Brigid Kinloch, and Hao Khuu were not sent from the ATO.  The Sharples and Batey email reports commissioned by Dr Wright do not disprove this. Neither attaches the emails they were provided with; as such we cannot identify which emails were analysed. Despite this large omission, the forensic reports found anomalies in all four emails analysed. We note in particular, only Sharples attempted to revalidate the emails as genuine using DKIMs and in each instance he was unable to do so. This shows the emails either did not originate from the ATO, or they did originate from the ATO however had the content altered such that the DKIM signature was no longer valid.

222.2.   We have not been provided with the PDF file or the details of the tweet to enable us to test the taxpayer's claims that Dr Wright saved a contemporaneous hash of the purported Tulip Trust document. Batey's hash report is rejected as evidence of the contention as it does not attach the PDF file and makes no reference to the purported tweet.

222.3.   We also reject the conclusion of Batey's PGP report. Given anyone can upload a key pair to the MIT key server with no proof of identity requirements, Batey is not in a position to state that the keys belonged to Mr Kleiman. We maintain that the creation dates of keys on the MIT key server and the time stamping of digital signatures can be easily manipulated by changing the time and date settings on the computer they are created on.

222.4.   The key purportedly used by Mr Kleiman to sign the IaaS contract was created with an encryption algorithm that did not exist at the time it was purportedly created.

222.5.   The existence of two versions of the email purportedly from Mr Kleiman attaching the Tulip Trust 'deed', the doctored Bitcoin wallet screenshot and the anomalies with other email times indicates electronic evidence has been falsified or tampered with.

222.6.   We maintain that Bitmessages can be created locally by anyone (instead of received over the internet) to support a claim, thus they cannot be treated as unalterable evidence.

223.   This casts considerable doubt over all of the evidence provided by the taxpayer that we have been unable to independently verify. We therefore cannot accept the veracity of any of the electronic communications the taxpayer claims support its contentions in relation to the transactions under audit unless verified directly with the ATO by an independent third party.

---

[256] *Richard Walter Pty Ltd v FC of T* 95 ATC 4440 at 4452.
[257] See *Snook v. London & West Riding Investments* [1967] All ER 518 at 528–529.
[258] *Richard Walter Pty Ltd v. Commissioner of Taxation* (1996) 67 FCR 243 at 257–258.

CONFIDENTIAL

DEF_01617857

### *Existence of the purported supercomputer*

224.    In relation to the existence of the purported C01N supercomputer, the anomalies outlined above at 115 to 126 lead us to the following conclusions:

224.1.    none of the information supplied to the ATO by the taxpayer is sufficiently reliable to support the assertion that it has access to, or built, a supercomputer matching the specifications of the purported C01N supercomputer

224.2.    the results shown on screen of the hardware suggest that someone has manipulated the results in an attempt to replicate the specifications of the purported C01N supercomputer, however, when examined more closely, the results show inconsistencies and errors which should not occur. These errors include:

(a)    incorrect names of processors

(b)    hardware details which are incorrect, including socket and number of memory slots

(c)    the discrepancies over the system being a Supermicro or SGI system, with identical identifiers which should be unique (such as Serial Numbers and UUID's).

224.3.    The display of details of the nVidia Tesla cards is also unconvincing. Duplicates of serial numbers and UUIDs were observed and the fact that they are also obfuscated, and appear to have been taken from an internet source, makes them unconvincing as proof of the existence of the purported C01N supercomputer. The duplication and obfuscation of these numbers suggests that no Tesla card matching the specifications claimed by the taxpayer was accessed during the presentation and the results were entirely fabricated with material taken from the internet.

224.4.    These errors and inconsistencies would not occur if a legitimate system with the specifications claimed to have been acquired by the taxpayer was being interrogated.

224.5.    The IP addresses used for the system are registered for the use of Dr Wright in Australia. The other addresses listed are for a Private Network which can't be routed over the internet. As all the nodes must connect to the same network this suggests the compute nodes were not in Panama, as contended by the taxpayer

224.6.    The specifications for the purported C01N supercomputer provided by Dr Wright to the ATO are not consistent with each other nor with those listed on the Top 500 website. Again this information appears unreliable.

224.7.    The evidence presented by the taxpayer at the ATO's visit on 26 March 2015 suggests a Hewlett Packard system was used to conduct the demonstration and third party information indicates that that Hewlett Packard system was sold and shipped to a purchaser located in Australia.

224.8.    The evidence presented by the taxpayer does not match the configuration of any systems sold by SGI. The SGI system the taxpayer claims to have acquired access to was not available for sale at the time the taxpayer purportedly acquired access to it, nor was any system of that kind shipped to any purchaser within the 2012-13 income year.

224.9.    The videos and screen captures recorded at the visit therefore provide no reliable evidence to support any assertion that the purported C01N supercomputer exists. The most reasonable conclusion to draw from the material

CONFIDENTIAL

DEF_01617858

presented is that someone has produced reports and then deliberately modified the results, with the intention of misleading the ATO into accepting that a supercomputer, as described by the taxpayer, had been acquired.

224.10. Given Dr Wright's relevant qualifications and experience we understand that he would have sufficient computer programming skills to be able to make the system appear to be using known commands but program those commands to produce the results he wants to show.

225. From these anomalies, and our conclusions below regarding the purported agreement and payment, we conclude that the taxpayer did not have access to the purported supercomputer. Given Dr Wright's extensive IT qualifications, it is inconceivable that he was unaware of this fact. We therefore conclude that the evidence provided to us was manufactured by the taxpayer in an attempt to deceive us.

### Purported payment

226. The non-existence of the supercomputer is consistent with the evidence that the taxpayer did not make a payment to W&K. In relation to this we note:

226.1. Primary evidence for the payment consists of a purported screenshot from a now defunct website. As such, it cannot be verified. However, we note the screenshot is inconsistent with other screenshots of the Liberty Reserve Transaction History screen available on the internet from around the same time. Instead, the screen shot provided appears to have been based on the Liberty Reserve home page and appears to have been altered to include a transaction list. This indicates it has been fabricated.

226.2. The taxpayer did not provide the requested evidence of the establishment of or transfer of funds into the Liberty Reserve account. The failure to provide this further indicates the Liberty Reserve payment simply did not occur.

226.3. Further evidence provided by the taxpayer consists of a PDF of a purported email from High Secured where High Secured asserts it provided IaaS services to W&K and received payment from W&K in Liberty Reserves. The email file has not been provided to allow us to analyse its provenance and High Secured have failed to respond to our direct requests to verify services provided to the taxpayer and related entities. In light of this and the other matters detailed in paragraphs 174 to 194, we are unable to accept the email as legitimate, and consider it more than likely to be fabricated.

226.4. Evidence from independent sources supports the conclusion that C01N UK was an inactive shelf company which had no connection with the taxpayer at the time the alleged payment was made.

226.5. Anomalies in C01N UK's purported resolution to acquire shares, application to acquire shares and share certificates cast doubt on their authenticity. The use of a third party secretarial service to 'fix errors' and the issuing of documents in the wrong names confirms that these documents have little value as contemporaneous evidence of the actions of the parties.

226.6. On two separate occasions after the shares were purportedly issued to C01N UK, representatives of the taxpayer made written statements to the ATO regarding the taxpayer's share structure that did not include details of these shares. Mr Chesher, the author of one of the statements, was the taxpayer's internal accountant and authorised contact at the time. We therefore reject the taxpayer's contention that Mr Chesher made a mistake as he was unfamiliar with the taxpayer. Even if this was the case, no explanation was given for Dr Wright's

CONFIDENTIAL

failure to correct Mr Chesher's email, or the second occasion on which the taxpayer apparently erroneously advised of its shareholdings.

226.7. There are numerous inconsistencies in other evidence provided by the taxpayer which cast doubt on the contention that a payment was made:

(a) The purported invoice, which requires payment by way of an assignment of Bitcoin, is contrary to the statement of work, which requires payment through Liberty Reserve.

(b) The taxpayer has changed its explanation as to the circumstances of how the purported invoice was paid on six separate occasions.

(c) The taxpayer's most recent explanation conflicts with share certificates and the share register, although these are of limited value in any event given the taxpayer acknowledges that backdating has occurred.

227. Because of the circumstances listed above and our conclusion that access to a supercomputer of the nature described by the taxpayer was never acquired by it, we infer that no payment was made to W&K by or on behalf of the taxpayer and that the documentation was created by the taxpayer in order to fraudulently deceive the ATO and support the false and misleading statements made by it in its 2012-13 income tax return.

***Purported agreement***

228. This view is further supported by the irregularities concerning the purported agreement between the taxpayer and W&K. We note:

228.1. The statement of work has been created by making some minor alterations to a US government IaaS tender document obtained from the internet.

228.2. The statement of work does not fully identify or define the parties. The taxpayer is simply referred to as 'Strasan' or 'Strassan' and no company identifier, corporate seal, contact details or other identifying information is provided.

228.3. The taxpayer's director, Dr Wright is listed as the contact for W&K.

228.4. The statement of work does not contain any detailed specifications of quantity of services to be provided, the price of those services, the time at which those services are to be performed or that price is to be paid.

228.5. Purported appendices to the statement of work:

(a) do not state a price for the alleged services or a date for payment

(b) contradict pricing arrangements in the statement of work, which refer to a fixed fee over a 12 month period

(c) are excluded from the contract file which the taxpayer contends has been electronically signed

(d) refer to the taxpayer as 'C01N', even though the taxpayer did not change its name to C01N until 25 June 2014

(e) purport to provide for the management of systems access by a company which did not exist at the time of the agreement

(f) make references to escrow arrangements which are not otherwise found in the documentation

(g) otherwise have the style of a document created separately from the statement of work.

CONFIDENTIAL

DEF_01617860

228.6.  Nowhere in the purported statement of work or appendices are the technical requirements of the supercomputer specified.

228.7.  The taxpayer has made contradictory statements regarding the escrow arrangements for the transaction.

228.8.  We cannot verify that the electronic signature on the statement of work was made by Mr Kleiman, or the time or date on which the signing occurred. The key apparently used by Mr Kleiman to sign the agreement appears to have been created with a backdated creation date.

229.  Having regard to these inconsistencies and anomalies relating to the contract, the evidence that access to the purported supercomputer was never acquired by the taxpayer and the anomalies relating to the purported payment, we do not accept that the evidence provided substantiates that the taxpayer incurred expenditure to W&K. In fact, we infer that these documents were created with the intention of deceiving the Commissioner and in order to support the false and misleading statements of the taxpayer.

**R&D activities (if any) not conducted solely in Australia or an external Territory**

230.  We do not consider that all (or any) of the taxpayer's purported activities were conducted solely in Australia. Accordingly, expenditure on such activities could not have given rise to a notional deduction for the purposes of the R&D tax offset, even if the taxpayer had incurred expenditure on registered R&D activities.[259]

231.  In order for expenditure on such activities to qualify for a notional deduction, the activities would have to be conducted for the taxpayer solely within Australia or an external Territory.[260] This requirement would not be satisfied in the present case, as neither W&K nor High Secured conducted activities in these places.

232.  Where all or part of an R&D activity is conducted outside of Australia and its external Territories, it must be covered by an overseas finding.[261] In the present case, the taxpayer did not have an overseas finding in relation to activities purportedly conducted for it by W&K or High Secured.

233.  The statutory test to be applied concerns whether the relevant activity is 'conducted for' an entity within Australia or an external Territory. The word 'conducted' ordinarily means 'controlled', 'managed' or 'operated'.[262] However, it is clear that an entity can 'conduct' R&D activity for the purposes of the R&D provisions, despite having no actual or effective ownership of the results of the activity and no ultimate control over the R&D activity as a whole.[263] Such an entity conducts R&D activity 'for' an R&D entity by carrying out its actions for the benefit of the R&D entity, whether as agent or otherwise.[264]

234.  To the extent that core R&D activities were conducted in the present case they would have consisted of:

234.1.  'experiment[s]' being undertaken on computing infrastructure controlled by High Secured; and

---

[259] Paragraphs 355-100(1)(a), 355-205(1)(a) and 355-210(1)(a)
[260] Paragraph 355-210(1)(a)
[261] Paragraphs 355-210(1)(d) and (e) and IRDA paragraph 28C(1)(a)
[262] *Pharmaceutical Society of Great Britain (Council of) v. Fuller* (1932) 96 JP 422 at 424; *Pride of Derby v. British Calanese Ltd* [1953] 1 All ER 179 at 189.
[263] On the concept of ownership of results and control over conduct, see Taxation Ruling IT 2451 *Income tax: Investor funding of research and development activities*.
[264] See IT 2451, paragraph 21.

CONFIDENTIAL

234.2.  'observation and evaluation'[265] being undertaken by researchers on behalf of the taxpayer.

235.  Computer infrastructure would have been used to perform the core R&D activity to the extent that it was used to perform simulations,[266] since this process would bring into existence the very thing which forms the basis of experimentation.[267]

236.  To the extent that the IaaS services were directly related to the performance of experiments, despite not being part of the experiments themselves, they would have been supporting R&D activities.[268]

237.  In the present case, the purported services which provided the occasion for the purported expenditure comprise the provision of access to computing infrastructure for cloud storage, virtual machines and cloud web hosting.[269] That activity would be conducted in the place or places where the computing infrastructure is located. Those places were not in Australia or an external Territory.

238.  We note that the requirements above are only relevant to expenditure which the taxpayer contends that it incurred on R&D activities. The question does not arise in relation to expenditure on other activities, such as those which the taxpayer alleges were conducted by people located in Australia.[270]

## ISSUE 2: R&D TAX OFFSETS (PANG)

239.  **Issue:** Is the taxpayer entitled to an R&D tax offset in the 2012-13 income year, under Division 355 of the ITAA, in respect of expenditure incurred to Ignatius Pang?

240.  **Decision:** No.

### No R&D activities registered

241.  As detailed above, the taxpayer has no registered core or supporting R&D activities in the 2012-13 income year. It is therefore not entitled to claim any expenditure purportedly incurred to Dr Pang as a notional deduction for the purposes of the R&D tax offset.

### No expenditure incurred

242.  We do not consider the taxpayer to have incurred any expenditure to Dr Pang. Accordingly, the purported expenditure to Dr Pang would not have given rise to a notional deduction for the purposes of the R&D tax offset even if registered R&D activities were conducted for the taxpayer.[271]

243.  See paragraphs 218 to 219 above for discussion of the meaning of the term incurred.

244.  The evidence provided by the taxpayer does not establish that the taxpayer owed any obligation to Dr Pang, or paid him any amount.

245.  The taxpayer has not provided any written agreement with Dr Pang, an invoice issued by Dr Pang, or acknowledgement by Dr Pang that Dr Wright would invoice the taxpayer on his behalf that would evidence a presently existing liability existed. Further, the invoice

---

[265] Subparagraph 355-25(1)(a)(ii).
[266] See paragraph of this paper 133.
[267] Subsection 355-25(1); Explanatory memorandum to Tax Laws Amendment (Research and Development) Act 2011, paragraph 2.19.
[268] Subsection 355-30(1); Explanatory memorandum to Tax Laws Amendment (Research and Development) Act 2011, paragraph 2.21.
[269] Statement of Work, sections 2, 4.3.1, 4.3.2, 4.3.3. [C24]
[270] See paragraph of this paper 133.
[271] Paragraph 355-100(1)(a) and subsection 355-205(1)

CONFIDENTIAL

DEF_01617862

apparently issued by Dr Wright 'as agent' for Dr Pang is for the provision of software by Dr Wright to the taxpayer – not for services provided by Dr Pang as we would expect if it reflected the agency arrangement the taxpayer contends. The taxpayer has provided no evidence of the purported agency arrangement. Further, Dr Wright's statement to KPMG that the amount was not paid as at 23 May 2014 and would not be 'formally issued until June 2014', indicates that no invoice had been prepared at that date.

246. The taxpayer has provided contradictory accounts about whether Dr Pang was a contractor or employee and how Dr Pang was paid, including from Dr Pang himself. Dr Pang's email does not indicate what he was paid for, who he was paid by or when he was paid. This confusion is amplified by the fact that Dr Pang received remuneration from Hotwire in the 2013-14 income year. Further, the invoice states that Dr Pang received software and hardware, yet his email states he received a laptop, printer, salary and superannuation.

247. While the taxpayer contends the purported expenditure was entered into the its general ledger, the entry (or any entry for an amount of $5,000) cannot be located. This is also inconsistent with Dr Wright's earlier statement to KPMG.

248. Having regard to the lack of documentation evidencing that the taxpayer had a presently existing liability to, or paid Dr Pang in the 2012-13 income year, we do not accept that the taxpayer incurred a liability to Dr Pang.

**Notional deductions less than $20,000**

249. Further, or in the alternative, given we do not consider that the taxpayer is entitled to a notional deduction in respect of the purported W&K expenditure, any expenditure incurred to Dr Pang would not have given rise to a notional deduction for the purposes of the R&D tax offset even if registered R&D activities were conducted for the taxpayer.

250. Where notional deductions are less than $20,000, a tax offset is only available in relation to expenditure which has been incurred to a research service provider (within the definition of the IRDA).[272]

251. The taxpayer claims to have incurred $5,000 to Dr Pang, who was not a research service provider in the 2012-13 income year. Accordingly, the taxpayer would not be entitled to a tax offset even if it incurred expenditure to Dr Pang on, and had conducted, registered R&D activities.

## ISSUE 3: FOREIGN EXCHANGE LOSS

252. *Issue:* Is the taxpayer entitled to a deduction under section 775-55 of the ITAA for a forex realisation loss of $404,204 in the 2012-13 income year, in respect of an obligation to pay foreign currency to W&K?

253. *Decision:* No.

**No obligation to pay foreign currency**

254. We do not consider that the purported contract with W&K gave rise to any obligation to pay foreign currency for the purposes of the forex provisions.[273] Accordingly, the purported contract did not give rise to any forex realisation loss.

255. Forex realisation event 4 happens if an entity ceases to have all or part of an obligation to pay foreign currency.[274] An entity makes a forex realisation loss from forex realisation

---

[272] Item 1 of Subsection 355-105(2)
[273] Section 775-55
[274] Paragraph 775-55(1)(a)

CONFIDENTIAL

event 4 where the amount paid in respect of the event happening exceeds the proceeds of assuming the obligation to pay, and some or all of that excess is attributable to a currency exchange rate effect.[275]

256. In the present case we do not accept that the taxpayer had an obligation to pay foreign currency to W&K. Accordingly, the taxpayer did not make a deductible forex loss.

**Forex loss (if any) incorrectly calculated**

257. Further, or in the alternative, if the taxpayer did have an obligation to pay foreign currency to W&K, we consider that its deductible forex realisation loss was incorrectly calculated.

258. If the taxpayer did have an obligation to pay foreign currency to W&K, its deductible forex loss would be calculated as follows:

| Date | Item | US$ value | A$ value of US$1 | A$ value (rounded) |
|---|---|---|---|---|
| 30 July 2012[276] | Proceeds of assuming obligation | 5,175,000 | 0.9533019907 | 4,933,338 |
| 6 January 2013[277] | Proceeds of discharging obligation | 5,175,000 | 0.9544716999 | (4,939,391) |
| Forex realisation loss (A$) | | | | (6,053) |

## ISSUE 4: PROFESSOR REES DEDUCTION

259. *Issue:* Is the taxpayer entitled to a deduction of $2,258,534 in the 2012-13 income year under section 8-1 of the ITAA in respect of a purported loss or outgoing incurred in respect of an acquisition from Professor Rees?

260. *Decision:* No.

**No loss or outgoing**

261. We do not consider the taxpayer to have incurred a loss or outgoing in respect of any acquisition from Professor Rees. Accordingly, the purported arrangement with Professor Rees did not give rise to any general deduction.[278]

262. See paragraphs 218 to 219 above for discussion of the meaning of the term incurred.

263. The evidence provided by the taxpayer does not establish that the taxpayer acquired any material or services from, or owed any obligation to, Professor Rees.

264. The agenda for the visit to the taxpayer's premises on 1 and 2 April 2015 (issued in draft form on 25 March 2015 and final form on 30 March 2015) indicated under the heading 'Professor Rees material' that we requested to see the 'library'. Despite being advised in the taxpayer's response dated 20 February 2015 that selected papers would be available to view, no papers were shown. No papers were provided in response to the position paper.

265. Professor Sarah Rees indicated that she was only aware of one unpublished paper written by her father and that the content of that paper was later published in an updated form. We also asked to see evidence of the software provided under licence. The taxpayer showed us one piece of software and refused our request to run it. Professor Sarah Rees has advised us that her father did not write software. We further note that the software showed to us resembles that available from the CoCoA library. The taxpayer

---

[275] Subsection 775-55(5)
[276] Invoice issued by W&K Info Defence Research LLC to Strasan Pty Ltd dated 30 July 2012 [C25]
[277] Liberty Reserve screenshot: 'Craig Wright R&D Trust' [C34]
[278] Subsection 8-1(1)

CONFIDENTIAL

DEF_01617864

REASONS FOR DECISION

provided no evidence of the 'algebra' provided. All four of Professor Rees' daughters advise they have never heard of the taxpayer or Dr Wright. Professor Sarah Rees also advised that Professor Rees did not undertake consulting work. Accordingly, we do not accept that the taxpayer acquired anything from Professor Rees.

266. Regardless of whether the taxpayer acquired anything from Professor Rees, it has not demonstrated that it incurred any loss or outgoing. The taxpayer has stated that no written agreement existed with Professor Rees and the taxpayer has not provided any correspondence from Professor Rees himself regarding the arrangement.

267. The taxpayer has not substantiated that it paid Professor Rees, and has provided anomalous accounts of this. The taxpayer first advised that it had instructed an amount be held in trust for Professor Rees. The taxpayer then advised that it provided private keys to Professor Rees on 28 June 2013. Then it advised the Bitcoin was held in trust for Professor Rees until the keys were released. We note the following anomalies:

267.1. The taxpayer claims that Professor Rees was provided with private keys to seven addresses. At 28 June 2013, the contents of these addresses was 34,512.57 Bitcoin, greater than the 27,636.38 Bitcoin the taxpayer claims to have been in them.

267.2. The taxpayer claims that the contents of the addresses were forwarded to a new address, 1LXc on 13 August 2013. The taxpayer claims that that this was held for Professor Rees, a position that is inconsistent with Professor Rees having the private keys to the seven addresses. Further, if the private keys were transferred to Professor Rees on 28 June 2013 and the taxpayer was unable to recreate them as it contends, Professor Rees must have transferred the Bitcoin to 1LXc three days before his death. At 28 June 2013, Professor Rees was in a nursing home, declining in health and had ceased using a computer.

267.3. The taxpayer claims that a related entity used the 1LXc address to pay a third party, Mark Ferrier on 15 September 2013. If the Bitcoin was held by or for Professor Rees, it could not have been provided to Mr Ferrier. The taxpayer has further advised that the 1LXc address was still controlled by Dr Wright at 10 October 2013. Clearly, the address cannot have been held simultaneously by or for Professor Rees, Mr Ferrier and Dr Wright.

267.4. None of Professor Rees's daughters has any knowledge of the payment and no Bitcoin was known to the executors of Professor Rees's estate.

268. Further, we have not been provided with any evidence that the taxpayer received any Bitcoin from Hotwire to fund the purported payment to Professor Rees. Hotwire first claimed it paid the taxpayer on 18 June 2013 with Bitcoin in address 1MyG; then presented a deed indicating it paid using different Bitcoin addresses on 30 June 2013; then indicated that the deed, despite clearly indicating that legal title was to transfer, merely represented the transfer of equitable interests in the Bitcoin held within those addresses.

269. The taxpayer has not provided any evidence to substantiate the statement in the background to the Software Development Agreement that Mr Kleiman funded the agreement and then advised that following Mr Kleiman's death, Hotwire funded the agreement. The taxpayer declined to sign messages within the relevant addresses to evidence that it controlled them, stating that once the keys had been released to third parties, they cannot be recreated. An email purportedly sent by the taxpayer warning the ATO that it would not always be able to evidence ownership of the addresses into the future was never received by the ATO. The email was also purportedly sent at a time when 21 or 22 of the addresses purportedly controlled by the taxpayer and related

CONFIDENTIAL

DEF_01617865

REASONS FOR DECISION

entities had purportedly already been transferred to MJF and Professor Rees. On this basis, the taxpayer has not substantiated that it ever held the Bitcoin or interests in Bitcoin it purports to have paid Professor Rees. This casts further doubt on the taxpayer's assertion that it paid Professor Rees.

270. Based on these discrepancies and inconsistencies, and the taxpayer's reliance on electronic evidence, we do not accept that the taxpayer incurred or paid an amount to Professor Rees.

**No connection with assessable income**

271. Further, or in the alternative, if Professor Rees did provide the invoiced items and payment was made, the following evidence indicates any such payment was not incurred in gaining or producing assessable income, nor was it necessarily incurred in carrying on a business to gain or produce assessable income:

271.1. Professor Rees provided assistance to Dr Wright for many years without remuneration.

271.2. Professor Rees did not request payment or enter into negotiations with Dr Wright over the payment – Dr Wright told him what the taxpayer would give him.

271.3. Dr Wright had to instruct Mr Kleiman to make Professor Rees take the payment.

271.4. In addition, the taxpayer's most recent contention is that Professor Rees was paid for work carried out in the period between 1999 and 2008. The taxpayer did not exist until July 2011. Therefore we consider that if a loss or outgoing was incurred to Professor Rees (a position we do not agree with), it could not have been incurred by the taxpayer.

271.5. Dr Wright's description of the negotiation between the parties indicates that any payment made was a voluntarily payment, not reasonably capable as being seen as desirable or appropriate from the point of view of the pursuit of the business ends of the taxpayer, as any work performed or material provided by Professor Rees had occurred several years before the inception of the taxpayer on a voluntary basis, with no payment or reward required or contemplated.

## ISSUE 5: ASSESSABLE INCOME

272. Did the taxpayer derive assessable income [279]of $2,962,399 in the 2012-13 income year in respect of a supply to Hotwire related to the purported acquisition from Professor Rees?

273. *Decision:* No.

**No assessable income derived**

274. A taxpayer's assessable income includes the ordinary income derived by the taxpayer during the income year. Ordinary income has generally been held to include three categories, namely, income from personal service, income from property and income from carrying on a business.

275. Ordinary income is derived when a gain has 'come home' to the taxpayer in a realised or immediately realisable form.[280]

---

[279] Section 6-5
[280] *CT v. Executor & Trustee Agency Co of South Australia* (1938) 63 CLR 108 (*Carden's case*)

CONFIDENTIAL

DEF_01617866

REASONS FOR DECISION

276. The taxpayer's most recent contention is that it merely on-sold the Professor Rees 'technology' to Hotwire for a profit. Given that the taxpayer has failed to substantiate that it acquired anything from Professor Rees, we do not accept that the taxpayer provided anything to Hotwire. On the basis of the evidence currently available to us, we do not accept that the taxpayer received anything from Hotwire which could have the character of assessable income.

**Assessable income (if any) calculated incorrectly**

277. Further, or in the alternative, if, in accordance with Hotwire's earlier contention that the taxpayer provided Hotwire with the Professor Rees materials (or incorporated them into other products provided), a mathematic and cryptographic library, and prepared a project plan and budget, and Hotwire paid the taxpayer for these items, we consider the taxpayer derived income of $3,205,820.

278. Taxation Ruling TR 98/1 *Income tax: determination of income; receipts versus earnings* discusses the two methods of determining when income is derived: the receipts method and the earnings method. At paragraph 8, TR 98/1 states that under the receipts method, income is derived when it is received. At paragraph 9, it states that under the earnings method, income is derived when it is earned. At paragraph 17, TR 98/1 states that a taxpayer must adopt the method that, in the circumstances of the case, is the most appropriate, ie gives a substantially correct reflection of income (*Carden's case*).

279. Given the taxpayer's limited activities, we consider the receipts method gives a substantially correct reflection of the taxpayer's income.

280. If the taxpayer did provide goods and/or services to Hotwire, we consider this would have the character of assessable income and if it was paid, the amount would have 'come home' to the taxpayer. The taxpayer's tax agent calculated the amount of assessable income by translating the number of Bitcoin that the taxpayer purportedly received from Hotwire into Australian dollars. However, given the currency referred to in both the software development agreement and invoice is Australian dollars, we consider the amount and form of settlement to be irrelevant to the determination of the taxpayer's assessable income from the purported sale. The correct assessable income is therefore $3,205,820. This will be reduced by 1/11th if the sale is, found to be a taxable supply, being the GST-exclusive amount of the sale.

CONFIDENTIAL

SENSITIVE

REASONS FOR DECISION

**Appendix 1: C01N AusIndustry registration application for 2012-13**

**Appendix 2: Additional information provided to AusIndustry**

**Appendix 3: Additional information provided to the ATO**

**Appendix 4: Statement of Works**

CONFIDENTIAL

DEF_01617868