**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense
Research, LLC,

                *Plaintiffs,*

v.

CRAIG WRIGHT,

                *Defendant.*

CASE NO.: 9:18-cv-80176-BB

**PLAINTIFFS' OPPOSITION TO DR. WRIGHT'S MOTION TO EXCLUDE THE**
**OPINION TESTIMONY OF PLAINTIFFS' EXPERT WITNESSES**

## Contents

*I.*   *INTRODUCTION* .................................................................................................. *1*

*II.*   *LEGAL STANDARD* ........................................................................................... *1*

*III.*   *ARGUMENT* ....................................................................................................... *2*

  **A.**   **Gordon Klein** ................................................................................................. **2**
    1.   Mr. Klein Does Not Offer a Legal Opinion ................................................... 3
    2.   Mr. Klein Consistently Applies an Unchallenged Methodology That Will Assist the Jury. .................................................................................................... 6
    3.   Mr. Klein Is Not Offering an Opinion About Motive or Credibility ................. 7

  **B.**   **Dr. Matthew Edman** ..................................................................................... **8**
    1.   Dr. Edman is qualified. .................................................................................. 9
    2.   Dr. Edman's methodology for analyzing documents produced by Defendant is reliable. 11

  **C.**   **Andreas Antonopoulos** ............................................................................ **13**
    1.   Mr. Antonopoulos is qualified to opine on the spot market price of bitcoin.................. 13
    2.   Mr. Antonopoulos is not biased against Defendant. ...................................... 15
    3.   Mr. Antonopoulos's testimony regarding public statements by Satoshi Nakamoto is relevant. ....................................................................................... 16
    4.   Mr. Antonopoulos does not rely on inadmissible evidence ............................ 16

  **D.**   **Stefan Boedeker** ........................................................................................ **17**
    1.   Mr. Boedeker properly relied on the uniformity of the SHA-256 hashing function. ...... 18
    2.   Mr. Boedeker's Supplemental Report was substantially justified and harmless to Defendant. .................................................................................................... 19

  **E.**   **Dr. Robert Leonard** .................................................................................. **20**
    1.   Attacks on Dr. Leonard's Methodology Have Been Rejected by Other Federal Courts. 22
    2.   Dr. Leonard's opinions are based on sufficient facts and data. ...................... 24
    3.   Dr. Leonard's methodology satisfies Daubert. .............................................. 25
    4.   Dr. Leonard's testimony does not violate Rule 403. ...................................... 26

  *CONCLUSION* ......................................................................................................... *27*

## I.  <u>INTRODUCTION</u>

Plaintiffs allege Dave Kleiman and Defendant partnered to create the Bitcoin protocol, mine billions of dollars in bitcoin, and create intellectual property. The Defendant denies this and instead asserts that he alone created the Bitcoin protocol, mined a significant amount of Bitcoin, and created all the related intellectual property himself.

Since Dave is no longer here to tell his side of this story, Plaintiffs have enlisted a series of experts to assist the finder of fact in determining who is right. First, Plaintiffs retained world renowned bitcoin expert Andreas Antonopoulos to explain the origins of the Bitcoin protocol and how it works so that the jury becomes familiar with the technology at the heart of this dispute. Second, Plaintiffs retained Gordon Klein, an entrepreneur with extensive expertise in the interpretation of business communications, to explain to the jury how the communications and conduct between Craig and Dave Kleiman are consistent with partnership and/or joint ventures. Finally, Plaintiffs retained Dr. Matthew Edman, Stefan Boedeker, and Dr. Robert Leonard to employ various technical disciplines to show the jury that various documents and testimony submitted by the Defendant are either inauthentic or self-contradictory.

Defendant responds by seeking to exclude the testimony of *all* of Plaintiffs' experts. His *Daubert* challenges are best characterized as a mixed bag of attacks on the qualifications, bias, and the methodologies deployed by Plaintiffs' experts. At best, the vast majority of Defendant's arguments go towards questions of weight rather than admissibility. Accordingly, the issues raised in Defendant's motion do not implicate this Court's "gatekeeping" function under the *Daubert* standard and, for the reasons explained below, Defendant's motion should be denied.

## II.  <u>LEGAL STANDARD</u>

Federal Rule of Evidence 702 provides that an expert may testify if their "specialized knowledge will help the trier of fact . . . to determine a fact in issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case." *Daubert v. Merrell Dow Pharmaceuticals, Inc.* established that the "overarching subject [of Rule 702] is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." 509 U.S. 579, 594–95 (1993). Rule 702 is a flexible standard that "grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in

light of the particular facts and circumstances of the particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999); *United States v. Hankey*, 203 F.3d 1160, 1168-69 (9th Cir. 2000) (trial court must be given broad discretion to decide whether to admit expert testimony). Courts should apply Rule 702 consistent with the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.'" *Daubert*, 509 U.S. at 588 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)). If an expert satisfies Rule 702, he or she has "wide latitude to offer opinions." *Daubert*, 509 U.S. at 592.

III. **ARGUMENT**

A. **Gordon Klein**

Plaintiffs' expert Gordon Klein is a CPA, a teacher at the UCLA School of Management, and an entrepreneur with extensive expertise in the interpretation of business communications. Using an unchallenged methodology, he is well qualified to provide expert testimony that will be helpful to the jury on whether the conduct of and communications by and between Craig Wright, Dave Kleiman, and others are consistent with and indicative of a partnership and/or joint venture between the two men. Contrary to Defendant's assertions, he is not offering any "legal opinions."

Defendant's Motion begins (at p. 2) by describing Mr. Klein as a "California lawyer with 40 years of experience who teaches at UCLA." Although the "teach[ing] at UCLA" part is correct (where, incidentally, Mr. Klein primarily teaches courses related to the business topics covered by his opinions and not to law), Defendant's description of Mr. Klein as "a California lawyer with 40 years of experience" is highly misleading. Mr. Klein graduated law school in 1979, practiced law for a year or two, and has not done so since. (Ex. 1 (Klein Dep.) at 9:7–15.) His bar membership has been "inactive" since 1981 (almost 40 years). *Gordon Lee Klein,* State Bar of California, http://members.calbar.ca.gov/fal/Licensee/Detail/91430.

Defendant also asserts (at p. 2) that "Plaintiffs retained [Mr. Klein] to testify about the legal requirements of a Florida partnership." No such statement of the scope of Mr. Klein's retention is found anywhere in his report, and it was specifically and repeatedly denied by Mr. Klein at his deposition. (*See, e.g.*, Ex. 1 at 251:19–252:1 (explaining he had "not researched or examined Florida law, because [he is] not rendering a legal opinion and didn't even want to be tempted to come close to rendering a legal opinion"), 254:14–18 ("I am not rendering an opinion on what the elements of a, quote, 'legal partnership' are.").

2

Based on these two false premises, Defendant makes three specious arguments (at pp. 7-11) for precluding Plaintiffs' business and accounting expert, Mr. Klein, from testifying at trial: (1) he opines on the law; (2) his testimony is unhelpful to the jury; and (3) he opines on the parties' motive and intent. None of these are true, and there is no basis to preclude Mr. Klein from testifying.

### 1.   *Mr. Klein Does Not Offer a Legal Opinion.*

Defendant's argument that Mr. Klein offers legal opinions boils down to the following tautology: (1) Mr. Klein graduated from law school; (2) therefore Mr. Klein is a lawyer; (3) therefore any opinions he gives are "legal opinions"; and (4) therefore he must not be allowed to testify. Initially, it is worth noting that although Mr. Klein is *not* a practicing lawyer and is *not* offering legal opinions in this case, there is no prohibition on active lawyers serving as expert witnesses, including on legal topics, and it happens frequently enough that the ABA has issued an ethics opinion on the topic. *See* ABA Opinion 97-407, at 4.

Here, however, Mr. Klein is not opining as a lawyer or about the law. And none of the cases Defendant cites remotely suggest that an expert with legal training cannot testify about non-legal conclusions. In fact, notwithstanding his law degree from the 1970s, Mr. Klein has been permitted to testify at trial as an expert in approximately 40 cases. (Ex. 1 at 19:17–19.)

Mr. Klein has been an *inactive* bar member of the California bar for nearly 40 years, practicing law for just a year or two after his 1979 graduation. (*Id.* at 9:7–15.) Since then, he has taught business and accounting classes at UCLA's Anderson School of Management,[1] he has advised numerous partnerships and joint ventures, and he is an established entrepreneur. (ECF No. [500-1], ¶¶ 2–10 & App'x A.) It is these latter experiences, and his training as a certified public accountant, that support his opinion in this case, not his over 40-year-old, unused, law degree.

Defendant falsely asserts (at p. 7) that Mr. Klein "admits that he was retained to give so-called 'legal opinion' testimony, which purports to state legal standards (the Court's province), and then weigh the evidence to determine if the standards were met (the jury's province)." There is no truth to this argument.

As Mr. Klein repeatedly made clear at his deposition and in his report, he was *not* "asked to opine that there was a partnership or joint venture." (*E.g.*, Ex. 1 at 251:4–15.) Rather, using an

---

[1] He also taught classes at the UCLA law school 20 years ago, but those were business classes for law students. Klein Dep. 12:14–20.

unchallenged methodology, he provided an opinion following established guideposts that indicate whether or not Dave Kleiman and Defendant's conduct was consistent with them having formed a partnership or joint venture, "leaving it to others to utilize that information in the context of the overall proceeding." (*Id.* at 251:4–15; ECF No. [500-1], ¶ 11.) He was asked numerous times whether he was giving legal opinions, including whether he was opining on the law in Florida on partnership formation. (Ex. 1 at 225:20–226:7, 252:14–253:21, 266:13–24, 267:21–268:14.) Each time, he stated that he was not. (*Id.*) Unable to obtain any such statement in deposition, Defendant simply alleges a non-existent "admission" in his Motion. (*Cf.* ECF No. [500-1], ¶ 11 ("I have not been asked to give a legal opinion and do not purport to give one herein.").)

Mr. Klein's opinion that the communications and conduct in this case are consistent with the existence of a joint business relationship between Defendant and Dave Kleiman is grounded in his business and accounting expertise and experience, not in his legal training from four decades ago. (*See* Ex. 1 at 202:1–18 ("My opinions rest on the framework I've established and been trained in as accountant and observed as a participant in partnerships and entrepreneurial endeavors . . . .").) That expertise will assist the jury in understanding the way in which individuals in joint business enterprises typically conduct themselves consistent with an established methodology. (ECF No. [500-1], ¶¶ 2–13, 17–25; *see, e.g.*, Ex. 1 at 38:22–40:3 ("I've taught people to interpret communications in a business context"; "I am an expert on entrepreneurship, business formation and development and conduct and an expert who's qualified many times on accounting and valuation"); *id.* at 184:22–185:9 ("somebody who works with partnership all the time").)

Courts recognize this type of expert testimony is admissible and useful to the jury. *See, e.g.*, *Elia v. Roberts*, No. 1:16-CV-0557 AWI EPG, 2017 WL 4844296, at \*6 (E.D. Cal. Oct. 25, 2017) (allowing experts to "opine on whether [certain] practices (accounting, taxes, etc.) are consistent or inconsistent with a partnership relationship or a commission relationship"); *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 845, 853 (E.D. Mich. 2010) (expert's "opinions comparing the way the defendants operated the Haden Companies to the way private equity funds operate in general may shed some light on . . . whether the LPs indeed intended to form a partnership or a joint venture"); *Leeds LP v. United States*, No. 08CV100 BTM (BLM), 2010 WL 3911429, at \*1 (S.D. Cal. Oct. 5, 2010)

(allowing expert testimony on the sufficiency of entity formation documents over objections that it constituted a legal opinion, was unreliable, and would not assist the jury).

As Defendant concedes (at p. 8), the guideposts Mr. Klein sets forth for analyzing whether the conduct and communications of Dave Kleiman and Defendant are or are not consistent with a joint business relationship are clearly *not* the same as the legal requirements for a partnership in Florida. For example, the guidepost of partners having complementary skillsets is not a necessary element of a legal partnership, but Mr. Klein recognizes it is nonetheless consistent with the existence of a joint business relationship. (Ex. 1 at 267:21–268:23.) And even if there were overlap, expert testimony is not subject to exclusion just because it mentions principles with legal meaning. *See Kearney v. Auto-Owners Ins. Co.*, No. 8:06-CV-595T24TGW, 2009 WL 3712343, at *10 (M.D. Fla. Nov. 5, 2009) ("[W]hen the substance of the expert's testimony concerns ordinary practices and trade customs which are helpful to the fact-finder's evaluation of the parties' conduct against the standards of ordinary practice in the insurance industry, his passing reference to a legal principle or assumption in an effort to place his opinions in some sort of context will not justify the outright exclusion of the expert's testimony in its entirety." (alterations and quotation marks omitted)), *aff'd*, 422 F. App'x 812 (11th Cir. 2011).

Tellingly, Defendant cites nothing in Mr. Klein's report or deposition testimony to support his view that Mr. Klein opines on the law, instead resorting to hyperbole and name-calling. *See* Mot. at 8 (describing the guideposts as "laughable subterfuge").[2] Nor could he, because Mr. Klein's methodology was explained and went unchallenged at his deposition in this case. *See infra.* Mr. Klein's testimony will assist the jury in assessing whether the elements of a partnership are met, but it does not purport to supplant the jury's role to weigh the evidence with the benefit of Mr. Klein's expert opinion, or the role of this Court in establishing the law the jury must apply.

---

[2] Defendant also suggests Mr. Klein's testimony is excludable because it goes to a "core" issue. ECF No. [500], at 11. Relevance to a core issue is not a ground to exclude an expert but rather a reason to believe his testimony will assist the jury. *See* Fed. R. Evid. 704(a) ("Except [for opinions about intent or state of mind in a criminal case], testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.").

2. *Mr. Klein Consistently Applies an Unchallenged Methodology That Will Assist the Jury.*

Defendant next asserts that Mr. Klein's testimony will not assist the jury. But, again, this argument is undermined by Mr. Klein's report, his deposition testimony, and the law Defendant cites.

At his deposition, Mr. Klein testified without challenge that he had used a "well established methodology" in this case, applying what "is published in CPA review materials" and what he was "trained in" and believes is "a practical methodology for the determination of guideposts associated with a shared business enterprise." (Ex. 1 at 183:11–22.) He sets out his methodology (the "DOGS framework") in the guideposts section of his report and then applies the methodology in the following section. (*Id.* at 222:9–23.)[3] He has offered related testimony in other cases (*id.* at 82:4–24), and his testimony in this case will assist the jury in placing the evidence regarding the joint business relationship between Defendant and Dave Kleiman in the context of Mr. Klein's significant experience and expertise as the jury determines whether the two men formed a partnership.[4]

Defendant takes issue with Mr. Klein identifying evidence in this case and explaining how it fits in with the methodology he employs. However, an expert may "articulate the factual underpinning upon which he bases his opinion." *Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, No. 18-CV-63130, 2020 WL 1666763, at *15 (S.D. Fla. Apr. 3, 2020) (quotation marks omitted). "Additionally, expert testimony that 'synthesizes or summarizes data in a manner that streamlines the presentation of that data' is admissible." *Id.* (citation omitted).

Furthermore, to the extent the cases cited by Defendant apply at all, they support the admissibility of Mr. Klein's testimony. Defendant cites *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida*, 402 F.3d 1092 (11th Cir. 2005). But the question in that case relevant to helpfulness to the jury was whether the expert possessed experience or expertise "beyond the

---

[3] The methodology was so unchallenged that Defendant did not even ask Mr. Klein to explain the "DOGS" acronym. For the Court's information, it is an acronym for the well-established guideposts listed by Mr. Klein in Section V of his report and refers to: (1) Decision-making that is shared; (2) Ownership (as opposed to a non-ownership relationship such as participation as an employee or commissioned independent contractor); (3) Goals that are shared; and (4) Skills that are complementary and non-ministerial. Ex. 2 (Klein Declaration).

[4] Defendant misconstrues (at p. 11 n.3) a reference in Mr. Klein's report to Coin-Exch. Mr. Klein opined that Defendant's "explanation to Ira Kleiman of the reasoning behind supporting Coin-Exch" supported his understanding of the broader business relationship between Defendant and Dave Kleiman, particularly with respect to the guidepost regarding shared decision-making. ECF No. [500-1], ¶ 36.

understanding of the average lay person." *Id.* at 1111. *Whelan v. Royal Caribbean Cruises Ltd.*, 976 F. Supp. 2d 1328 (S.D. Fla. 2013), similarly focused on whether the expert was testifying about topics "beyond the understanding of the average lay person." *Id.* at 1332 (quotation marks omitted).

Mr. Klein has relevant experience and expertise as a teacher and practitioner of business and accounting, and he has applied an established methodology to the communications and conduct in this case. (Ex. 1 at 183:11–22.) His experience, education, and training in these areas goes far beyond that of the average lay person. Defendant's citation to *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006), is similarly inapposite as it concerned an expert offering legal opinions. Again, Mr. Klein is not opining on the law. *See, supra*, Section I.A.

### 3. Mr. Klein Is Not Offering an Opinion About Motive or Credibility.

Defendant finally asserts, but does not demonstrate, that Mr. Klein improperly offers opinions about credibility, motives, state of mind, and intent. Unsurprisingly, Defendant has not cited any portion of Mr. Klein's report that opines on any party's credibility. And the one portion he does cite does not reflect any opinion about Defendant's or Dave Kleiman's subjective intent, but rather discusses what the communication in question reflected with respect to their business relationship. Mot. at 10-11 (citing ECF No. [500-1], ¶ 36).

Moreover, none of the guideposts Mr. Klein uses rely on a determination of a party's state of mind or intent. And under Florida law the parties' subjective intent to form a partnership is not dispositive on the issue of whether a partnership has or has not been formed. Fla. Stat. § 620.8202 ("Except as otherwise provided in subsection (2), the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership."). Instead, as described above, Mr. Klein's opinions are limited to whether communications and conduct in this case are consistent or inconsistent with that typically seen in the context of a joint business relationship, applying established guideposts for that determination. (*See* Ex. 1 at 258:22–259:12 (agreeing with Defendant's counsel that he "did not consider whether the two parties in question here intended to form a joint venture or partnership"); *see also id.* at 226:8–14, 251:4–15.)

Defendant cites no case holding that an expert cannot consider whether communications are consistent or inconsistent with those typically seen in a particular business context. And as the

cases cited above show, courts routinely allow this type of testimony. *See, e.g.*, *Sheet Metal Workers' Nat'l Pension Fund*, 722 F. Supp. 2d at 853.

Because Mr. Klein does not offer a legal opinion or opinion based on anyone's credibility, motive, or state of mind, and because he consistently applies an established, undisputed methodology to yield an opinion that will assist the jury, the Court should reject Defendant's challenge to his testimony.

### B.  Dr. Matthew Edman

For more than a year, Dr. Matthew Edman has submitted testimony relating to the authenticity of documents submitted by the Defendant to this Court.

On April 28, 2019, Dr. Edman filed an affidavit in which he testified that a document submitted by Defendant in support of his motion for judgment on the pleadings was not authentic. (ECF No. [159-9].) Specifically, he testified that an email purportedly sent from Dave Kleiman to Uyen Nguyen appointing her to be a "director" of W&K Info Defense Research, LLC was in fact a PDF that was created from an email that Defendant sent from himself to himself in 2014—a year after Dave's death. (*Id.* at 4.) A day before oral argument on this motion, Dr. Edman submitted a supplemental affidavit in which he testified that further analysis revealed that a second email submitted by Defendant in support of his motion for judgement on the pleadings was in fact another manipulation created from an email that Defendant sent from himself to himself in 2014. (ECF No. [242-2], at 2.) In response to Dr. Edman's testimony, counsel for Defendant withdrew the exhibit in the middle of oral argument. (ECF No. [256], at 39:6-9 ("We're not relying on it under these circumstances because last night we learned that their expert is challenging that document. So Judge, for this purpose, I would withdraw it now.").)

Dr. Edman next testified on August 5, 2019, at the Court's show cause hearing. Again, his testimony concerned the authenticity of documents submitted by Defendant in this litigation. At that hearing, Defendant mounted a *Daubert* challenge to prevent Dr. Edman from testifying. (ECF No. [264], at 100:7-9.) In that challenge, Defendant's counsel argued that Dr. Edman should be prevented from testifying whether or not documents submitted by Defendant were "forgeries." (*Id.* at 112:13-21.) In denying that challenge, the Court determined that:

> [T]here's a difference between a forgery and a fraud. A forgery simply means the document is not what it purports to be. So it is – that, to me, is a fact. That doesn't go to Dr. Wright's state of mind or anybody else's state of mind. I would allow him

> to testify that he believes the document is a forgery. I will not allow him to testify
> to whether he believes it was fraudulently prepared.

(*Id.* at 112:22-113:4.) Notably, Defendant did not challenge Dr. Edman's testimony on the basis
that he did not possess the requisite expertise to opine about the forensic analysis of documents.

The testimony that Dr. Edman is prepared to offer at trial is materially the same type of
testimony that he has already offered throughout the course of this litigation, and that this Court
has already credited in finding that certain evidence was fabricated. (*See* ECF No. [277], at 20-
21.) That is, Dr. Edman has been asked to analyze certain documents submitted by Dr. Wright in
this litigation to determine, to the extent possible, whether they are authentic.

Defendant's *Daubert* challenge argues that Dr. Edman's testimony should be excluded
primarily on three bases: *First*, he argues that Dr. Edman does not have the "requisite expertise to
opine about the forensic analysis of documents." *Second*, he argues that Dr. Edman's methodology
is insufficiently reliable. *Finally*, he argues that Dr. Edman's use of the word "forgery" in
describing the documents he's reviewed would confuse the jury. For the reasons set forth below,
these arguments are without any merit, and Dr. Edman should be permitted to testify concerning
the opinions he offers in his expert reports.

### 1. Dr. Edman is qualified.

Defendant's assertion (at pp. 12-13) that Dr. Edman is not qualified to offer opinions
concerning the authenticity of documents produced by Defendant is frivolous. As an initial matter,
when Defendant previously attempted (and failed) to exclude Dr. Edman's testimony at the August
5, 2019 hearing, Judge Reinhart explicitly invited Defendant's counsel to focus their voir dire on
his qualifications:

> THE COURT: Okay. So Ms. McGovern, you're asking to be able to voir dire him on his
> qualifications and his opinions and then make your *Daubert* motion, is that the way you'd
> like to proceed?

(ECF No. [264], at 103:22-25.) Despite the invitation, Defendant did not (and could not) challenge
Dr. Edman's qualifications. (*See id.* at 106:10-13.)

Defendant did not challenge Dr. Edman's qualifications because he is *clearly* qualified to
testify concerning the opinions he is offering. Dr. Edman possesses B.S., M.S., and Ph.D. degrees

in computer science. (Ex. 3 (Expert Report of Dr. Matthew J. Edman dated Dec. 13, 2019), at 3.)[5] He has authored multiple research papers in peer-reviewed journals such as the *IEEE Transactions on Information Forensics and Security* on topics ranging from cryptographic security to the design and analysis of anonymous communication systems on the internet. (*Id.*) He worked directly with the FBI's New York field office to affect the seizure of bitcoins and other data on Ross Ulbricht's[6] personal laptop and other devices, and later with the U.S. Attorney's Office for the Southern District of New York to identify, extract, and analyze forensic artifacts from Ulbricht's devices; this analysis was presented at Ulbricht's trial. (*Id.*) He also holds a current AccessData Certified Examiner credential, which is a certification recognized in the field of digital forensics. (*Id.* at 5.)

Dr. Edman's experience with Berkeley Research Group and FTI Consulting Inc. includes client consultation engagements where he performs tasks similar to what he was asked to do as an expert in this case. For example, Dr. Edman regularly reviews emails that have been manipulated by the sender in the context of phishing-related investigations. Such investigations bear a striking similarity to the manipulated emails in this case, because the sender's address is usually manipulated to make it appear as if the email originated from someone who the recipient knows. Additionally, Dr. Edman has reviewed documents in the context of investigations into what is often called "business email compromise" involving ACH fraud. In those cases, a malicious actor manipulates documents, like a PDF of an invoice from a vendor, to alter the invoice amount and payment details. Accordingly, Dr. Edman is undoubtedly "qualified to testify competently regarding the matters he intends to address." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003) (internal citations omitted).

In mounting their *Daubert* challenge, the Defendant grossly mischaracterizes (at p. 12) Dr. Edman's deposition testimony, asserting that Dr. Edman "has virtually no training in the forensic analysis of documents to determine whether they were altered or forged." In the cited testimony, Dr. Edman references the qualifications discussed earlier in the deposition:

Q.   Do you have any training related to the forensic analysis of documents?
A.   Yes.
Q.   What type of training?

---

[5] Although Defendant purports to attach this report to his *Daubert* motion (*see* ECF No. [500-2]), he omitted the "Materials Considered" page.

[6] Ross Ulbricht is the infamous creator of Silk Road. Silk Road was an online black market, best known as a platform for selling illegal drugs.

A.   Well, I have a PhD. in Computer Science which provides the foundation for that sort of analysis. **I have significant work experience that we discussed related** to that type of analysis. I am also an access data certified examiner which is a type of forensic certification.

(ECF No. [500-4], at 51:10-19 (emphasis added).) The "significant work experience" that Dr. Edman and Defendant's counsel previously discussed included (1) being previously admitted as an expert to testify about a forensic examination of certain web sites and emails (*id.* at 36:5-19), *and* (2) numerous consulting engagements from 2014 onward involving the forensic collection and examination of documents (*id.* at 37:6-22).

For these reasons, Defendant's motion to exclude Dr. Edman on the basis that he lacks the requisite qualifications is baseless and should be denied.

> 2. *Dr. Edman's methodology for analyzing documents produced by Defendant is reliable.*

Dr. Edman's methodology for analyzing the authenticity of documents he reviews in his reports is comprised of "the following components: (i) reviewing the 'human-readable' contents of the documents (e.g. the visible text in an email or PDF file), (ii) analyzing the internal 'machine readable' code or structure contained within the documents' native files (e.g. the object code within a PDF file), and (iii) identifying and extracting metadata about the documents (e.g. information about how the documents were created, when, and by whom)." (Ex. 3, at 6.) In addition, some documents he reviewed contained cryptographic signatures that allow an individual to verify that "data (i) originated from the expected sender and (ii) has not been altered." (*Id.*)

As part of this analysis, Dr. Edman extracted and analyzed metadata contained in documents produced by Defendant in this litigation. (*See, e.g.*, Ex. 3, at 30.) Accordingly, the vast majority of the data Dr. Edman relies upon is contained within electronic documents produced by Defendant in this litigation. Based on this data and supporting technical documentation, Dr. Edman opines that numerous documents produced by Defendant, including some that Defendant swore were authentic, were in fact manipulated.

Despite the gravity of Dr. Edman's testimony, Defendant has not put forth an expert to opine that the documents at issue are in fact authentic. Indeed, Defendant's rebuttal expert, Mr. Nicholas Chambers, failed to perform any independent review of the documents reviewed by Dr. Edman and cannot opine on the authenticity of such documents, despite the fact that he was involved in the collection of these documents at the onset of discovery in this litigation. (Ex. 4

(Deposition of Nicholas Chambers), at 28:3-11). Defendant's decision to not ask Mr. Chambers to analyze, let alone challenge, the substance of Dr. Edman's opinions is telling.

Mr. Chambers does not offer any opinion concerning whether or not Dr. Edman extracted metadata correctly (*id.* at 63:15-19), whether he reviewed the metadata correctly (*id.* at 63:22-64:2), or whether there was anything inaccurate in his report relating to his characterization of the metadata and the content of the files Dr. Edman reviewed (*id.* at 63:2-11.) Instead, Mr. Chambers appears to take issue with the weight Dr. Edman ascribes to the metadata he reviewed:

> Q:    If Dr. Edman used the word "modified" instead of "manipulated" in his report, would you have any issues with the opinions he's offering?
>
> A:    Again, I understand that Dr. Edman is offering an opinion, but in my experience, **having the existence of a certain item of metadata that might indicate modification is not enough to make a definitive conclusion of modifications** – simply don't understand who made that modification, how it was done, when it was done -- potentially that might be available -- but to state that something as a definitive conclusion has been modified instead of just a possibility, that's something I would not do.

(*Id.* at 70:16-71:7 (emphasis added).) Accordingly, Defendant's argument at best goes to the weight of Dr. Edman's testimony—not its admissibility.

*Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 169 (D.N.J. 2008) is instructive. There, the defendant challenged the admissibility of the plaintiff's expert Luke Cats, who opined on a series of web server logs and the meaning of technical data logs. *Id.* at 168. The defendant argued that Mr. Cats's testimony was unreliable because he failed to ensure or confirm the accuracy of the data upon which he relied because "neither Mr. Cats nor Plaintiff can explain how the data was first saved to Plaintiff's network, or, later, to the CD that Plaintiff provided to Mr. Cats." *Id.* The court rejected that argument, holding that "[w]hether Mr. Cats should have more diligently researched the underlying facts given to him by Plaintiff . . . is a question of weight, not admissibility." *Id.*

Like the defendant in *Floorgraphics*, Defendant attacks the admissibility (at p. 13) of Dr. Edman's testimony on the grounds that he "failed to use a clean workstation and write blocker to ensure that he didn't inadvertently alter the documents when conducting his 'analysis.'" Defendant conveniently ignores Dr. Edman's testimony that he "would generate a hash prior to reviewing the file and then hash the file again after reviewing to make sure the hashes are the same." (Ex. 5 (Apr. 29, 2020 Deposition of Dr. Edman), at 35:6-17.) But if Defendant was truly concerned about the

alteration of documents, he could have easily tested the reliability of Dr. Edman's analysis because the documents he analyzed were produced *directly by* Defendant.

Finally, Defendant's assertion that Dr. Edman's use of the word "forgery" would confuse the jury is similarly misguided. As an initial matter, Judge Reinhart already found that Dr. Edman's use of the word forgery was appropriate because "[a] forgery simply means a document is not what it purports to be." (ECF No. [264], at 112:22-113:4.) To the extent Defendant wishes to cross-examine Dr. Edman about the conclusions that can be drawn from the metadata he reviewed, he can do that just as he did at the August 5, 2019 evidentiary hearing. (*See, e.g.*, *id.* at 219:17-23 (Q: "Okay. Okay. The metadata that is extracted and reflected on plaintiffs' exhibit 3 that relates to plaintiffs' exhibit 2 all could have been done by anybody; isn't that right?" A: Anybody could manipulate the metadata, but, again, there are a number of indicators contained within the metadata that are consistent with the defendant.")

Accordingly, Defendant's motion to exclude the testimony of Dr. Edman should be denied.

### C.  Andreas Antonopoulos

Defendant argues that Mr. Antonopoulos should be excluded because he is not qualified to opine on damages, has a "deeply rooted bias" against Defendant, his testimony regarding the public statements of Satoshi Nakamoto would not be helpful to the jury, and his opinions reference evidence that Defendant believes is inadmissible. Each of these arguments should be rejected.

> *1.  Mr. Antonopoulos is qualified to opine on the spot market price of bitcoin.*

In Mr. Antonopoulos's report, he discloses that the spot trading price of bitcoin and bitcoin forks is traceable through the use of sites such as coincap.io. (ECF No. [500-5], at 18-19.) Coincap.io identifies the market value in U.S. dollars of Bitcoin forks at different points in time. (Ex. 6 (Jan. 7, 2020 Deposition of Mr. Antonopoulos), at 264:19-22.) Mr. Antonopoulos will be prepared at trial to testify as to the price information conveyed at coincap.io at any point in time. (*Id.* at 264:23-265:1.)

Mr. Antonopoulos is qualified to testify about the spot market of bitcoin and bitcoin forks at different points in time. Mr. Antonopoulos has worked exclusively in the Bitcoin and Open Blockchain industry since 2012. (ECF No. [500-5], at 2.) In 2014, he published Mastering Bitcoin, which is viewed as the definitive guide on the subject and to date is the world's most cited book on Bitcoin. (*Id.*) He's been interviewed by Bloomberg, CNN, CNBC, CBS, NBC, ABC, BBC, the

Financial Times, and many more media organizations for his industry expertise. (*Id.* at 3.) Finally, Mr. Antonopoulos sits on oversight committee for the CME Bitcoin price index and reference rate, the world's first regulated price index by the world's largest derivatives marketplace. (https://www.cmegroup.com/trading/cryptocurrency-indices.html.) Given this background, Mr. Antonopoulos is plainly qualified to testify about the spot price of bitcoin and bitcoin forks.

Contrary to Defendant's assertions (at pp. 15-16), Mr. Antonopoulos is not opining on the ultimate damages to be awarded in this litigation. He is not opining on *either* the number of bitcoin Defendant has wrongfully taken *or* the appropriate date to measure damages. Plaintiffs intend to demonstrate the number of bitcoin stolen through documents produced in this litigation and through fact witness testimony. The date at which damages is to be measured is a question of law. *See, e.g.*, *Cole v. Am. Capital Partners Ltd., Inc.*, 394 F. App'x 544, 547 (11th Cir. 2010) ("We conclude that the district court did not err in calculating the damages . . . . Under Florida law, [t]he goal of damages in tort actions is to restore the injured party to the position it would have been in had the wrong not been committed. In this regard, Florida applies a flexibility theory of damages. Under that approach, damages are calculated using either the benefit of the bargain rule or the out of pocket rule. Courts are to use the rule that would more likely fully compensate the injured party.") (alteration in original) (internal citations and quotation marks omitted). Plaintiffs will brief this issue at the appropriate time as determined by the Court. Accordingly, Plaintiffs only intend to rely on Mr. Antonopoulos's testimony to show how damages should be calculated *after* the Court determines the appropriate date on which damages should be measured.

Defendant's attack on Mr. Antonopoulos appears to stem from their desired use of their rebuttal witness William Choi. (ECF No. [500-8].) In his report, Mr. Choi opines that (1) damages should be calculated at the time of the harm (*id.* at 10), and (2) damages should be discounted because of liquidation of a large number of bitcoin would impact the price of bitcoin (*id*. at 20.) With respect to his first point, the question of when damages should be measured is a question of law, and thus Mr. Choi's opinion as to when damages should be measured is irrelevant. As to the second point, if Defendant wants to argue at trial that there should be a discount on Plaintiffs' damages calculation, it is his burden to put forth evidence to show why such a discount should be applied, as the resources Mr. Choi relies upon points out. (*See* ECF No. [500-8], at 11 n.25 (citing *Litigation Service Handbook*); Ex. 7 (*Litigation Service Handbook*), at 13 ("When the court has

found liability, the wrongdoer's rule gives the benefit of the doubt to plaintiffs, leaving defendants with the burden of dispelling any uncertainty.").)

### 2. *Mr. Antonopoulos is not biased against Defendant.*

Mr. Antonopoulos does not harbor any bias against Defendant, (Ex. 6, at 264:6-8.), and none of his opinions are based on any bias against Defendant. (*Id*. at 264:9-12.) Instead, Mr. Antonopoulos has been asked to opine on:

1) The technical mechanics of the Bitcoin protocol;

2) The concept of bitcoin forks and their value at different points in time;

3) The email addresses used by Satoshi Nakamoto; and

4) Technical analysis of certain lists of bitcoin submitted in this litigation and whether they reflect an accurate and complete list of the Defendant's bitcoin holdings.

(ECF No. [500-5], at 3-4.)

But even if Mr. Antonopoulos did harbor some sort of bias against Defendant, such bias is not a basis for exclusion. "[A]llegations of bias are attacks against credibility. And a witness's credibility goes to the weight of the evidence – **not admissibility**." *Frank Anthony Zaccone v. Ford Motor Company*, 2017 WL 11532918, at *1 (M.D. Fla. Apr. 17, 2017) (citing *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986)) (emphasis added).

The authority cited by Defendant is wholly inapposite. In *Hall v. C.I.A.*, the plaintiff attempted to offer expert testimony from *himself* that was "conclusory and contain[ed] no foundation." 538 F. Supp. 2d 64, 72 (D.D.C. 2008). Importantly, in holding that the plaintiff's attempt to offer expert testimony was "hopelessly partisan in nature," the Court was careful to articulate how its finding did not offend the rule that issues of credibility be left for the finder of fact:

> [I]t cannot be said that precluding plaintiff from being considered an expert offends the principle that the court does not pre-judge the credibility of a witness but lets it be judged by the finder of fact. While one may be able to conjure a case where a party could be party and expert in the same case, and his credibility be for the finder of fact, in this case, plaintiff is taking unquestionably hearsay statements and, by the stratagem of having himself testify as an expert, magically transforming them into "non-hearsay." The Court cannot permit such a transparent evasion of its processes and requirements for the admissibility of evidence.

*Id*. at 73.

Accordingly, Defendant's request that this Court exclude Mr. Antonopoulos on the ground of bias has no basis in fact or law, and should be denied.

> 3.  *Mr. Antonopoulos's testimony regarding public statements by Satoshi Nakamoto is relevant.*

Communications sent by Satoshi Nakamoto are plainly relevant to this litigation. The Second Amended Complaint details how Satoshi Nakamoto created the bitcoin protocol, mined a significant amount of bitcoin, and how Defendant years later came out and claimed that he and Dave Kleiman were the individuals behind the Satoshi Nakamoto moniker. (ECF No. [83] ¶¶ 30-36; 51.) Indeed, Plaintiffs requested from Defendant all documents and emails "contained in the Satoshi Nakamoto email accounts," but Defendant claimed he "no longer has access" to these accounts. (ECF No. [339-5], at 5-6.)

Accordingly, Plaintiffs requested that Mr. Antonopoulos retrieve and authenticate communications that are known to have originated from the Satoshi Nakamoto email accounts. To retrieve this information, Mr. Antonopoulos reviewed the archive of a cryptography mailing list that has been public since its inception and reviewed the original sources containing communications from Satoshi Nakamoto. (ECF No. [500-7], at 50:9-21.) In doing so, Mr. Antonopoulos drew upon his experience as a computer scientist and his knowledge of information protocols, in addition to his understanding of the historical record of Satoshi Nakamoto's communications and various archives that exist on the web. (*Id.* at 51:1-14.)

Mr. Antonopoulos is not opining on the substance of those communications, but his testimony will be helpful for the jury and this Court to authenticate communications written by Satoshi Nakamoto. *See, e.g.*, *United States v. Koziy*, 728 F.2d 1314, 1321-22 (11th Cir. 1984) (expert testimony that questioned documents "were very similar to the ones he had seen" was sufficient to authenticate them).

> 4.  *Mr. Antonopoulos does not rely on inadmissible evidence.*

Defendant next asserts (at pp. 19-20) that Mr. Antonopoulos improperly relied on inadmissible evidence, namely (1) the "CK List" and "DK List" of bitcoin, and (2) a message contained within a particular bitcoin message. Mr. Antonopoulos's reliance on this data does not offend the Federal Rules of Evidence.

*First,* the CW and DK lists were provided by Defendant in this litigation. Mr. Antonopoulos does not opine on who created these lists, nor does he opine on how they were

created. Instead, Mr. Antonopoulos examined the CK and DK lists, along with two other lists related to Defendant's bitcoin holdings (the "Shadders List" and the "CSW Filed List"), and concluded that "CW List, and CSW Filed Lists produced by the Defendant . . . could not have plausibly been produced independently of the Shadders List." (ECF No. [500-5], at 28.)

Second, Mr. Antonopoulos examined a signed message on the bitcoin blockchain to verify the date the transaction and message was signed, as well as the underlying substance of the transaction. Mr. Antonopoulos does not opine on the relevancy of the message, but Plaintiffs intend to use the signed message to show that an address that Defendant previously claimed to be his in fact belongs to someone else.

Such transactional data is admissible under Fed. R. Evid. 803(6) because it is a record of a regularly conducted activity. To qualify for this exception, the following factors must be met: "(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness . . .; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *United States v. Osborne*, 677 F. App'x 648, 653 (11th Cir. 2017). All the factors are met here, and Mr. Antonopoulos's testimony assists Plaintiffs in establishing these factors.

*First*, the message was signed by the individual with the private key necessary to control the at-issue bitcoin wallet at the same time it became available on the public Bitcoin blockchain. (ECF No. [500-5], at 29-30.) *Second* and *third*, bitcoin transactional records and messages are kept in the regular course of transferring bitcoin on the blockchain, and this record was made as part of that process. *Fourth*, Mr. Antonopoulos is a qualified witness capable of testifying as to the nature of this transaction and signature. *Fifth*, Defendant has not shown that the message indicates a lack of trustworthiness—namely, that the address at issue does in fact belong to Defendant. If it did in fact belong to Defendant, he could easily prove the lack of its authenticity by signing a message himself.

### D. Stefan Boedeker

Mr. Boedeker is a statistician and an economist with B.S. and M.S. in Statistics who, for 25 years, has focused on the application of economic, statistical, and financial models. (ECF No.

[500-9], at 2.) He is currently employed as a Managing Director at the Berkeley Research Group, where he has gained extensive experience working on consumer class actions. In those cases, he has developed consumer demand and pricing models. (*Id.*)

Mr. Boedeker was retained to review the list of Defendant's bitcoin holdings submitted to Plaintiffs in connection with his Notice of Compliance with the Court's January 10, 2020 Order. (ECF No. [376].) Specifically, Mr. Boedeker reviewed this list and the associated lists (the Shadders List, the CSW List, and the DK List) to determine whether there were any statistical anomalies in the data. (*Id.* at 3.) During this review, Mr. Boedeker reviewed the "Transaction IDs" associated with the Bitcoin in these lists and observed patterns in the data that have "an infinitesimally small chance of occurring naturally without any outside intervention such as data manipulation after the fact." (*Id.*)

> 1. *Mr. Boedeker properly relied on the uniformity of the SHA-256 hashing function.*

Defendant's motion correctly points out (at p. 20) that Mr. Boedeker's list relies on the premise that SHA 256—a mathematical function used to compute the Transaction IDs—is random and evenly distributed across a given numerical range. And this premise is true. Dr. Edman confirmed it. (Ex. 5, at 176:6-13.) Even Defendant's own expert, Mr. Choi, confirmed it. (Ex. 8, at 204:8-16.) The uniformity of SHA 256 is a well-established fact concerning cryptographic hash functions.

Defendant lacks any rebuttal witness testimony challenging this assertion – because it's true.[7] Instead, they assert that Mr. Boedecker has no expertise in SHA 256 hashes or the hashing process, while not challenging the conclusions he reached about the subject.

---

[7] In a footnote, Defendant tries to attack the unrebutted expert testimony about the uniformity of SHA-256 hash outputs through a "little googling." Defendant should leave expert work to the experts. The three articles cited simply support reality, that SHA-256's **outputs are** uniformly distributed. In the first article, the author tests the uniformity of hash functions related to SHA-256. **For each hash function,** he computes p-values for 94 different "experiments." Of those, five from the SHA-224 (and 4 from the SHA-512) fell under the 0.05 significance level. This is exactly what you'd expect **if the hash functions are actually uniformly distributed**. In other words, it's asking how often something with a one in twenty chance would happen if tried 94 times. **If the hash functions are uniformly distributed, it *should* happen about 4 or 5 times, which is exactly what happened.** This is perfectly in line with the output of SHA-256 being an excellent approximation to a randomly uniform distribution. In the second article **(which is just a blog post)**, the author concludes, "[g]iven two black boxes, one being a random 256-bit permutation, the other being SHA256, it is possible to distinguish between them using carefully constructed input and about 2^80 hashes. Obviously, this doesn't apply to coinbase transaction IDs which are not "carefully constructed" **in the manner described**. But regardless, and more importantly, the author says it takes 2^80 hashes to merely distinguish the SHA-256 output set from completely random. This number, written out, is: 1,208,925,819,614,629,174,706,176. Here, the

But Mr. Bodeker *did* in fact ensure that SHA-256 hashes are "approximately uniformly randomly distributed over their full range and independent. (ECF No. 500-9, at 7.) To do so, he utilized the Kolmogorov-Smirnov Test ("KS-Test"). (*Id.*) Mr. Boedeker applied the test across the SHA-256 outputs in the data sets provided by Defendant and determined that where the gaps were absent, the data was uniformly distributed. (*Id.* at 7-8.) In other words, he validated the uniformity of the SHA-256 distribution.

Even if Mr. Boedeker had not established the uniformity of SHA-256 functions in his expert report (he did), it is proper for him to rely on the testimony of other experts to do so. "An expert may properly rely on the opinion of another expert [so long as] the expert [does] not simply repeat or adopt the findings of other experts without investigating them." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568 (N.D. Fla. 2009) *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010). Accordingly, it is appropriate for Mr. Boedeker to rely on Dr. Edman's opinion and his own confirmatory research to conclude that SHA-256 functions are uniformly distributed.

### 2. *Mr. Boedeker's Supplemental Report was substantially justified and harmless to Defendant.*

At Mr. Boedeker's deposition, he was asked if the manipulation he observed could have occurred before the bitcoin were mined. (ECF No. 500-10, at 104:18-105:22.) In other words, Defendant's counsel was asserting that the list could have been authentic if Defendant deliberately filtered out bitcoin that fell within a certain SHA-256 range. The next day Mr. Boedeker issued a supplemental report to disprove this new theory by Defendant. It was not a "new analysis," but rather an explanation to an attack on his analysis that was first posed at his deposition.

Immediately after Mr. Boedeker issued his supplemental report, he offered to a sit for an additional deposition on April 24, 26-30, and May 1—all dates prior to the close of discovery. Plaintiffs' counsel also offered to move the Court for more time to take the deposition and agreed to provide Mr. Boedeker for deposition past the discovery deadline by party agreement *without* any motion practice. See April 2020 email exchange between counsel, attached hereto as Ex. 9. Defendant declined.

---

number of hashes is just 16,404. Finally, in the third article, the author again **conclusively** indicates the reality that SHA-256's outputs are randomly and uniformly distributed. Here is the key sentence (emphasis added): "As expected, the . . . SHA-2 hash function input-output mappings exhibit random behavior."

In determining whether to permit expert disclosures issued beyond the time permitted, courts consider the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Al-Ghena Int'l Corp. v. Radwan*, 2016 WL 8203480, at *1 (S.D. Fla. May 17, 2016); *Joslyn v. Essentia Nat. Memory Foam, Inc.*, 2017 WL 5434583, at *2 (S.D. Fla. Jan. 26, 2017). Each of these factors weigh in favor or permitting the supplemental opinion.

*First*, Defendant was not surprised by Mr. Boedeker's expert report, as the opinion is merely a natural extension and defense of his first report. *Second,* Plaintiffs went out their way to offer Defendant's counsel an opportunity to re-depose Mr. Boedeker and Defendant declined— presumably in an attempt to exclude his opinion through gamesmanship rather than cross-examination. *Third*, there is no argument this would disrupt trial. *Fourth*, the evidence is important, because without it, Defendant will be given an opportunity to explain away Mr. Boedeker's testimony through falsehoods. *Fifth*, Plaintiffs first learned of this deceptive attack on Mr. Boedeker's analysis in his deposition and immediately worked to address it by issuing a supplemental report the following day. It is also notable that Defendant offered supplemental reports from his own expert after Mr. Boedeker did. (*See* ECF No. [492-12] (second supplemental Norwitch report, dated May 2, 2020).

Accordingly, the Court should permit Mr. Boedeker's use of the opinions he discloses in his Supplemental Report at trial.

### E.  Dr. Robert Leonard

Dr. Robert Leonard is a tenured Professor of Linguistics at Hofstra University. He was the founding Director of Hofstra's Institute for Forensic Linguistics, Threat Assessment, and Strategic Analysis, and currently serves as the Director of Hofstra's graduate program in Forensic Linguistics. Dr. Leonard has authored or co-authored numerous publications, including peer-reviewed literature in field of linguistics. (ECF No. 500-12, at 30-32.) The FBI's Behavioral Analysis Unit-1 has retained him to advise on cases and analyze their Communicated Threat Assessment Database. (*Id.* at 2.)

Plaintiffs retained Dr. Leonard to conduct a forensic linguistic authorship analysis of certain documents. To do that analysis, he reviewed a set of documents known to have been written

by Wright (K Docs), a set of documents Wright denies authoring (Q1 Docs), and a set of documents Wright claims are partly his writing, and partly an imposter's (Q2 Docs) (collectively, "Q Docs").[8] Dr. Leonard identified uncommon idiosyncratic language features in the Q docs ("Linking Features").[9] He then compared the identified features against the Corpus of Global Web-based English's (GloWbE) Australian English subcorpus "in order to help determine how common certain relevant features are to Australian English, and thus how useful the features are as comparators for likely common authorship in [his] analysis." ECF No. 500-12 at 8. After determining that the Linking Features were sufficiently uncommon to be probative of common authorship, Dr. Leonard analyzed whether they also appeared in the K Docs. (*See* Leonard Dep. at 83:2-16, attached as Exhibit 10.) He found they did. (ECF No. 500-12 at 6.) He then analyzed the Linking Features in the aggregate to identify patterns of language usage (or absence of usage) that, while uncommon to Australian English writers, are used consistently across the K and Q writings. Dr. Leonard ultimately opined that "the language patterns of the Q documents are consistent with the language patterns found in the documents known to have been written by Dr. Craig Steven Wright." This response will refer to this methodology as the forensic stylistics approach.

Defendants' contention that Dr. Leonard's methodology is unreliable under *Daubert* is patently false. The peer-reviewed methodology used by Dr. Leonard has been accepted and relied upon by federal courts in major cases, including the well-known *Ceglia v. Zuckerberg* matter referenced in the report of Defendant's rebuttal witness, Dr. William G. Eggington, attached as Exhibit 11. *See also Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 648 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016) (approving of Dr. Leonard's forensic linguistics methodology).

Dr. Leonard's opinions are based on sufficient facts and data as the number of writings analyzed by Dr. Leonard far exceed the number of writings Dr. Eggington has previously testified were sufficient. Defendant's remaining arguments are unavailing as they all go towards the weight of Dr. Leonard's opinions, which are matters the jury must resolve. Dr. Leonard's methodology and opinions easily satisfy *Daubert's* admissibility requirements and Defendant's motion should be denied.

---

[8] Dr. Leonard's methodology is founded largely on the pioneering work of a leading forensic linguist, Dr. Gerald R. McMenamin whose opinions are discussed below. *See e.g.,* GERALD MCMENAMIN, *FORENSIC STYLISTICS* (1993); Gerald McMenamin, *Style Markers in Authorship Studies*, 8 Forensic Linguistics 93 (2001); GERALD MCMENAMIN, *FORENSIC LINGUISTICS: ADVANCES IN FORENSIC STYLISTIC* (2002).

[9] Dr. Leonard describes "linking features" as "similar instances of variation of language use in more than one data set." ECF No. 500-12 at 8.

1. *Attacks on Dr. Leonard's Methodology Have Been Rejected by Other Federal Courts.*

It appears Defendant retained Dr. Eggington solely to provide fodder for his misguided *Daubert* challenge to the underlying methodology of Dr. Leonard's authorial attribution analysis. (Eggington Dep. at 77:12-18, attached as Exhibit 12.) But Defendant's motion glaringly fails to mention (and Dr. Eggington's Report fails to disclose) that federal courts have repeatedly rejected Dr. Eggington's criticisms of the methodology employed by Dr. Leonard, and that, in fact, Dr. Leonard's methodology is an accepted expert methodology in Federal court.

**_Dutcher v. Bold Films LP_**: Dr. Eggington's criticisms of Dr. Leonard's methodology was most recently rejected in *Dutcher v. Bold Films LP*, No. 15-110, 2019 WL 181353 (D. Utah 2019), which involved a dispute over who authored a screenplay. In *Dutcher,* Dr. Eggington offered opinions in support of a *Daubert* challenge to Dr. McMenamin (the pioneer of the forensic stylistics approach). *Dutcher,* 2019 WL 181353 at *1. Notably, Dr. Eggington's Report in this case is a near carbon copy of the report he issued in *Dutcher*, citing to the same articles that criticized the forensic stylistics approach used by Dr. Leonard here (e.g. Chaski, Butters), Eggington Report in *Dutcher*, attached hereto as Exhibit 13. But after analyzing the same critiques Dr. Eggington makes here, the *Dutcher* court summarily rejected the *Daubert* challenge to the methodology and reliability of Dr. McMenamin's forensic stylistics analysis. At his deposition, Dr. Eggington conceded that his challenges to Dr. Leonard's methodology here are based on the same grounds as the failed *Daubert* challenge in *Dutcher.* Ex. 12, Eggington Dep., at 71:1-10.

**_Ceglia v. Zuckerberg_**: While Dr. Eggington did not testify in *Zuckerberg*, his Report cites to Professor Ronald Butters' criticism of the forensic stylistics methodology used by Dr. McMenamin in the *Zuckerberg* case—the same methodology employed by Dr. Leonard here. Eggington Rpt. ¶¶ 11, 18. But what's not included in Dr. Eggington's Report is that the *Zuckerberg* court analyzed and expressly rejected Dr. Butters' criticisms in favor of the forensic stylistics methodology employed by Dr. McMenamin in that case and Dr. Leonard here. *Ceglia v. Zuckerberg*, 10-CV-00569A F, 2013 WL 1208558, at *56 (W.D.N.Y. Mar. 26, 2013), *report and recommendation adopted*, 10-CV-00569-A, 2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014), *aff'd*, 600 F. App'x 34 (2d Cir. 2015). Indeed, the *Zuckerberg* court specifically cited Dr. McMenamin's authorial attribution analysis as one of the bases for its decision to dismiss the case. *See Zuckerberg*, 2013 WL 1208558, at *56-57; Ex. 12 at 121:10—124:18.

**_U.S. v. Zajac:_** In *Zajac,* Dr. Eggington offered opinions in support of a *Daubert* challenge to the government's forensic linguistic expert, James R. Fitzgerald. *United States v. Zajac*, 748 F. Supp. 2d 1340 (D. Utah 2010). There, Mr. Fitzgerald employed the forensic stylistics approach used by Dr. McMenamin in *Dutcher and Zuckerberg* and by Dr. Leonard here. *Id.* at 1343. Dr. Eggington testified that because Mr. Fitzgerald only analyzed three writings, his sample size was too small to offer an opinion on authorship. *Id.* at 1347, 1350. According to Dr. Eggintgon, Fitzgerald should have had at least five writings as a sample size. *Id.* at 1346-48. The Court found that Fitzgerald's small sample size meant he could not specifically opine on who authored any particular document but could offer an opinion on the patterns of idiosyncratic features he identified across the disputed writings (in the same vein as the opinions offered by Dr. Leonard here). *Id.* at 1351, 1353.  Dr. Eggington does not challenge the size of the data set analyzed by Dr. Leonard in this case. Notably, in contrast to the three document sample size that troubled the *Zajac* court, Dr. Leonard's sample size in this case is nearly 30 documents. Obviously, that well exceeds the five-document sample size Dr. Eggington testified was sufficient in *Zajac*. *Id.* at 1350.

It is hard to fault Dr. Eggington's decision to participate in this case. By his own admission, he is part of one school of academics who disagrees with the methodologies used by a second school (forensic stylistics) that includes Drs. McMenamin and Leonard. Ex. 12, Eggington Dep., at 140:21—143:18. And he is being paid for his work.

It is much more difficult to extend that same charity to Wright. While he likely knew Dr. Eggington's exact challenge had been repeatedly rejected by the courts prior to, or shortly after, retaining Dr. Eggington -- Wright certainly knew this once Plaintiffs deposed Dr. Eggington, raised these opinions with him, and marked them as exhibits. Ex. 12, Eggington Dep., at 97:4—99:16 (discussing the *Dutcher* ruling), 122:3—124:18 (discussing the *Zuckerberg* ruling); Eggington Dep. Exs. 7-8, attached hereto collectively as Ex. 14 (*Dutcher* and *Zuckerberg* rulings, respectively). And while Plaintiff wouldn't fault Wright for trying to have this Court come out differently in this case, query why Wright didn't disclose these directly on point opinions in his motion? Other courts have criticized this exact approach to "hide and seek litigation" tactics

> While Abbott's failure to cite a contrary, but non-controlling decision did not violate any ethical obligation, ethical obligations establish only the barest minimum floor for attorney conduct. What attorney would want to be known as a minimally ethical lawyer rather than a highly professional one? Where the pool of decisions considering the same experts and methods is so limited, it is inconceivable to me that reasonably conscientious and highly professional counsel would not cite contrary authority, then

> meet it head on and attempt to distinguish it . . . Defense counsels' lack of candor is troubling. Hide and seek litigation strategy seldom works and did not work here. As a result, I will find it more difficult to rely on the trustworthiness of defense counsel—a trial lawyer's most important asset. This is not an auspicious beginning for counsel before a judge newly assigned to the case.

*See Sec. Nat'l Bank of Sioux City, Iowa v. Abbott Labs*., No. C 11-4017-MWB, 2013 WL 2420841, at *9 n.7 (N.D. Iowa 2013).

### 2. *Dr. Leonard's opinions are based on sufficient facts and data.*

As held by previous courts, Dr. Leonard's analysis in this case is reliable and based on sufficient facts and data to satisfy Rule 702, *Daubert*, and its progeny.

Dr. Leonard conducted his analysis using a sample size of nearly 30 documents, consisting of over 8000 words. *See* Leonard Rpt. Tables 1-3. Notably, in prior cases such as *Dutcher* and *Zajac*, Dr. Eggington took the position that a minimum of only five documents were required to conduct a scientifically sound authorial attribution analysis. *Zajac*, 748 F. Supp. 2d at 1350; Ex. 13, Eggington *Dutcher* Rpt. ¶ 40. Here, the number of documents analyzed by Dr. Leonard well-exceeded the minimum number Dr. Eggington previously represented as sufficient.

Despite knowing Dr. Leonard relied on a sufficient number of documents, Wright nevertheless refers to this data set as "miniscule" and contends, based on pure conjecture, that this data is insufficient to conduct a reliable analysis. *See* Motion at 25. Notably, Wright does not cite any authority in support of this bald assertion of insufficiency, and Dr. Eggington himself did not opine that Dr. Leonard's document set was too small. (Ex. 12 at 131:5–133:9, 139:5-16.)[10]

Next, Defendant argues, again with no citation to any authority, that the number of occurrences of the 12 linking features across the writings are insufficient to render a valid opinion. Here, Defendant wholly fail to address Dr. Leonard's aggregate analysis of the 12 linking features and instead contends that certain linking features, standing alone, are not "significant." Motion at 25. Defendant misrepresents Dr. Leonard's testimony on this issue as he specifically testified that he is "not claiming that any single feature is probative in and of itself," but rather "pointing out

---

[10] While it's Plaintiffs' position that the quality of the documents in the data set is more probative than raw quantity, the Language Log blog post cited in Dr. Eggington's Report, Dr. Chaski—whose methodology and scholarship Dr. Eggington subscribes to—commented that she has "tested for minimal data requirements, and have found that 2000 words and/or 100 sentences per author affords the most robust results." *See* Chaski, https://languagelog.ldc.upenn.edu/nll/?p=3309 (July 26, 2011 at 6:33 a.m.). It therefore appears that the data set analyzed by Dr. Leonard would even be sufficient to satisfy the requirements of Dr. Chaski, who Dr. Eggington elevates as one of the staunch critics of Dr. Leonard's methodology.

that the patterns in the linguistic data show strings of correspondences in the K to strings of correspondences in the Q." (Ex. 10 at 50:4-8, 51:12—53:21.)

Moreover, Defendant's challenges to the sufficiency of an individual linking feature merely goes to the weight the jury should afford Dr. Leonard's analysis. Defendant are free to raise these contentions on cross examination of Dr. Leonard, or in their own direct examination of Dr. Eggington,[11] and allow the jury to decide the whether the frequency of the occurrences of the 12 linking features, on an individual and aggregate basis, support Dr. Leonard's opinion.

### 3. *Dr. Leonard's methodology satisfies Daubert.*

The methodology employed by Dr. Leonard is based in peer-reviewed literature and academic scholarship.[12] In reading Dr. Eggington's one-sided critique of Dr. Leonard's methodology one would be left with the impression, albeit incorrect, that the "general forensic linguistic field has serious problems with the scientific reliability and validity of the forensic stylistics approach used by Dr. Leonard." Ex. 11, Eggington Rpt. ¶ 20.[13] However, at his deposition Dr. Eggington conceded that his report only discusses one side of the academic scholarship and debate on this issue, and that there is a robust debate among academics regarding best practices for authorial attribution. (Ex. 12 at 140:21—143:18.) But a "debate in the scientific community . . . is not a basis for exclusion." *In re Chantix (Varenicline) Products Liab. Litig.*, 889 F. Supp. 2d 1272, 1288 (N.D. Ala. 2012). Moreover, as discussed above, the critique of Dr. Leonard's

---

[11] It is difficult to conceive how Dr. Eggington's testimony could aid the jury. As is his *modus operandi*, he did not do any evaluation of any of the documents Dr. Wright now claims are written by imposters. Ex. 12, Eggington Dep. 21:14—21, 24:9—25:5, 60:10-18. Indeed, he struggled to come up with what would be an acceptable methodology to do so. *Id.* at 77:12-18, 135:10-21, 139:5-16, 191:3—192:12.

[12] *See generally* WILLIAM LABOV, *SOCIOLINGUISTIC PATTERNS,* University of Pennsylvania Press (1973); GERALD MCMENAMIN, *FORENSIC STYLISTICS* (1993); Gerald McMenamin, Style Markers in Authorship Studies, 8 Forensic Linguistics 93 (2001); GERALD MCMENAMIN, *FORENSIC LINGUISTICS: ADVANCES IN FORENSIC STYLISTIC* (2002); COULTHARD ET AL., *INTRODUCTION TO FORENSIC LINGUISTICS* (2d ed. 2016); Robert Leonard, *Forensic Linguistics, in* HANDBOOK OF BEHAVIORAL CRIMINOLOGY: CONTEMPORARY STRATEGIES AND ISSUES (Van Hasselt and Bourke, eds., 2017); Robert Leonard et al., *Forensic Linguistics: Applying the Science of Linguistics to Issues of the Law,* 45 HOFSTRA L. REV. 881 (2017); Ainsworth and Juola, *Who Wrote This?: Modern Forensic Authorship Analysis as a Model for Valid Forensic Science.* 96 WASH. L. REV. 1159 (2019).

[13] In support of this contention, Dr. Eggington cites to an internet blog comment from an individual claiming to be Marcel Matley. *Id.* ¶ 19. Putting aside the lack of scholarly citation, incredulously, Dr. Eggington admitted at his deposition that he does not know Mr. Matley, does not know Mr. Matley's profession, and does not even know whether Mr. Matley is a forensic linguist. Ex. 12, Eggington Dep., at 107:17—112:20. Notably, a brief Google search would have revealed to Dr. Eggington that Mr. Matley is a professed handwriting examiner—not a trained forensic linguist. *See https://handwritingexpertconsultant.com/.*

methodology by Drs. Chaski and Butters, relied upon by Dr. Eggington, has previously been rejected by courts who found Dr. Leonard's forensic stylistics methodology sufficiently reliable to satisfy *Daubert.*

Dr. Leonard's analysis is also sufficiently reliable because it is completely transparent and replicable. (*See* Ex. 10, at 116:25—117:12; Ex. 12 at 55:19—56:4.) Tellingly, while Dr. Eggington criticizes Dr. Leonard's methodology, he himself was able to reproduce Dr. Leonard's analysis using the same documents and did not reach any conclusions that Dr. Leonard erred in the identification and tabulation of any of the linking features.[14] (Ex. 12 at 241:16—242:20, 243:3—244:21.)

Defendant relies on Dr. Egginton's analysis of the fifth linking feature (ALL CAPS for emphasis) as proof that Dr. Leonard's methodology is flawed. Instead, Dr. Eggington simply disagrees with Dr. Leonard's opinion that the linking feature's probative value is tied to the fact that Defendant in the reviewed data set always uses all caps for emphasis (and never uses any other formatting feature for emphasis in that set), rather than the total number of times that all caps are used. (Ex. 12 at 246:22—247:9.) Dr. Leonard's methodology is not rendered flawed merely because Dr. Eggington believes it supports a different hypothesis than the one reached by Dr. Leonard. *In re Chantix*, 889 F. Supp. 2d at n.9 (noting "the fact that plaintiffs' experts simply disagree with defendant's experts is not a valid basis to exclude plaintiffs' experts.").

### 4. Dr. Leonard's testimony does not violate Rule 403.

Ironically, Defendant argues (at 29) that Dr. Leonard's opinion lacks "probative value." Of course, the relevance of his analysis is occasioned by Dr. Wright's unsubstantiated claim that emails that he produced and purport to be from him, were actually written by unknown "others" who he claims "hacked" his devices. Conveniently, Dr. Wright employs this excuse to explain away documents that evidence his business partnership with Dave Kleiman. *See e.g.,* DEFAUS_00550141 ("David Kleiman was my best friend and business partner."); DEFAUS_00119570 ("We did partner ;) . . . I will have to see what I can dig up. The old Bitcoin logo we did is no longer used."); KLEIMAN_00561744 ("The trust Dave setup should have around 300,000"),

---

[14] Moreover, despite having complete access to Defendant and a limitless supply of his other known writings upon which to test Dr. Leonard's methodology, Dr. Eggington did not come forward with any other known writing of Defendant that would disrupt the consistent pattern of linking features identified by Dr. Leonard. To the extent any existed, Defendant would have been obligated to disclose this information in Dr. Eggingtons's rebuttal report. Fed. R. Civ. P. 26(a)(2)(B).

attached collectively hereto as Ex. 15.   Dr. Leonard's opinions are highly relevant to debunking these claims.

Dr. Leonard's use of forensic linguistics to identify patterns of linking features between the questioned and know writings, generally undetectable by untrained lay person, will be of substantial assistance to the jury. Defendant's remaining purported concerns can be addressed through their own rebuttal expert or rigorous cross-examination of Dr. Leonard. *See Dutcher*, 2019 WL 181353 at *1; *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003) (holding that challenges to alleged "flaws in generally reliable scientific evidence is precisely the role of cross-examination.").

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's motion to exclude testimony of Gordon Klein, Dr. Matthew Edman, Andreas Antonopoulos, Stefan Boedeker, and Dr. Robert Leonard should be denied.

Dated: May 22, 2020                           Respectfully submitted,

*/s/ Andrew S. Brenner*
Andrew S. Brenner, Esq.
Florida Bar No. 978663
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

Velvel (Devin) Freedman, Esq.
Florida Bar No. 99762
**ROCHE CYRULNIK FREEDMAN LLP**
200 S. Biscayne Blvd, Suite 5500
Miami, Florida  33131
Telephone: (305) 357-3861
vel@rcfllp.com
nbermond@rcfllp.com

Kyle W. Roche, Esq.
Joseph M. Delich, Esq.
*Admitted Pro Hac Vice*
**ROCHE CYRULNIK FREEDMAN LLP**
99 Park Avenue, Suite 1910
New York City, NY 10016
kyle@rcfllp.com

jdelich@rcfllp.com

*Counsel to Plaintiff Ira Kleiman as Personal*
*Representative of the Estate of David Kleiman*
*and W&K Info Defense Research, LLC*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 22, 2020 a true and correct copy of the foregoing was

filed under Seal with CM/ECF, and served by E-mail to all counsel of record.


*s/ Andrew S. Brenner*
ANDREW S. BRENNER

28