1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2
           CASE NO.:  9:18-cv-80176-BB/BR
3

4    IRA KLEIMAN, as the personal representative
     of the Estate of David Kleiman, and W&K Info
5    Defense Research, LLC,

6
              Plaintiffs,
7
              -vs-
8
     CRAIG WRIGHT,
9
              Defendant.
10   _____/

11
                  DEPOSITION OF GORDON KLEIN
12

13
                  Thursday, April 30, 2020
14                11:04 a.m. - 7:33 p.m.
           Deposition was conducted remotely
15                via video conference

16

17

18

19

20

21

22
              Stenographically Reported By:
23               LAURIE YANNACCONE, FPR
              Florida Professional Reporter
24

25

Page 2

```
 1                    APPEARANCES
 2   On Behalf of the Plaintiffs:
 3        BOIES SCHILLER FLEXNER, LLP
          44 Montgomery Street
 4        Floor 41
          San Francisco, California 94104
 5        415-293-6800
          Mpritt@bsfllp.com
 6        Aholtzman@bsfllp.com
          BY:  MAXWELL PRITT, ESQUIRE
 7        BY:  ALEXANDER HOLTZMAN, ESQUIRE
 8
 9   On Behalf of the Defendant:
10        RIVERO MESTRE, LLP
          2525 Ponce de Leon Boulevard
11        Suite 1000
          Coral Gables, Florida 33134
12        305-445-2500
          Amcgovern@riveromestre.com
13        BY:  AMANDA McGOVERN, ESQUIRE
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX OF PROCEEDINGS
 2   Deposition of GORDON KLEIN              Page
 3
     Direct Examination by Ms. McGovern         5
 4
     Certificate of Oath                      272
 5   Certificate of Reporter                  273
     Witness Review Letter                    274
 6   Errata Sheet                             275
 7
     PLAINTIFF'S EXHIBITS
 8
     Number    Description                   Page
 9
       1    Gordon Klein's Expert Report      15
10
       2    Engagement Letter                 98
11
       3    Billing Statement                130
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1        THE COURT REPORTER:  The attorneys
 2   participating in this proceeding acknowledge that I
 3   am not physically present in the proceeding room
 4   and that I will be reporting this proceeding
 5   remotely.  They further acknowledge that, in lieu
 6   of an oath administered in person, the witness will
 7   verbally declare their testimony itself in this
 8   matter is under penalty of perjure.  The parties
 9   and their counsel consent to this arrangement and
10   waive any objections to this manner of reporting.
11        Please indicate your agreement by stating your
12   name and your agreement on the record.
13        MS. McGOVERN:  This is Amanda McGovern from
14   Rivero Mestre on behalf of the defendant, Dr. Craig
15   Steven Wright, and we agree.
16        MR. PRITT:  This is Maxwell Pritt from Boises
17   Schiller Flexner on behalf of the plaintiffs and
18   the witness, Mr. Klein, and we agree.
19        THE COURT REPORTER:  I'm going to go ahead and
20   swear you in now, okay, Mr. Klein?
21        MS. McGOVERN:  May I just ask, who is Mr.
22   Holtzman?
23        MR. PRITT:  He is also from Boies Schiller.
24        MS. McGOVERN:  Oh, okay.  Sorry.
25        Hi, Mr. Holtzman.
```

Page 5

```
 1   Nice to meet you.
 2        MR. HOLTZMAN:  Hi.
 3   Nice to meet you.
 4        THE COURT REPORTER:  Will the witness please
 5   say and spell your first and last name for the
 6   record.
 7        THE WITNESS:  Yes, my name is Gordon Klein,
 8   spelled, G-O-R-D-O-N, Klein, K-L-E-I-N.
 9        THE COURT REPORTER:  Thank you.
10        Will the witness now please repeat the
11   following declaration for the record:  "I declare
12   my testimony in this matter is under penalty of
13   perjury."
14        THE WITNESS:  I declare that my testimony in
15   this matter is under penalty of perjury.
16        THE COURT REPORTER:  Thank you.
17        The witness has declared his testimony in this
18   matter is under penalty of perjury, and the parties
19   have stated their agreement for the record.
20        You may now proceed.
21              DIRECT EXAMINATION
22   BY MS. McGOVERN:
23   Q.   Good morning, Mr. Klein.
24   A.   Ms. McGovern, good morning as well.
25   Q.   How are you today?
```

Page 6

1    A.   I think we're all as well as we can be.
2    Q.   Yes.
3         As I stated earlier my name is Amanda
4    McGovern.  I am with the law firm of Rivero Mestre and
5    we represent the defendant in this case, Dr. Craig
6    Steven Wright.
7         We are taking this deposition, as you see, by
8    Zoom and because of that I'd like to just make sure that
9    we're all on the same page in terms of the best way to
10   proceed efficiently in this deposition.
11        First --
12   A.   Just a quick point of order, just so you know,
13   your screen is substantially frozen.  I don't see your
14   lips moving, for example.
15   Q.   Okay.  Can you hear me?
16   A.   I do hear you, however, but I just wanted you
17   to know that it's purely audio at this juncture.
18   Q.   Okay.  If I ever interrupt you in the middle
19   of your answer, I apologize for that, I don't mean to do
20   it, it's because we have a bit of a delay and as you
21   said -- as you just said, sometimes we freeze our faces
22   through the Internet and don't mean to.  So if I ever
23   interrupt you, please just tell me you're not finished
24   with your answer and I will immediately stop and allow
25   you to finish.  Okay?

Page 7

1    A.   Very good.
2    Q.   If my face freezes in the video at any point
3    in time during this video, but you can still hear me,
4    I'd like to just proceed with the deposition, if you
5    don't mind so that we can finish it.  Sometimes lawyers
6    don't even go on the camera when they're asking
7    questions.  I've chosen to be on the camera, because I
8    want you to be able to see me, but I don't want that
9    frozen-face situation to prevent us from proceeding if
10   you can otherwise hear me.  Okay?
11   A.   I understand.
12   Q.   Are you okay with that, Mr. Klein?
13   A.   I am, at least thus far I am.  I don't see
14   this posing any issues.  I also just wanted to let you
15   know that in the event there are any issues with
16   document transmission or document presentation, but
17   we'll get to that if such a problem arises, for the
18   moment let's go full speed ahead.
19   Q.   We have no rush in finishing your deposition
20   so I'm going to try and speak slowly, I'm not doing it
21   on purpose.  I'm going to try and speak slowly for the
22   court reporter so that my questions are clear and I'm
23   going to speak slowly for you so that my questions are
24   clear, because we're not all in the same room realtime
25   and I found in these depositions it makes it difficult

Page 8

1    when we all start talking very quickly.  Is that okay?
2    A.   Yes, and I will probably have a longer pause
3    for similar reasons of communication.
4    Q.   If at any time, Mr. Klein, you don't
5    understand my question, if you think I'm asking you to
6    guess, I'm not.  If you don't understand my question I
7    would ask you to please ask me to rephrase it or repeat
8    it, I will not take it personally.  I want my question
9    to be crystal clear and I only want you to answer the
10   question based upon your personal knowledge or the
11   purpose for you being deposed today, which is your
12   proposed expert testimony.  Okay?
13   A.   Yes.
14   Q.   Mr. Klein, could you please state your full
15   name for the record and spell your last name.
16   A.   My full name is Gordon Klein, I spell my last
17   name, K-L-E-I-N.
18   Q.   What your business address, sir?
19   A.   One of my business addresses is the location
20   from which I am communicating, which is my home office,
21   that address is 24724 Calle, spelled, C-A-L-L-E, new
22   word, Conejo, spelled, C-O-N-E-J-O, in the town of
23   Calabasas, California, I will spell Calabasas,
24   C-A-L-A-B-A-S-A-S, ZIP code 91302.  Additionally, I have
25   an office at the University of California in Los Angeles

Page 9

1    commonly called, UCLA, that address would be Gordon
2    Klein, UCLA, Anderson School of Management, Room D-521,
3    Los Angeles, California 90095.
4    Q.   Mr. Klein, how long have you lived in
5    California?
6    A.   Approximately four years.
7    Q.   You're a lawyer, correct?
8    A.   I'm a nonpracticing lawyer for the bulk of
9    that 40-year period, but yes, I'm an inactive member of
10   the California Bar.
11   Q.   You've been a lawyer for about 40 years since
12   1980, correct?
13   A.   I've been a member of the California Bar, but
14   I've not been a practicing lawyer other than the first
15   year or two of that 40-year duration.
16   Q.   Do you consider yourself -- strike that.
17        Do you consider that you are not a lawyer,
18   because you are an inactive member of the California Bar
19   or do you consider yourself a lawyer?
20        MR. PRITT:  Objection.  Form.
21        THE WITNESS:  I believe that I'm a lawyer, but
22   that might in the eyes of a layperson have some
23   meaning that I'm an actively practicing lawyer so I
24   thought it merited the clarification that I am a
25   nonpracticing lawyer and have not been for many

Page 10

1      decades.
2  BY MS. McGOVERN:
3      Q.   Okay.  But you are a lawyer?
4      A.   Yes.
5      Q.   You're initial training in your profession was
6  as a lawyer, right?
7           MR. PRITT:  Objection.  Form.
8           THE WITNESS:  Well, I have multiple
9       professions so I think the answer is likely, no.
10  BY MS. McGOVERN:
11      Q.   What was your first thing that you did after
12  you graduated from college?
13      A.   I worked as a professional musician.
14      Q.   How long were you a musician?
15      A.   I've been a paid professional musician since I
16  was age 12 and upon graduating college I worked
17  full-time at a summer resort playing in the orchestra,
18  as well as touring with some Broadway shows in the
19  orchestra as a professional keyboard musician.
20      Q.   What did you do after that?
21      A.   I turned to professional activities.  I also
22  passed the Certified Public Accountant exam passing all
23  four of its parts at one sitting.  I also then, several
24  months later, attended law school while continuing to
25  work certain weekends and summers as a professional

Page 11

1  musician.
2      Q.   And you went to law school and graduated?
3      A.   Absolutely.
4      Q.   And what did you do when you graduated from
5  law school?
6      A.   I got married.  I passed the bar exam in the
7  state of California and I started a business in the
8  financial publishing domain, concurrent with commencing
9  work as a legal associate at the prominent financial --
10  well, financially oriented or corporate oriented law
11  firm in Beverly Hills, California.
12      Q.   And what was the name of that firm?
13      A.   Ervin, Cohen and Jessup, Jessup is spelled,
14  J-E-S-S-U-P.
15      Q.   And with whom did you primarily work while you
16  were working at that prominent Beverly Hills law firm?
17      A.   Are you asking for clients?  Are you asking
18  for lawyers?
19      Q.   Lawyers.
20      A.   It's been nearly 40 years, I can remember
21  individuals by first name.  I did work with Mr. Jessup
22  of the three named partners.  I don't know that I am
23  going to remember anyone's surname 40 years later.
24      Q.   Okay.  You taught as a professor in California
25  as well, correct?

Page 12

1      A.   Can I hear that question again, please?
2      Q.   You taught as a law professor in California as
3  well; is that right?
4      A.   I have taught at UCLA Law School, that is
5  correct, as well as Loyola Law School in the areas of
6  financial analysis and taxation principally, yes.
7      Q.   So you consider yourself a lawyer and you were
8  a law professor at UCLA; is that right?
9           MR. PRITT:  Objection.  Form.
10           THE WITNESS:  There's an ambiguity that I was
11       a law professor, I currently teach an undergraduate
12       class in general business law --
13  BY MS. McGOVERN:
14      Q.   Okay.
15      A.   -- that, however, is not my only endeavor at
16  UCLA.  I principally teach in the areas of financial
17  analysis, those courses happen to have been at least in
18  part roughly 20 years ago in a law school environment,
19  but the primary focus was on accounting, financial
20  analysis skills, entrepreneurship skills.
21      Q.   But going back to my original question, I
22  appreciate you elaborating on that, that's helpful.  But
23  going to back to my original question, I just want to
24  make sure I understand two things:
25           Number one, since 1980, when you were

Page 13

1  admitted, I believe to the California Bar, you have
2  considered yourself a lawyer, correct?
3           MR. PRITT:  Objection.  Form.
4           THE WITNESS:  I have not practiced law so to
5       the extent that people have asked me to perform the
6       duties of a lawyer, I have always readily told them
7       that I am not an active practitioner and I'm not in
8       a position then or now to render legal advice, but
9       yes, I'm somebody who has legal training.  I'm
10       somebody who has some legal knowledge, but I have
11       not been actively practicing lawyer for the better
12       part of 40 years.
13  BY MS. McGOVERN:
14      Q.   Well, as a law professor don't you have to
15  have more than just training?  You taught law.
16           So I guess my question, I'm not trying to
17  trick you, I'm just saying for 40 years you've been a
18  lawyer; now, you're qualifying that by saying, not a
19  practicing lawyer.  But what I want to know is whether
20  you consider yourself for the last 40 years having
21  taught law, practiced law a lawyer?
22           MR. PRITT:  Objection.  Form.
23           THE WITNESS:  I'm sorry, I missed the last
24       couple of words you said.  Please.
25           MS. McGOVERN:  Could you read the question

Page 14

1    back, please.
2        (A portion of the record was read by the court
3        reporter.)
4    BY MS. McGOVERN:
5        Q.   Let me say it again.
6             Mr. Klein, do you consider yourself a lawyer?
7        A.   I consider -- a member of the California Bar
8    and therefore I consider myself a lawyer, but not a
9    practicing lawyer, nor do I present myself to be a
10   practicing lawyer, nor am I here in a capacity to render
11   a legal opinion, as my expert report explicitly states.
12       Q.   Mr. Klein, I understand that that is the
13   position that you're taking, but it is not -- that you
14   are not here to render a legal opinion, but that's not
15   my question.
16            To be clear, I just want to understand whether
17   you consider yourself a lawyer, understanding that
18   you're not practicing, but whether you, Mr. Klein,
19   consider himself to be a lawyer?
20            MR. PRITT:   Objection.  Form.
21            THE WITNESS:   I consider myself to be a lawyer
22       in the broadest sense of the word, but not actively
23       practicing lawyer.
24   BY MS. McGOVERN:
25       Q.   How long did you teach law?  How long were you

Page 15

1    a professor of law in California?
2        A.   Well, that's a somewhat vague question,
3    because I've taught some business law classes within the
4    school management.  In addition, to having been teaching
5    under the auspice of a former law school so I'm not sure
6    what is the scope of your question.
7        Q.   Okay.  Let me clarify, let's include it all.
8    How long have you taught law whether that legal class is
9    in a management school or a law school?
10       A.   I am not certain when I first taught my first
11   class that touched upon law.  I don't have my CV in
12   front of me, it would bear the date.  I take that back,
13   is it all right if I take a look at my CV?
14       Q.   Of course.
15            Please feel free, Mr. Klein, to refer to both
16   your report, the exhibits to your report, including your
17   CV.  In fact, if you'd like, we can go ahead right now
18   and mark your expert report as Exhibit 1 to your
19   deposition.
20       (Thereupon, Gordon Klein's Expert Report, was
21       marked as Exhibit Number 1 for identification.)
22            THE WITNESS:   Please feel free to do so.  I've
23       got your question still in my head.
24   BY MS. McGOVERN:
25       Q.   I'm going to do something really quickly,

Page 16

1    here, and I'm going to put this on the screen.
2            I apologize for that.  I have so many tabs
3    open in my computer right now, I don't know if you're
4    suffering from the same thing, during these difficult
5    times, but multitasking electronically is on steroids at
6    this point.
7            Mr. Klein, you stated that you were referring
8    to your expert report or your CV, which I believe it was
9    attached to your expert report.  Let me just go ahead
10   for purposes of your deposition and ask the court
11   reporter to mark as Exhibit 1 the expert report of
12   Gordon Klein dated April 10, 2020.
13            Mr. Klein, I believe that your curriculum
14   vitae is attached as Appendix A to your expert report
15   that has been marked as Exhibit 1 to your deposition.
16   I'm scrolling through the expert report and I have a
17   question for you about it.  Is this the expert report
18   that you prepared in this case?  It's quite long.  I can
19   try to scroll down more quickly or I can just keep
20   scrolling page by page, whatever you feel more
21   comfortable with.
22       A.   You can speed it up a bit.
23       Q.   Okay.  Have you had a chance to review
24   Exhibit 1 to your deposition, Mr. Klein?
25       A.   Well, Exhibit 1 I think included those

Page 17

1    appendices, and you haven't completed the scrolling.
2        Q.   Have you had a chance to review Exhibit 1 to
3    your deposition, Mr. Klein?
4        A.   I have, and just a note for the record, my
5    screen is not a laptop beneath me, it's a large roughly
6    81" flat screen up against the wall with my desk being
7    in the middle of the room so to the extent that I avert
8    my eyes upward I mean no disrespect by that, it's simply
9    the physical placement in the room.
10            The direct answer to your question is yes,
11   I've now had a chance to review that which you scrolled
12   through, and it does appear to be my expert report in
13   its totality.
14       Q.   So going back to the question that I asked
15   before we marked your report as Exhibit 1, my question I
16   believe was:  How long have you been teaching law,
17   whether the law class that you have taught or teaching
18   is part of the curriculum of a law school or in another
19   school which includes that class?
20            MR. PRITT:   Objection.  Form.
21            THE WITNESS:   Well, at the law school, as my
22       CV indicates, I was principally teaching accounting
23       principles and financial analysis issues, which
24       happen to be in a law school, but there were many
25       days where there were law or legal terms didn't

Page 18

1   even necessarily arise.  So I guess it's a bit of a
2   question whether I was literally teaching law, but
3   without a doubt I was teaching within a law school,
4   in a law school curriculum.
5        I believe, best I can recall, the first time I
6   taught such a class was in 1987.
7   BY MS. McGOVERN:
8        Q.   And how many classes -- how many law classes
9   do you believe that you've taught since 1987?
10       MR. PRITT:  Objection.  Form.
11       THE WITNESS:  Well, again, if I adopt the
12            definition that anything taught at a law school is
13            a law class, I was teaching at UCLA's law school I
14            think in the early phase one class per year and
15            then we added the class called, Financial Analysis
16            is sort of a more advanced financial or accounting
17            course, and I think I was then teaching two.  I
18            also, for a brief period, when there was a absence
19            of a faculty member at Loyola Law School in their
20            LLM program I taught two classes there for one
21            semester, possibly two semesters -- 1987 it was
22            sometime thereafter.
23   BY MS. McGOVERN:
24       Q.   Okay.  So you've been a lawyer since 1980 and
25   you've been teaching law, in addition, to being a lawyer

Page 19

1   since 1987.  Are you still teaching law classes today?
2   Are you currently teaching law classes today?
3        MR. PRITT:  Objection.  Form.
4        THE WITNESS:  I am not currently teaching at a
5            law school, no.
6   BY MS. McGOVERN:
7        Q.   Mr. Klein, have you, in fact, testified in
8   lawsuits or in depositions or at trial other than
9   this -- in this matter?
10       MR. PRITT:  Objection.  Form.
11       THE WITNESS:  Yes.
12   BY MS. McGOVERN:
13       Q.   Okay.  How many times have you testified in a
14   lawsuit?
15       A.   Are you restricting that to at trial?
16       Q.   Yes.
17            How many times have you testified in a lawsuit
18   at trial?
19       A.   Approximately 40 times, plus or minus.
20       Q.   Have any of those times been in federal
21   district court of the United States?
22       A.   Yes.
23       Q.   How many times have you testified in federal
24   district court in the U.S.?
25       A.   I'm not sure that I could give you a

Page 20

1   meaningful count as I look back, I haven't mentally
2   categorized things in that fashion.
3        Q.   Okay.  Is it more than one?
4        A.   Yes.
5        Q.   Okay.  Have you ever testified as an expert in
6   a lawsuit in federal district court in the state of
7   Florida?
8        A.   I was deposed in a matter that I believe was a
9   Florida matter, I don't recall if it was federal or
10   state, because we never actually got to trial, the case
11   settled ahead of time.  So I have entered deposition
12   testimony in what likely was a federal matter, because
13   it involved, among other parties, an international bank
14   headquartered in Germany, but that case, as I said, did
15   not actually go to trial.
16       Q.   And when was that case?
17       A.   Approximately seven to nine years ago.
18       Q.   What was the name of the bank?
19       A.   The name of the bank -- there were two actions
20   and I believe they were joined together, the principle
21   caption that I would recall was Deutsche Bank, obviously
22   out of Germany, and Deutsche Bank was the plaintiff
23   suing the international accountancy firm, Deloitte.
24   There was a second financial institution, which I didn't
25   particularly focus on, but I believe -- I believe that

Page 21

1   in some fashion the cases were consolidated together,
2   and it involved I think an enterprise called Ocale,
3   O-C-A-L-E, which I understand to be a city in Florida, I
4   believe it was Ocale Funding, as a second matter, I
5   believe they were the plaintiff suing Deloitte again, to
6   the best of my recollection, which is somewhat vague.
7   The fact that it was in Florida is not vague, but the
8   precise posture of the parties, plus or minus, eight
9   years ago is vague in my mind.
10       Q.   So that was approximately 2012; is that right?
11       A.   Well, it's a very rough approximation, but the
12   answer is yes.
13       Q.   What was the scope of your testimony?
14       A.   I was principally opining about rules
15   governing revenue recognition associated with the
16   transfer of accounts receivable involving two entities
17   that had co-conspired or conspired to commit financial
18   fraud of a very serious magnitude.
19       Q.   So is it fair to say that your testimony
20   involved accounting issues?
21       MR. PRITT:  Objection.  Form.
22   BY MS. McGOVERN:
23       Q.   I'm sorry, I didn't hear the answer.
24       A.   Yes.
25       Q.   Did your testimony in that case involve in any

Page 34

```
1    Q.   Your testimony was not this constitutes a
2  fraudulent transfer under the law of California, was it?
3    A.   Well, the very simple answer is no, because it
4  involved international transactions outside the United
5  States, so no.
6    Q.   Your testimony in that case was not the legal
7  conclusion as to whether there was a fraudulent
8  transfer, was it?
9    A.   I don't recall the case well enough to tell
10 you precisely what I said and whether it would elevate
11 to the standard you're speaking about.  I could
12 speculate that it was not a legal conclusion, but rather
13 it was information that would lead to a legal conclusion
14 and facilitate the trier of fact, but that's simply my
15 general and customary understanding of the litigation
16 process involving financial matters, it doesn't come
17 from a specific recollection I have about a matter that
18 was easily more than five years ago.
19   Q.   You have matters on Appendix B that were more
20 than five years, don't you, Mr. Klein?
21   A.   Well, I have --
22        MS. McGOVERN:  Before you answer that
23   question, can I say something before I forget?  If
24   you ever want to take a break, not in the middle
25   question, please, but if you ever want to take a
```

Page 35

```
1    break during this deposition, please just say it
2    and we will take a break.  I actually find these
3    Zoom depositions can be a bit exhausting for
4    everybody, the court reporter and everyone.  So I'm
5    just going to keep going, but that doesn't mean
6    that I think that you should keep going.  If you
7    would like to take a break now or -- it's been
8    about an hour, we can come back in five minutes I'm
9    happy to do that.
10        THE WITNESS:  As long as you don't view it
11   that there is a question pending, which I'm happy
12   to answer, I welcome a break.
13        MS. McGOVERN:  I do not view it that way and
14   would never view it that way, Mr. Klein, with you.
15        Let's take a break for five minutes and we can
16   come back around 12 -- let's just do ten minutes,
17   come back at 12:05, if that is okay?
18        THE WITNESS:  It is.
19        Thank you.
20        (There was a discussion off of the record.)
21 BY MS. McGOVERN:
22   Q.   Mr. Klein, I believe before the break I asked
23 you --
24        MS. McGOVERN:  Actually, I'm going to ask the
25   court reporter to read the question back before we
```

Page 36

```
1    took the break.
2        (A portion of the record was read by the court
3        reporter.)
4        THE WITNESS:  I don't believe that that was my
5    full answer.
6  BY MS. McGOVERN:
7    Q.   It was not.  It was not.
8    A.   Thank you for acknowledging that.
9        May I give the comprehensive answer now, if
10 that is what you would like me to do.
11   Q.   Yes, please.
12   A.   When you say, I have matters that are more
13 than five years ago, I think that that's vague, because
14 there's a difference between the filing date of the case
15 and the final date at which I had involvement with the
16 matter and some of them such as, for example, the
17 bankruptcy of General Motors was quite clearly a 2009
18 matter, I don't know when it was filed, but I believe
19 they filed for bankruptcy or around June 2009 and that
20 case, by way of filing date, was certainly approximately
21 or almost 11 years ago, but in terms of my involvement
22 it was within the most recent four years and so your
23 question when you characterize things as being, you
24 know, clearly more than five years ago or more than five
25 years ago I need a clarification, what was more than
```

Page 37

```
1  five years ago?  Filing date?  My participation?  My
2  rendition of testimony at trial or deposition?  It's a
3  vague in my mind given those alternative interpretations
4  of your phrase.
5    Q.   Mr. Klein, in the matter that we were
6  discussing before the break, which was I believe the
7  matter that you defined as your client being Ho, H-O, I
8  believe you testified in this deposition that it
9  involved international transactions; is that correct?
10   A.   Correct.
11   Q.   What law governed the alleged fraudulent
12 transfer at issue in that case?
13   A.   It is too long ago for me to recall what law
14 was at issue.  I simply remember it involved
15 inappropriate or allegedly inappropriate movements of
16 assets between and among Mr. Ho and various entities he
17 owned around the world.  There could have been multiple
18 laws implicated, I -- I don't -- I simply don't know.  I
19 was speaking about general principles of fraudulent
20 conveyance and economic consideration underlying the
21 performance of contracts.
22   Q.   So is it fair to say that your testimony in
23 that case did not involve an expert opinion regarding
24 that particular jurisdiction's law on fraudulent
25 transfer?
```

Page 38

```
1         MR. PRITT:  Objection.  Form.
2         THE WITNESS:  Well, you said that "particular
3    jurisdiction."  I don't know what you mean by that
4    "particular jurisdiction."
5  BY MS. McGOVERN:
6     Q.   Well, the jurisdiction involved in the
7  fraudulent transfer.
8         MR. PRITT:  Objection.  Form.
9         THE WITNESS:  Well, again, these were
10    transfers made among one or more companies in Asia,
11    one or more companies in Europe and probably one or
12    more companies in the United States, although I
13    don't have that detail of recollection and so when
14    you say that "particular jurisdiction" there were
15    multiple countries involved.
16  BY MS. McGOVERN:
17     Q.   Did you research the law and opine on any of
18  the law in any of those jurisdictions?
19     A.   It's too long ago for me to recall if I was
20  shown the law in one or more such jurisdictions I just
21  don't remember, now that it's well more than five years.
22     Q.   So that involves the research aspect of it.
23  Let me make my question more specific.  Do you recall
24  sitting here today whether you rendered expert testimony
25  in that case on the law of any of the jurisdictions that
```

Page 39

```
1  you referenced?
2         MR. PRITT:  Objection.  Form.
3         THE WITNESS:  I do not, as I sit here today,
4    remember, for example, putting a statute in front
5    of the court and rendering a specific opinion on a
6    statute or a regulation, I am quite confident I do
7    did not do that, but I believe it's often
8    instructive in a litigation context to hear from
9    somebody's familiar with the behavior and operation
10    of entities and ventures, somebody who can analyze
11    accounting information and communications
12    associated with business practices.  I am, in
13    addition, to being, as like you like to
14    characterize me, a lawyer, who has not practiced
15    for nearly 40 years, during that 40 years I have
16    earned an income from a number of entrepreneurial
17    endeavors and including, as I spoke before, the
18    interpretation of accounting information, and I've
19    taught people to interpret communications in a
20    business context, and so I believe I brought those
21    skills to bear in that matter as I brought them to
22    bear in many matters.  I don't have a specific
23    recollection of speaking to a particular statute of
24    that particular case, because again, I am not an
25    expert on law, I believe I am an expert on
```

Page 40

```
1    entrepreneurship, business formation and
2    development and conduct and an expert whose
3    qualified many times on accounting and valuation.
4  BY MS. McGOVERN:
5     Q.   Does fraudulent transfer involve an element of
6  intent?
7     A.   Does it involve an element of intent?
8     Q.   Yes.
9         MR. PRITT:  Objection.  Form.
10         THE WITNESS:  I believe that calls for a legal
11    opinion, but knowledge as an accountant of that has
12    supplemented by knowledge of having attended law
13    school is that fraud is an intentional action
14    involving state of mind, and therefore I think
15    you're correct.
16  BY MS. McGOVERN:
17     Q.   Do professors at UCLA teach law if they are
18  not lawyers?
19         MR. PRITT:  Objection.
20  MS. McGOVERN:
21     Q.   Do you know?
22     A.   Yes, I can name at least one, his name a Paul
23  Habibi, H-A-B-I-B-I.  Paul is currently teaching the
24  course I used to teach.  Paul has no law degree
25  whatsoever, never attended a law school.  He's a
```

Page 41

```
1  wonderful gentleman who is a CPA and an MBA, but yes, he
2  teaches the course I taught with a complete absence of
3  any legal training whatsoever other his real world
4  experiences.
5     Q.   What course is that, Mr. Klein?
6     A.   As I understand from Paul he's teaching the
7  same class that I used to teach, it was known roughly 20
8  years ago as Accounting for Lawyers, it's name may have
9  changed slightly, but it's a course which is accounting
10  and/or financial analysis in the law.
11     Q.   And where is that course taught?
12     A.   UCLA Law School.
13     Q.   Do you know of any other law professors who
14  teach law at the UCLA Law School who do not have a law
15  degree?
16     A.   Yes.
17     Q.   Who?
18     A.   The gentleman who had taken over teaching the
19  class before Mr. Habibi, who I just spoke to,
20  immediately after I withdrew from teaching at the law
21  school there was a gentleman whose background was as a
22  chief financial officer, and he been an audit partner at
23  the firm then known as Pricewaterhouse and now known as
24  PricewaterhouseCoopers.  His name escapes me, because
25  it's roughly 20 years ago, but I remember his background
```

Page 78

1     Q.   What was your expert -- what was the expert
2 opinion that you offered at trial in that case?  And let
3 me clarify, I'd like you to answer the question not with
4 respect to what you thought or what was in your mind.
5 My question specifically is:  What was your expert
6 opinion offered at trial in that case specifically?
7     A.   My expert opinion was ultimately a conclusion
8 of damages.  Those damages entailed in significant
9 measure, however, alleged legal violations.  There had
10 been an FCC investigation of the businesses and so I had
11 to assess either the historical or perspective liability
12 that would flow from that.  And there were issues of
13 penalties, contractual penalties to the extent that this
14 set of automobile dealerships violated, not only FCC
15 rules of misrepresentations to customers, but also the
16 economic impact of that, because it appeared to be that
17 there was not only misrepresentations, but they appeared
18 to adversely affect certain demographic groups,
19 principally individuals of Hispanic origin, and the
20 government appropriately came after the dealerships
21 based on that improper conduct were those of Hispanic
22 origin.
23     Q.   So other then damages, Mr. Klein, specifically
24 and I'd like all these questions, if I could preface it
25 with I'm asking for your specific expert opinion, what

Page 79

1 you opined in the case.  Other than damages, did you
2 offer in testimony at trial any other expert opinion?
3     A.   I testified about the elements each of which
4 triggered damages and then I summed those damages.
5     Q.   Did you offer any other expert opinion?  I'm
6 not asking about you testified.  I'm saying your
7 ultimate -- you understand when I say "expert opinion"
8 it is actual conclusion that you reach and offer as an
9 expert that's what I'm referring to.  Okay?
10     A.   Well, I understand that, but --
11     Q.   Do you understand that -- do you understand
12 that part of my question?
13     A.   Only in part I understand it and in part I do
14 not, because there was an aggregate damages number, and
15 then there were damages associated with particular acts
16 of misconduct or legal violations, and I don't know if
17 you simply want the global statement or the more
18 specific, which might have tied together two or three or
19 four categories.
20     Q.   So you understand, Mr. Klein -- you're a
21 lawyer, you've taught law -- you understand that damages
22 flow from liability, correct?  Sometimes they do,
23 sometimes they don't, sometimes there are no damages,
24 but without liability there are no damages.  Can we
25 agree on that?

Page 80

1          MR. PRITT:  Objection.  Form.
2          THE WITNESS:  We can agree that I'm always
3     asked to assume liability for misconduct, but
4     sometimes the damages from misconduct are
5     uncertain; for example, in that case there were
6     some investigations, which had not been concluded,
7     and so there was an element of estimation of what
8     damages would be associated with included FCC
9     investigations and I believe there's also fraud
10    upon Nissan, the franchisor, so broadly there was a
11    breach of fiduciary duty.
12 BY MS. McGOVERN:
13     Q.   That's not my question, Mr. Klein.
14          I'm asking about your opinion.  I'm simply
15 asking other than damages in the global sense did you
16 offer any expert opinion on any other issue other than
17 damages?
18          MR. PRITT:  Objection.  Form.
19          THE WITNESS:  Well, you said "in the global
20    sense."  I had a global damages number and I also
21    had a more specific damages number or set of
22    numbers, some of which involved alleged legal
23    violations.
24 BY MS. McGOVERN:
25     Q.   I understand.

Page 81

1          My question is other than damages, did you
2 offer any other expert opinion at that trial?
3          MR. PRITT:  Objection.
4 BY MS. McGOVERN:
5     Q.   In whatever form the damages were that you
6 opined on, other than a general category of damages, did
7 you offer any other expert opinion?
8          MR. PRITT:  Objection.  Form.
9          THE WITNESS:  I think there were some issues
10    principally raised on cross-examination which would
11    go to liability, I don't know if you call that an
12    opinion, because I don't believe it was part of my
13    report, but I answered questions which I believe
14    would go to liability when those questions were
15    presented.
16 BY MS. McGOVERN:
17     Q.   Did you offer expert testimony on who was
18 liable in that case from a legal perspective, who was
19 legally liable in that case?  Was that part of your
20 expert opinion?
21          MR. PRITT:  Objection.  Form.
22 BY MS. McGOVERN:
23     Q.   Pardon me?
24          MR. PRITT:  Objection.  Form?
25          THE WITNESS:  Not as to who was liable, but

Page 82

1    elements that likely were taken into account by the
2         judge with regard to liability.
3    BY MS. McGOVERN:
4         Q.   What was your expert opinion specifically?
5         A.   I was asked about the propriety of an auto
6    dealer giving cars to his family members and running it
7    through the business for tax purposes, and as an alleged
8    instructive distribution or taking from the company; and
9    I believe I was asked that question, because there were
10   somewhat similar allegations made with regard to the
11   defendant running private jet planes for their family
12   members through the company for tax purposes and
13   financial accounting purposes.  And so I spoke to
14   whether it would normally be viewed as a reasonable
15   business expense to give an automobile usage to a family
16   member and then listen to their opinions about the
17   vehicle, which might help make marketing decision or
18   purchase decisions of various models.  And that it
19   appeared to go to the issues of breach of fiduciary duty
20   whether there's a -- whether there was potentially a
21   mutual understanding that all the partners were allowed
22   to run things through the business, you did it and I did
23   it and so I answered those questions when they were put
24   forth to me.
25        Q.   That was on cross-examination?

Page 83

1         A.   Yes.
2         Q.   And was your expert opinion that you gave on
3    behalf of one of the brothers in the case on the
4    question of whether there was a breach to fiduciary
5    duty?
6         A.   I didn't conclude there was a breach of
7    fiduciary duty.  I didn't use those words.  I was asked
8    about the propriety of the conduct of -- as I perhaps am
9    doing here as an entrepreneur familiar with the
10   operation of the partnerships.
11        MS. McGOVERN:  Can you read that answer back,
12        please?
13        (A portion of the record was read by the court
14        reporter.)
15   BY MS. McGOVERN:
16        Q.   What do you mean by "perhaps here"?  I don't
17   understand in connection with that answer?
18        A.   Well, the transmission from Laurie didn't come
19   through to me.
20        THE WITNESS:  So I'm sorry, Laurie, but I'm
21        going to ask you to pose that.
22        (A portion of the record was read by the court
23        reporter.)
24   BY MS. McGOVERN:
25        Q.   Mr. Klein, let me see if I understand your

Page 84

1    answer, you please clarify and correct me if I'm wrong,
2    but I just want to understand what you're saying.
3         Is -- are you referring or analogizing your
4    testimony in Schrage to the testimony that you proposed
5    to give here as an expert opinion?
6         MR. PRITT:  Objection.  Form.
7         THE WITNESS:  They're certainly different
8         matters, but I understand in both matters there are
9         allegedly shared business -- there is an allegedly
10        shared business enterprise and there are
11        allegations about impropriety --
12        And, by the way, Laurie, I think the word I
13        used was "propriety," at least that didn't come
14        through in how I heard you read it back.
15        And so I say, as perhaps here without
16        concluding that there's a parallelism perhaps there
17        is some degree of parallelism.
18   BY MS. McGOVERN:
19        Q.   I believe the next matter that you testified
20   in this -- deposition view as expert testimony -- was
21   medical --
22        THE WITNESS:  I don't know if others are
23        having an audio problem, but that audio did not
24        come through to me.
25        THE COURT REPORTER:  Me either.

Page 85

1    BY MS. McGOVERN:
2         Q.   Mr. Klein, I believe the next matter -- can
3    you hear me?
4         MR. PRITT:  No, your connection is breaking
5         up, Amanda.
6         MS. McGOVERN:  The storm has just begun here
7         as well.  Let's keep trying our best here.
8         Can you hear me, Mr. Klein?
9         THE WITNESS:  That sentence I heard just fine.
10   BY MS. McGOVERN:
11        Q.   I'm going to the next matter, the Medicare --
12   or the "Medcare Finance LLC."  Do you see that?
13        A.   I do.
14        Q.   Did you offer an expert opinion at trial in
15   that case?
16        A.   I did.
17        Q.   What was that case about and what specific
18   expert testimony did you provide?
19        A.   My memory is a bit vague, but it involved the
20   valuation of so-called factored accounts receivable and
21   business practices associated with the reselling of
22   accounts receivable.  And I remember there were some
23   other issues that might have gone to form of entity,
24   because Mr. Nickell did business among many entities,
25   I'm not recalling precisely, but I think there were

Page 182

1  BY MS. McGOVERN:
2      Q.   Why did Dr. Browne think it was important for
3  you to understand Bitcoin in connection in rendering
4  your opinion in this case?
5           MR. PRITT:  Objection.  Form.
6           THE WITNESS:  Well, I think that would call
7      for me to speculate about her state of mind, I
8      don't know --
9  BY MS. McGOVERN:
10     Q.   Your understanding of why she thought it was
11 important in formulating your expert opinion in this
12 case for you to understand Bitcoin?
13          MR. PRITT:  Objection.  Form.
14          THE WITNESS:  Well, I think that early on I
15     didn't know what the scope of my testimony would
16     be, and given the case involving Bitcoin, I am the
17     type of person who welcomes a little bit of
18     industry background and familiarization.  And so
19     again, this was very early in the case, I think it
20     was even before I was retained and so I thought
21     it's a case about Bitcoin I'm -- first of all, I'm
22     intrigued, I think many people are intrigued about
23     the operation and nature of Bitcoin and given that
24     it was going to be a Bitcoin case I thought I would
25     like to educate myself.  I'm a curious man.

Page 183

1  BY MS. McGOVERN:
2      Q.   Do you feel that you are sufficiently educated
3  in Bitcoin and the Bitcoin blockchain to render the
4  expert opinion that you gave on April 10, 2020 in this
5  case?
6      A.   I do.
7      Q.   Why?
8      A.   Because I don't think the opinions are any
9  different or at least not materially different than if
10 the business involves something other than Bitcoin.
11     Q.   Why not?
12     A.   Because I believe my methodologies is a well
13 established methodology.  My methodology applies that
14 which is published in CPA review materials among others,
15 that is the methodology that I heard long time ago, was
16 trained in it and I believe that it's an practice
17 methodology for the determination of guideposts
18 associatively sharedness enterprise irrespective of
19 whether the product or service involved is the
20 development of a Bitcoin platform, the minding of
21 Bitcoin or the notion of intellectual property that
22 flows from it.
23     Q.   So is it your opinion, Mr. Klein, that the
24 nature of the partnership is irrelevant in determining
25 issues regarding the partnership, is that what you are

Page 184

1  saying?
2           MR. PRITT:  Objection.  Form.
3           THE WITNESS:  I don't understand your
4      question.
5  BY MS. McGOVERN:
6      Q.   Is it your opinion that the nature of the
7  partnership is irrelevant in forming your expert opinion
8  regarding issues surrounding the partnership?  Is that
9  your testimony?
10          MR. PRITT:  Objection.  Form.
11          THE WITNESS:  I'm not understanding
12     particularly or specifically what you're saying
13     about the nature of the partnership, I don't -- I
14     don't understand that.
15 BY MS. McGOVERN:
16     Q.   Well, what do you understand the nature of the
17 partnership to mean?  Do you not understand it at all or
18 do you just -- are you just unclear as to whether you
19 and I are on the same page?
20          MR. PRITT:  Objection.  Form.
21 BY MS. McGOVERN:
22     Q.   Do you know what "nature of the partnership"
23 means?
24     A.   Well, I could --
25          MR. PRITT:  Objection.  Form.

Page 185

1           THE WITNESS:  -- I could supply various
2      interpretations of that phrase, but if you're
3      talking about the nature of the business or goods
4      or services that's one question, or the nature
5      being equal, or the nature being something else,
6      but it's a very broad comment, which could, as
7      somebody who works with partnership all the time,
8      requires for me to give you, I think, a meaningful
9      answer with more specificity.
10 BY MS. McGOVERN:
11     Q.   Okay.  So let me rephrase that.  Is it your
12 opinion that the deal that you make with somebody else
13 to form a partnership or a joint venture that the
14 underlying subject matter of that deal is irrelevant in
15 determining the issues surrounding the partnership?
16          MR. PRITT:  Objection.  Form.
17          THE WITNESS:  I think that as a general matter
18     unless demonstrated with some specific fact to the
19     contrary that the nature of the good or services
20     that are involved do not matter.  Whether I'm a
21     shoe repair or dry cleaner I don't think it really
22     matters what the service is in ascertaining whether
23     there is a partnership.  I think there may will be
24     differences based on whether individuals have a
25     longstanding relationship of friendship and truth

Page 186

1    that would be one element of nature, I think that's
2    very important.  I think that the nature of
3    something being investigation stage or development
4    stage where it might require a month or at least
5    potentially more than a few months time to get up
6    and running potentially makes a difference as
7    opposed to when I say a couple months as opposed to
8    tomorrow we can all open a shoe store, let's go.  I
9    don't think that those things are irrelevant, but I
10   believe that I understand Bitcoin well enough that
11   there is a platform that yields under certain
12   circumstances when mined an asset called Bitcoin
13   and that Bitcoin is commonly used as a form of de
14   facto currency allows me to render the opinions
15   that I render.
16   BY MS. McGOVERN:
17        Q.   So let's go to the opinions that you've
18   rendered.  I'm looking here on the screen on page two
19   and it says, "Summary of Opinion" and it says that you
20   have reached the following opinion and then it has a
21   bullet point.
22             It says, "The conduct and communications by
23   and between Dave Kleiman, Wright and other parties,
24   including but not limited to communications by and
25   between Wright and those associated with him and the

Page 187

1    Kleiman family following Dave Kleiman's death,
2    communications with governmental entities,
3    communications with third parties and public statements
4    and writings by Wright, are consistent with an
5    indicative of a partnership and/or joint venture between
6    Dave Kleiman and Wright."
7             Do you see that?
8        A.   I do.
9        Q.   Is that the expert opinion that you intend to
10   provide to this court and to this jury in the Southern
11   District of Florida in this case?
12        A.   Yes, if so requested, yes.
13        Q.   Is there anything about what you've written
14   there that you wish to clarify or change?
15        A.   Unless you raise some issues with me the
16   answer as I sit here now is no.
17        Q.   And you continue to say, "For ease of
18   reference, I refer to this venture as the Satoshi
19   Nakamoto Enterprise, the SN Enterprise," in quotes.  And
20   then you say, "The SN Enterprise appears to have been
21   formed for multiple purposes, including the mining of
22   Bitcoin and the development of software and intellectual
23   property related to Bitcoin and blockchain
24   technologies."
25             Do you see that?

Page 188

1        A.   I do.
2        Q.   Okay.  Is this the opinion that you intend to
3    provide to this district court judge and to the jury in
4    the Southern District of Florida in this case?
5        A.   Yes.
6        Q.   Is there anything that you wish to clarify or
7    change about the statements contained in your summary of
8    opinion Section III of your expert report Exhibit 1 to
9    your deposition?
10       A.   Not as I sit here today, no.
11       Q.   I believe you testified, but I just want to
12   make it clear -- my understanding clear, you've never
13   met or spoken with anyone in the Kleiman family; is that
14   correct?
15       A.   Correct.
16       Q.   You've never met or spoken with Dr. Wright or
17   anyone in Dr. Wright's family; is that correct?
18       A.   Correct.
19       Q.   You've never met or spoken with any of the,
20   quote/unquote, "people or entities associated with him;"
21   is that correct?
22       A.   Correct.
23       Q.   And you've never met or spoken with any of
24   the, quote, "governmental entities" or, quote, "third
25   parties" that you reference in that first bullet point;

Page 189

1    is that correct?
2        A.   Correct.
3        Q.   So you've never met or spoken with anybody
4    involved in what you define to be the "Satoshi Nakamoto
5    Enterprise;" is that right?
6        A.   Correct.
7        Q.   Instead -- I want to make sure I'm
8    understanding this correctly so I'm not trying to trap
9    you; I really want you to correct me if I'm wrong,
10   because that's really the purpose for today, as you
11   know, you've testified many times, you've been deposed
12   many times.  I do not want to limit you.  I want you to
13   tell me everything so there's no doubt what we're going
14   to hear in July, if we're going to hear it at all.
15       A.   All right.
16       Q.   Right.
17             So it appears from this expert report that
18   what you did in concluding that there was a joint
19   venture or partnership between the plaintiff's deceased
20   brother and the defendant, Dr. Wright in this case, is
21   review certain documents that were produced in this
22   case; is that right?
23       A.   Yes.
24       Q.   Is there anything else that you did besides
25   review documents that were produced in this case or --

Page 198

1  of Bitcoin and success mining of Bitcoin.
2     Q.   And first let me ask you, what is the basis
3  for your understanding that Dave Kleiman was the first
4  one to publish the Bitcoin whitepaper?
5     A.   My understanding is that Dave Kleiman was in
6  charge of the e-mail account, which was Satoshi@ a -- a
7  e-mail client and it was the one who first published it,
8  but that was a joint effort of both Craig Wright and
9  Dave Kleiman.
10    Q.   What is your basis for your understanding that
11 Dave Kleiman was the person who published the Bitcoin
12 whitepaper specifically?
13    A.   Give me a moment.
14         In paragraph 35 to my report there's a
15 reference document which in substance was an e-mail from
16 Craig Wright to Ira Kleiman where Craig Wright writes
17 that Dave Kleiman had control of the e-mail account
18 Satoshi@vistomail.com that was of the originating source
19 in the publication of the initial Bitcoin whitepaper.
20    Q.   So -- I'm sorry, what are you pointing to,
21 paragraph 35?
22    A.   Yes, please.
23    Q.   Okay.  I'm looking at it.  And what is the
24 actual underlying document now supports your position
25 that Dave Kleiman published the Bitcoin whitepaper?

Page 199

1     A.   It is identified in that paragraph as a
2  February 15, 2014 e-mail written by Craig to Ira Kleiman
3  with the Bates stamp number indicating ending in the
4  last four digits -2712.
5     Q.   And what is it about the language in that
6  e-mail that makes you believe that Dave Kleiman
7  published the Bitcoin whitepaper?
8     A.   I can't recall the exact words used, but I
9  concluded from reading that that that was indeed what
10 happened.
11    Q.   So was that important that that e-mail confirm
12 Dave Kleiman as the one who published the Bitcoin
13 whitepaper, was that important to you in formulating the
14 opinion that you propose to present in this case at
15 trial?
16         MR. PRITT:  Objection.  Form.
17         THE WITNESS:  This is an opinion that I
18    reached based on a variable avalanche of documents.
19    If you look at Section IV to my report that runs
20    from paragraph 26 to roughly paragraph 70, which is
21    in excess of 40 such items of reference,
22    paragraph 71 I think to be precise.  There is well
23    in excess of 40 paragraphs of information all of
24    which I think are supportive of the opinion that
25    I've reached.  I can't tell you that the number of

Page 200

1  references in any given paragraph have two
2  supporting items, maybe takes two paragraphs to get
3  to the one supporting item, but in ballpark terms
4  there is something like 47 paragraphs there and
5  easily I believe there is probably something north
6  of 30, maybe 40 items of relevant information that
7  allowed me and facilitate me in reaching this
8  opinion.
9       If one such item were removed from that
10 avalanche you still will have an avalanche of evidence.
11 It would be just a hint tinier, but it would be
12 still remarkably overwhelming and therefore it's an
13 importance in the sense of would it change my
14 opinion if this fact did or did not exist; and the
15 answer is no.
16 BY MS. McGOVERN:
17    Q.   So on a scale to one to ten how important was
18 it to you that the fact that you cite in your opinion
19 regarding publication of the bit- -- of the whitepaper
20 be true?
21         MR. PRITT:  Objection.  Form.
22 BY MS. McGOVERN:
23    Q.   Is it your opinion, Mr. Klein, that we can
24 remove that fact altogether and your opinion stands?
25    A.   Yes.

Page 201

1     Q.   Okay.  And again, just for purposes of
2  understanding the basis for it, the sole basis for your
3  understanding that Dave Kleiman published the Bitcoin
4  whitepaper is the reference in paragraph 35 and its
5  footnote; is that correct?
6     A.   Yes.
7     Q.   Is there any other documentary or the other
8  basis for that opinion or for that understanding?
9         MR. PRITT:  Objection.  Form.
10        THE WITNESS:  Not that I'm aware of.
11 BY MS. McGOVERN:
12    Q.   Okay.  In the -- on the screen we have
13 paragraph 15 and you have identified or you have written
14 certain facts in connection with the Bitcoin blockchain,
15 I want to ask you about that.
16        You say, "On October 31, 2008, a message
17 from," quote, "Satoshi Nakamoto was posted to the
18 cryptography mailing list."
19        Do you see that first sentence?
20    A.   I do.
21    Q.   What is the cryptography mailing list,
22 Mr. Klein?
23    A.   I would have to go to the underlying document,
24 which is referenced there as footnote two to give you a
25 more thorough description if it's avail.

Page 202

```
1     Q.   Sitting here today, off the top of your head,
2  in this background information, which you believe to
3  have been important in your report, you can't tell us
4  what the cryptography mailing list is?
5          MR. PRITT:  Objection.  Form.
6          THE WITNESS:  First of all, background is not
7      important to my opinions.  I could have reached my
8      opinions without including any background for the
9      court's edification.  My opinions rest on the
10     framework I've established in being trained in as
11     an accountant and observed as a participant in
12     partnerships and entrepreneurial endeavors and
13     paragraph 17 onward, which layout the guideposts
14     and then the analysis of that in the roughly 46
15     paragraphs I believe it's in thereafter.
16         Background is simply background and therefore
17     it's not something that led to me reaching any
18     particular conclusions that section follows.
19 BY MS. McGOVERN:
20     Q.   So Section IV can be completely eliminated in
21 your opinion and your opinion stands; is that correct?
22         MR. PRITT:  Objection.  Form.
23         THE WITNESS:  Yes, it does.
24 BY MS. McGOVERN:
25     Q.   Let's continue.
```

Page 203

```
1          You state, "In this message, Satoshi wrote,"
2  quote, "I've been working on a new electronic cash
3  system that's fully peer-to-peer, with no trusted third
4  party."
5          Do you see that?
6      A.   I do.
7      Q.   Do you know what a "peer-to-peer electronic
8  cash system" is?
9      A.   I believe I do.
10     Q.   What is it?
11     A.   Peer-to-peer is where you have distributed
12 processing or distributed participants and it's spread
13 out among various peers as opposed to things going
14 through a centralized, concentrated system.
15     Q.   Is that significant to the Bitcoin
16 blockchain's purpose and function?
17     A.   I believe the answer is yes.
18     Q.   Why?
19     A.   Because it makes it more difficult for a
20 governmental authority to control it or gather certain
21 information from it.
22     Q.   Do you think -- is it your understanding,
23 Mr. Klein, that the reason that the peer-to-peer
24 function is important is to eliminate the government
25 function or the government role in that system?
```

Page 204

```
1      A.   Can I hear your question again?
2      Q.   Is it your understanding that the significance
3  of the peer-to-peer aspect of the Bitcoin blockchain is
4  to eliminate the government role in the system?
5      A.   I have read previously and again, it's not
6  critical to my opinion, but I have read previously that
7  one of the economic attributes of Bitcoin is it makes it
8  more difficult for taxing authorities to detect
9  transactions; that is to say, evade governmental
10 taxation or from the view of some intrusion.
11     Q.   Do you have understanding, Mr. Klein, as to
12 the underlying purpose for the development of the
13 Bitcoin blockchain by the inventor?
14         MR. PRITT:  Objection.  Form.
15         THE WITNESS:  I could not describe for you
16     what their broad purposes were beyond the notion
17     that one such purpose was to become quite wealthy
18     and develop a currency that worked around existing
19     physical currency.
20 BY MS. McGOVERN:
21     Q.   Do you have any other understanding as to what
22 the purpose for the Bitcoin blockchain was meant to be
23 by the inventor?
24         MR. PRITT:  Objection.  Form.
25         THE WITNESS:  I don't believe that impacts my
```

Page 205

```
1      opinion, but I cannot articulate purposes beyond
2      that which I've already shared today.
3  BY MS. McGOVERN:
4      Q.   So you don't know sitting here today why the
5  inventor of the Bitcoin blockchain wanted to invent it,
6  do you?
7          MR. PRITT:  Objection.  Form.
8          THE WITNESS:  I can only look at the
9      manifestation and the excitement of the great
10     wealth that achieved as certainly one of the
11     purposes, based upon the evidence that I have seen
12     I would be speculating about purposes beyond the
13     acquisition of substantial level.
14         MS. McGOVERN:  Guys, can you give me one quick
15     second?  I just have to make the noise --
16         THE WITNESS:  Sure.
17     (There was a discussion off the record.)
18 BY MS. McGOVERN:
19     Q.   Let me go back to your expert report,
20 Exhibit 1 to your deposition, Mr. Klein, it is on the
21 screen, and I'd like to refer you to paragraph 16 of
22 your report.
23     A.   I'm there.
24     Q.   The first sentence of paragraph 16 says,
25 "Since 2009, the most famous mystery in the Bitcoin
```

Page 218

1  other than Craig Wright's own words, as you call them,
2  that forms your basis for an understanding regarding
3  David Kleiman as being a skilled and talented
4  individual?
5      A.   Skilled and talented individual with regard to
6  Bitcoin and its development and its mining, no.
7          THE COURT REPORTER:  I'm sorry, did you say
8      "and its money, no"?
9          THE WITNESS:  I'm sorry, there's a word in
10     this case called "mining" --
11         THE COURT REPORTER:  Mining.
12         THE WITNESS:  -- like coal.
13         THE COURT REPORTER:  Okay.  Thank you.
14 BY MS. McGOVERN:
15     Q.   Mr. Klein, if you could please look at the
16 last sentence of paragraph 16 which says, "Dr. Wright
17 has claimed" -- well, you say, "Wright" you referring
18 throughout the report as "Wright" and I assume that's
19 because, you either didn't pay attention to it or it
20 doesn't matter to you or you don't believe that Craig
21 Wright has PhD, and therefore you're not referring to
22 him as a doctor.  I'm going to refer to the way that
23 you've written it in your report so there's no
24 confusion.  Okay?
25     A.   That's fine.

Page 219

1      Q.   I refer to my client as Dr. Wright, but I want
2  this -- the court has asked the parties to refer to
3  Craig Wright as Dr. Wright, but in your report I'm going
4  to read it as you've written it, which is just "Wright."
5      A.   That's fine, and I certainly meant no
6  disrespect, and the only reason I added Mr. Kleiman's
7  first name is because there is an addition Kleiman, or
8  two, in this case, which are Dave Kleiman's brother, Ira
9  and his father; otherwise, I would have referred to --
10 in a very parallel fashion by their surname meaning no
11 disrespect to any of them.
12     Q.   Okay.  Well, throughout the report you call
13 him --
14     A.   You're -- I simply cannot hear.
15     Q.   Okay.  So let's look at the last sentence of
16 paragraph 16.  You say, "Wright claimed to be one of
17 the creators of Bitcoin and has acknowledged that Dave
18 Kleiman was his partner in these efforts," and you
19 footnote to paragraph eight.
20          Do you see that?
21     A.   I do.
22     Q.   Could you explain what the basis for that
23 statement is in paragraph eight the footnote is a bit
24 confusing to me?  I can't quite figure out what you're
25 relying on.

Page 220

1      A.   I have seen a document called, "Media Training
2  Session 1."
3      Q.   Okay.
4      A.   I'm trying to refresh myself that in speaking
5  with counsel it's my understanding the document came
6  from the e-mail that I'm referring to, but in any event
7  in addition to that there are references elsewhere in my
8  report I didn't intend this to be exhaustive where Craig
9  Wright has claimed that Dave Kleiman was his partner.
10     Q.   Okay.  I'm still stuck on footnote eight.  Can
11 you just explain to me exactly what the relying -- what
12 are you relying on?  You say -- you first say with
13 respect to that statement that you're relying on the
14 Media Training Session, right, March 18, 2016, and
15 there's a Bates stamp number.  What is that?
16     A.   That is a document that I reviewed bearing
17 that Bates stamp number, then I attempted to put it into
18 context, best I understand it, that it emanated from the
19 source indicated an e-mail from Nick to Craig.
20     Q.   Who is Nick Caley?
21     A.   Craig.
22     Q.   Yeah, who is that?
23     A.   As I sit here right now, I don't recall.
24     Q.   Okay.  And what media training session does
25 that relate to?

Page 221

1      A.   It was session one relating to Craig Wright
2  contemplating going public, if you will, about his
3  co-creation of the Bitcoin.
4      Q.   And what is it about that media training
5  session that allowed you to formulate a conclusion in
6  paragraph 16 that Dave Kleiman was Dr. Wright's partner
7  in the creation of the Bitcoin blockchain?
8          MR. PRITT:  Objection.  Form.
9          THE WITNESS:  I would have to have the Bates
10     stamp document placed in front of me.  I've
11     indicated the nature of the document and have
12     indicated the various page references; but without
13     the document in front of me, given the volume of
14     documents in this and many other cases, I have
15     don't have a specific recollection of greater
16     detail about what those pages refer to without
17     having it in front of me.
18 BY MS. McGOVERN:
19     Q.   So you don't know sitting here today what that
20 was that formed a basis for a conclusion that Dr. Wright
21 and Dave Kleiman were partners in the creation of the
22 Bitcoin blockchain, you don't remember?
23         MR. PRITT:  Objection.  Form.
24         THE WITNESS:  No.
25 BY MS. McGOVERN:

Page 222

```
 1       Q.   I'm sorry, did you say, "no"?
 2       A.   First of all, this refers to Craig Wright
 3  making the claim, I'm not necessarily, from this
 4  document, reaching a conclusion.  What I've said is
 5  Craig Wright makes that claim and he makes that claim,
 6  not only here, but he also makes it with other documents
 7  referenced within the body of my report, and I'm happy
 8  to direct you to those now if you'd like me to.
 9       Q.   Yeah, well, let's stick with paragraph
10  eight -- I'm sorry, footnote eight, because I'm just
11  having a tough time understanding what your methodology
12  is in reaching certain conclusions from certain
13  documents from other people?
14       A.   Well, once again, I shared with you that this
15  introductory background; it was not the basis for my
16  conclusion.  The basis for my conclusion are stated in
17  the framework what I commonly call the DOS framework in
18  Roman numeral V and on the application of the DOS
19  framework Roman numeral VI.  There are further
20  references to Craig Wright acknowledging Dave Kleiman
21  having been his partner, those are the one which I'm
22  relying, this is simply part of a generalized background
23  section.
24       Q.   Did you write this background section?
25       A.   I did not write the background section
```

Page 223

```
 1  initially.  I reviewed the background section, and I
 2  entered the background section consistent with my
 3  conversation with Mark Huntley.  That is why I said,
 4  this is not my opinions.  I had individuals at Compass
 5  Lexecon assist with background items and procedural
 6  items, but not my core opinion.
 7       Q.   So you didn't write Section IV; is that right?
 8       A.   I didn't initially draft it, however, I formed
 9  it into my style of communication.
10       Q.   Because you previously stated in your
11  testimony earlier today that you wrote this report from
12  scratch, and I just want to make it clear, just for
13  purposes of correcting the record, that as to
14  Section IV, which is the background section of Bitcoin,
15  and the purpose of Bitcoin, and so forth you did not
16  write this section?
17            MR. PRITT:  Objection.  Form.
18  BY MS. McGOVERN:
19       Q.   Am I correct in understanding?
20            MR. PRITT:  Objection.  Form.
21            THE WITNESS:  It is correct there were certain
22       items that I viewed as administrative, such as, for
23       example, the front page I didn't type up, the
24       background.
25            What I intended to state was everything that
```

Page 224

```
 1  goes to my substantive opinions I wrote.  I did
 2  not, so we're clear, I didn't write the
 3  documents -- list, I only selectively wrote the
 4  footnotes, others in many cases initiated the
 5  footnotes or as I said, nearly corrected my
 6  footnote articulation, and I was not the initial
 7  drafter of the peripheral information, which
 8  doesn't go to my opinions, the introductory
 9  background.
10  BY MS. McGOVERN:
11       Q.   Wait, I'm sorry, I just want to make sure that
12  I understand.
13            You did not write most of the footnotes; is
14  that fair?
15            MR. PRITT:  Objection.  Form.
16            THE WITNESS:  I did not draft most of the
17       footnotes, these were documents that I had relied
18       upon and communicated to others, but there is a
19       specialized style guide and I let them at Compass
20       Lexecon, in some cases, not all, I would say in the
21       majority of cases they wrote the footnote, yes.
22  BY MS. McGOVERN:
23       Q.   All right.  We're almost done with Section IV,
24  but I have one more question.  In paragraph -- in
25  footnote eight, you also cite what is referred to as
```

Page 225

```
 1  "The Satoshi Affair:  Andrew O'Hagan on the many lives
 2  of Satoshi Nakamoto."
 3            Do you see that?
 4       A.   I do.
 5       Q.   Did you read that article?
 6       A.   Absolutely.
 7       Q.   Did you base any or all of the legal
 8  conclusions that you reach in this report on what was
 9  written in the Andrew O'Hagan article?
10            MR. PRITT:  Objection.  Form.
11            THE WITNESS:  It was part of information set
12       that I received, I need to go through my report to
13       refresh myself on it if I, in any specific way,
14       relied upon it.  For example, footnote 52 indicates
15       that to somewhat of a degree reliance and that
16       whole -- essentially that back section about
17       nonpublic statements will reference in particular
18       article.
19  BY MS. McGOVERN:
20       Q.   Was it part of methodology, Mr. Klein, in
21  reaching the conclusions in your report to refer to an
22  article that was published in a magazine?
23            MR. PRITT:  Objection.  Form.
24            THE WITNESS:  Well, first of all, did you
25       refer to my conclusions as a legal conclusions?
```

Page 226

1  BY MS. McGOVERN:
2      Q.  Yes.
3      A.  Well, I've indicated very clearly, both in my
4  report and in my statement, that I have reached no legal
5  conclusions and I'm not rendering any legal opinion; so
6  I therefore cannot answer your question as it was posed.
7  I've not reach legal conclusions.
8      Q.  Okay.  So how would you characterize your
9  conclusions, factual?
10     A.  I would characterize my conclusions as
11 identifying an established methodology that I've learned
12 and taught others and then applying that to the facts as
13 I was best able to garner those facts to reach the
14 conclusions that I've reached.
15     Q.  With respect to Section IV that concerns the
16 background of your report, what did you do to ensure the
17 statements contained in Section IV are consistent with
18 the methodology and principles that are reliable?
19     A.  Section IV --
20         MR. PRITT:  Objection.  Form.
21         I didn't know she was done, sorry.
22         THE WITNESS:  Section IV is simply, as I
23     state, something I thought a reader might find
24     helpful by way, as best I understand it,
25     background.  It, as I've stated before, could have

Page 227

1      been omitted from the report and not alter the
2      accuracy or integrity of the conclusions I've
3      reached.  The concussions I have reached appear in
4      Section V and thereafter.
5  BY MS. McGOVERN:
6      Q.  Could you please answer my question?
7         MR. PRITT:  Objection.  Form.
8         THE WITNESS:  I thought I did.
9         Why don't you pose it again, please.
10 BY MS. McGOVERN:
11     Q.  With respect to the statements contained in
12 Section IV --
13     A.  Can you speak up, I'm really -- you know, this
14 is a deposition so I'm really struggling to hear your
15 words.
16     Q.  No, I understand.  This Zoom is tough.  I just
17 feel like it's weird with my face right next to the --
18 I'm like a hairy monster in one of those Japanese
19 things.
20         All right.  Let me -- let me say it again, and
21 please listen to my question, because I think everyone
22 is tired.
23         With respect to Section IV, and I understand
24 your position that we can take it out, we don't need it,
25 you're not relying on it for your final conclusions, but

Page 228

1  it's in your report and I need to understand this.
2         With respect to Section IV, which purports to
3  provide a background on Satoshi Nakamoto and the
4  beginnings of Bitcoin what did you do to ensure if the
5  statements contained in this section followed a
6  methodology that is acceptable generally and is
7  reliable?
8         MR. PRITT:  Objection.  Form.
9         THE WITNESS:  I don't believe that the
10     provision to a reader of background information
11     that doesn't form the basis of my opinion needs to
12     follow a methodology, it is a brief history, best I
13     understand it, in this case, very brief, history
14     that sets the stage for this matter, as I've
15     indicated very clearly, it was simply provided as
16     something that could be of help to a reader, but
17     nothing more than that.
18     I've written many background sections in my
19     life and none of them follow a methodology, they're
20     more of a narrative that helps set the stage for
21     people.  I want it to be an accurate narrative, of
22     course, and I believe that I have referenced here
23     the support for that narrative, but is indeed a
24     narrative.  In contradict -- in contradistinction
25     to that there is a methodology for the opinions

Page 229

1      that I've raised, I've said it many times it's in
2      Roman numeral V, the DOS approach and the elements
3      that identified within that section.
4         MS. McGOVERN:  One second, please.
5      (There was a discussion off of the record.)
6         MS. McGOVERN:  I apologize for that.
7  BY MS. McGOVERN:
8      Q.  Mr. Klein, you -- I believe you stated that
9  the background Section IV is intended to be a narrative
10 that you believe is helpful in the formation of your
11 opinion that you propose to offer to the district court
12 judge and to the jury in this case; is that right?
13     A.  I think it is background that sets the stage
14 that gives a little perhaps color to the discussion, but
15 it does not go to my methodology or the analysis that I
16 have performed consistent with that established
17 methodology.
18     Q.  So my question is:  With respect to this
19 factual narrative that you have included in your report
20 have you included any of the statements or the positions
21 of Dr. Craig Wright?
22         MR. PRITT:  Objection.  Form.
23         THE WITNESS:  Nor have I included any
24     statements of any of the participants among them,
25     Craig Wright, because this is simply viewed,

Page 250

1    Q.   What is your understanding with respect to the
2 issue of partnership or joint venture, Mr. Klein?  What
3 is your understanding of how that issue relates to this
4 case, if at all?
5    A.   My understanding is that there is a claim by
6 plaintiff that Dave Kleiman was a partner with Craig
7 Wright; therefore, he is asserting a claim to his
8 interest in the partnership, including its intellectual
9 property, Bitcoin and derivative products, including
10 intellectual property that -- both in that relationship
11 and that there are additionally issues of fiduciary duty
12 that have been raised as well involving alleged breached
13 by Mr. Wright -- or Dr. Wright.
14    Q.   The core legal issue in this case is whether
15 or not a partnership existed between Ira Kleiman's
16 deceased brother, David Kleiman and Dr. Craig Steven
17 Wright; isn't that true?
18         MR. PRITT:  Objection.  Form.
19         THE WITNESS:  And I apologize the question was
20      garbled on my end.
21 BY MS. McGOVERN:
22    Q.   A core legal issue in this case is whether Ira
23 Kleiman's deceased brother, David Kleiman, and Dr. Craig
24 Steven Wright had a partnership; isn't that true?
25         MR. PRITT:  Objection.  Form.

Page 251

1         THE WITNESS:  I believe that is certainly one
2      of the critical issues, yes.
3 BY MS. McGOVERN:
4    Q.   What is the expert opinion you have been asked
5 to provide in this case on that issue?
6    A.   I have not been asked to opine that there was
7 a partnership or joint venture.  I've been asked to
8 organize for the trier of fact in an established
9 methodology the information that I see that provide
10 support for guideposts indicative of such a shared
11 business relationship and also speak to any guidepost
12 that are indicative of the absence of such a shared
13 business relationship leaving it to others to utilize
14 that information in the context of the overall
15 proceeding.
16    Q.   Have you ever been admitted to practice law in
17 the state of Florida?
18    A.   I have not.
19    Q.   Do you know the law in the state of Florida on
20 partnership?
21    A.   I do not.  I would have a broad understanding,
22 because the laws tend to be similar among the states,
23 but per se I have not researched or examined Florida
24 law, because I'm not rendering a legal opinion and
25 didn't even want to be tempted to come close to

Page 252

1 rendering a legal opinion.
2    Q.   Because you're a lawyer, right?
3         MR. PRITT:  Objection.  Form.
4         THE WITNESS:  No, no, I didn't want to --
5 BY MS. McGOVERN:
6    Q.   Is it possible, Mr. Klein, to extricate the
7 lawyer mind out of you in rendering an opinion on
8 whether a partnership exists as a matter of law; is that
9 even possible?
10         MR. PRITT:  Objection.  Form.
11         THE WITNESS:  Can -- can -- I'm sorry.
12         I just didn't hear the question.
13 BY MS. McGOVERN:
14    Q.   Is it possible for you.  As a lawyer of 40
15 years and a law professor at UCLA, to opine on the
16 existence of a partnership or joint venture and claim
17 that that is not a legal conclusion?
18         MR. PRITT:  Objection.  Form.
19         THE WITNESS:  Oh, I think it's very easy to
20 not only claim it, but to know it to be the case.
21 I have practiced law for a grand total of
22 approximately five months and went on inactive
23 status, for almost to the day, 40 years.  In
24 40 years I've spent my time teaching small business
25 management, consulting with a -- I was trying to do

Page 253

1 a quick calculation, at least ten partnerships, if
2 not more, per year for 40 years.  I have also
3 trained 8,000 people to pass the Certified Public
4 Accountancy exam and as we have discussed,
5 qualified as an accounting expert one of which it
6 has the task of determining the scope, breadth and
7 ownership of a joint business endeavor.  The
8 dominant element in my professional experience for
9 40 years has not been the practice of law, that
10 practice was trivial in something that I can barely
11 recognize or remember, but for 40 years I've been
12 an entrepreneur, I've been a partner, I've advised
13 partnerships and other start-up endeavors.  I've
14 taught accountants about it and performed
15 accounting tasks, including as an expert.  And so
16 the dominate attribute in my professional
17 experience has nothing whatsoever to do what I did
18 when I was a kid, which was not study maybe all
19 that hard for three years of law school, and then
20 practice for four months in a professional that I
21 personally did not enjoy.
22 BY MS. McGOVERN:
23    Q.   But you taught law at the UCLA School of Law,
24 correct?
25    A.   I taught accounting as applied to law.  I

Page 254

1  taught financial analysis as applied to law.  And as I
2  shared earlier today, I taught it based on my
3  credentials in those disciplines as if others have
4  taught it based on their credentials in those
5  disciplines not because I was a lawyer nor were they.
6      Q.   And you each business law -- you teach
7  Business Law 101 as a full-time faculty member at UCLA,
8  wasn't that your testimony earlier today, Mr. Klein?
9      A.   I have from time to time taught business law,
10 that's correct.
11     Q.   Okay.  What are the elements of partnership?
12          MR. PRITT:  Objection.  Form.
13 BY MS. McGOVERN:
14     Q.   What are the elements of a legal partnership?
15          MR. PRITT:  Objection.  Form.
16          THE WITNESS:  I am not rendering an opinion on
17     what the elements of a, quote, "legal partnership"
18     are.
19 BY MS. McGOVERN:
20     Q.   That's not my question, Mr. Klein, before you
21 go off, let me just, you know, try to get back on track
22 here.
23          What are the legal elements of a partnership
24 or joint venture?
25          MR. PRITT:  Objection.  Form.

Page 255

1  BY MS. McGOVERN:
2      Q.   I'm not asking you what -- how you want to
3  characterize your expert opinion here.  I'm asking you
4  what are the elements of a partnership or a joint
5  venture?
6          MR. PRITT:  Objection.  Form.
7          THE WITNESS:  There is a widely accepted
8     definition of what a partnership is, as I
9     understand it, in uniform partnership -- last I
10    checked, which is an association of two or more
11    persons carrying on activity in the pursuit of
12    profit.
13 BY MS. McGOVERN:
14     Q.   Are there specific elements that the law looks
15 to generally -- I understand it can vary from state to
16 state, jurisdiction to jurisdiction -- but are there
17 specific elements that the law looks to in determining
18 whether a partnership, a legal partnership or joint
19 venture was formed?
20          MR. PRITT:  Objection.  Form.
21          THE WITNESS:  I cannot speak to what, quote,
22    "the law" looks to beyond the statement that I just
23    gave you.  I cannot tell you specific elements that
24    would go to the phrase, for example, association.
25    I can tell you in my capacity as an accountant, in

Page 256

1     my capacity as an entrepreneur and one who teaches
2     entrepreneurship and consults with partnerships the
3     elements that I would understand to reflect a
4     shared business enterprise.
5  BY MS. McGOVERN:
6      Q.   Is a joint partnership -- does a partnership
7  or joint venture require intent by the parties to form a
8  business for the purpose of generating profit?
9          MR. PRITT:  Objection.  Form.
10          THE WITNESS:  My broad understanding is that
11     often there would be such an intent, but that isn't
12     necessary a -- that one looks at conduct,
13     appearance created and that individuals can be
14     deemed to be partners based on that which they have
15     presented to the world by their course of
16     construct.
17 BY MS. McGOVERN:
18     Q.   I'm not referring to whether somebody can rely
19 upon the partnership as a -- I'm not relying on whether
20 a third party can rely upon something that has been held
21 out to the world or that particular person as a
22 partnership, Mr. Klein.  I'm referring to your statement
23 regarding your understanding of a partnership or a joint
24 venture and with respect to that statement of your
25 understanding of what a partnership or joint venture is

Page 257

1  between those two people, does that require that the
2  parties intended for there to be a partnership or joint
3  venture --
4          MR. PRITT:  Objection.  Form.
5  BY MS. McGOVERN:
6      Q.   -- in your opinion?
7          MR. PRITT:  Objection.  Form.
8          THE WITNESS:  I think it is calling for a
9     legal opinion --
10          THE COURT REPORTER:  I'm sorry, say that
11     again.
12          THE WITNESS:  I believe what you're asking is
13     calling for a legal opinion, and I don't know what
14     the law looks to in terms of the word "association
15     of two or more persons."  I don't know to what
16     extent there is an intent element or if an
17     association looks to the notion of association.
18     Again, I've not researched partnership law at this
19     level of detail.  I'm not a Florida lawyer, I've
20     not looked at Florida law.  You're calling for me
21     to speculate about the relevance or lack of
22     relevance of intent.  I sit here today and I
23     sincerely don't know.
24 BY MS. McGOVERN:
25     Q.   So is it your understanding based upon

Gordon Klein
April 30, 2020                                                258 to 261

Page 258

1  methodology that you use in providing expert opinion
2  that two people can form a partnership or joint venture
3  by mistake?
4           MR. PRITT:  Objection.  Form.
5  BY MS. McGOVERN:
6      Q.   Whether it be unilateral or mutual mistake, is
7  it your experience and understanding, Mr. Klein, that
8  two people in forming an association for the purposes of
9  generating a profit can form a partnership or joint
10 venture in either one or both of them didn't mean to do
11 it?
12          MR. PRITT:  Object to the form.
13          THE WITNESS:  I think that calls for a legal
14      opinion.  I sincerely think you're asking a very,
15      although not the same question, I think the
16      opposite of doing something intentionally is doing
17      something not intentionally, which appears to be a
18      rough, if not, precise synonym for the word
19      "mistake," and I therefore provide the same answer
20      I just did.
21 BY MS. McGOVERN:
22     Q.   So in your analysis of the documents that the
23 plaintiffs provided you for purposes of rendering your
24 expert opinion in this case, you did not consider
25 whether the two parties in question here intended to

Page 259

1  form a joint venture or partnership; is that right?
2           MR. PRITT:  Objection.  Form.
3           THE WITNESS:  I believe that that is correct.
4       I think it will depend upon the instruction, if
5       there is a jury, that jury is given and it will be
6       their assessment of the importance of that element,
7       in part based on whatever instruction they're
8       given; and I think that is a meaningful way to
9       distinguish what I'm providing here, than me
10      providing a legal opinion, because I don't know
11      under the law of Florida what that is; I have
12      no idea.
13 BY MS. McGOVERN:
14     Q.   So specifically what is -- strike that.
15          Is it your understanding, Mr. Klein, that a
16 business -- a partnership or a joint venture requires a
17 common purpose?
18          MR. PRITT:  Objection.  Form.
19          THE WITNESS:  It requires a shared purpose of
20      the participants, I think that is rough synonym
21      when you say "common purpose."  I guess that's a
22      yes.
23 BY MS. McGOVERN:
24     Q.   Is it your understanding, Mr. Klein, that a
25 partnership or a joint venture requires a joint

Page 260

1  proprietary interest?
2           MR. PRITT:  Objection.  Form.
3           THE WITNESS:  Again, I'm sorry, the -- it was
4       a bit garbled.
5           Did you say, proprietary interest?
6  BY MS. McGOVERN:
7      Q.   Yes.
8      A.   Yes, they must intend a shared ownership
9  interest as distinguished from an employment
10 relationship or an independent contractor relationship
11 or a friendly-favor relationship, yes.  And to the
12 extent that there are W-2s or 1099s or indications of
13 payment made to a Dave Kleiman by Craig Wright that
14 would be important information to me, and indeed I ask
15 counsel if such documents exist, and I welcome you to
16 provide them to me, because certainly if you showed me a
17 W-2 or a 1099 document that would be strong information
18 that I would love to put in my report as undercutting
19 the notion of shared ownership and calling into question
20 whether, in fact, there was a manifestation of a desire
21 to create shared ownership as opposed to some
22 alternative legal relationship as I indicated as
23 employment, gift, favor independence and independent
24 contractor.
25     Q.   Let me see if I understand what you're saying.

Page 261

1  If there were evidence of a W-2 or some sort of K-1 or
2  1099, am I correct in my understanding that you say that
3  would be an important thing to consider in rendering
4  your opinion?
5           MR. PRITT:  Objection.  Form.
6           THE WITNESS:  I think that any item that --
7       any document that would undercut shared ownership
8       would be a significant item that I would take into
9       account certainly as an item that would notate
10      against there being the presence of the ownership
11      guidepost.
12 BY MS. McGOVERN:
13     Q.   So what specifically did you rely upon in
14 determining that the parties in this case acted
15 consistent with joint proprietary interest?
16     A.   Because they were making shared decisions,
17 they had shared goals, goals which might well as
18 business is more in transform over time to take
19 advantage of opportunities might --
20     Q.   I'm asking you for the specific documents,
21 Mr. Klein, that you referred to and let me stick to sort
22 of an accounting side of this.  Okay?  Let's get away
23 from the general.
24          It's my understanding that you have set forth
25 in your expert report that you believe David Kleiman and

Page 262

1  Dr. Craig Wright shared a joint proprietary interest in
2  a partnership; am I right about that?
3        A.    Based on everything that I have seen that is
4  all consistent with a shared business venture often
5  styled as a partnership or joint venture.
6        Q.    And it's my understanding that you intend to
7  testify at trial and offer that expert opinion to the
8  court and to the jury in this case; am I right about
9  that?
10       A.    I intend to offer, if so asked the core
11  opinion that's present in my report into summary of
12  opinion and if so asked what is my framework for
13  reaching that conclusion --
14       Q.    No, we're not there yet.  I haven't asked you
15  about your framework.  I've actually -- I'm stuck on
16  number -- on a particular issue here, and I want to keep
17  you stuck on it too.
18             I'm referring specifically to the joint
19  proprietary interest and I want to understand -- if my
20  understanding -- I want to confirm that my understanding
21  is correct so here is my question:
22             Mr. Klein, do you intend to offer expert
23  testimony to the court and to the jury in this case that
24  David Kleiman and Dr. Wright shared a joint proprietary
25  interest?

Page 263

1             MR. PRITT:  Objection.  Form.
2             THE WITNESS:  Yes.
3  BY MS. McGOVERN:
4        Q.    What is the basis for that expert opinion as
5  to the proprietary interest?
6        A.    One paragraph that immediately comes to mind
7  is paragraph 50 of my report, where Craig Wright
8  informed the tax authorities that Bitcoin assets were
9  placed into a trust, and although they were the result
10  of Dave Kleiman's individualized effort, they reflected
11  a resource of them jointly specifically, although this
12  was by one perspective the sole asset of Dave Kleiman,
13  nonetheless Craig Wright speaks about the trust to be
14  set up for their joint benefit, and he states, as I
15  placed in bold, these were resources that, quote, "we,"
16  not Dave, but "we" would use that to further the goals
17  we were doing, which were all to do with promotion of
18  Bitcoin and cryptocurrencies.
19             That is suggestive of the fact the effort set
20  forth individually by Dave Kleiman and assets that the
21  head, himself, at least on an narrow level, generated
22  were for the joint benefit of himself and Craig Wright
23  for the joint benefit of the goals they were pursuing of
24  associated with the promotion and development of Bitcoin
25  and related intellectual property, which is a clear

Page 264

1  indication I think of both Dave Kleiman's -- Dave
2  Kleiman's view that his personal labor created a
3  proprietary interest in Craig Wright and I believe that
4  Craig Wright's statement that it belonged to,
5  quote/unquote, "we," or "us" to be converted
6  grammatically, to further our goals is indicative of it
7  having been a joint ownership or proprietary interest.
8        Q.    Other than that statement in an ATO
9  transcript, which you've quoted in paragraph 50, is
10  there any other basis for your expert opinion that Dave
11  Kleiman and Dr. Wright shared a joint proprietary
12  interest with respect to Bitcoin and intellectual
13  property?
14       A.    Yes, and I --
15       Q.    What's that?
16       A.    I'll begin at paragraph 50, I'd have to review
17  all such paragraphs, but the next one in order that
18  jumps out is paragraph 53 where Mr. Wright states, "I
19  said if you have a partnership and someone dies, it's no
20  longer a partnership."
21             That appears to indicate -- and reasonably I
22  think can be inferred, unless somebody else's death is
23  being referred to -- that Dave Kleiman's death in the
24  view of Craig Wright closed out their joint proprietary
25  interest in a partnership.

Page 265

1        Q.    So with respect to the statement in
2  paragraph 53 you're interpreting what you believe Craig
3  Wright meant in a podcast interview regarding Dave
4  Kleiman's death; is that right?
5             MR. PRITT:  Objection.  Form.
6             THE WITNESS:  That's correct.
7  BY MS. McGOVERN:
8        Q.    So let's try to stick to the proprietary
9  nature of your statement, because what we're talking
10  about in this line of questioning, Mr. Klein, as you
11  know, is your expert opinion that you intend to offer to
12  the judge and to the jury that there was a joint
13  proprietary interest between David Kleiman and Craig
14  Wright.  So my question is:  What other evidence goes to
15  the issue of the joint proprietary interest in either
16  Bitcoin or intellectual property between David Kleiman
17  and Dr. Wright?
18             MR. PRITT:  Object to form.
19             THE WITNESS:  I believe that the use of the
20             word "partnership" and a partnership coming to an
21             end upon the death of an individual, if this refers
22             to Dave Kleiman, is indicative of the use of the
23             word "partnership" to reflect a joint proprietary
24             or co-ownership enterprise.
25  BY MS. McGOVERN:

Page 266

1    Q.   Paragraph 53 appears to be paraphrasing an
2  interview on a podcast and not a direct quote; is that
3  right, Mr. Klein?
4    A.   I don't understand it to be a paraphrase, I've
5  placed it in my report as a quote and I believe it was a
6  quote.
7        MR. PRITT:  Can we take a short restroom break
8    soon?
9        I'm sorry.
10       MS. McGOVERN:  Yeah, we can take a break now.
11   (There was a discussion off of the record.)
12  BY MS. McGOVERN:
13   Q.   Mr. Klein, you've got -- you set forth a
14  number of guideposts in your expert report; those are
15  the same as elements to the legal elements of a
16  partnership or a joint venture; is that right?
17       MR. PRITT:  Objection.  Form.
18       THE WITNESS:  Well, I tend to think of the
19       word "element" as a legalistic -- and I'm not
20       rendering a legal opinion.  I'm looking at it from
21       a business standpoint, and I think business people
22       would call them guideposts as opposed to -- for
23       example, you talked about intent that might be a
24       legal element, I'm not speaking to legal issues.
25  BY MS. McGOVERN:

Page 267

1    Q.   But they, in fact, are the same, the
2  guideposts are, in fact, the same as the legal elements
3  of a partnership or a joint venture; isn't that right?
4        MR. PRITT:  Objection.  Form.
5        THE WITNESS:  I've not looked at Florida law
6        so I really couldn't tell you one way or the other.
7  BY MS. McGOVERN:
8    Q.   What about California law or any law at all,
9  just the general principles of partnership and joint
10  venture, your legal -- your legal guideposts are, in
11  fact, the same or substantially same as the legal
12  elements that form a partnership -- that form a legal
13  partnership or joint venture; isn't this right?
14       MR. PRITT:  Objection.  Form.
15       THE WITNESS:  I can't tell if you're asking me
16       to assume that right, and then you're going to pose
17       a question or you're asking me to align it with the
18       law of Florida or some other state, which I can't
19       do for you.
20  BY MS. McGOVERN:
21   Q.   I'm just asking you whether, in fact, you're
22  taking the position that the legal -- that the
23  guideposts that you call "guideposts" are distinct from
24  the legal elements that form a partnership or a joint
25  venture?  Is it your position that they are distinct or

Page 268

1  is it, in fact, the case that they align directly with
2  the elements of a partnership or joint venture?
3        MR. PRITT:  Objection.  Form.
4        THE WITNESS:  I don't know to an extent what
5        they are calling extensive with Florida law or its
6        interpretation, but again, I'm speaking, for
7        example, with all of the items we've talked about
8        from paragraph 26 through 71 as being indicative of
9        a shared business relationship, I don't know that
10       there is any legal element, which speaks to the
11       fact it is typical in partnerships for people when
12       they have complementary skill sets to more likely
13       form a partnership than if they had the same skill
14       set.  I don't know if that's a --
15  BY MS. McGOVERN:
16   Q.   I have one more question for you and then
17  we're done.
18   A.   May I complete my answer?
19   Q.   Yes.
20   A.   I don't know that people having complementary
21  skill sets is a legal element of a partnership.  It is
22  my observation that that is what I tend to see in a
23  shared business relationship.
24   Q.   That wasn't my question, Mr. Klein, but that's
25  okay.

Page 269

1        With respect to the role of the judge in a
2  federal courtroom, Mr. Klein, isn't it true that the
3  judge is the only source of law in the courtroom before
4  a jury?
5        MR. PRITT:  Objection.  Form.
6        THE WITNESS:  Well, I guess that is a
7        philosophical question.  I mean, the law is the
8        law, a statute is a statute.  I mean, no disrespect
9        to the importance of a judge, but I think a judge
10       is one who either reaches conclusions on her or his
11       own, or a judge is one who guides the jury, but
12       they can be reversed on appeal if what they
13       indicate is inconsistent with other sources of the
14       law, which are more broadly recognized and so I
15       don't know how I can say that the judge is the only
16       source of the law.
17  BY MS. McGOVERN:
18   Q.   My question was:  In a federal courtroom
19  before a jury in a trial the judge is the source of law
20  for the jury; isn't that correct?
21   A.   In the sense that the judge is the one who
22  either writes or proves submissions of instructions to
23  the jury, I think that is correct.
24   Q.   You want to qualify that answer in any other
25  way, Mr. Klein?

Page 270

1       MR. PRITT:  Objection.  Form.
2   BY MS. McGOVERN:
3       Q.   Just trying to understand your understanding.
4   The judge tells the jury what the law is; isn't that
5   right, yes or no?  Otherwise, you can explain your
6   answer, but I think it's a yes or a no.
7       A.   Well, I think the answer is yes, I'm not a
8   litigator, but that's what comes to my mind is the
9   answer.  The answer is yes.
10      MS. McGOVERN:  I have no further questions.
11      MR. PRITT:  I don't have any questions, but
12  we, of course, elect to read the deposition
13  transcript and we don't waive that.
14      MS. McGOVERN:  Thank you so much, Mr. Klein,
15  for all your time today.
16      THE WITNESS:  And likewise, and Laurie, if I
17  can be of assistance with spellings or otherwise
18  I'd be happy to stay on the line for you.
19      THE COURT REPORTER:  I'm good.
20      Thank you very much.
21      I appreciate it, sir.
22      THE WITNESS:  Well, on that note I will wave
23  goodbye to all.
24      THE COURT REPORTER:  Would you like to order
25  this, Ms. McGovern?

Page 271

1       MS. McGOVERN:  Yes, we do need it rush, we've
2   got deadlines.
3       THE COURT REPORTER:  When would you like ti?
4       MS. McGOVERN:  Whatever your rush fastest is,
5   even if it's rough.
6       THE COURT REPORTER:  By Monday or Tuesday is
7   that okay or is that too long?
8       MS. McGOVERN:  Monday is good.  We have -- all
9   of our dispositive deadlines -- I'm sorry,
10  dispositive motions are due May 8th.
11      THE COURT REPORTER:  Would you like to order a
12  copy?
13      MR. PRITT:  Yes.
14      Thank you.
15          ------
16  (The deposition was concluded at 7:33 p.m.)
17  (Reading and signing of the deposition was not
18  waived by the witness and all parties.)
19
20
21
22
23
24
25



Page 272

1              CERTIFICATE OF OATH
2   STATE OF FLORIDA
3   COUNTY OF MIAMI-DADE
4
5       I, LAURIE YANNACCONE, Florida Professional
6   Reporter, Notary Public, State of Florida, certify that
7   GORDON KLEIN personally appeared before me on Thursday,
8   the 30th day of April 2020, and was duly sworn.
9       Signed this 5th day of May 2020.
10
11
12
13  _____
    LAURIE YANNACCONE, FPR
14  Notary Public, State of Florida
    Commission No.: GG 908690
15  Commission Expires: October 19, 2023
16
17
18
19
20
21
22
23
24
25

LAURIE M. YANNACCONE
MY COMMISSION # GG 908690
EXPIRES: October 19, 2023
Bonded Thru Notary Public Underwriters

Page 273

1            CERTIFICATE OF REPORTER
2   STATE OF FLORIDA
3   COUNTY OF MIAMI-DADE
4
5       I, LAURIE YANNACCONE, Florida Professional
6   Reporter, certify that I was authorized to and did
7   stenographically report the deposition of GORDON KLEIN,
8   pages 1 through 271; that a review of the transcript was
9   requested; and that the transcript is a true record of
10  my stenographic notes.
11      I further certify that I am not a
12  relative, employee, attorney, or counsel of any of the
13  parties, nor am I a relative or employee of any of the
14  parties' attorneys or counsel connected with the action,
15  nor am I financially interested in the action.
16
17      Dated this 5th day of May 2020.
18
19
20
21  _____
    LAURIE YANNACCONE, FPR
22  Florida Professional Reporter
23
24
25

Page 274

```
1                    WITNESS NOTIFICATION LETTER
2    May 5, 2020
3    GORDON KLEIN
4    c/o BOIES SCHILLER FLEXNER, LLP
     44 Montgomery Street
5    Floor 41
     San Francisco, California 94104
6    415-293-6800
     BY:  MAXWELL PRITT, ESQUIRE
7    BY:  ALEXANDER HOLTZMAN, ESQUIRE
8         E-mail: Mpritt@bsfllp.com
          E-mail: Aholtzman@bsfllp.com
9

     In Re: IRA KLEIMAN v. CRAIG WRIGHT
10        Deposition of GORDON KLEIN
          Taken on 04/30/2020
11        U.S. Legal Support Job No. 2144381
12
          The transcript of the above proceeding is now
13   available for your review.
14        Please call 305-373-8404 to schedule an
     appointment between the hours of 9:00 a.m. and 4:00
15   p.m., Monday through Friday, at a U.S. Legal Support
     office located nearest you.
16
          Please complete your review within a reasonable
17   amount of time.
18
19
20        LAURIE YANNACCONE, FPR
          Florida Professional Reporter
21        U.S. Legal Support, Inc.
          700 East Dania Beach Boulevard
22        First Floor
          Dania Beach, Florida 33004
23        (305) 373-8404
          SouthEastProduction@USLegalSupport.com
24
25   CC: Via Transcript
```

Page 275

```
1                         ERRATA SHEET
2    DO NOT WRITE ON THE TRANSCRIPT-ENTER CHANGES ON THIS
                              PAGE
3
          IN RE: IRA KLEIMAN v. CRAIG WRIGHT
4                       GORDON KLEIN
                        04/30/2020
5            U.S. Legal Job No. 2144381
6
     Page No.  Line No.   Change             Reason
7    _____
     _____
8    _____
     _____
9    _____
     _____
10   _____
     _____
11   _____
     _____
12   _____
     _____
13   _____
     _____
14   _____
     _____
15   _____
     _____
16   _____
     _____
17   _____
     _____
18   _____
     _____
19   _____
     _____
20   _____
     _____
21   _____
     _____
22
     Under penalties of perjury, I declare that I have read
23   the foregoing document and that the facts stated in it
     are true and correct.
24
     _____          _____
25   Date                    Witness Name
```

Gordon Klein
April 30, 2020                                    275

```
1                         ERRATA SHEET

2      DO NOT WRITE ON THE TRANSCRIPT~ENTER CHANGES ON THIS
                              PAGE
3
            IN RE: IRA KLEIMAN v. CRAIG WRIGHT
4                      GORDON KLEIN
                        04/30/2020
5             U.S. Legal Job No. 2144381

6
```

| Page No. | Line No. | Change | Reason |
|---|---|---|---|
| 9 | 6 | "four" to "40" | TRANSCRIPTION ERROR |
| 13 | 11 | "not been actively" to "not been an actively" | TRANSCRIPTION ERROR |
| 14 | 22 | "not actively" to "not an actively" | TRANSCRIPTION ERROR |
| 15 | 4 | "school management" to "school of management" | TRANSCRIPTION ERROR |
| 17 | 25 | Delete "there were" | TRANSCRIPTION ERROR |
| 18 | 15 | "class called, Financial Analysis" to "class called Financial Analysis," | TRANSCRIPTION ERROR |
| 18 | 16 | "is sort of" to "it is sort of" | TRANSCRIPTION ERROR |
| 18 | 20 | "LLM program I taught" to "LLM program, I taught" | TRANSCRIPTION ERROR |
| 18 | 21 | "it was" to "or" | TRANSCRIPTION ERROR |
| 20 | 20 | "principle" to "principal" | TRANSCRIPTION ERROR |
| 21 | 2 | "Ocale" to "Ocala" | CORRECTION |
| 21 | 3 | L-E" to "L-A" | CORRECTION |
| 21 | 4 | "Ocale Funding" to "Ocala Funding" | CORRECTION |
| 22 | 25 | "come to mine" to "come to mind" | TRANSCRIPTION ERROR |
| 23 | 19 | "one much matter" to "one such matter" | TRANSCRIPTION ERROR |
| 25 | 1 | "tax matter Marvin" to "tax matter. Marvin" | TRANSCRIPTION ERROR |

| | | | |
|---|---|---|---|
| 25 | 2 | "was extremely" to "was an extremely | TRANSCRIPTION ERROR |
| 25 | 2-3 | "in your time refer" to "at one time or referred" | TRANSCRIPTION ERROR |
| 25 | 18 | "not, eliminate the" to "not eliminate, the" | TRANSCRIPTION ERROR |
| 26 | 15 | "judge" to "judge who" | TRANSCRIPTION ERROR |
| 26 | 20 | "but it also," to "but it is also" | TRANSCRIPTION ERROR |
| 27 | 2 | "contracts as purchase documents and invoices" to "contracts, purchase documents, and invoices" | TRANSCRIPTION ERROR |
| 27 | 13 | "and the court doesn't" to "and if the court doesn't" | TRANSCRIPTION ERROR |
| 28 | 20 | "notion in my ears" to "notion to my ears" | TRANSCRIPTION ERROR |
| 30 | 8 | "today don't remember" to "today I don't remember" | TRANSCRIPTION ERROR |
| 31 | 12-13 | "transactions were there allegations" to "transactions. There were allegations" | TRANSCRIPTION ERROR |
| 32 | 1 | "at minimum" to "at a minimum it" | TRANSCRIPTION ERROR |
| 33 | 8 | "its" to "it's" | TRANSCRIPTION ERROR |
| 33 | 20 | "valuation, principles accounting" to "valuation principles and accounting" | TRANSCRIPTION ERROR |
| 36 | 19 | "bankruptcy or around" to "bankruptcy in or around" | TRANSCRIPTION ERROR |
| 37 | 2 | "It's a vague" to "It's vague" | TRANSCRIPTION ERROR |
| 39 | 6 | Delete "do" | TRANSCRIPTION ERROR |
| 39 | 9 | "somebody's" to "somebody" | TRANSCRIPTION ERROR |
| 39 | 13 | Delete "like" in "like you" | TRANSCRIPTION ERROR |

| | | | |
|---|---|---|---|
| 39 | 17 | Add "about" in "I spoke about before" | TRANSCRIPTION ERROR |
| 39 | 23 | "statute of" to "statute in" | TRANSCRIPTION ERROR |
| 40 | 2 | "whose" to "who's" | TRANSCRIPTION ERROR |
| 40 | 11 | "of that has" to "of that as" | TRANSCRIPTION ERROR |
| 40 | 12 | "knowledge of having" to "knowledge from having" | TRANSCRIPTION ERROR |
| 40 | 22 | "his name a Paul" to "his name is Paul" | TRANSCRIPTION ERROR |
| 41 | 3 | "other his" to "other than his" | TRANSCRIPTION ERROR |
| 41 | 8 | "it's" to "its" | TRANSCRIPTION ERROR |
| 42 | 1 | "he" to "his" | TRANSCRIPTION ERROR |
| 43 | 21 | "are" to "but are" | TRANSCRIPTION ERROR |
| 45 | 12 | Delete "a" | TRANSCRIPTION ERROR |
| 46 | 2 | "not" to "now" | TRANSCRIPTION ERROR |
| 46 | 16 | "procesor" to "professor" | TRANSCRIPTION ERROR |
| 72 | 17 | "something" to "not something" | TRANSCRIPTION ERROR |
| 75 | 19 | "input" to "a put" | TRANSCRIPTION ERROR |
| 82 | 8 | "instructive" to "constructive" | TRANSCRIPTION ERROR |
| 82 | 15 | "give an automobile usage" to "give usage of an automobile" | TRANSCRIPTION ERROR |
| 82 | 18 | "And that it" to "And it" | TRANSCRIPTION ERROR |
| 86 | 17 | "Seminole" to "seminal" | TRANSCRIPTION ERROR |
| 99 | 23 | "only" to "don't" | TRANSCRIPTION ERROR |
| 183 | 12 | "methodologies" to "methodology" | TRANSCRIPTION ERROR |
| 183 | 15 | "that is the" to "and is the" | TRANSCRIPTION ERROR |

| | | | |
|---|---|---|---|
| 183 | 15 | "ago, was" to "ago, I was" | TRANSCRIPTION ERROR |
| 183 | 16 | "an practice" to "a practical" | TRANSCRIPTION ERROR |
| 183 | 18 | "associatively sharedness enterprise" to "associated with a shared business enterprise" | TRANSCRIPTION ERROR |
| 183 | 20 | "minding of" to "mining of" | TRANSCRIPTION ERROR |
| 202 | 10 | "in being" to "and been" | TRANSCRIPTION ERROR |
| 202 | 12 | "endeavors and" to "endeavors. And" | TRANSCRIPTION ERROR |
| 202 | 13 | "layout" to "lays out" | TRANSCRIPTION ERROR |
| 202 | 15 | Delete "it's in" | TRANSCRIPTION ERROR |
| 202 | 18 | "that section follows" to "in the section that follows" | TRANSCRIPTION ERROR |
| 222 | 17 | "DOS" to "DOGS" | TRANSCRIPTION ERROR |
| 222 | 18 | "DOS" to "DOGS" | TRANSCRIPTION ERROR |
| 229 | 2 | "DOS" to "DOGS" | TRANSCRIPTION ERROR |
| 251 | 9 | "provide" to "provides" | TRANSCRIPTION ERROR |
| 251 | 11 | "speak" to "speaks" | TRANSCRIPTION ERROR |
| 251 | 11 | "guidepost" to "guideposts" | TRANSCRIPTION ERROR |
| 259 | 9 | "than" to "from" | TRANSCRIPTION ERROR |

Under penalty of perjury under the laws of the United States, I declare that I have read the foregoing document and that the facts stated in it are true and correct.

5/20/20
Date

Witness Name