Confidential

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

-----------------------------------X
IRA KLEIMAN, as the personal        )
representative of the Estate of     )
David Kleiman, and W&K Info         )
Defense Research, LLC,              )
                                    )
              Plaintiffs,           )   CASE NO.:
                                    )
v.                                  )   9:18-cv-80176-BB/BR
                                    )
CRAIG WRIGHT,                       )
                                    )
              Defendant.            )
-----------------------------------X

CONFIDENTIAL

REMOTE DEPOSITION OF NICHOLAS JOSEPH CHAMBERS

Friday, May 1, 2020; 10:06 a.m. EST


Job No.:   573692

Pgs.  1 - 8, 22 - 227

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR,

CLR, RSA, Remote Counsel Reporter, LiveDeposition

Authorized Reporter

MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Confidential

Page 27

```
 1          Q.     Is he -- is Mr. White your boss?
 2          A.     I wouldn't say he's -- he's my boss.
 3    He's my colleague.
 4          Q.     And what -- within AlixPartners, what
 5    group do you work in?
 6          A.     I work in the e-Discovery and forensics
 7    group at AlixPartners.
 8          Q.     Is -- and are you aware that Mr. White
 9    also issued an expert report in this litigation?
10          A.     I'm aware that he issued expert reports
11    previously, yes.
12          Q.     Were you involved in the drafting of
13    those reports?
14          A.     I assisted Mr. White in some of the
15    draft -- the drafting of his device reports -- one
16    of his device reports previously.
17          Q.     Was Mr. White involved in the drafting
18    of your report?
19          A.     No -- insofar as he looked at the
20    formatting and grammar, like I mentioned
21    previously.
22          Q.     Are you aware why Mr. White is no
```



Confidential

Page 28

1    longer a testifying expert in this case?
2         A.    I am not, no.
3         Q.    And you stated previously you were
4    involved in the collection of documents in this
5    litigation.
6               Were you involved in the collection of
7    documents from the Defendant?
8         A.    I collected some documents at the
9    Defendant's residence, yes.
10        Q.    When was that?
11        A.    I believe that was February 2019.
12        Q.    Have you been involved in any of the
13   other document collection processes in this
14   litigation, beside -- besides the -- the initial
15   one that took place in February 2019?
16        A.    I've performed collections since then,
17   yes.
18        Q.    Which collections have you performed?
19        A.    I collected five of the Plaintiff hard
20   drives that were presented to us for collection.
21        Q.    Outside of the initial collection in
22   February 2019 from the Defendant and the collection



Confidential

Page 29

1    of the Plaintiffs' devices, have you participated
2    in any of the collection of devices in this
3    litigation?
4       A.   Not that I'm aware of, off the top of
5    my head, but I would have to review collection
6    documentation to be able to say that with
7    certainty.
8       Q.   Have you traveled in this -- outside --
9    you stated you traveled to the Defendant's home?
10       A.   Yes, correct.
11       Q.   In London or outside of London?
12       A.   It was outside of London, yes.
13       Q.   Who else was at that -- who else
14    assisted in that process?
15       A.   Do you mean from the AlixPartners team,
16    or are you referring to other entities?
17       Q.   Yes, who was -- who was involved in --
18    anybody. Who was involved in the collection
19    process at the Defendant's home?
20       A.   I was involved in the process;
21    David White was there as well; and there were
22    members of counsel, as well as additional forensic



Page 62

```
 1    looking at the file and its structure itself?
 2         A.    That is one way to look at it, yes.
 3         Q.    Okay.  Outside of reviewing metadata,
 4    would you have done anything else with the file
 5    itself?
 6         A.    As I mentioned, more than just the
 7    metadata, is looking at the actual content of the
 8    file with any sort of header, body attachment.  I
 9    don't necessarily consider that metadata, but it is
10    content and potentially relevant information.
11         Q.    So you would have reviewed metadata and
12    the contents of the file.
13               Is there anything -- is that a fair
14    characterization of two of the things you would
15    have done?
16         A.    Among others, yes.
17         Q.    Did Dr. Edman review the metadata and
18    the contents of the files he opined upon?
19         A.    Based on his reports, he appears to've
20    looked at certain pieces of metadata within those
21    documents, yes.
22         Q.    And I'm just talking -- I'm not talking
```



Page 63

1  about the eventual opinions he offered.
2           Is there anything inaccurate in
3  Dr. Edman's report relating to his
4  characterizations of the metadata and the content
5  of the files?
6       A.   Again, I wasn't in my report
7  determining whether or not his facts were accurate.
8  I was opining on his methodology and the
9  conclusions that he comes based on those facts as
10 it relates to specifically metadata and the content
11 of a file.
12          There were certain items related to IP
13 addresses and others that I think are kind of a
14 separate issue.
15      Q.   Let me -- so you have no opinion on
16 whether or not the -- Dr. Edman extracted the
17 metadata correctly from the file?
18      A.   In my report, I wasn't opining on that,
19 no.
20      Q.   And I'm not even -- I'm not looking at
21 your report.
22          Did you analyze whether Dr. Edman



Confidential

Page 64

1  reviewed the metadata correctly?

2     A.   I did not, no.

3     Q.   So sitting here today, you don't know
4  whether or not Dr. Edman reviewed the -- accurately
5  extracted the metadata from the files
6  produced -- the files he opines on?

7     A.   From reviewing the exhibits, you know,
8  I can make some determination on the fact that --
9  based on what sort of metadata he is pulling out
10 and what sort of information he is extracting.
11 Beyond that, I did not make a definitive conclusion
12 on whether that was performed correctly in terms of
13 actually extracting the data.

14    Q.   And you haven't formed any opinion
15 whether he's done that incorrectly?

16    A.   I don't have an opinion either way.

17    Q.   Okay.  So you would have reviewed the
18 metadata, the contents of the file.

19         The next thing you would have done --
20 is it fair to say -- chain of custody?

21    A.   Correct, that is one thing.  Sure.

22    Q.   Okay.  Outside of metadata, contents of



Page 65

1  the file, chain of custody, what else would you
2  have done?
3       A.     Understanding -- and by "chain of
4  custody," I mean, the historical significance of a
5  file beyond just the actual are we into forensic
6  process and the methodology of chain of custody,
7  which is typically documenting how something was
8  collected.  But beyond that, we're looking at
9  historical use of a document, how it came to be.
10  All that is best forensic approach and something
11  that we have to consider when analyzing a
12  document.
13       Q.     What do you mean by "historical use of
14  a document"?
15       A.     So as an example, if I get a document
16  from someone and I don't understand how that -- the
17  background of that document, I just analyze it as
18  is, my conclusion might be potentially incorrect or
19  the possibility of a conclusion that I come to
20  might be incorrect simply because I don't
21  understand how that document came to be.  But if
22  someone is able to tell me, Oh, this document has



Page 66

```
 1    gone through four different e-mail systems and been
 2    scanned and OCR'd, that's a completely different
 3    situation and something where we have to take the
 4    conclusions of the data that we're seeing in a
 5    document in a different light.
 6         Q.    So you would've reviewed -- in your --
 7    what you would have done -- correct me if I'm
 8    wrong -- is, I suppose, interviewed the person that
 9    the document came from?
10         A.    No, not necessarily interviewed, but,
11    certainly, tried to determine the best -- to the
12    extent that information is available and exists,
13    how it was collected, where it came from and any
14    sort of other historical information we can find
15    out about it.
16         Q.    And how would you find out that
17    information besides -- I mean, we talked about
18    metadata content.
19               I'm trying to understand -- it seems
20    there's this additional layer analysis you would
21    have performed, which is the context of the
22    document.
```



Page 67

1  Outside of a chain of custody review,
2  how else would you have determined the historical
3  context of a document?
4  A.   It depends on the document and what
5  information might be available.
6  Q.   Let's talk about the documents that
7  Dr. Edman analyzed.
8  What would you have done in relation to
9  the documents Dr. Edman analyzed from the
10 historical context?
11 A.   Sure.
12 So if there was a document that we
13 could determine was collected from a certain device
14 and we know that that device had, say, a label on
15 it that indicated that it was belonging to a
16 company or potentially a former employee at that
17 company, that could -- that context could change
18 the conclusions that we draw from our analysis of
19 that document.
20 Q.   What -- you collected some of
21 Dr. Wright's documents in this case, correct?
22 A.   I collected some of his -- some of the



Page 68

1   devices in his possession, yes.
2       Q.    What would you have done to determine
3   the authenticity of those documents, besides
4   reviewed their content and metadata?
5       A.    As I mentioned, I would look to the
6   historical collection documentation that we have
7   that might indicate other additional information
8   about that document or the device where it was
9   collected from.
10      Q.    For the devices that you collected,
11  what additional historical information can you tell
12  us about those devices?
13      A.    It depends on the device.  I would have
14  to review collection documentation to determine
15  exactly what was there, but, like I said, things
16  such as labels on the device, papers inside the
17  laptop lid, other information like that.
18      Q.    "Papers inside the laptop lid."
19            How would papers inside the laptop lid
20  give you any information about electronic device --
21  files stored within the laptop?
22      A.    It potentially could, because it's --



Page 69

1  it's common for, say, an IT person when they're --
2  say, if you take a laptop from someone and you put
3  some identifying information about that laptop or
4  who it came from, you can put that on a label or a
5  piece of paper and attach that to the device.
6  That's something that's certainly common and for
7  us, as forensic examiners, might yield additional
8  information that might flavor and provide context
9  to our conclusion.
10      Q.    Is it ever possible to determine the
11  authenticity of a document from the metadata and
12  contents of the document alone?
13      A.    Can you -- can you clarify for me what
14  you mean by "inauthentic" or "inauthenticity"?
15      Q.    What's your definition of
16  "inauthenticity"?
17      A.    It would be something that's been
18  altered for the purposes of deceit, essentially
19  kind of a synonym for forgery.
20      Q.    So in your definition of
21  "inauthenticity," you're assuming that there needs
22  to be a layer of deceit involved in order to make a



Page 70

1      determination of inauthenticity?
2           A.    In my experience and my expert opinion,
3      the use of the word "forgery" or "inauthentic"
4      implies intent, and attempting to state intent
5      based on the contents of a single file alone, in my
6      opinion, is unreasonable and not something I would
7      do.  I think you would need additional data points
8      in order to perform that.
9           Q.    If so -- and so -- okay.  I understand.
10                What word would you use to describe a
11     file that has been altered but that you don't
12     necessarily know the intent of that alteration?
13          A.    I think one possibility you could say
14     is that that document has been modified.
15          Q.    The document has been modified.
16                If Dr. Edman used the word "modified"
17     instead of "manipulated" in his report, would you
18     have any issues with the opinions he's offering?
19          A.    Again, I understand that Dr. Edman is
20     offering an opinion, but in my experience, having
21     the existence of a certain item of metadata that
22     might indicate modification is not enough to make a



Confidential

Page 71

1   definitive conclusion of modifications -- simply
2   don't understand who made that modification, how it
3   was done, when it was done -- potentially that
4   might be available -- but to state that something
5   as a definitive conclusion has been modified
6   instead of just a possibility, that's something I
7   would not do.
8        Q.   Have you reviewed the documents
9   Dr. Edman analyzed to determine whether or not they
10  were modified?
11       A.   Based on my examination of the
12  exhibits, I can determine that there potentially
13  could be markers of modification, but to state that
14  as an indication of forgery or inauthenticity or
15  even a definitive conclusion of modification rather
16  than just a possibility, I think is what this comes
17  down to.
18       Q.   Are there any documents you reviewed
19  that you can, sitting here today, say were not
20  modified, in your opinion?
21       A.   I don't have an opinion on that one way
22  or another.



Page 72

```
1      Q.    You don't have an opinion on whether or
2   not any of the documents that Dr. Edman reviewed
3   were modified?
4      A.    Again, because that's not what the
5   purpose of my rebuttal report was, I did not
6   analyze those documents to determine whether or not
7   the metadata that was being indicated is actually
8   the result of a modification or not.  I was merely
9   looking at the methodology and the conclusions
10  drawn from those facts.
11           I think it's a possibility of what's
12  being seen but not a definitive conclusion.
13     Q.    It's possible that the documents that
14  Dr. Edman cited to were modified?
15     A.    It's possible, yes.
16     Q.    It's possible they were manipulated?
17     A.    Again, "manipulation" implies intent,
18  so it's -- I'm --
19     Q.    I'm asking is it possible.
20     A.    In the realm of possibility, yes, that
21  is a possible explanation.
22     Q.    Is it possible that the documents that
```

