*Litigation Services Handbook: The Role of the Financial Expert, Sixth Edition.*
Edited by Roman L. Weil, Daniel G. Lentz and Elizabeth A. Evans.
Copyright © 2017 by John Wiley & Sons, Inc.

CHAPTER **5**

# *EX ANTE* VERSUS *EX POST* DAMAGES CALCULATIONS*

## Elizabeth A. Evans
## Roman L. Weil

### CONTENTS

5.1 Introduction   5.1
5.2 Expectancy versus Outcome Damages   5.2
5.3 Application of the *Ex Ante* Approach in Litigation   5.3
  (a) The Mechanics of *Ex Ante* Analyses   5.3
  (b) The Debate   5.6
5.4 Application of the *Ex Post* Approach in Litigation   5.7
  (a) The Mechanics of *Ex Post* Analyses   5.7
  (b) The Debate   5.9
5.5 Hybrid Approach   5.10

5.6 The Book of Wisdom   5.11
5.7 The Wrongdoer's Rule   5.13
5.8 Conclusion   5.14

**APPENDIX: CASE LAW SUPPORTING *EX ANTE* AND *EX POST* ANALYSES**   5.15

**NOTES**   5.21

**LIST OF CASES**   5.22

**REFERENCES**   5.23

## 5.1  INTRODUCTION

Economic damages awards in litigation serve a double purpose: they compensate entities that suffered harm from unlawful acts and they deter future unlawful acts. The optimal compensation award should put an injured entity in the same economic position it would have been but for the act. The optimal deterrent award, putting aside punitive issues, should be equal to the ill-gotten gain derived from the unlawful act adjusted for the probability that someone will detect the act. In many cases these two amounts are the same. Consider an example whereby I steal $100 from you. If my immediate apprehension and the return of your money to you were certain—an environment where the legal system is costless to operate and makes no errors, then your economic loss would be eliminated and my ill-gotten $100 would have been disgorged. Under that circumstance, the compensation amount equals the deterrent amount. I would have no incentive to steal from you, and you would have no incentive to incur costs to deter the robbery.

---

*The coauthors acknowledge their former coauthors, Michael Wagner and Michael Dunbar; this chapter has retained much of their work from previous editions of the *Litigation Services Handbook*.

In this example of immediate restitution, one can easily find an optimal award that satisfies both the compensation and deterrent purposes. Ideally, plaintiffs would receive instantaneous compensation for the damages they suffered without delay between the date of injury and the award of damages. If a delay occurs between the time of the unlawful act and the date of restitution, however, the victim's harm and the wrongdoer's ill-gotten gain often diverge.

In the real world, a delay always occurs between the date of injury and the date the plaintiff receives compensation. During the time lag, in addition to the divergence between the damages and ill-gotten gain, information about the payoffs to the unlawful act becomes available, which can change the parties' perception of the damages.

For example, suppose that you buy a lottery ticket for $1. Then suppose I steal it from you before the lottery drawing occurs and the winner becomes publicly known. Assume that on the date of the injury all lottery tickets had an equal chance of winning and there was no shortage of tickets available for $1. Time passes and it turns out that the ticket I stole from you is the lottery winner and is now worth $32 million. How much should I pay you to make you whole? Do I owe you the expected value of the return from the ticket, about 12 cents, called the *ex ante* value—its value before the event?[1] Or do I owe you the fair market value of the ticket I stole, $1? Immediately after the theft, I can restore you to your position before the theft by paying you $1 so that you can buy a replacement lottery ticket, to which you are indifferent before the lottery drawing occurs. Or do I owe you the amount that you would have made had you owned the winning ticket, $32 million, the *ex post* value—its value after the event?

Surely one could argue that if you bought a ticket with an expected value of 12 cents, you were not planning to try to resell it before the winner was announced. If you weren't keeping the ticket through the lottery drawing, you would have been better off not buying it at all. Therefore, after the fact—*ex post*—it is a virtual certainty that you would have won the lottery.

Given these circumstances, and considering that at the time of the theft you could have bought another ticket with equal probability of winning for $1, most would agree that damages on the date of theft are $1. After the lottery ends and your ticket becomes worth $32 million, few juries would consider a remuneration of $1 for $32 million in winnings a just resolution, even though all might agree that you could have mitigated the harm after the theft, before the drawing, by buying another ticket.

Consider a damages system that awards $1 if the ticket was not a winner and $32 million if it was. Such a system gives the original owner an incentive to have his or her ticket stolen. Such a system is defective.

## 5.2   EXPECTANCY VERSUS OUTCOME DAMAGES

Most business activities resemble lotteries: the firm invests time and money up front in an activity with an uncertain outcome. Thus, the damages expert faces the question of whether to compute damages at the time of the investment (or unlawful act) or after the outcome is known.

*Ex ante* is Latin for "from before." A pure *ex ante* analysis would use information only if it were available at the time of the unlawful act to calculate the damages

|  | *Ex Ante* | *Ex Post* |
|---|---|---|
| **Information** | Use information known or knowable on the date of the unlawful act; ignore subsequent events. | Use all available information. |
| **Measurement Date** | Date of unlawful act. | Date of analysis. |
| **Discounting** | Discount all cash flows back to the date of unlawful act using a rate that reflects the risk of the asset. Calculate prejudgment interest on this amount from the date of the unlawful act to the date of judgment using a rate reflecting either the plaintiff's cost of capital, or the defendant's debt rate. | Bring past cash flows (i.e., damages) to present value using an interest rate reflecting either the plaintiff's cost of capital or the defendant's debt rate. Discount future cash flows (i.e., damages) to the date of judgment. |

**Exhibit 5-1.   Differences between *Ex Ante* and *Ex Post* Calculations**

incurred at the time of the act. Practitioners base the analysis, therefore, as though they were to analyze the damage caused by the act contemporaneously with the occurrence of the act. *Ex post* is Latin for "from after." A pure *ex post* analysis uses all the information available up to the date of the analysis. Such an outcome-based analysis accounts for facts that become known after the unlawful act, such as a product's success in the marketplace, the increased value of a tangible asset, or, indeed, the outcome of a lottery.

One could also perform an analysis that is a hybrid between *ex post* and *ex ante*. For example, when analysts use information available after the date of the unlawful act, they often discount cash flows that occurred at a risk-adjusted discount rate to the *ex ante* measurement date. See Section 5.5 of this chapter.

The differences between *ex ante* and *ex post* analyses lie in which information subsequent to the unlawful act the analyst uses, the date of the damages measurement, and how the analyst discounts future damages. Exhibit 5-1 highlights the differences between the two approaches as practitioners have applied them.

## 5.3   APPLICATION OF THE *EX ANTE* APPROACH IN LITIGATION

### (a) The Mechanics of *Ex Ante* Analyses

To illustrate the mechanics of *ex ante* analyses, we use the following example. Suppose that on New Year's Day 1999, the defendant stole the victim's 1997 first edition of *Harry Potter and the Philosopher's Stone*. At that time, the victim, the defendant, and others could have bought an identical replacement for $300. The market value of this rare first edition increased steadily so that by 2010 it was worth $40,000 (and by the time of publication of this chapter its value exceeds $60,000).

The first edition's original owner files a lawsuit, and the trial begins on December 31, 2010. An expert using a pure *ex ante* approach would calculate damages of

$300 and then might calculate interest on the $300 from January 1, 2000, to December 31, 2010. Three hundred dollars is the expected value of the book as dictated by the then-current market price. If the plaintiff had a different expectation for the book's future value, he could have mitigated any damages by buying another book for $300 after the theft. In fact, if he had thought the book was worth more than its market value of $300, he should have bought additional books (although only 800 were published and of those 300 went to libraries).

Advocates of *ex ante* analyses point out that using *ex ante* information properly allocates risk.[2] In the *Potter* example, the book's market price on the date of the theft already incorporates the probability that it will become a collector book. The market price also incorporates the then-higher probability that the book will ultimately be worth only the decorator value of used books generally.

When the victim's $300 book was stolen, he was relieved of the risk that it would ultimately become nearly worthless and deprived of the low-probability outcome that it would become a collectible. The market value of the book on the theft date reflects the present value of these two possible outcomes and all future costs and benefits associated with ownership. In this way, an *ex ante* approach helps analysts avoid two significant potential pitfalls associated with an *ex post* approach: incorrectly accounting for avoided risk and neglecting avoided costs and benefits.

Proponents of the *ex ante* approach argue that awarding $40,000 improperly rewards the plaintiff for the full current value of the book without taking into account that the plaintiff avoided the costs and risks of ownership. Implicitly, the costs and risks of ownership equal $39,700 (= $40,000 – $300). An *ex ante* approach properly measures the value of an asset at the time it was taken, whereas an *ex post* approach converts a risky investment into a certain outcome.

Even though the *ex ante* approach solves some particularly sticky problems associated with the *ex post* approach, it has problems of its own. For example, some firms have private information on which they value particular assets more or less highly than the market does. In that case, do the firms' expectations set the amount of damages? Likewise, suppose the plaintiff had a once-in-a-lifetime chance to succeed (i.e., there were no additional lottery tickets nor *Potter* first editions available to replace the stolen one). Additionally, the assets can have unique value to a particular firm. Is this unique value the relevant measure of *ex ante* damages if the firm falls victim to an unlawful act? Proving that an asset has a value that differs from market value can be difficult.

The damages expert can rarely value the act's consequences with accuracy as of the time of the act because of the difficulty of reconstructing the information known when the act occurred. Sometimes contemporaneous forecasts exist, but these can be imprecise information sources. Forecasts produced for different purposes or by different business units in the same organization can vary. Sometimes individuals associated with a project prepare more aggressive forecasts than those prepared by management, whose bonuses rely on performance compared against those forecasts. Banks and venture capitalists prefer conservative forecasts. Firms and industries often make multiple forecasts showing different expected outcomes. These problems sometimes drive experts to inappropriately rely on unreliable forecasts made at the time of the unlawful act.

*(i) Usable Information*   An *ex ante* analysis relies on information known or knowable at the time of the unlawful act. One cannot, however, easily identify all knowable information.

Anything in the public domain is arguably knowable. Private information held by the opposing parties or third parties is also arguably knowable. Indeed, patent law accepts that the patent holder's private information is knowable. Patent law regards all subsequent information as knowable at the time of the hypothetical negotiation that the courts assume to occur contemporaneously with the act. Section 5.6 of this chapter discusses this concept, also known as the *book of wisdom*.

One way to identify relevant information hypothesizes an analysis that the plaintiff could have performed at the time of injury. This current analysis could include any information that the injured party would have used in performing that contemporaneous analysis. As a practical matter, the expert may use other information from documents dated slightly after the date of the unlawful act on the basis that the information was known or knowable prior to the date that the document memorialized it.

Questions often arise regarding the treatment of subsequent mitigation and investment. If one uses an *ex ante* analysis, one should not consider the outcome of subsequent actual mitigation. Doing so converts the analysis into an *ex post* measure of damages. Similarly, in theft of trade secrets or patent infringement cases, the injured party often makes significant investments after the date of the theft that it might not have made had it been aware of the theft. To ensure consistency, a pure *ex ante* analysis should not consider subsequent information about these actual investments.

*(ii) Measurement Date*   The measurement date is the date as of which the expert calculates damages. In the case of an unlawful act that occurs on a single date—the breach of a contract, for instance—the measurement date would be the date of the breach. Some cases have multiple unlawful acts occurring on different dates. For example, one could argue that every time a patent infringer makes, or uses, or offers to sell, or sells an infringing product, the infringer commits a new unlawful act. In this example, an expert applying an *ex ante* analysis should measure the damages associated with each separate unlawful act on the date that each occurred.[3]

*(iii) Probability of Outcome*   If no contemporaneous market price exists, or if, for whatever reason, the market price does not reflect the idiosyncratic value to the victim, then the expert can forecast future cash flows with contemporaneous information. Such forecasts lend themselves to the assignment of relative probabilities to different possible outcomes. Similarly, if contemporaneous analyses do exist, one may find multiple analyses, such as best-case, worst-case, and expected-case analyses. A proper analysis should assign probabilities to the various scenarios and weight the resultant net present values of damages proportionately.

*(iv)* Ex Ante *Discounting*   In *ex ante* discounting, an expert applies a risk-adjusted rate of return appropriate for the company or project at issue when discounting the lost cash flows back to the date of damage (or breach). This calculation yields a lump sum equal to the present value of the damages on the date of the injury. The analysis can weight this lump sum according to the probability of outcome

as described in Section 5.3(a)(iii) of this chapter. The expert subsequently applies prejudgment interest to the damages amount starting from the date of the act and continuing through the restitution date.

As with identifying measurement dates, discounting becomes complicated when the unlawful act is not a one-time event. For example, suppose that two unlawful acts occur on different dates. An analyst could ascertain separate discount rates for each unlawful act and discount the lost cash flows back to the corresponding unlawful act dates. Or, as in the case of the patent infringement discussed in Section 5.3(a)(ii) of this chapter, one should not discount all the cash flows back to the date of first infringement; instead, an expert should discount the separate cash flows (at different discount rates, if necessary) to the date of each lost sale. In sum, if the unlawful act does not occur on a single date, then the expert should calculate damages associated with each unlawful act and discount the damages for each act back to the appropriate date at the appropriate discount rate, which depends on the date of each unlawful act.[4]

*(v) Prejudgment Interest*   Some courts allow the computation of prejudgment interest and grant that amount to plaintiffs. One should calculate prejudgment interest from the date of damages to the date of recovery. Because of uncertain recovery dates, the courts often use the date of trial as a proxy for the recovery date. Courts have used a variety of interest rates for prejudgment interest. State law and federal statutes often specify a statutory rate. If no statutory rate exists, it is common and logical to use the defendant's unsecured borrowing rate.[5] This practice makes sense because the defendant owes the damages to the plaintiff; thus, the analysis can regard the damages as funds that the plaintiff has, albeit involuntarily, lent to the defendant. The appropriate risk-adjusted rate for this loan reflects the defendant's default risk, captured by the defendant's unsecured borrowing rate for loans of similar duration initiated in the same time period. Even though courts sometimes use the plaintiff's opportunity cost as a measure of prejudgment interest rates, this rate is inappropriate because it is calculated under the false assumption that the plaintiff would have assumed the average risk of all its assets in order to earn its opportunity cost, rather than merely the default risk that the defendant would fail to pay.

**(b) The Debate**

*(i) Advantages*   The *ex ante* approach properly accounts for risk. The contemporaneous market price or contemporaneously conducted analyses capture the probability of the entire spectrum of outcomes. Awarding a plaintiff with all the benefits of a successful project without the plaintiff's need to assume the project risk would overcompensate the plaintiff. In fact, it would give the plaintiff an incentive to seek harm. Better that I should induce you to deprive me of the right to drill for oil on a site that is likely a dry hole than that I should spend the, say, $1 million to drill for myself. If I can induce you to deprive me of the right to drill, then I can save the $1 million of drilling costs but still collect the value of the oil if, contrary to expectation, the well turns out to be a gusher. Additionally, the results of an *ex ante* analysis are independent of when the trial occurs. Therefore, there is no

incentive for a plaintiff to attempt to game the court system by timing a potential lawsuit to maximize damages awards. *Ex ante* analyses also provide foreseeability of consequences to potential wrongdoers. Another advantage: it does not penalize the plaintiff for a decision to either pursue or not pursue mitigation.

*(ii) Disadvantages*   *Ex ante* approaches often require a complex reconstruction of the world at the time of the unlawful act, likely impaired by a shortage of contemporaneous information. The expert will often need to construct both an actual and a but-for world, neither of which in fact existed. The constructed actual world reflects the cash flow from the next best alternative given the unlawful act. The but-for world is composed of future cash flows that would have followed but for the act.

Another potential disadvantage of the *ex ante* approach lies in its use of contemporaneous markets for valuation at the time of the unlawful act. The notion that the market value at any given time reflects the present value of future cash flows assumes efficient markets and perfect information. However, some markets are not efficient, and perfect information rarely exists. In fact, proponents of the *ex ante* approach agree that since private information related to the value at the date of the act provides the best information, the market is not the ultimate arbiter of value.[6] Also, even with complete information, market forecasts can be wrong. Even if one had a broad portfolio of used books, for example, the forecast future value of a book at the time of theft will not likely closely match the actual future value if the restitution were many years away.

## 5.4   APPLICATION OF THE *EX POST* APPROACH IN LITIGATION

### (a) The Mechanics of *Ex Post* Analyses

*Ex post* computations rely on actual outcomes. The expert looks backward from the time of trial and uses actual information. In an *ex post* analysis, experts believe that events that happened after the date of the unlawful act provide information useful in understanding the economic effect of the act and, thus, affect the cost imposed by the act. Consider our example of the stolen *Potter* first edition introduced in Section 5.3(a) of this chapter. The market value on the date of theft was $300 even though the December 31, 2010 market value was $40,000. Using *ex post* information, damages would be $40,000 less the avoided costs of ownership between the theft date and the date of trial (e.g., costs of storage costs and  insurance) plus any lost benefits of ownership between the theft date and the trial date (e.g., exhibition fees in book shows).

The application of *ex post* information raises several questions:

- If subsequent information is available, how should the expert use it?
- If the analysis uses subsequent information, how does this affect the risk profile of the cash flows, and, consequently, how does this affect the appropriate discount rate for discounting those cash flows?
- Does the use of subsequent information affect the selection of the present value date used for the calculation of damages?
- How should the analysis treat subsequent mitigation and investment?

*(i) Usable Information*   In a pure *ex post* analysis, all available information has relevance. Because the analysis aims to value the unlawful act as of the date of restitution, more recent information about the value becomes particularly important in assessing the current value. If forecasts are available at the time of computation, the analysis uses recent forecasts, not earlier ones, and adjusts those forecasts for known differences in assumptions.

Additionally, both the outcomes of mitigation efforts and the actual investments made by the victim provide relevant and important information in *ex post* analyses. If, for example, the defendant wrongfully precluded the plaintiff from making a particular investment, an expert should consider what the plaintiff subsequently did or should have done with the funds it could not invest.

*(ii) Measurement Date*   Experts measure *ex post* damages as of the date of restitution. Such analyses use the trial date or the analysis date as proxies for the date of restitution. One could also use the expected date of final payment or even the expected date of the resolution of subsequent appeal, depending on the facts of the case and the available information.

*(iii) Ex Post Discounting of Cash Flows*   The *ex post* approach discounts future lost cash flows at the risk-adjusted rate of return appropriate for the company or project at issue. *Ex post* discounting uses past lost cash flows and brings them forward to the restitution date at a rate sufficient to compensate for the defendant's default risk, but with no other risk considerations. As the previous paragraph discusses, the analysis can use various dates as a proxy for the restitution date.

Proponents of the *ex post* approach argue that their method of discounting has merit because it gives the plaintiff the exact recovery that, if invested at the same risk-adjusted rate of return as that of the firm, would reproduce the future stream of lost cash flows. Proponents also argue that the *ex post* approach offers the only means of putting plaintiffs in the same position they would have been in but for the unlawful act. In fact, one could argue that this approach is conservative because it regards the plaintiff's restitution date as the date of trial when, in fact, restitution often does not occur until later, after appeals. In that situation, even though the plaintiff does not receive restitution until years after the initial trial date, the method discounts the amount generated from future cash flows further back than necessary, to the initial trial date.

Critics of the *ex post* approach argue that by discounting only future damages that occur after the restitution date, experts accept pretrial damages as though they were certain and neglect the risk associated with earning those cash flows. The counterarguments have a legal, rather than economic, basis. In fact, the defendant precluded the plaintiff from taking the risks associated with earning those particular cash flows. If the plaintiff wanted to and could take those risks, the defendant should not benefit from preventing the plaintiff from taking those risks. One could also argue that once the plaintiff proves liability, the benefit of any uncertainty should go to the plaintiff. Section 5.7 of this chapter discusses the case law supporting this concept, known as the wrongdoer's rule. Moreover, critics argue that *ex post* damages reduce the incentive for mitigation—after all, victims could have bought another lottery ticket or another *Potter* first edition and restored their economic position as of the time of the unlawful act. If victims know they will collect *ex post* damages, then they have no incentive to mitigate.

*(iv) Prejudgment Interest*   Even though *ex post* analyses do not discount past lost cash flows, the cash flows should accrue prejudgment interest from the date the plaintiff lost them to the date of recovery (or a proxy for such a date). As with *ex ante* analyses, courts have used various interest rates for prejudgment interest. State law or federal statutes often specify a statutory rate. If no statutory rate exists, one can use the defendant's unsecured borrowing rate because the plaintiff is effectively lending the damages amount to the defendant.

### (b) The Debate

*(i) Advantages*   The *ex post* approach appeals to an individual's sense of justice. If someone steals your lottery ticket that becomes worth $32 million, even an unskilled lawyer can persuade jurors to award you $32 million in damages, not $1. While proponents of the *ex ante* approach argue that an *ex ante* analysis makes the victim whole as of the *date of the unlawful act*, proponents of the *ex post* approach argue that the *ex post* approach makes the victim whole at any time.

The *ex post* approach also provides a social deterrent to violating the legal rights of others. Only cases with significant damages will go to trial. For example, no one will bring a case to trial for a stolen lottery ticket that became worthless. *Ex ante* damages, therefore, will fail to deter when the plaintiff has little incentive to bring the wrongdoer to justice either because the outcome was small (or negative) or because even when the outcome was large, its expected value was small and the defendant would need to pay only the expected value. In the real world of potential judicial error and high transaction costs to litigating, this implication suggests that *ex ante* damages analysis without compensation for both the chance of court error and transaction costs does not properly deter.

Additionally, the *ex post* approach ensures that those who commit unlawful acts do not receive windfalls from doing so. Even though the thief of a losing lottery ticket is not brought to justice, the theft does not benefit him or her. This observation poses a powerful argument for using *ex post* information to calculate unjust enrichment.

*(ii) Disadvantages*   The *ex post* approach to measuring damages has disadvantages, one being that the damages amount changes over time as new data become available. Because the changing environment influences *ex post* damages, this approach provides incentive for gaming the courts to maximize or minimize damages. For instance, a party can intentionally delay proceedings until the stock market improves, or, as in our example, until *Potter* first editions have increased in value. Second, as Section 5.4(a)(iii) of this chapter discusses, the *ex post* approach unquestionably gives plaintiffs the benefit of the proceeds from a risk that they did not bear—it gives plaintiffs the incentive to seek harm, to seek to be deprived of the right to drill for a likely dry hole. Also, this approach risks overcompensation of the plaintiff. In particular, if the plaintiff can choose between an *ex post* and an *ex ante* remedy, the plaintiff is overcompensated when the *ex post* damages exceed *ex ante* damages. A defendant will argue whichever approach gives the lower damages figure as the correct approach to use.

Frank Fisher puts forth an alternative argument that the *ex post* method can overly deter wrongdoers because the infringer runs the risk of the downside loss.

For example, assume that an infringer has a 50 percent chance of a $200 gain and a 50 percent chance of a $100 loss; the expected gain then equals $50 [= (50% × $200) + (50% × −$100)]. The plaintiff will not choose to sue if the infringer incurs a loss but will sue if the infringer makes a gain. The plaintiff's expected recovery equals $100 [= (50% × $200) + (50% × $0)], and the defendant's expected net loss after disgorgement is −$50 {= [50% × ($200 − $200)] + [50% × (−$100 − $0)]}.[7]

Thus, the plaintiffs could be compensated for risks they did not bear while the infringers could be overpenalized by both bearing the downside risk and potentially being forced to disgorge the entire upside.

## 5.5   HYBRID APPROACH

Experts frequently blend different aspects of both *ex ante* and *ex post* analyses in a hybrid approach. A common hybrid between a pure *ex ante* and a pure *ex post* analysis uses *ex post* information but an *ex ante* measurement date. Experts discount the lost cash flows back to the date of the unlawful act, using a risk-adjusted discount rate based on the actual volatility of the returns in the *ex post* period.

The hybrid approach reasons that if all parties know what the lost cash flows would have been, no rationale exists for ignoring this information. What actually happened was, after all, one of the plausible outcomes at the time of the breach. This hybrid approach also appeals to some individuals' sense of justice because it uses the real world as a basis for the calculation of damages as opposed to a hypothetical expectation of what was known and knowable at the time of the unlawful act. It eliminates some speculation as to what the cash flows would have been.

Advocates argue that we must discount the actual cash flows to reflect the business risk of earning those cash flows. If the analyses do not discount actual cash flows at a risk-adjusted rate—as occurs in a pure *ex ante* approach—plaintiffs enjoy a superior economic position relative to where they would have been but for the unlawful act because the analyses ignore business risk.

Consider the situation in which a person has a choice between earning cash flows associated with some uncertainty and holding a free call option on his or her future cash flows. This individual would invariably choose the call option in order to avoid downside risk. Likewise, pursuing a pure *ex post* result in court is like giving the plaintiff a free call on his or her future lost cash flows because to obtain those cash flows, but for the unlawful act, the plaintiff would have had to suffer through some level of uncertainty, whereas he or she avoided such uncertainty when the act occurred.[8]

Discounting the *ex post* cash flows back to the date of the unlawful act at the appropriate risk-adjusted discount rate moves the pure *ex post* result closer to a position that is at risk parity with what would have happened but for the unlawful act. The appropriate discount rate for the hybrid approach should incorporate information from proxy companies in the market. The risk premium would be the market risk premium multiplied by the beta of the proxy companies for a period that parallels the damages period as closely as feasible. This hybrid analysis should calculate prejudgment interest as in the *ex ante* analyses—from the date of the unlawful act to the date of restitution. Therefore, an expert would first discount future lost cash flows to the date of the unlawful act, and then apply

prejudgment interest to both future and past lost cash flows from the date of the illegal act. When the statute does not specify a prejudgment interest rate, a reasonable rate would be the defendant's borrowing rate.

## 5.6   THE BOOK OF WISDOM

Some hybrid analyses use the concept of the *book of wisdom*. This concept allows damages experts to apply to their calculation facts established after the date of damage. The Supreme Court first set forth the concept of the book of wisdom in 1933 in the landmark case *Sinclair Ref. Co. v. Jenkins Petroleum Co.*[9] In its decision, the Court stated that

> at times the only evidence available may be that supplied by testimony of experts as to the state of the art, the character of the improvement, and the probable increase of efficiency or savings of expense. . . . This will generally be the case if the trial follows quickly after the issue of the patent. But a different situation is presented if years have gone by before the evidence is offered. Experience is then available to correct uncertain prophecy. Here is a book of wisdom that courts may not neglect. We find no rule of law that sets a clasp upon its pages, and forbids us to look within.

Further, the Court opined that facts established after the date of damage do not necessarily change past facts; rather, they "bring out and expose to light the elements of value that were there from the beginning."

Use of the book of wisdom often persuades courts because one could perceive it as a call for less speculation. In *Transit RR. Comm'rs.*,[10] the courts ruled that "certainty is better than conjecture, and injuries actually inflicted a better guide than opinion of experts as to the market values just before and after." Likewise, in *Fishman et al. v. Estate of Arthur M. Wirtz et al.*,[11] the Seventh Circuit allowed a damages calculation that applied the book of wisdom, stating that "we know of no case that suggests that a value based on expectation of gain is more relevant and reliable than one derived from actual gain."

In cases involving a measurement of value, the courts have used the book of wisdom to allow an analysis or to grant an award based on a lost outcome (i.e., *ex post*) approach, as opposed to a lost expectancy (i.e., *ex ante*) approach. For example, the Seventh Circuit sided with a book of wisdom approach in *Fishman*. The Fifth Circuit also supported a valuation analysis based on the book of wisdom in *Park v. El Paso Board of Realtors*,[12] even where it opined that, though a hypothetical sale at the date of the unlawful act can present a useful analogy for purposes of valuation, a lost going-concern value offers a more appropriate measure of loss when the plaintiff has been driven out of business. The court based its support of a lost going-concern calculation because nothing in principle prevents a plaintiff with a destroyed business from recovering future profits.

In addition to cases of valuation, courts often apply the book of wisdom in patent infringement cases when deciding the details of the hypothetical negotiation that would have occurred between two parties. In *Fromson v. Western Litho Plate & Supply Co.*,[13] the Federal Circuit, citing *Sinclair*, indicated that one could look at post-infringement events in calculating reasonable royalty damages. In this case, the plaintiff wanted to use the infringer's actual profits as evidence of the value of the patent. The court found that excluding the evidence was erroneous and explained that

the methodology [of simulating a hypothetical negotiation] encompasses fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators.

Likewise, in *Jamesbury Corporation v. United States*,[14] the opining judge found that because he was "aided by the benefit of hindsight, it [seemed] unnecessary to create such a fictional [analysis]" as a hypothetical negotiation would have used.

On occasion, however, courts have limited the applicability of the book of wisdom. In *TWM Manufacturing Co., Inc. v. Dura Corp.*,[15] the defendant argued that the plaintiff erred in its damages calculation because it based damages on a gross profit value that the defendant's management had projected in an internal memorandum prior to the defendant's infringement of the patent. The defendant believed that the plaintiff should have considered actual gross profit values, not projected values. The Federal Circuit rejected the defendant's argument and considered its pre-infringement memorandum as probative on the reasonable royalty issue. Thus, the court focused on the time the infringement began—specifically, it ruled that the book of wisdom did not apply in this case. Evidence of what happened after that time did not mitigate damages. Additionally, in *Odetics, Inc. v. Storage Technology Corp. (CAFC)*,[16] the U.S. Court of Appeals for the Federal Circuit found that the federal district court had not abused its discretion by disallowing a book of wisdom approach and thus excluding evidence of two licenses granted by a patent infringement plaintiff from consideration in calculating a reasonable royalty rate for award of damages. The Federal Circuit reasoned that, because the hypothetical negotiation required in reasonable royalty analysis obliges courts to envision the terms of a licensing agreement reached between patentee and infringer when the infringement began, the court could not in this case consider the license agreements in question, which were negotiated four and five years after the date of infringement.

Robert Goldscheider reconciles the contrary positions of the courts by stating that "one may employ the book of wisdom only by looking prospectively from the date of the hypothetical negotiation, not retrospectively." He illustrates this concept with the example of an invention that had no noninfringing alternative at the date of the hypothetical negotiation but had one—a design-around—five years later. In this case, the expert cannot use the book of wisdom to say that this alternative technology was potentially available at the time of the hypothetical negotiation just because it was achieved five years later. However, this example shows that it took five years to design around the infringed patent. The expert should use this information in calculating damages. Goldscheider adds that "reference should be made by expert witnesses to the book of wisdom whether or not such actual subsequent events were non-foreseeable aberrations. Anything that can contribute to the realism of the exercise should be given serious consideration."[17]

In sum, case law indicates that experts can, and indeed should, incorporate all information, even information relating to events that occurred after the date of damage or after the date of hypothetical negotiation in the damages analysis. If the goal is to ascertain the amount of damages that would return the plaintiff to the same position it would have been in but for the unlawful act, the expert should

use all available information in reconstructing the but-for world so that the resulting award reflects all the events that have contributed to or limited the damages suffered by the plaintiff.

## 5.7   THE WRONGDOER'S RULE

Because precedent has accepted both *ex ante* and *ex post* analyses, how do the courts decide which approach to use? Both experts and courts often overlook the concept of the *wrongdoer's rule*.

When the court has found liability, the wrongdoer's rule gives the benefit of the doubt to plaintiffs, leaving defendants with the burden of dispelling any uncertainty. In *Story Parchment Co. v. Paterson Parchment Paper Co. et al.*,[18] the Supreme Court ruled that "whatever . . . uncertainty there may be in [a] mode of estimating damages, it is an uncertainty caused by the defendant's own wrong act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced." The courts can apply this ruling to find in favor of a plaintiff's damages calculation.

Although its application is certainly not limited to *ex ante* and *ex post* cases, the wrongdoer's rule can provide a guideline for courts dealing with these two alternative analyses when deciding which damages calculation to award. Unless proved otherwise by the wrongdoer, courts will not withhold a reasonable damages estimate from the plaintiff. In *Fishman et al. v. Estate of Arthur M. Wirtz et al.*,[19] the Seventh Circuit granted a damages award based on an *ex post* analysis, opining that the defendants' objections of speculation were not sufficient, as the "defendants . . . should not benefit because their wrongdoing made it difficult to establish the exact amount of injury." Additionally, the court held that an *ex post* analysis was a reasonable estimate of damages, as "we know of no case that suggests that a value based on expectation of gain is more relevant and reliable than one derived from actual gain." It also cited *Sinclair* in saying that "to correct uncertain prophecies . . . is not to charge the offender with elements of value nonexistent at the time of his offense. It is to bring out and expose to the light the elements of value that were there from the beginning." As applied by the Court of Appeals of Maryland in *M & R Contractors & Builders, Inc. v. Michael et al.*,[20] the court can use the wrongdoer's rule in awarding an *ex ante* damages calculation. In this case, the court found nothing wrong in a damages calculation based on a profit expectation that was measured as of the signing of the subsequently broken contract. The court advised the district court, "Where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty." Citing from *Corbin on Contracts* (1951), the court further expressed "doubts [as to the amount of lost profits] will generally be resolved in favor of the party who has certainly been injured and against the party committing the breach."

Courts have not frequently applied the wrongdoer's rule to cases in which *ex ante* and *ex post* have been points of contention, but courts have tested and upheld its applicability on many occasions. In each of these occasions, the defendants complained that the plaintiffs' measures of damages were speculative, yet the courts allowed these calculations because, as stated in *Story Parchment*, the uncertainty involved was "caused by the defendant's own wrong act." Following

*Story Parchment*, the Supreme Court again applied the wrongdoer's rule in granting damages based on historical performance to the plaintiff in *Bigelow et al. v. RKO Radio Pictures, Inc., et al.*[21] The wrongdoer's rule as established by *Story Parchment* allowed for the granting of damages "which are definitely attributable to the wrong and only uncertain in respect of their amount." However, in *Bigelow*, the Supreme Court went one step further than it had in *Story Parchment*, concluding that even though a jury cannot "render a verdict based on speculation or guesswork . . . the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because [it is] not based on more accurate data which the wrongdoer's misconduct has rendered unavailable." Few courts, however, have applied the wrongdoer's rule as recognized in *Bigelow* to establish a causal relation between the harmful act and economic damages.

   The Second Circuit has also used the wrongdoer's rule to award the plaintiff damages when damage has resulted from the defendant's harmful act. See *Contemporary Mission, Inc. v. Famous Music Corp.*[22] and *Indu Craft, Inc. v. Bank of Baroda*.[23] As the Second Circuit stated in its *Contemporary Mission* decision, "Under the longstanding New York rule, when the existence of damage is certain, and the only uncertainty is as to its amount, the plaintiff will not be denied a recovery of substantial damages." State courts have also supported the wrongdoer's rule. The Supreme Court of Michigan has ruled that the risk of uncertainty should be thrown upon the wrongdoer instead of upon the injured party (*Allison v. Chandler*).[24] Similarly, in *Tull v. Gundersons, Inc.*,[25] the Supreme Court of Colorado granted damages to the plaintiff, stating that "although the amounts were not mathematically certain, had we disallowed recovery . . . for injuries that had been proven in fact, we would have rewarded the injurious party."

   In cases of *ex ante* and *ex post*, the courts can use the wrongdoer's rule in siding with the plaintiff's measure of damages. Because both approaches yield arguably reasonable results, defendants carry the burden of showing why the plaintiff's analysis is not appropriate for a specific case. This approach is especially relevant when the defendant's own acts have precluded an accurate understanding of the but-for world (e.g., in cases of antitrust and breach of contract).

## 5.8   CONCLUSION

The time lag between the date of the unlawful act and the date of restitution will always cause debate as to the merits of using *ex ante* and *ex post* analyses in calculating damages. No single approach will be appropriate for all situations; the decision to apply any particular approach will depend on case specifics. For any method described in this chapter, one can concoct a situation in which the result of applying that method would not satisfy a common perception of fairness.

# Appendix: Case Law Supporting *Ex Ante* and *Ex Post* Analyses

## CASE LAW SUPPORTING *EX ANTE* ANALYSES

This section discusses cases that reflect court decisions supporting *ex ante* analyses. We list these cases in chronological order. Note that the following cases reflect that breach of contract damage measures usually employ *ex ante* approaches.

*M&R Contractors & Builders v. Michael*, **215 Md. 340, 351; 138 A.2d 350, 356 (1958).**   Defendants hired a contractor (plaintiff) to build a home for them. Several months later the defendants informed the plaintiff that they did not want to have a home built at that time and asked the plaintiff to release them from the contract. Plaintiff filed suit against the defendants for the contract price of $23,420, of which $20,020 represented costs and $3,400 the expected profit. The plaintiff admitted that the only work done prior to the breach consisted of contract preparation, studying plans, and obtaining estimates from subcontractors. The plaintiff did not begin digging, paying for building materials, or signing contracts with subcontractors. At trial, the plaintiff abandoned his claim for the cost of the home and asked only for his anticipated profit, which he calculated by subtracting the estimates of the subcontractors from the contract price. The trial court found the plaintiff's proof of lost profits speculative and granted the defendants a motion for dismissal. The plaintiff appealed that decision and the appellate court reversed and remanded for a new trial. The appellate court held that one should measure unrealized profits as the difference between the contract price and the actual or estimated costs of full performance and that in this case the plaintiff appeared to make a reasonable estimate of his lost profits. The defendants also raised the issue of whether the plaintiff had minimized his damages. The appellate court held that the court should not deduct from the damages measure the gains made by

the plaintiff on another transaction unless the plaintiff could not have worked on another job without the defendants' having breached the original contract. Hence, while the lost profits damages measure relied on an *ex ante* analysis, whether the court should reduce the plaintiff's lost profits by the amount of profit made on a substituted contract depended on an *ex post* analysis.

***Sharma v. Skaarup Ship Management Corporation*, 916 F.2d 820, 825–26 (1990).** The plaintiffs alleged that the defendants (Chemical Bank and other individuals) breached a refinancing agreement, causing the plaintiffs to lose ownership of four tankers that became the property of the defendants. The plaintiffs sought as damages not only the market value of the vessels ($15 million) but also lost profits from future years ($80 million). The plaintiffs argued that Chemical Bank believed the shipping industry would experience sharply increased demand shortly and wished to acquire these tankers prior to the economic boom and that, but for Chemical Bank's wrongful actions, the plaintiffs would have received substantial profits when demand for the tankers increased. The trial court disagreed with this reasoning, stating that the plaintiffs could recover only the market value of the tankers and that lost prospective profits was not a proper damages measure. The plaintiffs appealed that decision. The appellate court also disagreed with the plaintiffs. The appellate court stated that "it is a fundamental proposition of contract law, including that of New York, that the losses caused by a breach are determined as of the time of the breach." The appellate court cited the following examples:

- In measuring damages, courts cannot take into account changes in currency exchange rates subsequent to a breach.
- Damages for the breach of an agreement to purchase securities equal the difference between the contract price and the market value of the asset at the time of the breach.
- Damages for a breach of contract to buy real estate equal the difference between the contract price and the market value at the time of the breach.

The appellate court concluded this discussion by noting that measuring damages by using the value of the items at the time of breach takes expected lost future profits into account. "The value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce. This stream of income, of course, includes expected future profits and/or capital appreciation."

***Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (1995).**   The jury found that the Bank of Baroda (the defendant) had curtailed the credit of Indu Craft (the plaintiff) and had caused Indu Craft difficulties in obtaining letters of credit because Indu Craft's president failed to invest in the computer business of the son of one of the bank's officers. The jury further found that these actions caused Indu Craft to go out of business in November 1987. The plaintiff presented two claims: (1) lost profits and (2) the loss of the value of the business. The appellate court rejected the calculation of lost profits because the plaintiff did not include fixed costs in its analysis. The appellate court, however, accepted the plaintiff's calculation of

the lost business value. The plaintiff calculated the lost business value by esti-
mating the earnings as of November 1987 (adjusted for a nonrecurring event—
the embargo of a country from which Indu Craft imported goods) and applying
to that number an earnings multiplier based on the earnings of publicly traded
comparable companies. The appellate court cited the *Sharma* case, which stated
that "where the breach involves the deprivation of an item with a determinable
market value, the market value *at the time of the breach* is the measure of damages"
(emphasis added).

***Brushton–Moira Central School District v. Fred H. Thomas Associates*, 91 N.Y.2d
256, 261–62; 692 N.E.2d 551, 553–54; 669 N.Y.S.2d 520, 522–23 (1998).**   The plain-
tiff school district employed the defendant to renovate its high school building.
Three months after the defendant completed the renovations, insulated panels
that replaced glass windows began to deteriorate, permitting water to penetrate
the building. The plaintiff sued for breach of contract. On appeal, the Appellate
Division of the Supreme Court of New York held, among other issues, that the
plaintiff should receive the replacement cost of the defective panels measured as
of the trial date, and sent the case back to the trial court. In turn, the plaintiff and
defendant appealed that decision. The Court of Appeals of New York rejected the
prior measurement date (i.e., the trial date) for damages. "Damages are intended
to return the parties to the point at which the breach arose and to place the non-
breaching party in as good a position as it would have been had the contract been
performed. . . . A cause of action for defective design or construction accrues upon
the actual completion of the work." The Court of Appeals also held that the trial
court should award prejudgment interest from that same date.

***Kelly v. Marx*, 428 Mass. 877, 878; 705 N.E.2d 1114, 1115 (1999).**   The plaintiffs
paid the defendants a $17,500 deposit for the $355,000 purchase of the defendants'
property. Five months later, the plaintiffs informed the defendants that they could
not purchase the property and asked the defendants to put it back on the market.
Several weeks after that, the defendants sold the property for $360,000, but refused
to return the plaintiffs' deposit. The plaintiffs sued to recover their deposit. The
trial court held that the liquidated damages clause in the contract was enforceable
and allowed the defendants to retain the deposit. The Appeals Court of Massachu-
setts ruled that the defendants should not keep the deposit in that they suffered no
damage, and as a result liquidated damages served as a penalty, not as compensa-
tion for a loss. The Supreme Court of Massachusetts sided with the trial court. It
rejected examining the amount the defendants finally received (i.e., the retrospec-
tive or "second look" approach) and instead focused on the circumstances at the
time of contract formation or the time of the plaintiffs' breach (i.e., the "first look"
approach). The Supreme Court noted that "a liquidated damages clause in a pur-
chase and sale agreement will be enforced where, at the time the agreement was
made, potential damages were difficult to determine and the clause was a reason-
able forecast of damages expected to occur in the event of a breach." The court
found that, under the circumstances, the deposit was a reasonable forecast of the
defendants' losses should the plaintiffs breach the contract.

## CASE LAW SUPPORTING *EX POST* ANALYSES

This section cites cases containing *ex post* analyses by courts. For example, decisions related to antitrust, patent infringement, damage to property by government, and legal malpractice cases have used *ex post* analyses. We list these cases by subject matter in chronological order.

### (a) Antitrust

#### *A.C. Becken Co. v. Gemex Corporation*, 314 F.2d 839, 840 (1963).
*Civil Antitrust.* The plaintiff claimed injury because the defendant refused to sell the plaintiff watch bands after 1956. At the original trial, the district court had found as fact and concluded as law that the plaintiff was not damaged. The Seventh Circuit Court of Appeals reversed and remanded in 1959, stating that, in fixing the proper amount of damages, the district court should consider the evidence already in the record on the subject of the plaintiff's damages, any proper evidence offered by the defendant, and rebuttal evidence of plaintiff. On remand, the district court considered additional evidence that occurred while the case was on appeal. According to the Seventh Circuit, these actions by the district court placed it in a position "where it had the benefit, not only of such projections as might have been reasonable based on the facts appearing at the first trial . . . but it also had the superior advantage of evidence of conditions which had in fact occurred while the case had been on appeal." The Seventh Circuit noted that while the evidence at the first trial was a reliable basis for damages, "no one can deny that to the extent future events modified its correctness, the entire evidence must be considered together."

#### *Park v. El Paso Board of Realtors*, 764 F.2D 1053, 1068 (1985).
*Sherman Act.* The plaintiff filed suit in 1978, claiming that the defendants had conspired to boycott his real estate firm in retaliation for the plaintiff's attempts to reduce real estate commissions. In 1982, the jury found that six of the ten remaining defendants had conspired to boycott the plaintiff's firm and entered a $927,559 judgment against them for past and future profits for the period from 1978 to 1991. To calculate damages, the plaintiff relied solely on the testimony of its expert, Dr. George. Among other factors, Dr. George estimated that by 1983 the plaintiff's firm would have captured 20 percent of the El Paso real estate market but presented no basis to support that assumption. The Fifth Circuit Court of Appeals reversed and remanded for a new trial on several issues. Because the court believed that the issue of adequate support for the damages amount might arise on remand, it noted that several aspects of Dr. George's model lacked a rational basis. For example, had the plaintiff's firm captured 20 percent of the El Paso real estate market, it would have equaled the size of the four largest real estate firms in El Paso combined. "On remand, the plaintiff must present a revised damages model, with a rational basis for each of the model's principal assumptions." The Fifth Circuit further stated that "since the exact number of residential resales can now be determined for much of the damages period, the plaintiff should incorporate these figures into his model rather than rely on projections as he did previously. The plaintiff should also use actual figures rather than projections for the home

resale inflation rate, when calculating the commission he would have received for his lost sales."

### Fishman v. Estate of Wirtz **and** Illinois Basketball, Inc. v. Estate of Wirtz, **807 F.2d 520, 552 (1986).**

*Sherman Act and Illinois Law.* In 1972, Illinois Basketball Inc. (IBI) and Marvin Fishman sought to purchase the Chicago Bulls. Instead the Chicago Professional Sports Corporation (CPSC) purchased the Bulls. IBI and Fishman filed a lawsuit claiming that CPSC had acquired the Bulls through violations of the Sherman Act and Illinois common law. The district court found that the defendants had engaged in anticompetitive acts in destroying the contract the plaintiffs had executed with the former owners of the Bulls. The Seventh Circuit Court of Appeals agreed that the defendant had violated Sections 1 and 2 of the Sherman Act, but disagreed with the district court's judgment that the defendant's actions amounted to a boycott or tortious interference with the contract. The Seventh Circuit also found that the district court erred in its computation of damages and remanded the case back to the district court for a new trial on this issue. The district court calculated IBI's damages using the yardstick of CPSC's actual financial experience from 1972 until 1982 (the time of the original trial). While the Seventh Circuit agreed with the general use of this yardstick, it found that the district court's damages method required revision. The Seventh Circuit, nevertheless, specifically disagreed with the defendant's assertion on appeal that damages must be computed as of the date of the injury (i.e., July 1972). "We know of no requirement that damages must always be computed as of the time of the injury or, if not, reduced by some appropriate discount rate to produce a value as of that date. . . . If a victim is deprived of what may turn out to be an unusually successful investment, his damages should reflect that fact." Further, the majority opinion disagreed with the dissent, which adopted 1972 as the time at which the court should measure damages. The dissent argued that while IBI lost one business opportunity, it could go out and invest in the next best business opportunity in 1972, and that the district court should have awarded the plaintiffs only the bargain element of its contract (i.e., the amount at which the plaintiffs would have been able to buy the Bulls below their "market price"). The dissent concluded that the plaintiffs lost no bargain element and no unique opportunity (in 1972), and they had no damages. The majority opinion noted that "we find the dissent's analysis unpersuasive insofar as it may suggest that IBI should have invested promptly in another basketball team. The dissent appears to treat basketball teams as fungible commodities. But the record does not disclose that there is anything like an auction market in basketball teams. As far as we know, the law imposes no duty on a buyer who has been unlawfully done out of a purchase of the Bulls to cover immediately with the Bucks, Celtics, or the Lakers. The record does not disclose that these teams were either fungible or available."

### (b) Patent Infringement

### Trans-World Manufacturing Corp. v. Al Nyman & Sons, Inc., **750 F.2d 1552, 1568 (1984).**

*Design Patent Infringement.* In 1978, the defendant (Nyman) asked the plaintiff (Trans-World) to design display racks for the eyeglasses that the defendant

sold. The plaintiff delivered to the defendant models of the display racks. Later, the plaintiff obtained design patents for these racks. Meanwhile, the defendant arranged for another firm to manufacture display racks based on the plaintiff's designs. The plaintiff claimed that the defendant's design patents were invalid. The plaintiff filed for two design patents for the racks in 1979 and the Patent Office issued the patents in 1980 and 1981. The plaintiff filed this suit in 1981. The trial judge refused to admit evidence of the defendant's profits on the sale of eyeglasses sold from the infringing display racks. Ultimately, that decision was irrelevant because the jury concluded that both patents were invalid. The appellate court, however, reversed the jury's decision on the patents' validity. Hence, the appellate court decided to issue an advisory opinion on the admissibility of the defendant's profits because the plaintiff would likely seek to introduce that evidence at the new trial. The appellate court noted that among the *Georgia-Pacific* factors, the jury should consider the infringer's "anticipated" profit from use of the patented invention and that "evidence of the infringer's actual profits generally is admissible as probative of his anticipated profits." Hence, the trial judge should admit this previously excluded evidence at the new trial, if offered.

*Fromson v. Western Litho Plate and Supply Co.***, 853 F.2d 1568, 1575 (1988).**
*Patent Infringement.* The plaintiff accused the defendant of violating its patent. Both parties appealed from the district court's decision. In discussing the proper damages measure, the appellate court stated that without evidence of an established royalty rate, the district court must create one based on "hypothetical negotiations between a willing licensor and a willing licensee." The court went on to state that this hypothetical negotiation "encompasses fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators."

### (c) Damage to Property by Government

*The Board of Rapid Transit Railroad Commissioners of the City of New York***, 197 N.Y. 81, 90 N.E. 456 (1909).**   The building of a subway caused damages to homes in Brooklyn, making them unfit for habitation for approximately 18 months. The court found that a railroad constructed beneath the street was a new burden, not contemplated by the original owner of the land when he agreed to devote the land to use as a street. As a result, the claimants were entitled to the full value of their property that was taken without deduction for benefits and also to just compensation for the injury done to the remainder. The commissioners must adapt the measure of damages to the actual injury. "It is the duty of the commissioners of appraisal to receive evidence relating to the condition of the properties down to the time of trial."

*Michigan State Highway Commission v. Davis***, 38 Mich. App. 674; 197 N.W.2d 71 (1972).**   For the purposes of highway construction, in 1968 the Highway Commission proposed to take portions of a parcel that would have severely limited

the owners' use of the remaining property. Two preliminary appraisals valued the damages at $62,200 and $78,000. The Highway Commission, however, did not complete the contracting process until May 1969. Moreover, in June 1969 the Commission made changes to the plans, giving the owners access to their remaining property. A third appraisal made at this time valued the damages at $25,650. In the condemnation hearing, the trial court ruled that it would calculate damages as of the time of possession in 1968. The appellate court overruled the trial court's exclusion of the third appraisal, stating that "since we are dealing here not with the value of the property taken, but rather with the damage done to the residue as a result of the taking, we find no bar to the introduction of evidence bearing on those damages despite the fact that the evidence concerns facts occurring after the date of the taking."

### (d) Legal Malpractice

*Kilpatrick v. Wiley, Rein & Fielding*, **37 P.3d 1130, 1145 (2001).**   The plaintiffs, who had formed MWT, Ltd., alleged that the defendants represented them from 1981 to 1991 in connection with their efforts to acquire a television station and that the defendants breached their fiduciary duties. The plaintiffs' expert presented two valuations of the television station, one as of 1987 and the other as of 1997, but for the alleged breaches of fiduciary duty. The defendants appealed the trial court's decision to allow the jury to measure the plaintiffs' damages "*either* from the date of defendants' alleged breaches of fiduciary duty or from the date almost a decade later when the case was ready for trial" (emphasis added). The appellate court disagreed and stated that, while measuring damages at the time of the breach is appropriate in some cases, "the general objective of tort law [is] to place an injured person in a position as nearly as possible to the position he would have occupied but for the defendant's tort" and that "the trial court is in the best position to determine what award of damages will make a plaintiff whole." As a result, the appellate court ruled that the trial court could use its discretion in deciding the date from which the jury would measure damages. The appellate court concluded that allowing the jury to hear evidence related to both dates "allowed the jury to come to a reasonable approximation of the damages the MWT, Ltd., limited partners actually incurred as a result of defendants' alleged breaches of fiduciary duty. Accordingly, the trial court's decision was within its permitted discretion."

### NOTES

1. Here we ignore the state's vigorish in selling tickets. Because of the state's take from the proceeds before disbursing to the winners, the expected value of all legal lotteries of which we are aware is negative.
2. The statement of this approach appears in J. M. Patell, R. L. Weil, and M. A. Wolfson, "Accumulating Damages in Litigation: The Role of Uncertainty and Interest Rates," *Journal of Legal Studies* 11 (June 1982): 341–64.
3. In the case of continuing breach, such as patent infringement, the limiting case occurs when each period approaches zero length. (Recall the limit theorems and analysis of first-year calculus.) In that case, under suitable assumptions of continuity of damages paths, the *ex ante* analysis and the *ex post* analysis will give the same result. The periods are so short that the before-the-fact analysis of each period becomes identical with the after-the-fact analysis of the preceding period.

4. Obviously, this approach merits a measure of common sense. At some point, this exercise becomes so complex that it becomes unfeasible.

5. The first showing of this result appears to be in Patell et al. (see n. 2). See also Chapter 16 in this book.

6. Franklin M. Fisher and Craig R. Romaine, "Janice Joplin's Yearbook and the Theory of Damages," *Journal of Accounting, Auditing and Finance* 5 (Winter 1990): 156–57.

7. Edward F. Sherry and David J. Teece, *Some Economic Aspects of Intellectual Property Damages*, Practicing Law Institute; Patents, Copyrights, Trademarks and Literary Property Course Handbook Series, PLI Order No. G0–007N, New York City, October 7–8, 1999, Section XI.

8. As stated earlier in the chapter, we assume that courts do not err. If the courts will assume that there is some chance of error, then they should divide the result by the probability of being found guilty.

9. *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698–99, 53 S. Ct. 736, 77 L. Ed. 1449 (1933).

10. *Transit RR. Comm'rs.*, 197 N.Y. 81, 108, 90 N.E. 456, 465 (1909).

11. *Fishman et al. v. Estate of Arthur M. Wirtz et al.*, 807 F.2d 520 (7th Cir. 1986).

12. *Park v. El Paso Board of Realtors*, 764 F.2d 1053 (1985).

13. *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1586, 1575–76 (Fed. Cir. 1988).

14. *Jamesbury Corporation v. United States*, 207 USPQ 131 (US ClCt 1980).

15. *TWM Manufacturing Co., Inc. v. Dura Corp.*, 789 F.2d 895, 899–900 (Fed. Cir. 1986).

16. *Odetics, Inc. v. Storage Technology Corp. (CAFC)*, 51 USPQ2d 1225 (1999).

17. Robert Goldscheider, "The Employment of Licensing Expertise in the Arena of Intellectual Property Litigation," *IDEA: Journal of Law and Technology* (1996).

18. *Story Parchment Co. v. Paterson Parchment Paper Co. et al.*, 282 U.S. 555, 51 S. Ct. 248 (1931).

19. *Fishman et al. v. Estate of Arthur M. Wirtz et al.*, 807 F.2d 520 (7th Cir. 1986).

20. *M & R Contractors & Builders, Inc. v. Michael et al.*, 215 Md. 340, 138 A.2d 350 (1958).

21. *Bigelow et al. v. RKO Radio Pictures, Inc., et al.*, 327 U.S. 251; 66 S. Ct. 574 (1946).

22. *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918 (1977).

23. *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (1995).

24. *Allison v. Chandler*, 11 Mich. 542, 550–56 (1863).

25. *Tull v. Gundersons, Inc.*, 709 P.2d 940, 945 (1985).

## LIST OF CASES

*A.C. Becken Co. v. Gemex Corporation*, 314 F.2d 839, 840 (1963)

*Allison v. Chandler*, 11 Mich. 542, 550–56 (1863)

*Bigelow et al. v. RKO Radio Pictures, Inc., et al.*, 327 U.S. 251; 66 S. Ct. 574 (1946)

*The Board of Rapid Transit Railroad Commissioners of the City of New York*, 197 NY 81, 90 NE 456 (1909)

*Brushton-Moira Central School District v. Fred H. Thomas Associates*, 91 N.Y.2d 256, 261–62; 692 N.E.2d 551, 553–54; 669 N.Y.S.2d 520, 522–23 (1998)

*Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918 (1977)

*Contractors & Builders, Inc. v. Michael et al.*, 215 Md. 340, 138 A.2d 350 (1958)

*Fishman et al. v. Estate of Arthur M. Wirtz et al.*, 807 F.2d 520 (7th Cir. 1986)

*Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1575 (1988)

*Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490 (1995)

*Jamesbury Corporation v. United States*, 207 USPQ 131 (US ClCt 1980)

*Kelly v. Marx*, 428 Mass. 877, 878; 705 N.E.2d 1114, 1115 (1999)

*Kilpatrick v. Wiley, Rein & Fielding*, 37 P.3d 1130, 1145 (2001)
*Michigan State Highway Commission v. Davis*, 38 Mich. App. 674; 197 N.W.2d 71 (1972)
*M&R Contractors & Builders v. Michael*, 215 MD. 340, 351; 138 A.2D 350, 356 (1958)
*Odetics, Inc. v. Storage Technology Corp. (CAFC)*, 51 USPQ2d 1225 (1999)
*Park v. El Paso Board of Realtors*, 764 F.2d 1053, 1068 (1985)
*Sharma v. Skaarup Ship Management Corporation*, 916 F.2d 820, 825–26 (1990)
*Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698–99, 53 S. Ct. 736, 77 L. Ed. 1449 (1933)
*Story Parchment Co. v. Paterson Parchment Paper Co. et al.*, 282 U.S. 555, 51 S. Ct. 248 (1931)
*Transit RR. Comm'rs.*, 197 N.Y. 81, 108, 90 N.E. 456, 465 (1909)
*Trans-World Manufacturing Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (1984)
*Tull v. Gundersons, Inc.*, 709 P.2d 940, 945 (1985)
*TWM Manufacturing Co., Inc. v. Dura Corp.*, 789 F.2d 895, 899–900 (Fed. Cir. 1986)

## REFERENCES

Adams, Edward S., and David E. Runkle. "Solving a Profound Flaw in Fraud-on-the-Market Theory: Utilizing a Derivative of Arbitrage Pricing Theory to Measure Rule 10B-5 Damages." *University of Pennsylvania Law Review* (May 1997): 1097–145.

Ben-Shahar, Omri, and Lisa Bernstein. "The Secrecy Interest in Contract Law." *Yale Law Journal* (June 2000): 1885–925.

Bonsack, Konrad. "Damages Assessment, Janis Joplin's Yearbook, and the Pie-Powder Court." *George Mason University Law Review* 13 (Fall 1990): 1–26.

Fisher, Franklin M., and R. Craig Romaine. "Janis Joplin's Yearbook and the Theory of Damages." *Journal of Accounting, Auditing and Finance* 5 (Winter 1990): 145–57.

Kabe, Elo R., and Brian L. Blonder. 1999. "Discounting Concepts and Damages (New)." In *Litigation Services Handbook, 1999 Supplement to the 2nd Edition*. Hoboken, NJ: John Wiley & Sons, pp. 325–54.

Kolaski, Kenneth M., and Mark Kuga. "Measuring Commercial Damages via Lost Profits or Loss of Business Value: Are These Measures Redundant or Distinguishable?" *Journal of Law and Commerce* 18 (Fall 1998): 1–24.

Lanzillotti, R. F., and A. K. Esquibel. "Measuring Damages in Commercial Litigation: Present Value of Lost Opportunities." *Journal of Accounting, Auditing and Finance* 5 (Winter 1990): 125–44.

MacIntosh, Jeffrey G., and David C. Frydenlund. "An Investment Approach to a Theory of Contract Mitigation." *University of Toronto Law Journal* (Spring/May 1987): 113–82.

Patell, James M., Roman L. Weil, and Mark A. Wolfson. "Accumulating Damages in Litigation: The Roles of Uncertainty and Interest Rates." *Journal of Legal Studies* 11 (June 1982): 341–64.

Phillips, John R. "The Rite Way to Discount Damages." Putnam, Hayes & Bartlett, Inc.

Scott, Robert E. "The Case for Market Damages: Revisiting the Lost Profits Puzzle." *University of Chicago Law Review* 57 (Fall 1990): 1155–202.

Taurman, John D., and Jeffrey C. Bodington. "Measuring Damage to a Firm's Profitability: *Ex Ante* or '*Ex Post*'?" *Antitrust Bulletin* 37 (Spring 1992): 57–106.

Tye, William B., and Stephen H. Kalos. "Antitrust Damages from Lost Opportunities." *Antitrust Bulletin* (Fall 1996).