CONFIDENTIAL

## RESPONSE TO LEONARD REPORT: KLEIMAN V. WRIGHT
## EXPERT REPORT OF DR. WILLIAM G. EGGINGTON, APRIL 17 2020

**Introduction**

1.　　I am a professor of English Language and Linguistics at Brigham Young University, Utah and have been at the university since 1988. From 2007 to 2013, I was chair of the Linguistics Department, one of the largest linguistics department in the U.S. with respect to undergraduate enrollments. The Department consists of 24 full-time faculty. From 2013 to 2018, I was Ludwig-Weber-Seibach Humanities Professor within the College of Humanities. This is a five-year professorship given in recognition of one's contributions to the university and to the general field. Throughout my university-level teaching career, I have taught a range of graduate and undergraduate classes including general linguistics, sociolinguistics, psycholinguistics, varieties of English, grammar and usage, semantics, discourse analysis, second language acquisition, TESL (Teaching English as a Second Language) methodology and applied linguistics research methodologies.

2.　　Over the past 12 years, I have taught a specialized class in Forensic Linguistics at both Brigham Young University, and, by invitation, at the University of Utah; I have presented papers in forensic linguistics at national and international conferences; and I have published in this area. I co-authored two peer-reviewed papers in the *Harvard Latino Law Review*; the first of these papers was co-authored with Judge Lynn. W. Davis of Utah's Fourth District Court. I have been an instructor in a number of Continuing Legal Education events concerning Forensic Linguistics and Corpus Linguistics. Most recently, I convened a colloquium on Corpus Linguistics and the Law at the American Association of Applied Linguistics and co-taught a workshop on the same topic to the Georgia State Supreme Court.

3.　　I received my M.A. and Ph.D. in Linguistics from the University of Southern California with a sub-specialization in Sociolinguistics – the study of how language functions at the social level. My Ph.D. dissertation consisted of a study of minority language behavior and behavior toward language within a Los Angeles area school district.

4.      My attached curriculum vitae (Exhibit 1) reveals a research and publications record and involvement in other scholarly activities in the applied linguistics field that qualifies me to provide expert analysis of legal and non-legal issues involving English as a second language proficiency, non-standard Englishes, discourse analysis, communication breakdowns, and textual analysis. As such, I have been involved as a consultant and designated as an expert witness in cases involving linguistic analysis. I have testified numerous times in U.S. state and federal courts. A brief synopsis of these cases is provided in Exhibit 2.

5.      I am a member of the International Association of Forensic Linguistics (IAFL), the premier forensic linguistics association. As such, I adhere to the IAFL's code of practice. This code of practice recommends inserting the following statement in each report.

> This report is based on my professional knowledge and expertise, and on my research using established and accepted linguistic knowledge and methodology. The data and sources that I considered in forming the professional opinions expressed here are referenced where relevant throughout the report. If sworn as a witness, I could testify competently to the matters stated herein. I understand that my duty in providing written reports and giving evidence is to assist the justice system—and that this duty overrides any obligation to the party by whom I am engaged or the person who has paid or is liable to pay me. I confirm that I have complied and will continue to comply with my duty.

6.      I am being compensated in this case at an hourly rate of $500.00 for analysis, research, consultation, and report writing, and $600.00 per hour with minimums for live testimony at deposition, hearing, or trial. My compensation is not contingent in any way on the outcome of this case.

7.      I was recently contacted by Zalman Kass of Rivero Mestre LLP, Miami Florida and asked to undertake the following:

a.      Respond to a report written by Dr. Robert Leonard in which he was asked "to analyze specific emails belonging to two different sets of documents of questioned origin[1]" and determine their relationship to a set of documents known to have been written by Dr. Craig Wright.

---

[1] Leonard Report, p. 6

b.      Write a report based upon my findings.

## Research Design

8.      In accordance with this request, I determined to conduct a multifaceted research design that involved the following:

a.      Conduct a review of forensic linguistics published, peer-reviewed authorial attribution research.

b.      Conduct a detailed analysis of Dr. Leonard's report.

c.      Conduct an assessment of that report with respect to the reliability and validity of its findings.

d.      Offer an opinion of the reliability and validity of that report and its findings.

e.      Write a report detailing the rationale for that opinion.

## Opinion

9.      After conducting a study as outlined above and as described in detail in the following paragraphs, I have determined that the research methods Dr. Leonard uses in coming to his opinion fail essential reliability and validity tests and cannot be considered "scientific." Having failed both the reliability and validity tests, it is impossible to ascribe any scientific worth or credibility to Dr. Leonard's opinions with respect to the author of the questioned documents. In fact, these opinions appear to be the result of advocacy research rather than a representation of scientific principles.

## Rationale for my Opinion

10.      The following discussion will provide evidence of the assertions contained in the opinion above. I will first briefly review the field of authorial attribution within general forensic linguistics concluding with a critique of the research methodology used by Dr. Leonard. I will then evaluate Dr. Leonard's findings in terms of reliability and validity by conducting a number of tests on the same data set he has used.  A summary of findings and rationale for my opinion will then conclude this report.

CONFIDENTIAL

**Authorial Attribution and Forensic Stylistics**

11.     The forensic linguistic subfield of "Authorial Attribution" has a substantial literature (see "References" at the end of this report and related footnotes). Much of this literature focuses on ensuring that strict scientific standards are met, often in response to strong claims that each author possesses a distinct individual writing style, or a word print, that can be used to identify who wrote an unknown text. Herein lies a long and on-going, sometimes contentious, dispute among scholars in forensic linguistics revolving around the professional integrity of the field. A small group of individuals are proponents of "forensic stylistics," a case-by-case qualitative research method pioneered by Dr. Gerald McMenamin and followed by Dr. Robert Leonard[2] as asserted by Chaski (2013) and confirmed by his use of this method in his Kleiman v. Wright report. Members of this group claim that an individual's writing style is revealed through various "stylemarkers". These style markers are subjectively chosen, on a case-by-case basis, because, as McMenamin (2002) states " … authorship identification requires the identification of an aggregate of markers, each of which may be found in other writers, but all of which would unlikely be present together in any other writer."

12.     As will be further discussed below, many forensic linguists with research and court experience in authorial attribution feel that the reliance on subjective, case-by-case markers followed by proponents of forensic stylistics undermines the integrity of the broad forensic linguistics subfield.  This group advocate for a more objective, "big data" quantitative approach to determining authorship sometimes referred to as "forensic stylometry."[3] In essence, forensic stylometric approaches use computational linguistic methods to objectively and scientifically determine "a priori" the linguistic features of an "idiolect" (an individual's "word print"), and then apply that knowledge to discovering the authorship of unknown texts. This approach is very much in line with established scientific methods.

---

[2] Chaski, C. E. (2013). Best Practices and Admissibility of Forensic Author Identification. *Journal of Law and Policy.* 11(2). p.362.

[3] Ainsworth, J., and P. Juola (2019), "Who Wrote This?: Modern Forensic Authorship Analysis as a Model for Valid Forensic Science." Washington University Law Review, 96, 5, 2019: 1159-1186.

13.     A leading linguist and legal scholar, Professor Lawrence M. Solan of the Brooklyn Law School has issued the following challenge to forensic stylistic proponents:

> ... it will be incumbent upon those whose work is more intuitively stylistic to demonstrate its scientific underpinnings. This can be accomplished by incorporating stylistic features into the computational algorithms being developed by computational linguists and computer scientists. The insightful observations of stylistic analysts that take advantage of such nuances as word choice, punctuation, and spelling errors can be used to expand the range of factors that computer scientists include in their models, with the potential of adding power, even if only incrementally (Solan, 2013, p. 574).

Professor Solan's recommendation to those advocating forensic stylistics suggests that they have yet to "demonstrate its scientific underpinnings." To this date, no known demonstration has been forthcoming. It is this severe methodological weakness that is at the heart of my misgivings regarding the reliability and validity of forensic stylistics as it is currently practiced, and as demonstrated by Dr. Leonard in Kleiman v. Wright.

14.     Because linguists advocate for the scientific study of language, I am not alone in questioning the scientific standing and research methodology of Dr. McMenamin's and Dr. Leonard's "forensic stylistics" approach. In her appraisal of forensic stylistics, noted forensic linguist Carol Chaski (2013:362) states that:

> As actually practiced in the reports … , the [forensic stylistics] method consists of two steps:
>
> 1.   Select style markers by reading the questioned ("Q") and known ("K") documents;
> 2.   Decide the authorship of the questioned document(s) based on the style markers by listing similarities and/or differences and deciding which similarities and which differences are important or not.
>
> The method offers:
>
> i.      no protocol for the order of reading Q or K first, or back and forth between Q and K;
> ii.     no protocol for internal consistency testing of K or Q documents, so that any number of Q documents can be put together, in violation of a standard forensic science principle of non-contamination;
> iii.    no protocol for determining the importance or "significance" of style markers,
> iv.     no use of statistical analysis (in actual case reports);
> v.      no standard reference set of style markers to be reviewed in each case.

15.     By selecting author determinative style markers, Leonard, following McMenamin, disregards the substantial sociolinguistic variation research which indicates that adult speakers and writers

of any language have a repertoire of genre and register styles available to them that vary according to cultural and situational contexts involving the norms of the speech, or discourse community one is addressing, the topic one is writing about, the relationship between writers and their audience, and the mode or vehicle of transmission (e.g., spoken, written, telephone, email, text).  I often engage my students in an exercise where we transform, informal spoken English, "I looked at the ball" into academic English, "Personal observations were conducted vis-à-vis a designated spherical object." In so doing, we replace all the Germanic-influenced vocabulary with Latinate and French influenced vocabulary (except for "a"), we nominalize the verb (observe to observations), and we transform a simple active voice sentence into a complex passive sentence.

16.     Using large corpus data, Biber (1988) has shown that many speakers and writers regularly and subconsciously access a wide selection of linguistic features in order to change their language style along a spectrum ranging from informal phone conversations to formal academic or legal papers. This ability to engage in sophisticated "intra-textual variation" presents huge problems for "inter-textual variation" studies involving authorial attribution that rely on the notion of cherry-picked "style markers" that supposedly are maintained across different genre and different registers.

17.     As noted previously, Ainsworth[4] and Juola (2019) advocate an author identification approach they label as "forensic stylometry" that relies on computer algorithms derived from large sets of linguistic data that have successfully identified the authors of questioned writings. In order to contrast their approach with forensic stylistics they quote:

> … lawyer and linguist Lawrence Solan [who] considered the question of how the legal system should judge the admissibility of forensic stylistic analyses conducted by linguists who had not subjected their methods to objective testing.[5] He contrasted two kinds of authorship attribution experts, calling one  Lucy  and  the  other Lacy. Lucy is trained in using computer algorithmic analysis of textual features, has tested those algorithms on texts, and can supply a known error rate. Her methods provide correct answers in 88% of her tests, and she is working to improve the algorithms to increase the accuracy of her

[4] It should be noted that Janet Ainsworth, a law professor at Washington University, is the immediate-past president of the International Association of Forensic Linguistics.

[5] Solan, L. M. (2013). Intuition versus Algorithm: The Case of Forensic Authorship Attribution. *Brooklyn Journal of Law and Policy*, 21(551). Retrieved from http://ssrn.com/abstract=2272090

methods. Lacy, on the other hand, is trained in linguistics and uses style markers to analyze texts. Her experience in analyzing texts and her training in linguistics have led her to conclude that a set of 36 style markers can be used to determine whether a known author likely composed a questioned text. She has never tested the method on samples where the answer is already known, so she cannot provide an error rate -- that said, she is confident that her analyses actually work. How then, Solan asks, should a judge determine the admissibility of testimony presented by Lucy versus Lacy? In considering that question, Solan relies in part on the fact that Lucy's methods have been subjected to validity tests. By examining the results of those tests, fact-finders can judge for themselves how to weigh her testimony. Thus, if the results of Lucy's tests exonerate the defendant, the fact-finder not only knows this conclusion by Lucy, but also knows that these tests, and the conclusions Lucy draws from them, have been shown to be fairly accurate (although not perfect).

… Conversely, Lacy's error rate may be enormous. Without validity testing, neither Lacy nor the factfinders weighing her testimony have any way of calculating the method's true error rate; thus, the jurors have no basis for judging whether her conclusions in these cases are likely to be right or wrong (Ainsworth and Juola, 2019:1168).

18.     These concerns regarding the non-scientific methodological weaknesses of forensic stylistics gained public prominence in 2011 when Dr. McMenamin submitted a report in a case involving Facebook founder, Mark Zuckerberg, as to who wrote a set of disputed e-mails.  The case was reviewed in the *New York Times* by Ben Zimmer (July 24 2011).[6] Zimmer references a statement by Dr. Ron Butters, a highly respected linguist and then out-going president of the International Association of Forensic Linguists. Zimmer states:

> But Mr. McMenamin's report has raised eyebrows in the forensic linguistics community. Earlier this month, the outgoing president of the International Association of Forensic Linguists, Ronald R. Butters, publicly questioned whether Mr. McMenamin could actually establish that Mr. Zuckerberg likely did not write the e-mails based on such slender evidence. For example, the would-be Zuckerberg e-mails had one instance of uncapitalized "internet," while a sample of e-mails known to be sent by Mr. Zuckerberg had two capitalized instances of "Internet." "Are we really doing 'scientific' and 'linguistic' analysis at all when we simply note instances or absences of this or that superficial textual feature?" Mr. Butters asked.

19.     This notoriety prompted a discussion on the premier academic linguistics blog "Language Log"[7] where Dr. McMenamin's forensic stylistic methodology was overwhelmingly challenged. Indeed, one commentator (Marcel B. Maatley, September 28, 2011 @ 3:29 pm) stated that:

---

[6] See http://www.nytimes.com/2011/07/24/opinion/sunday/24gray.html

[7] See http://languagelog.ldc.upenn.edu/nll/?p=3309

Several years ago I was consulted on a case in Oregon. Defendant was convicted of murdering his wife solely on stylistic evidence, what I call "guilt by grammar." Dr. McMenamin and another stylistic expert persuaded the judge that defendant had typed a photocopied document sent to Oregon State Police describing the woman's death. They concluded that every fact in the letter exonerating defendant was a lie, that every statement offering an instigative lead was a clever ruse, and that everything that said she was killed incriminated him. Dr. McMenamin relied on 69 markers. In a murder case at the same time in San Diego County, CA, Dr. McMenamin used a different set of markers to prove defendant wrote an incriminating note. If the two sets of markers had been switched between the two cases, the stylistic evidence would have proven each defendant had not written the note in his own case but had written the note in the other case.

In his two books Dr. McMenamin says markers are decided on a case-by-case basis. He gives no objective, or even subjective, guidelines for deciding what is specific to one case vis-à-vis another. Surveying thirteen cases reported in transcripts of his testimony, in his presentations, or in his books, I found each case had some significant difference in theory, method and observations when compared to any other of the thirteen cases.

20.     It is not my usual practice to cite internet blog commentary. I do so here, however, to show that the general forensic linguistic field has serious problems with the scientific reliability and validity of the forensic stylistics approach used by Dr. Leonard in his Kleiman v. Wright report.

**Leonard's Forensic Stylistics Applications to Kleiman v. Wright**

21.     As noted, Dr. Leonard's research method in his Kleiman v. Wright report consists of applying an analytical method commonly known as "forensic stylistics," but, interestingly, not labeled as such by Leonard, to:

a.     A set of 21 emails, one "tweet" and one Facebook posting, in all consisting of 4,360 words all "known" to have been written by Craig Wright (referred to as "Known Craig Wright Documents"),

b.     a set of 32 emails, of "questioned" authorship, that Dr. Wright denies having authored, consisting of 3,738 words (referred to as "Category 1 Questioned Emails," or **Q** documents),

c.     a set of three emails that Dr. Wright claims are partly authored by him, and partly authored by an imposter consisting of 187 words (referred to as Category 2 Questioned Emails, or **Q** documents).

22.     Leonard opines that, "the language patterns of the **Q** documents are consistent with the language patterns found in the documents known to have been written by Dr. Craig Steven Wright."

23.     As noted and implied thus far, it is my opinion that Dr. Leonard's research method fails the test of scientific reliability in that it does not produce stable and consistent results. Dr. Leonard claims to have discovered linguistic features that show that Craig Wright's writing style, as determined by an examination of selected linguistic features in the emails known to have been written by Wright, appear in the Q emails. However, there is no scientific evidence that these specific features are unvarying predictors, or markers, of an individual's writing style. In addition, the presence or absence of Dr. Leonard's style markers has not been established in the research literature as having any predictive value. Thus, Dr. Leonard's research method and his derived opinion also fail the validity test in that they do not measure what they claim to measure.

24.     Having failed both the reliability and validity tests, it is impossible to ascribe any scientific worth or credibility to Dr. Leonard's opinions with respect to the author of the questioned documents. They appear to be the result of advocacy research rather than a representation of scientific principles.

25.     Nevertheless, I will now proceed to examine the 12 "linking features" or style markers as listed in Table 5 of Leonard's report (p. 9) that Leonard claims prove that Craig Wright wrote the **Q** emails.

    a.     TRY AND + VERB

        Leonard notes that there are three instances of the *TRY AND + VERB* construction (e.g., I will try and talk to you tomorrow") in the **K Wright** (Known Wright) emails. There are two instances of this construction in the **Q Cat 1** (Questioned Author) emails. There are no instances of TRY TO + VERB in any of the emails. For Leonard, this is a salient style marker because Craig Wright is an Australian, and, according to Leonard's research

derived from using the GloWbE Corpus[8], "'try and' is the much less frequent variation as compared to 'try to' in the Australian English sub-corpus." I think what Dr. Leonard is suggesting is that the TRY AND + VERB marker links Craig Wright to the **Q** emails because of the complete absence of any TRY TO + VERB constructions in the **K** and **Q** emails. To draw any conclusions from such a small data base is not scientifically sound. In tennis, if I serve two aces in a row, does it follow that all my serves will be aces? Of course not. In addition to the need of a much larger sample size, Leonard's claim would have integrity if there were evidence of peer-reviewed linguistic research establishing TRY AND + VERB as a non-variant idiolect feature for some English speakers, particularly Australian English speakers. However, there is none. Explorations of TRY AND + VERB across various large corpora reveal that it is a common linguistic feature found in all English varieties including U.S., U.K., and Australian Englishes across formal and informal registers including U.S. Supreme Court opinions. English speakers sometimes use TRY TO + VERB, and sometimes use TRY AND + VERB. The presence, or absence of a smattering of TRY TO + VERB/TRY AND + VERB in the **Q** emails basically means that any English speaker could have written the **Q** emails.

b.    SETUP/BACKUP AS VERBS

Leonard has found four examples of Craig Wright using single word SETUP as a verb and single word BACKUP as a verb. He finds one example of SETUP as a verb in the **Q** email set. Based upon this single example in the **Q** email set, he draws a linkage. Once again, the extremely low number of **Q** (1) instances fails scientific credibility standards. In addition, an examination of the data in the GloWbE corpus indicates that using SETUP

---

[8] The GloWbE (Global Web-based English) is a tagged (for part of speech) corpus consisting of 1.9 billion words of global English sectioned, if needed, among 20 countries. It, like the other linguistic corpora mentioned in my report, was developed by Dr. Mark Davies, a colleague of mine at Brigham Young University. Dr. Davies and I have team taught a class on Corpus Linguistics and the Law, and we have contributed to BYU's Law School's preeminence in Law and Corpus Linguistics studies.

CONFIDENTIAL

as a verb can be explained more as a typo, or as a feature of quickly constructed discourse than an idiolect feature. Note that in the first of Leonard's **K Wright** examples, the sentence reads "We can setup a mapping plan to in our system." Clearly this is unedited writing. There are other examples of quick, unedited writing in this email: "whist" for "whilst," "others to the we outside," and a sentence concluding with, "a global solution from Australia that". This same email (DEF_00027396) contains BACKUP as a verb, and one of two COUPLE WITHOUT OF style markers. Perhaps these SETUP/BACKUP AS VERB features are simply examples of quick, unedited construction rather than style markers.

c.      "COUPLE" WITHOUT "OF"

Leonard has found two examples of COUPLE WITHOUT OF in the **K Wright** emails and one in the **Q** emails – again, to draw any conclusions from such a small data base is not scientifically sound. One is in DEF_00027396 which we have previously established was likely a hastily written email. The other example is contained in a one sentence response in an on-going email conversation where, once again, the focus is on content rather than on edited text. Leonard goes to great lengths to show that the COUPLE WITHOUT OF construction is "not in widespread use" in Australian English, but is a feature of American English. He implies that this reveals a style marker indicating that the **Q** document was written by Craig Wright. There is, however, a simpler explanation falling under the umbrella of Occam's Razor, and that is that this particular **Q** email, at least, was written by someone who speaks American English.

d.      EN-DASHES AND HYPHENS USED AS EM-DASHES

Leonard has found 12 examples of EN-DASHES AND HYPHENS USED AS EM-DASHES in the **K Wright** emails and 8 examples in the **Q** emails. He cites these as style markers indicating same authorship. I am unaware of any research that looks at

variability in EN/EM DASH usage[9]. I suspect the distinction between EN and EM dashes seems of negligible consequence to most professionals, something left to computer auto-correct settings.   In the absence of usage data, and given the inconsequential nature of EN –/EM - DASH with respect to meaning especially in email communication, I suspect that there is considerable variability.[10]   I note, however, that Leonard cites **Q** "That was Dave - his idea" as an example of an EN DASH being used as an EM DASH (DEFAUS_00119173), but does not note two dashes in the following page (DEFAUS _00111974) that appear to be EM DASHES. Leonard also notes that his marked EN/EM DASHES "do not offset an internal clause in pairs of em-dashes, instead separating two related clauses as one might expect with a semi-colon." The on-line "Punctuation Guide"[11] states that "the em-dash is the most versatile punctuation mark." As such, it is going to serve a wide range of rhetorical purposes especially in free-flowing email communication.

e.   ALL CAPS FOR EMPHASIS

Leonard's analysis reveals two all caps words (IS and NO) used for emphasis in the **K Wright** documents (note the small number of instances, again) and 17 all caps words (PLUS, ONLY, NO, STILL, ENTIRE, WILL, WILL NOT, ALL EVERYTHING, NO, YOUR, NO WAY, NOT, PROMISE, PLEASE) used for emphasis in the **Q** emails. If Leonard claims that exemplars consisting of one, two or three items are indicators of the

---

[9] The year 2015 was "The English Projects" "Year of Punctuation." Research was conducted on many of the English language's punctuation convention, but not on en- or em- dashes. See Mulvey, C. (2016). The English Project's history of English punctuation. English Today, 32(3), 45-51. doi:http://dx.doi.org.erl.lib.byu.edu/10.1017/S0266078416000110

[10] Note, in this sentence, that my computer, using MS Word, chose to use an EM-DASH after EN, but an EN-DASH after EM.

[11] See https://www.thepunctuationguide.com/em-dash.html

**Q** documents being written by Craig Wright, then surely a 2**K**/17**Q** imbalance indicates that Craig Wright did not write the **Q** documents.

f.      "ETC" WTHOUT PERIODS

Leonard provides two examples in **K Wright** of ETC without a period (note the small "sample of the whole" size), and seven examples in **Q** of ETC without periods. The **K Wright** ETCs are each followed by either a "?" or  "):".  On the other hand, four of the **Q** ETCs have no punctuation marks following them at all, and two are followed by commas. Once again, following Leonard's faith in the veracity of small quantities as indicators of same, or different, authorship, surely his ETC analysis must point in the direction of the **Q** emails not being written by Craig Wright.

g.      SEVERAL NEGATIONS IN A ROW

Leonard points to two sequences of **K Wright**'s use of negatives used "to stress a point" and one negative sequence in the **Q** emails. Once again, any assertion Leonard makes regarding this so-called style marker is undermined by the extremely low frequency. In addition, multiple use of negatives for emphasis is a common rhetorical device and cannot be used as a distinctive marker of same authorship.

h.      N-GRAMS

Leonard provides a list of n-grams that, in reality, are mostly common simple expressions. Table 1 below lists their GloWbE frequencies.

Table 1: GloWbE Frequencies for Leonard N-Grams

| N-Gram | Frequency |
| --- | --- |
| was my best friend | 309 |
| to be a part of it | 1187 |
| Dave and I did | 4 |
| do not want to | 18685 |

| Dave and I had | 21 |
| I do not believe | 5961 |
| the value of the | 15208 |
| do not know of | 647 |
| I had a few | 1439 |
| just before he died | 125 |
| so that we have | 601 |
| that is what is | 1990 |
| to be able to | 97910 |
| I am not | 118596 |
| it is not | 217836 |
| I will not | 21883 |
| I am a | 75801 |

The point of these GloWbE corpus searches is to show that many of the n-grams Leonard lists are simple common expressions and not indicators that the **Q** emails were written by Craig Wright. In fact, the absence of any highly unusual expressions is an indicator that the **Q** emails were not written by Craig Wright.

i.    THE EMOTICON ";)" AS SENTENCE FINAL PUNCTUATION

Once again, Leonard asks us to believe in the power of miniscule frequencies by pointing out that Craig Wright wrote the **Q** emails based on one **K Wright** use of the ";)" emoji and two uses in the **Q** emails.

j.    NON-CONTRACTED "WILL"

Leonard points out that non-contracted "will" is used exclusively in **K Wright** and all **Q** emails. There are no instances of contracted I'll, He'll, You'll etc. He provides 14 examples of non-contracted "will" in the **K Wright** emails consisting of 4360 words.

This means that Craig Wright used "will" 3.2 times per 1000 words in his emails. On the other hand, Leonard provides 44 examples of non-contracted "will" in all the **Q** emails consisting of 3925 words. Thus, in the **Q** emails, non-contracted "will" was used 11.1 times per 1000 words. Following Leonard's adherence to Forensic Stylistics, this significant difference in "will" usage per 1000 words (3.2/1000 versus 11.1/1000) must surely indicate that the writer of the **Q** emails was not Craig Wright. Note also that the subjects of the "will" modal in the **K Wright** emails consist of "we" (3), "he (2), "my wife" (1), "you" (1), "I" (7). On the other hand (again), the subjects of the "will" modal in the **Q** emails consist "I" (39), "he" (2), "you" (1) and "we" (1). Thus, the expression "I will" makes up 88.6% of the "will" modal in the **Q** emails while only 50% of the "will" modal in the emails written by Craig Wright. Following Forensic Stylistic notions, this finding has to be seen as another significant indicator that the **Q** emails were not written by Craig Wright – unless we choose to cherry-pick the data within an advocacy research model and ignore data that does not support our confirmation biases.

k.      SENTENCE INITIAL CONJUNCTION, NO COMMA

Leonard points out that there are two examples (low frequencies again) of Craig Wright beginning sentences with conjunctions "and" and "but". These usages are labeled as "non-standard" except that I suspect that they are standard within informal e-mail communications. Leonard indicates that there are six examples of initial sentence conjunctions in the **Q** emails: three times as many leading to a much higher frequency in the **Q** emails than in the **K Wright** emails suggesting that the **Q** emails were not written by Craig Wright.

l.      THE PREPOSITION "OF" MEANING "ABOUT"

Leonard indicates that **K Wright** emails use the preposition "of" meaning "about" six times while the **Q** emails use it five times. This finding is apparently an indicator that Craig Wright wrote the **Q** emails. However, of the instances of "of" meaning about in the

**K Wright** set of emails, four involve "know" or "knowledge". A search of the GloWbE

Corpus for the "know of" phrase retrieves 3004 hits whereas a search for the "know

about" phrase produces only 428 hits. Thus Craig Wright is using the "standard" "know

of" expression, as is the author of the **Q** emails who uses "know of" four out of five

times. In this instance, Craig Wright cannot be identified as the writer of the **Q** emails

based upon his purported use of a standard, high frequency expression.

**Conclusion and Opinion**

26.      In his report, Dr. Leonard posits three hypotheses.  They are:

a.        Hypothesis 1. The language patterns in the Q documents are consistent with the language

          patterns found in the Known documents of Dr. Wright.

b.        Hypothesis 2. The language patterns in the Q documents are inconsistent with the

          language patterns found in the Known documents of Dr. Wright.

c.        Hypothesis 3. The data are insufficient to reach a conclusion either way.

He then states:

> "As demonstrated in the analysis below, the superior hypothesis for all Q documents
> (individual email threads) is Hypothesis 1. That is, the language patterns of the Q
> documents are consistent with the language patterns found in the documents known to
> have been written by Dr. Craig Steven Wright."

27.      In my response to his report, I have shown that "forensic stylistics," the foundation of Dr.

Leonard's method, lacks both theoretical and practical reliability and validity. It is simply not scientific.

Furthermore, for many of Dr. Leonard's Linking Features, I have presented information that leads one to

accept Leonard's Hypothesis 3 in that many of his features were simply standard English practices that

could have been written by anyone.

28.      In addition, once again, following forensic stylistics frameworks, I have indicated so-

called "linking features" that support the notion that Craig Wright did not author the **Q** emails, thus

supporting Hypothesis 2, namely that "the language patterns in the Q documents are inconsistent with the

language patterns found in the Known documents of Dr. Wright."

29.     I conclude by restating Dr. Ron Butters' question presented in Paragraph 18 of this report as reported in the *New York Times* (July 24 2001):  "Are we really doing 'scientific' and 'linguistic' analysis at all when we simply note instances or absences of this or that superficial textual feature?"

Dr. William G. Eggington, 17 April 2020

CONFIDENTIAL

## References

In preparation for this report, I cited or referenced the following published literature:

Aissen, J. (2003) Differential object marking: iconicity vs. economy. *Natural Language and Linguistic Theory* 213: 435–448.

Baayen, R. H., van Halteren, H. and Tweedie, F. J. (1996) Outside the cave of shadows: using syntactic annotation to enhance authorship attribution. *Literary and Linguistic Computing* 11(3): 121–131.

Bell, A. (1984) Language style as audience design. *Language in Society* 13(2): 145–204.

Biber, Douglas. (1988), *Variation across Speech and Writing*. Cambridge: Cambridge University Press, 1988.

Carroll, S. E. (2001) *Input and Evidence: the raw material of second language acquisition*. Amsterdam and Philadelphia: John Benjamins.

Chaski, C. E. (2013). Best Practices and Admissibility of Forensic Author Identification. *Journal of Law and Policy*. 11(2). p.333-376.

Chaski, C. E. (2001) Empirical evaluations of language-based author identification techniques. *Forensic Linguistics. The International Journal of Speech, Language and the Law* 8(1): 1–65.

Coulthard, R. M. (1994) On the use of corpora in the analysis of forensic texts. *Forensic Linguistics* 1(1): 26–43.

Coulthard, R. M. (2004) Author identification, idiolect, and linguistic uniqueness. *Applied Linguistics* 25(4): 431–447.

Coulthard, R. M. (2005a) The linguist as expert witness. *Linguistics and the Human Sciences* 1(1): 39–58.

Coupland, N. (2007) *Style, Variation and Identity.* Cambridge: Cambridge University Press.

Feiguina, O. and Hirst, G. (2007) Authorship attribution for small texts: literary and forensic experiments. Paper presented to the International Workshop on Plagiarism Analysis, Authorship Identification and Near-Duplicate Detection. 30th Annual International ACM SIGIR Conference (SIGIR '07).

Grant, T. (2007) Quantifying evidence in forensic authorship analysis. *The International Journal of Speech, Language and the Law* 14(1): 1–25.

Grant, T. and Baker, K. (2001) Identifying reliable, valid markers of authorship: a response to Chaski. *Forensic Linguistics. The International Journal of Speech, Language and the Law* 8(1): 66–79.

Holmes, D. I. (1994) Authorship attribution. *Computers and the Humanities* 28(2): 87–106.

Lancashire, I. (1997). 'Empirically determining Shakespeare's Idiolect. *Shakespeare Studies*, 25: 171–85.

Love, H. (2002) *Attributing Authorship: an introduction*. Cambridge: Cambridge University Press.

McMenamin, G. (2001) Style markers in authorship studies. *Forensic Linguistics. The International Journal of Speech, Language and the Law* 8(2): 93–97.

McMenamin, G. (2002) *Forensic Linguistics: advances in forensic stylistics.* London: CRC Press.

McMenamin, G. (2004) Disputed authorship in US Law. *The International Journal of Speech,*

CONFIDENTIAL

*Language and the Law* 11(1): 73–82.

Smith, S. S. and Shuy, R. (2002) Forensic psycholinguistics using language analysis for identifying and assessing offenders. http://www.fbi.gov/publications/leb/2002

Solan, L. M. (2013). Intuition versus Algorithm: The Case of Forensic Authorship Attribution. *Brooklyn Journal of Law and Policy*, 21(551). Retrieved from http://ssrn.com/abstract=2272090

Turell, M. T. (2004b) The disputed authorship of electronic mail: linguistic, stylistic and pragmatic markers in short texts. Paper presented at the First European IAFL Conference on Forensic Linguistics, Language and Law. Cardiff University.

Williams, E. (1981) Language acquisition, markedness and phrase structure. In S. L. Tavakolian (ed.) *Language Acquisition and Linguistic Theory* 8–34. Cambridge, Mass.: MIT Press.

Woolls, D. and Coulthard, R. M. (1998) Tools for trade. *Forensic Linguistics. The International Journal of Speech, Language and the Law* 5(1): 33–57.

**CONFIDENTIAL**

Exhibit 1: CV of Dr. William G. Eggington
(attached)


Exhibit 2: Overview of Forensic Linguistics Experience, Dr. William G. Eggington
(attached)

CONFIDENTIAL

# WILLIAM GREGORY EGGINGTON
Curriculum Vitae
February 2020

4048 JFSB, Brigham Young University
Provo, Utah 84602
Ph: 801-422-3483, 801-615-0751
E-mail: william_eggington@byu.edu

---

## EDUCATION

Ph.D. Linguistics. University of Southern California, 1985.

   Ph.D. dissertation: *Toward a language policy for the Hacienda-La Puente School District*

M.A. Linguistics, University of Southern California, 1981.

B.A. (Summa Cum Laude), Double Major: English, Teaching English as a Second Language, Brigham Young University - Hawaii, (with secondary teaching credential), 1975.

## PROFESSIONAL APPOINTMENTS

### University615-0751

| | |
|---|---|
| 1988-present: | Brigham Young University, Provo, Utah |

| | |
|---|---|
| 2013-2018: | Ludwig-Weber-Siebach Humanities Professor |
| 2015-present: | Linguistics MA Coordinator |
| 2007-2013: | Chair, Department of Linguistics and English Language |
| 1998-2001: | Associate Chair, English Department |
| 1997- present: | Full Professor, Linguistics Department |
| 1992-1997: | Associate Professor |
| 1988-1992: | Assistant Professor |

2018 - present: Guest adjunct professor in forensic linguistics, University of Utah.

2013-2014: Visiting Professor (International Scholar), Kyung Hee University, Global Campus, South Korea. (On professional development leave from Brigham Young University).

2003: Visiting Professor, Brigham Young University – Hawaii. Charged with the responsibility of developing a comprehensive language policy for the campus.

1995-1996: Visiting faculty, Languages, Literature and Communications Division, Brigham Young University - Hawaii

1992-1993: Visiting Scholar, Centre for Applied Linguistics and Languages, Griffith University, Brisbane, Australia.

1988: Visiting Scholar, Institute of Applied Linguistics, Brisbane College of Advanced Education, Brisbane, Australia.

1984-1988: Lecturer, Senior Lecturer, Head of Division, Darwin Institute of Technology (now Charles Darwin University).

1979-1984: Assistant Lecturer at the American Language Institute, University of Southern California

*Eggington, CV, January 2020* 2

**Public Education**

> 1979-1984:  Teacher (part-time and full-time) at the La Puente Valley Adult School, Hacienda-La Puente School District, Los Angeles, California.
>
> 1975-1978: Administrator, program developer and instructor for the Adult Migrant Education Centre, Queensland Department of Education, Brisbane Australia.
>
> 1974-1975:  Secondary Teacher (English and Humanities), Kahuku High School, Kahuku, Hawaii

## UNIVERSITY TEACHING EXPERIENCE

**Graduate:**  Forensic Linguistics, Language Policy and Planning, Applied Corpus Linguistics, English and Cross-cultural Communication, Varieties of English, Sociolinguistics, Semantics and Pragmatics, Language and Literature, Advanced Grammar, Second Language Acquisition, TESOL Methods.

**Undergraduate**:  Introduction to Human Language, Cross-cultural Communication, Introduction to Language, History of the English Language, English Grammar and Usage, Semantics, Discourse Analysis, Forensic Linguistics, Seminar in Contrastive Rhetoric, Seminar in Language and Society, Seminar in the Sociopolitics of the English Language, Language Planning and Policy in the Pacific Rim, Book of Mormon, Doctrine and Covenants.

## PUBLICATIONS

### Books

2015: *ESL Readers and Writers in Higher Education: Understanding Challenges, Providing Support.* N. Evans, N. Anderson, W. Eggington (eds.). Routledge.

2014: *Mastering English through Global Debate*. E. Talalakina, T. Brown, J. Bown, W. Eggington. Georgetown University Press.

2005:  *Directions in Applied Linguistics*. P. Bruthiaux, D. Atkinson, W. Eggington, W. Grabe, V. Ramanathan (eds). London: Multilingual Matters.

2000:  *The Sociopolitics of English Language Teaching.*  J. Kelly-Hall and W. Eggington (eds.), London: Multilingual Matters.

1997: *Language Policy: Dominant English, Pluralist Challenges*. W. Eggington and H. Wren (eds.), Amsterdam: John Benjamins Publishing Co.

1990:  *Language: Maintenance, Power and Education in Australian Aboriginal Contexts.* C. Walton and W. Eggington (eds.), Darwin, Australia: Northern Territory University Press.

### Peer-Reviewed Articles, Book Chapters, Conference Proceedings

2020 "The monolingual and monocultural realities of South Korea's English language policies" with Josh Jeung, Mary Garceau and Lindsay Stephenson. In Kashif Raza, Christine Coombe and Dudley Reynolds  (eds.), *Policy Development in TESOL and Multilingualism: Past, Present and the Way Forward.*

2020 "Factors Influencing ESL Students' Selection of Intensive English Programs" with K. Blanco, M. Tanner, J. Hartshorn. Accepted for publication in *TESOL Journal.*

2015: "Focusing on the Challenges: Institutional Language Planning." In *ESL Readers and Writers in Higher Education: Understanding Challenges, Providing Support*. N. Evans, N. Anderson, W. Eggington (eds). Routledge.

2015: "When Everything's Right, but It's Still Wrong: Cultural Influences on Written Discourse." In *ESL Readers and Writers in Higher Education: Understanding Challenges, Providing Support*. N. Evans, N. Anderson, W. Eggington (eds.). Routledge.

2014: "Language and the Law: An Overview of Forensic Linguistics". In New Horizons in Linguistic Research: Conference Proceedings of the Linguistics Society of Korea. May 2014

2013:  "Using English Corpora to Teach and Learn High-Code/Low Code Register Variation."  In *Proceedings of the*

CONFIDENTIAL

*2013 Korea Multi-media Assisted Language Learning (KAMALL) International Conference*, Seoul, South Korea. October 2013.

2013:  "Using Elicited Oral Response Testing in Order to Determine the Need for an Interpreter" (with Troy Cox).  In *Harvard Latino Law Review,* Spring 2013

2011:  "Finding Justice in Translation: Recent American Jurisprudence Affecting Due Process for Linguistic Minorities Together with Practical Solutions" (with Judge Lynn W. Davis, Maxwell Alan Miller, Adam Prestidge). In *Harvard Latino Law Review.*  Spring 2011.

2010: "Towards Accommodating the "Tragedy of the Commons" Effect in Language Policy Development." *Current Issues in Language Planning.* 11(4), 2010

2010:  Teacher Research Used to Evaluate Sheltered Instruction in a Science Classroom Setting" (with Kalani J. Eggington) *Electronic Journal of Literacy Through Science.* Volume 9 (Fall, 2009 - Spring 2010).

2010:  "Unplanned language planning." In R. Kaplan (ed.), *Oxford Handbook of Applied Linguistics.* 2nd Edition, Oxford: Oxford University Press

2008:  "Is There a Drift Towards Universal English-Based Rhetorical Patterns?" Proceedings of the 18th International Congress of Linguistics, Linguistics Society of Korea.

2008:  "Deception and Fraud."  In *Dimensions of Forensic Linguistics,* M. Teresa Turell and John Gibbons (eds.). Amsterdam: John Benjamins.

2008:  "So, You Want to Chair a Conference" (with M. Algren, E. Dwyer, B. Witt) in *Leadership Skills for English Language Educators.*  N. Anderson, C. Coombe, M. McClosky (eds.) University of Michigan Press.

2005: "Language Policy and Planning: Introduction."  In *Directions in Applied Linguistics.* P. Bruthiaux, D. Atkinson, W. Eggington, W. Grabe, V. Ramanathan (eds).  London: Multilingual Matters.

2004:  "Rhetorical Influences: As Latin was, English is?"  In *Discourse across Languages and Cultures.*  C. M. Moder, A. Martinovic-Zic (eds.),   Amsterdam: Benjamins.

2004:  "Unrestricting the Academic Restricted Code."  *MEXTESOL National Convention, Selected Presentations*, October 2004.

2001:  "Language Revitalization Planning within a Power/Solidarity Framework". In *Current Issues in Language Planning:* Vol 2:2&3, 2001: 231-241.

2001:  "Unplanned language planning." In R. Kaplan (ed.), *Oxford Handbook of Applied Linguistics.* Oxford: Oxford University Press, pp. 404-414.

1999:  "Bilingual creativity, multidimensional analysis, and world Englishes (with W. Baker)." In *World Englishes*, Vol. 18, No. 3, pp. 343-357. Oxford: Blackwell Publishers.

1998:  "Written Academic Discourse in Korean:  Implications for Effective Communication."  In D. Oaks (ed.), *Applications of Linguistics: An Introductory Reader.* Fort Worth, Texas: Harcourt. 1998. Reprinted from "Written Academic Discourse in Korean:  Implications for Effective Communication."  In R. Kaplan, U. Conner (eds.) Writing Across Languages:  Analysis of L2 Text.  Reading MA:  Addison-Wesley, 1987 (see below).

1998:  "To maintain, or to empower or to try to do both? Language policy in the South Pacific."  In Frank Brinkhuis & Sascha Talmor (eds*.), Memory, History and Critique: European Identity at the Millennium. Proceedings of the Fifth Conference of the International Society for the Study of European Ideas* (ISSEI), 19-24 August 1996, University for Humanist Studies, Utrecht, The Netherlands. CD-ROM.  MIT Press Journals, Cambridge MA, USA

1997:  "Language Policy and English as a Metaphor." In W. Eggington and H. Wren (eds.) *Language Policy: Dominant English, Pluralist Challenges.*  Amsterdam: John Benjamins Publishing Co.

1997:  "The roles and responsibilities of ESL teachers within national language policies." In W. Eggington and H. Wren (eds.) *Language Policy: Dominant English, Pluralist Challenges.*  Amsterdam: John Benjamins Publishing Co.

1996:  "Analogical Modeling - A New Horizon". In W. Eggington (ed.), *Revista di Linguistica*, Special Edition on Analogical Modeling. Pisa, Italy. 7, II, 1995

1995:  "English: Everyone's Rock at the Center of the World?  In *Journal of Asian Pacific Communication.* Avon, England: Multilingual Matters, 6: 139-151.

1994:  "Language Planning and Policy in Australia."  In W. Grabe (ed.), *Annual Review of Applied Linguistics,* 1994. Cambridge University Press. 137-155.

1993: "Language Planning, Language Teaching: An Exercise in HUMAN Resource Management". In *TESOL: Building on Strength.* Sydney: ACTA,

1992:  "From Oral to Literate Culture: An Australian Aboriginal Experience." In F. Dubin and N. Kuhlman (eds.) *Cross-*

CONFIDENTIAL

*Cultural Literacy: Global Perspectives on Reading and Writing.* Regents/Prentice Hall, 81-98.

1992:   "Our Weakness in Writing:  The Literacy Continuum Applied to Book of Mormon Peoples.  *Occasional Papers Series.* Provo, Utah: FARMS.

1991:   "The History of the LDS Church in Australia."  Requested contribution for *The Encyclopedia of Mormonism: The History, Scripture, Doctrine, and Procedure of the Church of Jesus Christ of Latter-Day Saints.* Macmillan.

1990:   "Evaluating the Impact of Bilingual Education in Aboriginal communities in the Northern Territory" (with R. Baldauf.  In R. Baldauf and A. Luke (eds*.) Language Planning and Education in Australasia*, Avon, England: Multilingual Matters.

1990:   "Aboriginal English Prose:  Similarities and Differences to Standard Australian English Prose."  In C. Walton and W. Eggington (eds.) *Language:  Maintenance, Power and Education in Australian Aboriginal Contexts.* Northern Territory University Press.

1990:   "Editors' Introduction."  In C. Walton and W. Eggington (eds.) *Language:  Maintenance, Power and Education in Australian Aboriginal Contexts.* Northern Territory University Press.

1989:   "Vocabulary Development in Aboriginal Languages" (with R. Baldauf).  In Istvan Fodor and Claude Hagege (eds.) *Language Reform: History and Future.*  Hamburg:  H. Buske Publishing House.

1987:   "Written Academic Discourse in Korean:  Implications for Effective Communication."  In R. Kaplan, U. Conner (eds.) *Writing Across Languages:  Analysis of L2 Text.*  Reading MA.:  Addison-Wesley.

1983:   "Discourse Analysis as a Pedagogical Tool" (with T. Ricento).  *In CATESOL (California TESOL) Occasional Papers*, Fall 1983.

1974:   "Teaching English in Korea."  In *TESL Reporter* Vol. 07 No 4, Summer 1974.

## Professional Reports, Proceedings and Miscellaneous Publications

2019:   *How Valid and Reliable Is the Cayman Island Department of Immigration English Language Test?* Report submitted to Samson Law Associates, George Town, Cayman Islands.

2018*:   The Meaning and Scope of "Full" in the Expression "Full Costs": A Brief of Amici Curiae to the U.S. Supreme Court in Rimini Street V. Oracle USA, Inc.*

2018:   *Are "Quick Speed" and "One Touch" Trademarks Owned by ICON Health and Fitness?* Report submitted to Maschoff Brennan, Salt Lake City, Utah

2018:   *Did Lily Lee Understand the Prenuptial Agreement She Signed in 1999?* Report submitted to Laughlin Legal PC, San Mateo, California.

2017:   *Does "Governable" Mean "Required to be Governed" or "Able to be Governed"?*  Report Submitted to Parr Brown Gee & Loveless, Salt Lake City.

2017:   *Who Wrote the Nightcrawler Screenplay? Report submitted to* Parr Brown Gee & Loveless, Salt Lake City, Utah.

2017:   *Did Schellman Submit Incorrect Information on Their Licensing Renewal?* Report submitted to Schellman and Company LLC, Tampa, Florida.

2017:   *Did Hao Zheng Understand His Miranda Rights?* Report submitted to Alston and Bird, LLP.

2016:   *Who Wrote Certain Slanderous Emails?* Report submitted J.J. Kim & Associates, P.C. Garden Grove, CA.

2016:   *Did Tanveer Shah Understand His Miranda Rights?* Report submitted to Attny Paul Morgan, Houston, Tx.

2016:   *Did Khatandi Understand His Police Interrogation?* Report Submitted to Mitchell, Stein and Carey, Az.

2015:   *Were Police Interpreter Services Adequate?* Report submitted to Klein, Thorpe and Jenkins, Chicago, IL.

2015:   *Did Perez Understand His Police interrogation?* Report submitted to Attorney Norm Silverman, Tx.

2015:   *Did Liu Understand Her Child's Custody Agreement?* Report submitted to Federal Pub Defend Office, Va.

2015-1992: 31 additional legal reports

2012:   "Therefore Ye Are No More Strangers and Foreigners."  *BYU Speeches, 2011-2012.* BYU Publications.

2003:   "Reversing Samoan Language Shift."  Web-published by U.S. Congressman Eni Faleomavaega, http://www.house.gov/faleomavaega/eggingtonspeech.pdf.  Paper presented at International Samoan Language Commission conference, Los Angeles, December 2003.

2002:   "When a language dies, it doesn't stink." In *TESOL Matters*, Washington, DC: TESOL Publications, June 2002.

1999:   "Toward a Language Services Plan for the Salt Lake City 2002 Olympic Games: A Report for the Salt Lake Olympic Committee"  1999.

1997:   "Non-English Language Services at the Atlanta Olympic Games: A Report to the National Language and Literacy Institute of Australia." (with E. Touchstone).

*Eggington, CV, January 2020* 5

1996:  "Of things professional and corporate." In *TESOL Matters*, Washington, DC: TESOL Publications, October 1996.

1995:  "Sociopolitical Concerns at TESOL'96" (with David Shea).  In *TESOL Matters*, Washington, DC: TESOL Publications, December 1995.

1995:  "Sociopolitical Issues at TESOL '95." In *TESOL Matters*, Washington, DC: TESOL Publications, June 1995

1994:  "Policies of the Oppressed:  Positive and Negative Language Policies." In Network Notes 4, May 1994.

1993:  "The Written English Metaphors We Live, Plan, Teach and May Be Bound By"   *Interchange*.  Brigham Young University, General and Honors Education. December 1993.

1993:  "Preparing for Choices."   In *TESOL Matters*, Washington, D.C: TESOL Publications, June 1993.

1993:  "Policies of the Oppressed:  Positive and Negative Language Policies."   In *TESOL Matters*, Washington, D.C: TESOL Publications, June 1993.

1993:  "On the Sociopolitical Nature of TESOL."  In *TESOL Matters*, Washington, D.C: TESOL Publications, January 1993.

**Peer Reviewed Journal Publications as Editor**

1995:  "Special Section on Analogical Modeling" W. Eggington (ed.), *Revista di Linguistica*, Pisa, Italy 1995.

**Professional Newsletter Publications as Editor**

1994-1996: "Sociopolitical Concerns Column." *TESOL Matters*, TESOL Publications
1977-1978:  *QATESOL News*, Queensland, Australia.

## PRESENTATIONS

## Plenary or Invited Presentations

2020:   "Social Advocate Versus Forensic Linguist: A Case Study of an Internal Conflict."  Invited to present at the International Applied Linguistics Conference, Grogingen, The Netherlands, August 2020.

2019:  "Relativity Applies to Physics, not Ethics': Exploring Ethical Issues in FL/FP Research." Invited to participate in expert's panel, Germanic Society for Forensic Linguistics, Graz, Austria, September 2019.

2019:  "Law and Corpus Linguistics in Brief." Invited to present at the Annual Language and Law conference, Brigham Young University Law School. Audience consisted of lawyers, including prosecutors, public defenders, and law enforcement representatives. This was a Continuing Legal Education (CLE) event. March 2019.

2019:  "Corpus Linguistics Workshop" (with James Heilpern). A workshop to Justices and law clerks of the Georgia State Supreme Court, Atlanta, Georgia, March 2019.

2019:  "Non-native English Speakers and Their Comprehension of Legal English."  Invited to present at the Annual Law and Corpus Linguistics Conference, Brigham Young University Law School, February 2019.

2018:  "Language proficiency and citizen's rights." Invited to present at the Language and Law Forum, University of Utah, April 2018.

2018:   "Fair and equal language access to justice for those not proficient in English." A Continuing Legal Education (CLE) presentation with Judge Lynn W. Davis (Utah Fourth District Court). Invited to present at the Annual Language and Law conference, Brigham Young University Law School, March 2018. Audience consisted of lawyers, including prosecutors, public defenders, and law enforcement representatives.

2017:   "An Evaluation of South Korea's English-in-Education Language Plan."  Invited to present the keynote plenary at the Korean Association of Teachers of English (KATE) Conference, July 2017.

2017:  "The Sociopolitics of English in South Korea." Invited to present at the U.S. Embassy, Seoul, South Korea, July 2017.

2016:   "Forensic linguist versus sociolinguist: A battle within." Invited to present at an "Invited Colloquia: Applied Linguistics in the Courtroom."  American Association for Applied Linguistics Annual Conference, April 2016.

2016:  "Free Speech, Hate Speech: Exploring the Language of Hate Crimes."  Invited to present at an "Extraordinary Session: Panel on Hate Speech."  Linguistics Society of America Annual Conference, Washington D.C. January 2016.

2015: "The Educational Language Planning Challenge: Can You Bring Them Here from There?" Invited to present at

CONFIDENTIAL

*Eggington, CV, January 2020* 6

the "K-12 Dream Day: Engaging English Language Learners in the Mainstream." University of New Orleans, Louisiana.

2015: "Are Dictionaries Done? The Developing Role of Corpus Linguistics in Definitional Disputes." Invited to present at the Association of Corporate Counsel Quarterly Meeting, Salt Lake City, Utah.

2014: "How Can Linguistic Analysis Help Define a Hate Crime?" Invited to present at the West Coast Round Table on Language and Law, Missoula, Montana.

2014: "Language and the Law: An Overview of Forensic Linguistics". Plenary Address: Linguistics Society of Korea. Seoul National University.

2014: "Using Corpus Linguistics to Teach and Learn High-Code/Low Code Register Variation". Alice Pack Memorial Lecture, Brigham Young University, Hawaii.

2013: "Using English Corpora to Teach and Learn High-Code/Low Code Register Variation." Plenary Address. Korea Multi-media Assisted Language Learning (KAMALL) International Conference, Seoul, South Korea.

2013: "Some Matters American Jurisprudence Should Know about the English Proficiency of Linguistic Minorities." Invited speaker, Utah State Bar Association Conference, St. George, Utah.

2012: "How Blind Is Justice in the Age of Proximity?" UCLA Multilingualism in Institutional Contexts Conference, Los Angeles. Invited Speaker.

2012: "Intercultural Rhetoric in the Age of Proximity." 7th Intercultural Rhetoric and Discourse Conference, Indiana University Purdue University Indianapolis, Invited Plenary Speaker.

2011: "Some Matters American Jurisprudence Should Know about the English Proficiency of Linguistic Minorities." Invited to present at the West Coast Symposium on Language and the Law. San Diego State University.

2010: "Toward solving the language testing paradox in English language planning, teaching and learning." Opening Plenary, Current Trends in Language Testing Conference, Dubai, UAE. Funded by U.S. State Department.

2010: "Toward solving the language testing paradox in English language planning, teaching and learning". Teacher seminar, Sultan Qaboos University, Oman, Funded by U.S. State Department.

2010: "Thinking about Culture in TESOL." Plenary Speaker. MIDTESOL Conference, Dubuque, Iowa.

2010: "What Linguistics Can Tell Us about Strategies for Teaching Metaphor." Plenary Speaker. MIDTESOL Conference, Dubuque, Iowa.

2010: "Re-imagining Culture in TESOL" (with Dr. Ulla Connor). Invited luminary speaker. TESOL International Conference, Boston, MA.

2008: "Language Planning at U.S. Universities" Invited featured speaker with Norm Evans), TESOL, New York City.

2008: "From Learner Voice to Academic Voice," Invited Featured Speaker. TESOL Arabia, Dubai, UAE.

2007: "From Language Teacher to Language Planner" (with Norman Evans), Invited spotlight speaker. TESOL, Seattle WA.

2005: "Harnessing the power of language planning for university contexts." Invited, funded featured speaker. TESOL Arabia Conference, Dubai, UAE.

2005: "Teachers of English to Speakers of Other Languages (TESOL): Why, What and How We Advocate." Invited to present at the National Council of Teachers of English Conference, Pittsburgh, PA.

2004: "Unrestricting the Academic Restricted Code through Language Planning." Featured Speaker, Bennion Teachers Workshop, Utah State University.

2003: "Reversing Samoan Language Shift." Invited Speaker. International Samoan Language Commission Conference, Los Angeles.

2003: Lessons in language services from four previous Olympics. Invited Speaker. First Beijing 2008 Olympic Cultural Festival. Beijing, China.

2003: Are we really participating in linguistic genocide? Invited Spotlight Session, TESOL 2003, Baltimore, Md.

2002: "English within the power/solidarity paradigm." Invited Spotlight Session, TESOL, 2002, Salt Lake City, Utah.

1998: "Rhetorical Style: As Latin Was, English Is?" Invited featured speaker, University of Wisconsin Linguistics Symposium on Discourse Across Languages and Cultures.

1998: "Foundations for a Language Policy for the Olympic Games." Invited to present to the Sydney 2000 Olympic Language Policy Consortium, Sydney, Australia.

1995: "Grammars of academic success." Invited to present at the Teacher's Seminar, Liahona, Tonga.

1995: "Hybrid literacies in international communication." Invited to present for the "New Directions in Intercultural Literacy Studies Colloquium", TESOL '95, Long Beach, Ca.

1995: "Literacies in conflict: From primary to secondary school literacies in an Aboriginal community." Invited as a featured speaker (with honorarium), Australian Council of TESOL Associations Conference, Sydney, Australia.

CONFIDENTIAL

*Eggington, CV, January 2020* 7

1995: "The English language metaphors we write by." Invited as a featured speaker (with honorarium), Australian Council of TESOL Associations Conference, Sydney, Australia.
1994: "English intrusion in academic genres." Invited to present for the "New Directions in Intercultural Literacy Studies Colloquium", TESOL '94, Baltimore, MD. U.S.A.
1993: "Korean Written Discourse Styles:  Towards an International Discourse?".  Invited to present for the "New Directions in Intercultural Literacy Studies Colloquium", TESOL '93, Atlanta, Ga. U.S.A.
1993: "From the Past to the Present:  A Conceptual Overview of Language Policies in English Speaking Nations." Invited to present for the "Language Policies in English Speaking Nations Colloquium", TESOL '93, Atlanta, Ga. U.S.A.
1993: "Language Planning, Language Teaching: An Exercise in HUMAN Resource Management."  Invited as a featured speaker at the Australian TESOL Conference/Summer School, Sydney, Australia.
1991: "Culture and Cognition: Research from Australian Aboriginal Education."  Invited to present within the Culture and Cognition Research Colloquium at the TESOL Conference, New York.
1991: "What It Means to Read and Write in Australian Aboriginal Culture."  Invited to present as part of the 7th Annual Cross-Cultural Literacy Colloquium at the TESOL Conference, New York.
1990: "Varieties of English."  Invited to present in the Applied Linguistics Academic Interest Section at the TESOL Conference, San Francisco.

## Peer Reviewed Paper Presentations

2020:  "Quantitative and Qualitative Analyses of Rehearsed Speech Characteristics on the Oral Proficiency Interview – Computer (OPIc)" with G. Gates and T. Bell. Language Assessment Research Conference, Provo, Utah. March 2020.
2020:  "Corpus Linguistics and Trademark Genericity" with James Heilpern, Zach Smith, & Earl Brown. Fifth Annual Law and Corpus Linguistics Conference, Brigham Young University, Provo, Utah. February 2020.
2019:  "Examining the Objectivity of Corpus-based Approaches to Statutory Interpretation."  Germanic Society for Forensic Linguistics, Grazz, Austria, September 2019.
2019:  "Corpus Linguistics Applications to the Law: An Overview of the Development and Applications of Specialized Legal Corpora." Colloquium convener and presenter. American Association of Applied Linguistics Conference, Atlanta, Georgia, March 2019.
2019:  "The use of corpora in forensic linguistic contexts." American Association of Applied Linguistics Conference, Atlanta, Georgia, March 2019.
2018:  "Cross-cultural Pragmatic Failure between Police and Young African American Urban Males" with Tanner Call. Translating and Translanguaging: Communication in the Multicultural City Conference, Birmingham, U.K., March 2018.
2018:  "Cross-cultural Pragmatic Failure between Police and Young African American Urban Males" with Tanner Call. Georgetown University Roundtable of Linguistics, March 2018.
2018:  "Service Learning: Innovative Pedagogies in Linguistics Mini-course" with Michal Temkin Martinez. Linguistics Society of America, Salt Lake City, Utah, January 2018.
2018:  "Triangulating corpus and human subjects data in determining ordinary meaning in legal contexts" with Madison Grant. Linguistics Society of America, Salt Lake City, Utah, January 2018.
2017:  "Triangulating corpus and human subjects data in determining ordinary meaning in legal contexts". West Coast Roundtable on Language and the Law, August, 2017.
2017: "Combining textual analysis and field work within a trans-"sub"-disciplinary model" with SunOk Kim. American Association of Applied Linguistics (AAAL) Conference, Portland, Or, March 2017.
2017:  "Black Pragmatics Matter: Miscommunication between U.S. Police and Inner-City African Americans," with Tanner Call. International Association of Forensic Linguistics Conference, Porto, Portugal, July 2017.
2017: "Causes and Effects of the Complexity of Legal Language in South Korea," with SunOk Kim. International Association of Forensic Linguistics (IAFL) Conference, Porto, Portugal, July 2017.
2017:  "Testing language or culture? A discourse analysis of the Test of Proficiency in Korean," with SunOk Kim. International Association of Applied Linguistics (AILA) Conference, Rio de Janeiro, Brazil, July 2017.
2016:  "Avoiding Confirmation Bias in Forensic Linguistics Research." West Coast Roundtable on Language and the Law, August, 2016.
2016:  "Understanding and Supporting ESL Readers and Writers in Higher Education",   Publisher's Sponsored Presentation, TESOL 2016, Baltimore, April 2016.

CONFIDENTIAL

*Eggington, CV, January 2020* 8

2015: "A Case Study of the Development and Demise of a University-Wide ESL Language Plan." Bridging Language Acquisition and Language Policy Symposium, Lund University, Sweden, June 2015.

2014: "Using Debate in the Classroom to Develop Global Proficiency," with T. Brown, J. Bown, E. Talalakina, ACTFL Conference, San Antonio, Texas.

2013: "Toward the Development of an Epistemology of Linguistics for Pedagogical Purposes." Linguistics Society of America Conference, Boston, MA.

2012: "Measuring Language Ability in Legal Contexts" (with T. Cox).  Georgetown University Roundtable on Languages and Linguistics.  Georgetown University, Washington D.C.

2011: Elicited Imitation as a Determiner of the Need for a Court Interpreter" (with T. Cox and S. Wood). International Association of Forensic Linguistics Conference, Birmingham, U.K.

2011: "The Consequences of Feigned Comprehension in Interrogation Settings" (with T. Cox and S. Wood). International Association of Forensic Linguistics Conference, Birmingham, U.K.

2011: "Culture(s) in Global and Local Englishes: Theory and Teaching Practice" (with U. Connor).  TESOL, 2011. New Orleans, LA.

2010: "Towards Accommodating the "Tragedy of the Commons" Effect in Language Policy Development." Applied Linguistics Association of Australia Conference, Brisbane, Australia.

2010: "Towards Accommodating the "Tragedy of the Commons" Effect in Language Policy Development."  American Association of Applied Linguistics Conference, Atlanta, Georgia.

2009: "Fake Comprehension Strategies by Non-native English Speakers in Police Interrogations."  International Association of Forensic Linguistics Conference, Amsterdam, NL.

2008: "Opposing Language Restrictionist Policies in the U.S."  International Association of Applied Linguistics, Essen, Germany.

2008: "Is There a Drift Towards Universal English-Based Rhetorical Patterns?" 18th International Congress of Linguistics. Seoul, Korea.

2007:  "Linguistic Elements of Hate Crimes," International Association of Forensic Linguistics Conference, Seattle, WA.

2006: "Resolving Trade Name Legal Disputes through Corpus Research" (with M. Davies).  The American Association of Applied Corpus Linguistics.  American Association of Applied Corpus Linguistics."  Flagstaff, Az.

 2006:  "Is There a Drift Toward Universal English-based Rhetorical Patterns?  Applied Linguistics Association of Australia Conference, Brisbane, Australia.

2006: "The Public Face of Language Planning." Applied Linguistics Association of Australia Conference, Brisbane, Australia.

2006: "Language Planning and Foreign Language teaching in the U.S. "Applied Linguistics Association of Australia Conference, Brisbane, Australia.

2006: "Leading with Action Research" (with K. Eggington). TESOL, Tampa, Fl.

2005: "Incorporating Academic Restricted Code in Language-in-Education Planning." 14th World Congress of Applied Linguistics, Madison, Wisconsin.

2005: "Studies in Forensic Linguistics for Pre-Law Students."  International Association of Forensic Linguistics Conference, Cardiff, Wales.

2005: "Home Literacy Influence and Academic Success." (with E. Petelo)  TESOL, San Antonio.

2004: "Unrestricting the Academic Restricted Code."  MEXTESOL National Convention, Morellia, Mexico.

2004: "Language Planning in Applied Linguistics Theory and Practice."  American Association of Applied Linguistics. Portland.

2004: "From Brand Name to Generic Name:  The Kelley Blue Book Cases". American Names Society Conference at Linguistics Society of America conference, Boston, MA.

2003: "From Brand Name to Generic Name:  The Kelley Blue Book Cases."  International Association of Forensic Linguistics Conference, Sydney, Australia.

2001: "Writing programs in conflict: ESL writing versus freshmen composition programs."  AAAL 2001, St. Louis.

2000: "Toward an Understanding of Linguistic Predictors of Academic Success." Georgetown University Roundtable.

2000: "The so-far successful resistance to Official English in Utah." AAAL 2000, Vancouver.

1999: "An analysis of American/Brazilian business communication." (with Jennifer Harrington) TESOL '99, New York, New York.

1999: "Integrating video-conferencing into EFL curricula. "TESOL '99, New York, New York.

1998: "Utah's language planning response to changing demographics" (co-presented with Laura McCrea)

*Eggington, CV, January 2020* 9

TESOL'98, Seattle, Wa.

1998: "Solving EFL communication problems through interactive video", Technology Connects Symposium, (with Marian Ashley) TESOL'98, Seattle, Wa.

1997: "Exploring the scope of "language" in language-in-education policy" (Co-presented with Brent Green). American Association for Applied Linguistics Conference, Orlando, Florida.

1997: "Predictors of academic success in an oral society" (co-presented with Brent Green) in the "Contact, contexts and contrast in cross-cultural literacy colloquium." TESOL 1997, Orlando, Florida.

1997: "About language -- the latest from and to applied linguists". Applied Linguistics Interest Section Academic Session, TESOL 1997, Orlando, Florida.

1996: "Rhetorical influence: As Latin was, English is." World Englishes Conference, Honolulu, Hawaii.

1996: "To maintain, or to empower or to try to do both? Language policy in the South Pacific." Invited to present at the "Post-Colonial Language Problems and Language Planning: Assessing the Past Half Century Workshop" of the Memory, History and Critique: European Identity at the Millennium, Fifth Conference of the International Society for the Study of European Ideas, Utrecht, The Netherlands.

1996: "Chinese cultural influences on topic choice and rhetorical style." With Diana Nelson, TESOL 1996, Chicago, Il.

1996: "To boldly go where no feminist theory has gone before." Popular Culture Association International Conference, Honolulu, Hi.

1995: "Elementary, secondary and community literacies in conflict." TESOL '95, Long Beach Ca.

1995: "Copy this down: From language policy to classroom practice." American Association of Applied Linguistics Conference, Long Beach Ca.

1995: "Contrastive discourse analysis of World English literatures." (Co-presented with Wendy Baker). Ninth Annual International Conference on Pragmatics and Language Learning. University of Illinois at Urbana-Champaign.

1995: "Language and language-in-education policy in English dominant nations," In Language Policy Colloquium, Australian Council of TESOL Associations Conference, Sydney, Australia.

1994: "Literacies in conflict: From elementary to secondary school literacies in an Aboriginal community." TESOL'94, Baltimore, MD. U.S.A.

1994: "Text and Context in Australian Aboriginal Rhetorics." Pragmatics Research Parasession, 8th Annual International Conference on Pragmatics and Learning, University of Illinois at Urbana-Champaign.

1993: "Stylistic Norms and Cultural Variation: A Comparison of Narrative Fiction by European-American and Mexican American Male and Female Authors" (with Joanna Brooks). American Association for Applied Linguistics Conference, Atlanta, Ga. U.S.A.

1992: "The Development of Peace Approaches in Materials and Teaching." TESOL 1992, Vancouver, B.C.

1992: "Policies of the Oppressed: Positive and Negative Language Policies." American Association Applied Linguists Conference, Seattle.

1992: "Policies of the Oppressed: Positive and Negative Language Policies." TESOL Conference, Vancouver.

1990: "From Oral to Literate Culture: The Australian Aboriginal Experience." TESOL Conference, San Francisco.

1989: "Contrastive Analysis of Varieties of Australian Aboriginal Text." TESOL 23rd Annual Convention, San Antonio, Texas, U.S.A.

1987: "Evaluating the Impact of Bilingual Education in Aboriginal Communities in the Northern Territory." ANZAAS (Australian and New Zealand Association for the Advancement of Science) Congress, Townsville, Australia.

1987: "A Contrastive Analysis of Aboriginal English Prose." Presented at the AILA (International Applied Linguistics Association) Congress, Sydney, Australia.

1987: "Aboriginal English Prose: Similarities and Differences to Standard Australian English Prose." Cross Cultural Issues in Educational Linguistics Conference, Batchelor, Australia.

1987: "The Impact of Sociolinguistics Research on Language Development Programs." Australian TESOL Summer School, Sydney, Australia.

1986: "The Value of Language Planning Theory on Adult ESL Program Design." Applied Linguistics Association of Australia Conference, Adelaide, Australia.

1986: "Theoretical Foundations of Adult Second-Language Literacy Methodologies." Applied Linguistics Association of Australia Conference, Adelaide, Australia.

1984: "Toward a Language Plan for Southern California." TESOL National Convention, Houston.

1983: "Contrastive Rhetoric: Applications in a Korean-English Context." TESOL National Convention, Toronto.

1983: "A Case for the Cost-Effectiveness of Adult ESL Programs." TESOL National Convention, Toronto.

CONFIDENTIAL

*Eggington, CV, January 2020*  10

**CONSULTANCIES**

**Legal Consultancies:** (* indicates 21 instances of deposition or court testimony provided)

1. 2020: Forensic Consultant for Attorney Jim Langdon of Dorsey and Whitney (Minnesota) in a case involving two disputed clauses in a contract.
2. 2020: Forensic Consultant for Attorney Norm Silverman of Austin Texas in a case involving the leading of, and coercive interrogation of, witnesses and suspects in a criminal case.
3. 2019: Forensic Consultant for Attorney Dirk Vandever of The Popham Law Firm, Kansas City, MO in a case involving a disputed clause in an auto-insurance policy.
4. 2019: Forensic Consultant for David L. Clarke, The Clarke Law Firm, Murfreesboro, TN, in a case involving the English proficiency of a non-native English speaker.
5. 2019: Forensic Consultant for Cynthia Orr of Goldstein Goldstein, Hilley and Orr, San Antonio, Texas in a case involving a discourse analysis of a court transcript and the meaning of a specific phrase.
6. 2018: Chief consulting linguist in a Brief of Amici Curiae to the U.S. Supreme Court in Rimini Street V. Oracle USA, Inc. In conjunction with Schaerr & Jaffe LLP, Washington, DC. The brief argued for a resolution of a contested legal term using corpus linguistics as the prime research tool.
7. *2018: Forensic Consultant for Maschoff Brennan, Salt Lake City, Utah, in a case involving contested trademarks.
8. 2018: Forensic Consultant for Samson Law Associates, George Town, Cayman Islands in a case involving the reliability and validity of a government English language testing protocol.
9. *2018: Forensic Consultant for Laughlin Legal PC, San Mateo, California in a case involving whether a non-native English speaker understood her pre-nuptial agreement. Ongoing.
10. *2017: Forensic Consultant for Parr Brown Gee & Loveless, Salt Lake City, Utah in a case involving the meaning of a contested term in a contract.
11. *2017: Forensic Consultant for Parr Brown Gee & Loveless, Salt Lake City, Utah in a case involving determining the author of a movie script.
12. 2017: Forensic Consultant for Alston and Bird, LLP., Atlanta Ga. In a case involving whether a non-native English speaker understood his Miranda Warnings.
13. 2017: Forensic Consultant for Ben Allen, General Counsel, Schellman and Company LLC, Tampa, Florida in a case involving the interpretation of an ambiguous government regulation.
14. 2016: Forensic Consultant for J.J. Kim & Associates, P.C. Garden Grove, California in a case involving determining the author of a series of slanderous emails written by an employee of a Korean-based international shipping company. The case will be tried in a South Korean court.
15. 2016: Forensic Consultant for Attorneys Paul Morgan and Kimberly Hoof (Houston, Texas) in a case involving the ability of a non-native English speaker to comprehend a police interrogation.
16. 2016: Forensic Consultant for Attorney Emma Isakson of Mitchell, Stein and Carey, Phoenix, Arizona in a case involving the ability of a non-native English speaker to comprehend a police interrogation.
17. 2016: Forensic consultant for Attorney Norm Silverman (Austin, Texas) in a case involving the ability of a non-native English speaker to comprehend police interrogations as well as an evaluation to determine whether defendant should be considered as an adult. Settled.
18. *2015: Forensic consultant for Carmen P. Forte, Jr. of Klein, Thorpe and Jenkins, LTD., Chicago in a case involving the ability of a non-native English speaker to understand police questioning without the aid of an interpreter. Ongoing.
19. *2015: Forensic consultant and expert witness for Attorney Norm Silverman (Austin, Texas) in a case involving the ability of a non-native English speaker to understand his Miranda warnings and police questioning with respect to coercive interrogation techniques used by the police. Testimony provided in jury trial. Case resulted in a hung jury.
20. *2015: Expert witness for the Federal Public Defender's Office (Alexandria, Virginia) in a criminal case involving a defendant's English language proficiency. Testimony provided in federal court in an evidentiary hearing and jury trial.
21. *2014: Expert witness for Attorney James F. Halley (Portland Oregon) in a criminal case involving alleged hate crime accusations based on defendant's use of a derogatory term. Court testimony provided. Case resulted in hung jury leading to reduced charges.
22. 2014: Expert witness for Attorney Jon H. Rogers (Salt Lake City, Utah) in two cases involving the scope of a

*Eggington, CV, January 2020*  11

"provided however that" clause in a legal contract.

23. *2013:  Expert witness for the Federal Defender's Office (Salt Lake City) in a case involving a defendant's English language proficiency. Testimony provided in evidentiary hearing. Issue resolved in favor of defendant.

24. 2013:  Expert witness for Attorney Andrew W. Bodeau of Cahill, Davis & O'Neall, LLP, Los Angeles Ca. in a case involving the meaning of a phrase in a legal document.  Case settled.

25. *2013: Expert witness for Attorney Linda Parisi (Sacramento, Ca) in a criminal case involving alleged hate crime accusations based on defendant's use of a derogatory term.

26. *2013:  Expert witness for the Federal Defender's Office (Salt Lake City) in a criminal case involving the ability of a non-native English speaker to understand Miranda Rights and police questioning.

27. *2012:  Expert witness for Glenn Gimbut, City Attorney, City of San Luis, Az., in a case involving the ability of a non-native English speaker to comprehend complex spoken and written English. (Case found in favor of City Attorney)

28. 2011:  Expert witness for V. John Ella of Jackson Lewis LLP, Minneapolis, Minnesota in a case involving trade-mark infringement.  (Case settled)

29. 2010:  Expert witness for the Federal Defender's Office (Salt Lake City) in a case involving a defendant's English language proficiency  (case dismissed).

30. *2010:  Expert witness for Edwin S. Wall, P.C (Salt Lake City) in a case challenging the conclusions of a former FBI document examiner who claims a defendant wrote a series of threatening letters. (Services no longer needed due to prosecution's withdrawal of examiner's services based upon results of evidentiary hearing).

31. 2010: Expert witness for Sheiness, Scott, Grossman and Cohn, LLP (Houston, Texas) in a case involving the meaning of a term in a legal contract. (case settled)

32. 2009:  Expert witness for Attorney Jon H. Rogers (Salt Lake City, Utah) in a case involving the scope of a "provided, however, that" clause in a legal contract. (case settled)

33. 2009:  Expert witness for Druyon Law Offices (Bountiful, Utah) in a case involving identifying the author of a police statement.

34. *2008: Expert witness for the Federal Defender's Office (Salt Lake City) in a criminal case involving the ability of a native American to understand his Miranda Rights.

35. *2008: Expert witness for the Federal Defender's Office (Salt Lake City) in a case involving the English language proficiency of a Korean immigrant charged with a criminal activity.

36. 2008:  Expert witness for the Federal Defender's Office (Salt Lake City) in a case challenging the conclusions of a document examiner who claims a defendant wrote a series of threatening letters.

37. 2007:  Expert witness for Van Cott, Bagley, Cornwall & McCarthy (Salt Lake City, Utah) in a case involving the referent of an exclusionary clause in a disputed contract between two legal firms.

38. 2007:  Forensic document examiner in a case requiring the identification of the author of a series of documents (Strict confidentiality required)

39. 2007:  Expert witness for Glenn Ioffredo, Maitland, Fl. in a case involving the interpretation of  ambiguous references in a will.

40. 2006:  Expert witness for The Sandage Law Firm, P.C., Kansas City, Mo. in a case involving the determination of a crime as a hate crime based upon the defendant's use of an ethnic epithet. (pro bono)

41. 2006: Expert Witness for Craig Cook, Attorney-at-law, (Salt Lake City, Utah) in a case involving a content analysis of a signed, but undated holographic will.

42. 2005:  Consulting Expert Witness for Wilmer Cutler Pickering Hale and Dorr (Washington D.C.) in a case involving generic use of a trade name.

43. *2003: Expert witness for the California State Attorney General (Sacramento) in a case involving the readability of parole documentation.

44. 2002:  Expert witness for Nielsen and Senior (Salt Lake City, Utah) in a case involving the scope of an exclusionary clause in a mining lease agreement.

45. 2002:  Expert witness for Ted Weckel, (Attorney-at-law, Utah) in a case involving the English language proficiency of a Cambodian refugee charged with criminal activity.

46. *2003: Expert Witness for Kaye, Scholer LLP (New York, Los Angeles) in a case involving national and international brand name infringement.

47. *2002: Expert Witness for Kaye, Scholer LLP (New York, Los Angeles) in a case involving national and international brand name infringement.

48. *2002: Expert witness for Robert Lucherini, Attorney-at-law (Las Vegas, Nevada) in a case involving the

CONFIDENTIAL

*Eggington, CV, January 2020*  12

English language proficiency of a Chinese-Vietnamese immigrant under criminal investigation.

49.  *2002: Expert witness for Giauque, Crocket, Bendinger & Peterson (Salt Lake City, Utah) in a case involving Utah's Official English policy. (pro bono)
50.  1997: Expert Witness for Abbott and Walker, Attorneys-at-law (Provo, Utah), in a case involving the meaning of two related words in a "non-compete clause" within a sale-of-business contract.
51.  *1992: Expert Witness for Holme, Roberts and Owen, (Salt Lake City, Utah) in a case involving the meaning of a mining contract between the State of Utah and an international mining company.

## General Applied Linguistics:

1999:  Sorenson Development Corporation, Salt Lake City, Utah, ESL Applications for Sorenson Vision Project.
       Duties: Advising on the development of materials and applications for video-conferencing technology for ESL purposes.
1995-2000:  National Languages and Literacy Institute of Australia (NLLIA), Olympic Games Language Policy Project.(With Dr. Ellen Touchstone, Touchstone Language Management, Los Angeles)
       Duties: To develop an "international event language provision policy and plan" for the Sydney 2000 Olympic Games. The specific objective of this consultancy was to conduct a sociolinguistic survey of participants during the Atlanta Games to evaluate language provision at those games. We undertook this task July-August 1996, and wrote a report which was presented to the Prime Minister's office.
1992-1996:  LDS Church Education System (CES), South Pacific Region.
       Duties:  Visited, researched and participated in a task-force formed by the CES to investigate the effectiveness of CES schools in Samoa, Tonga, Fiji and Kiribati.  As part of this consultancy, I prepared a "white" discussion paper for the CES on bilingual education which has been disseminated for further action.
1992:  Australian Language and Literacy Council (ALLC).
       Duties:  Researched and wrote a report which placed the Australian Language and Literacy Policy into rational frameworks. The ALLC advises the Australian Federal Government's Minister of Employment, Education and Training.  My rationale frameworks paper is now being used to evaluate current language policy in Australia.
1988:  ELICOS Program (English Language Intensive Course for Overseas Students), University of Queensland, Australia.
       Duties:  I was asked to conduct a number of staff training workshops with ELICOS personnel.
1988: International Development Program, Australian Federal Government
       Duties:  Through a contract arranged by the Brisbane College of Advanced Education, Institute of Applied Linguistics, assisted in the development of the English Language Testing Service General Listening test.
1985: Murdoch University, Australia
       Duties:  Investigating the American Language Program at the University of Southern California with the aim of assisting those preparing for the Yan Chep University project.
1982: University of California at Santa Barbara, California
       Duties:  Developing and teaching a course on second language literacy to Teachers of English as a Second Language.
1980-1981: California Department of Education, Office of Staff Development.
       Duties:  Planning, implementing and participating in a number of "institutes" sponsored by the department of train ESL teachers from Baja California Department of Education, Mexico.

## PROFESSIONAL SERVICE

## Professional Organizations, Editorial Boards

1999-present:  Editorial Board, *Current Issues in Language Planning*, London: Multilingual Matters.
2000-present:  Large Grants Assessor for the Research Grants Committee of the Australian Research Council (Australian Government) Department of Employment, Education and Training. Involvement includes the evaluation of large research grants (above $100,000) in the fields of linguistics, sociolinguistics and educational

CONFIDENTIAL

*Eggington, CV, January 2020* 13

linguistics.

2000-present: Member, International Association of Forensic Linguists; Conference Proposal Reviewer, 2019

1993-present: American Association of Applied Linguistics (AAAL). Involvement includes: AAAL 1997, Program Strand Coordinator, Language Policy Strand., Abstract reader for AAAL Conference, 1993, 1995,1997, 2018, 2019.

2012-13:  Linguistics Society of America, Co-chair, Linguistics in Higher Education Sub-committee.

1996-2007: Teachers of English to Speakers of Other Languages (TESOL Inc.).

Involvement included:

> Member, Board of Directors, 2003-2006.
> Convention Chair, San Antonio, 2005.
> Convention Local Organizing Committee Member, 2000 - 2002.
> Chair, Applied Linguistics Interest Section, 1997 - 1998,
> Editor, Sociopolitical Concerns Column, TESOL Matters, 1994 - 1996,
> Chair, Sociopolitical Concerns Standing Committee, 1992-1993,
> Chair of the Peace Education Sub-committee of the Sociopolitical Concerns Standing Committee, 1990-1991,
> Invited to participate as an "expert researcher" in the 3rd Annual Research Fair at TESOL 1992,
> Abstract reader for TESOL 1991, 1992, 1993, 1997 Conference, Applied Linguistics Special Interest Section,
> Abstract reader for TESOL 1994, 1995 Research Special Interest Section,
> Colloquium co-chair (with Helen Wren) for 1992, Sociopolitical Concerns Committee, Academic Session,
> Colloquium co-chair (with Natalie Kuhlman) for 1996, 1997, Annual Cross-cultural Literacy Colloquium,
> Colloquium co-chair (with William Grabe) for 1996, Thirty Years of Contrastive Rhetoric. This colloquium was selected as the Presidential Colloquium for TESOL 1996,
> Colloquium chair for 1997 Applied Linguistics Interests Section Academic Session,
> Discussion Session program organizer for 1997 Applied Linguistics Interests Section, Discussion Sessions

1996-2000: Manuscript Reviewer/Referee, *Asian Journal of English Language Teaching*, Involvement includes reviewing manuscripts for acceptance in the journal published by the Chinese University of Hong Kong.

1985-1988: Australian Council of TESOL Associations (ACTA) and a member of the executive board of that organization.

1985-1988: Applied Linguistics Association of Australia (ALAA) and the Northern Territory representative

1985-1988: Association of Teachers of English as a Second Language, Australia (ATESL, N.T.).

1985-1988: Australian College of Education.

**Conference Organization**

2016:  Conference convener and chair, West Coast Roundtable on Language and the Law. Provo, Utah, August, 2016.

2005:  Convention chair for TESOL (Teachers of English to Speakers of Other Languages) Annual Convention and Exposition held at San Antonio, Texas, March-April 2005.  The conference attracted over 8,000 participants.

2002:  Local conference chair for TESOL (Teachers of English to Speakers of Other Languages) Annual Convention and Exposition held at Salt Lake City, April 2002. The conference attracted over 6,500 participants.

1987:  Co-convener of the AILA/ALAA (International Applied Linguistics Association/Applied Linguistics Association of Australia) International Pre-Congress Conference held in Darwin, August 1987 focusing on applied linguistics in Aboriginal education.

# PERSONAL

Married to Pamela Joy Eggington (B.Ed., Elementary Teaching Credential, Graduate TESOL Certificate).
Three children:

> William Barry Eggington, Owner and CEO, Eggington Productions, a computer animations producer (see http://www.eggington.net)
> Kalani Joy Eggington, Ph.D. Curriculum and Instruction, University of Queensland, Australia. Assistant Professor, Westminster College, Utah.

CONFIDENTIAL

*Eggington, CV, January 2020*  14

http://www.westminstercollege.edu/apps/directory/directory_dsp.cfm?unit=keggington.  Science Teacher, Dixon Middle School, Provo, Utah. 2002 Olympics Torch bearer.

Julie Malia Eggington, Ph.D. Bio-chemistry, University of Wisconsin, Madison. CEO & Co-founder of Center for Genomic Interpretation, LLC.

Speaker of Korean.

CONFIDENTIAL

# Dr. William G. Eggington,
# Forensic Linguistics Experience, February 2020

Professor.
Linguistics Department
Brigham Young University, Provo, Utah, 84604
 Chair, Linguistics Department, 2007-2013
 Ludwig-Weber-Siebach Humanities Professor, 2013-2018

Contact:
 wegg@byu.edu,
 william.eggington@gmail.com
 801-615-0751

B.A. English and TESOL, Brigham Young University, Hawaii, 1975 (summa cum laude)
M.A. Linguistics, University of Southern California, 1981
Ph.D. Linguistics, University of Southern California, 1985

**Publications Involving Forensic Linguistics:**

I have published 6 books and over 50 articles in applied linguistics including the following articles involving forensic linguistics.

"Language and the Law: An Overview of Forensic Linguistics." In *Proceedings of the Linguistics Society of Korea 2014 Conference.* Linguistics Society of Korea, 2014.

"Using Elicited Oral Response Testing in Order to Determine the Need for an Interpreter" (with Troy Cox).  In *Harvard Latino Law Review*, Spring 2013

 *This article focuses on using a valid, reliable, practical and inexpensive language testing method to determine the need for an interpreter for non-native English speakers living in the United States.*

"Finding Justice in Translation: Recent American Jurisprudence Affecting Due Process for Linguistic Minorities Together with Practical Solutions" (with Judge Lynn W. Davis, Maxwell Alan Miller, Adam Prestidge). In *Harvard Latino Law Review.*  Spring 2011.

 *This article, co-authored with Judge Lynn W. Davis of the Utah State 4th District Court along with two BYU students, focuses on actual and potential miscarriages of justice due to communication breakdowns and the inadequate provision of interpreters and translators involving non-native English defendants.*

"Deception and Fraud."  In *Dimensions of Forensic Linguistics*, M. Teresa Turell and John Gibbons (eds.). Amsterdam: John Benjamins 2008.

 *This article examined the reliability of linguistic markers of deception and fraud.*

CONFIDENTIAL

**Research Presentations Involving Forensic Linguistics:**

2020:  "Social Advocate Versus Forensic Linguist: A Case Study of an Internal Conflict." Invited to present at the International Applied Linguistics Conference, Grogingen, The Netherlands, August 2020.

2020:  "Quantitative and Qualitative Analyses of Rehearsed Speech Characteristics on the Oral Proficiency Interview – Computer (OPIc)" with G. Gates and T. Bell. Language Assessment Research Conference, Provo, Utah. March 2020.

2020:  "Corpus Linguistics and Trademark Genericity" with James Heilpern, Zach Smith, & Earl Brown. Fifth Annual Law and Corpus Linguistics Conference, Brigham Young University, Provo, Utah. February 2020.

2019:  "Examining the objectivity of corpus-based approaches to statutory interpretation." Germanic Society for Forensic Linguistics, Graz, Austria, September 2019.

2019:  "Relativity Applies to Physics, not Ethics': Exploring Ethical Issues in FL/FP Research." Invited to participate in expert's panel, Germanic Society for Forensic Linguistics, Graz, Austria, September 2019.

2019:  "Corpus Linguistics Applications to the Law: An Overview of the Development and Applications of Specialized Legal Corpora." Colloquium convener and presenter. American Association of Applied Linguistics Conference, Atlanta, Georgia, March 2019.

2019:  "The use of corpora in forensic linguistic contexts." American Association of Applied Linguistics Conference, Atlanta, Georgia, March 2019.

2019:  "Corpus Linguistics Workshop" (with James Heilpern). A workshop to members and law clerks of the Georgia State Supreme Court, Atlanta, Georgia, March 2019.

2019:  "Law and Corpus Linguistics in Brief." Invited to present at the Annual Language and Law conference, Brigham Young University Law School. Audience consisted of lawyers, including prosecutors, public defenders, and law enforcement representatives. This was a Continuing Legal Education (CLE event). March 2019.

2019:  "Non-native English Speakers and Their Comprehension of Legal English." Invited to present at the Annual Law and Corpus Linguistics Conference, Brigham Young University Law School, February 2019.

2018:   "Language proficiency and citizen's rights." Invited to present at the Language and Law Forum, University of Utah, April 2018.

2018:   "Fair and equal language access to justice for those not proficient in English." A Continuing Legal Education (CLE) presentation with Judge Lynn W. Davis (Utah Fourth District Court). Invited to present at the Annual Language and Law conference, Brigham Young University Law School. Audience consisted of lawyers, including prosecutors, public defenders, and law enforcement representatives. March 2018.

2018:  "Cross-cultural Pragmatic Failure between Police and Young African American Urban Males" with Tanner Call. Translating and Translanguaging: Communication in the Multicultural City Conference, Birmingham, U.K., March

2018.

2018: "Cross-cultural Pragmatic Failure between Police and Young African American Urban Males" with Tanner Call. Georgetown University Roundtable of Linguistics, March 2018.

2018: "Triangulating corpus and human subjects data in determining ordinary meaning in legal contexts" with Madison Grant. Linguistics Society of America, Salt Lake City, Utah, January 2018.

2017: "Triangulating corpus and human subjects data in determining ordinary meaning in legal contexts". West Coast Roundtable on Language and the Law, August, 2017.

2017: "Black Pragmatics Matter: Miscommunication between U.S. Police and Inner-City African Americans," with Tanner Call. International Association of Forensic Linguistics Conference, Porto, Portugal, July 2017.

2017: "Causes and Effects of the Complexity of Legal Language in South Korea," with SunOk Kim. International Association of Forensic Linguistics (IAFL) Conference, Porto, Portugal, July 2017.

2016: "Forensic linguist versus sociolinguist: A battle within." Invited to present at an "Invited Colloquia: Applied Linguistics in the Courtroom." American Association for Applied Linguistics Annual Conference, April 2016.

2016: "Free Speech, Hate Speech: Exploring the Language of Hate Crimes." Invited to present at an "Extraordinary Session: Panel on Hate Speech." Linguistics Society of America Annual Conference, Washington D.C. January 2016.

2015: "Are Dictionaries Done? The Developing Role of Corpus Linguistics in Definitional Disputes." Invited to present at the Association of Corporate Counsel Quarterly Meeting, Salt Lake City, Utah.

2014: "Linguistics Elements of Hate Crimes Revisited." West Coast Round Table of Language and the Law. Missoula, Montana, July 2014.

2014: "Language and the Law: An Overview of Forensic Linguistics." Invited plenary address, Linguistics Society of Korea Annual Conference, Seoul, Korea, May 2014.

2013: "Some Matters American Jurisprudence Should Know about the English Proficiency of Linguistic Minorities." Invited speaker, Utah State Bar Association Conference, St. George, Utah, March 2013.

2012: "How Blind Is Justice in the Age of Proximity?" UCLA Multilingualism in Institutional Contexts Conference, Los Angeles. Invited Speaker, November 2012.

2012: "Intercultural Rhetoric in the Age of Proximity." 7th Intercultural Rhetoric and Discourse Conference, Indiana University Purdue University Indianapolis, Invited Plenary Speaker, August 2012.

2012: "Measuring Language Ability in Legal Contexts" (with T. Cox). Georgetown University Roundtable on Languages and Linguistics 2012. Georgetown University, Washington D.C. March 2012.

2011: "Some Matters American Jurisprudence Should Know about the English Proficiency of Linguistic Minorities." West Coast Symposium on Language and the Law. San Diego State University, August 2011.

2011: Elicited Imitation as a Determiner of the Need for a Court Interpreter" (with T.

Cox and S. Wood). International Association of Forensic Linguistics Conference, Birmingham, U.K. July 2011.

2011:  "The Consequences of Feigned Comprehension in Interrogation Settings" (with T. Cox and S. Wood). International Association of Forensic Linguistics Conference, Birmingham, U.K. July 2011.

2010:  "Toward solving the language testing paradox in English language planning, teaching and learning."  Invited Opening Plenary Speaker, Current Trends in Language Testing Conference, Dubai, UAE. November 2010. Funded by U.S. State Department.

2010:  "Toward solving the language testing paradox in English language planning, teaching and learning".  Teacher seminar, Sultan Qaboos University, Oman, November 2010. Funded by U.S. State Department.

2009:  "Fake Comprehension Strategies by Non-native English Speakers in Police Interrogations."  International Association of Forensic Linguistics Conference, Amsterdam, NL., July 2009.

2007:  "Linguistic Elements of Hate Crimes, "International Association of Forensic Linguistics Conference, Seattle, WA, July 2007.

2006:  "Resolving Trade Name Legal Disputes through Corpus Research" (with M. Davies).  The American Association of Applied Corpus Linguistics.  American Association of Applied Corpus Linguistics."  Flagstaff, Az., October 2006.

2005: "Studies in Forensic Linguistics for Pre-Law Students."  International Association of Forensic Linguistics Conference, Cardiff, Wales, July 2005.

2004:  From Brand Name to Generic Name:  The Kelley Blue Book Cases". American Names Society Conference at Linguistics Society of America conference, Boston, MA, January 2004.

2003:  From Brand Name to Generic Name:  The Kelley Blue Book Cases. International Association of Forensic Linguistics Conference. Sydney, Australia, July, 2003.

**Professional Affiliations:**

- Member, International Association of Forensic Linguistics
- Member, Linguistics Society of America (served as co-chair of the Linguistics in Higher Education Sub-committee, 2011-2012)
- Member, Teachers of English to Speakers of English International Association (former member, Board of Directors, 2003-2006)

**Professional Development in Forensic Linguistics:**

2019:  Participated in a three-day Federal Bureau of Investigation training program in Investigative Statement Analysis conducted by the FBI's Language Services Section.

2015:  Invited to participate in the "Communication of Rights to Suspects Working Group", an international group of linguists, psychologists, lawyers and interpreters who established guidelines for communicating rights to suspects who

CONFIDENTIAL

speak English as a second/additional language. Our guidelines have been adopted by many international entities.

2011/2016:  Participated in two three-day Oral Proficiency Interview training programs conducted by certified ACTFL trainers.

**Consultancies:** (* indicates 21 instances of deposition or court testimony provided)

1. 2020: Forensic Consultant for Attorney Jim Langdon of Dorsey and Whitney (Minnesota) in a case involving two disputed clauses in a disputed contract.
2. 2020:  Forensic Consultant for Attorney Norm Silverman of Austin Texas in a case involving the leading of, and coercive interrogation of, witnesses and suspects in a criminal case.
3. 2019:  Forensic Consultant for Attorney Dirk Vandever of The Popham Law Firm, Kansas City, MO in a case involving a disputed clause in an auto-insurance policy.
4. 2019:  Forensic Consultant for David L. Clarke, The Clarke Law Firm, Murfreesboro, TN, in a case involving the English proficiency of a non-native English speaker.
5. 2019:  Forensic Consultant for Cynthia Orr of Goldstein Goldstein, Hilley and Orr, San Antonio, Texas in a case involving a discourse analysis of a court transcript and the meaning of a specific phrase.
6. 2018:  Chief consulting linguist in a Brief of Amici Curiae to the U.S. Supreme Court in Rimini Street V. Oracle USA, Inc. In conjunction with Schaerr & Jaffe LLP, Washington, DC. The brief argued for a resolution of a contested legal term using corpus linguistics as the prime research tool. Case decided in favor of the brief's advocacy.
7. *2018:  Forensic Consultant for Maschoff Brennan, Salt Lake City, Utah, in a case involving contested trademarks. Ongoing.
8. 2018: Forensic Consultant for Samson Law Associates, George Town, Cayman Islands in a case involving the reliability and validity of a government English language testing protocol.
9. *2018: Forensic Consultant for Laughlin Legal PC, San Mateo, California in a case involving whether a non-native English speaker understood her pre-nuptial agreement. Ongoing.
10. 2018: Forensic Consultant for Armstrong Teasdale LLP, Las Vegas, Nevada in a case involving whether a non-native English speaker understood the language of his Miranda Warning and his police interview.
11. *2017:  Forensic Consultant for Parr Brown Gee & Loveless, Salt Lake City, Utah in a case involving the meaning of a contested term in a contract.
12. *2017:  Forensic Consultant for Parr Brown Gee & Loveless, Salt Lake City, Utah in a case involving determining the author of a movie script.
13. 2017:  Forensic Consultant for Alston and Bird, LLP., Atlanta Ga. In a case involving whether a non-native English speaker understood his Miranda Warnings.
14. 2017:  Forensic Consultant for Ben Allen, General Counsel, Schellman and

CONFIDENTIAL

Company LLC, Tampa, Florida in a case involving the interpretation of an ambiguous government regulation.

15. 2016:  Forensic Consultant for J.J. Kim & Associates, P.C. Garden Grove, California in a case involving determining the author of a series of slanderous emails written by an employee of a Korean-based international shipping company. The case will be tried in a South Korean court. Ongoing.

16. 2016:  Forensic Consultant for Attorneys Paul Morgan and Kimberly Hoof (Houston, Texas) in a case involving the ability of a non-native English speaker to comprehend a police interrogation.

17. 2016:  Forensic Consultant for Attorney Emma Isakson of Mitchell, Stein and Carey, Phoenix, Arizona in a case involving the ability of a non-native English speaker to comprehend a police interrogation.

18. 2016:  Forensic consultant for Attorney Norm Silverman (Austin, Texas) in a case involving the ability of a non-native English speaker to comprehend police interrogations as well as an evaluation to determine whether defendant should be considered as an adult. Settled.

19. *2015:  Forensic consultant for Carmen P. Forte, Jr. of Klein, Thorpe and Jenkins, LTD., Chicago in a case involving the ability of a non-native English speaker to understand police questioning without the aid of an interpreter. Ongoing.

20. *2015:  Forensic consultant and expert witness for Attorney Norm Silverman (Austin, Texas) in a case involving the ability of a non-native English speaker to understand his Miranda warnings and police questioning with respect to coercive interrogation techniques used by the police. Testimony provided in jury trial. Case resulted in a hung jury.

21. *2015:  Expert witness for the Federal Public Defender's Office (Alexandria, Virginia) in a criminal case involving a defendant's English language proficiency. Testimony provided in federal court in an evidentiary hearing and jury trial.

22. *2014:  Expert witness for Attorney James F. Halley (Portland Oregon) in a criminal case involving alleged hate crime accusations based on defendant's use of a derogatory term. Court testimony provided. Case resulted in hung jury leading to reduced charges.

23. 2014:  Expert witness for Attorney Jon H. Rogers (Salt Lake City, Utah) in two cases involving the scope of a "provided however that" clause in a legal contract.

24. *2013:  Expert witness for the Federal Defender's Office (Salt Lake City) in a case involving a defendant's English language proficiency. Testimony provided in evidentiary hearing. Issue resolved in favor of defendant.

25. 2013:  Expert witness for Attorney Andrew W. Bodeau of Cahill, Davis & O'Neall, LLP, Los Angeles Ca. in a case involving the meaning of a phrase in a legal document.  Case settled.

26. *2013: Expert witness for Attorney Linda Parisi (Sacramento, Ca) in a criminal case involving alleged hate crime accusations based on defendant's use of a derogatory term.

27. *2013:  Expert witness for the Federal Defender's Office (Salt Lake City) in a criminal case involving the ability of a non-native English speaker to understand Miranda Rights and police questioning.

CONFIDENTIAL

28. *2012:  Expert witness for Glenn Gimbut, City Attorney, City of San Luis, Az., in a case involving the ability of a non-native English speaker to comprehend complex spoken and written English. (Case found in favor of City Attorney)

29. 2011:  Expert witness for V. John Ella of Jackson Lewis LLP, Minneapolis, Minnesota in a case involving trade-mark infringement.  (Case settled)

30. 2010:  Expert witness for the Federal Defender's Office (Salt Lake City) in a case involving a defendant's English language proficiency  (case dismissed).

31. *2010:  Expert witness for Edwin S. Wall, P.C (Salt Lake City) in a case challenging the conclusions of a former FBI document examiner who claims a defendant wrote a series of threatening letters. (Services no longer needed due to prosecution's withdrawal of examiner's services based upon results of evidentiary hearing).

32. 2010: Expert witness for Sheiness, Scott, Grossman and Cohn, LLP (Houston, Texas) in a case involving the meaning of a term in a legal contract. (case settled)

33. 2009:  Expert witness for Attorney Jon H. Rogers (Salt Lake City, Utah) in a case involving the scope of a "provided, however, that" clause in a legal contract. (case settled)

34. 2009:  Expert witness for Druyon Law Offices (Bountiful, Utah) in a case involving identifying the author of a police statement.

35. *2008: Expert witness for the Federal Defender's Office (Salt Lake City) in a criminal case involving the ability of a native American to understand his Miranda Rights.

36. *2008: Expert witness for the Federal Defender's Office (Salt Lake City) in a case involving the English language proficiency of a Korean immigrant charged with a criminal activity.

37. 2008:  Expert witness for the Federal Defender's Office (Salt Lake City) in a case challenging the conclusions of a document examiner who claims a defendant wrote a series of threatening letters.

38. 2007:  Expert witness for Van Cott, Bagley, Cornwall & McCarthy (Salt Lake City, Utah) in a case involving the referent of an exclusionary clause in a disputed contract between two legal firms.

39. 2007:  Forensic document examiner in a case requiring the identification of the author of a series of documents (Strict confidentiality required)

40. 2007:  Expert witness for Glenn Ioffredo, Maitland, Fl. in a case involving the interpretation of  ambiguous references in a will.

41. 2006:  Expert witness for The Sandage Law Firm, P.C., Kansas City, Mo. in a case involving the determination of a crime as a hate crime based upon the defendant's use of an ethnic epithet. (pro bono)

42. 2006:  Expert Witness for Craig Cook, Attorney-at-law, (Salt Lake City, Utah) in a case involving a content analysis of a signed, but undated holographic will.

43. 2005:  Consulting Expert Witness for Wilmer Cutler Pickering Hale and Dorr (Washington D.C.) in a case involving generic use of a trade name.

44. *2003: Expert witness for the California State Attorney General (Sacramento) in a case involving the readability of parole documentation.

45. 2002:  Expert witness for Nielsen and Senior (Salt Lake City, Utah) in a case

CONFIDENTIAL

involving the scope of an exclusionary clause in a mining lease agreement.

46. 2002:  Expert witness for Ted Weckel, (Attorney-at-law, Utah) in a case involving the English language proficiency of a Cambodian refugee charged with criminal activity.

47. *2003: Expert Witness for Kaye, Scholer LLP (New York, Los Angeles) in a case involving national and international brand name infringement.

48. *2002: Expert Witness for Kaye, Scholer LLP (New York, Los Angeles) in a case involving national and international brand name infringement.

49. *2002: Expert witness for Robert Lucherini, Attorney-at-law (Las Vegas, Nevada) in a case involving the English language proficiency of a Chinese-Vietnamese immigrant under criminal investigation.

50. *2002: Expert witness for Giauque, Crocket, Bendinger & Peterson (Salt Lake City, Utah) in a case involving Utah's Official English policy. (pro bono)

51. 1997: Expert Witness for Abbott and Walker, Attorneys-at-law (Provo, Utah), in a case involving the meaning of two related words in a "non-compete clause" within a sale-of-business contract.

52. *1992: Expert Witness for Holme, Roberts and Owen, (Salt Lake City, Utah) in a case involving the meaning of a mining contract between the State of Utah and an international mining company.