Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

---------------------------------X

IRA KLEIMAN, as the personal      )

representative of the Estate of   )

David Kleiman, and W&K Info       )

Defense Research, LLC,            )

                                  )

                 Plaintiffs,      ) CASE NO.:

                                  )

v.                                ) 9:18-cv-80176-BB/BR

                                  )

CRAIG WRIGHT,                     )

                                  )

                 Defendant.       )

---------------------------------X


CONFIDENTIAL

REMOTE DEPOSITION OF

WILLIAM GREGORY EGGINGTON, PH.D.

Wednesday, April 29, 2020; 12:06 p.m. EST


Job No.:   572757

Pgs.   1 - 296

Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR, CCR,

CLR, RSA, Remote Counsel Reporter, LiveDeposition

Authorized Reporter


MAGNA LEGAL SERVICES

(866) 624-6221

www.MagnaLS.com



Page 2

1              Remote Confidential Deposition of

2      WILLIAM GREGORY EGGINGTON, PH.D. taken by Counsel

3      for Plaintiffs, held remotely before Cindy L. Sebo,

4      Registered Merit Court Reporter, Certified Real-Time

5      Reporter, Registered Professional Reporter,

6      Certified Shorthand Reporter, Certified Court

7      Reporter, Certified LiveNote Reporter, Real-Time

8      Systems Administrator, Remote Counsel Reporter,

9      LiveDeposition Authorized Reporter and Notary

10     Public, beginning at approximately 12:06 p.m. EST,

11     when were present on behalf of the respective

12     parties:

13

14

15

16

17

18

19

20

21

22



```
 1               A P P E A R A N C E S:

 2           (All via Zoom Video Communications)

 3   Attorney for Plaintiffs:

 4        BOIES SCHILLER FLEXNER LLP

 5        ANDREW S. BRENNER, ESQUIRE

 6        100 SE 2nd Street, Suite 2800

 7        Miami, Florida 33131

 8        305.357.8414

 9        abrenner@bsfllp.com

10

11   Attorney for Defendant:

12        RIVERO MESTRE LLP

13        NEHA DAGLEY, ESQUIRE

14        2525 Ponce de Leon Boulevard, Suite 1000

15        Miami, Florida 33134

16        305.445.2500

17        ndagley@riveromestre.com

18

19   ALSO PRESENT:

20        ROBERT A. LEONARD, PH.D.

21

22
```



Page 4

```
 1                    INDEX OF EXAMINATION

 2    WILLIAM GREGORY EGGINGTON, PH.D.

 3     EXAMINATION BY                              PAGE

 4       Mr. Brenner                                 7

 5

 6                        -  -  -

 7                    INDEX TO EXHIBITS

 8                        -  -  -

 9       (Exhibits Attached to the Original Transcript.)

10    EGGINGTON

      DEPOSITION

11    EXHIBIT NUMBER          DESCRIPTION          PAGE

12          1          Notice of Taking Deposition

13                     Duces Tecum                   13

14

            2          William G. Eggington

15

                       Consulting Record            15

16

17          3          Engagement Letter, Kass to

18                     Eggington, April 13, 2020     17

19

            4          Response to Leonard Report:

20

                       Kleiman v. Wright; Expert

21

                       Report of Dr. William G.

22
```



```
 1                         -   -   -

 2              INDEX TO EXHIBITS (Continued)

 3                         -   -   -

 4    EGGINGTON

      DEPOSITION

 5    EXHIBIT NUMBER        DESCRIPTION           PAGE

 6         5           Report or Affidavit of

 7                     William G. Eggington

 8                     Dutcher v. Bold Films       94

 9

           6           Robert A. Leonard, Ph.D.

10

                       Expert Report              289

11

12         7           Court Opinion, Dutcher v.

13                     Bold Films                 289

14

           8           Court Opinion, Ceglia v.

15

                       Zuckerberg                 290

16

17         9           Defendants' Motion to Exclude

18                     Expert Testimony of Gerald

19                     R. McMenamin               290

20

21

22
```



Page 6

```
 1              S T I P U L A T I O N S

 2              IT IS HEREBY STIPULATED AND AGREED

 3     by and between counsel no party to the litigation

 4     will object to the remote deposition on the grounds

 5     that the certified stenographer may not have the

 6     legal authority to swear in the witness.

 7

 8              FURTHER STIPULATED AND AGREED

 9     that in lieu of the oath administered in person,

10     the witness declares the testimony in this matter

11     under the penalty of perjury.

12

13              FURTHER STIPULATED AND AGREED

14     that the certified stenographer is not physically

15     present in the deposition room and will be

16     reporting this deposition remotely.

17

18              FURTHER STIPULATED AND AGREED

19     all parties and their counsel consent to this

20     arrangement and waive any objections to this manner

21     of reporting.

22
```



MAGNA
LEGAL SERVICES

```
 1                    P R O C E E D I N G S

 2

 3                    Remote Deposition

 4              April 29, 2020; 12:06 p.m. EST

 5

 6                         -  -  -

 7            WILLIAM GREGORY EGGINGTON, PH.D.,

 8     after having been first duly sworn remotely by the

 9             certified stenographer, was examined

10                  and testified as follows:

11                         -  -  -

12                         -  -  -

13             EXAMINATION BY COUNSEL FOR PLAINTIFFS

14                         -  -  -

15     BY MR. BRENNER:

16          Q.     Good morning, Dr. Eggington.

17                 How are you?

18          A.     Fine.

19          Q.     We at least met via Zoom, I think, at

20     the deposition of Dr. Leonard last week, but let me

21     reintroduce myself.  My name is Andrew Brenner, and

22     I represent the Plaintiffs in this lawsuit.
```



Page 8

1              Do you understand that?

2       A.     Yes.

3       Q.     Have you had your deposition taken

4  before?

5       A.     Yes.

6       Q.     Have you had your deposition taken

7  through a remote connection such as Zoom or

8  telephone before?

9       A.     No.

10      Q.     Okay.  So the rules of the

11 deposition -- rules of deposition, generally, are

12 you familiar with?

13      A.     Yes.

14      Q.     Okay.  The only change I would say when

15 appearing remotely -- and it's really not a change;

16 it's a point of emphasis -- is, because there's a

17 little delay, to the best of your ability, try to

18 give maybe just an extra second before you answer

19 to give counsel for Dr. Wright a chance to object.

20             Okay?

21      A.     Yes.

22      Q.     And then you and I, since the dialogue



Page 9

```
 1    is primarily going to be between you and I -- let's

 2    each try to be extra careful to -- in your case, to

 3    make sure you let me finish my question, even if

 4    you're pretty sure where I'm going; and I will do

 5    the same for you, to make sure I let you finish

 6    your answer.

 7              Okay?

 8       A.    Yes.

 9       Q.    There will be times, I suspect, that

10    one or both of us will violate that rule

11    unknowingly or unintentionally, and if I do that

12    and I cut you off in answer, just let me know and

13    raise your hand or say "I wasn't done."  And I will

14    back off and let you finish your answer.

15              Okay?

16              (Connectivity issues.)

17              THE WITNESS:  Things froze up.  I

18          have a little thing down here that's

19          telling me that all sorts of buzz, going

20          red -- not at my end, but at you guys' end.

21          It doesn't probably mean anything, but I'll

22          answer "yes" to that.
```



Page 10

1    BY MR. BRENNER:

2        Q.    Okay.  We'll work our way through the

3    technology as best we can.

4              I'm going to share my screen with you

5    and show you your notice of deposition for today.

6        A.    Okay.

7        Q.    And let me just first ask you, have you

8    seen that document before?

9        A.    Yes.

10       Q.    Okay.  I'm going to scroll down to

11   Schedule A, which is what we call the -- the "duces

12   tecum request," or the "request for documents."

13             Do you see that?

14       A.    Yes.

15       Q.    Okay.  And there were four things

16   requested of you, and I just want to walk through

17   each of them and make sure our record is clear.

18             Okay?

19       A.    Yes.

20       Q.    The first thing was all invoices for

21   your work in this case.  And I was provided --

22   well, let me show you what I was provided and see



1    if that's responsive.

2              Give me one second.

3              (Pause.)

4    BY MR. BRENNER:

5        Q.    Did you -- have you sent an invoice for

6    your work in this case?

7        A.    No.

8        Q.    Okay.  You -- for Number 2, it was --

9    so the answer for Schedule A, you didn't bring

10   anything because you don't have such an invoice;

11   that is correct?

12       A.    Correct.

13       Q.    Okay.  You did provide something

14   responsive to Number 2, and that was a one-page

15   time sheet; is that correct?

16       A.    A record, yes --

17       Q.    Okay.

18       A.    -- a record of mine.

19       Q.    And that listed the hours you've spent

20   on the case to date?

21       A.    Correct.

22       Q.    Okay.  And is that the most up-to-date



Page 12

1    listing you have of what you call your time record?

2         A.    Yes.

3         Q.    And what is your hourly charge or

4    charges in this case?

5         A.    Five hundred an hour, and 600 an hour

6    for deposition.

7         Q.    And then the third thing -- well, let's

8    skip the third for a second.  That'll take a little

9    more time.

10             The fourth thing was any engagement

11   letters for your work in this case.  And I'll

12   represent that your -- counsel for Dr. Wright

13   provided me an engagement letter that you had

14   entered with the Rivero Mestre law firm; is that

15   correct?

16        A.    Yes.

17        Q.    Okay.  I'm going to try to pull those

18   up just so we can mark it.

19             MR. BRENNER:  We'll mark the

20             deposition notice as Exhibit 1, Cindy.

21

22



Page 13

```
 1                    -   -   -

 2              (Eggington Deposition Exhibit Number

 3               1, Notice of Taking Deposition

 4               Duces Tecum, marked for

 5               identification, as of this date.)

 6              CERTIFIED STENOGRAPHER:  Okay.

 7         Sure.

 8              MR. BRENNER:  Let me try to pull

 9         those things up.

10    BY MR. BRENNER:

11         Q.    While we're doing that, Doctor, the

12    time record -- does that reflect your first work in

13    the case?

14         A.    Yes.

15         Q.    And how -- how were you first contacted

16    to work on the case?

17         A.    I think -- I was contacted by e-mail

18    by -- and on -- on April the 12th.

19         Q.    And do you know who contacted you?

20         A.    Yes, Zalman -- I don't know his last --

21    is it Ness?

22         Q.    Kass.
```



Page 14

1          A.      Kass.  Sorry.  Yes.

2          Q.      Does that sound right?

3          A.      Yes.

4          Q.      And what was -- what was in that

5     e-mail, meaning was there any information?

6                  What did that e-mail say?

7          A.      Oh.  I can't recollect -- I can't

8     recollect --

9          Q.      Okay.

10         A.      -- just -- yeah; I can't recollect.

11         Q.      Okay.  Let's pull those up and see if

12    that -- I don't know why I'm -- I'm having such

13    trouble.

14                 Just give me a moment.

15                 Okay.  You see that on the screen?

16         A.      Yes.

17         Q.      That's what you refer to as the -- as

18    the "consulting record."

19                 Is that your -- is that an up-to-date

20    description or description and listing of the time

21    you spent working on this case?

22         A.      Up till 27th of April, yes.



1       Q.      Okay.  And there was an entry on the

2    27th of April for your deposition preparation and

3    your discussion with counsel, correct?

4       A.      Correct.

5       Q.      And I guess that -- did you have

6    additional time on the 28th, which was yesterday?

7       A.      Yeah, I think there was some contact.

8       Q.      How much time was that?

9       A.      I haven't -- I haven't figured out that

10   time.  It might have been two or three hours.

11      Q.      Okay.  And what about this morning,

12   today, any -- any additional time?

13      A.      Just brief conversations.

14      Q.      Okay.  Less than an hour?

15      A.      Oh.  Yeah.

16      Q.      Okay.  Okay.

17              MR. BRENNER:  We'll mark this as

18          Exhibit 2, the consulting record.

19                      -  -  -

20              (Eggington Deposition Exhibit Number

21               2, Consulting Record, marked for

22



Page 16

1              identification, as of this date.)

2                   -  -  -

3    BY MR. BRENNER:

4         Q.    And let me just bring up Exhibit -- the

5    next document.

6              Is this the -- you see that, sir?

7         A.    Yes.

8         Q.    -- is this the retainer agreement

9    between yourself and the Rivero Mestre law firm?

10        A.    There isn't a retainer, but it's the

11   agreement, yes, engagement agreement.

12        Q.    Okay.  Fair enough.

13             It's the engagement agreement for your

14   work in this case, correct?

15        A.    Correct.

16        Q.    It's signed or dated April 13th, 2020.

17             Is that the -- to the best of your

18   recollection, your first involvement in the case?

19        A.    Other than the initial phone call on --

20   the initial contact on April 12th, yes.

21             MR. BRENNER:  Okay.  And we'll mark

22        this as Exhibit 3.



Page 17

```
 1                          -  -  -

 2                 (Eggington Deposition Number 3,

 3                  Engagement Letter, marked for

 4                  identification, as of this date.)

 5                          -  -  -

 6     BY MR. BRENNER:

 7          Q.     And that's your signature on the bottom

 8     dated the same day, April 13, 2020, correct?

 9          A.     Yes.

10          Q.     Okay.

11                 Okay.  Let's go back to the deposition

12     notice.  The only item we haven't gone through is

13     Item Number 3, and let me ask you this:  When I

14     refer to "case documents," what I'm referring to

15     is -- is documents specifically related to the case

16     itself or to the parties in the case as opposed to,

17     for example, literature you reviewed and things

18     like that.

19                 Do you understand that distinction?

20          A.     Yes.  Yes.

21          Q.     Okay.  Now, you noticed in

22     Dr. Leonard's report that he referenced various
```



1    case documents that he was provided.

2             You saw that?

3    A.      Yes.

4    Q.      Okay.  And some of those documents have

5    what we call "Bates stamps" on the bottom.

6             Do you know what that is?

7    A.      Well, it's the legal recordkeeping.

8    Q.      Right.  It's a number that -- that

9    marks that it's a production -- a production

10   document by one side or the other or a third party

11   in the lawsuit.

12            Do you understand that?

13   A.      Yes.

14   Q.      Okay.  So you saw that he referenced a

15   bunch of those in his report.

16            Did you review all those documents?

17            (Connectivity issues.)

18            THE WITNESS:  Okay.  Something's

19       gone quiet.

20   BY MR. BRENNER:

21   Q.      Okay.  Can you not hear me?

22   A.      Now I can.



Page 19

1       Q.      Okay.  I'll ask the question again.

2               You noticed in Dr. Leonard's report

3       that he reviewed an amount of documents that all

4       had Bates stamps on them.

5               Did you see that?

6       A.      Yes.

7       Q.      And those were predominantly e-mails by

8       and amongst various parties in the lawsuit.

9               Correct?

10      A.      Correct.

11      Q.      Did you review all of those?

12      A.      To the best of my knowledge, yes.

13      Q.      Now, there were -- were there any

14      documents in -- again, putting aside literature and

15      things like that, were there any case documents in

16      Dr. Leonard's report that you did not also review?

17      A.      I -- I cannot say for sure that I

18      reviewed all the documents.  I know there was some

19      controversy, and you guys talked about that in the

20      deposition, and -- but I think counsel has provided

21      me with all the documents that were available.

22      Q.      It's fair to say that it was your



1    intention to review all of the case documents that

2    were cited in Dr. Leonard's report?

3         A.    Correct.

4         Q.    And if one got missed because either we

5    produced it late, or something, you just can't

6    guarantee it's 100 percent, but your goal was

7    100 percent?

8         A.    Correct.

9         Q.    Okay.  Now, there were also

10   documents -- and I think you saw this in

11   Dr. Leonard's deposition -- also case documents --

12   although not with Bates stamps; so, for example,

13   blog posts from Dr. Wright that were not cited in

14   Dr. Leonard's report but were, in fact, reviewed by

15   him.

16             Do you recall that discussion at his

17   deposition?

18        A.    Yeah, I have a vague memory of that.

19        Q.    Okay.  Did you review those documents

20   as well?

21        A.    Not -- not for the report, but I have

22   since.



1        Q.      You reviewed all of them since?

2        A.      I cannot say "all," but I believe I

3    have.

4        Q.      And what was the purpose of that

5    review?

6        A.      I don't know.  Just to have a look at

7    these.

8        Q.      Okay.  Did the -- the -- what I'll call

9    the -- the "non-Leonard-cited documents" that we're

10   talking about -- did those impact your opinions in

11   this case one way or the other?

12       A.      No -- excuse me.

13               No.

14       Q.      Now, are there any documents, case

15   documents, as we've defined them, that you reviewed

16   that were not reviewed by Dr. Leonard?

17       A.      No.

18       Q.      So, for example, you didn't review any

19   additional e-mails that at least on their face

20   purported to be from Dr. Wright?

21       A.      No.

22       Q.      Did you -- do you know if there are



Page 22

1    additional e-mails from Dr. Wright or that purport

2    to be from Dr. Wright that have been produced in

3    this case that you have not reviewed?

4         A.    There -- wasn't there some discussion

5    in Dr. Leonard's deposition of some kind of a

6    spreadsheet?  But I don't know -- basically, I -- I

7    reviewed the documents that -- as many documents as

8    I could that I had that were referenced in

9    Dr. Leonard's report, and -- and I'm not certain

10   about anything else.

11        Q.    Okay.  And my last question was bad

12   because I called Dr. Leonard "Dr. Wright."  So let

13   me try again.

14        A.    Okay.  Did --

15        Q.    I'm trying to get -- I'm trying to

16   understand if you know one way or the other whether

17   there are e-mails that purport to be from

18   Dr. Wright that were not reviewed by Dr. Leonard.

19             Do you know if those exist?

20             MS. DAGLEY:  Object to form.

21             THE WITNESS:  Can you ask that

22   again, please?



Page 23

```
 1    BY MR. BRENNER:

 2         Q.     Sure.

 3               So you understood that Dr. Leonard

 4    cited in his report a -- you know, a series of

 5    e-mails that he reviewed in connection with his

 6    opinion?

 7         A.     Correct.

 8         Q.     And then you also know that he -- he

 9    also provided a list of additional documents that

10    he reviewed but that were not considered with his

11    opinion?

12               (Connectivity issues.)

13               THE WITNESS:  Okay.  You're breaking

14         up.

15               MR. BRENNER:  Okay.  Let's go off

16         the record for one second.

17                         -   -   -

18               (Whereupon, a discussion was held

19                off the record.)

20                         -   -   -

21    BY MR. BRENNER:

22         Q.     Dr. Eggington, before we had some
```



Page 24

1    technical difficulties, here's what I'm trying to

2    understand:  Do you have an understanding one way

3    or the other whether there are additional e-mails

4    from Dr. Wright that have been produced in this

5    case but have not been provided to you to review?

6            A.    I don't have a clear understanding.  My

7    focus is on -- is on the report that Dr. Leonard

8    wrote and the documents there.

9            Q.    Okay.  So I think you just answered

10   this question, but I will ask it anyway:  Did you

11   ask counsel if there were additional -- what

12   Dr. Leonard refers to as "K documents" for

13   Dr. Wright, meaning documents that are known to be

14   written by him?

15               MS. DAGLEY:  Object to form.

16               THE WITNESS:  All I did was focus on

17          the record -- on the -- on the documents

18          referenced in -- in Dr. Leonard's report.

19          And I had no recollection of asking for any

20          additional documents.

21   BY MR. BRENNER:

22           Q.    I'll ask you the same question for



1    Q documents:  Did you ask if there were any

2    additional e-mails that on their face purport to be

3    from Dr. Wright that have been produced in this

4    case that were not provided to you to review?

5         A.    No, I didn't.

6              MS. DAGLEY:  Object to form.

7    BY MR. BRENNER:

8         Q.    Now, on the document set that you

9    reviewed, you understand -- when I use the word "K

10   documents," I'm not asking you to agree that they

11   are K documents, that they are known Craig Wright

12   documents; I'm doing that so you understand what

13   I'm talking about.

14             Okay?

15        A.    Correct.

16        Q.    Okay.  Now, this question I am going to

17   ask you about whether they are, in fact, K

18   documents.

19             So let me ask you that:  Did you

20   inquire of counsel or anyone else of whether the

21   documents in Dr. Leonard's report that are

22   identified as K documents were, in fact, written by



Page 26

1    Dr. Wright?

2              MS. DAGLEY:  Object to form.

3              THE WITNESS:  No.

4    BY MR. BRENNER:

5         Q.    Was that not of interest to you?

6         A.    I assumed that the record -- that the

7    documents labeled as K documents in Dr. Leonard's

8    report were K documents, because I had no reason

9    not to make that assumption.

10        Q.    Okay.  So the same question for the

11   Q documents:  Did you ask counsel or anyone else

12   whether the documents that are identified in

13   Dr. Leonard's report as either Q 1 or Q 2 -- did

14   you ask about any of those documents whether they

15   were or were not authored by Dr. Wright?

16             MS. DAGLEY:  Object to form.

17             THE WITNESS:  No, I did not.

18   BY MR. BRENNER:

19        Q.    Have you formed -- in your report --

20   strike that.

21             Are you offering an opinion to a

22   reasonable degree of certainty whether Dr. Wright



Page 27

1      is or is not the author of any of the Q documents?

2           A.     My focus mostly is on the report, and

3      that's what I was asked to do, and so I offered an

4      opinion, I think, more on the reliability and the

5      validity of the report.  And so that opinion, as it

6      reflects on the nature of the documents, is -- is

7      guided more by the reliability -- my assessment of

8      the reliability and validity of Dr. Leonard's

9      report.

10          Q.     Okay.  And I appreciate that you're

11     telling me the -- the emphasis or what you did more

12     in your report, but I just need to know if you're

13     offering an opinion to a reasonable degree of

14     certainty in your field that any of the Q documents

15     identified in Dr. Leonard's report were or were not

16     authored by Dr. Wright.

17               MS. DAGLEY:  Object to form.

18               THE WITNESS:  I think I've answered

19          that question as much as I can right now,

20          because my focus, as I said, was on the

21          reliability and validity of Dr. Leonard's

22          report.



Page 28

1    BY MR. BRENNER:

2         Q.    Well, I understand you think you

3    answered it, but you keep answering it by saying

4    where your focus is.  So we can go through your

5    report line by line, if you want to, but I want to

6    know if you have an opinion in your report to a

7    reasonable degree of scientific certainty whether

8    any of the Q documents were or were not authored by

9    Dr. Wright.

10            MS. DAGLEY:  Object to form.

11            THE WITNESS:  I -- my -- I'm sorry.

12            Can I refer to the opinion in my

13        report?

14   BY MR. BRENNER:

15        Q.    Sure, of course.  And that's a standing

16   permission.  Anytime you need to go to your report,

17   we can do it one of two ways:  You can do it in

18   front of you, or you can ask me to put it up.

19   Either way is fine with me.

20        A.    So I have the report in front of me --

21        Q.    Okay.

22        A.    -- so let me just go to the end of the



Page 29

1     report.

2          Q.     Yes, sir.

3                 And for the benefit of everyone, I'm

4     just going to pull the report up.

5          A.     Okay.

6                 MR. BRENNER:  And, Cindy, while he's

7          looking, let's mark the report as the next

8          exhibit.  This is Dr. Eggington's rebuttal

9          report from -- I believe it's dated

10         April 17th.

11                CERTIFIED STENOGRAPHER:  Okay.

12                          -   -   -

13                (Eggington Deposition Exhibit Number

14                 4, Response to Leonard Report:

15                 Expert Report of Dr. William G.

16                 Eggington, marked for

17                 identification, as of this date.)

18                          -   -   -

19    BY MR. BRENNER:

20         Q.     Okay.  Doctor, did you want to direct

21    us to a portion of your report?

22         A.     Yeah, because my -- I'm sorry.  I keep



Page 30

1    coming back to this, but this was the whole purpose

2    of my report and the focus of my report, and that

3    is to discuss -- to evaluate the reliability and

4    validity of Dr. Leonard's conclusions.  And you'll

5    note there that he has three hypotheses, and so

6    based upon the analysis that I did, I evaluated the

7    reliability and validity of those three hypotheses

8    and concluded that some of the evidence points

9    to -- to Hypothesis 3 and some of the evidence

10   points to -- Hypothesis 2, and that with respect to

11   Hypothesis 1, anyone who -- who has control of

12   standard English basically could have written those

13   documents.

14           And so Hypothesis 1 is a very weak

15   confirmation, from my perspective, when Dr. Leonard

16   makes that -- that finding and that there's equal

17   validity, if not more validity, and reliability

18   to -- to go to support Hypothesis 2 and

19   Hypothesis 3.

20           So that's really what I did in the

21   case.

22       Q.    So let's -- just so the record is



Page 31

1    clear, you are -- you are -- we have on the screen

2    and you're referring to Page 16 of your report?

3         A.    Correct.

4         Q.    And this will highlight why I'm asking

5    you the question.

6              So in Page 16 of the report, under

7    where it says Conclusions and Opinion, the first

8    paragraph, Paragraph 26, you list the three

9    hypotheses from Dr. Leonard's report, correct?

10        A.    Correct.

11        Q.    And then just under that, the back part

12   of the -- the bottom part of Paragraph 26, you

13   quote from Dr. Leonard's report?

14        A.    Correct.

15        Q.    So those are not your opinion; those

16   are setting up what you're about to give your

17   opinion in Paragraphs 27 and 28, correct?

18        A.    Correct.

19        Q.    Now, in 27 is what you're telling me

20   the focus of your report was.

21             In 27, you issued an opinion -- and I'm

22   going to paraphrase it, but it stands for what it



Page 32

1       says -- but, essentially, you issued an opinion

2       that says that hypothesis -- based on Dr. Leonard's

3       analysis, which you find lacks theoretical and

4       practical reliability and validity, one would have

5       to land on Hypothesis 3 of Dr. Leonard's three

6       hypotheses, correct?

7                    MS. DAGLEY:  Object to form.

8                    THE WITNESS:  Correct.

9       BY MR. BRENNER:

10          Q.    Now, but Paragraph 28 is a little

11      different, because Paragraph 28, with all due

12      respect, sir, you put your toe in the water a

13      little bit and you offer an opinion that well, some

14      of this is probably better suited to Hypothesis 2.

15      And that's what I'm trying to figure out.

16                   Okay?

17                   MS. DAGLEY:  Object to form.

18      BY MR. BRENNER:

19          Q.    Okay, sir?

20          A.    So as I look at Paragraph -- can you

21      scroll up a little bit?

22          Q.    You mean to go lower in number or



Page 33

1    higher in number?

2         A.    To 28 --

3         Q.    Yes, sir.

4         A.    -- in the middle of the page.

5         Q.    Okay.  In the future, for me that means

6    scroll down.

7         A.    Okay.  Or I can just look at my thing.

8         Q.    Yeah.

9         A.    There we go.

10             So what I'm doing is evaluating

11   Hypothesis 1, 2 and 3.  And so in Paragraph 27, I'm

12   finding that there is some evidence to support

13   Hypothesis 3; and then in Paragraph 28, there's

14   some evidence to support Hypothesis 2, that the

15   language patents --

16        Q.    You keep --

17        A.    -- that the language patents found in

18   my documents --

19             (Connectivity issues.)

20             THE WITNESS:  Did I break up?

21             MR. BRENNER:  You did.

22             I'm just trying to figure out what



Page 34

```
 1          to do about this.

 2               THE WITNESS:  You can do it by

 3          phone, if you want.

 4               MR. BRENNER:  No, I really can't,

 5          because I need to use documents and --

 6               MS. DAGLEY:  Do you want to go off

 7          the record?

 8               MR. BRENNER:  Sure.  Let's go off

 9          the record.

10                    -   -   -

11               (Whereupon, a discussion was held

12                off the record.)

13                    -   -   -

14     BY MR. BRENNER:

15          Q.    Dr. Eggington, again, we had some

16     technical difficulty, so I'm -- I'm going to try to

17     reframe where we were to make sure the record is

18     complete.

19               We had talked about what your opinion

20     was in -- in Paragraph 27 of your report, and I

21     want to focus on Paragraph 28.

22               Okay?
```



Page 35

1          A.      All right.

2          Q.      In Paragraph 28, you say that the

3    so-called, quote, linking features, end quote, that

4    support the notion that Craig -- strike that.

5                  Let me start again.

6                  In -- in Paragraph 28, you say,

7    Following forensic stylistics frameworks, I've

8    indicated so-called, quote, linking features, end

9    quote, that support the notion that Craig Wright

10   did not author the Q e-mails, thus supporting

11   Hypothesis 2.

12                 Do you see that?

13         A.      Yes.

14         Q.      And then you explain the reason.  You

15   say, Namely, that -- and you have a quote.  And is

16   that a quote from Dr. -- where's that quote from,

17   the end of 28?

18         A.      I think that's the hypothesis in --

19   that's Hypothesis 2.

20         Q.      Okay.  So my question for you is, Do

21   you believe that -- strike that.

22                 Are you offering an opinion to a



Page 36

1    reasonable degree of certainty, as you say here,

2    that Craig Wright did not offer the Q e-mails?

3         A.    No.   What I'm doing there is saying

4    that -- and you can see that in Line 1 of

5    Paragraph 28, Following forensic stylistics

6    frameworks.

7              So, essentially, if I buy into the

8    notion that forensic stylistics has any validity

9    and reliability, I can then say that Hypothesis 2

10   has credibility and has support, but that is all

11   contingent upon if I buy into the notion that

12   forensic stylistics framework has reliability and

13   validity.

14             My point in saying that is to show

15   that -- that Dr. Leonard's method -- basically, it

16   can account for all three conflicting hypotheses

17   and thus is not a sound method.

18        Q.    So just to close the loop on that, the

19   condition is, if you bought the notion that the

20   forensic stylistics -- stylistic frameworks -- or

21   framework was sufficient to reach a reliable

22   opinion in this case -- if you bought into that



Page 37

```
 1    notion, you would find that the Q e-mails better

 2    support Hypothesis 2; but the fact is you don't buy

 3    into that notion, correct?

 4              MS. DAGLEY:  Object to form.

 5              THE WITNESS:  That's correct,

 6         because it offers evidence for three

 7         conflicting hypotheses.

 8    BY MR. BRENNER:

 9         Q.    Okay.

10         A.    Okay.

11         Q.    Were you at -- I didn't ask you

12    something.  I was thinking.

13              Were you asked to offer an opinion

14    whether any particular e-mail cited in

15    Dr. Leonard's report was or was not offered by

16    Dr. Wright?

17              MS. DAGLEY:  Object to form.

18              THE WITNESS:  No.

19    BY MR. BRENNER:

20         Q.    Okay.  You use in your report a phrase

21    called "authorial attribution."

22              Can you explain to me what that is?
```



Page 38

```
 1                    (Connectivity issues.)

 2                    THE WITNESS:  Okay.  You're breaking

 3         up.

 4                    Can you repeat that question?

 5    BY MR. BRENNER:

 6         Q.     I can, but this is not going to work.

 7                    MS. DAGLEY:  Mr. Brenner, I just

 8         turned off my video.  You can try it for

 9         another minute, if you want.

10                    MR. BRENNER:  Sure.  Okay.

11    BY MR. BRENNER:

12         Q.     Dr. Eggington, let me go back again.

13    We had some technical difficulties.

14         A.     Yes.

15         Q.     You use in your report, I think several

16    times -- but you certainly use the term "authorial

17    attribution"; is that correct?

18         A.     Correct.

19         Q.     What is that?

20         A.     The ability -- authorial attribution is

21    a fancy name for author identification, so the

22    claimed ability to -- if -- it refers to the
```



Page 39

1    claimed ability to basically be able to identify

2    who wrote questioned or unknown documents based

3    upon patterns established in known documents.

4         Q.     And putting aside the methodology to do

5    that for a moment and whether you -- you buy into

6    what Dr. Leonard did or how he did it, is it your

7    understanding what Dr. Leonard was trying to do was

8    authorial attribution?

9              MS. DAGLEY:  Object to form.

10             THE WITNESS:  Yeah, he's trying to

11         basically link known documents to unknown

12         documents, and that fits, I think, within

13         the framework or context of authorial

14         attribution.

15   BY MR. BRENNER:

16        Q.     Okay.  And you -- the -- the word you

17   used to describe the methodology or the -- or the

18   methodology that Dr. Leonard uses -- use the term

19   "forensic stylistics"; is that correct?

20        A.     Yes.

21        Q.     Does Dr. Leonard use the term "forensic

22   stylistics" in this report?



1      A.      Not in this report.

2      Q.      He -- and I'm just jumping off your

3   answer.

4              Does that mean that you've seen him use

5   that in other reports?

6      A.      I haven't seen him use it in other

7   reports.

8      Q.      Okay.  You -- you refer to someone in

9   your report by "Dr. McMenamin."

10             Did I pronounce that right?

11     A.      McMenamin.

12     Q.      McMenamin.

13             Have you seen him use the term

14   "forensic stylistics" in his work?

15     A.      Yes.

16     Q.      Is that where you're getting

17   that -- that terminology from?

18     A.      Well, it's -- yes.

19     Q.      Okay.  And my understanding -- well,

20   correct me if I'm wrong.  Is it your opinion that

21   forensic stylistics is never a reliable and valid

22   way to do authorial attribution?



Page 41

```
 1              MS. DAGLEY:  Object to form.

 2              THE WITNESS:  When I -- when I --

 3         sorry.  I'm going to give a little bit

 4         roundabout answer, but it establishes

 5         something.

 6              (Connectivity issues.)

 7    BY MR. BRENNER:

 8         Q.    Sure, except you froze again.

 9         A.    His class is in forensic linguistics --

10         Q.    Hold on.  Hold on.

11         A.    Sorry?

12              MR. BRENNER:  Okay.  We're going to

13         go off the record for a few minutes.  I'm

14         going to think about what we're going to

15         do, but this is not going to work.

16              THE WITNESS:  Okay.

17              MR. BRENNER:  Give me -- you guys

18         can stay on the line.  I just -- I don't

19         know what we're going to do.

20              Let's take a five-minute break.

21         Okay?

22              MS. DAGLEY:  Sure.
```



Page 42

1                    THE WITNESS:  Okay.

2                    MR. BRENNER:  Thank you, Doctor.

3                         -  -  -

4                    (Whereupon, a recess was taken from

5                     12:43 p.m. EST to 12:50 p.m. EST.)

6                         -  -  -

7          BY MR. BRENNER:

8               Q.    Dr. Eggington, we're back on now after

9          trying to do our best to resolve some technical

10         difficulties, and what I was trying to ask you

11         was -- I was asking you about forensic

12         stylistics --

13                    (Connectivity issues.)

14         BY MR. BRENNER:

15              Q.    And I see you already froze, but we'll

16         try it again --

17              A.    Yeah.

18              Q.    -- I was asking you about forensic

19         stylistics -- you're already freezing, right?

20              A.    Yeah -- from my perspective, you're

21         freezing.

22                    MR. BRENNER:  All right.  This is



Page 43

```
 1        not going to work, folks.

 2              We have to figure something else out

 3        because we're not even getting through one

 4        question.

 5              THE WITNESS:  Okay.  So I can -- I

 6        can -- I live 40 minutes away from BYU, my

 7        university.  BYU -- they've got a

 8        steadier -- I think, hopefully -- I don't

 9        hear any complaints from my colleagues when

10        they do their face -- their -- their Zoom

11        from my office -- well, from using the BYU

12        system.

13              So I can do that.

14              MR. BRENNER:  When you teach from

15        there, do you --

16              We're off the record, right, Cindy?

17              CERTIFIED STENOGRAPHER:  We're still

18        on.

19              MR. BRENNER:  Let's go off the

20        record.

21                        -  -  -

22              (Whereupon, a discussion was held
```



Page 44

```
1                 off the record.)

2                     -   -   -

3              MR. BRENNER:  We're back on the

4        record, Dr. Eggington.  And, unfortunately,

5        as the record will reflect, we can barely

6        make it through a question without having

7        technical difficulties on someone's end.

8        It's unclear whether it's yours, mine or

9        anyone else's, but either way, we're unable

10       to communicate.

11             So I'm going to -- I'm going to have

12       to adjourn the deposition for the purpose

13       of figuring out a different way to -- to do

14       this, and that may -- that may involve

15       doing it from a different location.  But

16       we'll try to figure it out, and we'll be

17       back with you as quick as we can.

18             THE WITNESS:  Okay.

19             MR. BRENNER:  Is that acceptable?

20             MS. DAGLEY:  And, Mr. Brenner, do

21       you have a time frame?  Like, can we confer

22       in the next 20 minutes, 30 minutes to
```



Page 45

1        figure out what we're going to do?

2              MR. BRENNER:  We can confer

3        immediately, if you want.

4              MS. DAGLEY:  Okay.

5              MR. BRENNER:  But if you want to

6        talk to your colleagues, that's fine, too,

7        before -- whatever you want.

8              Why don't we decide -- why don't we

9        confer at 1:30?

10             MS. DAGLEY:  Sure.  I mean, it will

11       only take me 10 minutes, so I can -- why

12       don't we do 1:15?

13             MR. BRENNER:  1:15.  Just shoot me

14       an e-mail with a number, and I'll call you

15       at it.

16             MS. DAGLEY:  Okay.  We'll do it.

17             MR. BRENNER:  Okay.

18             Thank you, Dr. Eggington.

19             THE WITNESS:  Okay.  Sorry about

20       that from my end.

21             MR. BRENNER:  No worries.

22             Thank you, Cindy.



Page 46

```
 1                          -  -  -

 2                 (Whereupon, a recess was taken from

 3                 12:56 p.m. EST to 2:45 p.m. EST.)

 4                          -  -  -

 5    BY MR. BRENNER:

 6         Q.     Dr. Eggington, it's now 2:45, and we

 7    have tried to figure out a way to proceed with this

 8    deposition through alternative remote connection,

 9    so we'll give it a shot.

10              I'm going to go to where I think I was,

11    and I was asking you -- I'm going to bring up your

12    report.

13              Okay.  I was asking you about forensic

14    stylistics.

15              Do you recall where we were?

16         A.     Yes.

17         Q.     Okay.  And what I was trying to figure

18    out was, first of all, you -- it's your opinion

19    that the -- or is it your opinion that the

20    methodology used by Dr. Leonard in this case is

21    what you call "forensic stylistics"?

22         A.     Well, Dr. Leonard doesn't really
```



Page 47

1    mention what -- what method he's using and doesn't

2    cite any references, any research showing

3    that -- that his particular method has any history

4    other than him using it himself.  He

5    doesn't -- it's Leonard's method, I guess.  But I'm

6    basically saying, based upon Carole Chaski's work

7    and my knowledge of forensic stylistics, that it's

8    very -- if it's not forensic stylistics, it's

9    basically a clone of forensic stylistics.

10                So that's why I have that in there.

11   The -- the -- essentially, he's using that method,

12   as far as I can gather.

13                Like, if you look at Paragraph 27 --

14        Q.     Yes, that's what I'm looking at.

15        A.     -- that first line, I've got forensic

16   linguistics in quotes, because I think that's what

17   he's using.  And to the best of my knowledge, that

18   is what he's using and that's what -- and earlier

19   on in the report or somewhere in the report, I

20   outline Carole Chaski's summary of forensic

21   linguistics -- sorry -- forensic stylistics, and it

22   basically matches Dr. Leonard's method as well.



Page 48

```
 1           Q.      Okay.  So just so we're clear, and in

 2    that answer -- well, twice you did it; once you

 3    corrected yourself -- one time you used "forensic

 4    linguistics," but you meant to say "forensic

 5    stylistics," right?

 6           A.      Sorry.  Yeah.

 7                   Getting back into the groove.

 8           Q.      That's okay.

 9                   So I'm just trying to make sure we're

10    using the same nomenclature when we're talking

11    about your report.

12                   So when you're using the term "forensic

13    stylistics" in the report, if it's -- I think

14    sometimes it's in quotes; sometimes it's not.  In

15    fact, on Page 27, it is; in 28, it is not -- either

16    way, that's what you're using as your description

17    of the method Dr. Leonard used in this case?

18                   MS. DAGLEY:  Object to form.

19                   THE WITNESS:  To the best --

20                   Sorry. I've got to remember to wait.

21                   -- to the best of my knowledge, it

22           seems like that's what he's using.
```



1    BY MR. BRENNER:

2         Q.     Okay.  So let's -- so I want to make

3    sure I understand your opinions in the case.  And

4    you have early -- earlier in the report, you have a

5    statement of opinion in addition to the one we were

6    just showing on the screen, so let me get to that.

7               So I'm looking at Paragraph 9 of your

8    report --

9         A.     Um-hum.

10        Q.     -- and that's entitled Opinion, right?

11        A.     Yes.

12        Q.     And that is, in fact, one of your

13   opinions in this case?

14        A.     Yeah, just hang on.

15              For some reason, I have a bar over the

16   bottom of my screen that -- that gets in the way of

17   that document.  If you could raise it a little bit.

18        Q.     You want me to go a little bit higher?

19        A.     Yeah, there we go.

20        Q.     Is that better?

21        A.     Yeah.  I don't want to touch anything

22   on that bar in case all sorts of weird things



Page 50

1    happen.  So, yeah, if you can raise things up to

2    basically mid screen, that will help.

3        Q.    I will make it a little bigger so it's

4    easier to read it.

5             Does that help you?

6        A.    Yeah, that's fine.

7        Q.    This is on Page 3 of your report.  You

8    have a section titled Opinion.

9        A.    Right.

10       Q.    And Paragraph 9 -- is that, in fact,

11   one of your opinions in this case?

12       A.    Yes.

13       Q.    And are the other opinions you have in

14   this case the ones we just looked at in

15   Paragraphs 27 and 28?

16             We can go back down to see it.

17       A.    No, it's okay.

18             Yes, they're in my report.

19       Q.    Okay.  Do you have any other opinions

20   in this case other than what you revealed in your

21   report?

22             MS. DAGLEY:  Object to form.



Page 51

1              THE WITNESS:  Well, my focus is on

2        this report, and no relevant opinions other

3        than what's in this report.

4   BY MR. BRENNER:

5        Q.    Okay.  Now, if -- we're now looking at

6   Paragraph 9 --

7        A.    Um-hum.

8        Q.    -- and this is your opinion

9   regarding the research methods -- the research

10  methods Dr. Leonard used.

11             Do you see that?

12       A.    Yes.  Yes.

13       Q.    I need to make sure I understand.

14             Is it your opinion that forensic

15  stylistics can never be used to provide reliable

16  and valid results in an authorial attribution

17  scenario?

18             MS. DAGLEY:  Object to form.

19             THE WITNESS:  It depends what you

20        mean by "reliable and valid," but in terms

21        of meeting evidentiary standards, forensic

22        stylistics, as it's presented in this



Page 52

```
 1          report -- and that's really my only

 2          concern; basically, my focus is on this

 3          report -- and in my experience with

 4          forensic stylistics elsewhere suggests that

 5          it does not meet scientific standards.

 6   BY MR. BRENNER:

 7          Q.     Okay.  And that's -- that's -- that's

 8   the opinion you're trying to capture on Paragraph 9

 9   here?

10          A.     Yes.

11          Q.     Okay.  Now, I think you told me before

12   that -- I have such a hard time pronouncing it.  I

13   apologize -- authorial attribution is trying to

14   assess whether an author of what's known as

15   K documents, or known documents, is also an author

16   of a set of question documents.

17                 Did I get that right?

18          A.     Yes.

19          Q.     Okay.  Is there any way to do --

20   putting aside what Dr. Leonard did and whether we

21   call it "forensic stylistics," or something else,

22   is there another method that you subscribe to from
```



Page 53

1    which you can do authorial attribution?

2              MS. DAGLEY:  Object to form.

3              THE WITNESS:  Well, the problems --

4         yeah, you can do things that address the

5         reliability and validity standards with

6         authorial attribution, and that's what

7         folks are trying to do within this field

8         of -- I think I mentioned it in my

9         report -- forensic stylometry, where

10        they're trying to reduce the subjective

11        value and raise the objectivity value in

12        all sorts of ways that increase reliability

13        and validity.

14   BY MR. BRENNER:

15        Q.    Do you, yourself, subscribe to any such

16   methodology to do authorial attribution in a way

17   that, as you put it, would meet evidentiary

18   standards?

19        A.    What do you mean by "subscribe"?

20        Q.    Do you -- you, obviously, think what

21   Dr. Leonard did is not good enough.  I'm asking

22   you, Is there a method that you would suggest is


MAGNA
LEGAL SERVICES

Page 54

```
 1   good enough?

 2        A.      Within -- one of the articles that I

 3   referenced and quoted from was the 2019 article by

 4   Ainsworth and Juola.  And then also, I -- in the

 5   report, I cite -- and I don't know whether I

 6   directly, but probably indirectly reference a -- an

 7   article by Larry Solan.

 8             In both those articles, they're

 9   advocating, as I say in my report, a -- a more

10   objective approach possibly using and -- not

11   possibly, but using computational linguistics to

12   develop algorithms that reduce the objectivity

13   and -- sorry -- reduce the subjectivity and

14   increase the reliability and validity.  So that

15   generally, yes, that's the kind of thing I'm

16   advocating.

17        Q.      Do you find -- how do you pronounce

18   Juola's name?

19             Say that again.

20        A.      Juola.

21        Q.      Juola.

22             You cited an article to Juola in your
```



Page 55

1    report.  I think it's -- I think the article you

2    just referred to is in Footnote 3 of your report,

3    if you want to go to that, it's on Page -- I'll

4    scroll down to it -- on Page 4 there, on

5    Footnote 3.

6         A.    Oh, okay.  You've got it?

7         Q.    Probably below the bar.  Let me get

8    back there.

9               Okay.  Do you see it?

10        A.    Okay.

11        Q.    Do you see it?  Footnote 3?

12        A.    That's the article I -- yeah, the

13   Footnote 3, Ainsworth and Juola.

14        Q.    Do you consider that article a reliable

15   source of information?

16        A.    What do you mean by "reliable"?

17        Q.    I don't know.  You've used that word in

18   your report.

19              What do you mean by "reliable"?

20        A.    Well, that's why I asked.

21              Within the scientific method, the word

22   "reliability" and "validity" mean -- for example,



1    "reliable" means that the -- the -- the methods can

2    be replicated to essentially create the same

3    results by different people using objective

4    standards.

5           And so it's -- it's -- using that same

6    definition, you can't really say that this article

7    is scientifically reliable in the sense that it can

8    be replicated, but I think it is -- has an article

9    with considerable credibility, considering the

10   people who wrote it and the place where it was

11   published, with respect to the things that we're

12   talking about.

13        Q.    And I know this sounds like a dumb

14   question, but you, obviously, reviewed this article

15   in connection with your work in this case?

16        A.    Yes.

17        Q.    Let me ask you this:  I'm going to ask

18   you to assume that you were presented the exact

19   data set of the same K document and the same key

20   documents that Dr. Leonard cites in his report.

21           Okay?

22        A.    Yes.



Page 57

```
 1          Q.      And you were asked to do an authorial

 2     attribution of the Q documents to see if they have

 3     the -- if you could determine whether the same

 4     author as the K documents.

 5               Okay?

 6          A.      No, I wasn't.

 7          Q.      No, I'm asking you to assume that you

 8     were asked to do that.

 9          A.      No, I don't want to make any

10     assumptions.

11          Q.      Well, let me just -- let me -- let

12     me -- I don't mean to be rude, but I get to ask you

13     to make assumptions.

14          A.      Okay.

15          Q.      So that's just one of your jobs as an

16     expert, so --

17          A.      Okay.

18          Q.      -- I'm going to ask you to assume that,

19     that you have the same K and Q documents that

20     Dr. Leonard has and you were asked to do an

21     authorial attribution of them.

22               How would you do that?
```



Page 58

```
 1       A.      Okay.  If I've got all the documents --
 2               MS. DAGLEY:  Object to the form.
 3               THE WITNESS:  Sorry.
 4               -- if I've got all the documents --
 5       I'm working on -- I'm just wanting to make
 6       sure I sort of -- it's developing a new
 7       research design that I haven't spent a lot
 8       of time thinking about.
 9               Essentially, what I would do would
10       be to -- to -- well, one of the things
11       that's mentioned in Patrick -- in the
12       Ainsworth and Juola article is that he has
13       a program called JGAAP, where you can
14       upload files and, basically, run them
15       through a computational program that comes
16       up with probability of authorship.
17               And that's the file he used --
18       sorry -- that's the program that he used to
19       identify the unknown author of the book
20       that was written by -- sorry, I've
21       forgotten the name -- the same person that
22       wrote Harry Potter, but she was writing it
```



Page 59

1          under a pseudonym, and that gained a little

2          bit of credibility.

3               So that's one of the -- that's one

4          of the strategies that I would use if I

5          were making that assumption.

6     BY MR. BRENNER:

7          Q.     Any other strategies?

8          A.     I would -- what we have in -- in --

9     there's an established set of -- and these are in

10    some -- the articles referenced in -- in my report.

11    There's an established set of linguistic features

12    which seem to carry some weight, some

13    predictability within the notion of an idiolect,

14    and I would -- and because of these -- these

15    linguistic features have been established through

16    pretty rigorous research and published, et cetera,

17    and are seen as the set of stylistic features -- or

18    not stylistic features -- linguistic markers

19    that -- that can be transferred, perhaps, then I

20    would apply those linguistic markers to examining

21    the documents.

22               Those markers are essentially contained



Page 60

1      within Patrick Juola's JGAAP program, and -- and so

2      I think doing that possibly would be a redundancy.

3            Q.      When you say "JGAAP," can you spell

4      that for me?

5            A.      J-G-A-A-P.

6            Q.      Okay.  Any other methodology that you

7      would use to -- to do the authorial attribution

8      under the assumption that I've asked you to make?

9            A.      Not that one comes to mind right now.

10           Q.      And you told me this before, but just

11     so the record is clear, you did not run the K and

12     the Q in this case through JGAAP, correct?

13           A.      Correct.

14           Q.      You didn't run them through any other

15     methodology to try an authorial attribution,

16     correct?

17           A.      No.  That was outside of the

18     requirements that I was being asked to do.

19           Q.      Outside the scope of what you

20     understood your assignment to be?

21           A.      Yeah.  Correct.

22           Q.      Okay.  Now, let me expand it a little



Page 61

1     bit.

2              Have you -- you've testified before in

3     court cases, correct?

4          A.    Correct.

5          Q.    In fact, let's just -- let's do it this

6     way:  Let's go to -- I'm going to Page -- I'm

7     trying to find in your report where you have the

8     list of cases.  I think I'm there.

9              So I'm on Page 30 of your report --

10         A.    Right.

11         Q.    -- and it says, Consultancies, and the

12    first one says -- it says, Legal Consultancies.

13             Is that the words you use to indicate

14    your work in court cases?

15         A.    Correct.

16         Q.    Okay.  And then you have an asterisk

17    which indicates that of all the ones you list, 21

18    of them resulted in either deposition or court

19    testimony or both?

20         A.    Yeah.

21         Q.    Okay.  So what I want you to do,

22    because -- well, I just want you to do it.  I want



Page 62

1    to walk through these with you, and I want to ask

2    which one -- which ones of these cases had to do

3    with -- that the issue you were working on had to

4    do with authorial attribution.

5         A.    Okay.

6               MS. DAGLEY:  Object to form.

7    BY MR. BRENNER:

8         Q.    So we'll start from the top.

9               Number 1?

10        A.    No.

11        Q.    Two?

12        A.    No.

13        Q.    And, Dr. Eggington, I'm happy to do it

14   the other way, which is you can go through and take

15   a second and make a note of it, or we can go

16   through them one by one, whatever is easier for

17   you.

18        A.    The ones that have to do with authorial

19   attribution, let me -- can I look at my --

20        Q.    Of course.

21        A.    -- my CV just to -- here it is -- just

22   to basically scan down really quickly?



Page 63

```
1          Q.      You can do that as long as you confirm

2     for me you're looking at the same thing that I

3     have; otherwise, the numbers won't match.

4          A.      There's -- you see that?

5          Q.      No, but if you tell me it's the same

6     one you put in your report, I'll take your word for

7     it.

8          A.      It is.

9                  Okay.  Let me just -- so Number 11.

10         Q.      I'm going to write these down, 11.

11                 Thank you.

12         A.      Number 30.

13         Q.      Yes.  Yes, Doctor.

14                 Thank you.

15         A.      I think -- I think that's all.  Let me

16    just go back.  There's . . .

17                 If you look at Number 14 --

18         Q.      Yep.

19         A.      -- okay.  Number 14 essentially was --

20    I think this is what I was trying to get at also

21    when we were having our conversation this morning

22    and -- and the -- the line went bad and we sort of
```



Page 64

1    got cut off.

2        Q.    Yeah.

3        A.    When I teach my classes on forensic

4    linguistics, I often -- not often -- always make a

5    distinction between investigative standards and

6    evidentiary standards --

7        Q.    Okay.

8        A.    -- and so investigative standards

9    essentially is looking for clues, and you basically

10   then put them in the mix to try to come up with

11   some conclusive evidence.  And in that particular

12   case, the -- you note that it says something, The

13   author of a series of slanderous e-mails --

14       Q.    I do.

15       A.    -- by an employee of a Korean-based

16   international shipping company?

17       Q.    Yes.

18       A.    The shipping company was based in

19   Singapore.  There was one Korean person -- there

20   was a limited number of people who could've written

21   these e-mails, and there was one person who was

22   Korean.



Page 65

```
 1                  I speak Korean, and I'm aware of

 2      Korean English, and so I was basically brought into

 3      that case.  And I did an analysis of some extreme

 4      first language interference features that were not

 5      shared by anyone else in that particular office,

 6      because the other speakers in that office were

 7      either Indian English or Malay English or

 8      Singapore English or American, I think, English.

 9                  Now, that was what I would consider

10      meeting investigative standards in helping the

11      people come to some kind of conclusion as to who

12      wrote those, but that material was never entered

13      into any kind of evidence, as far as I'm aware.

14          Q.    Okay.  The other two cases that you

15      identified as having to do with authorial

16      attribution were 11 and 30.

17          A.    Yes.

18          Q.    Those -- were those done for

19      evidentiary standards, as you called it, as opposed

20      to investigative standards?

21          A.    Yeah.  Yes.

22          Q.    Okay.  Now, do you remember the name of
```



Page 66

1    the case, Number 11?

2         A.    Dutcher -- Dutcher versus Bold Films --

3         Q.    I have that.

4         A.    -- or something.

5         Q.    Yeah, I have that one, so we'll pull

6    that one up.  I'm just making sure I'm on the same

7    page as you.

8               And then you said 30.  If you can just

9    give me a second to scroll down.

10        A.    Yeah.

11        Q.    Do you remember -- let me get 30 up

12   here.

13              Thirty is the -- you worked for

14   Edwin Wall, or is that who retained you?

15        A.    Yeah.

16        Q.    Is that an attorney?

17        A.    Yes.

18              And that one was Zajac versus -- I

19   don't know --

20        Q.    I think U.S. versus Zajac maybe?

21        A.    Yeah, U.S. versus Zajac.

22        Q.    A criminal case, right?



Page 67

1          A.      Yes.

2                  (Connectivity issues.)

3                  THE WITNESS:  Oh.  Something weird

4          just happened to my screen.

5                  Are you there?

6     BY MR. BRENNER:

7          Q.      I'm there.

8          A.      That's weird.

9          Q.      You're in trouble now because my dog

10    joined us and he actually has better questions.

11         A.      I'm going to -- what's going on?

12         Q.      What's -- what's the problem?

13         A.      Well, I'm not seeing you.  I'm not

14    seeing anybody.

15         Q.      Let's see if everyone else --

16                 MR. BRENNER:  Is everyone else on

17         the phone?

18                 MS. DAGLEY:  Yes, I'm here.  I can

19         see everything and everyone.

20    BY MR. BRENNER:

21         Q.      Let's see if the doctor's fixes itself.

22         A.      So what I'm seeing are a whole bunch



1    of -- oh.  Wait a minute.  What happens when I go

2    up here?

3         Q.    I don't know.

4         A.    Here we go.

5               I think I'm back.  Right.

6               I'm looking at -- I'm looking at my CV.

7         Q.    Right.  You're looking at that

8    Consultancies list, and I had scrolled down to --

9    to Item Number 30, which was the other case --

10        A.    Correct.

11        Q.    -- that involved authorial attribution

12   to an evidentiary standard --

13        A.    Correct.

14        Q.    -- and that's the Zajac case?

15        A.    Correct.

16        Q.    So I want to talk about those two

17   cases.

18               In the Dutcher case, did you, yourself,

19   conduct an authorial attribution?

20        A.    No.

21        Q.    In that case, what you did is similar

22   to what you did here, is you were asked to rebut



Page 69

1    the authorial attribution that was done by someone

2    else, right?

3         A.    By Gerald McMenamin --

4               MS. DAGLEY:  Object to form.

5               THE WITNESS:  Sorry.

6               -- by Gerald McMenamin, yes.

7    BY MR. BRENNER:

8         Q.    Okay.  In Number 30, did you do any

9    authorial attribution analysis?

10              MS. DAGLEY:  Object to form.

11              THE WITNESS:  No.

12   BY MR. BRENNER:

13        Q.    You can answer again.  I know that

14   you --

15        A.    No.

16        Q.    Okay.  The answer is no?

17        A.    Correct.

18        Q.    And instead what you did there is you

19   were called to rebut the authorial attribution that

20   was done by someone named -- is that Fitzgerald?

21        A.    Yeah, Jim Fitzgerald.

22        Q.    What McMenamin -- pronounce it again



Page 70

1    for me.  Say it again.

2          A.      McMenamin.

3          Q.      McMenamin.

4                  McMenamin.  It's your understanding --

5    I think you put this in your report -- is a -- was

6    a -- called a "mentor" to Dr. Leonard?

7          A.      Oh, I wouldn't -- I don't know if I can

8    say "mentor," but I'm basically -- I -- I'm saying

9    that in agreement with Chaski and other folks

10   that -- that the method that Dr. Leonard is using

11   seems to follow the McMenamin method.

12         Q.      Right.  That's fair.

13                 "Mentor" is my word because I couldn't

14   remember.

15                 On Page 4 of your report, you said --

16   you say, A small group of individuals are

17   proponents of, quote, forensic stylistics, end

18   quote, a case-by-case qualitative research method

19   pioneered by Dr. Gerald McMenamin and followed by

20   Dr. Robert Leonard as asserted by Chaski.  And then

21   the sentence goes on.

22         A.      Yes.



Page 71

1       Q.      So in your understanding, Dr. Leonard

2    is -- is following a -- a research method that was

3    pioneered by Dr. McMenamin?

4       A.      Based upon my -- my reading of his

5    report and the absence of any other method that

6    he's mentioning and the parallels between the

7    method that he's using and the method that I'm

8    familiar with that McMenamin uses but stressing

9    that if he's not doing that method, then Leonard is

10   using a very idiosyncratic method.

11      Q.      Okay.  By the way, before this case,

12   have you ever, in a professional context,

13   encountered Dr. Leonard?

14      A.      Oh, yeah.  We've -- we were -- we

15   were -- I don't know how you -- guest speakers at a

16   conference in -- here in Salt Lake City, and our

17   paths have crossed personally at conferences.  And

18   then Dr. Leonard was an opposing expert witness in

19   another case.

20      Q.      Which one was that?

21      A.      The Ciner case that goes up the top.

22      Q.      Can you give me a number?



Page 72

```
 1          A.     Oh, yeah, that's right, I've got my

 2    paper.

 3          Q.     Yep.

 4          A.     Here we go, Number 4 -- no, that's not

 5    it.  Number 10.

 6          Q.     What was the name of that case?

 7          A.     Ciner -- it's got C-I-N-E-R v. -- and I

 8    can't remember the other one.

 9          Q.     Sure.

10                 That case did not involve authorial

11    attribution?

12          A.     No.

13                 MS. DAGLEY:  Object to form.

14    BY MR. BRENNER:

15          Q.     Were you called in that case or were

16    you hired in that case as a rebuttal to

17    Dr. Leonard?

18          A.     Oh, I can't quite -- I can't -- I think

19    it might have been the other way.  He might have

20    been a rebuttal for me.  But I'm not quite sure.

21          Q.     Sure.  Okay.  So let's -- let's go back

22    to -- to Dutcher.
```



Page 73

```
 1                    Do you remember -- let me -- let me ask
 2      you about a couple -- a couple other of these on
 3      this list because I want to make sure I know what
 4      they are.
 5                    Number 33.
 6                    You see that?
 7           A.      Oh, yeah.  Um-hum.
 8           Q.      Was that another authorial attribution
 9      case?
10           A.      Sorry.  Yeah, sorry.
11                    We're talking a long time ago now.
12                    Yeah, that was a case -- basically, a
13      very nasty case where you've got a -- a divorce
14      going on -- to the best of my recollection, right,
15      you've got a divorce going on, and there was an
16      accusation that -- that some -- one of the
17      parents -- I'm going to be vague -- that one of the
18      parents had -- had done something inappropriate to
19      one of the children, and the child wrote --
20      supposedly wrote a police statement, and -- but the
21      police statement was written -- the claim was that
22      the police statement was written either with the
```



Page 74

1    other parent and/or in collaboration with a police

2    officer.

3              And so I went through and showed that

4    there was a -- a set of terminologies that did not

5    match the -- the claim that this was written by the

6    individual.

7              That was an investigative -- once

8    again, that was an investigative case, and I didn't

9    testify.  And I don't know how that was resolved.

10        Q.    All right.  Did you do -- so you did

11   not do an authorial attribution to what you call

12   "evidentiary standards" in that case?

13        A.    Yeah, because I think it have been --

14   yes.

15        Q.    Yes, you agree with me you did not do

16   that?

17        A.    State the question again, please.

18        Q.    Sure.

19              Did you -- in -- in the -- I'm going to

20   call it Number 33, which you worked for the

21   Druyon Law Offices --

22        A.    Um-hum.



Page 75

1       Q.      -- did you do an authorial attribution

2   analysis to evidentiary standards?

3               MS. DAGLEY:  Object to form.

4               THE WITNESS:  No.

5   BY MR. BRENNER:

6       Q.      Okay.  In that case, was there -- was

7   there a -- a K document, meaning a known document,

8   that the child had authored?

9       A.      I can't remember.  I'm sorry.

10      Q.      Okay.  That's okay.

11              Let's look at 36, because that also

12  looks like it has to do with -- at least on its

13  face, has to do with authorial attribution.  So

14  tell me about that one.

15      A.      I can't remember that case.

16      Q.      Okay.  On 33 -- and I don't -- I don't

17  care which parent, and I don't want to know about

18  the abuse of the child, but what I do want to

19  know -- I'm trying to understand, what were you

20  trying to -- to help either the court or the

21  lawyers understand?

22              What was the dispute?



MAGNA
LEGAL SERVICES

Page 76

1           MS. DAGLEY:  Object to form.

2           THE WITNESS:  Whether the person

3       that was claimed to have written this

4       police statement had written it without

5       adult or police assistance.

6   BY MR. BRENNER:

7       Q.    Okay.  And how did you go about doing

8   that?

9       A.    I can't remember the specifics, because

10  once again, this was a long time ago.  So I just

11  have to be vague on that.  I can't remember.

12      Q.    Okay.  And I think we covered -- well,

13  I think we were on -- were we on 38?

14           Now we were on 36.

15           What -- what was 36 about?

16           Is that one you don't remember?

17      A.    Yes, that's the one I don't remember.

18      Q.    And then what's 38?

19           I see you don't have the case name, and

20  I'll decide whether that's -- whether we'll have to

21  try to get that from you.  But without getting into

22  that, tell me what 38 was about.


MAGNA
LEGAL SERVICES

Page 77

1      A.      Do you see where it says Strict

2    confidentiality required?

3      Q.      Yeah.

4      A.      That's -- that's -- that -- I just

5    can't go there.  Maybe I should not have that on

6    my -- in my list of cases.

7      Q.      Well, let me ask you this:  Without --

8    without --

9      A.      Well, let me just say this:  This was,

10   once again, an investigative -- an investigative

11   case, not an evidentiary standards case.

12     Q.      Okay.  Is it fair to say that you have

13   never done an authorial attribution to evidentiary

14   standards in a court case?

15            MS. DAGLEY:  Object to form.

16            THE WITNESS:  I've critiqued claims

17        of authorial attribution, but I've never

18        conducted an authorial attribution.

19   BY MR. BRENNER:

20     Q.      Okay.  So let's talk -- let's go to --

21   to Dutcher, and I'm going -- I'm going to help so

22   you don't have to remember it.  I'm going to bring



Page 78

1    up your report.

2              Okay?

3              Nothing came up, huh?

4         A.    Yeah, something came up, and then it

5    disappeared.

6         Q.    Oh, all right.

7         A.    This is working much better than Zoom,

8    isn't it?

9         Q.    It's a low bar, Doctor.  It's a low bar

10   to clear.

11        A.    I sort of -- I'm sort of relieved

12   because it shows it wasn't at my end.  It was

13   Zoom's fault.

14        Q.    All right.  So I hope on the screen you

15   have a document that says Dutcher versus

16   Bold Films.

17        A.    Correct.

18        Q.    That -- that is Number -- was that the

19   Number 11 on your list?

20        A.    Yes.

21        Q.    Now, what I'm going to do is -- I want

22   to give you an opportunity just to reorient



Page 79

```
1      yourself generally what the case was, unless you

2      think you have it committed to memory.

3          A.      No, I definitely don't.

4          Q.      Okay.  So what we have on the screen

5      here, just so you know, it's a printout from what's

6      called Westlaw, which is a repository for legal

7      filings in the country, and this one -- your report

8      happens to be in -- in Westlaw.

9                  Okay?

10                 So it says, Report or Affidavit of

11     William G. Eggington.

12                 That's you, correct?

13         A.      Yes.

14         Q.      April 6th, 2018 -- sound about right

15     when you did that report?

16                 MS. DAGLEY:  Object to form.

17                 THE WITNESS:  Yes.

18     BY MR. BRENNER:

19         Q.      Okay.  It says that you were -- in that

20     case, you were retained on the side of the

21     defendant; is that correct?

22         A.      Yes.
```



Page 80

```
 1          Q.     Okay.  So it starts off with your --
 2     what I would call your sort of background and
 3     professional accomplishments.
 4               Okay?
 5          A.     Yes.
 6          Q.     I'm going to scroll through them.  I'm
 7     not trying to belittle them.  I just don't have any
 8     questions for you on them.
 9               Okay?
10               Now, this is a case where you are -- we
11     can go to Paragraph 6.
12               Do you see that?
13          A.     Um-hum.  Yes.
14          Q.     Well, let's go to Paragraph 8a because
15     that says what you were asked to do.
16               So you were contacted by a law firm in
17     Utah, Gee & Loveless; is that right?
18          A.     Parr Brown Gee & Loveless, yes.
19          Q.     By the way, do you know a lawyer in
20     Salt Lake City named John Wunderli?
21          A.     No.
22          Q.     Do you know the Wunderli family?
```



Page 81

```
 1         A.      No.

 2         Q.      Okay.  He's a very close friend of

 3    mine.  That's why I asked.

 4         A.      Okay.

 5         Q.      He's a great guy.  You should meet him.

 6         A.      Okay.

 7         Q.      8a says you were -- which I think you

 8    told me earlier -- you were asked to -- in -- I'm

 9    going to call it "the Dutcher case" -- you were

10    asked by the defendant to respond to a report

11    written by Dr. McMenamin.

12                 Correct?

13         A.      Yes.

14         Q.      And what Dr. McMenamin did in that

15    case, as you quote, was a review and analysis of

16    the questioned and known screenplays in the matter

17    Dutcher v. Bold, correct?

18         A.      Correct.

19         Q.      What Dr. McMenamin did in that case is

20    he compared -- his case set was -- was two

21    documents, right?

22                 Do you remember that?
```



Page 82

```
 1        A.     I'm -- I'm -- I'm sort of -- like, it's

 2   been a long time since I read that, but to the best

 3   of my memory, there were two documents, yes.

 4        Q.     Not a memory test.  I'm going to help

 5   you out.

 6               Okay?

 7        A.     Okay.

 8        Q.     Let me just find it.

 9               It may be easier to do it this way.

10               Okay.  So in Paragraph 37 -- you see

11   that?

12               Do you see that on the screen?

13               Did I lose you?

14        A.     Okay.  Something just went wrong, but

15   it looks like I'm back online.

16        Q.     Okay.  I've put Paragraph 37 on the

17   screen from your report in Dutcher.

18               Do you see that?

19        A.     Right.  Um-hum.  Yes.

20        Q.     And does it refresh your recollection

21   that what Dr. McMenamin did is he was comparing two

22   K documents --
```



Page 83

```
 1          A.      Correct.

 2          Q.      -- with one Q document?

 3          A.      Correct.

 4                  MS. DAGLEY:  Object to form.

 5  BY MR. BRENNER:

 6          Q.      Okay.  So let's go -- now that we've

 7  refreshed your recollection at least what the case

 8  was about, and it had to do with deciding whether a

 9  particular screenplay was written by a particular

10  author, right?

11          A.      Correct.

12          Q.      Okay.  And in that case, you -- let's

13  see if we can find where your opinions are.

14                  I apologize.  This format is a little

15  bumpy when you're going through documents.

16                  Okay.  So Paragraph 10 -- or it starts

17  under III.  This is Opinion.

18                  Do you see that?

19          A.      Correct.

20          Q.      Okay.  You said that -- the first part

21  you say on the bottom of that page is you have

22  determined the following with respect to the
```



Page 84

1    scientific and reliability and validity of

2    Dr. McMenamin's opinion in that case, right?

3         A.    Correct.

4         Q.    You say, His forensic stylistics

5    approach fails the test of scientific reliability.

6               Do you see that?

7         A.    You've got to scroll up because I still

8    got that bar at the bottom.

9         Q.    Oh, sure.  Yeah.

10              You wanted me to do that before.

11        A.    I don't want to play with it.  There's

12   no place for me to get rid of it, so . . .

13        Q.    User error, and I'm the user.

14              There you go.

15              You say that Dr. McMenamin's forensic

16   stylistics approach fails the test of scientific

17   reliability, right?

18        A.    Correct.

19        Q.    That's the same thing you say about

20   Dr. Leonard in this case, correct?

21              Yes.

22              MS. DAGLEY:  Object to form.



Page 85

1    BY MR. BRENNER:

2         Q.    You say -- you then point out that the

3    approach consists of comparing stylistic, quote,

4    markers, end quote, that he identifies in known and

5    questioned texts.

6              That's your understanding of what

7    Dr. Leonard did here, too, right?

8              MS. DAGLEY:  Object to form.

9              THE WITNESS:  Yes.

10   BY MR. BRENNER:

11        Q.    You -- you say, None of these so-called

12   markers -- these are the stylistic markers --

13   selected by Dr. McMenamin have been subject --

14   subjected to any prior scientific or empirical

15   testing, and none of them has proven to be -- to

16   reliably predict authorship.

17             Did I read that right?

18        A.    Correct.

19        Q.    You make the same criticism of

20   Dr. Leonard here, correct?

21             MS. DAGLEY:  Object to form.

22             THE WITNESS:  Correct.



Page 86

1    BY MR. BRENNER:

2         Q.    Okay.  And then you say, Indeed, the

3    markers used in Dr. McMenamin's approach are

4    selected on an ad hoc and impressionistic basis,

5    without any grounding in empirical, scientific

6    research.

7              You make the same criticism of

8    Dr. Leonard here, correct?

9              MS. DAGLEY:  Object to form.

10             THE WITNESS:  Correct.

11   BY MR. BRENNER:

12        Q.    I think the next -- the next opinion

13   is -- is a little more case specific because you're

14   going into the documents Dr. McMenamin reviewed in

15   that case, correct?

16        A.    Okay.  What next opinion?

17        Q.    10b.  I'm in Paragraph b.

18        A.    Oh, I see.

19        Q.    I'm just going one down.  I think we're

20   in Paragraph 10 -- yeah, 10b.

21        A.    Okay.

22        Q.    Let's go through it.



Page 87

1            You put in the second sentence or third

2      sentence of that, Dr. McMenamin improperly

3      expresses his conclusions in terms of, quote,

4      probability, when, in fact, he's offered no

5      statistical evidence to support the notion that any

6      of the markers he has selected makes authorship

7      attribution more or less probable.

8            Do you see that?

9      A.    Yes.

10     Q.    Is that a criticism that is contained

11     in your report of Dr. Leonard -- regarding

12     Dr. Leonard's work in this case?

13            MS. DAGLEY:  Object to form.

14            THE WITNESS:  Well, no, because

15        Dr. McMenamin improperly expresses his

16        conclusions in terms of probability; and

17        McMenamin's report, if my memory serves me

18        correctly, had a series of probability

19        levels.  And when you evoke notions of

20        probability within a scientific report, you

21        evoke notions of statistical significance,

22        et cetera --



1    BY MR. BRENNER:

2         Q.    Got it.

3         A.    -- and that is not in -- in the Leonard

4    report.

5         Q.    Okay.  Dr. Eggington, I'm on 10d now --

6    d, as in David.

7         A.    Yes.

8         Q.    You write, Having failed both the

9    reliability and validity tests, it is impossible to

10   ascribe any scientific worth or credibility to

11   Dr. McMenamin's opinions with respect to the author

12   of the Nightcrawler screenplay.

13              Do you see that?

14        A.    Correct.

15        Q.    You have made the same criticism of

16   Dr. Leonard, although not with regard to the

17   Nightcrawler screenplay, but with regard to the Q

18   documents in this case, correct?

19              MS. DAGLEY:  Object to form.

20              THE WITNESS:  To the best of my -- I

21        mean, I don't know about the exact wording,

22        but, yes.



Page 89

1    BY MR. BRENNER:

2        Q.    Okay.  And then this one, I think, is

3    the exact wording.  You say that for both

4    Dr. McMenamin and Dr. Leonard, their opinions

5    appear to be the result of advocacy rather than

6    representation of scientific principles.

7              MS. DAGLEY:  Object to form.

8              THE WITNESS:  Yes.

9    BY MR. BRENNER:

10        Q.    All right.  And then you write, These

11    failings of the forensic stylistics approach are

12    well recognized in the field of forensic

13    linguistics at large.

14              That's an opinion you have that is

15    equally applicable to Dr. McMenamin's work in

16    Dutcher as it is to Dr. Leonard's work in the

17    Kleiman case, correct?

18        A.    Correct.  Yes.

19              MS. DAGLEY:  Object to form.

20    BY MR. BRENNER:

21        Q.    Okay.  So what happened in Dutcher?

22        A.    The judge dismissed it at summary



Page 90

```
 1    judgment, dismissed the claim of authorial

 2    attribution -- dismissed the claim that somebody

 3    else had written those screenplays, in summary

 4    judgment, to the best of my knowledge.

 5         Q.    Okay.  What happened with -- with your

 6    opinion -- your opinion was not -- you didn't give

 7    an opinion on summary judgment; you gave an opinion

 8    on the reliability of Dr. McMenamin's methods,

 9    correct?

10         A.    Correct.

11         Q.    So let's -- let's pull something else

12    up.  I'm going to stop the share for one moment.

13               Okay.  Tell me when it comes up.

14         A.    I've got the document.

15         Q.    Okay.  You'll see this is in that same

16    case.

17         A.    Yes.

18         Q.    All right.  You'll see that -- you're

19    aware that your opinion -- were you aware that your

20    opinion was used as part of a motion to exclude the

21    testimony of Dr. McMenamin?

22         A.    I -- I'm not -- I'm assuming so, but
```



1    I'm not -- I wasn't aware.

2         Q.    Let's look.

3              The basis for the motion -- just in the

4    table of contents -- the first basis for the motion

5    was, McMenamin Admits His Methods Have Not Been

6    Empirically Tested or Verified.

7              You wouldn't testify -- that would be

8    an admission from Dr. McMenamin, so that wouldn't

9    be your -- your opinion, correct?

10             MS. DAGLEY:  Object to form.

11             THE WITNESS:  I'm not --

12   BY MR. BRENNER:

13        Q.    Let's look at it.  I'm going to go to

14   the actual -- instead of the table of contents, I'm

15   going to go to the actual motion.

16             Okay?

17             You won't have to guess.

18        A.    Okay.

19        Q.    Okay.  What I'm going to do is I'm

20   going to scroll to where we find citations to you.

21             Okay?

22        A.    Right.  I don't think I've ever seen



Page 92

1      this document, by the way.

2            Q.      Okay.  I'll try to do a shortcut.

3                    Your name comes up 11 or 12 times.

4            A.      Okay.

5            Q.      Okay?

6                    This is -- apparently the first time in

7      the document you see is Footnote 8.

8            A.      Um-hum.  Yes.

9            Q.      Let's see what you're cited for.

10                   This is a citation to you about the

11     issue we talked before about McMenamin talks in a

12     semistatistical way, right?

13                   We covered that?

14           A.      Okay.

15                   MS. DAGLEY:  Object to form.

16     BY MR. BRENNER:

17           Q.      Okay.  Next time -- the next one.

18                   Here's your -- your -- you're cited in

19     Footnote 16, and you're cited for the -- that

20     there's -- that Dr. McMenamin does not use a

21     standard reference set of style markers to be

22     reviewed in each case.



Page 93

```
 1              Right?

 2        A.    Yes.

 3              MS. DAGLEY:  Object to form.

 4    BY MR. BRENNER:

 5        Q.    We've covered that's -- that's a

 6    critique you have of Dr. Leonard's work as well in

 7    this case?

 8              MS. DAGLEY:  Object to form.

 9              (Connectivity issues.)

10    BY MR. BRENNER:

11        Q.    I have -- I'm going to try to

12    short-circuit this a little, if I can.

13              We have on the screen the --

14    Dr. Eggington, your report in the Dutcher case.

15              Okay?

16        A.    Correct.

17        Q.    Okay.  We had gone through that a

18    little bit before.

19              MR. BRENNER:  I want to mark that as

20         the next exhibit, Cindy.

21              CERTIFIED STENOGRAPHER:  Okay.

22
```



Page 94

```
 1                        -   -   -

 2                   (Eggington Deposition Exhibit Number

 3                    5, Report or Affidavit of William

 4                    G. Eggington, Dutcher v. Bold

 5                    Films, marked for identification,

 6                    as of this date.)

 7                        -   -   -

 8      BY MR. BRENNER:

 9          Q.    Let me ask you this:  You pointed out

10      for me, for example, there was one criticism in

11      here regarding speaking in probabilities that was

12      not also included in the Leonard report because he

13      didn't do that.

14                   Is there any --

15                   MS. DAGLEY:  Object to form.

16      BY MR. BRENNER:

17          Q.    -- is there any criticism --

18                   MR. BRENNER:  You've got to let me

19          finish.

20                   MS. DAGLEY:  Sorry.

21      BY MR. BRENNER:

22          Q.    Let's do it this way --
```



Page 95

1                    MR. BRENNER:  Why you are objecting

2           to form -- that is your expert -- on every

3           question?

4                    And maybe I can clean it, or maybe

5           I'll just give you a standing objection,

6           because it's beyond me why you're objecting

7           to every question I ask.

8                    MS. DAGLEY:  Okay.  I'm not trying

9           to.  I'm just listening to the question,

10          and I'm objecting where appropriate.  I

11          will be more cautious in not interrupting

12          you.

13                   MR. BRENNER:  Okay.

14     BY MR. BRENNER:

15          Q.    All right.  Dr. Eggington --

16          A.    Yes.

17          Q.    -- I have back up your report in the

18     Dutcher case, where you were -- you were a rebuttal

19     expert to Dr. McMenamin --

20          A.    Correct.

21          Q.    -- and I want to ask you if there's any

22     criticism that you have of the methodology of



Page 96

1    Dr. Leonard in this case that's not also included

2    in the Dutcher report.

3         A.    That's a very difficult question to

4    answer.  Having not seen this report for about

5    three or four years, I can -- I can't, basically,

6    answer that.

7         Q.    I don't think that that's accurate.

8    The report is two years ago.

9         A.    Okay.  Two years.  Sorry.

10              I still can't answer it.  Like, I

11   haven't memorized the report in -- well . . .

12        Q.    I'll have to ask you to take a look at

13   it.  So scroll through, tell me where you want me

14   to let you read.

15        A.    So what am I looking for?

16        Q.    You're looking for if there's any

17   criticism of Dr. Leonard in this case that's not

18   also included in this report -- in the Dutcher

19   case.

20        A.    Well, there's specific -- like in the

21   Leonard report, there's -- because the style

22   markers, as Leonard calls them, the linkage, link



Page 97

1    features, or whatever, linking features, are

2    different, and so they're going to be different --

3         Q.    Right.

4         A.    -- but in terms of the overall

5    methodology, as I say in the Leonard report, it

6    appears to be based upon a methodology also done by

7    McMenamin.

8         Q.    Okay.  So in -- let's just close the

9    loop a little bit on Dutcher.  I'm going to unshare

10   the screen for a second so I can pull up another

11   document.

12            Just tell me when the document comes

13   up.

14        A.    It's here.

15        Q.    All right.  So this again is from

16   Westlaw.  This is the opinion of the judge in the

17   Dutcher case.

18            Do you see that?

19        A.    Yes.

20            Now, by the way, I've been -- my little

21   clock tells me that I've been doing this for about

22   an hour.  And I think it would be appropriate to



Page 98

1      basically have a break at least once an hour.

2            Q.      I completely agree.

3                    Not only that, if you want to take it

4      any more frequently or less frequently, you just

5      tell me.

6                    Do you want to take it right now, or

7      just want -- if you give me two minutes, we'll

8      finish this document.  But if you want to take it

9      now, we can.

10           A.      Okay.  Let's finish the document.

11           Q.      Okay.  But at any time you want a

12     break, you just tell me.

13           A.      Okay.

14           Q.      You control that, not me.

15                   This is the opinion in the Dutcher

16     case.

17                   Have you ever seen that before?

18           A.      Not to my recollection.

19           Q.      Okay.  Those highlights are mine.

20     They're not in the actual opinion, but they've been

21     added by me.

22                   Okay?



Page 99

1          A.      Okay.

2          Q.      This there -- you see they're talking

3    about the motion we were just looking at, which is

4    the motion to exclude the testimony of

5    Dr. McMenamin, right?

6          A.      Right.

7          Q.      And that was based on -- at least in

8    part, on the report or affidavit you filed,

9    correct?

10         A.      Correct.

11         Q.      And the Court rejected your rebuttal of

12   Dr. McMenamin and said that his testimony could be

13   heard by the jury, correct?

14              MS. DAGLEY:  Object to form.

15              THE WITNESS:  With respect to --

16   yes.

17   BY MR. BRENNER:

18         Q.      Okay.  Did you know this order existed?

19         A.      As I said, I don't think I've seen

20   this.

21         Q.      Did you know that Dr. McMenamin's

22   testimony was not stricken based on your rebuttal?



```
 1        A.      I'm aware that -- no, I'm -- I'm

 2   searching too much into -- into conversations that

 3   I have no way to validate or verify.  So my

 4   response to that would be, to the best of my

 5   recollection, I was not aware.

 6        Q.      Okay.

 7                MR. BRENNER:  Let's take a break.

 8                How long do you need?

 9                THE WITNESS:  Five minutes.

10                MR. BRENNER:  Okay.

11                Five minutes it is.

12                THE WITNESS:  Okay.

13                MR. BRENNER:  Thanks.

14                        -  -  -

15                (Whereupon, a recess was taken from

16                 3:46 p.m. EST to 3:52 p.m. EST.)

17                        -  -  -

18   BY MR. BRENNER:

19        Q.      All right.  I want to take you to

20   another part of your report -- oh, by the way, did

21   you -- other than in the Dutcher case, have you

22   ever been asked in a court case to critique the
```



```
 1      work of Dr. McMenamin?

 2           A.     In the -- in the Zajac case, the -- the

 3      FBI agent, Jim Fitzgerald, was building -- was

 4      using a methodology that I -- if I remember

 5      correctly, he identified as McMenamin's

 6      methodology, and I testified in an evidentiary

 7      hearing in that case, and so -- so -- I'm sorry.  I

 8      can't remember the exact wording of your question,

 9      but assuming that that's what -- that that would

10      be -- my answer would be in the affirmative.

11           Q.     Okay.  So the cases that you've been

12      called on to either critique Dr. McMenamin directly

13      or critique his -- his methodology would be the

14      Dutcher case, the Zajac case and then this case,

15      correct?

16           A.     Correct.

17           Q.     Okay.  None others, correct?

18           A.     Not that I'm aware of.

19           Q.     Okay.  And do you remember what

20      happened in the Zajac case?

21           A.     In the Zajac case, there were two --

22      there were one known threat letter and two unknown
```



Page 102

```
1      threat letters -- or questioned threat letters.

2      And -- and I can't remember the legal things, but

3      the judge decided, I think, that Fitzgerald could

4      testify on one but not on the other.  And then

5      that's the result of the evidentiary hearing.  And

6      then the prosecution, who Fitzgerald was working

7      with, withdrew him as -- as -- as an expert

8      witness.

9           Q.     Okay.  In that case, in the Zajac case,

10     Mr. Fitzgerald was comparing stylistic markers or

11     linguistic markers between the threat letters,

12     correct?

13          A.     Correct.

14          Q.     All right.  Let's go to another topic,

15     and let me just find it so you don't have to watch

16     me scrolling on the screen.

17               Okay.  So I'm going to go so you can --

18     because I know you have your report with you, while

19     I pull it up, I'm going to go to Paragraph 7 of --

20     Page 7 of your report and Paragraph 18.

21          A.     During the break, I should have

22     rearranged all my stuff, but I didn't, so just hang
```



Page 103

```
 1    on --

 2         Q.    No worries.

 3         A.    -- things are a little bit out of

 4    order.

 5         Q.    I have it on the screen, if it's easier

 6    for you.

 7         A.    I got it.

 8               This is Paragraph?

 9         Q.    Eighteen.

10         A.    Eighteen.

11         Q.    So you put in your report -- throughout

12    your report, frankly, references to what other

13    people say about other people.  So you have -- for

14    example, you have references to what Mr. -- what

15    Mr. -- Professor Solan has to say about -- about

16    authorial attribution of the various methodologies,

17    right?

18               That's one of the things you cite?

19         A.    Correct.

20         Q.    And in your -- in this paragraph, in

21    particular, you're citing to a gentleman by the

22    name Dr. Ron Butters, right?
```



Page 104

```
 1          A.      Correct.

 2          Q.      And you cite to Dr. Ron Butters -- you

 3    call him a highly respected linguist?

 4          A.      Correct.

 5          Q.      And you were actually quoting from a

 6    New York Times piece where Zimmer is writing about

 7    Butters' statements about the Facebook case,

 8    correct?

 9          A.      Correct.

10                  And you'll have to raise it up a little

11    bit because that bar is the --

12          Q.      I will.  I will.

13                  Okay.

14          A.      There we go.

15          Q.      Okay.  And I want to walk through this

16    with you and -- and understand why it's in your

17    report, first of all, and then talk about some

18    other things.

19                  Okay?

20          A.      Okay.

21          Q.      You write -- you're quoting from

22    Mr. Zimmer -- is Mr. Zimmer a journalist, as far as
```



Page 105

1    you know?

2          A.     Yes, I think so.

3          Q.     He writes that Mr. McMenamin's report

4    has raised eyebrows in the forensic linguistics

5    community.

6                 This is something -- he's picking up on

7    what Dr. Butters is talking about, correct?

8          A.     I don't know whether it's only what

9    Dr. Butters is talking about, but -- so I can't put

10   words into his mouth.

11         Q.     Okay.  It goes on to then talk about

12   Dr. Butters specifically and comments he had made

13   earlier in the month.

14                Do you see that?

15         A.     Yes.

16         Q.     What McMenamin -- do you recall what

17   McMenamin was doing in the Zuckerberg case?

18         A.     No, not -- not definitively.

19         Q.     Well, do you know enough to know that

20   it's the same type of work that you are critiquing

21   Dr. Leonard for doing here?

22                MS. DAGLEY:  Object to form.



Page 106

1              THE WITNESS:  Yes.

2     BY MR. BRENNER:

3         Q.    Okay.  Otherwise, it wouldn't be in

4     this report; it wouldn't have any relevance,

5     correct?

6         A.    Correct.

7         Q.    And just -- just to be clear, what --

8     what Mr. McMenamin was doing specifically in the

9     Zuckerberg matter is he was comparing a case set

10    and a Q set of e-mails to determine authorial

11    attribution, correct?

12        A.    To the best of my knowledge, yes.

13        Q.    And there -- you go on to say in

14    Paragraph 19 -- you say, This notoriety.  And this

15    is the debate or the questioning that Dr. Butters

16    had done of Mr. McMenamin, right?

17              MS. DAGLEY:  Object to form.

18    BY MR. BRENNER:

19        Q.    When you say, This notoriety, what are

20    you referring to?

21        A.    Yes, that -- that -- I think the

22    notoriety is the fact that this was written in a --



Page 107

1     it was written in a New York Times article.

2           Q.     Yes.

3           A.     I mean, when something gets written in

4     The New York Times article about linguistics, it

5     evokes a sense of notoriety amongst some.

6           Q.     Among linguists, right?

7           A.     Yes.

8           Q.     So there's a discussion among -- you

9     say there's a discussion among premier academic

10    linguist in a blog called Language Log, right?

11          A.     Correct.

12          Q.     And you say in that -- that -- that

13    log -- that Language Log, or blog, that the

14    forensics stylistic methodology of Dr. McMenamin

15    was overwhelmingly challenged, right?

16          A.     Yes.

17          Q.     And then you cite to a commentator, and

18    this is someone who is just posting a comment on a

19    blog, right?

20          A.     Correct.

21          Q.     And who is Marcel Matley?

22          A.     I don't know.



1        Q.      I don't mean to be flippant about it,

2    but are you -- you quote -- you're quoting someone

3    that you have -- you don't know who they is -- who

4    they are in an expert report filed in the

5    United States Southern District of Florida; is that

6    your testimony?

7        A.      I --

8                MS. DAGLEY:  Objection.

9                THE WITNESS:  Sorry.

10               -- I think when you look at

11          Paragraph 20, I sort of address that issue

12          by saying that it's not my usual practice

13          to cite Internet blog commentary.  I do so

14          here, however, to show that general

15          forensic linguistic field has serious

16          problems with the scientific reliability

17          and validity of the forensics stylistics

18          approach used in this case.

19               So, essentially, I'm sort of

20          recognizing that this is an unusual

21          practice, but I'm doing it to basically say

22          that there's serious questions about peer



Page 109

1          support, peer recognition of this

2          methodology.

3     BY MR. BRENNER:

4          Q.     Have you ever quoted either a blog or

5     Mr. Matley in particular in another report, if it's

6     so rare?

7          A.     I think I might have quoted him also in

8     the -- in the Dutcher report.

9          Q.     Right.

10              The only other two reports you've ever

11    filed on authorial attribution about the forensic

12    stylistics method -- you're two for two -- you

13    quote someone you don't know from an Internet blog,

14    right?

15              MS. DAGLEY:  Object to form.

16              THE WITNESS:  Well, we quote people

17         all the time that we don't know.

18    BY MR. BRENNER:

19         Q.     That's not my question.

20              You put in -- let's scroll down -- you

21    put in Paragraph Number 20 -- that is not your

22    quote -- let's see what you say -- it's not your



1    usual practice to cite Internet blog commentary.

2            Do you see that?

3    A.    Yes.

4    Q.    Both times you filed a report

5    critiquing the forensic stylistics methods in

6    courts, you have quoted this very Internet blog

7    commentary, have you not, sir?

8    A.    Yes.

9    Q.    Okay.  Are you asking the Federal Court

10   in this case to -- why are you quoting Mr. Matley?

11           What do you want that to be used for?

12   A.    As I said before, it's an example of

13   how -- how contentious people who are doing

14   forensic linguistics find this particular

15   methodology, the McMenamin and his -- and others

16   are using.

17   Q.    Do you know that -- do you even know

18   what the profession is of Mr. Matley?

19   A.    No.

20   Q.    So you don't know if he's a -- a

21   linguistic at all, correct?

22   A.    Well, he's on Language Log, and it was



Page 111

1       part of a discussion on Language Log.

2            Q.     Was anyone offering a competing view to

3       Mr. Matley?

4            A.     I can't remember.

5            Q.     So you picked out a quote from someone

6       you don't know, you don't know what his job is, and

7       you put it in your report as evidence of the

8       overwhelmingly -- overwhelming challenges to the

9       forensic stylistic methodology on this blog; is

10      that correct?

11                  MS. DAGLEY:  Object to form.

12                  THE WITNESS:  As probably the most

13               succinct and -- way to inform the Court as

14               to the standing of this methodology held by

15               many of the -- of people involved in -- in

16               the field.

17      BY MR. BRENNER:

18           Q.     But, sir, you don't even know if

19      Mr. Matley is involved in the field.

20                  Why didn't you just write it yourself

21      if you wanted to critique Dr. Leonard or

22      Mr. McMenamin?



Page 112

1              MS. DAGLEY:  Objection.

2      BY MR. BRENNER:

3          Q.    Why did you not write it yourself as

4      opposed to quote someone that you don't know even

5      who they are?

6              MS. DAGLEY:  Object to form.

7              THE WITNESS:  Well, if you look at

8          Page 8 right above that, it's somebody who

9          has consulted on the case in Oregon, so

10         it's somebody who has experience in

11         forensic linguistics and somebody who has

12         testified, I think, if I'm reading this

13         correctly -- I can't remember -- that has

14         testified and so feels, based upon his

15         experience, that he can offer a blog

16         opinion.

17             Once again, this is why I don't

18         usually cite blog commentary, but this is

19         an example of the standing of forensic

20         stylistics in the field.

21     BY MR. BRENNER:

22         Q.    Do you adopt as your own statements the



Page 113

1      statements of Mr. Matley here?

2              Do you agree with everything he says?

3      A.    I put it in the report as an example

4      of -- as I say in the report, to show that the

5      general forensic linguistics field has serious

6      problems with the scientific reliability and

7      validity of the forensic stylistics approach.

8      Q.    So what -- who else is representing the

9      general linguistics field, other than Mr. Matley,

10     for this point?

11     A.    Ron Butters --

12     Q.    Okay.

13     A.    -- and the comments by Carole Chaski,

14     the comments by Ainsworth and Juola and some of the

15     other folks that I've cited in my references.

16     Q.    Okay.  I want you to assume for a

17     moment that the Rules of Evidence are not going to

18     allow you in court to tell the jury what other

19     people are saying; they're only going to let -- the

20     judge is only going to allow you to say what your

21     opinion is.

22             Tell me, are you -- are you critical of



Page 114

```
 1    the work that Dr. McMenamin did in the Facebook

 2    case.

 3          A.    Yes.

 4          Q.    Okay.  And what -- what -- what were

 5    your criticisms of Dr. McMenamin's work in the

 6    Facebook case?

 7          A.    Well, that he's using the same

 8    methodology, the forensic stylistics methodology,

 9    and that has not been -- that is -- that has the

10    same problems that I've mentioned in the Leonard

11    report.

12          Q.    Okay.  And the -- I keep calling it the

13    "Facebook case."  It's -- it's -- actually,

14    Zuckerberg is the -- is the name of the Facebook

15    side of the ledger.

16          A.    Yeah.

17          Q.    That was a pretty famous case, right?

18          A.    Yes.

19          Q.    There was a lot of money involved,

20    right?

21          A.    Yes.

22          Q.    Even an article written about the
```



1    linguistic side of it in The New York Times.

2              Pretty big deal, right?

3         A.    Yes.

4         Q.    You are directing the Court and,

5    ultimately, the jury here to that case in your

6    report, correct?

7         A.    Yes.

8         Q.    You know what happened in that case,

9    right?

10        A.    I don't know the particular details in

11   terms of -- of, you know, all of the court

12   decisions, et cetera.

13        Q.    Do you know that Dr. McMenamin's

14   opinions were adopted -- were -- were accepted by

15   the Court?

16        A.    I think that was the case.

17        Q.    And do you know that the case was

18   dismissed in part based on those opinions?

19        A.    I don't know about in part.

20        Q.    Well, do you know if it was in whole

21   dismissed?

22        A.    I don't know -- I don't know the degree



Page 116

1    to which the case was dismissed or what were the

2    variables that led to the case being dismissed.

3         Q.    Let's see if we can pull that up.

4               Did I pull up for you the different

5    screen?

6         A.    Yes.

7         Q.    Okay.  So this is the -- the Ceglia

8    versus Zuckerberg case, correct?

9         A.    Correct.

10        Q.    The same one you're talking about in

11   your report, correct?

12        A.    Yes.

13        Q.    Okay.  I'll represent to you that this

14   is what's called a "reported recommendation," which

15   means it's heard in the first instance by a

16   United States Magistrate judge.

17               Okay?

18        A.    Okay.

19        Q.    Ultimately, that -- that opinion is --

20   I'll represent to you is -- is adopted by the

21   District Court judge, the Trial Court judge.

22               Okay?



Page 117

```
 1        A.      If you say so.

 2        Q.      Yep.  I'm asking -- I'm asking you to

 3    accept -- you don't have to agree with it.  I'm

 4    just telling you, to save some time.

 5        A.      Okay.

 6        Q.      Let's put in McMenamin.

 7                Am I spelling that right?

 8        A.      No.  M-C-M- --

 9        Q.      I'm never going to get it.

10        A.      M.

11        Q.      I got it.  It will come up now.

12        A.      There you go.

13        Q.      I was just going to try to get you to

14    the point where they actually decide -- where they

15    actually talk about his stuff, so let me just do it

16    this way.

17                Okay.  Linguist Analysis.

18                Do you see that?

19        A.      Yes.

20        Q.      Okay.

21                "Finally, the Defendants retained the

22    services of McMenamin, who performed a stylistic
```



```
1        analysis of the supporting e-mails determining

2        Zuckerberg's authorship of the e-mails is

3        improbable."

4                  Right?

5        A.     Yes.

6        Q.     Okay.  You know --

7        A.     You have to scroll up.

8        Q.     Sure.  Thank you.

9        A.     Sorry about that.

10       Q.     No, you have nothing to apologize for.

11  I'm sorry I keep forgetting.

12                  Let me do that, and let me . . .

13                  How's that?

14       A.     Yeah, that's fine.

15       Q.     When I get to the bottom, I'll move up.

16       A.     Yeah.

17       Q.     We'll take it in small chunks.

18       A.     Yeah.

19       Q.     So you understand that McMenamin did

20  his -- his typical methodology in this case, right?

21       A.     I think so, yeah.

22       Q.     Okay.
```



1          A.      I mean, I haven't seen his report, but

2     I'm assuming, yes.

3          Q.      Okay.  And here he actually -- the

4     Court actually says that he used the probability

5     language which you found problematic in Dutcher.

6                  Do you see that?

7          A.      Having not seen the report, I don't

8     know whether -- that he used the same scale --

9          Q.      Sure.

10         A.      -- probability scale, but they're using

11    the word "improbable" there.

12         Q.      Scroll up.

13                 This is just saying that he did a Q

14    versus K authorial attribution, which we've talked

15    about, correct?

16         A.      Correct.

17         Q.      No surprise there, right?

18         A.      Right.

19         Q.      Okay.  That he used style marker --

20    style markers like Dr. Leonard does here, correct?

21                 MS. DAGLEY:  Object to form.

22                 THE WITNESS:  Keep scrolling up so I



Page 120

1          can read the whole thing.

2     BY MR. BRENNER:

3          Q.     Sure.  Here you go.

4          A.     Correct.

5          Q.     Okay.  Let me just make sure you see

6     it.  I don't want you to think that I'm trying to

7     hide anything from you.

8                 Tell me when you're ready to go to the

9     next column.

10         A.     Okay.  Keep going.

11         Q.     I've got to go back up to the next

12    column.  I'm at the bottom of the page there.

13         A.     Okay.

14         Q.     You see that?

15                Can I go to the right column there?

16         A.     Okay.  Keep going up on the bottom of

17    the page, because I don't see anything -- oh, I

18    see.

19                Okay.  I'm just looking at the yellow

20    parts because I'm --

21         Q.     I'm going to get there.

22         A.     -- thinking that that's highlighted by



Page 121

1    you.

2         Q.    I'm going to get there.  I just want

3    you to be able to see it.  So I'm not . . .

4              And this is explaining that -- the

5    McMenamin methodology in sort of a topical way,

6    correct?

7         A.    Um-hum.

8              MS. DAGLEY:  Object to form.

9    BY MR. BRENNER:

10        Q.    Then it says, In opposition -- this is

11   what the -- this is where Dr. Butters comes in,

12   right?

13        A.    Yes.

14        Q.    They reference the very article that

15   you have in your report, correct, that you talk

16   about?

17        A.    Yes.

18        Q.    And Dr. Butters' questions, because he

19   says it's based on the slender evidence reviewed.

20             Do you see that?

21        A.    Yes.

22        Q.    Okay.



Page 122

```
 1                    Okay.  I'm at the bottom of the page,
 2        where the Court rules.
 3                    Do you see the Court now assesses the
 4        methodology --
 5            A.      Yes.
 6            Q.      -- considered as a whole, the stylistic
 7        differences McMenamin observed between the two sets
 8        of writings indicate the author of the known
 9        writings possessed a better grasp of proper English
10        usage and grammar than the author of the questioned
11        writings?
12                    Again, here, Dr. McMenamin is using
13        his -- his system where he uses -- he didn't use a
14        preset set of -- of markings or -- or features; he
15        lets the data determine which ones he's going to
16        focus on, correct?
17                    MS. DAGLEY:  Object to form.
18                    THE WITNESS:  Correct.
19        BY MR. BRENNER:
20            Q.      Okay.  And you critique Dr. Leonard for
21        doing the same thing here, correct?
22                    MS. DAGLEY:  Object to form.
```



Page 123

1              THE WITNESS:  Correct.

2     BY MR. BRENNER:

3         Q.     Okay.  And then the Court says, As

4     such, the stylistic differences point to a highly

5     probable conclusion that the questioned writings

6     were not authorized by Zuckerberg.

7              Do you see that?

8         A.     Yes.

9              MS. DAGLEY:  Objection.

10    BY MR. BRENNER:

11        Q.     And then the Court says, To summarize,

12    based on the evidence in the record, it is highly

13    probable and reasonably certain that the

14    work-for-hire document and the supporting e-mails

15    were fabricated for the express purpose of filing

16    the instant action.

17              Those are the Q documents in that case,

18    correct?

19        A.     Yes.

20        Q.     Then the Court dismisses the case.

21              Do you see that?

22              MS. DAGLEY:  Object to form.



Page 124

1              THE WITNESS:  Is that the next --

2      BY MR. BRENNER:

3          Q.     Yeah, the next highlighting.

4                 I'm sorry.

5          A.     Scroll it up.

6                 Yeah, there we go.

7                 Okay.  Yes.

8          Q.     Correct.

9          A.     Yes.

10         Q.     Okay.  Now, in your report, when you're

11     citing Dr. McMenamin's criticism to a Federal judge

12     in Florida, did you tell that judge that a

13     Federal judge in -- I think it's New York, but

14     we'll see -- in New York had rejected that very

15     criticism?

16                Did you -- just answer my question --

17     did you put that in your report?

18         A.     No.

19         Q.     Why not?

20         A.     Because the purpose of that report was

21     to say that these misgivings that I had in the --

22     Leonard's methodology were shared by a considerable



Page 125

```
 1    number of well-respected peers and that that is one

 2    of the issues to do with evidentiary standards.

 3         Q.    So to summarize that, I mean, you felt

 4    it was appropriate to tell the Court that folks

 5    like Mr. Matley and Dr. Butters and Dr. Chaski

 6    agreed with you, but you did not tell the Court

 7    that those very criticisms had been rejected by

 8    now -- by now, we've seen two -- two Courts,

 9    correct?

10              MS. DAGLEY:  Object to form and the

11         characterization.

12    BY MR. BRENNER:

13         Q.    You can answer.

14         A.    Okay.

15              My purpose in writing that -- the

16    rhetorical purpose was to show that -- that this

17    methodology lacks credibility amongst many of my

18    peers.  I wasn't going to opine on judges.

19         Q.    As an academician -- do you consider

20    yourself an academician?

21         A.    Yes.

22         Q.    Okay.  Do you believe that -- do you
```



Page 126

```
 1    also consider yourself someone who engages in the

 2    scientific method?

 3         A.     Yes.

 4         Q.     Do you believe it's important for the

 5    readers -- by the way, have you written

 6    publications?

 7         A.     Have I what?

 8         Q.     Have you written publications?

 9         A.     Oh, yeah.  Yes.

10         Q.     Have you written in peer-reviewed

11    journals?

12         A.     Yes.

13         Q.     Do you believe that your cite -- your

14    decision to cite to Mr. Matley and Mr. Butters and

15    Dr. Chaski in this report and not cite to the

16    Federal judge who ruled on the very issue you're

17    discussing is consistent with the standards for

18    peer-reviewed publications?

19         A.     I'm a linguist, and so my -- my

20    academic field is constrained by -- by my field of

21    linguistics, and so I feel that I can comment on

22    linguistics and the linguistic opinion of my peers
```



MAGNA
LEGAL SERVICES

Page 127

1    but not on judges and lawyers and the whole legal

2    domain.

3         Q.     Well, did you cite in this section of

4    your report, Paragraphs 18, 19 and 20 -- did you

5    cite any linguists who disagreed with your

6    critiques of Dr. McMenamin?

7         A.     No.

8         Q.     You know they exist, right?

9         A.     Yes.

10        Q.     And why did you not cite to them?

11        A.     To the best of my knowledge, there

12   isn't a lot to cite.  And it -- it sort of boggles

13   my mind a little bit that Dr. Leonard didn't cite

14   any support in his report for that particular

15   methodology.

16              One would think that when you basically

17   write a report that you're going to cite the

18   validity and reliability of that methodology;

19   you're going to refer to how it is accepted by your

20   peers, et cetera.  And to the best of my knowledge,

21   Leonard's report doesn't do that.

22        Q.     One of your -- let me go back to the



Page 128

1      Dutcher case.

2                   Give me one second.

3                   (Pause.)

4      BY MR. BRENNER:

5           Q.      Okay.  So let's go back to your report

6      in the Dutcher case, and I'm going to direct your

7      attention to Page 8.  So let's get there.  And I

8      want to talk to you about Paragraphs 37 through 40.

9                   Okay?

10          A.      Yes.

11          Q.      Okay.  So we'll start at 37, but as we

12     get down, I'll remember to lower the screen.

13                  Do you want to take a quick view of

14     what the four paragraphs are so you'll know where

15     we're going?

16          A.      Yeah.

17          Q.      Okay.  So you tell me when to hit the

18     down arrow.

19          A.      Okay.  Keep going.

20                  Stop.

21                  So what paragraphs are they?

22          Q.      We're going -- we're mainly going to



1      talk about 37 through 40 right now.

2           A.     Okay.  What's on my screen takes me to

3      halfway through 39, so let me just read that and

4      then -- wait a minute.  Go back.

5           Q.     You weren't there yet.

6           A.     Yeah.

7           Q.     You say when.

8           A.     Yeah.

9                  Okay.  Scroll up, please.

10          Q.     How's that?

11          A.     Yes.

12                 (Whereupon, the witness reviews the

13                  material provided.)

14                 THE WITNESS:  Okay.

15     BY MR. BRENNER:

16          Q.     Okay.  One of your critiques of

17     Dr. McMenamin in the Dutcher case was that his --

18     his sample size was insufficient, correct?

19          A.     Correct.

20          Q.     And the sample size in that case was

21     two known documents and one questioned document?

22          A.     Yes.



Page 130

1        Q.      And if we scroll down to 40, you cite

2     to someone named Grant.

3              Who's Grant?

4        A.      He's -- I think he's cited in my

5     bibliography.  He's a researcher in forensic

6     linguistics and linguistics.

7        Q.      Do you consider --

8        A.      Can we just go back up a little bit?

9        Q.      Yeah, but your up and my down -- I'm

10    not sure what they mean.

11             Do you want me to go --

12       A.      Go up to 37.

13       Q.      Thirty-seven.  Okay.

14       A.      So when you -- stop there.

15             I think you're confusing two things in

16    your question.  You're confusing, at least as I

17    read this -- and you'll have to forgive me if I've

18    misread it -- but you're confusing known versus

19    unknown and the particular text, the numerical fact

20    of a particular text; but I think we're also

21    talking about number of features, linguistic

22    features -- oh, no, we're not.



Page 131

1           Sorry.

2       Q.      I don't think we are.

3       A.      Not there yet.

4               Okay.  Go ahead.

5       Q.      I think you were telling me who Grant

6   was, though.

7       A.      Yeah, he's a linguistic who does

8   forensic linguistics.

9       Q.      You cite to a specific article in 2007.

10              Is that an article you consider

11  reliable?

12      A.      I think that's the one published in the

13  International Journal of Speech, Language and

14  Law --

15      Q.      Okay.

16      A.      -- so because it's been peer-reviewed,

17  et cetera, I consider it to be worth -- worthy.

18      Q.      Okay.  And you considered it -- you

19  considered it as you -- as you did in the Dutcher

20  case.  I believe you also -- did you also cite that

21  in the report in this case, the Grant article?

22      A.      I don't think I cited it in the actual



Page 132

```
 1    report.  I just referred to it in the bibliography.

 2         Q.    Okay.  Okay.  So let's -- I was going

 3    down to 40.

 4              So in 40, you say, Grant shows that

 5    it's very difficult to make an authorial

 6    determination --

 7              That's another way of saying authorial

 8    attribution, correct?

 9         A.    Right.

10         Q.    -- under five samples per author, and

11    definitely no determination can be made under three

12    samples per author.

13              Right?

14         A.    Yes.

15         Q.    How many samples did Dr. Leonard use in

16    this case?

17         A.    Well, he's got them listed in his

18    report.  I can't -- I can't remember the exact

19    number, but they were maybe around 20.

20         Q.    Okay.  You know they exceed five,

21    correct?

22         A.    Correct.
```



1     Q.     Okay.  But yet throughout your

2     report -- well, do you -- did you consider -- this

3     is where we may have a distinction between linking

4     features and -- and actual documents.

5             Did you consider the number of

6     documents Dr. Leonard reviewed to be insufficient

7     to do an authorial attribution analysis?

8     A.     I can't remember, but I don't think I

9     did.

10    Q.     Okay.  You did -- you did -- as we'll

11    go through, you found certain features that had a

12    frequency that you found was not significant to --

13    to reach any conclusion based on it.  That's a

14    distinction --

15    A.     That's right.  In the linking features,

16    yes.

17    Q.     -- that was the distinction you were

18    trying to draw for me a few minutes ago?

19    A.     Yes.

20    Q.     Okay.  Did you -- did you re --

21    reproduce Dr. Leonard's analysis using his

22    methodology?



Page 134

```
 1          A.      My focus was on critiquing the report,

 2     and to some extent, I did; to some extent, I

 3     didn't.

 4          Q.      All right.  And the reason I'm asking

 5     is, is -- in my mind, there's two possible

 6     critiques -- well, there may be many possible

 7     critiques, but one of your critiques is the

 8     methodology's not sound.  And I think that is your

 9     opinion, correct?

10          A.      Yes.

11          Q.      A second critique could be -- and I'm

12     just trying to see if you have this opinion -- that

13     even -- even -- even using that methodology, he

14     didn't do it correctly.

15               Do you have that opinion as well?

16          A.      I think what I'm saying in some of

17     the -- when I go through three or four of the

18     linguistic linking features, that he's got --

19     sorry, the linking -- I've forgotten what he calls

20     them -- linking features, that his -- his

21     conclusions -- his -- for example, some of them are

22     pointing in the other direction that support the --
```



Page 135

1    the hypothesis that Wright, Craig Wright, did not

2    write these documents, but he chooses to disregard

3    evidence pointing in another direction, using his

4    same criteria.

5              So that aspect of it all I have

6    difficulty with, with respect to his method.  I

7    think what he's doing is confirmation bias and --

8    and cherry-picking -- not only cherry-picking the

9    data, but cherry-picking the results.

10   Q.    Now, you told me earlier that -- when I

11   was asking you about what methodologies that you

12   would -- you would use if you were to do an

13   authorial attribution, one of the ones you told

14   me -- or one of the things you told me is you

15   should use something that has established

16   linguistic markers.

17             Do you recall that?

18   A.    Yes.  Yes.

19   Q.    And you said the JGAAP program from

20   Juola has such established linguistic markers?

21   A.    Yes.

22   Q.    Do you know what those are?



```
 1        A.     Well, there's a whole range of them,

 2   and some of them have to do with syntactic

 3   punctuation, with -- with word choice, with reading

 4   level, with -- and it just goes on.  There's a

 5   whole range of those ones that are being

 6   established in the literature.

 7        Q.     Is it -- is it your opinion that --

 8   well, strike that.

 9               Is it possible that one would be

10   confronted with a set of Q docs and K docs that

11   don't have any of those established markers in

12   them?

13        A.     Yes.

14        Q.     And is that -- in that case, is it not

15   possible to do authorial attribution?

16        A.     I think it would be very difficult to

17   justify doing authorial attribution if they haven't

18   been established a priori to meet evidentiary

19   standards.

20        Q.     So in your understanding of the -- or

21   your opinion, what you need to do is -- you have

22   these preestablished markers that have been tested
```



Page 137

```
1    for evidentiary standards, and then you would

2    essentially -- you told me a computer can do

3    this -- run the K documents and the Q documents and

4    see -- look to the presence of those markers and

5    how they compare between the two sets.

6              Is that the basic method?

7    A.    Yeah --

8              MS. DAGLEY:  Object to form.

9              THE WITNESS:  -- yeah, Juola --

10             Sorry.

11             -- Juola, in his report, basically

12        makes reference -- and this is

13        Janet Ainsworth and Juola -- make reference

14        to how easy it would be to construct

15        experiments.  Basically, someone selects a

16        group of known and unknown writings and

17        then gives them to a group of forensic

18        linguists or people who are investigating

19        this in terms of authorial attribution

20        and -- and basically runs a little

21        bit -- they called it in -- in -- in the

22        Ainsworth-Juola document Forensic
```



Page 138

1          Linguistics or an authorial attribution

2          dojo runs a little bit of things, saying,

3          Okay, which one of these -- which stylistic

4          features are going to have greatest

5          predictability.  And so I think that method

6          meets evidentiary -- scientific standards.

7                When I said "evidentiary," I should

8          say "scientific standards" more than

9          that --

10   BY MR. BRENNER:

11        Q.    Okay.

12        A.     -- but I think it meets scientific

13   standards and, as Ainsworth and Juola say,

14   that -- that approach -- and I participated in

15   that -- that -- that authorial attribution dojo at

16   the International Association of Forensic Linguists

17   Conference in Portugal a number of years ago, and I

18   was very impressed as to, you know, the number of

19   people -- there were about 20 of us who were able

20   to use that program and came up with -- with what I

21   would consider to be scientifically --

22   scientifically sound attribute -- or conclusions.



Page 139

```
1                    Now, I want to say that there -- that
2       there are large amounts of data and that seems to
3       be the key to this, that -- that each of the known
4       and unknown documents were fairly large.
5            Q.    So what method -- because when I asked
6       you before, I asked you to assume you had the same
7       data set that Dr. Leonard had, the same amount of
8       K documents and Q documents.
9                    Is that data set insufficient to use
10      Juola's method?
11           A.    I don't know.  I haven't considered
12      that --
13           Q.    Okay.
14           A.    -- I would have to go to the
15      literature.  I'd have to go to investigate that
16      further.
17           Q.    Do you know what Juola's views are on
18      forensic stylistics?
19           A.    Not outside of what he infers in that
20      article --
21           Q.    Okay.
22           A.    -- that I referenced.
```



Page 140

```
 1          Q.      And you -- what do you think he infers

 2     in that article?

 3          A.      That it lacks reliability and validity.

 4          Q.      And "it" being forensic stylistics?

 5          A.      Say that again.

 6          Q.      You said, "it lacks reliability" --

 7          A.      Yes.

 8          Q.      What's the "it"?

 9          A.      I'm not quite sure.  I mean, I'm just

10     inferring that from his article.

11          Q.      Okay.

12                  Okay.  Let's go to -- back to your

13     report.

14                  Let's see if I can get there.  I'm on

15     Paragraph 11.

16                  You identified that -- I'm going to the

17     middle of the paragraph where it says, Herein lies.

18          A.      Let me try to find that.

19          Q.      Yeah, five lines down in the paragraph.

20          A.      Um-hum.

21          Q.      Here you're writing about -- just to

22     orient the record and to orient you, you're writing
```



Page 141

```
1      about the linguistic subfield of authorial

2      attribution, right?

3           A.     Correct.

4           Q.     And you write that there's a lot of

5      literature about ensuring that strict scientific

6      standards are met when doing that work, correct?

7           A.     Correct.

8           Q.     Then you write, Herein lies a long and

9      ongoing, sometimes contentious, dispute among

10     scholars in forensic linguists revolving around the

11     professional integrity of the field.

12               Do you see that?

13          A.     Yes.

14          Q.     And then you set out that there's

15     actually -- there's a dispute in the field

16     regarding which methodology or methodologies is --

17     are scientifically sound, correct?

18          A.     Correct.

19          Q.     So one -- on one side of the debate

20     is -- you say is Dr. McMenamin and Dr. Leonard,

21     correct?

22          A.     Correct.
```



Page 142

```
1        Q.      Is it your testimony that those are the

2    only two linguists on that side of the debate?

3        A.      No; there are others.

4        Q.      Right.

5                And it is definitely true and the

6    tenure of your report, with all due respect,

7    supports this -- it's a contentious dispute, right?

8        A.      Yes.

9        Q.      And you're on the other side of that

10   dispute, and Dr. Chaski is on the other side of

11   that; is that correct?

12       A.      Yes.

13       Q.      Yourself, Dr. Chaski.

14               Who else is on the other side?

15       A.      Some other folks that we've mentioned,

16   Ron Butters and Janet Ainsworth and Patrick Juola,

17   I think, based upon that article, and -- and --

18   well, I could -- I could go on, but I don't want to

19   go through the list.

20       Q.      Right.  There's more people on both

21   sides of the ledger that you haven't named,

22   correct?
```



Page 143

```
 1          A.      Yes.

 2          Q.      Okay.  And this -- and I don't mean to

 3     use war terms, but this battle is being fought out

 4     both at the -- in the courtrooms around the

 5     country, as we've seen, right?

 6                  MS. DAGLEY:  Object to form.

 7                  THE WITNESS:  The courtroom battle

 8          is -- it's in a different field, right?

 9          It's in legal constraints, et cetera, and

10          the whole legal domain.  Whereas I would

11          rather just say that there's a -- a battle

12          within the linguistic field.

13     BY MR. BRENNER:

14          Q.      Okay.  The linguistic academic field?

15          A.      Yes.

16          Q.      And there's folks publishing on both

17     sides of the battle, correct?

18          A.      Yes.

19          Q.      And that people go to -- to seminars --

20          A.      I'm not quite sure -- let me just

21     qualify that.

22                  Other than McMenamin -- I have to be
```



Page 144

1    careful here -- I'm not quite sure who's publishing

2    consistently in support of authorial attribution.

3    And this speaks, once again, to the absence of

4    those kinds of references that you would expect to

5    find in the Leonard report to validate his

6    methodology.

7         Q.    Has Leonard, himself, published in that

8    area?

9         A.    I'm not aware of that -- well, he's

10   published, but whether he's -- he's published

11   opinions, but I'm not aware of the specifics.

12        Q.    Well, when you say "opinions," I'm not

13   talking about in courtrooms; I'm talking about

14   in -- in --

15        A.    Sorry.

16        Q.    -- in journals and academic literature.

17        A.    Yeah, I'm not -- I'm not aware.

18        Q.    So the only one you're aware that

19   publishes on the side of the ledger that is

20   sponsoring forensic stylistics is Dr. McMenamin?

21        A.    To the best of my knowledge, yes.

22        Q.    All right.  And on the other side, who



Page 145

```
 1    has published -- now that we've defined what

 2    "published" means -- on the other side of that

 3    debate?

 4         A.    Carole Chaski, Tracy Terrell.  I'd have

 5    to go down through the list of my references to

 6    sort of enlarge that group.

 7         Q.    Let me ask you this:  Have you been at

 8    any seminars or conferences where this debate that

 9    we've been talking about is discussed among

10    linguists?

11         A.    Yes.

12         Q.    And who has represented -- I'll call it

13    "the McMenamin side"?

14         A.    That's what's interesting, is that to

15    the best of my knowledge, the folks that are

16    representing the McMenamin side of it don't seem to

17    participate in these discussions.

18         Q.    I just asked you if there was a debate

19    during these presentations.

20               Are you telling me the debate is only

21    with one side?

22         A.    The debate is a group of -- okay.  It
```



Page 146

1    depends what you mean by "debate."  Are we talking

2    about formal debate, where you've got people on

3    both sides?

4              I think Larry Solan talks about a

5    conference that was held that looked at those

6    issues.  I think McMenamin was there, et cetera.

7    But I wasn't there.  So I'm only thinking about my

8    experience at forensic linguistics conferences.

9         Q.    Is that the only one you can think of

10   where this subject was addressed?

11        A.    Yes.

12        Q.    What is an idiolect?

13        A.    An idiolect -- I'm going to, by the

14   way, just foreshadow this.  I'm trying to just

15   maybe take breaks at the top of the hour --

16        Q.    You're the boss.

17        A.    -- not at the top of the hour in the

18   thing, but in terms of how many hours we've been

19   online.  So we're approaching 1 hour, 58 minutes,

20   and we've stopped --

21        Q.    Just so I know, you -- we're about to

22   hit the hour mark?



```
 1          A.      You're about to, yes.

 2                  MR. BRENNER:  Okay.  Let's take a

 3          break now because I'm changing topics.

 4                  THE WITNESS:  Okay.  That's what I

 5          figured.

 6                  MR. BRENNER:  Okay.  All right.

 7                  THE WITNESS:  Five minutes?

 8                  MR. BRENNER:  Let's take seven.

 9                  THE WITNESS:  Seven.  Okay.

10                          -   -   -

11                  (Whereupon, a recess was taken from

12                   4:40 p.m. EST to 4:49 p.m. EST.)

13                          -   -   -

14     BY MR. BRENNER:

15          Q.      Back on the record.

16                  Dr. Eggington, when we had taken a

17     break, I had asked you a question but you didn't

18     have an opportunity to answer because we broke.  So

19     the question I asked you is, What is an idiolect?

20          A.      Okay.  An idiolect -- so you begin

21     with -- with dialect is -- is a group of similar

22     linguistic features that are shared by a community.
```



Page 148

```
 1    You can make that even more narrow and say a

 2    familylect is a group of features, linguistic

 3    features, that are shared by a family.

 4              And then this may sound absurd, but,

 5    essentially, an idiolect is a group of linguistic

 6    features that are -- you can't use the word

 7    "shared" by an individual but are basically native

 8    to that individual.  And I want to stress here that

 9    the whole theory of idiolect is -- is still sort of

10    hanging out there.

11              As I say in my report, you know, we are

12    very adept at writing in different styles, and so

13    this notion that we have some linguistic markers

14    that stick with us across time, across space,

15    across genre, across people who -- whoever we're

16    talking to, across topic, et cetera -- it's still

17    out there, whether that exists.

18    Q.    Okay.  Let me just see if I can break

19    that down a little bit.

20              Give me an example of a dialect.

21    A.    Well, I'm speaking with an Australian

22    dialect right now.  You can probably distinguish
```



1      some phonological elements that are different.

2      There are some vocabulary differences.  I refer to

3      the trunk of a car as a "boot," for example.  So

4      that would be, you know, a group of linguistic

5      features shared by regional -- commonly seem to be

6      shared by a regional group of folks.

7          Q.     Okay.  And then the next classification

8      I'll say down, but narrower, you called it a

9      "familylect"?

10         A.     Yeah.  You can also, like, you know --

11     you can do all sorts of categorizations.  Okay?

12     But I just pulled that one out, a familylect, but

13     usually it's vocabulary items, expressions,

14     et cetera, that are sort of part of the ingroup

15     within a family.

16         Q.     Okay.  And are you using the word

17     "family" just like in a generic sense, like -- like

18     my family, the Brenner family?

19         A.     Yeah.

20         Q.     Okay.  And then as we get -- and I

21     understand that you're saying there's other

22     gradations along the way, but is the -- is the most



Page 150

1    narrow, because it's down to one individual, the

2    idiolect?

3        A.    Correct.

4        Q.    Okay.  And just to try to understand

5    what you were -- where you were -- when you were

6    saying the theory of the idiolect is out there, you

7    agree that -- well, do you agree that each

8    individual has their own idiolect?

9        A.    I don't agree with that.  I think the

10   jury is still out -- wrong metaphor there.  But

11   essentially -- as much as I think we can say is

12   that there may be some features that -- for

13   example, when I teach idiolect in class, for some

14   unknown reason, you know, when somebody is crazy

15   and we've got the word they've gone "berserk,"

16   right --

17       Q.    Yeah.

18       A.    -- for some reason, I stress "berserk."

19   So I put stress on the first syllable.  It does not

20   seem to be a dialect feature; it just seems to be

21   something that -- that I use.

22            So I'm aware of it now, and so I



1       basically avoid using that term because my wife

2       will laugh at me; but, essentially, that could be

3       something that sticks with me as a phonological

4       feature that for some reason I picked up and that

5       is -- there may be lots and lots of other people

6       who use it in -- with a stress on the first

7       syllable but not that I'm aware of --

8              Q.      Okay.

9              A.      -- and so that becomes sort of a marker

10      of -- of my particular speech behavior.

11             Q.      So -- and phonological means it's

12      speech, right?

13             A.      Sound.

14             Q.      Sound.

15                     Okay.

16             A.      Yeah.

17             Q.      Okay.  Do -- do idiolects also exist in

18      the way people write?

19             A.      I can't say definitively yes, because

20      we can switch very easily between registers.  So we

21      write something -- like, if I'm writing a text

22      message versus writing an e-mail, versus writing a



Page 152

```
 1    business e-mail, versus writing a memo, an office

 2    memo -- across the whole spectrum of what we call

 3    "registers" in language, we seem to be very adept

 4    in writing to adjusting our style for our audience,

 5    for the purpose of the communication and other

 6    variables that go in there.  We seem to do quite

 7    well at doing that.

 8         Q.    Right.

 9               So you used the word "register," which

10    is not -- not necessarily the common word, so let

11    me make sure I understand.

12         A.    Yeah.

13         Q.    People may write differently, depending

14    on the format or the audience they're writing to,

15    correct?

16         A.    And the topic -- the topic, the

17    relationship between the people they're

18    communicating with, the mode of discourse -- you

19    know, spoken, written, e-mail, text, et cetera --

20         Q.    Right.  So --

21         A.    -- so you've got a myriad of

22    interlacing variables that seem to influence our
```



Page 153

1    linguistic output.

2         Q.    Right.  So let me see if I can dumb it

3    down a little bit for myself.

4              So I don't mean to pry, but you did

5    have on your -- your CV that -- that you have

6    children.

7              You may write differently in an

8    academic journal than you would if you're texting

9    your child, for example?

10        A.    Yeah.  Two of my children have got

11   Ph.D.s, and the other one has a Master's degree, so

12   we're all pretty adept at writing in the academic

13   code, but I should imagine if I were to write to my

14   children in the academic -- I'm actually

15   copublished with one of them, but if I were to

16   write in the academic code to them, they would --

17   they would raise -- that would raise eyebrows.

18        Q.    Right.  Still -- no matter how smart

19   they are, you're still their dad.

20        A.    Correct.

21        Q.    And so when -- when -- you use

22   "register" as a term to connote all the



Page 154

```
1    different -- well, do you use it to connote

2    different mediums of writing?

3              What do you use "register" for?

4    A.      "Register" is a broad term.  This

5    depends on which mode of -- of linguistics sort of

6    you're -- you're going to follow, but I generally

7    teach what's called "Halliday and systemics," which

8    basically says that register is what is produced --

9    what is influenced by the language that's

10   influenced by the topic of discourse, the mode of

11   discourse and the relationship between the

12   participants.  So, basically, you've got a ton of

13   bubbles there, interlocking bubbles -- that's a

14   wrong metaphor, but defining all sorts of

15   registers.

16             We can talk -- in broad terms, we can

17   talk about the academic register, the -- the

18   informal register, the formal register, the legal

19   register and so forth.

20   Q.      Okay.  Now, when we were talking

21   earlier about authorial attribution and Juola's --

22   is it a computer program that he uses, that JGAAP?
```



Page 155

1           A.     Yes.  Yes.

2           Q.     Okay.  How does that -- how does that

3      computer program account for the different

4      registers?

5           A.     Yeah, and see, that's -- that's the

6      issue with this whole notion of the idiolect,

7      because some of us who are skeptical of the notion

8      of idiolect would say that you sort of need to --

9      need to hold register constant so that if you're

10     comparing -- even within relationships with people,

11     so if you're comparing mode to mode, it's --

12     it's -- some of us would say it's difficult to

13     compare academic register to informal e-mail

14     register or even text register, of course.

15               And so if I were doing something -- if

16     I were involved in a JGAAP type of program, I will

17     want to ensure that registers are being held

18     constant.

19          Q.     In this case, the K and the Q documents

20     that were reviewed by Dr. Leonard and cited in his

21     report were almost exclusively e-mails, correct?

22          A.     Correct.



Page 156

1        Q.      On a general sense -- on a broad sense,

2    that is some effort to -- to adjust for register,

3    meaning it's e-mails versus e-mails, right?

4               MS. DAGLEY:  Object to form.

5    BY MR. BRENNER:

6        Q.      You can answer.

7        A.      At -- at the broad level, yes, but at

8    the specific level, you've got some e-mails where

9    you've got a friendship that's been established and

10   so the relationship between the participants is

11   different than some e-mails where you've got a

12   business type of relationship, you've got different

13   rhetorical goals going on, et cetera.

14              So I find -- and I think most people

15   find this -- that I -- I have a persona -- I have

16   an academic persona, for example, I have a teaching

17   persona, and I suspect what happens at the deep

18   psycholinguistic level is that our personas change

19   according to the context and so does the

20   linguistics.

21              If -- if you'll forgive me, I'll give a

22   demonstration of that.



Page 157

1          Q.      Sure.

2          A.      A number of years ago -- we go back to

3      Australia often -- a number of years ago, I was

4      asked in Australia to talk to a group of young

5      people about why we should go to university.

6      And -- and my wife was there, and she sort of was

7      sitting in the front seat somewhat with a bemused

8      look on her face because she noticed that -- okay.

9      I have an Australian-American accent, but when I go

10     back to Australia, the Australianisms come out

11     very -- very much; I become far more Australian,

12     right?  So I shift.

13             But when I stood up to lecture to this

14     group of young people and put myself into the

15     academic lecture mode, she laughed -- my wife

16     noticed that my American persona -- at least

17     American-Australian persona came out.  And so my

18     language behavior changed because I was somehow

19     more comfortable in talking as an Australian

20     American than talking as an Australian when I

21     lecture.

22             So that's an example of how our



Page 158

```
1    idiolect can change based upon who we're talking to

2    and what role we're playing and the topic under

3    discourse, et cetera.

4         Q.    So as I understand that, ideally, if

5    someone was trying to study your idiolect and

6    compare -- make an authorial attribution of two

7    different -- a few different statements made by

8    you, they would want to make sure that the -- the

9    medium or the registry is as constant as possible?

10        A.    Yeah, you want to control for these

11   conflicting -- or variables that may mess up the

12   data -- mess up the results.

13        Q.    Right.

14              So explain to me, then, how the Juola

15   computer algorithm accounts for that.  Or does it

16   not?

17        A.    I think it accounts for it in the

18   selection of the texts that go into the algorithm,

19   so that I, as a researcher, would have to --

20   depending upon how much weight I give to

21   variability between registers, I, as a researcher,

22   would have to say, Okay, this is going into the
```



Page 159

1    system, whereas this isn't going into the system

2    because it's outside of the register.

3                So I would have a difficulty, for

4    example, putting in -- you know, if there were an

5    authorial attribution case and I was doing JGAAP, I

6    would not put in -- I would not ask the program to

7    compare text messages versus academic discourse.  I

8    mean, if all the known were text messages and all

9    the unknown or the questions were academic

10   discourse, then you're basically biasing the

11   results, it seems to be.

12               Okay.  I've used an extreme example,

13   but that's -- that's the point I'm trying to make.

14        Q.    No, I think it's a great example.

15   Because in the example you just gave, there would

16   be a bias to find that the Qs were not the same

17   author as the Ks because they're being written in a

18   different -- in a different persona or a different

19   medium.

20        A.    Correct.

21        Q.    Okay.  By the same token, if you could

22   control for medium, then the presence of



Page 160

1    similarities in the idiolects would be more

2    powerful?

3         A.    Yes.

4         Q.    Okay.

5         A.    I mean, you've got to control for all

6    sorts of other variables, but if you could -- if

7    you could control those things, then you can come

8    up with, I think, a more reliable and valid result.

9         Q.    Okay.  You need to control for a bunch

10   of other variables, meaning a bunch of other types

11   of register variables?

12        A.    Correct.

13        Q.    Okay.  And, in fairness, you could

14   probably -- that list could be endless, and if you

15   want to always critique the methodology, you could

16   say, Well, this one was to a business partner that

17   was local, but this one is to a business partner

18   that's out of state, and that's a different

19   register, so I'm not going to care -- at some

20   point, you have to accept that the registers are

21   close enough that a comparison can be made,

22   correct?



Page 161

```
 1              MS. DAGLEY:  Object to form.

 2              THE WITNESS:  Yeah, if you're buying

 3         into the whole notion of an idiolect, I

 4         mean, if you're searching for an idiolect,

 5         then at some times -- at some time, you

 6         have to go, All right; well, I need to be

 7         practical here.

 8    BY MR. BRENNER:

 9         Q.    Okay.  Do you not accept that

10    similarities in idiolect could be a factor in

11    making authorial attributions?

12         A.    "Accept" is an interesting word.  I

13    basically have what I would call "scientific

14    skepticism" about it that in some -- as I used in

15    my example of the word "berserk," in some

16    instances, yes; in other instances, no.  So it's

17    not a universal.

18         Q.    Right.  But, for example, what Juola is

19    doing is using a large set of data and trying to

20    find similar or dissimilar uses of established

21    linguistic markers between sets of data, correct?

22         A.    Yes.  Yes.
```



Page 162

1        Q.     And is -- is that -- strike that.

2               In this case, did you -- we talked

3     about it before, but I want to drill down a little

4     bit.  You saw that one of the things or one of the

5     groups of documents that Dr. Leonard reviewed but,

6     ultimately, did not consider in his opinion were a

7     few hundred blog posts from Dr. Wright.

8               Do you recall that?

9        A.     Yes.

10       Q.     I think you said you read some, you

11    wouldn't commit -- you don't know if you read them

12    all, but you read enough of them to get a flavor

13    for what they were, right?

14              MS. DAGLEY:  Object to the

15          characterization of -- of his testimony.

16    BY MR. BRENNER:

17       Q.     Okay.  Did I characterize that

18    correctly?

19       A.     I can't remember saying that.  I think

20    what I said -- now, are we referring to the

21    documents that were listed on the -- on the Excel

22    spreadsheet?



Page 163

```
 1        Q.      Right.  Remember in Dr. Leonard's

 2   deposition, there was a spreadsheet -- I want to

 3   say it was in the low 300s of entries and the

 4   first -- I don't know -- 300 or so were all blog

 5   posts from a particular -- I think it's from

 6   Medium, but it's a particular -- a particular

 7   Internet blog.

 8                Do you remember that?

 9        A.      Yeah; but I need to say here that as

10   far as I'm aware, that the existence of that

11   spreadsheet came to my knowledge after the report

12   was -- after or near the end of where that report

13   was submitted.

14        Q.      Right.  I -- and forgive me.  I was

15   not -- I'm not -- I'm not insinuating that you

16   should have read it earlier or you should know --

17   that's not what I'm insinuating at all.

18                So let me back up.

19        A.      The point I'm trying to make is that,

20   basically, I was responding to the documents -- my

21   goal was to basically evaluate the Leonard report,

22   and I'm responding to the documents that Leonard
```



Page 164

1    analyzed.

2         Q.    Okay.  Here's my question -- and I'll

3    just cut to the chase -- is that -- do you recall

4    in his deposition, Dr. Leonard -- was Dr. Leonard

5    asked why he did not consider those Internet

6    postings in his opinion?

7              MS. DAGLEY:  Object to form.

8              THE WITNESS:  I have vague memories

9         of that.  So I can't offer any response to

10        that.

11   BY MR. BRENNER:

12        Q.    Okay.  Okay.

13             Okay.  And, frankly, I'm not sure I

14   remember that question either.  So that's why I was

15   asking.

16             So let me -- let me ask you this:  If

17   you were to assume that the reason Dr. Leonard did

18   not -- did not consider those in his case set docs

19   was because he -- he expected that the style of

20   that writing would either be a different style

21   and/or it would be edited by others -- those 300

22   blog posts -- I want you to assume that that's his



Page 165

1      reason.

2              Okay?

3      A.      All right.

4      Q.      Okay.  That would be -- that would be

5      something that you would agree with, that this

6      would be a great point of trying to compare things

7      from different registers, correct?

8              MS. DAGLEY:  Object to form.

9              THE WITNESS:  If it can be clearly

10             established that -- that that assumption is

11             valid, right?  Then I would -- I would

12             agree with that.

13     BY MR. BRENNER:

14     Q.      Okay.  Meaning established that either

15     it's a different style of writing or it may have

16     been edited by others, if that were true --

17     A.      You have to be --

18     Q.      Let me finish.

19     A.      -- you have to be careful --

20     Q.      But let me finish --

21     A.      -- you have to be careful as to who's

22     making that call.  You know, is this call being



1    made by Dr. Leonard or is this call being made by

2    some other source, some more -- some -- sorry, not

3    more -- but some objective source.

4         Q.    Okay.  I'm not asking you to agree with

5    the call.  I'm not asking you to accept the call.

6    I'm asking you, If that were the case, meaning that

7    the -- the assumption was made that those Internet

8    postings were either written -- written in a

9    different register and/or were edited by others --

10   those would be appropriate reasons not to consider

11   them when comparing them to Q documents that are

12   e-mails?

13        A.    Yes, under the assumption.

14        Q.    Okay.  Good.

15              You -- one of the distinctions you made

16   that could cause registers to be different, you

17   said that in your review of the -- the documents in

18   this case, meaning the Wright -- I'm going to call

19   them "the Wright e-mails."

20              Okay?

21        A.    Right.

22        Q.    When you reviewed the Wright e-mails,



1    you noticed that, for example, they were -- they

2    were written to different people?

3         A.    Correct.

4         Q.    Do you know who those e-mails were

5    written to?

6         A.    No, I don't know them personally.  I

7    just know that there are names there.

8         Q.    There were -- there were e-mails

9    written to Dave Kleiman, right?

10        A.    Right.

11        Q.    Okay.  When you're considering the

12   register of the Craig Wright/Dave Kleiman e-mails,

13   who did you assume Dave Kleiman was?

14             MS. DAGLEY:  Object to form.

15             THE WITNESS:  In the content of --

16        context of what was written in the

17        articles, I mean, there's -- I'm not -- not

18        articles -- the e-mails, as I read through

19        all of the e-mails, it became -- it emerged

20        that Dave Kleiman was a friend of

21        Craig Wright, that they developed an

22        acquaintance that developed into a



Page 168

1          friendship.  And so that's coming through

2          the documents.

3     BY MR. BRENNER:

4          Q.     Okay.  So when you're -- when you're

5     considering register -- a register analysis, the

6     Craig Wright to Dave Kleiman would go into a --

7     what you would expect in a friend-to-friend

8     communication?

9          A.     Friend-to-friend, but you can see -- I

10    think you can see evolving friendship as well, you

11    know, an initial -- an initial way you would define

12    the relationship as colleagues but then evolving

13    into friendship.

14         Q.     Okay.  Starting off as colleagues,

15    evolving into a friendship?

16         A.     Yes.

17         Q.     Okay.  And the reason I'm asking you

18    this is because I'm trying to understand how you

19    assess the register differences or similarities

20    between the Ks and the Qs.

21               You know where I'm going, right?

22         A.     Yes.



Page 169

```
1          Q.     Who else do you recall, in either the

2    Ks or the Qs, that the e-mails from Craig Wright

3    were to?

4          A.     There's Craig Wright to Ira, but other

5    than that, it's just a bunch of other names that I

6    have no -- no recollection of.

7          Q.     Well -- okay.  First of all, who is

8    Ira, in your understanding?

9          A.     It's my understanding that it's

10   Craig -- sorry -- it's Dave Kleiman's brother.

11         Q.     Okay.  So you're correct.

12                Ira Kleiman is -- is -- or was -- he

13   was Dave Kleiman's brother when Dave was still

14   alive.

15                Ira Kleiman also is -- just so you

16   know, is the personal representative of Dave's

17   estate, and in that capacity, he's the Plaintiff in

18   the lawsuit.

19                All right?

20         A.     Right.

21         Q.     Here's what I'm trying to understand.

22                In order for you to make a -- an
```



Page 170

1    analysis one way or the other regarding the

2    similarities or dissimilarities of the register,

3    you need to know just not the name of the person

4    that's the recipient; you need to know their

5    affiliation or relationship with Dr. Wright,

6    correct?

7         A.    Are you asking me whether -- when you

8    say "you," are you saying "you" as me or "you" as

9    the general field of people doing authorial

10   attribution?

11        Q.    "You," as you.

12        A.    I would consider that as -- as an item

13   that needs to be factored into any conclusion.

14        Q.    Okay.  And other than Dave Kleiman, who

15   you told us what you understood his relationship to

16   be, what do you understand Ira's relationship to be

17   with Craig?

18        A.    That's speculative.  I just don't know.

19        Q.    Okay.  You didn't form an opinion one

20   way or the other?

21        A.    No.

22        Q.    Okay.  Do you know any -- the



```
 1     relationships of any of the other people that were

 2     recipients of the Craig e-mails that are in the K

 3     and Q set?

 4          A.     Not definitively.

 5          Q.     Well, generally?

 6          A.     They would be guesses.

 7          Q.     Okay.  So nothing more than

 8     speculation?

 9          A.     Correct.

10          Q.     Okay.  So the one you seem to

11     understand the most of the relationship about --

12     and, again, you're operating off a limited data

13     set -- is the Craig and -- the

14     Craig-to-Dave e-mails, correct?

15          A.     Yes.  And that's built upon content

16     within the e-mails.

17          Q.     Okay.  And that's fair.  You can -- by

18     reading the e-mails, you can -- you can evaluate

19     what -- somewhat what the relationship is?

20          A.     Correct.

21          Q.     Did you make an effort to analyze as a

22     subset of the -- the K and Q e-mails here just the
```



Page 172

1      e-mails from Craig to Dave?

2          A.     No, I didn't, and I think that's

3      because Leonard didn't either.  I may be wrong with

4      that, but it wasn't in Leonard's report.

5          Q.     Would you agree that if you're trying

6      to identify similarities in idiolect, that e-mails

7      that compare Craig to Dave among the two sets would

8      be important to the analysis?

9              MS. DAGLEY:  Object to form.

10             THE WITNESS:  Yeah, based upon my

11         knowledge of what we talked about with the

12         factors that influence communication style,

13         I would say yes.

14     BY MR. BRENNER:

15         Q.     Okay.  You used the terms earlier --

16     you originally used "investigative" versus

17     "evidentiary," and then a little later in the

18     deposition, you said "evidentiary" means -- also

19     means "scientific"?

20         A.     Yeah.

21         Q.     Okay.  So just can you -- can you --

22     I'm just not sure I'm understanding what the



Page 173

1    difference is between -- in your mind, between

2    "investigative" and -- well, strike that.

3              Are you using "evidentiary" and

4    "scientific" synonymously for the purpose of

5    comparing to "investigative"?

6         A.    Yes.  I'm reluctant to use

7    "evidentiary" because that's sort of outside of

8    my -- and -- and that's why -- it's in my head, but

9    I'm reluctant to use it, even though it comes out

10   sometimes, because evidentiary standards are legal

11   standards and I'm not a lawyer --

12        Q.    Right.

13        A.    -- so -- so I prefer to sit with the

14   notion of scientific -- rigid scientific standards.

15        Q.    Right.  And I appreciate that.

16             And it's a good clarification, because

17   I am a lawyer, so when I hear "evidentiary," I hear

18   law.  And you were using it in a different -- a

19   different context, right?

20        A.    Essentially, standards that are a lot

21   higher that have to meet certain criteria.

22        Q.    The scientific standards are higher



Page 174

1    than the investigative standards?

2         A.    So let me talk about scientific

3    standards with respect to what we're talking about

4    here.  We're probably talking about what threshold

5    of probability do we accept a result and do we say

6    that this is a significant result in the sense that

7    this is a result that we can -- excuse the --

8    because we're talking about probability, but we can

9    bet some money on, right?

10             This -- I talk about this when -- I --

11   I refer to this when I talk about these things in

12   my classes.

13        Q.    Okay.

14        A.    So -- so an evidentiary standard is --

15   is a standard where we're prepared to -- to bet the

16   farm, so to speak.  Whereas an investigative

17   standard is a clue, but we're not going to, you

18   know, put everything we've got on an investigative

19   standard, because it needs to be corroborated with

20   other evidence, and that's how the -- the

21   investigative part of forensic science works.

22        Q.    Okay.  Can you quantify for me any



Page 175

1    better than "bet the farm"?

2        A.    You have probability, and so you have

3    probability .05, .001, et cetera.  I would say, in

4    determining scientific significance, I'm going to

5    go under a surgery and the doctor says -- the

6    surgeon says, You've got five chances out of 100

7    versus -- of surviving versus 1 chance out of

8    10,000 of -- of dying, right?  So I'm going to

9    basically go with the standard.  And so when we do

10   significance levels, we go .0001 is -- has high

11   significance and so meets the sort of classifiable

12   notion of -- of significance.

13       Q.    Are you saying that the

14   scientific -- the threshold to be -- to meet

15   scientific standards is essentially 99.999 percent

16   probability?

17       A.    Often, when you go to the linguistic

18   journals that do quantifiable research, you get

19   standards of -- of 0.01, 0.001, 0.0001, and if you

20   can show something has a probability of 0.0001,

21   then that is a very strong -- we use the expression

22   "strongly significant" finding.



Page 176

1          Q.      Right.

2                  But I'm just trying to see -- I

3     understand that that would be strongly significant

4     and scientific.  But I'm trying to find out where's

5     the threshold, meaning is anything below 99 percent

6     not scientifically sound?

7          A.      Usually, 0.05 so -- is -- is, in social

8     science research, a cutoff point.

9          Q.      So when you're talking about, for

10    example, in your own -- you mentioned earlier you

11    had done some work through an investigate standard

12    and some to an evidentiary, which I think you've

13    now clarified it means scientific, not evidentiary

14    in the law, until you reach the 99- -- I guess it's

15    -.95 percent threshold, you have not reached

16    scientific validity?

17         A.      Using the word "scientific validity"

18    within social science research.

19         Q.      And that's what this is -- linguistics

20    research is social science research?

21         A.      Yes.

22         Q.      Okay.  So now I'm on Paragraph 9.



Page 177

1                    Am I still sharing the screen with you?

2         A.     Yes.

3         Q.     Okay.  I forget sometimes.

4                    I'm on Paragraph 9.  And that's your --

5    one of your opinions.  You do have opinions later

6    in the report, but I want to focus on this one.

7                    You say, After conducting a study that

8    you had outlined earlier in the report in detail in

9    the following paragraphs, you've determined that

10   the research methods Dr. Leonard uses in coming to

11   his opinion fail essential reliability and validity

12   tests and cannot be considered, quote, scientific.

13                   We've now -- is that the way you're

14   using the word "scientific," the way we just

15   described it?

16                   MS. DAGLEY:  Object to form.

17                   THE WITNESS:  If somebody finds --

18         for example, referring to Dr. Leonard's

19         report, if somebody finds one example of

20         known -- now I'm just pulling these figures

21         out, but they tend to be consistent with

22         the report -- one example of known and two



Page 178

1              examples of unknown of the same linking

2              feature, that would fail any scientific

3              standard, right?  And so that's what I mean

4              in that sense.

5         BY MR. BRENNER:

6              Q.     But here you're a little broader than

7         that.  And we'll get to the individual linking

8         features, but here you describe the overall

9         research methods as not being scientific.  I want

10        to know what that means.

11             A.     Well, when you combine all the linking

12        features that lead to his conclusion in his report,

13        then that's what it means.

14             Q.     What -- what -- even though he doesn't

15        use "probability," you've defined scientific terms

16        or probability.

17                    So what probability do you assess to

18        the -- or assign to the conclusions reached by

19        Dr. Leonard?

20             A.     I would have to do a statistical

21        analysis to come up with that, you know, basically

22        quantifying what was -- quantifying this to that



Page 179

1    and looking at all the variables that go into

2    constructing a statistical analysis to come up with

3    a probability level, but I should imagine it would

4    follow scientific standards.

5         Q.    Right.  That's my point, is that

6    scientific standards are pretty darn high the way

7    you evaluate them; it's 99 -- over 99.9 percent.

8              So I need you to tell me, without

9    doing -- without getting into a single number, but

10   where are you assessing the probability that

11   Dr. Leonard's conclusion that Hypothesis 1 is

12   correct, between 0 and scientific probability?

13              Where does it land?

14              MS. DAGLEY:  Object to form.

15              THE WITNESS:  It's pretty close to

16        0.

17   BY MR. BRENNER:

18        Q.    Okay.  So it wouldn't even reach

19   investigative standards, correct?

20        A.    Yeah, it would be hard-pressed -- yeah,

21   it would be sort of, you know, back-in-the-mind

22   clue, but we're not going to consider it until --



Page 180

1    until there's a lot more conclusive evidence.

2         Q.    I don't understand that.

3              What do you mean, "We're not going to

4    consider it"?

5              I don't understand what you're saying.

6         A.    So if I've got one known feature -- one

7    known linguistic feature and two questions --

8    linguistic features and they're the same feature,

9    then -- then the likelihood of them being a valid

10   and reliable linguistic feature is miniscule.

11        Q.    Okay.  But in fairness to

12   Dr. Leonard -- and I would hope you would try to be

13   fair -- you know that he didn't reach his

14   conclusions based on any one of the linking

15   features, right?

16             That's -- that's a false -- that's a

17   strawman argument, with all due respect, sir.  Do

18   you agree with that?

19             MS. DAGLEY:  Object to form.

20             THE WITNESS:  There are only 11, 12

21        -- is it 12 in this case? -- 12 features

22        where the majority of those 12 features



Page 181

```
 1          have that same -- the same level of --

 2          without evoking this, but I can't think of

 3          any other way of explaining it -- the same

 4          level of probability, then -- and then he's

 5          disregarding features that point in the

 6          other direction that -- that support the

 7          other two hypotheses, then I think that

 8          this is a significant red flag to that

 9          particular method that he's using.

10   BY MR. BRENNER:

11          Q.     Okay.  Let me ask my question again.

12                 You understand that Dr. Leonard's

13   opinion is not based on any single linking feature.

14                 You do understand that, right?

15          A.     Correct.

16          Q.     Okay.

17          A.     He's -- he mentions the word, I think,

18   in his deposition.  I don't know whether he

19   mentions it in the report, but he mentions the word

20   "pattern" -- there's a pattern here.  But as you

21   think about what pattern is, a pattern has to

22   indicate -- I think I mentioned in the report, you
```



1    know, serving in tennis, if I serve one ace, is

2    there a pattern, has a pattern been established?

3    Let's say one ace in -- in a -- in a match,

4    right --

5         Q.     Yes, sir.

6         A.     -- or one ace in -- in a game.  Okay?

7    If I serve one ace, that's not a pattern.

8              Does two aces signify a pattern?

9              It seems to me you're not going to get

10   a pattern when you're dealing with pro tennis until

11   you get up to maybe, in a match, let's say 20 aces.

12             So you have to -- you have to give

13   credibility to the size of the pattern.  And these

14   are individual elements that construct the

15   broader -- and so if the individual element is low

16   in terms -- you know, one, two instances -- one or

17   two linking features and that's consistent across

18   the 11 or 12 broader linguistic features, then I

19   think what you're establishing is very weak.

20        Q.    Okay.  We'll talk about whether the

21   conglomeration or the pattern of multiple linking

22   features changes anything as far as your opinion,



Page 183

```
1      but you agree that he, in fact, is relying on

2      the -- all of the linking features together as

3      opposed to any single one of them, correct?

4           A.     Correct.  But at the same time, he's

5      disregarding and dismissing other features that

6      aren't linking --

7           Q.     Okay.

8           A.     -- that are pointing to different

9      directions.

10          Q.     So let's use your aces example for a

11     second.  Okay?

12                 If you're in a tennis match and you

13     serve an ace, that probably doesn't tell us a whole

14     lot of whether you're going to serve an ace on the

15     next one, right?

16          A.     Correct.

17          Q.     Okay.  So now we use the same thing.

18     You get up there again and you serve a second ace,

19     right?

20          A.     Correct.

21          Q.     That -- you think the third ace is a

22     little bit more likely than the second ace was?
```



Page 184

1           MS. DAGLEY:  Object to form.

2      BY MR. BRENNER:

3           Q.    Of course it is, right?

4           MS. DAGLEY:  Object to form.

5           THE WITNESS:  Yes.

6      BY MR. BRENNER:

7           Q.    Right?

8           A.    Yes.

9           Q.    Now, you serve three in a row; the

10     likelihood becomes greater the fourth one will be

11     an ace, right?

12          A.    Okay.  Now we're getting into -- into

13     all sorts of issues of probability and et cetera

14     and skill set and everything like that.  But you're

15     setting up a likelihood, yes.

16          MR. BRENNER:  Okay.  Let me just

17          look up something real quick.  Give me one

18          second.

19          (Pause.)

20     BY MR. BRENNER:

21          Q.    Let me share my screen back with you.

22          How do I do that?



Page 185

```
 1                    Okay.  You got it?

 2          A.       Yes.

 3          Q.       Okay.  I'm in Paragraph 12 of your

 4     report --

 5          A.       Um-hum.  Yes.

 6          Q.       -- in this case.

 7                    So I'm focusing on the sentence --

 8     first of all, what is forensic stylometry?

 9          A.       That's the notion -- that's the term

10     that -- that Ainsworth and Juola and some other

11     folks are using for doing big data,

12     computer-assisted big data, of trying to determine

13     authorial attribution.

14          Q.       Okay.  And when you use the word "big

15     data," are you using -- is that -- is the "big"

16     referring to the -- you just used it in your

17     answer.

18          A.       Yeah.  I didn't even know that it was

19     there.

20          Q.       No, it's not -- oh, it is there.  It

21     actually is there.  It's both in your answer and in

22     your report.
```



Page 186

1          A.       I used it before.

2          Q.       When you use the term "big data," is

3     the "big" -- I think of "big data" as being, like,

4     the computer is taking over the world, but are you

5     using "big data" to mean -- what do you use "big

6     data" to mean there?

7          A.       Okay.  Within the field of linguistics

8     in general, lately we've -- in the last maybe 20 --

9     25, 30 years, even as computer power has increased,

10    as ease of computers have increased, we've -- we're

11    essentially just -- just as the rest of the

12    field -- mathematics, statistics, et cetera -- is

13    using the power of computers to process large

14    amounts of data, so we're doing the same sort of

15    thing in linguistics.

16               And we're -- we have a thing called

17    "corpus linguistics," which is basically figuring

18    out how language works through the use of large

19    bodies of data.

20               So you've got corpus linguistics.  And

21    then with respect to forensic linguistics, now you

22    have -- using corpus linguistics to inform legal



Page 187

1    issues and then, with respect to authorial

2    attribution, using large bodies of data to inform

3    us about possible authorship.

4        Q.    Okay.  I'm now going to focus on the

5    sentence that says, In essence.

6        A.    Yes.

7        Q.    I just want you to read it to yourself

8    and explain to me what you mean by "a priori"

9    there.

10        A.    Okay.  So what I mean by that is that

11    when we -- and this is, in some ways, what -- what

12    some of the research that I cited in my report is

13    doing, essentially -- let's say we have large

14    bodies of data.  Let's refer to what Patrick Juola

15    talks about in his article.  So you've got all of

16    the -- or a large collection -- I don't want to say

17    "all" -- but a large collection -- who wrote

18    Harry Potter?

19                Is it J.K. Rowling?

20        Q.    Yes.

21        A.    So you've got a large body of data of

22    J.K. Rowling's novels, right?



Page 188

1          Q.     Yes.

2          A.     And then you've got an unknown novel

3     that -- that some people are suspecting was written

4     as -- by J.K. Rowling but under an alias.  So

5     you've got hundreds of thousands of words.

6     Probably in the J.K. -- in the known, you've got

7     more than a millions -- more than a million words.

8     And so that allows you -- the large bodies of data

9     allows you then to subject that data to some of

10    these style markers, using McMenamin's term.

11              Now, what style markers are you going

12    to look for?  You're going to look for those style

13    markers that have been established in the

14    peer-reviewed literature as issues -- sorry -- as

15    linguistic features that carry from known

16    to -- that can be used to identify unknown

17    writings.  And so these things have been selected

18    before you subject the known and unknown, or

19    questioned, documents.  So that's a priori.

20         Q.     Okay.  So let me make sure I understand

21    it.

22              In the forensic stylometry field,



Page 189

```
 1    what's done is -- well, the markings that you

 2    talked about in the forensic stylometry -- how are

 3    those determined?

 4         A.    By doing other analyses of large data.

 5         Q.    But not the data that's necessarily the

 6    part of your investigative set?

 7         A.    No.

 8         Q.    Correct?

 9         A.    Correct.

10         Q.    Okay.  So you take a large -- and you

11    take a large set of data and you come up with

12    certain stylistic markings that folks have studied

13    and peer-reviewed literatures have determined are

14    stylistic markings that are reliable and valid for

15    purposes of authorial attribution?

16              MS. DAGLEY:  Object to form.

17    BY MR. BRENNER:

18         Q.    Is that right?

19         A.    Correct.  Yes.

20         Q.    Okay.  And then -- only after you've

21    done that, then you run your investigative set

22    against those markings, and the results are what
```



1      the results are, correct?

2            A.      Correct.

3            Q.      Okay.  What -- the key difference -- so

4      the difference -- there's no problem with using

5      linguistic markings to do authorial attribution as

6      that -- that principle is okay with you, right?

7                    MS. DAGLEY:  Object to form.

8                    THE WITNESS:  As much as it holds.

9            I mean, the jury is still out.  This comes

10           back to my skepticism -- and I think, you

11           know, as -- within scientific parameters,

12           skepticism is very healthy -- this comes

13           back to my skepticism of -- of the validity

14           of the idiolect and the notion of the

15           idiolect.

16                   So in a sense, this is why you need

17           large bodies of data.  And getting back to

18           our probability, if it can be shown that a

19           particular linguistic feature reaches high

20           levels of scientific reliability and

21           validity, then that shows, in this

22           particular instance, the existence of an



Page 191

1          idiolect.

2     BY MR. BRENNER:

3          Q.     This forensic stylometry and the Juola

4     method is the only one you identified to me as --

5     that you considered valid to do authorial

6     attribution.

7                 Are you now telling me that there's no

8     way to do authorial attribution?

9          A.     No, I didn't say that.

10          Q.     Okay.  So can I -- can I -- can I still

11     rely on your earlier testimony that this is the

12     method that you would -- you would subscribe to as

13     being valid to do authorial attribution?

14          A.     I can't remember what I said earlier,

15     so I don't want to basically say that -- I don't

16     want to allow you to interpret my words.  But,

17     essentially, I would give that far more credibility

18     than the method that -- that Leonard is using.

19          Q.     Okay.  But as far as you know, it's the

20     best method we have, right?

21                 MS. DAGLEY:  Object to form.

22                 THE WITNESS:  Forensic stylometry --



Page 192

1          and this is something that comes out in the

2          Ainsworth-Juola article.  As all scientific

3          proceedings are and should be doing,

4          forensic stylometry is evolving as more and

5          more data comes in, as we experiment more;

6          but right now, it appears to be -- to be

7          one, if not -- one of the best out there.

8               I can't say the best, because I

9          haven't -- someone -- someone in Russia may

10          be coming up with -- with a far better

11          system.  But I think it -- it's -- it has

12          proven worth.

13     BY MR. BRENNER:

14          Q.    Okay.  Now, the -- why I focused on

15     "a priori" is that -- that's a key difference

16     between what Juola and that field is doing and what

17     Leonard did here, correct?

18          A.    Correct.

19          Q.    Leonard did not use a -- a

20     preestablished set of markings, right?

21          A.    No.

22          Q.    My question is bad.  When I end with



Page 193

1    "right" and you say "no," I've got to ask it again.

2              Am I correct that Leonard did not use a

3    established set of linguistic markings?

4    A.    Correct.

5    Q.    What he did was -- first of all, he was

6    asked in his deposition if he had run the Q set or

7    the K set -- excuse me.

8              He was asked at his deposition whether

9    he had reviewed the Q set or the K set first.

10             Do you recall that?

11   A.    Yes.

12   Q.    And do you recall what his answer was?

13   A.    I think he said he ran -- he looked at

14   the Q -- he went from the Q to the K.

15   Q.    Okay.  Is that significant to you?

16   A.    I think it is, yes.

17   Q.    Why?

18   A.    Because what you're doing -- and when

19   he -- when he goes through the Q set, what the --

20   and this comes up in his report, where he basically

21   says such and such is a nonstandard usage, right?

22   So I think what they're doing is looking at the



Page 194

1    data set in terms of standard/nonstandard

2    linguistic features and -- and when they see a

3    nonstandard linguistic feature, they then look for

4    that linguistic feature in the K documents.

5        Q.    Okay.  So your understanding of --

6    of -- of his -- his methodology here is he first

7    started by reviewing the Q documents; at least

8    that's what he testified to, correct?

9        A.    Yeah.  And it's interesting that he --

10   I mean, one of the things that -- that caused me to

11   scratch my head as I read his report is that he

12   doesn't detail his methodology in his report.

13   Like, he -- he doesn't explain what he did.  And it

14   seems to me, when you write a scientific report,

15   you explain your methodology so that other people

16   can replicate it.

17              It doesn't -- it doesn't come across in

18   the report.  I may -- I may have missed it, but it

19   doesn't come across in that report.

20       Q.    Right.  So I'm -- I'm going to grant

21   you that the only way you know Dr. Leonard's

22   methodology in this case is either what he put in



Page 195

1    the report or what he testified to in deposition.

2    That's the only information you have.

3         A.    Yeah.  And I can't remember it being in

4    the report.

5         Q.    Okay.  You do remember him testifying

6    in deposition that he -- that he reviewed the Q set

7    first?

8         A.    Correct.

9         Q.    Okay.  And what is your understanding

10   of how he -- how he arrived at the linking features

11   that are listed in the report?

12             MS. DAGLEY:  Object to form.

13             THE WITNESS:  I think as I just said

14        essentially he looks at -- now, I probably

15        should not be saying anything because it

16        doesn't say it in his report, right?  So

17        I'm nearly conjecturing here based upon

18        what he said in the deposition, but I think

19        he's looking -- and so -- so I probably

20        should be quiet here and, essentially, say

21        what I'm saying now is -- is my best

22        estimate as to what he did.



Page 196

1              And so that's all I can say,

2         essentially, is, as I said before, he looks

3         at the Q, he finds some features in the Qs,

4         he looks at the K and looks for presence

5         and absence of those features in the K.

6         But I qualify that by saying, because this

7         is not explicated in his report, this is

8         conjecture.

9    BY MR. BRENNER:

10        Q.    Okay.  I know we're about three minutes

11   away from a break, so I'm trying to wrap this

12   section up.

13             Would -- would you consider a better

14   methodology if he had reviewed the K set before the

15   Q set?

16             MS. DAGLEY:  Object to form.

17             THE WITNESS:  Now, you understand I

18        don't adhere to this methodology, right?

19   BY MR. BRENNER:

20        Q.    Yes.

21        A.    And so by me saying this, I'm not

22   trying to in any way validate this methodology.



Page 197

1          Q.      Understood.

2          A.      But one of the things we try to do in

3     science, following the scientific method, is -- is

4     you have an experimental hypothesis, and then you

5     have what's called a "null hypothesis."  And the

6     null hypothesis is the opposite of your

7     experimental hypothesis, right?

8                  And so --

9          Q.      Right.

10         A.      -- so good science invests as much in

11    proving the null hypothesis as they've -- as they

12    do in proving the experimental hypothesis.  And so

13    a scientific methodology, it seems, to me, would be

14    to go Q to K and then K to Q.  And in doing K to Q,

15    you are investigating -- you're trying to support

16    the notion -- that's one way, not the only way.

17    It's one way to support the notion that -- the null

18    hypothesis.

19                 You can also support the null

20    hypothesis by going from Q to K, as I did in -- in

21    my response to -- to some of those examples in his

22    linguistic features -- in linking features,



Page 198

1    where -- where the behavior in the Q documents was

2    very different in the K documents, but Leonard

3    disregarded those indicators pointing in -- that

4    support the null hypothesis.

5              So I don't know which method -- so,

6    yeah, I'll just stop there.

7         Q.    Well, just to close it out.  You

8    actually -- you don't know if -- if -- you are not

9    offering an opinion that starting with the K

10   instead of starting with the Q would have improved

11   his methodology?

12        A.    No, I don't.

13             MR. BRENNER:  All right.  Let's take

14        a break.

15             THE WITNESS:  Okay.

16                  -   -   -

17             (Whereupon, a recess was taken from

18              5:48 p.m. EST to 5:57 p.m. EST.)

19                  -   -   -

20   BY MR. BRENNER:

21        Q.    All right.  Dr. Eggington, I have your

22   report still on the screen, or at least I hope I



Page 199

```
 1    do --

 2           A.      Yes.

 3           Q.      -- and I just want to go through the

 4    linguistic features or linking features and

 5    specifically your -- your comments on them in your

 6    report --

 7           A.      All right.

 8           Q.      -- okay?

 9                   So I think -- although I can't confirm

10    for you -- I think the way you ordered these was in

11    the order they were in Dr. Leonard's report; is

12    that right?

13           A.      Correct.

14           Q.      Okay.  So the first linking feature is

15    the "Try" -- the "Try and plus verb," right?

16           A.      Correct.

17           Q.      Okay.  And this -- just so we can both

18    be oriented, this was a feature which Dr. Leonard

19    claimed to have found where Dr. Wright, when he

20    uses "try and plus a verb," he always says "try

21    and" instead of "try to"?

22           A.      Correct.
```



Page 200

1      Q.      All right.  And he noted that -- he

2   noted the -- the "try and" combination in three of

3   the -- of the K documents?

4      A.      Correct.

5      Q.      And he noted them in two of the Q 1s,

6   right?

7      A.      Correct.

8      Q.      Now, he commented that the marker is --

9   one of the reasons the marker is significant is

10   because the prevalence of "try and" or "try to" in

11   Australia -- at least in Dr. Leonard -- it was

12   notable, right?

13      A.      Yes.

14      Q.      By the way, you -- in your review of

15   the documents that Dr. Leonard reviewed, did -- did

16   Dr. Wright ever use "try to"?

17            MS. DAGLEY:  Object to form.

18            THE WITNESS:  Dr. Leonard says he

19      didn't.

20   BY MR. BRENNER:

21      Q.      Okay.  Did you check that?

22      A.      Yes.



Page 201

1          Q.      And did you find any uses of "try to"?

2          A.      No.

3          Q.      Now, you say, To draw any conclusions

4    from such a small data base is not scientifically

5    sound.

6                  Do you see where I am in the paragraph?

7          A.      No, I can't say that.

8          Q.      Okay.  I'm trying to -- let me see if I

9    can highlight it.

10         A.      There it is.  I see it.

11         Q.      Got it?

12         A.      Yep.

13         Q.      When you say it's too small to be

14   scientifically sound, what -- what amount of

15   instances in the K or the Q of "try and" would you

16   have considered scientifically sound?

17         A.      I can't come up with a direct figure,

18   because often this thing, you know -- but getting

19   back to our references or discussion on -- on

20   statistical significance -- and this is why I can't

21   come up with one -- one would have to basically put

22   in some data, probably words-per-million data, and



Page 202

1    develop an equation that says, Okay, we would need

2    this number of -- this number of "try and" versus

3    this number of "try to" to come up with something

4    that suggests that this is a -- a statistically

5    significant marker.

6           Q.    You would agree with me that

7    100 percent of the time in the K documents, when

8    Dr. Wright could've used "try and" or "try to," he

9    used "try and"?

10          MS. DAGLEY:  Object to form.

11          THE WITNESS:  Okay.  What are you

12    saying?  I agree with you that he could

13    have used "try and."

14          I'm trying to get at what you said.

15   BY MR. BRENNER:

16          Q.    I'll rephrase.  I'll rephrase it.

17          Each and every time in the K documents

18   that in the context of his writing, it would've

19   called for either "try and" or "try to," Dr. Wright

20   used "try and"?

21          A.    Correct.

22          MS. DAGLEY:  Object to form.



Page 203

```
 1    BY MR. BRENNER:

 2         Q.     And the same for the Q documents:  Each

 3    and every time in his writing when he had the

 4    choice, in the context of what he was writing, to

 5    use "try and" or "try to," he used "try and,"

 6    correct?

 7              MS. DAGLEY:  Object to form.

 8              THE WITNESS:  Yes, a total of five

 9         choice points.

10    BY MR. BRENNER:

11         Q.     Right.  And your -- and your criticism

12    here is, you would like to see more choice points?

13         A.     Yes --

14         Q.     Right.

15         A.     -- that's one of the criticisms.

16         Q.     Right.  Your criticism is not within

17    the choice points, the -- the percentage use is

18    insignificant -- is not meaningful; it's that you

19    just did not have a big-enough data set to draw

20    scientific conclusions from "try and"?

21         A.     That --

22              MS. DAGLEY:  Object to form.
```



Page 204

1          THE WITNESS:  Sorry.

2          MS. DAGLEY:  You can answer.

3          THE WITNESS:  -- that -- that's one

4     of the criticisms.  The other criticism is

5     that "try and" is -- is very much a feature

6     of lots of Englishes, including American

7     English.

8          I think in this thing, I even say

9     it -- I did a search of the U.S.

10    Supreme Court corpus, and it shows up in

11    the U.S. Supreme Court a number of times in

12    their opinions.  And so it's -- it's a

13    feature, a linguistic feature, shared by a

14    lot of English speakers.  It has

15    historicity in the sense it goes back

16    hundreds of years.  It's got, in a sense,

17    linguistic validity.  And so -- and it's

18    predominantly used, in terms of

19    percentages, in British English.

20         And so one has to consider all of

21    that in saying that this is a linking

22    feature.  And -- and definitely, especially



Page 205

1           on the issue of size and, in some ways, the

2           quasi-standardization of "try and," I can't

3           see how it can be a predictor.

4      BY MR. BRENNER:

5           Q.     What is your understanding of -- well,

6      do you have an understanding of -- of where

7      Dr. Wright was born?

8           A.     My understanding is that he was born in

9      Australia.

10          Q.     And do you have an understanding of how

11     long he lived in Australia?

12          A.     No, I don't.

13          Q.     Do you have an understanding of where

14     he lives now?

15          A.     I think he -- no, I don't.

16          Q.     Okay.  Do you have an understanding of

17     whether he ever lived in the United States?

18          A.     No.

19          Q.     So when you're assessing regional

20     dialects, where do you place Dr. Wright?

21                 MS. DAGLEY:  Object to form.

22                 THE WITNESS:  I'm just responding to



Page 206

1          Leonard's placement of Dr. Wright as an

2          Australian English speaker.

3     BY MR. BRENNER:

4          Q.     Did you accept that for the purposes of

5     critiquing his report?

6          A.     Yes.

7          Q.     Okay.  And, again, when I say that, I'm

8     not asking you to agree that it's accurate.

9                 You didn't -- you didn't do your own

10    research to respond to something else; you just

11    accepted it as true, whether it is or not, correct?

12                MS. DAGLEY:  Object to form.

13                THE WITNESS:  I was responding to

14         the comments made in Dr. Leonard's report,

15         and so I accepted it as being in

16         Dr. Leonard's report.

17    BY MR. BRENNER:

18         Q.     Okay.  What I'm saying is, you don't

19    have knowledge that says that Dr. Leonard's wrong

20    about that, that Dr. Wright is not an Australian

21    English speaker?

22         A.     No.



Page 207

```
 1        Q.      Okay.

 2                So I'm just seeing if there's anything

 3     more in here we need to go over for this linking

 4     feature.

 5                Did you run -- did you attempt to run

 6     "try and" and "try to" through the GloWbE,

 7     G-L-O-W-B-E?

 8        A.      Yeah, the GloWbE corpus?

 9        Q.      Yes.

10                I can scroll down, if you want to look

11     at the report.

12        A.      No, no, it's all right.  I'm just

13     looking at this.  And I did run it through, and I

14     confirmed, as I ran it through, that it has higher

15     frequency, percentage frequency, et cetera, in

16     British English than Australian English.

17        Q.      Let me -- let me just pull one thing --

18     one other thing up.

19                Okay.  What I pulled up here, just so

20     we can toggle back and forth, is -- I pulled up

21     Dr. Leonard's report.

22        A.      Correct.
```



Page 208

1        Q.      So I'm going to go down to -- to his

2     discussion of this linking feature.

3        A.      Okay.

4        Q.      Okay.  There we are.

5                Okay.  Do you have his report in front

6     of you?

7        A.      Yes, I've got -- that's Page 9, right?

8        Q.      It starts on Page 9.  I think it's

9     going to fold into Page 10, too.

10       A.      Yeah, I've got Page 9.

11       Q.      Okay.  Good.

12               So if you go to Page 10 -- let me

13    scroll down or up, depending on what we call it, so

14    you can see it a little better.

15               Okay.  So just so you know, I'm on

16    Page 10 now.  I'll still in the "try and" linking

17    feature.

18       A.      Okay.

19       Q.      First of all -- we covered this --

20    Dr. Leonard says that he understands Dr. Wright's

21    Australian.  Then he said he ran the "try and" and

22    "try to" through the Australian subcorpus of



Page 209

```
 1      GloWbE.

 2              Do you see that?

 3      A.      Correct.

 4              MS. DAGLEY:  Object to form.

 5              I think you said, "he ran."

 6   BY MR. BRENNER:

 7      Q.      Dr. Leonard ran.

 8              MS. DAGLEY:  Right.  It doesn't say

 9      that, right?

10   BY MR. BRENNER:

11      Q.      All right.  Okay.  That's fine.

12              What is GloWbE?

13      A.      GloWbE is corpus of Globe -- Global

14   Web-based English.

15              MR. BRENNER:  And for the benefit of

16      the court reporter, it's capital G, L-O,

17      capital W, small B, capital E.

18   BY MR. BRENNER:

19      Q.      Within GloWbE, are there subcorpuses

20   for various regions and types of dialects?

21      A.      Yes.  Yes, there is.

22      Q.      And there is one for Australian --
```



Page 210

1      there's an Australian subcorpus?

2           A.     Correct.

3           Q.     Do you consider the Australian

4      subcorpus to be a reliable source of information?

5           A.     Yes.

6           Q.     Okay.  In Dr. Leonard's report, it

7      says, If you run "try and" and "try to" through the

8      Australian subcorpus of GloWbE, you find that "try

9      and" is used 29 percent -- or 28.6 percent of the

10     time in that subcorpus and "try to" is used

11     71.4 percent of the time.

12                 Do you see that?

13          A.     Correct.

14          Q.     First of all, did you -- did you

15     attempt to validate those numbers?

16          A.     Yes, I did.

17          Q.     And do you agree with them?

18          A.     Yes.

19          Q.     Okay.  You would agree with me,

20     therefore, that in the Australian subcorpus, "try

21     to" is used about -- oh, two and a half more

22     times -- more often than "try and"?



Page 211

1          A.     Correct.

2          Q.     Now, when you were saying that "try

3    and" is used more frequently -- excuse me -- "try

4    to" is used more frequently in Australia, what --

5    what -- strike that.

6                 Where were you saying that "try and" is

7    used more frequently?

8          A.     In Great Britain; in England.

9          Q.     Okay.  Got it.

10                Did you run that same analysis for

11   American English?

12         A.     Yes.

13         Q.     And what did you find?

14         A.     So you get the analysis across a bar,

15   so you pull up -- when you do a GloWbE search and

16   you type in "try and" in the -- in the search box,

17   if you've got your settings set up correctly, the

18   figures come up for all of 20, I think, right

19   across the bar.  And so if you've looked at one,

20   you've looked at all of them.

21         Q.     When you say across the bar there's 20,

22   is it 20 subcorpuses?



Page 212

```
1        A.      Twenty subcorpuses, yeah.

2        Q.      Okay.  And one of those is Australian?

3        A.      One of them is British; one is

4   American; one is New Zealand; Canadian.  It goes

5   on.

6        Q.      Okay.  And was there any other country

7   where "try and" was used less frequently than

8   Australia?

9        A.      Less frequently?

10       Q.      Yes.

11               If you know.

12       A.      I don't know.  I would have to look at

13  the documents.  But I have to look at the search

14  engine.

15       Q.      Okay.  All right.  Let's go to "setup,"

16  "backup" as a verb.  I'm going to try to toggle

17  back over to your report.

18               This one is the second linking feature

19  that's noted in Dr. Leonard's report, correct?

20       A.      Correct.

21       Q.      And here he points out that Dr. -- that

22  in the -- you know, let's look at what he points
```



Page 213

1    out so we're on the same page.  He points out that

2    in standard English varieties, the verb "set up"

3    and "back up" are spelled in two words.

4                Do you agree with that statement?

5    A.     Yes.

6    Q.     Okay.  He says, Whereas the equivalent

7    nouns are spelled in one word.

8                Do you agree with that statement?

9    A.     Yes.

10   Q.     Then he says he found five occurrences

11   of "setup" or "backup," both of those being one

12   word, used as a verb in the K documents and one in

13   the Q docs.

14               Right?

15   A.     Yes.

16   Q.     And did you attempt to validate or

17   refute that fact -- that factual finding?

18   A.     Yes.

19   Q.     And did you validate or refute it?

20   A.     I validated it.

21   Q.     Okay.  Good.

22               So I'm going to -- I'm going to scroll



Page 214

1    down just so we get his full -- his full opinion,

2    and then we'll go to your rebuttal.

3           Okay?

4    A.     Okay.

5    Q.     He says, The following table instances

6    that demonstrates instances of "setup" and "backup"

7    as verbs, as compared to "setup" and "backup" as

8    nouns, and the verb forms "setup" and "backup" as

9    found in the Australian subcorpus of GloWbE.

10   A.     Right.

11   Q.     So if he -- when he looks at the

12   Australian subcorpus, he finds that when you're

13   using "setup" as a verb, that 1.7 percent of the

14   time in the Australian -- Australian English

15   subcorpus, it's spelled as one word, correct?

16   A.     Correct.

17   Q.     And 98.3 percent of the time, it's

18   spelled as two words, right?

19   A.     Yeah, that "setup" as a verb data is --

20   I had trouble replicating that data because you

21   can't -- when you do your part of speech search,

22   you can't -- if you put "set up" and then "verb,"



Page 215

1    it just looks for "up" as a verb and it crashes.

2              And so the only way that they were able

3    to get that raw frequency, as far as I can see, was

4    to basically eyeball the data.  And I don't know if

5    they did this.  I don't know who did it.  But that

6    figure is an eyeball figure in terms of raw

7    frequency --

8        Q.    Okay.

9        A.    -- like -- like a similar -- with

10   "backup" as well.

11       Q.    Okay.  When you say the raw frequency

12   figure, that's not the percentage figure; that's

13   the -- essentially the number of hits, the 159 and

14   the 9,401?

15       A.    9,401, which, of course, influences the

16   percentage furring.

17       Q.    Right.  Well, both of them influence.

18   The two together are your denominator, 159 plus

19   9,401?

20       A.    Correct.

21       Q.    And you told me you were not able to

22   validate that data, and I appreciate that.



Page 216

1            By the same token, you weren't able to

2     refute it either; is that fair?

3          A.     Yes.

4          Q.     Okay.  So that's a pretty -- a pretty

5     big disparity, 98.3 to 1.7 percent --

6          A.     Yes.

7          Q.     -- generally -- numerically speaking,

8     correct?

9          A.     Yes.

10         Q.     Now, accepting the fact that you did

11    not -- you did not count them up by -- my

12    understanding is, is when you use eyeball figures,

13    you actually have to look at it and count them up?

14         A.     Yeah.  I can't see any other way of

15    doing that.

16         Q.     Right.

17                You were not able to have the computer

18    spit out the raw frequency numbers?

19         A.     For "setup" as a verb.

20         Q.     Right, for the reasons you explained to

21    me.

22         A.     Yes.



Page 217

```
 1        Q.      But when you looked at it, did it seem

 2    like there was sort of a 2 percent/98 percent

 3    disparity?

 4        A.      Yes.

 5        Q.      Okay.

 6                The -- the -- every time that "setup"

 7    is used as a verb in Dr. Wright's either Q or his K

 8    e-mails, he uses it -- he spells it with one word,

 9    correct?

10        A.      When you say "every time," how many

11    times?

12        Q.      We can go back and look.  I'll scroll

13    back up.  That's fair.

14                I'm going to scroll back up to the

15    prior page.

16                Okay?

17        A.      All right.

18        Q.      Unless you want to do it because you've

19    got it in front of you.

20        A.      I've got it in front of me.

21        Q.      You can help me a little bit.  I'm

22    working hard here, Doctor.
```



Page 218

```
 1          A.      So am I.

 2          Q.      I know.  That's why I'm trying to help

 3    you.

 4          A.      Four times.

 5          Q.      Four times in the Q or four times in

 6    the K or four times --

 7          A.      Four times in the K and only one time

 8    in the Q.

 9          Q.      And that's for "setup," or "setup" and

10    "backup"?

11          A.      That's "setup."

12          Q.      So "setup" is used as a verb -- "setup"

13    is used as a verb four times in the K documents,

14    correct?

15          A.      Correct.

16          Q.      And every time, it's spelled with one

17    word?

18          A.      Correct.

19          Q.      Okay.  Let's go to "backup."

20                  How -- what was the frequency in the

21    K -- strike that.

22                  In the Q documents, "setup" was only
```



Page 219

1    used once as a verb?

2        A.    Correct.

3        Q.    And it was spelled with one word or two

4    words?

5        A.    One word.

6        Q.    Okay.  Let's go to "backup."

7              The same question:  Did you -- were you

8    able to get the computer to -- to churn out the raw

9    frequency numbers for "backup" as a verb?

10              MS. DAGLEY:  Object to form.

11              THE WITNESS:  The same issue:

12        "backup" as a verb, as a single word -- I

13        was able to verify that.

14              "Back up" as a verb, as two words --

15        I wasn't able to verify that.

16    BY MR. BRENNER:

17        Q.    Okay.  Got it.

18              The same, exact reasons you explained

19    with "setup"?

20        A.    Correct.

21        Q.    When you did the eyeball search, just

22    your eyeball test -- did it seem to be a valid -- a



Page 220

```
 1     three-to-one ratio as shown in the Leonard report

 2     for "backup" in the Australian GloWbE?

 3         A.     Yeah, just by memory.

 4         Q.     Okay.  Now, the -- how often is

 5     "backup" used by Dr. Wright as a verb in the K

 6     documents?

 7         A.     Once.

 8         Q.     And how does he spell it?

 9         A.     One word.

10         Q.     And in the Q documents, how often is it

11     used?

12         A.     No times.

13         Q.     So I don't have to ask you how he

14     spells it, right?

15         A.     No.

16         Q.     Now let's go to your report, and let's

17     see -- let's just walk through your -- by the way,

18     I -- I realize that maybe I'm using a term that is

19     not suitable to you.  I use the word "criticize" or

20     "critique" for your rebuttal, but if you want me to

21     use a different word, that's -- I don't know what

22     word you use, but I'm happy to use the word that
```



Page 221

1    you feel most comfortable.

2         A.    I'm fine.

3         Q.    "Critique" is fine?

4         A.    Yeah, yeah.

5         Q.    Okay.

6               Okay.  So I'm on Page 10 of your

7    report.  I'm in that linking feature, and it is

8    going to spill us into 11.

9         A.    Right.

10        Q.    Okay.  You point out -- you do point

11   out the frequencies that we just went through --

12        A.    Yes.

13        Q.    -- and you -- you find it notable that

14   the low number in the Q -- you say it fails

15   scientific credibility standards.  When I say "low

16   numbers," only one.

17        A.    Correct.

18        Q.    Okay.

19        A.    I mean, that's basically the lowest

20   number you can get.

21        Q.    Come on, give us credit.  We had 0 in

22   the backup.



Page 222

1        A.     Well, it's 0 --

2               MS. DAGLEY:  Object to form.

3               MR. BRENNER:  It wasn't a question.

4        I withdraw it.

5               THE WITNESS:  Okay.

6   BY MR. BRENNER:

7        Q.     I just went to the next page.  Let me

8   just see if I missed something on the bottom of

9   that page.

10              Okay.  So you write, In addition -- I'm

11  on the bottom of the page -- you write, In

12  addition, an examination of the data in the

13  GloWbE corpus indicates that using "setup" -- one

14  word -- as a verb could be explained more as a typo

15  or as a feature quickly constructed discourse than

16  an idiolect feature.

17              Right?

18       A.     Yes.

19       Q.     Can what -- what in GloWbE gives you

20  that indication?

21       A.     Let me just go back here.

22       Q.     The bottom of Page 10.



Page 223

1          A.     Yeah.

2                 What do I do?

3                 Yeah, there we go.

4                 Yeah, so -- so, basically, the "or"

5     there is basically -- "can be explained more as a

6     typo or as a feature quickly constructed discourse"

7     is another way to explain that setup, because when

8     you look at -- as I look -- as I eyeballed the

9     examples of "setup" as a one-word verb in the

10    GloWbE corpus, the registers in there suggested

11    quickly constructed -- like GloWbE comments,

12    et cetera -- quickly constructed discourse; and

13    that got me thinking, as we go down into my report,

14    that that's just an example of somebody writing

15    quickly and not paying attention to form,

16    essentially paying attention to -- to content.

17         Q.     To the extent that it -- that it's a

18    typo -- and I'm focusing on "setup" now -- to the

19    extent that it's a setup -- it's a typo in

20    Dr. Wright's K e-mail set, it's the same typo four

21    times, correct?

22         A.     Yes.



Page 224

1        Q.      And he never -- he never fails to make

2    the typo -- every time he uses "setup" as a verb,

3    he has the same typo, right?

4        A.      Yes.

5        Q.      Let me just scroll down in this

6    section.

7                Okay.  I don't have any more questions

8    on Number B.

9        A.      Okay.

10       Q.      We're going to go to C, and I think it

11   works best if we start with Dr. Leonard so we can

12   be oriented on what he's saying before we get to

13   yours.

14       A.      Okay.

15       Q.      Okay.  So this is -- this feature

16   identified by Dr. Leonard is using the word

17   "couple" and then not using the word "of" to follow

18   it, when perhaps in standard English, you would

19   expect to see it.

20               Is that at least what Dr. Leonard is

21   trying to observe?

22       A.      Yes.



Page 225

```
 1          Q.     Okay.  Let's just go through the

 2     basics.

 3                 He says that he found it in -- this

 4     feature in two of the K documents.

 5          A.     Correct.

 6          Q.     Do you disagree with that, that that --

 7          A.     No.

 8          Q.     -- is that correct frequency?

 9          A.     That's right.

10          Q.     He says he found it in one of the Q

11     documents, correct?

12          A.     Yes.

13          Q.     And I just -- just for -- for clarity.

14     I'm not -- I'm not -- in these questions, I'm not

15     drawing the distinction between Q1 and Q2.  I'm

16     just calling it -- collectively, that's the Q

17     documents.

18                 Okay?

19          A.     Okay.

20          Q.     If you feel the distinction is one that

21     you want to note and you think I'm glossing over

22     it, you tell me.
```



Page 226

1               Okay?

2       A.      Okay.

3       Q.      So we can get past the chart.  I think

4    that's just the frequency.  He says --

5    Dr. -- Dr. Leonard says, The use of, quote, couple

6    plus noun/adjective without the -- is considered

7    nonstandard and a feature more prominent in

8    informal spoken or working-class American English

9    than in Australian or British English, where the

10   construction is predominantly found with the

11   proposition "of," "couple of" plus noun/adjective.

12               Do you see that?

13      A.      Yes.

14      Q.      Do you disagree with that?

15      A.      Yes -- no, I don't.

16      Q.      Okay.  The next -- next is -- next --

17   it purports to give the frequency for when "couple"

18   is used with and without "of" before the noun or

19   adjective?

20      A.      Yes.

21      Q.      And it finds that -- this is also from

22   the Australian subcorpus, correct?



Page 227

```
 1        A.     Correct.

 2        Q.     It finds that 90 percent of the time --

 3   or just over 90 percent, it's "couple of," correct?

 4        A.     Yes.

 5        Q.     Okay.  And then there's -- there's

 6   two -- there's two other ones.  There's "couple

 7   more" and then just "couple" with nothing, right?

 8        A.     Correct.

 9        Q.     And "couple more" is -- is

10   relatively -- relatively minor; it's under a

11   percent, correct?

12        A.     Yes.

13        Q.     And "couple" -- "couple" noun, which is

14   what Dr. Wright is -- is doing in these three

15   e-mails, is 8.61 percent?

16        A.     Correct.

17        Q.     Did you attempt to run these numbers

18   through the Australian English subcorpuses to

19   either validate them or refute them?

20        A.     Yes, I did.  And I found, like, "couple

21   of" plus nouns/adjective was about 14,000, more

22   frequency was about 14,000, and so there was a
```



Page 228

```
 1    significant disparity there.  And then the other

 2    ones were close.

 3         Q.    Okay.  So what you did at the -- at the

 4    denominator of the total number would have -- would

 5    have decreased by 5 -- between 5 -- about 5,500

 6    let's say, right?

 7         A.    Correct.

 8         Q.    And if -- if that were the case, the

 9    percentages -- we don't have to figure them out

10    now -- but the 90 percent looks like it would go

11    down to maybe -- oh, I don't know.  I'm not good

12    with math on the fly -- 65 percent or 70 percent?

13         A.    Yeah, something like that.  Correct.

14              MS. DAGLEY:  Object to the form.

15              MR. BRENNER:  Which part?  How I did

16        my math?

17              MS. DAGLEY:  Yes.

18              MR. BRENNER:  I think it's pretty

19        good.

20    BY MR. BRENNER:

21         Q.    Okay.  Then it says, In the Australian

22    English subcorpus, the frequencies of the
```



Page 229

1     nonstandard "couple" plus noun -- which is what

2     he's saying Dr. Wright used in those few e-mails --

3     are very low.

4                    Do you agree with that?

5          A.     Yes.

6          Q.     Then he says, If it's low, it indicates

7     it's not in widespread use.

8                    You agree with that, correct?

9          A.     Yes.

10         Q.     Okay.  So now let's go to --

11         A.     What is in widespread -- let me just

12    say, what is in widespread use is -- Australians

13    will say, Give me a coupla minutes.

14                   Right?  "A coupla," like that.

15         Q.     "A coupla"?

16         A.     Yeah.  Because what you've got there is

17    a nice, little example of historical linguistics

18    working, because in historical linguistics, when we

19    look at patterns of language change over time, you

20    essentially have commonalties, and one of the

21    commonalties is, when you have a word like "of" in

22    unstressed position, like "a coupla books," that



Page 230

```
 1    what happens is that the elements get deleted or

 2    deleted in speech and then the unstressed vowel

 3    becomes a schwa, which is an "a."

 4              So what happens is, a lot of people

 5    will say this, even in America, "a coupla minutes,"

 6    right --

 7         Q.    Right.

 8         A.    -- and so the tendency -- and this is a

 9    historical trend -- the tendency is to reduce the

10    "of" in informal and essentially to the point where

11    it becomes a zero -- a totally eliminated element.

12              That pattern is occurring across all

13    Englishes and is more frequent in American English

14    than other places, but it is occurring in the other

15    Englishes.

16         Q.    Right.  But we just went through -- as

17    far as where we are today -- and we're talking

18    about writing as opposed to speech -- other than

19    the change in the denominator you noted, you -- you

20    do not dispute Dr. Leonard's findings regarding how

21    couple -- "couple of" is used in the Australian

22    supplements, correct?
```



MAGNA ▶
LEGAL SERVICES

Page 231

```
 1        A.      Yeah, but when you look at the e-mails

 2    written by Craig Wright, the known, where there's

 3    "couple" plus noun, these are almost stream of

 4    consciousness -- there's some indicators that

 5    they're stream of consciousness writings; and so

 6    the speech is in his head and it's coming out.  And

 7    so in his head, he might have said "coupla" and it

 8    just came out "couple."

 9        Q.      He never writes "couple of," though,

10    right?

11        A.      Not in these documents.

12        Q.      Not -- not -- right.

13                Okay.  So let's go back to your report

14    and make sure we've -- we've captured your rebuttal

15    opinions.

16                Okay?

17                Again, you -- there's a -- there's a

18    similar criticism you had in the prior set, which

19    is that -- that the amount of -- the amount of

20    frequency of the linking features is too small to

21    be scientifically sound.

22        A.      Correct.
```



Page 232

1          Q.      That's one of your criticisms.

2          A.      Let me just say that -- that's the

3     elephant in the kitchen, so to speak, you know;

4     it's a significant significance.

5          Q.      All right.  So you're the

6     linguistic -- the linguist.  Tell me where the

7     expression "elephant in the kitchen comes from."

8          A.      It's my idiolect.  It's --

9          Q.      Touché.  You win that one.

10          Okay.  Fair enough.

11          Then you reference -- I think you were

12     just telling me before, one of the -- one of the

13     places where "couple" followed by noun or adjective

14     is found is in DEF_0027396 and your assessment is

15     that it was likely a hastily written e-mail.

16          A.      Right.

17          Q.      Is the reason you put that there as an

18     indicator that he may be writing closer to the way

19     he may speak as opposed to the way he would -- he

20     would write?

21          A.      That's a conjecture, yes.

22          Q.      Okay.  That's a conjecture, but it is a



Page 233

1    conjecture, right?

2         A.    Yes, because you -- I can't get into

3    his head.

4         Q.    Right, of course.  And that's what I

5    was going to ask you.

6               You write in here that Defense -- or

7    DEF_0027396, you write, Which we have previously

8    established was likely a hastily written e-mail --

9    you haven't established that.

10              No one's established that, correct?

11        A.    Well, there's indicators that it's

12   unedited, right?

13              I went -- I think I showed some

14   examples of poorly constructed sentences,

15   et cetera.  So there are some examples there that

16   this is unedited with a focus on content rather

17   than a focus on form.

18        Q.    Isn't that true of almost every e-mail

19   you reviewed?

20        A.    Oh, I can't say that for now.  I mean,

21   I -- I haven't looked at it like that.

22        Q.    Okay.  And just to be clear, because



Page 234

1     we -- we've been talking about scientific

2     certainty, are you comfortable with the language

3     you used here, that you have established that this

4     was likely a hastily written e-mail?

5              Is that language that you're

6     comfortable with?

7        A.    Show me that language where it says

8     I've established.

9        Q.    Sure, of course.  Yeah.

10             I'm going to start --

11       A.    I see --

12       Q.    You see that?

13       A.    Um-hum.

14       Q.    Yeah.

15       A.    No, I'm not comfortable with that.  I

16    should have said something like, which we have

17    previously indicated may have been likely a hastily

18    written e-mail using academic discourse, you know,

19    where we use hedges all the time.  But I think

20    the -- the rationale for coming to that is valid,

21    considering the indicators of "hastily written."

22       Q.    But you have not made a judgment



Page 235

```
 1     whether all of the e-mails were, for example,

 2     unedited, right?

 3               MS. DAGLEY:  Object to form.

 4               THE WITNESS:  No.

 5     BY MR. BRENNER:

 6          Q.    You have not made an assessment of

 7     whether all of the e-mails were hastily written?

 8               MS. DAGLEY:  Object to form.

 9               THE WITNESS:  Correct.

10     BY MR. BRENNER:

11          Q.    Okay.  So I'm just reading through your

12     report now.

13               So explain to me your sentence here

14     about Occam's razor because I, frankly, had a

15     little bit of a hard time following.

16               What do you mean in the last sentence

17     of Subsection c?

18          A.    That the simplest explanation of a

19     phenomena is usually the most accurate, and so the

20     simplest explanation of "couple" plus noun in the Q

21     documents is that they were written by an American.

22          Q.    What about the explanation of them in
```



Page 236

1      the K documents?

2             A.     That this is just a variance in

3      Wright's -- Wright's writing that reflected a --

4      maybe something hastily written.

5             Q.     Are you applying a different standard

6      in your analysis to the K documents than the

7      Q documents?

8             A.     I think in the K documents -- first of

9      all, you've got to consider that the -- sorry.

10            Let me start again.

11            First of all, you've got to consider

12     that in the Q documents, "couple" plus noun is an

13     American -- an American feature, right, an American

14     linguistic feature?  So I think you can't just

15     disregard that.

16            In Leonard's report, he is disregarding

17     that it's -- it's an American feature in the sense

18     of not giving it any credibility that the

19     Q document could have been written by an American

20     with -- with -- with -- based upon that evidence.

21            Q.     And -- and you find no significance to

22     the fact that the -- as far as this feature goes,



Page 237

1    it's the same in the K and the Q -- at least in the

2    three that we're looking at?

3         A.    In the three that we're looking at and

4    the one example in the Q.  I can't give it any

5    significance because the number of frequencies

6    is -- is low.  I mean, you can't get lower than 1.

7    You can -- you can only get two steps lower than 3.

8         Q.    Okay.  In all of the e-mails you

9    reviewed, Dr. Wright never uses "couple" followed

10   by the word "of," correct?

11        A.    I didn't see that.

12        Q.    Okay.  We're going to the next one,

13   which is the en dashes and em dashes, and I just --

14   this one may be a little quicker, but let's go on.

15             What -- do you understand Dr. Leonard

16   was not placing any significance between some --

17   whether something was an en or an em dash?

18             Did you understand that from his

19   report?

20        A.    Well, it looks like what he's saying is

21   that these things are -- are connecting semicolons

22   where a semicolon would work.



Page 238

1                    Is that what you're referring to?

2          Q.      Right.  Whether it's an en or an

3     em dash, he's commenting on essentially how the

4     dashes are used in Dr. Wright's e-mails or in the

5     K e-mails and the Q e-mails.

6                    You understand that, right?

7          A.      Yes.

8          Q.      All right.  He's not making a

9     distinction that it matters if it's an en or an em;

10    it's how grammatically dashes are used.

11                   You get that?

12         A.      Let me just look at my report.  I'm not

13    sure -- not my report -- let me go down a little

14    more in that report.

15         Q.      Okay.

16                   (Whereupon, the witness reviews the

17                    material provided.)

18                   THE WITNESS:  Okay.  I think I must

19         have misread that when I did this report

20         and thought he was making a distinction

21         between en dashes and em dashes.  But it

22         looks like he's making a distinction --



Page 239

```
 1          he's basically saying that his use of

 2          en dashes or em dashes takes a place of a

 3          semicolon.

 4               Is that what he's saying?

 5     BY MR. BRENNER:

 6          Q.    Right.  I think -- I think you -- you

 7     did misunderstand it, and that's why I was trying

 8     to --

 9          A.    Yeah.

10          Q.    Okay.  So let me just see if you have

11     anything in your report that actually addresses

12     what -- what he was saying.  So let's go to what

13     you said.

14               Okay.  So -- so let's go to the bottom

15     part of your Subsection c, because I think that

16     does directly address what Dr. Leonard was saying.

17               Do you agree with me?

18          A.    Yes.

19          Q.    So I'm -- I'm starting at the sentence

20     where my cursor says, Leonard also notes.

21          A.    Correct.

22          Q.    Okay.  So did you see any instances --
```



Page 240

```
1      you know what?  I don't think I have any questions

2      for you on this one.

3           A.     Okay.

4           Q.     Let's go to the next one.

5                  I think I owe you a break in

6      10 minutes.

7           A.     The time goes quickly when you're

8      having fun.

9           Q.     Right.  Exactly.

10                 I'm on e, which is All Caps for

11     Emphasis.

12          A.     Right.

13          Q.     Let's go to Dr. Leonard's report.

14                 Okay.  Let me try to scroll a little

15     for you so we can get on the screen.

16                 Okay.  Did you understand what

17     Dr. Leonard was saying here to mean that when

18     Dr. Wright uses emphasis, he always chooses to use

19     all caps?

20                 Is that what you understand

21     Dr. Leonard's opinion to be?

22          A.     I don't know how he comes to the
```



Page 241

1    conclusion that -- how he can define when he's

2    using emphasis.

3          Q.    Okay.

4                Okay.  I understand that criticism.

5    I'm just trying to get on the same page of what

6    your understanding of what Dr. Leonard's opinion

7    was.

8                You understood his opinion was that in

9    his opinion, each time Dr. Wright was trying to use

10   emphasis, he used all caps?

11         A.    We don't know when Dr. Wright is trying

12   to use emphasis, but he uses all caps only two

13   times.  So are we assuming that he only uses

14   emphasis twice in all of those e-mails?  I guess --

15   I guess you are.

16         Q.    Okay.  You -- so I'm just going to his

17   report first, so we'll walk through it a little

18   more methodologically.

19               You agree that one way in the English

20   language to -- to -- to connote emphasis is to bold

21   a word, correct?

22         A.    Correct.


MAGNA
LEGAL SERVICES

Page 242

1      Q.     You agree another way would be to

2   italicize a word?

3      A.     Correct.

4      Q.     You believe another way would be to

5   underline a word?

6      A.     Correct.

7      Q.     Another way would be to increase font

8   size of a word, correct?

9      A.     Correct.

10      Q.     Another way would be to change the

11   color of the word?

12      A.     Correct.

13      Q.     Another way would be to put the word in

14   all caps?

15      A.     Correct.

16      Q.     Putting aside Dr. Leonard's judgment of

17   when Dr. Wright was using emphasis, did you find

18   Dr. Wright using emphasis in any of the K or Q

19   e-mails in any way other than all caps?

20      A.     No.

21      Q.     Okay.  So let's just go through

22   the -- this table -- Table 16 shows that the all



Page 243

1    caps was used -- is that in one K document?

2         A.     Okay.  Let me get my --

3         Q.     Yeah, it probably would be easier if

4    you get yours, because I think you counted them up.

5         A.     Okay.  So we're referring to Table 16,

6    and we've got one document that contains in the --

7    in the K, one document that contains "IS" and --

8    and "NO" as -- in all caps.

9         Q.     In the K document cited by Dr. Leonard,

10   he cited a single K document that had two instances

11   of this use of all caps for emphasis?

12        A.     Correct.

13        Q.     Okay.  And then in the Q, he cited two

14   different documents, right?

15        A.     Correct.

16        Q.     Those two documents included three

17   different e-mails, right?

18        A.     Yes.

19        Q.     And I think --

20        A.     And -- and --

21        Q.     I'm sorry.

22        A.     -- and one -- and two of those e-mails



Page 244

1 were from the Q 2 category, right?

2   Q. Right. There's a single Q 2 document

3 that has two e-mails in it that use all caps for

4 emphasis, correct?

5   A. Correct.

6   Q. And then in the Q 1, there's a single

7 e-mail that, I guess, uses it 15 times -- I'm only

8 saying that because I think you counted 17 total --

9   A. Yes.

10   Q. -- right?

11   A. Yes.

12   Q. Okay. And did you -- did you check

13 Dr. Leonard's work to make sure that

14 -- that -- that the count of the use of all caps or

15 bold was correct?

16   A. Yes.

17   Q. And is it?

18   A. To the best of my knowledge, it was

19 correct.

20   Q. Okay. So now let's go back to your

21 report.

22   Okay. I think the first part is -- we



Page 245

1      just did the count, right?

2           A.      Correct.

3           Q.      Okay.  Let's talk about that.

4                   So here what you did is -- your

5      critique is, again, on the number of instances, but

6      you -- you make a different point here.  If you

7      could read what you write in e, and then we'll talk

8      about it.

9           A.      You want me to read e?

10          Q.      Yeah, just to yourself because I'm

11     going to ask you a question.

12          A.      Okay.  I see, just to myself.

13          Q.      Yeah.  I don't need you to read it for

14     the camera.  Well, there's no camera, but . . .

15                  (Whereupon, the witness reviews the

16                   material provided.)

17                  THE WITNESS:  Okay.

18     BY MR. BRENNER:

19          Q.      So I'm focusing on the last sentence,

20     and you say -- and I will read this into the

21     record -- you say, If Leonard claims that exemplars

22     consisting of one, two or three items are



Page 246

1    indicators of the Q documents being written by

2    Craig Wright, then surely a 2K/17-Q imbalance

3    indicates that Craig Wright did not write the

4    Q documents.

5              Right?

6         A.    Yes, that's what I wrote.

7         Q.    And what you're saying here -- and

8    correct me if I'm wrong -- is that -- well, what

9    are you saying there?

10             Why don't you tell me?

11        A.    I'm saying that if we follow the logic

12   or the consistency of the -- of the -- of Leonard's

13   method and pointing out that we have one, two

14   instances in the -- in the K and one instance in

15   the Q or vice versa, then if we've got an imbalance

16   of 17 in the Q and one -- sorry -- two in the -- in

17   the K, then surely that has to be addressed as

18   supporting the null hypothesis, which I believe was

19   Hypothesis Number 2; and in his report, Leonard

20   essentially ignores this evidence that's pointing

21   in a different direction.

22        Q.    So as I understand it, what you're



Page 247

1     focusing on is the amount of times emphasis is used

2     in the K versus the Q?

3          A.     Yes.

4          Q.     And what Dr. Leonard is focusing on is,

5     regardless of the amount of time it's used,

6     whenever it's used, it's used -- it uses the same

7     emphasis marker in the K and the Q, right?

8               MS. DAGLEY:  Object to form.

9               THE WITNESS:  Yes.

10    BY MR. BRENNER:

11         Q.     Okay.  Let's -- okay.  I understand --

12    I understand your opinion, so we can move on.

13              Do you want to do one more before we

14    break?

15         A.     Okay.

16         Q.     Okay.  So we're going to f, and I'm

17    going to toggle back to Dr. Leonard's report.

18              This is the "et cetera" without the

19    period.

20              Do you see that?

21         A.     Um-hum.

22         Q.     Okay.  Do you understand that what



Page 248

1    Dr. Leonard is saying here is that every time

2    Dr. Wright uses the term "et cetera" in an e-mail,

3    he spells it "etc" without a period?

4         A.    Yes.

5         Q.    Okay.  And let's just do our frequency,

6    the same drill we've been doing.

7              In the -- when it comes to the bottom

8    of the page, it gets really hard to navigate.

9              Okay.

10        A.    I've got it in front of me.

11        Q.    Okay.  So how many times did he find it

12   in the K?

13        A.    Two times.

14        Q.    Okay.  And how many times did he find

15   it in the -- in the two Q sets?

16        A.    Let me see.  One, two, three, four,

17   five -- six, I think.  I mean, he -- oh, I'm

18   counting rather than looking at what he said.

19        Q.    Actually, I don't think he counted for

20   you.

21        A.    He doesn't count.  That's interesting.

22        Q.    You usually count.



Page 249

```
 1          A.      Hmm?

 2          Q.      I said, "You usually count."

 3          A.      I count, yeah.  It seems, to me, that

 4     you know --

 5          Q.      I think it's six.  Just by your report

 6     and by my eyeball, I think it's six.

 7          A.      Yeah.

 8          Q.      Okay.  And it was -- did we just say it

 9     was two K and four Q?

10          A.      Yes.  Two in -- sorry -- two in K and

11     six in Q.

12          Q.      Two and 6.  Thank you.

13                  You agree with me that every time in

14     the Q and the K that Dr. Wright uses the term

15     "et cetera," he used -- he does not follow with a

16     period?

17          A.      But he follows it with some form of

18     punctuation.

19          Q.      I'm going to get there, but let me

20     just -- because it's important for me, as a lawyer,

21     to get my record clean.

22                  You agree with me that every time he
```



Page 250

1    uses "etc," he does not follow with a period?

2         A.    Correct.

3         Q.    And that's what Dr. Leonard found, and

4    from your review of the documents, that's true,

5    correct?

6         A.    Correct.

7         Q.    Okay.  Now, you -- in your rebuttal --

8    we'll go back to your report.

9               Actually, in -- in your report, you say

10   there's seven examples in Q of the etc.

11        A.    Oh, really?

12        Q.    Yeah.

13        A.    Sorry.

14        Q.    You say in -- in -- each time in the

15   e -- the "et cetera" is used in the K, it's

16   followed by either a question mark or -- I don't

17   understand.

18              Is that quotation parentheses colon

19   quote?

20        A.    Yeah, parentheses -- parentheses --

21   closed parentheses and then a colon.

22        Q.    Oh, I see.  I see.



Page 251

```
 1                    I see.  I see what you did.

 2          A.       It's not an emoticon.

 3          Q.       No, no.  I see.  I got it.  I got it.

 4                    Well, is it an emoticon?

 5          A.       Well, we've got -- we've got -- when

 6     you look at the sentence, I now have, parentheses,

 7     without the knowledge of Uyen, comma, Ian,

 8     et cetera, so we've got a parentheses there and

 9     then a colon, or we've got an emoticon.  I don't

10     know --

11          Q.       Let's just take a look --

12          A.       -- it seems, to me, that it's

13     parentheses -- we're closing the parentheses.

14          Q.       Let's just make sure I agree with you.

15                    I'm back on Dr. Leonard's report.  The

16     first time he uses "et cetera" in the K documents,

17     it's "etc" and then question mark?

18          A.       Correct.

19          Q.       The second time he uses it, it's "etc,"

20     closed paren, colon?

21          A.       Correct.

22          Q.       In the -- in the Q, every time he uses
```



Page 252

1    it, it's -- there is no end mark, right?

2         A.    Except for --

3         Q.    Except for the second-to-last one?

4         A.    The second one, yeah.

5         Q.    The second-to-last one.  Okay.

6               Okay.  So let's go back to your report

7    since we don't --

8         A.    In the last one, he has a comma there,

9    but there's no period.

10        Q.    Right, he has a comma on a couple of

11   them.

12        A.    Yeah.

13        Q.    I didn't consider that an end mark.

14              So I'm going to go back to your

15   critique of that.

16              Explain to me what you mean by the last

17   sentence of your critique in f.

18        A.    Well, what you've got is -- actually,

19   you go up one sentence.  He's basically saying

20   you've got four examples of et cetera with

21   absolutely no punctuation, right?  Absolutely no

22   punctuation.  And -- and so moving into the next



Page 253

1       sentence, you've got -- given Leonard's faith in

2       small numbers, the fact that in the Q documents,

3       you've got four et ceteras with zero punctuation

4       and no et ceteras with zero punctuation whatsoever

5       in the K documents, surely has -- he has to

6       consider that as evidence of the null hypothesis,

7       basically disproving that they are written by the

8       same person.

9            Q.    And the null hypothesis in

10      Dr. Leonard's -- the -- in Dr. Leonard's report

11      would be --

12           A.    Hypothesis 2, yeah.  I'll try to

13      refer --

14                 CERTIFIED STENOGRAPHER:  Could you

15           repeat the last bit there?  You got a

16           little cut off.

17      BY MR. BRENNER:

18           Q.    -- in Dr. Leonard's report would be

19      Hypothesis 2?

20           A.    My answer was -- I can't remember.

21                 MR. BRENNER:  Let's take a break.

22                 THE WITNESS:  Do you want to take a



Page 254

1          break now?

2                    MR. BRENNER:  You want to do another

3          one?

4                    THE WITNESS:  No.  No.  Let's --

5          let's take a break.

6                    MR. BRENNER:  I'm trying to honor

7          your request.

8                    THE WITNESS:  Yeah.  Thank you.

9                    MR. BRENNER:  Okay.  Let's take a

10         break.

11                   THE WITNESS:  Okay.  How long?

12         Seven minutes?

13                   MR. BRENNER:  Yeah.  All right.

14                        -   -   -

15                   (Whereupon, a recess was taken from

16                    6:55 p.m. EST to 7:01 p.m. EST.)

17                        -   -   -

18         BY MR. BRENNER:

19             Q.    Dr. Eggington, it's my goal and

20         expectation that we'll finish up in the next hour.

21             A.    Wait a minute.

22                   MR. BRENNER:  Off the record.



Page 255

```
 1                        -   -   -

 2              (Whereupon, a discussion was held

 3               off the record.)

 4                        -   -   -

 5    BY MR. BRENNER:

 6         Q.     Okay.  Dr. Eggington, I think where we

 7    left off, we were about to start Linking Feature g.

 8         A.     Right.

 9         Q.     Let's do the convention that we've been

10    doing before, which is start off with Dr. Leonard's

11    report and make sure we're on the same page on what

12    he's opining, and then we'll get to your rebuttal.

13               All right?

14         A.     Right.

15         Q.     Here he's -- Dr. Leonard is observing

16    what he observes is a linking feature of success of

17    uses of negations in a row, right?

18         A.     Right.

19         Q.     And as far as frequency, he finds two

20    documents that have that in the K, correct?

21         A.     Correct.

22         Q.     And he finds one document in the Q,
```



Page 256

1    although it arguably uses two different strings of

2    negation?

3         A.    Correct.

4         Q.    Okay.  Do you acknowledge the counts

5    and -- that that data is correct?

6         A.    Yes.

7         Q.    Okay.  He says -- Dr. Leonard says that

8    this is the type of feature that does not lend

9    itself to corpus searches.

10               Do you agree with that?

11        A.    I can understand why, but I think

12   because I've got a little bit more experience with

13   corpus searches, I was able to replicate some of

14   the data but not -- that's the wrong word -- I was

15   able to do corpus searches on some of it and not on

16   other parts of it.

17               So there's a way to do it, but

18   it -- it's not easy.

19        Q.    Did you include that in your report?

20        A.    No, I didn't.

21        Q.    All right.  So that's all that

22   Dr. Leonard says, but he points out that this is



1      what he considers to be a linking feature between

2      the Qs and the Ks, correct?

3            A.     Correct.

4            Q.     So let's see what you have to say.

5      Let's go to your rebuttal.

6                   You say that -- first of all, you make

7      the point, which you made before, but -- that

8      there's a very low frequency of the -- of the

9      amount of time it shows up in the K and the Q,

10     correct?

11           A.     Correct.

12           Q.     No different opinion there than when

13     you've offered that low frequency opinion

14     throughout your report?

15           A.     Correct.

16           Q.     Okay.  Then you say, In addition,

17     multiple use of negatives for emphasis is a common

18     rhetorical device and cannot be used as a

19     distinctive marker of same authorship.

20                  What do you base the statement that

21     it's a common rhetorical device?

22           A.     Yeah.  And this is where I'm kicking



1     myself that I didn't include the corpus data in

2     my -- in this report.  I don't know why I didn't.

3     But, basically, what I was able to show, I think,

4     in the -- by going to the corpus data is that it is

5     a common rhetorical device for emphasis.

6          Q.     Reserving my objection to it not being

7     in the report, I -- since you offer that, which

8     corpus data did you use?

9          A.     GloWbE.

10         Q.     GloWbE's Australian subcorpus or not?

11         A.     All of the GloWbE, and then it pops

12    up -- as I said before, it pops up in a bar across

13    the top --

14         Q.     Okay.  Did you --

15         A.     -- I don't know whether this one does,

16    because what I'm doing is collocates -- collocation

17    searches, so the search was essentially No, and

18    then No or Nothing found within nine words --

19    sorry -- yeah, nine words to the left and nine

20    words to the right.  And then at some point, I

21    remember reversing that and going Nothing, No,

22    because it was coming up as an error, and then



1    bringing in the number of words to the left and the

2    number of words to the right, but I brought up some

3    examples of multiple negations in a row.

4         Q.    You -- when you use the word "common"

5    in this sentence, common rhetorical device, what

6    does "common" mean?

7              Is there --

8         A.    Used by a lot of people in normal

9    speech and normal writing for emphasis.

10        Q.    Okay.  Let's go to n-grams.

11             Are you familiar with n-grams, prior to

12   receiving Dr. Leonard's report?

13        A.    Yeah.

14        Q.    So Dr. Leonard, in his report,

15   identified -- first of all, what is an n-gram?

16        A.    So an n-gram is essentially a string

17   of -- of words -- the way they're using it here, is

18   a string of words where N stands for any number; so

19   it could be a two-word string or a three-word

20   string or a four-word string, et cetera.

21        Q.    And as used by Dr. Leonard in his

22   report -- first of all, he only used n-grams of



Page 260

1      three or higher, correct?

2          A.      Three up to six.

3          Q.      Okay.  And an n-gram -- the way that

4      Dr. Leonard uses it, it's the exact same words used

5      in the exact same order, correct?

6          A.      Yeah, a string -- yeah, I didn't put

7      "identical" in there -- a string of identical

8      words.

9          Q.      Okay.  Very well.

10             And Dr. Leonard identifies -- and

11     here -- you recall in his report, here he didn't --

12     for the Ks, the Bates number was missing.

13             Do you remember that?

14         A.      Yeah.

15         Q.      Were you able to find these in the K

16     documents?

17         A.      Yeah, I was able to do searches and --

18     and locate them.

19         Q.      Sure.

20             Are you able to validate the count that

21     Dr. Leonard has in his report of the n-grams?

22         A.      Yes.  Yes.



Page 261

```
 1        Q.     Okay.

 2               Okay.  And the way Dr. Leonard did

 3    this, he has two different charts:  One was K

 4    versus Q, Category 1, and then the next was K

 5    versus Q, Category 2?

 6        A.     Correct.

 7        Q.     Okay.  And this one, just by mere

 8    numbers, is the most -- the most matches of

 9    anywhere in the report, correct?

10        A.     Are you talking about "I am not"?

11        Q.     No, no, just in general, the n-grams,

12    the most come up in between the Ks and the Qs?

13        A.     Oh, you're saying in terms of

14    instances?

15        Q.     Yes.

16        A.     Well, in terms of instances as a

17    category, yes, but in terms of instances as

18    individual, particular n-grams, you know, you

19    scroll down, you've only got three -- one K, "I do

20    not believe" and two Q, "I do not believe," right?

21               So you still got very, very small

22    numbers of instances.
```



Page 262

```
 1          Q.      Right.  And that -- that's fair.

 2                  I -- I didn't mean to insinuate

 3      otherwise.

 4                  As far as the category, the n-grams

 5      themselves have the most overlap between the Qs and

 6      the Ks?

 7          A.      Correct.

 8          Q.      For each individual n-gram, sometimes

 9      it's as few as one on each, correct?

10          A.      Yes.

11          Q.      For example, the one on the screen

12      right now, Was my best friend, was my best friend;

13      one was K -- one Q 1?

14          A.      Yeah.

15          Q.      Okay.  Let's go to what -- what your

16      report says.

17                  I want to talk to you about -- let's

18      see if I can get it to stay on the screen.  Here

19      for each of the -- each of the n-grams, you do --

20      you have -- you have a chart in your report -- it

21      starts on Page 13; it scrolls into Page 14 -- and I

22      think for each of the n-grams, you found a
```



Page 263

```
 1    frequency.

 2         A.    Correct.

 3         Q.    Okay.  The first basic question:  The

 4    frequency in what?  In which corpus were you

 5    searching?

 6         A.    This is all of the GloWbE --

 7         Q.    Okay.

 8         A.    -- together.

 9         Q.    Okay.  So, for example, what -- what

10    was the purpose of this chart for you to illustrate

11    your opinion?

12         A.    It's my understanding that the -- that

13    using n-grams to -- to come to a finding of

14    authorial attribution, the n-grams have to have a

15    certain degree of -- of rarity, right, a certain

16    special quality to them?

17         Q.    Okay.

18         A.    Once -- and on the other hand, if you

19    have an n-gram of just very high frequency strings,

20    essentially, they could be -- they could have been

21    constructed by anybody.  They don't -- are not

22    really an indicator of authorial attribution.
```



Page 264

1          Q.      So -- so in your -- in your chart, on

2     the -- on the right column, the frequency

3     number -- the higher the number, the less important

4     it is to an authorial attribution analysis?

5          A.      Yes.

6          Q.      Okay.  And the flip side of that, of

7     course, is the lower number, the more important it

8     is, correct?

9          A.      Except if you look at Number 4 there --

10    sorry -- Number 1, 2, 3, you've got four instances

11    of "Dave and I did."

12             Now, Dave is -- is the name of an

13    individual, and so, obviously, that's going to pop

14    up a lot lesser -- a lot less than if you just had

15    "and I did."

16         Q.      Right.  And I wasn't trying to -- I

17    wasn't trying to do it to this particular chart.

18    I'm just -- just in general, the lower the

19    frequency number, all else being equal, is more

20    impactful to an authorial attribution analysis than

21    the higher the numbers?

22         A.      Within -- it seems, to me, yeah.  I



Page 265

1    cannot speak to that with respect to external

2    research and looking at n-grams in external

3    research.

4              My intuition tells me that may be the

5    case, but I cannot validate that in terms of

6    external research that's been done.

7        Q.    Okay.  And I'm just trying to get a

8    sense for how big is -- in terms of words is the

9    GloWbE corpus?

10       A.    I think it's about 4 billion words, or

11   something.

12       Q.    So the 4 billion words -- just so I

13   understand your chart, I'm just going to pick

14   one -- "so that we have" -- those four words

15   appearing in that order -- would appear 601 times?

16       A.    Yes.

17       Q.    Okay.  Let me scroll down.

18             I should have been more patient.  In

19   your report, you say, The point of these is -- I

20   could have just went right there instead of asking

21   you to reply.

22             Okay.  You say, The point of these



Page 266

1    GloWbE corpus searches is to show that many of the

2    n-grams Leonard lists are simple, common

3    expressions and not indicators that the Q e-mails

4    were written by Craig Wright.

5              That's just what we went through

6    regarding high frequency, correct?

7         A.    Right.

8         Q.    In fact, the absence of any highly

9    unusual expressions is an indicator that the

10   Q e-mails were not written by Craig Wright.

11             That's not an opinion that you're

12   offering to a scientific certainty, is it?

13        A.    Actually, what I should have said there

14   is, in fact, within the framework of forensic

15   stylistics or the method that -- that Dr. Leonard

16   is using, the absence of any highly unusual

17   expressions indicated that e-mails were not written

18   by Craig Wright.

19             I guess what I'm saying here is that in

20   the Q documents, you don't find any unusual

21   expressions that are then found in the K documents.

22        Q.    But you're not offering an opinion --



Page 267

```
1     you're not offering an opinion based on reasonable

2     degree of scientific certainty that the absence of

3     any highly unusual expressions is an indicator that

4     the Q e-mails were not written by Craig Wright?

5          A.     As I said, I should have -- that's a --

6     I misspoke there.  I should have put, in fact,

7     within the framework of forensic stylistics, the

8     absence of any.

9          Q.     Okay.  Let's go to the next one.

10              Okay.  This is the emoticon section,

11    correct?

12         A.     Right.

13         Q.     Let's just get on the same page with

14    what Dr. Leonard is saying, and then we'll -- we'll

15    get to your report.

16              He's calling this emoticon a winky

17    smiley.

18              Do you see that?

19         A.     Yes.

20         Q.     So you know what he's talking about,

21    right, the semicolon parentheses?

22         A.     Yes.
```



Page 268

```
 1          Q.      He makes two points here:  One, he says

 2    that -- he points out each time that Dr. Wright --

 3    each time that Dr. Wright uses this emoticon in the

 4    K -- in the Q, correct?

 5          A.      Well, he uses it once in the K.

 6          Q.      Right.  He -- Dr. Wright -- excuse me.

 7                  Dr. Leonard finds that Dr. K used that

 8    emoticon once in the K documents, correct?

 9          A.      Correct.

10          Q.      And did you validate that count?

11          A.      Yes.

12          Q.      And then in the Q documents, it looks

13    like we have two, correct?

14          A.      Correct.

15          Q.      Two different documents, one time each?

16          A.      Correct.

17          Q.      Okay.  The other point that Dr. Leonard

18    uses is that the span of time that this emoticon is

19    being used across the data set spans seven years.

20                  Do you see that?

21          A.      Correct.

22          Q.      Did you offer a rebuttal opinion to
```



Page 269

```
 1    that part of Dr. Leonard's finding?

 2         A.    No.  I think, basically, I was focusing

 3    on, once again, the low quantity, like one in K

 4    document, two in the Q.

 5         Q.    Okay.  So let's go back to what you

 6    said.  This one is pretty quick.  You were just --

 7    again, this is your low frequency opinion that

 8    you've offered in relation to other linking

 9    features as well, correct?

10         A.    Correct.

11         Q.    Let's go to Noncontracted "will."

12               What Dr. Leonard is saying here is that

13    every time in the K and the Q documents that

14    there's an opportunity to use the contraction for

15    the word "will," Dr. Wright does not do so and

16    instead spells out the full word "will," correct?

17         A.    Right.

18         Q.    Okay.  So he -- he notes that in the

19    K documents, that happens -- I'm having trouble

20    scrolling -- in the K documents, it happens -- one,

21    two, three, four, five, six, seven, eight, nine,

22    10, 11 -- 12.
```



Page 270

1              Did you count them up, Doctor?

2         A.   I have 14.

3         Q.   Okay.  Fourteen in the K.

4              Do you -- do you -- do you agree with

5    the count?

6         A.   Um --

7         Q.   I guess it's your count, so --

8         A.   It's my count, so that's what I counted

9    a couple of weeks ago.

10        Q.   Okay.  And then in the Q, how many were

11   there?

12        A.   How come I don't have a figure there --

13   44.

14        Q.   Forty-four.  Okay.

15        A.   Forty-four.

16        Q.   Is there -- is there any instances in

17   the K documents where Dr. Wright uses the

18   contraction for "will"?

19        A.   No.

20        Q.   And is there any instances in the

21   Q documents that Dr. Wright uses -- well, if it's

22   Dr. Wright, that the Q documents use the -- the



Page 271

1    contraction for "will"?

2              MS. DAGLEY:  Object to form.

3              THE WITNESS:  No, except that in

4         the -- no.  I just note that in the

5         Q documents, the writer of the Q documents

6         uses "I will" an exceptional amount of

7         time; whereas, in the K documents, it's not

8         used that -- that often.  So there's a

9         frequency imbalance --

10   BY MR. BRENNER:

11        Q.    Okay.  So -- I'm sorry.  I cut you off.

12        A.    -- well, as I say in my report, there's

13   a ratio imbalance there, considerable ratio

14   imbalance, 3.2 times more in the Q document than in

15   the K documents, which points in the direction of

16   Hypothesis 2.

17        Q.    Right.  And that -- that's a similar

18   criticism you made when you pointed out the -- the

19   two versus -- the two in the Q versus the 17, which

20   I think was on the all caps.

21        A.    Correct.

22        Q.    Right.  So the -- the -- the debate, or



Page 272

1    the disagreement, between you and Dr. Wright is --

2    excuse me.

3              The debate here between you and

4    Dr. Leonard is really about what's the more

5    important linking feature --

6              MS. DAGLEY:  Object to form.

7              MR. BRENNER:  I hadn't finished yet,

8         but okay.

9              MS. DAGLEY:  Oh, I apologize.

10             MR. BRENNER:  That's okay.  That's

11        okay.  I know you didn't do it on purpose.

12        That's okay.

13   BY MR. BRENNER:

14        Q.    What I'm saying, Dr. Eggington, is

15   that -- what's important to Dr. Kleiman -- or

16   Dr. Leonard is that every time Dr. Wright has the

17   option of using the contraction for the word

18   "will," he chooses to spell it out, right?  That's

19   the point of his feature, correct?

20             MS. DAGLEY:  Object to form.

21             THE WITNESS:  That's his point, yes.

22



Page 273

1    BY MR. BRENNER:

2         Q.    And one of your counterpoints is, he

3    uses the spell-out of the word "will" a lot more,

4    with a much higher frequency in the Q documents

5    than he does in the K documents.

6              Have I captured that?

7              MS. DAGLEY:  Object to form.

8              THE WITNESS:  Correct.

9    BY MR. BRENNER:

10        Q.    Okay.  Is there anything else in your

11   rebuttal to -- on this section that I'm missing?

12        A.    No.

13        Q.    Okay.  Let's go to the next one, the

14   sentence Initial conjunction, no commas.  So this

15   is starting sentences with the word "and" or "but,"

16   right?

17        A.    Correct.

18        Q.    We're supposed to be at Leonard's

19   report.

20              By the way, let me just go back to

21   the -- the -- the "will" section real quick.  I

22   have back on the screen -- I have -- I neglected to



Page 274

1      go over this with you.

2              In Dr. Leonard's report, he runs a

3      GloWbE analysis of the Australian English subcorpus

4      for the use of "I will" versus "I'll."

5              Do you see that?

6              Do you see that?

7      A.      Yes.

8      Q.      Okay.  And he basically finds it's --

9      it's a -- it's a coin flip, it's a 50/50

10     proposition, right?

11     A.      Right.

12     Q.      Did you run your own search?

13     A.      I brought those up and, basically, the

14     same data.

15     Q.      Okay.  So you don't disagree with that,

16     that finding?

17     A.      No.

18     Q.      Okay.  So now we'll go to the sentence

19     Initial conjunction, no comma.  And we've got to go

20     back to -- or we'll stay on -- I don't know.

21              Here he finds that Dr. Wright, in the

22     K documents, assuming he wrote the K documents,



Page 275

```
 1      uses "and" and "but" to start a sentence two times?

 2           A.     Correct.

 3           Q.     And the Q, we have one, two -- six

 4      times the sentence starts with an "and" or "but,"

 5      correct?

 6           A.     Right.

 7           Q.     And do you understand that what

 8      Dr. Leonard -- what Dr. Leonard is pointing to is

 9      the use -- not so much the use of the word to start

10      the sentence but the use of it without a following

11      comma?

12           A.     No, I didn't.

13           Q.     Okay.  I'm not saying he did.  I'm

14      asking -- I should have asked you, What is your

15      understanding of -- of what Dr. Leonard is -- is

16      identifying as the importance of this linking

17      feature to him?

18           A.     No, I didn't.

19           Q.     Okay.  My question is bad.  We're

20      getting tired.  Let me try it again.

21                  Okay?

22                  We started with the first question bad,
```



Page 276

1     and it got us down the wrong track.

2              What is your understanding --

3        A.     We're all tired.

4        Q.     Okay.

5              -- what is your understanding of what

6     Dr. Leonard was observing in -- with the linking

7     feature Number 11 sentence, Initial Conjunction, No

8     Comma?

9        A.     Yeah, I focused on the

10    following -- that first part of that sentence, The

11    following table demonstrates nonstandard use of

12    conjunctions sentence-initially --

13       Q.     Okay.

14       A.     -- and -- but I didn't follow up on,

15    With no commas separating them from the remainder

16    of the sentences.

17       Q.     So let's focus on the part you did

18    focus on, then.

19       A.     Okay.

20       Q.     And so I'm going to go back to your

21    report.

22              Again, one of your criticisms here is



Page 277

1    that it's a low frequency linking feature, correct?

2         A.    Correct.

3         Q.    And then you write, These usages are

4    labeled as, quote, nonstandard --

5         A.    Correct.

6         Q.    -- except that I suspect that they are

7    standard within informal e-mail communications.

8               Do you see that?

9         A.    Yes.

10        Q.    What do you base that on, that you

11   suspect that using sentences that start with "and"

12   or "but" are standard within informal e-mail

13   communications?

14        A.    The -- the -- informal e-mail

15   conversations usually reflect spoken English,

16   stream of consciousness, spoken English; and quite

17   often in spoken English, we begin sentences with

18   "and" in conversation.

19        Q.    So as I understand your opinion, that

20   at least in this regard, you think it's more likely

21   that "and" and "but" would be used in e-mails as

22   opposed to other writings because e-mails more



Page 278

```
1      mimic or closer -- close -- are closer to speech

2      than other types of writings are?

3           A.    Some e-mails --

4                 MS. DAGLEY:  Object to form.

5                 THE WITNESS:  Sorry.

6                 -- some e-mails.

7      BY MR. BRENNER:

8           Q.    And what about the Q and the K e-mails

9      in this case -- do you put them in that category of

10     "some e-mails"?

11          A.    The e-mails that reflect a sort of

12     stream of consciousness writing would reflect that.

13          Q.    Okay.  And then you write, Leonard

14     indicates that there are six examples of initial

15     sentence conjunctions in the Q e-mails: three times

16     as many leading to a much higher frequency in the

17     Q e-mails than the K Wright e-mails, suggesting the

18     Q e-mails were not written by Craig Wright.

19          A.    Correct.

20          Q.    So explain that to me.

21          A.    Well, basically, you've got -- you've

22     got an imbalance.  It gets back to this thing I
```



Page 279

```
1     brought up a couple times before.  You've got an

2     imbalance.  There's two -- if I'm -- remember

3     right -- yeah -- there's two in the K and six in

4     the Q, and so this shows a higher preponderance of

5     beginning a sentence with a conjunction in the Q.

6               This is all within the framework of

7     forensic stylistics.  I'm not trying to be

8     definitive here.  I'm just saying, if you accept --

9     if you accept low frequencies in this model, then

10    you have to account for imbalances.

11         Q.    Okay.  Is this -- is this the same type

12    of opinion that you offered with regard to the all

13    caps, where it was the two in the K and the 17 in

14    the Q?

15         A.    Yeah, and I think some of the others as

16    well.

17         Q.    Yeah, you did.  I was just using one as

18    an example.

19         A.    Yeah.

20         Q.    You used it at least in one other.

21         A.    Yeah.

22         Q.    I wanted to make sure it wasn't
```



Page 280

```
 1    something new.

 2              Let's go to the next one.

 3              Back in the other one, you say,

 4    Suggesting that the Q e-mails were not written by

 5    Craig Wright.

 6              Again, you're saying, if you were to

 7    buy into the -- the methodology used by

 8    Dr. Leonard, it would lead to that suggestion that

 9    the Q e-mails were not written by Craig Wright?

10         A.   That's correct, confirming

11    Hypothesis 2.

12         Q.   You, yourself, are not offering that

13    opinion that the Q e-mails were -- were not written

14    by Craig Wright?

15         A.   I wouldn't offer that opinion.

16         Q.   Okay.  The next one is, The preposition

17    "of" meaning "about."

18         A.   Correct.

19         Q.   This is our last one.  How about that?

20              Let's go back to Dr. Leonard's report.

21              Tell me what your understanding of

22    Dr. Leonard's opinion on this thinking here is.
```



Page 281

```
 1        A.      Okay.  Let me just take a time-out

 2     while I find the right pages.  Somehow I'm missing

 3     pages.  I didn't staple these pages because I

 4     didn't want to be turning pages.

 5        Q.      Okay.  While you're doing that, I'm

 6     going to take 30 seconds to unshare the screen and

 7     look at something.

 8              Okay?

 9        A.      Okay.  Here it is.

10              (Pause.)

11              THE WITNESS:  Okay.

12     BY MR. BRENNER:

13        Q.      Give me a second.  Let me get the share

14     screen back on.

15              I think we were on Dr. Leonard's

16     report, correct?

17        A.      Correct.

18        Q.      Okay.  So we're on the -- on the 12th

19     linking feature.

20        A.      Correct.

21        Q.      Can you tell me what -- your

22     understanding of what Dr. Leonard's opinion was
```



Page 282

1    here?

2          A.     Basically, that in -- in a place where

3    you could use "about," know about something, then

4    we have this evidence of "know of" something, and

5    the "know of" expression is used how many times?

6    One, two, three, four, five -- six times in the

7    known and one, two, three, four -- five times in

8    the questioned.  So this is an example Leonard is

9    claiming that this is another linking feature.

10         Q.     Okay.  Those counts that you just gave

11   I know were your counts, and -- and those are the

12   same as Dr. Leonard's counts, correct?

13         A.     Yes.

14         Q.     Okay.  So now let's go to --

15         A.     I'm getting it from his table.

16         Q.     Okay.  Let's go -- well, did you go

17   back and look at the documents to confirm that?

18         A.     Yes.

19         Q.     Let's go to your -- your rebuttal to

20   this.

21                Okay.  You start off by just giving the

22   count that you just gave, correct?



Page 283

```
 1          A.      Correct.

 2          Q.      Okay.  So I'm -- are you with me?

 3          A.      Yes.

 4          Q.      Okay.  You have a reference here to --

 5     to a search of GloWbE, and tell me the search you

 6     did.

 7          A.      I just put in the search feature --

 8     search string was "know of," and then the other

 9     search was search string of "know about."

10          Q.      And this was of the overall GloWbE, not

11     the Australian subcorpus?

12          A.      Correct.

13          Q.      And you found that "know of" appeared

14     just over 3,000 times?

15          A.      Correct.

16          Q.      And "know about" was 428 times?

17          A.      Correct.

18          Q.      So, therefore, you concluded based

19     on -- correct me if I'm wrong -- you concluded

20     based on the about seven times higher usage of

21     "know of" than "know about" that "know of" was

22     actually the -- the standard usage?
```



Page 284

```
 1        A.      I don't want to say "standard," but

 2   it's the most common.

 3        Q.      I just used "standard" --

 4        A.      I put "standard" -- that's -- that's

 5   why I put "standard" in quotes, because I don't

 6   want to get into a -- both Dr. Leonard and I are

 7   social linguists, and so we -- the word "standard"

 8   and "nonstandard" evokes a whole different

 9   discussion.

10        Q.      Okay.  You're using the word "standard"

11   in quotes there to mean the more common usage?

12        A.      Yes.

13        Q.      Okay.  And, therefore, it's your

14   opinion that if -- if the linking feature is the

15   more common feature, then it cannot be used as a --

16   it cannot be used to identify Dr. Wright as the

17   writer of the Q e-mails?

18        A.      Because it's just a standard feature

19   that everyone uses -- or not everyone, but a lot of

20   people use.

21        Q.      So as I understand that, if someone is

22   using a very standard use of language across two
```



Page 285

1    sets of -- across the set of K documents and a set

2    of Q documents, it's not significant because it's

3    what you would just expect almost anyone to use,

4    correct?

5          A.    Correct.

6          Q.    So if -- let me give you an example.

7    If -- for example, if -- someone used the word

8    "you" after the word "thank," that would not be a

9    very significant identifying feature, correct?

10         A.    Correct.

11         Q.    By the -- by the same token, then, if

12   you do the flip side of that, if -- if someone is

13   using something that's quite rare, that would be a

14   more significant identifying feature?

15         A.    Within the parameters of the forensic

16   stylistic framework.

17         Q.    Well, the questions I was asking before

18   were not within the framework.  It can't be one and

19   not the other.

20               More common features are less

21   important, and less common features are more

22   important.



Page 286

1      A.      Okay.

2      Q.      Do you agree with that?

3      A.      Yes.

4              MR. BRENNER:  Okay.  I'm going to

5      take three to five minutes to see if I have

6      any more questions, but I don't think I'm

7      going to.

8              THE WITNESS:  Okay.

9              MR. BRENNER:  Okay.  So let's take

10     five minutes, and then we'll be done,

11     hopefully.

12             THE WITNESS:  Okay.

13             MR. BRENNER:  Thank you.  Okay.

14                     -  -  -

15             (Whereupon, a recess was taken from

16              7:37 p.m. EST to 7:41 a.m. EST.)

17                     -  -  -

18     BY MR. BRENNER:

19        Q.      Dr. Eggington, have we covered all of

20     the opinions that you intend to offer in this case?

21        A.      Yes.

22        Q.      Do you intend to do any further work in



Page 287

1      this case, other than preparation for trial?

2          A.     I don't know how to answer that.  I

3      don't think so, but there may be further work that

4      I might do.  I don't know.

5          Q.     I'm not asking you -- I'm not asking

6      you to predict if the lawyers are going to ask you

7      to do anything else.

8                 As you sit here today, you don't have

9      any plans to do any future -- any further work,

10     other than to prepare for trial to offer the

11     opinions you've already discussed?

12         A.     I don't currently have any plans.

13                MR. BRENNER:  Okay.  I thank you so

14         much for your time and your patience with

15         the technical difficulties we had.  And I

16         have no further questions for you.

17                THE WITNESS:  Okay.  Thank you.

18                MR. BRENNER:  Neha, do you want to

19         read or waive, or do you have any

20         questions?

21                MS. DAGLEY:  Yeah.  I don't have

22         anything.  And we will read.



Page 288

```
1                MR. BRENNER:  Okay.  Thank you,

2        Doctor.

3                Stay safe.

4                THE WITNESS:  The same to you.

5                MR. BRENNER:  Neha, stay safe.

6                I will -- you know what, before we

7        go off the record, let's just make sure

8        we're on the same page what the exhibits

9        were, because it's hard with the -- with

10       the Zoom or the remote.  I want to make

11       sure we mark everything.

12               THE WITNESS:  Do you want me to get

13       off?

14               MS. DAGLEY:  Not yet.

15               MR. BRENNER:  Stay on for one sec.

16               Madam Court Reporter, do you have a

17       list?

18               (Discussion off the record.)

19               MR. BRENNER:  Here's what I'm going

20       to do in an abundance of caution -- in an

21       abundance of caution, let me mark some

22       additional exhibits, and if we've marked
```



Page 289

1            them twice, then we've marked them twice.

2                   Since we went through the Leonard

3            report, let's mark that as an exhibit.

4                         -   -   -

5                   (Eggington Deposition Exhibit Number

6                   6, Robert A. Leonard, Ph.D. Expert

7                   Report, marked for identification,

8                   as of this date.)

9                         -   -   -

10                  MR. BRENNER:  Let's mark as an

11           exhibit Dr. Eggington's report in the

12           Dutcher case.

13                        -   -   -

14                  (Eggington Deposition Exhibit Number

15                  4 was previously marked.)

16                        -   -   -

17                  MR. BRENNER:  Let's mark as an

18           exhibit the Court opinion in the Dutcher

19           case.

20                        -   -   -

21                  (Eggington Deposition Number 7,

22                  Court Opinion, Dutcher v. Bold



Page 290

```
 1                 Films, marked for identification,

 2                 as of this date.)

 3                      -  -  -

 4            MR. BRENNER:  Let's mark as an

 5       exhibit the Court opinion in the Zuckerberg

 6       case.

 7                      -  -  -

 8                 (Eggington Deposition Exhibit Number

 9                 8, Court Opinion, Ceglia v.

10                 Zuckerberg, marked for

11                 identification, as of this date.)

12                      -  -  -

13            MR. BRENNER:  And let's mark as an

14       exhibit -- when I say "the Court opinion in

15       the Zuckerberg case," the only one we went

16       through was the report and recommendation.

17            And we've marked already the --

18       let's mark as an exhibit the motion to

19       exclude McMenamin in the Dutcher case.

20                      -  -  -

21                 (Eggington Deposition Exhibit Number

22                 9, Defendants' Motion to Exclude
```



Page 291

```
 1              Expert Testimony of Gerald R.

 2              McMenamin, marked for

 3              identification, as of this date.)

 4                   -   -   -

 5         MR. BRENNER:  And I think

 6    that's -- that would be the complete set;

 7    although some, I think, we've already

 8    marked.

 9         CERTIFIED STENOGRAPHER:  Okay.

10         MR. BRENNER:  Okay.  And what I'll

11    do -- why don't you, when we sign off

12    tonight or tomorrow, send what you think

13    the list is, and I'll make sure you get all

14    the documents?

15         CERTIFIED STENOGRAPHER:  Okay.

16         MR. BRENNER:  Neha, I will, of

17    course, copy you with whatever I send.

18         MS. DAGLEY:  I was just going to ask

19    you if you could, please.

20         MR. BRENNER:  Of course.

21         Okay.

22
```



Page 292

1          Everyone have a great night.

2          Thank you so much.

3

4

5                      -  -  -

6              (Witness excused.)

7                      -  -  -

8

9                      -  -  -

10         (Deposition concluded at 7:47 p.m.

11          EST.)

12

13

14

15

16

17

18

19

20

21

22



Page 293

```
 1              C E R T I F I C A T E

 2    STATE OF MARYLAND:

 3    COUNTY OF PRINCE GEORGE'S:

 4              I, Cindy L. Sebo, a Notary Public within

 5    and for the Jurisdiction aforesaid, do hereby certify

 6    that the foregoing deposition was taken before me

 7    remotely, pursuant to notice, at the time and place

 8    indicated; that said deponent was by me duly sworn

 9    remotely to tell the truth, the whole truth, and

10    nothing but the truth; that the testimony of said

11    deponent was correctly recorded in machine shorthand by

12    me remotely and thereafter transcribed under my

13    supervision with computer-aided transcription; that

14    the deposition is a true record of the testimony

15    given by the witness remotely; and that I am neither

16    of counsel nor kin to any party in said action, nor

17    interested in the outcome thereof.

18

19              _____

20              Cindy L. Sebo, RMR, CRR, RPR, CSR,

                CCR, CLR, RSA, Courtroom Connect

21              Court Reporter, LiveLitigation

                Authorized Reporter, Notary Public

22
```



Page 294

1                    INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over

4     carefully and make any necessary corrections.  You

5     should state the reason in the appropriate space on

6     the errata sheet for any corrections that are made.

7                    After doing so, please sign the errata

8     sheet and date it.

9                    You are signing same subject to the

10    changes you have noted on the errata sheet, which will

11    be attached to your deposition.

12                   It is imperative that you return the

13    original errata sheet to the deposing attorney within

14    thirty (30) days of receipt of the deposition

15    transcript by you.  If you fail to do so, the

16    deposition transcript may be deemed to be accurate and

17    may be used in court.

18

19

20

21

22



Page 295

```
 1                  E R R A T A
 2     PAGE  LINE  CHANGE
 3     _____ _____ _____
 4     Reason For
       Change: _____
 5
       PAGE  LINE  CHANGE
 6

 7     _____ _____ _____

       Reason For
 8     Change: _____
 9     PAGE  LINE  CHANGE
10     _____ _____ _____
11     Reason For
       Change: _____
12
       PAGE  LINE  CHANGE
13

14     _____ _____ _____

       Reason For
15     Change: _____
16     PAGE  LINE  CHANGE
17     _____ _____ _____
18     Reason For
       Change: _____
19
       PAGE  LINE  CHANGE
20

21     _____ _____ _____

       Reason For
22     Change: _____
```



Page 296

1              ACKNOWLEDGMENT OF DEPONENT

2

3                   I, _____, do

4     hereby certify that I have read the foregoing

5     pages, 1 to 292, and that the same is a correct

6     transcription of the answers given by me

7     remotely to the questions therein propounded, except

8     for the corrections or changes in form or substance,

9     if any, noted in the attached errata sheet.

10

11    _____  _____

12     DATE                  SIGNATURE

13

14

15    Subscribed and sworn to before me

16    this _____ day of_____, 20____.

17

18        My Commission expires:

19

      _____

20

21

      _____

22



**A**

**ability** 8:17 38:20
38:22 39:1
**able** 39:1 121:3
138:19 215:2
215:21 216:1
216:17 219:8
219:13,15
256:13,15
258:3 260:15
260:17,20
**abrenner@bsfl...**
3:9
**absence** 71:5
144:3 196:5
266:8,16 267:2
267:8
**absolutely**
252:21,21
**absurd** 148:4
**abundance**
288:20,21
**abuse** 75:18
**academic** 107:9
126:20 143:14
144:16 153:8
153:12,14,16
154:17 155:13
156:16 157:15
159:7,9 234:18
**academician**
125:19,20
**accent** 157:9
**accept** 117:3
160:20 161:9
161:12 166:5
174:5 206:4
279:8,9
**acceptable** 44:19
**accepted** 115:14
127:19 206:11
206:15
**accepting** 216:10
**accomplishme...**
80:3

**account** 36:16
155:3 279:10
**accounts** 158:15
158:17
**accurate** 96:7
206:8 235:19
294:16
**accusation** 73:16
**ace** 182:1,3,6,7
183:13,14,18
183:21,22
184:11
**aces** 182:8,11
183:10
**acknowledge**
256:4
**ACKNOWLE...**
296:1
**acquaintance**
167:22
**action** 123:16
293:16
**actual** 91:14,15
98:20 131:22
133:4
**ad** 86:4
**added** 98:21
**addition** 49:5
222:10,12
257:16
**additional** 15:6
15:12 21:19
22:1 23:9 24:3
24:11,20 25:2
288:22
**address** 53:4
108:11 239:16
**addressed** 146:10
246:17
**addresses** 239:11
**adept** 148:12
152:3 153:12
**adhere** 196:18
**adjective** 226:19
232:13
**adjourn** 44:12

**adjust** 156:2
**adjusting** 152:4
**administered** 6:9
**Administrator**
2:8
**admission** 91:8
**Admits** 91:5
**adopt** 112:22
**adopted** 115:14
116:20
**adult** 76:5
**advocacy** 89:5
**advocating** 54:9
54:16
**affidavit** 5:6
79:10 94:3 99:8
**affiliation** 170:5
**affirmative**
101:10
**aforesaid** 293:5
**agent** 101:3
**ago** 73:11 76:10
96:8 133:18
138:17 157:2,3
270:9
**agree** 25:10
74:15 98:2
113:2 117:3
150:7,7,9 165:5
165:12 166:4
172:5 180:18
183:1 202:6,12
206:8 210:17
210:19 213:4,8
229:4,8 239:17
241:19 242:1
249:13,22
251:14 256:10
270:4 286:2
**agreed** 6:2,8,13
6:18 125:6
**agreement** 16:8
16:11,11,13
70:9
**ahead** 131:4
**Ainsworth** 54:4

55:13 58:12
113:14 137:13
138:13 142:16
185:10
**Ainsworth-Juola**
137:22 192:2
**algorithm** 158:15
158:18
**algorithms** 54:12
**alias** 188:4
**alive** 169:14
**allow** 113:18,20
191:16
**allows** 188:8,9
**alternative** 46:8
**America** 230:5
**American** 65:8
157:16,20
204:6 211:11
212:4 226:8
230:13 235:21
236:13,13,13
236:17,19
**American-Aus...**
157:17
**amount** 19:3
139:7 201:14
231:19,19
247:1,5 257:9
271:6
**amounts** 139:2
186:14
**analyses** 189:4
**analysis** 30:6
32:3 65:3 69:9
75:2 81:15
117:17 118:1
133:7,21 168:5
170:1 172:8
178:21 179:2
211:10,14
236:6 264:4,20
274:3
**analyze** 171:21
**analyzed** 164:1
**Andrew** 3:5 7:21

**and/or** 74:1
164:21 166:9
9:12,14,22 11:9
40:3 41:4 48:2
69:13,16 96:4,6
96:10 101:10
124:16 125:13
147:18 156:6
185:17,21
193:12 204:2
253:20 287:2
**answered** 24:9
27:18 28:3
**answering** 28:3
**answers** 296:6
**anybody** 67:14
263:21
**Anytime** 28:16
**anyway** 24:10
**apologize** 52:13
83:14 118:10
272:9
**apparently** 92:6
**appear** 89:5
265:15
**appeared** 283:13
**appearing** 8:15
265:15
**appears** 97:6
192:6
**applicable** 89:15
**apply** 59:20
**applying** 236:5
**appreciate** 27:10
173:15 215:22
**approach** 54:10
84:5,16 85:3
86:3 89:11
108:18 113:7
138:14
**approaching**
146:19
**appropriate**
95:10 97:22
125:4 166:10



294:5
approximately
2:10
April 1:14 4:18
7:4 13:18 14:22
15:2 16:16,20
17:8 29:10
79:14
area 144:8
arguably 256:1
argument 180:17
arrangement
6:20
arrived 195:10
arrow 128:18
article 54:3,7,22
55:1,12,14 56:6
56:8,14 58:12
107:1,4 114:22
121:14 131:9
131:10,21
139:20 140:2
140:10 142:17
187:15 192:2
articles 54:2,8
59:10 167:17
167:18
ascribe 88:10
aside 19:14 39:4
52:20 242:16
asked 27:3 37:13
55:20 57:1,8,20
60:8,18 68:22
80:15 81:3,8,10
100:22 139:5,6
145:18 147:17
147:19 157:4
164:5 193:6,8
275:14
asking 24:19
25:10 31:4
42:11,18 46:11
46:13 53:21
57:7 110:9
117:2,2 134:4
135:11 164:15

166:4,5,6
168:17 170:7
206:8 265:20
275:14 285:17
287:5,5
aspect 135:5
asserted 70:20
assess 52:14
168:19 178:17
assesses 122:3
assessing 179:10
205:19
assessment 27:7
232:14 235:6
assign 178:18
assignment 60:20
assistance 76:5
Association
138:16
assume 56:18
57:7,18 113:16
139:6 164:17
164:22 167:13
assumed 26:6
assuming 90:22
101:9 119:2
241:13 274:22
assumption 26:9
59:5 60:8
165:10 166:7
166:13
assumptions
57:10,13
asterisk 61:16
attached 4:9
294:11 296:9
attempt 207:5
210:15 213:16
227:17
attention 128:7
223:15,16
attorney 3:3,11
66:16 294:13
attribute 138:22
attribution 37:21
38:17,20 39:8

39:14 40:22
51:16 52:13
53:1,6,16 57:2
57:21 60:7,15
62:4,19 65:16
68:11,19 69:1,9
69:19 72:11
73:8 74:11 75:1
75:13 77:13,17
77:18 87:7 90:2
103:16 106:11
109:11 119:14
132:8 133:7
135:13 136:15
136:17 137:19
138:1,15 141:2
144:2 154:21
158:6 159:5
170:10 185:13
187:2 189:15
190:5 191:6,8
191:13 263:14
263:22 264:4
264:20
attributions
161:11
audience 152:4
152:14
Australia 157:3,4
157:10 200:11
205:9,11 211:4
212:8
Australian
148:21 157:11
157:19,20
206:2,20
207:16 208:21
208:22 209:22
210:1,3,8,20
212:2 214:9,12
214:14,14
220:2 226:9,22
227:18 228:21
230:21 258:10
274:3 283:11
Australianisms

157:10
Australians
229:12
Australian-Am...
157:9
author 27:1
35:10 38:21
52:14,15 57:4
58:19 64:13
83:10 88:11
122:8,10
132:10,12
159:17
authored 26:15
27:16 28:8 75:8
authorial 37:21
38:16,20 39:8
39:13 40:22
51:16 52:13
53:1,6,16 57:1
57:21 60:7,15
62:4,18 65:15
68:11,19 69:1,9
69:19 72:10
73:8 74:11 75:1
75:13 77:13,17
77:18 90:1
103:16 106:10
109:11 119:14
132:5,7 133:7
135:13 136:15
136:17 137:19
138:1,15 141:1
144:2 154:21
158:6 159:5
161:11 170:9
185:13 187:1
189:15 190:5
191:5,8,13
263:14,22
264:4,20
authority 6:6
authorized 1:19
2:9 123:6
293:21
authorship 58:16

157:10
Australians
229:12
Australian-Am...
157:9
85:16 87:6
118:2 187:3
257:19
available 19:21
avoid 151:1
aware 65:1,13
90:19,19 91:1
100:1,5 101:18
144:9,11,17,18
150:22 151:7
163:10
a.m 286:16

**B**
b 86:17 209:17
224:8
back 9:14 17:11
30:1 31:11
38:12 42:8 44:3
44:17 48:7
50:16 55:8
63:16 68:5
72:21 82:15
95:17 120:11
127:22 128:5
129:4 130:8
140:12 147:15
157:2,10
163:18 184:21
190:10,13,17
201:19 204:15
207:20 212:17
213:3 217:12
217:13,14
219:14 222:21
231:13 244:20
247:17 250:8
251:15 252:6
252:14 269:5
273:20,22
274:20 276:20
278:22 280:3
280:20 281:14
282:17
background 80:2
backup 212:16



213:11 214:6,7
214:8 215:10
218:10,19
219:6,9,12
220:2,5 221:22
**back-in-the-mi...**
179:21
**bad** 22:11 63:22
192:22 275:19
275:22
**bar** 49:15,22 55:7
78:9,9 84:8
104:11 211:14
211:19,21
258:12
**barely** 44:5
**base** 201:4
257:20 277:10
**based** 30:6 32:2
39:2 47:6 64:18
71:4 97:6 99:7
99:22 112:14
115:18 121:19
123:12 133:13
142:17 158:1
172:10 180:14
181:13 195:17
236:20 267:1
283:18,20
**basic** 137:6 263:3
**basically** 22:6
30:12 36:15
39:1,11 47:6,9
47:22 50:2 52:2
58:14 62:22
64:9 65:2 70:8
73:12 96:5 98:1
108:21 127:16
137:11,15,20
148:7 151:1
154:8,12
159:10 161:13
163:20,21
175:9 178:21
186:17 191:15
193:20 201:21

215:4 221:19
223:4,5 239:1
252:19 253:7
258:3 269:2
274:8,13
278:21 282:2
**basics** 225:2
**basis** 86:4 91:3,4
**Bates** 18:5 19:4
20:12 260:12
**battle** 143:3,7,11
143:17
**beginning** 2:10
279:5
**behalf** 2:11
**behavior** 151:10
157:18 198:1
**believe** 21:2 29:9
35:21 125:22
126:4,13
131:20 242:4
246:18 261:20
261:20
**belittle** 80:7
**bemused** 157:7
**benefit** 29:3
209:15
**berserk** 150:15
150:18 161:15
**best** 8:17 10:3
16:17 19:12
42:9 47:17
48:19,21 73:14
82:2 88:20 90:4
100:4 106:12
127:11,20
144:21 145:15
191:20 192:7,8
195:21 224:11
244:18 262:12
262:12
**bet** 174:9,15
175:1
**better** 32:14 37:1
49:20 67:10
78:7 122:9

175:1 192:10
196:13 208:14
**beyond** 95:6
**bias** 135:7 159:16
**biasing** 159:10
**bibliography**
130:5 132:1
**big** 115:2 185:11
185:12,14,15
186:2,3,3,5,5
216:5 265:8
**bigger** 50:3
**big-enough**
203:19
**billion** 265:10,12
**bit** 32:13,21 41:3
49:17,18 59:2
61:1 93:18 97:9
103:3 104:11
127:13 130:8
137:21 138:2
148:19 153:3
162:4 183:22
217:21 235:15
253:15 256:12
**blog** 20:13
107:10,13,19
108:13 109:4
109:13 110:1,6
111:9 112:15
112:18 162:7
163:4,7 164:22
**bodies** 186:19
187:2,14 188:8
190:17
**body** 187:21
**boggles** 127:12
**BOIES** 3:4
**bold** 5:8,13 66:2
78:16 81:17
94:4 241:20
244:15 289:22
**book** 58:19
**books** 229:22
**boot** 149:3
**born** 205:7,8

**boss** 146:16
**bottom** 17:7 18:5
31:12 49:16
83:21 84:8
118:15 120:12
120:16 122:1
222:8,11,22
239:14 248:7
**bought** 36:19,22
**Boulevard** 3:14
**box** 211:16
**break** 33:20
41:20 98:1,12
100:7 102:21
147:3,17
148:18 196:11
198:14 240:5
247:14 253:21
254:1,5,10
**breaking** 23:13
38:2
**breaks** 146:15
**Brenner** 3:5 4:4
7:15,21 10:1
11:4 12:19 13:8
13:10 15:17
16:3,21 17:6
18:20 23:1,15
23:21 24:21
25:7 26:4,18
28:1,14 29:6,19
32:9,18 33:21
34:4,8,14 37:8
37:19 38:5,7,10
38:11 39:15
41:7,12,17 42:2
42:7,14,22
43:14,19 44:3
44:19,20 45:2,5
45:13,17,21
46:5 49:1 51:4
52:6 53:14 59:6
62:7 67:6,16,20
69:7,12 72:14
75:5 76:6 77:19
79:18 83:5 85:1

85:10 86:1,11
88:1 89:1,9,20
91:12 92:16
93:4,10,19 94:8
94:16,18,21
95:1,13,14
99:17 100:7,10
100:13,18
106:2,18 109:3
109:18 111:17
112:2,21 120:2
121:9 122:19
123:2,10 124:2
125:12 128:4
129:15 138:10
143:13 147:2,6
147:8,14
149:18 156:5
161:8 162:16
164:11 165:13
168:3 172:14
178:5 179:17
181:10 184:2,6
184:16,20
189:17 191:2
192:13 196:9
196:19 198:13
198:20 200:20
202:15 203:1
203:10 205:4
206:3,17 209:6
209:10,15,18
219:16 222:3,6
228:15,18,20
235:5,10 239:5
245:18 247:10
253:17,21
254:2,6,9,13,18
254:22 255:5
271:10 272:7
272:10,13
273:1,9 278:7
281:12 286:4,9
286:13,18
287:13,18
288:1,5,15,19



MAGNA ▶
LEGAL SERVICES

289:10,17
290:4,13 291:5
291:10,16,20
**brief** 15:13
**bring** 11:9 16:4
46:11 77:22
**bringing** 259:1
**Britain** 211:8
**British** 204:19
207:16 212:3
226:9
**broad** 154:4,16
156:1,7
**broader** 178:6
182:15,18
**broke** 147:18
**brother** 169:10
169:13
**brought** 65:2
259:2 274:13
279:1
**Brown** 80:18
**bubbles** 154:13
154:13
**building** 101:3
**built** 171:15
**bumpy** 83:15
**bunch** 18:15
67:22 160:9,10
169:5
**business** 152:1
156:12 160:16
160:17
**Butters** 103:22
104:2,7 105:7,9
105:12 106:15
113:11 121:11
121:18 125:5
126:14 142:16
**buy** 36:7,11 37:2
39:5 280:7
**buying** 161:2
**buzz** 9:19
**BYU** 43:6,7,11

**————— C —————**

**c** 3:1 7:1 224:10
235:17 239:15
293:1,1
**call** 10:11 12:1
16:19 18:5 21:8
45:14 46:21
52:21 74:11,20
80:2 81:9 104:3
145:12 152:2
161:13 165:22
165:22 166:1,5
166:5,18
208:13
**called** 22:12
37:21 58:13
65:19 69:19
70:6 72:15 79:6
101:12 107:10
116:14 137:21
149:8 154:7
186:16 197:5
202:19
**calling** 114:12
225:16 267:16
**calls** 96:22
134:19
**camera** 245:14
245:14
**Canadian** 212:4
**capacity** 169:17
**capital** 209:16,17
209:17
**caps** 240:10,19
241:10,12
242:14,19
243:1,8,11
244:3,14
271:20 279:13
**capture** 52:8
**captured** 231:14
273:6
**car** 149:3
**care** 75:17
160:19
**careful** 9:2 144:1
165:19,21

**carefully** 294:4
**Carole** 47:6,20
113:13 145:4
**carry** 59:12
188:15
**case** 1:6 9:2
10:21 11:6,20
12:4,11 13:13
13:16 14:21
16:14,18 17:14
17:15,16 18:1
19:15 20:1,11
21:11,14 22:3
24:5 25:4 30:21
36:22 46:20
48:17 49:3,13
49:22 50:11,14
50:20 56:15
60:12 64:12
65:3 66:1,22
68:9,14,18,21
71:11,19,21
72:6,10,15,16
73:9,12,13 74:8
74:12 75:6,15
76:19 77:11,11
77:14 79:1,20
81:19,20 83:7
83:12 84:2,20
86:13,15 87:12
88:18 89:17
90:16 92:22
93:7,14 95:18
96:1,17,19
97:17 98:16
100:21,22
101:2,7,14,14
101:14,20,21
102:9,9 104:7
105:17 106:9
108:18 110:10
112:9 114:2,6
114:13,17
115:5,8,16,17
116:1,2,8

118:20 123:17
123:20 128:1,6
129:17,20
131:20,21
132:16 136:14
155:19 159:5
162:2 164:18
166:6,18
180:21 185:6
194:22 228:8
265:5 278:9
286:20 287:1
289:12,19
290:6,15,19
**cases** 61:3,8,14
62:2 65:14
68:17 77:6
101:11
**case-by-case**
70:18
**categorizations**
149:11
**category** 244:1
261:4,5,17
262:4 278:9
**cause** 166:16
**caused** 194:10
**caution** 288:20
288:21
**cautious** 95:11
**CCR** 1:18 293:20
**Ceglia** 5:14 116:7
290:9
**certain** 22:9
123:13 133:11
173:21 189:12
263:15,15
**certainly** 38:16
**certainty** 26:22
27:14 28:7 36:1
234:2 266:12
267:2
**certified** 2:4,6,6
2:7 6:5,14 7:9
13:6 29:11
43:17 93:21

253:14 291:9
291:15
**certify** 293:5
296:4
**cetera** 59:16
87:22 115:12
127:20 131:17
143:9 146:6
148:16 149:14
152:19 156:13
158:3 175:3
184:13 186:12
207:15 223:12
233:15 247:18
248:2 249:15
250:15 251:8
251:16 252:20
259:20
**ceteras** 253:3,4
**challenged**
107:15
**challenges** 111:8
**chance** 8:19
175:7
**chances** 175:6
**change** 8:14,15
156:18 158:1
229:19 230:19
242:10 295:2,4
295:5,8,9,11,12
295:15,16,18
295:19,22
**changed** 157:18
**changes** 182:22
294:10 296:8
**changing** 147:3
**characterization**
125:11 162:15
**characterize**
162:17
**charge** 12:3
**charges** 12:4
**chart** 226:3
262:20 263:10
264:1,17
265:13



**charts** 261:3
**chase** 164:3
**Chaski** 70:9,20
    113:13 125:5
    126:15 142:10
    142:13 145:4
**Chaski's** 47:6,20
**check** 200:21
    244:12
**cherry-picking**
    135:8,8,9
**child** 73:19 75:8
    75:18 153:9
**children** 73:19
    153:6,10,14
**choice** 136:3
    203:4,9,12,17
**chooses** 135:2
    240:18 272:18
**chunks** 118:17
**churn** 219:8
**Cindy** 1:18 2:3
    12:20 29:6
    43:16 45:22
    93:20 293:4,20
**Ciner** 71:21 72:7
**citation** 92:10
**citations** 91:20
**cite** 47:2 54:5
    103:18 104:2
    107:17 108:13
    110:1 112:18
    126:13,14,15
    127:3,5,10,12
    127:13,17
    130:1 131:9,20
**cited** 20:2,13
    23:4 37:14
    54:22 92:9,18
    92:19 113:15
    130:4 131:22
    155:20 187:12
    243:9,10,13
**cites** 56:20
**citing** 103:21
    124:11

**City** 71:16 80:20
**claim** 73:21 74:5
    90:1,2
**claimed** 38:22
    39:1 76:3
    199:19
**claiming** 282:9
**claims** 77:16
    245:21
**clarification**
    173:16
**clarified** 176:13
**clarity** 225:13
**class** 41:9 150:13
**classes** 64:3
    174:12
**classifiable**
    175:11
**classification**
    149:7
**clean** 95:4 249:21
**clear** 10:17 24:6
    31:1 48:1 60:11
    78:10 106:7
    233:22
**clearly** 165:9
**clock** 97:21
**clone** 47:9
**close** 36:18 81:2
    97:8 160:21
    179:15 198:7
    228:2 278:1
**closed** 250:21
    251:20
**closer** 232:18
    278:1,1
**closing** 251:13
**CLR** 1:18 293:20
**clue** 174:17
    179:22
**clues** 64:9
**code** 153:13,16
**coin** 274:9
**collaboration**
    74:1
**colleagues** 43:9

45:6 168:12,14
**collection** 187:16
    187:17
**collectively**
    225:16
**collocates** 258:16
**collocation**
    258:16
**colon** 250:18,21
    251:9,20
**color** 242:11
**column** 120:9,12
    120:15 264:2
**combination**
    200:2
**combine** 178:11
**come** 64:10 65:11
    117:11 157:10
    160:7 178:21
    179:2 189:11
    194:17,19
    201:17,21
    202:3 211:18
    221:21 261:12
    263:13 270:12
**comes** 58:15 60:9
    90:13 92:3
    97:12 121:11
    173:9 190:9,12
    192:1,5 193:20
    232:7 240:22
    248:7
**comfortable**
    157:19 221:1
    234:2,6,15
**coming** 30:1
    168:1 177:10
    192:10 231:6
    234:20 258:22
**comma** 251:7
    252:8,10
    274:19 275:11
    276:8
**commas** 273:14
    276:15
**comment** 107:18

126:21
**commentary**
    108:13 110:1,7
    112:18
**commentator**
    107:17
**commented**
    200:8
**commenting**
    238:3
**comments**
    105:12 113:13
    113:14 199:5
    206:14 223:11
**Commission**
    296:18
**commit** 162:11
**committed** 79:2
**common** 152:10
    257:17,21
    258:5 259:4,5,6
    266:2 284:2,11
    284:15 285:20
    285:21
**commonalties**
    229:20,21
**commonly** 149:5
**communicate**
    44:10
**communicating**
    152:18
**communication**
    152:5 168:8
    172:12
**communications**
    3:2 277:7,13
**community**
    105:5 147:22
**company** 64:16
    64:18
**compare** 137:5
    155:13 158:6
    159:7 165:6
    172:7
**compared** 81:20
    214:7

**comparing** 82:21
    85:3 102:10
    106:9 155:10
    155:11 166:11
    173:5
**comparison**
    160:21
**competing** 111:2
**complaints** 43:9
**complete** 34:18
    291:6
**completely** 98:2
**computational**
    54:11 58:15
**computer** 137:2
    154:22 155:3
    158:15 186:4,9
    216:17 219:8
**computers**
    186:10,13
**computer-aided**
    293:13
**computer-assis...**
    185:12
**concern** 52:2
**concluded** 30:8
    283:18,19
    292:10
**conclusion** 65:11
    123:5 133:13
    170:13 178:12
    179:11 241:1
**conclusions** 30:4
    31:7 87:3,16
    134:21 138:22
    178:18 180:14
    201:3 203:20
**conclusive** 64:11
    180:1
**condition** 36:19
**conduct** 68:19
**conducted** 77:18
**conducting** 177:7
**confer** 44:21 45:2
    45:9
**conference** 71:16



138:17 146:5
**conferences**
71:17 145:8
146:8
**Confidential**
1:11 2:1
**confidentiality**
77:2
**confirm** 63:1
199:9 282:17
**confirmation**
30:15 135:7
**confirmed**
207:14
**confirming**
280:10
**conflicting** 36:16
37:7 158:11
**confronted**
136:10
**confusing** 130:15
130:16,18
**conglomeration**
182:21
**conjecture** 196:8
232:21,22
233:1
**conjecturing**
195:17
**conjunction**
273:14 274:19
276:7 279:5
**conjunctions**
276:12 278:15
**Connect** 293:20
**connecting**
237:21
**connection** 8:7
23:5 46:8 56:15
**Connectivity**
9:16 18:17
23:12 33:19
38:1 41:6 42:13
67:2 93:9
**connote** 153:22
154:1 241:20

**consciousness**
231:4,5 277:16
278:12
**consent** 6:19
**consider** 55:14
65:9 125:19
126:1 130:7
131:10,17
133:2,5 138:21
162:6 164:5,18
166:10 170:12
179:22 180:4
196:13 204:20
210:3 236:9,11
252:13 253:6
**considerable**
56:9 124:22
271:13
**considered** 23:10
122:6 131:18
131:19 139:11
177:12 191:5
201:16 226:6
**considering** 56:9
167:11 168:5
234:21
**considers** 257:1
**consistency**
246:12
**consistent** 126:17
177:21 182:17
**consistently**
144:2
**consisting** 245:22
**consists** 85:3
**constant** 155:9
155:18 158:9
**constrained**
126:20
**constraints** 143:9
**construct** 137:14
182:14
**constructed**
222:15 223:6
223:11,12
233:14 263:21

**constructing**
179:2
**construction**
226:10
**Consultancies**
61:11,12 68:8
**consulted** 112:9
**consulting** 4:15
14:18 15:18,21
**contact** 15:7
16:20
**contacted** 13:15
13:17,19 80:16
**contained** 59:22
87:10
**contains** 243:6,7
**content** 167:15
171:15 223:16
233:16
**contentious**
110:13 141:9
142:7
**contents** 91:4,14
**context** 39:13
71:12 156:19
167:16 173:19
202:18 203:4
**contingent** 36:11
**Continued** 5:2
**contraction**
269:14 270:18
271:1 272:17
**control** 30:11
98:14 158:10
159:22 160:5,7
160:9
**controversy**
19:19
**convention** 255:9
**conversation**
63:21 277:18
277:15
**conversations**
15:13 100:2
277:15
**copublished**
153:15

**copy** 291:17
**corpus** 186:17,20
186:22 204:10
207:8 209:13
222:13 223:10
256:9,13,15
258:1,4,8 263:4
265:9 266:1
**correct** 11:11,12
11:15,21 12:15
15:3,4 16:14,15
17:8 19:9,10
20:3,8 23:7
25:15 31:3,9,10
31:14,17,18
32:6,8 37:3,5
38:17,18 39:19
40:20 60:12,13
60:16,21 61:3,4
61:15 68:10,13
68:15 69:17
78:17 79:12,21
81:12,17,18
83:1,3,11,19
84:3,18,20
85:18,20,22
86:8,10,15
88:14,18 89:17
89:18 90:9,10
91:9 93:16
95:20 99:9,10
99:13 101:15
101:16,17
102:12,13
103:19 104:1,4
104:8,9 105:7
106:5,6,11
107:11,20
110:21 111:10
115:6 116:8,9
116:11 119:15
119:16,20
120:4 121:6,15
122:16,18,21
123:1,18 124:8
125:9 129:18

129:19 132:8
132:21,22
134:9 141:3,6,7
141:17,18,21
141:22 142:11
142:22 143:17
150:3 152:15
153:20 155:21
155:22 159:20
160:12,22
161:21 165:7
167:3 169:11
170:6 171:9,14
171:20 179:12
179:19 181:15
183:3,4,16,20
189:8,9,19
190:1,2 192:17
192:18 193:2,4
194:8 195:8
199:13,16,22
200:4,7 202:21
203:6 206:11
207:22 209:3
210:2,13 211:1
212:19,20
214:15,16
215:20 216:8
217:9 218:14
218:15,18
219:2,20
221:17 223:21
225:5,8,11
226:22 227:1,3
227:8,11,16
228:7,13 229:8
230:22 231:22
233:10 235:9
237:10 239:21
241:21,22
242:3,6,8,9,12
242:15 243:12
243:15 244:4,5
244:15,19
245:2 246:8
250:2,5,6



251:18,21
255:20,21
256:3,5 257:2,3
257:10,11,15
260:1,5 261:6,9
262:7,9 263:2
264:8 266:6
267:11 268:4,8
268:9,13,14,16
268:21 269:9
269:10,16
271:21 272:19
273:8,17 275:2
275:5 277:1,2,5
278:19 280:10
280:18 281:16
281:17,20
282:12,22
283:1,12,15,17
283:19 285:4,5
285:9,10 296:5
**corrected** 48:3
**corrections** 294:4
294:6 296:8
**correctly** 87:18
101:5 112:13
134:14 162:18
211:17 293:11
**corroborated**
174:19
**could've** 64:20
202:8
**counsel** 1:18 2:2
2:8 6:3,19 7:13
8:19 12:12 15:3
19:20 24:11
25:20 26:11
293:16
**count** 216:11,13
244:14 245:1
248:21,22
249:2,3 260:20
268:10 270:1,5
270:7,8 282:22
**counted** 243:4
244:8 248:19

270:8
**counterpoints**
273:2
**counting** 248:18
**country** 79:7
143:5 212:6
**counts** 256:4
282:10,11,12
**COUNTY** 293:3
**coupla** 229:13,14
229:15,22
230:5 231:7
**couple** 73:2,2
224:17 226:5
226:11,17
227:3,6,7,9,13
227:13,20
229:1 230:21
230:21 231:3,8
231:9 232:13
235:20 236:12
237:9 252:10
270:9 279:1
**course** 28:15
62:20 155:14
184:3 215:15
233:4 234:9
264:7 291:17
291:20
**court** 1:1 2:4,6
5:12,14 61:3,14
61:18 75:20
77:14 99:11
100:22 110:9
111:13 113:18
115:4,11,15
116:21,21
119:4 122:2,3
123:3,11,20
125:4,6 204:10
204:11 209:16
288:16 289:18
289:22 290:5,9
290:14 293:21
294:17
**courtroom** 143:7

293:20
**courtrooms**
143:4 144:13
**courts** 110:6
125:8
**covered** 76:12
92:13 93:5
208:19 286:19
**Craig** 1:8 25:11
35:4,9 36:2
135:1 167:12
167:21 168:6
169:2,4,10
170:17 171:2
171:13 172:1,7
231:2 246:2,3
266:4,10,18
267:4 278:18
280:5,9,14
**Craig-to-Dave**
171:14
**crashes** 215:1
**crazy** 150:14
**create** 56:2
**credibility** 36:10
56:9 59:2 88:10
125:17 182:13
191:17 221:15
236:18
**credit** 221:21
**criminal** 66:22
**criteria** 135:4
173:21
**critical** 113:22
**criticism** 85:19
86:7 87:10
88:15 94:10,17
95:22 96:17
124:11,15
203:11,16
204:4 231:18
241:4 271:18
**criticisms** 114:5
125:7 203:15
204:4 232:1
276:22

**criticize** 220:19
**critique** 93:6
100:22 101:12
101:13 111:21
122:20 134:11
160:15 220:20
221:3 245:5
252:15,17
**critiqued** 77:16
**critiques** 127:6
129:16 134:6,7
134:7
**critiquing** 105:20
110:5 134:1
206:5
**crossed** 71:17
**CRR** 1:18 293:20
**CSR** 1:18 293:20
**currently** 287:12
**cursor** 239:20
**cut** 9:12 64:1
164:3 253:16
271:11
**cutoff** 176:8
**CV** 62:21 68:6
153:5
**C-I-N-E-R** 72:7

___

**D**
**d** 7:1 88:6
**dad** 153:19
**DAGLEY** 3:13
22:20 24:15
25:6 26:2,16
27:17 28:10
32:7,17 34:6
37:4,17 38:7
39:9 41:1,22
44:20 45:4,10
45:16 48:18
50:22 51:18
53:2 58:2 62:6
67:18 69:4,10
72:13 75:3 76:1
77:15 79:16
83:4 84:22 85:8

85:21 86:9
87:13 88:19
89:7,19 91:10
92:15 93:3,8
94:15,20 95:8
99:14 105:22
106:17 108:8
109:15 111:11
112:1,6 119:21
121:8 122:17
122:22 123:9
123:22 125:10
137:8 143:6
156:4 161:1
162:14 164:7
165:8 167:14
172:9 177:16
179:14 180:19
184:1,4 189:16
190:7 191:21
195:12 196:16
200:17 202:10
202:22 203:7
203:22 204:2
205:21 206:12
209:4,8 219:10
222:2 228:14
228:17 235:3,8
247:8 271:2
272:6,9,20
273:7 278:4
287:21 288:14
291:18
**darn** 179:6
**dash** 237:17
238:3
**dashes** 237:13,13
238:4,10,21,21
239:2,2
**data** 56:19
122:15 135:9
139:2,7,9
158:12 161:19
161:21 171:12
185:11,12,15
186:2,3,5,6,14



186:19 187:2
187:14,21
188:8,9 189:4,5
189:11 190:17
192:5 194:1
201:4,22,22
203:19 214:19
214:20 215:4
215:22 222:12
256:5,14 258:1
258:4,8 268:19
274:14
**date** 11:20 13:5
16:1 17:4 29:17
94:6 289:8
290:2,11 291:3
294:8 296:12
**dated** 16:16 17:8
29:9
**Dave** 167:9,13,20
168:6 169:10
169:13,13
170:14 172:1,7
264:11,12
**Dave's** 169:16
**David** 1:4 88:6
**day** 17:8 296:16
**days** 294:14
**de** 3:14
**deal** 115:2
**dealing** 182:10
**debate** 106:15
141:19 142:2
145:3,8,18,20
145:22 146:1,2
271:22 272:3
**decide** 45:8 76:20
117:14
**decided** 102:3
**deciding** 83:8
**decision** 126:14
**decisions** 115:12
**declares** 6:10
**decreased** 228:5
**deemed** 294:16
**deep** 156:17

**defendant** 1:9
3:11 79:21
81:10
**Defendants** 5:17
117:21 290:22
**Defense** 1:5
233:6
**define** 168:11
241:1
**defined** 21:15
145:1 178:15
**defining** 154:14
**definitely** 79:3
132:11 142:5
204:22
**definition** 56:6
**definitive** 279:8
**definitively**
105:18 151:19
171:4
**DEF_0027396**
232:14 233:7
**degree** 26:22
27:13 28:7 36:1
115:22 153:11
263:15 267:2
**delay** 8:17
**deleted** 230:1,2
**demonstrates**
214:6 276:11
**demonstration**
156:22
**denominator**
215:18 228:4
230:19
**depending**
152:13 158:20
208:13
**depends** 51:19
146:1 154:5
**deponent** 293:8
293:11 296:1
**deposing** 294:13
**deposition** 1:12
2:1 4:10,12 5:4
6:4,15,16 7:3

7:20 8:3,6,11
8:11 10:5 12:6
12:20 13:2,3
15:2,20 17:2,11
19:20 20:11,17
22:5 29:13
44:12 46:8
61:18 94:2
163:2 164:4
172:18 181:18
193:6,8 195:1,6
195:18 289:5
289:14,21
290:8,21
292:10 293:6
293:14 294:3
294:11,14,16
**describe** 39:17
178:8
**described** 177:15
**description** 4:11
5:5 14:20,20
48:16
**design** 58:7
**detail** 177:8
194:12
**details** 115:10
**determination**
132:6,11
**determine** 57:3
106:10 122:15
185:12
**determined**
83:22 177:9
189:3,13
**determining**
118:1 175:4
**develop** 54:12
202:1
**developed** 167:21
167:22
**developing** 58:6
**device** 257:18,21
258:5 259:5
**dialect** 147:21
148:20,22

150:20
**dialects** 205:20
209:20
**dialogue** 8:22
**difference** 173:1
190:3,4 192:15
**differences** 122:7
123:4 149:2
168:19
**different** 32:11
44:13,15 56:3
97:2,2 116:4
143:8 148:12
149:1 154:1,2
155:3 156:11
156:12 158:7,7
159:18,18,18
160:18 164:20
165:7,15 166:9
166:16 167:2
173:18,19
183:8 198:2
220:21 236:5
243:14,17
245:6 246:21
256:1 257:12
261:3 268:15
284:8
**differently**
152:13 153:7
**difficult** 96:3
132:5 136:16
155:12
**difficulties** 24:1
38:13 42:10
44:7 287:15
**difficulty** 34:16
135:6 159:3
**direct** 29:20
128:6 201:17
**directing** 115:4
**direction** 134:22
135:3 181:6
246:21 271:15
**directions** 183:9
**directly** 54:6

101:12 239:16
**disagree** 225:6
226:14 274:15
**disagreed** 127:5
**disagreement**
272:1
**disappeared** 78:5
**discourse** 152:18
154:10,11
158:3 159:7,10
222:15 223:6
223:12 234:18
**discuss** 30:3
**discussed** 145:9
287:11
**discussing**
126:17
**discussion** 15:3
20:16 22:4
23:18 34:11
43:22 107:8,9
111:1 201:19
208:2 255:2
284:9 288:18
**discussions**
145:17
**dismissed** 89:22
90:1,2 115:18
115:21 116:1,2
**dismisses** 123:20
**dismissing** 183:5
**disparity** 216:5
217:3 228:1
**disproving** 253:7
**dispute** 75:22
141:9,15 142:7
142:10 230:20
**disregard** 135:2
236:15
**disregarded**
198:3
**disregarding**
181:5 183:5
236:16
**dissimilar** 161:20
**dissimilarities**



170:2
**distinction** 17:19
  64:5 133:3,14
  133:17 225:15
  225:20 238:9
  238:20,22
**distinctions**
  166:15
**distinctive**
  257:19
**distinguish**
  148:22
**District** 1:1,2
  108:5 116:21
**divorce** 73:13,15
**docs** 136:10,10
  164:18 213:13
**doctor** 13:11
  29:20 42:2
  63:13 78:9
  175:5 217:22
  270:1 288:2
**doctor's** 67:21
**document** 10:8
  16:5 18:10 25:8
  49:17 56:19
  75:7,7 78:15
  83:2 90:14 92:1
  92:7 97:11,12
  98:8,10 123:14
  129:21 137:22
  236:19 243:1,6
  243:7,9,10
  244:2 255:22
  269:4 271:14
**documents** 10:12
  17:14,15 18:1,4
  18:16 19:3,14
  19:15,18,21
  20:1,10,11,19
  21:9,14,15 22:7
  22:7 23:9 24:8
  24:12,13,17,20
  25:1,10,11,12
  25:18,21,22
  26:7,7,8,11,12

26:14 27:1,6,14
  28:8 30:13
  33:18 34:5 39:2
  39:3,11,12
  52:15,15,16
  56:20 57:2,4,19
  58:1,4 59:21
  81:21 82:3,22
  83:15 86:14
  88:18 123:17
  129:21 133:4,6
  135:2 137:3,3
  139:4,8,8
  155:19 162:5
  162:21 163:20
  163:22 166:11
  166:17 168:2
  188:19 194:4,7
  198:1,2 200:3
  200:15 202:7
  202:17 203:2
  212:13 213:12
  218:13,22
  220:6,10 225:4
  225:11,17
  231:11 235:21
  236:1,6,7,8,12
  243:14,16
  246:1,4 250:4
  251:16 253:2,5
  255:20 260:16
  266:20,21
  268:8,12,15
  269:13,19,20
  270:17,21,22
  271:5,5,7,15
  273:4,5 274:22
  274:22 282:17
  285:1,2 291:14
**dog** 67:9
**doing** 13:11
  25:12 33:10
  36:3 44:15 60:2
  71:9 76:7 97:21
  105:17,21
  106:8 108:21

110:13 122:21
  135:7 136:17
  141:6 152:7
  155:15 159:5
  161:19 170:9
  179:9 185:11
  186:14 187:13
  189:4 192:3,16
  193:18,22
  197:14 216:15
  227:14 248:6
  255:10 258:16
  281:5 294:7
**dojo** 138:2,15
**domain** 127:2
  143:10
**Dr** 4:21 7:16,20
  8:19 12:12
  17:22 19:2,16
  20:2,11,13,14
  21:16,20 22:1,2
  22:5,9,12,12,18
  22:18 23:3,22
  24:4,7,12,13,18
  25:3,21 26:1,7
  26:13,15,22
  27:8,15,16,21
  28:9 29:8,15
  30:4,15 31:9,13
  32:2,5 34:15
  35:16 36:15
  37:15,16 38:12
  39:6,7,18,21
  40:9 42:8 44:4
  45:18 46:6,20
  46:22 47:22
  48:17 51:10
  52:20 53:21
  56:20 57:20
  62:13 70:6,10
  70:19,20 71:1,3
  71:13,18 72:17
  81:11,14,19
  82:21 84:2,15
  84:20 85:7,13
  85:20 86:3,8,14

87:2,11,12,15
  88:5,11,16 89:4
  89:4,15,16 90:8
  90:21 91:8
  92:20 93:6,14
  95:15,19 96:1
  96:17 99:5,12
  99:21 101:1,12
  103:22 104:2
  105:7,9,12,21
  106:15 107:14
  111:21 114:1,5
  115:13 119:20
  121:11,18
  122:12,20
  124:11 125:5,5
  126:15 127:6
  127:13 129:17
  132:15 133:6
  133:21 139:7
  141:20,20
  142:10,13
  144:20 147:16
  155:20 162:5,7
  163:1 164:4,4
  164:17 166:1
  170:5 177:10
  177:18 178:19
  179:11 180:12
  181:12 194:21
  198:21 199:11
  199:18,19
  200:11,15,16
  200:18 202:8
  202:19 205:7
  205:20 206:1
  206:14,16,19
  206:20 207:21
  208:20,20
  209:7 210:6
  212:19,21
  217:7 220:5
  223:20 224:11
  224:16,20
  226:5,5 227:14
  229:2 230:20

237:9,15 238:4
  239:16 240:13
  240:17,18,21
  241:6,9,11
  242:16,17,18
  243:9 244:13
  247:4,17 248:1
  248:2 249:14
  250:3 251:15
  253:10,10,18
  254:19 255:6
  255:10,15
  256:7,22
  259:12,14,21
  260:4,10,21
  261:2 266:15
  267:14 268:2,3
  268:6,7,7,17
  269:1,12,15
  270:17,21,22
  272:1,4,14,15
  272:16,16
  274:2,21 275:8
  275:8,15 276:6
  280:8,20,22
  281:15,22
  282:12 284:6
  284:16 286:19
  289:11
**draw** 133:18
  201:3 203:19
**drawing** 225:15
**drill** 162:3 248:6
**Druyon** 74:21
**duces** 4:13 10:11
  13:4
**due** 32:11 142:6
  180:17
**duly** 7:8 293:8
**dumb** 56:13
  153:2
**Dutcher** 5:8,12
  66:2,2 68:18
  72:22 77:21
  78:15 81:9,17
  82:17 89:16,21



95:18 96:2,18
97:9,17 98:15
100:21 101:14
109:8 119:5
128:1,6 129:17
131:19 289:12
289:18,22
290:19
**dying** 175:8

**E**
**e** 3:1,1 7:1,1
209:17 240:10
245:7,9 250:15
293:1,1 295:1
**earlier** 47:18
49:4 81:8
105:13 135:10
154:21 163:16
172:15 176:10
177:8 191:11
191:14
**early** 49:4
**ease** 186:10
**easier** 50:4 62:16
82:9 103:5
243:3
**easily** 151:20
**easy** 137:14
256:18
**edited** 164:21
165:16 166:9
**Edwin** 66:14
**effort** 156:2
171:21
**Eggington** 1:13
2:2 4:2,10,14
4:18 5:4,7 7:7
7:16 13:2 15:20
17:2 23:22
29:13,16 34:15
38:12 42:8 44:4
45:18 46:6
62:13 79:11
88:5 93:14 94:2
94:4 95:15

147:16 198:21
254:19 255:6
272:14 286:19
289:5,14,21
290:8,21
**Eggington's** 29:8
289:11
**eight** 269:21
**Eighteen** 103:9
103:10
**either** 20:4 26:13
28:19 44:9
48:15 61:18
65:7 73:22
75:20 101:12
109:4 164:14
164:20 165:14
166:8 169:1
172:3 194:22
202:19 216:2
217:7 227:19
250:16
**element** 182:15
230:11
**elements** 149:1
182:14 230:1
**elephant** 232:3,7
**eliminated**
230:11
**else's** 44:9
**em** 237:13,17
238:3,9,21
239:2
**emerged** 167:19
**emoticon** 251:2,4
251:9 267:10
267:16 268:3,8
268:18
**emphasis** 8:16
27:11 240:11
240:18 241:2
241:10,12,14
241:20 242:17
242:18 243:11
244:4 247:1,7
257:17 258:5

259:9
**empirical** 85:14
86:5
**Empirically** 91:6
**employee** 64:15
**en** 237:13,17
238:2,9,21
239:2
**encountered**
71:13
**endless** 160:14
**engagement** 4:17
12:10,13 16:11
16:13 17:3
**engages** 126:1
**engine** 212:14
**England** 211:8
**English** 30:12
65:2,7,7,8,8
122:9 204:7,14
204:19 206:2
206:21 207:16
207:16 209:14
211:11 213:2
214:14 224:18
226:8,9 227:18
228:22 230:13
241:19 274:3
277:15,16,17
**Englishes** 204:6
230:13,15
**enlarge** 145:6
**ensure** 155:17
**ensuring** 141:5
**entered** 12:14
65:12
**entitled** 49:10
**entries** 163:3
**entry** 15:1
**equal** 30:16
264:19
**equally** 89:15
**equation** 202:1
**equivalent** 213:6
**errata** 294:6,7,10
294:13 296:9

**error** 84:13
258:22
**especially** 204:22
**ESQUIRE** 3:5,13
**essence** 187:5
**essential** 177:11
**essentially** 32:1
36:7 47:11 56:2
58:9 59:22
63:19 64:9
108:19 137:2
148:5 150:11
151:2 173:20
175:15 186:11
187:13 191:17
195:14,20
196:2 215:13
223:16 229:20
230:10 238:3
246:20 258:17
259:16 263:20
**EST** 1:14 2:10
7:4 42:5,5 46:3
46:3 100:16,16
147:12,12
198:18,18
254:16,16
286:16,16
292:11
**established** 39:3
59:9,11,15
135:15,20
136:6,11,18
156:9 161:20
165:10,14
182:2 188:13
193:3 233:8,9
233:10 234:3,8
**establishes** 41:4
**establishing**
182:19
**estate** 1:4 169:17
**estimate** 195:22
**et** 59:16 87:22
115:12 127:20
131:17 143:9

146:6 148:16
149:14 152:19
156:13 158:3
175:3 184:13
186:12 207:15
223:12 233:15
247:18 248:2
249:15 250:15
251:8,16
252:20 253:3,4
259:20
**evaluate** 30:3
163:21 171:18
179:7
**evaluated** 30:6
**evaluating** 33:10
**evidence** 30:8,9
33:12,14 37:6
64:11 65:13
87:5 111:7
113:17 121:19
123:12 135:3
174:20 180:1
236:20 246:20
253:6 282:4
**evidentiary**
51:21 53:17
64:6 65:19
68:12 74:12
75:2 77:11,13
101:6 102:5
125:2 136:18
137:1 138:6,7
172:17,18
173:3,7,10,17
174:14 176:12
176:13
**evoke** 87:19,21
**evokes** 107:5
284:8
**evoking** 181:2
**evolving** 168:10
168:12,15
192:4
**exact** 56:18 88:21
89:3 101:8



132:18 219:18
260:4,5
**Exactly** 240:9
**examination** 4:1
4:3 7:13 222:12
**examined** 7:9
**examining** 59:20
**example** 17:17
20:12 21:18
55:22 94:10
103:14 110:12
112:19 113:3
134:21 148:20
149:3 150:13
153:9 156:16
157:22 159:4
159:12,14,15
161:15,18
167:1 176:10
177:18,19,22
183:10 223:14
229:17 235:1
237:4 262:11
263:9 279:18
282:8 285:6,7
**examples** 178:1
197:21 223:9
233:14,15
250:10 252:20
259:3 278:14
**exceed** 132:20
**Excel** 162:21
**exceptional**
271:6
**exclude** 5:17
90:20 99:4
290:19,22
**exclusively**
155:21
**excuse** 21:12
174:7 193:7
211:3 268:6
272:2
**excused** 292:6
**exemplars**
245:21

**exhibit** 4:11 5:5
12:20 13:2
15:18,20 16:4
16:22 29:8,13
93:20 94:2
289:3,5,11,14
289:18 290:5,8
290:14,18,21
**exhibits** 4:7,9 5:2
288:8,22
**exist** 22:19 127:8
151:17
**existed** 99:18
**existence** 163:10
190:22
**exists** 148:17
**expand** 60:22
**expect** 144:4
168:7 224:19
285:3
**expectation**
254:20
**expected** 164:19
**experience** 52:3
112:10,15
146:8 256:12
**experiment**
192:5
**experimental**
197:4,7,12
**experiments**
137:15
**expert** 4:20 5:10
5:18 29:15
57:16 71:18
95:2,19 102:7
108:4 289:6
291:1
**expires** 296:18
**explain** 35:14
37:22 158:14
187:8 194:13
194:15 223:7
235:13 252:16
278:20
**explained** 216:20

219:18 222:14
223:5
**explaining** 121:4
181:3
**explanation**
235:18,20,22
**explicated** 196:7
**express** 123:15
**expresses** 87:3,15
**expression**
175:21 232:7
282:5
**expressions**
149:13 266:3,9
266:17,21
267:3
**extent** 134:2,2
223:17,19
**external** 265:1,2
265:6
**extra** 8:18 9:2
**extreme** 65:3
159:12
**eyeball** 215:4,6
216:12 219:21
219:22 249:6
**eyeballed** 223:8
**eyebrows** 105:4
153:17
**e-mail** 13:17 14:5
14:6 37:14
45:14 151:22
152:1,19
155:13 223:20
232:15 233:8
233:18 234:4
234:18 244:7
248:2 277:7,12
277:14
**e-mails** 19:7
21:19 22:1,17
23:5 24:3 25:2
35:10 36:2 37:1
64:13,21
106:10 118:1,2
123:14 155:21

156:3,3,8,11
166:12,19,22
167:4,8,12,18
167:19 169:2
171:2,14,16,18
171:22 172:1,6
217:8 227:15
229:2 231:1
235:1,7 237:8
238:4,5,5
241:14 242:19
243:17,22
244:3 266:3,10
266:17 267:4
277:21,22
278:3,6,8,10,11
278:15,17,17
278:18 280:4,9
280:13 284:17

_____

**F**

**f** 247:16 252:17
293:1
**fabricated**
123:15
**face** 21:19 25:2
43:10 75:13
157:8
**Facebook** 104:7
114:1,6,13,14
**fact** 20:14 25:17
25:22 37:2
48:15 49:12
50:10 61:5 87:4
106:22 130:19
183:1 213:17
216:10 236:22
253:2 266:8,14
267:6
**factor** 161:10
**factored** 170:13
**factors** 172:12
**factual** 213:17
**fail** 177:11 178:2
294:15
**failed** 88:8

**failings** 89:11
**fails** 84:5,16
221:14 224:1
**fair** 16:12 19:22
70:12 77:12
171:17 180:13
216:2 217:13
232:10 262:1
**fairly** 139:4
**fairness** 160:13
180:11
**faith** 253:1
**false** 180:16
**familiar** 8:12
71:8 259:11
**family** 80:22
148:3 149:15
149:17,18,18
**familylect** 148:2
149:9,12
**famous** 114:17
**fancy** 38:21
**far** 47:12 65:13
104:22 157:11
163:10 182:22
191:17,19
192:10 215:3
230:17 236:22
255:19 262:4
**farm** 174:16
175:1
**fault** 78:13
**FBI** 101:3
**feature** 150:20
151:4 178:2
180:6,7,8,10
181:13 190:19
194:3,4 199:14
199:18 204:5
204:13,13,22
207:4 208:2,17
212:18 221:7
222:15,16
223:6 224:15
225:4 226:7
236:13,14,17



236:22 255:7
255:16 256:8
257:1 272:5,19
275:17 276:7
277:1 281:19
282:9 283:7
284:14,15,18
285:9,14
**features** 35:3,8
59:11,15,17,18
65:4 97:1,1
122:14 130:21
130:22 133:4
133:11,15
134:18,20
138:4 147:22
148:2,3,6 149:5
150:12 178:8
178:12 180:8
180:15,21,22
181:5 182:17
182:18,22
183:2,5 188:15
194:2 195:10
196:3,5 197:22
197:22 199:4,4
231:20 269:9
285:20,21
**Federal** 110:9
124:11,13
126:16
**feel** 126:21 221:1
225:20
**feels** 112:14
**felt** 125:3
**field** 27:14 53:7
89:12 108:15
111:16,19
112:20 113:5,9
126:20,20
141:11,15
143:8,12,14
170:9 186:7,12
188:22 192:16
**figure** 32:15
33:22 43:2

44:16 45:1 46:7
46:17 201:17
215:6,6,12,12
228:9 270:12
**figured** 15:9
147:5
**figures** 177:20
211:18 216:12
**figuring** 44:13
186:17
**file** 58:17
**filed** 99:8 108:4
109:11 110:4
**files** 58:14
**filing** 123:15
**filings** 79:7
**Films** 5:8,13 66:2
78:16 94:5
290:1
**Finally** 117:21
**find** 32:3 37:1
54:17 61:7 82:8
83:13 91:20
102:15 110:14
140:18 144:5
156:14,15
159:16 161:20
176:4 201:1
210:8 211:13
221:13 236:21
242:17 248:11
248:14 260:15
266:20 281:2
**finding** 30:16
33:12 175:22
213:17 263:13
269:1 274:16
**findings** 230:20
**finds** 177:17,19
196:3 214:12
226:21 227:2
255:19,22
268:7 274:8,21
**fine** 7:18 28:19
45:6 50:6
118:14 209:11

221:2,3
**finish** 9:3,5,14
94:19 98:8,10
165:18,20
254:20
**finished** 272:7
**firm** 12:14 16:9
80:16
**first** 7:8 10:7,20
13:12,15 16:18
31:7 46:18
47:15 61:12
65:4 83:20 91:4
92:6 104:17
116:15 150:19
151:6 163:4
169:7 185:8
193:5,9 194:6
195:7 199:14
208:19 210:14
236:8,11
241:17 244:22
251:16 257:6
259:15,22
263:3 275:22
276:10
**fits** 39:12
**Fitzgerald** 69:20
69:21 101:3
102:3,6,10
**five** 12:5 100:9
100:11 132:10
132:20 140:19
147:7 175:6
203:8 213:10
248:17 269:21
282:6,7 286:5
286:10
**five-minute**
41:20
**fixes** 67:21
**flag** 181:8
**flavor** 162:12
**FLEXNER** 3:4
**flip** 264:6 274:9
285:12

**flippant** 108:1
**Florida** 1:2 3:7
3:15 108:5
124:12
**fly** 228:12
**focus** 24:7,16
27:2,20 28:4
30:2 31:20
34:21 51:1 52:2
122:16 134:1
177:6 187:4
233:16,17
276:17,18
**focused** 192:14
276:9
**focusing** 185:7
223:18 245:19
247:1,4 269:2
**fold** 208:9
**folks** 43:1 53:7
70:9 113:15
125:4 142:15
143:16 145:15
149:6 185:11
189:12
**follow** 70:11
154:6 179:4
224:17 246:11
249:15 250:1
276:14
**followed** 70:19
232:13 237:9
250:16
**following** 35:7
36:5 71:2 83:22
177:9 197:3
214:5 235:15
275:10 276:10
276:11
**follows** 7:10
249:17
**font** 242:7
**Footnote** 55:2,5
55:11,13 92:7
92:19
**foregoing** 293:6

296:4
**forensic** 35:7
36:5,8,12,20
39:19,21 40:14
40:21 41:9
42:11,18 46:13
46:21 47:7,8,9
47:15,20,21
48:3,4,12 51:14
51:21 52:4,21
53:9 64:3 70:17
84:4,15 89:11
89:12 105:4
108:15 109:11
110:5,14 111:9
112:11,19
113:5,7 114:8
130:5 131:8
137:17,22
138:16 139:18
140:4 141:10
144:20 146:8
174:21 185:8
186:21 188:22
189:2 191:3,22
192:4 266:14
267:7 279:7
285:15
**forensics** 107:14
108:17
**foreshadow**
146:14
**forget** 177:3
**forgetting** 118:11
**forgive** 130:17
156:21 163:14
**forgotten** 58:21
134:19
**form** 22:20 24:15
25:6 26:2,16
27:17 28:10
32:7,17 37:4,17
39:9 41:1 48:18
50:22 51:18
53:2 58:2 62:6
69:4,10 72:13



75:3 76:1 77:15
79:16 83:4
84:22 85:8,21
86:9 87:13
88:19 89:7,19
91:10 92:15
93:3,8 94:15
95:2 99:14
105:22 106:17
109:15 111:11
112:6 119:21
121:8 122:17
122:22 123:22
125:10 137:8
143:6 156:4
161:1 164:7
165:8 167:14
170:19 172:9
177:16 179:14
180:19 184:1,4
189:16 190:7
191:21 195:12
196:16 200:17
202:10,22
203:7,22
205:21 206:12
209:4 219:10
222:2 223:15
228:14 233:17
235:3,8 247:8
249:17 271:2
272:6,20 273:7
278:4 296:8
**formal** 146:2
154:18
**format** 83:14
152:14
**formed** 26:19
**forms** 214:8
**forth** 154:19
207:20
**Forty-four**
270:14,15
**fought** 143:3
**found** 33:17
119:5 133:11

133:12 199:19
213:10 214:9
225:3,10
226:10 227:20
232:14 250:3
258:18 262:22
266:21 283:13
**four** 10:15 96:5
128:14 134:17
218:4,5,5,6,7
218:13 223:20
248:16 249:9
252:20 253:3
264:10 265:14
269:21 282:6,7
**Fourteen** 270:3
**fourth** 12:10
184:10
**four-word**
259:20
**frame** 44:21
**framework** 36:12
36:21 39:13
266:14 267:7
279:6 285:16
285:18
**frameworks** 35:7
36:6,20
**frankly** 103:12
164:13 235:14
**freezing** 42:19,21
**frequencies**
221:11 228:22
237:5 279:9
**frequency** 133:12
207:15,15
215:3,7,11
216:18 218:20
219:9 225:8
226:4,17
227:22 231:20
248:5 255:19
257:8,13 263:1
263:4,19 264:2
264:19 266:6
269:7 271:9

273:4 277:1
278:16
**frequent** 230:13
**frequently** 98:4,4
211:3,4,7 212:7
212:9
**friend** 81:2
167:20 262:12
262:12
**friendship** 156:9
168:1,10,13,15
**friend-to-friend**
168:7,9
**front** 28:18,20
157:7 208:5
217:19,20
248:10
**froze** 9:17 41:8
42:15
**full** 214:1,1
269:16
**fun** 240:8
**furring** 215:16
**further** 6:8,13,18
139:16 286:22
287:3,9,16
**future** 33:5 287:9

———————
**G**
**g** 4:14,21 5:7 7:1
29:15 79:11
94:4 209:16
255:7
**gained** 59:1
**game** 182:6
**gather** 47:12
**Gee** 80:17,18
**general** 108:14
113:5,9 156:1
170:9 186:8
261:11 264:18
**generally** 8:11
54:15 79:1
154:6 171:5
216:7
**generic** 149:17

**genre** 148:15
**gentleman**
103:21
**GEORGE'S**
293:3
**Gerald** 5:18 69:3
69:6 70:19
291:1
**getting** 40:16
43:3 48:7 76:21
179:9 184:12
190:17 201:18
275:20 282:15
**give** 8:18,19 11:2
14:14 31:16
41:3,17 46:9
66:9 71:22
78:22 90:6 95:5
98:7 128:2
148:20 156:21
158:20 182:12
184:17 191:17
221:21 226:17
229:13 237:4
281:13 285:6
**given** 253:1
293:15 296:6
**gives** 137:17
222:19
**giving** 236:18
282:21
**Global** 209:13
**Globe** 209:13
**glossing** 225:21
**GloWbE** 207:6,8
209:1,12,13,19
210:8 211:15
214:9 220:2
222:13,19
223:10,11
258:9,11 263:6
265:9 266:1
274:3 283:5,10
**GloWbE's**
258:10
**go** 17:11 23:15

28:4,16,22
30:18 32:22
33:9 34:6,8
38:12 41:13
43:19 46:10
49:18,19 50:16
55:3 61:6 62:14
62:15 63:16
68:1,4 72:4,21
76:7 77:5,20
80:11,14 83:6
84:14 86:22
91:13,15
102:14,17,19
104:14 106:13
117:12 120:3,8
120:11,15
124:6 127:22
128:5 129:4
130:8,11,12
131:4 133:11
134:17 139:14
139:15 140:12
142:18,19
143:19 145:5
152:6 157:2,5,9
158:18 161:6
168:6 175:5,9
175:10,17
179:1 197:14
199:3 207:3
208:1,12
212:15 214:2
217:12 218:19
219:6 220:16
222:21 223:3
223:13 224:10
225:1 228:10
229:10 231:13
237:14 238:13
239:12,14
240:4,13
242:21 244:20
250:8 252:6,14
252:19 257:5
259:10 262:15



267:9 269:5,11
273:13,20
274:1,18,19
276:20 280:2
280:20 282:14
282:16,16,19
288:7
**goal** 20:6 163:21
254:19
**goals** 156:13
**goes** 70:21 71:21
105:11 136:4
193:19 204:15
212:4 236:22
240:7
**going** 9:1,4,19
10:4,10 12:17
25:16 29:4
31:22 34:16
38:6 41:3,12,14
41:14,15,19
43:1 44:11,11
45:1 46:10,11
56:17 57:18
61:6 63:10
67:11,11 73:14
73:15,17 74:19
77:21,21,22
78:21 80:6 81:9
82:4 83:15
86:14,19 90:12
91:13,15,19,20
93:11 97:2,9
102:17,19
113:17,19,20
117:9,13
120:10,16,21
121:2 122:15
125:18 127:17
127:19 128:6
128:15,19,22
128:22 132:2
138:4 140:16
146:13 154:6
156:13 158:22
159:1 160:19

166:18 168:21
174:17 175:4,8
179:22 180:3
182:9 183:14
187:4 188:11
188:12 194:20
197:20 208:1,9
212:16 213:22
213:22 217:14
221:8 224:10
233:5 234:10
237:12 241:16
245:11 247:16
247:17 249:19
252:14 258:4
258:21 264:13
265:13 276:20
281:6 286:4,7
287:6 288:19
291:18
**good** 7:16 53:21
54:1 166:14
173:16 197:10
208:11 213:21
228:11,19
**gradations**
149:22
**grammar** 122:10
**grammatically**
238:10
**grant** 130:2,3
131:5,21 132:4
194:20
**grasp** 122:9
**great** 81:5 159:14
165:6 211:8
292:1
**greater** 184:10
**greatest** 138:4
**GREGORY** 1:13
2:2 4:2 7:7
**groove** 48:7
**grounding** 86:5
**grounds** 6:4
**group** 70:16
137:16,17

145:6,22
147:21 148:2,5
149:4,6 157:4
157:14
**groups** 162:5
**guarantee** 20:6
**guess** 15:5 47:5
91:17 176:14
241:14,15
244:7 266:19
270:7
**guesses** 171:6
**guest** 71:15
**guided** 27:7
**guy** 81:5
**guys** 9:20 19:19
41:17
**G-L-O-W-B-E**
207:7

---

**H**

**half** 210:21
**halfway** 129:3
**Halliday** 154:7
**hand** 9:13 263:18
**hang** 49:14
102:22
**hanging** 148:10
**happen** 50:1
**happened** 67:4
89:21 90:5
101:20 115:8
**happens** 68:1
79:8 156:17
230:1,4 269:19
269:20
**happy** 62:13
220:22
**hard** 52:12
217:22 235:15
248:8 288:9
**hard-pressed**
179:20
**Harry** 58:22
187:18
**hastily** 232:15

233:8 234:4,17
234:21 235:7
236:4
**head** 173:8
194:11 231:6,7
233:3
**healthy** 190:12
**hear** 18:21 43:9
173:17,17
**heard** 99:13
116:15
**hearing** 101:7
102:5
**hedges** 234:19
**held** 2:3 23:18
34:11 43:22
111:14 146:5
155:17 255:2
**help** 50:2,5 75:20
77:21 82:4
217:21 218:2
**helping** 65:10
**hide** 120:7
**high** 175:10
179:6 190:19
263:19 266:6
**higher** 33:1
49:18 173:21
173:22 207:14
260:1 264:3,21
273:4 278:16
279:4 283:20
**highlight** 31:4
201:9
**highlighted**
120:22
**highlighting**
124:3
**highlights** 98:19
**highly** 104:3
123:4,12 266:8
266:16 267:3
**hired** 72:16
**historical** 229:17
229:18 230:9
**historicity**

204:15
**history** 47:3
**hit** 128:17 146:22
**hits** 215:13
**Hmm** 249:1
**hoc** 86:4
**hold** 41:10,10
155:9
**holds** 190:8
**honor** 254:6
**hope** 78:14
180:12 198:22
**hopefully** 43:8
286:11
**hour** 12:5,5
15:14 97:22
98:1 146:15,17
146:19,22
254:20
**hourly** 12:3
**hours** 11:19
15:10 146:18
**How's** 118:13
129:10
**huh** 78:3
**hundred** 12:5
162:7
**hundreds** 188:5
204:16
**hypotheses** 30:5
30:7 31:9 32:6
36:16 37:7
181:7
**hypothesis** 30:9
30:10,11,14,18
30:19 32:2,5,14
33:11,13,14
35:11,18,19
36:9 37:2 135:1
179:11 197:4,5
197:6,7,11,12
197:18,20
198:4 246:18
246:19 253:6,9
253:12,19
271:16 280:11



**I**

Ian 251:7
ideally 158:4
identical 260:7,7
identification
  13:5 16:1 17:4
  29:17 38:21
  94:5 289:7
  290:1,11 291:3
identified 25:22
  26:12 27:15
  65:15 101:5
  140:16 191:4
  224:16 259:15
identifies 85:4
  260:10
identify 39:1
  58:19 172:6
  188:16 284:16
identifying
  275:16 285:9
  285:14
idiolect 59:13
  146:12,13
  147:19,20
  148:5,9 150:2,6
  150:8,13 155:6
  155:8 158:1,5
  161:3,4,10
  172:6 190:14
  190:15 191:1
  222:16 232:8
idiolects 151:17
  160:1
idiosyncratic
  71:10
ignores 246:20
III 83:17
illustrate 263:10
imagine 153:13
  179:3
imbalance 246:2
  246:15 271:9
  271:13,14
  278:22 279:2

imbalances
  279:10
immediately
  45:3
impact 21:10
impactful 264:20
imperative
  294:12
importance
  275:16
important 126:4
  172:8 249:20
  264:3,7 272:5
  272:15 285:21
  285:22
impossible 88:9
impressed
  138:18
impressionistic
  86:4
improbable
  118:3 119:11
improperly 87:2
  87:15
improved 198:10
inappropriate
  73:18
include 256:19
  258:1
included 94:12
  96:1,18 243:16
including 204:6
increase 53:12
  54:14 242:7
increased 186:9
  186:10
INDEX 4:1,7 5:2
Indian 65:7
indicate 61:13
  122:8 181:22
indicated 35:8
  234:17 266:17
  293:8
indicates 61:17
  222:13 229:6
  246:3 278:14

indication 222:20
indicator 232:18
  263:22 266:9
  267:3
indicators 198:3
  231:4 233:11
  234:21 246:1
  266:3
indirectly 54:6
individual 74:6
  148:7,8 150:1,8
  178:7 182:14
  182:15 261:18
  262:8 264:13
individuals 70:16
inferring 140:10
infers 139:19
  140:1
influence 152:22
  172:12 215:17
influenced 154:9
  154:10
influences 215:15
Info 1:4
inform 111:13
  186:22 187:2
informal 154:18
  155:13 226:8
  230:10 277:7
  277:12,14
information 14:5
  55:15 195:2
  210:4
ingroup 149:14
initial 16:19,20
  168:11,11
  273:14 274:19
  276:7 278:14
inquire 25:20
insignificant
  203:18
insinuate 262:2
insinuating
  163:15,17
instance 116:15
  190:22 246:14

instances 161:16
  161:16 182:16
  201:15 214:5,6
  239:22 243:10
  245:5 246:14
  261:14,16,17
  261:22 264:10
  270:16,20
instant 123:16
INSTRUCTIO...
  294:1
insufficient
  129:18 133:6
  139:9
integrity 141:11
intend 286:20,22
intention 20:1
interest 26:5
interested 293:17
interesting
  145:14 161:12
  194:9 248:21
interference 65:4
interlacing
  152:22
interlocking
  154:13
international
  64:16 131:13
  138:16
Internet 108:13
  109:13 110:1,6
  163:7 164:5
  166:7
interpret 191:16
interrupting
  95:11
intuition 265:4
investigate
  139:15 176:11
investigating
  137:18 197:15
investigative
  64:5,8 65:10,20
  74:7,8 77:10,10
  172:16 173:2,5

  174:1,16,18,21
  179:19 189:6
  189:21
invests 197:10
invoice 11:5,10
invoices 10:20
involve 44:14
  72:10
involved 68:11
  111:15,19
  114:19 155:16
involvement
  16:18
Ira 1:3 169:4,8
  169:12,15
Ira's 170:16
issue 62:3 92:11
  108:11 126:16
  155:6 205:1
  219:11
issued 31:21 32:1
issues 9:16 18:17
  23:12 33:19
  38:1 41:6 42:13
  67:2 93:9 125:2
  146:6 184:13
  187:1 188:14
italicize 242:2
item 17:12,13
  68:9 170:12
items 149:13
  245:22

**J**

Janet 137:13
  142:16
JGAAP 58:13
  60:1,3,12
  135:19 154:22
  155:16 159:5
Jim 69:21 101:3
job 1:16 111:6
jobs 57:15
John 80:20
joined 67:10
journal 131:13



153:8
journalist 104:22
journals 126:11
  144:16 175:18
judge 89:22
  97:16 102:3
  113:20 116:16
  116:21,21
  124:11,12,13
  126:16
judges 125:18
  127:1
judgment 90:1,4
  90:7 234:22
  242:16
jumping 40:2
Juola 54:4,20,21
  54:22 55:13
  58:12 113:14
  135:20 137:9
  137:11,13
  138:13 142:16
  158:14 161:18
  185:10 187:14
  191:3 192:16
Juola's 54:18
  60:1 139:10,17
  154:21
Jurisdiction
  293:5
jury 99:13
  113:18 115:5
  150:10 190:9
justify 136:17
J-G-A-A-P 60:5
J.K 187:19,22
  188:4,6

K
K 24:12 25:9,11
  25:17,22 26:7,8
  52:15 56:19
  57:4,19 60:11
  75:7 82:22
  119:14 136:10
  137:3 139:8

155:19 171:2
171:22 193:7,9
193:14 194:4
196:4,5,14
197:14,14,14
197:20 198:2,9
200:3 201:15
202:7,17
213:12 217:7
218:6,7,13,21
220:5 223:20
225:4 236:1,6,8
237:1 238:5
242:18 243:1,7
243:9,10
246:14,17
247:2,7 248:12
249:9,10,14
250:15 251:16
253:5 255:20
257:9 260:15
261:3,4,19
262:13 266:21
268:4,5,7,8
269:3,13,19,20
270:3,17 271:7
271:15 273:5
274:22,22
278:8,17 279:3
279:13 285:1
Kass 4:17 13:22
  14:1
keep 28:3 29:22
  33:16 114:12
  118:11 119:22
  120:10,16
  128:19
key 56:19 139:3
  190:3 192:15
kicking 257:22
kin 293:16
kind 22:5 54:15
  65:11,13
kinds 144:4
kitchen 232:3,7
Kleiman 1:3,4

4:20 89:17
167:9,12,13,20
168:6 169:12
169:15 170:14
272:15
Kleiman's
  169:10,13
know 9:12 13:19
  13:20 14:12
  18:6 19:18 21:6
  21:22 22:6,16
  22:19 23:4,8
  27:12 28:6
  41:19 54:5
  55:17 56:13
  66:19 68:3
  69:13 70:7
  71:15 73:3 74:9
  75:17,19 79:5
  80:19,22 88:21
  99:18,21
  102:18 105:1,8
  105:19,19
  107:22 108:3
  109:13,17
  110:17,17,20
  111:6,6,18
  112:4 115:8,10
  115:11,13,17
  115:19,20,22
  115:22 118:6
  119:8 127:8
  128:14 132:20
  135:22 138:18
  139:11,17
  146:21 148:11
  149:4,10
  150:14 152:19
  159:4 162:11
  163:4,16
  165:22 167:4,6
  167:7 168:11
  168:21 169:16
  170:3,4,18,22
  174:18 178:10
  178:21 179:21

180:13 181:18
182:1,16
185:18 190:11
191:19 194:21
196:10 198:5,8
201:18 208:15
212:11,12,22
215:4,5 218:2
220:21 228:11
232:3 234:18
240:1,22
241:11 249:4
251:10 258:2
258:15 261:18
267:20 272:11
274:20 282:3,4
282:5,11 283:8
283:9,13,16,21
283:21,21
287:2,4 288:6
knowledge 19:12
  47:7,17 48:21
  90:4 106:12
  127:11,20
  144:21 145:15
  163:11 172:11
  206:19 244:18
  251:7
known 24:13
  25:11 39:3,11
  52:14,15 75:7
  81:16 85:4
  101:22 122:8
  129:21 130:18
  137:16 139:3
  159:8 177:20
  177:22 180:6,7
  188:6,15,18
  231:2 282:7
Korean 64:19,22
  65:1,2
Korean-based
  64:15
Ks 159:17 168:20
  169:2 257:2
  260:12 261:12

262:6

L
L 1:18 2:3 6:1
  293:4,20
labeled 26:7
  277:4
lacks 32:3 125:17
  140:3,6
Lake 71:16 80:20
land 32:5 179:13
language 33:15
  33:17 65:4
  107:10,13
  110:22 111:1
  119:5 131:13
  152:3 154:9
  157:18 186:18
  229:19 234:2,5
  234:7 241:20
  284:22
large 89:13 139:2
  139:4 161:19
  186:13,18
  187:2,13,16,17
  187:21 188:8
  189:4,10,11
  190:17
Larry 54:7 146:4
late 20:5
lately 186:8
laugh 151:2
laughed 157:15
law 12:14 16:9
  74:21 80:16
  131:14 173:18
  176:14
lawsuit 7:22
  18:11 19:8
  169:18
lawyer 80:19
  173:11,17
  249:20
lawyers 75:21
  127:1 287:6
lead 178:12



280:8
**leading** 278:16
**lecture** 157:13,15
  157:21
**led** 116:2
**ledger** 114:15
  142:21 144:19
**left** 255:7 258:19
  259:1
**legal** 1:21 6:6
  18:7 61:12 79:6
  102:2 127:1
  143:9,10
  154:18 173:10
  186:22
**lend** 256:8
**Leon** 3:14
**Leonard** 3:20
  4:19 5:9 7:20
  21:16 22:12,18
  23:3 24:7,12
  29:14 30:15
  39:6,7,18,21
  46:20,22 48:17
  51:10 52:20
  53:21 56:20
  57:20 70:6,10
  70:20 71:1,9,13
  71:18 72:17
  84:20 85:7,20
  86:8 87:11 88:3
  88:16 89:4
  94:12 96:1,17
  96:21,22 97:5
  105:21 111:21
  114:10 119:20
  122:20 127:13
  132:15 133:6
  139:7 141:20
  144:5,7 155:20
  162:5 163:21
  163:22 164:4,4
  164:17 166:1
  172:3 177:10
  178:19 180:12
  191:18 192:17

192:19 193:2
198:2 199:18
200:11,15,18
208:20 209:7
220:1 224:11
224:16,20
226:5 237:15
239:16,20
240:17 243:9
245:21 246:19
247:4 248:1
250:3 255:15
256:7,22
259:14,21
260:4,10,21
261:2 266:2,15
267:14 268:7
268:17 269:12
272:4,16 275:8
275:8,15 276:6
278:13 280:8
282:8 284:6
289:2,6
**Leonard's** 17:22
  19:2,16 20:2,11
  20:14 22:5,9
  24:18 25:21
  26:7,13 27:8,15
  27:21 30:4 31:9
  31:13 32:2,5
  36:15 37:15
  47:5,22 87:12
  89:16 93:6
  124:22 127:21
  133:21 163:1
  172:4 177:18
  179:11 181:12
  194:21 199:11
  206:1,14,16,19
  207:21 210:6
  212:19 230:20
  236:16 240:13
  240:21 241:6
  242:16 244:13
  246:12 247:17
  251:15 253:1

253:10,10,18
255:10 259:12
269:1 273:18
274:2 280:20
280:22 281:15
281:22 282:12
**lesser** 264:14
**letter** 4:17 12:13
  17:3 101:22
**letters** 12:11
  102:1,1,11
**let's** 9:1 12:7
  14:11 17:11
  23:15 29:7
  30:22 34:8
  41:20 43:19
  49:2 61:5,5,6
  67:15,21 72:21
  72:21 75:11
  77:20,20 80:14
  83:6,12 86:22
  90:11,11 91:2
  91:13 92:9
  94:22 97:8
  98:10 100:7
  102:14 109:20
  109:22 116:3
  117:6 128:5,7
  132:2 140:12
  140:14 147:2,8
  182:3,11
  183:10 187:13
  187:14 198:13
  212:15,22
  218:19 219:6
  220:16,16,17
  225:1 228:6
  229:10 231:13
  237:14 239:12
  239:14 240:4
  240:13 242:21
  244:20 245:3
  247:11 248:5
  251:11,14
  252:6 253:21
  254:4,5,9 255:9

257:4,5 259:10
262:15,17
267:9,13 269:5
269:11 273:13
276:17 280:2
280:20 282:14
282:16,19
286:9 288:7
289:3,10,17
290:4,13,18
**level** 136:4 156:7
  156:8,18 179:3
  181:1,4
**levels** 87:19
  175:10 190:20
**lies** 140:17 141:8
**lieu** 6:9
**likelihood** 180:9
  184:10,15
**limited** 64:20
  171:12
**line** 28:5,5 36:4
  41:18 47:15
  63:22 295:2,5,9
  295:12,16,19
**lines** 140:19
**linguist** 104:3
  107:10 117:17
  126:19 232:6
**linguistic** 59:11
  59:15,18,20
  102:11 108:15
  110:21 115:1
  126:22 130:21
  131:7 134:18
  135:16,20
  141:1 143:12
  143:14 147:22
  148:2,5,13
  149:4 153:1
  161:21 175:17
  180:7,8,10
  182:18 188:15
  190:5,19 193:3
  194:2,3,4
  197:22 199:4

204:13,17
232:6 236:14
**linguistics** 41:9
  47:16,21 48:4
  54:11 64:4
  89:13 105:4
  107:4 110:14
  112:11 113:5,9
  126:21,22
  130:6,6 131:8
  138:1 146:8
  154:5 156:20
  176:19 186:7
  186:15,17,20
  186:21,22
  229:17,18
**linguists** 107:6
  127:5 137:18
  138:16 141:10
  142:2 145:10
  284:7
**link** 39:11 96:22
**linkage** 96:22
**linking** 35:3,8
  97:1 133:3,15
  134:18,19,20
  178:1,7,11
  180:14 181:13
  182:17,21
  183:2,6 195:10
  197:22 199:4
  199:14 204:21
  207:3 208:2,16
  212:18 221:7
  231:20 255:7
  255:16 257:1
  269:8 272:5
  275:16 276:6
  277:1 281:19
  282:9 284:14
**list** 23:9 31:8
  61:8,17 68:8
  73:3 77:6 78:19
  142:19 145:5
  160:14 288:17
  291:13



listed 11:19
132:17 162:21
195:11
listening 95:9
listing 12:1 14:20
lists 266:2
literature 17:17
19:14 136:6
139:15 141:5
144:16 188:14
literatures
189:13
litigation 6:3
little 8:17 9:18
12:8 32:10,13
32:21 41:3
49:17,18 50:3
59:1 60:22
83:14 86:13
93:12,18 97:9
97:20 103:3
104:10 127:13
130:8 137:20
138:2 148:19
153:3 162:3
172:17 178:6
183:22 208:14
217:21 229:17
235:15 237:14
238:13 240:14
241:17 253:16
256:12
live 43:6
lived 205:11,17
LiveDeposition
1:18 2:9
LiveLitigation
293:21
LiveNote 2:7
lives 205:14
LLC 1:5
LLP 3:4,12
local 160:17
locate 260:18
location 44:15
log 107:10,13,13

110:22 111:1
logic 246:11
long 63:1 73:11
76:10 82:2
100:8 141:8
205:11 254:11
look 21:6 32:20
33:7 47:13
62:19 63:17
75:11 91:2,13
96:12 108:10
112:7 137:4
157:8 184:17
188:12,12
194:3 207:10
212:12,13,22
216:13 217:12
223:8,8 229:19
231:1 238:12
251:6,11 264:9
281:7 282:17
looked 50:14
146:5 193:13
211:19,20
217:1 233:21
looking 29:7
47:14 49:7 51:5
63:2 64:9 68:6
68:6,7 96:15,16
99:3 120:19
179:1 193:22
195:19 207:13
237:2,3 248:18
265:2
looks 75:12 82:15
195:14 196:2,4
196:4 214:11
215:1 228:10
237:20 238:22
268:12
loop 36:18 97:9
lose 82:13
lot 58:7 114:19
127:12 141:4
173:20 180:1
183:14 204:14

230:4 259:8
264:14,14
273:3 284:19
lots 151:5,5 204:6
Loveless 80:17
80:18
low 78:9,9 163:3
182:15 221:14
221:15 229:3,6
237:6 257:8,13
269:3,7 277:1
279:9
lower 32:22
128:12 237:6,7
264:7,18
lowest 221:19
L-O 209:16

**M**

M 117:10
machine 293:11
Madam 288:16
Magistrate
116:16
MAGNA 1:21
majority 180:22
making 59:5 66:6
161:11 165:22
238:8,20,22
Malay 65:7
manner 6:20
Marcel 107:21
mark 12:18,19
15:17 16:21
29:7 93:19
146:22 250:16
251:17 252:1
252:13 288:11
288:21 289:3
289:10,17
290:4,13,18
marked 13:4
15:21 17:3
29:16 94:5
288:22 289:1,7
289:15 290:1

290:10,17
291:2,8
marker 119:19
151:9 200:8,9
202:5 247:7
257:19
markers 59:18
59:20,22 85:4
85:12,12 86:3
87:6 92:21
96:22 102:10
102:11 119:20
135:16,20
136:11,22
137:4 148:13
161:21 188:10
188:11,13
markings 122:14
189:1,12,14,22
190:5 192:20
193:3
marks 18:9
MARYLAND
293:2
Master's 153:11
match 63:3 74:5
182:3,11
183:12
matches 47:22
261:8
material 65:12
129:13 238:17
245:16
math 228:12,16
mathematics
186:12
Matley 107:21
109:5 110:10
110:18 111:3
111:19 113:1,9
125:5 126:14
matter 6:10
81:16 106:9
153:18
matters 238:9
McMenamin

5:19 40:9,11,12
69:3,6,22 70:2
70:3,4,11,19
71:3,8 81:11,14
81:19 82:21
85:13 86:14
87:2,15 89:4
90:21 91:5,8
92:11,20 95:19
97:7 99:5,12
101:1,12
105:16,17
106:8,16
107:14 110:15
111:22 114:1
117:6,22
118:19 121:5
122:7,12 127:6
129:17 141:20
143:22 144:20
145:13,16
146:6 290:19
291:2
McMenamin's
84:2,15 86:3
87:17 88:11
89:15 90:8
99:21 101:5
105:3 114:5
115:13 124:11
188:10
mean 9:21 32:22
40:4 45:10
51:20 53:19
55:16,19,22
57:12 88:21
107:3 108:1
119:1 125:3
130:10 140:9
143:2 146:1
153:4 159:8
160:5 161:4
167:17 178:3
180:3 186:5,6
187:8,10 190:9
194:10 221:19



233:20 235:16
237:6 240:17
248:17 252:16
259:6 262:2
284:11
**meaning** 14:5
24:13 75:7
156:3 160:10
165:14 166:6
166:18 176:5
280:17
**meaningful**
203:18
**means** 33:5 56:1
116:15 145:2
151:11 172:18
172:19 176:13
178:10,13
**meant** 48:4
**medium** 158:9
159:19,22
163:6
**mediums** 154:2
**meet** 52:5 53:17
81:5 136:18
173:21 175:14
**meeting** 51:21
65:10
**meets** 138:6,12
175:11
**memo** 152:1,2
**memories** 164:8
**memorized** 96:11
**memory** 20:18
79:2 82:3,4
87:17 220:3
**mention** 47:1
**mentioned** 53:8
58:11 114:10
142:15 176:10
181:22
**mentioning** 71:6
**mentions** 181:17
181:19,19
**mentor** 70:6,8,13
**mere** 261:7

**Merit** 2:4
**mess** 158:11,12
**message** 151:22
**messages** 159:7,8
**Mestre** 3:12
12:14 16:9
**met** 7:19 141:6
**metaphor** 150:10
154:14
**method** 36:15,17
47:1,3,5,11,22
48:17 52:22
53:22 55:21
70:10,11,18
71:2,5,7,7,9,10
109:12 126:2
135:6 137:6
138:5 139:5,10
181:9 191:4,12
191:18,20
197:3 198:5
246:13 266:15
**methodologica...**
241:18
**methodologies**
103:16 135:11
141:16
**methodology**
39:4,17,18
46:20 53:16
60:6,15 95:22
97:5,6 101:4,6
101:13 107:14
109:2 110:15
111:9,14 114:8
114:8 118:20
121:5 122:4
124:22 125:17
127:15,18
133:22 134:13
141:16 144:6
160:15 194:6
194:12,15,22
196:14,18,22
197:13 198:11
280:7

**methodology's**
134:8
**methods** 51:9,10
56:1 90:8 91:5
110:5 177:10
178:9
**Miami** 3:7,15
**mid** 50:2
**middle** 33:4
140:17
**million** 188:7
**millions** 188:7
**mimic** 278:1
**mind** 60:9 127:13
134:5 173:1
**mine** 11:18 44:8
81:3 98:19
**miniscule** 180:10
**minor** 227:10
**minute** 38:9 68:1
129:4 254:21
**minutes** 41:13
43:6 44:22,22
45:11 98:7
100:9,11
133:18 146:19
147:7 196:10
229:13 230:5
240:6 254:12
286:5,10
**misgivings**
124:21
**misread** 130:18
238:19
**missed** 20:4
194:18 222:8
**missing** 260:12
273:11 281:2
**misspoke** 267:6
**misunderstand**
239:7
**mix** 64:10
**mode** 152:18
154:5,10
155:11,11
157:15

**model** 279:9
**moment** 14:14
39:5 90:12
113:17
**money** 114:19
174:9
**month** 105:13
**morning** 7:16
15:11 63:21
**motion** 5:17
90:20 91:3,4,15
99:3,4 290:18
290:22
**mouth** 105:10
**move** 118:15
247:12
**moving** 252:22
**multiple** 182:21
257:17 259:3
**myriad** 152:21
**M-C-M** 117:8

**_____**

**N**

**N** 3:1 6:1 7:1
259:18
**name** 7:21 38:21
54:18 58:21
65:22 72:6
76:19 92:3
103:22 114:14
170:3 264:12
**named** 69:20
80:20 130:2
142:21
**names** 167:7
169:5
**narrow** 148:1
150:1
**narrower** 149:8
**nasty** 73:13
**native** 148:7
**nature** 27:6
**navigate** 248:8
**ndagley@river...**
3:17
**near** 163:12

**nearly** 195:17
**necessarily**
152:10 189:5
**necessary** 294:4
**need** 27:12 28:16
34:5 51:13
100:8 136:21
155:8,9 160:9
161:6 163:9
170:3,4 179:8
190:16 202:1
207:3 245:13
**needs** 170:13
174:19
**negation** 256:2
**negations** 255:17
259:3
**negatives** 257:17
**neglected** 273:22
**Neha** 3:13 287:18
288:5 291:16
**neither** 293:15
**Ness** 13:21
**never** 40:21
51:15 65:12
77:13,17 117:9
224:1,1 231:9
237:9
**new** 58:6 104:6
107:1,4 115:1
124:13,14
212:4 280:1
**nice** 229:17
**night** 292:1
**Nightcrawler**
88:12,17
**nine** 258:18,19
258:19 269:21
**nomenclature**
48:10
**Noncontracted**
269:11
**nonstandard**
193:21 194:3
226:7 229:1
276:11 277:4



284:8
non-Leonard-c...
21:9
normal 259:8,9
notable 200:12
221:13
Notary 2:9 293:4
293:21
note 30:5 62:15
64:12 225:21
271:4
noted 200:1,2,5
212:19 230:19
294:10 296:9
notes 239:20
269:18
notice 4:12 10:5
12:20 13:3
17:12 293:7
noticed 17:21
19:2 157:8,16
167:1
notion 35:4,9
36:8,11,19 37:1
37:3 59:13 87:5
148:13 155:6,7
161:3 173:14
175:12 185:9
190:14 197:16
197:17
notions 87:19,21
notoriety 106:14
106:19,22
107:5
noun 226:18
227:13 229:1
231:3 232:13
235:20 236:12
nouns 213:7
214:8
nouns/adjective
227:21
noun/adjective
226:6,11
novel 188:2
novels 187:22

null 197:5,6,11
197:17,19
198:4 246:18
253:6,9
number 4:11 5:5
11:8,14 13:2
15:20 17:2,13
18:8 29:13
32:22 33:1
45:14 62:9 63:9
63:12,17,19
64:20 66:1 68:9
69:8 71:22 72:4
72:5 73:5 74:20
78:18,19 94:2
109:21 125:1
130:21 132:19
133:5 138:17
138:18 157:2,3
179:9 202:2,2,3
204:11 215:13
221:14,20
224:8 228:4
237:5 245:5
246:19 259:1,2
259:18 260:12
264:3,3,7,9,10
264:19 276:7
289:5,14,21
290:8,21
numbers 63:3
210:15 216:18
219:9 221:16
227:17 253:2
261:8,22
264:21
numerical
130:19
numerically
216:7
n-gram 259:15
259:16 260:3
262:8 263:19
n-grams 259:10
259:11,22
260:21 261:11

261:18 262:4
262:19,22
263:13,14
265:2 266:2

## O

O 6:1 7:1
oath 6:9
object 6:4 8:19
22:20 24:15
25:6 26:2,16
27:17 28:10
32:7,17 37:4,17
39:9 41:1 48:18
50:22 51:18
53:2 58:2 62:6
69:4,10 72:13
75:3 76:1 77:15
79:16 83:4
84:22 85:8,21
86:9 87:13
88:19 89:7,19
91:10 92:15
93:3,8 94:15
99:14 105:22
106:17 109:15
111:11 112:6
119:21 121:8
122:17,22
123:22 125:10
137:8 143:6
156:4 161:1
162:14 164:7
165:8 167:14
172:9 177:16
179:14 180:19
184:1,4 189:16
190:7 191:21
195:12 196:16
200:17 202:10
202:22 203:7
203:22 205:21
206:12 209:4
219:10 222:2
228:14 235:3,8
247:8 271:2

272:6,20 273:7
278:4
objecting 95:1,6
95:10
objection 95:5
108:8 112:1
123:9 258:6
objections 6:20
objective 54:10
56:3 166:3
objectivity 53:11
54:12
observe 224:21
observed 122:7
observes 255:16
observing 255:15
276:6
obviously 53:20
56:14 264:13
Occam's 235:14
occurrences
213:10
occurring 230:12
230:14
offer 32:13 36:2
37:13 112:15
164:9 258:7
268:22 280:15
286:20 287:10
offered 27:3
37:15 87:4
257:13 269:8
279:12
offering 26:21
27:13 35:22
111:2 198:9
266:12,22
267:1 280:12
offers 37:6
office 43:11 65:5
65:6 152:1
officer 74:2
Offices 74:21
oh 14:7 15:15
55:6 67:3 68:1
70:7 71:14 72:1

72:18 73:7 78:6
84:9 86:18
100:20 120:17
126:9 130:22
185:20 210:21
228:11 233:20
248:17 250:11
250:22 261:13
272:9
okay 8:10,14,20
9:7,15 10:2,6
10:10,15,18
11:8,13,17,22
12:17 13:6 14:9
14:11,15 15:1
15:11,14,16,16
16:12,21 17:10
17:11,21 18:4
18:14,18,21
19:1 20:9,19
21:8 22:11,14
23:13,15 24:9
25:14,16 26:10
27:10 28:21
29:5,11,20
32:16,19 33:5,7
34:22 35:20
37:9,10,20 38:2
38:10 39:16
40:8,19 41:12
41:16,21 42:1
43:5 44:18 45:4
45:16,17,19
46:13,17 48:1,8
49:2 50:17,19
51:5 52:7,11,19
55:6,9,10 56:21
57:5,14,17 58:1
60:6,22 61:16
61:21 62:5 63:9
63:19 64:7
65:14,22 69:8
69:16 71:11
72:21 75:6,10
75:10,16 76:7
76:12 77:12,20



78:2 79:4,9,19
80:1,4,9 81:2,4
81:6 82:6,7,10
82:14,16 83:6
83:12,16,20
86:2,16,21 88:5
89:2,21 90:5,13
90:15 91:16,18
91:19,21 92:2,4
92:5,14,17
93:15,17,21
95:8,13 96:9
97:8 98:10,11
98:13,19,22
99:1,18 100:6
100:10,12
101:11,17,19
102:9,17
104:13,15,19
104:20 105:11
106:3 110:9
113:12,16
114:4,12 116:7
116:13,17,18
116:22 117:5
117:17,20
118:6,22 119:3
119:19 120:5
120:10,13,16
120:19 121:22
122:1,20 123:3
124:7,10
125:14,22
128:5,9,11,17
128:19 129:2,9
129:14,16
130:13 131:4
131:15,18
132:2,2,20
133:1,10,20
138:3,11
139:13,21
140:11,12
143:2,14
145:22 147:2,4
147:6,9,20

148:18 149:7
149:11,16,20
150:4 151:8,15
151:17 154:20
155:2 157:8
158:22 159:12
159:21 160:4,9
160:13 161:9
162:17 164:2
164:12,12,13
165:2,4,14
166:4,14,20
167:11 168:4
168:14,17
169:7,11
170:14,19,22
171:7,10,17
172:15,21
174:13,22
176:22 177:3
179:18 180:11
181:11,16
182:6,20 183:7
183:11,17
184:12,16
185:1,3,14
186:7 187:4,10
188:20 189:10
189:20 190:3,6
191:10,19
192:14 193:15
194:5 195:5,9
196:10 198:15
199:8,14,17
200:21 201:8
202:1,11
205:16 206:7
206:18 207:1
207:19 208:3,4
208:5,11,15,18
209:11 210:6
210:19 211:9
212:2,6,15
213:6,21 214:3
214:4 215:8,11
216:4 217:5,16

218:19 219:6
219:17 220:4
221:5,6,10,18
222:5,10 224:7
224:9,14,15
225:1,18,19
226:1,2,16
227:5 228:3,21
229:10 231:13
231:16 232:10
232:22 233:22
235:11 237:8
237:12 238:15
238:18 239:10
239:14,22
240:3,14,16
241:3,4,16
242:21 243:2,5
243:13 244:12
244:20,22
245:3,12,17
247:11,11,15
247:16,22
248:5,9,11,14
249:8 250:7
252:5,6 254:9
254:11 255:6
256:4,7 257:16
258:14 259:10
260:3,9 261:1,2
261:7 262:15
263:3,7,9,17
264:6 265:7,17
265:22 267:9
267:10 268:17
269:5,18 270:3
270:10,14
271:11 272:8
272:10,11,12
273:10,13
274:8,15,18
275:13,19,21
276:4,13,19
278:13 279:11
280:16 281:1,5
281:8,9,11,18

282:10,14,16
282:21 283:2,4
284:10,13
286:1,4,8,9,12
286:13 287:13
287:17 288:1
291:9,10,15,21
**once** 48:2 74:7
76:10 77:10
98:1 112:17
144:3 219:1
220:7 263:18
268:5,8 269:3
**ones** 50:14 61:17
62:2,18 122:15
135:13 136:5
227:6 228:2
**one's** 233:10
**one-page** 11:14
**one-word** 223:9
**ongoing** 141:9
**online** 82:15
146:19
**operating** 171:12
**opine** 125:18
**opining** 255:12
**opinion** 5:12,14
23:6,11 26:21
27:4,5,13 28:6
28:12 31:7,15
31:17,21 32:1
32:13 34:19
35:22 36:22
37:13 40:20
46:18,19 49:5
49:10 50:8 51:8
51:14 52:8
83:17 84:2
86:12,16 89:14
90:6,6,7,7,19
90:20 91:9
97:16 98:15,20
112:16 113:21
116:19 126:22
134:9,12,15
136:7,21 162:6

164:6 170:19
177:11 181:13
182:22 198:9
214:1 240:21
241:6,8,9
247:12 257:12
257:13 263:11
266:11,22
267:1 268:22
269:7 277:19
279:12 280:13
280:15,22
281:22 284:14
289:18,22
290:5,9,14
**opinions** 21:10
49:3,13 50:11
50:13,19 51:2
83:13 88:11
89:4 115:14,18
144:11,12
177:5,5 204:12
231:15 286:20
287:11
**opportunity**
78:22 147:18
269:14
**opposed** 17:16
65:19 112:4
183:3 230:18
232:19 277:22
**opposing** 71:18
**opposite** 197:6
**opposition**
121:10
**option** 272:17
**order** 99:18
103:4 169:22
199:11 260:5
265:15
**ordered** 199:10
**Oregon** 112:9
**orient** 140:22,22
**oriented** 199:18
224:12
**original** 4:9



294:13
originally 172:16
outcome 293:17
outline 47:20
outlined 177:8
output 153:1
outside 60:17,19
139:19 159:2
173:7
overall 97:4
178:8 283:10
overlap 262:5
overwhelming
111:8
overwhelmingly
107:15 111:8
owe 240:5

**P**

P 3:1,1 6:1 7:1
page 4:3,11 5:5
31:2,6 33:4
48:15 50:7 55:3
55:4 61:6,9
66:7 70:15
83:21 102:20
112:8 120:12
120:17 122:1
128:7 208:7,8,9
208:10,12,16
213:1 217:15
221:6 222:7,9
222:11,22
241:5 248:8
255:11 262:21
262:21 267:13
288:8 295:2,5,9
295:12,16,19
pages 281:2,3,3,4
296:5
paper 72:2
paragraph 31:8
31:8,12 32:10
32:11,20 33:11
33:13 34:20,21
35:2,6 36:5

47:13 49:7
50:10 51:6 52:8
80:11,14 82:10
82:16 83:16
86:17,20
102:19,20
103:8,20
106:14 108:11
109:21 140:15
140:17,19
176:22 177:4
185:3 201:6
paragraphs
31:17 50:15
127:4 128:8,14
128:21 177:9
parallels 71:6
parameters
190:11 285:15
paraphrase
31:22
paren 251:20
parent 74:1
75:17
parentheses
250:18,20,20
250:21 251:6,8
251:13,13
267:21
parents 73:17,18
Parr 80:18
part 31:11,12
83:20 90:20
99:8 100:20
111:1 115:18
115:19 149:14
174:21 189:6
214:21 228:15
239:15 244:22
269:1 276:10
276:17
participants
154:12 156:10
participate
145:17
participated

138:14
particular 37:14
47:3 64:11 65:5
83:9,9 103:21
109:5 110:14
115:10 127:14
130:19,20
151:10 163:5,6
163:6 181:9
190:19,22
261:18 264:17
parties 2:12 6:19
17:16 19:8
partner 160:16
160:17
parts 120:20
256:16
party 6:3 18:10
293:16
patents 33:15,17
paths 71:17
patience 287:14
patient 265:18
Patrick 58:11
60:1 142:16
187:14
pattern 181:20
181:20,21,21
182:2,2,7,8,10
182:13,21
230:12
patterns 39:3
229:19
Pause 11:3 128:3
184:19 281:10
paying 223:15,16
peer 108:22
109:1
peers 125:1,18
126:22 127:20
peer-reviewed
126:10,18
131:16 188:14
189:13
penalty 6:11
people 56:3,10

64:20 65:11
103:13,13
109:16 110:13
111:15 113:19
137:18 138:19
142:20 143:19
146:2 148:15
151:5,18
152:13,17
155:10 156:14
157:5,14 167:2
170:9 171:1
188:3 194:15
230:4 259:8
284:20
percent 20:6,7
175:15 176:5
176:15 179:7
202:7 210:9,9
210:11 214:13
214:17 216:5
217:2 227:2,3
227:11,15
228:10,12,12
percentage
203:17 207:15
215:12,16
percentages
204:19 228:9
percent/98 217:2
performed
117:22
period 247:19
248:3 249:16
250:1 252:9
perjury 6:11
permission 28:16
person 6:9 58:21
64:19,21 76:2
170:3 253:8
persona 156:15
156:16,17
157:16,17
159:18
personal 1:3
169:16

personally 71:17
167:6
personas 156:18
perspective
30:15 42:20
Pgs 1:17
phenomena
235:19
phone 16:19 34:3
67:17
phonological
149:1 151:3,11
phrase 37:20
physically 6:14
Ph.D 1:13 2:2
3:20 4:2 5:9 7:7
289:6
Ph.D.s 153:11
pick 265:13
picked 111:5
151:4
picking 105:6
piece 104:6
pioneered 70:19
71:3
place 56:10 84:12
205:20 239:2
282:2 293:7
placement 206:1
places 230:14
232:13
placing 237:16
Plaintiff 169:17
Plaintiffs 1:6 2:3
3:3 7:13,22
plans 287:9,12
play 84:11
playing 158:2
please 22:22
74:17 129:9
291:19 294:3,7
plus 199:15,20
215:18 226:6
226:11 227:21
229:1 231:3
235:20 236:12



point 8:16 36:14 85:2 113:10 117:14 123:4 159:13 160:20 163:19 165:6 176:8 179:5 181:5 221:10 221:10 230:10 245:6 257:7 258:20 265:19 265:22 268:17 272:19,21
pointed 94:9 271:18
pointing 134:22 135:3 183:8 198:3 246:13 246:20 275:8
points 30:8,10 203:9,12,17 212:21,22 213:1 256:22 268:1,2 271:15
police 73:20,21 73:22 74:1 76:4 76:5
Ponce 3:14
poorly 233:14
pop 264:13
pops 258:11,12
portion 29:21
Portugal 138:17
position 229:22
possessed 122:9
possible 134:5,6 136:9,15 158:9 187:3
possibly 54:10,11 60:2
posting 107:18
postings 164:6 166:8
posts 20:13 162:7 163:5 164:22
Potter 58:22 187:18

power 186:9,13
powerful 160:2
practical 32:4 161:7
practice 108:12 108:21 110:1
predict 85:16 287:6
predictability 59:13 138:5
predictor 205:3
predominantly 19:7 204:18 226:10
preestablished 136:22 192:20
prefer 173:13
premier 107:9
preparation 15:2 287:1
prepare 287:10
prepared 174:15
preponderance 279:4
preposition 280:16
presence 137:4 159:22 196:4
present 2:11 3:19 6:15
presentations 145:19
presented 51:22 56:18
preset 122:14
pretty 9:4 59:16 114:17 115:2 153:12 179:6 179:15 216:4,4 228:18 269:6
prevalence 200:10
previously 233:7 234:17 289:15
primarily 9:1
PRINCE 293:3

principle 190:6
principles 89:6
printout 79:5
prior 85:14 217:15 231:18 259:11
priori 136:18 187:8 188:19 192:15
pro 182:10
probabilities 94:11
probability 58:16 87:4,16,18,20 119:4,10 174:5 174:8 175:2,3 175:16,20 178:15,16,17 179:3,10,12 181:4 184:13 190:18
probable 87:7 123:5,13
probably 9:21 32:14 54:6 55:7 111:12 148:22 160:14 174:4 183:13 188:6 195:14,19 201:22 243:3
problem 67:12 190:4
problematic 119:5
problems 53:3 108:16 113:6 114:10
proceed 46:7
proceedings 192:3
process 186:13
produced 20:5 22:2 24:4 25:3 154:8
production 18:9 18:9

profession 110:18
professional 2:5 71:12 80:3 141:11
Professor 103:15
program 58:13 58:15,18 60:1 135:19 138:20 154:22 155:3 155:16 159:6
prominent 226:7
pronounce 40:10 54:17 69:22
pronouncing 52:12
proper 122:9
proponents 70:17
proposition 226:11 274:10
propounded 296:7
prosecution 102:6
proven 85:15 192:12
provide 11:13 51:15
provided 10:21 10:22 12:13 18:1 19:20 23:9 24:5 25:4 129:13 238:17 245:16
proving 197:11 197:12
pry 153:4
pseudonym 59:1
psycholinguistic 156:18
Public 2:10 293:4 293:21
publications 126:6,8,18
published 56:11

59:16 131:12 144:7,10,10 145:1,2
publishes 144:19
publishing 143:16 144:1
pull 12:17 13:8 14:11 29:4 66:5 90:11 97:10 102:19 116:3,4 207:17 211:15
pulled 149:12 207:19,20
pulling 177:20
punctuation 136:3 249:18 252:21,22 253:3,4
purport 22:1,17 25:2
purported 21:20
purports 226:17
purpose 21:4 30:1 44:12 123:15 124:20 125:15,16 152:5 173:4 263:10 272:11
purposes 189:15 206:4
pursuant 293:7
put 28:18 32:12 53:17 63:6 64:10 70:5 82:16 87:1 103:11 105:9 109:20,21 111:7 113:3 117:6 124:17 150:19 157:14 159:6 174:18 194:22 201:21 214:22 232:17 242:13 260:6 267:6 278:9 283:7 284:4,5



**putting** 19:14
  39:4 52:20
  159:4 242:16
**p.m** 1:14 2:10 7:4
  42:5,5 46:3,3
  100:16,16
  147:12,12
  198:18,18
  254:16,16
  286:16 292:10

**Q**

**Qs** 159:16 168:20
  169:2 196:3
  257:2 261:12
  262:5
**qualify** 143:21
  196:6
**qualitative** 70:18
**quality** 263:16
**quantifiable**
  175:18
**quantify** 174:22
**quantifying**
  178:22,22
**quantity** 269:3
**quasi-standard...**
  205:2
**question** 9:3 19:1
  22:11 24:10,22
  25:16 26:10
  27:19 31:5
  35:20 38:4 43:4
  44:6 52:16
  56:14 74:17
  95:3,7,9 96:3
  101:8 109:19
  124:16 130:16
  147:17,19
  164:2,14
  181:11 192:22
  219:7 222:3
  245:11 250:16
  251:17 263:3
  275:19,22
**questioned** 39:2

81:16 85:5
  102:1 122:10
  123:5 129:21
  188:19 282:8
**questioning**
  106:15
**questions** 67:10
  80:8 108:22
  121:18 159:9
  180:7 224:7
  225:14 240:1
  285:17 286:6
  287:16,20
  296:7
**quick** 44:17
  128:13 184:17
  269:6 273:21
**quicker** 237:14
**quickly** 62:22
  222:15 223:6
  223:11,12,15
  240:7
**quiet** 18:19
  195:20
**quite** 72:18,20
  140:9 143:20
  144:1 152:6
  277:16 285:13
**quotation** 250:18
**quote** 31:13 35:3
  35:3,8,9,15,16
  35:16 70:17,18
  81:15 85:3,4
  87:3 108:2
  109:13,16,22
  111:5 112:4
  177:12 226:5
  250:19 277:4
**quoted** 54:3
  109:4,7 110:6
**quotes** 47:16
  48:14 284:5,11
**quoting** 104:5,21
  108:2 110:10
**Q1** 225:15
**Q2** 225:15

**R**

**R** 3:1 5:19 7:1
  291:1 293:1
  295:1,1
**raise** 9:13 49:17
  50:1 53:11
  104:10 153:17
  153:17
**raised** 105:4
**ran** 193:13
  207:14 208:21
  209:5,7
**range** 136:1,5
**rare** 109:6
  285:13
**rarity** 263:15
**ratio** 220:1
  271:13,13
**rationale** 234:20
**raw** 215:3,6,11
  216:18 219:8
**razor** 235:14
**reach** 36:21
  133:13 176:14
  179:18 180:13
**reached** 176:15
  178:18
**reaches** 190:19
**read** 50:4 82:2
  85:17 96:14
  120:1 129:3
  130:17 162:10
  162:11,12
  163:16 167:18
  187:7 194:11
  245:7,9,13,20
  287:19,22
  294:3 296:4
**readers** 126:5
**reading** 71:4
  112:12 136:3
  171:18 235:11
**ready** 120:8
**real** 184:17
  273:21

**realize** 220:18
**really** 8:15 30:20
  34:4 46:22 52:1
  56:6 62:22
  248:8 250:11
  263:22 272:4
**Real-Time** 2:4,7
**rearranged**
  102:22
**reason** 26:8
  35:14 49:15
  134:4 150:14
  150:18 151:4
  164:17 165:1
  168:17 232:17
  294:5 295:4,7
  295:11,14,18
  295:21
**reasonable** 26:22
  27:13 28:7 36:1
  267:1
**reasonably**
  123:13
**reasons** 166:10
  200:9 216:20
  219:18
**rebut** 68:22
  69:19
**rebuttal** 29:8
  72:16,20 95:18
  99:11,22 214:2
  220:20 231:14
  250:7 255:12
  257:5 268:22
  273:11 282:19
**recall** 20:16
  46:15 105:16
  135:17 162:8
  164:3 169:1
  193:10,12
  260:11
**receipt** 294:14
**receiving** 259:12
**recess** 42:4 46:2
  100:15 147:11
  198:17 254:15

286:15
**recipient** 170:4
**recipients** 171:2
**recognition**
  109:1
**recognized** 89:12
**recognizing**
  108:20
**recollect** 14:7,8
  14:10
**recollection**
  16:18 24:19
  73:14 82:20
  83:7 98:18
  100:5 169:6
**recommendation**
  116:14 290:16
**record** 4:15
  10:17 11:16,18
  12:1 13:12
  14:18 15:18,21
  23:16,19 24:17
  26:6 30:22 34:7
  34:9,12,17
  41:13 43:16,20
  44:1,4,5 60:11
  123:12 140:22
  147:15 245:21
  249:21 254:22
  255:3 288:7,18
  293:14
**recorded** 293:11
**recordkeeping**
  18:7
**red** 9:20 181:8
**reduce** 53:10
  54:12,13 230:9
**redundancy** 60:2
**refer** 14:17 17:14
  28:12 40:8
  127:19 149:2
  174:11 187:14
  253:13
**reference** 54:6
  92:21 121:14
  137:12,13



232:11 283:4
**referenced** 17:22
  18:14 22:8
  24:18 54:3
  59:10 139:22
**references** 47:2
  103:12,14
  113:15 144:4
  145:5 201:19
**referred** 55:2
  132:1
**referring** 17:14
  31:2 106:20
  162:20 177:18
  185:16 238:1
  243:5
**refers** 24:12
  38:22
**reflect** 13:12 44:5
  277:15 278:11
  278:12
**reflected** 236:3
**reflects** 27:6
**reframe** 34:17
**refresh** 82:20
**refreshed** 83:7
**refute** 213:17,19
  216:2 227:19
**regard** 88:16,17
  277:20 279:12
**regarding** 51:9
  87:11 94:11
  141:16 170:1
  230:20 266:6
**regardless** 247:5
**regional** 149:5,6
  205:19
**regions** 209:20
**register** 152:9
  153:22 154:3,4
  154:8,17,18,18
  154:19 155:9
  155:13,14,14
  156:2 159:2
  160:11,19
  166:9 167:12

168:5,5,19
  170:2
**Registered** 2:4,5
**registers** 151:20
  152:3 154:15
  155:4,17
  158:21 160:20
  165:7 166:16
  223:10
**registry** 158:9
**reintroduce** 7:21
**rejected** 99:11
  124:14 125:7
**related** 17:15
**relation** 269:8
**relationship**
  152:17 154:11
  156:10,12
  168:12 170:5
  170:15,16
  171:11,19
**relationships**
  155:10 171:1
**relatively** 227:10
  227:10
**relevance** 106:4
**relevant** 51:2
**reliability** 27:4,7
  27:8,21 30:3,7
  30:17 32:4 36:9
  36:12 53:5,12
  54:14 55:22
  84:1,5,17 88:9
  90:8 108:16
  113:6 127:18
  140:3,6 177:11
  190:20
**reliable** 36:21
  40:21 51:15,20
  55:14,16,19
  56:1,7 131:11
  160:8 180:10
  189:14 210:4
**reliably** 85:16
**relieved** 78:11
**reluctant** 173:6,9

**rely** 191:11
**relying** 183:1
**remainder**
  276:15
**remember** 48:20
  65:22 66:11
  70:14 72:8 73:1
  75:9,15 76:9,11
  76:16,17 77:22
  81:22 101:4,8
  101:19 102:2
  111:4 112:13
  128:12 132:18
  133:8 162:19
  163:1,8 164:14
  191:14 195:3,5
  253:20 258:21
  260:13 279:2
**remote** 1:12,18
  2:1,8 6:4 7:3
  8:7 46:8 288:10
**remotely** 2:3
  6:16 7:8 8:15
  293:7,9,12,15
  296:7
**reorient** 78:22
**repeat** 38:4
  253:15
**rephrase** 202:16
  202:16
**replicate** 194:16
  256:13
**replicated** 56:2,8
**replicating**
  214:20
**reply** 265:21
**report** 4:19,21
  5:6,10 17:22
  18:15 19:2,16
  20:2,14,21 22:9
  23:4 24:7,18
  25:21 26:8,13
  26:19 27:2,5,9
  27:12,15,22
  28:5,6,13,16,20
  29:1,4,7,9,14

29:15,21 30:2,2
  31:2,6,9,13,20
  34:20 37:15,20
  38:15 39:22
  40:1,9 46:12
  47:19,19 48:11
  48:13 49:4,8
  50:7,18,21 51:2
  51:3 52:1,3
  53:9 54:5,9
  55:1,2,18 56:20
  59:10 61:7,9
  63:6 70:5,15
  71:5 78:1 79:7
  79:10,15 81:10
  82:17 87:11,17
  87:20 88:4
  93:14 94:3,12
  95:17 96:2,4,8
  96:11,18,21
  97:5 99:8
  100:20 102:18
  102:20 103:11
  103:12 104:17
  105:3 106:4
  108:4 109:5,8
  110:4 111:7
  113:3,4 114:11
  115:6 116:11
  119:1,7 121:15
  124:10,17,20
  126:15 127:4
  127:14,17,21
  128:5 131:21
  132:1,18 133:2
  134:1 137:11
  140:13 142:6
  144:5 148:11
  155:21 163:11
  163:12,21
  172:4 177:6,8
  177:19,22
  178:12 181:19
  181:22 185:4
  185:22 187:12
  193:20 194:11

194:12,14,18
  194:19 195:1,4
  195:11,16
  196:7 198:22
  199:6,11 206:5
  206:14,16
  207:11,21
  208:5 210:6
  212:17,19
  220:1,16 221:7
  223:13 231:13
  235:12 236:16
  237:19 238:12
  238:13,14,19
  239:11 240:13
  241:17 244:21
  246:19 247:17
  249:5 250:8,9
  251:15 252:6
  253:10,18
  255:11 256:19
  257:14 258:2,7
  259:12,14,22
  260:11,21
  261:9 262:16
  262:20 265:19
  267:15 271:12
  273:19 274:2
  276:21 280:20
  281:16 289:3,7
  289:11 290:16
**reported** 1:18
  116:14
**reporter** 1:18,19
  2:4,5,5,6,7,7,8
  2:9 209:16
  288:16 293:21
  293:21
**reporting** 6:16
  6:21
**reports** 40:5,7
  109:10
**repository** 79:6
**represent** 7:22
  12:12 116:13
  116:20



**representation**
89:6
**representative**
1:4 169:16
**represented**
145:12
**representing**
113:8 145:16
**reproduce**
133:21
**request** 10:12,12
254:7
**requested** 10:16
**required** 77:2
**requirements**
60:18
**research** 1:5 47:2
51:9,9 58:7
59:16 70:18
71:2 86:6
175:18 176:8
176:18,20,20
177:10 178:9
187:12 206:10
265:2,3,6
**researcher** 130:5
158:19,21
**Reserving** 258:6
**resolve** 42:9
**resolved** 74:9
**respect** 30:10
32:12 56:11
83:22 88:11
99:15 135:6
142:6 174:3
180:17 186:21
187:1 265:1
**respected** 104:3
**respective** 2:11
**respond** 81:10
206:10
**responding**
163:20,22
205:22 206:13
**response** 4:19
29:14 100:4

164:9 197:21
**responsive** 11:1
11:14
**rest** 186:11
**result** 89:5 102:5
160:8 174:5,6,7
**resulted** 61:18
**results** 51:16
56:3 135:9
158:12 159:11
189:22 190:1
**retained** 66:14
79:20 117:21
**retainer** 16:8,10
**return** 294:12
**revealed** 50:20
**reversing** 258:21
**review** 18:16
19:11,16 20:1
20:19 21:5,18
24:5 25:4 81:15
166:17 200:14
250:4
**reviewed** 17:17
19:3,18 20:14
21:1,15,16 22:3
22:7,18 23:5,10
25:9 56:14
86:14 92:22
121:19 133:6
155:20 162:5
166:22 193:9
195:6 196:14
200:15 233:19
237:9
**reviewing** 194:7
**reviews** 129:12
238:16 245:15
**revolving** 141:10
**rhetorical** 125:16
156:13 257:18
257:21 258:5
259:5
**rid** 84:12
**right** 14:2 18:8
27:19 35:1

40:10 42:19,22
43:16 48:5
49:10 50:9
52:17 60:9
61:10 66:22
68:5,7 69:2
70:12 72:1
73:14 74:10
78:6,14 79:14
80:17 81:21
82:19 83:10
84:2,17 85:7,17
89:10 90:18
91:22 92:12
93:1 95:15 97:3
97:15 98:6 99:5
99:6 100:19
102:14 103:17
103:22 106:16
107:6,10,15,19
109:9,14 112:8
114:17,20
115:2,9 117:7
118:4,20
119:17,18
120:15 121:12
127:8 129:1
132:9,13
133:15 134:4
141:2 142:4,7
142:20 143:5,8
144:22 147:6
148:22 150:16
151:12 152:8
152:20 153:2
153:18 156:3
157:12 158:13
161:6,18
162:13 163:1
163:14 165:3
165:11 166:21
167:9,10
168:21 169:19
169:20 173:12
173:15,19
174:9 175:8

176:1 178:3
179:5 180:15
181:14 182:4
183:15,19
184:3,7,11
187:22 189:18
190:6 191:20
192:6,20 193:1
193:21 194:20
195:16 196:18
197:7,9 198:13
198:21 199:7
199:12,15
200:1,6,12
203:11,14,16
207:12 208:7
209:8,9,11
211:18 212:15
213:14 214:10
214:18 215:17
216:16,20
217:17 220:14
221:9 222:17
224:3 225:9
227:7 228:6
229:14 230:6,7
230:16 231:10
231:12 232:5
232:16 233:1,4
233:12 235:2
236:13 238:2,6
238:8 239:6
240:9,12
243:14,17
244:1,2,10
245:1 246:5
247:7 252:1,10
252:21 254:13
255:8,13,14,17
255:18 256:21
258:20 259:2
261:20 262:1
262:12 263:15
264:2,16
265:20 266:7
267:12,21

268:6 269:17
271:17,22
272:18 273:16
274:10,11
275:6 279:3
281:2
**rigid** 173:14
**rigorous** 59:16
**Rivero** 3:12
12:14 16:9
**RMR** 1:18
293:20
**Robert** 3:20 5:9
70:20 289:6
**role** 158:2
**Ron** 103:22
104:2 113:11
142:16
**room** 6:15
**roundabout** 41:4
**row** 184:9 255:17
259:3
**Rowling** 187:19
188:4
**Rowling's** 187:22
**RPR** 1:18 293:20
**RSA** 1:18 293:20
**rude** 57:12
**rule** 9:10
**ruled** 126:16
**rules** 8:10,11
113:17 122:2
**run** 58:14 60:11
60:14 137:3
189:21 193:6
207:5,5,13
210:7 211:10
227:17 274:12
**runs** 137:20
138:2 274:2
**Russia** 192:9

**S**

**S** 3:1,5 6:1,1 7:1
**safe** 288:3,5
**Salt** 71:16 80:20



**sample** 129:18,20
**samples** 132:10
   132:12,15
**save** 117:4
**saw** 18:2,14
   20:10 162:4
**saying** 28:3 36:3
   36:14 47:6 70:8
   108:12 113:19
   119:13 132:7
   134:16 138:2
   149:21 150:6
   162:19 170:8
   175:13 180:5
   195:15,21
   196:6,21
   202:12 204:21
   206:18 211:2,6
   224:12 229:2
   237:20 239:1,4
   239:12,16
   240:17 244:8
   246:7,9,11
   248:1 252:19
   261:13 266:19
   267:14 269:12
   272:14 275:13
   279:8 280:6
**says** 31:7 32:1,2
   61:11,12,12
   64:12 77:1
   78:15 79:10,19
   80:15 81:7
   113:2 119:4
   121:10,19
   123:3,11
   140:17 154:8
   175:5,6 187:5
   193:21 199:20
   200:18 202:1
   206:19 208:20
   210:7 213:6,10
   214:5 225:3,10
   226:4,5 228:21
   229:6 234:7
   239:20 256:7,7

256:22 262:16
   268:1
**scale** 119:8,10
**scan** 62:22
**scenario** 51:17
**Schedule** 10:11
   11:9
**SCHILLER** 3:4
**scholars** 141:10
**schwa** 230:3
**science** 174:21
   176:8,18,20
   197:3,10
**scientific** 28:7
   52:5 55:21 84:1
   84:5,16 85:14
   86:5 87:20
   88:10 89:6
   108:16 113:6
   126:2 138:6,8
   138:12 141:5
   161:13 172:19
   173:4,14,14,22
   174:2 175:4,14
   175:15 176:4
   176:13,16,17
   177:12,14
   178:2,9,15
   179:4,6,12
   190:11,20
   192:2 194:14
   197:3,13
   203:20 221:15
   234:1 266:12
   267:2
**scientifically**
   56:7 138:21,22
   141:17 176:6
   201:4,14,16
   231:21
**scope** 60:19
**scratch** 194:11
**screen** 10:4 14:15
   31:1 49:6,16
   50:2 67:4 78:14
   79:4 82:12,17

93:13 97:10
   102:16 103:5
   116:5 128:12
   129:2 177:1
   184:21 198:22
   240:15 262:11
   262:18 273:22
   281:6,14
**screenplay** 83:9
   88:12,17
**screenplays**
   81:16 90:3
**scroll** 10:10
   32:21 33:6 55:4
   66:9 80:6 84:7
   91:20 96:13
   109:20 118:7
   119:12 124:5
   129:9 130:1
   207:10 208:13
   213:22 217:12
   217:14 224:5
   240:14 261:19
   265:17
**scrolled** 68:8
**scrolling** 102:16
   119:22 269:20
**scrolls** 262:21
**SE** 3:6
**search** 204:9
   211:15,16
   212:13 214:21
   219:21 258:17
   274:12 283:5,5
   283:7,8,9,9
**searches** 256:9
   256:13,15
   258:17 260:17
   266:1
**searching** 100:2
   161:4 263:5
**seat** 157:7
**Sebo** 1:18 2:3
   293:4,20
**sec** 288:15
**second** 8:18 11:2

12:8 23:16
   62:15 66:9 87:1
   97:10 128:2
   134:11 183:11
   183:18,22
   184:18 212:18
   251:19 252:4
   281:13
**seconds** 281:6
**second-to-last**
   252:3,5
**section** 50:8
   127:3 196:12
   224:6 267:10
   273:11,21
**see** 10:13,22
   14:11,15 16:6
   19:5 35:12 36:4
   42:15 50:16
   51:11 55:9,11
   57:2 63:4 67:15
   67:19,21 73:6
   76:19 77:1
   80:12 82:10,12
   82:18 83:13,18
   84:6 86:18 87:8
   88:13 90:15,18
   92:7,9 97:18
   99:2 105:14
   109:22 110:2
   116:3 117:18
   119:6 120:5,14
   120:17,18
   121:3,20 122:3
   123:7,21
   124:14 134:12
   137:4 140:14
   141:12 148:18
   153:2 155:5
   168:9,10 176:2
   194:2 201:6,8
   201:10 203:12
   205:3 208:14
   209:2 210:12
   215:3 216:14
   220:17 222:8

224:19 226:12
   234:11,12
   237:11 239:10
   239:22 245:12
   247:20 248:16
   250:22,22
   251:1,1,3 257:4
   262:18 267:18
   268:20 274:5,6
   277:8 286:5
**seeing** 67:13,14
   67:22 207:2
**seen** 10:8 40:4,6
   40:13 59:17
   91:22 96:4
   98:17 99:19
   119:1,7 125:8
   143:5
**selected** 85:13
   86:4 87:6
   188:17
**selection** 158:18
**selects** 137:15
**semicolon** 237:22
   239:3 267:21
**semicolons**
   237:21
**seminars** 143:19
   145:8
**semistatistical**
   92:12
**send** 291:12,17
**sense** 56:7 107:5
   149:17 156:1,1
   174:6 178:4
   190:16 204:15
   204:16 236:17
   265:8
**sent** 11:5
**sentence** 70:21
   87:1,2 185:7
   187:5 235:13
   235:16 239:19
   245:19 251:6
   252:17,19
   253:1 259:5



273:14 274:18
275:1,4,10
276:7,10
278:15 279:5
**sentences** 233:14
273:15 276:16
277:11,17
**sentence-initially**
276:12
**separating**
276:15
**series** 23:4 64:13
87:18
**serious** 108:15,22
113:5
**serve** 182:1,7
183:13,14,18
184:9
**serves** 87:17
**services** 1:21
117:22
**serving** 182:1
**set** 25:8 52:16
56:19 59:9,11
59:17 74:4
81:20 92:21
106:9,10
122:14 136:10
139:7,9 141:14
161:19 164:18
171:3,13
184:14 189:6
189:11,21
192:20 193:3,6
193:7,9,9,19
194:1 195:6
196:14,15
203:19 211:17
213:2 214:22
223:20 231:18
268:19 285:1,1
291:6
**sets** 122:7 137:5
161:21 172:7
248:15 285:1
**setting** 31:16

184:15
**settings** 211:17
**setup** 212:15
213:11 214:6,7
214:8,13,19
216:19 217:6
218:9,9,11,12
218:12,22
219:19 222:13
223:7,9,18,19
224:2
**seven** 147:8,9
250:10 254:12
268:19 269:21
283:20
**share** 10:4 90:12
184:21 281:13
**shared** 65:5
124:22 147:22
148:3,7 149:5,6
204:13
**sharing** 177:1
**sheet** 11:15 294:6
294:8,10,13
296:9
**shift** 157:12
**shipping** 64:16
64:18
**shoot** 45:13
**shortcut** 92:2
**shorthand** 2:6
293:11
**short-circuit**
93:12
**shot** 46:9
**show** 10:5,22
36:14 108:14
113:4 125:16
175:20 234:7
258:3 266:1
**showed** 74:3
233:13
**showing** 47:2
49:6
**shown** 190:18
220:1

**shows** 78:12
132:4 190:21
204:10 242:22
257:9 279:4
**side** 18:10 79:20
114:15 115:1
141:19 142:2,9
142:10,14
144:19,22
145:2,13,16,21
264:6 285:12
**sides** 142:21
143:17 146:3
**sign** 291:11 294:7
**signature** 17:7
296:12
**signed** 16:16
**significance**
87:21 175:4,10
175:11,12
201:20 232:4
236:21 237:5
237:16
**significant**
133:12 174:6
175:22 176:3
181:8 193:15
200:9 202:5
228:1 232:4
285:2,9,14
**signify** 182:8
**signing** 294:9
**similar** 68:21
147:21 161:20
215:9 231:18
271:17
**similarities** 160:1
161:10 168:19
170:2 172:6
**simple** 266:2
**simplest** 235:18
235:20
**Singapore** 64:19
65:8
**single** 179:9
181:13 183:3

219:12 243:10
244:2,6
**sir** 16:6 29:2
32:12,19 33:3
110:7 111:18
180:17 182:5
**sit** 173:13 287:8
**sitting** 157:7
**six** 248:17 249:5
249:6,11 260:2
269:21 275:3
278:14 279:3
282:6
**size** 129:18,20
182:13 205:1
242:8
**skeptical** 155:7
**skepticism**
161:14 190:10
190:12,13
**skill** 184:14
**skip** 12:8
**slanderous** 64:13
**slender** 121:19
**small** 70:16
118:17 201:4
201:13 209:17
231:20 253:2
261:21
**smart** 153:18
**smiley** 267:17
**social** 176:7,18
176:20 284:7
**Solan** 54:7
103:15 146:4
**somebody** 90:2
112:8,10,11
150:14 177:17
177:19 223:14
**someone's** 44:7
**Something's**
18:18
**somewhat** 157:7
171:19
**sorry** 14:1 28:11
29:22 41:3,11

45:19 47:21
48:6,20 54:13
58:3,18,20 69:5
73:10,10 75:9
94:20 96:9
101:7 108:9
118:9,11 124:4
131:1 134:19
137:10 144:15
166:2 169:10
188:14 204:1
236:9 243:21
246:16 249:10
250:13 258:19
264:10 271:11
278:5
**sort** 58:6 63:22
78:11,11 80:2
82:1 108:11,19
121:5 127:12
145:6 148:9
149:14 151:9
154:5 155:8
157:6 173:7
175:11 179:21
186:14 217:2
278:11
**sorts** 9:19 49:22
53:12 149:11
154:14 160:6
184:13
**sound** 14:2 36:17
79:14 134:8
138:22 141:17
148:4 151:13
151:14 176:6
201:5,14,16
231:21
**sounds** 56:13
**source** 55:15
166:2,3 210:4
**Southern** 1:2
108:5
**so-called** 35:3,8
85:11
**space** 148:14



294:5
span 268:18
spans 268:19
speak 65:1
  174:16 232:3
  232:19 265:1
speaker 206:2,21
speakers 65:6
  71:15 204:14
speaking 94:11
  148:21 216:7
speaks 144:3
special 263:16
specific 86:13
  96:20 131:9
  156:8
specifically 17:15
  105:12 106:8
  199:5
specifics 76:9
  144:11
spectrum 152:2
speculation
  171:8
speculative
  170:18
speech 131:13
  151:10,12
  214:21 230:2
  230:18 231:6
  259:9 278:1
spell 60:3 220:8
  272:18
spelled 213:3,7
  214:15,18
  218:16 219:3
spelling 117:7
spells 217:8
  220:14 248:3
  269:16
spell-out 273:3
spent 11:19
  14:21 58:7
spill 221:8
spit 216:18
spoken 152:19

226:8 277:15
  277:16,17
sponsoring
  144:20
spreadsheet 22:6
  162:22 163:2
  163:11
stamps 18:5 19:4
  20:12
standard 30:12
  68:12 92:21
  174:14,15,17
  174:19 175:9
  176:11 178:3
  213:2 224:18
  236:5 277:7,12
  283:22 284:1,3
  284:4,5,7,10,18
  284:22
standards 51:21
  52:5 53:5,18
  56:4 64:5,6,8
  65:10,19,20
  74:12 75:2
  77:11,14 125:2
  126:17 136:19
  137:1 138:6,8
  138:13 141:6
  173:10,11,14
  173:20,22
  174:1,3 175:15
  175:19 179:4,6
  179:19 221:15
standard/nonst...
  194:1
standing 28:15
  95:5 111:14
  112:19
stands 31:22
  259:18
staple 281:3
start 35:5 62:8
  128:11 224:11
  234:10 236:10
  255:7,10 275:1
  275:9 277:11

282:21
started 194:7
  275:22
starting 168:14
  198:9,10
  239:19 273:15
starts 80:1 83:16
  208:8 262:21
  275:4
state 74:17
  160:18 293:2
  294:5
statement 49:5
  73:20,21,22
  76:4 213:4,8
  257:20
statements 104:7
  112:22 113:1
  158:7
States 1:1 108:5
  116:16 205:17
statistical 87:5
  87:21 178:20
  179:2 201:20
statistically
  202:4
statistics 186:12
stay 41:18 262:18
  274:20 288:3,5
  288:15
steadier 43:8
stenographer 6:5
  6:14 7:9 13:6
  29:11 43:17
  93:21 253:14
  291:9,15
steps 237:7
stick 148:14
sticks 151:3
STIPULATED
  6:2,8,13,18
stood 157:13
stop 90:12
  128:20 130:14
  198:6
stopped 146:20

strategies 59:4,7
strawman 180:17
stream 231:3,5
  277:16 278:12
Street 3:6
stress 148:8
  150:18,19
  151:6
stressing 71:8
stricken 99:22
strict 77:1 141:5
strike 26:20 35:4
  35:21 136:8
  162:1 173:2
  211:5 218:21
string 259:16,18
  259:19,20,20
  260:6,7 283:8,9
strings 256:1
  263:19
strong 175:21
strongly 175:22
  176:3
studied 189:12
study 158:5
  177:7
stuff 102:22
  117:15
style 92:21 96:21
  119:19,20
  152:4 164:19
  164:20 165:15
  172:12 188:10
  188:11,12
styles 148:12
stylistic 36:20
  59:17,18 85:3
  85:12 102:10
  107:14 111:9
  117:22 122:6
  123:4 138:3
  189:12,14
  285:16
stylistics 35:7
  36:5,8,12,20
  39:19,22 40:14

40:21 42:12,19
  46:14,21 47:7,8
  47:9,21 48:5,13
  51:15,22 52:4
  52:21 70:17
  84:4,16 89:11
  108:17 109:12
  110:5 112:20
  113:7 114:8
  139:18 140:4
  144:20 266:15
  267:7 279:7
stylometry 53:9
  185:8 188:22
  189:2 191:3,22
  192:4
subcorpus
  208:22 210:1,4
  210:8,10,20
  214:9,12,15
  226:22 228:22
  258:10 274:3
  283:11
subcorpuses
  209:19 211:22
  212:1 227:18
subfield 141:1
subject 85:13
  146:10 188:9
  188:18 294:9
subjected 85:14
subjective 53:10
subjectivity
  54:13
submitted 163:13
subscribe 52:22
  53:15,19
  191:12
Subscribed
  296:15
Subsection
  235:17 239:15
subset 171:22
substance 296:8
success 255:16
succinct 111:13


MAGNA
LEGAL SERVICES

**sufficient** 36:21
**suggest** 53:22
**suggested** 223:10
**suggesting**
  278:17 280:4
**suggestion** 280:8
**suggests** 52:4
  202:4
**suitable** 220:19
**Suite** 3:6,14
**suited** 32:14
**summarize**
  123:11 125:3
**summary** 47:20
  89:22 90:3,7
**supervision**
  293:13
**supplements**
  230:22
**support** 30:18
  33:12,14 35:4,9
  36:10 37:2 87:5
  109:1 127:14
  134:22 144:2
  181:6 197:15
  197:17,19
  198:4
**supporting** 35:10
  118:1 123:14
  246:18
**supports** 142:7
**supposed** 273:18
**supposedly** 73:20
**Supreme** 204:10
  204:11
**sure** 9:3,4,5
  10:17 13:7
  19:17 23:2
  28:15 34:8,17
  38:10 41:8,22
  45:10 48:9 49:3
  51:13 58:6 66:6
  72:9,20,21 73:3
  74:18 84:9
  118:8 119:9
  120:3,5 130:10

140:9 143:20
144:1 152:11
157:1 158:8
164:13 172:22
188:20 231:14
234:9 238:13
244:13 251:14
255:11 260:19
279:22 288:7
288:11 291:13
**surely** 246:2,17
  253:5
**surgeon** 175:6
**surgery** 175:5
**surprise** 119:17
**surviving** 175:7
**suspect** 9:9
  156:17 277:6
  277:11
**suspecting** 188:3
**swear** 6:6
**switch** 151:20
**sworn** 7:8 293:8
  296:15
**syllable** 150:19
  151:7
**synonymously**
  173:4
**syntactic** 136:2
**system** 43:12
  122:13 159:1,1
  192:11
**systemics** 154:7
**Systems** 2:8

_____
**T**
**T** 6:1,1 293:1,1
  295:1
**table** 91:4,14
  214:5 242:22
  242:22 243:5
  276:11 282:15
**take** 12:8 41:20
  45:11 62:14
  63:6 96:12 98:3
  98:6,8 100:7,19

118:17 128:13
146:15 147:2,8
189:10,11
198:13 251:11
253:21,22
254:5,9 281:1,6
286:5,9
**taken** 2:2 8:3,6
  42:4 46:2
  100:15 147:11
  147:16 198:17
  254:15 286:15
  293:6
**takes** 129:2 239:2
**talk** 45:6 68:16
  77:20 104:17
  105:11 117:15
  121:15 128:8
  129:1 154:16
  154:17 157:4
  174:2,10,11
  182:20 245:3,7
  262:17
**talked** 19:19
  34:19 92:11
  119:14 162:2
  172:11 189:2
**talking** 21:10
  25:13 48:10
  56:12 73:11
  99:2 105:7,9
  116:10 130:21
  144:13,13
  145:9 146:1
  148:16 154:20
  157:19,20
  158:1 174:3,4,8
  176:9 230:17
  234:1 261:10
  267:20
**talks** 92:11 146:4
  187:15
**teach** 43:14 64:3
  150:13 154:7
**teaching** 156:16
**technical** 24:1

34:16 38:13
42:9 44:7
287:15
**technology** 10:3
**tecum** 4:13 10:12
  13:4
**telephone** 8:8
**tell** 63:5 75:14
  76:22 90:13
  96:13 97:12
  98:5,12 113:18
  113:22 120:8
  124:12 125:4,6
  128:17 179:8
  183:13 225:22
  232:6 246:10
  280:21 281:21
  283:5 293:9
**telling** 9:19 27:11
  31:19 117:4
  131:5 145:20
  191:7 232:12
**tells** 97:21 265:4
**tend** 177:21
**tendency** 230:8,9
**tennis** 182:1,10
  183:12
**tenure** 142:6
**term** 38:16 39:18
  39:21 40:13
  48:12 151:1
  153:22 154:4
  185:9 186:2
  188:10 220:18
  248:2 249:14
**terminologies**
  74:4
**terminology**
  40:17
**terms** 51:20 87:3
  87:16 97:4
  115:11 137:19
  143:3 146:18
  154:16 172:15
  178:15 182:16
  194:1 204:18

215:6 261:13
261:16,17
265:5,8
**Terrell** 145:4
**test** 82:4 84:5,16
  219:22
**tested** 91:6
  136:22
**testified** 7:10
  61:2 101:6
  112:12,14
  194:8 195:1
**testify** 74:9 91:7
  102:4
**testifying** 195:5
**testimony** 5:18
  6:10 61:19
  90:21 99:4,12
  99:22 108:6
  142:1 162:15
  191:11 291:1
  293:10,14
**testing** 85:15
**tests** 88:9 177:12
**text** 130:19,20
  151:21 152:19
  155:14 159:7,8
**texting** 153:8
**texts** 85:5 158:18
**thank** 42:2 45:18
  45:22 63:11,14
  118:8 249:12
  254:8 285:8
  286:13 287:13
  287:17 288:1
  292:2
**Thanks** 100:13
**theoretical** 32:3
**theory** 148:9
  150:6
**thereof** 293:17
**thing** 9:18 10:20
  12:7,10 33:7
  54:15 63:2
  84:19 120:1
  122:21 146:18



183:17 186:15
186:16 201:18
204:8 207:17
207:18 278:22
**things** 9:17 10:15
13:9 17:17
19:15 49:22
50:1 53:4 56:11
58:10 102:2
103:3,18
104:18 130:15
135:14 138:2
160:7 162:4
165:6 174:11
188:17 194:10
197:2 237:21
**think** 7:19 13:17
15:7 19:20
20:10 24:9 27:4
27:18 28:2
35:18 38:15
39:12 41:14
43:8 46:10
47:16 48:13
52:11 53:8,20
55:1,1 56:8
60:2 61:8 63:15
63:15,20 65:8
66:20 68:5 70:5
72:18 74:13
76:12,13 79:2
81:7 86:12,19
89:2 91:22 96:7
97:22 99:19
102:3 105:2
106:21 108:10
109:7 112:12
115:16 118:21
120:6 124:13
127:16 130:4
130:15,20
131:2,5,12,22
133:8 134:8,16
135:7 136:16
138:5,12 140:1
142:17 146:4,6

146:9 150:9,11
156:14 158:17
159:14 160:8
162:10,19
163:5 168:10
172:2 176:12
181:2,7,17,21
181:22 182:19
183:21 186:3
190:10 192:11
193:13,16,22
195:13,18
199:9,10 204:8
205:15 208:8
209:5 211:18
224:10 225:21
226:3 228:18
232:11 233:13
234:19 236:8
236:14 238:18
239:6,6,15
240:1,5 243:4
243:19 244:8
244:22 248:17
248:19 249:5,6
255:6 256:11
258:3 262:22
265:10 269:2
271:20 277:20
279:15 281:15
286:6 287:3
291:5,7,12
**thinking** 37:12
58:8 120:22
146:7 223:13
280:22
**third** 12:7,8
18:10 87:1
183:21
**thirty** 66:13
294:14
**Thirty-seven**
130:13
**thought** 238:20
**thousands** 188:5
**threat** 101:22

102:1,1,11
**three** 15:10 30:5
30:7 31:8 32:5
36:16 37:6 96:5
132:11 134:17
184:9 196:10
200:2 227:14
237:2,3 243:16
245:22 248:16
260:1,2 261:19
269:21 278:15
282:6,7 286:5
**three-to-one**
220:1
**three-word**
259:19
**threshold** 174:4
175:14 176:5
176:15
**till** 14:22
**time** 11:15 12:1,9
13:12 14:20
15:6,8,10,12
44:21 48:3
52:12 58:8
73:11 76:10
82:2 92:6,17
98:11 109:17
117:4 148:14
161:5 183:4
202:7,17 203:3
210:10,11
214:14,17
217:6,10 218:7
218:16 224:2
227:2 229:19
234:19 235:15
240:7 241:9
247:5 248:1
249:13,22
250:14 251:16
251:19,22
257:9 268:2,3
268:15,18
269:13 271:7
272:16 287:14

293:7
**times** 9:9 38:16
92:3 104:6
107:1,4 110:4
115:1 161:5
204:11 210:22
217:11 218:4,5
218:5,6,7,13
220:12 223:21
241:13 244:7
247:1 248:11
248:13,14
265:15 271:14
275:1,4 278:15
279:1 282:5,6,7
283:14,16,20
**time-out** 281:1
**tired** 275:20
276:3
**titled** 50:8
**today** 10:5 15:12
230:17 287:8
**toe** 32:12
**toggle** 207:20
212:16 247:17
**token** 159:21
216:1 285:11
**told** 52:11 60:10
81:8 135:10,13
135:14 137:2
170:15 215:21
**tomorrow** 291:12
**ton** 154:12
**tonight** 291:12
**top** 62:8 71:21
146:15,17
258:13
**topic** 102:14
148:16 152:16
152:16 154:10
158:2
**topical** 121:5
**topics** 147:3
**total** 203:8 228:4
244:8
**totally** 230:11

**touch** 49:21
**Touché** 232:9
**track** 276:1
**Tracy** 145:4
**transcribed**
293:12
**transcript** 4:9
294:15,16
**transcription**
293:13 296:6
**transferred**
59:19
**trend** 230:9
**trial** 116:21
287:1,10
**tried** 46:7
**trouble** 14:13
67:9 214:20
269:19
**true** 142:5
165:16 206:11
233:18 250:4
293:14
**trunk** 149:3
**truth** 293:9,9,10
**try** 8:17 9:2
12:17 13:8
22:13 34:16
38:8 42:16
44:16 60:15
64:10 76:21
92:2 93:11
117:13 140:18
150:4 180:12
197:2 199:15
199:15,20,20
199:21 200:2
200:10,10,16
201:1,15 202:2
202:3,8,8,9,13
202:19,19,20
203:5,5,5,20
204:5 205:2
207:6,6 208:16
208:21,22
210:7,7,8,10,20



210:22 211:2,3
211:6,16 212:7
212:16 240:14
253:12 275:20
**trying** 22:15,15
24:1 32:15
33:22 39:7,10
42:9,10 46:17
48:9 52:8,13
53:7,10 61:7
63:20 75:19,20
80:7 95:8 120:6
133:18 134:12
146:14 158:5
159:13 161:19
163:19 165:6
168:18 169:21
172:5 176:2,4
185:12 196:11
196:22 197:15
201:8 202:14
218:2 224:21
239:7 241:5,9
241:11 254:6
264:16,17
265:7 279:7
**turned** 38:8
**turning** 281:4
**Twenty** 212:1
**twice** 48:2 241:14
289:1,1
**two** 15:10 28:17
62:11 65:14
68:16 81:20
82:3,21 96:8,9
98:7 101:21,22
109:10,12,12
122:7 125:8,8
129:21 130:15
134:5 137:5
142:2 153:10
158:6 172:7
177:22 180:7
181:7 182:8,16
182:17 200:5
210:21 213:3

214:18 215:18
219:3,14 225:4
227:6,6 237:7
241:12 243:10
243:13,16,22
244:3 245:22
246:13,16
248:13,15,16
249:9,10,10,12
255:19 256:1
261:3,20 268:1
268:13,15
269:4,21
271:19,19
275:1,3 279:2,3
279:13 282:6,7
284:22
**two-word** 259:19
**type** 105:20
155:16 156:12
211:16 256:8
279:11
**types** 160:10
209:20 278:2
**typical** 118:20
**typo** 222:14
223:6,18,19,20
224:2,3

---

**U**

**U** 6:1
**ultimately** 115:5
116:19 162:6
**Um** 270:6
**Um-hum** 49:9
51:7 73:7 74:22
80:13 82:19
92:8 121:7
140:20 185:5
234:13 247:21
**unable** 44:9
**unclear** 44:8
**underline** 242:5
**understand** 8:1
17:19 18:12
22:16 24:2 25:9

25:12 28:2 49:3
51:13 75:19,21
104:16 118:19
149:21 150:4
152:11 158:4
168:18 169:21
170:16 171:11
176:3 180:2,5
181:12,14
188:20 196:17
237:15,18
238:6 240:16
240:20 241:4
246:22 247:11
247:12,22
250:17 256:11
265:13 275:7
277:19 284:21
**understanding**
24:2,6 39:7
40:19 70:4 71:1
85:6 136:20
169:8,9 172:22
194:5 195:9
205:5,6,8,10,13
205:16 216:12
241:6 263:12
275:15 276:2,5
280:21 281:22
**understands**
208:20
**understood** 23:3
60:20 170:15
197:1 241:8
**unedited** 233:12
233:16 235:2
**unfortunately**
44:4
**unintentionally**
9:11
**United** 1:1 108:5
116:16 205:17
**universal** 161:17
**university** 43:7
157:5
**unknowingly**

9:11
**unknown** 39:2,11
58:19 101:22
130:19 137:16
139:4 150:14
159:9 178:1
188:2,16,18
**unshare** 97:9
281:6
**unstressed**
229:22 230:2
**unusual** 108:20
266:9,16,20
267:3
**upload** 58:14
**up-to-date** 11:22
14:19
**usage** 122:10
193:21 283:20
283:22 284:11
**usages** 277:3
**use** 25:9 34:5
37:20 38:15,16
39:18,21 40:4,6
40:13 59:4 60:7
61:13 92:20
122:13 132:15
135:12,15
138:20 139:9
143:3 148:6
150:21 151:6
153:21 154:1,3
173:6,9 175:21
178:15 183:10
183:17 185:14
186:2,5,18
192:19 193:2
200:16 203:5
203:17 216:12
220:19,21,22
220:22 226:5
229:7,12
234:19 239:1
240:18 241:9
241:12 243:11
244:3,14

257:17 258:8
259:4 269:14
270:22 274:4
275:9,9,10
276:11 282:3
284:20,22
285:3
**user** 84:13,13
**uses** 39:18 71:8
122:13 154:22
161:20 177:10
199:20 201:1
217:8 224:2
237:9 240:18
241:12,13
244:7 247:6
248:2 249:14
250:1 251:16
251:19,22
255:17 256:1
260:4 268:3,5
268:18 270:17
270:21 271:6
273:3 275:1
284:19
**usual** 108:12
110:1
**usually** 112:18
149:13 176:7
235:19 248:22
249:2 277:15
**Utah** 80:17
**Uyen** 251:7
**U.S** 66:20,21
204:9,11

---

**V**

**v** 1:7 4:20 5:8,12
5:14 72:7 81:17
94:4 289:22
290:9
**vague** 20:18
73:17 76:11
164:8
**valid** 40:21 51:16
51:20 160:8



165:11 180:9
189:14 191:5
191:13 219:22
234:20
**validate** 100:3
144:5 196:22
210:15 213:16
213:19 215:22
227:19 260:20
265:5 268:10
**validated** 213:20
**validity** 27:5,8,21
30:4,7,17,17
32:4 36:8,13
53:5,13 54:14
55:22 84:1 88:9
108:17 113:7
127:18 140:3
176:16,17
177:11 190:13
190:21 204:17
**value** 53:11,11
**variability**
158:21
**variables** 116:2
152:6,22
158:11 160:6
160:10,11
179:1
**variance** 236:2
**varieties** 213:2
**various** 17:22
19:8 103:16
209:20
**verb** 199:15,20
212:16 213:2
213:12 214:8
214:13,19,22
215:1 216:19
217:7 218:12
218:13 219:1,9
219:12,14
220:5 222:14
223:9 224:2
**verbs** 214:7
**Verified** 91:6

**verify** 100:3
219:13,15
**versa** 246:15
**versus** 66:2,18,20
66:21 78:15
116:8 119:14
130:18 151:22
151:22 152:1
156:3 159:7
172:16 175:7,7
202:2 247:2
261:4,5 271:19
271:19 274:4
**vice** 246:15
**video** 3:2 38:8
**view** 111:2
128:13
**views** 139:17
**violate** 9:10
**vocabulary** 149:2
149:13
**vowel** 230:2

———————
**W**
**W** 209:17
**wait** 48:20 68:1
129:4 254:21
**waive** 6:20
287:19
**walk** 10:16 62:1
104:15 220:17
241:17
**Wall** 66:14
**want** 10:16 28:5
28:5 29:20 34:3
34:6,21 38:9
45:3,5,7 49:2
49:18,21 55:3
57:9 61:21,22
61:22 62:1
68:16 73:3
75:17,18 78:21
84:11 93:19
95:21 96:13
98:3,6,7,8,11
100:19 104:15

110:11 113:16
120:6 121:2
128:8,13
130:11 139:1
142:18 148:8
155:17 158:8
158:10 160:15
162:3 163:2
164:22 177:6
178:9 187:7,16
191:15,16
199:3 207:10
217:18 220:20
225:21 245:9
247:13 253:22
254:2 262:17
281:4 284:1,6
287:18 288:10
288:12
**wanted** 84:10
111:21 279:22
**wanting** 58:5
**war** 143:3
**wasn't** 9:13 22:4
57:6 78:12 91:1
125:18 146:7
172:4 219:15
222:3 264:16
264:17 279:22
**watch** 102:15
**water** 32:12
**way** 10:2 21:11
22:16 24:2
28:19 40:22
44:9,13 46:7
48:16 49:16
52:19 53:16
61:6 62:14
71:11 72:19
80:19 82:9 92:1
92:12 94:22
97:20 100:3,20
111:13 117:16
121:5 126:5
132:7 146:14
149:22 151:18

168:11 170:1
170:20 177:13
177:14 179:6
181:3 191:8
194:21 196:22
197:16,16,17
199:10 200:14
215:2 216:14
220:17 223:7
232:18,19
241:19 242:1,4
242:7,10,13,19
256:17 259:17
260:3 261:2
273:20
**ways** 28:17 53:12
187:11 205:1
**weak** 30:14
182:19
**Web-based**
209:14
**Wednesday** 1:14
**week** 7:20
**weeks** 270:9
**weight** 59:12
158:20
**weird** 49:22 67:3
67:8
**well-respected**
125:1
**went** 63:22 74:3
82:14 193:14
221:11 222:7
230:16 233:13
265:20 266:5
289:2 290:15
**weren't** 129:5
216:1
**Westlaw** 79:6,8
97:16
**we'll** 10:2 12:19
15:17 16:21
42:15 44:16,16
45:16 46:9 62:8
66:5 76:20 98:7
118:17 124:14

128:11 133:10
178:7 182:20
214:2 241:17
245:7 250:8
254:20 255:12
267:14,14
274:18,20
286:10
**we're** 13:11 21:9
41:12,14,19
42:8 43:3,16,17
44:3,9 45:1
48:1,9,10 51:5
56:11 73:11
86:19 128:15
128:22,22
130:20,22
146:19,21
148:15 153:12
158:1,2 174:3,4
174:8,15,17
179:22 180:3
184:12 186:10
186:14,16
196:10 213:1
224:10 230:17
237:2,3,12
243:5 247:16
251:13 255:11
273:18 275:19
276:3 281:18
288:8
**we've** 21:15
71:14 83:6 93:5
119:14 125:8
142:15 143:5
145:1,9 146:18
146:20 150:15
174:18 177:13
186:8,10
231:14,14
234:1 243:6
246:15 248:6
251:5,5,8,9
255:9 274:19
288:22 289:1



290:17 291:7
**whatsoever**
253:4
**widespread**
229:7,11,12
**wife** 151:1 157:6
157:15
**William** 1:13 2:2
4:2,14,21 5:7
7:7 29:15 79:11
94:3
**win** 232:9
**winky** 267:16
**withdraw** 222:4
**withdrew** 102:7
**witness** 6:6,10
9:17 18:18
22:21 23:13
24:16 26:3,17
27:18 28:11
32:8 33:20 34:2
37:5,18 38:2
39:10 41:2,16
42:1 43:5 44:18
45:19 48:19
51:1,19 53:3
58:3 67:3 69:5
69:11 71:18
75:4 76:2 77:16
79:17 85:9,22
86:10 87:14
88:20 89:8
91:11 99:15
100:9,12 102:8
106:1 108:9
109:16 111:12
112:7 119:22
122:18 123:1
124:1 129:12
129:14 137:9
143:7 147:4,7,9
161:2 164:8
165:9 167:15
172:10 177:17
179:15 180:20
184:5 190:8

191:22 195:13
196:17 198:15
200:18 202:11
203:8 204:1,3
205:22 206:13
219:11 222:5
235:4,9 238:16
238:18 245:15
245:17 247:9
253:22 254:4,8
254:11 271:3
272:21 273:8
278:5 281:11
286:8,12
287:17 288:4
288:12 292:6
293:15 294:1
**word** 25:9 39:16
55:17,21 63:6
70:13 119:11
136:3 148:6
149:16 150:15
152:9,10
161:12,15
176:17 177:14
181:17,19
185:14 213:7
213:12 214:15
217:8 218:17
219:3,5,12
220:9,19,21,22
220:22 222:14
224:16,17
229:21 237:10
241:21 242:2,5
242:8,11,13
256:14 259:4
269:15,16
272:17 273:3
273:15 275:9
284:7,10 285:7
285:8
**wording** 88:21
89:3 101:8
**words** 61:13
105:10 188:5,7

191:16 213:3
214:18 219:4
219:14 258:18
258:19,20
259:1,2,17,18
260:4,8 265:8
265:10,12,14
**words-per-mill...**
201:22
**work** 10:2,21
11:6 12:11
13:12,16 16:14
38:6 40:14
41:15 43:1 47:6
56:15 61:14
87:12 89:15,16
93:6 101:1
105:20 114:1,5
141:6 176:11
237:22 244:13
286:22 287:3,9
**worked** 66:13
74:20
**working** 14:21
58:5 62:3 78:7
102:6 217:22
229:18
**working-class**
226:8
**works** 174:21
186:18 224:11
**work-for-hire**
123:14
**world** 186:4
**worries** 45:21
103:2
**worth** 88:10
131:17 192:12
**worthy** 131:17
**wouldn't** 70:7
91:7,8 106:3,4
162:11 179:18
280:15
**would've** 202:18
**wrap** 196:11
**Wright** 1:8 4:20

8:19 12:12
20:13 21:20
22:1,2,12,18
24:4,13 25:3,11
26:1,15,22
27:16 28:9 35:9
36:2 37:16
135:1,1 162:7
166:18,19,22
167:21 168:6
169:2,4 170:5
199:19 200:16
202:8,19 205:7
205:20 206:1
206:20 220:5
227:14 229:2
231:2 237:9
240:18 241:9
241:11 242:17
242:18 246:2,3
248:2 249:14
266:4,10,18
267:4 268:2,3,6
269:15 270:17
270:21,22
272:1,16
274:21 278:17
278:18 280:5,9
280:14 284:16
**Wright's** 208:20
217:7 223:20
236:3,3 238:4
**Wright/Dave**
167:12
**write** 63:10 88:8
89:10 104:21
111:20 112:3
127:17 135:2
141:4,8 151:18
151:21 152:13
153:7,13,16
194:14 222:10
222:11 232:20
233:6,7 245:7
246:3 277:3
278:13

**writer** 271:5
284:17
**writes** 105:3
231:9
**writing** 58:22
104:6 125:15
140:21,22
148:12 151:21
151:22,22
152:1,4,14
153:12 154:2
164:20 165:15
202:18 203:3,4
223:14 230:18
232:18 236:3
259:9 278:12
**writings** 122:8,9
122:11 123:5
137:16 188:17
231:5 277:22
278:2
**written** 24:14
25:22 30:12
58:20 64:20
73:21,22 74:5
76:3,4 81:11
83:9 90:3
106:22 107:1,3
114:22 126:5,8
126:10 152:19
159:17 166:8,8
167:2,5,9,16
188:3 231:2
232:15 233:8
234:4,18,21
235:7,21 236:4
236:19 246:1
253:7 266:4,10
266:17 267:4
278:18 280:4,9
280:13
**wrong** 40:20
82:14 150:10
154:14 172:3
206:19 246:8
256:14 276:1



283:19
**wrote** 24:8 39:2
56:10 58:22
65:12 73:19,20
187:17 246:6
274:22
**Wunderli** 80:20
80:22
**www.MagnaL....**
1:22
**W&K** 1:4

---
**X**
---
**X** 1:3,9

---
**Y**
---
**yeah** 14:10 15:7
15:15 20:18
29:22 33:8
39:10 42:17,20
48:6 49:14,19
49:21 50:1,6
53:4 55:12
60:21 61:20
64:2 65:21 66:5
66:10,15,21
69:21 71:14
72:1 73:7,10,12
74:13 77:3 78:4
84:9 86:20
114:16 118:14
118:16,18,21
124:3,6 126:9
128:16 129:6,8
130:9 131:7
137:7,9 140:19
144:17 149:10
149:19 150:17
151:16 152:12
153:10 155:5
158:10 161:2
163:9 172:10
172:20 179:20
179:20 185:18
194:9 195:3
198:6 207:8

208:10 212:1
214:19 216:14
220:3 221:4,4
223:1,3,4
228:13 229:16
231:1 234:9,14
239:9 243:3
245:10,13
249:3,7 250:12
250:20 252:4
252:12 253:12
254:8,13
257:22 258:19
259:13 260:6,6
260:14,17
262:14 264:22
276:9 279:3,15
279:17,19,21
287:21
**years** 96:5,8,9
138:17 157:2,3
186:9 204:16
268:19
**yellow** 120:19
**Yep** 63:18 72:3
117:2 201:12
**yesterday** 15:6
**York** 104:6 107:1
107:4 115:1
124:13,14
**young** 157:4,14

---
**Z**
---
**Zajac** 66:18,20
66:21 68:14
101:2,14,20,21
102:9
**Zalman** 13:20
**Zealand** 212:4
**zero** 230:11
253:3,4
**Zimmer** 104:6,22
104:22
**Zoom** 3:2 7:19
8:7 43:10 78:7
288:10

**Zoom's** 78:13
**Zuckerberg** 5:15
105:17 106:9
114:14 116:8
123:6 290:5,10
290:15
**Zuckerberg's**
118:2

---
**0**
---
**0** 179:12,16
221:21 222:1
**0.0001** 175:19,20
**0.001** 175:19
**0.01** 175:19
**0.05** 176:7
**0001** 175:10
**001** 175:3
**05** 175:3

---
**1**
---
**1** 1:17 4:12 12:20
13:3 26:13
30:11,14 33:11
36:4 62:9
146:19 175:7
179:11 237:6
244:6 261:4
262:13 264:10
296:5
**1s** 200:5
**1.7** 214:13 216:5
**1:15** 45:12,13
**1:30** 45:9
**10** 45:11 72:5
83:16 86:20
208:9,12,16
221:6 222:22
240:6 269:22
**10b** 86:17,20
**10d** 88:5
**10,000** 175:8
**100** 3:6 20:6,7
175:6 202:7
**1000** 3:14
**11** 63:9,10 65:16

66:1 78:19 92:3
140:15 180:20
182:18 221:8
269:22 276:7
**12** 92:3 180:20,21
180:21,22
182:18 185:3
269:22
**12th** 13:18 16:20
281:18
**12:06** 1:14 2:10
7:4
**12:43** 42:5
**12:50** 42:5
**12:56** 46:3
**13** 4:13,18 17:8
262:21
**13th** 16:16
**14** 63:17,19
262:21 270:2
**14,000** 227:21,22
**15** 4:15 244:7
**159** 215:13,18
**16** 31:2,6 92:19
242:22 243:5
**17** 4:18 244:8
246:16 271:19
279:13
**17th** 29:10
**18** 102:20 127:4
**19** 106:14 127:4

---
**2**
---
**2** 4:14 11:8,14
15:18,21 26:13
30:10,18 32:14
33:11,14 35:11
35:19 36:9 37:2
217:2 244:1,2
246:19 253:12
253:19 261:5
264:10 271:16
280:11
**2K/17-Q** 246:2
**2nd** 3:6
**2:45** 46:3,6

**20** 44:22 108:11
109:21 127:4
132:19 138:19
182:11 186:8
211:18,21,22
296:16
**2007** 131:9
**2018** 79:14
**2019** 54:3
**2020** 1:14 4:18
7:4 16:16 17:8
**21** 61:17
**25** 186:9
**2525** 3:14
**26** 31:8,12
**27** 31:17,19,21
33:11 34:20
47:13 48:15
50:15
**27th** 14:22 15:2
**28** 31:17 32:10,11
33:2,13 34:21
35:2,6,17 36:5
48:15 50:15
**28th** 15:6
**28.6** 210:9
**2800** 3:6
**289** 5:10,13
**29** 1:14 7:4 210:9
**290** 5:15,19
**292** 296:5
**296** 1:17

---
**3**
---
**3** 4:17 16:22 17:2
17:13 30:9,19
32:5 33:11,13
50:7 55:2,5,11
55:13 237:7
264:10
**3,000** 283:14
**3.2** 271:14
**3:46** 100:16
**3:52** 100:16
**30** 44:22 61:9
63:12 65:16



66:8,11 68:9
69:8 186:9
281:6 294:14
**300** 163:4 164:21
**300s** 163:3
**305.357.8414** 3:8
**305.445.2500**
3:16
**33** 73:5 74:20
75:16
**33131** 3:7
**33134** 3:15
**36** 75:11 76:14,15
**37** 82:10,16 128:8
128:11 129:1
130:12
**38** 76:13,18,22
**39** 129:3

**4**

**4** 4:19 29:14 55:4
70:15 72:4
264:9 265:10
265:12 289:15
**4:40** 147:12
**4:49** 147:12
**40** 43:6 128:8
129:1 130:1
132:3,4
**428** 283:16
**44** 270:13

**5**

**5** 5:6 94:3 228:5
228:5
**5,500** 228:5
**5:48** 198:18
**5:57** 198:18
**50/50** 274:9
**572757** 1:16
**58** 146:19

**6**

**6** 5:9 80:11
249:12 289:6
**6th** 79:14

**6:55** 254:16
**600** 12:5
**601** 265:15
**624-6221** 1:21
**65** 228:12

**7**

**7** 4:4 5:12 102:19
102:20 289:21
**7:01** 254:16
**7:37** 286:16
**7:41** 286:16
**7:47** 292:10
**70** 228:12
**71.4** 210:11

**8**

**8** 5:14 92:7 112:8
128:7 290:9
**8a** 80:14 81:7
**8.61** 227:15
**866** 1:21

**9**

**9** 5:17 49:7 50:10
51:6 52:8
176:22 177:4
208:7,8,10
290:22
**9,401** 215:14,15
215:19
**9:18-cv-80176-...**
1:7
**90** 227:2,3 228:10
**94** 5:8
**95** 176:15
**98.3** 214:17 216:5
**99** 176:5,14 179:7
**99.9** 179:7
**99.999** 175:15



MAGNA
LEGAL SERVICES