**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC,

          *Plaintiffs,*

v.

CRAIG WRIGHT,

          *Defendant.*

CASE NO.:  9:18-cv-80176-BB

**PLAINTIFFS' RESPONSE TO DEFENDANT'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

# Table of Contents

ARGUMENT ............................................................................................................1

I.   PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF
     LIMITATIONS ..............................................................................................1

     A.   WRIGHT'S CLAIM THAT THE PARTNERSHIP DISSOLVED IN 2011 IS UNSUPPORTED BY
          THE RECORD...............................................................................................................1

     B.   WRIGHT'S ARGUMENT THAT THE CLAIMS ACCRUED IN 2013 IS EQUALLY
          UNAVAILING. ..............................................................................................................2

          i.    The fraudulent "Consent Judgments" for intellectual property cannot have any
                bearing on the accrual of Plaintiffs' claims for stolen bitcoin. ...............................2

          ii.   The fraudulent "Consent Judgments" did not start the clock on Plaintiffs'
                intellectual property claims either b .......................................................................3

          iii.  The Australian Court's mailing of a Notice of Listing did not cause claims to
                accrue because it was received by Conrad, a friend and business partner of Dave
                who had no role in W&K, and no one ever told Ira Kleiman about it until March
                2016. .....................................................................................................................6

          iv.   Wright's baseless accusation that Ira Kleiman was "willfully blind" ...................7

     C.   REGARDLESS, PLAINTIFFS' CLAIMS WOULD BE TOLLED UNDER THE DOCTRINES OF
          FRAUDULENT CONCEALMENT OR EQUITABLE ESTOPPEL ..........................................8

II.  WRIGHT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE
     PARTNERSHIP CLAIMS .........................................................................12

     A.   THERE IS SUFFICIENT EVIDENCE OF WRIGHT AND KLEIMAN'S RELATIONSHIP AS A
          WHOLE TO SUPPORT THE FORMATION OF A PARTNERSHIP UNDER FLORIDA LAW. ....12

     B.   THERE IS SUFFICIENT EVIDENCE OF A "COMMON PURPOSE" FOR THE PARTNERSHIP TO
          CREATE A GENUINE DISPUTE OF MATERIAL FACT ABOUT THE EXISTENCE OF THE
          PARTNERSHIP. ...........................................................................................................16

     C.   THERE IS SUFFICIENT EVIDENCE OF A JOINT PROPRIETARY PROPERTY INTEREST TO
          CREATE A GENUINE DISPUTE OF MATERIAL FACT ABOUT THE EXISTENCE OF THE
          PARTNERSHIP. ...........................................................................................................18

     D.   THERE IS SUFFICIENT EVIDENCE OF A RIGHT TO SHARE PROFITS AND A DUTY TO
          SHARE LOSSES TO CREATE A GENUINE DISPUTE OF MATERIAL FACT ABOUT THE
          EXISTENCE OF THE PARTNERSHIP. ..............................................................................19

     E.   THERE IS SUFFICIENT EVIDENCE OF JOINT CONTROL TO CREATE A GENUINE DISPUTE
          OF MATERIAL FACT ABOUT THE EXISTENCE OF THE PARTNERSHIP. ...........................20

     F.   WRIGHT RELIES ON CASES THAT BEAR NO RESEMBLANCE TO THE RECORD HERE ......22

III. THE PARTNERSHIP IS NOT BARRED BY THE STATUTE OF FRAUDS. .............22

IV. DEFENDANT'S CONTINUED ATTACK ON SUBJECT MATTER
JURISDICTION STILL FAILS TO PRESENT ANY CREDIBLE EVIDENCE
THAT DIVERSITY IS LACKING ..................................................................23

A. THIS COURT PREVIOUSLY HELD THAT DEFENDANT HAD "FAILED TO PRESENT ANY
*CREDIBLE* EVIDENCE SHOWING THAT" LYNN WRIGHT WAS A MEMBER OF W&K. ..............23

B. WRIGHT HAS STILL NOT OFFERED ANY CREDIBLE EVIDENCE THAT DIVERSITY IS
LACKING. ........................................................................................................24

   i. *The "divorce settlement" is yet another fabrication Wright's forged.* ................24

   ii. *Lynn Wright has a strong motive to lie for Wright and has in the past.* .............25

   iii. *Other testimony by Lynn Wright and clearly forged documents Wright claims he
   received from her strongly suggest she was never a member of W&K and lacks any
   real knowledge of W&K's membership* ........................................................26

   iv. *Forgeries and unreliable witness testimony do not meet the burden of production
   for a factual attack on diversity.* ...............................................................26

C. BUT EVEN IF ALL THE INDICIA OF FRAUD IS IGNORED, MS. WRIGHT'S TESTIMONY
AND DOCUMENTS STILL FAILS TO MEET WRIGHT'S BURDEN OF PRODUCTION FOR A
FACTUAL ATTACK BECAUSE IT DOES NOT REFLECT THE MEMBERSHIP OF W&K AT
THE TIME OF FILING. ......................................................................................27

D. THIS COURT SHOULD EXERCISE SUPPLEMENTAL JURISDICTION REGARDLESS ................27

V. IRA KLEIMAN HAD AUTHORITY TO FILE THIS ACTION ON BEHALF
OF W&K ......................................................................................................30

VI. OVERWHELMING EVIDENCE SUPPORTS PLAINTIFFS' FRAUD
CLAIMS ......................................................................................................30

A. THE COMMON-LAW FRAUD CLAIM IS WELL SUPPORTED BY EVIDENCE. ..............30

   i. *The fraud claim is not primarily based on "promised future action" and valid.* .................30

   ii. *Plaintiffs Had the Right to Rely and Did Rely* ..........................................32

   iii. *Plaintiffs Suffered Billions in Damages Due in Wright's Fraud* ..........................34

B. THE CONSTRUCTIVE FRAUD CLAIM IS ALSO VALID AND WELL SUPPORTED BY
EVIDENCE ...................................................................................................34

VII. PLAINTIFFS' CLAIMS ARE NOT PREEMPTED .....................................35

A. DEFENDANT WAIVED HIS FUTSA PREEMPTION DEFENSE ..................................35

B. FUTSA DOES NOT DISPLACE OR PREEMPT PLAINTIFFS' CLAIMS .......................37

   i. *Because Counts I, II, V, VI, VII, and VIII seek stolen bitcoin, they are clearly not
   preempted by FUTSA* ............................................................................37

   ii. *Wright Has Not Established that the Alleged Wrongdoing in Those Counts Is Not
   Materially Separate and Distinct from Plaintiffs' FUTSA Claim.* .......................37

   iii. *Count VI Arises from a Contractual Relationship and is Therefore Exempt from
   FUTSA Preemption under Fla. Stat. § 688.008(2)(a)* ....................................40

At every turn, Wright's motion distorts the law, ignores the evidence, and generally tries to leverage his various frauds and lies in an attempt to prevail. It should be denied in its entirety.

# ARGUMENT

## I.   Plaintiffs' Claims Are Not Barred By The Statute Of Limitations

Wright moves for summary judgment on its affirmative defense that certain of Plaintiffs' claims are barred by the statute of limitations. As detailed below, the motion primarily rehashes the same arguments this Court rejected in its denial of Wright's motion to dismiss. To the limited extent Wright's motion makes new arguments, they fail factually and legally.

### A.   Wright's claim that the partnership dissolved in 2011 is unsupported by the record.

Wright argues the Complaint alleges the partnership between him and David Kleiman ("Dave") ended in 2011, thereby starting the statute of limitations.[1] Def. Mot. S.J., ECF No. [487] at 4. Wright relies on a single sentence in the Second Amended Complaint that "[t]he exact structure of their joint mining activities, intellectual property development, and 'partnership' from c. 2008 until February 2011 requires discovery to fully reveal." ECF No. [83], at ¶ 67.

But there is nothing in that allegation indicating the partnership ended in 2011, it simply demarcates an initial phase of the partnership that existed prior to when it began to operate, at least in part, through W&K.[2] Of course, that is exactly what the very next paragraph alleges: "From February 2011, Craig and Dave conducted their bitcoin mining activities and intellectual property research and development through W&K." ECF No. [83], at ¶ 68. Record evidence demonstrates the partnership went well beyond 2011; for example, in February 2013, Wright referred to Dave as his "partner." OSMF ¶ 51, Ex. 1 (Jan. 8, 2013 Email from Wright to Dave Kleiman, DEF_00000466) ("*I know you have been paying people from your own wallet*, is this enough to account for it all? It has been a shitload of work." (emphasis added)); OSMF ¶ 1, Ex. 2 (Jan. 16, 2013 Email from Dave Kleiman to Wright, DEF_00000170) ("I think I lost money. At times I wonder if it is worth it. We have done deals together for years and we have nothing but code to show for it all."); OSMF ¶ 1, Ex. 3 (Feb. 2013 messages between Craig Wright and Mark Ferrier,

---

[1] Even if accurate, the statute of limitations on Plaintiffs' remaining claims is not automatically triggered at the conclusion of active partnership activities.

[2] Tellingly, Wright did not make this argument when moving to dismiss the Amended Complaint that includes the exact same allegation. *See* ECF No. [24], at ¶ 67.

DEF_01667372) ("my partner Dave and I have been working on something of a while now . . . my business partner Dave . . . Sorry. My best frined [sic] and business partner died a few days back").

B. Wright's argument that the claims accrued in 2013 is equally unavailing.

Wright next argues the statute of limitations began to run in November 2013 after he obtained two "Consent Judgments" against W&K in an Australian court. This argument is as audacious as it is meritless.

In July and August 2013, Wright filed two lawsuits against W&K. OSMF ¶ 2; ECF No. [83-11] (Statements of Claim), at 2, 8; OSMF ¶ 52, Ex. 4 (Wright Mar. 16, 2020 Depo Tr., at 140:15, 149:16-18, 193:9-10, 196:10-11, 198:5-6). This was just a few months after Dave, Wright's "best friend," died. OSMF ¶ 53; ECF No. [511-1] (Mar. 18, 2010 Craig Wright Dep. Tr., at 200:3.)

But Wright did not notify anyone in Dave's family about these lawsuits. Instead, he listed his own Australian address as W&K's service address and himself as W&K's Australian Director. OSMF ¶ 59, ECF No. [83-30], at 3. He then had his own employee—with no connection to W&K—sign two papers "for" W&K purporting to "consent" to a transfer of all W&K's assets to Wright. OSMF ¶ 54, ECF No. [83-19] (Consent Orders), at 3, 5); OSMF ¶ 54, ECF No. [511-9] (Jamie Wilson Dep. Tr.) at 68:15-69:21. Wright then told the Australian Registrar that he owned 100% of W&K. OSMF ¶ 55, ECF No. [511-4], 23–24. He then obtained two "Consent Judgments" that effectively stole all of W&K's intellectual property. OSMF ¶ 56, ECF No. [83-19].

Wright now argues to this Court that the onus was on the Kleiman family to uncover his fraudulent "consent judgment" scheme in real time if they wanted to reclaim what was stolen. Of course, none of this has any legal or factual merit.

i. The fraudulent "Consent Judgments" for intellectual property cannot have any bearing on the accrual of Plaintiffs' claims for stolen bitcoin.

Wright's Australian "Consent Judgments" argument is centered around the claim that Plaintiffs were on notice he was stealing their intellectual property when the Australian Court entered two "Consent Judgments" against W&K. As an initial matter, the fraudulently obtained "Consent Judgments" do not purport to transfer any bitcoin. OSMF ¶ 57, ECF No. [83-19] (Consent Orders), at 1, 4; OSMF ¶ 57; ECF No. [488-8] (DEFAUS_00627954), at 5. All of Plaintiffs' remaining claims seek, at least in part, a return of stolen bitcoin. *See, e.g.*, ECF No. [83], at ¶¶ 171, 173, 196, 197, 202, 209, 215). Thus, regardless of the "Consent Judgments" effect on

abothe accrual of any claims for intellectual property, they could not possibly have started the clock for any claims seeking the return of stolen bitcoin.

      ii.  <u>The fraudulent "Consent Judgments" did not start the clock on Plaintiffs' intellectual property claims either b</u>

This is not the first time Wright has argued the entry of the Australian "Consent Judgments" mean Plaintiffs' claims were time-barred. He also did so when moving to dismiss. *See* ECF No. [33], at 8–10, 37. And while the Court was obligated to accept the factual allegations in the Complaint then, there was no dispute then that the Australian "Consent Judgments" were entered in November 2013. MTD Order, ECF No. [68], at 5.

The Court held the relevant date for accrual was not the Judgments date, but the date on which Ira Kleiman first learned about them. *Id.* at 29–31. In light of that, and accepting Plaintiffs' allegations as true, the Court found that "[i]n April of 2014, Ira first learned of the Australian Judgments, when an ATO auditor sent him some of the Australian court documents." *Id.* at 7. The Court stated that "[i]f during discovery, it becomes apparent that Plaintiffs became aware of the Defendant's" fraudulent consent judgments "more than four years before the filing of the instant action, Defendant may raise the statute of limitations issue again in a motion for summary judgment." *Id.* at 31. To be clear, Ira didn't find out about the fraudulent Judgments before then, and Defendant has come forward with no facts showing he did.

Instead, the only new "fact" Wright identifies is that, in September 2013, five months after Dave died, the Australian Court mailed what is effectively a hearing notice (a "notice of listing") to a mailbox that Dave used for some of his business and personal communications. Based on this fact, Defendant asserts over 20 times that Plaintiffs had "actual, timely notice" of the lawsuits and that the Australian court "perfected timely service" by October 2013. Def. Mot. S.J., ECF No. [487] at 8–12.

This is nonsense. As explained below, this notice was not "process"; nor was it validly served under the Hague Convention or otherwise. And all this is beside the point, because the uncontradicted evidence is that Ira Kleiman did not see the "notice of listing" until 2016, and therefore it cannot have caused Plaintiffs to "become aware" of the consent judgments "more than four years before the filing of the instant action."

1.   The Notice of Listing was not process

In Australia, Wright falsely testified in an affidavit that in July 2013 he served W&K by "mailing" a copy of the statement of claim to W&K's registered mailing address and by "leaving" a copy at W&K's registered address for service. OSMF ¶ 58; ECF No. [83-4], at ¶¶ 8–9. He then falsely listed his own address as the address for service on W&K. OSMF ¶ 59; ECF No. [83-30], at 3; OSMF ¶ 59 Ex. 5 (DEF_00001979, at 1980). All of these assertions were completely false (there is no evidence of the document being received at either address). Wright did not mail or leave anything about the suits, and does not now contend otherwise.

Instead, Wright relies solely on the fact that in September 2013 the Australian court sent via regular mail, for one of the two suits, a one-page "Notice of Listing" with nothing but the case caption, a date, and an internet link to obtain additional information (similar to a U.S. notice of hearing in state court).[3] OSMF ¶ 60; ECF No. [488-2], at 54 (Conrad Dep. Ex. 2, PAIGE_00001908)). This notice did not purport to be "process" and it certainly is not. Just as a notice of hearing from this or any other U.S. court would not constitute service of process. *See* Fed. R. Civ. P. 4.

It's not service of process in Australia either. There, service of process requires the delivery of a summons or the statement of claim (the Australian equivalent of a complaint),[4] and, for persons to be served outside Australia, a notice of the alleged scope and grounds of jurisdiction, and the right to challenge service. UCPR 11.7. The notice letter did not include any of this. OSMF ¶¶ 60–61; ECF No. [488-2], at 54 (Conrad Dep. Ex. 2).

2.   Even this purported "process" was not validly served

Even if the court's notice of listing letter could somehow be deemed "process," it was not validly served. Under the rules of the Australian court, foreign defendants may be served pursuant to the Hague Convention or as allowed by the law of the jurisdiction where the defendant resides.[5] W&K was not served by either of these two methods.

---

[3] In contrast, in support of his motion to dismiss Wright had alleged only that he effected service by his July 2013 actions, and did not even mention the court's September 2013 notice letter for which he now relies. ECF [61], at 17.

[4]   Rule   6.2   et   seq.,   New   South   Wales   Uniform   Civil   Practice   Rules   ("UCPR"), https://www.legislation.nsw.gov.au/#/view/regulation/2005/418.

[5] UCPR, Part 11.  The UCPR authorizes service outside Australia under the Hague Convention via the court's registrar and the foreign state's Central Authority, UCPR 11A.4 et seq., or "in accordance with the law of the country in which service is effected." UCPR 11.8AC.

The "jurisdiction where the defendant resides" provision does not help Wright as neither Florida nor federal law allows service of process by ordinary mail. *See* Fed. R. Civ. P. 4; Fla. Stat. § 48.011 *et seq*. Further, as explained by Wright's own expert, ECF No. [12-1], at ¶¶ 52–56, Hague Convention service requires the plaintiff to apply to the Australian court's registrar, which transmits the documents to the "Central Authority" of the defendant's state.[6] That undisputedly did not happen here. OSMF ¶ 62. To be sure, and contrary to Wright's repeated baseless contention, the Hague Convention does **not** authorize service by mail.

Wright relies on article 10(a) of the Convention, which states: "Provided the State of destination does not object, the present Convention shall not interfere with . . . the freedom to send judicial documents, by postal channels, directly to persons abroad." However, as the U.S. Supreme Court has unanimously explained, "this does not mean that the Convention affirmatively **authorizes** service by mail." *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1513 (2017) (emphasis in original). Rather,

> Article 10(a) simply provides that, as long as the receiving state does not object, the Convention does not "interfere with ... the freedom" to serve documents through postal channels. In other words, in cases governed by the Hague Service Convention, service by mail is permissible if two conditions are met: first, the receiving state has not objected to service by mail; and second, <u>service by mail is authorized under otherwise-applicable law</u>.

*Id.* (emphasis added) (reversing and remanding for determination whether the law of the issuing state—Texas—authorized service by mail).

Here, the law of the issuing state—Australia—does not authorize international service by mail. Australia does allow international service in any manner authorized by the jurisdiction where the party to be served resides but, as noted above, neither Florida law nor federal law allows service by mail. See Fed. R. Civ. P. 4; Fla. Stat. § 48.011 et seq. As neither article 10 of the Hague Convention nor "otherwise-applicable law" authorizes service by mail, Wright's contention that W&K was validly served is completely without merit.[7]

---

[6] Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, art. 5, https://www.hcch.net/en/instruments/conventions/full-text/?cid=17.

[7] To the extent, if any, that *Ackermann v. Levine*, 788 F.2d 830, 839-40 (2d Cir. 1986) is contrary, it has been overruled by *Water Splash*. The *Ackermann* defendant was served in the U.S. via registered mail with a German lawsuit. The result was correct, because German law authorizes service via registered mail. German Code of Civil Procedure (Zivilprozessordnung) art. 175. The question whether the Hague Convention affirmatively authorizes mail service or just permits it apparently was not raised or decided, but this issue has now been definitively resolved by *Water Splash* contrary to Wright's position.

3.   The Australian court notice was not sent to the address designated by W&K for service of process

Florida requires LLCs to identify an address for a registered agent to receive service of process. Fla. Stat. §§ 605.0113, 605.0201. W&K did just that. OSMF ¶ 63; ECF No. [83-3], at 2 (W&K articles of organization). Wright, however, glosses over the fact that the Australian court did not sent the notice to W&K's registered agent's address. OSMF ¶ 60; ECF No. [488-2], at 54 (Conrad Dep. Ex. 2). That alone should, again, defeat the notion that W&K was served.

Notably, Wright claimed W&K was served at the location Dave used for "all of his business affairs." This is unsupported by the record. Conrad did not testify that "all" of Dave's business was conducted at that address. He testified that it was "a Drop Box that Dave would use for his business and I guess personal items also." OSMF ¶ 64; ECF No. [488-2] (Conrad Dep. Tr.), at 26:6–9.[8] In fact, although W&K also listed that address as a mailing address (not a service address), Patrick Paige confirmed that this address actually belonged to Computer Forensics, LLC, the company that he, Conrad, and Dave ran. OSMF ¶ 66; ECF No. [488-1] (Paige Dep. Tr.), at 26:7–27:7, 35:4–23.

iii.   The Australian Court's mailing of a Notice of Listing did not cause claims to accrue because it was received by Conrad, a friend and business partner of Dave who had no role in W&K, and no one ever told Ira Kleiman about it until March 2016.

The Australian Court mailing was received by Conrad, Dave's partner in Computer Forensics, LLC. OSMF ¶ 67, ECF No. [488-2] (Conrad Dep. Tr.), at 25:25–26:2. It is undisputed that Conrad was not the registered agent for W&K and that he was not authorized to accept service on W&K's behalf. OSMF ¶ 68; ECF No. [83-3], at 2. To the contrary, Conrad testified that he had no involvement in W&K and, in fact, had never heard of the company until he received the Australian Court notice. OSMF ¶ 69; ECF No. [488-2] (Conrad Dep.), at 34:1–3.

Furthermore, Conrad confirmed he did not tell Ira Kleiman about the Australia Court notice. OSMF ¶ 70; ECF No. [488-2] (Conrad Dep.), at 26:19–21. Instead, he merely logged when he received it by writing the date on the envelope. Paige testified he too had nothing to do with W&K—he first learned about the company when the Australian Court hearing notice arrived at

---

[8] Of course, since Conrad had never even heard of W&K, there would certainly be no way for him to know what address Dave used for W&K. OSMF ¶ 65,, at 34:1–3. ("Q. Prior to receiving this had you heard of the entity W&K Info Defense Research, LLC? A. No.")

the Computer Forensics, LLC drop box. OSMF ¶ 71; ECF No. [488-1] (Paige Dep.)*, at 41:6–13, 43:22–44:13 & 115. Paige testified that the first communications he had with Ira about W&K generally, and specifically about the Australian Court hearing notice, were in March 2016. *Id.*; OSMF ¶ 72.

Similarly, the undisputed evidence is that Ira was not even aware of the existence of W&K until he learned about it from Wright in 2014. OSMF ¶ 73; ECF No. [488-14] (Ira Kleiman Apr. 8, 2020 Depo Tr., at 33:3–4, 126:25–127:13, 144:8–10). The evidence is also undisputed that Ira did not learn about the Australian court notice—the notice that Wright now hopes to fashion into a silver bullet— until 2016, when Paige first mentioned it to him. OSMF ¶ 74; ECF No. [488-1] (Paige Dep. Tr.)*, at 43:22–44:13 & 115.

Discovery is now closed, and Defendant never came forward with any proof that Ira or W&K were aware of the Australian Court proceedings before April 2014. Nothing has changed since this Court denied Defendant's motion to dismiss and the Court should deny his motion for summary judgment for the same reasons.

### iv.   Wright's baseless accusation that Ira Kleiman was "willfully blind".

Wright frivolously argues it is "irrelevant" that he never told the Kleiman's about the Australian lawsuit. Def. Mot. S.J. ECF No. [487], at 13. But of course it is. The entire point of the fraudulent concealment doctrine is to ensure that men like Wright cannot simultaneously deprive their victims of their assets and the legal remedies to recover them.

After granting himself immunity for his egregious fraud, Wright then has the gall to accuse Plaintiffs of making "damnably false" claims and of being "willfully blind" about the "actual notice" so they could "plan how they might sit on their hands for almost five years." Def. Mot. S.J. ECF No. [487], 13 & n.13.

The only support he offers for such serious accusations boils down to an argument that Ira failed to exercise "reasonable care and due diligence," (a far cry from willful blindness), by not monitoring the Computer Forensics, LLC drop box in 2013. According to Wright, allowing Dave's business partners to monitor their own business's mailbox shows not just a lack of "diligence" on his part, but that Ira actively "avoided checking W&K's and D.K.'s mail, " and that "hoping to stay willfully blind, I.K. refused to accept his fiduciary duty to check D.K.'s mail, even when asked to do so."  Def. Mot. S.J. ECF No. [487], 14.

<u>This makes no sense and is devoid of legal or evidentiary support.</u> There is not even a shred of evidence that Ira should have also monitored the mailbox on behalf of W&K since at that time he didn't even know W&K existed. "Reasonable care and due diligence" cannot possibly have required Ira to check for mail sent to a company that Wright kept secret from the Kleimans until 2014.

The vague "plot" conjured up by Wright collapses under even the most fleeting scrutiny. Why would Ira want to remain willfully blind back in 2013? Is Wright suggesting that in 2013 Ira decided he was going to file a lawsuit in February 2018, researched the applicable statutes of limitations for the envisioned claims, and identified the four-year time bar? And that rather than file within four years, Ira instead concocted an elaborate plot to avoid monitoring mail sent to a Computer Forensics mailbox Dave had used, on the off chance it would put Ira on notice, that someone (who he did not know about) was stealing his late brother's assets (which he also did not know about), by obtaining "Consent Judgments" in sham Australian court proceedings (another thing he did not know about), which had been initiated against W&K (yet another thing he had no idea existed)? Wright cites no authority that remotely supports the existence of such an outlandish duty and Plaintiffs are confident that none exists.  This "willful blindness" attack is frivolous.[9]

C.    <u>Regardless, Plaintiffs' claims would be tolled under the doctrines of fraudulent concealment or equitable estoppel</u>

But even if this Court concluded that an earlier accrual date had been established, Plaintiffs' claims would still survive because the statute of limitations should be tolled based on Wright's fraudulent concealment or equitable estoppel.

"Fraudulent concealment requires the defendants to engage in the willful concealment of the cause of action using fraudulent means to achieve that concealment." *Raie v. Cheminova, Inc.*, 336 F.3d 1278, 1282 n.1 (11th Cir. 2003) (citing *Berisford v. Jack Eckerd Corp.*, 667 So. 2d 809, 811-12 (Fla. 4th DCA 1995)). *Nardone v. Reynolds*, 333 So. 2d 25, 39 (Fla. 1976) (holding statute of limitations is tolled if fraud prevents discovery); *Vargas By and Through Vargas v. Glades*

---

[9] To divert attention from the shortcomings of his limitations defense, Wright's motion also included an accusatory footnote falsely asserting that Ira Kleiman had "actual notice of timely service on W&K" and that Plaintiffs' filing of this action therefore "amounts to an intrinsic fraud on *this* Court." Def. Mot. S.J. ECF No. [487], at 4 n.4. Later there is a similarly cursory outburst accusing Plaintiffs of making "damnably false" claims and of being "willfully blind" about the "actual notice" so they could "plan how they might sit on their hands for almost five years." Def. Mot. S.J. ECF No. [487], 13 & n.13. Wright may not take fraud on this Court seriously, but Plaintiffs certainly do. These baseless accusations have been thoroughly debunked in the previous sections and are entirely devoid of legal or evidentiary support. *See* Fed. R. Civ. P. 11(c)(3).

*General Hosp.*, 566 So. 2d 282, 285 (Fla. 4th DCA 1990).[10] To show fraudulent concealment, a plaintiff must show "(1) successful concealment of the cause of action; (2) fraudulent means to achieve that concealment and (3) that the plaintiff exercised reasonable care and diligence in seeking to discover the facts that form the basis of the claim." *Razor Capital, LLC v. CMAX Fin. LLC*, 17-80388-CIV, 2017 WL 3481761, at *4 (S.D. Fla. Aug. 14, 2017).

Another path to the same result would be equitable estoppel. "It is well settled in Florida . . . that the statutes of limitation can be deflected by the doctrine of equitable estoppel." *Fla. Dept. of Health and Rehab. Services v. S.A.P*, 835 So. 2d 1091, 1097–98 (Fla. 2002). "Equitable estoppel is based on principles of fair play and essential justice and arises *when one party lulls another party into a disadvantageous legal position*." *Morsani*, 790 So. 2d at 1077 (emphasis added). "The rationale of . . . equitable estoppel . . . is that a defendant cannot be taken by surprise by the late filing of an action when the defendant's own conduct is responsible for the tardiness of the filing." *S.A.P*, 835 So. 2d 1102.

Wright's fraudulent scheme to cover up his theft, coupled with his post-theft fraudulent representations to the Kleiman family, undoubtedly rises to the level of "willful concealment" necessary to show fraudulent concealment, and that same conduct both "lull[ed Ira] into a disadvantageous legal position" and was directly "responsible for the tardiness of the filing," if any. *S.A.P*, 835 So. 2d 1102; *Morsani*, 790 So. 2d at 1077. Because his "behavior caused [Ira] to delay filing suit," Wright would also be "equitably estopped from raising the statute of limitations to bar [Ira]'s claim." *Acoustic Innovations, Inc. v. Schafer*, 976 So. 2d 1139, 1144 (Fla. 4th Dist. App. 2008).

Wright went to great efforts to convince the Kleiman family he was only interested in helping it secure Dave's assets. In February 2014—nearly a year after Dave's death—Wright emailed Dave and Ira's father, Louis Kleiman:

> Your son Dave and I are two of the three key people behind Bitcoin . . . Please understand, I do not seek anything other than to give you information about your son. Know also that Dave was a key part of an invention that will revolutionise the world . . . When I can, I will let you know much more of Dave. I will also help you recover what Dave owned.

---

[10] Some Florida case law mistakenly uses the term "equitable tolling" when they are in fact applying the doctrine of fraudulent concealment. *Razor Capital*, 2017 WL 3481761, at *4 n.9.

ECF [511-16], at 1; ECF No. [495], at ¶¶ 43–44; OSMF ¶ 75. Louis was grateful for Wright's email and looking forward to the prospect of learning more about David's life. He replied:

> After reviewing the information you sent, I want to thank you very much. . . . I look forward to any information you can give me about my son DAVID. To me, he was always someone special. Lou Kleiman

*Id.*

Meanwhile, Wright had forged multiple contracts to make it appear Dave had willingly given him W&K's intellectual property and that Wright did not have Dave's bitcoins. *See* Part I.B, *supra*; OSMF ¶¶ 77–78, Ex. 6; ECF No. [500-2], at 6–28, 31–33, 35–6. In an effort to obstruct any notice, he also listed his Australian address as the address for service of process on W&K. Part I.B.ii. To further ensure his actions weren't uncovered, Wright, through his agent Uyen Nguyen, reached into Florida to unlawfully seize control of W&K. OSMF ¶ 79, Ex. 7 (KLEIMAN_00562350); ECF No. [83], at ¶ 139.

When corresponding with Ira Kleiman in April 2014, Wright continued to conceal his true intentions, falsely assuring the Kleiman family by representing that his only interest was helping the estate recover assets. OSMF ¶¶ 77–80; ECF No. [498-8], at 1 (Apr. 24, 2014 Email from Craig S Wright to Ira Kleiman, *re: Questions*); ECF No. [488-8] (DEFAUS_00627954), at 7954 ("The software Dave updated and which I have transferred back in OUR company, and it is OURs as you are Dave's heir…"). Wright also lulled Ira into inaction by promising to provide the estate with shares in a new company he misrepresented as having assets worth millions of dollars. OSMF ¶ 81; ECF No. [511-2], at 48 (DEFAUS_00119167, at 169); ECF No. [511-8], at 7 (DEFAUS_00627954, at 7960). It's very hard to sue someone promising you millions of dollars. Of course, about a year later Wright would abandon that company in liquidation proceedings after successfully stripping its IP assets and assigning them to nChain in exchange for millions of dollars and equity, and all without ever mentioning any of these developments to Ira. OSMF ¶ 82, Ex. 8 (Nguyen Dep. Tr., Ex. 16 (DEFAUS_01585291)), Ex. 43 (DEF_01885032, WK Unexecuted Assignment), Ex. 44 (DEF_01611949, Baker IP Analysis); Ex. 45 (DEF_00074671, term sheet); Ex. 46 (DEF_00073807, DeMorgan IP Assignment).

Wright also promised Ira he'd receive the first of many "locked in" multi-million-dollar payments in October 2014, again assuring there would be no suit. OSMF ¶ 83; ECF No. [83], at ¶ 145; ECF No. [511-8], at DEFAUS_00627061. When this payment didn't arrive, Dr. Wright falsely blamed the delay on the ATO investigation and reiterated his promise to Ira that he would

see value when the investigation closed, re-lulling Ira into non-suit (if it was even contemplated). OSMF ¶ 84; ECF No. [511-18] (KLEIMAN_00004269), at 4269. It wasn't until October 9, 2015, at the earliest, when it became apparent to Ira that Dr. Wright was stringing him along, and that he would likely have to sue. OSMF ¶ 85; ECF No. [511-19] (KLEIMAN_00398939), at 8939.)

Wright actively concealed this theft from Ira and tried to lull him into inaction by repeatedly making misrepresentations that Wright had no financial stake and was only concerned with assisting Ira in recovering Dave's property. *E.g.*, OSMF ¶ 86; ECF No. [83-24], at 6 ("I don't know what you have been led to believe. But I am not trying to take anything from Dave's estate."); ECF No. [511-16] ("Please understand, I do not seek anything other than to give you information about [Dave] . . . I will also help you recover what Dave owned."). Wright even enlisted his lawyer to help reassure Ira about the legitimacy of these claims.[11] OSMF ¶ 86; ECF [511-2], at 48, 65 (DEFAUS _00119167, 9184)).

Wright does not even dispute that he fraudulently concealed and lulled Ira into not suing as described above. Instead, he just makes the same naked assertion as before: that the Australian court's notice of listing effected service on Plaintiffs. Def. Mot. S.J., ECF No. [487] ("Plaintiffs cannot rely on the allegation that Dr. Wright concealed the existence of the Australian lawsuits, because they were timely served with process").

Again, there is no evidence in the record that Ira Kleiman learned about the Australian litigation earlier than February 2014, which was the only evidence this Court invited Wright to submit. *See* Part I.B.ii. By betting it all on this "notice of listing," Wright is more or less admitting he tried to conceal the case from Ira, but saying that his concealment should not matter because an Australian court sent a non-process document to a non-service mailbox that was collected by a non-party that never informed Plaintiffs until <u>years</u> later.

Since that could hardly have made anyone "aware of the Defendant's conduct more than four years before the filing of the instant action," ECF No. [68], at 31, the Court should deny Wright's motion and grant Plaintiffs' summary judgment that its claims are timely. *See* Pl. Mot. S.J., ECF No. [511], at 22–25. The factual evidence is clear, Wright has failed to substantiate his evidentiary burden in establishing his statute of limitations defense, and the Court should grant summary judgment to Plaintiffs' that their claims are timely. *Id.*That said, if the Court was not

---

[11] Just three months later this same lawyer would fire Wright as a client for fabricating documents and submitting them to the ATO. OSMF ¶ 87; ECF No. [512-12].

convinced that Plaintiffs deserve summary judgment on this issue, there is—at a minimum—a disputed issue of material fact regarding whether the lack of service and Wright's misrepresentations foreclose his limitations defense now. *E.g.*, *Razor Capital*, 2017 WL 3481761 at *4 ("[W]hether or not fraudulent concealment is sufficient to toll the statute of limitations is a question of fact.").

## II.   Wright Is Not Entitled to Summary Judgment On The Partnership Claims[12]

Wright's argument that there is "zero evidence" that he and Dave entered into a partnership is as baseless as it is shameless. Def. Mot. S.J., ECF No. [487], at 23. There is ample record evidence for each element of a partnership under Florida law. In fact, much of that evidence comes from Wright's own statements, including multiple admissions that Dave Kleiman was his "partner" and his "business partner."

The audacity of Wright's argument is hard to believe. From day one, Wright has done everything in his power to obstruct Plaintiffs' ability to prove their case. He has submitted forged documents and false declarations in support of case dispositive motions, committed perjury in open court, produced forged evidence, and regularly offered contradictory testimony under oath. *See* ECF No. [373], at 14–15; ECF No. [507] (Plaintiffs' Motion for Sanctions). He has withheld key evidence such as the Satoshi Nakamoto email account, the partnership's list of bitcoin holdings, and the contents of the encrypted files. *See id.* And now, after over a year of obstruction and discovery abuses, Wright asks this Court to find that the evidence of his partnership with Dave Kleiman is too "vague" or otherwise lacking.

Even though Plaintiffs have undoubtedly been denied key evidence, they have more than enough evidence to satisfy their burden here.

### A.   <u>There is sufficient evidence of Wright and Kleiman's relationship as a whole to support the formation of a partnership under Florida law.</u>

Wright's motion attacks the individual elements associated with a partnership under some Florida caselaw. And Plaintiffs respond in kind with ample evidence for each. But in determining whether a partnership existed, current Florida law looks at the parties' relationship as a whole,

---

[12] A party seeking summary judgment must "identify[ ] each claim . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a); *Gentry v. Harborage Cottages–Stuart, LLP*, 654 F.3d 1247, 1261 (11th Cir. 2011) (same). Defendant does not identify the claims on which he seeks summary judgment. His failure to do so is enough to defeat the Motion. *Mosley v. Alabama Unified Judicial Sys., Admin. Office of Courts*, 562 F. App'x 862, 864 (11th Cir. 2014) ("A district court commits reversible error when it enters judgment on claims not identified in the motion for summary judgment and without advance notice.").

rather than each element in isolation, stating that "an association of two or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership." Fla. Stat. § 620.8202.

The standard Florida jury instruction on this issue is not formulaic and instead asks the jury to determine whether the parties had "join[ed] together or agree[d] to join together in a business or venture for their common benefit, each contributing property, money or services and each having interest in any profits." FLA. STD. JURY INSTR. IN CIVIL CASE 401.14(d) (Feb. 1, 2018). As Wright concedes, a partnership agreement may of course be oral. *See Williams v. Obstfeld*, 314 F.3d 1270, 1275 (11th Cir. 2002).

Moreover, Florida's enactment of the Revised Uniform Partnership Act ("RUPA") contemplates partnership agreements that do not specifically address each of the four elements Wright advances because it creates defaults for partnership agreements that don't have those express terms. *See, e.g.*, Fla. Stat. § 620.8401(b)(2) (profits will be split evenly among partners and losses will be split in the same proportion as profits); *id.* § 620.8401(b)(6) (equal rights in the management and conduct of the partnership); Derrick Hibbard, BUS. LITIG. IN FLA. § 18.2 (10th ed. 2020) ("if there is no partnership agreement, the Act [RUPA] will control").*see also Rafael J. Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams*, 856 So. 2d 1, 6 (Fla. 4th DCA 2003) (distinguishing *Dreyfuss v. Dreyfuss*, 701 So. 2d 437 (Fla. 3d DCA 1997), in part based on the RUPA default partnership rules).

"Under Florida's Revised Uniform Partnership Act . . . a person who receives a share of the business's profits is presumed to be a partner, unless the profits were received in payment of rent, among other things. *Jackson-Shaw Co. v. Jacksonville Aviation Auth.*, 8 So. 3d 1076, 1090 (Fla. 2008) (citing Fla. Stat. § 620.8202(3)(c)). RUPA and the case law interpreting it make clear that even to the extent there is a requirement for certain evidence beyond an association in a profit-seeking business, it can be satisfied by inferences drawn from parties' shared business enterprise for profit. *See Rafael J. Roca, P.A.*, 856 So. 2d at 6 (finding the existence of partnership based on the sharing of profits among the parties); *see also* 8B FLA. JUR. 2D BUS. RELATIONSHIPS § 818 ("In the absence of an express agreement that the parties will share in any losses of a venture, such an agreement must be implied from the contract made and the circumstances surrounding its execution if a joint venture is to be established.").

Given Florida's pragmatic approach to determining partnership formation, some of the best evidence that Wright and Dave formed a partnership is Wright's own express statements characterizing their relationship in those terms. For example, Wright admitted to Ira Kleiman that he "did partner" with Dave. OSMF ¶ 89; ECF No. [83-2] (emphasis added)).

He told other people the same thing:

- "David Kleiman was my best friend and business partner." OSMF ¶ 90, Ex. 9 (May 20, 2015 Email, DEFAUS_00550141) (emphasis added);

- "my partner Dave and I have been working on something of a while now . . . my business partner Dave . . . Sorry. My best frined [sic] and business partner died a few days back," OSMF ¶ 91, Ex. 3 at 7372 (February 2013 Skype messages, DEF_01667372) (emphasis added));

- "In order to fund my work, my partner Dave Kleiman and I sold code. . . ." OSMF ¶ 92, Ex. 10 at 6 (Craig S. Wright, Satoshi's Vision (2019)));

- "This is an idea that I had developed with my business partner David KLEINMAN (David) for a period of over a decade." OSMF ¶ 93, Ex. 11 at 7503 (Statement of a Witness, DEF_01597500), Ex. 12 at 7263 (Proof of Evidence, DEF_01667260) (same), Ex. 47 at 7546 (Statement of a Witness, DEF_01597543) (same).

Wright's own accounts of this partnership involved creating Bitcoin with Dave Kleiman and profiting from the mining of bitcoin and development of related software. In February 2014, Defendant wrote Louis Kleiman that Dave was "[one] of the three key people behind Bitcoin" and "a key part of an invention that will revolutionise the world." OSMF ¶ 94; ECF No. [83-23]. In that same email, Wright promised to share additional information later, in part to help the Kleiman family "recover what Dave owned." OSMF ¶ 95; ECF No. [83-23].

He said the same things publicly. When Wright was asked in a media training session whether he was "trying to claim all the credit" for Bitcoin or if Satoshi Nakamoto was instead a "combination of people and minds," he responded, "I had a lot of help. In particular a friend of mine who died a few years ago, Dave Kleiman, gave me a lot of help." OSMF ¶ 96, Ex. 13 at 2528 (Media Training Session 1, Mar. 18, 2016, DEF_00172528). Wright reiterated the point later in the same session, "[h]ow many people were involved in Satoshi is probably a better question. That was two of us," he later added that "Dave was a key part of everything that I did" and that "Dave spoke as Satoshi." OSMF ¶ 97; Ex. 13 at 2533–34 (emphasis added). He also said that "both of us acted. Dave was the nice version of Satoshi" OSMF ¶ 97; Ex. 13 at 2547 (emphasis added). And when he was asked in an interview whether he had claimed to be Satoshi Nakamoto, Wright

14

responded, *"I also said if you have a partnership and someone dies, it's no longer a partnership."* OSMF ¶ 98, Ex. 14 (Bad Crypto Podcast, *Is Craig Wright the Real Satoshi?*, Feb. 20, 2019) (emphasis added).[13]

In describing the partnership's shared bitcoin mining, Wright stated, "I mined quite a number [of bitcoin] and I was with my partner, so to speak, in all of this, Dave, we mined quite a lot." OSMF ¶ 103, Ex. 13 at 2533 (Media Training Session 1, March 18, 2016, DEF_00172528) (emphasis added). The purpose of this partnership was profit, as Defendant explained in his interview with the Australian Taxation Office ("ATO"):

> There was a trust set up to put a number of bitcoin that Dave was mining and everything like that into," which was used as a "funding mechanism . . . [f]or research . . . When we were starting originally, we looked at a bitcoin value of probably $20 million. By the time we started looking at actually capitalising that and around Dave's death, that had gone up to, I think, $100 million.

OSMF ¶ 104–105, Ex. 18 at 8675, 8671–72 (Record of Interview of Craig Wright, Australian Tax Office, August 11, 2014, DEF_00068665). Additional documents cited below similarly support the existence of an association of a business for profit. *See infra* Part II.2.A.i–iv.

In light of the above, Defendant's assertion that there is "zero evidence of this purported 'partnership'" is so at odds with the record that it calls into question whether a reasonable investigation was made before it was included as the central factual assertion of Defendant's motion for summary judgment. *See* FED. R. CIV. P. 11(b)(3).

There is no doubt that this would more than enough evidence from which a jury could infer the existence of a partnership—a shared business involving Wright and Dave seeking profit. But even if separate evidence is required regarding the particular elements of partnership Defendant lists in his motion, there is abundant evidence for each one.

---

[13] *See also* OSMF ¶ 99, Ex. 15 (Brendan Sullivan, *EXCLUSIVE: First Interview with Craig Wright After Judge Orders Him to Pay $5 Billion in Bitcoin*, Modern Consensus, Aug. 26, 2019, https://modernconsensus.com/cryptocurrencies/bitcoin/exclusive-interview-with-craig-wright-just-after-ordered-to-pay-5-billion-in-bitcoin/) ("And I'm the only surviving member of Satoshi? The judge ruled it was a partnership. I'm the asshole Satoshi. And Dave was the nice one."); OSMF ¶ 92, Ex. 10 (Craig S. Wright, Satoshi's Vision 5 (2019); OSMF ¶ 100, Ex. 16 at 7396 (Oct. 9, 2013 Email from Craig S Wright to Michael Hardy, DEF_00027396)( "David Reese and David Kleiman have both been essential parts of this project."); OSMF ¶ 100, Ex. 17 at 5952 (Mar. 7, 2014 Email from Craig Wright to Ira Kleiman, *re: Another*, DEFAUS_00115950) ("I had an idea, but it would never have executed without Dave. Dave was my sounding board he fixed my errors").

B. <u>There is sufficient evidence of a "common purpose" for the partnership to create a genuine dispute of material fact about the existence of the partnership.</u>

The record is replete with evidence of Wright and Dave's "common purpose, where each party needed the other, as in any partnership in which each partner brings to the enterprise capital, skills, labor, licensing, resources, or knowledge not possessed by the other." *Arango v. Reyka*, 507 So. 2d 1211, 1213 (Fla. 4th DCA 1987). Specifically, there is substantial evidence that Defendant and Dave Kleiman formed a partnership for the common purpose of creating Satoshi Nakamoto, inventing Bitcoin, mining bitcoin, and developing related intellectual property.

In April 2014, Wright wrote to Ira Kleiman, "The Tax office know[s] that Dave and I have been working on this since 2008." ECF No. [83-20], at 2 (emphasis added); OSMF ¶ 106. And in another email, he told Ira, "I have attached a little more of what we did together." ECF No. [83-6], at 2 (emphasis added); OSMF ¶ 107.

One of those common undertakings Wright described was the invention of Bitcoin under the pseudonym Satoshi Nakamoto. He told Ira, "I am a terrible boss and slave driver, but **with Dave I was far more. Satoshi was a team. Without the other part of that team, he died.**" OSMF ¶ 108, Ex. 17 at 5953 (March 7, 2014 Email from Craig Wright to Ira Kleiman, DEFAUS_00115950) (emphasis added).[14]

Defendant went on in a later email to explain, "I had an idea, but it would never have [been] executed without Dave." *Id.* at 5952. When Ira asked Wright if Dave Kleiman had compiled the code for the first version of Bitcoin, Wright replied, "Yes. We both played. Dave compiled." OSMF ¶ 110, Ex. 19 at 4288 (May 10, 2017 Email from Craig Wright to Ira Kleiman, KLEIMAN_00004288);[15] Bitcoin mining is essential to the success of Bitcoin—one of the partnership's inventions—thus the Satoshi Nakamoto partnership's common purpose included the mining of bitcoin. *See* ECF No. [500-5], ¶¶ 34–46; OSMF ¶ 113.

There is direct evidence that the partnership's purpose included the mining of bitcoin. For example, shortly after Dave Kleiman died, Wright emailed a third party that "I have a trust overseas. I moved it and the mining process to Dave Kleiman when I have a few issues with the tax ppl [sic]." OSMF ¶ 114, Ex. 20 at 7485 (May 23, 2013 Email from Craig S Wright to Mark

---

[14] Defendant also told Ira in the same email to "[l]eave others to be Satoshi and Dave not to be," recognizing that Dave had been part of the creation of Satoshi Nakamoto and Bitcoin. *Id.* at 5953, 5955; OSMF ¶ 109.

[15] *See also* OSMF ¶ 112, Ex. 17 at 5953 (Mar. 7, 2014 Email from Craig Wright to Ira Kleiman, DEFAUS_0115950) (Defendant "had math skills and some coding," but Dave Kleiman "could edit his way through hell and back").

Ferrier, *re: Beer and congrats*, DEF_01597484) (emphasis added). Later in that correspondence Wright wrote that "I had Dave mine the Bitcoin overseas and all it has cost is sunk. . . . I have never touched the Bitcoin *we created* in the OS trust . . . ." *Id.* (emphasis added);[16] Craig has also produced a purported email from Dave stating they only needed one "company to sit as a owner of the bitcoin we are mining into them." OSMF ¶ 117, Ex. 22 at 9475 (Dec. 16, 2012 Email from dave@davekleiman.com to Craig S Wright, *re: Brits*, DEFAUS_01859475).

And before this lawsuit was initiated, Craig told his wife, his company's CFO, and the company lawyer that "**Dave mined all of this outside Australia . . . I was not the person doing the mining. Dave was**." *Id.* (Apr. 2, 2014 Email from Craig S Wright to John Chesher, Andrew Sommer, and Ramona Watts, *re: UK – design by human*); OSMF ¶ 118.

Beyond the creation of Bitcoin, the scope of the partnership also included the development/creation of various blockchain based intellectual property. Wright told Ira Kleiman that "Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code." OSMF ¶ 119; ECF No. [83-20]. Defendant also told the ATO about this work: "**A long-term friend of mine, Dave Kleiman and I, started that so that we could start building an exchange platform,…Dave and I had been friends and sort of partners that way for a long time.**" OSMF ¶ 120, Ex. 18 at 8669 (Record of Interview of Craig Wright, Australian Tax Office, August 11, 2014, DEF_00068665) (emphasis added).[17]

In the same correspondence where he called David his "partner" three times, Wright wrote that "what Dave and I want to do" included "creating autonomous agents in the Bitcoin block," developing "a completely open and malleable form of scriptable money," creating "ways to program a distributed contract using Bitcoin to form agreements with people via the block chain" as well as create "Smart property [that is] is property that can be atomically [sic] traded and loaned via the block chain," and solve how "a transaction could be issued potentially even after a

---

[16] *See also* OSMF ¶ 116, Ex. 21 at 6701 (Jan. 28, 2014 LinkedIn Message from Craig Steven Wright to Benjamin Wright, DEFAUS_00516701) ("Dave Kleiman and I started mining in 2009. So we have a few things that will interest them. It is a shame Dave died last year before fruition, but all is moving ahead.").

[17] Defendant went on to describe their projects together related to bitcoin and intellectual property. OSFM ¶ 121, Ex. 18 at 8669 ("We had worked on a number of patents together . . We had been planning putting together an exchange platform that would allow us . . . or bitcoin."); *see also* OSMF ¶ 122, Ex. 23 at 3367 (Scope of Work: Spyder extensions, DEF_00973364 (reflecting some of Defendant and Dave Kleiman's joint venture purpose)); OSMF ¶ 123, Ex. 11 at 7504 (Statement of a Witness in the matter of Police v FERRIS, July 2014, DEF_01597500) (elaborating on the shared purpose between Defendant and Dave Kleiman on an exchange platform).

confirmation if the block chain is reorganized." OSMF ¶ 124, Ex. 3 (Feb. 2013 messages between Craig Wright and Mark Ferrier, DEF_01667372).

After Dave died, Wright told Patrick Paige that reporters "ignored the stuff Dave and I did when he was alive . . . Dave . . . did a fair amount of research with me. Most yet to be completed and published . . . when it all comes out, there is no way Dave will be left out. We need at least a year more." ECF No. [83-8] at 13. Part of that research involved "smart contracts," and Defendant repeatedly credited Dave Kleiman with their shared work on that project. OSMF ¶ 124, Ex. 3 at 7263.

In arguing Dave Kleiman and Defendant lacked a shared purpose for their partnership, Defendant suggests that various witnesses will testify that Dave Kleiman never mentioned Bitcoin to them. Such testimony may not even meet the low bar for relevancy— but it certainly cannot support a motion for summary judgment, particularly since Wright himself admits that the two men desired to keep their work secret. OSMF ¶ 127, Ex. 24 at 2966 (Email from Craig S Wright to Patrick Paige, DEFAUS_00112964) ("We kept what we did secret.").[18] Bitcoin was a secretive project. OSMF ¶¶ 126-28. Even when Dave Kleiman spoke about Bitcoin with others, he did so in a guarded or cryptic fashion. *See* OSMF ¶ 130, (ECF No. [83-2], at 2–3).

C.  There is sufficient evidence of a joint proprietary property interest to create a genuine dispute of material fact about the existence of the partnership.

Dave and Wright had a joint proprietary interest because they "had a joint interest in the financial benefits and profits generated by the combination of their resources and services." *Arango*, 507 So. 2d at 1213. Wright has referred to his shared ownership in bitcoin and intellectual property with Dave Kleiman on numerous occasions, including some already described above.

Wright has explained to others that there was "a trust set up to put a number of bitcoin that Dave was mining and everything like that into and maintain, the idea being that we would use that to further the goals we were doing, which were all to do with promotion of bitcoin and cryptocurrencies . . . ." OSMF ¶ 103, Ex. 18 at 8671 (DEF_00068665–8710) (emphasis added). He has made similar statements many other times.[19]

---

[18] *See also* OSMF ¶ 89, Ex. 9 at 0141 (DEFAUS_00550141) ("we have many shared secrets"). In fact, Defendant's ex-wife Lynn Wright's testified that her husband never really mentioned Bitcoin to her. OSMF ¶ 128 (ECF No. [488], Ex. Q at 73:17–74:2) ("He never really mentioned it at all to me. He – he – I don't recall him ever using the term.").

[19] Defendant wrote to Dave Kleiman in May 2012, "We do not touch the trusts. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions," OSMF ¶ 132 (ECF No. [83-

Explaining where software Dave created had gone, Wright told Ira it was "transferred back in OUR company, and it is OURs as you are Dave's heir."OSMF ¶ 135 (ECF No. [83-24]) (emphasis added). And describing his fraudulent transfer of assets out of W&K to Ira Kleiman, Defendant explained that "[t]he reason for the transfer [was] to use the R&D tax credit on the value of the ***software Dave and I developed,***" OSMF ¶ 136 (ECF No. [83-20]) (emphasis added). These all reflect Wright and Dave's shared ownership of the software and shared commitment of funds regarding that software.

Presumably recognizing the abundance of evidence of joint proprietary interest in his partnership with Dave, Wright falls back on an irrelevant argument that this evidence is inconsistent with assertions by Ira Kleiman in separate state court proceedings, against different defendants for the return of any bitcoin owned by Dave to the extent there was any in their possession. Defendant does not even try to argue estoppel applies, because he cannot. This point is a non sequitur with no relevance to deciding Defendant's motion for summary judgment.

D.  There is sufficient evidence of a right to share profits and a duty to share losses to create a genuine dispute of material fact about the existence of the partnership.

Documents from Wright, his wife Ramona Watts, and Dave also show Wright and Dave agreed to share both profits and losses.[20] *See Arango*, 507 So. 2d at 1213 (element satisfied with "one party having to bear the cost of facilities, equipment and supplies, and the other the cost of services" and with a party receiving a share of revenue "without regard to the total amount of billing, without any 'floor' or 'ceiling,' and without regard to its costs).[21] This partnership element also captures Dave's contribution of time and effort to the partnership. *See Uhrig v. Redding*, 8 So. 2d 4, 6 (Fla. 1942) (finding sharing of losses element satisfied by the potential loss by one partner of invested capital and the other of his invested efforts if the partnership folded).

---

13] (emphasis added)). In fact, the Defendant told the ATO that the bitcoin in the tulip trust were sourced from both him and David. *See* OSMF ¶ 133, Ex. 25 at 0323 (DEFAUS_00560317) ("O'Mahoney: . . . are all the assets of the trust, they were originally sourced from you? Wright: And Dave. O'Mahoney: And David. Wright: Yes."). Wright also told the ATO that he and Dave had 1.1 million bitcoin which was worth "when we were starting probably $20 million," but by "Dave's death, that had gone up to . . . $100 million." OSMF ¶ 134, Ex. 18 at 8675 (DEF_00068665).

[20] Defendant's assertion that setting up the computers to mine bitcoin would have costs millions of dollars is unsupported and inaccurate. In fact, it only took "an average desktop computer" to mine bitcoin in 2009. OSMF ¶ 181 (ECF No. [500-5], ¶46).

[21] Where this element is not satisfied, it is typically because the parties agreed to a commission or salary arrangement inconsistent with partnership. *See Williams*, 314 F.3d at 1276 (commission structure).

Wright repeatedly referenced decisions by him and Dave with respect to profits and losses based on bitcoin's fluctuating value. *See* OSMF ¶ 81 (ECF No. [511-2], at 9167) ("Dave and I decided to start Coin-Exch so that we could lock in some of the value . . . We locked in the value of the software based on the price of BTC then, which was less than now and if it was a year later we would have been smart, but we took the option to cash out.").[22]

Wright and Dave also shared losses in the partnership. In January 2013 Wright told Dave, "I know you have been paying people from your own wallet, is this enough to account for it all? It has been a shitload of work." OSMF ¶ 141, Ex. 18 at 0468 (emphasis added). Defendant also described spending his own money on computers Dave was using for mining. OSMF ¶ 142, Ex. 29 (Craig Wright, *Looking the Other Way*); s*ee also* Part II.B, *supra* (evidence highlighting investments by Defendant and Dave Kleiman involved in mining).

Dave Kleiman himself commented on the shared partnership losses and time investment, observing, "I think I lost money. At times I wonder if it is worth it. We have done deals together for years and we have nothing but code to show for it all." OSMF ¶ 140, Ex. 2 at 0184 (DEF_00000170).[23] Wright also wrote to Ira that he had convinced Dave to delay taking money out of the partnership that had "come as a rebate on what ha[d] been expended." OSMF ¶ 147, Ex. 26 at 9167 (DEFAUS_00119167).

Ms. Watts best crystallized the two men's shared losses in their joint business, writing to Ira, *"Craig and I have put our entire life savings into this business, as did Dave . . ."* OSMF ¶ 146, Ex. 31, at 3312 (DEF_01103312) (emphasis added).

E. There is sufficient evidence of joint control to create a genuine dispute of material fact about the existence of the partnership.

Finally, there is again abundant evidence from Wright himself that he and Dave shared control over the partnership's email accounts and assets, and that each of them influenced decisions about what to do with the partnership and its assets. There is evidence of shared control when

---

[22] *See also* OSMF ¶ 139, Ex. 18 at 8675; OSMF ¶ 138, Ex. 27 (DEF_00068579). As described above, Defendant claimed David Kleiman put bitcoin into a trust to fund their joint research activities. OSMF ¶ 140, Ex. 18, at 8671 (DEF_00068665).

[23] Dave Kleiman at one point asked Defendant, with respect to their partnership profits and losses, "**Are we ever going to get a wage on this?** Just kidding I trust you." OSMF ¶ 139, Ex. 28 (DEFAUS_00115700) (emphasis added). *See also* OSMF ¶ 145, Ex. 30 at 3256 (purported Dave Kleiman bitmessage to Defendant, DEF_00023252) ("you funded the trust when Bitcoin was worth hardly anything, but we have all put all we have into this. So the gain is not yours, it remains with the trust . . . ");

control is "split or divided by mutual agreement between the" partners. *Arango*, 507 So. 2d at 1213.

      As mentioned above, Wright wrote to Ira, "**Dave and I decided** to start Coin-Exch so that we could lock in some of the value," and "**we took the option** to cash out." OSMF ¶ 147, Ex. 26 at 9167 (DEFAUS_00119167) (emphasis added). This email plainly shows Dave and Wright's shared control over their partnership assets. Wright and Dave also shared control over the bitcoin private keys that were shared online. *See* OSMF ¶ 148, Ex. 32 (DEF_00028008); OSMF ¶ 148, Ex. 33 at 8940 (DEFAUS_00558940) ("Worst case is my communications with Dave. The keys are on it as well . . ."); OSMF ¶ 149, Ex. 26 at 9167 (DEFAUS_00119167) ("in doing what we wanted to do, Dave and I arranged for the sale or [sic] around 500,000 BTC").

      And they had joint control over the partnership's software. *See* OSMF ¶ 150, Ex. 18 (DEF_00068665) ("Dave has other, he's got an estate who Andrew has been dealing with and I wanted to make sure I didn't rip off his estate . . . ."). In one April 2014 email to Ira, Wright admitted needing to "convince" Dave not to take money out of the partnership. *See* OSMF ¶ 151 (ECF No. [83-24], at 7) ("I convinced him that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us.").

      Defendant reaffirmed this joint control with Dave publicly, stating "[i]n order to fund my work, **Dave Kleiman and I sold code** that was used in gaming illegal out of countries such as Costa Rica. **David took the biggest risk** because gambling is not illegal in Australia. Nothing he was able to earn in Panama was able to be repatriated legally in the USA." OSMF ¶ 152, Ex. 34 (Craig Wright (Bitcoin SV is Bitcoin), *The story of Bitcoin, continued*( (emphasis added).

      Satoshi Nakamoto is known to have communicated from at least two email addresses, Satoshi@vistomail.com and Satoshin@gmx.com. OSMF ¶ 153 (ECF No. 500-5], at ¶89-93). In early 2014, Wright told Ira that Dave "had the vistomail account. I had the gmx one." OSMF ¶ 154, Ex. 35 (DEFAUS_00112712). Wright similarly told James Nguyen that "they both posted from Satoshi account sometimes." OSMF ¶ 155, Ex. 36 (J. Nguyen Deposition, 197:3-4).

      Because the record robustly supports a partnership generally and with respect to each element of a partnership specifically, Defendant is not entitled to summary judgment on the existence of a partnership.

F.   Wright relies on cases that bear no resemblance to the record here

The cases Wright cites do not lead to a different result. In two of the cases, there was a written agreement between the parties expressly refuting one of the elements of a partnership. *Williams v. Obstfeld*, 314 F.3d at 1275; *Progress Rail Services Corp. v. Hillsborough Regional Transit Authority*, No. 8:04CV200-T-23EAJ, 2005 WL 1051932 (M.D. Fla. Apr. 12, 2005).

Wright's third case is procedurally distinct. In *Dreyfuss v. Dreyfuss*, 701 So. 2d 437, 440 (Fla. 3d DCA 1997), the appellate court was asked to review a trial court's finding, following a bench trial, that the plaintiff had not proven the existence of a partnership. In other words, the case was decided by a factfinder at trial, not on summary judgment. It's also factually distinct. There, the evidence of partnership was exceptionally weak with sworn testimony from the putative partner asserting he was unsure about the key terms of the partnership.[24] *Id.*

In sum, as opposed to having "zero evidence" of partnership, Plaintiffs have a wealth of evidence showing Dave and Wright joined together in a business for profit. Defendant's motion for summary judgment should be denied.

**III.   The Partnership Is Not Barred by the Statute of Frauds.**

Plaintiffs moved for summary judgment on Wright's statute of frauds affirmative defense because there is no evidence that (i) Wright's partnership with Dave would have necessarily lasted longer than one year or that (ii) the two men agreed to a fixed-duration partnership longer than one year. Pl. Mot. S.J., ECF No. [498], at 28–29. Tellingly, in his motion for summary judgment on this defense, Wright identifies no such evidence either, even though it is blackletter law that he must prove it. *Dixon v. United States*, 548 U.S. 1, 8 (2006); *see Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001) (the "burden is on defendant to adduce evidence supporting [his] affirmative defense, not upon [plaintiffs] to negate its existence").

The only purported evidence Wright cites is an allegation that the partnership in fact lasted more than a year—it does not say the partnership was intended to last for more than one year. Def. Mot. S.J., ECF No. [487], at 12, 27, (citing ECF No. [83], at ¶ 67); OSMF ¶ 88. The fact that the

---

[24] As noted above, the court in *Dreyfuss* also pointed to absences in the purported partners' agreement that RUPA has since filled with default partnership provisions. *See Rafael J. Roca*, 856 So. 2d at 6 (distinguishing *Dreyfuss* on this basis). The other cases Wright cites likewise involve far more limited evidence of partnership than this case. *Cf. Vannamei Corp. v. Elite Int'l Telecommunications, Inc.*, 881 So. 2d 561, 562 (Fla. 3d DCA 2004) ("The only evidence presented as to the existence of an understanding among the parties was the self-serving testimony of Elite's principal."); *Conklin Shows, Inc. v. Dep't of Revenue*, 684 So. 2d 328, 331 (Fla. 4th DCA 1996) ("No evidence existed in the record to show that there was any contract, express or implied, which created a joint venture").

partnership ended up lasting more than a year does not trigger the statute of frauds. *See Martinez v. Lieberman*, 920 So. 2d 128, 129 (Fla. 3d DCA 2006) ("At best, this was an oral contract for an indefinite time which is not barred by the Statute of Frauds.").[25]

In deciding whether the statute of frauds bars an agreement, courts must determine whether, at the time of formation, "performance is <u>possible</u> within one year from the inception of the contract." *Browning v. Poirier*, 165 So. 3d 663, 666 (Fla. 2015) (emphasis added). If so, the agreement "falls outside the statute of frauds." *Id.* "The general rule is that an oral contract for an indefinite time is not barred by the Statute of Frauds." *Pittman v. Postco*, Inc., 15-14100-CIV, 2015 WL 12556160, at *3 (S.D. Fla. Dec. 17, 2015). "Only if a contract could not be performed within one year would it fall within the statute." *Id.*

Simply put, Wright fails to make any showing whatsoever that performance within one year was <u>impossible</u>, and accordingly his motion for summary judgment on his statute of frauds defense should be denied.

## IV.   Defendant's Continued Attack On Subject Matter Jurisdiction Still Fails To Present Any Credible Evidence That Diversity Is Lacking

### A.   <u>This Court previously held that Defendant had "failed to present any *credible* evidence showing that" Lynn Wright was a member of W&K.</u>

The Court previously rejected Wright's attempt to defeat subject matter jurisdiction by claiming his ex-wife, Lynn Wright, was a member of W&K. He first made this claim in a reply brief he filed in May 2019. OSMF ¶ 158.

The Court was appropriately skeptical, observing that Wright "did not list [Lynn Wright] as a relevant witness" in the sworn affidavit he executed on June 14, 2018, and that "at his April 4, 2019 deposition, the Defendant testified that he had no idea who owned W&K." OSMF ¶ 158 (ECF No. [265] at 9).

Wright first testified that Ms. Wright held shares in W&K at his June 28, 2019 deposition that occurred about two months *after* he first raised Ms. Wright as a possible member in his reply. OSMF ¶ 158; ECF No. [239]. As the record was "replete with instances in which the Defendant has proffered conflicting sworn testimony," the Court "[did] not find the Defendant's testimony to be credible." *Id.* (ECF No. [265] at 10). The Court proceeded to reject the only evidence Wright

---

[25] Defendant's position is that no partnership existed, making it odd that he now contends that he and Dave Kleiman indisputably agreed their partnership would last for more than a year.

put forward because it was an email that did "not demonstrate what ultimately occurred" with respect to the membership of W&K, and Defendant's "extremely speculative" interpretation was contradicted by the "first registration of W&K as a limited liability company in Florida, in which "Dave Kleiman listed himself as the "mgrm," the managing member."[26] *Id.* (ECF No. [265] at 9). The Court held that Defendant had "failed to provide any credible evidence showing a lack of diversity," and accordingly had "utterly failed in his burden of production" for a factual attack on diversity. *Id.* (ECF No. [265] at 10).

Since that date, Zachary Eisner, W&K's corporate representative, testified that the only individuals who have ever been members of W&K are David and (after he died) Ira Kleiman. OSMF ¶ 159 (ECF No. 498-13, at 91:19–21) ("It's our position that Dave Kleiman was 100 percent the sole member and now Ira is 100 percent the sole member.").

B.   Wright has still not offered any credible evidence that diversity is lacking.

Defendant now claims that Ms. Wright's deposition testimony and a copy of a document purporting to be his divorce settlement constitutes new evidence showing diversity is lacking. But as before, the evidence Wright's proffered is devoid of credibility and insufficient to meet his burden of production for a factual attack on diversity. *See* Order, ECF No. [265], at 4; *JPMCC 2005-CIBC13 Collins Lodging*, 2010 WL 11452084, at *3 ("While the plaintiff has the burden to prove diversity in a factual attack, that burden exists only if the defendant has first proffered evidence to show a lack of diversity.").

i.   The "divorce settlement" is yet another fabrication Wright's forged.

The divorce settlement is a document labeled as an "appendix" that purports to be a "family law settlement" between Wright and his ex-wife from June 2011 that mentions an interest in Plaintiff W&K. OSMF ¶ 160 (ECF No. [488-17] at 147). Of course, if this were an authentic document (it is not), Wright would have testified Ms. Wright owned W&K at his first deposition. He also would have had it all along and would have brought it to this Court's attention when he first claimed Lynn Wright was a member of W&K.

But as indicated in Plaintiff's sanctions motion, the document is a forgery. Plaintiffs obtained the Wrights' divorce records directly from the federal Magistrates Court in Australia. The

---

[26] Defendant contends this registration "evidences nothing," ECF No. [487], at 23, but this Court already found otherwise.

file did not contain this purported 2011 "family law settlement" and worse, the Wrights' <u>2013</u> divorce application stated unequivocally that there were not any "binding agreements . . . about family law . . . involving any of the parties . . . ." OSMF ¶ 161 (ECF No. [507-1], at 7). In other words, the Wrights' application represented *no such family law settlement existed*. This would certainly explain why Ms. Wright testified she did not have a copy of this agreement, and that the only copy she did have was provided *to her* by Wright's counsel, a week before the deposition. OSMF ¶ 162 (ECF No. [488-17], at 127:3–128:11).[27] The "family law settlement" being a forgery also helps explain why Wright testified at his June 28, 2019 deposition that he didn't have a copy of it—he still had to finish forging it. OSMF ¶ 163 Ex. 37 (June 28, 2019 Craig Wright Dep. Tr. 409:11–15) ("Q. And I'm presuming you have a copy of this settlement agreement? A. No, I don't. Q. Who has a copy of the settlement agreement? A. I don't know.").[28] It would also explain why Wright's June testimony that the forged agreement only "indirectly" dealt with bitcoin and no blockchain IP is at odds with the actual forgery which explicitly makes provision for "Any and ALL Bitcoin, private keys, trusts and software associated with Bitcoin" as well as "any and all IP…including….Bitcoin." *Compare* OSMF ¶¶ 165 (ECF No. [488-17] at 148) *with* OSMF ¶ 162 Ex. 37 (June 28, 2019 Craig Wright Dep. Tr. 408:9–11, 413:13–16.)[29]

   ii. <u>Lynn Wright has a strong motive to lie for Wright and has in the past.</u>

  Defendant asserts that Lynn Wright "has no reason to lie" for him, Mot. S.J., ECF. No. [487], at 31, but nothing could be further than the truth. At her deposition, Ms. Wright testified that she is financially dependent on Wright making monthly alimony payments, OSMF ¶ 166 (ECF No. [488-17], at 69:13–23,[30] 70:3–6),[31] that she has previously complied with requests from Defendant out of fear that he would cut off her monthly support, *id.* (ECF No. [488-17], at 111:22–

---

[27] It would also explain why Wright refused to grant Plaintiff's access to the divorce records from the Australian court and forced Plaintiffs to get Ms. Wright's permission to obtain them instead. ECF No. [512] (sanctions motion).

[28] This also begs the question of just where, exactly, this document materialized from and who should be considered the custodian for it. It was not produced to Plaintiffs until January 2020, less than two weeks prior to Lynn Wright's deposition. It's worth noting that at Defendant's June 2019 deposition, he also testified to having provided his lawyers with other records of Lynn Wright's ownership in W&K, but unless they were the fabricated operating agreement discussed in Plaintiffs' motion for sanctions, these records have never materialized.

[29] It seems he forgot about this testimony when finalizing the forgery.

[30] "Q. And how much is the monthly support?...THE DEPONENT: Five to six thousand a month…"

[31] "Q. And are you currently financially dependent on Craig? A. Yes."

112:2),[32] and that she had falsely confessed to a speeding infraction committed by Defendant, *id.* (ECF No. [488-17], at 115:1–16).[33]

      iii.   <u>Other testimony by Lynn Wright and clearly forged documents Wright claims he received from her strongly suggest she was never a member of W&K and lacks any real knowledge of W&K's membership</u>

        There are numerous examples from Lynn Wright's testimony that suggests a lack of familiarity with W&K and/or that is contradicted by W&K's articles of incorporation. OSMF ¶ 167 (ECF No. [488-17], at 13:6–10) (Ms. Wright testifying she did not recall if she was ever listed a manager or managing member in W&K); *id.*, at 48:22–25 (Ms. Wright testified her role in W&K was as an administrator); *id.*, at 56:12–17 (Ms. Wright testifying she had no documents relating to W&K); *id.*, at 91:18–92:10 (when asked where W&K was incorporated, Ms. Wright testified she "would assume that it was where Craig was living," but also that it "wasn't incorporated" at all because it was a "part of Cloudcroft," a different company operated by Defendant).

        Furthermore, on March 3, 2020, Wright produced a document he claimed he received from Ms. Wright that (i) purported to be W&K's operating agreement, that (ii) identified Lynn Wright as a member of W&K, and that (iii) was purportedly signed by Dave and Craig Wright. OSMF ¶¶ 168–69 (ECF No. [507-2]).[34] As explained in Plaintiffs motion for sanctions, it's another boldfaced forgery that contains anachronisms which could not possibly exist if the document was genuine. Namely, while the document was ostensibly executed on February 15, 2011, it mentions the "Florida Revised Limited Liability Company Act" (§ III.H), which was not enacted until June 2013 after Dave had died. Ms. Wright's provision of an indisputably forged document to substantiated her "membership" completely undermines the credibility of that assertion. *Id.*

      iv.   <u>Forgeries and unreliable witness testimony do not meet the burden of production for a factual attack on diversity.</u>

        Taken together, the issues above underscore that once again Wright "has failed to provide <u>credible</u> evidence showing a lack of diversity." *JPMCC*, 2010 WL 11452084, at *3 (emphasis

---

[32] "Q. And what was your reason for agreeing to do this research and write the paper?...THE DEPONENT: Look, it - probably because Craig was supporting me and I didn't want to run the risk of him saying, 'I will just stop giving you the money'."

[33] "A. He was caught speeding on a - on a speed camera . . . it was speeding in a school zone . . . He only had 1 point left. . . and he wrote me this asking me to say . . . I was driving the car. Q. Did you cop the points? A. Yes, I did."

[34] OSMF ¶ 168, (ECF No. [511-1], at 177:23–25) (Wright testimony the operating agreement came from Ms. Wright). Problematically, one week earlier Ms. Wright testified she had no documents relating to W&K. OSMF ¶ 167 (ECF No. [488-17], at 56:12–17).

added). The Court should once again find "that the Defendant has failed to present any *credible* evidence showing that any of the parties he suggests are *members* of W&K." Order, ECF No. [265] at 5 (emphasis in original).

      C. <u>But even if all the indicia of fraud is ignored, Ms. Wright's testimony and documents still fails to meet Wright's burden of production for a factual attack because it does not reflect the membership of W&K at the time of filing.</u>

While Ms. Wright testified she was a shareholder of W&K. OSMF ¶ 170 (ECF No. [488-17], at 22:14–15). She also testified this belief was based entirely on a copy of her forged "divorce settlement" that defense counsel provided to her. .*Id.* (ECF No. [488-17], 126:14–127:9 ("Q. And when did you get the copy of it? A. It was sent to me by Craig's solicitor a week or so ago. Because I - I guess I said I didn't have any - I didn't have a copy of it."); ECF No. [488-17], 98:9–12 ("Q. Okay. And - but you don't have any documentation, outside the divorce settlement, related to your ownership? A. That's right."); ECF No. [488-17], 99:2–5 ("Q. And what's your basis for assuming you still have ownership in W&K? A. The - nothing has changed, as far as I know, from the divorce settlement.").

But that "divorce settlement" purports to be from June 2011, OSMF ¶ 160 ECF No. [488-17], at 148. And Ms. Wright testified that *she declared bankruptcy* in 2011, it was finalized in January 2012, and that she did not list W&K as one of her assets during the bankruptcy "**because everything had been handed back to Craig.**" OSMF ¶ 171 (ECF No. [488-17], 105:3–18) (emphasis added). Thus, even if the "divorce settlement" and Lynn Wright's deposition testimony are taken at face value (they shouldn't be), they fail to make any showing about the membership of W&K a*t the time the complaint was filed*. At most, they show Ms. Wright held shares in W&K that she transferred to Wright prior to January 2012.  But Wright has repeatedly sworn to this Court that he was *never* an owner of W&K. *See* OSMF ¶ 172 (ECF No. [12-2], at ¶ 12; ECF No. [242-1], at 233:12–14).

In other words, the Court is presented with exactly the same type of evidence it considered when it denied Defendant's motion for judgment on the pleadings: Defendant's conflicting representations and "extremely speculative" extrinsic evidence that says little about the historic ownership of W&K and nothing about its membership at the time the complaint was filed.

      D. <u>This Court Should Exercise Supplemental Jurisdiction Regardless</u>

As shown above, there is no evidence that anyone other than Dave or Ira Kleiman were a member of W&K. Accordingly, this Court plainly has diversity jurisdiction. Regardless, the Court

has supplemental jurisdiction under 28 USC § 1367, which codified *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966). This Court undisputedly had original jurisdiction prior to dismissal of the federal trade secrets claim and thus the Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . ." § 1367(a). The state claims are all related to the federal claim and while there are differences between the factual allegations across the causes of action, the DTSA claim and the pending claims are still part of the same "case or controversy," arising from the same "common nucleus of operative fact." *Gibbs*, 383 U.S. at 725.

Of course, the exercise of supplemental jurisdiction is subject to § 1367(c)(3), which gives the Court the discretion to decline to retain jurisdiction if all federal claims are dismissed. The Court's discretion should be guided by principles of "judicial economy, convenience, fairness to the parties, and whether all the claims would be expected to be tried together." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 745 (11th Cir. 2006). Plaintiffs submit these factors warrant retention of jurisdiction by this Court. With respect to judicial economy, this Court has already devoted countless hours to this case that has been pending before this Court for over two years. Judge Reinhart has (i) reviewed numerous discovery memorandums; (ii) held twenty-two lengthy courtroom hearings, including three days of evidentiary hearings on Plaintiffs' motion to compel; (iii) issued a 29-page order granting Plaintiffs' motion to compel and Rule 37 sanctions; (iv) held a telephone hearing during Wright's London deposition; (v) served a special master at Defendant's March 2020 depositions; (vi) held an evidentiary hearing and ordered the production of over 11,000 wrongfully withheld documents; and (vi) adjudicated various other complex disputes. OSMF ¶ 173.

In addition, this Court has (i) issued a 4-page opinion staying discovery; (ii) issued a 39-page opinion largely denying Defendant's motion to dismiss (which consisted of over 150 pages of briefing); (iii) held a hearing and issued a 12-page opinion on Defendant's motion for judgment on the pleadings; (iv) issued a 23-page opinion partly affirming Judge Reinhart's August 2019 sanctions order; (v) issued a 20-page opinion overruling Defendant's objection to Judge Reinhart's order to produce 11,000 improperly withheld documents; (vi) appointed Judge Reinhart as a special master; and (vii) set and amended the scheduling order, trial date, and resolved various other issues. OSMF ¶ 174.

In light of the extensive expenditure of judicial labor and party resources,[35] it would not make sense to force the parties to start anew in state court. *See, e.g., Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1141 (8th Cir. 2014) (no error in exercising supplemental jurisdiction given the "substantial amount of time and judicial resources expended in this case"); *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 546 (2d Cir. 1989) (in light of "over eleven months of often heated pretrial litigation," it "would have been a pointless waste of judicial resources to require a state court to invest the time and effort necessary to familiarize itself with a case well-known to the presiding federal judge").[36]

With respect to convenience, state and federal court are likely neutral (with a slight favor toward the Miami locale of this Court given the location of counsel and MIA). As for "whether all the claims would be expected to be tried together," the answer is yes as the claims have far more in common than they have differences. Last but not least is simple fairness. This case involves the outright theft of billions of dollars' worth of property. Plaintiffs are entitled to a prompt day in court, particularly in light of Wright's perjury and delay "antics." Furthermore, as the case has been pending for over two years, should the Court dismiss this case and force Plaintiffs to file again in state court, Wright will try to argue that all of Plaintiffs' claims are time barred. *See HCA Health Services of Florida v. Hillman*, 906 So. 2d 1094 (Fla. 2nd DCA 2004).

Defendants' motion for summary judgment on subject matter jurisdiction should therefore be denied for a lack of any <u>credible</u> evidence about the <u>existing</u> membership of W&K that would defeat diversity, and in the alternative, based on this Court's exercise of supplemental jurisdiction.

---

[35] The parties have taken 32 depositions, including multiple international depositions in the U.K. and Australia, briefed innumerable issues, have nearly completed briefing on motions for summary judgment, motions in limine, and *Daubert* motions. Plaintiff has spent millions of dollars in attorneys' fees and costs pursing this action.

[36] There are cases suggesting a court should "usually" decline to exercise supplemental jurisdiction if all federal claims are dismissed "before trial" but, as the above-cited authorities demonstrate, that is not so where, as here, substantial federal judicial resources have been spent on the case. *Accord, e.g., Delgado v. Pawtucket Police Dept.*, 668 F.3d 42, 48 (1st Cir. 2012) (affirming jurisdiction where "the court had already determined many substantial questions of state law at summary judgment"); *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105–06 (2d Cir.1998) (no abuse of discretion in maintaining jurisdiction after discovery and a settlement conference had taken place); *Koul v. Strong Memorial Hospital*, 282 F.Supp.3d 569, 570–71 (W.D.N.Y. 2017) (jurisdiction retained because the court had "already developed knowledge about the case and the respective positions of the parties" and dismissal would "involve significant duplication of efforts not only by the attorneys but by a state court judge"); *Pilkington v. United Airlines, Inc.*, 921 F. Supp. 740, 747-48 (M.D. Fla. 1996) (retaining jurisdiction in light of extensive discovery and the substantial "amount of time and effort expended by the Court and the litigants in developing this case").

**V.      Ira Kleiman had authority to file this action on behalf of W&K**

For all the reasons discussed above, Ira was the sole member of W&K (as the properly appointed Personal Representative) and had full authority to initiate this action on W&K's behalf.

**VI.     Overwhelming Evidence Supports Plaintiffs' Fraud Claims**

A.   The common-law fraud claim is well supported by evidence.

Overwhelming evidence shows that Wright perpetuated a scheme to claim for himself all the bitcoins he and Dave had jointly mined and all the IP they jointly developed. Defendant's motion grossly misstates the facts and law and should be summarily denied.

Fraud "is not limited to misrepresentations and misleading omissions, [it] embraces all the multifarious means which human ingenuity can devise . . . and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (quotation omitted).

Contrary to Wright's brief, a Florida fraud action does not require a "false statement of fact," it can also be based on other types of deceptive acts, including concealment or non-disclosure of material facts where, as here, (1) the defendant had a duty to speak by virtue of a fiduciary or other special relationship, (2) some artifice or trick has been employed to prevent the plaintiff from making further independent inquiry, and (3) the other party does not have equal opportunity to become apprised of the facts. *Cohen v. Nat'l City Mortg.*, 2009 WL 2436595, at *3 (M.D. Fla. Aug. 6, 2009). Fraud can also be based on "half-truths," because even if "a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries respecting such facts, if he undertakes to do so he must disclose the whole truth." *Nicholson v. Kellin*, 481 So. 2d 931, 936 (Fla. 5th DCA 1985). [37] Moreover, fraud does not require proof of "justifiable" reliance. *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

i.   The fraud claim is not primarily based on "promised future action" and valid.

Wright's motion for summary judgment proceeds on the false premise that fraud counts exclusively concerned the February 2014 communications he had with Ira. However, his fraud started well before and continued well after that date. The overwhelming evidence of Wright's fraudulent conduct prior to 2014—which includes numerous instances of altering and falsifying

---

[37] *Accord*, *Cafaro v. Zois*, 693 F. App'x 810, 816–17 (11th Cir. 2017) ("Where a party in an arm's-length transaction undertakes to disclose information, all material facts must be disclosed"); *Vokes v. Arthur Murray, Inc*., 212 So. 2d 906, 909 (Fla. 2nd DCA 1968); *Ramel*, 135 So. 2nd at 882.

documents for the purpose of taking Dave's/W&K's property—alone requires denial of Defendant's motion. Moreover, Defendant's February 2014 emails to Ira <u>did</u> include numerous false statements of present facts, half-truths, and non-disclosures of highly material facts that he had a duty to disclose as Dave's partner.[38] And finally, even Defendant's promises of future action are actionable in fraud, because he made these promises with no intention of performing, and, independently, because he had superior knowledge of the subject and knew what he was saying was false.

Soon after Dave's 2013 death, and aware that Dave's estate had no knowledge of W&K or Dave's work with Wright on bitcoin, he began his scheme to take sole ownership/control of all bitcoins and intellectual property owned by Dave and/or W&K. This scheme included the falsification, back dating, and alteration of contracts, emails, so-called "trusts," and other documents. *See* OSMF ¶ 78 Ex. 6 (KLEIMAN_00561675-688; DEF_00051504-512; DEF_00013694-703); OSMF ¶ 56 (ECF No. [83-19) (Consent Orders), at 3, 5); OSMF ¶ 54 (ECF No. [511-9], at 68:15-69:21). He created "contracts" purportedly signed by Dave with computer font signatures and with entities that did not exist until after Dave died. ECF No. [83]. He falsely created a document stating that "All Bitcoin and associated ledger assets" had been "transferred into Tulip Trading Ltd by Mr David Kleiman on Friday 10th June 2011," which is patently false since Wright did not control Tulip Trading until after Dave's death. Order, ECF No. [277]. Wright even filed two lawsuits against W&K and submitted false documents claiming W&K had agreed to the entry of $56 million (AUD) consent judgments against it. OSMF ¶¶ 54–56.

As his scheme was unfolding, and with the ATO auditing him, Wright decided to contact Dave's family before the ATO. Again, Wright's motion for summary judgment completely ignores Wright's fraudulent acts that occurred before he reached out to the Kleimans in February 2014. But even these later emails constituted fraud, as they were intended to continue and cover up the fraudulent scheme to take Dave's bitcoins and IP. To give just a few examples, Wright's emails to Ira attached fake emails purportedly between Defendant and Dave about bitcoin and trusts, and falsely stated that W&K had received millions in funding from the U.S. Department of Homeland Security when in fact that never occurred. OSMF ¶ 176 Ex. 38 (DEFAUS_00118876). Without

---

[38] Partners and joint venturers such as Dave and Wright owe fiduciary duties to each other. *Donahue v. Davis*, 68 So. 2d 163, 171 (Fla. 1953); *Hallock v. Holiday Isle Resort & Marina, Inc.*, 885 So. 2d 459, 462 (Fla. 3rd DCA 2004); *Grossman v. Greenberg*, 619 So. 2d 406, 408 (Fla. 3rd DCA 1993).

disclosing his lawsuits against W&K, Defendant also wrote that "W&K was run by Uyen" when in reality Wright had himself filed the fake W&K "acknowledgements" of a fake $56 million debt of W&K to Wright. *Id.* When Ira finally learned about the fraudulent suits Defendant had filed against W&K, Wright falsely claimed he was just carrying out "Dave's idea" to move W&K's assets to a new company." *Id.*

Finally, even Defendant's promises of future action constitute fraud. Defendant inaccurately contends that fraud "cannot consist of mere broken promises, unfilled predictions or erroneous conjecture as to future events." However, there are exceptions to this general rule where, as here, 1) "the person promising future action does so with no intention of performing or with a positive intention not to perform," and 2) "the person expressing the opinion is one having superior knowledge of the subject of the statement and the plaintiff can show that said person knew or should have known from facts in his or her possession that the statement was false." *Mejia v. Jurich*, 781 So. 2d 1175, 1177–78 (Fla. 3rd DCA 2001). Both exceptions apply here. For example, the jury is entitled to infer that, when Defendant promised to pay the estate $10 million by October 2014, OSMF ¶ 83 (ECF No. [511-8], at 7967); OSMF ¶ 84 (ECF No. [511-18], at 4269), he had no intention of so doing and was merely attempting to hide his fraud and lull Ira into inaction. And Wright obviously had "superior knowledge" of W&K and Dave's other bitcoin-related business, and the jury is entitled to find that Defendant knew his forward-looking statements were false.

ii.    <u>Plaintiffs Had the Right to Rely and Did Rely</u>

Even with respect to the post-February 2014 emails, Plaintiffs had a "right to rely" and did rely on Wright's false statements, half-truths, non-disclosures, and promises of future actions he had no intention of performing. Wright completely misstates the law on the "right to rely" doctrine. Those cases concern a rare exception where there's no right to rely because the misrepresentations are made in settlement negotiations where the defendant has allegedly committed fraud. *Pettinelli v. Danzig*, 722 F.2d 706, 710 (11th Cir. 1984) ("When negotiating or attempting to compromise an existing controversy over fraud and dishonesty it is unreasonable to rely on representations made by the allegedly dishonest parties"). Moreover, Florida law does not require that a plaintiff's reliance be "justifiable,"[39] and, regardless of any antagonism, Defendant "cannot under the cover

---

[39] *Butler v. Yusem*, supra, 44 So. 3d at 105.

of law be permitted to retain the fruits of perfidy" if he "tricked and deceived and dealt fraudulently" those to whom he owed fiduciary duties.[40]

The "no right to rely" doctrine doesn't apply simply because parties are antagonistic or "because plaintiffs had counsel," and it definitely doesn't apply when Wright had a fiduciary duty as Dave's partner to be candid and truthful to Dave's estate. Anyways, Plaintiffs were not "in an adversarial relationship with Dr. Wright" in February 2014. To the contrary, as Ira had not known about W&K or Dave's involvement with bitcoin, he was thrilled to hear from Defendant. *See* OSMF ¶ 179 Ex. 39 ("Our family is truly blessed to know you").

Ira first had suspicions about Defendant in April 2014, when the ATO sent him copies of Defendant's fraudulent Australian suits against W&K. OSMF ¶ 56 (ECF No. [83-20], at 18). Even then, Wright was able to lull Ira into further inaction with more false statements and half-truths (he was just carrying out "Dave's idea" what "Dave and I had planned" and was "advised by accountants" it was necessary), and with promises of a $12 million payment by October 2014 (promises Wright never had any intention of fulfilling). OSMF ¶ 180 Ex. 40.

Wright's assertion of a "showstopping, temporal deficiency" is also baseless. As shown above in Part I, it is totally false that the "Australian court indisputably perfected service of process on W&K on October 10, 2013." Quite the contrary, it is undisputable that W&K was never served with process and that the court's notice of listing (which is not service) was not seen by Ira until 2016. *See supra*, Part I.B. Finally, Wright contends that Ira is somehow to blame because he "destroyed D.K.'s work papers and re-formatted his hard drives." This statement is exaggerated, inaccurate, and it ignores the fact that for ten months Wright totally failed to inform Dave's estate that his devices had any valuable property. Wright is not entitled to keep the property he stole, regardless of what Ira did or did not do. *See, e.g., Cruise v. Graham*, 622 So. 2d 37, 40 (Fla. 4th DCA 1993) ("the defrauder should not be shielded by his victim's negligence") (quotation omitted); *Cont'l Cas. Co. v. Cura Grp., Inc.*, 2005 WL 8155321, at *33 (S.D. Fla. Apr. 6, 2005) (plaintiff's negligence is not a defense to "fraud-based torts").

---

[40] *McLeod v. Gaither*, 94 Fla. 55, 57–58, 113 So. 687, 688 (1927). *See Bove v. PBW Stock Exch., Inc.*, 382 So. 2d 450, 453 (Fla. 2nd DCA 1980) (defendant liable for breach of fiduciary duty for informing plaintiff's ex-agent but not plaintiff despite "controversy, friction and ill will" between plaintiff and ex-agent).

iii.   Plaintiffs Suffered Billions in Damages Due in Wright's Fraud

In a brief filled with false and dubious factual allegations and legal arguments, one of the most surprising is Wright's assertion that his fraud caused Plaintiffs' no damages. Wright's fraud deprived Plaintiffs of bitcoin, forked assets, and IP worth billions of dollars, and Plaintiffs are entitled to recover damages that will "restore [them] to the position [they] would have been in had the wrong not been committed." *Totale, Inc. v. Smith*, 877 So. 2d 813, 815 (Fla. 4th DCA 2004). This includes the fair market value of the stolen property plus all profits Defendant garnered from his improper use and sale of these assets. The evidence shows that Wright and Dave/W&K mined approximately 1.1 million bitcoins during the course of their partnership, with, by Wright's own admission, most of the bitcoin mined by Dave. OSMF ¶ 181 (ECF No. [507-7]); OSMF ¶ 117 Ex. 22, at 9475.

Plaintiffs have been damaged in the amount of at least 50% of the value of the jointly mined bitcoin. The value of one bitcoin at the time of the expert report of Andreas Antonopoulos was $7400. OSMF ¶ 181, (ECF [500-5], at 19). The present value of a bitcoin—$9,326 as of this writing—is also publicly available anytime on the coincap.io website. Even using Mr. Antonopoulos' lower value, and not counting forked assets, Plaintiffs have incurred over $4 billion in damages as a result of Defendant's fraudulent misappropriation of Dave's/W&K's bitcoins.

The value of the misappropriated IP is also readily calculable. Although there are other available methods too, one way is based on Defendant's own valuation reports, which state the "W&K Source" "software package" has a value ranging from $126 million (AUD), OSMF ¶ 181 Ex. 41 (DEF_00029339, at 23) to $303,895,458 (AUD), OSMF ¶ 181 Ex. 42 (DEF_00013784, at 10). Accordingly, there is ample evidence that Plaintiffs suffered damages due to Defendant's fraud, so Defendant's motion should be denied.

B.   The Constructive Fraud Claim Is Also Valid and Well Supported by Evidence

Constructive fraud "includes all acts, omissions or concealments which involve a breach of legal or equitable duty, trust or confidence justly reposed, and are injurious to another." *Price v. Winter*, 15 Fla. 66, 93 (1875). Constructive fraud applies "to a great variety of transactions which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as that granted in cases of real fraud." *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc*., 390 F. Supp. 2d 1170, 1179 (M.D.

Fla. 2005) (quotation omitted). It occurs "when a duty under a confidential or fiduciary relationship has been abused or where an unconscionable advantage has been taken." *Id.*

Defendant's only argument for summary judgment on the constructive fraud count is that "an adversarial relationship existed when the parties first communicated in February 2014" and there is "not even a scintilla of evidence suggesting that Dr. Wright was a fiduciary to plaintiffs." But the evidence, including Defendant's own statements, shows that Dave and Defendant were partners in the development and mining of bitcoin. *See* Part II, *supra.* Partners and joint venturers owe fiduciary duties to each other. *Hallock v. Holiday Isle Resort & Marina, Inc.*, 885 So. 2d 459, 462 (Fla. 3rd DCA 2004). On the death of a partner, the "surviving partner's fiduciary obligations extend to the deceased partner's heirs and beneficiaries."[41] *Matter of Estate of Thomas*, 532 N.W.2d 676, 684 (N.D. 1995). In light of Defendant's fiduciary duties, his scheme to take the estate's and W&K's bitcoins and IP was at least constructive fraud. Defendant's pre-February 2014 conduct undisputedly constituted actual and constructive fraud, and his post-February 2014 emails, as set forth above, are additional acts in furtherance of the fraudulent scheme. *See* Part VI.A, *supra.*

Defendant finally and incorrectly asserts he is entitled to summary judgment on the constructive fraud count because the Plaintiffs were not the "weaker parties," but "weakness" is not an element of a constructive fraud claim, particularly where, as here, Defendant is patently a fiduciary as Dave's partner. In any event Defendant was the only person with knowledge of Dave's bitcoin activities; Ira knew nothing and depended on Defendant to fully inform him of the facts. For the above reasons, Defendant is not entitled to summary judgment on either of Plaintiffs' fraud counts.

## VII.   Plaintiffs' Claims Are Not Preempted

### A.   Defendant Waived His FUTSA Preemption Defense

Wright's FUTSA preemption defense is an affirmative defense. *See Small v. Amgen, Inc.*, No. 2:12-cv-476, 2016 WL 4942078, at *2 (M.D. Fla. Jan. 25, 2016). "Failure to plead an affirmative defense generally results in a waiver of that defense." *Keybank Nat'l Ass'n v. Hamrick*,

---

[41] *Biers v. Sammons*, 242 So. 2d 158, 161 (Fla. 3rd DCA 1970) (surviving partners are "required to account to the …deceased partner's estate" and must "act as trustees for the … deceased partner"); 68 C.J.S. Partnership § 314; 59A Am. Jur. 2d Partnership § 723 (surviving partners owe fiduciary duties to deceased partner's because "heirs are at a big disadvantage in dealing with the surviving partners, lacking knowledge of the extent of the partnership property or information about the amount of business done or the value of the partnership").

576 F. App'x 884, 888 (11th Cir. 2014) (quoting *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2020)).

Although Wright raised *fourteen affirmative defenses* in his Answer and Amended Answer, he failed to raise his preemption defense in either of those pleadings. (*See* ECF No. [80], at 30-32; ECF No. [87], at 32-35); *see United States ex rel. Ragghianti Founds. III, LLC v. Peter R. Brown Constr.*, No. 8:12-cv-942, 2014 WL 103457, at *11 (M.D. Fla. Jan. 10, 2014) (defendant precluded from raising release defense at summary-judgment stage, where answer included "six different affirmative defenses" and "release was not one of them"). Instead, notwithstanding the fact that this litigation commenced in February 2018, Wright declined to mention his defense until (in his own words) "the eve of trial." (ECF No. [487], at 16 n.6.) As a result, the defense is waived. *See Keybank Nat'l Ass'n*, 576 F. App'x at 888 ("When an affirmative defense was initially raised pursuant to a summary judgment motion, [the Eleventh Circuit] determined that the defendant's 'failure to specifically plead the defense in its answer or amended answer results in the waiver of this defense.'" (citations omitted)).

"[T]he Eleventh Circuit has only provided a *narrow window* to raise affirmative defenses [not raised in an answer] during summary judgment." *Am. Auto. Ins. Co. v. Quality Plastering & Stucco, Inc.*, No. 6:11-cv-1767, 2013 WL 12149411, at *6 (M.D. Fla. June 26, 2013) (emphasis added). Such a defense may only be permitted "if the plaintiff has suffered no prejudice from the failure to raise [it] in a timely fashion." *Id.* (quoting *Miranda de Villalba v. Coutts & Co. (USA) Int'l*, 250 F.3d 1351, 1353 (11th Cir. 2001)). For example, in *Britt Green Trucking v. FedEx National LTL*, the court rejected the defendant's argument that its failure to raise a preemption defense until summary judgment did not prejudice the plaintiff, where the defendant, after years of discovery, "waited until the eleventh hour to bring [the defense] to the attention of [the plaintiff] and [the court]." No. 8:09-cv-445, 2014 WL 3417569, at *12 (M.D. Fla. July 14, 2014).

Wright's decision to "wait[] until the eleventh hour" to bring this defense to Plaintiffs' and the Court's attention has undoubtedly prejudiced Plaintiffs. *See id.* Wright sat on this defense—which is not based on *any* information learned during discovery, and could have easily been asserted a two years ago—for (again, in his own words) "two years of extensive discovery." (ECF No. [487], at 23.) Accordingly, based on Wright's failure to disclose his preemption defense, Plaintiffs did not seek to tailor discovery in any way toward obtaining information relevant to the defense—e.g., whether or which part of the assets that Wright stole constitute trade secrets.

This is a critical question because FUTSA's preemption provision "does not affect 'other civil remedies that are not based on misappropriation of a trade secret.'" *Carlwood Safety, Inc. v. Wesco Distribution, Inc.*, — F. Supp. 3d —, 2020 WL 1046366, at *5 (M.D. Fla. Mar. 4, 2020).[42]. Wright's FUTSA preemption defense has been waived.

### B.  FUTSA Does Not Displace or Preempt Plaintiffs' Claims

Even if his preemption defense had not been waived (it has been) it would not bar any of Plaintiffs' remaining claims for the following reasons.

#### i.  Because Counts I, II, V, VI, VII, and VIII seek stolen bitcoin, they are clearly not preempted by FUTSA

FUTSA only displaces "civil remedies *for misappropriation of a trade secret*" and expressly does *not* displace "civil remedies that **are not based upon misappropriation of a trade secret**." Fla. Stat. § 688.008 (emphasis added). Counts I, II, V, VI, VII, and VIII demand return of the bitcoin Wright stole from Plaintiffs. Stolen bitcoins are indisputably not trade secrets, and therefore their recovery is not preempted by FUTSA.[43] Thus, these claims are materially separate and distinct from Plaintiffs' FUTSA claim, and are therefore not preempted. *Pelfrey v. Mahaffy*, No. 17-CV-80920, 2018 WL 3110797, at *3 (S.D. Fla. Feb. 7, 2018) (conversion claim alleging identical misconduct as misappropriation claim only preempted to the extent it involved conversion of trade secrets, as opposed to other property); *See Allied Portables, LLC v. Youmans*, No. 2:15-cv-294, 2016 WL 259548, at *4 (M.D. Fla. Jan. 21, 2016).

#### ii.  Wright Has Not Established that the Alleged Wrongdoing in Those Counts is Not Materially Separate and Distinct from Plaintiffs' FUTSA Claim.

As preemption is an affirmative defense, Defendant bears the burden of proving it. *See In re Rawson Food Servs., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988).  Other than making conclusory

---

[42] Notably, the fact that a plaintiff asserts a FUTSA claim does not establish, for purposes of FUTSA preemption, that the plaintiff's other claims based on the same information necessarily involve trade secrets. *See Healthcare Appraisers, Inc. v. Healthcare FMV Advisors, LLC*, No. 10-cv-80293, 2011 WL 4591960, at *9 (S.D. Fla. Sept. 30, 2011) (unjust enrichment claim that would otherwise be preempted could be asserted "in the alternative" in case "it [was] determined at a later time that there [were] no trade secrets"); Although some courts have found that "FUTSA preempts all non-contract claims based on the misappropriation of confidential and/or commercially valuable information even if the information does not constitute a trade secret under the FUTSA," *Vape Fiends, Inc. v. Lightfire Grp., LLC*, No. 17-cv-60951, 2017 WL 5953429, at *3 (S.D. Fla. Aug. 21, 2017), that interpretation directly contravenes the text of FUTSA's preemption provision, which expressly excludes "other civil remedies that are not based on misappropriation *of a trade secret*," *Carlwood*, 2020 WL 1046366, at *5 (emphasis added).

[43] In his motion to dismiss, Wright argued that "bitcoins are a form of money" and should be held to the higher pleading standard required for conversion of money claims.  ECF No. [33], at 47, n.11

statements, Defendant does not attempt to meet that burden. Wright cites an Eastern District of California case to argue that this Court must dismiss Plaintiffs' non-civil theft claims as preempted because they "share a common nucleus of operative facts" with the already-dismissed FUTSA claim. ECF No. [487], at 28-29 (citing *Deerpoint Grp., Inc. v. Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1238 (E.D. Cal. 2018)).

But that is not the standard that applies in Florida. Instead, Florida courts apply a much narrower standard under which FUTSA only preempts a claim "if there is no 'material distinction' between the plaintiff's FUTSA claim" and the challenged claim. *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1295 (S.D. Fla. 2018) (Bloom, J.); *see also XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F. Supp. 3d 1245, 1263 (S.D. Fla. 2016) (same). Pursuant to this standard, a claim is not preempted unless it is based on "allegations of trade secret misappropriation *alone*." *Rx Strategies*, 390 F. Supp. 3d at 1353-54 (emphasis added) (tortious interference claims that did "not consist only of allegations of [trade-secret] misappropriation" not preempted).[44]

As the *Xtech* court held, "[t]o conduct [the FUTSA preemption] analysis, the Court must compare the allegations of the [targeted] claim and the FUTSA claim to determine if the allegations are separate and distinct." 183 F. Supp. 3d at 1263 (denying preemption, even though FUTSA and challenged claims were "substantially similar," because slight differences—including "the *manner* in which" property was misappropriated—rendered claims materially distinct) (emphasis in original). Yet, Wright moves for summary judgment on this issue without even attempting to conduct this necessary analysis. If he had, it would become quickly apparent that Plaintiffs' remaining claims are sufficiently distinct from their FUTSA claim to survive preemption.[45]

First, as set forth above, unlike the FUTSA claim, the remaining claims allege the theft of non-trade secrets (*e.g.*, bitcoins). *See Allied Portables, LLC v. Youmans*, No. 2:15-cv-294, 2016 WL 259548, at *4 (M.D. Fla. Jan. 21, 2016) (claim that alleged that defendant misappropriated

---

[44] Notably, four of the five *Florida* cases that Wright cites rejected a preemption argument because there was a "material distinction" between the FUTSA and challenged claims. *See Flagstone Island Gardens, LLC v. Ser*, No. 11-cv-21865, 2011 WL 13223685, at *6 (S.D. Fla. Sept. 13, 2011); *Audiology Distribution, LLC v. Simmons*, No. 8:12-CV-02427-JDW, 2014 WL 7672536, at *9-10 (M.D. Fla. May 27, 2014); *Am. Honda Motor Co. v. Motorcycle Info. Network Inc.*, 390 F. Supp. 2d 1170, 1180-82 (M.D. Fla. 2005); *New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 908 (M.D. Fla. 2007). The fifth case, *Allegiance Healthcare Corp. v. Coleman*, 232 F. Supp. 2d 1329 (S.D. Fla. 2002), is easily distinguishable because, there, the challenged claim was *based solely* on the misappropriation of trade secrets. *See id.* at 1335-36. As explained herein, that is not true of Plaintiffs' remaining claims.

[45] Wright does not argue that Plaintiffs' civil theft claims are preempted. (*See* ECF No. [487], at 29.)

both trade secrets and non-trade secrets was not preempted because "the issue is whether or not the allegations of the misappropriations of trade secrets *alone* comprise the underlying wrong") (emphasis added).[46]

Second, these claims allege misconduct beyond that which underpinned the FUTSA claim. For example, Plaintiffs' conversion claim is based, in significant part, on Plaintiffs' allegation that Wright wrongfully took control of Plaintiffs' bitcoin after Dave's death by, among other things, "exercising exclusive possession over the private keys necessary to own, move, or sell the bitcoins"; "moving them to, or holding [them] in, 'trusts' known only to him and controlled by him"; and "using those bitcoins (or the 'rights' to them) to make large trades for his Australian businesses." (ECF No. [83], ¶ 111.) These allegations render that claim, and all of Plaintiffs' other remaining claims, materially distinct from the FUTSA claim.

Likewise, Plaintiffs' fraud claims (counts VII and VIII) involve proof of certain intentional misstatements and material omissions by Wright in his dealings with the Kleiman family following Dave's death. *See, e.g.*, *New Lenox Indus.*, 510 F. Supp. 2d at 908 (preserving fraud in the inducement claim after Defendant "misled Plaintiff . . . to obtain access to . . . confidential proprietary information."); *Am. Honda Motor Co.*, 390 F. Supp. 2d at 1181 (preserving fraud claim because it was "not entirely dependent upon the FUTSA claim."); *RxStrategies*, 390 F. Supp. 3d at 1354 (preserving fraudulent inducement and misrepresentation claims because they did "not consist only of allegations relating to . . . misappropriation . . . .").

Plaintiffs' other claims rely on breaches of specific common law duties (*e.g.*, count V) or set forth a different theory of damage beyond that which comes under the FUTSA claim (*e.g.*, count II). *See Allied Portables*, 2016 WL 259548, at *4 (claims not preempted because they alleged that defendant "breached her fiduciary duty" by "converting [plaintiff's] tangible and intangible property *for her own personal gain*") (emphasis added); *Mortgage Now, Inc. v. Stone*, No. 3:09-cv-80, 2009 WL 4262877, at *6-7 (N.D. Fla. Nov. 24, 2009) (breach of fiduciary duty claims not preempted because, even though they "contain[ed] a misappropriation allegation that overlap[ped] with the FUTSA claim," they also contained allegations that "arise from the relationship between employer and employee"); *ThinkLite v. TLG Solutions*, No. 16-cv-24417, 2017 WL 5972888, at

---

[46] The fact that each of Plaintiffs' claims incorporates paragraphs 1-170 of the Second Amended Complaint is not a basis for finding that Plaintiffs' non-FUTSA claims are preempted. *See Advice Interactive Grp., LLC v. Web.com Grp., Inc.*, No. 3:17-cv-801, 2017 WL 6554409, at *10-11 (M.D. Fla. Oct. 20, 2017).

*4 (S.D. Fla. Jan. 31, 2017) (denying preemption of unjust enrichment claim despite reliance on the FUTSA allegations "as evidence of wrongdoing," because the manner in which Defendant exploited the trade secrets—namely, the "formation of a new business"—made the claim materially distinct).

   iii. <u>Count VI Arises from a Contractual Relationship and is Therefore Exempt from FUTSA Preemption under Fla. Stat. § 688.008(2)(a)</u>

Wright's argument also fails with respect to Plaintiffs' partnership claim (Count VI) because that claim arises from a contractual relationship and is therefore exempt from FUTSA preemption. Wright's motion ignores the plain language of Fla. Stat. § 688.008(2)(a), which exempts "[c]ontractual remedies, whether or not based upon misappropriation of a trade secret." The exemption for contractual claims is well documented throughout Florida, including in the Southern District, and applies to both oral and written contracts. *See ThinkLite*, 2017 WL 5972888, at *4 (denying preemption because claim was "based on Defendants' contractual and confidential-relationship duties and actions other than misappropriation of trade secrets . . . ."); *Am. Honda Motor Co.*, 390 F. Supp. 2d at 1181 (holding that a "[b]reach of an oral agreement sounds in contract and is therefore excepted . . . ."); *Allied Portables*, 2016 WL 259548, at *3 (holding "FUTSA preempts all claims, other than claims *ex contractu . . .*"). Accordingly, because Count VI properly states a cause of action arising out of a contractual relationship, that count falls within the exemption set forth in Fla. Stat. § 688.008(2)(a) and is not preempted.

In sum, Wright has waived his preemption defense. Even if the defense was not waived in its entirety, it would still fail because Plaintiffs' remaining claims are "separate and distinct" from their FUTSA claim and are not preempted. First, these remaining claims seek relief based on misappropriation of assets (e.g. bitcoin) beyond the trade secrets identified in Count III. Second, the remaining counts alleged wrongdoing beyond the allegations in Count III. Lastly, Count VI sounds in contract, and is therefore expressly excluded from the preemption provision of Fla. Stat. § 688.008(2)(a).

Dated:  May 22, 2020                                    Respectfully submitted,


By: _/s/ Velvel (Devin) Freedman_
    Velvel (Devin) Freedman, Esq.
    **ROCHE CYRULNIK FREEDMAN LLP**
    200 S. Biscayne Blvd.
    Suite 5500 Miami, Florida 33131
    vel@rcfllp.com

    Kyle W. Roche, Esq.
    Joseph M. Delich
    *Admitted Pro Hac Vice*
    **ROCHE CYRULNIK FREEDMAN LLP**
    99 Park Avenue, 19th Floor
    New York, New York 10016
    kyle@rcfllp.com
    jdelich@rcfllp.com

    Andrew S. Brenner, Esq.
    **BOIES SCHILLER FLEXNER LLP**
    100 SE 2nd Street, Suite 2800
    Miami, Florida 33131
    abrenner@bsfllp.com

    *Counsel to Plaintiffs Ira Kleiman as Personal*
    *Representative of the Estate of David Kleiman*
    *and W&K Info Defense Research, LLC*