## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as the personal representative
of the Estate of David Kleiman, and W&K Info
Defense Research, LLC,

     *Plaintiffs,*

v.

CRAIG WRIGHT,

     *Defendant.*

CASE NO.:  9:18-cv-80176-BB/BR

## PLAINTIFFS' OPPOSING STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiffs Ira Kleiman, as Personal Representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC (collectively, "Plaintiffs"), by and through their undersigned attorneys, submit this Opposing Statement of Material Facts regarding Defendant's Motion for Summary Judgment.

1.    Mr. Patrick Paige was Mr. Dave Kleiman's ("D.K.") closest friend. P. Paige Depo. Tr. 37:6-11, attached as Exhibit A. Mr. Paige trained D.K. as a police officer. Id. at 8:2- 12. They were business partners in a company called Computer Forensics LLC, up until D.K.'s death. Id. at 35:13-23. They also spoke nearly every day. *Id.* at 11:20-25.

*Denied as phrased.[1] The citation to the first sentence only supports that Patrick Paige testified he considered Dave Kleiman his best friend. Ex. A at 37:6–11. Mr. Paige lacks foundation to speak about how Dave Kleiman saw him. Denied that Mr. Paige trained Dave Kleiman as a police officer because the asserted material fact misstates Mr. Paige's testimony that he was a "training officer" for Dave Kleiman, working with him for two weeks out of a 12-week training period after Dave Kleiman had graduated from the police academy. Id. at 8:3–19. Denied that they were business partners in Computer Forensics LLC, up until Dave Kleiman's death on grounds that LLCs do not have partners in a legal sense but admitted in the colloquial sense of working together. Denied as to the characterization of testimony in the last sentence. The citation to the last sentence only supports that Patrick Paige testified that "[t]here were times when [he] would talk to [Dave Kleiman] every morning basically. . . . We would talk sometimes on a daily basis for weeks on end." Id. at 11:20–25.*

2.    Mr. Paige testified that D.K. never said (1) anything about bitcoin, (2) that he owned bitcoin, (3) that he was involved in creating bitcoin, or (4) that Dr. Wright was his business partner. **Ex. A** at 12:1-7.

*Denied as to the characterization of the testimony. The citation supports only that Patrick Paige  answered no when asked if Dave Kleiman told him "he had a large amount of Bitcoin," "mention[ed] Bitcoin" to him, or told him "he had a partnership or a business partnership with Craig Wright." Ex. A at 12:1–8. Also, Mr. Paige testified "Not that I can recall" when asked if Dave "talk[ed] about Craig Wright." Id. at 12:11–12.*

3.    Mr. Carter Conrad was a close friend of D.K. and his business partner in Computer Forensics LLC. C. Conrad Depo. Tr. 8:22-25; 9:14-11:6, attached as **Exhibit B**. They spoke daily or at least every other day. *Id*. at 8:22-9:1.

---

[1] Defendant's Statement of Material Facts is replete with "facts" that are unsupported by the evidence and testimony cited by Defendant. All such unsupported "facts" and mischaracterizations of evidence and testimony are, of course, not admissible. *E.g.*, *Coquina Invs. v. Rothstein*, No. 10-60786-CIV, 2011 WL 4971923, at *1 (S.D. Fla. Oct. 19, 2011) (citing S.D. L.R. 7.5(D)), *aff'd sub nom. Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300 (11th Cir. 2014).

*Denied as to the characterization of the testimony. The citation supports only that Carter Conrad testified he considered Dave Kleiman a friend. Ex. B at 8:22–23. Mr. Conrad testified that he was in a joint venture with Dave Kleiman as part of Computer Forensics LLC. Id. at 9:18–10:11. Admitted that Mr. Conrad testified that he spoke with Dave Kleiman daily if not every other day. Id. at 8:24–9:1.*

4.      Mr. Conrad testified that D.K. never said (1) anything about bitcoin, (2) that he owned bitcoin, (3) that he was involved in creating bitcoin or bitcoin-related intellectual property, or (4) that Dr. Wright was his business partner. *Id*. at 14:10-12; 16:17-21; 17:21-25.

*Denied. While Carter Conrad did testify that Dave Kleiman did not mention Bitcoin to him, Ex. B at 14:10–12, the rest of the statements in the paragraph are unsupported by the citations. In fact, Mr. Conrad testified Dave and Defendant "worked together on a project. Dave classified it as a white paper", id. at 14:13-24, which may or may not be a reference to the Bitcoin White Paper. Mr. Conrad testified that Dave Kleiman had not said he was involved in "other business ventures" with Craig Wright beyond the white paper. Ex. B at 14:16–16:21. Mr. Conrad testified that Dave Kleiman never told him "that he had hundreds of millions of dollars worth of Bitcoin." Id. at 17:21–25.*

5.      Mr. Kimon Andreou was a close friend of D.K. K. Andreou Depo. Tr. 7:14-19, attached as **Exhibit C**. He visited D.K. almost every day while he resided in the VA hospital from 2011 through 2013. *Id*. at 11:20-12:-25.

*Denied as to the characterization of the testimony as to friendship only to the extent that Mr. Andreou lacks foundation to speak to how D.K. thought of him. The second sentence is admitted to the extent Mr. Andreou visited Mr. Kleiman daily during parts of the hospital stay.*

6.      Mr. Andreou recalls D.K. telling him that he was not close with Ira Kleiman ("I.K."). *Id*. at 21:14-21.

*Admit that this is what Mr. Andreou testified.  Plaintiffs object to this evidence as irrelevant and unfairly prejudicial under Fed. R. Evid. 401 and 403.*

7.      Mr. Andreou testified that D.K. never said (1) that he owned bitcoin, (2) that he was involved in creating bitcoin or bitcoin related intellectual property, or (3) that Dr. Wright was his business partner. *Id*. at 19:20-21:3. Mr. Andreou also testified that D.K. only spoke highly of Dr. Wright. *Id*.

*Denied. The first sentence is unsupported by the citation. In fact, Kimon Andreou said he "knew of [Dave Kleiman's] friendship with" Defendant, that Dave mentioned Defendant "quite a bit," and that the two men "were working on publishing some papers or working on a book," or the like. Ex. C at 19:23–20:6. The second sentence is admitted.*

8.      Ms. Kursten Karr was D.K. fiancée. K. Karr Decl. ¶ 2, attached as **Exhibit D**. She lived with him from around 2001 through 2007 or 2008. *Id*. ¶ 2. They kept in touch up until D.K.'s death. *Id*.

2

*Admitted, except that Kursten Karr testified she starting living with Dave Kleiman in 2000, not 2001.  Ex. D, ¶ 2.*

9.      Ms. Karr testified that D.K. never said anything bitcoin or cryptocurrency. **Ex. D** ¶ 3. She also testified that D.K. only described Dr. Wright as being a friend, and that he never described Dr. Wright as a business partner or mentioned that they had any business interests together. *Id*. ¶ 4.

*Admitted that this is what Ms. Karr testified.*

10.     Mr. Kaleb Jones is Ms. Karr's now-adult son. K. Jones Decl. ¶ 2, attached as **Exhibit E**. Mr. Jones lived with D.K. from 2001 through around 2010. *Id*. He considered D.K. as a father figure. *Id*. ¶ 3

*Admitted, except that Kaleb Jones states he lived with Dave Kleiman starting "approximately 2002," not 2001. Id. ¶ 2.*

11.     Jones testified that D.K. never said anything bitcoin or that he had a business partnership with Dr. Wright. **Ex. E** ¶ 4

*Admitted that this is what Mr. Jones testified.*

12.     Mr. David Kahurcik was D.K.'s accountant. D. Kahurcik Depo Tr. 25:2-24, attached as **Exhibit F**. D.K. never told him anything about bitcoin. *Id*. at 29:10-11.

*Denied as to the characterization of David Kahurcik as Dave Kleiman's "accountant." Mr. Kahurcik and Dave "were buddies," and he "prepared [Dave's] income tax returns over the years." Ex. F at 25:2–24. Also, the second sentence is objected as misleading as Mr. Kahurcik testified Dave never spoke to him about anything other than "just for comedic purposes." Id. 29:10–25.*

13.     In the years before his death, while he lived in the VA, D.K. could not afford to pay his mortgage; he stopped paying his mortgage on October 1, 2012. *See* Foreclosure Complaint ¶ 5, attached as **Exhibit G**.

*Denied. Exhibit G (verified foreclosure complaint) is hearsay and cannot be presented in admissible form at trial. "[A]t summary judgment [courts] can only credit a statement in a verified complaint if it is based on personal knowledge or observation."  Smith v. Salter, 794 F. App'x 817, 821 (11th Cir. 2019); see, e.g., Walker v. Tyler Cty. Comm'n, 11 F. App'x 270, 274 (4th Cir. 2001) ("a verified complaint that alleges facts that are made on belief or information and belief is insufficient to oppose summary judgment"). Exhibit G is based on "the best of my knowledge and belief." That is insufficient. In addition, "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion." Solliday v. Fed. Officers, 413 F. App'x 206, 207 (11th Cir. 2011). The allegation that "D.K. could not afford to pay his mortgage" is uncorroborated and contrary to record evidence. See OSMF ¶¶ 96–100.  In any event, the*

*evidence should be excluded as irrelevant under Fed. R. Evid. 401 and unduly prejudicial under Fed. R. Evid. 403.*

14.     He told Mr. Andreou that he was trying to save his home through a refinance. **Ex. C** at 103:20-23. He was never able to get the refinance to save his house from foreclosure. **Ex. B** at 18:7-14.

*Denied as phrased for misstating testimony. Kimon Andreou only testified that Dave Kleiman "refinanced and [was] trying to refinance his mortgage," Ex. C at 103:20–23, not that he was trying to save his home through a refinance. And Carter Conrad testified only that he saw foreclosure notices from Dave's mortgage company. Ex. B at 18:7–14. In any event, the testimony should be excluded as irrelevant under Fed. R. Evid. 401 and unduly prejudicial under Fed. R. Evid. 403.*

15.     D.K. also could not pay his cell phone bill. **Ex. B** at 19:8-24. Although D.K. would not ask, his close friends Messrs. Paige and Conrad would pay his cell phone bill. *Id.* They paid D.K. cell phone did this because it was the only way D.K. was connected to the world while living in the VA. *Id.*

*Denied as phrased. Id. Carter Conrad testified only that Dave Kleiman's cell phone "was in danger of being turned off several times for non-payment," and that he and Patrick Paige "provided money so we can take care of" Dave, not that they paid Dave's cell phone bill nor how often they provided funds. Ex. B at 19:8–24. In any event, the testimony should be excluded as irrelevant under Fed. R. Evid. 401 and unduly prejudicial under Fed. R. Evid. 403.*

16.     D.K.'s credit report shows that on April 22, 2013, just four days he was found dead, he applied for credit from Springleaf Financial. D. Kleiman Credit Report at 5, attached as **Exhibit H**. Springleaf Financial is a subprime lender that focuses a subprime, high-rate loans. Expert Report of W. Nicholson ¶¶ 10-13, attached as **Exhibit I**. He was likely denied that loan. *Id.* ¶ 13.

*Denied as phrased. Id. ¶ 9. Admitted that the credit report reflects a credit inquiry by Springleaf Financial on April 22, 2013. Id. Admitted that Mr. Nicholson opines that Springleaf is a subprime lender that offers high rate loans. Id. ¶ 12. Admitted that Mr. Nicholson opines that the absence of a new account suggests that a credit request was not approved. Id. ¶ 11. Exhibit H is hearsay and cannot be presented in admissible form at trial. E.g., Gannon v. IC Sys., Inc., No. 09-60302-CIV, 2009 WL 3199190, at \*2 (S.D. Fla. Sept. 25, 2009) (granting motion in limine and excluding credit report because such reports are inadmissible absent "testimony from someone at the credit bureau with knowledge of how the reports are compiled"); see also Fed. R. Civ. P. 37(c). Furthermore, Mr. Nicholson's speculative testimony that Dave Kleiman was likely denied a loan based on his reading of a credit report is not expert testimony admissible under Fed. R. Evid. 702. In any event, it should be excluded as irrelevant under Fed. R. Evid. 401 and unduly prejudicial under Fed. R. Evid. 403.*

17.     D.K. never took any higher education courses related to information technology. K. Andreou Depo. Tr., Exhibit 1 at 3, attached as **Exhibit C**.

*Denied as unsupported by the citation. Dave Kleiman's CV does not support Defendant's*

*assertion that Dave never took any higher education courses related to information technology.*

18.     D.K. obtained certifications about computer forensics and security from reading books on those topics that came with a certification test. *See* City of Lake Worth's Office of Human Resources/Risk Management Memorandum, dated August 19, 2009, at 2, attached as **Exhibit J**.

*Admitted, except that the supporting evidence should be excluded. Exhibit J is hearsay and*

*cannot be presented in admissible form at trial. Also, the statement lacks foundation, violates Fed.*

*R. Evid. 106, and should be excluded as irrelevant and unduly prejudicial under Fed. R. Evid. 401*

*and 403.*

19.     However, none of D.K.'s certifications had anything to do with blockchain technology. *See* Expert Report of K. Madura ¶¶ 29-41, attached as **Exhibit K**.

*Denied. This is an opinion of an expert, Kevin Madura, and not a fact. Moreover, Plaintiffs*

*have moved to exclude his testimony at trial, see ECF No. [509], at 16–20.*

20.     Furthermore, D.K. was hired to serve as an expert witness in the field of computer forensics. D. Kleiman Decl. ¶ 1, attached as **Exhibit L**.

*Denied as unsupported by the citation. The cited paragraph states that Dave Kleiman is*

*"a recognized computer security expert who has worked in the Information Technology sector*

*since 1990. I specialize in computer forensics, data security, and analysis. I have been accepted*

*to testify as a computer expert witness in the United States federal courts, Florida state courts,*

*and United States military courts. I have also served as a court-appointed neutral expert on*

*computer forensic matters. I am a former Florida Certified Law Enforcement Officer, and I have*

*assisted law enforcement agencies in computer crime analysis. Additionally, I am a published*

*author on the subjects of information security and computer forensics." Ex. L, Kleiman Decl., ¶*

*1.*

21.     In an expert report that D.K. prepared just two weeks before his death, D.K. discusses his experience with computers, and he does not say that he has experience with blockchain technology or bitcoin. *Id.* ¶¶ 1, 2. D.K. prepared this declaration well after blockchain and bitcoin had become mainstream in the information technology community. **Ex. C** at 64:23- 65:4 (discussing that bitcoin became computer news in 2010 or 2011 when a person famously purchased Dominos' pizza with bitcoin).

*Denied as unsupported by the citations. Kimon Andreou did not testify as to when*

*blockchain or bitcoin had become mainstream in the information technology community (and if he*

*did it would be improper lay opinion testimony), only that he first heard of Bitcoin in 2010 or 2011*

*when someone used Bitcoin to buy pizza. Ex. C at 64:23–65:6. Furthermore, the statements should*

*be excluded as irrelevant and unduly prejudicial under Fed. R. Evid. 401 and 403.*

22.     Ira Kleiman ("I.K.") testified that D.K. was purportedly working on bitcoin as a secretive project. I. Kleiman January 10, 2020 Depo. Tr. at 22:19-20. However, I.K. also testified that during Thanksgiving dinner in 2009, D.K. purportedly told him that he was working with a wealthy foreign man to develop digital currency and that it would be "bigger than Facebook," then drew for him what would become the symbol for bitcoin. *Id.* at 14:8-22:5. attached as **Exhibit M**. No one else heard this statement. *Id.* at 96:21-97:21. I.K. testified that he believed D. Kleiman was working on bitcoin as a secretive project. *Id.* at 16:22-17:12.

*Denied that Ira Kleiman testified Dave Kleiman told him his work on bitcoin was secretive.*

*To the contrary, he testified that that's what Defendant told him. Ex. M at 17:3–5, 23:2–5. Also,*

*the third sentence is unsupported by its citation.*

23.     I.K. never asked D.K. about this statement again, even after bitcoin had gone mainstream. *Id.* at 22:6-23.

*Denied as to when "bitcoin had gone mainstream," which is not supported by the citation.*

*Otherwise admitted.*

24.     After D.K.'s death, I.K. was appointed the personal representative of the Estate of D.K. Second Amended Complaint ("SAC") ¶ 1.

*Admitted.*

25.     Upon becoming the personal representative, Ira took possession of D.K.'s belongings, and threw away his work papers and re-formatted some of his hard drives. I. Kleiman April 8, 2019 Depo. Tr., Exhibit 6 at 1-2, attached as **Exhibit N**. I.K. discarded D.K.'s work papers and reformatted his hard drives without looking for any evidence of what D.K. allegedly had told him in 2009. *Id.* at 45:5-8.

*Denied as unsupported by the citations. Ira Kleiman wrote to Defendant on February 18,*

*2014 that he had "throw[n] away a bunch of Dave's papers and format[ted] drives [he] couldn't*

*access." Ex. N at Ex. 6. Ira explained at his deposition that he only "discard[ed] some papers"*

*that "didn't look relevant to keeping" like "junk mail," and reformatted two devices that did not*

*have anything on them. Ex. N at 44:20–45:3, 48:10–14, 49:13–17, 53:3–4.*

26.     I.K. continued writing his own data to those hard drives for six years, until 2019. **Ex. N** at 53:6-54:17. I.K.'s re-formatting and continued use of D.K's devices caused whatever data D.K had stored on them to be permanently deleted. See N. Chambers Expert Report ¶ 45, attached as **Exhibit O**.

*Denied. See supra, ¶ 25.*

27.     I.K. also came into possession of a few of D.K.'s hard drives, which he did not re- format. **Ex. M** at 55:16-25. He has made no attempt to access those drives.

*Denied as unsupported by the cited testimony. Defendant's unsupported speculation that*

*there is relevant evidence somewhere on some un-accessed device or email accounts of Dave*

*Kleiman's should be excluded as irrelevant and unduly prejudicial under Fed. R. Evid. 401 and*

*403.*

28.     He also has made no attempt to access several of D.K.'s email accounts, which we just learned during his January 10, 2020 deposition. **Ex M.** at 76:5-77:15.

*Denied. Ira Kleiman testified that he "may have tried to long in to" the referenced email accounts. Ex. M at 76:23–25. Defendant's unsupported speculation that there is relevant evidence somewhere on some un-accessed device or email accounts of Dave Kleiman should be excluded as irrelevant and unduly prejudicial under Fed. R. Evid. 401 and 403.*

29.     D.K. used a single mailbox for all of his business affairs and some of his personal affairs (the "Mailbox"). **Ex. B** at 26:3-9.

*Denied. Carter Conrad did not testify Dave Kleiman used a single mailbox for all of his business and some personal affairs, only that Dave would use a "Drop Box . . . for his business and I guess personal items also." Ex. B at 26:3-9. Further, we know that W&K had a different address for service of process. ECF No. [83-3], at 2.*

30.     The address for that Mailbox was 4371 North Lake Boulevard, Palm Beach, FL 33410. *Id.*

*Denied, but see supra, ¶ 29.*

31.     I.K. was aware of this address even before D.K. died because D.K. placed the address on his emails' signature block. *See, e.g.*, D. Kleiman's email to I. Kleiman and others, dated October 9, 2010, attached as **Exhibit P**.

*Admitted to the extent that Ira Kleiman received an email from Dave that included the mailing address identified by Defendant*

32.     W&K Info Defense Research LLC's members decided to list the Mailbox as its official mailing address. *See* W&K's Articles of Incorp. at D.E. 83-3 at 2-3.

*Denied as phrased. Admitted that the Articles of Incorporation list the mailing address identified by Defendant as the "mailing address of the Limited Liability Company." A different address was used for service of process. ECF No. [83-3], at 2.*

33.     In the Australian lawsuits, which are referenced in the SAC ¶ 117, the Supreme Court of New South Wales sent a Notice of Listing of at least one those lawsuits to D.K. and W&K's mailing address. Exhibit 2 to C. Conrad's Depo. [Ex. B] at 2.

*Denied as phrased. The notice of listing does not reflect it being sent, merely it having been issued, and misspells the mailing address for W&K. Id. Admitted that Mr. Conrad testified to receiving it.*

34.     Specifically, on September 3, 2013, the Supreme Court of New South Wales issued the Notice of Listing for the case styled *Craig Steven Wright v. W&K Info Defense Research LLC*, Case No. 2013/00245661. Exhibit 2 to C. Conrad's Depo. [Ex. B] at 1. The Notice of Listing stated that on October 30, 2013, at 9 a.m., the case would be "listed for Directions" in the "Supreme Court-Civil, Supreme Court Sydney Court 9C Queens Square Sydney," and warned that "[i]f you do not appear at Court, this matter may be dealt with in your absence." *Id*. Finally, the Notice of Listing stated that "[l]isitng details for the

cases are" available by, *inter alia*, an internet website link. *Id.*

> *Denied as phrased. Admitted that the notice of listing includes the above quotations except that the last quotation is misstated and misrepresents the availability of online information. The notice states that "[l]isting details for cases" are available online only "on the afternoon before the case is listed." Id.*

35.     D.K.'s business partner and close friend, Mr. Conrad, testified that he remembers receiving the Notice of Listing and marked the envelope as being received on October 10, 2013. **Ex. B**. at 25:20-26:17. I.K. knew that the Notice of Listing was received at W&K's mailing address before he filed this action. Exhibit 9 to P. Paige Depo. [Ex. A] at 1.

> *Denied as phrased. Regarding the first clause, denied as misrepresenting Mr. Conrad's testimony, see supra ¶ 3. Mr. Conrad testified that he remember receiving the document but did not testify regarding his understanding of it as "the Notice of Listing." Admitted that I.K. was told by Patrick Paige in March 2016 (before filing this lawsuit but 2.5 years after the listed dates on the document) that the referenced document had been received at Computer Forensics LLC's mailing address. Exhibit 9 to P. Paige Depo. [Ex. A] at 1.*

36.     Notably, Mr. Paige communicated with I.K. and asked him to take over control over the Mailbox and pay for its renewal, but he declined to do so. Exhibit 11 to P. Paige Depo. [Ex. A] at 1-2.

> *Denied to the characterization of being "notabl[e] but admit that Patrick Paige testified as cited.*

37.     Plaintiffs describe their intellectual property to include, *inter alia*, "[b]lockchain based technologies and the commercialization of [b]lockchain and smart contract system research." Exhibit 10 to I. Kleiman April 8, 2019 Depo. [Ex. N] at 7 (Interrogatory Response 7).

> *Admitted to the extent that the quote is correct but the purported fact is incomplete under Fed. R. Evid. 106. The cited response itemizes various intellectual property, including that identified by Defendant, and all of the listed intellectual property ought to be considered together.*

38.     Ms. Lynn Wright is the ex-wife of Dr. Wright. L. Wright Depo. Tr. 9:4-5., attached as **Exhibit Q**.

> *Admitted.*

39.     She speaks with Dr. Wright very infrequently. **Ex. Q** at 44:-6-8.

> *Admit that it is what Ms. Wright testified.*

40.     Ms. Lynn Wright testified that she has an ownership interest in W&K, which is evidenced by her divorce decree. **Ex. Q** at 28:17-30:5; 98:1-12.

> *Disputed that Lynn Wright testified that she has a current ownership interest in W&K or that it is evidenced by the divorce decree. All Ms. Wright said was she "had some interest in it," but was not sure what. Ex. Q at 29:6–12, 98:22–99:1. She further testified that whatever interest*

she may have had went to Defendant by 2012. *Ex. Q at 105:3–18.Accordingly, to the extent the Court credits her testimony. Ms. Wright has admitted that she had no ownership interest in W&K on the date this suit was filed. She also admitted that the only supposed documentation of any "ownership" in W&K is an "appendix" that purports to be a "family law settlement" between her and Defendant. Id. at 24:2–7. That document is inadmissible at trial under Fed. R. Evid. 802, and even if it was not should be excluded under Fed. R. Evid. 401 and 403 because it is a forgery. Plaintiffs obtained the Wrights' divorce records directly from the federal Magistrates Court in Australia, which include no such copy of the agreement. Worse, the court file revealed that their 2013 divorce application states, unequivocally, that there were not any "binding agreements . . . about family law . . . involving any of the parties. . . ." ECF No. [507-1], at Part E.21.3. The "appendix" thus should be excluded under Fed. R. Evid. 1002 and there is no credible witness who can lay the proper foundation to admit the document at trial. Its fabrication also explains why Ms. Wright testified she did not have a copy of the document, and that the only copy she had was provided to her by Defendant's counsel, a week before her deposition. Ex. Q at 127:3–128:11. Ms. Wright's testimony should also be excluded under Fed. R. Evid. 403 given her strong incentive to lie for Defendant: she is financially dependent on him, lives in fear of him cutting off her support, and has lied for him in the past due to that. See id. at 70:3–5.*

41.     She explained that the purpose of W&K was to submit tenders to the Department of Homeland Security ("DHS"). **Ex. Q** at 16:1-18:21.

*Disputed as incomplete under Fed. R. Evid. 106. Lynn Wright, who testified she did some "administration" for W&K, Ex. Q at 16:1–2, also testified a "reason for W&K . . . was for information security purposes." Ex. Q at 17:10–24. In any event, her testimony should be excluded under Fed. R. Evid. 403 because it is not credible in light of her subsequent testimony that she did not discuss business dealings with Defendant after the two separated in November 2010. Id. at 91:16. W&K was not formed until 2011.*

42.     She met D.K. when she and Dr. Wright visited Orlando, Florida for a cyber security conference. **Ex. Q** at 16:17-19. D.K. was included in W&K so that the tenders would come from an American company, and because D.K. was a veteran. **Ex. Q** at 16:1-18:21. DHS denied the tenders *See* D.E. 83-21 at 4.

*Denied as incomplete under Fed. R. Evid. 106, and not supported by the citation. Lynn Wright said she met Dave Kleiman twice in the U.S., including in Florida. Ex. Q at 31:4–10. With regard to her testimony regarding the business activities, see supra, ¶ 41.*

43.     She didn't have any concerns about her ownership interest in W&K after the tenders to

DHS were denied because she thought W&K was worthless at that point. **Ex. Q** at 29:13-25.

*Admitted that is her testimony, but see supra, ¶ 41. Her statement she "didn't think it [W&K] was worth anything" also lacks foundation.*

44.     On February 11, 2014, Dr. Wright contacted I.K.'s father and told him to secure D.K.'s devices, including bitcoin wallet files. SAC ¶ 133. I.K. began corresponding with Dr. Wright, shortly thereafter. *Id.* ¶ 134. Dr. Wright recommended that I.K. give D.K.'s devices to D.K.'s friends, Messrs. Paige and Conrad, because they are computer forensic experts who could help preserve and recover data from the devices. *See* I. Kleiman April 8, 2019 Depo. Tr., Exhibit 1 at 1-2, attached as **Exhibit N**.

*Admitted that Defendant contacted Louis Kleiman on February 11, 2014, and that Ira Kleiman and Defendant began corresponding after Defendant contacted Louis Kleiman. Denied that Defendant told Louis Kleiman "to secure "D.K.'s devices, including bitcoin wallet files." As Defendant's citation makes explicit, Defendant only told Louis "to save a file named 'wallet.dat,'" in addition to telling him that "Your son Dave and I are two of the three key people behind Bitcoin," that "Dave was a key part of an invention that will revolutionise the world," and that Defendant would "help [Louis] recover what Dave owned." ECF No. [83], ¶ 133. Also denied as to the third sentence, which is wholly unsupported by the citation. Exhibit 1 to the April 8, 2019 deposition transcript of Ira Kleiman has nothing to do with the asserted fact.*

45.     Just a month after Dr. Wright told I.K. to preserve D.K.'s devices, as of April 23, 2014, I.K. began questioning Dr. Wright's actions. I. Kleiman's email to C. Wright at D.E. 83-24 at 20.

*Denied as to the characterization but admit that Ira Kleiman wrote the email cited*

46.     I.K. testified that he cannot tell how or when the purported "theft" occurred. **Exhibit M** at 156:12-159:6. I.K. also testified that he didn't know how anything Dr. Wright said or did induced him to take any actions. *Id.* at 164:18-19.

*Disputed. The first sentence is wholly unsupported by the citation, and the second misstates the testimony. Ira Kleiman was asked "What did he [Defendant] induce you into doing?," and he said, "I guess – well, don't want to speculate. I don't know." Ex. M at 164:16–19.*

47.     Mr. Joseph Karp, Esq. is a lawyer with more than 40 years of experience. J. Karp Depo. Tr. 5:14-19, attached as **Exhibit R**.

*Admitted.*

48.     Mr. Karp represented I.K. during the time that he was representative of the estate and while I.K. spoke to Dr. Wright. **Ex. N**. at 78:13-24.

*Admitted that he represent Ira but denied to the extent that it implies that he was Ira's lawyer for in connection with his communications with Dr. Wright.*

49.     Mr. Karp sat in on calls that I.K. had with Dr. Wright. **Ex. R** at 70:22-71:2.

*Denied as wholly unsupported by the citation and irrelevant under Fed. R. Evid. 401. Mr.*

10

*Karp actually testified he communicated with Defendant directly. Id. at 62:2–22.*

50.     Plaintiffs have marked documents as work product made in the anticipation of litigation as early as February 2014. Plaintiffs' Privilege Log, attached as **Exhibit S**.

*Denied as phrased. Exhibit N (privilege log excerpts) is inadmissible. A privilege log is not evidence. E.g., Perez v. Cigna Health & Life Ins. Co., No. 8:19-CV-951-T-33AEP, 2020 WL 1308196, at \*7 (M.D. Fla. Mar. 19, 2020) ("a privilege log is not substantive evidence that can be considered on summary judgment") (citing Goldman v. Bracewell & Guiliani, L.L.P., 183 F. App'x 873, 873 n.1 (11th Cir. 2006) (affirming refusal to admit privilege log as evidence)). It is also inadmissible hearsay and should be excluded under Fed. R. Evid. 401 and 403.*

## ADDITIONAL FACTS

51.     In January and February 2013, Wright referred to Dave as his "partner." Ex. 1 (Jan. 8, 2013 Email from Wright to Dave Kleiman, DEF_00000466); Ex. 2 (Jan. 16, 2013 Email from Dave Kleiman to Wright, DEF_00000170) ("We have done deals together for years and we have nothing but code to show for it all."); Ex. 3 (February 2013 messages between Craig Wright and Mark Ferrier, DEF_01667372) ("my partner Dave and I have been working on something of a while now . . . my business partner Dave . . . Sorry. My best frined [sic] and business partner died a few days back").

52.     In July and August 2013, Wright filed two lawsuits against W&K. ECF No. [83-11] (Statements of Claim), at 2, 8; Ex. 4 (Mar. 16, 2020 Dep. of Craig Wright), at 140:15, 149:16-18, 193:9-10, 196:10-11, 198:5-6.

53.     This was just a few months after Dave, Wright's "best friend," died. ECF No. [511-1] (Mar. 18, 2010 Dep. of Craig Wright), at 200:3.

54.     Defendant had his own employee—with no connection to W&K—sign two papers "for" W&K purporting to "consent" to a transfer of all W&K's assets to Wright. ECF No. [83-19] (Consent Orders), at 3, 5; ECF No. [511-9] (Jamie Wilson Dep.), at 68:15–69:21.

55.     Defendant told the Australian Registrar that he owned 100% of W&K. ECF No. [511-4], at 23–24.

56.     He then obtained two "Consent Judgments" that effectively stole all of W&K's intellectual property. ECF No. [83-19]. Ira Kleiman first learned about these in April 2014 when he was sent copies by the Australian Tax Office. ECF No. [83-20], at 18.

57.     The "Consent Judgments" do not purport to transfer any bitcoin. ECF No. [83-19] (Consent Orders), at 1, 4; ECF No. [488-8] (DEFAUS_00627954), at 5.

58.     In Australia, Wright falsely testified in an affidavit that in July 2013 he served W&K by "mailing" a copy of the statement of claim to W&K's registered mailing address and by "leaving" a copy at W&K's registered address for service. ECF No. [83-4], at ¶¶ 8–9.

59.     He then listed his own address as the address for service on W&K. ECF No. [83-30], at 3; Ex. 5 (DEF_00001979), at 1980.

60.     In September 2013, the Australian court sent via regular mail, for one of the two suits, a one-page "Notice of Listing" with nothing but the case caption, a date, and an internet link to obtain additional information (similar to a U.S. notice of hearing in state court). ECF No. [488-2], at 54 (Conrad Dep. Ex. 2, PAIGE_00001908)).

61.     The notice letter did not include a summons, a statement of claim, a notice of the alleged scope and grounds of jurisdiction, or the right to challenge service. *Id.*

62.     W&K was not served with process via the court's registrar and the United States' central authority.

63.     W&K identified a registered agent to receive service of process. ECF No. [83-3], at 2 (W&K articles of organization).

64.     Carter Conrad testified that the address listed as the "mailing address" for W&K was "a Drop Box that Dave would use for his business and I guess personal items also." ECF No. [488-2] (Carter Conrad Dep. Tr.), at 26:6–9.[2]

65.     Conrad had never heard of W&K. *Id.*, at 34:1–3 ("Q. Prior to receiving this had you heard of the entity W&K Info Defense Research, LLC? A. No.").

66.     Patrick Paige confirmed that this address actually belonged to Computer Forensics, LLC, the company that he, Conrad, and Dave ran. ECF No. [488-1] (Patrick Paige Dep. Tr.), at 26:7–27:7, 35:4–23.

67.     The Australian Court mailing was received by Conrad, Dave's partner in Computer Forensics, LLC. ECF [488-2] (Carter Conrad Dep. Tr.), at 25:25–26:2.

68.     Conrad was not the registered agent for W&K and that he was not authorized to accept service on W&K's behalf. ECF No. [83-3], at 2.

69.     Conrad testified that he had no involvement in W&K and, in fact, had never heard of the company until he received the Australian Court notice. *Id.*, at 34:1–3.

---

[2] Of course, since there would certainly be no way for him to know what address Dave used for W&K.

70.     Conrad confirmed he did not tell Ira Kleiman about the Australia Court notice. ECF No. [488-2]*, at 26:19–21. He instead logged when he received it by writing the date on the envelope.

71.     Paige first learned about W&K when the Australian Court hearing notice arrived at the Computer Forensics, LLC drop box. ECF No. [488-1] (Paige Dep. Tr.)*, at 41:6–13, 43:22–44:13 & 115.

72.     Paige testified that the first communications he had with Ira about W&K generally, and specifically about the Australian Court hearing notice, were in March 2016. *Id.*

73.     Ira Kleiman was not aware of the existence of W&K until he learned about it from Wright in 2014. ECF No. [488-14] (Ira Kleiman Apr. 8, 2020 Depo Tr.), at 33:3–4, 126:25–127:13, 144:8–10.

74.     Ira did not learn about the Australian court notice until 2016, when Paige first mentioned it to him. ECF No. [488-1] (Paige Dep. Tr.)*, at 43:22–44:13 & 115.

75.     In February 2014—nearly a year after Dave's death—Wright emailed Dave and Ira's father, Louis Kleiman: "Your son Dave and I are two of the three key people behind Bitcoin . . . Please understand, I do not seek anything other than to give you information about your son. Know also that Dave was a key part of an invention that will revolutionise the world . . . When I can, I will let you know much more of Dave. I will also help you recover what Dave owned." ECF No. [511-16], at 1.

76.     Louis replied: "After reviewing the information you sent, I want to thank you very much. . . . I look forward to any information you can give me about my son DAVID. To me, he was always someone special. Lou Kleiman" *Id.*

77.     Defendant made it appear Dave Kleiman had willingly given him W&K's intellectual property and that Defendant did not have Dave's bitcoins. Ex. 6 (KLEIMAN_00561675, at 688; DEF_00051504, at 512; DEF_00013694, at 703).

78.     Defendant's scheme to take sole ownership/control of all bitcoins and intellectual property owned by Dave Kleiman and/or W&K included the falsification, back dating, and alteration of contracts, emails, so-called "trusts," and other documents. *Id.*; ECF No. [500-2] (Edman Rpt.), at 6–28, 31–33, 35–61.

79.     Wright, through his agent Uyen Nguyen, reached into Florida to unlawfully seize control of W&K. Ex. 7 (KLEIMAN_00562350); ECF No. [83], at ¶ 139.

80.     Defendant wrote to Ira Kleiman stating, "The software Dave updated and which I have transferred back in OUR company, and it is OURs as you are Dave's heir . . . ." Ex 10. (DEFAUS_00000954), at 2.

81.     Defendant promised to provide the estate with shares in a new company he misrepresented as having assets worth millions of dollars. ECF No. [511-2], at 48 (DEFAUS_00119167, at 169); ECF No. [511-8], at 7 (DEFAUS_00627954, at 7960).

82.     About a year later, Wright would abandon that company in liquidation proceedings after successfully stripping its IP assets and assigning them to nChain in exchange for millions of dollars and equity, and all without ever mentioning any of these developments to Ira. Ex. 8 (Nguyen Dep. Tr., Ex. 16, DEFAUS_01585291); Ex. 43 (DEF_01885032) (WK Unexecuted Assignment); Ex. 44 (DEF_01611949) (Baker IP Analysis); Ex. 45 (DEF_00074671) (term sheet); Ex. 46 (DEF_00073807) (DeMorgan IP Assignment).

83.     Wright also promised Ira he'd receive the first of many "locked in" multi-million-dollar payments in October 2014. ECF No. [511-8], at 7061. Wright promised to pay the estate $10 million by October 2014. ECF No. [511-8], at 7967

84.     When this payment didn't arrive, Dr. Wright blamed the delay on the ATO investigation and reiterated his promise to Ira that he would see value when the investigation closed. ECF No. [511-18], at 4269.

85.     It wasn't until October 9, 2015, at the earliest, when it became apparent to Ira that Dr. Wright was stringing him along. *See* ECF No. [511-19], at 8939.

86.     Wright actively concealed this theft from Ira and tried to lull him into inaction by repeatedly making misrepresentations that Wright had no financial stake and was only concerned with assisting Ira in recovering Dave's property. *See e.g.*, ECF No. [83-24], at 6 ("I don't know what you have been led to believe. But I am not trying to take anything from Dave's estate."); ECF No. [511-16] ("I will also help you recover what Dave owned."). Wright even enlisted his lawyer to help reassure Ira about the legitimacy of these claims. ECF [511-2], at 48, 65.

87.     Just three months later this same lawyer would fire Wright as a client for fabricating documents and submitting them to the ATO. ECF No. [512-12].

88.     Plaintiffs' SAC does not allege that Defendant's partnership with Dave Kleiman was intended at inception to last longer than one year. ECF No. [83], at ¶ 67.

89.     Defendant told Ira Kleiman that he "did partner" with Dave. ECF No. [83-2].

90.     Defendant told Michele Seven: "David Kleiman was my best friend ***and business partner***." Ex. 9 (May 20, 2015 Email from Craig Wright to Michele Seven, DEFAUS_00550141) (emphasis added).

91.     Defendant texted Mark Ferrier: "my partner Dave and I have been working on something of a while now . . . my business partner Dave . . . Sorry. My best frined [sic] and business partner died a few days back." Ex. 3 (February 2013 messages between Craig Wright and Mark Ferrier, DEF_01667372), at 7372.

92.     In a book compiling various writings by Defendant, he states: "In order to fund my work, my partner Dave Kleiman and I sold code. . ." Ex. 10 (Craig S. Wright, Satoshi's Vision (2019)), at 6.

93.     Defendant he told Australian police, in the context of a police investigation: "This is an idea that I had developed with my business partner David KLEINMAN (David) for a period of over a decade." Ex. 11 (Statement of a Witness in Police v FERRIS, July 2014, Name Craig WRIGHT, DEF_01597500)), at 7503; Ex. 12 (Proof of Evidence Craig Wright, DEF_01667260), at 7263 (same); Ex. 47 (Statement of a Witness, DEF_01597543), at 7546 (same).

94.     In February 2014, Defendant wrote to Louis Kleiman (Dave's father) that Dave was "[one] of the three key people behind Bitcoin," and "a key part of an invention that will revolutionise the world." ECF No. [83-23].

95.     In that same email, Defendant promised to share additional information later, in part to help the Kleiman family "recover what Dave owned." *Id.*

96.     When Defendant was asked in a media training session whether he was "trying to claim all the credit" for Bitcoin or if Satoshi Nakamoto was instead a "combination of people and minds," he responded, "I had a lot of help. In particular a friend of mine who died a few years ago, Dave Kleiman, gave me a lot of help." Ex. 13 (Media Training Session 1, March 18, 2016, DEF_00172528), at 2528.

97.     Defendant reiterated the point later in the same session, "[h]ow many people were involved in Satoshi is probably a better question. That was two of us," he later added that "Dave was a key part of everything that I did" and that "Dave spoke as Satoshi." *Id.* at 2533–34. He also said that "both of us acted. Dave was the nice version of Satoshi" *Id.* at 2547.

98.     When he was asked in an interview whether he had claimed to be Satoshi Nakamoto, Defendant responded, "I also said if you have a partnership and someone dies, it's no

longer a partnership." Ex. 14 (Bad Crypto Podcast, Is Craig Wright the Real Satoshi?, Feb. 20, 2019). Asked for further details on whether "Satoshi Nakamoto" was "a pseudonym for a group of at least 2 or more people that [he was] a part of," Defendant said he "had help from Dave." *Id.*

99.     In a different interview, Defendant stated: "And I'm the only surviving member of Satoshi? The judge ruled it was a partnership. I'm the asshole Satoshi. And Dave was the nice one." Ex. 15 (Brendan Sullivan, *EXCLUSIVE: First Interview with Craig Wright After Judge Orders Him to Pay $5 Billion in Bitcoin*, Modern Consensus, Aug. 26, 2019, https://modernconsensus.com/cryptocurrencies/bitcoin/exclusive-interview-with-craig-wright-just-after-ordered-to-pay-5-billion-in-bitcoin/).

100.     In October 2013, Defendant wrote to Michael Hardy: "David Reese and David Kleiman have both been essential parts of this project." Ex. 16 (Oct. 9, 2013 Email from Craig S Wright to Michael Hardy, DEF_00027396), at 7396.

102.     In a March 2014 email, Defendant wrote to Ira Kleiman: "I had an idea, but it would never have executed without Dave. Dave was my sounding board he fixed my errors" Ex. 17 (Mar. 7, 2014 Email from Craig Wright to Ira Kleiman, *re: Another*, DEFAUS_00115950), at 5952.

103.     In a media training session, Defendant stated, "I mined quite a number [of bitcoin] and I was with my partner, so to speak, in all of this, Dave, we mined quite a lot." Ex. 13 (Media Training Session 1, March 18, 2016, DEF_00172528), at 2533 (emphasis added).

104.     In an interview with the Australian Taxation Office ("ATO"), Defendant stated "[w]hen we were starting originally, we looked at a bitcoin value of probably $20 million. By the time we started looking at actually capitalising that and around Dave's death, that had gone up to, I think, $100 million." Ex. 18 (Record of Interview of Craig Wright, Australian Tax Office, Aug. 11, 2014, DEF_00068665), at 8675.

105.     He also told the Greg O'Mahoney of the ATO, "[t]here was a trust set up to put a number of bitcoin that Dave was mining and everything like that into," which was used as a "funding mechanism . . . [f]or research." *Id.* at 8671.

106.     In April 2014, Defendant wrote to Ira Kleiman, "The Tax office know[s] that Dave and I have been working on this since 2008." ECF No. [83-20], at 2 (emphasis added).

107.     In another email, he told Ira Kleiman, "I have attached a little more of what we did together." ECF No. [83-6], at 2 (emphasis added).

108.     Defendant wrote to Ira Kleiman in March 2014, "I am a terrible boss and slave

driver, but with Dave I was far more. Satoshi was a team. Without the other part of that team, he died." Ex. 17 (DEFAUS_00115950), at 5953.

109.   Defendant told Ira Kleiman in the same email to "[l]eave others to be Satoshi and Dave not to be." *Id.* at 5953, 5955.

110.   Defendant wrote in a later email, "I had an idea, but it would never have [been] executed without Dave." *Id.* at 5952.

111.   When Ira asked Defendant if Dave Kleiman had compiled the code for the first version of Bitcoin, Wright replied, "Yes. We both played. Dave compiled." Ex. 19 (May 10, 2017 Email from Craig Wright to Ira Kleiman, KLEIMAN_00004288), at 4288.

112.   Defendant wrote in March 2014 that he "had math skills and some coding," but Dave Kleiman "could edit his way through hell and back." Ex. 17 (DEFAUS_0115950), at 5953.

113.   Bitcoin can't function without mining. *See* ECF No. [500-5], ¶¶ 34–46.

114.   Shortly after Dave Kleiman died, Wright emailed a third party that "I have a trust overseas. I moved it *and the mining process* to Dave Kleiman when I have a few issues with the tax ppl [sic]." Ex. 20 (May 23, 2013 Email from Craig S Wright to Mark Ferrier, *re: Beer and congrats*, DEF_01597484), at 7485 (emphasis added).

115.   Later in that correspondence, Defendant wrote that "I had Dave mine the Bitcoin overseas and all it has cost is sunk. . . . I have never touched the Bitcoin **we created** in the OS trust." *Id*. (emphasis added).

116.   In a LinkedIn message to Benjamin Wright, Defendant wrote "Dave Kleiman and I started mining in 2009. So we have a few things that will interest them. It is a shame Dave died last year before fruition, but all is moving ahead." Ex. 21 (Jan. 28, 2014 LinkedIn Message, DEFAUS_00516701), at 6701.

117.   Defendant produced an email from Dave Kleiman purportedly writing that they only needed one "company to sit as a owner of the bitcoin we are mining into them." Ex. 22 (Dec. 16, 2012 Email from dave@davekleiman.com to Craig S Wright, *re: Brits*, DEFAUS_01859475), at 9475.

118.   Before this lawsuit was initiated, Defendant told his wife, his company's CFO, and the company lawyer that "Dave mined all of this outside Australia . . . I was not the person doing the mining. Dave was." *Id*. (Apr. 2, 2014 Email from Craig S Wright to John Chesher, Andrew Sommer, and Ramona Watts, *re: UK – design by human*).

119.     In an email to Ira Kleiman, Defendant wrote that "Dave took the 2 million lines of code that had in 2010 and transformed these into a documented set of over 6 million lines of code." ECF No. [83-20].

120.     Defendant also told the ATO's Mr. O'Mahoney, "A long-term friend of mine, Dave Kleiman and I, started that so that we could start building an exchange platform…Dave and I had been friends and sort of partners that way for a long time." Ex. 18 (Record of Interview, August 11, 2014, DEF_00068665), at 8669.

121.     Defendant went on to state, "We had worked on a number of patents together . . . . We had been planning putting together an exchange platform that would allow us ….. or bitcoin." *Id.*

122.     The document titled "Scope of Work: Spyder extensions" includes both Defendant's and Dave Kleiman's names as authors. Ex. 23 (Scope of Work: Spyder extensions, DEF_00973364), at 3364.

123.     Defendant told Australian law enforcement, "The idea conceived by David and me, was to develop a system that integrated Supervisory Control and Data Acquisition (SCADA) software and a Bitcoin exchange." Ex. 11 (Statement of a Witness, DEF_01597500), at 7504.

124.     Defendant wrote to Mark Ferrier that "what Dave and I want to do" included "creating autonomous agents in the Bitcoin block," developing "a completely open and malleable form of scriptable money," creating "ways to program a distributed contract using Bitcoin to form agreements with people via the block chain" as well as create "Smart property [that is] is property that can be atomically traded and loaned via the block chain" and solve how "a transaction could be issued potentially even after a confirmation if the block chain is reorganized." Ex. 3 (Feb. 2013 messages between Craig Wright and Mark Ferrier, DEF_01667372).

125.     Defendant told Patrick Paige that reporters "ignored the stuff Dave and I did when he was alive . . . . Dave . . . did a fair amount of research with me. Most yet to be completed and published . . . when it all comes out, there is no way Dave will be left out. We need at least a year more." ECF No. [83-8], at 13.

126.     Defendant credited Dave Kleiman with their shared work on "smart contracts." Ex. 12 (Proof of Evidence, DEF_01667260), at 7263 ("I started developing smart contracts in 2007. Dave and I worked on this for a number of years up to 2011."); *id.* at 7264 ("The idea conceived by David and me, was to develop a system that integrated Supervisory Control and Data

Acquisition (SCADA) software and a Bitcoin exchange.").

127.    Defendant wrote to Patrick Paige, stating, "We kept what we did secret." Ex. 24 (Email from Craig S Wright to Patrick Paige, DEFAUS_00112964), at 2966.

128.    Defendant wrote to Michele Seven stating, with reference to him and Dave Kleiman, "we have many shared secrets." Ex. 9 (May 20, 2015 Email from Craig Wright to Michele Seven, DEFAUS_00550141), at 0141.

129.    When asked whether Defendant had mentioned Bitcoin to her, Defendant's ex-wife Lynn Wright's testified, "He never really mentioned it at all to me. He – he – I don't recall him ever using the term." ECF No. [488-17], at 73:17–74:2.

130.    The closest Defendant apparently got to mentioning Bitcoin to his wife was a speculative comment in 2004 or 2005 about "digital currency" being "the way of the future." *Id.*

131.    When Dave Kleiman spoke about Bitcoin with others, he did so in a guarded or cryptic fashion. *See* ECF No. [83-2], at 2–3.

132.    Defendant told the ATO's Mr. O'Mahoney that there was "a trust set up to put a number of bitcoin that Dave was mining and everything like that into and maintain, the idea being that we would use that to further the goals we were doing, which were all to do with promotion of bitcoin and cryptocurrencies . . . ." Ex. 18 (Record of Interview of Craig Wright, Australian Tax Office, August 11, 2014, DEF_00068665), at 8671.

133.    Of the bitcoin in the trusts, Defendant wrote to Dave Kleiman in May 2012, "We do not touch the trusts. Not yet. Not even for this. ONE DAY, they will change the world. Not millions, not billions. If I am right, they will be trillions . . . ." ECF No. [83-13].

134.    Defendant told the ATO's O'Mahoney that the bitcoin in the tulip trust were sourced from him and Dave. Ex. 25 (Record of Interview of Craig Wright, Aug. 18, 2014, DEFAUS_00560317), at 0323 ("O'Mahoney: . . .are all the assets of the trust, they were originally sourced from you? Wright: And Dave. O'Mahoney: And David. Wright: Yes.").

135.    Defendant also told the ATO's Mr. O'Mahoney that he and Dave Kleiman had 1.1 million bitcoin which was worth "when we were starting probably $20 million," but by "Dave's death, that had gone up to . . . $100 million." Ex. 18 (Aug. 11, 2014 ATO Record of Interview, DEF_00068665), at 8675.

136.    Defendant wrote in an email to Ira Kleiman that he had "transferred back in OUR company, and it is OURs as you are Dave's heir," and that "[t]he software (including banking

software) has cost over 50 million alone. When I contracted for it, it was when BTC was worth $116." *Id.*

137.    Defendant wrote to Ira Kleiman that "[t]he reason for the transfer [was] to use the R&D tax credit on the value of the software Dave and I developed." ECF No. [83-20].

138.    Defendant wrote to Ira Kleiman in April 2014, "Dave and I decided to start Coin-Exch so that we could lock in some of the value. . . . We locked in the value of the software based on the price of BTC then, which was less than now and if it was a year later we would have been smart, but we took the option to cash out." Ex. 26 (April 23, 2014 Email from Craig Wright to Ira Kleiman, DEFAUS_00119167), at 9167.

139.    Defendant referred to the changing value of Bitcoin at other times and to other audiences as well. Ex. 18 (DEF_00068665), at 8675; Ex. 27 (May 22, 2012 Email from Craig Wright to Dave Kleiman, DEF_00068579).

140.    Dave Kleiman at one point asked Defendant, with respect to their partnership profits and losses, "Are we ever going to get a wage on this? Just kidding I trust you." Ex. 28 (Mar. 28, 2011 Email from Dave Kleiman to Craig Wright, DEFAUS_00115700).

141.    Defendant claimed to the ATO's Mr. O'Mahoney that David Kleiman put bitcoin into a trust to fund their joint research activities. Ex. 18 at 8671 (Aug. 11, 2014 Record of Interview, DEF_00068665).

142.    Defendant in January 2013 emailed Dave to ask, "I know you have been paying people from your own wallet, is this enough to account for it all? It has been a shitload of work." Ex. 1 at 0468 (Jan. 8, 2013 Email from Craig Wright to Dave Kleiman, DEF_00000466).

143.    Defendant wrote in a blog post, "I really did not care about the other computer systems, all the ASIC mining systems that had been set up and that Dave had contracted people (using my money) to run." Ex. 29 (Craig Wright, *Looking the Other Way*, Jan. 17, 2020, https://craigwright.net/blog/law-regulation/looking-the-other-way-2/).

144.    Defendant wrote to Ira Kleiman following Dave Kleiman's death that Defendant had convinced Dave to delay taking money out of the partnership that had "come as a rebate on what has been expended." Ex. 35 at 9167 (Apr. 23, 2014 Email from Craig Wright to Ira Kleiman, DEFAUS_00119167).

145.    Dave Kleiman observed in January 2013, "I think I lost money. At times I wonder if it is worth it. We have done deals together for years and we have nothing but code to show for

it all." Ex. 36 at 0184 (Jan. 16, 2013 Email from Dave Kleiman to Craig Wright, DEF_00000170).

146.    A purported bitmessage from Dave Kleiman to Defendant states, "you funded the trust when Bitcoin was worth hardly anything, but we have all put all we have into this. So the gain is not yours, it remains with the trust." Ex. 31 at 3256 (DEF_00023252).

147.    Ms. Watts wrote to Ira in June 2015, "Craig and I have put our entire life savings into this business, as did Dave." Ex. 31 at 3312 (June 23, 2015 Email from Ramona Watts to Ira Kleiman, DEF_01103312).

148.    Defendant wrote to Ira Kleiman in April 2014, "Dave and I decided to start Coin-Exch so that we could lock in some of the value," and "we took the option to cash out." Ex. 26 at 9167 (April 23, 2014 Email from Craig Wright to Ira Kleiman, DEFAUS_00119167).

149.    Defendant and Dave also shared control over the bitcoin private keys that were shared online. Ex. 32 (Oct. 31, 2012 Email from D. Kleiman to C. Wright, *re: Bond Villains*, DEF_00028008); Ex. 33 at 8940 (Nov. 21, 2015 Email from C. Wright to R. MacGregor, DEFAUS_00558940) ("Worst case is my communications with Dave. The keys are on it as well.").

150.    In an April 2014 email, Defendant stated "in doing what we wanted to do, Dave and I arranged for the sale or [sic] around 500,000 BTC." Ex. 26 at 9167 (Apr. 23, 2014 Email from Craig S Wright to Ira K, *re: Questions*, DEFAUS_00119167).

151.    Defendant told the ATO, "Dave has other, he's got an estate who Andrew has been dealing with and I wanted to make sure I didn't rip off his estate." Ex. 18 (ATO Interview, DEF_00068665).

152.    In an April 2014 email to Ira Kleiman, Defendant wrote, "I convinced [Dave Kleiman] that we could make it to Oct 2014 when if he needed we could take some of the R&D money that comes as a rebate on what has been expended and we could both spend a little time on us." ECF No. [83-24], at 7.

153.    In a blog post, Defendant reaffirmed this joint control with Dave Kleiman publicly, stating "In order to fund my work, Dave Kleiman and I sold code that was used in gaming illegal out of countries such as Costa Rica. David took the biggest risk because gambling is not illegal in Australia. Nothing he was able to earn in Panama was able to be repatriated legally in the USA." Ex. 34 (Craig Wright (Bitcoin SV is Bitcoin), *The story of Bitcoin, continued*, Feb. 9, 2019, https://medium.com/@craig_10243/the-story-of-bitcoin-continued-2f1ec78ba38b).

154.    Satoshi Nakamoto is known to have communicated from at least two email

addresses, Satoshi@vistomail.com and Satoshin@gmx.com. ECF No. [500-5], at ¶ 89–93.

155.    In early 2104, Defendant told Ira Kleiman that Dave Kleiman "had the vistomail account. I had the gmx one." Ex. 35 (DEFAUS_00112712).

156.    Defendant told James Nguyen that "they both posted from Satoshi account sometimes." Ex. 36 (J. Nguyen Deposition), at 197:3-4.

157.    At his April 4, 2019 deposition, Wright testified he had no idea who owned W&K. ECF No. [265] at 9. Defendant first testified that Lynn Wright held shares in W&K at his June 28, 2019 deposition that occurred approximately two months *after* he first raised Ms. Wright as a possible member in his reply. ECF No. [239]; ECF No. [171], at 6–7. The Court denied the motion. ECF No. [265] at 9–10.

158.    Zachary Eisner, W&K's corporate representative, testified that the only individuals who have ever been members of W&K are David and (after he died) Ira Kleiman. ECF No. [498-13] (Eisner Dep. Tr.), at 91:19–21 ("It's our position that Dave Kleiman was 100 percent the sole member and now Ira is 100 percent the sole member.").

159.    The divorce settlement is a document labeled as an "appendix" that purports to be a "family law settlement" between Wright and his ex-wife from June 2011 that mentions an interest in Plaintiff W&K. ECF No. [488-17], at 147.

160.    The Wrights' divorce records obtained directly from the federal Magistrates Court in Australia did not contain this purported 2011 "family law settlement." ECF No. [507-1], at 7. It stated unequivocally that there were not any "binding agreements . . . about family law . . . involving any of the parties . . . ." ECF No. [507-1], at 7.

161.    Ms. Wright testified she did not have a copy of this agreement, and that the only copy she did have was provided *to her* by Wright's counsel, a week before the deposition. ECF No. [488-17], at 127:3–128:11.

162.    Defendant testified at his June 28, 2019 deposition that he didn't have a copy of the agreement. Ex. 37 (June 28, 2019 Craig Wright Dep. Tr.), at 409:11–15.

163.    Defendant testified in June 2019 that the forged agreement only "indirectly" dealt with bitcoin and did not deal with any blockchain intellectual property. *Id.* at 408:9–11, 413:13–16.

164.    The purported agreement makes provision for "Any and ALL Bitcoin, private keys, trusts and software associated with Bitcoin" as well as "any and all IP…including….Bitcoin." ECF

No. [488-17] at 148.

165. At her deposition, Ms. Wright testified that she is financially dependent on Wright making monthly alimony payments, ECF No. [488-17], at 69:13–23, 70:3–6, that she has previously complied with requests from Defendant out of fear that he would cut off her monthly support, *id.* at 111:22–112:2, and that she had falsely confessed to a speeding infraction committed by Defendant, *id.* at 115:1–16.

166. Lynn Wright testified that she was a shareholder of W&K, ECF No. [488-17], at 22:14–15, but there are numerous examples from her testimony that suggests a lack of familiarity with W&K and/or that are contradicted by W&K's articles of incorporation. ECF No. [488-17], at 13:6–10. (Ms. Wright testifying she did not recall if she was ever listed a manager); ECF No. [488-17], at 48:22–25 (Ms. Wright testified her role in W&K was as an administrator); ECF No. [488-17], at 56:12–17 (Ms. Wright testifying she had no documents relating to W&K); ECF No. [488-17], at 91:18–92:10 (when asked where W&K was incorporated, Ms. Wright testified she "would assume that it was where Craig was living," but also that it "wasn't incorporated" at all because it was a "part of Cloudcroft," a different company operated by Defendant).

167. On March 3, 2020, Wright produced a document he claimed he received from Ms. Wright that (i) purported to be W&K's operating agreement, that (ii) identified Lynn Wright as a member of W&K, and that (iii) was purportedly signed by Dave and Craig Wright. ECF No. [507-2]; ECF No. [511-1], at 177:23–25

168. The document was ostensibly executed on February 15, 2011. *Id.*

169. Ms. Wright testified that her belief that she was still a shareholder in W&K was based entirely on a copy of her forged "divorce settlement" that defense counsel provided to her. ECF No. [488-17], 126:14–127:9, 98:9–12, 99:2–5.

170. Ms. Wright testified that she declared bankruptcy in 2011, it was finalized in January 2012, and that she did not list W&K as one of her assets during the bankruptcy "because everything had been handed back to Craig." ECF No. [488-17], 105:3–18.

171. Defendant has repeatedly sworn to this Court that he was *never* an owner of W&K. *See* ECF No. [12-2], at ¶ 12; ECF No. [242-1], at 233:12–14.

172. Since this case was filed, Judge Reinhart has (i) reviewed numerous discovery

memorandums;[3] (ii) held twenty-two lengthy courtroom hearings, including three days of evidentiary hearings on Plaintiffs' motion to compel;[4] (iii) issued a 29-page order granting Plaintiffs' motion to compel and Rule 37 sanctions (ECF No. [277]); (iv) held a telephone hearing during Wright's London deposition (ECF No. [137]); (v) served a special master at Defendant's March 2020 depositions (ECF No. [320]); (vi) held an evidentiary hearing and ordered the production of over 11,000 wrongfully withheld documents (ECF No. [420], [428]); and (vi) adjudicated various other complex disputes.[5]

173.    Since this case was filed, this Court has (i) issued a 4-page opinion staying discovery (ECF No. [21]); (ii) issued a 39-page opinion largely denying Defendant's motion to dismiss (which consisted of over 150 pages of briefing) (ECF No. [68]); (iii) held a hearing and issued a 12-page opinion on Defendant's motion for judgment on the pleadings (ECF No. [256], [265]); (iv) issued a 23-page opinion partly affirming Judge Reinhart's August 2019 sanctions order (ECF No. [373]); (v) issued a 20-page opinion overruling Defendant's objection to Judge Reinhart's order to produce 11,000 improperly withheld documents (ECF No. [454]); (vi) appointed Judge Reinhart as a special master (ECF No. [320]); and (vii) set and amended the scheduling order, trial date, and resolved various other issues.[6]

174.    Defendant's trade preemption defense is not based on any information learned during discovery, and could have been asserted a year ago—for "two years of extensive discovery." ECF No. [487], at 23.

175.    Plaintiffs' conversion claim is based, in significant part, on Plaintiffs' allegation that Wright wrongfully took control of Plaintiffs' bitcoin after Dave's death by, among other things, "exercising exclusive possession over the private keys necessary to own, move, or sell the bitcoins"; "moving them to, or holding [them] in, 'trusts' known only to him and controlled by him"; and "using those bitcoins (or the 'rights' to them) to make large trades for his Australian businesses." ECF No. [83], ¶ 111.

---

[3] *E.g.*, ECF Nos. [93], [96], [114], [127], [139], [141], [298], [362], [443], [449], [460].

[4] ECF Nos. [107], [110], [122], [123], [124], [129], [146], [195], [211], [236], [248], [264], [276], [342], [343], [380], [383], [387], [428], [435], [455], [458], [469], [471], [478].

[5] ECF Nos. [117] (confidentiality), [135] (forensic images), [408] (reconsideration), [129], [130] (R&Rs), [429].

[6] ECF Nos. [28], [30], [39]. [54], [57], [72], [78], [143], [148], [152], [164], [165], [289], [291], [340], [341], [345], [356], [357], [358], [361], [375], [382], [423], [424], [427], [437], [438], [441], [476], [483], [484], [502], [505], [508].

176.     Defendant's emails to Ira attached fake emails purportedly between Defendant and Dave about bitcoin and trusts, and falsely stated that W&K had received millions in funding from the U.S. Department of Homeland Security when in fact that never occurred. Ex. 38 (DEFAUS_00118876).

177.     Without disclosing his lawsuits against W&K, Defendant also wrote that "W&K was run by Uyen" and "I not know all of what was occurring in WK," when in reality Uyen had no connection to W&K and Defendant himself had filed in court the fake W&K "acknowledgements" of a fake $56 million debt of W&K to Defendant. *Id.*

178.     When Ira learned from the ATO about the fraudulent suits Defendant had filed against W&K, Defendant falsely claimed he was just carrying out "Dave's idea" to move W&K's assets to a new company and "accountants etc advised it was necessary." *Id.*

179.     Ira had not known about W&K or Dave's involvement with bitcoin, he was initially thrilled to hear from Defendant. See Ex. 39 (DEF_00002152) ("Our family is truly blessed to know you").

180.     Defendant was able to lull Ira into further inaction with more false statements and half-truths (he was just carrying out "Dave's idea" and was "advised by accountants" it was necessary), and with promises of a $12 million payment by October 2014 (promises Defendant never had any intention of fulfilling). Ex. 40 (KLEIMAN_00000136).

181.     One way is based on Defendant's own valuation reports, which state the "W&K Source" "software package" has a value ranging from $126 million (AUD), Ex. 41 (DEF_00029339, at 23) to $303,895,458 (AUD), Ex. 42 (DEF_00013784, at 10). The value of one bitcoin at the time of the expert report of Andreas Antonopoulos was $7400. ECF [500-5], at 19.

182.     It only took "an average desktop computer" to mine bitcoin in 2009. ECF No. [500-5], ¶46.

Dated:  May 23, 2020                                Respectfully submitted,


By: */s/ Velvel (Devin Freedman*
    Velvel (Devin) Freedman, Esq.
    **ROCHE CYRULNIK FREEDMAN LLP**
    200 S. Biscayne Blvd.
    Suite 5500 Miami, Florida 33131
    vel@rcfllp.com

    Kyle W. Roche, Esq.
    Joseph M. Delich
    *Admitted Pro Hac Vice*
    **ROCHE CYRULNIK FREEDMAN LLP**
    99 Park Avenue, 19th Floor
    New York, New York 10016
    kyle@rcfllp.com
    jdelich@rcfllp.com
    Andrew S. Brenner, Esq.
    **BOIES SCHILLER FLEXNER LLP**
    100 SE 2nd Street, Suite 2800
    Miami, Florida 33131
    abrenner@bsfllp.com


    *Counsel to Plaintiffs Ira Kleiman as Personal*
    *Representative of the Estate of David Kleiman*
    *and W&K Info Defense Research, LLC*