1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF FLORIDA

3           CASE NO. 9:18-cv-80176-BB/BR

4
   IRA KLEIMAN, as the personal representative
5  of the Estate of David Kleiman, and
   W&K Info Defense Research, LLC,
6
              Plaintiffs,
7
   -vs-
8
   CRAIG WRIGHT,
9
              Defendant.
10

11  * * * * * * * * * * * * * * * * * *

12  VIDEOTAPED TELECONFERENCE DEPOSITION OF JIMMY NGUYEN

13  DATE TAKEN: April 30, 2020

14  TIME: 12:05 p.m. - 7:35 p.m.

15
   TAKEN BEFORE: RICK E. LEVY, RPR, FPR
16              AND NOTARY PUBLIC

17

18  * * * * * * * * * * * * * * * * * *

19

20

21

22

23

24

25

## Page 2

```
1   APPEARANCES:
2   On behalf of the Plaintiff:
3       VEL FREEDMAN, ESQUIRE
        ROCHE FREEDMAN, P.A.
4       200 S. Biscayne Boulevard
        Suite 5500
5       Miami, Florida 33131
6       ANDREW BRENNER, ESQUIRE
        BOIES SCHILLER & FLEXNER, P.A.
7       100 S.E 2nd Avenue
        Suite 2800
8       Miami, Florida 33131
        abrenner@bsfllp.com
9
10  On behalf of the Defendant:
11      ANDRES RIVERO, ESQUIRE
        ZALMAN KASS, ESQUIRE
12      RIVERO MESTRE, P.A.
        2525 Ponce de Leon Boulevard
13      Suite 1000
        Coral Gables, Florida 33134
14
15  APPEARING ON BEHALF OF THE WITNESS:
16      SPENCER SILVERGLATE, ESQUIRE
        TREVOR GILLUM, ESQUIRE
17      CLARKE SILVERGLATE, P.A.
        799 Brickell Avenue
18      Suite 900
        Miami, Florida 33131
19
20  Also Present: Michael Hollander, The Videographer
21
22
23
24
25
```

## Page 3

```
1                    - - -
                  I N D E X
2                    - - -
3   WITNESS:      DIRECT   CROSS   REDIRECT   RECROSS
    JIMMY NGUYEN
4   BY MR. FREEDMAN:   6
5
6                    - - -
                E X H I B I T S
7                    - - -
8   NUMBER                       PAGE
    PLAINTIFF'S EX. 1            15
9   PLAINTIFF'S EX. 2            24
    PLAINTIFF'S EX. 3            29
10  PLAINTIFF'S EX. 4            45
    PLAINTIFF'S EX. 5            53
11  PLAINTIFF'S EX. 6            54
    PLAINTIFF'S EX. 7            67
12  PLAINTIFF'S EX. 8            76
    PLAINTIFF'S EX. 9            102
13  PLAINTIFF'S EX. 10           124
    PLAINTIFF'S EX. 11           140
14  PLAINTIFF'S EX. 12           147
    PLAINTIFF'S EX. 13           149
15  PLAINTIFF'S EX. 14           152
    PLAINTIFF'S EX. 15           157
16  PLAINTIFF'S EX. 16           161
    PLAINTIFF'S EX. 17           167
17  PLAINTIFF'S EX. 18           172
    PLAINTIFF'S EX. 19           176
18  PLAINTIFF'S EX. 20           192
    PLAINTIFF'S EX. 21           195
19
20
21
22
23
24
25
```

## Page 4

```
1                    - - -
2       THE VIDEOGRAPHER:  We are now on the record.
3   Participants should be aware that this proceeding
4   is being recorded.  As such all conversations held
5   will be recorded unless there is a request or
6   agreement to go off the record.  Private
7   conversations and attorney-client interaction
8   should be held outside the presence of this remote
9   interface.  This is the remote video recorded
10  deposition of James Nguyen taken by counsel for the
11  plaintiff.
12      Today is Thursday April 30th 2020 and the time
13  is now 12:04 p.m in the Eastern Time Zone.  We are
14  here in the matter of Kleiman vs Wright.  My name
15  is Michael Hollander, remote video technician on
16  behalf of US Legal Support.  I am not related to
17  any party in this action nor am I financially
18  interested in the outcome.
19      At this time will the reporter Rick Levy on
20  behalf of US Legal please enter the statement for
21  remote proceedings into the record.
22      THE COURT REPORTER:  The attorneys
23  participating in this deposition acknowledge that I
24  am not physically present in the deposition room
25  and that I will be reporting this deposition
```

## Page 5

```
1   remotely.
2       They further acknowledge that in lieu of an
3   oath administered in person I will administer the
4   oath remotely.  This arrangement is pursuant to the
5   Florida Supreme Court Administrative Order No.
6   AOSC20-16.
7       The parties and their counsel consent to this
8   arrangement and waive any objections to this manner
9   of reporting.  Please indicate your agreement by
10  stating your name and your agreement on the record.
11      MR. FREEDMAN:  Vel Freedman for the
12  plaintiffs, we agree.
13      MR. RIVERO:  Andres Rivero for Dr. Wright, we
14  agree.
15      MR. KASS:  Zalman Kass for Dr. Craig Wright,
16  we agree.
17      MR. SILVERGLATE:  Spencer Silverglate, counsel
18  for the witness Jimmy Nguyen, we agree.
19      MR. GILLUM:  Trevor Gillum with Jimmy Nguyen
20  agree.
21      THE WITNESS:  My name is James.  I go by Jimmy
22  Nguyen, N-G-U-Y-E-N.  I declare my testimony in
23  this matter is under penalty of perjury.
24                   - - -
25
```

Page 6

```
 1   Thereupon,
 2                   (JAMES NGUYEN)
 3              having been first duly sworn or
 4   affirmed, was examined and testified as follows:
 5                 DIRECT EXAMINATION
 6   BY MR. FREEDMAN
 7       Q.   Good morning Mr. Nguyen, how are you?
 8       A.   Fine.  How are you?
 9       Q.   Before we just get started with the
10   formalities of the deposition I just wanted to lay out a
11   quick schedule the way I was hoping this would go.  I
12   know it's about 9:00 by you.  Obviously we can take some
13   breaks but I wanted to take our lunch break at 12:00 by
14   you which would be 3:00 here.
15            A break for about an hour or hour and 15 if
16   that's enough for you.  Then if we still have more to go
17   we can finish up and if we're done obviously we're done.
18       A.   Okay.
19       Q.   All right.
20            MR. RIVERO:  Vel, if I may, just for avoidance
21       of doubt we're going to designate the deposition as
22       confidential and then review it subsequently to
23       de-designate but just for avoidance of that we're
24       invoking that.
25
```

Page 7

```
 1   BY MR. FREEDMAN
 2       Q.   Mr. Nguyen, can you please state your name --
 3   just before we begin am I pronouncing it correctly, is
 4   it Nguyen?
 5       A.   Tough name to pronounce.  That's good.
 6       Q.   What is properly I'll give it one shot and
 7   then we'll move on.
 8       A.   Well, Vietnamese pronunciation is Nguyen but
 9   that's very difficult for American English and you so a
10   lot of people say Nguyen or sometimes I just say Nguyen.
11       Q.   Got it.  I am going to stick to Nguyen because
12   you are right I would not have gotten that correct.
13   Mr. Nguyen, can you please state your name and date of
14   birth for the record?
15       A.   Name is N-G-U-Y-E-N.  I pretty much go by
16   Jimmy ████████████  ████████████ .
17       Q.   ████████████
18       A.   ████████████████████ , ████████ .
19       Q.   Actually Mr. Nguyen, every once in a while
20   your voice is cutting out a little bit.  I don't know if
21   there is a microphone if you can bring it a little
22   closer?
23       A.   I'll talk louder.
24       Q.   That works.  Perfect.  Mr. Nguyen, you
25   understand that your testimony is being recorded today?
```

Page 8

```
 1       A.   Yes.
 2       Q.   And you understand both by a court reporter
 3   who is taking a transcript and a videographer who is
 4   taking a video?
 5       A.   Yes.
 6       Q.   And you understand that your testimony may be
 7   shown to a jury at some point in this case?
 8       A.   Yes, I understand that.
 9       Q.   And I know you're a lawyer but you understand
10   that your testimony is being given today under oath,
11   correct?
12       A.   Yes, I do.
13       Q.   If you don't understand a question,
14   Mr. Nguyen, I need you to let me know and I'll re-ask
15   it, is that fair?
16       A.   Yes, that's fair.
17       Q.   If you don't I will assume you understood the
18   question and I'm going to rely on your answer, okay?
19       A.   Okay.
20       Q.   Are you -- I'm going to also assume you have
21   familiarity with the groundrules of a deposition like
22   oral responses and breaks and anything like that given
23   your experience.  Tell me if I'm wrong.
24       A.   Generally.  It's been a number of years since
25   I've been involved in a deposition.
```

Page 9

```
 1       Q.   Do you want me to go through?  I'll go through
 2   them just to refresh your memory.  You know I need you
 3   to give oral responses -- sorry?
 4       A.   I haven't practiced law in a while so it's
 5   been a while.
 6       Q.   So I need you to give oral responses if you
 7   can so the court reporter can take them down.
 8   Intuitively we nod our heads but I actually need you to
 9   say yes or no.  And if you need a break at any point in
10   time just let me know.  This isn't a marathon.  We'll
11   stop.  You can stretch your legs, get a drink, whatever,
12   use the restroom.  Are you on any medications that would
13   affect your ability to testify today?
14       A.   No.
15       Q.   Have you ever been deposed before?
16       A.   I believe so.  I have never testified in court
17   proceedings before but I think I've been deposed.
18       Q.   Did it have anything to do with the matters at
19   issue in this case?
20       A.   No.
21       Q.   One last housekeeping matter.  Do you hold
22   citizenship for any country besides the United States?
23       A.   No.
24       Q.   Can you give me a brief professional
25   background of your career?
```

Page 10

1    A.   Sure.  I have been a lawyer most of my
2  professional career.  I graduated law school in 1995 and
3  I was in private practice at corporate law firms from
4  1995 until I left legal practice, at least private
5  practice, in early 2017.
6         So I have been an associate and then a partner
7  at several major law firms.  I can list them for you if
8  you need?
9    Q.   Sure.
10    A.   Most of my career was spent at Foley & Lardner
11  in the Los Angeles office.  I lived in Los Angeles most
12  of my life.  Foley & Lardner in Los Angeles with a
13  little gap in between where I went to a boutique firm
14  before I came back.  Then I think I was in total at
15  Foley & Lardner about 12 years or so.  Then I went to
16  help a Chicago based firm launch their Beverly Hills/Los
17  Angeles office called Wildman, Herald.  It's now merged
18  into another firm and then the last major firm of my
19  career was Davis, Wright & Tremaine where I was for
20  about I think six years.  All of those were in Los
21  Angeles offices.
22         Then after I left Davis, Wright & Tremaine to
23  work with nChain which I know we'll talk about I was
24  there for a short period of time kept my own legal
25  practice to assist some of my longstanding clients on

Page 11

1  some matters they wanted me to continue helping them on
2  for a period of time.  It wasn't something I did for a
3  long time.
4    Q.   Go ahead.
5    A.   Then I joined the Bitcoin world.
6    Q.   When did you stop practicing law?
7    A.   Good question.  I went on inactive status with
8  the California Bar when I moved out of California which
9  was in December 2018.  I would say I stopped doing legal
10  work, legal advice work, towards the end of 2017.
11    Q.   Then I know that you said you left private
12  practice to join nChain.  Was that around 2018?
13    A.   No, we -- I signed on with nChain in I believe
14  it was September of 2016.  I notified my law firm
15  that I was intending to leave the law firm partnership
16  to pursue other ventures and it took -- there was kind
17  of a bit of a transition process.  A long period of time
18  to wind down, transfer my client relationships and
19  matters.  I had been a lawyer for so long.  Departing
20  and you don't want to leave your clients in a difficult
21  situation.
22         It took me longer than I expected to actually
23  complete the process to transition out of the law firm
24  but I signed on to join nChain in September of 2016 I
25  believe is the month and sort of overlapped with my

Page 12

1  departure from the law firm.
2    Q.   Can you walk me through the positions you held
3  at nChain starting from -- actually take one step back.
4  Are you still at nChain today?
5    A.   No, I am not.
6    Q.   Can you walk me through the positions you held
7  at nChain starting from November 2016 when you started
8  and going up until you left?
9    A.   Sure.  In the beginning I didn't have a formal
10  title.  The company was fairly new and part of my, you
11  know, job that I was asked to do was help figure out a
12  number of things at the company such as in particular
13  focusing on its IP program since my legal practice that
14  I had in law was focused on IP and digital technology
15  areas.
16         So in the beginning I would say I didn't have
17  a title.  Eventually we gave me a title to cover those
18  duties but the general area in which I was asked to work
19  was the commercialization of intellectual property.
20         Eventually I got the title of IP
21  Communications and Legal Officer to summarize the
22  variety of tasks that were described in my first
23  contract with nChain because it included IP strategy,
24  some communications, marketing related things as well as
25  legal advice related to particularly the IP.

Page 13

1         Then I became later chief business officer for
2  a very short period of time because then I got asked to
3  become CEO of the company.
4         So I was CEO for a while and then when I left
5  that role I was appointed to be chair of what we call a
6  Strategic Advisory Board and I maintained that role
7  until last month, March 2020.
8    Q.   Did you say the Strategic Advisory Board?
9    A.   Yes.
10    Q.   So I am going to try -- I think I took some
11  notes I'll try to break it down a little bit.  You
12  started with nChain in November 2016 and you didn't have
13  a formal title until you got the title of IP
14  Communications and Legal Officer.  How long did that no
15  formal title period last?
16    A.   I have to correct you one thing about your
17  question.  I signed on to nChain in September of 2016, I
18  believe, not November.
19    Q.   Sorry.  I have September written down.  I
20  don't know why I said November.  September.
21    A.   What was your question?
22    Q.   There was this intermediate period where you
23  didn't have a formal title.  How long did that last?
24    A.   From September 2016 to sometime I think in
25  spring of 2017.  I would say around March or April.

Page 14

1    Q.   Of 2017?
2    A.   Correct.
3    Q.   And then -- so I'm assuming around -- I
4    understand these aren't exact but around April of 2017
5    you obtained this title of IP Communications and Legal
6    Officer?
7    A.   Yes.
8    Q.   And then how long did that last until you were
9    made chief business officer?
10   A.   I think -- I have these dates on my LinkedIn
11   profile.  I think I would say it was around September,
12   October.  I think October because I was only the chief
13   business officer for two months before I got asked to
14   take on the CEO role and I took on the CEO role in 2017.
15   I think it was October 2017 when I became Chief Business
16   Officer.
17   Q.   Got it.  As you know this isn't a test so
18   you've referenced your LinkedIn page.  So if that helps
19   you I'm happy to bring that up on the screen for you.
20   Do you see that here?
21   A.   I saw it for a second.
22   Q.   What if I put it here and make it bigger.  How
23   is that?
24   A.   I can see that now.
25        MR. FREEDMAN:  Let's mark this as Exhibit 1

Page 15

1    though I'm never going to be able to keep track of
2    them all.  One drawback of these electronic
3    depositions but I'll do my best and maybe Rick,
4    Mr. Court reporter, you can help me here.
5        (Plaintiff's Exhibit No. 1 was
6         marked for identification.)
7    BY MR. FREEDMAN
8    Q.   I'm going to scroll down here to your nChain
9    titles.  Do you see that here?
10   A.   Yes.
11   Q.   So I guess -- why don't we go down to the
12   bottom.  You have from February 2017 to October 2017.
13   So I guess if I'm reading this correctly that no formal
14   title period probably went from September of 2016 until
15   February of 2017?
16   A.   That's correct.
17   Q.   And then we had February of 2017 you were the
18   IP -- chief IP Communications and Legal Officer, right?
19   A.   Yes.
20   Q.   That went about until November of 2017 it
21   looks like; right?
22   A.   Correct.
23   Q.   At which time you then became the Chief
24   Business Officer.  Sorry, I'm reading it wrong.  Then
25   that lasted until as you said a very short period just

Page 16

1    until December so about a month or so; right?
2    A.   About right.  About a month approximately.
3    Q.   And then on December of 2017 you became the
4    CEO?
5    A.   Correct.
6    Q.   And that lasted until November of 2018;
7    correct?
8    A.   Yes, approximately.  My transition out of the
9    CEO role was sort of gradual and so it's -- exact date
10   is hard to define.  It was right around -- there was I'm
11   sure you've heard about a hash war in the Bitcoin cash
12   and Bitcoin SV world so it was right after that time.
13   Q.   Got it.  Then you slowly transitioned out in
14   November of 2018 or so and then from about December of
15   2018 until March of 2020 you were then the chair of the
16   Strategic Advisory Board?
17   A.   Yes.
18   Q.   And at what point in this progression did you
19   stop performing any kind of legal services for nChain?
20   A.   I would say after I took the chief business
21   officer title.  I certainly still had to be involved in
22   legal matters, particularly with outside counsel since I
23   was the executive on the team that was a former lawyer
24   but I did -- was not acting in a legal advisor role I
25   think after that point.  Managing the legal affairs that

Page 17

1    happened but more from a business perspective.
2    Q.   Got it.  Who was your contact to initially
3    join nChain?
4    A.   Robert MacGregor.
5    Q.   How did you know Robert MacGregor?
6    A.   I've known Rob for many years.  Originally he
7    was a client contact of mine in my legal practice and
8    that's how I first got to know him.
9    Q.   Got it.  Let's get back to that.  When did you
10   first meet Calvin Ayre?
11   A.   A long time ago.  I'm trying to remember.  I
12   don't remember the exact year.  I would say around 2006.
13   Q.   What was the context of that meeting?
14   A.   When I was a lawyer I was asked to start doing
15   legal work for I think it was a media agency or media
16   business that worked with or was related to his Bodog
17   business at the time?
18   Q.   Did you ever do legal work for him or his
19   companies?
20   A.   I definitely did legal work for Bodog
21   companies.  I'm trying to remember if -- I believe my
22   firm also did some legal work for him individually.
23   Q.   Did you yourself?
24   A.   I was involved in it since I was the law
25   firms -- the relationship partner, the key contact with

Page 18

1   the client but you use colleagues with other specialty
2   areas, you know, that are outside of my specialty area.
3       Q.    Is it safe to say you have not acted as a
4   lawyer for -- let me just ask you.  When is the last
5   time you worked as a lawyer or gave legal advice to
6   Calvin Ayre?
7       A.    To Calvin Ayre personally?
8       Q.    Yes.
9       A.    Quite a long time.
10      Q.    10 years?
11      A.    Probably sooner than that.  I'm trying to
12  remember the sequence of law firms.  Probably we're in
13  2020 so around 2000 -- in the mid 2000s I think.  Sorry
14  not 2000s.  Around the 2013, 2014 maybe time period.
15      Q.    Is that the same response for any companies
16  that are affiliated with him as well?
17      A.    It's been a long time so that's why I don't
18  remember.
19      Q.    I understand.  Is that the same answer for
20  companies that may have been affiliated with him as well
21  not since 2013, 2014ish?
22      A.    Trying to remember that as well.  It would
23  probably be somewhere similar in that time period.
24  That's tougher for me to answer because I know at some
25  point Calvin left the Bodog organization from the online

Page 19

1   gaming industry and so there were some of the companies
2   that I did legal work for from that organization or I
3   continued to do legal work for but I don't think Calvin
4   was involved any more.
5       Q.    Got it.
6       A.    At least that's what I was told.
7       Q.    Do you know what Calvin's connection to Craig
8   Wright is?
9       A.    Yes.  So I wasn't involved personally but what
10  I've been told and tell me if you want me to testify
11  about things I've been told but Stefan Matthews had
12  known Craig Wright for many years ago from Australia.
13  They had a working relationship because Stefan was the I
14  think CIO or CTO of an online gaming company in
15  Australia that was going public and they needed auditing
16  work done and at the time Craig worked for BDO, one of
17  those auditing firms.  He used to work in the auditing
18  field and so they had -- you know, they had a prior
19  working relationship they knew each other.
20          At some point Craig's Australian companies
21  were in financial distress, financial trouble, and as I
22  understand it I was told by Stefan that Craig contacted
23  Stefan to try and find routes for help.  Stefan then
24  introduced Craig to Calvin and that's how they met.
25      Q.    Do you know about when that was?

Page 20

1       A.    Probably 2015 but I don't know for sure.
2       Q.    Have you ever talked to Craig about that?
3       A.    About the introduction?  I've talked to Craig
4   about his work with Stefan in years past.  I don't think
5   I've ever talked with Craig about how --
6       Q.    Do you know whether or not Calvin is funding
7   Craig Wright?
8       A.    Funding what I guess?
9       Q.    You tell me.  Do you know if he is funding
10  anything?
11      A.    So I understand they have some kind of
12  financial agreement that I don't know the terms of.
13      Q.    Who told you they have a funding agreement?
14      A.    I wouldn't call it a funding agreement.  I
15  don't know the terms of it.  I know they have some
16  agreement that I have heard about from some of Calvin's
17  representatives.  Calvin has a whole family office and
18  lawyers and executives so the subject has come up in
19  discussions since I don't represent either Calvin or
20  Craig individually that's sort of between the two of
21  them.
22      Q.    And Craig has never made any statements to you
23  about this financial relationship?
24      A.    No.
25      Q.    Do you know whether or not Calvin has given

Page 21

1   Craig a loan that is secured by Craig's Bitcoin or
2   intellectual property?
3       A.    I do not know.
4       Q.    Does Calvin own Coin Geek?
5       A.    Yes.  As far as -- does he own it personally I
6   don't know.  Sometimes from my understanding there's
7   companies that he is associated with but is he the
8   founder general owner of Coin Geek businesses that's my
9   understanding.
10      Q.    When I say owner I understand that affluent
11  individuals use complex structures to control assets.
12  The ultimate beneficial owner essentially traced back to
13  Calvin?
14      A.    From what I understand, yes.
15      Q.    Does Calvin have any financial interest in
16  nChain?
17      A.    He is now as I understand it a shareholder.
18      Q.    When did that start?
19      A.    You know, this was after I was CEO so I was
20  less involved in operational structure but -- there's I
21  think a press release or something about it.  I think it
22  was announced in December last year.  I don't know when
23  it became effective.
24      Q.    And before that date did he have any interest
25  in nChain at all even through holding companies or other

Page 22

1  companies affiliated with him?
2      A.   Not that I'm aware of.  I was always told he
3  was not a shareholder and didn't have a financial stake
4  in nChain at the time.
5      Q.   It doesn't -- I'm trying to figure it out
6  because you're saying that you've heard that Craig
7  turned to Stefan Matthews for help in bailing out the
8  businesses in Australia?
9      A.   Yes.
10     Q.   And then Stefan introduced Craig to Calvin?
11     A.   Yes.
12     Q.   And then as we'll talk about there is a
13 transfer of intellectual property from those Australian
14 companies to nChain; right?
15     A.   Yes.
16     Q.   And so I'm trying to figure out why Calvin
17 doesn't have a stake in it, doesn't add up to me?
18     A.   There's another step in the process you hadn't
19 asked me about yet.
20     Q.   Okay.
21     A.   Calvin and Stefan introduced Craig to Robert
22 MacGregor.
23     Q.   Got it.  I see.  And Robert MacGregor was the
24 one who provided all the funds then?
25     A.   Robert MacGregor was -- had a company in the

Page 23

1  UK called The Workshop and it's a holding company as I
2  understand it it's the one that did the deal with the
3  marketing group.
4      Q.   Got it.
5      A.   Craig's company in Australia.
6      Q.   But where is Robert MacGregor now?
7      A.   You know, I'm not sure.  I haven't heard from
8  him in a while.  Last I heard he was in London.
9      Q.   Do you have contact information for him?
10     A.   I do.  I would say the last time I e-mailed
11 him I didn't hear back so I don't know if it's still
12 valid.  He's had health -- a serious health issue over
13 the last few years so he has not been as active.
14     Q.   Does Robert MacGregor or any of his companies
15 maintain any kind of interest in nChain?
16     A.   Not that I know of.
17     Q.   So getting back to Calvin and nChain, Coin
18 Geek is it fair to say that Calvin's companies invest in
19 nChain?
20     A.   I'm sorry, could you repeat that question?
21     Q.   Is it fair to say --
22     A.   Give qualification to my last answer which is
23 since I've been out of the CEO role of nChain I'm less
24 aware of anything that's happened with respect to the
25 ownership structure, corporate structure.

Page 24

1      Q.   Of course.  Just what you know, all I'm asking
2  for is what you know.  So does Calvin -- do Calvin's
3  companies invest in nChain?
4      A.   Well, I don't -- I don't think I can answer
5  that because I was not involved in the share or whatever
6  agreement that led to him becoming a shareholder.
7  Presumably something happened there but I don't know the
8  terms.
9      Q.   I understand.  Give me a second here.  Does
10 nChain find lots of ways to work very closely with
11 Calvin's companies?
12     A.   Yes, that's a fair claim.  I don't know how
13 it's defined but there are a lot of common goals for the
14 growth of Bitcoin in particular, Bitcoin SV so there's
15 definitely a close working relationship.
16          (Plaintiff's Exhibit No. 2 was
17          marked for identification.)
18 BY MR. FREEDMAN
19     Q.   I am going to share with you Exhibit 2 to this
20 deposition which is a video or an interview that you did
21 I believe with Cryptofinder.  Do you recall this
22 interview?
23     A.   Yes.  I don't recall the interview but I
24 recall doing it.
25     Q.   Fair to say what the video captured is what

Page 25

1  you said?
2      A.   I would assume so.
3      Q.   I am going to play for you I hope this works
4  where at the 26 minute and 16 second mark let me know if
5  you can hear this, okay?
6      A.   Sure.  I cannot hear it.
7          MR. FREEDMAN:  You cannot hear it?  That is a
8  problem.  Let me see if I can fix that.
9          MR. SILVERGLATE:  Do you want to go off the
10         record?
11 BY MR. FREEDMAN
12     Q.   Give me one second.  I might be able to fix
13 that this way.  Can you still hear me?
14     A.   Yes.
15     Q.   Let's try I am going to go back to the 26
16 minute if it lets me.
17     A.   Still cannot hear it.
18     Q.   All right.  If this doesn't work we'll have to
19 go off the record but I'm hopeful we got it.  How about
20 now?
21          VIDEO AUDIO VOICE:  That relationship stopped
22         between Coin Geek and nChain.
23          MR. NGUYEN:  Well, Calvin's been interested in
24         Bitcoin for a while.  Online gaming industries one
25         of the first industries to adopt Bitcoin a long

Page 26

1    time ago.  So he got introduced to Craig and they
2    became friends a number of years ago.  I could say
3    2015 or so and then obviously Calvin has learned a
4    lot about Bitcoin from Craig so when nChain emerged
5    Calvin was kind of getting more involved in
6    Bitcoin.  He started the Coin Geek brand as a media
7    site at first and then decided to start getting
8    into mining.
9         So mining operations got more started
10   investing so nChain and Coin Geek are very close
11   business allies.  We lot of things together.
12   Obviously we both have money operations.  We have
13   the hash fork together.  We align on things.  We're
14   starting new efforts and investing where for
15   example Coin Geek is providing investment funds and
16   nChain is providing access to its IP and technical
17   portfolio to the investment companies.
18   BY MR. FREEDMAN
19        Q.   I want to stop there for a minute.  I don't
20   know if you recall I asked you whether or not Calvin's
21   companies invested in nChain I don't recall what your
22   answer was but I don't think it was yes.  Not sure if it
23   was no but this help refresh your recollection Coin Geek
24   does provide investment funds to nChain?
25        A.   It actually confirms what I -- my prior

Page 27

1    answer.  I think you're referring to the last part of
2    the clip you just played where I'm talking about they
3    collaborate where Coin Geek is investing in new Bitcoin
4    tech start ups and nChain is involved by providing
5    access to nChain's IP technology to help the new start
6    ups.
7         That happened because -- so it's not Coin Geek
8    investing in nChain.  I was talking about Coin Geek
9    investing in -- we even had nChain at first and then
10   Coin Geek has invested in a number of the Bitcoin start
11   ups in the world.  That's what I was talking about.
12        Q.   Thank you for that clarification.  Would it be
13   fair to say that Coin Geek financially supports nChain's
14   teams?
15        A.   Here is how I would answer that.  Certainly
16   not all the teams but the arrangement is when Calvin and
17   Coin Geek wanted to support a competing what we call
18   software implementation, by completing reference
19   implementation of Bitcoin protocol when there were
20   disagreements at the time in 2000 -- I guess this was
21   2018 we were supporting a version of Bitcoin called
22   Bitcoin Cash.  As you know now there's several competing
23   versions of Bitcoin.
24        There was a split between BTC, Bitcoin core as
25   we call it, and Bitcoin Cash.  Then we were supporting

Page 28

1    Bitcoin Cash after that split which happened in 2017.
2    There became disagreements among the different group
3    protocol developer groups involved in Bitcoin Cash and
4    Craig wanted to basically compete against the other
5    Bitcoin Cash implementation and see which the miners
6    would follow, that led to what's called this hash war.
7    To do that work to create a new version of the software
8    that more aligned to Craig's vision that's why we call
9    it the Satoshi Vision that took work.
10        The nChain team is the development team that
11   did that work.  It's done under a service agreement with
12   the Bitcoin Association which I now run and Calvin funds
13   the Bitcoin Association right now until we find other
14   ways of revenue which is membership revenue which is
15   something that's going to start happening soon.
16        The work that is done on not all of nChain but
17   the work -- nChain does a variety of things.  The
18   development work done for Bitcoin SV, the software
19   implementation, the technical scaling work for that
20   infrastructure is done through nChain under a service
21   agreement through Bitcoin Association which is funded by
22   I don't know that it's Coin Geek it's maybe -- some
23   entity associated with Calvin.
24        Q.   That's helpful.  Would it also be fair to say
25   nChain is a team that is the Bitcoin SV no team and they

Page 29

1    are financially supported by Coin Geek.
2         A.   I don't know if it's by Coin Geek per se but
3    ultimately by a Calvin funded organization.  That's
4    pretty public.  Very public about that.
5              (Plaintiff's Exhibit No. 3 was
6              marked for identification.)
7    BY MR. FREEDMAN
8         Q.   So I am going to attempt to share with you
9    again I guess we're now on Exhibit 3.  See this You Tube
10   page that's the popped up?
11        A.   Okay.
12        Q.   This appears to be a little I'm not sure if
13   it's an interview.  It looks like an interview Coin Geek
14   put out in April 2019.  Do you recall this interview?
15        A.   I do so many interviews -- meeting interviews.
16   I don't recall every single one but it looks familiar.
17        Q.   That's you?
18        A.   Yes, that's me.  I do a lot so when people ask
19   me do I remember particular interviews they sort of blur
20   together.
21        Q.   I totally understand that.  Do you understand
22   from an evidentiary perspective I just need to make sure
23   it's you, it's a video, it's what you said?
24        A.   I understand.
25        Q.   All those things are true?



**Page 30**

1  A.   Once you play the video I am fairly certain I
2  will be able to confirm it's video -- interview I did.
3  Q.   I am going to particularly direct you to the
4  time stamp of this video of 2:09.  We are going to start
5  at 2:08 and let's take listen for a second.
6         MR. NGUYEN:  Work for nChain.  So nChain has a
7         chain that is the Bitcoin.  They are supported
8         financially by Coin Geek.  They -- the project is
9         owned by the Bitcoin Association.  So it's kind of
10        an interrelated set of relationships but --
11 BY MR. FREEDMAN
12        Q.   I am going to stop there for a second.  I was
13 reading a quote from you again not -- this is not a test
14 but is it fair to say I guess that the nChain team --
15 nChain has a team that is the SV Bitcoin No Team they
16 are financially supported by Coin Geek.
17        A.   I think it's a fair statement.  I was trying
18 to remember what entity it is because Coin Geek is not a
19 single entity.  Coin Geek brand I guess you can say.
20        Q.   Absolutely understood.  I want to ask you
21 about something you said in the second half of that
22 which was Calvin and I are of course a huge supporter of
23 Bitcoin SV and the project owned by the Bitcoin
24 Association.  What do you mean by that?
25        A.   Someone -- when you create software you have

**Page 31**

1  to answer the question who owns it.  So it's the Bitcoin
2  Association.
3        Q.   So meaning like the source code that creates
4  the Bitcoin SV client is owned by Bitcoin Association?
5        A.   I'm just trying out that technical way to
6  describe it.  I'm not sure exactly right.  Bitcoin
7  Association owns the Bitcoin SV No software.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 32**

(lines 1–25 redacted)

**Page 33**

1
2
3
4
5
6
7
8
9
10
11
12
13
14        Q.   Understood.  So just getting back to the video
15 that is on the screen can you now confirm this is an
16 interview you gave and it's accurately recorded your
17 responses?
18        A.   Yes.
19        Q.   Thank you.  Have you ever communicated with
20 Calvin through text message?
21        A.   No.
22        Q.   WhatsApp?
23        A.   He is not a texter.
24        Q.   Any method beyond calling or e-mails?
25        A.   Not that I recall.  Just those two ways.

Page 34

1    Q.  I want to jump with Robert MacGregor if you'll
2  come with me.  You gave me some information about him
3  already.  Can you explain to me how -- I understand
4  practically how because you've told me Stefan Matthews
5  introduced Craig to Calvin and Calvin to Robert
6  MacGregor but so not mechanically how but I guess what
7  is Robert's connection to Craig.  How did that whole
8  thing come about?
9    A.  Sure.  Again I'll just repeat I wasn't
10  directly involved in any of this so I'm just going to
11  tell you what I've been told.  As I understand it so
12  Stefan outreached from Craig.  I introduced Calvin
13  because obviously he had an interest in Bitcoin.  Craig
14  used to also do work in the online gaming industry as
15  well in some parts.  And then at the time Rob, I don't
16  know if it was at the time but he had started a company
17  in Canada called nTrust.  It was a set of businesses
18  that brand name to the public was nTrust that was
19  involved in electronic money transfer and international
20  remittance.
21       So -- as I found out later I think Craig had
22  even talked once to Rob before and might have been
23  introduced to by Stefan because Rob and I have to be a
24  bit careful because nTrust was a client of mine for many
25  years when I was a lawyer so I have to be careful about

Page 35

1  what I disclose related to that but I can tell you that
2  nTrust and Rob MacGregor were interested in exploring
3  Bitcoin and virtual currency technologies as a fast,
4  more efficient way to be able to send funds across
5  countries for example.
6       The remittance fee could be very high.  An
7  overseas worker from the Philippines who is young and
8  left to move to Canada work and send money back to my
9  family in the Philippines the percentage you have to pay
10  to do that is high and so for the nTrust business I know
11  Rob MacGregor had been interested and once Bitcoin and
12  digital currencies came out in exploring how that could
13  be useful for his business and so as I understand it
14  that's why Stefan and Calvin introduced Craig to Rob at
15  this time thinking what Craig was doing with Bitcoin
16  could be useful for what nTrust could possibly do.
17    Q.  Do you know the final deal that Robert
18  MacGregor struck with Craig?
19    A.  No.  I was not involved in that at all.
20    Q.  Did you ever review the deal documents that
21  came out of that deal?
22    A.  I did later after I started working for nChain
23  but they're very long and so I won't say I read them all
24  in detail.  I have seen them but yes, it was after --
25  well after the transaction.

Page 36

1    Q.  Can you give me a kind of high level summary
2  understanding that it may not be 100 percent accurate of
3  what that deal looked like?
4       MR. RIVERO:  Object to the form.
5       THE WITNESS:  Not really.  Honestly I know
6  there was the agreement, some payments and transfer
7  of assets.  At a high level that's what happened.
8  BY MR. FREEDMAN
9    Q.  Do you know which assets got transferred?
10    A.  I couldn't tell you.  There's a long list I
11  know.  Without looking at that agreement I wouldn't
12  know.  Even looking at the agreement since I was not
13  involved with its negotiation.  I don't know I have the
14  basis to answer that.
15    Q.  Have you seen an agreement that involved the
16  transfer of Satoshi Nakamoto's life rights?
17    A.  I don't know if I've seen -- I know there is
18  one.  I think life story rights.
19    Q.  Do you know if the deal included all
20  intellectual property created?
21       MR. RIVERO:  Objection.
22  BY MR. FREEDMAN
23    Q.  Do you know if the deal included beyond just
24  life story rights but also included intellectual
25  property rights?

Page 37

1       MR. RIVERO:  Object to the form.
2       THE WITNESS:  As I understand it it included
3  certain -- I understand the deal included transfer
4  of certain IP assets but sitting here today I could
5  not tell you what those are.
6  BY MR. FREEDMAN
7    Q.  Owned by Robert MacGregor at the time these
8  transactions took place?
9    A.  Can you repeat that question?
10    Q.  Was nChain owned by Robert MacGregor at the
11  time these transactions took place?
12    A.  There was no nChain at the time.
13    Q.  The BITC Holdings, let me amend that.
14    A.  I think I don't know -- I'm not sure which was
15  the entity that acquired the DeMorgan Group assets and I
16  know that the entity that is now known as nChain I think
17  got created as I understand it in connection with what
18  happened with this transaction.
19       So that's why it's hard for to answer did Rob
20  MacGregor own nChain because I'm not sure the nChain
21  entity existed at the time.  I'm not certain.  I wasn't
22  involved in the transaction of the structure.
23    Q.  So the assets that were acquired by Robert
24  MacGregor in that deal with Craig eventually ended up
25  being controlled by nChain?

Page 38

1    MR. RIVERO:  Object to the form.
2         THE WITNESS:  I don't know that I have a basis
3    to answer that.
4    BY MR. FREEDMAN
5         Q.   Haven't you reviewed the agreements?
6         MR. RIVERO:  Objection.
7         THE WITNESS:  They were long and I didn't
8    review them for that purpose.  In general the
9    assets that were acquired from the DeMorgan Group
10   got transferred I believe -- I just don't know if
11   they all got transferred to the same entity.
12   That's part of why I'm pausing.  It's like which
13   entity owned which assets I'm not sure.
14   BY MR. FREEDMAN
15        Q.   I'll just go where I'm getting to maybe you
16   can help me make it easier which is I'm trying to find
17   out how Robert MacGregor ended up out of the picture.
18   Because you told me he was the one that purchased
19   everything from Craig then you told me he no longer has
20   interest in nChain.  How did he get removed?
21        A.   He became unhappy with Craig at a certain
22   point and again I'm telling you this all second hand
23   because I wasn't there.  So it's what I've heard from
24   other people and he thought about closing the nChain
25   operation at one point.  Stefan Matthews wanted to

Page 39

1    continue it and there was a transaction which was
2    announced in 2017 about a public investment fund in
3    Malta acquiring the nChain set of companies from Rob's
4    company.  Basically he was unhappy with Craig and didn't
5    necessarily want to be involved any more.
6         Q.   Do you know why he was unhappy with Craig?
7         A.   Yes.  Well, Craig is -- can be a difficult
8    business colleague.  You know, has been widely reported
9    in the media there was an effort in the spring of 2016 I
10   believe it was or in 2016 to show that Craig is Satoshi
11   Nakamoto, creator of Bitcoin.
12        It happened after there was some media
13   articles that tried to out Craig as Satoshi I believe in
14   the December before that this process to establish Craig
15   as Satoshi at the end did not go well and as I
16   understand it Rob was upset with Craig.
17        Q.   Can you explain what you mean "did not go
18   well?"
19        A.   Well, I'm telling you all that from reports
20   obviously because I wasn't -- I knew it was happening
21   because this was when I was in talks with Rob to start
22   working for nChain but I wasn't directly involved with
23   it.  You know Craig did media interviews to come out and say
24   I am Satoshi Nakamoto creator of Bitcoin.  The Bitcoin
25   community, you know, they're very technical people

Page 40

1    involved in cryptography.  They would not believe a
2    statement like that without some other proof and there
3    was supposed to be -- I can't remember the date it was a
4    date in May where he was supposed to -- I am not exactly
5    sure what he was supposed to do.  I think he was
6    supposed to either sign a transaction using private keys
7    from one of the early Bitcoin block chain blocks which
8    the Bitcoin community would recognize as only being held
9    or owned or accessible by Satoshi Nakamoto and he did
10   a -- I don't know if he was supposed to sign a
11   transaction or move a coin, I'm not entirely sure but
12   something using private key associated with one of the
13   first early Bitcoin blocks.
14        He did something but -- that the Bitcoin
15   community then quickly thought well, that's -- it's
16   using -- it wasn't using that private key of Satoshi.
17   It was using information he could have found publicly so
18   people thought well, he's just -- that doesn't prove he
19   is Satoshi.
20        Q.   It's fair to say it was a pretty big issue at
21   the time, right?
22        A.   Yes, very much.  There was a lot of news about
23   both his claim coming forward saying I'm Satoshi and
24   then there was a lot of news that came when the proof --
25   proof, you know, session, proof providing not believed

Page 41

1    by the Bitcoin community and I think he posted something
2    on the blog he had at the time saying I'm sorry.
3         Q.   I saw you produced documents in response to
4    our subpoena so thank you for that.  We just got through
5    them last night and I saw that you were involved in, you
6    know, PR campaigns to kind of correct that narrative and
7    kind of remediate the harm so to speak that had been
8    caused by the false procession?
9         A.   I wouldn't describe it that way because I
10   joined --
11        Q.   I didn't hear that.  I apologize, can you
12   repeat that?
13        A.   Sure.  I would not -- the way you characterize
14   the question is not how I would characterize it.  I
15   joined nChain after this attempt of proving Craig was
16   Satoshi and the PR work I was asked to oversee was more
17   focused on the launch of nChain publicly as a company
18   which would of course trigger a question of Craig he is
19   your chief scientist, is he really Satoshi why didn't he
20   fully prove he was Satoshi back then so this was an
21   element of it but that was not the main purpose of the
22   PR work I was asked to manage.
23        Q.   You consider Craig to be a friend?
24        A.   I do now.  He is a colleague.  We're
25   colleagues at first and eventually we became friends as



**Page 42**

1  you often do with people you work with.

2     Q.  Fair to call him your partner?

3     MR. RIVERO:  Object to the form.

4     THE WITNESS:  Not in any legal sense.  We

5  don't have any business partnership arrangements

6  together and, you know, we work together in

7  building his vision of Bitcoin and the Bitcoin

8  ecosystem.

9  BY MR. FREEDMAN

10    Q.  Do you understand whether or not this failed

11  proof session had an affect on Craig?

12     MR. RIVERO:  Object to the form.

13     THE WITNESS:  I don't know how to answer that.

14  BY MR. FREEDMAN

15  

16  

17  

18  

19  

20  

21  

22  

23  

24  

25  

**Page 43**

1  

2  

3  

4  

5  

6  

7  

8  

9  

10  

11  

12  

13  

14  

15  

16  

17     MR. FREEDMAN:  I don't know why but my

18  technology is glitching on me.  We've been going

19  for a while anyways.  Why don't we take a five

20  minute break, you can use the restroom and get a

21  drink.  I'll figure out my technical issues.

22     THE VIDEOGRAPHER:  We are going off the

23  record.  The time is 1:06 p.m.

24     (Discussion held off the record.)

25     THE VIDEOGRAPHER:  We are back on the video

**Page 44**

1  record.  The time is 1:13 p.m.

2  BY MR. FREEDMAN

3    Q.  Mr. Nguyen, do you know what happened to the

4  deal that -- where Satoshi Nakamoto's life rights were

5  sold to Rob MacGregor?  Strike that.  Let me take a step

6  back actually.

7     Before the break you told me that there was a

8  Malta based firm that ended up buying Robert MacGregor's

9  interest out of the nChain related companies; right?

10    A.  Bought the nChain companies.

11    Q.  From Robert MacGregor's companies?

12    A.  I would say he was the principal.  As far as I

13  understood it of the nChain companies.

14    Q.  So let's talk for a second about these

15  companies.  So nChain Holdings Limited is the parent

16  company, right?

17    A.  I don't think that's true any more.  It was I

18  think at one time.

19    Q.  Let's do before the Malta based purchase

20  nChain Holdings -- actually I wrote myself a little

21  chart here because it was hard to follow but I think I

22  got it to the point where the Workshop companies

23  Holdings, the Workshop Holdings was the ultimate parent

24  company and it owned nChain's Holdings formerly called

25  EITC Holdings.  Is that consistent with your

**Page 45**

1  recollection?

2    A.  Yes, at one point in time.  I will also

3  preface saying is I was not involved in the structuring

4  so I am answering based on just what I've seen in

5  documents after I started working for nChain.

6    Q.  And then nChain Holdings eventually acquired

7  NT International Holdings and its five subsidiaries.  Do

8  you recall that?

9    A.  I was involved at the time in terms of the

10  transactions the process by which they got held by

11  nChain Holdings or what entities were held by them I

12  couldn't answer for you.

13    Q.  I might be able to help you with that.  I

14  think your document production helped me with it.

15    A.  I know there are documents.

16     (Plaintiff's Exhibit No. 4 was

17     marked for identification.)

18  BY MR. FREEDMAN

19    Q.  I think I can help you with that.  I am going

20  to share with you I think we're now on Exhibit 4.  It's

21  a document you produced to us yesterday Nguyen 424.  Do

22  you recognize this as an e-mail from you to Jamie

23  Diaferia?

24    A.  Yes.

25    Q.  And on January 23rd 2017?

Page 46

1    A.   That's what it says.
2    Q.   Do you want to take a moment to review the
3    e-mail and it appears -- I'll tell you I read it last
4    night and it is you conveying over to Mr. Deaferia who
5    works with a PR firm called Infinite Global the
6    structure of how the at the time nChain company was
7    structured and so it was very helpful to me in mapping
8    out the entities and I think this might refresh your
9    recollection.  Do you want to take a moment to review
10   it?
11   A.   Yes, I will.  I generally remember.  As you
12   can see it's a complex set of transactions.
13   Q.   I can map it out.  I have a sketch pad in
14   front of me to map it out.  It seems to me that nChain
15   Holdings -- let's -- why don't we go in the order you've
16   laid out.  NChain Holdings acquires the nTrust companies
17   through two different transactions and this is
18   accomplished by first having nTrust Tech Solutions sell
19   itself be purchased by NT International Holdings?
20   A.   Yes, that's what it says.
21   Q.   And then NT International Holdings then has
22   itself and six subsidiaries underneath it that of
23   various nCrypt nTrust companies and then nChain Holdings
24   purchases NT International Holdings and -- hold on, let
25   me find it.  Sorry, so then purchases NT International

Page 47

1    Holdings and it already owns nChain Limited and nChain
2    Technology Limited and nChain Labs Limited.
3    A.   Here is what I would say.  I wasn't involved
4    in the transactions that led to this structure.  The
5    information that's contained in this e-mail was
6    summarized for me so that I could pass on to the PR
7    firm.
8         So I believe I would assume that the
9    information I summarized here is accurate because that's
10   what we were trying to communicate but I don't have
11   personal knowledge of all these transactions happening
12   in this way.
13   Q.   Right.  But at the time you were hired by the
14   company to manage their PR; right?
15   A.   Correct.  I don't have any reason to believe
16   this is incorrect.  I just can't give you personal
17   knowledge about this is what happened.
18   Q.   And then -- so at the end what ended up
19   happening was at the end of this transaction this
20   Pi-High Tech and PE Fund ends up purchasing three
21   different companies; nChain Limited, nChain Holdings and
22   NT International Holdings which basically sweeps all the
23   nChain and nTrust companies into its ownership; right?
24   A.   In effect, yes.
25   Q.   Who owns Pi-High Tech and PE Fund?

Page 48

1    A.   I didn't -- did not deal with the fund
2    directly much.  As I understand it's an investment fund
3    so it doesn't really have owners, it has a fund manager
4    and then there's people who invest into the fund.
5    Q.   Do you know who has invested into the fund and
6    who its investors are?
7    A.   I do not.
8    Q.   Have you ever -- I want to go back for a
9    second to Robert MacGregor have you ever texted or
10   messaged Robert MacGregor not through e-mail?
11   A.   I think I've tried a couple of times but don't
12   think I ever had a response which --
13   Q.   What about Stefan Matthews, have you ever
14   texted or messaged him not through e-mail?
15   A.   Not through e-mail, yes.
16   Q.   We did not have any text messages in your
17   production of documents.  Did you collect them?
18   A.   I did not have any text messages with any of
19   the people that were responsive to your request.
20   Q.   Have you ever text messaged or otherwise
21   non-e-mail messaged Craig Wright?
22   A.   Yes.
23   Q.   Did you collect those and review them for
24   production?
25   A.   I reviewed what text messages I have had with

Page 49

1    Craig and they are not responsive to your request.
2    Q.   So in 2015 there was a leak I think it's
3    described -- you know what, strike that.  In 2015 Wired
4    and Gizmodo ran articles contending that Craig Wright
5    was Satoshi.  Do you remember that?
6    A.   I do.
7    Q.   Were you involved in orchestrating that leak?
8    A.   No.
9    Q.   Do you know who was involved in orchestrating
10   that leak?
11   A.   No.
12   Q.   Do you know if anyone was involved -- let me
13   strike that.  Do you know if that was an orchestrated
14   leak or if it was actually a leak?
15   A.   I have no idea.
16   Q.   So then we talked about this in May of 2016
17   there was a coordinated effort to out Craig as Satoshi
18   which ended up not being successful and he failed to
19   provide public proof.  Did you talk -- do you recall
20   that?
21   A.   I recall that happening, yes.
22   Q.   Did you talk to -- were you involved in that
23   coming out?
24   A.   Not directly.  I knew it was happening.
25   Q.   Did you talk to or e-mail Andrew O'Hagan about

Page 50

1   this coming out?
2       A.   No.
3       Q.   Are you familiar with an article called The
4   Satoshi Affair?
5       A.   Yes.
6       Q.   Are you aware that in The Satoshi Affair
7   Andrew O'Hagan says that you e-mailed him?
8       A.   I'm aware my name is referenced.  I don't know
9   it's my e-mail though.
10      Q.   Let's take a look at it.  I'm sharing with you
11  docket entry 83-1 to the Second Amended Complaint.  It
12  is a copy of Andrew O'Hagan's The Satoshi Affair.  Let
13  me show you the title I successfully lost our place.  I
14  think we're on page ten.  Why don't you read from this
15  paragraph that starts with A in the middle of page nine
16  for the record?
17      A.   I see it.
18      Q.   Do you want me to go ahead and read that for
19  the record for us?
20      A.   "A few weeks before the raid on Craig Wright's
21  house, when his name still hadn't ever been public
22  associated with Satoshi Nakamoto I got an e-mail from a
23  Los Angeles lawyer called Jimmy Nguyen from the firm
24  Davis, Wright & Tremaine (self described as a one stop
25  shop for companies in entertainment, technology,

Page 51

1   advertising, sports and other industries).  Nguyen told
2   me they were looking to contract me to write the life of
3   Satoshi Nakamoto.  My client has acquired life story
4   rights dot dot from the true person behind the
5   pseudonym Satoshi Nakamoto the creator of the Bitcoin
6   protocol the lawyer wrote.  Quote, the story will be in
7   brackets of, end of bracket, great interest to the
8   public and we expect the book project will generate
9   significant publicity and media coverage once Satoshi's
10  true identity is revealed" end quote.
11      Q.   Does this refresh your recollection that you
12  did e-mail Andrew O'Hagan?
13      A.   No.  My memory is I e-mailed who I believe
14  Andrew O'Hagan's literary agent.
15      Q.   I see.  Suppose he didn't say you e-mailed him
16  directly he says I got an e-mail from a Los Angeles
17  lawyer not necessarily that he got directly from you.
18  Okay.  Do you see that he -- I got a couple questions
19  here.  He redacts out -- he replaces an ellipsis my
20  client has acquired life story rights dot dot dot from.
21  What did he remove?
22      A.   I have no memory of that e-mail.  That would
23  have been a number of years ago.
24      Q.   Then he replaced the original quote with the
25  word of.  Do you remember what it said previously?

Page 52

1       A.   No.
2       Q.   Can you tell me how this occurred?  How did
3   you come about e-mailing his literary agent?
4       A.   Rob MacGregor asked me to help them find a
5   writer to write about the story of Satoshi Nakamoto
6   Craig Wright and so he asked me to reach out and see if
7   I could find a contact to Andrew O'Hagan.
8       Q.   Was that the extent of your conversation
9   with -- about this issue that you just said -- sorry,
10  strike that.  Did you follow up and ask him any details
11  about what was going on and who Satoshi was?
12      A.   Ask who?
13      Q.   I guess Robert MacGregor.
14      A.   At this point I was already in discussions
15  with Mr. MacGregor about possibly working with nChain
16  but at this time I knew that he thought this was going
17  to be obviously a significant public interest in that he
18  was acquiring through one of the companies the life
19  story rights of Craig about Satoshi Nakamoto and he
20  thought it was going to be a great book.
21      Q.   And you wrote -- in your e-mail you wrote he
22  had already acquired at this point.  Is that what you
23  understood?
24      A.   That's what I was told.
25      Q.   You had no other insight into the plan other

Page 53

1   than this?
2       A.   I don't understand what you mean by the plan.
3       Q.   The plan to come out and reveal the true
4   person behind the pseudonym Satoshi Nakamoto?
5       A.   I am not sure if I had any understanding when
6   I sent that e-mail to Mr. O'Hagan's literary agent.
7       Q.   Do you know what date you sent that e-mail to
8   him?
9       A.   I don't remember.
10      Q.   Throughout the documents you produced you make
11  references to something called Project Satoshi?
12      A.   Yes.
13      Q.   Can you tell me what that is?
14      A.   It's just a name I think I gave to a project
15  that I was asked to work on.
16          MR. FREEDMAN:  Just as a housekeeping matter
17      before we continue this line of questioning I want
18      to make sure we marked for the record The Satoshi
19      Affair as Exhibit 5.
20          (Plaintiff's Exhibit No. 5 was
21          marked for identification.)
22  BY MR. FREEDMAN
23      Q.   So getting back what was the project that you
24  were asked to work on that you named the Satoshi --
25      A.   In short it was to help with the process to --

Page 54

1  how do I describe it?  It changed over time.  That's why
2  I'm trying to figure out how to describe it.  Ultimately
3  what it became is to help guide the efforts to
4  commercialize and monetize intellectual property that
5  was going to be created at nChain.
6      Q.   So did that project post date the failed
7  reveal in 2016?
8      A.   I started talking about it before but it did
9  not happen until afterwards.
10     Q.   Besides the e-mail to --
11     A.   Correct.  At the time I was not really part of
12 the project team.  It was something I got asked to do,
13 you know, while I was a lawyer.
14     Q.   Why do you think they asked you to do that if
15 it's not exactly legal advice to contact a literary
16 agent?
17     A.   Because I have a lot of connections and both
18 client and business relationships in the entertainment
19 media world in the United States.
20          (Plaintiff's Exhibit No. 6 was
21          marked for identification.)
22 BY MR. FREEDMAN
23     Q.   Got it.  And then let's introduce I think
24 we're on Exhibit 6 now which is Nguyen 229 and it
25 appears to me to be an e-mail from you to Robert

Page 55

1  MacGregor on -- let me take that back.  It appears to be
2  an e-mail chain between you and Robert MacGregor
3  starting on May 1st you responding on May 2 and him
4  respond -- you responding again on May 5th.  Is that
5  consistent with your observations?
6      A.   Yes, that's what it says.
7      Q.   Do you recall this e-mail?
8      A.   Yes.
9      Q.   Did you send this e-mail?
10     A.   I sent two of the e-mails on this chain.
11     Q.   Did you receive the first one on the bottom?
12     A.   Yes.
13     Q.   So Robert MacGregor tells you that the embargo
14 will lift and the news will break in 50 minutes.  Then
15 the next day you say "I see the online articles.  How
16 has reaction been in your world."  At this point did you
17 know there was a failure?
18     A.   A failure of what?
19     Q.   At this point had it blown up essentially that
20 Craig had not actually produced valid proof?
21     A.   I don't think that happened by May 2nd.  I
22 don't remember if it was -- it was certainly by May 5th
23 when I sent the top e-mail.  I don't remember what date
24 it was between the May 1st and May 5th sequence.
25     Q.   Got it.  And I don't have a response from

Page 56

1  Robert MacGregor to this e-mail.  Did he call you in
2  response to your e-mail?
3      A.   (Indicating).
4      Q.   No, he did not?
5      A.   No.
6      Q.   So you just never got a response to that?
7      A.   No.
8      Q.   Were you not -- I mean you then proceeded to
9  engage in Project Satoshi which was premised on this IP
10 that partly was Craig and -- it seems odd you wouldn't
11 inquire about what happened?
12     A.   I did not hear from Rob for a long time after
13 this.  Eventually I think I reached out to his
14 assistant.
15     Q.   When that happened and you got back in touch
16 with Rob did you discuss this?
17     A.   Discuss what?
18     Q.   This failure and this debacle of May of 2016?
19     A.   I wouldn't call it a debacle but we did
20 discuss or -- I had not heard from him after Craig did
21 not provide the cryptographic proof that the Bitcoin
22 community would like to see.  So we did eventually
23 discuss it.
24     Q.   What did he say?
25     A.   He said it's a really long story so I didn't

Page 57

1  get the whole story.  He said, you know, Craig didn't
2  sign using a private key that the Bitcoin world would
3  accept as from a Satoshi block and he was very angry and
4  very upset.
5      Q.   Did he say why?
6      A.   Rob?
7      Q.   Yes.
8      A.   That's what we expected Craig to do.
9      Q.   That was a bad question.  Did he say why Craig
10 didn't sign using a private key the Satoshi blocks?
11     A.   No.
12     Q.   You were a partner at a top law firm in the
13 country; right at Davis, Wright & Tremaine?
14     A.   Yes.
15     Q.   And you left that position to work on the
16 Satoshi Project and further nChain, right?
17     A.   Yes.
18     Q.   Don't you think the responsible thing would
19 have been to kind of dig into that a little bit more
20 before you gave up something so great for this new
21 venture you were betting on?
22     A.   Not necessarily.  I had been wanting to leave
23 law for many years before this.
24     Q.   So you -- it's your testimony today that you
25 did not push for what happened and why there was a

Page 58

1  failure?
2       A.   Well, I asked questions but I don't think even
3  Rob could even tell me why Craig didn't do it.
4       Q.   Did you ever Craig why he didn't do it?
5       A.   No.
6       Q.   Did you ever ask -- have you ever asked Craig
7  to give you a private proof session?
8       A.   Sorry, you cut off.
9       Q.   Have you ever -- can you hear me now?
10      A.   Yes.
11      Q.   Have you ever asked Craig to give you a
12  private proof session?
13      A.   No.
14      Q.   Why not?
15      A.   Because I knew he would if I asked him to and
16  I made a decision including before I decided to sign on
17  to nChain and leave my law practice that I wasn't doing
18  it based upon Craig having to be Satoshi Nakamoto.  That
19  I wasn't -- that that was certainly relevant to
20  everything, right, but since there's all this
21  controversy over whether he is or he isn't and how could
22  it be proven, you know, either way I had to make a
23  decision am I going to join this opportunity based upon
24  that and could be left disappointed if it turned out not
25  to be true so decided for myself while it certainly is

Page 59

1  relevant that the technology that can be built and his
2  vision for it is powerful and that I needed to focus on
3  that because otherwise you can drive yourself crazy with
4  is he or isn't he Satoshi and it's also what I said
5  publicly not what I asked.  So I did ask questions about
6  it but I didn't make my decision to join nChain based
7  upon it.
8       Q.   How do you know he would show it to you if you
9  asked him to?
10      A.   I've had this discussion with Steve Shadders,
11  the chief technology officer at nChain, and Steve has
12  said to me we're pretty confident Craig would do it if
13  we asked because, you know, Craig doesn't trust very
14  many people so we work together a lot.  I have never
15  asked him the question flat out so I don't know
16  100 percent he would say yes but I think he would.
17      Q.   How would he have access to the private keys
18  if they are -- let me take a step back.  Are you aware
19  that Craig has claimed the properties are locked in a
20  trust?
21           MR. RIVERO:  Sorry, you cut out and I could
22      not hear that question.
23  BY MR. FREEDMAN
24      Q.   Are you aware that Craig has claimed the
25  private keys to his Bitcoin are locked in a trust that

Page 60

1  he cannot access?
2           MR. RIVERO:  Object to the form.
3           THE WITNESS:  I'm aware that he's claimed -- I
4      can't -- I am aware that in this case he's claimed
5      that he cannot access private keys to certain
6      Bitcoin and so yes, I'm aware of that.
7  BY MR. FREEDMAN
8       Q.   And how then would he demonstrate a proof for
9  you if you asked him to?
10      A.   Well --
11           MR. RIVERO:  Object to the form.  Go ahead.
12      Sorry, Mr. Nguyen.
13           THE WITNESS:  Probably why I've never asked
14      him.
15  BY MR. FREEDMAN
16      Q.   Has Craig ever explained the trust to you?
17      A.   Only in the context of this litigation.
18      Q.   What has he said?
19           MR. SILVERGLATE:  Wait a second.  If it's in
20      the context of the litigation then it's privileged.
21           MR. FREEDMAN:  Mr. Nguyen testified he has not
22      acted as a lawyer since late 2018 or 2017 I think
23      it is.  I don't have the date.
24           MR. SILVERGLATE:  Well --
25           MR. RIVERO:  I'll join the objection and the

Page 61

1  instruction.
2           MR. FREEDMAN:  Actually I will actually say
3      that in this deposition Mr. Nguyen testified that
4      he is not a lawyer for Craig Wright.
5           MR. SILVERGLATE:  Right.  I'm not suggesting
6      that he is a lawyer for Craig Wright.  What I am
7      saying is that Mr. Nguyen has a joint interest
8      agreement with Craig Wright and he has also served
9      as Craig Wright's liaison to his counsel in the
10      litigation.
11           So he's part of the litigation team even
12      though he is not serving as a lawyer but a liaison.
13      So the conversation that you're inquiring about is
14      privileged both under the joint interest privilege
15      and under the attorney-client privilege.
16           MR. FREEDMAN:  What is the joint interest that
17      you're protecting?
18           MR. SILVERGLATE:  They both have a community
19      of interest and they have a signed agreement.
20           MR. FREEDMAN:  A signed agreement can't extend
21      the privilege, it just memorializes an existing
22      privilege under existing law.  I just want to -- I
23      understand you're instructing him not to answer and
24      I can't do anything about that but I need a record
25      of it so we can challenge it eventually.  What is

Page 62

1  the joint interest that you are memorializing with
2  the joint common interest privilege?
3         MR. SILVERGLATE:  Well, I believe you're
4  misstating what my objection was.  So first of all,
5  I'm asserting two privileges.  One is
6  attorney-client privilege because Mr. Nguyen is on
7  the team.  He is on the defense team, Mr. Wright's
8  defense team, okay and because of that there is
9  also a community of interest which implicates the
10 joint interest agreement and joint interest
11 privilege.
12        MR. FREEDMAN:  What is Mr. Nguyen's capacity
13 on the -- I'll direct this to Mr. Nguyen and
14 obviously you can instruct him not to answer so I
15 don't need to tell you Mr. Nguyen take a second to
16 allow your lawyer to give an instruction team.
17 What is your capacity on the defense team?
18        MR. SILVERGLATE:  You can answer that, Jimmy.
19        THE WITNESS:  When the lawsuit first got filed
20 Craig asked me to assist him in both finding
21 counsel and helping to communicate with counsel
22 regarding his defense.
23        MR. RIVERO:  And I haven't interrupted the
24 question but Mr. Nguyen, obviously you have a
25 lawyer but I just ask you to be careful since there

Page 63

1         are dates where you were counsel to nChain, dates
2         where there was this common interest.
3              Please refrain from testifying about anything
4         that would invade those privileges and I'll just
5         join as necessary, stay out of it.
6  BY MR. FREEDMAN
7         Q.   So you are not a lawyer on the defense team,
8  you are not providing legal advice; is that correct?
9         A.   Correct.  Basically how I would describe it is
10 I am his liaison with his lawyers because to help with
11 communication Craig is a difficult communicator on what
12 are complex topics here and he felt that he asked me to
13 do this because to help him because of the need to
14 communicate with his lawyers especially about dealing
15 with complex issues in this case.
16        MR. FREEDMAN:  Okay, so as I understand this
17 is directed to the lawyers you're asserting --
18 Mr. Rivero, you're asserting Craig's
19 attorney-client privilege through you because
20 Mr. Nguyen is the go between between you and the
21 client, is that an accurate assertion of your
22 privilege?
23        MR. RIVERO:  Can I hear the last question read
24 back?  Sorry, the last question where these
25 objections were actually posed?  It was probably a

Page 64

1  couple questions ago.
2         (Thereupon, a portion of the record
3         was read back by the reporter.)
4         MR. RIVERO:  I am asserting on behalf of Craig
5  Wright his common interest privilege with
6  Mr. Nguyen.
7         MR. FREEDMAN:  What is the common interest
8  that's seeking to be protected?
9         MR. RIVERO:  I've now answered your question.
10 Please ask your next question.  Let's move on.
11        MR. FREEDMAN:  You're not answering what is
12 the common interest question for the record?
13        MR. RIVERO:  Sir, I've made an instruction.
14 Your -- my role is to state an objection or
15 instruction.  I think your role is to ask the next
16 question.  I think that's what you should do next.
17        MR. FREEDMAN:  You are declining to answer my
18 question, Mr. Rivero?
19        MR. RIVERO:  Sir, if you want to have a good
20 faith conference about this, sir, I've already told
21 you you can speak to me and I'll be glad to discuss
22 it.  We don't have to do it on the record, you know
23 that.  We already discussed this week so please
24 move on to your next question.
25        MR. FREEDMAN:  Mr. Rivero, respectfully your

Page 65

1  client's breaches of protective orders or maybe at
2  this point alleged or perceived breaches of
3  protective order don't relate to this particular
4  instance here.
5         Mr. Rivero, you need to let me finish my
6  statement and then I'll give you an opportunity to
7  respond.
8         MR. RIVERO:  I didn't know you weren't
9  finished.  Go ahead.
10        MR. FREEDMAN:  I am simply trying to make a
11 record here so when we go back to the Court here we
12 have a clear record of what your position is and I
13 know what's happening.  So I'm only asking what is
14 the joint interest you're seeking to protect?
15        MR. RIVERO:  Mr. Freedman, it does not work
16 like that.  We make objections and instructions.
17 We don't litigate the objections or instructions.
18 Go ahead and ask your next question.  If you want
19 to discuss this after this deposition is over I'll
20 be glad to.  That's a good faith conference, sir.
21        At that time you'll identify to me what your
22 theory is why you get this answer.  Then I'll
23 respond to you in a good faith conference.  That's
24 how it works.  Go ahead, continue with your
25 deposition.

Page 66

```
1          MR. FREEDMAN:  We'll agree to disagree on how
2     it works.  Mr. Silverglate, are you also asserting
3     a privilege to prevent the answer to this question
4     or is it identical to the privilege that's been
5     asserted by Mr. Rivero?
6          MR. SILVERGLATE:  I think I've already voiced
7     my objection.  It's we've raised two objections,
8     attorney-client privilege and joint interest
9     agreement and we're making both of those
10    objections.  I'm making them on behalf of this
11    witness, Mr. Nguyen.
12         MR. FREEDMAN:  Okay, whose attorney-client
13    privilege are you invoking?
14         MR. SILVERGLATE:  For this particular question
15    we're invoking Mr. Wright's attorney-client
16    privilege because Mr. Nguyen is on his defense
17    team.
18 BY MR. FREEDMAN
19    Q.   Okay.  Mr. Nguyen, when did you start in your
20 role as a liaison?
21    A.   When the lawsuit got filed.
22    Q.   Are you still in a role as a liaison?
23    A.   Yes.
24    Q.   Is there an agreement memorializing your
25 liaison, a written agreement memorializing this liaison
```

Page 67

```
1  agreement?
2     A.   No, there is not a written agreement.  There
3  is an e-mail.
4
5
6
7
8
9
10
11
12
13
14
15
16
17 BY MR. FREEDMAN
18    Q.   I'm going to share with you, Mr. Nguyen, a
19 document that you have shared with us pursuant to the
20 subpoena.  I'm going to go to the top of this agreement
21 so you can see it's Schedule A.  Why don't we go to the
22 top of the actual agreement itself and then we can look
23 at all of it.  It looks like it starts at approximately
24 Nguyen 1586.  Do you recognize this Contracted Services
25 Agreement?
```

Page 68

```
1     A.   Yes.
2     Q.   That's your signature at the bottom?
3     A.   Yes.
4     Q.   Mr. Matthew's signature at the bottom?
5     A.   Yes.
6     Q.   This is the actual Contracted Services
7  Agreement and its terms.  Do you recognize this?
8     A.   Yes.
9     Q.   I'm going to scroll down.  At any point you
10 want me to stop let me know.  This is Schedule A;
11 correct?  Is this the Schedule A of that agreement,
12 Mr. Nguyen?
13    A.   Yes.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 69

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20    Q.   Did you tell me when this agreement
21 terminated?
22    A.   I can't remember exact time.
23    Q.   The agreement continues until Nguyen 1597;
24 correct?
25    A.   Correct.
```



Page 70

1    Q.   Mr. Nguyen, do you act as a liaison for anyone
2  else between them and their lawyers besides Craig
3  Wright?
4    A.   No.
5    Q.   Has your liaison role in this litigation been
6  continuous?
7    A.   Yes.
8    Q.   Were you acting as a liaison then to Rivero,
9  Mestre while we were attempting to serve process on you?
10         MR. SILVERGLATE:  Object to the form.
11         MR. RIVERO:  Join.
12         THE WITNESS:  I was acting as a liaison to
13  Craig.
14  BY MR. FREEDMAN
15    Q.   Between him and Rivero, Mestre?
16    A.   Yes.
17    Q.   Has Rivero, Mestre hired you or has Craig
18  engaged you in this task?
19         MR. RIVERO:  Object to the form.
20         THE WITNESS:  Craig.
21  BY MR. FREEDMAN
22    Q.   Does he pay you for this?
23    A.   No.
24    Q.   Can you walk me through without talking about
25  I'm sure your lawyers will make sure so just make a beat

Page 71

1  again but I think this is a permissible question.  Can
2  you walk me through not the substance but the mechanics
3  of how the liaisoning goes between you and Craig and his
4  lawyers?
5         MR. SILVERGLATE:  Obviously I'll object if
6      it -- if you're asking for specific communications.
7         MR. RIVERO:  Mr. Nguyen, I know you know this
8      but there are occasions where the procedure could
9      reveal confidences so answer to the extent you can
10      without revealing confidences.
11         THE WITNESS:  So just procedurally it began
12      with me being the person to help find Craig counsel
13      to represent him.  So I am the one that sought out
14      law firm options and helped Craig choose the
15      Rivero, Mestre firm which represents Craig, not me.
16      And then after that I was involved in
17      communications to -- between Craig and his lawyers
18      about subject matter in the case, helping
19      understand things and helping understand Craig I
20      guess most importantly because he is a difficult
21      communicator.
22  BY MR. FREEDMAN
23    Q.   So is the procedure Craig calls you and you
24  call Rivero, Mestre or is it procedure you all get on a
25  call together or how does it work?

Page 72

1         MR. SILVERGLATE:  Hang on.  Andres, do you
2      feel like that implicates your strategy, your
3      defense strategy?
4         MR. RIVERO:  From my perspective I would allow
5      that question but Mr. Nguyen, you're on thin ice of
6      the whole situation but you can answer the
7      question.
8         THE WITNESS:  I would say it varied.  There
9      were times where sometimes Craig asked me to deal
10      with his lawyers about a particular topic.
11      Sometimes they asked me to interface with Craig on
12      a topic.  Sometimes it was all joint.
13  BY MR. FREEDMAN
14    Q.   Are these via e-mail?  So are there e-mail
15  communications from you to Craig and then without his
16  lawyers -- let's start there.  Are there e-mail
17  communications about litigation from you to Craig that
18  his lawyers are not on?
19    A.   I don't remember.
20    Q.   Are there e-mail communications between you
21  and Rivero, Mestre that Craig is not on?
22    A.   I think so.
23    Q.   Sorry?
24    A.   I think so.
25    Q.   Are there e-mails from Rivero, Mestre to Craig

Page 73

1  and from Craig to Rivero, Mestre that you are on as
2  well?
3    A.   I have been on joint e-mails among them.  That
4  was the most common.
5    Q.   Do you have a stake in this litigation
6  Mr. Nguyen?
7    A.   No.
8    Q.   Can you be adversely affected by the outcome
9  of this litigation?
10    A.   I don't think so, no.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



**Page 74**

[Lines 1–24 redacted]

25   Q.   Okay.  So is there a document that formally

---

**Page 75**

1   terminates this agreement?
2       A.   I'm not sure.
3       Q.   Do you have any time -- do you have any
4   document that terminates this agreement formally?
5       A.   Not that one.  I think as I said I think there
6   was an updated one.
7       Q.   I want to -- sorry, going to jump you back to
8   the liaison role.  I want to understand the bookends.  I
9   know the current bookend is in effect meaning you're
10  still acting in that role.  I want to go back what is
11  the date that role started?
12      A.   I don't remember the exact date.  It was after
13  Craig got -- after the lawsuit was filed.  I don't
14  remember if it was before or after he got served with
15  the lawsuit.
16      Q.   It's been -- I guess the first time -- would
17  it be fair the first time Craig reached out to you about
18  the lawsuit you immediately started in that liaison
19  role?
20      A.   Yes.
21      Q.   It was sometime around the filing of the
22  lawsuit?
23      A.   Correct.
24      Q.   Do you maintain any equity at all in nChain?
25      A.   No.

---

**Page 76**

1       Q.   Do you have any financial interest that is in
2   any way connected to nChain?
3       A.   No.
4       Q.   Do you have any financial interest in Pi-High
5   Tech and PE Fund?
6       A.   No.
7       Q.   Who is Arthur Davis?
8       A.   Arthur Davis is a firm called Nuovo Capital
9   and he was brought on to help with the transaction.
10      Q.   What does Nuovo Capital do?
11      A.   I'm not certain.  Similar services from that
12  transaction they acted as financial advisor.
13      Q.   Does Nuovo Capital still maintain an active
14  interest in nChain companies, in the nChain companies?
15      A.   I don't know what you mean by active interest.
16  They don't do any work for nChain companies that I know
17  about.
18      Q.   Do they have any equity in nChain?
19      A.   Not that I know of.
20      Q.   Do they have any equity in Hi-tech Private
21  Equity Fund?
22      A.   Not that I know of.
23      Q.   Do you know whether Calvin Ayre has invested
24  in Hi-Tech Private Equity Fund?
25      A.   Not that I know of.

---

**Page 77**

1           (Plaintiff's Exhibit No. 8 was
2           marked for identification.)
3   BY MR. FREEDMAN:
4       Q.   Mr. Nguyen, you produced a document to us I am
5   going to share it on the screen with you.  It is Nguyen
6   4 and I think we're on Exhibit 8 and in this e-mail
7   Arthur Davis is e-mailing you and Stefan Matthews on
8   February 14th 2017 at 5:33 p.m.; correct?
9       A.   That's what it says.
10      Q.   Then he opens the e-mail saying "Stefan, you
11  and are completely agreement to focus 100 percent of
12  closing the transaction."  Is this transaction the
13  acquisition of nChain's companies by Hi-Tech Private
14  Equity Fund?
15      A.   I assume that's what he was referring to.
16      Q.   Mr. Nguyen, did you review all the documents
17  you produced to us before they were produced?
18      A.   Yes.  I tried to.  I tried to review them,
19  yes.
20      Q.   They were collected from your computers?
21      A.   Correct.
22      Q.   They are accurate records of what was located
23  on your computers?
24      A.   Yes.
25      Q.   Who is Marco Bianchi?

Page 78

```
1      A.   Marco it's Bianchi I think is how the name is
2   pronounced.
3      Q.   Thank you.
4      A.   He is principal at a firm called Stairway
5   Global some other words.  Just call it Stairway Global.
6      Q.   What was his involvement with the -- what was
7   his involvement with this transaction?
8      A.   Marco is a director of some of the nChain
9   companies.
10     Q.   Do you know why?
11     A.   No, I don't.  He was before I got involved.
12     Q.   Do you know what his role was with any of the
13  nChain companies?
14     A.   Like I said he is director of some of the
15  companies so he is one of the directors that I would
16  report to.
17     Q.   Does Craig Wright have any equity in nChain?
18     A.   Not that I know of.
19     Q.   Does Ramona Watts have any equity in nChain?
20     A.   I can tell you what I know as of the time I
21  was CEO and the answer to both of those questions is no.
22     Q.   Did they ever have equity in any nChain
23  companies?
24     A.   Not that I know of.
25     Q.   What about Hi-Tech Private Equity Fund?
```

Page 79

```
1      A.   No.
2      Q.   What about the Workshop Holdings?
3      A.   Not that I know of.
4      Q.   What about Nuovo Capital?
5      A.   I don't know anything about the ownership
6   structure of Nuovo Capital.
7      Q.   Are you familiar with the company called
8   Squire Mining?
9      A.   Yes.
10
11
12
13
14
15
16
17     Q.   Are you on the -- I apologize.  Hold on, give
18  me one second.  Nevermind.  Are you -- do you have a
19  position in Squire Mining?
20     A.   I was one of its advisory board members until
21  last month.
22     Q.   Was that a paid position?
23     A.   I have to look at the stock option.
24     Q.   Why did you step away from the advisory board?
25     A.   I stepped away because my new role as Bitcoin
```

Page 80

```
1   Association president I'm responsible for, you know,
2   being a leader in the building of the whole business
3   ecosystem for Bitcoin SV around the world.  There were
4   concerns about whether in that role I would be perceived
5   to have conflicts of interest if I also had roles with
6   other key companies in the Bitcoin SV space and so I
7   resigned from that advisory board position as well as
8   some others.
9      Q.   Does Calvin Ayre own any interest in TAAL?
10     A.   He is a shareholder.
11     Q.   Do you know what percent his shareholding is?
12     A.   I don't know.
13     Q.   Does Craig Wright have any equity interest in
14  TAAL?
15     A.   I do not know that.
16     Q.   As the president of the Bitcoin Association --
17  sorry, you are the president of the Bitcoin Association?
18     A.   Yes.
19     Q.   Is that position paid?
20     A.   Yes.
21
22
23
24
25
```

Page 81

```
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23     Q.   Do you currently have any other jobs or is
24  that your full time position?
25     A.   This is it.  Full time.  More than a full time
```



Page 82

1  job.
2      Q.   Is there a difference between the Bitcoin
3  Association and the B Com Association?
4      A.   It's the same thing.  We rebranded the name B
5  Com to Bitcoin Association.
6      Q.   Do you know what Calais Holdings is?
7      A.   No.
8      Q.   Have you ever heard of Calais Holdings?
9      A.   Don't think so.
10     Q.   Have you ever heard of the Sterling Group?
11     A.   I've heard of Sterling.  I don't know that
12 I've ever heard it referred to as Sterling Group.
13     Q.   What is Sterling?
14     A.   I'm not sure.
15     Q.   Do you know anything about it other than that
16 you've heard of it?
17     A.   I've heard of it.  I've seen it somewhere.  I
18 don't know.  About it.
19     Q.   Before you left nChain as CEO was it making
20 any revenue?
21     A.   Very little.
22     Q.   About how much?
23     A.   I don't recall.  I only know of -- I think it
24 had received about 500,000 I don't know if it was
25 British pounds in revenue from a source before you left.

Page 83

1      Q.   That was for licensing of technology?
2      A.   It was for under an agreement to help another
3  company build a more secure Bitcoin wallet.
4      Q.   Could you explain to me what nChain's purpose
5  was?
6      A.   Not sure I know how to answer that question.
7      Q.   Like every company has like a goal or mission
8  statement.  What was nChain's?
9      A.   At what point in time?
10     Q.   Why don't you start from when you joined until
11 you left if it ever changed let me know.
12     A.   That's a difficult question to answer because
13 when I first joined nChain I think the mission was not
14 that clear.  That was part of my task trying to help
15 bring clarity to it.  When I joined nChain it was set up
16 to research and development work, build an IP program,
17 to basically based upon Bitcoin block chain technology.
18 What to do with that next became less clear.  I would
19 say today from what I understand of nChain that it's
20 more clearly focused on enterprise level solutions and
21 services that want to provide the enterprises to build
22 block chain technology innovations and particular now
23 focus on Bitcoin SV chain as the scalable big block
24 Bitcoin which did not exist when I first joined nChain.
25          There was no split of the Bitcoin chain over

Page 84

1  time.  That's why the purpose of nChain has evolved over
2  time given what's in the Bitcoin network.
3      Q.   So would it be fair to say when you were first
4  brought on board nChain it was sitting on this massive
5  pot of intellectual property it had a required from the
6  DeMorgan Group and you were tasked with essentially
7  commercializing that asset?
8      A.   I would not describe it that way.
9      Q.   How would you describe it?
10     A.   First I would not say that nChain was sitting
11 on this pot of IP from the DeMorgan Group that could be
12 monetized.
13     Q.   Well, had -- why don't we break that down into
14 it parts.  Had nChain acquired -- when you were brought
15 on board did you believe that nChain had been
16 acquired -- sorry, let me restart that question.  Strike
17 that.
18          When you were brought on board to nChain did
19 you understand and believe that nChain had acquired
20 significant intellectual property assets from the
21 DeMorgan Group?
22     A.   I would say I knew they acquired assets from
23 the DeMorgan Group.  I could not say they were
24 significant IP assets.
25     Q.   So then your task was to review those

Page 85

1  intellectual property assets and determine how to
2  commercialize them?
3      A.   No.
4      Q.   What was your task?
5      A.   My task was to get involved with the new IP
6  program that nChain was developing and figuring out how
7  to commercial those new IP assets in the nChain
8  agreement.
9      Q.   So then you had absolutely nothing to do with
10 intellectual property that was acquired from the
11 DeMorgan Group?
12     A.   I just answered no.  I don't know what you
13 mean by nothing to do with intellectual property
14 acquired from the DeMorgan Group.
15     Q.   Well, if nChain -- is it your testimony that
16 nChain did not develop any intellectual that it obtained
17 from the DeMorgan Group?
18     A.   I can't answer that question because I never
19 reviewed in detail the assets that were acquired from
20 DeMorgan.
21     Q.   Do you know how much money Rob MacGregor paid
22 to purchase those assets from the DeMorgan Group?
23     A.   No.
24     Q.   Did you ever get the intellectual property
25 from -- that was purchased from The DeMorgan Group

Page 86

1  valuated or appraised?
2      A.   From the DeMorgan Group?
3      Q.   "Uh-uh."  So you never got an evaluation of
4  intellectual property assets nChain had acquired from
5  The DeMorgan Group?
6      A.   I was not involved in The DeMorgan Group
7  transaction.  So I was not involved.
8      Q.   I'm not talking about the time of the
9  transaction.  I'm saying at some point in time you
10  became the CEO of nChain and even before that you were
11  tasked with commercializing nChain's IP and I am trying
12  to figure out whether or not you have ever and I think I
13  know the answer to this because I think I've seen copies
14  of it whether you had ever obtained or reviewed an
15  appraisal of the intellectual property that resulted
16  from -- that was obtained from The DeMorgan Group?
17      A.   So the way you phrased the question.  So I
18  have never tried to get a valuation or analysis of the
19  IP -- the value of the IP assets from the DeMorgan Group
20  of companies.  I have been involved with looking at
21  valuation of nChain's IP assets which were newly created
22  after the DeMorgan transaction.
23      Q.   Did the assets that you had evaluated at
24  nChain include assets that had been received from the
25  DeMorgan Group?

Page 87

1      A.   I'll tell you what was valuated was looking at
2  the patent program that was being developed at nChain
3  which did not start until after the DeMorgan Group
4  transaction.
5      Q.   Were any of the patents that were in the
6  patent portfolio of nChain focused on intellectual
7  property obtained from the DeMorgan Group?
8      A.   I don't know.
9      Q.   Never looked at that as CEO of the company and
10  former IP lawyer?
11      A.   First of all, the patent program was started
12  before I got to nChain and was going.  That's just a
13  difficult question to answer anyway.
14      Q.   Why?
15      A.   Well, you have to look at each individual
16  patent application and go back and compare it to
17  anything the DeMorgan Group had done to be able to
18  answer that question.
19      Q.   You never conducted that analysis?
20      A.   No.
21      Q.   Are you aware of whether or not lawyers have
22  opined on whether -- where certain intellectual
23  property -- strike that.  Are you aware of whether
24  lawyers have opined on whether or not certain IP or
25  intellectual property currently owned by nChain was

Page 88

1  sourced from DeMorgan?
2      A.   I don't know that one can answer that without
3  getting into questions.  Not even about this litigation,
4  about -- I can't remember if it violates the legal
5  advice I ever gave in my role.



Page 89

23      Q.   When did you first meet Craig Wright?
24      A.   Not sure of the year.  Probably around 2007.
25      Q.   I said Craig Wright.

Page 90

```
1     A.   Oh, sorry, I thought you said Rob MacGregor.
2  When did I first meet Craig Wright, 2016.
3     Q.   Do you remember when in 2016?
4     A.   I believe it was in September.
5     Q.   Do you remember the circumstances of that
6  meeting?
7     A.   Yes.  After I -- it was clear I don't know if
8  I had signed the contract yet but after it was clear I
9  was going to start working with nChain I went to London
10 for some meetings and Stefan introduced me to Craig.
11    Q.   Do you remember what you talked about in that
12 initial conversation with Craig?
13    A.   We had dinner and I don't have any memory of
14 what we talked about other than trying to get to know
15 each other.
16    Q.   Did Craig ever mention Satoshi Nakamoto to
17 you?
18    A.   I guess I don't know how to answer that.  Had
19 he ever used that phrase Satoshi Nakamoto with me?
20    Q.   I'm trying to figure out.  Let me take a step
21 back.  You were aware before meeting him he claimed to
22 be Satoshi Nakamoto?
23    A.   Yes.
24    Q.   Who told you initially that they believed he
25 was Satoshi Nakamoto?
```

Page 91

```
1     A.   Rob MacGregor.
2     Q.   When was that?
3     A.   The year before this so sometime in the summer
4  of 2015.
5     Q.   Did you ask Rob MacGregor how he knew that,
6  why he knew that, what his proof was?
7     A.   I didn't ask him all those questions.  We had
8  a conversation about it.
9     Q.   What did he say?
10    A.   He said I think I found Satoshi Nakamoto.
11    Q.   You knew who that was at the time?
12    A.   The name didn't immediately trigger my memory.
13 I had seen the name in the past about Bitcoin but my
14 first response was who.  He said you know, the creator
15 of Bitcoin.  I said oh, yes, that's right.
16    Q.   And then in September of 2016 you come to
17 meet -- let me take a step back.  Going to meet Craig in
18 September 2016 did you have an opinion one way or
19 another whether he was or was not Satoshi Nakamoto?
20    A.   No.
21    Q.   So you come to meet the individual who is
22 claiming to be Satoshi Nakamoto who your long time
23 client thought was Satoshi and trying to figure out
24 whether -- so you're Satoshi Nakamoto how did that work?
25    A.   Not in that first time I met him.
```

Page 92

```
1     Q.   Do you remember the first time you had a
2  discussion with Craig about him -- his Satoshiness?
3     A.   It wasn't for a long time after that.
4     Q.   Do you remember the context of that setting?
5     A.   No, I don't.  I mean it's obviously a topic
6  that comes up a lot in my world with lots of people so I
7  don't remember the first time I spoke with Craig about
8  it.
9     Q.   I would imagine something you kind of needed
10 to know about because you were taking a leading role in
11 nChain or like it or not it was a big feature of nChain;
12 right?
13    A.   The answer to that is I needed to know about
14 it but I didn't need to know for myself as I explained
15 earlier.  I made a decision personally that I would be
16 willing to do this opportunity whether it was true or
17 not.
18    Q.   When you eventually got on to the topic of
19 Craig being Satoshi Nakamoto what did he say?
20    A.   I'm trying to remember how the first time I
21 even talked to him about it.
22    Q.   I mean would say tell me the story, did you
23 never say tell me your story?
24    A.   I know you might think I would but you know
25 it's a sensitive topic.  Obviously specially after that
```

Page 93

```
1  year with the potential reveal and I at the time thought
2  you know what, I'm not going to ask about it now.
3     Q.   That's fair.  So when eventually he got to
4  know you well enough and you got to know him well enough
5  when it came up what did he say?
6     A.   Not really how it happened.  It's not like one
7  day I asked tell me whether you're Satoshi or not.  It
8  was part of casual conversations and communications we
9  had at the company about him being Satoshi.
10    Q.   Tell me what you remember him telling you.
11 Like tell me the narrative he told you.
12    A.   I don't think I -- he's told me a number of
13 times he is Satoshi Nakamoto, the creator of Bitcoin.  I
14 don't think he ever -- he told me any details about the
15 story until gosh it might have been in maybe in 2018 we
16 did like an interview at one of the Coin Geek
17 conferences, G-E-E-K, conferences where he was going to
18 talk about it for the first time publicly with me and I
19 think that's the first time I went into any detail with
20 him about the story.
21    Q.   What did he tell you in that preparation
22 session?
23    A.   It wasn't a preparation session.
24    Q.   So you took -- let me ask it.  Did you not
25 prepare for that interview?
```

Page 94

1    A.   I came up with some sample questions and sent
2  them to him.  We did not -- I sent him a list of sample
3  questions to make sure he was comfortable talking about
4  them but we did not meet or rehearse or go over any of
5  them beyond him saying I'm comfortable answering these
6  questions.
7    Q.   And until that Coin Geek conference you never
8  discussed him becoming Satoshi or being Satoshi?
9    A.   I can't say we never discussed it.  I just
10 don't have any memory of the conversation where we went
11 into any detail about the story of, you know, how he
12 created Bitcoin or why.  I think little bits of it would
13 come out in regular communication such as when -- it
14 became more of a work function.
15       For example, when we would talk about why does
16 nChain need support, you know, the big block position in
17 Bitcoin why is it so important that we oppose this thing
18 at this time called Segregated Witness that the Bitcoin
19 core people were going to add to Bitcoin which we
20 thought was going to change Bitcoin and not make it no
21 longer Bitcoin and be detrimental.
22       The topic of -- would come up where he would
23 say well, that would change what I created.  That's no
24 longer a Bitcoin and he might sometimes talk about
25 things he did at the beginning and why certain parts of

Page 95

1  the technical design of Bitcoin are there.  It came up
2  more in that context as -- than going through all the
3  details.
4    Q.   Did he ever talk about -- when he was talking
5  to you about the things he did at the beginning of
6  Bitcoin did he discuss specifics of what he did?
7    A.   Not really until that interview I did of him
8  at Coin Geek Toronto.
9    Q.   Prior to that Coin Geek interview in Toronto
10 did Craig ever mention Dave Kleiman?
11   A.   I think I heard the name before but I didn't
12 know that much about their relationship.
13   Q.   Did you ever ask Craig whether he was Satoshi
14 alone or whether there was a team of people involved?
15   A.   I didn't ask it that way.
16   Q.   How did you ask it?
17   A.   I think I asked him if he had help.
18   Q.   What did he answer?
19   A.   He said "I was the primary creator but some
20 people helped me."
21   Q.   Did you ask him who?
22   A.   I don't remember if I did at the time.
23   Q.   Did you ever ask him how they helped?
24   A.   I don't remember.
25   Q.   Were you involved in preparing Craig for any

Page 96

1  of the media prep sessions that led up to his 2016
2  reveal?
3    A.   No.
4    Q.   Are you aware that there were media prep
5  sessions?
6    A.   I am aware now.
7    Q.   Did you ever review any of the transcripts
8  that were taken during those media prep sessions?
9    A.   No.
10   Q.   I'll represent to you that in those
11 transcripts Craig gives a lot of credit to Dave Kleiman
12 for --
13       MR. RIVERO:  Sorry?
14 BY MR. FREEDMAN
15   Q.   A lot of credit to Dave Kleiman for helping
16 him create Bitcoin and I am surprised to hear that you
17 don't recall hearing Dave Kleiman's name prior to that
18 date although you said you recall hearing it but not
19 prominently.  So I guess my question is can you think
20 hard and recall what it was he said about Dave Kleiman
21 that causes you to remember the name?
22       MR. RIVERO:  Objection to the form.
23       THE WITNESS:  That's a hard -- I don't even
24   know how to answer that question.  I'm not sure I
25   even heard of Dave Kleiman first from Craig.

Page 97

1  BY MR. FREEDMAN
2    Q.   Did you ever hear about Dave Kleiman from
3  Craig?
4    A.   From Craig?
5    Q.   Yes.
6    A.   Yes, at different points in time, yes.
7    Q.   What did he say?
8    A.   Well, some of it I learned in the context of
9  this litigation so I'm sure my lawyer would tell me not
10 to talk about that.
11   Q.   I'm sure he will.  Why don't we hear that
12 instruction from the lawyer.
13       MR. SILVERGLATE:  You're instructed not to
14   talk about things you learned during the course of
15   the litigation that are privileged but outside of
16   that you can answer the question.
17       MR. RIVERO:  Join.
18       THE WITNESS:  Well, in sum he told me that
19   Dave was a very good friend of his.  Probably his
20   best friend.  He doesn't have a lot of close
21   friends and that Dave was one of the few people who
22   he felt close to and that he told me some of Dave's
23   life story I think at one point that he was -- that
24   Dave would tell Craig he was very ill at the end
25   before Dave died and that Craig was very hurt and

Page 98

1    sad when he found out that Dave died and that he
2    had helped him with Bitcoin.  I think he said at
3    one point he helped Craig edit the white paper of
4    Bitcoin and trying to think if there was anything
5    else.  That's the gist of it.
6    BY MR. FREEDMAN
7        Q.   Did he ever refer to Dave Kleiman as his
8    partner?
9        A.   No.  Not to me.
10       Q.   You have a very clear recollection he never
11   referred to Dave Kleiman as his partner?
12            MR. RIVERO:  Object to the form.
13            THE WITNESS:  I have never heard him use that
14       word with almost anybody.
15   BY MR. FREEDMAN
16       Q.   Did you ever ask Craig how much Bitcoin he
17   mined as Satoshi and again given your lawyer's
18   instruction that will stay outside -- obviously without
19   prejudice to my right to get this later but I understand
20   the instruction you've been given so for purposes of the
21   deposition stay outside your liaison role?
22       A.   No, I never asked the question.
23       Q.   Did he ever tell you how much he mined?
24       A.   No.
25       Q.   When you had that Coin Geek conference where

Page 99

1    you hosted an interview of Craig about him being Satoshi
2    what was that date?
3        A.   It was sometime in 2018.
4        Q.   Had the lawsuit already been filed?
5        A.   Yes.
6        Q.   So you put Craig on a public stage, asked him
7    about Dave Kleiman's participation in the Bitcoin and
8    you had absolutely no preparation sessions with him
9    about that?
10       A.   That is correct.
11       Q.   Did anybody have preparation sessions with him
12   about it?
13       A.   Not that I know of.  Not how Craig works.
14       Q.   Did you think that was advisable?
15       A.   I told him we should be aware of what he said
16   publicly.  It would be viewed by opposing counsel.
17       Q.   So there was --
18       A.   I didn't have a session with him to prepare
19   what he would say.
20       Q.   But you admonished him to be careful?
21       A.   Yes.
22       Q.   Which is --
23       A.   Not the right word.  I obviously said, you
24   know, be aware that not just in that interview, anything
25   he says publicly, right, could be reviewed and since

Page 100

1    that was a first big effort time where he sat down and
2    talked about the creation of Bitcoin, you know, I want
3    him to be extra mindful.
4        Q.   Perfectly reasonable thing to do.  Did -- what
5    did he say?
6        A.   What do you mean what did he say?
7        Q.   When you told him be careful because opposing
8    counsel can review what's being said and he just said
9    okay?  Did he comment?  Did he not respond?  What was
10   his response?
11            MR. SILVERGLATE:  Objection, it calls for a
12       privilege.
13            MR. RIVERO:  Join.
14   BY MR. FREEDMAN
15       Q.   Did Craig Wright ever tell you that Dave
16   Kleiman was not his partner?
17            MR. SILVERGLATE:  Outside the scope of the
18       privilege, Jimmy.
19            THE WITNESS:  I can't answer the question.
20   BY MR. FREEDMAN
21       Q.   Just so it's clear while obviously I want to
22   know all the answers within that scope and your lawyers
23   and I don't see eye to eye on that you've been
24   instructed not to answer so you should assume for all of
25   my questions that you are not -- unless you are

Page 101

1    instructed otherwise by your lawyer you are not to give
2    me answers for that time period, okay?  We already have
3    a record that you're not going to answer anything so
4    don't want to waste our time to ask questions that
5    you'll be instructed.
6             In the media sessions that I referenced
7    earlier there are notes from the PR company about how to
8    alter the tone of the message or tweak the message
9    that's being given to make Craig more of a central focus
10   of the Satoshi Nakamoto team or the driving force behind
11   it.  Was that concern carried over into your tenor at
12   nChain?
13       A.   I'm not familiar with the notes you're talking
14   about.  I have never seen them.
15       Q.   So then let's -- let me rephrase that
16   question.  During your time at nChain was there a
17   concern about making sure Craig spoke very prominently
18   about his contribution to being Satoshi as opposed to
19   giving credit out to anyone else?
20       A.   No.
21       Q.   Did you see that Craig had a tendency to give
22   credit to other people when he talked about Satoshi --
23   about being Satoshi?
24       A.   I saw that he would acknowledge people often.
25   From what I've seen in his public statements were fairly

Page 102

1  consistent about that.
2      Q.   Do you believe that Dave Kleiman participated
3  in Bitcoin's early days?
4      A.   I don't have any basis to answer that.
5      Q.   Do you think that a lot of people will
6  acknowledge that?
7      MR. SILVERGLATE:  Object to the form.
8      MR. RIVERO:  Objection to the form.
9      THE WITNESS:  I can't speculate on what people
10  would acknowledge.
11      (Plaintiff's Exhibit No. 9 was
12      marked for identification.)
13  BY MR. FREEDMAN
14      Q.   I am going to share with you Mr. Nguyen a news
15  article.  I think we're going to be marking now as
16  Exhibit 9.  You see that article and let me scroll to
17  the top for you.  It's an interview with you conducted
18  by Finance Magnates and it was about April 9th of 2019.
19  Do you see that?
20      A.   Yes.
21      Q.   Do you remember giving this interview?
22      A.   Like I said I give a lot of interviews.  I
23  remember this happened but I don't remember the actual
24  interview itself but I remember it happened.
25      Q.   I want to point you to this quote where the

Page 103

1  reporter -- can you read it for the record?  Can you
2  read this quote for the record?
3      A.   "And more importantly if you look at the Court
4  order even though Craig disagrees with it, the Judge
5  decided to find that Craig was in a partnership with
6  Dave Kleiman.  A lot of people, even if they are
7  detractors of Craig will acknowledge that Dave was a
8  good person who participated in Bitcoin's early days."
9      Q.   Do you remember giving that quote?
10      A.   I don't remember saying it but it it's there
11  and that's what it says.
12      Q.   Do you doubt that you said it?
13      A.   I don't have any reason to doubt it.
14      Q.   So do you think you can agree with this
15  statement that a lot of people acknowledge that Dave
16  participated in Bitcoin's early days?
17      A.   From what I hear I think what I was
18  referencing there I rely on looking at the Bitcoin block
19  chain industry and there are people who believe Dave
20  Kleiman participated in the -- helping Craig with
21  Bitcoin.
22      Q.   Again outside of your role as a liaison did
23  Craig ever tell you that he mined Bitcoin with Dave
24  Kleiman?
25      MR. RIVERO:  Objection, asked and answered.

Page 104

1      THE WITNESS:  Well, I can answer he's never
2  told me that.
3  BY MR. FREEDMAN
4      Q.   I'm not sure if you're including the time you
5  were as a liaison there but I think your lawyers will
6  let you answer the question.  I just want to be clear as
7  the timeframe you gave that answer for.
8      MR. RIVERO:  Let me just be clear from our
9  perspective Mr. Nguyen, which we already talked
10  about we're instructing you not to answer in that
11  time period at all so just be careful.  That's the
12  instruction.
13      THE WITNESS:  No, he's never told me that.
14  BY MR. FREEDMAN
15      Q.   When you gave your answer before when you were
16  limiting it to the permissible timeframe let's say?
17      A.   I guess I wasn't thinking about the timeframe.
18      MR. SILVERGLATE:  Well, we'll move to strike
19  his testimony if it was within the impermissible
20  timeframe.
21      MR. FREEDMAN:  Why don't we just get a clear
22  answer whether it was or wasn't.  Was it in the --
23  did your answer include the impermissible
24  timeframe?
25      THE WITNESS:  I didn't think about it so --

Page 105

1      MR. RIVERO:  You know what it is a negative --
2  I don't want to have an argument about this later
3  on.  So if it's a negative it's a negative.
4      THE WITNESS:  I don't recall any time.
5      MR. RIVERO:  Exactly.
6  BY MR. FREEDMAN
7      Q.   Let's stay within the timeframe that you're
8  permitted to talk about.  Did he -- did he ever tell you
9  that they did not mine Bitcoin together?
10      MR. RIVERO:  Object to the form.
11      THE WITNESS:  I think to the time period which
12  is covered by the privilege.
13  BY MR. FREEDMAN
14      Q.   No, just asking outside of that timeframe did
15  he ever tell you "I did not mine Bitcoin with Dave
16  Kleiman?"
17      A.   I don't think so.
18      Q.   Did Craig ever tell you within the permissible
19  timeframe that he was holding backup files for Dave
20  Kleiman?
21      A.   No.
22      Q.   When is the first time you heard of W&K Info
23  Defense Research?
24      A.   After this lawsuit was filed.
25      Q.   So it's safe to say Craig never mentioned W&K

Page 106

1  prior to this lawsuit?
2      A.  That's correct.
3      Q.  You don't recall ever seeing W&K in any
4  documents you reviewed prior to this document?
5      A.  I do not recall seeing it before.
6      Q.  You don't recall any documents showing
7  potential concerns over ownership of intellectual
8  property vis a vis nChain because of W&K?
9      A.  I don't recall that.
10     Q.  Has Craig ever expressed a concern to you
11 about having to pay taxes on his Bitcoin?
12     A.  He's not expressed a concern to me about that.
13     Q.  Has he ever talked to you about strategically
14 deploying his Bitcoin so as to avoid taxation?
15     A.  No.  He has not said that.
16     Q.  Has he ever expressed a desire to become
17 Antiguan before he accesses his Bitcoin in order to
18 avoid a taxable event?
19     A.  He's never said that to me.
20     Q.  Has he ever expressed any kind of tax planning
21 statement around accessing Bitcoin?
22     A.  I have heard him generally say he needed to
23 deal with paying tax on Bitcoin when his family accesses
24 it one day.  That's pretty much all I know.
25         MR. FREEDMAN:  I think this is a good place

Page 107

1  for me to stop.  We're close enough to 12:00 your
2  time that we had talked about having a lunch break.
3  So if that works.  Do we want to take like an hour
4  20 and then come back on the record?
5         MR. SILVERGLATE:  I am not sure we even need
6  that much time do you Andres or Jimmy?
7         MR. RIVERO:  No.  It may be Amanda when we
8  resume but I don't think we need an hour 20.
9         MR. SILVERGLATE:  Want to say an hour?
10        MR. FREEDMAN:  I need the hour 20.  I will --
11 if you want I think there's an e-mail chain with
12 all of us on it if we can finish up earlier but I
13 need an hour 20.
14        MR. SILVERGLATE:  Any idea when you intend to
15 complete the deposition?
16        MR. FREEDMAN:  I've got to go back through my
17 notes see how your instruction has altered the
18 timeframe.  So let me figure that out and hopefully
19 when we get back I'll have a better sense of that.
20        MR. SILVERGLATE:  Okay.  Before we break I'm
21 going to join in designating the deposition as
22 confidential.
23        MR. FREEDMAN:  Okay.  You have a copy of the
24 protective order, there's timeframes you have to
25 de-designate and that sort of thing.  Great.  So

Page 108

1  thank you all see you back in about an hour 20.
2  I'm terrible with math so 3:20 about?
3         THE VIDEOGRAPHER:  Going off the video record
4  the time is 2:50 p.m.
5         MR. SILVERGLATE:  4:20.
6         MR. FREEDMAN:  I gave the caveat I am terrible
7  at math.  I wish I wouldn't have said it on the
8  record because now I look like an idiot.  It is
9  what it is.  4:20 it is.  Thank you everyone.  See
10 you soon.
11        (Thereupon, a brief recess was taken.)
12        THE VIDEOGRAPHER:  We are back on the video
13 record.  The time is 4:26 p.m.
14 BY MR. FREEDMAN
15     Q.  Good afternoon, Mr. Nguyen, I hope your lunch
16 was nice.  That was a little broken up but I don't know
17 if it was your connection or can you try to speak one
18 more time?
19     A.  Yes, thank you.
20     Q.  I want to spend a little bit more time
21 unpacking your liaison role.  So cautionary word of
22 caution wait a minute before -- after I ask my question
23 allow Spencer and Mr. Rivero to object if they feel
24 necessary.  Is there a joint defense agreement that you
25 are a party to?

Page 109

1      A.  Yes.
2      Q.  What is the date of that joint defense
3  agreement?
4      A.  There are two.
5      Q.  Sorry, I can't hear you.
6      A.  There are two.  I'm individually a party to is
7  the signed one in April of 2020.
8      Q.  So both joint defense agreements were signed
9  in April of 2020?
10     A.  No.  There is a joint defense agreement --
11 Spencer I'm assuming I can answer the question.
12        MR. SILVERGLATE:  You can describe the other
13 joint defense agreement, Jimmy.
14        THE WITNESS:  This is the first joint defense
15 agreement is between nChain and Craig Wright.
16 BY MR. FREEDMAN
17     Q.  What is the date of that agreement?
18     A.  I don't remember the exact date.  I don't have
19 a copy of it.  It would have been executed shortly after
20 the lawsuit was filed after outside counsel was selected
21 so early on in the case in 2018.
22     Q.  And are you a party to that individually?
23     A.  That I'm not a party to individually.
24     Q.  There is a second joint defense agreement.
25 What is the date on that one?

Page 110

1    A.   I don't know it has a specific date.  It's
2    signed in April 2020.
3    Q.   That's between you personally and who?
4    A.   Between Craig Wright, nChain and me
5    personally.
6    Q.   Did an amendment of the original or is it a
7    brand new defense agreement?
8    A.   Second joint defense agreement.  Not an
9    amendment.  It's not called a joint defense agreement
10   it's called interest agreement or common interest
11   agreement.
12   Q.   So the joint defense agreement from early 2018
13   between nChain and Craig Wright what is the basis of
14   that joint defense agreement?
15   A.   I guess I'm not sure I understand the
16   question.
17   Q.   What is the joint interest that is seeking to
18   be protected?
19   A.   I don't have the agreement in front of me.  I
20   know it discusses that.  I can tell you assuming Spencer
21   is allowing me to answer the question.  Can I answer the
22   question?
23        MR. SILVERGLATE:  You can answer, yes.
24        THE WITNESS:  The general feeling at the time
25   was -- at the time I was nChain's CEO we heard the

Page 111

1    lawsuit was filed.  We knew the lawsuit was against
2    Craig personally but the lawsuit I believe reading
3    the complaint asserted claims to an interest in any
4    intellectual property.  I don't know how it was
5    phrased but from or created by Craig in connection
6    with Bitcoin.
7         We believed there was a chance that the
8    Kleiman estate which you represent would either
9    assert claims directly or indirectly against nChain
10   or any of its assets and since Craig was an
11   employee of nChain and chief scientist we felt it
12   appropriate to enter into the agreement.  NChain or
13   any of its (inaudible) implicated whether it got
14   sued directly or not.
15   BY MR. FREEDMAN
16   Q.   What is the basis or what is the common
17   interest seeking to be protected in the new April 2020
18   agreement?
19   A.   Again I don't have it in front of me so I know
20   there's a description of it in there.  I would say
21   generally the -- I guess I have to be careful not to
22   disclose privileged communications here but in general I
23   left my role with nChain in March of 2020 just last year
24   so my dealings and communications with respect to the
25   lawsuit while I was at nChain would have been covered

Page 112

1    under the first joint interest agreement between nChain
2    and Craig and now that I am not with nChain any more
3    because the knowledge I have that relates to nChain
4    lawsuit is obviously being examined in this case I
5    thought it was appropriate to enter into a second
6    agreement to add to the first one to cover going forward
7    Craig Wright, nChain and me individually.
8    Q.   What is your specific interest in this
9    litigation that aligns with nChain and Craig Wright?
10   A.   I don't have a -- Spencer, can I answer this
11   question?
12        MR. SILVERGLATE:  Well, I would say -- so I've
13        already asserted what the interest is when you
14        asked me the question and I've already explained he
15        is a liaison to Craig in the litigation.  So that's
16        the interest.  If Jimmy wants to expand on that
17        that's fine but we've already plowed that ground I
18        think.
19   BY MR. FREEDMAN
20   Q.   Do you have anything to add to that,
21   Mr. Nguyen?
22   A.   Not at this time.
23   Q.   Are you aware of communications between Craig
24   and nChain that are subject to the joint defense
25   agreement?

Page 113

1    A.   I'm not sure how to answer that question.
2    Obviously an employee of nChain as well as a separate
3    individual capacity.
4    Q.   So in your role as a liaison did you ever do
5    your -- did you ever liaise in person?
6    A.   Yes.
7    Q.   Did you ever liaise through e-mail?
8    A.   Yes.
9    Q.   Did you ever liaise through text messages?
10   A.   Yes.
11   Q.   Did you ever liaise in any other form of
12   communication?
13   A.   I think that covers most of it.
14   Q.   Does Craig have access to his nChain e-mail
15   account?
16   A.   I can't answer that question.  I don't know.
17   Q.   While you were CEO did Craig have access to
18   his nChain e-mail account?
19   A.   I would assume so, yes.
20   Q.   Did you get e-mails from him from his nChain
21   e-mail account while you were CEO?
22   A.   Yes.
23   Q.   Have you recently received an e-mail from
24   Craig from his nChain e-mail account?
25   A.   Probably.  I haven't had that many e-mails

Page 114

1  with Craig but yes, probably.
2      Q.   In your role as liaison did you assist in the
3  collection of documents in this litigation?
4      A.   No.  You mean for Craig?  No.
5      Q.   Prior to -- I think your testimony earlier was
6  you began liaising before Rivero, Mestre was hired; is
7  that correct?  Sorry, I didn't hear the answer.
8      A.   That is correct.
9      Q.   I think there might be something up with your
10 mic if you can just project a little louder.
11     A.   That is correct.  Again liaising with Craig
12 before Rivero, Mestre was engaged to represent him.
13     Q.   So I'm not sure what your lawyer is going to
14 do here but pause a second allow Spencer.  Prior to
15 Rivero, Mestre being retained did you discuss this
16 lawsuit with Dr. Wright?
17         MR. SILVERGLATE:  So the answer to that
18     question is yes or no.
19         THE WITNESS:  Yes.
20 BY MR. FREEDMAN
21     Q.   And pause again, what were the substance of
22 those communications?
23         MR. SILVERGLATE:  Objection, instruct him not
24     to answer, it's privileged.
25         MR. RIVERO:  Join.

Page 115

1  BY MR. FREEDMAN
2      Q.   Again I'm going to ask you to give your lawyer
3  a chance I'm not sure how they're going to come out on
4  this.  Did you ever discuss your subpoena with Rivero,
5  Mestre?
6          MR. SILVERGLATE:  Objection.  Don't answer,
7      it's privileged.
8          MR. FREEDMAN:  Based on that instruction I'm
9      going to skip all the subsets of that.
10 BY MR. FREEDMAN
11     Q.   When did you first find out you had been
12 subpoenaed or attempted to be subpoenaed in this
13 litigation?
14     A.   I found out through counsel.
15     Q.   Who are you referring to when you say counsel?
16     A.   I found out not through my counsel, through
17 Craig's counsel.
18     Q.   Do you recall the date?
19     A.   I don't know the exact date.  It would have
20 been in --
21         MR. SILVERGLATE:  Stop Jimmy, stop.  I believe
22     that this is privileged.  It's your communications
23     with Craig's counsel so it's subject both to the
24     joint interest agreement and to the attorney-client
25     privilege.  So I'm going to assert the privilege

Page 116

1  here.
2  BY MR. FREEDMAN
3      Q.   Besides Rivero, Mestre that you've identified
4  as part of your liaising duties do you liaise with any
5  other lawyers for Craig Wright?
6          MR. SILVERGLATE:  Asked and answered.
7          MR. FREEDMAN:  You can answer unless he
8      instructs you not to.
9          MR. SILVERGLATE:  You can answer.
10         THE WITNESS:  Not on this case.
11 BY MR. FREEDMAN
12     Q.   Are there any other members of the defense
13 team that you're aware of that are similar -- are also
14 act as a liaison?
15     A.   No.
16     Q.   In your role on the defense team do you act as
17 a liaison between Craig and anyone that is not an
18 attorney?
19     A.   Not that I can recall.
20     Q.   Did you ever liaise between Craig and nChain?
21     A.   Not for this purpose.
22     Q.   Did you ever act as a liaison between Craig
23 Wright's lawyers and someone other than Craig Wright?
24     A.   Yes.
25     Q.   I am going to ask you but give your lawyer a

Page 117

1  second I don't know what he is going to say who did you
2  liaise in that capacity for?
3          MR. SILVERGLATE:  Are we talking about in the
4      litigation?
5          THE WITNESS:  Yes.
6          MR. SILVERGLATE:  Okay, can you answer without
7      encroaching on privileged communications?
8          THE WITNESS:  I think so, yes.  Steve
9      Shadders.
10 BY MR. FREEDMAN
11     Q.   Anyone else?
12     A.   I can't recall anybody else.
13     Q.   What about Calvin Ayre?
14     A.   No.
15     Q.   How about Ron Tarter?
16     A.   No.  Actually let me correct that.  I do
17 recall having communications with Ron Tarter in
18 connection with explaining things that were happening
19 with Craig in the lawsuit.
20     Q.   So wait before you answer.  Can you tell me
21 the content of those communications?
22         MR. SILVERGLATE:  So I'm not sure who this is.
23         MR. RIVERO:  Let me step in.  I'm going to
24     assert the common interest privilege and if the
25     question is about the substance of the conversation

Page 118

1    we're going to assert the privilege.
2  BY MR. FREEDMAN
3      Q.   Ron Tarter, is there a defense agreement
4  between Craig Wright -- to your knowledge Mr. Nguyen is
5  there a defense agreement between Craig Wright and any
6  of Calvin Ayre's companies?
7      A.   I do not know.
8      Q.   And you understand Ron Tarter works for Calvin
9  Ayre?
10     A.   Correct.
11     Q.   Is there a common interest between Calvin Ayre
12 and Craig Wright?
13     A.   I don't know if I can answer that question.
14 Certainly they have a common interest in, you know,
15 Bitcoin and the growth of Bitcoin.
16     Q.   But as it relates to this litigation?
17     A.   I don't know how to answer.  I don't have the
18 basis to answer that question.  I suppose you can say --
19     Q.   Just to be clear what was the date of the
20 communication between you and Ron Tarter?
21          MR. SILVERGLATE:  Before he answers that I
22     think you cut off his last answer.
23          MR. FREEDMAN:  I'm sorry, go ahead.
24          THE WITNESS:  I was going to say Calvin is now
25     a shareholder of nChain as was announced sometime

Page 119

1      last year and obviously nChain is -- I've explained
2      has a common interest with Craig about this
3      litigation.
4  BY MR. FREEDMAN
5      Q.   What was the date of your communication with
6  Ron Tarter?
7      A.   I don't recall.  It would have been in I would
8  say summer of 2018.  Later in the summer or fall of
9  2018.
10     Q.   That would be before Calvin Ayre became a
11 shareholder of nChain?
12     A.   I don't have the date -- I have the years
13 wrong.  2019.
14     Q.   Still before Calvin Ayre became a shareholder
15 of nChain?
16     A.   I don't know the exact date Calvin became a
17 shareholder.  I know when it was announced.  I don't
18 know when it became effective.
19     Q.   Did you ever liaise between Craig Wright and
20 Stefan Matthew?
21     A.   That was strange.
22     Q.   Steven Matthews.  Did you ever liaise between
23 Craig Wright and Steven Matthews?
24     A.   You mean Stefan?
25     Q.   Yes.

Page 120

1      A.   Stefan is part of nChain.  So I would get
2  questions about what's going on with the lawsuit to
3  provide him just general status of where the lawsuit is
4  going or what's happening with it, status to people like
5  Stefan.
6          MR. SILVERGLATE:  Vel, I think we lost Andres.
7          MR. FREEDMAN:  I see that.  Zalman is on.
8  Zalman -- I do see Andres is on.  He's turned off
9  his video but he is on.  He has muted himself so we
10 can't hear him.  He has not muted himself.  Somehow
11 he's been muted.  I'll try to undo that.
12         MR. RIVERO:  I did take myself off video.  I
13 didn't mute myself.  I don't know how that happens.
14 BY MR. FREEDMAN
15     Q.   Have you ever acted as liaison between Craig
16 Wright and Ramona Watts?
17     A.   No.
18     Q.   Have you ever participated in discussions
19 about this lawsuit between -- that involved Craig Wright
20 and Ramona Watts and yourself?
21     A.   Yes.
22     Q.   Give your lawyer a minute here but I'm going
23 to ask what was the content of those communications?
24         MR. SILVERGLATE:  I'm going to object if those
25     communications were with Craig Wright and Ramona I

Page 121

1      think it would all be subject to the privilege.
2          MR. RIVERO:  Join.
3          MR. FREEDMAN:  You said object Spencer, I
4      assume you're instructing him not to answer?
5          MR. SILVERGLATE:  I instruct him not to
6      answer.
7          THE WITNESS:  I guess I have to rephrase my
8      answer to the last question.  I won't answer the
9      substance of communications.  You asked me did I
10     act as a liaison between Craig and Ramona.  My
11     initial thought -- that's a hard question to
12     answer.
13         My initial thought was to say no but I was
14     asked to help facilitate understanding
15     communication things related to the case with Craig
16     and with Ramona involved and does that mean I was
17     liaising with Craig to Ramona to some extent I
18     guess it does.
19 BY MR. FREEDMAN
20     Q.   Well, I'm going to repeat my question and you
21 can take a beat there for Spencer to jump in.  Can you
22 tell me the content of those communications?
23         MR. SILVERGLATE:  I'm going to object and
24     assert the privilege instruction.
25         MR. RIVERO:  Join.

Page 122

1       MR. FREEDMAN:  Just so the record is clear
2   which privilege are you invoking?
3       MR. SILVERGLATE:  Attorney-client joint
4   interest.
5       MR. FREEDMAN:  Whose joint interest?
6       MR. SILVERGLATE:  I'm asserting a joint
7   interest privilege and I don't think I need to get
8   into a colloquy or argument with you here.
9       MR. FREEDMAN:  Okay.  There's two different
10  joint interest agreements, just trying to figure
11  out which one you're invoking.
12      MR. SILVERGLATE:  It depends which timeframe
13  we're talking about.
14      MR. FREEDMAN:  Fair question.  What was the
15  timeframe of these communications.
16      MR. SILVERGLATE:  He's already described that.
17      MR. FREEDMAN:  I don't think so.  He just
18  talked about their existence for the first time a
19  few minutes ago.
20      MR. SILVERGLATE:  You're right, I thought you
21  were asking about the timeframe for the agreements.
22  You're right, he didn't talk about the
23  communications.
24      THE WITNESS:  I can tell you it was during the
25  timeframe covered by the first joint interest

Page 123

1   agreement.
2       (Discussion held off the record.)
3   BY MR. FREEDMAN
4   Q.   Do you know if anyone else could fill the
5   liaison role you're filling -- that you described?
6       MR. RIVERO:  Object to the form.
7       THE WITNESS:  Do I believe anybody else could?
8   In theory you know yes, there probably could be
9   other people.  I would answer that -- how I would
10  answer that is Craig asked me because he felt I was
11  uniquely situated to do it because not that many
12  people understand Craig given his difficulty in
13  communication and also I was a former lawyer in the
14  U.S. and also I understand, you know, Bitcoin from
15  working with him so that's a rare combination
16  to find in one person especially the part about
17  deciphering Craig as I would say.  He's often
18  difficult to understand and people who are new to
19  him working with him have challenges understanding
20  what he is trying to say or communicate.
21      So could someone else fill this role, you
22  know, there's a lot of people in the world
23  potentially.  I am just -- I was the obvious choice
24  for it given my working relationship with him and
25  those other factors.

Page 124

1   BY MR. FREEDMAN
2   Q.   Have you heard -- had you heard of Dave
3   Kleiman prior to January of 2017?
4   A.   I think I might have seen the name somewhere
5   but I didn't really know much about him.
6   Q.   Do you know where you saw that name from?
7   A.   Before I reviewed documents that produced to
8   you in response to the subpoena I didn't think I had
9   even heard the name at all until much later but I think
10  there's an e-mail where Kleiman is mentioned and I don't
11  even remember seeing the reference to Kleiman in the
12  e-mail.
13      That may be the first time I saw it but at the
14  time I probably would not have even given it much
15  thought.  I think I did not really understand who Dave
16  Kleiman was until late 2017, maybe early 2018.
17      (Plaintiff's Exhibit No. 10 was
18      marked for identification.)
19  BY MR. FREEDMAN
20  Q.   I share with you what we're going to mark as
21  Exhibit 10.  It's Nguyen 642.  Is this the e-mail you're
22  referencing?
23  A.   That's correct.  I saw this e-mail in my
24  review to produce documents to you and some of it had
25  mentioned Dave Kleiman but when I saw it I don't even

Page 125

1   remember seeing the reference to Dave Kleiman at the
2   time.
3   Q.   You ask on the 27th of December you say "who
4   is Uyen" and then you get a response back from Stefan he
5   says "long story she worked with CSW" which is Craig
6   Steven Wright; correct?
7   A.   Correct.
8   Q.   "And Dave Kleiman professes love for CSW.
9   Sees us destroying our involvement with the CSW."  Did
10  you follow up with this and say who the heck is Dave
11  Kleiman?
12  A.   Not at the time.
13  Q.   Did you know who he was?
14  A.   No.  I think I had heard or read -- there's a
15  lot of media coverage about Craig and Bitcoin and this
16  question who is Satoshi Nakamoto.  I mean in my process
17  of understanding this world before I left my legal
18  practice to join nChain I remember surfing the internet
19  trying to read what I can see and I think I remember
20  seeing Dave Kleiman's name but I didn't have much of a
21  background so I didn't understand it.  This e-mail
22  you're focusing on Uyen in fact when I saw Dave
23  Kleiman's name like I said I can't even remember it
24  triggering any reaction at the time.
25  Q.   Glad you can help solve a little debate on our

Page 126

1  side here which is how do you pronounce her name?
2       A.  Well, again there's the Vietnamese
3  pronunciation and Americanized pronunciation.  Her last
4  name is mine Nguyen and I actually have -- even though I
5  am Vietnamese American I don't know that I've ever known
6  another person with that name so how I pronounce in
7  Vietnamese is I guess it would be Uyen Nguyen which
8  sounds very weird.  I'm not certain because I have never
9  met another Vietnamese person with that name.
10      Q.  I understand that the last name Nguyen is a
11 very common last name from Vietnam.  But I have to ask
12 obviously is there any relationship between you and
13 Ms. Nguyen?
14      A.  No.  And contrary to some internet rumors I am
15 not her.
16      Q.  I've seen pictures and I can attest to that
17 unless you're a master of disguise.  Prior to the time
18 and your not being permitted to testify about had Craig
19 ever mentioned about the trust to you?
20      A.  No.
21      Q.  Based on -- again prior to the time you're not
22 being permitted to testify did Craig ever mention the
23 Australian Tax Office investigation to you?
24      A.  Yes.
25      Q.  What did he say about it?

Page 127

1       A.  Well, generally I got the, you know, short
2  version of what I assume is a much longer story that he
3  had applied for tax credits for research and development
4  tax credits in Australia, the Australian Tax Office
5  denied those credits.  That led to some big, you know,
6  fight with the Australian Tax Office and that he felt
7  that the credits were proper and they did not understand
8  Bitcoin -- the work he was doing was a business.  They
9  thought it was a hobby which is why he said they denied
10 the tax credits and that led to a big fight.
11      Q.  Did he ever tell you that the Australian Tax
12 Office accused him of forging documents?
13      A.  I don't know if he told me that.  I heard that
14 somewhere.
15      Q.  Did he ever tell you that his lawyers in
16 Australia terminated their representation of his
17 companies based on these forgeries?
18      A.  No.  I never heard that before today.
19      Q.  Did he ever talk to you about Andrew Summer?
20      A.  I don't think so.  The name doesn't ring a
21 bell.
22      Q.  Did he ever tell you that he had meetings with
23 the Tax Office?
24      A.  I know he said he met with the Tax Office.
25      Q.  Did he ever tell you that there were

Page 128

1  transcripts made of his meetings with the Tax Office?
2       A.  I don't know if he told me that.  Somehow I
3  became aware there are.
4       Q.  Did he ever mention those transcripts to you?
5       A.  Nope.
6       Q.  Did he ever mention the name Mark Ferrier to
7  you?
8       A.  No.
9       Q.  Prior -- again all these are prior to the time
10 period you're permitted to testify about pursuant to
11 your lawyer's instruction.  Prior to the time -- prior
12 to the time you're forbidden to talk about did Craig
13 ever mention Uyen to you?
14      A.  Yes.
15      Q.  What did he say about her?
16      A.  I don't remember.  What I remember him
17 saying -- I had seen her name somewhere on the internet.
18 I thought it was funny that she has another Vietnamese
19 name and I asked who was she and he said, she used to
20 work for me.
21      Q.  You just left it at that?
22      A.  Yes.  Because this was at a point in my
23 working relationship with Craig where I don't think I --
24 we weren't -- I wouldn't call us friends at that point.
25 We were just getting to know each other and he's a hard,

Page 129

1  difficult person to get to know so I didn't feel
2  comfortable, you know, asking, you know, more probing
3  questions.
4       Q.  Did you ever talk to him again about her prior
5  to this time you're not permitted to testify about?
6       A.  I think her name came up again at some point
7  and I'm trying to remember when.  I think sometime in
8  2017.
9       Q.  Do you remember what that was about?
10      A.  Yes, I think it was I was at a conference with
11 Craig and Ramona in the Netherlands and I think it was
12 Ramona asked me if I knew that -- whether Uyen Nguyen
13 might be there and something -- that's the only
14 conversation I remember about it.
15      Q.  When you started working at nChain you
16 understood at that time that Satoshi Nakamoto had
17 control over billions of dollars of Bitcoin; right?
18      A.  I had read on the internet that there was this
19 question of who is Satoshi Nakamoto and that there were
20 all these coins that were mined, controlled by Satoshi
21 that had never been moved.
22      Q.  Did you make the connection to the extent
23 Craig Wright was Satoshi Nakamoto he would have control
24 over billions of dollars of Bitcoin?
25      A.  I didn't necessarily make the connection that

Page 130

1  he would have control over it because I didn't at the
2  time know any details about how the coins were held or
3  anything like that but did I think that yes, Craig
4  Wright or his family might have access at some point one
5  day to a lot of Bitcoin yes, I did -- that thought did
6  occur to me.
7      Q.   Why say one day, why wouldn't you think he
8  didn't have access immediately?
9      A.   Because I had read on the internet somewhere.
10  This is Satoshi Nakamoto, you know, question raises a
11  lot of internet stories and I think I read on some of
12  the online stories about that these coins had never
13  moved and that there were rumors.  There were in some
14  kind of trust or that they were locked up for some time
15  and that one day they would become accessible.
16      Q.   You never asked Craig about it?
17      A.   No, I didn't feel comfortable.
18      Q.   You exercised a lot of restraint?
19      A.   Well --
20          MR. SILVERGLATE:  Object to the form.
21          THE WITNESS:  He's a -- you know, here is what
22  I would say.  When I first joined nChain that was
23  after the proof attempt that did not go well so he
24  was very sensitive at that time and volatile as a
25  personality to anything -- talking about anything

Page 131

1  about being Satoshi Nakamoto and when I joined it
2  was my job to understand the work that was being
3  done at the company, get to know him, just that he
4  would be comfortable working with me and he is
5  important.
6          I didn't want to push him because that -- he's
7  got -- it's his personality where he is not like
8  the normal person.  He can blow up quickly so I
9  felt it more important to focus on the work that we
10  were doing than try to push what our sensitive
11  topics to extract questions out of him that I knew
12  he wouldn't want to talk about.
13  BY MR. FREEDMAN
14      Q.   You said before that he was volatile after the
15  proof failed.  What do you mean by volatile?
16      A.   Well, I wasn't at in London or nChain's office
17  after the proof failed.  I can only tell you about my
18  experience or things I learned afterwards and after I
19  joined nChain.  He's had moments of being volatile with,
20  you know, employees we had at the time at nChain in the
21  office.
22          He resisted wanting to do any media for a long
23  time.  When people -- when he feels he is not understood
24  he can, you know, get angry, blow up and what I've
25  learned is he has a hard time being understood, you

Page 132

1  know, what I say to you normal people might understand
2  and he gets really frustrated and agitated often when he
3  is trying to say something to me, people in our office
4  lot of times and they're not getting it and there were a
5  lot of times where there would be blow ups.
6      Q.   Prior to this time that you start acting as
7  liaison did Craig Wright ever mention Denis Mayaka?
8      A.   Yes.
9      Q.   What did he say about him?
10      A.   The first time I think I heard of Denis Mayaka
11  is I got an e-mail I'm not sure if it was from Denis or
12  someone who knew Denis about asking Craig to come speak
13  at a conference somewhere in Africa and I did not know
14  who this person was so I asked Craig who is Denis.
15      Q.   What did he say?
16      A.   He said he's someone who I know in Africa and
17  I don't know if he said he works for him but something
18  to the extent, you know, he does work for me or my
19  family, you know, I don't know if he said companies.
20  There was some professional relationship between them.
21      Q.   Did he say he was his lawyer?
22      A.   I don't remember.  I remember him saying at
23  some point he is a lawyer because it came up that I was
24  a lawyer and he was a lawyer.
25      Q.   Do you know if Mayaka is a lawyer?

Page 133

1      A.   I never asked the question I don't think.  I
2  was just told he is.
3      Q.   Have you ever spoken to Mayaka?
4      A.   No.
5      Q.   Do you know Mayaka exists?
6      A.   I think I've gotten a couple of e-mails over
7  the course of time.  That was about following up about
8  trying to find a time to get Craig to come speak at a
9  conference because that was part of the role I filled
10  while I was at nChain was fielding, facilitating,
11  speaking requests for Craig and so I got e-mails from
12  him but I have never spoken to him.  I got e-mails from
13  who I was told was Denis.
14      Q.   That was my next point which is you don't
15  actually know who sent you those e-mails, do you?
16      A.   No.  I just know they were named -- they came
17  from an e-mail account or person's name that was Denis.
18      Q.   Have you ever liaised with Mayaka?
19      A.   No.
20      Q.   Did he ever mention Mayaka and trusts?
21      A.   Only after the litigation was started.
22      Q.   Prior to the -- your job as a liaison did
23  Craig ever mention a bonded courier to you?
24      A.   I'm sorry, could you repeat the question?
25      Q.   Did Craig ever mention a bonded courier to

Page 134

1  you?
2       MR. SILVERGLATE:  Prior to your job as a
3  liaison.
4       THE WITNESS:  No.
5  BY MR. FREEDMAN
6       Q.  Prior to your job as a liaison did Craig ever
7  mention Shameer's Secret Sharing Algorithm to you?
8       A.  I don't know if he mentioned it.  I know I was
9  involved in meetings and discussions at nChain about the
10 concept of Shameer's Secret Sharing Scheme in the
11 context of the work being done at nChain by some of the
12 researchers and I believe Craig may have been in the
13 room for one or more of those meetings.
14      Q.  Do you believe Satoshi Nakamoto was one person
15 or a team of people?
16      MR. RIVERO:  Object to the form.
17      THE WITNESS:  I don't know that I can answer
18      that question.  I can tell you, you know, based on
19      what I know and my discussions with Craig, you
20      know, that would not fall into the privileged area
21      that he has consistently said he was the primary
22      visionary, architect, creator of Bitcoin and
23      drafter of the white paper.
24           He did the -- he coded most of the first
25      client software for Bitcoin, first version of the

Page 135

1       client software but that that he had help.
2  BY MR. FREEDMAN
3       Q.  But he never expanded on what help meant?
4       A.  I think I said earlier I believe at one point
5  he said -- told me that Dave helped him edit the white
6  paper and that conversation came up because I -- one of
7  my early tasks in starting to work with Craig was to
8  help him with his papers that he was trying to put out
9  while he was at nChain and so I helped review and edit
10 some of his papers to the best I could and he -- that's
11 how we got to somehow the conversation about he told me
12 that Dave Kleiman had helped him with it, the Bitcoin
13 white paper.
14      Q.  Did you ask him any more details about that?
15      A.  No.  Like I said it was probably a good year
16 in my working with nChain before I felt I could -- I
17 knew Craig enough that we had a level of relationship
18 where I can ask to -- to talk about the Satoshi topic
19 without risk of him, you know, getting agitated.
20      Q.  Do you believe Craig Wright is Satoshi
21 Nakamoto?
22      A.  Yes.
23      Q.  Why?
24      A.  It's based on a collection of many things.
25 Based on him telling me very consistently about it but

Page 136

1  it's more based on through my work with him seeing the
2  depth of knowledge he has about Bitcoin, the original
3  protocol, what it is capable of doing as a technology
4  platform.  People think of it just as a digital
5  currency.
6       A lot of the world that's all they know of
7  Bitcoin but it's protocol rule set and technology system
8  as I learned from Craig to be used for so many more
9  powerful things and he has explained to me things he put
10 in Bitcoin's early design and protocol and code that
11 have all of these advanced uses and features that no one
12 else would have been able to figure out or at least
13 certainly other Bitcoin developers wondered why for
14 example this certain thing in the code and it's because
15 as I learned from him he's always had this grand vision
16 that what it could be used for.
17      So that is a big part of why.  My
18 conversations with people like Steve Shadders, the CTO
19 of nChain who is very technically knowledge about
20 Bitcoin.  In fact probably the most knowledgeable
21 Bitcoin person I've met or worked with.  He believes
22 Craig is Satoshi.  We've had that discussion and he
23 knows more technically to be able to challenge Craig on
24 a lot of things than I do and also because people like
25 Stefan Matthews have told me the reasons for their

Page 137

1  belief.  So it's a collection of a lot of things that
2  lead me to the conclusion.  It's not any one thing.
3       Q.  Prior to the time you began acting as a
4  liaison did Craig ever mention to you that he had been
5  hacked?
6       A.  Yes.
7       Q.  What did he say?
8       A.  He told me that he's been the subject of many
9  hack attempts.  That that was an issue in his case with
10 the Australian Tax Office that someone hacked his
11 company computers and tried to change documents.
12      He believed it was former disgruntled
13 employees, staff and that caused all kinds of problems
14 in dealing obviously with defending himself before the
15 Tax Office.
16      Q.  Any other times?
17      A.  We've had that conversation more than once and
18 I'm trying to remember if there was anything to add to
19 that.  There was a former I guess I don't know if he was
20 an employee.  Someone who worked for Craig, his company
21 unless Australia I think his name was Jamie Wilson,
22 something to that effect who I got connected to because
23 he -- after nChain went public, surfaced publicly we
24 started getting all kinds of inquiries and e-mails and
25 stuff and Jamie Wilson I don't know how he contacted us

Page 138

1   but got somehow landed in my e-mail box wanting to sell
2   some IP he claimed he owned to nChain and said he knew
3   Craig from the past.
4            So I asked Craig who is this person and he
5   told me be very careful with him because he didn't trust
6   him and he thinks he was responsible for either altering
7   company documents or somehow doing something to disturb
8   the company computers and records and I think he was the
9   CFO or some kind of financial role.
10       Q.   Did Craig mention to you that the alterations
11  to the documents in the Australian Tax Office supported
12  the positions that he was taking in front of the
13  Australian Tax Office?
14       A.   I don't recall that.
15       Q.   Do you believe Craig's been hacked?
16       A.   I have no basis to answer that question since
17  I wasn't there at the time.  I just know what he told me
18  and he and I believe Ramona his wife also told me he had
19  to get some kind of forensic I don't know if you call it
20  forensic audit, investigator to go back in and try and
21  prove this.  So I don't have any personal basis to be
22  able to say yes or no.
23       Q.   Do you believe Craig is a truthful person?
24            MR. RIVERO:  Object to the form.
25            THE WITNESS:  Should I answer that question?

Page 139

1            MR. FREEDMAN:  Sure.
2            THE WITNESS:  I believe Craig is a truthful
3       person who has difficulty answering questions and
4       communicating in ways to normal people so that
5       people often think he is being less truthful than
6       he is.
7   BY MR. FREEDMAN
8       Q.   Has Craig ever lied to you?
9       A.   Not that I know of but I had to -- sometimes
10  he'll tell me something and it doesn't seem to make
11  sense and then I have to ask like five more questions to
12  extract out well, what do you mean that doesn't make
13  sense I thought you said this the other day.  Something
14  slightly different and then I have to -- when I ask five
15  follow-up questions then I get to the answer.  I said --
16  I'll say why didn't you just tell me that in the first
17  place and he'll say but that's not exactly the question
18  you asked and what I've learned is he is very linear,
19  right, in his way of thinking and answering questions
20  where, you know, you might ask me, you know what time of
21  day it is and I'll look at my clock I'll say okay it's
22  2:16 p.m. Pacific time.  Then he'll say but you didn't
23  ask me what part of the country or what part of the
24  world and in the beginning it was frustrating to deal
25  with him in that regard but I've learned that it's -- he

Page 140

1   interprets questions and how he answers them in a very,
2   you know, I would say in his own head in a way that I
3   learned that it takes time to sometimes get from him the
4   information you need.
5       Q.   I am going to share with you what's been filed
6   as Exhibit 15 to the second amended complaint.  Have you
7   ever seen this document before?  I'm going to keep
8   scrolling unless you tell me to stop.
9       A.   I'm not sure I've seen this exact document but
10  I've seen things that look like it.
11      Q.   Have you seen this page before?
12      A.   I have seen like -- as I recall there may be
13  disputes about different versions of this.  I've seen a
14  page that looks like this.
15      Q.   Have you ever asked Craig about it?
16      A.   Only in the context of litigation.
17           MR. FREEDMAN:  Sorry, that will be Exhibit 11
18  I think we're at to the deposition.
19           (Plaintiff's Exhibit No. 11 was
20           marked for identification.)
21  BY MR. FREEDMAN
22      Q.   Do you understand that the judge in this --
23  magistrate judge in this litigation has found that Craig
24  submitted forged documents as evidence?
25           MR. RIVERO:  Objection to form.

Page 141

1            MR. SILVERGLATE:  I'm going to object.  If you
2       learned as part of the litigation and as part of
3       your privileged work in the litigation I'll
4       instruct you not to answer.
5            MR. RIVERO:  Join that as well.
6            MR. FREEDMAN:  It's a publicly filed opinion.
7            MR. SILVERGLATE:  Can you read back the
8       question, please?
9            (Thereupon, a portion of the record
10           was read back by the reporter.)
11           MR. SILVERGLATE:  If you learned from public
12      records then fine.  If you learned from the lawyers
13      then I'm instructing you not to answer.
14           MR. RIVERO:  I'll repeat my form objection.
15      You may answer.
16           THE WITNESS:  I read the magistrate's order.
17      I don't recall the exact phrasing of it but I got
18      the order from counsel.
19  BY MR. FREEDMAN
20      Q.   Do you have any opinion on that?
21           MR. RIVERO:  Objection.
22           MR. SILVERGLATE:  Object to the form.
23           THE WITNESS:  Can I answer that question?
24           MR. RIVERO:  Yes.
25           THE WITNESS:  The only opinion I can draw upon

Page 142

1    is based on what I've been told or know in the
2    context of assisting Craig with the litigation
3    under the joint interest arrangement.
4          MR. SILVERGLATE:  I'm going to instruct him
5    not to answer.
6          MR. RIVERO:  Join.
7    BY MR. FREEDMAN
8          Q.  Do you understand that the magistrate in
9    Florida has found that Craig Wright has committed
10   perjury in his presence?
11         MR. SILVERGLATE:  Same admonition, Jimmy.
12         THE WITNESS:  As I said I read the
13   magistrate's -- I haven't read all the magistrate's
14   orders so if there's more than one I don't know.
15   I've read a magistrate order that discusses whether
16   Craig committed perjury or not.  I don't remember
17   the exact phrasing.
18   BY MR. FREEDMAN
19         Q.  So you testified earlier that you're aware we
20   were trying to subpoena you in February of 2020;
21   correct?
22         A.  Yes.
23         Q.  And you told the Court in Washington that you
24   lost access -- actually why don't you tell me when did
25   you lose access to your nChain e-mail address?

Page 143

1          A.  It was in March of 2020 sometime.
2          Q.  So did you not collect documents from your
3    nChain e-mail address in response to our subpoena?
4          A.  The document request only -- the time period
5    of your document request was only to May 2018 if I
6    recall; is that correct?
7          So the e-mails I have on my work computer only
8    go back one year, 2019.  So I didn't have any e-mail
9    communications from the time period that's responsive to
10   your request.
11         Q.  Where are the prior e-mails stored?
12         A.  Probably would be on the nChain server, I
13   assume.
14         Q.  Do you have access to that server?
15         A.  No, I do not.
16         Q.  When did you lose access to that server?
17         A.  Well, I don't control the server.  It's
18   nChain's information technology people who control the
19   server.
20         Q.  If you wanted an e-mail that was older than a
21   year old while you were still CEO of nChain how would
22   you get it?
23         A.  If I was still CEO then yes, I would talk to
24   one of the IT professionals.
25         Q.  You had no ability to search for documents,

Page 144

1    e-mails on your own that were over a year old?
2          A.  I don't recall how that was set up.
3          Q.  Did your access to nChain's e-mails change --
4    let me strike that.  When did you lose access to your
5    nChain e-mail account?
6          A.  I think it was around March 12th through 19th
7    timeframe.
8          Q.  And prior to March 12th through 19th did your
9    ability to access your nChain e-mail account change from
10   before you were CEO to after you were CEO and were the
11   chair of the Strategic Advisory Board?
12         A.  I'm sorry, can you repeat the question?
13         Q.  Yes, prior to March12th did your access to
14   your nChain e-mail account change when you went from
15   being nChain's CEO to the chair of nChain's Strategic
16   Advisory Board?
17         A.  No, but I can tell you something that I think
18   will short circuit this subject matter which is I -- my
19   first nChain e-mail account was using a domain called
20   nChainHoldings.com since I was working for the holding
21   company and that was until I believe sometime in the
22   summer or fall of 2018 when some of us who use
23   nChainHoldings.com account such as me Stefan Matthews
24   and some other people we decided to basically
25   consolidate down at the time and I moved over to an

Page 145

1    nChain.com e-mail account which was after the time
2    period of -- covered by your subpoena request and so any
3    access I would have to the nChainHoldings.com e-mail
4    account is not in my work.  In fact I didn't have that
5    e-mail box on my computer.
6          Q.  Remind me -- I know you said it.  What was the
7    date that you switched from nChain Holdings to the --
8          A.  I believe it was summer or fall of 2018.
9          Q.  Did Craig also have an nChain Holdings e-mail
10   account?
11         A.  I don't think he ever did.
12         MR. FREEDMAN:  I need to take -- we've been
13   going over an hour.  I need to take a quick
14   restroom break.  I don't know if anybody else does.
15   I can do five minutes or three minutes or even two
16   it's up to -- anybody have any preferences?
17         MR. RIVERO:  Follow up on Spencer's question
18   from earlier, any ETA on when we finish here?
19         THE VIDEOGRAPHER:  Should we go off the video
20   record?
21         MR. FREEDMAN:  Sure.
22         THE VIDEOGRAPHER:  Going off the video record
23   5:26 p.m. eastern.
24         (Thereupon, a brief recess was taken.)
25         THE VIDEOGRAPHER:  We are back on the record.

Page 146

```
 1        The time is 5:33 p.m. Eastern Standard Time.
 2   BY MR. FREEDMAN
 3        Q.    Mr. Nguyen, when did you -- when did you form
 4   the belief that Craig Wright was Satoshi Nakamoto?
 5        A.    That's a tough question to answer.  I don't
 6   know that there was a specific date.
 7        Q.    Why don't we do it this way.  Did that you
 8   have belief by the time you were CEO of nChain?
 9        A.    Yes, I would say by then, yes.
10        Q.    So by December 2017 you were confident he was
11   Satoshi?
12        A.    Yes, by that point I had been working with him
13   for over a year.  It was -- I would say, you know, nine
14   months to a year after working with him.  It's a hard
15   question to answer because, you know, my level of
16   confidence grew over time in believing that he is
17   Satoshi so at what point it gets past I feel confident
18   enough to say it out loud.
19        Q.    If by November of 2018 -- sorry, if by
20   December of 2017 when you came CEO you were pretty
21   confident about it.  Safe to say by January of 2019 you
22   were very sure about it or sufficiently sure that you
23   had reached maximum assurance you were going to reach?
24        A.    I wouldn't say I had reached maximum assurance
25   by then.  I would say just sufficiently confident.
```

Page 147

```
 1        Q.    Do you recall in approximately January of 2019
 2   being interviewed by SFOX?
 3        A.    SFOX, yes, I've done more than one interview
 4   with them so I don't remember the particular months but
 5   I remember being interviewed by SFOX.
 6              MR. FREEDMAN:  I am going to try and get this
 7         on the screen for you.  This is going to be our
 8         Exhibit 12.
 9              (Plaintiff's Exhibit No. 12 was
10              marked for identification.)
11   BY MR. FREEDMAN
12        Q.    Do you see that video on the screen now?
13        A.    I do.
14              MR. FREEDMAN:  So bear with me.  Let's listen
15         to the 24 minute 43 second mark.
16              MR. NGUYEN:  Disrupt that economic balance.
17         So while I again Satoshi's not sitting around
18         publicly telling us this is what I meant or didn't
19         mean.  So it was very hard to read early writings
20         and know what is meant.  That's why I say it
21         doesn't mean there can't be basic improvements to
22         fix bugs.  You shouldn't be messing around with
23         core principles.  A good example is --
24   BY MR. FREEDMAN
25        Q.    Did you -- do you recall making that sentence?
```

Page 148

```
 1        A.    Not specifically.  I remember doing that
 2   interview.
 3        Q.    That's you and that's your statements; right?
 4        A.    Correct.
 5        Q.    At a time when you said you were very sure
 6   that Craig Wright was Satoshi you just said I get it
 7   Satoshi is not sitting around telling us what he meant.
 8   I don't understand how those two statements are
 9   consistent.
10        A.    What I mean by that is first of all, not
11   everybody -- in fact most of the digital currency world
12   does not believe Craig is Satoshi and it's all over the
13   internet.  I was talking about whether we follow the
14   original protocol of Bitcoin which is a big debate in
15   the Bitcoin community and what I was meaning is that
16   there is not a person that everyone believes is Satoshi
17   and he is saying this is what I meant in section five of
18   the white paper and this part the code and therefore
19   people will follow him if there is a debate over what to
20   do.
21              I'll give you an analogy.  Ethereum which is a
22   competing block chain project Vitalik Buterin is well
23   known and recognized as founder of Ethereum.  If he says
24   we need to scale Ethereum with this new attempted
25   technology feature people will believe him because they
```

Page 149

```
 1   believe he is the founder of Ethereum.  When Craig
 2   Wright comes forward and says I am Satoshi many people
 3   do not believe him and that's why in the debates over
 4   the Bitcoin protocol and how to scale Bitcoin there's
 5   not a Satoshi people have consensus on that if he
 6   surfaces and says this is what we should do to grow
 7   Bitcoin and follow my original plan for Bitcoin no one
 8   believes it.  I hope that makes sense.
 9        Q.    Would you say that nChain was set up to
10   professionalize the research and work efforts that Craig
11   Wright had been doing in Australia?
12        A.    I would say nChain was set up to
13   professionalize Craig and Craig's work and certainly,
14   you know, professionalize his efforts to realize his
15   visions of Bitcoin.
16              MR. FREEDMAN:  I am going to share with you
17         what is now going to be Exhibit 13.
18              (Plaintiff's Exhibit No. 13 was
19              marked for identification.)
20   BY MR. FREEDMAN
21        Q.    Do you remember giving an interview to Bit
22   Stocks Media in March of 2019?
23        A.    I do.
24              MR. FREEDMAN:  And I'm going to bring you to
25         the 43 minute mark and let's take a listen here.
```

Jimmy Nguyen
April 30, 2020                                        150 to 153

Page 150

1    VIDEO AUDIO VOICE:  Good morning.
2    MR. NGUYEN:  No, yes, no, yes, I did -- I
3  thought about this whole effort.  I worked with him
4  sort of behind the scenes to help on certain
5  things.  Craig had moved his family from Australia
6  to London, the nChain business was set up to sort
7  of professionalize the research and work efforts he
8  had been undergoing in Australia and I had got
9  asked one day after just through conversations to
10  take on a role because I think they knew -- I had
11  close relationships with clients and I was looking
12  to explore something else.  I wasn't the obvious
13  person to bring on board because I was in the
14  United States, I didn't want to move to London
15  but --
16  BY MR. FREEDMAN
17     Q.   I can keep going but the part -- so do you
18  recall giving this interview?
19     A.   I do recall the interview.
20     Q.   That's you and an accurate recording?
21     A.   Yes.
22     Q.   So a couple questions.  What did you mean when
23  you said "I worked with them sort of behind the scenes."
24  Who is them?
25     A.   I was referring to the nChain company that we

Page 151

1  discussed.
2     Q.   You said "to help on certain things."  Are
3  those the things we've discussed in this deposition?
4     A.   Yes.
5     Q.   And then I believe you gave kind of the quote
6  what I was saying before nChain business was set up to
7  sort of the professionalize the research efforts he had
8  you know been undergoing in Australia.  Is that
9  accurate?
10     A.   Yes.  It's accurate that it was set up to
11  professionalize the research work efforts.
12     Q.   But actually at this time you hadn't even had
13  any communications with Craig Wright; correct?
14     A.   That's not -- at the time of the interview you
15  mean?
16     Q.   Not at this time of the interview.  At the
17  time you came on board to help behind the scenes.
18     A.   I had not had any communications with Craig.
19  I had communications with Stefan Matthews about the work
20  they were trying to do with nChain.
21     Q.   So was the plan to move him from Australia to
22  London and set up a business around him?
23     A.   I can't tell you what happened in the very
24  beginning because I was not involved with the
25  discussions with Craig which led to him moving to the

Page 152

1  United Kingdom.  I can tell you what I've learned since
2  if that's what you're asking.
3     MR. FREEDMAN:  So let me bring up another --
4  it will become Exhibit 14.
5     (Plaintiff's Exhibit No. 14 was
6  marked for identification.)
7  BY MR. FREEDMAN
8     Q.   I am going to share with you.  All right.  Do
9  you see an interview you've done here with Vincent
10  Everts?
11     A.   Yes.
12     Q.   Do you recall this interview?
13     A.   I do.
14     Q.   I'm going to bring you to the 16:43 minute
15  mark or so.  Okay.  Let's listen here for a minute and
16  I've got some questions for you if that's all right?
17     A.   Sure.
18     MR. NGUYEN:  Exploring digital currency and
19  then Craig was -- the plan was set to have him move
20  from Australia to London and reset the business.
21  He was running the business in Australia doing
22  Bitcoin research.  Essentially similar to what
23  nChain is doing now but we needed more professional
24  teams around him to elevate his process.  So I was
25  involved --

Page 153

1  BY MR. FREEDMAN
2     Q.   That's the part.  So I guess first
3  housekeeping accurate portrayal of your statements?
4     A.   That is my interview.
5     Q.   And so you just said the plan was to set -- to
6  have him move from Australia to London and reset up a
7  business around him.  He was running businesses in
8  Australia and doing Bitcoin research, block chain
9  research there essentially similar to what nChain is
10  doing now but needed more professional teams around him
11  to elevate his process.  Is that an accurate portrayal
12  of your statement?
13     A.   That's correct.
14     Q.   Is that a true statement?
15     A.   Yes, as far as I understand I guess I should
16  just explained what I mean by that.  As I understand it
17  Craig's Australian companies the work was to be, you
18  know, to be succinct about it a big mess.  It was messy.
19  He has brilliant ideas but they were being done.
20  There was research being done.  There was data being
21  collected through I think like some super computer but
22  he didn't have a particularly good vision of what to do
23  with it all and also manage a team.
24     Craig is not and he has told me this many
25  times himself that's why he didn't become CEO of nChain

Page 154

```
1   when it was formed he didn't want to manage people on a
2   business.  He wanted to focus on his work.  He is not
3   good at managing teams.  So I was told that what was,
4   you know required from the DeMorgan Group of companies
5   there was research but very just sort of undirected, not
6   a clear vision and plan of what to do with things.  A
7   lot of things about Bitcoin block chain and no effort or
8   even idea of patenting anything and nChain when it went
9   up and when I helped to move this process along was to
10  bring a professional team around him of both researchers
11  and developers and have a more coherent plan for what
12  the business was going to try to do and manage that and
13  developing an actual patent program that the DeMorgan
14  companies never even thought to do or tried to do.
15          Apparently Craig's told me several times while
16  he was in Australia at the DeMorgan companies he never
17  even thought about patenting anything.  The idea was
18  only raised by Rob MacGregor.  He's told me that as well
19  in the discussions to do the transaction that led to the
20  acquisition of DeMorgan assets and moving Craig to the
21  UK.
22          So it was putting a more professional team
23  around him and more professionalizing just the purpose
24  of the work because Craig is just not good at that.
25      Q.  Would it be fair to say that the nChain
```

Page 155

```
1   business in its origins was birthed by Craig?
2       A.  That's a hard question for me to answer
3   because I wasn't there.  I can just go from what I've
4   been told.  You know, I understand it was birthed by Rob
5   MacGregor.  Obviously Craig is, you know, a proponent of
6   it because he's the chief scientist and thinker but who
7   birthed nChain that's a tougher question for me to
8   answer.
9       Q.  I mean you were at one point the CEO of the
10  company.  I mean --
11      A.  Correct.
12      Q.  Didn't you review its records, didn't you go
13  through its contracts, didn't you get an understanding
14  of where it came from?
15      A.  I saw for example in one of the documents you
16  showed me earlier the history of entities that were part
17  of the group.  They were formed before me and as I
18  understood them and I was told they were formed by Rob
19  or people who worked for Rob.  The formation of the
20  company was as I understood it not formed by Craig.
21      Q.  But you saw that the assets were acquired and
22  the business was moved to London?
23      A.  Well, I would correct that statement.  The
24  DeMorgan businesses were not moved to London.  They were
25  as I understand them wound down.  I think there maybe --
```

Page 156

```
1   so what was moved to London is Craig assets acquired,
2   right, from the DeMorgan Group were not technically
3   moved to London.  I think they're owned by the nChain
4   Holdings company but the work -- the work process was
5   moved to London so the entities were not moved to
6   London.
7           I guess I hope that explains things.  In
8   Australia and/or wound down and nChain Holdings was
9   created in Antigua and nChain Limited was created in the
10  UK.  New companies that did not exist before with
11  Craig's DeMorgan Group of companies in Australia.
12      Q.  It just sounds to me that you're getting
13  technical about what exactly was moved but it seems to
14  me that at the -- end of the day the assets were
15  acquired and the business was moved to London with those
16  assets?
17      MR. RIVERO:  Object to the form.
18      THE WITNESS:  Depends what you mean by the
19      business moved to London.
20  BY MR. FREEDMAN
21      Q.  Well, why don't we take a look at this
22  interview you gave.  Do you recall giving this interview
23  introduction to nChain Jimmy Nguyen from ESILV?
24      A.  I'm not sure this is an interview.  It might
25  be a speech.
```

Page 157

```
1       MR. FREEDMAN:  Okay, that works too.  Let's go
2   to the 2:32 mark.
3       MR. NGUYEN:  Into huge wins.  Let me tell you
4   about nChain.  The nChain business in its origins
5   was birthed by Dr. Craig Wright our chief scientist
6   with businesses in Australia.
7       (Plaintiff's Exhibit No. 15 was
8       marked for identification.)
9   BY MR. FREEDMAN
10      Q.  Let me stop you there for a second.  I asked
11  you that before and you told me that's not what you said
12  that's exactly you said exactly verbatim in the speech?
13      MR. RIVERO:  Object to the form.
14      THE WITNESS:  Yes, I would say that's probably
15      not the most artfully phrased way of putting it.
16      What I meant by that is look, the work Craig wants
17      to do is about Bitcoin, block chain.  It's work he
18      started with research in Australia.  Those assets
19      were acquired.  He moved to the United Kingdom to
20      London and he wants to continue doing the same
21      field of work.
22          So I think it is accurate to say aspects of
23      his work were moved to London.  I think probably
24      why I didn't clarify because I was giving a speech
25      to students here, didn't want to get into all the
```

Page 158

1  technical details entities were not moved to London
2  and technically the assets of the DeMorgan Group
3  companies were actually not owned by the new London
4  company.  They were owned by a company in another
5  country.
6          This is me talking to this is a university in
7  Paris talking to students in shorthand you know
8  rather than getting into these more formal
9  corporate and technical legal details.
10 BY MR. FREEDMAN
11     Q.   But at the end of the day the company that
12 purchased the assets may have been formed in a foreign
13 jurisdiction still part of the nChain Group of
14 companies, right?
15     A.   I'm sorry, could you repeat that question?
16     Q.   Sure.  You seem to be saying that it's not
17 that the business was moved to London because the entity
18 that purchased the DeMorgan Group assets was actually
19 not incorporated in London, it was a foreign entity and
20 my statement to you is at the end of the day it was a
21 sister company that was a subsidiary of nChain Holdings;
22 right?
23     A.   I think at the time it was a subsidiary.
24     Q.   All part of the nChain Group of companies?
25     A.   Yes.  I think it's fair to say -- yes, it's

Page 159

1  part of the nChain group of companies.
2      Q.   I just wanted to let's hear the next sentence
3  here.
4          MR. NGUYEN:  The assets were acquired and the
5      business was moved to London.
6  BY MR. FREEDMAN
7      Q.   Again you were quibbling with it before I
8  understand you're explaining that you were talking to
9  students I think you and I are now on the same page that
10 while technically there might have been a foreign
11 jurisdiction the entity was still part of nChain's group
12 of companies, fair enough?
13     A.   Yes, but I think you may be misstating what
14 I'm intending here.  Craig's entities were not moved to
15 London.  They remained in Australia and were wound down.
16 So if you're asking me whether Craig's businesses, the
17 actual companies were moved to the United Kingdom or
18 anywhere else in Australia that's not true as far as I
19 understand.
20     Q.   Go ahead.  Sorry.  I think you're 100 percent
21 right and it's not my intention to say you took DeMorgan
22 and moved it to the UK, not you but whoever orchestrated
23 this, stripped out all the assets of the company, its
24 intellectual property and moved those into another
25 company?

Page 160

1          MR. RIVERO:  Object to the form.  Is this a
2      question?
3          MR. FREEDMAN:  You didn't let me finish.  I
4      guess it's not yet.  Why don't you let me finish my
5      question.  Let me restate that.
6  BY MR. FREEDMAN
7      Q.   I understand that the actual entity itself
8  wasn't moved and DeMorgan was wound down.  My point is
9  somebody and it appears it was either orchestrated by
10 Robert MacGregor took the assets of DeMorgan, its
11 intellectual property assets and moved those to the
12 nChain Group of companies?
13         MR. RIVERO:  Object to the form.
14         MR. FREEDMAN:  Sorry, you said that's correct.
15         THE WITNESS:  That is correct.
16         MR. FREEDMAN:  Thank you.
17 BY MR. FREEDMAN
18     Q.   Do you know whether after that sale occurred
19 if Craig retained any ownership interest in the
20 intellectual property?
21     A.   That was assigned to the nChain Group of
22 companies from DeMorgan?
23     Q.   Correct.
24     A.   I don't believe so.  I have had review of the
25 transaction documents in the past that I don't recall

Page 161

1  when he retained any.  Pretty sure they wanted -- when
2  you're acquiring a business you want -- the assets you
3  want to acquire what you can acquire.
4      Q.   Do you think that part of the motivation for
5  the sale was not to have challenges to any IP later on
6  when nChain really started to get big?
7      A.   I can't answer that question because I was not
8  involved in the transaction.
9      Q.   Do you think any motivation from these
10 transactions were about removing ownership from former
11 directors because -- before they knew what it would
12 become?
13         MR. RIVERO:  Objection.
14         THE WITNESS:  I have no basis to answer that
15     question.
16         MR. FREEDMAN:  I'm going to share with you
17     Mr. Nguyen an exhibit document that's been produced
18     by the defendant in this litigation.  It's under
19     the Bates label Defense AUS1585291 and that will
20     become according to my list Exhibit 16 to the
21     deposition.
22         (Plaintiff's Exhibit No. 16 was
23         marked for identification.)
24 BY MR. FREEDMAN
25     Q.   Can you see that document there?

Page 162

1    A.   I can.
2    Q.   Do you recognize this as a -- the ████ as
3  Calvin's e-mail address?
4    A.   No.
5    Q.   Do you Craig S. Wright Craig████ as Craig's?
6    A.   I believe that's Craig's personal address.
7    Q.   Have you e-mailed Craig at his personal e-mail
8  address?
9    A.   I think I have.
10    Q.   Has he e-mailed you back from his personal
11  e-mail address?
12    A.   Yes.
13    Q.   Also I see here that Sterling was mentioned.
14  Is this potentially where you picked up Sterling?
15    A.   No.  Because I don't recognize that e-mail
16  address.  I'm not sure I've ever seen an e-mail address
17  with the Sterling domain.
18    Q.   Have you ever seen this e-mail before?
19    A.   No.
20    Q.   Show you this e-mail that was sent from
21  Craig's personal e-mail address to ████ which I'll
22  represent to you is Calvin Ayre's e-mail address with CC
23  to Jim Phillip who I don't know and Stefan Matthews who
24  we both know.  It's on June 19th 2015 and I want to
25  bring you down to the bottom of the e-mail and I want

Page 163

1  to -- if you can, can you read from this paragraph here
2  that starts with so?
3    A.   So I understand who is the person who
4  supposedly sent this portion of the e-mail thread?
5    Q.   Craig from his personal e-mail address.  You
6  see it there?
7    A.   Okay.
8    Q.   Go ahead.  From "so" please for the record?
9    A.   Portion you're asking me to read says "so,
10  what I am seeking to do is have the entity as clean and
11  polished as I can before we start going forth.  I do not
12  want to have challenges to any IP later on when things
13  start to get big."
14    Q.   Can you read the second -- the next paragraph
15  underneath that that one that starts with I?
16    A.   Yes, next paragraph says "I want to remove any
17  ownership from former directors before they know what it
18  could become so they cannot challenge anything later."
19    Q.   Does this surprise you?
20    A.   I have no reaction to it.
21    Q.   I mean it seems to be and I'm not an IP lawyer
22  like you it seems to be Craig saying he wants to get the
23  assets out of the DeMorgan Group of companies before
24  anybody realized they had value and he wanted to
25  monetize them?

Page 164

1    A.   I don't interpret it that way.
2    MR. RIVERO:  Object to the form.
3  BY MR. FREEDMAN
4    Q.   How do you interpret it?
5    MR. RIVERO:  Objection to the form.
6    THE WITNESS:  Well, I wasn't involved at the
7    time or -- with this e-mail thread so I don't know
8    the full context of what they're talking about but
9    it sounds like you know, when you are setting up a
10    new company you don't want to have problems with,
11    you know, past company relations.  That's pretty
12    normal with acquisitions.
13    Then he says at the bottom the last line you
14    did not have me read concludes the e-mail "if you
15    need anything else explained I am open and will
16    answer honestly and completely."
17    That tells me that there wasn't anything
18    untoward going on here.  He is just saying he will
19    answer honestly and completely.
20  BY MR. FREEDMAN
21    Q.   Let's break that down a little bit.  Who
22  that -- he is e-mailing here Calvin Ayre and Stefan
23  Matthews the people who are helping him strip the assets
24  out, start a new company and monetize it so I wouldn't
25  say he is being open and honest here with the directors

Page 165

1  he's seeking to remove their ownership from before they
2  realize they actually had assets.  He is saying he will
3  be open and honest with his coconspirators?
4    MR. RIVERO:  Objection, argumentative.
5    THE WITNESS:  I disagree with many
6    characterizations in your very long question.  And
7    as I said I was not involved in this e-mail thread
8    or any of the discussions at the time of this
9    e-mail so I can't comment on it any further.
10  BY MR. FREEDMAN
11    Q.   As an IP lawyer who practiced for a long time
12  did you regularly see people say they want to remove any
13  ownership of former directors before they know what it
14  could become so they cannot challenge it later?
15    MR. RIVERO:  Objection, Mr. Nguyen is not
16    appearing as an expert so object to the form of the
17    question.
18    MR. FREEDMAN:  You can answer Mr. Nguyen.
19    THE WITNESS:  Have I heard that statement like
20    that before in my legal practice obviously I cannot
21    tell you about things that are protected by my
22    years of attorney-client privileged relationships.
23  BY MR. FREEDMAN
24    Q.   Mr. Nguyen, when nChain was formed did it have
25  any assets other than the assets that had been purchased

Page 166

1   from DeMorgan?
2       A.   I don't know because I was not there when the
3   nChain entities were formed.
4       Q.   During your time as CEO of nChain did you
5   identify any assets that were sourced from the beginning
6   of nChain that did not come from DeMorgan group of
7   companies?
8       A.   Well, while I was working for nChain including
9   while I was CEO nChain created many new assets.
10      Q.   But I'm not talking about what they did later.
11  I'm saying when nChain was formed did it have any assets
12  outside -- let me make it a narrow question.  When
13  nChain was formed did it have any intellectual property
14  assets outside of the ones it acquired from the DeMorgan
15  Group?
16      A.   I do not know.
17      Q.   Are you aware of any assets, any intellectual
18  property assets, it had at the time of its formation
19  besides the DeMorgan Group?
20      A.   Talking about nChain Holdings company or which
21  entity?
22      Q.   I realize I threw a word there that doesn't
23  belong.  Let me restate the question.  Are you aware of
24  nChain Holdings having any intellectual property outside
25  of the DeMorgan intellectual property assets it acquired

Page 167

1   when it acquired those assets?
2       A.   NChain Holdings did not that I know of.  I
3   guess I'll say I don't know whether nChain Holdings had
4   any other IP assets at this time of its formation or
5   acquisition of the DeMorgan assets.
6            Certain nChain Holdings subsidiaries, other
7   companies in the nChain group did.  I'll complete that
8   sentence.  Other subsidiaries in the nChain group of
9   companies did have other IP assets apart from and
10  unrelated to the DeMorgan Group assets.
11      Q.   Okay.  Mr. Nguyen, I'm going to share with you
12  another document that's been produced in this litigation
13  as Defense 1074241.  Can you -- is it showing up on your
14  screen?
15      A.   It is.
16           MR. FREEDMAN:  Can you take a look at that
17      document and let me know if you recognize it.  It
18      it's going to be marked as Exhibit 17 to your
19      deposition.
20           (Plaintiff's Exhibit No. 17 was
21           marked for identification.)
22           THE WITNESS:  I have never seen this before.
23  BY MR. FREEDMAN
24      Q.   You have never seen this document before?
25      A.   No.

Page 168

1       Q.   Do you know what ended up happening to the
2   company called nCrypt Limited?
3       A.   That's a little confusing.  I have to go back
4   and look at the history because I believe nCrypt Limited
5   that is referenced here because it's referencing a UK
6   address in London that is a prior name of nChain Limited
7   UK entity.  There was a name change.
8       Q.   And you were brought on board nChain about a
9   month after this was signed, right, less than a month.
10  In September of 2016.  So weeks after this was signed --
11  after this power of attorney was made; correct?
12      A.   Yes.
13      Q.   And during your entire stint at nChain
14  including your time as its CEO you did not know that
15  nChain held a power of attorney over the intellectual
16  property that had been assigned to it by Craig Wright?
17      A.   The purpose of these power of attorneys
18  typically is part of the patent prosecution process
19  where because Craig worked for the company for under its
20  name nCrypt Limited and changed to nChain Limited when a
21  patent lawyer files patent applications they need a
22  power of attorney.
23           So I don't know what happened with this one
24  but I'm assuming based on my experience with the patent
25  prosecution process that's why this was executed.

Page 169

1       Q.   That's certainly one use for them I agree but
2   isn't it also true that this would authorize nCrypt to
3   manage any litigation over intellectual property created
4   by Craig Wright?
5       A.   I have to read this first.
6       Q.   Why don't you go ahead.  Tell me.
7       A.   Yes, I think there's a mistake in the first
8   paragraph.  What this is meant to do is when employee
9   typically intellectual property I work for a company and
10  I create work product, you know, inventions, things
11  while doing my work at the company the company owns the
12  intellectual property, not the employee.  But when you
13  file patent applications you have to name who the
14  inventor is and the inventor is actually the individual
15  employee.
16           So for example I work for Microsoft I invent
17  something great and new at Microsoft.  I'm personally
18  the inventor but Microsoft under its employment
19  agreement or conditions with me owns the invention to
20  file a patent application for that patent lawyers still
21  have to identify the individual who is the inventor and
22  confirm that they have the power to file the patent
23  application in the name of the company even though the
24  inventor is the individual.
25           So that's why there is the explanation that

Page 170

1  this is designed to give power of attorney to be able to
2  file IP registration prosecution applications for the
3  employee IP as you can see is a defined term where Craig
4  is an employee of the company and therefore he needs to
5  give power of attorney to the company and its lawyers to
6  be able to prosecute, take action to protect the IP.
7       Q.  Do you know whether Ira Kleiman or Dave's
8  estate had any shares in Craig's former companies?
9       A.  I have no idea.
10      Q.  Do you know what the book value of any of
11 those former shares were?
12      A.  I said I don't know if they had any shares so
13 I couldn't tell you what the value is.
14      Q.  Let me refine that question.  Do you know what
15 the book value of any of the shares of Craig's former
16 companies were worth?
17      A.  No.
18      Q.  Are you aware of a WK ID software package that
19 was owned by Craig's companies prior to nChain?
20      A.  Could you repeat that?
21      Q.  Sure.  Are you aware of a WK ID software
22 package owned by Craig's companies prior to nChain?
23      A.  That does not ring a bell.
24      MR. FREEDMAN:  Why don't we take five.  Let me
25 see if I can reorganize things in a way to get us

Page 171

1  out of here a little quicker rather than sit and
2  wait while I do it.  Let's take five.
3       THE VIDEOGRAPHER:  Going off the record at
4  6:13 p.m. eastern time.
5       (Thereupon, a brief recess was taken.)
6       THE VIDEOGRAPHER:  We are back on the video
7  record.  The time is 6:29 p.m. Eastern time.
8  BY MR. FREEDMAN
9       Q.  Mr. Nguyen, I want to -- let's introduce
10 Exhibit 18 to your deposition which is another
11 interview.  You weren't kidding, you do a lot.  I
12 actually can't hear you.  I think you might be -- either
13 you're on mute -- you're not on mute but I can't hear
14 you talking.
15      A.  Can you hear me now?
16      Q.  Yes.
17      A.  I heard you play something.  I heard an audio
18 of me talking but didn't see anything.
19      MR. FREEDMAN:  I realize it's not Exhibit 18.
20 I already introduced this video as Exhibit 13.  I
21 already confirmed that's an accurate video of you
22 so we don't need to go back.
23 BY MR. FREEDMAN
24      Q.  Is it accurate Jimmy -- Mr. Nguyen, to say
25 nChain has one of the largest block chain portfolios in

Page 172

1  the world?
2       A.  Yes, from what I understand, yes.
3       (Plaintiff's Exhibit No. 18 was
4       marked for identification.)
5  BY MR. FREEDMAN
6       Q.  And I am going to now introduce what I hope is
7  going to work as Exhibit 18 and see if I can get that to
8  share with you.  Do you see that video up there?
9       A.  I see something that says Risk Warning and
10 Disclaimer.
11      Q.  Underneath Jimmy Nguyen on Bitcoin SV from
12 Trader Cobb.
13      A.  Okay.
14      Q.  I just want you -- do you recall this
15 interview now that you've had a chance to see it?  Happy
16 to let it play longer if you want.
17      A.  I recall being interviewed by Trader Cobb.  I
18 don't remember this specific one.
19      Q.  Play it for a minute.  You want to listen for
20 a minute to see if it recalls your recollection?
21      MR. NGUYEN:  I started working more with the
22      nChain business in 2016 and then it merged publicly
23      in 2016.  Recently I took an executive role with
24      dealing with IP portfolio.  It is one of the
25      largest block chain patent portfolios in the world.

Page 173

1  Eventually took another role as CEO.
2  BY MR. FREEDMAN
3       Q.  Again happy to let it play.  You don't recall
4  giving this interview?
5       A.  I don't recall it sitting here but I'm sure I
6  did because that's me.
7       Q.  That's an accurate portrayal of your
8  interview?
9       A.  Yes.
10      Q.  Approximately how valuable is nChain's IP
11 portfolio?
12      A.  I could not tell you.
13      Q.  As nChain's IP portfolio grows in value so
14 does nChain; right?
15      A.  Yes.  The enterprise value of nChain which is
16 different than IP value.
17      Q.  Have you ever contacted any prospective buyers
18 regarding nChain's intellectual property pursuant -- let
19 me just stop there.  Have you ever tried to sell any of
20 nChain's intellectual property or nChain itself?
21      A.  No.
22      Q.  Even though you were contracted to do that?
23      A.  Correct.
24      Q.  Why did you not end up doing that?
25      A.  It was too early in nChain and each new IP



Page 174

1  portfolio's life.  Intellectual property especially
2  patents take a long time to get through the system.
3  When you file a patent application it can take two,
4  three, sometimes even longer years for it to be granted.
5  And before a patent -- when a patent is still just an
6  application, right, you don't know if you're going to
7  get it granted.  You don't know what the scope of your
8  patent is.  You can get narrowed.  You can get split
9  into more than one.
10       So you know from my experience as a former IP
11  lawyer in dealing with such things value is.  Greater --
12  first of all, there's not that much value in patent
13  applications before they're granted.  Once they're
14  granted I think people would understand of course it
15  adds more value because it's been granted.  Then patents
16  get even more value after they've been tested,
17  challenged for example, right, just because you have a
18  patent another company or person can still challenge it
19  and say I think it infringes mine or it's invalid or it
20  gets tested in the litigation.
21       So patents have the most value after they have
22  not just been applied for, granted but tested and then
23  also commercialized.  Just because you have a piece of
24  intellectual property, a patent until companies use it,
25  you know, in business, make money off of it, right, it's

Page 175

1  very -- first of all, it's hard to show what its value
2  is.  You have a patent who an invention but you don't
3  know what the market demand for it is.  How many -- what
4  types of businesses want to use it.  What's the
5  industry.  Even though I was brought on board to
6  commercialize and help monetize the IP portfolio one of
7  the biggest, you know, pieces of advice I delivered
8  early on was I think this is too early.
9       Q.   So while you were doing your job of trying to
10  commercialize that IP portfolio did you -- were you
11  involved in the tracking the progress of these patents
12  as they were moving forward toward patents?
13       A.   I was involved.
14       Q.   And did nChain have like a patent road map or
15  a large Excel sheet of some kind where it would keep
16  track of all its patents and its inventorship and where
17  it was holding and what stage that sort of thing?
18       A.   I believe our outside patent counsel kept
19  that.
20       Q.   I'm going to share with you another exhibit I
21  think this is going to become.  Hold on.  There we are.
22  Technology is great until it stops working on you.
23       A.   I know that from block chain.
24       Q.   Come up with a deposition solution for block
25  chain.

Page 176

1       A.   I will try to think of one.

Page 177

Page 178

Page 179

Page 180

Page 181

7      Q.   You just said a moment ago you're not a
8   professional patent appraiser; right?
9      A.   That is correct.
10      Q.   But Baker & McKenzie is a professional patent
11   appraiser; correct?
12      A.   I don't know.
13      MR. RIVERO:  Objection.
14   BY MR. FREEDMAN
15      Q.   They were hired to perform this analysis?
16      A.   They were.  Not by me but they were.
17      Q.   And they are a very large, well known firm?
18      A.   Yes.
19      Q.   Did you ever orchestrate another assessment or
20   valuation of nChain's intellectual property?
21      A.   I did.
22      Q.   With who?
23      A.   It was precisely because I -- not just me
24   Stefan Matthews because he is the one who sent me this

Jimmy Nguyen
April 30, 2020                                          182 to 185

Page 182

1  Baker & McKenzie report to look at.  Neither of us found
2  it credible.  So he said would you -- he asked me to try
3  and find other valuation firms to take a look at the IP
4  portfolio and get a second or even a third opinion.
5  Like going to a doctor and not, you know, believing what
6  the doctor says and you want to get a second or third
7  opinion.
8          MR. FREEDMAN:  Let me just give you an update.
9  I've gone through my entire outline that I had
10 here.  I think I'm probably done.  I want to go
11 through it all, make sure there's nothing left.
12 Then I'll turn it over.  I don't know if Mr. Rivero
13 has any questions or not.
14         So let's take ten this time and hopefully come
15 back and either let you go right away or it will be
16 very short guaranteed.
17         THE WITNESS:  Thank you.
18         THE VIDEOGRAPHER:  Going off the video record
19 6:47 p.m. eastern time.
20         (Thereupon, a brief recess was taken.)
21         THE VIDEOGRAPHER:  We are back on the record.
22 The time is 7:03 p.m. Eastern Standard Time.
23 BY MR. FREEDMAN:
24     Q.  Mr. Nguyen, did you ever discuss -- again
25 during the time period that your lawyer's permitting you

Page 183

1  to testify about did you ever discuss with Craig how he
2  should explain his role and the development of Bitcoin?
3      A.  No.  I don't think I remember discussing that.
4      Q.  Did you ever discuss with Craig how he should
5  explain the role of others in the development of
6  Bitcoin?
7      A.  I heard him talk about it but I never talked
8  to him about how he described anything.
9      Q.  Did you ever convey to Craig he should
10 emphasize his role in developing Bitcoin and
11 de-emphasize the role of others?
12     A.  No.
13     Q.  To your knowledge has anyone conveyed that
14 sentiment to Craig?
15     A.  I have never heard that.
16     Q.  Did you ever convey to Craig that it was in
17 nChain's best interest for Craig to be Satoshi alone?
18     A.  No.
19     Q.  To your knowledge has anyone else tried to
20 convey to Craig that that was in nChain's best interest?
21     A.  Not to my knowledge.
22     Q.  Do you believe it's in nChain's best interest
23 for Craig to have been Satoshi alone?
24     A.  Right now I don't speak for nChain any more
25 but I'll say what I say to media generally which is I

Page 184

1  don't think it matters for nChain or for what is being
2  built in the Bitcoin SV ecosystem.  Both that company as
3  well as Bitcoin SV after we're trying to build real
4  value based on real utility and therefore that's more
5  important than this question of whether Craig is Satoshi
6  Nakamoto or not which I know is a question of great
7  interest out there but I believe the company as well as
8  what we're doing at Bitcoin SV has to succeed based on
9  its technology, not on whether Craig is Satoshi.
10     Q.  I understand that and I understand the
11 argument you're making and that's fine but that's not
12 quite what I was asking.  Let me phrase it this way.  Do
13 you really believe that nChain's value would not
14 increase if Craig came out and conclusively proved to
15 the crypto community that he was Satoshi Nakamoto?
16         MR. RIVERO:  Object to the form.
17         THE WITNESS:  Yes, I can't really answer that
18 question because mostly because of the second part
19 of it.  I don't know that there's anything he could
20 do given the history of the Satoshi question that
21 would definitively prove to the cryptocurrency
22 cryptography world that he is Satoshi Nakamoto.
23 There are too many people who will always doubt it.
24 BY MR. FREEDMAN:
25     Q.  I mean sitting here today you do not believe

Page 185

1  the value of nChain would increase if Craig Wright
2  signed a message publicly with a private key to the
3  Genesis block?
4          MR. RIVERO:  Object to the form.
5          THE WITNESS:  I don't have a basis to answer
6  that.
7  BY MR. FREEDMAN:
8      Q.  Do you really think the majority of the
9  Bitcoin world would reject his claim of being Satoshi
10 Nakamoto if he could sign with a private key to the
11 Genesis block?
12         MR. SILVERGLATE:  Object to the form.
13         MR. RIVERO:  Object to the form.
14         THE WITNESS:  I can't speak for the majority
15 of the Bitcoin community.  I can tell you I've seen
16 online posts, social media, you know, messages
17 online, I don't know if the media reports, lots of
18 online chatter with people saying even if he did
19 sign a transaction using a private key from one of
20 the early Bitcoin blocks that people would believe
21 it's Satoshi.
22         People wouldn't believe him.  I've seen many
23 people write that.  They'll say he just, you know,
24 got the keys from someone else, that they're not
25 really his and they don't prove he is Satoshi.

Page 186

1    Doesn't prove it.
2         Digital currency community has gone through
3    this evolution of all the different ways where you
4    could believe Craig is not Satoshi Nakamoto because
5    there's such dislike for him among so many people
6    in the cryptocurrency world.  That's what I mean by
7    there's almost nothing I think do that would
8    conclusively prove to many of the cryptocurrency
9    world.
10   BY MR. FREEDMAN
11        Q.   There will always be people on the fringes of
12   any community Mr. Nguyen I understand that.  There are
13   some people that will never accept Craig Wright as
14   Satoshi Nakamoto.  Are you really testifying that it's
15   your -- it's your testimony today that you think there
16   wouldn't be a significant contingent of people who would
17   accept his claim of Satoshi if he signed a public
18   message with the private key of the Genesis block?
19        MR. RIVERO:  Objection to form.
20        THE WITNESS:  I think if Craig did that it
21        would lead more people to conclude that he is
22        Satoshi Nakamoto.  I still believe there would be
23        many doubters.  So I can't really -- have no basis
24        to quantify whether an action like that would lead
25        the consensus of the world to believe that he is

Page 187

1        Satoshi.  I just know that many people are saying
2        even now they still wouldn't believe him.
3    BY MR. FREEDMAN
4         Q.   But many people would believe it.  Sorry, let
5    me finish the question.  Don't you think that would lead
6    to an increase in nChain's value?
7         MR. SILVERGLATE:  Object to the form.
8         MR. RIVERO:  Object to the form.
9         THE WITNESS:  I think you're asking me to
10        speculate on a number of different things as to how
11        it would play out.  I don't have a basis to do
12        that.
13   BY MR. FREEDMAN
14        Q.   I mean Robert MacGregor clearly believed he
15   would be able to sell the intellectual property for a
16   lot of money if he could prove Craig was Satoshi; right?
17        MR. RIVERO:  Objection.
18        MR. SILVERGLATE:  Objection.
19        THE WITNESS:  That's what was said to me.  I
20        don't know that it was just about selling the
21        intellectual property but monetizing it.
22   BY MR. FREEDMAN
23        Q.   Do you believe that Bitcoin's Satoshi Vision
24   or BSV would increase in value if Craig were able to
25   prove -- if Craig came out and signed with the key to

Page 188

1    the Genesis block?
2         MR. RIVERO:  Objection to this entire line of
3    questioning.
4         MR. SILVERGLATE:  Same objection.
5         THE WITNESS:  Again that would require me to
6        speculate on what affects digital currency prices
7        which SV -- if you've seen the digital currency
8        world are very volatile and frankly very hard to
9        explain.
10   BY MR. FREEDMAN
11        Q.   I understand I'm asking you to speculate.
12   Speculate for me do you think the price would go up?
13        MR. RIVERO:  Objection to form.
14        THE WITNESS:  I've always been advised to not
15        speculate in a deposition.
16   BY MR. FREEDMAN
17        Q.   That's true.  That's good advice but I am
18   specifically asking you to speculate so speculate for
19   me.
20        MR. RIVERO:  Objection.
21   BY MR. FREEDMAN
22        Q.   What do you think would happen to the price?
23        MR. SILVERGLATE:  Form.
24        THE WITNESS:  I don't know.  I can't tell you,
25        the event has not happened.  So it's clearly been

Page 189

1    as I recall when there was the proof efforts to try
2    and prove Craig is Satoshi in early reports.  I
3    don't remember that Bitcoin price at the time but I
4    don't recall that causing a significant change in
5    price then or significant drop in the price when it
6    appeared that Craig did not prove conclusively he
7    was Satoshi back in May of 2016.
8         That's the only basis I would have to know
9    about whether an event like that would affect the
10   price of Bitcoin.
11   BY MR. FREEDMAN
12        Q.   There was no BSV when he failed to prove in
13   2016 that he was Satoshi; right?
14        A.   That's true but there was BTC.
15        Q.   Sure.  But my point is BSV claims to be
16   following Satoshi's original vision?
17        A.   Yes.
18        Q.   Craig is very important part of the BSV story,
19   it's not the only part of BSV story but you and I can
20   agree it's an important part of the BSV story; right?
21        A.   It's certainly an important part of -- yes
22   it's important part of the BSV.  Exactly as you said I
23   in particular as a leader of the ecosystem has worked
24   very hard to make Bitcoin SV not about Craig.  Bitcoin
25   SV has to grow and grow in value and succeed not because

Page 190

1   of any one person.  It has to technically work.
2        We have to get away from a digital currency
3   value that's tied to a personality.  Who would want long
4   term to own a digital asset and to use a block chain
5   technology platform based upon the personality of one
6   person?  To me that doesn't give the coin value, real
7   value.  Sort of saying it's valuable because he is a
8   person.  That doesn't make sense.
9        Q.   Craig has stated to you that for a period he
10  sought to keep his involvement in Bitcoin a secret;
11  right?
12       A.   Yes.
13       Q.   And do you know why he sought to keep it a
14  secret?
15       A.   I don't know fully the reason in his head.  At
16  the time it's been over a very long period of time
17  before I knew Craig but as I understand from my talks
18  with him over the years he wanted privacy.  He likes to
19  work.  He wants to sit and work on his research and
20  thinking.  He is an academic.
21       He did not -- he is not comfortable or was not
22  comfortable with attention.  He's gotten more
23  comfortable with it now.  He was not comfortable with
24  public attention.  He wanted to protect his family from,
25  you know, too much scrutiny and the other thing he's

Page 191

1   told me is that, you know, some people -- a lot of
2   people in the digital currency world want to try and try
3   to treat Satoshi as like a god.  Some mythic figure,
4   right that has delivered Bitcoin to the world and he
5   didn't want to be that.  Be perceived that way he's told
6   me.
7        Most importantly big debate that happens in
8   the Bitcoin world is whether you should change the
9   protocol, the technical rule set upon which Bitcoin
10  works.  There is an early Satoshi Nakamoto famous online
11  post, famous in the digital currency world where Satoshi
12  says the Bitcoin protocol needs to be set in stone after
13  its client version I believe 0.1.0 and the reason that's
14  important to why Craig didn't want to be out as Satoshi
15  is he said his philosophy is like Craig rule set it's
16  got to say frozen, not change like the internet protocol
17  does not change very much therefore we can operate on a
18  stable platform.  And therefore there's nobody in
19  charge.
20       There's no king of Bitcoin who can change the
21  rules.  It should just be left there and if in the
22  beginning he told me if he was perceived to be Satoshi
23  then everyone will just follow what Satoshi says to do
24  and he wanted Bitcoin to be a system that was not
25  susceptible to interference by government or businesses

Page 192

1   who could change it in ways.
2        It was designed to provide light, prevent
3   fraud in the world.  All these things he envisioned that
4   required but not to be someone in charge of it or
5   perceived to be in charge of it.
6        Q.   I am going to keep asking questions.  My
7   screen I'm getting a little bit of interference.  I am
8   going to shut my video off to see if it helps with the
9   feed.  Still can you hear me?
10       A.   Yes.
11            (Plaintiff's Exhibit No. 20 was
12            marked for identification.)
13  BY MR. FREEDMAN
14       Q.   So I am going to share with you a video for
15  time purposes I just want to verify that this is in fact
16  an interview you recall.  This is Dr. Craig Wright Jimmy
17  Nguyen at the Oxford Union.  Happy to play some of it
18  for you so you can take a look.
19       A.   I remember this.
20            VIDEO AUDIO VOICE:  Everything it needs to do
21  anything --
22  BY MR. FREEDMAN
23       Q.   Do you recall this interview or this
24  recording, presentation?
25       A.   Yes.  It was not an interview more of I don't

Page 193

1   know what you call it.
2        Q.   Presentation of some kind?  Is this video an
3   accurate portrayal of that episode?
4        A.   I haven't watched the whole video but I would
5   assume so.
6        Q.   Any reason to believe it's not an accurate
7   video?
8        A.   Not so far from what you've shown me so far.
9            MR. FREEDMAN:  Well, then let's go
10  particularly to one particular portion.
11            MR. NGUYEN:  It's been the internet's biggest
12  mystery for long time who is Satoshi Nakamoto.  For
13  reasons we won't talk about here Craig chose to be
14  private about his history in Bitcoin.  As you might
15  imagine, you know, this has an impact on one's
16  family and one's personal life.
17            For various reasons he chose to be private
18  about it.  For various reasons that emerge
19  including the battle over Bitcoin's future what we
20  believe is vital to ensure that the network thrives
21  and survives.
22  BY MR. FREEDMAN
23       Q.   Is that an accurate statement you made?
24       A.   Yes.
25       Q.   And Craig was the one who told you he wanted

Page 194

1  to keep his involvement in Bitcoin a secret?
2      A.   He didn't say so in so many words.  Talk about
3  why he was private about it.
4      Q.   He never told you he wanted to stay private
5  about it?
6      A.   No, I said he told me he wanted to stay
7  private.  I don't know that he used the word secret.  We
8  have had discussions where -- reasons why he wanted to
9  stay private.  He did not want to be known publicly.
10         MR. WRIGHT:  Gizmodo played by a
11     contrarian.  Mr. Contrarian was sending documents
12     that were stolen from my company and payment we
13     didn't talk about our employees and everyone else.
14     As Jimmy knows we have 45 staff in 2013.  In the
15     dates when no one knew about Bitcoin I had 45 staff
16     in Australia working on Bitcoin projects basically
17     secretly under the radar.
18  BY MR. FREEDMAN
19     Q.   SO he has used the word "secret" involved in
20  his discussions of Bitcoin; right?
21     A.   There he is talking about secret team of
22  employees in Australia working in secret.  Wasn't
23  talking about keeping Satoshi a secret.  Not quibbling
24  over the word secret.  Certainly didn't want to be
25  private about being Satoshi.

Page 195

1      Q.   You don't have to use the word secret.  He
2  definitely expressed the desire he didn't want people to
3  know he was Satoshi; fair?
4      A.   Yes.
5      Q.   Are you now willing now that we've skipped
6  around this are you willing to say this is an accurate
7  video recording of your session at the Oxford Union?
8          MR. SILVERGLATE:  Objection to form.
9          THE WITNESS:  Sorry?
10         MR. SILVERGLATE:  I objected to the form.
11         MR. FREEDMAN:  Jimmy, what was your answer?
12         MR. RIVERO:  Join.
13         THE WITNESS:  Yes.  Obviously I hadn't watched
14     the whole video.  I never have.  It looks -- I
15     don't have any reason so far to believe it's not an
16     accurate recording.
17         (Plaintiff's Exhibit No. 21 was
18         marked for identification.)
19  BY MR. FREEDMAN
20     Q.   Okay.  You've mentioned this other let's
21  introduce Exhibit 21 to the deposition which is I
22  believe you've talked about this particular presentation
23  today with -- are you seeing the Bitcoin Association You
24  Tube on the screen?
25     A.   This is from Coin Geek's channel but has a

Page 196

1  picture of me with any name and Bitcoin Association on
2  it if that's the one.
3      Q.   This is I believe the interview you were
4  talking about earlier about interviewing Craig but why
5  don't we watch a few minutes of it and you tell me if
6  you recognize it?
7          VIDEO AUDIO VOICE:  So did you create Bitcoin?
8          MR. WRIGHT:  Yes.
9          THE WITNESS:  I did not to see any more.  This
10     is the video.
11  BY MR. FREEDMAN
12     Q.   You see it's on Coin Geek's channel.  Is this
13  an accurate portrayal of your back and forth with Dr.
14  Wright?
15     A.   Yes.
16     Q.   In this interview do you recall Craig telling
17  you that he had help from Dave Kleiman?
18     A.   Yes, I believe he said that.
19     Q.   And do you recall Dave telling you that --
20  sorry, strike that.  Do you recall Craig telling you
21  that Dave Kleiman responded from the Satoshi account?
22     A.   I don't remember if he said that in the
23  interview but it sounds familiar.  It's something Craig
24  has told me.  Whether it's in this interview or not I
25  don't recall.

Page 197

1      Q.   So Craig has told you previously that Dave
2  interacted and had access to the Satoshi account?
3      A.   He's told me that they both posted from
4  Satoshi account sometimes.
5      Q.   I just want to spend a little bit more time
6  because I would have thought that would have come out
7  earlier did he say anything else to you about Dave's
8  role as assisting him as Satoshi?
9      A.   In this interview or generally?
10     Q.   Generally.
11     A.   Not much other than what I've told you.
12     Q.   Did he tell you that Dave helped keep the
13  system running in the beginning?
14     A.   I don't remember if that quote was used.
15     Q.   Let's take a look first at --
16     A.   There's some familiarity to that --
17         MR. WRIGHT:  Because I had a cattle ranch and
18     ran up there with all the machines.  The other
19     aspect that followed that that I needed to address
20     was Microsoft and patch Tuesday.  Anyone remember
21     patch Tuesday?  I really hadn't thought about
22     running a bunch of stand alone Windows XP machines
23     until everything turned off at the same time.
24         So that was another reason Bitcoin before the
25     current block chain turned off from crashing

Page 198

1   literally on that Tuesday night everything updated,
2   turned off and restarted and just caused a massive,
3   massive problem because the two things split and
4   didn't sync and I had not thought about that one.
5   So that was the next part I had to do.  I had to
6   run around and I bought a whole bunch of Microsoft
7   licenses at excessive prices and installed a domain
8   in there and a work group and so I set up a forest
9   between my two locations and ran out all these
10  machines.  Set up a WUSS server, W-U-S-S, many
11  Australians we made fun of Microsoft calling it a
12  Wuss but we set up a Wuss service and Dave actually
13  helped on some of that because I couldn't get it
14  all done fast enough.  I had to set up a full --
15  BY MR. FREEDMAN
16      Q.  Does that help refresh your recollection?
17      A.  Yes, I did not remember that part of the
18  exchange but what you played for me I do remember that.
19      Q.  Did Craig tell you that Dave was one of the
20  first two users of Bitcoin?
21      A.  I don't recall and it depends what you mean by
22  users, user of Bitcoin.
23          MR. FREEDMAN:  Take a look.
24          MR. WRIGHT:  So that every node wouldn't go
25      out and calculate their own and people say it's

Page 199

1   wasting 50 Bitcoin but it's not wasting anything
2   because there was no value at the time.  We're
3   talking no exchanges, no users.  I mean for the
4   first few days I was the only user.  Then hell,
5   when Dave and a few other people jumped in.
6   BY MR. FREEDMAN
7       Q.  Do you recall now him telling you that Dave
8   was one of the first couple users or few users of
9   Bitcoin?
10      A.  Yes, I guess I interpret users of Bitcoin is
11  differently.  I think he is referring to running a
12  version of the client software and mining.
13      Q.  So right, that's -- you're right.  Let me
14  state that better.  Do you recall Craig telling you that
15  Dave Kleiman was one of the first two people to have ran
16  a Bitcoin node and mined Bitcoin beside himself?
17      A.  I think in that click you've just referred --
18  shown me that's what he means.  To the extent he didn't
19  quite phrase it that way.  My interpretation is that
20  what that means.
21      Q.  Did -- has he ever told you anything besides
22  that -- sorry, strike that.  Has he ever told you this
23  in any other setting besides this one?
24      A.  No.
25      Q.  You said to me previously that you believe --

Page 200

1   actually you know what let me ask you.  Do you believe
2   that Satoshi was a group of people or just one person?
3          MR. RIVERO:  Object to the form.
4          THE WITNESS:  I don't have a basis to answer
5      that because I wasn't there at the creation of
6      Bitcoin.  Did not work with whoever created Bitcoin
7      at the time.
8   BY MR. FREEDMAN
9       Q.  So let's introduce -- if it will let me,
10  Exhibit 22 to your deposition.  I'm going to bring us
11  to -- I think this is Exhibit 2 to your deposition
12  already.  Let's take a look at this time stamp.
13          MR. NGUYEN:  Does that mean I believe he is
14      Satoshi.  First of all I think Satoshi Nakamoto was
15      a group of people.
16  BY MR. FREEDMAN
17      Q.  Can you explain that?
18      A.  Yes, I have to see I guess the rest of the
19  answer.
20          MR. FREEDMAN:  Sure.  Hold on.  That's fair.
21      Let me play it for you.
22          MR. NGUYEN:  And do I believe --
23          MR. FREEDMAN:  I'll rewind it for you.
24          MR. NGUYEN:  So does that mean I believe he is
25      Satoshi Nakamoto.  First of all I think Satoshi

Page 201

1   Nakamoto was a group of people.  I don't think
2   that's a shock to anyone out there.  Do I believe
3   he was part of that group, tune in May 30th, Coin
4   Geek Toronto.
5   BY MR. FREEDMAN
6       Q.  Do you want to hear more?
7       A.  No, I think that's enough.
8       Q.  Is that a true statement?
9       A.  Yes, I think that's what I was willing to say
10  at the time.  You can tell I was trying to be coy to
11  tease what was going to happen at this conference.  I
12  think it's consistent with what I've said before which
13  is Craig was the -- as I understand is the primary
14  creator of Bitcoin and he had help including help as you
15  mentioned here responding from Satoshi online accounts.
16      Q.  Right.  But there's a difference between I am
17  Satoshi and I had some help doing it and I believe
18  Satoshi is a group of people.
19      A.  Well, like I said it depends on was there a
20  group of people who worked on helping Craig with the
21  creation of Bitcoin including at least one I've been
22  told responded from the Satoshi Nakamoto account, yes.
23      Q.  And one of those individuals is Dave Kleiman?
24      A.  Yes.
25      Q.  And your reference here to that group of

Page 202

1  people included a group that included Dave Kleiman?
2      A.  What's the date here?  Yes, it would include
3  Dave Kleiman because I had understood at the time he,
4  you know, was a friend of Craig and he helped Craig.
5      Q.  Are you aware of an expert report that's been
6  filed in this litigation by Amy Klinn?
7      A.  No.
8      Q.  Do you believe Craig is incapable of
9  manipulating anyone?
10         MR. RIVERO:  Object to the form.
11         THE WITNESS:  I can't answer that question.  I
12     don't have a basis to answer that question.  I am
13     not even sure what that means.
14  BY MR. FREEDMAN
15     Q.  Do you believe Craig is incapable of lying?
16         MR. RIVERO:  Objection.
17         THE WITNESS:  I can't answer that question.  I
18     don't know.
19  BY MR. FREEDMAN
20     Q.  Do you think he can lie?
21         MR. RIVERO:  Objection.
22         THE WITNESS:  I don't know.
23  BY MR. FREEDMAN
24     Q.  You don't know if you think he can lie?
25         MR. RIVERO:  Objection.

Page 203

1          MR. SILVERGLATE:  Objection, asked and
2      answered.
3          MR. FREEDMAN:  You can answer.
4          THE WITNESS:  I don't have a basis to answer
5      that because I have not had an occasion to think
6      that he lied to me.
7  BY MR. FREEDMAN
8      Q.  Not asking if he is a liar or if you think he
9  lied to you.  I'm just asking if you think he is capable
10 of telling a lie?
11     A.  I am not sure what you're asking.  To me?
12         MR. RIVERO:  Standing objection.  I've been
13     listening to this gibberish for almost eight hours,
14     seven hours.  You've asked the same thing four
15     times.  It's an improper question.  How long are
16     you going to keep going on this -- when you told us
17     40 minutes ago you were taking a ten minute break
18     because you were almost done?
19         MR. FREEDMAN:  Mr. Rivero, you know you're
20     limited to objection to form.
21         MR. RIVERO:  What's your time estimate since
22     once again you proved that I can't rely on your
23     word?  What's your time estimate?
24         MR. FREEDMAN:  Mr. Rivero, I have seven hours
25     and since every time I try in good faith to tell

Page 204

1  you how long I think it's going to take I told you
2  I made a mistake I pointed out I had missed a
3  module, that I was trying to get you out of here.
4  You can believe what you want to believe but please
5  objection to form.
6          MR. RIVERO:  Mr. Videographer, please count
7      the time up because I know how this ends.  I've
8      been to this movie before with this judge.
9          MR. FREEDMAN:  Do you want to take a break and
10     let him count it up?
11         MR. RIVERO:  No, sir, I want you to keep
12     going.  Ask your questions.
13  BY MR. FREEDMAN
14     Q.  So before we were interrupted, Mr. Nguyen, I
15 asked you yes, if he is mentally capable of telling a
16 lie?
17     A.  I have no basis to judge that.  Mental health
18 expert psychologist I don't know who would even be
19 qualified -- what kind of qualifications you need to
20 answer that question.
21     Q.  Have you ever heard to have someone called
22 Garreth Williams?
23     A.  I feel like I've heard the name.  I don't know
24 who that is.
25     Q.  Has Craig ever mentioned this person to you?

Page 205

1      A.  I don't recall.  I feel like I've heard the
2  name but not sure.
3      Q.  Has Craig ever mentioned Wing Commander Don
4  Linem to you?
5      A.  Again I think that name I heard before but I'm
6  not sure.
7      Q.  Have you ever reviewed a document identifying
8  potential red flags or competing claims to nChain's IP?
9      A.  Not that I can recall.
10     Q.  Has Calvin Ayre invested in BSV?
11     A.  What does that mean invested in BSV?
12     Q.  Do you think Calvin Ayre has assets invested
13 in BSV?
14     A.  I guess that's one question that does not make
15 sense to me.
16     Q.  I hear you.  Let me refine it for you.  Do you
17 believe that Calvin Ayre holds large amounts BSV?
18     A.  I know he mines BSV so I'm sure he holds BSV.
19     Q.  Do you believe Stefan Matthews holds large
20 amounts of BSV?
21     A.  I don't know.
22         MR. FREEDMAN:  That's all I have.  Thank you
23     so much Mr. Nguyen.  I apologize for interrupting
24     your day.  We can go off the record but I wanted to
25     have a meet and confer with Spencer.  Doesn't need

Page 206

1  to be on the record.  As far as I'm concerned
2  Mr. Nguyen you're free to go.  Thank you.
3        THE WITNESS:  Thank you.
4        MR. SILVERGLATE:  Questions, Andres?
5        MR. RIVERO:  Thank you Jimmy, I don't.  No, I
6  don't.
7        MR. SILVERGLATE:  We don't waive reading and
8  we will read the deposition if it's ordered.
9        THE VIDEOGRAPHER:  The time is 7:35 p.m. and
10  we're going off the video record.
11        MR. FREEDMAN:  Can you give me the rough
12  tonight, whatever condition it's in?
13              (Witness excused.)
14              (Deposition was concluded.)
15
16
17
18
19
20
21
22
23
24
25

Page 207

1
2                CERTIFICATE OF REPORTER
3                THE STATE OF FLORIDA
4                COUNTY OF DADE
5
6        I, Rick Levy, Registered Professional Reporter
    and Notary Public in and for the State of Florida at
7    large, do hereby certify that I was authorized to
    and did report said deposition in stenotype of DR.
8    JIMMY NGUYEN; and that the foregoing pages, numbered
    from 1 to 206, inclusive, are a true and correct
9    transcription of my shorthand notes of said
    deposition.
10
        I further certify that said deposition was
11    taken at the time and place hereinabove set forth
    and that the taking of said deposition was commenced
12    and completed as hereinabove set out.
13        I further certify that I am not attorney or
    counsel of any of the parties, nor am I a relative
14    or employee of any attorney or counsel of party
    connected with the action, nor am I financially
15    interested in the action.
16        The foregoing certification of this transcript
    does not apply to any reproduction of the same by
17    any means unless under the direct control and/or
    direction of the certifying reporter.
18
        IN WITNESS WHEREOF, I have hereunto set my hand
19  this 7th day of May, 2020.
20    _____
21
        Rick Levy, RPR, FPR, Notary Public
22    in and for the State of Florida
        My Commission Expires:  12/8/2023
23    My Commission No.:  GG937684
24
25

Page 208

1              CERTIFICATE OF OATH
2    THE STATE OF FLORIDA
3            COUNTY OF DADE
4
5        I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,
6    Notary Public, State of Florida, certify that JIMMY
7    NGUYEN remotely appeared before me on the 30TH day
8    of April, 2020 and was duly sworn.
9
10        Signed this 7th day of May, 2020.
11
12
13
14    _____
15
        Rick Levy, RPR, FPR
16    Notary Public - State of Florida
        My Commission Expires:  12/8/2023
17    My Commission No.:  GG937684
18
19
20
21
22
23
24
25

Page 209

1              E R R A T A   S H E E T
2    IN RE:  IRA KLEIMAN VS CRAIG WRIGHT
3    DEPOSITION OF:  JIMMY NGUYEN
4    TAKEN: 4/30/2020
5        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
6    PAGE # LINE #   CHANGE              REASON
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   Please forward the original signed errata sheet to
        this office so that copies may be distributed to all
18   parties.
19   Under penalty of perjury, I declare that I have read
        my deposition and that it is true and correct
20   subject to   any changes in form or substance
        entered here.
21
22   DATE: _____
23
24   SIGNATURE OF
        DEPONENT:_____
25

Jimmy Nguyen
April 30, 2020                                                    210

Page 210

1  DATE:      May 7, 2020
2  TO:  SPENCER SILVERGLATE, ESQUIRE
        TREVOR GILLUM, ESQUIRE
3       CLARKE SILVERGLATE, P.A.
        799 Brickell Avenue
4       Suite 900
        Miami, Florida 33131
5
   IN RE:      Ira Kleiman vs Craig Wright
6
7  Dear Mr. Silverglate:
8  Enclosed please find the original errata page with
   your copy of the transcript so JIMMY NGUYEN may read
9  and sign their transcript.  Please have him/her make
   whatever changes are necessary on the errata page
10 and sign it.  Then place the original errata page
   back into the original transcript.  Please then
11 forward the original errata page back to our office
   @1080 Woodcock Road, Suite 100, Orlando, Florida
12 32803.
13 If the errata page is not signed by the witness
   within 30 days after this letter has been furnished,
14 we will then process the transcript without a signed
   errata page.  If your client wishes to waive their
15 right to read and sign, please have him/her sign
   their name at the bottom of this letter and send it
16 back to the office.
17      Your prompt attention to this matter is
18 appreciated.
19 Sincerely,
20 _____
   RICK E. LEVY, RPR
21
   I do hereby waive my signature:
22
   _____
23 JIMMY NGUYEN
24 cc via transcript:  Vel Freedman, Esq.
                      Andres Rivero, Esq.
25 file copy

 Search     

**Florida Attorney Wanted** - 64 new legal clients seeking a Florida attorney. View their cases today. Ad ···



Jimmy Nguyen · 3rd 🔗

Founding President, Bitcoin Association

United States · 500+ connections · Contact info

Connect    More... 

B  Bitcoin Association

🏛 USC Gould School of Law

**Promoted**



**Harvard Analytics Online**

Earn a certificate in business analytics online in as few as 9 months.

**Learn more**

People Also Viewed


**Lisa Hatton**
· 3rd 🔗
General Cou
Privacy Offic
Experienced
Advisor. (CIF


**Adam Kling**
Blockchain a


**Blazo Bozo**
Crypto Analy
, Bitcoin SV i

## About

Jimmy Nguyen is one of the world's top Bitcoin advocates. He is a renowned public speaker and media commentator who speaks about Bitcoin and blockchain technology at worldwide events. Jimmy is a global advocate for Bitcoin SV - the only Bitcoin project following the original protocol, design and "Satos!  ... see more

**Jeannine T**
City of Rose

**Art O'Brier**
Principal Eng
Bryan, Inc.

## Activity

See all

2,488 followers

 **Our recent CoinGeek London 2020 conference was a big WIN for...**
Jimmy shared this
71 Reactions • 5 Comments

 **Kronoverse and Crypofights use #BitcoinSV #blockchain to bring...**
Jimmy shared this
13 Reactions • 1 Comment

 **The future of sports will be built on the original Bitcoin #blockchain – #Bitcoin...**
Jimmy shared this
25 Reactions

 **One of the top announcements from our recent CoinGeek London...**
Jimmy shared this
44 Reactions • 1 Comment

**Nick Spand**
Bitcoin Pione
Documentar
Founder, Bit
Center 2013

**Rory Zimm**
One protoco

**Neil Ford** ·
Special Proje

**Alexandra**
Communicat
MSc Marketi
Environment
Sustainable

## Experience

 **Founding President**
Bitcoin Association
Dec 2018 – Present · 1 yr 6 mos
Global

The leading global organization for Bitcoin business. It brings together merchants, exchanges, application developers, enterprises, miners and others in the Bitcoin ecosystem to advance the growth of bCommerce (Bitcoin commerce). We support Bitcoin SV [BSV] as the original Bitcoin, with a stable protocol and scaling roadmap to become the world's new money and global public blockchain for enterprise.

**Julie Fried**
· 3rd
Bold
on T

  Messaging 

in    Q Search    Try Premium Free for 1 Month

**Chair, Strategic Advisory Board**
Dec 2018 – Mar 2020 · 1 yr 4 mos

**CEO, nChain Group**
Dec 2017 – Nov 2018 · 1 yr

nChain is the global leader in advisory, research, and development of enterprise-grade blockchain technology solutions. Established in 2015 nChain is providing the tools and techniques for a scalable, stable, and secure infrastructure in global trade. Its focus is to global adoption and enterprise-level usage of the Bitcoin SV blockchain. ...se

**Show 2 more roles** ⌄

TAAL
**Advisory Board Member**
TAAL Distributed Information Technologies
Dec 2018 – Mar 2020 · 1 yr 4 mos

**Director**
Centbee
Jan 2018 – Mar 2020 · 2 yrs 3 mos

**Founder & Chief Win Advisor**
NEW WIN DIGITAL
Feb 2017 – Dec 2018 · 1 yr 11 mos
West Hollywood, California

Business development, advisory & legal services to help companies WIN in the digital ag

**Show 3 more experiences** ⌄

## Education

**USC Gould School of Law**
J.D., Law
1992 – 1995


**University of California, Los Angeles**
B.A., Communication Studies
1989 – 1992

Competed on speech/debate team for Mt. San Antonio College.

## Licenses & Certifications

**Certified Information Privacy Professional/US**
IAPP - International Association of Privacy Professionals

## Volunteer Experience

**National Tournament Director**
American Readers Theater association
2001 – Present · 19 yrs

 Messaging



it gets better tour

**Member Board Of Directors (previous)**
Equality California
Civil Rights and Social Action

Show 2 more experiences ⌄



Messaging

in Search

Try Premium Free
for 1 Month

map out PR and commun cat ons strategy for the year w th proact ve and react ve).  dea date wou d be March 23 or 24  f you can make  t happen.

**Jimmy Nguyen**  Dav s Wr ght Trema ne LLP
865 S Figueroa Street  Suite 2400  Los Angeles CA 90017
Office  + 1 213-633-8643  Mobile  + 1 310-498-2379
Email  jimmynguyen@    Website  www.dwt.com

Anchorage  Bellevue  Los Angeles  New York  Portland  San Francisco  Seattle  Shanghai  Washington DC



---

**From:** Nguyen, Jimmy
**Sent:** Monday, January 23, 2017 8:11 PM
**To:** 'Jamie Diaferia'
**Subject:** RE: nChain Ho dings Limited

Jam e – nCha n Ho d ngs L m ted (wh ch  s a parent ho d ng company of var ous subs d ar es) has been owned by The Workshop Ho d ngs L m ted.  There are a ser es of transact ons that  ead to the u t mate acqu s t on by the pr vate equ ty fund (P  H gh Tech & PE Fund L m ted) of nCha n Ho d ngs L m ted and a  ts groups/subs d ar es.

For reference, here is a description of the Fund from its test website – which a so provides other key facts about the fund (http://pi-hightech-fund.com/test/index.htm#):

π H gh Tech & PE Fund Ltd  s a pr vate equ ty fund based  n the attract ve European Un on  ur sd ct on of the Repub c of Ma ta. The  nvestment ob ect ve of the π H gh Tech & PE Fund Ltd ("Fund")  s to prov de  ong-term cap ta  apprec at on v a targeted  nvestment exposure  nto h gh growth bus nesses enab ed by the  r nnovat on and app cat on of d srupt ve d g ta  techno ogy.

A so note that nCha n Ho d ngs L m ted  s former y known as E TC Ho d ngs.  [E TC Ho d ngs has a ready been ment oned  n some med a art c es about what Cra g Wr ght  s try ng to do w th patent app cat ons;  t s the  sted owner of the current y f ed patent app  cat ons].

Be ow  s a summary (as best  understand  t now) of the transact ons.  Th s prov des more deta  than we w u t mate y want  n a press re ease but good for you to know.  Th s can be d ff cu t to fo  ow unt  you are more fam  ar w th the ent t es and structure – so  can get on the phone to wa k you through  t f needed.

**1) In 2016, nChain Holdings Limited acquired the "nTrust group" of companies (over 2 transactions).**
This comprised of 7 tota  entities:  a) nTrust Techno ogy So utions Corp, and then  ater b) NT Internationa Ho dings Corp (and 5 subsidiaries owned by it).  nTrust Techno ogy So utions Corp was part of the "nTrust group" but was the on y subsidiary not direct y owned by NT Internationa Ho dings Corp.

This adds the "nTrust group" of companies to nChain Ho dings  portfo io – which a so inc udes these entities:

- nChain Limited (UK)
- nChain Techno ogy Limited (Antigua) and nChain Labs Limited (Antigua) [these two companies were more recent y formed in September 2016]

**2) nChain Holdings sells nTrust Technology Solutions to NT International Holdings Corp**

(Previous y, one of the nTrust group subsidiaries – nTrust Techno ogy So utions Corp - was not owned direct y by NT Internationa Ho dings, which owned the other 5 subsidiaries.  As a resu t of this transaction, NT Internationa Ho dings now owns a  6 subsidiaries in the "nTrust group."  Together with NT Internationa Ho dings and the 6 subsidiaries, the "nTrust group" has 7 entities.

**3 Transactions for Pi High Tech & PE Fund to acquire the entirety of nChain Holdings Limited and its groups/subsidiaries**

**A) Pi High Tech & PE Fund acquires nChain Limited (UK) from nChain Holdings Limited**

**B) Pi High Tech & PE Fund acquires the "nTrust group" (NT International Holdings Corp + its now 6 subsidiaries) from nChain Holdings Limited**

As a resu t of the foregoing two transactions, nChain Ho dings Limited is  eft with itse f and its 2 Antiguan subsidiaries (nChain Techno ogy Limited and nChain Labs Limited)

**C) FINAL TRANSACTION:  Pi High Tech & PE Fund acquires the remainder of nChain Holdings Limited (i.e., the parent company nChain Holdings Limited + 2 Antiguan subsidiaries nChain Technology Limited and nChain Labs Limited) from the ultimate owner The Workshop Holdings**

CONFIDENTIAL

The focus of the press re ease shou d be that P H gh Tech & PE Fund s p eased to announce ts acqu s t on of nCha n Ho d ngs L m ted – and a ts subs d ar es ent t es, wh ch cons sts of nCha n ent t es ( nc ud ng nCha n L m ted (UK) focused on b ockcha n R&D) and the "nTrust group" of compan es.

**Jimmy Nguyen**  Dav s Wr ght Trema ne LLP
865 S Figueroa  Su te 2400  Los Angeles  CA 90017
Office  + 1 213-633-8643  Mobile  + 1 310-498-2379
Email  jimmynguyen@███   Website  www.dwt.com

Anchorage  Bellevue  Los Angeles  New York  Portland  San Francisco  Seattle  Shanghai  Washington DC



**From:** Jamie Diaferia [████████████████████]
**Sent:** Monday, January 23, 2017 4:44 AM
**To:** Nguyen, Jimmy
**Subject:** RE: nChain Ho dings Limited

J mmy, we w  get started on a press re ease.  w  et you know what we need. Thank you.

**Jamie Diaferia**
CEO

 : 212.838.0220
E: ██████████████████
W:  nf n teg oba .com

**From:** Nguyen, J mmy ████████████████]
**Sent:** January 20, 2017 3:43 PM
**To:** Jam e D afer a <████████████████>
**Subject:** nCha n Ho d ngs L m ted

H  Jam e – am hav ng a status update ca  on Sunday w th the key  eadersh p team for nCha n Ho d ngs (parent company) – an "Off ce of the CEO" group of 3 be ng formed wh ch w   nc ude me.

But meanwh  e, wanted to  et you know about status of the pr vate equ ty fund acqu s t on of nCha n Ho d ngs.  t's st  n process.  Cou d be f n shed at end of January or ear y February at th s po nt – though my sense  s t w  ke y take at  east another 3 weeks.

Meanwh  e, we th nk  t's w se to get started draft ng a press re ease, so that th ngs are not rushed, and your team and our team has t me to rev ew  t proper y.

What are steps to get started on that?   can put down key po nts we shou d cover  n a press re ease  f that wou d he p your team.

P.S.  My  ast day at DWT has now been set as February 10.

**Jimmy Nguyen**  Dav s Wr ght Trema ne LLP
865 S Figueroa  Su te 2400  Los Angeles  CA 90017
Office  + 1 213-633-8643  Mobile  + 1 310-498-2379
Email  jimmynguyen@███   Website  www.dwt.com

Anchorage  Bellevue  Los Angeles  New York  Portland  San Francisco  Seattle  Shanghai  Washington DC

CONFIDENTIAL

NGUYEN 001405

# EXHIBIT 1

# The Satoshi Affair

## Andrew O'Hagan on the many lives of Satoshi Nakamoto

**The Raid**

Ten men raided a house in Gordon, a north shore suburb of Sydney, at 1.30 p.m. on Wednesday, 9 December 2015. Some of the federal agents wore shirts that said 'Computer Forensics'; one carried a search warrant issued under the Australian Crimes Act 1914. They were looking for a man named Craig Steven Wright, who lived with his wife, Ramona, at 43 St Johns Avenue. The warrant was issued at the behest of the Australian Taxation Office. Wright, a computer scientist and businessman, headed a group of companies associated with cryptocurrency and online security. As one set of agents scoured his kitchen cupboards and emptied out his garage, another entered his main company headquarters at 32 Delhi Road in North Ryde. They were looking for 'originals or copies' of material held on hard drives and computers; they wanted bank statements, mobile phone records, research papers and photographs. The warrant listed dozens of companies whose papers were to be scrutinised, and 32 individuals, some with alternative names, or alternative spellings. The name 'Satoshi Nakamoto' appeared sixth from the bottom of the list.



*Craig Wright in the Oxford Circus office.*

Some of the neighbours say the Wrights were a little distant. She was friendly but he was weird – to one neighbour he was 'Cold-Shoulder Craig' – and their landlord wondered why they needed so much extra power: Wright had what appeared to be a whole room full of generators at the back of the property. This fed a rack of computers that he called his 'toys', but the real computer, on which he'd spent a lot of money, was nearly nine thousand miles away in Panama. He had already taken the computers away the day before the raid. A reporter had turned up at the house and Wright, alarmed, had phoned Stefan, the man advising them on what he and Ramona were calling 'the deal'. Stefan immediately moved Wright and his wife into

a luxury apartment at the Meriton World Tower in Sydney. They'd soon be moving to England anyway, and all parties agreed it was best to hide out for now.

At 32 Delhi Road, the palm trees were throwing summer shade onto the concrete walkways – 'Tailor Made Office Solutions', it said on a nearby billboard – and people were drinking coffee in Deli 32 on the ground floor. Wright's office on level five was painted red, and looked down on the Macquarie Park Cemetery, known as a place of calm for the living as much as the dead. No one was sure what to do when the police entered. The staff were gathered in the middle of the room and told by the officers not to go near their computers or use their phones. 'I tried to intervene,' one senior staff member, a Dane called Allan Pedersen, remarked later, 'and said we would have to call our lawyers.'

Ramona wasn't keen to tell her family what was happening. The reporters were sniffing at a strange story – a story too complicated for her to explain – so she just told everyone that damp in the Gordon house had forced them to move out. The place they moved into, a tall apartment building, was right in the city and Wright felt as if he was on holiday. On 9 December, after their first night in the new apartment, Wright woke up to the news that two articles, one on the technology site *Gizmodo*, the other in the tech magazine *Wired*, had come out overnight fingering him as the person behind the pseudonym Satoshi Nakamoto, who in 2008 published a white paper describing a 'peer-to-peer electronic cash system' – a technology Satoshi went on to develop as bitcoin. Reading the articles on his laptop, Wright knew his old life was over.

By this point, cameras and reporters were outside his former home and his office. They had long heard rumours, but the *Gizmodo* and *Wired* stories had sent the Australian media into a frenzy. It wasn't clear why the police and the articles had appeared on the same day. At about five that same afternoon, a receptionist called from the lobby of Wright's apartment building to say that the police had arrived. Ramona turned to Wright and told him to get the hell out. He looked at a desk in front of the window: there were two large laptop computers on it – they weighed a

few kilos each, with 64 gigabytes of RAM – and he grabbed the one that wasn't yet fully encrypted. He also took Ramona's phone, which wasn't encrypted either, and headed for the door. They were on the 63rd floor. It occurred to him that the police might be coming up in the elevator, so he went down to the 61st floor, where there were office suites and a swimming pool. He stood frozen for a minute before he realised he'd rushed out without his passport.

Ramona left the apartment shortly after Wright. She went straight down to the basement car park and was relieved to find the police weren't guarding the exits. She jumped into her car, a hire vehicle, and, in her panic, crashed into the exit barrier. But she didn't stop, and was soon on the motorway heading to north Sydney. She just wanted to be somewhere familiar where she would have time to think. She felt vulnerable without her phone, and decided to drive to a friend's and borrow his. She went to his workplace and took his phone, telling him she couldn't explain because she didn't want to get him involved.

Meanwhile, Wright was still standing beside the swimming pool in his suit, with a laptop in his arms. He heard people coming up the stairs, sped down the corridor and ducked into the gents. A bunch of teenagers were standing around but seemed not to notice him. He went to the furthest cubicle and deliberately kept the door unlocked. (He figured the police would just look for an engaged sign.) He was standing on top of the toilet when he heard the officers come in. They asked the youngsters what they were doing, but they said 'nothing' and the police left. Wright stayed in the cubicle for a few minutes, then went out and used his apartment keycard to hide in the service stairwell. Eventually, a call came from Ramona on her friend's phone. She was slightly horrified to discover he was still in the building and told him again to get out. He, too, had a rental car, and had the key in his pocket. He went down sixty flights of stairs to the car park in the basement, unlocked his car and opened the boot, where he lifted out the spare wheel and put his laptop in the wheel cavity. He drove towards the Harbour Bridge and got lost in the traffic.



*Craig Wright in 2016.*

As Ramona drove along she began texting the mysterious Stefan, who was at Sydney Airport, having already checked in for a flight to Manila, where he lived. Stefan had to make a fuss to get his bag removed from the plane and then he spoke to Ramona, telling her that Wright would have to get out of the country. She didn't argue. She called the Flight Centre and asked what flights were leaving. 'To where?' asked the saleswoman.

'Anywhere,' Ramona said. Within ten minutes she had booked her husband on a flight to Auckland.

In the early evening, Wright, scared and lost, made his way to Chatswood. He texted Ramona to come and meet him, and she immediately texted back saying he should go straight to the airport. She'd booked him a flight. 'But I don't have my passport,' he said. Ramona was afraid she'd be arrested if she returned to their apartment, but her friend said he'd go into the building and get the passport. They waited until the police left the building, then he went upstairs. A few minutes later he came back with the passport, along with the other computer and a power supply.

They met Wright in the airport car park. Ramona had never seen him so worried. 'I was shocked,' he later said. 'I hadn't expected to be outed like that in the media, and then to be chased down by the police. Normally, I'd be prepared. I'd have a bag packed.' As Ramona gave him the one-way ticket to Auckland, she was anxious about when she would see him again. Wright said New Zealand was a bit too close and wondered what to do about money. Ramona went to an ATM and gave him $600. He bought a yellow bag from the airport shop in which to store his computers. He had no clothes. 'It was awful saying goodbye to him,' Ramona said.

In the queue for security, he felt nervous about his computers. His flight was about to close when the security staff flagged him down. He was being taken to an interview room when an Indian man behind him started going berserk. It was just after the Paris bombings; the man's wife was wearing a sari and the security staff wanted to pat her down. The man objected. All the security staff ran over to deal with the situation and told Wright to go. He couldn't believe his luck. He put his head down and scurried through the lounge.

Back at Wright's office, Allan Pedersen was being interviewed by the police. He overheard one of them ask: 'Have we got Wright yet?'

'He's just hopped a flight to New Zealand,' his colleague said.

Wright was soon 30,000 feet above the Tasman Sea watching the programmer Thomas Anderson (Keanu Reeves) being chased by unknowable agents in *The*

*Matrix*. Wright found the storyline strangely comforting; it was good to know he wasn't alone.

At Auckland Airport, Wright kept his phone on flight mode, but turned it on to use the airport's wifi to Skype with Stefan, using a new account. They had a discussion about how to get him to Manila. There was a big rock concert that night in Auckland, and all the hotels were full, but he crossed town in a cab and managed to get a small room at the Hilton. He booked two nights, using cash. He knew how to get more cash out of ATMs than the daily limit, so he worked several machines near the hotel, withdrawing $5000. He ordered room service that night and the next morning went to the Billabong store in Queen Street to buy some clothes. He felt agitated, out of his element: normally he would wear a suit and tie – he enjoys the notion that he is too well dressed to be a geek – but he bought a T-shirt, a pair of jeans and some socks. On the way back to the hotel he got a bunch of SIM cards, so that his calls wouldn't be monitored. Back at the Hilton he was packing up his computers when the dependable Stefan came on Skype. He told Wright to go to the airport and pick up a ticket he'd left him for a flight to Manila. His picture was all over the papers, along with the story that he was trying to escape.

Within hours of Wright's name appearing in the press, anonymous messages threatened to reveal his 'actual history'. Some said he had been on Ashley Madison, the website that sets up extramarital affairs, others that he'd been seen on Grindr, the gay hook-up app. During a six-hour layover in Hong Kong, he killed his email accounts and tried to wipe his social media profile, which he knew would be heavy with information he wasn't keen to publicise: 'Mainly rants,' he said later. When he got to Manila airport, Stefan picked him up. They went to Stefan's apartment and the maid washed Wright's clothes while he set up his laptops on the dining-room table. They spent the rest of Saturday wiping his remaining social media profile. Stefan didn't want any contact to be possible: he wanted to cut Wright off from the world. The next day he put him on a plane to London.

**Mayfair**

Technology is constantly changing the lives of people who don't really understand it
– we drive our cars, and care nothing for internal combustion – but now and then a
story will break from that frontier. I was one of the people who had never heard of
Satoshi Nakamoto or the blockchain – the invention underlying bitcoin, which
verifies transactions without the need for any central authority – or that it is the
biggest thing in computer science. It was news to me that the banks were grabbing
onto the blockchain as the foundation of a future 'internet of value'. The story of a
mythical computer scientist was an odd one to come my way. I'm not much detained
by thoughts of new computer paradigms. (I'm still getting the hang of the first one.)
But to those who are much more invested in the world of tomorrow, the Satoshi
story has the lineaments of a modern morality tale quite independent of stock
realities. There are things, there are always things, that others assume are at the
centre of the universe but don't make a scratch on your own sense of the everyday
world. This story was like that for me, enclosing me in an enigma I couldn't have
named. A documentary is a fashioned thing, of course, as fashioned as fiction in its
own ways, but I had to overcome my own bafflement – as will you – to enter this
world.

A few weeks before the raid on Craig Wright's house, when his name still hadn't
ever been publicly associated with Satoshi Nakamoto, I got an email from a Los
Angeles lawyer called Jimmy Nguyen, from the firm Davis Wright Tremaine
(self-described as 'a one-stop shop for companies in entertainment, technology,
advertising, sports and other industries'). Nguyen told me that they were looking to
contract me to write the life of Satoshi Nakamoto. 'My client has acquired life story
rights … from the true person behind the pseudonym Satoshi Nakamoto – the
creator of the bitcoin protocol,' the lawyer wrote. 'The story will be [of] great interest
to the public and we expect the book project will generate significant publicity and
media coverage once Satoshi's true identity is revealed.'

Journalists, it turned out, had spent years looking for Nakamoto. His identity was
one of the great mysteries of the internet, and a holy grail of investigative reporting,
with writers who couldn't dig up evidence simply growing their own. For the*New*

*Yorker*'s Joshua Davis the need to find him seemed almost painful. 'Nakamoto himself was a cipher,' he wrote in October 2011:

> Before the debut of bitcoin, there was no record of any coder with that name. He used an email address and a website that were untraceable. In 2009 and 2010, he wrote hundreds of posts in flawless English, and though he invited other software developers to help him improve the code, and corresponded with them, he never revealed a personal detail. Then, in April 2011, he sent a note to a developer saying that he had 'moved on to other things'. He has not been heard from since.

Davis went on to examine Satoshi's writing quite closely and concluded that he used British spelling and was fond of the word 'bloody'. He then named a 23-year-old Trinity College Dublin graduate student, Michael Clear, who quickly denied it. The story went nowhere and Clear went back to his studies. Then Leah McGrath Goodman wrote a piece for *Newsweek* claiming Satoshi was a maths genius called Dorian Nakamoto, who lived in the Californian suburb of Temple City and didn't actually know, it turned out, how to pronounce bitcoin. When Goodman's article ran on the magazine's cover reporters from all over the world arrived on Dorian's doorstep. He said he would give an interview to the first person who would take him to lunch. It turned out that his hobby wasn't alternative currencies but model trains. Someone calling himself Satoshi Nakamoto, and using Satoshi's original email address, visited one of the forums Satoshi used to haunt and posted the message: 'I am not Dorian Nakamoto.'  Other commentators, including Nathaniel Popper of the *New York Times*, named Nick Szabo, a cool cryptocurrency nut and the inventor of Bit Gold, but he denied it profusely. *Forbes* believed it was Hal Finney, who, the blockchain irrefutably showed, was the first person in the world to be sent bitcoin by Satoshi. Finney, a native Californian, was an expert cryptographer whose involvement in the development of bitcoin was vital. He was diagnosed with motor neurone disease in 2009 and died in 2014. It came to seem that the holy grail would remain out of reach. 'Many in the bitcoin community … in deference to the bitcoin creator's clear desire for privacy … didn't want to see the wizard unmasked,' Popper wrote in the *New York Times*. 'But even among those who said this, few could resist debating the clues the founder left behind.'

The 'Stefan' who was hovering during the raid on Craig Wright's house and office is Stefan Matthews, an IT expert whom Wright had known for ten years, since they both worked for the online gambling site Centrebet. In those days, around 2007, Wright was often hired as a security analyst by such firms, deploying his skills as a

computer scientist (and his experience as a hacker) to make life difficult for
fraudsters. Wright was an eccentric guy, Stefan Matthews remembered, but known
to be a reliable freelancer. Matthews said that Wright had given him a document to
look at in 2008 written by someone called Satoshi Nakamoto, but Matthews had
been busy at the time and didn't read it for a while. He said that Wright was always
trying to get him interested in this new venture called bitcoin. He tried to sell him
50,000 coin for next to nothing, but Matthews wasn't interested, he told me,
because Wright was weird and the whole thing seemed a bit cranky. A few years
later, however, Matthews realised that the document he had been shown was, in
fact, an original draft of the by now famous white paper by Satoshi Nakamoto. (Like
the governments they despise, bitcoiners deal – when it comes to ideas – in 'white
papers', as if they were issuing laws.) Last year, when Wright was in financial
trouble, he approached Matthews several times. By that time, Matthews had
become friendly with Robert MacGregor, the founder and CEO of a Canada-based
money-transfer firm called nTrust. Matthews encouraged MacGregor to come to
Australia and assess Wright's value as an investment opportunity. Wright had
founded a number of businesses that were in trouble and he was deeply embedded
in a dispute with the ATO. Nevertheless, Matthews told MacGregor, Wright was
almost certainly the man behind bitcoin.

Matthews argued that since Satoshi's disappearance in 2011, Wright had been
working on new applications of the blockchain technology he had invented as
Satoshi. He was, in other words, using the technology underlying bitcoin to create
new versions of the formula that could, at a stroke, replace the systems of
bookkeeping and registration and centralised authority that banks and governments
depend on. Wright and his people were preparing dozens of patents, and each
invention, in a specific way, looked to rework financial, social, legal or medical
services, expanding on the basic idea of the 'distributed public ledger' that
constitutes the blockchain. This is utopian thinking, even by normal geek standards,

but it's a hot topic in computer science and banking at the moment, and hundreds of millions of dollars are being invested in such ideas. Thus: Matthews's proposal.

After initial scepticism, and in spite of a slight aversion to Wright's manner, MacGregor was persuaded, and struck a deal with Wright, signed on 29 June 2015. MacGregor says he felt sure that Wright was bitcoin's legendary missing father, and he told me it was his idea, later in the drafting of the deal, to insist that Satoshi's 'life rights' be included as part of the agreement. Wright's companies were so deep in debt that the deal appeared to him like a rescue plan, so he agreed to everything, without, it seems, really examining what he would have to do. Within a few months, according to evidence later given to me by Matthews and MacGregor, the deal would cost MacGregor's company $15 million. 'That's right,' Matthews said in February this year. 'When we signed the deal, $1.5 million was given to Wright's lawyers. But my main job was to set up an engagement with the new lawyers … and transfer Wright's intellectual property to nCrypt' – a newly formed subsidiary of nTrust. 'The deal had the following components: clear the outstanding debts that were preventing Wright's business from getting back on its feet, and work with the new lawyers on getting the agreements in place for the transfer of any non-corporate intellectual property, and work with the lawyers to get Craig's story rights.' From that point on, the 'Satoshi revelation' would be part of the deal. 'It was the cornerstone of the commercialisation plan,' Matthews said, 'with about ten million sunk into the Australian debts and setting up in London.'

The plan was always clear to the men behind nCrypt. They would bring Wright to London and set up a research and development centre for him, with around thirty staff working under him. They would complete the work on his inventions and patent applications – he appeared to have hundreds of them – and the whole lot would be sold as the work of Satoshi Nakamoto, who would be unmasked as part of the project. Once packaged, Matthews and MacGregor planned to sell the intellectual property for upwards of a billion dollars. MacGregor later told me he was speaking

to Google and Uber, as well as to a number of Swiss banks. 'The plan was to package it all up and sell it,' Matthews told me. 'The plan was never to operate it.'



*Clockwise from top left: Hal Finney, Gavin Andresen, Robert MacGregor, Stefan Matthews*

\*

Since the time I worked with Julian Assange, my computers have been hacked several times. It isn't unusual for me to find that material has been wiped, and I was careful to make sure the lawyer's approach wasn't part of a sting operation. But I was curious to see what these men had. I assumed MacGregor – or someone behind him – must be the 'client' referred to in the email I had received from California. On Thursday, 12 November, I turned up at MacGregor's office near Oxford Circus, where I signed in under a pseudonym and made my way to a boardroom wallpapered with mathematical formulae. MacGregor came into the room wearing a tailored jacket and jeans, with a blue-edged pocket square in his breast pocket, a scarf and brown brogue boots. He was 47 but looked about 29. There was something studied about him – the Alexander McQueen scarf, the lawyerly punctilio – and I'd never met anyone who spoke so easily about such large

sums of money. When I asked him the point of the whole exercise he said it was simple: 'Buy in, sell out, make some zeroes.'

MacGregor described Wright to me as 'the goose that lays the golden egg'. He said that if I agreed to take part I would have exclusive access to the whole story, and to everyone around Wright, and that it would all end with Wright proving he was Satoshi by using cryptographic keys that only Satoshi had access to, those associated with the very first blocks in the blockchain. MacGregor told me this might happen at a public TED talk. He said it would be 'game over'. Wright's patents would then be sold and Wright could get on with his life, out of the public eye. 'All he wants is peace to get on with his work,' MacGregor told me at that first meeting. 'And how this ends, for me, is with Craig working for, say, Google, with a research staff of four hundred.'

I told MacGregor that there would have to be a process of verification. We talked about money, and negotiated a little, but after several meetings I decided I wouldn't accept any. I would write the story as I had every other story under my name, by observing and interviewing, taking notes and making recordings, and sifting the evidence. 'It should be warts and all,' MacGregor said. He said it several times, but I was never sure he understood what it meant. This was a changing story, and I was the only one keeping account of the changes. MacGregor and his co-workers were already convinced Wright was Satoshi, and they behaved, to my mind, as if that claim was the end of the story, rather than the beginning.

I don't mean to imply anything sinister. The company was excited by the project and so was I. Very quickly we were working hand in hand: I reserved judgment (and independence) but I was very caught up in the thought of the story unfolding as planned. At this point, nobody knew who Craig Wright was, but he appeared, from the initial evidence, to have a better claim to being Satoshi Nakamoto than anyone else had. He seemed to have the technical ability. He also had the right social history, and the timeline worked. The big proof was up ahead, and how could it not be spectacular? I went slowly forward with the project, and said no to everything

that would hamper my independence. This would become an issue later on with MacGregor and Matthews, or the men in black, as I'd taken to calling them, but for those first few months, nobody asked me to sign anything and nobody refused me access. Mysteries would open up, and some would remain, but there seemed no mystery about the fact that these people were confident that a supremely important thing was happening and that the entire process should be witnessed and recorded. My emails to MacGregor took it for granted that what would be good for my story, in terms of securing proof, would also be good for his deal, and that seemed perfectly true. Yet I feel bad that I didn't warn him of the possibility that this might not be what happened, that my story wouldn't die if the deal died, that human interest doesn't stop at success.

It was at this point, four weeks after my first meeting with MacGregor, that *Wired* and *Gizmodo* reported that he might be Satoshi. The news unleashed a tsunami of responses from the cryptocurrency community, and most of it was bad for Wright's credibility. Had he left artificial footprints to suggest his involvement with bitcoin had been earlier than it was? Had he exaggerated the number and nature of the degrees he'd accumulated from various universities? Why did the company that supplied the supercomputer he claimed to have bought with amassed bitcoin say it had never heard of him?

'The smell,' as one commentator said, 'was a mile high.' The nCrypt people were unfazed by this mudslinging, believing that every one of the charges made against Wright could be easily disproved. Wright produced an impressive paper showing that his 'footprint' wasn't faked and that the 'cryptographic' evidence against him was bogus (people continue to argue on this point). He produced a letter from the supercomputer supplier acknowledging the order. Charles Sturt University provided a photocopy of his staff card, proving he had lectured there, and Wright sent me a copy of the thesis he'd submitted for a doctorate his critics claim he doesn't have.

*

I had arrived five minutes early at 28-50 Degrees, a wine bar and restaurant in Mayfair. It was just before 1 p.m. on 16 December and the lunchtime crowd, men in blue suits and white shirts, were eating oysters and baby back ribs and drinking high-end wine by the glass. A jeroboam of Graham's ten-year-old tawny port stood on the bar, and I was inspecting it when MacGregor arrived with Mr and Mrs Smith. That's what he'd been calling them in his emails to me. Craig Wright, 45 years old, wearing a white shirt under a black jacket, a pair of blue chinos, a belt with a large Armani buckle and very green socks, wasn't the kind of guy who seems comfortable in a swish restaurant. He sat across from me and lowered his head and at first he let MacGregor do the talking. Ramona was very friendly, chatting about their time in London as if they were a couple of holidaymakers who'd just blown into Mayfair. She wasn't drinking, but the rest of us ordered a glass of Malbec each. When Wright lifted his head to laugh at something, I noticed he had a nice smile but uneven teeth, and a scar that climbed from the top of his nose to the area just above his left eyebrow. He hadn't shaved since he'd left Sydney.

Wright told me he was rubbish at small talk. He too wanted what I wrote to be 'warts and all'; he felt he was being misunderstood by everybody, and normally that wouldn't bother him but he had to consider the respectability of his work, and his family's rights. He appeared to ponder this for a moment, then he told me his old neighbours at the house in Gordon hadn't been friendly.

'They barely even knew your name,' Ramona said.

'They do now,' he replied.

I found him easier to talk to than I'd expected. He said his father had worked for the NSA (he couldn't explain this), but that, to this day, his mother thinks he worked for Nasa. 'The few people I care about I care about a lot,' he said, 'and I care about the state of the world. But there's not much in between.' He said he was happy I was writing about him because he wanted 'to step into history', but mainly because he wanted to tell the story of the brilliant people he had collaborated with. He and

Ramona were both jet-lagged and anxious about things back home. 'We should have been having our company's Christmas party today,' Ramona said.

MacGregor asked Wright if being a libertarian had influenced his work, or if the work had turned him into a libertarian. 'I was always libertarian,' he replied, and then he told me his father had more or less kidnapped him after his parents got divorced. He hated being told what to do – that was one of his main motivations. He believed in freedom, and in what freedom would come to mean, and he said his work would guarantee a future in which privacy was protected. 'Where we are,' he said, 'is a place where people can be private and part of that privacy is to be someone other than who they were. Computing will allow you to start again, if you want to. And that is freedom.' In fact he never stopped imagining different lives for himself. That afternoon he seemed preoccupied by the case people were making against his being Satoshi. He shook his head a lot and said he wished he could just get on in silence with his work. 'If you want to stay sane through this, ignore Reddit,' his wife told him.

The next day, 17 December, we met again, in a private room in Claridge's. You could see outside, over the rooftops, cranes garlanded in fairy lights. Ramona came in looking tired and totally fed up. From time to time, especially when exhausted, she would resent the hold these people had over them. 'We have sold our souls,' she said to me in a quiet moment.

MacGregor said he would spend the evening preparing paperwork to be signed by Wright the following day. This would effectively be the final signing over to nCrypt of the intellectual property held by Wright's companies. This was the main plank in the deal. MacGregor was confident the work was 'world historical', that it would change the way we lived. He regularly described the blockchain as the greatest invention since the internet. He said that what the internet had done for communication, the blockchain would do for value.

MacGregor explained that Wright's Australian companies were being signed over to nCrypt and that he'd extended an 'olive branch' to the ATO, which had responded quickly and positively. A lot of trouble with the ATO had to do with whether bitcoin was a commodity or a currency and how it should be taxed. It also had doubts about whether Wright's companies had done as much research and development as they claimed, and whether they were therefore entitled to the tax rebates they had applied for. The ATO had said it couldn't see where the spending was going. Some critics in the media claimed Wright's companies had been set up only for the purpose of claiming rebates, though not even the ATO went that far.

Wright told me that thanks to the tax office they'd had to lay out all the research for their patents, which had been useful since the nCrypt team was in a hurry: the banks, now alert to cryptocurrencies and the effectiveness of the blockchain, are rushing to create their own versions. At that moment, Bank of America was patenting ten ideas for which Craig and his team told me they had a claim to 'prior art'. Governments spent a long time denying the value of bitcoin – seeing it as unstable, or the currency of criminals – but now they celebrate the potential of the technology behind it.

'They're behaving like children,' Wright said of the ATO.

MacGregor looked at his watch. He straightened his cuffs. 'I see this as a pivotal moment in history … It's like being able to go back in time and watch Bill Gates in the garage.' He turned to Wright. 'You released this thing into the wild. Some people got it right and some people got it wrong. But you've got a vision of where it's going next and next and next.'

'None of this would have worked without bitcoin,' Wright said, 'but it's a wheel and I want to build a car.'

Ramona looked depressed. She was worried that her husband, as the person claiming to have invented bitcoin, might be held liable for the actions of those who'd

used the currency for nefarious purposes. 'He didn't issue a currency,' MacGregor assured her. 'This is just technology – it is not money.' Ramona was still anxious. 'We're talking about legal risk … I'm giving you the legal answer,' MacGregor said. 'I would stake my career on the fact that the creation of bitcoin is not a prosecutable event.'

Right to the end, the Wrights would express worries about things Craig did as a young computer forensics worker. Much of his professional past looked questionable, but in the meeting room at Claridge's he simply batted the past away. 'It's what you're doing now that matters. I'm not perfect. I never will be … All these different people arguing about what Satoshi should be at the moment, it's crazy.'

**Ninjutsu**

Wright's father, Frederick Page Wright, was a forward scout in Vietnam, serving with the 8th Battalion of the Australian army. 'He lost all his friends,' Wright told me, 'every single one of them' – and before long he was drinking and being violent towards Wright's mother, who eventually left him. Both Wright and his mother, when I went to meet her in Brisbane in March, told me about his father's anger at his own mother: he sent all his army pay cheques home to her and she spent them while he was away. He also dreamed of a football career that never happened. 'I have a chip on my shoulder,' Wright said, 'but his was bigger.'

'Did you admire him?'

'He never admired me. I was never fucking good enough. We played chess from when I was three or four and if I made a wrong move he'd wallop me. We clashed right from the beginning.'

The boy had two great influences. The first was his grandfather Ronald Lyman, who his family claims received the first degree awarded by the Marconi School of Wireless in Australia, and who served in the army as a signals officer. They also say he later became a spy with the Australian security services. Craig's favourite place

was his grandfather's basement, a paradise of early computing. 'We'd sit there and look at these books of log tables,' he told me. 'I loved doing it.' Captain Lyman had an old terminal and a Hayes 80-103A modem that they used to connect to the University of Melbourne's network. To keep Craig quiet while he worked, Pop, as the children called him, would let him write code. 'I found this community of hackers,' Wright says, 'and I worked out how to interact with them. I started building games and hacking other people's games. In time, I'd be pulling apart hacker code, and eventually I did this for companies, to help them create defences against hackers.'

His mother told me he was sometimes picked on at school. 'He struggled,' she said, 'but after a while I sent him to Padua College' – a private Catholic college in Brisbane – 'and he shone there. I mean, he was different. He used to dress up and he had an obsession with Japanese culture. He had big samurai swords.'

'As a teenager?'

'Dressed up in samurai clothes, with the odd wooden shoes and everything. Making all the noises. His sisters would complain about him embarrassing them: "We're down the park, we've got friends down there, and he's walking around with webbed feet." He used to have this group of nerdy friends in the 1980s: they'd come around in horn-rimmed glasses and play Dungeons & Dragons for hours.'

He had a karate teacher called Mas who moved him quickly from karate through judo to Ninjutsu. Craig broke his knuckles over and over again and 'became stronger', he told me, because 'the pain led to a "me" that could handle more.' The thing that attracted him most to martial arts was the discipline. Learning to become a ninja involves 18 disciplines, including *bōjutsu* (tactics), *hensōjutsu* (disguise and impersonation), *intonjutsu* (escape and concealment) and *shinobi-iri* (stealth and infiltration). He walked home from his lessons feeling stronger, like another self.

When he was 18, Wright joined the air force. 'They locked me in a bunker,' he told me, 'and I worked on a bombing system. Smart bombs. We needed fast code, and I did that.' When he was in his twenties a melanoma appeared on his back and he had several skin grafts. 'This was after he got out of the air force,' his mother told me, 'and when he recovered he was off to university, and it's been degrees, degrees, degrees since then.' He went to the University of Queensland to study computer systems engineering. And over the following 25 years he would finish, or not finish, or finish and not do the graduation paperwork for degrees in digital forensics, nuclear physics, theology, management, network security, international commercial law and statistics. After our first full interview, he went home to work on an assignment for a new course he was taking at the University of London, a masters in quantitative finance.

Over the months I spent with him, I noticed that he loved the idea of heroism and was strongly attracted to creation myths. One of the first things he emailed me was a copy of one of his dissertations, 'Gnarled Roots of a Creation Mythos'. I noticed it was dedicated to Mas, his martial arts instructor. The text wasn't merely an argument for self-invention, but a feminist exegesis that railed against patriarchal views of the Fall. Wright also speaks of the pilgrim-visitor in the 'world garden'. 'While in the garden, the pilgrim almost inevitably suffers deception. His or her senses, enchanted by illusory and transitory formal appearances, betray his or her soul and lead to sin.'

Wright said he had never expected the myth of Satoshi to gather such force. 'We were all used to using pseudonyms,' he told me. 'That's the cypherpunk way. Now people want Satoshi to come down from the mountain like a messiah. I am not *that*. And we didn't mean to set up a myth that way.' Satoshi was loved by bitcoin fans for making a beautiful thing and then disappearing. They don't want Satoshi to be wrong or contradictory, boastful or short-tempered, and they don't really want him to be a 45-year-old Australian called Craig.

While reading Wright's ideas on creation, I kept thinking of his karate teacher and the position he had in the young man's life. An offhand remark Wright made had stayed with me. It was about storytelling and how a possible meaning of freedom might reside not only in martial arts, in the ability to defend oneself, but in the ability to make oneself. Mas 'taught me a lot of Eastern philosophy and gave me the means to become myself', Wright said. One day Mas told him about Tominaga Nakamoto. 'He was a Japanese merchant philosopher,' Wright told me. 'I read translations of his stuff, material from the 1740s.'

Weeks later, I was in the kitchen of the house Wright was renting in London drinking tea with him when I noticed a book on the worktop called *Visions of Virtue in Tokugawa Japan.* I'd done some mugging up by then and was keen to nail the name thing.

'So that's where you say you got the Nakamoto part?' I asked. 'From the 18th-century iconoclast who criticised all the beliefs of his time?'

'Yes.'

'What about Satoshi?'

'It means "ash",' he said. 'The philosophy of Nakamoto is the neutral central path in trade. Our current system needs to be burned down and remade. That is what cryptocurrency does – it is the phoenix …'

'So *satoshi* is the ash from which the phoenix …'

'Yes. And Ash is also the name of a silly Pokémon character. The guy with Pikachu.' Wright smiled. 'In Japan the name of Ash is Satoshi,' he said.

'So, basically, you named the father of bitcoin after Pikachu's chum?'

'Yes,' he said. 'That'll annoy the buggery out of a few people.' This was something he often said, as if annoying people was an art.

Wright's generation, now in their mid to late forties, are seeing a world that enlarges on their teenage kicks. For Wright, as for Jeff Bezos, the rules of how to shop and how to think and how to live are extrapolations of dreams they had sitting in a box room somewhere. 'The person who experiences greatness must have a feeling for the myth he is in,' Frank Herbert wrote in *Dune*, Wright's favourite novel as a teenager. '*Dune* was really about people,' Wright told me. 'It was about the idea that we don't want to leave things to machines and [should instead] develop as humans. But I see things a little differently from Mr Herbert. I see that it's not one or the other – man or machines – it's a symbiosis and a way of becoming something different together.' This kind of cyberpunk energy – as opposed to cypherpunk, which came later – delivered Wright's generation of would-be computer scientists into the brightness of the future.

After getting his first degree, Wright settled into IT roles in a number of companies. He became a well-known 'go-to guy' among startups and security firms: he always solved the problem and they always came back for more. 'When I've characterised Craig to colleagues and friends,' Rob Jenkins, who worked with Wright in this period and now holds a senior position in Australia's Westpac Bank, told me, 'I've always described him as the most qualified person I've ever known. I've worked with other smart people but Craig has such a strong desire to pursue knowledge. He has passion. And bitcoin was just another one of those bright things he was talking about.'

'Sketch it out for me,' I said to Wright. 'Those years before bitcoin. What was happening that would later have an influence? I want to know about all the precursors, all the previous attempts to solve the problem.'

'Back in 1997 there was Tim May's BlackNet …' May was a crypto-anarchist, who had been operating and agitating in the cypherpunk community since the mid-1980s. 'Computer technology is on the verge of providing the ability for individuals and groups to communicate and interact with each other in a totally anonymous manner,' he wrote in the *Crypto-Anarchist Manifesto in 1988*. BlackNet

operated like a precursor to WikiLeaks, soliciting secret information with payments made by untraceable, digital money.

'We all have a narcissistic hubris,' Wright told me. He wanted to take May's BlackNet idea further. He was also enthusiastic, in those early days, about Hashcash and B-money. The idea behind Hashcash, a 'proof of work' algorithm where each of a group of computers performs a small task that can be instantly verified (thus making life impossible for spammers, who depend on multiple emails going out with little to no work involved), was 'totally necessary for the building of bitcoin'.  Wright said that he spoke to Adam Back, who proposed Hashcash in 1997, 'a few times in 2008, whilst setting up the first trials of the bitcoin protocol'.

B-Money was invented by a man called Wei Dai. At the time of its creation, Wei wrote a paper which assumed 'the existence of an untraceable network, where senders and receivers are identified only by digital pseudonyms (public keys) and every message is signed by its sender and encrypted to its receiver.' The public key, or address, is matched, as John Lanchester handily described it in the *LRB*, to 'a private key which provides access to that address'. A key is really just a string of numbers and digits: the public key demonstrates ownership of any given address; the private key can only be used by the owner of that address. Wei went on to suggest a system for the exchange and transfer of money. 'Anyone can create money by broadcasting the solution to a previously unsolved computational problem,' he wrote. The system had methods for rewarding work and keeping users honest. 'I admired B-Money,' Wright told me, 'and he definitely gave me some of the cryptographic code that ended up in the first version of bitcoin.' Wright was always careful to give credit to those early developers. 'Wei was very helpful,' he went on, but 'to people like that bitcoin seems a bit of a fudge. It works, but it's not mathematically elegant.'

'Wei said that?'

'Wei was very polite. But others said it: Adam Back, Nick Szabo. They would probably like to find a more elegant solution to the problem. Perhaps they see the mining system in bitcoin as wasteful: there's wasted computation in my system –

machines which are trying to solve problems and not winning. But that's like society.'

'Are these early cryptocurrency people in a state of rivalry?'

'Yes, but it doesn't matter.'

**Kleiman**

The flat in Marylebone where I interviewed Wright had wooden shutters and modern ornaments and pictures, mainly of crows. I set the flat up for work while Craig and Ramona were in the City signing over his intellectual property, and all his companies, to MacGregor. They arrived at the flat a couple of hours late. 'When did you realise the whole Satoshi thing wasn't going to be a secret for ever?' I asked.

'Very recently,' Wright said. 'I didn't really believe it would need to come out. What we believed is that we could leave it in doubt – we wouldn't have to sign using the Satoshi keys or anything else. We have hundreds of patents and papers in progress – research from the beginning – and in the next year we're going to start releasing them. We thought people could suspect and people could query and we could leave it like that.'

'And how did that change?'

Ramona said a single word: 'Rob.'

The days in St Christopher Place were almost languorous. We would bring coffee back to the flat and spread out, and I'd try to build a picture of how he did what he said he did. We put up whiteboards and he bamboozled me with maths. Sometimes he would write at the board for hours, then tear open books and point to theories and proofs. I talked to the scientists he worked with, many of whom were better explainers than he was. One of the things I noticed was that Wright hated claiming outright to be Satoshi and would spend hours giving credit to everyone who had

ever contributed. It was odd: we were in the room because he was coming out as Satoshi, yet the claim embarrassed him and I have many hours of tape in which he deflects it. I felt this unwillingness supported his claim because it showed a proper regard for the communal nature of the work. He was contradictory enough sometimes to enjoy the limelight and actively court it, and this would cause trouble for him, but the idea of speaking directly as Satoshi seemed to fill him with dread. 'I'm afraid that they're just going to look at my papers because I've got Satoshi after my name,' he told me. 'I've got my little Satoshi mask on, and people go "Aren't you wonderful?" because you were Satoshi. I wanted the doubt. When I released future papers, I wanted people to go: "Oh, fuck, he could be, and these papers are so good he might be."'

Dave Kleiman was to become the most important person in Wright's professional life, the man he says helped him do Satoshi's work. They met online: they visited the same cryptography forums and had interacted since 2003. Both men were interested in cyber security, digital forensics and the future of money, but Kleiman was a boy's boy, an army veteran who loved contact sports and fast living. Five foot ten and weighing 200 pounds, he lived in Riviera Beach, Florida, and from 1986 to 1990 he was an army helicopter technician. When I looked into Kleiman's life, I discovered he had also done computer forensics work for Homeland Security and the army. After active service he became a deputy in the Palm Beach County sheriff's office. A motorcycle crash in 1995, when he was 28, left him in a wheelchair. Kleiman was a drug user and one source told me he was heavily into online gambling and various illicit activities; there is evidence he was associated with Silk Road, the online marketplace for all things illegal. After the accident he devoted himself to computers, and set up a company called Computer Forensics LLC.

Until Napster (the brainchild of a teenager called Shawn Fanning) came along in 1999, enabling users to share music files across the internet without a central server, the phrase 'peer-to-peer sharing' was familiar only to the early internet's true believers.  Napster, with its user-friendly interface, brought file-sharing to the

masses. The old model of copyright and revenue generation became obsolete
overnight: people stopped buying CDs; young people got music through the internet
for free. The music industry had to reinvent itself or die. Wright told me that his
earliest conversations with Kleiman were about file-sharing. In 2007 they wrote a
study guide together on hacking. 'I used to fire ideas off him,' Wright said. 'I'm pretty
good at maths but I'm not very good at people.' Kleiman, he said, could put up with
his temper, which not everybody could. They began to speak of ways to use the
Napster idea in other areas and solve some old problems in cryptography. Wright
never, I have to say, made it fully clear how they had collaborated on building
bitcoin. I kept returning to the subject, and my doubts would flare up when he failed
to be explicit.

'Give me a sense of how the idea of Satoshi formed,' I said.

'I guess,' Wright replied, 'the initial idea was having a pseudonymous head that
wouldn't be cut off.'

'More your idea than his?'

'Probably mine.'

'And was there a point you realised you needed a figurehead?' I asked.

'We needed people to respond to us,' he said. 'But I didn't really want people to
respond to me. There are a couple of reasons for that. I don't think I would really
have sold the idea to anyone. If I'd come out originally as Satoshi without Dave, I
don't think it would have gone anywhere. I've had too many conversations with
people who get annoyed because it's me.'

'The blockchain came about as an idea of a ledger,' he said. 'But there were a
number of problems that needed to be solved. It needed to be distributed, but how
do you make sure people don't collude – it may seem awful but you don't put trust in
people, you incentivise people to act. And you incentivise people to act by giving
them the opportunity to earn something. It's as Adam Smith says: it's not through
the goodness of the heart, it's not the baker caring about you, it's not the butcher

caring about you, it's them caring about their own families. Together, as he put it,
the invisible hand controls the way society works.'

I asked him to explain the distributed ledger in layman's terms and he went into an
algorithmic paroxysm of verbal ingenuity. Ignoring all that, a distributed ledger is a
database that is shared between multiple users, with every contributor to the
network having their own identical copy of the database. Any and all additions or
alterations to the ledger are mirrored in every copy as soon as they're made. No
central authority is in charge of it, but no entry on it can be disputed. Adam Smith's
point about 'incentive' is embedded in the way bitcoin works: people do not just buy
coins or use them; they 'mine' them. Miners use their computers to solve
increasingly difficult mathematical problems, the reward for the solving of which can
be paid in bitcoin. This keeps the currency honest and, ideally, stops it from being
dominated by any single entity.

I had brought rolls of disposable whiteboard and stuck it up around the flat, and,
while we were speaking, he would jump up and cover the walls in formulae, along
with arrows, arcs and curves. His wife told me she sometimes goes into the shower
room and finds him standing there, stark naked, writing on the steamed glass. 'Was
there a primary person doing the maths?' I asked.

'Me,' he said. 'Dave wasn't really a mathematician. What he did was make me
simplify it.'

'How did he know how to make you simplify it?'

'We got to a point in the writing of the Satoshi white paper where it was … People
say that it was hard.'

'He wanted you to bring the language down a little bit?'

'A lot. It's very simple. The elliptical curve stuff is not described in the paper at all,
it's just there. The crypto stuff isn't described either.' I asked him to show me the

trail of ideas that led to their collaboration. 'So all these things are there,' he said, pointing to a 337-page thesis on his computer called 'The Quantification of Information Systems Risk', which he had recently submitted in partial fulfilment of a philosophy doctorate at Charles Sturt University. 'Application to audits, how you analyse failures, deriving the mathematics behind it, simplifying the mathematics and there you go … The core of the bitcoin paper is a Poisson model based on binomial distribution. That's how it got solved.'

In 2008 it was a 'hodgepodge', he said. I asked him if he felt the development of bitcoin was, at some level, a response to the financial crisis. 'It was already in process. I saw [the crisis] coming though. It was a kind of perfect storm. During that year, I spoke to Wei Dai. So between him and Hal Finney there were a lot of really good ideas about making money work … [Finney] was the one who actually took what I said seriously. He received the first bitcoin.'

Craig started turning up to our interviews in a three-piece suit. His suits were unfashionable and his ties even more so – 1970s-style yellow, sometimes paisley – and he would ramble on a range of subjects. On his own subject, he could be brilliant, but he was wayward: he would side-track, miss the point and never come back to it. He was nothing like people imagine the mythical Satoshi to be – in fact, he was Satoshi's comic opposite. He told stories against himself that weren't really against himself. He was obsessed with his opponents' views but had no skill at providing a straight answer to their questions. 'I'm an arsehole,' he said many times, as if saying so were a major concession. But he wasn't really, he was actually pretty nice. He was arrogant about maths and computing, which wasn't so surprising. He also had a habit of dissembling, of now and then lying about small things in a way that cast shade on larger things. At one point, I asked him to send me an email from the original Satoshi account.

'Can you do that?' I asked.

'Yes,' he said. 'But I'd need Rob's permission.' When I asked MacGregor he said that was absurd. He simply didn't want to – or couldn't – give too much away, and that was unfortunate in someone who'd agreed to sit down every day with a writer. He seemed to have full knowledge of that email account, in a way that made it seem unquestionably his. But somehow, it offended his sense of personal power to prove it. At first, I thought he was a man in existential crisis, like the hero of Bellow's *Dangling Man*, brilliant but antisocial, waiting to be drafted. But as the months passed I began to think of him more as a Russian 'superfluous' man of the 1850s, a romantic hero out of Turgenev, constantly held back from self-realisation by some blinding secret, showing himself not by action but in speech. Wright talked all day and he scribbled on the board and he called me his friend. He cried and he shouted and he unloaded his childhood and spoke about his father. He claimed to be Satoshi and he spoke Satoshi's thoughts and described what he did and gave an account of what people misunderstood about his invention and where bitcoin needed to go now. I moved to an office in Piccadilly – it was like something out of John le Carré, all those rooftops and fluttering Union Jacks – and we continued to do interviews. He talked without cease, without direction, and continued to find it difficult to land near the spot where my question was marked on the ground. When I asked to see the emails between him and Kleiman, he shrugged. He said he wasn't getting on well with his first wife when he wrote them and I assumed that meant they were full of talk about her. 'Just edit them down for me,' I said.

'I don't know if I can find them,' he said. But I wouldn't let it go and eventually he sent me a selection and they certainly seem to be authentic. A few of the emails were obviously the same as those quoted in the *Wired* and *Gizmodo* stories before Christmas. Wright always said these stories had been provoked by a 'leak', the work of a disgruntled employee of his who had stolen a hard drive. In any case, the emails he sent me show a pair of men with shadowy habits – socially undernourished men, I'd say, with a high degree of intellectual ability – operating in a world where the line between inventing and scamming is not always clear. The first email Wright sent me was from 27 November 2007, when he was working for

the Sydney accountancy firm BDO Kendalls and the two men were working on a paper on 'Cookies in Internet Banking'. 'Next year Dave, we come out with something big. I will tell you, but not now,' he wrote to Kleiman on 22 December 2007. Kleiman's reply told him what he was reading – 'Sagan, Feynman, Einstein' – and added: 'I hope we make an event together this year so we can "break some bread" and have a casual conversation, instead of the brain dump middle of the night email exchanges we normally have.' On 1 January 2008, Wright closed an email: 'Nothing now, but I want your help on something big soon.'

The subject of bitcoin came up – quite starkly – in an email from Wright dated 12 March 2008. 'I need your help editing a paper I am going to release later this year. I have been working on a new form of electronic money. Bit cash, bitcoin … you are always there for me Dave. I want you to be part of it all. I cannot release it as me. GMX, vistomail and Tor. I need your help and I need a version of me to make this work that is better than me.' Wright told me that he did the coding and that Kleiman helped him to write the white paper and make the language 'serene'. With a protocol as clever as the one underlying bitcoin, you would imagine the work was complex and endlessly discussed. But Wright says they mainly talked about it by direct message and by phone. Wright had been fired from his job at BDO (the crash was taking effect) and had retired with his then wife, Lynn, and many computers to a farm in Port Macquarie. It was there, Wright says, that he did the majority of the work on bitcoin and where he spoke to Kleiman most regularly. The Satoshi white paper, 'Bitcoin: A Peer-to-Peer Electronic Cash System', was published on a cryptography mailing list on 31 October 2008.

On 27 December 2008, Wright wrote to Kleiman: 'My wife will not be happy, but I am not going back to work. I need time to get my idea going … The presentation was good and the paper is out. I am already getting shit from people and attacks on what we did. The bloody bastards are wrong and I friken showed it, they should stick to the science and piss off with their politicised crap. I need your help. You edited my paper and now I need to have you aid me build this idea.' Wright told me

that it took several attempts to get the protocol up and running. He began to test it early in January 2009. 'That was where the real money started rolling in,' he told me. The originating block in the blockchain – the file that provably records every transaction ever made – is called the Genesis block. 'There were actually a few versions of the Genesis block,' Wright told me. 'It fucked up a few times and we reviewed it a few times. The Genesis block is the one that didn't crash.' There from the beginning was Hal Finney, who would receive the first bitcoin transaction, on block 9. This was a key moment for the new cryptocurrency: block 9 for ever shows that Satoshi sent Finney ten bitcoin on 12 January 2009 – it is the first outgoing transaction we know to have come from Satoshi. Satoshi also sent four other transactions on the same day. I asked Wright who the recipients were – who the four addresses belonged to. 'Hal, Dave, myself,' he replied. 'And another I cannot name as I have no right to do so.' Wright told me that around this time he was in correspondence with Wei Dai, with Gavin Andresen, who would go on to lead the development of bitcoin, and Mike Hearn, a Google engineer who had ideas about the direction bitcoin should take. Yet when I asked for copies of the emails between Satoshi and these men he said they had been wiped when he was running from the ATO. It seemed odd, and still does, that some emails were lost while others were not. I think he believed it would be more interesting to play hide and seek than to be a man with a knowable past.

Wright's emails to Kleiman suggest that by this point he was starting to mine the million or so bitcoins that are said to be owned by Satoshi Nakamoto. 'I have a few potential clients in gaming and banking,' he wrote to Kleiman. 'I figure I can work ten to 15 hours a week and pretend to have a consultancy and use this to build and buy the machines I need. If I automate the code and monitoring, I can double the productivity and still offer more than others are doing … The racks are in place in Bagnoo and Lisarow. I figure we can have 100 cores a month setup and get to around 500.' Kleiman replied the same day to affirm their vows.

'Craig, you always know I am there for you. You changed the paradigm that was held for over a decade and destroyed the work of a couple [*sic*] academics. Do you really think they will just take this happily? I know you will not, but try not to take the comments to heart. Let the paper speak for itself. Next time you need to get me a copy of the conference proceedings as well. You know it is not easy for me to travel.' A picture emerges of an ailing Kleiman sitting at his computer day and night in his small ranch-style house in Riviera Beach, Florida. After writing this last email, he spent a frighteningly long period in hospital. The two men agreed to meet up at a conference in Florida on 11 March 2009 and Kleiman wrote expressing his excitement at the prospect of a few beers with Wright. Craig and Lynn stayed at Disney's Coronado Springs Resort Hotel and Kleiman drove there in his customised van, rolling into the bar with a big smile: Kleiman was the brother and drinking buddy and like-minded computer nerd Wright had never had. Not even Lynn had a clue what they were talking about.

During my visit to Australia I met Lynn in Chatswood, on Sydney's north shore, a busy commercial district that heaves with eager shoppers on a Saturday morning. She had met Wright on the internet while she was working as the nursing manager of the ICU in a military hospital in Ottawa. She told me Wright asked her to marry him about six weeks after they met online. When she eventually went to Sydney to visit him, he brought a ring to the airport. 'He was 26 and I was 44,' she said. Neither of them had been married before.

'He was very mature for 26,' Lynn told me. 'He always has to be the best. And the hard part about that is he left bodies by the wayside. He stepped on people.' She began working for him – 'he was the geek and I was the gofer' – and he got a lot of work in information security, working for the Australian Securities Exchange, and Centrebet, which is where he first got to know Stefan Matthews. Wright told me he was afraid some of the things he did for those online betting companies would come back to bite him, if and when he was outed as Satoshi. Other sources told me that he and Kleiman had had some involvement with illegal gambling. 'I knew Dave

Kleiman and he were working together,' Lynn told me, 'and I remember them saying that digital money was the way of the future. I've never said this to anybody, but I knew he was working on it and I didn't ask, because I knew he would bite my head off if I didn't understand it. He's got a very sociopathic personality.'

Lynn said her husband had admired Kleiman. And she admired him too: 'He loved life,' she said, 'and he had a brilliant mind, like Craig, but he had a gentler soul.' She remembered the Orlando conference. 'We stayed in a hotel that looked like a giant cartoon,' she told me. 'We met in one of the bars. He was a young guy, in his thirties or early forties, brown hair and moustache, average-looking. And boy, he loved to have a good time. It might have been his birthday. I went into the Disney store and bought some hats – Craig had Pluto, and Dave had one in the shape of a giant birthday cake.' Wright stepped out of himself for Kleiman: 'I'd never seen him like that with anybody. It was like, "I wanna grow up to be just like him." Dave softened Craig. A lot of what they wrote together was in his voice. I'd never seen Craig react like that to anybody. When he felt unsure of himself he went and talked to Dave. I think he wanted to be like Dave, but he knew he couldn't be.'

'In terms of having that kind of temperament?'

'Yeah. Dave was good for him. It made him realise that life doesn't go your way all of the time.'

I asked her if she thought he was a flawed person. 'Yes,' she said. 'He's starting to realise it. He knows he's done well in his work but he hasn't done well as a human being.' She stared into her cup. 'When we were at the farm,' she said, 'I was interested in finding four-leaf clovers. I would never find any, but Craig would just step out of the house and find three.'

In mid-2011 Satoshi suddenly disappeared from view. Apart from one or two emails denouncing fake Satoshis, he wasn't heard from again. Control of the network alert key is said to have been passed at this time to Andresen – possession of this key

makes its holder the closest thing bitcoin has to a chief. Wright sent Kleiman an email on 10 September 2011: 'It is recorded. I cannot do the Satoshi bit any more. They no longer listen. I am better as a myth. Back to my lectures and rants that everyone ignores as me. I hate this Dave, my pseudonym is more popular than I can ever hope to be.'

For some reason – possibly fear of the ATO – Wright set up a trust fund called the Tulip Trust in June 2011, and asked Kleiman to sign an agreement stating that he, Kleiman, would hold 1,100,111 bitcoin (then valued at £100,000, currently worth around $800 million). For clarity: there is no evidence that Kleiman ever took custody of that amount. However, there was a separate agreement that Kleiman would receive 350,000 bitcoin and this transaction was made. 'All bitcoin will be returned to Dr right on 1 January 2020,' it says in the trust document.

> No record of this arrangement will be made public at any time … Dr Wright MAY request a loan of bitcoin for the following reasons (and no others): Furthering research into peer to peer systems … commercial activities that enhance the value and position of bitcoin. In all events, all transactions in loaned funds will be concluded outside of Australia and the USA until and unless a clear and acceptable path to the recognition of bitcoin as currency has occurred … I lastly acknowledge that I will not divulge the identity of the Key with ID C941FE6D nor of the origins of the satoshin@gmx.com email.

Kleiman signed it. 'I think you are mad and this is risky,' he wrote in an email to Wright on 24 June 2011, perhaps spying a possible illegality. 'But I believe in what we are trying to do.' Wright meanwhile seemed to get more and more frustrated. He both wanted fame and repudiated it, craving the recognition he felt was his due while claiming his only wish was to get back to his desk. 'I have people who love my secret identity and hate me,' he wrote to Kleiman on 23 October that year. 'I have hundreds of papers. Satoshi has one. Nothing, just one bloody paper and I cannot associate myself with ME! I am tired of all these dicks Dave. Tired of academic attacks. Tired of tax fuckwits. Tired of having to do shenanigans like moving stuff overseas IN CASE it works.'

I came to feel that there were secrets between Wright and Kleiman that might never be revealed. Wright usually clammed up when asked about Kleiman and money. One day, in a fit of high spirits, he showed me a piece of software he said that US Homeland Security had ripped off from him and Kleiman. He smiled when I asked if they'd done government security work. The first thing most people ask about when you mention Satoshi is his alleged hoard of bitcoin: he invented the thing, and created the Genesis block, and mined bitcoin from the start, so where was Wright's money and where was Kleiman's? The emails, when I got them, seemed to clear this up slightly, but, during many dozens of hours of conversation with Wright, he never properly told me how many bitcoin he mined. I was aware – and he knew I was aware, because I told him several times – that he wasn't giving me a full account of everything that had occurred between him and Kleiman. He said it was complicated.

Somewhat more helpful are minutes taken during a meeting between the ATO and representatives from Wright's Australian companies in Sydney on 26 February 2014. According to the minutes, Wright's representative John Cheshire went into detail about the financial collaboration between Wright and Kleiman. This was a story that Wright, for some reason, didn't want to tell me. Cheshire said that Wright and Kleiman had set up a company called W&K Info Defense LLC (W&K), 'an entity created for the purpose of mining bitcoins'. Some of these bitcoins were put into a Seychelles trust and some into one in Singapore. Wright, according to Cheshire, 'had gotten approximately 1.1 million bitcoins. There was a point in time when he had around 10 per cent of all the bitcoins out there. Mr Kleiman would have had a similar amount.'

I asked Wright about this and he told me it was true that his and Kleiman's mining activity had led to a complicated trust. The trust question was persistently vague: not only how many trusts but the names of the trustees, and the dates of their formation. The only consistent thing is the amount of bitcoin Wright is said to have had at one time, 1.1 million. He said that his bitcoin could not now be moved without

the agreement of the (several) trustees. He also said that Kleiman had been given 350,000 bitcoin but had not moved them. He kept them on a personal hard drive.

Wright also set up a shell company in the UK. 'I know what you want and I know how impatient you can be,' Kleiman wrote on 10 December 2012, 'but really, we need to do this right. If you fail you can start again. That is the real beauty of what you have.' It's possible Kleiman was referring to their ability to mine bitcoins and then squirrel them away. But he was evidently worried about Wright's ability to cope with all the flak, and about Wright's kamikaze attitude to the tax authorities. 'I love you like a brother Craig,' he added, 'but you are a really difficult person to be close to. You need people. Stop pushing them away. You have over one million bitcoin now in the trust. Start doing something for yourself and this family you have.'

Around this time, an 18-year-old IT enthusiast called Uyen Nguyen began working with them. Very quickly, Kleiman made her a co-director of their company and she later became a powerful figure in the trust. It's unclear how such a young and inexperienced person came to have so much influence. Wright told me she was 'volatile, capricious and beyond control' and added that Kleiman liked young women and that she was loyal and trusted – but that 'she wants to help and this always leads to trouble.' While I was preparing this story, Wright began to seem worried about Nguyen. I always felt he was in the middle of a very complicated lie when he talked about her. 'My way of lying,' he told me one day, 'is to let you believe something. If you stop questioning and then you go off, and I don't correct you – that's my lie.'

Towards the end of 2012, Dave began to fail. 'Paraplegics get sick a lot,' Lynn Wright had told me, speaking as a nurse. 'The bedsores get bad and they can't fight infections. Dave was in and out of hospital a lot and I don't know what his life was really like.' Wright told me that Kleiman had girlfriends, but admitted he didn't really know much about his life. Like Wright and his first wife, they had met in a chatroom. They met in the flesh no more than half a dozen times. Kleiman seems to have lived in front of his computer day and night, and the sicker he got the more isolated he

seemed to be. Just after 6 p.m. on 27 April 2013 he was found dead by a friend who'd been trying to contact him for several days. He was sitting in his wheelchair and leaning to the left with his head resting on his hand. Lying next to him on the bed was a 0.45 calibre semi-automatic handgun, a bottle of whisky and a loaded magazine of bullets. In the mattress a few feet from where he sat, a bullet hole was found, but Kleiman had died from coronary heart disease. There were prescription medicines in his bloodstream and a modest amount of cocaine.

'We never really thought that "we made Satoshi,"' Wright told me once. 'It was good. It was done. It was cool. But I don't think we realised how big it would be.'

'There was no conversation between you about how it was going over? That Satoshi was becoming a guru?'

'We thought it was funny.'

Wright paused, shook his head, and broke down. 'I loved Dave,' he said. 'I would have seen him more. I would have talked to him more. I would've made sure he had some fucking money to go to a decent hospital. I don't think he had the right to choose not to tell me.'

'What was happening to him?'

'Neither of us had any money, physical money. We had money in Liberty, an exchange in Costa Rica, but the Americans closed it down as a money-laundering operation. Dave had a number of bitcoins on the hard drive he carried with him. Probably about 350,000.'

'Hoping it would …'

'As I said, it wasn't worth that much then. Dave died a week before the value went up by 25 times.' Wright kept wiping his eyes and shaking his head. He emphasised something he said the commentators never understood: for a long time, bitcoin

wasn't worth anything, and they constantly needed money to keep the whole operation going. They feared that dumping their bitcoin hoard would have flooded the market and devalued the currency. One of the things Wright and Kleiman had in common is that they had a problem turning their ideas into cash and were always being chased by creditors. Kleiman died feeling like a failure. No one in his family has the passwords to release the bitcoins on his computer. After he died, his family didn't open probate on his estate because they believed it had no value. Kleiman's supposed personal bitcoin holdings are worth $260 million at today's prices.

**The London Office**

In January this year, on a rainy London afternoon, Wright took me to see the large office that was being set up for him as part of the deal with nCrypt. It hadn't taken long for the world to forget that they'd once thought Wright was Satoshi. One or two of the media organisations that had 'outed' him in December had taken down the original articles from their websites, stung by the cries of fraud. After only a few days' interest in the notion, most people had made up their minds that Wright had nothing to do with Satoshi. Wright – under strict advisement – had said nothing in response to the media reports accusing him of perpetrating a hoax, but when we were alone, which was most of the time, he would launch into point-by-point rebuttals of what his critics had been saying. In the end he would shrug, as if the most obscure things were actually obvious.

The press coverage of Wright and Wright himself had something in common: they succeeded in making him seem less plausible than he actually was, and, to me, that is a general truth about computer geeks. They are content to know what they know and not to explain it. They will answer a straightforward slur with an algorithm, or fail to claim credit for something big then spend all night trying to claim credit for something small. Many of the accusations of lying that were thrown at Wright last December were thrown by other coders. And that's what they're like – see Reddit, or any of the bitcoin forums. Much of what these people do they do in the dark, beyond scrutiny, and, just as it's against their nature to incriminate themselves, it is

equally unnatural for them, even under pressure, to de-incriminate themselves.
They just shrug.

Coders call one another liars, when all they really mean is that they disagree about
how software should work. During the time I was working with Wright in secret, I
would text my colleague John Lanchester, who I knew I could trust to keep the
secret but also to understand what was at stake in the story. 'Imagine a situation,' I
wrote to John, 'where novelists were strangely invested in denying the plausibility of
each other's books. There's no "proof" as such that one is right and the other is
wrong, but they could argue fiercely and accuse each other of all sorts of things
while not really settling the problem.'

'Edmund Wilson says somewhere that the reason poets dislike each other's books
is because they seem wrong, false – a kind of lie,' John replied. 'If you were telling
the truth you would be writing the same poems as me.'

So the world that Wright knew best thought he was a liar. And the day we visited his
new offices he seemed resigned to the fact. Much later, he told me that these
months were the high-point of his career in computer science: he was working in
secret on material that seemed to be coming together beautifully and profitably. It
irked him that people called him a fraud and it irked him, just as much, that his deal
with nCrypt would require him to prove that he was Satoshi. He hated being
accused of being a fraud *and* he hated having to prove that he wasn't a fraud.
Having it both ways is a life, a life that requires a certain courage as well as
shamelessness, and Wright was living his double life to the hilt.

Wright introduced me to Allan Pedersen, who'd been his project manager in
Sydney. We were in the Workshop – a floor above MacGregor's office near Oxford
Circus – standing at a glass workbench beside a whiteboard covered in writing. The
opposite wall was stencilled with a quote from Henry Ford: 'Whether you think you
can or think you can't, you are right.' Pedersen told me he had been brought over to
direct a group preparing an initial batch of 32 patent applications, to be completed

by April. (This was in January.) Beyond that there were 'upwards of four hundred patents', ideas to do with using the blockchain to set up contracts that would come into action on specified dates years ahead, or using the blockchain to allow cars to tell their owners when they needed petrol and to debit the cost when they refuelled. At this point, and for several minutes afterwards, Wright spoke of himself in the third person. 'Craig has been given a big kick up the bum,' he said, 'because Craig, instead of doing tons of research and sticking it on a shelf, has to complete it and turn it into something.'

'How do you organise him?' I asked Pedersen.

'I'm the organised type,' he said. 'When Craig comes into the office he's always in the middle of a sentence. And I'm trying to work out what this sentence is and manage things around what he's saying. I'm sort of grounding his latest thoughts, placing them in what we're trying to do. I'm the glue between Craig and the developers.'

It had become obvious, mainly from things Wright himself had said, that he often found it difficult to get on with people who worked for him. He got rattled when they said things couldn't be done, or were too conventional in their thinking, or too stupid, as he saw it. Ramona told me that 40 per cent of his staff in Sydney had been in a state of rebellion. 'I'm an arsehole,' Craig said to me once again, 'and I know that.' Pedersen had the job of keeping things cool with the developers, whose job it was to turn Wright's ideas into a form in which they could be patented and eventually licensed. 'I'm making sure the ideas get executed,' he said. 'Craig's not that interested in that part. He's always moving on.'

'Craig's great at research,' Wright said, 'but his development and commercialisation sucks. I build it, and then it works, and then I walk off.'

'You're losing interest?'

'I've lost interest. I've proved it, and off I go.'

'It's getting easier,' Pedersen said, with a smile. 'It was quite complex in the beginning.' Wright had strong views about how the technology should develop, and how it could 'scale' to meet greater demand. 'It can go to any size,' Wright said that day. I've tested up to 340 gigabyte blocks, which is hundreds of thousands of times greater than it is now. It's every stock exchange, it's every registry rolled into one … Ultimately bitcoin is a 1980s program, because that's what I was trained in … The idea is good, the code is robust, it runs and does the job, but it's slow and cumbersome. There were some things early on that needed to be fixed and were, but it wasn't as perfect as everyone thinks. At the end of the day, it needs to be turned into professional code. It needs to move away from the home user network and into a server network environment. And then it can do much more and be faster.' There are those who feel it should remain small, and that making it bigger is a betrayal of its first principles.

'This is the future of the blockchain,' Pedersen said.

'People are saying, "It's not really something we can run yet,"' Wright said, 'but it's time that we grew up and that bitcoin becomes professional.'

Pedersen shook his head. 'We're not working in a world where we know exactly what we're doing,' he said. 'It's coming from Craig. And then I start establishing the ground rules and we begin rolling it out. I'm putting people on a certain track and I keep going back to Craig, saying, "We need to sort this or that out," and I'm constantly keeping them and him in the loop. The good thing about Craig is that he wants me to task him, so it's a very strange relationship we've got. I'm reporting to him but I'm tasking him at the same time and it seems to work beautifully.' He was tired, and so was the whole team, but they felt confident the patent applications would be filed on time.

When Craig left the room to take a phone call, Pedersen took pains to close the
door properly. 'He's a really nice person,' he said, 'but he's a fucking nightmare.
Every single morning he comes in and I think, "What is he talking about?"' Pedersen
told me how he handled him, how he made him focus, and how he worked hard to
keep him on track. 'When I've got new people here,' he said, and there were many
new people, 'I have to train them how to talk to Craig. That's what I have to do.
Sometimes, he can't explain things and this is where the anger comes from. It's the
interesting part. You can't be in the same room with him. He's constantly telling you
something. He's like Steve Jobs, you know – only worse.'

As we made our way to the new office – it was a building site that day, but would be
up and running four weeks later – Wright presented himself as a man who was
ready for anything. In a pinstripe suit and ruby tie, he looked like a hellbent 1980s
bond dealer, except the cypherpunk glint in the eye suggested he was getting away
with something. He wasn't the king of all he surveyed, he was the joker, and,
crossing Oxford Street, he joked that he might be Moses. The traffic parted and he
made his way to the promised land, a brand new suite of offices down a side street.

*

Pedersen had come along. 'This is how it works in this company,' he said. 'You're
sitting in Vancouver in October' – Vancouver is where nTrust, the parent company,
is based – 'and suddenly Rob MacGregor says: "We need these thirty-odd patents
by April and when can you go to London?"' The hurry for the patents was to help
with the giant sale to Google or whomever. The men behind the deal were very
keen to beat other blockchain developers to the punch, especially the R3
consortium of banks and financial institutions which late last year started spending a
fortune trying to deploy the technology. We were accompanied by a young Irish
woman who had been put in charge of designing the new office. MacGregor's firm
had invested millions in Wright. The new company, nCrypt, had pretty much been
built around him, and its offices showed it. He was to have the enormous corner
office with a view all the way along Oxford Street. MacGregor clearly believed in

Wright, however obnoxious he could be, but I never understood why he wasn't interrogating his uncertainties before spending his money. He was a lawyer, but he put trust in front of diligence, which is unusual in someone so intelligent. MacGregor never, incidentally, used the words 'off the record' with me – only once, later on, did he imply it, when he said something and then said he'd deny saying it if I quoted him – and he was a generous source of information. At no point, however, did he tell me where the money for this project was coming from.

The designer was waving a colour swatch. 'We've gone for a kind of Scandi look,' she said.

'This place will work,' Wright said, striding through the open space, 'mainly when it comes to protecting me from myself.' Amid the hammering and drilling, Wright stood in an office about 20 feet by 20 feet, with floor to ceiling windows and a view down into the heart of Soho.

'You remember J.R. Ewing in *Dallas*?' I asked.

Wright laughed. What he most enjoyed, he said, was that all this was going on in secret while the world outside had written him off as a mug and a fantasist. 'If Satoshi has to come out, he'll come out in style.' He turned back to the designer to tell her how the frosted glass should work in the meeting room. 'We do a lot of work on whiteboards,' he said. He pursed his lips, then smiled. 'Will the interactive whiteboards be set up so that I can contact the guys in Sydney?'

We spent an hour at the new office. 'And they say *nothing is going on*,' Wright said as we stepped back into the elevator. 'It's all a *figment of our imagination*. I'm not Satoshi, and none of this is real.' Out on the street again, he told me he had all the money he would ever need. 'And I'll have the monkeys off my back for ever and just get on with the one thing I'm good at, not business, not managing people, but doing research and honouring this thing we made.' Wright was enjoying himself, but nCrypt was already, as MacGregor told me repeatedly, negotiating the sale of the

whole package to the highest bidder: 'Buy in, sell out, make some zeroes,' as he had said, and he'd always been honest about that goal. Wright wasn't facing up to this. The next time I visited his corner office it was finished and decked out with claret-red leather armchairs and sofas flown in from Sydney. It looked, as I'd joked earlier, like the office of a Texan oil magnate. A host of management certificates were framed on the wall next to a signed photograph of Muhammad Ali.

I told Pedersen I thought Wright was struggling with the fine print of the deal – coming out. 'He's sold his soul,' Pedersen said. 'That's how simple this is. And the combination of Craig and Ramona is dangerous here. They can't just sign all these [legal] papers and think it's going to be all right, that they'll sort something out. It doesn't work that way. They now have to go to the end and live with it. But they're doing it on first class. When this Satoshi thing comes out I can see a lot of bad things happening, and they are not geared up for this, any of them.'

'I'm concerned for him,' I said.

'There's not really a happy ending here,' Pedersen said.

'Was it the same in Australia?'

'It was the exact same,' he said, 'except in Australia you could say he was in control. He's learned absolutely nothing. He's now in this box, he can't move, he can't do anything, and this box is getting smaller and smaller.'

'Do you think he wants to be outed as Satoshi?'

'Yes I do. It's in in his personality. He wants to be recognised. He says too much. After two weeks of working with him, I knew.'

'He and Ramona tell me they had a pact never to come out.'

'My feeling is that she doesn't want him to come out, but he does. He's been pushing for this to happen.'

I spoke to one of the scientists, a shy, unexcitable man in his late fifties, who has been working on this technology for several years. He and Pedersen are old-school IT people, quiet-spoken and completely uninterested in the limelight. Both of them thought Wright was working at a different level from everybody else. The scientist, who spoke to me from the beginning on condition that he wouldn't be named, worried about Wright's attention to detail and about his conspiratorial nature, but he had no doubts about Wright's command of the big picture. The scientist was helping to oversee all the white papers and patent applications and managing a large team of IT specialists and mathematicians. I asked him if he was worried about the R3 consortium's work on blockchain technology. 'They are going to fail,' he said. 'They don't have Satoshi. There is a panic out there, a misunderstanding about how the blockchain and bitcoin works. They hire people who know about bitcoin and are attempting to buy into it rather than being left behind. I've read some patent applications that are pending, applied for by the Bank of America. What I saw was ultimately unimpressive in comparison to what Craig is trying to do with the blockchain.'

The scientist described how the staff try to get the ideas out of Wright's head. 'You can't say: "Explain this to me." If you ask a question like that, he'll just go off on giant tangents. First, he'll have difficulty explaining what's in his head. Often he's just coming up with ideas on the spot that he'll throw into conversation. You want to try to get yes and no answers from him. We film him at the whiteboard and someone will type out the text.'

He described moments when everyone in the research team thought what Wright was saying was impossible. It couldn't be done, the software wasn't up to it, the blockchain couldn't scale to the task, and then suddenly everyone would understand what he was saying and appreciate its originality. 'I need to be able to go over what he's said,' the scientist told me, 'to find the pearls of wisdom and find out what the

hell he means. If I don't get it then I might have to make some guesses. I had to train my team to work in that mode. They have to be good researchers. They have to *understand* the technology as well as be able to work with it.'

Often, the scientist said, the staff were amazed by an unexpected turn in Wright's thinking. But he admitted to being amazed, too, by certain gaps in Wright's technical knowledge. It was bizarre. Wright had what the scientist and the team regarded as vast experience and command of the blockchain, which he spoke of as his invention and appeared to know inside out, but then he would file a piece of maths that didn't work. Or he would show a lack of detailed knowledge of something the team took for granted. Nobody I spoke to could explain this discrepancy. 'One of the problems with him is that he's a terrible communicator,' the scientist said. 'He's invented this beautiful thing – the internet of value. But sometimes he'll just talk in equations but can't or is unwilling to explain their content and application.' His mistakes could also, he implied, be a result of laziness and lack of attention to detail.

I knew this for myself, but I was, to some extent, vexed that the technologists had the same experience. At the same time, I was impressed that people like the scientist and Pedersen could live with such a high degree of ambivalence about their boss. When I asked Pedersen if he thought the work was truly revolutionary, a non-native weariness came into his blue eyes. 'I think so,' he said. 'But I don't think he'll get the Nobel Prize because he's too political. He's coming out as a street fighter and could end up in prison or whatever.'

*

The main players in this story were keen to help me, to talk about what they knew and to show me the documents, but, in every case, there were topics they would avoid, and that were never cleared up. One of the most helpful individuals was Stefan Matthews. He pointed me in the direction of people from Wright's personal life, and sent me a typed history of his association with the man who would be Satoshi. Matthews noted that, when he signed the deal with MacGregor, Wright didn't have a feasible business plan for any of his companies. The Wrights' financial situation was dire. They couldn't pay their staff and a number had already left.

Pedersen and some others had stayed on without pay; Wright owed his lawyers $1 million. Superannuation remittances were overdue and loan repayments unpaid; the companies needed £200,000 just to make it to next week. Craig and Ramona had sold their cars. One of the companies was already in administration and, with the ATO closing in, 'all related entities were on the brink of collapse.' Before signing the deal, MacGregor, sources say, tried to assess the value of Wright's research, commissioning a 'high-level overview' of the companies. MacGregor instructed Matthews to be in Sydney on 24 June 2015, when a final appraisal of the businesses was undertaken and a draft arrangement negotiated for nTrust 'to acquire the intellectual property and the companies themselves'.

One night I went to have dinner with Matthews on my own. We met in the restaurant at the back of Fortnum & Mason, 92 Jermyn Street, and he seemed incongruous among the red banquettes – a large, bald Australian with a rough laugh and wearing a plaid shirt, keen to tell me everything he thought useful. Matthews seemed a much more affable character than MacGregor, both upfront and very loyal, without perhaps seeing how the two might cancel each other out. One of the tasks of the eager businessman is to make himself more sure of his own position, and Matthews spent a lot of time, as did MacGregor, selling the idea of Wright as Satoshi rather than investigating it. They drafted me into telling the world who Wright was, but they didn't really know for sure themselves, and at one point their seeming haste threatened to drive a wedge between us. It seemed odd that they would ask a writer to celebrate a truth without first providing overwhelming evidence that the truth was true. I took it in my stride, most of the time, and enjoyed the doubts, while hoping for clarity.

Matthews drank a little wine but not much. He was talking about the night in Sydney when they signed the deal. 'We pulled up outside Rob's hotel. He said: "Do you realise what you have just done? You have just done the deal of a career. This is a billion dollar deal. Fucking more. Billion dollars plus."'

'Why is Rob so convinced?'

'Don't know, don't know.' (MacGregor later told me he was convinced because Wright had shown Matthews the draft Satoshi white paper. 'I always had that,' MacGregor said.) 'If it turns out that he's a fraud, I don't know how he's managed to do it because you couldn't make this up.'

Matthews told me about a meeting at the Bondi Iceberg Club in Sydney that Wright had with Ross Ulbricht, the founder of Silk Road, now serving two life sentences. Silk Road used bitcoin to trade all kinds of contraband items because the transactions could be made anonymously. Wright later confirmed that this meeting took place, but said only that Ulbricht was full of himself and they didn't discuss bitcoin. Matthews seemed to think this was unlikely. He wondered whether Kleiman had had more to do with Ulbricht; other sources suggested the same.

'Wright signed a deal to come out as Satoshi,' I said to Matthews. 'Does he realise everything that involves?'

'You're gonna have criminal groups that paid him lots of money and there are people who know about that,' Matthews alleged. 'If they quack? You've got Ross Ulbricht who's in prison and apparently going to appeal trial this year or next. What happens when Ross sees Satoshi's name splashed everywhere and Craig's name everywhere? Is he going to say "I had lunch with that guy. We made a deal"? I'm not worried about what Craig has done, I worry about people who have associated with him.' It was very strange to do an interview with someone who would come out with this stuff, given that he was also trying to market the guy. In fairness to Wright, Matthews might just have been running his mouth off, and I've left out the worst of what he said, now and later.

We talked about some of the difficulties that had arisen between Wright and MacGregor. 'Craig and Ramona are in a state about the keys leaving the room,' I said. 'He feels it is an act of self-annihilation to let them go. Rob has a Hollywood ending in mind and it's looking incredibly unlikely. You can't go into a marketplace claiming full legitimacy when the proof hasn't been produced.' I told Matthews that

there were emails still missing between Wright and Kleiman, emails that the public would want to see before accepting him as Satoshi, because the correspondence would presumably go into the kind of detail about the invention that only the inventors could know. Wright had told me he would produce the missing emails by the following Wednesday, but he never did.

'I know what's in there,' Matthews told me. 'It will be chatter to do with illegal stuff that he and Dave were doing in Costa Rica – particularly around Costa Rican casinos where they got $23 million of income. And you don't get paid that amount just for doing a security review … He mined all those bitcoins himself using equipment that he bought with money that he got from Costa Rica.' Again: why was Matthews saying this? It was obvious to me that Wright was going to have a problem telling the full story, whatever it was. I wasn't even sure he'd told the full story to his wife, but perhaps he had, because she referred, several times, to the fact that there were things that she just couldn't tell me. 'They'll come after us,' she said, in a state of high emotion. 'They'll destroy us.' Matthews said he didn't know what that was about. He did tell me something he said he had told MacGregor when MacGregor asked him what he was getting out of the deal. 'Absolutely nothing,' Matthews said. 'I get what I get paid by Calvin. Calvin is the only allegiance I have, then and now.'

Calvin Ayre is one of the topics the team routinely went dark on. When I first met Wright, he called him 'the man in Antigua'. MacGregor never mentioned him at all during our early meetings. When I later told him that Ramona had mentioned a big man in Antigua, he said he didn't mind talking about him, but didn't bring his name up again. When, in February this year, they took Wright to Antigua for a pep talk, I emailed Matthews to ask if I could come too, and he didn't reply. Wright, in a low moment, later asked me if I'd told MacGregor they were the ones who let the cat out of the bag about Ayre. I said it wasn't them: Ayre's name had first been mentioned to me by Matthews. The Antigua meeting was being arranged when I went out for dinner with Matthews, and he referred to Ayre freely without ever asking that it be

off the record. MacGregor never went into detail about Ayre's involvement but both men's regular visits to Antigua made me wonder about the extent of the connection. Matthews, explicit as usual, always spoke about Ayre as if he was the *capo di tutti capi* of the entire affair, though I have no other evidence that Ayre was anything but an interested observer. Interestingly, nCrypt's only shareholder (one share worth one pound) is nCrypt Holdings, registered in Antigua.

Like MacGregor, Calvin Ayre is Canadian. His father, a pig-farmer, was convicted in 1987 of smuggling large amounts of Jamaican marijuana to Canada. When Calvin left college he went to work for a heart-valve manufacturer called Bicer Medical Systems and was later charged with insider trading, agreeing a deal where he was fined $10,000 and barred from running a public company listed on the Vancouver Stock Exchange until 2016. 'I clearly made some mistakes,' Ayre told the Vancouver *Sun*, 'but it was not a criminal issue and nobody got hurt from anything I did.' Ayre later started a software development company intended to help offshore betting companies take online bets. He relocated to Costa Rica in 1996, where he worked with two online casinos, WinSports and GrandPrix. Unlike most bookmakers, Ayre would send cheques directly, without using Western Union or an equivalent. He then set up Bodog, which would become the biggest name in the online gambling industry. (It's the company Matthews worked for after Centrebet.) Bodog was a huge success. In 2005, it handled more than $7 billion. Ayre appeared on the *Forbes* billionaires' list in 2006. In the same year, Bodog moved its global headquarters to Antigua. The IRS had started following the company in 2003 and US Customs and Immigration were also on his tail. A joint inquiry was started in 2006 and, in 2012, Ayre, along with two of the website's operators, was indicted on money-laundering charges. He entered no plea, but he maintains his innocence, seeing the indictment as 'an abuse of the criminal justice system'. In one profile of Ayre, we find him drinking coffee and paraphrasing Sun Tzu's *The Art of War*. 'I've put a lot of energy into finding ways not to fight my enemies,' he says. My researcher Josh showed me this interview, then remembered a note from my first meeting with MacGregor, in which he, too, had quoted Sun Tzu. 'You build your enemy a golden bridge to

retreat over,' MacGregor had said, drinking coffee. When he said this, I wasn't sure who the enemy was. The only person MacGregor had built a golden bridge for, so far as I knew, was Wright.

At the Jermyn Street dinner, Matthews didn't tell me any of Ayre's history, referring to him simply as a great guy. 'Do you know how many bitcoins Craig's got left of the original 1.1 million?' he asked later on. There are conflicting stories about the 'Satoshi millions'. Many people refer to a Satoshi-mined hoard that has never been spent, and the figure – always around a million bitcoin – is the same one admitted to by Wright and Kleiman. The difference is that Wright says he spent a lot of his. This was what Matthews was getting at. 'He told me last week,' Matthews said, 'and I've been having some sledgehammer conversations with Craig. I said to him: "Time for straight answers on this one, my friend. How many coins are left under the control of the Seychelles trust? And don't tell me you don't know because you're a grown man, and don't lie to me." And his answer was 100,000. I know that 650,000 was taken out to fund all the research and development stuff. And 350,000 is on Dave's hard drive. "Why has Dave got 350,000 of your coins on his encrypted hard drive?" Because he gave them to him. They're Dave's. Those wallets are encrypted on his hard drive, with three or four keys to his trust. Now, why did Dave die in squalor?'

'Why?'

'Because bitcoins weren't worth that much when Dave died. They skyrocketed around that time and in the weeks thereafter. But he was a man of principle apparently and wouldn't spend those coins unless Craig told him to.'

'And you don't think Dave mined coins himself?'

'Of course he did. No doubt. But how many? Who knows … We know they ran a business together based in Florida. They did stuff for contractors. We know that they lost money jointly in Liberty Reserve. And they would both have lost money in Mt Gox.'

Wright had told me he'd lost quite a bit when the bitcoin exchange Mt Gox was hacked and then collapsed. He also referred, in a later email, to information that was seeping from the collapsed Mt Gox database, some of it linking him to Ulbricht. 'The amount to a large wallet was me,' Wright told me. I took him to mean that there was evidence of a bitcoin transaction between him and Ulbricht. He wouldn't explain further.

As I was paying the bill, Matthews reared up. 'You know Craig has gone out and bought himself some cars? One hundred and eighty thousand dollars' worth of cars.' (When I checked this with Wright he said the cars were leased.) 'One of them stands out like the dog's balls in the proverbial moonlight, and this is from the man we're trying to keep fucking secret. How many custom BMW i8s are going around London? He's spending every fucking penny that we've paid him … Does he think this is just a game? You know, these guys have gone from being backyard scrappers and they've suddenly found themselves in a high-stakes poker game.' Matthews said he wouldn't take any rubbish from the Wrights, and that they'd end up on a plane back to Australia and jail if they didn't fulfil their end of the bargain, to reveal Satoshi. 'The people that I work with are capable of deciding this was a $30 million bad decision and write it off,' he said. I thought this a curiously revealing line, and wondered again just how he expected me to use such information.

'You haven't asked me why I'm doing this,' Matthews said at the end of the evening. He worked his way round to an answer, but it wasn't an answer, just more questions. 'Part of me,' he said, 'has asked over the past three or four months, why did I ever get involved in this? Why did Craig keep coming back to me? Why did he never shake out of my life? Why did he show me the Satoshi white paper in 2008? Why was he delivered back to me in 2015? I didn't go looking for it.'

*

Satoshi Nakamoto is not really a man; he is a manifestation of public acclamation, an entity made by technology, and a myth. Old-fashioned journalism might bring you

to him – or cause you to miss him altogether – but he was born of relationships that depend on concealment. A reporter was once a person who could rely on visible evidence, recordings, notes, statements of fact, and I gathered these assiduously, but this was a story that challenged the foundations on which reporting depends. I fought to uphold familiar standards of truth, and fought to discover new ways to uncover it in this underworld of companies with a vested interest in disclosing some things but not others, but it felt like the walls of virtual reality were forever pressing in on my notepad. It is standard practice in Silicon Valley for everyone, from bagel boy to research chief, to sign a Non-Disclosure Agreement. This is because every company – Apple or Microsoft or Google or Facebook – has a mission not only to make money but to control the narrative of who they are. A writer requires determination if he is to write anything about that world that isn't paid for or manufactured by a company. There is nothing particularly underhand about this: they offer you big money up front and ask you to sign over your allegiance. But when you turn down this offer and they don't banish you from the court, your version of reality might end up clashing with theirs. This happened several times during the months I was working on the Craig Wright story. Wright himself never mentioned rights or agreements or privacy – until the very end, when he asked for two particular aspects of his private life not to be discussed – but when I went to Australia at the end of February to talk with Wright's family and friends, the nCrypt men began insisting I sign an NDA.

Why they hadn't asked me to sign one at the beginning I'll never know. I had roamed freely for three months, noting and recording, going to meetings and interviewing everyone, and only now did they want me to sign. Early on, MacGregor told me in an email that he had advised Craig and Ramona to tell me 'everything'. He went on to express, on Wright's behalf, worries about how the material would be used. This was especially sensitive, I gathered, because of the government security work Wright had done. I replied that we would be judicious about what was published. MacGregor still wanted to discuss contractual issues, and I replied, on 6 March, that I would have to see proof that Wright was Satoshi, and see it presented

before his peers and selected journalists. MacGregor replied that the proof package was in train and that he didn't understand why I wouldn't sign. I replied on 7 March that I couldn't write the story, no matter how good my access, if there wasn't proof that Wright was Satoshi, and I was still waiting for evidence. 'My commitment is clear,' I wrote, 'but the book turns to dust if we do not have unanswerable and generous proof.' I insisted that I wouldn't sign any document and eventually MacGregor accepted this. We fell out over it, but I saw their point and I still do. Despite my refusal they continued, without binding agreements or legal constraints, to provide me with access to every meeting and every aspect of the story, which was set to change faster and in ways none of us could ever have prepared for. My story and nCrypt's deal seemed to be on the same track, aligned and friendly, but none of us discussed what would happen if the deal came unstuck.

**Proof**

When I asked Wright what kind of martial arts he did as a kid he gave the following answer. 'I did a few actually. I have studied in the Chinese forms Wing Chun, *Tánglángquán*, Kuo Shu, Duan Da, Zui Quan and *lóng xíng mó qiáo*. I have also mastered Muay Thai, Kenpo and Taekwondo and Chito-ryu style karate. I started with karate and Ninjutsu.' As with most things about him, it's not that it's not true, it just smells of self-doubt and a need not to hide anything positive about himself. It's the kind of truth-telling that expresses fear and gives rise to doubt, but it's not the same as a lie.

Wright's mother had told me about her son's long-standing habit of adding bits on to the truth, just to make it bigger. 'When he was a teenager,' she said, 'he went into the back of a car on his bike. It threw him through the window of a parked car. That's where his scar comes from. His sister accompanied him to the hospital and he's telling the doctor that he's had his nose broken twenty or so times, and the doctor is saying "You couldn't possibly have had it broken." And Craig says: "I sew myself up when I get injured."' What his mother said connected with something I'd noticed. In what he said, he often went further than he needed to; further than he

ought to have done. He appeared to start with the truth, and then, slowly, he would inflate his part until the whole story suddenly looked weak.

In the time since I'd last seen Matthews, he and MacGregor had been to Antigua with Wright and had agreed a 'proof strategy'. I had been pushing hard for the proof, and Ramona had asked me several times what Wright could do to prove to me that he was Satoshi. MacGregor asked the same thing during a meeting I attended with him and the public relations firm they'd hired, the Outside Organisation. 'It's not about proving it to me,' I said. 'It's about proving it – full stop. You just prove it for the whole world to see and then everybody goes home.' The nCrypt guys, pointing out that they had always intended to set up a proof session, organised a series of events with the help of the PR company, intended to bring Satoshi into the open. Originally, the plan was for the London School of Economics to host a panel discussion about the evidence and the findings, but someone seems to have blabbed to the *Financial Times*, which ran an article on 31 March. 'After nearly four months of silence,' the *FT* blogger Izabella Kaminska wrote, 'and a bitcoin community mostly resigned to the notion that the story was an elaborate hoax – conditional approaches are being made to media and other institutions in connection to an upcoming "big reveal" of Wright as Satoshi Nakamoto.' Her source was clearly inside the project. 'Wright will publicly perform a cryptographic miracle which proves his identity once and for all,' she wrote. MacGregor was outraged, and the LSE was sacked from the project. But the first and biggest of these proofs was to involve Wright using Satoshi's private encryption keys in sessions with key members of the bitcoin community. Jon Matonis, former head of the Bitcoin Foundation, agreed to take part. So did Gavin Andresen, one of the most respected bitcoin core developers, someone who had been there since its inception. These proof sessions would begin the denouement of this search for Satoshi.

Just before these sessions took place, in April, I asked Wright what had happened in Antigua. 'We discussed the whole PR strategy,' he said. 'The truth thing is going to happen.' He talked about Matonis and Andresen. 'We're going to bring them in on

reveal sessions in the next few weeks. I guess that's the way it has to be. Do I like it? No. But I haven't really been given a choice. I'm between a rock and a hard place because of whoever outed me last year.' He said very clearly at a meeting with me that he would not sign with the key in public. We agreed that he would do it for me at home, signing with the private key from one of Satoshi's original blocks. He would do for me what he was going to do for Matonis and Andresen, and this would prove beyond doubt, he said, that he was Satoshi. We made a plan, then Wright asked me to come to his office so he could draw something for me on his whiteboard, a new timelock encryption scheme he'd come up with. He wanted to add it to the list of patent applications. I didn't always know what he was talking about, but his expertise in certain areas was startling, and so were his obfuscations.

<p style="text-align:center">*</p>

It was exactly 9 a.m. when I turned up at his house in South London, on one of those clear mornings when the planes leave trails in the sky. I knew his house by the BMW in the driveway, and I pressed the bell. He opened the door and a cloud of cologne came to meet me. In his study, there were three computers and seven screens. *Options, Futures and Other Derivatives* by John C. Hull was sitting on a grey sofa. There were rows of computing books and seven dead laptops stacked on top of a bookshelf. Even after all these months, Wright couldn't really do small talk, finding it hard to summon anything easy in himself. I asked him about his sofa and told him about a pain in my shoulder and he just said: 'Very good.' He made me a cup of tea and then beckoned me over to his main computer: it was time for him to prove to me that he was Satoshi. His manner was still that of a man who mildly resented having to prove anything. He smiled and pointed to the screen. 'This is his wallet, which is open,' he said. I saw a list of transactions with addresses specified. 'The initial Genesis block was hardcoded,' he said. 'There are no conflicting Genesis blocks. If a piece of code crashed on this machine it would still start on another machine with the same Genesis block. Always.' As I was looking at the screen in front of me and watching his hand move the mouse, lines from the

Wikipedia entry on the blockchain came into my head. 'The blockchain consists of blocks that hold time-stamped batches of recent valid transactions. Each block includes the hash of the prior block, linking the blocks together. The linked blocks form a chain, with each additional block reinforcing those before it.'

'It can't be moved or changed?'

'No. It's hardcoded into the original program,' he said.

Everything on his screen was time-stamped. I was looking at transactions from early January 2009. 'I was officially canned from my job at BDO on 3 January,' he said. He told me he went to his house at Port Macquarie and settled down to do the final work to get the bitcoin software up and running. 'The original definition was published by Satoshi Nakamoto in 2008 and implemented in the original source code of bitcoin published in 2009,' the Wikipedia entry said. As he explained what was in front of me, he clicked through the sequential blocks, the transactions database that underlies bitcoin. He was looking at the very earliest ones and all included dates, amounts of bitcoin and addresses. A long list of transactions showed incoming small amounts to Satoshi's wallet. 'Lots of people send micro payments to me,' he said. 'They think so much of Satoshi that they want to burn their pennies.'

'So these fans are sending tiny payments to that known address? It is the first generated and the first known address?'

'Yes. They're hoping I'll do something – out myself.'

The address was 12c6DSiU4Rq3P4ZxziKxzrL5LmMBrzjrJX. I could see that people had left messages – 'public notes' – for Satoshi: 'Hey satoshi, change my life, send me some bitcoins!' 'God bless you, China.' 'If you are reading this, please take some time to remember those who died 12 years ago today in the WTC attacks.'

'The bitcoin blockchain can be used as a trusted timestamp for arbitrary messages,' Wikipedia said.

If you scroll back to the very first transaction associated with this address – 12c6DSiU4Rq3P4ZxziKxzrL5LmMBrzjrJX – you find that it is the first bitcoin transaction recorded. It was for 50 bitcoin and remains unspent. Anyone can enter that bitcoin address into a search engine and inspect the history of transactions associated with it. 'The Genesis block was hardcoded on 3 January 2009,' Wright said to me, 'and that was the first run. There was no previous block.' (Under the heading 'Previous Block', there is a line of 74 zeros.) 'Then the code was reworked,' he continued, 'and fired up and the first address that was ever created from the hardcoded Genesis block – the first mined address – is the one I'm sending you a message from.' He was about to use the original cryptographic key to sign a message to me and it was as if he was dropping a sugar lump into my tea. He typed the words, 'Here I am, Andrew,' and rested his fingers. 'This gives us that little block there,' he said, before verifying the signature. He looked sheepish and resigned in his blue checked shirt. 'Welcome to the bit I was hoping to bury,' he said. He leaned back and I noticed a samurai sword by the desk.

I shook his hand. Then I stared at the screen and considered how strange it would be to live with a secret for seven years and then feel no relief when it finally came out. Perhaps it never felt like a professional secret; it felt like a part of his being, and now he was giving it up. 'I want it in layman's terms,' I said. 'Explain what you just did.'

'I just digitally signed a message using the first ever mined address on bitcoin.'

If he had done what he appeared to have done, and what he said he'd done, then his claim to be Satoshi was strong. For a moment, the amassed unlikelihoods and dissemblings seemed circumstantial, and the case against him suddenly much more fanciful than the idea of him being the famously secret man who invented this protocol. An alternative Satoshi would have had to share his entire password hoard

with him, and synchronised his 'real world' timeline in order to be placed where
Wright was placed and align with his email existence and his expertise. It wasn't
merely that Wright had been in the right place at the right time: he had been in the
only place at the only time, and that time was stamped not only into the blockchain
but into his correspondence and the experiences of those around him. He sat back
in his large black chair and asked me if I wanted more tea. 'I could have been
working with Satoshi, I guess,' he said, 'who told me he was going to fire it up at this
time and I had all my machines ready and just took over from him. But that would
make me Satoshi anyway.' He stared into the bank of screens and seemed
nostalgic for a more ghostly self, and I asked him if it felt overwhelming.

'I don't care – whatever,' he said. But of course he did care – care is what he did
most. He was agitated through the whole process, mainly, I guessed, from an old
cypherpunk embarrassment at having to bend to authority. He wasn't satisfied when
he sat back in his chair, he was annoyed and already making his detractors'
arguments for them. 'They'll say I killed Satoshi and stole the keys. Having them
doesn't prove I created them. Maybe it was a collaboration between me, Dave, Hal
and some random person. Maybe I compromised Hal's machine and stole
everything and his family didn't know. Maybe, maybe, fucking maybe. All that
bullshit. Those people don't believe in Occam's razor. I've seen Reddit. They want
the most convoluted explanation. But they can say what they want; I've got nothing
more to prove.'

There is a message embedded in the Genesis block, a headline from the *Times* of 3
January 2009, the day the block was mined: 'Chancellor on brink of second bailout
for banks.' I later asked Wright why he'd chosen that particular headline. 'As you
know, I am rather anti-central/reserve bank,' he wrote to me. 'I see them as the true
cause of these issues and the bubbles and collapses. But the date was important as
a timestamp. It means that I could not have been "pre-mining" and gaming the
system. The first iteration of the code was *finalised* on 9 January 2009. The run was
started when I was at the farm in Macquarie later that week. It means that I cannot
have been mining for months ahead and had collected a pre-mined set of solved

hashes to game the system. I ran more than fifty machines, so the headline was a
marker.'

The question of proof in a story about computer science is a question for the birds. If
you can't check the maths, how can you be sure? I wrote to four Princeton and
Stanford cryptocurrency experts during the preparation of this story and sent them
some of Wright's white papers. These men, who are together about to publish a
textbook on bitcoin and blockchain technology, are obsessed with who Satoshi is,
and obsessed with who he isn't. But they behave like visitors to a funhouse: they
see distorting mirrors everywhere and hear distant laughter and weird music. Some
of them did want to see the evidence, but they didn't want to be seen responding to
it and I never heard from them again. And that is the kind of attitude that pervades
the not entirely adult world of new inventions in the highly contested world of
computer science.

Another thing: when such people want to make a point, they often want to destroy
those they disagree with. It's clear how paranoia-inducing it is to be constantly
assaulted by people who hate you for thinking your thoughts. Geek culture in
general is fantastically vitriolic: even an issue that seems pretty marginal to the rest
of us – like the question of who might play Captain America's love interest – can
easily spiral into death threats. In the world of cryptography, this has been a bar to
invention and progress: developers are hung, drawn and quartered every day on the
internet and they have to be unusually robust to take it. The question of how to take
bitcoin forward has been riven with opposing views, and after Satoshi disappeared
there was no central authority to lead the discussion or calm the waters. By
increments, the task fell to Gavin Andresen, a Princeton graduate with experience in
Silicon Valley. Andresen only gradually accepted the role of lead core bitcoin
developer. This is not an official designation and he appears to have got none of the
thanks and all the flak, but by general consensus he is the most level-headed
thinker in the bitcoin world. One insider said there was an irony in Andresen's
situation that few people realised. 'The word is that Satoshi passed the torch to

Gavin before he retired in 2011,' he said. 'In fact, it was more like Satoshi threw the torch at Gavin and ran away leaving him holding it.'

From time to time during those months, I wondered what if, in some brutally postmodern way, the true identity of Satoshi could never be fully ascertained? What if Wright had every single element necessary to prove himself, but somehow couldn't? Anonymity – or at least pseudonymity – is an essential part of the cryptographic world. I had a job on my hands – as did MacGregor and Matthews, as would the core developers, as would the press – to establish the truth. Any narrative that is dependent on 'outing' such secretive people is at the mercy of their basic hatred of being controlled or being known, and Wright was a spectacular example of this.

*

Andresen had been in touch with Satoshi in the early days and would have records of their conversations. He would presumably be able to ask Wright questions that only Satoshi could answer. In December, after *Wired* published the story about Wright possibly being Satoshi, Andresen told the magazine he'd never heard of Craig Wright. But he began to believe in Wright once he started corresponding with him by email in early April. At one point, Wright sent him two emails, one written in his own Craig Wright way, and another one, with essentially the same content, written as Satoshi would have written it. They discussed maths and the history of the invention and the problems it had faced. Within a week, Andresen was sufficiently convinced to get on a plane to London. He was ready to see Wright sign a message to him using the original Satoshi cryptographic keys.

At this point, I began talking to Andresen. He told me he had written an email to Wright before getting on the plane, asking for a little more of his backstory and for his thoughts on 'the state of bitcoin in 2016'. 'He replied with a longish email,' Andresen told me, 'on the state of bitcoin and why he decided to reveal his secret now, then followed up with a couple of in-progress research papers. The email

"sounded like" the Satoshi I worked with, and the papers matched his academic, math-heavy voice, too.'

Andresen crossed the Atlantic overnight, arriving at the Covent Garden Hotel at 11 a.m. on 7 April. He went to his room – which had been booked, as had his flight, by nCrypt – and had two hours' sleep, after which MacGregor and Matthews turned up. 'They gave me a lot of the background and explained their involvement,' Andresen told me. When Wright turned up at the hotel, Andresen found it easy to talk to him, 'although I was so jet-lagged at one point,' he wrote, 'I had to stop him from diving deep into a mathematical proof he'd worked out related to how blocks are validated in bitcoin.'

Matthews had booked a conference room in the basement, and MacGregor could see that Wright was very emotional when he entered the room. 'He knew this was it,' MacGregor said to me. 'It's one thing to prove his identity to you and me, but the bitcoin community is something else. He knew that they would believe Gavin. He knew this was it – that he would have no plausible deniability after he'd talked to Gavin and shown him the keys.' Before the meeting in the basement properly started, Andresen said to MacGregor – as he said to me – that some of the phrases Wright had used in their email exchange had been 'familiar' to him; he sounded like the Satoshi he had been in contact with before. Andresen asked MacGregor and Matthews a few questions about what nCrypt hoped to achieve with this in the future. They didn't go into detail about the company's business plans, but they spoke about the future of bitcoin and alternative projects. Wright and Andresen quickly started scribbling on pieces of paper. Wright was using his big laptop to show his access to certain addresses. It was a strange situation in all sorts of ways, and the main one, perhaps, was that Andresen, who had, once upon a time, left behind high-paying job opportunities to work on the bitcoin project for free, was possibly about to meet his hero. But he stuck to practical questions. He asked Wright about the trust and about his bitcoin holdings and what had happened to them. MacGregor later told me that his first question after Matthews told him that

Wright was Satoshi was: 'Well, why isn't he sitting on an island surrounded by piles of gold?'

Wright became quite relaxed. He explained what it had cost him to keep his companies alive and to pay for research and development, and the supercomputer. It was about 5.30 p.m. when he finally logged on to his laptop to do for Andresen what he had done for me in his office at home, sign a message with the key and have it verified. Andresen looked on. Wright had just used Satoshi's key. At that point, it seemed to some of those in the room that Andresen's body language had changed; he seemed slightly awed by the situation. He reached over to his bag and took out a brand-new USB stick and removed it from its wrapping. He took out his own laptop. 'I need to test it on my computer,' he said. He added that he was convinced, but that if people were going to ask him, he had to be able to say that he'd checked it independently. He pointed to Wright's laptop and said it could all have been pre-loaded on there, though he knew that was unlikely. But he had to check on his own computer and then they would be done. He said the key could be used on his laptop and saved to the memory stick and that Wright could keep it. But for his own peace of mind, and for due diligence, so that there wasn't a chance of fraud, he had to see it work on a computer that wasn't Wright's own.

Wright suddenly baulked. He had just signed a message to Andresen from Satoshi, he said, and had demonstrated his complete familiarity with their correspondence, but, in his mind, what Andresen was now asking for was of a different order. 'I had vowed,' Wright told me, 'never to show the key publicly and never to let it go. I trusted Andresen, but I couldn't do it.' Wright got up from the table and started pacing. He had clearly believed he would be able to get through the proof session without this. In fact, he had said in my presence several times over the preceding months that he would never hand the key over to anyone or allow it to be copied or used on someone else's machine. 'I do not want to categorically prove keys across machines,' he wrote to me in an email. To him, this would be to give Satoshi away and perhaps to dilute his own proclaimed connection to him. He went to a chair in

the corner of the room and looked up at Andresen. 'Maybe you and I could get to know each other better,' he said.

Andresen just nodded his assent. 'Like, trade more emails,' Wright said, 'and I can sign more messages to you.'

At this point, Matthews's blood ran cold. 'It was the only time during all the years that I thought: "Jesus Christ, has he been spinning us the whole time?"' MacGregor too felt this was a very risky moment. He glanced at Matthews. There was no way he was going to let Andresen get back on the plane with *that* as a punctuation mark. They all felt Wright's behaviour was ludicrous: he'd demonstrated that he was Satoshi and only had to let this be verified on Gavin's laptop. End of story. But Wright spoke to me later in a way that showed his old cypherpunk suspicion had reared its head: what if Gavin was a plant? What if the whole thing was a plot to rob him of Satoshi's keys and exploit him or deny him? Wright told me he felt strong-armed and that, for some reason, he couldn't let this thing go and remain himself.

Afterwards, Andresen was sanguine. 'The proof session took longer than expected,' he told me. 'I insisted that the verification happen on a computer that I was convinced hadn't been tampered with. And they' – Wright, Matthews and MacGregor – 'insisted that the signed message never touch a computer that could have been tampered with (the risk would be that the proof might leak out before the official announcement). So we waited a bit while an assistant went to a computer shop and got a brand-new laptop.' The idea had been MacGregor's. He said the tension in the room was unbelievably high. Wright was refusing to do the one thing that would guarantee the success of his mission. He hadn't seen it coming, but Andresen wouldn't blindly trust Wright's hardware, and Wright wouldn't blindly trust Andresen's. The solution had to be a fresh computer straight out of the box. MacGregor called his assistant and gave her the task. 'This is how you get your One,' he said to her. (In his company the best score you could get in a staff appraisal was a One.) It was just before 6 p.m. on a Friday night and they needed a

brand-new laptop in Covent Garden. The assistant got hold of one and rushed over from Oxford Circus to the hotel.

The new laptop was lifted out of the box. It took a while to connect it to the hotel's wifi and to load the basic software. 'During all that time,' Andresen told me, 'it was obvious Craig was still, even then, deeply hoping his secret identity could remain secret. It was emotionally difficult for him to perform that cryptographic proof.'

'It was tense and there was a bit of shouting. There were a few drops during the day about "the evil businessman in the room",' MacGregor said. 'He stopped short of accusing Gavin of having a key-logger, but he clearly wasn't going to do it. He said he had trust issues, and he'd been attacked, and it had been so long, and he just couldn't bring himself over the line today, but they should keep talking. And Gavin was willing to do that. But we were like: "No, no, no". I remember what I said. I said, "Look, Craig, you've just been alone for way too long. Gavin has dedicated a huge chunk of his life to what you invented. I think he has the right to see this. He is the friend you don't have: Stefan and I can't fill that role for you; Ramona can't. This is someone who really understands what you have been trying to do."'

There were long silences. 'He was on the edge,' MacGregor said. Matthews was practically holding his breath. He didn't want to say too much out loud, so he texted MacGregor. The text said: 'He should call Ramona.' While MacGregor was out of the room Wright phoned his wife, and she said: 'Do it.' Everyone waited with bated breath as Wright used the new laptop to open the Satoshi wallet and set about signing a new message to Andresen. It failed. It wouldn't verify. He tried it again and again, until Andresen remembered that Wright hadn't typed 'CSW' at the end of the message the way he had in the original, the one he was seeking to verify. When he put 'CSW' at the end of his message to Gavin it said: 'Verified'. Wright had demonstrated, on a brand-new laptop, that he held Satoshi's private key. They stood up and shook hands and Gavin thanked him for all he had done. There were tears in Wright's eyes. 'His voice was breaking,' MacGregor told me. 'Gavin could see he was going though something.' Both MacGregor and Matthews later said that

Wright was turned inside out by the session. 'I didn't want to just put him in a taxi,'
MacGregor said. Andresen was wiped out, so he went to get some fish and chips,
and then headed to bed. 'Craig broke down,' MacGregor told me. 'He said he
thought he'd never have to do this. He said he never knew how to trust people in his
life.' Wright and Matthews and MacGregor went off to find a bottle of wine. 'He was
semi-apologising for being a pain in the ass,' MacGregor told me, 'but I understood
more than ever, at that point, how hard the whole thing was for him.'

When I asked Andresen if he thought ending the Satoshi mystery might be good for
the technology, he wasn't sure. 'On one hand,' he said, 'having a mysterious
founder is a great creation myth. People love a creation myth. Knowing the real
story might make bitcoin less interesting to people. On the other hand, money is
supposed to be boring – something that "just works", used by most people without
understanding how or why it works. I'm excited to see how Craig contributes to
making bitcoin work even better than it does today.' I later met with Jon Matonis,
who had been through his own proof session with Wright. He was equally
impressed and relieved. He too believed the search for Satoshi had come to an end
and he was looking forward to working with Wright, to seeing the patents and the
new blockchain ideas. During our lunch in Notting Hill, Matonis suggested that this
technology would change the world. One of the scientists said to me, 'This isn't
Bitcoin 2.0. This is something magnificent that will change who we are. This is Life
2.0,' and Matonis agreed.

The idea was now to use the 'proofs' – the gathered papers, the testimonies of the
two bitcoin experts, the use of the keys, plus solid, document-heavy answers to
every criticism previously made of Wright – and roll them out to selected members
of the press on a certain day. I told MacGregor and Matthews I didn't want to go first
with the story. I wanted to sit in on the interviews and proof sessions with the media
organisations, and fold their reports, and the response to their reports, into my story.

Wright began to fade as we entered the proof sessions. He went from being a man
with a clear picture of himself, to being a fuzzy screen. He would email me at all

hours with a pressing sense of anxiety. He seemed to be losing it. Yet we all forged ahead to a conclusion that seemed much more conclusive to him than anything he had ever expected, or could ever bear. He had signed up for it and was now faced with a full-frontal assault of cameras and lights. I had once asked him if he felt happy hiding in the internet and he said yes, it was his home. On a good day it is the bright field that contains all souls but on a bad day it is the final darkness, where misery is gapingly exposed. I came to believe that Wright, this last year, was fighting for his soul on that plain, like Aeneas with his ships at his back and all hell in front of him, going down to an underworld where he might meet his own father. Wright told me, without demur, that his life had been an attempt to prove himself to his father. In the wee small hours, he seemed like a child whose fantasy had gone too far. And the fantasy was not that he is Satoshi. He may well be Satoshi. The fantasy was that he could live as Satoshi, and take his place among the great men, and forget the little boy who was slapped for losing at chess. Like Aeneas, he knew that his journey was as much ordeal as opportunity, and though, again like Aeneas, he had asked for it, the process was increasingly unendurable. 'It is easy to descend into Avernus,' the Sibyl in Seamus Heaney's translation of Book VI of the *Aeneid* tells Aeneas:

Death's dark door stands open day and night.

But to retrace your steps and get back to upper air,

That is the task, that is the undertaking.

Only a few have prevailed, sons of gods

Whom Jupiter favoured, or heroes exalted to glory

By their own worth.

**The Reveal**

By my last weeks with Craig Wright, I was in two minds about the money men, probably because I liked them. And while I wanted to assert my journalistic doubts – preserve my innocence, stand back from the parade – my wish for the reveal to turn out well was beginning to cajole my judgment. I was wise enough to say no to the world exclusive; I still wanted material I didn't have and I was convinced that the real proof of the pudding would be in the world's tasting of it. The internet is great at crowdsourcing facts and establishing the accuracy of stories, and I had always felt this could be important. But in the meantime, I had to fight to give my doubts the oxygen they needed. The nCrypt boys said they understood – but did they? They appeared to have no Plan B if Wright couldn't prove to the world that he was who he said he was. People can start off by saying, 'Write everything, warts and all,' and end by saying: 'I don't exist, maybe you shouldn't mention me.' In a conversation with MacGregor at this point, I allowed for the possibility that I might give him a made-up name in the story. I said it because he seemed anxious, and because, as I told him at the time, he had brought the story to me and I meant him no harm – but this possibility depended on its being proved that Wright was Satoshi. Our discussion about using real names was inconclusive – during a later meeting at Berners Tavern, Matthews expressed the view that I should put their names in and make a final decision later – but the decision was really made by what the story became. The men in black seemed not to have prepared for any of that. They believed that only one big thing was going to happen: Craig Wright was going to emerge as Satoshi Nakamoto, the great mystery figure of the digital age, and the evidence would be 'overwhelming'. In the final week, as the men prepared the reveal, I found my independence slipping. No doubt about it: I felt like part of the team. I wanted to please MacGregor – pleasing people is my chief vice as a man and my main virtue as a reporter – but I could have told him my work so far might only be fieldwork. I wouldn't know how the story would turn out until it had turned out. Only in public relations is the story straight in advance.

In private, Wright was still saying he wouldn't 'jump through hoops', but then I'd find him agreeing to do exactly what was asked of him. Only a few nights before the

media appointments, I was sitting with him in the Coach & Horses in Greek Street.
The PR company, he told me, had asked if he wanted to go on TV, and he'd said
there was no way in hell they'd get him in front of a TV camera. Yet it was all
happening. I mentioned the fact that MacGregor, when I first met him, had spoken
about all this ending with a TED talk in which Satoshi would be revealed.

'Rob always said "eventually",' Wright replied.

'But what does "eventually" mean?' I asked.

'It originally meant, "*if* you came out",' Craig said.

The PR team, at MacGregor's behest, had been in touch with a number of
journalists; the ones who were interested were from the BBC, the *Economist* and
*GQ*. The inclusion of *GQ* had irked Wright from the start (he sees himself as an
academic), but the PR company, the Outside Organisation, had a connection there
– their founder was a contributing editor – and said the magazine would love the
story. But did the PR men explain to the editors there who was behind this project to
out Satoshi, and who was paying their fee? I later asked them by email and one of
them replied: 'It is not at all unusual to be instructed to represent an individual
through an independent company. Our conversation with [*GQ*] and the other
journalists was about the proposed story.'

I emailed him again. 'But did you tell them,' I wrote, 'that the outing of Satoshi was
being done at the behest of a commercial company?' He didn't reply.

All the journalists had signed NDAs and embargos. They would each be allowed a
brief interview with Wright after he had demonstrated to them his use of the Satoshi
key. These meetings would take place at the offices of the PR company in
Tottenham Court Road on Monday, 24 April and Tuesday, 25 April. I found all this a
bit odd: Wright was being difficult, for sure, but the PR strategy was crazily
old-fashioned. Everyone in the cryptography world knew that all Wright had to do
was send an email from the famous Satoshi email address, alert people he was

going to sign a message using Satoshi's keys, do so online and move a single bitcoin from an early block, and the entire internet would light up like Coney Island for the World's Fair. The piecemeal feeding of 'proof' to these journalists was compelling but anachronistic. I supposed it was an attempt to get the story out of the world of crypto-gab and into the real media, but it was set up with an alarming sense of security paranoia. Wright could never have handled a celebration, but the journalists were being managed to an extent that might have raised more questions than it answered. I was just an observer, and was worried about Wright by then, and, though I believed in him, I felt distinctly that there was something missing and something wrong.

When I turned up at Starbucks in Tottenham Court Road, Wright, Ramona and Matthews were already there. Wright was sulking a little. It had been decided that, as well as the demonstration, the journalists would be given a memory stick to take away with them, showing the signed Satoshi message. (Wright later told me the stuff he put on it was fake. There wasn't anything on there they could understand, but it certainly bore no relation to any of Satoshi's keys.) Matthews was dressed smartly and wearing dark glasses and Wright was wearing a gold tie and a business suit. Ramona sat beside him stroking his ear. 'Let me know if you have trouble with the guys upstairs,' Matthews said. He meant the PR guys. 'Sometimes they forget their role.' As usual, I found Matthews likeable and easy to talk to, but he seemed not to appreciate the difference between his way of talking and the circus of manipulation surrounding us.

Rory Cellan-Jones, the BBC's technology correspondent, was led into a conference room with his producer, Priya Patel, and Mark Ward, a technology correspondent for the BBC News website. Wright sat at his laptop, hardly looking up, and a screen on the wall showed what he was looking at. Matonis was in the room, and so was Matthews. Ramona had gone upstairs. Cellan-Jones was decent and professional, ready to get to the bottom of the story. He appeared to feel the tension, with Wright already behaving as if being asked questions was grossly humiliating and the

questioner openly hostile. But Cellan-Jones was not hostile: if anything, he was mildly pre-convinced, and just going about capturing the story for the layman.

'When I started out I asked myself what I'd need to see to know if someone who claimed to be Satoshi was Satoshi,' Matonis said. 'And you can break down three distinct lines of evidence: the cryptographic line, the social line and the technical line. Obviously, the social and technical lines are going to be more subjective … On the cryptographic side, I'll explain what I witnessed personally and give you a lead up to what Craig's going to demonstrate this morning.'

He then went into more detail about the cryptographic proof. 'The Genesis block is block zero,' Matonis said. 'And you can't spend any of the blocks in that chain – which means that the ones that come after that (which are spendable) can be attributed to the creator of bitcoin.'

'And what would they be called?' Cellan-Jones asked.

'In succession they'd be called block 1, block 2 etc. Now this morning, Craig is going to demonstrate signing blocks 1 through 9. I personally witnessed the signing of blocks 1 and 9, so this is not going to be a transfer of bitcoins, it's going to involve a signing of a message, which he'll do with the private key and which will be verified by the public key. Are we clear on that?'

Eventually, Wright asked Cellan-Jones to give him a message. 'Um. "Hi, historic message to the BBC."' Wright typed the message and added a bit of commentary as he did so.

'This message will verify, but if I change a single digit, it won't,' Wright said as he signed the message using block 9.

'This is the only key that we know is definitely owned by Satoshi because it was used with Hal Finney,' Matonis added.

'So,' Cellan-Jones said, 'just getting this clear in my mind. We've seen Craig use a private key known to have been used with Hal Finney. And we've seen it verified with the public key.'

'Yes,' Craig said. Then he proceeded to sign a message with the key associated with the first ever mined bitcoin.

'Out of interest,' Cellan-Jones said. 'How many bitcoins do you have?'

'Well, that would be telling,' Wright said.

'Do you still mine bitcoins?'

'Only for fun.'

Wright then went into an aria about Sartre's speech when he turned down the Nobel Prize. He planned to use a hash function – which turns information into a unique set of letters and numbers – to attach Sartre's famous speech cryptographically to block 9, and then later verify it publicly on his blog. 'He gave up the prize,' Wright said, 'because "If I were to accept it, I'd become the institution." I never wanted to sign Craig Wright as Satoshi,' he continued. 'I haven't done this because it's what I wanted, I just can't refuse it. Because I've got staff, I've got family. It's what I am and I'm not going to deny it because that's not the truth. So I'm choosing to sign Sartre because it's not my choice, I'm not choosing to come out, I've been thrust into it.'

'In what way have you been forced into it?' Cellan-Jones asked, quite reasonably.

'I've got people mudslinging,' Wright said. But that wasn't true: he wasn't feeling forced because of what people said. He felt forced, or obliged, to come out because he'd signed the deal with nCrypt in June 2015. And he deepened the lie when Cellan-Jones asked him why he hadn't revealed himself before. 'I liked to go to

conferences, put out papers,' he said. 'I can't do that now. I can never just be Craig again.'

He was asked whether he wanted to be the public face of bitcoin.

'I don't want to be the public face of anything.' He paused and looked down. He then said that his blog would explain everything and help people to download the material and understand how the keys work.

'When does that go live?' Cellan-Jones asked.

'Monday or Tuesday.'

'There will be people out there who will try desperately to prove this isn't the case. Are you confident that there are no chinks in your armour?'

'They'll say I stole keys, that I buried Satoshi in a ditch, they'll say all sorts of things.'

The BBC planned to come back the next day with cameras. Then a man arrived from the *Economist*, Ludwig Siegele, a man in a grey suit. He was less immediately friendly but his questions were fine-grained. You could see he wasn't entirely comfortable with this very PR-managed way of outing Satoshi. Wright signed a message for Siegele using block 9, and had the private key verified by the computer. 'I'm sorry,' Siegele said, 'but I'm still a little unsure what that proves.'

'It proves I have the private keys,' Wright said. 'All the original private keys.'

'OK, so. The first question that my readers are going to ask is: "Why now?"'

Wright didn't hesitate. He was using his media training. 'I've tried to avoid media,' he said, 'but it's starting to affect other people. I'd prefer to stay quiet. Why now? I have staff, I have family … All the innuendo, the falsehoods.' He had never suggested to me, in all our months of interviews, that he was outing himself because of media misrepresentation. I accepted it, though, when he said it to these journalists,

imagining that perhaps he had realised that the tax office pressure was the real pressure in his life, the thing that forced the outing. I said this later to the nCrypt guys and they agreed.

'Why conceal your identity anyway?' Siegele asked.

'I don't want to be a public figure,' Wright said. 'I hope people don't listen to Craig Wright. They will look at the facts, not decide based on what Satoshi says.'

That afternoon, I went to another appointment while Wright went off to Parsons Green to have his photograph taken for *GQ*. The next morning, at Starbucks again, Matthews was ridiculing the whole business with the photographs, and making fun of the magazine's original idea that he wear a mask in one photograph and rip it off in another. Matthews described what happened at the interview with the magazine's senior commissioning editor, Stuart McGurk. 'It actually went quite well,' Wright told me. 'The journalist was nice, but he brought along this complete wanker of an "expert".'

The man they were talking about is a university lecturer in cryptology. McGurk brought him along to help verify the claims. 'It was hilarious,' Matthews said. 'Craig threw the guy out.' According to one witness, he'd questioned Wright quite forcefully about his understanding of public and private encryption keys. 'He was totally in the guy's face at one point.'

'He was telling me he was more qualified than I am,' Wright said. 'It became a nice interview but this guy was a complete idiot and I told him to get the fuck out.' Matonis – who was there – said the scene was intense. I wasn't sure it was wise to greet dissenters and opponents, even ones who might be wrong, that way, but Wright was roundly applauded for doing so. I confess I felt it was wrong to tell journalists only half of the story, allowing them to misunderstand the reason he was suddenly coming out as Satoshi.

That day, the BBC came back. Wright was more irate than he had been the day before and less co-operative now that the camera crew was here. He felt he had done much more than he had ever wanted to and he said so, mainly under his breath. The cameraman set up the camera and then Cellan-Jones got into position. 'So who are you? And what are you about to show me?' he asked.

'My name's Craig Wright, and I'm about to demonstrate the signing of the message with a key that is associated with the first transaction ever done on bitcoin – a transaction of ten bitcoin to Hal Finney.'

'And who did that first transaction?'

'I did.'

'And whose name is associated with that transaction?'

'The moniker is Satoshi Nakamoto.'

'So you're going to show me that Satoshi Nakamoto is you?' Craig looked bewildered for a second and hesitated.

'Yes,' he said.

'Are you confident that this will prove to the world that you are Satoshi?'

'It proves I have keys … other things we'll be releasing will help … Some people will believe and some people won't, and, to tell you the truth, I don't really care.'

'But you can say, hand on heart, I am Satoshi Nakamoto?'

'I was the main part of it. Other people helped. At the end of the day, none of this would have happened without Dave Kleiman, without Hal Finney, and without those who took over – like Gavin and Mike.'

'And this is going to have a huge effect on your life?'

'Unfortunately, yes.'

Something changed in Wright in those few minutes. With these direct questions about Satoshi, his sense of himself – I don't know how else to put it – had come unstuck and he became noticeably uncomfortable. He said that he wanted to make the point that people should stop looking to him for answers.

'Make that point upstairs,' Cellan-Jones said.

'Upstairs?'

'We're going to film a straightforward interview upstairs, without the computer.'

Wright muttered something and stared into the depths of his computer as if he wanted to escape into it and never come out. 'I just want the basis to be on the computer,' he said.

The female producer interjected. 'Because we haven't actually done that bit on camera yet,' she said.

The PR executive came over, a little red in the face. 'Can we do that bit upstairs?' he asked. 'Are we all right to do the "why now?" question upstairs? And we'll be done?'

'You know, I don't actually watch TV,' Wright said.

The BBC left the room to scout out the location for the proper 'sit-down' interview. Wright complained to me that he was being pushed. 'I just didn't want a big facial

shot of me,' he said to the PR man. 'I preferred to be behind the screen a little bit …
I'm not against it, as long as I can hide behind the screen.' The PR man said he
didn't have to do anything he didn't want.

'I'm just doing the one question,' Wright said. The PR man left the room leaving me
alone with him.

'Does it feel completely against the grain of your nature to be asked, "Are you
Satoshi?" like that?'

'Yes.'

'Is it a crude question to you?'

'Why does it matter, other than that you need someone to attack, someone to deify.
I mean, fuck's sake. I'll do this. That's it. Fuck off. I can dance around saying
"please believe me." But it's more than absurd, it's melting clocks on a landscape.'
At that point, the door opened and the PR consultant came in.

'Craig,' he said, 'we've explained to the BBC that you want to stay down here, and
they're all making the point that this is the last thing you'll ever do …'

Craig started shaking and pushed his chair back. 'No! No! No!' His face was pale.
'You see this door,' he said. 'I don't want to hear another word. It's here, it's my
way.' Then he walked out and slammed the door, leaving me alone in the room with
the PR boss.

'We're only doing our job,' the boss said, with a shrug. Wright came back a second
later and his microphone pack was trailing behind him.

'It's my way or I don't come back. OK? I'm not doing this for fucking PR stuff, I'm not
doing this for anyone else. I don't give a fucking shit about what people say, I'd
rather not do it. One word about it and I'll never come back. Not exaggeration. I will

never enter this office again. I'll never answer an email again, and I'll never talk to another PR person in my life again … Got it?'

'Yeah,' the boss said.

'Thank you.'

He went out and I was alone with Wright again. 'They've already pushed me,' he said. 'I'm already beyond where I want to be: I'm already doing a TV thing. And everything is always: "Let's take it a little bit further, a little bit further." Which bit of "Go away" don't they get?'

I asked him if Kleiman would have handled it better. 'Better than I do,' he said. 'He would still have told them to fuck off. But in a nicer way. Hal would have done it far better.'

'What do you think they're talking about up there?' I asked.

'The fact that I don't want to jump through their fucking bloody crap. "This man has a big credibility gap he's got to overcome, I'm open to being convinced he's Satoshi but …"'

The BBC came back downstairs to ask their 'one question' and, naturally, Cellan-Jones asked more than one. In the panicked and hostile mood Wright was in, he needed scapegoats, and the PR weren't meat enough and Matthews was too much the boss. So he scapegoated the BBC, saying, as soon as they left the room, that they had broken their 'contract' with him, that they were liars. 'I'll never do any television interviews again in my life,' he said. 'Never.' And as he said it, I was imagining him with Fox News or the rottweiler interviewers. 'The whole thing was just an attempt to expose me as being something I'm not,' he said.

'That was actually a pretty softball interview, Craig,' I said. 'You can't blame them for turning up and asking for proof.'

'Are you talking about proof or evidence? You're conflating the two. They're not the same and that's one of the things I'm saying. I gave them proof. They want more.'

Wright was happy to lecture you day and night about algorithms, but he wouldn't name names, and he struggled to provide real-world evidence of Satoshi's footprints. The more I thought about it, the more I realised something was wrong, for him, with the footprints analogy, because if Satoshi was only one man he would only have one set of prints. The Satoshi who existed online could be any number of people. But there was something revealing about his treatment of the BBC – something not very nice in his attitude to people who make it their business to ask straight questions – and the handling of the proof sessions made it clear how much of a danger he was to his own credibility. A month later, when I asked Cellan-Jones if the PR company had ever explained to him that there was a commercial company behind the outing of Satoshi, he said he had never been given that information, 'just that they were representing the man who was Satoshi'.

**Life Rights**

At 7.51 A.M. on 2 May 2016 all was quiet on the Twitter front. Well, not quiet, but the names Satoshi Nakamoto and Craig Wright were nowhere to be seen. This was the day of reckoning, the day the embargo would lift and the media outlets could run their pieces and name Satoshi. At 7.55, *Game of Thrones* was trending and so was Gerry Adams, for allegedly using the word 'nigger'. Also trending was a wildfire in Fort McMurray and a bombing in West Bengal. There's a strange feeling of supreme calm before a storm breaks. At 8 a.m., Wright posted a blog containing the supposed hash of the Sartre speech and various postings about himself as Satoshi. At the same moment, Gavin Andresen posted a message to his blog. Title: 'Satoshi'. 'I believe Craig Steven Wright is the person who invented bitcoin,' it began.

I was flown to London to meet Dr Wright a couple of weeks ago, after an initial email conversation convinced me that there was a very good chance he was the same person

I'd communicated with in 2010 and early 2011. After spending time with him I am convinced beyond a reasonable doubt: Craig Wright is Satoshi.

Part of that time was spent on a careful cryptographic verification of messages signed with keys that only Satoshi should possess. But even before I witnessed the keys signed and then verified on a clean computer that could not have been tampered with, I was reasonably certain I was sitting next to the father of bitcoin.

During our meeting, I saw the brilliant, opinionated, focused, generous – and privacy-seeking – person that matches the Satoshi I worked with six years ago. And he cleared up a lot of mysteries, including why he disappeared when he did and what he's been busy with since 2011. But I'm going to respect Dr Wright's privacy, and let him decide how much of that story he shares with the world.

We love to create heroes – but also seem to love hating them if they don't live up to some unattainable ideal. It would be better if Satoshi Nakamoto was the codename for an NSA project, or an artificial intelligence sent from the future to advance our primitive money. He is not, he is an imperfect human being just like the rest of us. I hope he manages to mostly ignore the storm that his announcement will create, and keep doing what he loves – learning and research and innovating.

I am very happy to be able to say I shook his hand and thanked him for giving bitcoin to the world.

Also at 8 a.m., with the embargo lifted, the first tweet appeared, from Rory Cellan-Jones: 'Craig Wright tells BBC I am bitcoin inventor Satoshi Nakamoto, publishes evidence backing his claim.' One minute later, a tweet appeared from @CalvinAyre, naming Craig Wright as the proven Satoshi. The *Economist* went one minute later, with a link to Ludwig Seigele's open-minded piece asking for more and better evidence. At 8.09 a.m. Radio 4's *Today* programme broadcast Cellan-Jones's report. 'I'm about to demonstrate the signing of a message with a key that is associated with the first transaction ever done on bitcoin.' The report was brief and quoted Wright once. It said Wright hoped to disappear and that that would be

difficult. They played the part of the interview where Wright said he was part of the group behind Satoshi.

'He sounds plausible,' Justin Webb, the presenter, said, laughing. Then they played part of the interview with Matonis, who said he was '100 per cent convinced'.

'Why should people be excited by this?'

'I put it on the level of the Gutenberg printing press,' Matonis said.

'Quite a lot of people are saying that this is as important as the internet,' Cellan-Jones reported, 'and that this man – if he is the man – should be celebrated like Tim Berners-Lee.'

'Craig Wright has just outed himself as the leader of the Satoshi Nakamoto team,' the bitcoin insider Ian Grigg wrote on his blog:

> Sometime in summer of 2015 the secret started to spread, and the writing was on the wall. An extortionist and a hacker started attacking, perhaps together, perhaps apart; to add to the woes, Dr Wright and his companies were engaged in a long harsh bitter battle with the Australian Tax Office. Since then, the team has been more or less in hiding, guarded, at great expense and at some fear … Satoshi Nakamoto dies with this moment. Satoshi was more than a name, it was a concept, a secret, a team, a vision. Now Satoshi lives on in a new form – changed. Much of the secret is gone, but the vision is still there. Satoshi Nakamoto is dead, long live Satoshi. Yet, a warning to all. Satoshi was a vision, but Craig is a man. The two are not equal, not equivalent, not even close … It is true that Craig is the larger part of the genius behind the team, but he could not have done it alone.

Over the following two hours the words 'Craig Wright' were typed into search engines tens of thousands of times, and the Reddit forums and the cryptocurrency community got to work. Meanwhile, I was being copied into the emails sent from the PR company to nCrypt and the Wrights. It issued a press release spreading the news to less favoured outlets. 'Wright's decision to go public follows a series of

misleading statements that are circulating and which he seeks to set straight,' the release said. 'Wright has also launched a blog, with a vision to create a forum about bitcoin, which dispels myths and helps to unleash its full potential. He will create a space to provide developers and producers with the real facts about the technology so as to encourage the widespread use of bitcoin and the blockchain.'

'Great start!' the top PR man wrote to the group at 9.31 a.m.

'Ta. All going well,' Wright wrote just before ten.

'All going to plan,' the second PR man echoed a few minutes later.

'Right on course so far,' the first PR man wrote at 10.13 a.m. And that was the last of the good news to come from the world of public relations.

By midday the blog was receiving the wrong sort of attention. A number of researchers had studied what Wright had written and noticed that the explanation was fudged – worse than fudged, it was faked. Something that he said was signed with the Satoshi key had, in fact, been cut and pasted from an old, publicly available signature associated with Nakamoto. It was astonishing and the buzz quickly grew fierce. All those hours in secret flats scrolled through my head. There had always been something missing, something he hadn't wanted to show. But was that because he wouldn't, or because he couldn't? The thought that he would fake proof so publicly and so coarsely was hard to comprehend. He sent me an email. 'They changed my blog post,' he wrote. 'It will be back as I wanted. But first I need to negotiate with Stefan.' And I replied: 'How did they change it?'

I thought he was lying. He had lied before, but to lie so transparently and so publicly made me think he had lost his mind. There was no way to square such actions with his wish to have no publicity. He had faked his own proof, and now he was being ripped apart on the internet. I briefly wondered if he might be enjoying the cries of execration, but how could he do that to Andresen and Matonis? Suddenly his opponents seemed wiser and greater in number. It took me a few days to see that

Wright's action might be consistent with something deeper in his character. He never wanted to come out and when it came to it he flunked his own paternity test. But I had a feeling that that he was too close to the invention to be a simple hoaxer.

'I will explain why I think he's probably not Satoshi,' said Vitalik Buterin, a big wheel in the cryptocurrency scene, speaking at Consensus, a bitcoin conference in New York that day. A friend of mine was there. He said that men had started the day high-fiving and shouting 'Satoshi, baby', but that as the long day closed, his name became the punchline of every joke. Core developers and others were calling for him to sign something new and in public right away, using the Genesis block, which is unquestionably Nakamoto's. One of them, Peter Todd, was quoted by *Forbes*: 'All Wright needs to do, says Todd, is to provide a signature on the message "Craig Wright is Satoshi Nakamoto" signed by a key known to be Satoshi's. "This is *really* easy to do … if you're actually Satoshi. Also, you'll know sufficient proof has been provided when it actually happens, because cryptographers will be convinced."'

That was the strangest element of all: Wright must have known, having been a cryptographer all his adult life, that his fraud would be spotted immediately. But when I asked him about it he said it wasn't a fraud, it was a mistake. 'I cut and pasted something just for the time being but knew I would change it later,' he said. 'But then it went up.' That rang hollow to me, the words of a falling man. He intentionally faked it. I believed at that point that he had misled his colleagues and tried to get out of being Satoshi, which isn't necessarily the same thing as not being him. 'I can't think of a more convoluted way to go about claiming one is Satoshi than what Craig Wright has done so far,' Jerry Brito, the executive director of Coin Center, told the *Daily Beast*. 'He's provided no cryptographic evidence verifiable by the public, and many of his answers sound plain fishy.' Emin Gün Sirer, a Cornell professor who had criticised Wright before, referred to Wright's 'meta-modernist play'.

The next day, I turned up at MacGregor's office and found him sitting with Matthews in a dark meeting room. They were hunched over the desk, exhausted and

shellshocked. When I asked them what happened MacGregor shook his head. It was the first time in six months I'd heard him sounding incoherent. 'Craig happened,' he said. 'He got cute with the math. He has been trying to get consent from the trustees to get the private keys … But he wasn't allowed access to coin or to do anything other than that. So what he was trying to do was re-sign a message …' Matthews butted in, saying Wright never had authorisation from the trust to use the key publicly or let anyone take it away.

'Why didn't he just say that?' I asked.

'You tell me,' Matthews said. MacGregor went on to explain how a signed message can be used nefariously by people with enough computing power. He said the trustees didn't want anyone analysing those blocks. I'm not sure if he was grasping at straws, but what he said didn't explain the suddenness or the fraudulence of what Wright had done. MacGregor said that he and Matthews had since been with Wright and indicated that the encounter had been shouty and ugly. But he said it was OK now. 'We have verbal consent from the trustees to move coin, and we're just waiting on the written consent.'

MacGregor and Matthews had been in the meeting room for hours trying to work everything out. They thought it could all still be kept on track. MacGregor was writing new blog posts for Wright. He asked for my help with one of them and I explained that I had now to distance myself from the whole thing. I had got too close. MacGregor said they were going to 'flood the blog with evidence' and get Wright to 'move' some of the Satoshi bitcoin, to transfer it to someone else in a way that only someone in possession of Satoshi's private keys could do. Andresen had agreed to be on the other end of the coin transaction.

'Craig is being mauled out there,' I said.

Rob removed his glasses. 'The first meeting we had with him yesterday ended with: "You're fired. Buy a ticket to Sydney. You fucked us. Good luck with the ATO."'

'He didn't sleep last night,' Matthews said. 'He looks fucking terrible.'

'He risks destroying his entire reputation.'

'His and ours,' MacGregor said. 'I've been taking meetings with investment bankers for the last two months. I've pulled every string I know to get meetings with Google and Uber. If he goes down in flames, I'll go down with him. I mean, he's fucked me. Millions of dollars out of my pocket, nine months out of my life. But what we have now is a very pliant Craig Wright. We're going to drag this back from the brink.'

'It's a big task, Rob,' I said.

'We finally beat him to a pulp today. No more decisions. This is what we're going to do, because he knew the next move was pack your toothbrush and get on a plane and good luck in Australia.' MacGregor told me he'd started Monday morning on an unbelievable high. 'I can't believe we kept all the puppies in the box this whole time,' he'd thought to himself. 'Nobody broke embargo, holy shit this is going to work. And then … '

We spoke about Wright's possible lies. I said that all through these proof sessions, he'd acted this like this was the last thing he ever wanted.

'That's not true,' MacGregor said. 'He freaking loves it. Why was I so certain he'd do that BBC interview the next day? It's adoration. He wants this more than we want this, but he wants to come out of this looking like he got dragged into it.' He told me if everything had gone to plan, the groundwork was laid for selling the patents. It was a really big deal. He said Ramona had said that if Wright doesn't come out you still have this really smart guy who has made all these patents, who knows all about bitcoin. 'Yeah,' MacGregor said. 'You and five hundred other guys who have called today.' I shook their hands and wished them luck, thinking I would probably never see the men in black again. And as I descended in the lift, I thought I would miss their brio and their belief, despite everything.

Craig was lost in some labyrinth of his own making, or mostly of his own making. He didn't want to be Satoshi. And he didn't want to be Craig. And he didn't want to be a letdown. And yet the message boards lit up and the walls closed in. Over the next 24 hours, he agreed to move Satoshi's coin and his blog advertised the fact. It said, 'Extraordinary claims require extraordinary proof,' and he was set to provide it.

The next day, Wednesday, 4 May, Matthews was at Wright's house organising the movement of coin. The new (and final) proof session was intended to blow away the doubts created by the first. Many commentators felt it was too late, that Wright was beyond the pale, but Matthews and MacGregor had agreed with Andresen that the movement of coin, to Andresen and also to Cellan-Jones at the BBC, would undo the damage. Wright spoke to Andresen on the phone from his house – Andresen was in New York – and told him he was worried about a security flaw in the early blockchain, a problem in the way those first blocks were constructed that would make it dangerous for him to move coin, exposing him to exploitation or theft. My sources say that Andresen understood the problem and confirmed that it was all right, it had been fixed. But Wright continued to worry and was showing great reluctance about offering the final proof. Then he left the room abruptly and didn't come back.

The next day, he sent me an email. It linked to an article headlined 'UK Law Enforcement Sources Hint at Impending Craig Wright Arrest'. The article suggested that the father of bitcoin might be liable, under the Terrorism Act, for the actions of people who used bitcoin to buy weapons. Under the link, Wright had written an explanation: 'I walk from 1 billion or I go to jail. I never wanted to be out, but if I prove it, they destroy me and my family. I am the source of terrorist funds as bitcoin creator or I am a fraud to the world. At least a fraud is able to see his family. There is nothing I can do.'

He was devastated. He was the runner who failed twenty yards short of the finishing tape, the man who froze at the moment of truth, and started walking backwards. He said he feared prosecution on the one hand and humiliation on the other. The

borstal boy in Alan Sillitoe's 'The Loneliness of the Long Distance Runner' comes from a family who make much of running, 'especially running away from the police'. He hates being understood, feels authority is only there to grind you down, and holds on to his essential privacy, knowing 'they can't make an X-ray of our guts to find out what we're telling ourselves.' The boy lives on his own terms, which means not faking it for power, even when the pressure is high and the rewards are obvious. So he refuses to win. Representing the borstal in a championship race he is well ahead of the other runners, but he stops, and lets them pass, and at the end jogs up to the tape: 'I got to the rope,' Sillitoe writes, 'and collapsed, with a murderous-sounding roar going up through my ears while I was still on the wrong side of it.' In another email that day Wright wrote: 'Andrew, I don't know what I can say. If I was to do the proof and save myself, I damn myself.' That afternoon, he closed down the blog – the one that was intended to lead cryptocurrency fans into a new era – but left a final posting:

> I'm sorry. I believed that I could do this. I believed that I could put the years of anonymity and hiding behind me. But, as the events of this week unfolded and I prepared to publish the proof of access to the earliest keys, I broke. I do not have the courage. I cannot. When the rumours began, my qualifications and character were attacked. When those allegations were proven false, new allegations have already begun. I know now that I am not strong enough for this. I know that this weakness will cause great damage to those that have supported me, and particularly to Jon Matonis and Gavin Andresen. I can only hope that their honour and credibility is not irreparably tainted by my actions. They were not deceived, but I know that the world will never believe that now. I can only say I'm sorry.
>
> And goodbye.

<div align="center">*</div>

The next morning I drove through the traffic to a London suburb. It was early in the day and the high streets were empty, the happy boutiques, the delis and the wicker-and-candle dens where people come to improve their mood or do something

about their lifestyle. Craig and Ramona were sitting in the corner of a popular café. They were holding hands and staring at the table. He was wearing his Billabong T-shirt – I remembered it from his description of the clothes he'd bought in Auckland when he began his long-distance run last December. He looked as he'd looked the first night I met him in Mayfair: unshaven, unslept, the scar on his face more livid, his pupils like pinpricks and his breathing heavy. He wasn't just white, he was empty-looking, and his hands were trembling. Ramona was crying. The light of the café seemed too much for the darkness enclosing them. I went to shake his hand but we hugged instead, and it was like embracing a drowning man. He hadn't really slept since Monday and this was Friday. He wasn't drinking his latte, he made clouds on the spoon, and stared.

'Well, it was worth about a billion dollars to them,' he said. Ramona talked about jail and I asked if they were afraid of being prosecuted.

'They say it'll never happen,' she said. 'Of course it will … So how can he? How can he?' He spoke of men he knew who had sold bitcoin and had been prosecuted for money-laundering and said they might try to do that to him. 'It was always a present danger,' Ramona said. MacGregor, Wright alleged, had always had a plan to move him if necessary to Manila or Antigua if it looked like he might be arrested.

'It's always been incremental,' Craig said. 'One step, one step, and nobody realises that eventually that takes you over a precipice.'

'That's the thing,' Ramona said. 'Your happiness doesn't count at all. But now we're stuck. You come out – you go to jail. You don't come out – you're a fraud. It's got to the point where it's almost better if he's a fraud.'

'So what happened on Monday,' I asked, 'when it came to writing that blog?'

'I gave them the wrong thing,' he said. 'Then they changed it. Then I didn't correct it because I was so angry. Which was stupid. I put up the wrong one. No one wants

SN. I will never be SN. I'm not personable. You can lock me in a room and I'll write papers, I'll never be personable.'

Ramona was crying. 'They could take us down,' she said. 'They could really take you down if they want to.'

They spoke about moneymaking ventures Wright was involved in a long time ago. Wright alleged Matthews knew about these activities, which was true, because Matthews had mentioned them to me.

'I just couldn't do things anymore,' he said. 'That's all.'

They wanted to talk about the trust, but they didn't really explain it. He said it was to hide the bitcoin. 'It's not meant to be spent,' he said. 'Too many problems.'

'It's also a guarantee that you can't flood the market,' Ramona said. 'That we can't use it to pay the bills, no matter how desperate things get.' When I asked who the trustees were they went quiet.

Ramona began to worry about my story. She tried to strong-arm me. She began to tell me what I should say and what I shouldn't say and how I should hide from MacGregor and Matthews the comments she and Wright had made about them. 'I want to write the truth,' I said.

She said I knew too much. She said that Craig would go to jail or harm himself if I told everything I knew. I was stunned. There were many things that were said to me by every party in this story that I would choose not to print. Not only things they said about one another, but business arrangements and unsubstantiated allegations about the past, and things I knew in the present. But I had been recording this as a documentary from the start, as I'd said I would when we met at Claridge's in December. Now I was being told that my material was too hot and my story posed a threat.

Craig suddenly got very upset. His face crumpled and he put his head in his hands. 'And the Brits have their equivalent of Guantánamo Bay as well,' he said. 'I'll never write, I'll never see anyone. I'll be in a little room. I won't even have a pen and paper. I won't see my wife again. I'll never see …' He sobbed and was inconsolable. 'I'll never write again.'

'They won't do that,' Ramona said. I suggested they might get a lawyer to advise them on the possible threats they faced. Ramona said it was too expensive. She said the bills would run into the millions. Craig talked about Ian Grigg and others who'd 'outed' him last year by nominating him for various awards. Satoshi was nominated for a Nobel Prize and a Turing Prize. Wright told me that people in the bitcoin community wanted him to come out and receive recognition. He said it had never been in his interest to come out, but in other people's interest. 'I don't care if people like my work,' he said. 'I just have to *do* my work. That's the only thing that'll keep me sane.'

'I would like that his reputation gets redeemed but I don't know if that's possible,' Ramona told me. 'This is what I propose, if you can do it, you do it, if you can't, it's up to you. If [you say] he didn't choose to come out … then the company gets put in the spotlight. If you say you know he is Satoshi then we're in trouble. If you say you have your doubts then he looks like a fool.'

I'm sure I looked at her disbelievingly. 'You're basically saying that every version of the truth of this story is untellable.'

'But if you say it, Andrew …'

'If you were sure that this could never be said in the end, then you should never have allowed it to happen.'

'It was one step, then one step …' Craig said, again.

'And you let a writer into your life?' I said.

'Do you know how much this meant to me?' Craig said. 'The company. The people. To be doing that. To get all these papers out. To be in that position. It's my idea of heaven, but the cost is hell.'

'If we didn't co-operate with you,' Ramona said, 'they'd stop …'

I reminded them that every time I'd tried to walk away from this story – like when they tried to make me sign an NDA – she'd begged me to come back. I told them that full disclosure was much less damaging than any other option. Naturally enough, that was my view.

'No one wants to believe me,' Craig said.

'And I think that's great,' Ramona said. 'It's great that no one wants to believe you.'

Craig said he'd **filed all these patents** and they were all from him, <mark>'not just Dave'</mark>.

'What do you mean,' I asked. <mark>'"Not just Dave?"'</mark>

'I mean I wrote those patents,' he said. 'It means I knew all this shit.'

'Have you been able to talk to Matonis or Andresen?' I asked.

'No,' Ramona said. 'I don't know if they'll even talk to us.'

'I think you should have some crisis management advice.'

'From who?'

'From a therapist.'

'We don't have time for that,' she said.

I walked home with them and he slumped on a sofa, looking wan, gone. 'His mental health is fucked,' she said to me when he was out of the room. 'If he goes to jail, he'll kill himself. I can't leave him alone.'

When he returned he seemed almost paler than before. 'This is all because I wrote code,' Craig said. 'Not because I blew up something, because I wrote code.'

'Just out of interest,' I said. 'If you are a fraud … How hard a fraud would it have been to perpetrate?'

'It would be the best one in human history,' Craig said. 'It'd be Ronnie Biggs on steroids times a million. I invented a new form of money. Who has ever had anything to do with money that wasn't to do with government? Who has ever really succeeded?'

'You mean it's a thankless task?'

'It's always Prometheus,' he said.

*

This was a story in which everybody wanted their story told, then untold, then hidden, back in the vaults. It seemed like a very new story, but, in fact, it was a very old one, a story of metamorphosis, and of Prometheus unbound. Craig Wright proved cryptographically that he had Satoshi's keys, his emails seemed to show his involvement, his science extrapolated on the technology of the blockchain, and he spent a full year engaged in a business plan to reveal it all. But, when it came to it, he behaved like a fraud, he shape-shifted and he dissolved.

I began to wonder whether Craig Wright might be a man who had never known who he was, a missing person, constantly in discussion with some inner lost boy, unable to bear the conditions which forced him to say definitively who he was. Some people, it could be said, *really* aren't anyone, in the sense that the complications of

being themselves have wiped them out. The internet eats its own ciphers, and Wright is one of them. He might have sabotaged his own proof or simply flunked the paternity test because he isn't the right man, but his own doubts about himself are the real drama. He was sick, he was brilliant, he was manipulative – but much of what he said was true. And as I drove away that morning, it was the sickness that seemed predominant. Wright was a clever man who had gone to the very end of himself to prove who he wasn't. 'We are all Satoshi now,' became a tagline for bitcoin's early fans. And in the end we all are Satoshi, and we'll begin to accept it as paper currency starts to look stale, and our minds merge with our computers. There are new networks up ahead that will have grown from the seed Satoshi planted, and it was odd, after all my travels, to believe that the only man who wanted to opt out of being Satoshi was Craig Wright. A week after his 'proof sessions' with the BBC and others, he was in complete disgrace, his corner office at nCrypt had been emptied and his leather sofas had disappeared, removed from the building with the signed Muhammad Ali picture and the rest of his stuff. Without ceremony, the best room in the office became a conference room and his name was spoken in whispers.

My last meeting with MacGregor and Matthews was a time of conjecture and anger, devastation and apology. They felt Wright had perjured himself, and for no good reason. He had never admitted to problems with the trust, problems that would, though he hadn't admitted it, make the Satoshi reveal very difficult for him. They still believe, as do Andresen and Matonis, that he is Satoshi. To them, there is just too much evidence to accept Wright's late attempt to cloak himself in deniability. But no matter. He was now fired, they said, and the deal with Google was off. 'He put a gun to our head and pulled the trigger,' MacGregor told me. 'The world is still going to think we got fooled, but I know the facts. He has the keys.' There was a moment in our meeting when I realised this had gone all the way to the bone with MacGregor. He said he never wanted to see Wright again. 'This was supposed to be so noble,' he said, 'and it became so dark.' Matthews told me that Wright's office, his house, his job, his work visa, everything, was set to go. They had spent as much as $15 million and maybe lost a billion. MacGregor said the PR company would never deal

with him again, and there were investment bankers who weren't picking up his calls.
A way would be found, however, to continue developing the blockchain technology.
The company would go on. MacGregor shook his head. The whole thing was
unfathomable. It was baffling. For no obvious reason Wright had found a way to
disappear back into the shadows.

**Coda**

He seemed to miss me. Craig wanted to meet. It was a few weeks after the abortive
'reveal' and I saw when I got to Patisserie Valerie that he was happy again and
ready to take on the world. 'It was unfair of me to request you not to publish certain
things about our situation,' Ramona had written to me in an email. 'As you said, you
have a debt to the truth, and that is as it should be.' And yet, as we all know, the
truth has more faces than the town clock.

Wright told me in Patisserie Valerie that he felt free again. He had lost a third share
in a billion dollars but he felt unburdened. He was sorry to have let good people
down but now he could work in peace. Sherlock Holmes's central precept came into
my mind. 'When you have eliminated the impossible, whatever remains, however
improbable, must be the truth.'

'Do you want to know what I think?' I said to him after he told me again that all
would be well from now on.

'Yes.'

'What if you were 30 per cent Satoshi. You were there at its formation and you were
part of a brilliant group. You coded and you synthesised other people's work and
you shared in the encryption keys. Then, some time in the last year, you upgraded
yourself to 80 or 90 per cent. You were already a lot more Satoshi than anybody
else has been hitherto, but the deal, in your eyes, required you to be more and in
the end you couldn't carry that off.'

'No,' he said. And he flew off on a tangent about elliptical curves and the nature of the blockchain and how he never wanted to be a deity. I turned off my recording head at that point and stared through him.

Outside the café, he shook my hand. I knew I would never see him again. For six months we had allowed each other to think we were friends – subjects need storytellers, and storytellers need subjects. There had been a time when he'd imagined that I could free him from his fictions and build him a new story in reality. I was a willing stenographer, thinking Wright was something perhaps bigger than Satoshi. He was the internet's habit of self-dramatisation and self-concealment all at once; its new sort of persona. What he actually did may never be known. Either he's one of the greatest computer scientists of his generation, or he's a reckless opportunist, or he's both. We can't be sure. But there he was, standing in Old Compton Street in the pouring rain, saying sorry.

**Date : 5/5/2016 7:16:55 PM**
**From : "Jimmy Nguyen"** ▮▮▮▮▮▮▮▮▮▮
**To : "Robert MacGregor"** ▮▮▮▮▮▮▮
**Subject : Re: 3, 2, 1 ...**

So . . . did Craig cave under the pressure?

On May 2, 2016, at 11:23 AM, Jimmy Nguyen ‹ ▮▮▮▮▮▮▮ › wrote:

> I see the online articles.  How has reaction been in your world?
>
> Also have you reviewed the revised contract yet?  Would be good to get that signed off this week.
>
> Here we go . . .
>
> On May 1, 2016, at 11:09 PM, Robert MacGregor ‹ ▮▮▮▮▮▮▮▮▮ › wrote:
>
>> The embargo will lift and the news will break in 50 minutes.
>>
>> Here we go…
>>
>> T se a a da y attac  e t to ta e co f de t a  U ess yo  a e t e te ded ec pe t, yo   ay  ot  se, copy o  d sc ose e t  e t e  essage o a y  fo  at o  co ta  ed  t e  essage  If yo  a e  ot t e  te ded ec pe t, yo  s o  d de et e t  se  a  a d  ot fy t e se de    ed at e y  A y v ews o  op  o s exp essed  t se  a  a e t ose of t e se de  o  y,  ess ot e w se stated  A  copy  g t  a y of t e  ate a  t se a  s ese ved  A  e a s,  co   ga do t go  g,  ay e  eco  ded a  d  o to ed fo  eg t  ate b s  ess p  poses  We exc  de a   ab  ty fo  a y  oss o  da  age a s go  es t  g fo  t e  ecept, se o  ta s  sso  of t se a  a  tot e  f  est exte t pe   tted by  aw

CONFIDENTIAL

NGUYEN 000229

# CONTRACTED SERVICES AGREEMENT

## TERM SHEET

| | |
|---|---|
| Effective Date: | 1 September 2016 |
| Company Name: | EITC Holdings Ltd. |
| Provider Name: | James D. Nguyen |
| Provider Address: | 924 N. West Knoll Drive<br>West Hollywood, California 90069<br>United States of America |

The undersigned hereby acknowledge that they have read and agree to be bound by the terms and conditions of this Contracted Services Agreement, including this Term Sheet, the Standard Terms and Conditions and any and all Statements of Work attached hereto or subsequently executed (collectively, the "*Agreement*"):

**PROVIDER**

_____
Signature

JAMES D. NGUYEN
Print Name

_____
Title

29 SEPTEMBER 2016
Date

**COMPANY**

_____
Signature

STEFAN MATTHEWS

EITC Holdings Ltd.
Print Name

DIRECTOR
Title

24 SEPT 2016.
Date

CONFIDENTIAL

NGUYEN 001586

# CONTRACTED SERVICES AGREEMENT

### TERMS AND CONDITIONS

BETWEEN:

### COMPANY
(as defined on the Term Sheet)

- and -

### PROVIDER
(as defined on the Term Sheet)

WHEREAS Company (for itself and any subsidiary entities) wishes to retain Provider to provide certain Services (as hereinafter defined) and/or to develop and provide certain Work Product (as hereinafter defined);

AND WHEREAS the parties hereto wish to document the terms and conditions upon which the Services and/or Work Product are to be performed and/or provided;

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby by each party acknowledged, the parties hereto covenant and agree as follows:

---

## 1.    DEFINITIONS

1.1    "*Agreement*" means this Contracted Services Agreement;

1.2    "*Company*" means the individual or legal entity identified on the Term Sheet (for itself and any subsidiary entities);

1.3    "*Confidential Information*" means any and all of a party's business, proprietary and/or technical information, data and processes, whether tangible or intangible, including, without limitation, any and all techniques, discoveries, inventions, processes, patents, patent applications, copyrights, copyright applications, know-how, trade secrets, system designs, client or prospect lists, industrial designs, affiliate or partner lists, and software programs, products and the like, disclosed pursuant to this Agreement or in furtherance of this Agreement and shall expressly include the include the existence and terms of this Agreement. Company's Confidential Information shall expressly include the Work Product. This Agreement and its material terms shall be treated as Confidential Information;

1.4    "*Effective Date*" means the effective date of this Agreement, as identified on the Term Sheet;

CONFIDENTIAL

NGUYEN 001587

1.5     "*Engagement*" means a specific project for which Provider shall, pursuant to this Agreement, provide Services and/or develop and deliver Work Product to Company, the details of which shall be summarized on the applicable Statement of Work;

1.6     "*Intellectual Property Rights*" means patent rights (including patent applications and disclosures), copyrights (including copyright applications), trade secrets, moral rights, know-how and any other similar rights or intangible assets recognized under any law(s) or international convention(s) in any country or jurisdiction in the world where intellectual creations to which rights of ownership accrue;

1.7     "*Provider*" means the individual, entity, or corporation identified on the Term Sheet;

1.8     "*Services*" means the services to be performed by Provider, as described on each applicable Statement of Work;

1.9     "*Statement of Work*" means a document summarizing the details of a specific Engagement (including, without limitation, the Services to be provided and/or any Work Product to be developed by Provider and provided to Company). Statements of Work shall be substantially in the form attached hereto as Schedule "A"; and

1.10     "*Work Product*" means any and all concepts, data, designs, ideas, information, inventions, know-how, processes, techniques, and works of authorship or the like developed or created by Provider during the course of performing Services, regardless of the form of embodiment. Work Product shall (i) include Intellectual Property Rights in and to the foregoing, and (ii) in the case of copyrights, be considered (to the extent permitted by law) "works made for hire".

## 2. TERM AND TERMINATION

2.1     <u>Term</u>. Subject to the terms and conditions hereof, this Agreement will become effective on the Effective Date and will continue in force until terminated pursuant to the terms hereof.

2.2     <u>Termination</u>. Subject to any minimum duration of the Engagement or termination rights, if any, described in each applicable Statement of Work:

    (a)     Either party may terminate this Agreement and/or one or more Engagements upon thirty days' written notice to the other, which notice shall specify the effective date of such termination. On the issuance of such notice by either party, at Company's sole election, Company shall either require the continued provision of Services until the effective date of termination, or may pay any or all amounts that would otherwise accrue due to Provider during the notice period and terminate the Agreement or the applicable Engagement immediately.

    (b)     If a party fails to cure any material breach of its obligations hereunder (or pursuant to an applicable Statement of Work) within ten (10) days after its receipt of written notice thereof from the other party, then the other party may terminate this Agreement and/or the applicable Engagement at any time thereafter by providing the defaulting party with written notice of termination.

    (c)     This Agreement terminates automatically, with no further action by either party, if: (i) a receiver is appointed for either party or its property; (ii) either party makes an assignment for the benefit of its creditors; (iii) any proceedings are commenced by, for, or against either party

CONFIDENTIAL

under any bankruptcy, insolvency, or debtor's relief law for the purpose of seeking a reorganization of such party's debts, and such proceeding is not dismissed within sixty (60) calendar days of its commencement; or (iv) either party is liquidated or dissolved.

(d) *Engagement Termination*. All Engagements terminate automatically and without further notice upon termination of this Agreement.

2.3 <u>Consequences of Termination</u>. In the event of termination of this Agreement and/or any Engagement(s) for any reason, on the effective date of such termination:

(a) *Cease Provision of Services*. Provider shall cease providing any and all Services relating to the terminated Engagement(s); and

(b) *Delivery Of Materials*. In the event of termination of this Agreement for any reason, Provider shall, not later than three (3) days after such termination, at its own cost and without request surrender and deliver to Company all materials containing, embodying or otherwise evidencing any Confidential Information (including all Work Product), regardless of whether any such item or the information therein was prepared, produced or authored by Provider.

(c) *Survival* In the event of termination of this Agreement for any reason, clauses 2.3, 5 – 7, 8.1, 8.2, 8.3, 8.5, 8.6 and 8.7 shall survive such termination.

## 3.   PROVISION OF SERVICES

3.1 <u>Statements of Work Required</u>. Prior to the provision of any Services hereunder (including the development of any Work Product), the parties hereto shall prepare and execute a Statement of Work, which, upon execution, shall be incorporated herein by reference. The parties hereto expressly acknowledge and agree Company shall not be liable for and shall not pay for any Services rendered by Provider prior to the execution of (or in the absence of) a fully executed Statement of Work relating thereto.

3.2 <u>Services; Progress Reports</u>. Provider shall provide the Services to Company in accordance with the applicable Statement of Work, and promptly deliver to Company any Work Product resulting from the performance of Services. Provider will report its progress on its performance of Services to Company at the time and in the manner reasonably requested by Company or as otherwise described in the applicable Statement of Work.

3.3 <u>Method of Performing and Scheduling of Services</u>. Provider will determine the general method, details and means of performing the Services, provided that Provider shall strictly observe any Company policies or procedures applicable thereto or to the workplace if using the premises and/or equipment of Company. Provider shall complete the Services in accordance with the schedule set forth on each applicable Statement of Work.

3.4 <u>Changes in Scope of Work</u>. Company shall have the right to change the scope of the Services, if: (i) such change is reasonably acceptable to Provider; and (ii) the parties mutually agree on the terms applicable to any such change, including changes to Provider's compensation (if any), which shall be set forth in a signed, written amendment to the applicable Statement of Work.

CONFIDENTIAL

NGUYEN 001589

4.    **COMPENSATION**

4.1   <u>Compensation and Expenses</u>. Company will pay the applicable amount(s) set forth each applicable Statement of Work following Provider's completion and delivery, and Company's acceptance of, the Services and/or Work Product applicable to such payment. Provider shall be responsible for all costs and expenses incidental to its performance of the Services, except as otherwise may be expressly set forth on each applicable Statement of Work.

4.2   <u>Invoices and Payment</u>.  Provider shall submit invoices to Company in accordance with the schedule identified in each applicable Statement of Work, together with sufficiently detailed information for Company to verify all invoice items. Company will pay Provider within thirty (30) days of Company's receipt of Provider's invoice or acceptance of Services and/or Work Product, whichever is later. Company will not be liable for and will not pay any invoice that Provider submits to Company more than ninety (90) days after Provider performed and Company accepted the associated Services and/or Work Product.

5.    **WORK PRODUCT AND INTELLECTUAL PROPERTY**

5.1   <u>Ownership of Work Product</u>. Provider hereby assigns on an exclusive basis all of Provider's right, title and interest in and to the Work Product to Company, including any and all Intellectual Property Rights therein. Accordingly, Provider agrees that it shall (i) not use any Work Product for the benefit of any party other than Company, and (ii) perform such other acts (including, but not limited to, cooperating with and assisting Company in the protection and enforcement of Company's rights in the Work Product, by adjudication or otherwise), and (iii) execute such other documents and instruments as Company may now or hereafter deem reasonably necessary or desirable to evidence the transfer of sole ownership of all Work Product to Company. If, by operation of law, Provider is deemed to retain any rights in and to any Intellectual Property Rights relating to the Work Product, Provider, to the extent that any such rights cannot be assigned (including, without limitation, any and all moral rights therein), hereby waives all such rights in perpetuity and exclusively in favor of Company, Company's successors and assigns.

5.2   <u>Residual Rights of Provider</u>.  Subject to Provider's obligations relating to Company's Confidential Information, Provider shall be free to use its general skills, know-how and expertise in the course of providing its services to others, provided that Provider shall not provide or disclose Confidential Information (including Work Product) to any third party in so doing.

6.    **WARRANTIES AND LIABILITY**

6.1   <u>Warranties</u>. Provider represents and warrants to Company that:

(a)   *General*. Provider has all requisite right and authority to enter into this Agreement, and the performance of its obligations hereunder will not conflict with any of its agreements with or obligations to any third party;

(b)   *Performance of Services*.  Provider shall perform all Services in a good, professional and workman-like manner in accordance with the best practices of Provider's industry and such

CONFIDENTIAL

NGUYEN 001590

Services and any and all Work Product shall be of a high grade, nature and quality. All Services and Work Product shall conform to the applicable specifications or description set forth in Exhibit A;

(c) *Intellectual Property Rights*. The Services and Work Product shall not infringe any confidential information, copyright, patent, trade secret or other proprietary or Intellectual Property Right(s) of any third party or parties; and

(d) *Compliance With Laws*. Provider shall comply with all applicable international, national, state, provincial, regional and local laws and regulations in exercising its rights or fulfilling its obligations hereunder.

6.2    Indemnity.

(a) *To Company*. Provider shall indemnify, defend, and hold Company and its parent and affiliated companies, successors, officers, directors and employees harmless from any and all actions, causes of action, claims, demands, costs, liabilities, expenses and damages arising out of or in connection with: (i) Provider's breach of any of the warranties contained in clause 6.1; (ii) any failure of Provider to comply with its obligations hereunder; or (iii) the gross negligence or willful misconduct of Provider or its employees, representatives or agents in connection with Provider's performance of Services and/or production and/or delivery of Work Product. If any action shall be brought against Company in respect to which indemnity may be sought from Provider pursuant to the provisions of this clause, Company shall promptly notify Provider in writing, specifying the nature of the action and the total monetary amount sought or other such relief as is sought therein.    The foregoing indemnification shall also apply to damage or loss arising from the actions or inactions of Provider's employees or agents, whether in the course of their employment or not, including but not limited to acts of theft, vandalism or the like.

(b) *To Provider*. Company shall indemnify, defend, and hold Provider and its parent and affiliated companies, successors, officers, directors and employees harmless from any and all actions, causes of action, claims, demands, costs, liabilities, expenses and damages arising out of or in connection with: (i) any material or information provided by Company to Provider in order to enable Provider's provision of Services (ii) any failure of Company to comply with its material obligations hereunder (iii) any acts or omissions of Company with respect to any representations, negotiations, agreements or transactions between Company and any third parties related to the subject matter of the Engagement save and except to the extent such acts or omissions are attributable to the negligence or willful misconduct of Provider. If any action shall be brought against Provider in respect to which indemnity may be sought from Provider pursuant to the provisions of this Article, Provider shall promptly notify Company in writing, specifying the nature of the action and the total monetary amount sought or other such relief as is sought therein.

6.3    Limitation of Liability. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES, HOWEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT FOR BREACH OF CONFIDENTIALITY BY EITHER PARTY AND EXCEPT FOR ANY THIRD PARTY CLAIMS AGAINST EITHER PARTY FOR WHICH INDEMNIFICATION IS SOUGHT PURSUANT TO CLAUSE 6.2(a) or 6.2(b), IN NO EVENT WILL EITHER PARTY'S LIABILITY TO THE OTHER

CONFIDENTIAL

ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED THE SUM OF FEES PAID TO CONTRACTOR DURING THE TERM OF THIS AGREEMENT. THE PARTIES AGREE THAT THE PRECEDING LIMITATIONS REPRESENT A REASONABLE ALLOCATION OF RISK.

7. **CONFIDENTIAL INFORMATION**

7.1 <u>Non-Disclosure and Restriction on Use</u>. A party receiving Confidential Information (the "*Receiving Party*") from the other party (the "*Disclosing Party*") shall maintain in strict confidence all Confidential Information of the Disclosing Party and shall use such Confidential Information only for the specific purpose of exercising Receiving Party's entitlements or fulfilling Receiving Party's obligations hereunder.

7.2 <u>No License</u>. Receiving Party acknowledges and agrees all right title and interest (including all Intellectual Property Rights) in and to the Disclosing Party's Confidential Information vests absolutely in Disclosing Party and that no license or transfer of Intellectual Property Rights in or to Disclosing Party's Confidential Information is provided to Receiving Party's Confidential Information hereunder, either expressly or by implication, estoppel or otherwise.

7.3 <u>Irreparable Harm</u>. The parties hereto agree and acknowledge that misuse or disclosure of the Confidential Information shall cause irreparable harm to Disclosing Party and Disclosing Party shall be entitled to seek injunctive relief in respect of any misuse or disclosure of Confidential Information.

7.4 <u>Exceptions</u>. The restrictions on the use of Confidential Information contained in this Article shall not apply to information that Receiving Party can clearly show: (i) is known to Receiving Party at the time of disclosure; (ii) was independently developed by Receiving Party without use of the Confidential Information; (iii) became known to Receiving Party from another source without confidentiality restriction on subsequent disclosure or use; (iv) was or becomes part of the public domain through no wrongful act of Receiving Party; or (v) is disclosed pursuant to any judicial or governmental request or order, provided that Receiving Party takes reasonable steps to give Disclosing Party sufficient prior notice so that it may contest or limit any such request or order.

8. **GENERAL AND MISCELLANEOUS**

8.1 <u>Notices</u>. Any notice or other document required or permitted to be given to any party hereunder shall be validly given if delivered personally (including by courier service) or mail by prepaid registered mail or sent by facsimile transmittal to the addressee thereof. Notices shall be deemed received three (3) days after mailing in the case of registered mail, and on the next business day in the case of courier delivery or facsimile transmission. Notices shall be sent to Provider at the address noted above. Notices shall be sent to Company at the following address: 44 Church Street, St. John's, Antigua.

8.2 <u>Assignment</u>. Provider may not assign any rights or delegate any duties under this Agreement (other than to receive payments) without the other Company's prior written consent (not to be unreasonably withheld, conditioned, or delayed), and any attempt to do so without consent will be void. Company may assign this Agreement upon written notice to Provider.

CONFIDENTIAL

8.3   Independent Contractor Status. Each party is acting as an independent contractor and not as an agent, partner, or joint venturer with the other party for any purpose. Neither party shall have any right, power, or authority to act or create any obligation, express or implied, on behalf of the other. Provider shall not hold itself out, either expressly, by implication or through its conduct, to any third party as having authority to bind or act on behalf of Company. Provider acknowledges and agrees that this Agreement shall not give or extend to Provider any rights with respect to contributions by Company to any deferred compensation plan, bonus plans, pension plans or fringe benefits of any kind. Company shall not carry workers' compensation insurance or health or accident insurance to cover Provider. Company shall not pay any contribution to unemployment insurance, taxes, nor provide any other contribution or benefits which might be expected in an employer/employee relationship. In the event that any applicable regulatory authority should classify the Provider for any reason as other than an independent contractor, Provider agrees to indemnify and save harmless Company in respect of any claims made against Company including, without limitation, claims by for failing to withhold any taxes, pension plan contributions or insurance contributions payable by Provider.

8.4   Force Majeure. Neither party shall be responsible for delays or failure of performance resulting from acts beyond the reasonable control of such party. Such acts shall include, but not be limited to, acts of God, riots, acts of war, epidemics, failure of suppliers to perform, power failures, earthquakes or other disasters.

8.5   Waiver Not to Prejudice Rights. The failure of either party to require performance of any provision hereof shall not affect the right at a later time to enforce such provision.

8.6   Severance. In the event any provision in this Agreement contravenes any applicable legislation existing from time to time or is deemed unenforceable by a court of law, the offending provisions shall be deemed to be severed and the remainder of the Agreement shall remain in full force and effect and no provision shall be deemed to be dependent upon any other provision unless so expressed herein.

8.7   Disputes, Governing Law and Jurisdiction.

(a)   *Good Faith Attempts to Resolve*. The parties agree that they will make good faith efforts to settle any dispute, claim or controversy arising out of or relating to this Agreement by discussion and/or negotiation.

(b)   *Governing Law*. This Agreement shall be governed by and construed in accordance with the laws of the State of Antigua and Barbuda for purposes of any action commenced under this Agreement or with respect to any tort committed or alleged to be committed in the performance of this Agreement. No choice of law rules of any jurisdiction shall apply hereto. The parties hereto expressly waive any right they have to a jury trial and agree that any court preceding under this Agreement shall be tried by a judge without a jury.

(c)   *Arbitration*. Any claim, dispute or controversy arising out of or in connection with or relating to this Agreement or the breach or alleged breach hereof, shall be submitted to arbitration by the Arbitration and Mediation Institute of Antigua and Barbuda under the commercial rules then in effect for such Association, except as may be otherwise expressly provided herein. All proceedings shall be held and a transcribed record prepared in English. Each party shall choose one arbitrator within thirty (30) days of receipt of notice of the intent to arbitrate. Within fifteen (15) days of receipt of the notice of the intent to arbitrate the two (2) arbitrators shall choose a neutral third party arbitrator who shall act as chairman. If no arbitrator is appointed

CONFIDENTIAL

NGUYEN 001593

within the times herein provided or any extension of time that is mutually agreed upon, the Association shall make such appointment within fifteen (15) days of such failure. The award rendered by the arbitrators shall include costs of arbitration, reasonable attorneys' fees and reasonable costs for expert and other witnesses, and judgment on such award may be entered in any court having jurisdiction hereunder; provided however, that nothing in this clause shall be deemed as preventing either party from seeking relief from the courts as necessary to protect either party's name, proprietary information, trade secrets, know how or any other appropriate provisional or equitable remedy.

8.8     Non-exclusive Relationship. This Agreement is non-exclusive. Subject to the obligations herein, Provider shall have the right to perform work for others during the term of this Agreement. Company may cause similar work to be performed by its own personnel or other contractors during the term of this Agreement.

8.9     Representation by Counsel. Each party hereby certifies and represents that it has been, or had the opportunity to be, represented by counsel in the negotiation of this Agreement.   Company further acknowledges that it has received the disclosures from Provider, and provides the consent, set forth in Exhibit B hereto.

8.10    Entire Agreement.  The parties have read this Agreement and agree to be bound by its terms, and further agree that it constitutes the complete and entire agreement of the parties and supersedes all previous communications, oral or written, between them relating to the subject matter hereof.  No representations or statements of any kind made by either party that are not expressly stated herein shall be binding on such party.

8.11    Amendments.  If at any time during the term of this Agreement the parties hereto deem it necessary or expedient to make any alteration or addition to this Agreement they shall do so by means of a written agreement which shall be supplemental hereto and form part hereof.  No provisions in either party's purchase orders, or in any other business forms employed by either party will supersede the terms and conditions of this Agreement, and no supplement, modification, or amendment of this Agreement shall be binding, unless executed in writing by a duly authorized representative of each party to this Agreement; and

8.12    Time of the Essence.  Time shall be of the essence in this Agreement.

8.13    Execution in Counterpart.  This Agreement may be executed in two or more counterparts (by original or facsimile signature), each of which shall be deemed to be an original but all of which together shall constitute one and the same Agreement.

NGUYEN 001594

## SCHEDULE "A"

## CONTRACTED SERVICES AGREEMENT – STATEMENT OF WORK

### MADE PURSUANT TO AN AGREEMENT BETWEEN:

EITC Holdings Ltd. ("Company")

- and –

James D. Nguyen ("Provider")

made effective 1st September 2016

Additional Statement of Work Description Attached     Yes ☐     No ☒ 

| | |
|---|---|
| **Engagement Period** | This Engagement shall commence on the Effective Date or any later date mutually agreed-upon by the parties, and continue for a minimum period of sixteen (16) months until 31st December 2017 ("Initial Term"). Following the expiry of the Initial Term, the parties may by mutual written agreement renew the Engagement for successive six (6) month periods (each a renewal term). |
| **Detailed Description of Services, including Deliverables** | Company (itself or through its subsidiary entities) owns a number of existing and future patents, patent applications, claimed patent rights, inventions, and/or other intellectual property assets (the "IP Assets"), and desires to sell, license or otherwise commercially dispose of some or all of those IP Assets.  Company engages the services of Provider to provide intellectual property, technology and business consulting, and related legal services, concerning and to facilitate and negotiate the sale, license or other commercial disposition of any or all of the IP Assets.  (Provider may also provide Company a separate legal engagement letter for execution). |
| | Provider's services shall include: |
| | Legal, Advisory and Business Development: |
| |     i.   Advise on IP strategy for the IP Assets , including:  (a) advising on patent filings and any enforcement strategy; and (ii) advising on trademark filings (if any) |
| |     ii.  Preparing the pitch package/presentation materials for the IP Assets |
| |     iii. Coordinating events and introductions. |
| | Sales: Introduction, selection and negotiation with potential business partners, acquirers and/or licensors of the IP Assets. |
| | Specific objectives and KPIs will be reviewed, defined and agreed by the parties on a monthly basis. To the extent required, the parties will supplement this Statement of Work with additional Schedules or addenda documenting the objectives and business opportunities that are pursued. |
| **Engagement Pricing/Cost** | Company will pay the Provider (or his designee business) the fees as set out below: |
| | Retainer/Consultancy Fee |
| | A retainer/consultancy fee equal to Fifteen Thousand Dollars (USD 15,000.00) per month. |
| | Success Fee |

CONFIDENTIAL

NGUYEN 001595

<u>Individual IP Assets or Products</u>

Provider shall receive a commission equal to two percent (2%) of the net price of any individual or groups of IP Assets (including any products, inventions, claimed patents or patents comprising or based upon any IP Assets) sold, licensed or otherwise commercially disposed to customers or business partners introduced to Company by Provider where Provider has concluded (or substantially contributed to conclusion of) the sales, license or other applicable contract or negotiated the heads of terms pursuant to which the contract was concluded. Net Price shall mean the total price actually charged to the customer or business partner under the applicable contract, less any value added or other sales tax thereon.

<u>Entire IP Portfolio</u>

Where the Provider has introduced an acquirer or business partner which acquires all of the then-existing IP Assets of Company, nCrypt Limited or other relevant subsidiary entity, Provider shall be entitled to a success fee equal to a percentage of the purchase price received by Company as follows:

(i)     one percent (1%) of the purchase price where the purchase price is less or equal to $200,000,000; plus

(ii)    half percent (0.5%) of the purchase price where the purchase price exceeds $200,000,000 (subject to a minimum payment of $500,000 to Provider in this band).

For example, if the purchase price for the entire portfolio of IP Assets is $400,000,000, Provider shall be paid $2,000,000 plus $1,000,000, giving a total success fee of $3,000,000.

The Company shall be entitled to pay the fees in Euros, GBP or such other currency agreed between the Company and Provider.   Provider may designate a designee business to receive the fees.

Company will reimburse the Provider for reasonable travel and out-of-pocket expenses provided that such expenses are approved by the Company in accordance with the Company's travel and expenses policy.

The Provider shall submit a monthly invoice to the Company on the last day of each calendar month for the above mentioned fees.

**PROVIDER**

Signature

JAMES D. NGUYEN
Print Name

Title

29 SEPTEMBER 2016
Date

**COMPANY**

Signature   STEPAN WATTITEWS.

EITL HOLDINGS LTD.
Print Name

DIRECTOR
Title

22 SEPT 2016.
Date

CONFIDENTIAL

## Exhibit B

### Disclosure and Consent Related to Transaction Between Attorney (Provider) and Company

Provider is an attorney licensed to practice in the State of California, United States of America. Although Provider has not previously acted as attorney for or provided legal services to Company or nCrypt Limited, Provider has acted as attorney providing intellectual property and other legal services for affiliated entities of nCrypt Limited. Because this Agreement creates or may create a business transaction between Company (for itself or for nCrypt Limited) and Provider (beyond the scope of Provider's past or potential future relationship as attorney for nCrypt Limited or any of its subsidiary entities), Provider provides the following disclosures, and Company (for itself and for nCrypt Limited and its subsidiary entities) hereby acknowledges receipt of these disclosures and consent to this Agreement, as required by Rule 3-300 of the California Rules of Professional Conduct applicable to members of the State Bar of California.

1) This Agreement and its terms must be fair and reasonable to Company (and for nCrypt Limited and its subsidiary entities). Because the form of agreement was prepared by Company, is based upon Company's form of agreement for other contracted service providers, and the material terms were suggested by Company (rather than being prepared or suggested by Provider), Company (for itself and for nCrypt Limited and its subsidiary entities) acknowledges that the terms of this Agreement are fair and reasonable to it, that the terms are fully known to it and the terms are in a form which it reasonably understands.

2) Provider has advised Company (including by email dated April 9, 2016 and further by this Exhibit B) that it may and should seek the advice of an independent lawyer of its choice concerning this Agreement and any revisions proposed to it by Provider. Company acknowledges it has been so advised, has in fact obtained independent counsel of its own choice to prepare and review this Agreement, and has received a reasonable opportunity to seek that advice.

3) Company (for itself and for nCrypt Limited) hereby consents in writing to this Agreement after having received the above written disclosures from Provider.

PROVIDER

Signature

Print Name  JAMES D. NGUYEN

Title

Date  29 SEPTEMBER 2016

COMPANY

Signature  STEFAN MATTHEWS

Print Name  EITC HOLDINGS LTD.

Title  DIRECTOR

Date  29 SEPT 2016

CONFIDENTIAL

NGUYEN 001597

Date : 2/14/2017 5:33:36 PM
From : "Arthur Davis" ███████████
To : "Jimmy Nguyen" ████████████████   "Stefan Matthews" ███████████
Subject : confidential

Hi to both,
re: CSW

Stefan, you and I are in complete agreement to focus 100% of closing the transaction.  I filed for post closing reference all emails relating to anything else, however this one was the only one left accidentally in my inbox on the plane to ZH.  I scanned it quickly and actually I find it very sensible.

A child, and most people in fact, want to do the right thing to earn praise.  eg. if a parent always pays attention to a child when responding to a temper tantrum, then the child will keep acting out badly because it gets attention then.  The reverse is true also, if attention is paid in response to good behaviour, then the child is likely to recognise this and then respond to good behaviour more and more.  In psychology it is called Pavlov's Dog.

Stefan, you presumably will have your talk with CSW on Friday.  Some thoughts to hopefully help you prepare for this:

It seems to me that our outcome is to help CSW channel his energy positively in the direction we want.  At the moment it has been highly negative.  If we steer this into our direction, and we help him FOCUS on THE OUTCOME WE WANT, and reward this "good behaviour" with a positive response from us, then CSW will get the message, and want to do it again.  Like Pavlov's Dog.

We all do not respond to the multitude of negative emails coming from him.  CSW knows this as we don't respond.  So perhaps a constructive response to the email below would be helpful ?  Also, we have to channel this through the right management structure, and Allan manages him as we know.

So, perhaps we should help Allan formulate a response from the OCEO+Allan, and for Allan to deliver this message back to CSW.  We then reinforce management protocol & process.  We would give him a considerate response to a considerate and business oriented email below.  Reinforce no change to the business plan of today.  Reinforce we are building plans as a team additional elements for us to consider if valid or not.  The direction of Allan's response could be to first reward good behaviour by communicating we all felt this to be a sensible email, and then to request CSW to outline his thoughts around a step by step plan to achieve what he proposes below?  If he needs help doing this then Allan could assign someone to assist CSW in writing out the details.  This could be a good start to a rebound in the right direction, which then Stefan you could reinforce heavily on Friday, to help him channel this negative energy into a positive constructive thought process to help build in the right direction.

I say these things without real knowledge of his day to day work with the team.  But perhaps a combination of both initiatives might be good for him ?

Any thoughts ?

Arthur.


Begin forwarded message:

**From:** nCrypt Craig < ████████ >
**Subject: iDaemon**
**Date:** 14 February 2017 at 09:33:05 GMT
**To:** nCrypt A an < ████████ >, nCrypt Gavin < ████████ >, Shahnawaz Aziz
< ████████ >, nCrypt_Jon < ████████ >, Arthur Davis ████████ >, nCrypt_Stefan
< ████████ >

Good morning,
There seems to be a belief that this (iDaemon) will take 2 years to start rolling out from what I have been relayed.

This is not true and we will never have a complete solution (unless we fail and that will be the last version updated).

We start with what we have. This can be with the existing software minus Segwit and the additionally added crap-ware. As we have now, we take the Core software and integrate this to the systems we have been developing and that we are running and we offer this with our enhancements, with the cap removed and with a plan to scale continuously.

As with all things in business, the key is to involve our customers. One day, this will involve merchant and transaction nodes. For now, we have but a single customer, the **Miners**.

CONFIDENTIAL

NGUYEN 000004

FINANCE
MAGNATES

(https://www.financemagnates.com/)

(https://twitter.com/financemagnates) (https://www.facebook.com/financemagnates)
(https://www.linkedin.com/company/2255766/) (https://www.financemagnates.com/feed/)
(https://t.me/financemagnatesnews)
(https://www.youtube.com/channel/UCaMiOoCIu0Lb_bEO_V2kI_g/featured?view_as=public)

Contact us    News etter    Log n    Eng sh

NEWS (HTTPS://WWW.FINANCEMAGNATES.COM/ALL-NEWS/)
INTELLIGENCE (HTTPS://WWW.FINANCEMAGNATES.COM/INTELLIGENCE/)
EVENTS (HTTPS://WWW.FINANCEMAGNATES.COM/EVENTS/)
DIRECTORY (HTTPS://DIRECTORY.FINANCEMAGNATES.COM)
THOUGHT LEADERSHIP (HTTPS://WWW.FINANCEMAGNATES.COM/THOUGHT-LEADERSHIP/)
SEARCH

FM Home (https://www.financemagnates.com) > CryptoCurrency (https://www.financemagnates.com/cryptocurrency/)
> Interviews (https://www.financemagnates.com/cryptocurrency/interview/) > Jimmy Nguyen: Bitcoin SV is Bigger than Craig Wright

*Interview*

# Jimmy Nguyen: Bitcoin SV is Bigger than Craig Wright

**The former CEO of nChain discusses the BSV ecosystem and the effects of the media attention on Craig Wright.**

**All FM News (/all-news)**

Charles Schwab to ntroduce
Schwab Stock Slices
/ 44 mins ago

SC to Allow Capital Market
Product Distribution via e Service
/ 2 hours ago

Will COV D 19 Cause AS C to
Delay Leverage Restrictions?
/ 2 hours ago

Tradeweb Market Sees 14 6%
Volume Uptick in April

🐦 (https://twitter.com/financemagnates) | f (https://www.facebook.com/financemagnates) |
Rachel McIntosh in (https://www.linkedin.com/company/2255766/) | 🔊 (https://www.financemagnates.com/feed/)
✈ (https://t.me/financemagnatesnews)
▶ (https://www.youtube.com/channel/UCaMiOoClu0Lb_bEO_V2kI_g/featured?view_as=public)

(https://www.financemagnates.com/cryptocurrency/interview/) | CryptoCurrency
(https://www.financemagnates.com/cryptocurrency/)) | Wednesday, 04/09/2019 |
12:09 GMT+2

Contact us    News etter    Log n    Eng sh



HTTPS://WWW.FINANCEMAG...LL-NEWS/)
INTELLIGENCE (HTTPS...COM/INTELLIGENCE/)
EVENTS (HTTPS...VENTS/)
DIRECTORY (HTTPS...TORY.FINANCE...S.COM)
THOUGHT LEADERSHIP (HTTPS://WWW.FINA...COM/THOUGHT-LEADERSHIP/)
SEARCH...

Photo: Rachel McIntosh

### Related

"XRP is Not Cer
Addresses Cryp
Criticism
(https://www.fina
is not centralize
addresses crypt
criticism/)

Tagomi: Why W
Libra Associatio
(https://www.fin
why we joined f
association/)

Stablecoin 'Rus
Crypto s Gold B
(https://www.fin
rush infinigold c
backed trend/)

Vright+https://www.financemagnates.com/cryptocurrency/interview/jimmy-

ww.financemagnates.com/cryptocurrency/interview/jimmy-nguyen-bitcoin-sv-is-

ps://www.financemagnates.com/cryptocurrency/interview/jimmy-nguyen-

ι+Craig+Wright&source=https://www.financemagnates.com)

Vright&url=https://www.financemagnates.com/cryptocurrency/interview/jimmy-

oin SV is Bigger than Craig Wright&body=Check out this article from Finance
/interview/jimmy-nguyen-bitcoin-sv-is-bigger-than-craig-wright/)

In the 10 months since it was born, the Bitcoin SV network has not been
without controversy. Over the course of a hash war
(https://www.financemagnates.com/cryptocurrency/news/nerds-
arguing-about-nonsense-how-the-bch-fork-battle-is-taking-crypto-
down/), a series of legal battles
(https://www.financemagnates.com/cryptocurrency/news/craig-
wright-losses-kleiman-case-must-turn-half-of-his-btc-holdings/), a
number of delistings
(https://www.financemagnates.com/cryptocurrency/news/about-the-
bsv-delistings-whos-gonna-pay-for-this/), and a court case over a
deceased developer's estate, the network and its creator, Craig Wright
(who also claims to be the creator of the original Bitcoin network
(https://www.financemagnates.com/cryptocurrency/education-
centre/want-see-evidence-craig-wright-satoshi-fk-off/)), have been the
center of tons of media attention.

Directory Categories
(https://directory.financemag

Cryptocurrency Brokers    31
(https://d rectory.financemagnate
brokers/)

Soc a  Trad ng    3
(https://d rectory.financemagnate
and- ncorporat on/)



At the same time, however, [text partially obscured] time, BSV was the 9th largest cryptocurrency by market cap, and the value of the BSV token was roughly $225 [obscured]. At one point of around $225, but nonetheless up from its all-time low of approximately $90. According to data from BitInfoCharts, BSV [obscured] percent of Bitcoin's average number of transactions (6,344/14,936) per hour.

London Summit 2019 Launches the Latest Era in FX and Fintech – Join Now (https://events.financemagnates.com/londonsummit2019/?
utm_source=Autolink&utm_medium=Articles&utm_campaign=FM)



Recently, Finance Magnates spoke to Jimmy Nguyen, about some of the controversies that the network has faced since it was founded as well as the technological future of the network. Nguyen is the former CEO of nChain, the company where Craig Wright (https://www.financemagnates.com/cryptocurrency/news/alleged-satoshi-had-run-ins-with-the-law-businesses-insolvent/) serves as "Chief Scientist." Nguyen is also the president of the Bitcoin Association, which brings together merchants, exchanges, application developers, enterprises, miners and other members of the Bitcoin SV ecosystem.

**"There's a recognition that BSV is bigger than Craig Wright or any one person"**

5/5/2020

In the cryptocurrency world, collaboration is extremely important—therefore, the actions of any individual member of an organization can have immediate knock-on effects on a cryptocurrency network, whether or not the actions are directly associated with the network.

So, we asked Nguyen if he believes that the most recent developments of the Kleiman case (https://www.financemagnates.com/cryptocurrency/news/craig-wright-to-challenge-kleiman-case-ruling-to-protect-his-fortune/)—in which Craig Wright is currently embroiled—have affected BSV. The Kleiman estate is suing Wright for BTC that Wright allegedly fabricated documents to gain control of (https://www.financemagnates.com/cryptocurrency/news/craig-wright-allegedly-forged-correspondences-in-kleiman-case/). The court ruled in favor of the Kleiman estate, but Wright is appealing the case. (https://www.financemagnates.com/cryptocurrency/news/craig-wright-to-challenge-kleiman-case-ruling-to-protect-his-fortune/)

Katie Ananina
@KatieAnanina

1/ K e man   Wr ght °
THE END
°08.26.2019

°°h nt: It suck$ to be CSW r ght now

1 042   4 24 PM  Aug 26 2019

274 people are talking about this

"From the [perspective of the] ecosystem of BSV–I don't think it affects BSV much. It certainly hasn't so far," Nguyen said, explaining that although the case has been ongoing and "there has been a lot of news about it, BSV's price is relatively stable."

"I think that's because there's a recognition that BSV is bigger than Craig Wright or any one person," he went on. "We are trying to scale and create the original vision for what Bitcoin is supposed to be. There's a lot of people working in the space beyond Craig."

"And–more importantly–if you look at the court order–even though Craig disagrees with it, the judge decided to find that Craig was in a partnership with Dave Kleiman. A lot of people, even if they are detractors of Craig, will acknowledge that Dave was a good person who participated in Bitcoin's early days."

"If anything, it validates that Craig was involved–if not the key member–of Bitcoin's creation," Nguyen said, reiterating that he does not believe that the outcome of the case will have a major effect on the BSV ecosystem: "we've been based on building technology–building the best, most scalable, most usable blockchain. That's the vision that people have signed onto."

FINANCE
MAGNETS

(https://www.financemagnates.com/)

NEWS (HTTPS://WWW.FINANCEMAGNATES.COM/ALL-NEWS/)
INTELLIGENCE (HTTPS://WWW.FINANCEMAGNATES.COM/INTELLIGENCE/)
EVENTS (HTTPS://WWW.FINANCEMAGNATES.COM/EVENTS/)
DIRECTORY (HTTPS://DIRECTORY.FINANCEMAGNATES.COM)
THOUGHT LEADERSHIP (HTTPS://WWW.FINANCEMAGNATES.COM/THOUGHT-LEADERSHIP/)

Contact us     News etter     Log n     Eng sh

"What happens with [...] more interest, there's a lot of positive energy [...] people like dramatic events. But as BSV, our team just keeps working and building technology and I think that's a big difference between us and other crypto camps. We're not trying to pump up hype for our coin so people buy it quickly and drive up the price—we know we have to build up organic usage and organic value by showing how its technical capacity works."

## On the delistings, several months later

While Nguyen believes that the Kleiman case won't affect the BSV ecosystem, BSV has not been completely unaffected by the consequences of Craig Wright's actions in the past.

Earlier this year, a number of exchanges—including Binance, the world's largest cryptocurrency exchange by volume—chose to delist BSV (https://www.financemagnates.com/cryptocurrency/news/binance-delists-bchsv-ceo-calls-craig-wright-a-fraud/) following Wright's decision to file several lawsuits against big-name members of the cryptocurrency community, (https://www.financemagnates.com/cryptocurrency/news/uk-judge-dismisses-craig-wrights-case-against-roger-ver/)including Ethereum creator Vitalik Buterin, who publicly denied his claim that he is Satoshi Nakamoto, the mysterious figure behind the creation of Bitcoin.



CZ Binance ◆◆◆
@cz_binance

Cra g Wr ght s not Satosh .

Anymore of th s sh!t, we de st! tw tter.com/B tco nMagaz n…

**B**itcoin Magazine    @BitcoinMagazine
An attack against one is an attack against all  #WeAreAllHodlonaut

Artwork @CryptoScamHub

5/5/2020                                                       Jimmy Nguyen Bitcoin SV Is Bigger Than Craig Wright

15K  12 45 AM  Apr  🐦 (https://twitter.com/financemagnates)  📘 (https://www.facebook.com/financemagnates)

in (https://www.linkedin.com/company/2255766/)  🔊 (https://www.financemagnates.com/feed/)

▶ (https://www.youtube.com/channel/UCaMiOoCIy0Lb_bEQ_V2kI_g/featured?view_as=public)

FINANCE
MAGNATES

(https://www.financemagnates.com/)

Contact us    News etter    Log n    Eng sh

NEWS (HTTPS://WWW.FINANCEMAGNATES.COM/ALL-NEWS/)

INTELLIGENCE (HTTPS://WWW.FINANCEMAGNATES.COM/INTELLIGENCE/)

EVENTS (HTTPS://WWW.FINANCEMAGNATES.COM/EVENTS/)

DIRECTORY (HTTPS://DIRECTORY.FINANCEMAGNATES.COM/)

THOUGHT LEADERSHIP (HTTPS://WWW.FINANCEMAGNATES.COM/THOUGHT-LEADERSHIP/)

SEARCH

At the time of the delistings, Nguyen publicly commented that the
delistings were a good thing—for Binance and Kraken, and in
the cryptocurrency space.

"The big lesson we've learned is how the cryptocurrency world as a
whole needs to grow up and professionalize. The delisting decision by
Binance and Kraken is disappointing, and I say this because it's
clear that the decision was not based on a philosophical view of the
network," Nguyen told *CoinGeek* several weeks after the delistings took
place.

"It all had to do with dislike of Craig Wright, a key backer of BSV, and
his choice to invoke legal remedies and to pursue libel claims
(https://www.financemagnates.com/cryptocurrency/news/craig-
wright-defender-of-satoshis-vision-on-social-media-warpath/) against
people who he believes have been defaming him online."

Now, looking back several months after the fact, Nguyen told *Finance
Magnates* that "certainly, it was a dramatic event at the time, and we
were not pleased that it happened. BSV's price took an immediate hit
when that happened, but it's recovered, and it's higher than it was at
the time of the delistings," which Nguyen said he believes is because of
"the organic value that's being built and demonstrated on the network
over time."

> **"As much as cryptocurrency enthusiasts [proclaim] 'oh, we
> want decentralization, no one should be in control'," the
> delistings were a demonstration of centralized power**

"I also think the situation created a learning moment for
cryptocurrency. I get it–Craig Wright is provocative," Nguyen said,
adding that "I also say that you don't change the world without being
provocative."

Suggested articles

Fund za A ow ng Less-Exper enced Traders to Jo n The r P atform   Go to art c e >>
(https://www.financemagnates.com/thought- eadersh p/fund za-a ow ng- ess-exper enced-
traders-to-jo n-the-r-p atform/)

"It means that he has taken actions and said some things that people
don't like," he continued. "But that's not the criteria that I think *any* of
us involved in the cryptocurrency space–whether you like Craig,
whether you like BSV or not–I don't think that's the criteria you want
exchanges to be using in order to determine whether to list or delist
assets–especially delisting assets
(https://www.financemagnates.com/cryptocurrency/news/about-the-
bsv-delistings-whos-gonna-pay-for-this/)."

"Keep in mind that [the] market for assets and their price," Nguyen continued. "Even if you don't like [a particular cryptocurrency exchange] [suddenly] delist an asset, you affect all of the holders and investors in the asset worldwide."

"I think that shouldn't be done capriciously," he said. "I think that it should be done based [on] a case-by-case basis. I think that if we want the world that as many people believe [cryptocurrency] 'oh, we want decentralization,' then this kind of shows you how much influence and power the exchanges have on this world, and on the price [of crypto assets]."

"So, I hope regulators are looking at that and say that it shouldn't be [so]. I hope that regulators are looking at it and saying that 'we should have more oversight over exchanges', including having rules (just like a stock exchange) over what are [appropriate] listing and delisting criteria."

Nguyen explained that these rules should include things like advance notice and justification for delisting–"because otherwise, you could harm investors worldwide, beyond just the person you don't like."

## Nguyen: BSV "will certainly overtake" BTC

Regardless of who does and does not like Craig Wright, Nguyen is extremely confident about the future of BSV.

When asked whether he thought that BTC and BSV could coexist, he replied: "one will certainly overtake the other." (Bet you can't guess which one he meant.)

"I do think the cryptocurrency world as a whole will consolidate–we live in a world with far too many cryptocurrency and blockchain projects. Our view is that the Bitcoin network is a data ledger. It should have the power to become the global public data ledger of the future. Just like we operate on a single global public internet, we believe that the world is better [off] operating on a single global blockchain."

"Because then, you don't have this interoperability questions that are coming up now–you have one chain that can support the data capacity needed for global enterprise usage."

In short, "BTC and BSV will coexist for a time," Nguyen said, although he believes that ultimately, "BSV will overtake BTC. We are the only project with the roadmap and the commitment to infinitely scale the blockchain so that it can support both the electronic cash usage of vision by Satoshi, and become this global data ledger."

Nguyen added that "there's even some talk by some people in the BSV camps about using the greater data capacity of BSV to record other blockchain projects."

(https://twitter.com/financemagnates21) (https://www.facebook.com/financemagnates)
in (https://www.linkedin.com/company/2255766/) (https://www.financemagnates.com/feed/)
FINANCE
MAGNATES (https://www.youtube.com/channel/UCqrc0wpjexhdd8bdrV6CZ_g/featured?view_as=public)

https://www.financemagnates.com/

Contact us    News letter    Log n    Eng sh

NEWS (HTTPS://WWW.FINANCEMAGNATES.COM/ALL-NEWS/)
INTELLIGENCE (HTTPS://WWW.FINANCEMAGNATES.COM/INTELLIGENCE/)
EVENTS (HTTPS://WWW.FINANCEMAGNATES.COM/EVENTS/)
DIRECTORY (HTTPS://DIRECTORY.FINANCEMAGNATES.COM/)
THOUGHT LEADERSHIP (HTTPS://WWW.FINANCEMAGNATES.COM/THOUGHT-LEADERSHIP/)
SEARCH Q

"Ethereum, for exam... Vitalik Buterin came out recently in an interview acknowledging that the Ethereum blockchain is almost full (https://hackernoon.com/vitalik-buterin-says-ethereum-blockchain-running-out-of-room-again-crawford-insider), and they're even talking about using the Bitcoin Cash chain as the temporary data storage backdrop for Ethereum," he explained.

"We think that's all... so what we're doing with BSV is building up the data capacity. "We started...with a 128mb block cap, which is 128 times bigger than BTC." In February, Nguyen said that BSV's "Genesis" upgrade will remove the block cap restriction entirely.

"It doesn't mean that you'll automatically get humongous blocks," he explained. "What is means is that market forces and miners will decide based upon market demands what the block size would be, which will allow the network to infinitely scale."

This led Nguyen to a bold claim: "if that happens, this becomes the blockchain that will power the electronic cash system of the world, it will power global blockchain applications for enterprises, and I think (overtime) will subsume all the other blockchain projects."

## Clearing up misconceptions over chain splits

However, there have been some concerns regarding the BSV blockchain's ability to scale. In late July, BitMEX Research tweeted that the BSV blockchain nodes were on three "different chains" and at "different heights" following the mining of a 210mb block.



**BitMEX Research**
@BitMEXResearch

Accord ng to 420 B tco n SV peers, the nodes are current y on
d fferent cha ns and at d fferent he ghts:

* 65% at the current t p
* 17% stuck on a arge 210MB b ock
* 19% on the o d pre-hardfork cha n



(https://twitter.com/financemagnates)  (https://www.facebook.com/financemagnates)
in (https://www.linkedin.com/company/2255760/)  (https://www.financemagnates.com/feed/)
(https://t.me/financemagnatesnews)
(https://www.youtube.com/channel/UCaMiOoCIu0Lb_bEQ_V2kI_g/featured?view_as=public)

FINANCE
MAGNATES
(https://www.financemagnates.com/)

Contact us    News etter    Log n    Eng sh

However, Nguyen said that the news cycle that followed
it (https://www.financemagnates.com/cryptocurrency/news/bitcoin-sv-bsv-
network-splits-into-3-chains-after-210mb-block-mined/)–was
misleading.

NEWS (HTTPS://WWW.FINANCEMAGNATES.COM/ALL-NEWS/)

"On July 24th, the BSV network [underwent the] Quasar upgrade,
which increased the block size to a theoretical max of 2gb [bytes].

INTELLIGENCE (HTTPS://WWW.FINANCEMAGNATES.COM/INTELLIGENCE/)
EVENTS (HTTPS://WWW.FINANCEMAGNATES.COM/EVENTS/)
DIRECTORY (HTTPS://DIRECTORY.FINANCEMAGNATES.COM/)

"What happened was that there were a minority of node operators that
did not upgrade their software to have the software that was compatible
with this hard fork upgrade," he explained, adding that there may have
been various reasons behind this decision. "Because they did not
upgrade their software, when the network upgrade happened on July
24th, they forked off into a different chain, which eventually died out
because no one was mining that chain."

THOUGHT LEADERSHIP (HTTPS://WWW.FINANCEMAGNATES.COM/THOUGHT-LEADERSHIP/)
SEARCH

"In addition to that, after the hard fork happened, there were several
256mb blocks that were mined on the BSV chain. The size of those
blocks did cause some minor issues for some of the service providers
working on the network, but those were resolved pretty quickly."

"Then, about ten days later, on August 3rd, a user that is a supporter of
BSV in China decided to do his own stress test of the BSV blockchain.
He blasted two million payment transactions on the BSV network over
a very short period of time. It led to the mining of two very large blocks,
one being 210 megabytes that contained 808,000 individual
transactions, and another 183mb block that contained over 700,000
individual transactions."

"During that stress test, some of the nodes on the network were
running on smaller hardware that wasn't able to cope with that flood of
transactions in a very short period of time. They did not create a 'third
fork', as BitMEX was improperly suggesting. They just simply stopped
working."

## Nguyen believes that Wright is Satoshi–but "it should not matter"

Does Nguyen believe that Wright is
Satoshi? "The answer is yes," he
said. "I do believe it based on my
experience and work with him."

"I also believe that at the end of the
day, it should not matter. I know
that there's huge curiosity about it,
and a lot of drama about it–I know
why he is taking steps now to try to
prove definitively to the world that he is, because he wants to claim his
legacy."

However, "for what it's worth, ... 

(https://www.financemagnates.com/cryptocurrency/news/who-cares-what-craig-wright-says-anyway/)."

# (https://www.financemagnates.com/)

Contact us      News etter      Log n      Eng sh

NEWS (HTTPS://WWW.FINANCEMAGNATES.COM/ALL-NEWS/)

INTELLIGENCE (HTTPS://WWW.FINANCEMAGNATES.COM/INTELLIGENCE/)

EVENTS (HTTPS://WWW.FINANCEMAGNATES.COM/EVENTS/)

DIRECTORY (HTTPS://DIRECTORY.FINANCEMAGNATES.COM)

THOUGHT LEADERSHIP (HTTPS://WWW.FINANCEMAGNATES.COM/THOUGHT-LEADERSHIP/)

SEARCH 🔍      in (https://www.linkedin.com/shareArticle?
mini=true&url=https://www.financemagnates.com/cryptocurrency/interview/jimmy-nguyen-bitcoi
wright/&title=Jimmy+Nguyen%3A+Bitcoin+SV+is+Bigger+than+Craig+Wright&source=https://w

📧 (https://t.me/share/url?
text=Jimmy+Nguyen%3A+Bitcoin+SV+is+Bigger+than+Craig+Wright&url=https://www.financem
nguyen-bitcoin-sv-is-bigger-than-craig-wright/)

✉ (mailto:?subject=You're going to love it: Jimmy Nguyen: Bitcoin SV is Bigger
than Craig Wright&body=Check out this article from Finance Magnates:
https://www.financemagnates.com/cryptocurrency/interview/jimmy-nguyen-
bitcoin-sv-is-bigger-than-craig-wright/)

Tags: blockchain (https://www.financemagnates.com/tag/blockchain/) / craig wright
(https://www.financemagnates.com/tag/craig-wright/) / interview
(https://www.financemagnates.com/tag/interview/) / Podcasts
(https://www.financemagnates.com/tag/podcasts/)

## We Recommend



Legend who bought Apple at
$1.42 says buy TaaS now
Empire Financial Research
(https://monivation.com/pages/have-
you-heard-of-taas?
cid=MKT450682&eid=MKT458456&obOrigUrl=true)



Coronavirus & Altcoins: Why are
Some Crypto Assets Beating
Bitcoin?
(https://www.financemagnates.com/cryptocurrency/news/coronavirus-
altcoins-why-are-some-crypto-
assets-beating-bitcoin/?
obOrigUrl=true)



Want to earn 20x more interest on
your savings? Cheok this out.
NerdWallet
(https://www.nerdwallet.com/?
utm_content=7ff905&nw_campaign_id=151010402767892900&utm_medium=ntv&utm_sou



Iran Issues License to Bitcoin
Mining Farm with 6000 Miners
(https://www.financemagnates.com/cryptocurrency/news/iran-
issues-license-to-bitcoin-mining-
farm-with-6000-miners/?
obOrigUrl=true)



Ripple Faces Another Class-
Action Lawsuit in the US
(https://www.financemagnates.com/cryptocurrency/news/ripple-
faces-another-class-action-
lawsuit-in-the-us/?
obOrigUrl=true)



Riot Blockchain Buys 1,000
Bitmain Miners for $2.4 Million
(https://www.financemagnates.com/cryptocurrency/news/riot-
blockchain-buys-1000-bitmain-
miners-for-2-4-million/?
obOrigUrl=true)

Recommended by

**Got a news tip? Let Us Know**      **Found a mistake?**
**Let us know**



## Leave a Reply

🐦 (https://twitter.com/financemagnates)   f (https://www.facebook.com/financemagnates)
in (https://www.linkedin.com/company/2255766/)   🔊 (https://www.financemagnates.com/feed/)
📢 (https://t.me/financemagnatesnews)

FINANCE
MAGNATES    Start the discussion...    ▶ (https://www.youtube.com/channel/UCaMiOoCIu0Lb_bEO_V2kI_g/featured?view_as=public)

(https://www.financemagnates.com/)

Contact us    News etter    Log n    Eng sh

✉ Subscribe ▼

NEWS (HTTPS://WWW.FINANCEMAGNATES.COM/ALL-NEWS/)
INTELLIGENCE (HTTPS://WWW.FINANCEMAGNATES.COM/INTELLIGENCE/)
EVENTS (HTTPS://WWW.FINANCEMAGNATES.COM/EVENTS/)
DIRECTORY (HTTPS://DIRECTORY.FINANCEMAGNATES.COM)
THOUGHT LEADERSHIP (HTTPS://WWW.FINANCEMAGNATES.COM/THOUGHT-LEADERSHIP/)
SEARCH  Q

F
M    (https://www.financemagnates.com)

Keep in touch with us

🐦 (https://twitter.com/financemagnates)

f (https://www.facebook.com/financemagnates)

📢 (https://t.me/financemagnatesnews)

▶ (https://www.youtube.com/channel/UCaMiOoCIu0Lb_bEO_V2kI_g/featured?view_as=public)

🔊 (https://www.financemagnates.com/feed/)

in (https://www.linkedin.com/company/2255766/)

🎙 Latest Podcasts (/tag/podcasts)

**Content Channels**

Retail FX (https://www.financemagnates.com/forex/)

Institutional FX (https://www.financemagnates.com/institutional-forex/)

Executives (https://www.financemagnates.com/executives/)

CryptoCurrency (https://www.financemagnates.com/cryptocurrency/)

FinTech (https://www.financemagnates.com/fintech/)

**About**

Overview (https://www.financemagnates.com/about/)

Keep in touch with us (https://www.financemagnates.com/about/stay-in-touch-with-us/)

Advertise with Finance Magnates (https://www.financemagnates.com/advertise/)

**Services**

Directory (https://directory.financemagnates.com/)

Intelligence (https://www.financemagnates.com/intelligence/)

Events (https://www.financemagnates.com/events/)

About (https://www.financemagnates.com/about/)

**Website**

Terms, Cookies and
Privacy Notice (https://www.financemagnates.com/terms-of-use/)

Finance Magnates is a global B2B provider of multi-asset trading news, research and events with special focus on electronic trading, banking, and
investing
Copyright © 2020 "Finance Magnates Ltd " All rights reserved  For more information, read our **Terms, Cookies and Privacy Notice (/terms-of-use/)**

**Date : 12/27/2016 12:33:11 PM**
**From : "nCrypt Stefan"** ▮▮▮▮▮▮▮▮
**To : "Jimmy Nguyen"** ▮▮▮▮▮▮▮▮▮▮
**Subject : Re: PR Firm Engagement Letter**

Long story, she worked with CSW and Dave Klieman, professes love for CSW, sees us as destroying her involvement with CSW

Sent from my iPhone

> On 27 Dec 20 6, at  6: 7, Jimmy Nguyen ▮▮▮▮▮▮▮▮ > wrote:
>
> Also who is Uyen?
>
>
>> On Dec 27, 20 6, at 5:56 PM, nCrypt Stefan ▮▮▮▮▮▮ > wrote:
>>
>> Hi Jimmy,
>>
>> Attached is the counter signed Engagement Letter for Infinite Global
>>
>> CSW has advised that he has received several emails from Uyen indicating that Reuters is planning to release a sto y on 3 Jun outing CSW along with connections to pa tners mentioned in the O'Hagan a ticle  Says they has  ,000  documents that have been "leaked" to them upon which they are basing their story
>>
>> Can you alert Infinite Global as we need to be prepared to formulate a plan and response in the event a story breaks
>>
>> I am going to be in AG from 2 Jan and CSW will also be there from 3 Jan
>>
>> Thks
>>
>> Looping Marco and A thur for awareness
>>
>> <Scan023 pdf>
>>
>>
>>
>>
>

CONFIDENTIAL

NGUYEN 000642

# EXHIBIT 15

**DEED OF LOAN**

**PARTIES**

**Design by Human Ltd (08248988) UK**
(Mortgagee)

**AND**

**Craig Wright R&D (ABN 97 481 146 384)**
(Mortgagor)

**AND**

**Denariuz Seychelles Trust**
(Guarantor)

CRAIG S WRIGHT

Confidential
Not to be disclosed.

Uyen T. Nguyen

**THIS DEED** dated 23 day of October 2012

**BETWEEN:**

Uyen Nguyen of Design by Human Ltd (08248988) UK

(Mortgagee)

And

Craig Steven Wright of Craig Wright R&D (ABN 97 481 146 384)

(Mortgagor)

And

Panopticrypt Pty Ltd for Denariuz Seychelles International Trust

(Guarantor)

### RECITALS

A.  The mortgagee has, at the request of the guarantor, if applicable, agreed to lend money (in the form of Bitcoin) to the mortgagor in accordance with and subject to the terms of this deed.

B.  The guarantor, if any, and the mortgagor acknowledge that the money referred to in this deed has been received by the mortgagor.

C.  It is noted that the Mortgagee holds a sum of Bitcoin (in wallets noted in appendix A) for a trust that wishes to extend the uptake and value of Bitcoin globally.

### OPERATIVE PART

1.  **Loan**

    (a)  The mortgagee has at the request of the guarantor, agreed to lend to the mortgagor the principal sum shown in the first schedule on the drawdown date shown in the first schedule.

    (b)  The mortgagee may at the request of the mortgagor lend further amounts of money to the mortgagor and all such amounts shall be deemed to be money lent by the mortgagee to the mortgagor pursuant to this clause provided always that the mortgagee shall not be obliged or required to lend such further money to the mortgagor hereunder.

2.  **Interest**

    The mortgagor covenants with the mortgagee to pay to the mortgagee interest in respect of the principal sum calculated in accordance with the provisions of the second schedule at the time and in the manner therein set forth and to duly

Uyen T. Nguyen

Page 1 of 7

and punctually observe and perform every other obligation contained in the second schedule.

**3. Repayment**

(a) The mortgagor covenants with the mortgagee to repay the principal sum **or so much thereof as is then unpaid to the mortgagee on the due date** shown in the first schedule.

(b) **The mortgagor further covenants with the mortgagee that the money** owing will be repaid upon written demand being made by the mortgagee **at any time after the happening of any of the following events:**

    (i) Default being made by the mortgagor in the due or punctual payment to the mortgagee of any money which comprises part of the money owing;

    (ii) The failure of the mortgagor to rectify a default in the due or punctual **observance or performance of any other obligations on the part of** the mortgagor under this deed within 7 days of being requested to do **so by the mortgagee;**

    (iii) Any collateral security or any mortgage, charge or encumbrance **ranking in priority to or pari passu with any collateral security** becoming enforceable;

    (iv) If any collateral security is or becomes wholly or partly void, voidable or unenforceable or is claimed to be so by the mortgagor; and

    (v) If any event occurs that renders a collateral security enforceable.

**4. Early repayment**

The mortgagor shall be entitled to repay the whole of the principal sum or the amount then unpaid at any time with interest to the date of repayment.

**5. Security**

(a) In consideration of the mortgagee advancing money to the mortgagor under or pursuant to this deed each of the mortgagor and the guarantor, if any, agrees to execute or upon demand from the mortgagee procure the

Uyen T. Nguyen

Page 2 of 7

execution in favour of the mortgagee of the securities referred to in the third schedule.

(b) The mortgagor and the guarantor, if any, agree that each of the securities described in the third schedule is a collateral security to the intent that the money owing is secured thereby. Default under any of the collateral securities shall constitute default under this deed.

(c) Collateral security means any mortgage, charge or other encumbrance affecting any real or personal property now in existence or which may in the future be given to the mortgagee by the mortgagor or any other person as security for the payment of the whole or any part of the money owing whether or not any other money is also secured thereby.

6. **Governing laws and jurisdiction**

The laws in force in Seychelles govern this deed.

7. **Guarantors guarantee and indemnity**

(a) The guarantor agrees that the guarantee and indemnity is a continuing guarantee, and extends to the ultimate balance owing under this deed, and that the guarantor remains fully liable under the guarantee and indemnity despite the fact that the mortgagee might have done something which may otherwise have the effect at law or in equity of varying or discharging the guarantor's liability.

(b) The mortgagee need not first exercise its rights against any of the mortgagors or against the mortgagors' security before exercising its rights under this guarantee against the guarantors

8. **Costs**

The mortgagor shall pay all costs fees and duties in relation to this deed and any collateral security.

**THE FIRST SCHEDULE**

| | |
|---|---|
| Item 1 | **Principal sum 650,000 BTC** |
| Item 2 | **Due date** 30 June 2020 |
| Item 3 | **Drawdown date 01st July 2013** |

_Uyen T. Nguyen_

**THE SECOND SCHEDULE**

**Interest only loan**

The mortgagor will pay to the mortgagee the principal sum, or so much thereof as **shall remain unpaid on 30 June 2020 and in meantime may pay multiples of BTC** 50,000 in reduction of the principal sum on any due day for payment and interest **shall reduce accordingly from the date of such partial reduction in the principal sum.**

In the meantime the mortgagor will pay interest only to the mortgagee on any amount payable under this deed at the rate of 0.05% per annum calculated on monthly rests and payable on the first day of each and every month commencing on the 30th day of July 2016 and compounding monthly from the date upon which the amount becomes due until payment. Such interest may be capitalised by the mortgagee as it deems appropriate and the mortgagor shall pay interest on the capitalised interest at the same rate and calculated in the same manner. Provided always, and it is hereby agreed and declared, that if the mortgagor shall on every day on which interest is hereinbefore made payable under this security, or within 14 days after each such days respectively, pay to the mortgagee interest on the principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum, and shall also duly observe and perform each and every covenant on the mortgagor's part herein contained or implied then the mortgagee shall accept interest on the said principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum in lieu of 0.05% per annum for every month for which such interest shall be paid to the mortgagee within such 14 days aforesaid.

The mortgagor agrees, as an independent obligation which will not merge in any judgment or order, to pay interest on any judgement or order for the payment of all or any part of the money secured at the higher of the rate payable under the judgment or order or interest calculated at the rate and in the manner set out in the preceding sub-clause.

OR

**Reducible mortgage principal and interest repayments**

Uyen T. Nguyen

Page 4 of 7

The mortgagor will pay to the mortgagee the principal sum, or so much thereof as shall remain unpaid on 30 June 2018.

In the meantime the mortgagor will pay the principal and interest on the principal sum or on so much thereof as for the time being shall remain unpaid, and upon any judgment or order in which this or the preceding covenant may become merged at the rate of 0.05% per annum as follows, namely, by equal monthly payments on the first day of each and every month in each and every year until the principal sum and interest shall be fully paid and satisfied, the first of such payments computed from 01st July 2017 to be made on 01st July 2018 next. Provided always, and it is hereby agreed and declared, that if the mortgagor shall on every day on which principal and interest is hereinbefore made payable under this security, or within 14 days after each such days respectively, pay to the mortgagee interest on the principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum, and shall also duly observe and perform each and every covenant on the mortgagor's part herein contained or implied then the mortgagee shall accept interest on the said principal sum or on so much thereof as shall for the time being remain unpaid at the rate of 0.05% per annum in lieu of 0.05% per annum for every month for which such interest shall be paid to the mortgagee within such 14 days aforesaid.

The mortgagor agrees, as an independent obligation which will not merge in any judgment or order, to pay interest on any judgment or order for the payment of all or any part of the money secured at the higher of the rate payable under the judgment or order or interest calculated at the rate and in the manner set out in the preceding sub-clause.

## THE THIRD SCHEDULE

(COLLATERAL SECURITY) First/Second mortgage over PERMANENT SUCCESS LIMITED UK being the whole of the shares comprised in UK company reference 08260048 and all related trusts.

Uyen T. Nguyen

**EXECUTED AS A DEED**

**Design by Human Ltd (08248988) UK**
(Mortgagee)

By: Uyen Nguyen
016 Lô L, cư xá Thanh Đa, phường 27, quận Bình Thạnh, Thành phố Hồ Chí Minh

**Craig Wright R&D (ABN 97 481 146 384)**
(Mortgagor)

By: Craig Wright
7 Eastgate Ave Gordon NSW 2072

**Denariuz Seychelles Trust**
(Guarantor)

**Appendix 1:**
Bitcoin block addresses transferred:

| | |
|---|---|
| **12tLs9c9RsALt4ockxa1hB4lTCTSmxj2me** | 10,000.00 |
| **1933phfhK3ZgFQNLGSDXvqCn32k2buXY8a** | 111,114.00 |
| **1FeexV6bAHb8ybZjqQMjJrcCrHGW9sb6uF** | 79,957.05 |
| **1f1miYFQWTzdLiCBxtHHnNiW7WAWPUccr** | 10,009.25 |
| **1MHdm5XZMrfoZFoUktEaGhYevmdiXoc4x4** | 12,950.00 |
| **18JPragfuDVHWWG8ABQ15cghJFetnXUJBD** | 24,404.50 |
| **1LXc28hWx1t8np5sCAb2EaNFqPwqJCuERD** | 34,512.80 |
| **1FpqQnKQCgDkJFMC94JL8FpRyHTZ3uRVZ1** | 10,689.03 |
| **1F34duy2eeMz5mSrvFepVzy7Y1rBsnAyWC** | 10,770.52 |
| **1JtpgqCf3SSeCeYWEDJjkfYFH7Ruhy4Vp1** | 10,000.00 |
| **18k9tin39LKegFzHe8rxSgvJXDpuMriGJq** | 10,000.00 |
| **1HtTw9zR9wWFfgV8Jy8MqsaeVl7ZXrjdq6** | 1,014.00 |
| **18pn4NQ7NgsJjeuFjazeTdVRnsmfw5ofTz** | 750.00 |
| **12fZ2HxkLjG9zn1u44XYsFFYKHM4A2zCea** | 23,249.04 |
| **12tkqA9xSoowkzoERHMWNKsTey55YEBqkv** | 28,150.04 |
| **16Ls6azc76ixc9Ny7AB5ZPPq6oiEL9XwXy** | 40,000.04 |
| **12HddUDLhRP2F8JjpKYeKaDxxt5wUvx5nq** | 40,000.04 |
| **1P3S1grZYmcqYDuaEDVDYobJ5Fx85E9fE9** | 50,000.04 |
| **1MyGwFAJjVtB5rGJa32M6Yh46cGirUta1K** | 30,000.04 |
| **145YHsQU7HMzkRnD5SBSuFAzQgCYnAnLkN** | 10,000.00 |
| **16TPVCpvtJ6FkV5xNKBp35aMo4BWFGxiEY** | 10,000.00 |
| **1KbrSKrT3GeEruTuuYYUSQ35JwKbrAWJYm** | 10,000.00 |
| **1FLFnbN7m5psLfvLEwYfRUUjJ34YkmV3dM** | 3,700.00 |
| **1A6SDef1TJAM8Saw2SqmqFGhkWR1y3qMx2** | 4.65 |
| **16cou7Ht6WjTzuFyDBnht9hmvXytg6XdVT** | 53,000.00 |
| **12ib7dApVFvg82TXKycWBNpN8kFyiAN1dr** | 31,000.04 |



Ugen T. Nguyen

Page 7 of 7

Consent to act

I Uyen Nguyen of:

**016 Lô L, cư xá Thanh Đa, phường 27, quận Bình Thạnh, Thành phố Hồ Chí Minh,**

Consent to act as director of the following companies from the later date of 30 June 2013:

- Design by Human Ltd (08248988) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)
- PERMANENT SUCCESS LIMITED (08260048) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)

I also accept the position of COO (Chief Operations Officer) of the following companies from 18 Oct 2012.

- Design by Human Ltd (08248988) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)
- PERMANENT SUCCESS LIMITED (08260048) UK (Dept 2, 43 Owston Road Carcroft, Doncaster, DN6 8DA)

Signed:

**From:** c [S]
**Sent:** 6/20/2015 11:33:05 AM
**To:** Craig Wright [              ]
**CC:** JLP [              ]; Stefan Matthews [              ]
**Subject:** Re: OK...finished first cut of the LoI just now

Thanks...we will help you clean this up. We are good at this sort of thing.

C...

---

**From:** Craig S Wright <              >
**Date:** Friday, June 19, 2015 at 6:18 PM
**To:** c <              >
**Cc:** Jim Philip <              >, Stefan Matthews <              >
**Subject:** RE: OK...finished first cut of the LoI just now

Explanations of other costs.

Pay out former director

- <!--[if !supportLists]--><!--[endif]-->We have a former director who is not a part of the group any more. He has back wages of $300,000
- <!--[if !supportLists]--><!--[endif]-->There are no timeframes, but he is under the R&D provisions as a carry forward cost
- <!--[if !supportLists]--><!--[endif]-->If we pay this, he will no longer be a shareholder and going forward it is all cleaner
- <!--[if !supportLists]--><!--[endif]-->The amount is already audited, but as he is an associate, we cannot claim the R&D amount until after he is paid.
- <!--[if !supportLists]--><!--[endif]-->The rebate for this would be 45% and this comes to $135,000 rebate.
- <!--[if !supportLists]--><!--[endif]-->So the overall is an upfront payment that removes him cleanly and has a longer term cost to us of $165,000

HWPE

- <!--[if !supportLists]--><!--[endif]-->The ATO have caused us pain and grief for several years now.
- <!--[if !supportLists]--><!--[endif]-->One of the earlier companies is in a deed of company arrangement.
- <!--[if !supportLists]--><!--[endif]-->By paying out any ongoing debt, we remove any challenges to the IP. Some was developed in this entity.

Accounting

- <!--[if !supportLists]--><!--[endif]-->We have around $10,000,000 more due for this year and the claim we are lodging in July 2015 for this current tax year
- <!--[if !supportLists]--><!--[endif]-->The lawyers would manage this so that any errors are fixed under privilege, leaving nothing that the ATO could use against us going forward.
- <!--[if !supportLists]--><!--[endif]-->It is not just to have the accounts audited, but also to have them cleaned up and structured in such a manner that the ATO cannot reasonably hold up anything going forth.
- <!--[if !supportLists]--><!--[endif]-->Basically this will be so we can obtain the funds and structure payments with some level of confidence going forward.
- <!--[if !supportLists]--><!--[endif]-->The $250,000 covers having the accounts cleaned going forth and also closed so that we can move on without going into all the deals I did to make this happen.

DEFAUS_01585291

- <!--[if !supportLists]--><!--[endif]-->That is, we have the books spotless but from this point on. In getting to where I am now, I have dealt with organisations such as Liberty Reserve as there was nothing else a few years back that could move large amounts of value in Bitcoin.

Explanation of lawyer costs to come. Next email

So, what I am seeking to do is have the entity as clean and polished as I can before we start going forth. I do not want to have challenges to any IP later on when things start to get big.

I want to remove any ownership from former directors before they know what it could become, so they cannot challenge anything later.

If you need anything else explained, I am open and will answer honestly and completely.

---

**From:** c [                            ]
**Sent:** Saturday, 20 June 2015 10:11 AM
**To:** Craig S Wright
**Cc:** JLP; Stefan Matthews
**Subject:** Re: OK...finished first cut of the LoI just now

Good.  Its a sunny Friday afternoon here so we will be heading out for dinner in  a bit...but we are going to be here another hour or so and would like to see this spread sheet.

C....

---

**From:** Craig S Wright <                    >
**Date:** Friday, June 19, 2015 at 5:08 PM
**To:** c <            >
**Cc:** Jim Philip <            >, Stefan Matthews <                        >
**Subject:** RE: OK...finished first cut of the LoI just now

Thanks,
I am doing up a spreadsheet now.

I will do min as well as what makes it move faster as separate lines.

---

**From:** c [                            ]
**Sent:** Saturday, 20 June 2015 10:07 AM
**To:** Craig S Wright
**Cc:** JLP; Stefan Matthews
**Subject:** Re: OK...finished first cut of the LoI just now

LoI should be here in one hour.

C...

---

**From:** Craig S Wright <                    >
**Date:** Friday, June 19, 2015 at 5:04 PM
**To:** c <            >
**Cc:** Jim Philip <            >, Stefan Matthews <                        >
**Subject:** RE: OK...finished first cut of the LoI just now

DEFAUS_01585292

I will send it to you in 15 mins

I can make the tech work :)

That is the easy part.

CONFIDENTIAL

<div align="center">**POWER OF ATTORNEY**</div>

This power of attorney is made on 22nd August 2016 by Craig Steven Wright of 7 Oak Rd, Cobham, KT11 3AZ (**Principal**).

1.    **APPOINTMENT AND POWERS**

The Principal appoints nCrypt Limited, a company incorporated in England and Wales with company number 09823112 whose registered office is at Coddan Cpm, 3rd Floor, 120 Baker Street, London, England, W1U 6TU, and its substitutes as his attorney (**Attorney**) and in the Principal's name or otherwise and on his behalf in relation to any intellectual property devised by Principal but owned by or assigned to Attorney in accordance with Principal's contract of employment with Attorney (the "**Employee IP**"):

a)  to execute any such instrument, or do any such thing, and generally to use his name for the purpose of giving the Attorney the full benefit of the Employee IP.

b)  to represent the Principal in and with respect to all matters relating to the Employee IP to the extent permitted by applicable law, including but not limited to:

i.    representing the Principal vis-à-vis governmental authorities, patent offices and other intellectual property offices;

ii.   signing patent and other intellectual property applications, extensions and other related filings;

iii.  prosecuting and/or abandoning patents and other intellectual property rights on behalf of the Principal;

iv.   representing the Principal in matters of conflicts or disputes relating to intellectual property matters; and

v.    negotiating and entering into license and/or other agreements with respect to intellectual property matters; and

c)  to take any steps or do any thing which the Attorney in its absolute discretion considers desirable in connection with the Employee IP or any of the foregoing.

2.    **DELEGATION**

The Attorney may delegate one or more of the powers conferred on the Attorney by this power of attorney and may revoke such delegation.

<div align="center">1</div>

DEF_01074241

3.    RATIFICATION

The Principal undertakes to ratify and confirm whatever the Attorney does or purports to do in good faith in the exercise of any power conferred by this power of attorney as and when requested to do so by the Attorney.

4.    VALIDITY

The Principal declares that a person who deals with the Attorney in good faith may accept a written statement signed by that Attorney to the effect that this power of attorney shall supersede, void and replace all prior and existing powers with respect to the same subject matter as conclusive evidence of that fact.

5.    PREVIOUS POWERS

This power of attorney shall supersede, void and replace all prior and existing powers with respect to the same subject matter.

6.    GOVERNING LAW AND JURISDICTION

This power of attorney and any dispute or claim arising out of or in connection with it, its subject matter or its formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the law of England and Wales. Each party irrevocably agrees that the courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this power of attorney or its subject matter or formation (including non-contractual disputes or claims).

This document has been executed as a deed and is delivered and takes effect on the date stated at the beginning of it.

2

CONFIDENTIAL

DEF_01074242

Signed as a deed by Craig Steven Wright

SIGNATURE OF PRINCIPAL

in the presence of:

SIGNATURE OF WITNESS

ALLAN P.h.D. KRSKN

NAME

UNIT 59.1

RIVERLIGHT

QUAY, VAUX HALL

ADDRESS

DIRECTOR OF PROGRAMS.

OCCUPATION

Signed on behalf of nCrypt Limited

M. FARNWORTH

NAME



CONFIDENTIAL

DEF_01074243

BAKER & MCKENZIE

# EITC Holding Ltd

## IP valuation analysis



**Draft for discussion only**

STRICTLY PRIVATE AND CONFIDENTIAL

OCTOBER 2016

© 2016 Baker & McKenzie LLP. All rights reserved.

CONFIDENTIAL

NGUYEN 000875



Draft for discussion only

# Contents

**1 | Executive summary**     **3**

Overview     4

Key results     5

**2 | Valuation analysis**     **6**

Breakeven analysis     7

Market based approach     8

Assessment framework     9

Industry top-down analysis: value per patent     10

Key observations     11

**Appendix 1**     **12**

Benchmarking analysis     13

Market multiples analysis     15

Patent valuation     17

Key sources of data     18

© 2016 NGUYEN 000876 LLP | 2



# Executive Summary

CONFIDENTIAL

© 2016 Baker & McKenzie LLP | 3

NGUYEN 000877

Draft for discussion only

# Introduction

## Overview

Baker & McKenzie LLP has been engaged by EITC Holding Ltd ("**EITC**") to help inform its management of the potential value of the blockchain technology currently being developed by the group.

We understand that EITC is seeking to market and potentially sell all, or part of, its portfolio of technology from early 2017 hence the need to understand its potential value.

This presentation summarises:

- the valuation methodologies applied and analysis performed; and

- the initial data points identified to benchmark the potential value of the blockchain IP owned (being developed) by EITC.

## Scope and Limitations

- The analysis performed has relied on information and data provided by EITC and other third parties.  We have not independently audited or otherwise verified information identified or provided to us.

- Our work will not seek to verify the validity of the technical capabilities and applications of the technology being developed by EITC.

- We do not express an opinion or offer any form of assurance regarding the accuracy of the information, financial data or its completeness.

- The analysis performed also focuses on the evaluation of the blockchain technology being developed as a standalone asset.  Specifically the work undertaken does not consider:

  - The structure of the investment and IP holding structures in place in Antigua.

  - Licensing arrangements (as we have not reviewed the group's IP holding structure).

  - Any potential retention or on-going contractual obligations of key employees.



CONFIDENTIAL

NGUYEN 000878

**Draft for discussion only**

# Key results

## Break Even Analysis

### Return on Funding



The base case scenario assumes full recovery of the funding invested by EITC.

In 2016, total funding amounted to **c.£24.5m**, EITC's expected investment into developing blockchain technology will reach **c.£35m** by 2018.

## Industry Top-Down Analysis

### Patent Valuation

Using broad industry estimates, an implied value-per-patent was calculated. This was then multiplied by the expected number of patents to be filed by EITC.

This approach is considered the *least robust valuation methodology* providing estimated values ranging from **£94m to over £2bn.**

The values are based on projected patent filings for 2017.

## Market Based Approach

### Valuation multiples



The Market Based Approach sought to identify valuations for companies operating in the blockchain space or acquisition deals of start-up companies operating in high tech industries with broadly similar commercial potential (such as artificial intelligence ("AI"))

From the transactions identified, a number of valuation multiples (e.g. value over funding investment, value per employee) were applied to benchmark and generate a range of valuations.

Valuation based on 2017 data

| Comparable Set | Data points | Min (£m) | Interquartile Range* (£m) | Max (£m) |
|---|---|---|---|---|
| Blockchain only | 7 | 31.2 | 118.5 – 353.5 | 1184.7 |
| Other high tech start ups | 8 | 143.7 | 211.0 – 382.8 | 651.2 |
| Combined Set | 15 | 31.2 | 173.5 – 358.2 | 1184.7 |

* valuation based on on EITC projected funding for 2017.

© 2016 Andersen Mckenzie LLP | 5

NGUYEN 000879



# Valuation analysis

© 2016 Baker & McKenzie LLP | 6

NGUYEN 000880

**Draft for discussion only**

## Breakeven analysis

- As a first step, the breakeven analysis is determined on the valuation required for EITC to recover its financial investment into developing its portfolio of blockchain technology.

- EITC has currently invested £24m.  It is forecast to invest up to £35m by 2018.

- It follows that EITC would need to achieve a valuation of between **£24m to £35m** to recover its investment.



© 2016 Baker & McKenzie LLP | 7

NGUYEN_000881

**Draft for discussion only**

# Market based approach

### Valuation of companies in the blockchain space

- In applying the market valuation approach, work was first undertaken to identify third party valuations of existing blockchain focused technology companies on which a valuation for EITC could be derived from.

- The research undertaken identified 7 third party valuation of blockchain companies.

### Acquisition of other new technology start-up companies

- To supplement the initial search, further research was undertaken to identify recent acquisitions of other high tech start-up companies. The research focused on areas such as AI, which like blockchain, is considered to be a relatively new area of technology with significant future commercial potential and application.

- The additional research performed identified 8 acquisitions of new technology start-up companies.

### Valuation Multiples

- Using available information around the transaction identified, various valuation multiples were then computed. In particular, based on the information available, 2 key valuation multiples were considered.

  - Value on total investment

  - Value per employee
    (Data was obtained from Linkedin where no specific number of value of employees was given to provide a range of multiples)

### Results

- The valuation multiples calculated were then applied to EITC data (e.g. funding invested to date, number of employees) to derive a valuation for EITC.
- The results (*based on 2017 financials*) are summarised below and fully detailed in Appendix 1 to this study.

| Comparable Set | Data points | Minimum | Lower Quartile | Median | Upper Quartile | Maximum |
|---|---|---|---|---|---|---|
| Blockchain only (£m) | 7 | 31.2 | 118.5 | 198.4 | 353.5 | 1184.7 |
| Other high tech start-ups (£m) | 8 | 143.7 | 211.0 | 298.1 | 382.8 | 651.2 |
| Combined set (£m) | 15 | 31.2 | 173.5 | 256.9 | 358.2 | 1184.7 |

- The range above has been calculated based on the set of valuations derived from funding multiples and best case value per employee valuations.



© 2016 Baker & McKenzie LLP | 8

NGUYEN 000882

Draft for discussion only

## Assessment framework

| Key observations | Description | Application to EITC |
|---|---|---|
| Blockchain VS Other tech acquisitions | Higher funding multiples observed in other tech acquisitions compared to blockchain comparables.<br>• 3x – 4x for blockchain companies.<br>• 8x to 13x for other tech start-ups. | • Other tech start-ups operate in more established areas of AI – which has already attracted investors such as Google and Facebook.<br>• Some tech companies are actually revenue generating e.g. Occulus.<br>• In comparison, blockchain technology is in its relatively infancy.<br>• The blockchain company valuations observed relate to companies working to solve very specific applications in the fintech world.<br>• Whilst investors may consider EITC to be comparable to the set of blockchain comparables – EITC operates under a more agnostic model.<br>• Technology being developed by EITC, whilst not focused on specific applications, may form the basis for greater wider reaching solutions. |
| Occulus provides an indication of potential maximum Max funding multiple of 20x. | Occulus develops virtual reality technology:<br>• The company was revenue generating when acquired.<br>• The group operates in a clearly defined market e.g. technology to support the growth in smart phones and other gaming and visual audio applications. | • In contrast to Occulus, EITC is:<br>• pre-revenue;<br>• nTrust is expected to be a loss maker in the near to medium term;<br>• not focused on producing fully formed solutions; and<br>• the full potential and application of blockchain tech is still developing. |
| Occulus vs DeepMind | Comparing the acquisition of Occulus and DeepMind:<br>• DeepMind achieved a greater valuation per employee than Occulus.<br>• Occulus is a much larger business – it is unlikely that all employees are key value drivers. | • DeepMind arguably is the better comparable to EITC, in so far as:<br>• it is pre revenue;<br>• it is developing technology which yet to have specific application but has wide ranging potential; and<br>• Google acquired the business in part for the strength of its research team.<br>• EITC has also assembled a team of highly skilled researchers and engineers and high profile individuals. |
| Economic history | • Underlying investment into IP acquired from the De Morgan group. | • Significant investment was made (not only financial but also man-hours) into the initial development of IP by the De Morgan group.<br>• EITC managed to acquire the IP as a distressed asset. As such, the initial investment by De Morgan into developing the IP is not fully captured in the overall acquisition price paid and subsequent funding provided by EITC. |

© 2016 NGUYEN_00883 ie LLP | 9

**Draft for discussion only**

# Industry top-down analysis: value per patent

From various industry reports, estimates for total market value and the number of blockchain patents developed were taken to derive an implied value per patent.

### World Economic Forum

- According to the World Economic Forum, the development of fintech blockchain technology attracted US $1.4bn (£1.14bn) of investment funding over the past 3 years, with over 2500 patents filed to date.

- This implies an investment per patent of £0.46m.

- Multiplying this £0.46m per patent funding value, by the investment multiples identified in the market based approach provides for an implied value per patent of between **£0.5m to £9.5m**

### Santander Market Report

- Another study by Santander estimates the potential savings in the fintech sector in the range between US$15-20bn (£12.2-16.2bn).

- Dividing this market value by the 2,500 patents noted from the World Economic Forum provides for an implied per patent valuation of between **£4.9m to £6.5m.**

### Implied Valuation

- The valuation per patent derived, were then multiplied by the number of patents to be filed by EITC.

- The number of patents EITC is expected to file are set out in the table in the below:

| 2016 | 2017 | 2018 |
|------|------|------|
| 86 | 206 | 266 |

- This approach is considered the least robust valuation methodology providing estimated values ranging from **£94m to £2bn** (based on 2017 estimated number of patents filed)

### Results

The table below shows the range of estimated values based on EITC filing **206 patents by 2017**.

Results based on World Economic Forum and Market Multiples

| Range £m | Blockchain only | Other tech start up | Combined set |
|----------|-----------------|---------------------|--------------|
| Minimum | 93.9 | 557.8 | 93.9 |
| Lower Quartile | 293.1 | 798.2 | 331.0 |
| Average | 364.9 | 1106.6 | 735.7 |
| Median | 330.6 | 1,013.2 | 654.5 |
| Upper Quartile | 371.6 | 1,282.1 | 976.1 |
| Max | 768.3 | 1,957.3 | 1,957.3 |

Results based on Santander Market Report

| Santander Valuation | Implied value of patent portfolio |
|---------------------|-----------------------------------|
| Lower estimate £m | 1,006.1 |
| Upper estimate £m | 1,341.5 |



© 2016 NGUYEN 000884 LLP | 10

**Draft for discussion only**

## Key observations

### Industry Top-Down Analysis

- This analysis provides only a broad indication of value.

- The results are based on a range of estimates from industry reports on markets that have not yet been commercialised and therefore are still highly uncertain.

- The potential of the market as noted in the industry reports only reflects a best estimate of what they believe a complete hypothetical blockchain solution could provide e.g. the associated cost savings should blockchain reduce transaction processes in the financial services industry.

- EITC is arguably one step away from producing complete solutions.

- As discussed, EITC needs a partner (e.g. Google, Alibaba, Microsoft etc) to take its work to the next level.



# Appendix

© 2016 Nguyen & McKenzie LLP | 12

NGUYEN 000886

# Benchmark analysis

## Market Multiples Approach

| | Company | Area of focus | Relative size of the Company | Year of incorporation | Funding ($m) | Implied valuation | Acquisition ($m) | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Needham Report >$50M Total Funding** | Circle | Payments, Wallet | 51-200 | 2013 | 136 | 480 | | 3.5 | 2.4 | 5.9 | 9.4 |
| | Coinbase | Exchange, Wallet, Payments, Platform | 51-200 | 2012 | 142.5 | 500.5 | | 3.5 | 2.5 | 6.2 | 9.8 |
| | Ripple | Payments, Clearing & Settlement, Private Blockchain, Software, FX, Platform | 51-200 | 2012 | 100 | 410 | | 4.1 | 2.1 | 5.0 | 8.0 |
| | Bitfury | Transaction Processing | 51-200 | 2012 | 90 | | | | | | |
| | Digital Assets Holdings | Clearing and settlement, Software, Private & Public Blockchains | 51-200 | 2014 | 67.2 | | | | | | |
| **Suggested by nCrypt** | 21.co | Full-stack infrastructure for Bitcoin | 11-50 | 2013 | 121.1 | 362 | | 3.0 | 7.2 | 20.1 | 32.9 |
| | Blockstream | Crypto currencies, open assets and smart contracts | 11-50 | 2014 | 77.3 | 77.28 | | 1.0 | 1.5 | 4.3 | 7.0 |
| | R3 CEV | Crypto, exchange and venture practice | 51-200 | 2014 | | | 200* | | 1.0 | 2.5 | 3.9 |
| **MarketLine & ADVANTAGE** | INVeSHARE | Voting technology | 11-50 | 2008 | 16.5 | | 135 | 8.18 | 2.7 | 7.5 | 12.3 |
| | Juzhen Financials | Clearing and settlement solutions | | 2014 | 23 | | | | | | |
| | Align Commerce | Global payments | 11-50 | 2014 | 20.25 | | | | | | |
| **Pre-revenue or early stage high tech potential comparable acquisitions** | Crosswise | Big data and machine learning | 11-50 | 2013 | 5 | | 50 | 10.0 | 1.0 | 2.8 | 4.5 |
| | DeepMind | Artificial Intelligence | 75 | 2010 | 50 | | 400 | 8.0 | 5.3 | 5.3 | 5.3 |
| | Magic Pony Technology | Machine Learning and computer vision techniques for video compression performance | 11-50 | 2014 | N/A | | 150 | | 3.0 | 8.3 | 13.6 |
| | Nervana Systems | Deep Learning | 51-200 | 2014 | 24.4 | | 350 | 14.3 | 1.8 | 4.3 | 6.9 |
| | Oculus | Virtual reality | 501-1000 | 2012 | 96.0 | | 2000 | 20.8 | 2.0 | 3.0 | 4.0 |
| | Otto | Self-driving technology | 91 | 2016 | N/A | | 680 | | 7.5 | 7.5 | 7.5 |
| | SwiftKey (Touchtype Limited) | Typing technology | 51-200 | 2008 | 21.6 | | 250 | 11.6 | 1.3 | 3.1 | 4.9 |
| | Turi | AI and machine learning | 11-50 | 2013 | 25.3 | | 100-200* | 5.9 | 3.0 | 8.3 | 13.6 |

NGUYEN 000887

CONFIDENTIAL

# Benchmark analysis

## Market Multiples Approach (cont'd)

| Blockchain Focused Only | | | | |
|---|---|---|---|---|
| Range | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
| Minimum | 1.0 | 1.0 | 2.5 | 3.9 |
| Lower Quartile | 3.1 | 1.8 | 4.7 | 7.5 |
| Average | 3.9 | 2.8 | 7.3 | 11.9 |
| Median | 3.5 | 2.4 | 5.9 | 9.4 |
| Upper Quartile | 4.0 | 2.6 | 6.8 | 11.0 |
| Max | 8.2 | 7.2 | 20.1 | 32.9 |
| Data Points | 6.0 | 7.0 | 7.0 | 7.0 |

| Other Tech Start-Ups | | | | |
|---|---|---|---|---|
| Range | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
| Minimum | 5.9 | 1.0 | 2.8 | 4.0 |
| Lower Quartile | 8.5 | 1.6 | 3.1 | 4.8 |
| Average | 11.8 | 3.1 | 5.3 | 7.5 |
| Median | 10.8 | 2.5 | 4.8 | 6.1 |
| Upper Quartile | 13.7 | 3.6 | 7.7 | 9.0 |
| Max | 20.8 | 7.5 | 8.3 | 13.6 |
| Data Points | 6.0 | 8.0 | 8.0 | 8.0 |

| Combined Set | | | | |
|---|---|---|---|---|
| Range | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
| Minimum | 1.0 | 1.0 | 2.5 | 3.9 |
| Lower Quartile | 3.5 | 1.6 | 3.7 | 5.1 |
| Average | 7.8 | 2.9 | 6.3 | 9.6 |
| Median | 7.0 | 2.4 | 5.3 | 7.5 |
| Upper Quartile | 10.4 | 3.0 | 7.5 | 11.0 |
| Max | 20.8 | 7.5 | 20.1 | 32.9 |
| Data Points | 12.0 | 15.0 | 15.0 | 15.0 |

© 2016 NGUYEN 000888 LLP | 14

# Benchmark analysis

## Market Multiples Analysis

**Case 2** Valuation based on blockchain companies only
Using EITC 2016 Metrics

|  | Funding | Employees |
|---|---|---|
| EITC Metrics | 24 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 24.5 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 76.4 | 64.7 | 167.9 | 271.2 |
| Average | 95.2 | 100.0 | 264.4 | 428.9 |
| Median | 86.2 | 86.4 | 212.6 | 338.8 |
| Upper Quartile | 96.9 | 93.6 | 245.6 | 397.6 |
| Max | 200.4 | 260.6 | 722.7 | 1184.7 |

**Case 3** Valuation based on other tech start-up comparables only
Using EITC 2016 Metrics

|  | Funding | Employees |
|---|---|---|
| EITC Metrics | 24 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 145.5 | 36.0 | 99.8 | 143.7 |
| Lower Quartile | 208.2 | 58.5 | 110.0 | 173.3 |
| Average | 288.6 | 111.6 | 191.7 | 271.7 |
| Median | 264.3 | 90.0 | 173.5 | 219.5 |
| Upper Quartile | 334.4 | 129.0 | 276.6 | 324.5 |
| Max | 510.5 | 269.0 | 299.5 | 490.9 |

**Case 4** Valuation based on combined set
Using EITC 2016 Metrics

|  | Funding | Employees |
|---|---|---|
| EITC Metrics | 24 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 24.5 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 86.3 | 59.3 | 132.5 | 184.2 |
| Average | 191.9 | 106.2 | 225.6 | 345.1 |
| Median | 170.7 | 86.4 | 192.0 | 269.0 |
| Upper Quartile | 254.6 | 108.0 | 269.3 | 397.6 |
| Max | 510.5 | 269.0 | 722.7 | 1184.7 |

**Case 5** Valuation based on blockchain companies only
Using EITC 2017 Metrics

|  | Funding | Employees |
|---|---|---|
| EITC Metrics | 31 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 31.2 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 97.5 | 64.7 | 167.9 | 271.2 |
| Average | 121.4 | 100.0 | 264.4 | 428.9 |
| Median | 110.0 | 86.4 | 212.6 | 338.8 |
| Upper Quartile | 123.6 | 93.6 | 245.6 | 397.6 |
| Max | 255.6 | 260.6 | 722.7 | 1184.7 |

**Case 6** Valuation based on other tech start-up comparables only
Using EITC 2017 Metrics

|  | Funding | Employees |
|---|---|---|
| EITC Metrics | 31 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 185.6 | 36.0 | 99.8 | 143.7 |
| Lower Quartile | 265.6 | 58.5 | 110.0 | 173.3 |
| Average | 368.2 | 111.6 | 191.7 | 271.7 |
| Median | 337.1 | 90.0 | 173.5 | 219.5 |
| Upper Quartile | 426.5 | 129.0 | 276.6 | 324.5 |
| Max | 651.2 | 269.0 | 299.5 | 490.9 |

**Case 7** Valuation based on combined set
Using EITC 2016 Metrics

|  | Funding | Employees |
|---|---|---|
| EITC Metrics | 31 | 36 |

| Range £m | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 31.2 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 110.1 | 59.3 | 132.5 | 184.2 |
| Average | 244.8 | 106.2 | 225.6 | 345.1 |
| Median | 217.8 | 86.4 | 192.0 | 269.0 |
| Upper Quartile | 324.8 | 108.0 | 269.3 | 397.6 |
| Max | 651.2 | 269.0 | 722.7 | 1184.7 |

CONFIDENTIAL

NGUYEN_000889

# Benchmark analysis

## Market Multiples Analysis (cont'd)

**Case 9** — Valuation based on blockchain companies only

Using EITC 2018 Metrics

| | Funding | Employees |
|---|---|---|
| EITC Metrics | 35 | 36 |

| Range Em | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| Minimum | 35.1 | 36.0 | 88.6 | 141.2 |
| Lower Quartile | 109.4 | 64.7 | 167.9 | 271.2 |
| Average | 136.2 | 100.0 | 264.4 | 428.9 |
| Median | 123.4 | 86.4 | 212.6 | 338.8 |
| Upper Quartile | 138.7 | 93.6 | 245.6 | 397.6 |
| Max | 286.8 | 260.6 | 722.7 | 1184.7 |

**Case 10** — Valuation based on other tech start-up comparables only

Using EITC 2018 Metrics

| | Funding | Employees |
|---|---|---|
| EITC Metrics | 35 | 36 |

| | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| | 208.2 | 36.0 | 99.8 | 143.7 |
| | 298.0 | 58.5 | 110.0 | 173.3 |
| | 413.1 | 111.6 | 191.7 | 271.7 |
| | 378.2 | 90.0 | 173.5 | 219.5 |
| | 478.6 | 129.0 | 276.6 | 324.5 |
| | 730.7 | 269.0 | 299.5 | 490.9 |

**Case 11** — Valuation based on combined set

Using EITC 2018 Metrics

| | Funding | Employees |
|---|---|---|
| EITC Metrics | 35 | 36 |

| | Funding multiple | Acquisition / max # employees | Average value per employee | Acquisition / min # employees |
|---|---|---|---|---|
| | 35.1 | 36.0 | 88.6 | 141.2 |
| | 123.6 | 59.3 | 132.5 | 184.2 |
| | 274.6 | 106.2 | 225.6 | 345.1 |
| | 244.3 | 86.4 | 192.0 | 269.0 |
| | 364.4 | 108.0 | 269.3 | 397.6 |
| | 730.7 | 269.0 | 722.7 | 1184.7 |

© 2016 ... LLP | 16
NGUYEN 000890

# Patent value analysis

## Valuation based on patent portfolio

| Value per patent (pre acquisition) £m | | | 0.46 |
|---|---|---|---|
| | 2016 | 2017 | 2018 |
| Patents filed by EITC | 84 | 206 | 266 |

Implied valuation based on patent portfolio (as of 2016)

| Range £m | Blockchain only | Other tech start up | Combined set |
|---|---|---|---|
| Minimum | 38.3 | 227.4 | 38.3 |
| Lower Quartile | 119.5 | 325.5 | 135.0 |
| Average | 148.8 | 451.2 | 300.0 |
| Median | 134.8 | 413.1 | 266.9 |
| Upper Quartile | 151.5 | 522.8 | 398.0 |
| Max | 313.3 | 798.1 | 798.1 |

Implied valuation based on patent portfolio (as of 2017)

| | Blockchain only | Other tech start up | Combined set |
|---|---|---|---|
| | 93.9 | 557.8 | 93.9 |
| | 293.1 | 798.2 | 331.0 |
| | 364.9 | 1106.6 | 735.7 |
| | 330.6 | 1013.2 | 654.5 |
| | 371.6 | 1282.1 | 976.1 |
| | 768.3 | 1957.3 | 1957.3 |

Implied valuation based on patent portfolio (as of 2018)

| | Blockchain only | Other tech start up | Combined set |
|---|---|---|---|
| | 121.3 | 720.2 | 121.3 |
| | 378.4 | 1030.7 | 427.4 |
| | 471.2 | 1428.9 | 950.0 |
| | 426.9 | 1308.3 | 845.1 |
| | 479.8 | 1655.5 | 1260.4 |
| | 992.1 | 2527.4 | 2527.4 |

## Santander and World Economic Forum data*

**Valuation based on patent portfolio**

| | Lower estimate | Upper estimate |
|---|---|---|
| Potential efficiency gains to financial services from blockchain £m* | 18,428 | 24,570 |

*values were converted to £ using 20-10-2016 fx rate

| Patents filed in the financial sector per World Economic Forum report | 2500 |
|---|---|

| | Lower estimate | Upper estimate |
|---|---|---|
| Implied value per patent in £m | 7.4 | 9.8 |

| | 2016 | 2017 | 2018 |
|---|---|---|---|
| Patents filed by EITC | 84 | 206 | 266 |

| | Implied value of patent portfolio | | |
|---|---|---|---|
| Range £m | 2016 | 2017 | 2018 |
| Lower estimate | 619.2 | 1518.4 | 1960.7 |
| Upper estimate | 825.6 | 2024.6 | 2614.2 |

CONFIDENTIAL

© 2016 NGUYEN 000891 ...zie LLP | 17