Sydney



BAKER & McKENZIE

# DeMorgan

## DeMorgan Group Intellectual Property Ownership Analysis [Draft 2~~1~~]

~~13 November 2015~~27 November 2015

Privileged and confidential

DeMorgan
13 November 201527 November 2015
2635814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT

i

Table of contents

Formatted: DMReference

DEF_01611949

# Table of contents

Part A - Introduction and Commentary . . . . . . . . . . . . . . . . . . . . . . . 3
1.      Introduction ........................................................... 3
    **1.1**    Introduction ................................................ 3
    **1.2**    Definitions ................................................. 3
    **1.3**    The DeMorgan Group ................................. 3
    **1.4**    Craig Wright Entities ................................. 3
    **1.5**    Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    **1.6**    Out of scope issues .................................. 4
    **1.7**    Red Flag Third Party Issues . . . . . . . . . . . . . . . . . . . 4
    **1.8**    Next steps following this report . . . . . . . . . . . . . . . . . 4
    **1.9**    Review Material .......................................... 76
    **1.10**   Reliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    **1.11**   Confidentiality............................................ 7
    **1.12**   Questions ................................................ 7
2.      Definitions .............................................................. 8
3.      The DeMorgan Group .............................................. 10
    **3.1**    Corporate structure and IP Assignments ................ 10
    **3.2**    DeMorgan Limited ..................................... 11
    **3.3**    Hotwire ................................................... 11
    **3.4**    Coin-Exch................................................ 11
4.      Craig Wright Entities ............................................... 12
    **4.1**    Craig Wright ............................................. 12
    **4.2**    Wright Family Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5.      Red Flag Third Party Issues ....................................... 13
    **5.1**    W&K . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
6.      Employees ........................................................... 1514
    **6.1**    Copyright................................................. 1514
    **6.2**    Patents.................................................... 1514

    **6.3**    Employment agreements.......................................... 1514
Part B - DeMorgan Group Entities ........................................... 1716
7.      DeMorgan Limited - overview of findings .......................... 1716
8.      Hotwire - overview of findings....................................... 2322
9.      Integyrz - overview of findings ...................................... 4542
10.     Daso - overview of findings.......................................... 5651
11.     Zuhl - overview of findings .......................................... 6156
12.     Interconnected Research - overview of findings.............. 6761
13.     Denariuz - overview of findings...................................... 7770
14.     C01n - overview of findings .......................................... 8280
15.     Chaos - overview of findings......................................... 10090
16.     Cloudcroft - overview of findings.................................... 10393
17.     Pholus - overview of findings........................................ 10494
18.     Coin-Exch - overview of findings .................................... 110100
19.     Panopticrypt - overview of findings................................. 121111
20.     DeMorgan Holdings - overview of findings..................... 134122
21.     Misfit Games - overview of findings................................. 135123
Part C - Craig Wright Entities................................................. 139127
22.     Craig Wright - overview of findings ................................. 139127
23.     Wright Family Trust - overview of findings......................... 164148

Schedule A......................................................................... 169153
DeMorgan Group Corporate Chart . . . . . . . . . . . . . . . . . . . . . . . . . 169153

Schedule B......................................................................... 170154
List of Documents Reviewed .................................................. 170154

Schedule C ........................................................................ 186167
RFI List.............................................................................. 186167

Schedule D ........................................................................ 211192
Trade Marks ....................................................................... 211192

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611950

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611951

# Part A - Introduction and Commentary

## 1. Introduction

### 1.1 Introduction

This report has been prepared for DeMorgan Limited, an unlisted Australian public company.

DeMorgan Limited's website states that the company is focussed on "alternative currency, next generation banking and reputational and educational products". A large part of DeMorgan Limited's focus to date has related to Bitcoin, and the website notes that in "the six years since the first company in the group started, we have completed several Bitcoin based research projects that have lasted over and are now ready to start commercialising". We have been instructed that the inventions and projects to date relate not only to Bitcoin itself, but also to related items such as wallets and transactions.

DeMorgan Limited is in the process of undertaking investigations to help it identify which intellectual property rights are currently owned by it, and certain related entities (being the DeMorgan Group Entities and the Craig Wright Entities each as defined below).

The purpose of this report is to assist with this process, as further detailed in this **section 1**.

Please note that a separate Draft IP Assignment Schedule Report will be provided in connection with this report as further described in **section 1.8**.

### 1.2 Definitions

Where terms or expressions beginning with a capital letter are not defined in the text of the report, they are defined in **section 2**.

### 1.3 The DeMorgan Group

A corporate chart (**DeMorgan Group Corporate Chart**) showing DeMorgan Limited and the related entities identified to us by DeMorgan Limited as owning relevant intellectual property rights (together, the **DeMorgan Group** or **DeMorgan Group Entities**) is attached at **Schedule A**.

Further relevant background regarding the DeMorgan Group is set out in **section 3** of this report.

### 1.4 Craig Wright Entities

In addition to the DeMorgan Group, we have been instructed that a number of other individuals and entities own intellectual property rights relevant to the work of the DeMorgan Group. Specifically, we have been instructed that:

(a)     much of the work undertaken by the DeMorgan Group to date has been driven by Craig Steven Wright (**Craig Wright**); and

(b)     Craig Wright has operated both in his individual capacity and also through the Wright Family Trust.

In this report, Craig Wright (in his personal capacity) and the Wright Family Trust are referred to as the **Craig Wright Entities**.

Further relevant background regarding the Craig Wright Entities is set out in **section 4** of this report.

### 1.5 Purpose

We have been instructed that the intellectual property rights arising from the projects undertaken by the DeMorgan Group and related work by the Craig Wright Entities to date (**Core IP Rights**) have developed somewhat organically over time so that the current ownership position is unclear. We have been instructed that none of the DeMorgan Group Entities or Craig Wright Entities holds any registered intellectual property rights such as trade marks, patents or designs at present, although there has been some uncertainty over the

Formatted: DMReference

CONFIDENTIAL

DEF_01611952

registered trade mark position. We have commented on this further in the report, but have for the sake of certainty run trade mark searches which indicate that no registered trade marks are currently owned by the DeMorgan Group. Details of these searches are set out in Schedule D.

The purpose of this report is therefore to identify, to the extent possible based on our review of various documents provided to us by DeMorgan Limited, the Core IP Rights that are likely to be owned by:

(a)     the DeMorgan Group Entities; and

(b)     the Craig Wright Entities.

Our findings with respect to the DeMorgan Group Entities are set out in **Part B** of this report, and our findings with respect to the Craig Wright Entities are set out in **Part C** of this report. These findings are presented at a high level in summary form to enable DeMorgan to analyse and determine its strategy with regard to next steps.

## 1.6     Out of scope issues

This report is limited to the purpose outlined in section 1.5 above.  For the sake of clarity (but without limiting the matters not covered by this report) we note that this report does not consider:

(a)     whether any of the Core IP Rights owned by the DeMorgan Group Entities or the Craig Wright Entities infringe any third party rights; or

(b)     subject to the red flag issues described in section 1.7 below, whether there are any intellectual property rights of relevance to the work of the DeMorgan Group that are owned by third parties (i.e. individuals or entities other than the DeMorgan Group Entities or the Craig Wright Entities) (**Third Parties**);

(c)     the ability of the DeMorgan Group Entities and Craig Wright Entities to enter into the IP Assignments, and the necessary steps that they may be required to take to do so.  However, we have flagged some initial relevant considerations for analysis

and discussion in this regard in section 3.1This will be the subject of further advice following this report;

(d)     any tax advice which is outside the scope of this project.  We understand that DeMorgan Limited is separately obtaining tax advice in relation to these arrangements; or

(e)     issues arising under the laws of any jurisdiction other than Australia.  Please note that this report is limited to advice on Australian law only.  We note that a number of individuals referred to in the report below have been based in the United States of America when creating Core IP Rights, and as such, there is a possibility that US law could be relevant to some limited parts of the IP analysis.  We have flagged in the report when the Review Material suggests that relevant individuals have been based in the USA.

## 1.7     Red Flag Third Party Issues

As noted above, the purpose of this report is to seek to identify the Core IP Rights currently owned by the DeMorgan Group Entities and Craig Wright Group Entities.  The report does not focus on intellectual property rights owned by Third Parties.

However, where the documentation provided to us indicates that DeMorgan Limited believes that there are Core IP Rights owned by a DeMorgan Group Entity or Craig Wright Entity, and our review of the documentation provided to us indicates a material risk that this is not the case and that the relevant rights may be owned by Third Parties, we have flagged this in the report (**Red Flag Third Party Issue**).

Further comments on the Red Flag Third Party Issues are set out in **section 5** of this report.

## 1.8     Next steps following this report

A new company, Ncrypt Holdings Ltd (IBC number 16734), has been incorporated and registered under the laws of the State of Antigua and Barbuda with its registered address c/o Offshore Management & Trust

Formatted: DMReference

DEF_01611953

Services Inc, Fitzgerald House, 44 Church Street, St John's Antigua (**New IP Co**).

Following DeMorgan ~~Limited~~'s consideration of this report, the following steps are envisaged:

(a)    ~~Subject to our comments in (c) below with respect to intellectual property rights owned by DR Technologies Ltd, y~~You have instructed us that all Core IP Rights owned by the DeMorgan Group Entities and the Craig Wright Entities will be assigned to New IP Co (**IP Assignments**).  In addition:

(i)    our expectation is that the IP Assignments will be drafted on a "blanket" basis to capture *all* intellectual property rights owned by each of the DeMorgan Group Entities and the Craig Wright Entities, but that there will be a schedule attached to each of the IP Assignments setting out a non-exhaustive list of key Core IP Rights included in the relevant assignment.  In this regard we note as follows:

(A)    As you are aware, a first draft of the Craig Wright IP Assignment has already been prepared and is intended to operate on a slightly different basis to the IP Assignments from the DeMorgan Group Entities (in that it is intended to be executed prior to completion of the Assignment Schedules referred to in paragraph (ii) below and therefore includes a process for the Assignment Schedules to be finalised as well as protections (eg warranties) as to the included rights and obligations for Craig Wright to procure necessary IP Assignments, in order to provide protection given the absence of an Assignment Schedule at the time of signing).  Given that Panopticrypt is owned by Craig Wright and

Ramona Watts, the Craig Wright IP Assignment should be extended to ensure that Craig Wright procures an IP Assignment from Panopticrypt in addition to the Craig Wright Entities.

(B)    It is envisaged that the other IP Assignments from the DeMorgan Group Entities will simply be assignments of all intellectual property rights owned by those entities, and will not include completeness warranties or similar protections.  This is because we assume it is not at this stage envisaged that recourse would be sought against the DeMorgan Group Entities at any point (if it became evident that one of the DeMorgan Group Entities did not own intellectual property rights it had previously purported to own) and, in addition, limiting each assignment only to the rights owned by the relevant entity including all intellectual property rights in a listed set of materials (rather than requiring each entity to assign a listed set of intellectual property rights which could require an entity to procure assignments from other entities) avoids any inconsistencies or uncertainties around how particular intellectual property rights are split between multiple DeMorgan Group Entities as flagged throughout this report; and

(ii)    in connection with this report, we intended to provide a separate Draft IP Assignment Schedule Report containing draft lists of the Core IP Rights likely to be owned by each of the DeMorgan Group Entities and the Craig Wright Entities.  It is intended that each of the Schedules in the Draft IP Assignments Schedule

**Formatted:** DMReference

DEF_01611954

Report will form the basis for the schedules to the IP Assignments (**Assignment Schedules**).  We have cross-referenced the various draft Assignment Schedules contained in the Draft IP Assignment Schedule Report throughout this report.  To assist with finalising the Assignment Schedules please note that we have highlighted next steps that are required to finalise the Assignment Schedules **in bold** throughout this report.

(b)      In parallel with work on this report, all employees of the DeMorgan Group have or will be moved to become employed by DeMorgan Limited with effect from 1 July 2015 (**Transfer Date**).  Employment contracts for these employees are currently being amended to ensure, amongst other things, that all intellectual property rights that arise on and from the Transfer Date vest in DeMorgan Limited (**Future IP**).

(c)      As the employees will continue to be employed by DeMorgan Limited, a licence back will be entered into between New IP Co and DeMorgan Limited to enable DeMorgan Limited to continue to use the Core IP Rights.  This licence will be limited to usage for research and development activity only, and DeMorgan Limited will not be granted rights to commercialise any of the Core IP Rights.  As we have been instructed that some employees will be transferred in coming months to a subsidiary of New IP Co in the United Kingdom (and Craig Wright will become employed by this entity in December 2015) an additional licence will be required from New IP Co to this entity.

(c)(d)      With effect from the Transfer Date, all IP created under the Research, Development and Technical Services Agreement between DeMorgan Limited and DR Technologies Ltd (Doc ID DM8) is assigned by DeMorgan Limited to DR Technologies Ltd.  This means that, to the extent it relates to the work done

pursuant to the Research, Development and Technical Services Agreement, the Future IP is, or will on creation become, owned by DR Technologies Ltd.  It is unclear if and when this part of the Future IP will be assigned to New IP Co.We have been instructed that there will be an assignment of all Core IP Rights owned by DR Technologies Ltd to New IP Co (Doc ID DM161) and that the Research, Development and Technical Services Agreement between DeMorgan Limited and New IP Co will be novated from DR Technologies Ltd to New IP Co (so that New IP Co will be the customer pursuant to that services arrangement going forwards, and will take an assignment of all of the intellectual property rights created pursuant to it).

(e)      Where a Red Flag Third Party Issue has been raised, we recommend that DeMorgan Limited consider the importance and value of the relevant Core IP Rights to which the Red Flag Third Party Issue relates and the risks associated with leaving the current position as it is.  Where the relevant Core IP Rights are of material importance to the ongoing operations of the DeMorgan Group, one possibility may be considering whether the relevant Third Party would be willing to assign the relevant Core IP Rights to New IP Co in appropriate circumstances.  If the Third Party is unwilling to do so, further consideration of the consequences of this refusal for the DeMorgan Group and DeMorgan Limited's strategy for addressing those consequences will need to be considered.  Our instructions as to DeMorgan Limited's strategy for addressing identified Red Flag Third Party Issues is set out in this report.  We note that DeMorgan Limited intends to seek separate assignments of relevant intellectual property rights from:

(i)      Uyen Nguyen (to address the Red Flag Third Party Issues identified in sections 8.3A and 11:3A); and

[Formatted: Heading 5]

[Formatted: DMReference]

CONFIDENTIAL

DEF_01611955

(d)(ii)   W&K (to address the Red Flag Third Party Issues identified in sections 22.3A to 22.3C).

(e)(f)   The Summary of Agreed Terms between DeMorgan Ltd and The Sterling Group indicates that at some point in the future, the employees currently employed by DeMorgan Limited will have their employment transferred to a new company set up for research and development purposes (**New R&D Co**). Given this may be some years away, this additional transfer, and the consequences of this for the intellectual property rights ownership position, is not considered in this report. However, we note for completeness that if this occurs, consideration will need to be given to whether the intellectual property rights created by those employees need to be assigned from New R&D Co to New IP Co.

## 1.9   Review Material

This report has been prepared based on the factual background and assumptions outlined in this section 1, and is based solely on the information that has been provided to us by DeMorgan Limited.  A complete list of the documents on which this report is based is set out in **Schedule B** and a complete list of the responses to RFIs which have been considered in the preparation of this report is set out in **Schedule C**.  We have referred to those documents and RFI responses together in this report as the **Review Material**.

Please note that we have not, at this stage, conducted independent searches (such as company searches, or IP searches) to verify the Review Material other than the trade mark searches in Schedule D and therefore this report is solely based on the Review Material and assumes that it is accurate and complete.  If there are any alterations in the factual background or Review Material, please let us know as this may alter the advice.

We also note that the Review Material contains copies of some R&D incentive claims previously made by DeMorgan Group Entities and

Craig Wright Entities.  However, we have been instructed that more R&D incentive claims have been made than those included in the Review Material.  Whilst this does not alter the ownership position with respect to the Core IP Rights subsisting in the work created in the course of the research and development activity the subject of those R&D incentive claims that have not been provided, we note that to the extent that it is possible to provide the additional R&D incentive claims, this would assist to further itemise the Core IP Rights likely to be owned by each of the DeMorgan Group Entities and Craig Wright Entities.

## 1.10   Reliance

This report is intended as an aid for DeMorgan Limited in seeking to identify the intellectual property rights most likely owned by the DeMorgan Group Entities and the Craig Wright Entities.  Please note that, given it is based only on the Review Material, and it is therefore not definitive but rather reflects the most likely position based on the Review Material only.  We therefore recommend that all IP Assignments be drafted on a "blanket" basis to capture all Core IP Rights owned by the assigning entities, with a non-exhaustive list of included Core IP Rights scheduled to each IP Assignment by way of an Assignment Schedule.

## 1.11   Confidentiality

This report contains information that is confidential, commercially sensitive and subject to legal professional privilege.  Any solicitor/client privilege is not waived or lost by reason of delivery or transmission to any person whether mistaken or otherwise.

## 1.12   Questions

If you have any questions regarding this report, please contact Adrian Lawrence (+61 2 8922 5204) or Byron Angelopulo (+61 2 8922 5395).

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611956

## 2.   Definitions

In addition to the terms defined in brackets throughout this report, the following definitions are used:

**Assignment Schedule** has the meaning given in section 1.8(a)(ii);

**Baker & McKenzie, we our, us** or **firm** means Baker & McKenzie a member firm of Baker & McKenzie International, a Swiss Verein;

**Chaos** means Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd (ACN 600516149) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Cloudcroft** means Cloudcroft Pty Ltd (ACN 149735365) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**C01n** means C01N Pty Ltd (ACN 152222421) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Coin-Exch** means Coin-Exch Pty Ltd (ACN 163338467) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Core IP Rights** has the meaning given at section 1.5;

**Craig Wright** means the individual identified at section 1.4(a);

**Daso** means Daso Pty Ltd (ACN 600512249) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**DeMorgan Group** or **DeMorgan Group Entities** has the meaning given in section 1.3;

**DeMorgan Group Corporate Chart** has the meaning given in section 1.3;

**DeMorgan Group Services Agreements** means services and consultancy agreements between DeMorgan Group Entities pursuant to which one DeMorgan Group Entity performs services for another DeMorgan Group Entity, as set out in the DeMorgan Group internal Agreements Register (Doc ID DM140) or otherwise contained in the Review Material;

**DeMorgan Holdings** means DeMorgan Holdings Pty Ltd (ACN 600655427) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**DeMorgan Limited** means DeMorgan Limited (ACN 601560525) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Denariuz** means Denariuz Pty Ltd (ACN 165471983) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Draft IP Assignment Schedule Report** means the report setting out initial drafts of each of the IP Assignment Schedules to be provided separately by Baker & McKenzie;

**Future IP** has the meaning given in section 1.8(b);

**Hotwire** means Hotwire Preemptive Intelligence Pty Ltd (ACN 164068348) of Macquarie Park, NSW 2113;

**Integyrz** means Integyrz Pty Ltd (ACN 165263007) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Interconnected Research** means Interconnected Research Pty Ltd (ACN 165472097) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**IP Assignments** has the meaning given in section 1.8(a);

**Misfit Games** means Misfit Games Pty Ltd (ACN 601677105) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**New IP Co** has the meaning given in section 1.8;

**New R&D Co** has the meaning given in section 1.8(f)1.8(e);

**Panopticrypt** means Panopticrypt Pty Ltd (ACN 151567118) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Pholus** means Pholus Pty Ltd (ACN 165472079) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226;

**Red Flag Third Party Issue** has the meaning given in section 1.7;

**Review Material** has the meaning given in section 1.9;

**Third Parties** has the meaning given in section 1.6(b);

Formatted: DMReference

DEF_01611957

**Transfer Date** has the meaning given in section 1.8(b);

**W&K** means W&K Info Defense Research LLC of 4371 Northlake Blvd #314, Palm Beach Florida 33410-6253 USA;

**Wright Family Trust** means the Wright Family Trust (noting that the ABN of the trustee for the Wright Family Trust is 72 433 066 448);

**Zuhl** means Zuhl Pty Ltd (ACN 165472006) of Unit 7, 492 Christine Avenue, Robina, Queensland 4226.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611958

# 3.   The DeMorgan Group

As noted in section 1, a corporate chart (**DeMorgan Group Corporate Chart**) showing DeMorgan Limited and the related entities identified to us by DeMorgan Limited as owning relevant intellectual property rights (together, the **DeMorgan Group** or **DeMorgan Group Entities**) is attached at **Schedule A**.  Some of the DeMorgan Group Entities are 100% owned by DeMorgan Limited.  However, some are not (for example, Coin-Exch).  In addition, whilst Panopticrypt is treated as a DeMorgan Group Entity for the purposes of internal group arrangements, it is in fact owned by Craig Wright and his wife, Ramona Watts (and therefore will not be treated as part of the DeMorgan Group for the purposes of the IP Assignments, but will be added to the list of IP Assignments that Craig Wright is to procure).

We are currently preparing advice as to the steps and documents that will need to be taken and prepared in order to undertake these transactions.

## 3.1    Corporate structure and IP Assignments

As noted in section 1.8 (Next Steps), you have instructed us that all Core IP Rights owned by the DeMorgan Group Entities and the Craig Wright Entities will be assigned to New IP Co by way of the IP Assignments once the draft Assignment Schedules have been finalised.

In addition to the IP considerations flagged throughout this report, please note that it will be necessary to also consider whether any steps are required (for instances under corporations law or from a tax perspective) in order for the DeMorgan Group Entities to transfer significant assets to New IP Co.  (Transfer of Core IP Rights by the Craig Wright Entities is a matter for such entities to consider).  This will be the subject of separate advice following this report

Whilst as noted in section 1.6 (Out of Scope Issues), such issues are outside the scope of this report, we note that, in addition to the taxation issues under consideration, next steps following this report will require consideration of the following:

(a)    It will be necessary to ensure that the directors of the various DeMorgan Group Entities are meeting their directors' duties under Australian corporations law when approving entry into the IP Assignments.  In particular, the directors are obliged to exercise their powers and discharge their duties with a reasonable degree of care and diligence (section 180, Corporations Act) and in good faith in the best interests of the corporation and for a proper purpose (section 181, Corporations Act).  This requires consideration of the interests of the shareholders as a whole, including minority shareholders.  For example, to the extent that any of the shareholders in the current DeMorgan Group Entities will not be shareholders of New IP Co, their interests will also need to be considered.  In the event that the transaction is not at fair value, this could raise issues.

(b)    You have instructed us that DeMorgan Limited is an unlisted public company.  As a public company, DeMorgan Limited will be subject to additional restrictions on related party transactions as set out in Part 2E of the Corporations Act.  DeMorgan Limited, and any entities that it controls, will be prohibited from giving a financial benefit to a related party (including directors, entities that control DeMorgan Limited and entities that are controlled by the same entity as controls DeMorgan Limited) without shareholder approval, unless an exception applies.  One relevant exception arises where the transaction is on arm's length terms.  Whilst the shareholding of New IP Co is yet to be confirmed, given we have been instructed that the Wright Family Trust currently has a 63.1% interest in DeMorgan Limited, and the Summary of Agreed Terms indicates that a 37% interest in New IP Co is intended to be held on trust for "the Wrights" via a vehicle nominated by them, there is a possibility that the transfer of the Core IP

CONFIDENTIAL

DEF_01611959

~~Rights to New IP Co could be classified as giving a financial benefit to a related party. If there is any doubt over whether relevant transactions are on arm's length terms, such transactions are permissible with shareholder approval which is often a sensible path to take in any event to avoid issues arising. The resolution is only required to be passed by shareholders holding at least 50% of the voting shares in DeMorgan Limited, although related parties to whom the resolution would permit a financial benefit to be given, and their associates, cannot vote. The shareholder meeting and voting materials must also be lodged with ASIC, who may review and comment on them.~~

~~We also note that potential insolvency/winding up issues could be need to be considered, depending on the current status of the various entities.~~

We also note that there are a number of uncertainties relating to the DeMorgan Group Corporate Chart which should be noted and clarified as these could become important for the purposes of the analysis mentioned above. We have highlighted uncertainties arising from the Review Material below.

### 3.2   DeMorgan Limited

We have been instructed that the current shareholders of DeMorgan Limited are as set out in the DeMorgan Group Corporate Chart (RFI #33). However, we have been instructed that there have also been discussions regarding a potential employee share / option issue.

We have been instructed that the "*share options have been structured, but have not been paid for or issued. They are in the system as the directors had discussed them, but we will be forfeiting most of them as they are not going to be offered to all members of staff on that list [see {RFI #2}]. We have only discussed and agreed with Allan Pedersen in terms of the share options below. Not issued, but discussed and*

*agreed. Not discussed with Ray, but we would like to have that option if possible*" (RFI #33).

~~This suggests that some commitment has been made to issue shares or options to certain employees. It is not clear when this will occur.~~

We assume that this will not be occurring prior to the IP Assignments being entered into, but **please confirm that our assumption is correct**. Please let us know if you require us to review any of the employment agreements or other arrangements with relevant employees to determine what commitments as to timing have already been given to any relevant employees We have subsequently been instructed that options have already been issued to Allan Pedersen (but are partly paid) (Doc ID DM204).

### 3.3   Hotwire

We have been instructed that Hotwire is currently in administration, but that DeMorgan Limited is currently in discussion with the expectation of communicating a proposal in relation to the Hotwire assets or business.

~~Our comments in this report are provided on the assumption~~We have been instructed that this ~~has or~~ will shortly occur, and ~~on the assumption~~ that Hotwire continues to own all Core IP Rights and that none of the Core IP Rights have been assigned or otherwise transferred to any third party in connection with the administration (Doc ID DM161). ~~If this assumption is incorrect please let us know.~~

### 3.4   ~~Coin-Exch~~

The DeMorgan Group Entity shareholding table (Doc ID DM154) indicates that the level of Craig Wright's shareholding in Coin-Exch is as set out in Schedule A (i.e. 26.5%). However, we have subsequently been instructed that Craig Wright's shares carry a "voting factor" of 10 and that this equates to 78% of the voting rights (Doc ID DM191).

**Formatted:** Font: Not Bold

**Formatted:** Font: Italic

**Formatted:** Heading 2, Space Before: 0 pt, After: 0 pt, No bullets or numbering

**Formatted:** Space Before: 3 pt, After: 3 pt, No bullets or numbering

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611960

Clause 14.3 of the Coin-Exch Shareholders Agreement (Doc ID DM194) sets out that: *"each ordinary Shareholder has a number of votes equal to the number of ordinary Shares it holds. Each Preference Shareholder (FOU) has a number of votes equal to the number of ordinary Shares that their Preference Shares may convert into (whether or not they have been converted).*

    *(a) FOU shares will be issued with 10 ordinary share votes for each Founder Class preference share.*
    *(b) Founder Shares are not transferable and convert to Ordinary shares in any of the following events:*
        *1. The death or permanent mental incapacity of the holder.*
        *2. The sale of the company or merger."*

This indicates that Craig Wright's shareholding (as a "Founding Shareholder") has voting rights equal to 10 times the number of shares that he holds. We note that the other "Founding Shareholder" under the Shareholders Agreement is Dave Kleiman (who is now deceased). According to clause 14.3(b)(1) of the Shareholders Agreement, Dave Kleiman's shares should have reverted to ordinary shares on his death. Ira Kleiman (Dave Kleiman's brother) is listed as the current holder of Dave Kleiman's shares (which as noted above, would appear to have converted into ordinary shares). However, we note there appears to be an inconsistency in the ASIC Company Extract (dated 16 July 2015) (Doc ID DM193), which lists Ira Kleiman as also holding "FOU Shares" rather than ordinary shares.

CONFIDENTIAL

DEF_01611961

## 4. Craig Wright Entities

As noted in section 1.4, much of the work undertaken by the DeMorgan Group to date has been driven by an individual called Craig Wright, who has operated both in his individual capacity and also through the Wright Family Trust.

### 4.1 Craig Wright

In addition to appearing in the Review Material in his individual capacity, we note that "Craig Wright R&D" is also listed as a party to a number of contracts.

RFI #28 indicates that Craig Wright R&D is a registered business name used by Craig Wright. As such, our understanding is that references to Craig Wright R&D should be read as references to Craig Wright in his individual capacity.

### 4.2 Wright Family Trust

We have been instructed that the Wright Family Trust was incorporated in 2013. The Trust Deed for the Wright Family Trust identifies the trustee of the Wright Family Trust as Panopticrypt. We have been instructed that this is still the case. However, there is some uncertainty surrounding the present trustee given RFI #27 notes that "Craig and Stefan are trustees of the WFT". Please confirm the current trustee.

**Formatted:** DMReference

CONFIDENTIAL

# 5.   Red Flag Third Party Issues

Red Flag Third Party Issues have been identified throughout the report.  Where a Red Flag Third Party Issue has been raised, we recommend that DeMorgan Limited consider the importance and value of the relevant Core IP Rights to which the Red Flag Third Party Issue relates and the risks associated with leaving the current position as it is.  Where the relevant Core IP Rights are of material importance to the ongoing operations of the DeMorgan Group, one possibility may be considering whether the relevant Third Party would be willing to assign the relevant Core IP Rights to New IP Co in appropriate circumstances.  If the Third Party is unwilling to do so, further consideration of the consequences of this refusal for the DeMorgan Group and DeMorgan Limited's strategy for addressing those consequences will need to be considered.

## 5.1   W&K

One key Third Party that appears a number of times in the review material is W&K.

We have been instructed (RFI #5) that W&K was an LLC incorporated in Florida, USA.  The current status of the entity is uncertain, and we have been instructed that DeMorgan is unaware of its current details or status (RFI#15).  However, we have been instructed that at some point the shareholders of W&K were as follows:

(a)     16% Craig Wright

(b)     16% Lynn Wright (Craig Wright's ex-wife)

(c)     33% Estate of the late Dave Kleiman

(d)     33% Uyen Thuc Nguyen

However, RFI #34 states that, currently, Craig Wright is only a minor shareholder in W&K and W&K has "[no] other relationship to the group".The DeMorgan Group internal agreements register (Doc ID DM141) indicates that, as at 25 July 2013, the company operated from Palm Beach, Florida, and undertook research into homeland security.

We note that amongst the documents provided, there have been differing references to W&K.  Namely:

(a)     the IP Deed of Assignment between The Wright Family Trust DeMorgan and Coin-Exch (Doc ID DM1) and IP Deed of Assignment between The Wright Family Trust DeMorgan and Hotwire (Doc ID DM2) which refer in their recitals to "W&K Information Defense LLC";

(b)     the Software Development Agreement between Craig Wright R&D/Dave Kleiman and Strasan Pty Ltd (Doc ID DM82), the Intellectual Property Licence Funding Agreement between Craig Wright of Craig Wright R&D and Dave Kleiman of W&K Info Defense LLC (Doc ID DM86) and Contract for the Sale of Shares between Dave Kleiman for W&K Info Defense LLC, Craig Wright R&D and W&K Info Defense LLC (Doc ID DM87), and the consent order in response to the Judgment of the Supreme Court of New South Wales at Doc ID DM143 which refer to "W&K Info Defense LLC"; and

(c)     the Statements of Claim at Doc ID DM141, Doc ID DM142 and Judgment at Doc ID DM 143 which refer to "W&K Info Defense Research LLC".

It is unclear whether these different references are to separate entities, or, if there is only one "W&K" entity (and all other references are intended as references to that particular entity), which is the correct entity name.We have been instructed that there is, in fact, only one W&K entity and that all of these references are intended to be references to W&K (Doc ID DM161).  This means that there are a number of errors in the documentation.  We have assumed for the purposes of this report that there is only one entity, and the correct

Formatted: DMReference

name is that provided in the Statements of Claim. ~~Please let us know~~     ~~if this is not correct.~~

Formatted: DMReference

CONFIDENTIAL                                                                                          DEF_01611964

# 6.    Employees

A number of the company summaries that follow in Part B and Part C of this report refer to ownership of intellectual property rights in work carried out by employees of the DeMorgan Group Entities.

We way of introduction we note that most of the intellectual property rights in work created by a DeMorgan Group Entity employee will have vested in that DeMorgan Group Entity on creation.  An employee may create a number of different types of intellectual property during their employment and, as a matter of law, the ownership test varies slightly between different categories of intellectual property.

Given the scope of this report as outlined in section 1, we have provided some brief comments below as to ownership of copyright and patents as the two most relevant sets of intellectual property rights under consideration here.

## 6.1    Copyright

Section 35 of the *Copyright Act 1968* (Cth) states the general proposition that the author of a literary, dramatic, musical or artistic work is the owner of any copyright subsisting in the work.

Section 35(6) of the Copyright Act sets out a key exception to the general rule in section 35 - that is, that when a literary work *"is made by the author in pursuance of the terms of his or her employment by another person under a contract of service or apprenticeship, that other person is the owner of any copyright subsisting in the work."*

This does not mean that copyright in <u>all</u> work created by employees is necessarily automatically owned by their employer, only work made "in pursuance of the terms of his or her employment".  Determining ownership of particular material will involve a factual inquiry into the particular terms of employment and whether the work in question was created by the employee acting in the course of that employment.

Some of the key factors that courts have considered when determining whether or not a particular piece of intellectual property was created in the course of employment include:

(a)    as a primary consideration, what was the employee employed to do – i.e. a careful consideration of the scope of work required of the employee pursuant to the terms of his/her employment;

(b)    to what extent was the work done in the employee's own time and for his/her own purposes;

(c)    to what extent was the work carried out during work hours; and

(d)    to what extent was the work carried out using the employer's resources.

The importance of factors (b), (c) and (d) varies depending on the particular circumstances.  However, factor (a) is a primary consideration in all cases.

## 6.2    Patents

Unlike the Australian law on copyright, there is no statutory provision granting an employer ownership in relation to patents for inventions created in the course of employment.  From an intellectual property perspective, it is therefore extremely important that employment agreements are clear in the way that they expressly deal with the issue of intellectual property ownership in relation to inventions.

## 6.3    Employment agreements

Whilst, as noted above, there will be a significant automatic assignment of at least copyright created by an employee to his or her employer, from a patent perspective specifically, but also more generally to limit disputes as to whether particular intellectual property

**Formatted: DMReference**

CONFIDENTIAL

DEF_01611965

rights created by employees are automatically assigned to an employer (as being work made pursuant to the employee's contract of employment or not), it is standard practice for employment contracts to contain a clear and express assignment of relevant intellectual property rights to the employer (alongside related protections such as moral rights consents and confidentiality obligations).

Whilst we have not received copies of past employment contracts for all DeMorgan Group Entity employees (and the contracts we have seen are unexecuted, although we have been instructed they are in final form), all of the employment contracts that we have seen have included an intellectual property assignment clause which provides comfort that all intellectual property rights in material produced during the course of, in connection with, or in contemplation of the employee's employment have been assigned. ~~Given all of the employment contracts that we have been provided with in the Review Material are on substantially the same intellectual property terms, we have assumed that~~ We have been instructed that all employees of DeMorgan Group Entities have been dealt with on the same terms (and hence that all have executed intellectual property provisions on the same basis) (Doc ID DM161). ~~Please let us know if this not correct.~~

~~However, w~~We do note that there are some risks with the current clause.  In particular, it does not contain any moral rights consents and it is not drafted as broadly as it ideally would be (for instance it does not expressly include the right to apply for relevant intellectual property rights, and whilst it expressly includes work directly produced at the employer's direction during business hours or on the employer's property, this express inclusion could perhaps raise questions over whether it is intended to include work carried out remotely or outside business hours or at the direction of other entities in the DeMorgan Group).

As you are aware, we are currently seeking to rectify this with current employees by replacing the intellectual property rights assignment

clause in their employment contracts with a broader assignment of all past and future Core IP Rights.

Despite the risks identified above, we have proceeded, for the purposes of this report, on the basis that all Core IP Rights have been assigned from employees to their relevant DeMorgan Group Entity employer[1].  However, whilst the risks here are relatively limited, DeMorgan should note that, to the extent that the clause is not replaced, some risk will remain (and that this will also be the position for any non-current employees who were only signed up to the old terms).

---

[1] We also that the R&D applications made by DeMorgan Group Entities that have been provided, in many instances, identify certain numbers of R&D "employees" on the relevant DeMorgan Group Entity applications in circumstances where we have been instructed that the relevant DeMorgan Group Entity never had any employees. However, you have instructed us that these references are simply to the number of individuals working on the projects of that DeMorgan Group Entity (eg under DeMorgan Group Services Agreements) not the number of employees of the actual DeMorgan Group Entity making the relevant application (RFI#71).  We have therefore disregarded these inconsistencies for the purposes of this report.

**Formatted:** DMReference

CONFIDENTIAL

# Part B - DeMorgan Group Entities
# 7.   DeMorgan Limited - overview of findings

| DEMORGAN LIMITED | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 1.  Overview of company role | **7:1A**<br><br>DeMorgan Limited is the head company in the DeMorgan Group.<br><br>However we have been instructed that, as at the Transfer Date, DeMorgan Limited had no employees, no contractors and had undertaken no R&D activity (RFI #6).<br><br>This position changed on the Transfer Date when certain employees from the DeMorgan Group were verbally "transferred" to become employed by DeMorgan Limited (with this "transfer" currently being documented in writing). | It appears likely that very limited, if any, Core IP Rights were owned by DeMorgan Limited prior to the Transfer Date but that this position changed on and from the Transfer Date when DeMorgan Limited employed its first employees.<br><br>However, there are a number of uncertainties with this position as outlined in sections 7:2, 7:3 and 7:4 below. |
| 2.  Summary of IP likely to be owned by the company[2] | **7:2A**<br><br>Pre-Transfer Date<br><br>The Review Material does not identify any Core IP Rights owned by DeMorgan Limited as at the Transfer Date.<br><br>**7:2B**<br><br>On and from Transfer Date<br><br>There may be some Future IP owned by DeMorgan Limited arising from the work of employees who have been employed by | **Pre-Transfer Date**<br><br>Whilst no Core IP Rights have been identified, we recommend obtaining a blanket IP Assignment for completeness, particularly given the uncertainties noted in section 7.4.<br><br>**On and from Transfer Date**<br><br>Residual Future IP (i.e. Future IP since the Transfer Date including Future IP that arises going forwards, other than the Future IP transferred to DR Technologies Ltd) to be assigned by DeMorgan Limited to New IP Co. |

---

[2] A draft Assignment Schedule for the DeMorgan Limited IP Assignment is set out in Schedule A of the Draft IP Assignment Schedule Report.

DeMorgan                                          18                    Wright Family Trust - overview of findings
13 November 201527 November 2015
26358l4-v1SYDDMS26358l4-v1SYDDMS_DRAFT

Formatted: DMReference

CONFIDENTIAL

DEF_01611967

| DEMORGAN LIMITED | COMMENTS REGARDING APPROACH |
|---|---|
| DeMorgan Limited since the Transfer Date, but only to the extent that it is not created under the Research, Development and Technical Services Agreement between DeMorgan Limited and DR Technologies Ltd (Doc ID DM8) described at section 7:4A below. | **This has been added to the draft Assignment Schedule in Schedule A of the Draft IP Assignment Schedule Report.** |
| Note that the Summary of Agreed Terms between DeMorgan Limited and The Sterling Group appears to anticipate that most, if not all, work done by the employees since the Transfer Date will be done under the Research, Development and Technical Services Agreement between DeMorgan Limited and DR Technologies Ltd (Doc ID DM8) stating that "IP and technology development done during this period will accrue under the agreement to DRTL". This may mean that the residual Future IP that remains owned by DeMorgan Limited is quite limited. | |

**3. Red Flag Third Party Issues**

**7:3A**

None identified in the Review Material. However, note DR Technologies Ltd ownership of some Future IP as referenced below.

N/A.

**4. Other issues to note**

**7:4A**

DR Technologies Ltd

To the extent that Future IP is, or has been, created under the Research, Development and Technical Services Agreement between DeMorgan Limited and DR Technologies Ltd (Doc ID DM8) it will be assigned to DR Technologies Ltd.

In addition to the assignment, we note that there is a licence back from DR Technologies to DeMorgan Limited for the purposes of performing the relevant services (which cannot be assigned or sublicensed without consent).

Query whether there will be an assignment of this Future IP from DR Technologies Ltd to New IP Co, or whether there is an intention for this Future IP to remain owned by DR Technologies Ltd. To be discussed We have been instructed that there will be an assignment of all Core IP Rights owned by DR Technologies Ltd to New IP Co (Doc ID DM161) and that the Research, Development and Technical Services Agreement between DeMorgan Limited and New IP Co will be novated from DR Technologies Ltd to New IP Co (so that New IP Co will be the customer pursuant to that

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814 v1SYDDMS2635814 v1SYDDMS  DRAFT
19
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611968

| DEMORGAN LIMITED | COMMENTS REGARDING APPROACH |
|---|---|
| | services arrangement going forwards, and will take an assignment of all of the intellectual property rights created pursuant to it). |
| | Please note that the copy of the Research, Development and Technical Services Agreement that we have been provided with has not been executed by DR Technologies Ltd. We have assumed that it was executed in the form provided. **Please let us know if that is not correct.** However, we have been instructed that this document was fully executed in the form provided (Doc ID DM161). |
| | For present purposes, we assume that only DeMorgan Limited is performing services under the Research, Development and Technical Services Agreement. We note for completeness that if there is any further restructuring, such that any other entities undertake services for DR Technologies, the scope of the licence back will need to be considered (noting that consent is required for any sublicensing). |

**7:4B**

DeMorgan Group Services Agreements

We have been instructed that DeMorgan Limited has never undertaken any R&D activity prior to the Transfer Date and had no employees or contractors prior to that time (RFI #6).

However, despite this, we note that DeMorgan Limited is party to a number of the DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM 140) indicates that "DeMorgan" receives services under Consultancy

Given the statement that DeMorgan Limited has not undertaken any R&D activity prior to the Transfer Date (and had no employees or contractors), it appears unlikely (if not impossible) that any work of any significance has been carried out under these services agreements. However, the mere fact that they exist raises a question over why they were put in place if no work was carried out.

DeMorgan Limited should confirm that We have been instructed that no research or development work has

| Formatted: Font: Not Bold |
|---|
| Formatted: Font: Not Bold |
| Formatted: DMReference |

DEF_01611969

| DEMORGAN LIMITED | COMMENTS REGARDING APPROACH |
|---|---|
| Agreements with Integyrz (Doc ID DM38), Interconnected Research (Doc ID DM35), Panopticrypt (Doc ID DM28) and Pholus (Doc ID DM14).  Those Consultancy Agreements confirm that these arrangements are with DeMorgan Limited as services recipient. | been carried out under the Consultancy Agreements between DeMorgan Limited and Integyrz, Interconnected Research, Panopticrypt and Pholus (Doc ID DM161) or, otherwise, provide details of the work that was carried out. |

In addition, Doc ID DM58 – Doc ID DM70 comprise Business Service and Management Agreements between DeMorgan Group Entities as listed below, in which DeMorgan Limited is engaged by the relevant "Company" to provide services related to the management of the Company's technology research business ("Business"), namely:

- to provide all employees during the term whether full or part time as is reasonably required in order to properly and efficiently conduct the Business;
- to engage consultants and independent contractors from time to time to provide services for the conduct of the Business;
- to administer and manage all aspects of the Business during the term;
- to provide advice to the Company on all matters relating to the day to day conduct of the Business during the term;
- to maintain and keep in good repair all the chattels and leased equipment during the term and employ such persons as may be required to carry on such work; and
- to make recommendations to the Company concerning acquiring further chattels or leased equipment.

We note that none of the agreements contain any provisions relating to IP including any assignment or licence of IP which may be created pursuant to those Business Service and Management Agreements.  There is a definition of "Intellectual Property" but no intellectual property rights provisions or references beyond that definition.

**Comments column (right):**

As such, the Consultancy Agreements should not have a material impact on the ownership position with respect to the Core IP Rights.

Similarly, DeMorgan should confirm that We have been instructed that no work has some very minor administrative work has been carried out under the various Business Service and Management Agreements with DeMorgan Holdings, Chaos, Coin-Exch, C01n, Cloudcroft, Daso, Panopticrypt, Denariuz, Misfit Games, Pholus, EZAS Pty Ltd, Zuhl and Interconnected Research (Doc ID DM161).  We note that this appears inconsistent with the instructions that DeMorgan Limited has not had any employees or contractors prior to the Transfer Date, as noted in section 7.1A above.

If work was carried out under these Agreements, it is likely that the Core IP Rights in that work product will be owned by DeMorgan Limited in which case they should be added to the Assignment Schedule for the DeMorgan Limited IP Assignment (and could impact other sections of this report below) It is therefore uncertain who has been carrying out these "minor administrative services" on behalf of DeMorgan Limited under these Business Service and Management Agreements.  However, regardless of the answer to this, if this work was purely "minor administrative work" it is unlikely to materially alter the ownership position with respect to the Core IP

**Right margin formatting boxes:**

Formatted: Font: Not Bold
Formatted: Font: Not Bold
Formatted: Font: Not Bold
Formatted: Font: Not Bold
Formatted: DMReference

CONFIDENTIAL

DEF_01611970

| DEMORGAN LIMITED | COMMENTS REGARDING APPROACH |
|---|---|

**List of Business Service and Management Agreements**

Business Service and Management Agreement between DeMorgan Limited (Manager) and the following DeMorgan Group Entities as service recipients (Company):

- DeMorgan Holdings
- Chaos
- Coin-Exch
- C01n
- Cloudcroft
- Daso
- Panopticrypt
- Denariuz
- Misfit Games
- Pholus
- EZAS (as noted in section 7:4D below)
- Zuhl
- Interconnected Research

**COMMENTS REGARDING APPROACH**

Rights. We have been instructed that this work has been limited to office work such as paying bills (Doc ID DM205) and as such seems unlikely to have a material impact on the ownership position.

As such we do not propose taking any particular steps with respect to these intellectual property rights, but rather relying on the "blanket" nature of the IP Assignment from DeMorgan Limited to capture any minor rights that do exist.

We note for completeness that the DeMorgan Group internal Agreements Register at Doc ID DM140 indicates that the Consultancy Agreements with "DeMorgan" each appear twice in the DeMorgan Group internal Agreements Register at Doc ID DM140, but as only one Consultancy Agreement with DeMorgan Limited has been provided in each case. We have been instructed that this was an error in the DeMorgan Group internal Agreements Register, and that there is only one Consultancy Agreement in each case (Doc ID DM161). we have assumed that this is an error. Please let us know if that is not correct.

**7:4C**

Other DeMorgan Group Services Agreements

The DeMorgan Group internal Agreements Register (Doc ID DM140) notes that there could be other DeMorgan Group Services Agreements other than those listed in the register. This is headed "Others (TBD)".

The only contract listed under this heading at present is a draft

We have assumed been instructed that the draft Business Service and Management Agreement between "DeMorgan and Hotwire" never came into effect since it is listed as a draft only (Doc ID DM161). Please let us know if our assumption is incorrect.

We have also assumed been instructed that, despite this section of the DeMorgan Group internal Agreements Register (Doc ID DM140) being marked "TBC" that there

DeMorgan
13 November 201527 November 2015
26365R14 v1SYDDMSDR35314 v1SYDDMS  DRAFT
23.
Wright Family Trust - overview of findings

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611971

| DEMORGAN LIMITED | COMMENTS REGARDING APPROACH |
|---|---|
| Business Service and Management Agreement between "DeMorgan and Hotwire".  No further information has been provided regarding this contract. | are no other DeMorgan Group Services Agreements other than as set out in the DeMorgan Group internal Agreements Register Doc ID DM140 or otherwise provided and listed in section 7:4B above.  ~~Please let us know if our assumption is incorrect.  Please note that if there are other DeMorgan Group Services Agreements other than those listed, this could impact other sections of this report.~~

As such, these documents appear unlikely to have an impact on the ownership position for the Core IP Rights. |

**7:4D**

<u>EZAS</u>

We have been provided with a copy of a DeMorgan Group Services Agreement between a company called EZAS Pty Ltd and DeMorgan Limited (Doc ID DM68).  However, we have been instructed that this agreement can be ignored as EZAS Pty Ltd *"was formed with the intend to use for a specific area of R&D but nothing ever happened. The entity was never assigned any IP, never undertook any R&D (or any other activity), no staff, no consultants.  EZAS is a non-trading shell.  The intent was that it would be a 100% subsidiary of DeMorgan Ltd"*.

We note that the Business Service and Management Agreement defines "Intellectual Property" but contains no intellectual property rights provisions or references beyond that definition.

Whist the current status of EZAS Pty Ltd is unclear, if it is correct that it has never been operational in any way (and that no work has ever been carried out under the Business Service and Management Agreement) this is unlikely to impact the ownership position with regard to any Core IP Rights.

CONFIDENTIAL

DEF_01611972

## 8.   Hotwire - overview of findings

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| **1.   Overview of company role** | **8:1A**<br><br>Business<br><br>The primary business of Hotwire relates to education and training, and in particular an eLearning Platform (DeMorgan Group Entity shareholding table at Doc ID DM154).<br><br>**8:1B**<br><br>Volume of likely Core IP Rights<br><br>In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):<br><br>• Hotwire has employed a number of individuals in the past but has not had any employees since May 2014.  A list of past Hotwire employees is set out in Doc ID DM153.  It appears from this document that the majority of past employees within the DeMorgan Group were employed by Hotwire.  All Hotwire employees were located in Australia.<br>• Hotwire has also engaged individual contractors in both Australia and the USA.<br>• Hotwire has filed a number of R&D incentive claims (and intended to do so again in the 2015 financial year) which suggests that it has been carrying out significant R&D activity. | At a general level, for completeness, Hotwire's work relating to an eLearning Platform should be captured in the IP Assignment from Hotwire.<br><br>**We have added this into the draft Assignment Schedule in Schedule B of the Draft IP Assignment Schedule Report.**<br><br>It appears possible that a significant amount of R&D activity has occurred via Hotwire, particularly given this appears to be where the majority of the employees within the DeMorgan Group were employed, and as such Hotwire could own significant Core IP Rights. However, there are a number of uncertainties surrounding this as noted in sections 8:2, 8:3 and 8.4 below. |
| **2.   Summary of IP likely to be** | **8:2A** | Subject to our comments in section 6 above, it is likely that the intellectual property rights in work carried out by |

DeMorgan
13 November 201527 November 2015
2636814 v1SYDDMS2636814 v1SYDDMS   DRAFT
24
Wright Family Trust - overview of findings

Formatted: DMReference

   DEF_01611973

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| **owned by the company**[3] Employee created material (generally) As noted above, the response to the initial information request at Doc ID DM152 indicates that Hotwire has, in the past, employed a relatively significant number of employees.  A list of past Hotwire employees is set out in Doc ID DM153. However, there is ~~has been~~ some uncertainty over whether that list is accurate.  Whilst we do not have employment contracts for all past DeMorgan Group employees, a number of the employment contracts that we have been provided with are for employees listed on the Hotwire employee list in Doc ID DM153.  The uncertainty ~~arises~~ arose because most (but not all) of these employment contracts are in the name of Interconnected Research and <u>not</u> Hotwire (as employer) including the employment contracts for:<br><br>• Olga Kuznetzova<br>• Trupti Birje<br>• Nicholas Desmond<br>• Stefane Savannah<br>• Allan Pederson<br><br><u>We have subsequently been instructed that the reason for this is that due to the Hotwire administration (as noted in section 3.3) Hotwire employees became employed by Interconnected Research, and the employment contracts provided are those contracts with Interconnected Research not the original employment agreements with Hotwire (Doc ID DM205).</u> In addition, whilst Doc ID DM152 (response to initial information request) states that the only contractors used to undertake work for Hotwire ~~work~~ are the individuals listed in section 8:3A below, Doc ID | Hotwire employees vested on creation in Hotwire. ~~However, there is a question over whether employees on the Hotwire employee list were, in fact, actually employed by Interconnected Research.  In addition, as noted, there is some uncertainty over whether some of the Hotwire work has been outsourced to Interconnected Research without any written contract documenting this arrangement.~~  <u>As noted, we have been instructed that a number of Hotwire employees became employed by Interconnected Research (Doc ID DM205).  The employment contracts that we have seen in this regard are dated in September or October 2014.  We note that, as noted in section 8:1B, we have been instructed that Hotwire has not had any employees since May 2014 (leaving a gap of 4-5 months here).</u>  This gives rise to a risk that <u>if those employees continued performing work for Hotwire after that time,</u> the Core IP Rights identified in sections 8:2B and 8:2C below: <u>(1) to the extent created after these individuals were employed by Interconnected Research,</u> are actually owned in part or in whole by Interconnected Research (rather than Hotwire) because they were created by Interconnected Research employees (rather than Hotwire employees) and because there was no written assignment of those intellectual property rights from Interconnected Research to Hotwire<u>; and (2) to the extent created during the "gap", are actually owned by the relevant individuals.  However, we have been instructed that despite the</u> |

---

[3] A draft Assignment Schedule for the Hotwire IP Assignment is set out in Schedule B of the Draft IP Assignment Schedule Report.

Formatted: DMReference

DEF_01611974

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

DM102 (a Hotwire R&D Tax Incentive Application in relation to certain technologies related to its automated self matching learning system) indicates that work carried out by Hotwire included work outsourced to Interconnected Research. ~~No contract has been provided to us for this, and there has been no reference to such an arrangement in any of the other Review Material. However, if this were correct, we suggest that this could be consistent with the proposition that many of the listed individuals who "worked for Hotwire" as set out in the list of past Hotwire employees (Doc ID DM153) were in fact employed by Interconnected Research~~However, we have been instructed that, despite this reference, Hotwire in fact never outsourced any work to Interconnected Research (Doc ID DM161).

Finally, we note that Doc ID DM102 (a Hotwire R&D Tax Incentive Application in relation to certain technologies related to its automated self matching learning system), in addition to the reference to outsourcing to Interconnected Research, also refers more generally to collaboration with unspecified research organisations (with references to some projects being contracted to another type of publicly funded research organisation, to a research service provider and to another type of private research organisation). ~~We assume that these various references to unspecified research organisations are, in fact, intended to be references to Interconnected Research (given no other third party is referred to as providing services to Hotwire in any of the other Review Material). However, as noted in our comments to the right, this should be confirmed.~~Despite this, we have been instructed that no Hotwire work has ever been performed by any contractor other than as set out in section 8:3A below (Doc ID DM161).

reference to outsourcing to Interconnected Research and other unspecified research organisations in Doc ID DM102, Hotwire in fact never actually outsourced any work to Interconnected Research or any other third party (Doc ID DM161). Further, we have been instructed that there are no contractors to Hotwire other than as set out in section 8:3A below which suggests that no other individuals have performed work other than pursuant to an employment relationship.

**At this stage,** given it appears from these instructions that the work for Hotwire was primarily carried out by employees of the DeMorgan Group whilst such individuals were employed by Hotwire, **we have** ~~therefore~~ **included the IP identified in section 8:2B and 8:2C below in** ~~square brackets in both~~ **the draft Assignment Schedule for Hotwire in Schedule B of the Draft IP Assignment Schedule Report.** However, due to the risk that some of this work could have occurred after those individuals became employed by Interconnected Research, as well as we have (for the sake of completeness) included a reference to the Core IP Rights in such work in **the draft Assignment Schedule for Interconnected Research in Schedule B of the Draft IP Assignment Schedule Report.** We have drafted this only to catch such Core IP Rights to the extent they are in fact owned by Interconnected Research (due to this change in employment status). We note that to the extent relevant individuals performed work during the "gap" period, and are signing up to the new employment terms, this should help to

> **Formatted:** Font: Bold

> **Formatted:** DMReference

CONFIDENTIAL

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| | strengthen the IP position for such individuals further (but will obviously not assist with any individuals who are no longer employees). |
| | ~~We recommend that Hotwire and Interconnected Research check their records to confirm: (1) whether the individuals listed in the list of past Hotwire employees at Doc ID DM153 as Hotwire employees were in fact Hotwire employees or Interconnected Research employees; (2) whether Hotwire has outsourced any work to Interconnected Research; and (3) whether there is a written services agreement between Hotwire and Interconnected Research. This will assist with determining whether the relevant Core IP Rights are currently owned by Hotwire, or Interconnected Research, or potentially both entities.~~ |
| | As the Review Material does not contain a full list of employees, or a full copy of employment contracts, please note that we have assumed that there are no other inconsistencies other than as provided. However, if this assumption is incorrect, it is possible that this could alter the ownership position of relevant Core IP Rights. |
| | ~~In addition, as noted, we have assumed that all of the references to third party input into Hotwire's research and development activity in Doc ID DM102 (a Hotwire R&D Tax Incentive Application in relation to certain technologies related to its automated self matching learning system) are references to Interconnected Research. Please let us know if this assumption is incorrect. If this is incorrect, and Hotwire work has~~ |

**Formatted: DMReference**

CONFIDENTIAL

DEF_01611976

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| | ~~been performed by other third parties, this will need to be investigated separately. Further, if any of those references are to other third parties outside the DeMorgan Group, this raises a risk of Red Flag Third Party Issues with regard to the Hotwire Core IP Rights.~~ |

**8:2B**

<u>Employee created material (category 1)</u>

The list of previous Hotwire employees at Doc ID DM153 indicates that the Hotwire employees have been engaged in working on the following:

- "IT infrastructure proof-of-concept platform;"
- "P-20140307-IT-Pholus-DC-Hotwire 2014";
- "P-20130005-Denariuz-Core-Banking";
- "P-20130006-Denariuz-Exchange-Server";
- "P-20140002-Hierarchical-Deterministic-eWallet";
- "P-20140003-Sochi-Bitcoin-Management-System";
- "P-20130001-Genoa-eWallet";
- "P-20130004-Beijing-eRedPacket";
- "P-20140004-Denariuz-eWallet";
- "Load Test and Distributed data design (Registration)";
- "Course Structuring";
- "P-20130002-Socrates-Adaptive eLearning (Phase 1)"; and
- "P-20130007-Plato-eLearning-Phase 2".

On its face, some of the listed work appears to be work for other DeMorgan Group Entities (eg work for Pholus or Denariuz). However, Hotwire is not listed as a party to any of the DeMorgan Group Services Agreements other than the agreement with Coin-Exch referred into in section 8:4A below and Doc ID DM152 (response to initial information request) indicates that Hotwire has not assigned any intellectual property rights to any third party other than the assignment of intellectual property rights to Coin-Exch (as noted in section 8:4A below).

It therefore appears from the Review Materials that the Core IP Rights in this work were created by Hotwire employees (subject to our comments in 8:2A) and have not been assigned to any other DeMorgan Group Entity.

Please therefore see our comments above in section 8:2A (as to employee created material (generally)) as to next steps regarding these Core IP Rights.

> **Formatted:** DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~26308~~14-v1\SYDDMS 26308314-v1\SYDDMS   DRAFT
28
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611977

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

**8:2C**

Employee created material (category 2)

Hotwire has filed a number of R&D incentive claims which give further detail regarding the work undertaken by the company.

The Hotwire Tax Incentive Application (2012-2013) (Doc ID DM129) and the Hotwire R&D Tax Incentive Application in relation to certain technologies related to its automated self matching learning system (Doc ID DM102) together refer to the following Hotwire projects (in summary):

- "Training B: Automated self matching learning system"
- "Core - Develop and tune Initial System and Software Engine"
- "Security N: Preemptive Security and Learning System"
- "Core - Collection system"
- "Load Test and Distributed Data Design"
- "Building a system to manage data analytics"
- "Building a system to store all the relevant data"
- "Testing of the combined data system"
- "Building a system to store all the relevant data"
- "Development of search and structure algorithms (Development of adaptive algorithms)"
- "Course development"

**8:2D**

Core IP Rights assigned to Hotwire by "Craig Wright R&D"

Doc ID DM152 (response to initial information request) states that IP has been assigned to Hotwire by "Craig Wright R&D" under a

Please see comments above in section 8:2A (as to employee created material (generally)) as to next steps regarding these Core IP Rights.

~~It is currently unclear what this document is.~~We were not provided with a copy of this assignment.

However, we have subsequently been instructed that ~~One possibility here is that~~ the reference in Doc ID DM152 (response to initial information request) which, in

Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814 v1\SYDDMS~~2635814 v1\SYDDMS   DRAFT
29
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611978

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| Deed of Assignment dated 1 July 2013. | full reads: |
| However, no copy of this assignment has been provided. | "Deed of Assignment (Craig Wright R&D) 1 July 2013 |

IP Deed of Assignment (Wright Family Trust for DeMorgan) 15 Sept 2013"

which could be a~was in fact an incorrect reference to the fact that the Core IP Rights the subject of the IP Deed of Assignment (Wright Family Trust for DeMorgan) referred in section 8:3C below were previously assigned from Craig Wright to the Wright Family Trust on 1in July 2013 (i.e. this is a "background assignment" to the document referred to in section 8:3C). However, if this were the case, the date reference appears to be an error given our understanding that the "background" assignment is in fact Doc ID DM 148, being a Deed of Assignment from Craig Wright to the Wright Family Trust datedThe error related to the date, which should have read *15* July 2013 (i.e. the Deed of Assignment from Craig Wright to the Wright Family Trust dated 15 July 2013 Doc ID DM148).

Please provide a copy of the Deed of Assignment from Craig Wright to Hotwire dated 1 July 2013 or confirm that the reference in Doc ID DM152 (response to initial information request) was an error and was intended to simply be a reference to Doc ID DM 148.Please see our comments in section 23:3A regarding that document.

Formatted: Font: Not Bold

**8:2E**

<u>Assignment to Hotwire by C01n</u>

The response to the initial information request (Doc ID DM152)

There is some uncertainty over whether this document constitutes an assignment of intellectual property rights (and if so, which rights and which party took the

Formatted: DMReference

CONFIDENTIAL
DEF_01611979

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| states that C01N has assigned and licensed IP rights to Hotwire.<br><br>The Review Material provided as evidence of this assignment and licence constitutes a "Software Development Agreement" between Strasan Pty Ltd (now C01n) Craig Wright and Dave Kleiman (together, the "Client").<br><br>The Agreement is stated, in the Background recitals, to reflect Craig Wright and Dave Kleiman's "wish to develop an "Automated self-matching learning system" by engaging "Strasan and its selected contractors to start this project".<br><br>The Agreement contains a licence (which appears to have now expired) from C01n to "the Customer" for the "Developer Software" subject to payment in full by 30 June 2013. "The Customer" is not defined, but as noted above Craig Wright and Dave Kleiman are stated to be "the Client". The execution block for the "Customer" states "Write name of incorporated body when filed". There is a handwritten note next to this that reads "incp. Hotwire Premptive Intelligence Pty Ltd - 02 June 13 - Paid By [illegible]". Further, RFI#45 instructs us that the company that Craig Wright incorporated was Hotwire.<br><br>There is no express assignment of intellectual property rights in the operative provisions of the Agreement. However, in the background recitals it states that: "Craig Wright will arrange an Australian Company to be formed to host and own the intellectual property…The project is for the creation of intellectual property. All rights to said IP are to vest within the company Craig Wright incorporates when  the completion of the contract (to occur before 30 June 2013) occurs. The incorporated entity will be incorporated within Australia and the ABN will be sent as formal notice to Strasan by the first week of June 2013. The formal invoice and payment will be made through the incorporated entity owned by the client and as | assignment).<br><br>In our view, there are some reasonable arguments in favour of it constituting a valid assignment (although these are not without risks as noted below). It includes a written statement that "the intellectual property" is to vest in a particular company and has been executed by the entity that is being engaged to do the relevant development work. Whilst the scope of the assignment is very unclear (given the document merely refers to "the intellectual property") it seems possible that it is intended to cover the intellectual property rights in the material developed under the Software Development Agreement. As such, the assignor of the relevant rights is most likely the developer (i.e. C01n).<br><br>Whilst the company in which the intellectual property rights are stated to vest does not yet exist at the point of signing, there are steps listed for it to be identified. Whilst it is unclear whether this process has been formally followed, as noted the signed copy of the Agreement in the Review Material contains a note (next to the "Customer" execution block) stating that "Hotwire Premptive Intelligence Pty Ltd" had been incorporated although the timing and origins of this note are unknown.<br><br>The biggest risks as we see it with the document are: (1) whether it was intended to constitute an assignment of Core IP Rights without further steps being taken to formalise that assignment, particularly given the reference to the rights vesting in a particular entity is included in the Background "recitals" not the operative provisions where the substantive provisions such as the licence are located; (2) uncertainty as to the scope of the |

Formatted: DMReference

CONFIDENTIAL

DEF_01611980

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| notified to Strasan." We have been instructed that payment was made by Hotwire "so by default, the IP vested in Hotwire" (RFI#45).  Payment was to be made in Bitcoin.  An invoice is attached, but the amount does not appear to reconcile with the contract amount. | Core IP Rights being assigned; (3) given the developer was permitted to sub-contract work to third parties, and there are no express provisions requiring the developer to procure assignments of intellectual property rights in such work, uncertainty over the current ownership position with respect to any subcontracted work; (4) uncertainty over whether the assignment constituted an effective assignment to *Hotwire* given the Background recitals suggest it was executed prior to Hotwire being incorporated; and (5) uncertainty over whether valuable consideration has passed given payment was to be made in Bitcoin. **For present purposes, we suggest proceeding on the basis that there has been a valid assignment of the Core IP Rights created by C01n pursuant to this Agreement to Hotwire.** We have therefore added these Core IP Rights into the draft Assignment Schedule at Schedule B of the Draft IP Assignment Schedule Report. **However, given the identified risks, we also recommend expressly including any retained rights in the IP Assignment from C01n and we have therefore added such rights into the draft Assignment Schedule at Schedule H of the Draft IP Assignment Schedule Report.** |

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814.v1SYDDMS2635814.v1SYDDMS   DRAFT
33
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611981

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

**8:2F**

Core IP Rights assigned to Hotwire by Craig Wright R&D for DeMorgan

Whilst not originally identified as an assignment of Core IP Rights to Hotwire in the response to the initial information request (Doc ID DM152), we note that Doc ID DM3 (Intellectual Property Licence between Craig Wright R&D for DeMorgan and Jamie Wilson and Ramona Watts for Hotwire Pre-emptive Intelligence Pty Ltd dated 22 August 2013) (which RFI #29 confirms to be the only valid licence between Craig Wright and Hotwire) contains an assignment of intellectual property rights from "Craig Wright R&D for DeMorgan" to Hotwire in any improvements, modification, enhancement or derivative developed by Hotwire, of the intellectual property the subject of the licence, being:

- Risk algorithms and C/C++/C#/R code;

- Training systems patent (in progress and covered under the AusIndustry Notice of Registration for the R&D Tax Incentive including IR1300282); and

- All trade marks associated with Integyrz and associated marks.

Payment was to be made in Bitcoin.

We note that it is unclear what would actually be included in this IP assignment that wouldn't otherwise be owned by Hotwire at law (given the assignment is limited to improvements, modifications, enhancements or derivative work developed by Hotwire, not the underlying Core IP Rights being licensed by Craig Wright).

Further, the identity of the party assigning Core IP Rights is quite unclear. The party is listed on the cover page as "C W R&D ABN 47 481 146 384 as trustee for DeMorgan ABN 62 433 066 448" and elsewhere as "CW R&D for DeMorgan" but is then executed simply by "Craig Wright R&D".

~~We have not seen any arrangement pursuant to which Craig Wright holds any Core IP Rights on trust for any of the DeMorgan Group Entities and we have assumed for present purposes, particularly given the document has been executed by Craig Wright, that Craig Wright does not hold any Core IP Rights on trust for any of the DeMorgan Group Entities. However, given the uncertainty over the contracting parties here please confirm whether or not this is the case as this would alter the ownership position of relevant Core IP Rights.~~We have been instructed that Craig Wright does not hold any Core IP Rights on trust for any of the DeMorgan Group Entities and that Craig Wright intended to execute this document in his personal capacity (Doc ID DM205).

In addition to the issues raised above, we note that there could be some question over whether consideration has passed given payment was to be in Bitcoin.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611982

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| | Despite this, and regardless of whether it is, in fact, Craig Wright or DeMorgan Limited (or DeMorgan Holdings) that is the assignor of relevant rights under this document, in our view there seems to be a reasonable likelihood that at least some of these Core IP Rights may have been assigned to Hotwire and as such these should for completeness be included in the Hotwire IP Assignment (even though they seem likely to be quite limited). **We have therefore added this into the draft Assignment Schedule in Schedule B of the Draft IP Assignment Schedule Report.** In addition we suggest that the licensed rights be added into the Craig Wright IP Assignment. Whilst there is uncertainty over the licensor entity, our instructions are that the licensor is intended to be Craig Wright (which suggests, although does not confirm, that Craig Wright is the owner of these Core IP Rights). We note for completeness that although the agreement is drafted as a licence, the fee is expressed as being "for exclusive assignment". Nonetheless, given this is the only reference to an assignment and the agreement is otherwise drafted as a licence, **we have added these licensed rights into the draft Craig Wright Assignment Schedule in Schedule P of the Draft IP Assignment Schedule Report.** We otherwise recommend relying on the "blanket" nature of the other IP Assignments to ensure that any other relevant Core IP Rights held within the DeMorgan Group are captured. |

**Formatted:** Font: Not Bold

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2636814-v3\SYDDMS_DRAFT
34
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611983

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
|  | We note that the rights licensed from Craig Wright include trade marks. ~~Given we had understood that there were not currently any registered trade marks of relevance as part of the Core IP Rights,~~ **please confirm whether there are any registered trade marks currently owned by the DeMorgan Group Entities or Craig Wright Entities. Alternatively we can carry out trade mark searches on the DeMorgan Group Entities and Craig Wright Entities to confirm.** We have therefore run the trade mark searches outlined in Schedule D which, as noted therein, confirm that there are no current trade mark registrations owned by any DeMorgan Group Entity. Further, we have been instructed that there is no intention to continue to use any trade marks previously developed by or for the DeMorgan Group (Doc ID DM205) and, as such, regardless of the status of current trade marks, they are not material to the Core IP Rights ownership analysis. |

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01611984

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

**3. Red Flag Third Party Issues**

**8:3A**

_David Perry and Uyen Nguyen_

The response to the initial information request (Doc ID DM152) states that a number of individual contractors have also been engaged by Hotwire.  It is therefore possible that they may have created some of the work outlined in section 2 above.

The contractors identified to us in the Review Material were David Perry (Australia) and Uyen Nguyen (USA).  (We note that Ignatius Pang was also initially identified as a Hotwire contractor, but we were subsequently instructed that he was, in fact, an employee.)

RFI #10 indicated that no written contract was entered into between Hotwire and David Perry or Hotwire and Uyen Nguyen.

The position with respect to independent contractors is quite different from the position outlined in section 6 above.  All intellectual property rights in material created by an independent contractor will generally vest in the independent contractor under Australian law.  Therefore, absent an assignment of those intellectual property rights, they will remain owned by the independent contractor.

Therefore, in the absence of any written contract with David Perry or Uyen Nguyen, it is likely that under Australian law they remain the owner of all intellectual property rights in any material that they created for Hotwire.  (We note for completeness that Uyen Nguyen was located in the USA.  Whilst we have only considered the position under Australian law, please note that this could also raise US law considerations.)

Hotwire should assess the importance of the work undertaken by David Perry and Uyen Nguyen and determine whether it is necessary (and possible) to approach them to assign relevant Core IP Rights.  In this regard we note: (1) RFI#10 indicated that David Perry did not do much and as such it is possible that he is the owner of only limited Core IP Rights; and (2) given Uyen Nguyen appears to have been a director of W&K at the time of the litigation that Craig Wright brought against it as described in section 22:3C we query, at least with regard to Uyen Nguyen, whether this raises a question mark over the likelihood of obtaining such an assignment.

We have been instructed that David Perry did not do

**Formatted:** Font: Not Bold

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611985

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| | much work for Hotwire (RFI#10), and the work he did do was in the area of marketing communications not research and development. As such, whilst it is possible that David Perry could own some intellectual property rights of relevance to the DeMorgan Group, it is less likely to be in the form of material Core IP Rights than if he had been engaged in research and development work (particularly given, as noted in section 8.2F above, we are instructed that there is no intention to retain or continue to use any existing branding or marketing materials moving forwards). We are instructed that given David Perry was not involved in creating any material Core IP Rights, there is no intention to approach him for an assignment of any intellectual property rights (Doc ID DM205). |
| | We have been instructed that Uyen Nguyen did research work for Hotwire, and is willing to execute an IP assignment (Doc ID DM 161). **We will therefore prepare an IP Assignment from Uyen Nguyen in addition to the other IP Assignments.** |
| | Further, we are instructed that Uyen Nguyen has continued to do contract work on an informal basis for the DeMorgan Group more generally, and has been paid via DeMorgan Limited (Doc ID DM205). **We will therefore ensure that the IP Assignment from Uyen Nguyen captures not just work for Hotwire, but also work performed more generally for the DeMorgan Group.** |

**Formatted:** Font: Not Bold

**Formatted:** Font: Not Bold

**Formatted:** Font: Bold

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611986

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

**8:3B**

Third party research institutions

Please see comments in 8:2A regarding research institutions utilised by Hotwire as referenced in Doc ID DM102 (a Hotwire R&D Tax Incentive Application in relation to certain technologies related to its automated self matching learning system). ~~As noted in 8:2A, we have assumed that these are references to Interconnected Research.~~As noted, we have been instructed, however, that no Hotwire work has ever been performed by any contractor other than as set out in section 8:3A above (Doc ID DM161).

~~As noted in 8:2A, we have assumed that these are references to Interconnected Research. However, if this is incorrect, and any of those references are to other third parties outside the DeMorgan Group, this raises a risk of Red Flag Third Party Issues with regard to the Hotwire Core IP Rights.~~

~~Please see comments in 8:2A.~~

Given no other contractors or collaborators have been identified, no further steps have been taken at this stage.

**8:3C**

Core IP Rights assigned to Hotwire by the Wright Family Trust

The response to the initial information request (Doc ID DM152) states that IP has been assigned to Hotwire by the "Wright Family Trust for DeMorgan" under an IP Deed of Assignment dated 15 September 2013.

It is unclear why the contracting entity here is called "The Wright Family Trust DeMorgan" (given that is not the name of the Wright Family Trust). However, this is potentially related to the issues discussed at section 23:3A below. Please see our comments there which are also relevant here.

There are a number of question over whether the

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611987

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|

Doc ID DM2 is an assignment from the "Wright Family Trust DeMorgan" to Hotwire dated 15 September 2013 that purports to assign intellectual property rights in three categories namely:

- Category A: "Automation Software" held by DeMorgan, being: MJF Siemens Control and Operations Suite;

- Category B: WK (1) - Software Assurance through Economic Measures and Anti-Fraud System; and

- Category C: WK (1) - Risk Quantification system (for financial modelling in Bitcoin)).

The assignment is stated only to take effect once payment has been completed (operating as an exclusive licence until that point).  RFI #25 instructed us that this has occurred which suggests that the assignment has was intended to have taken effect.

However, we note that the background indicates that these intellectual property rights were assigned to the Wright Family Trust from "Craig Wright R&D" and, prior to that, from a number of Third Parties to Craig Wright.

There are a number of question over whether the *original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the Wright Family Trust to Hotwire had the desired effect.  This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

Please see our comments in section 22:3A and 22:3C below with respect to the original assignments from the relevant Third Parties to Craig Wright.

*original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the Wright Family Trust to Hotwire had the desired effect.  This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

Please see our comments in sections 22:3A and 22:3C below with respect to the original assignments from the relevant Third Parties to Craig Wright.

As noted in those sections this means that there are significant open questions over whether all of these rights were originally assigned to Craig Wright, and if so, whether they were effectively assigned to the Wright Family Trust to enable this assignment to take effect. Please see proposed steps in sections 22:3A and 22:3C in this regard.

In addition, there are a number of issues raised by the drafting of this assignment itself.

- Firstly, there is a possibility that it itself does not assign any rights but rather is simply a confirmation that the assignor has completed, or will complete at its earliest opportunity, an irrevocable assignment of any "existing and future Intellectual Property and Intellectual Property Rights".  We have not separately seen any other document under which the intellectual property rights are separately assigned and understand that there may not be any such separate document.  This raises a question over whether the assignment has actually occurred or

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
26308I4-v1SYDDMS26303I4-v1SYDDMS  DRAFT
39
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611988

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---------|----------------------------------------|
|         | not.  However, even if it has not occurred, the assignor agrees pursuant to the IP Deed of Assignment to complete the assignment (and grants a licence to use the relevant rights until this is done) meaning it could be called on to perfect the assignment if necessary.  ~~As such, we suggest that the Wright Family Trust and Hotwire check their records to confirm whether the assignment was completed and in the meantime proceed on the basis that it has been completed.  If it has not, please let us know as this could alter the position.~~ |
|         | • Secondly, there is a risk that the assignment envisaged by the IP Deed of Assignment is broader than just the intellectual property rights in the "Core Technology" as the assignment is of both "Intellectual Property" (which is defined, in summary, as including certain property relating to the "Core Technology") and "Intellectual Property Rights" (which is not defined by reference to the "Core Technology" at all).  This opens a risk that more of Core IP Rights were assigned to Hotwire than just the Core IP Rights in the "Core Technology".  This risk is somewhat mitigated (although not removed entirely), however, by the fact that the IP Deed of Assignment states, in its background Recitals, that "the Assignor agrees to an irrevocable assignment of all Intellectual Property and Intellectual Property Rights to the Assignee in the Core Technology" which supports an interpretation that limits the assignment to the "Core Technology". |
|         | As noted in sections 22 and 23 below, our initial view is |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01611989

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---------|----------------------------------------|
| | that there is a significant risk that the ownership of these Core IP Rights sits at law with Third Parties or Craig Wright (and that even if that is not the case, there is a real question over whether this assignment to Hotwire has been effective).  However, despite the significant uncertainty over what (if any) Core IP Rights were assigned here, for completeness we recommend that any Core IP Rights that *were* assigned to Hotwire under this assignment agreement be included in the Hotwire Assignment Schedule.  **We have therefore added this into the draft Assignment Schedule in Schedule B of the Draft IP Assignment Schedule Report.**<br><br>**As noted in section 23 below, we recommend that the IP Assignment from Craig Wright and the Wright Family Trust also be expressly stated to include any of these Core IP Rights that they have retained.** |
| **4.  Other issues to note**<br><br>**8:4A**<br><br>Assignment to Coin-Exch<br><br>The response to the initial information request (Doc ID DM152) states that Hotwire has assigned Core IP Rights to Coin-Exch.<br><br>We have been instructed that this is a reference to the assignment of intellectual property rights from Hotwire to Coin-Exch contained in Doc ID DM7 (R&D Services Agreement between Coin-Exch Pty Ltd and Hotwire Preemptive Intelligence Ltd and Interconnected Research Pty Ltd) pursuant to which Hotwire and Interconnected Research provide services to Coin-Exch.<br><br>Whilst "Project Foreground IP" rights are transferred to Coin-Exch by both Hotwire and Interconnected Research on payment in full, Hotwire and Interconnected Research retain ownership of any | It is likely that these Core IP Rights will be owned by Coin-Exch (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by Hotwire and Interconnected Research and subject to our comment below regarding payment.<br><br>Without an extensive factual investigation into the manner in which all of this work was undertaken, it will not be possible to determine exactly where the line between "Project Foreground IP" and "Provider IP"  sits. This is particularly the case given that the "Provider IP" is defined exceedingly broadly, and is not for instance tied to pre-existing rights that pre-dated the agreement/projects meaning there is a risk of significant overlap between the two categories.  **However, for the** |

Formatted: Font: Bold

Formatted: DMReference

CONFIDENTIAL

DEF_01611990

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| "Provider IP" (being intellectual property rights in their methodologies, models and other confidential or proprietary information for the purposes of providing the services).  The arrangement relates to services for a defined set of projects as follows, and therefore (subject to the retained "Provider IP") the "Project Foreground IP" rights being assigned are likely be those arising from this work:<br><br>• Cornerstone Firewall<br><br>We note that the Review Material does not contain an executed copy of this Agreement. | **purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Coin-Exch IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by Hotwire and Interconnected Research acting as service providers to Coin-Exch.  We have therefore added this into Schedule L of the Draft IP Assignment Schedule Report.**<br><br>We do note that the assignment of "Project Foreground IP" under the Services Agreements is only effective "when corresponding amounts invoiced and due are paid".  ~~Please note that we have assumed for present purposes that~~We have been instructed that all such amounts have been paid (and therefore that the assignments have taken effect) (Doc ID DM161).  ~~However, please confirm that our assumption is correct noting~~We note that there is some confusion over when this arrangement was intended to be completed due to incorrect dates which we have been instructed were errors in the document.  We have been instructed that the project is not intended to complete until 2017 (even though the completion date reads 30/06/11 (which is prior to the commencement date)).  As such, this work may be incomplete. |
| **8:4B**<br><br>Licence from Craig Wright R&D for DeMorgan<br><br>The response to the initial information request (Doc ID DM152) states that IP is licensed from "Craig Wright R&D for DeMorgan" to | Please see comments in section 8:2F above regarding this document.<br><br>~~We also note that it will be necessary to consider whether this licence is still required or not.  Presumably, the intellectual property rights that are licensed here are~~ |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2635814 v1SYDDMS2635814 v1SYDDMS  DRAFT
43
Wright Family Trust - overview of findings

CONFIDENTIAL

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| Hotwire under Doc ID DM3 (Intellectual Property Licence between CW R&D for DeMorgan (with the executing entity set out as Craig Wright R&D) and Jamie Wilson and Ramona Watts for Hotwire Pre-emptive Intelligence Pty Ltd dated 22 August 2013).  We note that this is an exclusive licence with payment to be made in Bitcoin. | ~~themselves Core IP Rights that will be transferred to New IP Co and as such, following that assignment, there will be no need for this licence.~~Moving forwards, we are instructed that the current licences between existing DeMorgan Group Entities and Craig Wright Entities are no longer needed.  The DeMorgan Group should therefore terminate its existing internal licensing arrangements. |
|  | ~~Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with~~Moving forwards, DeMorgan Limited will require a licence from New IP Co in order to continue its operations and research and development work. |

*Formatted: Pattern: Clear*

Further, we note that C/C++/C#/R Code is also referenced in the W&K litigation referred to in section 22:3C below.  It is not clear if this is the same code referenced here but we note for completeness, for the reasons outlined in section 22:3C, that if this is the same code that was assigned to Craig Wright coming out of the W&K litigation (in the manner, and subject to the issues identified in, section 22:3C) this could support the view that those relevant Core IP Rights remain owned by Craig Wright for the reasons identified in section 23 below.

| **8:4C** | No comments. |
|---|---|
| <u>No licences to third parties</u> |  |
| The response to the initial information request (Doc ID DM152) |  |

*Formatted: DMReference*

CONFIDENTIAL

DEF_01611992

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---|---|
| indicates that Hotwire has never granted any third party (individual or other entity) a licence to use any intellectual property rights. | |

**8:4D**

Please see our comments at section 7.4C.

Other Group Services Agreements

The DeMorgan Group internal Agreements Register (Doc ID DM140) notes that there could be other DeMorgan Group Services Agreements other than those listed in the register.  This is headed "Others (TBD)".

The only contract listed under this heading at present is a draft Business Service and Management Agreement between "DeMorgan and Hotwire".  No further information has been provided regarding this contract.

8:4E

Craig Wright

We have been instructed that Craig Wright was an employee of Hotwire until late 2014.

It is unclear what work Craig Wright created pursuant to his contract of employment with Hotwire, and what work was created in his personal capacity.

> **Formatted:** Font: Bold, No underline

> **Formatted:** Font: Not Bold

There is therefore a possibility that some of the Core IP Rights created by Craig Wright have already vested in Hotwire due to the employment arrangement, for the reasons given in section 6 above.

Please see our comments in section 22:1A in this regard.

> **Formatted:** Font: Not Bold

As noted in section 22:1A, whilst these rights will also be included in the IP Assignment from Craig Wright, we recommend for completeness that any rights that *are* owned by Hotwire in the work described in section 22:2A be included in the Assignment Schedule for Hotwire in Schedule B of

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01611993

| HOTWIRE | COMMENTS REGARDING ISSUES AND APPROACH |
|---------|----------------------------------------|
|         | the Draft IP Assignment Schedule Report. |

Formatted: DMReference

CONFIDENTIAL

DEF_01611994

# 9.   Integyrz - overview of findings

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| **1.  Overview of company role** | **9:1A**<br><br>Business<br><br>The primary business of Integyrz relates to an eLearning Training System (DeMorgan Group Entity shareholding table at Doc ID DM154). | At a general level, for completeness, Integyrz's work relating to the eLearning Training System should be captured in the IP Assignment from Integyrz.<br><br>**We have added this into the draft Assignment Schedule in Schedule C of the Draft IP Assignment Schedule Report.** |
| | **9:1B**<br><br>Volume of likely Core IP Rights<br><br>In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):<br><br>• Integyrz has had one employee, being Dr Stef Savanah.  Dr Savanah has been located in Australia.<br>• Work has also been carried out for Integyrz by other DeMorgan Group Entities under DeMorgan Group Services Agreements (and Integyrz has itself also provided services to other DeMorgan Group Entities under other DeMorgan Group Services Agreements).<br>• Integyrz has submitted one previous R&D incentive claim and was intending to do so again in the 2015 financial year. | It appears possible that R&D activity has occurred via Integyrz, both through its employee (Dr Savanah) and under DeMorgan Group Services Agreements, and as such Integyrz could own Core IP Rights.  However, there are a number of uncertainties surrounding this as noted in sections 9:2, 9:3 and 9:4 below. |
| **2.  Summary of IP likely to be** | **9:2A**<br><br>Employee created material (generally) | Subject to our comments in section 6 above, it is likely that the intellectual property rights in work carried out by |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814 v1SYDDMS2636814 v1SYDDMS   DRAFT
46
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611995

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| **owned by the company**[4] The response to the initial information request (Doc ID DM152) indicates that Integyrz has had one employee only, Dr Stef Savanah.<br><br>However, there is some uncertainty regarding whether this is accurate because the employment contract that we have been provided with for Dr Stef Savanah is in the name of Interconnected Research and not Integyrz.<br><br>We also note that the response to the initial information request (Doc ID DM152) states that there have been no assignments of intellectual property rights in or out of Integyrz, suggesting that there has been no assignment from Interconnected Research.  However, we do note that there is an assignment of intellectual property rights in the DeMorgan Group Services Agreement between Integyrz and Interconnected Research referred to in section 9:2C below which could, to the extent that Dr Savanah was performing work under that arrangement, constitute an assignment of the relevant intellectual property rights. | Integyrz employees vested on creation in Integyrz.<br><br>However, there is a question over whether Dr Savanah was, in fact, actually employed by Interconnected Research rather than Integyrz.  This gives rise to a risk that the Core IP Rights identified in section 9:2B below are actually owned in part or in whole by Interconnected Research (rather than Integyrz) because they were created by an Interconnected Research employee (rather than an Integyrz employee) and because there was no written assignment of those intellectual property rights from Interconnected Research to Integyrz.<br><br>~~However, at this stage, given the Review Material contains multiple references to Dr Savanah being employed by Integyrz, we have proceeded on basis that the most likely position is~~ <u>We have subsequently been instructed</u> that the employment contract for Dr Savanah is incorrect (or that there was immediately a transfer in employment to Integyrz) <u>(Doc ID DM205)</u> and have therefore proceed<u>ed</u> on the ~~assumption basis~~ that Dr Savanah was employed by Integyrz as <u>instructed</u>~~stated~~. ~~Please confirm whether or not our assumption is correct.  This will assist to confirm whether additional or different steps are required.~~<br><br>~~If this assumption is not correct, but the work performed by Dr Savanah was performed under the DeMorgan Group Services Agreement between Integyrz and Interconnected Research referred to in section 9:2C~~ |

[4] A draft Assignment Schedule for the Integyrz IP Assignment is set out in Schedule C of the Draft IP Assignment Schedule Report.

**Formatted:** DMReference

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|

<table>
<tr>
<td></td>
<td>~~below, we note that the intellectual property rights could have been assigned to Integyrz in any event subject to our comments in section 9:2C below.~~

**For these reasons, we have at this stage added the Core IP Rights identified in 9:2B below into the draft assignment schedule for Integyrz in Schedule C of the Draft IP Assignment Schedule Report.**</td>
</tr>
</table>

**9:2B**

<u>Employee created material (category 1)</u>

Integyrz has filed a number of R&D incentive claims which give further detail regarding the work undertaken by the company.

The Integyrz Tax Incentive Application (2013-2014) (Doc ID DM96) refers to the following Integyrz projects (in summary):

- "Adaptive Delivery Platform":
  - "Basic Platform"
    - "Supporting - Data centre and systems"
  - "Online Learning Style model"
  - "Product Offerings Research and Development:"
    - "SuperMOOC"
    - "Indie"
    - "Corporate"
    - "University Suite (layered offerings)"
  - "Design research partnership program"

In addition Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) refers to the following "pending patent applications":

- "20. eLearning"

Please see comments above in section 9:2A (as to employee created material (generally)) as to next steps regarding these Core IP Rights.

Please also note that work may have been carried out under DeMorgan Group Services Agreements and see our comments in section 9:2C below in this regard.

> **Formatted:** DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1~~SYDDMS~~2635814-v1~~SYDDMS  DRAFT
48
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01611997

## INTEGYRZ

**9:2C**

<u>DeMorgan Group Services Agreements</u>

Integyrz is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Integyrz has been the recipient of services under:

- Services Agreement with Interconnected Research (service provider) (Doc ID DM48)
- Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM32)
- Consultancy Agreement with Pholus (service provider) (Doc ID DM10)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Integyrz (as services recipient).  However in terms of the scope of those assignments, we note that:

- pursuant to the *Services Agreements*, whilst "Project Foreground IP" rights are transferred to the services recipient by the service provider on payment in full, the service provider retains ownership of any "Provider IP" (being intellectual property rights in the service provider's methodologies, models and other confidential or proprietary information for the purposes of providing the services).  The Services Agreements relate to services for a defined set of projects as follows, and therefore (subject to the retained "Provider IP") the "Project Foreground IP" rights being assigned are likely be those arising from this work:
  - o Services Agreement with Interconnected Research: (i) MOOC 1.1; (ii) SuperMOOC 1.0; (iii) SuperMOOC 2.0; (iv) SuperMOOC 3.0; (v) LMS 1 (plug in); (vi) LMS 2 (full function).  Note that this work had a

## COMMENTS REGARDING APPROACH

<u>General comment regarding employees</u>

As noted throughout this report, whilst we have not been provided with copies of all employment contracts for the DeMorgan Group Entities' employees, some concerns have been raised as to inconsistencies in the stated employer of listed individuals.  We ~~have assumed~~had initially worked on the assumption, for ~~present~~ the purposes of this report, that where a DeMorgan Group Entity acts as a service provider under a DeMorgan Group Services Agreement that it has only utilised its own employees to perform those services.  However, we have subsequently been instructed that this may not have always been the case due to the fact that DeMorgan Group Entities have utilised employees from other DeMorgan Group Entities (although not contractors unless specifically identified in this report) to perform services (Doc ID DM205).  ~~wW~~e note for completeness that if a DeMorgan Group Entity has used other individuals (other than employees) to perform services under a DeMorgan Group Services Agreement and has not obtained an intellectual property assignment from those individuals, that this raises concerns that the ownership position for the intellectual property rights generated under that DeMorgan Group Services Agreement may be other than as set out below (as those individuals are likely to retain ownership of any intellectual property rights they have created).  We have proceeded on the assumption that this is not the case.  Please, however, see our comments below regarding the consequences of outsourcing to other DeMorgan Group Entity employees.

| Formatted: DMReference |
| --- |

CONFIDENTIAL

DEF_01611998

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|

completion date of 30 June 2017 and therefore may be incomplete; and

- pursuant to the *Consultancy Agreements*, (1) all inventions, discoveries and novel designs (whether or not registrable as designs or patents) ("Inventions") and copyright ("Works") created by the service provider "as consulting company" are assigned to the service recipient, and this is backed up with (2) a separate obligation to disclose and assign all Inventions and Works and all intellectual property rights therein to the services recipient.

We also note that the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

### Services Agreement

It is likely that these Core IP Rights will be owned by Integyrz (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Integyrz ~~and subject to our comment below regarding payment~~.

Without an extensive factual investigation into the manner in which all of this work was undertaken, it will not be possible to determine exactly where the line between "Project Foreground IP" and "Provider IP" sits. This is particularly the case given that the "Provider IP" is defined exceedingly broadly, and is not for instance tied to pre-existing rights that pre-dated the agreement/projects meaning there is a risk of significant overlap between the two categories.  **However, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Integyrz IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Integyrz.  We have therefore added this into Schedule C of the Draft IP Assignment Schedule Report.**

We do note that the assignment of "Project Foreground IP" under the Services Agreements is only effective "when corresponding amounts invoiced and due are paid".  ~~Please note that we have assumed for present purposes~~We have been instructed that all such amounts have been paid (and therefore that the assignments

DeMorgan
13 November 201527 November 2015
2636B14 v1SYDDMS2636B14 v1SYDDMS  DRAFT
50
Wright Family Trust - overview of findings

Formatted: DMReference

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|

have taken effect) (Doc ID DM161).  However, please confirm that our assumption is correct particularly givenWe note that the completion date for this work is, as noted, not until 30 June 2017 meaning that the work may be incomplete.  If this assumption is incorrect please let us know as this will alter the ownership position.

<u>Consultancy Agreements</u>

In our view, there are issues with the drafting of the IP assignment under the Consultancy Agreements given the present assignment of rights is limited to "Inventions" and "Works" only, backed up by a separate agreement that the service provider "will assign" <u>all</u> intellectual property rights in those "Inventions" and "Works".  Whilst this appears likely to be an effective assignment of copyright, there are some doubts over whether additional steps were required to perfect the assignment of other intellectual property rights.  **However, for the purposes of the IP Assignments, we suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have therefore added these into Schedule C of the Draft  IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

<u>Third Party Licences</u>

We have assumed that there are no additional third party

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612000

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| | licences other than as provided as part of the Review Material.  (As noted, the Services Agreements envisage that third party licences may be required for some of the work product).  We note that, if there are any additional third party licences, it will be necessary to reconsider whether these licences remain licensed to the correct DeMorgan Group Entity following the present restructuring project.  (Obviously, to the extent that third party inputs have been included without relevant licences, we note for completeness that this would raise an infringement risk.) |

> **Formatted:** Font: Bold

**Outsourcing to other DeMorgan Group Entities**

> **Formatted:** Font: Bold

As noted above, we have been instructed that when acting as service provider under a DeMorgan Group Services Agreement, some DeMorgan Group Entities have themselves utilised the employees of other DeMorgan Group Entities to perform services.

> **Formatted:** Font: (Default) +Headings (Arial)

There is no way, other than tracking back to an individual level to determine which individual has created which work and pursuant to which contractual arrangements (which may still not result in absolute certainty given the potential lack of records of relevant creation of work), to quantify the impact that the uncertainty over the use of employees has on the ownership position for the Core IP Rights.

> **Formatted:** Font: Bold

However, we note, given the various DeMorgan Group Services Agreements also operate in the same manner (in that the Services Agreements are on the same intellectual property terms and the Consultancy Agreements are on the same intellectual property terms)

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612001

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| | that, to the extent that a DeMorgan Group Entity acting as service provider under a DeMorgan Group Services Agreement ("Agreement 1") has utilised the employees of other DeMorgan Group Entities to perform its services under that Agreement 1" and this subcontracting *has itself occurred* pursuant to a DeMorgan Group Services Agreements in the form of a Services Agreement ("Agreement 2"), the outsourced work under Agreement 2 will be assigned to the customer entity as "Project Foreground IP" (subject to any Core IP Rights retained as "Provider IP" in the same manner noted above) and will then be "on-assigned" to the actual client again pursuant Agreement 1 provided that the DeMorgan Group Entity acting as outsourced service provider is an "approved sub-contractor" for the purposes of Agreement 1.  The assignment of intellectual property rights under the Consultancy Agreements extends to the DeMorgan Group Entity acting as service provider and its "employees, agents and consultants". |
| | There are a range of risks here (for instance, the risk that DeMorgan Group Entities have used employees of other DeMorgan Group Entities to perform services, *other than* pursuant to a DeMorgan Group Services Agreement; the risk that the subcontracted DeMorgan Group Entity under a Services Agreement is not an approved subcontractor; the risk of retained "Provider IP" acting to split the ownership of relevant Core IP Rights under a Services Agreement as noted above; and a risk that a subcontracted DeMorgan Group Entity may not be classified as an "employee, agent or consultant" under the Consultancy Agreements) which could result in Core |

Formatted: Font: Italic

Formatted: Font: Bold

Formatted: DMReference

CONFIDENTIAL

DEF_01612002

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| | IP Rights being, in fact, split between different DeMorgan Group Entities other than in the manner set out in this report. However, the contractual arrangements noted above mean that there is at least some argument that a significant part of the Core IP Rights created in projects under DeMorgan Group Services Agreements has been assigned "through" to the eventual client. |
| | As such, we have drafted throughout on the basis that each DeMorgan Group Entity that is customer under a DeMorgan Group Services Agreement owns the primary Core IP Rights in that work by including it in the draft IP Assignment Schedule for that customer entity, and then providing that retained Core IP Rights may be held by each entity acting as service provider under a DeMorgan Group Services Agreements. The "blanket" nature of the IP Assignments will ensure that any other rights that are distributed throughout the DeMorgan Group due to the risks outlined above will be captured in the assignments. |

Formatted: Font: Bold

Formatted: Font: Bold

| | | |
|---|---|---|
| 3. | **Red Flag Third Party Issues** | None identified in the Review Material. | N/A. |
| 4. | **Other issues to note** | **9:4A** <br><br> DeMorgan Group Services Agreements <br><br> In addition to the DeMorgan Group Services Agreements listed at 9:2C, the DeMorgan Group internal Agreements Register (Doc ID DM140) identifies Integyrz as the service provider under the | Services Agreement <br><br> It is likely that these Core IP Rights will be owned by the DeMorgan Group Entities acting as services recipients (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by Integyrz and subject |

Formatted: DMReference

CONFIDENTIAL

DEF_01612003

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| following DeMorgan Group Services Agreements:<br><br>• Services Agreement with C01N (services recipient) (Doc ID DM53)<br>• Services Agreement with Cloudcroft (services recipient) (Doc ID DM54)<br>• Services Agreement with Coin-Exch (services recipient) (Doc ID DM57)<br>• Services Agreement with Daso (services recipient) (Doc ID DM56)<br>• Services Agreement with Interconnected Research (services recipient) (Doc ID DM51)<br>• Services Agreement with Panopticrypt (services recipient) (Doc ID DM49)<br>• Services Agreement with Pholus (services recipient) (Doc ID DM50)<br>• Services Agreement with Zuhl (services recipient) (Doc ID DM52)<br>• Services Agreement with Denariuz (services recipient) (Doc ID DM55)<br>• Consultancy Agreement with Misfit Games (services recipient) (Doc ID DM36)<br>• Consultancy Agreement with DeMorgan Limited (services recipient) (Doc ID DM38)<br>• Consultancy Agreement with Chaos (services recipient) (Doc ID DM37)  (Noting that this is not listed on the DeMorgan Group internal Agreements Register (Doc ID DM140) but a contract has been provided as part of the Review Materials).<br><br>All of these Agreements contain an assignment of intellectual property rights from Integyrz (as service provider) to the DeMorgan Group Entity acting as services recipient.  However in terms of the | ~~to our comment below regarding payment.~~<br><br>Please see our comments in section 9:2C above regarding issues regarding the distinction between "Project Foreground IP" and "Provider IP" under the DeMorgan Group Services Agreements.  The same issues arise here.<br><br>**As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the "Project Foreground IP") be included in the IP Assignments from the DeMorgan Group Entities acting as services recipients, leaving the blanket nature of the IP Assignment from Integyrz to capture any residual "Provider IP" retained by Integyrz (as service provider).  We have added a general description of these retained rights into Schedule C of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe these very broadly given the uncertainty regarding what has been retained.**<br><br>We do note that the assignment of "Project Foreground IP" under the Services Agreements is only effective "when corresponding amounts invoiced and due are paid".  ~~Please note that we have assumed for present purposes~~We have been instructed that all such amounts have been paid (and therefore that the assignments have taken effect) (Doc ID DM161).  ~~However, please confirm that our assumption is correct particularly given~~We note that the completion date for this work is. ~~as noted.~~ not until 30 June 2017. ~~If this assumption is incorrect please let us know as this will alter the ownership position~~This could mean that the work is |

DeMorgan
~~13 November 2015~~27 November 2015
~~2636814 v1\SYDDMS~~2635814 v4\SYDDMS  DRAFT
56
Wright Family Trust - overview of findings

Formatted: DMReference

DEF_01612004

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner) whilst noting that in this instance Integyrz is acting as service provider. | incomplete. |

**Consultancy Agreements**

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements. The same issues arise here.

**As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the majority of the work carried out under the Consultancy Agreements) be included in the IP Assignments from the DeMorgan Group Entities acting as services recipients, leaving the blanket nature of the IP Assignment from Integyrz to capture any residual intellectual property rights retained by Integyrz as services provider. We have added a general description of these retained rights into Schedule C of the Draft IP Assignment Schedule Report. We note that it will only be possible to describe these very broadly given the uncertainty regarding what has been retained.**

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

Note that it will be necessary to consider whether licences are still required or not. Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be

**9:4B**

Grant of licences

The response to the initial information request (Doc ID DM152) states that Integyrz has not granted any intellectual property licences, or itself been granted any intellectual property licences.

| Formatted: Font: Not Bold |
| Formatted: Font: Not Bold, Underline |
| Formatted: Underline |
| Formatted: DMReference |

CONFIDENTIAL

DEF_01612005

| INTEGYRZ | COMMENTS REGARDING APPROACH |
|---|---|
| However, we note that many of the DeMorgan Group Services Agreements contain licences. | rethought. ~~Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with.~~ Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place. |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612006

# 10. Daso - overview of findings

| DASO | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **10:1A** <br><br> Business <br><br> The primary business of Daso involves side projects split off from Denariuz (DeMorgan Group Entity shareholding table at Doc ID DM154). | Given we do not have any R&D claim documentation with respect to Daso, and the DeMorgan Group Services Agreements to which Daso is a party describe the projects in which it is involved as "TBD", it is difficult to provide any general description of the nature of Daso's work. |
| | **10:1B** <br><br> Volume of likely Core IP Rights <br><br> In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152): <br><br> • Daso was intending to submit its first R&D incentive claim in the 2015 financial year. <br> • Work has been carried out for Daso by other DeMorgan Group Entities under DeMorgan Group Services Agreements. <br> • Daso has never had any employees. | It appears that R&D activity has occurred via Daso, but only via DeMorgan Group Services Agreements.  As such, it seems possible that Daso owns some Core IP Rights but these are perhaps more limited than some of the other DeMorgan Group Entities.  However, there are a number of uncertainties surrounding the scope of these as noted in sections 10.2, 10.3 and 10.4 below. |
| **2. Summary of IP likely to be owned by the company[5]** | **10:2A** <br><br> DeMorgan Group Services Agreements <br><br> Daso is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register | General comment regarding employees <br><br> Please see our comments in section 9:2C regarding employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here. |

---

[5] A draft Assignment Schedule for the Daso IP Assignment is set out in Schedule D of the Draft IP Assignment Schedule Report.

Formatted: DMReference

DeMorgan                                                          59                          Wright Family Trust - overview of findings
13 November 201527 November 2015
2636814-v1SYDDMS2635314-v1SYDDMS  DRAFT

CONFIDENTIAL

DEF_01612007

| DASO | COMMENTS REGARDING APPROACH |
|---|---|
| (Doc ID DM140) states that Daso has been the recipient of services under: | **Services Agreement** |

**DASO**

(Doc ID DM140) states that Daso has been the recipient of services under:

- Services Agreement with Integyrz (services provider) (Doc ID DM56)
- Services Agreement with Interconnected Research (service provider) (Doc ID DM41)
- Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM21)
- Consultancy Agreement with Pholus (service provider) (Doc ID DM18)
- Consultancy Agreement with Denariuz (service provider) (Doc ID DM39)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Daso (as services recipient).  However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects.  We note as follows regarding the projects carried out under the Services Agreements for Daso:

- Services Agreement with Integyrz (services provider): projects covered by this arrangement are simply described as "TBD".  Note that this work had a completion date of 30 June 2017 and therefore may be incomplete; and
- Services Agreement with Interconnected Research (service provider): projects covered by this arrangement are simply described as "TBD".  Note that this work had a completion date of 30 June 2017 and therefore may be incomplete.

**COMMENTS REGARDING APPROACH**

Services Agreement

It is likely that these Core IP Rights will be owned by Daso (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Daso ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP".  Those comments also apply here.  **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Daso IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Daso.  We have therefore added this into Schedule D of the Draft IP Assignment Schedule Report.  Given the projects under these agreements are defined as "TBC" we note that it is only possible to describe these very generally.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made~~, and we have assumed for present purposes~~ We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc ID DM161).  ~~However, please confirm that our assumption is correct particularly given, again,~~ We note that the completion date for the work is not until 30 June

Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015                                    59                              Wright Family Trust - overview of findings
~~2635814-v1\SYDDMS~~2635814-v1\SYDDMS_DRAFT

DEF_01612008

| DASO | COMMENTS REGARDING APPROACH |
|---|---|
| As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure). | 2017.  If this assumption is incorrect please let us know as this will alter the ownership position.This could mean that the work is incomplete. |

Consultancy Agreements

Please see our comments in section 9:2C above regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule D of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Third Party Licences

Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements.  Those comments also apply here.

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

**10:2B**

As no detail has been provided regarding the proposed claim we have not been able to include details of any

> **Formatted:** Font: Bold

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612009

| DASO | COMMENTS REGARDING APPROACH |
|---|---|
| <u>Contractor created material</u> | ~~work carried out~~this has not provided any detail that can be included in Schedule D of the Draft IP Assignment Schedule Report. ~~Given~~In addition, as noted in 10.2A, there is uncertainty over the scope of work carried out for Daso under DeMorgan Group Services Agreements (particular given project descriptions under relevant Services Agreements are marked "TBC") ~~it would be useful to have more detail of Daso's proposed claim if possible to give us some understanding of the work carried out by Daso in the past.  Please provide a copy if available.~~ |
| Daso has never filed R&D incentive claims but was intending to submit a claim for FYE 2015. | |
| <u>We have been instructed, however, that the following following projects (noted in section 13.2B below) were also worked on via Denariuz and Daso;</u> | |
| • Decentralized Consensus (Distributed Autonomous Smart Organisation) Project | |
| • Core - Virtualised HPC: The development of a HPC (High Performance Computing) Platform | |
| • Supporting - Development of a virtualised multicore platform | The projects listed as worked on via both Denariuz and Daso may have resulted in Core IP Rights arising from that work being either jointly owned by Denariuz and Daso, or in some Core IP Rights arising from that work being owned by Daso and some by Denariuz.  As such, we have reflected this in both the draft Daso IP Assignment schedule in Schedule D of the Draft IP Assignment Schedule Report and the draft Denariuz IP Assignment schedule in Schedule G of the Draft IP Assignment Schedule Report. |
| • Core - Decentralized Autonomous Consensus Platform (DACP) and associated experimental case studies | |
| • Core - DACP Assurance Contracts and associated experimental case studies | |
| • Core - Time Clock and Log-in based contractor DAC | |
| • Core - Peer to Peer Insurance Markets and DAC | |
| • Core - DASO employment and contractor Smart Contract | |
| • Core - Anti-Fraud loyalty DASO | |
| • Core - Smart Switch DASO | |
| • Core - Sportsbook | |
| • Distributed Autonomous Smart Organisation Project | |
| • Smart Contracts | |
| • Online Distributed Ledger DASO | |
| **10:2C** | |
| <u>Assignment from Denariuz</u> | **We have added these Core IP Rights into the draft Daso Assignment Schedule in Schedule D of the Draft IP Assignment Schedule Report.** |
| The response to the initial information request (Doc ID DM152) | |

CONFIDENTIAL

DEF_01612010

| DASO | | COMMENTS REGARDING APPROACH |
|---|---|---|
| | indicates that IP has been assigned to Daso by Denariuz.  Doc ID DM39 is a Consultancy Agreement between Daso and Denariuz.  Whilst it is unclear why this assignment has been singled out over the other DeMorgan Group Services Agreements referred to in section 10:2A  above, we have been instructed (RFI #9 and #47) that this is the only intellectual property rights assignment between these two entities.  Please see further comments in section 13:4A regarding the scope of this assignment. | Please see further comments in section 13:4A regarding the scope of this assignment. |
| 3. **Red Flag Third Party Issues** | None identified in the Review Material. | N/A. |
| 4. **Other issues to note** | **10:4A** <br><br> <u>Grant of licences</u> <br><br> Doc ID DM152 states that Daso has not granted any intellectual property licences, or itself been granted any intellectual property licences.  However, we note that the DeMorgan Group Services Agreements contain licences. | ~~Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between DeMorgan Group Entities will need to be rethought.~~ <br><br> ~~Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from NewCo and how existing licences should be dealt with.~~ <br><br> <u>Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.</u> |

**Formatted:** Font: Not Bold

**Formatted:** Font: Bold

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612011

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612012

# 11. Zuhl - overview of findings

| ZUHL | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 1. Overview of company role | **11:1A**<br><br>Business<br><br>The primary business of Zuhl relates to an online academic network known as a social learning system (DeMorgan Group Entity shareholding tableDoc ID DM154). | At a general level, for completeness, Zuhl's work relating to an online academic network known as a social learning system should be captured in the IP Assignment from Zuhl.<br><br>**We have added this into the draft Assignment Schedule in Schedule E of the Draft IP Assignment Schedule Report.** |
| | **11:1B**<br><br>Volume of likely Core IP Rights<br><br>In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):<br><br>• Zuhl has filed an R&D incentive claim in the past and was intending to do so again in the 2015 financial year.<br>• Work has been carried out for Zuhl by other DeMorgan Group Entities under DeMorgan Group Services Agreements.<br>• Zuhl has never had any employees but has in the past engaged one independent contractor (in the USA). | It appears possible that R&D activity has occurred via Zuhl, but only via DeMorgan Group Services Agreements and one independent contractor rather than employees. As such, Zuhl could own some Core IP Rights. However, there are a number of uncertainties surrounding the scope of these as noted in sections 11.2, 11.3 and 11.4 below. |
| 2. Summary of IP likely to be | **11:2A**<br><br>DeMorgan Group Services Agreements | General comment regarding employees<br><br>Please see our comments in section 9:2C regarding |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2635814 v1SYDDMS2635814 v1SYDDMS    DRAFT
64
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612013

| ZUHL | COMMENTS REGARDING APPROACH |
|---|---|
| **owned by the company**[6] Zuhl is party to a number of DeMorgan Group Services Agreements. Doc ID DM140 states that Zuhl has been the recipient of services under: <br><br> • Services Agreement with Integyrz (services provider) (Doc ID DM52) <br> • Services Agreement with Interconnected Research (service provider) (Doc ID DM45) <br> • Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM29) <br> • Consultancy Agreement with Pholus (service provider) (Doc ID DM12) <br><br> All of these Agreements contain an assignment of intellectual property rights from the service provider to Zuhl (as services recipient). However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner). <br><br> As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects. We note as follows regarding the projects carried out under the Services Agreements for Zuhl: <br><br> • Services Agreement with Integyrz (services provider): projects covered by this arrangement are simply described as "TBD". Note that this work had a completion date of 30 June 2017 and therefore may be incomplete; and <br> • Services Agreement with Interconnected Research (service provider): projects covered by this arrangement are simply | employee issues relating to the DeMorgan Group Services Agreements. The same issues arise here. <br><br> _Services Agreement_ <br><br> It is likely that these Core IP Rights will be owned by Zuhl (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Zuhl ~~and subject to our comment below regarding payment~~. <br><br> Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP". Those comments also apply here. **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Zuhl IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Zuhl. We have therefore added this into Schedule E of the Draft IP Assignment Schedule Report. Given the projects under these agreements are defined as "TBC" we note that it is only possible to describe these very generally.** <br><br> As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made. We |

---

[6] A draft Assignment Schedule for the Zuhl IP Assignment is set out in Schedule E of the Draft IP Assignment Schedule Report.

Formatted: DMReference

| ZUHL | COMMENTS REGARDING APPROACH |
|---|---|
| described as "TBD". Note that this work had a completion date of 30 June 2017 and therefore may be incomplete.<br><br>As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure). | have been instructed, and we have assumed for present purposes that all payments have been made (and therefore that the assignments have taken effect) (Doc ID DM 161). However, please confirm that our assumption is correct particularly given, again.We note that the completion date for the work is not until 30 June 2017. If this assumption is incorrect please let us know as this will alter the ownership positionThis could mean that the work is incomplete. |

**Consultancy Agreements**

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements. The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above. We have added these into Schedule E of the Draft IP Assignment Schedule Report. We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Third Party Licences

Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements. Those comments also apply here.

| Formatted: Font: Bold |
| Formatted: DMReference |

CONFIDENTIAL

DEF_01612015

| ZUHL | COMMENTS REGARDING APPROACH |
|---|---|
| | Outsourcing to other DeMorgan Group Entities |
| | Please see our comments in section 9:2C above. |

**11:2B**

Contractor created material

Zuhl has filed a number of R&D incentive claims which give further detail regarding the work undertaken by the company.

Doc ID DM113 (Zuhl Tax Incentive Application (2013-2014)) refers to the following Zuhl projects (in summary):

- "Project - Social Learning system"
  - o "Core - Integrating Distributed Autonomous Smart Organisation DASO to Zuhl"
  - o "Core - 3D Neural Network"
  - o "Supporting - Base system"

In addition Doc ID DM160 ((list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) lists the following "pending patent applications":

- "P2P social network payment settlement system "
- "Distributed Reputation system"
- "Reputation based authentication system "
- "System and method for creating a secure trusted social network with reputation recorded into the blockchain"
- "Method of Sharing Possessions among "Friends" Connected through a Social Network using blockchain based tracking"
- "A method and system to allow for the exchange of personal information whilst maintaining [privacy] in social and dating networks"

Please see comments above in 11:2A (as to work under the DeMorgan Group Services Agreements generally) as to next steps regarding these Core IP Rights.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612016

| ZUHL | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 3. Red Flag Third Party Issues | **11:3A**<br><br>Uyen Nguyen<br><br>The response to the initial information request (Doc ID DM152) states that Uyen Nguyen (USA) was engaged as an individual contractor by Zuhl. It is therefore possible that she may have created some of the work outlined in section 2 above.<br><br>RFI #11 indicated that no written contract was entered into between Zuhl and Uyen Nguyen. | As noted in 8:3A, all intellectual property rights in material created by an independent contractor will generally vest in the independent contractor under Australian law. Therefore, absent an assignment of those intellectual property rights, they will remain owned by the independent contractor.<br><br>Therefore, in the absence of any written contract with Uyen Nguyen, it is likely that under Australian law she remains the owner of all intellectual property rights in any material that he created for Zuhl. (We note for completeness that Uyen Nguyen was located in the USA. Whilst we have only considered the position under Australian law, please note that this could also raise US law considerations.)<br><br>~~Zuhl should assess the importance of the work undertaken by Uyen Nguyen and determine whether it is necessary (and possible) to approach him to assign relevant Core IP Rights. Given Uyen Nguyen appears to have been a director of W&K at the time of the litigation that Craig Wright brought against it as described in section 22:3C we query whether there raises a question mark over the likelihood of obtaining such an assignment.~~We have been instructed that Uyen Nguyen is willing to execute an IP assignment (Doc ID DM 161). We will therefore prepare an IP Assignment from Uyen Nguyen in addition to the other IP Assignments. |
| 4. Other issues to note | **11:4A** | ~~Note that it will be necessary to consider whether licences are still required or not. Given that the~~ |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612017

| ZUHL | COMMENTS REGARDING APPROACH |
|---|---|
| **Grant of licences**<br><br>The response to the initial information request (Doc ID DM152) states that Zuhl has not granted any intellectual property licences, or itself been granted any intellectual property licences. However, we note that the DeMorgan Group Services Agreements contain licences. | intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co. licences between DeMorgan Group Entities will need to be rethought.<br><br>Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from NewCo and how existing licences should be dealt with.<br><br>Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place. |

**Formatted:** Font: Not Bold

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612018

## 12. Interconnected Research - overview of findings

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **12:1A** |
| | Business |
| | The primary business of Interconnected Research involves research and development focussed on cryptocurrencies (DeMorgan Group Entity shareholding table at Doc ID DM154). |

At a general level, for completeness, Interconnected Research's work relating to cryptocurrencies should be captured in the IP Assignment from Interconnected Research.

**We have added this into the draft Assignment Schedule in Schedule F of the Draft IP Assignment Schedule Report.**

**12:1B**

Volume of likely Core IP Rights

In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):

- Interconnected Research had employees in Australia in 2014 and 2015.
- Work has also been carried out for Interconnected Research under DeMorgan Group Services Agreements (and Interconnected Research has itself also provided services to other DeMorgan Group Entities under other DeMorgan Group Services Agreements).
- Interconnected Research has submitted one previous R&D incentive claim and was intending to do so again in the 2015 financial year.

It appears possible that R&D activity has occurred via Interconnected Research, both ~~through~~ via its employees and under DeMorgan Group Services Agreements, and as such Interconnected Research could own Core IP Rights.  However, there are a number of uncertainties surrounding this as noted in sections 12:2, 12:3 and 12:4 below.

**2. Summary of IP likely to be owned by the**

**12:2A**

Employee created material (generally)

As noted throughout this report, whilst we have not been provided with copies of all employment contracts for the DeMorgan Group Entities' employees, some concerns

Formatted: DMReference

CONFIDENTIAL

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| **company**[7] The response to the initial information request (Doc ID DM152) indicates that Interconnected Research has had a number of employees, primarily being developers. | have been raised as to inconsistencies in the stated employer of listed individuals.<br><br>For instance, as noted in section 8:2A, a number of individuals listed as Hotwire employees have employment contracts that are actually with Interconnected Research.  Please see comments in section 8:2A in this regard.  For the reasons outlined in section 8:2A, we have therefore included the IP identified in sections 8:2B and 8:2C (as category 1 and category 2 created material) below in square brackets in both the draft Assignment Schedule for Hotwire as well as the draft Assignment Schedule for Interconnected Research in Schedule F of the Draft IP Assignment Schedule Report.<br><br>As noted in 8:2A, we recommend that both Hotwire and Interconnected Research check their records to confirm: (1) whether individuals listed in the list of previous Hotwire employees at Doc ID DM153 are in fact Hotwire employees or Interconnected Research employees; (2) whether Hotwire has outsourced any work to Interconnected Research; and (3) whether there is a written services agreement between Hotwire and Interconnected Research.  This will assist with determining whether the certain Core IP Rights are currently owned by Hotwire, or Interconnected Research, or potentially both entities. |

> Formatted: Font: Not Bold

---

[7] A draft Assignment Schedule for the Interconnected Research IP Assignment is set out in Schedule F of the Draft IP Assignment Schedule Report.

> Formatted: DMReference

DeMorgan                                          71                      Wright Family Trust - overview of findings
13 November 201527 November 2015
2635814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT

CONFIDENTIAL

DEF_01612020

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| | At this stage, given it appears that the work for Hotwire was primarily carried out by employees of the DeMorgan Group whilst such individuals were employed by Hotwire, we have included the IP identified in section 8:2B and 8:2C in the draft Assignment Schedule for Hotwire in Schedule B of the Draft IP Assignment Schedule Report.  However, due to the risk that some of this work could have occurred after those individuals became employed by Interconnected Research, we have (for the sake of completeness) included a reference to the Core IP Rights in such work in the draft Assignment Schedule for Interconnected Research in Schedule B of the Draft IP Assignment Schedule Report.  We have drafted this only to catch such Core IP Rights to the extent they are in fact owned by Interconnected Research (due to this change in employment status). |
| | Further, as noted in section 9:2A, Dr Stef Savanah is stated to be an employee of Integyrz in the response to the intial information request at Doc ID DM152, but her employment contract is with Interconnected Research.  Please note that, for the reasons given in section 9:2A, we have at this stage added the Core IP Rights identified at section 9:2B into the draft Assignment Schedule for Integyrz in Schedule C of the Draft IP Assignment Schedule Report, not the draft Assignment Schedule for Interconnected Research.  However, if there is any change to the position and assumptions outlined in section 9:2A in this regard, this could require changes to move or replicate this into the Assignment Schedule for |

**Formatted:** Font: Not Bold

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612021

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| | Interconnected Research. |

**COMMENTS REGARDING APPROACH**

Interconnected Research.

The above are issues identified from the Review Material. As the Review Material does not contain a full list of employees, or a full copy of all employment contracts, please note that we have assumed that there are no other inconsistencies other than as provided. However, if this assumption is incorrect, it is possible that this could alter the ownership position of relevant Core IP Rights.

We have otherwise proceed, subject to our comments in section 6 above, on the basis that material created by its employees is owned by Interconnected Research as employer.

**INTERCONNECTED RESEARCH**

**12:2B**

Employee created material (category 1)

Interconnected Research has filed an R&D incentive claim which gives further detail regarding the work undertaken by the company.

Doc ID DM103 (Interconnected Tax Incentive Application (2013-2014)) refers to the following Interconnected Research projects (in summary):

- "BTC Accounting: XBT Accounting Project"
  - "Core - Bitcoin daemon and mapping system"
  - "Supporting - Development of a base accounting system that can be linked to the Blockchain"

In addition, Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) refers to the following "patent pending applications" for

Please see comments above in section 12:2A (as to employee created material (generally)) as to next steps regarding these Core IP Rights.

Formatted: DMReference

CONFIDENTIAL

DEF_01612022

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|

Interconnected Research:

- "blockchain based accounting system"
- "blockchain based accounting system" (a system and method to utilise the blockchain for an accounts receivable system)
- "System and method for conducting an electronic financial asset deposit auction using the Blockchain"
- "Method and electronic apparatus for performing automated book keeping utilising the Blockchain"
- "P2P System and method for facilitating the lending of digital content using contacts lists"
- "P2P Personal financial network"
- "A system [for] reading, organizing and manipulating accounting data held within the blockchain"
- "Blockchain based activity information accounting method and system"
- "System and method for automatically managing bad accounts of accounts receivable using the Blockchain"
- "Transaction accounting payment and classification system for Blockchain [based] accounting"
- "A method to Integrate utility accounting, materials management, work management and regulatory reporting software based on the Blockchain"
- "Automatic taxonomy merge system for blockchain based accounting"
- "Extensible vote based property ownership system"
- "Vote based blockchain requisition and authorization process"
- "Method and system to manage blockchain enabled services for multiple managed computer systems"

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612023

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|

- "XML mapping system block chain integration"
- "An integrated secure blockchain based voting system"
- "Auditable secret voting system"

**12:2C**

DeMorgan Group Services Agreements

Interconnected Research is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Interconnected Research has been the recipient of services under:

- Services Agreement with Integyrz (service provider) Doc ID DM51
- Consultancy Agreement with Pholus (service provider) Doc ID DM9
- Consultancy Agreement with Panopticrypt (service provider) Doc ID DM26

All of these Agreements contain an assignment of intellectual property rights from the service provider to Interconnected Research (as services recipient).  However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects.  We note as follows regarding the projects carried out under the Services Agreements for Interconnected

**General comments regarding employees**

Please see our comments in section 9:2C regarding employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here.

Services Agreements

It is likely that the Core IP Rights in these listed projects will be owned by Interconnected Research (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Interconnected Research ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP".  Those comments also apply here.  **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Interconnected Research IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Interconnected Research.  We have therefore added this into Schedule F of the Draft IP Assignment Schedule Report.**

| Formatted: DMReference |
|---|

CONFIDENTIAL

DEF_01612024

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| Research: | As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made~~, and we have assumed for present purposes~~ We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc ID DM161). ~~However, please confirm that our assumption is correct~~ particularly given, again.We note that the completion date for the work is not until 30 June 2017. ~~If this assumption is incorrect please let us know as this will alter the ownership position~~This could mean that the work is incomplete. |
| • Services Agreement with Integyrz (services provider) covers the following projects: (1) XBT Accounting System; (2) XBT Accounting System (regulated); and (iii) XBT Accounting System Commercialisation.  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete. | |
| As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure). | |

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule F of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Third Party Licences

Please see our comments in section 9:2C regarding third

Formatted: DMReference

DEF_01612025

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| | party licences relevant to work under DeMorgan Group Services Agreements.   Those comments also apply here. |
| | ~~Outsourcing to other DeMorgan Group Entities~~ |
| | ~~Please see our comments in section 9:2C above.~~ |
| **3.   Red Flag Third Party Issues** | None identified in the Review Material. | N/A |
| **4.   Other issues to note** | **12:4A** | **Services Agreement** |
| | <u>DeMorgan Group Services Agreements</u> | It is likely that these Core IP Rights will be ~~owand~~ <u>owned</u> by the DeMorgan Group Entities acting as services recipients (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by Interconnected Research ~~and subject to our comment below regarding payment.~~ |
| | In addition to the DeMorgan Group Services Agreements listed at 12:2C, Doc ID DM 140 identifies Interconnected Research as the service provider under the following DeMorgan Group Services Agreements: | |
| | • Services Agreement with C01N (services recipient) (Doc ID DM44) | Please see our comments in section 9:2C above regarding issues regarding the distinction between "Project Foreground IP" and "Provider IP" under the DeMorgan ~~Groupo~~ <u>Group</u> Services Agreements.   The same issues arise here. |
| | • Services Agreement with Cloudcroft (services recipient) (Doc ID DM42) | |
| | • Services Agreement with Coin-Exch (services recipient) (Doc ID DM43) | **As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the "Project Foreground IP") be included in the IP Assignments from the DeMorgan Group Entities acting as services recipients, leaving the blanket nature of the IP Assignment from Interconnected Research to capture any residual** |
| | • Services Agreement with DASO (services recipient) (Doc ID DM41) | |
| | • Services Agreement with Integyrz (services recipient) (Doc ID DM48) | |
| | • Services Agreement with Panopticrypt (services recipient) (Doc ID DM40) | |
| | • Services Agreement with Pholus (services recipient) (Doc | |

Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814 v1\SYDDMS~~2635814 v1\SYDDMS   DRAFT
77
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612026

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|

ID DM47)

- Services Agreement with Zuhl (services recipient) (Doc ID DM45)
- Services Agreement with Denariuz (services recipient) (Doc ID DM46)
- Consultancy Agreement with Misfit Games (services recipient) (Doc ID DM33)
- Consultancy Agreement with DeMorgan Limited (services recipient) (Doc ID DM35)
- Consultancy Agreement with Chaos (services recipient) (Doc ID DM34)  (Noting that this is not listed on the DeMorgan Group internal Agreements Register (Doc ID DM140) but a contract has been provided as part of the Review Materials.)

As referred to in section 8:4A there is also an R&D Services Agreement between Coin-Exch Pty Ltd and Hotwire Preemptive Intelligence Ltd and Interconnected Research Pty Ltd on similar terms where both Hotwire and Interconnected Research act as service provider.

All of these Agreements contain an assignment of intellectual property rights from Interconnected Research (as service provider) to the DeMorgan Group Entity acting as services recipient. However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner) whilst noting that in this instance Interconnected Research is acting as service provider.

**"Provider IP" retained by Interconnected Research (as service provider).  We have added a general description of these retained rights into Schedule F of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe these very broadly given the uncertainty regarding what has been retained.**

We do note that the assignment of "Project Foreground IP" under the Services Agreements is only effective "when corresponding amounts invoiced and due are paid".  ~~Please note that we have assumed for present purposes that~~We have been instructed that all such amounts have been paid (and therefore that the assignments have taken effect) (Doc ID DM161). ~~However, please confirm that our assumption is correct particularly given~~We note that the completion date for this work is ~~as noted~~ not until 30 June 2017.  ~~If this assumption is incorrect please let us know as this will alter the ownership position.~~This could mean that the work is incomplete.

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here.

**As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the majority of the work carried out under the Consultancy Agreements) be included in the IP Assignments from the DeMorgan Group**

Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814 v1~~SYDDMS2635814 v1SYDDMS  DRAFT
73
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612027

| INTERCONNECTED RESEARCH | COMMENTS REGARDING APPROACH |
|---|---|
| | Entities acting as services recipients, leaving the blanket nature of the IP Assignment from Interconnected Research to capture any residual intellectual property rights retained by Interconnected Research as services provider.  We have added a general description of these retained rights into Schedule F of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe these very broadly given the uncertainty regarding what has been retained. |

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9.2C above.

**12:4B**

Grant of licences

The response to the initial information Doc ID DM 152 states that Interconnected Research has not granted any intellectual property licences, or itself been granted any intellectual property licences.  However, we note that many of the DeMorgan Group Services Agreements contain licences.

Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be rethought.

Consideration will need to be given moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with.

Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.

DeMorgan
13 November 201527 November 2015
2635814 v1\SYDDMS2835814 v1\SYDDMS  DRAFT
79
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612028

## 13. Denariuz - overview of findings

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **13:1A**<br><br>Business<br><br>The primary business of Denariuz relates to a Bitcoin Banking System (response to initial information request at Doc ID DM152). | At a general level, for completeness, Denariuz's work relating to the Bitcoin Banking System should be captured in the IP Assignment from Denariuz.<br><br>**We have added this into the draft Assignment Schedule in Schedule G of the Draft IP Assignment Schedule Report.** |
| | **13:1B**<br><br>Volume of likely Core IP Rights<br><br>In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):<br><br>• Denariuz has never had any employees.<br>• Work has been carried out for Denariuz under DeMorgan Group Services Agreements (and Denariuz has itself also provided services to Daso under a DeMorgan Group Services Agreement).<br>• Denariuz has submitted one previous R&D incentive claim and was intending to do so again in the 2015 financial year. | It appears possible that R&D activity has occurred via Denariuz but only via DeMorgan Group Services Agreements. As such, Denariuz could own some Core IP Rights. However, there are a number of uncertainties surrounding the scope of these as noted in sections 13.2, 13.3 and 13.4 below. |
| **2. Summary of IP likely to be** | **13:2A**<br><br>DeMorgan Group Services Agreements | General comments regarding employees<br><br>Please see our comments in section 9:2C regarding |

**Formatted:** DMReference

CONFIDENTIAL

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|

**owned by the company[8]**

Denariuz is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Denariuz has been the recipient of services under:

- Services Agreement with Integyrz (service provider) Doc ID DM55
- Services Agreement with Interconnected Research (service provider) Doc ID DM46
- Consultancy Agreement with Pholus (service provider) Doc ID DM15
- Consultancy Agreement with Panopticrypt (service provider) Doc ID DM30

All of these Agreements contain an assignment of intellectual property rights from the service provider to Denariuz (as services recipient). However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects. We note as follows regarding the projects carried out under the Services Agreements for Denariuz:

- Services Agreement with Integyrz (services provider) covers the following projects: (1) Bitcoin Core banking; (2) Bitcoin Bank regulated; (3) Bitcoin Payment and Merchant

employee issues relating to the DeMorgan Group Services Agreements. The same issues arise here.

<u>Services Agreements</u>

It is likely that the Core IP Rights in these listed projects will be owned by Denariuz (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Denariuz ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP". Those comments also apply here. **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Denariuz IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Denariuz. We have therefore added this into Schedule G of the Draft IP Assignment Schedule Report.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made. ~~We have been instructed , and we have assumed for present purposes~~ that all payments have been made (and

---

[8] A draft Assignment Schedule for the Denariuz IP Assignment is set out in Schedule G of the Draft IP Assignment Schedule Report.

DeMorgan
13 November 201527 November 2015
2635814 v1SYDDMS2635814 v1SYDDMS   DRAFT
81
Wright Family Trust - overview of findings

Formatted: DMReference

DEF_01612030

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|

Gateway; (4) Smart Contract (basic transactions).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

- Services Agreement with Interconnected Research (services provider) covers the following projects: (1) Bitcoin Core banking; (2) Bitcoin Bank regulated; (3) Bitcoin Payment and Merchant Gateway; (4) Smart Contract (basic transactions).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

We also note that Doc ID DM110 and DM111 (AusIndustry R&D Tax Incentive application forms 2014-2015 and 2013-2014 respectively) refer to collaborations with an unspecified "research service provider".  We assume that this reference to an unspecified "research service provider" is, in fact, a reference to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus) given it is clear that work has been outsourced to these entities (and given no other third party is referred to as providing services to Denariuz in any of the other Review Material).  However, as noted in our comments to the right, this should be confirmed.

therefore that the assignments have taken effect) (Doc ID DM161).  However, please confirm that our assumption is correct particularly given, again,We note that the completion date for the work is not until 30 June 2017.  If this assumption is incorrect please let us know as this will alter the ownership positionThis could mean that the work is incomplete.

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here.  **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule G of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Third Party Licences

Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements.  Those comments also apply here.

Unspecified "Research Service Provider"

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2636814-v1SYDDMS  DRAFT
82
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612031

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| | Finally, as noted to the left, we have assumed that the references to collaboration with an unspecified "research service provider" in Doc ID DM110 and DM111 in the course of research and development activity are references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus). ~~Please let us know if this assumption is incorrect. If this is incorrect, and Denariuz work has been performed by other third parties, this will need to be investigated separately. Further, if any of those references are to third parties outside the DeMorgan Group, this raises a risk of Red Flag Third Party Issues with regard to the Denariuz Core IP Rights.~~We have been instructed that no other Third Parties are involved. |
| | Outsourcing to other DeMorgan Group Entities |
| | Please see our comments in section 9:2C above. |
| **13:2B**<br><br>Contractor created material<br><br>Denariuz has filed an R&D incentive claim which gives further detail regarding the work undertaken by the company.<br><br>Doc ID DM111 refers to the following Denariuz projects (in summary):<br><br>• "DASO: Decentralized Consensus (Distributed Autonomous Smart Organisation) Project"<br>  o "Core - Virtualised HPC"<br>    ▪ "Supporting - Development of a virtualised multicore platform"<br>  o "Core - Decentralized Autonomus Consus Platform | Please see comments above in 13:2A (as to work under the DeMorgan Group Services Agreements generally) as to next steps regarding these Core IP Rights.<br><br>As noted in section 10:2B above, we have been instructed that some of this work has been conducted via *both* Daso and Denariuz (Doc ID DM205). The projects listed as worked on via both Denariuz and Daso (as set out in section 10:2B above) may have have resulted in Core IP Rights arising from that work being either jointly owned by Denariuz and Daso, or in some Core IP Rights arising from that work being owned by Daso and some by Denariuz. As such, we have reflected the "joint" projects identified in section 10:2B in both the draft |

| Formatted: DMReference |
|---|

CONFIDENTIAL

DEF_01612032

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| (DACP)" | Daso IP Assignment schedule in Schedule D of the Draft IP Assignment Schedule Report and the draft Denariuz IP Assignment schedule in Schedule G of the Draft IP Assignment Schedule Report. |

(DACP)"
- o "Core - DACP Assurance Contracts"
- o "Core - Experimental Case Studies"
- o "Core - Time Clock and Log-in based contractor DAC"
- o "Core - Peer to Peer Insurance Markets and DAC"
- o "Core - DASO employment and contractor Smart Contract"
- o "Core - Anti-Fraud loyalty DASO"
- o "Core - Smart Switch DASO"
- o "Core - Triple entry distributed Ledger"
- o "Core - Sub experiment and extension"
- o "Core - Trustless Oracle"
- o "Core - Smart Registry"
- o "Core - Multi Signature Trust"
- o "Core - Sportsbook"

Doc ID DM110 refers to the following Denariuz projects (in summary):
- "Distributed Autonomus Smart Organisation Project (DASO)"
- "Smart Contracts"
- "Multilayer Perceptrons for DASO"
- "Decentralized Autonomus Consensus Platform (DACP)"
- "Experimental DASO Case Studies"
- "Online Distributed Ledger DASO"

In addition, Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) lists the following "pending patent applications" for Denariuz:

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2635814-v1USYDDMS2635314-v1USYDDMS   DRAFT
84
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612033

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| <ul><li>"Consolidated blockchain based accounting"</li><li>"Multi signature trust"</li><li>"Distributed financial distress rating system"</li><li>"One-step posting for approval-based ledger transactions using multi-[signature] wallets"</li><li>"Non-interest property purchase"</li><li>"Lease and loan sub-ledger blockchain accounting methods and system"</li><li>"A capital asset planning system for smart property contracts"</li><li>"Combination cryptocurrency wallet and muli-account ledger balancing system for monitoring a user's spending habits in real-time"</li><li>"System and method for capturing and storing casino information in a Blockchain"</li><li>"Financial management system and method with blockchain transaction and non-debt management"</li><li>"System and method for margin loan securitization using non-debt based allocation and account payment"</li><li>"Blockchain mapped budgetary ledger"</li><li>"Intercompany transactions elimination system"</li><li>"A stock allocation and capitalisation system for a DAC"</li><li>"A bond system for a DAC"</li><li>"Sportsbook"</li><li>"Method and system for using invoice categorization in blockchain accounting to deliver an automated management application"</li><li>"Electronic P2P Margin Management System For Managing Actions Such As Margin Calls Under Margin Agreements"</li><li>"Electronic P2P Martin Management System For Managing</li></ul> | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612034

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|

Actions Such As Margin Recalls Under Margin Agreements"

- "Method and system for facilitating commerce, social interaction and charitable acitivites as a distributed autonomous Social organisation"
- "Automata, system and Method for Equity-Based Compensation Accounting utilising the Bloc[k]chain"
- "Smart event ticketing"
- "Methods and systems for improving timely loan repayment by controlling online accounts, notifying social contacts, using loan repayment DASo's employing social graphs"
- "Verify signed software on the Blockchain"
- "System and method of tracking and recognizing the exchange of favours in a DASO"
- "DASO - (e) Sports bet (85%)"
- "User-controlled blockchain verified sweepstakes entries"
- "Blockchain enabled Enterprise information management system and methods"
- "System and method for international merchandise return service against the blockchain"
- "DASO - (a) Employment smart contract"
- "DASO - (c) Anti-fraud loyalty"
- "Blockchain verified Player reward program with loyalty-based reallocation"
- "Automatically verified Player reward program with loyalty-based reallocation"
- "DASO - (d) Smart switch"
- "DASO - (b) Time clock"
- "Vehicle history log"
- "Autonomous consensus platform"
- "Method and system for generating occupant schedules that

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612035

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| | are maintained in the blockchain"<br>• "DASO and method for collaborative shopping, business and entertainment"<br>• "Deterministic Finite Automata Graph Traversal with Nodal Bit Mapping based on a distributed block system" | |

| | | |
|---|---|---|
| 3. | Red Flag Third Party Issues | **13:3A**<br><br>Third party research service provider<br><br>Please see comments in section 13:2A regarding research service providers utilised by Denariuz as referenced in Doc ID DM110 and DM111.  As noted in section 13:2A, we have assumed that these are references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus). | As noted in section 13:2A, we have assumed that these are references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus). However, if this is incorrect, and any of these references are to other third parties outside the DeMorgan Group, this raises a risk of a Red Flag Third Party Issue with regard to the Denariuz Core IP Rights.  We have been instructed that no Third Parties are involved.<br><br>Please see comments in section 13:2A. |
| 4. | Other issues to note | **13:4A**<br><br>Assignment to Daso<br><br>In addition to the DeMorgan Group Services Agreements listed in 13:2A, the DeMorgan Group internal Agreements Register (Doc ID DM 140) identifies Denariuz as the service provider under a Consultancy Agreement with Daso (services recipient) (Doc ID DM39).<br><br>This Agreement contains an assignment of intellectual property rights from Denariuz (as service provider) to Daso as services recipient.  However, in terms of the scope of the assignment, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements that are *Consultancy Agreements* operate in the same manner with regard to intellectual property rights) whilst noting that in this instance Denariuz is acting as the | Please see our comments in section 9:2C above regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here.<br><br>**As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the majority of the work carried out under the Consultancy Agreement between Daso and Denariuz) be included in the IP Assignment from Daso (as services recipient), leaving the blanket nature of the IP Assignment from Denariuz to capture any residual intellectual property rights retained by Denariuz as services recipient.  We have added a general description of these retained rights into Schedule G of the Draft IP Assignment Schedule** |

Formatted: DMReference

DEF_01612036

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| service provider. | Report.  We note that it will only be possible to describe these retained rights very broadly given the uncertainty regarding what has been retained. |
| We note that the response to the initial information request at Doc ID DM152 specifically indicates that IP has been assigned to Daso by Denariuz.  Whilst it is unclear why this assignment has been singled out over the other DeMorgan Group Services Agreements pursuant to which Daso obtains assignments of intellectual property rights from other DeMorgan Group Entities as outlined in section 13:2A above, we have been instructed (RFI #9 and #47) that Doc ID DM39  is the only assignment of intellectual property rights between these two entities. | Finally, we also note that some of the listed IP above in section 13:2B  seems on its face to relate to Daso (given the word "Daso" forms part of the name of a number of the projects) has been identified to us as "jointly" created with Daso, but there is no way to tell from the face of the documents if this was created under the Consultancy Agreement with Daso or not.  As such, we have at this stage dealt with such work as set out in section 13.2B above.  However, if Denariuz is aware that some of this work was in fact carried out under the Consultancy Agreement with Daso please let us know as this is likely to change the ownership position. |

**13:4B**

<u>Assignment to Misfit Games</u>

| | |
|---|---|
| Despite the response to the initial information request stating that no intellectual property rights had been assigned by Denariuz to any other entity other than Daso (as noted in section 13:4A above) we note Denariuz has also entered into an IP Deed of Assignment under which it confirms that it has assigned certain intellectual property rights to Misfit Games (Doc ID DM147). | There are a number of issues raised by the drafting of the assignment.

Firstly, there is a question over whether it itself assigns any rights given it appears to simply confirm that Denariuz has completed, or will complete at its earliest opportunity, an irrevocable assignment of any "existing and future Intellectual Property and Intellectual Property Rights".  We have not separately seen any document under which the intellectual property rights are separately assigned and understand that there may not be any such separate document.  This raises a question over whether the assignment has actually occurred or not (which is heightened due to the fact that Doc ID DM152 does not identify this in the list of assignments by |
| The IP Deed of Assignment intellectual property rights intended to be assigned appear intended to relate to "Heat and Power simulations to be conducted on the Denariuz SuperComputer system at a max load of 50TFlop for 3 months" being the "Core | |

Formatted: DMReference

DEF_01612037

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|
| Technology". | Denariuz).  However, even if it has not occurred, Denariuz agrees pursuant to the IP Deed of Assignment to complete the assignment (and grants a licence to use the relevant rights until this is done) meaning it could be called on to perfect the assignment if necessary.  ~~As such, we suggest that Denariuz and Misfit Games check their records to confirm whether the assignment was completed and in the meantime proceed on the basis that it has been completed.  If it has not, please let us know as this could alter the position.~~

Secondly, there is a risk that the assignment envisaged by the IP Deed of Assignment is broader than just the intellectual property rights in the "Core Technology" as the assignment is of both "Intellectual Property" (which is defined, in summary, as including certain property relating to the "Core Technology") and "Intellectual Property Rights" (which is not defined by reference to the "Core Technology" at all).  This opens a risk that more of Denariuz's Core IP Rights were assigned to Misfit Games than just the Core IP Rights in the "Core Technology".  This risk is somewhat mitigated (although not removed entirely), however, by the fact that the IP Deed of Assignment states, in its background Recitals, that "the Assignor agrees to an irrevocable assignment of all Intellectual Property and Intellectual Property Rights to the Assignee in the Core Technology they are creating" which supports an interpretation that limits the assignment to the "Core Technology".

**For the reasons set out above, we have added the Core IP Rights relating to the "Core Technology" ~~only~~ into the Assignment Schedule for Misfit Games** |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612038

| DENARIUZ | COMMENTS REGARDING APPROACH |
|---|---|

**in Schedule O of the Draft IP Assignment Schedule Report,**

However, we have also, for completeness, added any Core IP Rights retained by Denariuz into the Assignment Schedule for Denariuz in Schedule G of the Draft IP Assignment Schedules Report.

Note that it will be necessary to consider whether licences are still required or not. Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be rethought.

Consideration will need to be given moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with.

Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.

**13:4C**

Grant of licences

The response to the initial information request at Doc ID DM152 states that Denariuz has not granted any intellectual property licences, or itself been granted any intellectual property licences. However, we note that many of the DeMorgan Group Services Agreements contain licences.

**Formatted:** Font: Not Bold

**Formatted:** Font: Not Bold

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612039

## 14. C01n - overview of findings

| C01N | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **14:1A** <br><br> <u>Business</u> <br><br> The primary business of C01n (previously called Strasan Pty Ltd) relates to eWallet and iDaemon (Doc ID DM154). | At a general level, for completeness, C01n's work relating to eWallet and iDaemon should be captured in the IP Assignment from C01n. <br><br> **We have added this into the draft Co1n Assignment Schedule in Schedule H of the Draft IP Assignment Schedule Report.** |
| | **14:1B** <br><br> <u>Volume of likely Core IP Rights</u> <br><br> In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152): <br><br> • C01n has never had any employees but has in the past engaged two independent contractors in Australia. <br> • C01n has filed R&D incentive claims in the past and was intending to do so again in the 2015 financial year. <br> • Work has been carried out for C01n in the past by other DeMorgan Group Entities under DeMorgan Group Services Agreements. | It appears possible that R&D activity has occurred via C01n, but only via DeMorgan Group Services Agreements and two independent contractors rather than employees. As such, C01n could own some Core IP Rights. However, there are a number of uncertainties surrounding the scope of these as noted in sections 14.2, 14.3 and 14.4 below. |
| **2. Summary of IP likely to be** | **14:2A** <br><br> <u>DeMorgan Group Services Agreements</u> | <u>General comments regarding employees</u> <br><br> Please see our comments in section 9:2C regarding |

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814 v1SYDDMS2635814 v1SYDDMS  DRAFT
91
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612040

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

**owned by the company**[9]

C01n is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that C01n has been the recipient of services under:

- Services Agreement with Integyrz (service provider) Doc ID DM53
- Services Agreement with Interconnected Research (service provider) Doc ID DM44
- Consultancy Agreement with Pholus (service provider) Doc ID DM20
- Consultancy Agreement with Panopticrypt (service provider) Doc ID DM25

All of these Agreements contain an assignment of intellectual property rights from the service provider to C01n (as services recipient).  However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects.  We note as follows regarding the projects carried out under the Services Agreements for C01n:

- Services Agreement with Integyrz (services provider) covers the following projects: (1) eWallet Secure; (2) iDaemon; and (3) 3D Transactions Analysis Tool.  Note that this work has

employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here.

Services Agreements

It is likely that the Core IP Rights in these listed projects will be owned by C01n (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to C01n ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP".  Those comments also apply here.  **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the C01n IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to C01n.  We have therefore added this into Schedule H of the Draft IP Assignment Schedule Report.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made~~...~~, and we have assumed for present purposes We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc

---

[9] A draft Assignment Schedule for the Co1n IP Assignment is set out in Schedule H of the Draft IP Assignment Schedule Report.

DeMorgan
~~13 November 2015~~27 November 2015
~~2636814-v1\SYDDMS~~2636814-v1\SYDDMS  DRAFT
9:
Wright Family Trust - overview of findings

**Formatted:** DMReference

DEF_01612041

| C01N | COMMENTS REGARDING APPROACH |
|---|---|
| a completion date of 30 June 2017 and therefore may be incomplete.<br><br>• Services Agreement with Interconnected Research (services provider) covers the following projects: (1) eWallet Secure; (2) iDaemon; and (3) 3D Transactions Analysis Tool. Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.<br><br>As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).<br><br>We also note that Doc ID DM88 and DM90 (AusIndustry R&D Tax Incentive application form 2012-2013 and 2013-2014 respectively) refers to collaboration with an unspecified "private research organisation". We assume that this reference to an unspecified "private research organisation" is, in fact, a reference to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus) given it is clear that work has been outsourced to these entities (and given no other third party is referred to as providing services to C01n in any of the other Review Material). However, as noted in our comments to the right, this should be confirmed. | ID DM 161). However, please confirm that our assumption is correct particularly given, again.We note that the completion date for the work is not until 30 June 2017. If this assumption is incorrect please let us know as this will alter the ownership positionThis may mean that the work is incomplete.<br><br>Consultancy Agreements<br><br>Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements. The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above. We have added these into Schedule H of the Draft IP Assignment Schedule Report. We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**<br><br>Third Party Licences<br><br>Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements. Those comments also apply here.<br><br>Unspecified "private research organisation"<br><br>Finally, as noted to the left, we have assumed that the |

Formatted: DMReference

DeMorgan<br>
13 November 201527 November 2015<br>
2636814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT<br>
93<br>
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612042

| C01N | COMMENTS REGARDING APPROACH |
|------|------------------------------|
| | references to collaboration with an unspecified "private research organisation" in Doc ID DM88 and DM90 in the course of research and development activity are references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus). ~~Please let us know if this assumption is incorrect. If this is incorrect, and C01n work has been performed by other third parties, this will need to be investigated separately. Further, if any of those references are to third parties outside the DeMorgan Group, this raises a risk of Red Flag Third Party Issues with regard to the C01n Core IP Rights.~~ However, we have subsequently been instructed that two other Third Parties worked with C01n – one company undertook chip and board design work to C01n and Craig Wright's specifications, and another Chinese company put together boards and hardware (Doc ID DM205). This raises a risk of a Red Flag Third Party Issue as noted below in section 14:3C. |
| | Outsourcing to other DeMorgan Group Entities |
| | Please see our comments in section 9:2C above. |
| **14:2B** | Please see comments above in section 12:2A (as to work under the DeMorgan Group Services Agreements generally) as to next steps regarding these Core IP Rights. |
| <u>Contractor created material</u> | |
| C01n has filed a number of R&D incentive claims which give further detail regarding the work undertaken by the company. | |
| Doc ID DM88 and DM90 refer to the following C01n projects (in summary): | |
| • "Sukuriputo: Sukuriputo okane" | |
|     ○ "Core - Scriptable Money" | |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612043

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

- o "Supporting - Coding test site"
- o "Core - Transaction signing"
- "Sukuriputo: Sukuriputo okane"
  - o "Core - Scriptable Money"
  - o "Core - BTC Agents"
    - ▪ "Supporting - Coding test side"
  - o "Core - Transaction Signing"

In addition Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) refers to the following "pending patent applications":

- "Method for the processing of allocated and automated collored coins"
- "Coloured coins"
- "System, method and computer program product for reconciling financial data from multiple sources and tagged "coloured coin" sources"
- "Colored coin exchange exception balancing system"
- "On block Future Derivative and risk instrument"
- "Programmable Bond system"
- "Single or multi-company business accounting system and method for same including account number maintenance"
- "Method and system for storing inventory holders against a tagged Blockchain token"
- "System and method for utilizing proforma processing of adjustments in consolidation processes based on colored coins"
- "Date effective quantity on hand and adjusted unit cost calculation system for cryptocurrencies"
- "Blockchain automata financial trading method and system"
- "System and method for synchronizing ledger accounts by

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814-v11SYDDMS2635814-v1SYDDMS  DRAFT
95
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612044

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

company group in blockchain allocated transactions"

- "Secure account aggregation using the Blockchain with one-way chains"
- "Programmable budget"
- "A method of automatic accounting that can be used for Input, Authorize and Settlement without need for reconciliation"
- "Method and system to allow for the adjustments to relational chart of accounts against the blockchain"
- "Selective Processing of Reverse Invoices in Computer Systems for Financial Transactions and implementing a chargeback system for merchant using a blockchain based system"
- "System and method for utilizing proforma processing of adjustments in blockchain based consolidation processes"
- "System, method and computer program product for automatically posting transactions associated with a transaction in the blockchain that is mapped to an account into a general ledger"
- "6. Intelligent bitcoin agents"
- "System and method for cryptocurrency business logic and validation"
- "Automated autromata and system and method for managing and monitoring financial performance associated with benefits"
- "Automated blockchain system for customizing and managing benefits"

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612045

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

**3. Red Flag Third Party Issues**

**14.3A**

<u>Shaoib Mahammad</u>

The response to the initial information request (Doc ID DM152) states that Shaoib Mahammad worked as an independent contractor for C01n.  It is therefore possible that he may have created some of the work outlined in section 14:2 above.

RFI #12 indicates that Shaoib Mahammad worked on putting together "different versions of the modules and project managed the process".  The reference to "modules" appears to be a reference to "Hardware modules for Hoyts and Qantas staff credit union".

RFI #12, #39 and #41 indicate that Shaoib Mahammad was engaged "via Critical Infrastructure" in the sense that "any payment made would go to the company, not the individual", but that there is no written contract between C01n and Shaoib Mahammad or between C01n and Critical Infrastructure.  RFI #40 notes that "Critical Infrastructure" was "Shaoib's company" and had "[n]o relation to the group".

RFI #12 indicates that Shaoib Mahammad ceased working as a contractor for C01n, but continued in the capacity of a director.

Please see our comments in section 8:3A above regarding independent contractors.  Those comments also apply here.

Therefore, in the absence of any written contract with Shaoib Mahammad or Critical Infrastucture, it is likely that under Australian law Shaoib Mahammad or Critical Infrastructure (to the extent that it was his employer, or otherwise took an assignment of those rights) remains the owner of all intellectual property rights in any material that he created for C01n.

~~C01n should assess the importance of the work undertaken by Shoaib Mahammad and determine whether it is necessary (and possible) to approach him and/or Critical Infrastructure (as relevant) to assign relevant Core IP Rights.~~  We have been instructed that Shaoib Mahammad was a project manager, not a designer, architect or developer, and that he did not create any Core IP Rights that are ongoing use to the DeMorgan Group (Doc ID DM205).  As such, we are instructed that the DeMorgan Group does not wish to approach Shoaib Mahammad for an assignment of any intellectual property rights (Doc ID DM205).

We also note that this appears to relate to work for Hoyts and Qantas.  We have not been provided with any contracts with Hoyts or Qantas governing such work.  We note for completeness that to the extent that such contracts exist, it ~~is also would be~~ possible that these could have an impact on the ownership position for these Core IP Rights.  However, we have been instructed that the work for Hoyts and Qantas never

| Formatted: Font: Not Bold |
|---|
| Formatted: Font: Not Bold |
| Formatted: Font: Not Bold |
| Formatted: Font: Not Bold |
| Formatted: DMReference |

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1\SYDDMS~~2685814-v1\SYDDMS  DRAFT
37
Wright Family Trust - overview of findings

CONFIDENTIAL

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

eventuated, and that there are no contracts in this regard (Doc ID DM205).  If no work was ever undertaken, this is unlikely to have an impact on the ownership of any Core IP Rights.

<div style="margin-left: 60%; border: 1px solid black; padding: 2px;">Formatted: Font: Not Bold</div>

**14:3B**

<u>Assignment from Professor Rees</u>

The response to our initial information request (Doc ID DM152) states that C01n has been assigned intellectual property rights by "W&K and Professor Rees".

However, we were subsequently instructed that W&K had no involvement and that this only related to an assignment from Professor Rees in his personal capacity (RFI #44).

RFI #17 states that *"On 30 June 2013 C01N paid 19,470.12 XBT to Professor David Rees for research notes relating to Professor Rees' work related to cryptography.  The Rees material is of immense importance to C01N as it contains the key knowledge required to progress the company's long term ambitions.  Furthermore, the material is inherently valuable due to its exclusivity to C01N. Professor Rees stopped publishing in 1952 although he continued to research in his field of expertise well into the current century (he passed away in 2013).  By purchasing Professor Rees' research notes C01N is and will remain the sole beneficiary of this work."*

However, RFI #17 and RFI #44 both confirm that no contract or formal assignment agreement was ever entered into with Professor Rees.  The only documentation provided as part of the Review Material has been a set of invoices and evidence of payment.

The invoice from David Rees to C01n (then called Strasan Pty Ltd)

Based on the documentation provided, there is a real question over whether there has been an assignment of any intellectual property rights from Professor David Rees to C01n.  On the face of the documentation in the Review Material, we think it is unlikely that there is an effective assignment of intellectual property rights at law given there is nothing to suggest, on the face of the material, an intention to assign any intellectual property rights.

This gives rise to a serious risk that these Core IP Rights remained owned by Professor Rees (who passed away in 2013).

We suggest we discuss, particularly given the comments noted to the left that these Core IP Rights are of critical importance to C01n's work.  It is possible, depending on the facts, that the parties have been mutually operating on the basis that an assignment of intellectual property rights has taken place and therefore, even if this is not correct at law, there may potentially be grounds to argue that the parties should be estopped from proceeding on another basis - however, the likelihood of such an argument being successful will depend very closely on the detailed facts, which are likely to be further complicated here due to Professor Rees' death in

<div style="margin-left: 60%; border: 1px solid black; padding: 2px;">Formatted: DMReference</div>

DeMorgan
13 November 201527 November 2015
2636814 v1SYDDMS2635814 v1SYDDMS  DRAFT
93
Wright Family Trust - overview of findings

CONFIDENTIAL

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

is for:

- *"License of software for research and development project. Automated design and BTC chain splitting.  Algebra known as semi-group theory and commutative algebra - For use in developing an automated self-matching learning System. Solutions using the Otway-Rees protocol and Northcott-Rees theory of reductions and integral closures".*

The bill/final invoice attached to the transaction summary noting payment describes the material as "Algorithmic Matching system".

Payment is in Bitcoin.

2013.  We suggest we discuss further.

We have been instructed that Professor Rees was engaged to verify Craig Wright's mathematics in relation to commutative ring theory.

Whilst this gives rise to a potential Red Flag Third Party Issue we note that: (1) whilst the facts would need to be explored in more detail to determine the exact nature of Professor Rees' input (in order to determine whether any Core IP Rights arose from that input and whether this gives rise to any issues including as to patentability), if as instructed  Professor Rees' work related solely to verification of work originally conducted by Craig Wright, there is a reasonable argument that the Core IP Rights that are actually of ongoing relevance to the DeMorgan Group (and used by the DeMorgan Group) are owned by Craig Wright as the original creator; and (2) we are instructed that, given the death of both Professor Rees and his wife since this occurred, whilst there is a theoretical risk of a Red Flag Third Party issue arising via Professor Rees's estate, DeMorgan Limited's view is that the practical risk of a claim is low due to those with knowledge of the relevant circumstances now being deceased (with the exception of Craig Wright and individuals employed by the DeMorgan Group, and Uyen Nguyen)  As such, we are instructed that the DeMorgan Group does not intend to approach Professor Rees's estate for an assignment of any intellectual property rights.

*Formatted: Font: Not Bold*

*Formatted: Font: Not Bold*

*Formatted: DMReference*

CONFIDENTIAL

DEF_01612048

| C01N | COMMENTS REGARDING APPROACH |
|---|---|
| **14:3C**<br><br>Third party "private research organisation"<br><br>Please see comments in section 14:2A regarding research service providers utilised by C01n as referenced in Doc ID DM88 and DM90.  As noted in section 14:2A, we ha~~ve~~ assumed that these ~~a~~were references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus). | As noted in section 14:2A, we ha~~ve~~ assumed that these ~~a~~were references to either Integyrz or Interconnected Research (or potentially Panopticrypt or Pholus).  ~~However, if this is incorrect, and any of these references are to other third parties outside the DeMorgan Group, this raises a risk of a Red Flag Third Party Issue with regard to the C01n Core IP Rights.~~<br><br>~~Please see comments in section 14:2A.~~  However, we have subsequently been instructed that two other Third Parties worked with C01n – one company undertook chip and board design work to C01n and Craig Wright's specifications, and another Chinese company put together boards and hardware (Doc ID DM205).  This raises a risk of a Red Flag Third Party Issue.<br><br>However, we have been instructed that the DeMorgan Group's view is that the intellectual property rights created by these Third Parties are not material, and that it is not used and there is no plan to use any of this intellectual property (Doc ID DM205).  Further, we are instructed that the DeMorgan Group's view, given the specifications for the work undertaken by these Third Parties was created by Craig Wright, and given C01n paid for the work, is that the Core IP Rights in the work are owned by either C01n or Craig Wright (Doc ID DM205).  We note for completeness that there is some risk with this proposition.  Whilst it is correct to say that, absent an assignment to any Third Party, Craig Wright will own the Core IP Rights in any specifications that he has created, there is still a possibility that separate Core IP Rights may subsist in subsequent work undertaken by these Third |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612049

| C01N | COMMENTS REGARDING APPROACH |
|------|------------------------------|
| | Parties and that those rights could be owned by the relevant Third Parties absent an assignment back to Co1n and/or Craig Wright.  The mere fact that Co1n has paid for the work does not, at law, mean that it has been assigned any intellectual property rights.  We have not seen any documentation pursuant to which such an assignment is purported to have occurred. |

> **Formatted:** Font: Not Bold

Despite the above, given the instructions that this work is not being used by DeMorgan Group and will not be used going forwards, we confirm our understanding that Co1n does not plan to take any further steps in this regard to obtain assignments from these Third Parties.

> **Formatted:** Font: Not Bold

Therefore the only step we propose taking is to include a reference to the specifications in the Assignment Schedule for Craig Wright in Schedule P of the Draft IP Assignment Schedule Report.

**4. Other issues to note**

**14:4A**

<u>Craig Wright</u>

The response to the initial information request (Doc ID DM152) states that Craig Wright worked as an independent contractor for C01n.  It is therefore possible that he may have created some of the work outlined in section 14:2 above.

RFI #12 indicates that Craig Wright "arranged design of Hardware modules for Hoyts and Qantas staff credit union" in "the initial phase" and then "continued working on the virtualized platform and the creation of a cloud managed virtual supercomputer".

Please see our comments in section 8:3A above regarding independent contractors.  Those comments also apply here.

This suggests, absent a separate assignment of intellectual property rights from Craig Wright to Panopticrypt and an additional assignment from Panopticrypt to C01n (neither of which has been provided us as part of the Review Material), that the intellectual property rights in this material are likely to still be owned by Craig Wright. **We have therefore added these Core IP Rights into the Craig Wright**

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612050

| C01N | COMMENTS REGARDING APPROACH |
|---|---|

RFI #12 and #39 state that Craig Wright was engaged by C01n "via Panopticrypt" in the sense that any payment made would go to the company, not to the individual.  However, this does not appear necessarily to have occurred via the Consultancy Agreement between C01n and Panopticrypt (referred to in section 14:2A above) since we have been instructed that there is no written contract available governing the arrangement with Craig Wright.

Further, when we sought confirmation of which DeMorgan Group Entities Craig Wright had been employed by in the past, Panopticrypt was not one of the listed employers of Craig Wright (RFI #61) and, further, we have been instructed (response to initial information request at Doc ID DM152) that Panopticrypt's employees were "admin staff only" as noted further in section 19 below We do note, however, that Craig Wright has been an employee of Panopticrypt (see section 19:4E).

**14:4B**

Assignment to Hotwire

The response to the initial information request (Doc ID DM152) states that C01N has assigned and licensed IP rights to Hotwire.

The Review Material provided as evidence of this assignment and licence constitutes a "Software Development Agreement" between Strasan Pty Ltd (now C01n) Craig Wright and Dave Kleiman (together, the "Client").

Please see comments in section 8:2E above.  Those comments also apply here.

**14:4C**

Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.

Formatted: Font: Not Bold

We also note that this appears to relate to work for Hoyts and Qantas.  We have not been provided with any contracts with Hoyts or Qantas governing such work.  We note for completeness that to the extent that such contracts exist, it is also would be possible that these could have an impact on the ownership position for these Core IP Rights.  However, we have been instructed that the work for Hoyts and Qantas never eventuated, and that there are no contracts in this regard (Doc ID DM205).  If no work was ever undertaken, this is unlikely to have an impact on the ownership of any Core IP Rights.

For the reasons outlined in section 8:2E above, **for present purposes, we suggest proceeding on the basis that there has been a valid assignment of the Core IP Rights created by C01n pursuant to the Software Development Agreement at Doc ID DM82 to Hotwire.**

**However, given the identified risks, we also recommend expressly including any retained rights in the IP Assignment from C01n and we have therefore added such rights into the draft Assignment Schedule at Schedule H of the Draft IP Assignment Schedule Report.**

Given that the intellectual property rights being licensed

Formatted: DMReference

CONFIDENTIAL

| C01N | COMMENTS REGARDING APPROACH |
|---|---|
| **Grant of licences**<br><br>The response to the initial information request (Doc ID DM152) states that, other than the licence granted to Hotwire referenced in section 14:4B above, C01n has not ever granted any third party a licence to use any intellectual property rights.<br><br>However, we note that many of the DeMorgan Group Services Agreements also contain licences. | under the DeMorgan Group Services Agreements and the Software Development Agreement referred to in section 14:4B above are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be rethought.<br><br>Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences form New IP Co and how the existing licences should be dealt with.<br><br>Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place. |

Formatted: Font: Not Bold

Formatted: DMReference

CONFIDENTIAL

DEF_01612052

# 15.  Chaos - overview of findings

| CHAOS | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **15:1A** |
| | Business |
| | The primary business of Chaos relates to 100% theory based, fractal patterns in finance and trade application to BTC and cryptocurrencies (Doc ID DM 154). |
| | **15:1B** |
| | Volume of likely Core IP Rights |
| | In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152): |
| | • Chaos has never had any employees. |
| | • Work has been carried out for Chaos by other DeMorgan Group Entities under DeMorgan Group Services Agreements. |
| | • Chaos has never filed any R&D incentive claim in the past but was intending to do so for the first time in the 2015 financial year. |
| **2. Summary of IP likely to be** | **15:2A** |
| | DeMorgan Group Services Agreements |

**Comments column:**

At a general level, for completeness, Chaos' work relating to theory based, fractal patterns in finance and trade application to BTC and cryptocurrencies should be captured in the IP Assignment from Chaos.

**We have added this into the draft Chaos Assignment Schedule in Schedule I of the Draft IP Assignment Schedule Report.**

It appears possible that R&D activity has occurred via Chaos, but only via DeMorgan Group Services Agreement rather than employees.  As such, it seems possible that Chaos could own some Core IP Rights but these are perhaps more limited than some of the other DeMorgan Group Entities.  However, there are a number of uncertainties surrounding the scope of these as noted in sections 15.2, 15.3 and 15.4 below.

General comment regarding employees

Please see our comments in section 9:2C regarding

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2636814-v1SYDDMS_ DRAFT
104
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612053

| CHAOS | COMMENTS REGARDING APPROACH |
|---|---|

**CHAOS**

**owned by the company**[10]

Chaos is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) does not identify Chaos as a recipient of any services. However, we have been provided with the following Agreements:

- Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM23)
- Consultancy Agreement with Pholus (service provider) (Doc ID DM16
- Consultancy Agreement with Integyrz (service provider) (Doc ID DM37)
- Consultancy Agreement with Interconnected Research (service provider) (Doc ID DM34)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Chaos (as services recipient). However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, the work carried out under Consultancy Agreements is defined broadly.

**10:2B**

Contractor created material

Chaos has never filed R&D incentive claims but was intending to

**COMMENTS REGARDING APPROACH**

employee issues relating to the DeMorgan Group Services Agreements. The same issues arise here.

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements. The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we have added the Core IP Rights created under the Consultancy Agreements into the Chaos Assignment Schedule in Schedule I of the Draft IP Assignment Schedule Report. We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

> **Formatted:** Font: Not Bold

---

[10] A draft Assignment Schedule for the Chaos IP Assignment is set out in Schedule I of the Draft IP Assignment Schedule Report.

> **Formatted:** DMReference

CONFIDENTIAL

DEF_01612054

| CHAOS | COMMENTS REGARDING APPROACH |
|---|---|
| | submit a claim for FYE 2015. | |
| **3. Red Flag Third Party Issues** | None identified in the Review Material. | N/A |
| **4. Other issues to note** | **10:4A**<br><br>Grant of licences<br><br>Doc ID DM152 states that Chaos has not granted any intellectual property licences, or itself been granted any intellectual property licences.  However, we note that the DeMorgan Group Services Agreements contain licences. | ~~Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between DeMorgan Group Entities will need to be rethought.~~<br><br>~~Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from NewCo and how existing licences should be dealt with.~~<br><br>Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place. |

**Formatted:** Font: Not Bold

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612055

## 16. Cloudcroft - overview of findings

| CLOUDCROFT | COMMENTS REGARDING APPROACH |
|---|---|
| 1. **Overview of company role** | To be completed pending separate Cloudcroft review. |
| 2. **Summary of IP likely to be owned by the company**[11] | |
| 3. **Red Flag Third Party Issues** | |
| 4. **Other issues to note** | |

---

[11] A draft Assignment Schedule for the Cloudcroft IP Assignment is set out in Schedule J of the Draft IP Assignment Schedule Report.

Formatted: DMReference

DeMorgan
13 November 201527 November 2015                     107                     Wright Family Trust - overview of findings
2635B14-v1USYDDMS2635B14-v1USYDDMS_DRAFT

CONFIDENTIAL                                                                                          DEF_01612056

# 17.  Pholus - overview of findings

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|
| **1.  Overview of company role** | |

**1.  Overview of company role**

**17:1A**

Business

The primary business of Pholus relates to IT support, IPSEC and NAP systems research (Doc ID DM154).

At a general level, for completeness, Pholus' work relating to IT support, IPSEC and NAP systems should be captured in the IP Assignment from Pholus.

**We have added this into the draft Pholus Assignment Schedule in Schedule K of the Draft IP Assignment Schedule Report.**

Volume of likely Core IP Rights

In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):

- Pholus has filed one previous R&D incentive claim and was intending to submit another in the 2015 financial year.
- Pholus has never had any employees.
- Work has been carried out for Pholus under DeMorgan Group Services Agreement.  There is also a question as to whether Pholus has performed services for other DeMorgan Group Entities under other DeMorgan Group Services Agreements.  This appears to be the case, but as noted above Pholus has never had any employees which raises questions over this.

It appears possible that R&D activity has occurred via Pholus, but only under DeMorgan Group Services Agreements, and as such it is possible that Pholus could own some Core IP Rights.  However, there are a number of uncertainties surrounding this as noted in sections 17.2, 17.3 and 17.4 below.

**2.  Summary of IP likely to be**

**17:2A**

DeMorgan Group Services Agreements

General comment regarding employees

Please see our comments in section 9:2C regarding

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814.v1SYDDMS2635814.v1SYDDMS  DRAFT
108
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612057

## PHOLUS

**owned by the company**[12]

Pholus is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Pholus has been the recipient of services under:

- Services Agreement with Integyrz (services provider) (Doc ID DM50)
- Services Agreement with Interconnected Research (service provider) (Doc ID DM47)
- Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM27)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Pholus (as services recipient). However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects. We note as follows regarding the projects carried out under the Services Agreements for Pholus:

- Services Agreement with Integyrz (services provider): projects covered by this Agreement include: (1) IT infrastructure proof-of-concept platform; (2) IT infrastructure; (3) Top 500 System (Tulip); (4) Hyper Croft Mark I (5.8 PB); (5) Hyper Croft Mark II (7.2 PB); (6) Hyper Croft Mark III (10.2 PB); (7) Thor Super Computer; and (8) Secure Wallet (ref. Refer to 20140622 Coin-Exch Pty Ltd Request for

## COMMENTS REGARDING APPROACH

employee issues relating to the DeMorgan Group Services Agreements. The same issues arise here.

Services Agreement

It is likely that these Core IP Rights will be owned by Pholus (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Pholus ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP". Those comments also apply here. **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Pholus IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Pholus. We have therefore added this into Schedule K of the Draft IP Assignment Schedule Report.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made ~~and we have assumed for present purposes~~ We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc

---

[12] A draft Assignment Schedule for the Pholus IP Assignment is set out in Schedule K of the Draft IP Assignment Schedule Report.

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814 v1\SYDDMS~~2635814 v1\SYDDMS _DRAFT

100

Wright Family Trust - overview of findings

Formatted: DMReference

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|

additional Information v2.0 as provided to AusIndustry). Note that this work had a completion date of 30 June 2017 and therefore may be incomplete; and

- Services Agreement with Interconnected Research (service provider): projects covered by this Agreement include (1) IT infrastructure proof-of-concept platform; (2) IT infrastructure; (3) Top 500 System (Tulip); (4) Hyper Croft Mark I (5.8 PB); (5) Hyper Croft Mark II (7.2 PB); (6) Hyper Croft Mark III (10.2 PB); (7) Thor Super Computer; and (8) Secure Wallet (ref. Refer to 20140622 Coin-Exch Pty Ltd Request for additional Information v2.0 as provided to AusIndustry). Note that this work had a completion date of 30 June 2017 and therefore may be incomplete.

As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

ID DM161). However, please confirm that our assumption is correct particularly given, again. We note that the completion date for the work is not until 30 June 2017. If this assumption is incorrect please let us know as this will alter the ownership position. This could mean that the work is incomplete.

Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements. The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above. We have added these into Schedule K of the Draft IP Assignment Schedule Report. We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Third Party Licences

Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements. Those comments also apply here.

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

> Formatted: Font: Bold

> Formatted: DMReference

CONFIDENTIAL

DEF_01612059

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|
| **17:2B**<br><br>Contractor created material<br><br>Pholus has filed an R&D incentive claim which gives further detail regarding the work undertaken for the company.<br><br>Doc ID DM125 refers to the following Pholus projects (in summary):<br><br>• "Project - Network Design and Services Research"<br> ◦ "Core - Self Scaling Hyper V Domain system"<br> ◦ "Core - Interdependencies among Critical Infrastructures"<br>  ▪ "Supporting - Virtualised Modeling system"<br> ◦ "Core - NAP Domain tests"<br><br>In addition, Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) lists the following "pending patent applications":<br><br>• "Universal P2P ledger"<br>• "Service provision - Pseduonomous"<br>• "Blockchain-based resource tracking"<br>• "Online distributed ledger"<br>• "A method to provide ad-hoc updates to source transactions against the blockchain"<br>• "Automated 3d fabrication system"<br>• "A method to efficiently allocate connections in a Gossip protocol network" | Please see comments above in section 17:2A (as to work under the DeMorgan Group Services Agreements generally) as to next steps regarding these Core IP Rights. |
| **3.  Red Flag Third Party Issues** | None identified in the Review Material. | N/A |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612060

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|

**4. Other issues to note**

1<s>72</s>:4A

<u>DeMorgan Group Services Agreements</u>

In addition to the DeMorgan Group Services Agreements listed at 17:2A, the DeMorgan Group internal Agreements Register (Doc ID DM 140) identifies Pholus as the service provider under the following DeMorgan Group Services Agreements:

- Consultancy Agreement with C01n (services recipient) (Doc ID DM20)
- Consultancy Agreement with Cloudcroft (services recipient) (Doc ID DM13)
- Consultancy Agreement with Coin-Exch (services recipient) (Doc ID DM19)
- Consultancy Agreement with Daso (services recipient) (Doc ID DM18)
- Consultancy Agreement with Integyrz (services recipient) (Doc ID DM10)
- Consultancy Agreement with Panopticrypt (services recipient) (Doc ID DM11)
- Consultancy Agreement with Interconnected Research (services recipient) (Doc ID DM9)
- Consultancy Agreement with Zuhl (services recipient) (Doc ID DM12)
- Consultancy Agreement with Denariuz (services recipient) (Doc ID DM15)
- Consultancy Agreement with Misfit Games (services recipient) (Doc ID DM17)
- Consultancy Agreement with DeMorgan Limited (services recipient) (Doc ID DM14)
- Consultancy Agreement with Chaos (services recipient)

**COMMENTS REGARDING APPROACH**

There is a key initial question here relating to what, if any, services have actually been provided under these Consultancy Agreements.

Generally speaking, the entities that have acted as services provider under the DeMorgan Group Services Agreements are those with employees.  However, we have been instructed that Pholus has never had any employees (and has never engaged independent contractors other than the services it itself obtains under DeMorgan Group Services Agreements).  As such, we query what work Pholus has been performing under these Consultancy Agreements (if any).

<s>At this stage, we have assumed that there has not been any work occurring under these Consultancy Agreements.  **Please confirm whether or not this is correct.**</s><u>We have been instructed that limited services were performed under these Consultancy Agreements with the primary work relating to some R&D activity around computers (Doc ID DM205) and that the work was subcontracted via other DeMorgan Group Services Agreements.</u>

<u>Outsourcing to other DeMorgan Group Entities</u>

<u>Please therefore see our comments in section 9:2C above.</u>

<u>It is not possible to identify any additional Core IP Rights owned by Pholus from these Consultancy Agreements.</u>

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612061

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|

(Doc ID DM16)  (Noting that this is not listed on the DeMorgan Group internal Agreements Register (Doc ID DM140) but a contract has been provided as part of the Review Materials).

All of these Agreements contain an assignment of intellectual property rights from Pholus (as service provider) to the DeMorgan Group Entity acting as services recipient.  However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner) whilst noting that in this instance Pholus is acting as service provider.

There is a real question over what work is performed under these Consultancy Agreements given that Pholus has never had any employees.

**17~~2~~:4B**

Grant of licences

The response to the initial information request at Doc ID DM152 states that Integyrz has not granted any intellectual property licences, or itself been granted any intellectual property licences. However, we note that many of the DeMorgan Group Services Agreements contain licences.

~~Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be rethought.~~

~~Consideration will need to be given moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with.~~

Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited

> **Formatted:** Font: Not Bold

> **Formatted:** DMReference

CONFIDENTIAL

| PHOLUS | COMMENTS REGARDING APPROACH |
|---|---|
| | will be put in place. |

Formatted: DMReference

CONFIDENTIAL

DEF_01612063

# 18. Coin-Exch - overview of findings

| COIN-EXCH | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 1. **Overview of company role** | **18:1A**<br><br>Business<br><br>The primary business of Coin-Exch relates to "Exchange" (Doc ID DM154). | At a general level, for completeness, all of Coin-Exch's work relating to "Exchange" should be captured in the IP Assignment from Coin-Exch.<br><br>**We have added this into the draft Assignment Schedule in Schedule K of the Draft IP Assignment Schedule Report.** |
| | **18:1B**<br><br>Volume of likely Core IP Rights<br><br>In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request at Doc ID DM152):<br><br>• Coin-Exch has never had any employees.<br>• Work has been carried out for Coin-Exch under DeMorgan Group Services Agreements.<br>• Coin-Exch has previously had independent contractors - namely, the late Dave Kleiman (USA) and W&K.<br>• Coin-Exch has filed R&D incentive claims in the past and was intending to do so again in the 2015 financial year. | It appears possible that R&D activity has occurred via Coin-Exch, both through its independent contractor (Dave Kleiman) and under DeMorgan Group Services Agreements, and as such Coin-Exch could own Core IP Rights. However, there are a number of uncertainties surrounding this as noted in sections 18.2, 18.3 and 18.4 below. |
| 2. **Summary of IP likely to be** | **18:2A**<br><br>DeMorgan Group Services Agreements | General comments regarding employees<br><br>Please see our comments in section 9:2C regarding |

**Formatted:** DMReference

CONFIDENTIAL

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

**owned by the company**[13] Coin-Exch is party to a number of DeMorgan Group Services Agreements. The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Coin-Exch has been the recipient of services under:

- Services Agreement with Integyrz (service provider) Doc ID DM57
- Services Agreement with Interconnected Research (service provider) Doc ID DM43
- Consultancy Agreement with Pholus (service provider) Doc ID DM19
- Consultancy Agreement with Panopticrypt (service provider) Doc ID DM24

All of these Agreements contain an assignment of intellectual property rights from the service provider to Coin-Exch (as services recipient).  However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects.  We note as follows regarding the projects carried out under the Services Agreements for Coin-Exch:

- Services Agreement with Integyrz (services provider) covers the following projects: (1) Exchange Server baseline and proof of concept; (2) Bitcoin Exchange Escrowed

employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here.

Services Agreements

It is likely that Core IP Rights in these listed projects will be owned by Coin-Exch (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Coin-Exch ~~and subject to our comment below regarding payment~~.

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP".  Those comments also apply here.  **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in the Coin-Exch IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Coin-Exch.  We have therefore added this into Schedule L of the Draft IP Assignment Schedule Report.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made __,__ ~~and we have assumed for present purposes~~ We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc

---

[13] A draft Assignment Schedule for the Coin-Exch IP Assignment is set out in Schedule L of the Draft IP Assignment Schedule Report.

**Formatted:** DMReference

DEF_01612065

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|
| Marketplace; (3) Bitcoin Exchange Escrowed Marketplace (Regulated).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete. | ID DM161).  However, please confirm that our assumption is correct particularly given, again, tWe note that the completion date for the work is not until 30 June 2017.  If this assumption is incorrect please let us know as this will alter the ownership position.  This could mean that the work is incomplete. |

- Services Agreement with Interconnected Research (services provider) covers the following projects: (1) Exchange Server baseline and proof of concept; (2) Bitcoin Exchange Escrowed Marketplace; (3) Bitcoin Exchange Escrowed Marketplace (Regulated).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

### Consultancy Agreements

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here.  **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule L of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

### Third Party Licences

Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements.  Those comments also apply here.

### Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814-v1SYDDMS2635814-v1SYDDMS  DRAFT
117
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612066

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

**18:2B**

Contractor created material

Coin-Exch has filed R&D incentive claims which give further detail regarding the work undertaken for the company.

Doc ID DM118 and DM121 refers to the following Coin-Exch projects (in summary):

- "AF00053: Virtual Currency Economy"
    - o "Core - Bayesian Design"
        - ▪ "Supporting - Development of a virtualised multicore platform"
    - o "CORE-1: C01N - eWallet including NFC application"
    - o "CORE-2: Bitcoin marketing and exchange"
    - o "CORE-3: Bitcoin Payment and Merchant Gateway"
    - o "CORE-4: Bitcoin Banking (Super-Node Depository)"
    - o "CORE-5: Secure Wallet"
    - o "CORE-6: P2P Exchange"
- "FL7 Pi Calculus: Project"
    - o "Core FL7Pi Calculus"
        - ▪ "Supporting - Machine Launguage Coding"
- "Bitcoin Ex: Bitcoin Exchange Project"
    - o "Core - Bayesian Design"
        - ▪ "Supporting"
    - o "Core - payment system"
- "Proposed Project: Virtual Currency Economy (Virtual Payment)"

In addition, Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and

Please see comments in section 18:2A above regarding next steps regarding the Core IP Rights that subsist in this work

Formatted: DMReference

CONFIDENTIAL

DEF_01612067

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

prioritization) lists the following "pending patent applications":

- "System and method for managing lending in a non-debt system"
- "Peer to peer exchange - (a) Exchange model"
- "Bitcoin banking system"
- "Peer to peer exchange - (d) Automated self-enforcing derivatives"
- "Peer to peer exchange - (e) Collateralized debt obligation"
- "Method for coordinating smart property--guaranteed loans utilising the blockchain"
- "Peer to peer exchange - (b) Mobile ATM model"
- "Peer to peer exchange - (c) Insurance markets"
- "Method and system for managing spending through wallet allocation"
- "Chargeback and escrow system based on bitcoin"
- "Automated P2P cryptocurrency loan risk assessment system and method"
- "Systems and methods for credit worthiness scoring and non-debt and cryptocurrency loan facilitation"
- "Cyrptocurrency Accounting allocation accuracy methodology"
- "Intercompany loan management system that utilises the Blockchain"
- "Electronic P2P Margin Management System"
- "System, Method and computer program for operating web-based collective e-money lending/borrowing circles between members and non-members of social network sites and DASOs"
- "System and method for implementing a revenue recognition model based on hashed information stored in

<div style="text-align:right">Formatted: DMReference</div>

CONFIDENTIAL

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|
| Blockchain transactions"<br>• "General ledger (gl) journal delete/accounting line reversal blockchain service"<br>• "Pay yourself first with auto bill pay system and method for blockchain accounting and budget system"<br>• "Pay yourself first with revenue generation as a system to budget against the blockchain"<br>• "Blockchain integrated Budget management system and method"<br>• "Extensible object oriented framework for blockchain integrated general ledger"<br>• "Insurance monitoring system"<br>• "Online wallet User interface for processing request for approval in com[pany] accounts"<br>• "Apparatus and method for dynamically auditing blockchain accounts to produce metadata"<br>• "Cryptocurrency-implemented method and system for reading tr[a]nsactions posted into the blockchain and posting journal entries to general ledger"<br>• "An authentication system based on the use of crypto[currency] wallets"<br>• "Blockchain integrated revenue management systems and methods with re-rating and rebilling"<br>• "A blockchain and cryptocurrency Gift card assembly and method"<br>• "General ledger chart of accounts combination editing request response" | |

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814-v1\SYDDMS2635814-v1\SYDDMS_DRAFT
120
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612069

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

**18:2C**

<u>Assignment from Hotwire</u>

In addition to the DeMorgan Group Services Agreements, Coin-Exch is party to a Research & Development Services Agreement with Hotwire (Doc ID DM7).

Please see our comments in section 8:4A in this regard. Those comments also apply here.

Whilst "Project Foreground IP" rights are transferred to Coin-Exch by both Hotwire and Interconnected Research on payment in full, Hotwire and Interconnected Research retain ownership of any "Provider IP" (being intellectual property rights in their methodologies, models and other confidential or proprietary information for the purposes of providing the services). The arrangement to services for a defined set of projects as follows, and therefore (subject to the retained "Provider IP") the "Project Foreground IP" rights being assigned are likely be those arising from this work:

- Cornerstone Firewall

We note that the Review Material does not contain an executed copy of this Agreement but we have been instructed that it has been executed in this form (Doc ID DM205).

**COMMENTS REGARDING APPROACH**

Please see our comments in section 8:4B with respect to this agreement. These comments also apply here.

We assume that it has been executed in the form provided. Please let us know if this is incorrect.

It is likely that these Core IP Rights will be owned by Coin-Exch (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by Hotwire and Interconnected Research and subject to our comment in section 8.4B regarding payment.

**We have therefore included these Core IP Rights in the Coin-Exch Assignment Schedule in Schedule L of the Draft IP Assignment Schedule Report.**

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612070

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

**3. Red Flag Third Party Issues**

**18:3A**

Assignment from the Wright Family Trust

The response to our initial review request (Doc ID DM 152) states that intellectual property rights have been assigned to Coin-Exch by the "Wright Family Trust for DeMorgan".

Doc ID DM1 is an assignment from "the Wright Family Trust DeMorgan" to Coin-Exch Pty Ltd dated 15 September 2013 that purports to assign intellectual property rights in:

- Category A: "Core Banking and Exchange Software" (held by DeMorgan), being: MJF iMal (Source Code); MJF T24 updates and guides;
- Category B: WK (2) - Metered Payments system;
- Category C: WK (2) - Software Derivative Markets & Information Security Risk Systems;
- Category D: WK (2) - Software Assurance Marketplace (SWAMP).

The assignment is stated only to take effect once payment has been completed (operating as an exclusive licence until that point). RFI #25 instructed us that this has occurred which suggests that the assignment ~~has~~was intended to have taken effect.

However, we note that the background indicates that these intellectual property rights were assigned to the Wright Family Trust from "Craig Wright R&D" and, prior to that, from a number of Third Parties to Craig Wright.

There are a number of question over whether the *original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the

It is unclear why the contracting entity here is called "The Wright Family Trust DeMorgan" (given that is not the name of the Wright Family Trust). However, this is potentially related to the issues discussed at section 23:3A below. Please see comments in that regard, which also apply here.

There are a number of questions over whether the *original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the Wright Family Trust to Hotwire had the desired effect. This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

Please see our comments in sections 22:3B and 22:3C below with respect to the original assignments from the relevant Third Parties to Craig Wright.

As noted in those sections this means that there are significant ~~open~~ questions over whether all of these rights were originally assigned to Craig Wright, and if so, whether they were effectively assigned to the Wright Family Trust to enable this assignment to take effect. Please see proposed steps in sections 22:3B and 22:3C in this regard.

In addition, there are a number of issues raised by the drafting of the assignment itself.

- Firstly, there is a possibility that it itself does not assign any rights itself but rather is simply a confirmation that the assignor has completed, or

> Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814 v1\SYDDMS~~2635814 v1\SYDDMS  DRAFT
122
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612071

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

Wright Family Trust to Hotwire had the desired effect. This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

Please see our comments in sections 22:3B and 22:3C below with respect to the original assignments from the relevant Third Parties to Craig Wright.

will complete at its earliest opportunity, an irrevocable assignment of any "existing and future Intellectual Property and Intellectual Property Rights". We have not separately seen any other document under which the intellectual property rights are separately assigned and understand that there may not have been any such separate document. This raises a question over whether the assignment has actually occurred or not. However, even if it has not occurred, the assignor agrees pursuant to the IP Deed of Assignment to complete the assignment (and grants a licence to use the relevant rights until this is done) meaning it could be called on to perfect the assignment if necessary. As such, we suggest that the Wright Family Trust and Coin-Exch check their records to confirm whether the assignment was completed and in the meantime proceed on the basis that it has been completed. If it has not, please let us know as this could alter the position.

- Secondly, there is a risk that the assignment envisaged by the IP Deed of Assignment is broader than just the intellectual property rights in the "Core Technology" as the assignment is of both "Intellectual Property" (which is defined, in summary, as including certain property relating to the "Core Technology") and "Intellectual Property Rights" (which is not defined by reference to the "Core Technology" at all). This opens a risk that more of Core IP Rights were assigned to Hotwire than just the Core IP Rights in the "Core Technology". This risk is somewhat mitigated (although not removed entirely),

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612072

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|
| | however, by the fact that the IP Deed of Assignment states, in its background Recitals, that "the Assignor agrees to an irrevocable assignment of all Intellectual Property and Intellectual Property Rights to the Assignee in the Core Technology" which supports an interpretation that limits the assignment to the "Core Technology". |

As noted in sections 22 and 23 below, our initial view is that there is a significant risk that the ownership of these Core IP Rights sits at law with Third Parties or Craig Wright (and that even if that is not the case, there is a real question over whether this assignment to Coin-Exch has been effective). Despite the significant uncertainty over what (if any) Core IP Rights were assigned here, for completeness we recommend that any Core IP Rights that *were* assigned to Coin-Exch under this assignment agreement be included in the Hotwire Assignment Schedule. **We have therefore added this into the draft Assignment Schedule in Schedule L of the Draft IP Assignment Schedule Report.**

As noted in section 23 below, we recommend that the assignment from Craig Wright and the Wright Family Trust also be expressly stated to include any of these Core IP Rights that they have retained.

| | |
|---|---|
| **4. Other issues to note** | **18:4A** |
| | Dave Kleiman and "W&K" |
| | The response to our initial information request stated that, in addition to the DeMorgan Group Services Agreements noted in section 18:2A and the arrangement with Hotwire noted in section | On the understanding that We have been instructed that no services were performed by Dave Kleiman or "W&K" for Coin-Exch (Doc ID DM205). On this basis, then no further steps are required here. |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2635814 v1 SYDDMS2635814 v1 SYDDMS DRAFT
124
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612073

| COIN-EXCH | COMMENTS REGARDING APPROACH |
|---|---|

18:2C above, Coin-Exch had also engaged both Dave Kleiman (USA) and "W&K" (USA) as independent contractors utilised to perform services for Coin-Exch.  Please see our comments in section 5.1 above regarding confusion of which entity is "W&K".

However, we were subsequently instructed that Dave Kleiman died before this contract was finalised and "[t]herefore no services were performed to Coin-Exch by Dave Kleiman or W&K".

**18:4B**

<u>Grant of licences</u>

The response to the initial information request at Doc ID DM152 states that Coin-Exch has not granted any intellectual property licences, or itself been granted any intellectual property licences. However, we note that:

- many of the DeMorgan Group Services Agreements contain licences; and
- the Research and Development Services Agreement with Hotwire (Doc ID DM7) referred to in section 18:2C above also includes a licence from Coin-Exch to Hotwire.

~~Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between group entities will need to be rethought.~~

~~Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from New IP Co and how the existing licences should be dealt with.~~

<u>Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.</u>

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT
126
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612074

## 19. Panopticrypt - overview of findings

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **19:1A**<br><br>Business<br><br>The primary business of Panopticrypt relates to IT security services (Doc ID DM154). | At a general level, for completeness, Panopticrypt's work relating to IT security services should be captured in the IP Assignment from Panopticrypt.<br><br>**We have added this into the draft Assignment Schedule in Schedule M of the Draft IP Assignment Schedule Report.** |
|  | **19:1B**<br><br>Volume of likely Core IP Rights<br><br>In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to initial information request Doc ID DM152):<br><br>• Panopticrypt has filed a number of R&D incentive claims in the past and was intending to do so again in the 2015 financial year.<br>• Panopticrypt has had employees in the past (in Sydney). However we have been instructed that Panopticrypt's employees were only ever "admin staff".<br>• Work has been carried out for Panopticrypt by other DeMorgan Group Entities under DeMorgan Group Services Agreements (and Panopticrypt has itself also provided services to other DeMorgan Group Entities under other DeMorgan Group Services Agreements).<br>• Panopticrypt has also engaged one independent contractor (Jamie Wilson). | It appears possible that a significant amount of R&D activity has occurred via Panopticrypt, particularly given the number of R&D claims that have been submitted in the past by this entity, and as such Panopticrypt could own significant Core IP Rights.  However, there are a number of uncertainties surrounding this as noted in sections 19:2, 19:3 and 19:4 below. |

**Formatted: DMReference**

CONFIDENTIAL

DEF_01612075

| PANOPTICRYPT | | COMMENTS REGARDING APPROACH |
|---|---|---|

2. **Summary of IP likely to be owned by the company[14]**

**19:2A**

Employee created material generally

The response to the initial information request (Doc ID DM152) indicates that Panopticrypt has had a number of employees.

However, we have been instructed (in response to initial information request at Doc ID DM152) that Panopticrypt's employees were "admin staff only" which suggests that these employees may not necessarily have been involved in creating significant Core IP Rights.

We have, however, subsequently been informed that Craig Wright was himself an employee of Panopticrypt between late 2014 and mid 2015.

As noted throughout this report, whilst we have not been provided with copies of all employment contracts for the DeMorgan Group Entities' employees, some concerns have been raised as to inconsistencies in the stated employer of listed individuals.

With regard to Panopticrypt, we note in particular our comments in section 14:4A above, with regards to statements that Craig Wright was at some point engaged by C01n "via Panopticrypt". We have not seen any other suggestion in the Review Material that Craig Wright was potentially employed by Panopticrypt at any point (and neither the response to the initial information request at Doc ID DM152 nor RFI #12 list Panopticrypt as one of Craig Wright's employers) and we have therefore proceeded on the understanding that Craig Wright was never an employee of Panopticrypt, but please let us know if that understanding is incorrect.

(We note for completeness that if Craig Wright was at any stage an employee of Panopticrypt this could have resulted in some of the intellectual property rights in any material created by Craig Wright in the course of such employment vesting in Panopticrypt for the reasons outlined in section 6 above.) Please see our comments in section 19.4E below regarding Craig Wright. It has been confirmed that Craig Wright was an employee of Panopticrypt between late 2014 and mid 2015.

Given the other employees were "admin staff" it appears

---

[14] A draft Assignment Schedule for the Panopticrypt IP Assignment is set out in Schedule M of the Draft IP Assignment Schedule Report.

**Formatted:** DMReference

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

likely that most of the research and development work carried out via Panopticrypt was done either by Craig Wright himself, or under the DeMorgan Group Services Agreements referred to in section 19:2B below.

As the Review Material does not contain a full list of employees, or a full copy of employment contracts, please note that we have assumed that there are no other inconsistencies other than as provided.  However, if this assumption is incorrect, it is possible that this could alter the ownership position of relevant Core IP Rights.

**19:2B**

General comments regarding employees

DeMorgan Group Services Agreements

Please see our comments in section 9:2C regarding employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here.

Panopticrypt is party to a number of DeMorgan Group Services Agreements.  The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Panopticrypt has been the recipient of services under:

Services Agreements

It is likely that the Core IP Rights in these listed projects will be owned by Panopticrypt (as "Project Foreground IP"), subject to any Core IP Rights retained as "Provider IP" by the relevant DeMorgan Group Entities acting as service providers to Coin-Exch and subject to our comment below regarding payment.

- Services Agreement with Integyrz (service provider) Doc ID DM49
- Services Agreement with Interconnected Research (service provider) Doc ID DM40
- Consultancy Agreement with Pholus (service provider) Doc ID DM11

(We note that Doc ID DM152 also states that Panopticrypt was a recipient of services under a DeMorgan Group Services Agreement with itself.  However, we have assumed this is simply an error.)

Please see our comments in section 9:2C regarding issues relating to the distinction between "Project Foreground IP" and "Provider IP".  Those comments also apply here.  **As per those comments, for the purposes of the IP Assignments, we suggest that the Core IP Rights in the listed projects be included in**

- All of these Agreements contain an assignment of intellectual property rights from the service provider to Panopticrypt (as

DeMorgan
13 November 201527 November 2015
2635814.v1SYDDMSODMS814.v1SYDDMS  DRAFT
128
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612077

Formatted: DMReference

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

services recipient).  However, in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

- As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly, Services Agreements relate to specific projects.  We note as follows regarding the projects carried out under the Services Agreements for Panopticrypt:

- Services Agreement with Integyrz (services provider) covers the following projects: (1) BODOG Security Assessment and Testing; (2) iVote System Security Review; and (iii) Panopticrypt Commercialisation (campaign).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

- Services Agreement with Interconnected Research (services provider) covers the following projects: (1) BODOG Security Assessment and Testing; (2) iVote System Security Review; and (3) Panopticrypt Commercialisation (campaign).  Note that this work has a completion date of 30 June 2017 and therefore may be incomplete.

As noted in section 9:2C, the Services Agreements envisage that there could be third party inputs into the work produced and that third party licences could be required for any such inputs (which the service provider has a reasonable efforts obligation to procure).

**the Panopticrypt IP Assignment leaving the blanket nature of the other IP Assignments to capture any residual "Provider IP" retained by the DeMorgan Group Entities acting as service providers to Panopticrypt.  We have therefore added this into Schedule M of the Draft IP Assignment Schedule Report.**

As noted in section 9:2C, the assignment of "Project Foreground IP" under the Services Agreements is only effective when relevant payment has been made. , and we have assumed for present purposes We have been instructed that all payments have been made (and therefore that the assignments have taken effect) (Doc ID DM161).  However, please confirm that our assumption is correct particularly given, again,We note that the completion date for the work is not until 30 June 2017.  If this assumption is incorrect please let us know as this will alter the ownership positionThis could mean that the work is incomplete.

<u>Consultancy Agreements</u>

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be dealt with in the same way as those under the Services Agreements above.  We have added these into Schedule M of the Draft IP Assignment Schedule Report.  We note that it will only be possible to describe the Core IP Rights under the**

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
26365I14-v1SYDDMS26365I14-v1SYDDMS   DRAFT
123
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612078

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

**COMMENTS REGARDING APPROACH**

**Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

<u>Third Party Licences</u>

Please see our comments in section 9:2C regarding third party licences relevant to work under DeMorgan Group Services Agreements. Those comments also apply here.

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

**19:2C**

<u>Contractor and employee created material</u>

Given the statement noted in section 19:2A above that, other than Craig Wright, all Panopticrypt employees were "admin staff" only, it appears possible that most of the research and development work carried out via Panopticrypt was carried out either by Craig Wright himself or under the DeMorgan Group Services Agreements noted in section 19:2B above.

Panopticrypt has filed a number of R&D incentive claims which give further detail regarding the work undertaken by the company.

Doc ID DM122 refers to the following Panopticrypt projects (in summary):

- "Risk Project (as per 2012 review)"
- "Core - Risk tests"
  - ○ "Supporting - Editing and presentation"

Please see comments above in section 19:2B (as to work under the DeMorgan Group Services Agreements generally) as to next steps regarding these Core IP Rights.

Please see our additional comments in section 19:4D below regarding Craig Wright.

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814 v11SYDDMS2635814 v11SYDDMS   DRAFT
130
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612079

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

- "Core - Registry design and test"
  - "Supporting - Editing and presentation"

In addition, Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) lists the following "pending patent applications":

- "Smart contract registry"
- "A method and system to provide ECC/ECDH key exchange to three or more parties"
- "Secure video/audio"
- "Remote wipe system"
- "IoT remote control system"
- "A method to use wallet integrated ECC for lightweight Application authentication"
- "Integrated utility accounting, materials management, work management and regulatory reporting software that derives information and stores it into the blockchain"
- "A Method and system for providing Rational Secret Sharing with Repeated Games using the blockchain"
- "A method to encrypt and notorise messages using the bitcoin protocol"
- "Wallet based authentication system"
- "Bl[ock]chain based Incremental automata verification"
- "Unified, configurable services stack for integration of enterprise applications using a loop stack against the blockchain"
- "Blockchain based Deterministic finite automata graph traversal with nodal bit mapping into bitcoin addresses"
- "Method and apparatus for data encryption/decryption using cellular automata transform"
- "CGA++ cryptographic key"

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612080

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

- "Anti-theft system"
- "A method to create Efficient Wireless Security Protocols using the blockchain"
- "A blockchain wallet system to enable Object Signing and Encryption"
- "A system and methods to ensure High-priority communications sessions within a wireless communications system using ECCDSA based access with a blockchain integrated ledger"
- "Network and system modelling"
- "System and method for credential management and administration using the blockchain"
- "Analog and Preceptron nureal network logic automata (on the blockchain)"
- "Asynchronous logic automata"
- "Deterministic encoding of fuzzy finite state automata in continuous recurrent neural networks related to blockchains"

**3. Red Flag Third Party Issues**

**19:3A**

<u>Your Digital File</u>

The response to our initial information request (Doc ID DM152) stated that intellectual property rights in "Your Digital File" "Patent Registered by Craig Wright and Jamie Wilson" have been assigned by Panopticrypt to an unidentified third party.

Absent an assignment of these intellectual property rights to Panopticrypt in the first place (which we have not been provided with) it is unclear to us how any intellectual property rights in Craig Wright/Jamie Wilson created material could have been owned by Panopticrypt (in order to have been assigned out to a third party)

It is extremely unclear what this means for the ownership of the YDF IP.

As noted, it is unclear whether the YDF IP was created for FASV by Jamie Wilson and Craig Wright and, if so, whether this was done in the capacity of employees or some other capacity.

We note however that the response to RFI #52 states that "[a]ny IP that Craig created within that company initially remained within FASV". It is unclear on what basis these Core IP Rights were assigned to FASV, and whether a similar assignment was given by Jamie Wilson. If the YDF IP was created by them for FASV in

<u>Formatted: DMReference</u>

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS_ DRAFT
132
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612081

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| given, as noted in section 19:2A above, we are not aware that Craig Wright has ever been an employee of Panopticrypt, and as noted in section 19:4A below we have been instructed that Jamie Wilson was never a contractor to Panopticrypt. | the capacity of employees, subject to our comments in section 16, it is likely that the YDF IP vested in FASV. As noted elsewhere in the report, the position could be quite different if the YDF IP was created outside an employment relationship as this would be likely to mean that, absent an express assignment of these intellectual property rights from Craig Wright and Jamie Wilson to FASV, these rights remained owned by Craig Wright and Jamie Wilson. |
| In response to RFI#21 in this regard, and our subsequent follow-up question in RFI#52, we were instructed that the relevant background was as follows: | |

In response to RFI#21 in this regard, and our subsequent follow-up question in RFI#52, we were instructed that the relevant background was as follows:

- Jamie Wilson and Craig Wright previous worked for another company (which no longer exists and has been deregistered).  This company was called "Family Affairs Security Vault" (**FASV**).  It is unclear whether Jamie Wilson and Craig Wright worked for FASV in the capacity of employees or some other capacity.
- "There was a contract with [that] previous company".  It is unclear whether this means a contract between Jamie Wilson and Craig Wright and that company or between Panopticrypt and that company.  However RFI#52 clarifies that "[t]he contract mentioned shares in a company that Craig did not receive".
- Following deregistration of FASV "a new company, YDF" was started and there was a negotiation of a share agreement whereby Craig Wright was to have a 25% equity interest in "YDF" in exchange for ownership of the intellectual property rights (being initial cryptographic research as well as continuing research that led to the final patent) (the **YDF IP**).
- Jamie Wilson filed for a patent in the US in the name of "YDF" covering an invention that Craig Wright contributed to.
- "A new contract [was] drawn up with YDF".  It is unclear if this was the shareholders agreement referred to in the preceding bullet point, a contract with Craig Wright and

Subsequently, RFI#52 states that the Core IP Rights owned by FASV were "transferred to YDF since its deregistration".  Again, it is unclear how this was done.

Further we understand that Craig Wright never assigned any intellectual property rights to "YDF".

This gives rise to a significant risk that at least some of the YDF IP is owned by a, as yet unidentified, Third Party.  This Third Party could be Jamie Wilson (to the extent that ownership of the YDF IP remains split between Craig Wright and Jamie Wilson, in the event that there was no valid assignment to FASV in the first place).  Alternatively, if there was a valid assignment to FASV in the first place, ownership of the YDF could have been dealt with as part of the winding up of FASV.  Or, alternatively, there could have been a valid assignment from FASV to YDF (meaning it remains owned by YDF).

We are happy to discuss this further.  The first question here is whether the YDF IP is of ongoing importance to the operations of the DeMorgan Group and New IP Co.  The fact that it is acknowledged to have been assigned to a third party (despite the

**Formatted: DMReference**

CONFIDENTIAL

DEF_01612082

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| Jamie Wilson or a contract with Panopticrypt. | uncertainty over how this could have occurred and the identity of the third party) suggests that perhaps these Core IP Rights are no longer used by or relevant to the DeMorgan Group - in which case, its status may not be a concern. |
| • That "new contract" was never signed and shares in "YDF" were never issued by Jamie Wilson. "Hence the contract was never finalised". | |
| • We have been instructed that Jamie Wilson sought an assignment of Craig Wrights intellectual property rights in the YDF IP but that Craig Wright never signed this (Doc ID DM205). | However, if the DeMorgan Group still uses the YDF IP, we suggest the position here be clarified further to work out the likely current ownership position and how best to proceed. We would recommend the following steps in the first instance: (1) Provide full corporate details for FASV and YDF. (2) Confirm whether the YDF IP created by Craig Wright and Jamie Wilson was assigned to FASV and provide a copy of the relevant assignment. (3) Provide a copy of the assignment from FASV to YDF and details as to when this occurred (with respect to the deregistration of FASV). (4) Provide details of the registered patent. (5) Confirm how this is relevant to Panopticrypt, given as noted above, we have not seen any suggestion in the Review Material (other than the statement in initial information request at Doc ID DM152 that relevant Core IP Rights had been assigned by Panopticrypt) that the YDF IP was ever owned by Panopticrypt. |
| | We have been instructed that DeMorgan Limited is comfortable that it is not using the YDF IP or otherwise infringing it in any way. As such DeMorgan Limited does not intend to investigate the ownership of the YDF IP further, or approach any Third Party of an assignment of relevant rights. |

**Formatted: DMReference**

CONFIDENTIAL

DEF_01612083

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

**4. Other issues to note**

**19:4A**

<u>Jamie Wilson</u>

The response to the initial information request (Doc ID DM152) stated that an independent contractor (Jamie Wilson) had been engaged to perform services for Panopticrypt.

However, we have subsequently been instructed (RFI#14) that Jamie Wilson was never a contractor for Panopticrypt, but rather acted as a director for Hotwire.

Given the response to RFI#14 we have assumed that Jamie Wilson never performed any work for Panopticrypt. **Please let us know if this assumption is incorrect.**

**19:4B**

<u>DeMorgan Group Services Agreements</u>

In addition to the DeMorgan Group Services Agreements listed at 19:2B, the DeMorgan Group internal Agreements Register (Doc ID DM140) identifies Panopticrypt as the service provider under the following DeMorgan Group Services Agreements:

- Consultancy Agreement with C01N (services recipient) (Doc ID DM25)
- Consultancy Agreement with Cloudcroft (services recipient) (Doc ID DM22)
- Consultancy Agreement with Coin-Exch (services recipient) (Doc ID DM24)
- Consultancy Agreement with Daso (services recipient) (Doc ID DM21)
- Consultancy Agreement with Interconnected Research (services recipient) (Doc ID DM26)
- Consultancy Agreement with Integyrz (services recipient) (Doc ID DM32)
- Consultancy Agreement with Pholus (services recipient)

There is a key initial question here relating to what, if any, services have actually been provided under these Consultancy Agreements and whether they have given rise to any significant Core IP Rights.

The reason for this question is the fact that, as noted in section 19:2A above, we have been instructed that the Panopticrypt employees are "admin staff only" (response to initial information request at Doc ID DM152) and as such, it is unclear what type of consultancy work they have been undertaking for the other DeMorgan Group Entities and an equal question as to whether it would have given rise to any significant Core IP Rights.

<u>Given that Craig Wright has been confirmed as a Panopticrypt employee, Ww</u>**e recommend proceeding on the basis that these DeMorgan Group Services Agreements could have given rise to some Core IP Rights and, as such, we recommend proceeding on the following basis.**

<u>Consultancy Agreements</u>

<div style="border:1px solid black; display:inline-block; padding:2px;">**Formatted:** DMReference</div>

CONFIDENTIAL

DEF_01612084

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|

(Doc ID DM27)

- Consultancy Agreement with Zuhl (services recipient) (Doc ID DM29)
- Consultancy Agreement with Denariuz (services recipient) (Doc ID DM30)
- Consultancy Agreement with Misfit Games (services recipient) (Doc ID DM31)
- Consultancy Agreement with DeMorgan Limited (services recipient) (Doc ID DM28)
- Consultancy Agreement with Chaos (services recipient) (Doc ID DM23) (Noting that this is not listed on the DeMorgan Group internal Agreements Register (Doc ID DM140) but a contract has been provided as part of the Review Materials.)

All of these Agreements contain an assignment of intellectual property rights from Panopticrypt (as service provider) to the DeMorgan Group Entity acting as services recipient. However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner) whilst noting that in this instance Panopticrypt is acting as service provider.

**19:4C**

New South Wales Electoral Commission Licence

The response to our initial information request (Doc ID DM152) states that Panopticrypt has been granted a licence to use intellectual property rights under a "1 Vote contract".

The contract that has been provided in response to our request for

Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements. The same issues arise here.

**As per those comments, for the purposes of the IP Assignments, we nevertheless suggest that these Core IP Rights (the majority of the work carried out under the Consultancy Agreements) be included in the IP Assignments from the DeMorgan Group Entities acting as services recipients, leaving the blanket nature of the IP Assignment from Panopticrypt to capture any residual intellectual property rights retained by Panopticrypt as services provider. We have added a general description of these retained rights into Schedule M of the Draft IP Assignment Schedule Report. We note that it will only be possible to describe these very broadly given the uncertainty regarding what has been retained.**

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

Note that "New Contract Material" rights have already been assigned to the New South Wales Electoral Commission.

The ongoing need for this licence needs to be considered. Please confirm whether there is still work occurring for the New South Wales Electoral Commission, and whether any of the DeMorgan

**Formatted:** DMReference

CONFIDENTIAL

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| this is a Consultancy Agreement between Panopticrypt and the New South Wales Electoral Commission (Doc ID DM71). | ~~Group Entities still requires a licence to this material.~~The Consultancy Agreement with the New South Wales Electoral Commission was stated to expire on 30 April 2015 unless otherwise agreed between the parties.  We have been instructed that the contract was not extended and there is no further work being undertaken for the New South Wales Electoral Commission, and no longer any need for the licence. |
| We note that Panopticrypt has assigned the intellectual property rights in "New Contract Material" being material created, written or otherwise brought into existence by or on behalf of Panopticrypt in performing the agreement to the New South Wales Electoral Commission. | |
| **19:4D** | ~~Note that it will be necessary to consider whether licences are still required or not.  Given that the intellectual property rights being licensed under the DeMorgan Group Services Agreements are themselves Core IP Rights that will be transferred to New IP Co, licences between DeMorgan Group Entities will need to be rethought.~~ |
| <u>Grant of licences</u> | |
| The response to initial information request (Doc ID DM152) states that Panopticrypt has not granted any intellectual property licences, or itself been granted any intellectual property licences other than the licence from the New South Wales Electoral Commission noted in section 19:4C above.  However, we note that the DeMorgan Group Services Agreements contain licences. | ~~Consideration will need to be given, moving forwards, to which DeMorgan Group Entities require licences from NewCo and how existing licences should be dealt with.~~ |
| | <u>Existing DeMorgan Group Services Agreements should be terminated and, as noted in section 1, a licence back from New IP Co to DeMorgan Limited will be put in place.</u> |
| <u>19:4E</u> | It is unclear what work Craig Wright created pursuant to his contract of employment with Panopticrypt, and what work was created in his personal capacity. |
| We have been instructed that Craig Wright was employed by Panopticrypt between late 2014 and the end of June 2015. | There is therefore a possibility that some of the Core IP Rights created by Craig Wright have already vested in |

Formatted: Font: Not Bold

Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2636514-v1\SYDDMS~~2636514-v1\SYDDMS   DRAFT
137
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612086

| PANOPTICRYPT | COMMENTS REGARDING APPROACH |
|---|---|
| | Panopticrypt due to the employment arrangement, for the reasons given in section 6 above. |
| | Please see our comments in section 22:1A in this regard. |
| | **As noted in section 22:1A, whilst these rights will also be included in the IP Assignment from Craig Wright, we recommend for completeness that any rights that *are* owned by Panopticrypt in the work described in section 22:2A be included in the Assignment Schedule for Panopticrypt in Schedule M of the Draft IP Assignment Schedule Report.** |

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814 v1SYDDMS2635814 v1SYDDMS  DRAFT
138
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612087

## 20. DeMorgan Holdings - overview of findings

| DEMORGAN HOLDINGS | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 1. **Overview of company role** | DeMorgan Holdings appears to be the holding company of Misfit Games.<br><br>We have been instructed that DeMorgan Holdings has never, at any staged, engaged employees or contractors and has never been assigned or licensed any intellectual property rights or itself assigned or licensed any intellectual property rights (response to initial information request at Doc ID DM152). | Consideration should be given to obtaining an IP Assignment from DeMorgan Holdings for completeness. However, no ownership of Core IP Rights has been identified. |
| 2. **Summary of IP likely to be owned by the company**[15] | None identified in the Review Material. | N/A |
| 3. **Red Flag Third Party Issues** | None identified in the Review Material. | N/A |
| 4. **Other issues to note** | None identified in the Review Material. | N/A |

---

[15] A draft Assignment Schedule for the DeMorgan Holdings IP Assignment is set out in Schedule N of the Draft IP Assignment Schedule Report.

Formatted: DMReference

CONFIDENTIAL

# 21. Misfit Games - overview of findings

| MISFIT GAMES | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of company role** | **21:1A** <br><br> <u>Business</u> <br><br> The primary business of Misfit Games involves gaming technology (both hardware and software) including the "Super Cool Gaming" project (Doc ID DM154). <u>We have further been instructed that this work relates to cooling systems research (Doc ID DM205).</u> | At a general level, for completeness, all of Misfit Games' work relating to gaming technology and the "Super Cool Gaming" project should be captured in the IP Assignment from Misfit Games. <br><br> **We have added this into the draft Assignment Schedule in Schedule O of the Draft IP Assignment Schedule Report.** |
| | **21:1B** <br><br> <u>Volume of likely Core IP Rights</u> <br><br> In terms of the volume of work conducted within this entity, we note in summary that we have been instructed as follows (response to the initial information request at Doc ID DM152): <br><br> • Misfit Games had employees (in Sydney) in 2014 and 2015. <br> • Misfit Games was intending to submit its first R&D incentive claim in the 2015 financial year. <br> • Whilst we were originally instructed that Misfit Games had never utilized any independent contractors, the DeMorgan Group internal Agreements Register (Doc ID DM140) indicates that work has been carried out for Misfit Games under DeMorgan Group Services Agreements. | It appears possible that some R&D activity has occurred via Misfit Games, both via its own employees and under DeMorgan ~~Grouop~~ Group Services Agreements, and as such Misfit Games could own Core IP Rights. <br><br> <u>However, we have been instructed that the Core IP Rights owned by Misfit Games may not be used in the future (and the DeMorgan Group and New IP Co are not considering applying for any patents with respect to this work) so is considered to be of low value (Doc ID DM205).</u> <br><br> ~~However~~<u>In addition</u>, there are a number of uncertainties surrounding this as noted in sections 21:2, 21.3 and 21.4 below. |
| **2. Summary of IP likely to be owned by the** | **21:2A** <br><br> <u>Employee created material (generally)</u> | As noted throughout this report, whilst we have not been provided with copies of all employment contracts for the DeMorgan Group Entities' employees, some concerns |

Formatted: DMReference

| MISFIT GAMES | COMMENTS REGARDING APPROACH |
|---|---|
| **company**[16] The response to the initial information request (Doc ID DM152) indicates that Misfit Games has had Australian employees in 2014 and 2015. | have been raised as to inconsistencies in the stated employer of listed individuals.<br><br>No particular inconsistencies have been noted with respect to Misfit Games, and we have proceeded on the assumption that no such inconsistencies exist. However, as the Review Material does not contain a full list of employees, or a full copy of employment contracts, please note that we have assumed that there are no other inconsistencies other than as provided.  However, if this assumption is incorrect, it is possible that this could alter the ownership position of relevant Core IP Rights. |
| **21:2B**<br><br>DeMorgan Group Services Agreements<br><br>Misfit Games is party to a number of DeMorgan Group Services Agreements.  The DeMorgan Group internal Agreements Register (Doc ID DM140) states that Misfit Games has been the recipient of services under:<br><br>• Consultancy Agreement with Integyrz (services provider) (Doc ID DM36)<br>• Consultancy Agreement with Interconnected Research (service provider) (Doc ID DM33)<br>• Consultancy Agreement with Panopticrypt (service provider) (Doc ID DM31)<br>• Consultancy Agreement with Pholus (service provider) (Doc | General comment regarding employees<br><br>Please see our comments in section 9:2C regarding employee issues relating to the DeMorgan Group Services Agreements.  The same issues arise here.<br><br>Consultancy Agreements<br><br>Please see our comments in section 9:2C above regarding issues regarding the assignment of intellectual property rights other than copyright under the Consultancy Agreements.  The same issues arise here. **As per those comments, for the purposes of the IP Assignments, we nonetheless suggest these Core IP Rights be added these into Schedule O of the Draft IP Assignment Schedule Report.  We note that it will** |

---

[16] A draft Assignment Schedule for the Misfit Games IP Assignment is set out in Schedule O of the Draft IP Assignment Schedule Report.

Formatted: DMReference

DEF_01612090

| MISFIT GAMES | COMMENTS REGARDING APPROACH |
|---|---|

ID DM17)

All of these Agreements contain an assignment of intellectual property rights from the service provider to Misfit Games (as services recipient).  However in terms of the scope of those assignments, please see our comments in section 9:2C above (noting that all DeMorgan Group Services Agreements contain substantially the same intellectual property assignment provisions with all such *Services Agreements* operating in the same manner, and all such *Consultancy Agreements* operating in the same manner).

As noted in section 9:2C, whilst the work carried out under Consultancy Agreements is defined broadly.

**21:2C**

Employee and contractor created material

Misfit Games has never filed R&D incentive claims but was intending to submit a claim for FYE 2015.

**21:2D**

Assignment from Denariuz

Please see comments in section 13:4B in relation to an IP Deed of Assignment (Doc ID DM147) that appears to relate to "Heat and

**only be possible to describe the Core IP Rights under the Consultancy Agreements very broadly given the Consultancy Agreements do not relate to work on identified projects in the same way as the Services Agreements.**

Outsourcing to other DeMorgan Group Entities

Please see our comments in section 9:2C above.

As no detail has been provided regarding the proposed claim we have not been able to include details of any work carried out in Schedule O of the Draft IP Assignment Schedule Report other than as set out in section 21:1A above.  Given, as noted in 21:2B, there is uncertainty over the scope of work carried out for Misfit Games under DeMorgan Group Services Agreements (particularly given they are all Consultancy Agreements which are not drafted by reference to particular projects) it would be useful to have more detail of Misfit Games' proposed claim if possible to give us some understanding of the work carried out by Misfit Games in the past.  **Please provide a copy if available.**

Please see our comments in section 13:4B.

As noted in section 13:4B, we suggest that Denariuz and Misfit Games check their records to confirm whether the assignment was completed and in the meantime proceed on the basis that it has been completed.  If it

> Formatted: DMReference

CONFIDENTIAL

DEF_01612091

| MISFIT GAMES | | COMMENTS REGARDING APPROACH |
|---|---|---|
| | Power simulations to be conducted on the Denariuz SuperComputer system at a max load of 50TFlop for 3 months" being the "Core Technology".<br><br>Those comments and the issues raised also apply here. | ~~has not, please let us know as this could alter the position.~~<br><br>~~Further, iF~~or the reasons set out in section 13:4B, we have added the Core IP Rights relating to the "Core Technology" ~~only~~ into the Assignment Schedule for Misfit Games in Schedule O of the Draft IP Assignment Schedule Report.<br><br>We have also, for completeness, added any Core IP Rights retained by Denariuz into the Assignment Schedule for Denariuz in Schedule G of the Draft IP Assignment Schedules Report. |
| 3. **Red Flag Third Party Issues** | None identified in the Review Material. | N/A |
| 4. **Other issues to note** | None identified in the Review Material. | N/A |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612092

# Part C - Craig Wright Entities
## 22. Craig Wright - overview of findings

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| **1. Overview of role** **22:1A** | There is a risk that some of the Core IP Rights created by Craig Wright have already vested in Hotwire and ~~DeMorgan Limited~~Panopticrypt due to the employment arrangement, for the reasons given in section ~~1.4~~ above. |
| As noted in section 1.4, much of the work undertaken by the DeMorgan Group to date has been driven by an individual called Craig Wright. | **The "completeness" warranties that Craig Wright gives in his IP Assignment as to the fact that the IP Assignment includes all Core IP Rights he has created should exclude Core IP Rights that have already vested in Hotwire or ~~DeMorgan Limited~~Panopticrypt due to this employment relationship. The initial draft prepared for the Craig Wright IP Assignment has been drafted on this basis.** |
| We have been instructed that Craig Wright has been employed, at various points, by both Hotwire and ~~DeMorgan Limited~~ Panopticrypt (RFI #61 as clarified and amended by Doc ID DM205). | We also recommend that any rights that _are_ owned by Hotwire or Panopticrypt in the work described in section 22:2A below be included in the Assignment Schedule for Hotwire in Schedule B of the Draft IP Assignment Schedule Report and Panopticrypt in Schedule M of the Draft IP Assignment Schedule Report respectively. |
|  | ~~Please also see our comments in section 19:2A regarding possible confusion over whether Craig Wright was also employed by Panopticrypt at some point. As noted in section 19:2A, we have assumed for present purposes that he was not, but~~ please let us know if |

**Formatted: DMReference**

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1\SYDDMS~~2635814-v1\SYDDMS   DRAFT
144
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612093

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| | ~~that is incorrect.~~ |

**2. Summary of IP likely to be owned by the individual[17]**

**22:2A**

<u>IP created by Craig Wright</u>

Doc ID DM160 (list of DeMorgan Group Entities' pending patent applications, progress, backlog, status and prioritization) contains a list of "pending patent applications" in the name of Craig Wright:

- "A method to securely distribute keys and pins for online wallets"
- "Software signing on the Blockchain"
- "Anti-counterfeit system"
- "Autonomous machine based oracle"
- "A secure blockchain based medial record system"
- "Secure off-block transfers"
- "BOTMAN"
- "Blockchain computing as a basis for equipment health monitoring service"
- "Blockchain based medical insurance verification and processing system"
- "Content search mechanism that uses a Blockchain based deterministic finite automata (DFA) graph, a DFA state machine, and a walker process"
- "System verification using one or more blockchain automata"
- "Blockchain based Deterministic finite automata (DFA) graph compression"

**Comments column:**

If these were created by Craig Wright then, subject to our comments in section 22:1A above, and any assignments out noted in section 22:4 below, it appears likely that these Core IP Rights remain owned by Craig Wright. **As such, we have added these into the Craig Wright IP Assignment by including them at Schedule P of the Draft IP Assignment Schedule Report.**

---

[17] A draft Assignment Schedule for the Craig Wright IP Assignment is set out in Schedule P of the Draft IP Assignment Schedule Report.

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1 SYDDMS~~2635814-v1 SYDDMS  DRAFT
146
Wright Family Trust - overview of findings

Formatted: DMReference

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

- "Blockchain based Deterministic finite automata graph traversal with nodal bit mapping"
- "Content search mechanism that uses a deterministic finite automata (DFA) graph, a DFA state machine, and a walker process"
- "A point recording system and network graph analysis platform based on the Blockchain:
- "Plausible deniability wallet"
- "Intelligent blockchain graph walking"
- "Method and apparatus for traversing a deterministic finite automata (dfa) graph compression to find optimised blockchain exchange paths"
- "Blockchain automata Toilet and Facilities management systems, methods and techniques"

**22:2B**

**IP assigned to Craig Wright**

We have been instructed that Craig Wright has never been assigned any Core IP Rights of relevance (RFI #62).

However, this appears to be inconsistent with much of the Review Material noted above in this report.

**MJF and W&F assignments**

Please see our comments in section 22:3 below regarding various assignments to Craig Wright.  (For the reasons noted in section 22:3 there are questions over ~~all of~~ these.)

**C01n assignment**

In addition, as noted in section 8:2E, the response to our initial information request (Doc ID DM152) states that C01n has assigned and licensed Core IP Rights to Hotwire.  However, the Review Material provided as evidence of this assignment and licence constitutes a "Software Development Agreement" between Strasan Pty Ltd (now C01n) Craig Wright and Dave Kleiman (together, the

**MJF and W&F assignments**

Please see our comments in section 22:3 regarding the status of various assignments made to Craig Wright.  Our comments in that section apply to those assignments.  ~~As suggested.~~

**C01n assignment**

Please see our comments at section 8:2E regarding the status of the "Software Development Agreement" between Strasan Pty Ltd (now C01n) Craig Wright and Dave Kleiman.  Those comments also apply here.

Given Craig Wright and Dave Kleiman are listed as the "Client" in that "Software Development Agreement" there is at least a theoretical risk that the assignment could be construed as an assignment to them.  We believe that risk is relatively low and that, if an assignment has, in

Formatted: DMReference

CONFIDENTIAL

DEF_01612095

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

"Client").  Please see our comments in section 8:2E in this regard.

Cloudcroft

[Position with respect to Cloudcroft assignments still to be confirmed]

fact, occurred (which as noted in section 8:2E there is some question over) it is likely to have been an assignment to Hotwire.

**For present purposes, we suggest proceeding on the basis that there has been a valid assignment of the Core IP Rights created by C01n pursuant to this Agreement to Hotwire.**

**However, given the identified risks, we also recommend expressly including any retained rights in the IP Assignment from C01n and we have therefore added such rights into the draft Assignment Schedule at Schedule H of the Draft IP Assignment Schedule Report.**

Cloudcroft

[Position with respect to Cloudcroft assignments still to be confirmed]

**22:2C**

Work for C01n

As noted in section 14:4A, the response to the initial information request (Doc ID DM152) states that Craig Wright worked as an independent contractor for C01n "via Panopticrypt".  It is therefore possible that he may have created some of the work outlined in section 14:2.

Please see our comments in section 14:4A in this regard.

We note that Craig Wright has now been confirmed as having been employed by Panopticrypt for a period.  It is unclear if this work was carried out during the time he was an employee.

Please see our comments in section 8:3A above regarding independent contractors.  Those comments also apply here.

This suggests, absent a separate assignment of intellectual property rights from Craig Wright to Panopticrypt and an additional assignment from Panopticrypt to C01n (neither of which has been provided us as part of the Review Material), that the intellectual property rights in this material are likely to still be owned by Craig Wright.  **We have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP**

Formatted: Highlight

Formatted: DMReference

CONFIDENTIAL

DEF_01612096

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| | **Assignment Schedule Report.** |
| | To the extent that this work was carried out whilst Craig Wright was an employee it is possible that Core IP Rights in the work could vest in in Panopticrypt, unless the work was carried out pursuant to the Consultancy Agreement with Co1n (Doc ID DM25).  Please see our comments at section 19:4B in this regard.  For certainty, any retained rights in Panopticrypt should be included in the IP Assignment from Panopticrypt. **We have therefore added these into the Panopticrypt Assignment Schedule at Schedule M of the Draft IP Assignment Schedule Report.** |
| | **As noted in section 14:4A, we also note that this appears to relate to work for Hoyts and Qantas.** ~~We have not been provided with any contracts with Hoyts or Qantas governing such work. We note for completeness that to the extent that such contracts exist, it is also possible that these could have an impact on the ownership position for these Core IP Rights.~~We are instructed that no work was undertaken for Hoyts and Qantas, meaning that if this is the only work undertaken, the impact on the ownership position for the Core IP Rights is likely to be minimal. |
| 22:2D | Please see our comments in section 14:3C. |
| Craig Wright Specifications | For completeness, we have added a reference to the specifications into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report. |
| Please see our comments in section 14:3C regarding specifications prepared by Craig Wright | |

**Formatted: DMReference**

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS  DRAFT
148
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612097

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

**3. Red Flag Third Party Issues**

**22:3A**

MJF Automation Software, WK Software Assurance and WK Risk Quantification

Please see our comments in section 8:3C above noting the assignment of Core IP Rights to Hotwire by the "Wright Family Trust DeMorgan" (Doc ID DM2).  As noted in section 8:3C, Doc ID DM2 is an assignment from the "Wright Family Trust DeMorgan" to Hotwire dated 15 September 2013 that purports to assign intellectual property rights in three categories namely:

- Category A: "Automation Software" held by DeMorgan, being: MJF Siemens Control and Operations Suite;

- Category B: WK (1) - Software Assurance through Economic Measures and Anti-Fraud System; and

- Category C: WK (1) - Risk Quantification system (for financial modelling in Bitcoin)).

However, we note that the background indicates that these intellectual property rights were assigned to the Wright Family Trust from "Craig Wright R&D" and, prior to that, from a number of Third Parties to Craig Wright.

There are a number of question over whether the *original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the Wright Family Trust to Hotwire had the desired effect.  This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

We note as follows with respect to the original assignments from the relevant Third Parties to Craig Wright.

- Category A: RFI #23 states that the Category A Core IP Rights were "purchased" from MJF Mining Pty Ltd and that

**Category A:**

Based on the documentation provided, we think it is unlikely that the Category A Core IP Rights have been assigned at law from either of the listed MJF entities, to Craig Wright.  From an intellectual property rights perspective, the Agreement at Doc ID DM151 is, in our opinion, most correctly described as a licence of intellectual property rights not an assignment (as the document does not include an assignment, but instead uses wording consistent with a licence such as "full use and source code provided" and "no restrictions on deployment or development").  Based on this documentation, we believe it likely that the Category A Core IP Rights remained owned by the relevant MJF entities.

This means that it would not have been possible for Craig Wright to assign these intellectual property rights to the Wright Family Trust, and similarly for the Wright Family Trust to assign these intellectual property rights to Hotwire.

We suggest we discuss.  Unless there is a separate intellectual property assignment from relevant MJF entities to Craig Wright that has not yet been provided, it is likely that the Category A Core IP Rights remain owned by those MJF entities.  It is possible, depending on the facts, that the parties have been mutually operating on the basis that an intellectual property rights assigned has taken place and therefore, even if this is not correct at law, there may potentially be grounds to argue that MJF should

**Formatted: DMReference**

DeMorgan
13 November 201527 November 2015
2636814 v1SYDDMS2636814 v1SYDDMS  DRAFT
143
Wright Family Trust - overview of findings

CONFIDENTIAL

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

the "IP rights were included in the purchase". However, the only documentation provided for this purchase is:

- Doc ID DM 85: an invoice from MJF Contracting to Craig Wright R&D for "Supply of Automation Software" including "update and installation of Siemens control software for systems control for up to 2,048 cores" which references an agreement; and

- Doc ID DM151: a contract provided in response to our request for a copy of the agreement referred to in the invoice, being an agreement dated 3 June 2013 between "Mark Ferrier of MJF Mining Services WA Pty Limited" and "Craig S Wright of Craig S Wright R&D". The Agreement is for the sale of listed chattels namely, "Siemens control software", "Supply of Microfinance Software" and "Gold options".

Neither of these documents contains an express assignment of intellectual property rights. Payment was to be in Bitcoin.

- Category B: The background recitals to the IP Deed of Assignment with Hotwire state that some of the Core IP Rights the subject of the assignment were originally obtained from W&K Information Defense Research LLC noting that "*although the contract with W&K Information Defense Research LLC has been executed, the principal died before completion. This has led to the filing of a Statement of Claim (SoC) against this entity for this IP … This case has not received judgment at the present time with the court having requested extensive levels of evidence due to the quantum of the amount in the case … The deed may not have been invalidated once the judgement has been entered but the assignor can dispute the assignment if the judgment is not forthcoming.*"

Please see our comments in section 22:3C below regarding

now be estopped from proceeding on another basis - however, the likelihood of such an argument will depend very closely on the detailed facts.  However, as noted in section 22:4C below there are inconsistent references in the review material given statements that Craig Wright has been granted a licence for "Scade" (from Siemens) and "IMal" (from Al Baraka) which appears to be inconsistent with the proposition that the rights from Siemens were assigned.  We suggest we discuss. We have been instructed that DeMorgan Limited accepts that there was not an assignment of these intellectual property rights to Craig Wright, but that instead Craig Wright was licensed by way of:

- a commercial licence to use the "SCALA" and "Automation" software suite from Siemens; and

- a licence to use the source code of core banking and microfinance software (Doc ID DM205).

Further, we have been instructed that Craig Wright utilised these products (eg by reverse engineering and running tests on them to understand how they worked) to create his own products and that it is the intellectual property rights in the work carried out by Craig Wright that was intended to be assigned from Craig Wright to the Wright Family Trust (and then to Hotwire) not the Third Party intellectual property rights (Doc ID DM205). This is despite the fact that the relevant Core IP Rights are described in the relevant agreements by reference to the relevant Third Party intellectual property rights.

This leaves open a number of risks.  Most significantly, there is a risk that intellectual property rights in the Core

*Formatted:* Font: Bold

*Formatted:* Table Bullet 1, Space Before:  0 pt, After:  0 pt, No bullets or numbering

*Formatted:* Font: Bold

*Formatted:* Font: Not Bold

*Formatted:* DMReference

CONFIDENTIAL

DEF_01612099

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| the W&K litigation generally.  We note as follows specifically with regard to the Core IP Rights stated to have been assigned on to Hotwire.<br><br>Doc ID DM 141 is a Statement of Claim (2013/225983) filed in the NSW Supreme Court by Craig Steven Wright ABN 97 481 146 384 (Plaintiff) in proceedings against W&K Info Defense Research LLC relating to four projects associated with the Department of Homeland Security USA:<br><br>    ○ BAA 11-02-TTA 01-0127-WP: TTA 01 - Software Assurance: Software Assurance through Economic Measures<br>    ○ BAA 11-02-TTA 05-0155-WP: TTA 05 - Secure Resilient Systems and Networks<br>    ○ BAA 11-02-TTA 09-0049-WP: TTA 09 - Cyber Economics<br>    ○ BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace (SWAMP)<br><br>On its face, it appears that the first of these four projects could relate to the Category B Core IP Rights.  Consent Orders were made on 6 November 2013 including judgment in the sum of $28,254,666 in favour of Craig Wright.  The consent orders state that "The court notes the agreement of the parties that the plaintiff will accept the transfer of Intellectual property held by the plaintiff in full and final satisfaction of the judgment" and that "A deed of transfer for the Intellectual Property is to be completed before 1 September 2013".  We have been provided with a short document executed by Uyen Nguyen (as director of W&K Info Defense LLC) which reads "In consideration of the amounts due, W&K Info Defense hereby accepts the offer to transfer all agreed items to Craig Wright R&D for the agreed consideration."<br><br>   • Category C: Please see our comments in section 22:3C | IP Rights created by Craig Wright infringe the intellectual property rights of the relevant Third Parties.  We note that the exact scope of the licence granted to Craig Wright is not clear.  We note as follows:<br><br>   * The contract at Doc ID DM151 states that "Mark Ferrier of MJF Mining Services WA Pty Limited" is "the owner of the chattels itemized in the schedule hereto and has agreed to sell them to the purchaser".  The "chattels" includes the "Siemens control software" which is stated to be "mining automation software" and the "Microfinance Software" that is "Developed by Daliah Al-Baraka".<br><br>   * Whilst the vendor is stated to "own" the chattels, it appears possible (if not probable) that the intellectual property rights in the relevant items are actually owned by other Third Parties (i.e. Siemens and Daliah Al-Baraka respectively) and that it is only the physical chattels that are being "sold", as there is no reference to the intellectual property rights and no warranties or third party intellectual property indemnities that would suggest, in the normal way, that "Mark Ferrier of MJF Mining Services WA Pty Limited" has the right to grant licences for the relevant intellectual property rights from their owners.<br><br>   * Despite this, somewhat confusingly, the contract *does* include some statements about the permitted use of the software which *could* suggest that the contract is purporting to grant Craig Wright a licence to use the software as follows: (1) Siemens: The contract states that "no warranty" is given as to use of the "Siemens |

CONFIDENTIAL                    DEF_01612100

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| below regarding the W&K litigation.  On its face, Category C does not align with any of the Core IP Rights identified in either Claim A or Claim B (as described in section 22:3C).  It is therefore unclear whether these Core IP Rights were intended to form part of the assignment to Craig Wright pursuant to the document executed by Uyen Nguyen (referred to in Category B above). | control software" but that it is "for development in systems automation".  This could suggest that it is licensed "for development" relating to systems automation, or that its use is entirely at Craig Wright's own risk given that "no warranty" is given as to use.  (2) Al-Baraka: The contract states that "Full use and source code" is provided for the Al-Baraka software and that there are "no restrictions on deployment or development". |

The document therefore leaves open some significant uncertainty as to: (1) whether Siemens and Al-Baraka remain the owners of the relevant intellectual property rights; (2) whether they have granted "Mark Ferrier of MJF Mining Services WA Pty Limited" a licence to use those intellectual property rights that permits sublicensing; (3) whether "Mark Ferrier of MJF Mining Services WA Pty Limited" is actually purporting to grant a licence (or simply stating that use of the software is at the user's risk); and (3) whether the activities that have been undertaken breach the licence granted (if any). This risk is heightened by the fact that we have been instructed that Mark Ferrier and/or the "MJF" entities have subsequently gone into bankruptcy/insolvency (as applicable) leaving limited protection between Craig Wright and the relevant Third Parties (Doc cID DM205).

**This leaves some risk of a Red Flag Third Party Issue open.  We have been instructed that the only Core IP Rights being used in this regard are the Core IP Rights created by Craig Wright "using" the material referred to above.  However, we note for completeness that this could still leave open an infringement risk.  For example, we note that to the**

Formatted: Font: 10 pt

Formatted: Font: 10 pt

Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Font: 10 pt
Formatted: Font: (Default) Arial, No underline

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT
152
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612101

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| | extent that there was copyright subsisting in the relevant material referred to above, and the version created from that material was an adaptation of it, it is possible for that adaptation to itself infringe the original even though there is separate copyright subsisting in the adaptation, |

**Formatted:** Font: Bold, No underline

Category B

We have been instructed Firstly, please confirm that the Category B Core IP Rights (i.e. WK (1) - Software Assurance through Economic Measures and Anti-Fraud System) are in fact those described in the Statement of Claim (i.e. BAA 11-02-TTA 01-0127-WP: TTA 01 - Software Assurance: Software Assurance through Economic Measures).

**Formatted:** Font: Not Bold

Assuming for present purposes that this is the case, gGiven it does not appear that a separate "deed of transfer for the Intellectual Property" referred to in the consent orders was ever executed, there is a question mark over (1) whether the words "accepts the offer to transfer" is itself an effective assignment of those Core IP Rights or whether a separate deed of transfer was required; and (2) exactly what Core IP Rights were the subject of the "transfer".  Whilst there could be some argument around point (1), there is at least a potential counterargument that the note executed by Uyen Nguyen was intended to (and in fact did) operate as an immediate assignment of the relevant Core IP Rights, and even if that is not correct, a strong argument that even if W&K Info Defense Research LLC ever sought to argue differently, that Craig Wright could immediately request the assignment of those Core IP Rights to

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612102

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| | himself (given the consent orders require the entry into a deed of transfer and W&K Info Defense Research LLC would be likely to be in contempt of court of it refused to enter into such a deed). As such, we think the position with regard to these Core IP Rights is stronger than Category A above. We therefore think there is some possibility that these Core IP Rights were assigned to Craig Wright, or at least, that there is an extremely low risk that any counterargument would be raised to that proposition. |

**Formatted:** Font: Bold

We have been instructed that W&K is willing to formalise this assignment (Doc ID DM205), and will prepare a draft assignment of intellectual property rights for this purpose.

**Formatted:** Font: Bold

**Formatted:** Font: Bold

Please see our comments in section 23:3A regarding the potential subsequent assignment of these any rights that were assigned from W&K to Craig Wright on to the Wright Family Trust and potential issues in that regard. As noted there, we believe there is a significant risk that, to the extent that there are any such rights, these rights were not validly assigned onto the Wright Family Trust and as such **we have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.**

**Formatted:** Font: Bold

Please also see our comments in section 23.3C in this regard.

Category C

It is unclear whether these Core IP Rights were intended to be transferred as part of the document executed by

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814 v1SYDDMS2635814 v4SYDDMS  DRAFT
154
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612103

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| | Uyen Nguyen (referred to in Category B above) or not given, on their face, these Core IP Rights are not the subject of either Claim A or Claim B (referred to in section 23:3C below).  Please confirm the basis on which DeMorgan believes that these rights were included in Claim A or Claim B (as described in section 23:3C below).We have been instructed that these Core IP Rights were the same intellectual property rights that were the subject of the litigation (Doc ID DM205).  Please therefore see our comments in Category B above regarding approach to these rights. |
| | To the extent that it is unclear whether these rights were included in Claim A or Claim B, there remains a possibility that these are still owned by W&K. |
| | We have been instructed that W&K is willing to formalise this assignment (Doc ID DM208), and will prepare a draft assignment of intellectual property rights for this purpose. |
| | Please see our comments in section 23:3A regarding the potential subsequent assignment of any rights that *were* assigned from W&K to Craig Wright on to the Wright Family Trust and potential issues in that regard.  As noted there, we believe there is a significant risk that, to the extent that there *are* any such rights, these rights were not validly assigned onto the Wright Family Trust and as such we have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report. |
| | Please also see comments in section 23:3C below in this |

Formatted: DMReference

CONFIDENTIAL

DEF_01612104

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

**CRAIG WRIGHT**

**22:3B**

Core Banking and Exchange Software, WK Metered Payments, WK Software Derivative Markets & Information Security Risk Systems, WK SWAMP

Please see our comments in section 18:3A above noting the assignment of Core IP Rights to Coin-Exch by the Wright Family Trust (Doc ID DM1).  As noted in section 18:3A, Doc ID DM1 is an assignment from the "Wright Family Trust DeMorgan" to Coin-Exch dated 15 September 2013 that purports to assign intellectual property rights in:

- Category A: "Core Banking and Exchange Software" (held by DeMorgan, being: MJF iMal (Source Code); MJF T24 updates and guides;
- Category B: WK (2) - Metered Payments system;
- Category C: WK (2) - Software Derivative Markets & Information Security Risk Systems;
- Category D: WK (2) - Software Assurance Marketplace (SWAMP).

The assignment is stated only to take effect once payment has been completed (operating as an exclusive licence until that point). RFI #25 instructed us that this has occurred which suggests that the assignment has taken effect.

However, we note that the background indicates that these intellectual property rights were assigned to the Wright Family Trust from "Craig Wright R&D" and, prior to that, from a number of Third Parties to Craig Wright.

The IP Deed of Assignment to Coin-Exch states, by way of

**COMMENTS REGARDING APPROACH**

regard.

Category A

It is not clear from the description of the items being sold by MJF Mining under the sale agreement at Doc ID DM151, that these include the intellectual property rights purportedly being assigned by the Wright Family Trust to Coin-Exch at Doc ID DM1.  ~~Please let us know if you are aware of a separate agreement between Craig Wright and MJF Mining which may cover the IP rights being assigned on to Coin-Exch at Doc ID DM1.~~

In any event, as noted in section 22:3A which addresses the same documentation, we think that, even if these rights were included in that assignment, it is unlikely that IP rights have been assigned at law from either of the listed MJF entities, to Craig Wright.  From an intellectual property rights perspective, the Agreement at Doc ID DM151 is, in our opinion, most correctly described as a licence of intellectual property rights not an assignment. Please see our comments in section 22:3A with regard to next steps in this regard.

Category D

With respect to the Software Assurance Marketplace (SWAMP) which is listed as one of the projects comprising the Statement of Claim at Doc ID DM141, please refer to our comments at section 22:3A relating to Category B Core IP Rights.  Those comments also apply here.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612105

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

background that all of the intellectual property rights in the "core technology" the subject of the assignment has been assigned and transferred from Craig Wright and isare therefore owned by the Wright Family Trust at the time of the assignment.

However, there are a number of question over whether the *original* assignment (from the Third Parties to Craig Wright) was effective and, as a consequence, whether the assignment from Craig Wright to the Wright Family Trust and the consequent assignment from the Wright Family Trust to Hotwire had the desired effect. This presents risks that the original Third Parties still own some or all of the relevant Core IP Rights.

We note as follows with respect to the original assignments from the relevant Third Parties to Craig Wright:

Category A

- RFI #23 states that "Core Banking and Automation Software was purchased from MJF Mining Pty Ltd". The background recitals in the IP Deed of Assignment to Coin-Exch refer to this as as being assigned from "MJF Mining Services WA Pty Ltd" for Al Baraka and "MJF Mining Services WA Pty Ltd for Siemens". However, the only documentation provided for this purchase is the following (which as noted in section 22:3A is also provided with respect to the Core IP Rights the subject of the assignments referenced in section 22:3A):

  o   Doc ID DM 85: an invoice from MJF Contracting to Craig Wright R&D for "Supply of Automation Software" including "update and installation of Siemens control software for systems control for up to 2,048 cores" which references an agreement; and

  o   Doc ID DM151: a contract provided in response to our request for a copy of the agreement referred to

As noted in section 22:3A, we have been instructed that W&K is willing to formalise this assignment (Doc ID DM205), and will prepare a draft assignment of intellectual property rights for this purpose.

Please see our comments in section 23:3A regarding the potential subsequent assignment of any rights that were assigned from W&K to Craig Wright on to the Wright Family Trust and potential issues in that regard. As noted there, we believe there is a significant risk that, to the extent that there *are* any such rights, these rights were not validly assigned onto the Wright Family Trust and as such we have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.

Please also see comments in section 23:3C below in this regard please also see our comments in section 23:3A regarding the potential subsequent assignment of these rights to the Wright Family Trust and potential issues in that regard. As noted there, we believe there is a significant risk that these rights were not validly assigned onto the Wright Family Trust and as such we have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.

Category B and C

It is very unclear whether the remainder of the Core IP Rights the subject of the assignment in Doc ID DM 1 were the subject of the ligitation commenced via the two Statements of Claim referred to in section 23:3C below.

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS  DRAFT
157
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612106

Formatted: Font: Bold

Formatted: DMReference

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

in the invoice, being an agreement dated 3 June 2013 between "Mark Ferrier of MJF Mining Services WA Pty Limited" and "Craig S Wright of Craig S Wright R&D".  The Agreement is for the sale of listed chattels namely, "Siemens control software", "Supply of Microfinance Software" and "Gold options".

On their face, neither of these documents appear to describe the intellectual property subject of the assignment at Doc ID DM1 and it therefore unclear how the Category A Core IP Rights were assigned to Craig Wright.

Category B to D

- The background recitals to the IP Deed of Assignment from Coin-Exch state that the remainder of the Core IP Rights were originally obtained from W&K Information Defense Research LLC noting that "although the contract with W&K Information Defense Research LLC has been executed, the principal died before completion.  This has led to the filing of a Statement of Claim (SoC) against this entity for this IP … This case has not received judgment at the present time with the court having requested extensive levels of evidence due to the quantum of the amount in the case … The deed may not have been invalidated once the judgement has been entered bu the assignor can dispute the assignment if the judgment is not forthcoming."  Please see our comments in section 22:3C below regarding the W&K litigation generally.  We note as follows specifically with regard to the Core IP Rights stated to have been assigned on to Coin-Exch.

  Please see section 23:3C below for a description of the W&K litigation and the Core IP Rights the subject of Claim A and Claim B (as described in section 23:3C).

However, we have been instructed that this is the case (Doc ID DM205).

It is therefore unclear whether these Core IP Rights were intended to be transferred as part of the document executed by Uyen Nguyen (referred to in Category B above of section 22:3A above) or not given, on their face, these Core IP Rights are not the subject of either Claim A or Claim B (referred to in section 23:3C below).  Please confirm the basis on which DeMorgan believes that these rights were included in Claim A or Claim B (as described in section 23:3C below).  To the extent that it is unclear whether these rights were included in Claim A or Claim B, there remains a possibility that these are still owned by W&K.

As noted in section 22:3A, we have been instructed that W&K is willing to formalise this assignment (Doc ID DM205), and will prepare a draft assignment of intellectual property for this purpose.

Please see our comments in section 23:3A regarding the potential subsequent assignment of any rights that were assigned from W&K to Craig Wright on to the Wright Family Trust and potential issues in that regard.  As noted there, we believe there is a significant risk that, to the extent that there are any such rights, these rights were not validly assigned onto the Wright Family Trust and as such we have therefore added these Core IP Rights into the Craig Wright Assignment Schedule at Schedule P of the Draft IP Assignment Schedule Report.

Please also see comments in section 23:3C below in this

**Formatted:** Underline

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612107

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

Of the projects comprising the subject matter of the Statement of Claim for Claim A, item BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace (SWAMP) appears to describe part of the intellectual property the subject of Doc ID DM1. It is not clear whether all the rest of the intellectual property is covered by the subject matter of the Statements of Claim.

**22:3C**

W&K litigation

As noted in sections 22:3A and 22:3B above, part of the Core IP Rights stated to have been assigned to Craig Wright (and then subsequently to the Wright Family Trust and then Hotwire and Coin-Exch pursuant to the arrangements described in sections 22:3A and 22:3B above) are described in those arrangements as having originally been owned by W&K Information Defense Research LLC.

From the Review Materials, our understanding of the background to the assignment from W&K Information Defense Research LLC to Craig Wright is as follows:

Claim A

In 2013, Craig Wright filed proceedings in the NSW Supreme Court against "W&K Info Defense Research LLC" (Case number 2013/225983). The Statement of Claim stated (in summary) that:

- Between 2013 and 2013, Craig Wright provided contract labour services and loaned money (by way of Bitcoin and gold bonds) to W&K Info Defense Research LLC.
- By contract dated 27 October 2008, W&K Info Defense Research LLC agreed to pay Craig Wright for services with that contract "bonded against the intellectual property of the defendant". The contract included an agreement that all intellectual property rights would revert to ownership by

**Comments column:**

regard.

Please see comments in section 23:3C below in this regard.

Please see comments in section 22:3A with respect to Category B Core IP Rights. Those comments apply here.

As noted above, it is impossible to confirm on the face of the documents whether the rights assigned to Craig Wright pursuant to the Consent Orders in the W&K litigation (noting our comments in this regard in section 22:3A and section 22:3B with respect to the validity of the assignment) were then all assigned onto the Wright Family Trust (and "on-assigned" to Hotwire and Coin-Exch). Please see comments in section 23:3A regarding the open questions over whether such Core IP Rights were assigned on to the Wright Family Trust. As such, we recommend including these rights in the Craig Wright IP Assignment Schedule for the sake of certainty. **As such, we have added these into the Craig Wright IP Assignment by including them at Schedule P of the Draft IP Assignment Schedule Report.**

As noted in section 22:3A and 223B, we are instructed that W&K will agree to formalise the assignment that was purported to occur at the conclusion of the litigation which will ensure that no relevant Core IP Rights (that were the subject of the litigation) remain owned by W&K.

CONFIDENTIAL

DEF_01612108

*[margin annotations: Formatted: Underline; Formatted: Font: Bold; Formatted: Font: Bold; Formatted: DMReference]*

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

**CRAIG WRIGHT**

Craig Wright if the projects under the contract concluded without an assignment of shares in W&K Info Defense Research LLC.  Further, the contract stated that a breach would lead to liquidated damages and, if not paid, all intellectual property rights would return to be solely owned by Craig Wright.

- The services performed by Craig Wright related to projects associated with the Department of Homeland Security USA and included four projects:
  - BAA 11-02-TTA 01-0127-WP: TTA -1 - Software Assurance: Software Assurance through Economic Measures
  - BAA 11-02-TTA 05-0155-WP: TTA 05 - Secure Resilient Systems and Networks
  - BAA 11-02-TTA 09-0049-WP: TTA 09 - Cyber Economics
  - BAA 11-02-TTA 14-0025-WP: TTA 14 - Software Assurance MarketPlace (SWAMP)

and the relevant intellectual property rights included software and code used by the US military, Department of Homeland Security and other associated parties.

- In May 2013, Dave Kleiman died leaving the project incomplete and without repaying the loan.

The only other documentation provided in the Review Materials is:

- a set of consent orders whereby the parties have agreed that Craig Wright "will accept the transfer of intellectual property held by the plaintiff in full and final satisfaction of the judgment"; and

- a short document executed by Uyen Nguyen as director of W&K Info Defense LLC stating that W&K Info Defense LLC "accept[s] the consent orders in 2013/225983 and 2013/245661.  In consideration of the amounts due, W&K

**COMMENTS REGARDING APPROACH**

We also note that Claim A related to projects carried out for the US Department of Homeland Security.  The Review Material does not contain any contract between W&K and the US Department of Homeland Security, but to the extent that W&K was engaged to do work for the US Department of Homeland Security we would have expected that to be governed by contract leaving open a possibility that the contract dealt with intellectual property rights created in the course of those projects being carried out.  This leaves open a risk that some relevant Core IP Rights may have been assigned by W&K to the US Department of Homeland Security.  **We suggest this be confirmed.**

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2636814-v1\SYDDMS_DRAFT
160
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612109

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

Info Defense hereby accepts the offer to transfer all agreed items to Craig Wright R&D for the agreed consideration."

Claim B

Craig Wright also filed proceedings in the NSW Supreme Court against "W&K Info Defense Research LLC". The Statement of Claim stated (in summary) that:

- Between 2013 and 2013, Craig Wright provided contract labour services and loaned money (by way of Bitcoin and gold bonds) to W&K Info Defense Research LLC.
- By contract dated 8 January 2009, W&K Info Defense Research LLC agreed to pay Craig Wright for services with that contract "bonded against the intellectual property of the defendant". The contract included an agreement that all intellectual property rights would revert to ownership by Craig Wright if the projects under the contract concluded without an assignment of shares in W&K Info Defense Research LLC. Further, the contract stated that a breach would lead to liquidated damages and, if not paid, all intellectual property rights would return to be solely owned by Craig Wright.
- The services performed by Craig Wright related to the development of a "Bitcoin SDK and exchange" and the relevant intellectual property rights included software and code used in the creation of a Bitcoin system.
- The defendeant was unable to complete its responsibilities due to the death of its director, Mr Kleiman.

The Statement of Claim in the Review Materials for this Claim B is not dated or stamped. However, RFI #56 states that both Statements of Claim (i.e. both Claim A and Claim B) were filed and litigated. However, the judgment in relation to the Statement of Claim at Doc ID DM142 cannot be located and has therefore not been provided for review. ~~We do note that the document executed by Uyen Nguyen mentioned above with regard to Claim B refers to~~

Formatted: DMReference

CONFIDENTIAL

DEF_01612110

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

~~two separate Claims (which potentially suggests that the consent orders for Claim B are similar to Claim A, although this is purely speculation)~~We have been instructed that the consent orders for Claim B were in the same form and on the same terms as Claim A with respect to the transfer of intellectual property rights.

We have been provided with various background documents relevant to this litigation namely:

- A copy of a contract for the Sale of Shares of a Company Owning Business between Dave Kleiman for W&K Info Defense LLC ("Vendor") and Craig Wright R&D ("Purchaser") (Doc ID DM87).  As noted above, both Statements of Claim (for Claim A and Claim B) refer to an agreement that that all intellectual property rights would revert to ownership by Craig Wright if the projects under the contract concluded without an assignment of shares in W&K Info Defense Research LLC.  Whilst this is purely speculation (given the Statement of Claim does not refer to the specific agreement) it seems possible that this Sale of Shares of a Company Owning Business could be the agreement executed for the transfer of shares as referred to in the Statements of Claim.  This is supported by RFI #58 which notes that this, and the agreement noted in the second bullet point below, were "taken to court to finalise position".  We note that the recitals to the Sale of Shares of a Company Owning Business state that "*the parties agree that they will incorporate into this agreement those agreements contained in the attached contract for the sale of the business to the intent that they shall in relation to the sale of shares have the rights and obligations contained in such contract as part of the agreement. The company includes all software, research material and other aspects of the business*".  It is unclear whether any assets were intended to comprise part of the sale here but we assume that, as the body of the agreement contains only a sale of

DeMorgan
13 November 201527 November 2015
2635814-v1\SYDDMS2635814-v1\SYDDMS  DRAFT
162
Wright Family Trust - overview of findings

Formatted: DMReference

CONFIDENTIAL

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

shares and no further details of a sale of assignment of IP that this agreement acts only as evidence of a share sale of Dave Kleiman's stake in W&K to Craig Wright.  Payment was to be in Bitcoin.

- An Intellectual Property Licence Funding Agreement" between Craig Wright of Craig Wright R&D (Financer) and Dave Kleiman for W&K Info Defense LLC (Provider) (Doc ID DM86) dated April 2011 with payment to be in Bitcoin. Under this Agreement:

  o Craig Wright agrees to fund Dave Kleiman's research and development of several software products – Bitcoin and Exchange Software in C/C++/C#/R Code.  Other IP the subject of the Agreement includes (1) all IP under the patent BAA-001/002/003/004 and (2) all trademarks associated with C01N and associated marks to be filed.  The funding is to be in the form of a loan repayable by Dave Kleiman on or before 1 July 2013 and 30 December 2013.  The recitals state that CW remains owner of all copyright in the Bitcoin and Exchange Software in C/C++/C#/R Code at all times.

  o Craig Wright also grants an "exclusive transferrable licence to copy publish sell or otherwise use the works in the course of its business in Australia and/or Overseas in respect of the whole or any part of the works commencing on 1 July 2013" for a fee of $20,000,000.

We also note that the Statement of Claim for Claim A refers to a research consulting agreement between Craig Wright and W&K Info Defense Research LLC dated 27 October 2008 which was "secured against W&K's intellectual property".  We have been instructed that a copy of this agreement cannot be located (RFI #55).

Similarly the Statement of Claim for Claim B refers to a research

Formatted: DMReference

CONFIDENTIAL

DEF_01612112

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

consulting agreement between Craig Wright and W&K Info Defense Research LLC dated 8 January 2009, which was "secured against W&K's intellectual property".  We have been instructed that a copy of this agreement cannot be located (RFI #56).

**22:3D**

Overseas trust arrangements

We have been instructed that prior to the establishment of the Wright Family Trust in August 2013, Craig Wright had "purchased software personally" (see section 22:2 in this regard) and also "had agreements (Bitcoin rights) with overseas trusts WII and Tulip Trading" (RFI #27).

The status of WII and Tulip Trading, and their relationship with Craig Wright, are very unclear.

We requested a copy of all documentation relating to any agreements between Craig Wright and WII and Tulip.  Via RFI #60, we were instructed that Craig Wright "had a loan from the overseas trust.  No BTC rights were purchased.  Craig has a loan of BTC rights from the trust which he used to purchase software".  This appears to be a reference to the arrangements with MJF (see sections 22:3A and 3B above).

We also requested details regarding WII and Tulip Trading and how they relate to the group.  RFI #60 states that "they are companies in the Seychlles incorporated by Craig Wright.  They are the main entities that Tulip Trust stems from.  They do not relate to the other entities.  They are asset management and holding companies."

Doc ID DM 156 contains an explanation of the "Tulip Trust" referenced in this response.  It states that:

*"The Seyshell's trust, also known as Tulip Trust, is not a standard*

We suggest we discuss.  It is extremely unclear whether these entities hold any interest in the Core IP Rights.  To the extent that they do, Craig Wright should be obliged to obtain assignments of all such rights.We have been instructed that these arrangements constitute a capital/funding source in relation to Bitcoin rights and ownership of shares, and they do not have any impact on the Core IP Rights ownership position (Doc ID DM205).

We also note for completeness that RFI#26 goes on to state that information regarding WII and Tulip Trading has not been disclosed to the ATO.  We note for completeness that DeMorgan should **obtain advice from its tax advisors** as to the scope of the disclosures it is required to make to ensure compliance, to the extent it has not already done so.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612113

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

*trust. It is a homomorphic encryption scheme for the distribution of keys. It is a trust written into software and cryptographic code. It is a DAC (Distributed Autonomous Corporation). Each trustee has a slice of public keys which do not allow access to anything on their own. When ordered correctly, the correct sequence of keys allows for the release of certain other keys in the pool which then allows for the release of legal ownership of private keys to be issued. Therefore the recipient has received a private key that has never been held by another person. Ie. Nobody ever has your private key.*

*The Trust was established before DBH.*

*Wright International Investments was established in 2009. It was designed as the holding company. Tulip Trading was established in 2011. Tulip Trust was a blind trust planned in 2011 and set up by Dave Kleiman under in 2012 Tulip Trading. Craig is independent of the trust."*

**4. Other issues to note**

**22:4A**

<u>IP assigned by Craig Wright</u>

We have been instructed that Craig Wright has never assigned any Core IP Rights to any other person or entity (RFI#63).

However, this appears to be inconsistent with much of the Review Material noted above in this report.

We note in particular:

- [Cloudcroft position to be confirmed].
- Category 1: RFI#27 states that Craig Wright (trading as Craig Wright R&D) "sold to [the Wright Family Trust] the software, Bitcoin rights, W&K software, Albaraka, Siemens etc" noting that "The ATO are aware of this and have these invoices". This appears to be a reference to the Deed of

<u>Category 1:</u> Please see comments in section 23:3A in this regard. Those comments also apply here.

<u>Category 2:</u> Please see comments in section 8:2F in this regard. Those comments also apply here.

<u>Category 3:</u> Please see our comments in section 22:3C above in this regard. Those comments also apply here.

<u>Category 4:</u> Please see our comments in section 23:3A in this regard. Those comments also apply here.

<u>Category 5:</u> Please see our comments in section 8:2D in this regard. Those comments also apply here.

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612114

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

Assignment from Craig Wright to The Wright Family Trust (dated 15 July 2013) (Doc ID DM 148). Please see our comments at section 23:3A in this regard. Those comments also apply here.

- Category 2: Please see our comments above in section 8:2F regarding a possible assignment of Core IP Rights to Hotwire by "Craig Wright R&D for DeMorgan". Those comments also apply here.

- Category 3: We note that Doc ID DM86: Intellectual Property Licence Funding Agreement between Craig Wright of Craig Wright R&D (ABN 97 481 146 384) (Financer) and Dave Kleiman of W&K Info Defense LLC (Provider) - contains an assignment of intellectual property rights from Craig Wright R&D to Dave Kleiman for W&K Info Defence LLC in any improvements, modification, enhancement or derivative developed by Dave Kleiman for W&K Info Defence LLC, of the intellectual property the subject of the Agreement, being:

  o Bitcoin and Exchange Software in C/C++/C#/R Code;

  o all trademarks associated with C01N and associated marks to be filed; and

  o all IP under the patent BAA-001/002/003/004.

Payment was to be in Bitcoin.

However, it appears possible (although unclear) that these Core IP Rights were subsequently assigned back to Craig Wright at the conclusion of the W&K litigation as outlined in section 22:3C. Please see our comments in section 22:3C above in this regard.

- Category 4: Doc ID DM148: Deed of Assignment and Charge between Craig Wright (ABN 97 481 146 384) (Chargee) and DeMorgan Wright Family Trust (ABN 72 433 066 448) (Chargor) dated 15 July 2013 provides for the

**Formatted:** DMReference

DeMorgan
13 November 2015 27 November 2015
2635814-v1 SYDDMS 2635814-v1 SYDDMS  DRAFT
168
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612115

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

following IP to be transferred from Craig Wright to the Wright Family Trust upon payment of consideration in full (operating as an exclusive licence until that point). The Deed states that all IP will be transferred by the Chargee as assigned to the Chargor on or before 30 September 2013:

- o Core Software and training materials;
- o Source code developed under agreement with W&K Information Defence Research LLC:
  - WK - Software Assurance Market Place (SWAMP);
  - WK - Software Derivative Markets and Information Security Risk Systems;
  - WK - Software Assurance through Economic Measures and Anti-Fraud System;
  - WK - Risk Quantification System (for financial modelling in Bitcoin);
  - WK - Metered Payments System
- o Software being sourced from MJF Mining (MJF) which is to be assigned at cost:
  - iMAL Core Banking software source code;
  - SCADA automation software suite; and
  - Islamic and Micropayment software source code.

Please see our comments in section 23:3A in this regard. Those comments also apply here.

Category 5: The response to our initial information request stated that there had been an assignment from "Craig Wright R&D" to Hotwire dated 1 July 2013.  However, as noted in section 8:2D above, no copy of this assignment has been provided.  Please see our comments in section 8:2D in this regard.

Formatted: DMReference

CONFIDENTIAL

DEF_01612116

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|

**22:4B**

IP licensed by Craig Wright

We have been instructed that Craig Wright is not currently party to any licence of Core IP Rights pursuant to which he licences Core IP Rights that he owns to any other person or entity (RFI#64).

However, this appears to be inconsistent with much of the Review Material noted above in this report.

- [Cloudcroft position to be confirmed.]

- Category 1: Please see our comments above in section 8:2F regarding a possible assignment of Core IP Rights to Hotwire by "Craig Wright R&D for DeMorgan".  Those comments also apply here.

- Category 2: Doc ID DM86: Intellectual Property Licence Funding Agreement between Craig Wright of Craig Wright R&D (ABN 97 481 146 384) (Financer) and Dave Kleiman of W&K Info Defense LLC (Provider) - as set out in section 22:2B, under the Intellectual Property Licence Funding Agreement at Doc ID DM86 Craig Wright also grants an "exclusive transferrable licence to copy publish sell or otherwise use the works in the course of its business in Australia and/or Overseas in respect of the whole or any part of the works commencing on 1 July 2013." for a fee of $20,000,000.  The licence was due to expire on 1 July 2013.

- Category 3: As noted in section 22:4A above under the Deed of Assignment and Charge between Craig Wright (ABN 97 481 146 384) (Chargee) and DeMorgan Wright Family Trust (ABN 72 433 066 448) (Chargor) dated 15 July 2013 (Doc ID DM148) the IP to be assigned is licensed to the Wright Family Trust on

Category 1: Please see our comments above in section 8:2F above.   Those comments also apply here.

Category 2:  This was a two year licence and should have now expired.

Category 3:  Please see our comments in section 23:3A below in this regard.  Those comments also apply here.

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814 v1SYDDMS2638814 v1SYDDMS  DRAFT
168
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612117

| CRAIG WRIGHT | COMMENTS REGARDING APPROACH |
|---|---|
| an exclusive basis until payment of consideration in full.  Please see our comments in section 23:3A below in this regard. | |

**22:4C**

IP licensed to Craig Wright

We have been instructed that Craig Wright has been granted two licences to use Core IP Rights by third parties namely (RFI#65):

- A licence for "Scade" (from "Siemens")
- A licence for "iMal" (from "Al Baraka")

Copies of these have not been provided.

~~There is some confusion over whether the rights obtained by Craig Wright in this regard were a licence or an assignment given these seem to be the same rights the subject of the assignments noted in sections 23:3A and 3B above.  The fact that these are licences, not assignments, is consistent with our comments in sections 23:3A and 23:3B with regard to the Category A Core IP Rights, and supports the view that ownership of these materials remains with the relevant Third Parties.~~This is consistent with our finding above that the rights to the "Siemens" and "Al Baraka" software did not constitute an assignment.

Please see our comments in section 23:3A and 22:3B in this regard.

Formatted: DMReference

CONFIDENTIAL

## 23. Wright Family Trust - overview of findings

| WRIGHT FAMILY TRUST | | COMMENTS REGARDING APPROACH |
|---|---|---|
| 1. Overview of role | **23:3A**<br><br>We have been instructed that the Wright Family Trust was established in August 2013 (RFI #27).<br><br>RFI #27 states that prior to the formation of the Wright Family Trust, Craig had "purchased" software personally but then "sold" the Wright Family Trust "the software, Bitcoin rights, W&K software, Albaraka, Siemens etc" which the Wright Family Trust then "collated and distributed these from the overseas trusts and overseas entities to the local companies in Australia". It appears from the Review Material that this is a reference to the assignments of Core IP Rights from the Wright Family Trust to Hotwire and Coin-Exch described in sections 8:3C and 18:3A above. | From the response to RFI #27 it appears likely that the main purpose of the Wright Family Trust was to take ownership of various Core IP Rights from Craig Wright, and then to assign those Core IP Rights to DeMorgan Group Entities. It remains unclear whether any Core IP Rights still vest in the Wright Family Trust or whether it has simply "on-assigned" all of the Core IP Rights that were previously assigned to it.<br><br>**Regardless, we recommend obtaining a blanket IP Assignment from the Trustee for the Wright Family Trust, particularly given the uncertainty over the validity of the assignment referred to in section 23:3A below.** |
| 2. Summary of IP likely to be owned by the entity[18] | **23:2A**<br><br>Please note Red Flag Third Party Issues below. | Please note Red Flag Third Party Issues below. |
| 3. Red Flag Third Party Issues | **23:3A**<br><br>Assignment from Craig Wright<br><br>We have been instructed that the only Core IP Rights assigned to the Wright Family Trust were assigned by Craig Wright to the Wright Family Trust under Doc ID DM 149 being a Deed of Assignment | As noted there is some confusion over whether this assignment actually took place. As noted, clause 14.5 suggested that Craig Wright would assign the relevant intellectual property rights on or before 30 September 2013. From the other remarks in the document, it |

---

[18] A draft Assignment Schedule for the Wright Family Trust IP Assignment is set out in Schedule Q of the Draft IP Assignment Schedule Report.

**Formatted:** DMReference

CONFIDENTIAL

| WRIGHT FAMILY TRUST | COMMENTS REGARDING APPROACH |
|---|---|

and Charge between Craig Wright (ABN 97 481 145 384) and DeMorgan Wright Family Trust (ABN 72 433 066 448) dated 15 July 2013 (RFI #67).

Whilst the party name here is "DeMorgan The Wright Family Trust" the ABN listed is simply the ABN for the Trustee for the Wright Family Trust.

We note:

- The recitals state that Craig Wright has agreed to "transfer IP" to "DeMorgan The Wright Family Trust" in terms of "a float for the value of the Intellectual Property (IP)". The recitals also state "*It is agreed that [DeMorgan Wright Family Trust] will have good title for all IP transferred in the deed at the completion of the deed and that a license to use the IP will be granted as an exclusive term prior to the completion of the deed.*" We have not seen any material confirming whether this has occurred.

- A separate "introduction" states that "*[Craig Wright] has granted or agreed to grant, during the pleasure of [Craig Wright], an exclusive license to use and exploit certain Intellectual Property (IP) to, for or on account of [DeMorgan The Wright Family Trust] and to secure such payment for the consideration associated with such, [DeMorgan The Wright Family Trust] has agreed to execute this Deed. It is further agreed that [DeMorgan The Wright Family Trust] will gain full title to all IP in this deed at or on the completion of the deed and when all consideration has passed in full.*"

- The operative provisions of the Deed do not contain an express assignment of any intellectual property rights other than the reference in the following bullet point. They provide that "*[DeMorgan The Wright Family Trust] charges to [Craig Wright] all the undertaking, property and assets of [DeMorgan The Wright Family Trust]* both present and

appears that this was intended to occur after full payment was received. ~~Please confirm whether this occurred and provide the relevant documentation.~~ We have been instructed that payment was made (Doc ID DM161) but that no separate document was entered into to document the assignment (Doc ID DM205).

Formatted: Font: Not Bold

If ~~this~~ the assignment from Craig Wright did not occur, there is a chance that these Core IP Rights are still owned by Craig Wright (subject to the Red Flag Third Party Issues outlined in section 22:3 above). **We therefore recommend that if the assignment cannot be confirmed, for completeness, any Core IP Rights retained by Craig Wright under this arrangement be included in the Craig Wright Assignment Schedule.**

Further, even if the Deed of Assignment and Charge *itself* constituted an assignment, there would be a question over which entity took the assignment ~~given~~:

- ~~t~~The Trust Deed for the Wright Family Trust is dated 9 August 2013 (nearly a month later than the Deed of Assignment and Charge) raising a question over whether the Wright Family Trust even existed at the time of the Deed of Assignment and Charge. However, we have been instructed that the Wright Family Trust was in existence prior to 9 August 2013 (pursuant to an earlier Trust Deed dated 1 July 2013 which does not form part of the Review Materials).; and

- ~~t~~The party executing the document is "DeMorgan The Wright Family Trust". We note that the execution block indicates that it is being

Formatted: DMReference

CONFIDENTIAL

DEF_01612120

| WRIGHT FAMILY TRUST | COMMENTS REGARDING APPROACH |
|---|---|

*future including the [DeMorgan The Wright Family Trust]'s Uncalled Capital to be called if so done for repayment of current amounts in the account".  "The charge secures the due and punctual payment of the Secured IP".*  We note that neither "Uncalled Capital" or "Secured IP" are defined.  We also note that the Deed refers to a separate "Agreement" entered into on or around the same date.  It is unclear what this is.  Clause 15.1 stated that *"This Deed will be a continuing security despite any settlement of account, intervening payment or other matter or thing whatsoever until a final discharge of this Deed has been given by the Chargee."*  We have not seen any documentation showing that "a final discharge of this Deed has been given by the Chargee" (i.e. Craig Wright).

- The only reference to a "transfer" in the operative provisions is a statement at clause 14.5 that *"All IP in this agreement will be transferred by the chargee as assigned to the charger On or before 30 September 2013"*.  This could suggest that a separate assignment was to be entered into at the relevant time.  It is unclear whether this occurred.

Whilst the "Intellectual Property" to be assigned is not defined, it is described (in clause 14 of the Deed) as:

- Core Software and training materials
- Source code developed under agreement with W&K Information Defence Research LLC:
  - WK - Software Assurance Market Place (SWAMP)
  - WK - Software Derivative Markets and Information Security Risk Systems
  - WK - Software Assurance through Economic Measures and Anti-Fraud System
  - WK - Risk Quantification System (for financial modelling in Bitcoin)

signed by "Trustee (DeMorgan)".  Given DeMorgan Limited is not the Trustee of The Wright Family Trust (and we do not understand it to have ever been the trustee) this raises a question over whether the incorrect entity has executed the Deed.  We note that, next to the execution block, there is a handwritten note that reads "4 Panopticrypt" which could suggest an intention that "Trustee (DeMorgan)" was executing on behalf of Panopticrypt (which was the trustee of the Wright Family Trust) however this is unclear and it is uncertain how and when this note was added.  It also appears that this party has failed to execute the document as a Deed.

For the reasons outlined above, we recommend, for completeness, that any Core IP Rights retained by Craig Wright under this arrangement be included in the Craig Wright Assignment Schedule.  **As such, we have added the Core IP Rights identified in section 22.3 as potentially owned by Craig Wright (namely the source code and other material developed with regard to WK - Software Assurance through Economic Measures and Anti-Fraud System and WK - Software Assurance Market Place (SWAMP)) into the Craig Wright IP Assignment by including them at Schedule P of the Draft IP Assignment Schedule Report.**

For completeness, any rights that in this materials that do sit with the Wright Family Trust (which are likely to be minimal) should be captured in the Wright Family Trust IP Assignment.  We have

DeMorgan
13 November 201527 November 2015
2635B14-v1SYDDMS2635B14-v1SYDDMS  DRAFT
172
Wright Family Trust - overview of findings

Formatted: DMReference

DEF_01612121

| WRIGHT FAMILY TRUST | COMMENTS REGARDING APPROACH |
|---|---|

|  | therefore added this into Schedule Q of the Draft IP Assignment Schedule Report as noted in section 23:4A below. |

    ○  WK - Metered Payments System

- Software being sourced from MJF Mining (MJF) which is to be assigned at cost:
  - iMAL Core Banking software source code;
  - SCADA automation software suite;
  - Islamic and Micropayment software source code.

**4. Other issues to note**

**23:4A**

**Assignments to Hotwire and Coin-Exch**

Please see our comments in sections 8:3C and 18:3A above regarding the assignments of Core IP Rights to Hotwire and Coin-Exch of Core IP Rights acquired from Craig Wright under the assignment referred to in section 23:3A above.

There are real questions over whether the relevant Core IP Rights were effectively assigned to Craig Wright in the first place (as outlined in sections 22:3A, 22:3B and 22:3C) and, if they were, whether they were then assigned to the Wright Family Trust (for the reasons outlined in section 23:3A above).

However, to the extent those assignments were effective there is some risk that some of these Core IP Rights remain owned by the Wright Family Trust (due to the issues over the drafting of the assignments to Hotwire and Coin-Exch) as noted in sections 8:3C and 18:3A. Further, we note that there is some query over whether the Wright Family Trust executed these documents correctly (given Ramona Watts has executed one, and Craig Wright has executed the other, for the Wright Family Trust - it is unclear who the authorised signatories were). As such, we recommend that any of these Core IP Rights that *are* retained by the Wright Family Trust be expressly referenced in the IP Assignment from the Wright Family Trust. **As such, we have added a general reference to the retained rights into the Wright Family Trust IP Assignment by including them at Schedule P of the Draft IP Assignment Schedule Report.**

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2635814 v1\SYDDMS2635814 v1\SYDDMS  DRAFT
173
Wright Family Trust - overview of findings

CONFIDENTIAL

DEF_01612122

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612123

**Schedule A**

**DeMorgan Group Corporate Chart**

Note that Allan Pedersen also holds partially paid options in DeMorgan Limited.



Formatted: DMReference

CONFIDENTIAL

DEF_01612124

## Schedule B

### List of Documents Reviewed

| Doc ID Number | File Name | Description |
|---|---|---|
| DM1 | 20130915 IP Deed of Assignment DeMorgan Coin Exch | IP Deed of Assignment between The Wright Family Trust DeMorgan (ABN 72 433 066 448) and Coin-Exch Pty Ltd (ABN 31 163 338 467). |
| DM2 | 20130915 IP Deed of Assignment WFT to HW | IP Deed of Assignment between The Wright Family Trust DeMorgan (ABN 72 433 066 448) and Hotwire Preemptive Intelligence Pty Ltd (ABN 31 163 338 467). |
| DM3 | Intellectual Property Licence DeMorgan and Hotwire 22 August 2013 (1) | Intellectual Property Licence between C W R&D (ABN 97 481 146 384) ATF DeMorgan (ABN 72 433 066 448) and Hotwire Preemptive Intelligence Pty Ltd |
| DM4 | Intellectual Property Licence b | |
| DM5 | Intellectual Property Licence | Intellectual Property Licence between C W R&D (ABN 97 481 146 384) and Hotwire Preemptive Intelligence Pty Ltd |
| DM6 | Intellectual Property Licence (1) | |
| DM7 | Hotwire and CoinEx Research and Development Services Agreement 15 Sept | R&D Services Agreement between Coin-Exch Pty Ltd (Client) and Hotwire Preemptive Intelligence Pty Ltd and Interconnected Research Pty Ltd (Service Providers) |
| DM7 duplicate | Research and Development Services Agreement 15 Sept 2013 | R&D Services Agreement between Coin-Exch Pty Ltd (Client) and Hotwire Preemptive Intelligence Pty Ltd and Interconnected Research Pty Ltd (Service Providers) |
| DM8 | Technical Services Agreement - 29062015145045 | Research, Development and Technical Services Agreement between DeMorgan Ltd (Service Provider) and Dr Technologies Ltd (Client). |
| DM9 | Pholus Consultancy Agreement V3.1 (ICR) | Consultancy Agreement between Interconnected Research Pty Ltd (ACN 165 472 097) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM10 | Pholus Consultancy Agreement V3.1 (Integyrz) | Consultancy Agreement between Integyrz Pty Ltd (ACN 165 263 007) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM11 | Pholus Consultancy Agreement V3.1 (Panopticrypt) | Consultancy Agreement between Panopticrypt Pty Ltd (ACN 151 567 118) (Company) and Pholus Pty Ltd |

Formatted: DMReference

CONFIDENTIAL

DEF_01612125

| Doc ID Number | File Name | Description |
|---|---|---|
| | | (ACN 165 472 079) (Consulting Company) |
| DM12 | Pholus Consultancy Agreement V3.1 (Zuhl) | Consultancy Agreement between Zuhl Pty Ltd (ACN 165 472 006) (Company) and Pholus Pty Ltd (ACN 165 472 079)  (Consulting Company) |
| DM13 | Pholus Consultancy Agreement V3.1 (Cloudcroft) | Consultancy Agreement between Cloudcroft Pty Ltd (ACN 149 732 365) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM14 | Pholus Consultancy Agreement V3.1 (DeMorgan) | Consultancy Agreement between DeMorgan Ltd (ACN 601 560 525) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM15 | Pholus Consultancy Agreement V3 (Denariuz) | Consultancy Agreement between Denariuz Pty Ltd (ACN 165 471 983) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM16 | Pholus Consultancy Agreement V2.0 (CHAOS) | Consultancy Agreement between Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd (ACN 600 516 149) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM17 | Pholus Consultancy Agreement V3 (Misfit) | Consultancy Agreement between Misfit Games Pty Ltd (ACN 601 677 105) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM18 | Pholus Consultancy Agreement V3 (DASO) | Consultancy Agreement between DASO Pty Ltd (ACN 600 512 249) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM19 | Pholus Consultancy Agreement V3 (Coin-Exch) | Consultancy Agreement between Coin-Exch Pty Ltd (ACN 163 338 467) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM20 | Pholus Consultancy Agreement V3.0 (C01N) | Consultancy Agreement between C01N Pty Ltd (ACN 152 222 421) (Company) and Pholus Pty Ltd (ACN 165 472 079) (Consulting Company) |
| DM21 | Panopticrypt Consultancy Agreement V3 (DASO) | Consultancy Agreement between DASO Pty Ltd (ACN 600 512 249) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM22 | Panopticrypt Consultancy Agreement V3 (Cloudcroft) | Consultancy Agreement between Cloudcroft Pty Ltd  (ACN 149 732 365) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |

Formatted: DMReference

CONFIDENTIAL

DEF_01612126

| Doc ID Number | File Name | Description |
|---|---|---|
| DM23 | Panopticrypt Consultancy Agreement V2.0 (CHAOS) | Consultancy Agreement between Chaos and Nonliner Forecastability in Economics and Finance Pty Ltd  (ACN 600 516 149) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM24 | Panopticrypt Consultancy Agreement V3 (Coin-Exch) | Consultancy Agreement between Coin-Exch Pty Ltd (ACN 163 338 467) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM25 | Panopticrypt Consultancy Agreement V3 (C01N) | Consultancy Agreement between C01N Pty Ltd (ACN 152 222 421) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM26 | Panopticrypt Consultancy Agreement V3 (ICR) | Consultancy Agreement between Interconnected Research Pty Ltd (ACN 165 472 097) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM27 | Panopticrypt Consultancy Agreement V3 (Pholus) | Consultancy Agreement between Pholus Pty Ltd (ACN 165 472 079) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM28 | Panopticrypt Consultancy Agreement V3 (DeMorgan) | Consultancy Agreement between DeMorgan Ltd (ACN 601 560 525) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM29 | Panopticrypt Consultancy Agreement V3 (Zuhl) | Consultancy Agreement between Zuhl Pty Ltd (ACN 165 472 006) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM30 | Panopticrypt Consultancy Agreement V3 (Denariuz) | Consultancy Agreement between Denariuz Pty Ltd (ACN 165 471 983) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM31 | Panopticrypt Consultancy Agreement V3 (Misfit) | Consultancy Agreement between Misfit Games Pty Ltd (ACN 601 677 105) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM32 | Panopticrypt Consultancy Agreement V3 (Integyrz) | Consultancy Agreement between Integyrz Pty Ltd (ACN 165 263 007) (Company) and Panopticrypt Pty Ltd (ACN 151 561 118) (Consulting Company) |
| DM33 | ICR Consultancy Agreement V3 (Misfit) | Consultancy Agreement between Misfit Games Pty Ltd (ACN 601 677 105) (Company) and Interconnected Research Pty Ltd (ACN 165 472 097) (Consulting Company) |
| DM34 | ICR Consultancy Agreement V2.0 (CHAOS) | Consultancy Agreement between Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd (ACN |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612127

| Doc ID Number | File Name | Description |
|---|---|---|
| | | 600 516 149) (Company) and Interconnected Research Pty Ltd  (ACN 165 472 097) (Consulting Company) |
| DM35 | ICR Consultancy Agreement V3 (DeMorgan) | Consultancy Agreement between DeMorgan Pty Ltd (ACN 601 560 525) (Company) and Interconnected Research Pty Ltd  (ACN 165 472 097) (Consulting Company) |
| DM36 | Integyrz Consultancy Agreement V3 (Misfit) | Consultancy Agreement between Misfit Games Pty Ltd (Company) and Integyrz Pty Ltd (ACN 165 263 007) (Consulting Company) |
| DM37 | Integyrz Consultancy Agreement V2.0 (CHAOS) | Consultancy Agreement between Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd (ACN 600 516 149) (Company) and Integyrz Pty Ltd (ACN 165 263 007) (Consulting Company) |
| DM38 | Integyrz Consultancy Agreement V3 (DeMorgan) | Consultancy Agreement between DeMorgan Pty Ltd (ACN 601 560 525) (Company) and Integyrz Pty Ltd (ACN 165 263 007) (Consulting Company) |
| DM39 | Denariuz Consultancy Agreement V4 (DASO) | Consultancy Agreement between DASO Pty Ltd  (CAN 600 512 249) (Company) and Denariuz Pty Ltd (ACN 165 471 983) (Consulting Company) |
| DM40 | Interconnected RD Service Agreement v3.0 (Panopticrypt) | Research and Development Services Agreement between Panopticrypt Pty Ltd (ABN 34 151 567 118) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097) (Provider) |
| DM41 | Interconnected RD Service Agreement v3 (DASO) | Research and Development Services Agreement between DASO Pty Ltd (ABN 86 600 542 249) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097)  (Provider) |
| DM42 | Interconnected RD Service Agreement v3 (Cloudcroft) | Research and Development Services Agreement between Cloudcroft Pty Ltd (ABN 94 149 732 365) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097)  (Provider) |
| DM43 | Interconnected RD Service Agreement v3 (Coin-Exch) | Research and Development Services Agreement between Coin-Exch Pty Ltd (ABN 31 163 338 467) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097)  (Provider) |
| DM44 | Interconnected RD Service Agreement v3 (C01N) | Research and Development Services Agreement between C01N Pty Ltd (ABN 56 152 222 421) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097)  (Provider) |
| DM45 | Interconnected RD Service Agreement v3 (Zuhl) | Research and Development Services Agreement between Zuhl Pty Ltd (ABN 45 165 472 006) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097)  (Provider) |

Formatted: DMReference

CONFIDENTIAL

DEF_01612128

| Doc ID Number | File Name | Description |
|---|---|---|
| DM46 | Interconnected RD Service Agreement v3 (Denariuz) | Research and Development Services Agreement between Denariuz Pty Ltd (ABN 22 165 471 983)  (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097)  (Provider) |
| DM47 | Interconnected RD Service Agreement v3 (Pholus) | Research and Development Services Agreement between Pholus Pty Ltd (ABN 47 165 472 079)  (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097)  (Provider) |
| DM48 | Interconnected RD Service Agreement v3.0 (Integyrz) | Research and Development Services Agreement between Integyrz Pty Ltd (ABN 42 165 263 007) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097)  (Provider) |
| DM49 | Integyrz RD Service Agreement V3 (Panopticrypt) | Research and Development Services Agreement between Panopticrypt Pty Ltd (ABN 34 151 567 118) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM50 | Integyrz RD Service Agreement V3 (Pholus) | Research and Development Services Agreement between Pholus Pty Ltd (ABN 47 165 472 079) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM51 | Integyrz RD Service Agreement V3 (ICR) | Research and Development Services Agreement between Interconnected Research Pty Ltd (ABN 51 165 472 097) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM52 | Integyrz RD Service Agreement V3 (Zuhl) | Research and Development Services Agreement between Zuhl Pty Ltd (ABN 45 165 472 006) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM53 | Integyrz RD Service Agreement V3 (C01N) | Research and Development Services Agreement between C01N Pty Ltd (ABN 56 152 222 421) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM54 | Integyrz RD Service Agreement V3 (Cloudcroft) | Research and Development Services Agreement between Cloudcroft Pty Ltd (ABN 94 149 732 365) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM55 | Integyrz RD Service Agreement V3 (Denariuz) | Research and Development Services Agreement between Denariuz Pty Ltd (ABN 22 165 471 983) (Client) and Integyrz Pty Ltd (ABN 42 165 263 007) (Provider) |
| DM56 | Integyrz RD Service Agreement V3 (DASO) | Research and Development Services Agreement between DASO Pty Ltd (ABN 86 600 542 249) (Client) and Interconnected Research Pty Ltd (ABN 51 165 472 097)  (Provider) |
| DM57 | Integyrz RD Service Agreement V3 (Coin-Exch) | Research and Development Services Agreement between Coin-Exch Pty Ltd (ABN 31 163 338 467) (Client) |

Formatted: DMReference

CONFIDENTIAL

DEF_01612129

| Doc ID Number | File Name | Description |
|---|---|---|
| | | and Integyrz Pty Ltd (ABN 42 165 263 007)  (Provider) |
| DM58 | Business Service & Management Agreement DeMorgan Holdings | Business Service and Management Agreement between DeMorgan Holdings Pty Ltd (ACN 600655427) (Company) and DeMorgan Ltd (ACN 601560525) (Manager) |
| DM59 | Business Service & Management Agreement CHAOS | Business Service and Management Agreement between Chaos and Nonlinear Forecastability in Economics and Finance Pty Ltd (ACN 600516149) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM60 | Business Service & Management Agreement Coin-Exch | Business Service and Management Agreement between Coin-Exch Pty Ltd (ACN 163338467) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM61 | Business Service & Management Agreement C01N | Business Service and Management Agreement between C01N Pty Ltd (ACN 152222421) (Company) and DeMorgan Ltd (ACN 601560525) (Manager) |
| DM62 | Business Service & Management Agreement Cloudcroft | Business Service and Management Agreement between Cloudcroft Pty Ltd (ACN 149735365) (Company) and DeMorgan Ltd (ACN 601560525) (Manager) |
| DM63 | Business Service & Management Agreement DASO | Business Service and Management Agreement between DASO Pty Ltd (ACN 600512249) (Company) and DeMorgan Ltd (ACN 601560525)   (Manager) |
| DM64 | Business Service & Management Agreement Panopticrypt | Business Service and Management Agreement between Panopticrypt Pty Ltd (ACN 151567118) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM65 | Business Service & Management Agreement Denariuz | Business Service and Management Agreement between Denariuz Pty Ltd (ACN 165471983) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM66 | Business Service & Management Agreement Misfit Games | Business Service and Management Agreement between Misfit Games Pty Ltd (ACN 601677105) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM67 | Business Service & Management Agreement Pholus | Business Service and Management Agreement between Pholus Pty Ltd (ACN 165472079) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM68 | Business Service & Management Agreement EZAS | Business Service and Management Agreement between EZAS Pty Ltd  (ACN 602717788) (Company) and DeMorgan Ltd (ACN 601560525)  (Manager) |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612130

| Doc ID Number | File Name | Description |
|---|---|---|
| DM69 | Business Service & Management Agreement Zuhl | Business Service and Management Agreement between Zuhl Pty Ltd (ACN 165472006) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM70 | Business Service & Management Agreement ICR | Business Service and Management Agreement between Interconnected Research Pty Ltd (ACN 165472097) (Company) and DeMorgan Ltd  (ACN 601560525) (Manager) |
| DM71 | Consultancy Agreement NSW Electoral Commission and Panopticrypt | Consultancy Agreement between NSW Electoral Commission (Principal) and Panopticrypt Pty Ltd (Consultant) |
| DM72 | Sale Agreement Info Defense Cloudcroft | Sale Agreement between Information Defense Pty Ltd (Seller) and Lynn Wright/Cloudcroft Pty Ltd (Buyer) |
| | | Agreement between Craig Steven Wright (Vendor) and Information Defense Pty Ltd (Purchaser) |
| | | Agreement between Craig Steven Wright and Carroll Lynn Wright |
| DM73 | Ignatius Pang - signed contract | Employment contract between Hotwire Preemptive Intelligence Pty Ltd and Chi Nam Ignatius Pang |
| DM74 | Olga Kuznetsova (Sep 1) | Employment contract between Interconnected Research Pty Ltd and Olga Kuznetsova |
| DM75 | Ray Hoang | Employment contract between Interconnected Research Pty Ltd and Ray Hoang |
| DM76 | Trupti Birje | Employment contract between Interconnected Research Pty Ltd and Trupti Birje |
| DM77 | Nicolas Desmond | Employment contract between Interconnected Research Pty Ltd and Nicolas Desmond |
| DM78 | Allan Pedersen | Employment contract between Interconnected Research Pty Ltd and Allan Pedersen |
| DM79 | Stef Savanah | Employment contract between Integyrz Pty Ltd and Stephane Savanah |
| DM80 | Viveca Magnusson - employment agreement - (Panopticrypt) | Employment contract between Panopticrypt Pty Ltd and Viveca Magnusson |
| DM81 | Intellectual Property Licence CW R&D Cloudcroft | Intellectual Property Licence between Craig Wright R&D (For GICSR/CSCSS) (ABN 97 481 146 384) (Licensor) and Cloudcroft Pty Ltd (ABN 48 164 068 348) (Licensee) |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612131

| Doc ID Number | File Name | Description |
|---|---|---|
| DM82 | Strasan Hotwire Agreement June 2013 [C01N Pty Ltd] | Software Development Agreement between Craig Wright R&D (ABN 97 481 146 384)/Dave Kleiman (W&K Info Def LLC) (Client) and Strasan Pty Ltd (ABN 56 152 222 421) (Strasan) |
| DM83 | Strasan and HW Software Development Plan- HotwirePE | Strasan Software Development Plan: An experimentation framework for the development of algorithmic systems based on the use of evolutionary process development [attachment to Software Development Agreement] |
| DM84 | Strasan and HW Invoice Automated self matching learning system (1) | Invoice between Hotwire Preemptive Intelligence Pty Ltd and David Rees (1 July 2013) |
| DM85 | MJF Invoices | Invoice between MJF Contracting and Craig Wright R&D |
| DM86 | 2.Intellectual Property Licence Funding Agreement_Ref CEWK01 | Intellectual Property Licence Funding Agreement between Craig Wright of Craig Wright R&D (ABN 97 481 146 384) (Financer) and Dave Kleiman of W&K Info Defense LLC (Provider) |
| DM87 | 1.Contract for the Sale of Shares_ref-CEWK03 | Contract for the Sale of Shares of a Company Owning Business between Dave Kleiman for W&K Info Defense LLC (Vendor) and Craig Wright R&D (ABN 97 487 146 384) (Purchaser) and W&K Info Defense LLC (Company) |
| DM88 | R&D Tax Incentove (C01N 1) 2012-2013 | Strasan Pty Ltd R&D Tax Incentive Application (2012-2013) |
| DM89 | C01N 2014 | C01N Pty Ltd 2014 Company tax return |
| DM90 | R&D Tax Incentive - C01N 2 | C01N Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM91 | 20150730_C01N_S27F | Notification of examination of registrations under section 27F of the Industry Research and Development Act 1986 - C01N Pty Ltd |
| DM92 | C01N Notice of Registration R&D Tax Incentive 15 Oct 2014 | Notice of Registration for R&D Tax Incentive - C01N Pty Ltd |
| DM93 | R&D Cloudcroft Final Version 1 | Cloudcroft Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM94 | Cloudcroft 2014 | Cloudcroft Pty Ltd 2014 Company tax return |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2635814-v1SYDDMS2635814-v1SYDDMS_DRAFT

183

CONFIDENTIAL

| Doc ID Number | File Name | Description |
|---|---|---|
| DM95 | Integyrz Notice of Registration for R&D Tax Incentive | Notice of Registration for R&D Tax Incentive - Integyrz Pty Ltd |
| DM96 | R&D Tax Incentive Integyrz (final) | Integyrz Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM97 | Integyrz 2014 | Integyrz Pty Ltd 2014 Company tax return |
| DM98 | Hotwire Advanced Finding 1314AF97440 22 April 2014 | Certificate for Advanced Finding under s28A of the Industry Reseach and Development Act 1986 dated 22 April 2014 |
| DM99 | Hotwire 2014 | Hotwire Preemptive Intelligence Pty Ltd 2014 Company tax return |
| DM100 | HotwirePE AF assessment report | Hotwire Preemptive Intelligence Pty Ltd R&D Tax Incentive Application: Advance/Overseas Finding |
| DM101 | Hotwire Core Technology Company notification | Certificate for core technology finding under s28E of the Industry Research and Development Act 1986 |
| DM102 | R&D Tax Incentive Hotwire final version | Hotwire Preemptive Intelligence Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM103 | R&D Tax Incentive - IR | Interconnected Research Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM104 | ICR Notice of Registration for R&D Tax Incentive 9 Oct 2014 | Notice of Registration for R&D Tax Incentive - Interconnected Research |
| DM105 | Registration for RSP (IR) | Notice of continuing registration as a Research Service Provider |
| DM106 | Interconnected Research 2014 | Interconnected Research Pty Ltd 2014 Company tax return |
| DM107 | Denariuz Core Tech Certificate CT00002 SIGNED | Certificate for core technology finding under s28E of the Industry Research and Development Act 1986 |
| DM108 | Denariuz 2014 | Denariuz Pty Ltd 2014 Company tax return |
| DM109 | Denariuz CoreTech cover letter Company Notice SIGNED | Certificate for core technology finding under s28E of the Industry Research and Development Act 1986 - Denariuz (2014) |
| DM110 | RRDAA-2523020-31340 | Denariuz Pty Ltd R&D Tax Incentive Application (2014-2015) |

Formatted: DMReference

CONFIDENTIAL

DEF_01612133

| Doc ID Number | File Name | Description |
|---|---|---|
| DM111 | R&D Tax Incentive Denariuz | Denariuz Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM112 | Zuhl Notice of Registration for R&D Tax Incentive - Zuhl | Notice of Registration for R&D Tax Incentive - Zuhl |
| DM113 | R&d Tax Incentive- Zuhl | Zuhl Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM114 | Zuhl 2014 | Zuhl Pty Ltd 2014 Company tax return |
| DM115 | Coin-Exch 2014 | Coin-Exch Pty Ltd 2014 Company tax return |
| DM116 | Advanced finding Coin Exch R&D Tax Incentive Application - Coin Exch | Coin-Exch Pty Ltd R&D Tax Incentive Application: advanced/overseas finding |
| DM117 | Coin-Exch Pty Ltd _Core_Technology_FindingCertificate | Findings of the R&D Incentives Delegate |
| DM118 | RRDAA-1965982-23184 | Coin-Exch Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM119 | Certificate AF00053 Coin-Exch Pty Ltd | Certificate for advance finding under s28A of the Industry Reseach and Development Act 1986 |
| DM120 | Coin-Exch Pty Ltd_Core_Technology_Finding_Notification | Certificate for core technology finding under s28E of the Industry Research and Development Act 1986 |
| DM121 | RRDAA-2492759-31088 | Coin-Exch Pty Ltd R&D Tax Incentive Application (2014-2015) |
| DM122 | R&D Tax Incentive Panopticrypt | Panopticrypt Pty Ltd R&D Tax Incentive Application (2013-2014) |
| DM123 | Panopticrypt 2014 | Panopticrypt Pty Ltd 2014 Company tax return |
| DM124 | 20150730_Panopticrypt_s27f | Notification of examination of registrations under section 27F of the Industry Research and Development Act 1986 - Panopticrypt Pty Ltd |
| DM125 | R&D Tax Incentive - Pholus | Pholus Pty Ltd R&D Tax Incentive Application (2013-2014) |

Formatted: DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1\SYDDMS2635814-v1\SYDDMS_DRAFT

186

CONFIDENTIAL

DEF_01612134

| Doc ID Number | File Name | Description |
|---|---|---|
| DM126 | Pholus 2014 | Pholus Pty Ltd 2014 Company tax return |
| DM127 | Notice AF53 Coin-Exch Pty Ltd | Certificate for advance finding under s28A of the Industry Reseach and Development Act 1986 |
| DM128 | Hotwire Notice of Registration 20 Oct 2014 | Notice of Registration for R&D Tax Incentive - Hotwire |
| DM129 | AusIndustry R&D Tax Incentive Application 2012-2013 | Hotwire Preemptive Intelligence Pty Ltd R&D Tax Incentive Application (2012-2013) |
| DM130 | Rees Purchase | Additional information regarding transaction between C01N and Professor Rees |
| DM131 | Rees transaction | Payments to Professor Rees |
| DM132 | David Rees Invoice 4501 30 June 2013 GBP… | Invoice from Professor Rees to Strasan (C01N) |
| DM133 | Intellectual property licence (4) | Additional copy of agreement between Craig Wright R&D and Hotwire |
| DM134 | Intellectual Property Licence DeMorgan and Hotwire 22 August 2013 (2) | Copy of Intellectual Property Licence DeMorgan and Hotwire 22 August 2013 (1) |
| DM135 | Hotwire Preemptive Intelligence Pty Ltd - shareholding | Shareholder table |
| DM136 | View company details | ASIC Company details for DeMorgan Ltd (ACN 601 560 525) |
| DM137 | Xero_Balance Sheet_Australia_DeMorgan Limited | DeMorgan Ltd Balance Sheet |
| DM138 | DEMORGAN LTD | DeMorgan Ltd Minutes of a meeting of the directors (16/4/15) |
| DM139 | ADVANCE FINDING Misfit | Description of Misfit |
| DM140 | Agreements Register (1)(1) | Table of documents under RFI #8 |
| DM141 | Statement of Claim Case No 2013-225983 | Statement of Claim (2013/225983) between Craig Steven Wright (ABN 97 481 146 384) (Plaintiff) and W&K Info Defense Research LLC (Defendant) |
| DM142 | Consent order 2013-225983_245661 | Acceptance of 'consent orders' between W&K Info Defense LLC and Craig Wright R&D |

Formatted: DMReference

CONFIDENTIAL

DEF_01612135

| Doc ID Number | File Name | Description |
|---|---|---|
| DM143 | Judgement-Order_Supreme Court_Case No 2013-255983 | Judgment/order between Craig Steven Wright (ABN 97 481 146 384) (Plaintiff) and W&K Info Defense Research LLC (Defendant) |
| DM144 | Statement of Claim Case No 2013-245661 | Statement of Claim (2013/225983) between Craig Steven Wright (ABN 97 481 146 384) (Plaintiff) and W&K Info Defense Research LLC (Defendant) |
| DM145 | 20130915 IP Deed of Assignment DeMorgan - Coin-Exch Att (1) | Appendix 1 – DeMorgan Wright Family Trust: Coin-Exch Pty Ltd Statement of Work – Independent Verification and Validation (IV&V) Services -15 Sept 2013. |
| DM146 | Reactive and pre-emptive Security System based on choice theory | Pending patent application. |
| DM147 | Misfit and Denariuz IP Deed of Assignment | IP Deed of Assignment between Denariuz Pty Ltd (Assignor) to Misfit Games Pty Ltd (Assignee) of all IPR in and to heat and power simulations to be conducted on the Denariuz SuperComputer system. |
| DM148 | cw and WFT-09102015130851 | Deed of Assignment and Charge between Craig Wright (ABN 97 481 146 384) (Chargee) and DeMorgan Wright Family Trust (ABN 72 433 066 448) (Chargor) dated 15 July 2013. |
| DM149 - Duplicate of DM2 | WFT and Hotwire - 09102015131008 | Deed of Assignment between The Wright Family Trust DeMorgan (Assignor) and Hotwire Preemptive Intelligence Pty Ltd (Assignee) dated 15 September 2013. |
| DM150 | RDPlan - DeMorgan | R&D project plan for Project "Spyder" |
| DM151 | MJF agreement automation software 09102015125427 | Agreement between Mark Ferrier of MJF Mining Services WA Pty Limited (Vendor) and Craig S Wright of Craig S Wright R&D (Purchaser) |
| DM152 | Baker and McKenzie Questions | Initial information request completed by DeMorgan on 21 August 2015 |
| DM153 | Appendix A Final | Appendix A to initial information request (DM152) - Hotwire Pre-emptive Intelligence Pty Ltd resourcing diagram |
| DM154 | DeMorgan Group Entity shareholding table | Table showing shareholdings, directors and business descriptions of DeMorgan Group Entities |
| DM155 | Latest DeMorgan Holdings Pty Company Report | DeMorgan Holdings Pty Ltd Company Report at 14.10.2015 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612136

| Doc ID Number | File Name | Description |
|---|---|---|
| | showing share capital | |
| DM156 | Explanation of Tulip Trust | Document explaining Tulip Trust and Wright International Investments (WII) |
| DM157 | Tulip Trust Attachment | Email from Dave Kleiman to Craig Wright dated June 24 2011 |
| DM158 | WFT | Trust Deed for Wright Family Trust dated 9 August 2013 |
| DM159 | Property split for the family law settlement between Craig and Lynn Wright | Schedule of asset-split between Craig Wright and Lynn Wright as part of family law settlement. |
| DM160 | DeMorgan Patents Roadmap and Status | List of DeMorgan Group Entity pending patent applications, progress, backlog, status and prioritization |
| DM161 | Email from Stefan Matthews to Adrian Lawrence dated 16 November 2015. Responses to IP Report | Email from Stefan Matthews dated 16 November 2015 setting out assumptions and responses to Baker and McKenzie IP report |
| DM162 | IP Acquisition Apportionment | Spreadsheet detailing R&D incentive analysis and apportionment of value of patents between DeMorgan Group Entities |
| DM163 | Email from Stefan Matthews to Adrian Lawrence dated 16 November 2015. AusIndustry responses | Email chain from Stefan Matthews dated 16 November 2015 setting out DeMorgan Group Entity R&D incentive responses to be finalised |
| DM164 | AusIndustry Response Interconnected | Letter to AusIndustry detailing Notification of examination of registrations for Interconnected Research Pty Ltd |
| DM165 | Interconnected Research and Contemporaneous Data Report | Report detailing subject matter of AusIndustry R&D Incentive Application |
| DM166 | Interconnected Research and Contemporaneous Data Report Attachment | Attachment to DM165 |
| DM167 | AusIndustry Response Integyrz | Letter to AusIndustry detailing Notification of examination of registrations for Integyrz Pty Ltd |
| DM168 | Design research partnership program (Integyrz) | AusIndustry response supplementary information (Integyrz) - design research partnership program |
| DM169 | Integyrz - RoadMap | Integyrz eLearning RoadMap 'Go-Live' Products |

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** DMReference

DeMorgan
13 November 201527 November 2015
2636814-v1SYDDMS2635814-v1SYDDMS  DRAFT

188

DEF_01612137

| Doc ID Number | File Name | Description |
|---|---|---|
| DM170 | Online Learning Style Model | Suite of documents detailing online learning style model (Integyrz) (hufferfly models) |
| DM171 | Product Offerings Research and Development | Chart depicting products and markets (Integyrz) |
| DM172 | AusIndustry Response Panoptcrypt | Letter to AusIndustry detailing Notification of examination of registrations for Panoptcrypt Pty Ltd |
| DM173 | PhD1. CSW Thesis | Craig Wright PhD thesis: The Quantification of Information Risk Systems |
| DM174 | Panoptcrypt BTC vault Digital File (2013-14) | Panoptcrypt BTC vault Digital File experiment summary |
| DM175 | AusIndustry Response Cloudcroft | Letter to AusIndustry detailing Notification of examination of registrations for Cloudcroft Pty Ltd |
| DM176 | AusIndustry Cloudcroft - Development of a Core hardware platform | AusIndustry Cloudcroft - Development of a Core hardware platform - experiment summary |
| DM177 | AusIndustry Response Denariuz | Letter to AusIndustry detailing Notification of examination of registrations for Denariuz Pty Ltd |
| DM178 | Supercomputer simulation platform | Denariuz supercomputer simulation platform experiment summary |
| DM179 | AusIndustry Response C01N | Letter to AusIndustry detailing Notification of examination of registrations for C01nPty Ltd |
| DM180 | Sukuriputo okane Core - BTC Agents + Supporting Coding Test Site (2012-13 2013-14) | Sukuriputo okane Core - BTC Agents + Supporting Coding Test Site (2012-13 2013-14)  experiment summary |
| DM181 | Sukuriputo okane Core - Transaction Signing (2012-13 2013-14) | Sukuriputo okane Core - Transaction Signing (2012-13 2013-14) experiment summary |
| DM182 | Sukuriputo okane Core - Scriptable Money (2012-13 2013-14) | Sukuriputo okane Core - Scriptable Money (2012-13 2013-14) experiment summary |
| DM183 | AusIndustry Response Coin-Exch | Letter to AusIndustry detailing Notification of examination of registrations for Coin-Exch Pty Ltd |
| DM184 | Bayesian Design (2013-14 2014 - 15) | Bayesian Design (2013-14 2014 - 15)  experiment summary |
| DM185 | Coin-Exch CORE Network Emulation | Coin-Exch CORE Network Emulation  experiment summary |

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** Font: (Default) +Headings (Arial), 8 pt

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612138

| Doc ID Number | File Name | Description |
|---|---|---|
| DM186 | Coin-Exch Experiment - Intermediate Node Test | Coin-Exch Experiment - Intermediate Node Test experiment summary |
| DM187 | Coin-Exch Experiment - Medium Node Test | Coin-Exch Experiment - Medium Node Test experiment summary |
| DM188 | Coin-Exch Experiment - Simple Node Test | Coin-Exch Experiment - Simple Node Test experiment summary |
| DM189 | Coin-Exch FL7 Pi Calculus | Coin-Exch FL7 Pi Calculus experiment summary |
| DM190 | Coin-Exch Payment System | Coin-Exch Payment System experiment summary |
| DM191 | DeMorgan Coin-Exch Shareholding Analysis | DeMorgan Coin-Exch Shareholding Analysis - list of shareholders and their shareholding |
| DM192 | Cloudcroft ASIC record | Historical Company Extract for Cloudcroft Pty Ltd |
| DM193 | Coin-Exch ASIC record | Historical Company Extract for Coin-Exch Pty Ltd |
| DM194 | Coin-Exch Shareholders Agreement | Coin-Exch Shareholders Agreement |
| DM195 | Cloudcroft Matter (Lynn Wright) - letter re bankruptcy | Letter from Andrew Aravanis of Aravanis Insolvency to Cloudcroft Pty Ltd dated 7 September 2015 |
| DM196 | Email from Kaval Sandhu of Aravanis Insolvency to Lynn Wright dated 18 December 2012 | Email from Kaval Sandhu of Aravanis Insolvency to Lynn Wright dated 18 December 2012 re: her bankrupt estate and appointment of trustee |
| DM197 | Certificate of Appointment of Trustee dated 11 December 2012 | Certificate of Appointment of Trustee dated 11 December 2012 |
| DM198 | Email from Craig S Wright to John Chesher dated 25 February 2014 | Email from Craig S Wright to John Chesher dated 25 February 2014 detailing "what occurred" re: Lynn Wright and Cloudcroft Pty Ltd |
| DM199 | Craig Wright - ASIC | Submissions on behalf of Craig Steven Wright - Clayton Utz draft dated 25 February 2014 |
| DM200 | Craig Wright - ASIC chronology | Chronology prepared by Clayton Utz re: Craig Wright/Lynn Wright/Cloudcroft, Interzurg and Interconnected Research |
| DM201 | Email from Joseph Collins (Clayton Utz) to John Chesher attaching Asic reports dated 24 February 2014 | Email from Joseph Collins (Clayton Utz) to John Chesher attaching Asic reports, dated 24 February 2014 for: Interzurg, Information Defense, Hotwire and Cloudcroft |
| DM202 | ASIC Change to Company Details dated 13 July 2015 - Cloudcroft Pty Ltd | ASIC Change to Company Details dated 13 July 2015 - Cloudcroft Pty Ltd |

CONFIDENTIAL

DEF_01612139

| Doc ID Number | File Name | Description | |
|---|---|---|---|
| DM203 | Separation Timeline | Email from John Chesher to Joseph Collins dated 27 February 2014 detailing Lynn Wright/ATO timeline. | **Formatted:** Font: 8 pt |
| DM204 | DeMorgan Ltd Register Documents | Register of Members for DeMorgan Limited | **Formatted:** Font: 8 pt |
| DM205 | Meeting notes and client instructions dated 19.11.2015 | Notes from meeting between B&M and S Matthews and C Wright held on 19 November 2015 | **Formatted:** Font: 8 pt |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612140

**Schedule C**

**RFI List**

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 1. | How does DeMorgan Holdings Pty Ltd relate to DeMorgan Limited?<br><br>Please provide a copy of the share certificate which indicates that DeMorgan Holdings Pty Ltd is a 100% subsidiary of DeMorgan Ltd. | DeMorgan Holdings Pty Ltd is a 100% subsidiary of DeMorgan Ltd. The share certificate indicates that it is non beneficially held by Craig Wright, in effect, he is holding it for DeMorgan Ltd. | See RFI #32 | DM155 |
| 2. | Please list the shareholders in DeMorgan Limited (with relevant shareholding percentages). | The share options have been structured, but have not been paid for or exercised. They are in the system as the directors had discussed them, but we will be forfeiting some of them as they are not going to be offered to all members of staff on that list. For example, we had discussed with Stef the option of share options or being paid out for work done over the stand down period. He requested the money over the shares. Olga has had a pay raise in lieu of shares. We have only discussed and agreed with Allan Pedersen in terms of the share options below. | See RFI #33 | |

| Founder and Other Shareholders | Number and Class of Shares |
|---|---|
| The Wright Family Trust | 131,915,375 FOU |
| DENARIUZ SINGAPORE | 64,046,144 A |
| Uyen Ngyen | 1,800,000 A |
| C01N Ltd (UK) | 11,000,000 A |
| CRITICAL INFRASTRUCTURE SECURITY PTY LTD | 302,500 A |

| Employee share pool (Class EMP) | Number of Shares | Paid up initial |
|---|---|---|
| Allan Pedersen | 400,000 | 4,000 |
| Faye | 50,000 | 500 |

Formatted: DMReference

| RFI Number | Question | Answer | | | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|---|---|
| | | Stef | 125,000 | 1,250 | | |
| | | Nick | 50,000 | 500 | | |
| | | Trupti | 125,000 | 1,250 | | |
| | | Olga | 125,000 | 1,250 | | |
| | | Ray | 100,000 | 1,000 | | |
| | | Viveca | 50,000 | 500 | | |
| 3. | Please list the shareholders in Hotwire Pre-emptive Intelligence Pty Ltd (with relevant shareholding percentages). | Denariuz Sg | 1,000,000 | 10.0% | | |
| | | Ramona Watts | 306,000 | 3.1% | | |
| | | Uyen Thuc Nguyen | 774,000 | 7.7% | | |
| | | Robert Urquhart | 250,000 | 2.5% | | |
| | | Craig Steven Wright | 7,670,000 | 76.7% | | |
| | | | 10,000,000 | 100.0% | | |
| 4. | Please list the shareholders in DeMorgan Holdings Pty Ltd (with relevant shareholding percentages). | DeMorgan Holdings Pty Ltd is a 100 % subsidiary of DeMorgan Ltd. The share certificate indicates that it is non beneficially held by Craig Wright, in effect, he is holding it for DeMorgan Ltd. | | | Share certificate shows 723,059 shares held by DeMorgan Ltd; and 10,000 shares in name of Craig Steven Wright, Beneficial Owner: DeMorgan Ltd. | DM155 |
| 5. | Please provide details of W&K Information Defence Research LLC (including corporate registration details, details of shareholders and relevant percentage holdings). | I can't tell you much about W&K Information Defence Research LLC actually. I know it was an LLC in Florida. I have no idea as to the corporate registration details or current status, however, I believe the shareholding was: 16% Craig Wright 16% Lynn Wright (ex wife) 33% Dave's Estate (estate of the late Dave Kleiman) 33% Uyen Thuc Nguyen | | | See RFI #34 According to the pleadings in the Statement of Claim (2013-225983), the company operates from Palm Beach, Florida and does research in homeland security research. | |
| 6. | Please provide the same details for DeMorgan Limited as was provided for the other group companies (i.e. details of employees, contractors etc)? | Until 1st July 2015, DeMorgan Ltd had no employees, no contractors and had undertaken no R&D activity. Olga Kuznetsova, Ray Hoang, Trupti Birje, Allan Pedersen (hired by | | | See RFI #35 | DM74-DM80 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612142

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | *Interconnected Research Pty Ltd)* | | |
| | | *Viveca Magnusson (hired by Panopticrypt Pty Ltd)* | | |
| | | *Stephane Savanah (hired by Intergyz)* | | |
| | | The employment contracts sent are the current and existing contracts for the staff "transferred" to DeMorgan as at 1st July 2015. Contracts have not been changed, amended etc. simply **assigned verbally**. | | |
| | | There is no other documentation. Any changes etc. will be recommended by Baker & McKenzie, this is part of the brief. | | |
| 7. | Please provide a short explanation of what Misfit Games Pty Ltd does?  This information is missing from the initial list of group companies and their shareholdings and operations. | "Misfit Games aims to be a world leader in gaming technology services covering aspects of both hardware and software. We take a holistic approach to our research and development programs in order to coordinate advances in both areas – that is, the hardware innovations will facilitate improvements in software and vice versa. | | |
| | | As games become more and more advanced the hardware and software requirements become ever more demanding. On one hand both PCs and game consoles are moving to a smaller form factor while on the other hand clock speeds are increasing. In addition, in an attempt to squeeze better performance from PCs, serious gamers have a tendency to 'overclock' them (adjust the CPU and/or GPU settings to run the clock speeds at faster rates than manufacturers' settings [1]). These factors lead to machines running hotter, risking damage to the CPU/GPU while also degrading software performance. Superior, affordable cooling solutions will protect computer hardware, enable safer overclocking and improve software performance. | | |
| | | Gaming software relies on solving mathematical equations in real time to simulate realistic actions and graphics. More complex problems traditionally result in requirements for faster processors. Moreover, software advances that require more intense CPU/GPU processing leads to faster overheating. Nevertheless, these problems can be mitigated by developing more efficient algorithms. Using our supercomputer resources and in-house expertise in computer programming, physics and | | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612143

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | mathematics we will develop optimised code for these advances. These improvements will not only be commercially valuable to game developers but will also minimise the rate of increase in hardware cooling requirements.<br><br>Thus, by a combination of R&D in gaming hardware and software, the Super Cool Gaming project will be super cool both literally as well as colloquially."<br><br>[See "Advance Finding Company: Misfit Games Pty Ltd"] | | |
| 8. | The responses to the initial information request provided on Friday 21 August refer to a number of companies in the group having entered into Services Agreements with Pholus, Inter Connected Research, Panopticrypt and Integyrz.  Please provide copies of these agreements. | See table entitled "Agreements Register" -  agreements provided | See RFI #36 | DM140<br>DM9 - DM57 |
| 9. | The responses to the initial information request provided on Friday 21 August refer to an assignment of IP from Denariuz Pty Ltd to Daso Pty Ltd.  Please provide a copy of the agreement that documents this assignment. | Consultancy Agreement between DASO and Denariuz provided.<br><br>Confirmed as the only IP assignment between DASO Pty Ltd and Denariuz Pty Ltd (see RFI #37). | See RFI #37 | DM39 |
| 10. | The responses to the initial information request provided on Friday 21 August refer to three contractors (David Perry, Iggy Pang and Uyen Nguyen) being engaged by Hotwire Preemptive Intelligence Pty Ltd.  Please provide (i) a copy of their engagement contracts; and (ii) details of what they were engaged to do. | Igantius Pang contract received.<br><br>David Perry did not sign a contract or do much.  This was ongoing negotiation and he and Craig could not come to an agreement, so it fell through.<br><br>Uyen has no written agreement. | See RFI #38<br><br>No written contracts for Perry or Nguyen | DM73 |
| 11. | The responses to the initial information request provided on Friday 21 August refer to a contractor (Uyen Nguyen (USA)) being engaged by Zuhl Pty Ltd.  Please provide (i) a copy of his engagement contract | Same answer as #10 | No contracts for Nguyen | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612144

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | and (ii) details of what Uyen Nguyen was engaged to do. | | | |
| 12. | The responses to the initial information request provided on Friday 21 August refer to contractors (Shoab Mahammad and Craig Wright) being engaged by CO1N Pty Ltd.  Please provide (i) a copy of their engagement contracts; and (ii) details of what they were engaged to do. | Shaoib via Critical Infrastructure and CW via Panopticrypt were engaged by CO1N.  No written contracts available. <br><br> In the initial phase, Craig arranged design of Hardware modules for Hoyts and Qantas staff credit union.  Shaoib put together different versions of the modules and project managed the process.  Shaoib then left Coin as a contractor as he needed funds, but continued as a director. <br><br> Craig continued working on the virtualized platform and the creation of a cloud managed virtual supercomputer (our original supercomputer, not the current one.  We have merged this with a bigger one to create the current supercomputer Tulip that is ranked No 15 globally). | No written contracts available <br><br> See RFI #39 - 41 | |
| 13. | The responses to the initial information request provided on Friday 21 August refer to contractors (Dave Kleiman (USA) and W&K (USA)) being appointed to perform services for Coin-Exch Pty Ltd. Please provide (i) a copy of their engagement contracts; and (ii) details of what they were engaged to do. | Dave Kleiman died before the contract was finalised.  Therefore no services were performed to CoinExch by Dave Kleiman or W&K. | | |
| 14. | The responses to the initial information request provided on Friday 21 August refer to a contractor (Jamie Wilson) being engaged by Panopticrypt Pty Ltd.  Please provide (i) a copy of his engagement contract; and (ii) details of what he was engaged to do. | Can I see this response?  Jamie was not a contractor for Panopticrypt. He was a director for Hotwire. | Client confirmed Jamie Wilson was director for Hotwire and not contractor for Panopticrypt. | |
| 15. | The initial information request states that IP was assigned to Hotwire Preemptive Intelligence Pty Ltd by both Craig Wright R&D (Deed of Assignment July 2013) and Wright Family Trust for DeMorgan (IP Deed | IP Licence between Craig Wright R&D and Hotwire Pre-Emptive Intelligence Pty Ltd <br><br> IP Licence between CW R&D and Hotwire Pre-Emptive Intelligence Pty Ltd | See RFI #29 - client confirmed that the executed version is the only agreement on foot and the | DM3 <br> DM4 <br> DM5 <br> DM6 <br> DM133 |

**Formatted: DMReference**

CONFIDENTIAL

DEF_01612145

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | of Assignment 15 September 2013).<br>We have a copy of an IP Deed of Assignment between The Wright Family Trust DeMorgan and Hotwire Preemptive Intelligence Pty Ltd, but do not have a copy of an assignment from Craig Wright R&D to Hotwire Preemptive Intelligence Pty Ltd. Please provide a copy of that agreement. | | others are drafts.<br>See also RFI #42 which states that the IP licences should be disregarded.<br>Client unable to locate July 2013 Deed of Assignment. | DM134 |
| 16. | The initial information request states that Hotwire Preemptive Intelligence Pty Ltd assigned IP to Coin-Exch Pty Ltd but that the documentation for this is still being sought. Please provide a copy once available. | Research and Development Services Agreement between Coin-Exch Pty Ltd and Hotwire Pre-emptive Intelligence Pty Ltd | Not signed; had been provided previously.<br>See RFI #43 | DM7 |
| 17. | The responses to the initial information request provided on Friday 21 August refer to an assignment of IP from "W&K and Professor Rees" to C01N Pty Ltd. Please provide a copy of the agreement(s) that documents this assignment(s). | Invoice from Professor Rees to "Strasan (Australia) c/o Craig S. Wright). No contract was entered into. Background documents and invoices provided.<br>**Executive Summary**<br>On 30 June 2013 CO1N paid 19,470.12 XBT to Professor David Rees for research notes relating to Professor Rees' work related to cryptography. The Rees material is of immense importance to CO1N as it contains the key knowledge required to progress the company's long term ambitions. Furthermore, the material is inherently valuable due to its exclusivity to CO1N. Professor Rees stopped publishing in 1952 although he continued to research in his field of expertise well into the current century (he passed away in 2013). By purchasing Professor Rees' research notes CO1N is and will remain the *sole beneficiary* of this work.<br>The amount was agreed earlier in the same tax year in Bitcoin and was assigned in the 2013 income tax year.<br>The present document aims to explain at a high level the nature of the Rees material and show how it contributes to the solution sought by CO1N to enable its vision to be met.<br>**The CO1N Vision**<br>CO1N aims to create the infrastructure for a truly 'trustless', | See RFI #44<br>No formal assignment documentation; invoices for the subject matter received only. | DM130-DM132 |

Formatted: DMReference

DEF_01612146

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | decentralised, optimally secure exchange mechanism. This will allow peer-to-peer transactions of any sort in an environment secure from cyber-attack and free from centralised governance or interference. The underlying protocol will be based on the Bitcoin Blockchain. Central to this vision is a cryptographic technique that is not only highly secure against cyber-attacks but also independent of centralised authorities. | | |

**Cryptography**

The fundamental principle of cryptography is the creation of encryption/decryption keys based on calculations that are easy in one direction but extremely difficult in the opposite direction. The original technique, invented in the 1970s, used prime number multiplication/factorisation. While it is easy to multiply two prime numbers together, it is much harder to factorise the result into the original two primes. Factorisation becomes exponentially more difficult the longer the primes, to the point where the task is so difficult as to be altogether impractical. The encryption/decryption keys are generated using the two prime numbers[19]. Newer techniques (such as those based on elliptic curves) are more efficient but still employ the same underlying principle[20].

In early implementations, cryptographic keys would be shared by each party, meaning that at time of set-up keys would need to be somehow securely transmitted. A major vulnerability in this system is that if either party loses a key or it is intercepted, the system is compromised. A more recent method known as PKI (public key infrastructure) uses a combination of public and private keys[21]. This method relies on a third party to issue certificates to authenticate the owners of keys that are made public (via issuance of digital certificates).

Although PKI solved the authentication problem, it was also vulnerable to

---

[19] http://en.wikipedia.org/wiki/RSA_(cryptosystem)

[20] http://en.wikipedia.org/wiki/Elliptic_curve_cryptography

[21] http://searchsecurity.techtarget.com/definition/PKI

DeMorgan
13 November 201527 November 2015
26358I4-v1\SYDDMS26358314-v1\SYDDMS  DRAFT

198

**Formatted:** DMReference

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | attack (for example, in 2011 Certificate Authority DigiNotar was closed down after 500 fake certificates were discovered[22]). Furthermore, the reliance on a third party means that the communicating parties are beholden to a centralised authority (for example, a totalitarian government can force usage of their own PKI and thereby have access to all data traffic). As a result, techniques are in development using a three-pass protocol in which each party owns two private keys: an encryption key ($e_x$) paired with a decryption key ($d_x$). For the technique to work the encryption function must be *commutative*, meaning that changing the order of two successive encryptions yields the same result.<br><br>**The Rees Material**<br>Commutative algebra was Professor Rees' field of expertise and this aspect of the three-pass protocol is critical. As such the three-pass protocol is worth further elaboration.<br><br>Let's denote the encryption of a message M with an encryption key $e_x$ as $e_x M$. Decrypting this encrypted message with the paired decryption key is denoted $d_x e_x M$. Since decrypting the encrypted message gives the original message, then $d_x e_x M = M$.<br><br>The three-pass protocol works as follows:<br><br>1. Alice uses her encryption key $e_A$ to encrypt message M and sends $e_A M$ to Bob.<br><br>2. Bob uses his encryption key $e_B$ to further encrypt this giving $e_B e_A M$ and sends it back to Alice.<br><br>3. Alice decrypts this message using her decryption key $d_A$ to create $d_A e_B e_A M$. *This is where the commutative aspect comes in.* Since changing the order of encryption does not matter, $e_B e_A = e_A e_B$. So $d_A e_B e_A M = d_A e_A e_B M = e_B M$ (in other words, after Alice performs decryption we are left with message encrypted | | |

[22] http://en.wikipedia.org/wiki/DigiNotar

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814-v1\SYDDMS~~2635814-v1\SYDDMS  DRAFT

190

**Formatted:** DMReference

DEF_01612148

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | with Bob's encryption key). Alice now sends this back to Bob.<br><br>4. Bob can now decrypt $e_B M$ with his paired decryption key $d_B$:<br>$$d_B e_B M = M$$<br><br>Note that Alice and Bob have each only used their own private keys in this exchange. Using this protocol we have the elements required to resolve the key issues mentioned earlier: *there is no need to transmit any keys at set-up and no reliance on a third party.*<br><br>Of course, the main requirement is to determine a suitable commutative function usable for an encryption algorithm. Moreover, this technique has to be integrated with the Bitcoin Blockchain protocol. The expertise and knowledge contained within the Rees material, exclusive to CO1N, was essential and invaluable to solving these problems. | | |
| 18. | The responses to the initial information request provided on Friday 21 August refer to C01N Pty Ltd licensing and assigning IP rights to Hotwire Preemptive Intelligence Pty Ltd.  Please provide a copy of the agreement(s) that documents this assignment or licence. | 3 x documents provided. | See RFI #44 | DM82-DM84 |
| 19. | The responses to the initial information request provided on Friday 21 August refer to Cloudcroft Pty Ltd being assigned IP rights in a "Sale Agreement (Information Defense) March 2010".  Please provide a copy of the Sale Agreement. | Sale Agreement between Information Defense Pty Ltd and Lynn Wright /Cloudcroft Pty Ltd | See RFI #46, #48 and #50 Understanding of three agreements: Craig transfers all the IP in the Projects to Information Defense Pty Ltd [not in group chart] on 30/01/09. Craig agrees to transfer all his shares in Information Defense Pty Ltd to Lynn on 21/5/09. Lynn then buys the Information Defense Pty Ltd business (which "includes the IP") in | DM72 DM150 DM159 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612149

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | | March 2010 (or 2011 – inconsistent dates). | |
| | | | Schedules appear to be attached to the wrong agreements | |
| | | | Refer to by-doc spreadsheet | |
| 20. | The responses to the initial information request provided on Friday 21 August appear to refer to Cloudcroft Pty Ltd granting W&K a licence to use intellectual property rights under the Intellectual Property Licence (Craig Wright R&D 22 Aug 2013). However, Cloudcroft Pty Ltd is not a party to any of the Intellectual Property Licences we have received. Please provide a copy of this licence(s). | IP Licence between Craig Wright R&D (for GICSR/CSCSS) and Cloudcroft Pty Ltd | See RFI #51 | DM81 |
| 21. | The responses to the initial information request in relation to Panopticrypt Pty Ltd provide that Panopticrypt has assigned IP rights to a third party, being "Your Digital File Patent Registered by Craig Wright and Jamie Wilson". Please provide a copy of the agreement(s) that documents this assignment. | The idea was to have the IP rights assigned to YDF. There was a contract with the previous company that Jamie and Craig had worked together at. That company has since been deregistered, and a new company, YDF was started. There was a negotiation of a share agreement where Craig was to have 25% of YDF in exchange for the IP (initial cryptographic research as well as continuing research that led to the final patent) and a new contract drawn up with YDF, but that was never signed as that was the time when Jamie was trying to "sell" our BTC in the US. And the fact that Jamie did not issue the shares as agreed. <u>Hence that contract was never finalised.</u> | See RFI #52 | |
| 22. | The responses to the initial information request in relation to Panopticrypt Pty Ltd refer to a "1 Vote contract" in response to a query on whether Panopticrypt has been granted a licence to use any IP rights by a third party. Please provide a copy of this contract. | Consultancy Agreement between New South Wales Electoral Commission and Panopticrypt Pty Ltd | See RFI #53 | DM71 |

Formatted: DMReference

DeMorgan
~~13 November 2015~~27 November 2015
~~2635814~~v1SYDDMS~~2635814 v1SYDDMS~~ DRAFT

201

CONFIDENTIAL

DEF_01612150

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 23. | Please provide copies of all documentation relating to the assignment/transfer of IP rights in the Core Banking and Exchange Software and Automation Software:<br><br>• from the unrelated entities (MJF Mining Services WA Pty Ltd for Al Bareka; MJF Mining Services WA Pty Ltd (MJF) for Siemens; and W&K Information Defense Research LLC) to Craig Wright R&D (ABN 97 481 146 384); and<br><br>• from Craig Wright R&D to the Wright Family Trust DeMorgan (ABN 72 433 066 448).<br><br>These transfers are referred to in the IP Deeds of Assignment. | • Invoices from MJF Contracting provided<br><br>• No deed or document exists that covers the assignment from Craig Wright R&D to the Assignor (ie The Wright family Trust DeMorgan)<br><br>• Core Banking and Automation Software was purchased from MJF Mining Pty Ltd. The IP rights were included in the purchase.2 invoices and a contract that you already have.<br><br>• -transfer of IP between W&K and Craig Wright R&D are the 2 statement of claims and 2 judgements mentioned in # …….. | See RFI #54 | DM85<br>DM148<br>DM151 |
| 24. | The IP Deeds of Assignment between The Wright Family Trust DeMorgan and Coin-Exch Pty Ltd (Core Banking and Exchange Software) and The Wright Family Trust DeMorgan and Hotwire Preemptive Intelligence Pty Ltd (Automation Software) note that transfers of IP from W&K Information Defense Research LLC to Craig Wright R&D was not completed and a Statement of Claim has been filed against W&K Information Defense Research LLC. Please provide further details and documentation and confirm the outcome of those proceedings. | Documents received:<br><br>• Consent 'order'<br><br>• Statement of Claim (2013/245661) - not executed. Unclear whether litigated. No judgment provided.<br><br>• Statement of Claim (2013/225983) - Contractual dispute as a result of the death of primary director or W&K Info Defense Research LLC. Judgment was awarded in the sum of $28,254,666 in favour of Craig Steven Wright. Wright agreed to accept the transfer of IP held by Wright in full and final satisfaction of the judgment. [have not received copy of the transfer - unless dates in provided the IP Licence Funding Agreement are incorrect or the "consent order" document is a sufficient transfer]<br><br>• IP Licence Funding Agreement between Craig Wright R&D and W&K Info Defense LLC<br><br>• Judgment/order (2013/225983) | See RFI #55 - #59 | DM141-145<br>DM86-87 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612151

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | • Contract for the sale of shares of a company owning business between Dave Kleiman for W&K Info Defense LLC and Craig Wright R&D | | |
| 25. | It is unclear whether the consideration due under each of the two IP Deeds of Assignment has been paid in full. Page 31 of the Appendix to the IP Deed of Assignment for the Core Banking and Exchange Software demonstrates that payments are due annually on 30 August each year (from 30 August 2013 to 30 August 2017), with the IP being assigned on full payment of the final invoice. Have all invoices been paid, including for future financial years, or have only some of the invoices been paid? Please provide further details of which payments have been made. | Yes, there were invoices and prepaid in 2013 for the full term of the agreement. | Invoices not provided for review. Client confirmed that invoices were paid in 2013. | |
| 26. | Please provide the Appendix to the IP Deed of Assignment between the Wright Family Trust DeMorgan and Hotwire Preemptive Intelligence Pty Ltd (Automation Software). The document we received does not include the Appendix. | Appendix 1 to DeMorgan Wright Family Trust / Coin-Exch Pty Ltd Statement of Work: Independent Verification and Validation (IV&V) Services | | DM145 |
| 27. | Can further details be provided regarding the entity "The Wright Family Trust DeMorgan" (ABN 72 433 066 448)? | WFT was established in August 2013. At that point Craig (CW R&D) had purchased software personally as well as had agreements (Bitcoin rights) with overseas trusts WII and Tulip Trading. (This information regarding the other two trusts has not been disclosed to the ATO.) CW R&D sold to WFT the software, Bitcoin rights, W&K software, Albaraka, Siemens etc . The ATO are aware of this and have these invoices. WFT then collated and distributed these from the overseas trusts and overseas entities to the local companies in Australia. Craig and Stefan are trustees of the WFT. | Trustee listed in Trust Deed is Panopticrypt Pty Ltd. Correct name of entity with ABN 72 433 066 448 is "The Wright Family Trust". | DM148 DM158 |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612152

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 28. | Please provide further detail about the entity "C W R&D (ABN 97 481 146 384)". Is this a company? | CW R&D (ABN 97 481 146 384) is a registered business name owned by Craig Wright. It is still current in its registration and was also registered for GST but, since 1 July 2015, is in the process of being de-registered for GST. | | |
| 29. | We have been provided with four IP Licences, which are nearly identical: <br><br> - Intellectual Property Licence DeMorgan and Hotwire 22 August 2013 (1); <br><br> - Intellectual Property Licence b; <br><br> - Intellectual Property Licence; and <br><br> - Intellectual Property Licence (1). <br><br> References above are to the names of the documents sent to us (i.e. the names the documents are saved under). <br><br> The only executed document is the Intellectual Property Licence DeMorgan and Hotwire 22 August 2013. Are the others drafts? Or are the others intended to licence separate IP (the Intellectual Property Licence and Intellectual Property (1) are expressed as also covering the Bitcoin Contract system and Escrow contract system, while the other two do not.) Please explain the relationship between the four IP Licence documents. | Of the documents forwarded in relation to this question, the executed document is the one that is valid. It is the final document. The others are the various drafts that should not have been included. | A copy of Intellectual Property Licence was provided in response to RFI #15 [unexecuted]. <br><br> A copy of Intellectual Property Licence DeMorgan and Hotwire 22 August 2013 (1) was provided in response to RFI #15. | DM3 - DM6 <br> DM133 <br> DM134 |
| 30. | The R&D Services Agreement between Coin-Exch Pty Ltd (Client) and Hotwire Preemptive Intelligence Pty Ltd and Interconnected Research Pty Ltd (Service Providers) has not been executed. Please confirm the status of this agreement and, if possible, please provide an executed version of this agreement. | | Version thought to be executed does not actually contain signatures. | DM7 |

**Formatted:** DMReference

CONFIDENTIAL

DEF_01612153

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 31. | The R&D Services Agreement distinguishes between:<br>• "Project Background Intellectual Property" being IP supplied by Coin-Exch Pty Ltd for use in conducting R&D;<br>• "Project Foreground Intellectual Property" being IP created by or on behalf of Coin-Exch by Hotwire and/or Interconnected (including that IP relating to the project created by the approved sub-contractors) during the term; and<br>• "Provider Intellectual Property" being IP in Hotwire / Interconnected's methodologies, models and other confidential or proprietary information made available to Coin-Exch as part of the services.<br><br>Please provide further information if available on these three categories and what IP has been supplied by Coin-Exch, created pursuant to the agreement, or made available by Hotwire / Interconnected under this Agreement? |  | No response provided as at 06.10.15.<br><br>Services Agreements reviewed for further information. | DM9 - DM57 |
| 32. | Please provide a copy of the share certificate which indicates that DeMorgan Holdings Pty Ltd is a 100% subsidiary of DeMorgan Ltd. [Refer to RFI #1] | This is confirmed.  Certificate attached.  Note that Craig Wright is holding the shares for DeMorgan Ltd |  | DM155 |
| 33. | We refer to your response to RFI #2 and understand that there have been discussions regarding potentially issuing share options for shares in DeMorgan Ltd.  In light of this, could you please clarify:<br>(a) who the current shareholders of DeMorgan Ltd are;<br>(b) whether any of the discussed share options | Current shareholders confirmed and issued:<br><br>| Founder and Other Shareholders | Number and Class of Shares |<br>|---|---|<br>| The Wright Family Trust | 131,915,375 FOU |<br>| DENARIUZ SINGAPORE | 64,046,144 A |<br>| Uyen Ngyen | 1,800,000 A |<br>| C01N Ltd (UK) | 11,000,000 A |<br>| CRITICAL INFRASTRUCTURE SECURITY PTY LTD | 302,500 A | |  |  |

Formatted: DMReference

CONFIDENTIAL

DEF_01612154

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | have been issued; and <br><br> (c) whether the tables provided in response to RFI #2 indicate either the share options under discussion, the share options issued or current shareholders. (We understand from your response that it is likely to be a combination of the three but if you could clarify that would be much appreciated.) | Re employee share poll - The share options have been structured, but have not been paid for or issued. They are in the system as the directors had discussed them, but we will be forfeiting most of them as they are not going to be offered to all members of staff on that list. We have only discussed and agreed with Allan Pedersen in terms of the share options below. Not issued, but discussed and agreed. Not discussed with Ray, but we would like to have that option if possible. | | |
| 34. | We understand, based on your response to RFI #5, that you have limited information about the current legal status of W&K Information Defense Research LLC. However, it would be helpful if you could provide a general description of the company and its relationship to the group given that a number of the shareholders are connected to the group. We can conduct corporate searches but any background you can provide regarding the company's relationship to the group would be much appreciated. | Craig Wright is a minor shareholder of W&K. No other relationship to the group. | | |
| 35. | We received a number of unexecuted employment agreements in response to RFI #6. Please provide executed copies of these agreements (Olga Kuznetsova, Ray Hoang, Trupti Birje, Allan Pedersen, Viveca Magnusson, and Stephane Savanah). | It will take me time (that I don't have right now) to search for this. The executed copies are identical to the ones you have received. | Unexecuted versions reviewed. | DM74 - DM80 |
| 36. | We received a Business Service and Management Agreement between EZAS Pty Ltd (ACN 602717788) and DeMorgan Ltd in response to RFI #8. Please clarify who EZAS Pty Ltd is and how it relates to the group (or whether it is simply an unrelated third party). | You can ignore this agreement with EZAS. <br><br> The entity was formed with the intent to use for a specific area of R&D but nothing ever happened. The entity was never assigned any IP, never undertook any R&D (or any other activity), no staff, no consultants. <br><br> EZAS is a non-trading shell. <br><br> The intent was that it would be a 100% subsidiary of DeMorgan Ltd. | | |

Formatted: DMReference

CONFIDENTIAL

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 37. | Please confirm our understanding that the only IP assignment between DASO Pty Ltd and Denariuz Pty Ltd is the Consultancy Agreement you provided in response to RFI #9? | This is confirmed. | | DM39 |
| 38. | We understand, based on your responses to RFI #10 and #11 that no written contracts were entered into in respect of Ignatius Pang's services engagement with Hotwire Preemptive Intelligence Pty Ltd or Uyen Nguyen's services engagement with Hotwire Preemptive Intelligence Pty Ltd and Zuhl Pty Ltd.<br><br>However, if possible, please provide details of what these contractors were engaged to do. | Ignatius Pang signed contract provided and is the ONLY document related to the services of Ignatius Pang. | | DM73 |
| 39. | We note in your response to RFI #12 that Shoab Mahmammad "via Critical Infrastructure" and Craig Wright "via Panopticrypt" were engaged by C01N. Please clarify what you mean in saying that these individuals were engaged "via" those third party companies. You have noted that there were no written contracts with the individuals. If there is any relevant documentation or agreements with companies who supplied the services of these individuals please provide copies. | "Via" – any payment made would go to the company, not to the individual.<br>None. | | |
| 40. | Please confirm who "Critical Infrastructure" is and how it relates to the group. [Refer to RFI #12] | Shaoib's company. No relation to the group. | | |
| 41. | Please provide all service and consulting agreements, if any, between the group entities and Critical Infrastructure. [Refer to RFI #12] | None | | |
| 42. | In response to RFI #15, we received the following | (a)    a  and b should not be used. | | DM148 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612156

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | documents:<br><br>(a)  IP Licence between Craig Wright R&D and Hotwire Pre-Emptive Intelligence Pty Ltd; and<br><br>(b)  IP Licence between CW R&D and Hotwire Pre-Emptive Intelligence Pty Ltd.<br><br>Please confirm our understanding, following your response to RFI #29, that the document referred to in (a), which is unexecuted, is a draft only and therefore should not be considered.<br><br>Please also confirm that the document referred to in (b) (i.e. the IP Licence between CW R&D and Hotwire) is the "assignment" from Craig Wright R&D to Hotwire Preemptive Intelligence Pty Ltd that was referred to in the initial information request. | (b)  The document was signed but not executed, as it was incorrect. Another 2 documents were created – Assignment of IP from CW R&D to DeMorgan (WFT) and then DeMorgan (WFT) to Hotwire.  I have the Assignment from DeMorgan (WFT) to Hotwire.<br><br>Both are attached as :<br><br>(a)  cw and WFT<br><br>(b)  WFT and Hotwire | | DM149 |
| 43. | We received the Research and Development Services Agreement between Coin-Exch Pty Ltd and Hotwire Pre-emptive Intelligence Pty Ltd in response to RFI #16 and 30. Please:<br><br>provide an executed copy as we have only received unexecuted versions;<br><br>clarify that this Services Agreement is the only assignment of IP that exists between the two entities; and<br><br>confirm why the Agreement lists the Completion Date (being the date that the Agreement will be terminated) as 30/6/11 but the Commencement Date as 1/7/13 (being the date that the Agreement will commence). | Cannot locate executed copy.  It would be identical.<br><br>Yes<br><br>Typo - Termination date should state 2017 | Treat unexecuted copies as final. | DM7 |
| 44. | We note that your response to RFI #17 refers to an assignment between Professor Rees and C01N Pty | Dave Kleiman communicated in his own capacity with Prof Rees to receive his advice re commutative ring algebra.  There was a verbal | | DM130-DM132 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612157

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | Ltd. Please clarify how W&K Information Defense Research LLC is involved in this assignment (given the initial information request stated that the assignment was from W&K and Professor Rees) noting that W&K is not mentioned in the documentation provided, and provide any relevant documents regarding W&K's involvement. | agreement to pay him.  There is no assignment between Rees and coin.  Coin paid Rees.  There is an invoice.<br><br>Dave Kleiman was a principal of W&K, but W&K had no involvement.  The initial information provided stating that the assignment was from W&K and Professor Rees is incorrect. | | |
| 45. | We note that three documents were provided in response to RFI #18. An invoice was provided between Professor David Rees and Hotwire Preemptive Intelligence Pty Ltd. However, the agreement provided in relation to this question is a Software Development Agreement between Craig Wright R&D, W&K Information Defense LLC and Strasan Pty Ltd (C01N). Please confirm:<br>(a)   how the David Rees invoice relates to the C01N agreement, given that Rees is not a party to that agreement; and<br>**(b)**   why the Rees invoice amount differs from the payment required under the Software Development Agreement. | Invoice was between Strasan and Hotwire simply mentioning Rees' name because the developed IP involved some of the solutions from Rees.  It was purely a marker.  It was NOT an invoice between Hotwire and Rees.<br><br>For the 3 attachments in #18 -<br>It comes in 3 parts.  (note that Strasan is now called CO1N)<br>The first acknowledges that "the project is for the creation of intellectual property.  All rights are said to vest within the company that Craig Wright incorporates when the payment of the contract (to occur before June 30 2013) occurs."<br><br>The company in question is of course Hotwire.  But that is not specified.  The invoice is attached.  Payment was made as agreed, so by default, the IP vested in Hotwire.<br>The second attachment details the project.<br>So you need all 3 attachments to make sense of this. | | DM82 - DM84 |
| 46. | We received one attachment containing the following three agreements in response to RFI #19:<br>(a)   Sale Agreement between Information Defense Pty Ltd (Seller) and Lynn Wright/Cloudcroft Pty Ltd (Buyer);<br>(b)   Agreement between Craig Steven Wright (Vendor) and Information Defense Pty Ltd (Purchaser); and<br>(c)   Agreement between Craig Steven Wright | (i)   Craig to provide<br>(ii)   Craig to provide<br>(iii)   Craig to provide<br><br>Not able to find executed copy of (b), or (c) but is identical to the one provided.<br><br>iii. I do not have access to what was sent, but if schedule following c looks like it belongs to a, then it is likely that.<br><br>iv.It was a Typo .  Correct date is 2010 | Treat unexecuted versions as final. | DM72 DM150 DM159 |

Formatted: DMReference

CONFIDENTIAL

DEF_01612158

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | and Carroll Lynn Wright. Can you please provide copies of the following. (i)  Please provide an executed copy of document (b). (ii)  Please provide an executed copy of document (c) which has only been signed by Craig Wright. (iii)  Please also confirm which schedule belongs to which agreement, as it appears that the schedule following document (c) belongs to document (a). (iv)  Document (a) is dated March 2010 on the cover sheet, but March 2011 on the execution page. Please confirm the appropriate date. | Email from Stefan re: Cloudcroft dated 20.10.15 stated that Lynn Wright transferred her shareholding in Cloudcroft by a share transfer dated 15 November 2012 whereby 620,000 shares were transferred from Lynn Wright to Panopticrypt (500,000) and Craig Wright (120,000). Lynn Wright ceased as a director and secretary 11 December 2012. Craig Wright subsequently transferred 120,000 shares to Panopticrypt 01 August 2013. | | |
| 47. | Please confirm who Information Defense Pty Ltd (ABN 90 135 141 347) is and how it relates to the group. [Refer to RFI #19] | Doesn't relate to group at all.  A company Craig owned in 2009, sold in 2010 | | |
| 48. | We note that in the Agreement between Craig Steven Wright and Carroll Lynn Wright provided in response to RFI #19, Craig Wright agrees to assign all his shares in Information Defense Pty Ltd and Integyrz Pty Ltd to Lynn Wright. Please confirm whether these transfers took place and provide all relevant documents (as we note that Lynn Wright purchased the Information Defense business in the subsequent Sale Agreement). | Transfers took place, will provide These are deregistered companies - we no longer have those records | Client confirmed transfers took place, but that no record of such transfers are available. | |
| 49. | We further note that in the Agreement between Craig Steven Wright and Carroll Lynn Wright provided in response to RFI #19, Lynn Wright is described as | Contract employee, no contracts | Unclear whether she was a contractor or an employee. | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612159

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | having worked in businesses owned and operated by Craig Wright. Please confirm whether Lynn Wright was engaged as a contractor by any of the group entities and, if so, provide the relevant agreements. | | Details of which entities within the group Lynn Wright worked for is outstanding. | |
| 50. | The Schedule to the Agreement between Craig Steven Wright and Information Defense Pty Ltd (see RFI #19) refers to an attachment entitled "DeMorgan R and D plan Appendix". Please provide a copy of this Appendix. | Byron, this is a highly sensitive document, I will provide this to you separately and we can discuss confidentially.<br><br>Provided as RDPlan - DeMorgan | Note this was provided to the wider group. | DM150 |
| 51. | We have received an Intellectual Property Licence between Craig Wright R&D (for GICSR/CSCSS) and Cloudcroft Pty Ltd. Please clarify who 'GICSR/CSCSS' are and how these entities relate to the group. [Refer to RFI #20]. | Not related<br><br>Craig Wright R&D acted as agent and local business for GICSR/CSCSS in a trust.  This licence is irrelevant.  Never utilised. Has expired | Term of licence at DM81 is indefinite. | DM81 |
| 52. | We note your response to RFI #21. Please provide a copy of the contract you refer to between Jamie Wilson, Craig Wright and the previous company they worked together at.<br><br>Please also provide details of this company (which we understand is now deregistered). | Craig worked for company FASV (Family Affairs Security Vault).  The contract mentioned shares in a company that Craig did not receive.  Any IP that Craig created within that company initially remained within FASV – it has since been transferred to YDF since its' deregistration.<br><br>Can't locate contract | Contract cannot be located by client. | |
| 53. | The Consultancy Agreement between New South Wales Electoral Commission and Panopticrypt Pty Ltd provided in response to RFI #22 anticipates that the Commission may, upon request, require Panopticrypt to execute all necessary documents to permit the vesting of the intellectual property in the New Contract Material with the Commission.  Please confirm whether the Commission ever made such requests and, if so, please provide the requested assignment documentation. | no | | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612160

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 54. | MJF Contracting Invoice OB0188 refers to an "agreement" between MJF Contracting and Craig Wright R&D in respect of the Supply of Automation Software. Please provide a copy of this agreement. [Refer to RFI #23] | Provided as MJF agreement automation software | | DM151 |
| 55. | We note that Statement of Claim (2013/225983) refers to a research consulting agreement between Craig Steven Wright and W&K Info Defense Research LLC, dated 27 October 2008, which was secured against W&K's intellectual property. Please provide a copy of this agreement. [Refer to RFI #24] | Cannot locate contract | Contract cannot be located by client. | |
| 56. | In regards to Statement of Claim (2013/245661), please: | | Judgment outstanding - cannot be located currently. | |
| | • confirm whether this Claim was filed and litigated as we have not received a judgment in respect of this claim, nor has the Claim been stamped by a court registry; and | Yes. Filed and litigated. will try and locate judgement | Research consulting agreement cannot be located by client. | |
| | • provide a copy of the research consulting agreement between Craig Steven Wright and W&K Info Defense Research LLC, dated 8 January 2009, which was secured against W&K's intellectual property. [Refer to RFI #24] | Cannot locate contract. | | |
| 57. | Please confirm whether the "consent order" provided in response to RFI #24 is the "deed of transfer for the Intellectual Property" referred to in the Court Judgment (2013/225983) or otherwise provide a copy of the deed of transfer. | Yes | | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612161

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 58. | We note that an Intellectual Property Licence Funding Agreement between Craig Wright of Craig Wright R&D and Dave Kleiman of W&K Info Defense LLC, as well as a Contract for the Sale of Shares of a Company Owning Business between Dave Kleiman for W&K Info Defense LLC and Craig Wright R&D and W&K Info Defense LLC was provided in response to RFI #24. Please confirm how these documents relate to the litigation material. | Taken to court to finalise position. Dave died, therefore needed consent orders to affirm position of agreements | | |
| 59. | We note that the Recitals in the Contract for the Sale of Shares of a Company Owning Business between Dave Kleiman for W&K Info Defense LLC and Craig Wright R&D and W&K Info Defense LLC provided in response to RFI #24 refer to "the attached contract". Please confirm our understanding that the attached contract is the actual Agreement that follows the Recitals, rather than a separate agreement. | Yes | | DM86 DM87 |
| 60. | According to your response to RFI #27, CW R&D purchased software and Bitcoin rights with overseas trusts WII and Tulip Trading. Please provide all documentation regarding: these purchases; WII and Tulip Trading and how these entities relate to the group; and the subsequent sale of the software and Bitcoin rights by CW R&D to the Wright Family Trust. | CW has a loan from the overseas trust. No BTC rights were purchased. Craig has a loan of BTC rights from the trust with which he used to purchase software. See attachment "Explanation of Tulip Trust" You will already have the contracts for CW purchase eg MJF, AlBaraka They are companies in the Seychelles incorporated by Craig Wright. They are the main entities that Tulip Trust stems from. They do not relate to the other entities. They are asset management and holding companies. Attached as cw and WFT Note: explanation of Tulip Trust (DM156) provides: The Seyshell's trust, also known as Tulip Trust, is not a standard trust. It is a homomorphic encryption scheme for the distribution of keys. It is a trust written into software and cryptographic code. It is a DAC (Distributed Autonomous Corporation). Each trustee has a slice of public | | DM156 DM157 DM148 |

Formatted: DMReference

DeMorgan

13 November 201527 November 2015

2635814-v1SYDDMS2635814-v1SYDDMS  DRAFT

213

DEF_01612162

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | | keys which do not allow access to anything on their own.  When ordered correctly, the correct sequence of keys allows for the release of certain other keys in the pool which then allows for the release of legal ownership of private keys to be issued. Therefore the recipient has received a private key that has never been held by another person.  Ie. Nobody ever has your private key. | | |
| | | The Trust was established before DBH. | | |
| | | Wright International Investments was established in 2009.  It was designed as the holding company.  Tulip Trading was established in 2011. Tulip Trust was a blind trust planned in 2011and set up by Dave Kleiman under in 2012 Tulip Trading.  Craig is independent of the trust. | | |
| 61. | Has Craig Wright been an employee of any of the group entities at any stage? | Yes, Hotwire and DeMorgan as CEO | | |
| 62. | Has Craig Wright, in his personal capacity, ever been assigned any intellectual property rights:<br>(a)     from any individual (eg an employee or individual contractor); or<br>(b)     from any other company or other entity? | Nothing of relevance. | | |
| 63. | Has Craig Wright, in his personal capacity, ever assigned any intellectual property rights to any third party (individual, company or other entity)? | Yes, books and papers.  Nothing of relevance to this | | |
| 64. | Has Craig Wright, in his personal capacity, ever granted any third party (individual, company or other entity) a licence to use any intellectual property rights? | Nothing current, not relevant | | |
| 65. | Has Craig Wright, in his personal capacity, ever been granted a licence to use any intellectual property rights by any third party (individual, company or other entity)? | Yes.     Scade (Siemans)<br>           iMal (Al Baraka) | | |

<div style="text-align:right">**Formatted:** DMReference</div>

DeMorgan
13 November 201527 November 2015
2635814-v1SYDDMS2635814-v1SYDDMS_DRAFT

214

DEF_01612163

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| 66. | Please provide a copy of the Wright Family Trust deed | Provided on 20.10.2015.<br>Name of Trust: Wright Family Trust<br>Date of Trust Deed: 9 August 2013<br>Trustee: Panopticrypt Pty Ltd<br>Primary Beneficiaries Craig Steven Wright and Ramona Wattd | | DM158 |
| 67. | Has the Wright Family Trust ever been assigned any intellectual property rights:<br>(a)    from any individual (eg an employee or individual contractor); or<br>(b)    from any other company or other entity? | Yes, from Craig Wright<br>Agreement attached as cw and WFT | | DM149 |
| 68. | Has the Wright Family Trust ever assigned any intellectual property rights to any third party (individual, company or other entity)? | DeMorgan (WFT) to Hotwire and Coin Exch  - provide this | | DM1<br>DM2 |
| 69. | Has the Wright Family Trust, ever granted any third party (individual, company or other entity) a licence to use any intellectual property rights? | As above | | |
| 70. | Has the Wright Family Trust ever been granted a licence to use any intellectual property rights by any third party (individual, company or other entity)? | Yes, by Craig Wright R&D – provided as cw and WFT | | DM149 |
| 71. | We have compared the information set out in the AusIndustry R&D Applications with the company data provided in response to our initial information request. We note that Zuhl Pty Ltd, Denariuz Pty Ltd, C01N Pty Ltd, Pholus Pty Ltd, Coin-Exch Pty Ltd and Panopticrypt Pty Ltd have identified R&D employees on the respective R&D applications - despite the fact that the response to our initial information request | No employees<br>What was listed on the AusIndustry applications was not employees, however, there were people working on the projects that were contracted through *other* companies to perform the work for the entities mentioned. There are intercompany contracts. | | |

**Formatted:** DMReference

CONFIDENTIAL

| RFI Number | Question | Answer | Follow up queries/comments | Doc Ref |
|---|---|---|---|---|
| | listed these companies as never having had any employees. Please confirm whether these entities have ever had employees and if not, why employees are listed on the R&D Applications. | | | |

Formatted: DMReference

CONFIDENTIAL

DEF_01612165

## Schedule D

### Trade Marks

From a search of the trade marks database maintained by IP Australia conducted on 18 November 2015, for trade marks applied for and/or registered in the name of the companies listed below, disclosed no current trade mark registrations or pending applications in the name of these entities.

1. DeMorgan Limited (ACN 601 560 525)
2. Hotwire Preemptive Intelligence Pty Ltd (ACN 164 068 348)
3. DeMorgan Holdings Pty Ltd (ACN 600 655 427)
4. Misfit Games Pty Ltd (ACN 601 677 105)
5. Panopticrypt Pty Ltd (ACN 151 567 115)
6. Coin-Exch Pty Ltd (ACN 163 338 467)
7. Integyrz Pty Ltd (ACN 165 263 007)
8. Pholus Pty Ltd  (ACN 165 472 079)
9. Cloudcroft Pty Ltd (ACN 149 732 365)
10. Chaos and Nonlinear Forecasting in Economics and Finance Pty Ltd (ACN 600 516 149)
11. C01N Pty Ltd (ACN 152 222 421) formerly Strasan Pty Ltd
12. Denariuz Pty Ltd (ACN 165 471 983)
13. Interconnected Research Pty Ltd (ACN 165 472 097)
14. Zuhl Pty Ltd (ACN 165 472 006)
15. Daso Pty Ltd (ACN 600 512 249)

Our searches disclosed a number of trade mark applications filed in the name of DeMorgan Pty Ltd or Hotwire Preemptive Intelligence Pty Ltd, which have now lapsed.  Details of these applications marks are set out below.

CONFIDENTIAL

DEF_01612166

| Country | [Mark/Trademark/Application] | [Number] | [Class] | [Applicant/Proprietor] | [Status] | [Notes/Reason] |
|---|---|---|---|---|---|---|
| Australia | TAIPAN24X7 | 881820 | 9, 42 | DeMorgan Pty Ltd | Lapsed | No response to examiner's report |
| Australia | Vocational learning guides | 1572479 | 1 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed | No response to examiner's report - filed in wrong class |
| Australia | Professional learning guides | 1572479 | 1 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed | No response to examiner's report - filed in wrong class |
| Australia | Hotwire Pre-emptive Intelligence | 1572635 | 41 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed - Accepted | No registration fees paid |
| Australia | INTEGYRS | 1572890 | 41 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed - Accepted | No registration fees paid |
| Australia | Integyre | 1572891 | 41 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed - Accepted | No registration fees paid |
| Australia | bito01n | 1584361 | 38 | Hotwire Preemptive Intelligence Pty. Ltd. | Lapsed | No response to examiner's report |

Formatted: Font: (Default) Arial, 10 pt

Formatted: DMReference

CONFIDENTIAL

DEF_01612167

bakermckenzie.com

## Baker & McKenzie has been global since inception.   Being global is part of our DNA.

Our difference is the way we think, work and behave – we combine an instinctively global perspective with a genuinely multicultural approach, enabled by collaborative relationships and yielding practical, innovative advice.  Serving our clients with more than 4,200 lawyers in more than 45 countries, we have a deep understanding of the culture of business the world over and are able to bring the talent and experience needed to navigate complexity across practices and borders with ease.

Baker & McKenzie
ABN 32 266 778 912

AMP Centre
Level 27
50 Bridge Street
Sydney NSW 2000
Australia

P.O. Box R126
Royal Exchange NSW 1223
Australia

Tel: +61 2 9225 0200
Fax: +61 2 9225 1595
DX: 218 SYDNEY

**www.bakermckenzie.com**

Baker & McKenzie, an Australian Partnership, is a member firm of Baker & McKenzie International, a Swiss Verein with member law firms around the world.  In accordance with the common terminology used in professional service organisations, reference to a "partner" means a person who is a partner, or equivalent, in such a law firm.  Similarly, reference to an "office" means an office of any such law firm

© 2015 Baker & McKenzie
All rights reserved.
2635814-v1\SYDDMS2635314-v1\SYDDMS_DRAFT

Formatted: DMReference

CONFIDENTIAL

DEF_01612168