**BAKER & McKENZIE**

# IP Assignment Deed

**Ncrypt Holdings Ltd**

**DeMorgan Limited**

**DeMorgan Holdings PTY. Ltd.**

**Misfit Games Pty. Ltd.**

**Panopticrypt Pty Ltd**

**Coin-Exch Pty. Ltd.**

**Integyrz Pty Ltd**

**Pholus Pty. Ltd.**

**Cloudcroft Pty. Ltd.**

**Chaos and Nonlinear Forecasting in Economics and Finance Pty. Ltd.**

**C01N Pty Ltd**

**Denariuz Pty. Ltd.**

**Interconnected Research Pty. Ltd.**

**Zuhl Pty. Ltd.**

**Daso Pty. Ltd.**

Baker & McKenzie
ABN 32 266 778 912
AMP Centre
Level 27
50 Bridge Street
Sydney NSW 2000
Australia
www.bakermckenzie.com

2649672-v4A\SYDDMS

ATTORNEY'S EYES ONLY

**Table of contents**

| | | |
|---|---|---:|
| 1. | **Definitions and interpretation** | **2** |
| 2. | **Assignment** | **6** |
| 3. | **Moral Rights** | **8** |
| 4. | **Payment** | **8** |
| 5. | **GST** | **9** |
| 6. | **Notices** | **9** |
| 7. | **General provisions** | **12** |

**Schedule 1**     **21**
Head Vendor Co     21

**Schedule 2**     **22**
DeMorgan Holdings     22

**Schedule 3**     **23**
Misfit Games     23

**Schedule 4**     **24**
Panopticrypt     24

**Schedule 5**     **34**
Coin-Exch     34

**Schedule 6**     **50**
Integyrz     50

**Schedule 7**     **57**
Pholus     57

**Schedule 8**     **63**
Cloudcroft     63

**Schedule 9**     **72**
Chaos     72

**Schedule 10**     **73**
C01N     73

**Schedule 11**     **81**
Denariuz     81

**Schedule 12**     **105**
Interconnected Research     105

**Schedule 13**     **112**
Zuhl     112

**Schedule 14**     **117**
Daso     117

ATTORNEY'S EYES ONLY      DEF_00073808

| | |
|---|---|
| **Title** | **IP Assignment Deed** |
| **Date** | 7 January 2016 |
| **Parties** | **Ncrypt Holdings Ltd** (IBC number 16734) a company incorporated and registered under the laws of the State of Antigua and Barbuda with its registered address c/o Offshore Management & Trust Services Inc, Fitzgerald House, 44 Church Street, St John's Antigua (**Purchaser**) |

**DeMorgan Limited** (ABN 26 601 560 525) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Head Vendor Co**)

**DeMorgan Holdings Pty. Ltd.** (ACN 600 655 427) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**DeMorgan Holdings**)

**Misfit Games Pty. Ltd.** (ACN 601 677 105) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Misfit Games**)

**Panopticrypt Pty Ltd** (ACN 151 567 118) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Panopticrypt**)

**Coin-Exch Pty. Ltd.**(ACN 163 338 467) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Coin-Exch**)

**Integyrz Pty Ltd** (ACN 165 263 007) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Integyrz**)

**Pholus Pty. Ltd.** (ACN 165 472 079) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Pholus**)

**Cloudcroft Pty. Ltd.** (ACN 149 732 365)of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Cloudcroft**)

**Chaos and Nonlinear Forecasting in Economics and Finance Pty. Ltd.** (ACN 600 516 149) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Chaos**)

**C01N Pty Ltd**(ACN 152 222 421) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**C01N**)

**Denariuz Pty. Ltd.** (ACN 165 471 983) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Denariuz**)

**Interconnected Research Pty. Ltd.** (ACN 165 472 097) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Interconnected Research**)

**Zuhl Pty. Ltd.** (ACN 165 472 066) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Zuhl**)

ATTORNEY'S EYES ONLY                                                    DEF_00073809

**Daso Pty. Ltd.** (ACN 600 512 249) of 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 (**Daso**)

## Recitals

A       The Vendors own various Intellectual Property Rights.

B       In return for payment of the Contract Amount to the Head Vendor Co for allocation between the Vendors, each Vendor has agreed to assign all Intellectual Property Rights that it owns to the Purchaser on the terms and conditions set out in this Deed.

## Operative provisions

## 1.       Definitions and interpretation

**Definitions**

1.1     In this Deed, unless the context requires another meaning:

**Assigned Rights** means, with respect to a Vendor, the Intellectual Property Rights assigned by that Vendor under clause 2.1.

**Business** means the business undertaken by the Vendors or the Purchaser Group at any point prior to the Effective Date.

**Business Day** means a day that is not a Saturday, Sunday, a public holiday or bank holiday in Sydney.

**Contract Amount** means AU $1,500,000.

**Contract Works** means, with respect to a Vendor, any and all Works or work output in which any of that Vendor's Assigned Rights subsist.

**Contract Works Information** means, with respect to a Vendor, all information contained in or comprised by the Contract Works and any other information the benefit of which is to be transferred to the Purchaser.

**Corporations Act** means the Corporations Act 2001 (Cth).

**Effective Date** means 18 December 2015.

**GST Act** means A New Tax System (Goods and Services Tax) Act 1999 (Cth).

**GST Amount** means the amount calculated by multiplying the monetary consideration payable by the recipient (excluding the amount payable as GST) for the relevant taxable supply by the prevailing GST rate.

**Intellectual Property Rights** means all present and future rights in or to any copyright, database, patent, design, utility model, trade mark (including any rights in get up or trade dress), brand name, service mark, trade name, domain name, business name, eligible layout right, chip topography right, plant breeder's right and any other rights of a proprietary nature in or to the results of intellectual activity in the industrial, commercial, scientific, literary or artistic fields, whether registered, registrable, patentable or not and wherever existing in the

ATTORNEY'S EYES ONLY                                                                              DEF_00073810

world, including all renewals, extensions and revivals of, and all rights to apply for, any of the foregoing rights, including all rights in or to the Patent Rights.

**IP Schedule** means:

(a)     where Head Vendor Co is the Vendor, Schedule 1;

(b)     where DeMorgan Holdings is the Vendor, Schedule 2;

(c)     where Misfit Games is the Vendor, Schedule 3;

(d)     where Panopticrypt is the Vendor, Schedule 4;

(e)     where Coin-Exch is the Vendor, Schedule 5;

(f)     where Integyrz is the Vendor, Schedule 6;

(g)     where Pholus is the Vendor, Schedule 7;

(h)     where Cloudcroft is the Vendor, Schedule 8;

(i)     where Chaos is the Vendor, Schedule 9;

(j)     where C01N is the Vendor, Schedule 10;

(k)     where Denariuz is the Vendor, Schedule 11;

(l)     where Interconnected Research is the Vendor, Schedule 12;

(m)     where Zuhl is the Vendor, Schedule 13; and

(n)     where Daso is the Vendor, Schedule 14.

**Know-How** means, with respect to a Vendor, any confidential information, know-how or trade secret described or comprised in or relating to the Contract Works or Contract Works Information, including all inventions whether or not patentable and including the Patentable Inventions, but excluding:

(a)     any such information or know-how:

   (i)     which is publicly known;

   (ii)     which is disclosed to the Vendor after the Effective Date without restriction by a third party and without any breach of confidentiality by the third party; or

   (iii)     which is developed independently by the Vendor after the Effective Date without reliance on:

      (A)     any of the Contract Works Information or Contract Works; or

      (B)     any of the other confidential information of the Purchaser Group;

   provided that such development occurs entirely independently from and outside any contractual arrangement with any member of the Purchaser Group; and

(b)     any confidential information, know-how or trade secret relating to customers of the Business or contracts with such customers.

ATTORNEY'S EYES ONLY                                                                                          DEF_00073811

**Moral Rights** means without limitation any rights subsisting under Part IX of the Copyright Act 1968 (Cth) as amended, including rights contemplated by Articles 6*bis* and 14*ter* of the Berne Convention and any rights under existing or future law in the nature of moral rights, wherever existing in the world.

**Patent Rights** means any patents and patent applications in any jurisdictions, including without limitation, all patent applications and registrations (and any patents that issue from them) and all provisional applications, divisions, renewals, continuations, continuations-in-part, extensions, reissues, re-examinations, substitutions, confirmations, registrations, revalidations and additions of or to them, as well as the right to apply for any of the foregoing, as well as any patent term extension or supplementary protection certificate, or like form of protection, whether on file now or in the future with the appropriate governmental agencies in any jurisdiction.

**Patentable Inventions** has the meaning given in clause 2.3.

**Personnel** means in relation to a person, its employees, directors, officers, agents, advisers and contractors and the Personnel of any such advisers and contractors (if any).

**Purchaser Group** means the Purchaser and its related bodies corporate (as that term is defined in the Corporations Act) from time to time, and also includes Tyche Consulting Ltd (a company incorporated and registered in England and Wales, company number 06249705).

**Security Interest** means a right, interest, power or arrangement in relation to any property which provides security for, or protects against default by a person in, the payment or satisfaction of a debt, obligation or liability, including a mortgage, charge, bill of sale, pledge, deposit, lien, encumbrance or hypothecation and a security interest as defined in sections 12(1) and 12(2) of the Personal Property Securities Act 2009 (Cth).

**Third Party Claim** means, with respect to a Vendor, a claim by any person alleging that any of the Vendor's Assigned Rights, Contract Works or Contract Works Information, or any use of them, infringes any Intellectual Property Right, Moral Right or right of confidence of any person in any country.

**Third Party Interest** means any Security Interest, licence, option, covenant, notation, restriction, interest under any agreement, interest under any trust, or other right, equity, entitlement or other interest of any nature held by a third party.

**Vendors** means the following entities:

(a)     Head Vendor Co;

(b)     DeMorgan Holdings;

(c)     Misfit Games;

(d)     Panopticrypt;

(e)     Coin-Exch;

(f)     Integyrz;

(g)     Pholus;

(h)     Cloudcroft;

(i)     Chaos;

ATTORNEY'S EYES ONLY                                                                    DEF_00073812

(j)      C01N;

(k)      Denariuz;

(l)      Interconnected Research;

(m)      Zuhl; and

(n)      Daso,

and **Vendor** means each one of them.

**Vendors' Account** means BSB: 062 173, Account number: 10239751.

**Works** means the product or other result (whether tangible or intangible, and regardless of whether or not reduced to writing or other material form) of any work or other activity, including any know-how, discovery, design, improvement, formula, algorithm, process, technique, computer programs and software (whether comprising object code, source code, procedure language, job control language or any other form of computer code), documents, prototypes, methodologies, business plans, specifications, packaging, marketing materials, models, information, ideas and inventions as well as any other literary and artistic works and other items in which Intellectual Property Rights subsist or are capable of subsisting.

## Interpretation

1.2      In this Deed:

(a)      unless the context requires, a reference to:

(i)      the singular includes the plural and vice versa;

(ii)     a gender includes all genders;

(iii)    a document (including this Deed) is a reference to that document (including any Schedules and Annexures) as amended, consolidated, supplemented, novated or replaced;

(iv)    an agreement includes any undertaking, representation, deed, agreement or legally enforceable arrangement or understanding whether written or not;

(v)     a party means a party to this Deed;

(vi)    an item, recital, clause, schedule or annexure is to an item, recital, clause, schedule or annexure of or to this Deed;

(vii)   a notice means a notice, approval, demand, request, nomination or other communication given by one party to another under or in connection with this Deed;

(viii)  a person (including a party) includes:

(A)     an individual, company, other body corporate, association, partnership, firm, joint venture, trust and government agency;

(B)     the person's successors, permitted assigns, substitutes, executors and administrators; and

(C)     a reference to the representative member of the GST group to which the person belongs to the extent that the representative member has

ATTORNEY'S EYES ONLY                                                                        DEF_00073813

assumed rights, entitlements, benefits, obligations and liabilities which would remain with the person if the person were not a member of a GST group;

(ix) a law includes any legislation, judgment, rule of common law or equity or rule of any applicable stock exchange, and is a reference to that law as amended, consolidated, supplemented or replaced and includes a reference to any regulation, by-law or other subordinate legislation;

(x) proceedings includes litigation, arbitration and investigation;

(xi) a judgment includes an order, injunction, decree, determination or award of any court or tribunal;

(xii) time is to Sydney time;

(xiii) day is to a day in Sydney;

(xiv) an outcome being "reasonably likely" is a reference to an outcome which is more likely than merely likely and is not intended to mean something which is less than likely;

(xv) the words "including" and "includes" mean "including, but not limited to", and "includes, without limitation" respectively; and

(xvi) a "matter" is a reference to a fact, matter, circumstance or event;

(b) where a word or phrase is defined, its other grammatical forms have a corresponding meaning;

(c) headings are for convenience only and do not affect interpretation of this Deed;

(d) if a payment or other act must (but for this clause) be made or done on a day that is not a Business Day, then it must be made or done on the next Business Day; and

(e) if a period must be calculated from, after or before a day or the day of an act or event, it must be calculated excluding that day.

1.3 This Deed may not be construed adversely to a party only because that party was responsible for preparing it.

## 2. Assignment

2.1 In consideration for the payment by the Purchaser to the Vendors of the Contract Amount in accordance with clause 4, each Vendor hereby assigns to the Purchaser absolutely all of the Intellectual Property Rights that it owns as at the Effective Date, free from any Third Party Interest, including any and all such Intellectual Property Rights that it owns in the items and Works identified in its IP Schedule.

2.2 The assignment the subject of clause 2.1 includes the right to take action and obtain relief (including to be paid all amounts recovered in any action whether as damages, or following an account of profits or on any other basis) in relation to infringements of the Assigned Rights which occurred on or before the Effective Date.

ATTORNEY'S EYES ONLY                                                                    DEF_00073814

**Patent Rights**

2.3      Each Vendor agrees that the Purchaser, at its cost, is entitled to apply for patent protection anywhere in the world in respect of any Contract Works that comprise inventions that are or may be patentable (**Patentable Inventions**).

2.4      Each Vendor must (and must take all reasonable steps to procure that any employee who is an inventor of any Patentable Invention will), at the Purchaser's cost and expense, cooperate with and do all things reasonably requested by the Purchaser in connection with such applications in any jurisdiction including by:

   (a)      disclosing all relevant matters to the Purchaser in connection with such applications;

   (b)      preparing any material or otherwise taking any steps reasonably requested by the Purchaser (or its patent agents) to enable such applications to be prepared and filed by the Purchaser, including by providing the Purchaser (or its patent agents) with a full description of each Patentable Invention accompanied by suitable drawings or sketches and such further explanation as they may require; and

   (c)      by signing, confirming and authenticating all forms, declarations and papers reasonably requested by the Purchaser (or its patent agents) including all such forms and documents as necessary for the making of the application and any other documentation properly required by any patent office in support of any such application.

**Know-How**

2.5      Each Vendor agrees that:

   (a)      the entire benefit and sole use of the Know-How will be enjoyed by the Purchaser;

   (b)      it must, as soon as reasonably possible following the Effective Date, disclose to the Purchaser all Know-How; and

   (c)      it must (and must take all reasonable steps to ensure that any employee who is an inventor of any Patentable Invention will), at the Purchaser's cost and expense, cooperate with and do all things reasonably requested by the Purchaser in connection with the efficient exploitation of the Know-How and the Assigned Rights under this Deed.

2.6      Each Vendor must hold all Know-How on a confidential basis and must not:

   (a)      to the extent that the Purchaser is permitted by law to prohibit the Vendor from doing so, use any Know-How other than for the purposes of performing any contract it is party to with a member of the Purchaser Group; and

   (b)      publish or disclose (or permit or assist any person to do so) any particulars of the Know-How (including any Patentable Inventions) to any person,

except as expressly permitted in writing by the Purchaser or as expressly permitted by clause 2.7.

2.7      Each Vendor may disclose Know-How:

   (a)      to its employees whose duties reasonably require such disclosure, on condition that it:

ATTORNEY'S EYES ONLY                                                                         DEF_00073815

(i)     ensures that each such person to whom such disclosure is made is informed of the confidentiality of the information and the obligations of confidentiality under this Deed; and

(ii)    ensures that each such person to whom such disclosure is made complies with those obligations as if they were bound by them; and

(b)     when required to do so by law or any regulatory authority provided that, if required to disclose as permitted by this clause, the Vendor must (at the Purchaser's expense):

(i)     notify the Purchaser of the requirement as soon as is reasonably possible;

(ii)    take all steps necessary, or reasonably requested by the Purchaser, to allow the Purchaser to challenge or limit the requirement to disclose, using any available channel or in any forum (including a court of law);

(iii)   provide the Purchaser with all assistance and co-operation reasonably requested by the Purchaser to assist it to challenge or limit the requirement to disclose; and

(iv)    use its best endeavours to ensure that confidential treatment will be given to the Know-How by any person to whom it is required to be disclosed.

**Other assistance**

2.8     If the Purchaser notifies a Vendor of any Third Party Claim, the Vendor must provide all reasonable assistance requested by the Purchaser to assist the Purchaser to deal with the Third Party Claim (which assistance, for the avoidance of doubt, does not include the payment of money).

## 3.      Moral Rights

3.1     Each Vendor must, and must ensure that all other persons, absolutely and irrevocably:

(a)     consent as permitted by applicable laws to any act or omission that would otherwise infringe their Moral Rights in the Contract Works whether occurring before or after the consent is given; and

(b)     waive as permitted by applicable laws all of their respective Moral Rights in the Contract Works,

for the benefit of the Purchaser and the Purchaser Group and their licensees, successors in title and anyone authorised by any of them to do acts comprised in the copyright.

3.2     If the consent or waiver above does not operate as an immediate consent in relation to or a waiver of these rights, each Vendor agrees to procure a written consent and waiver at any time at the Purchaser's request in accordance with clause 3.1 above.

## 4.      Payment

4.1     On the Effective Date, the Purchaser must pay the Contract Amount to the Vendors.

4.2     All payments required to be made under this Deed must be made by way of direct transfer of immediately available funds to the Vendors' Account or any other method as agreed in writing between the parties.

ATTORNEY'S EYES ONLY                                                                      DEF_00073816

4.3     The Vendors agree that receipt of funds in accordance with clause 4.2 will constitute a full discharge of the Purchaser's obligations in respect of the payment of the relevant amounts and the Purchaser will not be obliged to see to or be liable for the ultimate distribution of those funds out of the Vendors' Account.

4.4     The parties acknowledge and agree that:

    (a)     the Contract Amount includes an amount that is intended to be paid to Hotwire Preemptive Intelligence Pty Ltd (subject to deed of company arrangement) (ACN 164 068 348) in return for Intellectual Property Rights that it will be assigning to the Purchaser; and

    (b)     the Purchaser will not be obliged to see to or be liable for the ultimate distribution of that amount out of the Vendors' Account.

## 5.     GST

5.1     Terms defined in the GST Act have the same meaning when used in this clause, or in the definition of "GST Amount" unless expressly stated otherwise.

5.2     Unless expressly stated otherwise, any sum payable or amount used in the calculation of a sum payable under this Deed (including the Contract Amount) has been determined without regard to GST and must be increased, on account of any GST payable under this clause.

5.3     If any GST is payable on any taxable supply made under this Deed to the recipient by the supplier ("Supplier") the recipient must pay the GST Amount to the Supplier on the earlier of:

    (a)     the time of making payment of any monetary consideration on which the GST is calculated; and

    (b)     the issue of an invoice relating to the taxable supply.

5.4     The recipient must pay the GST Amount in the same manner as making payment of any monetary consideration on which the GST is calculated.  The Supplier must provide as a precondition for payment by the recipient of the GST Amount, a tax invoice or a document that the Commissioner will treat as a tax invoice.

5.5     The amount recoverable on account of GST under this clause by the Supplier will include any fines, penalties, interest and other charges incurred as a consequence of late payment or other default by the recipient under this clause.

5.6     If a party is required to pay, reimburse or indemnify the other for the whole or any part of any cost, expense, loss, liability or other amount that another party has incurred or will incur in connection with this Deed, the amount must be reduced by the amount for which the other party (or representative member if this is not the other party) can claim an input tax credit, partial input tax credit, or other like offset.

## 6.     Notices

**Requirements**

6.1     All notices must be:

    (a)     in legible writing and in English;

ATTORNEY'S EYES ONLY                                          DEF_00073817

(b)    addressed to the recipient at the address set out below or to such other address as that party may notify in writing to the other parties:

**to the Purchaser:**

| | |
|---|---|
| Address: | Offshore Management & Trust Services Inc, Fitzgerald House, 44 Church Street, St John's Antigua |
| Attention: | The Directors |

**to Head Vendor Co:**

| | |
|---|---|
| Address: | 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 |
| Attention: | The Directors |

**to DeMorgan Holdings:**

| | |
|---|---|
| Address: | 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 |
| Attention: | The Directors |

**to Misfit Games:**

| | |
|---|---|
| Address: | 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 |
| Attention: | The Directors |

**to Panopticrypt:**

| | |
|---|---|
| Address: | 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 |
| Attention: | The Directors |

**to Coin-Exch:**

| | |
|---|---|
| Address: | 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 |
| Attention: | The Directors |

ATTORNEY'S EYES ONLY                                                                        DEF_00073818

**to Integyrz:**

Address:                        502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                      The Directors

**to Pholus:**

Address:                        502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                      The Directors

**to Cloudcroft:**

Address:                        502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                      The Directors

**to Chaos:**

Address:                        502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                      The Directors

**to C01N:**

Address:                        502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                      The Directors

**to Denariuz:**

Address:                        502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                      The Directors

**to Interconnected Research:**

Address:                        502, Level 5, 32 Delhi Road, North Ryde NSW 2113

Attention:                      The Directors

ATTORNEY'S EYES ONLY                                                    DEF_00073819

**to Zuhl:**

| | |
|---|---|
| Address: | 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 |
| Attention: | The Directors |

**to Daso:**

| | |
|---|---|
| Address: | 502, Level 5, 32 Delhi Road, North Ryde NSW 2113 |
| Attention: | The Directors |

(c)    signed by the party, or where the sender is a company by an authorised officer of that company or under the common seal of that company;

(d)    sent to the recipient by hand, prepaid post (airmail if to or from a place outside Australia).

**Receipt**

6.2    Without limiting any other means by which a party may be able to prove that a notice has been received by another party, a notice will be deemed to be duly received:

(a)    if sent by hand, when left at the address of the recipient; or

(b)    if sent by pre-paid post, three days (if posted within Australia to an address in Australia) or seven days (if posted from one country to another) after the date of posting,

but if a notice is served by hand, or is received by the recipient's facsimile or via email on a day which is not a Business Day, or after 5:00 pm (recipient's local time) on a Business Day, the notice is deemed to be duly received by the recipient at 9:00 am (recipient's local time) on the first Business Day after that day.

## 7.    General provisions

**Joint and several liability**

7.1    A warranty, representation, covenant, or obligation given or entered into by a party that comprises more than one person binds them jointly and each of them severally.

**Entire agreement**

7.2    This Deed and any other documents referred to in this Deed or executed in connection with this Deed is the entire agreement of the parties about the subject matter of this Deed and supersedes all other representations, negotiations, arrangements, understandings or agreements and all other communications.

ATTORNEY'S EYES ONLY                                                                                    DEF_00073820

**Further assurances**

7.3     Each party must, at its own expense, whenever reasonably requested by another party, promptly do or arrange for others to do, everything reasonably necessary or desirable to give full effect to this Deed and the transactions contemplated by this Deed.

**Costs**

7.4     Each party must pay its own costs in respect of this Deed and the documents and transactions contemplated by this Deed, except that Purchaser must pay all stamp duty chargeable on this Deed, and any other documents contemplated by this Deed.

**No merger**

7.5     The warranties, other representations and promises by the parties in this Deed are continuing and will not merge or be extinguished on completion of this Deed.

**Assignment**

7.6     Subject to clause 7.7, a party must not assign or otherwise transfer, create any charge, trust or other interest in, or otherwise deal in any other way with any of its rights under this Deed without the prior written consent of the other parties.

7.7     For the avoidance of doubt, the Purchaser may deal with the Assigned Rights and the Contract Works without restriction or reference to the Vendors.

**Moratorium legislation**

7.8     To the extent permitted by law, a provision of a law is excluded if it does or may, directly or indirectly:

        (a)     lessen or vary in any other way a party's obligations under this Deed; or

        (b)     delay, curtail or prevent or adversely affect in any other way the exercise by a party of any of its rights, remedies or powers under this Deed.

**Invalid or unenforceable provisions**

7.9     If a provision of this Deed is invalid or unenforceable in a jurisdiction:

        (a)     it is to be read down or severed in that jurisdiction to the extent of the invalidity or unenforceability; and

        (b)     that fact does not affect the validity or enforceability of that provision in another jurisdiction or the remaining provisions.

**Waiver and exercise of rights**

7.10    A provision of or of a right under this Deed may not be waived or varied except in writing signed by the person to be bound.

**Amendment**

7.11    This Deed may be amended only by a document signed by all parties.

**Counterparts**

7.12    This Deed may be signed in counterparts and all counterparts taken together constitute one document.

ATTORNEY'S EYES ONLY                                                                              DEF_00073821

**Rights cumulative**

7.13   The rights, remedies and powers of the parties under this Deed are cumulative and do not exclude any other rights, remedies or powers.

**Consents and approvals**

7.14   A party may give its approval or consent conditionally or unconditionally or withhold its approval or consent in its absolute discretion unless this Deed expressly provides otherwise.

**Successors and assigns**

7.15   This Deed is binding on, and has effect for the benefit of, the parties and their respective successors and permitted assigns.

**Governing law**

7.16   This Deed is governed by the laws of New South Wales.

**Jurisdiction**

7.17   Each party irrevocably and unconditionally:

(a)   submits to the non-exclusive jurisdiction of the courts of New South Wales; and

(b)   waives, without limitation, any claim or objection based on absence of jurisdiction or inconvenient forum.

**Service of process**

7.18   Each party agrees that a document required to be served in proceedings about this Deed may be served:

(a)   by being delivered to or left at its address for service of notices under clause 6; or

(b)   in any other way permitted by law.

ATTORNEY'S EYES ONLY                                                              DEF_00073822

## Execution

**Executed** as a deed.

**Signed sealed and delivered**
by **Ncrypt Holdings Ltd**
:

_____         _____
Signature of director           Signature of director

Stefan Matthews                 Robert MacGregor
Name of director                Name of director


**Signed sealed and delivered**
by **DeMorgan Limited**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____         _____
Signature of director           Signature of director

Allan Granger                   David Jensen
Name of director                Name of director


**Signed sealed and delivered**
by **DeMorgan Holdings Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____         _____
Signature of director           Signature of director

Allan Granger                   Ramona Watts
Name of director                Name of director (please print)


2649672-v4A\SYDDMS                    15                    IP Assignment Deed
                                                            Execution Counterpart

ATTORNEY'S EYES ONLY                                   DEF_00073823

**Signed sealed and delivered** by
**Misfit Games Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Craig Steven Wright
Name of director (please print)

_____
Signature of director

_____
Ramona Watts
Name of director

**Signed sealed and delivered**
by **Panopticrypt Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Craig Steven Wright
Name of director

_____
Signature of director

_____
Ramona Watts
Name of director

IP Assignment Deed
**Execution Counterpart**

ATTORNEY'S EYES ONLY                                          DEF_00073824

**Signed sealed and delivered**
by **Coin-Exch Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Allan Granger
Name of director

_____
Signature of director

_____
Ramona Watts
Name of director


**Signed sealed and delivered**
by **Integyrz Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Allan Granger

_____
Signature of director

_____
Ramona Watts


**Signed sealed and delivered**
by **Pholus Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Allan Granger
Name of director

_____
Signature of director

_____
Ramona Watts
Name of director


2649672-v4A\SYDDMS                    17                    IP Assignment Deed
                                                            **Execution Counterpart**

ATTORNEY'S EYES ONLY                                    DEF_00073825

**Signed sealed and delivered**
by **Cloudcroft Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

**Signed sealed and delivered**
by **Chaos and Nonlinear Forecasting in
Economics and Finance Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Craig Steven Wright
_____
Name of director

**Signed sealed and delivered**
by **C01N Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of /director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

ATTORNEY'S EYES ONLY                                    DEF_00073826

**Signed sealed and delivered**
by **Denariuz Pty Ltd.**

in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

| | |
|---|---|
| _____ | _____ |
| Signature of director | Signature of director |
| | |
| Allan Granger | Ramona Watts |
| Name of director | Name of director |

**Signed sealed and delivered**
by **Interconnected Research Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

| | |
|---|---|
| _____ | _____ |
| Signature of director | Signature of director |
| | |
| Allan Granger | Ramona Watts |
| Name of director | Name of director |

IP Assignment Deed
**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073827

**Signed sealed and delivered**
by **Zuhl Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____       _____
Signature of director                Signature of director

Allan Granger                        Ramona Watts
Name of director                     Name of director

**Signed sealed and delivered**
by **Daso Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____       _____
Signature of director                Signature of secretary/director

Craig Steven Wright                  Ramona Watts
Name of director                     Name of director

IP Assignment Deed
**Execution Counterpart**

ATTORNEY'S EYES ONLY                                    DEF_00073828

## Execution

**Executed** as a deed.

**Signed sealed and delivered**
by **Ncrypt Holdings Ltd**
:

_____
Signature of director

_____
Signature of director

Stefan Matthews
_____
Name of director

Robert MacGregor
_____
Name of director

**Signed sealed and delivered**
by **DeMorgan Limited**
in accordance with section 127 of the
_Corporations Act 2001_ by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

David Jensen
_____
Name of director

**Signed sealed and delivered**
by **DeMorgan Holdings Pty Ltd.**
in accordance with section 127 of the
_Corporations Act 2001_ by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director (please print)

2649672-v4A\SYDDMS                    15                    IP Assignment Deed
                                                           Execution Counterpart

ATTORNEY'S EYES ONLY                                                    DEF_00073829

**Signed sealed and delivered** by
**Misfit Games Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____          _____
Signature of director                               Signature of director

_____          _____
Craig Steven Wright                                  Ramona Watts
Name of director (please print)                  Name of director

**Signed sealed and delivered**
by **Panopticrypt Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____          _____
Signature of director                               Signature of director

_____          _____
Craig Steven Wright                                  Ramona Watts
Name of director                                      Name of director

IP Assignment Deed
Execution Counterpart

ATTORNEY'S EYES ONLY

DEF_00073830

**Signed sealed and delivered**
by **Coin-Exch Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:


_____
Signature of director

Allan Granger
_____
Name of director


_____
Signature of director

Ramona Watts
_____
Name of director


**Signed sealed and delivered**
by **Integyrz Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:


_____
Signature of director

Allan Granger
_____


_____
Signature of director

Ramona Watts
_____


**Signed sealed and delivered**
by **Pholus Pty Ltd**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:


_____
Signature of director

Allan Granger
_____
Name of director


_____
Signature of director

Ramona Watts
_____
Name of director

IP Assignment Deed
**Execution Counterpart**

ATTORNEY'S EYES ONLY                                         DEF_00073831

**Signed sealed and delivered**
by **Cloudcroft Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

**Signed sealed and delivered**
by **Chaos and Nonlinear Forecasting in Economics and Finance Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of director

Allan Granger
_____
Name of director

Craig Steven Wright
_____
Name of director

**Signed sealed and delivered**
by **C01N Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

_____
Signature of /director

Allan Granger
_____
Name of director

Ramona Watts
_____
Name of director

2649672-v4A\SYDDMS                              18                    IP Assignment Deed
                                                                      Execution Counterpart

**Signed sealed and delivered**
by **Denariuz Pty Ltd.**

in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____          _____
Signature of director                     Signature of director

Allan Granger                             Ramona Watts
_____          _____
Name of director                          Name of director

**Signed sealed and delivered**
by **Interconnected Research Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____          _____
Signature of director                     Signature of director

Allan Granger                             Ramona Watts
_____          _____
Name of director                          Name of director

IP Assignment Deed
**Execution Counterpart**

ATTORNEY'S EYES ONLY                                              DEF_00073833

**Signed sealed and delivered**
by **Zuhl Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Allan Granger
_____
Name of director

_____
Signature of director

Ramona Watts
_____
Name of director


**Signed sealed and delivered**
by **Daso Pty Ltd.**
in accordance with section 127 of the
*Corporations Act 2001* by 2 directors:

_____
Signature of director

Craig Steven Wright
_____
Name of director

_____
Signature of secretary/director

Ramona Watts
_____
Name of director

IP Assignment Deed
**Execution Counterpart**

ATTORNEY'S EYES ONLY

## Schedule 1

### Head Vendor Co

| Number | Description |
|--------|-------------|
| 1. | All Works owned by Head Vendor Co including its Personnel on and from 1 July 2015 except to the extent assigned under the Research, Development and Technical Services Agreement with an effective date of 29 June 2015 between Head Vendor Co and DR Technologies Ltd. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073835

**Schedule 2**

**DeMorgan Holdings**

No IP Schedule for DeMorgan Holdings.

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                        DEF_00073836

## Schedule 3

**Misfit Games**

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by Misfit Games in its gaming technology (both hardware and software) including the "Super Cool Gaming" project and related cooling systems research. |
| 2. | All Intellectual Property Rights owned by Misfit Games in the Core Technology as defined in and created under the IP Deed of Assignment between Denariuz and Misfit Games Pty Ltd dated 30 December 2014 (acknowledging that Denariuz may also own some Intellectual Property Rights in the Core Technology). |
| 3. | All Intellectual Property Rights owned by Misfit Games that were assigned by Pholus to Misfit Games under the Consultancy Agreement between Pholus and Misfit Games s. |
| 4. | All Intellectual Property Rights owned by Misfit Games that were assigned by Panopticrypt to Misfit Games under the Consultancy Agreement between Panopticrypt and Misfit Games. |
| 5. | All Intellectual Property Rights owned by Misfit Games that were assigned by Interconnected Research to Misfit Games under the Consultancy Agreement between Interconnected Research and Misfit Games. |
| 6. | All Intellectual Property Rights owned by Misfit Games that were assigned by Intergyrz to Misfit Games under the Consultancy Agreement between Intergyrz and Misfit Games. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073837

## Schedule 4

### Panopticrypt

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by Panopticrypt in connection with its IT security services. |
| 2. | All Intellectual Property Rights owned by Panopticrypt that were assigned by Integyrz to Panopticrypt under the R&D Services Agreement between Integyrz and Panopticrypt including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• BODOG Security Assessment and Testing;<br>• iVote System Security Review; and<br>• Panopticrypt Commercialisation (campaign). |
| 3. | All Intellectual Property Rights owned by Panopticrypt that were assigned by Interconnected Research to Panopticrypt under the R&D Services Agreement between Interconnected Research and Panopticrypt including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• BODOG Security Assessment and Testing;<br>• iVote System Security Review; and<br>• Panopticrypt Commercialisation (campaign). |
| 4. | All Intellectual Property Rights owned by Panopticrypt that were assigned by Pholus under the Consultancy Agreement between Pholus and Panopticrypt. |
| 5. | All Intellectual Property Rights owned by Panopticrypt in Works created by Craig Wright in the course of his employment with Panopticrypt which vest in Panopticrypt as Craig Wright's employer. |
| 6. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and C01N (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and C01N). |
| 7. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Cloudcroft (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Cloudcroft). |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073838

| Number | Description |
|---|---|
| 8. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Coin-Exch (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Coin-Exch). |
| 9. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Daso (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Daso). |
| 10. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Integyrz (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Integyrz). |
| 11. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Interconnected Research Pty Ltd (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Interconnected Research). |
| 12. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Pholus (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Pholus). |
| 13. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Zuhl (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Zuhl). |
| 14. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Denariuz (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Denariuz). |
| 15. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Misfit Games (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt and Misfit Games). |
| 16. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073839

| Number | Description |
|--------|-------------|
| | Consultancy Agreement between Panopticrypt and Head Vendor Co). |
| 17. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Chaos (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt Pty Ltd and Chaos. |
| 18. | All Intellectual Property Rights owned by Panopticrypt under the Consultancy Agreement between Panopticrypt and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Panopticrypt Pty Ltd and Head Vendor Co. |
| 19. | All Intellectual Property Rights owned by Panopticrypt Pty Ltd that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:<br><br>**PROJECT TITLE: Risk Project (as per 2012 review): The Quantification of Information Systems Risk**<br><br>**Project description**:<br><br>*To act rationally requires that we forecast the future with inadequate information using the past as a guide. This has led information security practitioners to engage in qualitatively derived flawed risk practices due to the lack of scientifically valid quantitative risk models. The result is both a misallocation of valuable resources with alternative uses and a corresponding decrease in the levels of protection for many systems. Using a combination of modern scientific approaches and the advanced data mining techniques now available, this research effort aims to create a set of game theoretic quantitative models of risk to information systems within set confidence levels. Using empirical evidence, this research aims to investigate and quantify the root cause of security flaws that act as a source of system compromise. Research into the effects of poor system design, market based risk solutions based on derivative instruments and the impact of common system misconfigurations will be incorporated into multivariate survival models. This research incorporates the economic impact of various decisions as a means of determining the optimal distribution of costs and liability when applied to information security and in particular when assigning costs in computer system security and reliability engineering. For decades, information security practitioners have engaged in qualitatively derived risk practices due to the lack of a scientifically valid quantitative risk model. This has led to a systems failing "not ultimately for technical reasons but because incentives are wrong" Here "security failure is caused at least as often by misaligned incentives as by technical design mistakes". This misallocation of valuable resources with alternative uses and the corresponding decrease in the levels of protection for many systems not only makes systems less secure in the present, but limits future expenditure on security controls. Using a combination of modern scientific approaches and the advanced data mining techniques, this research effort is aimed at creating a game theoretic quantitative model for information systems risk that incorporates both contract theory and the methods developed within Behavioural Economics. The objective of this research is to produce an innovative modelling architecture designed around information systems security and risk based reliability and survivability analysis. The objectives of the research are:* |

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                           DEF_00073840

| Number | Description |
|---|---|
| | *(1) To address the critical limitations that are associated with reliability engineering in regards to computer systems. This will be completed with competing risks analysis and multivariate survival analysis coupled with a game theoretic approach. Data collected from an analysis of systems in the field will be used to test assumptions. These assumptions include:* <br><br> *a. constant and homogenous failure rates,* <br><br> *b. binary failure and univariate reliability,* <br><br> *c. censoring of failure data, and* <br><br> *d. independent failures.* <br><br> *(2) To produce a methodology for the creation and testing of hazard and survival models for information systems. This will become a risk based quantitative approach to reliability and survivability engineering.* <br><br> *(3) To incorporate methods that represent the effects of misaligned incentives and their consequence to security controls.* <br><br> *To do this, it is necessary to recognise that information security is a risk function [2]. Paying for too much security can be more damaging in economic terms than not buying enough. This leads to decisions about where the optimal expenditure on damage prevention should lie. This research will investigate who should be responsible for the security failures that are affecting the economy and society and how can this be maximized in order to minimize negative externalities.* |

20. All Intellectual Property Rights owned by Panopticrypt Pty Ltd that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Risk tests**:

**Project description:**

*This activity is to research and test the following two hypotheses:*

*- Hypothesis 1:  Criminal groups adjust the territory size to the density of the critical resources (such as access to systems, bandwidth or data) such that the resulting territory contains sufficient benefits to offset the costs of obtaining and maintaining the component systems.*

*- Hypothesis 2:  Variation in territory size occurs because more competitors are attracted to networks that are rich in resources, and such areas are, therefore, costlier to defend per unit host. Kaspersky (Press, 2009b) and iDefense (Danchev, 2010) support this thesis.*

*Both hypotheses are fundamentally raising a very simple but complex question: Can software security be modeled and predicted?*

*The answer to this question will require a complex and comprehensive research activity associated with data gathering.*

*Sophisticated risk algorithms and honeypot systems operating on a large number of computer hosts (640) in selected locations*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073841

| Number | Description |
|--------|-------------|

*with objective to test and gathering of data associated with the hypotheses including:*

*1. The length of time for an attached to break into each system;*

*2. Optimization, continuous tuning and "training" of the algorithms allowing accurate prediction and detection of risks;*

*3. Optimization using historical data; and*

*4. Intelligent redirection of attackers to honeypot sites imitating real sites.*

*The undertaking for the income year 2013/14 has been to gather historical and iterative data used for the optimization and tuning of risk algorithms. This activity has been proven to be larger and much more complex than anticipated.*

*This exercise used Snort IDS, which provided the details of the attacks allowing an analysis of worm (automated) compromises against manual (attacker, script kiddies, etc.). The IDS sat between the Internet connected router and the virtualised hosts. Any outgoing traffic was investigated.*

*In a simple test of a single control, the enabling of this control had a marked effect on the survivability of the system. This demonstrates that leaving the host running with the firewall enabled provided a good level of protection (without a user on the system).*

*We next altered the experiment to investigate the attacks in classes; in particular, comparing the systems that have been compromised by an automated process (such as worms) against those which have at least some level of interaction. Tests were developed to determine that the more secure a system is (in this case, patched of known vulnerabilities), the more likely that a compromise is manually initiated.*

***Supporting – Editing and presentation****: This activity is mainly associated with management of the core activity including:*

*1. Manage the execution of the research activities (planning, schedule, reporting);*

*2. Ensuring we have correctly documented the design in a manner that defines the scientific or technological objectives stated in the core processes.*

*3. To capture all information, results and experiments in written format and to be able to assess the scientific or technological feasibility and developing the hypothesis stated in the core activity*

*This includes project management and collection of report data for analysis.*

21.   All Intellectual Property Rights owned by Panopticrypt Pty Ltd that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Registry design and test**:

**Project description:**

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                                                    DEF_00073842

| Number | Description |
|---|---|
| | This activity is seeking to emulate and model decentralized behaviour using agile system testing methodologies (scenarios, injection etc). |
| | A test net system was designed using a cloud based computer. |
| | A series of agents where configured using evolutionary coding techniques. The aim is to have a system that is more effective than existing human based ones. |
| | From this we seek to create a series of automated bots that can manage an escrow system without (or with only limited) human interaction. |
| | This will stop the loss of distributed (such as is used in Bitcoin) private keys (even on the death of the owner) and without centralised authority, and allow for distributed secure transactions. |
| | We are using a set of evolutionary coded autonomous "bots" based on a set of Multi-layer Perceptrons that "learn and improve". |
| | To create and train Multi-Layer Perceptron neural network we did the following set of steps for each test or experiment subset: |
| | 1. Create start case Perceptron neural network project; |
| | 2. Create Multi-Layer perceptron network; |
| | 3. Create training set; |
| | 4. Train network; and |
| | 5. Test trained network. |
| | Multi-Layer perceptron (MLP) is a feedforward neural network with one or more layers between input and output layer. Feedforward means that data flows in one direction from input to output layer (forward). This type of network is trained with the backpropagation learning algorithm. MLPs are widely used for pattern classification, recognition, prediction and approximation. Multi-Layer Perceptron can solve problems which are not linearly separable. |
| | Initial tests have been centred on the neighbourhood effects in diffusion and play when separate but interrelated reputational systems interact. |
| | We are testing the hypothesis that: |
| | Given q e(0,1), where we suppose there is a cofinite set such that none of its subsets is (1-q)-cohesive that diffusion is possible. |
| | In order to do this, we have constructed a set of cofinite nodes that are represented by a series of MLPs. We have started with the assumption that no bot can remain in a choice of action (define a valid registry contract) when t exceeds a set value and a threshold is achieved by a level of of consensus between bots with competing agenda. |
| | This differs from the heretical work of Morris (2000) as the network we postulate is countably infinite and adds a level of more delicate technical issues that need to be solved. |

2649672-v4A\SYDDMS                                    29                              IP Assignment Deed

**Execution Counterpart**

ATTORNEY'S EYES ONLY

| Number | Description |
|--------|-------------|
| | *In testing this postulation, we have created a series of components in a network that is not fully connected. We see that diffusion is only possible where the original seed is not set to be fully connected.* |
| | ***Supporting - Editing and presentation****: This activity is mainly associated with management of the core activity including:* |
| | *1. Manage the execution of the research activities (planning, schedule, reporting);* |
| | *2. Ensuring we have correctly documented the design in a manner that defines the scientific or technological objectives stated in the core processes.* |
| | *3. To capture all information, results and experiments in written format and to be able to assess the scientific or technological feasibility and developing the hypothesis stated in the core activity.* |
| | *This includes project management and collection of report data for analysis.* |
| 22. | The Works comprised in the body of work described as: Smart contract registry. |
| 23. | The Works comprised in the body of work described as: A method and system to provide ECC/ECDH key exchange to three or more parties. |
| 24. | The Works comprised in the body of work described as: Secure video/audio. |
| 25. | The Works comprised in the body of work described as: Remote wipe system. |
| 26. | The Works comprised in the body of work described as: IoT remote control system. |
| 27. | The Works comprised in the body of work described as: A method to use wallet integrated ECC for lightweight Application authentication. |
| 28. | The Works comprised in the body of work described as: Integrated utility accounting, materials management, work management and regulatory reporting software that derives information and stores it into the blockchain. |
| 29. | The Works comprised in the body of work described as: A Method and system for providing Rational Secret Sharing with Repeated Games using the blockchain. |
| 30. | The Works comprised in the body of work described as: A method to encrypt and notorise messages using the bitcoin protocol. |
| 31. | The Works comprised in the body of work described as: Wallet based authentication system. |
| 32. | The Works comprised in the body of work described as: Blockchain based Incremental automata verification. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073844

| Number | Description |
|---|---|
| 33. | The Works comprised in the body of work described as: Unified, configurable services stack for integration of enterprise applications using a loop stack against the blockchain. |
| 34. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata graph traversal with nodal bit mapping into bitcoin addresses. |
| 35. | The Works comprised in the body of work described as: Method and apparatus for data encryption/decryption using cellular automata transform. |
| 36. | The Works comprised in the body of work described as: CGA++ cryptographic key. |
| 37. | The Works comprised in the body of work described as: Anti-theft system. |
| 38. | The Works comprised in the body of work described as: A method to create Efficient Wireless Security Protocols using the blockchain. |
| 39. | The Works comprised in the body of work described as: A blockchain wallet system to enable Object Signing and Encryption. |
| 40. | The Works comprised in the body of work described as: A system and methods to ensure High-priority communications sessions within a wireless communications system using ECCDSA based access with a blockchain integrated ledger. |
| 41. | The Works comprised in the body of work described as: Network and system modelling. |
| 42. | The Works comprised in the body of work described as: System and method for credential management and administration using the blockchain. |
| 43. | The Works comprised in the body of work described as: Analog and Perceptron nureal network logic automata (on the blockchain). |
| 44. | The Works comprised in the body of work described as: Asynchronous logic automata. |
| 45. | The Works comprised in the body of work described as: Deterministic encoding of fuzzy finite state automata in continuous recurrent neural networks related to blockchains. |
| 46. | The Works comprised in the body of work described as: A method to securely distribute keys and pins for online wallets (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |

ATTORNEY'S EYES ONLY                                                        DEF_00073845

| Number | Description |
|---|---|
| 47. | The Works comprised in the body of work described as: Software signing on the Blockchain (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 48. | The Works comprised in the body of work described as: Anti-counterfeit system(to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 49. | The Works comprised in the body of work described as: Autonomous machine based oracle (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 50. | The Works comprised in the body of work described as: A secure blockchain based medial record system (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 51. | The Works comprised in the body of work described as: Secure off-block transfers (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 52. | The Works comprised in the body of work described as: BOTMAN (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 53. | The Works comprised in the body of work described as: Blockchain computing as a basis for equipment health monitoring service (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 54. | The Works comprised in the body of work described as: Blockchain based medical insurance verification and processing system (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 55. | The Works comprised in the body of work described as: Content search mechanism that uses a Blockchain based deterministic finite automata (DFA) graph, a DFA state machine, and a walker process (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 56. | The Works comprised in the body of work described as: System verification using one or more blockchain automata (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 57. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata (DFA) graph compression (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073846

| Number | Description |
|---|---|
| | Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 58. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata graph traversal with nodal bit mapping(to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 59. | The Works comprised in the body of work described as: Content search mechanism that uses a deterministic finite automata (DFA) graph, a DFA state machine, and a walker process(to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 60. | The Works comprised in the body of work described as: A point recording system and network graph analysis platform based on the Blockchain (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 61. | The Works comprised in the body of work described as: Plausible deniability wallet (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 62. | The Works comprised in the body of work described as: Intelligent blockchain graph walking (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 63. | The Works comprised in the body of work described as: Method and apparatus for traversing a deterministic finite automata (dfa) graph compression to find optimised blockchain exchange paths (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |
| 64. | The Works comprised in the body of work described as: Blockchain automata Toilet and Facilities management systems, methods, and techniques (to the extent that the Intellectual Property Rights in this body of work were created by Craig Wright in the course of his employment with Panopticrypt and vest in Panopticrypt as Craig Wright's employer). |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073847

## Schedule 5

### Coin-Exch

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by Coin-Exch in and to the Works known as "Exchange". |
| 2. | All Intellectual Property Rights owned by Coin-Exch that were assigned by Hotwire Preemptive Intelligence Pty Ltd and Interconnected Research to Coin-Exch under the R&D Services Agreement between Hotwire Preemptive Intelligence Pty Ltd and Interconnected Research and Coin-Exch including all such Intellectual Property Rights created in the course of or in connection with these projects, including in all Works created in the course of or in connection with the project known as "Cornerstone Firewall". |
| 3. | All Intellectual Property Rights owned by Coin-Exch that were assigned by Interconnected Research to Coin-Exch under the R&D Services Agreement between Interconnected Research and Coin-Exch including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

- Exchange Server baseline and proof of concept;
- Bitcoin Exchange Escrowed Marketplace; and
- Bitcoin Exchange Escrowed Marketplace (Regulated).

| | |
|---|---|
| 4. | All Intellectual Property Rights owned by Coin-Exch that were assigned by Intergyrz to Coin-Exch under the R&D Services Agreement between Intergyrz and Coin-Exch including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

- Exchange Server baseline and proof of concept;
- Bitcoin Exchange Escrowed Marketplace; and
- Bitcoin Exchange Escrowed Marketplace (Regulated).

| | |
|---|---|
| 5. | All Intellectual Property Rights owned by Coin-Exch that were assigned to Coin-Exch under the IP Deed of Assignment between The Wright Family Trust DeMorgan and Coin-Exch dated 15 September 2013, being: |

- Core Banking and Exchange Software, being: MJF iMal (Source Code); MJF T24 updates and guides;
- Metered Payments system;
- Software Derivative Markets & Information Security Risk Systems; and
- Software Assurance Marketplace (SWAMP),

(acknowledging that Craig Wright, The Wright Family Trust, MJF Mining Services WA Pty Ltd, Siemens, Al Baraka and W&K Info

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073848

| Number | Description |
|--------|-------------|
| | Defense Research LLC may also own some Intellectual Property Rights in connection with the above items). |
| 6. | All Intellectual Property Rights owned by Coin-Exch that were assigned by Pholus to Coin-Exch under the Consultancy Agreement between Pholus and Coin-Exch. |
| 7. | All Intellectual Property Rights owned by Coin-Exch that were assigned by Panopticrypt to Coin-Exch under the Consultancy Agreement between Panopticrypt and Coin-Exch. |
| 8. | All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**PROJECT TITLE: AF00053: Virtual Currency Economy**

**Project description:**

> We endeavour to build a risk contained alternate currency trading platform that conforms to AML (Anti-Money Laundering) and APRA provisions that allows people to trade Bitcoins in a rate hedged risk controlled environment. We propose that computer simulations based on mathematical models are an indispensable research tool for studying the phenomenological behaviour of physical systems including currency exchange. In order to use a mathematical model, it is often necessary to adjust some of its parameters such that the simulation output best matches some given experimental data obtained from physical experiments a task often called parameter estimation. In addition, optimal experimental design methodology, taking into account certain sensitivities of the model, can be used to maximize the information gained from the physical experiments. This project will take a number of trading systems and test for resilience and risk control in a manner that can lead to a hedged derivative measure attacked to a alternate currency transaction.

> The goal is to create a means to trade in normal "bricks and mortar" stores within Australia using alternate currency (Bitcoin) from a cloud based wallet in a manner that is both secure as well as protected from the existing issues with Bitcoin (such as a loss of wallet leading to a loss of currency – as with cash).

> ANZSRC code: Economics; Applied Economics.

| 9. | All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**PROJECT TITLE: Core - Bayesian Design**

**Project description**:

> Investigations on Bitcoin volatility and resilience against speculative attack. It is known that investors 'attack' currencies. The low distribution and perceived volatility of Bitcoin leads it open to such speculation-derived currency fluctuations. The environment is such that trading strategies are well known by 'competing' investors (or, 'players' in the context of game theory). This makes the

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073849

| Number | Description |
|---|---|

situation suitable for analysis and experimentation using game theory concepts such as Nash Equilibrium. The experiment is designed to create systems that can hedge risk as well as leading to Nash optimal non-attack game outcomes. Hypotheses:

(1a) The success of a currency attack on Bitcoin depends on the number of attackers and the time intervals involved in this process.

(1b) There are two pure Nash equilibria in this macro coordination game: (i) everyone attacks or (ii) nobody attacks.

Research: Creation of a simulation model using surface derivative analysis to enable resilience in Currency Attack experiments. Two versions of the game are run simultaneously. Speculators, if seen to act in the same way as with 'real world' currency, would be expected to coordinate on the 'attack' equilibrium in one, but not the other version (see hypothesis 1b above). Simulations will be tested in live exchange environments. Feedback is designed to control and optimise exchange feedback and limit the risk position of the currency exchange.

**Supporting – Development of a virtualised multicore platform**: Supercomputing is rapidly becoming an essential element of innovation and competitiveness. Computer-based methods now play a central role in all areas of economic development, education, and research. Economically, computational analysis, modelling, and simulation have become a distinguishing factor in business competitiveness. Educationally, developing computing skills in students is an essential part in preparing for a future in a wide range of careers. Establishing the virtualised core supercomputer will greatly accelerate these trends to the benefit of Denariuz and allow it to complete the creation of a DASO in a timely manner. These system will have very high-speed fibre connectivity, small computing clusters, high-speed, high definition video conferencing, a large 3-D visualization screen, and desktop computing platforms with 3-D visualization. In order to support the proposed research activities with access to world-class computing assets, we will first will acquire state-of-theart cluster computing capacity with a nominal speed of 1,000-2,000 Teraflops. The central workhorse of the project will be one of the fastest computers for unclassified research in the world performing at more than 1,000 Teraflops when it goes live. Opportunistic Supercomputing is a form of networked grid computing whereby a "super virtual computer" of many loosely coupled volunteer computing machines performs very large computing tasks. Grid computing has been applied to a number of large-scale embarrassingly parallel problems that require supercomputing performance scales. The problem with many approaches is that basic grid and cloud computing approaches that rely on volunteer computing cannot handle traditional supercomputing tasks such as fluid dynamic simulations and will not be adequate for the use in the creation of a set of multi-level perceptron based DASO's that compete in evolutionary formats. http://www.top500.org/system/178468.

10.   All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-1: CO1N – eWallet including NFC application**

**Project description**:

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073850

| Number | Description |
| --- | --- |
| | ***Main activities:*** |

- *Develop Bitcoin wallet management features to enable create/modify/delete/import/export of wallet details including use of mobile and web access.*
- *Develop protocols and rule-based algorithms to reduce transaction times.*
- *Design novel security protocols and encryption algorithms.*
- *Performance tests for speed and scalability.*

*All experiments are in the set-up or early stages with no reportable results to date.*

*Hypothesis 1: a generic, scalable and efficient scaffold for peer-to-peer applications based on Bitcoin protocols can be integrated into existing eWallet applications.*

*Research into decentralized, self-organizing fault-tolerant set of Blockchain nodes (specialised servers) to provide efficient request routing, deterministic object location, and load balancing. We require mechanisms that support and facilitate application-specific object replication (for data resilience), caching (for processing efficiency/speed), and fault recovery (for data integrity):*

- *Replication. Mapping of application-specific objects to multiple 'eligible' nodes to optimally balance efficiency versus resilience. Objects are inserted by routing a Bitcoin message which, when reaching an eligible node, replicates the object among all the other eligible nodes.*
- *Distributed Caching. Efficient protocol to guarantee access to copies of application-specific objects by routing a Bitcoin message and caching objects on nodes encountered along the path to the primary nodes.*
- *Fault Recovery. Uniform random assignment of node-ids for load balancing and quorum-based protocols for data robustness. Nodes with adjacent node-ids are diverse in geographic location, ownership, jurisdiction, network attachment, etc. Quorum-based protocols securely update the state of replicated objects, even given a limited number of malicious nodes in the system.*

*Hypothesis 2: Specialised Bitcoin clients can be created to realise savings in data storage and processing overheads.*

*Research:*

*Signing-only clients: request data about certain transactions from the server and only send out their own transactions. Restrict file system usage to our own keys and transactions of concern.*

*Headers-only clients: download full blocks only when expect incoming transactions and when searching Blockchain for keys in the wallet. Development using Bitcoin software library employing certain precautions to preserve security.*

*Hypothesis 3a: Can use NFC (efficiently) to connect the eWallet to the Point-Of-Sale.*

*Hypothesis 3b: A multi-factor authentication procedure will improve security.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073851

| Number | Description |
|---|---|
| | *Research:* |

*Transaction confirmation on a mobile phone.*

*Multi-signature transactions (multiple recipient addresses). Drawbacks to be overcome:*

- *more Blockchain space used; and*
- *need to save copies of public keys involved in these transactions after they happen.*

*Three-party escrow: the Buyer chooses an Arbiter, trusted by both Buyer and the Seller to resolve disputes. Requires three public keys rather than two.*

11.   All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-2: Bitcoin market and exchange**

**Project description:**

*Creating a fast, decentralised and secure universal trading platform using Bitcoin as currency and utilising the protocols developed for the Blockchain. The system allows value backed exchange of any items at all levels of transaction from micro-finance to high finance.*

*A contracted dispute process is built into the mechanism using a time-stamped permanent record that acts as a notarised proof process for a complete and managed contract exchange system. The platform extends beyond financial transactions to include secure storage and authorised exchange of any type of information. Users can exchange goods, services, contracts, id eas; proof of work tokens or even public utility records (see Core 6: P2P exchange). This phase is the design and implementation of a basic exchange platform to enable customers to buy and sell Bitcoins. All experiments are in the set-up or early stages with no reportable results to date.*

*Hypothesis 1: The basic platform can be enhanced to enable any kind of exchange including new Bitcoin-based financial products similar to bonds and derivatives.*

*Research is ongoing for:*

*- Valuations and risk models for new Bitcoin-based financial instruments.*

*- Provision of 3 strong security guarantees: (1) tamper-proof credentials, (2) no party can control the addition of credentials to the exchange, and (3) all parties will share a consistent view of the exchange.*

*Hypothesis 2: anonymous credentials can be constructed by enhancing the public/private key method; attaching vector commitments and non-interactive proofs to the private key.*

*Research is ongoing to:*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073852

| Number | Description |
|---|---|
|  | *(i) Design an efficient publicly verifiable accumulator to gather the set of all previous commitments together. An efficient membership algorithm is employed to avoid the difficulty level of credential verification scaling with the increasing number of commitments.* |
|  | *(ii) Prove that our construction provides for: consistency of credentials (ensuring multiple users cannot pool their credentials); the establishment of pseudonyms; and a long set of extensions built upon anonymous credentials.* |
|  | *(iii) Formally define and prove the security of this distributed anonymous credential scheme and provide a model for the distributed ledger.* |
|  | *Hypothesis 3: Impersonation ('Sybil') attacks in ad hoc networks can be effectively counteracted by setting a threshold for re-use of anonymous credentials within a given time period. Research is ongoing on adapting the anonymous subscription service concept for distributed application and determining the optimum k-value (re-use threshold).* |
|  | *Hypothesis 4: An anonymous credential system allows peers to identify their contributions to routing traffic in exchange for a credential that they can then use to originate traffic. Research is ongoing on configurations to ensure that peers contribute resources back to the network while preserving their anonymity. This allows fair resource utilization where peers both contribute and consume resources.* |

12. All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-3: Bitcoin Payment and Merchant Gateway**

**Project description:**

*Development of a Merchant Gateway with fast, secure and scalable Bitcoin transaction processes to enable merchants to accept and widely use Bitcoin.*

*Main activities:*

*- Creation of the world's first low fraud system that enables secure transactions of any party anywhere in the world instantaneously with another individual or merchant.*

*- Development of a method to transact within seconds and at a rate of over 10,000tps (and eventually 1,000,000tps).*

*- Development of a Simplified Payment Verification (SPV) system which allows proof of inclusion without needing the full contents of the block.*

*- A merchant gateway that has a permanent and verifiable record that cannot be altered.*

*- Researching varying local and international government regulations and international trading terms to allow new types of transactions that are contract based to be accepted in the international Bitcoin community.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073853

| Number | Description |
|--------|-------------|
| | *All experiments are in the set-up or early stages with no reportable results to date.* |

*Hypothesis 1: The existing Bitcoin network can scale to much higher transaction rates.*

*Research: sync lightweight clients to more powerful backbone nodes capable of scaling to millions of users and tens of thousands of transactions/second. Aim to handle 10 million plus connections/second.*

*Hypothesis 2: It is possible to build a reliable Bitcoin implementation that does not verify everything, but instead relies on either connecting to a trusted node, or puts its faith in high difficulty as a proxy for proof of validity.*

*Research: new protocols that provide variable degrees of trusts and human-free third party mediations at low transaction costs. E.g., clients connect to an arbitrary full node and download only the block headers. The level of difficulty required to obtain confidence that the remote node is not feeding fictional transactions depends on the threat model.*

*Hypotheses: (3a) Block headers buried sufficiently deep can be discarded after some time; (3b) it is possible to create a system that can connect to a random node whilst making the cost for an attacker to mine a block sequence containing a counterfeit transaction higher than the value to be obtained by defrauding the target.*

*Research: determining how deeply buried the block must be to manage the trade-off between confirmation time vs. cost of an attack.*

*Hypothesis 4: anonymous credentials can exist without a centralised certification authority (CA) acting as trusted issuer. Using this decentralised ledger and standard cryptographic primitives, it is possible to provide a proof of security for a basic anonymous credential system that allows users to make flexible identity assertions with strong privacy guarantees. Current certificates (SSL/TLS) are centralised and thus flawed since any loss of trust is fatal.*

*Research: Using Bitcoin's distributed, public, append-only ledger model at individual nodes to make assertions about identity in a fully anonymous fashion.*

13. All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-4: Bitcoin Banking (Super-Node Depository)**

**Project description:**

*Aim is to build a world-first Bitcoin based retail bank in Australia adapting current standard traditional banking software, methodologies and systems, but with the introduction of Bitcoins. Includes primary bank functions such as balance request; cash flow; funding; withdrawal; and tax reporting.*

*Hypothesis 1: A super-node depository can replace existing fractional reserve banking systems on a global basis with a lower level of fraud, corruption and loss as well as having the potential for far greater levels of efficiency in international trade.*

*Research: Ability for the Bank to provide traditional banking products such as loans and deposits, and services such as ATM,*

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                                                    DEF_00073854

| Number | Description |
|---|---|

*credit and debit cards. New Bitcoin versions need to satisfy various local and international regulations as well as Bitcoin-specific technical requirements (e.g., Bitcoin requires 8 decimal places with the potential to extend to 16 decimal places). We had partnered with external companies who could not provide a solution. We are researching solutions to these issues.*

*Hypothesis 2: a system can be created that is capable of securely storing Bitcoin keys without a centralised key store and only the owner can recover (except in cases of a legal order or an estate issue such as a death).*

*Research: Ability to eliminate or sufficiently minimise theft and duress. Example is a "fake" code that can make it look as if the transaction has occurred, but which can be tainted later (and still noted on the Blockchain). Must have a means to reverse transactions (this can be an escrow and block message that can only be reversed on pre-confirmed situations).*

*Hypothesis 3: A system can be created to achieve the fundamental requirements of any financial organization of any country, but currently unknown to Bitcoin. For example, automatically reporting tax and generating receipts (in a manner that cannot be lost). That is, the key holder can recreate all transactions without needing to go back to the merchant.*

*Associated research questions include:*

*- How to log and register a sufficient number of Bitcoin transactions and the IP addresses to report to financial  authorities in a manner that allows for user anonymity and crime reporting.*

*- Can an economically feasible, trustless peer-to-peer system be created that will allow for secure deposits where fraud by the bank/exchange operator is prevented?*

*- Is a Bitcoin Dealer Network Association book balancing between national dealers feasible for an international "bank"?*

*- Can existing Core Banking Technology be extended and Integrated into a distributed Blockchain? If so, which components can be reused and which will need to be created from scratch?*

14. All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: CORE-5: Secure Wallet**

**Project description:**

*This activity involves building a large-scale data warehouse that will support secured high-speed data transmissions and transformation activities. The study of various multi-layered crypto-graphical schemes is undertaken to provide a highly secure eWallet. The activity studies how to combine two or more encryption schemes under the project's proposed "multi-layered security schemes" (cascade encryption or multiple encryption) to provide highly secure eWallets. Testing is undertaken to find the right balance between computational performance and the level of security that the system requires as a feasible system to use in the commercial world. This involves the study of various multi-layered crypto-graphical schemes to identify the optimum trade-off in terms of speed and security where the strength of security will be measured by effective key size and resistance to*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073855

| Number | Description |
|---|---|
| | *crypto-analytic attacks. To find the optimal point of the design, heuristic algorithms are employed.* |
| | *All experiments are in the set-up or early stages with no reportable results to date.* |
| | *Hypothesis 1: It is not required for most fully validating nodes to store the entire chain, only the size of the current unspent output size plus some additional data that is needed to handle re-orgs.* |
| | *Research: currently at very high transaction rates each block can be over a gigabyte in size.* |
| | *Prove the ability to delete unnecessary data about transactions that are fully spent. We seek to develop a block system where the size of the unspent output set is less than 50,000MB, which is small enough to easily fit in RAM in a distributed system.* |
| | *Hypothesis 2: Only a small number of archival nodes need to store the full chain going back to the genesis block. These nodes can be used to bootstrap new fully validating nodes from scratch but are otherwise unnecessary.* |
| | *Research: creation of a format and block structure such that the set will always fit in memory on dedicated server class machines.* |
| | *Hypothesis 3: The creation of a custom verifier tuned for secp256k1 that can go beyond 20,000 signature verifications per second can be developed along the lines of the OpenSSL solution.* |
| | *Research: This proposal requires careful review by professional cryptographers as confidence in the scheme will be a part of the project being successful.* |
| | *Hypothesis 4: It is possible to create a distributed wallet with escrow and considerations for Estate planning.* |
| | *Associated research questions:* |
| | *How to ensure the wallet is able to:* |
| | *- Block undesirable transactions.* |
| | *- Recompute blocks without selected transactions (reversals) and how can this be defended.* |
| | *- Link a user to a set of addresses and keys in a secure manner.* |
| | *- Allow a wallet be created where names are not linkable (no intermediaries between a payee and payer).* |
| | *- Securely hold multiple keys for separate parties who can all access without interacting with the other.* |
| 15. | All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |
| | **PROJECT TITLE: CORE-6: P2P Exchange** |
| | **Project description:** |
| | *Bitcoin-based P2P exchange capable of handling large concurrent users providing secure transactions and traceability. A* |

ATTORNEY'S EYES ONLY

DEF_00073856

| Number | Description |
|---|---|
| | simplified contracting system allows any entity to exchange anything with any other using a set of embedded contractual conditions and incorporating a resolution/penalty process. Involves experimentation with novel Bitcoin-based commodities and non-financial instruments. |

*Hypothesis 1: new Blockchain techniques allow the continued huge growth of the Blockchain without compromising speed or security.*

*Research:*

*- Isolated blockchains (smaller size) for each virtual exchange and protocols to regularly synchronise them with the global block.*

*- Filtering techniques to send only relevant transactions to nodes that have registered for the service.*

*- Validation over mini-blockchain or trimmed Merkle tree to speed up the transaction time.*

*- Analysis and testing of algorithms and cryptographic functionalities for throughput, bandwidth efficiency, scalability and security.*

*Hypothesis 2: P2P Exchange eliminates the need for intermediaries in complex financial transactions. Includes trades in traditional securities and derivatives; new Bitcoin-denominated instruments; and other instruments such as title deeds and letters of credit.*

*Research involves:*

*- Development of derivatives (such as futures, forwards, options and swaps) and securities denominated purely in Bitcoins using 'smart contracts' saved into the Blockchain.*

*- New protocols that operate securely despite lack of regulation and without external intervention. (Currently, Bitcoin derivatives are unlikely to be subject to full regulation under the Commodities and Exchange Act).*

*Associated research issues:*

*1. How to integrate Bitcoin derivatives into the protocol as smart contracts.*

*2. Effective protocols for algorithmic trading and hedging strategies.*

*3. What is the effect on volatility (e.g. for Bitcoin Margin Trading)?*

*4. Can Bitcoin-denominated instruments be used in Commodities and Futures trading without call to Fiat money? Can they be linked into the Blockchain without losing privacy?*

*5. How to implement automated functions such as dividend payments; shareholder votes; tax and other reporting; etc.*

*Hypothesis 3: Bitcoins could be used to represent something besides money. It is possible to assign a single Satoshi to any type of token to represent a house, a car, a share of stock, a futures contract, etc. Thus the Blockchain becomes a completely decentralized and perfectly reconciled property registry and verification mechanism.*

*Research: letters of credit as a specific example of this usage. Letters of credit are mostly used in international goods*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073857

| Number | Description |
|---|---|
| | *transactions, where trust between contracting parties is relatively low. A system is being trialled using Bitcoin as a substitute for the third party verification function of letters of credit. This will confer substantial cost savings to merchants.* |

16.  All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: FL7 Pi Calculus: Project**

**Project description:**

*Coin-Exch Pty Ltd's experimental activities are to create knowledge in the form of solution improvements that lead to the development and creation of a new product. These experimental activities apply the scientific method to address a knowledge gap. At present, there is no known application of a Blockchain based system to implement a Core Banking System (CBS) and several commercial organisations have failed in even the basic accounting of Bitcoin let alone a complete integration of the Bitcoin system into a banking infrastructure. World leading banking software vendors and providers of core bank products, such as Temenos T24 and RUBIK, have mistakenly assumed that Bitcoin can be treated as a 'normal' currency not taking into account the fundamental requirement to support Bitcoin fields (> 8 decimal places) nor the need to account for an extended ledger that can be distributed (not simply a balance). Current banking product systems are not designed and/or prepared for Bitcoins. Coin-Exch was unfortunate to discover the evident limitation by engaging with RUBIK/Temenos T24 to setup a proof-of-concept project with the aim of supporting Bitcoin in their current suite of banking products. This project was a complete failure and was terminated soon after when the inability of the vendor to provide the base system was established. Component-based commercial banks' core system or Core Banking System (CBS) refers to the design and implementation of CBS using the computer system components. Coin-Exch is using a series of experiments in order to investigate and research two primary parts of the CBS in order to be able to integrate and create a new form of technology:*

*1. the Integrated Financial Enterprise (IFE), or rather, the CBS framework for component-based application services, and*

*2. Financial Level 7(FL7), or rather, the service framework of the application layer language.*

*The paper defines the FL7 language elements we seek to explore, descriptive methods and formal specification by means of mapping the components from the service layer onto the connectors from the semantic layer as a response to the AusIndustry request for information. Various business requirements within and between banks and requirements of business process reengineering are met by adjusting the connector glue parts on the semantic layer. Finally, Coin-Exch proposes to demonstrate that the FL7 π-calculus is a feasible foundation for exploring and researching the use of Blockchain technologies in creating a distributed Blockchain based core banking solution and to thus implement this system.*

*ANZSRC code: Information, computing and communication services; Computer software.*

17.  All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073858

| Number | Description |
|---|---|

including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core FL7Pi Calculus**

**Project description:**

*It is our thesis that the framework which intends to meet business requirements should be divided into the requirement layer, the semantic layer and the component-based service layer [2,3,4]. The analysis and solutions from business requirements to system components are semantic mapping processes of gradual decomposition of the demands and these mappings are completed within the semantic layer. For this purpose, we define both the Integrated Financial Enterprise (IFE) services framework [4] and the application layer language FL7 (Financial Level Seven) describing the IFE. This research will address and study several some key points in the design and implementation of CBS by using system components mapping within semantic layer of IFE and will demonstrates the approach using FL7 π-calculus.*

*In simple way, Core Banking has traditionally been involved with doing all banking operations of branches and head office by connecting to a central computer kept at data centre. With technology advancement particularly in "Tele Communication" and "Wireless Communication" it has become possible to send data from one computer to another computer. Taking advantage of this it was thought fit to connect branch computers to a single computer at data centre and have all transactions of all branches recorded live at one place. This concept is "CORE BANKING". At the root level, our research seeks to fundamentally alter the manner in which banking is conducted and to distribute the core banking function in a Peer-to-Peer (P2P) manner where the public Blockchain is used as a distribution and ledger point.*

*Key Hypothesis and propositions being tested*

*Coin-Exch has purchased a set of software and statistical packages as a baseline test. In order to scientifically test a hypothesis, it is necessary to have both the null position (null hypothesis or HO) which is being investigated as well as the alternative hypothesis (Ha) that is being used to test the research proposition in an automated manner incorporating self-derived updates where the system is defined to compare and evolve against a pre-existing base (in this instance, iMal). Coin-Exch is seeking to test not only the hypothesis that Blockchain technology can be used as a ledger system in a Core Bank software solution, but that this distributed and decentralised system will be:*

*• More resilient to attacks and defend better against cyber-attacks including DDoS*

*• Less susceptible to state and criminal depredation (such as the seizure of bank accounts seen in Cypress)*

*• Faster in settlement (esp. international settlements)*

*• Able to operate at lower costs.*

***Supporting - Machine Language Coding:*** *We will develop a machine translation system using derivational morphological rules recognize and analyze words that are not found in its source lexicons, and generate default transfers for these unlisted words. Unfound words with no inflectional or derivational affixes will be initially incorporated using by default nouns. These rules are now*

2649672-v4A\SYDDMS                                45                                IP Assignment Deed

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073859

| Number | Description |
|---|---|

*expanded to provide lexical coverage of a particular set of words created on the fly in an analysis of English speaking economic and banking forums (such as Quoria). What characterizes the approach is the generation of additional default parts of speech, and the use of morphological, semantic, and syntactic features from both source and target lexicons for analysis and transfer. A built-in rule-based strategy to handle language borrowing and code-mixing allows for the recognition of words with variable and unpredictable frequency of occurrence, which would remain otherwise unfound, thus affecting the accuracy of parsing and the quality of translation output. This foundation will be used in the development of a self learning machine translation system.*

18.    All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Bitcoin Ex: Bitcoin Exchange Project**

**Project description:**

*We endeavour to build a risk contained alternative currency trading platform that conforms to AML (Anti-Money Laundering) and APRA provisions and that allows people to trade Bitcoins in a rate hedged risk controlled environment. We will design and implement computer simulations based on mathematical models as a research tool for studying the behaviour of physical systems including currency exchange in a cybercrime prone environment. In order to use a mathematical model, it is often necessary to adjust some of its parameters such that the simulation output best matches some given experimental data obtained from physical experiments, a task often called parameter estimation. In addition, optimal experimental design methodology, taking into account certain sensitivities of the model, can be used to maximize the information gained from the physical experiments.*

*This project will simulate a number of trading systems and experiment with designs for resilience against currency attacks and risk control in a manner that can lead to a hedged derivative measure attached to an alternative currency transaction. The goal is to create a means to trade in normal "bricks and mortar" stores within Australia using alternative currency (Bitcoin) from a cloud based wallet in a manner that is both secure as well as protected from the existing issues with Bitcoin (such as a loss of wallet leading to a loss of currency and the potential threat of volatility posed by currency trading).*

19.    All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - payment system**

**Project description:**

*The aim of this core activity is to create a system that integrates seamlessly into the existing payment systems and anti-money laundering (AML) based banking infrastructure while providing audit trails and forensic mapping to the Bitcoin exchange platform. An extension to payment systems (such as Paywave/PayPass) is under development. The improved technology will support the*

2649672-v4A\SYDDMS                                    46                          IP Assignment Deed

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073860

| Number | Description |
|---|---|
| | *scripted integration of the Bitcoin currency. In effect, the bank becomes a centralised depository with social networking capacities to enable peer to peer transactions. Rather than having traditional remittance markets (e.g. Filipino national working in Saudi Arabia sending money back to the Philippines – transferring between currencies) it is all done in Bitcoin – so no need for foreign exchange transactions. The facility will use a multikey wallet configurable for any combination of 'm of n' signatures. For example, a '1 of 2 (or more)' structure in which Bob puts an amount into a shared family wallet and Alice can immediately access it (as only one of the signatures is necessary). In other cases we might have 2 of 3 signatures (for greater control) – or any other combination according to the requirements of the signatories. Of course we have attributions so we have an audit trail of who did what action (i.e. deposit or withdrawal) and when. In principle this is already technically achievable within the Blockchain protocol – i.e. without requiring fundamental changes to the protocol. The challenge is to design and test the superstructure that will interface seamlessly with the Blockchain to enable the variety of transactions envisioned. Research includes investigating transaction times required across different networks to be securely recorded in the Blockchain. One important issue under investigation is that micro-transactions might take much longer than average because of the future inherent disincentive to miners to validate low value transactions. Micro-transactions are a key feature of our proposed system (both because of its democratising effect across poorer communities as well as the need to use token amounts for some types of smart contracts). Trials are continuing using the Supercomputer. Again, due to constraints on staff and budget progress has been limited but expected to ramp up later in the year as these constraints are lifted.* |

20. All Intellectual Property Rights owned by Coin-Exch that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Virtual Currency Economy (Virtual Payment)**

**Project description:**

*The aim is to create a virtual currency economy allowing virtual currency such as Bitcoin for mainstream financial activities.*

*Technical objective is to research and develop virtual currency components in order to facility a future and stable virtual currency economy. The components are: virtual payment, Bitcoin market and exchange; Bitcoin payment and merchant gateway; Bitcoin banking; Secure Wallet and P2P Exchange. For example, an early prototype of the virtual payment is "Pay Groove". Google Wallet, Bitcoin and PayPass have been linked to create a means to allow small payments as if they are cash [youtube link provided]. The golove has an ability to process hand gestures. We used this function as the means to authorise the transaction. Swipe your palm over the payment pad and touch your fingers together and you link to your Google Wallet and payment occurs. The end goal of virtual payment is the creation of a completely virtualised end user payment system based on the use of NFC comms.*

*ANZSRC code: Economics; Applied economics.*

21. The Works comprised in the body of work described as: System and method for managing lending in a non-debt system.

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                                                    DEF_00073861

| Number | Description |
|---|---|
| 22. | The Works comprised in the body of work described as: Peer to peer exchange - (a) Exchange model. |
| 23. | The Works comprised in the body of work described as: Bitcoin banking system. |
| 24. | The Works comprised in the body of work described as: Peer to peer exchange - (d) Automated self-enforcing derivatives. |
| 25. | The Works comprised in the body of work described as: Peer to peer exchange - (e) Collateralized debt obligation. |
| 26. | The Works comprised in the body of work described as: Method for coordinating smart property--guaranteed loans utilising the blockchain. |
| 27. | The Works comprised in the body of work described as: Peer to peer exchange - (b) Mobile ATM model. |
| 28. | The Works comprised in the body of work described as: Peer to peer exchange - (c) Insurance markets. |
| 29. | The Works comprised in the body of work described as: Method and system for managing spending through wallet allocation. |
| 30. | The Works comprised in the body of work described as: Chargeback and escrow system based on bitcoin. |
| 31. | The Works comprised in the body of work described as: Automated P2P cryptocurrency loan risk assessment system and method. |
| 32. | The Works comprised in the body of work described as: Systems and methods for credit worthiness scoring and non-debt and cryptocurrency loan facilitation. |
| 33. | The Works comprised in the body of work described as: Cryptocurrency Accounting allocation accuracy methodology. |
| 34. | The Works comprised in the body of work described as: Intercompany loan management system that utilises the Blockchain. |
| 35. | The Works comprised in the body of work described as: Electronic P2P Margin Management System. |
| 36. | The Works comprised in the body of work described as: System, Method and computer program for operating web-based collective e-money lending/borrowing circles between members and non-members of social networking sites and DASOs. |
| 37. | The Works comprised in the body of work described as: System and method for implementing a revenue recognition model based on hashed information stored in Blockchain transactions. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                      DEF_00073862

| Number | Description |
|--------|-------------|
| 38. | The Works comprised in the body of work described as: General ledger (gl) journal delete/accounting line reversal blockchain service. |
| 39. | The Works comprised in the body of work described as: Pay yourself first with auto bill pay system and method for blockchain accounting and budget system. |
| 40. | The Works comprised in the body of work described as: Pay yourself first with revenue generation as a system to budget against the blockchain. |
| 41. | The Works comprised in the body of work described as: Blockchain integrated Budget management system and method. |
| 42. | The Works comprised in the body of work described as: Extensible object oriented framework for blockchain integrated general ledger. |
| 43. | The Works comprised in the body of work described as: Insurance monitoring system. |
| 44. | The Works comprised in the body of work described as: Online wallet User interface for processing requests for approval in company accounts. |
| 45. | The Works comprised in the body of work described as: Apparatus and method for dynamically auditing blockchain accounts to produce metadata. |
| 46. | The Works comprised in the body of work described as: Cryptocurrency-implemented method and system for reading trenasactions posted into the blockchain and posting journal entries to general ledger. |
| 47. | The Works comprised in the body of work described as: An authentication system based on the use of cryptocurrency wallets |
| 48. | The Works comprised in the body of work described as: Blockchain integrated revenue management systems and methods with re-rating and rebilling. |
| 49. | The Works comprised in the body of work described as: A blockchain and crypotocurrency Gift card assembly and method. |
| 50. | The Works comprised in the body of work described as: General ledger chart of accounts combination editing request response. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073863

## Schedule 6

### Integyrz

| Number | Description |
| --- | --- |
| 1. | All Intellectual Property Rights owned by Integyrz in its eLearning Training System. |
| 2. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integryz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

**MOOC (Massive Open Online Course) 1.1**. Including:

- MOOC 1.0
- Ease-of-use
- Seeded Content
- Product:  Indie (individual educators/learners)
- Usability feature
- Support FAQ
- Basic Rating

Exclusions:

- No Virtual Classroom
- No Interaction data capture except quiz
- No multimedia content creation tool

| | |
| --- | --- |
| 3. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integryz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

**SuperMOOC 1.0**. Including:

- Indie Presentation layer
- ADP 1:  static model
- Basic delivery odes (videos; slides and other documents; links)
- Virtual classroom 1.0
- Basic stimulation
- Quizzes

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073864

| Number | Description |
|--------|-------------|
| 4. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integryz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br><br>**SuperMOOC 2.0**. Including:<br><br>• Corp Presentation layer<br>• ADP 2:  Q-Drive<br>• Basic Gamified module<br>• Twitter module<br>• Second Life<br>• Flashcard maker<br>• Payment System incl. Bitcoin |
| 5. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integryz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br><br>**SuperMOOC 3.0**. Including:<br><br>• Beta release (university)<br>• ADP 3:  Dynamic<br>• Biometric data v1<br>• Customer support live chat<br>• Algodoo<br>• Learner Authentication (Basic) |
| 6. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integryz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br><br>**LMS 1 (plug in)**. Including:<br><br>• LMS1 Beta release (university)<br>• Moodle/Blackboard integration<br>• Biometric data v2<br>• Computable Document Format<br>• Augmented Reality<br>• Interactive Graphic Narrative |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073865

| Number | Description |
|---|---|
| | • Learner Authentication (Advanced) |
| 7. | All Intellectual Property Rights owned by Integyrz that were assigned by Interconnected Research to Integyrz under the R&D Services Agreement between Interconnected Research and Integyrz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

**LMS 2 (full function)**. Including:

- Supersedes Blackboard/Moodle
- Biometric data v3
- Big Data analysis
- Multiple Languages
- Universal Design
- Enhanced multimedia integration

| | |
|---|---|
| 8. | All Intellectual Property Rights owned by Integyrz that were assigned by Pholus to Integyrz under the Consultancy Agreement between Pholus and Integyrz. |
| 9. | All Intellectual Property Rights owned by Integyrz that were assigned by Panopticrypt to Integyrz under the Consultancy Agreement between Panopticrypt and Integyrz. |
| 10. | All Intellectual Property Rights owned by Integyrz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**PROJECT TITLE:** **Adaptive Delivery Platform - Basic Platform**

**Project description**:

*Current online platforms such as MOOCs (Massive Open Online Courses) use a limited range of formats, mostly video-recorded lectures and slides. Our platform will provide the ability to deliver content using a great range of formats. For example, we will include virtual 3D objects; virtual classrooms; discussion boards; simulations; gamified modules; social media based content; immersive animations; physics sandboxes, 3rd party utilities (e.g. Second Life, Microsoft Lab, SoundCloud, etc.) and many other emerging technologies. This variety provides for greater student engagement and is pedagogically more effective. The same educational content can and will be formatted into multiple delivery modes, enabling students to engage with the content using the modes most suitable to their individual needs. This is the essence of the Adaptive Delivery Platform.*

*The Integyrz platform will enable Adaptive Delivery. This innovation allows the system to automatically adjust the delivery of content to that which best suits the individual learner or cohort. This includes (i) adjusting the pace of delivery; (ii) adjusting the density of content according to the learner's level of knowledge; and especially (iii) adjusting the mode of delivery – i.e.,*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073866

| Number | Description |
| --- | --- |

whichever format(s) best match the learners' Online Learning Style (OLS) profile. The system is able to determine the learners' OLS via a variety of 'interaction data' such as the results of progress quizzes and biometric data (for example, keyboard stroke patters, click profiles, eye-tracking, facial expression recognition, etc). The platform represents state-of-the-art research into learning styles for online learning and is unmatched in the market. Using a continuous feedback process each learner's learning parameters (OLS, pace and knowledge level) will be kept up to date in real time. This will allow dynamic content delivery adjustment constantly matched to the individual learner's needs.

Integyrz's core platform will be designed to support several products targeting different potential markets. Presentation layers and special purpose plug-ins will enable products suitable for MOOC providers; tertiary education providers (for example, a Learning Management System as commonly used in universities); stand-alone self-paced training (as is commonly used by large corporations and government departments for staff training) and individuals or small businesses (for example, makers of 'How To' training modules). The platform will be designed for usability on any internet-enabled device (i.e. including smartphones and tablets) and will support Universal Design (for disabled learners) and multiple languages.

**Supporting - data centre and systems**

In order to support the proposed research activities with access to world-class computing assets, we will first acquire state-of-the-art cluster computing capacity with a nominal speed of 1,000-2,000 Teraflops. The central workhorse of the project will be one of the fastest computers for unclassified research in the world performing at more than 1,000 Teraflops when it goes live.

We are proposing to test and create a quasi-opportunistic supercomputing platform using cluster cores. In this, distributed computing solution will be developed where the "super virtual computer" of a large number of networked geographically disperse computers performs huge processing power demanding computing tasks. Using quasi-opportunistic supercomputing, we aim to deliver a higher quality of service than opportunistic grid computing by achieving more control over the assignment of tasks to distributed resources and the use of intelligence about the availability and reliability of individual systems within the supercomputing network.

The cluster shall consist of commercially available virtualised servers as nodes; with a high-speed interconnect for high-bandwidth, low-latency communication between the nodes, as well as Ethernet for administrative communication. The cluster will be designed to leverage multi-socket/multi-core node technologies to optimize system performance, switch port count and interconnect bandwidth utilization.

A scalable administration process will be provided to ensure the system can be rebooted in 30 minutes or less and that the overall uptime for at least 98% or all cores remains at 99.999999%. The project requirement is that the cluster performance, as measured in Tflops/s (10e12 floating point operations per second), be as high as achievable.

11.     All Intellectual Property Rights owned by Integyrz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                           DEF_00073867

| Number | Description |
|--------|-------------|
|        | **PROJECT TITLE:** Online Learning Style model |

**Project description**:

> *Literature research on most valid learning styles based on empirical evidence.*
>
> *Design of hypothesis-based online-specific learning style model (The Butterfly Model) as described further in the publication by Savanah (2014) entitled "Online Learning Styles - THE BUTTERFLY MODEL".*
>
> *Design initial 'questionnaire' (online activities) to determine learner's initial OLS profile. Design of hypothesis-based pedagogical profile for delivery modes and creation of generic profiles for each of 17 modes of delivery (Video; podcast; Second Life; Physics Sandbox; simulation; social media; virtual 3D; CDF; documents; interactive and non-interactive graphic narrative; virtual classroom; online discussion board; digital flashcard; gamified module; immersive animation; quiz & Augmented Reality). Creation of matching algorithm to map OLS with Pedagogical profile (to optimise mode selection).*

12.   All Intellectual Property Rights owned by Integyrz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE**: **Product Offerings Research and Development**

**Project description**:

> *(1) SuperMOOC*
>
> *Design presentation layer for MOOC offering (target market: all educational institutions offering open courses). Admin functions; certification (optional); authentication options.*
>
> *(2) Indie*
>
> *Design presentation layer for Indie offering (target market: individuals and small businesses). Self-service module uploads; advertisement management.*
>
> *(3) Corporate*
>
> *Design presentation layer for Corporate offering (target market: corporations and government departments). Self-paced training modules with timing and scoring functions; authentication; certification.*
>
> *(4) University Suite (Layered offerings)*
>
> *Design presentation layer for University Suite (target market: universities and other educational institutions from primary to tertiary that offer courses to formally enrolled students).*
>
> *(a) Hosting services. Offline hosting of content enabling one-way delivery of all content formats (i.e. presentation only, no interaction data capture). Enable soft-branding (i.e. institution's logo).*
>
> *(b) Plug-in. Back-end API for integration of core platform with existing LMSs such as Moodle or Blackboard). Enables full*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073868

| Number | Description |
|--------|-------------|
|        | |

*functionality – Adaptive Delivery and hosting of all content formats with two way data transfer (i.e. enable feedback of interaction data such as scores, etc).*

*(c) Learning Management System. I.e. competition for Moodle and Blackboard. Design customisable APIs to integrate the core platform with university's core systems (i.e. student records, syllabus, etc). Full core functionality is hosted at university site.*

13.   All Intellectual Property Rights owned by Integyrz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Design research partnership program**

**Project description**:

*For collaboration with NSW Universities, primarily Macquarie and Charles Sturt.*

*High level design of research programs to test Integyrz hypotheses. Research questions include:*

- *Are there new Learning Styles specific to online learning?*
- *How do online content formats map onto Online Learning Styles? (i.e. validate the Butterfly Model).*
- *How to determine an individual's online Learning Style?*
- *How to scale up Social Learning in an online environment?*
- *How to match formats to discipline areas and learning outcomes?*
- *How to use AI to grade written work.*

14.   All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and C01N (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz).

15.   All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Cloudcroft (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz).

16.   All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Coin-Exch (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz).

17.   All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Daso (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz).

18.   All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Interconnected Research (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073869

| Number | Description |
|--------|-------------|
|        | Integyrz). |
| 19. | All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Panopticrypt (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz). |
| 20. | All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Pholus (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz). |
| 21. | All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Zuhl (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz). |
| 22. | All Intellectual Property Rights owned by Integyrz under the R&D Services Agreement between Integyrz and Denariuz (being all such Intellectual Property Rights in Integyrz's methodologies, models and other confidential or proprietary information of Integyrz). |
| 23. | All Intellectual Property Rights owned by Integyrz under the Consultancy Agreement between Integyrz and Misfit Games (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Integyrz and Misfit Games). |
| 24. | All Intellectual Property Rights owned by Integyrz under the Consultancy Agreement between Integyrz and Chaos (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Integyrz and Chaos). |
| 25. | All Intellectual Property Rights owned by Integyrz under the Consultancy Agreement between Integyrz and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Integyrz and Head Vendor Co). |
| 26. | The Works comprised in the body of work described as: 20. eLearning. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073870

## Schedule 7

**Pholus**

| Number | Description |
|--------|-------------|
| 1. | All Intellectual Property Rights owned by Pholus in its IT support, IPSEC and NAP systems research. |
| 2. | All Intellectual Property Rights owned by Pholus that were assigned by Interconnected Research to Pholus under the R&D Services Agreement between Interconnected Research and Pholus including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

- IT infrastructure proof-of-concept platform;
- IT infrastructure;
- Top 500 System (Tulip);
- Hyper Croft Mark I (5.8 PB);
- Hyper Croft Mark II (7.2 PB);
- Hyper Croft Mark III (10.2 PB);
- hor Super Computer; and
- Secure Wallet (ref. Refer to 20140622 Coin-Exch Pty Ltd Request for additional Information v2.0 as provided to AusIndustry)

| | |
|--------|-------------|
| 3. | All Intellectual Property Rights owned by Pholus that were assigned by Intergyrz to Pholus under the R&D Services Agreement between Intergyrz and Pholus including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects: |

- IT infrastructure proof-of-concept platform;
- IT infrastructure;
- Top 500 System (Tulip);
- Hyper Croft Mark I (5.8 PB);
- Hyper Croft Mark II (7.2 PB);
- Hyper Croft Mark III (10.2 PB);
- hor Super Computer; and
- Secure Wallet (ref. Refer to 20140622 Coin-Exch Pty Ltd Request for additional Information v2.0 as provided to AusIndustry)

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073871

| Number | Description |
|--------|-------------|
| 4. | All Intellectual Property Rights owned by Pholus that were assigned by Panopticrypt to Pholus under the Consultancy Agreement between Pholus and Panopticrypt. |
| 5. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and C01N (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and C01N). |
| 6. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Cloudcroft (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Cloudcroft). |
| 7. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Coin-Exch (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Coin-Exch). |
| 8. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Daso (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Daso). |
| 9. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Intergyrz (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Intergyrz). |
| 10. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Interconnected Research (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Interconnected Research). |
| 11. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Panopticrypt (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Panopticrypt). |
| 12. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Zuhl (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Zuhl). |
| 13. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Denariuz (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073872

| Number | Description |
|--------|-------------|
| | between Pholus and Denariuz). |
| 14. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Misfit Games (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Misfit Games). |
| 15. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Chaos (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Chaos). |
| 16. | All Intellectual Property Rights owned by Pholus under the Consultancy Agreement between Pholus and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Pholus and Head Vendor Co). |
| 17. | All Intellectual Property Rights owned by Pholus that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:<br><br>**PROJECT TITLE: 201401: Project - Network Design and Services Research**<br><br>**Project description**:<br><br>*The work carried out within  "Network Design and Services" research aims at significantly contributing to the design and delivery of the next generation converged network and service infrastructure supporting a wide variety of applications, in the context of which optical networks and network services play a key role.  We aim to create secure IPv6 based systems and converged networks that are automatically scalable.*<br><br>*Main topics of focus include transparency, sustainable scaling, dependability and cost/resource efficiency, taking into consideration the increasing heterogeneity in technologies and devices.*<br><br>*One of the practical situations information technology modeling needs to achieve is in developing methods for leveraging computer-aided dispatch databases in emergency services systems to improve decision making at the tactical (e.g., station location), strategic (e.g., staffing), and operational (e.g., ambulance redeployment) levels.*<br><br>*We aim to study networks to build a network that supports specified communication patterns at the least possible cost. This will allow us to better design networks with self-interested users, trust and reputation in online interactions, fair and robust protocol design, and wireless networks and sensor nets.*<br><br>*The research involves a benchmarking program aimed at measuring the impact of applying our encryption technology to hard drives and virtual hard drives as a replacement of existing, less secure technologies. The impact was measured in terms of CPU usage required for the encryption/decryption steps during several processes: initiation (i.e. set up of encryption keys including* |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073873

| Number | Description |
|--------|-------------|

*key recovery protocols), disk reading and disk writing. The encryption technology we have researched involves a process for generating multiple shared secrets without transmission and is currently undergoing patent application.*

*The above research activities have all been undertaken on the Tulip Trading Supercomputer leased for the purpose of the Pholus research program.*

*ANZSRC code: Information, computing and communication services; distributed computing.*

*Dr. Craig Wright undertook the Benchmark Testing experiments, and conducted research based on the paper authored by Craig Wright dated 10 February 2013 entitled "Network Implementation Project".*

*R&D Engineers outsourced from Hotwire undertook the following activities:*

*1. Prototype a proof-of-concept platform for the IT infrastructure; and*

*2. Design, develop and implement a scalable and cost efficient based IPv6 IT Network Infrastructure.*

18.   All Intellectual Property Rights owned by Pholus that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Self Scaling Hyper V Domain system**

**Project description**:

*The system will use self tuning algorithms to predict and deploy systems as needed in a efficient manner.*

19.   All Intellectual Property Rights owned by Pholus that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Interdependencies among Critical Infrastructures**

**Project description**:

*We seek to model Interdependencies among Critical Infrastructures, both inside the ICT domain and between ICT0 and other sectors(e.g. Oil & Gas and Finance), are complex to be understood. Critical Infrastructures risk always changing due to new threats, interdependencies and possible usage scenarios. The aim of this project is to define and develop a Methodology and Tools for a simulation based Risk Assessment of Critical Infrastructures interdependencies and contingency plans. Two kinds of tools are of direct concern:*

*a the Framework modelling and*

*b. the Simulation & Risk Assessment environment.*

*The Framework provides instruments to model interdependencies among Critical Infrastructures, services and contingency plans using a common taxonomy. The Simulation & Risk Assessment environment allows the user to simulate disasters and threats, to*

ATTORNEY'S EYES ONLY                                                                              DEF_00073874

| Number | Description |
|--------|-------------|
|        |             |

*evaluate the risk using objective metrics and to analyze the impact of an ICT contingency plan to other interdependent Critical Infrastructures. Moreover the Methodology and the tools will support the user to evaluate the efficiency of the ICT emergency process, such as restoration and reconfiguration procedures, band to optimize interdependent contingency plans in order to enhance the availability and robustness of ICT networks.*

*A set of contingency plans will be analysed and evaluated in two complex scenarios: The first scenario will consider ICT intra-domain interdependencies. The second scenario will take into account cross-sector interdependencies (e.g. between ICT and Oil & Gas sector, or between ICT and Finance sector).*

20. All Intellectual Property Rights owned by Pholus that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Supporting - Virtualised Modelling system**

**Project description**:

*A platform for the development and testing of the models will be deployed using a NAP based distributed database.*

21. All Intellectual Property Rights owned by Pholus that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - NAP Domain tests**

**Project description**:

*We seek to tests the deployment of a distributed automatically scaling HyperV based network that goes through several stages enrolment. These are:*

*1. Policy Validation: System health validator (SHV) servers first check the "health" of client systems that are requesting access to the secure domain. Basically, this stage checks that the client is compliant with the policy used and enforced within the organisation.*

*A NAP health policy server software counterpart to a system health agent (SHA). An SHV verifies the statement of health (SoH) made by its corresponding SHA.*

*2. NAP enforcement and network restriction: These systems limit network access. They act as go-between's to the secure network for non-compliant servers and hosts and allow some limited but controlled access to the secure zone.*

*3. Remediation: Non-compliant hosts can be placed into quarantine and forced to have patches, signature updates and more applied.*

*4. Ongoing monitoring and auditing: A health certificate does not last forever and can also be revoked. If a system is seen to become non-compliant, it can be isolated from the secure network.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073875

| Number | Description |
|--------|-------------|
| | *This network will scale to the use and deploy and report automatically.* |
| 22. | The Works comprised in the body of work described as: Universal P2P ledger. |
| 23. | The Works comprised in the body of work described as: Service provisioning – Pseduonomous. |
| 24. | The Works comprised in the body of work described as: Blockchain-based resource tracking. |
| 25. | The Works comprised in the body of work described as: Online distributed ledger. |
| 26. | The Works comprised in the body of work described as: A method to provide Ad-hoc updates to source transactions against the blockchain. |
| 27. | The Works comprised in the body of work described as: Automated 3d fabrication system. |
| 28. | The Works comprised in the body of work described as: A method to efficently allocate connections in a Gossip protocol network. |
| 29. | The Works comprised in the body of work described as: A method to securely distribute keys and pins for online wallets. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073876

## Schedule 8

### Cloudcroft

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by Cloudcroft in its reactive and preemptive security systems. |
| 2. | All Intellectual Property Rights owned by Cloudcroft that were assigned by Interconnected Research to Cloudcroft under the R&D Services Agreement between Interconnected Research and Cloudcroft including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• Cloudcroft Commercialisation (WEB Company Profile, marketing campaigns);<br>• Hyper Croft Mark (5.8 PB) Commercialisation;<br>• Exascale Monitoring Tool;<br>• Hyper Croft Mark II (7.2 PB) Commercialisation; and<br>• Hyper Croft Mark III (10.2 PB) Commercialisation. |
| 3. | All Intellectual Property Rights owned by Cloudcroft that were assigned by Intergyrz to Cloudcroft under the R&D Services Agreement between Intergyrz and Cloudcroft including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• Cloudcroft Commercialisation (WEB Company Profile, marketing campaigns);<br>• Hyper Croft Mark (5.8 PB) Commercialisation;<br>• Exascale Monitoring Tool;<br>• Hyper Croft Mark II (7.2 PB) Commercialisation; and<br>• Hyper Croft Mark III (10.2 PB) Commercialisation. |
| 4. | All Intellectual Property Rights owned by Cloudcroft that were assigned by Pholus to Cloudcroft under the Consultancy Agreement between Pholus and Cloudcroft. |
| 5. | All Intellectual Property Rights owned by Cloudcroft that were assigned by Panopticrypt to Cloudcroft under the Consultancy Agreement between Panopticrypt and Cloudcroft. |
| 6. | All Intellectual Property Rights owned by Cloudcroft that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073877

| Number | Description |
|--------|-------------|
| | **PROJECT TITLE: Reactive and Pre-emptive Security System based on choice theory**: |

**Project description**:

*The objective is to research and develop an alternative to existing attacker preventive systems by re-directing traffic instead of blocking it. We will seek to create a Virtual Universe tailored specifically for the attacker's profile without disrupting the attack currently in progress. For example, an attacker may be in the process of an illegal credit card transaction and the preventive system will switch the attacker to a Virtual Universe. The attacker will then be able to continue the illegal transaction but in a controlled environment with no harm to the credit card holder or financial institution.*

*The Virtual Universe will not only provide a "fake" environment for the attacker, but we aim to also analyse the attackers 'behaviour, profile, systems, algorithms and methodologies to prevent future attacks. The objective is for the attacker to continue his attack as long as possible allowing profiling and scoring of the attacker's strengths and weaknesses.*

*Current preventative systems  block the attacker (in some cases disrupting systems being attacked) but does not stop future attacks. Current solutions are insufficient (no information gathering about attackers and with limited or no data sharing). The cost to scan and attack systems is insignificant and will not be prevent future attacks.*

*We are seeking to develop a reactive and pre-emptive security system to prevent attacks by cyber criminals by redirecting traffic instead of blocking it, thus switching the attacker to a Virtual Universe, and by gathering and sharing information about attackers. Most importantly by making it a very time-consuming and a costly affair for attackers.*

*The Reactive and Pre-emptive Security System will 'welcome' the attacker, but in a controlled environment, without disrupting the system being attacked.*

*We are now working on creating a system, method, server processing system, and computer program product for operating a cybercriminal attack pattern database and using this to update systems to intercept and modify attacks.*

*It is hypothesised that the present invention relates to a pre-emptive security system that protects network connected systems. We hypothesise that we can create a system which redirects network traffic instead of blocking it, and that the Virtual Universe server system will make cybercriminal attacks economically unprofitable.*

*The solution including the cybercriminal attack pattern database will be attractive to most large corporations and institutions worldwide from an economical perspective. Cloudcroft will maintain and distribute the cybercriminal attack pattern database in conjunction with clients.*

7.   All Intellectual Property Rights owned by Cloudcroft that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Development of a Core hardware Platform (Part 1)**:

**Project description**:

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073878

| Number | Description |
|--------|-------------|
| | *The goal of our core experiment was to create a set of applications-relevant codes enabling rapid exploration of algorithmic options and their mapping to computer platforms. In order to do this, we utilised algorithms that are designed to solve a scalar equation and used that to test a set number of performance domains as below:* |
| | *• Node memory bandwidth;* |
| | *• Cache hit to miss ratio; and* |
| | *• Weak scaling* |
| | *These have been broken down into separate cores (1, 2, 3).* |
| | *We then examined the performance on 2 types of chip architecture (Xeon phi and AMD).* |
| | *Hypothesis: We believe we can create PSOMADs (Particle Swarm Optimisation Mesh Adaptive Direct) that will capture key performance issues on system architecture performance that will enable rapid exploration of these performance issues in a meaningful context and will be modified accordingly that impact a broader set of scientific programs. We further postulate that these sets of captured performance metrics will enable us to create a robust simulation model that correctly mimics the chip architecture environment. Our goal is to begin to answer the question: under what conditions does a PSOMAD represent a key performance characteristic in a full application?* |
| | *Test 1 - Node memory bandwidth* |
| | *Node memory bandwidth has a significant impact on the performance of an application. In order to test node memory bandwidth, we utilised a circuit simulation code. Circuit simulation adheres to a general flow. We used mini applications which are circuit analysers which simulate electronic circuits (including microchips) and simulated different chip designs in software. What we are running on this simulation are differential equation solvers, finite problem solvers, physics engines and general linear equation solvers.* |
| | *Here we are trying to discover the quickest manner to find the fastest bitshift architecture. In doing this we:* |
| | *1. Passed original input feed (data) in to non-linear DAE solver;* |
| | *2. Which was passed through a non-linear solver;* |
| | *3. Which was finally passed through a linear solver; and* |
| | *4. We then tested to see if the information in our seed file (our original input feed) has been converged, meaning that if it has correctly solved the posited problem and returned the correct values from system cache.* |
| | *There were many iterations of this particular experiment. If there is non-convergence, the data is resent into the nonlinear solver. If it has converged, we can then test if the simulation is complete or still running. We can conclude that if the simulation is not complete, it has failed, meaning that or code is not functioning as a suitable model and so the experiment begins again from the start (passing through non-linear DAE again). If it is completed, we can end the simulation and take the data.* |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073879

| Number | Description |
|--------|-------------|
|        |             |

*This allows us to model the processing power of the various architectures in real time and to test a variety of platform architectures before deciding on a large scale deployment.*

***Supporting****: This activity is mainly associated with management of the core activity including:*

*1. Manage the execution of the research activities (planning, schedule, reporting);*

*2. Ensuring we have correctly documented the design in a manner that defines the scientific or technological objectives stated in the core processes;*

*3. Documentation issued in-line with Croudcraft project lifecycle processes and practices;*

*4. System Design;*

*5. System Setup and Configuration;*

*6. System Deployment and Testing; and*

*7. System Acceptance Testing.*

*The experiments undertaken are further detailed in the document entitled "Cloudcroft - Development of a Core hardware Platform (Part 1, Part 2 & Part 3)" by Craig Wright.*

8.  All Intellectual Property Rights owned by Cloudcroft that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

    **PROJECT TITLE: Development of a Core hardware Platform (Part 2)**

    **Project description:**

    *The goal of our core experiment was to create a set of applications-relevant codes enabling rapid exploration of algorithmic options and their mapping to computer platforms.  In order to do this, we utilised algorithms that are designed to solve a scalar equation and used that to test a set number of performance domains as below:*

    *• Node memory bandwidth;*

    *• Cache hit to miss ratio; and*

    *• Weak scaling.*

    *These have been broken down into separate cores (1, 2, 3).*

    *We then examined the performance on 2 types of chip architecture (Xeon phi and AMD).*

    *Hypothesis*

    *We believe we can create PSOMADs (Particle Swarm Optimisation Mesh Adaptive Direct) that will capture key performance issues on system architecture performance that will enable rapid exploration of these performance issues in a meaningful*

 IP Assignment Deed

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073880

| Number | Description |
|--------|-------------|

*context and will be modified accordingly that impact a broader set of scientific programs. We further postulate that these sets of captured performance metrics will enable us to create a robust simulation model that correctly mimics the chip architecture environment.*

*Our goal is to begin to answer the question: under what conditions does a PSOMAD represent a key performance characteristic in a full application?*

*Test 2 - Cache hit to miss ration*

*We set up a series of multi-dimensional matrices that are loaded into memory. These were passed into and out of cache to measure processor metrics under load in a torus array. We then looked at the effect of non-contiguous blocks of global node identifiers.*

*This was designed to swap bit-strings in to and out of primary memory to test if the application is getting a cache hit (CPU cache) or whether it is just a system memory. The reason for this is to model the behaviour of the CPU when dealing with large array variables.*

*When bit-shifting 256 bit values, the system has to load the string into 64 bit registers, process the calculation and reassemble the original byte string. In this process, data loss and error can occur, but more critically for our tests, the time to swap from fast cache into slower system memory can critically impart the operation of the sorting and decision algorithms.*

*As such, we are seeking to model the processors in a manner that allows us to determine the most effective architecture for a given problem set.*

*The experiments undertaken are further detailed in the document entitled "Cloudcroft - Development of a Core hardware Platform (Part 1, Part 2 & Part 3)" by Craig Wright.*

9.   All Intellectual Property Rights owned by Cloudcroft that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Development of a Core hardware Platform (Part 3):**

**Project description**:

*These have been broken down into separate cores (1, 2, 3). We then examined the performance on 2 types of chip architecture (Xeon phi and AMD).*

*Hypothesis*

*We believe we can create PSOMADs (Particle Swarm Optimisation Mesh Adaptive Direct) that will capture key performance issues on system architecture performance that will enable rapid exploration of these performance issues in a meaningful context and will be modified accordingly that impact a broader set of scientific programs. We further postulate that these sets of captured performance metrics will enable us to create a robust simulation model that correctly mimics the chip architecture*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073881

| Number | Description |
| --- | --- |

environment.

*Our goal is to begin to answer the question:  under what conditions does a PSOMAD represent a key performance characteristic in a full application?*

*Test 3 - Weak Scaling*

*Our goal is to understand where specificity is required and where it is not.  Sensitivity and specificity are statistical measures of the performance of a binary classification test.*

*We postulate that previous algorithms are not predictive of existing processor systems as they do not include the sort of computations found in the operations that we seek to do.  Our previous research has demonstrated that inter process message passing requirements send over 40% more message per core than would be acceptable.  We reason that in analytically comparing scaling behavior, we expect performance to differ significantly across different architectures.  We further speculate that this would be a function of the differences in pre conditioning strategies used across different architectures.*

*To test this we are using an incomplete factorization algorithm with no fill, a multilevel ML algorithm and a solver with 2 preconditioning strategies.  We collected the results of each of these strategies across different Hardware platforms using tests on the scaling of vectors, inner products and sparse matrix vector product.*

*Conclusion: From our memory bandwidth and cache hit studies, we have been able to show that the codes we used work well when it is representative of the performance within a single compute node.  However the weak scaling study for large numbers of compute nodes demonstrates the differences between system architecture. We conclude that the codes used were not intended to model an application code that employs a multi-grid preconditioner.  This is a concern as there will be no convergence of algorithms across multiple nodes in our large scale simulations with multi grid multilevel preconditions.  Hence further investigations into the impact of differences such as the difference in domain decomposition are necessary.*

*The experiments undertaken are further detailed in the document entitled "Cloudcroft - Development of a Core hardware Platform (Part 1, Part 2 & Part 3)" by Craig Wright.*

10.   All Intellectual Property Rights owned by Cloudcroft that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Reactive and Pre-emptive Security System based on choice theory:**

**Project description:**

*The reactive and pre-emptive security system will revolutionise firewall, IDS, anti-virus and contents scanning industries. Advances in anti-attack protection has been small and incremental in the last 20 years allowing attackers to compromise systems for economical gain. Our project will result in a means to make attacks on systems economically unviable. Resulting in significant global benefits and increased harmful criminal activity.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073882

| Number | Description |
|---|---|
| | *We will in the first instance need to establish the cybercriminal attack pattern database. This is a massive exercise by modelling criminal groups and attackers (ref. choice theory).* |
| | *This experiment starts with the proposition that organised criminal groups can be modelled using rational choice theory (Wright, 2011b). It is proposed that criminal groups act as profit-seeking enterprises, and the ability to shift economic returns away from this activity results in a lower amount of crime. Criminal behaviour does not need to rely on social deviance, but is moving towards the greatest financial rewards. As a consequence, as criminal groups face few financial disincentives, a growing class of criminal specialists has resulted. The course of action to best minimise the online criminal threat can be linked to minimisation of economic returns from cyber-crime.* |
| | *To support this, a model is presented that extends the concept of economic defendability (Brown, 1964) to the use of criminal botnets. The research shows that the size of a botnet is constrained in economic terms. Crime groups need to maintain "territories" based on compromised systems (Wright, 2012b) that need to be defended from competing criminal groups as well as from the system owners who seek to purge the attacker as an immune system seeks to purge a virus.* |
| | *These experiments are executed on super computers due to the large numbers of interactions modelling these system becomes computationally unviable without the ability to replicate large number of systems interactions using self-adjusting and self-tuning artificial Intelligent agents that self-compete in an evolutionary manner to self NP level complexity problems.* |
| | *These result from the exponential interactions of non-deterministic agents. As cybercriminals can interact with multiple entities and in multiple manners, the agent is a pan-dimensional structure that increases in computational complexity as the number of agents in a system is incremented. We hypothesise that this system can be modelled to an economically viable solution using evolutionary systems of Artificial intelligent agents (bots) that "learn", adapt and replicate based on a results based economic framework using evolutionary programming to deliver the proposed solution.* |
| | *We hypothesise that we can create a system which redirects network traffic instead of blocking it, and that the Virtual Universe server system will make cybercriminal attacks economically unprofitable.* |
| | ***Supporting:** This activity is mainly associated with management of the core activity including:* |
| | *1. Manage the execution of the research activities (planning, schedule, reporting);* |
| | *2. Ensuring we have correctly documented the design in a manner that defines the scientific or technological objectives stated in the core processes;* |
| | *3. Documentation issued in-line with Croudcraft project lifecycle processes and practices;* |
| | *4. System Design;* |
| | *5. System Setup and Configuration;* |
| | *6. System Deployment and Testing; and* |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073883

| Number | Description |
|--------|-------------|
|        | *7. System Acceptance Testing.* |
|        | *In looking at the types of systems, one can compare the time required to maintain the botnet against the benefits received and then formulate economic defence strategies that reduce the benefits reaped by the botnet. We look at the decision to be territorial or not from the perspective of the criminal bot-herder. This is extended to an analysis of territorial size. The criminal running a botnet seeks to maximise profit (or economic returns). In doing this they need to analyse the costs expended and benefits received against the territorial size. The result is a means to calculate the optimal size of the botnet and the expected returns. This information can be used to formulate security strategies designed to reduce the profitability of criminal botnets.* |
|        | *Continuous monitoring is essential. Automation is an aid, but it does not replace people, it allows them to do more. To achieve this, we needed to develop systems that are designed to be secure and not to simply fulfil a checklist, a systematic tool to ensure that one remembers and executes all the things one has to do.* |
|        | *This activity was modelled and reported for analysis.* |
| 11. | The Works comprised in the body of work described as: Reactive and Pre-emptive Security System based on choice theory including the pending patent application described below |
|     | **Pending patent application description**: |
|     | *Patent application for invention relating to a pre-emptive security system that protects network connected systems. This system redirects network traffic instead of blocking it.* |
|     | ***Abstract***: *A system, method, server processing system, and computer program product for operating a cybercriminal attack pattern database and using this to update systems to intercept and modify attacks. In one aspect, the server processing system is configured to: receive, from a local processing system in data communication with the server processing system, attack data indicative of cybercriminal probes and attacks against information systems relating to the security state of the individual site; receive, from the server protection system, summarised criminal profile data indicative of an attack against a system; store, in a data store associated with the server processing system, a traffic pattern database for the individual site indicative of the cybercriminal profile data and the attack specification data; determine that the particular information flow is an attack or normal traffic that should not be interfered with; and in response to determining that the traffic is from an attacker or cybercriminal, provide the local security system access to the criminal profile data via a server processing system in data communication with the server processing system and which allows the local security device to redirect the attacker (without alerting them) to a honeypot system such that the attacker has to expend large amounts of time and resources to attack a system and to make the attack of most systems using this method economically untenable.* |
| 12. | The Works comprised in the body of work described as: System to enhance security of mobile ad hoc networks using ECCDSA and the Blockchain. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073884

| Number | Description |
| --- | --- |
| 13. | The Works comprised in the body of work described as: A system and method to provide for automated secure cloud based file sharing. |
| 14. | The Works comprised in the body of work described as: A system and methodology to integrate key exchange and bonding for site and system access. |
| 15. | The Works comprised in the body of work described as: A blockchain integrated transaction accounting payment and classification system. |
| 16. | The Works comprised in the body of work described as: Smart media contract. |
| 17. | The Works comprised in the body of work described as: Blockchain system to ensure the prioritization of group communications at a wireless communication device. |
| 18. | The Works comprised in the body of work described as: A system and method to store and implement network and system level controls into the Blockchain. |
| 19. | The Works comprised in the body of work described as: Reactive and preemptive security system based on choice theory. |
| 20. | The Works comprised in the body of work described as: Secure bitcoin messaging platform. |
| 21. | The Works comprised in the body of work described as: Automata-Theoretic Approach Compiler for Adaptive Software. |
| 22. | The Works comprised in the body of work described as: Blockchain enabled automata driven self-evolution in multi-agent environments. |
| 23. | The Works comprised in the body of work described as: Blockchain based Deterministic finite automata (DFA) processing. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073885

**Schedule 9**

**Chaos**

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by Chaos in its 100% theory based, fractal patterns in finance and trade application to BTC and cryptocurrencies. |
| 2. | All Intellectual Property Rights owned by Chaos that were assigned by Pholus to Chaos under the Consultancy Agreement between Pholus and Chaos. |
| 3. | All Intellectual Property Rights owned by Chaos that were assigned by Panopticrypt to Chaos under the Consultancy Agreement between Panopticrypt and Chaos. |
| 4. | All Intellectual Property Rights owned by Chaos that were assigned by Interconnected Research to Chaos under the Consultancy Agreement between Interconnected Research and Chaos. |
| 5. | All Intellectual Property Rights owned by Chaos that were assigned by Intergyrz to Chaos under the Consultancy Agreement between Intergyrz and Chaos. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073886

**Schedule 10**

**C01N**

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by C01N in eWallet and iDaemon. |
| 2. | All Intellectual Property Rights owned by C01N in and to the material developed including any Works created by C01N under the Software Development Agreement between Strasan Pty Ltd, Craig Wright and David Kleiman dated 4 April 2013 (acknowledging that Hotwire Preemptive Intelligence owns the majority of the Intellectual Property Rights in this material including any such Works). |
| 3. | All Intellectual Property Rights owned by C01N that were assigned by Interconnected Research to C01N under the R&D Services Agreement between Interconnected Research and C01N including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• eWallet Secure;<br>• iDaemon; and<br>• 3D Transactions Analysis Tool. |
| 4. | All Intellectual Property Rights owned by C01N that were assigned by Integyrz to C01N under the R&D Services Agreement between Intergyrz and C01N including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• eWallet Secure;<br>• iDaemon; and<br>• 3D Transactions Analysis Tool. |
| 5. | All Intellectual Property Rights owned by C01N that were assigned by Pholus to Interconnected Research under the Consultancy Agreement between Pholus and Interconnected Research. |
| 6. | All Intellectual Property Rights owned by C01N that were assigned by Panopticrypt to Interconnected Research under the Consultancy Agreement between Panopticrypt and Interconnected Research. |
| 7. | The Intellectual Property Rights owned by C01N in and to the specifications for chip and board designs and other associated hardware including as used for the purposes of works completed by Craig Wright and commissioned by C01N. |

2649672-v4A\SYDDMS                                  73                        IP Assignment Deed

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                                                 DEF_00073887

| Number | Description |
|--------|-------------|
| 8. | The Intellectual Property Rights owned by C01N in and to Algorithmic Matching System and associated mathematics in relation to commutative ring theory. |
| 9. | All Intellectual Property Rights owned by C01N that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**PROJECT TITLE: Sukuriputo: Sukuriputo okane**

**Project description**:

*Sukuriputo okane (S0) is being developed as a software library for financial cryptography, including a prototype server and a high-level client API (available in most languages.) The S0 server is able to process all sorts of P2P Bitcoin transactions. S0 also supports markets (for offers and trading, like you might see on MtGox or other exchanges) as well as basket currencies. S0 will feature a full client-side scripting engine enabling the creation of financial scripts using the S0 API.*

*C01N is creating a resilient financial system based on bitcoin that grows and changes over time according to the needs of the financial market.  We seek to create autonomous agents in the Bitcoin block in order to facilitate this. One of the objectives is to make bitcoin secure and to enable it to be open so that the bitcoin blockchain can be used for all transactions including monetary transaction, contracts etc.  Currently when a person who uses bitcoin wants to make a transaction, it involves a time consuming process of checking for changes in the blockchain that relate to his keys.  With Sukuriputo Okane, we are aiming to reduce the time while making it much more secure by having a partial completion of the transaction that is listed on the blockchain which will only be finalised when a transaction is agreed upon (eg signature).  In effect it is putting the transaction on escrow.*

*C01N is experimenting with different smart contract forms (e.g. escrow, multi-party agreements, DRM payments and two way trade), the evolution of autonomous agents (bots) and the total security and viability of the system.   In order to do this, we are working primarily on a set of linked experiments.*

*The objective of this project Sukuriputo okane (S0) is to create a completely open and malleable form of scriptable money. This is money that can be contracted in advance (Smart Contract).  It has added security measures, hence it greatly reduces the chances of fraud and speeds up the transaction process considerably.    We are seeking to explore ways to program a distributed contract using Bitcoin to form agreements with people via the block chain. These are agreements built into the coin itself. That is, money with conditions (such as you get paid if you pay your taxes or the house sells if the pest inspection comes back OK).*

*S0 will start with a few sample smart contracts including:*

- *Escrow,*
- *Multi-party agreements,*
- *DRM payments, and*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073888

| Number | Description |
|--------|-------------|

- *Two-Way Trade.*

*One iteration is a form of Bitcoin with GST payments built in. This will allow tax enabled transactions. Thus for instance, a GST component could be built into the transaction BEFORE it is completed allowing complete compliance and payment in advance.*

*The primary research is into scriptable contracts ("Smart Contracts") using Bitcoin (BTC). These will be able to be signed by multiple parties and then activated on the BTC blockchain for processing.*

*ANZSRC code: Information, computing and communication services; Artificial intelligence and image processing.*

10.  All Intellectual Property Rights owned by C01N that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Scriptable Money:**

**Project description**:

*Our hypothesis is that it is possible to create a distributed contract system that integrates seamlessly into the bitcoin blockchain. Currently transaction in bitcoin allows payments to be made between two individuals without the intercession of an independent agency. Contracts solve common problems in a way that minimizes trust.  Minimal trust makes transactions more convenient by removing the need for human judgement and emotions, thus allowing for complete automation.  We seek to build contracts into the bitcoin blockchain (Scriptable money).*

*Experiment:*

*Our experiment is an attempt to create an autonomous agent that can search for selected information and feed that information back into the system.  The goal is to find a way of matching the idealised algorithm for different types of conditions over a period of time by running many ( millions) of iterations of self autonomous algorithms (also called bots) to self-create their own contract into the blockchain.*

*In this, we set each "agent" as a block of code.  We set the code with a slightly different set of parameters with distinct algorithms for each bot.(a bot is a self-autonomous algorithm)*

*We then "release" the agents (ie the blocks of code).*

*The most successful bot (self- autonomous algorithms ) learns over time and over many millions of iterations to self- create their own contract into their own bitcoin test net code and eventually into the Bitcoin Blockchain.  Over time we will have created a smarter bot that looks for its own information (e.g. twitter feeds or currency ratings etc.) and start solving problems on its own.*

*This is an evolutionary program (the bot evolves constantly) and is based on swarm technology because there are millions and billions of bots working at the same time.  These agents are all PSO's. (Particle Swarm Optimised agents).*

*We compare these algorithms with the actual reality by running perhaps 1 billion iterations of these formulas.  The bots are programmed with a set balance in the database.  The bot that predicts well survives. The ones that do not will be deleted.  The*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073889

| Number | Description |
|---|---|

end result is that we have created a series of "bot"s, ie an algorithm which is self autonomous, that has the ability to build a secure and viable contract (through trial and error and millions of iterations) into the blockchain.

*Results and conclusions*

*We have found that this is a much larger program than anticipated. It is indeed possible to create self autonomous algorithms that build their own contracts into the bitcoin blockchain, but the computational power required is substantial. . As a result we are splitting these experiments off and setting up separate projects computationally. We have increased the size and scope of this project.*

*Our research has led us to believe that distributed markets allow for a means to implement peer to peer bond and stock trading, allowing Bitcoin to be evolve into a full competitor to the international financial system if the issues are solved.*

*Sukuriputo okane (S0) seeks to create a completely open and malleable form of scriptable money.*

*This is money that can be contracted in advance. We are seeking to explore ways to program a distributed contract using Bitcoin to form agreements with people via the block chain. These are agreements built into the coin itself. That is, money with conditions (such as you get paid if you pay your taxes or the house sells if the pest inspection comes back OK).*

*Contracts solve common problems in a way that minimizes trust. Minimal trust often makes things more convenient by allowing human judgments to be taken out of the loop, thus allowing complete automation. We seek to create autonomous agents in the Bitcoin block.*

*By building low trust protocols that interact with Bitcoin, entirely new products can be created:*

- *Smart property is property that can be atomically traded and loaned via the block chain.*
- *Transferable virtual property are digital items that can be traded but not duplicated.*

*We seek to explore currency agents. Agents are autonomous programs that maintain their own BTC wallet, which they use to buy server time. It is expected that funds are to be obtained by the agent selling services. If demand exceeds supply the agents can spawn children that either survive or die depending on whether they can get enough business.*

11. All Intellectual Property Rights owned by C01N that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - BTC Agents**

**Project description**:

*By building low trust protocols that interact with Bitcoin, entirely new products can be created:*

- *Smart property is property that can be atomically traded and loaned via the block chain.*
- *Transferable virtual property are digital items that can be traded but not duplicated.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073890

| Number | Description |
|--------|-------------|
| | *We seek to explore currency agents. Agents are autonomous programs that maintain their own BTC wallet, which they use to buy server time. It is expected that funds are to be obtained by the agent selling services. If demand exceeds supply the agents can spawn children that either survive or die depending on whether they can get enough business. Distributed markets allow for a means to implement peer to peer bond and stock trading, allowing Bitcoin to be evolve into a full competitor to the international financial system if the issues are solved.* |
| | ***Supporting - Coding test side:*** *We will code an API to test data and validate the APIs.* |
| | *The supporting activity for Smart contracts (and thus Scriptable Money) is the Coding test site.  This is required to run the self-autonomous algorithms that are necessary for the SO project.  We have explained that we define "agents" as blocks of code. Here we seek to explore currency agents - the agents are autonomous programs that maintain their own BTC wallet, which they use to buy server time. It is expected that funds are to be obtained by the agent selling services. If demand exceeds supply the agents can spawn other agents that either survive or die depending on whether they can get enough business.* |
| | *We have started to test and create a quasi-opportunistic supercomputing platform that utilises a self-defining platform and a programming language that makes it possible for any developer to build and publish next-generation distributed applications. To complete this, we have established a virtual supercomputer that uses virtualised system cores.  Without this, we are not able to test the core project.  Evolutionary coding utilises an enormous volume of processing and memory and hence without a supercomputer we could not run the bots discussed.* |
| | *The project will create a AI (artificial intelligence) and learning system can be used to codify, decentralize, secure and trade just about anything: voting, domain names, financial exchanges, crowd funding, company governance, contracts and agreements of most kind, intellectual property, and even smart property through hardware integration. At present, laws are created by intuition and written in an imprecise language. This project seeks to create the tools for expressing laws in a precise semantic language, better understanding their likely impacts, and automatically designing laws to achieve desired outcomes.* |

12. All Intellectual Property Rights owned by C01N that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Transaction Signing**

**Project description**:

*The hypothesis is that it is possible to create a system that enables payment and signalling in a single transaction.  We further believe this will allow in the creation of an address derivation function to contract that will involve a creation of a payment address related to a defined payment merchant, but also obscured from general analysis – i.e. a person involved in a transaction can prove it is actually them, however, their identity will not be known to the general public unless you choose to allow that (pseudo anonymous). The core activity for transaction signing involves building a system that cannot be easily repudiated and that can sign contracts on someone else's behalf which is legally accountable whilst maintaining security with a complete audit*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073891

| Number | Description |
|---|---|
| | *trail.* |
| | *The initial coding will be set up and we will continue by coding new types of contracts, escrow etc. to see what works best on the Blockchain. To ensure that the system is resilient, the security of the system will be constantly tested. We do this by programming certain bots to try to "cheat" the system and monitor its survival. In this way, bots compete, but can also attack one another to test for security issues. For example, bot A will try to cheat bot B by forging or creating an insecure document. If bot B is repudiated, it loses a predetermined amount of the monetary value assigned to it. If this occurs several times, bot B will lose its money and may eventually be deleted. It is not a good algorithm in terms of the security of the system. Thus algorithms that allow for insecurity and break-ins will not survive. As such, the more secure bot wins.* |
| | *We used an agile development system coupled with evolutionary programming (that is contantly refining a system) where merchants identified with a public key as a pseudonym create a reputation system and funding source. We are currently testing a variety of models to ensure that security implications do not lead to private keys that can be computed from one another allowing recipients access to other users funds.* |
| | *Results and conclusions* |
| | *We have found that this is a much larger program than anticipated. It is indeed possible to create a secure system that enables payment and signalling in a single transaction, but the computational power required is substantial. As a result we are splitting these experiments off and setting up separate projects computationally. We have increased the size and scope of this project.* |
| | *While transactions are signed, the signature does not currently cover all the data in a transaction that is hashed to create the transaction hash. Thus while uncommon it is possible for a node on the network to change a transaction you send in such a way that the hash is invalidated. Note that this just changes the hash, the output of the transaction remains the same and the bitcoins will go to their intended recipient. However this does mean that, for instance, it is not safe to accept a chain of unconfirmed transactions under any circumstance because the latter transactions will depend on the hashes of the previous transactions, and those hashes can be changed until they are confirmed in a block.* |
| | *This leads to an issue where a transaction could be issued potentially even after a confirmation if the block chain is reorganized. We seek to solve this issue and also create a means to embed simple scripting into BTC. Currently in BTC, clients must always actively scan for transactions to them; assuming a txout exists because the client created it previously is unsafe.* |
| | *1. ↑ **https://bitcointalk.org/index.php?topic=8392.msg122410#msg122410**.* |
| | *2. ↑ https://bitcointalk.org/index.php?topic=8392.msg1245898#msg1245898.* |
| 13. | The Works comprised in the body of work described as: Method for the processing of allocated and automated coloured coins. |
| 14. | The Works comprised in the body of work described as: Coloured coins. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073892

| Number | Description |
|--------|-------------|
| 15. | The Works comprised in the body of work described as: System, method, and computer program product for reconciling financial data from multiple sources and tagged "coloured coin" sources. |
| 16. | The Works comprised in the body of work described as: Coloured coin exchange exception balancing system. |
| 17. | The Works comprised in the body of work described as: On block Futures Derivative and risk instrument. |
| 18. | The Works comprised in the body of work described as: Programmable Bond system. |
| 19. | The Works comprised in the body of work described as: Single or multi-company business accounting system and method for same including account number maintenance. |
| 20. | The Works comprised in the body of work described as: Method and system for storing inventory holders against a tagged Blockchain token. |
| 21. | The Works comprised in the body of work described as: System and method for utilizing pro-forma processing of adjustments in consolidation processes based on colored coins. |
| 22. | The Works comprised in the body of work described as: Date effective quantity on hand and adjusted unit cost calculation system for cryptocurrencies. |
| 23. | The Works comprised in the body of work described as: Blockchain automata financial trading method and system. |
| 24. | The Works comprised in the body of work described as: System and method for synchronizing ledger accounts by company group in blockchain allocated transactions. |
| 25. | The Works comprised in the body of work described as: Secure account aggregation using the Blockchain with one-way chains. |
| 26. | The Works comprised in the body of work described as: Programmable budget. |
| 27. | The Works comprised in the body of work described as: A method of automatic accounting that can be used for Input, Authorize and Settlement without need for reconciliation. |
| 28. | The Works comprised in the body of work described as: Method and system to allow for the adjustments to relational chart of accounts against the blockchain. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073893

| Number | Description |
|--------|-------------|
| 29. | The Works comprised in the body of work described as: Selective Processing of Reverse Invoices in Computer Systems for Financial Transactions and implementing a chargeback system for merchant using a blockchain based payment system. |
| 30. | The Works comprised in the body of work described as: System and method for utilizing proforma processing of adjustments in blockchain based consolidation processes. |
| 31. | The Works comprised in the body of work described as: System, method, and computer program product for automatically posting transactions associated with a transaction in the blockchain that is mapped to an account into a general ledger. |
| 32. | The Works comprised in the body of work described as: 6. Intelligent bitcoin agents. |
| 33. | The Works comprised in the body of work described as: System and method for cryptocurrency business logic and validation. |
| 34. | The Works comprised in the body of work described as: Automated automata and system and method for managing and monitoring financial performance associated with benefits. |
| 35. | The Works comprised in the body of work described as: Automated blockchain system for customizing and managing benefits. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073894

## Schedule 11

### Denariuz

| Number | Description |
|--------|-------------|
| 1. | All Intellectual Property Rights owned by Denariuz in its Bitcoin Banking System. |
| 2. | All Intellectual Property Rights owned by Denariuz that were assigned by Interconnected Research to Denariuz under the R&D Services Agreement between Interconnected Research and Denariuz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• Bitcoin Core banking;<br>• Bitcoin Bank regulated;<br>• Bitcoin Payment and Merchant Gateway; and<br>• Smart Contract (basic transactions). |
| 3. | All Intellectual Property Rights owned by Denariuz that were assigned by Intergyrz to Denariuz under the R&D Services Agreement between Intergyrz and Denariuz including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• Bitcoin Core banking;<br>• Bitcoin Bank regulated;<br>• Bitcoin Payment and Merchant Gateway; and<br>• Smart Contract (basic transactions). |
| 4. | All Intellectual Property Rights owned by Denariuz that were assigned by Pholus to Denariuz under the Consultancy Agreement between Pholus and Denariuz. |
| 5. | All Intellectual Property Rights owned by Denariuz that were assigned by Panopticrypt to Denariuz under the Consultancy Agreement between Panopticrypt and Denariuz. |
| 6. | All Intellectual Property Rights owned by Denariuz under the Consultancy Agreement between Denariuz and Daso (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Denariuz and Daso). |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073895

| Number | Description |
|---|---|
| 7. | All Intellectual Property Rights owned by Denariuz in the Core Technology as defined in and created under the IP Deed of Assignment between Denariuz and Misfit Games Pty Ltd dated 30 December 2014 (acknowledging that Misfit Games may also own some Intellectual Property Rights in the Core Technology). |
| 8. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project): |

**PROJECT TITLE: Core – Triple entry distributed Ledger**

**Project description**:

*The ability for a centralized platform to tap into decentralized processes can be used in the creation of an in-application accounting API that enables developers and businesses to integrate financial databases, including those based on cryptoprotocols into a triple-entry real-time ledger analytics engine.*

*We propose that the creation of an API and Application designed to make entries into an Online Distributed Ledger (ODL) can be created that will account for and report on every transaction in real-time. We propose that this will allow the simple sharing of account records with the parties they represent, such as customers and vendors. The use of a decentralised ledger is designed to build trust by eliminating the need for it. Based and attached to the Blockchain, the token will consist of an assigned Satoshi.*

*We hypothesise that this can be segmented to provide refined segmentation that allows users create individual, separate and private accounts for anything that needs to be tracked. These would be able to be aggregated during reporting and for tax consolidation. This would be created in a manner that never deletes old entries saving the complete documents (time-stamped and hashed) against each transaction in a manner that will maintain an audit trail.*

*We state that accounting is not simply about money. The process is nearly universally used to track money but it's really about tracking state changes of units of account which are not necessarily money. We hypothesise that this system can be extended into a universal tracking and reporting system.*

*We note that the time to close (e.g., the lag time between the close of a quarter and the close of the books) is a well-documented business problem. The time needed to obtain and report on actionable information is critical for all companies and large amounts are spent on minimising this time gap. We seek to prove that this form of ledger is more effective than existing software accounting systems and could be incrementally improved to outperform any existing accounting system and reporting platform.*

*As the system maintains a triple entry ledger with all records in a time-stamped format that cannot be altered, the need to audit accounts is also greatly reduced. We postulate that this will result in a far less expensive reporting and auditing process where auditing can take place in real-time and where tax audits will not interrupt business. Auditors could verify a percentage of transactions every day, hour or minute and, essentially, continually attest to the accuracy of the information and this would be maintained in perpetuity.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY      DEF_00073896

| Number | Description |
|---|---|

*The information contained within the ledger DASO would be public knowledge. We propose that the use of a hashed key could maintain these records privately allowing the organisations internal cost accounting to be shared publicly (such as with listed reporting entities) where needed and maintained secretly in other cases.*

9. All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Multilayer Perceptrons for DASO:**

**Project description**:

*We propose to use an Artificial Intelligence paradigm (Multi-Layer Perceptrons) in a decentralised trustless mode to automate and manage risk modelling functions in our proposed DASO. If this can be achieved using the existing Bitcoin Blockchain, it will facilitate the advent of smart contracting and allow global use and deployment of distributed corporations.*

*We hypothesise that for market data that can be built into a DASO that MLPs can be used to accept data from risk models and automatically update the risk profile of an organization or individual. This will minimise economic loss conditions to create a more rational considered approach to financial transactions. We further hypothesise that when modelling risk, each application and system can be modelled using a perceptron. The aim is to model the selected risk factors for the system and calculate a base risk that is trained and updated over time. The data from multiple organizations can be fed into a central system that can be distributed to all users. In this way, a risk function can be created that not only calculates data based on existing and known variables [5], but also updates automatically using external sources and trends.*

*As an example, an input layer with one neuron for each input (system or application) could be used to map for IP Options, fraud and market conditions, price volatility and reputation, etc. The system of perceptrons would be processed using a hidden neuron layer in which each neuron represents combinations of inputs and calculates a response based on current data coupled with expected future data, a priori data and external systems data. Data processed at this level would feed into an output layer. The result of the neural network would supply the output as an economic risk function. Progress has been limited due to staff and funding constraints. Progress is expected to ramp up once the constraints are lifted in the latter part of this year.*

10. All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core - Sub-experiment and extentsion**

11. All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE: Core -Trustless oracle**

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073897

| Number | Description |
|---|---|
| 12. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:<br>**PROJECT TITLE: Core -Smart Registry** |
| 13. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:<br>**PROJECT TITLE: Core -Multi Signature Trust** |
| 14. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*)*:<br>**PROJECT TITLE**: **Decentralized Consensus (Distributed Autonomous Smart Organisation) Project**<br>**Project description**:<br>*The creation of a self-defining platform and a programming language that makes it possible for any developer to build and publish next-generation distributed applications. The project will create a AI (artificial intelligence) and learning system can be used to codify, decentralize, secure and trade just about anything: voting, domain names, financial exchanges, crowd funding, company governance, contracts and agreements of most kind, intellectual property, and even smart property through hardware integration.*<br><br>*At present, laws are created by intuition and written in an imprecise language. This project seeks to create the tools for expressing laws in a precise semantic language, better understanding their likely impacts, and automatically designing laws to achieve desired outcomes.*<br><br>*At present Smart Contracts are limited. Contracts are society's programming language. Today they're written in an imprecise, hard to read, and hard to write language. We seek to develop a new framework that supports automatic contract creation, enforcement, and interpretation.*<br><br>*This will extend into developing a smarter framework for modelling economic behaviour and making better decisions.*<br><br>*A DASO is a virtual AI agent capable of performing, fulfilling, and executing the tasks, actions, and functions normally conducted by managers and executives, such as paying bills, issuing dividends and even crowd funding an IPO.*<br><br>*The aim is to produce a system that allows this to occur within a trustless or quasi-trustless environment with the "balance of trustlessness" determined by the intention of the parties and the capabilities of the code.  The use of a Turing-complete language integrated with a cryptoledger, a DASO could be used to create a tamper-resistant or tamperproof entity, immune to many of the abuses and vulnerabilities that have been happening to brick-and-mortar organizations are today (e.g., burglaries, arson,* |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073898

| Number | Description |
|---|---|

*unintentional exposure to proprietary documents).*

*Currently no real decentralized autonomous organization (also known as a decentralized autonomous corporation or autonomous agent) is known to actually exist on a cryptoledger, although there are payroll bots and various software-based HR tools out on the market that integrate at the edges (BitPay).*

*The use of Bitcoin will help facilitate the creation of a DASO as all users technically must submit a digital key which counts as some kind of voting mechanism, shareholders (miners) receive direct compensation for their work (seigniorage) – and there is no administrative overhead per se.*

15.     All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project):

**PROJECT TITLE: Core - Virtualised HPC: The development of a HPC (High Performance Computing) Platform**

**Project description**:

*Multi-Layer perceptron (MLP) is a feedforward neural network with one or more layers between input and output layer. Feedforward means that data flows in one direction from input to output layer (forward). This type of network is trained with the backpropagation learning algorithm. MLPs are widely used for pattern classification, recognition, prediction and approximation. Multi-Layer Perceptron can solve problems which are not linearly separable.*

*To create and train Multi-Layer Perceptron neural network we will do the following set of steps for each test or experiment subset:*

*1. Create start case Perceptron neural network project;*

*2. Create Multi-Layer perceptron network;*

*3. Create training set;*

*4. Train network; and*

*5. Test trained network.*

*The main advantage to a systems engineering approach is the ease with which it can be automated. We hypothesise that the various inputs and formula we seek to test as seed inputs can become inputs into a neural network algorithm. Equation (1) could be modelled in three layers*

*Here, an input layer with one neuron for each Input (system or application) could be used to map for IP Options, fraud and market conditions, price volatility and reputation etc. The system of perceptrons would be processed using a hidden neuron layer in which each neuron represents combinations of inputs and calculates a response based on current data coupled with expected future data, a prior data and external systems data. Data processed at this level would feed into an output layer. The result of the*

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                          DEF_00073899

| Number | Description |
|---|---|

*neural network would supply the output as an economic risk function. In this way, a risk function can be created that not only calculates data based on existing and known variables (He, Wang, & Yan, 1992), but also updates automatically using external sources and trends. Many external sources have become available in recent years that provide external trending and correlation points. Unfortunately, most of these services have clipped data as the determination of complex market conditions is generally unclear and takes time to diagnose where much otherwise useful data is lost.*

*A depiction of a Multi-Layer layer topology neural network: We hypothesise that for market data that can be built into a DASO that multi- layer topology neural networks can be used to accept data from risk models and automatically update the risk profile of an organization or individual and hence to minimise economic loss conditions and create a more rational considered approach to financial transactions. We further hypothesise that when modelling risk, each application and system can be modelled using a perceptron.*

*Inputs being fed into a perceptron: The perceptron is the computational workhorse in this system. In this it is reasonable to model the selected risk factors for the system and calculate a base risk that is trained and updated over time.*

16.  All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Supporting – Development of a virtualised multicore platform:**

**Project description**:

*Supercomputing is rapidly becoming an essential element of innovation and competitiveness. Computer-based methods now play a central role in all areas of economic development, education, and research. Economically, computational analysis, modelling, and simulation have become a distinguishing factor in business competitiveness. Educationally, developing computing skills in students is an essential part in preparing for a future in a wide range of careers.*

*Establishing the virtualised core supercomputer will greatly accelerate these trends to the benefit of Denariuz and allow it to complete the creation of a DASO in a timely manner.*

*These systems will have very high-speed fibre connectivity, small computing clusters, high-speed, high definition video conferencing, a large 3-D visualization screen, and desktop computing platforms with 3-D visualization. In order to support the proposed research activities with access to world-class computing assets, we will first acquire state-of-the-art cluster computing capacity with a nominal speed of 1,000-2,000 Teraflops. The central workhorse of the project will be one of the fastest computers for unclassified research in the world performing at more than 1,000 Teraflops when it goes live. Opportunistic Supercomputing is a form of networked grid computing whereby a "super virtual computer" of many loosely coupled volunteer computing machines performs very large computing tasks. Grid computing has been applied to a number of large-scale embarrassingly parallel problems that require supercomputing performance scales.  The problem with many approaches is that basic grid and*

ATTORNEY'S EYES ONLY                                                                                        DEF_00073900

| Number | Description |
|---|---|
| | *cloud computing approaches that rely on volunteer computing cannot handle traditional supercomputing tasks such as fluid dynamic simulations and will not be adequate for the use in the creation of a set of multi-level perceptron based DASO's that compete in evolutionary formats.* |
| 17. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project): |

**PROJECT TITLE: Core – Decentralized Autonomous Consensus Platform (DACP) and associated experimental case studies: - Project description**:

*Unlike in a legacy company where decision-making authority is concentrated at the executive level, in a Decentralized Autonomous Consensus Platform (DACP), the decision-making authority is part automated, in that it has specific rules that are followed without possibility of deviation from expected form, and conversely human interaction and bias is limited to the edges. In such a model, power and authority, rather than being collected at the top, is spread to the edges of the network by allowing key holders (or VoiceHolders) to influence the decision-making and priorities of the DACP proportionally with their preapproved voting rights (e.g., when setting up a firm, a voting structure is put in place usually based on the amount of equity or shares an individual has).*

*Bitcoin introduced the idea of autonomous distributed consensus, automation at the centre of the network and intelligence on the edges.*

*The legal liability and responsibility of a DACP or DAC still trace back to the key holders who sign their digital keys with a DACP which then calculates results based upon the prearranged voting proportionality. For example, Bob's Boutique requires that the allocation of special funds used by the DACP to hire contractors must be approved by a threshold of digital signatures. If the threshold is unmet then the DACP does not release the funds to hire the contractors.*

*Software-based solutions used to calculate, authenticate and verify shareholder votes for many corporations and organizations exist. These however are all centralised and rely on a trusted third party (or parties) making them susceptible to social engineering and man-in-the-middle attacks. The initial opportunity is the creation of a DASO that allows for e-voting enterprises built using consoles and virtual applications that utilize a cryptoledger, allowing members of organizations and institutions of all sizes to securely sign policy decisions. This would be designed in a manner able to prevent internal takeovers and allow for quick dissolution (e.g., to manually reallocate assets), as a self-termination clause could be programmatically designed within a DACP that could be triggered if enough shareholders submit signatures (or Voice) to a specific internal address within a specific timeframe (nLockTime). In such a model, power and authority, rather than being collected at the top, is spread to the edges of the network by allowing key holders (or VoiceHolders) to influence the decision-making and priorities of the DACP proportionally with their preapproved voting rights (e.g., when setting up a firm, a voting structure is put in place usually based on the amount of equity or shares an individual has). The legal liability and responsibility of a DACP or DAC still trace back to the key holders who*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073901

| Number | Description |
|--------|-------------|
| | |

*sign their digital keys with a DACP which then calculates results based upon the prearranged voting proportionality.  For example, Craig's Coffee requires that the allocation of special funds.*

18.   All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: DACP Assurance Contracts:**

**Project description**:

*A DACP can be created as articulation of an assurance contract based upon a predesigned outcome, those who agree with the sentiment send funds to the DACP (the fundraising) and after a value-threshold is met, the DACP acts to bring about the desired result. Funds that are raised during this process are not releasable until a threshold (e.g., 51%) of those who put the value there in the first place, or those who purchased extra shares (e.g., giving larger voting pools) agree to both the need for the expenditure, and the final product being submitted for reimbursement. This would be created as a DASO with the ability to spend funds, but only at the direction and authorization of the majority of shareholders. The creation of such a system will mirror and utilise Bitcoin creating a DACS and DACP that are consensus driven, rules-based systems.  To be part of the system is to follow the rules, so there can be no pre-mining, no individuals with privileged status at all.  Privilege is the antithesis of efficiency, and these structures seek efficiency above all things.*

*A hypothetical DACP assurance contract that will be built and tested is detailed below:*

*1. DACP specification is proposed with Kickstarter Address collecting Bitcoin;*

*2. Received funds comprise development funds and initial DACP monetary base;*

*3. Kickstarter Address hits funding threshold and DACP Proposal Hub bounty is issued and rewarded by DACP consensus,*

*4. Proposals to develop DACP are created, and one or multiple are accepted;*

*5. Completed bounties are reviewed, and bounties are released by prearranged consensus.  DACs cannot integrate submitted bounty solutions until the winner has been paid; and*

*6. Once the platform is created and operational, DACP token holders can sell their tokens for Bitcoin at current market rate, hold it to speculate on the platform becoming more popular relative to the fixed number of DACP tokens, or exchange their DACP token with the DACP itself for DAC token as described above.*

***Associated Experimental Case Studies:*** *Creating an initial simple DAO designed to execute a contract based on pre-agreed to conditions.*

*In this, the contract would be coded such that if a digital signature counts as a vote, the only way to modify what a DAO would do is to get X amount of votes to approve some kind of execution process.  The specific amounts are hardcoded into the program*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073902

| Number | Description |
|---|---|
| | *beforehand and perhaps some are weighted differently. To a limited extent, multi-signature transactions, also known as m-of-n transactions (e.g., "joint bank account" "multi-signature lotteries").*<br><br>*There is some minor ability to do this with Bitcoin alone, but the limit of around 10,000 bytes will not be enough to fit hundreds of "votes" and hence could not be used for any large scale system. Multi-signature authorization of transactions is not a new concept as it has existed for hundreds of years in every corner of the globe. These have been utilised in order to force conspiracy to take place in order for abuse to be undertaken. That is to say, no single individual has the unilateral ability to abuse the treasury of an organization (or launch a ballistic missile). For instance, using the Bitcoin protocol today as established by the built-in rules of Script (the name of the internal language), three parties could sign a contract which is programmed to release funds so as long as it receives the digital key of at least two of the parties. As a consequence, this makes the Bitcoin protocol the legal system as it is impossible to use the tokens without the signatures. Or in other words, if Bob operates a small company he may need to have 2-out-of-3 executives sign a document in order to release funds to pay for warehouse expansions. With cryptocurrencies, the same idea applies wherein to move a ledger value (a Bitcoin) to a different address, a smart contract or DAO that holds and controls "locked" tokens needs a predetermined amount (threshold) of digital signatures to release them. While it is not a complete DAO (let alone a DASO), Bits of Proof has developed software that provides this type of 2-out-of-3 reconciliation on a small scale using Bitcoin. The aim is to extend this such that a small company could create a DAO (and one day a DASO) on the Bitcoin ledger. As an example, if the company has five executives, each with a digital key needed to utilize and modify the cryptoledger, based on the company charter (and as specified in the smart contract or DAO), at least three of the five are required to use their keys in order for the tokens within a DAO to be used. After a company meeting, an agreement is made to use the funds and three executives – Alice, Bob, and Carol – are asked to use their digital signatures (keys) to tell the DAO to release a certain amount of tokens. Utilizing their smartphones (or any network connected device with an app tied into the ledger), they then submit their key and the funds are released.* |

19. All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*)*:
**PROJECT TITLE: Core - Time Clock and Log-in based contractor DAC**

20. All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*)*:
**PROJECT TITLE: Core - Peer to Peer Insurance Markets and DAC**

21. All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073903

| Number | Description |
|--------|-------------|
|        |             |

Rights in connection with this project*)*:

**PROJECT TITLE: Core – DASO employment and contractor Smart Contract:**

**Project description**:

*We postulate that the creation of a DASO based in the Blockchain can be created that incorporates various clauses programmed into the contract to hedge against (or prevent, or in case of) some type of counterparty risk. One example of such a smart contract system would be the development of a contract for a low paid migrant job.*

*For example, we propose to develop and test a system that would, work in the following way:*

*• Bob, an employee, would use a digital key to sign a smart contract with his boss Alice, who also uses a digital key to sign it.*

*• Within the contract will be a number of provisions and stipulations regarding payment time periods and clauses that hedge against the possibility that one party does not fulfil his or her end of the bargain.*

*• The system will be developed to allow for a clause that says how payment will actually take place and an escrow service will be enabled.*

*• The contract would be stored on a public decentralized cryptoledger (Bitcoin).*

*• Being stored on a public cryptoledger we seek to prove that it would be tamper proof and forge proof as it sits there immune from third party interference.*

*Note that whilst most people think of Bitcoin as a currency tracking tool, in arithmetic terms it is more akin to a database that can be used to track any particular dataset (e.g., a Bitcoin) as long as it fits within the technical limitations.  It just so happens that the sole data this past four years has been for one particular "token" as represented by an integer on the ledger (i.e., Bitcoin).*

*While there is a way to change the way the DAO could operate by convincing the rest of those with votes to modify it with their private keys, the original contract would still be left in public view and remain untampered.*

*We propose that the creation of a contract with an nLockTime (time-based) clause or condition that after X amount of time can be generated such that where predefined conditions are not met (for example, payment) then the contract would follow a turning complete path through a series of predefined termination clauses.*

*It is postulated that this could be extended to send the contract terms to a predefined arbiter or escrow DAO or DASO. There is a long way and much research to be completed before a smart contracts could be expected to solve the majority of the problems on the edges of a network (e.g. brick-and-mortar infrastructure), but we seek to prove that it will prevent tampering with the actual contract itself thereby protecting employees (and employers) from trusted third party risks such as fraud.*

*We seek to demonstrate the initial test contract that would be formulated in the following manner:*

*• Bob (the employee or contractor) digitally signs a smart contract (on the Bitcoin Blockchain) with Alice (the employer) stipulating various expectations, terms of compensation, etc.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073904

| Number | Description |
|---|---|
| | • The smart contract stipulates that payment will be released at set each month if no issues occur. |
| 22. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project): |

**PROJECT TITLE: Core – Anti-Fraud loyalty DASO:**

**Project description**:

*We believe that the development of a series of fraud resistant loyalty programs, merchant reward programs and "Frequent flier tokens" can be built into a Bitcoin based cryptoledger.  These aid in preventing and mitigating the risks involved in travel and loyalty system fraud  (e.g. getting frequent-flier miles without flying).*

*We hypothesise that it will be possible to create an economically viable loyalty scheme on the Blockchain that can offload the auditing, storage and transportation of rewards and utilize the "contract" system of the Bitcoin cryptoledger by using an arbitrary amount of a token (0.001 BTC), creating a "contract" that defines a set amount of mileage (which itself will likely have some predefined expatriation dates).  Assuming that flyers are using cryptocurrency wallets and provide the airline with their wallet addresses, the users will be able to receive the mileage amount in their wallets. In turn the users can sell and trade the reward tokens by sending a specified amount to the company such as trading Airline miles.*

*We propose that this would not simply suit frequent flier miles but that other institutions (even stores such as Woolworths) could use a smart contract to issue and track its own customer loyalty program rewards. We propose that a Blockchain based system similar to a coffee card requiring a customer to collect a certain threshold of stamps for a free coffee can be developed on the cryptoledger where customers would be stopped from gaming the system. Such fraud occurred with Subway where by buying and selling entire reams of stamps on eBay, creating massive stamp inflation costing the parent company an unspecified amount in losses and led to Subway ending the loyalty program in 2005.*

*We hypothesise that this can be extended into cryptoledger based coupons.*

*While this may seem like a mundane area, it is important to note that Juniper Research predicted that by 2016 "the total redemption value of mobile coupons will exceed $43 billion globally" because coupons are increasingly delivered by mobile apps. For perspective, 48% of adult internet users in the United States redeemed a digital coupon for shopping in 2012. Consumer Packaged Goods (CPG) manufacturers distributed 305 billion coupons in 2012, the same quantity as the year prior. Total redemption for 2012 fell 17% to 2.9 billion coupons, saving CPG companies a substantial $800 million in face value discounts. We seek to create a DASO providing coupons or discounts for companies to manage these redemption contracts (e.g., a type of time-locked token), which will not only reduce the logistical overhead but also prevent coupon abuse and fraud (e.g., double-spending).  According to the US postal inspector Roberta Williams, "for every coupon successfully counterfeited, it costs the manufacturer $1 million." Initially these fake coupons are scannable but the coupon inflation ultimately forces*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073905

| Number | Description |
|---|---|
| | *manufacturers to redeem more than they had intended.* |
| 23. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*):*<br><br>**PROJECT TITLE: Core – Smart Switch DASO** |
| 24. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*):*<br><br>**PROJECT TITLE: Triple entry distributed ledger** |
| 25. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*):*<br><br>**PROJECT TITLE: Core – Sportsbook:**<br><br>**Project description***:*<br><br>*We seek to develop and create an artificial intelligence oracle involving a sports bet. This could conduct the scenario of:*<br><br>*• Bob bet that team A would win and Alice bet the other team would win.*<br><br>*• An oracle holds the deciding key to a contract that says if team A wins, Bob receives the funds (Bitcoins) and if team B wins, Alice receives the funds.*<br><br>*The parties write and agree to a bet as a contract noting how the transaction should proceed in the event of disputes or potential ties. On the completion of event, the DAO oracle signs the contract as a payout to the winner without having an explicit middleman.*<br><br>*We postulate that unlike ordinary legal disputes involving nuances and grey areas, sports betting is an objective, idealized scenario because there is no grey area as all that an oracle would have to do is have access to an ESPN data feed for instance.* |
| 26. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*):*<br><br>**PROJECT TITLE: Distributed Autonomous Smart Organisation Project (DASO):** |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073906

| Number | Description |
|---|---|

**Project description**:

*We aim to use the Bitcoin Blockchain to create the world's first true DASO (Distributed Autonomous Smart Organisation). Although the ideas underlying the project are currently much discussed there is a lack of consensus about these concepts and related concepts such as Distributed Autonomous Organisations (DAOs) and Decentralised Autonomous Companies (DACs) (e.g. see [7]). A DAO has been described as a virtual agent capable of performing functions normally conducted by company managers and executives [1], while a DAC can be thought of as a DAO acting as a corporation (i.e. it pays dividends to shareholders [7]). These entities purport to automate business rules without recourse to centralised control and with strong defence against cyber-attacks. Despite the vision of some early luminaries [4] and current attempts to build DAOs/DACs, few known decentralized autonomous organizations exist today [1] and according to Bitcoin developer Mike Hearn there are currently no DACs in existence (though Bitcoin comes close) [1]. Our intention is to go beyond the concept of a DAO and create a Distributed Autonomous Smart Organisation by incorporating artificial intelligence. We will achieve this by leveraging our expertise in Bitcoin protocols, cyber security and AI. A core concept to be employed in our DASO is the 'smart contract' whereby various clauses are programmed into the contract to hedge against all types of counterparty risk [3]. The system operates within the quasi-trustless environment of Bitcoin's cryptoledger. 'Trustless' in this context means the system obviates the need for trust between transacting parties because of secure, independent verification processes. The project consists of research and development of the underlying processes to support this functionality as well as experimental implementations of various applications of the techniques.*

*References used throughout the application and further reading:*

*[1] Swanson, Tim (2014). Great Chain of Numbers (chapter 5). http://www.ofnumbers.com/2014/03/04/chapter-5-how-smartcontracts-could-work/ retrieved Nov 2014.*

*[2] Chen, Caleb (2014). Gavin Andresen Outlines Bitcoin 2.0 Without Ethereum. https://www.cryptocoinsnews.com/gavin-andresenoutlines-bitcoin-2-0-without-ethereum/ retrieved Nov 2014.*

*[3] Omohundro, Steve (2014). Smart Contracts. http://www.ustream.tv/recorded/54549113/highlight/570340?utm_campaign=www.meetup.com&utm_source=ustre.am/_3GSlp:2 on2&utm_medium=social&utm_content=20141125034218retrieved Nov 2014.*

*[4] Szabo, Nick (1996). Smart Contracts: Building Blocks for Digital Markets.*
***http://szabo.best.vwh.net/smart_contracts_2.html retrieved Nov 2014.***

*[5] He, Wang, & Yan (1992). Semimartingale Theory and Stochastic Calculus. Since Press, Beijin, New York*

*[6] Buterin, Vitalik. Bootstrapping A Decentralized Autonomous Corporation: Part I (http://bitcoinmagazine.com/7050/bootstrappinga-decentralized-autonomous-corporation-part-i/) retrieved Nov 2014.*

*[7] Buterin, Vitalik. DAOs, DACs, DAs and More: An Incomplete Terminology Guide. https://blog.ethereum.org/2014/05/06/daos-*

IP Assignment Deed

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073907

| Number | Description |
|---|---|
| | *dacsdas-and-more-an-incomplete-terminology-guide/ retrieved Nov 2014.* |
| | *ANZSRC code: Information, computing and communication sciences; Artificial intelligence and image processing.* |
| 27. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project): |

**PROJECT TITLE: Smart Contracts:**

**Project description**:

*Traditional contracts require interpretation of imprecise language. Using our proposed contract programming language, evenunskilled users can develop 'smart contracts' that encode and automate both obligations and consequences such that once the clauses are agreed by all parties, there is no possibility of default as all behaviours are automatically executed. E.g, we propose monetary transfers be secured using a predefined escrow DASO. As these are stored on a public decentralized cryptoledger they are virtually tamper-proof and immune to third party interference. We will experiment on a range of specific real-world applications, as follows:*

**Employment Smart Contract**

*Employee and employer use digital keys to 'sign' a smart contract specifying all obligations. Payment is enforced via an escrow service.*

**Time Clock DASO**

*A DASO manages employee timekeeping to ensure fair pay for fair work. In the simplest form the DASO monitors the employee'selectronic punch card (log-in/log-out) and enforces payment by the hour. More sophisticated versions process other metrics such as keystroke rates; websites visited; files accessed; etc.*

**Anti-Fraud loyalty DASO**

*Loyalty programs (Frequent Flyer, Merchant Rewards, coupons and even coffee cards) can be economically built into the Blockchain to handle the storage and management of rewards.*

**Smart Switch DASO**

*Utilise smart contracts to create digital security systems for property (e.g. vehicles and housing) [4]. Only the rightful owner controls the cryptographic keys for property operation based on the terms of the contract. E.g, a vehicle could be rendered inoperable unless the proper challenge-response protocol is completed.*

**Sports Betting DASO**

*The parties agree to a bet using a smart contract that encodes clauses to handle ties and other incidents (e.g. horse scratching).*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073908

| Number | Description |
|--------|-------------|
|        | *The DASO automatically enacts the payout to the winner.* |

**Peer to Peer Insurance Markets DASO**

*Smart contracts will be used to instantiate peer-to-peer insurance agreements.*

**Current progress**

*Progress has been limited due to staff and funding constraints. Some trials on underlying techniques (i.e. across different types of contract) are underway in which we are investigating an autonomous system with loops based on payment points (i.e., what types of systems can be built with a ten-minute average payment loop, as ten minutes is the average Bitcoin transaction verification lag).*

*Progress is expected to ramp up once the constraints are lifted in the latter part of this year.*

28.   All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Experimental DASO Case Studies:**

**Project description**:

*We aim to design and simulate a company capable of executing all company functions and meeting all statutory regulations but operating on the Bitcoin cryptoledger as a full-blown DAC (Distributed Autonomous Corporation). All company operations will be managed by a customised DASO programmed to enforce activities and obligations via smart contracts and multi-signature keys (i.e. consensus voting techniques). A further aim is to extend this concept to experiment with AI bots that hold the keys and act independently based on market conditions or stakeholder representation.*

*In the initial iteration the DAC's stakeholder (e.g., a board of directors, say) will have the ability to modify operations of the DAC based upon pre-approved programmatic rules managed by the DASO. The DASO will use the multi-signature technique to control decisions. By prior agreement of the stakeholders, the DASO would be pre-programmed to enact decisions based on agreed voter thresholds. For example, a five-member board of directors could be set up to require 3 members to vote in favour of any proposal before enacting it. In later versions, AI bots will take the place of human agents. Experiments will be set up where bots run companies based on learned behaviour optimised by 'natural selection' of competing algorithms. In still other experiments, configurable AI bots will be created in such a way as to allow a human stakeholder to delegate authority to the bot. A stakeholder will select values from a range of parameters that essentially encapsulates the stakeholder's personal ethics and business outlook. From this, the AI bot can determine the stakeholder's probable position on any possible proposal and then vote on the stakeholder's behalf automatically. For example, parameters might relate to the stakeholder's risk profile; political leaning; level of profit motivation; degree of social responsibility; etc. Progress has been limited due to staff and funding constraints. Progress is expected to ramp up once the constraints are lifted in the latter part of this year.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073909

| Number | Description |
|---|---|
| 29. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*)*: |

**PROJECT TITLE: Online Distributed Ledger DASO**:

**Project description**:

*A well-known business problem is the lag time between the close of a financial period and the closing of the books. We aim to build a type of DASO called an Online Distributed Ledger (ODL) into the Bitcoin Blockchain that will account for and report on every transaction in real time. The intention is to create an API designed to allow even traditional companies to make entries into the ODL. Thus, a centralized system can interface with decentralized processes to enable businesses to integrate financial databases. Account records will be kept up to date and will be accessible at any time to all authorised parties including customers, vendors and auditors. Audit trail would persist in perpetuity as each transaction would be time-stamped, hashed and never deleted. This lessens the requirement for regular auditing, thereby reducing costs and minimising disruption to business activities.*

*Accounting methods are about tracking state changes in units of account. The units usually represent money but the same underlying process can be extended into a universal tracking and reporting system for any type of property. This can be implemented on the Bitcoin Blockchain by assigning a nominal value to the transaction (i.e. a single satoshi). Furthermore, the system can be segmented, allowing individual users to create separate and private accounts for anything that needs to be tracked. We aim to demonstrate this latter function with an experiment on Vehicle Tracking. We will maintain vehicle records using data derived from various sources (e.g. GPS and user calendar information) transmitted into the ODL. Progress has been limited due to staff and funding constraints. Progress is expected to ramp up once the constraints are lifted in the latter part of this year.*

| Number | Description |
|---|---|
| 30. | All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*)*: |

**PROJECT TITLE**: **Decentralized Consensus (Distributed Autonomous Smart Organisation) Project**

**Project description**:

*The creation of a self-defining platform and a programming language that makes it possible for any developer to build and publish next-generation distributed applications. The project will create a AI (artificial intelligence) and learning system can be used to codify, decentralize, secure and trade just about anything: voting, domain names, financial exchanges, crowd funding, company governance, contracts and agreements of most kind, intellectual property, and even smart property through hardware integration.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY                DEF_00073910

| Number | Description |
|---|---|
| | *At present, laws are created by intuition and written in an imprecise language. This project seeks to create the tools for expressing laws in a precise semantic language, better understanding their likely impacts, and automatically designing laws to achieve desired outcomes.* |
| | *At present Smart Contracts are limited. Contracts are society's programming language. Today they're written in an imprecise, hard to read, and hard to write language. We seek to develop a new framework that supports automatic contract creation, enforcement, and interpretation.* |
| | *This will extend into developing a smarter framework for modelling economic behaviour and making better decisions.* |
| | *A DASO is a virtual AI agent capable of performing, fulfilling, and executing the tasks, actions, and functions normally conducted by managers and executives, such as paying bills, issuing dividends and even crowd funding an IPO.* |
| | *The aim is to produce a system that allows this to occur within a trustless or quasi-trustless environment with the "balance of trustlessness" determined by the intention of the parties and the capabilities of the code. The use of a Turing-complete language integrated with a cryptoledger, a DASO could be used to create a tamper-resistant or tamperproof entity, immune to many of the abuses and vulnerabilities that have been happening to brick-and-mortar organizations are today (e.g., burglaries, arson, unintentional exposure to proprietary documents).* |
| | *Currently no real decentralized autonomous organization (also known as a decentralized autonomous corporation or autonomous agent) is known to actually exist on a cryptoledger, although there are payroll bots and various software-based HR tools out on the market that integrate at the edges (BitPay) .* |
| | *The use of Bitcoin will help facilitate the creation of a DASO as all users technically must submit a digital key which counts as some kind of voting mechanism, shareholders (miners) receive direct compensation for their work (seigniorage) – and there is no administrative overhead per se.* |

31.  All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Core - Virtualised HPC: The development of a HPC (High Preformance Computing) Platform**

**Project description**:

*Multi-Layer perceptron (MLP) is a feedforward neural network with one or more layers between input and output layer. Feedforward means that data flows in one direction from input to output layer (forward). This type of network is trained with the backpropagation learning algorithm. MLPs are widely used for pattern classification, recognition, prediction and approximation. Multi-Layer Perceptron can solve problems which are not linearly separable.*

*To create and train Multi-Layer Perceptron neural network we will do the following set of steps for each test or experiment*

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                                          DEF_00073911

| Number | Description |
| --- | --- |

*subset:*

*1. Create start case Perceptron neural network project;*

*2. Create Multi-Layer perceptron network;*

*3. Create training set;*

*4. Train network; and*

*5. Test trained network.*

*The main advantage to a systems engineering approach is the ease with which it can be automated. We hypothesise that the various inputs and formula we seek to test as seed inputs can become inputs into a neural network algorithm. Equation (1) could be modelled in three layers*

*Here, an input layer with one neuron for each Input (system or application) could be used to map for IP Options, fraud and market conditions, price volatility and reputation etc. The system of perceptrons would be processed using a hidden neuron layer in which each neuron represents combinations of inputs and calculates a response based on current data coupled with expected future data, a prior data and external systems data. Data processed at this level would feed into an output layer. The result of the neural network would supply the output as an economic risk function. In this way, a risk function can be created that not only calculates data based on existing and known variables (He, Wang, & Yan, 1992), but also updates automatically using external sources and trends. Many external sources have become available in recent years that provide external trending and correlation points. Unfortunately, most of these services have clipped data as the determination of complex market conditions is generally unclear and takes time to diagnose where much otherwise useful data is lost.*

*A depiction of a Multi-Layer layer topology neural network: We hypothesise that for market data that can be built into a DASO that multi- layer topology neural networks can be used to accept data from risk models and automatically update the risk profile of an organization or individual and hence to minimise economic loss conditions and create a more rational considered approach to financial transactions. We further hypothesise that when modelling risk, each application and system can be modelled using a perceptron.*

*Inputs being fed into a perceptron: The perceptron is the computational workhorse in this system. In this it is reasonable to model the selected risk factors for the system and calculate a base risk that is trained and updated over time.*

32.    All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*):*

**PROJECT TITLE: Supporting – Development of a virtualised multicore platform:**

**Project description**:

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073912

| Number | Description |
|--------|-------------|
|  | *Supercomputing is rapidly becoming an essential element of innovation and competitiveness. Computer-based methods now play a central role in all areas of economic development, education, and research. Economically, computational analysis, modelling, and simulation have become a distinguishing factor in business competitiveness. Educationally, developing computing skills in students is an essential part in preparing for a future in a wide range of careers.* |
|  | *Establishing the virtualised core supercomputer will greatly accelerate these trends to the benefit of Denariuz and allow it to complete the creation of a DASO in a timely manner.* |
|  | *These systems will have very high-speed fibre connectivity, small computing clusters, high-speed, high definition video conferencing, a large 3-D visualization screen, and desktop computing platforms with 3-D visualization. In order to support the proposed research activities with access to world-class computing assets, we will first acquire state-of-the-art cluster computing capacity with a nominal speed of 1,000-2,000 Teraflops. The central workhorse of the project will be one of the fastest computers for unclassified research in the world performing at more than 1,000 Teraflops when it goes live. Opportunistic Supercomputing is a form of networked grid computing whereby a "super virtual computer" of many loosely coupled volunteer computing machines performs very large computing tasks. Grid computing has been applied to a number of large-scale embarrassingly parallel problems that require supercomputing performance scales. The problem with many approaches is that basic grid and cloud computing approaches that rely on volunteer computing cannot handle traditional supercomputing tasks such as fluid dynamic simulations and will not be adequate for the use in the creation of a set of multi-level perceptron based DASO's that compete in evolutionary formats.* |

33. All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project):

**PROJECT TITLE: Core – Decentralized Autonomous Consensus Platform (DACP) and associated experimental case studies: - Project description**:

*Unlike in a legacy company where decision-making authority is concentrated at the executive level, in a Decentralized Autonomous Consensus Platform (DACP), the decision-making authority is part automated, in that it has specific rules that are followed without possibility of deviation from expected form, and conversely human interaction and bias is limited to the edges. In such a model, power and authority, rather than being collected at the top, is spread to the edges of the network by allowing key holders (or VoiceHolders) to influence the decision-making and priorities of the DACP proportionally with their preapproved voting rights (e.g., when setting up a firm, a voting structure is put in place usually based on the amount of equity or shares an individual has).*

*Bitcoin introduced the idea of autonomous distributed consensus, automation at the centre of the network and intelligence on the edges.*

*The legal liability and responsibility of a DACP or DAC still trace back to the key holders who sign their digital keys with a DACP*

ATTORNEY'S EYES ONLY

DEF_00073913

| Number | Description |
|---|---|

which then calculates results based upon the prearranged voting proportionality.  For example, Bob's Boutique requires that the allocation of special funds used by the DACP to hire contractors must be approved by a threshold of digital signatures.  If the threshold is unmet then the DACP does not release the funds to hire the contractors.

Software-based solutions used to calculate, authenticate and verify shareholder votes for many corporations and organizations exist. These however are all centralised and rely on a trusted third party (or parties) making them susceptible to social engineering and man-in-the-middle attacks.  The initial opportunity is the creation of a DASO that allows for e-voting enterprises built using consoles and virtual applications that utilize a cryptoledger, allowing members of organizations and institutions of all sizes to securely sign policy decisions.  This would be designed in a manner able to prevent internal takeovers and allow for quick dissolution (e.g., to manually reallocate assets), as a self-termination clause could be programmatically designed within a DACP that could be triggered if enough shareholders submit signatures (or Voice) to a specific internal address within a specific timeframe (nLockTime). In such a model, power and authority, rather than being collected at the top, is spread to the edges of the network by allowing key holders (or VoiceHolders) to influence the decision-making and priorities of the DACP proportionally with their preapproved voting rights (e.g., when setting up a firm, a voting structure is put in place usually based on the amount of equity or shares an individual has). The legal liability and responsibility of a DACP or DAC still trace back to the key holders who sign their digital keys with a DACP which then calculates results based upon the prearranged voting proportionality.  For example, Craig's Coffee requires that the allocation of special funds.

34.     All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*):*

**PROJECT TITLE: DACP Assurance Contracts:**

**Project description**:

A DACP can be created as articulation of an assurance contract based upon a predesigned outcome, those who agree with the sentiment send funds to the DACP (the fundraising) and after a value-threshold is met, the DACP acts to bring about the desired result. Funds that are raised during this process are not releasable until a threshold (e.g., 51%) of those who put the value there in the first place, or those who purchased extra shares (e.g., giving larger voting pools) agree to both the need for the expenditure, and the final product being submitted for reimbursement. This would be created as a DASO with the ability to spend funds, but only at the direction and authorization of the majority of shareholders. The creation of such a system will mirror and utilise Bitcoin creating a DACS and DACP that are consensus driven, rules-based systems.  To be part of the system is to follow the rules, so there can be no pre-mining, no individuals with privileged status at all.  Privilege is the antithesis of efficiency, and these structures seek efficiency above all things.

A hypothetical DACP assurance contract that will be built and tested is detailed below:

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                                                  DEF_00073914

| Number | Description |
|---|---|
| | *1. DACP specification is proposed with Kickstarter Address collecting Bitcoin;* |
| | *2. Received funds comprise development funds and initial DACP monetary base;* |
| | *3. Kickstarter Address hits funding threshold and DACP Proposal Hub bounty is issued and rewarded by DACP consensus,* |
| | *4. Proposals to develop DACP are created, and one or multiple are accepted;* |
| | *5. Completed bounties are reviewed, and bounties are released by prearranged consensus.  DACs cannot integrate submitted bounty solutions until the winner has been paid; and* |
| | *6. Once the platform is created and operational, DACP token holders can sell their tokens for Bitcoin at current market rate, hold it to speculate on the platform becoming more popular relative to the fixed number of DACP tokens, or exchange their DACP token with the DACP itself for DAC token as described above.* |
| | ***Associated Experimental Case Studies:*** *Creating an initial simple DAO designed to execute a contract based on pre-agreed to conditions.* |
| | *In this, the contract would be coded such that if a digital signature counts as a vote, the only way to modify what a DAO would do is to get X amount of votes to approve some kind of execution process. The specific amounts are hardcoded into the program beforehand and perhaps some are weighted differently.  To a limited extent, multi-signature transactions, also known as m-of-n transactions (e.g., "joint bank account" "multi-signature lotteries").* |
| | *There is some minor ability to do this with Bitcoin alone, but the limit of around 10,000 bytes will not be enough to fit hundreds of "votes" and hence could not be used for any large scale system. Multi-signature authorization of transactions is not a new concept as it has existed for hundreds of years in every corner of the globe.  These have been utilised in order to force conspiracy to take place in order for abuse to be undertaken.  That is to say, no single individual has the unilateral ability to abuse the treasury of an organization (or launch a ballistic missile). For instance, using the Bitcoin protocol today as established by the built-in rules of Script (the name of the internal language), three parties could sign a contract which is programmed to release funds so as long as it receives the digital key of at least two of the parties.  As a consequence, this makes the Bitcoin protocol the legal system as it is impossible to use the tokens without the signatures.  Or in other words, if Bob operates a small company he may need to have 2-out-of-3 executives sign a document in order to release funds to pay for warehouse expansions.  With cryptocurrencies, the same idea applies wherein to move a ledger value (a Bitcoin) to a different address, a smart contract or DAO that holds and controls "locked" tokens needs a predetermined amount (threshold) of digital signatures to release them. While it is not a complete DAO (let alone a DASO), Bits of Proof has developed software that provides this type of 2-out-of-3 reconciliation on a small scale using Bitcoin. The aim is to extend this such that a small company could create a DAO (and one day a DASO) on the Bitcoin ledger.  As an example, if the company has five executives, each with a digital key needed to utilize and modify the cryptoledger, based on the company charter (and as specified in the smart contract or DAO), at least three of the five are required to use their keys in order for the tokens within a DAO to be used.  After a company meeting, an agreement is made to use the funds and three executives – Alice, Bob, and Carol – are asked to use their digital signatures* |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073915

| Number | Description |
|---|---|
| | *(keys) to tell the DAO to release a certain amount of tokens.  Utilizing their smartphones (or any network connected device with an app tied into the ledger), they then submit their key and the funds are released.* |
| 35. | The Works comprised in the body of work described as: consolidated blockchain based accounting. |
| 36. | The Works comprised in the body of work described as: multi signature trust. |
| 37. | The Works comprised in the body of work described as: distributed financial distress rating system. |
| 38. | The Works comprised in the body of work described as: one-step posting for approval-based ledger transactions using multi-signature wallets. |
| 39. | The Works comprised in the body of work described as: non-interest property purchase. |
| 40. | The Works comprised in the body of work described as: lease and loan sub-ledger blockchain accounting methods and system. |
| 41. | The Works comprised in the body of work described as: a capital asset planning system for smart property contracts. |
| 42. | The Works comprised in the body of work described as: combination cryptocurrency wallet and multi-account ledger balancing system for monitoring a user's spending habits in real-time. |
| 43. | The Works comprised in the body of work described as: system and method for capturing and storing casino information in a blockchain. |
| 44. | The Works comprised in the body of work described as: financial management system and method with blockchain transaction and non-debt management. |
| 45. | The Works comprised in the body of work described as: system and method for margin loan securitization using non-debt based allocation and account payment. |
| 46. | The Works comprised in the body of work described as: blockchain mapped budgetary ledger. |
| 47. | The Works comprised in the body of work described as: intercompany transactions elimination system. |
| 48. | The Works comprised in the body of work described as: a stock allocation and capitalisation system for a DAC. |
| 49. | The Works comprised in the body of work described as: a bond system for a DAC. |
| 50. | The Works comprised in the body of work described as: sportsbook. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073916

| Number | Description |
|--------|-------------|
| 51. | The Works comprised in the body of work described as: method and system of using invoice categorization in blockchain accounting to deliver an automated management application. |
| 52. | The Works comprised in the body of work described as: Electronic P2P Margin Management System For Managing Actions Such As Margin Calls Under Margin Agreements. |
| 53. | The Works comprised in the body of work described as: Electronic P2P Margin Management System For Managing Actions Such As Margin Recalls Under Margin Agreements. |
| 54. | The Works comprised in the body of work described as: method and system for facilitating commerce, social interaction and charitable activities as a distributed autommous Social organisation. |
| 55. | The Works comprised in the body of work described as: automata, system and Method for Equity-Based Compensation Accounting utilising the blockchain. |
| 56. | The Works comprised in the body of work described as: smart event ticketing. |
| 57. | The Works comprised in the body of work described as: methods and systems for improving timely loan repayment by controlling online accounts, notifying social contacts, using loan repayment DASo's employing social graphs. |
| 58. | The Works comprised in the body of work described as: verify signed software on the Blockchain. |
| 59. | The Works comprised in the body of work described as: system and method of tracking and recognizing the exchange of favors in a DASO. |
| 60. | The Works comprised in the body of work described as: DASO - (e) Sports bet (85%). |
| 61. | The Works comprised in the body of work described as: user-controlled blockchain verified sweepstakes entries. |
| 62. | The Works comprised in the body of work described as: blockchain enabled Enterprise information management system and methods. |
| 63. | The Works comprised in the body of work described as: system and method for international merchandise return service against the blockchain. |
| 64. | The Works comprised in the body of work described as: DASO - (a) Employment smart contract. |
| 65. | The Works comprised in the body of work described as: DASO - (c) Anti-fraud loyalty. |
| 66. | The Works comprised in the body of work described as: blockchain verified Player reward program with loyalty-based reallocation. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073917

| Number | Description |
|---|---|
| 67. | The Works comprised in the body of work described as: automatically verified Player reward program with loyalty-based reallocation. |
| 68. | The Works comprised in the body of work described as: DASO - (d) Smart switch. |
| 69. | The Works comprised in the body of work described as: DASO - (b) Time clock. |
| 70. | The Works comprised in the body of work described as: vehicle history log. |
| 71. | The Works comprised in the body of work described as: autonomous consensus platform. |
| 72. | The Works comprised in the body of work described as: method and system for generating occupant schedules that are maintained in the blockchain. |
| 73. | The Works comprised in the body of work described as: DASO and method for collaborative shopping, business and entertainment. |
| 74. | The Works comprised in the body of work described as: deterministic Finite Automata Graph Traversal with Nodal Bit Mapping based on a distributed block system. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073918

## Schedule 12

### Interconnected Research

| Number | Description |
|--------|-------------|
| 1. | All Intellectual Property Rights owned by Interconnected Research in its research and development focussed on cryptocurrencies. |
| 2. | All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):<br>**PROJECT TITLE: IT infrastructure proof-of-concept platform.** |
| 3. | All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):<br>**PROJECT TITLE:** P-20140307-IT-Pholus-DC-Hotwire 2014. |
| 4. | All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):<br>**PROJECT TITLE:** P-20130005-Denariuz-Core-Banking. |
| 5. | All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):<br>**PROJECT TITLE:** P-20130006-Denariuz-Exchange-Server |
| 6. | All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):<br>**PROJECT TITLE:** P-20140002-Hierarchical-Deterministic-eWallet. |
| 7. | All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073919

| Number | Description |
|--------|-------------|

the Intellectual Property Rights in connection with this project):

**PROJECT TITLE:** P-20140003-Sochi-Bitcoin-Management-System.

8.   All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):

**PROJECT TITLE:** P-20130001-Genoa-eWallet.

9.   All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):

**PROJECT TITLE:** P-20130004-Beijing-eRedPacket.

10.  All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):

**PROJECT TITLE:** P-20140004-Denariuz-eWallet.

11.  All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):

**PROJECT TITLE:** Load Test and Distributed data design (Registration).

12.  All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):

**PROJECT TITLE:** Course Structuring.

13.  All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):

**PROJECT TITLE:** P-20130002-Socrates-Adaptive eLearning (Phase 1).

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073920

| Number | Description |
|---|---|
| 14. | All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Hotwire owns the majority of the Intellectual Property Rights in connection with this project):<br><br>**PROJECT TITLE:** P-20130007-Plato-eLearning-Phase 2. |
| 15. | All Intellectual Property Rights owned by Interconnected Research that were assigned by Integyrz to Interconnected Research under the R&D Services Agreement between Integyrz and Interconnected Research including all such Intellectual Property Rights created in the course of or in connection with the following projects, including in all Works created in the course of or in connection with these projects:<br>• XBT Accounting System;<br>• XBT Accounting System (regulated); and<br>• ABT Accounting System Commercialisation. |
| 16. | All Intellectual Property Rights owned by Interconnected Research that were assigned by Pholus to Interconnected Research under the Consultancy Agreement between Pholus and Interconnected Research. |
| 17. | All Intellectual Property Rights owned by Interconnected Research that were assigned by Panopticrypt to Interconnected Research under the Consultancy Agreement between Panopticrypt and Interconnected Research. |
| 18. | All Intellectual Property Rights owned by Interconnected Research under the R&D Services Agreement between Interconnected Research and Pholus (being all such Intellectual Property Rights in Interconnected Research's methodologies, models and other confidential or proprietary information of Interconnected Research). |
| 19. | All Intellectual Property Rights owned by Interconnected Research under the R&D Services Agreement between Interconnected Research and Zuhl (being all such Intellectual Property Rights in Interconnected Research's methodologies, models and other confidential or proprietary information of Interconnected Research). |
| 20. | All Intellectual Property Rights owned by Interconnected Research under the R&D Services Agreement between Interconnected Research and Denariuz (being all such Intellectual Property Rights in Interconnected Research's methodologies, models and other confidential or proprietary information of Interconnected Research). |
| 21. | All Intellectual Property Rights owned by Interconnected Research under the R&D Services Agreement between Interconnected Research and C01N (being all such Intellectual Property Rights in Interconnected Research's methodologies, models and other confidential or proprietary information of Interconnected Research). |
| 22. | All Intellectual Property Rights owned by Interconnected Research under the R&D Services Agreement between Interconnected Research and Cloudcroft (being all such Intellectual Property Rights in Interconnected Research's methodologies, models and other |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073921

| Number | Description |
|---|---|
| | confidential or proprietary information of Interconnected Research). |
| 23. | All Intellectual Property Rights owned by Interconnected Research under the R&D Services Agreement between Interconnected Research and Coin-Exch (being all such Intellectual Property Rights in Interconnected Research's methodologies, models and other confidential or proprietary information of Interconnected Research). |
| 24. | All Intellectual Property Rights owned by Interconnected Research under the R&D Services Agreement between Interconnected Research and Daso (being all such Intellectual Property Rights in Interconnected Research's methodologies, models and other confidential or proprietary information of Interconnected Research). |
| 25. | All Intellectual Property Rights owned by Interconnected Research under the R&D Services Agreement between Interconnected Research and Panopticrypt (being all such Intellectual Property Rights in Interconnected Research's methodologies, models and other confidential or proprietary information of Interconnected Research). |
| 26. | All Intellectual Property Rights owned by Interconnected Research under the R&D Services Agreement between Interconnected Research and Integyrz (being all such Intellectual Property Rights in Interconnected Research's methodologies, models and other confidential or proprietary information of Interconnected Research). |
| 27. | All Intellectual Property Rights owned by Interconnected Research under the R&D Services Agreement between Hotwire Preemptive Intelligence Pty Ltd and Coin-Exch (being all such Intellectual Property Rights in Interconnected Research's methodologies, models and other confidential or proprietary information of Interconnected Research). |
| 28. | All Intellectual Property Rights owned by Interconnected Research under the Consultancy Agreement between Interconnected Research and Misfit Games (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Interconnected Research and Misfit Games). |
| 29. | All Intellectual Property Rights owned by Interconnected Research under the Consultancy Agreement between Interconnected Research and Chaos (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Interconnected Research and Chaos). |
| 30. | All Intellectual Property Rights owned by Interconnected Research under the Consultancy Agreement between Interconnected Research and Head Vendor Co (being Intellectual Property Rights other than intellectual property in "Inventions and Works" as defined in and created under the Consultancy Agreement between Interconnected Research and Head Vendor Co). |
| 31. | All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073922

| Number | Description |
|--------|-------------|

project including all Works created in the course of or in connection with such project:

**PROJECT TITLE**: **BTC Accounting: XBT Accounting Project**

**Project description**:

*The project is designed to deliver an accounting system that can utilise the blockchain directly to account for transactions using Bitcoin. No accounting system currently uses any crypto currency natively. The aim of this project is to create an accounting platform that can use both Fiat currency as well as crypto currency. The means to do this will be to develop a system that directly calls the Bitcoin Blockchain and matches the transactions against a market rate. This market rate will be determined as follows:*

- *XE.com  XBT to XBT based transactions;*
- *XE.com  XBT to goods transactions; and*
- *XE.com  Goods to XBT based transactions.*

*In this manner, we believe that a system can be created that can self-reconcile and also resist fraud through the matching of transactions against the public Blockchain. First, with regard to the notion that price can vary from value market-wide, as Ludwig von Mises points out in Human Action, "There is no such thing as prices outside the market." In other words, the price is the market value. Market makers maintain books of Bid and Ask prices.*

*When a buyer or seller enters the market, he, she, it, or they will have a combination of price and quantity in mind.  For example, if the most recent trade took place at USD 120, and one wanted to buy bitcoin, that person would offer to buy a specific quantity at that price.  If a seller were willing to sell that quantity or more at, e.g., USD 119.99, then the buyer might be willing to buy a little bit more, so that the value of the entire transaction were constant, or that person might buy the original quantity at the lower price and keep the difference.*

*From one perspective, Bitcoin is a commodity, where one unit is as valuable as any other.  However, each unit is also unique, and can be traced through the blockchain's permanent transaction record. One can use a Bitcoin wallet to sign blocks of text, and embed the cryptographic hashes of those signed blocks of text into the blockchain as a kind of notarization.  Although it can be used as a currency—as cigarettes can be used as a currency—it is much more. This ability can lead to "Coloured coins" that have a value in market greater than the "face" value of a standard bitcoin and this also needs to be accounted when "smart property" starts to be utilised in force.*

32.     All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE**: **Core - Bitcoin daemon and mapping system:**

**Project description**:

**Testing hypothesis**:

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073923

| Number | Description |
|---|---|
| | *If one can use a Bitcoin wallet to sign blocks of text, and embed the cryptographic hashes of those signed blocks of text into the blockchain as a kind of notarization, can this be accounted separately.* |
| | *Can market transactions be accounted automatically with blockchain based accounts linking to cloud based invoice systems?* |
| 33. | All Intellectual Property Rights owned by Interconnected Research that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |
| | **PROJECT TITLE**: **Development of a base accounting system that can be linked to the Blockchain** |
| | **Project description**: |
| | *We will create a system that uses existing accounting practices. This will be used to integrate the blockchain based functions. Users of this platform will have access to discounted accounting and business services in partnership with accountants, including entity incorporation, crowdfunding (pre-sales or equity), and networking.* |
| | *In order to develop a software based platform, the system to run, test and compile this platform needs to exist first.* |
| 34. | The Works comprised in the body of work described as: blockchain based accounting system. |
| 35. | The Works comprised in the body of work described as: blockchain based accounting system (a system and method to utilise the blockchain for an accounts receivable system). |
| 36. | The Works comprised in the body of work described as: system and method for conducting an electronic financial asset deposit auction using the blockchain. |
| 37. | The Works comprised in the body of work described as: method and electronic apparatus for performing automated bookkeeping using the blockchain. |
| 38. | The Works comprised in the body of work described as: P2P system and method for facilitating the lending of digital content using contacts lists. |
| 39. | The Works comprised in the body of work described as: P2P personal financial network. |
| 40. | The Works comprised in the body of work described as: a system for reading, organising and manipulating accounting data held within the blockchain. |
| 41. | The Works comprised in the body of work described as: blockchain based activity information accounting method and system. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073924

| Number | Description |
|--------|-------------|
| 42. | The Works comprised in the body of work described as: system and method for automatically managing bad accounts of accounts receivable using the blockchain. |
| 43. | The Works comprised in the body of work described as: transaction accounting payment and classification system for blockchain based accounting. |
| 44. | The Works comprised in the body of work described as: a method to integrate utility accounting, materials management, work management and regulatory reporting software based on the blockchain. |
| 45. | The Works comprised in the body of work described as: automatic taxonomy merge system for blockchain based accounting. |
| 46. | The Works comprised in the body of work described as: extensible vote based property ownership system. |
| 47. | The Works comprised in the body of work described as: vote based blockchain requisition and authorisation process. |
| 48. | The Works comprised in the body of work described as: method and system to manage blockchain enabled services for multiple managed computer systems. |
| 49. | The Works comprised in the body of work described as: XML mapping system block chain integration. |
| 50. | The Works comprised in the body of work described as: an integrated secure blockchain based voting system. |
| 51. | The Works comprised in the body of work described as: auditable secret voting system. |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073925

**Schedule 13**

**Zuhl**

| Number | Description |
|---|---|
| 1. | All Intellectual Property Rights owned by Zuhl in its online academic network known as a social learning system. |
| 2. | All Intellectual Property Rights owned by Zuhl that were assigned by Intergyrz to Zuhl under the R&D Services Agreement between Intergyrz and Zuhl. |
| 3. | All Intellectual Property Rights owned by Zuhl that were assigned by Interconnected Research to Zuhl under the R&D Services Agreement between Interconnected Research and Zuhl. |
| 4. | All Intellectual Property Rights owned by Zuhl that were assigned by Pholus to Zuhl under the Consultancy Agreement between Pholus and Zuhl. |
| 5. | All Intellectual Property Rights owned by Zuhl that were assigned by Panopticrypt to Zuhl under the Consultancy Agreement between Panopticrypt and Zuhl. |
| 6. | All Intellectual Property Rights owned by Zuhl that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**PROJECT TITLE: Project - Social Learning system**

**Project description**:

*The object of the Zuhl project is to create an online academic network that extends beyond education to encompass research and career management. The membership will comprise learners (all levels, both formal and informal), educators, researchers, service providers, employers and employment seekers. Members may belong to several of these categories simultaneously.*

*The end product will apply new and emerging technologies to extract deep layer relationships between members; between actions; and between members and actions. This adaptive technology will enable latent mutually beneficial connections to be automatically identified and promoted within the community. Thus, the product will not only subsume the functionality of several existing social networking websites but will significantly supersede them by providing new network-based functionality enhanced by the ability to expose opaque opportunities for collaborations.*

*The range of functions available to members will be in accordance with their category and membership status. For example, learners may form study subgroups and may meet both online or (where geographically appropriate) offline. Educators may form subgroups for sharing educational material and may utilise cohorts of higher-achieving learners to act as tutors. Researchers will*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073926

| Number | Description |
|---|---|
| | form cross-disciplinary collaborations to share their expertise and accelerate new knowledge acquisition in otherwise undiscoverable research directions. |
| | All members may upload their profile including qualifications and credits, which will be certified by Zuhl before display. Entities from private individuals to major corporations and government departments may source closer-fitting potential employees and/or service providers automatically. An inbuilt authentication/reputation system will ensure the integrity of the process and protect the interests of both sides of these relationships. An automated feedback system will ensure that reputation credits are kept up to date in real time. |
| | In addition to enhanced networking functionality and connection mapping, cutting edge peer-to-peer payment systems will ensure ultra-secure transactions at minimal overhead costs to members. The platform will use Bitcoins as a medium of exchange between members acting as service providers and their Zuhl clients. Bitcoins will also be used for crowdfunding functionality. |
| | With the aid of the emergent or still-developing technologies mentioned, the product envisioned will provide not only superior services than similar existing networking websites, but will enable all these services to be available from the same website and with cross-functionality. Thus, for example, a learner may begin by building reputation credits (either through internally earned Zuhl credits via Integyrz courses or through traditional educational institutions in the form of degrees) and later may offer her services as either an educator or potential employee or service provider. Alternatively, the individual may earn credits through participation in research projects or peer-reviewing papers submitted to Zuhl's publication journal or successfully publishing their own papers in the Zuhl journal. The individual might later leverage her reputation credits to initiate an entrepreneurial endeavour and seek funding via the Zuhl community. In this way, Zuhl consolidates and supplants existing networking sites such as LinkedIn (for job seeker and employer functions); Kickstarter (for crowdfunding); Freelancer (for service providers); ResearchGate (for research collaborations); and so on. |
| 7. | All Intellectual Property Rights owned by Zuhl that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project: |

**PROJECT TITLE: Core – Integrating Distributed Autonomous Smart Organisation DASO to Zuhl**

**Project description**:

> DASO is an artificial intelligence and learning system that can be used to codify, decentralize, secure and trade just about anything: voting, domain names, financial exchanges, crowdfunding, company governance, contracts and agreements of most kinds, and intellectual property through hardware integration.
>
> Some of the purposes of integrating DASO to Zuhl are:
>
> • Zuhl Opportunities: crowdfunding, freelancing services, contracts and agreements.
>
> • Club Zuhl Unit: voting & promotion (including prevention of malicious attempts).

ATTORNEY'S EYES ONLY                                                                    DEF_00073927

| Number | Description |
|---|---|
| | • *Zuhl Research: securing intellectual findings and crediting to correct researchers.* |
| | • *Zuhl Report: automatic "bot" releasing Zuhl reports to requesting parties after transactions or subscriptions.* |
| | • *Zuhl Reading Room: securing book authors' rights of ownership.* |
| | *Automated processes ('bots') are deployed with the intention of exploring self-organising group formation within social networks.* |
| | *The hypothesis is that complex self-organising groups form (sub) network connection patterns that are recognisable (via pattern 'signatures') and therefore detectable. The hypothesis will be tested by modelling the patterns using external data feeds of real world data. Specialised bots (known as 'perceptrons') take publicly available feeds from several sources (Facebook; CNN; Reuters; Twitter; Baidu) and apply varying algorithms to detect group formation. The perceptrons compete with each other. The technique uses an 'artificial selection' paradigm whereby successful algorithms are 'rewarded' and allowed to proliferate while unsuccessful ones are extinguished. Currently 1,118 Xeon Phi processor cores are deployed on this experiment.* |
| | *Multi-Layer perceptron (MLP) is a feedforward neural network with one or more layers between input and output layer. Feedforward means that data flows in one direction from input to output layer (forward). This type of network is trained with the backpropagation learning algorithm. MLPs are widely used for pattern classification, recognition, prediction and approximation. Multi-Layer Perceptrons can solve problems which are not linearly separable.* |
| | *This experiment is still continuing with no definitive results as yet. The research program is highly experimental with many alternative avenues to be explored. Activities include computer programming, monitoring and data collection, and data mapping.* |

8.  All Intellectual Property Rights owned by Zuhl that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE:Core – 3D Neural Network**

**Project description**:

*In this experiment data mining and network visualization techniques were tested for efficacy in highlighting network connections. Real world databases were examined using a test case (child grooming). The hypothesis was that 3D visualisation would simplify complex datasets to uncover previously hidden relationships in the data (such as social networks, chats and logs). This would occur by creating an easily comprehensible 3D map that a user can rotate and zoom. The GEOMI software (Ahmed et al., 2005; Ho et al., 2008) was used to visualize the network. SO far the experiment has resulted in a journal paper (Wright, CS & Pang, I: Three-dimensional visualization of social interactions network) pending publication (available on request).*

*This study analysed the social interaction networks built from person-to-person conversations. The dataset contains the content of the conversation, the IP address of each username, date and time of online events such as log-in, log-out, broadcast, and conversation. The IP address recorded from log-in and log-out records are used to find users with several usernames. The first three layers of the IP address is used to determine whether the same user utilises more than one username. Similarly, using the first two layers of the IP address, we created a network of each person linking to each first two layer of the IP address. The*

**Execution Counterpart**

ATTORNEY'S EYES ONLY          DEF_00073928

| Number | Description |
|---|---|
| | *resulting network provides a rough idea of the geographical proximity of each user to each other user.* |
| | *So far it has been determined that the presence of multiple identities causes the network to be less connected and, predictably, creates the illusion that there are more users in the network. The ability to consolidate multiple identities helps recover missing connections in the network and therefore could expose a more accurate clustering co-efficient (the degree to which nodes in a network tend to cluster together). Activities include computer programming, monitoring and data collection, and data mapping.* |

9. All Intellectual Property Rights owned by Zuhl that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project:

**PROJECT TITLE:Supporting - Base system**

**Project description**:

*In order to support the proposed research activities with access to world-class computing assets, we will first will acquire state-of-the-art cluster computing capacity with a nominal speed of 1,000-2,000 Teraflops. The central workhorse of the project will be one of the fastest computers for unclassified research in the world performing at more than 1,000 Teraflops when it goes live.*

*We are proposing to test and create a quasi-opportunistic supercomputing platform using cluster cores. In this, distributed computing solution will be developed where the "super virtual computer" of a large number of networked geographically disperse computers performs huge processing power demanding computing tasks. Using quasi-opportunistic supercomputing, we aim to deliver a higher quality of service than opportunistic grid computing by achieving more control over the assignment of tasks to distributed resources and the use of intelligence about the availability and reliability of individual systems within the supercomputing network.*

*The cluster shall consist of commercially available virtualised servers as nodes; with a high-speed interconnect for high-bandwidth, low-latency communication between the nodes, as well as Ethernet for administrative communication. The cluster will be designed to leverage multi-socket/multi-core node technologies to optimize system performance, switch port count and interconnect bandwidth utilization.*

*A scalable administration process will be provided to ensure the system can be rebooted in 30 minutes or less and that the overall uptime for at least 98% or all cores remains at 99.999999%. The project requirement is that the cluster performance, as measured in Tflops/s (10e12) floating point operations per second), be as high as achievable.*

10. The Works comprised in the body of work described as: P2P social network payment settlement system.

11. The Works comprised in the body of work described as: Distributed reputation system.

12. The Works comprised in the body of work described as: Reputation based authentication system .

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                                 DEF_00073929

| Number | Description |
|--------|-------------|
| 13. | The Works comprised in the body of work described as: System and method for creating a secure trusted social network with reputation recorded into the blockchain |
| 14. | The Works comprised in the body of work described as: Method of sharing possessions among "friends" connected through a social network using blockchain based tracking. |
| 15. | The Works comprised in the body of work described as: A method and system to allow for the exchange of personal information whilst maintaining privacy in social and dating networks. |

ATTORNEY'S EYES ONLY                    DEF_00073930

**Schedule 14**

**Daso**

| Number | Description |
| --- | --- |
| 1. | All Intellectual Property Rights owned by Daso in its primary business functions, including Distributed Autonomous Smart Organisation (DASO) and Decentralized Autonomous Consensus Platforms (DACP). |
| 2. | All Intellectual Property Rights owned by Daso that were assigned by Interconnected Research to Daso under the R&D Services Agreement between Interconnected Research and Daso. |
| 3. | All Intellectual Property Rights owned by Daso that were assigned by Integyrz to Daso under the R&D Services Agreement between Intergyrz and Daso. |
| 4. | All Intellectual Property Rights owned by Daso that were assigned by Pholus to Daso under the Consultancy Agreement between Pholus and Daso. |
| 5. | All Intellectual Property Rights owned by Daso that were assigned by Panopticrypt to Daso under the Consultancy Agreement between Panopticrypt and Daso. |
| 6. | All Intellectual Property Rights owned by Daso that were assigned by Denariuz to Daso under the Consultancy Agreement between Denariuz and Daso. |
| 7. | All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project): |

**PROJECT TITLE**: **Decentralized Consensus (Distributed Autonomous Smart Organisation) Project**

**Project description**:

*The creation of a self-defining platform and a programming language that makes it possible for any developer to build and publish next-generation distributed applications. The project will create a AI (artificial intelligence) and learning system can be used to codify, decentralize, secure and trade just about anything: voting, domain names, financial exchanges, crowd funding, company governance, contracts and agreements of most kind, intellectual property, and even smart property through hardware integration.*

*At present, laws are created by intuition and written in an imprecise language. This project seeks to create the tools for expressing laws in a precise semantic language, better understanding their likely impacts, and automatically designing laws to*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073931

| Number | Description |
|---|---|

*achieve desired outcomes.*

*At present Smart Contracts are limited. Contracts are society's programming language. Today they're written in an imprecise, hard to read, and hard to write language. We seek to develop a new framework that supports automatic contract creation, enforcement, and interpretation.*

*This will extend into developing a smarter framework for modelling economic behaviour and making better decisions.*

*A DASO is a virtual AI agent capable of performing, fulfilling, and executing the tasks, actions, and functions normally conducted by managers and executives, such as paying bills, issuing dividends and even crowd funding an IPO.*

*The aim is to produce a system that allows this to occur within a trustless or quasi-trustless environment with the "balance of trustlessness" determined by the intention of the parties and the capabilities of the code. The use of a Turing-complete language integrated with a cryptoledger, a DASO could be used to create a tamper-resistant or tamperproof entity, immune to many of the abuses and vulnerabilities that have been happening to brick-and-mortar organizations are today (e.g., burglaries, arson, unintentional exposure to proprietary documents).*

*Currently no real decentralized autonomous organization (also known as a decentralized autonomous corporation or autonomous agent) is known to actually exist on a cryptoledger, although there are payroll bots and various software-based HR tools out on the market that integrate at the edges (BitPay) .*

*The use of Bitcoin will help facilitate the creation of a DASO as all users technically must submit a digital key which counts as some kind of voting mechanism, shareholders (miners) receive direct compensation for their work (seigniorage) – and there is no administrative overhead per se.*

8.  All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project):

**PROJECT TITLE: Core - Virtualised HPC: The development of a HPC (High Preformance Computing) Platform**

**Project description**:

*Multi-Layer perceptron (MLP) is a feedforward neural network with one or more layers between input and output layer. Feedforward means that data flows in one direction from input to output layer (forward). This type of network is trained with the backpropagation learning algorithm. MLPs are widely used for pattern classification, recognition, prediction and approximation. Multi-Layer Perceptron can solve problems which are not linearly separable.*

*To create and train Multi-Layer Perceptron neural network we will do the following set of steps for each test or experiment subset:*

*1. Create start case Perceptron neural network project;*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073932

| Number | Description |
| --- | --- |
| | *2. Create Multi-Layer perceptron network;* |
| | *3. Create training set;* |
| | *4. Train network; and* |
| | *5. Test trained network.* |

*The main advantage to a systems engineering approach is the ease with which it can be automated. We hypothesise that the various inputs and formula we seek to test as seed inputs can become inputs into a neural network algorithm. Equation (1) could be modelled in three layers*

*Here, an input layer with one neuron for each Input (system or application) could be used to map for IP Options, fraud and market conditions, price volatility and reputation etc. The system of perceptrons would be processed using a hidden neuron layer in which each neuron represents combinations of inputs and calculates a response based on current data coupled with expected future data, a prior data and external systems data. Data processed at this level would feed into an output layer. The result of the neural network would supply the output as an economic risk function. In this way, a risk function can be created that not only calculates data based on existing and known variables (He, Wang, & Yan, 1992), but also updates automatically using external sources and trends. Many external sources have become available in recent years that provide external trending and correlation points. Unfortunately, most of these services have clipped data as the determination of complex market conditions is generally unclear and takes time to diagnose where much otherwise useful data is lost.*

*A depiction of a Multi-Layer layer topology neural network: We hypothesise that for market data that can be built into a DASO that multi- layer topology neural networks can be used to accept data from risk models and automatically update the risk profile of an organization or individual and hence to minimise economic loss conditions and create a more rational considered approach to financial transactions. We further hypothesise that when modelling risk, each application and system can be modelled using a perceptron.*

*Inputs being fed into a perceptron: The perceptron is the computational workhorse in this system. In this it is reasonable to model the selected risk factors for the system and calculate a base risk that is trained and updated over time.*

9.    All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Supporting – Development of a virtualised multicore platform:**

**Project description**:

*Supercomputing is rapidly becoming an essential element of innovation and competitiveness. Computer-based methods now play a central role in all areas of economic development, education, and research. Economically, computational analysis, modelling, and simulation have become a distinguishing factor in business competitiveness. Educationally, developing*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073933

| Number | Description |
|---|---|

computing skills in students is an essential part in preparing for a future in a wide range of careers.

Establishing the virtualised core supercomputer will greatly accelerate these trends to the benefit of Denariuz and allow it to complete the creation of a DASO in a timely manner.

These systems will have very high-speed fibre connectivity, small computing clusters, high-speed, high definition video conferencing, a large 3-D visualization screen, and desktop computing platforms with 3-D visualization. In order to support the proposed research activities with access to world-class computing assets, we will first acquire state-of-the-art cluster computing capacity with a nominal speed of 1,000-2,000 Teraflops. The central workhorse of the project will be one of the fastest computers for unclassified research in the world performing at more than 1,000 Teraflops when it goes live. Opportunistic Supercomputing is a form of networked grid computing whereby a "super virtual computer" of many loosely coupled volunteer computing machines performs very large computing tasks. Grid computing has been applied to a number of large-scale embarrassingly parallel problems that require supercomputing performance scales. The problem with many approaches is that basic grid and cloud computing approaches that rely on volunteer computing cannot handle traditional supercomputing tasks such as fluid dynamic simulations and will not be adequate for the use in the creation of a set of multi-level perceptron based DASO's that compete in evolutionary formats.

10.    All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project):

**PROJECT TITLE: Core – Decentralized Autonomous Consensus Platform (DACP) and associated experimental case studies: - Project description**:

Unlike in a legacy company where decision-making authority is concentrated at the executive level, in a Decentralized Autonomous Consensus Platform (DACP), the decision-making authority is part automated, in that it has specific rules that are followed without possibility of deviation from expected form, and conversely human interaction and bias is limited to the edges. In such a model, power and authority, rather than being collected at the top, is spread to the edges of the network by allowing key holders (or VoiceHolders) to influence the decision-making and priorities of the DACP proportionally with their preapproved voting rights (e.g., when setting up a firm, a voting structure is put in place usually based on the amount of equity or shares an individual has).

Bitcoin introduced the idea of autonomous distributed consensus, automation at the centre of the network and intelligence on the edges.

The legal liability and responsibility of a DACP or DAC still trace back to the key holders who sign their digital keys with a DACP which then calculates results based upon the prearranged voting proportionality.  For example, Bob's Boutique requires that the allocation of special funds used by the DACP to hire contractors must be approved by a threshold of digital signatures.  If the

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073934

| Number | Description |
|---|---|

*threshold is unmet then the DACP does not release the funds to hire the contractors.*

*Software-based solutions used to calculate, authenticate and verify shareholder votes for many corporations and organizations exist. These however are all centralised and rely on a trusted third party (or parties) making them susceptible to social engineering and man-in-the-middle attacks.  The initial opportunity is the creation of a DASO that allows for e-voting enterprises built using consoles and virtual applications that utilize a cryptoledger, allowing members of organizations and institutions of all sizes to securely sign policy decisions.  This would be designed in a manner able to prevent internal takeovers and allow for quick dissolution (e.g., to manually reallocate assets), as a self-termination clause could be programmatically designed within a DACP that could be triggered if enough shareholders submit signatures (or Voice) to a specific internal address within a specific timeframe (nLockTime). In such a model, power and authority, rather than being collected at the top, is spread to the edges of the network by allowing key holders (or VoiceHolders) to influence the decision-making and priorities of the DACP proportionally with their preapproved voting rights (e.g., when setting up a firm, a voting structure is put in place usually based on the amount of equity or shares an individual has). The legal liability and responsibility of a DACP or DAC still trace back to the key holders who sign their digital keys with a DACP which then calculates results based upon the prearranged voting proportionality.  For example, Craig's Coffee requires that the allocation of special funds.*

11.   All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: DACP Assurance Contracts:**

**Project description**:

*A DACP can be created as articulation of an assurance contract based upon a predesigned outcome, those who agree with the sentiment send funds to the DACP (the fundraising) and after a value-threshold is met, the DACP acts to bring about the desired result. Funds that are raised during this process are not releasable until a threshold (e.g., 51%) of those who put the value there in the first place, or those who purchased extra shares (e.g., giving larger voting pools) agree to both the need for the expenditure, and the final product being submitted for reimbursement. This would be created as a DASO with the ability to spend funds, but only at the direction and authorization of the majority of shareholders. The creation of such a system will mirror and utilise Bitcoin creating a DACS and DACP that are consensus driven, rules-based systems.  To be part of the system is to follow the rules, so there can be no pre-mining, no individuals with privileged status at all.  Privilege is the antithesis of efficiency, and these structures seek efficiency above all things.*

*A hypothetical DACP assurance contract that will be built and tested is detailed below:*

*1. DACP specification is proposed with Kickstarter Address collecting Bitcoin;*

*2. Received funds comprise development funds and initial DACP monetary base;*

**Execution Counterpart**

ATTORNEY'S EYES ONLY                    DEF_00073935

| Number | Description |
|---|---|
| | *3. Kickstarter Address hits funding threshold and DACP Proposal Hub bounty is issued and rewarded by DACP consensus,* |
| | *4. Proposals to develop DACP are created, and one or multiple are accepted;* |
| | *5. Completed bounties are reviewed, and bounties are released by prearranged consensus.  DACs cannot integrate submitted bounty solutions until the winner has been paid; and* |
| | *6. Once the platform is created and operational, DACP token holders can sell their tokens for Bitcoin at current market rate, hold it to speculate on the platform becoming more popular relative to the fixed number of DACP tokens, or exchange their DACP token with the DACP itself for DAC token as described above.* |
| | ***Associated Experimental Case Studies:*** *Creating an initial simple DAO designed to execute a contract based on pre-agreed to conditions.* |
| | *In this, the contract would be coded such that if a digital signature counts as a vote, the only way to modify what a DAO would do is to get X amount of votes to approve some kind of execution process.  The specific amounts are hardcoded into the program beforehand and perhaps some are weighted differently.  To a limited extent, multi-signature transactions, also known as m-of-n transactions (e.g., "joint bank account" "multi-signature lotteries").* |
| | *There is some minor ability to do this with Bitcoin alone, but the limit of around 10,000 bytes will not be enough to fit hundreds of "votes" and hence could not be used for any large scale system. Multi-signature authorization of transactions is not a new concept as it has existed for hundreds of years in every corner of the globe.  These have been utilised in order to force conspiracy to take place in order for abuse to be undertaken.  That is to say, no single individual has the unilateral ability to abuse the treasury of an organization (or launch a ballistic missile). For instance, using the Bitcoin protocol today as established by the built-in rules of Script (the name of the internal language), three parties could sign a contract which is programmed to release funds so as long as it receives the digital key of at least two of the parties.  As a consequence, this makes the Bitcoin protocol the legal system as it is impossible to use the tokens without the signatures.  Or in other words, if Bob operates a small company he may need to have 2-out-of-3 executives sign a document in order to release funds to pay for warehouse expansions.  With cryptocurrencies, the same idea applies wherein to move a ledger value (a Bitcoin) to a different address, a smart contract or DAO that holds and controls "locked" tokens needs a predetermined amount (threshold) of digital signatures to release them. While it is not a complete DAO (let alone a DASO), Bits of Proof has developed software that provides this type of 2-out-of-3 reconciliation on a small scale using Bitcoin. The aim is to extend this such that a small company could create a DAO (and one day a DASO) on the Bitcoin ledger.  As an example, if the company has five executives, each with a digital key needed to utilize and modify the cryptoledger, based on the company charter (and as specified in the smart contract or DAO), at least three of the five are required to use their keys in order for the tokens within a DAO to be used.  After a company meeting, an agreement is made to use the funds and three executives – Alice, Bob, and Carol – are asked to use their digital signatures (keys) to tell the DAO to release a certain amount of tokens.  Utilizing their smartphones (or any network connected device with an app tied into the ledger), they then submit their key and the funds are released.* |

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073936

| Number | Description |
| --- | --- |

12.  All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project):

**PROJECT TITLE: Core - Time Clock and Log-in based contractor DAC**

13.  All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project):

**PROJECT TITLE: Core - Peer to Peer Insurance Markets and DAC**

14.  All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project):

**PROJECT TITLE: Core – DASO employment and contractor Smart Contract:**

**Project description**:

> We postulate that the creation of a DASO based in the Blockchain can be created that incorporates various clauses programmed into the contract to hedge against (or prevent, or in case of) some type of counterparty risk. One example of such a smart contract system would be the development of a contract for a low paid migrant job.
>
> For example, we propose to develop and test a system that would, work in the following way:
>
> • Bob, an employee, would use a digital key to sign a smart contract with his boss Alice, who also uses a digital key to sign it.
>
> • Within the contract will be a number of provisions and stipulations regarding payment time periods and clauses that hedge against the possibility that one party does not fulfil his or her end of the bargain.
>
> • The system will be developed to allow for a clause that says how payment will actually take place and an escrow service will be enabled.
>
> • The contract would be stored on a public decentralized cryptoledger (Bitcoin).
>
> • Being stored on a public cryptoledger we seek to prove that it would be tamper proof and forge proof as it sits there immune from third party interference.
>
> Note that whilst most people think of Bitcoin as a currency tracking tool, in arithmetic terms it is more akin to a database that can be used to track any particular dataset (e.g., a Bitcoin) as long as it fits within the technical limitations.  It just so happens that the sole data this past four years has been for one particular "token" as represented by an integer on the ledger (i.e., Bitcoin).
>
> While there is a way to change the way the DAO could operate by convincing the rest of those with votes to modify it with their

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073937

| Number | Description |
|---|---|
| | *private keys, the original contract would still be left in public view and remain untampered.* |

*We propose that the creation of a contract with an nLockTime (time-based) clause or condition that after X amount of time can be generated such that where predefined conditions are not met (for example, payment) then the contract would follow a turning complete path through a series of predefined termination clauses.*

*It is postulated that this could be extended to send the contract terms to a predefined arbiter or escrow DAO or DASO. There is a long way and much research to be completed before a smart contracts could be expected to solve the majority of the problems on the edges of a network (e.g. brick-and-mortar infrastructure), but we seek to prove that it will prevent tampering with the actual contract itself thereby protecting employees (and employers) from trusted third party risks such as fraud.*

*We seek to demonstrate the initial test contract that would be formulated in the following manner:*

*• Bob (the employee or contractor) digitally signs a smart contract (on the Bitcoin Blockchain) with Alice (the employer) stipulating various expectations, terms of compensation, etc.*

*• The smart contract stipulates that payment will be released at set each month if no issues occur.*

15.    All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Core – Anti-Fraud loyalty DASO:**

**Project description**:

*We believe that the development of a series of fraud resistant loyalty programs, merchant reward programs and "Frequent flier tokens" can be built into a Bitcoin based cryptoledger.  These aid in preventing and mitigating the risks involved in travel and loyalty system fraud  (e.g. getting frequent-flier miles without flying).*

*We hypothesise that it will be possible to create an economically viable loyalty scheme on the Blockchain that can offload the auditing, storage and transportation of rewards and utilize the "contract" system of the Bitcoin cryptoledger by using an arbitrary amount of a token (0.001 BTC), creating a "contract" that defines a set amount of mileage (which itself will likely have some predefined expatriation dates).  Assuming that flyers are using cryptocurrency wallets and provide the airline with their wallet addresses, the users will be able to receive the mileage amount in their wallets. In turn the users can sell and trade the reward tokens by sending a specified amount to the company such as trading Airline miles.*

*We propose that this would not simply suit frequent flier miles but that other institutions (even stores such as Woolworths) could use a smart contract to issue and track its own customer loyalty program rewards. We propose that a Blockchain based system similar to a coffee card requiring a customer to collect a certain threshold of stamps for a free coffee can be developed on the cryptoledger where customers would be stopped from gaming the system. Such fraud occurred with Subway where by buying and selling entire reams of stamps on eBay, creating massive stamp inflation costing the parent company an unspecified amount*

ATTORNEY'S EYES ONLY                                                                 DEF_00073938

| Number | Description |
|---|---|

*in losses and led to Subway ending the loyalty program in 2005.*

*We hypothesise that this can be extended into cryptoledger based coupons.*

*While this may seem like a mundane area, it is important to note that Juniper Research predicted that by 2016 "the total redemption value of mobile coupons will exceed $43 billion globally" because coupons are increasingly delivered by mobile apps. For perspective, 48% of adult internet users in the United States redeemed a digital coupon for shopping in 2012. Consumer Packaged Goods (CPG) manufacturers distributed 305 billion coupons in 2012, the same quantity as the year prior. Total redemption for 2012 fell 17% to 2.9 billion coupons, saving CPG companies a substantial $800 million in face value discounts. We seek to create a DASO providing coupons or discounts for companies to manage these redemption contracts (e.g., a type of time-locked token), which will not only reduce the logistical overhead but also prevent coupon abuse and fraud (e.g., double-spending).  According to the US postal inspector Roberta Williams, "for every coupon successfully counterfeited, it costs the manufacturer $1 million." Initially these fake coupons are scannable but the coupon inflation ultimately forces manufacturers to redeem more than they had intended.*

16.   All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Core – Smart Switch DASO**

17.   All Intellectual Property Rights owned by Denariuz that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Daso may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Triple entry distributed ledger**

18.   All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Core – Sportsbook:**

**Project description**:

*We seek to develop and create an artificial intelligence oracle involving a sports bet. This could conduct the scenario of:*

*• Bob bet that team A would win and Alice bet the other team would win.*

*• An oracle holds the deciding key to a contract that says if team A wins, Bob receives the funds (Bitcoins) and if team B wins, Alice receives the funds.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073939

| Number | Description |
|--------|-------------|
| | *The parties write and agree to a bet as a contract noting how the transaction should proceed in the event of disputes or potential ties. On the completion of event, the DAO oracle signs the contract as a payout to the winner without having an explicit middleman.* |
| | *We postulate that unlike ordinary legal disputes involving nuances and grey areas, sports betting is an objective, idealized scenario because there is no grey area as all that an oracle would have to do is have access to an ESPN data feed for instance.* |

19.   All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Distributed Autonomous Smart Organisation Project (DASO):**

**Project description**:

*We aim to use the Bitcoin Blockchain to create the world's first true DASO (Distributed Autonomous Smart Organisation). Although the ideas underlying the project are currently much discussed there is a lack of consensus about these concepts and related concepts such as Distributed Autonomous Organisations (DAOs) and Decentralised Autonomous Companies (DACs) (e.g. see [7]). A DAO has been described as a virtual agent capable of performing functions normally conducted by company managers and executives [1], while a DAC can be thought of as a DAO acting as a corporation (i.e. it pays dividends to shareholders [7]). These entities purport to automate business rules without recourse to centralised control and with strong defence against cyber-attacks. Despite the vision of some early luminaries [4] and current attempts to build DAOs/DACs, few known decentralized autonomous organizations exist today [1] and according to Bitcoin developer Mike Hearn there are currently no DACs in existence (though Bitcoin comes close) [1]. Our intention is to go beyond the concept of a DAO and create a Distributed Autonomous Smart Organisation by incorporating artificial intelligence. We will achieve this by leveraging our expertise in Bitcoin protocols, cyber security and AI. A core concept to be employed in our DASO is the 'smart contract' whereby various clauses are programmed into the contract to hedge against all types of counterparty risk [3]. The system operates within the quasi-trustless environment of Bitcoin's cryptoledger. 'Trustless' in this context means the system obviates the need for trust between transacting parties because of secure, independent verification processes. The project consists of research and development of the underlying processes to support this functionality as well as experimental implementations of various applications of the techniques.*

*References used throughout the application and further reading:*

*[1] Swanson, Tim (2014). Great Chain of Numbers (chapter 5). http://www.ofnumbers.com/2014/03/04/chapter-5-how-smartcontracts-could-work/ retrieved Nov 2014.*

*[2] Chen, Caleb (2014). Gavin Andresen Outlines Bitcoin 2.0 Without Ethereum. https://www.cryptocoinsnews.com/gavin-andresenoutlines-bitcoin-2-0-without-ethereum/ retrieved Nov 2014.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073940

| Number | Description |
|---|---|
| | *[3] Omohundro, Steve (2014). Smart Contracts.*<br>*http://www.ustream.tv/recorded/54549113/highlight/570340?utm_campaign=www.meetup.com&utm_source=ustre.am/_3GSlp:2*<br>*on2&utm_medium=social&utm_content=20141125034218retrieved Nov 2014.* |
| | *[4] Szabo, Nick (1996). Smart Contracts: Building Blocks for Digital Markets.*<br>**http://szabo.best.vwh.net/smart_contracts_2.html retrieved Nov 2014.** |
| | *[5] He, Wang, & Yan (1992). Semimartingale Theory and Stochastic Calculus. Since Press, Beijin, New York* |
| | *[6] Buterin, Vitalik. Bootstrapping A Decentralized Autonomous Corporation: Part I*<br>*(http://bitcoinmagazine.com/7050/bootstrappinga-decentralized-autonomous-corporation-part-i/) retrieved Nov 2014.* |
| | *[7] Buterin, Vitalik. DAOs, DACs, DAs and More: An Incomplete Terminology Guide. https://blog.ethereum.org/2014/05/06/daos-dacsdas-and-more-an-incomplete-terminology-guide/ retrieved Nov 2014.* |
| | *ANZSRC code: Information, computing and communication sciences; Artificial intelligence and image processing.* |

20.    All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Smart Contracts:**

**Project description**:

*Traditional contracts require interpretation of imprecise language. Using our proposed contract programming language, evenunskilled users can develop 'smart contracts' that encode and automate both obligations and consequences such that once the clauses are agreed by all parties, there is no possibility of default as all behaviours are automatically executed. E.g, we propose monetary transfers be secured using a predefined escrow DASO. As these are stored on a public decentralized cryptoledger they are virtually tamper-proof and immune to third party interference. We will experiment on a range of specific real-world applications, as follows:*

**Employment Smart Contract**

*Employee and employer use digital keys to 'sign' a smart contract specifying all obligations. Payment is enforced via an escrow service.*

**Time Clock DASO**

*A DASO manages employee timekeeping to ensure fair pay for fair work. In the simplest form the DASO monitors the employee'selectronic punch card (log-in/log-out) and enforces payment by the hour. More sophisticated versions process other metrics such as keystroke rates; websites visited; files accessed; etc.*

**Anti-Fraud loyalty DASO**

**Execution Counterpart**

ATTORNEY'S EYES ONLY

DEF_00073941

| Number | Description |
|---|---|

Loyalty programs (Frequent Flyer, Merchant Rewards, coupons and even coffee cards) can be economically built into the Blockchain to handle the storage and management of rewards.

**Smart Switch DASO**

Utilise smart contracts to create digital security systems for property (e.g. vehicles and housing) [4]. Only the rightful owner controls the cryptographic keys for property operation based on the terms of the contract. E.g, a vehicle could be rendered inoperable unless the proper challenge-response protocol is completed.

**Sports Betting DASO**

The parties agree to a bet using a smart contract that encodes clauses to handle ties and other incidents (e.g. horse scratching). The DASO automatically enacts the payout to the winner.

**Peer to Peer Insurance Markets DASO**

Smart contracts will be used to instantiate peer-to-peer insurance agreements.

**Current progress**

Progress has been limited due to staff and funding constraints. Some trials on underlying techniques (i.e. across different types of contract) are underway in which we are investigating an autonomous system with loops based on payment points (i.e., what types of systems can be built with a ten-minute average payment loop, as ten minutes is the average Bitcoin transaction verification lag).

Progress is expected to ramp up once the constraints are lifted in the latter part of this year.

21.     All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project):

**PROJECT TITLE: Experimental DASO Case Studies:**

**Project description**:

We aim to design and simulate a company capable of executing all company functions and meeting all statutory regulations but operating on the Bitcoin cryptoledger as a full-blown DAC (Distributed Autonomous Corporation). All company operations will be managed by a customised DASO programmed to enforce activities and obligations via smart contracts and multi-signature keys (i.e. consensus voting techniques). A further aim is to extend this concept to experiment with AI bots that hold the keys and act independently based on market conditions or stakeholder representation.

In the initial iteration the DAC's stakeholder (e.g., a board of directors, say) will have the ability to modify operations of the DAC based upon pre-approved programmatic rules managed by the DASO. The DASO will use the multi-signature technique to control decisions. By prior agreement of the stakeholders, the DASO would be pre-programmed to enact decisions based on

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                                                    DEF_00073942

| Number | Description |
|--------|-------------|

*agreed voter thresholds. For example, a five-member board of directors could be set up to require 3 members to vote in favour of any proposal before enacting it. In later versions, AI bots will take the place of human agents. Experiments will be set up where bots run companies based on learned behaviour optimised by 'natural selection' of competing algorithms. In still other experiments, configurable AI bots will be created in such a way as to allow a human stakeholder to delegate authority to the bot. A stakeholder will select values from a range of parameters that essentially encapsulates the stakeholder's personal ethics and business outlook. From this, the AI bot can determine the stakeholder's probable position on any possible proposal and then vote on the stakeholder's behalf automatically. For example, parameters might relate to the stakeholder's risk profile; political leaning; level of profit motivation; degree of social responsibility; etc. Progress has been limited due to staff and funding constraints. Progress is expected to ramp up once the constraints are lifted in the latter part of this year.*

22. All Intellectual Property Rights owned by Daso that were created in the course of or in connection with the following project including all Works created in the course of or in connection with such project (acknowledging that Denariuz may also own some Intellectual Property Rights in connection with this project*)*:

**PROJECT TITLE: Online Distributed Ledger DASO**:

**Project description**:

*A well-known business problem is the lag time between the close of a financial period and the closing of the books. We aim to build a type of DASO called an Online Distributed Ledger (ODL) into the Bitcoin Blockchain that will account for and report on every transaction in real time. The intention is to create an API designed to allow even traditional companies to make entries into the ODL. Thus, a centralized system can interface with decentralized processes to enable businesses to integrate financial databases. Account records will be kept up to date and will be accessible at any time to all authorised parties including customers, vendors and auditors. Audit trail would persist in perpetuity as each transaction would be time-stamped, hashed and never deleted. This lessens the requirement for regular auditing, thereby reducing costs and minimising disruption to business activities.*

*Accounting methods are about tracking state changes in units of account. The units usually represent money but the same underlying process can be extended into a universal tracking and reporting system for any type of property. This can be implemented on the Bitcoin Blockchain by assigning a nominal value to the transaction (i.e. a single satoshi). Furthermore, the system can be segmented, allowing individual users to create separate and private accounts for anything that needs to be tracked. We aim to demonstrate this latter function with an experiment on Vehicle Tracking. We will maintain vehicle records using data derived from various sources (e.g. GPS and user calendar information) transmitted into the ODL. Progress has been limited due to staff and funding constraints. Progress is expected to ramp up once the constraints are lifted in the latter part of this year.*

**Execution Counterpart**

ATTORNEY'S EYES ONLY                                                            DEF_00073943