**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

      plaintiffs,

v.                                                                    **Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

      defendant.

_____/

**DR. CRAIG WRIGHT'S OPPOSITION**
**TO PLAINTIFFS' OMNIBUS MOTION FOR SANCTIONS**

      Craig Wright, the defendant in this multibillion-dollar case, has a constitutionally protected right to a trial by jury, which plaintiffs ask this Court to deny him. "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.[1] As the Supreme Court stated more than sixty years ago, "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 501 (1959).

      Now, for the second time in 13 months, plaintiffs ask this Court to deny defendant his right to a jury trial and issue a judgment against defendant without bothering with a trial before a jury and without having all the evidence and witnesses heard and presented. Plaintiffs seek to silence defendant from telling his side of the story and present witnesses and evidence in support of his defense (and frankly his character, which plaintiffs have put squarely at issue). Plaintiffs

---

[1] J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 1757 (1833). "[I]t is a most important and valuable amendment; and places upon the high ground of constitutional right the inestimable privilege of a trial by jury in civil cases, a privilege scarcely inferior to that in criminal cases, which is conceded by all to be essential to political and civil liberty." *Id.* at 1762.

seek to have only one person weigh and determine the evidence presented by both plaintiffs and defendant, transforming this case from a jury trial to a bench trial.

Because of a supposed "sustained pattern of perjury, forged evidence, misleading filings, and obstruction," plaintiffs argue that "Wright must be made to understand that perjury, forgery, and purposeful obfuscation are not 'efficient breaches.'" Plaintiffs' Omnibus Sanctions Motion (the "Motion") [D.E. 507] at 1. Accordingly, plaintiffs argue, this Court should "impos[e] not only any sanctions, but default sanctions." *Id*. at 17-18. In support of their extreme request, plaintiffs roll out a parade of horrors detailing defendant's purported misconduct. But plaintiffs both understate the extremely high burden of proof they bear in seeking to have the Court impose a death sentence on defendant's case (*i.e.*, clear and convincing evidence of a fraud on the Court) and overstate the nature and extent of defendant's alleged "well documented history of lies, forgeries and overall disdain for the legal system." Plaintiffs have not met their burden of proving, by clear and convincing evidence, that defendant has committed a "fraud on the court" because he has not done so.

In the Motion, plaintiffs spill a lot of ink on defendant's supposed misconduct, including the purported fabrication of evidence, alleged perjury, and supposed non-compliance with court orders. But plaintiffs have not proven, by any evidentiary standard, let alone "clear and convincing" evidence, that (1) defendant fabricated any evidence for this case, that he bribed the Court or a witness, (2) any supposedly false evidence goes to any "linchpin" or critical issue in this case, (3) his counsel in this case was involved in any of the purported wrongdoing, and (4) defendant or his counsel at any time acted in bad faith, all of which plaintiffs are required to prove before this Court can deny defendant his Constitutionally-protected day in court. At most, what plaintiffs have done is argue that certain evidence—relating to collateral issues that have little, if anything to do with the actual merits of this case—is "suspicious." But "suspicion is not enough." *Tarasewicz v. Royal Caribbean Cruises Ltd.*, 2016 WL 3944176, at *7 (S.D. Fla. 2016) (Bloom, J.).

Plaintiffs in essence ask this Court to rule as a *matter of law*, based on an incomplete record, that defendant is not credible. But the standard for the Court to make such a ruling is extremely high because it would deprive a defendant of his constitutional right to a jury trial. Trial by jury is essential to our system so that the parties in a high-stakes case like this one— where the reasonableness and believability of the parties' narratives are the primary issues—

2

should have the opportunity to convince a jury of their peers—a cross-section of the community—of their case. However, plaintiffs seek to prevent a jury from hearing the witnesses and weighing the evidence in this case. The Court should reject plaintiffs' invitation to serve as judge, jury and executioner, deny the Motion, and allow this case to be tried on the merits, by a jury, as is defendant's constitutional right.

## I.   Plaintiffs' Arguments as to Defendant's Misconduct Should be Addressed to the Jury

Throughout their Motion, plaintiffs make serious allegations as to defendant's purported misconduct. Those allegations include the supposed fabrication of evidence, inconsistent statements, perjury, and purported discovery violations. Based on those allegations, plaintiffs ask this Court to declare them the victor in a lawsuit seeking a multibillion-dollar judgement. But plaintiffs should save their arguments for the jury trial.

Plaintiffs' allegations are just that—allegations. They aren't undisputed facts, they aren't supported by admissible evidence, and defendant hasn't had the opportunity to challenge the so-called "evidence" on which plaintiffs base their allegations. *Tarasewicz v. Royal Caribbean Cruises Ltd.*, 2016 WL 3944178, at *5 (S.D. Fla. 2016) (Bloom, J.) (affirming report and recommendation denying motion for sanctions because "the issue of whether the plaintiff worked on the vessel at all times material—including in December of 2012—[is] an issue of fact that has not been conclusively decided, as the case was not adjudicated on the merits."). In other words, plaintiffs ask this Court to simply accept as true their allegations, notwithstanding the fact that plaintiffs have not established any of them to be true. But the "power to resolve disputes over the truth or falsity of claims belongs to a jury." *Dawsey v. Carnival Corp.*, 2018 WL 5251850, at *7 (S.D. Fla. 2018) (quoting *Bender v. Tropic Star Seafood, Inc.*, 2008 WL 4097602, at *1 (N.D. Fla. 2008)). "In determining which cases are egregious enough to warrant dismissal, courts have been mindful that '[t]rials result from factual disputes. In these disputes, the facts on one side are, at best, less true and, at worse, false or fraudulent.'" *Id.* Thus, in many cases, factual inconsistencies can be resolved by the jury." *Id.; Bender v. Tropic Star Seafood, Inc.*, 2008 WL 4097602, at *3 (N.D. Fla. 2008) ("The factual inconsistencies in Plaintiff's statements can be properly resolved by a jury."); *Deshon v. Circle K Stores, Inc.*, 2018 WL 566840, at *3 (S.D. Fla. 2018) ("The Court finds that the law mandates that the trier of fact determine this case on the merits.").

3

Soon enough, Plaintiffs will have the opportunity to put on their evidence in front of the jury and make their arguments. *Bryant v. Troutman*, 2006 WL 1640484, at *2 (M.D. Fla. 2006) (denying a motion to dismiss based on misconduct and instructing the movant that they "will have ample opportunity to bring those untruths to light at trial"). Defendant also will have the opportunity to cross-examine plaintiffs' witnesses and put on his own rebuttal evidence. At this stage, plaintiffs' request for sanctions is premature and unwarranted.

      **A.**      ***Even if the Court were inclined to adjudicate the existence of the purported misconduct, the severe sanctions plaintiffs seek are inappropriate because the alleged misconduct cannot constitute a fraud on the court***

As demonstrated above, the upcoming jury trial is the appropriate forum to adjudicate plaintiffs' allegations of misconduct. But even if the Court were inclined to consider plaintiffs' arguments and to adjudicate the purported misconduct, the severe sanctions plaintiffs seek are inappropriate, *even if plaintiffs' allegations are true* (to be clear, they aren't). "The outright dismissal of a lawsuit . . . is a particularly severe sanction" that "must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). The "extreme sanction [of dismissing a lawsuit is] meant to be one of last resort." *Idearc Media Corp. v. Kimsey & Assocs., P.A.*, 2009 WL 928556, at *4–5 (M.D. Fla. 2009). For that reason, dismissal of a lawsuit (or a default judgment) is generally only appropriate when there has been a fraud on the Court. *Bender v. Tropic Star Seafood, Inc.*, 2008 WL 4097602, at *2 (N.D. Fla. 2008) (citing *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335-36 (11th Cir. 2002). The type of misconduct plaintiffs allege cannot constitute a fraud on the Court.

      **1.**      *As a general rule, creating fraudulent documents, making false statements, or committing perjury does not constitute a fraud on the court*

The misconduct plaintiffs allege does not constitute a fraud on the Court to impose the severe sanction of a default judgment. "Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of the jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute fraud upon the court." *Aguilar v. United Floor Crew, Inc.*, 2015 WL 2415421, at *9 (S.D. Fla. 2015) (citing *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978)). Here, plaintiffs do not allege that defendant bribed a judge or jury member or that he has submitted fabricated evidence in which an attorney was implicated.

Further, courts in this circuit have repeatedly found that "the 'fraud on the court' necessary to . . . invoke the inherent power of a court is 'fraud which is directed to the judicial

machinery itself ... **not fraud between the parties or fraudulent documents, false statements or perjury.**'" *Leon v. M.I. Quality Lawn Maint., Inc.,* 2018 WL 6250529, at *13–14 (S.D. Fla. 2018) (emphasis added) (quoting *Bulloch v. United States,* 763 F.2d 1115, 1121 (10th Cir. 1985)); *Gupta v. Walt Disney World Co.,* 482 Fed. App'x. 458, 459 (11th Cir. 2012) ("Fraud between parties does not constitute fraud on the court, as it does not carry the same threat of public injury.") (citing *S.E.C. v. ESM Group, Inc.,* 835 F.2d 270, 273 (11th Cir. 1988)).

      For that reason, "perjury and fabricated evidence do not constitute fraud upon the court, because they 'are evils that can and should be exposed at trial.'" *Cerrato v. Nutribullet, LLC,* 2017 WL 1519815, at *2–3 (M.D. Fla. 2017) (citing *Council v. American Federation of Government Employees (AFGE) Union,* 559 Fed. App'x. 870, 873 (11th Cir. 2014) (citation omitted)); *Travelers Indem. Co. v. Gore,* 761 F.2d 1549, 1552 (11th Cir. 1985); *Great Coastal Exp., Inc. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.,* 675 F.2d 1349, 1357 (4th Cir. 1982) ("[C]ourts confronting the issue have consistently held that perjury or fabricated evidence are not grounds for relief as "fraud on the court.") (collecting cases); *Brown v. Sec. & Exch. Comm'n,* 2015 WL 11254726, at *3 (S.D. Fla. 2015), *aff'd sub nom. Brown v. S.E.C.,* 644 Fed. App'x. 957 (11th Cir. 2016) ("[n]either perjury nor fabricated evidence constitutes fraud upon the court, since both can and should be exposed at trial.") (quoting *Travelers,* 761 F.2d at 1552); *Matthews, Wilson & Matthews, Inc. v. Capital City Bank,* 614 Fed. App'x. 969, 971 (11th Cir. 2015) (same); *Hunt v. Nationstar Mortg., LLC,* 779 Fed. App'x. 669, 671 (11th Cir. 2019) (same). "Fraud on the court is therefore limited to the more egregious forms of subversion of the legal process, . . . those we cannot necessarily expect to be exposed by the normal adversary process." *Cerrato,* 2017 WL 1519815, at *2-3; *Travelers,* 761 F.2d at 1552 (same).

      In practice, courts in this Circuit and in this District have found that:

- "Lying under oath, giving misleading answers under oath, thwarting Defendants' discovery, and concealing the existence and/or extent of both prior and subsequent injuries" in personal injury action did not constitute fraud on the court." *Fahmy v. Sch. Bd. of Miami-Dade Cty.,* 2011 WL 13269611, at *3 (S.D. Fla. 2011)) (citing *Bryant v. Troutman,* 2006 WL 1640484 (M.D. Fla. 2006).

- Falsely testifying in a deposition testimony about prior injuries did "not establish that [plaintiff] engaged in a concerted plan to deceive [the] Court." *Reina-Leon v. Home Depot U.S.A. Inc.*, 2019 WL 1558738, at *4 (M.D. Fla. 2019).

- Lying at a deposition about "about preexisting injuries" did not rise to "to the level of willful misconduct substantiating dismissal. *Dawsey v. Carnival Corp.*, 2018 WL 5251850, at *6, *8 (S.D. Fla. 2018).

- "Allegedly fail[ing] to disclose his full medical history, commit[ing] perjury, and act[ing] in bad faith," did not establish a "clear record of bad faith or willful contempt." *Deshon v. Circle K Stores, Inc.*, 2018 WL 566840, at *2 (S.D. Fla. 2018).

- Failing to disclose additional arrests and a conviction in purported "willful violation" of the court's order was not "clear evidence of the type of wilful misconduct that these courts have found sufficient to warrant terminating sanctions." *McIntyre v. Sheriff, Seminole Cty. Sheriff's Office*, 2014 WL 12906199, at *1 (M.D. Fla. 2014).

- "A long train of abuses" including plaintiff "misrepresenting a history of injuries and pain…, prior physicians and medical history,… prior personal injury claims,… [an] ability to wear a wig and heels, … [and] her weight," . . . "does not constitute fraud on the court." *Bassett v. Wal-Mart Stores E., LP*, 2019 WL 4691824, at *2 (S.D. Fla. 2019).

- "Numerous statements of Plaintiff in the deposition and the interrogatory answers were [purportedly] knowingly false or fraudulent" did not demonstrate "a fraud against the court. *Hornbuckle v. Woods*, 2007 WL 781901, at *1, *3 (N.D. Fla. 2007).[2]

---

[2] *See also, e.g., Leon v. M.I. Quality Lawn Maint., Inc.*, 2018 WL 6250529, at *12 (S.D. Fla. 2018) (refusing to reverse judgment under court's inherent powers based on plaintiff's perjury and noting that "perjury and fabricated evidence do not constitute fraud upon the court, because they 'are evils that can and should be exposed at trial,' and '[f]raud on the court is therefore limited to the more egregious forms of subversion of the legal process, ... those we cannot necessarily expect to be exposed by the normal adversary process.'") (quoting *Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1552 (11th Cir. 1985)); *McCarthy v. Am. Airlines, Inc.*, 2008 WL 2517129, at *2 (S.D. Fla. 2008) (declining to dismiss case as a remedy where plaintiff had not disclosed previous injuries and treating physicians in a personal injury case because "this is a question of fact that is best left to a jury's consideration."); *S.E.C. v. ESM Group, Inc.*, 835 F.2d 270, 273–74 (11th Cir. 1988) (finding that there was no fraud on the court in a negligent audit case, where the plaintiff—which was operating a Ponzi scheme at the time—had repeatedly committed perjury and that party's attorney had known that his clients was committing securities

None of those cases should come as any surprise to plaintiffs. In fact, they cite a case by this very Court where the Court declined to dismiss for fraud on the court where the plaintiffs had allegedly perjured themselves with respect to the dates of the husband's employment and whether the husband and wife were actually married and living together, despite filing suit for unpaid wages and loss of consortium. *Tarasewicz*, 2017 WL 3944178, at *5.

        2.     *The cases on which plaintiffs rely are inapposite*

The case that plaintiffs rely on are inapposite. In the vast majority of those cases, the manufactured evidence was manufactured for the purposes of the litigation, it was relied on by the party during the litigation, and the manufactured evidence played a pivotal role. That did not occur over here.

        i.    *The cases that plaintiffs rely on require that the manufactured evidence was made up by the party for the purposes of the litigation, it was relied on by the party in the litigation, and the false evidence played a pivotal and essential role in the party's defense or prosecution of the case.*

In their Motion, plaintiffs rely on a select minority of cases for the proposition that manufactured evidence or testimony is a sufficient basis for the ultimate sanction—default judgment. However, those cases have a common thread: the manufactured evidence or testimony was made up by the party for the purposes of that litigation, it was relied on by the party in the litigation, and the false evidence played a pivotal and essential role in the party's defense or prosecution of the case. In fact, in many of those cases, because the evidence was so essential to the prosecution of the case, there was little to do but dismiss the case after having excluded the evidence.

In *Stonecreek - AAA, LLC v. Wells Fargo Bank N.A.*, 2014 WL 12514900, at *1, *3 (S.D. Fla. 2014), plaintiffs' claims were based on an engagement letter and assignment, both of which were attached to the complaint and were the "two most important documents in [the] case." *Id.* at *3. Finding those documents to be fraudulent, the judge dismissed the case, concluding that "without these documents, I fail to see how this case continues." Similarly, in *Nichols v. Klein Tools, Inc.*, 949 F.2d 1047 (8th Cir. 1991), the plaintiff filed suit alleging that he was injured while using a hook manufactured by the defendant, and he swore that to be true in his first and

---

fraud during the litigation because "This is the type of fraud which the litigants should discover; it does not prevent a party from gaining access to an impartial system of justice.").

second deposition. The plaintiff later admitted in a third deposition that he was using a homemade hook and not the defendant's hook. *Id.* at 1048. The court found that the defendant's lie went to "the pivotal issue in [the] case" and that his "use of a homemade hook at the time of the accident undermines the entire theory of his products liability claim." As such, the court found it appropriate to dismiss the plaintiff's case.[3]

Likewise, in *Vargas v. Peltz*, 901 F. Supp. 1572 (S.D. Fla. 1995), plaintiff brought a sexual harassment action in which she claimed that the defendant had given her a pair of panties and asked her to pose in them. The court found that "Plaintiff here attempted, by fraudulent means, to 'enhance' her case through the introduction of fabricated women's panties and through fictionalized testimony concerning how she supposedly received the panties." *Id.* at 1580. The court further found that "Plaintiff fabricated the panties evidence and the story that [defendant] gave them to her . . . to deceive the Court, [defendants], and eventually, the trier of fact." *Id.* Critically, the court noted that "[w]here, as here, the fabricated evidence undermines the theory in the case, dismissal is particularly appropriate," *id.*, and that "[f]alse evidence in the form of women's panties indeed concern the central issue in this case—i.e., claims of sexual harassment against [defendant]." *Id.* at 1581.[4] And in *Forsberg v. Pefanis*, 634 Fed. App'x. 676, 677 (11th Cir. 2015), the plaintiff sued her boss for sexual harassment. In support of his defense, the defendant offered a false declaration from a coworker stating that he denied seeing the alleged misconduct. *Id.* That coworker later submitted two declarations stating that he had never made the statement submitted by the defendant, and that to the contrary, he had seen the misconduct. *Id.* The court struck the defendant's answer as a sanction for defendant's manufacturing of the false declaration, which defendant had listed as a pretrial exhibit. The Eleventh Circuit, in affirming the trial court's decision, noted that the sanction was appropriate because "the [coworker's] statement was important to [the defendant's] case because it discredited [the plaintiff's] accusations. *Id.* at 679-80.[5]

---

[3] The court also found that monetary sanctions would not be appropriate because the plaintiff didn't have the funds.

[4] The court also found that plaintiff had fabricated and presented false evidence and testimony to the court during a hearing. *Vargas*, 901 F. Supp. at 1581.

[5] The bulk of plaintiffs' remaining cases fare no better:
- *Qantum Comm's Corp. v. Star Broad, Inc.*, 473 F. Supp. 2d 1249 (S.D. Fla. 2007), the court found that "the misconduct related to [one defendant's] testimony and Defendants'

Trying to fit into the caselaw, plaintiffs claim that "the evidence Wright has withheld, concealed, altered, and forged concerns the key issues in this case: whether Wright and David partnered to mine bitcoin and develop intellectual property, the amount of bitcoin that they collectively mined, and which intellectual property they created." Motion at 24. But they offer little analysis or evidence to back up that assertion. Defendant will demonstrate below that each instance of alleged "manufactured evidence" does not relate to a pivotal part of defendants' defense of the case, was not created by defendant for the purposes of this litigation, and in many instances, is not relied on by defendant (and in some instances even hurts defendant's case). As such, plaintiff's cases are inapposite. For the purposes of this analysis, without conceding that plaintiffs' allegations are in any way valid or accurate, defendant will take them at face value.

---

failure to produce evidence related to the pivotal or 'linchpin' issue in this case, a factor which militates heavily in favor of the severe sanction of default" *Id*. at 1278.

- *CFPB v. Morgan Drexen, Inc*., 101 F. Supp. 3d 856 (C.D. Cal. 2015) the fabricated evidence went to the linchpin of plaintiff's claims. Specifically, in a case that turned on whether defendant's business involved the preparation of bankruptcy proceedings for its clients, the defendant fabricated proven false bankruptcy records for its clients after plaintiff had requested those records. *Id*. at 869.
- *Am. Rena Int'l. Corp. v. Sis-Joyce Int'l. Co., Ltd*., 2015 WL12732433 (C.D. Cal. 2015): in a trademark infringement case, the fabricated evidence was made during the litigation and went to the core of the case—the defendant's purported prior use of the mark. *Id*. at *2.
- *KCI USA, Inc. v. Healthcare Essentials, Inc.*, 2018 WL 3196950 (N.D. Ohio 2018): the defendants "created and submitted false invoices and inventory spreadsheets" that went to the very essence of plaintiff's claims against them, deleted data from various devices that had been ordered to be deposited with the court, intimidated and interfered with witnesses, *and* physically destroyed documents and evidence that the court had ordered delivered to plaintiff's counsel. *Id.* at *5, *7, *8.
- *Rosenthal Collins Grp., Inc. v. Trading Techs. Int'l, Inc*., 2011 WL 722467 (N.D. Ill. 2011): the court found that the plaintiff had fabricated evidence during the litigation (which it used to support its position in a summary judgment motion) by back-dating the software code that was the core of the case, in order to show that it was "prior art" to support its trademark claims.
- *Bernal v. All Am. Inves. Realty, Inc.*, 479 F. Supp. 2d 1291 (S.D. Fla. 2007): the defendant and his lawyer engaged in a campaign of disruptive litigation, including the hiding of documents, perjury, the wrongful filing of unsupported sanctions motions, and "most importantly, [defendant] procured false evidence" by bribing a witness into providing a knowingly false declaration. *Id*. at 1300.

Later on in the opposition, he will demonstrate that plaintiffs' allegations are unsupported and wrong as a matter of fact.

> ii.   *There is little evidence that defendant manufactured evidence for the purposes of this litigation, that defendant relied on the evidence in the litigation, or that the allegedly manufactured evidence played a pivotal and essential role in the defendant's defense of the case*

Starting with the Tulip Trust documents, defendant addresses each purported instance of manufactured evidence below:

### 1.     *The Tulip Trust Documents*

Plaintiffs' allege that all three of the Tulip Trust documents are forgeries. Motion at 13. But these documents simply relate to how defendant manages his finances.[6] None of the trusts have any bearing on whether there was a purported partnership with Dave Kleiman to mine bitcoin or develop intellectual property, which is what this case is actually about. Tellingly, defendant never has attempted to introduce any of the trust documents, nor has he substantively relied on them. It's plaintiffs who have continually introduced the documents, referenced them, and written extensively about them, all to show that the documents are forgeries and that defendant is a liar. In the end, however, the documents have little to do with the substance of this case.

Further, even accepting plaintiffs' allegation of forgery for argument's sake, they were not forged for the purposes of this litigation. Plaintiffs' own expert testified that Tulip Trust I and II documents (as with most other documents plaintiffs claim were forged) were allegedly forged sometime in 2014 or 2015—years before this litigation started. Edman Depo. Tr. 108:4-7, January 16, 2020.[7] Attached as **Exhibit A**.

### 2.     *Bitmessages and emails*

Plaintiffs claim that a number of Bitmessages are forgeries. Motion at 12, 19. Those messages, however, primarily relate to the trusts defendant set up, not whether there was a

---

[6] The trust documents can be found at D.E. [237-9], [237-22], and [507-14].

[7] With respect to the citations to deposition transcripts in this opposition, the corresponding exhibits include the relevant excerpt from the transcript. Should the Court desire any additional portion of the transcript, defendant will file the requested portion. Citation to the deposition transcripts shall be [deponent] [page]:[line].

partnership between defendant and Dave Kleiman.[8] And any minimal relationship that those messages may have to the partnership issue actually tends to support plaintiffs' theory of the case (the messages can be viewed as some sort of collaboration between defendant and Dave Kleiman). It makes no sense that defendant would manufacture those documents for this case when they are not helpful to him.

Similarly, plaintiffs claim that many emails between defendant and Dave Kleiman are forgeries. But plaintiffs' expert Gordon Klein opines that many of those emails *support plaintiffs' theory of the case* that there was a partnership between defendant and Dave Kleiman:

> Counsel has asked me not to rely on purported communications directly between Wright and Dave Kleiman based on many of those communications being forgeries by Wright.  I note, however, that many of those communications – if authentic – would be strongly consistent with the types of communications between co-venturers typical of partnerships or joint venture relationships.

Klein report at 6, n.9 [D.E. 500-9]. Plaintiffs are free to ignore those emails if they believe their provenance is suspect, but they have no basis to argue to this Court that defendant is manufacturing evidence to support his defenses or to prejudice plaintiffs' case.[9]

### 3.    WAT00000001

Plaintiffs argue that the "email, if genuine, appears to support Wright's story about keyslices, Dave, and trusts." Motion at 14. But plaintiffs' case is not about "keyslices, Dave, and trusts." Their case is about "whether Wright and David partnered to mine bitcoin and develop intellectual property, the amount of bitcoin that they collectively mined, and which intellectual property they created." Motion at 22. The email has nothing to do with those subjects. *See* D.E.

---

[8] The Bitmessages can be found at D.E. [270-4]. Warren Depo. Tr. Plaintiffs' Exhibits 8, 9, and 11.

[9] While defendant has relied on some emails for his motion for judgment of the pleadings [D.E. 144-1], and [D.E. 144-6], they were only used to demonstrate that the Court lacked jurisdiction, and defendant withdrew the email as soon as he learned that there were inconsistencies in the metadata dates [D.E. 154]. Importantly, plaintiffs' expert has opined that the documents were created in "early 2014," Edman Aff. [D.E. 159-9]—three years before this lawsuit was initiated. In other words, the supposed forgeries were not created for the purposes of this litigation. It's also worth noting that defendant's motion was not dependent on those emails. There is ample other evidence that W&K has foreign members. *See* D.E. 171 at 6-7. In fact, in the BAA proposals that plaintiffs attached to their complaint state that W&K "is a Joint Venture Company between a US Vet. Owned Enterprise and an Australian Research Company." D.E. 83-4 at 51, 57, 64, 71, 77 and 84.

507-16. And even it if did, it doesn't support defendant's theory of the case. The email was also produced by a non-party, not defendant. There is no evidence that defendant was involved in its creation, or that defendant intends to rely on that email at trial.

### 4. The Family Law Settlement

Plaintiffs argue that the appendix to defendant's family law settlement is a forgery. Motion at 2. But, again, that document has nothing to do with the substantive issues in this case. Further, as will be further explained later on in this opposition, the document's bates stamp conclusively establishes that defendant couldn't have created that document for the purposes of this litigation. He didn't have access to it since 2015. And plaintiffs neglect to tell the Court that Ms. Wright authenticated the document and twice testified that it was her signature on the document. L. Wright Depo. Tr. 22:21-24:1; 98:13-16, [D.E. 488-17].

### 5. W&K's Operating Agreement

Plaintiffs allege that W&K's operating agreement that "identif[ies] Lynn Wright as a member," is "another boldface forgery." Motion at 3. But that document relates to jurisdictional issues, not substantive issues.

As with many of the other so-called forgeries, defendant has never relied on that document. He didn't rely on it when moving for judgment on the pleadings and he didn't rely on it when moving for summary judgment. There also is no evidence that the document is a recent forgery created for the purposes of this litigation. At best, plaintiffs can argue that it was created sometime after June 2013 (Motion at 3), which is five years before plaintiffs brought this lawsuit.

### 6. The Highsecured emails

Plaintiffs claim that "Wright's communications with Highsecured" are "inauthentic." Motion at 19. Again, the actual substance of those communications has nothing to do with any purported partnership with Dave Kleiman. Edman Depo. Tr., April 29, 2020, 113:21-114:14 (testifying as to Exhibit 10 of the Edman deposition); 127:2-139:13 (testifying as to Exhibits 18 to 25 of the Edman deposition), attached as **Exhibit B**. The bulk of the communications are innocuous emails related to the purchase of supplies and related invoices. They do not relate to the central issues in the case, they don't advance the defense of the case, and defendant has not relied on any of those documents.

7.      *Defendant's list of bitcoin*

Plaintiffs allege that the list of bitcoin that defendant produced isn't accurate or complete. Motion at 11. But they fail to show how the list of bitcoin that defendant mined has any bearing on the purported partnership with Dave Kleiman to mine bitcoin or to develop bitcoin-related intellectual property.

Plaintiffs have persistently argued that a list of defendant's bitcoin holdings is crucial to the prosecution of their case because they could analyze the bitcoin to show that there was partnership between defendant and Dave Kleiman to mine bitcoin and develop intellectual property. Of course, plaintiffs have never offered any specifics as to what sort of analysis they would conduct, which is not surprising, considering that *plaintiffs own bitcoin expert recently admitted under oath that such an analysis would not be possible*:

Q. Is it possible to identify what real person mined particular blocks of Bitcoin?
A. It is --
Q. Let me -- solely based on information solely on the Bitcoin block chain?
A. It is not possible to identify persons solely based on information recorded on the block chain because the block chain records non-personally identifiable control of each Bitcoin amount.
                                        *        *        *
Q. And using information solely on the block chain am I able to identify who owns particular Bitcoin?
A. The block chain records information about control, not ownership in the legal sense of the word.
Q. Okay. Has it ever shown or recorded any information as to ownership?
A. Legal?
Q. Yes.
A. Ownership?
A. Not that I know. I do not believe that that is possible . . . .

Antonopoulos Tr., Jan. 7, 2020, 221:21-224:10, attached as **Exhibit C**.

In fact, plaintiffs' expert also testified that there is a group of bitcoin that have a certain pattern known as the "Satoshi fingerprint," and which are generally believed to have been mined by Satoshi. Antonopoulos Tr. April 24, 2020, 88:4-18, attached as **Exhibit D**. One would think that plaintiffs would have analyzed that bitcoin to determine whether Dave had mined any of them, in an effort to prove that Dave was Satoshi. Plaintiffs didn't (and can't) conduct that analysis because there is "no way of knowing who mined that bitcoin … because mining is an anonymous activity." *Id*. at 88:19-89:16.

Plaintiff's conduct with respect to the CSW Filed List further proves this point. Plaintiffs' argue that the bitcoin aren't defendants because, after plaintiffs "forgot" to seal the most sensitive document in this case, somebody anonymously posted a message using the keys for 144 bitcoin addresses listed on the CSW list, stating that the bitcoin do not belong to defendant. D.E. 541. They also point to some bitcoin having been recently transacted with. Motion at 9.

But none of that is "evidence" is conclusive of anything, or even admissible. One would think that plaintiffs would simply conduct their long-touted analysis of the bitcoin list to demonstrate to the Court that the bitcoin weren't mined by, and don't belong to, defendant. Plaintiffs haven't done that, *because it can't be done*. At bottom, defendant's list of bitcoin, accurate or not, does not go to any key issues in this case. Plaintiffs assertion that the correct list of bitcoin would enable them to prove all allegations in the complaint, including what bitcoin Dave Kleinman mined or owned, is baseless.

3.     *Plaintiffs' theory that defendant is purposefully manufacturing documents to mislead this Court makes no sense*

According to plaintiffs, defendant is behind all the alleged forgeries and is purposefully trying to mislead the Court. For example, plaintiffs maintain that both the appendix to the family law settlement and the W&K operating agreement are forgeries. Yet, the appendix to the family law agreement contains Ms. Wright signature [D.E. 488-17] at 147, and thus, plaintiffs would have to concede that defendant is able to reproduce Ms. Watts signature. But the W&K operating agreement [D.E. 507-2], which plaintiffs also maintain is a forgery, has a blank spot for Ms. Wright's signature. Why would defendant leave her signature line blank? Wouldn't the perfect forgery be a fully executed document? Why would defendant produce the Bitmessage keys, which according to plaintiffs' experts show that he had the capability to send the Bitmessages on behalf of Dave Kleiman and High Secured? Motion at 12. And why would defendant forge emails that according to plaintiffs' expert support their case? Plaintiffs theory doesn't make sense because it isn't true.

The only rational explanation is that the defendant did exactly what this Court ordered him to do. He produced all documents that hit on search terms, regardless of relevance or provenance. *See* D.E. 231 ("The Court finds that Plaintiffs are entitled to the immediate production of all the documents containing positive hits from the search terms agreed upon by the parties, without waiting for defense counsel to conduct a relevance review.").

Further, the purported forgeries need to be put into context. Defendant has produced over 1.9 million pages of documents, and from all those documents, plaintiffs have identified an extremely small subset of documents that they claim are suspect. But many of those documents *did not originate from defendant's* devices. Defendant produced data from well over 100 different media storage devices, many of which were used by former employees of defendant's companies. There is ample evidence that defendant's computer systems were hacked. *See* D.E. 523 at 8-10.  Defendant cannot accept responsibility for every document that he has produced, especially when many of the nearly two million pages he has produced were not his own documents.

As Magistrate Reinhart stated, "[n]ow, you have asked for a lot in this case, Mr. Freedman. I've given you a lot, but when you ask for a lot, don't complain that you got a lot." Hr. Tr. 43:20-22 (Jan. 2, 2020). The same can be said about the quality of the documents that one gets. Sometimes it will be helpful data, sometimes it will be harmful data, and sometimes it will be data that can't be verified or authenticated. It's not always defendant's fault.

### a. *Even if the alleged misconduct could constitute a fraud on the Court (it can't), plaintiffs cannot meet their high evidentiary burden*

As demonstrated above, the Court should reject outright plaintiffs' Motion because the purported misconduct it is not the type of misconduct that could be considered a fraud on the Court and because there is little evidence that the purportedly manufactured evidence relates to key issues in this case, was manufactured by the defendant for this litigation, or was relied on by the defendant. Yet, were the Court inclined consider the evidence, plaintiffs cannot meet their high evidentiary burden to show that there has been a fraud on the Court.

### 1. *Plaintiffs must demonstrate the alleged misconduct with clear and convincing evidence*

The Court must employ the clear and convincing standard in determining whether defendant engaged in the purported bad conduct, as required by law. *Tarasewicz*, 2016 WL 3944178, at \*2 (when imposing sanctions pursuant to their inherent authority, courts require that the conduct or fraud be proven by clear and convincing evidence) (citing *Barash v. Kates*, 585 F. Supp. 2d 1347, 1365 (S.D. Fla. 2006)); *Johnson v. Law Offices of Marshall C. Watson, PA*, 348 Fed. App'x. 447, 448 (11th Cir. 2009) (same). In their Motion, plaintiffs boldly ask the Court to accept as undisputed their recitation of the purported misconduct, completely ignoring that they

are required to prove the alleged misconduct under the extremely high evidentiary standard of clear and convincing evidence.

This evidentiary standard is so high that a "party must show "more than inconsistencies," "suspicion," and "contradictory statements." *Tarasewicz*, 2016 WL 3944176, at *7 ("Although the circumstances surrounding [a] text message [that appeared to show bribery of a key witness] are suspicious, suspicion is not enough."); *Bender v. Tropic Star Seafood, Inc.*, 2008 WL 4097602, at *3 (N.D. Fla. 2008) (Although the "Defendant has properly shown that Plaintiff has stated inconsistent facts and made contradictory statements," it did not rise to the level of "clear and convincing evidence."); *Snider-Hancox v. NCL Bahamas Ltd.*, 2018 WL 6448765, at *2 (S.D. Fla. 2018) ("Proving a fraud on the court requires more than inconsistencies."). Defendant will demonstrate below that plaintiffs' so-called evidence cannot meet the high standard of clear and convincing evidence.

        2.     *Expert opinions contained in hearsay expert reports are not evidence, let alone clear and convincing evidence*

Throughout their Motion, plaintiffs rely heavily on the expert reports of Dr. Edman, Mr. Boedeker, and Mr. Antonopoulos, and the opinions contained therein.  But those reports are inadmissible hearsay and thus cannot reach the clear and convincing **evidentiary** standard. *Johnston v. Borders*, 2018 WL 4215027, at *1 (M.D. Fla. 2018) ("Expert reports are hearsay; that is, a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Further, the opinions contained in those reports are subject to defendant's *Daubert* motion [D.E. 500], which demonstrates that the experts are not qualified and that their opinions have serious methodological flaws.

More troubling, is plaintiffs request that this Court simply accept as fact the opinions of their experts. Expert opinions are not facts, and given the opportunity to fully cross-examine the experts, defendant will undoubtedly expose additional flaws in their opinions. The Court cannot properly rely on plaintiffs' hearsay expert opinions in adjudicating plaintiffs' sanctions motion. *Bryan v. John Bean Div. of FMC Corp.*, 566 F.2d 541, 546 (5th Cir. 1978) (finding that the district court erred in "admit[ting] the hearsay opinion of an expert [that was] not subject to cross-examination [because it] goes against the natural reticence of courts to permit expert opinion unless the expert has been qualified before the jury to render an opinion. The [relevant] opinions were brought before the jury without qualifying the experts who

rendered them." As such "the jury had no way of determining whether the opinions were credible or worthy of belief.").

At bottom, there is no need to rush to judgment on an incomplete and hearsay riddled "record." If the Court finds that the expert opinions meet the Daubert standard (to be clear they don't), then the experts may present their opinion at trial, defendant will have the opportunity to fully cross-examine the experts and introduce his own evidence, and the jury will determine what weight to give to the evidence, if any.

> 3.     *Plaintiffs' So-Called Evidence as to the Specific "Forgeries" and Purported Misconduct is Neither Clear nor Convincing*

Plaintiffs repeatedly accuse defendant of manufacturing evidence and ask this Court to use that as a basis to deny defendant his constitutional right to a jury trial. Defendant demonstrated above that much of that evidence doesn't go to key issues in the case, that defendant doesn't rely on much of that evidence, and there is little evidence that the so-called forgeries were created for this litigation. Now, defendant demonstrates that there is little evidence that those documents are even forgeries in the first place. Not every shadow is a monster.

> a.     *Defendant's divorce settlement*

Plaintiffs argue that the appendix to defendant's family law settlement is a "forgery." As a basis for that assertion, they point to the following two supposed facts:

> ii.   Plaintiffs obtained the Wrights' divorce records directly from the federal Magistrates Court in Australia, which include no such copy of the agreement
>
> iii.  The court file revealed that their <u>2013</u> divorce application states, unequivocally, that there were <u>not any "binding agreements . . . about family law. . . involving any of the parties."</u>

Motion at 2 (emphasis in original).

But those supposed facts simply aren't determinative of anything. First, plaintiffs have failed to lay any predicate to establish that one would necessarily expect the appendix to be part of the 2013 court file. *To the contrary*, the settlement appendix does not purport to be a court-facilitated settlement. It is dated in June 2011, when defendant and Ms. Wright separated, not in 2013, when they applied to the courts for a formal divorce. And even if it should have been part of the file, plaintiffs failed to establish that the court retains all records for seven years and that all those records are available to the general public.

Second, plaintiffs' argument relies on cherry-picking select words from the divorce application, which plaintiffs then present out of context to deceive this Court. Below is the entirety of the relevant section of the divorce application:



D.E. 507-1 at 4. As an initial matter, the title of Part E makes it clear that the application asks whether there are any other related court cases. That is the actual title of the section. Question 21, which is part of Part E (and from which plaintiffs selectively quote) needs to be viewed in that context. It its entirety, question 21 asks:

> *Are there any existing orders,* binding agreements, *parenting plans or undertakings to a court* about family law, *child support, family violence or child welfare* involving any of the parties *and/or children listed in this application*?

D.E. 507-1 at 4 (words in italics omitted by plaintiff in Motion). In light of the actual text of the question, not plaintiffs' doctored quote, when defendant answered "No" it does not reflect that there are no binding family law agreements, but rather that there are no binding agreements entered into *in connection with a court proceeding*. As discussed above, the 2011 settlement agreement was not issued as part of a court case. As such, there was no reason why defendant should have listed it the application.  Further, even if the settlement agreement was required to be listed on the application (to be clear, by the terms of the application, it needn't have) defendant's failure to list the document doesn't necessarily mean that it's a forgery created for this litigation. It could be that he simply failed to properly fill out the form.

Plaintiffs further attempt to bolster their argument that the document is a forgery by noting that Ms. Wright didn't retain her own copy of the settlement agreement nine years after it

was executed. Motion at 2. But common sense dictates that people don't always keep every scrap of paper from nearly a decade ago, especially when it could bring back painful memories, such as a divorce. And as discussed above, Ms. Wright authenticated the document and twice asserted that it was her signature on it. L. Wright Depo. Tr. 22:21-24:1; 98:13-16, [D.E. 488-17].

In any event, plaintiffs' theory fully collapses when one considers the "DEFAUS" bates stamp prefix for the divorce settlement document. That prefix establishes that the document was created prior to 2015 and that defendant didn't have access to the document since that date.[10] In other words, it cannot possibly be a forgery created by defendant to defeat subject matter jurisdiction, as plaintiffs argue, unless, of course, plaintiffs maintain that defendant had the foresight to know that he would be sued in 2018 and would need such a document to defeat subject matter jurisdiction.

b.    *Bitmessages*

Plaintiffs continue to insist that certain Bitmessages between defendant and Dave are "provable forgeries." Motion at 12. As a basis for that serious allegation, they rely on the testimony of the creator of Bitmessage (Johnathon Warren), who according to plaintiffs "testified that some of the[] messages are dated from before he even released the application and that he is 'as certain as you could possibly be that they are forgeries.'" *Id.* But plaintiffs' fail to tell the court that the very same creator of Bitmessage also testified that a version of the bitcoin software could have been circulating on the dark web before the date the messages were sent, and he kept a copy of the software running on an unprotected server in his parents' home. J. Warren Depo. Tr. 89:24-91:7; 104:16- 105-22, [D.E. 261-1].

In any event, Mr. Warren is not a forensic examiner and he has basis no basis to concluded that the documents are forgeries. *Id*. At 117:14- 118:3. In fact, he has no idea as to the circumstances of the documents' creation. *Id*. At 118:4-120:25.

c.    *Tulip Trust III*

---

[10] The documents starting with a DEFAUS prefix were obtained from defendant's Australian counsel that were reviewing documents that the ATO seized from defendant in 2015.

Plaintiffs claim that the Tulip Trust III document is a conclusively proven a "forgery" because:

> i.    The Trust claims to have been executed on July 7, 2017 and lists 'JBruk Ltd (UK) (10859457)' as one of its assets.
> ii.   But JBruck Ltd wasn't incorporated until July 11, 2017.
> iii.  Thus, Tulip Trust III could not have been executed on July 7 since neither JBruk nor the corporate number assigned to it would have existed yet.

Motion at 13. Plaintiffs have failed to lay a predicate for their argument and they overstate the importance of their "discovery."

As an initial matter, plaintiffs have failed to establish that a corporation cannot have a corporate number prior to being incorporated, and they also have failed to establish that one cannot chose their own corporate number (and thus know in advance what the corporate number would be). Yet, even if plaintiffs had established that (to be clear they haven't) all their "discovery" would show is that the document was finalized sometime after July 11, 2017, which is a mere five days after the July 6, 2017 date listed in the agreement. It's not uncommon for people to sign documents without updating the dates throughout the document. And we know this occurred here, because the cover page of the trust document is dated July 7, 2017, which is one day after the July 6, 2017 date.

In any event, the mere fact that the document possibly was signed a few days after the date listed in the document does not mean that the document is a forgery, nor does it mean that it was created sometime after August 2019, as plaintiffs suggest. There simply is no basis for plaintiffs' forgery claims.[11]

> d.    The W&K Operating Agreement

Plaintiffs claim that the W&K operating agreement is a "boldfaced forgery," that is supported by "incontrovertible evidence." Motion at 3. The document references the "Florida Revised Limited Liability Company Act," but plaintiffs' claim that it wasn't enacted until June 2013. *Id.* Even if that were true (again, plaintiffs have not admitted any admissible evidence to support that), plaintiffs fail to consider that the "Florida Limited Liability Company Act," (*i.e.*, without the "revised") *did exist when the document purports to have been drafted*. *See* Fla. Stat. § 608.401 (2011), attached as **Exhibit E.** It's entirely possible that the document contains a

---

[11] Defendant already addressed the Tulip Trust I and II documents in D.E. 311 at 18.

miscite. That is not clear and convincing evidence of a fraud.[12] *Tarasewicz*, 2016 WL 3944176, at *6 ("Suspicion is not enough.").

      *e.*     *Defendant's notice of compliance and the list of bitcoin addressees*

Plaintiffs claim that the "notice of compliance was an egregious misrepresentation directly to this Court." Motion at 8. But plaintiffs don't challenge that defendant provided plaintiffs with precisely the information they demanded—a list of what he believes to be bitcoin that he mined prior to December 2013. Instead, they challenge the specific wording of the notice of compliance.

The notice states:

> That a third party has provided the necessary information and key slice to unlock the encrypted file, and Dr. Wright has produced a list of his bitcoin holdings, as ordered by the Magistrate Judge, to plaintiffs today.

D.E. 376.

According to plaintiffs, the notice was a "clear attempt to deceive the Court" because the information was delivered by defendant's Kenyan counsel instead of a "bonded courier." Motion at 8. But the notice never stated that the information was provided by bonded courier. Plaintiffs also take issue with which specific encrypted file was unlocked, but again, the notice didn't identify any specific encrypted file. The key takeaway from the notice of compliance was that defendant had received what he believed to be his list of bitcoin addresses and that he had produced them to plaintiffs, as ordered by Magistrate Reinhart—something which did in fact occur.

Admittedly, while the notice of compliance could have been clearer as to the exact circumstances of how defendant received the list of bitcoin, it does not follow that defendant intentionally set out to deceive this Court, especially when one considers defendant's autism diagnosis. And in any event, defendant cleared up any resulting confusion in his interrogatory responses, where he provided a detailed narrative as to how he obtained the list of bitcoin addresses. *See* D.E. 404-1, at 4-7; D.E. 507-8.

---

[12] Plaintiffs don't make any attempt to show the document meets any elements of a "fraud." In fact, they haven't even shown how this document is even relevant to their claims or how they were prejudiced by its purportedly late production.

Moving on from the notice of compliance, plaintiffs claim that the actual list of bitcoin the defendant provided "is another forgery… that doesn't constitute an accurate list of Wrights' bitcoin." Motion at 8. As support for that allegation, they make the following five assertions:

    i.     "Four addresses on the list have spent bitcoin since July 2019 and as recently as May 13, 2020" and "two of the bitcoin 'transactions' that spent the . . . bitcoin from the CSW Filed List also simultaneously spent bitcoin that are not included on the CSW Filed List and sent them to one recipient address;"

    ii.    The CSW Filed List contains "an exact replica of the Shadders Bug;"

    iii.   The Transaction Ids on the CSW Lista are not uniformly distributed; and

    iv.   The FSW Filed List does not include addresses "that are publicly known to have been mined and then spent by Satoshi."

Motion at 9-10.

Defendant will address each of those assertions below, but first reemphasizes that those assertions rely on opinions contained in hearsay expert reports and declarations, which as demonstrated above, are not admissible evidence and cannot reach the clear and convincing evidentiary standard.

    i.     *"Four addresses on the list have spent bitcoin since July 2019 and as recently as May 13, 2020" and "two of the bitcoin 'transactions' that spent the . . . bitcoin from the CSW Filed List also simultaneously spent bitcoin that are not included on the CSW Filed List and sent them to one recipient address."*

According to plaintiffs, the list of 820,200 bitcoin addresses is a "forgery" because somebody recently spent the bitcoin in four addresses and included in the transaction bitcoin that are not contained on the list. But plaintiffs' conclusion does not flow from their assertion. All it shows is that somebody other than defendant has access to some of the private keys of the bitcoin on defendant's list. This is not a novel concept. In fact, plaintiffs' entire *case is premised on a purported theft of bitcoin from Dave Kleiman*, which necessarily would have required someone to have gained access to Dave Kleiman's private keys. It also is entirely possible that the CSW Filed List inadvertently included some bitcoin that no longer belong to defendant. That, of course, does not mean that the entire list is wrong or a forgery. As defendant explained in his interrogatory response, the list that he provided plaintiffs does not come from the encrypted file

that he produced on August 27, 2019. D.E. 507-8; D.E. 17 n.14. Rather it comes from the trust records that he obtained from his Kenyan lawyer. *Id.*[13]

> ii.    *The CSW Filed List contains "an exact replica of the Shadders Bug"*

Plaintiffs maintain that the CSW File List must be derived from the Shadders list because they both contain the same Shadder's Bug. But plaintiffs neglect to tell the Court that their own expert conceded in his deposition that the Shadder's Bug is "a relatively common form of bug" and that he'd "seen bugs like [that] many times before."[14] Antonopoulos Depo. Tr., April 24, 2020, 100:15-24, attached as **Ex D**. As such, plaintiffs have not established that the Shadders' Bug could not have been independently reproduced when the CSW Filed List was compiled.

> iii.   *The Transaction IDs on the CSW Filed list are not uniformly distributed*

Again, relying on an expert opinion, plaintiffs assert that the "list's transaction IDs provide irrefutable statistical evidence that it is not the result of someone having mined 16404 blocks on the bitcoin." Motion at 10.  This is because, according to plaintiffs' expert, S. Boedeker, the "Transaction Ids on the CSW Filed List are not uniformly distributed." *Id*. But that supposed fact is only relevant if one would expect (1) SHA 256 to be uniformly randomly distributed, and (2) if one were not able to mine bitcoin in a manner to avoid certain Transaction IDs. As for the first premise, Boedeker admitted in his deposition that he was relying on a google search, which isn't evidence of anything. *See* Motion to Exclude the Opinion Testimony of Plaintiffs' Expert Witnesses [D.E. 500] at 21. As for the second premise, plaintiffs' bitcoin expert, Andres Antonopoulos, has conceded in his deposition that one could adjust the bitcoin address or the Coinbase input to avoid certain transaction IDs. Antonopoulos Depo. Tr., April 24, 2020, 97:18-99:19, attached as **Ex. D**.[15] In other words, independent of the random uniformity (or lack thereof) of the SHA 256 algorithm, plaintiffs cannot establish that a list of bitcoin Transaction IDs must always be uniformly randomly distributed.

---

[13] This same response also applies to the 144 bitcoin addresses listed in the notice of supplemental "evidence" that plaintiffs filed on May 27, 2020. *See* D.E. 541.

[14] This is a perfect example of why the Court simply cannot rely on the say so of plaintiffs' expert reports. Defendant must be given a chance to fully cross-examine their experts and introduce his own evidence.

[15] Mr. Antonopoulos tried to walk back this testimony on redirect, where he stated that while it was "possible" it was "highly implausible." 117:20-25. All that matters is that it is possible. Plaintiffs can argue the plausibility and probability to the jury.

          i.       *The CSW Filed List does not include addresses "that are publicly known to have been mined and then spent by Satoshi."*

Plaintiffs cite to the supposed fact that the CSW Filed List doesn't contain every "known" Satoshi transaction to conclude that the list is a forgery. But plaintiffs don't explain what a "known Satoshi transaction" is. They simply had their expert (who admits that he has no idea who Satoshi is) read some unauthenticated emails that he found online. See Motion to Exclude the Opinion Testimony of Plaintiffs' Expert Witnesses [D.E. 500] at 18. That is not evidence of anything, let alone clear and convincing evidence.

Further, plaintiffs fail to consider that the trust may not have maintained records of spent bitcoin, and they also fail to consider that not every bitcoin was mined directly into the trust. In fact, defendant previously disclosed one such bitcoin address to plaintiffs. See June 25, 2019 email from Z. Markoe to V. Freedman [D.E. 311-1].

Finally, plaintiffs' theory that "Wright's list is clearly a fabrication . . . most likely created by, inter alia, taking the Shadders list, sorting it by Transaction ID, deleting two large swaths of addresses, and then resorting the list by block height," Motion at 11, is both demonstrably false and shockingly sloppy "detective work." Even when one sorts the Shadders list by Transaction ID, there are no blocks of bitcoin that appear to have been consecutively copied to the CSW Filed List. There remains disbursed throughout bitcoin that are either on the DK list or that remain on the Shadders list.

          4.       *Any purportedly inconsistent statements need to be viewed in light of defendant's autism diagnosis*

Plaintiffs rely heavily on purported inconsistent statements by defendant to try and demonstrate that he committed perjury. Motion at 19, 21. But as shown above, inconsistent statements don't meet the clear and convincing standard. This is especially true when the declarant has cognitive disabilities, such as the defendant, who is on the Autism Spectrum. *See Tarasewicz*, 2016 WL 3944176, at *6 ("Although Plaintiff's [cognitive] impairment does not explain every inconsistent statement, it undermines Defendants' argument that the inconsistencies were the product of a deliberate scheme to defraud the court"); *Inverpan S.A. v. Am. Express Bank Int'l*, 2009 WL 150657, at *5 (S.D. Fla. 2009) (denying sanctions where plaintiff's owner's age and prior stroke undermined defendant's claim of fraud on the court); *Doe v. City of Miami Gardens*, 2019 WL 3312533, at *4 (S.D. Fla. 2019), *report and recommendation adopted*, 2019 WL 3318505 (S.D. Fla. 2019) ("The considerable evidence of

Plaintiff's unstable mental state leaves this Court unable to conclude that her Interrogatory Response was part of a plan she devised to intentionally deceive the Court.").

Dr. Klin, who serves as the Director of the Marcus Autism Center, is a clinical psychologist with more than 35 years' experience dealing with people on the autism spectrum. D.E. 509. Dr. Klin has diagnosed defendant as being on the autism spectrum, and he has provided a closely reasoned opinion explaining how someone with defendant's diagnosis could be incorrectly perceived as having provided untruthful testimony. *See* D.E. 509-1 at 13-18.

## II.    A Large Portion of Plaintiffs' Motion is an Untimely and Inappropriate Motion for Reconsideration

Plaintiffs dedicate five pages of their motion to recounting issues that already have been adjudicated by both Magistrate Reinhart and Judge Bloom. *See* D.E.  277, 373. Per Judge Bloom's order, defendant was required to pay reasonable attorney's fees. Defendant paid those fees. There is no valid justification for plaintiffs' attempt to rehash the same arguments that the Court already rejected. Plaintiffs' attempt to do so is nothing more than an untimely and inappropriate motion for reconsideration, which the Court should summarily reject. Tellingly, plaintiffs make no effort to address the actual standard for a motion for reconsideration.  *See Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 477 (S.D. Fla. 2002).

Further, to the extent that plaintiffs are claiming that defendant didn't produce a list of his bitcoin addresses,[16] then this Court has already determined that the sanction would be an instruction to the jury that defendant has failed to provide that information. D.E. 373 at 22. There is no basis for a sanctions motion asking to default defendant or to find deemed facts, a remedy that this Court has already found to be inappropriate.

## III.    Plaintiffs Have Long Waived the "New" Purported Discovery Violations

Plaintiffs claim for the first time in a motion for sanctions, that defendant "flagrantly obstructed the discovery process and Plaintiffs attempt to prove the scope and extent of the Satoshi Nakamoto Partnership."  Motion at 11. As "support" for that serious accusation,

---

[16] Plaintiffs' position on this matter is unclear. On the one hand, plaintiffs argue that defendant has access to the encrypted file because certain bitcoin have been spent, which indicates that plaintiffs believe the list to be accurate. Yet on the other hand, plaintiffs claim it isn't accurate because its supposedly missing some "known" Satoshi transaction and because someone signed a message saying some bitcoin don't belong to defendant. *See* D.E. 541 at 2.

plaintiffs reference three purported discovery violations: (1) that defendant didn't "attempt[] to access and collect the three email accounts that belonged to Satoshi Nakamoto," (*Id*. at 11); (2) that he didn't open an encrypted file, *(Id. at 11)* and (3) that he purportedly changed his testimony about a Panama trust. *Id*. at 12. Thus, according to plaintiffs, they are entitled to a default judgment.

As an initial matter, plaintiffs cite to no legal support for this argument. Nor could they. As this Court stated on January 10, 2020, there is a process to obtain sanctions for discovery violations. D.E. 373 at 13-14. First, the aggrieved party must file a motion to compel, after which the court can issue sanctions if the responding party doesn't comply with the court's order. *Id.* In other words, plaintiffs are asking the wrong judge for the wrong remedy at the wrong time.

 Plaintiffs should have filed a motion to compel months ago. *See* S.D. Fla. L. R. 26.1(g)(1) ("All disputes related to discovery shall be presented to the court by motion . . . within (30) days from the . . . date on which a party first learned of or should have learned of a purported deficiency concerning the production of discovery materials."). Plaintiffs don't get to sit on their hands for months, wait for discovery to conclude, and then ask the Court to default defendant because they believe defendant failed to produce all the evidence to which they were entitled. Any arguments that plaintiffs had as to the Satoshi emails and the encrypted file have been waived long ago.

In any event, even if the Court were to consider the untimely complaint about purported discovery violations, the premise of plaintiffs' allegation is flawed, as it presupposes that there was a "Satoshi Nakamoto Partnership" (something which is far from established). But more to the point, there were no discovery violations and plaintiffs misstate the record. While defendant acknowledged in his deposition that he hadn't tried to log into the accounts that he opened as Satoshi "to collect documents for this case," he testified that he didn't do so because he no longer had access to those accounts (something that plaintiffs conveniently neglect to tell this Court). D.E. 507-3 at 191:10-193:24. Further, the fact that defendant was not able to enter the Satoshi accounts is no new revelation. Not only is it public knowledge, but defendant specifically informed plaintiffs of that fact on July 2, 2019. D.E. 339-5 at 5-6 (responding to plaintiffs' request for production asking for "all emails contained in the Satoshi Nakamoto email accounts satoshin@gmx.com, satoshi@vistomail.com, and satoshi@anonymousspeech.com," by stating that defendant "no longer has access to those email accounts and that he has not maintained

copies of the emails contained in those accounts."). If plaintiffs had any concerns about defendant's statements, they should have brought it to the Court's attention many months ago—within 30 days of hat discovery response, as required by Local Rule 26.1 (g)(1)—unless, of course they are trying to manufacture evidence to obtain a final judgment by way of sanctions.

As for the encrypted file, plaintiffs offer no evidence that defendant has access to it. As demonstrated above, the purported fact that some of the bitcoin listed on CSW Filed list moved or were signed simply demonstrates that someone other than defendant has access to the private keys to some of the bitcoin. It does not mean that defendant moved those bitcoins. Again, this concept is not without precedent. Plaintiffs' entire claim is premised on someone gaining unauthorized access to Dave Kleiman's private keys.[17]

Plaintiffs have also failed to establish that they are entitled to any information on the encrypted file (other than a list of bitcoin, which they have already received from the trust). There is absolutely no evidence that the file contains information that is relevant to plaintiffs' claims in this case. Plaintiffs simply state as "fact" that the file contains evidence of a partnership, and that certain bitcoin belonged to the partnership along with bitcoin intellectual property. Motion at 11. Yet, plaintiffs have to establish even the most minimal of predicates. The encrypted file is not a magic box, where one can simply imagine whatever one wishes the file to contain. And even if it were (it isn't) plaintiffs don't get to change their wish as it suits them. A mere five months ago, plaintiffs were arguing to this court that the encrypted file didn't even exist, let alone contain anything. *See* D.E. 332 (arguing that "there is no independent evidence such an encrypted file exists. No one – not even Craig – testified to having seen it," and that even if it did exist, there was "no mechanism of being able to independently confirm its apparent[] contents") (internal quotations omitted).[18]

Plaintiffs' theory also makes no sense when one considers that defendant has cooperated extensively in the discovery process. In addition to sitting for three depositions, responding to ten discovery requests, and responding to well over 25 interrogatories, defendant has produced over 1.9 million pages of documents, many of which are not helpful to defendant's case—a fact that

---

[17] Again, as defendant explained in his interrogatory responses, it is not the definitive list from the encrypted file. *See* D.E. 507-8.

[18] Importantly, plaintiffs waited months to make this argument after having received the file from defendant.

was not lost on Magistrate Judge Reinhart: "[h]aving sat through the hearing today, you've obviously gotten some – they've turned over, to their credit, some stuff that's really not helpful to them, and you have made good use of it. So I have to ascribe good faith to them in that regard." Hr. Tr. 194:2-6 (June 28, 2019) [D.E. 236]. It makes no sense that defendant would produce the purportedly incriminating documents but refuse to produce (non-existent and supposedly) relevant documents on the encrypted file (that he doesn't have access to).

Further, plaintiffs' argument as to defendant's supposed withholding of evidence is ironic, to say the least, considering that *plaintiffs actively destroyed evidence during the pendency of this lawsuit*.  Ira Kleiman deleted his brother's electronic media and continued to write to those media devices well after October of 2018,[19] and then took absolutely no steps to recover the files that were deleted. *See* I. Kleiman Depo. Tr., January 10, 2020, 45:21-46:17, [D.E. 488-13]. He also made no attempt to access many of Dave Kleiman's email accounts. *Id*. At 76:17-79:10.

Moving on, plaintiffs claim that they are prejudiced by defendant's purportedly inconsistent statements.  According to plaintiffs, they started "building their case around [defendant's] sworn representation[]" that he mined bitcoin into a trust "located in Panama." Motion at 12. They say that effort was for naught because defendant later testified that he "did not mine Bitcoin into a Panama trust." *Id.* But, as is clearly becoming a pattern, plaintiffs fail to provide the Court with defendant's full deposition testimony.  Defendant clarified that when he said "I am mining," it includes people who worked for certain companies who did the mining. Wright Depo. Tr., March 18, 2020, at 104:8-106:1, attached as **Exhibit G**. He further explained that he used the terminology "I am mining" to make it easier for people to understand the complex structure of his companies and trusts. *Id*. at 105:12-106:1. In other words, there is no contradiction, and in any event, plaintiffs make no effort explain how defendant's clarification harmed their case preparation, other than a vague assertion that it is so.

At bottom, plaintiffs are understandably upset that there is little evidence to support the central theory of their case—that there was a partnership between defendant and Dave Kleiman to develop bitcoin intellectual property and mine bitcoin. But plaintiffs' lack of proof for their theory doesn't mean that defendant is withholding any evidence.

---

[19] *See* Chambers Report, attached as **Exhibit F**, at 14.

**IV.     The Court Already Has Rejected Plaintiffs' Request for Deemed Facts**

At the conclusion of their Motion, perhaps knowing that they have overstated their case for default, plaintiffs make the following request:

> In the event the Court disagrees that default sanctions are appropriate, Plaintiffs respectfully request that the Court deem the following facts established; (1) Dr. Wright and Dave entered into a 50/50 partnership to develop blockchain-related intellectual property and mine bitcoin; (2) all bitcoin (and forked assets) included in the CSW Filed List is, and remains, property of the partnership; and (3) any such intellectual property developed by Wright prior to Dave's death is, and remains, property of the partnership.

Motion at 24. If this sounds familiar, it's because these are the precise "deemed facts" that Magistrate Judge Reinhart held established as a sanction against defendant in August 2019. *See* Order on Plaintiffs' Motion to Compel [D.E. 277]. These are the same "deemed facts" that this Court later reversed because they "do not specifically relate to the discovery issue that was pending before the Magistrate Judge." *Kleiman v. Wright*, 2020 WL 113396, at *10 (S.D. Fla. 2020).

Now plaintiffs ask the Court to sanction defendant, if not by default, by deeming those same facts admitted.[20] But nothing has changed. The facts that plaintiffs ask the court to deem established still "do not specifically relate to the discovery issue[s]" they raise in the Motion. *Kleiman*, 2020 WL 113396, at *10. Plaintiffs do try to manufacture a "nexus" between defendant's alleged misconduct by claiming that the encrypted file contains "the partnership's genuine records—records which would conclusively prove the partnership and assets in this case." Motion at 24. But just because plaintiffs think or hope that that's so does not make it so. There remains no nexus between defendant's alleged misconduct and the "deemed facts"

---

[20] In reality, plaintiffs' appeal for the "deemed facts" sanction "in the event the Court disagrees that default sanctions are appropriate," Motion at 24, is little more than a back-door attempt at the same remedy. Plaintiffs claim that "[n]on-dispositive issue-related sanctions only require proof by a preponderance of the evidence." *Id.* (internal quotes and citations omitted). But the facts plaintiffs ask the court to deem establish would have the same effect as a default judgment in this case. Because their request for deemed facts would decide the central issues of the case, plaintiffs should be held to the higher, "clear and convincing evidence" standard required for a default judgment.

plaintiffs ask the court to impose as a sanction. Thus, just as the Court did when it overturned that sanction, it should reject plaintiffs request to impose it now.

## CONCLUSION

As discussed above, plaintiffs have not met their burden in proving, by clear and convincing evidence, the defendant has engaged in the sort of misconduct that warrants the entry of a default. The Court should deny the Motion for Sanctions and allow this case to proceed to a jury.

*Attorneys for Dr. Craig Wright*

RIVERO MESTRE LLP
2525 Ponce de Leon Boulevard,
Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: amcgovern@riveromestre.com
Email: zkass@riveromestre.com
Email: receptionist@riveromestre.com

By: s/ Amanda McGovern
ANDRES RIVERO
Florida Bar No. 613819
AMANDA MCGOVERN
Florida Bar No. 964263
SCHNEUR KASS
Florida Bar No. 100554

## CERTIFICATE OF SERVICE

I certify that on June 1, 2020, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

/s/ Amanda McGovern
Amanda McGovern
Florida Bar No. 964263