UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IRA KLEIMAN, as personal representative of
the estate of David Kleiman, and W&K INFO
DEFENSE RESEARCH, LLC

    plaintiffs,

v.　　　　　　　　　　　　　　　　　　　　**Case No. 9:18-cv-80176 (BB/BR)**

CRAIG WRIGHT,

    defendant.
_____/

**DR. CRAIG WRIGHT'S REPLY IN SUPPORT OF HIS MOTION TO EXCLUDE
THE OPINION TESTIMONY OF PLAINTIFFS' EXPERT WITNESSES**

The flaws in plaintiffs' expert opinions are manifest. *First,* through the use of a California lawyer, Gordon Klein, plaintiffs seek to establish the legal elements of their claim that plaintiff's estranged brother Dave Kleiman had an alleged oral partnership with Dr. Wright to create the Bitcoin protocol, mine over a million bitcoins and create intellectual property. *Second*, based upon alterations or metadata inconsistencies in a select sampling of documents, Dr. Edman provides an impermissible legal conclusion of forgery that goes to intent. *Third*, plaintiffs offer expert testimony on damages through Andreas Antonopoulos, who concedes he conducted no damages analysis, used no methodology, and is not an economist. *Fourth*, Stefan Boedeker, a statistician who knows nothing about bitcoin, provides an opinion that a list of public bitcoin addresses was "manipulated." *Fifth*, Dr. Robert Leonard uses a predetermined and miniscule data set and a play on the use of grammar and syntax to attribute authorship of certain e-mails to Dr. Wright. None of the above constitute "expert testimony" and all should be excluded.

## ARGUMENT

I. **GORDON L. KLEIN**

   A. **The Opinion Offered by Klein is an Impermissible Legal Opinion**

Klein provides an impermissible legal opinion as to an alleged partnership between Dave Kleiman and Dr. Wright. *Montgomery v. Aetna Cas. & Sur. Co.,* 898 F.2d 1537, 1541 (11th Cir. 1990). This is demonstrably true on the face of his report. *E.g.*, Mot. Ex. A, Klein Rep. ¶ 35 (discussing joint control); ¶ 71 (discussing a "profit-seeking motive"), ECF No. [500-1]. Plaintiffs' argument that Klein is not offering a legal opinion because Klein says so (Resp.[1] at 3) does not vary the fact that he opines on what are essentially the legal elements of a Florida partnership and whether there was conduct and communication consistent with a partnership. Permitting Klein to effectively instruct the jury using his "guideposts" will confuse the jury, particularly where the "guideposts" are either identical to or share phrases and other parallels with, the legal elements of a partnership. *E.g.*, Klein Rep. ¶¶ 19, 23, 25. Further, Klein manufactures a term "SN Enterprise" to refer to what he calls the "Satoshi Nakamoto Enterprise." Klein Rep. ¶ 13.[2] Permitting Klein to

---

[1] Plaintiffs' Opposition to Dr. Wright's Motion to Exclude the Opinion Testimony of Plaintiffs' Expert Witnesses, ECF No. [528] (the "Response" or "Resp.").

[2] "For ease of reference, I refer to this venture as the Satoshi Nakamoto Enterprise ('SN Enterprise'). The SN Enterprise appears to have been formed for multiple purposes, including the mining of bitcoin . . . ."

place this loaded term in front of the jury is confusing and prejudicial. Additionally, the jury will place certain weight on Klein's testimony and could even accord special weight[3] based on the fact that he is a lawyer; even though an inactive member of the California bar, he nevertheless attended law school, passed the bar, practiced law for a period of time, and taught classes at UCLA School of Law for thirteen years.

The opinion offered by Klein does not introduce specialized industry terms, practices, or standards outside the understanding of an ordinary person's knowledge. Although plaintiffs claim that Klein is their "business and accounting expert," (Resp. at 3), he offers no specialized opinion on either subject. Moreover, the cases cited by plaintiffs are distinguishable because they involved an industry standard or practice that would be outside the understanding of a lay person.[4] Klein's opinions, however, do not contribute any such specialized knowledge but directly equate to a legal opinion on a core issue in this case, i.e., the existence of an alleged partnership between Dave Kleiman and Dr. Wright.

### B. Klein's Methodology Constitutes Impermissible Factual Narrative

Plaintiffs claim that Klein's methodology is set forth in a purported framework which he "commonly call[s] the DOS framework."[5] Resp. Ex. 1, Klein Dep. 222:14-19, ECF No. [528-1]. However, this purported methodology is simply an improper factual narrative that goes well beyond the scope of a "factual underpinning." *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, 2020 WL 1666763, at *15–16 (S.D. Fla. 2020); *e.g.*, Klein Rep. at ¶¶ 15-16, ECF No. [500-1]. It is further improper for an expert to simply rehash evidence about which he

---

[3] *See MDS (Canada), Inc. v. Rad Source Techs, Inc.*, 822 F. Supp. 2d 1263, 1319 (S.D. Fla. 2011) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. This concern *is further compounded where the purported witness is an attorney*") (emphasis supplied) (citation omitted).

[4] *Elia v. Roberts*, 2017 WL 4844296, at *1 (E.D. Cal. 2017) (permitting accountant's testimony on matters such as the tax significance of reporting income paid on a 1099 or K-1, etc.); *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Palladium Equity Partners, LLC*, 722 F. Supp. 2d 845 (E.D. Mich. 2010) (permitting testimony on private equity funds' investment and management practices because it is outside the domain of an ordinary person's knowledge); *Leeds LP v. United States*, 2010 WL 3911429 (S.D. Cal. 2010) (permitting expert testimony on formation documents in the context of estate planning); *Kearney v. Auto-Owners Ins. Co.*, 2009 WL 3712343, at *1 (M.D. Fla. 2009), *aff'd*, 422 F. App'x 812 (11th Cir. 2011) (permitting expert testimony on ordinary and reasonable claims handling practice in the context of an insurance claim).

[5] There is no reference to the acronyms "DOS" or "DOGS" in Klein's report, yet plaintiffs now attribute it to Klein's opinion through their Response. Resp. at n.3.

has no personal knowledge. *Ohio State Troopers Ass'n, Inc*. Klein's testimony primarily consists of recounting plaintiffs' version of the facts and drawing inferences from them, and as such, would not be helpful to the jury. *See Omar v. Babcock*, 177 F. App'x 59, n.5 (11th Cir. 2006). The jury, apprised with all the relevant facts, is equally able to draw its own conclusions. This type of expert testimony also presents a risk that the jury might surrender its own common sense and simply rely on the expert's opinion. *See Somnis v. Country Mut. Ins. Co.*, 840 F. Supp. 2d 1166 (D. Minn. 2012).

      **C.**      **Klein Improperly Opines on Intent and His Opinion Is Not Helpful to the Jury**

Klein's report also provides improper opinions on intent. *In re Trasylol Prod. Liab. Litig.*, 2010 WL 4259332, at *8 (S.D. Fla. 2010). His report contains specific words and phrases that drive to a conclusion of intent. *For example*, in paragraph 29 of the report, a sentence in one email from Dr. Wright is characterized by Klein as a "promise" but that word does not appear anywhere in the e-mail. The word "promise" is defined as "[t]he manifestation of an *intention* to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made; a person's assurance that the person will or will not do something." PROMISE, Black's Law Dictionary (11th ed. 2019) (emphasis added). *Another example* is in paragraph 41 of the report where Klein opines on how to interpret Dr. Wright's "emphatic" use of words "our" and "ours" (case modified); this goes to a matter of intent (and word choice) and is outside the scope of any purported application of "business and accounting" practices. These are but two examples of why Klein's characterization of the evidence (plaintiffs' version) amounts to an improper opinion on intent and will not be helpful to the jury because jurors are capable of reading and interpreting e-mails and correspondence. For the reasons set forth above, Klein should not be permitted to testify.

**II.**      <u>**MATTHEW EDMAN**</u>

Through Dr. Edman, plaintiffs seek to establish that alterations or metadata inconsistencies in documents constitute a forgery committed by Dr. Wright.[6] *First*, Dr. Edman, regardless of his background, cannot opine on forgery because it goes to the issue of intent and will serve to confuse

---

[6] **Exhibit A**, M. Edman Dep. Tr., April 29, 2020, 20:24-21:2 (Q: Are you opining that it was Dr. Wright in fact who made that forgery? A: I don't believe I explicitly state so in my report but the implication is *clear*) (emphasis added).

3

and mislead the jury. *United States v. London*, 714 F.2d 1558, 1563 (11th Cir. 1983) (defining common law forgery as the "false making or materially altering, with *intent to defraud*, of a writing . . . .") (emphasis added). To Edman, however, the word "forgery" is synonymous with "manipulated,"[7] and he considers virtually any document edit to be a "forgery" *regardless of intent*. Mot. Ex. C at 55:13-59:23, ECF No. [500-3]. Not only is this testimony improper but will confuse the jury. Moreover, plaintiffs' suggestion to the contrary based on Magistrate Reinhart's understanding of "forgery" fails to acknowledge the critical distinction between the role of a judge and a jury. Although Magistrate Reinhart understood the implication of the term, the jury will not. Edman's opinion on forgery also brings with it an element of intent that is outside the scope of permissible expert testimony. *See In re Trasylol Prod. Liab. Litig.*, 2010 WL 4259332 at *8.

*Second*, the fact of Edman's prior testimony in this case[8] does not qualify him as to subsequently offered opinions. Although Edman was subject to *voir dire* at the August 5, 2019 hearing, the *Daubert* challenge involved a different inquiry with Magistrate Reinhart *serving as the trier of fact*. *E.g.*, ECF No. [264] at 111:12 ("I'm the finder of fact. I understand.").

*Third*, Edman relies on a select sampling of documents to show inconsistencies in metadata which he was unable to conclusively attribute to a specific person.[9] He nevertheless concludes with a strong implication that the documents were "forged" by Dr. Wright. This in and of itself lacks any marker of reliability and presents an analytical gap that is too vast to be bridged regardless of Edman's qualifications or purported methodology.

### III. <u>ANDREAS ANTONOPOULOS</u>

#### A. Antonopoulos is Not Qualified to Provide an Opinion on Purported Damages

Plaintiffs claim that Antonopoulos "will be prepared at trial to testify as to the price information conveyed at coincap.io at any point in time." Resp. at 13. Antonopoulos' purported opinion about bitcoin's market price, regardless of the source from which it might be derived,

---

[7] Ex. A, Edman Apr. Dep. at 55:16-56:7 (testifying that the word "forgery" was synonymous with "manipulated").

[8] Edman testified at an evidentiary hearing on August 5, 2019 before Magistrate Reinhart. *See* ECF No. [264].

[9] Ex. A, Edman Apr. Dep. at 14:10-14 ("Again I don't believe in my report I conclude decisively that it was Dr. Wright who made the modifications but the implication is that the modifications are consistent with the defendant having done them").

should be excluded in its entirety for the reasons set forth in the Motion. Mot. at 15-16. Additionally, Antonopoulos' background lends no support to his ability to analyze *financial market factors* or *pricing* related to bitcoin (or bitcoin forks), nor is he qualified to construct a damages analysis or model. Any technical knowledge he claims to possess regarding bitcoin, the blockchain or cryptocurrency does not render him qualified to provide an opinion on either of the above subjects. *See Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 536 (D. Md. 2002) (general business experience unrelated to antitrust economics does not render a witness qualified to offer an opinion on complicated antitrust issues such as defining relevant markets); Mot. Ex. F at 250:15-251:19 (admission by Antonopoulos that he is not an economist), ECF No. [500-6]. Moreover, parroting information retrieved from a publicly available website (i.e., coincap.io), without anything more, does not qualify as expert testimony that would be helpful to the jury. By his own admission, Antonopoulos never performed any *analysis* to determine the actual value of a bitcoin transaction at any point in time. *See* Mot. Ex. F at 249:16-25, ECF No. [500-6]. Plaintiffs' assertion that they intend to rely on Antonopoulos' testimony to show how damages should be calculated (Resp. at 14) is unwarranted as Antonopoulos is not qualified to provide this type of testimony and it should be excluded. Mot. Ex. E, Antonopoulos Amend. Rep. ¶¶ 2-3 (identifying Antonopoulos' educational background which is limited to computer science, data communications and other technology), ECF No. [500-5].

      **B.    Plaintiffs Should Not Be Permitted to Use Antonopoulos' Report and Testimony to Introduce Inadmissible Evidence**

*First*, Antonopoulos' proposed testimony regarding the CW and DK lists is an attempt to improperly present inadmissible evidence.[10] Plaintiffs argue that Antonopoulos does not opine on who created the lists or how they were created but the fact remains that Antonopoulos will be used as a conduit to present inadmissible evidence and will attempt to provide a sweeping conclusion that the CSW Filed List is false.[11] *Second*, plaintiffs claim that a message signed in connection with a public bitcoin address on the bitcoin blockchain is admissible under Fed. R. Evid. 803(6). Plaintiffs' argument fails to adequately address the elements of the business record exception. It

---

[10] The production of a document in discovery does not render it admissible at trial, even if the plaintiffs seem to imply that it does.

[11] Also problematic is the fact that Antonopoulos' analysis is based on the CW and DK lists, both from an anonymous source, yet Antonopoulos implies in his report that the lists were produced by Dr. Wright. Antonopoulos Amend. Rep. ¶¶ 103-104, ECF No. [500-5].

does not address how the record was kept in the course of a regularly conducted activity of a *business organization, occupation, or calling*. The blockchain itself is not a business organization, occupation, or calling, so the record cannot constitute a regularly conducted activity. Antonopoulos cannot testify that the message was made by someone with knowledge, since he has no idea who created the message. Plaintiffs should not be permitted to use Antonopoulos' report and testimony as a backdoor to introduce inadmissible evidence.

### C. Public Statements Regarding Satoshi Nakamoto Would Not Be Helpful to the Jury

Antonopoulos should not be permitted to testify regarding publicly posted communications of Satoshi Nakamoto from a publicly available archive. Even if Antonopoulos does not testify on the substance of the communications, his opinion as to their authenticity (a claim first made in the Response) should be excluded for several reasons. *First*, Antonopoulos testified that he does not know who Satoshi Nakamoto is.[12] *Second*, his report does not identify the specific e-mails he is purporting to authenticate, and does not provide any basis or methodology for the purported authentication.[13] *Third*, he does not have a contemporaneous understanding of Satoshi Nakamoto's communications because he was not even aware of bitcoin until 2012 which was after Satoshi left the bitcoin community.[14] *Fourth*, he does not manage nor control the public archive where the subject communications are maintained, and he does not know who put together the public archive.[15] Lastly, plaintiffs cite one case but that case does not support their position.[16]

### D. Antonopoulos' Bias Against Dr. Wright

The type of bias harbored by Antonopoulos against Dr. Wright is far beyond the type of potential bias that has been addressed by courts in the context of expert witness testimony. Antonopoulos harbors actual bias against Dr. Wright. Mot. at 16-17. There are few cases addressing potential bias. Plaintiffs attempt to distinguish one such case cited in the Motion, *Hall*

---

[12] Mot. Ex. G at 33:15-34:21, 55:5-9, 57:6-16, 65:14-22, ECF No. [500-7].

[13] Mot. Ex. E, Antonopoulos Amend. Report ¶¶ 88-96, ECF No. [500-5].

[14] **Exhibit B**, A. Antonopoulos Dep. Tr., April 24, 2020, 61-2:10.

[15] *See id.* at 61:19-62:7.

[16] In *United States v. Koziy*, the court permitted expert testimony regarding two Ukranian police employment forms to corroborate witnesses' testimony that Koziy was a member of the Ukranian police force. One expert testified that the forms were very similar to the ones he had personally seen. *United States v. Koziy*, 728 F.2d 1314, 1321 (11th Cir. 1984). This case is dissimilar and does not support allowing Antonopoulos to repeat information from a website.

6

*v. C.I.A.*, 538 F. Supp. 2d 64 (D.D.C. 2008). Although the case is factually different (the propounded expert was the plaintiff), the court's analysis is instructive: "One would be hard pressed to imagine a case where a court, confronted with a partisan disguised as an expert, would not preclude the so-called-expert's testimony on the grounds that what little probative value it has is outweighed by its hopelessly partisan nature." *Id.* at 73. Antonopoulos' bias has been publicly aimed at Dr. Wright prior to his engagement as an expert, making him a partisan advocate rather than an objective expert.

IV. **STEFAN BOEDEKER**

Stefan Boedeker is a statistician who provides an opinion that a list of bitcoin public addresses was "manipulated," even though he concedes that he knows nothing about bitcoin, never attempted to look at the bitcoin on the blockchain, and has no idea as to *how* the supposed manipulation occurred, *when* it occurred, *who* caused it to occur, or possible explanations beyond the gaps in the list as to *why* it occurred. Mot. at 21-23. Accordingly, Boedeker's opinion that the list of bitcoin public addresses is manipulated is not expert testimony.

The imprimatur of a statistician asserting that a list of public addresses was manipulated is misleading to the jury because the field of statistics is not the basis for Boedeker's opinion. Boedeker did not review any data or use any methodology to determine the reasons for the stated anomalies in the list of the public addresses. Instead, he merely applies a statistical analysis to the data in the list of public addresses. Without analyzing sufficient data concerning possibilities for purported data anomalies in the public list, he cannot possibly reach the conclusion that it was in fact manipulated.

Lastly, plaintiffs' claim that Boedeker can rely on Edman's opinion about the specific issue of SHA-256 hashing (Resp. at 19) is misleading because Boedeker testified that he has never met Edman or communicated with him, and that he has not read Edman's report. **Exhibit C**, S. Boedeker Dep. Tr., 49:14-50:3. Therefore, Boedeker has not relied on Edman's opinion. For the reasons set forth above, Boedeker should not be permitted to testify.

V. **DR. ROBERT LEONARD**

Dr. Leonard looks at grammar and syntax features in a cherry-picked set of documents and arrives at an opinion that implies Dr. Wright authored certain e-mails that he has denied writing. Instead of affirmatively showing that Leonard's opinion is based on sufficient data and a product

7

of a reliable method, plaintiffs hide behind a peripheral discussion of Dr. Wright's rebuttal expert (Dr. William Eggington) and his prior testimony in two cases (*Dutcher* and *Zajac*, discussed *infra*). Plaintiffs place undue importance on the notion that these two courts permitted the testimony of a competing expert despite Dr. Eggington's criticisms of the expert's method. The question before this Court, however, is "specific, not general," and should be determined on the particular facts and circumstances of this case. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156-158 (1999).

Plaintiffs cite three cases.[17] None are from a Florida jurisdiction and Leonard is not an expert in any of them. *First*, plaintiffs cite *Dutcher* because Dr. Eggington provided a rebuttal opinion and the court permitted the competing expert, Gerald McMenamin, to testify. The *Dutcher* opinion does not, however, provide any detailed explanation underlying its *Daubert* ruling which is contained in a one paragraph summary without reference to Dr. Eggington's rebuttal. Thus, plaintiffs' representation that *Dutcher* "rejected" Dr. Eggington's criticism of "Dr. Leonard's methodology" is misleading. Resp. at 22. *Second*, in *Ceglia*, a stylistic analysis by McMenamin (via a written declaration) was considered on a motion to dismiss,[18] a procedural posture that is substantially different from the one here. Further, in *Ceglia* there was no meaningful examination of McMenamin's method or its application, and no analysis in the context of the Court's important gate-keeping role under *Daubert*. *Third*, *Zajac* was a case involving the 2006 bombing of the Salt Lake City Public Library. Plaintiffs claim that Dr. Eggington took a position in *Zajac* that a minimum of five documents were required to conduct a scientifically sound authorial attribution analysis; this testimony is taken out of context.[19] Additionally, in *Zajac*, James Fitzgerald, the government's linguistic expert was given a total of three samples to examine; "[n]o additional

---

[17] *United States v. Zajac*, 748 F. Supp. 2d 1340 (D. Utah 2010); *Dutcher v. Bold Films LP*, 2019 WL 181353, at *1 (D. Utah 2019); *Ceglia v. Zuckerberg*, 2013 WL 1208558 (W.D.N.Y. 2013), *report and recommendation adopted*, 2014 WL 1224574 (W.D.N.Y. 2014), *aff'd*, 600 F. App'x 34 (2d Cir. 2015).

[18] *Ceglia* at *6-11 (allowing forensic expert testimony on a motion to dismiss where defendants claimed that a document relied upon by the plaintiffs and supporting e-mails were fraudulent).

[19] The reference to Chaski's five-sample notion carries with it the weight of factoring in error rates when smaller sample sizes are used. *Zajac* at 1346. Plaintiffs do not address these distinctions in their broad statements. Additionally, Dr. Eggington's report in *Dutcher* states that it is "difficult to make an authorial attribution under five samples per author," *not that five samples are always sufficient for this type of analysis*. The same paragraph clarifies, "[l]arger sample sizes are required to account for intra-textual variability." Resp. Ex. 13, ¶ 40, ECF No. [528-13].

8

documents were available, no witnesses or interviews were necessary for the examination, and there was no known author from whom to obtain an exemplar." *Zajac* at 1350. The landscape of *Zajac* is dissimilar to the one here where plaintiffs have access to (a) millions of words (which plaintiffs ignored), and (b) exemplars from a known author, namely, Dr. Wright. Plaintiffs attempt to question the integrity of Dr. Wright's counsel by stating that counsel should have disclosed these cases even though as just discussed, they are inapposite and distinguishable. For the reasons set forth above, plaintiffs' reliance on the cited cases is misplaced.

Absent from plaintiffs' argument is any meaningful analysis of how Leonard's methodology satisfies the *Daubert* factors. Also, Leonard's opinion lacks any persuasive value because it has no purpose other than to (a) attack Dr. Wright's credibility; and (b) highlight sound bites of plaintiffs' case using Leonard as a conduit. Lastly, plaintiffs fail to demonstrate how Leonard's limited analysis on connecting grammatical and syntactic features would be helpful to the jury. For the reasons set forth above, Dr. Leonard should not be permitted to testify.

## CONCLUSION

For all of these good and sufficient reasons, Dr. Wright respectfully requests that the Court grant his Motion to Exclude the Opinion Testimony of Plaintiffs' Expert Witnesses.

Respectfully submitted,

RIVERO MESTRE LLP
*Attorneys for Dr. Craig Wright*
2525 Ponce de Leon Boulevard, Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
Email: amcgovern@riveomestre.com
Email: zmarkoe@riveromestre.com
Secondary: receptionist@riveromestre.com

By: s/ Andres Rivero
ANDRES RIVERO
Florida Bar No. 613819
AMANDA MCGOVERN
Florida Bar No. 964263
ZAHARAH MARKOE
Florida Bar No. 504734

## **CERTIFICATE OF SERVICE**

      I certify that on June 2, 2020, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record either by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

                                            /s/ Andres Rivero
                                            ANDRES RIVERO