**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IRA KLEIMAN, as the personal representative of the Estate of David Kleiman, and W&K Info Defense Research, LLC, | CASE NO.:  9:18-cv-80176-BB |
| *Plaintiffs,* | |
| v. | |
| CRAIG WRIGHT, | |
| *Defendant.* | |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**PLAINTIFFS' DAUBERT MOTION TO STRIKE DEFENSE EXPERTS**

**DR. KLIN**

I.      **Dr. Klin's Opinion #2 is improper character evidence guised as a mental health opinion.**

As set forth in Plaintiffs' Motion to Strike Defendant's expert, Dr. Klin's second opinion is an impermissible ploy to have an expert vouch for Wright's credibility, under the thin veneer of a completely unbelievable psychological diagnosis of "severe" autism.  ECF No. [492], at 10-12; ECF [492-1].  If anything, Defendant's response confirms that.

A.  ***Dr. Klin's conclusions in Opinion #2 are not supported by evidence.***

Defendant argues that Dr. Klin's opinion is not "speculative" because it is a "gold standard diagnosis."  ECF No. [529], at 9.  But the "gold standard" identified by Dr. Klin has nothing to do with Opinion #2.

Dr. Klin has two opinions in the case.  Opinion #1, as identified in his Report, is that Wright is "severely" autistic.  Although Opinion #1 should be stricken because of Dr. Klin's willful destruction of the materials he relied upon to reach it (*see* Section II, *infra*), Plaintiffs do not argue in the instant Motion that the *diagnosis* itself is "speculative." The supposed "gold standard" is what Dr. Klin claims to have used to reach Opinion #1 (*i.e.* his autism diagnosis).  ECF [492-1], at 2, 9.  Opinion #2 is different, it is not based on any "gold standard", and it is that opinion which is speculative, based on insufficient methodology and should be precluded.

As the proponent of expert testimony, Dr. Wright carries the burden to demonstrate his expert's opinion is reliable, based on sound methodology, and that his conclusions are based on sufficient facts.  *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1107 (11th Cir. 2005) ("Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough"); *see also McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (proponent has "burden to show" the "methodology by which the expert reach[ed] his conclusions is sufficiently reliable");; *Yellowpages Photos, Inc. v. YP, LLC*, No. 8:17-CV-764-T-36JSS, 2019 WL 6033084, at *5 (M.D. Fla. Nov. 14, 2019) (an expert's opinion must be supported by good grounds for every step in the analysis, meaning that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible).

Opinion #2 in Dr. Klin's Report does not cite to a single piece of literature. Klin Depo Trn., 48:17-49:4, Ex. 1 (Q: "[I]n the report, [do] you cite to any literature in support of any of the opinions you've offered?"  A: "No, I do not.")  It is based on Dr. Klin's read of Defendant's deposition transcript and video.  ECF [492-1], at 13 ("The basis for this portion of the opinion is a review of Dr. Wright's deposition transcript and videos relative to his diagnostic formulation").  He provides no scientific analysis to explain the basis of his conclusions and refute the subjective nature of his assertions.  See *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.")

In support of Opinion #2's validity, Defendant claims that Dr. Klin "authored similar opinions," and "wrote" a book that addressed these issues.  ECF No. [529], at 10 (ASPERGER SYNDROME, (James C. McPartland, Ami Klin, and Fred R. Volkmar eds., Guilford Press 2d ed. 2013).  But Wright has not produced, even in response to this Motion, any similar reports or opinions that Dr. Klin has allegedly offered in other cases.  Indeed, Wright has not identified *any* case where a Court has allowed an expert to testify that "autism" causes a witness to appear evasive or give testimony that defies "common sense."  Surely, if such an opinion is as common as Dr. Klin and Wright would have this Court believe, at least one example could be found.

In regards to the book, (which Dr. Klin did not cite in this opinion), Dr. Klin authored two of the fourteen chapters contained in the book, neither of which address nor relate to autism presentation in legal proceedings. One chapter in the book, written by a different psychologist, focuses on how certain behaviors (such as "rigid coping responses") can lead to unnecessary run-ins with the criminal justice system, and does make passing reference to how certain difficulties may play out in the courtroom.  *Id.* at Ch. 12. However, even that reference is a far cry from what Dr. Klin proposes to do here, and is also not sufficient to establish admissibility.

### B.  *Opinion #2 is impermissible credibility testimony.*

In his Response, Wright insists that "Dr. Klin is not opining as to whether Dr. Wright is truthful or respectful."  ECF No. [529], at 7.  Instead, Wright insists that Dr. Klin is merely going to tell the jury how he believes Wright's testimony should be evaluated.  ECF No. [529], at 6-8. This is a distinction without a difference.

As set forth in his Report, Dr. Klin's Opinion #2 spends five pages describing Wright as a "**respectful**" and "**truthful**" individual, he opines that Wright has a "deferential attitude towards

the Judge, **which is sincere**," and he opines that Wright's prior testimony is "**not contrived to manipulate others.**" ECF No. [492-1], at 14, 17 (emphasis added). Dr. Klin then relies on his diagnosis of Wright with "severe" autism to explain away Wright's behavior that may "transgress the rules of common sense." ECF No. [529], at n.4. This is neither an appropriate use of Rule 702, nor a proper means of assisting the jury in determining the disputed issues of facts in this case. *United States v. Falcon*, 245 F. Supp. 2d 1239, 1245 (S.D. Fla. 2003) ("[i]t is well-settled in this Circuit that, absent extreme or unusual circumstances, expert scientific testimony concerning the truthfulness or credibility of a witness is inadmissible").

The case law Defendant primarily relies upon to support Dr. Klin's opinion, *Shay, Gonzalez-Maldonado,* and *Hall* (all from outside this Circuit) do not stand for the broad proposition Defendant posits. *United States v. Shay*, 57 F.3d 126 (1st Cir. 1995); *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996); *United States v. Gonzalez-Maldonado*, 115 F.3d 9 (1st Cir. 1997). These criminal cases involve situations where courts allowed experts to explain how certain mental disorders may have caused the defendants to make specific statements (including false confessions), which ultimately led to their conviction. They do not stand for the far more expansive position that Dr. Klin can give the type of generalized, overall credibility vouching testimony highlighted above.

Dr. Klin does not simply offer an opinion describing the symptoms and presentation of autism in individuals, such as extreme literalism or a lack of eye contact. Nor does he attempt to explain how his diagnosis of Wright may explain a particular statement or action taken by Wright. Instead, Dr. Klin uses Opinion #2 to insert his own impressions of Wright's overall credibility in a way that does much more than describe "the mental illness…and its impact on [Defendant's] behavior." *United States v. Gonzalez-Maldonado*, 115 F.3d 9, 16 (1st Cir. 1997). Indeed, Dr. Klin discusses how Wright "**sees the litigation as mistaken and misguided,**" "**makes statements with profound sincerity,**" is "**respectful, truthful, and made a real effort to answer questions [during depositions]**" and that his behavior is not "**disingenuous.**" ECF No. [492-1], at 14, 16, 17 (emphasis added). These statements are not psychological opinions based on an accepted methodology -- they are instead a back-door attempt to have a mental health professional vouch for Wright's overall credibility.[1]

---

[1] Wright also includes a footnote with a laundry list of cases that do nothing other than cite various instances where psychological testimony was admitted, which Plaintiffs do not contest is acceptable in certain circumstances (*See e.g.*

The situation at hand is more analogous to the facts of *United States v. Falcon*, a case from this District. *Falcon*, 245 F. Supp. 2d 1239 (S.D. Fla. 2003). There, a criminal defendant retained a psychologist to testify as to how psychological symptoms of the government's key witness would affected the witness's cognitive and emotion functioning. *Id.*, at 1242. Similar to Wright here, the defendant in *Falcon* repeatedly maintained that the psychologist was not offering an opinion on the witness's credibility, but rather only to the "symptomology" of the witness's alleged psychological disorder so that the jury can make its own credibility determination. *Id.*, at 1245. The court found that "opinion evidence from a forensic psychologist as to a witness' psychological motivations for the way the witness testifies is not only irrelevant, but is clearly inadmissible under Federal Rule of Evidence 608." *Id.*, at 1247; *See also* Section I (C) discussing Rule 608, *infra.*[2]

### C.  608 Does Not Allow Dr. Klin to Opine on Wright's "Character for Truthfulness."

Wright argues that pursuant to Rule 608, Dr. Klin should be able "to offer his observations to rehabilitate Wright's character for truthfulness." DE 529, at 8. But the only case Wright cites to support his Rule 608 argument, *United States v. Gonzalez-Maldonado*, does not even mention Rule 608. Wright claims that there, "the expert would have testified that the defendant 'had a medical condition that led him to exaggerate' and that evidence would have been admitted under Rule 608(a) to establish the defendant's poor character for truthfulness." *Id.* That is a misstatement of the holding.

Rather, the *Gonzalez-Machado* Court relied on FRE 702 to admit specialized expert testimony about symptoms of a mental condition to assist the jury in interpreting specific recorded statements made by that defendant. Here, Dr. Klin is being proffered to opine as to Wright's "character for truthfulness", which is clearly not permitted in this Circuit. *See generally, Falcon*

---

*United States v. Peralta,* 941 F.2d 1003 (9th Cir. 1991) (admitting testimony on Stockholm Syndrome); *United States v. Winters,* 729 F.2d 602 (9th Cir.1984) (admitting testimony about post-traumatic stress disorder). At issue is Wright's use of an expert to vouch for his credibility and justify his inevitable evasiveness and presentation of a story that "transgress the rules of common sense" at trial. Klin Depo Trn., at 390:12-20, Ex. 2; ECF No. [492-1], at 17.

[2] Importantly, in excluding the witness, the *Falcon* court also noted that no other psychologist had assessed or treated the witness for the alleged disorder. Falcon, 245 F. Supp. 2d 1247-48 ("[t]here is no documented medical evidence.... No other psychologist or psychiatrist who has treated [the witness] has assessed her with these or other personality disorders"). The same is true for Wright, a 52 year old man who, until he was "examined" by a forensic psychologist retained by his counsel for the express purpose of offering an expert opinion on his behalf at trial, had no prior diagnosis or even any evidence of any prior mental health evaluation. Klin Depo Trn., at 132-134, 308:17-19, collectively Ex. 3.

245 F. Supp. 2d 1239 (S.D. Fla. 2003); *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996) (Expert medical testimony concerning the truthfulness or credibility of a witness is generally inadmissible because it invades the jury's province to make credibility determinations).

Dr. Wright cannot use Rule 608 to bring in character witness testimony through an expert he retained to offer scientific testimony about his alleged autism. Dr. Klin was hired by Wright's counsel on April 5, conducted a 2.5 hour interview with Defendant on April 8, and two days later produced a report making countless assertions of Wright's sincerity, truthfulness, and genuineness. That is the expanse of his ability to personally observe Dr. Wright.[3]

This situation can be analogized to cases in this District involving polygraph examiners. In those cases, Courts do not allow polygraph experts to opine on a party's character for truthfulness or untruthfulness because "it is inconceivable that anyone, expert or not, could form a valid, reliable, and admissible opinion as to the 'character' of a witness based on nothing more than one single [] examination." *United States v. Piccinonna*, 729 F.Supp.1336, 1338 (S.D.Fla.1990); *United States v. Monroe*, No. 1:13-CR-76-RWS-CMS-2, 2015 WL 7176417, at *5 (N.D. Ga. Nov. 12, 2015) ("the expert was not qualified to render such an opinion, given the brief time he was acquainted with defendant"); *Sirpal v. Univ. of Miami*, No. 09-22662-CIV, 2011 WL 13217981, at *1 (S.D. Fla. Mar. 18, 2011) ("a single polygraph testing session represents an inadequate foundation upon which an expert can base an opinion on the defendant's 'character' for truthfulness or untruthfulness").

**II.     Dr. Klin's Willful Destruction of His Reliance Materials Warrants His Exclusion**

Wright's assertion that he "unequivocally" met the Rule 26 disclosure requirements is as bold as it is false. To the contrary, Dr. Klin destroyed most of his reliance materials immediately upon completion of his Report.

The facts on this issue are not in dispute. Dr. Klin designed a protocol for reaching his opinions in this case. That protocol relied almost exclusively on interviews of Dr. Wright and four close family members. The interviews were conducted by Dr. Klin (who interviewed only Dr. Wright) and his colleague, Dr. Saulnier (who interviewed the four others). Each of the doctors took "copious" notes of their respective interviews. Drs. Klin and Saulnier used those notes to run

---

[3] *See generally United States v. Monroe*, No. 1:13-CR-76-RWS-CMS-2, 2015 WL 7176417, at *5 (N.D. Ga. Nov. 12, 2015) ("even if it were an opinion as to character, the expert was not qualified to render such an opinion, given the brief time he was acquainted with defendant").

various psychological assessments.[4]  Dr. Klin then wrote a Report, which relied on the notes of the interviews and the assessments – ***and then he immediately destroyed the very materials he just relied on to write his Report***.[5]

There is also no legitimate dispute over whether these materials are relevant, and were required to be preserved and disclosed. Judge Reinhart ruled they were, and Dr. Wright did not object to the ruling.  ECF No. [457]. Also, Plaintiffs are not asking for "every scrap of paper" or every "nano-detail" relevant to forming Dr. Klin's opinion. Plaintiffs asked for (i) the notes and assessments Dr. Klin unambiguously admitted he primarily relied upon, (ii) Dr. Saulnier's clinical observations and responses she recorded during her assessments (which she preserved and sent to Dr. Klin), (iii) the "million notes" Dr. Klin generated during his interview with Dr. Wright, the (iv) remaining "copious" notes created from interviews with Dr. Wright's family, and (v) the answers input into two of the four psychological assessments the doctors conducted.  ECF No. [529], at 5-7.  Defendant argues that he produced "*208 pages*" of materials (emphasis in original), but inexplicably fails to inform the Court that **147 of those 208 pages are completely blank assessment forms**. The produced documents contain no interview notes, no contemporaneous clinical observations made during the interviews, only some of the responses to the assessment questions, all of which formed the basis for their "scores" and Dr. Klin's overall diagnosis.

Accordingly, it is indisputable that Plaintiffs have been deprived of important Rule 26 materials and have been prejudiced. This prejudice is even more pronounced since Dr. Wright, a 52 year old man, has never been previously diagnosed with autism, and consequently has no previous medical records or assessments to compare. Thus, the only real question that remains is the remedy this Court chooses to impose.

Dr. Wright argues that Dr. Klin's opinion should not be stricken because his discovery violation was "harmless" and "substantially justified". He asserts that Dr. Klin's notes were incorporated into his draft and thus his failure to produce notes and raw scores is harmless to Plaintiffs. This argument is factually inaccurate, and was expressly rejected at the April 17

---

[4]  Two of the assessments were self-reported; meaning, Wright and Ms. Watts chose responses from a set of answer choices.  These were produced. The remaining tests and corresponding notes, which include Dr. Klin's *only direct assessment of Dr. Wright*, were not produced.

[5] Dr. Klin's Report was served on April 10th.  By April 12th, Plaintiffs had requested Dr. Klin's notes and other reliance materials.  By that time, these materials had already been destroyed. *See* Apr. 17 Discovery Hrg Trn.,38:17-39:5, Ex. 4; Klin Dep. Trn., at 312:14-313:1, 123:21-125:8, collectively Ex. 5; *See also* Apr. 12, 2020 Email from A. Brenner to Def.'s counsel, attached hereto as Ex. 6.

discovery hearing on the issue.  See Hrg. Trn., at 44:22 – 45:3, Ex. 7.[6] There is no doubt that a party has the right to test the bases of an expert's opinion; Drs. Klin and Saulnier cannot run assessments and take notes on hours of interviews, and then not provide them to Plaintiffs.

Finally, Defendant asserts that his discovery violation was "substantially justified" because "the destruction of handwritten notes by Dr. Klin was in accordance with his routine practice" and that "case law supports the conclusion that there is no Rule 26 violation" under those circumstances. But Rule 26 does not defer to Dr. Klin's alleged "procedures."[7] The case law is clear – one cannot evade the Rule's requirements by hiring an expert whose practice is to discard his records. *Whalen v. CSX Transportation, Inc.*, 2016 WL 5660381, at *1 (S.D.N.Y. Sept. 29, 2016*)* at *5 (ordering expert testimony precluded unless discarded records were produced because a party "should not be able to evade the Rule's requirements through the simple expedient of hiring an expert who discards [his] records"). Finally, Wright's argument that Dr. Klin's opinion should not be stricken because he did not "deliberately intend to evade disclosure," is irrelevant. Rule 26 requires disclosure for fairness, regardless of an expert's good or bad faith.

The prejudice to Plaintiffs here is clear.  It cannot be cured because the materials are gone. Accordingly, the only fair remedy is to preclude Dr. Klin from testifying at trial. *See generally United States v. Twenty-Nine Pre-Columbian & Colonial Artifacts from Peru*, No. 13-21697-CIV, 2015 WL 457860, at *2 (S.D. Fla. Feb. 3, 2015) ("Courts in this Circuit routinely strike expert affidavits or preclude expert testimony for a failure to meet the requirements of Federal Rule 26").

## KEVIN MADURA

I.      **Madura's Opinion Should Be Stricken Because He Failed To Disclose Information Relevant To His Opinion.**

Wright's assertion (at 23) that "there is no ambiguity as to the delineation of Mr. Madura's role as a testifying expert . . . and the work[] performed as a consultant" is devoid of substance. This is because neither Wright nor Madura have yet disclosed any information to inform Plaintiffs

---

[6] Further, the case cited by Defendant (*Bona Fide Conglomerate, Inc. v. SourceAmerca,* 2019 WL 1369007, at *18 (S.D. Cal. 2019)) is distinguishable because there, the notes were "entirely incorporated" into the draft. Based on Dr. Klin's testimony and Judge Reinhart's ruling, that is expressly not the case here.

[7] Notably, Dr. Klin was retained not as a treating physician, but as an expert witness, that was well aware they would be deposed and cross examined. It is therefore all the more troubling that he destroyed his so quickly.

and this Court the nature of Mr. Madura's consulting work. The sole disclosure Wright points to (at 24) regarding "the general topics of his consulting work" is the following exchange:

> Q. Sitting here today, can you recall anything that you examined prior to the drafting of Mr. White's report?
> MS. MARKOE: Objection.
> A. Not specifically, no, it's been different things.
> Q. What about generally?
> A. Generally, *I provided my technical opinion regarding various data*.

(ECF No. [529-2], at 145:2-10 (emphasis added).)

It is not possible, based on that disclosure, for the Court to determine whether the "documents have no relation to the subject matter of [his] report." The documents reviewed by Mr. Madura should have been disclosed, and Plaintiffs should have had the opportunity to depose him on the full scope of his work in this case. *See Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.*, 2019 WL 6896299, at *4 (S.D. Fla. Dec. 18, 2019). Indeed, given the scope of the documents Wright has produced in this litigation, it is highly likely that Mr. Madura reviewed evidence that undermines his opinion that David was not involved in the creation of bitcoin.

*First*, any documents that show David mined a substantial amount of early bitcoin are plainly relevant to his involvement in the creation of bitcoin, and Wright has produced numerous documents that bear on this point. *Second,* any communications he reviewed from David or Wright are plainly relevant to the extent they reveal each of their respective roles in the creation and development of the Bitcoin protocol. *Lastly*, any documents relating to Wright's capacity to develop the code for Bitcoin are plainly relevant because the core theory of his defense is that he created Bitcoin and Dave did not.

Wright's assertion (at 23-24) that the "parties had extensive good-faith exchanges on the record to determine the boundaries of the privilege as to Mr. Madura's consulting work" is unsupported by the record. Immediately after the on-the-record discussion cited by Wright (Madura Dep. Trn, at 188-194, Ex. 8), Wright's counsel continued to prevent any discovery into Madura's expert work.  In addition to the line of questioning cited in Plaintiffs' opening brief (at 18), Wright's counsel instructed Madura not to answer the following questions:

- Q: Approximately how many documents have you reviewed in Relativity in connection with your litigation -- in connection with your role as a consultant in this litigation?
  MS. MARKOE: Objection. *I'm going to instruct him not to answer, to the extent any of those documents might have helped inform any of his opinions rendered as a testifying expert*. (*Id.* at 197:15-24 (emphasis added).)

- Q: Have you reviewed any evidence related to Dave Kleiman's electronic devices?
  MS. MARKOE: . . . Whether or not he did any review of Dave Kleiman's electronic devices or any analysis of Dave Kleiman's electronic device is outside the scope of the report and outside the scope of his opinions and to that extent, I would instruct him not to answer. (*Id.* at 202:24-204:6.)
- Q: Do you have a record of all the documents you reviewed in this litigation?
  MS. MARKOE: Objection. I'm going to instruct him not to answer that one. (*Id.* at 195:15-19.)

These instructions do not evidence "good-faith exchanges" to "determine the boundaries of the privilege." Rather, they demonstrate a clear attempt by Wright to shield Mr. Madura from disclosing any evidence he reviewed that can be used to cross-examine and undermine the opinions he is offering

Wright next argues (at 25-26) that even if this Court finds that there was a failure to disclose, such failure was "substantially justified" or "harmless." But the Court should not find Wright's failure was "substantially justified" because (i) his own counsel has repeatedly told Plaintiffs they must disclose every document their expert relied on – something Defendant failed to do here (ECF No. [509-6], at 3) and (ii) Wright cannot argue disclosure was clearly unnecessary because it related exclusively to consultant work as Madura himself could not draw a line between work he did as a consultant and work as a testifying expert. (Ex. 9, at 217:12-18 ("I'm trying to determine whether it would be considered part of the consulting or expert work. I think for these purposes, it's the consulting work. I'm not sure.").)

Finally, Wright's failure to disclose was not harmless. Madura's deposition took place the day before discovery closed. With the current case schedule there simply isn't enough time to re-depose him, consider yet another motion to exclude, and for this Court to review such briefing.

## II.    Madura's Opinion Should Be Excluded Because It Is Speculative And Unreliable.

In our opening brief, Plaintiffs asserted (at 18) that Mr. Madura's "methodology fails to pass *Daubert's* gatekeeping requirement because (1) Madura inappropriately 'cherry-picked' the evidence he relied on in forming his ultimate opinion and (2) such paltry materials are insufficient for reliably concluding anything about Dave's C++ programing skills."[8] In response, Defendant asserts (at 2) that "Mr. Madura's testimony, although not science-based, constitutes admissible non-scientific, experience-based testimony" and that this Court "has flexibility in assessing the

---

[8] Plaintiffs' did not challenge admissibility on the basis of Madura's qualifications.

relevant factors relating to reliability." Wright appears to proffer this characterization of Mr. Madura's opinions with the aim of lowering the hurdle he must clear to show that Madura's testimony is admissible. This argument fails because regardless of whether Madura's testimony is scientific, it must still satisfy the minimum requirements of Rule 702.

Under Rule 702, expert testimony must be capable of being "tested," "based upon sufficient facts or data," and not based on "anecdotal evidence." *Mosby v. Railey*, 2005 WL 8159837, at *3-4 (M.D. Fla. July 29, 2005) (excluding proposed testimony because it could not be tested and was based on materials such as plaintiff's personnel file, the complaint, and anecdotal evidence).[9] Madura cannot support his opinion and methodology based on the limited information on which he relies. Indeed, based on Plaintiffs' review of case law, no federal court has permitted expert testimony relating to the coding capacity of an absent witness based on an abridged review the witness's education and work experience, and Wright has not cited any case law to support such admissibility. Add in the fact that Madura premised his opinion on cherry picked data submitted in connection with topics unrelated to coding – and it becomes apparent Madura's testimony is completely unreliable.

Madura's sole experience dealing with this kind of an issue was making a recommendation to his employer on whether a specific programmer should be permitted to manipulate their code. (Ex. 10, at 61:3-20.) Of course, in those instances, Madura either had a working relationship with the programmers, or they had submitted resumes specifically attempting to demonstrate their proficiency. First, hiring or promotion recommendations are not expert opinions. But second, in this case, Madura can't even perform the base level analysis he did for his employer. He didn't know David and David never submitted a resume on his coding abilities. Madura has failed to meet his burden to show his opinion is reliable; it should be excluded.

## F. HARLEY NORWITCH

As Plaintiffs explained in our opening brief (at 20-21), Wright's handwriting expert, F. Harley Norwitch, intends to testify that signatures purporting to be from Wright on a "Deed of Loan" that *Wright produced in this action*, that *Wright previously submitted to the Australian*

---

[9] While Wright contends (at 20) that certain information necessary for the opinions Madura forms is missing because of Plaintiffs' doing, that excuse—which lacks factual basis—does not render Madura's opinions reliable.

*government,* and that *Wright testified one of which was his,* are not Wright's. Unsurprisingly, Norwitch fails to adequately explain the methodology that he relied upon to reach this, and his other, opinions. This failure warrants exclusion under both the Federal Rules of Evidence and the Federal Rules of Civil Procedure.

## I.       Mr. Norwitch Should be Excluded Pursuant to the Federal Rules of Evidence

"The proponent of the expert testimony carries a substantial burden" to "demonstrate" that the expert's "opinions are based on sound methodology." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (proponent has "burden to show" the "methodology by which the expert reach[ed] his conclusions is sufficiently reliable"). A party that fails to adequately explain its expert's methodology necessarily fails to meet that burden. *See Affiliati Network, Inc. v. Wanamaker*, No. 1:16-cv-24097, 2017 WL 7361048, at *7 (S.D. Fla. Aug. 14, 2017) (excluding expert, where proponent provided "nowhere near enough to show, by a preponderance of the evidence, that [the expert's] calculations [were] reliable under *Daubert*").[10] That is exactly what happened here.

Indeed, as Plaintiffs explained in their opening brief, Norwitch completely failed to explain *how* or *why* he reached his conclusions, let alone explain enough to demonstrate his "methodology" was reliable. (*See* ECF No. [509], at 34-35.) He did not explain the dimensions on which he compared the relevant signatures, why he compared the signatures on those dimensions, how he compared the signatures on those dimensions, what portions of the signatures were compared, what differed, how it differed, why that difference matters, or whether his methodology had any indicia of reliability (*e.g.*, whether it was peer reviewed, subject to publication, empirically tested or testable, or had a known error rate). (*See id.*). Courts in this Circuit have repeatedly found, when ruling on the admissibility of handwriting expert opinions, that such nondisclosure requires exclusion. (*See id.* at 34-37 (citing *Dracz v. Am. Gen. Life Ins. Co.*, 426 F. Supp. 2d 1373, 1379-80 (M.D. Ga. 2006); *Am. Gen. Life & Accident Ins. Co. v. Ward*, 530 F. Supp. 2d 1306, 1313-14 (N.D. Ga. 2008); *Agri-AFC, LLC v. Everidge*, No. 5:16-cv-00224, 2019 WL 385421, at *15 (M.D. Ga. Jan. 30, 2019)).)

---

[10] *See also Bussey-Morice v. Kennedy*, No. 6:11-cv-970, 2012 WL 8010853, at *3-4 (M.D. Fla. Dec. 28, 2012) (excluding expert testimony, where "there [was] insufficient information in the record to show that the methodology [the expert] used to arrive at his opinions [was] reliable").

Wright's response wholly fails to refute Plaintiffs' arguments, let alone meet his burden to establish that Norwitch's opinions are sufficiently reliable.

*First*, Wright's argument (at 26-28) that Norwitch is *qualified* (which Plaintiffs don't challenge) does not establish that his *methodology* (which Plaintiffs do challenge) is reliable. *See Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("Under *Daubert*, the 'district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.'" (citations omitted)). Indeed, "even if a witness is qualified as an expert," the witness's methodology still "must be sufficiently reliable." *Smith v. Royal Caribbean Cruises, Ltd.*, No. 13-cv-20697, 2014 WL 6997644, at *3 (S.D. Fla. Dec. 10, 2014). Accordingly, Norwitch's general qualifications do excuse his nondisclosure of methodology. (*See* ECF No. [509], at 34-37.)

*Second*, Wright's claim (at 27) that "[t]he primary holding" of *Dracz*, *Ward*, and *Agri-AFC* was that "the experts were not qualified to provide expert opinions" is simply wrong. At best, Wright mischaracterizes each of these cases, which say nothing about "primary holdings" and expressly exclude expert testimony based on the expert's failure to adequately explain his or her methodology. Most egregiously, Wright represents (at 28) that the *Agri-AFC* court "exclud[ed] [the handwriting] expert based on inadequate qualifications." ***Directly contrary to that representation***, the court held (on the same page of the opinion that Wright cites) that: "**Although the Court finds Ms. Peterson to be a qualified document examiner, it must exclude her expert report and conclusions, as they are not based on any methodology that is readily apparent from the record.**" 2019 WL 385421, at *15 (emphasis added). Wright's inability to distinguish *Dracz*, *Ward*, and *Agri-AFC* on any real basis is understandable: each case involved a district court in the Eleventh Circuit excluding a handwriting expert who provided as much (or more) of an explanation to their opinions than Norwitch does here.

*Third*, Wright's next argument (at 28)—that Plaintiffs "ignore binding precedent from the Eleventh Circuit, which has repeatedly held that handwriting expert reports and testimony were properly admissible under Rule 702"—is not only factually incorrect, but also fails to demonstrate anything beyond the fact that expert testimony regarding handwriting *may* be admissible in some cases. Indeed, setting aside the fact that Wright doesn't identify a single binding case that Plaintiffs

failed to cite, none of the "binding precedent"[11] that Wright identifies stands for the proposition that testimony from handwriting experts is automatically admissible. *See United States v. Johnsted*, 30 F. Supp. 3d 814, 821 (W.D. Wis. 2013) (explaining that, in *United States v. Paul*, 175 F.3d 906 (11th Cir. 1999), the Eleventh Circuit was "not laying down a rule that handwriting analysis must always be admissible under Rule 702"). Plaintiffs' argument is that *Norwitch's testimony* should be excluded, not that handwriting testimony should *always* be excluded.

   *Fourth*, contrary to Wright's assertion (at 28-29), Norwitch did not adequately explain his methodology in the "Forensic Document Examination Protocol" paragraphs in his reports (*see, e.g.*, ECF No. [509-11], at 37). Although those paragraphs describe *a* methodology, they do not necessarily describe the methodology used by Mr. Norwitch *in this case*. For instance, Norwitch states that signatures may be compared on a number of dimensions "*such as, but not limited to*: form, height ratios, slant, proportions, skill level, movement, speed, pressure, and line quality, *where possible and/or necessary*," but he completely fails to say which of these dimensions (*if any*) he considered for which signatures, let alone explain what any of these terms mean or how that analysis would work. *See Agri-AFC*, 2019 WL 385421, at *15 (excluding handwriting expert who provided similar explanation, on grounds that "none of these terms [were] defined or specifically applied in the report to show exactly what [the expert] did while evaluating the signatures"). He likewise states that "[e]xamination, comparisons, and archival procedures *may* employ, *but are not limited to*, stereo microscopy, video-spectral comparison and electro-static instrumentation, transparency comparison, computer scanning, and photo microscopy (photomicrographs)," but provides no explanation in his report as to whether he employed *any* of these tools (let alone what these tools are, or why they might be used). *See Wheeler v. Olympia Sports Ctr., Inc.*, No. 03-cv-265, 2004 WL 2287759, at *4 n.2 (D. Me. Oct. 12, 2004) (excluding

---

[11] Wright cites three cases to support this argument, *United States v. Paul*, 175 F.3d 906 (11th Cir. 1999); *United States v. Velasquez*, 64 F.3d 844 (3d Cir. 1995); and *Salamaya v. MasTec Inc.*, No. 6:11-cv-1633, 2012 WL 13137096 (M.D. Fla. Apr. 20, 2012). Plaintiffs cited the only one that is actually binding. (*See* ECF No. [509], at 32 (citing *Paul*).) Plaintiffs further note that Wright—in a paragraph about "binding precedent"—failed to indicate that *Velasquez* was decided by the Third Circuit. In any event, that case merely stands for the same proposition as *Paul*—that handwriting analysis is not per se inadmissible. *See Johnsted*, 30 F. Supp. 3d at 821 (citing *Velasquez*). Wright's third case, *Salamaya*, involved an expert report that was far more detailed than Norwitch's. (*See* Ex. 11(*Salamaya*, No. 6:11-cv-1633 (M.D. Fla. Apr. 13, 2012), ECF No. 58-1).) Indeed, the report in that case explained that the expert examined certain documents on a particular date with a particular tool "for evidence of latent writing impressions," and explained the "latent writing impressions recorded" for each document analyzed. (*Id.* at 10-11.) That expert also included detailed charts highlighting differences between signatures. (*Id.* at 12.) As explained below, Norwitch did not provide any such information.

handwriting expert who listed equipment that may be used in analysis, but failed to state that "he used any of this equipment in reaching his conclusion in this case, let alone how he used it"). In fact, Norwitch testified that he did not use any of that equipment. (*See* ECF No. [529], at 29.) This underscores the methodologies mentioned in Norwitch's reports are not connected to the actual methodology he employed to reach his opinions here.

*Fifth* (and relatedly), Wright is wrong (at 29) that Norwitch's deposition testimony adequately explains his methodology. Although Norwitch testified that he "employed a 'side-by-side examination'" of "each portion" of the relevant signatures, he does not explain what dimensions of the signatures he compared, why he chose to compare those dimensions, or why his particular approach was reliable. *See* Wheeler, 2004 WL 2287759, at *4 (excluding handwriting expert who "offer[ed] no details about his methodology, beyond 'comparing' the handwriting on several documents"). In arguing that Norwitch's testimony is admissible under Rule 702, Wright repeatedly states that Plaintiffs deposed Norwitch twice. (*See* ECF No. [529], at 29 & 29 n.28). But whether Plaintiffs *could* have elicited more information from Norwitch is irrelevant; the burden is on Wright, not Plaintiffs or the Court, to establish that Norwitch's testimony is reliable. He's failed to carry that burden.

*Finally*, Wright's last argument (at 29-30)—that the conclusory "Findings, Opinions" sections of Norwitch's reports somehow save Norwitch from *Daubert*—also fails. As Plaintiffs explained in their opening brief, those sections provide no information about Norwitch's methodology, or the bases for his opinions, and raise far more questions than answers. (*See* ECF No. [509], at 26-29). For example, Norwitch explains that the signatures that purport to be from Wright on the "Deed of Loan" are not authentic because, "although bearing some pictorial resemblance to the standard Wright signatures, the questioned signatures do not compare favorably with the individual characteristics present in the standard signatures and, in fact, display significant and fundamental departures from the genuine signatures," and that "[t]hese dissimilarities are beyond the range of normal variation found within the standard signatures and are indicative and consistent with simulation." (*See* ECF No. [509-11], at 38). But he doesn't (among other things) identify the "pictorial resemblance," state why or in what way "the questioned signatures do not compare favorably with the individual characteristics present in the standard signatures," state what those "individual characteristics" are (unless he is referring to the supposed fact that the signatures are "symbolic . . . , complex, and are written rapidly," *which is the exact same*

*description* he provides for Uyen Nguyen's signatures), identify the "significant and fundamental departures," explain what the "range of normal variation" is (or how he determined it), or why those "dissimilarities" are "indicative and consistent with simulation." *See Dracz*, 426 F. Supp. 2d at 1379-80 (excluding handwriting expert who failed to explain "*how* [he] evaluated the documents and drew his conclusion").

Likewise, although Norwitch's report includes a "comparison chart" of sample and questioned Wright signatures (*see* ECF No. [509-11], at 40), that chart does not highlight *any* differences between the two groups. Instead, it is just an aggregation of the signatures he's comparing (without even identifying where those signatures were taken from). Courts have excluded opinions with **far more detailed charts**. *See Agri-AFC*, 2019 WL 385421, at *15 (expert who provided chart that highlighted particular parts of signatures and noted differences between them inadequately explained methodology).

None of the cases Wright cites actually support his claim (at 30) that this Court should admit Norwitch's opinion because "[s]imilar findings and opinions have been affirmed by the Eleventh, and other Circuits, to suffice under Rule 702 and *Daubert*." Indeed, while Wright claims that in *United States v. Dale*, an expert who submitted a "one-page expert report" that "provided fewer details" than Mr. Norwitch's reports was permitted to testify, the supposedly "one-page expert report" Wright references appears to have been longer.[12] In any event, the Eleventh Circuit's opinion in *Dale* doesn't even address whether the expert adequately explained his methodology. *See* 618 F. App'x 494, 497 (11th Cir. 2015) (addressing argument that handwriting analysis is per se inadmissible). Moreover, contrary to Wright's assertion, there is no indication that the expert reports at issue in *any of the other cases he cites* were "similar" to Norwitch's reports in any respect – or even challenged on the grounds Plaintiffs have raised here.

Ultimately, the out-of-Circuit cases Wright cites demonstrate precisely why Mr. Norwitch's explanations are inadequate and why his opinions should be excluded. For example, in *United States v. Prime*, the proponent submitted evidence demonstrating that the handwriting expert's analysis was testable, subject to peer review and publication, had a known error rate, and was generally accepted. *See* 431 F.3d 1147, 1153-54 (9th Cir. 2005). The same was true in *United*

---

[12] In particular, the "one-page" report that Wright references from *Dale* appears to be an excerpt of the expert report submitted in that case: the top center is marked with "30," the bottom right is marked with "253," and the document references an "evidence description above" and an "Attachment 1" that are not included in the single-page version cited by Wright. (*See* Ex. 12 (*United States v. Dale*, No. 12-cr-60251 (S.D. Fla. Nov. 26, 2012), ECF No. 30-1)).

*States v. Mooney*, 315 F.3d 54, 62-63 (1st Cir. 2002). Likewise, in *United States v. Crisp*, the expert's testimony was supported by "several studies" demonstrating the reliability of his methodology. 324 F.3d 261, 270-71 (4th Cir. 2003).[13] In contrast, just like in *Dracz*, "this case is sorely lacking in any such evidence regarding [the expert's] methodology or its reliability." 426 F. Supp. 2d at 1379-80 (distinguishing *Mooney* and excluding expert).

## II. Mr. Norwitch Should Be Excluded Pursuant to the Federal Rules of Civil Procedure

To satisfy Rule 26(a), "expert reports must include 'how and why the expert reached a particular result, not merely the expert's conclusory opinions.'" (ECF No. [509], at 25 (quoting *Calhoune v. Ford Motor Co.*, No. 17-cv-61702, 2018 WL 7287871, at *1 (S.D. Fla. Dec. 26, 2018)).) As explained above and in Plaintiffs' opening brief (*see* ECF No. [509], at 26-29), Norwitch's reports fail to provide *any* meaningful explanation of the bases and reasons for his opinions and instead raise more questions than they answer (such as what "significant and fundamental departures" he identified, and what constitutes a "significant and fundamental departure").

Wright contends (at 31) that "Norwitch provides ample basis and reasons for his opinions." The only support Wright can muster for this conclusory claim comes from Nevada, but even the expert in that case identified "6 major dissimilarities between the questioned signatures and the known samples." *Boomj.com v. Pursglove*, No. 2:08-cv-00496, 2011 WL 2174966, at *3 (D. Nev. June 3, 2011). In any event, cases decided by courts in this Circuit—including the cases cited in Plaintiffs' opening brief (*see* ECF No. [509], at 25-26)[14]—demonstrate that Norwitch's reports do not comply with Rule 26.

Accordingly, Norwitch must be excluded pursuant to Federal Rule of Civil Procedure 37 unless *Wright demonstrates* that his "failure to comply with Rule 26(a) was 'substantially justified or harmless.'" (ECF No. [509], at 29-30 (quoting *Rembrandt Vision Techs., LP v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (11th Cir. 2013)).) Wright doesn't meet this burden. Indeed, Wright doesn't even bother arguing that his failure was substantially justified and

---

[13] Wright's final case, *United States v. Jolivet*, 224 F.3d 902 (8th Cir. 2000), merely stands for the proposition that handwriting analysis *may* be admissible. *See Johnsted*, 30 F. Supp. 2d at 821.

[14] Wright contends (at 31 n.31) that these cases are irrelevant because they did not involve handwriting analysis. This is a distinction without a difference. His contention (at 31) that "Plaintiffs cite no case law for the proposition that they would be surprised" by testimony that Norwitch offers is likewise meritless; the cases cited by Plaintiffs demonstrate that disclosures similar to Norwitch's report provide insufficient notice to the opposing party.

his "harmlessness" argument is unavailing. He asserts (at 32) that "there is no demonstrable harm to the plaintiffs" because they "could have sought to engage a rebuttal expert on the handwriting analysis" and because "Plaintiffs have had the opportunity to depose Mr. Norwitch more than once regarding his opinions." But Wright completely ignores the fact that his failure to adequately disclose the basis for Norwitch's opinions prejudiced Plaintiffs' ability to depose Norwitch. (*See* ECF No. [509], at 30 (citing *Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-cv-947, 2009 WL 1139575, at *3 (M.D. Fla. Apr. 27, 2009), and *Street v. Drury Inns, Inc.*, No. 08-cv-0700, 2009 WL 3784330, at *2 (S.D. Ala. Nov. 10, 2009)).) Likewise, Plaintiffs' ability to obtain a rebuttal opinion was necessarily prejudiced by the lack of notice that they received regarding Norwitch's methodology.

## DR. MACINTYRE

Plaintiffs moved to strike Dr. MacIntyre's opinions because they are not relevant to the claims or defenses in the case. Instead, as demonstrated by the Motion, and Dr. Wright's response, MacIntyre's opinions are part of an improper attempt by Wright to introduce an emotional narrative to impugn David Kleiman's character, portray Ira as an undeserving Plaintiff, and otherwise distract the jury. This should not be allowed.

Dr. MacIntyre is an infectious disease specialist. His knowledge about David comes almost exclusively from medical records generated during David's on-and-off stay in the VA hospital from 2011 until his death in 2013, and David's death records. MacIntyre knows nothing about David's medical history prior to 2011—other than that he was a paraplegic.

As this Court is aware, the merits of the case flow from whether or not David had a joint business relationship with Dr. Wright that included the creation of Bitcoin in c. 2008, the mining of bitcoin, and joint development of other intellectual property. MacIntyre does not opine that David had any disability, medical or otherwise, that impacted his ability to enter into the joint business relationship with Wright.  ECF No. [492-13,14]; Apr. 20, 2020 Depo Trn., at 51-54, Ex.13.

Nonetheless, Wright makes clear that he intends to use Dr. MacIntyre to paint an inaccurate and unflattering portrait of David which, even if true, is not relevant to the claims or defenses in

the case. At a minimum, the prejudicial value of such evidence outweighs any minimum probative value.

  ***Cause of Death***:

  Dr. MacIntyre blames David's death, at least in part, on a "lack of care by family, friends, or medical personnel after his discharge." ECF No. [492-14], at 3 ("[t]he circumstances of his death are strange, with aspects suggesting uncontrolled infection, related to his lack of care by family, friends, or medical personnel after his discharge"). According to MacIntryre, if David had more support from his friends and family, he might not have died when he did.

  This opinion should be stricken because it is (1) speculative, (2) contrary to the undisputed factual record in the case, and (3) is a back-door attempt to prejudice make the jury "punish" Ira for alleged familial failings. Oddly, Dr. Wright himself does not think Dave died as a result of lack of visitation -- he claims it was suicide.[15]

  First, the only evidence we have regarding visitation is that Dave was visited regularly. ECF No. [492-19, 18], ("In the beginning it was almost every day, as I would leave the office I would just head over there, spend maybe half hour, one hour with him"); Patrick Paige Depo Trn., at 10:11-14, Ex. 14 (Q: Did you ever visit Dave in the hospital? A: Yes…. Several times); Carter Conrad Depo Trn., at 13, Ex. 15 (Q: Did you ever visit him while – David while he was in the hospital? A: Multiple times)? MacIntyre's sole support for this statement is that he did not see mentions of in person visits in the medical records. ECF No. [492-14], at 3. It appears Wright's counsel never showed MacIntyre the contrary affirmative evidence. ECF No. [492-14], at 1 (listing materials reviewed). MacIntyre admitted he actually does not know who or how often David had visitors, only that Ira did not visit. Apr. 20, 2020 MacIntyre Depo Trn., 46, Ex. 16 (Q: Okay. The truth is, you have no idea who was with Mr. Kleiman for any some or all of those three weeks, do you? [Objection] A: All I know is what is in the depositions that I read, that Mr. Ira Kleiman was not there, and there is no indication of what other people may or may not have been there. Q: Right. You don't know. The only thing you know is that Ira Kleiman was not there, correct? A: That is correct.). This admission reveals that the "lack of visitation" claim is not a medical opinion – it is yet another attempt to smear Ira.

---

[15] That testimony is one of the subjects identified in Plaintiffs' Omnibus Motion in Limine, ECF No. [497], MIL #5 at 20.

Second, more importantly, there is no basis to opine that Dave's death was in any was caused by lack of support from friends and family. As determined by the Medical Examiner, Dave died of "CORONARY ARTERY DISEASE." David A. Kleiman Apr. 27, 2013 Autopsy Rep., at 1, Ex. 17; ECF No. [492-20] He did not die of neglect. He did not commit suicide. Injecting these baseless accusations into the trial should be beyond the pale – although Dr. Wright has confirmed that is exactly what he intends to do. ECF No. [523], at 13-14.

Third, MacIntyre speculates that drug use *may* have contributed to David's death because there where "trace levels" of cocaine found in his body. Of course, the Medical Examiner made no such finding, and MacIntyre concedes he himself has not formed an opinion that drug use contributed to David's death. Apr. 20, 2020 MacIntyre Depo Trn., at 41:24-42, Ex. 18 (Q: Did the medical examiner make a determination whether cocaine contributed to Mr. Kleiman's death? A: I did not see that in his report, no. …. Q: [You] do not issue an opinion that cocaine was a cause of Mr. Kleiman's death, correct? A: That is correct. That would be a little bit out of my expertise."). Testifying to the *possibility* that cocaine *may* have contributed to David's death has no relevance to the claims in the case, and is instead part of Dr. Wright's efforts to smear David as a drug abuser. ECF No. [523], at 15. This is a reckless and baseless attack with no connection to the issues the jury will decide.

### Impact of Prescription Drugs on David's Ability to Perform Complex Tasks:

It appears Wright intends to have MacIntyre opine that David took antibiotics and "opiate pain relievers" in the hospital, and that those drugs impacted his "ability to perform complex tasks." ECF No. [492-14], at 2. Like his cause of death opinions, this too lacks evidentiary support, and is irrelevant to the claims and defenses in the case. Again, this is innuendo disguised as a medical opinion -- and is yet another attempt to distract the jury and impugn the character of Mr. Kleiman. It should not be allowed.

Despite having access to Mr. Kleiman's full medical records from his hospital stay, Dr. MacIntyre does not know how often Dave Kleiman took the medications identified in his report. Apr. 20, 2020 MacIntyre Depo Trn., at 27:6-29:2; 52:1-53:24, collectively Ex. 19. He also admits that there is no indication in the medical records that any of these medications had any effect on Mr. Kleiman's "ability to perform complex tasks." *Id.*, at 31-32:18; Jan. 10 MacIntyre Depo Trn., at 62:3-63:24, collectively Ex. 20. Indeed, Dr. MacIntyre admitted that, to the extent the medical records shed any light on this issues, they describe Mr. Kleiman as someone who was regularly

doing work on his computer throughout his hospital stay, notwithstanding his periodic use of pain relievers and antibiotics prescribed by his physicians. ECF No. [492-17]; ECF No. [492-14], at 2; Ex. 19, at 51:20-25.

Given this lack of evidence, Dr. MacIntyre was left to opining that prescription medications *could have* had the ability to impact David is not sufficient. ECF No. [492-14], at 2.

### Dave Kleiman's Medical Condition Impeding David's Ability to "Function at Work":

Lastly, as a catch-all, Dr. Wright plans to have MacIntyre opine that the medical conditions "plaguing Dave Kleiman" impeded his "independence, mobility and ability to function at work." ECF No. [529], at 33-34.

First, the jury does not need an *infectious disease* specialist to opine that paraplegia impedes mobility. As far as independence is concerned, the evidence in the record is that David usually lived alone, and was actually quite independent. However, even if that was in dispute, it is unrelated to the claims and defenses in the case.

Second, Dr. MacIntyre's opinions regarding Dave's so-called impeded "ability to function at work" is not supported in the record upon which Dr. MacIntyre bases his opinion. To the contrary, the medical records demonstrate that, during the only period of time Dr. MacIntrye reviewed, Dave was regularly working, primarily on his computer. ECF No. [492-17]; ECF No. [492-14], at 2. We also know that Wright has produced emails showing David was working with Wright during this time. *See* DEF_00013808, DEF_00028003, collectively Ex. 21.

Although it should go without saying, the joint business relationship between Dr. Wright and David did not require physical labor or even ability to move around. Instead, their work was primarily in the development of intellectual property (including but not limited to the Bitcoin protocol), and the mining of bitcoin. There is nothing about David's physical condition that would impact any of this activity. And Wright has rightly conceded that Dr. MacIntyre has no opinions about Dave's mental abilities. ECF No. [529], at 32.

In sum, Dr. MacIntyre has no opinions that go to the merits of the claims or defenses in the case. Instead, he is just another cog in Wright's improper attempt to make this trial about emotions, family relationships, and drug use – instead of the merits of his business relationship with David. He should be precluded from testifying.

Dated: June 2, 2020

Respectfully submitted,

*/s/ Velvel (Devin) Freedman*
Velvel (Devin) Freedman, Esq.
**ROCHE CYRULNIK FREEDMAN LLP**
200 S. Biscayne Blvd.
Suite 5500
Miami, Florida 33131
vel@rcfllp.com

Kyle W. Roche, Esq.
Joe Delich, Esq.
*Admitted Pro Hac Vice*
**ROCHE CYRULNIK FREEDMAN LLP**
185 Wythe Avenue F2
Brooklyn, New York 11249
kyle@rcfllp.com

Andrew S. Brenner, Esq.
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
abrenner@bsfllp.com

*Counsel to Plaintiffs Ira Kleiman as*
*Personal Representative of the Estate of*
*David Kleiman and W&K Info Defense*
*Research, LLC.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 2, 2020 a true and correct copy of the foregoing was

filed under Seal with CM/ECF, and served by E-mail to all counsel of record.

*/s/ Velvel (Devin) Fredman*
VELVEL (DEVIN) FREEDMAN