Page 51

1   Q.  You don't know what his ability is, and you
2   don't know how much it was diminished?
3       MS. MARKOE:  Objection.
4       THE WITNESS:  I would expect what he
5       underwent, while he was in the hospital, to
6       alter or be diminished to be unable to do
7       those things.
8   BY MR. BRENNER:
9   Q.  Can you give me a percentage of his
10  diminishment?
11  A.  I cannot quantify it.
12  Q.  In any way?
13  A.  Other than it would be expected to be
14  diminished.
15  Q.  Going back one page in your report, and I'm
16  looking at paragraph -- let me find it for you.
17  Yeah.  Paragraph 7.  The last sentence of paragraph 7
18  we're going to look at.  Do you see that?
19  A.  Yes.  Uh-huh.
20  Q.  As an infectious disease doctor, you opine
21  that the medications Mr. Kleiman was taking during
22  the hospitalizations from 2010 to 2013 "could affect
23  ability to do complex tasks and computations."
24      Do you see that?
25  A.  That is correct.



Page 52

1    Q.   First of all, are you now going beyond the
2  word "could" and say it did affect his ability to do
3  tasks and complex computations?
4         MS. MARKOE:  Objection.
5         THE WITNESS:  I will say just the
6     could.  All those factors would be expected
7     to alter his ability to do those things,
8     similar to the other paragraphs.
9  BY MR. BRENNER:
10   Q.   And in what way would it affect his ability
11 to do complex tasks?
12   A.   The fact that he was on medications that
13 can dull mental acuity, that he was receiving
14 antibiotics that might make him not feel so well.
15 That's also in that paragraph.  That he had multiple
16 surgical procedures, that he was having to undergo
17 multiple treatments and therapies all contributed.
18   Q.   Right.  My question must have been a bad
19 one, because I didn't get the information I'm trying
20 to get.  I'm not asking you what was the cause.  I'm
21 asking how it manifested.
22        What was the affect on his ability to do
23 complex tasks?
24   A.   Well, as I said before, I did not measure
25 or quantify that.  I can't quantify the affect.



```
                                                        Page 53
 1        Q.   Same question:  What was his affect on his
 2   ability to do computations?
 3        A.   I can't say exactly how much it was.  All I
 4   can say is one would have expected an alteration in
 5   his ability to do those things.
 6        Q.   And you have no opinion on Mr. Kleiman's
 7   ability to do complex tasks or computations prior to
 8   2010, correct?
 9        A.   I have no information on that.
10        Q.   You have no opinion on his mental ability
11   prior to 2010, correct?
12        A.   That's correct, no information.
13        Q.   Right.  You have no opinion on his ability
14   to work before 2010, correct?
15        A.   Again, no information.
16        Q.   You have no ability -- you have no opinion
17   on his ability to write computer code before 2010?
18             MS. MARKOE:  Objection.  Beyond the
19        scope.
20   BY MR. BRENNER:
21        Q.   You can answer.
22        A.   Well, I have no idea what it takes to write
23   computer code.  I don't do that myself.  That's
24   outside of the field of my expertise.
25        Q.   You don't know anything about his abilities
```



Page 54

1  before 2010 other than physically limited by the
2  spinal injury, correct?
3      A.  I do know something about the physical
4  abilities.  But as far as the computers and things
5  like, that I have to leave that to a compute geek.
6      Q.  Anything about his mental ability before
7  2010, correct?
8          MS. MARKOE:  Objection.
9          THE WITNESS:  I have no information on
10     that.
11 BY MR. BRENNER:
12     Q.  Well, if you have no information, it's
13 correct you don't have an opinion on his mental
14 ability prior to 2010; is that correct?
15     A.  I have no information.
16         MR. BRENNER:  Okay.  That's all I have.
17     Thank you.
18         MS. MARKOE:  I don't have anything.
19         MR. BRENNER:  So I think we just
20     marked -- we just marked the report, which
21     I'll mark to the court reporter -- actually,
22     sorry.
23         Will you just advise on read or waive,
24     please?
25         MS. MARKOE:  We'll read.

