Page 31

```
 1   part that I have up.
 2       Q.   Let's do that.  Let's just be literally on
 3   the same page, page 32.
 4       A.   I got it, 32.
 5       Q.   Okay.  I asked if you're offering any
 6   opinions regarding Mr. Kleiman's mental state.
 7            Do you see that, line 7?
 8       A.   Got it.  Yes.  Uh-huh.
 9       Q.   You tell me that although you point out the
10   medications could do that, you were not stating that
11   as an opinion, correct?
12       A.   That is correct.  And you got me on that.
13   Gotcha.
14            However, as I pointed out before, that my
15   opinions have been amplified.  Just looking at the
16   fact he was on these medications for that period of
17   time -- and, again, using the more likely than not
18   phrase, that more likely than not, there was an
19   affect on his mental status.
20       Q.   Okay.  Was there any notation in the
21   medical records from any of the doctors that treated
22   him over a two-and-a-half-year period that he had a
23   decreased mental state?
24            MS. MARKOE:  Objection.
25            THE WITNESS:  I don't remember -- okay.
```



Page 32

1      I don't remember seeing anything like that.
2  BY MR. BRENNER:
3      Q.  Well, surely you would have looked for it,
4  because you were asked to offer an opinion whether
5  the medications had, in fact, decreased his mental
6  state.
7          So you certainly looked for it, didn't you,
8  Doctor?
9          MS. MARKOE:  Objection.
10         THE WITNESS:  As I was going through, I
11     would have recorded if I saw something.
12 BY MR. BRENNER:
13     Q.  Right.
14     A.  Doesn't mean I didn't miss something, but I
15 didn't find anything.
16     Q.  Right.  You looked for it, and you didn't
17 find it?
18     A.  That's correct.
19     Q.  All right.  So, now, the medical records
20 and your report do talk about whether Dave Kleiman
21 was, in fact, working while he was in the hospital,
22 correct?
23     A.  That is correct.
24     Q.  And that's noted in paragraph 6 of your
25 report, correct?



Page 62

```
 1   are possible.  I'm only asking what you know based on
 2   your review and your opinion.  Okay?
 3       And you -- do you have an opinion that
 4   there was anything about Mr. Kleiman's medical
 5   condition that other than the times that he was in
 6   surgery that prevented him from using the phone and
 7   using the computer and otherwise working?
 8           MS. MARKOE:  Objection to the term
 9       "otherwise working."
10           THE WITNESS:  Again, as I mentioned
11       before, there could very well have been
12       periods of time when he might have
13       medications that might get in the way.  I'd
14       have to leave that opinion to somebody else.
15   BY MR. BRENNER:
16       Q.  Okay.  You've testified in lots of medical
17   malpractice and -- and other litigation, right?
18       A.  Yes.  Uh-huh.
19       Q.  You understand the term "to a reasonable
20   degree of medical certainty," right?
21       A.  Yes.  Uh-huh.
22       Q.  You are not offering an opinion, to a
23   reasonable degree of medical certainty, that there
24   was anything in Mr. Kleiman's medical condition, that
25   other than when he was in surgery, that prevented him
```

Page 63

```
 1   from using a computer, using a phone, and otherwise
 2   working, correct?
 3       A.  Well, again, I cannot give that full
 4   opinion, because part of that is a psychological or
 5   pharmacological opinion that's outside of my field.
 6   From an infectious disease point of view, I don't see
 7   anything getting from -- that would get in the way of
 8   use -- him using a computer.
 9       Q.  Or otherwise working?
10           MS. MARKOE:  Objection.
11           THE WITNESS:  Or otherwise -- well,
12       obviously, he's not gonna get up and walk
13       over to an office and work and go back
14       again.
15   BY MR. BRENNER:
16       Q.  Right.  I'll rephrase it.
17           Nothing from an infectious disease
18   standpoint, which is what you are --
19       A.  Uh-huh.
20       Q.  -- prevented him from using the phone,
21   using the computer, and working, as long as it was
22   done in a wheelchair or in his bed?
23       A.  Yeah.  With the exceptions given before
24   regarding surgery and so forth.
25       Q.  Other than that?
```

Page 64

```
 1       A.  That's correct.
 2           MS. MARKOE:  Objection.
 3   BY MR. BRENNER:
 4       Q.  Okay.  Let's just look at a few more.
 5           MS. MARKOE:  Andrew, can we take a
 6       break?
 7           MR. BRENNER:  Absolutely.  We can take
 8       it this second, if you want.
 9           MS. MARKOE:  If you don't mind.
10           MR. BRENNER:  I don't.
11           VIDEO TECHNICIAN:  We are going off the
12       record.  The time is 11:55 a.m.
13           (A recess was taken.)
14           VIDEO TECHNICIAN:  We are now back on
15       the record.  The time is 12:04 p.m.
16           (MacIntyre, M.D. Deposition Exhibit 6,
17   Medical record dated January 10, 2011 for David
18   Kleiman, was marked for identification.)
19   BY MR. BRENNER:
20       Q.  All right.  I'm handing you what's been
21   marked as Exhibit 6.
22           There we go.  We'll just go through this
23   pretty quickly, if that's okay with you.
24           It's a medical record for an encounter
25   January 10, 2011.  It's about midway down the page.
```

Page 65

```
 1           Do you see that?
 2       A.  Yeah.  I see it.  Uh-huh.
 3       Q.  Again, Mr. Rosenstein and Dr. Somoza.
 4           Do you see that?
 5       A.  Yes.  Got it.
 6       Q.  If you go to the second page of the record,
 7   again, the highlighting is -- is not what you had
 8   seen.  That's been added by my office.  Okay?
 9           Do you see that?
10       A.  Yes.  Uh-huh.
11       Q.  So Mr. Kleiman is reporting that is he
12   "very productive" and doing work regarding his
13   business.
14           Do you see that?
15       A.  I see that.
16       Q.  Okay.  And that's consistent with other
17   records we've looked at?
18       A.  It's consistent that he was reporting these
19   things, that's correct.
20       Q.  Right.  And -- and you -- you don't -- you
21   don't have reason to say that it was accurate or
22   inaccurate, correct?
23       A.  I have no reason.  That has really nothing
24   to do with infectious disease.
25       Q.  Right.  Outside of your scope of opinion,
```

