```
              RAMONA WATTS - CONFIDENTIAL
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA


                 CASE NO.:9:18-cv-80176-BB/BR


------------------------------------------
IRA KLEIMAN, as the personal          )
representative of the Estate of David  )
Kleiman, and W&K Info Defense          )
Research, LLC                          )
                    Plaintiffs,.       )
                                       )
        v.                             )
                                       )
CRAIG WRIGHT                           )
                    Defendant.         )
------------------------------------------


               DEPOSITION OF RAMONA WATTS


                          On


                 Thursday March 19, 2020


                  At the offices of:


                    SCA Ontier
                    Halton House,
                    20-23 Holborn,
                    London EC1N 2JD,
                    United Kingdom


Taken by:
AMY COLEY, Court Reporter
```



Page 141

1              RAMONA WATTS - CONFIDENTIAL

2    Wright International, yes, the trust holds shares

3    in Wright International.

4          Q.    Right.  The next line, now this is

5    directly about you, so I am just trying to give

6    context to it.  It says:  "Ramona made a request

7    to the director of this company, Denis Mayaka, in

8    December 2019."  Do you see that?

9          A.    I see what it is written, yes.

10         Q.    Okay, it is true that you made a

11   request to Mr. Mayaka; correct?

12         A.    I did.

13         Q.    Is it true that Mr. Mayaka is a

14   director of Wright International Investments?

15         A.    I don't know.

16         Q.    Okay, so you don't know whether

17   that statement is true or false; correct?

18         A.    I do not know.  That is right.

19         Q.    Now, he says specifically, now

20   Dr. Wright has specifically testified about what

21   he asked you to do; do you see that?

22         A.    I do.

23         Q.    "I asked my wife, who is the

24   primary trustee of the trust, to obtain a copy of

25   the trust agreement."  Is that true?



Page 142

1           RAMONA WATTS - CONFIDENTIAL

2           A.      It could have been.  As I said,

3    I don't have a specific recollection.

4           Q.      He also asked you, according to

5    this, to obtain the associated records, including

6    the company accounts that related to the entities

7    owned by the trust?

8           A.      That one I specifically remember

9    because he actually did say to me when we got --

10   so we got the trust document in December, I think

11   it was, and he said it was not the full documents,

12   he said that there should be other company

13   documents as well.  And I couldn't remember what

14   Denis had and what he didn't have.  So I asked him

15   again, I don't know if it was the end of December

16   or early January, to give us the company

17   documents.  I remember that conversation.

18          Q.      Okay, so you asked Mr. Mayaka for

19   the trust document; correct?

20          A.      So I asked him or the for the trust

21   document -- again, I don't remember the dates, but

22   I am sure it was in December.  Yes.  Then I asked

23   him for all the documents, so including company

24   records and everything else in, I think it was

25   January.



Page 143

1                RAMONA WATTS - CONFIDENTIAL

2          Q.     Okay.  He gave you the trust

3   documents, you already testified to that; correct?

4          A.     He did.

5          Q.     Did he give you these related

6   company documents that are referred to here?

7          A.     At a later stage, he did, yes.

8          Q.     Did you turn those over to US

9   counsel?

10         A.     Yes.

11         Q.     I am going to now go to the next

12  paragraph, because it is saying something you

13  specifically said -- I shouldn't say specifically,

14  there is no quotation mark, it is talking about

15  you.  Do you see that?

16         A.     "My wife requested the trust

17  agreement" that one?

18         Q.     No, next paragraph?

19         A.     Okay.

20         Q.     Before looking at that paragraph

21  let me ask you a question.  Did you understand

22  that there was dispute in the lawsuit regarding

23  the public addresses to certain Bitcoin?

24         A.     No.

25         Q.     Okay.  Here it says:  "Ramona told



Page 223

1                    RAMONA WATTS - CONFIDENTIAL

2                         MR. BRENNER:  Let's take a break.

3                         THE EXAMINER:  It is now 4.38 in

4    Britain, so if we take a break for five minutes

5    this time, unless anybody needs longer.

6                    (A short break off the record

7                         from 4.38 to 4.47 p.m.)

8                         THE COURT REPORTER:  We are going

9    back on the record at 4.47.

10   BY MR. BRENNER:

11           Q.     Miss Watts, I just want to follow

12   up on the very last thing we were talking about,

13   which is at -- or at least partly talk about

14   authentic and inauthentic documents.  Okay?

15           A.     Sure.

16           Q.     You made a reference a few times,

17   that if you could see your corporate records you

18   would be able to answer with better clarity some

19   of the things I have asked you to today; is that

20   true?

21           A.     I believe so, yes.

22           Q.     And you told me today that although

23   you have referenced your corporate secretary on a

24   few occasions, you do not know who that is;

25   correct?



1                RAMONA WATTS - CONFIDENTIAL

2          A.    I don't know the name of the

3    corporate secretary, they are in Brisbane.

4          Q.    Okay.  Do you know how to contact

5    them?

6          A.    So, my secretary used to do that,

7    my assistant used to do that.  I could find a way

8    of contacting my assistant, but I haven't

9    contacted her in five years.

10          Q.    You haven't contacted your

11    assistant in five years?

12          A.    Yes, this was the companies in

13    Australia.

14          Q.    As you sit here today, you would

15    not now know how to get in contact with the

16    corporate secretary that you have referenced?  Is

17    that fair?

18          A.    I don't know.  I think I would have

19    to try and find the search, I might be able to,

20    I don't know.  I haven't tried.

21          Q.    Are you aware of any accusations

22    that have ever been made that DeMorgan Ltd

23    submitted false documents to the Australian Tax

24    Office; are you familiar with that allegation?

25          A.    I am familiar that the Australian



Page 225

1                    RAMONA WATTS - CONFIDENTIAL
2    Tax Office might have mentioned that, but the
3    thing is we were actually hacked, so I would not
4    be surprised if some of our staff changed some of
5    our documents.
6              Q.     Documents that were submitted by
7    the Australian Tax Office; is it your testimony
8    that if they were false it was someone else that
9    did it?
10             A.     Well, I certainly didn't do it.
11             Q.     What about your husband?
12             A.     He would doubt very much that he
13   would have done something like that.
14             Q.     Who is Andrew Sommers?
15             A.     He was our lawyer in Australia.
16             Q.     Do you trust him?
17             A.     I don't know him personally.  He is
18   a lawyer.
19             Q.     Do you remember the name of his law
20   firm?
21             A.     Clayton Utz.
22             Q.     Did they Clayton Utz represent
23   DeMorgan in connection with -- well, did Clayton
24   Utz ever represent DeMorgan Limited?
25             A.     I do not know if he represented the



1                   RAMONA WATTS - CONFIDENTIAL

2      companies, I actually really don't know the

3      relationship whether he represented Craig

4      personally, or represented the companies.  It

5      probably was the companies.  I am not sure which

6      one in particular.

7              Q.     Okay.  If you could go to tab 32.

8      Let me know when you are there?

9              A.     Yes.

10          (Exhibit 10 marked for identification)

11             Q.     Miss Watts, do you see what I have

12      marked as exhibit 10?

13             A.     I do.

14             Q.     Is that a letter from Clayton Utz?

15             A.     Yes.

16             Q.     Is it an authentic letter?

17             A.     I do not know, but I recognise it.

18             Q.     It is e-mailed to you; correct?

19             A.     Yes.

20             Q.     As a director of what company?

21             A.     As a director of DeMorgan.

22             Q.     It has your e-mail address, was

23      that your Hotwire e-mail address?

24             A.     Its was, but we worked across

25      several companies, as I said to you before.

