# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3              CASE NO. 9:18-cv-80176-BB/BR

4

5    IRA KLEIMAN, as the personal
     representative of the Estate of
     David Kleiman, and W&K Info Defense
6    Research, LLC

7              Plaintiffs,

8    -vs-

9    CRAIG WRIGHT

10             Defendant.

11

12   * * * * * * * * * * * * * * * * * *

13   VIDEOTAPED DEPOSITION OF IRA KLEIMAN

14   DATE TAKEN: April 8, 2019

15   TIME: 10:10 - 2:55 p.m.

16   PLACE:100 S.E. 2nd Street

17   Miami, Florida 33131

18

19   TAKEN BEFORE: RICK E. LEVY, RPR, FPR
                   AND NOTARY PUBLIC

20

21   * * * * * * * * * * * * * * * * * *

22

23

24

25

```
 1    APPEARANCES:

 2   On behalf of the Plaintiff:

 3         KYLE ROCHE, ESQUIRE
           BOIES, SCHILLER & FLEXNER LLP
 4         333 Main Street
           Armonk, NY 10504
 5
           VEL FREEDMAN, ESQUIRE
 6         ANDREW BRENNER, ESQUIRE
           BOIES, SCHILLER & FLEXNER LLP
 7         100 S.E. 2nd Street
           Suite 2800
 8         Miami, Florida 33131

 9

10   On behalf of the Defendant:

11
           BRYAN PASCHAL, ESQUIRE
12         AMANDA MCGOVERN, ESQUIRE
           ANDRES RIVERO, ESQUIRE (VIA PHONE)
13         RIVERO MESTRE, LLP
           2525 Ponce de Leon Boulevard
14         Suite 1000
           Coral Gables, Florida 33134

15

16

17   Also Present: Rene Lavandera, The Videographer

18

19

20

21

22

23

24

25
```

```
 1                          -   -   -
                         I N D E X
 2                          -   -   -

 3   WITNESS:         DIRECT    CROSS    REDIRECT    RECROSS
     IRA KLEIMAN
 4   BY MR. PASCHAL     5

 5                          -   -   -
                     E X H I B I T S
 6                          -   -   -

 7
     NUMBER                        PAGE
 8   DEFENDANT'S EX. 1              6
     DEFENDANT'S EX. 2             29
 9   DEFENDANT'S EX. 3             34
     DEFENDANT'S EX. 4             37
10   DEFENDANT'S EX. 5             39
     DEFENDANT'S EX. 6             45
11   DEFENDANT'S EX. 7             56
     DEFENDANT'S EX. 8             58
12   DEFENDANT'S EX. 9             59
     DEFENDANT'S EX. 10            63
13   DEFENDANT'S EX. 11            82
     DEFENDANT'S EX. 12            84
14   DEFENDANT'S EX. 13            90
     DEFENDANT'S EX. 14           108
15   DEFENDANT'S EX. 15           115
     DEFENDANT'S EX. 16           123
16   DEFENDANT'S EX. 17           122
     DEFENDANT'S EX. 18           138
17   DEFENDANT'S EX. 19           139

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2                      -  -  -

 3        Deposition taken before Rick E. Levy,

 4   Registered Professional Reporter and Notary Public

 5   in and for the State of Florida at Large, in the

 6   above cause.

 7                      -  -  -

 8            THE VIDEOGRAPHER:  Good morning.  We are now

 9        on the record in the matter of Kleiman, Ira and the

10        estate of David Kleiman vs. Wright, Craig.  Today

11        is April 8th 2019.  The time is now 10:10 a.m.

12            This is the video recorded deposition of

13        Mr. Ira Kleiman being taken here at 100 Southeast

14        2nd Street, Suite 2800, Miami, Florida 33131.  My

15        name is Rene Lavandera representing First Choice

16        Reporting located in Orlando, Florida.

17            The court reporter this morning is Mr. Rick

18        Levy.  Will all counsel present please introduce

19        yourselves for the record?

20            MR. PASCHAL:  Bryan Paschal for Dr. Craig

21        Wright and Amanda McGovern for Dr. Craig Wright as

22        well.

23            MR. RIVERO:  Andres Rivero on the telephone

24        also representing Dr. Craig Wright.

25            MR. ROCHE:  Kyle Roche of Boies, Schiller &
```

```
 1        Flexner representing plaintiffs.

 2             MR. FREEDMAN:  Vel Freedman, Boies, Schiller

 3        representing plaintiff.

 4             THE VIDEOGRAPHER:  Mr. Court reporter, you may

 5        swear in the witness.

 6   Thereupon,

 7                       (Ira Kleiman)

 8             having been first duly sworn or affirmed,

 9   was examined and testified as follows:

10                   DIRECT EXAMINATION

11             THE WITNESS:  Yes.

12   BY MR. PASCHAL:

13        Q.   Could you please state your full name?

14        A.   Ira Kleiman.

15        Q.   Ira, have you ever been deposed before?

16        A.   No.

17        Q.   I'll go over a few basics how a deposition is

18   going to work today.  We need you to provide clear, oral

19   responses so the court reporter, this is the court

20   reporter, can hear you.  Please keep in mind the court

21   reporter can only take down one person at a time so only

22   one person can talk at a time.  Do you understand?

23        A.   Yes.

24        Q.   If at any time I ask you a question that you

25   do not understand please let me know right away
```

1    otherwise I'll assume that you understood the question;

2    okay?

3         A.   Yes.

4         Q.   If at any point you remember something or want

5    to clarify an answer you previously gave please do so.

6    You understand?

7         A.   Yes.

8         Q.   If you need to take a break at any point just

9    let me know, okay?

10        A.   (Indicating).

11        Q.   Is there any reason preventing you from giving

12   your best deposition testimony today?

13        A.   No.

14        Q.   Are you currently on any prescribed

15   medication?

16        A.   No.

17        Q.   Is there any medical condition or other reason

18   why it might be difficult for you understand my

19   questions today?

20        A.   No.

21             MR. PASCHAL:   This is going to be Exhibit 1.

22             (Defendant's Exhibit No. 1 was

23             marked for identification.)

24   BY MR. PASCHAL:

25        Q.   If you turn to page two of that exhibit this

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 7

```
 1    is the topics that you're to -- you're here for today in

 2    this deposition.

 3         A.   Okay.

 4         Q.   When did you first see this list?

 5         A.   When did I first receive this list?

 6         Q.   When did you review this list?

 7         A.   I believe my attorneys sent it to me maybe --

 8              MR. FREEDMAN:  One second.  Don't discuss

 9    anything that we spoke with you.  If you can answer

10    the question by just giving a date, good.  If not

11    you can't recall you can't recall.

12              THE WITNESS:  I don't remember exactly.

13    BY MR. PASCHAL:

14         Q.   Did you see this list before today?

15         A.   Yes.

16         Q.   Are you prepared to discuss these topics

17    today?

18         A.   Yes.

19         Q.   What did you do to prepare?

20              MR. FREEDMAN:  Again don't discuss anything

21    you spoke about with your attorneys but to the

22    extent you've done preparation you should answer

23    the question.

24              THE WITNESS:  I haven't done anything to

25    prepare.
```

```
 1              MS. MCGOVERN:  Can you speak up a little bit?

 2              THE WITNESS:  Yes, I haven't done anything.

 3   BY MR. PASCHAL:

 4        Q.   Did you look at any documents?

 5        A.   I reviewed some of my old e-mails, yes.

 6        Q.   About how many e-mails did you review?

 7        A.   I don't know.

 8        Q.   You met with your attorneys, right?

 9        A.   Yes.

10        Q.   What's your date of birth?

11        A.   ███████████, 1970.

12        Q.   Where were you born?

13        A.   New Jersey.

14        Q.   When did you move to Florida?

15        A.   1975.

16        Q.   Have you always lived in Palm Beach Gardens?

17        A.   No.

18        Q.   Where else did you live?

19        A.   Hollywood, Florida.

20        Q.   How long did you live in Hollywood, Florida?

21        A.   Maybe two or three years.

22        Q.   Is that right after you moved from Jersey?

23        A.   Yes -- no.  We went from New Jersey to

24   California for I think just about one year and then

25   Hollywood.
```

```
 1        Q.    So when did you move to Palm Beach Gardens?

 2        A.    Probably around 1978.

 3        Q.    From 1998 -- I show that you purchased the

 4   home in 1998.  Was that your first home that you

 5   purchased?

 6        A.    Yes.

 7        Q.    Then you have that home until 2014 and it was

 8   located at ████████████████  in Palm Beach Gardens; is

 9   that right?

10        A.    Yes.

11        Q.    2014 through today you have a home that's

12   located at ███████████████  in Palm Beach Gardens; is

13   that correct?

14        A.    Yes.

15        Q.    How long have you been married?

16        A.    Since 2009.

17        Q.    What is your wife's name?

18        A.    Ju.

19        Q.    Ju Kleiman?

20        A.    Yes.

21        Q.    Did she go by the name of Sasithorn?

22        A.    Yes.

23        Q.    When did she change her name?

24        A.    I guess Sasithorn would be her official Thai

25   name.  Ju is what she goes by in the States.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                Page 10

```
 1         Q.    That's her legal name?

 2         A.    I suppose so.  Sasithorn.

 3         Q.    Sasithorn is her legal name?

 4         A.    Yes.

 5         Q.    What is your wife's occupation?

 6         A.    She doesn't work.

 7         Q.    You have two other siblings; right?

 8         A.    Yes, I had two siblings, yes.

 9         Q.    Was that Dave and Leonard Kleiman?

10         A.    Yes.

11         Q.    How did Leonard pass away?

12         A.    I believe a drug overdose.

13         Q.    Did you speak with him often?

14         A.    Not too often, no.

15         Q.    Do you know why Dave excluded Leonard from his

16    will?

17         A.    They were --

18              MR. FREEDMAN:  Hold on, you're outside the

19         scope of your deposition unless you can tell me

20         what topic you're tied to then I'm happy to let you

21         proceed.  Otherwise I think you're outside the

22         scope.

23              MR. PASCHAL:  You're going to instruct him not

24         to answer?

25              MR. FREEDMAN:  Unless you tell me what topic,
```

1       yes.

2              MR. PASCHAL:  I think this ties into location

3       of evidence of the case.  I think that was a

4       general order from the Court.

5              MR. FREEDMAN:  How does the reason Dave

6       Kleiman did or did not exclude one of his brothers

7       tie into the --

8              MR. PASCHAL:  This is my deposition.  I'm

9       asking him.

10             MR. FREEDMAN:  Don't answer the question.

11  BY MR. PASCHAL:

12      **Q.   Have you ever been sued?**

13      A.   No.

14      **Q.   Have you ever sued someone or an entity**

15  **excluding this lawsuit?**

16      A.   Yes.

17      **Q.   What lawsuit was that?**

18      A.   A case against Computer Forensics, LLC.

19      **Q.   What is currently happening in that case?**

20      A.   It's still ongoing.

21      **Q.   There's another lawsuit here it might not be**

22  **you it says Steve Kleiman vs. Metropolitan Health**

23  **Networks?**

24      A.   Not me.

25      **Q.   Sometimes you go by your middle name Steven?**

1        A.    Yes.

2        Q.    **Is there a reason you --**

3        A.    Certain amount of years I went by Steve and

4   earlier people that know me from a younger age always

5   call me Ira.

6        Q.    **So it's interchangeable?**

7        A.    Yes.

8        Q.    **Have you ever been charged or accused of a**

9   **crime?**

10       A.    No.

11       Q.    **What schools have you attended?**

12       A.    Palm Beach Gardens High School and Palm Beach

13  Community College.

14       Q.    **Was the community college, that was the last**

15  **school attended?**

16       A.    Yes.

17       Q.    **What degrees and certifications do you have?**

18       A.    I just have a high school diploma.

19       Q.    **So you didn't graduate from the community**

20  **college?**

21       A.    No.

22       Q.    **Did you get any certifications from the**

23  **community college?**

24       A.    No.

25       Q.    **Do you have any professional licenses?**

```
 1        A.    No.

 2        Q.    What is your current profession?

 3        A.    Self employed, web site designer, affiliate

 4   marketing.

 5        Q.    What type of web sites do you design?

 6        A.    Basically I just design my own type of web

 7   sites that are related to affiliate marketing.

 8        Q.    What's affiliate marketing?

 9        A.    Like take Amazon as an example.  Put up a web

10   site and you advertise other people's products and if

11   someone clicks through you would -- you receive a

12   commission when someone purchases.

13        Q.    So do you typically do work for companies or

14   individuals?

15        A.    Just myself.

16        Q.    I guess the way that you get -- how do you

17   charge people, it's by the clicking?

18        A.    I receive commission.  That's it.

19        Q.    Do you work from home or an office?

20        A.    From home.

21        Q.    Is that your primary source of income?

22        A.    And trading stocks.

23        Q.    How much money more or less do you make from

24   trading stocks?

25              MR. FREEDMAN:  Wait, stop.  You're outside the
```

```
1        scope of your deposition.  Instruct him not to

2        answer unless you tie it to a topic.

3              MR. PASCHAL:  These are background questions

4        trying to find out.

5              MR. FREEDMAN:  Don't answer the question.

6              MR. PASCHAL:  I can't find out about his

7        professional --

8              MR. FREEDMAN:  Not unless you tie it to topic

9        you disclosed.  Tie it to a topic and I'll give it

10       to you.

11             MR. PASCHAL:  Are you instructing him not to

12       answer?

13             MR. FREEDMAN:  Yes, unless you tie it to a

14       topic.

15  BY MR. PASCHAL:

16       Q.   How much -- what was your income for your

17  affiliate marketing?

18             MR. FREEDMAN:  Same instruction.

19             MR. PASCHAL:  Not to answer?

20             MR. FREEDMAN:  Don't answer unless you tie it

21       to a topic.

22  BY MR. PASCHAL:

23       Q.   From 2012 to today relatively what was your

24  income?

25             MR. FREEDMAN:  Again don't answer unless he
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                        Page 15

```
 1        ties it to a topic.
 2   BY MR. PASCHAL:
 3        Q.   What was your previous occupations?
 4        A.   The last time I worked for somebody I think it
 5   was for a company called Active Frame.  I was also doing
 6   web design for them.  Prior to that just like part-time
 7   jobs, florist delivery, stock person at pharmacy.  For
 8   the most part I've pretty much always worked for myself.
 9             MR. FREEDMAN:  Just one housekeeping matter.
10        I forgot to do this before we started we're going
11        the mark the whole deposition transcript
12        confidential and then we'll go through it obviously
13        with the timeframe.  For now everything is
14        confidential.
15             MS. MCGOVERN:  We disagree with that position.
16             MR. FREEDMAN:  The same for Dr. Wright just so
17        you know.
18             MS. MCGOVERN:  I think it was a different
19        situation.
20             MR. FREEDMAN:  Is it your position that you'll
21        disclose things from the deposition immediately?
22             MS. MCGOVERN:  Not taking any position with
23        respect to Dr. Wright's deposition.
24             MR. FREEDMAN:  I need to know if you intend to
25        disclose things from the deposition immediately or
```

```
 1        if you're going to give me time to dictate a

 2        report?

 3            MS. MCGOVERN:  Absolutely, no.  Would never do

 4        that.  Not going to disclose anything.  I don't

 5        think a blanket confidential stamp over the

 6        plaintiff's deposition is appropriate in this case.

 7        Just stating that for the record.

 8            MR. FREEDMAN:  Okay.  Just so it's clear --

 9        the record is clear I'm saying it's temporary.

10        We're just saying don't disclose anything, we'll go

11        through it and then we'll --

12            MR. PASCHAL:  That's fine.  I want to go back

13        to the questions you told him not to answer.  We

14        did ask for his technical experience and how much

15        money he was making off this technical experience.

16            MR. FREEDMAN:  Disagree with that.  Take that

17        up with the judge.

18            MR. PASCHAL:  So you did not object in your

19        e-mail but you're going to tell him not to --

20        instruct him?

21            MR. FREEDMAN:  Don't agree this goes to the

22        technical experience.  The amount of money they

23        make doesn't go to technical experience.

24  BY MR. PASCHAL:

25        Q.   Have you ever been fired from a job?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Page 17

```
 1        A.    No.

 2        Q.    Have you ever been asked to resign from a job?

 3        A.    No.

 4        Q.    I want to ask you about a few companies you've

 5   been involved with.  What was the business purpose of

 6   The Gigabyte Connection?

 7        A.    I set that company up a long time ago.  I

 8   don't even remember what I was doing with that.  I'm not

 9   even sure I actually used it or not.

10        Q.    How long ago did you set it up?

11        A.    I think it was in the '90s.

12        Q.    Do you know how long it lasted?

13        A.    No, I don't remember.

14        Q.    Did you set it up with any business partners?

15        A.    No, it was my own company.  Probably going to

16   do some kind of computer related type of business with

17   it.

18        Q.    So Future World Shopper, Inc.  What was the

19   business purpose of that company?

20        A.    I intended on setting up like an online

21   portal.  I guess at the time I think they only had like

22   BBSs.  I don't think the internet existed and I was

23   thinking of creating a portal where people could log

24   into it and purchase products.  I guess similar to what

25   people do with Amazon today.  It never got off the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Page 18

```
 1   ground.

 2        Q.    What about Hackers, Inc.?

 3        A.    That wasn't my company.  That was my

 4   brother's.

 5        Q.    Which brother?

 6        A.    David.

 7        Q.    Did you work with Dave in that company?

 8        A.    No.

 9        Q.    Do you know what was the purpose of that

10   company?

11        A.    I think he was doing some kind of computer

12   consulting with a partner.

13        Q.    Do you know who that partner was?

14        A.    I think his name was Scott Howell.

15        Q.    What's the status of that company?

16        A.    That was closed many years -- that was like

17   early '90s.

18        Q.    It was closed?

19        A.    Yes.

20        Q.    What about Steve's Web Design?

21        A.    I don't think I ever did anything with it.

22        Q.    You just created it?

23        A.    Yes.

24        Q.    Did you have any partners in that?

25        A.    No.
```

```
 1         Q.    Ira, how many computers do you own?

 2         A.    Primarily one laptop.

 3         Q.    Do you own any computers from Dave?

 4         A.    Oh, yes, if you're including Dave's.

 5         Q.    In all how many computers do you own?

 6         A.    I think Dave had three laptops.

 7         Q.    What was his three laptops?

 8         A.    Two of them were Alienware.  One was a Dell

 9    laptop.

10         Q.    What's the one computer that you own?

11         A.    I believe it's an ASIS.

12         Q.    ASIS.  What year did you purchase that

13    computer?

14         A.    I don't remember.

15         Q.    Was it after 2013?

16         A.    I don't know.

17         Q.    Did you purchase it with a credit card?

18         A.    I'm not sure.  I may have got it like from one

19    of my affiliate marketing web sites where it's possible

20    I didn't need a credit card to purchase it.

21         Q.    Do you own any Bitcoin or crypto currency?

22         A.    Yes.

23         Q.    How much?

24              MR. FREEDMAN:  Don't answer the question.

25         You're outside the scope of your deposition.
```

```
1        MR. PASCHAL:  How much Bitcoin he has is

2   outside the scope?

3        MR. FREEDMAN:  You tell me where the topics

4   that list the amount of crypto assets that are

5   being held.

6        MR. PASCHAL:  I don't know.  Let me ask this

7   then.  That was your topic we put it on here and

8   you guys asked that question so is it your position

9   that's not -- that asking how much Bitcoin somebody

10  has is outside the scope?  I'm fine if that's your

11  response.

12       MR. FREEDMAN:  Is it in yours?

13       MR. PASCHAL:  I copied yours.  I put that in

14  and you had no objection.

15       MR. FREEDMAN:  Where is the topic that says

16  the amount of Bitcoin mined or owned I think is the

17  question.

18       MR. PASCHAL:  One of them and you asked that

19  question.

20       MR. FREEDMAN:  If you show it to me I can read

21  it.  If you don't show it to me --

22       MR. PASCHAL:  Let me ask this question.  If

23  you asked that at your depo are you saying it was

24  outside the scope of your deposition topics?

25       MR. FREEDMAN:  My questions were different --
```

```
 1        my list of topics are different than your list of

 2        topics.  I had just off the top of my head I

 3        remember I had the words Satoshi Yakamoto in mine

 4        and I don't see it in yours.  This isn't an

 5        identical copy of my list.

 6            MR. PASCHAL:  So you're instructing him not to

 7        answer the question?

 8            MR. FREEDMAN:  Correct.

 9   BY MR. PASCHAL:

10        Q.   Are you familiar with how Bitcoin is stored on

11   a device?

12        A.   Not really.

13        Q.   Have you read any literature on Bitcoin and

14   crypto currency?

15        A.   I've read articles about it.

16        Q.   If you own Bitcoin how are you not familiar in

17   the manner in which it's owned?

18            MR. FREEDMAN:  Hold on a second.  Can you

19        repeat the question?

20            MR. PASCHAL:  Want me to repeat it or want the

21        reporter?

22            MR. FREEDMAN:  You can repeat it or the

23        reporter, whatever your preference.

24   BY MR. PASCHAL:

25        Q.   If you own Bitcoin how are you not familiar
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                          Page 22

```
 1   with how it's stored?

 2          MR. FREEDMAN:  Objection.  You can answer the

 3      question.

 4          THE WITNESS:  I don't know the technical

 5      workings of how it works.  I just know you can

 6      purchase it.

 7   BY MR. PASCHAL:

 8      Q.   Is it stored on your computer?

 9          MR. FREEDMAN:  Objection, hold on.  If you

10      know what the question means you can answer.

11          THE WITNESS:  Is it --

12          MR. PASCHAL:  You can have a standing

13      objection to form but we're not going to have

14      speaking objections so let's not do that today,

15      okay?

16          MR. FREEDMAN:  Isn't that ironic?

17          MR. PASCHAL:  You can answer the question.

18          THE WITNESS:  I've heard that it can be stored

19      on a computer.

20   BY MR. PASCHAL:

21      Q.   So as you own Bitcoin do you know how it's

22   held?

23          MR. FREEDMAN:  Objection.  Go ahead and

24      answer.

25          THE WITNESS:  Not really.
```

```
 1   BY MR. PASCHAL:
 2       Q.   I want to ask you a few questions about your
 3   relationship with Dave.  Before Dave passed away when
 4   was the last time you spoke with him?
 5            MR. FREEDMAN:  Hold on, Ira.  What topic does
 6       this relate to?
 7            MR. PASCHAL:  His communications with Dave.
 8            MR. FREEDMAN:  I think you're a little bit
 9       outside.  I'll give you some leeway.  Go ahead Ira,
10       answer the question.
11            THE WITNESS:  2009 November.
12   BY MR. PASCHAL:
13       Q.   That was the last time you spoke with him?
14       A.   No, that's the last time I saw him.  The last
15   time I spoke with him would probably be sometime late
16   2012.
17       Q.   Was that by phone or e-mail?
18       A.   I think I have an e-mail around that date and
19   I also think I spoke with him on the phone around then
20   too.
21       Q.   What did you talk about?
22       A.   I would have to go back and look at the
23   e-mail.  On the phone I don't remember.
24       Q.   Do you remember what his mood was like when
25   you spoke to him?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 24

```
 1        A.    I --
 2               MR. FREEDMAN:  Objection.
 3               THE WITNESS:  Not really.
 4   BY MR. PASCHAL:
 5        Q.    So in 2009 you met Dave in person -- or you
 6   saw him in person.  From then though just relatively how
 7   many times would you speak with him per year, was it
 8   monthly, weekly?
 9               MR. FREEDMAN:  Objection.
10               THE WITNESS:  It would vary.
11   BY MR. PASCHAL:
12        Q.    I just want to be clear the last time that you
13   saw your brother was 2009; right?
14        A.    I believe so.
15        Q.    Under what circumstances was that?
16        A.    We were having Thanksgiving dinner.
17        Q.    Did you have any other business ventures with
18   Dave?
19        A.    No.
20        Q.    Did you ever work together with Dave in any
21   business?
22        A.    No.
23        Q.    Dave's autopsy report showed that he had
24   cocaine in his system.  Did you know anything about
25   that?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 25

```
 1              MR. FREEDMAN:  Objection.  What topic is this

 2        relating to?

 3              MR. PASCHAL:  If he is not going to answer

 4        tell him.

 5              MR. FREEDMAN:  You can't tell me which topics

 6        this relates to?

 7              MR. PASCHAL:  This goes to background

 8        information.  Trying to find documents that was the

 9        general mandate from the Court.

10              MR. FREEDMAN:  I just don't see how Ira's

11        knowledge of cocaine in Dave's system has anything

12        to do with the --

13   BY MR. PASCHAL:

14        Q.    Do you have any documents showing that Dave

15   had cocaine in his system?

16        A.    I would have to look at the autopsy report

17   again.

18        Q.    That's the only document that you have?

19        A.    Yes, that's the only one I have.

20        Q.    Are there any communications between you and

21   Dave when you spoke about cocaine?

22        A.    No.

23        Q.    Do you know any of Dave's girlfriends?

24        A.    Not personally -- I mean I've heard of them.

25   I don't personally know them.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 26

1       Q.    Which ones have you heard of?

2       A.    One named Kirsten and another named Lynada and

3    a very old girlfriend named Angela.

4       Q.    How did you learn about these girlfriends?

5       A.    Angela we knew -- he was like dating her in

6    high school.  Kirsten I believe I met once at my

7    parent's wedding anniversary and Lynada I only found out

8    after he passed away.

9       Q.    Have you been in contact with any of these

10   three girlfriends?

11      A.    I think I spoke with Angela a little bit.

12      Q.    You didn't speak to Lynada?

13      A.    No.

14      Q.    Who was the last girlfriend that you know that

15   Dave had?

16      A.    That would be Lynada.

17      Q.    You haven't spoken to her?

18      A.    No.

19      Q.    When did you speak with Angela?

20      A.    Maybe like a year ago.

21      Q.    What circumstances did you speak with her,

22   what were the circumstances?

23      A.    I think I saw her -- she left like a Facebook

24   posting on my dad's web site -- I mean my dad's Facebook

25   page and then I responded to her Facebook posting.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 27

```
 1        Q.   So there's a Facebook message where you
 2   responded to her?
 3        A.   Yes, I think so.  No, I just e-mailed her.
 4   She left a Facebook posting and then I e-mailed her.
 5        Q.   When did you e-mail her?
 6        A.   I think it could have been like a year, year
 7   and a half ago.
 8        Q.   What did the Facebook posting say, do you
 9   remember?
10        A.   No.
11        Q.   What did you discuss with Angela?
12        A.   We talked about David a little bit.
13        Q.   What did you talk to her about, talking about
14   David?
15        A.   At first just general things I think.
16        Q.   We'll get into that a little later.  When did
17   you learn that Dave was appointed as the representative
18   of -- or that Dave appointed you as the representative
19   of his estate, sorry?
20        A.   After he passed away.
21        Q.   So Dave never discussed that with you before
22   he passed away?
23        A.   No.
24        Q.   Were you surprised to learn --
25             MR. FREEDMAN:  Objection, don't answer the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 28

```
 1   question.
 2        MR. PASCHAL:  What's the reason for
 3   instructing him?
 4        MR. FREEDMAN:  Don't see how it has anything
 5   to do with your topics.
 6        MR. PASCHAL:  Just asking --
 7        MR. FREEDMAN:  His state of mind when he found
 8   out whether or not Dave Kleiman appointed him as
 9   the personal representative.  Where is that any of
10   your topics?
11        MR. PASCHAL:  I am going to say for the record
12   that these topics are helpful but the judge mandate
13   was really that hey, I want to have a depo so you
14   can figure out what discovery is and a number of
15   times you shut down inquiries because you just
16   don't think that these match the topic which isn't
17   helpful for us to.  It will force us to have to go
18   to the Court unnecessarily and bring Ira back here
19   for another deposition to do that.  Purpose to find
20   out where documents are and find out where evidence
21   is.  I just don't think it's helpful for the record
22   for you to instruct him not to answer background
23   questions, very basic questions.
24        MR. FREEDMAN:  Just so the record is complete
25   the parties set the tone that we had to stay
```

```
 1        strictly by the disclosed topics at Dr. Wright's

 2        deposition where we were held strictly to the

 3        topics --

 4             MR. PASCHAL:  And I don't believe you did

 5        so --

 6             MR. FREEDMAN:  If it's the defendant's

 7        position that refusing to answer background

 8        questions should necessitate a second deposition we

 9        might just able to agree to reach a second

10        deposition.  Do you want to agree to a second

11        deposition?

12             MR. PASCHAL:  I'm just moving on with you.

13        Just --

14             MR. FREEDMAN:  Okay.

15             MR. PASCHAL:  I want to ask you about what

16        you're alleging in the complaint so we know what

17        documents we're looking for.  I'm going to give you

18        a copy of the complaint.

19             (Defendant's Exhibit No. 2 was

20             marked for identification.)

21   BY MR. PASCHAL:

22        Q.   Can you turn to page 37.  Under Count I you

23   have a claim for conversion.  Do you see that?

24        A.   Yes.

25        Q.   If you go down to paragraph 171 you allege
```

```
 1    that Dr. Wright converted to his own use, Bitcoins,

 2    forked assets and intellectual properties that were the

 3    property of, and owned by, the estate and/or W&K.  Do

 4    you see that?

 5         A.   Yes.

 6         Q.   If you can turn to 46 and 47.

 7              MR. FREEDMAN:  Bryan, I think you just asked

 8         the witness to turn to two pages.  Which one?

 9              MR. PASCHAL:  I said page 46 and 47.

10              MR. FREEDMAN:  Which one do you want him to

11         start at?

12    BY MR. PASCHAL:

13         Q.   Start at 46.  It's Count X, 46 and 47.  You

14    have a claim for civil theft, you see that?

15         A.   Yes.

16         Q.   In that claim you allege that Dr. Wright took

17    with felonious criminal intent Bitcoins, forked assets

18    and intellectual properties that were the property of

19    and owned by the estate and/or W&K.  You see that?

20         A.   Yes.

21         Q.   Ira, is it your position that Dr. Wright stole

22    from Dave?

23              MR. FREEDMAN:  Hold on a second.  Go ahead

24         answer the question.

25              THE WITNESS:  I believe so.
```

```
 1    BY MR. PASCHAL:

 2         Q.    You believe so?

 3         A.    Yes.

 4         Q.    I want you to turn to page 16 of your

 5    complaint.  There you have a bold heading saying -- are

 6    you there?

 7         A.    Yes.

 8         Q.    You have a bold heading saying Dave and/or W&K

 9    owned a substantial amount of Bitcoin.  You see that?

10         A.    Yes.

11         Q.    Ira, do you have any e-mails from Dave where

12    he told you he had a substantial amount of Bitcoin?

13         A.    No.

14         Q.    Do you have any text messages from Dave where

15    he said that he had a substantial amount of Bitcoin?

16         A.    No.

17         Q.    Do you have any handwritten letters where Dave

18    says to you I have a substantial amount of Bitcoin?

19         A.    No.

20         Q.    Did he put that in his personal will -- let me

21    say it differently.  Did Dave put in his will that he

22    has a substantial amount of Bitcoin?

23         A.    No.

24         Q.    Are there any documents from Dave to you

25    stating that he has a substantial amount of Bitcoin?
```

```
 1        A.    No.

 2        Q.    After Dave died did you go through his

 3   possessions?

 4        A.    Yes.

 5              MR. FREEDMAN:   Objection.

 6   BY MR. PASCHAL:

 7        Q.    Did you find any mention of a substantial

 8   amount of -- any evidence to suggest there was a

 9   substantial amount of Bitcoin?

10        A.    No.

11        Q.    Do you have any documents where Dave tells you

12   about W&K and Info Defense Fund Research, LLC?

13        A.    No.

14        Q.    After Dave died did you find any documents at

15   his house regarding W&K?

16        A.    No.

17        Q.    When you became the personal representative

18   for Dave's estate did you look on SunBiz.org?  Are you

19   familiar with that web site?

20        A.    Yes.

21        Q.    Did you look on SunBiz.org to see if he owned

22   any companies?

23        A.    I was only aware of Computer Forensics

24   Company.

25        Q.    But just my question was did you go on
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                        Page 33

```
 1   SunBiz.org to search to see if he owned any companies?

 2        A.   I don't think so.

 3        Q.   Did you first learn of W&K from Dr. Wright?

 4        A.   Yes.

 5        Q.   Ira, you're aware that Dave was receiving debt

 6   collection calls in mid 2012?

 7        A.   2012, I was not aware of it.

 8        Q.   Do you have documents reflecting Dave's debt?

 9        A.   The autopsy report.

10        Q.   Sorry.  Do you have documents reflecting

11   Dave's debt?

12        A.   Oh, debt.  Sorry.

13        Q.   My mistake, sorry.

14        A.   I don't think so.

15        Q.   Do you know how much debt Dave had when he

16   died?

17        A.   I remember getting some kind of paperwork.  I

18   may have handed it over to my estate attorney so he

19   might have the actual number but I don't remember.

20        Q.   Is that attorney Joseph Karp?

21        A.   Yes.

22        Q.   Do you remember what that document was?

23        A.   No.  I didn't really look at it.

24        Q.   Do you have any bank account statements for

25   Dave?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 34

```
 1        A.    Bank account statement, I don't think so.

 2        Q.    What efforts did you take to locate any bank

 3   accounts?  Did you take any efforts?

 4        A.    I believe so.

 5        Q.    What did you do?

 6        A.    I think I contacted Joe Karp about that.

 7        Q.    Sorry, what did you say?

 8        A.    I think I contacted Joe Karp about that.  I

 9   think he looked into it to see if Dave had any -- what

10   bank accounts.

11        Q.    Was Joe Karp was he your attorney at that

12   time?

13        A.    Yes.

14        Q.    So we went over documents regarding the

15   substantial Bitcoin.  Have you spoken to any witnesses

16   that told you that Dave had a substantial amount of

17   Bitcoin?

18              MR. FREEDMAN:  Objection to form.

19              THE WITNESS:  No.

20   BY MR. PASCHAL:

21        Q.    So just to clarify then.  There are no

22   witnesses -- no testimony that says that Dave has a

23   substantial amount of Bitcoin that you have?

24              MR. FREEDMAN:  Objection.

25              THE WITNESS:  Not that I'm aware of.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 35

```
 1              MR. PASCHAL:  Ira, I'm showing you a complaint
 2         that was filed against Dave by Wells Fargo Bank.
 3              (Defendant's Exhibit No. 3 was
 4              marked for identification.)
 5              MR. FREEDMAN:  Do you have a copy for us?
 6              MR. PASCHAL:  (Indicating).
 7    BY MR. PASCHAL:
 8         Q.  Can you go to page two of that complaint.  If
 9    you look at paragraph five Wells Fargo alleges that
10    there's been a default under the note and mortgage held
11    by plaintiff and that payment due October 1, 2012 and
12    all subsequent payments have not been made?
13              MR. FREEDMAN:  Bryan, where are you?
14              MR. PASCHAL:  Page two, paragraph five.
15              MR. FREEDMAN:  Page two, paragraph five I
16         don't see that.
17              MR. PASCHAL:  Not page numbered.  Just turn to
18         the next page.
19              MR. FREEDMAN:  There is a number on the bottom
20         page.
21              THE WITNESS:  Five up top.
22              MR. PASCHAL:  Yes, paragraph five.
23    BY MR. PASCHAL:
24         Q.  Do you see that?
25         A.  Where it says there's been a default?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 36

```
 1        Q.    Yes.   Are you aware that Dave stopped making
 2   payments on his house October 1st 2012?
 3        A.    I wasn't aware.
 4        Q.    So Dave never told you that?
 5        A.    No.
 6        Q.    When was the first time that you learned this?
 7        A.    I think after he passed away.
 8        Q.    Ira, did you speak to Dave while he was in the
 9   V.A. Hospital?
10        A.    I think couple times, yes.
11        Q.    About how many?
12        A.    Don't remember.
13        Q.    You say less than ten?
14        A.    Maybe.
15        Q.    Did you visit him while he was in the V.A.?
16        A.    No.
17        Q.    Did you exchange e-mails with him while he was
18   in the V.A.?
19        A.    Yes.
20        Q.    How many e-mails did you exchange roughly?
21        A.    I would have to go look.   Couldn't tell you
22   off the top of my head.
23        Q.    What e-mail account did you use to e-mail him,
24   do you remember?
25        A.    Mostly Dex561@███████.
```

```
 1        Q.   What e-mail did you send to Dave -- I mean not

 2   e-mail but what e-mail address was -- for Dave would you

 3   send it to?

 4        A.   Are you talking about that period of time when

 5   he was in the V.A.?

 6        Q.   When you sent those e-mails in the V.A.

 7        A.   I think at that time he was probably using

 8   Dave@███████████.

 9        Q.   Do you remember what you talked about with

10   Dave?

11        A.   No.  I would have to go back and look.

12             MR. FREEDMAN:  Are you done with this?

13             MR. PASCHAL:  Yes.

14             MR. FREEDMAN:  Don't want to lose them.

15             MR. PASCHAL:  May want to keep them close

16        because I may go back.

17             MR. FREEDMAN:  Just keep them right here.

18   BY MR. PASCHAL:

19        Q.   Did Dave ever ask you for money in 2012?

20        A.   I don't think so.

21        Q.   Do you know if anyone made any personal loans

22   to Dave?

23        A.   I remember his friend Patrick mentioning that

24   he may have loaned Dave money like once in a while but

25   as far as like an amount I don't know.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 38

```
 1        Q.   Do you have any documents related to those
 2   loans or no?
 3        A.   No.
 4        Q.   Did Dave ever tell you he needed help paying
 5   V.A. bills?
 6        A.   Paying V.A. bills, no.
 7        Q.   So you -- did you ever help him pay any V.A.
 8   bills?
 9        A.   No.
10             MR. PASCHAL:   Mark this as Exhibit 4.
11             (Defendant's Exhibit No. 4 was
12             marked for identification.)
13   BY MR. PASCHAL:
14        Q.   Showing you an e-mail from Dave to Dr. Wright
15   dated October 11, 2012.  In that e-mail Dave says to
16   Dr. Wright, "Craig, if you don't mind please do transfer
17   in USD from Liberty.  If you can handle it that way I
18   would be grateful.  I have been in the V.A. again.
19   Nothing to worry about more of a routine as we have to
20   live with.  But I am not sure when I'll be able to get
21   back home for enough time to manage all the exchanges.
22   The cost of the hospital also comes as the reason for
23   this request.  Nothing I need help on but the funds in
24   USD will make my life easier right now."  Have you seen
25   this e-mail before?
```

```
 1              MR. FREEDMAN:  Objection.  Go ahead.

 2              THE WITNESS:  I recently saw it in one of the

 3        produced documents that Craig turned over, yes.

 4        But I have never seen it before.

 5   BY MR. PASCHAL:

 6        Q.   In this case?

 7        A.   Yes, in this case.

 8        Q.   Do you know if Dr. Wright helped Dave with his

 9   V.A. bills?

10        A.   No.

11        Q.   Ira, do you have any communications or

12   documents or anything from Dave to Dr. Wright accusing

13   him of theft?

14        A.   No.

15        Q.   Do you still have the October -- going back to

16   the October 11th e-mail do you have any documents -- do

17   you have any documents showing that Dave had a foreign

18   account with the bank called Liberty Reserve?

19        A.   No.

20        Q.   Did you know that Liberty Reserve was seized

21   by the United States Government?

22        A.   I remember hearing that from Craig.

23        Q.   When did you hear that from Craig?

24        A.   In one of the e-mails that he sent me.  I

25   don't remember when it was.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                        Page 40

1      Q.    Have you done any research on Liberty Reserve?

2      A.    I looked it up to see what it was.

3      Q.    What did you learn?

4      A.    It was some kind of like money exchange

5  business.

6            MR. PASCHAL:  Can you mark that as the next

7      exhibit?

8            (Defendant's Exhibit No. 5 was

9            marked for identification.)

10  BY MR. PASCHAL:

11     Q.    Showing you the unsealed indictment for the

12  United States Government versus Liberty Reserve.  Can

13  you turn to page -- paragraph 20 and that's going to be

14  on page nine?  If you look at the second sentence there

15  it starts "with the merchants who accepted."  Do you see

16  that?

17     A.    Did you say the second sentence?

18     Q.    Yes, on paragraph 20 "the merchants who

19  accepted."  You can read the whole paragraph but I'm

20  starting with "the merchants who accepted."

21     A.    "To further enable to use of Liberty Reserve"

22  on 20.

23     Q.    I'll just read the whole thing.  "To further

24  enable the use of Liberty Reserve for criminal activity,

25  its website offered shopping cart interface that

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                    Page 41

```
 1   merchant web sites could use to access LR, which means

 2   Liberty Reserve, currency as a form of payment.  The

 3   merchants who accepted LR, being Liberty Reserve,

 4   currency was overwhelmingly criminal in nature.  They

 5   included, for example traffickers of stolen credit card

 6   data and personal identity information, peddlers of

 7   various types of online Ponzi and get-rich-quick

 8   schemes, computer hackers for hire, unregulated gambling

 9   enterprises and underground drug dealing web sites."

10             MR. FREEDMAN:  Objection.

11   BY MR. PASCHAL:

12        Q.   Aside from any documents we produced to you do

13   you have any documents showing that Dave was involved in

14   developing software for gambling activities?

15        A.   No.

16        Q.   Do you have any knowledge of that?

17        A.   No.  Knowledge of him creating gambling type

18   software, no.

19        Q.   Have you heard that he was doing that before

20   today?

21        A.   I heard of Craig mentioned that he was

22   involved in that type of stuff but -- and I think he

23   mentioned that Dave may have assisted him in some

24   capacity but I don't have any evidence of Dave ever

25   doing that type of stuff.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                           Page 42

```
 1        Q.   Did you learn from any third parties that --
 2   aside from Craig that Dave may have been involved in
 3   online gambling activities?
 4        A.   I don't believe so, no.
 5        Q.   Is that your testimony today?
 6        A.   Yes.
 7        Q.   One second --
 8        A.   I think the ATO may have mentioned something
 9   about Liberty Reserve but I don't know if they were
10   specifically saying that Dave was involved or not but
11   yes, I think I did get a document from ATO.
12        Q.   Let me ask you this.  Did you ever exchange an
13   e-mail with Patrick Paige where you mentioned you were
14   surprised to find out that Dave was --
15        A.   Yes.
16        Q.   Let me finish that question.  E-mail with
17   Patrick Paige where you said you were surprised to learn
18   that Dave was involved with gambling activities?
19        A.   Yes.
20             MR. FREEDMAN:  You have to wait until he
21        finishes the question and then answer so that he
22        has a clean record.
23   BY MR. PASCHAL:
24        Q.   Have you made any efforts to find the Liberty
25   Reserve account that Dave had?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Page 43

```
 1        A.    No.
 2        Q.    Have you spoken to the Southern District of
 3   New York about Liberty Reserve?
 4        A.    No.
 5        Q.    Have you spoken to the FBI agents that were
 6   investigating Liberty Reserve?
 7        A.    No.
 8        Q.    So you mentioned the Thanksgiving dinner
 9   earlier and you allege in your complaint so let's talk
10   about that.  The 2009 Thanksgiving dinner.  Who was at
11   that dinner?
12        A.    Myself, my wife, my six month old daughter,
13   Dave and my father.
14        Q.    Now, in your complaint I don't know if you
15   want a copy but you say at paragraph 61 that Dave told
16   you that he was working on something bigger than
17   Facebook by creating his own digital money.  Do you
18   remember that?
19        A.    Yes.
20        Q.    Do you have any pictures from that day?
21        A.    Yes.
22        Q.    Do you know if they were produced in
23   discovery?
24        A.    I'm not sure.
25        Q.    After the Thanksgiving dinner did you have any
```

1   communications with Dave in 2009 regarding the digital

2   money that he said would be bigger than Facebook?

3        A.   No.

4        Q.   Do you have any communications with Dave in

5   2010 regarding the digital money that Dave said would be

6   bigger than Facebook?

7        A.   No.

8        Q.   Do you have any communications with Dave in

9   2011 regarding the digital money that Dave said would be

10  bigger than Facebook?

11       A.   No.

12       Q.   Do you have any communications with Dave in

13  2012 regarding the digital money that Dave said would be

14  bigger than Facebook?

15       A.   No.

16       Q.   Do you have any communications with Dave up

17  until April 2013 regarding the digital money that Dave

18  said would be bigger than Facebook?

19       A.   No.

20       Q.   After Dave died I understand that you formated

21  some of Dave's hard drives and threw out a bunch of his

22  work papers; is that correct?

23            MR. FREEDMAN:  Objection.

24            THE WITNESS:  I did discard some papers and

25       hard drives I first examined to see if there was

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                Page 45

1        anything on them and once I found out that there

2        wasn't I believe there were two hard drives that I

3        formated.

4   BY MR. PASCHAL:

5        Q.   Before you formated and before you threw those

6   papers away did you find any evidence of the digital

7   currency that Dave said would be bigger than Facebook?

8        A.   No.

9             MR. PASCHAL:  I want to show you an e-mail

10       exchange that you had with Dr. Wright.

11            (Defendant's Exhibit No. 6 was

12            marked for identification.)

13  BY MR. PASCHAL:

14       Q.   So if you look at the bottom of page one and

15  you sent this e-mail -- do you remember this e-mail?  Go

16  ahead and read it.

17            MR. FREEDMAN:  What exhibit number is this?

18            MR. PASCHAL:  I think it's 6.

19            THE WITNESS:  Yes, I remember.

20  BY MR. PASCHAL:

21       Q.   You remember this e-mail?

22       A.   Yes.

23       Q.   At the bottom you'll say "hi Craig, I would

24  like to ask for your advice if I may.  After everything

25  you have shared with me I feel like I can completely

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 46

```
 1    trust you.  As mysterious and exciting as all this news

 2    is I also feel nervous about making mistakes.  I very

 3    well could have already made some mistakes months ago by

 4    throwing away of bunch of Dave's papers and formating

 5    drives that I could not access."  Do you remember that

 6    statement?

 7               MR. FREEDMAN:  Objection.

 8               THE WITNESS:  Yes.

 9               MR. FREEDMAN:  Wait one second let me object

10        and then go ahead and answer the question.

11    BY MR. PASCHAL:

12        Q.   Do you remember that statement?

13        A.   Yes.

14        Q.   I just want to go over this e-mail.  First you

15    say that you may have made some mistakes some months

16    ago.  When you say "some months ago" what timeframe are

17    you talking about, how many months ago?

18        A.   Sometime in 2013.

19        Q.   Was it before Thanksgiving, after

20    Thanksgiving?

21               MR. FREEDMAN:  Objection.

22               THE WITNESS:  You're talking about 2013?

23    BY MR. PASCHAL:

24        Q.   Yes, November 2013 Thanksgiving.

25        A.   It could have been before that.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                              Page 47

```
 1        Q.   Our analysis shows that two drives were

 2   formated and installed with Windows on November 10, 2013

 3   would that date be about right?

 4        A.   Possibly, yes.

 5        Q.   Did you purchase the Windows software

 6   installed on those drives?

 7        A.   I don't remember.

 8        Q.   You don't remember?

 9        A.   (Indicating).

10        Q.   Would any -- do you have any documents like

11   credit card receipts showing you purchased the Windows

12   software?

13        A.   I don't know.

14        Q.   You don't know?

15        A.   Could have been a version of Windows that my

16   brother had.

17        Q.   You also say that you threw out a bunch of

18   Dave's work papers.  How much is a bunch?

19        A.   Just when I was cleaning out his house.  I

20   don't remember exactly how many.

21        Q.   When you threw these papers out was it the

22   same day November 10th 2013 or November of 2013?

23        A.   No.  This was like shortly after he passed

24   away when I was going through his house, going through

25   his stuff.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                               Page 48

```
 1        Q.   Did you keep any of the documents that he had,

 2   any of his work papers?

 3        A.   I couldn't really find any like work papers.

 4   I only found things like related to the certificates

 5   that he earned like security related certificates.

 6        Q.   You threw away his certificates?

 7        A.   No, I'm saying I kept --

 8        Q.   You kept those?

 9        A.   Right.

10        Q.   When you say the working papers you threw away

11   what are you referring to?

12        A.   Actually I'm not even sure they were work

13   papers.  I guess they looked like things that didn't

14   look relevant to keeping.

15        Q.   Did you read all the papers before you threw

16   them away?

17        A.   Briefly.

18        Q.   So I guess none of it seemed important?

19        A.   Exactly.

20        Q.   Let me ask you.  If any of those documents had

21   a random set of numbers and letters and just random

22   gibberish you would haven't considered that important,

23   would you?

24             MR. FREEDMAN:  Objection.

25             THE WITNESS:  I don't know.  I don't know.
```

```
 1    BY MR. PASCHAL:

 2         Q.   So what did you do to determine whether or not

 3    something was important?

 4         A.   Just whatever I looked at -- I don't know

 5    specifically.  I mean like I was just going through

 6    papers quickly and if something looked like it was

 7    connected to him I would keep it.

 8         Q.   Say the last part again, I couldn't hear you.

 9         A.   If something looked like it was connected to

10    him I would keep it.  Like certificates, things he

11    earned, anything personal.

12         Q.   So --

13         A.   Like a lot of stuff I threw out could have

14    just been like junk mail.  That was unimportant I didn't

15    need to keep it.

16         Q.   How would you consider something junk mail?

17         A.   Like advertisement type stuff.

18         Q.   Let me just -- when you were formating or when

19    you threw out the papers were you already the personal

20    representative of the estate?  Let me rephrase that.  Do

21    you know -- do you know that you were the personal

22    representative of the estate when you --

23         A.   I'm not sure if I knew at that time.

24         Q.   Okay.

25              MR. FREEDMAN:  We've been going an hour.  Can
```

1        we take a break?

2              MR. PASCHAL:  Can we --

3              MR. FREEDMAN:  If you have more questions go

4        ahead.

5              MR. PASCHAL:  Few more questions and then we

6        can take a break.

7    BY MR. PASCHAL:

8        **Q.   So you said if it was connected to Dave you**

9    **would keep it.  So if something I'm just trying to**

10   **figure out what the measurement that was.  If there was**

11   **scribbling on papers would you just throw that away?**

12             MR. FREEDMAN:  Objection.

13             THE WITNESS:  I don't know.  Possibly.

14   BY MR. PASCHAL:

15       **Q.   When did you become familiar with Bitcoin?**

16             MR. FREEDMAN:  Do you think maybe we can take

17       a break here?  Sounds like you're going to a

18       different topic.

19             MR. PASCHAL:  Let's take a break.

20             THE VIDEOGRAPHER:  The time is 11:03 a.m. and

21       we're off the record.

22             (Thereupon, a brief recess was taken.)

23             THE VIDEOGRAPHER:  The time is now 11:17 a.m.

24       and we're back on the record.

25

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Page 51

```
 1   BY MR. PASCHAL:

 2        Q.   Sorry.  Just briefly before we left off and

 3   earlier today.  I have some follow-up questions.  Did

 4   Dave live in Palm Beach Gardens?

 5        A.   It might be officially called like Riviera

 6   Beach.

 7        Q.   It's in the area, right?

 8        A.   Yes.

 9        Q.   Palm Beach County?

10        A.   Yes.

11        Q.   Last time you saw Dave was in 2009?

12        A.   Yes.

13        Q.   And you guys lived in the same county?

14        A.   Yes.

15        Q.   About how far apart did you guys live from

16   each other?

17        A.   Five to ten minutes.

18        Q.   When we left off we were talking about on the

19   e-mail where you formated and you said you formated

20   threw out some of Dave's work papers so I think we were

21   talking about the work papers.  Why were you throwing

22   the papers away?

23        A.   Like I said it just looked like it was

24   unimportant stuff.  Everyday stuff you get in the mail

25   just advertisements, news clipping type and things.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 52

```
 1        Q.   So if you go back to that e-mail in front of
 2   you you say that you were concerned that you made a
 3   mistake?
 4        A.   Yes.
 5        Q.   How were you concerned?
 6             MR. FREEDMAN:  You said how or what?
 7   BY MR. PASCHAL:
 8        Q.   Why?  Why were you concerned?
 9        A.   What's that?
10        Q.   Why were you concerned?
11        A.   Because I had just discarded some of his
12   stuff.
13        Q.   But you said the stuff you discarded was junk
14   mail?
15        A.   Right.  And I was using his drives.
16        Q.   So you were concerned because you were using
17   his drives, not because you threw out his work papers?
18        A.   No.  I was concerned about a little of
19   everything.
20        Q.   But sitting here today you can't tell us the
21   content of the papers that you threw out?
22             MR. FREEDMAN:  Objection.
23             THE WITNESS:  No.
24   BY MR. PASCHAL:
25        Q.   But you were concerned that you were throwing
```

```
 1    them out and formated certain drives?

 2              MR. FREEDMAN:  Objection.

 3              THE WITNESS:  Well, the drives that I formated

 4         there was nothing on them.

 5    BY MR. PASCHAL:

 6         Q.   We're going to talk about that more but you

 7    said you were concerned because you were using the

 8    drives; right?

 9         A.   Yes.  After -- after he passed away yes, I

10    started using them.

11         Q.   And you were concerned you were using them.

12    Did you continue to use them in 2014?

13         A.   Yes.

14         Q.   Did you continue to use them in 2015?

15         A.   Yes.

16         Q.   Did you continue to use them in 2016?

17         A.   Yes.

18         Q.   Did you continue to use them in 2017?

19         A.   Yes.

20         Q.   Did you continue to use them in 2018?

21         A.   I believe so.

22         Q.   After you filed the lawsuit you continued to

23    use Dave's devices; right?

24         A.   Yes.

25         Q.   When did you stop using Dave's devices?
```

```
 1        A.    I don't remember exactly.
 2        Q.    Was it maybe like a few months ago, few weeks
 3   ago?
 4              MR. FREEDMAN:  Objection.
 5              THE WITNESS:  In the range of like around this
 6        lawsuit but --
 7   BY MR. PASCHAL:
 8        Q.    Sorry, go ahead.
 9        A.    I was just putting my personal files on them.
10   I never touched Dave's stuff.
11        Q.    Let me break that statement down.  So what
12   caused you to stop using the devices?
13              MR. FREEDMAN:  If you can answer this question
14        without going into conversation you had with your
15        lawyers then answer it.
16              THE WITNESS:  Well, I just didn't want to
17        tamper with anything.
18   BY MR. PASCHAL:
19        Q.    So you were using them in 2018 you were
20   tampering with it?
21              MR. FREEDMAN:  Objection.
22              THE WITNESS:  No.  I mean I -- I was just
23        using it for my own personal use.
24   BY MR. PASCHAL:
25        Q.    I want to go back two questions ago and you
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                            Page 55

1    just said that you stopped using the devices because you

2    didn't want to tamper with anything.  So were you

3    concerned that you were tampering with anything in 2018?

4         A.   I was never concerned about tampering with

5    anything of Dave's.  I was concerned about tampering

6    with my own personal things like -- like through the

7    lawsuit you might view that I was somehow like deleting

8    my own stuff or something that might be a bad thing but

9    I wasn't --

10        Q.   Let me say it this way.  Because of the

11   lawsuit you were concerned that it would appear that you

12   were trying to delete things by using the devices; is

13   that fair to say?

14             MR. FREEDMAN:  Objection.

15             THE WITNESS:  Can you repeat that?

16   BY MR. PASCHAL:

17        Q.   Yes, was it because of the lawsuit that you

18   stopped using the devices because you were concerned

19   that it would appear that you were trying to delete

20   things?

21             MR. FREEDMAN:  Objection.

22             THE WITNESS:  I guess that's part of it.

23   BY MR. PASCHAL:

24        Q.   When do you remember that you first considered

25   suing or bringing this action against Dr. Wright?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                           Page 56

```
 1                MR. FREEDMAN:  Hold on.  What topic are you

 2         in?

 3                MR. PASCHAL:  That goes to the facts alleged

 4         in the amended complaint.

 5                MR. FREEDMAN:  Which number?

 6                MR. PASCHAL:  That goes to the facts alleged

 7         in the alleged complaint.  Goes to preservation of

 8         device, chain of custody.  I think it goes to

 9         several topics.  You want to go through them all?

10                MR. FREEDMAN:  Where -- can you show me the

11         number?

12                MR. PASCHAL:  Preservation of devices I think

13         that's like the first five.  That's the very

14         purpose of this deposition.

15                MR. FREEDMAN:  I don't think so.  He can

16         answer.  I'll allow the question but keeping an eye

17         on you.

18                MR. PASCHAL:  Can you read my question back?

19                (Thereupon, a portion of the record

20                was read back by the reporter.)

21                THE WITNESS:  I don't remember the exact date.

22    BY MR. PASCHAL:

23         Q.  Was it 2016?

24         A.  I don't know.

25         Q.  Could it have been after that?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 57

```
 1        A.    It could have been after that.

 2        Q.    So I'm going to show you an e-mail that you

 3    had with Patrick Paige, March 31st 2016.

 4              (Defendant's Exhibit No. 7 was

 5              marked for identification.)

 6    BY MR. PASCHAL:

 7        Q.    If you turn to the second page and you can

 8    look at what you said before but you say there are a lot

 9    of details left out -- you're discussing Craig and

10    things you think about Dr. Wright.  "There are a lot of

11    details left out that I may have to reserve until

12    litigation."  You see that?

13        A.    Yes.

14        Q.    So this was March 31st 2016.  So as early at

15    least March 31st 2016 you were considering litigation?

16              MR. FREEDMAN:  Objection.

17              THE WITNESS:  I'm not sure about that.

18    BY MR. PASCHAL:

19        Q.    So what were you considering to reserve until

20    litigation when you were talking to Patrick Paige?  Who

21    were you planning on litigating against?

22              MR. FREEDMAN:  Ira, if you need to read the

23         whole e-mail read the whole e-mail and answer the

24         question.

25              MR. PASCHAL:  Take your time.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 58

```
 1              THE WITNESS:  Yes, I guess --
 2              MR. FREEDMAN:  Don't guess Ira.  Answer the
 3         question if you know it.  Not going to help them if
 4         you guess.
 5              THE WITNESS:  I may have been considering
 6         litigation against him at that time.
 7    BY MR. PASCHAL:
 8         Q.   March 31st 2016?
 9         A.   I don't believe I filed anything -- it was
10    just --
11         Q.   Just asking --
12         A.   I was thinking about it, yes.
13         Q.   Are there any documents to reflect an earlier
14    date than that?
15         A.   I don't know.
16         Q.   You don't know?  Sorry, I didn't hear you.
17         A.   I don't know.
18              MR. PASCHAL:  Showing you an article that
19         Dr. Wright and your brother wrote.
20              (Defendant's Exhibit No. 8 was
21              marked for identification.)
22    BY MR. PASCHAL:
23         Q.   It's called Overwriting Hard Drive Data: The
24    Great Wiping Controversy.  You produced this document to
25    us, do you recall that?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 59

```
 1        A.   I guess if we produced it we --

 2        Q.   Have you read this?

 3        A.   No.

 4        Q.   You have what, 20 plus years of experience

 5   with computers; right?

 6        A.   Just general use, yes.

 7        Q.   You're generally familiar with how to

 8   preserve, overwrite or delete data on a hard drive?

 9        A.   I don't have any special training in that.  I

10   just have general computer use.

11        Q.   To my question you have general experience

12   with how to overwrite, preserve or delete data from a

13   hard drive?

14        A.   Not preserve.  If you're talking about like

15   how a forensic specialist might know how to secure data

16   I don't have any training in that type of thing.  I just

17   know how to general --

18        Q.   Generally do you know how to preserve,

19   overwrite and delete data from a hard drive?

20             MR. FREEDMAN:  Objection.

21             THE WITNESS:  I just know how to generally

22        store data on a hard drive.

23   BY MR. PASCHAL:

24        Q.   You understand you're under oath today;

25   correct?
```

```
 1        A.   Yes.
 2        Q.   You understand the importance when you're
 3   under oath you have to give complete and truthful
 4   answers to the best of your ability; correct?
 5        A.   Yes.
 6             MR. PASCHAL:  I'm showing you your responses
 7        to our interrogatories.  This is going to be number
 8        eight?
 9             MR. FREEDMAN:  9.
10             (Defendant's Exhibit No. 9 was
11             marked for identification.)
12             MR. FREEDMAN:  Do you have a copy for us?
13             MR. PASCHAL:  Yes.
14   BY MR. PASCHAL:
15        Q.   If you turn to page six a response to request
16   it should be interrogatory number 20 at the second
17   sentence you say "additionally Ira has been employed in
18   web site design and affiliate marketing for the past 22
19   years and uses computers extensively as a part of his
20   work.  During this time Ira became generally familiar
21   with how to preserve, overwrite or erase data on
22   electronic devices."  Is that your statement?
23        A.   Yes.
24        Q.   And you swore this under penalty of perjury
25   just like you did here today; correct?
```

```
 1        A.    Yes.

 2        Q.    So do you know or do you have general

 3   experience with how to preserve, overwrite or delete

 4   data from a hard drive?

 5        A.    That's just general every day use.  Just like

 6   an average computer --

 7        Q.    With that general knowledge you were in

 8   possession of overwriting paper that Dave and Dr. Wright

 9   wrote from March of 2016 you continued to use Dave's

10   electronic devices for your personal use until well

11   after -- almost a year after this litigation was filed;

12   is that correct?

13             MR. FREEDMAN:  Objection.

14             THE WITNESS:  Yes.

15   BY MR. PASCHAL:

16        Q.    So could we go back to the February 2014

17   e-mail that you had with Craig?

18             MR. FREEDMAN:  What exhibit number?

19             MR. PASCHAL:  I wasn't writing them down.  I

20        think that might be three.

21             MR. FREEDMAN:  No, three is the verified

22        complaint.

23             MR. PASCHAL:  Four?  Maybe it's five.

24             MR. FREEDMAN:  Four is the 11th October 2012

25        e-mail.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                        Page 62

```
 1            MR. PASCHAL:  Yes, that's it, four.

 2   BY MR. PASCHAL:

 3       Q.   So we talked about the work papers.  Let's

 4   talk about the formating of the drives.  You said in

 5   that e-mail that you couldn't --

 6            MR. FREEDMAN:  Give me one second to grab it

 7       myself.  Okay.  Go ahead.

 8   BY MR. PASCHAL:

 9       Q.   So you said in that e-mail that you formated

10   drives you could not access.  You see that?

11       A.   Yes.

12       Q.   What did --

13            MR. FREEDMAN:  Wait, this is the wrong e-mail.

14       This is not that e-mail.  This is from Dave Kleiman

15       to Craig Wright.  What's the date on it?

16            MR. PASCHAL:  You know what, you can borrow

17       mine and give it back to me after this question.

18            MR. FREEDMAN:  He doesn't have it in front of

19       him either.  This is Exhibit 4.

20            THE WITNESS:  I know what you're talking

21       about.

22            MR. FREEDMAN:  Hold on a second.

23       February 14th.  It's Exhibit 6.

24   BY MR. PASCHAL:

25       Q.   Ira, you said you know what I'm talking about.
```

```
 1   So you said that you couldn't -- you formated drives you

 2   couldn't access?

 3        A.   I formated drives that prompted me that they

 4   could only be formated.

 5        Q.   Sorry, say that again.

 6        A.   When I tried to access the drive the pop up

 7   screen appears and it says that the drive needs to be

 8   formated.  So I take that as the drive's empty and I

 9   could format it.

10        Q.   Let's break that down then.  So before you

11   formatted the drive did you ask for any professional

12   help in recovering any data from the drive?

13        A.   No.

14        Q.   When you say I take that as the drive is empty

15   what are you basing that -- your -- that statement on?

16        A.   Just my general computer use.

17        Q.   Your general -- what I discussed before your

18   general knowledge of preserving, deleting and

19   overwriting data?

20             MR. FREEDMAN:  Objection.

21             THE WITNESS:  My general use of hard drives,

22        computers.

23   BY MR. PASCHAL:

24        Q.   So Ira, I mean in 2009 Dave tells you that he

25   is working on something that's bigger than Facebook,
```

```
 1   this digital currency, you have two hard drives and you

 2   format them; right?

 3        A.   Yes.

 4        Q.   And then you continue to use them for several

 5   years; right?

 6        A.   Yes.

 7             MR. PASCHAL:  I'm showing you your second

 8        amended responses and objections to our first set

 9        of interrogatories.  This is going to be number

10        ten.

11             (Defendant's Exhibit No. 10 was

12             marked for identification.)

13   BY MR. PASCHAL:

14        Q.   Can you look at response number two and that

15   interrogatory two is identify all electronic devices

16   that Dave Kleiman owned or possessed at the time of his

17   death.  You see that?

18        A.   Yes.

19        Q.   Is this a complete list or is there anything

20   else that needs to be added to this list?

21        A.   I believe that's a complete list.

22        Q.   So these were all electronic devices that Dave

23   had?

24        A.   Yes.

25        Q.   Which of these drives did you format?
```

1       A.   I believe it was two of the Seagate Momentus.

2       Q.   So there's the first one, right the Seagate

3  Momentus 500GB, that one?

4       A.   I think so.

5       Q.   Then it said the amount of data currently

6  stored is 17.6 GBs.  You see that?

7       A.   Yes.

8       Q.   Now, you said that you took the prompt as to

9  format the drive there was no information on the drives.

10  Is this entire 17.6 GBs your personal information?

11      A.   I think that's probably mostly the operating

12  system that I installed on it.

13      Q.   And then the next Seagate would be the -- I

14  think three down it's a Seagate Momentus 500 GB.  Are

15  those the same types of drive, just two of them?

16      A.   I believe so.

17      Q.   The third one that's the other one that you

18  formated?

19      A.   I think so.

20      Q.   Did you format the drives so that you could

21  use them personally?

22      A.   Yes.

23      Q.   Well, now if you've been using them for so

24  long why is it saying on the third one the amount of

25  data currently stored is zero?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                          Page 66

1      A.   I'm not sure the amount of data on that one is

2   accurate.  I'm not sure if that one was reported

3   accurately.

4      **Q.   Would that be for the same one -- scratch**

5   **that.  Strike that.  Would that be the same for the**

6   **first one where you said 17.6 GB was for the operating**

7   **system alone; is that accurate?**

8      A.   I believe so.

9      **Q.   You've been using that device for years you**

10  **haven't stored anything on it?**

11     A.   I don't think I really used it that much.  I

12  remember installing operating systems on those two

13  drives but I never really used it much.

14     **Q.   So you formated them so you could use them;**

15  **right?**

16     A.   Yes.  I may have not used it for a very

17  limited amount of time.

18     **Q.   When was that limited amount of time?**

19     A.   I don't remember.

20     **Q.   What are you storing on those devices?**

21     A.   I think just the operating systems.  I may

22  have also put like maybe some web site design program on

23  there.

24     **Q.   That's it?**

25     A.   As far as I can recall.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 67

```
 1        Q.   Ira, are you storing any commercial videos on
 2   those devices?
 3        A.   Commercial videos?  I don't know.
 4        Q.   Are you storing any commercial music files on
 5   those devices?
 6             MR. FREEDMAN:  Objection.
 7             THE WITNESS:  I would have to look at that, I
 8        don't know.
 9   BY MR. PASCHAL:
10        Q.   Are you storing any personal photos of your
11   family on those devices?
12             MR. FREEDMAN:  Objection.
13             THE WITNESS:  Are you talking about just the
14        Seagate?
15   BY MR. PASCHAL:
16        Q.   On these two you formated.
17        A.   I don't know.  I don't think so.  I don't
18   think I put any photos on there.
19        Q.   Were you able to access the remainder of all
20   of Dave's drives?
21        A.   No.
22             MR. FREEDMAN:  Objection.
23   BY MR. PASCHAL:
24        Q.   That's in this list.
25        A.   Yes, right.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 68

1      Q.    You weren't able to access them?

2      A.    I think there might be one or two that we

3  weren't able to access.

4      Q.    What were those?

5      A.    I think the Hitachi Travelstar.

6      Q.    What was the other one?

7      A.    I don't remember.

8      Q.    What did you do to access the Hitachi

9  Travelstar 100 GB?

10     A.    I think I just plugged it in.

11     Q.    You haven't done anything else to it?

12     A.    No.

13     Q.    There's no forensic image of it?

14     A.    There was like you mean after litigation

15  started?  Not prior to litigation.

16     Q.    There was none.  There was one done after the

17  litigation?

18     A.    Yes.

19     Q.    When was that done?

20     A.    I don't remember the date.

21     Q.    Was it this year?

22     A.    Yes.

23     Q.    Are you storing any commercial videos on any

24  of these devices?

25     A.    I don't remember.

```
 1        Q.    Are you storing any commercial music files on

 2   any of these devices?

 3        A.    I would have to look at them.  I don't know.

 4        Q.    You didn't look at them before today?

 5        A.    Yes, I've looked at them before today but I

 6   don't remember it exactly what was on them.

 7        Q.    Do you remember storing any pictures of your

 8   family on any of those devices?

 9        A.    I think -- yes, I think I put some photos.  I

10   mean I would imagine that some of these drives have

11   photos.

12        Q.    Which drives have photos?

13        A.    I don't know specifically.

14        Q.    Can you look at I think it's seven down where

15   you say four to five hard drives that are no longer in

16   the estate's possession.  You see that?

17        A.    Yes.

18        Q.    Then a footnote you say "Ira gave three or

19   four drives that were possessed by Dave Kleiman at the

20   time of his death to Patrick Paige (Dave's business

21   partner in Computer Forensics LLC) as Patrick informed

22   him they were Computer Forensic LLC drives with business

23   data stored on them.  There was one other drive that was

24   on Dave's bedroom counter.  This drive was broken and

25   would not power on.  Ira disposed of this drive in
```

```
 1    2013."  Do you recall that?

 2         A.   Yes.

 3         Q.   I'm going to just break that down.  Can you

 4    tell me today whether it's three or four drives that you

 5    gave to Patrick Paige and Carter Conrad?

 6         A.   I don't remember.

 7              MR. FREEDMAN:  Objection.

 8    BY MR. PASCHAL:

 9         Q.   Can you say your answer again?

10         A.   I don't remember the exact number.

11         Q.   Do you recall when you gave him those drives?

12              MR. FREEDMAN:  Objection.

13              THE WITNESS:  I believe it was maybe within

14         like a month after Dave passed away.

15    BY MR. PASCHAL:

16         Q.   Did they ever give those drives back to you?

17         A.   No.

18         Q.   I want to go into that but let me ask you

19    this.  You said you found this drive on the bedroom

20    counter.  Did Dave have an office at his house?

21         A.   Yes, he had a room in the back, yes.

22         Q.   Was this -- were the three or four drives you

23    you gave to Patrick Paige, were those in his bedroom or

24    were they in his office?

25         A.   They were in his office.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Page 71

```
 1        Q.   Before you gave those drives to Patrick Paige

 2   did you get any professional analysis to see what was on

 3   the drives?

 4        A.   No.

 5        Q.   Did you look in the drives yourself?

 6        A.   No.

 7        Q.   Did you access the drives?

 8        A.   No.

 9        Q.   How was Patrick able to access the drives?

10        A.   Repeat that.

11        Q.   How was Patrick able to access the drives?

12        A.   I don't know.

13        Q.   So how did Patrick know that -- well, did

14   Patrick tell you how did you know that those drives

15   belonged to Computer Forensics?

16        A.   He told me that they belonged to Computer

17   Forensics.

18        Q.   Did you --

19        A.   I don't remember if they were labeled or not.

20        Q.   But so other than Patrick's word they belonged

21   to Computer Forensics did you have anything else to show

22   that they may have not been belonged to Computer

23   Forensics?

24             MR. FREEDMAN:  Objection.

25             THE WITNESS:  No.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 72

```
 1   BY MR. PASCHAL:
 2        Q.   You don't know what was stored on those
 3   drives, do you?
 4        A.   Correct.
 5        Q.   So if a Bitcoin wallet was on that drive you
 6   wouldn't know?
 7        A.   Yes, I don't know -- I never looked at the
 8   drives.
 9        Q.   Have you asked for those drives back from
10   Patrick?
11        A.   No.
12        Q.   Now, you say that there was a drive on the
13   bedroom counter that you couldn't power on and you
14   disposed of it.  Do you recall that?
15        A.   Yes.
16        Q.   Dave had an office so was this the only drive
17   that was in his bedroom?
18        A.   No.  I believe there were -- he kept his
19   backpack.
20        Q.   So let me do this then.  I'm not going to show
21   you the photo but on his counter he had a backpack, a
22   blue backpack?
23        A.   Not on the counter.  In his bedroom.  You
24   asked if there were other hard drives in his bedroom.
25        Q.   Okay.  Were there any hard drives in his
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 73

1    bedroom?

2        A.   Yes.

3        Q.   What other drives were in his bedroom?

4        A.   I believe most of the drives that you have

5    listed here.

6        Q.   So he kept all of his drives in his bedroom?

7        A.   In a backpack, yes.

8        Q.   But the three or four drives that he didn't

9    have in the backpack they were in his office?

10       A.   Yes.

11       Q.   Now, this one drive was on the bedroom

12   counter; right?

13       A.   Yes.

14       Q.   It was the only drive that was on the bedroom

15   counter?

16       A.   Yes.

17       Q.   What was on his bedroom counter?

18            MR. FREEDMAN:  Objection.

19            THE WITNESS:  I don't remember exactly.

20   BY MR. PASCHAL:

21       Q.   What did this drive look like?

22       A.   I just remember it was an external drive.

23       Q.   Do you remember what color it was?

24       A.   No.

25       Q.   You don't know what type it was either?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                           Page 74

```
 1        A.    Not offhand.

 2        Q.    Do you remember how big it was?

 3        A.    Maybe like six or seven inches high by a

 4   couple inches wide.

 5        Q.    So like --

 6        A.    Yes.

 7        Q.    It was a big hard drive?

 8        A.    I don't --

 9        Q.    It wasn't like a laptop hard drive, let me ask

10   that?

11        A.    No, it wasn't a laptop drive.  It was an

12   external drive.

13        Q.    For like a tower computer?

14        A.    For a tower computer?

15        Q.    For like a regular computer?  For like a

16   desktop computer?

17        A.    It could be used with anything.

18        Q.    You just plug it in?

19        A.    You can connect it to any type of computer.

20        Q.    I'm not going to show the picture but on

21   Dave's countertop he had a blue backpack, he had a

22   yellow shirt, he had another bag, he had a bottle of

23   beer.  There was a wine glass that was empty and then he

24   had his glass mirror here.  There was a cell phone on

25   the top of a white box and then right below it there was
```

```
 1    a very, very small black box, that doesn't fit the
 2    description of the hard drive you're talking about but
 3    could that have been the hard drive?
 4              MR. FREEDMAN:  Objection.
 5              THE WITNESS:  Where are you getting this
 6         picture?  I don't even -- I don't understand the
 7         picture that you're just painting.
 8    BY MR. PASCHAL:
 9         Q.    The pictures that the police took after when
10    they --
11         A.    You have actual photos?
12         Q.    Yes.  I can show them.
13         A.    Yes, it would help if I could see the photo
14    then I might -- I don't know.
15              MR. PASCHAL:  Can we print here?
16              MR. FREEDMAN:  Yes.
17              MR. PASCHAL:  So on our next break I'll print
18         it and show you.  I don't know -- the reason why I
19         did not show you is because it's -- it is graphic.
20         So I don't know if -- at the next break you guys
21         decide if you want to see it and I can point it out
22         to you, okay?
23              THE WITNESS:  Okay.
24    BY MR. PASCHAL:
25         Q.    So the pictures that the police took from the
```

1  day that they went to Dave's house you haven't seen any

2  of those pictures?

3         A.   No.

4         Q.   On the drive that you -- you threw away you

5  wouldn't be able to tell us today one way or another

6  whether or not there was Bitcoin wallets or Bitcoin

7  information on that drive?

8         A.   I was never able to access it.

9         Q.   So you wouldn't be able to tell us today

10  whether or not Bitcoin wallets or Bitcoin were on that

11  drive?

12            MR. FREEDMAN:  Objection.

13            THE WITNESS:  Again I wasn't able to access

14      it.

15  BY MR. PASCHAL:

16         Q.   Is it a yes or no?

17         A.   Anything could have been on it.

18         Q.   But you wouldn't know?

19         A.   I wouldn't know because I couldn't access it.

20         Q.   And you threw it away?

21         A.   Yes.  It was -- it didn't work.

22         Q.   Just going back.  So when you came in

23  possession of Dave's computers did you have your own

24  personal computer?

25         A.   Yes.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                           Page 77

1      Q.   So why did you format Dave's devices so that

2   you could use those computers?

3      A.   I guess I needed more storage space.  Maybe my

4   computer was full with stuff, other stuff.

5      Q.   So sitting here today you can't tell us why

6   you decided to use Dave's computers, you're speculating,

7   are you?

8      A.   Why I couldn't use --

9      Q.   Why did you use Dave's computers rather than

10  your own?

11     A.   I put the operating systems on there because

12  my computer might have had a different operating system.

13  For one reason or another I needed to use like Windows 7

14  or Windows 8 so that's why I formated those two and put

15  those operating systems on there.

16     Q.   Why didn't you just get another hard drive or

17  computer?

18          MR. FREEDMAN:  Objection.

19          THE WITNESS:  His were laying around and

20      they -- they said they could be formated.

21  BY MR. PASCHAL:

22     Q.   Who said they could be formated?

23     A.   When I plugged them in the pop up screen said

24  that the drives need to be formated.  So that to me that

25  appears that the drives were empty.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                            Page 78

```
 1        Q.    When you had the drive that was broken what
 2   made you think it was broken?
 3        A.    It wouldn't turn on.  You didn't hear like the
 4   platter spinning or anything.
 5        Q.    Did you ask for any professional help trying
 6   to get it to start, to turn on?
 7        A.    No.
 8        Q.    So just -- you tried turning it on it didn't
 9   turn on so you threw it away?
10        A.    Yes.
11             MR. FREEDMAN:  Objection.
12   BY MR. PASCHAL:
13        Q.    So when you became the personal representative
14   of the estate of Dave Kleiman what steps did you take to
15   preserve the assets of the estate?
16        A.    Well, I reached out to my attorney --
17             MR. FREEDMAN:  Ira, if you can answer the
18        question without revealing what you discussed with
19        your attorney then answer it.  But don't discuss
20        anything that you discussed with your attorney.
21             MR. PASCHAL:  Your objection is don't talk
22        about Karp?
23             MR. FREEDMAN:  Just discussions with your
24        lawyer.
25             MR. PASCHAL:  Don't tell me about your
```

```
 1        conversations with Karp.

 2   BY MR. PASCHAL:

 3        Q.   When you became the personal representative

 4   what did you do to preserve the assets of the estate?

 5        A.   My attorney assisted me with doing that.

 6        Q.   But what did you do like did you -- what did

 7   you do personally to preserve whatever was in Dave's

 8   house?

 9             MR. FREEDMAN:  Objection.

10             THE WITNESS:  I collected his personal things.

11   BY MR. PASCHAL:

12        Q.   And what did you collect?

13        A.   Well, his computer equipment, some guns in his

14   gun safe.  Some of his clothing.  Just personal items.

15   Like I said, his computer certificates, things like

16   that.

17        Q.   Can you go back to the February 2014 e-mail

18   that you had with Dr. Wright where you discussed

19   formating the drives?

20             MR. FREEDMAN:  Which exhibit number?

21             MR. PASCHAL:  I didn't write it down.  Do you

22        have it?

23             MR. FREEDMAN:  I think it's Exhibit 6.

24   BY MR. PASCHAL:

25        Q.   So if you go to the second page that's the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Page 80

```
 1   second paragraph where you start with Patrick.  You say

 2   "Patrick and his partner e-mailed me the other day and

 3   would like me to bring over his, I guess that means

 4   Dave's, drives.  I haven't spoken with them about what

 5   happened if they did manage to access his account.  I

 6   assume that anything in it cannot be traced when there

 7   is a withdrawal.  Being that I've only met Patrick a

 8   couple times in my life I was wondering if there are any

 9   safety measures you can recommend to me so I don't make

10   another mistake."  So let's break this down.  What did

11   you mean by another mistake?

12       A.   I guess I was thinking that if I discarded

13   anything that could have been important or related to

14   Bitcoin.

15       Q.   Then the section before you say "being that

16   I've only met Patrick a couple times in my life I was

17   wondering if there were any safety measures to

18   recommended to me again so I don't make another

19   mistake."  This is in February 2014 and you're saying

20   that you have only met Patrick a couple times in my

21   life?

22            MR. FREEDMAN:  Objection.

23   BY MR. PASCHAL:

24       Q.   Is that correct?

25            MR. FREEDMAN:  Objection.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                            Page 81

```
 1              THE WITNESS:  Yes.
 2   BY MR. PASCHAL:
 3        Q.   But one month after Dave died you gave him
 4   three or four of Dave's hard drives; right?
 5        A.   Correct.
 6        Q.   That was only based on him telling you these
 7   belong to Computer Forensics?
 8        A.   Yes.
 9        Q.   I want to be clear you take any images of the
10   drives that you gave to Patrick; right?
11        A.   No.
12        Q.   So you have no copies?
13        A.   No.
14        Q.   So if you go back to the e-mail you say you're
15   going to give certain drives to Patrick and Conrad for
16   them to analyze.  Do you see that?
17        A.   Yes.
18        Q.   Did you give them drives?
19        A.   No.
20        Q.   Why didn't you give them any drives excluding
21   the three or four that you had already given him why
22   didn't you give him drives at this point?
23        A.   I didn't -- what date are we talking about
24   again?
25        Q.   So in February of 2014 you told Craig that you
```

```
 1   were going to give Patrick and Conrad some of Dave's

 2   electronic devices to analyze.  Did you give Patrick and

 3   Conrad Dave's --

 4        A.   No.

 5        Q.   The answer is no?

 6        A.   No, I didn't.

 7             MS. MCGOVERN:  Just finish the question.

 8   BY MR. PASCHAL:

 9        Q.   And why didn't you give Patrick and Conrad the

10   drives?

11        A.   I thought that the best idea would be to allow

12   Craig to examine them.

13        Q.   So you didn't give any drives to Patrick

14   Paige?

15        A.   No.

16        Q.   Except for the three or four; right?

17        A.   Right.

18             MR. PASCHAL:  I'm showing you the first

19        amended complaint you filed against Patrick Paige

20        and Carter Conrad.  This is going to be what

21        exhibit?

22             THE COURT REPORTER:  11.

23             (Defendant's Exhibit No. 11 was

24             marked for identification.)

25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 83

```
 1    BY MR. PASCHAL:

 2        Q.   Can you turn to paragraph 18?  Let me know

 3    when you're there.

 4        A.   Okay.

 5        Q.   So at paragraph 18 you say "shortly after

 6    David Kleiman's passing plaintiff, and that's you, also

 7    entrusted Computer Forensics and Patrick Paige with a

 8    smart phone owned by decedent, being Dave, which was

 9    provided the defendants for the purpose of unlocking the

10    phone as it was password protected in aid of plaintiff's

11    efforts to develop information as to assets of the

12    estate.

13             The phone has never been returned to plaintiff

14    and defendant Paige has since claimed that he, a

15    computer forensic consultant, had thrown away the phone

16    after he had dropped the phone and cracked the screen."

17    Do you recall making this allegation?

18        A.   Yes.

19        Q.   So you attempted to access the device being

20    the phone by giving it to Patrick Paige; correct?

21        A.   Yes.

22        Q.   But he never gave you any information from

23    that device?

24        A.   Correct.

25        Q.   Did he ever give it back to you?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 84

```
 1        A.    No.

 2        Q.    When did you give that phone to -- that device

 3   to Patrick?

 4        A.    It was the same time that I handed him -- when

 5   he took the three drives from Dave's home.

 6        Q.    Why did you give him something?

 7        A.    Because I couldn't access it and he is a

 8   computer forensics expert I thought he would have a

 9   better chance at it than I would.

10              MR. PASCHAL:   Showing you your response and

11        objections to our first set of interrogatories.

12              (Defendant's Exhibit No. 12 was

13              marked for identification.)

14   BY MR. PASCHAL:

15        Q.    Can you turn to the last page of this

16   document?  Can you read that statement that you made?

17        A.    "I, Ira Kleiman declare under penalty of

18   perjury under the laws in the United States and the

19   State of Florida that the foregoing is true and

20   correct."

21        Q.    Can you turn to interrogatory response number

22   three?

23        A.    Okay.

24        Q.    We ask you "describe with specificity all

25   attempts you have made to access Dave Kleiman's
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 85

```
 1   electronic devices."  Your response was "Ira did not
 2   keep a record of every attempt he made to access Dave
 3   Kleiman's electronic devices.  That said, Ira states
 4   that he personally reviewed all drives that were
 5   accessible.  During this review Ira looked through each
 6   individual folder and each individual file contained on
 7   these drives to find anything of importance."
 8            You didn't mention in here that you gave a
 9   device the cell phone to Patrick Paige for them to
10   access; is that correct?
11        A.   Well, those drives from what I believe --
12        Q.   Not the drives I'm asking you -- go ahead.
13        A.   What are you referring to?
14        Q.   The phone, the device, the one that you allege
15   in the Computer Forensic lawsuit.
16        A.   Yes, I didn't give him the cell phone.  I just
17   asked him to access it.
18        Q.   So in your amended complaint for Computer
19   Forensics you didn't allege that you gave the phone to
20   Patrick to access the phone and that he told you that he
21   cracked the screen and threw it away?
22        A.   I handed the phone to him with an expectation
23   that it would be returned to me.
24        Q.   But you gave it to him so he could access the
25   phone; right?
```

 1      A.   Yes.

 2      Q.   Your testimony earlier was you gave it to him

 3 because he is a computer forensic expert so you can

 4 access the device?

 5      A.   Yes.

 6      Q.   I'm asking you you gave this answer under the

 7 penalty of perjury.  When we asked you describe with

 8 specificity all attempts you made to access Dave

 9 Kleiman's devices.  You did not say in this answer that

10 you gave an electronic device, being the phone, to

11 Patrick to access?

12      A.   I thought we listed that phone on here.

13      Q.   I'm looking just this one interrogatory right

14 here.  You can go through them but nowhere in there do

15 you say you gave the phone to Patrick Paige.

16      A.   Okay.

17      Q.   So is this an untruthful response?

18      A.   It's possible we just missed including the

19 cell phone.

20      Q.   Can you go to your amendment to this

21 interrogatory which is second amended response and

22 objection to Dr. Wright's first set of interrogatories.

23 That's Exhibit 10.

24           MR. FREEDMAN:  Are you done with 12?

25           MR. PASCHAL:  We're going to use it again.

1    BY MR. PASCHAL:

2         Q.   Can you turn to page 11, that's the last page.

3    You took an oath to the court reporter today and you

4    also signed this verification.  Can you read it out to

5    me?

6         A.   "I, Ira Kleiman, declare under penalty of

7    perjury under the law of the United States and State of

8    Florida that the foregoing is true and correct."

9         Q.   Can you go back to that same interrogatory

10   request number three.  In the first paragraph you say

11   the same thing that you said -- just so I'm clear on

12   these you revised them you served us on March 21, 2019,

13   okay?  Your first interrogatory responses the first

14   version of this you served on March 7th 2019.  So two

15   weeks later we get this revised response.  If you look

16   in the second paragraph you add one paragraph to this

17   response.  You want to go ahead and read that?

18        A.   Where are you?

19        Q.   Interrogatory three, the same one we're

20   talking about.  It says request number three but it

21   should be -- you say describe with specificity?

22        A.   "Describe with specificity all the attempts

23   you have made to access Dave Kleiman's electronic

24   devices."

25        Q.   Now, that first paragraph it's the same

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 88

```
 1    paragraph you had in your previous version to this

 2    interrogatory; right?

 3         A.   Yes.

 4         Q.   Now, if you turn the page you added the

 5    paragraph.   In this paragraph you mention that you gave

 6    an electronic device to Patrick Paige to access?

 7         A.   Apparently not.

 8         Q.   So in the two week span that you revised you

 9    did not include that additional information in this

10    interrogatory response; correct?

11         A.   I guess we missed it.

12         Q.   In the two weeks that you served the first

13    response and the second response what information did

14    you get to remember that you installed Windows operating

15    systems on two drives in an effort to gain access to the

16    drives in 2013?   What caused you to remember that that

17    information was missing?

18              MR. FREEDMAN:   Objection.

19              THE WITNESS:   Can you repeat that again?

20    BY MR. PASCHAL:

21         Q.   Yes, you give us a response on March 7th 2019;

22    right?

23         A.   Yes.

24         Q.   You supplement that response two weeks later

25    to add a new paragraph in that second paragraph here
```

```
 1   where you're saying you installed windows on the drives

 2   which you didn't include in your first version to these

 3   interrogatories.

 4        A.   I don't know.

 5             MR. FREEDMAN:  Objection.

 6   BY MR. PASCHAL:

 7        Q.   Are there any documents that shows why you

 8   remembered that your first answer was incomplete?

 9             MR. FREEDMAN:  Objection.

10             THE WITNESS:  I don't know.

11   BY MR. PASCHAL:

12        Q.   Is this a truthful answer?

13        A.   At the time I believe it was.

14        Q.   Is it truthful today?

15        A.   It's possible some information was missed.

16        Q.   Is it truthful?

17             MR. FREEDMAN:  Objection.

18             THE WITNESS:  If it's missing some information

19        I guess it's not completely.

20   BY MR. PASCHAL:

21        Q.   While we're on the interrogatories I'm showing

22   you an e-mail that you had with Patrick Paige and this

23   is June 27, 2015.  I think that's Exhibit 12.

24             MR. ROCHE:  13.

25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 90

```
 1              (Defendant's Exhibit No. 13 was
 2              marked for identification.)
 3    BY MR. PASCHAL:
 4         Q.   In this e-mail you start by saying "hi
 5    Patrick, I don't think I'm going to be able to meet up
 6    this week.  Need to finish a client's web site.  But for
 7    now I stored the drives in a safe deposit box so they'll
 8    remain safe and as Craig mentioned there's no time limit
 9    with this stuff so we have time to figure it all out."
10    Do you remember this e-mail?
11         A.   Yes.
12         Q.   Just as an initial matter is there any
13    reason -- what computer did you send this e-mail from?
14         A.   I guess my personal computer.
15         Q.   Is there a reason why the date is set for the
16    day to go first then the month and then the year?
17         A.   Can you repeat that?
18         Q.   If you look at the sent the time where it says
19    Saturday and then it says the date 27 and then it says
20    the month 6 and then the year 2015?
21         A.   Right.
22         Q.   Is there -- was is it unusual to you that it's
23    set like that?
24         A.   I never really paid attention to it.
25         Q.   Your e-mail is -- your e-mail sends out using
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 91

```
 1   that date format; right?
 2            MR. FREEDMAN:  Objection.
 3            THE WITNESS:  I don't know.  I never paid
 4       attention to it.
 5   BY MR. PASCHAL:
 6       Q.   There's no cause for concern let me ask you
 7   that that your e-mails are sending out --
 8            MR. FREEDMAN:  Objection.
 9   BY MR. PASCHAL:
10       Q.   No, right?
11       A.   No.
12       Q.   Would it be surprising to you if Dave had
13   e-mails that also had -- used that same date
14   configuration?
15            MR. FREEDMAN:  Objection.
16   BY MR. PASCHAL:
17       Q.   Date, month, year?
18       A.   I suppose not.
19       Q.   In the February 2000 -- February 15, 2014
20   e-mail you told Patrick that you put the drives in a
21   safe deposit box; correct?
22            MR. FREEDMAN:  Objection.
23            THE WITNESS:  Yes.
24   BY MR. PASCHAL:
25       Q.   Now, can you turn to your responses and
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 92

```
 1    objections to the second set of interrogatories.  I

 2    don't have an exhibit number on that but you guys have

 3    it.

 4              MR. FREEDMAN:  Second amended?

 5              MR. PASCHAL:  Not the second amended, the

 6         second set of interrogatories.

 7              MR. FREEDMAN:  I have responses objections to

 8         Wright's first set of interrogatories to plaintiff.

 9         I have plaintiff's second amended responses and

10         objection to Wright's first set of interrogatories.

11              MR. PASCHAL:  Is it in that stack?

12              MR. FREEDMAN:  It should be identical.  One is

13         marked and one is not.

14              MR. ROCHE:  Plaintiff's responses and

15         objections to plaintiff's second set?

16              MR. FREEDMAN:  What number?

17              MR. ROCHE:  Nine.

18    BY MR. PASCHAL:

19         Q.   So at 14 we ask you to describe with

20    specificity all efforts you made to preserve Dave

21    Kleiman's electronic devices and data contained on them.

22    Do you see that interrogatory?

23         A.   Yes.

24         Q.   Under the penalty of perjury again you said "I

25    restored all of Dave Kleiman's electronic devices in the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 93

```
 1    exact same place that he found them in Dave's computer

 2    backpack?"

 3         A.   Yes.

 4         Q.   Are they in a backpack or safety deposit box?

 5         A.   In a back pack.

 6         Q.   So you never put them in a safe deposit box?

 7         A.   I was thinking about them putting them in a

 8    save deposit.  Then I decided to keep them where I found

 9    them.

10         Q.   You said when Ira reviewed these devices he

11    found nothing of importance or out of ordinary but you

12    did find the true crypt file on the drive which you

13    could not access.  You made copies of these files?

14              MR. FREEDMAN:  Objection.

15    BY MR. PASCHAL:

16         Q.   You see that?

17         A.   Yes.

18         Q.   How did you determine what was of importance

19    or whether something was out of the ordinary?

20         A.   I basically kept everything of Dave's, all of

21    his files.  But are you -- are you asking me about the

22    true crypt file specifically?

23         Q.   I'm asking in that sentence.  "When I reviewed

24    Dave's devices he found nothing of importance or out of

25    the ordinary."  These are Dave's work laptops; correct,
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 94

```
 1    some of them were his personal laptops, work laptops;

 2    right?

 3              MR. FREEDMAN:  Objection.

 4              THE WITNESS:  I don't know what drives were in

 5        his laptops.

 6    BY MR. PASCHAL:

 7        Q.    But these drives had Dave's work on them;

 8    right?

 9        A.    It had forensic related software on them.  I

10    don't know.

11        Q.    How did you determine that there was nothing

12    of importance or out of the ordinary on Dave's drives?

13        A.    I kept all of his stuff.

14        Q.    That's not my question.  My question is how

15    did you determine whether something was of importance or

16    out of the ordinary?

17        A.    Being that I didn't delete any of his

18    things -- I just kept everything.

19        Q.    You made a statement here that he found or you

20    found nothing of importance out of the ordinary.  What

21    were you looking for in those drives to determine

22    whether anything was of importance or was out of the

23    ordinary?

24        A.    I don't know.

25        Q.    I'm sorry, could you say that again?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                                    Page 95

```
 1        A.    I don't know.

 2        Q.    The true crypt file, what have you done to

 3   access that file?

 4        A.    I just stored it -- I just made copies of it.

 5   There's been no attempt to access it.

 6              THE VIDEOGRAPHER:  The time is 12:18 p.m. and

 7        we're off the record.

 8              (Thereupon, a brief recess was taken.)

 9              THE VIDEOGRAPHER:  The time is now 1:11 p.m.

10        and we are now back on the record.

11   BY MR. PASCHAL:

12        Q.    So Ira, when we left off we were talking about

13   where Dave's devices were located, whether they were in

14   a safety deposit box or computer bag.  You said they're

15   in the computer bag?

16        A.    Yes.

17        Q.    Where is that computer bag located?

18        A.    In my home.

19        Q.    So you have the hard drives and the bag?

20        A.    Yes.

21        Q.    What type of bag is it?

22        A.    Just a large backpack.

23        Q.    Do you know the brand?

24        A.    Not offhand.

25        Q.    Where in your house are you keeping it?
```

```
 1         A.    I think it's in my bedroom.

 2         Q.    You think or -- are you guessing, do you know

 3    for sure?

 4         A.    Well, I sometimes move around.  Sometimes if I

 5    was like using the drives it would be in my bedroom.

 6    Other times I would store it in an extra room.

 7         Q.    You said when you use the drives, what are you

 8    using the drives for?

 9         A.    Just my personal files.

10         Q.    What personal files?

11         A.    I don't recall exactly.

12         Q.    Because earlier we spoke and on the drives

13    you -- strike that.  So I'm going back to Computer

14    Forensics, the complaint you filed against Computer

15    Forensics and Patrick Paige.  Do you have that in front

16    of you?

17              MR. FREEDMAN:  11, right?

18              MR. PASCHAL:  Yes.  Do you have it?

19              MR. FREEDMAN:  Yes.

20    BY MR. PASCHAL:

21         Q.    So if you go to paragraph 32 on page eight.

22    That's a Count III and you're seeking a permanent

23    injunction.  Do you see that?

24         A.    32?

25         Q.    The heading Count III seeking a permanent
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                          Page 97

```
1    injunction?

2         A.   Yes.

3         Q.   If you go to paragraph 32 and you look at the

4    last sentence you say "further upon information and

5    belief David Kleiman created and maintained Bitcoin

6    wallets which were his personal property during the time

7    he was a member of Computer Forensics."  Do you recall

8    making that allegation?

9         A.   I don't remember saying those exact words

10   but --

11        Q.   But this is your complaint; right?

12        A.   Yes.

13        Q.   Now, if you go to paragraph 35 at the last

14   sentence as a part of your permanent injunction you say

15   to the extent that Computer Forensics, Paige or Conrad

16   have retained any Bitcoin wallets that were the personal

17   property of David Kleiman Computer Forensics should be

18   enjoined from monetizing, transferring or otherwise

19   converting such Bitcoin to its use and that's a typo it

20   should be or it says of or the use of its principals or

21   third parties.  Do you see that allegation that you

22   made?

23        A.   Yes.

24        Q.   So can you turn to your second amended

25   responses to our first interrogatories I think that's
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 98

```
 1  ten.

 2            MR. FREEDMAN:  Second amended responses?

 3            MR. PASCHAL:  Yes.

 4            MR. FREEDMAN:  It is ten.

 5            MR. PASCHAL:  10.

 6  BY MR. PASCHAL:

 7       Q.  Can you turn to page four?  You ready?  You

 8  say "describe with specificity all attempts you made to

 9  determine the identity and location of any crypto

10  currency that David Kleiman owned or possessed at the

11  time of his death."

12            In your answer under the penalty of perjury

13  you did not make any mention that you're seeking a

14  permanent injunction against Computer Forensics, Patrick

15  Paige, Carter Conrad for the return of David Kleiman's

16  personal Bitcoin wallets, do you?

17       A.  Could you repeat that?

18       Q.  Yes.  Can you read it back?

19            (Thereupon, a portion of the record

20            was read back by the reporter.)

21            THE WITNESS:  I don't know -- I suppose we

22       missed that.

23  BY MR. PASCHAL:

24       Q.  Ira, so can you go to the last page of this

25  interrogatory.  This is your signature, right?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 99

```
 1        A.   Yes.

 2        Q.   And you are swearing the under penalty of

 3   perjury that the foregoing answers are true and correct;

 4   correct?

 5        A.   Yes.

 6        Q.   And the question we're asking is whether all

 7   attempts that you've made to find or locate or access

 8   David Kleiman's Bitcoin, right?

 9        A.   Yes.

10        Q.   Isn't it important to mention that you're

11   seeking a permanent injunction against three or two

12   people in a company to get those very Bitcoin?

13             MR. FREEDMAN:  Objection.

14             THE WITNESS:  We didn't know if they possessed

15        any Bitcoin.

16   BY MR. PASCHAL:

17        Q.   You made the allegation without knowing?

18        A.   I don't know.

19        Q.   You don't know if you made the allegation in

20   this complaint without knowing whether it was true or

21   not?

22             MR. FREEDMAN:  Objection.

23             THE WITNESS:  I don't remember.

24   BY MR. PASCHAL:

25        Q.   But aside from whether it's true or not you
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 100

```
 1   did not mention that you were seeking an injunction in

 2   the sworn interrogatory?

 3           MR. FREEDMAN:  Objection.

 4   BY MR. PASCHAL:

 5       Q.   Did you?

 6           MR. FREEDMAN:  Objection.

 7           THE WITNESS:  I don't know.

 8   BY MR. PASCHAL:

 9       Q.   Is that a yes or no?

10       A.   I don't know.

11       Q.   You don't know in this interrogatory response

12   whether you make any mention of the injunction that

13   you're seeking against Patrick Paige, Carter Conrad and

14   Computer Forensics?

15           MR. FREEDMAN:  Objection.

16           THE WITNESS:  I don't know.

17   BY MR. PASCHAL:

18       Q.   Ira, you can turn to the interrogatory and

19   read it if you would like.

20       A.   What page?

21       Q.   It's on page four.

22       A.   What is your question?

23       Q.   Nowhere in here do you mention that you're

24   seeking a permanent injunction for David Kleiman's

25   Bitcoin for Patrick Paige, Carter Conrad and Computer
```

```
 1   Forensics?

 2            MR. FREEDMAN:  Objection.

 3            THE WITNESS:  I don't know.

 4   BY MR. PASCHAL:

 5       Q.   Ira, it's really a yes or no.  In this answer

 6   do you mention that you're seeking an injunction against

 7   Patrick Paige, Carter Conrad and Computer Forensics?

 8   You're under oath today just like you were under oath

 9   under these interrogatories.

10            MR. FREEDMAN:  Objection.

11            THE WITNESS:  My attorneys drafted this and I

12       don't -- I don't completely understand what an

13       injunction is.

14   BY MR. PASCHAL:

15       Q.   Well, without understanding what an injunction

16   is you do allege here in Computer Forensics' complaint

17   that to the extent that Computer Forensics, Paige,

18   Conrad have retained any Bitcoin wallets that were the

19   personal property of David Kleiman, Computer Forensics

20   should be enjoined from monetizing, transferring or

21   otherwise converting Bitcoin to its use or its use to

22   third parties.  Do you understand the allegation you

23   made?

24            MR. FREEDMAN:  Objection.

25            THE WITNESS:  No.
```

```
 1   BY MR. PASCHAL:
 2        Q.   So if there is a similar allegation in the
 3   Second Amended Complaint which you filed against
 4   Dr. Wright you wouldn't understand that allegation
 5   either, would you?
 6             MR. FREEDMAN:  Objection.
 7             THE WITNESS:  I didn't draft the complaints.
 8   BY MR. PASCHAL:
 9        Q.   Did you look at them?
10        A.   Yes.
11        Q.   Did you review them?
12        A.   Yes.
13        Q.   Did you say it's okay to file this?
14        A.   Yes.
15        Q.   Are did you look at these interrogatories?
16        A.   Yes.
17        Q.   Did you review them?
18        A.   Yes.
19        Q.   Did you swear under the penalty of perjury
20   that these answers are correct?
21        A.   Yes.
22             MR. FREEDMAN:  Objection.
23   BY MR. PASCHAL:
24        Q.   Are they correct?
25             MR. FREEDMAN:  Objection.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 103

```
 1              THE WITNESS:  I don't know entirely.

 2   BY MR. PASCHAL:

 3        Q.   So do you have any basis to support the

 4   allegation you're making here in the Computer Forensics

 5   complaint?

 6              MR. FREEDMAN:  Objection.

 7              THE WITNESS:  I believe so at the time.

 8   BY MR. PASCHAL:

 9        Q.   And what was that?  What evidence?  What

10   documents?

11        A.   I thought it was possible that they retain --

12   being that they were partners with Dave they may have

13   shared equipment, they may have had access to Dave's

14   property.

15        Q.   So Ira, just -- your testimony today is that

16   you made that allegation because they were partners with

17   Dave and they had access to Dave's information?

18              MR. FREEDMAN:  Objection.  There's no question

19        pending.

20              MR. PASCHAL:  There is a question.

21              MR. FREEDMAN:  What's the question?  Do you

22        want to read it back?

23              MR. PASCHAL:  Read the question back.

24              (Thereupon, a portion of the record

25              was read back by the reporter.)
```

```
 1                MR. FREEDMAN:  It's not a question.

 2   BY MR. PASCHAL:

 3        Q.   Add a question mark.  That's a question.  Is

 4   that your testimony today?

 5        A.   We're talking about Computer Forensics?

 6        Q.   Computer Forensics, this allegation.

 7        A.   Yes, because I believe that they had access to

 8   Dave's --

 9        Q.   Sorry, go ahead.

10        A.   To Dave's -- well, property that they shared

11   with Dave.

12        Q.   That was enough for you to file a complaint

13   against Computer Forensics?

14                MR. FREEDMAN:  Objection.

15                THE WITNESS:  That's not what solely the

16        complaint was about.

17   BY MR. PASCHAL:

18        Q.   I'm talking about this very sentence, these

19   two sentences I mentioned.

20                MR. FREEDMAN:  Objection.

21                THE WITNESS:  I suppose so.

22   BY MR. PASCHAL:

23        Q.   Getting back to this though are there any

24   communication aside from with your lawyers or any

25   documents showing why you decided to leave out this
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                Page 105

```
 1    injunction or mention of the injunction in your
 2    interrogatories?
 3              MR. FREEDMAN:  Objection.
 4              THE WITNESS:  I don't know.
 5    BY MR. PASCHAL:
 6         Q.   We talked about three or four hard drives
 7    earlier that you gave to Dr. Wright after Dave died.
 8    Let me repeat the question.  That there were three to
 9    four hard drives you gave to Patrick one month after
10    Dave died?
11         A.   (Indicating).
12         Q.   Could Bitcoin address, Bitcoin wallets have
13    been on those hard drives?
14              MR. FREEDMAN:  Objection.
15              THE WITNESS:  I was told that they were just
16         work related drives.
17    BY MR. PASCHAL:
18         Q.   And who told you that?
19         A.   Patrick.
20         Q.   The person you're suing?
21         A.   Yes.
22         Q.   And that lawsuit is still active today?
23         A.   Yes.
24         Q.   Ira, did you ever notify this court in this
25    action that you have a separate action where you're
```

```
 1   seeking the same stuff against three other people?

 2            MR. FREEDMAN:  Hold on.  Where are you in your

 3       topics?

 4            MR. PASCHAL:  I'm just asking him.

 5            MR. FREEDMAN:  Don't answer the question.

 6   BY MR. PASCHAL:

 7       Q.   Ira, let's talk about as a personal

 8   representative when you came in possession of Dave's

 9   stuff.  When did you learn that Dave passed away?

10       A.   Around April -- I think it was 27, 28 of 2013.

11       Q.   So if Dave passed on the 26th you learned the

12   day after, two days after?

13       A.   I think so.

14       Q.   Where were you?

15       A.   I don't exactly recall.  Probably home.

16       Q.   Do you remember what you were doing when you

17   found out that Dave died?

18       A.   No.

19       Q.   Do you remember what time of the day it was?

20       A.   No.

21       Q.   Do you remember who told you?

22       A.   Yes, my dad.

23       Q.   Did you go to his house right away?

24       A.   Go to whose house?

25       Q.   Your brother, Dave.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                    Page 107

```
 1        A.    No.

 2        Q.    When did you go to Dave's house after you

 3    learned that he died?

 4        A.    Probably maybe two or three weeks afterwards.

 5        Q.    Did you go to your dad's house right after you

 6    learned that Dave died?

 7        A.    I don't remember.

 8        Q.    Do you remember what you did after you learned

 9    that Dave died?

10            MR. FREEDMAN:  Objection.

11            THE WITNESS:  I just remember talking to my

12        dad about it.

13    BY MR. PASCHAL:

14        Q.    But you don't remember anything else?

15        A.    No.

16        Q.    Ira, would it be fair to say that you weren't

17    really close with Dave?

18            MR. FREEDMAN:  Objection, stop.  What does

19        this go to?

20    BY MR. PASCHAL:

21        Q.    Let me rephrase.  You don't have personal

22    knowledge relating to Dave's business activities, do

23    you?

24        A.    No.

25        Q.    I'm showing you an e-mail exchange you had
```

```
 1   with Angie Ojea, is that how you say her last name?

 2        A.   Angie Ojea.

 3             (Defendant's Exhibit No. 14 was

 4             marked for identification.)

 5   BY MR. PASCHAL:

 6        Q.   Can you turn to -- do you remember this

 7   e-mail?  Take a look at it.

 8        A.   The one at the very top?

 9        Q.   Do you remember this e-mail in general?  Do

10   you remember having this e-mail conversation with

11   Angela?

12        A.   I remember having a few e-mail exchanges.

13        Q.   If you go to page six.

14        A.   Okay.

15             MR. FREEDMAN:  These aren't Bates stamped.

16             MR. PASCHAL:  No, these are the ones you

17        produced to us.  I guess when I printed them out

18        they didn't have the Bates stamp.

19   BY MR. PASCHAL:

20        Q.   Not important.  Somewhere in this e-mail you

21   mentioned you hired a cleaning crew?

22        A.   Yes.

23        Q.   The cleaning crew found bullet casing?

24        A.   Yes.

25        Q.   Did you take out Dave's work papers and
```

```
 1   electronic devices before the cleaning crew cleaned the

 2   house?

 3        A.   No.  I definitely did not.

 4        Q.   Can you tell me the name of the cleaning crew?

 5        A.   I don't have it off --

 6        Q.   Do you have any documents showing who the

 7   cleaning crew is?

 8        A.   I think I can get the name.

 9             MR. PASCHAL:  Can you give us that?

10             MR. FREEDMAN:   (Indicating).

11   BY MR. PASCHAL:

12        Q.   Did the cleaning crew find anything else other

13   than the bullet casing that they mentioned to you?

14        A.   That was the only thing they mentioned.

15        Q.   So how -- when did the cleaning crew clean

16   Dave's house?

17        A.   Maybe -- I don't remember exactly.  I'm

18   thinking maybe one or two weeks after.

19        Q.   Do you know when Dave's house was foreclosed?

20        A.   No.

21        Q.   Did you go by his house and check on his

22   things or did you already remove everything from the

23   house?

24             MR. FREEDMAN:  Objection.

25             THE WITNESS:  What time are you talking about?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 110

```
 1   BY MR. PASCHAL:

 2        Q.   After he died -- before the house was

 3   foreclosed on did you already remove Dave's belongings

 4   from the house?

 5        A.   I don't know exactly.  Are you talking like

 6   after the cleaning crew?

 7        Q.   No.  So before Wells Fargo finished the

 8   foreclosure sale --

 9        A.   I don't know when that was.

10        Q.   I know but let's say it's this date.  Any time

11   before that date did you remove Dave's electronic

12   devices, his papers, his possessions?

13             MR. FREEDMAN:  Objection.

14   BY MR. PASCHAL:

15        Q.   Or were they foreclosed with his stuff still

16   in the house?

17             MR. FREEDMAN:  Objection.

18             THE WITNESS:  I don't know when they

19        foreclosed.

20   BY MR. PASCHAL:

21        Q.   Did you ever take all of Dave's stuff out of

22   the house?

23        A.   I don't think I took everything.

24        Q.   Stuff was left in the house though?

25        A.   Yes.
```

```
 1        Q.    Who else had access to Dave's house?

 2        A.    I think his girlfriend at the time, Lyneda.

 3        Q.    What about after his death who had access to

 4   the house?

 5        A.    I'm not sure if -- I'm not sure if anyone

 6   else -- I had his key.

 7        Q.    Did you change his locks?

 8        A.    No.

 9        Q.    Did you have a security system on the house?

10        A.    I think he did.

11        Q.    Was it active after he died?

12        A.    I don't remember using a security system to

13   get in.  I just used the key.

14        Q.    Were you paying the electrical bill for the

15   house?

16        A.    I didn't.  I don't believe.

17        Q.    Was anybody paying the electric bill for the

18   house?

19        A.    Not that I'm aware of.

20        Q.    So there was no electricity in the house as

21   far as you're aware after he died?

22        A.    I'm trying to -- I don't remember.

23        Q.    So if there was no electricity in the house

24   the house was going into foreclosure -- strike that.

25   Can you definitively say whether or not there was any
```

```
 1   other electronic devices in the house you may have not

 2   known about?

 3              MR. FREEDMAN:  Objection.

 4              THE WITNESS:  I believe I collected all of the

 5         equipment that I visibly saw.

 6   BY MR. PASCHAL:

 7         Q.   But there was still stuff in the house; right?

 8         A.   Like furniture.

 9         Q.   Did you check all the furniture to see what

10   was in them?

11         A.   I don't remember.

12         Q.   So if something was important in some of his

13   furniture you wouldn't be able to tell us that; right?

14              MR. FREEDMAN:  Objection.

15              THE WITNESS:  I don't remember searching

16         through his furniture.

17   BY MR. PASCHAL:

18         Q.   Sorry, what did you say?

19         A.   I don't remember searching through his

20   furniture.

21         Q.   When you saw -- so Dave had two Alienware

22   computers and a laptop?

23         A.   Yes.

24         Q.   Was the Alienware -- was it -- was the

25   Alienware computer was it the color black?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                 Page 113

1     A.   Yes.

2     Q.   One of them was, right?

3     A.   I believe both.

4     Q.   Were the hard drives in the computer or were

5  they out of them when you got the Alienware computer?

6     A.   They were out of them.

7     Q.   Was there any evidence in the house showing

8  why the hard drives were removed from the computers?

9          MR. FREEDMAN:  Objection.

10         THE WITNESS:  No.  I don't think so.

11 BY MR. PASCHAL:

12    Q.   Did Dave typically keep his hard drives out of

13 his computer?

14    A.   I don't know what he did.

15    Q.   On the ESI disclosure you listed one phone but

16 you said that Patrick had destroyed Dave's phone so what

17 phone -- did Dave have two phones?

18    A.   Yes.

19    Q.   What phone -- do you remember the make and

20 model of the phone you gave to Patrick Paige?

21    A.   I believe it was a Samsung Galaxy.  I don't

22 remember the model.  It's probably listed in --

23    Q.   It's in the disclosures.  No, it's not

24 actually.  It's a Samsung Galaxy?

25    A.   That's all it says?

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                                    Page 114

```
 1          Q.    I'm asking you.

 2          A.    Yes, it was a Samsung Galaxy.

 3          Q.    Did you see any devices used for Bitcoin

 4    mining, Bitcoin servers, anything?

 5          A.    Not that I'm aware of.  I wouldn't know what a

 6    Bitcoin mining server would look like.

 7          Q.    Would you have known what a Bitcoin wallet

 8    looks like?

 9          A.    No.

10          Q.    So if you saw one you wouldn't have thought it

11    was important, would you?

12                MR. FREEDMAN:  Objection.

13                THE WITNESS:  If I saw one?  I suppose not.  I

14          wouldn't know how to detect what a Bitcoin wallet

15          was.

16    BY MR. PASCHAL:

17          Q.    If he had a wallet for example on paper and it

18    just had random letters and numbers on it you wouldn't

19    have known that was a Bitcoin wallet; right?

20                MR. FREEDMAN:  Objection.

21                THE WITNESS:  I suppose not.

22    BY MR. PASCHAL:

23          Q.    So when you threw papers away that you thought

24    weren't important you could have thrown away one of

25    those papers that had a Bitcoin wallet on it; right?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT

IRA KLEIMAN on 04/08/2019                                            Page 115

```
 1                MR. FREEDMAN:  Objection.

 2                THE WITNESS:  It's possible, yes.

 3                MR. PASCHAL:  Let's go to the ESI disclosure.

 4        I haven't given that to you, I'm sorry.

 5                (Defendant's Exhibit No. 15 was

 6                marked for identification.)

 7   BY MR. PASCHAL:

 8        Q.   On this ESI disclosure under number one you

 9   list David Kleiman's e-mail accounts.  You list five.

10   You see that?

11        A.   Yes.

12        Q.   Do you have access to all five e-mail

13   accounts?

14        A.   I don't believe so.

15        Q.   Which ones do you not have access to?

16        A.   I would have to check.  I don't remember

17   offhand.

18        Q.   Do you know which e-mail account you do have

19   access to?

20        A.   I have access to Dave@█████████████.

21        Q.   But you're not sure about the rest?

22        A.   I don't believe I have access to the two on

23   the bottom.  The two at the top I'm not sure about.

24        Q.   Have you tried to log into those?

25        A.   I may have.
```

1    Q.    When did --

2    A.    I just don't remember at the present time.

3    Q.    So you don't remember any efforts you took to

4    access those e-mail accounts, do you?

5          MR. FREEDMAN:  Objection.

6          THE WITNESS:  Like I said I do recall

7    accessing Dave@███████████ .

8    BY MR. PASCHAL:

9    Q.    The first two and last two?

10   A.    The first two I don't remember.

11   Q.    The last two what did you do to access those

12   accounts?

13   A.    I think I recovered the domain names to those

14   but I don't think I ever like set up an active account

15   for them.  So I don't think those e-mail addresses work.

16   Q.    So when you say you have the domain name you

17   should be able to get access then to the e-mail address,

18   right?

19   A.    No, not unless you set up an account for it.

20   Q.    You haven't set up an account for these?

21   A.    I don't believe so.

22   Q.    Could you set up an account?

23   A.    Yes.

24   Q.    Why haven't you?

25   A.    Just there's no purpose.  If I set up an

```
 1   account it's not going to suddenly give me access to

 2   e-mails that were sent to those addresses a long time

 3   ago.

 4        Q.   Why not?

 5        A.   It's just because his e-mails were hosted

 6   elsewhere.

 7        Q.   Where were they hosted?

 8        A.   I think they were hosted with Patrick's

 9   company, Computer Forensics LLC.

10        Q.   All five of his e-mail addresses were hosted

11   by Patrick?

12        A.   I believe so.

13        Q.   Did Patrick give you access to these e-mail

14   accounts?

15        A.   It's possible after the litigation with

16   Patrick that he gave me those.  I would to check the

17   records.

18        Q.   You said through the litigation, through the

19   lawsuit?

20        A.   Yes.

21        Q.   When do you think you got access -- when do

22   you think that Patrick may have given you access to

23   those e-mail accounts?

24        A.   I would have to go back and look at the

25   records.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019

Page 118

```
 1        Q.    I just want to know the process.   For
 2   Patrick -- it would just be Patrick he can access the
 3   e-mail accounts and give you the documents in them?
 4        A.    I'm not exactly sure what access he had to
 5   those accounts after Dave passed.
 6        Q.    Did you request from Patrick access to those
 7   e-mails before you filed this lawsuit?
 8        A.    Before this lawsuit?
 9        Q.    Before this lawsuit.
10        A.    I believe so.
11        Q.    And he never gave them to you?
12        A.    I think eventually yes, he did.
13        Q.    So we haven't received any production from
14   these e-mail addresses.   Why haven't we?
15             MR. FREEDMAN:  Objection.
16             THE WITNESS:  I don't know if we've -- if
17        they're currently active.  Like I said the only one
18        that I know for certain is Dave@███████████.
19        The others I have to check.
20   BY MR. PASCHAL:
21        Q.    So Patrick obviously can help get access to
22   these two e-mail address; right?
23             MR. FREEDMAN:  Objection.
24             THE WITNESS:  I don't know.  I don't know what
25        access he had to them.  For Dave@████████, yes.
```

```
 1    BY MR. PASCHAL:

 2         Q.   Did you access Dave Kleiman -- the one you can

 3    access before you filed this lawsuit?

 4         A.   Well, it only allowed me to set up a new

 5    account.  Like once I received the domain name from that

 6    point forward I start getting new e-mail to it.

 7    BY MR. PASCHAL:

 8         Q.   Not old e-mails?

 9         A.   Not old e-mail.

10         Q.   What about the Dave@▓▓▓▓▓▓▓▓▓?

11         A.   That's what I'm talking about.  Once I

12    received the domain at that point --

13         Q.   Do you have any old e-mails?  I'm sorry.  Do

14    you want me to repeat the question because I wasn't

15    finished?

16         A.   I may have some old that Patrick produced.  I

17    have to check.

18         Q.   So the only -- I want to break this down.  So

19    the only e-mails that you have from Dave are coming from

20    Patrick; right?

21              MR. FREEDMAN:  Objection.

22              THE WITNESS:  Yes.

23    BY MR. PASCHAL:

24         Q.   So none of them are coming from these five

25    e-mail addresses directly?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 120

```
 1              MR. FREEDMAN:  Objection.

 2              THE WITNESS:  Like I said I would have to go

 3         back and look at those accounts to see if I have

 4         access to them.  Like I said the two at the bottom

 5         I'm certain I never accessed.  The two at the top I

 6         have to check.

 7    BY MR. PASCHAL:

 8         Q.   Just back on my question.  Did you review any

 9    documents from these e-mail accounts before you filed

10    this lawsuit?

11              MR. FREEDMAN:  Obviously don't answer anything

12         to the extent it involves conversations with your

13         attorneys.

14              THE WITNESS:  I have to go back and look at

15         what records were produced.

16    BY MR. PASCHAL:

17         Q.   What e-mail account is verifymail@███████?

18         A.   Which one?

19         Q.   Verifymail@███████.

20         A.   I think it was just like a temporary account

21    that I set up for my attorneys.

22         Q.   Them being them?

23         A.   Yes.

24         Q.   Do you have separate attorneys in the Computer

25    Forensics lawsuit?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 121

```
 1        A.    I had separate, yes.

 2        Q.    Do you have attorneys in the lawsuit now?

 3        A.    Currently, no.

 4        Q.    So I think you have about 35 e-mail addresses

 5   give or take, I don't know.  Why so many?

 6        A.    I don't know.

 7        Q.    I want to ask you about one e-mail address in

 8   particular.  It's on the second page and I don't know

 9   what number it is but it's WrightKleiman@███████.

10   What's the purpose of that e-mail account?

11        A.    It probably had something to do with the

12   litigation but I would have to look at it to see.  I

13   don't remember offhand.

14        Q.    Have you produced documents from that e-mail

15   account?

16        A.    I don't know.

17        Q.    I think we have one document which you

18   produced to us where you communicated with the ATO which

19   is this e-mail address?

20        A.    Maybe that's what it was.

21        Q.    Do you recall in this e-mail asking ATO if

22   they're continuing to investigate your brother and

23   Craig?

24        A.    Can you repeat that?

25        Q.    Do you remember if in that e-mail if you asked
```

```
 1    the ATO whether they're investigating your brother as in

 2    Dave Kleiman and Craig Wright?

 3         A.   I don't specifically remember what I discussed

 4    with them.

 5         Q.   Did the ATO ever tell you we're not

 6    investigating David Kleiman?

 7         A.   They never mentioned that to me.

 8              MR. PASCHAL:  I'm showing you your e-mail to

 9         Michael Hardy on June 30th 2015.

10              (Defendant's Exhibit No. 16 was

11              marked for identification.)

12    BY MR. PASCHAL:

13         Q.   At the bottom you say "dear Mr. Hardy, I

14    understand that you are investigating a case involving

15    my brother David Kleiman and his partner Craig Wright.

16    Could you tell me if you are still seeking new

17    information regarding this case or if it was closed can

18    you tell me when.  Thank you, Ira Kleiman."  Do you

19    remember that?

20         A.   Yes.

21         Q.   And at the top -- I guess he doesn't give you

22    an answer but at the top you say "what you can confirm

23    there is presently no investigation of Dr. Craig Wright

24    and my brother."  You see that?

25         A.   Yes.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 123

```
 1        Q.   Did Mr. Hardy ever tell you one way or the
 2   other or give you an answer to that question one way or
 3   another?
 4        A.   I guess if there's no e-mail to it probably
 5   not.
 6        Q.   So was WrightKleiman@██████     was it used
 7   for any other reason?
 8        A.   Not that I remember.
 9        Q.   Let's talk about Coin Exchange briefly.  You
10   had 10.5 million shares in Coin Exchange; right?
11        A.   Yes.
12        Q.   Now, you understand that Coin Exchange is
13   under the control of an Australian liquidator; right?
14        A.   I didn't know who took control of it.
15        Q.   Is it your testimony today that you don't know
16   who took control of it?
17        A.   Yes, I wasn't sure what happened with Coin
18   Exchange.  I knew a liquidator was trying to find out
19   information about Coin Exchange but I'm not exactly sure
20   what activity they did.
21             MR. PASCHAL:  I'm showing you an e-mail with
22        Mr. Jeremy Mudford.  And these are August 31st
23        2017.
24             (Defendant's Exhibit No. 17 was
25             marked for identification.)
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 124

```
 1   BY MR. PASCHAL:
 2        Q.   Is Jeremy Mudford, is he the liquidator for
 3   Coin Exchange?
 4        A.   That's what he told me, yes.
 5        Q.   I want you to look at his e-mail to you
 6   August 29, 2017.  Do you recall discussing W&K that you
 7   believe that Dr. Wright transferred assets from W&K to
 8   Coin Exchange and then to other various entities?
 9        A.   Are you referring to an e-mail?
10        Q.   I'm just asking.  Do you remember telling
11   Jeremy Mudford that, yes or no?
12        A.   Can you repeat that?
13        Q.   Do you remember telling Jeremy Mudford that
14   Dr. Wright transferred from W&K assets to Coin Exchange
15   and then to other entities that he was involved in?
16        A.   I don't remember specifically saying that but
17   if you show me the e-mail --
18        Q.   I'll show it to you in a second.  Let's go to
19   the bottom here.  On Jeremy Mudford's e-mail to you
20   August 29, 2017?
21        A.   First page?
22        Q.   Yes.
23        A.   Of course.
24        Q.   It says "dear Ira, I referred to your e-mail
25   below in your prior e-mail correspondence regarding the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                      Page 125

1    company.  Besides the information provided which

2    predominately has consisted of various blog site

3    articles it would be appreciated if you could provide

4    any tangible evidence that the company, being Coin

5    Exchange, and/or its related entities" and you were

6    talking about W&K "that we have been appointed over any

7    IP which may include related to Bitcoin.  In the interim

8    our preliminary investigations do not reveal any

9    trademark registration to the company name" and then he

10   refers you to two links supporting his conclusion.  Do

11   you recall that e-mail?

12        A.   Yes.

13        Q.   This is in 2017.  In 2018 do you have any

14   communications with Jeremy Mudford?

15        A.   Do you have any e-mails that --

16        Q.   I don't.  That's why I'm asking.

17        A.   I don't know.

18        Q.   Do you have any e-mails for 2019?

19        A.   Pretty sure, no.

20        Q.   Let's talk about W&K.  You said you first

21   learned of W&K through Dr. Wright; is that correct?

22        A.   Yes.

23        Q.   At the time -- well, you reinstated W&K as a

24   company in I think it was March of 2018; correct?

25        A.   I don't remember the date.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Page 126

```
 1        Q.    But you reinstated it; correct?

 2        A.    Yes.

 3        Q.    When you reinstated W&K what was its business

 4   purpose?

 5              MR. FREEDMAN:  Hold on.  Where are you in your

 6        topics?

 7              MR. PASCHAL:  W&K, information regarding W&K.

 8              MR. FREEDMAN:  I don't see a general

 9        information regarding W&K.  Maybe I'm missing it.

10              MR. PASCHAL:  I guess this is going to go to

11        the location of W&K's proprietary documents and

12        information slips identified W&K purchases, bit

13        message account, Panama and also W&K's membership.

14              MR. FREEDMAN:  What was the question?  Can you

15        read it back?

16              (Thereupon, a portion of the record

17              was read back by the reporter.)

18              MR. FREEDMAN:  Don't answer the question.

19   BY MR. PASCHAL:

20        Q.    Can you tell me what W&K's business purpose

21   ever was?

22              THE WITNESS:  According to Craig it was for

23        research purposes and mining of Bitcoin.

24   BY MR. PASCHAL:

25        Q.    Based on your personal knowledge what was the
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 127

```
 1    business purpose of W&K?

 2        A.   Like I said according to Craig --

 3        Q.   Not according to Craig.  Based on your own

 4    personal knowledge?

 5        A.   My own personal knowledge about W&K came from

 6    Craig Wright.

 7        Q.   So you have no testimony, documents or

 8    evidence other than Craig Wright?

 9        A.   Correct.

10        Q.   About W&K?

11        A.   What's that?

12        Q.   About W&K?

13        A.   Yes.

14        Q.   When you reinstated W&K you removed Coin

15    Exchange and Ms. Uyen as its publicly identified

16    members, do you recall that?

17             MR. FREEDMAN:  Can you repeat the question?

18        Sorry, I didn't hear.

19             (Thereupon, a portion of the record

20             was read back by the reporter.)

21             MR. FREEDMAN:  Don't answer the question.  I

22        don't see where it connects to your topics about

23        W&K's e-mail addresses, bit message accounts or W&K

24        Panama.

25             MR. PASCHAL:  I'm asking about proprietary
```

```
 1        documents about W&K.  That includes W&K's

 2        membership and its filings with Sunbiz.org.  That

 3        is the definition of proprietary documents.

 4             MR. FREEDMAN:  And the location.

 5             MR. PASCHAL:  Also very basic allegation in

 6        the second amended complaint.

 7             MR. FREEDMAN:  You'll have another chance to

 8        depose Ira when you can go to the merits.  Right

 9        now you're supposed to be asking location

10        proprietary documents.

11   BY MR. PASCHAL:

12        Q.   Do you have documents establishing W&K's

13   membership?

14        A.   From like SunBiz?

15        Q.   Do you have any documents establishing W&K's

16   membership?

17        A.   The only documents would be whatever I found

18   on the SunBiz web site.

19        Q.   Does SunBiz.org list every member of a

20   company?

21        A.   I don't know.

22             (Thereupon, a portion of the record

23             was read back by the reporter.)

24             THE WITNESS:  No, I don't know.

25
```

```
1    BY MR. PASCHAL:

2         Q.    Do you have any documents from the Department

3    of Finance telling you that SunBiz.org you cannot rely

4    on it to determine the membership of a company?

5              MR. FREEDMAN:   Objection.

6              THE WITNESS:   No.

7    BY MR. PASCHAL:

8         Q.    You do not -- is it your testimony you do not

9    have a document stating that?

10        A.    The Department of Finance -- say that again?

11        Q.    From the Department of Finance stating that

12   you cannot rely on SunBiz.org to determine membership of

13   the company?

14        A.    I'm not aware of it.

15        Q.    Before you filed this lawsuit or before you

16   filed your amended complaint in this lawsuit are there

17   any documents with Jeremy Mudford where you discussed

18   removing Coin Exchange as a member of W&K?

19        A.    Discussing with Jeremy Mudford?

20        Q.    The liquidator for Coin Exchange.

21        A.    I don't believe so.

22        Q.    Do you have any documents that are resignation

23   letters from any members of W&K before you reinstated

24   and listed yourself as the member of W&K?

25        A.    No.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 130

```
 1          Q.   Did you take out any loans on W&K's behalf?

 2          A.   Not that I'm aware of.

 3          Q.   Are you paying -- are there any tax returns

 4     right now for W&K or any tax information for W&K?

 5          A.   No.

 6          Q.   Are you paying W&K's taxes?

 7          A.   No.

 8          Q.   Do you know who last paid W&K's taxes?

 9          A.   No.

10          Q.   Does W&K have any revenue for this year?

11          A.   Not that I'm aware of.

12          Q.   Does W&K have any revenue from last year?

13          A.   Not that I'm aware of.

14          Q.   Are you conducting any business on behalf of

15     W&K?

16          A.   Me personally?

17          Q.   Yes.

18          A.   No.

19          Q.   Is anyone conducting business on behalf of

20     W&K?

21          A.   No.

22          Q.   Has W&K assigned any of its rights in this

23     lawsuit to anyone else?

24               MR. FREEDMAN:  Hold on.  What topic are you

25          on?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                Page 131

```
 1    BY MR. PASCHAL:
 2         Q.   Are there any documents showing whether or not
 3    W&K assigned any of its interest in its lawsuit to
 4    anyone else?
 5              MR. FREEDMAN:  Don't answer the question.
 6              MR. PASCHAL:  Under what basis?
 7              MR. FREEDMAN:  If such documents exist they
 8         would be work product.
 9              MR. PASCHAL:  An assignment of a claim?  That
10         would be work product?
11              MR. FREEDMAN:  You don't like the instruction
12         bring it to the judge.
13              MR. PASCHAL:  I'm just trying to get it.  I
14         just want the record to be complete on the
15         objection.  So you're saying that an assignment of
16         claim is going to be protected by work product?
17              MR. FREEDMAN:  Either work product or
18         attorney-client privilege or the common interest
19         privilege, yes.
20    BY MR. PASCHAL:
21         Q.   We'll skip this.  Have the allegations that
22    you made in this lawsuit or this second amended
23    complaint or the amended complaint or its original
24    complaint been given to any third party other than your
25    attorneys?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 132

```
 1                   MR. FREEDMAN:  Objection.

 2                   THE WITNESS:  I believe so.

 3      BY MR. PASCHAL:

 4           Q.   Who are those third parties?

 5           A.   A company that assists in funding litigation

 6      cases.

 7           Q.   What's the name of that company?

 8           A.   Parabelum.

 9           Q.   Can you say that again?

10           A.   Parabelum.

11           Q.   When did you give that complaint to Parabelum?

12           A.   I don't remember the date.

13           Q.   When did you first meet Parabelum?

14           A.   I don't remember the date.

15           Q.   Was it 2016?

16           A.   I would have to go look at the records.

17           Q.   Did Parabelum give you any money?

18                   MR. FREEDMAN:  Hold on.  What topic are you

19           on?

20                   MR. PASCHAL:  This goes to -- this really goes

21           to 31 but he just answered something different so

22           I'm --

23                   MR. FREEDMAN:  How does it go into 31?  I

24           don't see how it ties into 31.  If you want to ask

25           it with a tie in to 31 I'm happy to listen to it,
```

 1   otherwise don't answer the question.

 2        MR. PASCHAL:  Let me break that down in two

 3   things.  One, we asked questions about this

 4   regarding interrogatories, you objected.  We spoke

 5   on the phone yesterday we told you we would lay the

 6   record here so the judge could make a ruling based

 7   on the record and we wrote these topics what we

 8   knew.  I can't give exact topics on events because

 9   I just didn't know your witness would say that.  I

10   can't -- I mean --

11        MR. FREEDMAN:  I had the same problem deposing

12   Dr. Wright.

13        MR. PASCHAL:  That's the problem.  That's not

14   here right now.  I wasn't there.

15        MR. FREEDMAN:  Just saying the parties kept

16   each other to their topics.  Your team members kept

17   me to my topics so keeping you to your topics.

18   Goose gander provision.

19        MR. PASCHAL:  Did Parabelum give you any

20   money?

21        MR. FREEDMAN:  Don't answer the question.

22        MR. PASCHAL:  What's the basis?

23        MR. FREEDMAN:  First of all, I think you're

24   outside the topic.  Second of all -- I think you're

25   outside the topic.  I'm just going to rely on you

```
 1        being outside the topic.

 2   BY MR. PASCHAL:

 3        Q.    Who is BTCN1610491, LLC?

 4        A.    I think that's a company related to the entity

 5   that assists in litigation funding.

 6        Q.    Is that Parabelum?

 7        A.    Yes.

 8        Q.    So when did you first speak with Parabelum?

 9        A.    Like I said I would have to check the records.

10        Q.    Did BTCN or Parabelum give you any money?

11              MR. FREEDMAN:  Hold on.  We're going to

12        instruct Ira not to answer the question.

13              MR. PASCHAL:  On what basis?

14              MR. FREEDMAN:  A, on relevance and -- stay

15        with relevance for now.

16   BY MR. PASCHAL:

17        Q.    Under what circumstances did BTCN give you

18   money?

19              MR. FREEDMAN:  Stop.  Hold on a second.

20        Trying to figure out the position to take on your

21        question.  If you want to just stop or you want

22        take a break?

23              MS. MCGOVERN:  Let's take five minutes.

24              THE VIDEOGRAPHER:  The time is 2:08 p.m. and

25        we're off the record.
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 135

```
 1              (Thereupon, a brief recess was taken.)

 2              THE VIDEOGRAPHER:  The time is now 2:23 p.m.

 3         and we are now back on the record.

 4              MR. FREEDMAN:  So we just spoke with our

 5         client.  I'm going to state for the record that

 6         BTCN is owned by Parabelum Capital which is an

 7         entity that provides litigation financing

 8         assistance.  Parabelum has provided litigation

 9         financing assistance in this case.

10              I am not going to allow Ira to answer any

11         other questions about that topic because I believe

12         it will invade either work product privilege,

13         attorney-client privilege or common interest

14         privilege.  If you want more you have to go to the

15         court but I think your record is clear now what's

16         going on and what more you would want.

17              MR. PASCHAL:  There are a few things I want.

18              MR. FREEDMAN:  You can ask but I most likely

19         will instruct him not to answer.

20    BY MR. PASCHAL:

21         Q.   When did you first speak to Parabelum?

22              MR. FREEDMAN:  That you can answer.

23              THE WITNESS:  I would have to go back and

24         check the records.

25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 136

```
 1   BY MS. MCGOVERN:
 2        Q.    What records would you have to check?
 3        A.    I guess e-mail exchanges with them.
 4        Q.    Did you give Parabelum documents relating to
 5   this case?  You don't have to say what documents?
 6             MR. FREEDMAN:  Go ahead.
 7             THE WITNESS:  I would have to check my
 8        records.
 9   BY MR. PASCHAL:
10        Q.    What records would you have to check?
11        A.    E-mail.
12        Q.    E-mail?  Did you sign any documents with
13   Parabelum?
14             MR. FREEDMAN:  That's fine.  Go ahead and
15        answer that question.
16             THE WITNESS:  I don't remember.  I have to
17        check that too.
18   BY MR. PASCHAL:
19        Q.    Did W&K or the estate of Dave Kleiman --
20   strike that.  Are there any documents showing that Dave
21   Kleiman or the estate of Dave Kleiman or W&K assigned
22   any portion or any right in this lawsuit to Parabelum or
23   any third party?
24             MR. FREEDMAN:  Don't answer the question.
25             MR. PASCHAL:  What's the basis?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 137

```
 1                  MR. FREEDMAN:  I told you the basis.

 2   BY MR. PASCHAL:

 3        Q.   Are there any documents that give your right

 4   to recovery of any money to Parabelum or BTCN?

 5                  MR. FREEDMAN:  Don't answer the question.

 6   BY MR. PASCHAL:

 7        Q.   In connection with getting funding from

 8   Parabelum did you provide any documents to support any

 9   of the allegations of the complaint?

10                  MR. FREEDMAN:  Don't answer that.  Well, the

11             answer yes or no you can answer.  Just don't

12             identify what, if any, documents you provided.

13                  THE WITNESS:  Yes.

14   BY MR. PASCHAL:

15        Q.   What documents did you provide?

16                  MR. FREEDMAN:  Don't answer that.

17   BY MR. PASCHAL:

18        Q.   Are there any documents that you provided to

19   them that you haven't produced in this case?

20                  MR. FREEDMAN:  Don't answer that.

21                  MR. PASCHAL:  I'm showing you an e-mail you

22             had with Patrick Paige on March 24th 2016.

23                  (Defendant's Exhibit No. 18 was

24                  marked for identification.)

25
```

```
 1   BY MR. PASCHAL:

 2        Q.   In the e-mail you say "hey Patrick, I haven't

 3   heard back from you about the hosting file stuff.

 4   Anyway, there is another issue I was wondering if you

 5   can help me with.  I'm trying to locate any documents

 6   related to the W&K business Dave operated.  I remember

 7   we had a conversation at Dave's house shortly after he

 8   passed away.  You were mentioning to me how my dad was

 9   asking for the return of a file cabinet he bought for

10   Dave and you said something like what does your dad need

11   another file cabinet.  I was like I don't know I guess

12   he just wants it because he bought it.  Of course I

13   didn't think anything of it at the time but it just

14   donned on me maybe inside that cabinet is where Dave

15   stored his W&K related stuff.  You didn't possibly come

16   across any papers mentioning W&K."  Do you remember this

17   e-mail?

18        A.   Yes.

19        Q.   Did you ever recover that file cabinet?

20        A.   No.

21        Q.   Did you ever see what was in that file

22   cabinet?

23        A.   No.

24        Q.   Why did you believe that Dave may have kept

25   his W&K stuff in that file cabinet?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 139

```
 1                MR. FREEDMAN:  Objection.

 2                THE WITNESS:  I didn't know what was kept in

 3          the file cabinet.

 4    BY MR. PASCHAL:

 5          Q.   Well, I'm asking -- so --

 6          A.   I wanted to determine what was --

 7                MR. FREEDMAN:  There's no question pending,

 8          Ira.

 9    BY MR. PASCHAL:

10          Q.   Are there any documents showing or any

11    documents evidencing or supporting your belief that W&K

12    documents may have been inside that cabinet?

13          A.   No.

14                MR. PASCHAL:  I'm showing you an e-mail with

15          Patrick Paige on March 17, 2017.

16                (Defendant's Exhibit No. 19 was

17                marked for identification.)

18    BY MR. PASCHAL:

19          Q.   If you go on the second page on March 28th

20    2016 Patrick Paige says "what would Appriver support do

21    for us," question mark.  "Also I found the original

22    court mailing about W&K.  Has a case number, see

23    attached."

24                You respond -- you respond by saying I don't

25    know -- only relevant part is when did you find that W&K
```

1    filing question mark.  Were you ever contacted by the

2    girl Uyen that took over David's position as director

3    for W&K?  Patrick responds "I just found the filing

4    today and I was looking for something else.  I was never

5    contacted by anyone about W&K and never heard the girl."

6           Then you respond on the first sentence in the

7    next e-mail responding to Patrick "can you keep the

8    letter and envelope in a safe place for me?  I would

9    like to check it out some time."

10           Then Patrick responds "yes, I will keep it.

11   It seems weird that the address of the envelope is

12   handwritten considering it came from the Supreme Court."

13   How did Patrick get the original envelope from the

14   Australian case?

15           MR. FREEDMAN:  Objection.

16   BY MR. PASCHAL:

17       Q.   Strike that.  Do you know where Patrick found

18   the original court mailing about W&K?

19       A.   I assume it would be to the mailing address --

20   the Computer Forensics mailing address that they shared.

21       Q.   Was that the address that was listed for W&K

22   on SunBiz.org as the registered agent?

23       A.   I would have to check.  I don't remember what

24   that address is.

25       Q.   Could this envelope had been -- you sent this

```
 1    e-mail four days after you asked about the file cabinet.

 2    Could this envelope have been in the file cabinet?

 3         A.    I never asked Patrick where he found it.

 4         Q.    Did you ever recover the envelope from

 5    Patrick?

 6         A.    No, I think he just e-mailed me like a scan of

 7    it.

 8         Q.    What was the document?  What was the contents

 9    of the document?

10         A.    I would have to look at it.  I don't remember.

11         Q.    Was it the statement of claim in Australia?

12         A.    I would have to look at it.  I remember seeing

13    like an envelope but I don't remember what the contents

14    inside of it was.

15         Q.    So is it fair to say that something was mailed

16    from Australia with the W&K court case to a mailing

17    address in Palm Beach from either Computer Forensics or

18    Dave's house?

19              MR. FREEDMAN:  Objection.

20              THE WITNESS:  Again I would have to go look at

21         it to make sure what it was.

22    BY MR. PASCHAL:

23         Q.    Well, in your Second Amended Complaint you

24    allege that W&K was never served with the filings in the

25    Australian court.  Do you recall that?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                   Page 142

```
 1        A.    I believe --

 2              MR. FREEDMAN:  Objection.

 3              THE WITNESS:  I believe so.

 4   BY MR. PASCHAL:

 5        Q.    Did you make the allegation -- well,

 6   obviously -- you sent this e-mail before you made that

 7   allegation; correct?

 8        A.    I think so.

 9        Q.    And you never bothered -- sorry, you never

10   read that document before you filed the complaint?

11              MR. FREEDMAN:  Objection.

12              THE WITNESS:  I'm pretty sure I did.

13   BY MR. PASCHAL:

14        Q.    But you just don't remember what it says?

15        A.    I don't remember now.  I have to look at it.

16        Q.    Just earlier I asked you about two homes you

17   had.  I think one was on ██████████ that's the one you

18   you live in now?

19        A.    Yes.

20        Q.    Then you had one on ████████?

21        A.    ████████████.

22        Q.    You didn't sell your first home when you

23   purchased your second home; right?

24        A.    Correct.

25        Q.    You kept it until about 2018?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                              Page 143

```
 1        A.    I would have to check.  Possibly.

 2        Q.    On your second home there's no mortgage

 3   recorded for that house?

 4             MR. FREEDMAN:  Don't answer the question.

 5             MR. PASCHAL:  On what basis?

 6             MR. FREEDMAN:  What basis are you asking?

 7        Where does this tie into your topics?

 8             MR. PASCHAL:  Several of my topics.

 9             MR. FREEDMAN:  Which one of them, name one?

10             MR. PASCHAL:  Goes to the administration of

11        the estate and goes into --

12             MR. FREEDMAN:  Whether or not Ira Kleiman has

13        a mortgage on his house goes to the administration?

14             MR. PASCHAL:  That's my question.

15             MR. FREEDMAN:  I instruct him not to answer

16        unless you can convince me it comes into a topic.

17             MS. MCGOVERN:  We're just going to make the

18        record.

19   BY MR. PASCHAL:

20        Q.    Are there any documents showing where the

21   source of funds came to purchase the second home?

22             MR. FREEDMAN:  Don't answer.

23   BY MR. PASCHAL:

24        Q.    Did you purchase that home two or three weeks

25   after Craig first reached out to you?
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                               Page 144

```
 1        A.   I would have to check.  I don't remember.
 2        Q.   Would it sound about right if you purchased
 3   that home -- the finalized closing was in March of 2014?
 4             MR. FREEDMAN:  Objection.
 5             THE WITNESS:  I would have to check.  I know
 6        it was 2014.
 7   BY MR. PASCHAL:
 8        Q.   Then Craig first reached out to you in about
 9   February 2014?
10        A.   Right.
11        Q.   Telling you about Bitcoin?
12        A.   Yes.
13        Q.   You paid $450,000 cash for that house?
14             MR. FREEDMAN:  Objection, don't answer.
15   BY MR. PASCHAL:
16        Q.   Did the purchase of that house have anything
17   to do with the administration of the estate or Bitcoin?
18        A.   No.
19        Q.   Do you have documents reflecting that?
20             MR. FREEDMAN:  Objection.  You can answer.
21             THE WITNESS:  Showing that it didn't have
22        anything to do with --
23   BY MR. PASCHAL:
24        Q.   Yes.  That the source of funds for that house
25   did not come from Dave's possession, Bitcoin?
```

| 1 | A. I probably do. |
|---|---|

     1        A.    I probably do.

     2        Q.    What documents would that be?

     3        A.    I guess a check written by myself for the

     4   house.

     5        Q.    What about the underlying funds for that

     6   check?

     7             MR. FREEDMAN:  Objection.  I don't understand

     8        your question and it's touching on this area I've

     9        been instructing him not to answer so could you try

    10        to clarify what you mean?

    11   BY MR. PASCHAL:

    12        Q.    Were there any documents to show that the

    13   underlying funds to write a $450,000 check for that

    14   house are there any documents showing it didn't come

    15   from Dave's estate, from Bitcoin, from Dave's

    16   possession?

    17             MR. FREEDMAN:  So I don't want to instruct him

    18        not to answer if I can avoid it.  The problem is

    19        you're asking him about proving a negative.  Are

    20        you asking whether -- obviously you don't have to

    21        adopt my formulation just to see if I can get you

    22        the information you want.  Are you asking whether

    23        there's documents that identify where the funds

    24        actually came from?

    25             MR. PASCHAL:  I've asked that you've told him

```
 1        not to answer so I'm asking a different one.

 2             MR. FREEDMAN:  If you ask if there are

 3        documents that exist to show where the funds came

 4        from I'll allow him to answer.

 5             MR. PASCHAL:  Can you repeat my question,

 6        Mr. Court reporter, and then you can answer?

 7             (Thereupon, a portion of the record

 8             was read back by the reporter.)

 9             MR. FREEDMAN:  Don't answer.

10   BY MR. PASCHAL:

11        Q.   Are there any documents showing the source of

12   the funds to purchase the house came from?

13        A.   I imagine yes, there should be.

14        Q.   What documents would those be?

15             MR. FREEDMAN:  You can describe the types of

16        documents.  Don't go beyond that.

17             THE WITNESS:  Checks.

18   BY MR. PASCHAL:

19        Q.   That's it?

20        A.   Yes.  Personal checks.

21        Q.   Did the purchase of the house have anything to

22   do with the financing of this lawsuit?

23        A.   No.

24             MR. PASCHAL:  I think we're almost done so can

25        we take a break?
```

```
 1              MR. FREEDMAN:  Sure.

 2              THE VIDEOGRAPHER:  The time is now 2:38 p.m.

 3         and we're off the record.

 4              (Thereupon, a brief recess was taken.)

 5              THE VIDEOGRAPHER:  The time is 2:49 p.m. and

 6         we're back on the record.

 7    BY MR. PASCHAL:

 8         Q.   Ira, could you go back to your second amended

 9    complaint and that's probably Exhibit 2 or 3?

10              MR. FREEDMAN:  2.

11    BY MR. PASCHAL:

12         Q.   Can you go to page 46.  From 46 to 47 you

13    allege that Dr. Wright stole or committed theft of

14    Dave's Bitcoin, forked assets and intellectual

15    properties.  Do you see that?

16         A.   Yes.

17         Q.   Ira, you don't have any documents showing that

18    Dr. Wright stole Dave's Bitcoin, do you?

19              MR. FREEDMAN:  Objection.

20              THE WITNESS:  Documents?  Well, I have

21         documents that lead me to believe that he stole

22         Dave's Bitcoin.

23    BY MR. PASCHAL:

24         Q.   Well, let me break that down in two parts.  Do

25    you have documents that actually show that Dr. Wright
```

```
 1    stole Dave's Bitcoin?

 2              MR. FREEDMAN:  Objection.

 3              THE WITNESS:  I don't have like a document

 4        with the kind of evidence like showing that he

 5        withdrew funds like from a bank account, no.

 6        Nothing like that, no.

 7    BY MR. PASCHAL:

 8        Q.    What documents led you to believe that

 9    Dr. Wright stole from Dave?

10        A.    Lots of e-mails from Craig Wright.

11        Q.    Are the e-mails that you produced to us?

12        A.    Should be.

13        Q.    In none of those e-mails does Dr. Wright say I

14    took Dave's Bitcoin; right?

15        A.    He may not have said that, no.  I would

16    imagine he wouldn't say that.

17        Q.    Other than communications with Craig do you

18    have any other documents evidencing that Dr. Wright

19    stole Bitcoin from Dave?

20        A.    I would have to check.  I don't know off the

21    top of my head.

22        Q.    Sitting here today do you have any knowledge

23    of any documents that evidence that Dr. Wright stole

24    Bitcoin from Dave?

25        A.    Again I would have to go back and look at all
```

1   my documents.

2       Q.   Right now today can you recall any of them?

3       A.   At this moment, no.

4       Q.   Do you have testimony from anyone or

5   statements saying that -- or evidencing that Dr. Wright

6   stole Bitcoin or intellectual property from Dave?

7       A.   Testimony from other people?

8       Q.   Or statements.

9       A.   Not that I remember.

10      Q.   So today in this deposition you can't recall

11  any testimony or documents?

12      A.   No.

13      Q.   That last question to be clear is about

14  Bitcoin and intellectual property?

15          MR. FREEDMAN:  Objection.

16          THE WITNESS:  Okay.

17  BY MR. PASCHAL:

18      Q.   The answer is still the same; right?

19      A.   Yes.

20      Q.   The answer is no?

21      A.   No.

22          MR. PASCHAL:  I think that's about it.

23          MR. FREEDMAN:  Okay.

24          THE VIDEOGRAPHER:  Read or waive?

25          MR. FREEDMAN:  We'll read.

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 150

```
 1        THE VIDEOGRAPHER:  The time is now 2:54 p.m

 2   and this concludes the video deposition.  We're off

 3   the record.

 4        THE COURT REPORTER:  Do you want to order?

 5        MR. PASCHAL:  Yes.

 6        MR. FREEDMAN:  Take a copy as well.

 7        MR. PASCHAL:  As soon as possible.

 8        MR. ROCHE:  Can we get a rough of that?

 9        THE COURT REPORTER:  Yes.

10        MR. ROCHE:  You guys as well?

11        MR. PASCHAL:  Yes.

12               (Witness excused.)

13          (Deposition was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 151

```
 1
 2                    CERTIFICATE OF REPORTER
 3              THE STATE OF FLORIDA
 4              COUNTY OF DADE
 5
 6        I, Rick Levy, Registered Professional Reporter
      and Notary Public in and for the State of Florida at
 7    large, do hereby certify that I was authorized to
      and did report said deposition in stenotype of IRA
 8    KLEIMAN; and that the foregoing pages, numbered from
      1 to 148, inclusive, are a true and correct
 9    transcription of my shorthand notes of said
      deposition.
10
          I further certify that said deposition was
11    taken at the time and place hereinabove set forth
      and that the taking of said deposition was commenced
12    and completed as hereinabove set out.
13        I further certify that I am not attorney or
      counsel of any of the parties, nor am I a relative
14    or employee of any attorney or counsel of party
      connected with the action, nor am I financially
15    interested in the action.
16        The foregoing certification of this transcript
      does not apply to any reproduction of the same by
17    any means unless under the direct control and/or
      direction of the certifying reporter.
18
          IN WITNESS WHEREOF, I have hereunto set my hand
19    this 10TH day of April, 2019.
20
      _____
21
          Rick Levy, RPR, FPR, Notary Public
22        in and for the State of Florida
          My Commission Expires:  12/7/19
23        My Commission No.:  FF 939483.
24
25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                    Page 152

```
 1                    CERTIFICATE OF OATH

 2   THE STATE OF FLORIDA

 3           COUNTY OF DADE

 4

 5       I, Rick Levy, REGISTERED PROFESSIONAL REPORTER,

 6   Notary Public, State of Florida, certify that IRA

 7   KLEIMAN personally appeared before me on the 8th day

 8   of April, 2019 and was duly sworn.

 9

10           Signed this 11th day of April, 2019.

11

12

13

14

15           _____

16                    Rick Levy, RPR, FPR
                      Notary Public - State of Florida
17                    My Commission Expires:  12/7/19
                      My Commission No.:  FF 939483
18

19                    RICK LEVY
                      Notary Public - State of Florida
20                    Commission # FF 939483
                      My Comm. Expires Dec 7, 2019
21                    Bonded through National Notary Assn

22

23

24

25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                      Page 153

```
 1              E R R A T A   S H E E T

 2   IN RE:  IRA KLEIMAN VS CRAIG WRIGHT

 3   DEPOSITION OF:  IRA KLEIMAN

 4   TAKEN: 4/8/2019

 5       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

 6   PAGE #  LINE #   CHANGE              REASON

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   Please forward the original signed errata sheet to
     this office so that copies may be distributed to all
18   parties.

19   Under penalty of perjury, I declare that I have read
     my deposition and that it is true and correct
20   subject to  any changes in form or substance
     entered here.

21

22   DATE: _____

23

24   SIGNATURE OF
     DEPONENT:_____
25
```

IRA KLEIMAN (ESTATE OF DAVID KLEIMAN), ET AL. vs CRAIG WRIGHT
IRA KLEIMAN on 04/08/2019                                                Page 154

```
 1   DATE:         April 11, 2019

 2   TO:   VEL FREEDMAN, ESQUIRE
           BOIES, SCHILLER & FLEXNER LLP
 3         100 S.E. 2nd Street
           Suite 2800
 4         Miami, Florida 33131

 5   IN RE: IRA KLEIMAN VS CRAIG WRIGHT

 6   Dear Mr. Freedman:

 7   Enclosed please find the original errata page with
     your copy of the transcript so IRA KLEIMAN may read
 8   and sign their transcript.  Please have him/her make
     whatever changes are necessary on the errata page
 9   and sign it.  Then place the original errata page
     back into the original transcript.  Please then
10   forward the original errata page back to our office
     @1080 Woodcock Road, Suite 100, Orlando, Florida
11   32803.

12   If the errata page is not signed by the witness
     within 30 days after this letter has been furnished,
13   we will then process the transcript without a signed
     errata page.  If your client wishes to waive their
14   right to read and sign, please have him/her sign
     their name at the bottom of this letter and send it
15   back to the office.

16        Your prompt attention to this matter is

17   appreciated.

18   Sincerely,

19   _____
     RICK E. LEVY, RPR
20
     I do hereby waive my signature:
21
     _____
22   IRA KLEIMAN

23   cc via transcript:  Bryan Paschal, Esq.
                         Vel Freedman, Esq.
24   file copy

25
```